Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In re:

5

6    LEHMAN BROTHERS HOLDINGS INC.,

7    et al.,                        Case No. 08-13555(SCC)

8            Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   In re:

11

12   LEHMAN BROTHERS INC.,          Case No. 08-01420(SCC)

13                                  (SIPA)

14           Debtor.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16                   U.S. Bankruptcy Court

17                   One Bowling Green

18                   New York, New York

19

20                   February 19, 2015

21                   10:02 AM

22

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1   Adversary Proceeding: 08-01420-scc   Lehman Brothers, Inc.

2   Doc. #11147 Motion to Authorize/Trustee's Motion for an

3   Order to (I) Establish a Second Interim Distribution Fund

4   for Unsecured General Creditor Claims, (II) Release Reserves

5   from the Secured and Priority Reserve and the First Interim

6   Distribution Fund, and (III) Make a Second Interim

7   Distribution to Holders of Allowed Unsecured General

8   Creditor Claims with a Record Date of February 6, 2015

9

10   Doc. #11046 Motion to Authorize/Trustee's Motion for an

11   Order Authorizing the Abandonment of Certain Lehman Brothers

12   Inc. Data

13

14   Doc. #6758 One Hundred Second Omnibus Objection to General

15   Creditor Claims (Satisfied Claims)

16

17   Doc. #9605 Two Hundred Sixtieth Omnibus Objection to General

18   Creditor Claims (No Liability Claims)

19

20   08-13555-scc Lehman Brothers Holdings Inc.

21   Doc. #47931 Motion to Approve Compromise: Motion Pursuant to

22   Rule 9019 of the Federal Rules of Bankruptcy Procedure and

23   Section 105(a) of the Bankruptcy Code for Approval of

24   Settlement Agreement Relating to Exum Ridge CBO 2007-2

25   Credit Default Swap Agreement and Indenture

Page 3

1    Doc. #47078 Four Hundred Eighty-Sixth Omnibus Objection to

2    Claims (Satisfied Claims)

3

4    Doc. #47589 Motion to Allow/Deem Proofs of Claim to Be

5    Timely Filed by the Claims Bar Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach

Page 4

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3         Attorney for LBHI

4         787 Fifth Avenue

5         New York, New York 10153

6

7    BY:  GARRETT A. FAIL, ESQ.

8         JACQUELINE MARCUS, ESQ.

9         MAURICE HORWITZ, ESQ.

10        CANDACE ARTHUR, ESQ.

11

12   CHAPMAN AND CUTLER, LLP

13        Attorney for U.S. Bank National Association, as

14        Trustee

15        111 West Monroe Street

16        Chicago, Illinois 60603-4080

17

18   BY:  FRANKLIN H. TOP III, ESQ.

19

20   WINSTON & STRAWN, LLP

21        Attorneys for Nomura

22        200 Park Avenue

23        New York, New York 10166

24

25   BY:  DAVID NEIER, ESQ.

Page 5

1   HUGHES, HUBBARD & REED, LLP

2       Attorneys for James Giddens, SIPA Trustee

3       One Battery Park Plaza

4       New York, New York 10004-1482

5

6   BY:  MEAGHAN C. GRAGG, ESQ.

7       JEFFREY S. MARGOLIN, ESQ.

8       DINA R. HOFFER, ESQ.

9       JORDAN E. PACE, ESQ.

10

11  HOGAN LOVELLS US, LLP

12      Attorneys for Dr. Thomas Marsoner

13      875 Third Avenue

14      New York, New York 10022

15

16  BY:  M. SHANE JOHNSON, ESQ.

17      CHRISTOPHER R. DONOHO, III, ESQ.

18

19  MAX MARCUS KATZ, PC

20      Attorney for Eli Eddie

21      88 University Place

22      New York, New York 10003

23

24  BY:  MAX MARCUS KATZ, ESQ.

25

Page 6

1    MOSES & SINGER

2         Attorneys for claimants

3         The Chrysler Building

4         405 Lexington Avenue

5         New York, New York 10174

6

7    BY:  MARK N. PARRY

8

9    THOMPSON COBURN, LLP

10        Attorneys for Claimants

11        One US Bank Plaza

12        St. Louis, Missouri 63101

13

14   BY:  DAVID D. FARRELL, ESQ.

15        WARREN L. DEAN, JR., ESQ.

16

17

18

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2        **(DISCLAIMER:  Channel 4 of the audio is not working;

3    thus when objections are made, and can't be heard, they are

4    noted as "indiscernible")

5              THE COURT:  How is everyone today?

6              All right.  We're ready when you are.

7        (Pause)

8              THE COURT:  Okay.  Good morning.

9              MS. GRAGG:  Good morning, Your Honor.  Meaghan

10   Gragg of Hughes, Hubbard & Reed, Counsel for James W.

11   Giddens, the SIPA trustee.  We have four items on the LBI --

12             THE COURT:  Yes.

13             MS. GRAGG:  -- agenda.  I -- you are --

14             THE COURT:  Yes.

15             MS. GRAGG:  -- aware of it?  Okay.

16             THE COURT:  Uh-huh.

17             MS. GRAGG:  I'm addressing the first item on the

18   agenda which is the second interim distribution motion.

19             THE COURT:  Yes.

20             MS. GRAGG:  In that motion we're asking this Court

21   to authorize the trustee to establish a second interim

22   distribution fund of $2.45 billion for purposes of making a

23   second interim distribution to allow to unsecured general

24   creditors and release reserves from the secured priority

25   claim reserve and first interim distribution fund,

Page 8

1    preserving for remaining unresolved claims, and to authorize

2    the trustee to make a second interim distribution from the

3    LBI general estate to allow to unsecured general creditors

4    with a record date of February 6th, 2015 which would achieve

5    a cumulative 27 percent interim distribution to LBI's

6    unsecured general creditors.

7              Your Honor, it is with great satisfaction that we

8    appeared before the Court this past summer seeking authority

9    first to establish a reserve for and satisfy allowed secured

10   and priority claims and, second, to establish a first

11   interim distribution fund of 4.6 billion and make a 17

12   percent first interest -- interim distribution to allow to

13   unsecured creditors.

14             Since then, the trustee has distributed more than

15   3.8 billion to LBI's creditors which includes 100 million

16   distributed in January alone.

17             Now we're pleased to appear before the Court once

18   again to report that as a result of substantial progress

19   over the past six months in reconciling the Court's

20   assistance and advice and support of SiPC, disputed customer

21   and general creditor claims.  Over the past six months we've

22   resolved more than 900 general creditor claims to allow the

23   release of over half a billion dollars that had previously

24   been set aside as reserved and, in addition, resolve

25   disputed customer claims and recover customer property

Page 9

1   allowed to the allegation of another 1.2 billion from the

2   customer estate to the general estate.

3          As a result, the trustee is in the position with a

4   sufficient pool of available cash to significantly increase

5   the distribution to general creditors.  Unsecured general

6   creditors now stand to receive more than a quarter of their

7   allowed claims with future distributions likely.

8          If approved, this second interim distribution

9   would achieve a cumulative 27 percent interim distribution

10  to LBI's unsecured creditors, a remarkable point in this

11  proceeding particularly given that when this liquidation

12  began it was far from certain that general creditors would

13  receive anything.

14         The relief the trustee now seeks, which is

15  detailed in the motion, is consistent with the relief

16  already granted by the Court and secured in priority reserve

17  order in the first interim distribution order.  All

18  outstanding general creditor claimants were served with the

19  motion and schedules and had the opportunity to be heard.

20         We've discussed the motion with certain claimants

21  concerned about how the relief requested in the motion might

22  affect their claims and reserves established by the

23  trustee's previous distribution motions.  The trustee

24  resolved the claimants' concerned through explanation and

25  some minor adjustments to the proposed order.

```
1              The trustee only received one response to the

2      motion filed by Mr. Steven --

3              THE COURT:  Yes.

4              MS. GRAGG:  -- Geiters (ph).  It reiterates his

5      opposition that was overruled by the Court --

6              THE COURT:  Yes.

7              MS. GRAGG:  -- previously.

8              Entering this order will benefit creditors

9      supported by SiPC and supported by major creditors of the

10     estate.  If you have -- Your Honor has any questions I'm

11     here to answer them, otherwise we respectfully request that

12     the Court enter the proposed order.

13             THE COURT:  Okay.  Very well.  Does anyone wish to

14     be heard with respect to the trustee's motion regarding a

15     second interim distribution and related relief?

16             All right.  Well, I quite agree that this is a

17     noteworthy achievement, one that was not at all anticipated

18     when these cases were commenced.  Indeed, it was unlikely

19     that it was anticipated three or four years ago, and I

20     believe it stands as a testament to the continuing efforts

21     of all the professionals involved in the winding down of

22     these estates, both on behalf of the estates and SiPC and

23     the creditors as well because the creditors have waited this

24     long a period of time and have, in many instances, worked

25     with the trustee toward a consensual resolution of
```

Page 11

1    outstanding matters for which we are particularly grateful.

2            So, yes, we will enter the order approving the

3    trustee's motion today.

4            Thank you.

5            MS. GRAGG:  Thank you, Your Honor.  I'll turn this

6    over to Jeff Margolin to address the second item --

7            THE COURT:  Very good.

8            MS. GRAGG:  -- on the agenda.

9            THE COURT:  Thank you.

10        (Pause)

11            THE COURT:  Good morning.

12            MR. MARGOLIN:  Good morning, Your Honor.  For the

13    record Jeffrey Margolin, Hughes, Hubbard & reed for Mr.

14    Giddens.

15            Your Honor, the next matter on the agenda is the

16    trustee's uncontested motion for authority to abandon and

17    destroy 236 terabytes of data maintained by the LBI estate.

18    This data constitutes copies, Your Honor.  It's fully

19    duplicative of data that will be continued to be maintained

20    by the estate.

21            With many phases of the liquidation substantially

22    complete, Your Honor, this motion is the first step in a

23    process initiated by the trustee's professionals to

24    determine whether documents and data are necessary to

25    effectuate the remaining work streams of the estate or

Page 12

1    whether such documents and data may be ripe for abandonment

2    and destruction in furtherance of the trustee's goals of

3    further reducing administrative expenditures and conducting

4    an orderly wind-down and closure of the estate.

5             I anticipate, Your Honor, that we'll be back here

6    on additional motions for abandonment of documents and data

7    as work streams further cease.

8             THE COURT:  In this case, though, as you

9    represented, these are -- these files are duplicative of

10   files or data that are stored elsewhere?

11            MR. MARGOLIN:  That's correct.  They're maintained

12   by the trustee's professionals.  In fact, Your Honor, this

13   data is in certain respects outdated and obsolete.  It --

14   there's also a modest cost savings involved with abandoning

15   and destroying this data.

16            THE COURT:  All right.

17            MR. MARGOLIN:  Your Honor, no responses were

18   received to the motion.  SiPC and the ad hoc group of LBI

19   creditors are -- were among the largest of the estate to

20   support the relief requested.

21            Unless the Court has any questions, the trustee

22   respectfully requests entry of an order as yet another step

23   toward winding down the estates.

24            THE COURT:  All right.  Very well.  Let me ask if

25   anybody wishes to be heard with respect to the trustee's

Page 13

1   motion to authorize the abandonment of certain electronic

2   data?

3           All right.  No response.  The motion will be

4   granted.

5           MR. MARGOLIN:  Thank you, Your Honor.  We'll

6   submit an order at the end --

7           THE COURT:  Thank you very much.

8           MR. MARGOLIN:  -- of the hearing.

9           THE COURT:  All right.  So the next matter, I

10  think we're now turning to the contested matters.   And the

11  first one I have is with respect to the claim of Mr. Eddie

12  (ph).

13          MS. HOFFER:  Good morning, Your Honor.  Dina

14  Hoffer of Hughes, Hubbard & Reed for the SIPA trustee.

15  Today I'll be addressing the response to the trustee's one

16  hundred and second omnibus objection to satisfy general

17  creditor claims.

18          The trustee initially objected to 22 claims that

19  had been satisfied through the customer accounts transfer

20  process.  The trustee did not receive responses as to the

21  other 21 of those claims.  They have been disallowed and

22  expunged by order of the Court.

23          Claimant does not dispute that the assets in his

24  account as of the filing date were transferred to Barclays

25  Capital, Inc. and that he received those assets.  Instead,

Page 14

1    he claims $248,900 in market losses incurred between July

2    2007 and September 2008 in connection with shares of

3    Carlisle Capital Corporation.

4           On his claim form claimant characterized the basis

5    of his claim as unsuitable investment on the part of LBI

6    prior to the SIPA proceeding.  And in his opposition he

7    vaguely alleges that LBI was negligent and/or breached its

8    fiduciary duties in its management of his account.

9           Claimant has been represented by the same counsel

10   since filing his initial claim form, yet he has provided no

11   evidentiary support or legal theory in either his original

12   claim materials or his opposition brief to establish any of

13   these basis for LBI liability in connection with the market

14   losses he incurred during the height of the financial

15   crisis.

16          Thus, claimant has failed to meet the pleading

17   requirements of Rule 8(a)(2) of the Federal Rules of Civil

18   Procedure by offering only labels and conclusions without

19   providing factual content that could allow the Court to draw

20   the reasonable inference that LBI is liable for the alleged

21   misconduct.

22          Claimant has also failed to meet the heightened

23   pleading requirements of Rule 9(b) which require plaintiff

24   to allege the content of the misrepresentations on which he

25   has relied as well as the fraudulent scheme and intent of

Page 15

1    the defendants.

2            In the context of unsuitable trading, subsequent

3    diminution in value and conclusary allegations regarding

4    inappropriate investments are not sufficient to meet the

5    pleading requirements.  Claimant vaguely alleges claims of

6    unsuitable investment, negligence and/or breach of fiduciary

7    duty prior to the filing date in connection with the alleged

8    mismanagement of his account.

9            However, the alleged mismanagement is described

10   only as recommending purchasing the shares of Carlisle and

11   advising retaining the shares of Carlisle.  Neither of the

12   statements in the claim nor the response are sufficiently

13   particularized for alleging negligence, breach of fiduciary

14   duty or fraudulent conduct based on unsuitable investing.

15   The claimant has offered no evidentiary proof to support his

16   claims despite several opportunities to do so.

17           On that basis, unless the Court has questions, we

18   request that for the reasons set forth in the trustee's

19   reply claimant's response be overruled and the one hundred

20   second omnibus objection be granted with respect to this

21   claim.

22           THE COURT:  Thank you very much.

23           Someone wish to be speak on behalf of Mr. Eddie?

24           MR. KATZ:  Yes, Your Honor.

25           Good morning, Your Honor.

Page 16

1   THE COURT:  Good morning.

2   MR. KATZ:  My name is Max Marcus Katz.  I

3 represent the claimant, Eli Eddie.

4   The issues of unsuitability, Your Honor, as they

5 lay themselves out are a matter of fact --

6   THE COURT:  They haven't been laid out.

7   MR. KATZ:  Well --

8   THE COURT:  That's the problem.  There's been a

9 very conclusory allegation that the investment in the

10 Carlisle securities constituted unsuitable trading.  Nothing

11 has been laid out other than the conclusion that that was an

12 unsuitable trade and that somehow that breached some

13 unspecified fiduciary duty.

