**Execution Version**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is made and entered into as of January 22, 2014 by and among Lehman Brothers Holdings Inc. ("<u>LBHI</u>"), as Plan Administrator for LBHI under the Modified Third Amended Joint Chapter 11 Plan (the "<u>Plan</u>") of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "<u>Plan Administrator</u>"),[1] Aurora Commercial Corporation (f/k/a Aurora Bank, FSB) ("<u>Aurora</u>"), Aurora Loan Services LLC ("<u>ALS</u>," together with LBHI and Aurora, the "<u>Lehman Parties</u>"), and the Federal National Mortgage Association ("<u>Fannie Mae</u>"). The Plan Administrator, Aurora, ALS and Fannie Mae shall each be referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

## RECITALS

WHEREAS:

A. On September 6, 2008, the Federal Housing Finance Agency was appointed conservator for Fannie Mae (hereinafter, the "<u>Conservator</u>"), and granted all rights, titles, powers and privileges as conservator thereof, pursuant to 12 U.S.C. §4617, as amended by P.L. 110-289, which was enacted as part of the Housing and Economic Recovery Act of 2008;

B. On September 15, 2008 and on various dates thereafter, LBHI and certain of its affiliates (collectively, the "<u>Debtors</u>") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), which cases are being jointly administered under Case Number 08-13555 (JMP);

C. On September 22, 2009, Fannie Mae timely filed a proof of claim (the "<u>Fannie Mae Claim</u>") against LBHI in the approximate amount of not less than $19,058,000,000, which was assigned claim number 29557 by the Bankruptcy Court-approved claims and noticing agent, Epiq Bankruptcy Solutions, LLC ("<u>Epiq</u>");

D. As set forth with greater specificity in the Fannie Mae Claim, the Fannie Mae Claim is comprised of claims against LBHI allegedly arising out of, among other things, the following: (a) a Mortgage Selling and Servicing Contract (i.e., the MSSC set forth and defined in the Fannie Mae Claim) which incorporates provisions of the Fannie Mae Selling and Servicing Guides and related agreements, including but not limited to, the Contract (as defined in the Fannie Mae Claim); (b) certain Sale and Servicing Agreements (i.e., the SSAs set forth and defined in the Fannie Mae Claim); (c) LBHI's alleged guarantee pursuant to that certain Guaranty, dated May 13, 2003 of Lehman Brothers Special Financing Inc.'s obligations under an ISDA Master Agreement, dated May 8, 2003 (the "<u>Guaranty Claim</u>"); (d) LBHI's alleged violations of the Federal Securities Laws relating to certain private label securities (the "<u>PLS Claim</u>"); (e) LBHI's alleged violations of the Federal Securities Laws relating to certain LBHI Notes (i.e., the Notes as set forth and defined in the Fannie Mae Claim); (f) that certain Sale Agreement, dated October 5, 2007 between Fannie Mae, as Purchaser, and LBHI, as seller; and

---

[1] Capitalized terms not defined in this Agreement shall have the meanings ascribed to such terms in the Plan.

(g) LBHI's alleged indemnity/reimbursement obligations in connection with the MSSC and/or SSAs (as more fully set forth in the MSSC);

E. On September 1, 2011, LBHI, Fannie Mae and certain other parties entered into a tolling agreement (as amended on March 20, 2012, January 7, 2013, May 20, 2013, and December 20, 2013, the "Tolling Agreement");

F. On December 6, 2011, the Bankruptcy Court entered an order confirming the Plan (ECF No. 23023). The Plan became effective on March 6, 2012;

G. On January 6, 2012, the Bankruptcy Court so ordered a stipulation between Fannie Mae and LBHI pursuant to which, among other things, LBHI agreed that the Reserve Amount for the Fannie Mae Claim (excluding the Guaranty Claim) would be $5,000,000,000 in LBHI Class 7 (ECF No. 24097);

H. On January 26, 2012, the Bankruptcy Court entered an order allowing only the Guaranty Claim portion of the Fannie Mae Claim in the reduced amount of $110,000,000 (ECF No. 24670);

I. On June 11, 2012, ALS, Fannie Mae and Aurora (or its predecessor in interest) entered into that certain Amended and Restated Repurchase, Pledge and Security Agreement (the "RPSA") pursuant to which ALS and Aurora pledged certain collateral to Fannie Mae to secure certain obligations of Aurora and/or ALS (the "Collateral");

