# SETTLEMENT AND ASSIGNMENT AGREEMENT

This Settlement and Assignment Agreement (the "Agreement") is made and entered into as of February 12, 2014 by and among Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator for LBHI under the Modified Third Amended Joint Chapter 11 Plan (the "Plan") of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan Administrator"),[1] Aurora Commercial Corporation (f/k/a Aurora Bank, FSB) ("Aurora"), Aurora Loan Services LLC ("ALS," together with LBHI and Aurora, the "Lehman Parties"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The Plan Administrator, Aurora, ALS and Freddie Mac shall each be referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS:

A.    On September 6, 2008, the Federal Housing Finance Agency was appointed conservator for Freddie Mac (hereinafter, the "Conservator"), and granted all rights, titles, powers and privileges as conservator thereof, pursuant to 12 U.S.C. §4617, as amended by P.L. 110-289, which was enacted as part of the Housing and Economic Recovery Act of 2008 ("HERA");

B.    On September 15, 2008 and on various dates thereafter, LBHI and certain of its affiliates (collectively, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered under Case Number 08-13555 (SCC) (the "Chapter 11 Cases");

C.    Freddie Mac timely filed the below proofs of claim against certain of the Debtors in the Chapter 11 Cases:

| Claim Number | Debtor | Filed Amount of Claim | Basis for Claim |
|---|---|---|---|
| 33568 (the "Loan Claim") | LBHI | $1,202,241,875.00 | ▪ Two loans made by Freddie Mac to LBHI on August 19 and August 20, 2008 in the amounts of $450,000,000 and $750,000,000, respectively, plus accrued interest, regarding which an entitlement to a priority recovery under section 4617(b)(15) of HERA (the "HERA Priority") was asserted. |
| 33569 | Lehman Brothers Special Financing Inc. ("LBSF") | $17,239,087.33 | ▪ Derivatives contract |

---

[1] Capitalized terms not defined in this Agreement shall have the meanings ascribed to such terms in the Plan.

US_ACTIVE:\44419364\14\58399.0011

| Claim Number | Debtor | Filed Amount of Claim | Basis for Claim |
|---|---|---|---|
| 33576 | LBHI | $885,839,087.33 plus unliquidated and contingent amounts | ▪ Guarantee of derivatives contract<br>▪ Indemnity and servicer related obligations<br>▪ Other contingent and unliquidated obligations |

D.      Pursuant to a termination agreement, dated July 27, 2011 (the "Termination Agreement"), claim number 33569 and a portion of claim number 33576 were allowed by order of the Bankruptcy Court entered on December 22, 2011 (ECF No. 23681), respectively, (i) against LBSF as a general, non-priority unsecured claim in the amount of $16,394,310.08 (the "Allowed LBSF Claim"); and (ii) against LBHI as a general, non-priority unsecured guarantee claim in the amount of $16,100,024.63 (the "Allowed Guarantee Claim," and together with the Allowed LBSF Claim, the "Allowed Derivatives Claims");

E.      The portions of claim number 33576 that were not allowed pursuant to the Termination Agreement and remain pending against LBHI (such portions, collectively, the "Indemnity and Servicing Claims") include claims allegedly arising out of, among other things, the following: (i) indemnity claims totaling approximately $934,000,000 based upon alleged breaches of certain representations and warranties; and (ii) servicing-related claims totaling approximately $27,000,000, including claims based upon servicing, back-end mortgage insurance, compensatory fees, and foreclosure assignments;

F.      On September 1, 2011, LBHI, Freddie Mac and certain other parties entered into a tolling agreement (as amended on March 20, 2012, January 7, 2013, May 20, 2013, December 20, 2013, and February 12, 2014, the "Tolling Agreement");

G.      In connection with confirmation of the Plan, Freddie Mac, LBHI, and certain other parties entered into a stipulation (ECF No. 22998) (the "Plan Stipulation"), which was so ordered by the Bankruptcy Court on December 6, 2011 (ECF No. 23023).  Among other things, the Plan Stipulation provided that LBHI would establish cash reserves on account of the Loan Claim in the amount of $1,202,241,875.00 (the "Priority Reserve");

H.      On December 6, 2011, the Bankruptcy Court entered an order confirming the Plan (ECF No. 23023) (the "Confirmation Order").  The Plan became effective on March 6, 2012;

I.      LBHI has historically been a seller/servicer of portfolios of residential mortgage loans to Freddie Mac, including pursuant to a Master Commitment, dated as of April 26, 2005, between LBHI and Freddie Mac (the "Master Commitment"), and designated Aurora Bank, FSB and ALS as subservicers of such loans.

J.      Aurora Bank, FSB underwent a number of organizational and structural changes in 2013, including a charter conversion from a federal thrift institution to a national banking institution known as Aurora Interim National Bank, a merger of Aurora Interim National Bank into Aurora, and a termination of the bank charter of Aurora Interim National Bank;

2

K.      Aurora and ALS are wholly-owned, indirect subsidiaries of LBHI;

L.      Aurora is the successor to all rights, liabilities, duties, and obligations of Aurora Bank, FSB as a result of the organizational changes referenced above;

M.      On September 13, 2013, the Plan Administrator filed a motion seeking to classify and allow the Loan Claim as a "Senior Unsecured Claim" against LBHI in LBHI Class 3 under the Plan (ECF No. 40066) (the "Classification Motion").  On October 17, 2013, Freddie Mac and the Conservator filed an objection to the Classification Motion asserting that the Loan Claim should be classified as a "Priority Non-Tax Claim" against LBHI in LBHI Class 1 under the Plan (ECF No. 40550) (the "Objection").  On October 22, 2013, LBHI filed a reply to the Objection (ECF No. 40630) (the "Reply");

