Mark D. Sherrill (*pro hac vice*)
Sutherland Asbill & Brennan LLP
700 Sixth Street, NW
Suite 700
Washington, DC  20001
(202) 383-0100

Counsel for Derivative Questionnaire Respondents

| | |
|---|---|
| **In re:** § | |
| § | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS,** § | |
| **INC., et al.,** § | **Jointly Administered under** |
| § | **Case No. 08-13555 (JMP)** |
| **Debtors.** § | |
| § | |

# OBJECTION OF DERIVATIVE QUESTIONNAIRE RESPONDENTS TO MOTION TO ALLOW DISCLOSURE OF THE DERIVATIVE QUESTIONNAIRES PURSUANT TO SECTION 107(a) OF THE BANKRUPTCY CODE

The Derivative Questionnaire Respondents[1] file this *Objection to Motion to Allow Disclosure of the Derivative Questionnaires Pursuant to Section 107(a) of the Bankruptcy Code* (the "Objection"), and in support thereof, respectfully state as follows:

## I.  PRELIMINARY STATEMENT

1.    In 2009, this Court issued its Bar Date Order,[2] which not only set the customary deadline for filing proofs of claim, but also created a requirement for derivatives counterparties to furnish additional data to Lehman in response to the Derivative Questionnaire created by Lehman.  As reflected in the Transcript from the Hearing on the Bar Date Motion, the Bar Date

---

[1]    The Derivative Questionnaire Respondents, or "Questionnaire Respondents," consist of the following Lehman counterparties, each of which submitted responses to the Derivative Questionnaire:  Blue Chip Multi-Strategy Master Fund LP; C.M. Life Insurance Company; the Federal Home Loan Bank of Atlanta; MacKay Shields Strategy Partners LP; Massachusetts Mutual Life Insurance Company; Massachusetts Mutual Life Insurance Company on behalf of its FPD Alpha Backed Notes Separate Account; Massachusetts Mutual Life Insurance Company on behalf of its IBM Index Guaranteed Separate Account; MassMutual Asia Limited; Mass Mutual Life Insurance Company; New York Life Insurance and Annuity Corporation; New York Life Insurance Company; New York Life Insurance and Annuity Corporation Private Placement Variable Universal Life Separate Account 70; Principal Life Insurance Company; Quantitative Enhanced Decisions Master Fund LP.

[2]    All defined terms in the Preliminary Statement are defined elsewhere in the Objection.

1

Order created a bifurcated treatment of information submitted by Lehman's counterparties: proofs of claim were to be publicly available and, as an accommodation to the counterparties' confidentiality concerns, other information would be kept private.

2.  Lehman now tries to overcome that prior ruling, but it cannot do so.  Lehman is unable to – and indeed, does not even attempt to – meet the applicable standards to obtain relief from an existing Order.  In addition, a host of equitable considerations favor the denial of the Motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

3.  On May 26, 2009, Lehman Brothers Holdings Inc. ("LBHI") and its debtor affiliates (collectively, "Lehman") filed their *Motion Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form* (docket no. 3654) (the "Bar Date Motion").

4.  In the Bar Date Motion, Lehman requested approval of certain deadlines and procedures related to the assertion of claims against Lehman.  Among the requested procedures was the requirement for derivatives counterparties to submit responses to a questionnaire (the "Derivative Questionnaire").  A copy of the Derivative Questionnaire is attached as Exhibit A.

5.  The Bar Date Motion drew approximately 55 objections, an unusually high number of objections to a traditionally uncontroversial type of motion.  Nearly all of the objections were focused on the Derivative Questionnaire and the burdens it placed on derivatives counterparties.

2

6.   The Court held a hearing (the "Hearing") on the Bar Date Motion on June 24, 2009. At the Hearing, counsel for Lehman outlined a number of changes made to the proposed procedures, including the following:

> The next paragraph, inserted paragraph, on page 9, the claims process we're all familiar with involves a claims agent that has a publicly attestable Web site where one's proofs of claim are submitted; they're available on the Web site to any member of the public. The general proof of claim Web site here maintained by Epiq Systems will not be any different. ***Proofs of claim that are filed need to be, as part of the Court's records, publicly available. But due to many of the concerns received from counterparties to the derivatives questionnaires specifically, the derivatives questionnaire will be a separate Web site. And as parties upload information, it will not be viewable or accessible other than by the party making the submission and by the debtors and the creditors' committee. So no party will be able to go onto the derivative questionnaire Web site and view the submissions information of another party.***

*In re Lehman Bros. Holdings Inc.*, case no. 08-1355 (Bankr. S.D.N.Y. Jun. 24, 2009) (the "Transcript"), 94:10-25 (emphasis added). A copy of the relevant portions of the Transcript is attached as <u>Exhibit B</u>.

