Hearing Date and Time: May 5, 2015 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: April 28, 2015 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard Slack
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
In re                                                    :        **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :        **08-13555 (SCC)**
:
Debtors.                            :        **(Jointly Administered)**
:
---------------------------------------------------------------x

**NOTICE OF MOTION PURSUANT TO RULE 9019**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND**
**SECTION 105(a) OF THE BANKRUPTCY CODE FOR APPROVAL OF**
**SETTLEMENT AGREEMENT RELATING TO RESTRUCTURED ASSET**
**CERTIFICATES WITH ENHANCED RETURNS, SERIES 2006-20AT**
**CREDIT DEFAULT SWAP AGREEMENT AND TRUST AGREEMENT**

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated April 3,

2015 (the "Motion"), of Lehman Brothers Holdings Inc. (the "Plan Administrator") as Plan

Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers*

*Holdings Inc. and Its Affiliated Debtors* for certain entities in the above-referenced chapter 11

cases, on behalf of itself and Lehman Brothers Special Financing Inc., pursuant to section 105(a)

of title 11 of the United States Code and Rule 9019 of the Federal Rules of Bankruptcy

Procedure for approval of the settlement agreement among LBSF, LBHI, U.S. Bank National

Association, as Trustee, and the Restructured Asset Certificates with Enhanced Returns, Series

2006-20AT, as more fully described in the Motion, will be held before the Honorable Shelley C.

Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander

Hamilton Customs House, Courtroom 623, One Bowling Green, New York, New York 10004

(the "Bankruptcy Court"), on **May 5, 2015 at 10:00 a.m. (Prevailing Eastern Time)** (the

"Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the

objecting party, the basis for the objection and the specific grounds thereof, and shall be filed

with the Bankruptcy Court electronically in accordance with General Order M-242 (which can

be found at *www.nysb.uscourts.gov*) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the

Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom

623; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153,

Attn:  Richard Slack, Esq. and Jacqueline Marcus, Esq., attorneys for the Plan Administrator;

(iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building 201

Varick Street, Suite 1006, New York, New York 10014, Attn: William K. Harrington, Esq.,

Susan Golden, Esq. and Andrea B. Schwartz, Esq.; and (iv) Chapman and Cutler LLP, 111 West

Monroe Street, Chicago, Illinois 60603, Attn: Franklin H. Top, III, Esq. and Mark D.

Rasmussen, Esq., attorneys for U.S. Bank National Association, as Trustee, so as to be so filed

WEIL:\95279847\8\58399.0011

and received no later than **April 28, 2015 at 4:00 p.m. (Prevailing Eastern Time) (the**

**"<u>Objection Deadline</u>")**.

    PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

    PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: April 3, 2015
   New York, New York

       /s/ Jacqueline Marcus
       Richard Slack
       Jacqueline Marcus
       WEIL, GOTSHAL & MANGES LLP
       767 Fifth Avenue
       New York, New York 10153
       Telephone: (212) 310-8000
       Facsimile: (212) 310-8007

       *Attorneys for Lehman Brothers Holdings Inc.*
       *and Lehman Brothers Special Financing Inc.*

