# EXHIBIT D

Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 08-13555-jmp

4  Case No. 08-01420-jmp

5  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6  In the Matter of:

7  LEHMAN BROTHERS HOLDINGS INC., ET AL,.

8          Debtors.

9  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10  In the Matter of:

11  LEHMAN BROTHERS INC.

12          Debtor.

13  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14  LBHI,

15          Plaintiff,

16      v.

17  JPMORGAN CHASE BANK, N.A.,

18          Defendant.

19  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20

21          U.S. Bankruptcy Court

22          One Bowling Green

23          New York, New York

24

25

Page 2

1                    February 13, 2013

2                        10:04 AM

3

4    B E F O R E :

5    HON JAMES M. PECK

6    U.S. BANKRUPTCY JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    evening.  So this is not a great day for me.

2            I might suggest -- I don't know how long you're

3    going to be.  I would like an estimate.

4            MS. MARCUS:  Sure.

5            THE COURT:  But I might suggest that we could

6    perhaps break for lunch, come back -- because I am going to

7    need to break for lunch -- come back at say 1:15, which is a

8    half-hour from now, a very quick lunch, and then go from

9    1:15 to however long it takes and then the people who come

10   in for the 2:00 will be in the same position that you've

11   been in, in effect, waiting for me to deal with what's

12   before me.

13           MS. MARCUS:  That would be fine for us, Your

14   Honor.  I think -- I think my initial argument will be about

15   20 minutes.

16           THE COURT:  Let's take a half-hour recess and

17   return at 1:15.

18           MS. MARCUS:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20       (Recess at 12:46 p.m.)

21           THE COURT:  Please be seated.

22           MS. MARCUS:  Good afternoon, Your Honor.

23   Jacqueline Marcus for the Lehman estates.

24           The next item on the agenda is Item Number 9, it's

25   the three-hundred-and-twenty-eighth omnibus objection to

Page 116

1    claims, ECF Number 23 -- 29323.

2            In the omnibus objection, Lehman Brothers

3    Holdings, Inc., as plan administrator, objected to the proof

4    of claim filed by Spanish Broadcasting System, Inc., Claim

5    Number 67707 in the amount of approximately $55.5 million

6    against Lehman Commercial Paper, Inc.  The Spanish

7    Broadcasting claim is the only unresolved claim under this

8    omnibus objection.

9            Spanish Broadcasting filed their response to the

10   objection dated September 13th, 2012, two declarations and

11   with the permission of the Court, a supplemental response.

12           As a threshold matter, Your Honor, Spanish

13   Broadcasting repeatedly points out that we filed a two-and-

14   a-half page to its claim and implies that this was somehow

15   improper.  As the Court is aware, we have filed nearly 400

16   omnibus claims objections in this case -- in these cases.

17   We have followed the same procedure here as in every other

18   omnibus where we file a brief objection and then depending

19   on the response received, we file a more fulsome response.

20           The facts surrounding the relationship between

21   LCPI and Spanish Broadcasting are fairly straightforward.

22   In June of 2005, Spanish Broadcasting entered into a $350

23   million credit agreement pursuant to which LCPI was both the

24   lender and the administrative agent.

25           On October 3rd, 2008, Spanish Broadcasting sought

Page 117

1    to draw down the $25 million revolver provided under the

2    credit agreement.  LCPI, as administrative agent,

3    facilitated the funding of the draw request, but did not

4    fund its proportionate share, which was $10 million.

5    Ultimately, the credit agreement was terminated by a payoff

6    letter dated February 7th, 2012, when replacement financing

7    was provided and all of the lenders under the facility were

8    paid off.

9          Spanish Broadcasting's claim asserts approximately

10   $55 million in damages arising from LCPI's breach of the

11   credit agreement comprised of the following components:

12          $39.6 million reflecting "the expected loss in

13   total invested capital versus the actual decline in TIC that

14   Spanish Broadcasting experienced;

15          "Approximately $9.9 million in settlement amounts

16   that Spanish Broadcasting was obligated to pay Lehman

17   Brothers Special Financing, Inc. under a swap which

18   allegedly exceeds the amount Spanish Broadcasting would have

19   been obligated to pay if it had terminated the swap on

20   October 3rd, 2008;

21          "Approximately $5.7 million representing Spanish

22   Broadcasting's costs to replace LCPI's 10 million unfunded

23   share of the revolver; and

24          "Approximately $273,000 in financing and unfunded

25   revolver fees paid to LCPI for its loan commitment."

Page 118

1          In its objection to the claim, LCPI made the

2     following arguments:

3          First, that the damages related to the alleged

4     decline in total invested capital and the swap termination

5     are consequential damages, the recovery of which is

6     precluded by the waiver of consequential damages contained

7     in Section 10.12 of the credit agreement.

