# EXHIBIT E

63 Bus. Law. 777

**Business Lawyer**
May, 2008

Article

REASSESSING THE "CONSEQUENCES" OF CONSEQUENTIAL DAMAGE WAIVERS IN ACQUISITION
AGREEMENTS

Glenn D. West, Sara G. Duran[a1]

Copyright © 2008 by the American Bar Association; Glenn D. West, Sara G. Duran

*Consequential damage waivers are a frequent part of merger and acquisition agreements involving private company targets. Although these waivers are heavily negotiated, the authors believe that few deal professionals understand the concept of consequential damages and, as a result, the inclusion of such waivers may have an unexpected impact on both buyers and sellers. The authors believe that this Article is the first attempt to define "consequential damages," as well as some of the other terms used as purported synonyms, in the merger and acquisition context. After tracing the historical derivation of the term and its current use by the courts, this Article considers the impact of such waivers in a hypothetical business acquisition and proposes some specific guidelines for the negotiation of these waivers.*

All deal professionals evaluating a private company acquisition transaction should (and most do) fully appreciate the effect of contractual damage caps. Indeed, a fundamental part of today's private company deal market is that sellers frequently limit the maximum damages for which they may be held liable for breaches of their representations and warranties to a specified percentage of the purchase price.[1] Sellers rely upon these contractual damage caps in making distributions of sales proceeds to equity holders after the closing, and buyers take these caps into account in pricing the deal and approaching their due diligence.[2] Less understood by most deal professionals and many of their counsel, however, is the added limitation on a buyer's potential recovery resulting from certain "loss exclusions" commonly set forth in the indemnification provisions of acquisition agreements.

**\*778** In our experience,[3] these "loss exclusions" are thought by many to exclude items that should not be recoverable losses in the first place. Losses that are not actually incurred by the buyer as a result of the seller's breach obviously are not recoverable regardless of any specific exclusion.[4] Nevertheless, losses covered by insurance, losses that could have been avoided or mitigated by the buyer, losses recoverable from a third party, and losses for which there is a corresponding tax benefit are all examples of the kinds of losses that are expressly excluded from the indemnification provisions of many acquisition agreements to limit recoverable losses beyond the understood and agreed-upon cap. Each of these exclusions can contain traps for the unwary and may unintentionally exclude out-of-pocket losses that the buyer sustains. Exclusions relating to any of these losses, therefore, need to be carefully and appropriately limited. But by far the most often included and overlooked of these loss exclusions (and perhaps the one with the most significant traps) is a provision excluding all "consequential" or "special" damages.

Contrary to popular belief, "consequential damages" do not compensate a buyer for remote or speculative losses that fall into the category of items that should not be treated as true losses at all; rather, consequential damages compensate the buyer for real losses that the buyer has sustained as the result of the seller's breach of a bargained-for representation and warranty.[5] It is critical, therefore, that both the buyer and seller understand and appreciate the effect of excluding consequential damages from recoverable losses.

## THE "BOILERPLATE" CONSEQUENTIAL DAMAGE WAIVER CLAUSE

While there is truly no "standard" consequential damage waiver clause, the following is an example of one we frequently see in initial drafts of private company acquisition agreements (with common variations bracketed):

**No Consequential Damages**. Notwithstanding anything to the contrary contained in this Agreement or provided for under any applicable Law, no party hereto shall be liable to any other Person, either in contract or in tort, for any consequential, incidental, indirect, special or punitive damages of such other Person, [including] [or any] loss of future revenue, [or] income or profits[, or any diminution of value or multiples of earnings damages] relating to the breach or alleged breach hereof, whether or not the possibility of such damages has been disclosed to the other party in advance or could have been reasonably foreseen by such other party.

**\*779** These clauses are usually found in the miscellaneous provisions of the acquisition agreement or as a specific exception to the definition of "Losses" applicable to the agreement's indemnification provisions. Unlike the above example, sometimes these clauses waive the enumerated damage claims against only the seller rather than against both parties. Whether only for the benefit of the seller or for the benefit of both the buyer and seller, these provisions almost invariably exclude more than just "consequential" damages. Indeed, although often referred to as a "consequential" damage waiver (and sometimes referred to as an "extraordinary" damage waiver), these provisions almost always exclude losses that may not even constitute consequential (never mind extraordinary) damages and may, in fact, constitute direct contract damages. In some cases, the parties specifically exclude "lost profits" in addition to, and not merely as a subset of, consequential damages by eliminating "[including]" and instead using "[or any]" in the above clause. The distinction between lost profits as a stand-alone exclusion and as a subset of consequential damages is generally lost, however, because many deal professionals and their counsel believe that all lost profits are consequential damages and vice versa. The exclusion of "diminution in value damages" together with the sometimes used "any damages based on multiples of earnings" excludes market-measured direct damages and not consequential damages.

Including "punitive" damages (also known as "exemplary" damages) in a consequential damage waiver, at least to the extent the waiver relates to direct claims between the buyer and seller, typically does not affect contract damages between the parties (even though these types of damages are also not "consequential" damages).[6] This is the case because punitive damages are tort-based additional damages (beyond the actual damages caused by a wrongdoer's conduct) generally awarded to punish particularly egregious conduct, not damages to compensate a non-breaching party to a contract for the breaching party's failure to perform.[7] Most states do not award such non-compensatory damages for breach of contract, even in the absence of a waiver.[8] It is inappropriate for contracting parties **\*780** to attempt to import tort-based concepts into a contractual arrangement, and sophisticated deal professionals and their counsel should welcome any provision reaffirming that only the contract defines the parties' relationship.[9] As a result, the inclusion of punitive or exemplary damages in a waiver provision should cause no particular angst to either party.

All of the other enumerated terms in the above "boilerplate" consequential damage waiver provision should cause some concern, particularly to a buyer who has otherwise agreed to bear all of its losses sustained as a result of the seller's breach of bargained-for representations and warranties to the extent those losses fall below an agreed-upon deductible or exceed an overall cap on the seller's indemnification obligations. In the pressure to make a deal, however, deal professionals and their counsel may gloss over these provisions.

### "CONSEQUENTIAL DAMAGES" IN PRIVATE COMPANY ACQUISITION AGREEMENTS--A SHOCKINGLY AMBIGUOUS TERM

Few deal professionals or their counsel can define "consequential damages" accurately and many misconstrue the impact a waiver of such damages may have in the event the buyer later seeks to enforce its bargained-for representations and warranties from the seller.[10] In fact, there is little case law construing the effect of waivers of consequential damages in the specific context of mergers and acquisitions, and, as far as we have been able to determine, this is the first Article that has attempted to do so. Most of the case law regarding consequential damages arises in the context of the sale of equipment or goods, construction contracts, or agreements to provide transportation or other services.[11] Even in these frequently litigated arenas, however, the term "consequential damages" does not appear to have **\*781** a "clearly established meaning."[12] Nevertheless, a consequential damage waiver (as subsequently interpreted by a court in the context of a particular agreement) is generally enforced against a counterparty to a contract, even if the effect is to exclude all damages resulting from a breach of the affected agreement.[13]

While sellers have legitimate concerns over their potential liability for breach of contractual representations and warranties, there are other means of addressing those concerns without the use of terms that have such uncertain meanings. Similarly, where buyers have otherwise agreed to deductibles and caps with respect to the aggregate recovery that they can obtain from

the seller in the event the seller breaches contractual representations and warranties, they need to consider the burden a consequential damage waiver may add in light of their already limited remedies. For example, if a buyer agrees to a consequential damage waiver (like the "boilerplate" waiver above), and the seller breaches a representation that it is in compliance with a specific customer contract on which the buyer expects to earn an above-market profit, what damages can the buyer recover against the seller when the customer terminates that contract based on the seller's pre-closing breach? Does the fact that the buyer's losses are the profits that it could have earned from the affected customer contract make those losses consequential damages? Would all the losses from breach of this representation be unrecoverable pursuant to the above "boilerplate" waiver provision to the extent "lost profits" were a stand-alone loss exclusion independent of whether the lost profits were "consequential damages"? Even if the buyer could recover the lost profits from that contract, what about the fact that the buyer priced its acquisition based on a multiple of the business's earnings? Or, what if seller breaches a representation as to its compliance with certain laws, and the failure of the acquired business to comply with those laws exposes the buyer's parent and its affiliates to debarment or fines in addition to the direct negative impact on the acquired business? Are the losses suffered by the buyer's parent and its affiliates consequential losses arising from the seller's breach of the bargained-for representation or direct losses given the known effect of a violation of those laws?

**\*782** While there does not appear to be any case law directly answering any of these questions, the purpose of this Article is an attempt to provide a legally coherent framework for answering these and many other questions that are raised by the inclusion of a consequential damage waiver provision in a business acquisition or related agreement. To do so, we define "consequential damages," as well as some other terms used as purported synonyms, by examining the historical roots and the current use of such terms in the case law. We then determine how the current and historically extracted meanings of those terms translate in the merger and acquisition context. After considering how a waiver of consequential damages might affect a damage claim in a hypothetical purchase of a business, we last propose some guidelines for use by corporate lawyers in negotiating acquisition agreements in the future.

## UNDERSTANDING THE LIMITS OF CONTRACT DAMAGES GENERALLY

We first discuss the basic law of contract damages to enable us then to explain the meaning of the term "consequential damages" in the context of recoverable losses for breach of a representation and warranty set forth in an acquisition agreement. Contract damages are fundamentally different than the damages awarded against a wrongdoer to compensate a victim for the wrongdoer's tortious conduct. The law of torts enforces society's desire that we be left free from the harmful conduct of others, while the law of contracts enforces society's desire that promises made between its members be performed.[14] Successful tort claims must be based upon fault.[15] To the extent an injured party establishes fault (through a finding that the defendant intentionally or negligently breached a legally recognized duty), he or she is entitled to collect damages from the wrongdoer for all losses sustained by reason of the wrongful conduct, even if the wrongdoer could not have anticipated the ultimate amount or extent of the damages that were caused by his or her conduct.[16] Moreover, as previously noted, if the harmful conduct is particularly egregious, the wrongdoer may also be liable for punitive or exemplary damages.[17] In the law of contract, however, damages are not awarded based on fault but simply based on whether the contract was performed or breached.[18] Indeed, there is no distinction in damages awarded for breach of contract based on the reasons that motivated the breach.[19] Compensating the non-breaching party **\*783** to a contract, therefore, simply involves the court "seek[ing] to approximate the agreed-upon performance."[20]

As a result, the beginning premise of the law of contract damages is that all losses sustained by a non-breaching party (whether those losses are termed consequential, special, general, incidental, or direct) are recoverable as damages against a breaching party to the extent necessary to place the non-breaching party in the position in which such party would have been had there been no breach of contract.[21] In the law of contract (unlike the law of torts), however, the damages awarded for breach of contract are subject to a number of limitations that prevent a breaching party from being responsible for every conceivable loss that can be directly traced to the breach. In fact, in both the United States and the United Kingdom, losses sustained by a non-breaching party for which damages are awarded against the breaching party, including "consequential damages," generally must be "the natural, probable and reasonably foreseeable [or within the contemplation of the parties as a] consequence of the [breach]."[22] The rationale for this rule is that it "serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise."[23] Thus, to define "consequential damages" as those losses that are so remote that they were beyond the contemplation of the parties at the time they entered into the contract is to define consequential damages as losses for which the law does not allow recovery in contract, regardless of any provision excluding such damages. Yet, many sellers purport to require waivers of consequential damages because they believe consequential damages relate to losses beyond those that the breaching party would have ordinarily and reasonably foreseen or contemplated.[24]

The rules limiting all contractual damages to those that are "natural, probable, and reasonably foreseeable" impose a judicially created "rule of reasonableness" that generally limits the extent to which any consequential damages, including consequential damages, may be awarded for breach of contract.25 As a result, even in the absence of a contractual waiver of consequential damages, this standard of reasonableness **784** creates limits on the extent of the non-breaching party's recovery for losses that the breaching party did not otherwise specifically agree to bear. This judicially created "rule of reasonableness" originated in the nineteenth century English case of *Hadley v. Baxendale*.26 Law students study this case27 and most can likely recite its facts. It has been followed by courts throughout the United States and the United Kingdom, and it remains an important touchstone around the world.28 In our experience, *Hadley* is also the case most often referred to in any discussion of "consequential damages," although the court in *Hadley* never used that term.

