WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.<br><br>      Plaintiff,<br><br>  v.<br><br>Federal Home Loan Bank of New York<br><br>      Defendants. | Adv. Proc. No. 15-_____<br><br>**ADVERSARY**<br>**PROCEEDING**<br>**<u>COMPLAINT</u>** |

Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator" or "Plaintiff"), on behalf of itself and Lehman Brothers Special Financing Inc. ("LBSF") brings this adversary proceeding against Defendant Federal Home Loan Bank of New York ("FHLB") to recover in excess of $150 million, plus interest, that remains due and owing as a result of the termination by FHLB of a portfolio of 356 interest rate derivative transactions (the "Swaps") and alleges the following on knowledge as to LBSF's and LBHI's own acts and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.       For over six years, FHLB has hidden behind a simple but false story that permitted it to avoid paying more than $150 million that was due to LBSF when FHLB terminated its Swaps in 2008.  FHLB then compounded this failure by filing four proofs of claim (the "Original Claims" ) totaling $130 million against LBSF and LBHI, which asserted incomplete and false facts while relying on a fallacious legal theory.  LBHI and LBSF seek to compel the payment that has been due since 2008, together with contractual interest, and to disallow and expunge FHLB's claims.

2.       As was its right, FHLB chose September 18, 2008 as the "Early Termination Date" for the Swaps, after having spent the three days following LBHI's filing of its chapter 11 petition on September 15, 2008 (the "LBHI Petition Date") carefully considering its options. Notwithstanding FHLB's own choice of September 18th, FHLB failed to value any of the Swaps as of that date, as required by the contract and section 562 of the Bankruptcy Code (the "Code"). Instead, FHLB claims to have valued the Swaps over an extended period following the Early Termination Date.  FHLB's Original Claims contended that once it finished this exercise, LBSF owed it approximately $65 million, as did LBHI on its guarantee.

1

3.      The law and the governing ISDA Master Agreement,[1] however, require that once FHLB decided to terminate the Swaps, it must determine its total losses or gains (*i.e.*, its "Loss") *as of* that Early Termination Date "unless not reasonably practicable," and, if that were the case, FHLB was required to value its Loss "as of the earliest date thereafter that is reasonably practicable." The Master Agreement also requires that the Non-defaulting Party "reasonably determine[]" its Loss "in good faith"—a requirement that is also imposed by New York law. FHLB apparently now recognizes these obligations in seeking to amend its Original Claims by, in part, valuing certain apparently "unreplaced" swaps as of the Early Termination Date rather than as of later dates as in its Original Claims.

4.      When a swap agreement involves a chapter 11 debtor, like LBSF, section 562 of the Code is even more stringent in requiring a swap participant like FHLB to measure its Loss as of the Early Termination Date, unless it meets its burden of proof to show that there were no commercially reasonable determinants of value as of that date.

5.      FHLB's decision to value the Swaps over a period of time after the Early Termination Date was commercially unreasonable and inconsistent with both the language of the governing documents and the Code. For more than six years, FHLB has used these incorrect valuation dates to justify both its failure to pay anything to LBSF and its claims for the return of approximately $65 million in collateral that was held by LBSF under the Swaps.

6.      Given FHLB's failure to properly calculate its Loss, the fairest determinant of its Loss would be a market-standard, close of business, mid-market valuation (the same basis upon which FHLB and LBSF determined their respective collateral obligations) as of the Early

---

[1] Capitalized terms used but not defined herein shall have the meanings given them in the 1992 form (Local Currency-Single Jurisdiction) ISDA Master Agreement, dated as of April 5, 2000 (together with all schedules, annexes, and exhibits thereto, the "Master Agreement").

Termination Date.  If the Swaps were valued properly as of the Early Termination Date on this basis, FHLB should have paid more than $150 million to LBSF in 2008.

7.       FHLB used the fluctuation in interest rates in the days following the Early Termination Date to significantly undervalue the Swaps when calculating the termination payment.

8.       FHLB repeatedly claimed that calculating its Loss on the Early Termination Date was impossible.  However, there can be no question that the interest rate swap markets were open with robust trading on September 18, 2008.  Indeed, FHLB belatedly has admitted it can and has valued 27 of the Swaps it never replaced as of that date.  FHLB could have valued all of the Swaps on the Early Termination Date as required, but it deliberately chose not to do so. FHLB alone is solely responsible for its failure to timely value the Swaps.

9.       FHLB also has claimed that the delay in valuing the terminated Swaps was unavoidable because a drawn-out process of entering into replacement transactions was the only commercially reasonable approach.  Yet, by deciding to terminate all of the Swaps, but not to replace or rehedge any on September 18th, FHLB chose to accept the future market risk in the portfolio for its own account.  Any subsequent changes in market values for the Swaps are thus irrelevant to the calculation of the termination amount owed to LBSF.

