WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Paul V. Shalhoub
Todd G. Cosenza

JONES & KELLER, P.C.
1999 Broadway, Suite 3150
Denver, Colorado 80202
Telephone: (303) 573-1600
Facsimile: (303) 573-8133
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Lehman Brothers Holdings Inc.*
*and Structured Asset Securities Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
**In re:**                                                   :    **Chapter 11 Case No.**
                                                             :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*                  :    **08-13555 (SCC)**
                                                             :
                              **Debtors.**                   :    **(Jointly Administered)**
                                                             :
-------------------------------------------------------------x
                                                             :
**LEHMAN BROTHERS HOLDINGS INC. and**                        :    **(Adv. Pro. No. __-__)**
**STRUCTURED ASSET SECURITIES**                              :
**CORPORATION,**                                             :
                                                             :
                              **Plaintiffs,**                :
                                                             :
           **-against-**                                     :
                                                             :
**U.S. BANK NATIONAL ASSOCIATION,**                          :
**SYNCORA GUARANTEE INC., and**                              :
**GREENPOINT MORTGAGE FUNDING, INC.,**                       :
                                                             :
                              **Defendants.**                :
                                                             :
-------------------------------------------------------------x

**ADVERSARY COMPLAINT AND FURTHER OBJECTIONS SEEKING (I) THE
DISALLOWANCE OF THE CLAIMS OF U.S. BANK, N.A., AND SYNCORA
GUARANTEE INC.; (II) SUBORDINATION OF THE SYNCORA CLAIM TO THE U.S.
BANK CLAIM; (III) ESTIMATION OF THOSE CLAIMS AT ZERO DOLLARS FOR
RESERVE PURPOSES; (IV) AN INJUNCTION STAYING A RELATED THIRD-
PARTY ACTION; (V) A DECLARATION THAT THE ASSIGNMENT OF CERTAIN
REPURCHASE RIGHTS WAS VALID; AND (VI) A DECLARATION THAT
GREENPOINT MORTGAGE FUNDING, INC. MUST INDEMNIFY LEHMAN
BROTHERS HOLDINGS INC. FOR ITS LIABILITY, IF ANY, TO U.S. BANK AND
SYNCORA IN CONNECTION WITH THE CLAIMS**

Lehman Brothers Holdings Inc. ("LBHI" or "Plan Administrator") and Structured Asset

Securities Corporation ("SASCO" and, together with LBHI, "Lehman"), as Plaintiffs in the

above-captioned adversary proceeding, by and through their undersigned attorneys, submit this

complaint (the "Complaint") against (i) U.S. Bank, N.A. ("U.S. Bank"), (ii) Syncora Guarantee

Inc. ("Syncora" and, together with U.S. Bank, the "Claimants"), and (iii) GreenPoint Mortgage

Funding, Inc. ("GreenPoint") and hereby allege as follows:

## INTRODUCTION[1]

1.      This adversary proceeding concerns three proofs of claim, the first two filed by

U.S. Bank, Proof of Claim Nos. 20586 and 20587 (collectively, the "U.S. Bank Claim"), and the

third by Syncora, Proof of Claim No. 66099 (the "Syncora Claim" and together with the U.S.

Bank Claim, the "Claims").    Syncora, as the "controlling insurer" in the securitization

transaction, effectively controls all three Claims at issue here.    Notwithstanding the Plan

Administrator's continuing efforts to resolve these Claims over the past two years, the Claims

remain unliquidated and the reserves for each of the Claims remain in place.

2.      Further, the Syncora Claim is lodged in Lehman's disputed claims reserve at $600

million, despite the fact that the Syncora Claim is duplicative of the U.S. Bank Claim and U.S.

Bank (as trustee for the same trust that experienced the alleged losses) has negotiated a $5 billion

---

[1]      Capitalized terms used but not defined in this section have the meanings given them later in this Complaint.

reserve for the same losses (among others).  As a consequence, although Syncora ███████

████████████████████, it has not reduced its claim, which would permit the Plan

Administrator to release ████████████ of the $600 million reserve associated with that

claim.  Instead, Syncora maintains its claim in full, asserting a right to recover even on loss

amounts ██████████████████████, and on account of losses for which Lehman

has no liability.

3.    This Adversary Proceeding also involves an indemnification claim against

GreenPoint in Lehman's favor should Lehman have any liability on account of the Claims.

Lehman believes U.S. Bank's and Syncora's recourse is solely against GreenPoint, and these

Claimants presently are suing GreenPoint in New York state court for substantially identical

claims.  (Indeed, upon information and belief, Syncora has the sole power to direct U.S. Bank as

to such litigation.)  However, should Lehman have any liability (and it should not), Lehman has

an independent cause of action for indemnification against GreenPoint to recover the full amount

of that potential liability.  This, too, demonstrates why no reserve should be set aside for the

Claims.  Whether GreenPoint is liable to U.S. Bank and Syncora directly or indirectly through

Lehman, estate funds will not be required to satisfy the Claims.

4.    By this Adversary Proceeding, Lehman seeks to resolve and determine its rights

and obligations in respect of these matters so it can effectively and efficiently administer its

estate and resolve the over $600 million dollars of reserves that have been asserted with respect

to the Claims.  These Claims, which Lehman has been trying to resolve over the past two years,

continue to impede the administration of the Plan and the orderly distribution of assets.

5.    The Claims are on account of one Trust—GreenPoint Mortgage Funding Trust

2006-HE1 (the "Trust").  The Trust, which is a Transferor Trust (as explained below), comprises

second-lien home equity lines of credit ("HELOCs") and second-lien mortgages—both higher risk loans that are more likely to default when home values decline—as well as some first-lien mortgages. U.S. Bank serves as trustee for the Trust. The U.S. Bank Claim demands recovery for losses suffered by the Trust. Based on currently available information, as of April 30, 2015, the Trust has experienced cumulative losses of approximately $922 million. However, that number does not represent net losses because, among other reasons, it fails to take into account the $350 million earned by the Trust from payments made by mortgageholders. Furthermore, actual losses to noteholders (and Syncora, their insurer) appear to be much smaller ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

6.      Syncora serves as the insurer of certain of the notes issued by the Trust. Syncora, a sophisticated party with extensive experience insuring these types of trusts, participated in the due diligence process and was very knowledgeable of distinct risks associated with HELOCs and second lien loans. Having made a business decision to insure a class of notes issued by the Trust, Syncora knows that Lehman should bear no liability for the alleged breaches at issue, but has nonetheless brought the Syncora Claim (seeking hundreds of millions of dollars in damages) to serve as a backstop in the event it and U.S. Bank lose their litigation against GreenPoint (the responsible party here). Of course, without Syncora's insurance policy, the losses would have been suffered only by the noteholders. With the insurance policy in place, however, some portion of the loss was shifted from the noteholders to Syncora (a business decision made by Syncora). Further, as described in greater detail below, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

7.      As described in prior submissions to this Court, there is a critical distinction between Transferor Loans, like those in the Trust at issue here, and Bank-Originated Loans. With respect to trusts containing Bank-Originated Loans, Lehman directly made (or re-made) representations and warranties regarding the underlying loans. In stark contrast, with respect to trusts containing only Transferor Loans, while Lehman assigned the representations and warranties made by the Transferors to the trusts, it only retained liability for breaches of such representations and warranties to the extent there was not a corresponding breach of the representations and warranties passed through to the trust from the Transferor. For corresponding breaches, the trusts' (and thus the trustees') exclusive remedy was directly against the Transferor. (With respect to trusts containing only Transferor Loans, Lehman also made certain limited direct representations for which there is very limited potential liability.)

8.      Consequently, for the Transferor Trust at issue here, GreenPoint, as the originator and Transferor, made various representations and warranties regarding the underlying loans, and Lehman merely passed those representations and warranties along to the Trust.[2] Thus, it is GreenPoint, as originator and Transferor, that is liable for breaches of those representations and warranties—Lehman is not. Even U.S. Bank, in its pending litigation against GreenPoint, has expressly admitted that the Trust's remedy for any breaches of representations and warranties lies against GreenPoint, *not against Lehman*. Specifically, on September 9, 2014, during an oral argument in the New York Supreme Court, U.S. Bank's counsel explained that LBHI is not liable on any representations made by GreenPoint: "With respect to [LBHI] what it says is that . . . [LBHI] is not liable. . . . [LBHI] is not liable on its representations if the basis for your claims against [LBHI] is also the basis for a claim against GreenPoint." Hearing Transcript, *U.S. Bank*

---

[2]      In addition, Lehman made limited "gap" representations, which are representations that covered the short period of time after GreenPoint made its representations and warranties.

*N.A. v. GreenPoint Mortgage Funding, Inc.*, No. 600352/2009, at 30:17-32:6 (Sept. 9, 2014)
[Docket No. 544].

9.      U.S. Bank and Syncora fully understand the structure of the securitization in
which they participated and that their recovery lies against GreenPoint. That is precisely why
they filed a lawsuit against GreenPoint. Their Claims against Lehman here are a transparent
effort to preserve a fall-back position in the event their suit against GreenPoint is unsuccessful.
This fall-back, however, is inconsistent with the agreements governing the suite of interlocking
transactions, and there is no reason to delay indefinitely the administration of the Plan and
distributions to creditors. Hundreds of millions of dollars of estate assets cannot continue to be
locked up for these baseless Claims. Lehman thus requests the disallowance of these Claims, or
an order estimating the Claims at zero dollars for reserve purposes.

10.     Further, even if U.S. Bank is permitted to pursue claims against Lehman on
account of the Trust, the Court should require U.S. Bank to prove its claims using the same
Court-approved RMBS Protocol that U.S. Bank and other RMBS Trustees have been required to
follow in connection with similar claims against the estate. Accordingly, if the Court does not
disallow these Claims or estimate the Claims at zero dollars for reserve purposes, the Court
should, at a minimum, require U.S. Bank to comply with the RMBS Protocol so that Lehman can
perform the loan-level validation process required by the governing agreements. This would also
resolve the Syncora Claim, as any liability of Lehman to Syncora under these circumstances
would correspond to any liability U.S. Bank is able to establish against Lehman. At the same
time, the Court should declare that GreenPoint must indemnify Lehman for any liability U.S.
Bank and/or Syncora establishes against Lehman.

