## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| IN RE: |
| LEHMAN BROTHERS HOLDINGS INC., et al., |
| *Debtors.* |
| MOORE MACRO FUND, LP, MOORE MACRO MARKETS FUND (MASTER), LP, SJL MOORE, LTD., JR MOORE, LP, LM MOORE LP, MF MOORE LP (formerly MOORE GLOBAL FIXED INCOME FUND (MASTER) LP), MOORE GLOBAL INVESTMENTS, LTD., MOORE EMERGING MARKETS FUND (MASTER) LP, MOORE CAPITAL ADVISORS, L.L.C., and TRADE PROCESS CORPORATION, |
| *Plaintiffs,* |
| *-against-* |
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS SPECIAL FINANCING INC., and LEHMAN BROTHERS COMMERCIAL CORPORATION, |
| *Defendants* |

### CHAPTER 11

### CASE NO. 08-13555 (SCC)

### ADV. PRO. NO. 14-02021 (SCC)

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL

Bennette D. Kramer
Jeffrey M. Eilender
Erik S. Groothuis
Samuel L. Butt
**SCHLAM STONE & DOLAN LLP**
26 Broadway
New York, New York 1004

**OF COUNSEL**
Lauren Teigland Hunt
**TEIGLAND HUNT LLP**
127 West 24th Street – 4th Floor
New York, New York 10011

*Attorneys for Plaintiffs Moore Macro Fund, LP, Moore Macro Markets Fund (Master), LP, SJL Moore, Ltd., JR Moore, LP, LM Moore LP, MF Moore LP (formerly Moore Global Fixed Income Fund (Master) LP), Moore Global Investments, Ltd., Moore Emerging Markets Fund (Master) LP, Moore Capital Advisors, L.L.C., and Trade Process Corporation*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................ii-iv

PRELIMINARY STATEMENT AND FACTS RELEVANT TO
DISCOVERY DISPUTE ...........................................................................................................2

ARGUMENT ..............................................................................................................................5

I.    NO PRIVILEGE ATTACHES TO LEHMAN'S INTERNAL MARKS OF THE
      MOORE/LEHMAN SWAPS.............................................................................................5

      A.    Work Product Privilege...........................................................................................8

      B.    Attorney-Client Privilege .....................................................................................10

            1.    Examples Where No Attorneys Are Mentioned On The Privilege Log ..........11

            2.    Examples Where The Documents Are Not Confidential Because They Were
                  Disclosed To Numerous Parties, Including Outsiders .....................................12

            3.    Examples Where The Documents Do Not Represent Legal Advice ...............13

            4.    The Court Should Conduct An *In Camera* Review Or Otherwise Establish
                  a Procedure For the Documents to Be Reviewed .............................................14

II.   DOCUMENTS SHOWING VALUATIONS OF THE SAME TERMINATED
      SWAPS WITH OTHER COUNTERPARTIES ARE RELEVANT AND THEIR
      PRODUCTION IS NOT BURDENSOME ......................................................................16

      A.    The Similar Swap Valuations Are Highly Relevant..............................................16

      B.    There Is No Undue Burden Regarding The Production Of The Similar
            Swap Valuations ...................................................................................................18

III.  THE TIMING OF SIMILAR SWAP VALUATIONS IS ALSO
      DISCOVERABLE ...........................................................................................................19

CONCLUSION..........................................................................................................................20

## **TABLE OF AUTHORITIES**

**CASES**

*In re Agent Orange Prod. Liab. Litig.*,
   517 F.3d 76 (2d Cir. 2008) ...................................................... 19

*Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*,
   232 F.R.D. 103 (S.D.N.Y. 2005).............................................. 13

*Fort Worth Employees' Retirement Fund. v. J.P. Morgan Chase & Co.*,
   297 F.R.D. 99 (S.D.N.Y. 2013)............................................... 16

*Go v. Rockefeller Univ.*,
   280 F.R.D. 165 (S.D.N.Y. 2012)...........................................19-20

*In re Grand Jury Subpoena Dated July 6,* 2005,
   510 F.3d 180 (2d Cir. 2007) ...................................................5-6

*Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*,
   2013 WL 1191895 (S.D.N.Y. 2013) .......................................16-17

*In re Lehman Bros. Holdings, Inc.*,
   502 B.R. 383 (Bankr. S.D.N.Y. 2013) ..................................... 2

*Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*,
   295 F.R.D. 28, 37 (E.D.N.Y. 2013)
   *aff'd*, 2014 WL 223173 (E.D.N.Y. Jan. 21, 2014) .................. 13

*Lehman Bros. Holdings Inc., et al. v. Citibank, N.A., et al (In re Lehman Bros. Holding, Inc.)*,
   No. 12-01044 (Bankr. S.D.N.Y.) ............................................ 5

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. H & R Block, Inc.*,
   2014 WL 4377845 (S.D.N.Y. Sept. 4, 2014) .......................... 6

*Occidental Chemical Corp. v. OHM Remediation Services, Corp.*,
   175 F.R.D. 431 (W.D.N.Y.1997) ............................................ 12

*In re Refco Inc. Sec. Litig.*,
   2012 WL 678139 (S.D.N.Y. Feb. 28, 2012) ........................... 12

*Scott v. Chipotle Mexican Grill, Inc.*,
   2015 WL 1424009 (S.D.N.Y. Mar. 27, 2015) .......................10-11

*Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*,
   2015 WL 1290897 (S.D.N.Y. Mar. 20, 2015) ......................... 11

*Sokol v. Wyeth, Inc.*,
    2008 WL 3166662 (S.D.N.Y. Aug. 4, 2008) .......................................................... 13

*Thompson v. Chertoff*,
    2007 WL 4125770 (N.D. Ind. Nov. 15, 2007) ....................................................... 13

*United States v. Int'l Bus. Machines Corp.*,
    66 F.R.D. 206 (S.D.N.Y. 1974) .............................................................................. 13