14   So we -- we've now been -- we're now several years

15 into this and, indeed, this very hearing has been adjourned

16 from time to time.  And as counsel indicated, nothing -- no

17 further detail has been provided.

18   So, frankly, the only question, the only question

19 that I think bears some discussion is whether or not the

20 objection is going to be granted and the claim dismissed

21 with prejudice or whether or not there's going to be any

22 opportunity to re-plead.

23   MR. KATZ:  Your Honor, let me explain who I

24 represent.  I represent a fifty-year-old man --

25   THE COURT:  Okay.

Page 17

1          MR. KATZ:  -- who invested a sum of $250,000 with

2     Lehman Brothers, put it into the account as cash.  A month

3     later a -- Lehman Brothers proceeded to purchase, in his

4     behalf, through an IPO a number of shares --

5          (Pause)

6          MR. KATZ:  The number of shares was 13,000 in

7     Carlisle Capital Corp.  The 13,000 shares represented 99

8     percent of the capital that Mr. Eddie had invested with

9     Lehman.  This in spite of the fact that Lehman, in each of

10    its monthly statements, sends out a caveat stating, "Lehman

11    Brothers would like to remind you about the importance of

12    diversifying your portfolio."

13         THE COURT:  Okay.  So let's focus on that point.

14         MR. KATZ:  Okay.

15         THE COURT:  Mr. Eddie got monthly statements from

16    Lehman -- from LBI, from the broker?

17         MR. KATZ:  Well, he joined --

18         THE COURT:  He --

19         MR. KATZ:  -- in June --

20         THE COURT:  Why don't we say yes or no?  After the

21    --

22         MR. KATZ:  Yes.

23         THE COURT:  After the securities were purchased

24    did Mr. Eddie get monthly statements?

25         MR. KATZ:  After.

Page 18

```
 1                THE COURT:  Okay.

 2                MR. KATZ:  Not before.

 3                THE COURT:  And that occurred in 2007 --

 4                MR. KATZ:  Yes.

 5                THE COURT:  -- right, before the market took its

 6     --

 7                MR. KATZ:  Yes.

 8                THE COURT:  -- historic plunge, right?

 9                MR. KATZ:  Yes.

10                THE COURT:  Did Mr. Eddie call his broker at

11     Lehman and say --

12                MR. KATZ:  Yes.

13                THE COURT:  Where is that alleged?

14                MR. KATZ:  Not about that.  Not about this

15     statement.  Not about the fact that his portfolio should

16     have been diversified, but he did call to sell the stock.

17                THE COURT:  When did he do that?

18                MR. KATZ:  In August of that year.

19                THE COURT:  Has any of this been alleged in

20     response to the trustee's many, many requests for

21     information?  Has any of this been provided?

22                MR. KATZ:  The answer is no.

23                THE COURT:  Well, that's a massive waste of

24     everyone's time.

25                MR. KATZ:  Your Honor, as far as -- Your Honor,
```

Page 19

1    we've never had --

2             THE COURT:  If you would like to --

3             MR. KATZ:  -- any demand for this.

4             THE COURT:  I'm sorry.

5             MR. KATZ:  We've never had any demand for

6    information to the trust -- that the trustee would need.

7             THE COURT:  The counsel for the trustee just stood

8    at the podium and indicated, consistent with what happens on

9    every claim in this case, procedures that are designed to

10   elicit any further information to inform the trustee's

11   decision as to whether or not to allow the claim.  The

12   trustee has indicated that that has not been forthcoming.

13            MR. KATZ:  It hasn't been forthcoming because it

14   hasn't been requested.  And not only that, but there are a

15   few simple facts here, Judge, that put this thing into

16   perspective.

17            THE COURT:  Go right ahead.

18            MR. KATZ:  One, I represent an individual who

19   doesn't have a high school diploma.

20            Two, and this is all information that Lehman

21   Brothers had through its --

22            THE COURT:  Okay.  I would like you to tell me why

23   that should have any bearing on the legal decision as to

24   whether or not your client has -- should have an allowed

25   claim against LBI.

Page 20

1           MR. KATZ:  No.  No.  But --

2           THE COURT:  There are -- have been many, many

3    claimants who come before me and who also came before Judge

4    Peck before me whose personal situations were very dire and

5    unfortunate in light of the cataclysmic fail of Lehman

6    Brothers.  But there's nothing in the law that allows me to

7    make decisions on claims based on the personal circumstances

8    of any individual.

9           MR. KATZ:  Well, there are -- I can appreciate

10   that fact.  But there are outside facts and outside laws

11   that regulate the relationship between the broker and the

12   customer --

13          THE COURT:  Okay.

14          MR. KATZ:  -- such as Article III, Rule 2 of the

15   NASDAQ rules which requires that a broker and a security

16   dealer make inquiry into the makeup of a -- of an investor,

17   of a customer.

18          THE COURT:  Okay.  Are you alleging or suggesting

19   that the purchase of the Carlisle securities was outside the

20   parameters that had been established between your client and

21   LBI?

22          MR. KATZ:  Yes.

23          THE COURT:  You are?

24          MR. KATZ:  Yes.  Yes, because --

25          THE COURT:  But you don't allege that.  You --

Page 21

1    this was a -- as far as anyone can tell or surmise this was

2    a discretionary account.  The investment was made, and you

3    don't allege that particular parameters were given to LBI

4    and that the trade was made in contravention of those

5    parameters.

6            MR. KATZ:  Judge, we allege unsuitability.  When

7    the broker goes ahead and puts 100 percent of a client's

8    money, even though the broker is recommending that it be

9    diversified, speaks for itself that it's not suitable.  He's

10   violated his own rules.  The broker has violated his own

11   rules, and it's violated the rules of the NASDAQ which means

12   -- which requires inquiry into who you're investing -- who

13   you're acquiring the securities for.  There was no inquiry

14   here.  A hundred percent of the securities were purchased

15   without the customer knowing what he was purchasing.  How

16   can that be -- how can that not be unsuitable when the

17   customer doesn't know?

18           Oh, by the way, customer didn't get a prospectus

19   until after the purchase.  That's if he would be able to

20   read it to begin with to understand what it states.

21           THE COURT:  Okay.  Well, don't suggest to me that

22   it's problematic that he didn't get a prospectus until

23   afterwards and then in the very next sentence tell me that

24   had he gotten it he wouldn't have read it or been able to

25   understand it either way.  Those are inconsistent

Page 22

1    allegations.

2              And the fact -- the unfortunate fact is that had

3    the -- had the numbers gone up we wouldn't be here.  It's

4    only because --

5              MR. KATZ:  Well, of course.

6              THE COURT:  -- of what -- right.  But it's only

7    because there was a cataclysmic worst recession since the

8    Great Depression ever that we have this --

9              MR. KATZ:  Well --

10             THE COURT:  -- issue.  So many, many others with

11   multiple advanced degrees lost a lot of value in 2008 and

12   2009.

13             MR. KATZ:  But, certainly, if there had been some

14   caution and care maybe the loss wouldn't have been 100

15   percent of the investment.  And certainly I can agree no

16   harm, no foul situation, but when there's harm you have to

17   ask whether there's a foul.

18             THE COURT:  That's my job.

19             MR. KATZ:  And --

20             THE COURT:  Let me hear from the counsel --

21             MR. KATZ:  -- from --

22             THE COURT:  Let me hear -- now that you have as

23   far as I -- my visibility into this is concerned for the

24   first time articulated anything by way of a granular

25   allegation regarding what you mean by unsuitability let me

Page 23

1    hear from counsel for LBI.

2            Thank you.

3            MS. HOFFER:  Well, first, I just would like to

4    address counsel's suggestion that no documentary support

5    needed to be provided because it was not requested.  As Your

6    Honor knows, the claim forms that every claimant fills out

7    do request all forms of supporting documentation.  And

8    counsel knew enough to file an opposition to our objection.

9    I would think they would know to support that opposition

10   with the relevant facts.

11           Another point, I think, is that nowhere in his

12   papers does the claimant allege that this was a

13   discretionary account and our review of the related

14   documentation suggested it was not, in which case as a

15   matter of law these duties would not exist to, you know,

16   investigate claimant's trades or, you know, what --

17           THE COURT:  Do you actually have the underlying

18   agreement between the claimant and LBI?

19           MS. HOFFER:  Yes, we do.

20           THE COURT:  Counsel, do you have a copy of that?

21           MR. KATZ:  No, I don't, Judge.

22           MS. HOFFER:  I could provide those.

23           And then, finally, as to the unsuitable trading

24   allegation, Counsel just keeps reiterating the diminution in

25   value, but the case law clearly states that that is simply

Page 24

1    not enough to support a claim for unsuitable trading.

2           THE COURT:  All right.  Thank you.

3           Now with respect to -- there also seems to be an

4    attempt to allege a fraud claim.  And I need to hear from

5    you whether or not that's true because if there is an

6    attempt to allege a fraud claim, there is a requirement that

7    should be imposed to plead it with the kind of particularity

8    that's required by Rule 9(b) of the Federal Rules of Civil

9    Procedure.  In other words, specific statements were made,

10   specific fraudulent misrepresentations were made.  And it's

11   unclear to me whether that's, in fact, what's being

12   attempted here.

13          Can you help me out on that question?

14          MR. KATZ:  Yes, Judge.

15          I would not want to be involved with an allegation

16   or a list of allegations as to actual fraud committed by

17   either the broker or by Lehman.  What was more salient other

18   than fraud are the facts that --

19          THE COURT:  Well, hold on.  Let me parse your

20   words very carefully.  You said you don't want to be

21   involved with that and what's more salient other than fraud.

22          So my question to you is very -- my very pointed

23   question to you is are you or are you not attempting to

24   allege a claim based on fraudulent misrepresentation or any

25   kind of a fraud by LBI?

Page 25

1          MR. KATZ:  No.

2          THE COURT:  Okay.  So that's off the table?

3          MR. KATZ:  That's off the table.

4          THE COURT:  So we're only talking about -- we're

5    talking, though, about the application of Rule 9(b) to the

6    unsuitable trading allegation as well.  And, clearly, we're

7    at a juncture now where for the first time in real time

8    today we've heard anything about what you really mean by

9    that.

10         So I don't believe that based on what I've heard

11   that you're going to be able to satisfy the heightened

12   pleading requirements that I'm going to make applicable to

13   this, but I'm going to give you an opportunity to try.

14         MR. KATZ:  Okay.

15         THE COURT:  You need to meet with counsel for LBI,

16   see what documents they have, see if that informs your path

17   going forward, and if there is anything else by way of

18   communication, records, anything that indicates protests or

19   communication or concern in the immediate time frame prior

20   to the time that the loss has actually occurred, that's

21   something that you're going to have to share with the

22   trustee.

23         MR. KATZ:  Okay.

24         THE COURT:  So I'm going to grant the objection

25   with leave to re-plead only with respect to any alleged

Page 26

1    unsuitability or negligence claim, not with respect to

2    anything sounding in fraud because you have now clarified

3    that that's not what you're seeking.  And the deadline for

4    submitting that will be 45 days from today's date.

5                MR. KATZ:  Okay, Your Honor.

6                THE COURT:  All right.

7                MR. KATZ:  Thank you.

8                THE COURT:  Okay.  Thank you.

9                Okay.  Shall we next go to the two hundred and

10   sixtieth omnibus objection?

11               MR. PACE:  Yes, Your Honor.  Jordan Pace of

12   Hughes, Hubbard & Reed for the SIPA trustee.

13               The trustee's two hundred and sixtieth omnibus

14   objection is an objection to six claims related to account

15   transfers that were made immediately before LBI's filing

16   date.  Only five of the claimants subject to the objection

17   responded.

18               THE COURT:  Right.

19               MR. PACE:  And these claims together seek

20   approximately $118 million in close filing date market

21   losses.

22               The basic facts of these claims are the same, and

23   I understand that they're related claimants, too.

24               Each of the claimants submitted an account

25   transfer request within three days of LBI's filing date and

Page 27

1   an account transfer takes longer than that.  The parties --

2           THE COURT:  Right.  Well, they, themselves sight

3   to the FINRA rules that say four or five days is --

4           MR. PACE:  That's correct, Your Honor.

5           THE COURT:  -- is not unusual.

6           MR. PACE:  So I would note as we noted, I believe,

7   in our objection that both the SEC and FINRA say that it

8   takes longer than that.

9           But the more important point is that there's no

10  issue with the fact that the securities were still at LBI on

11  the filing date.  Everyone agrees on that and there's no

12  issue with that.  So because the securities were still at

13  LBI on the filing date they became part of the estate and

14  they became subject to a SIPA proceeding.

15          It's also undisputed that each of the claimants

16  received all of their securities and their full filing date

17  net equity through the transfer to Barclays as part of the

18  --

19          THE COURT:  Can we -- let's go through -- can we

20  go through the time line day by day?

21          MR. PACE:  Sure.

22          THE COURT:  Okay.  So it starts with -- it seems

23  as if it starts with a direction to Goldman, right, at least

24  on behalf of one of the claimants, right?

25          MR. PACE:  In the example that's provided a form

Page 28

1   is --

2           THE COURT:  Right.

3           MR. PACE:  -- is submitted --

4           THE COURT:  A form is submitted --

5           MR. PACE:  -- to Goldman.

6           THE COURT:  -- to Goldman, right?

7           MR. PACE:  Uh-huh.

8           THE COURT:  And then Goldman turns around and

9   submits a TIF, I think, to --

10          MR. PACE:  To NSCC.

11          THE COURT:  -- to NSCC, right?

12          MR. PACE:  Yes.

13          THE COURT:  It's a lot of alphabet soup here --

14          MR. PACE:  It is.

15          THE COURT:  -- right?  So then -- and then at that

16  point where the -- it's -- that begins on September 16th,

17  right?

18          MR. PACE:  The submission -- the allegation is

19  that there was a submission to Goldman Sachs on September

20  16th.  We don't know at what time of the day.  We don't know

21  when that comes over to --

22          THE COURT:  Okay.

23          MR. PACE:  -- LBI.  There's not an allegation --

24          THE COURT:  I thought there was an allegation that

25  the request I'll call it to LBI is as of September 19th, the

1    Friday?

2              MR. PACE:  The --

3              THE COURT:  The request for the transfer.

4              MR. PACE:  The request for the transfer to happen?

5              THE COURT:  Yes.

6              MR. PACE:  Well, so --

7              THE COURT:  The new authorization.

8              MR. PACE:  So the authorization, the transfer

9    instruction form in the example that's provided, it comes in

10   on September 16th to Goldman Sachs.

11             THE COURT:  To Goldman.

12             MR. PACE:  How it comes into LBI, if it came in on

13   the 16th or the 17th, a request for a transfer is not a

14   request for a transfer on a specific date.

15             THE COURT:  I understand that.  I thought that

16   there was allegation somewhere that it was good to go on the

17   19th.