J. Aurora's predecessor Aurora Bank, FSB underwent a number of organizational and structural changes in 2013, including a charter conversion from a Federal thrift institution to a national banking institution known as Aurora Interim National Bank, a merger of Aurora Interim National Bank into Aurora, and a termination of the bank charter of Aurora Interim National Bank;

K. Aurora and ALS are wholly-owned, indirect subsidiaries of LBHI;

L. Aurora is the successor to all rights, liabilities, duties, and obligations of Aurora Bank, FSB as a result of the organizational changes referenced above, including, without limitation, all rights with respect to the Collateral;

M. On September 27, 2013, the Plan Administrator filed an objection seeking to subordinate the PLS Claim portion of the Fannie Mae Claim (the "Objection") (ECF No. 40244);

N. On October 28, 2013, Fannie Mae filed a response to the Objection asserting that the Objection should be denied (the "Response") (ECF No. 40770);

O. On November 20, 2013, the Plan Administrator filed a reply to the Response (the "Reply," collectively with the Objection and the Response, the "Claim Objection Pleadings");

P. The hearing on the Claim Objection Pleadings has been adjourned until January 28, 2014;

2

Q.   Fannie Mae has advised LBHI that the Conservator has approved Fannie Mae's entry into the settlement of the Fannie Mae Claim pursuant to the terms and conditions set forth in this Agreement;

R.   The Parties have engaged in extensive arm's length negotiations concerning the Claim Objection Pleadings, the other claims that comprise the Fannie Mae Claim, the RPSA, and the Transaction Agreements (as defined in the RPSA); and

S.   The Parties wish to resolve all outstanding issues regarding the matters described above and to avoid extensive and expensive litigation in connection therewith.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to and on the terms and conditions set forth herein, the parties hereto, intending to be legally bound, agree as follows:

1.   *Effectiveness of Agreement.*

1.1   This Agreement, except for Sections 2, 3, 4, 5 and 8, shall be effective upon the first date upon which this Agreement is signed by all of the Parties (the "Execution Date").

1.2   This Agreement, including Sections 2, 3, 4, 5 and 8, shall be fully effective upon the first date (the "Effective Date") following (i) the approval of LBHI's entry into and performance under this Agreement by a Final Order[2] in form and substance acceptable to the Plan Administrator and Fannie Mae ("Bankruptcy Court Approval"); and (ii) the execution and delivery of an amendment to the Tolling Agreement, in form and substance acceptable to the Plan Administrator and Fannie Mae (the "Tolling Amendment"), providing that as of the Effective Date the Tolling Agreement (a) shall be deemed terminated only in respect of the extension of the Limitations Periods (as defined in the Tolling Agreement) related to the Fannie Mae Claim, including the Fannie Mae Priority Claim, in each case as defined in the Tolling Agreement; and (b) shall otherwise remain in full force and effect in accordance with the terms and conditions thereof

---

[2] A "Final Order" shall mean an order of the Bankruptcy Court (a) that has not been reversed, rescinded, stayed, modified, or amended; (b) that is in full force and effect; and (c) with respect to which: (1) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely-filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; or (2) any such appeal or petition has been withdrawn, dismissed or resolved by the highest court to which the order or judgment was timely appealed or from which review, rehearing, remand, or a writ of certiorari was timely sought; *provided that* the possibility of a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") or other applicable law being filed with respect to such order will not cause such order not to be a Final Order.

3

1.3    As soon as practicable after the Execution Date (but in all events not later than 3 Business Days after the Execution Date), the Plan Administrator shall (i) file with the Bankruptcy Court a motion (the "Approval Motion") pursuant to Bankruptcy Rule 9019 and the Bankruptcy Court's Order Modifying Certain Existing Claims Orders (ECF No. 29505), entered on July 18, 2012, seeking Bankruptcy Court Approval of this Agreement, and (ii) notice the objection deadline and the hearing on the Approval Motion for the earliest dates then available under the Second Amended Case Management Order (ECF No. 9635).

1.4    The Parties shall make commercially reasonable efforts to secure approval of the Approval Motion by a Final Order, and the execution and delivery of the Tolling Amendment, and shall cooperate with each other in such efforts.

1.5    In the event that Bankruptcy Court Approval of this Agreement is denied by a Final Order, or if the Bankruptcy Court Approval or the Tolling Amendment has not been obtained by March 14, 2014, this Agreement shall be void *ab initio* and the Parties shall be restored to their respective positions as of the date prior to the Execution Date, with the same effect as that provided for in the event of a Termination pursuant to Section 9.4 of this Agreement.