N.      On December 17, 2013, the United States District Court for the Southern District of New York (the "District Court") entered an Opinion and Order that withdrew the bankruptcy reference in respect of the Classification Motion and referred the Classification Motion to the Bankruptcy Court for issuance of a report and recommendation;

O.      On January 10, 2014, (i) LBHI filed a supplemental brief in support of the Classification Motion (ECF No. 42020) ("LBHI's Supplemental Brief") and (ii) Freddie Mac and the Conservator filed a supplemental brief in opposition to the Classification Motion (ECF No. 42026) (the "Freddie Mac Supplemental Brief", and collectively with the Classification Motion, the Objection, the Reply, and LBHI's Supplemental Brief, the "Classification Pleadings");

P.      On January 31, 2014, the Lehman Parties and Freddie Mac entered into a Term Sheet that outlined the material terms of this Agreement subject to various conditions set forth in the Term Sheet;

Q.      The hearing on the Classification Motion before the Bankruptcy Court has been adjourned until February 19, 2014;

R.      Freddie Mac has advised LBHI that the Conservator has approved Freddie Mac's entry into the settlement of the Loan Claim and the Indemnity and Servicing Claims pursuant to the terms and conditions set forth in this Agreement;

S.      The Parties have engaged in extensive arm's length negotiations concerning the Classification Pleadings, the Loan Claim, the Indemnity and Servicing Claims, and various other matters; and

T.      The Parties wish to resolve all outstanding issues regarding the matters described above and to avoid extensive and expensive litigation in connection therewith.

3

# AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to and on the terms and conditions set forth herein, the parties hereto, intending to be legally bound, agree as follows:

1.    ***Effectiveness of Agreement;***

1.1    This Agreement, except for Sections 2, 3, 4, 5 and 8, shall be effective upon the first date upon which this Agreement is signed by all of the Parties (the "Execution Date").

1.2    This Agreement, including Sections 2, 3, 4, 5 and 8, shall be fully effective upon the first date (the "Effective Date") following approval of LBHI's entry into and performance under this Agreement by a Final Order[2] of the Bankruptcy Court in form and substance acceptable to the Plan Administrator and Freddie Mac (the "Bankruptcy Court Approval").

1.3    As soon as practicable after the Execution Date, the Plan Administrator shall (a) file with the Bankruptcy Court a motion (the "Approval Motion") pursuant to Bankruptcy Rule 9019 and the Bankruptcy Court's Order Modifying Certain Existing Claims Orders (ECF No. 29505), entered on July 18, 2012, seeking Bankruptcy Court Approval of this Agreement, and (b) notice the objection deadline and the hearing on the Approval Motion for the earliest dates then available under the Second Amended Case Management Order (ECF No. 9635), including, to the extent required, on shortened notice by Order to Show Cause.

1.4    The Parties shall make commercially reasonable efforts to ensure that (a) the Approval Motion is heard by the Bankruptcy Court on February 19, 2014, and (b) all conditions precedent to the occurrence of the Effective Date are satisfied by March 13, 2014.

1.5    In the event that Bankruptcy Court Approval of this Agreement is denied by a Final Order, or if the Effective Date has not occurred on or before March 13, 2014 (the "Automatic Termination Date"), absent the consent of the Parties, this Agreement shall be void *ab initio* and all parties shall be restored to their respective positions as if this Agreement had

---

[2] A "Final Order" shall mean an order of the Bankruptcy Court (a) that has not been reversed, rescinded, stayed, modified, or amended; (b) that is in full force and effect; and (c) with respect to which: (1) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely-filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; or (2) any such appeal or petition has been withdrawn, dismissed or resolved by the highest court to which the order or judgment was timely appealed or from which review, rehearing, remand, or a writ of certiorari was timely sought; provided, however, that the possibility of a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") or other applicable law being filed with respect to such order will not cause such order not to be a Final Order.

never been executed, with the same effect as that provided for in the event of a Termination pursuant to Section 10.5 of this Agreement.

2.    ***Assignment of Claims***

2.1    Immediately upon the Effective Date, the Plan Administrator shall cause LBHI to transfer $767 million in cash to Freddie Mac (the "Settlement Amount") in exchange for the assignment of the Assigned Claims (as such term is defined below) by Freddie Mac to LBHI as provided in Sections 2.2 and 2.3 below.  The Settlement Amount shall not be subject to withholding, return, setoff, disgorgement, recoupment, or claims of any kind and such Settlement Amount shall not be treated as a Distribution for any purpose under the Plan, including Section 8.13 or 8.14 of the Plan.  The payment described in this paragraph shall be made by wire transfer in accordance with the wiring instructions to be provided by Freddie Mac.

2.2    Simultaneously upon payment and receipt of the Settlement Amount as set forth in Section 2.1 above, Freddie Mac shall be deemed to have absolutely, unconditionally, and irrevocably sold, transferred, conveyed, and assigned to LBHI, free and clear of all of Freddie Mac's right, title, and interest in, to, and under, the following:

(a)    the Loan Claim and the Indemnity and Servicing Claims (the "LBHI Claims"), including, without limitation, all of Freddie Mac's rights, title, and interest in and to any cash and/or other proceeds, property, or distributions that may be paid, distributed, exchanged or issued on account of the LBHI Claims, subject in all events to Section 2.3 below;

(b)    all rights, including any and all claims or causes of action, and any proceeds derived therefrom, that Freddie Mac may have against any person or entity other than LBHI arising out of or relating to the Loan Claim and/or the Indemnity and Servicing Claims, including, without limitation, any and all rights, claims, and causes of action related to the Rep and Warranty Default Loans (as such term is defined in Section 4.1 below) listed on Exhibits A and B attached hereto that Freddie Mac holds against any originating lenders, secondary mortgage market sellers, borrowers, appraisers, brokers, title companies, escrow agents, insurers, and/or other third parties in connection with the Rep and Warranty Default Loans, subject in all events to Section 2.3 below; provided, however, that (i) Freddie Mac shall retain all rights to the sale proceeds from the disposition Real Estate Owned properties ("REO Properties") for the loans listed on Exhibit B, and (ii) nothing herein shall be deemed to be a waiver of any defense of any Party hereto regarding claims made against it by third parties and all such defenses are expressly reserved by each Party; and

(c)    any claims or causes of action that Freddie Mac may have against Aurora, ALS, and/or any of the Debtors, but excluding the Allowed Derivatives Claims, subject in all events to Section 2.3 below.