7.   At the Hearing, Judge Peck was generally receptive to the idea of the Derivative Questionnaire, but asked Lehman to take additional time to confer with other parties in interest to strike the right balance between Lehman's needs and the counterparties' rights. Among his concerns was that the procedures for asserting claims, including derivatives-based claims, should be final once he entered a bar date order. Judge Peck commented:

> Any procedures that we adopt will be strictly enforced. There'll be no slippery slopes … [T]he procedures that I want to adopt are the procedures that everybody will comply with. But in order to develop those procedures, I need to be assured that they're right and appropriate and that they balance, under the circumstances of this case, the relative burden…
>
> I want to make sure that when I approve the procedures I don't, nine months from now, have a hearing like I had today on the sale hearing in which somebody says we didn't think of something we should have thought of.

Transcript,112:13-19; 114:11-14.

8. On July 2, 2009, the Court entered its *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form* (docket no. 4271) (the "Bar Date Order"). The Bar Date Order generally granted the Bar Date Motion, but in accordance with the discussion at the Hearing, also specifically stated: "the information submitted on the website http://www.lehamn-claims.com in respect of Derivative Contracts and Guarantees will not be accessible on the website other than by the party that submitted such information, the Debtors, the Creditors' Committee and their respective advisors and counsel." Bar Date Order, p. 9 (the "Confidentiality Provision").

9. Of separate relevance, the Bar Date Order also included the following:

> "any holder of a claim against the Debtors who is required, but fails to file a proof of such claim in accordance with the Bar Date Order on or before the Bar Date, <u>specifically</u>, including filling out the Derivative Questionnaire ... and uploading required information to the website http://www.lehman-claims.com ... shall be forever barred, estopped and enjoined from asserting such claim against the Debtors."

Bar Date Order, pp. 9-10 (the "Injunction Provision").

10. The information requested in the Derivatives Questionnaire included sensitive information that counterparties generally would not publicly disclose. As one example, Section 4(a) of the Derivative Questionnaire requires copies of "all master agreements and schedules thereto [and] credit support agreements." Many market participants regard their ISDA Master Agreements and the related Credit Support Annex as proprietary, because broader knowledge of the negotiated terms of such agreements would allow potential counterparties to gain a negotiating advantage. As a further example, Section 4(d) of the Derivative Questionnaire requires a spreadsheet "including, as applicable, trade id, electronic trade reference id, trade type, product, trade date, reference obligation or reference entity, factor and original contract notional

4

amount, quantify/unit of measure, currency, price or strike price, buy/sell, call or put, cap or floor, effective date, and maturity date." Such trade-level details provide the essence of commercial decisions made by a trading desk.

11. The Questionnaire Respondents provided their responses in a timely manner and in compliance with the Bar Date Order. They did so, in large part, in reliance on the Confidentiality Provision of the Bar Date Order, fully expecting that their responses would not be distributed beyond the representatives of Lehman and the Creditors' Committee and their respective professionals. One aspect of that reliance is that the Questionnaire Respondents did not analyze their submissions with regard to broader dissemination, as they would have had they known that their data would later become publicly available.

12. Furthermore, the Questionnaire Respondents complied strictly with the requirements of the Derivative Questionnaire because the language of the Injunction Provision suggested that any defect in the response to the Derivative Questionnaire would result in a creditor having its claim barred.

13. On March 19, 2015, Lehman filed its *Motion to Allow Disclosure of the Derivative Questionnaires Pursuant to Section 107(a) of the Bankruptcy Code* (docket no. 48939) (the "Motion"). In the Motion, notwithstanding the Confidentiality Provision in the Bar Date Order, Lehman seeks authority to disclose the information submitted by its derivatives counterparties pursuant to the Bar Date Order and the Derivative Questionnaire. Although the Motion itself is vague in terms of the scope of the prospective disclosure, its attendant proposed order contemplates the information later being filed with the Court (and further, would prohibit such information from being sealed in subsequent proceedings).