WEIL:\95279847\8\58399.0011

Hearing Date and Time: May 5, 2015 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: April 28, 2015 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard Slack
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (SCC)
                                        :
                   Debtors.             :    (Jointly Administered)
                                        :
-----------------------------------------------------------------x
```

**MOTION PURSUANT TO RULE 9019 OF**
**THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND**
**SECTION 105(a) OF THE BANKRUPTCY CODE FOR APPROVAL OF**
**SETTLEMENT AGREEMENT RELATING TO RESTRUCTURED ASSET**
**CERTIFICATES WITH ENHANCED RETURNS, SERIES 2006-20AT**
**CREDIT DEFAULT SWAP AGREEMENT AND TRUST AGREEMENT**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator") as Plan

Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers*

*Holdings Inc. and Its Affiliated Debtors* (the "Plan") for certain entities in the above-referenced

chapter 11 cases, on behalf of itself and Lehman Brothers Special Financing Inc. ("LBSF"),

submits this motion (the "Motion") and respectfully represents:

## Relief Requested

1.        By this Motion, pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), the Plan Administrator on behalf of itself and LBSF seeks approval of a settlement agreement, dated as of March 12, 2015 (the "Settlement Agreement"), among LBHI, LBSF, U.S. Bank National Association ("U.S. Bank" or the "Trustee"), solely in its capacity as trustee under the Series Trust Agreement dated as of December 8, 2006 (the "Trust Agreement"),[1] and the Restructured Asset Certificates with Enhanced Returns, Series 2006-20AT Trust (the "Trust Issuer").  The Settlement Agreement resolves certain disputes relating to a credit default swap transaction and interest rate swap transactions (the "Transactions") described below.

## Background

2.        Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including LBSF, commenced with this Court voluntary cases (together, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.

3.        On September 17, 2009, the Court entered the *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors under Derivatives Contracts* [ECF No. 5207] (the "ADR Procedures Order"), as subsequently amended by order of the Court entered on October 2, 2013 [ECF No. 40267]).

---

[1]  A copy of the Trust Agreement (without exhibits) is annexed hereto as Exhibit A.

2

4.      On March 3, 2011, the Court entered the *Alternative Dispute Resolution Procedures Order for Affirmative Claims of the Debtors under Derivatives Transactions with Special Purpose Vehicle Counterparties* [ECF No. 14789] (the "SPV ADR Procedures Order").

5.      On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023]. The Plan became effective on March 6, 2012.

### Jurisdiction

6.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### The Credit Default Swap Agreement and The Trust Agreement

7.      LBSF and the Trust Issuer entered into the Transactions pursuant to a 1992 form ISDA Master Agreement, dated as of December 8, 2006 (the "ISDA Master Agreement"), as amended and supplemented by those certain Schedules to ISDA Master Agreement (collectively, the "Schedule"), and those certain Confirmations, each dated December 8, 2006 (collectively, the "Confirmation"). A copy of the ISDA Master Agreement, the Schedule, and the Confirmation is annexed hereto as Exhibit B. LBHI guaranteed LBSF's obligations under the ISDA Master Agreement, the Schedule, and the Confirmation (the "Guarantee" and, together with the ISDA Master Agreement, the Schedule, and the Confirmation, the "Credit Default Swap Agreement").[2]

8.      Under the Credit Default Swap Agreement, LBSF agreed to make periodic payments to the Trust Issuer in exchange for the Trust Issuer's promise to make payments to LBSF in respect of losses incurred in respect of certain specified reference obligations. In effect, LBSF, as the "Swap Counterparty," purchased protection from the Trust Issuer, which sold

---

[2] Capitalized terms used herein but not otherwise defined have the meaning ascribed to them in the Credit Default Swap Agreement or the Trust Agreement, as applicable.

WEIL:\95279847\8\58399.0011

protection on the creditworthiness of the obligations referenced in the Credit Default Swap Agreement.

9.      On December 8, 2006, Lehman Brothers Inc. as depositor and the Trustee on behalf of the Trust Issuer, entered into the Trust Agreement.  The Trust Agreement is supplemented by and incorporates by reference the Standard Terms for Trust Agreements entered into on December 8, 2006, which establishes the provisions that may be incorporated from time to time with respect to any trust established by the Trust Issuer and the Trustee.  LBSF is a named third-party beneficiary of the Trust Agreement, under which the Trust Issuer issued certain Series 2006-20AT Variable Certificates, due 2046 (the "Certificates").  The Trust Issuer used the money it received from holders of the Certificates (the "Certificateholders") to acquire assets, the proceeds of which would be used, first, to satisfy its payment obligations to LBSF under the Credit Default Swap Agreement and, thereafter, to serve as collateral for its obligations to the Certificateholders.  The assets purchased by the Trust Issuer consisted of Class A-3 asset-backed notes issued by Accredited Mortgage Loan Trust 2006-2 in an initial principal amount of $40.5 million (the "Collateral").   The Collateral constituted the Trust Issuer's principal assets.

10.     In January 2007, the Trust Issuer and LBSF entered into a total return swap (the "Total Return Swap") that was novated to an insurance company counterparty (the "TRS Counterparty").  Under the terms of the Total Return Swap between the Trust Issuer and the TRS Counterparty, the Trust Issuer was entitled to put the Collateral to the TRS Counterparty for par value in certain circumstances, including when it needed funds with which to make payments to LBSF.  The Trust Issuer elected to exercise this right in January 2011, and, accordingly, approximately $40.5 million in cash assets (the "Collateral Proceeds") were placed in the Trust Issuer's Principal Collection Account.

4

11.     Under the terms of the Trust Agreement, the Trustee applies payment proceeds received generally in accordance with a "waterfall" provision. *See* Trust Agreement § 5. Section 5(o)(ii)(1) of the Trust Agreement provides that a termination payment owed to LBSF as Swap Counterparty will be paid in advance of any distributions to Certificateholders unless, inter alia, LBSF is the defaulting party under a Swap Agreement. *See also id*. § 5(n)(ii)(4). Under Section 5(o)(ii)(4) of the Trust Agreement, if, *inter alia*, LBSF is the defaulting party under a Swap Agreement, the termination payment owed to LBSF is paid after the Certificateholders. *See also id*. § 5(n)(ii)(7). As a result, the provisions of Section 5(n) and Section 5(o) of the Trust Agreement (the "Waterfall Provisions") purport to provide that LBSF will receive termination payments before any distributions are made to Certificateholders unless, *inter alia*, LBSF is the defaulting party under a Swap Agreement.

12.     Upon a default by LBSF, such as a bankruptcy filing by LBSF or LBHI, the Trust Agreement and section 5(g) of the Schedules modify the Waterfall Provisions such that Certificateholders gain senior payment priority over LBSF (the so-called the "Priority Flip"). In that circumstance, the Priority Flip changes LBSF's position to junior payment priority for any early termination payment due under the Credit Default Swap. Provisions similar to the Priority Flip have been found to be unenforceable *ipso facto* provisions by this Court. *See, e.g., Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. et al. (In re Lehman Bros. Holdings Inc.)*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011); *Lehman Bros. Special Fin. Inc. v. BNY Corp. Trust Servs. Ltd. (In re Lehman Bros. Holdings Inc*.), 422 B.R. 407 (Bankr. S.D.N.Y. 2010). The Plan Administrator maintains that established *ipso facto* law, confirmed by the above precedent, as well as other legal theories, allows LBSF to be paid from the Collateral Proceeds first, before any amounts are paid to the Certificateholders.

5

## The Dispute

13.     On September 22, 2008, the Trustee sent LBSF a Notice of Early Termination of Transactions for the Trust Issuer stating that an Event of Default had occurred under the Credit Default Swap Agreement because LBHI had filed for bankruptcy.   The notice designated September 23, 2008 as the early termination date.   On November 25, 2008, the Trustee received a letter from LBSF's counsel advising, *inter alia*, that (a) any action taken to exercise remedies with respect to the Certificates would violate the automatic stay and, therefore, any actions to make distributions to Certificateholders would violate the stay, and (b) any provision subordinating any termination payment due LBSF would be unenforceable.

14.     On April 19, 2010, LBSF commenced Derivatives ADR No. 158 by serving an ADR Notice upon the Trustee and the Trust Issuer pursuant to the ADR Procedures Order.[3]   On June 4, 2010, the Trustee served an ADR Response to the ADR Notice.   LBSF issued a reply on June 21, 2010. While not provided for under the ADR Procedures Order, on August 6, 2010, the Trustee served a sur-reply to the ADR Notice.

15.     On September 14, 2010, LBSF commenced Adversary Proceeding No. 10-03547, captioned *Lehman Bros. Special Fin. Inc. v. Bank of Am. National Ass'n, et al.* (*In re Lehman Bros. Holdings Inc., et al.*), Case No. 08-13542 (SCC) (the "Adversary Proceeding"), challenging, among other things, (a) the proper interpretation of the Credit Default Swap Agreement and the Trust Agreement, and (b) the enforceability of certain provisions in the Credit Default Swap Agreement and the Trust Agreement purporting to modify LBSF's right to receive payment upon early termination of the Transactions solely as a result of LBSF's or

---

[3] ADR No. 158 involves seven RACERS transactions, including the Transactions subject to this Motion.   Because the other six RACERS transactions all shared the same certificateholder, those transactions were dealt with in a separate, single mediation.

WEIL:\95279847\8\58399.0011

LBHI's bankruptcy filings.  The Adversary Proceeding also involves other similar disputes involving other issuers and trustees.

16.    Specifically, in the Adversary Proceeding, LBSF seeks a declaratory judgment that provisions purporting to modify LBSF's economic rights to a termination payment premised on the bankruptcy filing of either LBHI or LBSF constitute unenforceable *ipso facto* clauses that inappropriately modify a debtor's interest in property, in violation of sections 365(e)(1) and 541(c)(1) of the Bankruptcy Code.  LBSF also seeks a declaratory judgment that effectuation of the Waterfall Provisions violates the automatic stay under section 362(a)(3) of the Bankruptcy Code because it involves an improper exercise of control over property of LBSF's estate.  *See generally Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros. Holdings Inc.)*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011); *Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010).  In the alternative, LBSF seeks a declaratory judgment that, if the Waterfall Provisions ultimately are found to be enforceable in whole or in part, they constitute either (i) a preferential transfer of an interest of LBSF in property that may be avoided under section 547 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; (ii) a constructive fraudulent transfer of an interest of LBSF in property that may be avoided under section 548(a)(1)(B) of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; or (iii) an unauthorized postpetition transfer of property of LBSF's estate that may be avoided under section 549 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and

WEIL:\95279847\8\58399.0011

preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code. The positions advanced by LBSF in the Adversary Proceeding are not those of the Trustee.

17.     On October 20, 2010, the Court entered the *Order Staying Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1)* [ECF No. 12199], thereby staying, among other things, certain adversary proceedings, including the Litigation, to allow parties to the Litigation and other similar actions time to explore the possibility of resolving their disputes without the need for litigation (the "Stay"). The Stay has been subsequently extended by orders of the Court, most recently pursuant to the *Order Extending Stay of Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1)*, dated January 31, 2014 [ECF No. 42417], which extended the Stay until the later of (i) May 20, 2014 or (ii) thirty (30) days after the date on which the Court enters a scheduling order governing the adversary proceedings defined as the "Distributed Actions" and identified on Exhibit A of the order. On July 14, 2014, the Court entered a scheduling order governing the Distributed Actions, including the Litigation. *See* Adv. Proc. No. 10-03547 (SCC) [ECF No. 794] (the "Scheduling Order"). The Scheduling Order sets forth a schedule for litigation of various issues in the Adversary Proceeding. The Trust Issuer and the Trustee have not answered or otherwise moved for any relief in the Adversary Proceeding.

18.     On or about April 1, 2011, the ADR Notice was subsequently amended and LBSF submitted a SPV Derivatives ADR Election pursuant to which LBSF recommenced the ADR process under the SPV ADR Procedures Order. The Trustee served an amended ADR Response on June 13, 2011, and LBSF served its ADR Reply on July 5, 2011. On November 3, 2011, LBSF, the Trustee and the Certificateholders engaged in mediation pursuant to the SPV

8

ADR Procedures Order, ultimately resulting in entry into the Settlement Agreement described immediately below.

19.    Throughout the course of its settlement negotiations with LBSF and its participation in the Adversary Proceeding, the Trustee has made attempts to contact the Certificateholders for direction regarding the dispute among LBSF, the Trust Issuer, and the Trustee pertaining to application of Collateral Proceeds.[4]  As a result of these efforts, LBSF and many of the Certificateholders have consensually resolved the dispute surrounding the enforceability of the Waterfall Provisions and the application of the Collateral Proceeds.  These resolutions have resulted in distribution of over $30 million of the Collateral Proceeds. However, certain of the Certificateholders have not responded to the Trustee's communications. The Trustee has advised LBSF that it is prepared to enter into the Settlement Agreement regarding the approximately $5.185 million of remaining Collateral Proceeds (the "Remaining Collateral Proceeds"), provided the Court approves of the terms of the Settlement Agreement pursuant to the terms of Bankruptcy Rule 9019.  Entry of an order by this Court, in the form annexed hereto, is a condition precedent to the effectiveness of the Settlement Agreement.

---

[4] The Trustee will file an affidavit detailing its attempts to contact Certificateholders in advance of the hearing on this Motion.

WEIL:\95279847\8\58399.0011

## The Settlement Agreement[5]

20.     The salient terms of the Settlement Agreement are as follows:

a.  Notwithstanding any provision to the contrary in the Trust Agreement, the Trustee shall distribute and apply all Remaining Collateral Proceeds and any interest earned thereon, as well as certain other amounts as set forth in the Settlement Agreement, as follows, and in the following order and priority:

1.  Pay the outstanding fees and expenses of the Trustee in the amount specified.

2.  Pay to each Certificateholder that does not object to the Settlement Agreement or this Motion an amount equal to the Settlement Offer (as defined in the Settlement Agreement) (the "Certificateholder Settlement Amount"), in full satisfaction of claims of such Certificateholder; provided however that payment of the Certificateholder Settlement Amount is subject to the receipt by the Trustee of an opinion or information regarding the fairness and reasonableness of the Certificateholder Settlement Amount, or waiver of such receipt by the Trustee as to all or some of the Certificates (collectively, the "Remaining Certificates") by written instruction from such Certificateholders (such receipt or waiver of receipt, the "Certificateholder Settlement Amount Condition").

3.  Place into an interest-bearing account an amount to be held in respect of a reserve, which the Trustee may use for fees and expenses as enumerated in the Settlement Agreement, which amount may be invested in eligible investment vehicles as agreed upon by the Plan Administrator and the Trustee (the "Reserve Amount").

4.  Pay any amount remaining after application of the foregoing to LBSF, by wire transfer (the "Lehman Settlement Amount").

---

[5] In keeping with the confidentiality provisions of the Settlement Agreement, and due to LBHI's and LBSF's desire to keep the economic terms of the settlement confidential, the Settlement Agreement is not included as an exhibit to this Motion. The Plan Administrator will provide the Settlement Agreement to the Court, the U.S. Trustee, and the attorneys for the official committee of unsecured creditors appointed in these cases. Certificateholders must contact the Trustee for a copy of the Settlement Agreement and, before receiving any such copy, such Certificateholders will be required to execute an agreement binding them to the confidentiality restrictions of the settlement, including paragraph 13 of the SPV ADR Procedures Order.

WEIL:\95279847\8\58399.0011

5.  Subject to certain conditions, pay to LBSF any remaining portion of the Reserve Amount.

b.  Upon payment of the Trustee's fees and expenses, the Trustee's claims for fees and expenses included within any and all proofs of claim asserted in these Chapter 11 Cases, whether liquidated, unliquidated or contingent in nature, shall be reduced accordingly.

c.  In the event that there is no Certificateholder that timely objects to the Settlement Agreement or this Motion (an "Objecting Certificateholder"), and subject to the other terms of the Settlement Agreement, each claim and demand set forth in any and all proofs of claim filed by the Trust Issuer, a Certificateholder, or the Trustee on behalf of the Trust Issuer, whether liquidated, unliquidated or contingent in nature, other than claims and demands related to the fees and expenses of the Trustee, shall be withdrawn.  The Trustee and Trust Issuer (or the Trustee on its behalf) authorize the Plan Administrator to execute and deliver an Instruction Letter to Epiq Bankruptcy Solutions, LLC, the claims agent, to update the claims register accordingly.

d.  Upon the Effective Date (as defined in the Settlement Agreement), the Trust Issuer and LBSF are deemed to terminate and/or acknowledge the termination of the Transactions.

e.  In the event that there is no Objecting Certificateholder, and upon LBSF's receipt of the Lehman Settlement Amount, LBSF shall dismiss with prejudice any and all claims against the Trust Issuer and U.S. Bank, individually and/or as the Trustee, arising under, related to, or in connection with the Certificates, the Trust Agreements or the Credit Default Swap Agreement, including, if applicable, any such claims made in the Adversary Proceeding.

f.  Upon the Effective Date (as defined in the Settlement Agreement), LBSF, LBHI, and the Plan Administrator release U.S. Bank, individually and as Trustee, and any and all former, current, or future Certificateholders from any and all claims arising from, related to, or in connection with the Certificates, the Trust Agreements or the Credit Default Swap Agreement, that have been or could be asserted in the Adversary Proceeding and shall covenant never to commence a proceeding regarding the same.

g.  LBSF shall indemnify and hold harmless the Trust Issuer and the Trustee, as specified in the Settlement Agreement, in connection with taking any action in furtherance of the Settlement Agreement.

11

h. LBSF and the Plan Administrator acknowledge and agree that they will limit any damages sought in the Adversary Proceeding resulting from any and all claims made against the Trust Issuer and U.S. Bank, individually and/or as Trustee, arising under, related to, or in connection with, the Trust Agreement, the Transactions (including related documents and any termination payment), or the Certificates, to the pro rata portion of the Remaining Collateral Proceeds held by the Trustee (net of any accrued, due and owing Trustee's fees and expenses or allocable Reserve Amount) and attributable to the Certificates held or beneficially held by any Objecting Certificateholders.

21. Although the Plan Administrator believes that LBSF's claims against the Trust Issuer are valid and meritorious, the Plan Administrator has determined in its informed business judgment that the terms of the Settlement Agreement are in the best interest of LBSF's estate.  Absent consummation of the Settlement Agreement, LBSF, LBHI, the Trust Issuer, and the Trustee likely would proceed with litigation, which could include time-consuming and expensive legal proceedings, including potential appeals, as well as the risks inherent in any litigation.  The Settlement Agreement will enable LBSF and LBHI to avoid expending further resources in connection with this dispute, while recovering a substantial portion of the amount in dispute.

## The Settlement Agreement Is in
## LBSF's Best Interests and Should Be Approved

22. The Plan Administrator on behalf of itself and LBSF submits that the Settlement Agreement is in LBSF's best interests and should be approved under Rule 9019 of the Bankruptcy Rules.  Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement."  Fed. R. Bankr. R. 9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate."  *In re Drexel Burnham Lambert Group*, *Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  The settlement need not result in the best possible outcome for the debtor, but

12

must not "fall beneath the lowest point in the range of reasonableness." *Id.*; *see also Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

23.    Compromises are "a normal part of the process of reorganization." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). Compromises may be effected separately during the reorganization proceedings or in the body of the plan itself. *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. at 758. The decision to approve a particular compromise lies within the sound discretion of the Court. *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). The Court's discretion may be exercised "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and in the best interest of the [debtor's] estate." *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted). The court must apprise itself "of all relevant facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424.

24.    Courts typically consider the following factors in determining whether a settlement should be approved: (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the difficulties of collecting any litigated judgment; (iii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iv) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; (v) the competence and experience of counsel

13

who support the settlement; (vi) the relative benefits to be received by members of any affected

class; (vii) the extent to which the settlement is truly the product of arm's-length bargaining and

not the product of fraud or collusion; and (viii) the debtor's informed judgment that the

settlement is fair and reasonable.  *See Id.*; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr.

S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. at 50.

25.     While a court must "evaluate . . . all . . . factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *Cosoff v. Rodman (In re

W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), or conduct a full independent investigation.

*Drexel Burnham Lambert Group*, 134 B.R. at 496.   Moreover, in reviewing a global

compromise, a court need not be aware of or decide the particulars of each individual claim

resolved by the settlement or "assess the minutia of each and every claim"; rather, a court "need

only canvass the issues and see whether the settlement falls 'below the lowest point in the range

of reasonableness.'"  *Shugrue*, 165 B.R. at 123.  As one court explained in assessing a global

settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement *in its

entirety* is appropriate for the . . . estate."  *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust

Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d

Cir. 1993) (emphasis added).

26.     Here, the Settlement Agreement will benefit LBHI, LBSF and their

creditors.  First, the Settlement Agreement will result in a substantial payment to LBSF's estate

that the Plan Administrator has determined, in the exercise of its business judgment, will

adequately compensate LBSF's estate for the early termination value of the Transactions in light

14

of the risks and costs of further litigation. Second, entry into the Settlement Agreement will avoid future disputes and litigation concerning the Certificates.

27. For the reasons stated above, and in the Plan Administrator's informed business judgment, the compromises set forth in the Settlement Agreement are a "fair and equitable" resolution of the parties' dispute, well within the "range of reasonableness," and are in the best interests of LBHI, LBSF, and their respective estates and creditors. Accordingly, the Plan Administrator requests that the Settlement Agreement be approved, effective immediately upon entry of an Order granting the relief requested herein.

**The Bankruptcy Court Has Authority Pursuant to
Section 105(a) of the Bankruptcy Code to Approve the Settlement Agreement**

28. The Plan Administrator also seeks approval of the Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code. This Court has authority under the broad equitable powers of the Bankruptcy Code, as set forth in section 105(a), to approve the Settlement Agreement. Courts have used their equitable powers to permit deviations in trust agreements in order to preserve and protect a trust or where circumstances exist that would defeat or substantially impair the accomplishment of the purposes of the trust. *See, e.g., In re A.H. Robbins*, 880 F.2d 769, 776 (4th Cir. 1989) (noting that section 105(a) authorizes the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code and finding that matters relating to the control and supervision of trusts are within the equity jurisdiction of the court); *In re Joint Eastern and Southern Districts Asbestos Litigation*, 878 F. Supp 473 (E.D.N.Y. & S.D.N.Y. 1995) and 129 B.R. 710 (E.D.N.Y. & S.D.N.Y. 1991) (holding that section 105(a) authorizes the federal courts in bankruptcy cases to approve a settlement modifying distributions, obligations, and payment procedures under a trust). Accordingly, the Court has authority under section 105(a) of the