8          Second, Spanish Broadcasting has not provided any

9     proof that it actually obtained replacement financing, let

10    alone that it incurred almost $6 million in incremental

11    costs.

12         And, third, that LCPI earned the commitment fees

13    and the financing fees as a result of its performance under

14    the terms of the credit agreement from June 2005 to

15    September 2008.

16         Under the claims procedures approved by the Court,

17    this hearing is in the nature of a sufficiency hearing.

18    However, the characterization of the hearing as a

19    sufficiency hearing does not prevent the Court from ruling

20    on several important legal issues.

21         First, Your Honor, Spanish Broadcasting has failed

22    to respond to LCPI's objection regarding the alleged

23    replacement capital damages in the amount of 5.7 million.

24    In its response, Spanish Broadcasting has actually listed

25    only three categories of damages, completely omitting any

Page 119

1   reference to the alleged replacement capital damages.  You

2   can look at the -- at the objection, paragraph 7, for that.

3           In the declaration of Joseph A. Garcia, filed on

4   January 29th, Mr. Garcia acknowledges in paragraph 11 that

5   financing -- that replacement financing was not, in fact,

6   obtained.  It appears, therefore, that what looked like

7   itemized damages set forth in the proof of claim for the

8   cost of replacement financing were not actual damages at

9   all.

10          Consequently, the Court should disallow the 5.7

11  million of the Spanish Broadcasting claim today.

12          The second issue, Your Honor, is that the waiver

13  of consequential damages is enforceable.  As set forth in

14  our reply, under New York law absent bankruptcy waivers of

15  consequential damages are generally enforceable.  It doesn't

16  appear that Spanish Broadcasting disputes that point.  So in

17  light of the time I certainly won't belabor that issue now.

18          In its objection, Spanish Broadcasting sought to

19  avoid the effect of the waiver by arguing that the credit

20  agreement was rejected and, therefore, the waiver of

21  consequential damages is effective -- is ineffective, excuse

22  me.

23          That argument now seems to be off the table as a

24  result of the debtors' explanation that the credit agreement

25  was not, in fact, rejected.  Now in its own gotcha moment,

Page 120

1    Spanish Broadcasting seeks to find another reason why the

2    clear language of the consequential damages waiver should

3    not be enforced.  Its latest argument is that the waiver did

4    not survive the termination of the credit agreement.

5            Now, Your Honor, think about what Spanish

6    Broadcasting is arguing here.  It's claiming that in

7    calculating the damages occasioned by a breach that

8    allegedly occurred in October of 2008 before the contract

9    was terminated, the Court may not take into account the

10   provisions of the credit agreement as it existed at that

11   time.  In essence, Spanish Broadcasting has argued that it

12   can rely on the terms of the contract to establish LCPI has

13   liability, but LCPI can't rely on the terms of the contract

14   to contest the magnitude of the damages.

15           Not only would such a result be inequitable and

16   incorrect, but it is also not supported by the cases cited

17   by Spanish Broadcasting in support of its position.

18   Specifically, in the Azcap (ph) case cited, Azcap was

19   seeking to establish that a contract term that limited the

20   amount of license fees that certain radio stations could

21   seek would apply with respect to the period subsequent to

22   the -- to the termination of the agreement.  Those are not

23   the facts here.

24           The Scientific Component case also cited by

25   Spanish Broadcasting is equally unavailing.  That case

Page 121

1    involved a review of a decision of an arbitration panel.

2    The terminated contract at issue had both an arbitration

3    clause and a waiver of consequential damages.  The

4    arbitration panel failed to give effect to the waiver of

5    consequential damages.  The District Court began its

6    decision by noting that, "An arbitration award is subject to

7    very limited review."  That's at page 5 of the SLIP (sic)

8    opinion.  The Court went on to hold, and I quote, "It is not

9    up to this Court to second guess the panel's interpretation

10   of the supply agreement, but only to determine if it had the

11   authority to do so.  Because of the broad arbitration

12   clause, the panel had the authority."  That's at page 9 of

13   the opinion.

14          For Spanish Broadcasting, therefore, to cite this

15   case as authority for the proposition that termination of

16   the credit agreement nullified the consequential damages

17   waiver is disingenuous at best.

18          More pertinent are the authorities that we've

19   found that stand for the opposite preposition.  And Your

20   Honor, to the extent you would like them, we have copies of

21   the decision for -- the decisions for you.

22          In Rensselaer (ph) Polytechnic Institute versus

23   Varian at 340 F. Appex. 747 (2nd Cir. 2009) is a case in

24   which the relevant contract had been terminated.  The

25   contract included a waiver of consequential damages.