### THE LEGACY OF *HADLEY V. BAXENDALE*

For those unfamiliar with the facts of *Hadley*, we give a brief primer. Hadley owned and operated a flour mill.29 The crankshaft used to operate Hadley's mill broke and the mill had to be shut down.30 Each day that the mill was not operating resulted in lost business for Hadley.31 Hadley needed a new crankshaft and the shaft's manufacturer was located in a different city.32 Hadley hired Baxendale's common carrier firm to deliver the broken crankshaft to the manufacturer so that the crankshaft could be used as a pattern for a replacement part that would fit with the existing parts in Hadley's mill.33 Hadley apparently did not inform the carrier firm of the reason he needed the crankshaft to be delivered to the manufacturer or the specific impact that a delivery delay would cause to Hadley's mill.34 Nevertheless, Baxendale's carrier firm agreed to transport the broken shaft to the manufacturer the day after the firm received it from Hadley.35 In breach of that agreement, Baxendale's carrier firm did not ship the crankshaft until five days after receiving it from Hadley.36 Hadley brought suit against Baxendale's carrier firm and sought recovery for his lost profits resulting from the mill being shut down for the additional period beyond when the mill would have been shut down had the shaft been transported at the agreed time.37

**785** The court denied Hadley's claim for his lost profits.38 In reaching this conclusion, the court created what is still followed today as a basic limitation on damages for breach of contract:

> [T]he damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally ... from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it.39

Noting that the shutdown of a business would not have been the result in the "great multitude" of cases in which a carrier failed to ship goods by the contractually agreed date, the court found

that the loss of profits here cannot reasonably be considered such a consequence of the breach of contract as could have been fairly and reasonably contemplated by both the parties when they made this contract. For such loss would neither have flowed naturally from the breach of this contract in the great multitude of such cases ... nor were the special circumstances ... communicated to or known by the defendants.40

Because lost profits were the only claimed damages, it is not clear what other losses the court might have been willing to award to Hadley as the natural result of the defendant's breach. But the *Hadley* court did not prohibit parties from agreeing to more expansive damages than those provided for under the court's rule. Rather, the court merely imposed a "default rule" that limited the damages that a party could recover in situations where the contract did not otherwise specify damages in the event of a breach.41

The rule in *Hadley* has two branches: (1) recoverable contract damages always include those losses that would arise normally and naturally as the result of a breach of any similar contract; and (2) recoverable contract damages also include any other losses arising from the special circumstances of the non-breaching party to the extent such special circumstances were communicated to the breaching party at the time the contract was made and were, therefore, "within the contemplation of the parties" as a probable consequence of a breach of that contract.

### THE IMPACT OF INDEMNIFICATION PROVISIONS ON GENERAL CONTRACT DAMAGE RULES

As previously noted, the rule in *Hadley* is a "default rule" that applies in the absence of a specific agreement between the parties to the contrary.42 Does a broad indemnification provision constitute a specific agreement to the contrary and render *Hadley's* contract damage limitation rule irrelevant? Stated differently, does the **786** rule limiting contract damages to those that are natural, probable, and reasonably foreseeable cease to apply to a contract breach where a broadly worded

indemnification provision is triggered by that breach?

A typical indemnification provision has an indemnifying party agreeing to "indemnify and hold the Buyer Indemnified Parties harmless from and against any Losses incurred by the Buyer Indemnified Parties based upon or arising from any breach of the representations and warranties made by the Seller in this Agreement." There may also be specific indemnification provisions covering the occurrence of particular events or litigation unrelated to any breach of the agreement that simply require the seller to indemnify the buyer for all losses that the buyer incurs as the result of any of those specific events. "Losses" are usually broadly defined to include "all losses, liabilities, obligations, damages, actions, suits, proceedings, claims, demands, assessments, judgments, costs, penalties, and expenses, including reasonable attorney's fees and disbursements," and "Buyer Indemnified Parties" are defined to include the buyer and various affiliated persons. Many times the indemnification provisions are the sole and exclusive remedy of the buyer under the agreement. These indemnification provisions may also set a cap on the maximum amount that may be recoverable thereunder, contain exclusions from recoverable losses below certain thresholds or deductibles, and provide for certain categories of losses (most notably, "consequential losses") that are simply not recoverable under any circumstance.

Contract damages are recoverable simply based on the fact that there was a breach of the contract, wholly apart from the existence of an indemnification provision and independent of whether there is any provision in the contract specifying the remedy for that breach.[43] Indeed, an obligation to indemnify for losses incurred as the result of a specified event is distinguishable from the liability that arises from breach of the contract itself. Damages for breach of contract are designed to compensate a party for non-performance of the contract; an indemnification provision, on the other hand, obligates the indemnifying party to pay money if certain events occur.[44] When the indemnification claim is triggered by specific events that are unrelated to any breach of the underlying contract, this distinction appears clear, and imposing limitations on indemnification payments related to the probability or foreseeability of the specific events seems inappropriate. As one Scottish court has noted:

> In the case of an indemnity the parties are deemed to have had in contemplation that a claim might arise, and it is immaterial how improbable it is that a claim would arise **787** or that the circumstances in which the claim arises might be of an unusual nature, so long as the claim is of a type which prima facie falls within the indemnity.[45]

When the indemnification claim is triggered by a breach of the contract itself, however, the distinction between the indemnification obligation and the underlying breach of contract becomes a little less clear. If breach of contract claims are subject to the rule of reasonableness and an indemnification claim for breach of contract is brought pursuant to a specific contractual provision, why should the rule of reasonableness not remain applicable, unless the parties clearly and unequivocally make it inapplicable? As one English court noted with respect to an indemnification provision indemnifying a party for "all consequences" of the other party's breach:

It would be odd in such circumstances if [a party] were legally liable to indemnify a loss which was not recoverable for breach of contract, and vice versa .... [U]nder a clause where the indemnity is triggered by a breach of contract, the indemnity is subject to the same rules of remoteness as are damages, including the rules under Hadley v. Baxendale. Thus "all consequences" would mean "all consequences within the reasonable contemplation of the parties." If the law is prepared to select some consequences as relevant and others not, and in contract to do so in accordance with the reasonable contemplation of the parties, then absent clear language to the contrary I do not see why the parties should not be viewed as intending to cover only consequences which are reasonably foreseeable and not consequences which are wholly unforeseeable .... [W]here the indemnity is triggered by a breach of contract, the indemnity as a matter of construction, absent contrary provision of which "all consequences" is not to my mind an example, only covers foreseeable consequences caused by that trigger.[46]

Delaware appears to follow the same reasoning as this English case, suggesting that the analysis that governs the award of damages for breach of contract also governs claims for indemnification that are triggered by a breach of the contract in which such indemnification provisions are contained.[47] On the other hand, another English court has suggested the opposite conclusion. Noting that the court in *Hadley* had specifically recognized the right of parties to a contract to specify the damages that would be payable upon a default, the court in *Patrick & Co. Ltd. v. Russo-British Grain Export Co. Ltd.*[48] suggested that a contract of indemnity was exempt from *Hadley's* default rules governing damages. The rationale for this suggestion was that a contract of indemnity specifies the damages payable in the event of a default under the underlying contract, not a promise to perform some obligation, the breach of which would itself give rise to damages.[49]

**788** While the judicial precedent is sparse on this issue, it would appear that *Hadley's* rule of reasonableness does not apply

to indemnification claims triggered by events that are unrelated to a breach of the underlying agreement in which the indemnification provision is contained. However, to the extent the indemnification claim is triggered by breach of the underlying agreement, there are solid arguments both for the applicability and the inapplicability of *Hadley's* rule of reasonableness, the success of which often depends on the wording of the indemnification provision.

## CONSEQUENTIAL DAMAGES--A CONSISTENTLY MISUNDERSTOOD AND MISUSED CONCEPT

"Consequential damages" and "special damages" are generally treated as synonyms by the courts.[50] Whether termed "special" or "consequential," these particular losses arising from a breach of contract are often (and imperfectly) understood as being "such damage, loss, or injury as does not flow directly and immediately from the act of the party, but only from the consequences or results of such act."[51] In other words, consequential damages are typically understood as being those damages that "do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach."[52] As a result, many deal professionals and their counsel think of consequential damages as being limited to damages that would not have occurred without the "interposition of an additional cause" beyond the breach of the immediate contract[53] and as being limited to the "lost profits expected under contracts between the aggrieved party and third parties."[54] A more careful review of the case law, however, reveals a potentially broader (and in some cases narrower) category of damages than these common understandings of the term "consequential damages."

Despite these common understandings of the term, we believe that a better understanding of "consequential damages" is that it includes all losses sustained by the non-breaching party to a contract as a result of the breaching party's **\*789** default beyond those losses that would normally and necessarily result from such breach in the absence of the non-breaching party's "special circumstances."[55] Even more simplistically, "consequential" or "special" damages should be understood as encompassing all contractually recoverable damages that do not fit within the category of either "incidental" damages or "direct" damages. To understand the meaning of "consequential" or "special" damages, therefore, one must first understand the meaning of "incidental" and "direct" damages.

## THE MEANING OF "INCIDENTAL" AND "DIRECT" DAMAGES AS INFORMING THE MEANING OF "CONSEQUENTIAL" OR "SPECIAL" DAMAGESSS

The term "incidental" damages is not a synonym for "consequential" damages. Indeed, "incidental" damages are a very limited category of damages. "Incidental" damages are limited to the expenses incurred by: (i) a buyer in connection with the rejection of non-conforming goods delivered by the seller in breach of contract, or (ii) by a seller in connection with the wrongful rejection by a buyer of conforming goods delivered by the seller to the buyer.[56] For example, if a buyer contracted to receive a 2007 Lexus LS 460 and instead received a 2007 Lexus ES 350, the cost of returning the wrong car to the dealer would be "incidental" damages. Similarly, if a buyer ordered a new boiler for its plant and the delivered boiler was defective, the costs of attempting to fix the problem by repairing the defective parts or the costs of returning the defective boiler to the seller might also be treated as "incidental" damages. Thus, all costs and expenses incurred by the non-breaching party to avoid other direct and consequential losses caused by the breach can be considered "incidental" damages.[57] It is ill-advised, therefore, to include "incidental" damages in a loss exclusion provision under the assumption that the term is a synonym for consequential damages.