10.       The Master Agreement is designed to relieve both parties of any continuing obligations under the Swaps following termination and, for this reason, explicitly requires the Non-defaulting Party promptly to crystalize the value of the terminated Swaps "as of" the Early Termination Date.  In clear words, the Defaulting Party is to be spared any risk of changing market value of the Swaps after the Early Termination Date.  Permitting FHLB to value the Swaps "as of" dates other than the Early Termination Date would eviscerate LBSF's protections

3

under the Master Agreement and effectively provide FHLB with a free option.  FHLB in fact did

ride the market at LBSF's expense and then chose to value the Swaps as of dates more favorable

to itself and less favorable to LBSF.  This is exactly the kind of optionality that the *Metavante*

and *American Home Mortgage* decisions rejected, as explained below.

11.    Judge Peck, while presiding over these Chapter 11 Cases, recognized Congress'

"stated rationale that the immediate termination for default and the netting provisions are critical

aspects of swap transactions and are necessary for the protection of all parties in light of *the*

*potential for rapid changes in the financial markets*."  Hr'g Tr. at 112, *In re Lehman Bros.*

*Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2009 [ECF No. 5261] ("*Metavante*")

(emphasis added) (citing Senate Report number 101-285 at 1 (1990)).

12.    The *Metavante* decision echoes the rationale in the *In re American Home*

*Mortgage Holdings, Inc.* decision, which emphasized that section 562 was designed to prevent

"moral hazard," which could result from the counterparty holding assets at little or no risk to

itself (and instead shifting the risk to the debtor) until some future date when the price of the

asset rose:

> Section 562 serves to align the risks and rewards associated with an investment in
> those assets.  By fixing damages as of the date the . . . agreement is terminated,
> accelerated, etc. the Code attempts to prevent a moral hazard.  If damages were
> measured at some future date, the [Non-defaulting Party] could hold the asset at
> little or no risk.  If the price of the asset were to rise, the [Non-defaulting Party]
> would capture that increase up to the full amount owed under the agreement.  If
> the price were to fall, however, the [Non-defaulting Party]'s losses would be
> covered because its . . . claim would rise accordingly.  Even if such a claim were
> not to be paid at 100%, there would certainly be instances where the discounted
> claim is sufficiently large to motivate the [Non-defaulting Party] to shift the risk
> to the debtor.  ***In effect, this would make the debtor an insurer of the [Non-***
> ***defaulting Party]'s investment even though the debtor has no control over the***
> ***management of the asset—thus, the moral hazard.***

4

411 B.R. 181, 194 (Bankr. D. Del. 2009) (emphasis added), *aff'd*, 637 F.3d 246 (3d Cir. 2011).[2]
In *American Home Mortgage*, the Third Circuit agreed with the Bankruptcy Court that the
counterparty's "interpretation involve[d] a moral hazard that is counter to the policy of
preserving liquidity." 637 F.3d at 258.

13.    Here, FHLB's deliberate delay in measuring Loss and subsequent posture that
LBSF should be forced to bear any loss resulting from the significantly diminished market value
of the Swaps over the extended period constitute *the exact "moral hazard"* identified by the
*American Home Mortgage* court. FHLB's conduct of "riding the market" at LBSF's expense—
when FHLB should have valued the Swaps as of the Early Termination Date—is inconsistent
with the Master Agreement as well as the letter and spirit of the Code.

14.    Plainly, FHLB's Loss calculations, which disregarded the Master Agreement's
and the Code's clear mandates to value the Swaps *as of* the Early Termination Date, were not
reasonably determined in good faith and should be disregarded. FHLB, therefore, owes LBSF a
principal payment of more than $150 million plus contractual interest, which continues to accrue
until payment in full.[3]

## JURISDICTION AND VENUE

15.    On September 15, 2008, and periodically thereafter, LBHI and certain of its
subsidiaries, including LBSF, commenced in this Court voluntary cases under chapter 11 of the
Code (the "Chapter 11 Cases"). A little over two weeks after the LBHI Petition Date, LBSF
filed its own chapter 11 petition on October 3, 2008.

---

[2] The *American Home Mortgage* decision addressed section 562's timing requirement and rejected a counterparty's
argument that its inability to sell the assets in question prevented it from complying with the timing provisions of
section 562. *Id.*

[3] Specifically, the value of the Swaps on the Early Termination Date after accounting for FHLB's posted collateral
and missed payments under the Swaps resulted in FHLB owing LBSF more than $150 million in principal.

16.     This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Rules"), as well as sections 501, 502, 510, and 562 of the Code, and New York law, which governs the Master Agreement pursuant to Part 4(h) of the Schedule.

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

18.     The Court has personal jurisdiction over Defendant FHLB.  FHLB has consented to this Court's jurisdiction by filing its four Original Claims:  Claim Nos. 19165 and 42291 against LBSF and Claim Nos. 19166 and 42290 against LBHI.

19.     This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

20.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11 Cases are pending in this district.

## THE PARTIES

21.     LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.  On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

22.     LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

23.     FHLB is a congressionally chartered, wholesale Federal Home Loan Bank with its principal place of business in New York, New York.  It is part of the Federal Home Loan Bank System, a national wholesale banking network of 12 regional, stockholder-owned banks.  As of

December 31, 2014, FHLB had over $6.5 billion in capital; FHLB made over $314 million in net income in 2014.