## NATURE OF THE ACTION[3]

11.    Three grossly exaggerated and baseless proofs of claim have been filed, the U.S.

Bank Claim and the Syncora Claim, each of which seeks substantially identical relief for the

same alleged breaches.[4] Having been pending for nearly six years, the time has come to resolve

the Claims so that outsized reserves can be eliminated and distributions can be made to creditors

holding valid claims.    Waiting another several years to resolve the Claims, or for outside

litigation like the GreenPoint Litigation to be resolved, is not a viable option, and would unduly

delay administration of the Plan. The time to act on these Claims is now.

12.    The U.S. Bank Claim is on account of one trust—GreenPoint Mortgage Funding

Trust 2006-HE1 (the "Trust")—a Transferor Trust, which contains only Transferor Loans. See

generally Docket No. 46526 at 16-19 (describing the LBHI-sponsored RMBS and explaining

difference in remedies for Transferor and Bank-Originated Loans). As explained below, Lehman

primarily made limited "gap" representations or warranties relating to Transferor Trusts, while

passing along representations and warranties made by the applicable originating bank (in this

case, GreenPoint).  Lehman has no material liability for these types of claims.  (Lehman also

made certain limited direct representations for which there is very limited potential liability.)

Indeed, in the GreenPoint Litigation, U.S. Bank has conceded that LBHI has no liability for

breaches of representations and warranties relating to the subject trust.   Rather, U.S. Bank

recognizes that those liabilities are properly liabilities of GreenPoint, *and not LBHI*.  The U.S.

Bank Claim should therefore be disallowed.

13.    Moreover, the Syncora Claim should also be disallowed.   Under the I&I

---

[3]    Capitalized terms used but not defined in this section have the meanings given them later in this Complaint.

[4]    As stated above, the U.S. Bank Claim is two separate claims, one against LBHI and one against SASCO.
The claims are duplicative of one another.

Agreement between Syncora, LBHI, and SASCO, among others, Syncora expressly agreed that its remedies for breaches of representations and warranties were limited to those specified in the MLSAA. The MLSAA, in turn, empowers only the Indenture Trustee, U.S. Bank, to pursue remedies for breaches of representations and warranties. Syncora, as the insurer of the Trust, has no greater rights for breaches of representations and warranties than those of U.S. Bank, and if U.S. Bank has no valid claim against Lehman, then neither does Syncora. This outcome is consistent with the Trust Indenture, which establishes a cashflow waterfall structure that directs that any recoveries by U.S. Bank on behalf of the Trust in this situation must first be paid out to the insurer, Syncora. Allowing the Syncora Claim, in addition to the U.S. Bank Claim, would only serve to require Lehman to pay out twice on the same loss—and to essentially the same party.

14.    To the extent U.S. Bank and Syncora have a valid claim for breaches of representations and warranties related to the mortgage loans owned by the Trust, again, that claim lies against GreenPoint. Indeed, U.S. Bank is pursuing claims against GreenPoint in the GreenPoint Litigation for the very claims that U.S. Bank and Syncora have asserted against Lehman. Simply put, the Syncora Claim is duplicative of both the U.S. Bank Claim and the GreenPoint Litigation and should therefore be disallowed.

15.    Moreover, Syncora's claim for reimbursement of litigation fees incurred in the GreenPoint Litigation should also be disallowed because Syncora is only entitled to be reimbursed for reasonable litigation fees and Syncora was dismissed for lack of standing in that action, demonstrating that any such fees were unreasonable.

16.    Syncora also has no valid independent cause of action against Lehman under either the I&I Agreement or New York Insurance Law. Syncora cannot show that any alleged

misrepresentations by Lehman were false or misleading, material, and justifiably relied upon or that any alleged misrepresentations materially increased Syncora's risk of loss. Nor could Lehman have intended to defraud Syncora merely by passing on representations and warranties made by GreenPoint. Furthermore, under New York law, Syncora's continued acceptance of premiums pursuant to the I&I Agreement during the course of this proceeding now precludes it from obtaining any relief, in the form of either rescission or rescissory damages, based upon on any alleged misrepresentation pursuant to the New York Insurance Law.

17.    In any event, to the extent the Court determines that it may not be appropriate to disallow the Claims at this time, Lehman respectfully submits that the Court should estimate the Claims at zero dollars for reserve purposes under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [Docket No. 23023] (the "Plan"). Estimation at zero dollars for reserve purposes is appropriate here because (i) as to both the U.S. Bank Claim and the Syncora Claim, Lehman has no liability for such claims for the reasons outlined above and discussed in detail below, and (ii) as to the Syncora Claim, such claim may either be disallowed under section 502(e)(1)(B) of the Bankruptcy Code or subordinated under section 509 of the Bankruptcy Code.

18.    Additionally, Lehman respectfully submits that the Court should stay the GreenPoint Litigation filed by U.S. Bank and Syncora in New York state court. At issue in the New York state court action is whether there was an effective assignment of rights *between two Lehman entities*, Lehman Brothers Bank, FSB ("LBB") and LBHI. The effectiveness of the assignment at issue in the GreenPoint Litigation implicates LBB and Lehman directly and may also form the basis for the Claimants' decision to assert additional claims against the estate. Thus, this Court is the only proper forum for determining whether the internal Lehman

assignment was effective, and a stay is necessary because core estate rights are at stake.

19.     Furthermore, any liability found against Lehman on account of the U.S. Bank and Syncora Claims will be the direct result of GreenPoint's misrepresentations to Lehman in connection with the sale of the Loans.  GreenPoint made representations and warranties, and provided a repurchase remedy, that it intended Lehman rely on in connection with its agreement to purchase and then securitize the Loans.  Lehman justifiably relied on the representations and warranties, as well as GreenPoint's promise to repurchase breaching Loans, when it agreed to participate in the transaction.  If GreenPoint failed to live up to its obligations, and Lehman is held responsible for any part of that failure, GreenPoint is liable for indemnification of Lehman.  Thus, if Lehman is liable to U.S. Bank and Syncora, Lehman also seeks a declaration that LBHI has valid indemnification claims against GreenPoint—as the originator of the underlying defective loans.

20.     The importance of staying the GreenPoint Litigation is further underscored by the fact that the parties to that litigation have taken positions – in their pending cross-motions for summary judgment – that may affect the ability of the Plan Administrator to administer the assets of the estate.  Specifically, Defendant GreenPoint has alleged that U.S. Bank, as Indenture Trustee for the Trust, lacks standing to prosecute the Trust's repurchase rights because LBB purportedly failed to properly assign the repurchase rights to LBHI, thereby breaking the chain of assignment and leaving the Trust with no remedy.  As LBHI has represented to U.S. Bank— and reasserts here—that it properly assigned contractual rights to U.S. Bank on behalf of the Trust, a controversy exists as to LBHI's potential liability for the alleged failure to do so.  Accordingly, Lehman also hereby seeks a declaration that all assignments were proper so as to eliminate the risk of a state court ruling that could affect the Plan Administrator's ability to

administer the assets of the estate.

21.     In sum, Lehman brings this action to obtain: (i) the disallowance of the Claims in their entirety; (ii) in the alternative, if the Court denies disallowance of the Claims, estimation of the Claims at zero dollars for reserve purposes; (iii) a stay of the GreenPoint Litigation; and (iv) a declaratory judgment finding that the assignment of repurchase rights from LBB to LBHI with respect to the underlying loans was valid.

22.     Alternatively, if the Court denies this relief, and if U.S. Bank is able to establish that Lehman is potentially liable to it, notwithstanding the fact that the Trust is a Transferor Trust, Lehman respectfully requests that the Court require U.S. Bank to prove its Claim pursuant to the the Court's December 29, 2014 Order Establishing a Protocol to Resolve Claims Filed by Trustees on Behalf of Certain Issuers of Residential Mortgage Backed Securities [Docket No. 47569] (the "RMBS Protocol").  In all cases, Lehman further requests a declaratory judgment that GreenPoint must indemnify LBHI for any Lehman liability established by U.S. Bank and/or Syncora in connection with losses sustained by the Trust.

## JURISDICTION AND VENUE

23.     This Adversary Proceeding is brought pursuant to (i) Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure, and (ii) sections 105, 502, 509, and 1142(b) of title 11 of the United States Code (the "Bankruptcy Code").

24.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157, 1334, 2201, and 2202, Article XIV of the Plan, and Paragraph 77 of the order confirming the Plan (the "Confirmation Order").

25.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).

26.     This Court has personal jurisdiction over U.S. Bank based upon the filing of the

U.S. Bank Claim in the Debtors' (as defined herein) chapter 11 cases, and U.S. Bank's active participation in these proceedings.

27.    This Court has personal jurisdiction over Syncora based upon the filing of the Syncora Claim in the Debtors' chapter 11 cases, and Syncora's active participation in these proceedings.

28.    GreenPoint is in the process of being served with a summons and this Complaint. Accordingly, this Court has personal jurisdiction over GreenPoint based upon Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

29.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

30.    On September 15, 2008 (the "Commencement Date"), LBHI and the affiliated debtors in the above-captioned cases (collectively, the "Debtors") commenced in this Court a voluntary case under chapter 11 of the Bankruptcy Code. LBHI and SASCO's principal place of business is located at 1271 Sixth Avenue, New York, New York 10020. Following the Commencement Date, LBHI was authorized to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On March 6, 2012, the Plan became effective. In accordance with its terms, LBHI was appointed as Plan Administrator and LBHI began the wind-down of the Debtors and implementation of the Plan. Pursuant to the Plan, the Court retained broad authority to issue injunctions and implement such other necessary orders to enforce the Plan. LBHI and SASCO are the Plaintiffs in this Adversary Proceeding.