*United States v. Mejia*,
    655 F.3d 126 (2d Cir. 2011) ................................................................................. 5, 10

*United States v. Textron Inc.*,
    577 F.3d 21 (1st Cir. 2009) .................................................................................... 8, 9


**RULES, STATUTES AND OTHER AUTHORITIES**

11 U.S.C. § 560 .......................................................................................................... 2

Bankruptcy Rule 7037 ................................................................................................ 1

Fed. R. Civ. P.
    26 .......................................................................................................................... 8
    26(b)(1) ............................................................................................................... 19
    37(a) ..................................................................................................................... 1
    37(a)(4) ................................................................................................................ 6

Charles A. Wright, Arthur R. Miller, and Richard L. Marcus,
    8 Fed. Prac. & Proc. § 2024 (1994) ......................................................................... 8

http://www.shearman.com/~/media/Files/NewsInsights/Publications/2012/08/Lesson-from-
    Lehman-Brothers-for-Hedge-Fund-Manag__/Files/View-full-article-Lesson-from-Lehman
    Brothers-fo__/FileAttachment/BR_080112_Lessonfrom LehmanBrosforHedge Fund
    Manage__.pdf ........................................................................................................ 18

ISDA, User's Guide to the 1992 Master Agreements (1993 Ed), p. 25, available at
    http://assets.isda.org/media/e0f39375/fb087821.pdf/; PLI, Terminating Derivative
    Transactions, Ch. 5, §5:10.1 at 5-31, available at
    http://www.pli.edu/public/booksamples/22873_sample5.pdf ................................. 2-3

P.Shah, "Watch Your Swaps And Derivatives Termination Payments," available at
    http://www.law360.com/articles/448512/watch-your-swaps-and-derivatives-termination-
    payments ................................................................................................................. 3

S.J. Noh, "Lesson from Lehman Brothers for Hedge Fund Managers:
The Effect of a Bankruptcy Filing on the Value of the Debtor's Derivative Book,"
The Hedge Fund Law Report, Vol 5, No. 27 (July 12, 2012)................................................... 18

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br>    LEHMAN BROTHERS HOLDINGS INC., et al.,<br>*Debtors.* | **CHAPTER 11**<br><br>**CASE NO. 08-13555 (SCC)** |
| MOORE MACRO FUND, LP, MOORE MACRO MARKETS FUND (MASTER), LP, SJL MOORE, LTD., JR MOORE, LP, LM MOORE LP, MF MOORE LP (formerly MOORE GLOBAL FIXED INCOME FUND (MASTER) LP), MOORE GLOBAL INVESTMENTS, LTD., MOORE EMERGING MARKETS FUND (MASTER) LP, MOORE CAPITAL ADVISORS, L.L.C., and TRADE PROCESS CORPORATION,<br>*Plaintiffs,*<br><br>-against-<br><br>LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS SPECIAL FINANCING INC., and LEHMAN BROTHERS COMMERCIAL CORPORATION,<br>*Defendants.* | **ADVERSARY PROCEEDING**<br>**NO: 14-02021-scc** |

**PLANTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL**
**DOCUMENT DISCOVERY PURSUANT TO BANKRUPTCY RULE 7037**

Plaintiffs Moore Macro Fund, LP, Moore Macro Markets Fund (Master), LP, SJL Moore, Ltd., JR Moore, LP, LM Moore LP, MF Moore LP (formerly Moore Global Fixed Income Fund (Master) LP), Moore Global Investments, Ltd., Moore Emerging Markets Fund (Master) LP, Moore Capital Advisors, L.L.C., and Trade Process Corporation (collectively, the "Moore Entities") respectfully submit this Memorandum of Law, together with the Declaration of Erik S. Groothuis, dated May 26, 2015 ("Groothuis Decl.") and the exhibits annexed thereto, in support of their motion pursuant to Fed. R. Civ. P. 37(a), made applicable to this proceeding by Bankruptcy Rule 7037, to compel Defendants Lehman Brothers Holdings, Inc. ("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF"), and Lehman Brothers Commercial Corporation ("LBCC") (collectively, LBHI, LBSF and LBCC are referred to as "Lehman") to

produce documents responsive to the Moore Entities' First Request for Production of Documents, Items No. 4 and No. 5, and to the Moore Entities' Second Request for Production of Documents, Item No. 1.

## PRELIMINARY STATEMENT AND FACTS RELEVANT TO DISCOVERY DISPUTE

LBHI filed a voluntary petition for bankruptcy under Chapter 11 of Title 11 of the Bankruptcy Code on September 15, 2008.  The filing triggered termination rights under the Moore Entities' swap transactions with LBSF and LBCC (the "Moore/Lehman Swaps"), which were guaranteed by LBHI.  Under 11 U.S.C. § 560, the Moore Entities had a protected contractual right to terminate the Moore/Lehman Swaps and to apply the methodologies in the ISDA Master Agreements for termination and valuation of the parties' derivatives transactions. *In re Lehman Bros. Holdings, Inc.*, 502 B.R. 383, 385 (Bankr. S.D.N.Y. 2013).  As detailed in the Complaint (Doc. 1), the Moore Entities did so by designating "Early Termination Dates" for the Moore/Lehman Swaps, delivering to LBSF between June 2, 2009 and August 25, 2009 detailed calculations of the values, damages and setoffs of the respective parties' (and/or their assignees') positions as of those dates (together, the "Moore Valuations") and paying LBSF the calculated principal amounts (the "Settlement Amounts") plus interest with delivery of the Moore Valuations, all in accordance with the ISDA Master Agreements.