18             MR. PACE:  I don't recall such an allegation and

19   under even the claimant's allegations --

20             THE COURT:  All right.

21             MR. PACE:  -- of the FINRA rules --

22             THE COURT:  So --

23             MR. PACE:  -- that would be an --

24             THE COURT:  So here it is.  It's --

25             MR. PACE:  -- impossibility.

Page 30

1          THE COURT:  -- it's paragraph 23.  On the same

2   day, Tuesday, the 16th, Goldman Sachs initiated appropriate

3   instructions to LBI through the ACAT (ph) system that LBI

4   should immediately transfer to it the entire contents of

5   General Orrs (ph) brokerage account.  On Thursday, September

6   18th LBI provided notice through the ACAT system that it had

7   validated General Orrs' account transfer and that the

8   securities in General Orrs' LBI account were slated for

9   transfer and delivery to Goldman.

10          Okay.  So then -- now we're up to Friday, right,

11   where the board authorized the commencement of the

12   proceeding and then on Friday, the 19th, the SIPA case was

13   filed, right?

14          MR. PACE:  Yes.

15          THE COURT:  All right.  So that's the timeline.

16   And then on Friday night the sale was approved, right?

17          MR. PACE:  Yes.

18          THE COURT:  So that's Friday, the 19th, and the

19   sale order was entered on Saturday, the 20th, right, in the

20   wee hours of the morning --

21          MR. PACE:  Yes.

22          THE COURT:  -- right?

23          So then I guess -- and then the trustee sends out

24   a letter to NCSS ACATS saying we're transferring everything

25   pursuant to the sale, right?

Page 31

1          MR. PACE:  Yes.

2          THE COURT:  If I -- I'm not -- if I'm wrong you

3    should tell me.  I'm just -- I'm trying to focus very finely

4    on the day by day events.

5          MR. PACE:  Your Honor, I would just note that, to

6    put it in context, that there's a lot going on during those

7    days --

8          THE COURT:  Yeah.

9          MR. PACE:  -- including with DTC (ph) and --

10          THE COURT:  I think everyone would stipulate to

11    that.

12          MR. PACE:  -- NFCC (ph).

13          THE COURT:  Right.  Right.  But what I'm trying to

14    get at is that the allegation seems to be that

15    notwithstanding the commencement of the SIPA proceeding and

16    notwithstanding the entry of the sale order, that LBI should

17    not have done anything to countermand the process that it

18    started through the notice to the -- through the ACAT system

19    to transfer General Orr securities.

20          MR. PACE:  Sure, Your Honor.  To address that,

21    starting September 19th it's not LBI anymore, of course,

22    it's the trustee.

23          THE COURT:  Right.

24          MR. PACE:  And the paragraph that your paragraph

25    cited to in the response, the validation is a preliminary

Page 32

1   step in the account transfer process.  That's -- according

2   to the FINRA rule that happens generally within one day, but

3   that's not the end of it.  That doesn't mean that the

4   securities are ready to go.

5          If that were the case, then that would be the end

6   of it and they would just take one day.  But there's more to

7   be done.  And there are more steps that would be required to

8   be taken by LBI or --

9          THE COURT:  The trustee.

10         MR. PACE:  -- theoretically the trustee.

11         THE COURT:  But the -- but I think the allegation

12  is -- and obviously I'll hear from the claimants that the

13  SIPA order allowed certain businesses usual to continue,

14  including a transfer that was in process and that,

15  therefore, the trustee has liability for having

16  countermanded the transfer or ended the transfer that was in

17  process.  That seems to me to be the crux of the allegation.

18         MR. PACE:  Yes, Your Honor.  That's in some way --

19  in many ways the allegation.  But there are two points on

20  that.

21         First is if it's something that the trustee did,

22  if the claimants are saying that it's because the trustee

23  stepped in and did something, they've specifically stepped

24  away from that by distinguishing the -- it's Judge

25  Garretty's Adler Coleman case where the claimants said that

Page 33

1    the trustee is liable because of very similar facts.

2              They're not saying that.  They're saying that the

3    LBI estate is liable.  And, yes, the liquidation order did

4    allow for certain limited continuation of business, but

5    that's in the context of the SIPA proceeding.  That's in the

6    context of hundreds of thousands of customer accounts.

7    That's in the context of SIPA says to the trustee, your job

8    is to, as promptly as possible, satisfy net equity claims,

9    as promptly as possible makes sure that there's as little

10   disruption to investors as possible.  And one of the ways

11   that you can do that is to transfer accounts to Barclays, to

12   do a bulk transfer as happened.

13             So in this context the trustee under SIPA is

14   required to look at the hundred thousand accounts, not just

15   these five accounts.  It's required to do that.  And the

16   transfer, including the transfer of the claimants' accounts,

17   was approved by Judge Peck in his order.

18             THE COURT:  Well, that's a critical point and one

19   that doesn't seem to be squarely addressed and, in fact,

20   it's only mentioned in passing in your papers; that even if

21   you could look at SIPA and the orders that were entered in

22   connection with the SIPA proceedings, as of the early

23   morning hours of September 20th the assets were sold.  The

24   account -- they were sold.  Another process, court-approved

25   and court-sanctioned was beginning to take place.

Page 34

1          MR. PACE:  That's correct, Your Honor.

2          THE COURT:  So that's -- obviously I'll talk to

3     the claimants about that.  But that seems to me to be a very

4     pivotal -- to be a pivotal fact.

5          MR. PACE:  That is, Your Honor, and that and SIPA,

6     they're the forest, but when we get into the trees there's

7     just no legal claim here.  We've put that in our papers.  I

8     won't rehash it, but I think that's where we stand.

9          THE COURT:  Okay.  Let me hear from the claimants.

10         Good morning, Mr. Parry.  How are you?

11         MR. PARRY:  Good.  How are you, Your Honor?

12         THE COURT:  Good.

13         MR. PARRY:  It's a pleasure to appear before you.

14    Mark Parry of Moses & Singer.  I'm here to introduce David

15    Farrell and his partner, Warren Dean, from the firm --

16         THE COURT:  Okay.

17         MR. PARRY:  -- Thompson Coburn who will address

18    the argument on --

19         THE COURT:  Okay.

20         MR. PARRY:  -- behalf of the claimants.

21         THE COURT:  Very good.  Thank you.

22         MR. FARRELL:  Good morning, Your Honor.

23         THE COURT:  Good morning.  How --

24         MR. FARRELL:  David Farrell --

25         THE COURT:  -- are you?

Page 35

1           MR. FARRELL:  -- on behalf of the claimants.

2           THE COURT:  So can you just clarify the claim

3      seems to seek losses for the time period after, without

4      doubt, the accounts were at Barclays.

5           MR. FARRELL:  Yeah.  And --

6           THE COURT:  How could that be?

7           MR. FARRELL:  There may be -- and I don't -- Your

8      Honor, I guess the best way for me to address that issue,

9      there may be issues regarding the extent of our damages,

10     whether -- and perhaps the trustee can make an argument that

11     at that point in time we had an obligation to mitigate our

12     damages by --

13          THE COURT:  No.  No.  No.  I'm -- at some point

14     the accounts went to Barclays.

15          MR. FARRELL:  Correct.

16          THE COURT:  So the accounts going to Barclays

17     whether or not in the fog of the entire situation Barclays

18     might have been able to immediately liquidate the securities

19     or transfer them to Goldman or wherever else.  Once the

20     accounts leave LBI and go to Barclays LBI is done --

21          MR. FARRELL:  Right.

22          THE COURT:  -- right?  So to me it's a significant

23     matter when you have access to that data.  You know -- it's

24     knowable the date on which the accounts hit Barclays.  You

25     can't file a proof of claim that's meritless to that extent.

Page 36

1     I mean, that's kind of a big deal to me.  So --

2              MR. FARRELL:  Right.

3              THE COURT:  -- that's completely off the table.

4     The moments the accounts hit Barclays and LBI was legally

5     without any ability to do anything with respect to these

6     accounts, that's not even arguably on the trustee's or LBI's

7     watch.

8              MR. FARRELL:  Yeah.  And I -- if I may, Your

9     Honor, I think there's a misunderstanding about really what

10    the nature of our claim is.

11             THE COURT:  Okay.

12             MR. FARRELL:  And here's -- to put it in a

13    nutshell, we -- our position is -- we equate our position as

14    being essentially identical to any party that is in a

15    position of having a pre-commencement obligation that is

16    owed by the debtor --

17             THE COURT:  Right.

18             MR. FARRELL:  -- okay, and just to -- if I can take

19    a minute to just --

20             THE COURT:  Sure.

21             MR. FARRELL:  -- walk you through the time

22    sequence again.

23             And as you properly identified, Your Honor, your

24    clients submitted transfer instructions pre-commencement.

25    And if I can just take -- we take exception that in their

Page 37

1    reply the trustee asserts that, you know, we did that

2    because we knew that the brokerage firm was going to file.

3    That is completely an unfounded allegation.

4              THE COURT:  But it might have been.  So what,

5    right?

6              MR. FARRELL:  Well, it -- but it's -- I mean, we

7    take exception to that because it -- I mean, this had -- the

8    transfer had been in works for several weeks and it was

9    precipitated by the facts that the individual we were

10   working with out of Lehman had switched brokerage firms and

11   that's -- that was the reason for the move.  And I realize

12   for today's purposes that that may be irrelevant, but I just

13   wanted to take exception on the record to the assertion that

14   we were somehow trying to opt out of the impending --

15             THE COURT:  Okay.

16             MR. FARRELL:  -- insolvency.  I mean, no one knew

17   that the brokerage firm -- and, in fact, I think at the time

18   they were advertising that the brokerage firm was not going

19   to be part of the bankruptcy.  But in any event let's get

20   back to the important timeline.

21             So we submit our transfer instructions pre-

22   commencement.  Those are received by the debtor pre-

23   commencement.  At that point in time --

24             THE COURT:  By LBI.  Actually they're not a

25   debtor.

Page 38

1              MR. FARRELL:  Okay.  LBI.

2              THE COURT:  Right.

3              MR. FARRELL:  It's received by LBI.  That --

4              THE COURT:  What date are we talking about now?

5              MR. FARRELL:  We're talking about essentially

6    either the 17th or 18th of September.

7              THE COURT:  Okay.

8              MR. FARRELL:  Before the commencement of the SiPC

9    proceeding.  That creates a duty on the part of LBI to honor

10   that transfer instruction.

11             THE COURT:  Sure.

12             MR. FARRELL:  We can talk about the sources of

13   that duty in a minute, but --

14             THE COURT:  Okay.

15             MR. FARRELL:  -- it clearly created a duty.

16             So, then, the -- and then LBI, in accordance with

17   that duty, takes steps to consummate that transfer, but

18   intervening we have the board of LBI saying, hey, we consent

19   to a SiPC proceeding, SiPC proceeding's commenced and the --

20   and a trustee is appointed.

21             Now the trustee at that point in time has a

22   decision.  I can continue to honor the debtors' -- what's

23   now the debtors' pre-commencement duty to transfer these

24   securities or I can repudiate that and take some other

25   course of action.

Page 39

```
 1              THE COURT:  But you're skipping a couple of

 2    important facts.  It's not just any old trustee.  It's a

 3    SIPA trustee and SIPA applies.  So the trustee can't just

 4    come up with his own game plan under then existing law.  The

 5    trustee has to follow the requirements of SIPA and at that

 6    point in your time line, in your time line in which you're

 7    still well within the, I'll call it ordinary window to

 8    effectuate the transfer of accounts, the account -- the sale

 9    order is entered.

10              MR. FARRELL:  Right.

11              THE COURT:  Right?

12              MR. FARRELL:  Yeah.  But --

13              THE COURT:  The sale order is entered.

14              MR. FARRELL:  But the prime of that time and even

15    apparently at some point afterwards that the ACATS were

16    continuing to be processed during that time period.  So the

17    trustee -- and as you pointed out the order appointing the

18    trustee gives -- gave the trustee flexibility to continue to

19    conduct this --

20              THE COURT:  I didn't say that.

21              MR. FARRELL:  Well --

22              THE COURT:  I didn't say that.  I said that the --

23    certain provision of SIPA arguably enable the trustee to

24    continue to conduct --

25              MR. FARRELL:  And we would --
```

Page 40

1          THE COURT:  -- some business.

2          MR. FARRELL:  Right.

3          THE COURT:  I don't know -- I don't know if

4    whether this falls into this category.

5          MR. FARRELL:  Right.  Well, we would submit that

6    the order appointing him did allow the trustee to continue

7    to conduct business.

8          So the trustee had a choice.  And I -- we

9    understand that the trustee -- just like a Chapter 7

10   trustee, that SIPA requires the trustee to do what's in the

11   best interest of the estate and, in particular, in a SIPA

12   proceeding to get the brokerage accounts to another -- to a

13   solvent broker as quickly as possible.

14         And so the trustee said, well, I'm going to make a

15   decision here.  I'm not going to honor the -- you know,

16   initially he allows the ACATs to be honoured, but,

17   essentially -- eventually he takes the decision, well, I'm

18   not going to.  I'm going to stop.  I'm going to reject those

19   pending ACATs' requests and instead I'm going to transfer

20   all these brokerage accounts to Barclays because I think

21   that's the best decision to do.

22         THE COURT:  Well, it -- but I don't think I agree

23   with your characterization.  There was a sale order entered

24   on September 20th prior to in -- what -- there was a sale

25   order entered --

Page 41

1                MR. FARRELL:  Correct.

2                THE COURT:  -- that required, that sold the

3      accounts to Barclays, that required the trustee to --

4                MR. FARRELL:  Well --

5                THE COURT:  -- take steps to consummate the sale,

6      pursuant to the sale order, and effectuate the transfers

7      pursuant to SIPA.

8                MR. FARRELL:  Well, the trustee supported it.

9      That was a relief that the trustee supported.

10               THE COURT:  So how can there be a cause of action

11     for the trustee complying with an order of court and SIPA?

12     How could there be a cause of action --

13               MR. FARRELL:  Well --

14               THE COURT:  -- to that?

15               MR. FARRELL:  -- we're not saying that the trustee

16     did anything improper.  As far as we know the trustee did

17     exactly what he was supposed to do.

18               THE COURT:  Okay.  But what is the duty that --

19     what did LBI do --

20               MR. FARRELL:  Well, our position is no different

21     from anybody who's party to any kind of executory contract

22     or executory obligation that existed as of the petition

23     date.  Trustee's appointed, trustee says, hey, I can't honor

24     that.  I've got more important things to do.  I've got to

25     tell these brokerage accounts I'm going to dishonour the

Page 42

1    debtors' pre-existing duty to transfer those.

2              And what do we tell the party in that position,

3    the non-debtor party who's executory obligation is not

4    performed?  We tell that party, hey, you -- you're not

5    without any recourse.  You get to file a general unsecured

6    claim against the bankruptcy estate for any harm that you

7    suffered as a result of the debtors' pre-commencement

8    obligation not being honoured.  And that's all we're asking

9    to do.  We're just simply saying, hey, the debtor owed us a

10   pre-commencement obligation.  You had to dishonour it.  We

11   -- that's fine. We understand.  Your fiduciary duty dictated

12   that you dishonour that.  But that doesn't mean we don't

13   have any recourse because that -- as a result of the non-

14   performance of that pre-commencement obligation.  We have a

15   right to file a general unsecured claim.