2.    ***Settlement of Disputes Concerning the Fannie Mae Claim.***

2.1    Upon the Effective Date, the Fannie Mae Claim (excluding the Guaranty Claim) shall be reduced and Allowed in the amount of $2,150,000,000 (the "Settlement Amount") in LBHI Class 7 (the "Allowed Fannie Mae Claim"), and any asserted amounts in respect of the Fannie Mae Claim (excluding the Guaranty Claim) in excess of the Settlement Amount shall be expunged.

2.2    Upon the Effective Date, the Claim Objection Pleadings shall be deemed withdrawn.

2.3    Within five (5) Business Days after the Effective Date, the Plan Administrator shall direct Epiq to modify the claims registry to reflect the terms provided for in this Agreement.

2.4    Fannie Mae shall be entitled to receive Distributions on the Allowed Fannie Mae Claim effective as of the first Distribution Date following the Effective Date. In connection therewith, Fannie Mae shall be entitled to catch-up Distributions on account of the Allowed Fannie Mae Claim as provided in section 8.4 of the Plan.

3.    ***Turnover of Documents Supporting Repurchase Claims, Allocation of Settlement Amount***

3.1    On the Execution Date, Fannie Mae shall provide Columns A, B and G for each of the loans set forth on Exhibit A (the "Rep and Warranty Default Loans"), which Rep and Warranty Default loans are fully liquidated loans with respect to which Fannie Mae has valid make whole claims for indemnity/reimbursement against LBHI directly arising out of a violation of a representation or warranty contained in the MSSC and/or the Transaction Agreements. The Plan Administrator shall make only Columns A, B and G publicly available. The remaining

4

information for the Rep and Warranty Default Loans set forth in Exhibit A shall be provided no later than thirty (30) days following the Effective Date but shall not be made publicly available by the Plan Administrator, *provided* that the Lehman Parties may subsequently disclose a limited version of Exhibit A in furtherance of seeking reimbursement by parties owing indemnities to the Lehman Parties so long as the Lehman Parties make a reasonable effort to secure a protective order or confidentiality agreement prior to disclosing such information. The limited version of Exhibit A may show data in all columns, but shall be redacted to identify to any receiving indemnifying entity only data for loans for which the receiving indemnifying entity has potential liability.

        3.2     Subject to all applicable laws:

a. From and after the Effective Date, at any time and from time to time until January 1, 2017, Fannie Mae shall provide the Plan Administrator with access to the following information in Fannie Mae's QAS system (or any successor system of record) related to each Rep and Warranty Default Loan:

    i.    Fannie Mae's findings as set forth in repurchase or findings letters;

    ii.   Any mortgage insurance rescission letters; and

    iii.  The documents supporting Fannie Mae's findings.

provided, however, that if any of the above information is unavailable in the QAS System for any reason, in response to a written request from the Plan Administrator, Fannie Mae shall use commercially reasonable efforts to provide such missing information otherwise in its possession to the Plan Administrator within thirty (30) calendar days of such request.

b. Within thirty (30) calendar days of the Effective Date, Fannie Mae shall provide the Plan Administrator with a "Loss Reimbursement Statement" for each of the Rep and Warranty Default Loan. The term "Loss Reimbursement Statement" shall mean the loan-level report of loss realized from a liquidated loan as of approximately January 7, 2014, in the form generally prepared for Fannie Mae servicers, containing line items for all expenses incurred and revenues received, including, but not limited to, the following information: (i) unpaid principal balance at liquidation; (ii) accrued interest; (iii) corporate advances; (iv) escrow advances; (v) mortgage insurance proceeds; and (vi) liquidation proceeds.

c. Fannie Mae shall provide to the Plan Administrator such written authorization as is reasonably required for the Plan Administrator to obtain the Loan File (as such term is defined in Exhibit B hereto) from any third party servicer; provided, however, that Fannie Mae shall not be obligated to provide the Plan Administrator with any authorization related to a Rep and Warranty Default Loan with respect to which Aurora or ALS was the primary servicer or subservicer on the date such Rep and Warranty Default Loan was liquidated. If after commercially reasonable efforts the Plan Administrator is unable to retrieve a Loan File from a third party servicer (other than Aurora or ALS), in response to a written request from the Plan Administrator, Fannie Mae shall make commercially reasonable efforts to provide to the Plan Administrator such Loan File, or portion thereof

5

that is otherwise in QAS or any successor system of record.