2.3    The LBHI Claims and the rights, claims, and causes of action set forth in Sections 2.2(b) and 2.2(c) above, are collectively hereinafter referred to as the "Assigned Claims."  Notwithstanding anything in Section 2.2 above, this Agreement or otherwise to the contrary, for the avoidance of doubt, the Assigned Claims, including any and all rights, title, and interest in and to any cash and/or other proceeds, property, or distributions that may be paid,

distributed, exchanged or issued on account of the LBHI Claims, and all rights, claims, causes of action, and any  proceeds derived from the Assigned Claims, in each case as sold, transferred, conveyed and assigned by Freddie Mac to LBHI pursuant to Section 2.2 above, shall not include any and all rights, titles, powers, privileges, interests, claims, causes of action, remedies, priorities or proceeds arising under HERA, including, without limitation, in respect of the Assigned Claims and in respect of any rights of recovery against transferees arising under HERA (collectively, the "HERA Rights"); provided, however, that Freddie Mac covenants and agrees (i) to never pursue any rights, claims, causes of action, remedies, priorities or proceeds arising under HERA, if any, against JPMorgan Chase Bank, N.A. or its affiliates arising out of or in connection with the transactions that purportedly give rise to the Loan Claim or in respect of the adversary proceeding captioned *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holdings Inc.*), Adversary No. 10-03266 (SCC) (the "Adversary Proceeding"), and (ii) that notwithstanding the foregoing, to the extent Freddie Mac, whether voluntarily or involuntarily, receives any proceeds related to the Adversary Proceeding or the Loan Claim from JPMorgan Chase Bank, N.A. or its affiliates, such proceeds shall promptly be remitted to LBHI; provided further, however, that except with respect to any party expressly released pursuant to Sections 8.1 and 8.2 hereof and the HERA Rights, nothing herein shall effect the Lehman Parties' subrogation, indemnification, recoupment, reimbursement, or any other similar state law rights, including, without limitation, any right to setoff with respect to any of the foregoing, against any party or entity, including, without limitation JPMorgan Chase Bank, N.A. or its affiliates.

2.4     Upon payment and receipt of the Settlement Amount as set forth in Section 2.1 above, LBHI shall be deemed to be the owner of the Assigned Claims and entitled to identify itself as the owner of the Assigned Claims (in each case subject to Section 2.3 above) including, as necessary, on the records of the Bankruptcy Court, and to that end, the proposed order approving the Approval Motion shall direct Epiq Bankruptcy Solutions, LLC ("Epiq") to, upon notice from the Plan Administrator of the occurrence of the Effective Date and the payment and receipt of the Settlement Amount, update the claims register in these Chapter 11 Cases to reflect the transfer of the LBHI Claims from Freddie Mac to LBHI and reflect LBHI as the holder of the LBHI Claims effective immediately, including for purposes of the fifth Distribution notwithstanding the passage of the applicable Record Date.

2.5     Freddie Mac and LBHI agree to execute, acknowledge, and deliver all such further certificates, instruments, and other documents, and to take all such further action as may be necessary or appropriate, to affect assignment of the Assigned Claims to LBHI as provided for herein.

2.6     Upon payment and receipt of the Settlement Amount as set forth in 2.1 above, all disputes in respect of the Assigned Claims, including those raised in the Classification Pleadings, shall be deemed fully compromised and resolved.  The Plan Administrator shall have the right to determine, without further Bankruptcy Court approval, the classification, allowance, and/or disallowance of the LBHI Claims, or any portion thereof, in order to carry out and implement the Plan and this Agreement, and may instruct Epiq to update the claims register in these Chapter 11 Cases accordingly; provided, however, that (i) neither this Agreement, any agreement entered into incident to this Agreement, nor any other document executed by the Plan Administrator (a) shall contain any determination regarding the validity or invalidity of the

6

application of Section 4617(b)(15) of HERA to the Loan Claim or (b) shall in any way be construed as a concession as to the validity of any disputes or defenses interposed to the Loan Claim, including, without limitation, with respect to the assertions of rights, powers, and priorities under 12 U.S.C. § 4617(b)(15), as all such disputes shall be deemed compromised and settled upon the Effective Date and payment and receipt of the Settlement Amount as set forth in 2.1 above, (ii) nothing in this Agreement, any subsequent agreement, the Plan, the Confirmation Order, or any order granting or denying the Approval Motion, or any other court order, shall affect, limit, or otherwise prejudice the Conservator's rights, titles, powers, and privileges under HERA, and (iii) any documents or agreements entered into incident to this Agreement and any pleadings or other documents filed in connection with or related to this Agreement (and, if applicable, any record, notice, or claims register update) shall recite that all disputes in respect of the Assigned Claims, including those raised in the Classification Pleadings, were compromised by LBHI's purchase of the Assigned Claims pursuant to this Agreement.

2.7     This Agreement shall have no effect on the Allowed Derivatives Claims, which will not be assigned or transferred pursuant to this Agreement.

3.     *Release of the Priority Reserve and Withdrawal of Classification Pleadings*

3.1     Upon payment and receipt of the Settlement Amount as set forth in Section 2.1 above, LBHI shall no longer be required to maintain the Priority Reserve for the Loan Claim, as required by paragraph 2 of the Plan Stipulation.