### III.  OBJECTION AND BASES THEREFOR

14. The Questionnaire Respondents object to the relief requested in the Motion, and respectfully request that the Court retain the rule developed in the Bar Date Order, shielding the questionnaire responses from broader disclosure.

    A. **Lehman Has Failed to Carry Its Burden**

15. The present Motion is structured as if it were the Court's first consideration of the relevant issues. If that were the case, perhaps the authorities asserted by Lehman would be pertinent. Here, however, the Transcript makes clear that the Court has previously considered issues surrounding the confidentiality of the information submitted by derivatives-based claimants pursuant to the Derivative Questionnaire. More specifically, the quotation above from debtors' counsel evidences Lehman's intention to differentiate between proofs of claim, which would be publicly available, and the questionnaire responses, which were intended not to "be viewable or accessible other than by the party making the submission and by the debtors and the creditors' committee." Transcript, 94:21-23. That same quotation demonstrates that the bifurcation of publicly available and private information was an accommodation, "due to many of the concerns received from counterparties." *Id.*, 94:17-18.

16. With that as a backdrop, the Bar Date Order represents an existing Order of this Court on the issues *sub judice*. If Lehman wishes to overcome that existing Order, it must satisfy the applicable burdens under the procedural rules.

17. Rule 9024 of the Federal Rules of Bankruptcy Procedure provides for the application of Rule 60 of the Federal Rules of Civil Procedure, which expressly governs "Relief from Judgment or Order." Fed. R. Civ. P. 60; Fed. R. Bankr. P. 9024. Rule 60 allows for relief

6

from an existing Order in certain discrete circumstances, such as clerical errors, excusable neglect, fraud on the court or newly discovered evidence. Fed. R. Civ. P. 60(a), (b).

18. Although Lehman is essentially seeking relief from the Bar Date Order, it has advanced no argument regarding why it is entitled to relief under Rule 60. One is left to infer that it cannot meet the applicable burdens of establishing some basis for Rule 60 relief.[3]

19. Even if Lehman were not subjected to Rule 60 scrutiny, there is a fatal flaw in its analysis. The Motion's legal argument begins with, and is premised entirely upon, the statement that "all documents filed in federal court are presumptively open to public inspection." Motion, ¶ 8. Under the Bar Date Order, however, the responses to the Derivative Questionnaires were never *filed*. Black's provides the applicable definition of filing as: "Delivery of legal documents to clerk of court or other proper officer with intent that it be filed with court." BLACK'S LAW DICTIONARY 628 (6th ed. 1990).

20. Responses to the Derivative Questionnaire were never delivered to the Clerk or anyone else associated with the Court. That stands to reason, because they were more akin to discovery responses than pleadings or other filings.[4] Because the questionnaire responses were never delivered to any officer of the Court,[5] they were never "filed." As a result, Lehman's arguments concerning a presumption for open inspection are simply inapplicable.

---

[3] "When a moving party fails to specify the rule under which it makes a post-judgment motion, the characterization is left to the court with the risk that the moving party may lose the opportunity to present the merits of the underlying motion to the appellate court." *In re Barger*, 219 BR 238, 244 (B.A.P. 8th Cir. 1998) (citing *Sanders v. Clemco Indus.*, 862 F.2d 161, 168 (8th Cir. 1988)).

[4] As an analogy, a generic (*i.e.*, non-derivatives) creditor will occasionally have confidentiality concerns regarding a contract underlying its claim. In that scenario, the creditor might file its proof of claim with an abridged version of the contract attached to the claim, with the understanding that the full contract can be provided to the debtor/trustee if necessary for the estate's evaluation of the claim. The full contract might become public later if it is an exhibit in an evidentiary hearing, but at the time when it is privately shared with the estate, there is no expectation that it should be publicly available.