Bankruptcy Code to direct the Trustee to deviate from the terms of the Trust Agreement, where strict adherence to the terms of the Trust Agreement would frustrate the Issuer's economic stakeholders from realizing the value of their interests in the Remaining Collateral Proceeds held under the Trust Agreement by the Trustee for the benefit of the Certificateholders.

29.    The Court has granted similar relief in these chapter 11 cases, pursuant to section 105(a) of the Bankruptcy Code.  On November 7, 2014, the Court entered an order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving a settlement agreement among Putnam Structured Product Funding 2003-1 Ltd., Putnam Structured Product Funding 2003-1 LLC, U.S. Bank National Association, as Successor Trustee, LBSF and LBHI [ECF No. 46854].  *See also Order Approving the Settlement Agreement Relating to Exum Ridge CBO 2007-2 Credit Default Swap Agreement and Indenture* [ECF No. 48318]; *Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy Code for Approval of Partial Settlement Agreement Relating to SGS HY Credit Fund I (Exum Ridge CBO 2006-3) Swap Agreement and Indenture* [ECF No. 45451]; *Order Approving Partial Settlement Agreements Relating to Certain Credit Default Swap Agreements and Trust Agreements* [ECF No. 39624]; *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Partial Settlement Agreement Relating to Airlie CDO I, Ltd.* [ECF No. 39017]; *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Partial Settlement Agreement Relating to Pebble Creek LCDO 2007-3, Ltd.* [ECF No. 36867]; *Order Approving Settlement Agreement and Indemnity Between Lehman Brothers Special Financing Inc. and Deutsche Bank Trust Company Americas, as Trustee, Relating to Credit Default Swap Agreement* [ECF No. 30096].

30.       The use of the Court's equitable authority is justified and appropriate here. The Settlement Agreement protects the interests of Certificateholders by providing that the Settlement Agreement shall not become effective if there is an Objecting Certificateholder.  In addition, the Settlement Agreement provides for the reservation of the Reserve Amount, which the Trustee may use for fees and expenses as enumerated in the Settlement Agreement. Moreover, any interested parties that may object to the terms of the Settlement Agreement will have the opportunity to lodge an objection with and be heard by this Court.

### Notice

31.       No trustee has been appointed in these chapter 11 cases.  The Plan Administrator has served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [ECF No. 9635] on (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) the attorneys for the Trustee; and (vi) all parties who have requested notice in the Chapter 11 Cases.  The Plan Administrator submits that no other or further notice need be provided.

WEIL:\95279847\8\58399.0011

32.     No other request for the relief sought herein has been made by the Plan

Administrator to this or any other Court.

WHEREFORE the Plan Administrator on behalf of itself and LBSF respectfully

requests that the Court grant the relief requested herein and such other and further relief as it

deems just and proper.

Dated: April 3, 2015
         New York, New York              /s/ Jacqueline Marcus
                                         Richard Slack
                                         Jacqueline Marcus
                                         WEIL, GOTSHAL & MANGES LLP
                                         767 Fifth Avenue
                                         New York, New York 10153
                                         Telephone: (212) 310-8000
                                         Facsimile: (212) 310-8007

                                         *Attorneys for Lehman Brothers Holdings Inc.
                                         and Lehman Brothers Special Financing Inc.*

18

# EXHIBIT A

Trust Agreement (without exhibits)

WEIL:\95279847\8\58399.0011

EXECUTION COPY

## SERIES TRUST AGREEMENT

SERIES TRUST AGREEMENT, dated as of December 8, 2006 (the "Series Trust Agreement"), by and between LEHMAN BROTHERS INC., as Depositor, and U.S. BANK NATIONAL ASSOCIATION, as Trustee.

### W I T N E S S E T H:

WHEREAS, the Depositor desires to create the Trust designated herein by executing and delivering this Series Trust Agreement, which shall incorporate the Standard Terms (as the same may be modified with respect to the Trust by the terms of this Series Trust Agreement);

WHEREAS, the Depositor shall deposit or cause to be deposited into the Trust on the Closing Date the Underlying Securities described in Appendix A attached hereto;

WHEREAS, the Depositor desires to direct the Trustee, acting on behalf of the Trust pursuant to the Trust Agreement, to enter into (i) the Master Agreement(s) (ii) the Portfolio Swap Confirm (iii) the Total Return Swap Confirm, (iv) the Collateral Substitution Agent Agreement, and (v) the Escrow Agreement;

WHEREAS, in connection with the creation of the Trust, it is desired to provide for the delivery of Certificates evidencing undivided interests in the Trust; and

WHEREAS, in evidence of the acceptance by the Trustee of the Trust, the Trustee has joined in the execution of the Standard Terms and this Series Trust Agreement;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants expressed herein, it is hereby agreed by and between the Depositor and the Trustee as follows:

Section 1.    Incorporation of Standard Terms.

All of the provisions of the Standard Terms for Trust Agreements, dated as of December 8, 2006, between the Depositor and the Trustee (the "Standard Terms"), a copy of which is attached hereto as Appendix B, are herein incorporated by reference in their entirety, such that this Series Trust Agreement and the Standard Terms form a single agreement between the parties.  In the event of any inconsistency between the provisions of this Series Trust Agreement and the provisions of the Standard Terms, this Series Trust Agreement shall prevail for purposes of the Restructured Asset Certificates with Enhanced Returns, Series 2006-20AT Trust and the Restructured Asset Certificates with Enhanced Returns, Series 2006-20AT Variable Certificates, due 2046.  Capitalized terms used and not defined herein shall have the meaning ascribed thereto in the Standard Terms.

Section 2.　　Definitions.

"Acquisition Calculation Amounts" has the meaning specified in the Total Return Swap Confirm.

"Additional Fixed Amounts" has the meaning specified in the Portfolio Swap Confirm.

"Additional Fixed Payment" has the meaning specified in the Portfolio Swap Confirm.

"Additional Fixed Payment Event" has the meaning specified in the Portfolio Swap Confirm.

"Additional Termination Event" has the meaning specified in the Master Agreement.

"Additional Termination Event Date" means:  Not applicable.

"Additional Underlying Securities" shall have the meaning set forth in Section 5(d) hereof.

"Alternative Settlement Amount" has the meaning specified in the Portfolio Swap Confirm.

"Business Day" means any day which is not (i) a Saturday or a Sunday or (ii) a day on which commercial banks in the State of New York or London, England are authorized or required by law to be closed.

"Certificates" has the meaning set forth in Section 3(a) hereof.

"Certificate Distribution Date" means the 5th day of each month, commencing in January 2007 and ending on the Effective Maturity Date (or if any such day is not a Business Day, the next following Business Day).

"Closing Date" means December 8, 2006.

"Collateral Substitution Agent" shall mean Lehman Brothers Inc. or any successor in interest under the Collateral Substitution Agent Agreement.

"Collateral Substitution Agent Agreement" shall mean the agreement between the Trust and the Collateral Substitution Agent, dated as of the Closing Date as amended from time to time.

"Corporate Trust Office" means the office of the Trustee specified in 7.04(b) of the Standard Terms.

"Deferred Certificate Distribution Date" means each date falling 5 Business Days after each Additional Fixed Rate Payer Payment Date occurring after the Effective Maturity Date.

"Deferred Maturity Date" means the last to occur of (i) the Effective Maturity Date, (ii) the last Additional Fixed Rate Payer Payment Date, (iii) the last Release Date and (iv) if either a Termination Event or an Event of Default has occurred with respect to a Master Agreement relating to the Portfolio Swap Confirm or the Total Return Swap Confirm and the Portfolio Swap Counterparty or the TRS Counterparty is the "Defaulting Party" or the sole "Affected Party" (as defined therein), the day falling one year after the related "Early Termination Date" (as defined therein).

"Delayed Distribution Date" means:  Not applicable.

"Delayed Distribution Underlying Securities" means:  Not applicable.

"Early Termination Date" has the meaning specified in the Master Agreement.

"Effective Maturity Date" shall mean the earliest to occur of (i) the Final Scheduled Distribution Date, (ii) the first Certificate Distribution Date following the date upon which the Outstanding Tranche Notional Amount under the Portfolio Swap Agreement is reduced to zero (*unless*, the Outstanding Tranche Notional Amount has not been increased to an amount greater than zero within one year) and (iii) the first Certificate Distribution Date following the Early Termination Date with respect to the Master Agreement relating to the Portfolio Swap Confirm.

"Escrow Agent" shall mean U. S. Bank National Association.

"Escrow Agreement" shall mean the agreement between the Trust, Lehman Brothers Special Financing and the Escrow Agent.

"Event of Default" with respect to a Swap Agreement shall have the meaning specified in the related Master Agreement.

"Excess Principal Balance" means, on any date, the positive difference (if any) between (i) the sum of (A) amounts on deposit in the Principal Collection Account on such date and (B) the outstanding principal amount of the Underlying Securities on deposit in the Underlying Securities Account on such date, and (ii) the Outstanding Tranche Notional Amount.

"Expected Interest Distribution Amount" means, with respect to an Interest Collection Period, the product of (i) the sum of LIBOR and 2.30%, (ii) the Principal Amount as of the Certificate Distribution Date falling during the Interest Collection Period (taking into account all adjustments on such date), and (iii) a fraction, the numerator of which is the number of days in the related Interest Collection Period and the denominator of which is 360.

"Failure to Pay Principal" has the meaning specified in the Portfolio Swap Confirm.

"Final Exchange Amount" shall have the meaning set forth in the Total Return Swap Confirm.

"Final Exchange Date" shall have the meaning set forth in the Total Return Swap Confirm.

"Final Scheduled Distribution Date" means June 5, 2046.

"Fixed Amount" shall have the meaning set forth in the Portfolio Swap Confirm.

"Floating Amount" shall have the meaning specified in the Portfolio Swap Confirm.

"Floating Amount Event" shall have the meaning specified in the Portfolio Swap Confirm.

"Floating Amount Payment Date" shall have the meaning specified in the Portfolio Swap Confirm.

"Floating Rate Payer Payment Date" shall have the meaning specified in the Portfolio Swap Confirm.

"Incurred Interest Shortfall Amount" shall have the meaning specified in the Portfolio Swap Confirm.

"Incurred Interest Shortfall Reimbursement Amount" shall have the meaning specified in the Portfolio Swap Confirm.

"Incurred Principal Loss Amount" shall have the meaning set forth in the Portfolio Swap Confirm.

"Incurred Principal Reimbursement Amount" shall have the meaning set forth in the Portfolio Swap Confirm.

"Interest Collection Period" means, with respect to each Certificate Distribution Date, the period from and including the 25th day of the month two months preceding the month of such Certificate Distribution Date (or the Closing Date in the case of the first Certificate Distribution Date) to, but excluding the 25th day of the month one month preceding the month of such Certificate Distribution Date.

"Interest Distribution Amount" shall mean with respect to each Certificate Distribution Date, an amount equal to (i) the Expected Interest Distribution Amount for the related Interest Collection Period, *minus* (ii) the Incurred Interest Shortfall Amount (if any) determined during the related Interest Collection Period, *plus* (iii) the Incurred Interest Shortfall Reimbursement Amount (if any) determined during the related Interest Collection Period.

"Initial Principal Amount" shall mean $40,500,000.

"Initial Underlying Securities" means $40,500,000 Class A-3 Asset-Backed Notes, Series 2006-2, as described more fully in Appendix A annexed hereto.

"Initial Underlying Securities Issuer" means Accredited Mortgage Loan Trust 2006-2.

"Interest Collection Account" shall have the meaning set forth in Section 5(o) hereof.

"Interest Shortfall" has the meaning specified in the Portfolio Swap Confirm.

"Interest Shortfall Reimbursement Payment Amount" has the meaning specified in the Portfolio Swap Confirm.

"Investment Advisor" means:  Not applicable.

"LIBOR" means, with respect to the Interest Collection Period, the London interbank offered rate for one-month United States dollar deposits determined on the second Business Day preceding the first day of such Interest Collection Period.

"Market Agent" means:  Not applicable.

"Master Agreement" means (i) the 1992 ISDA Master Agreement, dated as of the Closing Date, by and between the Trust and Lehman Brothers Special Financing Inc. and schedule thereto as the same may be amended or supplemented by confirmations from time to time as provided herein and therein and (ii) any other 1992 ISDA Master Agreement and schedule thereto that the Trust executes, as the same may be amended or supplemented by confirmations from time to time as provided therein.

"Minimum Authorized Denomination" means $500,000 and integral multiples of $1 in excess thereof.

"Minimum Rating" shall mean a short-term rating of "A-1+" by S&P or a long-term rating of "AA-" by S&P.

"Notice of Amendment" shall mean the notice of amendment delivered to the Trust by the Collateral Substitution Agent indicating changes to Annex A of the Total Return Swap Confirm.

"Optional Delivery" shall have the meaning set forth in the Total Return Swap Confirm.

"Optional Redemption" means:  Not applicable.

"Outstanding Tranche Notional Amount" shall have meaning set forth in the Portfolio Swap Confirm.

"Partial Unwind Amount" means:  Not Applicable.

"Parties to the Trust" means, collectively, the Depositor, the Trustee, Lehman Brothers Special Financing Inc., the Swap Guarantor, Lehman Brothers Inc. or any of their respective affiliates.

"Portfolio Swap Confirm" shall mean the single tranche portfolio credit default swap confirmations dated as of the Closing Date, by and between the Trust and the Portfolio Swap Counterparty.

"Portfolio Swap Counterparty" means Lehman Brothers Special Financing Inc. or any successor in interest under the Portfolio Swap Confirm.

"Premium Distribution Amount" means:  Not applicable.

"Principal Collection Account" has the meaning set forth in Section 5(p) hereof.

"Principal Amount" means the Initial Principal Amount (i) decreased on each date on which a payment of principal is made to Certificateholders, by the amount of such principal payment; (ii) decreased on the day, if any, on which a Failure to Pay Principal or Writedown occurs under the Portfolio Swap Confirm by the relevant Incurred Principal Loss Amount; (iii) increased on each day on which a Principal Shortfall Reimbursement or Writedown Reimbursement occurs under the Portfolio Swap Confirm by the relevant Incurred Principal Reimbursement Amount; *provided* that if the Principal Amount would be less than zero, it shall be deemed to be zero.  For the avoidance of doubt, any increase or decrease of the Principal Amount with respect to an event specified in clauses (ii) or (iii) will not take effect until the next succeeding Certificate Distribution Date.

"Principal Payment" has the meaning specified in the Portfolio Swap Confirm.

"Principal Shortfall" has the meaning specified in the Portfolio Swap Confirm.

"Principal Shortfall Amount" has the meaning specified in the Portfolio Swap Confirm.

"Principal Shortfall Reimbursement" has the meaning specified in the Portfolio Swap Confirm.

"Record Date" means, with respect to each Certificate Distribution Date, the day which is immediately prior to such Certificate Distribution Date whether or not such day is a Business Day.

"Reference Entity" has the meaning specified in the Portfolio Swap Confirm.

"Reference Obligation" has the meaning specified in the Portfolio Swap Confirm.

"Reference Obligation Notional Amount" has the meaning specified in the Portfolio Swap Confirm.

"Release Date" shall have the meaning set forth in the Escrow Agreement.

"Sale Procedures" shall mean, notwithstanding anything to the contrary in the Standard Terms, in connection with any sale of the Underlying Securities, the Collateral Substitution Agent will, on behalf of the Trust, sell such Underlying Securities to the highest of not less than three solicited bidders for such Underlying Securities, which bidders may include Lehman Brothers Inc., or any of its respective affiliates ("Parties to the Trust"); provided, however, that at least three of the solicited bidders will be financial institutions which (a) are independent of each of the Parties to the Trust, (b) are "qualified institutional buyers" within the meaning of Rule 144A under the Securities Act and (c) deal in assets of the same type as the Underlying Securities.  In the sole judgment of the Collateral Substitution Agent, bids may be evaluated on the basis of bids for all or a portion of the Underlying Securities being sold or valued or any basis selected in good faith by the Collateral Substitution Agent.

"Swap Agreement" means either of the Portfolio Swap Confirm together with its related Master Agreement or the Total Return Swap Confirm together with its related Master Agreement, as applicable.

"Swap Counterparty" shall mean the Portfolio Swap Counterparty or TRS Counterparty, as applicable.

"Swap Guarantee" means the agreement executed by Lehman Brothers Holdings Inc. dated as of December 8, 2006 or any other agreement which provides for a guarantee of the obligations of the Portfolio Swap Counterparty under the Portfolio Swap Confirm or the obligations of the TRS Counterparty under the Total Return Swap Confirm.

"Swap Guarantor" means Lehman Brothers Holdings Inc. or any other party which guarantees the obligations of the Portfolio Swap Counterparty under the Portfolio Swap Confirm or the TRS Counterparty under Total Return Swap Confirm.

"Termination Event" with respect to a Swap Agreement, shall have the meaning set forth under the related Master Agreement.

"Total Return Swap Confirm" shall mean the total return swap confirmation, dated as of the Closing Date, by and between the Trust and the TRS Counterparty (and any substitution for it under a different Master Agreement).

"Trustee Fee" means the amount agreed upon between the Depositor and the Trustee.

"TRS Counterparty" shall mean Lehman Brothers Special Financing Inc. or any successor in interest (or other counterparty) under the Total Return Swap Confirm.

"Underlying Obligor" has the meaning set forth in Appendix A annexed hereto.

"Underlying Securities" shall mean the Initial Underlying Securities together with any Additional Underlying Securities and any cash amounts on deposit in the Underlying Securities Account representing amortization on the Underlying Securities.

"Underlying Securities Account" shall have the meaning set forth in Section 5(p) hereof.

"Underlying Securities Default" means the occurrence of a "Final Exchange Event" with respect to the Underlying Securities as provided in the Total Return Swap Confirm.

"Writedown" has the meaning specified in the Portfolio Swap Confirm.

"Writedown Amount" has the meaning specified in the Portfolio Swap Confirm.

"Writedown Reimbursement" has the meaning specified in the Portfolio Swap Confirm.

"Writedown Reimbursement Amount" has the meaning specified in the Portfolio Swap Confirm.

Section 3.    Designation of Trust and Certificates.

(a)    The Trust created hereby shall be known as "Restructured Asset Certificates with Enhanced Returns, Series 2006-20AT Trust" and the Certificates evidencing undivided ownership interests therein shall be known as "Series 2006-20AT Variable Certificates, due 2046 (the "Certificates").    On the Closing Date, the Trust shall issue $40,500,000 principal amount of Certificates.  Except as provided in the Trust Agreement, the Trust shall not issue additional Certificates or incur any additional indebtedness.

(b)    The Certificates will be sold in reliance on Rule 144A under the Securities Act and will be represented by one or more global certificates issued in fully registered form, which will be deposited with the Trustee as custodian for, and registered in the name of Cede & Co., as nominee of, DTC.  Any purported sales or transfers of any beneficial interest in a Certificate to a transferee which does not comply with the requirements of this paragraph shall be null and void ab initio.

Section 4.    Satisfaction of Conditions to Initial Execution and Delivery of Certificates.

The Trustee hereby acknowledges receipt on or prior to the Closing Date of:

(a)    the Initial Underlying Securities, deposited in accordance with Section 2.01 of the Standard Terms;

(b)    an opinion of counsel to the Depositor, addressed to the Trustee, substantially in the form of Appendix D to the Standard Terms;

(c)    a fully executed copy of the Master Agreement (and related schedule thereto), the Portfolio Swap Confirm and the Total Return Swap Confirm together with all documents and opinions required to be delivered to the Trust upon execution thereof pursuant to the terms thereof;

(d)    a certificate signed by an authorized officer of the Depositor certifying that all of the requirements of Section 2.09 of the Standard Terms have been satisfied;

(e)    written acknowledgment from the Collateral Substitution Agent that no additional fees and expenses are owed by the Trust for the performance of its duties under the Collateral Substitution Agent Agreement;

(f)    written instructions from the Depositor directing the Trustee to enter into (i) the Master Agreement (and related schedule thereto), (ii) the Portfolio Swap Confirm, (iii) the Total Return Swap Confirm, and (iv) the Collateral Substitution Agent Agreement.

Section 5.    Amendment/Modification of Standard Terms.

(a)    Distributions on the Effective Maturity Date.  On the Effective Maturity Date, following payment in full of all amounts owed by the Trust to each of the Swap Counterparties under the applicable Master Agreement, the Trustee will distribute *first* to the Certificateholders, *pro rata*, an amount equal to the Principal Amount on the Effective Maturity Date and *second*, to the Collateral Substitution Agent all remaining amounts on deposit in the Interest Collection Account and Principal Collection Account on such date.

(b)    Trustee Actions Regarding Swap Guarantee.  Upon a Responsible Officer of the Trustee becoming aware of a failure to pay by either Swap Counterparty, the Trustee shall notify the defaulting Swap Counterparty and the related Swap Guarantor and shall promptly exercise the remedies  of the Trust under the applicable Swap Agreement and Swap Guarantee.

(c)    Underlying Securities Default.   (i) Notwithstanding anything to the contrary in the Standard Terms, in the event a Responsible Officer of the Trustee has actual knowledge of an Underlying Securities Default, the Trustee shall (x) within one Business Day of becoming aware of the occurrence of such event, notify the TRS Counterparty, Collateral Substitution Agent and the Swap Guarantor with respect to the Total Return Swap Confirm of such Underlying Securities Default and (y) deliver the entire principal amount of the related Underlying Security held by the Trust to the TRS Counterparty on the relevant Final Exchange Date in exchange for the related Final Exchange Amount.

(d)    Additional Underlying Securities.  In the event that the Trust has received (A) amortization proceeds in respect of an Underlying Security, (B) a Final Exchange Amount from the TRS Counterparty, or (C) an Incurred Principal Reimbursement Amount from the Portfolio Swap Counterparty, the Collateral Substitution Agent shall provide the Trust with a Notice of Amendment specifying Additional Underlying Securities and, upon receipt of a Notice of Amendment from the Collateral Substitution Agent, the Trustee, on behalf of the Trust, shall purchase on the same day additional Underlying Securities as instructed in the related Notice of Amendment (such Underlying Securities the "Additional Underlying Securities").  Furthermore, on any Business Day, the Trustee shall, upon instruction from the Collateral Substitution Agent, (i) deliver an Underlying Security to the TRS Counterparty and (ii) use the proceeds received from the TRS Counterparty in connection with such delivery (and/or any cash amounts in the Underlying Securities Account) to purchase an Additional Underlying Security (such Additional Underlying Security to be selected by the Collateral Substitution Agent under a related Notice of

Amendment).  Any Additional Underlying Securities shall (i) on the date of their acquisition have a long-term rating of "AAA" by S&P and a long-term rating of "Aaa" by Moody's or a short-term rating of "A-1+" by S&P and a short-term rating of "P-1" by Moody's, (ii) be denominated in United States dollars and (iii) be acquired in an ordinary course open market transaction (unless the Trust has received written confirmation from S&P that such acquisition will not result in a downgrade or withdrawal of the rating assigned to the Certificates) *provided that*, (A) Additional Underlying Securities with a maturity of greater than 60 days must have a long-term rating of "AAA" by S&P and a short-term rating of "A-1+" by S&P, (B) under no circumstances shall the Trust own more than ten (10) Underlying Securities, (C) notice shall be provided to S&P with respect to each purchase of an Underlying Security, (D) payments on the Underlying Securities are not subject to deduction or withholding for or on account of any withholding or similar tax, unless the issuer of such security is required to make "gross up" payments that ensure that the net amount actually received by the Trust (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Trust would have received had no such deduction or withholding been required and (E) all Additional Underlying Securities must be either (I) floating rate residential mortgage backed securities or (II) floating rate credit card backed securities (unless the Trust has received written confirmation from S&P that such acquisition will not result in a downgrade or withdrawal of the rating assigned to the Certificates); *provided further that*, the Trustee shall have no obligation to determine, investigate or inquire as to whether such Underlying Securities are subject to any such deduction, withholding or similar tax, such obligation being solely that of the Depositor.