Page 122

1   Despite the termination of the contract, the Second Circuit

2   remanded the matter back to the trial court for a

3   determination of whether the damages sought were direct or

4   consequential damages and, thus, whether they were

5   permissible under the contract.

6           In G.V. Trademark Investments, Ltd. versus Gemini

7   Shirtmakers, Inc. -- that's at 1999 Westlaw 61808 -- the

8   Southern District of New York held that the plaintiff did

9   not forfeit its rights to sue for money owed under a

10  contract even though there was no explicit provision for

11  survival of the provision providing for guaranteed payments.

12          In the landlord-tenant arena, the appellate

13  division in New York has held that a waiver of consequential

14  damages is enforceable despite the termination of a lease.

15  That was in 124 Intogo Corp. versus Roundabout Theater

16  Company.  I have the cite, but it looks like I transcribed

17  it wrong.  I can provide it later.

18          THE COURT:  Okay.

19          MS. MARCUS:  In addition, Your Honor, in the

20  WorldCom case in resolving a dispute involving a contract

21  governed by Arizona law, Judge Gonzalez granted the debtors'

22  motion for summary judgment and found that the contractual

23  limitation of liability clause was effective,

24  notwithstanding that the contract had been terminated.

25  That's at 368 B.R. 308.

Page 123

```
 1              THE COURT:  Well, here's my understanding of

 2    Spanish Broadcasting's argument on this point, and they can

 3    obviously speak for themselves at the right time.

 4              I think they take the position that because the

 5    agreement that was executed at the time of termination

 6    included a provision that certain specified terms of the

 7    contract survived --

 8              MS. MARCUS:  Uh-huh.

 9              THE COURT:  -- and that this was not one of them,

10    that this may be one of those situations where, by virtue of

11    not specifically referencing the continuation in perpetuity

12    of the waiver of consequential damages that they can now

13    assert that they're in a better position now as a result of

14    termination than if the contract had been in effect.

15              MS. MARCUS:  That is what they're arguing, Your

16    Honor, or that's how I understand their argument as well.

17    And I actually -- your -- your question is timely because I

18    was going to get to another decision where the effect of a

19    survival clause I thought was -- it was very cogently

20    explained.  It was by the Bankruptcy Court in the District

21    of Columbia Circuit in a case called, In re: Ardent, Inc.,

22    305 BK 133.

23              There, there was a contractual provision that

24    provided the claimant would earn its full fee

25    notwithstanding termination of the agreement and the debtor
```

Page 124

1    argued, much like Spanish Broadcasting argues, that because

2    the provision wasn't covered by the survival provision it

3    had no effect after termination of the agreement.  And the

4    Court held as follows:

5         "The agreement elsewhere explicitly states that

6    certain obligations are to by the termination of the

7    agreement" -- I'm going to skip a little bit and continue

8    with the quote -- "However, this simply makes clear that the

9    parties remain subject to such obligations and are required

10   to perform them, including the party not in default who

11   generally is excused from future performance, but not as to

12   promises of confidentiality which implicitly survived

13   termination.

14        "It relates, in other words, to a matter,

15   confidentiality, whose survival the parties might want to

16   make explicit instead of implicit.  It does not purport to

17   address an issue of damages upon termination.  The wholly

18   different issue that the claim presents as to which there

19   would be no date -- doubt that damage claims survive,

20   including the claim for the unperformed promise of paying

21   the access fee."

22        That's at 305 B.R. 137.  And just to relate that

23   to our case, here there were provisions in that notice of

24   termination that were -- that's -- the notice of termination

25   indicated certain contractual provisions that survive in

Page 125

1   case there was any doubt about that.  But the fact that they

2   permitted or specifically excluded the claim from the

3   release has to mean that -- that Lehman had the ability to

4   defend itself from that claim.  Any other -- any other

5   interpretation really wouldn't make any sense.

6         The next issue, Your Honor, is that Spanish

7   Broadcasting contends that if the waiver is enforceable,

8   then the credit agreement would "fail of its essential

9   purpose."  Failure of essential purpose, Your Honor, is a

10  concept found in Article 2 of the Uniform Commercial Code

11  that has no applicability to the credit agreement.

12        Spanish Broadcasting points to Judge Gonzalez's

13  decision in Enron as support, but that case is markedly

14  different.  There, Judge Gonzalez held that because the

15  underlying contract was for a sale of good and because no

16  one contested the applicability of the UCC, he would apply

17  the UCC to the dispute.

18        Here, in contrast, there's no argument that the

19  credit agreement is governed by the UCC and, therefore, the

20  argument should be rejected.