"Direct" damages (also known as "general" damages) are more difficult to define clearly. For example, according to one New York court, "direct" or "general" damages seek to compensate the non-breaching party for "the value of the very performance promised," while "'[s]pecial' or 'consequential' damages ... seek to **\*790** compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach."[58] Linking "direct" damages to those damages that compensate a non-breaching party for the value of the contractually promised performance could lead to the conclusion that "direct" damages, in the context of a breach of a representation and warranty, are limited to "market-measured" damages, i.e., the difference between the value of assets or stock as purchased by the buyer and the value such assets or stock "would have had if they had been as warranted by the seller."[59] Indeed, it is often assumed that the general (or direct) damages available to a buyer as the result of a seller's breach of warranty in connection with a sale of assets are limited to "the difference between the contract price and the market or cover price," with all other damages suffered by the buyer relegated to the realm of "special or consequential damages."[60] But "[t]here is no general rule that direct damages are limited to the difference between the value of the product or service contracted for and the value of the product or service actually provided."[61] In fact, while "direct" damages certainly include "market-measured" damages, they also include all losses "which arise 'naturally' or 'ordinarily' from a breach of contract; they are damages which, in the

ordinary course of human experience, can be expected to result from a breach."[62]

Stated differently, "[d]irect damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong."[63] The instructions given to a jury in a Texas case are illustrative of the correct understanding of "general" or "direct" damages:

> "Direct damages" means those damages which naturally and necessarily flow from a wrongful act, are so usual an accompaniment of the kind of breach alleged that the mere allegation of the breach gives sufficient notice, and are conclusively presumed to have been foreseen or contemplated by the party as a consequence of his breach.[64]

We therefore gain the best understanding of "direct" or "general" damages by referring to the first branch of *Hadley's* contract damage limitation tree; i.e., "direct" or "general" damages are "those which may fairly and reasonably be considered as arising naturally from the breach" of any similar contract ("in the great multitude of such cases") and which do not arise from any special circumstances applicable to the non-breaching party.[65]

## *791 CONSEQUENTIAL DAMAGES AS THE SECOND BRANCH OF THE *HADLEY* CONTRACT DAMAGE LIMITATION TREE

If "direct" or "general" damages are the first branch of the *Hadley* contract damage limitation tree, it should not be surprising that many courts have understood "consequential" or "special" damages as the second branch, i.e., "those damages which, though they do not always or even usually flow from the breach of contract, are, at the time of making the contract, recognized by the parties as those which in the particular case may result from a breach."[66] In other words, the better reasoned and historically accurate definition of "consequential damages" is any loss or damage resulting from a breach of contract that does not "directly and naturally [result] in the ordinary course of events"[67] but instead arises from "'special circumstances' not ordinarily predictable."[68] Of course, to be legally recoverable, the damages arising from those "special circumstances not ordinarily predictable" must nevertheless have been within the contemplation of the parties at the time the contract was made. The link between consequential damages and "special circumstances" is the likely historical reason "consequential" and "special" damages are viewed as synonyms by the courts.

While consequential damages are not "direct" damages because they are not "the usual result of the wrong," they still must be "directly traceable to the wrongful *792 act."[69] Thus the idea that "consequential" simply means "indirect" is potentially misleading. As articulated by one court:

> The distinction between general [or direct] and special [or consequential] damages is not that one is and the other is not the direct and proximate consequence of the breach complained of, but that general [or direct] damages are such as naturally and ordinarily follow the breach, whereas special [or consequential] damages are those that ensue, not necessarily or ordinarily, but because of special circumstances.[70]

In other words, consequential damages are not unbounded and unlimited losses loosely traceable to a contract breach. Rather, consequential damages are losses directly attributable to and caused by a contract breach as a result of the special circumstances of the non-breaching party that would not have occurred in the ordinary case of a breach of a similar contract not involving such special circumstances.

## CONSEQUENTIAL DAMAGES ARE NOT LIMITED TO "LOST PROFITS" AND NOT ALL "LOST PROFITS" ARE CONSEQUENTIAL DAMAGES

Lost profits are clearly the most common form of consequential damages sought in a breach of contract case.[71] Lost profits, however, are not the only form of consequential damages and not all lost profits constitute consequential damages. Certain lost profits can in fact be "direct" damages.[72] A good example is a construction contract. If a property owner wrongfully terminates a construction contract with the contractor, the direct damages that naturally arise from that wrongful termination are the "profits necessarily inherent in the contract," i.e., the "net profit to which the contractor would have been entitled had full performance of the contract been permitted."[73] Similarly, if a breach foreseeably and naturally deprives the non-breaching party of profits that would have been earned in the ordinary course of business and not under special circumstances, those lost profits may also constitute direct damages rather than consequential damages.[74]

*793 In the context of a business acquisition priced at a multiple of revenue, lost profits may be the only true basis upon which to determine market-measured direct damages for breach of a representation affecting that revenue.[75] Specifically excluding "lost profits" in addition to "consequential damages," therefore, may result in the exclusion from recoverable

losses of "direct" damages and the only actual losses that the non-breaching party has sustained. Nevertheless, it is a common fixture of consequential damage exclusions to exclude "lost profits" as recoverable losses, in addition to consequential damages, regardless of whether the lost profits constitute consequential damages or are in fact direct damages.[76] As previously noted, many deal professionals and their counsel do this because they believe, wrongly, that the term "lost profits" (like the term "indirect damages" or "incidental damages") is simply a synonym for "consequential damages."[77]

## SO WHAT HAVE WE LEARNED?

"Consequential damages" are simply those losses suffered as a result of a breach that would not have occurred in the absence of some special circumstance applicable to the non-breaching party that would not normally have been applicable to most other parties to a similar contract. If the buyer would have suffered losses "in the great multitude" of situations involving buyers of similar businesses, the court should properly view the losses as "direct" rather than "consequential" damages. Assuming the damages sought by the buyer do in fact qualify as "consequential damages," the buyer has to establish that its consequential damages are recoverable pursuant to *Hadley's* rule of reasonableness, which is applicable to all contract damage claims, including claims for "direct damages." Under *Hadley's* rule of reasonableness, all damages the buyer seeks from the seller (both direct **794** and consequential) must be the "natural, probable, and reasonably foreseeable" result of the seller's breach of the representations and warranties set forth in the acquisition agreement.[78] In the case of consequential damages (as opposed to direct damages), the buyer must prove that the special circumstances that contributed to its consequential damages were communicated to or otherwise known to the seller and therefore within the contemplation of the parties at the time they entered into the contract.[79] Because the rule of reasonableness is a "default rule," it is at least theoretically possible to craft an indemnity provision that waives this rule and makes the seller liable for any and all damages sustained by the buyer as a result of the seller's default. The little case law in this area, however, suggests that the indemnification provision needs to be very specific to accomplish this result.[80]

To the extent a buyer meets these requirements, but has nonetheless contractually waived all of its consequential damages, all damages caused by the seller's breach that would not have occurred in the absence of the buyer's special circumstances (even if those circumstances were otherwise known to and contemplated by the parties at the time they entered into their agreement) are not recoverable, even if they are effectively the only real damages suffered by the non-breaching party.[81] Assuming the decision to waive its consequential damages was made with full knowledge of the "consequences" of that waiver, the buyer should accept that this result was simply the bargain that was made. We suspect, however, that too many buyers agree to these waivers without a full appreciation of the resulting limitations on recoverable damages. Moreover, sellers may similarly make assumptions about the extent of a consequential damages waiver and wrongly assume that all damages other than market-measured damages have been waived.

Unfortunately, even after learning how to better define and distinguish "direct" and "consequential" damages, a party and its counsel may still have difficulty reliably predicting how a court will apply those definitions and distinctions to the buyer's particular losses after the seller's breach. Even if the court follows the correct meanings of these terms (which is by no means certain), identifying the category of loss as either "direct" or "consequential" requires a determination of what is an ordinary and natural result, as opposed to a result that only occurs because of special circumstances. As a result, understanding the terms' definitions does not make the identification of any specific loss as clearly "direct" or clearly "consequential" any less elusive. Therefore, it will always be difficult to advise deal professionals with any "predictability or uniformity"[82] as to which types of losses will fall into which category. Nevertheless, we use a series of hypothetical transactions to help apply what we have discussed generally about the meaning of the term "consequential damages" to some situations typically faced by private **795** companies in merger and acquisition transactions. While our first hypothetical involves the purchase of a bull, and not a business, the legal principles applicable to one apply equally to the other.

## APPLYING WHAT WE HAVE LEARNED TO A CONSEQUENTIAL DAMAGE HYPOTHETICAL--THE INFECTIOUS INFERTILITY SYNDROME[83]

Imagine a situation in which a breeder of prize bulls sells one of her bulls to a cattle rancher. The cattle rancher plans to use the purchased bull (together with bulls she already owns) to impregnate her substantial herd of heifers and reap the profits from the sale of the resulting calves the following spring, as well as to improve the quality of her herd through the retention of some of the calves for future use. In the bill of sale, the buyer specifically demands (and the selling breeder, having no actual knowledge to the contrary, provides) a written warranty that the purchased bull is disease free and fertile. It turns out that the purchased bull has a contagious disease that not only renders the bull infertile but infects and renders infertile all of the rancher's other bulls. As a result, there are no calves born the next spring. In addition, the rancher contracted with a neighboring rancher to loan the neighbor for a fee several of her existing bulls to impregnate the neighbor's herd. The

contract with the neighboring rancher contained a warranty respecting the loaned bulls similar to the warranty provided by the breeder respecting the purchased bull. Because of the unknown infertility of our rancher's bulls (caused by the infection spread from the purchased bull), the neighbor has now suffered losses similar to the losses suffered by our rancher, and the neighbor is looking to our rancher for recovery. Worse still, our rancher, in reliance upon the anticipated profits from her calf crop and the breeding fees from the neighboring rancher, mortgaged her ranch to buy adjoining land to accommodate her growing herd. As a result of her lost profits, she was unable to pay her mortgage and the bank foreclosed on her ranch.[84]

Assuming our rancher can prove that the purchased bull caused the barrenness of her herd of heifers, the infertility of her other bulls, and the infertility of her neighbor's heifers, what are our rancher's damages? How much of those damages are legally recoverable from the selling breeder? Would the answer be different if **796** the breeder had specifically indemnified our rancher for "all losses" that she sustained as a result of any breach of the breeder's written warranty? What would be the impact be on our rancher's damages if the infertility disease were curable and the bull (together with the other infected bulls) could, after an inexpensive treatment, be returned to full health notwithstanding the loss of an entire calving season? How would any of these answers differ if our rancher had waived any claim for "consequential damages" in connection with the breeder providing the warranty or agreeing to an indemnity? We assume in our hypothetical that our rancher has no ground for asserting a claim of fraud against the breeder. As a result, our rancher's remedies are limited to the damages available for breach of contract (as opposed to tort-based remedies).[85]

## APPLYING CONTRACT'S RULE OF REASONABLENESS TO THE RANCHER'S LOSSES

There is no question that our rancher has suffered substantial losses as a result of the breeder's breach of warranty. The promised performance was the delivery of a disease-free and fertile bull. That did not occur. Based on the general damages rule for breach of contract,[86] our rancher should be entitled to whatever amounts would compensate her fairly for all losses she has sustained as a result of the breeder's failure to deliver the bull in its warranted condition. But *Hadley's* rule of reasonableness generally limits the recovery of damages to those losses (whether direct or consequential) that are natural, probable, and reasonably foreseeable at the time the contract was made.[87]

Despite the loss of her ranch, it is very unlikely that any court would allow the rancher to recover damages for that loss in the absence of some specific indemnification agreement by the breeder. The losses are not natural, probable, or reasonably foreseeable. Thus, absent a clear indemnification provision, this loss is a remote loss and is unrecoverable even in the absence of a consequential damage waiver. On the other hand, the cost of replacing the defective bull with one that is fertile and disease free is natural, probable, and reasonably foreseeable, as is the cost of restoring the bull to the disease-free and fertile condition that was warranted.[88] These are the market-measured direct damages available for any breach **797** of contract, i.e., the difference in value between the bull that was warranted and the bull that was actually delivered (or the cost of restoring the bull to its warranted condition).