## BACKGROUND

### A.    The Master Agreement and the Swaps.

24.    The Master Agreement provides the basic terms for the parties' contractual relationship, while the "confirmations" set forth the specific economic details of particular transactions.  As of September 15, 2008, LBSF and FHLB had entered into 356 separate, unmatured Swaps pursuant to the Master Agreement, each memorialized by a written confirmation.  The Swaps were primarily interest rate swaps, presumably intended to hedge the risk involved with FHLB's floating interest-rate exposures, and included different types of derivatives instruments including regular and cancelable swaps,[4] generally with FHLB as the fixed rate payer and LBSF as the floating rate payer.

25.    Three days following LBHI's Petition Date, on September 18, 2008, FHLB hand-delivered to LBSF a termination notice (the "Early Termination Notice"), designating September 18, 2008 as the Early Termination Date under the Master Agreement and effectively terminating all outstanding Swaps.  The Master Agreement provides the Non-defaulting Party with the sole discretion to designate an "Early Termination Date" of its choosing following the occurrence of an Event of Default.  *See* Master Agreement §§ 5, 6.

26.    The Schedule to the Master Agreement provides that the payment owed upon early termination will be calculated using "Loss and the Second Method."  Master Agreement at Schedule at Part 1(f).  The Master Agreement defines "Loss" as "an amount that [the Non-

---

[4] A cancelable swap permits one of the counterparties to terminate the Swap on one or more predetermined dates during the life of the Swap.  FHLB did not rely on this option in terminating the cancelable Swaps and instead terminated all its outstanding Swaps with LBSF on the basis of LBHI's bankruptcy filing.

defaulting] party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this [Master] Agreement or that . . . group of Terminated Transactions." Master Agreement § 14. Of critical importance to this dispute, the Master Agreement also provides that in calculating Loss, a "party will determine its Loss *as of the relevant Early Termination Date*, or, if that is not reasonably practicable, as of the *earliest date thereafter* as is reasonably practicable." *Id.* (emphasis added).

27.    The "Second Method" provides for the Non-defaulting Party (here, FHLB) to pay "the absolute value" of its net gain or loss under the Transaction to the Defaulting Party. *Id.* § 6(e)(i). If the amount of Loss is a positive number, it would be payable *to* the Non-defaulting Party, but where Loss is a negative number, the absolute value of such number would be payable *to* the Defaulting Party *by* the Non-defaulting Party. *See id.* In other words, the party that is "in the money" on the Early Termination Date – here LBSF – has a right to an early termination payment even if it is the Defaulting Party. Thus, the termination payment provisions selected in the Master Agreement are not designed to punish the Defaulting Party or deprive it of the benefits accrued under the Swaps.

28.    Here, because LBSF was "in the money" on the terminated Swaps—meaning that the present value of FHLB's expected future payments from and after the Early Termination Date under the Swaps was much greater than the present value of LBSF's expected future payments—LBSF was entitled to a substantial early termination payment from FHLB.

### B.    FHLB Violates the Master Agreement and Section 562 of the Code and Harms LBSF Through Its Flawed Valuation of the Early Termination Payment.

29.    On December 1, 2008, over two months after receiving the Early Termination Notice, LBSF received a statement (the "Calculation Statement") from FHLB containing its calculation of the termination payment with respect to the Swaps pursuant to section 6(d)(i) of

the Master Agreement.  In preparing the Calculation Statement during the months following the

Early Termination Date, FHLB stated that it had valued most, but not all, of the Swaps by

referencing replacement transactions it entered into over an extended period *following* the Early

Termination Date, *i.e.*, from September 19, 2008 to September 30, 2008.

30.     In the Calculation Statement and in its Original Claims, FHLB asserted that it did

not replace approximately 71 of the Swaps.  Now FHLB admits this was not true, and that it had

actually replaced 44 out of those 71 transactions between October 1 through November 17,

2008—prior to sending LBSF the Calculation Statement dated November 26, 2008 and well

before filing the Original Claims—as explained below.  FHLB claimed it calculated the values of

those allegedly "unreplaced" 71 Swaps using models, but, again, FHLB chose not to use the

Early Termination Date, September 18, 2008.  Instead it ran the models to calculate the values of

those 71 allegedly unreplaced Swaps as of September 19th.  (FHLB recently informed LBSF that

it intends to amend its valuation for those 71 transactions.  *See infra* at Part C.)

31.     Pursuant to this methodology of accounting for replacement values over an

extended period following the Early Termination Date and then using modeled values as of

September 19th for the 71 allegedly "unreplaced" Swaps, FHLB claimed in its Calculation

Statement that it was owed a total of $64,497,844.43 by LBSF after adjusting for posted

collateral and missed payments under the Swaps.

32.     Due to significant moves in the interest rates market in the days following the

Early Termination Date, FHLB's decision to value the Swaps as of later dates led it to massively

understate the termination values of the Swaps.  The termination values FHLB determined as of

those later dates were hundreds of millions of dollars different from the values of the Swaps as of

the Early Termination Date.  Consequently, not only was FHLB's valuation unreliable and not

commercially reasonable, but FHLB also failed to comply with the plain timing requirements for

valuation set forth in the Master Agreement and section 562 of the Code.