31.    Defendant U.S. Bank is a national banking association organized and existing under the laws of the United States. U.S. Bank does business in and maintains offices in New

York, including a corporate trust office at 100 Wall Street, New York, New York 10005. Upon information and belief, U.S. Bank currently serves as trustee for thousands of residential mortgage-backed securities ("RMBS") trusts with assets of over $1 trillion in original face value, and is trustee for approximately 30% of all RMBS issued between 2004 and 2007.

32.    Defendant Syncora is a New York corporation with its principal place of business at 135 West 50th Street, New York, New York 10020. Upon information and belief, Syncora provides credit enhancement for the obligations of debt issuers, including guarantees of asset-backed securities.

33.    Defendant GreenPoint is a New York corporation with its principal place of business at 1680 Capital One Drive, McLean, Virginia 22102. GreenPoint originated the mortgage loans at issue in the Claims and in the GreenPoint Litigation.

## BACKGROUND

### I.    Prior Proceedings and the Claims

34.    On the Commencement Date, the Debtors filed for chapter 11 protection. On July 2, 2009, the Court entered an order setting forth the procedures and deadlines for filing proofs of claim [Docket No. 4271]. Pursuant to that order, the Debtors provided notice of the bar date of September 22, 2009, to all known and potential creditors, including U.S. Bank and Syncora.

35.    On or around the bar date, various trustees for certain residential mortgage-backed securitization trusts (the "RMBS Trustees") filed approximately $37 billion in repurchase claims (the "RMBS Claims") premised on allegations that LBHI or SASCO: (i) breached various representations and warranties regarding the quality and characteristics of hundreds of thousands of mortgage loans; and (ii) provided deficient mortgage loan files to 405 residential mortgage-backed securitization trusts (the "RMBS Trusts"). Included among the RMBS Claims is the U.S. Bank Claim.

36.    On September 21, 2009, U.S. Bank filed the U.S. Bank Claim, alleging that

Lehman made certain representations and warranties under the terms of the Indenture and the

MLSAA regarding the GreenPoint Loans (as defined below) to, or for the benefit of, U.S. Bank,

which it contends were incorrect or untrue, and materially and adversely affected the value of the

GreenPoint Loans.    Such representations and warranties included certain of the representations

and warranties made by GreenPoint, which Lehman passed along.    As a result of the alleged

breaches of representations and warranties by SASCO, as depositor, and/or LBHI, as sponsor,

U.S. Bank asserted a claim (the "Put-Back Claim"):

> in an amount not less than the repurchase price as and when
> required by the Trust Agreements and/or [certain Mortgage Loan
> Sale and Assignment Agreements], plus such additional amount
> for any other breaches of the obligations to repurchase as may exist
> from time to time plus interest on any past due amount.

U.S. Bank Claim at 3.

37.    In early 2011, LBHI filed omnibus objections to certain of the RMBS Trustees'

claims seeking to disallow and expunge such claims on the grounds that insufficient supporting

documentation was provided [Docket No. 15008].    In response to those objections, the RMBS

Trustees responded in the following ways:    Trustee Bank of New York Mellon allowed its put-

back claims to be expunged; Trustee Hong Kong and Shanghai Banking Corporation allowed its

put-back claims except those relating to identified breaches in 15 loans to be expunged; Trustee

Bank of America transferred nearly all of its put-back claims to U.S. Bank and Citibank,

N.A./Wilmington Trust Company as successor trustees; and Citibank/Wilmington Trust

Company, Deutsche Bank National Trust Company, U.S. Bank, and Wells Fargo Bank, N.A.

challenged the objections.

38.    In their claims as filed, none of the RMBS Trustees drew the necessary distinction

between Lehman and third-party Transferor repurchase liability. Moreover, a number of the RMBS Trustees' claims were duplicative, extremely inflated, lacked specificity regarding which loans contained breaches of representations and warranties, and/or failed to identify specific document exceptions for which LBHI might bear liability. Most notably, only after LBHI requested loan-level evidence to support the RMBS Trustees' claims for damages did certain of the RMBS Trustees identify a few specific loans for which alleged breaches of representations and warranties had occurred. As a result, Lehman believes that the amounts claimed by the RMBS Trustees bear no relation to any actual compensable damages sustained by the RMBS Trusts.

39.    On June 30, 2011, the Court held a hearing on LBHI's motions to disallow U.S. Bank and Citibank/Wilmington's claims. One issue addressed at the hearing was whether the RMBS Trustees would be required to prove their claims on a loan-by-loan basis. The Court dismissed 130 claims, but deferred ruling on the loan-by-loan proof issue, and instead encouraged the parties to consider other means of resolving their dispute. The Court noted, however, that "if there are claims, the trustees would be put to their proof, and whether they can actually succeed in carrying a burden of proof establishing residential and mortgage loan breaches . . . would be extraordinarily difficult." Hearing Transcript at 72:12-17 (June 30, 2011) [Docket No. 18251].

40.    The parties thereafter attempted to reach agreement on a loan-level claim validation protocol (like the Court-ordered RMBS Protocol currently underway for the Bank-Originated Loans). These efforts were forestalled in December 2011, when the Plan was approved, pursuant to which distributions are to be made to creditors holding allowed claims [Docket No. 23023]. If required to reserve for the entire $37 billion in claims then being pursued

by the RMBS Trustees, LBHI would have been hampered in its ability to make distributions to creditors with allowed claims. LBHI thus attempted to negotiate with the RMBS Trustees surrounding the amount of the claims. When those negotiations broke down, LBHI moved to estimate the RMBS Trustees' claims for reserve purposes [Docket No. 24254]. Using a seven-step methodology, LBHI estimated that the amount of RMBS Trustee claims for reserve purposes was between $1.1 and $2.4 billion.[5] Accordingly, LBHI proposed to establish an estimated claim amount of $2.4 billion solely for purposes of making an initial distribution to other unsecured creditors. The RMBS Trustees objected to LBHI's proposed estimation, contending that the estimated claim should be at least $15.3 billion.

41.    The Court declined to rule on LBHI's estimation motion, and instead encouraged a negotiated resolution between the parties. The parties thereafter stipulated to an estimated claim of $5 billion for reserve purposes for the RMBS Claims, 95% of which was to be allocated to breach of representation and warranty claims against LBHI, and 5% of which was to be allocated to document exception claims against SASCO. The parties' agreement to estimate the RMBS Trustees' claims at $5 billion for reserve purposes (the "Reserve") was memorialized in a February 2012 order of this Court [Docket No. 25643] (the "Reserve Order").

42.    The RMBS Claims have also been the subject of recent litigation before this Court. [*See* Docket Nos. 46078, 46526, 46960, and 47185.] In those proceedings, the RMBS Trustees sought (i) to increase the previously agreed-upon Reserve from $5 billion to $12.143 billion, and (ii) to "estimate and allow their claims for covered loans at $12.143 billion pursuant to section 502(c) of the Bankruptcy Code" [Docket No. 46078 (the "Reserve/Estimation Motion")]. The RMBS Trustees sought this relief only with respect to a 255-trust subset of the

---

[5]    LBHI's estimate was solely for purposes of establishing a reserve, and it was not an estimate of LBHI's likely or potential liability.

405 total RMBS Trusts. This 255-trust subset was limited to the Bank-Originated Loans, and therefore did not apply to the Transferor Trusts. As a result, the Trust at issue here is not part of that 255-trust subset. LBHI cross-moved for entry of a loan-level claim resolution protocol.

43.   That litigation culminated in the Court's Order Establishing a Protocol to Resolve Claims Filed by the Trustees on Behalf of Certain Issuers of Residential Mortgage-Backed Securities. [Docket No. 47569 (the "Protocol Order").] Pursuant to the Protocol Order, the RMBS Trustees must prove their claims on a loan-by-loan basis for the Covered Trusts (the "RMBS Protocol").

44.   The RMBS Protocol consists of five steps: (i) production and review of claim files by the RMBS Trustees; (ii) review of claim files by LBHI; (iii) negotiation of claim disputes between the parties; (iv) non-binding alternative dispute resolution procedures to resolve claim files disputes; and (v) court review and approval of claim amounts. *See* Protocol Order Exhibit A. Implementation of the Protocol Order is underway, and the RMBS Trustees are required to assert all claims by March 31, 2016, or face disallowance of any unasserted claims.

45.   On January 13, 2010, Syncora filed the Syncora Claim (which amended its previously filed proof of claim number 13909) for approximately $1.3 billion (plus interest). Syncora alleged, *inter alia*, that LBHI breached certain representations and warranties and was thus required to indemnify and reimburse Syncora for certain expenses, fees, and losses arising from such breaches. The approximately $1.3 billion asserted in the Syncora Claims falls largely into two categories: (i) reimbursement claims for amounts that Syncora has paid under the Policy (the "Existing Losses"), and (ii) contingent amounts that Syncora may be obligated to pay in the future (the "Contingent Amounts"). The Syncora Claim also includes approximately $6

million for fees and expenses it incurred in connection with the GreenPoint Litigation prior to its dismissal from that action (the "Syncora GreenPoint Expenses"). Specifically, Syncora alleged that LBHI "remade as its own GreenPoint's representations and warranties" and agreed to indemnify Syncora for losses incurred in connection with breaches of GreenPoint's representations and warranties, including all payouts Syncora made to Investors. In the Syncora Claim, Syncora is also seeking reimbursement of the expenses it incurred in the GreenPoint Litigation. Syncora has filed no other proofs of claim in these cases other than the Syncora Claim.

46.     LBHI objected to the Syncora Claim on September 16, 2011 [Docket No. 20087], and sought to disallow and expunge the Syncora Claim. The primary basis for LBHI's objection was that Syncora's sole remedy under the Transaction Documents was against GreenPoint as the Transferor under the various sale agreements. Stated differently, LBHI did not "remake" GreenPoint's representations and warranties, and only made (i) limited direct representations and warranties and (ii) "gap" representations and warranties, which cover the short period of time after GreenPoint made its representations and warranties. In addition, LBHI alleged that the portion of the Syncora Claim seeking reimbursement of expenses incurred in connection with the GreenPoint Litigation should be disallowed because Syncora was dismissed for lack of standing in the GreenPoint Litigation, thus demonstrating that such fees were unreasonable and should not be recoverable from LBHI. The objection has been held in abeyance pending informal discovery and negotiations.