Section 6 of the applicable ISDA Master Agreements and the defined terms used therein provided the Moore Entities, as the non-defaulting parties, substantial discretion in arriving at the valuations and damages calculations and the time for delivery of the Moore Valuations, subject to the requirements of good faith and reasonableness.  *See also* ISDA, User's Guide to the 1992 Master Agreements (1993 Ed), p. 25, available at http://assets.isda.org/media/e0f39375/fb087821.pdf/; PLI, Terminating Derivative Transactions,

Ch. 5, §5:10.1 at 5-31, available at http://www.pli.edu/public/booksamples/22873_sample5.pdf;

P. Shah, "Watch Your Swaps And Derivatives Termination Payments," available at

http://www.law360.com/articles/448512/watch-your-swaps-and-derivatives-termination-

payments (ISDA agreement confers "considerable discretion" upon non-defaulting party to value

swaps as of termination date).

Generally speaking, the ISDA 1992 Master Agreements selected by the parties provide

two methodologies for calculating values upon early termination:  (1) "Market Quotation" and

(2) "Loss."   Lehman's Amended Answer, Counterclaims and Claim Objections contend that the

Moore Valuations under either or both methodologies were not "commercially reasonable" and

that they "deviate[d] substantially from the industry standard."   Doc. 31 ¶¶ 41-43.[1]  Lehman's

pleading further contends that the written Moore Valuations were not delivered to LBSF "as

soon as reasonably practicable" (id. at ¶130), thereby delaying the accrual of interest at an

alleged "Default Rate."[2]

To test and ultimately refute Lehman's contentions on unreasonableness,[3] industry

standards and practicability, the Moore Entities seek discovery from Lehman of (1) how Lehman

internally valued the Moore/Lehman Swaps as of the Early Termination Dates, (2) how other

sophisticated Lehman counterparties besides the Moore Entities valued, as of the same dates as

the Moore Entities, swaps of the same type as those underlying the Moore/Lehman Swaps, and

(3) when other counterparties delivered their final valuation statements to the Lehman entities.

---

[1] As of this writing, the parties have narrowed their dispute to those transactions for which the Moore Entities used the "Loss" method of valuation.  Further, the disputed transactions are limited to those between the Entities and LBSF; the LBCC transactions are no longer at issue, although the parties continue to dispute whether LBCC is owed any additional interest.

[2] The Moore Entities have moved to dismiss Lehman's counterclaim to the extent that it seeks the "Default Rate" of interest on the ground that the counterclaim is inconsistent with the terms of the ISDA Master Agreements (Doc. 39). Oral argument was held on that motion on May 19, 2015.

[3] The Moore Entities do not accept Lehman's reference to the concept of "commercial reasonableness" in connection with this case.

Specifically, on the issue of Lehman's internal valuations of the Moore/Lehman ISDAs, the Moore Entities requested "[a]ll Documents concerning valuations performed by [Lehman] or any other Lehman entity relating to the Master Agreements or Moore Claims." Plaintiffs' First Request for Production of Documents (annexed to Groothuis Declaration as Exhibit 1) at Item No. 5. Lehman objected to this request on the ground of "attorney-client privilege and/or the work product doctrine." *See* Defendants' Objections and Responses to Plaintiffs' First Request for Production of Documents (annexed to Groothuis Declaration as Exhibit 2) at pp. 6-7.

On the issue of other counterparties' valuations of the same swap transactions as those underlying the Moore/Lehman Swaps, the Moore Entities requested "[a]ll documents concerning any valuations of trades of the type reflected in the Moore Valuations that Defendants engaged in with other counterparties" and that were terminated under the same conditions (First Request for Production, Groothuis Decl. Ex. 1, Item No. 4). On the timing of delivery of valuation statements, the Moore Entities requested "documents sufficient to show the dates of any Valuation Statements [as defined in Lehman's responsive pleading] delivered to Lehman" by counterparties other than the Moore Entities (Second Request for Production, annexed to Groothuis Declaration as Exhibit 3, Item No. 1). Lehman objected to these two requests in their entirety, primarily on relevance and burden grounds. *See* Groothuis Decl. Ex. 2 at 6 (Response to Plaintiffs' First Request Item No. 4) *and* Defendants' Responses and Objections to Plaintiff's Second Request For Production of Documents (annexed to Groothuis Declaration as Exhibit 4) at 4 (Response to Plaintiffs' Second Request Item No. 1).

In researching this motion, the Moore Entities have learned that Lehman took the exact opposite discovery positions earlier in 2014 in a similar Adversary Proceeding in which *Lehman* is the plaintiff against Citibank. Specifically, Lehman moved to compel the first two categories

of documents that the Moore Entities seek here in a dispute "regarding Citibank's close-out valuation of … derivative trades following Lehman's chapter 11 filing . . . . " *Lehman Bros. Holdings Inc., et al. v. Citibank, N.A., et al (In re Lehman Bros. Holding, Inc.)*, No. 12-01044 (Bankr. S.D.N.Y.) (the "Citibank Adversary Proceeding") (Doc. 48; letter from Lehman's counsel to Hon. Shelly C. Chapman, annexed to the Groothuis Declaration as Exhibit 5).

As discussed below, Lehman has represented to the Court in the Citibank Adversary Proceeding that the "values Citibank assigned to [its own] trades" with Lehman were <u>not</u> privileged and, together with discovery of "similar trades" by third-parties, were highly-relevant to the key issue of the "reasonableness" of the Citibank close-out valuations at issue. *Id*. ("To establish the commercial unreasonableness of Citibank's claims, [Lehman] has sought document discovery from both Citibank and third parties to demonstrate how major dealers valued trades similar to those at issue here, both prior to and after Lehman's bankruptcy filing.").

The parties to this Adversary Proceeding sought the Court's assistance in resolving these disputes through informal letters to the Court and a conference on January 16, 2015.   The Court was unable to broker a compromise, and despite several subsequent attempts by the Moore Entities to limit their requests concerning valuations of third-party transactions (*see* discussion at Point II, *infra*), Lehman has refused to cooperate.   Accordingly, the Moore Entities have filed this motion to compel.