16             Does -- will it - you know, we realize that we'll

17   get paid in bankruptcy dollars, pennies on the dollar or

18   whatever, but, you know, that -- we are at least entitled --

19   I mean, that's kind of fundamental bankruptcy law.  The non-

20   debtor parties to executory obligations, you know, they --

21   we don't have a right to come and assist that those be

22   performed; that the trustee ignore his fiduciary duty.  He's

23   got to do his fiduciary duty.  But we are -- the -- you

24   know, it's fundamental bankruptcy law that we have some

25   recourse and that recourse is filing a general unsecured

1    claim against the estate.

2              THE COURT:  I hear the words, but I don't hear

3    what the claim is.  I hear the words, but I -- I have --

4    only last week or perhaps the week before I heard another

5    argument related to the -- a hung transfer and there's no

6    claim there.

7              MR. FARRELL:  Well, what happened to the debtor --

8    I guess the question is what happened to the debtors' pre-

9    commencement duty to transfer our securities?  Did that just

10   -- the minute they filed that just vaporized, that just

11   disappeared and never -- as if it never existed?

12             THE COURT:  Well, it was superseded by the court

13   order --

14             MR. FARRELL:  Yeah.  It --

15             THE COURT:  -- selling the assets.

16             MR. FARRELL:  It's -- it superseded it, but it

17   doesn't go away.  I mean --

18             THE COURT:  The -- because as you admit that in

19   the ordinary course of business the transfer would have

20   taken at least four or five days from the time you initiated

21   it.  All right.  So then things happened that caused that

22   transfer to not be able to occur.

23             You didn't -- we're not talking about -- you,

24   yourself, at the top of the hour said this had been in the

25   works for a while because our point person left Lehman.

Page 44

1    We're not talking about a situation in which this transfer

2    was hung, if you will, for three weeks or four weeks or five

3    weeks.  The transfer was initiated in the turmoil of the

4    second and into the third week of September 2008.  SIPA

5    proceeding was commenced.  The sale order was entered, and

6    the accounts went with the rest of the accounts.

7              And I'm just finding it hard to understand how the

8    estate could be liable for having acted in accordance with

9    SIPA and with the sale order.

10             Let me give you an example.  So if there's a

11   suspension of trading and there are market losses during the

12   suspension of trading by -- because of SIPA, there can't be

13   any liability associated with that.  SIPA happens.

14             MR. FARRELL:  I understand that.  And so does

15   bankruptcy and so do -- and executory contracts get rejected

16   every day.  Bankruptcy happens.  Trustee says, hey, I know

17   the debtor had a pre-existing duty to do something to you,

18   but guess what?  I have to act for the fiduciary interest of

19   all creditors and I'm not going to perform your pre-existing

20   -- I'm not going to perform the debtors' pre-existing

21   obligation, and that's exactly what happened here.  The

22   trustee came in and said, hey, I've got Barclays over here

23   that's paying me lots of money to -- and paying the estate

24   lots of money to -- if I transfer your brokerage account to

25   them. So I know you want our account at Goldman Sachs, but

Page 45

1    I'm not going to do it and I'm not going to do it because

2    it's not in the best interest of the estate.  And we fully

3    appreciate that.

4           But the fact of the matter is bankruptcy does not

5    leave a client in my position who's owed a pre-commencement

6    obligation, doesn't say --

7           THE COURT:  That's --

8           MR. FARRELL:  -- you --

9           THE COURT:  For the --

10          MR. FARRELL:  -- it does not say you don't have

11   any recourse whatsoever.

12          THE COURT:  For the sake of narrowing down the

13   scope of what you're seeking, okay, so, hypothetically, the

14   -- hypothetically you say the trustee should have followed

15   up, allowed the ACAT transfer --

16          MR. FARRELL:  No.

17          THE COURT:  Hold on.  Should have not

18   countermanded.

19          MR. FARRELL:  We're not saying that.

20          THE COURT:  Okay.  What are you saying then?

21          MR. FARRELL:  I'm saying -- I'm -- and I think I'm

22   not -- obviously I'm not doing a good job of communicating

23   this.  I -- we fully understand that once the trustee is

24   appointed --

25          THE COURT:  Okay.  So they shouldn't --

Page 46

1            MR. FARRELL:  -- he had to act in the best

2      interest of the estate.  And if that meant rejecting some of

3      the debtors' pre-petition --

4            THE COURT:  Okay.

5            MR. FARRELL:  -- obligations, just like --

6            THE COURT:  Okay.

7            MR. FARRELL: -- trustees do all the time.

8            THE COURT:  All right.

9            MR. FARRELL:  If he had to reject that --

10           THE COURT:  I got it.

11           MR. FARRELL:  -- then he was absolutely --

12           THE COURT:  Okay.

13           MR. FARRELL:  -- correct in doing that.

14           THE COURT:  Okay.  But you want to be compensated

15      for that.

16           MR. FARRELL:  We want to assert a general

17      unsecured claim --

18           THE COURT:  Okay.  So let's --

19           MR. FARRELL: -- like -- just like any other --

20           THE COURT:  So --

21           MR. FARRELL:  -- party to a rejected contract.

22           THE COURT:  So let's just try to cabin it, okay?

23           MR. FARRELL:  Okay.

24           THE COURT:  So in your scenario the transfer would

25      have gone through, right?  In your scenario the transfer

Page 47

1    should have gone through?  You --

2            MR. FARRELL:  In our --

3            THE COURT:  I'm backing you -- I'm trying to back

4    you up, not back you into a corner.  I'm trying to back up

5    into a time frame for the calculation of your alleged

6    damages without -- putting to one side a duty and liability.

7            MR. FARRELL:  Okay.

8            THE COURT:  And what I'm suggesting to you is that

9    you would have to establish that the transfer would have

10   gone through on X date.

11           MR. FARRELL:  Correct.

12           THE COURT:  Okay.

13           MR. FARRELL:  Right.

14           THE COURT:  Okay.  So it wasn't until Thursday the

15   18th that LBI provided the notice through the ACAT system.

16   That's Day One, right?

17           MR. FARRELL:  Correct.

18           THE COURT:  So let's say five business days.

19           MR. FARRELL:  No.  It was initiated on --

20           THE COURT:  Yes.

21           MR. FARRELL:  -- it was initiated on the 16th.  It

22   was received by LBI -- that --

23           THE COURT:  Right.

24           MR. FARRELL:  The five days would really start --

25   from my calculation would start running on the 16th.  From

Page 48

1  start to finish in ACAT's process normally takes five

2  business days from start to finish.

3          THE COURT:  Okay.  For the sake of my point I will

4  -- we can start there.

5          MR. FARRELL:  Okay.

6          THE COURT:  But the four or five days, one would

7  really have to -- really going far down the road you would

8  have to actually establish or provide evidence of what it

9  actually is. That's like a recommendation.  Let's just say

10 five days --

11         MR. FARRELL:  Okay.

12         THE COURT:  -- just for the --

13         MR. FARRELL:  Okay.

14         THE COURT:  -- sake of this.  So Tuesday,

15 September 16th is day one, the fifth business day is Monday,

16 September 22nd.

17         MR. FARRELL:  Correct.

18         THE COURT:  Right.  All of the accounts were at

19 Barclays no later than September 29th.

20         MR. FARRELL:  Correct.

21         THE COURT:  Okay.  So what's the number that's

22 associated because as of September 29th LBI is done,

23 unquestionably done, or -- and that's the outside date and I

24 don't have familiarity with the mechanics of the transfers.

25 I don't know if they go over in lots or -- I don't know how

Page 49

1    they do.  But for the sake of argument let's say the 29th.

2              So the 22nd to the 29th, those are the outside

3    dates of any damages that you could allege, whatever the

4    securities were worth on the 22nd and the delta between that

5    and whatever they were worth on the 29th.

6              And from there I would suggest to you that it

7    could only be narrowed because, as a matter of fact, it

8    might have taken longer to transfer a day or two say and

9    that I would suggest to you wouldn't give rise to liability

10   on behalf of the transferring broker because things just

11   take longer.  I'm making this up.  I'm just trying to

12   demonstrate the point.

13             Then we know that no later than the 29th

14   everything was at Barclays.  LBI could do -- and the trustee

15   couldn't do anything.  It was on Barclays, right?

16             MR. FARRELL:  Correct.

17             THE COURT:  Perhaps the accounts got there

18   earlier.  We don't know.  I'm curious as to what the delta

19   is in the -- what the market loss is over that period of

20   time because it's probably a lot smaller than what the

21   market loss is between your starting point and October 22nd,

22   2008 because --

23             MR. FARRELL:  Yeah.

24             THE COURT:  -- I can remember --

25             MR. FARRELL:  And --

Page 50

1           THE COURT:  -- the sinking feeling that everyone

2    had in their stomachs during that period of time.  So --

3           MR. FARRELL:  That's a fair point, Your Honor.

4    And that --

5           THE COURT:  Thank you.

6           MR. FARRELL:  And that, you know, that may go to

7    the fact of, you know, our ability to demonstrate our

8    damages.  But, I mean, I think -- and I don't want to make

9    light of that point.  I think it's an important point.  But,

10   I mean, obviously, we're here today to address the -- you

11   know, the issue of whether or not we have a claim at all as

12   it's a sufficiency hearing, and which goes back to the --

13   you know, the discourse we were having earlier as to whether

14   or not, you know, my clients have any claim whatsoever.

15          And, you know, again, I -- my point is that the

16   debtor had a prepetition duty.  That duty, we understand the

17   trustee had to make the decision and we have no reason to

18   believe, no reason whatsoever to believe that he didn't make

19   the absolutely right decision as a fiduciary that he was not

20   going to honor that pre -- I'll call it a prepetition duty.

21          But, you know, it's Bankruptcy 101 that when a

22   debtor's prepetition duties are not honoured, the party to

23   whom those obligations are owed are entitled to at the very

24   least file a general unsecured claim for any damages that

25   they can demonstrate flowed as a result of the non-

Page 51

1   performance of that prepetition obligation.

2           THE COURT:  Okay.  All right.  Let me hear from

3   the trustee again.

4           MR. PACE:  Your Honor, I guess the overall point

5   is that we're not in Bankruptcy 101.  We're in SIPA.  We're

6   in the situation where congress specifically established a

7   regime to deal with securities that are in the estate.  And

8   these securities, there's no dispute that they were in the

9   estate; that they were customer property; that they had to

10  become a part of the fund of customer property.

11          The -- Counsel's reference to a prepetition duty,

12  what is that prepetition duty?  We've put in our papers --

13          THE COURT:  Well, I think the prepetition duty is

14  that they lodged a request to transfer the funds; that even

15  if the commencement of the SIPA proceeding and/or the sale

16  order prevented that from happening, that the failure to

17  transfer gives rise to their claim for damages associated

18  with the failure to transfer the cost.  In other words, the

19  cost of complying with SIPA and with Judge Peck's order is a

20  rejection damage claim -- is a damage claim.  I think that's

21  what they're saying.

22          MR. PACE:  Sure.  If there's -- in order for there

23  to be a rejection damage claim there has to be a contract.

24  There's no contract alleged here.  There's no fiduciary duty

25  because the UCC says that there's no fiduciary duty.  And

Page 52

1    then the UCC, which is -- that governs pre -- that governs

2    contractors that says that once you hit that wall of

3    insolvency all bets are off.  Your UCC duties don't apply

4    anymore.  We look to SIPA.

5           The revised Article VIII was enacted in 1997.

6    That's 27 years after SIPA was enacted.  That's 27 years of

7    experience of this is what happens in a SIPA proceeding.

8    There's nothing in the UCC about you get a claim.  It's that

9    your accounts and your --

10          THE COURT:  So what governs -- what governs is the

11   prime brokerage -- is there a prime brokerage agreement that

12   governs this situation as between LBI and these claimants?

13          MR. PACE:  Your Honor, in operation it's the UCC,

14   but the UCC --

15          THE COURT:  What I'm trying to get at is that I

16   know that under the prime brokerage agreement there can be

17   no liability for suspensions in trading as a result of

18   forced mature events.  I'm just trying to struggle with the

19   notion that the SIPA proceeding came into existence and

20   there doesn't seem to be a connecting up by the claimants

21   between that event and the failure to transfer the accounts.

22   I'm just having a hard time understanding it.

23          MR. PACE:  Your Honor, we don't know what the

24   agreement says, if there was an agreement because there are

25   no allegations about the agreement.

Page 53

1          But, you know, there was discussion with counsel

2    -- between Your Honor and counsel about, you know, different

3    dates when it should have been -- when it should have not

4    been allowed.  The larger point is that they received their

5    securities.  They received all of the securities in their

6    account.  They received their filing date and that equity.

7    And every single customer would love it if their securities

8    happened to go down, that they could recover from the

9    general estate for that market loss.

10          I was before Your Honor in November of precisely

11   such a claim.  And the rule is, that Your Honor expressed

12   and that Judge Glenn has expressed, that you don't get

13   market loss post-filing in a SIPA proceeding.

14          THE COURT:  But here the -- but, yes.  I've said

15   that.  Judge Peck has said that.  Judge Glenn has said that

16   and I'm not backing away from that.

17          But here what I'm struggling with is the different

18   allegation that we wanted our account.  We gave an

19   instruction to transfer our account.  Notwithstanding SIPA,

20   the commencement of the SIPA proceeding and the entry of the

21   sale order we should be compensated for the failure to

22   transfer.  That's what they're saying.

23          So in the absence of a fail -- in the absence of a

24   request for transfer, then we fit neatly into the bucket of

25   the rule of no claim for market losses.  Here the allegation

Page 54

1    seems to me to be different that we wanted a transfer and

2    you could have transferred it.  Even if you were prevented

3    from transferring it we still have a claim.  So why

4    shouldn't I let them survive a sufficiency hearing on that

5    very, very narrow allegation of a claim -- of liability?

6             MR. PACE:  Your Honor, I keep returning to the UCC

7    because the UCC is really the central thing here and it says

8    that if the -- if the securities intermediary, if LBI is not

9    available to perform because it's insolvent, then the UCC,

10   the obligations under the UCC don't apply anymore.  That

11   prepetition obligation doesn't apply anymore.

12            The -- and I would note that UCC 8508, that's not

13   an obligation without reservation to transfer securities.

14   That's an obligation to act in a commercially reasonable

15   manner up until the filing date.  When the filing date

16   happens, you look to SIPA.  That's how it's handled.

17   There's nothing in the UCC that says that just because you

18   made an instruction or you made a request you are

19   unconditionally guaranteed no matter what.

20            THE COURT:  But your position is that once the

21   SIPA proceeding was commenced it's -- SIPA superseded any

22   application of the UCC.

23            MR. PACE:  It's not just that it superseded it.

24   It's that the UCC stopped dead in its tracks.

25            THE COURT:  Right.  Yeah.  SIPA became the

Page 55

1    governing set of rules.

2              MR. PACE:  Yes.  But even if the UCC --

3              THE COURT:  Even if the UCC applied.

4              MR. PACE:  Even -- well, even if the UCC applied

5    post-filing date, there's that 8509 part that says if you

6    comply with another statute rule or regulation that governs

7    the same subject matter, transfer of accounts, which SIPA

8    undoubtedly does, then you're fine under the UCC.

9              So it's kind of an all roads lead to Rome

10   situation here.  Whether it's that the UCC stops at the

11   filing date, which it says it does or it goes on, there's no

12   claim here, Your Honor.