d. Fannie Mae shall make commercially reasonable efforts to provide to the Plan Administrator, within thirty (30) days of its receipt of a written request (with the understanding that the timing of any response is subject to the volume of requests received from the Plan Administrator), any broker price opinion, any appraisal and any Department of Housing and Urban Development Settlement Statement, commonly known as a "HUD-1," that is available to Fannie Mae with respect to the underlying support for the sale price realized by Fannie Mae in connection with the liquidation of a Rep and Warranty Default Loan; provided, however, that the Plan Administrator agrees that such requests will be made only when reasonably necessary to support the claims of the Lehman Parties or their respective affiliates against third parties related to the Rep and Warranty Default Loans.

e. Within thirty (30) calendar days of the Effective Date, Fannie Mae shall make commercially reasonable efforts to provide the Plan Administrator with all of the available information set forth on Exhibits D and E hereto for each Rep and Warranty Default Loan (which Exhibits D and E are forms for the information to be provided and which Exhibits D and E shall be redacted from any publicly available version of this Agreement, *provided* that the Lehman Parties may subsequently disclose a limited version of Exhibits D and E in furtherance of seeking reimbursement by parties owing indemnities to the Lehman Parties so long as the Lehman Parties make a reasonable effort to secure a protective order or confidentiality agreement prior to disclosing such information. The limited version of Exhibits D and E may show data in all columns, but shall be redacted to identify to any receiving indemnifying entity only data for loans for which the receiving indemnifying entity has potential liability.

        3.3      From and after the Effective Date, at any time and from time to time until January 1, 2017, Fannie Mae shall use commercially reasonable efforts to assist the Plan Administrator in the Plan Administrator's efforts to acquire the Servicing File (as such term is defined in Exhibit C hereto) for each Rep and Warranty Default Loan (with it being understood that Fannie Mae does not have any Servicing File under its direct control). In connection therewith, Fannie Mae agrees to provide to the Plan Administrator such authorization as is reasonably required for the Plan Administrator to obtain such Servicing Files from any third party servicer or subservicer, subject to applicable laws and the rights of such servicer or subservicer; provided, however, that Fannie Mae shall not be obligated to (i) require such servicer or subservicer to produce all information requested or pay any associated expenses sought by such servicer or subservicer; or (ii) assist the Plan Administrator with any Servicing File related to a Rep and Warranty Default Loan with respect to which Aurora or ALS was the primary servicer or subservicer on the date such Rep and Warranty Default Loan was liquidated.

        3.4      From and after the Effective Date, at any time and from time to time until January 1, 2017, Fannie Mae shall, within thirty (30) days of its receipt of a written request, use commercially reasonable efforts to (i) provide to the Plan Administrator such additional information in its possession as may reasonably be requested by the Plan Administrator subject to applicable laws; and (ii) otherwise reasonably cooperate with the Plan Administrator, in each case as reasonably necessary to pursue the claims of the Lehman Parties or their respective

6

affiliates against third parties related to the Rep and Warranty Default Loans; provided, however, that the Plan Administrator shall reimburse Fannie Mae's actual, reasonable and documented out of pocket expenses, including necessary and reasonable attorney fees incurred in connection with the Plan Administrator's requests. Fannie Mae will reasonably consider use of counsel recommended by the Lehman Parties. Nothing herein constitutes a representation, warranty, or guarantee by Fannie Mae that all information, data, or records sought by the Plan Administrator will be located and/or turned over to the Plan Administrator.

3.5     The amounts set forth in column G of Exhibit A represent Fannie Mae's current losses incurred with respect to each Rep and Warranty Default Loan, but the amounts are subject to minor variation over time to record adjustments to expenses or receipts. Notwithstanding the preceding sentence, Fannie Mae shall retain sole and absolute discretion to determine how and when to apply the Settlement Amount toward the various components of the Fannie Mae Claim.

3.6     The Parties agree that all columns of Exhibit A except for columns A, B and G shall be redacted in any version of this Agreement that is filed on the Bankruptcy Court's public docket in connection with the Approval Motion or is otherwise made publicly available *provided* that the Lehman Parties may subsequently disclose a limited version of Exhibit A in furtherance of seeking reimbursement by parties owing indemnities to the Lehman Parties so long as the Lehman Parties make a reasonable effort to secure a protective order or confidentiality agreement prior to disclosing such information. The limited version of Exhibit A may show data in all columns, but shall be redacted to identify to any receiving indemnifying entity only data for loans for which the receiving indemnifying entity has potential liability.

4.      *Release of Collateral, Termination of Agreements*

4.1     Upon the Effective Date, any Collateral (as defined in the RPSA) remaining in the Custody Account (as defined in the RPSA) shall be released to Fannie Mae in full and final satisfaction of any obligation, whether accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, of Aurora or ALS under the RPSA or the Transaction Agreements.