3.2     Upon payment and receipt of the Settlement Amount as set forth in Section 2.1 above, the Classification Pleadings shall be deemed withdrawn with prejudice, and the Parties shall take such action and file such pleadings with the District Court as necessary to resolve the pending proceedings in the District Court in respect of the Classification Motion.

4.     *Turnover of Documents Supporting the Indemnity and Servicing Claims*

4.1     On the Execution Date, Freddie Mac shall provide (i) columns A, B, and G for each of the loans set forth on  Exhibit A (the "Liquidated Rep and Warranty Default Loans"), which loans are fully liquidated loans with respect to which Freddie Mac has valid make whole claims for indemnity/reimbursement against LBHI directly arising out of a violation of a representation or warranty contained in the Master Commitment, documents incorporated therein, and/or related agreements, and (ii) columns A, B, and G for each of the loans set forth on Exhibit B (together with the Liquidated Rep and Warranty Default Loans, the "Rep and Warranty Default Loans"), which loans are not yet fully liquidated but for which Freddie Mac has provided the Lehman Parties an estimate of its expected damages and for which Freddie Mac expects to have valid make whole claims for indemnity/reimbursement against LBHI directly arising out of a violation of a representation or warranty contained in the Master Commitment, documents incorporated therein, and/or related agreements.  The Plan Administrator shall make only columns A, B and G of Exhibits A and B publicly available.  The remaining information for the Rep and Warranty Default Loans set forth on Exhibits A and B shall be provided no later than thirty (30) days following the Effective Date but shall not be made publicly available by the Plan Administrator; provided, however, that the Lehman Parties may subsequently disclose limited versions of Exhibits A and B in furtherance of seeking reimbursement by parties owing

7

indemnities to the Lehman Parties so long as the Lehman Parties make a reasonable effort to secure a protective order or confidentiality agreement prior to disclosing such information. The limited versions of Exhibits A and B may show data in all columns, but shall be redacted to identify for any receiving indemnifying entity only data for loans for which the receiving indemnifying entity has potential liability.

      4.2    Subject to all applicable laws:

      (a)    From and after the Effective Date and the payment and receipt of the Settlement Amount as set forth in Section 2.1 above, at any time and from time to time until January 1, 2017, Freddie Mac shall provide the Plan Administrator with the following information related to each Rep and Warranty Default Loan:

      (i)    Freddie Mac's findings as set forth in repurchase or findings letters;

      (ii)    Any mortgage insurance rescission letters; and

      (iii)    The documents supporting Freddie Mac's findings.

provided, however, that if any of the above information is unavailable, in response to a written request from the Plan Administrator, Freddie Mac shall use commercially reasonable efforts to provide such missing information otherwise in its possession to the Plan Administrator within thirty (30) calendar days of such request.

      (b)    Within thirty (30) calendar days of the Effective Date and the payment and receipt of the Settlement Amount as set forth in Section 2.1 above, Freddie Mac shall provide the Plan Administrator with a "Loss Reimbursement Statement" for each of the Rep and Warranty Default Loans. The term "Loss Reimbursement Statement" shall mean the loan-level report of loss realized from a liquidated loan as of the date most recently available, in the form generally prepared for Freddie Mac servicers, containing line items for all expenses incurred and revenues received, including, but not limited to, the following information: (i) unpaid principal balance at liquidation; (ii) accrued interest; (iii) corporate advances; (iv) escrow advances; (v) mortgage insurance proceeds; and (vi) liquidation proceeds.

      (c)    Freddie Mac shall provide to the Plan Administrator such written authorization as is reasonably required for the Plan Administrator to obtain the Loan File (as such term is defined in Exhibit C hereto) from any third party servicer; provided, however, that Freddie Mac shall not be obligated to provide the Plan Administrator with any authorization related to a Rep and Warranty Default Loan with respect to which Aurora or ALS was the primary servicer or subservicer on the date such Rep and Warranty Default Loan was liquidated. If after commercially reasonable efforts the Plan Administrator is unable to retrieve a Loan File from a third party servicer (other than Aurora or ALS), in response to a written request from the Plan Administrator, Freddie Mac shall make commercially reasonable efforts to provide to the Plan Administrator such Loan File, or portion thereof that is available.

      (d)    Freddie Mac shall make commercially reasonable efforts to provide to the Plan Administrator, within thirty (30) days of its receipt of a written request (with the understanding that the timing of any response is subject to the volume of requests received from

the Plan Administrator), any broker price opinion, any appraisal and any Department of Housing and Urban Development Settlement Statement, commonly known as a "HUD-1," that is available to Freddie Mac with respect to the underlying support for the sale price realized by Freddie Mac in connection with the liquidation of a Rep and Warranty Default Loan; provided, however, that the Plan Administrator agrees that such requests will be made only when reasonably necessary to support the claims of the Lehman Parties or their respective affiliates against third parties related to the Rep and Warranty Default Loans.

(e)     Within thirty (30) calendar days of the Effective Date and the payment and receipt of the Settlement Amount as set forth in Section 2.1 above, Freddie Mac shall make commercially reasonable efforts to provide the Plan Administrator with all of the available information set forth on Exhibits E and F hereto for each Rep and Warranty Default Loan (which Exhibits E and F are forms for the information to be provided and which Exhibits E and F shall be redacted from any publicly available version of this Agreement; provided, however, that the Lehman Parties may subsequently disclose a limited version of Exhibits E and F in furtherance of seeking reimbursement by parties owing indemnities to the Lehman Parties so long as the Lehman Parties make a reasonable effort to secure a protective order or confidentiality agreement prior to disclosing such information.  The limited version of Exhibits E and F may show data in all columns, but shall be redacted to identify for any receiving indemnifying entity only data for loans for which the receiving indemnifying entity has potential liability.