[5] In contrast, proofs of claim were delivered to an outside third-party, Epiq Systems, LLC ("Epiq"). Various Orders of the Court, however, make clear that Epiq serves as a delegee of the Court's authority with regard to the

21. Another aspect of Lehman's argument is similarly flawed. The Motion asserts: "most of the data submitted in connection with the Derivative Questionnaire was originally obtained from publicly available market sources, and is plainly not confidential." Motion, ¶ 13. A review of the Derivative Questionnaire indicates that is not the case, however. Master Agreements, credit support information, trade-level data, and market quotations would have all been non-public information. It is difficult to find any information requested in the Derivative Questionnaire that would have been publicly available, much less "most of" it.

22. Lehman also suggests that the passage of time should make confidentiality concerns "unwarranted because the information is now out of date." *Id.* The passage of time has not diminished the confidentiality concerns of the Questionnaire Respondents, however. In particular, the disclosure of the actual derivative contracts and their credit support arrangements would affect future negotiations with potential derivatives counterparties.

**B.    Equity Demands that the Court Retain Existing Confidentiality Requirements**

23. Even if Rule 60 were not applicable, equity would demand that the Court deny the Motion. A number of equitable considerations weigh heavily in favor of retaining the existing confidentiality requirements under the Bar Date Order.

24. First, the questionnaire responses do in fact contain sensitive commercial information. Allowing other market participants to see negotiated terms in the Questionnaire Respondents' derivatives contracts and the commercial terms of their individual trades would give those other market participants an unfair commercial advantage.

25. Second, as noted above, the Questionnaire Respondents submitted their sensitive commercial data with the expectation of it remaining private. Certainly, most of the

---

receipt of proofs of claim.  Nothing in the Bar Date Order delegates the Court's authority to any entity with regard to the Web site administered for the purpose of Derivative Questionnaires.

8

counterparties would have scrutinized their submissions with an eye toward confidentiality concerns, had they known that their submissions would eventually be made public. That reliance was entirely justifiable, considering the language in the Bar Date Order.

26. Creditors commonly perform a cost-benefit analysis regarding whether to file a claim: is the expected distribution more than the claim process will cost in legal fees and related costs? Here, if counterparties had known that their information might eventually be disclosed, that surely would have been part of the cost-benefit analysis. In a close call on the economics, perhaps a counterparty would elect not to file the claim due to the additional disclosure concerns. In contrast, Lehman's requested approach would deprive the counterparties from that ability to essentially "opt out" of the process. For any such counterparty that might have opted out in the face of disclosure requirements, it would be particularly inequitable to force the dissemination of data now that there is no longer an option.

27. Third, it is relevant to emphasize the language in the Bar Date Order that led counterparties to believe they any defect in their questionnaire responses could lead to the expungement of their claim. As a result of the stringent language in the Injunction Provision, counterparties surely believed that they should err on the side of over-inclusion. Again, however, that analysis would have been performed differently had those counterparties known that their data would eventually become publicly available.

28. Fourth, Judge Peck emphasized the need for finality in the procedures he approved concerning the Derivative Questionnaire. He specifically stated that he did not want to revisit the issues and hold a subsequent "hearing in which somebody says we didn't think of something we should have thought of." Transcript, 114:13-14. Despite that warning, Lehman now seeks the hearing that Judge Peck prospectively disfavored.

29. Finally, one must remember that Lehman is the defaulting party in its derivatives contracts, and all of its counterparties are non-defaulting parties. The Questionnaire Respondents are mindful that a bankruptcy court is no stranger to contractual defaults, but other things being equal, equity should favor the non-defaulting parties.

### IV.  CONCLUSION

WHEREFORE, the Questionnaire Respondents respectfully request that the Court (a)(i) deny the Motion and retain the Confidentiality Provisions from the Bar Date Order, or (ii) otherwise provide robust protections for the sensitive commercial information in the Questionnaire Respondents' responses; and (b) grant the Derivative Questionnaire Respondents such further relief as the Court deems just.

Dated: March 30, 2015
Washington, DC

SUTHERLAND ASBILL & BRENNAN LLP

By:  /s/ Mark Sherrill
Mark D. Sherrill (*pro hac vice*)
700 Sixth Street, NW, Ste. 700
Washington, DC  20001
Tel:  (202) 383-0100
Fax:  (202) 637-3593

*Counsel for the Derivative Questionnaire Respondents*