(e)     Amendment and Assignment

(i) Master Agreement.  Notwithstanding anything to the contrary in the Standard Terms, the Trustee shall not consent to any transfer or assignment by Lehman Brothers Special Financing Inc. of its respective rights under the Master Agreement (including the schedule thereto, the Portfolio Swap Confirm and the Total Return Swap Confirm unless the Trustee shall have received written confirmation from each Rating Agency that such transfer or assignment will not result in a downgrade or withdrawal of the rating assigned to the Certificates. The Trustee shall not consent to any amendment to or assignment of the Master Agreement, (including the schedule thereto, the Portfolio Swap Confirm and the Total Return Swap Confirm) unless the Trustee shall have received (A) advice from Cadwalader, Wickersham & Taft LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters to the effect that such amendment or assignment will not have a material adverse affect on the U.S. federal income tax characterization of the Trust or on the U.S. federal income tax treatment of any beneficial owners as described in the "—Certain U.S. Federal Income Tax Considerations" section of the Supplement to the Private Placement Memorandum for the Certificates and (B) written confirmation from S&P that such amendment or assignment will not result in a downgrade or withdrawal of the rating assigned to the Certificates.

(ii) Swap Guarantee:  The Trustee shall not consent to any amendment to a Swap Guarantee unless the Trustee shall have received written confirmation from S&P that such amendment will not result in a downgrade or withdrawal of the rating assigned to the Certificates.

(f)    Portfolio Swap Confirm.

(i)    Upon the occurrence of a "Failure to Pay Principal" or a "Writedown" under the Portfolio Swap Confirm, the Principal Amount of the Certificates shall be decreased by the related Incurred Principal Loss Amount.  On the related Floating Rate Payer Payment Date, the Trust shall (i) so long as Lehman Brothers Special Financing Inc. is the TRS Counterparty under the Total Return Swap Confirm and the Incurred Principal Loss Amount is not less than the minimum denomination of the Underlying Security held by the Trust with the lowest minimum denomination, assign to the Portfolio Swap Counterparty one or more Underlying Securities in an aggregate outstanding principal amount equal to the related Alternative Settlement Amount; and (ii) under all other circumstances, pay to the Portfolio Swap Counterparty an amount equal to the related Incurred Principal Loss Amount.

(ii)    If a Writedown Reimbursement or Principal Shortfall Reimbursement occurs in respect of a Floating Amount Event prior to the one-year anniversary thereof, the Portfolio Swap Counterparty shall make an Additional Fixed Payment to the Trust for deposit into the Principal Collection Account.

(g)    Interest on the Certificates.  On each Certificate Distribution Date, each holder of the Certificates shall be entitled to receive its *pro rata* share of the Interest Distribution Amount in respect of the related Interest Collection Period.

(h)    Excess Principal Balance. On any Certificate Distribution Date on which an Excess Principal Balance exists, the Trust shall pay to each Certificateholder its pro rata share of an amount equal to the amount of such Excess Principal Balance, which shall (i) *first*, be paid from the Principal Collection Account; and (ii) *second*, in the event that an Excess Principal Balance remains following the application of clause (i) above, the Trust shall make an Optional Delivery to the TRS Counterparty of a principal amount of Underlying Securities equal to each remaining Excess Principal Balance in exchange for a Final Exchange Amount equal to such remaining Excess Principal Balance.

(i)    Investment Advisor.  Section 5.13 of the Standard Terms and all other provisions of the Standard Terms relating to the Investment Advisor shall be not applicable to the Certificates.

(j)    Certification Requirements for Certificates.  If a Responsible Officer of the Trustee becomes aware that a Beneficial Owner of a Certificate is not a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act, the Trustee shall request such Beneficial Owner to certify that it meets the requirements of Section 3(c)(7) of the Investment Company Act.  If such Beneficial Owner fails to timely provide such certification and the Trustee has not determined in good faith based upon independent inquiry that such a certification could have been made (provided the Trustee shall not be obligated to make such an inquiry), such Beneficial Owner shall have 30 days to transfer its beneficial interest to a person that is a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act.  If such Beneficial Owner fails to timely effect such a transfer, at the direction of the Trustee, (x) the Certificate Registrar shall cause such Beneficial Owner's interest to be transferred in a

-11-

commercially reasonable sale arranged by the Depositor (and the proceeds thereof remitted to such Beneficial Owner), to a person that certifies that it is a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act and (y) pending such transfer, no payments shall be made in respect of such beneficial interest.

(k)    Trust Account Held Uninvested.   Notwithstanding any provision to the contrary in Section 3.02 of the Standard Terms, other than as set forth in 5(d) herein and the Portfolio Swap Confirm, the amounts within the Interest Collection Account and Principal Collection Account shall be non-interest bearing and amounts held therein from time to time shall remain uninvested.

(l)    Trustee Taking Actions with Respect to the Underlying Securities. Notwithstanding anything in the Standard Terms to the contrary, within 5 Business Days after receipt of actual notice by a Responsible Officer of the Trustee of any meeting or other occasion for taking any action with respect to the Underlying Securities, the Trustee shall give notice to the TRS Counterparty and the Swap Guarantor, setting forth such information as is contained in such notice to owners of the Underlying Securities.  The Trustee shall take any such action with respect to the Underlying Securities only in accordance with the instructions of the TRS Counterparty or Collateral Substitution Agent.

(m)    ERISA.   If a Responsible Officer of the Trustee becomes aware that a Beneficial Owner of a Certificate is, or is using the assets of, an employee benefit plan subject to Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") or a plan or employee benefit plan that is subject to any federal, state or local law that is materially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or an entity whose underlying property includes plan assets by reason of investment in the entity by such a plan or employee benefit plan, it shall notify the Beneficial Owner and such Beneficial Owner shall have 30 days to transfer its beneficial interest to a Person that meets all of the requirements for holding the Certificates.  If such Beneficial Owner fails timely to effect such a transfer, the Trustee shall notify the Depositor and the Depositor, on behalf of the Trust, shall cause such Beneficial Owner's interest to be transferred in a commercially reasonable sale arranged by the Depositor (and the proceeds thereof remitted to such Beneficial Owner), to a Person that certifies that it meets all the requirements for holding the Certificates.

(n)    Principal Collection Account.

(i)    On the Closing Date, the Trustee shall establish, in accordance with the procedures and requirements with respect to Trust Accounts in Section 3.02 of the Standard Terms, a principal collection account (the "Principal Collection Account") into which amounts received by the Trust (v) in respect of the deposit made by the Depositor on the Closing Date in connection with amounts (if any) paid to the Trust pursuant to the Escrow Agreement, (w) in respect of any Additional Fixed Amounts relating to Incurred Principal Reimbursement Amounts received by the Trust under the Portfolio Swap Confirm or the Swap Guarantee with respect to the Portfolio Swap Confirm, if applicable, (x) in respect of any Acquisition Calculation Amounts and Final Exchange Amounts received by the Trust under the Total Return Swap Confirm or the Swap

Guarantee with respect to the Total Return Swap Confirm, if applicable, and (y) in respect of any termination payments under any Master Agreement (if any) shall be deposited.

(ii)    Notwithstanding Section 3.05 of the Standard Terms, in addition to disbursements pursuant to Section 5(d) the Trustee shall disburse amounts from the Principal Collection Account in the following order of priority:

(1)    on each Certificate Distribution Date, to the Certificateholders, *pro rata*, in an amount equal to any Final Exchange Amounts received under the Total Return Swap Confirm to the extent of the Excess Principal Balance;

(2)    concurrently, (I) to the TRS Counterparty in an amount equal to the absolute value of any Acquisition Calculation Amount owed under the Total Return Swap Confirm (if such Acquisition Calculation Amount is a negative amount), and (II) to the Portfolio Swap Counterparty, if a Floating Amount in respect of an Incurred Principal Loss Amount is due and the Trust is unable to effect Alternative Settlement pursuant to the terms of the Portfolio Swap Confirm, an amount equal to such Incurred Principal Loss Amount;

(3)    to the Escrow Agent in an amount equal to all amounts owed by the Trust under the Escrow Agreement;

(4)    on each Early Termination Date (if any), unless a Swap Counterparty is the sole Affected Party or Defaulting Party under a Swap Agreement, to each Swap Counterparty, *pari passu*, in an amount equal to any termination payments owed by the Trust;

(5)    on any day upon which the Trust is required to purchase Additional Underlying Securities (as instructed by the Collateral Substitution Agent), the required amount for such purchase (including Additional Fixed Amounts in respect of Incurred Principal Reimbursement Amounts) to the Underlying Securities Account;

(6)    on the Effective Maturity Date, to the Certificateholders, *pro rata,* in an amount equal to the Principal Amount on such date;

(7)    on each Early Termination Date (if any), if a Swap Counterparty is the sole Affected Party or Defaulting Party under a Swap Agreement, *first*, to the Swap Counterparty that is not a sole Affected Party or Defaulting Party (if applicable), in an amount equal to any termination payments owed by the Trust to such Swap Counterparty (if any), and *second*, to the Swap Counterparty or Swap Counterparties, as applicable, that are sole Affected Parties or Defaulting Parties under their respective Swap Agreements with the Trust, in an amount equal to any

-13-

termination payments owed by the Trust to such Swap Counterparty or Swap Counterparties, as applicable;

(8)    on the Effective Maturity Date, all remaining proceeds to the Collateral Substitution Agent;

(9)    on each Deferred Certificate Distribution Date, to the Certificateholders, *pro rata*, based on the Certificate Principal Amount held by such Certificateholder as of the Effective Maturity Date (without giving effect to any distributions on such date), an amount equal to the Additional Fixed Amount (or portion thereof) relating to an Incurred Principal Reimbursement Amount; and

(10)    on the Deferred Maturity Date, all remaining proceeds to the Collateral Substitution Agent.

(o)    <u>Interest Collection Account</u>.

(i)    On the Closing Date, the Trustee shall establish, in accordance with the procedures and requirements with respect to Trust Accounts in Section 3.02 of the Standard Terms, a collection account (the "<u>Interest Collection Account</u>") into which amounts received by the Trust (w) in respect of payment received under any Swap Guarantee in respect of interest, (x) in respect of interest payments on the Underlying Securities (or accrued interest from liquidation proceeds in respect thereof), (y) in respect of any Fixed Amounts or Additional Fixed Amounts (or portions thereof) relating to an Incurred Interest Shortfall Reimbursement Amount received by the Trust under the Portfolio Swap Confirm or the related Swap Guarantee, if applicable, and (z) in respect of Receiver Floating Amounts received by the Trust under the Total Return Swap Confirm or the related Swap Guarantee, if applicable, shall be deposited.

(ii)    The following amounts shall be paid from the Interest Collection Account in the following order of priority:

(1)    on each Early Termination Date (if any), unless a Swap Counterparty is the sole Affected Party or Defaulting Party under a Swap Agreement, to each Swap Counterparty, *pari passu*, in an amount equal to any termination payments owed by the Trust;

(2)    on each Certificate Distribution Date to the Certificateholders, *pro rata,* in an amount equal to the relevant Interest Distribution Amount;

(3)    on each Floating Amount Payment Date under the Total Return Swap Confirm, to the TRS Counterparty in an amount equal to any interest proceeds received in respect of the Underlying Securities owned by the Trust;

(4)    on each Early Termination Date (if any), if a Swap Counterparty is the sole Affected Party or Defaulting Party under a Swap Agreement, *first*, to the Swap Counterparty that is not a sole Affected Party or Defaulting Party (if any), in an amount equal to any termination payments owed by the Trust to such Swap Counterparty, and *second*, to the Swap Counterparty or Swap Counterparties, as applicable, that are a sole Affected Party or Defaulting Party under a Swap Agreement, in an amount equal to any termination payments owed by the Trust to such Swap Counterparty or Swap Counterparties, as applicable; and

(5)    on the Effective Maturity Date, all remaining amounts within the Interest Collection Account to the Collateral Substitution Agent.

(6)    on each Deferred Certificate Distribution Date, to the Certificateholders, *pro rata*, based on the Certificate Principal Amount held by such Certificateholder as of the Effective Maturity Date (without giving effect to any distributions on such date), an amount equal to the Additional Fixed Amount (or portion thereof) relating to an Incurred Interest Shortfall Reimbursement Amount; and

(7)    on the Deferred Maturity Date, all remaining amounts within the Interest Collection Account to the Collateral Substitution Agent.

(p)    <u>Underlying Securities Account</u>.  On the Closing Date, the Trustee shall establish, in accordance with the procedures and requirements with respect to Trust Accounts in Section 3.02 of the Standard Terms, a collection account (the "<u>Underlying Securities Account</u>") into which the Trustee shall deposit (x) Underlying Securities, (y) certain amounts from the Principal Collection Account and (z) principal payments received on the Underlying Securities. All cash deposits in the Underlying Securities Account shall be invested by the Trustee in any money market fund or similar investment vehicle (including those for which U.S. Bank National Association or its affiliates may act as manager or advisor, whether or not for a fee) having at the time of investment therein a credit rating of at least "Aaa" by Moody's and "AAAm" by S&P as directed in writing by the Depositor until receipt of instructions from the Collateral Substitution Agent. Any deliveries of Underlying Securities pursuant to the Total Return Swap Confirm and deliveries of Underlying Securities pursuant to Alternative Settlement under the Portfolio Swap Confirm will be made out of this Underlying Securities Account. For the avoidance of doubt, principal payments received on Underlying Securities and amounts transferred from the Principal Collection Account shall be reinvested in Underlying Securities as instructed by the Collateral Substitution Agent.  Any Additional Fixed Amount relating to an Incurred Principal Reimbursement Amount will be directed into the Underlying Securities Account by the Trustee in accordance with Section 5(n)(ii)(v) to be reinvested in Additional Underlying Securities as instructed by the Collateral Substitution Agent.

Section 6.    <u>Trustee's Fees, Extraordinary Expenses</u>.

Section 5.12 of the Standard Terms is hereby modified as follows:

(a)    As compensation for its services under the Trust Agreement, the Trustee shall be entitled to receive the Trustee Fee.  The Trustee shall bear all Ordinary Expenses but shall be entitled to receive an amount equal to the Necessary Third Party Expenses.  Any and all fees and expenses shall be subordinated to the Certificates, other than Extraordinary Expenses, it being understood that Extraordinary Expenses shall have a first priority claim upon the Trust Property.  Notwithstanding anything to the contrary in the Standard Terms, the Trustee Fee shall be paid by the Depositor and not from Trust Property.

(b)    The Trustee shall not take any action, including appearing in, instituting or conducting any action under the Trust Agreement or in relation thereto which, in the Trustee's opinion, would or might cause it to incur Extraordinary Expenses unless (i) it has received satisfactory security or indemnity and (ii) Certificateholders representing 100% of the aggregate Voting Rights of the Certificates then outstanding shall instruct the Trustee to incur such Extraordinary Expenses.

Section 7.    <u>Tax Treatment</u>.

It is the intention of the parties hereto that the Trust shall not be treated for U.S. federal income tax purposes as an association (or publicly-traded partnership) taxable as a corporation and otherwise will be treated as set forth in the "—Certain U.S. Federal Income Tax Considerations" section of the Supplement to the Private Placement Memorandum.  All provisions of the Trust Agreement shall be construed and the affairs of the Trust shall be conducted to achieve the aforementioned treatment for U.S. federal income tax purposes, and the Holders of the Certificates shall agree that all transactions contemplated by the Trust Agreement will be reported on all applicable tax returns consistently with the aforementioned treatment.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Series Trust Agreement to be duly executed by their respective authorized officers as of the date first written above.

LEHMAN BROTHERS INC.,
    as Depositor

By: _____
    Name: LEE, JEONG GU
    Title: VICE PRESIDENT

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee

By: _____
    Name:
    Title:

[Series Trust Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Series Trust Agreement to be duly executed by their respective authorized officers as of the date first written above.

LEHMAN BROTHERS INC.,
as Depositor

By:_____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Name:    **David J. Kolibachuk**
    Title:    **Vice President**

[Series Trust Agreement]

**Appendix A**

<u>THE INITIAL UNDERLYING SECURITIES</u>

| | |
|---|---|
| **Initial Underlying Securities Issuer**: | Accredited Mortgage Loan Trust 2006-2 |
| **Title of Underlying Securities**: | Class A-3 Asset-Backed Notes, Series 2006-2 |
| **Principal Amount of Underlying Securities Deposited with the Trust on the Closing Date**: | $40,500,000 |
| **Initial Underlying Securities Payment Dates**: | The 25th day of each month, or if such day is not a business day, on the next business day, commencing in July 2006. |
| **Issuance Date**: | June 29, 2006 |
| **Final Scheduled Payment Date**: | September 25, 2036 |
| **Expected Final Payment Date**: | June 2011 |
| **Ratings**: | "AAA" by S&P, "Aaa" by Moody's. |
| **Interest**: | 1 Month LIBOR + 0.15% |
| **Form**: | Book-Entry. |
| **Authorized Denominations**: | $25,000 and integral multiples of $1,000 in excess thereof. |
| **CUSIP**: | 00437NAC6 |

**Appendix B**

STANDARD TERMS FOR TRUST AGREEMENTS

**EXHIBIT B**

Credit Default Swap Agreement

**(Multicurrency—Cross Border)**



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of December 8, 2006

**LEHMAN BROTHERS SPECIAL FINANCING INC.**    and    RESTRUCTURED ASSET CERTIFICATES WITH ENHANCED RETURNS, SERIES 2006-20AT TRUST

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.  **Interpretation**

(a)    ***Definitions.***    The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    ***Inconsistency.***    In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    ***Single Agreement.***    All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.  **Obligations**

(a)    ***General Conditions.***

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii) *Liability*. If:—

    (1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2) X does not so deduct or withhold; and

    (3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

    (i) *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii) *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv) *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v) *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

    ISDA® 1992

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

## 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

> (i)   any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;
>
> (ii)  any other documents specified in the Schedule or any Confirmation; and
>
> (iii) upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.     Events of Default and Termination Events

(a)     *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

> (i)   *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

> (ii)   *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

> (iii)   *Credit Support Default.*

>> (1)   Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

>> (2)   the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

>> (3)   the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

> (iv)   *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

> (v)   *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

> (vi)   *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If:—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)     *Effect of Designation.*

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)     *Calculations.*

(i)  *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)  *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)  *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)  *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)   *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)   *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)   *Two Affected Parties.* If there are two Affected Parties:—

(A)   if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)   if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9,      Miscellaneous

(a)      *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)      *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)      *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)      *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)      *Counterparts and Confirmations*.

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)      *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)      *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    Offices; Multibranch Parties

(a)      If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)      Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)      If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.   Notices

(a)      *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)   if in writing and delivered in person or by courier, on the date it is delivered;

(ii)   if sent by telex, on the date the recipient's answerback is received;

(iii)   if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.   Governing Law and Jurisdiction

(a)      *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.     Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Office*" means a branch or office of a party, which may be such party's head or home office.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
(Name of Party)

**RESTRUCTURED ASSET CERTIFICATES WITH ENHANCED RETURNS, SERIES 2006-20AT TRUST**
(Name of Party)

By: **U.S. Bank National Association, not in its individual capacity but solely as Trustee under the Amended and Restated Trust Agreement**

By: ............................................................
    Name:
    Title:
    Date:

By: ............................................................
    Name:
    Title:
    Date:

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

(Name of Party)

**RESTRUCTURED ASSET CERTIFICATES WITH ENHANCED RETURNS, SERIES 2006-20AT TRUST**

(Name of Party)

By: U.S. Bank National Association, not in its individual capacity but solely as Trustee under the Amended and Restated Trust Agreement

By: ........................................................

    Name:
    Title:
    Date:

By: _____

    Name:   **David J. Kolibachuk**
    Title:    **Vice President**
    Date:
        12/8/2006

EXECUTION COPY

# SCHEDULE

to the Master Agreement
dated as of December 8, 2006

between

## LEHMAN BROTHERS SPECIAL FINANCING INC.  ("Party A"),
a corporation organized under the laws of
the State of Delaware

and

## RESTRUCTURED ASSET CERTIFICATES WITH ENHANCED RETURNS, SERIES 2006-20AT TRUST  ("Party B")
a trust created under the laws of the State of New York
pursuant to the Trust Agreement (as defined herein)

Part 1.   **Termination Provisions**

In this Agreement:-

(a)      **"Specified Entity"** means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

and in relation to   Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

(b)      **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)      **Failure to Pay or Deliver**.  Section 5(a)(i) is hereby amended by replacing the word "third" with the word "fifth" in the last line of subsection (i) thereof.

(d)      [Reserved].

(e)    The following shall each be specified as an "Additional Termination Event" pursuant to Section 5(b)(v):

**Payment of Certificates prior to Scheduled Termination Date**.  In the event that (i) the Certificates are redeemed on any Certificate Distribution Date (as defined in the Series Trust Agreement) prior to the Termination Date of any Transaction existing under this Agreement or (ii) (x) the Certificates are accelerated and (y) the Trustee has proceeded to liquidate the Underlying Securities and the requisite percentage of the Holders of the Certificates agree in writing with such determination, in each case, on or before any Certificate Distribution Date preceding the Scheduled Termination Date.

For purposes of the foregoing Additional Termination Event, Party B shall be the sole Affected Party.