21        Moreover, even if the principle were to apply,

22  there hasn't been a failure of essential purpose.  Spanish

23  Broadcasting had an ample remedy under the contract to sue

24  for direct damages.  What happened here, however, is that

25  Spanish Broadcasting did not suffer any legally cognizable

Page 126

1    damages.  There's no basis for the -- therefore, for the

2    Court to disregard the waiver of consequential damages here.

3            The next argument has to do with the nature of the

4    damages themselves and whether they are consequential or

5    direct damages.

6            As we've cited in our papers, New York Courts have

7    held that the measure of direct damages in the case of a

8    breach of a contract to loan money is the incremental cost

9    of any replacement financing, and we cite for that

10   proposition Avalon Construction Corp. versus Kirsch Holding,

11   256 N.Y. 137.

12           Spanish Broadcasting contends in its supplemental

13   papers that it is black letter law that the measure of

14   damages may be greater than the incremental cost of

15   replacement financing if no replacement financing is

16   available.

17           There are several problems with Spanish

18   Broadcasting's position:

19           First, the declaration of Joseph A. Garcia states,

20   not that no alternate financing was available, but that

21   "based on our understanding of the financial markets at the

22   time of the credit crisis and Lehman's bankruptcy filing, we

23   recognized that alternative" -- excuse me -- "that alternate

24   financing simply was not an option."  That's at paragraph

25   11.

Page 127

1          Second, the full quote from the authority cited by

2    Spanish Broadcasting for the black letter law provides as

3    follows:

4          "The better rule and the one generally followed

5    today is that for a breach of contract to lend money, the

6    borrower can obtain judgment for damages measured by the

7    resulting injury so far as the defendant had reason to

8    foresee such injury when the contract was made."  That's

9    Corbin on contracts, Section 59.3.

10          Similarly, the restatement second of contract

11    Section 351 provides, in pertinent part, "In most cases,

12    then, the lenders' liability will be limited to the

13    relatively small additional amount that it would ordinarily

14    cost to get a similar loan from another lender.  However, in

15    the less common situation in which the lender has reason to

16    foresee that the borrower will be unable to borrow elsewhere

17    or will be delayed in borrowing elsewhere, the lender may be

18    liable for much heavier damages."

19          There are two critical aspects to this exemption.

20    First, the lack of alternate financing must be foreseeable

21    and, second, foreseeability is measured at the time the

22    contract is entered into.  Thus, in order to avoid the

23    default rule, Spanish Broadcasting would have to show that

24    in June of 2005 when the credit agreement was entered into,

25    Lehman had reason to foresee that the credit markets would

Page 128

1    be frozen in October of 2008.  None of Spanish

2    Broadcasting's papers argue that Lehman knew or should have

3    known in June of 2005 that alternate financing would not be

4    available, and for obvious reasons.  No one foresaw the 2008

5    financial meltdown.

6            Thus, Spanish Broadcasting is precluded, even by

7    the authority that it cites, from asserting that it is

8    entitled to damages in excess of the cost of replacement

9    financing.

10           THE COURT:  Let me ask you a question.  And it

11   kind of follows from your last argument.

12           If there's a future event that is unforeseeable,

13   does the same rule apply, and how it -- how can you hold

14   Spanish Broadcasting to a strict test of damage calculation

15   when in 2005, as you point out, nobody could have foreseen

16   that the credit markets would end up frozen?  And I saw in

17   the Spanish Broadcasting papers a very enjoyable quote from

18   my Charter decision, which I appreciated, but I also

19   recognize that we're only talking about $10 million here.

20           So I have actually two questions:

21           One is, does a general collapse of the credit

22   markets represent a foreseeable event for purposes of

23   calculating damages associated with the failure to fund;

24   and, is it a factual question that needs to be more fully

25   developed to determine whether or not at the relevant time

Page 129

1   that LCPI failed to fund its $10 million share it was

2   impossible or impracticable or very difficult to replace

3   that financing?  And there may also be a related factual

4   question, because I don't know the answer to it based upon

5   my review of the papers, what diligent efforts did Spanish

6   Broadcasting actually undertake to try to obtain that

7   financing, and did it have other sources of liquidity

8   including from investors and related parties?

9              MS. MARCUS:   Okay.

10             In response to your first question, does the

11  general collapse of the credit markets represent a

12  foreseeable event for the calculation of damages, we submit

13  that the answer is no.  If we had foreseen what happened in

14  2008, it probably wouldn't have happened.  But --

15             THE COURT:  Precisely.

16             MS. MARCUS:  Right.  So the test is -- you know,

17  it's the combination, Your Honor, of the general rule on

18  what you can recover for breach of a contract to loan money

19  with the waiver of the consequential damages that creates

20  the problem.  And I might add even if consequential damages

21  were available, even consequential damages have to be

22  foreseeable.