Even setting aside the rancher's unrecoverable damages for foreclosure of her ranch, these market-measured direct damages would not compensate our rancher for the many other losses that resulted from the breeder's breach. What about the other bulls that were healthy and fertile before the rancher added the purchased bull to her herd? What about her loss of the profits that she expected to earn from the sale of some of the anticipated crop of calves? What about the lost breeding fees payable by our rancher's neighbor and the rancher's liability for the inability of her neighbor's heifers to bear calves? And, what about our rancher's loss of the anticipated group of new bulls and breeding heifers from her expected crop of calves that would normally have been retained and available for use to strengthen her herd and correspondingly increase profits in future calving seasons? All of these losses were sustained by our rancher and are directly traceable to the breach of the breeder's written warranty. But are they the natural, probable, and reasonably foreseeable result of the breach and therefore recoverable in contract?

A breeding bull's purpose is to impregnate awaiting heifers. A natural, probable, and reasonably foreseeable consequence of a bull's infertility is the failure of the awaiting heifers to conceive and bear calves, assuming the heifers were themselves fertile. Whatever profits would have been normally, naturally, and foreseeably lost if one breeding bull was unavailable to impregnate awaiting heifers should therefore be recoverable, whether as direct damages or consequential damages. But was the loss of an entire calving season natural, probable, and reasonably foreseeable? If fertility alone were the warranted condition of the bull, perhaps not. Our rancher had an existing supply of other bulls to impregnate at least part of her herd. In our hypothetical, however, the purchased bull was also warranted as disease free. There are a number of contagious diseases that can infect cattle (although the unnamed disease that only affects fertility is so far as we are aware completely imagined), and the possibility that introducing an infected bull to a herd would infect the rest of the herd with whatever disease that bull carried was natural, probable, and reasonably foreseeable.[89] It is not necessary that the breeder actually knew or was able to

foresee that an infertility disease would infect the rest **\*798** of the herd and the exact consequences of that widespread infection.[90] It is enough that an adverse impact on our rancher's entire herd was natural, probable, and reasonably foreseeable, even if the exact extent of that impact was not necessarily known or foreseeable.[91]

Whether our rancher's losses arising out of the contract with her neighbor were natural, probable, and reasonably foreseeable is a closer question and, in the absence of an unequivocal indemnity by the breeder, would ultimately be an issue for the trier of fact to decide. Similarly, in the absence of a specific indemnity, it is uncertain whether a court would view the rancher's loss of profits from future breeding seasons as natural, probable, and reasonably foreseeable, as opposed to "remote" and "uncertain" and, therefore, unrecoverable. Thus, even in the absence of a consequential damage waiver, it is not clear whether all of these additional losses would be recoverable by our rancher under general contract damage principles, unless there was a specific indemnity covering them. Moreover, as previously noted, an indemnity for "all losses" arising from a breach of the breeder's warranty may not be sufficiently specific to take the indemnity provision outside the rule of reasonableness otherwise applicable to damages arising from a breach of contract.[92]

### THE RANCHER'S RECOVERABLE OR INDEMNIFIABLE LOSSES AS CONSTITUTING "DIRECT" OR "CONSEQUENTIAL" DAMAGESSS

Assuming that our rancher's losses are otherwise recoverable under the rule of reasonableness or under an express indemnity in the contract, the categorization of those losses as direct, consequential, or incidental damages is irrelevant absent a **\*799** consequential damages waiver. If the bill of sale for the purchased bull contained a consequential damage waiver, however, the distinction among those losses as consequential, direct, or incidental may become critical. If the consequential damage waiver in the bill of sale read like the "boilerplate" example set out previously in this Article, our rancher may have also waived many of her direct losses.

Had our rancher discovered the bull's disease, quarantined the infected bull before it infected her herd, and attempted to treat and transport the bull back to the breeder, all of these out-of-pocket costs would most likely be classified as "incidental" losses. Had the bill of sale contained the "boilerplate" consequential damage waiver, however, these "incidental" damages would all have been waived despite the fact that they are "incidental" and not "consequential" damages. But in our hypothetical, none of these actions occurred because our rancher did not discover the disease in time to take them.[93] All of her resulting losses, therefore, are either direct or consequential losses.

The breeder warranted that the bull was both disease free and fertile. The loss of profits from the anticipated calving season was a direct result of the introduction to our rancher's herd of the infected bull. That result would in fact have occurred in the "great multitude" of cases involving the sale of any infected bull to any cattle rancher owning a herd of cattle. The special circumstances of this particular cattle rancher, therefore, are not necessarily relevant to the losses she sustained as a result of the lost calving season.[94] But it is not certain all courts would agree and the issue would possibly need to be determined by a trier of fact, whether a jury in the United States or a judge in the United Kingdom.[95]

On the other hand, our rancher's liability for the losses sustained by the neighboring rancher, as well as the breeding fees that she failed to receive, are clearly damages that resulted from her special circumstances. Thus, even in the absence of a consequential damage waiver, these losses would be unrecoverable unless those special circumstances were communicated to the breeder or the bill of sale contained an unequivocal indemnity that made communication of such circumstances irrelevant. If there were a consequential damage waiver, however, these losses would not be recoverable under any circumstances.

**\*800** Our rancher's loss of the prospective bulls and breeding heifers that she normally would have retained and used for future breeding to increase the quality of her herd appears to be direct damages as opposed to consequential damages, but a trier of fact would probably need to decide this issue.[96] Those damages and the actual difference in value between the bull as warranted and the bull as delivered (which is also direct damages), however, may nevertheless have been waived if the so-called "consequential damage waiver" clause contained a waiver of "diminution in value damages."

### THE BULL AS A BUSINESS AND THE RANCHER AS A PRIVATE COMPANY BUYER--THE WIDGET MANUFACTURING PLANT HYPOTHETICAL

A purchaser of a business, like the purchaser of a bull, can incur substantial losses beyond the direct out-of-pocket costs of remedying the breach of a specific representation and warranty made by the seller in an acquisition agreement and beyond the difference in value between the business as represented and the business as actually purchased. So let us examine a hypothetical that is a little closer to the kind of situation that would be faced by the purchaser of a private company.

Imagine a situation in which a buyer acquires from a seller a widget manufacturing business. The buyer acquired the widget manufacturing business as an add-on to its existing widget manufacturing business. In fact, the buyer was able to pay substantially more than other potential bidders for this business based on the potential synergies between the buyer's existing business and the acquired business. Indeed, after the closing, the purchased plant had excess capacity, so the buyer moved business from its other plants to the newly purchased plant, disposed of its other plants to capitalize on the synergies between the acquired business and its existing business, and even contracted to provide manufacturing services to third-party suppliers of widgets.

In the acquisition agreement, the seller represented and warranted to the buyer that the acquired business had been conducted in compliance with all applicable laws and held all permits and licenses necessary to operate. The acquisition agreement also contained a specific representation by the seller that a long-term customer contract, which had historically accounted for a significant portion of the acquired business's revenues, was in full force and effect without any default by the seller. In addition, in the title warranty for the real property on which the acquired manufacturing plant was located, the seller represented that there were no encumbrances on the property. The acquisition agreement contained standard indemnification provisions, including a deductible of 1 percent of the purchase price and a cap of 20 percent of the purchase price as a limit on the seller's liability for indemnification. The acquisition agreement also contained a waiver of all "consequential damages."

**\*801** As it turns out, the purchased plant is missing a permit that is required to operate the plant. The permit can be easily obtained for a cost of only $10 (because the plant otherwise complies with all applicable regulations), but the process to obtain the permit takes a minimum of four weeks and requires the expenditure of $25,000 in professional fees to complete the engineering reports that are required to accompany the permit application. After the closing, the buyer discovers this problem as the result of a routine inspection conducted by the governmental entity that issues such permits. The official in charge is a stickler for the rules and orders that the plant be shut down until the buyer can complete the permit approval process.

Having survived the shut down of its business for the four weeks required to navigate the permit approval process, the buyer is then informed by a natural gas pipeline company that there is a high pressure gas line running directly beneath the plant that is in need of repair. According to the utility easement agreement (of which the buyer was unaware and the existence of which violates the title warranty provided by the seller), the pipeline company has the right to shut down the plant, dig up the floor, and perform maintenance on the gas line. Absent the need for repair of the pipeline, the easement would not have had any impact on the operation of the plant. The process of repairing the gas line takes several more weeks, during which the plant cannot operate.

The buyer is then informed that a major customer of the purchased business, whose long-term contract was the subject of the seller's specific representation that it was not in default under the contract, is terminating its contract with the business based upon violations of that contract that occurred prior to the closing.

Furthermore, the buyer also learns that the seller had previously violated certain corrupt practices laws applicable in a jurisdiction in which the purchased business operated. The penalty for such violations is debarment from any government contracts in that jurisdiction for five years. The debarment applies to both the purchased business and any parent or affiliate of the purchased business. As a result of those violations and penalties, the buyer's existing business, as well as the purchased business, have become subject to a debarment order in that jurisdiction. Although government contracts in that jurisdiction are a small part of the purchased business, they are a significant part of the buyer's existing business. Indeed, the buyer was well aware of the effect that a violation of those laws could have on its existing business, discussed the importance of the purchased business complying with those laws with the seller, and bargained with the seller for the specific language of the compliance with laws representation having that risk in mind.

We are again assuming in this hypothetical that the buyer has no basis for pursuing a claim of fraud against the seller. Accordingly, with the contract providing for a deductible and cap on indemnifiable damage claims, the buyer is running calculations as to how much the plant shutdowns, government debarment, and lost customer contract are going to cost in terms of lost business. The buyer is hoping that after incurring the 1 percent deductible, damages do not exceed the 20 percent cap.

**\*802** Then more bad news arrives. The buyer's chief financial officer informs the buyer that the lost business will likely cause the company to miss its next quarterly financial covenants under the financing facility put in place in connection with

the acquisition of the purchased business. Accordingly, the buyer needs to obtain a waiver or face a possible default. The chief financial officer expects the waiver to be costly.

Then the really, really bad news arrives. Buyer's counsel informs the buyer that, according to seller's counsel, the only recoverable losses under the acquisition agreement are the $10 fee required to purchase the missing permit and the difference in value (if there is any) at the time of contract between the market value of the purchased business as warranted and the market value of the business as received.[97] All other losses the buyer sustained, according to seller's counsel, are "consequential damages" that are unrecoverable (and do not even count against the deductible) because of the consequential damage waiver set forth in the acquisition agreement.