33.    The Master Agreement provides in the definition of Loss that a "party will

determine its Loss *as of the relevant Early Termination Date*, or, if that is not reasonably

practicable, as of the earliest date thereafter as is reasonably practicable." Master Agreement

§ 14 (emphasis added). The primary motivation for this time constraint requiring the Non-

defaulting Party to determine Market Quotation or Loss *as of* the Early Termination Date or as

soon as reasonably practicable thereafter is to prevent an inaccurate valuation.

34.    The strict date requirement in the Master Agreement is reinforced by section 562

of the Code, which also requires that a terminated swap be valued as of the termination date.

Section 562 is even more protective of a chapter 11 debtor in that it expressly places the burden

on the non-debtor swap participant (here, FHLB) to show that commercially reasonable

determinants of value were not available on the Early Termination Date before it will be

permitted to use a later date. Specifically, section 562 provides as follows:

> (a) If the trustee rejects a swap agreement . . . or if a . . . swap
> participant liquidates, terminates, or accelerates such . . .
> agreement, ***damages shall be measured as of the earlier of—***
>
> (1) the date of such rejection; or
>
> (2) ***the date or dates of such liquidation, termination, or
> acceleration.***
>
> (b) If there are not any commercially reasonable determinants of
> value as of any date referred to in paragraph (1) or (2) of
> subsection (a), damages shall be measured as of the earliest
> subsequent date or dates on which there are commercially
> reasonable determinants of value.
>
> (c) For the purposes of subsection (b), if damages are not
> measured as of the date or dates of rejection, liquidation,
> termination, or acceleration, and the . . . swap participant . . . or the
> trustee objects to the timing of the measurement of damages— . . .

10

(2) *the . . . swap participant*, in the case of an objection by the trustee, ***has the burden of proving that there were no commercially reasonably determinants of value as of such date or dates***.

11 U.S.C. § 562(a) (emphases added).

35.    FHLB insists that it was impossible to value its Loss on the Early Termination Date.  Its claim rings hollow in light of the clear evidence that valuation was possible on the Early Termination Date, including FHLB's recent indication that it will amend its valuation of 27 of the Swaps to be as of that date, as well as historical trading data.  Indisputably, the markets were open and functioning in an orderly manner on September 18, 2008, and trades were being executed.  All broker-dealers were quoting and trading interest rate swaps on that day.  The Swaps could have been valued and rehedged or even replaced on September 18, 2008.

36.    FHLB's delay resulted in a calculation that did not accurately reflect the value of the Swaps.  The chart below shows the valuation as of various dates in September 2008 of a simple swap, which is a useful proxy for how the FHLB Swaps would have changed in value over this time period.[5]  The chart shows that the market value of the proxy swap was significantly higher on September 18, 2008 and fell rapidly after the Early Termination Date.  As the value movements depicted on the chart below demonstrate, FHLB's deliberate choice to measure its Loss on several dates after the Early Termination Date dramatically lowered the termination value of the Swaps to LBSF's detriment.

---

[5] The chart uses standard Bloomberg models to value $10.25 billion notional of an eight-year, non-call one year, cancelable swap with a fixed rate of 4.175%.



37.    The chart above shows that by relying on data from the days following the Early

Termination Date, FHLB would be able to calculate an amount that vastly underestimated the

termination value of the swaps.[6]  By doing so, FHLB significantly prejudiced LBSF and its

creditors, and its valuation was unreliable and not commercially reasonable.

38.    As the *In re American Home Mortgage Holdings* court recognized, the Code

protections in section 562 are designed to avoid the moral hazard of allowing the Non-defaulting

---

[6] LBSF has calculated that FHLB owes it a termination payment of more than $150 million in principal based on the market value of the Swaps on the Early Termination Date after adjusting for the collateral that FHLB had posted with LBSF and missed payments under the Swaps, among other things.

Party to play the market at the defaulting party's expense. *See* 411 B.R. at 191. FHLB's conduct here implicates the exact moral hazard that the *American Home Mortgage Holdings* court warned against.

39.     If the Code and the contract did not require FHLB to value the Swaps as of the Early Termination Date it had designated, FHLB would have the economic incentive to play the market at LBSF's risk. If the value of the Swaps moved in FHLB's favor, it could choose to value the Swaps as of later dates to reduce its payment obligation to LBSF. If the value of the Swaps moved against FHLB, it could simply value the Swaps as of the Early Termination Date. If this latter scenario had occurred, it is highly unlikely that LBSF ever would have learned of the existence of FHLB's late replacement swaps.

40.     Here, the former scenario occurred, and FHLB has not paid LBSF a single penny of the substantial termination payment it is owed. By failing to measure its Loss as of the Early Termination Date, as both the Master Agreement and section 562 require, FHLB materially harmed LBSF, breached the Master Agreement, did not act in good faith, and violated section 562.

### C.      FHLB Files Claims in this Court Based On a Fallacious Legal Theory And That Asserted Incomplete and False Facts.