47.     On May 2, 2013, LBHI also commenced an adversary proceeding (the "First Syncora Adversary Proceeding") by filing its *Complaint Seeking a Declaratory Judgment that Syncora Guarantee Inc's Claim Number 66099 Is Disallowed And/Or Subordinated* (the "First

Syncora Complaint") [A.P. Docket No. 1].[6]

48.    In the First Syncora Complaint, LBHI asserted, *inter alia*, that: (a) the portion of the Syncora Claim that constitutes Contingent Amounts should be disallowed pursuant to section 502(e)(1)(B) of the Bankruptcy Code; and (b) any portion of the Claim that is allowed should be subordinated under (i) section 509(c) of the Bankruptcy Code, and/or (ii) the New York "make-whole" doctrine.

49.    On July 7, 2013, Syncora filed its Answer to the First Syncora Complaint, denying the allegations in the First Syncora Complaint and asserting the following affirmative defenses:  (a) that LBHI had failed to state a claim upon which relief can be granted; (b) that LBHI lacked standing to assert its claims; and (c) that the relief sought by LBHI was premature [A.P. Docket No. 8].

50.    Subsequently, on September 26, 2013, LBHI filed its *Motion for Summary Judgment on Its Adversary Complaint against Syncora Guarantee Inc.*, reasserting the arguments raised in the First Syncora Complaint [A.P. Docket Nos. 16 & 17].   On October 25, 2013, Syncora filed its *Cross Motion for Summary Judgment of LBHI's Adversary Complaint*, asserting, *inter alia*, that the Claim could not be disallowed under section 502(e)(1)(B) or subordinated under section 509(c) or the make-whole doctrine (the "Cross MSJ") [A.P. Docket No. 20]. On November 4, 2013, LBHI filed its response to the Cross MSJ [Docket No. 22], and on November 21, 2013, Syncora filed a reply in further support of the Cross MSJ [Docket No. 24].

51.    On February 20, 2014, this Court held a hearing (the "Hearing") on the First Syncora Adversary Proceeding.  At the Hearing, LBHI and Syncora agreed to a reduction in LBHI's reserve for the Syncora Claim (from $1.3 billion, which represented the full principal

---

[6]    Citations to "A.P. Docket" numbers pertain to the filings in the First Syncora Adversary Proceeding.

balance) to $600 million. LBHI and Syncora also agreed that LBHI would not seek to further reduce the reserve amount for the ninety (90) day period following February 20, 2014, to allow the parties to see if a consensual agreement could be reached regarding their dispute. Both LBHI and Syncora withdrew their Motions for Summary Judgment without prejudice.

52.    Lehman and Syncora recently participated in a mediation conducted by David Geronemus, Esq., to try to resolve the Claims, but the mediation was unsuccessful.

## II.    Transferor Trusts

53.    Prior to the Commencement Date, LBHI originated certain residential mortgage loans and purchased certain residential mortgage loans from third-party originators (together with LBHI-originated residential mortgage loans, the "Loans"). LBHI then sold the Loans to SASCO, the depositor, who subsequently sold such Loans into trusts that issued residential mortgage-backed securities. The RMBS Claims asserted by the RMBS Trustees cover roughly 1.8 million Loans that were placed into 405 RMBS Trusts.

54.    Generally, LBHI acquired Loans that were subsequently sold to the trusts from two sources: (i) the majority of mortgage loans in the LBHI-sponsored securitizations came from third-party originators ("Transferors") who sold mortgage loans on an on-going or "flow" basis to LBHI through LBB (the "Transferor Loans" and, when referring to the resulting trusts whose assets are comprised of Transferor Loans, the "Transferor Trusts"); and (ii) LBHI either purchased a smaller group of mortgage loans from local and regional lenders (including, in some cases, its own affiliated lenders BNC Mortgage Company and Finance America LLC) referred to as "Correspondents" on an individual basis or in "minibulk" deals, or purchased mortgage loans originated or funded through brokers by LBB (collectively, the "Bank-Originated Loans").

55.    When LBHI purchased mortgage loans on the secondary mortgage market from Transferors, Correspondents, or affiliates, it received representations and warranties as to the

quality and characteristics of the mortgage loans from the originators.  Generally speaking, LBHI individually *re-made* the representations and warranties to the trusts for Bank-Originated Loans, but only *assigned or passed on* representations and warranties to the trusts for Transferor Loans (*e.g.*, LBHI assigned the representations made regarding the mortgage loans and the corresponding put-back rights under the applicable transfer agreement to the trust, but made very limited representations or warranties itself regarding the mortgage loans).  The more fulsome representations and warranties made by the Transferors with respect to the Transferor Loans and the repurchase remedy for breaches of such representations and warranties were assigned to the Trusts.

56.     The gravamen of the RMBS Claims against Lehman is that Lehman breached mortgage loan-level representations.  As far as the Transferor Trusts are concerned, there were two main types of representations and warranties that form the basis of the RMBS Trustees' Claims.

57.     First, LBHI passed on the representations and warranties of the Transferors down to the Transferor Trusts.  In some circumstances, LBHI may have also made some of its own representations and warranties, but under the agreements governing these Transferor Trusts (the "Governing Agreements"), when a similar representation and warranty was made by both LBHI and the Transferor, LBHI's representations and warranties were cancelled in that respect and the Trust's sole recourse would be to the Transferor unless the representation was true when made by the Transferor but false when made by LBHI.  (Lehman made certain direct representations that may not have been cancelled in this manner.  But those representations were limited and Lehman is not materially liable because of them.)

58.     Second, when SASCO deposited the loans into the trusts, it represented and

warranted that certain title-related documents were present in the mortgage loan file. Thereafter,

the trustees (or their designated document custodians) were contractually obligated to verify the

completeness of the mortgage loan files and, where gaps were identified, provide a list of

"exceptions," which Lehman would then have an opportunity to cure. If Lehman was unable to

cure, and the claimed exception was material (*i.e.*, would adversely affect the trust's ability to

foreclose or perfect a mortgage insurance claim), Lehman would be required to repurchase the

related loan.

59.     From time to time, in the ordinary course of business, trustees asserted repurchase

claims against LBHI and, where appropriate, LBHI provided the requested remedy. This process

proceeded on a loan-by-loan basis, as required by the governing agreements, and typically

involved a series of demands and rebuttals to ensure that all parties complied with the terms of

the governing agreements.

60.     Nevertheless, prepetition, *LBHI never repurchased a Transferor Loan*. Rather,

when the RMBS Trustees' repurchase demands involved Transferor Loans, at the request of

certain trustees, Aurora Loan Services, as master servicer, pursued the Transferor Trusts' rights

directly against the third-party Transferors. For example, in *Aurora Loan Services, et al. v.

Ameriquest Mortgage Company, et al.*, U.S. Bank *joined* LBB, LBHI, and Citibank to pursue a

$40 million repurchase case directly against a Transferor. The present dispute is therefore an

anomaly in the history of dealing between Lehman and U.S. Bank, as the parties previously

cooperated to seek relief from the Transferors. There is no reason that this case should be any

different, and U.S. Bank should solely be seeking relief from GreenPoint.

**III.     Overview of the Transaction**

61.     The securitization of residential mortgage loans into the Trust at issue here (the

"Transaction") was effectuated in a series of steps pursuant to a set of inter-related agreements

(collectively, the "Transaction Documents") among mortgage originators, mortgage purchasers, depositors, and an indenture trustee, culminating in the issuance of notes to investors, which are insured by Syncora. The Transaction Documents include, among others, the Indenture, the Assignment and Assumption Agreement, the I&I Agreement, the Policy, the Trust Agreements, the MLSAA, and the Transfer and Servicing Agreement (each as defined herein).

62. Prior to the Petition Date, GreenPoint originated mortgage loans. Pursuant to that certain Flow Revolving Credit Loan Purchase and Warranties Agreement, dated as of September 26, 2005, between GreenPoint and GMAC Mortgage Corporation ("GMAC") (the "HELOC Sale Agreement"), and that certain Flow Mortgage Loan Purchase and Warranties Agreement, dated as of July 26, 2006, between GreenPoint and GMAC (the "Mortgage Loan Sale Agreement" and, together with the HELOC Sale Agreement, the "Sale Agreements"), GreenPoint sold certain of such mortgage loans to GMAC.

63. LBB then purchased certain of the loans originated by GreenPoint pursuant to certain Purchase Price and Terms Letters. Thereafter, in accordance with (i) the Assignment, Assumption and Recognition Agreement dated as of July 28, 2006 by and among LBB, GreenPoint and GMAC (the "GreenPoint HELOC AAR"), and (ii) the Assignment, Assumption and Recognition Agreement dated as of July 28, 2006 by and among LBB, GreenPoint and GMAC (the "GreenPoint Second Lien AAR" and, together with the GreenPoint HELOC AAR, the "AAR Agreements"), GMAC assigned these mortgage loans and certain contractual rights and remedies to LBB.[7] As both the GreenPoint HELOC AAR and the GreenPoint Second Lien AAR plainly state:

> [GMAC] acknowledges and agrees that upon execution of this

---

[7]   The GreenPoint HELOC AAR concerns the mortgage loans acquired by GMAC in connection with the HELOC Sale Agreement. The GreenPoint Second Lien AAR concerns the mortgage loans acquired by GMAC in connection with the Mortgage Loan Sale Agreement.

> Agreement, [LBB] shall become the "Purchaser" under the
> Purchase Agreement [*i.e.*, the HELOC Sale Agreement or the
> Mortgage Loan Sale Agreement, as applicable], and *all
> representations, warranties, and covenants by [GreenPoint] to the
> "Purchaser" under such Purchase Agreement, including, but not
> limited to, the rights to require repurchase of any Mortgage Loan
> and to receive indemnification, shall accrue to [LBB] by virtue of
> this Agreement.*

GreenPoint HELOC AAR § 1 (emphasis added); GreenPoint Second Lien AAR § 1 (same).