## <u>ARGUMENT</u>

## I.    <u>NO PRIVILEGE ATTACHES TO LEHMAN'S INTERNAL MARKS OF THE MOORE/LEHMAN SWAPS</u>

Lehman of course bears the burden of establishing that the documents it has withheld are privileged.   *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) ("party asserting the privilege...bears the burden of establishing its essential elements"); *In re Grand Jury Subpoena*

*Dated July 6, 2005*, 510 F.3d 180, 184 (2d Cir. 2007) ("burden of showing entitlement to a privilege is on the party asserting that privilege"); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. H & R Block, Inc.*, 2014 WL 4377845, at *2 (S.D.N.Y. Sept. 4, 2014) ("it is beyond question that the party asserting the attorney-client privilege or work-product protection bears the burden of proving the applicability of either privilege").

Lehman's two privilege logs contain 2,377 entries dated on or after the Early Termination Date of September 15, 2008.[4]  1,790 of those entries expressly refer to Lehman's "valuation" or "treatment" of "Transactions post-bankruptcy" and would thus appear to relate to documents that, but for the privilege assertions, should be produced as responsive to Item 5 of the Moore Entities' First Request for Production of Documents (i.e., seeking Lehman's internal marks of the Moore/Lehman Swaps as of the Early Termination Date).[5]

The privilege claims are highly dubious and appear to be evasive under Fed. R. Civ. P. 37(a)(4).  For accounting and its own business purposes, Lehman was required to place values on its derivatives after its bankruptcy filing.  Many of the log entries describe ordinary business documents such as "spreadsheets" that are circulated to numerous people (including in several cases, people outside Lehman itself) and do not include lawyers as authors or recipients. Nevertheless, Lehman's logs make the conclusory claim that each such valuation or treatment is either (i) "prepared in anticipation of litigation" (for work product privilege claims) or (ii) "legal advice prepared in anticipation for litigation" (for combined attorney/client and work product privilege claims).

---

[4] Lehman's Log No. 1 has only 45 entries, while their Log No. 2 has 2,479 entries.

[5] Many of the entries refer to "Transactions" for "multiple funds," which presumably means that the documents in question relate to "Transactions" that include, but are not limited to, those with the Moore Entities.  This motion to compel seeks only those portions of such "multiple funds" documents as are relevant to the Moore/Lehman Swaps remaining in dispute.  We have found only 400 references in the logs where the description replaces the words "multiple funds" with the name of a specific Moore Entity.

The vague and rote verbiage in Lehman's logs do not support a claim of either privilege, especially in the face of the other information which strongly indicates that "valuation/treatment" documents were created and communicated for non-legal purposes.   As we show, the law does not allow Lehman's post-bankruptcy marks on the Moore/Lehman Swaps to "become" privileged just because the Moore Entities submitted their own valuations and Lehman later decided to dispute them.

The Moore Entities are not asking the Court to review *in camera* the thousands of documents on Lehman's privilege logs.   Rather, movants propose to narrow the dispute as follows:

> **First**, the "anticipation of litigation" requirement of work-product privilege allows this Court to make one, uniform ruling for <u>all</u> documents dated *before* Lehman anticipated any litigation with the Moore Entities.  Below we argue that since Lehman did not even begin to dispute the Moore Valuations until 2014, all of its internal valuations of transactions pursuant to the Moore/Lehman ISDAs as of the Early Termination Date prior to May 7, 2014, or a date shortly before May 7, 2014, should be produced.   There can be no good-faith basis for Lehman to assert work product privilege over its internal marks that were created <u>before</u> such a date.

> **Second**, there are only 36 entries on the logs that add a claim of attorney-client privilege to the work product privilege claim with respect to a "valuation/treatment" document that expressly mentions one of the Moore Entities.  This number may be further narrowed down once the Court has made the determination of the time period before which Lehman cannot reasonably claim that it anticipated litigation against the Moore Entities. The Court would need to evaluate the separate attorney-client privilege claim only for documents dated before that time period.

> **Finally**, there are several hundreds of documents on the logs that refer to "multiple funds" (although again, the Moore entities seek production of only the portions that relate to the Moore/Lehman Swaps)   Based on the examples we discuss below, it appears that Lehman's claims for attorney-client privilege for such documents are unfounded.  We respectfully propose that the Court select a sample consisting of the Moore-specific portions of 5 "multiple fund" documents from each year on the logs to assess the propriety of the privilege claims as to such documents.

These steps should greatly reduce the burden on the Court and provide a realistic assessment on the *bona fides* of Lehman's privilege assertions.

### A. <u>Work Product Privilege</u>

In the Citibank Adversary Proceeding, Lehman provided the Court with the following summary of, and citations to, the law on work product privilege:

> [M]aterials are "deemed prepared 'in anticipation of litigation,' and thus within the scope of the [privilege], if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" <u>Adlman</u>, 134 F.3d at 1202 (quoting Charles A. Wright, Arthur R. Miller, and Richard L. Marcus, 8 Fed. Prac. & Proc. § 2024 (1994)). Critically, however, "[i]t is not enough to trigger work product protection that the subject matter of a document relates to a subject that might conceivably be litigated." <u>United States v. Textron Inc.</u>, 577 F.3d 21, 29 (1st Cir. 2009) (en banc). "Nor is it enough that the materials were prepared by lawyers or represent legal thinking," for "[e]ven if prepared by lawyers and reflecting legal thinking, '[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes are not under the qualified immunity provided by'" the doctrine. Id. at 29-30 (quoting Fed. R. Civ. P. 26 advisory committee note). "Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created 'because of' actual or impending litigation." <u>Adlman</u>, 134 F.3d at 1202.

Groothuis Decl. Ex. 5, Appendix C, pp. 1-2.   The Moore Entities adopt this position.