13             THE COURT:  Okay.  Thank you.

14             MR. PACE:  Thank you.

15             MR. FARRELL:  Your Honor, if I may be heard?

16             THE COURT:  Yeah.  I mean, it does -- you are kind

17   of in a labyrinth because of the particular timing and it

18   gets you to that point where the operation of SIPA is

19   inconsistent with the assertion of a claim for the failure

20   to transfer.

21             MR. FARRELL:  I -- Your Honor, I would respond to

22   that by saying that I think it is SIPA presents a roadblock

23   in terms of our ability to insist that post-commencement the

24   trustee was obligated to honor our transfer requests.

25             In other words, let's say that the -- let's say we

Page 56

1    rushed into the court in the first days of the case, right

2    as the sale order was being considered and we said, no, Your

3    Honor.  Don't allow the trustee to-- at least carve out our

4    accounts and insist that the trustee honor our pending

5    ACAT's request.

6            THE COURT:  Okay.  So that -- let me take you up

7    on that.  You could have gone to the sale hearing and said,

8    I don't want my accounts to go.  Carve me out from the sale

9    order and let's enforce the pending ACAT's transfer.  You

10   could have done that.

11           MR. FARRELL:  I could have done that.  And I think

12   -- and what the trustee would have said in that situation

13   is, no.  I've got a fiduciary duty.  It's in the best

14   interest of the estate to transfer all these --

15           THE COURT:  Okay.  But now here we are these many

16   years later and that objection -- so we're in this

17   hypothetical land where you're saying, the trustee didn't

18   have to transfer.  The trustee just wanted to transfer the

19   claims with the rest of the accounts -- with the rest of the

20   accounts to Barclays.  The trustee could have, you know,

21   corded them all.  And you could have come in at the sale

22   hearing and said, I'm not going to Barclays.  I'm going to

23   Goldman Sachs.  Carve me out.

24           MR. FARRELL:  Well, in fact, it's not

25   hypothetical, Your Honor, because the AATs and we allege

Page 57

1    this very clearly in our pleadings that the ACATs continued

2    to get honor and it was only -- not until the following

3    Monday, the following Monday sale -- as you pointed out the

4    sale was approved late in the wee hours on Saturday.

5            It was the following Monday the trustee and

6    Barclays get together and they send a letter to DTC and the

7    NSCC and say, hey, wait a minute.  Put a hold on those

8    ACATs.  We're figuring out what to do.  And then the next

9    day they say, well, we think we've figured out a procedure.

10   We want it verified by the -- that we're going to go through

11   this elaborate process where we -- before we honor this

12   ACATs we're going to just  -- we're going to verify that

13   they're correct.

14           And then the following day they say, no.  We've

15   decided all bets are off.  We're putting a stop to the

16   ACATs.  So we know what the trustee's position is.  The

17   trustee ultimately decided it's going to frustrate his

18   efforts to consummate the sale to Barclays if he's stuck, if

19   he continues to honor these ACATs.

20           And so, you know, again, those are decisions that

21   the trustee -- we're not -- we're --

22           THE COURT:  I understand.  I absolutely understand

23   what you're saying, but I'm coming up against a roadblock of

24   what's been stated time and time again in this case, stated

25   at least once by Judge Glenn in MF Global is that I hear all

Page 58

1    the words.  I hear UCC, but then SIPA comes into effect,

2    right, and that becomes the operative regime and --

3              MR. HORWITZ:  Right.

4              THE COURT:  -- that there's no basis for a claim

5    under SIPA or the Bankruptcy Code because all of the

6    securities were transferred.  The trustee has satisfied all

7    claims under Section 78(fff)(2)(f), an that there is no

8    additional claim for decline in value or lack of access

9    associated with that period of time.  That's been the clear

10   ruling of Judge Peck on at least one occasion and you're

11   asking me to depart from that and --

12             MR. FARRELL:  Well --

13             THE COURT:  -- I'm really struggling with that.

14             MR. FARRELL:  Okay.  Well, I'll try to help you.

15             First of all, SIPA doesn't -- SIPA -- in terms of

16   the claims allowance process for general unsecured claims it

17   incorporates by reference Chapter 5 of the Bankruptcy Code.

18   So that's -- you know, in that regard we're dealing with

19   normal Chapter 5 provisions of claims allowance under 502.

20             So the notion that, you know, I keep coming back

21   to this -- to this point that I guess -- and I don't -- I

22   can't speak to all the various contexts in which you've

23   pronounced the issue that, hey, if you get your securities

24   you didn't have any further complaints.  I would guess that

25   most of those cases are ones where people are just

Page 59

1    dissatisfied of the fact that they had to sit around and

2    wait for two weeks while the SIPA proceeding took place

3    because their securities moved to -- eventually moved over

4    to Barclays.

5            And I -- I'm in complete agreement that the case

6    law is very clear that there are no -- you can't come in and

7    assert a claim, either a customer claim or a general

8    unsecured claim, for the mere fact that during the SiPC

9    proceeding you were delayed access to your securities.  That

10   -- that's black letter law.  Okay.

11           But that's not our situation.  We're not alleging

12   that, hey, we -- we're filing a claim cause we had to -- our

13   only grievance is that we had to sit around and wait while

14   the SIPA proceeding.  We're claiming that we were owed a

15   duty.  Unlike other folks that didn't submit transfer

16   requests prepetition, we submitted a transfer request

17   prepetition.  That gave rise to a duty, a duty on behalf of

18   LBI.  That duty did not just simply vaporize the minute that

19   the SiPC proceeding was commenced.

20           Sure.  It was superseded that -- the trustee has

21   superseding duties.  He has fiduciary duties.  He has to --

22   you know, he may not be able to honor those consistent with

23   his fiduciary duty and ultimately in this case he didn't.

24   But, again, that doesn't mean -- that duty doesn't vanish --

25           THE COURT:  But for you to prevail on that theory,

Page 60

1    which I don't necessarily agree with you, again, we get back

2    to commercial reasonableness.  We get back to the time

3    frame, and we get back to the fact that in actuality you're

4    looking at a very, very narrow window of time.

5             MR. FARRELL:  That may be --

6             THE COURT:  Very narrow window of time.

7             MR. FARRELL:  That may be, but I still contend,

8    Your Honor, that there was a duty that was not performed

9    here and we have the basis for a general unsecured claim.

10            Now opposing counsel makes mention that under

11   their construction of Article VIII that a duty arises, but

12   as soon as the -- as soon as the SIPA proceeding is

13   commenced Article VIII provides that that right just totally

14   vaporizes, just totally disappears.

15            That's a point that they only raise in their reply

16   brief.  It's a complicated issue.  The standing order in

17   this case didn't allow -- doesn't permit us to file a

18   surreply unless we get your permission.  I guess if Your

19   Honor --

20            THE COURT:  See, that's exactly it.  The duty is

21   super -- the duty under the UCC is superseded by SIPA.  So

22   you're asking me to give you a claim notwithstanding the

23   operation of SIPA.  And that's a real stumbling block for

24   me.

25            So let's try to wrap it up.  You can tell me what

Page 61

1    that note from Mr. Parry says --

2         (Laughter)

3              THE COURT:  -- or not.

4              MR. FARRELL:  Let me read it first, please.

5         (Pause)

6              MR. FARRELL:  Well, I think -- he makes a very

7    good point that -- I mean, there's a claim for a prepetition

8    -- a failure to perform a prepetition duty.  Okay.  And what

9    happens post-petition, his point is that that doesn't

10   matter.  It's you still have a claim as a result of the

11   breach of that prepetition duty.

12              And I think it just -- essentially, I think that

13   argument dovetails with the fact -- I mean, you cannot deny

14   the fact that two seconds before the SIPA proceeding was

15   commenced debtor owed us a duty.  The SIPA proceeding is

16   commenced.  That duty just -- it doesn't vaporize.  The

17   trustee had a choice whether to continue to honor that or

18   not.  He made -- in accordance with his fiduciary duty he

19   made the decision that it's not going to be honoured, just

20   like trustees all the time say, I'm not going to honor the

21   debtor's executory obligation.  I've weighed the risks --

22   the benefits and I think it's in the overall interest of the

23   estate not to honor that prepetition obligation.

24              So non-debtor party, I'm sorry, you get the -- you

25   can file a general unsecured claim and you're going to get

Page 62

1    repaid in bankruptcy dollars.  That's how it works.  There's

2    nothing in SIPA that changes that.  SIPA says -- SIPA

3    incorporates the claim process under the Bankruptcy Code and

4    the fact that we got our securities back doesn't mean, hey,

5    you know, any other breaches that may have been committed

6    you have no recourse for.

7              THE COURT:  All right.

8              MR. FARRELL:  And that nothing in SIPA says that,

9    Your Honor.

10             THE COURT:  All right.  You indicated that the

11   point with respect to the superseding of the UCC by SIPA was

12   raised for the first time on reply.  You haven't had a

13   chance to put in briefing on that.

14             MR. FARRELL:  Correct.

15             THE COURT:  You can do that.  You also need to put

16   in amended amounts connected to each of the claims that

17   reflect what the dollars are associated with the time frames

18   that we focused on today.

19             MR. FARRELL:  All right.

20             THE COURT:  Not indicate -- not indicating at all

21   as to whether or not those actually are the correct dates,

22   but my view preliminarily would be even if you have a claim

23   -- which I'm highly sceptical that you do, but I'm willing

24   to read your further briefing on this narrow point -- that

25   it's cabined at those dates.

Page 63

1          MR. FARRELL:  Okay.  Fair enough, Your Honor.

2          THE COURT:  And I suspect that the numbers are

3    going to be dramatically smaller.  It doesn't affect the

4    legal analysis of whether or not there's a claim at all, but

5    I think it's important to have at least there being a more

6    accurate statement of your alleged damages.

7          Now with respect to Claim Number 7001166 filed by

8    Jennifer Candell (ph), there was no response to the

9    objection.

10          MR. FARRELL:  Your Honor, you had previously

11    ordered that claimant --

12          THE COURT:  Okay.  All right.  So why don't you

13    submit those papers within 30 days.  If the trustee would

14    like to have an opportunity to reply thereafter, let's say

15    14 days after that.  If I feel that there's a need for

16    further argument I'll let you know, otherwise I'll just

17    issue a decision.  All right.

18          MR. FARRELL:  Thank you --

19          THE COURT:  Thank you so much.

20          MR. FARRELL:  -- very much, Your Honor.

21          THE COURT:  Have a good day.

22          MR. FARRELL:  You too, Your Honor.

23          THE COURT:  Thank you.

24          MR. PACE:  Thank you, Your Honor.

25          THE COURT:  Okay.  Let's go to the LBHI calendar,

Page 64

1    please.

2         (Pause)

3              UNIDENTIFIED SPEAKER:  Your Honor --

4              THE COURT:  Yes.

5              UNIDENTIFIED SPEAKER:  -- may I approach with the

6    order?

7              THE COURT:  Yes.  Thank you very much.

8         (Pause)

9              MS. ARTHUR:  Good morning, Your Honor.

10             THE COURT:  Good morning.  How are you?

11             MS. ARTHUR:  For the record, Candace Arthur of

12   Weil, Gotshal & Manges on behalf of Lehman Brothers Holdings

13   Inc. as plan administrator.  As reflected on the agenda, the

14   plan administrator has three matters before the Court today.

15             THE COURT:  Okay.

16             MS. ARTHUR:  First, we're moving forward on an

17   uncontested basis with the plan administrator's motion,

18   pursuant to Bankruptcy Rule 9019 and Section 105(a) of the

19   Bankruptcy Code seeking approval of a settlement agreement

20   that relates to the Exum Ridge CBO 2007-2 credit default

21   swap agreement and indenture.

22             The motion was filed on January 20th and a copy of

23   the confidential settlement agreement was provided to the

24   Court on February 2nd.

25             THE COURT:  Yes.  I have it.

1          MS. ARTHUR:  I would also like to note for the

2     Court that we filed the declaration of Lawrence Brahman (ph)

3     in support of the motion on February 11th, and U.S. Bank

4     National Association in its capacity as trustee under the

5     indenture filed an affidavit on February 17th in connection

6     with the motion.

7          By way of background, Your Honor, about a year ago

8     on October 18th, 2013, the plan administrator filed a motion

9     that sought, among other things, approval of a settlement

10    agreement that related to the Exum Ridge 2007-2 transaction.

11    There were objections and the plan administrator withdrew

12    the motion solely with respect to the initial Exum Ridge

13    settlement agreement without prejudice.

14         The amended -- the agreement has been subsequently

15    amended and we noticed to all parties in interest, and the

16    amended settlement agreement is before the Court today.

17         THE COURT:  Okay.

18         MS. ARTHUR:  The plan administrator submits that

19    the agreement is in the best interest of LBSF and its estate

20    and creditors.

21         As the Court will note, pursuant to the terms of

22    the settlement agreement on February 6th one of the Class V

23    noteholders did file a limited objection in order to opt out

24    of the settlement agreement and obtain a status of an

25    objecting noteholder.

1              The settlement agreement provides that amounts

2      will be set aside into escrow in order to cover the

3      objecting noteholders' claims.

4              THE COURT:  Okay.

5              MS. ARTHUR:  The limited objection is not an

6      objection to the actual motion or settlement agreement.  No

7      other responses were filed in connection with the motion and

8      we are moving forward on an uncontested basis.

9              THE COURT:  All right.

10             MS. ARTHUR:  Accordingly, subject to any question

11     that Your Honor may have, the plan administrator

12     respectfully requests that the Court grant the motion and

13     approve the settlement agreement.

14             THE COURT:  All right.  You've confirmed that the

15     objection that was filed by the noteholder is, in fact, not

16     an objection to the settlement itself.

17             Let me ask if anyone else wishes to be heard with

18     respect to the trustee's motion pursuant to Rule 9019 to

19     approve the Exum Ridge settlement agreement.

20             Good morning.

21             MR. TOP:  Good morning, Your Honor.  Frank Top on

22     behalf of --

23             THE COURT:  How are you, Mr. Top?

24             MR. TOP:  -- U.S. Bank National Association.  Very

25     well.

Page 67

1              I obviously don't have any objection to the

2     settlement agreement.

3              THE COURT:  Okay.

4              MR. TOP:  I just wanted to note for the record

5     that there were actually two -- initially two limited

6     objections filed with respect to the original motion.  I

7     reached out to both those people.  One decided that they

8     would file a motion, the other elected not to file a motion.