4.2     Aurora and/or ALS shall promptly provide JPMorgan Chase Bank, in its capacity as custodian of the Collateral (the "Custodian") with any notice, authorization, consent, or other approval reasonably required by the Custodian to release the Collateral to Fannie Mae.

4.3     Upon the Effective Date, the RPSA and the Transaction Agreements, and any other related agreements or understandings between or among any of the Lehman Parties on the one hand, and Fannie Mae on the other, in respect thereof, shall be deemed to be terminated without breach by any Party and without termination fee, charge or penalty.

5.      *Assignment of Rights/No Waiver of Defenses.* Fannie Mae hereby sells, assigns, and otherwise transfers to LBHI any claims related to the Rep and Warranty Default Loans listed on Exhibit B that Fannie Mae holds against any originating lenders, secondary mortgage market sellers, borrowers, appraisers, brokers, title companies, escrow agents, insurers, and/or other third parties in connection with the Rep and Warranty Default Loans; provided, however, that

7

nothing herein shall be deemed to be a waiver of any defense of any Party hereto regarding claims made against it by third parties and all such defenses are expressly reserved by each Party.

6. ***Representations, Warranties and Agreements of Fannie Mae.*** As consideration for the Lehman Parties entering into and performing their respective obligations under this Agreement, Fannie Mae hereby represents, warrants, acknowledges and agrees, as of the Execution Date and the Effective Date, and subject to the occurrence of the Effective Date to the extent applicable, as follows:

6.1 *Authority.* (i) Fannie Mae has the power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated herein; (ii) the execution, delivery and performance by Fannie Mae of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of Fannie Mae and no other proceedings on the part of Fannie Mae are necessary to authorize and approve this Agreement or any of the transactions contemplated herein; and (iii) Fannie Mae has been duly authorized by all necessary action to approve Fannie Mae's entry into and performance of this Agreement.

6.2 *Validity.* This Agreement has been duly executed and delivered by Fannie Mae and upon the Effective Date, constitutes the legal, valid and binding agreement of Fannie Mae, enforceable against Fannie Mae in accordance with its terms.

6.3 *Authorization of Governmental Authorities.* No further action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance of its obligations under this Agreement by Fannie Mae.

6.4 *Title; No Prior Transfer of Claim.*

(a) *Title.* Fannie Mae, in conservatorship, is the legal owner and record holder of the Fannie Mae Claim and as such Fannie Mae is entitled to receive any proceeds of the Fannie Mae Claim.

(b) *Transfer.* Fannie Mae has not conveyed, transferred, assigned, encumbered, or participated, in whole or in part, the Fannie Mae Claim, or any right or interest arising thereunder or related thereto.

6.5 *No Reliance.* Fannie Mae (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Plan Administrator, LBHI, Aurora, ALS, or any of the Lehman Parties' respective affiliates or any officer, employee, agent or representative thereof, and based on such information as Fannie Mae has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Fannie Mae has relied upon the Lehman Parties' express representations, warranties and covenants in this Agreement. Fannie Mae acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

US_ACTIVE:\44408744\5\58399.0011

7. ***Representations, Warranties and Agreements of the Lehman Parties.*** As consideration for Fannie Mae entering into and performing its respective obligations under this Agreement, each of the Lehman Parties, solely with respect to itself, hereby represents, warrants, acknowledges, and agrees, as of the Execution Date and the Effective Date, and subject to the occurrence of the Effective Date to the extent applicable, as follows:

7.1 *Authority.* Subject to Bankruptcy Court Approval, (i) each Lehman Party has the power and authority to execute, deliver and perform its obligations under this Agreement, and (ii) the execution, delivery and performance by each Lehman Party of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of each Lehman Party and no other proceedings on the part of a Lehman Party are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

7.2 *Validity.* This Agreement has been duly executed and delivered by each Lehman Party and, upon the Effective Date, shall constitute the legal, valid and binding agreement of each Lehman Party, enforceable against each Lehman Party in accordance with its terms.

7.3 *Authorization of Governmental Authorities.* No action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by each Lehman Party of its respective obligations hereunder, other than Bankruptcy Court Approval.

7.4 *No Reliance.* Each Lehman Party (i) is a sophisticated party with respect to the matters that are the subject of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon Fannie Mae or any officer, employee, agent or representative thereof, and based on such information as each Lehman Party has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon the express representations, warranties and covenants of Fannie Mae in this Agreement, which it enters into voluntarily and of its own choice and not under coercion or duress.