4.3     From and after the Effective Date and the payment and receipt of the Settlement Amount as set forth in Section 2.1 above, at any time and from time to time until January 1, 2017, Freddie Mac shall use commercially reasonable efforts to assist the Plan Administrator in the Plan Administrator's efforts to acquire the Servicing File (as such term is defined in Exhibit D hereto) for each Rep and Warranty Default Loan (with it being understood that Freddie Mac does not have any Servicing File under its direct control).  In connection therewith, Freddie Mac agrees to provide to the Plan Administrator such authorization as is reasonably required for the Plan Administrator to obtain such Servicing Files from any third party servicer or subservicer, subject to applicable laws and the rights of such servicer or subservicer; provided, however, that Freddie Mac shall not be obligated to (i) require such servicer or subservicer to produce all information requested or pay any associated expenses sought by such servicer or subservicer; or (ii) assist the Plan Administrator with any Servicing File related to a Rep and Warranty Default Loan with respect to which Aurora or ALS was the primary servicer or subservicer on the date such Rep and Warranty Default Loan was liquidated.

4.4     From and after the Effective Date and the payment and receipt of the Settlement Amount as set forth in Section 2.1 above, at any time and from time to time until January 1, 2017, Freddie Mac shall, within thirty (30) days of its receipt of a written request, use commercially reasonable efforts to (i) provide to the Plan Administrator such additional information in its possession as may reasonably be requested by the Plan Administrator subject to applicable laws; and (ii) otherwise reasonably cooperate with the Plan Administrator, in each case as reasonably necessary to pursue the claims of the Lehman Parties or their respective affiliates against third parties related to the Rep and Warranty Default Loans; provided, however, that the Plan Administrator shall reimburse Freddie Mac's actual, reasonable and documented out of pocket expenses, including necessary and reasonable attorney fees incurred in connection with the Plan Administrator's requests.  Freddie Mac will reasonably consider use of counsel

9

08-13555-scc    Doc 42734    Filed 02/12/14    Entered 02/12/14 17:18:51    Main Document
Pg 190 of 214

recommended by the Lehman Parties. Nothing herein constitutes a representation, warranty, or guarantee by Freddie Mac that all information, data, or records sought by the Plan Administrator will be located and/or turned over to the Plan Administrator.

4.5    The amounts set forth in column G of Exhibit A represent Freddie Mac's current losses incurred with respect to each Rep and Warranty Default Loan, but the amounts are subject to minor variation over time to record adjustments to expenses or receipts.

4.6    The Parties agree that all columns of Exhibits A and B except for columns A, B and G shall be redacted in any version of this Agreement that is filed on the Bankruptcy Court's public docket in connection with the Approval Motion or is otherwise made publicly available; provided, however, that the Lehman Parties may subsequently disclose limited versions of Exhibits A and B in furtherance of seeking reimbursement by parties owing indemnities to the Lehman Parties so long as the Lehman Parties make a reasonable effort to secure a protective order or confidentiality agreement prior to disclosing such information. The limited versions of Exhibits A and B may show data in all columns, but shall be redacted to identify to any receiving indemnifying entity only data for loans for which the receiving indemnifying entity has potential liability.

5.    ***Termination of Agreements.***  Upon the Effective Date and the payment and receipt of the Settlement Amount as set forth in Section 2.1 above, the following agreements shall be deemed terminated, if not already terminated, without breach by any Party and without termination fee, charge, or penalty: (i) the Master Commitment; and (ii) any other agreements or understandings between or among any of the Lehman Parties on the one hand, and Freddie Mac on the other, in respect of or related to the Master Commitment.

6.    ***Representations, Warranties and Agreements of Freddie Mac.***  As consideration for the Lehman Parties entering into and performing their respective obligations under this Agreement, Freddie Mac hereby represents, warrants, acknowledges and agrees, as of the Execution Date and the Effective Date, and subject to the occurrence of the Effective Date to the extent applicable, as follows:

6.1    *Authority.*  (i) Freddie Mac has the power and authority to execute, deliver and perform its obligations under this Agreement, to assign the Assigned Claims, and to consummate the transactions contemplated herein; (ii) the execution, delivery, and performance by Freddie Mac of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of Freddie Mac and no other proceedings on the part of Freddie Mac are necessary to authorize and approve this Agreement or any of the transactions contemplated herein; and (iii) Freddie Mac has been duly authorized by all necessary action to approve Freddie Mac's entry into and performance of this Agreement.

6.2    *Validity.*  This Agreement has been duly executed and delivered by Freddie Mac and upon the Effective Date, constitutes the legal, valid, and binding agreement of Freddie Mac, enforceable against Freddie Mac in accordance with its terms.

6.3    *Authorization of Governmental Authorities.*  No further action by (including any authorization, consent, or approval), in respect of, or filing with, any

governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance of its obligations under this Agreement by Freddie Mac.

6.4     *Title; No Prior Transfer of Claim*.

(a)     *Title*.     Freddie Mac, in conservatorship, is the legal owner and record holder of the Assigned Claims and, as such, Freddie Mac is entitled to receive any proceeds of the Assigned Claims.

(b)     *Transfer*.     Freddie Mac has not conveyed, transferred, assigned, encumbered, or participated, in whole or in part, the Assigned Claims, or any right or interest arising thereunder or related thereto.