**Downgrade of Party A.**

(i)    It shall constitute an Additional Termination Event if either of (A) or (B) occur and Party A does not take the appropriate steps set forth in paragraph (ii) below: (A) Party A or Party A's Credit Support Provider shall fail to have a short-term rating of "A-1+" by S&P or a long-term unsecured debt or counterparty rating of "AA-" or above by S&P (or, subject to the satisfaction of the Rating Condition by S&P, a long-term unsecured debt or counterparty rating of "A+" provided that Party A has posted collateral or made an advance payment pursuant to the Portfolio Swap Confirmation in an amount equal to the fixed amount payable on the next succeeding fixed rate payment date thereunder) (in each case, due to a downgrade or withdrawal of such rating) or (B) Party A or Party A's Credit Support Provider shall fail to have both a short-term rating of "P-1" and a long-term senior unsecured debt or counterparty rating of "A1" by Moody's (and is not on credit watch for possible downgrade) or, if Party A or Party A's Credit Support Provider does not have a short-term rating by Moody's, Party A or Party A's Credit Support Provider shall fail to have a long-term senior unsecured debt or counterparty rating of "Aa3" or above by Moody's (and is not on credit watch for possible downgrade).  The ratings set forth above (i) with respect to Moody's shall be known as the "Moody's Rating Requirement" and (ii) with respect to S&P shall be known as the "S&P Ratings Requirement" (together with the Moody's Rating Requirement, the "Required Ratings").  Notwithstanding the forgoing, the short-term debt rating with respect to S&P may be changed to "A-2" or better under clause (A) of this Part 1(e)(i) after the execution of this Agreement without the consent of either party hereto, if Party B has received written confirmation from S&P that such change will not result in a downgrade or withdrawal of the rating assigned to the Certificates.

(ii)    It shall not be an Additional Termination Event unless (A) Party A or Party A's Credit Support Provider fails to satisfy the Required Ratings and Party A fails to take one of the following actions within 30 calendar days of such failure: (w) post collateral pursuant to the Credit Support Annex, (x) assign all of its rights and obligations under the Transactions to a counterparty with the Required Ratings or

-2-

whose guarantor satisfies the Required Ratings (provided that if Party A is not able to effect any of the actions hereunder within the requisite time and Lehman Brothers Special Financing Inc. (or any affiliate thereof) meets the Required Ratings, Party A must make reasonable efforts to assign to Lehman Brothers Special Financing Inc. (or such affiliate)), (y) obtain a guarantor with the Required Ratings, or (z) take other steps as each Rating Agency that has downgraded Party A or Party A's Credit Support Provider may require to satisfy the Rating Condition; or (B) Party A or Party A's Credit Support Provider shall fail to have (a) a long term unsecured debt or counterparty rating of at least "BBB+" by S&P and a short-term rating of at least "A-2" by S&P (in each case due to a downgrade or withdrawal of such rating) or (b) a long term unsecured debt or counterparty rating of at least "A3" by Moody's and a short-term rating of at least "P-2" by Moody's or, if Party A or Party A's Credit Support Provider does not have a short-term rating by Moody's, Party A or Party A's Credit Support Provider shall fail to have a long-term senior unsecured debt or counterparty rating of "A2" or above by Moody's  and Party A fails to take one of the following actions within 10 Business Days of such failure: (w) post collateral pursuant to the Credit Support Annex (provided that such action shall not be permitted if Party A or Party A's Credit Support Provider fails to meet the ratings specified in subclause (b) of clause (B) of this paragraph), (x) assign all of its rights and obligations under the Transactions to a counterparty with the Required Ratings or whose guarantor satisfies the Required Ratings (provided that if Party A is not able to effect any of the actions hereunder within the requisite time and Lehman Brothers Special Financing Inc. (or any affiliate thereof) meets the Required Ratings, Party A must make reasonable efforts to assign to Lehman Brothers Special Financing Inc. (or such affiliate)), (y) obtain a guarantor with the Required Ratings, or (z) take other steps as each Rating Agency may require to satisfy the Rating Condition.  With respect to the above Termination Event, Party A shall be the sole Affected Party.  With respect to subclauses (x) and (y) of clause (A) of this paragraph or subclauses (x) and (y) of clause (B) of this paragraph, any guarantee shall be subject to the Rating Condition.  With respect to subclause (x) of clause (A) and subclause (y) of clause (B), any assignment shall be conducted at the assignee's sole expense.

(iii)    If Party A or Party A's Credit Support Provider posts collateral upon the rating of Party A or Party A's Credit Support Provider falling below "A-2" or "BBB+" by S&P and Party A is no longer an entity organized under the laws of any of the United States, then, if required upon consultation with S&P, Party A shall cause its outside counsel to deliver to Party B an opinion in form and substance reasonably acceptable to S&P as to the enforceability of Party B's security interest in such collateral in all relevant jurisdictions (i.e., that, notwithstanding Party A's insolvency, the collateral will be available to meet swap obligations free from any preference claim or moratorium).

(iv)    Any action of Party A pursuant to this Part 1(e) shall be conducted at its sole expense.

(f)     The provisions of <u>Section 5(a)</u> (as modified by (c) above) and <u>Section 5(b)</u> (as modified by (e) above) will apply to Party A and to Party B as follows:-

| **<u>Section 5(a)</u>** | | **<u>Party A</u>** | **<u>Party B</u>** |
|---|---|---|---|
| (i) | "Failure to Pay or Deliver" | Applicable. | Applicable. |
| (ii) | "Breach of Agreement" | Applicable. | Not Applicable. |
| (iii) | "Credit Support Default" | Applicable. | Not Applicable. |
| (iv) | "Misrepresentation" | Applicable. | Not Applicable. |
| (v) | "Default under Specified Transaction" | Not Applicable. | Not Applicable. |
| (vi) | "Cross Default" | Applicable. | Not Applicable. |
| (vii) | "Bankruptcy" | Applicable. | Applicable. |
| (viii) | "Merger Without Assumption" | Not Applicable. | Not Applicable. |

| **<u>Section 5(b)</u>** | | **<u>Party A</u>** | **<u>Party B</u>** |
|---|---|---|---|
| (i) | "Illegality" | Applicable. | Applicable. |
| (ii) | "Tax Event" | Applicable. | Applicable. |
| (iii) | "Tax Event Upon Merger" | Applicable. | Applicable. |
| (iv) | "Credit Event Upon Merger" | Not Applicable. | Not Applicable. |
| (v) | "Additional Termination Event" | Applicable. | Applicable. |

(g)     **"Termination Currency"** means United States Dollars ("<u>USD</u>").

(h)     The "**Automatic Early Termination**" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(i)     The provisions of Section 6(e) will apply; provided, however, that Section 6(e) is hereby amended by deleting the following sentence in the first paragraph thereof: "The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off."

(j)     Section 14 is hereby amended by deleting the definition of "Set-off" therein.

(k)     For purposes of Section 5(a)(vi) only, "Threshold Amount" means three percent (3%) of the Stockholders' Equity of Party A or Party A's Credit Support Provider, as applicable.

(l)     The "Bankruptcy" provisions of Section 5(a)(vii) will apply to Party A and to Party B; *provided that* clauses (2), (7) and (9) thereof shall not apply to Party B. Clause (4) of Section 5(a)(vii) will not apply to Party B to the extent that it refers to proceedings or petitions instituted or presented by Party A or any of its Affiliates. Clause (6) of Section 5(a)(vii) will not apply to Party B to the extent that it refers to (i) any appointment that is contemplated or effected by the Trust Agreement or (ii) any appointment to which Party B has not become subject. Clause (8) of Section 5(a)(vii) will not apply to Party B to the extent that it applies to Section 5(a)(vii)(2), (4), (6), and (7) (except to the extent that such provisions are not disapplied with respect to Party B).

Part 2. **Tax Representations.**

(A)      **Payee Tax Representations**.   For the purpose of <u>Section 3(f)</u> of this Agreement, Party A and Party B make the following representations:-

     (i)      The following representation applies to Party A:-

     Party A is a corporation organized under the laws of the State of Delaware.

     (ii)      The following representation applies to Party B:-

     Party B is a trust that has not elected to be treated as a corporation for U.S. federal income tax purposes.

(B)      **Payer Tax Representations**.   For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e)</u>, <u>6(d)(ii)</u> or <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.

Part 3.  **Agreement to Deliver Documents.**

For the purpose of <u>Section 4(a)(i)</u> and Section <u>4(a)(ii)</u> of this Agreement, Party A and Party B each agree to deliver the following documents, as applicable:-

(a)      Tax forms, documents or certificates to be delivered are:

| **Party required to <u>deliver document</u>** | **Form, Document <u>or Certificate</u>** | **Date by which <u>to be Delivered</u>** | **Covered by <u>Section 3(d)</u>** |
|---|---|---|---|
| Party A | A complete and executed U.S. Internal Revenue Service Form W-9 (or any successor thereto), that eliminates U.S. federal backup | (i) Before the first Payment Date under this Agreement, (ii) promptly upon | No |

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| | withholding tax on payments under this Agreement. | reasonable demand by Party B, and (iii) promptly upon learning that any such Form previously provided by Party A has become obsolete or incorrect. | |
| Party B | A complete and executed U.S. Internal Revenue Service Form W-9 (or any successor thereto) if the Trust has two or more beneficial owners of Certificates, and a complete and executed U.S. Internal Revenue Service Form W-8BEN, W-8IMY, W-8ECI or W-9 (or any successor thereto) from each Certificateholder (and, where applicable, such forms from the beneficial owners of such Certificates) and in any case in which the Certificateholder is eligible for the benefits of an income tax treaty with the United States, a Form W-8BEN including a claim of treaty benefits under Part II, claiming such benefits with respect to all payments received with respect to the Certificates, in each case that eliminates U.S. federal withholding tax and backup withholding on payments under this Agreement. | (i) Before the first Payment Date under this Agreement, (ii) before December 31 of each third succeeding calendar year, (iii) promptly upon reasonable demand by Party A, and (iv) promptly upon learning that any such Form previously provided by Party B has become obsolete or incorrect. | No |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit B to this Schedule. | Promptly after execution of this Agreement. | No |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party A | A guarantee of Holdings substantially in the form of Exhibit D to this Schedule. | Upon execution of this Agreement | No |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit C to this Schedule. | Promptly after execution of this Agreement. | No |
| Party B (with respect to the Trustee) | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B (with respect to the Trustee) | A certified copy of the resolution or resolutions or by-laws (the "Authorizing Resolution") of the Board of Directors or loan committee of the Trustee, certified by a secretary, or an assistant secretary of the Trustee, pursuant to which the Trustee is authorized, on behalf of Party B, to enter into this Agreement and each Swap Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by the Trustee to Party A) and, with respect to each Swap Transaction not covered by a previously furnished Authorizing Resolution, within five Business Days of the Trade Date. | Yes |
| Party B | A certified copy of the | Upon execution of this | Yes |

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| | Trust Agreement and each amendment thereof. | Agreement and on the date of each amendment thereof. | |

Part 4.  **Miscellaneous.**

(a)  **Addresses for Notices.**  For purpose of Section 10(a):

Address for notices or communications to Party A:-

Address:       Lehman Brothers Special Financing Inc.
               745 Seventh Avenue
               New York, New York  10019

Attention:     Jeong Gu Lee

Telephone No.: 212-526-5461

Email:         jglee@lehman.com

With a copy to:-

Address:       Lehman Brothers Holdings Inc.
               745 Seventh Avenue
               New York, New York  10019

Attention:     Structured Products Transaction Management Group

Telephone No.: 212-526-0806

Address for notices or communications to Party B:-

Address:       U.S. Bank National Association
               100 Wall Street, 16th Floor
               New York, New York 10005

Attention:     David Kolibachuk and Marlene Fahey

Facsimile No.: 212-509-3384

(b)  **Process Agent.**  For the purpose of Section 13(c):-

Party A appoints as its Process Agent:  Not Applicable.

Party B appoints as its Process Agent:  Not Applicable.

(c)   **Offices.**  The provisions of Section 10(a) will apply to this Agreement.

(d)   **Multibranch Party.**  For the purpose of Section 10(c) of this Agreement:-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)   **Calculation Agent.**  The Calculation Agent is Party A.

(f)   **Credit Support Document.**  Details of any Credit Support Document:-

In the case of Party A, (i) a guarantee of Party A's obligations hereunder in the form of Exhibit D attached to this Schedule and (ii) a Credit Support Annex in the form of Exhibit E attached to this Schedule.

In the case of Party B, not applicable.

(g)   **Credit Support Provider.**

Credit Support Provider means in relation to Party A:  Lehman Brothers Holdings Inc. ("Holdings").

Credit Support Provider means in relation to Party B:  Not Applicable.

(h)   **Limitation on Trustee Liability.**    In the absence of negligence, willful misconduct or bad faith on the part of the Trustee, the Trustee shall have no personal liability hereunder or under the Trust Agreement. All amounts due by Party B under any Transaction or the Trust Agreement shall be paid solely from the trust assets of Party B in accordance with the Trust Agreement. Party A acknowledges that the Trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by Party B in this Agreement.

(i)   **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without regard to choice of law doctrine).

(j)   **Jurisdiction.**  Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

(k)   **"Affiliate"** will have the meaning specified in Section 14 of this Agreement; provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.


Part 5.  **Other Provisions.**

(a)   **Confirmation.**  Each Confirmation supplements, forms part of, and will be read and construed as one with this Agreement.  A form of each Confirmation is set forth as Exhibit A hereto.

(b)    **[Reserved]**

(c)    **No Bankruptcy Petition.**  Prior to the date that is one year and one day after the date upon which the trust created under the Trust Agreement is terminated in accordance with the terms thereof, Party A shall not institute against, or join any other person in instituting against, the trust created thereby, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, that this provision shall not restrict or prohibit Party A from joining any other person, including, without limitation, the Trustee, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings already commenced or other analogous proceedings already commenced under applicable law.

(d)    **Transfer.**  Section 7 is hereby amended by:  (i) adding the words "(which consent may not be unreasonably withheld)" after the words "consent" on the second line thereof, (ii) adding the words "(and notice of the transferee to)" after the word "of" on the third line thereof, and (iii) adding the words "(subject to providing written notice of the transferee to the other party)" after the word "transfer" on the fourth and seventh line thereof.    The Trustee, on behalf of Party B, shall not consent to any transfer or assignment by Party A of its rights under this Agreement unless the Trustee shall have been directed to do so by holders of 100% of the then outstanding Certificates and Party A; provided, that any transfer or assignment of Party A's rights under the Total Return Swap Confirm shall be subject to receipt by the Trustee of written confirmation from each Rating Agency that such transfer or assignment will not result in a downgrade or withdrawal of the rating assigned to the Certificates.    Notwithstanding anything to the contrary in Section 7 of the Agreement or the preceding sentence, Party A may assign its rights and obligations under the Agreement, in whole or in part, (1) to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor, or (2) to any entity with the same or higher long term senior unsecured debt rating (as determined by S&P or Moody's) as Party A or Party A's Credit Support Provider at the time of such transfer. Any transfer or assignment by Party A of its rights under the Total Return Swap Confirm shall be subject to receipt by the Trustee of written confirmation from each Rating Agency that such transfer or assignment will not result in a downgrade or withdrawal of the rating assigned to the Certificates.

(e)    **Intention to Enter into a "Swap Agreement"**.    Each of Party A and Party B hereby acknowledges and agrees that this Agreement and each Transaction hereunder or thereunder is intended to be a "swap agreement" as that term is defined in the U.S. Bankruptcy Code (as amended from time to time) and that the rights granted to each party under Section 6 include a contractual right to terminate a "swap agreement" and to offset and net out termination values and payments in conjunction therewith.

(f)    **Waiver of Right to Trial by Jury**.  Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support

Document. Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable, by, among other things, the mutual waivers and certifications in this section.

(g)     **Payments Upon Early Termination.**   (i) Upon the occurrence of an Early Termination of this Agreement, if any termination payments are owed by Party B on such date, such amounts will be paid in accordance with <u>Section 5(n)</u> and <u>Section 5(o)</u> of the Series Trust Agreement.

(ii) If an Early Termination Date is designated hereunder, Loss and Second Method will apply.

(h)     **General Conditions**.   <u>Section 2(a)(iii)</u> is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occurred and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(i)     **No Violation or Conflict Representation**.   Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to, the Trust Agreement, as amended, and any and all resolutions, investment policies, guidelines, procedures or restrictions)."; provided, such amendment shall be applicable only with respect to the Representations of Party B.

(j)     **Additional Definitions**.

"<u>Business Day</u>" shall have the meaning specified therefor in the Trust Agreement.

"<u>Certificates</u>" shall mean Restructured Asset Certificates with Enhanced Returns, Series 2006-20AT Variable Certificates due 2046 issued pursuant to the Trust Agreement.

"<u>Interest Collection Account</u>" shall have the meaning specified therefor in the Trust Agreement.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc. and any successors thereto.

"<u>Parties to the Trust</u>" shall have the meaning specified therefor in the Trust Agreement.

"<u>Principal Collection Account</u>" shall have the meaning specified therefor in the Trust Agreement.

"<u>Rating Agency</u>" shall mean S&P or Moody's, as applicable.

-11-

"Rating Condition" shall mean with respect to any action hereunder, receipt by the Trustee of written confirmation from each Rating Agency that such action will not result in a downgrade, withdrawal or other modification to the then current ratings of the Certificates.

"S&P" shall mean Standard & Poor's, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Stockholder's Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

"Trust Agreement" shall mean, collectively, the Series Trust Agreement (the "Series Trust Agreement"), dated as of December 8, 2006, which supplements and amends the Standard Terms for Trust Agreements ("Standard Terms"), dated as of December 8, 2006, each between Lehman Brothers Inc., as depositor, and U.S. Bank National Association, as trustee, as the same may be amended or supplemented from time to time as provided therein.

"Trustee" shall mean U.S. Bank National Association, as Trustee of Party B, and any additional or successor trustee of Party B.

"Underlying Securities" shall have the meaning specified therefor in the Trust Agreement.

"Underlying Securities Default" shall have the meaning specified therefor in the Trust Agreement.

(k)     **Tax Event and Tax Event Upon Merger.**  Section 5(b)(ii) will apply, provided that the words "(x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y)" shall be deleted.  Section 5(b)(iii) will apply to both parties, provided that Party A shall not be entitled to designate an Early Termination Date by reason of a Tax Event Upon Merger in respect of which it is the Affected Party.  Section 6(b)(ii) will apply, provided that the words "or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party" shall be deleted.

(l)     **Representations.**  Section 3 is hereby amended by adding the following subsections after subsection (f) thereof:

(g)     **Eligible Contract Participant.** It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act, as amended.

(h)     **Status of Parties.**  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(n)     **Third-Party Beneficiary.**  Party B agrees with Party A that Party A shall be an express third-party beneficiary of the Trust Agreement.

(o)     **Notices.**  For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(p)     **Service of Process.**  The third sentence of Section 13(c) shall be amended by adding the following language at the end thereof:   "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(q)     **Severability**.  If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement; provided, however, that this severability provision shall not be applicable if any provision of Section 2, 5, 6 or 13 (or any definition or provision in Section 14 to the extent it relates to, or is used in or connection with any such Section) shall be held to be invalid or unenforceable.

(r)     **Amendments to Trust Agreement**.  Party B agrees that it will obtain Party A's written consent at least ten Business Days prior to amending, supplementing or assigning the Trust Agreement (or any of the agreements referred to therein, including without limitation the Total Return Swap Confirm if Party A is not the TRS Counterparty) if such amendment, assignment and/or supplement could: (a) reasonably be expected to have a material and adverse effect on any of Party A's rights or obligations hereunder or under the Indenture or (b) modify the obligations of, or impact the ability of, Party B to fully perform any of Party B's obligations hereunder or under the Trust Agreement.

(s)     **Ratings.**  If either Party A or Party A's Credit Support Provider fails to maintain the S&P Ratings Requirements it shall pursue one of the remedies specified in Part 1(e) hereof.

-13-

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
    Name:
    Title:

RESTRUCTURED ASSET CERTIFICATES WITH
ENHANCED RETURNS, SERIES 2006-20AT TRUST

By:  U.S. Bank National Association, not in its
    individual capacity but solely as Trustee under the
    Trust Agreement

By:_____
    Name:
    Title:

[Schedule]

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
    Name:
    Title:

RESTRUCTURED ASSET CERTIFICATES WITH ENHANCED RETURNS, SERIES 2006-20AT TRUST

By:  U.S. Bank National Association, not in its individual capacity but solely as Trustee under the Trust Agreement

By: _____
    Name:   **David J. Kolibachuk**
    Title:    **Vice President**

[Schedule]

## EXHIBIT A TO SCHEDULE

### FORM OF PORTFOLIO SWAP CONFIRMATION

A-1

## EXHIBIT B TO SCHEDULE

### FORM OF OPINION OF COUNSEL FOR PARTY A

USActive 6270406.19

## EXHIBIT C TO SCHEDULE

### FORM OF OPINION OF COUNSEL FOR PARTY B

USActive 6270406.19

<u>EXHIBIT D TO SCHEDULE</u>

<u>FORM OF GUARANTEE</u>

D-1

USActive 6270406.19

EXHIBIT E TO SCHEDULE

FORM OF CREDIT SUPPORT ANNEX

E-1

# LEHMAN BROTHERS

**Transaction**

Date:          December 8, 2006

To:            Restructured Asset Certificates with Enhanced Returns, Series 2006-20AT

From:          Lehman Brothers Special Financing Inc.
               Jonathan Lai - Structured Products Transaction Management Group
               Facsimile:  212-652-0556
               Telephone:  212-526-0806

RE:            Single Tranche Credit Derivative Transaction relating to a Mortgage-Backed Security
               Portfolio

_____

        The purpose of this communication (the "**Confirmation**") is to confirm the terms and
conditions of the single tranche Credit Derivative Transaction relating to a portfolio of mortgage-
backed securities entered into on the Trade Date specified below (the "**Transaction**").  This
Confirmation constitutes a "**Confirmation**" as referred to in the ISDA Master Agreement
specified below.

        The definitions and provisions contained in the 2003 ISDA Credit Derivatives
Definitions (the "**Credit Derivatives Definitions**"), as published by the International Swaps and
Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any
inconsistency between the Credit Derivatives Definitions and this Confirmation, this
Confirmation shall govern.

        This Confirmation supplements, forms a part of, and is subject to, the ISDA Master
Agreement, dated as of December 8, 2006, as amended and supplemented from time to time (the
"**Agreement**"), between Lehman Brothers Special Financing Inc. ("**Party A**") and Restructured
Asset Certificates with Enhanced Returns, Series 2006-20AT Trust ("**Party B**").  All provisions
contained in the Agreement govern this Confirmation except as expressly modified below.

        References in this Confirmation to the "**Reference Obligation**" shall be to the terms of
the Reference Obligation (as defined below) set out in the Underlying Instruments (as defined
below) as amended from time to time unless otherwise specified below.

The terms of the Transaction to which this Confirmation relates are as follows:

**1. General Terms:**

Trade Date:                        December 8, 2006

Effective Date:                    December 8, 2006

Scheduled Termination Date:        May 25, 2046

Termination Date:                  The day falling one year after the date upon which the
                                   Outstanding Tranche Notional Amount is reduced to zero
                                   *unless,* the Outstanding Tranche Notional Amount
                                   is increased to an amount greater than zero within such year,
                                   *provided* that if an Early Termination Date has occurred and
                                   Party A or the TRS Counterparty is the Defaulting Party or
                                   the sole Affected Party, the last Additional Fixed Amount

|                              |                              |
|------------------------------|------------------------------|
|                              | Payment Date.                |
| Fixed Rate Payer:            | Party A ("**Buyer**")        |
| Floating Rate Payer:         | Party B ("**Seller**")       |
| Attachment Point:            | 13.00%                       |
| Detachment Point:            | 19.75%                       |
| Weighting:                   | 1.25%                        |
| Original Tranche Notional:   | USD 40,500,000               |
| Initial Tranche Factor:      | 100.00%                      |

Outstanding Tranche Notional Amount:

An amount, as of the date of determination, equal to:

(i) the product of the Original Tranche Notional and the Initial Tranche Factor; *plus,*

(ii) the sum of each Incurred Principal Reimbursement Amount; *minus,*

(iii) the sum of each Incurred Principal Loss Amount; *minus,*

(iv) the greater of (a) an amount equal to (I) the sum of each Principal Payment Amount, *minus* (II) the Initial Portfolio Size, *plus* (III) the Loss Cap; and (b) zero;

*provided,* if such amount is less than zero, the Outstanding Tranche Notional Amount shall be zero.

Tranche Width:

A percentage equal to the Detachment Point *minus* the Attachment Point.

Initial Portfolio Size:

An amount equal to the Original Tranche Notional *divided by* the Tranche Width.

Outstanding Portfolio Size:

An amount, as of the relevant date of determination, equal to the sum of the Reference Obligation Notional Amounts in respect of each Reference Obligation.

Loss Threshold:

An amount equal to the product of the Initial Portfolio Size and the Attachment Point.

Loss Cap:

An amount equal to the product of the Initial Portfolio Size and the Detachment Point.

Reference Obligation Notional Amount:

With respect to each Reference Obligation, an amount, as of the relevant date of determination, equal to:

(i) the product of (a) the Initial Face Amount, and (b) Initial Factor (in respect of such Reference Obligation), *minus,*

(ii) the sum of each Principal Payment Amount in respect of such Reference Obligation; *minus,*

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

(iii) the sum of each Principal Loss Amount in respect of such Reference Obligation; *plus,*

(iv) the sum of each Principal Reimbursement Amount in respect of such Reference Obligation.

*provided*, if such amount is less than zero, the Reference Obligation Notional Amount in respect of such Reference Obligation shall be zero.

| | |
|---|---|
| Calculation Agent: | Party A |
| Calculation Agent City: | New York |
| Business Days | New York and London. |
| Business Day Convention: | Following (which, with the exception of the Effective Date, the Final Amortization Date, each Reference Obligation Payment Date and the period end date of each Reference Obligation Calculation Period, shall apply to any date referred to in this confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Each entity listed in Annex A attached hereto; thereafter, any entity that succeeds to the obligations of such Reference Entity under the related Reference Obligation.<br><br>Section 2.2 of the Credit Derivatives Definitions shall not apply. |
| Reference Obligation: | The obligation set across from the applicable Reference Entity in Annex A. Section 2.30 of the Credit Derivatives Definitions shall not apply.<br><br>The Reference Obligations are used herein solely for the purpose of making certain calculations hereunder and there is no requirement that Buyer or Seller own any of the Reference Obligations. |
| Initial Face Amount: | With respect to each Reference Obligation, an amount equal to the product of (i) the Initial Portfolio Size, and (ii) the Weighting. |
| Initial Factor: | With respect to a Reference Obligation, the factor set forth opposite the relevant Reference Obligation in Annex A. |
| Applicable Percentage: | On any day, with respect to each Reference Obligation, a percentage equal to A divided by B.<br><br>"A" means, with respect to a Reference Obligation, the product of the Initial Face Amount and the Initial Factor.<br><br>"B" means, with respect to a Reference Obligation, the product of the Original Principal Amount and the Initial Factor. |

(i) as increased by the outstanding principal balance of

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

|  | any further issues by the Reference Entity that are fungible with and form part of the same legal series as such Reference Obligation; and |
|  | (ii) as decreased by any cancellations of some or all of the Outstanding Principal Amount resulting from purchases of such Reference Obligation by or on behalf of the Reference Entity. |
| Initial Payment: | If an Initial Payment Payer and an Initial Payment Amount are specified below, the Initial Payment Payer shall pay an amount equal to the Initial Payment Amount to the other party on the date that is five Business Days following the Trade Date. |
| Initial Payment Payer: | Not Applicable |
| Initial Payment Amount: | Not Applicable |

## 2. Fixed Payments:

| | |
|---|---|
| Fixed Rate: | 2.30% per annum. |
| Fixed Rate Payer Period End Date: | The 25th calendar day of each month. |
| Fixed Rate Payer Payment Dates: | The fifth Business Day following each Fixed Rate Payer Period End Date.  For the avoidance of doubt, Party A shall not make any payment of the Fixed Amount after (i) the Outstanding Tranche Notional Amount has been reduced to zero (unless the Outstanding Tranche Notional Amount is increased to an amount greater than zero within such year) or (ii) after an Early Termination Date. |
| Fixed Rate Day Count Fraction: | ACT / 360 |
| Fixed Amount: | The product of: |
|  | (a)  the Fixed Rate; |
|  | (b)  an amount equal to: |
|  |     (1)  the sum of the Outstanding Tranche Notional Amount as of 5:00 p.m. in the Calculation Agent City on each day in the related Fixed Rate Payer Calculation Period; *divided by,* |
|  |     (2)  the actual number of days in the related Fixed Rate Payer Calculation Period; and |
|  | (c)  the Fixed Rate Day Count Fraction. |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

**3. Floating Payments**:

| | |
|---|---|
| Floating Rate Payer Payment Dates: | In relation to one or more Floating Amount Events, the first Fixed Rate Payer Payment Date falling at least two Business Days after delivery of a notice by the Calculation Agent to the parties or a notice by Buyer to Seller (each such notice, a "**Floating Amount Event Notice**") containing a description of the facts relevant to the determination that one or more Floating Amount Events have occurred and showing in reasonable detail how the related Floating Amount (if any) was calculated. |

Notwithstanding anything herein to the contrary, Buyer and Calculation Agent may each deliver one Floating Amount Event Notice with respect to each Floating Rate Payer Payment Date; *provided,* the later Floating Amount Event Notice (if any) must include each Floating Amount Event in the earlier Floating Amount Event Notice and shall replace and supercede each prior Floating Amount Event Notice; *provided further*, the Floating Amount on such Floating Rate Payer Payment Date shall be the amount specified in the last Floating Amount Event Notice delivered with respect to such Floating Rate Payer Payment Date.

| | |
|---|---|
| Floating Payments: | Seller shall pay the relevant Floating Amount to Buyer on the relevant Floating Rate Payer Payment Date, subject to Alternative Settlement and Floating Payment Escrow. |

For avoidance of doubt, Seller shall have no obligation to pay a Floating Amount in respect of a Floating Amount Event that occurs outside the Term of this Transaction. For the avoidance of doubt, the Conditions to Settlement under the Credit Derivatives Definitions shall not apply.

| | |
|---|---|
| Floating Amount Event: | A Writedown, a Failure to Pay Principal or an Interest Shortfall. |
| Floating Amount: | With respect to each Floating Rate Payer Payment Date, an amount equal to the sum of: |

(i) the Incurred Principal Loss Amount(s) (if any) specified in a Floating Amount Event Notice delivered after the immediately preceding Floating Rate Payer Payment Date; and,

(ii) the Incurred Interest Shortfall Amount(s) (if any) specified in a Floating Amount Event Notice delivered after the immediately preceding Floating Rate Payer Payment Date.

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

**4. Additional Fixed Payments:**

| | |
|---|---|
| Additional Fixed Amount Payment Dates: | In relation to a Additional Fixed Amount Event with respect to a Reference Obligation, the first Fixed Rate Payer Payment Date falling at least two Business Days after delivery of a notice  by the Calculation Agent to the parties or a notice by Seller to Buyer (each such notice, an "**Additional Fixed Event Notice**") containing a description of the facts relevant to the determination that a Additional Fixed Amount Event has occurred and showing in reasonable detail the related Additional Fixed Amount (if any) was calculated. |
| | Notwithstanding anything herein to the contrary, Seller and Calculation Agent may each deliver one Additional Fixed Amount Event Notice with respect to each Additional Fixed Amount Payment Date; *provided,* the later Additional Fixed Amount Event Notice (if any) must include each Additional Fixed Amount Event in the earlier Additional Fixed Amount Event Notice and shall replace and supercede each prior Additional Fixed Amount Event Notice; *provided further*, the Additional Fixed Amount on such Additional Fixed Amount Payer Payment Date shall be the amount specified in the last Additional Fixed Amount Event Notice delivered with respect to such Additional Fixed Amount Payment Date. |
| Additional Fixed Payments: | Buyer shall pay the relevant Additional Fixed Amount to Seller on the relevant Additional Fixed Amount Payment Date. |
| | For avoidance of doubt, Buyer shall have no obligation to pay an Additional Fixed Amount in respect of an Additional Fixed Amount Event that occurs outside the Term of this Transaction. |
| Additional Fixed Payment Event: | In respect of any Reference Obligation, the occurrence of a Writedown Reimbursement, a Principal Shortfall Reimbursement or an Interest Shortfall Reimbursement on or after the Effective Date and on or before the later of (i) the day that is the one calendar year after the related Effective Maturity Date of such Reference Obligation or (ii) if an Early Termination Date has occurred and Party A or the TRS Counterparty is the Defaulting Party or the sole Affected Party, the day that is one calendar year after the related Early Termination Date.  For the avoidance of doubt, notwithstanding Section 6(c)(ii) of the Agreement, Additional Fixed Payments may fall due on or following the Early Termination Date, if any. |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

Additional Fixed Amount:

With respect to each Additional Fixed Amount Payment Date, an amount equal to the sum of:

(i) the Incurred Principal Reimbursement Amount(s) (if any) specified in an Additional Fixed Amount Event Notice delivered after the immediately preceding Additional Fixed Amount Payment Date; and

(ii) the Incurred Interest Shortfall Reimbursement Amount(s) (if any) specified in an Additional Fixed Amount Event Notice delivered after the immediately preceding Additional Fixed Amount Payment Date.

## 5. Principal Loss

Incurred Principal Loss Amount:

With respect to a Floating Rate Payer Payment Date, an amount equal to the lesser of:

(i)   (a) the Periodic Principal Loss Amount, *minus* (b) the Periodical Principal Reimbursement Amount, subject to a minimum of zero;

(ii)  (a) the Aggregate Principal Loss Amount, *minus* (b) the Loss Threshold, subject to a minimum of zero; and,

(iii) the Outstanding Tranche Notional Amount as of the immediately preceding Fixed Rate Payer Payment Date.

Principal Loss Amount:

With respect to a Reference Obligation, a Writedown Amount or a Principal Shortfall Amount determined in respect of such Reference Obligation.

Periodic Principal Loss Amount:

With respect to a Floating Rate Payer Payment Date, an amount equal to the sum of the Principal Loss Amount(s) in respect of each Writedown (if any) and each Failure to Pay Principal (if any) for each Reference Obligation hereof specified in a Floating Amount Event Notice delivered in respect of such Floating Rate Payer Payment Date.

Aggregate Principal Loss Amount:

As of the relevant date of determination, an amount equal to:

(i) the sum of the Principal Loss Amount(s) in respect of each Writedown (if any) and each Failure to Pay Principal (if any) for each Reference Obligation hereof occurring prior to such date (if any); *minus,*

(ii) the sum of the Principal Reimbursement Amount(s) in respect of each Writedown Reimbursement (if any) and each Principal Shortfall Reimbursement (if any) for each Reference Obligation hereof occurring prior to such date;

---

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

*provided*, if such amount is less than zero, the Aggregate Principal Loss Amount shall be zero.

| | |
|---|---|
| Incurred Principal Reimbursement Amount: | With respect to an Additional Fixed Amount Payment Date, an amount equal to the lesser of: |

    (i) an amount, subject to a minimum of zero, equal to:

        (a) the Periodic Principal Reimbursement Amount; *minus*,

        (b) the Periodical Principal Loss Amount, *minus,*

        (c) the greater of (1) the Aggregate Principal Loss Amount as of the immediately preceding Fixed Rate Payer Calculation Period, *minus,* the Loss Cap, and (2) zero; and,

    (ii) an amount, subject to a minimum of zero, equal to:

        (a) the sum of the Incurred Principal Loss Amounts determined on or prior to such Additional Fixed Amount Payment Date (if any); *minus*,

        (b) the sum of the Incurred Principal Reimbursement Amounts (if any) determined on or prior to the immediately preceding Additional Fixed Amount Payment Date.

| | |
|---|---|
| Principal Reimbursement Amount: | With respect to a Reference Obligation, a Writedown Reimbursement Amount or a Principal Shortfall Reimbursement Amount determined in respect of such Reference Obligation. |
| Periodic Principal Reimbursement Amount: | With respect to an Additional Fixed Amount Payment Date, an amount equal to the sum of the Principal Reimbursement Amount(s) in respect of each Writedown Reimbursement (if any) and each Principal Shortfall Reimbursement (if any) for each Reference Obligation hereof specified in an Additional Fixed Amount Event Notice delivered in respect of such Additional Fixed Amount Payment Date (if any). |

## 6. Interest Shortfall

| | |
|---|---|
| Actual Interest Amount: | With respect to any Reference Obligation Payment Date in respect of a Reference Obligation, payment by or on behalf of the Issuer of an amount in respect of interest due under such Reference Obligation (including, without limitation, any deferred interest or defaulted interest but excluding payments in respect of prepayment penalties, yield maintenance provisions or principal, except that the Actual Interest Amount shall include any payment of principal representing capitalized interest) to the holder(s) of such |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

|  | Reference Obligation in respect of such Reference Obligation. |
|---|---|
| Expected Interest Amount: | With respect to any Reference Obligation Payment Date in respect of a Reference Obligation, the amount of current interest that would accrue during the related Reference Obligation Calculation Period calculated using the Reference Obligation Coupon on a principal balance of such Reference Obligation equal to the Outstanding Principal Amount taking into account any reductions due to a principal deficiency balance or realized loss amount (however described in the Underlying Instruments) that are attributable to such Reference Obligation and that will be payable on the related Reference Obligation Payment Date assuming for this purpose that sufficient funds are available therefor in accordance with the Underlying Instruments. |
|  | Except as provided in (i) in the previous sentence, the Expected Interest Amount in respect of a Reference Obligation shall be determined without regard to (i) unpaid amounts in respect of accrued interest on prior Reference Obligation Payment Dates or (ii) any prepayment penalties or yield maintenance provisions. |
|  | The Expected Interest Amount shall be determined without regard to the effect of any provisions (however described) of the Underlying Instruments that otherwise permit the limitation of due payments to distributions of funds from proceeds of the Underlying Assets, or that provide for the capitalization or deferral of interest on such Reference Obligation, or that provide for the extinguishing or reduction of such payments or distributions (but, for the avoidance of doubt, taking account of any Writedown within paragraph (i) of the definition of "**Writedown**" occurring in accordance with the relevant Underlying Instruments). |
| Interest Shortfall: | With respect to any Reference Obligation Payment Date in respect of a Reference Obligation, either (i) the nonpayment of an Expected Interest Amount or (ii) the payment of an Actual Interest Amount that is less than the Expected Interest Amount. |
|  | For the avoidance of doubt, the occurrence of an event within (i) or (ii) shall be determined taking into account any payment made under the relevant Reference Policy, if applicable. |
| Unadjusted Interest Shortfall Amount: | With respect to any Reference Obligation Payment Date in respect of a Reference Obligation, an amount equal to the greater of: |
|  | (i) zero; and |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

(ii) the amount equal to the product of:

(a) (1) the Expected Interest Amount; *minus*

(2) the Actual Interest Amount; and

(b) the Applicable Percentage;

*provided that*, with respect to the first Reference Obligation Payment Date in respect of such Reference Obligation, the Interest Shortfall Amount shall be the amount determined in accordance with (i) and (ii) above multiplied by a fraction equal to:

(i) the number of days in the initial Fixed Rate Payer Calculation Period; *over*

(ii) the number of days in the first Reference Obligation Calculation Period with respect to such Reference Obligation.

| | |
|---|---|
| Interest Shortfall Amount: | With respect to any Reference Obligation Payment Date, in respect of a Reference Obligation, an amount equal to the lesser of the related Unadjusted Interest Shortfall Amount and the related Reference Obligation Interest Shortfall Cap Amount. |
| Interest Shortfall Reimbursement: | With respect to any Reference Obligation Payment Date for a Reference Obligation on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date of such Reference Obligation, the payment by or on behalf of the Issuer of an Actual Interest Amount in respect of such Reference Obligation that is greater than the Expected Interest Amount. |
| Unadjusted Interest Shortfall Reimbursement Amount: | With respect to any Reference Obligation Payment Date in respect of a Reference Obligation, the product of (a) the amount of any Interest Shortfall Reimbursement on such day and (b) the Applicable Percentage. |
| Interest Shortfall Reimbursement Amount: | As set forth in the Annex D attached hereto. |

**Incurred Interest Shortfalls:**

| | |
|---|---|
| Incurred Interest Shortfall Amount: | With respect to each Fixed Rate Payer Calculation Period, an amount equal to the lesser of: |

(i) an amount, subject to a minimum of zero, equal to:

(a) the relevant Periodic Interest Shortfall Amount; *minus,*

(b) the relevant Periodic Interest Shortfall Reimbursement Amount; *minus,*

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

(c) relevant Interest Shortfall Threshold; and,

(ii) the relevant Interest Shortfall Cap.

| | |
|---|---|
| Periodic Interest Shortfall Amount: | With respect to each Fixed Rate Payer Calculation Period, an amount equal to the sum of the Interest Shortfall Amount(s) in respect of each Interest Shortfall (if any) for each Reference Obligation hereof occurring within such Fixed Rate Payer Calculation Period. |
| Cumulative Incurred Interest Shortfall Amount: | With respect to each Fixed Rate Payer Calculation Period, an amount equal to: |

(i) the relevant Incurred Interest Shortfall Amount; *minus,*

(ii) the relevant Incurred Interest Shortfall Reimbursement Amount; *plus,*

(iii) the product of:

  (a) the Cumulative Incurred Interest Shortfall Amount as of the immediately preceding Fixed Rate Payer Period End Date; and,

  (b) the relevant Interest Shortfall Compounding Factor.

| | |
|---|---|
| Interest Shortfall Compounding Factor: | With respect to each Fixed Rate Payer Calculation Period, an percentage equal to the sum of: |

(i) 100.00%; and,

(ii) the product of (a) the sum of the Fixed Rate and the Relevant Rate, and (b) the Fixed Rate Day Count Fraction in respect of such Fixed Rate Payer Calculation Period.

| | |
|---|---|
| Relevant Rate: | With respect to a Fixed Rate Payer Calculation Period, the Floating Rate, expressed as a decimal number with seven decimal places, that would be determined if: |

(i)    the 2000 ISDA Definitions (and not the 2003 ISDA Credit Derivatives Definitions) applied to this paragraph;

(ii)    the Fixed Rate Payer Calculation Period were a "**Calculation Period**" for purposes of such determination; and

(iii)    the following terms applied:

  (a)    the Floating Rate Option were USD-LIBOR-BBA;

  (b)    the Designated Maturity were the period

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

that corresponds to the usual length of a Fixed Rate Payer Calculation Period; and

    (c)    the Reset Date were the first day of the Calculation Period;

| | |
|---|---|
| Interest Shortfall Threshold: | As set forth in the Annex C attached hereto. |
| Interest Shortfall Cap: | With respect to each Fixed Rate Payer Calculation Period, an amount equal to the Fixed Amount for such Fixed Rate Payer Calculation Period. |

**Incurred Interest Shortfall Reimbursements:**

Incurred Interest Shortfall Reimbursement Amount:

With respect to each Fixed Rate Payer Calculation Period, an amount equal to the lesser of:

(i) an amount, subject to a minimum of zero, equal to:

    (a) the relevant Periodic Interest Shortfall Reimbursement Amount; *minus,*

    (b) the relevant Periodic Interest Shortfall Amount; *minus,*

    (c) the relevant Cumulative Excess Interest Shortfall Amount; and,

(ii) the product of:

    (a) the Cumulative Incurred Interest Shortfall Amount as of the immediately preceding Fixed Rate Payer Period End Date; and,

    (b) the relevant Interest Shortfall Compounding Factor.

Periodic Interest Shortfall Reimbursement Amount:

With respect to each Fixed Rate Payer Calculation Period, an amount equal to the sum of the Interest Shortfall Reimbursement Amount(s) in respect of each Interest Shortfall Reimbursement (if any) and Reference Obligation hereof occurring within such Fixed Rate Payer Calculation Period.

Cumulative Excess Interest Shortfall Amount:

As set forth in the Annex C.

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

**7. Additional Provisions:**

(a)     *Delivery of Servicer Report*

If either party makes a request in writing, the Calculation Agent agrees to provide such party with a copy of the most recent Servicer Report promptly following receipt of such request, if and to the extent such Servicer Report is reasonably available to the Calculation Agent (whether or not the Calculation Agent is a holder of the Reference Obligation). In addition, if a Floating Payment or an Additional Fixed Payment is due hereunder, then the Calculation Agent or the party that notifies the other party that the relevant Floating Payment or Additional Fixed Payment is due, as applicable, (the "**Notifying Party**") shall deliver a copy of any Servicer Report relevant to such payment that is requested by the party that is not the Notifying Party or by either party where the Notifying Party is the Calculation Agent, if and to the extent that such Servicer Report is reasonably available to the Notifying Party (whether or not the Notifying Party is a holder of the Reference Obligation).

(b)     *Calculation Agent and Buyer and Seller Determinations*

The Calculation Agent shall be responsible for determining and calculating, for each Reference Obligation, (i) the Fixed Amount payable on each Fixed Rate Payer Payment Date; (ii) the occurrence of a Floating Amount Event, (iii) the occurrence of an Additional Fixed Payment Event, (iv) the Floating Amount(s) (if any) and all amounts relating thereto and (v) the Additional Fixed Amount(s) (if any) and all amounts relating thereto; *provided that* notwithstanding the above, each of Buyer and Seller shall be entitled to determine and calculate the above amounts to the extent that Buyer or Seller, as applicable, has the right to deliver a notice to the other party demanding payment of such amount.

The Calculation Agent or Buyer or Seller, as applicable, shall make such determinations and calculations solely on the basis of the Servicer Reports to the extent such Servicer Reports are reasonably available to the Calculation Agent or such party. The Calculation Agent or Buyer or Seller, as applicable, shall, as soon as practicable after making any of the determinations or calculations specified in (ii) through (v) above, notify the parties or the other party, as applicable, of such determinations and calculations.

(c)     *Adjustment of Calculation Agent Determinations*

To the extent that a Servicer furnishes any Servicer Reports correcting information contained in previously issued Servicer Reports, and such corrections impact calculations or determinations made hereunder, such calculations or determinations shall be adjusted retroactively by the Calculation Agent to reflect the corrected information (provided that, for the avoidance of doubt, no amounts in respect of interest shall be payable by either party and provided that the Calculation Agent in performing the calculations or determinations pursuant to this paragraph will assume that no interest has accrued on any adjusted amount), and the Calculation Agent shall promptly notify both parties of any corrected payments required by either party. Any required corrected payments shall be made on the second Fixed Rate Payer Payment Date following the day on which such notification by the Calculation Agent is effective.