23             But our position is that because the -- it wasn't

24  foreseeable, and not only wasn't it foreseeable, but I think

25  I'm answering your second question about the factual record,

Page 130

1    there's no allegation that it was foreseeable in 2005, which

2    is what the test is.  Those two factors mean that the more

3    extensive damages are not available to Spanish Broadcasting

4    and having waived consequential damages, they waived it and

5    they were sophisticated parties who negotiated an agreement

6    that included the waiver.  We believe that that should be

7    enforceable.

8            As to whether the factual record needs to be more

9    fully developed regarding whether it was, in fact,

10   impossible to replace the financing and what efforts were

11   undertaken, I don't believe that that -- those are relevant

12   unless the Court determines that our argument is incorrect

13   as to what the standard is.  And if that were the case, of

14   course we would reserve the right to develop that more --

15   expand the factual record.  But we don't think it's

16   necessary and we think the Court can make the determination

17   today based on what's in the record thus far.

18           The last component or the last issue, Your Honor,

19   has to do with the alleged fee damages.  There's no dispute

20   that -- and, obviously, this is the tail wagging the dog a

21   little bit.  There's no dispute that LCPI performed the

22   services as administrative agent and complied with all of

23   its obligations prior to October 3rd, 2008.  Nevertheless,

24   Spanish Broadcasting has asserted a claim for all of the

25   financing fees and unfunded revolver fees that it paid to

Page 131

1     LCPI during the term of the agreement.

2              While it may not be required as a matter of law,

3     LCPI is sympathetic to the fact that Spanish Broadcasting

4     doesn't want to pay fees for the period after which LCPI

5     defaulted on its funding obligation.  Therefore, in our

6     response we offered to allow Spanish Broadcasting a claim

7     for $13,334 which we calculate as the amount paid for the

8     periods of September 30 and October 4th.

9              Your Honor, as I indicated --

10             THE COURT:  As you -- as you say it, it doesn't

11    seem very generous.

12        (Laughter)

13             MS. MARCUS:  We're only looking out for the

14    interest of all creditors, Your Honor.

15             THE COURT:  I understand.  I have a question for

16    you about whether or not this is an outlier or whether or

17    not this is a fact pattern and set of arguments that may

18    flow through to other claimants in respect of unfunded

19    commitments during the period immediately following the

20    bankruptcy filing.

21             And I don't know if you can answer that, but I --

22    I'm interested in knowing whether the issues that are being

23    presented here are all by themselves or whether or not these

24    issues tie into other potential damage claims that may be

25    asserted against LCPI.

Page 132

1          MS. MARCUS:  Sure.  And I think I have the -- to

2     divide my response into two different debtors.

3          As to LCPI -- and Mr. Walsh is here, David Walsh,

4     from Alvarez & Marsal is here in court.  He's done most of

5     the work during the case on LCPI.

6          As to LCPI, this is the only failure to fund claim

7     that remains.  There had been others made.  Every single one

8     of them has been resolved.  So as to LCPI, this is an

9     outlier as you described it.

10          As to LBHI, and I think those funding issues arise

11     more in the real estate world, there have been a number of

12     creditors who have raised the issues.  I can think off the

13     top of my head of two claims that were in excess of $100

14     million that have been settled for drastically -- and I

15     can't emphasize that enough -- substantially less than $100

16     million where there were similar waivers of consequential

17     damages.

18          So it's an issue that I think on the LBHI side may

19     exist more than what's left on the LCPI side.

20          THE COURT:  Okay.

21          MS. MARCUS:  With that, Your Honor, I -- I reserve

22     the right to -- to respond to Spanish Broadcasting's

23     argument.  But as I indicated, if the Court were to

24     determine that the damages asserted are direct damages or

25     that the waiver of consequential damages is not enforceable,

Page 133

1    then LCPI reserves its right to assert a variety of

2    additional objections regarding causation, the actual and

3    reasonable amount of the damages, and mitigation issues.

4    But arguing about those things at this time doesn't seem to

5    be a prudent way to proceed.

6              THE COURT:  Fine.

7              MS. MARCUS:  Thank you.

8              THE COURT:  Thank you.

9              MS. PRIMOFF:  Good afternoon, Your Honor.  Madlyn

10   Primoff of Kaye Scholer for Spanish Broadcasting.

11             As Your Honor knows from our papers, Spanish

12   Broadcasting is the largest Hispanically-controlled public

13   media and entertainment company in the United States.

14   Lehman cites a lot of cases in its papers.  We cite a lot of

15   cases in our papers, and we've had dialogue today over some

16   other cases.