The buyer is also informed that a valuation expert with whom buyer's counsel has consulted does not believe that the market value of the purchased business as warranted is significantly more than the market value of the business as received. In other words, the existence of the very conditions that caused the damages of which the buyer complains, and which violated specifically bargained-for representations and warranties, did not affect significantly the market value of the business. Accordingly, the buyer is unlikely to recover significant market-measured damages notwithstanding that the "consequential damage" waiver does not contain a waiver of "diminution in value" damages.

The buyer does not believe that this can be the case. Having agreed to a generous deductible and a limited cap, the buyer believes that it should certainly be entitled to compensation for losses sustained as a direct result of the seller's breach of specifically negotiated warranties. Is the buyer entitled to such compensation?

## THE BUYER'S RECOVERABLE OR INDEMNIFIABLE LOSSES AS CONSTITUTING "DIRECT" OR "CONSEQUENTIAL" DAMAGESSS

The seller warranted that the business was in compliance with all applicable laws, held all required permits, had a valid, long-term customer contract, and was located on real property without encumbrances--in sum, the buyer was to receive a business that it could continue to operate as the seller had operated it at the time of contract. Because that did not occur, absent the consequential damages waiver, the buyer would have been entitled to compensation for all losses sustained as a result of the seller's breach of warranty, subject, however, to *Hadley's* rule of reasonableness. Many of the buyer's damages may well fail the test of reasonableness, whether those damages constitute "direct" or "consequential" damages. For the **\*803** purposes of this hypothetical, however, we will bypass the application of *Hadley's* rule of reasonableness and go directly to the categorization of the buyer's damages as direct, incidental, or consequential.

A court would likely find that any losses that the buyer incurred as a result of the missed financial covenant are remote damages. Those losses are likely unrecoverable even if there had not been a consequential damage waiver. The $10 fee required to purchase the missing permit, on the other hand, should be recoverable as direct damages. Any costs and expenses incurred by the buyer in applying for the permit beyond the actual fee, however, may be "incidental damages" and excluded by the specific language of the particular waiver provision.

If there is any difference between the market value of the business as warranted and the market value of the business as received, that difference should be recoverable as direct market-measured damages (and, if appropriate, a financial expert could use multiples of earnings to determine those market values). If the consequential damage waiver had included "diminution in value damages" or "damages based on multiples of earnings," however, the buyer would have waived those market-measured damages.

But what about the buyer's lost profits on the third-party contracts it was unable to perform as a result of the shutdown of the manufacturing plant? In our hypothetical, the buyer sustained lost profits from three groups of contracts--(i) contracts with its existing customers, the performance of which moved to the newly acquired manufacturing plant, (ii) contracts with existing customers of the acquired business, and (iii) manufacturing contracts with third-party widget suppliers obtained after the acquisition.

The lost profits from the buyer's failure to perform the third-party contracts with its existing customers (group (i) above) and the manufacturing contracts with third-party widget suppliers (group (iii) above) are both likely consequential damages. These lost profits would likely be unrecoverable (absent a very specific indemnity provision) even if consequential damages had not been waived because they arose from special circumstances applicable to the buyer that were unknown and uncontemplated by the seller. Again, we see that even in the absence of a consequential damage waiver, not all of the losses sustained by the buyer would be recoverable under general contract damage principles. The lost profits from the contracts in

group (ii) above, i.e., those lost profits sustained by the buyer as a result of the buyer's inability to perform under the contracts with the existing customers of the acquired business during the plant shutdowns, are likely direct damages. The buyer bought a going concern and the seller's representations and warranties were designed to ensure that the buyer could continue to operate that going concern as the seller had previously operated it. The special circumstances of the buyer were unrelated to the damages that resulted from its inability to manufacture widgets for the acquired business's existing customers. But, if the consequential damage waiver were an expansive waiver, including a waiver of all lost profits (whether or not they constitute consequential damages), then even these direct damages would be unrecoverable. The lost profits from the termination of the business's long-term customer contract are also direct damages. Determining **\*804** what those damages are, however, may be difficult if the price the customer was paying was not above market and the contract was easily replaceable. Additionally, those damages may be part of the market-measured damages calculation, and recoverable damages cannot be duplicative.[98]

The damages from the acquired business's loss of government contracts, both existing and prospective, should also constitute direct damages, but they too may be part of the calculation of market-measured damages. The losses by the buyer and its affiliates of their existing government contracts (and any prospective government contracts traceable to their existing businesses at the time of the acquisition), however, are most likely consequential damages, as they are a result of the special circumstances of the buyer.

Both of these hypothetical situations demonstrate that even with our understanding of how to define the various damage types, the application of those definitions to specific facts remains difficult. Moreover, these difficulties may be even greater if the court considering our hypothetical situations does not correlate the distinction between the first and second branch of the *Hadley* damage tree to the distinction between direct and consequential damages. Indeed, one recent Australian court suggested that this distinction, although recognized at common law, should not be relevant to the court's consideration of the meaning of the term "consequential losses" in a loss exclusion clause in a contract because "reasonable business persons naturally conceive of 'consequential loss' in contract as everything beyond the normal measure of damages."[99] According to this court, the normal measure of damages for breach of contract is market-measured damages, i.e., the difference between the contract price and the value of the goods or services delivered pursuant to that contract.[100] Anything beyond that measure of damages, whether it fits within the first or second branch of *Hadley*, is therefore a consequential loss.[101] As previously indicated, there are certainly U.S. courts that have reached similar results, although without the clear decision to depart from the recognized distinctions between the first and second branches of *Hadley*.[102]

A consequential damage waiver in either of our hypothetical situations thus presents significant challenges both to the buyer seeking to recover damages resulting from the seller's breach of bargained-for representations, and to the seller seeking to limit certain categories of those damages. Unfortunately, these same challenges could arise under acquisition agreements negotiated between buyers and sellers in the current marketplace.

### \*805 CONCLUSION AND SUGGESTED GUIDELINES

Damages for breach of contract are losses caused by the breach that were natural, probable, and reasonably foreseeable at the time of contract, whether those damages are direct or consequential. Unless a contractual indemnification provision states unequivocally that the seller will indemnify the buyer for losses "whether or not the possibility of such losses has been disclosed to the other party in advance or whether or not such losses could have been reasonably foreseen by such other party," claims under indemnification provisions may similarly be limited to those losses that are natural, probable, and reasonably foreseeable, at least to the extent the indemnification claims arise from a breach of contract.[103] As a result, both sellers and buyers need to discuss their intentions with regard to the inclusion of a consequential damage waiver and whether it is necessary or appropriate in the context of indemnification claims based on breaches of representations and warranties that are otherwise limited by deductibles and caps.

We are not so naive as to believe that this Article will suddenly change existing deal practice and result in more deliberate and thoughtful negotiation regarding so-called "consequential damage" waivers. But for those of you who have now read this Article and want to incorporate your new-found knowledge, what can you do? We offer the following basic guidelines for addressing consequential damage waivers in acquisition agreements:

• At a minimum, buyers should avoid the "kitchen sink" approach to the consequential damage waiver. A buyer may have no choice but to agree to a waiver of consequential damages, but waivers that include lengthy lists of other enumerated damages, many of which may actually constitute direct damages, should be rejected.

• If possible, buyers should try to define "consequential damages" for the purpose of any waiver provision in such a manner that the term covers only those consequential damages for which the law already denies recovery for breaches of contract, i.e., those damages that arise solely from the special circumstances of the buyer that have not been communicated to the seller.

• Buyers should avoid including the broad term "lost profits" as a separate category of damages in the waiver provision. The buyer might accept waiving lost profits that in fact constitute consequential damages if stuck with a broad waiver of consequential damages. But buyers should think about the widget manufacturing plant hypothetical and attempt to carve out "business interruption losses" from the reach of the consequential damage waiver, as those losses may be the only losses the buyer actually sustains.

• Sellers, on the other hand, should consider expressly limiting recoverable losses under their indemnification provisions to the "normal measure" of contract damages, i.e., market-measured damages based on the difference **806** between the value of what the buyer received and the value of what the buyer should have received if there had been no breach of a specific representation and warranty by the seller. This may more directly achieve what most sellers are actually attempting to achieve with consequential damage waivers in the first place.

• Buyers should never include "incidental" damages in their waiver provisions under the assumption that they are a synonym for "consequential" damages. They are not. It is unclear that the term even has a well understood meaning in the business acquisition context. "Incidental" damages likely constitute those out-of-pocket costs incurred by a buyer in attempting to fix problems with the purchased assets as a result of those assets not being in the condition represented. Those types of damages are more closely analogous to "direct" damages than to "consequential" damages.

• Instead of waiving "consequential" damages, buyers should seek waivers of "remote" or "speculative" damages. Even the term "indirect" damages is preferable to the term "consequential" damages for a buyer. In the alternative, buyers should suggest limiting the seller's indemnification obligation to losses "directly" arising from the breach, particularly if the seller says it is concerned with "indirect" consequences arising from intervening causes.

• Buyers should never agree to waivers of "diminution in value" or "multiples of earnings" damages. Diminution in value is the bedrock of direct or general damages for breach of contract. Moreover, businesses are frequently priced on a multiple. If the seller represents that a specific long-term customer contract (which has an above-market profit margin) is in full force and effect without default by the seller, and after closing the buyer discovers that the contract is in default and subject to termination by the customer, the business is worth less and the buyer has lost a multiple of that profit margin.

• Sellers frequently agree to an exception to the consequential damage waiver that allows recovery of "any such damages that are recovered by third parties in connection with Losses indemnified hereunder." The reason is that to the extent the buyer is out-of-pocket for third-party damage claims that constitute a breach of a specific representation and warranty, those claims should be indemnified by the seller even if the damages sought by the third party are otherwise consequential damages. Sellers should appreciate what they are agreeing to with this exception, and buyers should understand that this exception is not a cure-all. While this exception may protect the buyer from claims by third parties that could otherwise constitute consequential damages, it does not protect the buyer from lost revenues incurred by the buyer as a result of lost relationships with third parties that do not result in actual claims against the buyer.

• Sellers should not assume that contract law's "rule of reasonableness" necessarily applies to broadly worded indemnification provisions that purport to indemnify buyers for any and all losses that arise from a breach of a seller's representation and warranty. Consequently, sellers may wish to **807** limit the losses for which it is indemnifying the buyer to those losses that are the "probable and reasonably foreseeable" result of any breach of such representations and warranties. Doing so more directly protects the seller than a waiver provision using a misunderstood term like "consequential damages."

• Buyers, on the other hand, should not assume that contract's "rule of reasonableness" fails to apply to broadly worded indemnification provisions. A bargained-for indemnification provision that makes the seller liable for all losses that are causally connected to the seller's breach, particularly where the recovery of those losses is capped at a fixed percentage of the purchase price and subject to a generous deductible, may suggest that the rule of reasonableness does not apply, but case law supporting that view is sparse. Therefore, buyers may wish to clarify that the rule does not apply by providing that its rights of indemnification for any indemnifiable losses are not adversely affected whether or not the possibility of such losses was disclosed to the seller at the time of contract and whether or not the seller could have reasonably foreseen the possibility of

the buyer incurring such losses as a consequence of the seller's breach.