41.     In September and October 2009, about ten months after completing its replacement transactions and sending LBSF its Calculation Statement, FHLB filed its four Original Claims to recover the amounts FHLB asserts it is owed in connection with the Swaps – Original Claim numbers 19165 (for $65,073,667) and 42291 (for $65,489,786.59) against LBSF, and Original Claim numbers 19166 (for $65,073,667) and 42290 (for $64,889,951.59) against LBHI.

42.    Nearly six years later, on May 5, 2015, FHLB notified LBSF of its intent to file amended proofs of claims in the amounts of $45,491,534.16 against LBSF, and $44,891,699.16 against LBHI, both of which also include a claim for "unliquidated damages and interest" (together, the "Proposed Amended Claims").  The Plan Administrator, LBHI, and LBSF have agreed not to oppose FHLB's motion to file the Proposed Amended Claims on the condition that the Plan Administrator, LBHI, and LBSF expressly reserve, and do not waive, any and all rights, claims, defenses, challenges, and objections on any and all grounds relating to the validity, enforceability, and amount of the Original Claims and the Proposed Amended Claims.  LBSF expects that FHLB will move to file its Proposed Amended Claims with the Court shortly.

43.    As a threshold matter, there is no basis for any FHLB claim against LBSF or LBHI.  FHLB is not entitled to a claim in *any* amount because LBSF was "in the money" on the Early Termination Date, and, for that reason alone, FHLB's Original Claims and Proposed Amended Claims should be disallowed and expunged.

44.    FHLB's Proposed Amended Claims reveal that it actually had entered into replacement transactions for 44 of the 71 allegedly "unreplaced" Swaps.  If FHLB had accounted for those actual replacements in its Calculation Statement, its "Loss" would have been significantly lower by millions of dollars in LBSF's favor.  Yet, FHLB never disclosed these facts in either its Calculation Statement or in its Original Claims filed with the Court.

45.    Indeed, FHLB affirmatively represented to the Court that its Original Claims were based on its valuation of the Swaps using replacement transaction values—but FHLB deliberately excluded the 44 actual replacement transactions it executed between October 1 and November 17, 2008 from that calculation.  If FHLB consistently had applied its alleged "methodology" of relying on delayed (after the Early Termination Date) replacement values to

14

calculate its Loss (which is incorrect and violates the Master Agreement and section 562 as explained above), FHLB would have calculated a purported "claim" amount millions of dollars lower than actually reflected in the Original Claims FHLB filed with the Court.

46.    Moreover, the supporting documentation FHLB filed along with its Original Claims stated that FHLB obtained valuations from Principia Partners LLC based on modeled September 19, 2008 values of those 71 "unreplaced" Swaps.  Yet, under its incorrect replacement-value-always-controls theory, FHLB would have no possible reason to use a model to value 44 of those 71 Swaps, because – over ten months before filing the Original Claims – FHLB had entered into actual replacement swaps, leaving only 27 swaps "unreplaced" and in need of valuation.  FHLB also arbitrarily chose to model the value of those allegedly "unreplaced" swaps as of September 19th, rather than as of the Early Termination Date.

47.    FHLB's supporting documentation for the Original Claims also purportedly included "True Copies of Replacement Trade Confirmations," but FHLB did not include trade confirmations for the 44 Swaps that FHLB replaced in October and November 2008.  FHLB has failed to explain why its Original Claims disregarded the actual replacement values for those 44 trades, why FHLB told an incorrect and false story to the Court, including purporting to attach "all" the confirmations for replaced trades while purposefully excluding confirmations for 44 of those replacement Swaps, and why it chose to value those "unreplaced" transactions as of September 19th.

48.    FHLB's Calculation Statement and Original Claims demonstrate that FHLB cherry picked when it wanted to rely on replacement transactions and when it wanted to rely on model valuations for the Swaps.  FHLB also hid the existence of its 44 late replacement transactions until very recently.  Its methodology is severely flawed based on the plain terms of

15

the Swap Agreement and section 562 as described above—and is additionally flawed because FHLB inconsistently relied on replacement values. If FHLB were going to adopt the (flawed) theory that its Loss should be measured based on delayed actual replacement values of the Swaps, it cannot deliberately disregard the millions of dollars of value it obtained when it replaced 44 of the Swaps in October and November of 2008. For all these reasons, FHLB's Original Claims are based on false facts and inconsistent methodology.

49.    The filing of a false or fraudulent claim constitutes an abuse of the claims process as well as an attempted fraud upon the court. *In re Varona*, 388 B.R. 705, 717 (Bankr. E.D. Va. 2008). The consequences of filing a false claim include having the claim equitably subordinated. 11 U.S.C. § 510(c); *ABF Capital Mgmt. v. Kidder Peabody & Co* (*In re Granite Partners*), 210 B.R. 508 (Bankr. S.D.N.Y. 1997) (listing examples of equitable subordination of claims "based upon a finding of actionable wrongdoing" and citing *In re 604 Columbus Ave. Realty Trust*, 119 B.R. 350, 377 (Bankr. D. Mass. 1990) (equitably subordinating a bank's claims based on its fraud and breaches of contract, among other things), *aff'd in part & vacated in part on other grounds*, 968 F.2d 1332 (1st Cir. 1992)). Such conduct can also prevent a claimant from supplementing the record to support its claims if it submitted incomplete or false information to the court. 11 U.S.C. § 105(a).