64.    GreenPoint acknowledged GMAC's assignment of these rights—including the

right to indemnification—to LBB:

> [GreenPoint] acknowledges and agrees that upon execution of this
> Agreement, [LBB] shall become the "Purchaser" under the
> Purchase Agreement [*i.e.*, the HELOC Sale Agreement or the
> Mortgage Loan Sale Agreement, as applicable] and Interim
> Servicing Agreement . . . and all representations, warranties and
> covenants by [GreenPoint] as the "Seller" thereunder, including,
> but not limited to, the representations, warranties and covenants to
> repurchase any Mortgage Loan *and to indemnify the "Purchaser"*,
> [sic] shall accrue to [LBB] by virtue of this Agreement.

GreenPoint HELOC AAR § 6(b) (emphasis added); GreenPoint Second Lien AAR § 6(b)
(same).

65.    LBB then assigned certain of those loans (the "GreenPoint Loans") and certain

contractual rights and remedies to LBHI pursuant to a certain Assignment and Assumption

Agreement, dated as of August 1, 2006 (the "Assignment and Assumption Agreement"), by and

between LBB, as assignor, and LBHI, as assignee.

66.    LBB's successor in interest, Aurora Commercial Corporation, subsequently

assigned to LBHI its right to indemnification from GreenPoint pursuant to the Assignment and

Assumption Agreement, dated as of May 11, 2015, by and between Aurora Commercial Corp.,

as assignor, and LBHI, as assignee (the "Indemnification Rights Assignment"):

The Assignor hereby assigns to the Assignee all of its right, title

- 24 -

> and interest in and to the Indemnification Rights (such Indemnification Rights, together with any other rights, claims or remedies of whatever nature, whether at law or equity, Assignor may have against Greenpoint or Impac with respect to the Loans, the "Assigned Rights"). The Assignee hereby accepts such assignment, and shall be entitled to exercise all such rights of the Assignor under each of the Transfer Agreements, as if the Assignee had been a party to each such agreement.

Indemnification Rights Agreement § 1.

67.     In connection with the Transaction, LBHI then transferred the GreenPoint Loans and the related contractual rights and remedies (along with certain other loans originated by Impac Funding Corporation) to SASCO pursuant to that certain Mortgage Loan Sale and Assignment Agreement, between LBHI and SASCO, dated as of August 1, 2006 (the "MLSAA").

68.     SASCO, in its capacity as a depositor, subsequently transferred the GreenPoint Loans to the Trust pursuant to the terms of that certain Transfer and Servicing Agreement, dated as of August 1, 2006 (the "Transfer and Servicing Agreement"), by and among the Trust, as issuer, SASCO, as depositor, GMAC, as servicer, and U.S. Bank, as Indenture Trustee. The Trust then issued mortgage-backed notes that were secured by the GreenPoint Loans.

69.     The Trust itself is governed by an Indenture dated as of August 1, 2006 (the "Indenture"), by and between the Trust, as issuer, and U.S. Bank, as Indenture Trustee. The Indenture provides for, among other things, the issuance of Class Ax Notes (the "Class Ax Notes" or the "Wrapped Tranche") and Class Ac notes representing indebtedness of the Trust, each containing $1,331,838,000 and $500,000,000 in aggregate principal amount, respectively. Under the Policy, Syncora insured the Class Ax Notes, but did not insure the Class Ac Notes.

## IV.     Summary of Applicable Provisions in the Transaction Documents

70.     In the I&I Agreement, LBHI incorporated the representations and warranties

made in the MLSAA:   "[e]ach of the representations and warranties . . . contained in the

applicable Operative Documents is true and correct in all material respects . . . and [LBHI]

makes each such representation and warrant to, and for the benefit of, the Insurer."   I&I

Agreement § 2.01(m).

71.     In the MLSAA, LBHI passed along the representations and warranties made by

GreenPoint, and only made limited representations and warranties of its own.   Specifically, in

section 1.04(b)(iii), LBHI made a number of representations and warranties that were originally

made by GreenPoint and then passed down the transaction chain.   *See* MLSAA § 1.04(b)(iii).

However, section 1.04(b) contains an important limitation on those representations and

warranties with respect to LBHI's liability:

> The Depositor [SASCO] acknowledges and agrees that the
> representations and warranties of the Seller in this Section 1.04(b)
> [except those in subsection 1.04(b)(i)] are applicable only to facts,
> conditions, or events that do not constitute a breach of any
> representation or warranty made by the Transferor in the Transfer
> Agreements."

MLSAA § 1.04(b).   Thus, LBHI did not remake GreenPoint's representations and warranties, but

brought GreenPoint's representations and warranties down into the MLSAA.   As a result,

LBHI's representations and warranties are cancelled to the extent that they overlap with the

representations and warranties made by GreenPoint.[8]   LBHI's representations and warranties

thus serve as gap representations and warranties (the "Gap Reps") designed to cover the period

of time that GreenPoint's do not—the one-month timeframe between July 28, 2006, when

GreenPoint made the representations, and August 28, 2006, the closing date of the MLSAA.

72.     The I&I Agreement also expressly limited Syncora's remedies to those specified

in the MLSAA:

---

[8]     U.S. Bank has confirmed that the documents work in this manner, as explained below (*see* ¶ 82, *infra*).

> [T]he remedy for any breach of representation and warranty of the
> Seller in under [sic] Section 1.04(b) of the [MLSAA] and the
> remedy with respect to any defective Mortgage Loan under Section
> 1.03 of the [MLSAA] *shall be limited to the remedies specified in
> the [MLSAA]. The Insurer agrees that the rights it shall have as a
> third-party beneficiary under the Indenture shall be limited to the
> rights granted to it and to the Noteholders in the Indenture.*"

I&I Agreement § 2.02(i) (the "I&I Remedy Limitation") (emphasis added).

## V.    Syncora's Financial Guaranty Insurance Policy ███████████

73.    At the time of the Transaction, Syncora entered into an Insurance and Indemnity
Agreement dated as of August 28, 2006 (the "I&I Agreement"), by and among Syncora, as
insurer, LBHI, as sponsor, SASCO, as depositor, the Trust, as issuer, GMAC, as servicer, and
U.S. Bank, as Indenture Trustee.  Syncora also issued a financial guaranty insurance policy,
effective as of August 28, 2006 (the "Policy") to U.S. Bank.

74.    Pursuant to the Policy, in consideration of insurance premiums, Syncora provided
an unconditional, irrevocable guarantee that the investors in Class Ax Notes (the "Investors")
would receive the promised payments of principal and interest when due regardless of any
shortfall in cash flow that the Trust may experience and regardless of the reason for such
shortfall.

75.    After the Policy was issued, many of the GreenPoint Loans went into payment
default.  Such payment defaults caused a considerable decline of cash flows, *i.e.*, the source of
payments to the Trust, and ultimately caused a shortfall in the Trust's payments of principal and
interest to the Investors.  As a result, U.S. Bank submitted claims to Syncora under the Policy for
amounts equal to the shortfall in payments to the Investors.  To Lehman's knowledge, Syncora
has made payments in amounts equal to the shortfall.  As discussed further below, ███████

████████████████████████████████████████████████████

████████████████████████████

76. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

## VI.    The GreenPoint Litigation

77.    U.S. Bank filed a complaint against GreenPoint on February 5, 2009, in New York State Supreme Court, alleging that GreenPoint breached numerous representations and warranties with respect to the origination of 30,000 GreenPoint Loans (the "GreenPoint Litigation"). U.S. Bank did not purchase the loans directly from GreenPoint, but alleges that the right to enforce the representations and warranties made by GreenPoint, including the right to seek repurchase of the loans, was assigned to it, as Indenture Trustee of the Trust into which the loans were ultimately transferred through a chain of assignments that included a transfer from

LBB to LBHI. U.S. Bank alleges that pursuant to the terms of the Sale Agreements, GreenPoint agreed to cure any breach that materially or adversely affected the value of a loan or to repurchase the loan at a contractually specified repurchase price. According to U.S. Bank, GreenPoint (i) breached numerous representations and warranties, and (ii) failed to repurchase the loans when demand was made.

78.    GreenPoint has asserted a number of defenses against U.S. Bank's claims, including that U.S. Bank lacks standing to seek repurchase of the loans from GreenPoint because U.S. Bank never was assigned those rights. Specifically, GreenPoint asserts that, at an earlier point in the series of transactions through which the Trust was created, LBB failed to properly assign repurchase rights to LBHI because LBB failed to use a specific form called for in the Sale Agreements, or one substantially like it. The Court addressed a similar issue during a hearing on May 5, 2015, concerning a motion to vacate certain alternative dispute resolution procedures pursuant to Federal Rule of Civil Procedure 60(b):

> So then how about the notion that the originators engaged in a massive fraud, because the words in the seller's guide surely led everybody to believe that third-party assignments were contemplated. The entire structure of this industry was premised on the subsequent assignment pooling and selling of those mortgages. That's the way these folks made money.
>
> So for you to be telling me that in fact if you didn't do the paper in exactly the right way all of those rights would be cut off is pretty astonishing.

79.    U.S. Bank, for its part, argues that the assignment between LBB and LBHI was "substantially" in the form required by the Sale Agreements, and that, even if it were not, the transfer of the loans from LBB to LBHI fell under an exception to the form requirement because the transfer qualifies as a "Securitization Transfer" under the Sale Agreements. A Securitization Transfer under the Sale Agreements is defined as a transfer to a "securitized trust structure,"

which itself is not defined in the agreements. U.S. Bank argues that because LBHI was the sponsor of the Trust, the transfer from LBB to LBHI must have been a transfer to a securitized trust structure.