As noted in the Moore Entities' Complaint, it was not until 2014 – five years after the Entities submitted their Valuation Statements to Lehman in mid-2009 – that Lehman expressed any material disagreement with the Valuation Statements.   Doc. 1, ¶¶ 45-46.   Lehman did not send its Rule 2004 subpoenas seeking discovery from the Moore Entities until May 7, 2014. Therefore, none of the documents withheld by Lehman dated prior to May 7, 2014, or shortly before that date, relating to the Moore Entities could be considered to be in "anticipation of litigation," as the work product privilege requires.   There was no dispute prior to that time to trigger a work product privilege with respect to the Moore Entities.

Nevertheless, Lehman claims that any and all "valuation work [that Lehman] performed post-bankruptcy" is "in anticipation of litigation" and therefore protected work product.   *See*

8

Groothuis Decl. Ex. 7 (3/30/15 letter from Lehman's counsel, p. 2, third full paragraph). Lehman's position on work product privilege is unsupportable.  Undoubtedly, there were many derivative transactions reflected on the spreadsheets included among the withheld documents that were terminated and valued in the bankruptcy without, or at least before, any actual or threatened litigation.  Work product privilege cannot apply to the values that Lehman placed on such unchallenged terminated derivative transactions.

Further, Lehman's position here squarely contradicts the position it took before this Court in the Citibank Adversary Proceeding.   In the Citibank Adversary Proceeding, Lehman rejected that work product privilege applied to "close out" valuations of derivative transactions made by Citibank or its accountants after Lehman filed for bankruptcy.   Lehman argued in this Court that:

> Nothing on the face of [the Citibank valuation] documents suggests that they (or their redacted portions) were created "*because of*" actual or impending litigation, such as Citibank's claims against the LBHI estate. Adlman, 134 F.3d at 1202. To the contrary, the context and content of the documents makes clear that they were "prepared to support financial filings and gain auditor approval" for those filings. Textron, 577 F.3d at 31-32 (denying work product protection to documents "calculat[ing] reserves to be entered on the company books to account for contingent tax liability").

Groothuis Decl. Ex. 5, Appendix C pp. 1-2 (emphasis in original).

Precisely the same principles apply here.  Nothing on the face of the log entries for the documents at issue appears to relate to any litigation at all, let alone (in so far as they are relevant to the Moore/Lehman Swaps) to an actual or even potential dispute with the Moore Entities.  For all intents and purposes, the valuation-related documents appear to be created by non-lawyers for the ordinary business purpose of understanding Lehman's assets and liabilities.  In fact, some of log entries recite that the documents were "automatically generated" on a "daily" basis and sent to scores of people inside and outside of Lehman.  *See, e.g.*, Groothuis Decl. Ex. 6 (Log 2 entries

Nos. 1/1a dated 12/8/2008 and 19/19a, dated June 23, 2009).[6] Such routine, widely disseminated

financial documents cannot qualify as litigation work product.

Because there is no question that Lehman's own valuations and treatments of the

Moore/Lehman Swaps are relevant to whether the Moore Valuations are "reasonable," the Court

need only determine, on this aspect of this motion to compel, the time period after which

Lehman can justifiably assert a work product privilege.   The Moore Entities argue that this date

should be sometime in mid-2014, around the time the Rule 2004 discovery was sought.[7]

Accordingly, the Court should order the production of all documents on Lehman's privilege log

responsive to Item No. 5 of the Moore Entities' First Request for Production of Documents that

are (a) dated before the time the Court finds that a work product privilege adheres and (b) as to

which Lehman has claimed only work product and not also attorney-client privilege.

### B. <u>Attorney-Client Privilege</u>

Lehman also asserts attorney-client privilege as to a much smaller set of internal

valuations/treatments of "Transactions" that are either expressly with a Moore Entity or are with

"multiple funds" that include a Moore Entity.   For the attorney-client privilege to attach, there

must be a communication between (1) attorney and client (2) that is confidential (*i.e.*, not

disclosed to third-parties) and (3) that is made for the purpose of either soliciting or rendering

legal (as opposed to business or financial) advice.   *Mejia*, 655 F.3d at 132 (setting forth

elements); *Scott v. Chipotle Mexican Grill, Inc.*, 2015 WL 1424009, at *1 and *9 (S.D.N.Y. Mar.

---

[6] The Moore Entities assume that when Lehman logs two documents by the numbers, for example, 1 and 1**a** or 19 and 19**a**, that the existence of the "a" means that the latter is an attachment to or otherwise related to the former.  We note that log entries for 1/1a and 19/19a state that because there are so many daily "iterations" of similar documents to the same group of people on different dates, Lehman's outside counsel in this matter, Jones Day, has logged only these "representative example[s]."   In order "to save space on this privilege log, Jones Day has removed individual entries for other iterations of this family of documents."  The Moore Entities reserve their right to request other "iterations" during the time period that is the subject of this motion to compel.

[7] At the very least, there can be no legitimate work product privilege prior to June 2, 2009, when the Moore Entities sent their first Valuation Statement to Lehman.

27, 2015) (setting forth elements and also holding "one's status as an attorney does not transform what would otherwise be human resources and business communications into legal communications"); *Small Bus. Bodyguard Inc. v. House of Moxie, Inc*., 2015 WL 1290897, at *5 (S.D.N.Y. Mar. 20, 2015) ("The attorney-client privilege protects only legal advice, not economic, business, or policy advice").

Only 36 entries on the logs claim attorney-client privilege as to a "valuation" or "treatment" document that expressly relates to a Moore Entity.  There are, however, hundreds of such attorney-client privilege claims for documents relating to "multiple funds."  Below we provide examples of why the attorney-client privilege assertions are dubious and why (a) all such claims as to Moore-specific documents and (b) a representative sample as to the "multiple funds" documents should be tested by the Court or before a special discovery master.