9     I also physically sent them a copy of the notice --

10             THE COURT:  An objection you mean.

11             MR. TOP:  Yeah.  Right.  That's right.

12             THE COURT:  You said to file a motion --

13             MR. TOP:  That's right.  No.  I'm sorry.  Yeah.

14    The other --

15             THE COURT:  Okay.

16             MR. TOP:  -- elected not to file an objection to

17    it.  And so I just wanted to make sure that this Court knows

18    that, you know, we -- at least we've physically reached out

19    to people to make sure that they knew that this motion was

20    pending and --

21             THE COURT:  Very good.

22             MR. TOP:  -- and whether or not they wanted to

23    continue their --

24             THE COURT:  Okay.

25             MR. TOP: -- limited objections.

```
 1              THE COURT:  Very good.  Thank you.

 2              MR. TOP:  Thank you.

 3              THE COURT:  All right.  That being said, the

 4    settlement clearly falls above the lowest level of the range

 5    of reasonableness is in -- and is in the best interest of

 6    the estate and will be approved.

 7              MS. ARTHUR:  Thank you, Your Honor.

 8              THE COURT:  Okay.

 9              MS. ARTHUR:  I will turn the podium over now to my

10    colleague, Garrett Fail --

11              THE COURT:  All right.

12              MS. ARTHUR:  -- who will handle the second item.

13              THE COURT:  Very good.

14         (Pause)

15              THE COURT:  All right.  So that brings us to the

16    Nomura matter --

17              MR. FAIL:  Yes, Your Honor.

18              THE COURT:  -- correct?

19              MR. FAIL:  The next item on the agenda -- for the

20    record, Garrett Fail, Weil, Gotshal & Manges for Lehman

21    Brothers Holdings Inc, the plan administrator.

22              The next item on the agenda is the four hundred

23    and eighty-sixth objection --

24              THE COURT:  Okay.

25              Mr. FAIL:  -- specifically only with respect to
```

1   the two claims of Nomura Securities, Ltd.  We think the --

2   the plan administrator believes the objection is a simple

3   enforcement of plan provisions.  There's no dispute that

4   under the plan under the Bankruptcy Code claims are valued

5   as of the petition date.  There's no dispute that the plan

6   provides that consideration provided by a primary obligor is

7   converted to U.S. dollars from a foreign currency on a

8   confirmation date basis.  There's no dispute that the plan

9   determines how a guarantee claim would be satisfied, and

10  there's no dispute that Nomura's claims have been -- would

11  be satisfied in full if allowed using those calculations and

12  using Nomura's estimates.

13          Specifically, they -- Nomura is saying its

14  received approximately $52.7 million -- U.S. dollars for a

15  $52.1 million claim and 14.3 million for a $14.2 million

16  claim.

17          THE COURT:  Okay.

18          MR. FAIL:  Unless Your Honor has any questions.

19          THE COURT:  Let me talk to Mr. Neier.

20          MR. FAIL:  Thank you.

21          THE COURT:  How are you, Mr. Neier?

22          MR. NEIER:  Good morning, Your Honor.

23          THE COURT:  I'm going to pay you a left-handed

24  compliment.

25          MR. NEIER:  Okay.

```
 1              THE COURT:  If this object -- if this had been

 2    filed by someone other than you, I would have dismissed it

 3    out of hand as being frivolous.

 4              MR. NEIER:  Oh, really?

 5              THE COURT:  Yeah.  So the fact that you filed it

 6    got my attention.  But I'm not with you at all.

 7              MR. NEIER:  Well, Your Honor --

 8              THE COURT:  The 502(b) is -- speaks to the amount

 9    of claims as of the petition date.  It's not about a

10    distribution on account of the claims.

11              MR. NEIER:  Well, it's sort of about

12    distributions, Your Honor.  It says, and I'll just quote it,

13    or just the relevant part.  It says --

14              THE COURT:  Okay.

15              MR. NEIER:  -- "after a notice and a hearing shall

16    determine the amount of such claim in lawful currency of the

17    United States as of the date of the filing of the petition

18    and shall allow such claim in such amount."

19              THE COURT:  Sure.  So it's an allowed claim.  I

20    mean, we go to your charts.  It's an allowed claim as of the

21    petition date in U.S. dollars.

22              MR. NEIER:  Right.  I just want to correct Mr.

23    Fail in that that particular chart was -- what I said was

24    Lehman's characterization of a claim would result in the

25    following calculation.  It's not that there was no dispute.
```

Page 71

1    It's that I was taking Lehman's math and using that here.

2              THE COURT:  Right.  But do we agree that value as

3    of the petition date in U.S. dollars based on the exchange

4    rate then in effect, Claim Number 14150 is 52,156,907.

5    There's no dispute about that, right?

6              MR. NEIER:  Correct, Your Honor.

7              THE COURT:  Okay.  And, similarly, with respect to

8    --

9              MR. NEIER:  I don't think there's any math

10   dispute.

11             THE COURT:  Okay.  So there's no math dispute.  So

12   those -- so, then, the next question is if you take the

13   recovery, if you take the recovery amount, right, as of the

14   confirmation date as the plan says and you do the math,

15   right, you get 100 percent recovery on these claims.

16             MR. NEIER:  But we didn't get 100 percent

17   recovery.  It's not a satisfied claim.  We got 74 percent

18   recovery.

19             THE COURT:  Well, but that's only because you are

20   taking the actual -- you got actual currency, right?

21             MR. NEIER:  We got --

22             THE COURT:  You got Yens.

23             MR. NEIER:  -- Yen.

24             THE COURT:  Right.

25             MR. NEIER:  And in Yen we got --

Page 72

1                THE COURT:  In Yen --

2                MR. NEIER:  -- a 74 percent recovery.

3                THE COURT:  Right.  You got a 74 percent recovery

4     when you value the Yen in U.S. dollars as of the petition

5     date.  And --

6                MR. NEIER:  But from our perspective, Your Honor,

7     you can't do an end run around 502(b) by saying we're going

8     to value the distribution in a -- using a different date.

9     That --

10               THE COURT:  Well --

11               MR. NEIER:  -- means the entire Bankruptcy Code --

12               THE COURT:  But how -- how about --

13               MR. NEIER:  -- is based on valuing things --

14               THE COURT:  Sure.

15               MR. NEIER:  -- as of the petition date.

16               THE COURT:  Right.  But you have to -- you value

17    -- but you don't value --

18               MR. NEIER:  And this -- and by the way this --

19               THE COURT:  But --

20               MR. NEIER:  -- could only be used -- I'm sorry,

21    Your Honor.

22               THE COURT:  Yeah.  But you --

23               MR. NEIER:  Go ahead.

24               THE COURT:  -- don't value, for example, other

25    forms of plan currency as of the petition date.  You value

Page 73

1    it as of some other date.  You --

2              MR. NEIER:  Your --

3              THE COURT:  Right?

4              MR. NEIER:  So, Your Honor, this could only be

5    used to discriminate against current claims against foreign

6    currency because, obviously, if the exchange rates were

7    different they could have gone to the market and paid it off

8    in Yen, okay, if it was to their advantage.  So this was

9    only been done to discriminate against people who have

10   claims in -- denominated in foreign currency --

11             THE COURT:  Well, it's not --

12             MR. NEIER:  - and treating them differently than

13   --

14             THE COURT:  But --

15             MR. NEIER:  -- those creditors who have claims in

16   U.S. currency.

17             THE COURT:  But if there's a discrimination, then

18   it's a discrimination that's -- that is not addressed in the

19   Bankruptcy Code.  The Bankruptcy Code provision only talks

20   about fixing the claims based on the exchange rates then in

21   effect on the petition date.  And everything else is a

22   negotiation, just like --

23             MR. NEIER:  So -

24             THE COURT:  -- it's a negotiation with any other

25   creditor.

1              MR. NEIER:  So --

2              THE COURT:  If the exchange rate had gone the

3      other way, right, and you looked at it on the distribution

4      date, you could have a windfall.  Somebody --

5              MR. NEIER:  So --

6              THE COURT:  Somebody has a --

7              MR. NEIER:  So the legislative history of the

8      section was designed -- of 502(b) was designed to prevent

9      gamesmanship by both sides.  It was to prevent gamesmanship

10     by a debtor and it was also, probably more important, for

11     congress at the time to prevent gamesmanship by creditors so

12     that they couldn't trade the claims.  Everybody knows what

13     the claims should be.  They should be valued as of the --

14             THE COURT:  Right.

15             MR. NEIER:  -- petition date.

16             THE COURT:  Right.

17             MR. NEIER:  And I don't think you can do an end

18     run about -- around that by saying, oh, no, we're going to

19     value distributions.  I mean, they could have put in this

20     plan, which, of course, a foreign creditor with a primary

21     claim against a foreign non-debtor can't vote on, can't

22     object to, and the court doesn't have subject matter

23     jurisdiction to determine.  Okay.

24             So they're -- they have no standing whatsoever to

25     object to the plan.  They're not even a party to the case

Page 75

1    because Lehman Brothers Japan is a separate foreign non-

2    controlled debtor.

3              THE COURT:  You could have --

4              MR. NEIER:  Non-debtor, excuse me.

5              THE COURT:  Okay.  But we're here on a guaranteed

6    claim against LBHI.

7              MR. NEIER:  Right.  And for the purposes of the

8    guarantee claim they could have written that a single

9    sheckle will be determined to be a hundred million dollars

10   for the purposes of calculating the guarantee claim and that

11   would be illegal and an end run around the Bankruptcy Code

12   and an end run around 502(b).

13             It's very smart.  It's marvellous clever thinking

14   and it was put into the amended plan.  There's a fascinating

15   footnote in the reply that says,  this was part of

16   negotiations as part of an amended plan.

17             THE COURT:  Well, sure, because you had to -- I

18   mean, think about the practical functioning of the

19   administration of a plan like this because if you think

20   about what the alternatives are, three come to mind:  One,

21   that you use the confirmation -- the petition date exchange

22   rate.  But that has no bearing on actual value just as the

23   value of other plan consideration is not valued as of the

24   confirmation date.  It's valued as of some other date in the

25   future, right?  So that was one choice.

Page 76

1              The second choice was confirmation.  Why is that a

2    good choice?  Well, that's a good choice because the plan

3    administrator can't be frozen.  It has to have the ability

4    to plan and establish reserves, right, and make

5    distributions, as opposed to the alternative which is on the

6    distribution date.  Well, how would that work?  Right.

7              So, I mean, I wasn't there, but just generally

8    being a little familiar with the way these things work --

9              MR. NEIER:  You could --

10             THE COURT:  -- right?

11             MR. NEIER:  -- game the system in all sorts of

12   manners of ways and the Bankruptcy Code does not permit it.

13   It --

14             THE COURT:  But you say --

15             MR. NEIER:  -- says that there's a --

16             THE COURT:  -- you say that, but --

17             MR. NEIER:  -- hard line --

18             THE COURT:  You say that, but 502(b) or some other

19   provision could have been drafted to say, and the value of

20   all distributions received on account of a claim valued as

21   of the petition date as the currency exchange rate then in

22   effect is similarly valued at that date.  It doesn't say

23   that.

24             MR. NEIER:  And very smart bankruptcy lawyers can

25   always find an end run around provisions in the Bankruptcy

Page 77

1    Code. They've been doing it since time in memorial and,

2    frankly, that's why we all have jobs, okay, because if the

3    Bankruptcy Code had all those specific little things to

4    prevent gotchas, we would be out of business.  So I think

5    that this is a clever way of an end run around 502(b) and it

6    should not be permitted.

7              THE COURT:  Well, I think I very much respect that

8    you're making this argument.  That gives me pause.  But I

9    absolutely disagree and I think that to the extent that you

10   believe that you're correct, you need to take it up with

11   congress or perhaps the Second Circuit because I -- I went

12   through all the scenarios in my mind of the different ways

13   that people could game the system.  I looked at the

14   confirmation order.  But, fundamentally, I have to apply the

15   Bankruptcy Code.

16             I don't believe that the plan provision proved by

17   Judge Peck violates the Bankruptcy Code in any way.  I think

18   that Lehman's math is correct and rarely do I read a

19   pleading where I agree with everything that's said.  The

20   reply that's been filed here is such a pleading.  And I

21   don't think your point, which is a nice point about whether

22   or not Nomura could have objected so to speak in the case

23   really makes a difference because you're here on a guarantee

24   claim against LBHI and presumably you had that claim at the

25   time, albeit in a contingent and/or unliquidated form.

Page 78

1            MR. NEIER:  What would be -- what would stop a

2       debtor in the future from saying in its plan, you know, we

3       have claims in foreign currency against non-debtor

4       affiliates, foreign non-debtor affiliates.  For the purposes

5       of calculating our guarantee claim we're going to say each

6       one of those claims is valued at $100 million and,

7       therefore, your starting point is $100 million in the hole

8       --

9            THE COURT:  Well --

10            MR. NEIER:  -- with respect to your guarantee

11       claim.

12            THE COURT:  -- that -- that hypothetical --

13            MR. NEIER:  I don't think you can do that.

14            THE COURT:  That hypothetical is not before me.

15       Clever lawyers can think of any number of things to do.

16            MR. NEIER:  They did here.

17            THE COURT:  And it was approved.  I don't think

18       it's in violation of the Bankruptcy Code.  I don't know if

19       there were any objections to it at the time that were

20       specifically or generally overruled by --

21            MR. NEIER:  I don't think so, Your Honor.

22            THE COURT:  -- Judge Peck.

23            MR. NEIER:  The -- you know, as I said, there's

24       this footnote in the reply that says that it was amended as

25       a result of negotiations, but there's no pleading or

Page 79

1    objection that addresses it.  It's not mentioned in the

2    disclosure statement --

3              THE COURT:  I have --

4              MR. NEIER:  -- other than a recitation of the

5    plan.

6              THE COURT:  You know as well as I do that I have

7    no ability to, you know, peel that onion back and I'm

8    certainly not going to entertain a collateral attack on the

9    confirmation.

10             MR. NEIER:  Yeah.  And I don't -- respectfully I

11   don't think I am collaterally attacking the plan.  I think

12   I'm relying on the plan to say that the last sentence, which

13   is omitted from the initial objection which says, "Nothing

14   contained in this provision shall affect the applicable

15   exchange rate for determining the allowed amount of any

16   claim," and claim includes foreign claims.  It includes --

17             THE COURT:  And I believe --

18             MR. NEIER:  -- foreign primary claims.

19             THE COURT:  -- that that's been -- that that's

20   wholly complied with by the plan and it does not dictate

21   that the distribution be allowed at the exchange rate then

22   in effect on the petition date

23             MR. NEIER:  But just --

24             THE COURT:  Mr. Neier --

25             MR. NEIER:  -- honestly -- I got it, Your Honor.

Page 80

```
 1                THE COURT:  Okay.

 2                MR. NEIER:  But, honestly, I don't understand how

 3     74 percent equals 100 percent.  It doesn't make any sense to

 4     me.

 5                THE COURT:  Okay.  All right.  I'm going to ask

 6     the trustee to submit an order on this one and I'll see you

 7     next time.  All right.

 8                MR. NEIER:  Thank you, Your Honor.

 9                THE COURT:  Thank you very much.

10                MR. PACE:  Thank you very much, Your Honor.  My

11     colleague, Maurice Horwitz, will be handling --

12                THE COURT:  I'm sorry.  I said the trustee.  I

13     meant LBHI.

14                MR. PACE:  Understood.  Thank you, Your Honor.

15                Maurice Horwitz will be handling the next matter

16     on the agenda.

17                THE COURT:  Okay.

18                And this is our last matter for today, correct?

19     This is the --

20                MR. HORWITZ:  This is the --

21                MR. JOHNSON:  This is the motion of Dr. Marsoner,

22     correct?

23                MR. HORWITZ:  Correct.  And I'll turn the podium

24     over to Dr. Marsoner's counsel.  It's his motion.

25                THE COURT:  Thank you.
```

```
 1          (Pause)

 2                    MR. DONOHO:  Good morning, Your Honor.

 3                    THE COURT:  Good morning.

 4                    MR. DONOHO:  Christopher Donoho of Hogan &

 5     Lovells.

 6                    THE COURT:  How are you?

 7                    MR. DONOHO:  I'm well, thank you.  How are you?

 8                    THE COURT:  I'm okay.

 9                    MR. DONOHO:  We have -- here in the courtroom Dr.

10     Marsoner has come in from Austria.

11                    THE COURT:  Okay.  Welcome, sir.

12                    MR. DONOHO:  I also have with me Shane Johnson --

13                    THE COURT:  Okay.

14                    MR. DONOHO:  -- a colleague of mine from Hogan &

15     Lovells --

16                    THE COURT:  Okay.

17                    MR. DONOHO:  -- who will --

18                    THE COURT:  Who looks vaguely familiar.

19                    MR. DONOHO:  Yes.  He was Judge Cropper's (ph)

20     clerk so you probably saw him in the hallway.  He's going to

21     be proceeding here.  He'll be running through a short

22     proffer and then a discussion of the law if that --

23                    THE COURT:  Okay.

24                    MR. DONOHO:  -- suits the Court.

25                    THE COURT:  Okay.  I don't think I'm having a
```

Page 82

1    proffer.  It's a motion so there's no -- it's not an

2    evidentiary hearing.  There's no proffer.  This is just a

3    straight up legal question of whether or not I'm -- I can

4    deem the proof of claim to be timely filed.