8. ***Releases.***

8.1 *Releases by LBHI.* Upon the occurrence of the Effective Date, and except as to the agreements, promises, settlements, representations and warranties set forth in this Agreement, and in consideration of the foregoing, from the beginning of time to the Execution Date:

(a) LBHI, as Plan Administrator for LBHI, on behalf of itself, and its direct and indirect affiliates and subsidiaries, other than Aurora and ALS, and its and their successors and assigns and any person or entity claiming under or through LBHI (collectively the "Lehman Releasing Parties"), fully and forever release, discharge and acquit Fannie Mae, the direct and indirect affiliates and subsidiaries of Fannie Mae, and their respective owners, directors, officers,

9

employees, financial advisors, accountants, attorneys, and other representatives, all in their capacities as such, and their respective successors and assigns (collectively, the "Fannie Mae Released Parties") and the Conservator, from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, claims, defenses and counterclaims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Lehman Releasing Parties ever had or claimed to have or now has or claims to have against the Fannie Mae Released Parties and the Conservator in connection with, related to or otherwise concerning the Fannie Mae Claim.

(b)  Subject to section 8.4 below, LBHI as Plan Administrator for LBHI, on behalf of itself and on behalf of the Debtors, fully and forever releases, discharges and acquits the Fannie Mae Released Parties and the Conservator from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, claims, defenses and counterclaims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Debtors ever had or claimed to have or now has or claims to have against the Fannie Mae Released Parties.

8.2  *Releases by Aurora and ALS.*  Upon the occurrence of the Effective Date, and except as to the agreements, promises, settlements, representations and warranties set forth in this Agreement, and in consideration of the foregoing, Aurora and ALS and each of their respective successors and assigns (collectively, the "Aurora Releasing Parties"), subject to section 8.4 below, fully and forever release, discharge and acquit the Fannie Mae Released Parties and the Conservator from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, claims, defenses and counterclaims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that each of the Aurora Releasing Parties ever had or claimed to have or now has or claims to have against the Fannie Mae Released Parties.

8.3  *Releases by Fannie Mae.*  Upon the occurrence of the Effective Date, and except as to (i) the Allowed Fannie Mae Claim, (ii) the Guaranty Claim, and (iii) the agreements, promises, settlements, representations and warranties set forth in this Agreement, and in consideration of the foregoing, from the beginning of time to the Execution Date:

(a)  Fannie Mae, on behalf of itself, and its direct and indirect affiliates and subsidiaries, and its successors and assigns, and any person or entity claiming under or through Fannie Mae, but in all events excluding the Conservator (collectively, the "Fannie Mae Releasing Parties"), fully and forever releases, discharges and acquits LBHI (for itself and as Plan Administrator for LBHI), LBHI's direct and indirect affiliates and subsidiaries, including, without limitation, Aurora and ALS, and its and their respective owners, directors, officers, employees, financial advisors, accountants, attorneys, and other representatives, all in their capacities as such, and their successors and assigns (collectively, the "Lehman Released

10

Parties"), from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Fannie Mae Releasing Parties ever had or claimed to have or now has or claims to have against the Lehman Released Parties in connection with, related to or otherwise concerning the Fannie Mae Claim. Except as provided in sections 8.3(b) and 8.3(c), nothing in this Agreement releases any Lehman Released Parties from claims and causes of action that are not part of the Fannie Mae Claim.

    (b) Subject to section 8.4 below, each of the Fannie Mae Releasing Parties (excluding, for the avoidance of doubt, the Conservator) fully and forever releases, discharges and acquits each of the Debtors (including LBHI in its individual capacity and as Plan Administrator for the Debtors) and each of their respective successors and assigns (collectively, the "Debtor Released Parties") from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Fannie Mae Releasing Parties ever had or claimed to have or now has or claims to have against any of the Debtor Released Parties.

    (c) Subject to section 8.4 below, each of the Fannie Mae Releasing Parties (excluding, for the avoidance of doubt, the Conservator) fully and forever releases, discharges and acquits Aurora and ALS and each of their respective predecessors, successors and assigns (collectively, the "Aurora Released Parties") from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Fannie Mae Releasing Parties ever had or claimed to have or now has or claims to have against the Aurora Released Parties.