6.5     *No Reliance*.     Freddie Mac (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Plan Administrator, LBHI, Aurora, ALS, or any of the Lehman Parties' respective affiliates or any officer, employee, agent, or representative thereof, and based on such information as Freddie Mac has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Freddie Mac has relied upon the Lehman Parties' express representations, warranties, and covenants in this Agreement.     Freddie Mac acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

7.     ***Representations, Warranties and Agreements of the Lehman Parties.***     As consideration for Freddie Mac entering into and performing its respective obligations under this Agreement, each of the Lehman Parties, solely with respect to itself, hereby represents, warrants, acknowledges, and agrees, as of the Execution Date and the Effective Date, and subject to the occurrence of the Effective Date to the extent applicable, as follows:

7.1     *Authority*.     Subject to Bankruptcy Court Approval, (i) each Lehman Party has the power and authority to execute, deliver, and perform its obligations under this Agreement, and (ii) the execution, delivery, and performance by each Lehman Party of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of each Lehman Party and no other proceedings on the part of a Lehman Party are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

7.2     *Validity*.     This Agreement has been duly executed and delivered by each Lehman Party and, upon the Effective Date, shall constitute the legal, valid, and binding agreement of each Lehman Party, enforceable against each Lehman Party in accordance with its terms.

7.3     *Authorization of Governmental Authorities*.     No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by each Lehman Party of its respective obligations hereunder, other than Bankruptcy Court Approval.

US_ACTIVE:\44419364\14\58399.0011

7.4    *No Reliance*.  Each Lehman Party (i) is a sophisticated party with respect to the matters that are the subject of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon Freddie Mac or any officer, employee, agent, or representative thereof, and based on such information as each Lehman Party has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon the express representations, warranties, and covenants of Freddie Mac in this Agreement, which it enters into voluntarily and of its own choice and not under coercion or duress.

8.    ***Releases***

8.1    *Releases by LBHI*.  Upon the occurrence of the Effective Date and the assignment of the Assigned Claims, and except as to the agreements, promises, settlements, representations, and warranties set forth in this Agreement, and in consideration of the foregoing:

(a)    LBHI, as Plan Administrator for LBHI, on behalf of itself, and its direct and indirect affiliates and subsidiaries, other than Aurora and ALS, and its and their successors and assigns and any person or entity claiming under or through LBHI (collectively the "Lehman Releasing Parties"), fully and forever releases, discharges, and acquits Freddie Mac, the direct and indirect affiliates and subsidiaries of Freddie Mac, and their respective owners, directors, officers, employees, financial advisors, accountants, attorneys, and other representatives, all in their capacities as such, and their respective successors and assigns (collectively, the "Freddie Mac Released Parties") and the Conservator, from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, claims, defenses, and counterclaims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Lehman Releasing Parties ever had or claimed to have or now has or claims to have against the Freddie Mac Released Parties and the Conservator in connection with, related to or otherwise concerning the Assigned Claims from the beginning of time to the Execution Date.

(b)    Subject to section 8.4 below, LBHI, as Plan Administrator for LBHI, on behalf of itself and on behalf of the Debtors, fully and forever releases, discharges, and acquits the Freddie Mac Released Parties and the Conservator from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, claims, defenses, and counterclaims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Debtors ever had or claimed to have or now has or claims to have against the Freddie Mac Released Parties from the beginning of time to the Execution Date.

8.2    *Releases by Aurora and ALS*.  Upon the occurrence of the Effective Date and the assignment of the Assigned Claims, and except as to the agreements, promises, settlements, representations, and warranties set forth in this Agreement, and in consideration of

US_ACTIVE:\44419364\14\58399.0011

the foregoing, Aurora and ALS and each of their respective successors and assigns (collectively, the "Aurora Releasing Parties"), subject to section 8.4 below, fully and forever release, discharge, and acquit the Freddie Mac Released Parties and the Conservator from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, claims, defenses, and counterclaims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that each of the Aurora Releasing Parties ever had or claimed to have or now has or claims to have against the Freddie Mac Released Parties from the beginning of time to the Execution Date.

8.3    *Releases by Freddie Mac*.  Upon the occurrence of the Effective Date and the payment and receipt of the Settlement Amount as set forth in Section 2.1 above, and except as to (i) the Allowed Derivatives Claims, and (ii) the agreements, promises, settlements, representations, and warranties set forth in this Agreement, and in consideration of the foregoing:

(a)    Freddie Mac, on behalf of itself, and its direct and indirect affiliates and subsidiaries, and its successors and assigns, and any person or entity claiming under or through Freddie Mac, but in all events excluding the Conservator (collectively, the "Freddie Mac Releasing Parties"), fully and forever releases, discharges, and acquits LBHI (for itself and as Plan Administrator for LBHI), LBHI's direct and indirect affiliates and subsidiaries, including, without limitation, the Debtors, Aurora, and ALS, and its and their respective owners, directors, officers, employees, financial advisors, accountants, attorneys, and other representatives, all in their capacities as such, and their successors and assigns (collectively, the "Lehman Released Parties"), from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Freddie Mac Releasing Parties ever had or claimed to have or now has or claims to have against the Lehman Released Parties in connection with, related to or otherwise concerning the Assigned Claims, including, without limitation, in respect of the HERA Priority and the HERA Rights as related to the Assigned Claims, from the beginning of time to the Execution Date;  provided, however, that such release does not release the rights of LBHI or a subsequent holder of the Assigned Claims to enforce such Assigned Claims, including to receive distributions or consideration on account of the Assigned Claims, but subject in all events to Section 2.3 above, to the extent that such Assigned Claims, or portions thereof, are Allowed by the Plan Administrator.  Except as provided in Sections 8.3(b) and 8.3(c), nothing in this Agreement releases any Lehman Released Parties from claims and causes of action that are not part of the Assigned Claims.