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

*(d)    Disclaimers*

Without limitation of Section 9.1(b)(iv) of the Credit Derivatives Definitions (as modified above), each party acknowledges that the other party or its Affiliates or the Calculation Agent may act from time to time as an originator, sponsor, servicer, administrator, trustee, underwriter or market maker, or otherwise act in a capacity as a result of which such party or its Affiliates may be in possession of information in relation to one or more Reference Obligations or Reference Entities contained in Annex A and that may or may not be publicly available or known to the other party. No furnishing by a party or its Affiliates or the Calculation Agent of any notice, report, or other information with respect to any Reference Obligation or any Reference Entity ("**Reference Obligation Information**") shall prejudice the foregoing provision or Section 9.1(b)(iv) of the Credit Derivatives Definitions, constitute a representation or warranty as to the correctness or completeness of such Reference Obligation Information, give rise to any duty to supplement, update or revise the Reference Obligation Information so provided, or otherwise result in such party or the Calculation Agent having any responsibility for the content of such Reference Obligation Information.

*(e)    Alternative Settlement*

Notwithstanding anything to the contrary, in lieu of paying a Floating Amount (or a portion thereof) in respect of an Incurred Principal Loss Amount, Seller shall Deliver one or more CDS Collateral Securities in an aggregate principal amount of equal to the related Alternative Settlement Amount on the relevant Floating Rate Payer Payment Date.

Pursuant to the delivery of a CDS Collateral Security under Alternative Settlement, Seller shall be deemed to represent to Buyer on the related Floating Rate Payer Payment Date that it has conveyed (or caused to be conveyed) to Buyer, or the designee (if applicable), all right, title and interest in such CDS Collateral Security on such date free and clear of any and all liens, charges, claims or encumbrances (including, without limitation, any right of set off by or of the issuer, any counterclaim, defense, other than a counterclaim or defense based on (i) any lack or alleged lack of authority or capacity of an issuer to enter to the related obligation, (ii) any actual or alleged unenforceability, illegality, impossibility or invalidity with respect to any obligation, (iii) any applicable law, order, regulation, decree or notice however described, or the promulgation of, or any change in, the interpretation by any court, tribunal, regulatory authority or similar administrative or judicial body with competent or apparent jurisdiction of any applicable law, order, regulation, decree or notice, however described, or (iv) the imposition of, or any change in, any exchange controls, capital restrictions or any other similar restrictions imposed by any monetary or other authority, however described.  Subject to reasonable verification by Seller, Seller shall indemnify and hold harmless Buyer for any loss, liability, claim, damage and expense whatsoever incurred arising out of Seller's breach of the representations contained in this paragraph.

Seller shall also be deemed to represent to Buyer, that, unless Buyer has received an indemnity acceptable to Buyer from Seller with respect to the following, delivery of such obligations will not require or cause Buyer, or the designee (if applicable), to assume, and

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

will not subject Buyer, or the designee (if applicable), to any obligation, liability or commitment to lend additional funds (including any outstanding contingent commitment) (in each case other than (a) immaterial nonpayment obligations and any assignment or transfer fee in respect of Loans, and (b) obligations arising under customary provisions in respect of borrowed money, including but not limited to requirements that holders thereof indemnify or reimburse a trustee, administrative or fiscal agent or similar person or entity for costs, liabilities or expenses and customary pro rata sharing provisions requiring any amount received by a lender through payment, set-off or otherwise other than through the procedures set forth in the relevant loan documentation to be shared with other lenders).

Notwithstanding the foregoing, Seller shall only be permitted to pay an Alternative Settlement Amount so long as (i) Lehman Brothers Special Financing Inc. is a party to a total return swap transaction with the Seller and (ii) the Alternative Settlement Amount is equal to or greater than the minimum denomination of the CDS Collateral Security with the lowest minimum denomination. Under all other circumstances the Seller shall make a cash payment to the Buyer equal to the relevant Floating Amount.

(f)     *Floating Payment Escrow*

Notwithstanding anything herein to the contrary, if (x) the long-term senior unsecured debt rating of Party A or Party A's Credit Support Provider from S&P is downgraded to below "AA-" or the short-term rating of Party A or Party A's Credit Support Provider from S&P is downgraded below "A-1+" then within 30 calendar days or (y) the long-term senior unsecured debt rating of Party A or Party A's Credit Support Provider from S&P is withdrawn or downgraded to below "BBB+" or the short-term rating of Party A or Party A's Credit Support Provider from S&P is withdrawn or downgraded to below "A-2" then within 10 Business Days, Buyer and Seller shall, prior to such Floating Rate Payer Payment Date, select an escrow agent reasonably acceptable to Buyer and Seller and execute an escrow agreement such that:

(i)     Buyer shall deposit an amount equal to the relevant Incurred Principal Loss Amount (or pro rata portion thereof) that relates to Writedown Amount(s) on the relevant Floating Rate Payer Payment Date (in either case, each such amount, an "**Escrowed Amount**"); and

(ii)    such Escrowed Amounts shall be released to Buyer on the earlier of (a) the day upon which the Rating Requirement is satisfied and (b) the first anniversary of the related Floating Rate Payer Payment Date (the later such date in respect of each Escrowed Amount, the "**Release Date**"); *provided, however,* that if Writedown Reimbursement Amount(s) in respect of Writedown Amount(s) relating to an Incurred Principal Loss Amount occurs prior to the relevant Release Date of the related Escrowed Amount, that portion of the Escrowed Amount equal to the relevant Incurred Principal Reimbursement Amount (or pro rata portion thereof) that relates to such Writedown Reimbursement Amount(s) will be paid by the escrow agent to the Seller on the related Additional Fixed Amount Payment Date.

For the avoidance of doubt, payment of an Escrowed Amount (or the relevant portion thereof) to Seller by the escrow agent in connection with an Incurred Principal

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

Reimbursement Amount shall satisfy Buyer's obligation to pay the related Additional Fixed Payment.

(g)    *Collateral Requirements*

On the Effective Date, Buyer shall post USD 77,625.00 with Seller and Seller shall deposit such amount in a segregated interest bearing account (the current balance of such account, the "**Posted Amount**"). On each Fixed Rate Payer Payment Date thereafter, (i) Seller shall release to Buyer an amount equal to the positive difference of the Posted Amount and the Posting Requirement (if any) and any interest earned thereupon within the immediately preceding Fixed Rate Payer Calculation Period and (ii) Buyer shall transfer to Seller an amount equal to the positive difference of the Posting Requirement and the Posted Amount (if any). On the earlier of the Termination Date and the Effective Maturity Date (the "**Posted Amount Release Date**") Seller shall release to Buyer the Posted Amount (and any interest earned thereon).

Seller may not take any actions with respect to the Posted Amount (or any interest earned thereon) unless Buyer fails to pay to Seller any due and unpaid amounts to Seller under this Transaction and such failure is not remedied on or before the following Fixed Rate Payer Payment Date.

8.    **Notice and Account Details**:

Telephone, Telex and/or
Facsimile Numbers and
Contact Details for Notices:

Party A: Lehman Brothers Special Financing Inc.
745 7th Avenue, 3rd Floor
New York, NY 10019
Attn:  Jeong Gu Lee
Phone: 212-526-5461
Email:  jglee@lehman.com

With a copy to:
Jonathan Lai
Structured Products Transaction Management Group
Tel:    (212) 526-0806
Fax:    (212) 652-0556

Party B: Please Advise

Account Details:

Account Details of Party A:        JPMorgan Chase Bank
ABA No. 021000021
Account:  066-143543
FBO LBSF

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

Account Details of Party B:          U.S. Bank National Association, Minneapolis, MN
                                     ABA # 091 000 022
                                     BNF: U.S. Bank Trust N.A.
                                     A/C 1801 2116 7365
                                     Attn: Omaira Krueger 651-495-3705
                                     Ref: RACERS Series 2006-20AT Trust, A/C 107831000

**9.        Additional Definitions and Amendments to the Credit Derivatives Definitions**

(a)      References in Section 9.1(a) of the Credit Derivatives Definitions as well as
Section 3(a)(iv) of the form of Novation Agreement set forth in Exhibit E to the Credit
Derivatives Definitions to the Reference Entity shall be deemed to be references to each
Reference Entity and the Insurer in respect of the relevant Reference Policy, if applicable.

(b)      the following terms have the meanings given below:

"**Actual Principal Amount**" means, with respect to a Reference Obligation and the Final
Amortization Date or the Legal Final Maturity Date, an amount paid on such day by or on behalf
of the relevant Issuer in respect of principal (excluding any capitalized interest) to the holder(s) of
such Reference Obligation in respect of such Reference Obligation.

"**Aggregate Asset Premium**" means, with respect to a Fixed Rate Payer Calculation Period, an
amount equal to the product of (i) the Portfolio Reference Spread; (ii) an amount equal to (a) the
sum of the Outstanding Portfolio Size as of 5:00 p.m. in the Calculation Agent City on each day
in the related Fixed Rate Payer Calculation Period; *divided by,* (b) the actual number of days in
the related Fixed Rate Payer Calculation Period; and, (iii) the relevant Fixed Rate Day Count
Fraction.

"**Alternative Settlement Amount**" means, with respect to Alternative Settlement, a USD amount
equal to each Floating Amount (or portion thereof) attributable to an Incurred Principal Loss
Amount, rounded down to the nearest integral multiple of 1,000.

"**CDS Collateral Security**" means any asset backed security held within Party B's Underlying
Securities Account for the purpose securing its payment obligations in respect of the Transactions
hereto.

"**Effective Maturity Date**" means, with respect to a Reference Obligation, the earlier of (a) the
Legal Final Maturity Date and (b) the Final Amortization Date.

"**Expected Principal Amount**" means, with respect to a Reference Obligation and the Final
Amortization Date or the Legal Final Maturity Date, an amount equal to (i) the Outstanding
Principal Amount of such Reference Obligation payable on such day (excluding capitalized
interest) assuming for this purpose that sufficient funds are available for such payment, where
such amount shall be determined in accordance with the Underlying Instruments, minus (ii) the
net aggregate principal deficiency balance or realized loss amounts (however described in the
Underlying Instruments) that are attributable to such Reference Obligation. The Expected
Principal Amount shall be determined without regard to the effect of any provisions (however

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be
reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending.
Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks
and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their
particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

described) of the Underlying Instruments that permit the limitation of due payments or distributions of funds in accordance with the terms of such Reference Obligation or that provide for the extinguishing or reduction of such payments or distributions.

"**Failure to Pay Principal**" means, with respect to a Reference Obligation, (i) a failure by the relevant Reference Entity (or any Insurer thereof) to pay an Expected Principal Amount on the Final Amortization Date or the Legal Final Maturity Date, as the case may be or (ii) payment on any such day of an Actual Principal Amount that is less than the Expected Principal Amount; provided that the failure by such Reference Entity (or any Insurer thereof) to pay any such amount in respect of principal in accordance with the foregoing shall not constitute a Failure to Pay Principal if such failure has been remedied within any grace period applicable to such payment obligation under the Underlying Instruments or, if no such grace period is applicable, within three Business Days after the day on which the Expected Principal Amount was scheduled to be paid.

"**Final Amortization Date**" means, with respect to a Reference Obligation, the first to occur of (i) the date on which the Reference Obligation Notional Amount is reduced to zero and (ii) the date on which the assets backing the Reference Obligation or designated to fund amounts due in respect of the Reference Obligation are liquidated, distributed or otherwise disposed of in full and the proceeds thereof are distributed or otherwise disposed of in full.

"**Insurer**" means, with respect to a Reference Obligation, the insurer of such Reference Obligation specified in Annex A.

"**Issuer**" means, with respect to a Reference Obligation, the issuer of such Reference Obligation specified in Annex A.

"**Legal Final Maturity Date**" means, with respect to a Reference Obligation, the date set out in the Annex A for such Reference Obligation (subject, for the avoidance of doubt, to any business day convention applicable to the legal final maturity date of such Reference Obligation), provided that if the legal final maturity date of such Reference Obligation is amended, the Legal Final Maturity Date shall be such date as amended.

"**Original Principal Amount**" means, with respect to a Reference Obligation, the amount specified as such in Annex A.

"**Outstanding Principal Amount**" means, with respect to a Reference Obligation as of any date of determination, the outstanding principal balance of such Reference Obligation as of such date, which shall take into account:

(i) all payments of principal;

(ii) all writedowns or applied losses (however described in the Underlying Instruments) resulting in a reduction in the outstanding principal balance of such Reference Obligation (other than as a result of a scheduled or unscheduled payment of principal);

(iii) forgiveness of any amount by the holders of such Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the outstanding principal balance of such Reference Obligation;

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

(iv) any payments reducing the amount of any reductions described in (ii) and (iii) of this definition; and

(v) any increase in the outstanding principal balance of such Reference Obligation that reflects a reversal of any prior reductions described in (ii) and (iii) of this definition).

"**Pari Passu Amount**" means, with respect to a Reference Obligation as of any date of determination, the aggregate of the Outstanding Principal Amount of the Reference Obligation and the aggregate outstanding principal balance of all obligations of the relevant Reference Entity backed by the relevant Underlying Assets and ranking *pari passu* in priority with such Reference Obligation.

"**Posting Requirement**" means, with respect to a Fixed Rate Payer Calculation Period, an amount equal to the lesser of (i) USD 77,625.00 and (ii) the product of (a) the Fixed Rate, (b) the Outstanding Tranche Notional Amount as of first date in the related Fixed Rate Payer Calculation Period, and (c) the Fixed Rate Day Count Fraction.

"**Principal Payment**" means, with respect to a Reference Obligation and any Reference Obligation Payment Date, the occurrence of a payment of an amount to the holders of such Reference Obligation in respect of principal (scheduled or unscheduled) in respect of such Reference Obligation including any amount determined under sub-clause (i) of Writedown Reimbursement, but excluding payments in respect of principal representing capitalized interest and any amount determined under sub-clause (ii) or (iii) of Writedown Reimbursement or Interest Shortfall Reimbursement.

"**Principal Payment Amount**" means, with respect to any Reference Obligation Payment Date for a Reference Obligation, an amount equal to the product of (i) the amount of any Principal Payment on such date and (ii) the Applicable Percentage.

"**Principal Shortfall Amount**" means, with respect to a Reference Obligation, in respect of a Failure to Pay Principal, an amount equal to the greater of:

(i) zero; and

(ii) the amount equal to the product of:

(A) the Expected Principal Amount minus the relevant Actual Principal Amount; and

(B) the Applicable Percentage;

If the Principal Shortfall Amount in respect of a Reference Obligation would be greater than the Reference Obligation Notional Amount immediately prior to the occurrence of such Failure to Pay Principal, then such Principal Shortfall Amount shall be deemed to be equal to the Reference Obligation Notional Amount at such time.

"**Principal Shortfall Reimbursement**" means, with respect to a Reference Obligation on any day on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date of such Reference Obligation, the payment by or on behalf of the relevant Issuer of an amount in respect of such Reference Obligation in or toward the satisfaction

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

of any deferral of or failure to pay principal arising from one or more prior occurrences of a Failure to Pay Principal.

"**Principal Shortfall Reimbursement Amount**" means, with respect to a Reference Obligation on any day, the product of (i) the amount of any relevant Principal Shortfall Reimbursement on such day and (ii) the relevant Applicable Percentage.

"**Principal Shortfall Reimbursement Payment Amount**" means, with respect to a Reference Obligation and an Additional Fixed Amount Payment Date, the sum of the Principal Shortfall Reimbursement Amounts in respect of all Principal Shortfall Reimbursements (if any) made during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date (or, in the case of an Additional Fixed Amount Payment Date after the final Fixed Rate Payer Payment Date, made on the related Reference Obligation Payment Date), provided that the aggregate of all such Principal Shortfall Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts (determined without regard to the Effective Date) in respect of occurrences of Failure to Pay Principal prior to such Additional Fixed Amount Payment Date.

"**Rating Requirement**" means, (i) the long-term debt obligations of the Buyer or its Credit Support Provider are rated at least "A1" by Moody's (and if rated "A1", such rating is not on watch for possible downgrade), and (ii) the long-term debt obligations of the Buyer or its Credit Support Provider are rated at least "AA-" by Standard & Poor's.

"**Reference Obligation Calculation Period**" means, with respect to a Reference Obligation and each Reference Obligation Payment Date, a period corresponding to the interest accrual period relating to such Reference Obligation Payment Date pursuant to the relevant Underlying Instruments.

"**Reference Obligation Coupon**" means, with respect to a Reference Obligation, the periodic interest rate applied in relation to each related Reference Obligation Calculation Period on the related Reference Obligation Payment Date, as determined in accordance with the terms of the relevant Underlying Instruments as at the Effective Date, without regard to any subsequent amendment.

"**Reference Obligation Payment Date**" means, with respect to a Reference Obligation, (i) each scheduled distribution date for such Reference Obligation occurring on or after the Effective Date and on or prior to the relevant Legal Final Maturity Date, determined in accordance with the Underlying Instruments and (ii) any day after the Effective Maturity Date on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date of such Reference Obligation on which a payment is made in respect of such Reference Obligation.

"**Reference Policy**" means, with respect to a Reference Obligation, the reference policy for such Reference Obligation specified in Annex A.

"**Senior Amount**" means, with respect to a Reference Obligation as of any day, the aggregate outstanding principal balance of all obligations of the Reference Entity backed by the Underlying Assets and ranking senior in priority to such Reference Obligation.

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

"**Servicer**" means, with respect to a Reference Obligation, any trustee, servicer, sub-servicer, master servicer, fiscal agent, paying agent or other similar entity responsible for calculating payment amounts or providing reports pursuant to the Underlying Instruments.

"**Servicer Reports**" means, with respect to a Reference Obligation, periodic statements or reports regarding the Reference Obligation provided by the Servicer to holders of the Reference Obligation.

"**Total Return Swap Confirm**" shall mean the total return swap confirmation, dated as of the Closing Date, by and between Party B and the TRS Counterparty (and any substitution for it under a different Master Agreement).

"**TRS Counterparty**" shall mean Lehman Brothers Special Financing Inc. or any successor in interest (or other counterparty) under the Total Return Swap Confirm.

"**Underlying Assets**" means, with respect to a Reference Obligation, the assets backing the Reference Obligation for the benefit of the holders of such Reference Obligation and which are expected to generate the cashflows required for the servicing and repayment (in whole or in part) of such Reference Obligation, or the assets to which a holder of such Reference Obligation is economically exposed where such exposure is created synthetically.

"**Underlying Instruments**" means, with respect to a Reference Obligation, the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation.

"**Underling Securities Account**" shall mean the collection account established by Party B.

"**Writedown**" means, with respect to a Reference Obligation, the occurrence at any time on or after the Effective Date of:

(i)   (A) a writedown or applied loss (however described in the Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount of such Reference Obligation (other than as a result of a scheduled or unscheduled payment of principal); or,

(B) the attribution of a principal deficiency or realized loss (however described in the Underlying Instruments) to such Reference Obligation resulting in a reduction or subordination of the current interest payable on such Reference Obligation; or

(ii) the forgiveness of any amount of principal by the holders of such Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the Outstanding Principal Amount.

*provided,* if Party A controls at least a plurality of votes with respect to a Reference Obligation and votes to forgive an amount of principal that would result in a reduction of the related Outstanding Principal Amount of the Reference Obligation (as set forth in clause (ii) hereof) then any such reduction shall not constitute a Writedown hereunder.

"**Writedown Amount**" means, with respect to a Reference Obligation on any day, the product of:

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

(i) the amount of any Writedown with respect to such Reference Obligation on such day and

(ii) the Applicable Percentage.

"**Writedown Reimbursement**" means, with respect to a Reference Obligation on any day on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date of such Reference Obligation, the occurrence of:

(i) a payment by or on behalf of the Issuer of an amount in respect of such Reference Obligation in reduction of any prior Writedowns; or

(ii) (A) an increase by or on behalf of the Issuer of the Outstanding Principal Amount of such Reference Obligation to reflect the reversal of any prior Writedowns; or

(B) a decrease in the principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) attributable to such Reference Obligation.

"**Writedown Reimbursement Amount**" means, with respect to a Reference Obligation on any day, an amount equal to the product of:

(i) the sum of all Writedown Reimbursements with respect to such Reference Obligation on that day; and

(ii) the Applicable Percentage;

"**Writedown Reimbursement Payment Amount**" means, with respect to a Reference Obligation and an Additional Fixed Amount Payment Date, the sum of the Writedown Reimbursement Amounts in respect of all Writedown Reimbursements (if any) during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date (or, in the case of an Additional Fixed Amount Payment Date after the final Fixed Rate Payer Payment Date, on the related Reference Obligation Payment Date, provided that the aggregate of all such Writedown Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts with respect to such Reference Obligation (determined without regard to the Effective Date) in respect of Writedowns occurring prior to such Additional Fixed Amount Payment Date.

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.


Yours sincerely,

**Lehman Brothers Special Financing Inc.**

By: _____
    Name:
    Title:


Confirmed as of the date first above written:

**U.S. Bank National Association, not in its
individual capacity but as trustee for
Restructured Assets with Enhanced Returns,
Series 2006-20AT Trust**

By: _____
    Name:
    Title:

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours sincerely,

**Lehman Brothers Special Financing Inc.**

By:_____
    Name:
    Title:

Confirmed as of the date first above written:

**U.S. Bank National Association, not in its
individual capacity but as trustee for
Restructured Assets with Enhanced Returns,
Series 2006-20AT Trust**

By: _____
    Name:    **David J. Kolibachuk**
    Title:    **Vice President**

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