17             And the overwhelming majority of those cases are

18   not decided on a motion to dismiss.  They're decided on a

19   fully developed factual record either following a trial or

20   at summary judgment.

21             THE COURT:  What -- is it your position that the

22   waiver of consequential damages issue is a subject that

23   requires discovery, that needs to be amplified with

24   discovery, or is it a pure legal question?

25             MS. PRIMOFF:  I think the issue is plain on its

Page 134

1    face and that your Court -- that Your Honor could rule in --

2    in our favor on that issue today.  But I don't think Your

3    Honor needs to rule on that issue today because I think that

4    the measure of damages in -- in any -- we're entitled to

5    damages as a matter of law for their breach of the failure

6    to fund.

7            The forseeability of the damages, there's a

8    discrepancy in the case law that ultimately Your Honor will

9    need to decide whether the 2005 date that the credit

10   agreement was entered into is the operative time period or

11   whether the October 2008 breach is the operative time

12   period.  In either event we think -- we think it's

13   foreseeable in both instances, obviously, clearly more so in

14   October 2008.

15           And so either way we -- we assert that our damages

16   are direct damages which is a question of fact under the

17   governing legal authorities that has to be determined at

18   trial or on a properly developed summary judgment record in

19   any event.

20           THE COURT:  When you say direct damages, are you

21   saying that all of the damages that you assert in your claim

22   are direct damages or are you saying that some of the

23   damages are direct damages and some are consequential

24   damages that have not been waived?

25           MS. PRIMOFF:  And thank you for the question, Your

1    Honor.

2         On the $5.7 million, I believe we previously

3    communicated to Lehman that we are withdrawing that element

4    of the claim.  So that's -- that's not -- that's not an

5    issue.

6         THE COURT:  That looks like progress to me

7    already.

8         MS. PRIMOFF:  Yes.

9         THE COURT:  That's good we had this hearing.

10         MS. PRIMOFF:  We're -- we're trying to be

11    constructive.

12         The total invested capital damages and the SWAP

13    termination damages, we assert that those are direct

14    damages.  If the Court were to disagree with us and say that

15    they're consequential damages, then our -- our position is

16    that the consequential damages waiver is of no force or

17    effect, so that -- so it -- it doesn't matter in the first

18    instance.  We think -- we think we get there either way,

19    whether they're direct or consequential.

20         THE COURT:  Okay.

21         MS. PRIMOFF:  I mean, there's -- there's expansive

22    case law on the distinction between -- and we've got this in

23    our papers -- on the distinction between diminution in value

24    damages with the -- which the case is, the Wyle (ph)

25    article, the UCC recognizes that diminution in value damages

Page 136

1    are direct damages, not consequential damages.  And Capstone

2    report -- I'm pointing at Mr. Heslen (ph) from Capstone.

3    The Capstone report next to our proof of claim establishes,

4    at least facially for purposes of this hearing, the

5    diminution in value damages.

6            I just want to make sure I address the questions

7    that Your Honor asked of Ms. Marcus.

8            We do believe that Your Honor could take judicial

9    notice based on what was going on in the credit markets at

10   the time about the inability, impossibility to obtain

11   financing.  We know that you heard lengthy proceedings over

12   that in Charter.  If Your Honor believes that that's an

13   issue for trial, you know, we're prepared to --

14           THE COURT:  Well, I think -- here's the issue with

15   respect to comparing your financial plight with the record

16   in Charter.

17           In Charter I was dealing with reinstatement of a

18   $12 billion credit facility and it was apparent, based on

19   the evidence, that it was not possible to replace a $12

20   billion credit facility at the time.

21           MS. PRIMOFF:  Uh-huh.

22           THE COURT:  Here, we're talking about a $10

23   million base of a loan that was not funded by Lehman at the

24   time of a draw request with respect to the entire revolver.

25           Now $10 million is a lot of money to a lot of

Page 137

1    people, but partly because of my experiences in these mega-

2    cases that I've been working on over the years, $10 million

3    has begun to seem like not a lot of money.  So one of the

4    questions becomes, was it really impossible to replace the

5    $10 million; what efforts were undertaken to replace the $10

6    million; could investors have provided the $10 million; and

7    was there any effort to obtain alternative financing from

8    other sources including hedgefunds, for example.

9            MS. PRIMOFF:  And I believe that we have

10   allegations to that effect in the declaration of Joseph

11   Garcia, the chief financial officer of the company.

12   Immediately following Lehman's breach of its obligation to

13   fund the $10 million, Spanish Broadcasting was downgraded by

14   both rating agencies.  The rating agencies explicitly cited

15   the failure to fund and Spanish Broadcasting's decreased

16   liquidity position is the reason for the downgrade.