While courts view that their role in contract disputes is to interpret the intentions of the parties to that contract, it is the actual words the parties use that define those intentions.104 Using undefined and misunderstood terms like "consequential damages" in waiver provisions makes determining the parties' intent very difficult. Sophisticated deal counsel and their clients need more certainty than that provided by the term "consequential damages," which is so misunderstood and fraught with uncertain application in the merger and acquisition context. Consequently, we strongly recommend that the term "consequential damages" be stricken from the deal lexicon.105 A properly drafted contract should clearly and unequivocally define the limits of the parties' obligations in words that are well understood. Well-counseled106 deal professionals deserve nothing less.

## Footnotes

a1    Glenn D. West is a partner and Sara G. Duran is an associate in the Private Equity Group of Weil, Gotshal & Manges LLP. The authors express their appreciation to Joseph M. Nathan and Sachin Kohli, both associates in the Private Equity Group of Weil, Gotshal & Manges LLP, and Toni Anderson and Jill Meyer, former student associates at Weil, Gotshal & Manges LLP, for their research assistance with this Article.

1     *See* MERGERS & ACQUISITIONS SUBCOMM., COMM. ON NEGOTIATED ACQUISITIONS, SECTION OF BUS. LAW, AM. BAR ASS'N, 2007 PRIVATE TARGET MERGERS & ACQUISITIONS DEAL POINTS STUDY 68-71 (2007), *available at* http:// www.abanet.org/abanet/common/login/securedarea.cfm? areaType=committee&role=CL560000&url=/ buslaw/committees/CL560000/materials/matrends/2007_private.pdf.

2     *See* Glenn D. West, *Avoiding Extra-Contractual Fraud Claims in Portfolio Company Sales Transactions--Is "Walk-Away" Deal Certainty Achievable for the Seller?*, WEIL, GOTSHAL & MANGES LLP PRIVATE EQUITY ALERT, Mar. 2006, http://www.weil.com/news/pubdetail.aspx?pub=3368.

3     Our observations throughout this Article about "loss exclusions," consequential damage waivers in acquisition agreements, and the attorneys and deal professionals who draft and rely on them are based on our combined thirty-four years of experience representing clients in acquisitions and divestitures.

4     *See* Neb. Nutrients, Inc. v. Shepherd, 626 N.W.2d 472, 481 (Neb. 2001) ("Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery ...."); *see also* 25 C.J.S. *Damages* § 40 (2008) ("Where it cannot be shown with reasonable certainty that any damage resulted from the act complained of, there can be no recovery ...."); 17A AM. JUR. 2D *Contracts* § 707 (2008) ("[T]he mere breach of an agreement that causes no loss to the plaintiff will not sustain a suit for damages ....").

5     *See infra* notes 50-55 and accompanying text.

6     Typically a buyer will want to be indemnified against (and sellers generally agree to indemnify the buyer for) punitive and exemplary damages that the buyer incurs as a result of a third-party claim for which there is a specific indemnity or the existence of which results in a breach of one of the seller's representations and warranties. What neither the buyer nor the seller wants is to expose itself to a direct claim for punitive and exemplary damages by the other party to the acquisition agreement in a context not involving a third-party claim. A typical provision to clarify this distinction between direct and third-party claims would be the following sentence added to the end of the above "boilerplate" waiver provision: "The exclusion of consequential, incidental, indirect, special, or punitive damages as set forth in the preceding sentence shall not apply to any such damages recovered by third parties against a Purchaser Indemnified Party or a Seller Indemnified Party, as the case may be, in connection with Losses that may be indemnified hereunder."

7     *See* City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-67 (1981) ("Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct."); *see also* 25 C.J.S. *Damages* § 195 (2008) (Punitive damages "are awarded by way of punishment to the offender ... and are not intended to compensate the injured party.").

8       *See, e.g., Roger Lee, Inc. v. Trend Mills, Inc., 410 F.2d 928, 929-30 (5th Cir. 1969)* (holding that claim for punitive damages was properly stricken because plaintiff alleged a cause of action in contract and not one in tort); *Purdy v. Consumers Distrib. Co., Ltd., 648 F. Supp. 980, 983 (S.D.N.Y. 1986)* (finding that punitive damages are not available where sole claim is for breach of contact); *E.I. DuPont de Nemours & Co. v. Pressman, 679 A.2d 436, 445 (Del. 1996)* (holding that unless bad faith breach of contract amounts to a tort, there are no punitive damages for breach of contract); *Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 618 (Tex. 1986)* (finding that where only injury is economic loss to the subject of the contract itself, recovery lies in contract and exemplary damages are inappropriate); *Kewin v. Mass. Mut. Life Ins. Co., 295 N.W.2d 50, 55 (Mich. 1980)* (holding that exemplary damages are only appropriate to compensate plaintiff in cases in which defendant acts tortiously).

9       For further discussion about the application of contractual principles to various aspects of the acquisition agreement, see West, supra note 2; Glenn D. West & Kim M. Shah, *Debunking the Myth of the Sandbagging Buyer: When Sellers Ask Buyers to Agree to Anti-Sandbagging Clauses, Who Is Sandbagging Whom?*, M&A LAW., Jan. 2007, at 3.

10      It may be a sad commentary on the state of deal lawyering generally but, as suggested by one court, many of the most sophisticated and "heavily counseled" acquisition agreements contain "glaringly ambiguous terms that lead to avoidable litigation." *See Johnson & Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 353 (S.D.N.Y. 2007).* The term "material" in a material adverse change clause is a good example of an often used but frequently misunderstood term that appears in acquisition agreements without definition. *See* Kenneth Adams, *What Does "Material" Mean?*, DEAL LAW., Sept.-Oct. 2007, at 4; Glenn D. West & S. Scott Parel, *Revisiting Material Adverse Change Clauses--Private Equity Buyers Should (but Mostly Can't/Don't) Special Order Their MACs.* WEIL, GOTSHAL & MANGES LLP PRIVATE EQUITY ALERT, July 2006, http:// www.weil.com/news/pubdetail.aspx?pub=3261.

11      *See, e.g., infra* note 13.

12      *See, e.g., Applied Data Processing, Inc. v. Burroughs Corp., 394 F Supp. 504, 508 (D. Conn. 1975)* ("neither in Michigan nor elsewhere does the term 'consequential damages' have a clearly established meaning"). *See also* Caledonia N. Sea Ltd. v. London Bridge Eng'g Ltd., [2000] S.L.T. 1123, 1207 (Sess.) (noting that the meaning of indirect and consequential losses "is a question on which it is difficult to obtain much assistance from authority or dictionary definitions"); Gregory K. Morgan & Albert E. Phillips, *Design Professional Contract Risk Allocation: The Impact of Waivers of Consequential Damages and Other Limitations of Liabilities on Traditional Owner Rights and Remedies, 33 J.C. & U.L. 1, 13 (2006)* (stating that "no one knows what consequential damages are or may be, at least not with predictability or uniformity").

13      *See, e.g., ASCH Webhosting, Inc. v. Adelphia Bus. Solutions Inv., LLC, No. 04-2593 (MLC), 2007 WL 2122044, at *5 (D.N.J. July 23, 2007)*; Marley Cooling Tower Co. v. Caldwell Energy & Envtl., Inc., 280 F Supp. 2d 651,658 & n.3 (W.D. Ky. 2003); *World-Link, Inc. v. Citizens Telecomms. Co., No. 99CIV3054 GEL, 2000 WL 1877065, at *4 (S.D.N.Y. Dec. 26, 2000).* However, exclusionary clauses (like consequential damage waivers) may not always work in the case of an intentional ton or other deliberate act. *See, e.g., Apache Bohai Corp. LDC v. Texaco China BV, 480 F.3d 397, 406 (5th Cir. 2007)* (holding that in accordance with New York public policy, limitations of liability do not apply to intentional or grossly negligent acts); *Kalisch-Jarcho, Inc. v. City of N.Y., 448 N.E.2d 413, 416 (N.Y. 1983)* (finding that an exculpatory clause is unenforceable to excuse intentional wrongdoings).

14      *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 459-60 (Cal. 1994).*

15      *See 86 C.J.S. Torts § 2 (2008)* ("[I]n order to impose tort liability, there must be fault.").

16      *Applied Equip. Corp., 869 P.2d. at 460. See also* Melvin Aron Eisenberg, *The Principle of* Hadley v. Baxendale, 80 CAL. L. REV. 563, 581 (1992) (stating that unlike the contract-based damage rule that limits recovery to losses that were probable and reasonably foreseeable at the time the contract was made, the tort-based damage rule "permits the recovery of all damages when the defendant's conduct is a substantial factor in bringing about the harm, as long as the result was not 'highly extraordinary'" (citing RESTATEMENT (SECOND) OF TORTS § 435 (1964))).

17      *See supra* note 7.

18    G.H. TREITEL, REMEDIES FOR BREACH OF CONTRACT 8 (1988).

19    *Applied Equip. Corp.*, 869 P.2d at 461.

20    *Id.* at 460.

21    *See, e.g.*, Reynolds Metals Co. v. Westinghouse Elec. Corp., 758 F.2d 1073, 1079 (5th Cir. 1985); World Metals, Inc. v. AGA Gas, Inc., 755 N.E.2d 434, 437 (Ohio Ct. App.), *appeal denied*, 754 N.E.2d 262 (Ohio 2001) (unpublished table decision); Smith v. Green, [1875] 1 C.P.D. 92, 94; Robinson v. Harman, [1848] 1 Exch. 850, 855; Victoria Laundry (Windsor) Ltd. v. Newman Indus. Ltd., [1949] 2 K.B. 528, 539.

22    *See* Enter. Oil Ltd. v. Strand Ins. Co. Ltd., [2006] EWHC (Comm) 58, [2006] 1 C.L.C. 33, 49. *See also Applied Equip. Corp.*, 869 P.2d at 460 ("Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable.").

23    *Applied Equip. Corp.*, 869 P.2d at 460. For a further discussion of the rationale, see *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 871 (Colo. 2002) ("The *Hadley* rule is designed to further a fundamental principle of contract law: parties must be able to confidently allocate risks and costs during their bargaining without fear that unanticipated liability may arise in the future, effectively negating the parties' efforts to build these cost considerations into the contract.").

24    Paul S. Turner, *Consequential Damages:* Hadley v. Baxendale *Under the Uniform Commercial Code*, 54 SMU L. REV. 655, 663 (2001).

25    *See* JOSEPH M. LOOKOFSKY, CONSEQUENTIAL DAMAGES IN COMPARATIVE CONTEXT 254 (DJOF Publishing 1996) (1989).

26    (1854) 9 Ex. 341, 156 Eng. Rep. 145.

27    *See, e.g.*, STEWART MACAULAY, JOHN KIDWELL & WILLIAM WHITFORD, CONTRACTS: LAW IN ACTION 110-12 (2d ed. 2003).

28    *See* Lookofsky, *supra* note 25, at 12.

29    *Hadley*, 9 Ex. at 342.

30    *Id.*

31    *See id.* at 344.

32    *Id.* at 342.

33    *Id.* at 342-43.

34    There is controversy about these facts more than 150 years after the case was decided. There is some evidence that Baxendale's clerk was in fact told that the mill was shut down due to the broken crankshaft, but he was apparently not informed that the mill

would remain shut down until the old crankshaft was delivered to the manufacturer so that a new crankshaft could be made. *See* Eisenberg, *supra* note 16, at 570 n.26.

35    *Id*. at 343.

36    *Id.*

37    *See id*. at 342-44.

38    *See id*. at 355-57.