50.    Consequently, FHLB's Original Claims and Proposed Amended Claims should be disallowed and expunged because it owes over $150 million to LBSF if the early termination payment is calculated correctly and, thus, FHLB is owed nothing by LBSF or LBHI. Alternatively, FHLB's Original Claims and Proposed Amended Claims should be equitably subordinated as a result of FHLB's false factual statements, inflated figures, and pattern of lack of candor in its claims filed with the Court.

### D.    FHLB Owes Contractual Default Interest on the Early Termination Payment.

51.    Upon early termination, section 6(e) of the Master Agreement required FHLB to value the termination payment on the Early Termination Date that it designated.  FHLB has defaulted on that obligation.  As a result, it owes interest to LBSF at the Default Rate as provided in the Master Agreement.  *See* Master Agreement § 6(d)(ii) (providing that "[a]n amount calculated as being due in respect of any Early Termination Date under section 6(e) will be payable on the day that notice of the amount payable is effective . . . .  Such amount will be paid together with . . . interest thereon (before as well as after judgment) . . . from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate.").  "Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed."  *Id.* § 6(d)(ii).  Section 14 of the Master Agreement provides that the "Applicable Rate" is the "Termination Rate" for the period of time between the Early Termination Date and provision of the Calculation Statement.  *Id.* § 14.  Thereafter, the "Applicable Rate" is the "Default Rate" for the period of time from the date of receipt of the Calculation Statement until the date when payment is made.  *Id.* § 14.  Here, this means that Default Rate interest began accruing on December 1, 2008 and continues to accrue until FHLB pays LBSF in full.

52.    To the extent that the Court may have discretion on the award of interest, FHLB's inequitable conduct in calculating the termination payment and asserting false facts in its Original Claims and Proposed Amended Claims should be taken into account.  Bad conduct weighs in favor of a high interest rate.  *See Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bd. Of Elec. Workers, AFL-CIO*, 955 F.2d 831, 836 (2nd Cir. 2006) (listing factors courts consider when awarding interest including "analysis of the pertinent statute and its purposes; the

need to fully compensate the injured party; fairness and the relative equities; and the specific circumstances of the parties and of the case"); *Bank of Am., N.A. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 439 B.R. 811 (Bankr. S.D.N.Y. 2010) (granting summary judgment and ordering the return of wrongfully withheld funds plus interest at the 9% New York statutory rate). Moreover, "interest may be compounded if the court determines that the defendants acted in bad faith." *Wilson v. Great Am. Indus.*, 763 F. Supp. 688, 691 (N.D.N.Y. 1991) (awarding compound interest given the defendant's fraudulent actions with respect to plaintiffs).

### E.    The Parties Attempt Settlement.

53.    Since early 2010, LBSF has been engaged in settlement discussions with FHLB without success. LBSF and FHLB participated in two mediation sessions, on December 8, 2010 and February 10, 2015, under the Court's Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2009) [ECF No. 5207]. During this period, the parties agreed to toll the running of the statute of limitations with respect their possible claims. The mediations were unsuccessful. FHLB terminated the tolling agreement, which is set to expire on May 14, 2015. Days before the tolling agreement expired and nearly six years after filing its Original Claims, FHLB contacted LBSF concerning FHLB's request to file the Proposed Amended Claims.

## COUNT I

### Breach of the Master Agreement

54.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-53 of this Complaint as though fully set forth in this cause of action.

55.     On the Early Termination Date, LBSF was the party "in-the-money" and thus entitled to receive a substantial termination payment from FHLB.

56.     The Master Agreement provides that the early termination payment shall be calculated *as of* the Early Termination Date or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable.  *See* Master Agreement § 14.  It was reasonably practicable for FHLB to calculate the termination payment as of the Early Termination Date, and, therefore, FHLB should have valued the early termination payment as of September 18, 2008, the Early Termination Date.

57.     By valuing the Swaps as of various dates over an extended period following the Early Termination Date and otherwise failing to use reasonable valuation practices and by failing to pay LBSF the substantial termination payment it is owed, FHLB breached the Master Agreement.  As a result, LBSF has been damaged in an amount to be proven at trial, but in excess of $150 million, representing the value of the Swaps to LBSF on the Early Termination Date (after adjusting for posted collateral and missed payments under the Swaps), plus contractual interest, which continues to accrue until final payment is made to LBSF.

## COUNT II

### Breach of the Master Agreement Based on FHLB's Breach of the
### Implied Covenant of Good Faith and Fair Dealing

58.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-57 of this Complaint as though fully set forth in this cause of action.