80. The parties have cross-moved for summary judgment on the issue of standing, with GreenPoint seeking to dismiss U.S. Bank for lack of standing, and U.S. Bank seeking to strike GreenPoint's lack of standing defense. GreenPoint and U.S. Bank's opening moving papers are dated December 16, 2013, and were filed with the court on March 7, 2014, and February 28, 2014, respectively. The last briefing on the matter was filed with the court on March 10, 2014, and the court held oral argument on the parties' cross-motions for summary judgment on the standing issue on September 9, 2014. The court marked the motion as fully submitted on October 10, 2014. During the pendency of the GreenPoint Litigation, Lehman diligently tried to resolve its dispute with U.S. Bank and Syncora consensually, but those efforts have continually failed. Accordingly, it is of the utmost importance that Lehman move quickly to safeguard the interests of the estate.

81. Importantly for purposes of the present dispute, however, the question arose at the September 9, 2014 oral argument whether U.S. Bank can also seek relief from LBHI for the same claims that it is asserting against GreenPoint. U.S. Bank's counsel explicitly answered that U.S. Bank's claims against GreenPoint are not the same as whatever claims it may have against LBHI; in fact, U.S. Bank's counsel explained that LBHI is not liable on any representations made by GreenPoint: "With respect to [LBHI] what it says is that . . . [LBHI] is not liable. . . . [LBHI] is not liable on its representations if the basis for your claims against [LBHI] is also the basis for a claim against GreenPoint." Hearing Transcript, *U.S. Bank N.A. v. GreenPoint Mortgage Funding, Inc.*, No. 600352/2009, at 30:17-32:6 (Sept. 9, 2014) [Docket No. 544].

**VII.   LBB Validly Assigned to LBHI the Right to Enforce GreenPoint's Representations and Warranties.**

82.   Critical to the securitization, and consistent with securitization industry practice, is that LBHI obtained the rights to enforce GreenPoint's representations and warranties.  As set forth more fully below, these rights were transferred from LBB to LBHI, and ultimately transferred to U.S. Bank, as Indenture Trustee for the Trust.

83.   As discussed above, GreenPoint made representations and warranties concerning the quality and characteristics of the individual loans, borrowers, and/or collateral in the Sale Agreements.

84.   In the Sale Agreements, GreenPoint agreed to cure or repurchase breaching loans upon discovery or notice of a material breach.  HELOC Sale Agreement, § 8; Mortgage Loan Sale Agreement, § 8.

85.   LBB obtained the right to enforce GreenPoint's representations and warranties through the AAR Agreements.  Under the AAR Agreements, GreenPoint agreed that LBB shall become "Purchaser" under the Sale Agreements, and "the representations, warranties, and covenants to repurchase any Mortgage Loan and to indemnify the 'Purchaser', shall accrue to [LBB] by virtue of this Agreement."  AAR Agreements, § 6(b).

86.   Under the Sale Agreements, "[t]he Purchaser may, subject to the terms of this Agreement, sell one or more of the Mortgage Loans."  The Sale Agreements then purport to limit the transfer of rights against GreenPoint, in some circumstances, where a particular form of assignment is not used:

> [A]ny transferee will not be deemed to be a Purchaser hereunder binding upon the Seller unless . . . an assignment and assumption of this Agreement substantially in the form of Exhibit G hereto executed by the transferee shall have been delivered to the Seller.

*See* HELOC Sale Agreement, § 21.[9]

87.    Section 21(i) of the HELOC Sale Agreement provides an exception to any requirement to use the assignment form, where the assignment was to a securitized trust structure. That provision provides:

> [I]n the case of a Securitization Transfer . . . Purchaser shall have the right to assign its rights under this Agreement into such Securitization Transfer . . . after which the issuer or trustee for the issuer of any such Securitization Transfer or such Agency Transfer shall be deemed to be a Purchaser . . . .

HELOC Sale Agreement, § 21(i). [10]

88.    The term "Securitization Transfer," is defined as "convey[ing] the . . . Loans to securitized trust structures."  HELOC Sale Agreement, § 28.  The term "securitized trust structure" is not defined in the HELOC Sale Agreement.

89.    A "securitized trust structure" includes a structure in which residential mortgage loans and HELOCs are pooled and deposited into a trust, which holds the loans and HELOCs and receives mortgage and other payments for the benefit of the holders of certificates or notes issued by the trust.

90.    The Trust is a "securitized trust structure."

91.    LBB also confirmed its agreement to purchase certain HELOCs and Mortgage Loans through five Purchase Price and Term Letters ("PPTLs"), dated between September 15, 2005 and July 11, 2006.  In the PPTLs, GreenPoint expressly agreed that LBB

---

[9]    Section 21 of the Mortgage Loan Sale Agreement varies slightly:  "[t]he transferee will not be deemed to be a Purchaser hereunder binding upon the Seller unless . . . an assignment and assumption of this Agreement is in the form of Exhibit H hereto executed by the transferee shall have been delivered to the Seller."

[10]    Section 21 of the Mortgage Loan Sale Agreement does not contain a "Securitization Transfer" exception, but it does provide a Purchaser with an unrestricted right to transfer to any of its affiliates, stating:  "The Purchaser may assign all of its rights under this Agreement with respect to any Mortgage Loans to any affiliate of the Purchaser."

had the unrestricted right to assign the Sale Agreements to any affiliate or third party.   A

representative PPTL states:

> The Purchaser [LBB] has the right to assign all of its rights under
> the Purchase Price and Terms Letter, the [Sale] Agreement, the
> Flow Interim Servicing Agreement and/or any of the HELOCs
> purchased under the Agreement to any affiliate of the Purchaser or
> third party.

PPTL, dated March 7, 2006.

92.    This broad right of transfer is also expressed in section 19 of the representative

PPTL, which indicates that LBB has the unrestricted right to transfer through whole loan,

agency, and pass-through transfers:

> The Purchaser [LBB] may sell the HELOCs either to whole loan
> purchasers ("Whole Loan Transfers"), exchange the HELOCs for
> agency securities ("Agency Transfers") or convey the securitized
> trust structures ("Pass-Through Transfers") (each a "Transfer").  In
> the event that the Purchaser sells certain HELOCs into Pass-
> Through Transfers or Agency Transfers, the Seller agrees to
> cooperate with the Purchaser in reviewing and adhering to the
> terms of any agreements which might be required as part of
> Agency Transfers or Pass-Through Transfers.

Id.

93.    Consistent with the structure and intent of the transaction as a whole, LBB agreed

to "assign to [LBHI] all of its right title and interest in and to the Loans and the

Sale/Service Agreements [including the Flow Agreements] . . . ." pursuant to the terms of

the Assignment and Assumption Agreement.  Assignment and Assumption Agreement, § 1(a).

94.    The Assignment and Assumption Agreement expressly releases LBB from any

liability with respect to a GreenPoint breach, and provides that any remedy for such a breach is

against GreenPoint:

> Upon discovery or notice of any breach by a seller [i.e.,
> GreenPoint] of any representation, warranty, or covenant under the

> Sale/Servicing Agreement [including the Flow Agreements], the Assignee's [LBHI] sole recourse shall be to enforce such seller's obligations under the Sale/Servicing Agreement [i.e., the Flow Agreements].

Assignment and Assumption Agreement, § 6.

95.     No particular form of assignment was required to effectuate the assignment of rights from LBB to LBHI because the PPTLs contained no such requirement, and, regardless of the PPTLs, the assignment was exempt from any form requirement in the HELOC Flow Agreement because it was into a "securitized trust structure."[11]

96.     Contemporaneous with the Assignment and Assumption Agreement, the rights to enforce GreenPoint's representations and warranties were passed simultaneously from LBHI to SASCO, through the MSLAA; to the Trust, through the Transfer and Servicing Agreement; and ultimately pledged to U.S. Bank for the benefit of the noteholders and insurers, through the Indenture; all dated August 1, 2006. The pertinent language in each transaction is as follows:

> a.   Section 1.01(a) of the MLSAA provides, "Seller [LBHI] hereby assigns to the Depositor [SASCO] all of its rights and interest under the Transfer Agreements [e.g., the AAR Agreements incorporating the Sale Agreements] and the Assignment and Assumption Agreement and delegates to the Depositor all of its obligations . . . ."
>
> b.   Section 2.01 of the Transfer and Servicing Agreement provides, "Depositor does hereby transfer, assign, set over, deposit and otherwise convey to the Issuer [the Trust] . . . any of the Depositor's rights in relation to a Transferor or the Seller to each Transfer Agreement and the Mortgage Loan Sale Agreement, including the representations and warranties of each Transferor."
>
> c.   The Granting Clause of the Indenture provides, "Each of the Issuer [the Trust] and the Owner Trustee hereby Grants to the Indenture Trustee [U.S. Bank] at the Closing Date, as Indenture Trustee for the benefit of the Holders of the Notes and the Insurers, . . . the Issuer's rights and benefits under the Transfer Agreements (including the Issuer's right to cause the Originator to repurchase the related Loans . . . )."

---

[11]    The assignment was also exempt from any form requirement in the Mortgage Loan Flow Agreement because LBHI is an affiliate of LBB.

97.    The offering documents confirm that the rights to GreenPoint's representations and warranties passed to LBHI and ultimately to U.S. Bank for the benefit of noteholders of the Trust:

> Each originator [e.g., GreenPoint] has made certain representations and warranties concerning the loans originated by it up to the date of the applicable sale agreement.  The seller's [LBHI] right to these representations and warranties will be assigned to the depositor [SASCO] under a sale and assignment agreement and, in turn, will be assigned at the owner trustee by the depositor to the indenture trustee for the benefit of the noteholders under the trust agreement.

ProSupp at S-8.

98.    GreenPoint itself contractually acknowledged that the rights to its representations and warranties passed to U.S. Bank, for the benefit of the Trust.   In an Indemnification Agreement, dated August 20, 2006, GreenPoint agreed to indemnify Syncora for:

> "any and all Losses  .  .  .  resulting from the Originator's [GreenPoint's] failure to cure, repurchase or substitute for any of the HELOCs upon breach of a representation and warranty with respect thereto, as, when and to the extent required pursuant to the terms of the Mortgage Loan Sale Agreements."