### 1.   Examples Where No Attorneys Are Mentioned On The Privilege Log

Under cover of letter dated March 11, 2015, counsel for Lehman provided counsel for the Moore Entities with a list of "Lehman In-House Attorneys Appearing on Privilege Log."  The entries for Log 2, Nos. 276/276a, 752, 753, 842 – each of which refers to an e-mail chain regarding "valuation of the Transactions post-bankruptcy *for Moore Macro*" (italics added) – show no such attorneys having sent, received or been copied on the documents.  Groothuis Decl. Ex. 6.  Yet, the log claims that these documents are attorney-client privileged.

The lack of attorneys is also evident in several Lehman attorney-client privilege log claims for documents relating to "multiple funds."  For example, the documents at Log Nos. 1680/1680a show no Lehman attorney having sent, received or been copied on the documents. *Id.*  The recipient appears to be a group of people: "CMCL Masters – NY."   Interestingly, another log entry claims no attorney-client privilege for documents sent to this same group.

11

Therefore, it appears that no such privilege can properly be claimed for Log Nos. 1680/1680a either. *Id.*

## 2. Examples Where The Documents Are Not Confidential Because They Were Disclosed To Numerous Parties, Including Outsiders

Log 2, Nos. 947 and 949 claim attorney-client privilege for documents described as an "e-mail chain reflecting legal advice prepared in anticipation of litigation regarding treatment of the Transactions post-bankruptcy *for SJL Moore*" (italics added). *Id.* The log entries identify the author and recipients as non-lawyers. There is one lawyer identified as having been copied along with an individual at Alvarez and Marsal ("A&M").[8]

Similarly, the "family of documents" corresponding to Log 2, entries Nos. 19/19a (dated 6/23/2009) -- which were "automatically generated" on a "regular basis" regarding "multiple funds" -- were communicated to scores of people inside and outside Lehman. *Id.* The same attributes that disqualify such documents from work product privilege (See Part I.A *supra*) also disqualify them from protection under the attorney-client privilege. The documents were sent or copied to over twenty people at A&M and at Barclays Capital Management, Inc. ("Barclays").[9]

---

[8] In a letter dated December 15, 2014, Groothuis Decl. Ex. 9, Lehman attempted to justify the withholding of documents created or sent to A&M on the ground that Lehman "retained [A&M] as restructuring advisors following Lehman's bankruptcy and [A&M] provided top level management to the Lehman estate." This alleged ground for preserving privilege does not hold up. *Occidental Chemical Corp. v. OHM Remediation Services, Corp.*, 175 F.R.D. 431, 436–37 (W.D.N.Y.1997) (no privilege attaching to communications from consultant who was not hired to assist in the rendition of legal services); *see also Sokol v. Wyeth, Inc.*, 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008) (privilege does not apply if what is sought is not legal advice but the services a third party offers). Finally, and in any event, the sheer number of both Lehman employees and outsiders that are parties to the documents in question demonstrate that they were not confidential communications.

[9] In the same December 15, 2014, letter Lehman attempted to justify claims of privilege over documents created by or circulated to Barclays on the ground that "[a]fter Lehman's bankruptcy filing many Lehman employees transitioned to Barclays and/or received Barclays e-mail addresses. Further, Barclays provided many services to Lehman after Lehman's bankruptcy filing pursuant to a Transition Services Agreement dated September 22, 2008." Groothuis Decl. Ex. 9. As in the case of A&M (see n. 8, *supra*), this second alleged ground for preserving privilege is not supportable. Further, the former reason is not legally relevant to maintaining attorney-client privilege belonging to a corporation like Lehman. *In re Refco Inc. Sec. Litig.*, 2012 WL 678139, at *2 (S.D.N.Y. Feb. 28, 2012) (privilege between counsel and former employees of the corporation extends only to discussions related to the former employee's conduct and knowledge gained during employment).

The only basis for the assertion of attorney-client privilege appears to be that a few of the listed recipients were in-house attorneys for Lehman. The mere fact that some former Lehman lawyers appear on a document transmitted daily to a huge number of recipients does not make the documents privileged. *See* Part I.B.3, *infra*. None of the documents circulated outside of Lehman should be deemed to be attorney-client privileged.

### 3.  Examples Where The Documents Do Not Represent Legal Advice

It appears from Lehman's privilege log that many of the documents for which Lehman claims attorney-client privilege do not involve the solicitation or rendering of legal advice. It is an axiom that mere inclusion of an attorney on the circulation of a document to several corporate employees does not cloak the document in the privilege. *United States v. Int'l Bus. Machines Corp.*, 66 F.R.D. 206, 213 (S.D.N.Y. 1974) (finding documents prepared for review by non-lawyers and lawyers alike are not privileged because such circumstances show the primary purpose of the document is not to secure legal advice); *Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 37 (E.D.N.Y. 2013) ("the mere fact that a communication is made directly to an attorney, or an attorney is copied on a memorandum, does not mean that the communication is necessarily privileged") *aff'd*, 2014 WL 223173 (E.D.N.Y. Jan. 21, 2014); *see also Sokol*, 2008 WL 3166662, at *7 (copying of the communications between a client and a third party to the client's attorney does not trigger, by itself, the attorney-client privilege); *Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (communications with financial advisor on which attorney was included were not privileged); *Thompson v. Chertoff*, 2007 WL 4125770, at *2 (N.D. Ind. Nov. 15, 2007) (e-mail whose primary recipients included a lawyer and several non-lawyers was not protected by attorney-client privilege because the email

is not seeking legal advice and lawyer "simply 'sat in' on the communication.").  The very

purpose of the circulation or communication must be to solicit or render legal advice.

Here, whether the document in question relates expressly to a Moore Entity or to

"multiple funds," the logs' description of the document as "spreadsheet regarding valuation" or

"treatment" of terminated derivative transactions indicates that legal advice is not the subject

matter.[10]    Furthermore, when the log discloses that attorneys are only among several business

people or groups copied on the documents, there is a strong inference that legal advice is not

being given or sought.   *See, e.g*., Log No. 25/25a (dated 5/4/2009) (e-mail and spreadsheet sent

to, among others, "Counterparty Relationships Team" and "Derivative Management

Information" groups, other individual non-lawyers and lawyers).