5            MR. DONOHO:  Okay.

6            THE COURT:  Okay.

7            MR. DONOHO:  Well, I think we'll -- then we'll

8    rely on the declarations and the statements and Mr. Johnson

9    will get right to it.

10           THE COURT:  That sounds better.

11           MR. DONOHO:  Thank you, Your Honor.

12           MR. JOHNSON:  Good morning, Your Honor.

13           THE COURT:  Good morning.

14           MR. JOHNSON:  My name is Shane Johnson, attorney

15   for Dr. Marsoner.

16           So Dr. Marsoner's claim is based on the well

17   established principal that under the due process clause if a

18   known creditor does not receive actual notice of the bar

19   date, then his claim cannot be constitutionally discharged.

20           THE COURT:  Okay.  So let's stop there.  So at

21   what point is it -- would it be too late for Dr. Marsoner to

22   say, hey, I didn't have specific notice of the bankruptcy,

23   but I want to be able to file a claim?

24           MR. JOHNSON:  Well, the statute of limitations

25   would still bar a claim that was, you know, outside whatever

Page 83

1   the applicable statute of limitations was.  So, you know,

2   that would still prevent a claim from being filed if you

3   were outside of whatever the applicable time period is.

4           Here, it's six years.  A contract claim or quantum

5   meruit claim and it didn't accrue --

6           THE COURT:  So --

7           MR. JOHNSON:  I'm sorry.

8           THE COURT:  Go ahead.  When did it --

9           MR. JOHNSON:  It didn't accrue until October 2012

10  which was when LCPI first earned revenues from the F1

11  transaction because they received a dividend recap in

12  October of 2012.  That was the first time they received

13  revenues from that and Dr. Marsoner's services were provided

14  for ten percent of the F1 transaction revenues.

15          So October 2012 to now is certainly under the six

16  years.

17          So based on that standard, Your Honor, Dr.

18  Marsoner has to prove that he was a known creditor and he

19  did not receive actual notice of the bar date.  So -- and

20  the amount of time that has lapsed since the bar date is not

21  part of that test.  So Dr. Marsoner was a known creditor

22  because he was reasonably ascertainable by LBHI and LCPI.

23          Now the debtors assert that Dr. Marsoner had no

24  contact with LBHI or LCPI.  That's simply untrue.  Vintorio

25  Piniati (ph), was at the time of the F1 reinvestment the

Page 84

1    former vice-chairmen and European M&A for LBHI.  He also was

2    signed with 2002 and 2004 elbow agreements that Mr. Marsoner

3    entered into.  He --

4            THE COURT:  You know, I -- before you get rolling

5    --

6            MR. JOHNSON:  Okay.

7            THE COURT:  Okay.  Just in the short time,

8    relatively short time that I've presided over these cases

9    there have been dozens, if not hundreds of pro se folks who

10   managed to file timely claims.  And you're asking me to

11   conclude that Dr. Marsoner, who by his own account, was

12   involved in these sophisticated transactions somehow should

13   be granted an exception to the general rule that requires

14   you to act expeditiously and file a claim.  It doesn't -- it

15   doesn't fly.  It doesn't fly.

16           MR. JOHNSON:  Well, Your Honor, he didn't know

17   that he had a claim against --

18           THE COURT:  That's not the way it works, though.

19   He -- any number of folks came in and filed claims, called

20   up Epiq, you know, filed claims, wrong, right, awkward,

21   inartful, however, attempting to preserve their rights.  And

22   Dr. Marsoner didn't do any of that.  He certainly had the

23   wherewithal -- to say that he couldn't figure out how the

24   U.S. Bankruptcy Code worked, there was probably the most

25   public court proceeding in the history of the world and the

Page 85

1    notion that he wasn't given a specific notice and,

2    therefore, could not know that he should have filed a claim,

3    it's very hard to credit.

4           MR. JOHNSON:  But, Your Honor, the test isn't

5    whether he knew that there was a Chapter 11 proceeding.   I

6    mean, case law is clear that simple knowledge that there was

7    Chapter 11 proceeding is not sufficient.  The standard is

8    you're a known creditor, which Dr. Marsoner is, then you

9    have to provide them actual notice of the bar date or under

10   the due process clause you cannot discharge his claim.

11          So he was a known creditor because of he knew --

12   Vintorio Piniati is who he coordinated his F1 advice for.

13   He was a senior member of LBHI's management.  And he has

14   stated to the Court in a sworn letter that it was his

15   understanding that Lehman was going to pay Dr. Marsoner for

16   his advice or he wouldn't have asked him for it.   The

17   agreements with LBEL also provided that Dr. Marsoner would

18   provide his advice to the Lehman group, not just LBEL.

19          And so -- and with respect to LCPI, they actually

20   benefited from his advice because they invested in the F1

21   transaction and they have received a benefit, a huge benefit

22   for his advice.  So Dr. Marsoner was a known creditor.  So

23   then if --

24          THE COURT:  A known creditor of LBHI?

25          MR. JOHNSON:  Of LBHI and LCPI.  He was a known

Page 86

1    creditor of LBHI because he coordinated his F1 transaction

2    advice with Vintorio Piniati who was a -- at the time was a

3    vice chairman and head of European M&A for LBHI.

4            So the -- LBHI had knowledge that he was a

5    creditor.  Vintorio Piniati has stated in his sworn letter

6    that he would not have undertaken Dr. Marsoner's services if

7    he did not believe that he was going to be paid for them.

8            LCPI has knowledge because they ultimately

9    benefited hugely from his advice.  So to say that they don't

10   know who Dr. Marsoner is.  They don't have any knowledge of

11   these agreements, even though the agreements stated that

12   they would be provided to the entire Lehman group and the

13   contact person was a senior member of LBHI.  The debtors

14   cannot say that they didn't know who Dr. Marsoner was.  They

15   didn't know anything about these agreements.  So he was a

16   known -- based on that he was a known creditor to them.

17           And so as a known creditor he was entitled to

18   actual notice of the claims bar date, but he never received

19   it.

20           Now -- and as I stated, actual knowledge of simply

21   the Chapter 11 proceeding is not sufficient.  Case law is

22   clear on that.  So --

23           THE COURT:  But the problem that you have also is

24   that the bar date notices went out in 2009 --

25           MR. JOHNSON:  That's correct.

1          THE COURT:  -- right?  And the revenues weren't

2     earned until the fall of 2012 --

3          MR. JOHNSON:  That's correct.

4          THE COURT:  -- right?  So he knows about the

5     bankruptcy.  You've got the bar date notice published.

6          MR. JOHNSON:  That he didn't receive.

7          THE COURT:  Published.

8          MR. JOHNSON:  But he's a -- he's a known creditor.

9     He's entitled --

10          THE COURT:  He's a -- he's not a known creditor to

11    LBHI.

12          MR. JOHNSON:  But, Your Honor, he is.  He

13    coordinated his F1 transaction advice with the senior member

14    of LBHI.  The knowledge of Vintorio Piniati is imputed to

15    LBHI.  They -- so through that they knew that he was a

16    creditor, so publication notice is not sufficient.  They had

17    to send him actual notice.

18          THE COURT:  But he didn't become a creditor, if at

19    all, until 2012.  So as of the time that the bar notice went

20    out, he wasn't a known creditor.

21          MR. JOHNSON:  He was a known potential creditor,

22    Your Honor, because he had a success fee.  Basically that

23    was the agreement that he had.  He would earn ten percent of

24    the revenues as a success fee.  SO whenever those revenues

25    materialized --

Page 88

1          THE COURT:  But that wasn't known to LBHI.

2          MR. JOHNSON:  But it was, Your Honor.  Vintorio

3    Piniati knew that.  He was the person who signed the

4    agreement.  He --

5          THE COURT:  Okay.  So let me -- so now -- so let's

6    do it the way you're suggesting.  Bar date notice, no good

7    because he was a known creditor who didn't get notice.

8    Publication notice, no good because he was a known creditor.

9    2012, right, he -- revenues are generated.  At some point,

10   right, he doesn't get paid, right?  What's the point at

11   which he realizes that he is a -- he should assert a claim

12   against LBHI?

13         MR. JOHNSON:  Your Honor, he first asserted a

14   claim against LBEL in their UK proceeding.

15         THE COURT:  Right.  And at that point he might

16   have said, uh-huh, I better assert a claim against LBHI, but

17   he didn't.

18         MR. JOHNSON:  He didn't, Your Honor, because he

19   didn't know that the investment had been made by LCPI, the

20   U.S. subsidiary.  He didn't know who had made -- what Lehman

21   entity had ultimately made the investment for the F1

22   transaction.

23         THE COURT:  So what?  I --

24         MR. JOHNSON:  Well, Your Honor, how could -- if it

25   hadn't been -- if it had been a European entity, he wouldn't

Page 89

1    have filed a U.S. claim.  If it had been for --

2            THE COURT:  You started off by telling me that

3    he's a known creditor of LBHI; that, look, here's this

4    person who he worked for who was part of LBHI, right, and

5    then we hold that thought and then you say, but he never

6    realized that he would -- might have a claim against LBHI

7    until just now.  Those two are irreconcilable.

8            If he thought and knew that he was dealing with

9    LBHI and that therefore, LBHI should have known about him,

10   then at that point in time he had the wherewithal and the

11   ability to file a claim against LBHI.  He didn't do that.

12           MR. JOHNSON:  Your Honor, Vintorio Piniati had --

13   he had dual roles.

14           THE COURT:  Right.  And one of the duo was that

15   you're saying it was LBHI.

16           MR. JOHNSON:  Yes.

17           THE COURT:  So that put Dr. Marsoner on notice

18   that if his view now is that, oh, I was really working for

19   LBHI all along, then he was -- did he just find out that

20   Vintorio Piniati was working for LBHI?

21           MR. JOHNSON:  No, Your Honor.  He didn't just find

22   out that Vintorio Piniati -- he was working for LBEL because

23   Vintorio Piniati was assigned his agreements that were with

24   LBEL.

25           And so, yes, Vintorio Piniati has dual roles which

Page 90

1    is why LBHI knew he was a creditor, a potential creditor,

2    but Dr. Marsoner didn't know he was a potential creditor of

3    LBHI until the UK proceeding when the administrators for

4    LBEL informed him that the F1 transaction had been invested

5    by -- the investor had been LCPI, a U.S. subsidiary, which

6    was one of the reasons that they provided him a relatively

7    small settlement amount in that case because they said the

8    benefit of your advice really went to the U.S. entities.

9    And at that point -- this is mid-2014.  So at that point he

10   begins to analyze his position under U.S. law, hires

11   counsel, and then we file this motion, Your Honor.

12        (Pause)

13             MR. JOHNSON:  Your Honor, because the test isn't

14   -- the test is whether the debtors knew he was a potential

15   creditor.

16             THE COURT:  But the test also has to do with

17   whether or not the claimant acted -- whether they're -- I

18   mean, this is, in effect, you're asserting excusable

19   neglect.

20             MR. JOHNSON:  We're not.  We haven't asserted

21   excusable neglect anywhere in our papers, Your Honor.

22             THE COURT:  That's because you know you couldn't

23   satisfy the standard.

24             MR. JOHNSON:  No.  That's because under the due

25   process clause a separate -- is totally separate from the

Page 91

1    excusable neglect standard.  Under the due process clause if

2    there's a known creditor you have to provide him actual

3    notice of the bar date or otherwise you cannot discharge his

4    claim.

5            So that's what we're relying on.  I suppose Your

6    Honor could say, well, he doesn't -- I'm not going to

7    discharge his claim and you can go pursue it somewhere else.

8    I doubt the debtors would want that, though, and we're

9    wanting to assert his claims through the bankruptcy process.

10   But case law is clear, Your Honor.  Under the due process

11   clause if you're a known creditor you have to --

12           THE COURT:  But if you -- let's go back to the

13   fact that he wasn't a known creditor.  You're saying he was

14   a known creditor because this individual that he worked with

15   had some connection to LBHI.

16           MR. JOHNSON:  Well, it's not some connection.

17   He's a senior member of LBHI's management at the time of the

18   F1 transaction or the F1 transaction advice.  So it's more

19   than some connection.

20           THE COURT:  You've submitted a number of letters

21   that you -- that seem to suggest -- that you want me to view

22   as lending support to the claim.

23           MR. JOHNSON:  Support for the motion and if we --

24   if the proofs of claim are deemed timely filed they would

25   ultimately serve as support for his claims as well.  Yes,

1      Your Honor.  And that -- in fact, the first letter is a

2      letter from Vintorio Piniati in which he states that Dr.

3      Marsoner provided valuable services on the F1 transaction;

4      that he wouldn't have asked for his advice -- and he's the

5      coordinating person under his agreements, under Dr.

6      Marsoner's agreements with LBEL.

7              And he's stating -- it's a sworn letter to the

8      Court.  He's stating that he would not have asked for Dr.

9      Marsoner's advice unless he expected Lehman to pay him and

10     that that -- they -- the usual practice was for him to

11     receive ten percent of the ultimate revenues stemming from

12     his advice.

13             There are other -- there are two other letters

14     from people who served as --also had --

15             THE COURT:  The letter from Mr. Bernard is

16     incomprehensible.

17             MR. JOHNSON:  Okay.

18             THE COURT:  Okay.  It lends no support to

19     anything.

20             MR. JOHNSON:  Okay.  The other two letters clearly

21     support that Dr. Marsoner was a known creditor and that it

22     was their belief, and they were the people coordinating the

23     F1 transaction, that he should be paid for his advice.

24             THE COURT:  Okay.  Let me hear from counsel for

25     LBHI.

Page 93

1              So tell me why he wasn't a known creditor.

2              MR. HORWITZ:  Good morning, Your Honor.  Maurice

3        Horwitz --

4              THE COURT:  Good morning.

5              MR. HORWITZ:  -- from Weil, Gotshal on behalf of

6        LBHI.

7              I can -- I'll answer that question first.

8              THE COURT:  Okay.

9              MR. HORWITZ:  The -- we've talked a lot about the

10       case law and what makes somebody a known creditor versus an

11       unknown creditor.  So I just -- I'll reiterate the standard.