    8.4 For the avoidance of doubt, nothing in this Agreement or otherwise shall release, waive, or discharge any claim, defense, or cause of action against the Lehman Released Parties other than as set forth in Section 8.3 above, and nothing herein or otherwise shall release, waive, or discharge or otherwise affect any other claim, defense or cause of action against the Lehman Released Parties, including, without limitation, any claim, defense or cause of action held by the Federal Home Loan Mortgage Corporation ("Freddie Mac") and/or the Conservator in its capacity as Conservator of Freddie Mac (including, without limitation, in respect of Claim Nos. 33568, 33569 and 33576 filed in connection with the LBHI bankruptcy proceedings); *provided, further*, that nothing contained herein or otherwise shall release, waive or discharge any claim, defense or cause of action against the Fannie Mae Released Parties or the Conservator other than as set forth in sections 8.1 or 8.2 above, and nothing contained herein shall release, waive, or discharge any other claim, defense or cause of action held by a Lehman Released Party against Freddie Mac and/or the Conservator in its capacity as Conservator of Freddie Mac.

8.5    *Waiver of Statutory Limitations on Releases.*  Each of the releasing parties in each of the releases contained herein expressly acknowledges that, although ordinarily a release may not extend to claims which the releasing party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each releasing party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party, including, without limitation, the provisions of California Civil Code section 1542.  The releases contained herein are effective regardless of whether matters released thereby are presently known or unknown, suspected or unsuspected, foreseen or unforeseen.

9.    **Termination.**

9.1    *Lehman Parties' Right to Terminate.*  Prior to the Effective Date, each of the Lehman Parties shall have the right, in its discretion, to terminate this Agreement by written notice to Fannie Mae if there is a breach, in any material respect, of the representations, warranties and/or covenants of Fannie Mae under this Agreement, taken as a whole, that has not been cured within three Business Days after notice thereof given to Fannie Mae.

9.2    *Fannie Mae's Right to Terminate.*  Prior to the Effective Date, Fannie Mae shall have the right, in its discretion, to terminate this Agreement by written notice to the Lehman Parties if there is a breach, in any material respect, of the representations, warranties and/or covenants of the Lehman Parties under this Agreement, taken as a whole, that has not been cured within three Business Days after notice thereof given to each of the Lehman Parties.

9.3    *Mutual Termination.*  This Agreement may be terminated at any time prior to the Effective Date with the written consent of all of the Parties.

9.4    *Effect of Termination.*  In the event that this Agreement is terminated in accordance with its terms, neither this Agreement (except for this Section 9) nor any motion or other papers filed in the Bankruptcy Court or on appeal with respect to the approval of this Agreement shall have any *res judicata* or collateral estoppel effect or be of any force or effect, each of the Parties' respective interests, rights, remedies and defenses shall be restored without prejudice as if this Agreement had never been executed, and the Parties shall be automatically relieved of any further obligations under this Agreement.  Upon such termination, this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver of or prejudice to the Parties' rights and remedies and the Parties hereby reserve all claims, defenses and positions that they may have with respect to each other.

10.    **Venue and Choice of Law.**

10.1    *Venue.*  The Parties agree that in the Approval Motion, LBHI shall request that the Bankruptcy Court retain jurisdiction over any actions or proceedings relating to the

12

enforcement or interpretation of this Agreement and that any proposed order approving this Agreement shall so provide. The Parties expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement and any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court. Each of the Parties consents to the Bankruptcy Court entering a final judgment determining such matter and agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law. If the Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement or interpretation of this Agreement and/or any actions or proceedings arising hereunder, then the Parties agree that venue shall be in any other federal court located within the County of New York in the State of New York having proper jurisdiction. Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to the enforcement or interpretation of this Agreement with the Bankruptcy Court or with any other federal court located within the County of New York in the State of New York, and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each Party irrevocably consents to service of process in the manner provided for notices in Section 11 hereof. Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by applicable law. The Parties otherwise expressly reserve their jurisdictional rights to any action, suit, or proceeding commenced outside the terms of this Agreement.

    10.2 *Choice of Law.* This Agreement and all claims and disputes arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of New York or the Bankruptcy Code, as applicable, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code, as applicable.