(b)    Subject to section 8.4 below, each of the Freddie Mac Releasing Parties (excluding, for the avoidance of doubt, the Conservator) fully and forever releases, discharges, and acquits each of the Debtors (including LBHI in its individual capacity and as Plan Administrator for the Debtors) and each of their respective successors and assigns  (collectively, the "Debtor Released Parties") from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature,

and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Freddie Mac Releasing Parties ever had or claimed to have or now has or claims to have against any of the Debtor Released Parties from the beginning of time to the Execution Date.

(c)     Subject to section 8.4 below, each of the Freddie Mac Releasing Parties (excluding, for the avoidance of doubt, the Conservator) fully and forever releases, discharges, and acquits Aurora and ALS and each of their respective predecessors, successors and assigns (collectively, the "Aurora Released Parties") from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that the Freddie Mac Releasing Parties ever had or claimed to have or now has or claims to have against the Aurora Released Parties from the beginning of time to the Execution Date.

8.4     For the avoidance of doubt, nothing in this Agreement shall release, waive, or discharge any claim, defense, or cause of action against the Lehman Released Parties other than as set forth in Section 8.3 above, and nothing herein shall release, waive, or discharge or otherwise affect any other claim, defense or cause of action against the Lehman Released Parties, including, without limitation, any claim, defense or cause of action held by the Federal National Mortgage Association ("Fannie Mae") and/or the Conservator in its capacity as Conservator of Fannie Mae (including, without limitation, in respect of Claim No. 29557 filed in connection with the LBHI bankruptcy proceedings); provided, further, that nothing contained herein shall release, waive or discharge any claim, defense or cause of action against the Freddie Mac Released Parties or the Conservator other than as set forth in sections 8.1 or 8.2 above, and nothing contained herein shall release, waive, or discharge any other claim, defense or cause of action held by a Lehman Released Party against Fannie Mae and/or the Conservator in its capacity as Conservator of Fannie Mae.

8.5     *Waiver of Statutory Limitations on Releases.*  Each of the releasing parties in each of the releases contained herein expressly acknowledges that, although ordinarily a release may not extend to claims which the releasing party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each releasing party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party, including, without limitation, the provisions of California Civil Code section 1542.  The releases contained herein are effective regardless of whether matters released thereby are presently known or unknown, suspected or unsuspected, foreseen or unforeseen.

14

08-13555-scc    Doc 42784    Filed 02/12/14    Entered 02/12/14 11:18:53    Main Document
Pg 15 of 114

9.    ***No Third Party Beneficiaries***.  This Agreement shall not confer any rights, remedies, or releases upon any person or entity, including, without limitation JPMorgan Chase Bank, N.A., or its affiliates, other than the Parties, the Conservator, the Lehman Released Parties, and the Freddie Mac Released Parties; *provided however* that Nationstar Mortgage, LLC is not a third party beneficiary as it relates to any and all claims arising post-transfer of the servicing rights to Nationstar Mortgage, LLC.

10.    ***Termination.***

10.1    *Lehman Parties' Right to Terminate*.  Prior to the Effective Date, each of the Lehman Parties shall have the right, in its discretion, to terminate this Agreement by written notice to Freddie Mac if there is a breach, in any material respect, of the representations, warranties, and/or covenants of Freddie Mac under this Agreement, taken as a whole, that has not been cured within three Business Days after notice thereof is given to Freddie Mac.

10.2    *Freddie Mac's Right to Terminate*.  Prior to the Effective Date, Freddie Mac shall have the right, in its discretion, to terminate this Agreement by written notice to the Lehman Parties if there is a breach, in any material respect, of the representations, warranties, and/or covenants of the Lehman Parties under this Agreement, taken as a whole, that has not been cured within three Business Days after notice thereof is given to each of the Lehman Parties.

10.3    *Mutual Termination.*  This Agreement may be terminated at any time prior to the Effective Date with the written consent of all of the Parties.

10.4    *Automatic Termination*. This Agreement shall be deemed terminated on the Automatic Termination Date if, absent consent of the Parties, the Effective Date has not occurred by March 13, 2014; provided, however, that the Automatic Termination Date may be extended with the written consent of all of the Parties.

10.5    *Effect of Termination*.  In the event that this Agreement is terminated in accordance with its terms, neither this Agreement (except for this Section 10) nor any motion or other papers filed in the Bankruptcy Court or on appeal with respect to the approval of this Agreement shall have any *res judicata* or collateral estoppel effect or be of any force or effect, each of the Parties' respective interests, rights, remedies, and defenses shall be restored without prejudice as if this Agreement had never been executed, and the Parties shall be automatically relieved of any further obligations under this Agreement.  Upon such termination, this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver of or prejudice to the Parties' rights and remedies and the Parties hereby reserve all claims, defenses, and positions that they may have with respect to each other.

11.    ***Venue and Choice of Law.***

11.1    *Venue*.  The Parties agree that in the Approval Motion, LBHI shall request that the Bankruptcy Court retain jurisdiction over any actions or proceedings relating to the enforcement or interpretation of this Agreement and that any proposed order approving this Agreement shall so provide.  The Parties expressly consent and submit to the exclusive

15

jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement and any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court. Each of the Parties consents to the Bankruptcy Court entering a final judgment determining such matter and agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law. If the Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement or interpretation of this Agreement and/or any actions or proceedings arising hereunder, then the Parties agree that venue shall be in any other federal court located within the County of New York in the State of New York having proper jurisdiction. Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to the enforcement or interpretation of this Agreement with the Bankruptcy Court or with any other federal court located within the County of New York in the State of New York, and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each Party irrevocably consents to service of process in the manner provided for notices in Section 12 hereof. Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by applicable law. The Parties otherwise expressly reserve their jurisdictional rights to any action, suit, or proceeding commenced outside the terms of this Agreement.

    11.2 *Choice of Law*. This Agreement and all claims and disputes arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of New York or the Bankruptcy Code, as applicable, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code, as applicable.