**Annex A: Reference Portfolio**

| Reference Entity: | Bloomberg ID: | ISIN / CUSIP | Legal final maturity date | Original Principal Amount (USD) | Initial Factor | Coupon (bps) |
|---|---|---|---|---|---|---|
| JP MORGAN MORTGAGE ACQUISITION CORP 2005-OPT1 M8 | JPMAC 2005-OPT1 M8 | 46626LAM2 | 6/25/2035 | 18,876,000 | 1 | 140 |
| NEW CENTURY HOME EQUITY LOAN TRUST 2005-4 M8 | NCHET 2005-4 M8 | 64352VNB3 | 9/25/2035 | 22,900,000 | 1 | 130 |
| GSAMP TRUST 2005-HE4 B2 | GSAMP 2005-HE4 B2 | 362341KK4 | 8/25/2035 | 18,316,000 | 1 | 130 |
| STRUCTURED ASSET INVESTMENT LOAN TRUST 2005-HE3 M8 | SAIL 2005-HE3 M8 | 86358EXE1 | 9/25/2035 | 20,147,000 | 1 | 140 |
| LONG BEACH MORTGAGE LOAN TRUST 2005-WL2 M8 | LBMLT 2005-WL2 M8 | 542514NJ9 | 8/25/2035 | 28,935,000 | 1 | 140 |
| ARGENT SECURITIES INC. 2005-W2 M8 | ARSI 2005-W2 M8 | 040104NL1 | 10/25/2035 | 27,500,000 | 1 | 145 |
| MERRILL LYNCH MORTGAGE INVESTORS TRUST 2005-AR1 B2 | MLMI 2005-AR1 B2 | 59020UG58 | 6/25/2036 | 10,528,000 | 1 | 145 |
| RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC. 2005-EFC4 M8 | RAMP 2005-EFC4 M8 | 76112BD31 | 9/25/2035 | 8,797,000 | 1 | 129 |
| MORGAN STANLEY ABS CAPITAL I 2005-HE5 B2 | MSAC 2005-HE5 B2 | 61744CUZ7 | 9/25/2035 | 19,333,000 | 1 | 130 |
| HOME EQUITY ASSET TRUST 2005-8 M8 | HEAT 2005-8 M8 | 437084QG4 | 2/25/2036 | 15,000,000 | 1 | 127 |
| STRUCTURED ASSET SECURITIES CORPORATION 2005-WF4 M8 | SASC 2005-WF4 M8 | 863576DN1 | 11/25/2035 | 14,717,000 | 1 | 175 |
| ACE SECURITIES CORP. 2005-HE7 M8 | ACE 2005-HE7 M8 | 004421UK7 | 11/25/2035 | 21,571,000 | 1 | 170 |
| MASTR ASSET BACKED SECURITIES TRUST 2005-NC2 M8 | MABS 2005-NC2 M8 | 57643LMX1 | 11/25/2035 | 8,576,000 | 1 | 195 |
| RESIDENTIAL ASSET SECURITIES CORPORATION 2005-KS11 M8 | RASC 2005-KS11 M8 | 76110W7L4 | 12/25/2035 | 16,560,000 | 1 | 180 |
| SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2005-HE1 B2 | SABR 2005-HE1 B2 | 81375WGK6 | 10/25/2035 | 14,925,000 | 1 | 200 |
| BEAR STEARNS ASSET BACKED SECURITIES, INC. 2005-HE11 M7 | BSABS 2005-HE11 M7 | 0738793U0 | 11/25/2035 | 8,334,000 | 1 | 150 |
| AMERIQUEST MORTGAGE SECURITIES INC. 2005-R11 M8 | AMSI 2005-R11 M8 | 03072SV85 | 1/25/2036 | 15,560,000 | 1 | 250 |
| SOUNDVIEW HOME EQUITY LOAN TRUST 2005-4 M8 | SVHE 2005-4 M8 | 83611MKM9 | 3/25/2036 | 11,921,000 | 1 | 250 |
| COUNTRYWIDE ASSET-BACKED CERTIFICATES 2005-BC5 M8 | CWL 2005-BC5 M8 | 126670NM6 | 1/25/2036 | 11,400,000 | 1 | 200 |
| FIRST FRANKLIN MTG LOAN ASSET BACKED CERTIFICATES 2005-FF12 B2 | FFML 2005-FF12 B2 | 32027NYD7 | 11/25/2036 | 21,616,000 | 1 | 175 |
| SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-OP1 B2 | SABR 2006-OP1 B2 | 81375WJN7 | 10/25/2035 | 11,337,000 | 1 | 140 |
| JP MORGAN MORTGAGE ACQUISITION CORP 2006-FRE1 M8 | JPMAC 2006-FRE1 M8 | 46626LFV7 | 5/25/2035 | 14,174,000 | 1 | 145 |
| ACE SECURITIES CORP. 2006-NC1 M8 | ACE 2006-NC1 M8 | 004421VB6 | 12/25/2035 | 16,553,000 | 1 | 185 |
| ARGENT SECURITIES INC. 2006-W1 M8 | ARSI 2006-W1 M8 | 040104RQ6 | 3/25/2036 | 31,850,000 | 1 | 150 |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending.  Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

| | | | | | | |
|---|---|---|---|---|---|---|
| LONG BEACH MORTGAGE LOAN TRUST 2006-1 M8 | LBMLT 2006-1 M8 | 542514RV8 | 2/25/2036 | 25,000,000 | 1 | 145 |
| MERRILL LYNCH MORTGAGE INVESTORS TRUST 2006-HE1 B2A | MLMI 2006-HE1 B2A | 59020U3N3 | 12/25/2036 | 6,251,000 | 1 | 145 |
| CARRINGTON MORTGAGE LOAN TRUST 2006-NC1 M8 | CARR 2006-NC1 M8 | 144531FF2 | 1/25/2036 | 15,852,000 | 1 | 155 |
| MASTR ASSET BACKED SECURITIES TRUST 2006-NC1 M8 | MABS 2006-NC1 M8 | 57643LNP7 | 1/25/2036 | 11,897,000 | 1 | 140 |
| RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC. 2006-NC2 M8 | RAMP 2006-NC2 M8 | 75156TAL4 | 2/25/2036 | 7,600,000 | 1 | 140 |
| BEAR STEARNS ASSET BACKED SECURITIES, INC. 2006-HE3 M8 | BSABS 2006-HE3 M8 | 07387UHZ7 | 4/25/2036 | 11,505,000 | 1 | 140 |
| FIRST FRANKLIN MTG LOAN ASSET BACKED CERTIFICATES 2006-FF4 M8 | FFML 2006-FF4 M8 | 362334GC2 | 3/25/2036 | 18,298,000 | 1 | 135 |
| MORGAN STANLEY CAPITAL I 2006-HE2 B2 | MSC 2006-HE2 B2 | 617451FD6 | 3/25/2036 | 29,469,000 | 1 | 120 |
| HOME EQUITY ASSET TRUST 2006-4 M8 | HEAT 2006-4 M8 | 437084VY9 | 8/25/2036 | 16,000,000 | 1 | 120 |
| GSAMP TRUST 2006-HE3 M8 | GSAMP 2006-HE3 M8 | 36244KAN5 | 5/25/2046 | 22,348,000 | 1 | 110 |
| SOUNDVIEW HOME EQUITY LOAN TRUST 2006-OPT5 M8 | SVHE 2006-OPT5 M8 | 83612CAN9 | 7/25/2036 | 38,750,000 | 1 | 110 |
| STRUCTURED ASSET INVESTMENT LOAN TRUST 2006-4 M7 | SAIL 2006-4 M7 | 86360WAM4 | 7/25/2036 | 19,571,000 | 1 | 120 |
| STRUCTURED ASSET SECURITIES CORPORATION 2006-WF2 M8 | SASC 2006-WF2 M8 | 86360LAM8 | 7/25/2036 | 12,342,000 | 1 | 105 |
| MORGAN STANLEY ABS CAPITAL I 2006-WMC2 B2 | MSAC 2006-WMC2 B2 | 61749KAP8 | 7/25/2036 | 27,331,000 | 1 | 105 |
| COUNTRYWIDE ASSET-BACKED CERTIFICATES 2006-8 M8 | CWL 2006-8 M8 | 045427AM3 | 1/25/2046 | 22,000,000 | 1 | 115 |
| JP MORGAN MORTGAGE ACQUISITION CORP 2005-OPT1 M9 | JPMAC 2005-OPT1 M9 | 46626LAN0 | 6/25/2035 | 15,101,000 | 1 | 185 |
| NEW CENTURY HOME EQUITY LOAN TRUST 2005-4 M9 | NCHET 2005-4 M9 | 64352VNC1 | 9/25/2035 | 22,900,000 | 1 | 180 |
| GSAMP TRUST 2005-HE4 B3 | GSAMP 2005-HE4 B3 | 362341KL2 | 8/25/2035 | 19,782,000 | 1 | 175 |
| STRUCTURED ASSET INVESTMENT LOAN TRUST 2005-HE3 M9 | SAIL 2005-HE3 M9 | 86358EXF8 | 9/25/2035 | 18,962,000 | 1 | 180 |
| LONG BEACH MORTGAGE LOAN TRUST 2005-WL2 M9 | LBMLT 2005-WL2 M9 | 542514NK6 | 8/25/2035 | 27,557,000 | 1 | 180 |
| ARGENT SECURITIES INC. 2005-W2 M9 | ARSI 2005-W2 M9 | 040104NM9 | 10/25/2035 | 16,500,000 | 1 | 175 |
| MERRILL LYNCH MORTGAGE INVESTORS TRUST 2005-AR1 B3 | MLMI 2005-AR1 B3 | 59020UG66 | 6/25/2036 | 11,082,000 | 1 | 180 |
| RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC. 2005-EFC4 M9 | RAMP 2005-EFC4 M9 | 76112BD49 | 9/25/2035 | 9,164,000 | 1 | 175 |
| MORGAN STANLEY ABS CAPITAL I 2005-HE5 B3 | MSAC 2005-HE5 B3 | 61744CVA1 | 9/25/2035 | 15,616,000 | 1 | 175 |
| HOME EQUITY ASSET TRUST 2005-8 B1 | HEAT 2005-8 B1 | 437084QD2 | 2/25/2036 | 12,750,000 | 1 | 170 |
| STRUCTURED ASSET SECURITIES CORPORATION 2005-WF4 M9 | SASC 2005-WF4 M9 | 863576DP6 | 11/25/2035 | 14,717,000 | 1 | 250 |
| ACE SECURITIES CORP. 2005-HE7 M9 | ACE 2005-HE7 M9 | 004421UL5 | 11/25/2035 | 19,774,000 | 1 | 250 |
| MASTR ASSET BACKED SECURITIES TRUST 2005-NC2 M9 | MABS 2005-NC2 M9 | 57643LMY9 | 11/25/2035 | 9,027,000 | 1 | 250 |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

| | | | | | | |
|---|---|---|---|---|---|---|
| RESIDENTIAL ASSET SECURITIES CORPORATION 2005-KS11 M9 | RASC 2005-KS11 M9 | 76110W7M2 | 12/25/2035 | 15,180,000 | 1 | 250 |
| SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2005-HE1 B3 | SABR 2005-HE1 B3 | 81375WGL4 | 10/25/2035 | 14,303,000 | 1 | 225 |
| BEAR STEARNS ASSET BACKED SECURITIES, INC. 2005-HE11 M8 | BSABS 2005-HE11 M8 | 0738793V8 | 11/25/2035 | 7,052,000 | 1 | 215 |
| AMERIQUEST MORTGAGE SECURITIES INC. 2005-R11 M9 | AMSI 2005-R11 M9 | 03072SV93 | 1/25/2036 | 14,640,000 | 1 | 250 |
| SOUNDVIEW HOME EQUITY LOAN TRUST 2005-4 M9 | SVHE 2005-4 M9 | 83611MKN7 | 3/25/2036 | 10,155,000 | 1 | 250 |
| COUNTRYWIDE ASSET-BACKED CERTIFICATES 2005-BC5 B | CWL 2005-BC5 B | 126670NN4 | 1/25/2036 | 11,875,000 | 1 | 200 |
| FIRST FRANKLIN MTG LOAN ASSET BACKED CERTIFICATES 2005-FF12 B3 | FFML 2005-FF12 B3 | 32027NYE5 | 11/25/2036 | 19,651,000 | 1 | 175 |
| SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-OP1 B3 | SABR 2006-OP1 B3 | 81375WJP2 | 10/25/2035 | 12,597,000 | 1 | 190 |
| JP MORGAN MORTGAGE ACQUISITION CORP 2006-FRE1 M9 | JPMAC 2006-FRE1 M9 | 46626LFW5 | 5/25/2035 | 11,136,000 | 1 | 235 |
| ACE SECURITIES CORP. 2006-NC1 M9 | ACE 2006-NC1 M9 | 004421VC4 | 12/25/2035 | 13,243,000 | 1 | 250 |
| ARGENT SECURITIES INC. 2006-W1 M9 | ARSI 2006-W1 M9 | 040104RR4 | 3/25/2036 | 22,750,000 | 1 | 250 |
| LONG BEACH MORTGAGE LOAN TRUST 2006-1 M9 | LBMLT 2006-1 M9 | 542514RW6 | 2/25/2036 | 20,000,000 | 1 | 250 |
| MERRILL LYNCH MORTGAGE INVESTORS TRUST 2006-HE1 B3A | MLMI 2006-HE1 B3A | 59020U3Q6 | 12/25/2036 | 5,079,000 | 1 | 225 |
| CARRINGTON MORTGAGE LOAN TRUST 2006-NC1 M9 | CARR 2006-NC1 M9 | 144531FG0 | 1/25/2036 | 14,410,000 | 1 | 265 |
| MASTR ASSET BACKED SECURITIES TRUST 2006-NC1 M9 | MABS 2006-NC1 M9 | 57643LNQ5 | 1/25/2036 | 7,778,000 | 1 | 250 |
| RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC. 2006-NC2 M9 | RAMP 2006-NC2 M9 | 75156TAM2 | 2/25/2036 | 7,600,000 | 1 | 245 |
| RESIDENTIAL ASSET SECURITIES CORPORATION 2006-KS3 M8 | RASC 2006-KS3 M8 | 76113ABT7 | 4/25/2036 | 12,650,000 | 1 | 120 |
| RESIDENTIAL ASSET SECURITIES CORPORATION 2006-KS3 M9 | RASC 2006-KS3 M9 | 76113ABU4 | 4/25/2036 | 11,500,000 | 1 | 215 |
| BEAR STEARNS ASSET BACKED SECURITIES, INC. 2006-HE3 M9 | BSABS 2006-HE3 M9 | 07387UJA0 | 4/25/2036 | 9,124,000 | 1 | 225 |
| MORGAN STANLEY CAPITAL I 2006-HE2 B3 | MSC 2006-HE2 B3 | 617451FE4 | 3/25/2036 | 23,802,000 | 1 | 215 |
| HOME EQUITY ASSET TRUST 2006-4 B1 | HEAT 2006-4 B1 | 437084VZ6 | 8/25/2036 | 11,200,000 | 1 | 225 |
| GSAMP TRUST 2006-HE3 M9 | GSAMP 2006-HE3 M9 | 36244KAP0 | 5/25/2046 | 19,156,000 | 1 | 187 |
| SOUNDVIEW HOME EQUITY LOAN TRUST 2006-OPT5 M9 | SVHE 2006-OPT5 M9 | 83612CAP4 | 7/25/2036 | 34,100,000 | 1 | 200 |
| STRUCTURED ASSET INVESTMENT LOAN TRUST 2006-4 M8 | SAIL 2006-4 M8 | 86360WAN2 | 7/25/2036 | 18,348,000 | 1 | 200 |
| STRUCTURED ASSET SECURITIES CORPORATION 2006-WF2 M9 | SASC 2006-WF2 M9 | 86360LAN6 | 7/25/2036 | 18,189,000 | 1 | 190 |
| MORGAN STANLEY ABS CAPITAL I 2006-WMC2 B3 | MSAC 2006-WMC2 B3 | 61749KAQ6 | 7/25/2036 | 26,030,000 | 1 | 200 |
| COUNTRYWIDE ASSET-BACKED CERTIFICATES 2006-8 M9 | CWL 2006-8 M9 | 045427AN1 | 1/25/2046 | 17,000,000 | 1 | 215 |
| FIRST FRANKLIN MTG LOAN ASSET BACKED CERTIFICATES 2006-FF4 B1 | FFML 2006-FF4 B1 | 362334GJ7 | 3/25/2036 | 12,961,000 | 1 | 280 |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending.  Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

**Annex B: Reference Tranche Matrix**

| Reference Tranche | Reference Spread | Lower Strike | Upper Strike |
|---|---|---|---|
| 1 | 9.84% | 0.00% | 13.00% |
| 2 | 2.30% | 13.00% | 19.75% |
| 3 | 0.33% | 19.75% | 100% |

**Portfolio Reference Spread:** 1.70%

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

**Annex C: Interest Shortfall Annex**

| | |
|---|---|
| **Aggregate Loss Percentage:** | A percentage, as of the relevant date of determination equal to the quotient of (i) Aggregate Principal Loss Amount, and (ii) the Initial Portfolio Size. |
| **Outstanding Portfolio Percentage:** | A percentage, as of the relevant date of determination equal to the sum of (i) the Outstanding Portfolio Size *divided by* the Initial Portfolio Size, and (ii) the Aggregate Loss Percentage. |
| **Reference Tranche Matrix:** | The matrix attached hereto as Annex B |
| **Reference Tranche**: | Each tranche specified in the Reference Tranche Matrix. |
| **Lower Strike:** | With respect to a Reference Tranche, the percentage listed as such opposite the relevant Reference Tranche in the Reference Tranche Matrix. |
| **Upper Strike:** | With respect to a Reference Tranche, the percentage listed as such opposite the relevant Reference Tranche in the Reference Tranche Matrix. |
| **Reference Spread:** | With respect to a Reference Tranche, the rate listed as such opposite the relevant Reference Tranche in the Reference Tranche Matrix. |
| **Outstanding Tranche Width:** | With respect to a Reference Tranche, a percentage as of the relevant date of determination equal to: |

(i) the lesser of (a) the Outstanding Portfolio Percentage and (b) the relevant Upper Strike; *minus,*

(i) the greater of (a) the Aggregate Loss Percentage and (b) the relevant Lower Strike;

*provided*, if such percentage is less than zero, the Outstanding Tranche Width in respect of such Reference Tranche shall be zero.

| | |
|---|---|
| **Subordinate Reference Tranche:** | With respect to a Reference Tranche, every other Reference Tranche with a lesser Lower Strike than such Reference Tranche. |
| **Senior Reference Tranche:** | With respect to a Reference Tranche, every other Reference Tranche with a greater Lower Strike than such Reference Tranche. |
| **Reference Tranche Fixed Amount:** | With respect to a Reference Tranche and a Fixed Rate Payer Calculation Period with respect to the Transaction: |

For each Reference Tranche with a Lower Strike equal to zero, an amount, subject to a minimum of zero, equal to:

(i)    the Aggregate Asset Premium; *minus,*

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

       (ii)   the sum of the Reference Tranche Fixed Amount of each Senior Reference Tranche

For each Reference Tranche with a Lower Strike not equal to zero, an amount equal to the lesser of:

    (i) the product of:

        (a) the relevant Reference Spread;

        (b) a percentage equal to:

            (1)  the sum of the relevant Outstanding Tranche Width as of 5:00 p.m. in the Calculation Agent City on each day in the related Fixed Rate Payer Calculation Period; *divided by,*

            (2)  the actual number of days in the related Fixed Rate Payer Calculation Period; and,

        (c) the Initial Portfolio Size;

        (d) the Fixed Rate Day Count Fraction; and,

    (ii) an amount, subject to a minimum of zero, equal to:

        (a)   the Aggregate Asset Premium; *minus,*

        (b)   the sum of the Reference Tranche Fixed Amount of each Senior Reference Tranche.

| | |
|---|---|
| **Interest Shortfall Threshold:** | With respect to a Fixed Rate Payer Calculation Period, an amount equal to the sum of the Reference Tranche Fixed Amount(s) for each Reference Tranche with an Upper Strike that is less than or equal to the Attachment Point. |
| **Reference Tranche Incurred Interest Shortfall Amount:** | With respect to a Reference Tranche and a Fixed Rate Payer Calculation Period, an amount equal to the lesser of: |

    (i) the relevant Reference Tranche Fixed Amount; and,

    (ii) an amount, subject to a minimum of zero, equal to:

        (a) the relevant Periodic Interest Shortfall Amount; *minus,*

        (b) the relevant Periodic Interest Shortfall Reimbursement Amount; *minus,*

        (c) the sum of the Reference Tranche Fixed Amount(s) in respect of each Subordinate Reference Tranche (if any).

| | |
|---|---|
| **Reference Tranche Incurred Interest Shortfall** | With respect to a Reference Tranche and a Fixed Rate Payer Calculation Period, an amount equal to the lesser of: |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

| | |
|---|---|
| **Reimbursement Amount:** | (i) the product of: |
| | (a) relevant Reference Tranche Cumulative Incurred Interest Shortfall Amount as of the immediately preceding Fixed Rate Payer Period End Date; and, |
| | (b) the relevant Reference Tranche Interest Shortfall Compounding Factor; and, |
| | (ii) an amount, subject to a minimum of zero, equal to: |
| | (a) the relevant Periodic Interest Shortfall Reimbursement Amount; *minus,* |
| | (b) the relevant Periodic Interest Shortfall Amount; *minus,* |
| | (c) the sum of the product(s) of: |
| | (1) Reference Tranche Cumulative Incurred Interest Shortfall Amount as of the immediately preceding Fixed Rate Payer Period End Date in respect of each Senior Reference Tranche (if any); and, |
| | (2) Reference Tranche Interest Shortfall Compounding Factor in respect of the relevant Senior Reference Tranche (if any). |
| **Reference Tranche Interest Shortfall Compounding Factor:** | With respect to a Reference Tranche and a Fixed Rate Payer Calculation Period, an percentage equal to the sum of: |
| | (i) 100.00%; and, |
| | (ii) the product of (a) the sum of the relevant Reference Spread and the Relevant Rate, and (b) the Fixed Rate Day Count Fraction in respect of such Fixed Rate Payer Calculation Period. |
| | Notwithstanding anything to the contrary, the Reference Tranche with a Lower Strike of 0 shall be deemed to have a Reference Spread of 9.84% solely for the purpose of determining the Reference Tranche Interest Shortfall Compounding Factor. |
| **Reference Tranche Cumulative Incurred Interest Shortfall Amount:** | With respect to a Reference Tranche and a Fixed Rate Payer Calculation Period, an amount equal to: |
| | (i) the relevant Reference Tranche Incurred Interest Shortfall Amount; *minus,* |
| | (ii) the relevant Reference Tranche Incurred Interest Shortfall Reimbursement Amount; *plus,* |
| | (iii) the product of: |
| | (a) the Reference Tranche Cumulative Incurred |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

Interest Shortfall Amount as of the immediately preceding Fixed Rate Payer Period End Date; and,

(b) the relevant Reference Tranche Interest Shortfall Compounding Factor.

**Cumulative Excess Interest Shortfall Amount:**

With respect to a Fixed Rate Payer Calculation Period, an amount equal to the sum of the Reference Tranche Cumulative Incurred Interest Shortfall Amount(s) for each Reference Tranche with an Lower Strike that is greater than or equal to the Detachment Point.

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

### Annex D: Reference Obligation Interest Shortfall Cap Annex

| | |
|---|---|
| Reference Obligation Interest Shortfall Cap Amount: | With respect to each Reference Obligation, as of the date of determination, an amount equal to the product of: |

(i)  the Portfolio Reference Spread specified in the Reference Tranche Matrix;

(ii)  the relevant Reference Obligation Notional Amount outstanding on the last day of the related Reference Obligation Calculation Period immediately prior to the related Reference Obligation Payment Date on which the relevant Interest Shortfall occurred, as adjusted for any increases or decreases of such Reference Obligation Notional Amount; and,

(iii)  the actual number of days in the related Reference Obligation Calculation Period immediately prior to the Reference Obligation Payment Date on which the relevant Interest Shortfall occurred divided by 360.

| | |
|---|---|
| Interest Shortfall Reimbursement Amount: | With respect to each Reference Obligation, zero for the first Additional Fixed Amount Payment Date; with respect to any subsequent Additional Fixed Amount Payment Date and calculated as of the Reference Obligation Payment Date immediately preceding such Additional Fixed Amount Payment Date an amount equal to the greater of: |

(i)  zero; and

(ii)  the amount equal to:

(a)  the product of:

(1)  the related Cumulative Interest Shortfall Amount as of the Additional Fixed Amount Payment Date immediately preceding such Reference Obligation Payment Date; and

(2)  the relevant Reference Obligation Interest Shortfall Compounding Factor for the Fixed Rate Payer Calculation Period immediately preceding such Additional Fixed Amount Payment Date (or 1.0 in respect of any Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Calculation Date);

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

minus

(b)    the Unadjusted Cumulative Interest Shortfall Amount as of such Reference Obligation Payment Date;

*provided* that if the Interest Shortfall Reimbursement Amount on an Additional Fixed Amount Payment Date would exceed the Unadjusted Interest Shortfall Reimbursement Amount in respect of the related Reference Obligation Payment Date, then such Interest Shortfall Reimbursement Amount shall be deemed to be equal to such Unadjusted Interest Shortfall Reimbursement Amount.

| | |
|---|---|
| Unadjusted Cumulative Interest Shortfall Amount: | With respect to each Reference Obligation and each Reference Obligation Payment Date thereof, an amount equal to the greater of: |

(i)    zero; and

(ii)    an amount equal to:

(a)    the Unadjusted Cumulative Interest Shortfall Amount as of the Reference Obligation Payment Date immediately preceding such Reference Obligation Payment Date or, in the case of the first Reference Obligation Payment Date, zero; plus

(b)    the Interest Shortfall Amount (if any) in respect of such Reference Obligation Payment Date; plus

(c)    an amount determined by the Calculation Agent as the amount of interest that would accrue on the Unadjusted Cumulative Interest Shortfall Amount immediately preceding such Reference Obligation Payment Date during the related Reference Obligation Calculation Period pursuant to the Underlying Instruments or, in the case of the first Reference Obligation Payment Date, zero; minus

(d)    the Unadjusted Interest Shortfall Reimbursement Amount (if any) in respect of such Reference Obligation Payment Date.

| | |
|---|---|
| Cumulative Interest Shortfall Amount: | With respect to each Reference Obligation, the Cumulative Interest Shortfall Amount with respect to any Fixed Rate |

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

Payer Payment Date and any Additional Fixed Amount Payment Date falling on such Fixed Rate Payer Payment Date shall be an amount equal to the greater of:

(i)     zero; and

(ii)    the amount equal to:

    (a)     the sum of:

        (1)     the Unadjusted Interest Shortfall Amount for the Reference Obligation Payment Date corresponding to such Fixed Rate Payer Calculation Date; and

        (2)     the product of:

            (A)     the Cumulative Interest Shortfall Amount as of the Fixed Rate Payer Calculation Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate Payer Calculation Date); and

            (B)     the relevant Reference Obligation Interest Shortfall Compounding Factor;

*minus*

    (b)     any Interest Shortfall Reimbursement Amount paid on such Fixed Rate Payer Calculation Date.

With respect to any Additional Fixed Amount Payment Date falling after the Legal Final Maturity Date of the related Reference Obligation, the Cumulative Interest Shortfall Amount shall be equal to:

(i)     the Cumulative Interest Shortfall Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the related Legal Final Maturity Date in the case of the first Additional Fixed Amount Payment Date occurring after the Legal Final Maturity Date of such Reference Obligation); minus

(ii)    any Interest Shortfall Reimbursement Amount paid on such Additional Fixed Amount Payment Date.

Reference Obligation Interest     With respect to each Fixed Rate Payer Calculation Period,

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

Shortfall Compounding Factor:    an percentage equal to the sum of:

(i) 100.00%; and,

(ii) the product of (a) the sum of the Portfolio Reference Spread and the Relevant Rate, and (b) the quotient of (1) the number of days in the related Reference Obligation Calculation Period with respect to such Reference Obligation and (2) 360.

*The content of this communication is proprietary and confidential information of Lehman Brothers, which may not be reproduced or disseminated in any manner without the specific written permission of Lehman Brothers. Patent Pending. Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  © 2006 Lehman Brothers Inc. Member SIPC / NYSE / NASD All Rights Reserved*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                       :

In re                             :    Chapter 11 Case No.
                                         :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :    08-13555 (SCC)
                                       :

               Debtors.        :    (Jointly Administered)
                                       :

------------------------------------------------------------------x

## ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY CODE APPROVING THE SETTLEMENT AGREEMENT RELATING TO RESTRUCTURED ASSET CERTIFICATES WITH ENHANCED RETURNS, SERIES 2006-20AT CREDIT DEFAULT SWAP AGREEMENT AND TRUST AGREEMENT

Upon the motion, dated April 3, 2015 (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator") as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors*, on behalf of itself and Lehman Brothers Special Financing Inc. ("LBSF"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") for approval of the settlement agreement (the "Settlement Agreement") among LBHI, LBSF, U.S. Bank National Association ("U.S. Bank" or the "Trustee"), solely in its capacity as trustee under the Series Trust Agreement dated as of December 8, 2006 (the "Trust Agreement"), and the Restructured Asset Certificates with Enhanced Returns, Series 2006-20AT Trust (the "Trust Issuer"), dated as of March 12, 2015, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance

with the procedures set forth in the amended order entered on June 17, 2010, governing case

management and administrative procedures for these cases [ECF No. 9635] on (i) the U.S.

Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the

United States Attorney for the Southern District of New York; (v) the attorneys for the Trustee;

and (vi) all parties who have requested notice in the Chapter 11 Cases, and it appearing that no

other or further notice need be provided; and a hearing having been held to consider the relief

requested in the Motion; and the Trustee having provided reasonable notice to the

Certificateholders; and the Court having found and determined that the relief sought in the

Motion is in the best interests of LBHI and LBSF, their estates, their creditors, and all parties in

interest and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Settlement Agreement is

approved; and it is further

ORDERED that LBSF and LBHI, acting through the Plan Administrator, are

authorized to execute, deliver, implement and fully perform any and all obligations, instruments,

documents and papers and to take any and all actions reasonably necessary or appropriate to

consummate the Settlement Agreement and perform any and all obligations contemplated

therein; and it is further

ORDERED that, pursuant to section 105(a) of the Bankruptcy Code, the Trustee

is authorized and directed to take such actions as it reasonably deems necessary or appropriate to

WEIL:\95279847\8\58399.0011

consummate the Settlement Agreement and to perform any and all obligations contemplated

therein, including, without limitation, to pay the Settlement Amount thereunder using proceeds

held by the Trustee under the Trust Agreement; and it is further

ORDERED that this Order is binding and effective on the Plan Administrator, the

Chapter 11 Estates, the Trust Issuer, all current and future Certificateholders, as well as the

Trustee and any successors thereto.  The Plan Administrator, the Chapter 11 Estates, and U.S.

Bank, in its individual capacity and as the Trustee, the Trust Issuer, and all of their respective

current and former officers, directors, shareholders, employees, agents, attorneys, successors and

assigns, shall be and hereby are, fully exculpated and shall not have liability to each other, the

Chapter 11 Estates, the Certificateholders arising out of, relating to, or in connection with the

Motion, the Settlement Agreement or this Order, except to the extent of any obligations set forth

in the Settlement Agreement that have not been performed; and it is further

ORDERED that the terms of this Order shall be immediately effective and

enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of thereof; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order.

Dated: _____, 2015
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

3