17           So there are both subjective factors and objective

18   factors that would come into play in -- in answering this

19   question for Your Honor.

20           So, for example, objectively, Spanish

21   Broadcasting's leverage ratios in September 2008 and

22   December 2008 were 14.77 and 16.87, respectively.  You know,

23   we would put on expert testimony to demonstrate that, you

24   know, no financial institution would make even a $10 million

25   loan with leverage ratios of that -- of that magnitude.

Page 138

1            And as to the other sources of liquidity, again,

2    Mr. Garcia's declaration shows that the purpose for the $25

3    million drawdown was to repay a loan of eighteen-and-a-half-

4    million-dollars that was maturing in January 2009 and, in

5    addition, to terminate its swap with Lehman which had

6    breakage costs of $6 million.

7            Because Lehman didn't fund the $10 million piece,

8    they had to -- Spanish Broadcasting had to use three-and-a-

9    half-million-dollars of its precious liquidity to repay the

10   eighteen-and-a-half-million-dollar obligation and that --

11   that three-and-a-half-million then was not available for

12   ordinary operations of the company, which caused the company

13   to suffer.

14           THE COURT:  What kind of shape is Spanish

15   Broadcasting in today?

16           MS. PRIMOFF:  It is in shaky -- it is -- it is --

17   what kind of shape is it in today?  It's a public company.

18   Its financials are publicly available.  If you look at

19   Debtwire, it's, you know, there from time to time.  It's on

20   some people's watch list, but it's operating.

21           THE COURT:  All right.  Well, this alleged loss

22   and total invested capital.  I'm hard pressed to understand

23   at what point we're measuring this and how you're able to

24   demonstrate causation, even if you're entitled to damages,

25   either as direct or consequential.

Page 139

1          MS. PRIMOFF:  What Capstone has done is it has

2     recognized that all similarly situated media and

3     entertainment companies at the time experienced a decline in

4     liquidity, performance, total invested capital.  And

5     essentially the Capstone report assumes that Spanish

6     Broadcasting should have performed the way its competitors

7     performed at the time, as a result of the credit crisis, the

8     recession, all of that.  But that's not what the numbers

9     show.

10          What the numbers show is that Spanish Broadcasting

11     performed worse than that because Spanish Broadcasting was

12     in a worse liquidity position than its competitors as a

13     result of Lehman's failure to fund the $10 million piece of

14     the revolver.

15          THE COURT:  Okay.

16          MS. PRIMOFF:  I think otherwise our points are set

17     forth in our papers, Your Honor, that we don't believe this

18     is susceptible to a motion to dismiss.  We believe that our

19     claims survive a motion to dismiss, both because we assert

20     direct damages and because the consequential damages waiver

21     is not enforceable, and ultimately, because the question of

22     direct versus consequential damages is a question of fact.

23          THE COURT:  Okay, thank you.  Is there anything

24     more?

25          MS. MARCUS:  A little bit, Your Honor.

Page 140

1          Your Honor, I certainly hadn't been aware that the

2    waiver of the $5.7 million claim had been communicated to

3    Lehman.  I don't know if it's been communicated, but I'm

4    happy for it, so we'll drop that.

5          THE COURT:  You've already had a good day in

6    Court.

7          MS. MARCUS:  Your Honor, with respect to the

8    diminution in value of damages as being direct damages, I

9    won't, you know, extend this hearing any longer than it

10   needs to be.  Suffice it to say that in our reply, we

11   distinguish those cases.  They're not cases in which the

12   contract at issue was a contract to loan money, and we

13   believe that the cases we cited regarding the appropriate

14   measure of damages are the appropriate ones to look at.

15          But I would like to comment partly in response to

16   Your Honor's questions regarding Spanish Broadcasting, and

17   the Capstone report, and the methodology because it's really

18   important and I think that by simply reading the declaration

19   of Mr. Garcia, the Court, if that's what you do, might have

20   the wrong impression.  Bear with me one second, I'm sorry.

21          Mr. Garcia's declaration in paragraph 5 provides

22   "as a result of Lehman's failure to fund, S&P and Moody's

23   both down graded Spanish Broadcasting.  In doing so, they

24   specifically cited Lehman's failure to fund as the reason

25   for the downgrade, as well as concerns about Spanish

Page 141

1   Broadcasting's liquidity position."

2         When reading of the two reports, which were

3   attached to Mr. Otchin's declaration, reflects that

4   Mr. Garcia's statement is only partially true.  Yes, Spanish

5   Broadcasting was downgraded by both agencies in mid-October.

6   I find it a little bit hard to believe that a downgrade

7   could happen that quickly if the failure to fund was

8   October 3rd, that they downgraded them on October 14th

9   simply for that reason.