39    *Id*. at 355.

40    *Id*. at 357.

41    *See* Barry E. Adler, *The Questionable Ascent of* Hadley v. Baxendale, 51 STAN. L. REV. 1547, 1554-59 (1999); Eisenberg, *supra* note 16, at 588.

42    *See supra* note 41.

43    *See* Marranzano v. Riggs Nat. Bank of D.C., 184 F.2d 349, 350 (D.C. Cir. 1950) ("The right of the party to a contract to sue when damaged by the other party's violation of it does not depend upon the grant of such right by the terms of the contract itself."); *see also* 17A AM. JUR. 2D *Contracts* § 709 (2008) ("Although the parties may, in their contract, specify a remedy for a breach, that specification does not exclude other legally recognized remedies.").

44    *See* County & Dist. Props. Ltd. v. C. Jenner & Son, [1976] 2 Lloyd's Rep. 728, 737 (QBD) (citing Birmingham & Dist. Land Co. v. London & N. W Ry. Co. (No. 1), (1887) L.R. 34 Ch.D. 261, 276 (CA)).

45    Caledonia N. Sea Ltd. v. London Bridge Eng'g Ltd., [2000] S.L.T. 1123, 1178 (Sess.).

46    Total Transp. Corp. v. Arcadia Petroleum Ltd. (The Eurus), [1996] 2 Lloyd's Rep. 408, 432 (QBD Comm), *aff'd*, [1998] 1 Lloyd's Rep. 351 (CA Civ).

47    *See* Cobalt Operating, LLC v. James Crystal Enters., LLC, No. Civ. A. 714-VCS, 2007 WL 2142926, at *30 (Del. Ch. July 20, 2007) ("In Delaware, damages recoverable under indemnification provisions such as the one involved here include all injurious consequences that were within the contemplation of the parties at the time the contract was made."), *aff'd*, No. 491, 2007, 2008 WL 652142 (Del. Mar. 11, 2008).

48    [1927] 2 K.B. 535.

49    *Id*. at 539 ("Where a contract contains a term that the promisor, if he shall not perform some term of the contract, shall pay a sum ascertained by the contract or ascertainable under its terms, and the promisee claims payment accordingly, the promisor is not called on to make compensation for breaking the contract, he is called on to perform it."). Some commentators in both the U.S. and the U.K. also seem to suggest that indemnity agreements are not subject to *Hadley*'s rule of reasonableness. *See* LANNING BRYER & MELVIN SIMENSKY, INTELLECTUAL PROPERTY ASSETS IN MERGERS AND ACQUISITIONS § 12, at 12.17 (2002); Belinda Doshi & Sarah Thompson, *Warranties and Indemnities in Contracts: Protecting and Exploiting IP*, J. INTELL PROP. L. & PRAC. 377, 379 (2007).

50    *See, e.g.,* Applied Data Processing, Inc. v. Burroughs Corp., 394 F. Supp. 504, 509 (D. Conn. 1975) (citing 5 A. CORBIN, CORBIN ON CONTRACTS § 1011 (1974)); *In re* Enron Corp., 367 B.R. 384, 408 (Bankr. S.D.N.Y. 2007); New Valley Corp. v. United States, 72 Fed. Cl. 411, 414 (2006); Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 214 S.E.2d 155, 160 (Va. 1975); Baylor Univ. v. Sonnichsen, 221 S.W.3d 632, 636 (Tex. 2007).

51    25 C.J.S. *Damages* § 2 (1966), *quoted in* Royal Ins. Co. of Am. v. Insignia Fin. Group, Inc., 751 N.E.2d 164, 170 (Ill. App. Ct. 2001).

52    Petroleo Brasileiro, S.A., Petrobras v. Ameropan Oil Corp., 372 F Supp. 503, 508 (E.D.N.Y. 1974).

53    *New Valley Corp.*, 72 Fed. CI. at 41 (internal quotation marks omitted).

54    Mead Corp. v. McNally-Pittsburg Mfg. Corp., 654 F.2d 1197, 1209 n.17 (6th Cir. 1981).

55    This understanding of "consequential damages" is described in various ways. For example, in one case decided under New York law, consequential damages were defined as "damages which arise from special circumstances that make them probable, although they would be unusual apart from such circumstances." Nat'l Investor Servs. Corp. v. Integrated Fund Servs., Inc., 85 F App'x 779, 781 (2d Cir. 2004) (quoting Coastal Power Int'l, Ltd. v. Transcon. Capital Corp., 10 F Supp. 2d 345, 364 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 163 (2d Cir. 1999)).

56    *See* Roy Ryden Anderson, *Incidental and Consequential Damages*, 7 J.L. & COM. 327, 334 (1987). *See also* U.C.C. § 2-715 (2002) ("Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."); RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. c (1981) ("Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction.").

57    *See* Anderson, *supra* note 56, at 334.

58    Schonfeld v. Hilliard, 218 F.3d 164, 175-76 (2d Cir. 2000).

59    *See, e.g., In re* Enron Corp., 367 B.R. 384, 408 (Bankr. S.D.N.Y. 2007).

60    *See, e.g.*, Eisenberg, *supra* note 16, at 565.

61    Wärtsilä NSD N. Am., Inc. v. Hill Int'l, Inc., 436 F. Supp. 2d 690, 697 (D.N.J. 2006).

62    Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 214 S.E.2d 155, 160 (Va. 1975).

63    Wade & Sons, Inc. v. Am. Standard, Inc., 127 S.W.3d 814, 823 (Tex. App. 2003).

64    Carlisle Corp. v. Med. City Dallas, Ltd., 196 S.W.3d 855, 865-66 (Tex. App. 2006), *rev'd on other grounds*, No. 06-0660, 2008 WL 1145752 (Tex. Apr. 11, 2008).

65    *Wärtsilä*, 436 F. Supp. 2d at 697 (citing *Addressograph-Multigraph Corp. v. Zink*, 329 A.2d 28, 33-34 (Md. 1974)). For another definition of "general" damages, see *City of Milford v. Coppola Constr. Co.*, 891 A.2d 31, 39 (Conn. App. Ct. 2006) ("'General damages are considered to include those damages that flow naturally from a breach, that is, damages that would follow any breach of similar character in the usual course of events.'" (quoting 24 WILLISTON ON CONTRACTS § 64:12 (4th ed. 2006))).

66    *Koufos v. C. Czarnikow Ltd. (The Heron II)*, [1969] 1 A.C. 350, 405-06 (HL 1967). The English courts appear uniform in so defining "consequential damages." *See, e.g.*, Millars Mach. Co. Ltd. v. Way, (1934) 40 Com. Cas. 204 (CA Civ); Saint Line Ltd. v. Richardsons Westgarth & Co., Ltd., (1940) 67 Lloyd's List L.R. 62, 67-69 (KBD); Croudace Constr. Ltd. v. Cawoods Concrete Prods. Ltd., [1978] 2 Lloyd's Rep. 55, 61-62 (CA Civ); British Sugar Plc v. NEI Power Projects Ltd., [1997] C.L.C. 622, 623-25 (QBD); Hotel Servs. Ltd. v. Hilton Int'l Hotels (UK) Ltd., [2000] B.L.R. 235 (CA Civ).
Courts in other common law jurisdictions appear to agree. *See, e.g.*, Sing. Telecomms. Ltd. v. Starhub Cable Vision Ltd., [2006] 2 S.L.R. 195, 218 (Sing. Ct. App.); Rolls-Royce N.Z. Ltd. v. Carter Holt Harvey Ltd., [2005] 1 N.Z.L.R. 324 (C.A.); Westcoast Transmission Co. Ltd. v. Cullen Detroit Diesel Allison Ltd., [1990] 45 B.C.L.R.2d 296, ¶¶ 24-27 (B.C. Ct. App.). *But see* Evtl. Sys. Pty Ltd v. Peerless Holdings Pty Ltd., [2008] VSCA 26, ¶ 87 (rejecting the English line of cases limiting "consequential loss" to the second rule in *Hadley v. Baxendale*, stating that "the true distinction is between 'normal loss', [sic] which is loss that every plaintiff in a like situation will suffer, and 'consequential losses', [sic] which are anything beyond the normal measure ...." The court noted, "[T]he prima facie measure of damages [is] the difference between contract price and market price: this is the normal loss." (internal quotation marks omitted)). Thus, according to this court, a consequential damage waiver would exclude any damages other than market-measured damages.); Peter Wood, *Australia: A Fundamental Change in the Law Concerning Consequential Loss*, MINTERELLISON NEWS ALERT, March 6, 2008, http://www.mondaq.com/article.asp?article_id=57988.
The following U.S. cases follow the traditional approach. *See Wärtsilä NSD N. Am., Inc. v. Hill Int'l, Inc.*, 436 F. Supp. 2d 690, 697 (D.N.J. 2006) (stating that consequential damages "arise from the intervention of 'special circumstances' not ordinarily predictable" (quoting Ryan Inc. E. v. Toll Bros., Inc., 43 F. App'x 601, 604 (4th Cir. 2002))); *City of Milford v. Coppola Constr. Co.*, 891 A.2d 31, 39 (Conn. App. Ct. 2006) ("'Consequential damages ... include those damages that, although not an invariable result of every breach of this son, were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach.'" (quoting 24 WILLISTON ON CONTRACTS § 64:12 (4th ed. 2006))).

67    *Croudace Constr. Ltd.*, [1978] 2 Lloyd's Rep. at 62.

68    Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 214 S.E.2d 155, 160 (Va. 1975).

69    Wade & Sons, Inc. v. Am. Standard, Inc., 127 S.W.3d 814, 823 (Tex. App. 2003).

70    Applied Data Processing, Inc. v. Burroughs Corp., 394 F. Supp. 504, 509 (D. Conn. 1975) (citing 5 A. CORBIN, CORBIN ON CONTRACTS § 1011 (1974)).

71    *See* Eisenberg, *supra* note 16, at 565.

72    *See, e.g.*, Penncro Assocs., Inc. v. Sprint Spectrum, L.P., 499 F.3d 1151, 1156 (10th Cir. 2007); Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1071 n.5 (8th Cir. 2000); ViaStar Energy, LLC v. Motorola, Inc., No. 1:05-cv-1095-DFH-WTL, 2006 WL 3075864, at *5 (S.D. Ind. Oct. 26, 2006); DP Serv., Inc. v. AM Int'l, 508 F. Supp. 162, 167 (N.D. Ill. 1981); Cont'l Holdings, Ltd. v. Leahy, 132 S.W.3d 471, 475 (Tex. App. 2003); lino Shipbuilding & Eng'g Co. v. Hellenic Lines, Ltd., 175 N.Y.S.2d 750, 754 (N.Y. App. Div. 1958), *aff'd*, 157 N.E.2d 726 (N.Y. 1959). *See also* Sha-shana N.L. Crichton, *Distinguishing Between Direct and Consequential Damages Under New York Law in Breach of Service Contract Cases*, 45 HOW. L.J. 597, 601 (2002) ("Lost profits and lost future earnings are categorized as direct damages in some instances, and consequential damages in others.").

73    Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc., 490 S.E.2d 124, 126 (Ga. Ct. App. 1997) (quoting Franklin v. Demico, Inc., 347 S.E.2d 718, 721 (Ga. Ct. App. 1986), and Williams v. Kerns, 265 S.E.2d 605, 609 (Ga. App. 1980)), *aff'd*, 543 S.E.2d 32 (Ga. 2001).