59.     On the Early Termination Date, FHLB knew that LBSF was the party "in-the-money" and thus entitled to receive a substantial termination payment from FHLB.  It was fully capable of calculating the termination payment as of the Early Termination Date.  Nevertheless, FHLB failed to acknowledge the substantial gain it realized by terminating the Swaps and instead it calculated the termination payment based on data from a series of dates after the Early Termination Date.

60.     FHLB's deliberate choice to measure its Loss on several dates after the Early Termination Date dramatically lowered the termination value of the Swaps to LBSF's detriment.

61.     FHLB cannot point to any valid excuse for its failure to measure its Loss on the correct date.  Even the Swaps FHLB did not replace were valued by FHLB as of a later, and apparently arbitrary, date *after* the Early Termination Date.  The markets were open and there was robust trading in interest rate swaps on September 18, 2008.  FHLB was, and is, a sophisticated player in these markets.  Upon information and belief, FHLB deliberately chose *not* to measure Loss on the Early Termination Date as required and instead played the market at LBSF's expense.  FHLB cannot meet its burden of proof that no commercially reasonable determinants of value existed on the Early Termination Date.

62.     FHLB should have paid LBSF a termination payment of more than $150 million and has to date paid LBSF nothing at all while claiming that LBSF owes it millions of dollars. FHLB's continued efforts to enforce its Original Claims and Proposed Amended Claims against

LBSF and refusal to pay LBSF the true termination value of the Swaps constitute commercially unreasonable behavior and evidence of FHLB's failure to comply with the implied covenant of good faith and fair dealing.

63.    FHLB also evidenced bad faith in preparing its Calculation Statement, because it represented that FHLB had not replaced 77 of the Swaps when FHLB had already actually replaced 44 of those allegedly "unreplaced" Swaps between October 1 – November 17, 2008. Moreover, FHLB claimed it had used a model to value those 77 "unreplaced" Swaps but again used September 19th values, which was *after* – instead of "as of" – the Early Termination Date. FHLB's pattern of false statements and incomplete facts was repeated when it filed its Original Claims and is additional evidence of FHLB's bad faith towards LBSF.

64.    In sum, by refusing to pay LBSF a properly calculated, commercially reasonable termination payment measured on the Early Termination Date in accordance with the Loss measure in the Master Agreement, FHLB violated the covenant of good faith and fair dealing implicit in all contracts governed by New York law.

65.    As a result of this breach, LBSF has been damaged in an amount to be proven at trial, but in excess of $150 million, an amount representing the value of the Swaps to LBSF on the Early Termination Date (after adjusting for posted collateral and missed payments under the Swaps) plus contractual interest, which continues to accrue until final payment is made to LBSF.

## COUNT III

### Violation of Section 562 of the Code

66.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-65 of this Complaint as though fully set forth in this cause of action.

67.    Section 562 of the Code requires that a terminated swap be valued as of the Early Termination Date unless no commercially reasonable determinants of value are available on that

date, and places a burden on the Non-defaulting Party – here, FHLB – to show that commercially reasonable determinants of value were not available on that date.

68.     As of the Early Termination Date, commercially reasonable determinants of value were available, and section 562 mandated FHLB to value the early termination payment for the Swaps as of that date.  However, FHLB purported to value the Swaps as of various dates over an extended period following the Early Termination Date, and, on information and belief, deliberately did not even attempt to measure its Loss on the Early Termination Date.  Therefore, FHLB violated the express terms of section 562.

69.     LBSF has been damaged by FHLB's violation in an amount to be proven at trial, but in excess of $150 million, an amount representing the value of the Swaps to LBSF on the Early Termination Date (after adjusting for posted collateral and missed payments under the Swaps), plus contractual interest, which continues to accrue until final payment is made to LBSF.

## COUNT IV

### Disallowance of FHLB's Claims and Objection to Claims

70.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-69 of this Complaint as though fully set forth in this cause of action.

71.     A proof of claim will not be deemed allowed if a party in interest objects thereto. 11 U.S.C. § 502(a).

72.     Plaintiff objects to FHLB's Original Claims and Proposed Amended Claims and seeks entry of a judgment against FHLB expunging and disallowing its Original Claims and Proposed Amended Claims pursuant to section 502(b) of the Code on the basis that LBSF and LBHI have no liability to FHLB.

73.    Indeed, FHLB's Original Claims and Proposed Amended Claims rely entirely on its flawed valuation of the termination payment owed for the Swaps.  Given FHLB's disregard of the Master Agreement's and Code section 562's clear timing requirements for valuing swap termination payments, FHLB's calculation underlying its Original Claims and Proposed Amended Claims is unsupportable.  Further, because FHLB's valuation over an extended period following the Early Termination Date coincided with a rise in interest rates, FHLB's calculation severely undervalues the Swaps, as the chart in paragraph 36 above reflects.

74.    Valuing the Swaps as of the Early Termination Date, as both the Master Agreement and section 562 require, yields a termination value of the Swaps greatly in LBSF's favor and results in FHLB owing more than $150 million to LBSF, before application of contractual interest.  Accordingly, LBSF and LBHI do not owe any amounts to FHLB.  As a result, FHLB's Original Claims and Proposed Amended Claims are not valid claims.