Pl.'s Memo. Of Law in Support of its Mot. For Partial Summ. J., *U.S. Bank Nat. Assoc. v. GreenPoint Mortgage Funding, Inc.*, No. 600325/09, Dkt No. 238, at 13 (quoting Indemnification Agreement, § 6(c)).

99.    Thus, U.S. Bank holds and has the right to enforce the GreenPoint representations and warranties.

100.    GreenPoint's present position, that U.S. Bank lacks standing to sue, has been inconsistent.  GreenPoint previously admitted in filings that the Trustee has standing.  When the Insurers, including Syncora were part of the litigation, GreenPoint moved to dismiss the Insurer's claims on the basis of standing, arguing that U.S. Bank was the real party in interest:

> The Indenture Trustee—not the Insurers—was assigned all of the
> rights pertaining to GreenPoint's representations and warranties.
> As the sole assignee of the rights asserted, the Indenture Trustee—
> and not the Insurers—is the real party in interest. . . Since the
> Indenture Trustee has (1) acted to protect the interest of the
> Insurers; and (2) is the only real party in interest here the Insurers
> must be dismissed for lack of standing.

Memo. Of Law in Support of Mot. to Dismiss, *U.S. Bank Nat. Assoc. v. GreenPoint*

*Mortgage Funding, Inc.*, No. 600325/09, Dkt No. 7, at 24-25.

### FIRST CAUSE OF ACTION

#### The U.S. Bank Claim Should be Disallowed Pursuant to 11 U.S.C.§ 502(a) and (b)

101.    Lehman hereby incorporates the foregoing paragraphs as if fully restated herein.

102.    Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be
"deemed allowed" where a party in interest objects thereto.

103.    Lehman hereby objects to the U.S. Bank Claim.

104.    U.S. Bank seeks reimbursement for amounts owed to the Trust from GreenPoint
based on alleged breaches of representations and warranties made by GreenPoint.

105.    Lehman is not liable for the breaches of representations and warranties that U.S.
Bank alleges against GreenPoint.

106.    Any recovery by U.S. Bank against GreenPoint would necessarily offset any
potential Lehman liability.

107.    Lehman assigned the representations and warranties made by GreenPoint to the
Trust.

108.    U.S. Bank has failed to provide sufficient documentation in support of the U.S.
Bank Claim.

109.    Lehman has no liability to U.S. Bank on account of the claims asserted in the U.S.

Bank Claim.

110.    For the aforementioned reasons, Lehman hereby requests that the Court disallow the U.S. Bank Claim in its entirety, and that the U.S. Bank Claim be expunged.

## SECOND CAUSE OF ACTION

### The Syncora Claim and Contingent Claims Should be Disallowed
### Pursuant to 11 U.S.C.§§ 502(a), 502(e)(1)(B)

111.    Lehman hereby incorporates the foregoing paragraphs as if fully restated herein.

112.    Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be "deemed allowed" where a party in interest objects thereto.

113.    Lehman hereby objects to the Syncora Claim.

114.    Syncora has no standing to enforce the MLSAA as against LBHI or any other party.

115.    Syncora's sole remedy, if any, is through the Indenture Trustee and is limited to the remedies available to the Indenture Trustee.

116.    The Syncora Claim is duplicative of the U.S. Bank Claim.

117.    Lehman is not liable for the breaches of representations and warranties that U.S. Bank alleges against GreenPoint.

118.    Lehman assigned the representations and warranties made by GreenPoint to the Trust.

119.    Thus, Syncora cannot recover on the same claims made in the U.S. Bank Claim.

120.    Even if Lehman were liable on the U.S. Bank Claim, Syncora's only claims against LBHI would be duplicative of LBHI's liability on the U.S. Bank Claim.

121.    Syncora cannot show that any breach of the MLSAA materially increased its risk of loss.

122.    Syncora has no valid independent cause of action under the I&I Agreement or New York Insurance Law §§ 3105 and 3106.  Indeed, Syncora has waived its right to relief under New York Insurance Law §§ 3105 and 3106 by continuing to provide coverage under the I&I Agreement and collect premiums after discovering the alleged misrepresentations at issue here.

123.    For the aforementioned reasons, Lehman hereby requests that the Court disallow the Syncora Claim in its entirety, and that the Syncora Claim be expunged.

124.    The Syncora Claim is also contingent to the extent that Syncora seeks reimbursement for Contingent Amounts that Syncora has not yet made to the Trust under the Policy.

125.    Pursuant to section 502(e)(1)(B) of the Bankruptcy Code, a court shall disallow a claim for reimbursement or contribution of an entity that is liable with the debtor to the extent that "such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution."

126.    The Contingent Amounts should be disallowed as: (i) the Syncora Claim establishes that Syncora is seeking reimbursement for amounts it has paid, and may have to pay in the future, to the Trust; (ii) Syncora and LBHI are both contractually obligated (*i.e.*, co-liable) to U.S. Bank, as indenture trustee of the Trust (to the extent any such liabilities exist); and (iii) the unpaid portion of the Syncora Claim constitutes a contingent claim.

127.    Thus, Syncora's claim for reimbursement of Contingent Amounts, as reflected in the Syncora Claim, should be disallowed pursuant to 11 U.S.C. § 502(e)(1)(B).

### THIRD CAUSE OF ACTION

**To the Extent Portions of the Syncora Claim are Allowed, They Should be Subordinated Pursuant to 11 U.S.C. § 509(c) to the U.S. Bank Claim**

128.     Lehman hereby incorporates the foregoing paragraphs as if fully restated herein.

129.     To the extent that any portion of the Syncora Claim is allowed, Syncora seeks reimbursement for amounts owed to the Trust for which both Lehman and Syncora are liable.

130.     To the extent that any portion of the Syncora Claim is allowed, those portions of the Syncora Claim that seek reimbursement of Existing Losses, as reflected in the Syncora Claim, must be subordinated to the U.S. Bank Claim for the benefit of U.S. Bank pursuant to 11 U.S.C. § 509(c).

## FOURTH CAUSE OF ACTION

### The U.S. Bank Claim Should be Estimated at Zero Dollars for Reserve Purposes Pursuant to 11 U.S.C. § 502(c)

131.     Lehman hereby incorporates the foregoing paragraphs as if fully restated herein.

132.     U.S. Bank seeks reimbursement for amounts owed to the Trust from GreenPoint based on alleged breaches of representations and warranties made by GreenPoint.

133.     Lehman is not liable for the breaches of representations and warranties that U.S. Bank alleges against GreenPoint.

134.     Any recovery by U.S. Bank against GreenPoint would necessarily offset any potential liability of Lehman.

135.     U.S. Bank has failed to provide sufficient documentation in support of the U.S. Bank Claim.

136.     Lehman has no liability to U.S. Bank on account of the claims asserted in the U.S. Bank Claim.

137.     Thus, to the extent the Court denies disallowance of the U.S. Bank Claim for the reasons asserted in the First Cause of Action, the Court should estimate the U.S. Bank Claim at zero dollars for reserve purposes pursuant to 11 U.S.C. § 502(c).

## FIFTH CAUSE OF ACTION

### The Syncora Claims Should be Estimated at Zero Dollars For Reserve Purposes Pursuant to 11 U.S.C. § 502(c)

138.   Lehman hereby incorporates the foregoing paragraphs as if fully restated herein.

139.   Syncora seeks reimbursement for amounts owed to the Trust based on claims that are duplicative of U.S. Bank's claim against GreenPoint.

140.   Lehman is not liable for the breaches of representations and warranties that U.S. Bank alleges against GreenPoint.

141.   Syncora cannot recover on the Syncora Claim because it is duplicative of the U.S. Bank Claim.

142.   Even if Lehman were liable on the U.S. Bank Claim, Syncora's only claims against Lehman would be duplicative of Lehman's liability on the U.S. Bank Claim.

143.   Syncora cannot recover on the Contingent Amounts because such portions of the Syncora Claim are to be disallowed pursuant to section 502(e)(1)(B) of the Bankruptcy Code as the Syncora Claim is contingent to the extent that Syncora seeks reimbursement for payments that Syncora has not yet made to the Trust under the Policy.

144.   Syncora's claims for reimbursement of fees incurred in the GreenPoint Litigation should also be estimated at zero because those fees were unreasonable given Syncora's dismissal from the GreenPoint Litigation for lack of standing.

145.   Furthermore, to the extent that any portion of the Syncora Claim is allowed, those portions of the Syncora Claim that seek reimbursement of Existing Losses, as reflected in the Syncora Claim, should be subordinated to the U.S. Bank Claim, pursuant to 11 U.S.C. § 509(c).

146.   Thus, to the extent the Court denies disallowance of the Syncora Claim for the reasons asserted in the Second Cause of Action, the Court should estimate the Syncora Claim at

zero dollars for reserve purposes pursuant to 11 U.S.C. § 502(c).

## SIXTH CAUSE OF ACTION

### The U.S. Bank Claim Should be Pursued Through the RMBS Protocol

147.    Lehman hereby incorporates the foregoing paragraphs as if fully restated herein.

148.    To the extent that the Court declines to disallow the U.S. Bank Claim and declines to estimate the U.S. Bank Claim at zero dollars for reserve purposes—or even if the Court estimates the U.S. Bank at zero dollars—the Court should direct that the U.S. Bank Claim be pursued through the RMBS Protocol and that U.S. Bank be required to prove such Claim on a loan by loan basis.

## SEVENTH CAUSE OF ACTION

### LBHI is Entitled to a Declaratory Judgment that GreenPoint Must Indemnify it for its Liability, if any, to U.S. Bank

149.    LBHI hereby incorporates the foregoing paragraphs as if fully restated herein.

150.    An actual, ripe and judiciable controversy exists between LBHI and GreenPoint regarding whether GreenPoint must indemnify LBHI for its liability, if any, to U.S. Bank and/or Syncora arising out of the breaches of representations and warranties concerning the mortgage loans at issue here.