### 4.    The Court Should Conduct An *In Camera* Review Or Otherwise Establish a Procedure For the Documents to Be Reviewed

Because Lehman's claims for attorney-client privilege on documents regarding

"valuations" or "treatment" of derivatives are so threadbare, this Court should order review of (a)

all documents that expressly relate to a Moore Entity and are dated before the time that the Court

finds that Lehman has a viable work product privilege and (b) a representative sample of

"multiple funds" documents (but only the pages of such documents that relate to the

Moore/Lehman Swaps) for each year prior to the time that the work-product privilege adheres.[11]

For the latter category, we respectfully suggest that the Court allow each side to identify 5

---

[10] This is further supported by the fact that in many of the log entries, Lehman does not claim attorney-client privilege over the e-mail that "belongs" with the spreadsheet attachment (*Compare, e.g*., Log No. 1675 (e-mail dated 9/16/2008 for which only work product privilege is claimed) with Log No. 1675a (attached spreadsheet for which work product and attorney-client privileges are claimed).    This suggests that the e-mail is just a covering piece and does not entail any substantive solicitation or provision of legal advice.

[11] By first making the determination as to the time when Lehman can justifiably assert a work product privilege, the Court will be narrowing the documents for the subsequent attorney-client privilege review.   In other words, the Moore Entities do not request review for attorney-client privilege of those logged documents that the Court finds *are* covered by work-product privilege.   On the other hand, documents for which the work-product privilege has been rejected, but for which Lehman has asserted a separate claim of attorney-client privilege, do require a second-level review for the attorney-client privilege claim.

documents from the logs per year.  The rulings concerning these samples should allow the parties to resolve among themselves the remaining similar documents.

Assuming that the Court adopts a date in 2014 as the time when Lehman's work-product/ "anticipation of litigation" claim is plausible, we estimate that this will produce approximate 75 documents for inspection as to the *bona fides* of the attorney-client privilege assertion. Obviously, if the date at which the work-product privilege adheres is earlier than 2014, this will reduce the number of documents in the attorney-client privilege review.

The Court can either conduct an *in camera* inspection itself or, as Moore is mindful of the burden imposed on the Court, Moore is open to the Court adopting other mechanisms of review if permitted under the Court's rules.

After that review, Lehman should be compelled to produce those documents that are not attorney-client privileged and are responsive to Item No. 5 of the Moore Entities' First Request for Production of Documents: "[a]ll Documents concerning valuations performed by [Lehman] or any other Lehman entity relating to the Master Agreements or Moore Claims" as those terms are defined in the Request.

## II.   DOCUMENTS SHOWING VALUATIONS OF THE SAME TERMINATED SWAPS WITH OTHER COUNTERPARTIES ARE RELEVANT AND THEIR PRODUCTION IS NOT BURDENSOME

To address Lehman's concern over the burden of producing documents evidencing Lehman's close-out of derivative transactions with other counterparties similarly situated to the Moore Entities, the Court suggested at the January 16, 2015 conference that the Moore Entities identify a "subset" of trades between Lehman and other counterparties for potential discovery. The Moore Entities have done so.

By letter dated February 10, 2015 counsel for the Moore Entities identified a list of trades with other counterparties that are substantially the same as the Moore/Lehman Swaps. Groothuis Decl. Ex. 8 (at p. 2 and appendix to letter).   As the letter shows, the Moore Entities are seeking discovery only of valuations of swaps with select additional counterparties involving the same (1) reference asset[12] and (2) valuation date as the Moore/Lehman Swaps (the "Similar Swap Valuations").

### A.   The Similar Swap Valuations Are Highly Relevant

There can be no doubt that the Similar Swap Valuations are highly relevant to the issues of "reasonableness" of the Moore Valuations.   Assessment of the "reasonableness" of one person's conduct, by its very nature, requires assessment of the conduct of similarly-situated third-parties. *Fort Worth Employees' Retirement Fund. v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 111-113 (S.D.N.Y. 2013) (compelling disclosure by defendant bank of documents regarding mortgage-back securities offerings similar to those engaged in with plaintiff because such similar third-party transactions "are relevant to how those [underwriting] procedures were or should have been applied in this case."); *Highland CDO Opportunity Master Fund, L.P. v. Citibank,*

---

[12] "Reference asset" means the same indices, rates, currencies, commodities, securities, entities, events or other assets or things that are the subject of the Moore/Lehman Swaps.

*N.A.*, 2013 WL 1191895, at *9 (S.D.N.Y. 2013) (in dispute between two counterparties over "reasonable and good faith basis" for "asset marks" on collateral underlying swap transaction, allegations concerning "'other third-party marks for the specific assets comprising the free collateral'" substantiated plaintiff's claim that defendant had acted unreasonably and in bad faith in its marks).

Even Lehman's own actions in the Citibank Adversary Proceeding support a finding that this court should compel it to produce documents evidencing the Similar Swap Valuations.  In that proceeding, Lehman admitted the relevance of documents like the Similar Swap Valuation documents the Moore Entities seek here when it informed the Court that it had "served more than thirty subpoenas *duces tecum* on [third-party] dealers, brokers, prominent derivatives market participants, clearinghouses, market data providers and other non-parties that uniquely possess documents or information relevant to assessing the reasonableness of the values Citibank assigned to its trades"  Groothuis Decl. Ex. 5 at 2 (underlining added).

Finally, the documents in Lehman's possession concerning Similar Swap Valuations may well be the only evidence that will be available to the parties and to their respective experts on the reasonableness of the Moore Valuations (aside from, of course, Lehman's own internal valuations of the Moore/Lehman Swaps in the Privilege Challenged Documents).  As noted above, the ISDA Master Agreement required Moore to apply the "Market Quotation" methodology upon early termination for default.  However, for many swaps with Lehman, there was very little "Market Quotation" information available to market participants back in 2008 – let alone now.  As one commentator noted:

> [D]uring the credit crisis that began in 2008, market quotations became virtually impossible to obtain from reference market-makers. …  This problem became particularly acute after the Lehman Brothers bankruptcy filing in September 2008 because tens of thousands of transactions involving Lehman Brothers were

terminated by hundreds of Lehman's counterparties.    Under these circumstances, attempting to procure market quotations was futile.