12             THE COURT:  Sure.

13             MR. HORWITZ:  A known creditor is someone who is

14       reasonably ascertainable by the debtor.  Their cases talk

15       about reasonably ascertainable by a search of -- a

16       reasonable search of the debtors' books and records.

17             An unknown creditor is someone who is -- a

18       creditor that is either conjectural or future and although

19       they could be discovered upon investigation, not in the due

20       course of business would come to the knowledge of the

21       debtor.

22             THE COURT:  Okay.

23             MR. HORWITZ:  The debtors essentially did a

24       reasonable search of their books and records at the time

25       that they were serving the bar date notice, which at that

Page 94

1    time they were already separate estates from LBEL.  They

2    didn't have access to the contracts that Dr. Marsoner may

3    have entered into with LBEL.  They couldn't have even gotten

4    them if they tried.

5              THE COURT:  The contract -- so the contract is --

6    there's no doubt that the contract is between Dr. Marsoner

7    and LBEL, right?

8              MR. HORWITZ:  The ones that are attached to the

9    motion.

10             THE COURT:  Right.

11             MR. HORWITZ:  Yes.

12             THE COURT:  Okay.

13             MR. HORWITZ:  So Dr. Marsoner relies a lot on his

14   contacts and extensive business communications with three

15   individuals who were associated with LBEL.  We did a search

16   in the human resources records and couldn't find any record

17   of Vintorio Piniati or the other two individuals having had

18   a role at LBHI.  The motion says that Vintorio Piniati was

19   the vice-chairman of LBEL.  In the reply he's now a vice

20   chairman of LBHI.

21             HR records show that he was -- that he held the

22   title of vice chairman of LBI, never a role at LBHI, none of

23   the three individuals did.  In any event, they all had left

24   by the time that the debtors were serving the bar date

25   notice.  Vintorio Piniati says in his letter he left by

1    2006.  So their knowledge of whatever conversations or

2    emails they had had with Dr. Marsoner were not at least  --

3    the debtors didn't have the benefit of that knowledge when

4    they were putting together their list of more than 250,000

5    addresses that were serving the bar date notice on.

6           The -- but that's a factual matter that I kind of

7    want to put aside because even if they had been in the --

8    employees of LBHI at the time, it doesn't -- the record

9    doesn't show that those business interactions would have

10   made him a known creditor.

11          And I think a good case to look to for support of

12   that is X -- In re: XO Communications.   That -- there are a

13   lot of cases that we cite and that Dr. Marsoner cites where

14   creditors are trying to get the status of known creditor

15   because they have some kind of a litigation claim.  And if

16   the litigation is already pending, the Court might say that

17   that was a known creditor, but when it was a contingent

18   litigation, something that's -- an action that somebody

19   might bring in the future, that doesn't rise to the level of

20   being a known creditor.

21          And XO is a good example because there the movant

22   was a vendor of the debtor who, itself, was in Chapter 11

23   and wanted to file a claim based on a preference.  And the

24   record established that there was a long-standing business

25   relationship between the debtor and this vendor.  The debtor

Page 96

1    admitted that.  The debtor actually even listed this vendor

2    in its list of creditors, served the bar date notice on an

3    old address, a lease that had already been rejected by the

4    debtor.

5         But the Court said it didn't matter that there

6    were these extensive business communications in the past

7    because the type of claim that the vendor was trying to

8    assert was a preference claim.  It was a litigation claim.

9    It was a creature of the Bankruptcy Code.  It's not the kind

10   of claim that a company tracks in its books and records.

11        And that's the kind of claim that Dr. Marsoner is

12   trying to assert here.  He's trying to assert a claim based

13   on quantum meruit or a contract claim, but not based on a

14   contract between these debtors and himself.  It's not the

15   type of claim that any of these debtors tracked in their

16   books and records.  And so it wouldn't have been -- it would

17   never have appeared no matter how long they searched through

18   their records.  They would have never seen his name come up

19   as a known creditor.

20        And even if these three individuals still worked

21   at LBHI they wouldn't have known that he was thinking he was

22   going to assert a quantum meruit claim against LBHI much

23   less LPCI.

24        For that reason he's not a known creditor.  The

25   notice that he got through publication and just through

Page 97

1    generally knowing that these cases existed, which he admits

2    he knows because he sent an email to somebody saying he was

3    no longer going to perform under his contract with LBCC

4    because of the bankruptcy.  He knew about the Chapter 11

5    cases.  He knew -- he had the ability to look on the docket,

6    to check the schedules, to see if we had his right --

7    correct address even to follow what else -- what happened

8    with that F1 investment that he worked so hard for, which

9    he's now seeking ten percent of $1.5 billion or whatever

10   it's for.

11           He didn't do any of those things.  And he was

12   trying to --

13           THE COURT:  So how this is beginning to sound

14   very, what I would say, facty (sic).  It -- is this -- does

15   this involve disputed facts as to which an order to rule in

16   LBHI's favour, if I were inclined to do so, I would need a

17   factual record.  In other words, to support your statement

18   of the law that his status as a known creditor was not

19   reasonably ascertainable?

20           MR. HORWITZ:  I don't think it's -- I think the

21   facts that you would need -- to find that he was a known

22   creditor, the facts are not there.  So I don't think -- I'm

23   not going to be able to provide them and I don't think Dr.

24   Marsoner is going to be able to provide them.  So it's facty

25   (sic) in the sense that those facts have not been alleged.

1    They're not in the record that he had any kind of a factual

2    relationship with these debtors that rise to the level of

3    making him a known creditor.

4           And because of that notice was adequate.  So those

5    -- whatever factual showing would have to be made, it's --

6    Dr. Marsoner has had his chance to make it and he hasn't

7    been able to show it.

8           THE COURT:  Okay.  Thank you.

9           So do I have to go to an evidentiary hearing?

10          MR. JOHNSON:  Your Honor, I think there are

11   serious factual disputes.  I mean, they're disputing that

12   Vintorio Piniati, you know, served in a senior role to LBHI.

13          THE COURT:  Okay.  But there's more to it than

14   that.  He's also saying that by -- Mr. Piniati himself said

15   that he left as of 2006.  So --

16          MR. JOHNSON:  The transaction occurred -- the

17   transaction advice occurred before then, Your Honor.

18          THE COURT:  Right.  But your due process argument

19   hinges on the motion of a known creditor --

20          MR. JOHNSON:  Sure.

21          THE COURT:  -- and then you have to look around to

22   see who or what was reasonably ascertainable.  Somewhat

23   similar maybe to the issues that Judge Gerber's been

24   struggling with this week, but different.

25          But I -- I'm -- if you were to clear the hurdle of

1   this hearing, and then we were to go to some sort of an

2   evidentiary proceeding, certainly the papers that you've

3   submitted now would not enable me to rule as a matter of law

4   and fact that Dr. Marsoner was a known creditor.  That

5   wouldn't do it.

6           MR. JOHNSON:  Well, Your Honor, we've presented a

7   sworn letter from Vintorio Piniati saying his role in LBHI

8   --

9           THE COURT:  But he left -- he says he was done as

10   of 2006 so that's obviously before even the commencement of

11   the bankruptcy proceeding.  So at the moment in time where

12   the debtor was obligated to do the reasonable ascertaining

13   of who its known creditors were, he wasn't around.  So you

14   can't impute his familiarity with Dr. Marsoner to LBHI as of

15   that point.

16           MR. JOHNSON:  Well, they knew as of 2006 when he

17   left.  They don't suddenly forget everything that's ever

18   happened to them.  They don't forget that Dr. Marsoner has

19   these agreements.  There was a subsequent agreement in 2007

20   that was his Austrian address that they didn't provide

21   notice to.

22           THE COURT:  But you're talking -- now you're

23   talking about they and that conflates LBEL and LBHI.

24           MR. JOHNSON:  No.  I mean, LBHI.  If I said they I

25   meant LBHI.  Sorry, Your Honor.  LBHI can't forget what

Page 100

1    they've -- what they knew through Vintorio Piniati.

2              THE COURT:  But they -- as a matter of law you

3    cannot impute the knowledge of every -- even every senior

4    employee of LBHI who may have left LBHI's employ, and then

5    at the time of the crafting of the known creditor list it's

6    not reasonable to say that LBHI at that point or counsel to

7    LBHI should have queried every single person, senior

8    executive, who may have left LBHI's employ in the five years

9    prior to that because under your construction the only thing

10   that applies is the statute of limitations.

11             So you would have had -- so what you're saying is

12   that for a bar date notice that issued in 2009, because

13   there might be creditors who could assert claims for six

14   years, you would have to go back five-plus years and figure

15   out every single person who ever had contact.  That can't be

16   -- it can't be right.

17             MR. JOHNSON:  No.  We're not asking -- we're not

18   stating that they should have done that.  They should have

19   -- they also should have done a reasonable check of their

20   books and records which would have shown that they had paid

21   Dr. Marsoner on numerous -- LBHI -- excuse me.  LBHI had

22   paid Dr. Marsoner on numerous occasions.  They paid him

23   contingent and fixed fees for services that he had

24   previously provided.

25             LBHI knew about --

Page 101

1            THE COURT:  On the Formula 1 deal?

2            MR. JOHNSON:  No, Your Honor.  They didn't pay him

3   on the Formula 1 deal.

4            THE COURT:  Okay.  But that doesn't -- the fact

5   that he was paid other amounts by LBHI, there's no nexus

6   between that and the Formula 1 deal.

7            MR. JOHNSON:  Well, the fact that LCPI ultimately

8   benefited, the U.S. subsidiary.

9            THE COURT:  But, again, the point that counsel

10  made, you're not handing me a contract, the counterparties

11  to which are, on the one hand, LBHI and Dr. Marsoner.

12  You're making a quantum meruit claim.  You're making a

13  quantum meruit claim on behalf of an individual who was not

14  on LBHI's radar screen via the individuals that you

15  identify.

16            MR. JOHNSON:  To say that it wasn't on LBHI's

17  radar screen is completely inaccurate, Your Honor.  I mean,

18  they -- the agreement stated that he would provide services

19  to the entire Lehman group and then the contact person is a

20  senior member of LBHI.  So to say we don't have any clue

21  about these agreements, we never saw them, we don't know --

22            THE COURT:  All right.  Well, only because I feel

23  a level of discomfort about the need for there to be a

24  factual record I'll -- I'm going to give you a trial date.

25  We're just going to go to trial.

Page 102

1              MR. JOHNSON:  Okay.

2              THE COURT:  If you think you need discovery, serve

3      a discovery request.  But I do not believe based on what

4      you've put before me at this point that I can come to the

5      conclusion that Dr. Marsoner was a known creditor.  That

6      being said, though, this feels sufficiently facty (sic) that

7      I'm willing to entertain having an evidentiary hearing on

8      it, or if the parties agree we can do it based on further

9      papers.

10             MR. JOHNSON:  Your Honor, if I could say one thing

11     about the -- one thing about the XO communications case.

12             THE COURT:  Sure.

13             MR. JOHNSON:  That case, I'm not sure why the

14     debtors focused so much on the known creditor analysis.  The

15     creditor there admitted that they weren't a known creditor.

16     So I'm not sure why the debtors focus so much on that.

17             THE COURT:  I'll take another look at it.

18             MR. JOHNSON:  Sure.

19             THE COURT:  But, again, I think the reasonably

20     ascertainable test is the right one.

21             MR. JOHNSON:  It is.

22             THE COURT:  And I think that based on what I have

23     before me I would not be able to conclude that Dr. Marsoner

24     was reasonably ascertainable and, therefore, is a known

25     creditor of LBHI and it's underscored by the nature of the

Page 103

1    claim that's being asserted.  There is no agreement that

2    says, LBHI and also you're going to have to deal more

3    comprehensibly with the separation between LBEL and LBHI.

4             So let me hear from counsel for LBHI who

5    undoubtedly is not going to be super excited with the

6    Court's determination.

7             MR. HORWITZ:  I just want to clarify -- Maurice

8    Horwitz on behalf of LBHI -- if we're talking about a trial

9    or evidentiary hearing, is this going to be limited to the

10   due process question or -- and not at all on the merits of

11   the underlying claim?

12            THE COURT:  Correct.

13            MR. HORWITZ:  Yes.

14            THE COURT:  Yes.  Correct.

15            MR. HORWITZ:  Okay.

16            THE COURT:  Just -- we're just at the threshold of

17   the door and that is whether or not I can deem this to be a

18   timely filed proof of claim and that turns on, I think, both

19   sides agree as to whether or not Dr. Marsoner was a known

20   creditor.

21            MR. HORWITZ:  Okay.  Thank you, Your Honor.

22            THE COURT:  All right.  So can I leave it to you

23   to work with each other to come up with a reasonable

24   schedule?

25            MR. HORWITZ:  Yes.

Page 104

1              THE COURT:  And reach out to Ms. Lutkis (ph) and

2      let us know and we'll get you on the calendar for whatever

3      you think ought to come next.  All right.

4              MR. JOHNSON:  Thank you, Your Honor.

5              THE COURT:  Okay.  Thank you.

6          (Whereupon these proceedings were concluded at 12:05

7      PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 105

1                              I N D E X

2

3                              RULINGS

4                                                           PAGE

5    Doc. #11147 Motion to Authorize/Trustee's Motion

6    for an Order to (I) Establish a Second Interim

7    Distribution Fund for Unsecured General Creditor

8    Claims, (II) Release Reserves from the Secured

9    and Priority Reserve and the First Interim

10   Distribution Fund, and (III) Make a Second Interim

11   Distribution to Holders of Allowed Unsecured

12   General Creditor Claims with a Record Date of

13   February 6, 2015                                        11

14

15   Doc. #11046 Motion to Authorize/Trustee's Motion

16   for an Order Authorizing the Abandonment of

17   Certain Lehman Brothers Inc. Data                       12

18

19   Doc. #6758 One Hundred Second Omnibus Objection

20   to General Creditor Claims (Satisfied Claims)           25

21

22   Doc. #9605 Two Hundred Sixtieth Omnibus Objection

23   to General Creditor Claims (No Liability Claims)        --

24

25

1                          **I N D E X**

2

3                          RULINGS

4                                                              PAGE

5    Doc. #47931 Motion to Approve Compromise: Motion

6    Pursuant to Rule 9019 of the Federal Rules of

7    Bankruptcy Procedure and Section 105(a) of the

8    Bankruptcy Code for Approval of Settlement

9    Agreement Relating to Exum Ridge CBO 2007-2

10   Credit Default Swap Agreement and Indenture          68

11

12   Doc. #47078 Four Hundred Eighty-Sixth Omnibus

13   Objection to Claims (Satisfied Claims)               80

14

15   Doc. #47589 Motion to Allow/Deem Proofs of Claim

16   to Be Timely Filed by the Claims Bar Date            --

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6
         Sherri          Digitally signed by Sherri Breach
7                         DN: cn=Sherri Breach, o=Veritext,
                          ou, email=digital@veritext.com,
         Breach          c=US
8                         Date: 2015.02.20 16:10:58 -05'00'
     _____

9    SHERRI L. BREACH

10   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

11

12   Date: February 20, 2015

13

14

15

16

17

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501