    11. *Notices.* All notices and other communications given or made pursuant to this Agreement shall be in writing and all communications shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by email if sent during normal business hours of the recipient, and if not so sent, then on the next Business Day, or (c) when delivery is confirmed by a nationally recognized overnight courier, with written verification of receipt. All communications shall be sent:

<u>To LBHI at:</u>

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attn: Matthew Cantor

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP

13

700 Louisiana, Suite 1600
Houston, Texas 77002-2755
Attn: Alfredo R. Perez, Esq.

To Aurora at:

Aurora Commercial Corporation
10350 Park Meadow Drive
Littleton, CO 80124
Attn: Stephanie Camara-Ray
Senior Vice President

To ALS at:

Aurora Loan Services LLC
c/o Aurora Commercial Corporation
10350 Park Meadow Drive
Littleton, CO 80124
Attn: Stephanie Camara-Ray
Senior Vice President

To Fannie Mae at:

Federal National Mortgage Association
3900 Wisconsin Avenue, N.W.
Washington, D.C. 20016
Attn: Jonathan L. Griffith, Esq.
Deputy General Counsel

With a copy (which shall not constitute notice) to:

Winston & Strawn LLP
200 Park Ave.
New York, New York 10166-4193
Attn: David Neier, Esq.

or to such other address as may have been furnished by a Party to each other Party by notice given in accordance with the requirements set forth above.

12.  *Expenses.*  The fees and expenses incurred by each Party (including the fees of any attorneys, accountants, investment bankers, financial advisors or any other professionals engaged by such Party) in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, will be paid by such Party, and not by any other Party.

13.  *Entire Agreement.*  This Agreement constitutes the entire agreement of the Parties concerning the subject matter hereof, and supersedes any and all prior or

14

contemporaneous agreements among the Parties concerning the subject matter hereof. The Parties acknowledge that this Agreement is not being executed in reliance on any oral or written agreement, promise or representation not contained herein.

14. *No Oral Modifications.* This Agreement, including this Section 14, may not be modified or amended orally. This Agreement only may be modified or amended by a writing signed by a duly authorized representative of each Party hereto. Any waiver of compliance with any term or provision of this Agreement on the part of a Party must be provided in a writing signed by each other Party. No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.

15. *Construction.* This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party based on the drafting of this Agreement, and any rule or maxim of construction to such effect shall not apply to this Agreement.

16. *Binding Effect; Successor and Assigns.* This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

17. **Counterparts**. This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the Parties need not appear on the same counterpart. Executed facsimile and/or .pdf copies of this Agreement shall be deemed and considered originals.

18. *Headings.* The headings utilized in this Agreement are designed for the sole purpose of facilitating ready reference to the subject matter of this Agreement. Said headings shall be disregarded when resolving any dispute concerning the meaning or interpretation of any language contained in this Agreement. References to sections, unless otherwise indicated, are references to sections of this Agreement. All Exhibits to this Agreement are hereby made a part hereof and incorporated herein by reference for all purposes.

19. *Severability and Construction.* If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect only if the essential terms and conditions of this Agreement applicable to each Party remain valid, binding and enforceable. If such essential terms and conditions are no longer valid, binding and enforceable as the result of any illegal, invalid or unenforceable provision, the Parties shall use all reasonable efforts to modify this Agreement (and to obtain the Bankruptcy Court's approval thereof, if necessary or advisable) so as to eliminate such provisions while preserving the intent of the Parties.

20. *Further Assurances.* From and after the Effective Date, each Party shall, at any time and from time to time, make, execute and deliver, or cause to be made, executed and delivered, such instruments, agreements, consents and assurances and take or cause to be taken all such actions as may reasonably be requested by the other Party for the effective consummation of this Agreement and the transactions contemplated hereby.

21. *Acknowledgments.* THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREIN ARE THE PRODUCT OF ARMS' LENGTH NEGOTIATIONS

15

AMONG THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES. NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

US_ACTIVE:\44408744\5\58399.0011

IN WITNESS WHEREOF, each Party by its duly authorized representative has executed this Agreement as of the date first written above:

Lehman Brothers Holdings Inc., as Plan Administrator for Lehman Brothers Holdings Inc.

By: _____
Name: MATTHEW CANTOR
Title: EVP LEGAL

Aurora Commercial Corporation

By: _____
Name: Stephanie Camaca Ray
Title: SVP

Federal National Mortgage Association

By: _____

Name: _____
Title: _____

Aurora Loan Services LLC

By: _____
Name: Leo C. Trautman, Jr.
Title: S.V.P.

17

US_ACTIVE:\44468744\5\58398.0011

IN WITNESS WHEREOF, each Party by its duly authorized representative has executed this Agreement as of the date first written above:

| Lehman Brothers Holdings Inc., as Plan Administrator for Lehman Brothers Holdings Inc. | Aurora Commercial Corporation |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |

| Federal National Mortgage Association | Aurora Loan Services LLC |
|---|---|
| By: *[signature]* | By: _____ |
| Name: *Bradley Lerman* | Name: _____ |
| Title: *Executive Vice President, General Counsel and Corporate Secretary* | Title: _____ |

17