    12. **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and all communications shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by email if sent during normal business hours of the recipient, and if not so sent, then on the next Business Day, or (c) when delivery is confirmed by a nationally recognized overnight courier, with written verification of receipt. All communications shall be sent:

To LBHI at:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attn: Matthew Cantor

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, Texas 77002-2755
Attn: Alfredo R. Pérez, Esq.

To Aurora at:

Aurora Commercial Corporation
10350 Park Meadow Drive
Littleton, Colorado 80124
Attn: Stephanie Camara-Ray
Senior Vice President

To ALS at:

Aurora Loan Services LLC
c/o Aurora Commercial Corporation
10350 Park Meadow Drive
Littleton, Colorado 80124
Attn: Stephanie Camara-Ray
Senior Vice President

To Freddie Mac at:

Federal Home Loan Mortgage Corporation
8200 Jones Branch Drive, MS 202
McLean, Virginia, 22102
Attn: George A. Kielman, Esq.

With a copy (which shall not constitute notice) to:

Landman, Corsi, Ballaine & Ford P.C.
120 Broadway, 27th Floor
New York, New York 10271
Attn: Mark S. Landman, Esq.

or to such other address as may have been furnished by a Party to each other Party by notice given in accordance with the requirements set forth above.

13.    **Expenses.**  The fees and expenses incurred by each Party (including the fees of any attorneys, accountants, investment bankers, financial advisors or any other professionals engaged by such Party) in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, will be paid by such Party, and not by any other Party.

14.    **Entire Agreement.**   This Agreement constitutes the entire agreement of the Parties concerning the subject matter hereof, and supersedes any and all prior or

US_ACTIVE:\44419364\14\58399.0011

contemporaneous agreements among the Parties concerning the subject matter hereof. The Parties acknowledge that this Agreement is not being executed in reliance on any oral or written agreement, promise or representation not contained herein.

15. **_No Oral Modifications._** This Agreement, including this Section 15, may not be modified or amended orally. This Agreement only may be modified or amended by a writing signed by a duly authorized representative of each Party hereto. Any waiver of compliance with any term or provision of this Agreement on the part of a Party must be provided in a writing signed by each other Party. No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.

16. **_Construction._** This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party based on the drafting of this Agreement, and any rule or maxim of construction to such effect shall not apply to this Agreement.

17. **_Binding Effect; Successor and Assigns._** This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

18. **_Counterparts_**. This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the Parties need not appear on the same counterpart. Executed facsimile and/or .pdf copies of this Agreement shall be deemed and considered originals.

19. **_Headings._** The headings utilized in this Agreement are designed for the sole purpose of facilitating ready reference to the subject matter of this Agreement. Said headings shall be disregarded when resolving any dispute concerning the meaning or interpretation of any language contained in this Agreement. References to sections, unless otherwise indicated, are references to sections of this Agreement. All Exhibits to this Agreement are hereby made a part hereof and incorporated herein by reference for all purposes.

20. **_Severability and Construction._** If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect only if the essential terms and conditions of this Agreement applicable to each Party remain valid, binding and enforceable. If such essential terms and conditions are no longer valid, binding and enforceable as the result of any illegal, invalid or unenforceable provision, the Parties shall use all reasonable efforts to modify this Agreement (and to obtain the Bankruptcy Court's approval thereof, if necessary or advisable) so as to eliminate such provisions while preserving the intent of the Parties.

21. **_Further Assurances._** From and after the Effective Date, each Party shall, at any time and from time to time, make, execute and deliver, or cause to be made, executed and delivered, such instruments, agreements, consents and assurances and take or cause to be taken all such actions as may reasonably be requested by the other Party for the effective consummation of this Agreement and the transactions contemplated hereby.

22. **_Acknowledgments._** THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREIN ARE THE PRODUCT OF ARMS' LENGTH NEGOTIATIONS

AMONG THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES. NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

*[Signature Page Follows]*

US_ACTIVE:\44419364\14\58399.0011

IN WITNESS WHEREOF, each Party by its duly authorized representative has executed this
Agreement as of the date first written above:

| Lehman Brothers Holdings Inc., as Plan Administrator for Lehman Brothers Holdings Inc. | Aurora Commercial Corporation |
|---|---|
| By: _____ | By: _____ |
| Name: MATTHEW CANTOR | Name: _____ |
| Title: EVP LEGAL AFFAIRS + CHIEF LEGAL OFFICER | Title: _____ |
| Federal Home Loan Mortgage Corporation | Aurora Loan Services LLC |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |

US_ACTIVE:\44419364\14\58399.0011

08-13555-scc Doc 42784-7 Filed 02/12/14 Entered 02/12/14 17:18:51 Main Document Pg 41 of 114

IN WITNESS WHEREOF, each Party by its duly authorized representative has executed this Agreement as of the date first written above:

Lehman Brothers Holdings Inc., as Plan Administrator for Lehman Brothers Holdings Inc.

By: _____

Name: _____

Title: _____

Aurora Commercial Corporation

By: _____

Name: _____

Title: _____

Federal Home Loan Mortgage Corporation

By: *Gina Healy*

Name: GINA HEALY

Title: VP CREDIT WORKOUT ;
MTG INSURANCE

Aurora Loan Services LLC

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, each Party by its duly authorized representative has executed this Agreement as of the date first written above:

Lehman Brothers Holdings Inc., as Plan Administrator for Lehman Brothers Holdings Inc.

By: _____

Name: _____

Title: _____

Aurora Commercial Corporation

By: _S Camara Ray_____

Name: _Stephanie Camara Ray_____

Title: _SVP_____

Federal Home Loan Mortgage Corporation

By: _____

Name: _____

Title: _____

Aurora Loan Services LLC

By: _Bmh_____

Name: _Brenda Darnell_____

Title: _Senior Vice President_____

20