10         Second, yes, both of them do mention LCPI's

11   failure to fund its $10 million commitment.  But the Moody's

12   -- the section of the Moody's report that refers to its

13   rating rationale doesn't even mention the failure to fund.

14   What it says instead is "Spanish Broadcasting's Caa1 rating

15   reflects high leverage and negative free cash flow risk

16   related to its 2006 launch of MegaTV, recent weaknesses and

17   operating performance of its radio segment, lack of scale,

18   and significant revenue concentration in the New York, Los

19   Angeles, and Miami markets."  There's more, but again, no

20   mention of the failure to fund.

21         The S&P report likewise cites a number of factors,

22   most prominent among them, Spanish Broadcasting's investment

23   in MegaTV.  In the outlook section of the report, S&P states

24   "an outlook revision to stable, which we view is unlikely

25   during the near term, would require the company to slow its

Page 142

1    rate of cash usage, and reign in its increasing leverage

2    through a debt reduction plan involving asset sales, or

3    through earlier than an anticipated, break-even results from

4    its MegaTV operations."  No mention is made of LCPI

5    financing its $10 million portion of the revolver.

6           So, when Ms. Primoff described the Capstone

7    methodology, Capstone assumed that Spanish Broadcasting is

8    just like everybody else in this industry.  I think that's a

9    faulty premise upon which to have done the analysis.  And

10   certainly if we get that far we will want to litigate over

11   that issue.

12          But, Your Honor, just in conclusion, we believe

13   that the waiver of consequential damages issue is something

14   that the Court can rule on today and should rule on today.

15   And in light of the waiver of consequential damages, and the

16   failure of Spanish Broadcasting to even allege that the

17   inability of replacement financing was foreseeable by Lehman

18   in June of 2005, we request that the Court expunge the

19   claim.  Thank you.

20          MS. PRIMOFF:  Just very briefly, Your Honor, just

21   to protect the record.

22          Looking at the two ratings reports, which are

23   attached as Exhibits C and D to Mr. Otchin's submission, the

24   Moody's report, Ms. Marcus is correct on rating -- what she

25   read from rating rationale, but the paragraph directly

Page 143

1    below, rating rationale specifically says in the second

2    sentence, the inability to draw down its full $25 million

3    revolver, combined with continued deterioration of industry

4    fundamentals is the reason for the draw.  And there's

5    similar language in Exhibit D, the S&P report under

6    liquidity, where in the first sentence there, it

7    specifically mentions the failure to fund Lehman's $10

8    million portion.

9            THE COURT:  Okay.  I can see why this is an

10   outlier.  The path to an allowed claim, whether they be

11   direct or consequential damages in connection with this

12   company that may well have been an outlier relative to its

13   peers at the time of the failure to fund suggests to me that

14   if, as in when, this ever gets to an evidentiary hearing,

15   Spanish Broadcasting will have an extraordinarily difficult

16   time proving causation, even if it has the right to.

17           The claims being asserted here are bloated,

18   excessive, and probably not allowable, but I'm not ruling on

19   that.  I'm providing indication of direction to counsel.

20   This matter should be settled, and should have been settled

21   a while ago.

22           I am not going to rule today on the waiver of

23   consequential damages, even though I might be able to.

24   Giving the benefit of the doubt fully to Spanish

25   Broadcasting, under a 12(b)(6) standard, they will get their

Page 144

1   day in court, or we'll deal with this on dispositive motions

2   after discovery.

3           I am frankly startled to be presented with an

4   almost $40 million claim, which is based upon an expert's

5   report.  That's not to say the report isn't correct.  That's

6   not to say the report may not be admissible.  But in the

7   fully contested setting, it may not be credible.

8           We'll see you another day.  And I suggest you take

9   to heart some of my remarks.

10          MS. MARCUS:  Thank you, Your Honor.  That

11  concludes the morning half of the agenda.

12          THE COURT:  Fine.  We're going to take a very

13  brief recess, five minutes, to allow those attorneys who

14  need to enter their appearances for the afternoon hearing to

15  do so.  So, we'll take five.

16          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

17      (Recess at 2:09 p.m.)

18          THE COURT:  Be seated, please.  I figure if I wait

19  long enough, somebody will talk.

20          MR. WOLINSKY:  Happy to oblige, Your Honor.  My

21  name is Marc Wolinsky from Wachtell Lipton for JP Morgan.

22  And we're here on a motion to compel an answer to an

23  interrogatory.

24          And it's, as you know, it's taken us a long time

25  to get here.  And I remember in one of the conferences, Your