74    *See, e.g., supra* note 72. In the classic English case of *Victoria Laundry (Windsor) Ltd. v. Newman Industries Ltd.*, [1949] 2 K.B. 528, the court apparently deemed ordinary lost profits natural and foreseeable under the first branch of *Hadley* and did not require

special notice, but the extraordinary profits that would have been obtainable from an available and highly lucrative government contract were not recoverable under that branch because there was no notice. *See id.* at 542. *See also* Transfield Shipping Inc of Panama v. Mercator Shipping Inc of Monrovia (The "Achilleas"), [2007] 2 Lloyd's Rep. 555 (CA Civ) (holding that loss of profits from loss of new ship charter contract because of ship's late return by current charterer are losses arising under first, not second, branch of *Hadley*).

75    *See, e.g.*, Cobalt Operating, LLC v. James Crystal Enters., LLC, No. Civ. A. 714-VCS, 2007 WL 2142926, at *30 (Del. Ch. July 20, 2007), *aff'd*, No. 491, 2007, 2008 WL 652142 (Del. Mar. 11, 2008).

76    In the "boilerplate" consequential damage waiver, this distinction is not made unless "[including]" is eliminated, "[or any]" is included, and the terms "lost profits" and "lost revenues" are thereby treated as standalone damage exclusions.

77    Courts tend to do this as well. *See, e.g.*, Topp, Inc. v. Uniden Am. Corp., No. 05-21698-CIV, 2007 WL 3256849, at *3 (S.D. Fla. Aug. 23, 2007); Aurora Health Care, Inc. v. CodoniX, Inc., No. 03-C-612, 2006 WL 1589629, at *7 (E.D. Wis. June 2, 2006); Roneker v. Kenworth Truck Co., 977 F. Supp. 237, 240 (W.D.N.Y. 1997); Scott v. Palermo, 649 N.Y.S.2d 289, 289 (N.Y. App. Div. 1996). So, deal counsel can perhaps be excused for this common misconception. Notwithstanding the common linking between all lost profits and consequential damages, the distinction between a clause that lists lost profits as a subset of consequential damages and a clause that lists lost profits as a separate category of excluded losses can, in fact, be a critical one. *See, e.g.*, Penncro Assocs., Inc., 499 F.3d at 1155-62; Spinal Concepts, Inc. v. Curasan, No. 3:06-CV-0448-P, 2006 WL 2577820, at *5-6 (N.D. Tex. Sept. 7, 2006); Sing. Telecomms. Ltd. v. Starhub Cable Vision Ltd., [2006] 2 S.L.R. 195, 218 (Sing. Ct. App.); Ease Faith Ltd. v. Leonis Marine Mgmt. Ltd., [2006] EWHC (Comm) 232, [2006] 1 Lloyd's Rep. 673, ¶¶ 139-50.

78    *See supra* note 22 and accompanying text.

79    *See supra* note 40 and accompanying text.

80    *See supra* notes 45-49 and accompany text.

81    *See supra* note 13 and accompanying text.

82    *See* Morgan & Phillips, *supra* note 12, at 13.

83    Any discussion of consequential damages invariably involves the use of a hypothetical. Typically a hypothetical in this area is a situation in which wild and ruinous losses are incurred by a contracting party and "caused" by a given breach for which no one would willingly make him- or herself liable. Properly understood, most of the wild and ruinous losses imagined in any such hypothetical are actually non-recoverable "remote" damages (i.e., damages that are not natural, probable, and reasonably foreseeable), not recoverable "consequential" damages arising from the buyer's special circumstances contemplated by the parties at the time they entered into the contract. But we hope our own hypotheticals illustrate the difference between non-recoverable "remote" damages and recoverable "consequential" damages and between "direct" damages and "consequential" damages.

84    This hypothetical fact pattern is loosely based on the English case of *Smith v. Green*, [1875] 1 C.P.D. 92, 94, the Scottish case of *Waddington v. Buchan Poultry Products, Ltd.*, [1963] S.L.T. 168 (Sess.), and the U.S. case of *Baden v. Curtiss Breeding Service*, 380 F. Supp. 243 (D. Mont. 1974). For other hypotheticals with some similar facts, see Lookofsky, *supra* note 25, at 64, 253 (*Contagious Abortion* hypothetical and *Bull Semen* hypothetical), and Treitel, *supra* note 18, at 167 (Pothier cow hypothetical).

85    For a discussion of extra-contractual claims of fraud in the context of contractual limitations on available remedies, see West, *supra* note 2.

86    *See supra* note 21.

87    *See supra* note 22. The two branches of *Hadley*'s rule of reasonableness are actually two different means of establishing foreseeability. Damages from the first branch (i.e., direct damages) are damages foreseeable because they occur in the "great multitude of such cases." Damages from the second branch require evidence of actual knowledge by the breaching party of the non-breaching party's "special circumstances" to hold the breaching party responsible for such damages. "[T]here are not so much two rules, as two means by which a defendant may possess the knowledge necessary to make his liability a fair one. That knowledge may either arise from the 'usual course of things', [sic] or from the communication of special circumstances ...." *See Transfield Shipping*, 2 Lloyd's Rep. at 567, 570.

88    Note, however, that the cost of repair or restoration must be reasonable and is generally limited by the diminution in value attributable to the breach. *See* Jacob & Youngs, Inc. v. Kent, 129 N.E. 889, 891 (N.Y. 1921). In a case for breach of a construction contract, Judge Benjamin Cardozo set forth what is now referred to as the doctrine of economic waste, writing: "[T]he measure of the allowance is not the cost of replacement, which would be great, but the difference in value, which would be either nominal or nothing .... The owner is entitled to the money which will permit him to complete, unless the cost of completion is grossly and unfairly out of proportion to the good to be attained. When that is true, the measure is the difference in value." *See id. See also* Check Cashers Express, Inc. v. Crowell, 950 So. 2d 1035, 1042 (Miss. Ct. App. 2007) ("The measure of damages for breach of contract and property damage can be either the reasonable cost of replacement or repairs, or diminution in value. The plaintiff must prove either of these measures with a reasonable certainty and the damage award must not unjustly enrich the plaintiff." (citation omitted)); Meade v. Kubinski, 661 N.E.2d 1178, 1184 (Ill. App. Ct. 1996) ("Where the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages. The purpose of this rule is 'to prevent windfall recoveries.'" (quoting Ceres Terminals, Inc. v. Chi. City Bank & Trust Co., 635 N.E.2d 485, 502 (Ill. App. Ct. 1994))).

89    *See, e.g.,* Waddington v. Buchan Poultry Prods., Ltd., [1963] S.L.T. 168 (Sess.).

90    *See* Victoria Laundry (Windsor) Ltd. v. Newman Indus. Ltd., [1949] 2 K.B. 528, 540 (stating that in order to make a breaching party liable for damages under the *Hadley* rule, "it is not necessary that he should actually have asked himself what loss is liable to result from a breach .... It suffices that, if he had considered the question, he would as a reasonable man have concluded that the loss in question was liable to result."); Lawrence v. Will Darrah & Assocs., Inc., 516 N.W.2d 43, 46 n.8 (Mich.) ("A reasonable test would require plaintiff to show only that defendant knew or should have known, from the nature of the transaction, that plaintiff would enter collateral transactions based upon it of the type actually entered. If this was foreseeable, then it is reasonable to hold defendant liable for plaintiff's losses."), *reh'g denied*, 519 N.E.2d 898 (Mich. 1994) (unpublished table decision).

91    *Victoria Laundry*, [1949] 2 K.B. at 540 ("[T]o make a particular loss recoverable, [it need not] be proved that upon a given state of knowledge the defendant could, as a reasonable man, foresee that a breach must necessarily result in that loss. It is indeed enough ... if the loss (or some factor without which it would not have occurred) is a 'serious possibility' or a 'real danger.'"); Manouchehri v. Heim, 941 P.2d 978, 983 (N.M. Ct. App. 1997) (holding that the buyer of an x-ray machine did not need to tell the seller the amount of income he would have earned from use of the machine in order to recover consequential damages "so long as the consequence of lost income was reasonably foreseeable. The law does not require those who enter into contracts to disclose to other parties the profits they expect to make from the contracts."); *Waddington*, 1963 S.L.T. at 171 ("If a party to a contract is aware that the breach of a stipulation which he has undertaken to observe is likely to result in physical injury to the property or person in respect of which, or of whom, the stipulation is made, I do not think he can be heard to say, a breach of contract being admitted, that he did not know the extent or consequences of the injury which his breach of stipulation was likely to inflict or cause. All the more so when the injury is a direct physical consequence of the breach.").

92    *See supra* notes 46-49 and accompanying text.

93    Had our rancher hired a veterinarian to attempt to cure the problem (albeit unsuccessfully) and incurred costs and expenses in responding to governmental inquiries into the cause and extent of the infection, these costs and expenses too would have constituted "incidental" losses or damages.

94    *But see* Vann v. McCord, 114 So. 418, 419-20 (Ala. Ct. App. 1927) (stating that the fact that an infected hog, which was warranted to be free of disease, would be placed with other hogs is a special circumstance that must be communicated to the seller of the

infected hog in order for the seller to be liable to the buyer for the loss of the buyer's other hogs). In our example, of course, the specific purpose of acquiring the bull was to place it with other cattle for breeding purposes. If, in our hypothetical, the loss in profits from the anticipated calves were treated as consequential damages, the fact that the breeder and the rancher both contemplated that the purchased bull was to be placed with the rancher's herd of heifers would be irrelevant if the rancher had waived all consequential damage claims against the breeder.

95    In the United Kingdom, purely commercial disputes are now decided by a judge without a jury, a practice that was not in effect when *Hadley* was decided. *See* Supreme Court Act, 1981, c. 54, § 69 (U.K.).

96    *See, e.g.*, Waddington v. Buchan Poultry Prods., Ltd., [1963] S.L.T. 168 (Sess.).

97    The market value of the business as received is the value of the business without the long-term contract and with the underground utility easement, missing required permit, and debarment from government contracts.

98    *See* S & S Textiles Int'l v. Steve Weave, Inc., No. 00 CIV. 8391 DLC, 2002 WL 1837999, at *10 (S.D.N.Y. Aug. 12, 2002) ("[A] party may not recover twice on the same obligation."); *see also* Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Se. Tex., No. 09-06-439 CV, 2007 WL 4991345, at *8 (Tex. App. Mar. 13, 2008) ("Double recoveries are not ordinarily allowed under law."); 22 AM. JUR. 2D *Damages* § 36 (2008) ("There cannot be double recovery for the same loss, even though different theories of liability are alleged in the complaint.").

99    Evtl. Sys. Pty Ltd v. Peerless Holdings Pty Ltd., [2008] VSCA 26, ¶ 93.

100    *Id.* at ¶¶ 87-88.

101    *Id.*

102    *See supra* notes 51-54; 58-60; 77.

103    *See supra* notes 45-49 and accompanying text.

104    *See* Hotchkiss v. Nat'l City Bank of N.Y., 200 F. 287, 293 (S.D.N.Y. 1911) ("A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent."), *aff'd*, 231 U.S. 50 (1913).

105    However, we realize that it is unlikely that lawyers and deal professionals will heed this recommendation.

106    *See supra* note 10.

**End of Document**                                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.