75.    To the extent no signed applicable specific guarantee exists to support FHLB's Original Claims and Proposed Amended Claim against LBHI, the Plan Administrator has no basis for allowing those claims.

76.    Pursuant to section 502(b) of the Code and Rule 3007, therefore, the Plan Administrator on behalf of LBSF and LBHI requests that this Court disallow and expunge the Original Claims and Proposed Amended Claims in their entirety.

77.    The Plan Administrator on behalf of LBSF and LBHI hereby expressly reserves the right to further object to the Original Claims and Proposed Amended Claims, or any other claim filed by FHLB, on any other basis.

## COUNT V

## Alternatively, Equitable Subordination of FHLB's Claims and Objection to Claims

78.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-77 of this Complaint as though fully set forth in this cause of action.

79.    The Court may issue any order, process, or judgment that is necessary to or appropriate to carry out the provisions of the Code or to prevent an abuse of process.  11 U.S.C. § 105(a).  The filing of a false or fraudulent claim constitutes an abuse of the claims process as well as an attempted fraud upon the court.  The consequences of filing a false claim include having the claim equitably subordinated.  11 U.S.C. § 510(c).  Courts in this District generally will exercise their power to equitably subordinate a claim when the following three conditions are met:  (i) the claimant engaged in some type of inequitable conduct; (ii) the misconduct resulted in injury to the debtor's creditors and conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim is consistent with the provisions of the Code.  *LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 347, 360 (Bankr. S.D.N.Y. 2014) ( finding that a creditor's failure to comply with "the most basic concepts of good faith that are fairly to be expected of chapter 11 creditors" may establish a basis for equitable subordination, especially where that conduct is targeted at manipulating the chapter 11 process for the creditor's gain at the expense of the debtor's other creditors).

80.    Here, FHLB made numerous false statements of fact to the Court to support FHLB's purported claims.  First, FHLB asserted in its Original Claims that it did not replace 77 of the Swaps when FHLB had in fact replaced 44 out of those 77 Swaps between October 1 –

November 17, 2008. FHLB also asserted in the Original Claims it had provided the Court with all the confirmations for the replaced Swaps but failed to include the confirmations for those 44 Swaps that it replaced in October and November 2008 when FHLB filed its Original Claims. Moreover, FHLB submitted its Calculation Statement to the Court as support for its Original Claims, but its Calculation Statement contains the same misrepresentation by falsely stating that FHLB had not replaced 77 of the Swaps. Both FHLB's Calculation Statement and its Original Claims assert claims against LBHI and LBSF for over $52 million in the aggregate related to those 77 "unreplaced" Swaps, yet FHLB had actually replaced 44 of those transactions, making its calculation with respect to those Swaps wildly inflated.

81.    FHLB cherry picked what values it wanted to rely on when concocting its Original Claims against LBSF and ignored the fact that it had actually already replaced an additional 44 swaps. FHLB maintained this incorrect and false information in its Original Claims that it filed with the Court and in its dealings with LBSF for nearly six years.

82.    Therefore, if the Court for some reason finds that LBSF is owed nothing by FHLB, and does not disallow and expunge FHLB's Original Claims and Proposed Amended Claims, then, alternatively, FHLB's Original Claims and Proposed Amended Claims should be equitably subordinated as a result of FHLB's false statements, inflated figures, and pattern of lack of candor in its claims filed with the Court.

83.    FHLB meets all the conditions required to equitably subordinate a claim. First, FHLB engaged in inequitable conduct. Second, FHLB's misconduct resulted in injury to LBSF's and LBHI's creditors and conferred an unfair advantage on FHLB. Third, equitable subordination of the Original Claims and the Proposed Amended Claims is consistent with the provisions of the Code.

84.    Pursuant to section 510(c) of the Code, therefore, the Plan Administrator on behalf of LBSF and LBHI requests that this Court equitably subordinate the Original Claims and Proposed Amended Claims in their entirety and award such other relief to Plaintiff as is just under the circumstances.

85.    The Plan Administrator on behalf of LBSF and LBHI hereby expressly reserves the right to further object to the Original Claims and Proposed Amended Claims, or any other claim filed by FHLB, on any other basis.

## CONDITIONS PRECEDENT

All conditions precedent have occurred, been performed, or been waived or excused.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered:

A.    As to Counts I, II, and III awarding LBSF damages from FHLB in an amount to be determined at trial, but in excess of $150 million, an amount representing the value of the Swaps to LBSF on the Early Termination Date (after adjusting for posted collateral and missed payments under the Swaps) plus contractual interest, which will continue to accrue until LBSF receives payment in full;

B.    As to Count IV, entry of a judgment against FHLB disallowing and expunging its Original Claims and Proposed Amended Claims pursuant to section 502(b) of the Code;

C.    As to Count V, in the alternative, entry of judgement against FHLB equitably subordinating its Original Claims and Proposed Amended Claims pursuant to section 510(c) of the Code;

D.    Pre-judgment and post-judgment interest; and

E.    Such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

Dated: May 13, 2015
      New York, New York

By:  /s/  Ralph I. Miller                
Ralph I. Miller
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.*