151.    This is a "core" matter under the Bankruptcy Code.

152.    Judgment on GreenPoint's obligation to indemnify LBHI will have a useful purpose in clarifying and settling the legal relations in issue, and will afford relief from the possibility of inconsistent judgments—each detrimental to Lehman—in the event this Court holds (i) that the assignment of repurchase rights between LBB and LBHI was not in the form required by the Sale Agreements and (ii) that the transfer of the loans from LBB to LBHI did not qualify as a "Securitization Transfer" under the Sale Agreements.

153.    If GreenPoint is not liable to U.S. Bank directly, and U.S. Bank's Claim is properly asserted against Lehman, LBHI is entitled to indemnification from GreenPoint in the full amount of its liability to U.S. Bank, if any, pursuant to the AAR Agreements and the Indemnification Rights Assignment.

154.    Pursuant to 28 U.S.C. § 2201, LBHI requests and the Court may now declare the rights and other legal relations of the parties.  The Court may grant further necessary or proper relief based on its declaratory judgment in this action pursuant to 28 U.S.C. § 2202.

155.    Based on the foregoing, LBHI requests a declaratory judgment that GreenPoint must indemnify LBHI for its liability, if any, to U.S. Bank and/or Syncora arising out of the breaches of representations and warranties concerning the mortgage loans at issue here.

## EIGHTH CAUSE OF ACTION

### The GreenPoint Litigation Should Be Enjoined
### Pursuant to 11 U.S.C. §§ 105, 1142(b)

156.    Lehman hereby incorporates the foregoing paragraphs as if fully restated herein.

157.    Section 1142(b) of the Bankruptcy Code empowers this Court to "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b).

158.    Section 105 of the Bankruptcy Code grants Bankruptcy Courts the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

159.    Under Sections 105 and 1142, a Bankruptcy Court may enforce the terms of a confirmed plan or stay other proceedings that would defeat or impair the Court's jurisdiction.

160.   U.S. Bank and Syncora have asserted nine-figure Claims in *Lehman's* bankruptcy case, even though they have acknowledged in the GreenPoint Litigation that GreenPoint—not Lehman—is liable for their losses.

161.   Lehman cannot wait indefinitely for the resolution of the GreenPoint Litigation while, at the same time, effectively and efficiently administering its estate.

162.   The GreenPoint Litigation is interfering with the resolution of a several hundred million dollar claim against the estate.

163.   Section 13.5(i) of the Plan and Paragraph 55(i) of the Confirmation Order enjoin U.S. Bank from "commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties."

164.   Section 13.6(vi) of the Plan and Paragraph 55(vi) of the Confirmation Order enjoin U.S. Bank from "taking any actions to interfere with the implementation or consummation of the Plan[.]"

165.   U.S. Bank has violated Section 13.5 of the Plan and Paragraph 55 of the Confirmation Order by continuing to litigate the GreenPoint Litigation.

166.   The U.S. Bank Claim and the GreenPoint Litigation involve common questions of law and fact that should be resolved by this Court.

167.   Neither U.S. Bank, nor Syncora, will be harmed by an injunction temporarily enjoining them from pursuing the GreenPoint Litigation.

168.   There is a threat that the simultaneous pursuit of the GreenPoint Litigation will result in judgments inconsistent with the judgments in this Court.

169.    The harm to Lehman that would result from a continuation of the GreenPoint Litigation far outweighs any harm to the Claimants that would result from the granting of the requested injunction.

170.    The public interest favors granting the extension of the automatic stay proposed by LBHI and temporarily enjoining the Claimants from pursuing the GreenPoint Litigation.

171.    Thus, the Court should enter injunctive relief enjoining the continued litigation of the GreenPoint Litigation, pursuant to 11 U.S.C. §§ 105(a), 1142(b).

## NINTH CAUSE OF ACTION

### LBHI Is Entitled to a Declaratory Judgment That the Assignment of Repurchase Rights from LBB to LBHI Was Valid

172.    LBHI hereby incorporates the foregoing paragraphs as if fully restated herein.

173.    An actual, ripe and judiciable controversy exists between LBHI, U.S. Bank, Syncora, and GreenPoint regarding whether LBB effectively assigned its rights to LBHI through the Assignment and Assumption Agreement.  GreenPoint has refused to perform its repurchase obligations and claims that the right to enforce its representations and warranties was not effectively assigned between LBB and LBHI.  In turn, Syncora seeks to hold LBHI liable for GreenPoint's refusal to repurchase.

174.    This is a "core" matter under the Bankruptcy Code.

175.    Judgment on the assignment between LBB and LBHI will have a useful purpose in clarifying and settling the legal relations in issue, and will afford relief from the uncertainty and insecurity giving rise to this claim.[12]

---

[12]    A bankruptcy court's discretion to grant declaratory relief is informed by two principles: (1) "whether the judgment will serve a useful purpose in clarifying and settling the legal relations in issue," and (2) "whether it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *In re Quigley Co., Inc.*, 361 B.R. 723, 738 (Bankr. S.D.N.Y. 2007).  As the Second Circuit has stated, "[i]f either prong is met, the action must be entertained." *Cont'l Cas. Co. v. Coastal Savs. Bank*,

176.    GreenPoint cannot escape its obligation to repurchase, and Syncora cannot hold LBHI liable for such failure, because, among other reasons, LBB effectively assigned its rights to LBHI through the Assignment and Assumption Agreement, including the rights to enforce GreenPoint's representations and warranties.

177.    The purported form requirement in the Sale Agreements was eliminated because the PPTLs provided LBB with an unrestricted right to assign all of its rights to any affiliate or third party.

178.    Alternatively, the assignment between LBB and LBHI was exempt from any form requirement under the HELOC Sale Agreement because the assignment was "into" a "Securitization Transfer," which is defined as "convey[ing] the . . . Loans to securitized trust structures." HELOC Sale Agreement, § 28.[13]

179.    LBHI, as a securitization sponsor, is plainly part of a "securitized trust structure" because it created the pool of loans for the securitization and immediately transferred such loans for securitization. *See, e.g., Dexia SA/NA v. Morgan Stanley*, 21 Misc. 3d 1214, *2 (N.Y. Sup. Ct. 2013) ("The first step in the securitization process is the creation of a pool of designated mortgages by the sponsor."); *Bayerische Landesbank v. HSBC Holdings PLC*, 2013 WL 6144762, * 1 (S.D.N.Y.) ("Both the sponsor and the depositor are considered the 'issuer' of the securities.").

180.    Moreover, the assignment form cannot apply to a securitization sponsor like LBHI because it requires an assignee to warrant that it is acquiring the loans "for investment in its own account only and not for any other person." HELOC Sale Agreement, Exhibit G ¶ 3(d). Reading the Sale Agreements to require a form of assignment for a transfer to a securitization

---

977 F.2d 734, 737 (2d Cir.1992).

[13]    The assignment was also exempt from any form requirement in the Mortgage Loan Sale Agreement because LBHI is an affiliate of LBB. *See* Mortgage Loan Sale Agreement, § 21.

sponsor would lead to an absurd result where a sponsor *must* use the assignment form, but *cannot* use the assignment form (because its role requires it to transfer the loans rather than hold them for its own account). *See In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) ("a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.").

181.    GreenPoint's course of conduct confirms that the assignment to LBHI was effective. GreenPoint acknowledged in its Indemnification Agreement with Syncora that it had repurchase obligations to U.S. Bank because it agreed to indemnify Syncora for any failure to fulfill those obligations. Indemnification Agreement, § 6(c). Indeed, it was not until midway through the GreenPoint litigation that GreenPoint argued that the assignment between LBB and LBHI was ineffective such that U.S. Bank did not have standing to enforce GreenPoint's repurchase obligations.

182.    Therefore, LBB's assignment of rights to LBHI to enforce GreenPoint's representations and warranties was effective, and such rights were ultimately transferred to U.S. Bank for the benefit of the note holders of the Trust.

183.    Pursuant to 28 U.S.C. § 2201, the Plan Administrator requests and the Court may now declare the rights and other legal relations of the parties. The Court may grant further necessary or proper relief based on its declaratory judgment in this action pursuant to 28 U.S.C. § 2202.

184.    Based on the foregoing, LBHI requests a declaratory judgment that the assignment of repurchase rights from LBB to LBHI was valid.

### RELIEF REQUESTED

WHEREFORE, the Debtors respectfully request that this Court:

A.    Sustain Lehman's objections to the Claims and disallow and expunge

the Claims in their entirety as set forth herein;

B.     In the alternative, subordinate the Syncora Claim to the U.S. Bank Claim;

C.     In the alternative, estimate the Claims at zero dollars for reserve purposes;

D.     Enter a preliminary injunction enjoining the continued litigation of the GreenPoint Litigation and the commencement of any action or proceeding of any nature whatsoever by U.S. Bank or Syncora based on the facts alleged in the GreenPoint Litigation;

E.     Award a declaratory judgment in favor of LBHI that the assignment of repurchase rights from LBB to LBHI was valid;

F.     Award a declaratory judgment in favor of LBHI that GreenPoint must indemnify LBHI for its liability, if any, to U.S. Bank and/or Syncora in connection with the Claims; and

G.     Grant Lehman such other and further relief as the Court deems just and proper.

Dated: New York, New York
        May 20, 2015

                                        /s/ Paul V. Shalhoub
                                        Paul V. Shalhoub
                                        Todd G. Cosenza
                                        WILLKIE FARR & GALLAGHER LLP
                                        787 Seventh Avenue
                                        New York, New York 10019
                                        Telephone: (212) 728-8000
                                        Facsimile: (212) 728-9000

                                        Michael A. Rollin
                                        Maritza Dominguez Braswell (*pro hac vice*)
                                        JONES & KELLER, P.C.
                                        1999 Broadway, Suite 3150
                                        Denver, Colorado 80202
                                        Telephone: (303) 573-1600

                                        *Attorneys for Lehman Brothers Holdings Inc.*
                                        *and Structured Asset Securities Corporation*