PLI, Terminating Derivative Transactions, Ch. 5, §5:4 at p. 5-9; *see also* S.J. Noh, "Lesson from Lehman Brothers for Hedge Fund Managers:  The Effect of a Bankruptcy Filing on the Value of the Debtor's Derivative Book," The Hedge Fund Law Report, Vol 5, No. 27 (July 12, 2012)[13] ("Many of Lehman's derivatives counterparties . . . were unable to obtain quotes from dealers during the chaotic period that followed LBHI's bankruptcy filing.").    The scarcity of this evidence renders the Similar Swap Valuations uniquely probative.

### B.    <u>There Is No Undue Burden Regarding The Production Of The Similar Swap Valuations</u>

Since the Similar Swap Valuations involve the same reference asset and termination dates as the Moore Valuations, the discovery is directed at a narrow subset (specifically, numbering 25) of the whole of Lehman's swaps and there can be no argument of undue burden.   As counsel for the Moore Entities understands Lehman's position on burden, Lehman has some skeletal information about the Similar Swap Valuations available in a computer database, but Lehman does not want to have to provide the supporting "confirmations or the counterparties' support for their valuations."   See Groothuis Decl. Ex. 7 (March 30, 2015 letter from Lehman's counsel, p. 2 at second full paragraph).    Such an incomplete disclosure would be useless in determining whether the Moore Valuations are reasonable.   For the limited number of Similar Swap Valuations identified by the Moore Entities, Lehman should be compelled to respond to Item No. 4 of the Moore Entities' First Request for Production of Documents by providing <u>all</u> of the

---

[13]    Available    at    http://www.shearman.com/~/media/Files/NewsInsights/Publications/2012/08/Lesson-from-Lehman-Brothers-for-Hedge-Fund-Manag__/Files/View-full-article-Lesson-from-Lehman-Brothers-fo__/FileAttachment/BR_080112_LessonfromLehmanBrosforHedgeFundManage__.pdf.

information in Lehman's possession, custody or control that corresponds to the February 10, 2015 letter (Groothuis Decl. Ex. 8).

### III.    THE TIMING OF SIMILAR SWAP VALUATIONS IS ALSO DISCOVERABLE

Section 6(d)(i) of the 1992 ISDA Master Agreement requires the non-defaulting party to deliver a valuation statement to the defaulting party "as soon as reasonably practicable" following the occurrence of the Early Termination Date.    What constitutes "reasonably practicable" is a fact-intensive inquiry.

In this Adversary Proceeding, Lehman has added a counterclaim that seeks damages (in the form of "Default Rate" interest) from the Moore Entities for alleged unreasonable delay in providing the Valuation Statements.  Doc. 31 (Eleventh Cause of Action).    The Moore Entities issued a discovery demand tailored to the reasonableness test by asking when other Lehman counterparties delivered their valuation statements:  specifically, "[d]ocuments sufficient to show the dates of any Valuation Statements [(as defined by Lehman's pleading)] delivered to Lehman by any counterparty" other than the Moore Valuations.    Second Request For Documents, Groothuis Decl. Ex. 3, Item No. 1.  Again, Lehman has "decline[d]" to produce any documents in response.   Groothuis Decl. Ex. 4 at 4.

Lehman should not be permitted to bring a claim for unreasonable delay against the Moore Entities yet simultaneously deny them discovery that may show that other counterparties with which Lehman dealt took as long or longer to deliver their valuation statements to Lehman. Fed. R. Civ. P. 26(b)(1) (permitting parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense"); *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008) ("A party must be afforded a meaningful opportunity to establish the facts necessary to support his claim."); *Go v. Rockefeller Univ.*, 280 F.R.D. 165,

177 (S.D.N.Y. 2012) (plaintiff is entitled to documents which reflect time off for medical appointments by other employees in the controller's office because such documents could demonstrate facts plaintiff alleged).[14]

If this Court finds that it is too burdensome for Lehman to provide "documents sufficient to show" when such valuation statements were delivered, the Moore Entities will accept a sworn affidavit by a Lehman representative (other than an attorney) detailing the days on which the counterparty valuation statements were delivered to it.

## CONCLUSION

For all the above reasons, the Court should compel Defendants to produce documents responsive to the Moore Entities' First Request for Production of Documents, Items No. 4 and No. 5 and to the Moore Entities' Second Request for Production of Documents, Item No. 1.

Dated: New York, New York
      May 26, 2015

*Respectfully Submitted,*

**SCHLAM STONE & DOLAN LLP**

By:         _____/s/_____
        Bennette D. Kramer
        Jeffrey M. Eilender
        Erik S. Groothuis
        Samuel L. Butt
        26 Broadway
        New York, New York  10004
        Telephone No.: (212) 344-5400
        bdk@schlamstone.com
        jme@schlamstone.com
        egroothuis@schlamstone.com
        sbutt@schlamstone.com

---

[14] As of the time of filing, Lehman is checking to see whether it would withdraw their objections, but given that its objections were lodged months ago and Lehman has indicated in prior discussions it would not turn these documents over, Moore believed it should seek the relief now to avoid both burdening the Court with a second motion to compel and further delay.  Should Lehman decide it will produce these documents, Moore will withdraw this portion of its motion as moot.

***OF COUNSEL***

Lauren Teigland-Hunt
Teigland-Hunt LLP
127 West 24th Street, 4th Floor
New York, New York 10011
Telephone No.: (212) 269-1600
lth@t-hllp.com
*Attorneys for Plaintiffs*