ELS 192, 200, 205?1

# LEHMAN BROTHERS

**Transaction**

Date:       5 September, 2007

To:         MIRAE ASSET SECURITIES CO LTD
            Attention:      Documentation Unit

From:       Lehman Brothers Commercial Corporation Asia Limited
            c/o Lehman Brothers Asia Limited
            Confirmations Group
            Facsimile:      (+1) 646-758-6317 (United States of America)
            E-Mail:         aseqdstrconf@lehman.com

Effort Id:  1591958
Global Id:  3326821

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, and MIRAE ASSET SECURITIES CO LTD ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

Party B represents that it is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer(s) and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

The terms of the particular Transaction to which this Confirmation relates are as follows:

### General Terms:

| | |
|---|---|
| Trade Date: | 31 August 2007 |
| Effective Date: | 5 September 2007 |
| Termination Date: | 31 August 2010, subject to adjustment in accordance with the Following Business Day Convention and subject to early termination in accordance with the Knock-out Event provisions below. |
| Basket: | The basket of Shares specified in Row 1 of Appendix I, as further identified by the stock code specified in Row 2 of Appendix 1. |
| Exchange(s): | For each Share in the Basket, as specified in Row 3 of Appendix I. |
| Related Exchange(s): | All Exchanges |
| Initial Reference Price: | For each Share in the Basket, as specified in Row 4 of Appendix I ($P_{i,0}$) |
| Initial Payment: | USD10,155,340.58 to be paid by Party B to Party A on the Effective Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Knock-out Event: | A "Knock-out Event" occurs if the Cumulative Perf (t) (t = 6, 12, 18, 24 and 30) is equal to or greater than the Knock-out Level on any Knock-out Determination Day. |
| | where: |

$$\text{Cumulative Perf (t)} = \sum_{i=1}^{t} \text{Min } \{\text{Monthly Perf (U1}_i), \text{Monthly Perf (U2}_i)\},$$

(t = 6, 12, 18, 24, 30 and 36)

Monthly Perf (U1$_i$) = (U1$_i$ − U1$_{i-1}$) / U1$_{i-1}$,

Monthly Perf (U2$_i$) = (U2$_i$ − U2$_{i-1}$) / U2$_{i-1}$,

U1$_i$ = the Closing Price of Share (1) on Monthly Observation Date (i),

U2$_i$ = the Closing Price of Share (2) on Monthly Observation Date (i),

U1$_{i-1}$ = the Closing Price of Share (1) on Monthly Observation Date (i-1),

U2$_{i-1}$ = the Closing Price of Share (2) on Monthly Observation Date (i-1),

U1$_0$ = the Initial Reference Price of Share (1),

U2$_0$ = the Initial Reference Price of Share (2), and

Monthly Observation Date (i) (i = 1 to 36) means each date as specified in Column 2 of Appendix III.

Upon the occurrence of a Knock-out Event, Party A shall pay to Party B the relevant Knock-out Settlement Amount on the relevant Knock-out Settlement Date and all the other rights and obligations of Party A and Party B in respect of the Transaction shall be terminated.

| | |
|---|---|
| Knock-out Level: | For each Knock-out Determination Day and the Valuation Date, as specified in Column 3 of Appendix III. |
| Knock-out Reference Securities: | The Shares in the Basket. |
| Knock-out Determination Days: | Each date as specified in Column 2 of Appendix II, subject to adjustment in accordance with the Following Business Day Convention. |
| Knock-out Valuation Time: | The Scheduled Closing Time on the Exchange on the Knock-out Determination Days. |
| Knock-out Settlement Amount: | The amount in USD, as determined using the relevant formula specified in Column 4 of Appendix II: |

where,

"Annual Return" means 17.00%;

"FX$_i$" means the Exchange Rate on the first Business Day following the Knock-out Determination Day in the relevant Period;

"Exchange Rate" means the spot KRW/USD exchange rate, expressed as the amount of Korean

Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters page "KFTC18" at around 4:00 p.m. (Seoul time). If it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in good faith and in a commercially reasonable manner.

For the avoidance of doubt, the Business Days for Initial Payment and Knock-out Settlement Date shall be used for determining the Business Days for Exchange Rate.

|  |  |
|---|---|
| Knock-out Settlement Date: | The third Business Day immediately following the Knock-out Determination Day, and which are currently expected to fall on the dates set out in Column 3 of Appendix II. |
| Business Days for Knock-out Determination Day(s): | Seoul |
| Business Days for Initial Payment and Knock-out Settlement Date: | Seoul and New York |
| Closing Price: | means, in relation to any Share in the Basket, the official closing price of such Share, calculated and published at the Valuation Time by the relevant Exchange or if there is no official closing price, the mid-market price per such Share as determined by the Calculation Agent. |

**Equity Amounts payable by Party A:**

|  |  |
|---|---|
| Equity Amount Payer: | Party A |
| Equity Amount Receiver: | Party B |
| Equity Notional Amount: | KRW9,771,000,000 |
| Equity Amounts payable by Party A: | Notwithstanding Section 8.6 of the Equity Definitions, an amount in USD determined in accordance with the following formula: |

(1) If the Cumulative Perf (36) on the Valuation Date is equal to or greater than the Knock-out Level (36), then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x (100% + 3 x Annual Return) / $FX_F$

(2) Or, if the Cumulative Perf (36) on the Valuation Date is less than -50%, then Party A Equity Amounts shall be calculated in accordance with the following formula:

Equity Notional Amount x 100% / $FX_F$

(3) Or, if the Cumulative Perf (36) on the Valuation Date is equal to or greater than -50%, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x 118% / $FX_F$

where,

"$FX_F$" means the Exchange Rate on the first Business Day following the final Valuation Date.

For the avoidance of doubt, the Equity Amounts shall only be payable in the event that a Knock-out Event has not occurred.

| | |
|---|---|
| Valuation Date: | 26 August 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Equity Notional Reset: | Not Applicable |
| Business Day for Valuation Date: | Seoul |
| **Floating Amount:** | Not applicable. No Floating Amount shall be payable by either party. |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the Exchange Rate by the Calculation Agent in a commercially reasonable manner) |
| Cash Settlement Payment Dates: | 31 August 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Business Days for Settlement Date: | Seoul and New York |

**Share Adjustments:**

| | |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment |

**Extraordinary Events:**

**Consequences of Merger Events:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |

| | |
|---|---|
| Determining Party: | Party A |
| **Tender Offer:** | Applicable |
| **Consequences of Tender Offers:** | |
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| Tender Offers: | The definition of "Tender Offer" in Section 12.1 of the Equity Definitions will be amended by replacing the phrase "outstanding voting shares of the Issuer" in the fourth line thereof with "outstanding Shares" |
| **Composition of Combined Consideration:** | Not Applicable |
| **Nationalization, Insolvency or Delisting:** | Cancellation and Payment (Calculation Agent Determination) |
| Determining Party: | Party A |
| **Additional Disruption Events:** | |
| Change in Law: | Applicable; provided that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction". |
| ✓  Insolvency Filing: | Applicable |
| | The definition of "Insolvency Filing" in Section 12.9 of the Equity Definitions shall be amended by deleting the clause "provided that such proceedings instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing" at the end of such definition and replacing it with the following: "; or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen days of the institution or presentation thereof." |
| | Section 12.9(b)(i) of the Equity Definitions is hereby |

amended by adding the following sentence at the end:
"If neither party elects to terminate the Transaction,
the Calculation Agent may adjust the terms of the
Transaction upon the occurrence of such an event
pursuant to Modified Calculation Agent Adjustment
(as if such event were a Tender Offer)."

Hedging Disruption:

Applicable. For the purpose of this Transaction,
"Hedging Disruption" means that, at any time from
and including the Trade Date, Party A or any of its
affiliates (the "Hedging Party"), is or will become
unable to or prevented from acquiring, establishing,
re-establishing, substituting, maintaining, unwinding
or disposing of, in whole or in part, any transaction(s)
the Hedging Party deems necessary to hedge the
equity price risk of entering into and performing Party
A's obligations with respect to the Transaction, acting
through customary legal channels (including but not
limited to purchasing, holding, selling or otherwise
disposing of any Shares, any options or future
contracts on the Shares or any other instruments or
assets) for any reason whatsoever including without
limitation any action by any authority of the Relevant
Country in the event of natural calamities, wars,
conflict or arms or grave and sudden changes in
domestic or foreign economic circumstances or other
similar circumstances pursuant to any law or
regulation of the Relevant Country or any other such
prohibition or restriction on transactions in the Shares,
options and/or future contracts on the Shares or on
other instruments or assets of any type whatsoever by
non-residents of the Relevant Country.

| | |
|---|---|
| Hedging Party: | Party A |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Determining Party: | Party A |

**Additional Representations, Agreements
and Acknowledgments:**

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

| | |
|---|---|
| **Additional Provision:** | If a Merger Date or Tender Offer Date is scheduled to be after, in respect of an Option Transaction, the Expiration Date or, in respect of any other Transaction, the final Valuation Date, the Calculation Agent will determine the economic effect on the theoretical value of the Transaction of the announcement of a potential Merger Event or Tender Offer Event (including without limitation any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) from the Announcement Date to the Expiration Date or the final Valuation Date, as applicable. If such economic effect is material, the Calculation Agent will adjust the terms of the Transaction to reflect such economic effect. |
| **Convertibility Event:** | An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country. |
| **Relevant Country:** | Republic of Korea |
| **Relevant Currency:** | The lawful currency of the Relevant Country |

| | |
|---|---|
| Consequences of a Convertibility Event: | If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Settlement Currency, then the determination of any amount that may be payable by Party A, or any early termination amount, as the case may be, and/or Party A's obligation to pay such amount, as the case may be, to Party B shall be postponed until the Business Day which falls the same number of Business Days after the Business Day on which such Convertibility Event ceases to exist as the Cash Settlement Payment Date was originally scheduled to be after the relevant Valuation Date. |
| | For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or other sum shall accrue to Party B in the event that any payment is postponed. |

**Unwinding:**

Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event.

In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD 10,000), Party A will provide an Indicative Market Value determined by Party A acting in good faith with a bid offer spread of 1.0%.

Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, acting in good faith as soon as practicable depending on prevailing market conditions, will notify Party B :

1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound; and
2) the identity of the party liable for such payment.

Such amount will be paid by the party liable for such payment to the other party on the third Currency Business Day following the day on which the above mentioned notice is sent by Party A to Party B.

**Representations:**

Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g) *No Reliance.* It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction. No communication

(written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(h)  *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(i)  *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of this Transaction.

(j)  *No Agency.* It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**    Party B represents to Party A in accordance with Section 3 of the ISDA Form (which representations will be deemed to be repeated by Party B at all times that this Transaction is outstanding) that:

(i)  It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance.

**Additional Termination Event:**    Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):-

(i)  **Sovereign Event.** Party B is not able to discharge its obligations with respect to this Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii)  **Non-Convertibility Event.** Party A has determined in its sole discretion that either of

the following has occurred and that any such occurrence has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Korea or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Adequate Assurances.** Party B fails to give Party A adequate assurances of Party B's ability to perform any of its obligations under this Transaction within one (1) Local Business Day of a written request to do so. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Material Adverse Change.** Party (A) has determined in its sole discretion that Party B has experienced or is experiencing a material adverse change in its business, assets, operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Additional Events of Default**

Section 5(a) of the ISDA Form shall be amended as follows:

(1)    deleting the word "or" at the end of Section 5(a)(vii);

(2)    deleting the full stop at the end of Section 5(a)(viii) and substituting therefor a semi-colon and the word "or"; and

(3)    adding the following additional subsections:

"(ix)    The voluntary or involuntary suspension of all or substantially all of Party B's business activities or the issuance of a court order or an administrative or other similar order to

suspend or revoke any of its business licenses in whole or in part;

(x)    A court of the Republic of Korea or the governmental authorities of the Republic of Korea issue an attachment order or a provisional attachment order against any payment or delivery owed to Party B under this Transaction;

(xi)   Party B is disqualified from a bill clearing house in the Republic of Korea; or

(xii)  The net capital ratio of Party B as defined in the Regulation on Supervision of Securities Business of the Republic of Korea falls below 150%. Such net capital ratio shall be calculated in accordance with the Regulation on Supervision of Securities Business in effect as of the Trade Date, provided, however, that Party A may elect, in its sole discretion, to calculate the net capital ratio in accordance with (i) any revised Regulation on Supervision of Securities Business that may be in effect from time to time after the Trade Date or (ii) any successor law, rule or regulation that may be adopted by the Republic of Korea."

**Miscellaneous:**

FETR

Party B represents to Party A (which representation will be deemed to be repeated by Party B at all times until the termination of this Transaction) that this Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

Failure to Pay or Deliver

Section 5(a)(i) of the ISDA Form is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

Calculation Agent:

Party A

Office:

For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

| | |
|---|---|
| Transfer: | Notwithstanding anything to the contrary in Section 7 of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Waiver of Trial by Jury: | Insofar as is permitted by law, Party A and Party B irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                    Accepted and agreed to:

**Lehman Brothers Commercial**                **MIRAE ASSET SECURITIES CO LTD**
**Corporation Asia Limited**


By: _____           By: _____
Name: Lokki Woo                                    Name:
Title: Authorized Signatory                    Title:                **YOO WON HWANG**
                                                                                        **Head Manager**
Execution time will be furnished upon Counterparty's written request


                                                        **EUN AH CHO**
                                                        **Manager**

## Appendix I

|       |                            | 1                        | 2               |
|-------|----------------------------|--------------------------|-----------------|
| Row 1 | Shares                     | Korea Electric Power Corp. | KT&G Corp.      |
| Row 2 | Bloomberg Code             | 015760 KS Equity         | 033780 KS Equity |
| Row 3 | Exchange                   | Korea Exchange           | Korea Exchange  |
| Row 4 | Initial Reference Price (KRW), $P_{i,0}$ | 41,900 | 71,400 |

## Appendix II

| Column 1 | Column 2 | Column 3 | Column 4 |
|----------|----------|----------|----------|
| Period | Knock-out Determination Day | Knock-out Settlement Date | Knock-out Settlement Amount (in USD) |
| 1 | Monthly Observation Date (6) | 5 March 2008 | Equity Notional Amount x (100% + 0.50 x Annual Return) / $FX_t$ |
| 2 | Monthly Observation Date (12) | 3 September 2008 | Equity Notional Amount x (100% + 1.00 x Annual Return) / $FX_t$ |
| 3 | Monthly Observation Date (18) | 4 March 2009 | Equity Notional Amount x (100% + 1.50 x Annual Return) / $FX_t$ |
| 4 | Monthly Observation Date (24) | 3 September 2009 | Equity Notional Amount x (100% + 2.00 x Annual Return) / $FX_t$ |
| 5 | Monthly Observation Date (30) | 4 March 2010 | Equity Notional Amount x (100% + 2.50 x Annual Return) / $FX_t$ |

## Appendix III

| Column 1 | Column 2 | Column 3 |
|----------|----------|----------|
| i | Monthly Observation Date | Knock-out Level |
| 0 | The Effective Date | NA |
| 1 | 28 September 2007 | NA |
| 2 | 31 October 2007 | NA |
| 3 | 30 November 2007 | NA |
| 4 | 28 December 2007 | NA |
| 5 | 31 January 2008 | NA |
| 6 | 29 February 2008 | -10% |
| 7 | 31 March 2008 | NA |

| 8 | 30 April 2008 | NA |
| 9 | 30 May 2008 | NA |
| 10 | 30 June 2008 | NA |
| 11 | 31 July 2008 | NA |
| 12 | 29 August 2008 | -15% |
| 13 | 30 September 2008 | NA |
| 14 | 31 October 2008 | NA |
| 15 | 28 November 2008 | NA |
| 16 | 30 December 2008 | NA |
| 17 | 30 January 2009 | NA |
| 18 | 27 February 2009 | -20% |
| 19 | 31 March 2009 | NA |
| 20 | 30 April 2009 | NA |
| 21 | 29 May 2009 | NA |
| 22 | 30 June 2009 | NA |
| 23 | 31 July 2009 | NA |
| 24 | 31 August 2009 | -25% |
| 25 | 30 September 2009 | NA |
| 26 | 30 October 2009 | NA |
| 27 | 30 November 2009 | NA |
| 28 | 30 December 2009 | NA |
| 29 | 29 January 2010 | NA |
| 30 | 26 February 2010 | -30% |
| 31 | 31 March 2010 | NA |
| 32 | 30 April 2010 | NA |
| 33 | 31 May 2010 | NA |
| 34 | 30 June 2010 | NA |
| 35 | 30 July 2010 | NA |
| 36 | Valuation Date | -35% |

DLS 448

# LEHMAN BROTHERS

**Transaction**

| | |
|---|---|
| Date: | 26 November, 2007 |
| To: | MIRAE ASSET SECURITIES CO LTD |
| | Attention:     Documentation Unit |
| | |
| From: | Lehman Brothers Commercial Corporation Asia Limited |
| | c/o Lehman Brothers Asia Limited |
| | Confirmations Group |
| | Facsimile:     (+1) 646-758-6317 (United States of America) |
| | E-Mail:     aseqdstrconf@lehman.com |
| | |
| Effort Id: | 1679864 |
| Global Id: | 3419037 |

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, and MIRAE ASSET SECURITIES CO., LTD. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2006 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 12 October 2007 |
| Termination Date: | 14 October 2008 |
| Option Style: | European |
| Option Type: | Call |
| Seller: | Party A |
| Buyer: | Party B |
| Basket: | The basket of six indices as specified in Column 1 of Appendix I, as further identified by the code specified in Column 2 of Appendix I (each, an $Index_i$, where $i = 1$ to 6) |
| Notional Amount: | KRW2,316,000,000 |
| Premium: | USD98,467.24 |
| Premium Payment Date: | 17 October 2007 |
| Exchange: | For $Index_1$, in respect of each component commodity then included in $Index_1$ (each, a "*Component Commodity*"), the organized exchange or market of trading on which futures contracts for such Component Commodity is traded, as determined by the Calculation Agent, and any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the Component Commodity has temporarily relocated (provided that the Calculation Agent has determined that there is comparative liquidity to the Component Commodity on such temporary substitute exchange or quotation system as on the original exchange or market of trading). |
| | For each other Index in the Basket, as specified in |

|  | Column 3 of Appendix I. |
| Related Exchange: | In respect of $Index_1$, not applicable. |
|  | For each Index in the Basket, as specified in Column 4 of Appendix I. |
| Scheduled Trading Day: | In respect of $Index_1$, $Index_2$ and $Index_3$, any day on which: (i) the relevant Index Sponsor is scheduled to publish the level of the Index; and (ii) the Related Exchange for such Index (if applicable) is scheduled to be open for trading for its regular trading session. |
|  | In respect of $Index_4$, $Index_5$ and $Index_6$, as defined in the Equity Definitions. |
| Exchange Business Day: | In respect of $Index_1$, $Index_2$ and $Index_3$, any Scheduled Trading Day on which: (i) the relevant Index Sponsor publishes the level of the Index; and (ii) the Related Exchange (if applicable) for such Index is open for trading during its regular trading session, notwithstanding the Related Exchange closing prior to its Scheduled Closing Time. |
|  | In respect of $Index_4$, $Index_5$ and $Index_6$, as defined in the Equity Definitions. |

**Procedure for Exercise:**

| Expiration Time: | The Valuation Time |
| Expiration Date: | The Valuation Date |
| Multiple Exercise: | Not Applicable |
| Automatic Exercise: | Applicable |

**Valuation:**

| Valuation Time: | For purposes of $Index_1$, $Index_2$ and $Index_3$, means: (i) for the purposes of determining whether a Market Disruption Event has occurred: (a) in respect of any Component Security or Component Commodity (as the case may be), the Scheduled Closing Time on the Exchange in respect of such Component Security or Commodity, and (b) in respect of option contracts or futures contracts on the Index, the close of trading on the Related Exchange (if applicable); and (ii) in all other circumstances, the time at which the official closing level of the Index is calculated and published by the Index Sponsor. |
|  | In respect of $Index_4$, $Index_5$ and $Index_6$, the close of trading on the Exchange without regard to pre-open or after hours trading outside of such regular trading session. |

| | |
|---|---|
| Valuation Date: | 8 October 2008, provided that if such day is not a Scheduled Trading Day, then the immediately following Scheduled Trading Day shall be the Valuation Date. |
| Observation Date: | 11 January 2008, 11 April 2008, 11 July 2008, and the Valuation Date. |
| | If an Observation Date is not a Scheduled Trading Day, then such Observation Date shall be next following Scheduled Trading Day, subject to the provisions under the "Consequences of a Disrupted Day" below. |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the Final KRW Exchange Rate by the Calculation Agent in a commercially reasonable manner). |
| Cash Settlement Payment Date: | The Termination Date |
| Option Cash Settlement Amount: | Notwithstanding Section 8.2 of the Equity Definitions, "Option Cash Settlement Amount" means, in respect of the Valuation Date, an amount as determined by the Calculation Agent as below: |
| | Maximum of {0, Basket Performance} x PR x Notional Amount / Final KRW Exchange Rate |
| | where: |
| | "Basket Performance" means the percentage value (rounded up or down to the nearest 4th decimal point) equal to the aggregate sum of the value of each Index derived from the following: |
| | Index Weight of each Index x  Index Performance of each Index ; |
| | "Index Weight" is specified in Column 6 of Appendix I; |
| | "Index Performance" means the arithmetic average of the official closing level of Index on each Observation Date / Initial Reference Level of such Index – 1.0; |
| | "Initial Reference Level" is specified in Column 5 of Appendix I; |
| | "PR" means 70%; |
| | "Final KRW Exchange Rate" means the spot KRW/USD exchange rate, expressed as the amount of Korean Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent |

with reference to such rate as displayed under "USD today" on the Reuters Page "KFTC 18" at around 4:00 p.m. (Seoul time) on the second Currency Business Day following the Valuation Date, as applicable. Provided that if it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in its sole and absolute discretion.

Currency Business Day:    Section 1.32 of the Equity Definitions shall be amended by adding the words "and in Seoul" after the words "in the principal financial center for the relevant currency" in the first sentence thereof.

Disrupted Day:    In respect of $Index_1$, $Index_2$ and $Index_3$, means any Scheduled Trading Day on which: (i) the Index Sponsor fails to publish the level of the relevant Index; (ii) the relevant Related Exchange (if applicable) fails to open for trading during its regular trading session; or (iii) a Market Disruption Event has occurred. The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the parties or other party, as the case may be, of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day, would have been a Valuation Date, Observation Date or an Expiration Date. Without limiting the obligation of the Calculation Agent to notify the parties as set forth in the preceding sentence, failure by the Calculation Agent to notify the parties of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day on this Transaction.

In respect of $Index_4$, $Index_5$ and $Index_6$, as defined in the Equity Definitions

Consequences of a Disrupted Day:    If there is a Disrupted Day in relation to an Index in the Basket on any date which would otherwise have been a Valuation Date or an Observation Date (as the case may be), then such Valuation Date or Observation Date (as the case may be) shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day in relation to that Index in the Basket, unless there is a Disrupted Day relating to that Index in the Basket on each of the eight Scheduled Trading Days immediately following the date that, but for the failure to open for trading during its regular trading session or the Market Disruption Event, would have been such Valuation Date or Observation Date (as the case may be). In that case:

(a)    that eighth following Scheduled Trading Day

shall be deemed to be the Valuation Date or Observation Date (as the case may be) in relation to such Index in the Basket notwithstanding it is a Disrupted Day; and

(b) the Calculation Agent shall determine its good faith estimate of the Index in the Basket that would have prevailed but for that Disruption Day as of the Scheduled Closing Time on the relevant Exchange on that eighth following Scheduled Trading Day.

**Market Disruption Event:**

In respect of $Index_1$, means one or more of the following occurs or exists in respect of any Component Commodity:
(1)     a Commodity Trading Disruption;
(2)     a Commodity Price Disruption; OR.
(3)     a Disappearance of Commodity Price.

In respect of $Index_2$ and $Index_3$, means either:

(i)     (a)     the occurrence or existence, in respect of any Component Security, of:

(1)     a Trading Disruption in respect of such Component Security, which the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the relevant Exchange on which such Component Security is principally traded;

(2)     an Exchange Disruption in respect of such Component Security, which the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the relevant Exchange on which such Component Security is principally traded; OR

(3)     an Early Closure in respect of such Component Security; AND

(b)     the aggregate of all Component Securities in respect of which a Trading Disruption, an Exchange Disruption and/or an Early Closure occurs or exists comprises 20 per cent. or more of the level of the Index; OR

(ii)     the occurrence or existence, in respect of futures or options contracts relating to the relevant Index, of: (a) a Trading Disruption; (b) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the Valuation Time in respect of the Related Exchange; or (c) an Early Closure, in each

case in respect of such futures or options contracts.

For the purposes of determining whether the condition in (i)(b) above has been satisfied, the relevant percentage contribution of each Component Security to the level of the Index shall be based on a comparison of (x) the portion of the level of the Index attributable to that Component Security to (y) the overall level of the Index, in each case using the official opening weightings as published by the Sponsor as part of the market "opening data".

In respect of $Index_4$, $Index_5$ and $Index_6$, as defined in the Equity Definitions.

| | |
|---|---|
| Commodity Trading Disruption: | In respect of $Index_1$, means any material suspension of, or material limitation imposed on trading in the futures contracts in respect of the Component Commodity on the relevant Exchange and for these purposes, (A) the suspension or limitation shall be deemed material only if: (i) all trading on the relevant Exchange is suspended for the entire Exchange Business Day; or all trading is suspended subsequent to the opening of trading on the Exchange Business Day, trading does not recommence prior to the regularly scheduled closed of trading on such Exchange Business Day and such suspension is announced less than one hour preceding its commencement; and (B) a limitation of trading shall be deemed material only if the relevant Exchange establishes limits on the range within which the price of the futures contracts in respect of the relevant Component Commodity may fluctuate and the closing or settlement price on such day is at the upper or lower limit of that range. |
| Commodity Price Disruption: | In respect of $Index_1$, means the settlement price of any futures contracts on the relevant Exchange has increased or decreased by an amount equal to the maximum permitted price change from the previous day's settlement price as specified by the relevant Exchange. |
| Disappearance of Commodity Price: | In respect of $Index_1$, means the settlement price of futures contracts for the relevant Component Commodity is not published by the relevant Exchange. Notwithstanding the foregoing, the following shall not constitute Market Disruption Events: (i) a limitation on the hours in an Exchange Business Day and/or number of Exchange Business Days, if it results from an announced change in the regular business hours of the relevant Exchange; or (ii) a decision to permanently discontinue trading in |

the futures contracts in respect of a Component Commodity then included in $Index_1$.

Trading Disruption:

In respect of $Index_2$ and $Index_3$, means any suspension of, or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise: (i) relating to any Component Security on the Exchange in respect of such Component Security; or (ii) in futures or options contracts relating to the Index on the Related Exchange.

In respect of $Index_4$, $Index_5$ and $Index_6$, as defined in the Equity Definitions.

Exchange Disruption:

In respect of $Index_2$ and $Index_3$, means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general to effect transactions in, or obtain market values for: (i) any Component Security on the Exchange in respect of such Component Security; or (ii) futures or options contracts relating to the Index on the Related Exchange.

In respect of $Index_4$, $Index_5$ and $Index_6$, as defined in the Equity Definitions.

Early Closure:

In respect of $Index_2$ and $Index_3$, means the closure on any Exchange Business Day of the Exchange in respect of any Component Security or the Related Exchange prior to its Scheduled Closing Time unless such earlier closing is announced by such Exchange or Related Exchange (as the case may be) at least one hour prior to the earlier of: (i) the actual closing time for the regular trading session on such Exchange or Related Exchange (as the case may be) on such Exchange Business Day; and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the relevant Valuation Time on such Exchange Business Day.

In respect of $Index_4$, $Index_5$ and $Index_6$, as defined in the Equity Definitions.

| | |
|---|---|
| **Index Adjustment Event:** | Insofar as Section 11.1 of the Equity Definitions apply to Index$_1$, the phrase "constituent stock and capitalization" in Section 11.1(b) shall be read as "constituent commodities futures contract"; and the word "securities" in Section 11.1(b)(A) shall be read as "commodities futures contracts". |
| Index Cancellation: | Cancellation and Payment |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |
| **Additional Disruption Events:** | |
| Change in Law: | Applicable; <u>provided</u> that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction". |
| Hedging Disruption: | Applicable.    Section 12.9(a)(v) of the Equity Definitions is replaced in its entirety as follows: "Hedging Disruption" means that a Hedging Party is unable, after using commercially reasonable efforts, to either (i) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity price risk (or any other relevant price risk including, but not limited to, the currency risk) of entering into and performing its obligations with respect to this Transaction, or (ii) freely realize, recover, receive, repatriate, remit or transfer the proceeds of Hedge Positions or this Transaction between accounts within the jurisdiction of the Hedge Positions (the "Affected Jurisdiction") or from accounts within the Affected Jurisdiction to accounts outside of the Affected Jurisdiction. For the purposes of Section 12.9(b)(iii) of the Equity Definitions, the reference to "the Hedging Party" shall be deemed to be a reference to the Hedging Party affected by the Hedging Disruption (the "Affected Hedging Party") (or if both parties are Affected Hedging Parties, to an Affected Hedging Party) and the reference to the "Non-Hedging Party" shall be deemed to be a reference to the other party (even if such party is also an Affected Hedging Party). |
| Hedging Party: | Party A |

| | |
|---|---|
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Determining Party: | Party A |

**Additional Representations, Agreements and Acknowledgments:**

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Index Disclaimer: | Applicable |
| Additional Acknowledgments: | Applicable |

**Convertibility Event:**

An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country.

| | |
|---|---|
| Relevant Country: | Republic of Korea |
| Relevant Currency: | The lawful currency of the Relevant Country |
| Consequences of a Convertibility Event: | If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as |

such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Settlement Currency, then:

(A) the determination of any amount that may be payable by Party A, or any early termination amount, as the case may be, shall be postponed to the Business Day which occurs after the day the Convertibility Event ceases to exist (the "New Determination Date"); and

(B) Party A's obligation to pay such amount to Party B shall be postponed to the last Business Day of the Postponement Duration. Where: "Postponement Duration" means the period from the New Determination Date to X Business Days after the New Determination Date; and "X" means same number of Business Days the Cash Settlement Payment Date was originally scheduled to occur after the relevant Valuation Date.

For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or other sum shall accrue to Party B in the event that any payment is postponed.

Unwinding:

Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event.

In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD10,000), Party A will provide an Indicative Market Value determined

by Party A acting in good faith with a bid offer spread of 1.0%.

Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, acting in good faith as soon as practicable depending on prevailing market conditions, will notify Party B:
1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound; and
2) the identity of the party liable for such payment.
Such amount will be paid by the party liable for such payment to the other party on the third Currency Business Day following the day on which the above mentioned notice is sent by Party A to Party B.

**Representations:**

Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g)   *No Reliance.*   It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction.   No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(h)   *Assessment and Understanding.*   It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction.   It is also capable of assuming, and assumes, the risks of this Transaction.

(i)   *Status of Parties.*   The other party is not acting as a fiduciary for or an advisor to it in respect of this Transaction.

(j)   *No Agency.*   It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**

Party B represents to Party A (which representations will be deemed to be repeated by Party B at all times

that this Transaction is outstanding) that:

(i) **Professional Investor**. It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance; and

(ii) **FETR**. This Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

**Additional Termination Event:**

Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):–

(i) **Sovereign Event**. Party B is not able to discharge its obligations with respect to this Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii) **Non-Convertibility Event.** Party A has determined in its sole discretion that either of the following has occurred and that any such occurrence has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Korea or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Adequate Assurances.** Party B fails to give Party A adequate assurances of Party B's ability to perform any of its obligations under this Transaction within one (1) Local Business Day of a written request to do so. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Material Adverse Change.** Party A has determined in its sole discretion that Party B has experienced or is experiencing a material adverse change in its business, assets, operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Events of Default and Termination Events:**    Section 5(a)(i) of the ISDA Form is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

Section 5(a)(vi) of the ISDA Form shall apply to both parties. For purposes hereof, "**Specified Indebtedness**" will have the meaning specified in Section 14 of the ISDA Form; "**Threshold Amount**" means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 10 million and (ii) two percent (2%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency); and "**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

Section 5(b)(iv) of the ISDA Form shall apply to both parties; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

| | |
|---|---|
| **Additional Events of Default:** | <u>Section 5(a)</u> of the ISDA Form shall be amended by inserting the following additional sub-sections (ix), (x), (xi) and (xii) as follows: |

"(ix)  The voluntary or involuntary suspension of all or substantially all of Party B's business activities or the issuance of a court order or an administrative or other similar order to suspend or revoke any of its business licenses in whole or in part;

(x)  A court of the Republic of Korea or the governmental authorities of the Republic of Korea issue an attachment order or a provisional attachment order against any payment or delivery owed to Party B under this Transaction;

(xi)  Party B is disqualified from a bill clearing house in the Republic of Korea; or

(xii)  The net capital ratio of Party B as defined in the Regulation on Supervision of Securities Business of the Republic of Korea falls below 150%. Such net capital ratio shall be calculated in accordance with the Regulation on Supervision of Securities Business in effect as of the Trade Date, provided, however, that Party A may elect, in its sole discretion, to calculate the net capital ratio in accordance with (i) any revised Regulation on Supervision of Securities Business that may be in effect from time to time after the Trade Date or (ii) any successor law, rule or regulation that may be adopted by the Republic of Korea."

**Miscellaneous:**

| | |
|---|---|
|   Calculation Agent: | Party A |
|   Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |
|   Transfer: | Notwithstanding anything to the contrary in <u>Section 7</u> of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings |

Inc.

| | |
|---|---|
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Waiver of Trial by Jury: | Insofar as is permitted by law, Party A and Party B irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,                          Accepted and agreed to:

**Lehman Brothers Commercial Corporation**     **Mirae Asset Securities Co., Ltd.**
**Asia Limited**

By: _____            By: _____
Name: Lokki Woo                          Name:
Title: Authorized Signatory               Title:

Execution time will be furnished upon Counterparty's written request.

Risk ID: 1679657A / Effort ID: 1679864 / Global Deal ID: 3419037

Appendix I

| | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 |
|---|---|---|---|---|---|---|
| i | Index | Bloomberg code | Exchange | Related Exchange | Initial Reference Level | Index Weight |
| 1 | Lehman Brothers Commodity Excess Return Index | LBCIER Index | As defined above. | Not Applicable | 96.0060 | 20% |
| 2 | FTSE EPRA / NAREIT Europe Index | EPRA Index | In respect of each component security of the Index (each, a "*Component Security*"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent | All Exchanges | 2,363.71 | 17.5% |
| 3 | Dow Jones EURO STOXX 50 | SX5E Index | In respect of each component security of the Index (each, a "*Component Security*"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent | Eurex | 4,476.02 | 15% |
| 4 | S&P / ASX 200 | AS51 Index | Australian Stock Exchange | All Exchanges | 6,748.90 | 20% |
| 5 | Nikkei 225 Stock Average Index | NKY Index | Tokyo Stock Exchange | Osaka Securities Exchange | 17,331.17 | 15% |
| 6 | Hang Seng China Enterprise Index | HSCEI Index | The Stock Exchange of Hong Kong | Hong Kong Futures Exchange | 19,081.30 | 12.5% |

*DLS 46†*

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 26 November, 2007 |
| To: | MIRAE ASSET SECURITIES CO LTD |
| | Attention:   Documentation Unit |
| From: | Lehman Brothers Commercial Corporation Asia Limited |
| | c/o Lehman Brothers Asia Limited |
| | Confirmations Group |
| | Facsimile:   (+1) 646-758-6317 (United States of America) |
| | E-Mail:   aseqdstrconf@lehman.com |
| Effort Id: | 1711630 |
| Global Id: | 3450970 |

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, and MIRAE ASSET SECURITIES CO., LTD. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions"), the 2005 ISDA Commodity Definitions (the "Commodity Definitions") and the 2006 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions and the Commodity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions, the Commodity Definitions and the Swap Definitions, the first listed below shall govern: (i) the Equity Definitions; (ii) the Commodity Definitions; and (iii) the Swap Definitions. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

Party B represents that it is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer(s) and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 26 October 2007 |
| Termination Date: | 28 October 2008 |
| Option Style: | European |
| Option Type: | Call |
| Seller: | Party A |
| Buyer: | Party B |
| Basket: | The basket of six underlyings, comprised of four Indices and two Commodities as specified in Column 1 of Appendix I, as further identified by the code specified in Column 2 of Appendix I (each, an $Underlying_i$, where $i = 1$ to 6) |
| Notional Amount: | KRW1,319,000,000 |
| Premium: | USD55,963.74 |
| Premium Payment Date: | 1 November 2007 |
| Exchange: | For each $Underlying_i$ in the Basket, as specified in Column 3 of Appendix I. |
| Related Exchange: | In respect of $Underlying_1$, $Underlying_2$, $Underlying_3$ and $Underlying_4$, as specified in Column 4 of Appendix I. |

|  | In respect of $Underlying_5$ and $Underlying_6$, not applicable. |
| Scheduled Trading Day: | Any day on which it is a Scheduled Trading Day (as defined) for <u>each</u> of the $Underlying_i$: |
|  | (a) In respect of $Underlying_1$ and $Underlying_2$, as defined in the Equity Definitions; |
|  | (b) In respect of $Underlying_3$ and $Underlying_4$, any day on which: (i) the relevant Index Sponsor is scheduled to publish the level of the Index; and (ii) the Related Exchange for such Index is scheduled to be open for trading for its regular trading session; |
|  | (c) In respect of $Underlying_5$, any day scheduled to be a Commodity Business Day; <u>AND</u> |
|  | (d) In respect of $Underlying_6$, any day scheduled to be a Bullion Business Day. |
| Exchange Business Day: | In respect of $Underlying_1$ and $Underlying_2$, as defined in the Equity Definitions. |
|  | In respect of $Underlying_3$ and $Underlying_4$, any Scheduled Trading Day on which: (i) the relevant Index Sponsor publishes the level of the Index; and (ii) the Related Exchange for such Index is open for trading during its regular trading session, notwithstanding the Related Exchange closing prior to its Scheduled Closing Time. |
|  | In respect of $Underlying_5$ and $Underlying_6$, a Commodity Business Day and Bullion Business Day, respectively. |

**Procedure for Exercise:**

| Expiration Time: | The Valuation Time |
| Expiration Date: | The Valuation Date |
| Multiple Exercise: | Not Applicable |
| Automatic Exercise: | Applicable |

**Valuation:**

| Valuation Time: | In respect of $Underlying_1$ and $Underlying_2$, the close of trading on the Exchange without regard to pre-open or after hours trading outside of such regular trading session. |
|  | For purposes of $Underlying_3$ and $Underlying_4$, means: (i) for the purposes of determining whether a Market Disruption Event has occurred: (a) in respect of any Component Security, the Scheduled Closing Time on the Exchange in respect of such Component Security, and (b) in respect of option contracts or futures |

contracts on the Index, the close of trading on the Related Exchange; and (ii) in all other circumstances, the time at which the official closing level of the Index is calculated and published by the Index Sponsor.

In respect of $Underlying_5$ and $Underlying_6$, not applicable.

| | |
|---|---|
| Valuation Date: | 22 October 2008, provided that if such day is not a Scheduled Trading Day, then the immediately following Scheduled Trading Day shall be the Valuation Date, subject to the provisions under the "Consequences of a Disrupted Day" below. |
| Observation Date: | 25 January 2008, 25 April 2008, 25 July 2008, and the Valuation Date. |

If an Observation Date is not a Scheduled Trading Day, then such Observation Date shall be next following Scheduled Trading Day, subject to the provisions under the "Consequences of a Disrupted Day" below.

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the Final KRW Exchange Rate by the Calculation Agent in a commercially reasonable manner). |
| Cash Settlement Payment Date: | The Termination Date |
| Option Cash Settlement Amount: | Notwithstanding Section 8.2 of the Equity Definitions, "Option Cash Settlement Amount" means, in respect of the Valuation Date, an amount in the Settlement Currency as determined by the Calculation Agent as below: |

Maximum of {0, Basket Performance} x PR x Notional Amount / Final KRW Exchange Rate

where:

"Basket Performance" means the percentage value (rounded up or down to the nearest 4th decimal point) equal to the aggregate sum of the value of each $Underlying_i$ derived from the following:

Index Weight of each $Underlying_i$ x Index Performance of each $Underlying_i$;

"Index Weight" is specified in Column 6 of Appendix I;

"Index Performance" means the arithmetic average of the Closing Level of an $Underlying_i$ on each

Observation Date / Initial Reference Level of such Underlying$_1$ – 1.0;

"Closing Level" means, in the case of Underlying$_1$, Underlying$_2$, Underlying$_3$ and Underlying$_4$, the official closing level of such Index, and in the case of a Underlying$_5$ and Underlying$_6$, the relevant Commodity Reference Price of such Commodity.

"Initial Reference Level" is specified in Column 5 of Appendix I;

"PR" means 70%;

"Final KRW Exchange Rate" means the spot KRW/USD exchange rate, expressed as the amount of Korean Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters Page "KFTC 18" at around 4:00 p.m. (Seoul time) on the second Currency Business Day following the Valuation Date, as applicable. Provided that if it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in its sole and absolute discretion.

| | |
|---|---|
| Currency Business Day: | Section 1.32 of the Equity Definitions shall be amended by adding the words "and in Seoul" after the words "in the principal financial center for the relevant currency" in the first sentence thereof. |
| Commodity Reference Price: | In relation to Underlying$_5$, "OIL-WTI-NYMEX", where "Pricing Date" means each Observation Date; "Specified Price" means the settlement price; and "Delivery Date" means First Nearby Month.<br><br>In relation to Underlying$_6$, "GOLD-P.M. FIX", where "Pricing Date" means each Observation Date. |
| Disrupted Day: | In respect of Underlying$_1$ and Underlying$_2$, as defined in the Equity Definitions.<br><br>In respect of Underlying$_3$ and Underlying$_4$, means any Scheduled Trading Day on which: (i) the Index Sponsor fails to publish the level of the relevant Index; (ii) the relevant Related Exchange fails to open for trading during its regular trading session; or (iii) a Market Disruption Event has occurred.<br><br>In respect of Underlying$_5$ and Underlying$_6$, means any Scheduled Trading Day on which a Commodity Disruption Event has occurred or exists.<br><br>The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the parties |

Risk ID: L07116349 / Effort ID: 1711630 / Global Deal ID: 3450970

or other party, as the case may be, of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day, would have been a Valuation Date, Observation Date or an Expiration Date. Without limiting the obligation of the Calculation Agent to notify the parties as set forth in the preceding sentence, failure by the Calculation Agent to notify the parties of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day on this Transaction.

**Consequences of a Disrupted Day:**    Notwithstanding Section 6.6 of the Equity Definitions, in the case of $Underlying_1$, $Underlying_2$, $Underlying_3$ and $Underlying_4$, if there is a Disrupted Day in relation to an Index in the Basket on any date which would otherwise have been a Valuation Date, an Observation Date or an Expiration Date, then such date for such Index shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day in relation to that Index, unless there is a Disrupted Day relating to that Index on each of the _five_ Scheduled Trading Days immediately following the date that, but for the failure to open for trading during its regular trading session or the Market Disruption Event, would have been such Valuation Date. In that case:

a) that _fifth_ following Scheduled Trading Day shall be deemed to be the Valuation Date, Observation Date or Expiration Date (as the case may be) in relation to such Index notwithstanding it is a Disrupted Day; and

b)    the Calculation Agent shall determine its good faith estimate of the Index that would have prevailed but for that Disruption Day as of the Scheduled Closing Time on the relevant Exchange on that _fifth_ following Scheduled Trading Day.

In the case of $Underlying_5$ and $Underlying_6$, if there is a Disrupted Day in relation to a Commodity on any date which would otherwise have been a Valuation Date, an Observation Date or an Expiration Date for such Commodity, then such date shall be the first succeeding Scheduled Trading Day on which the Commodity Disruption Event ceases to exist, provided however, that, where the relevant Commodity Disruption Event has been in existence for _five_ consecutive Scheduled Trading Days from the date of the first Disrupted Day, the Calculation Agent shall determine the Commodity Reference Price (or a method for determining the Commodity Reference

Price) for that Commodity, taking into consideration the latest available quotation for the relevant Commodity Reference Price and any other information that in good faith it deems relevant.

**Market Disruption Event:**     In respect of Underlying$_1$ and Underlying$_2$, as defined in the Equity Definitions.

In respect of Underlying$_3$ and Underlying$_4$, means either:

(i)     (a)     the occurrence or existence, in respect of any Component Security, of:

(1)     a Trading Disruption in respect of such Component Security, which the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the relevant Exchange on which such Component Security is principally traded;

(2)     an Exchange Disruption in respect of such Component Security, which the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the relevant Exchange on which such Component Security is principally traded; OR

(3)     an Early Closure in respect of such Component Security; AND

(b)     the aggregate of all Component Securities in respect of which a Trading Disruption, an Exchange Disruption and/or an Early Closure occurs or exists comprises 20 per cent. or more of the level of the Index; OR

(ii)     the occurrence or existence, in respect of futures or options contracts relating to the relevant Index, of: (a) a Trading Disruption; (b) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the Valuation Time in respect of the Related Exchange; or (c) an Early Closure, in each case in respect of such futures or options contracts.

For the purposes of determining whether the condition in (i)(b) above has been satisfied, the relevant percentage contribution of each Component Security to the level of the Index shall be based on a comparison of (x) the portion of the level of the Index attributable to that Component Security to (y) the overall level of the Index, in each case using the official opening weightings as published by the

Sponsor as part of the market "opening data".

| | |
|---|---|
| Trading Disruption: | In respect of Underlying$_1$, and Underlying$_2$, as defined in the Equity Definitions. |

In respect of Underlying$_3$ and Underlying$_4$, means any suspension of, or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise: (i) relating to any Component Security on the Exchange in respect of such Component Security; or (ii) in futures or options contracts relating to the Index on the Related Exchange.

| | |
|---|---|
| Exchange Disruption: | In respect of Underlying$_1$ and Underlying$_2$, as defined in the Equity Definitions. |

In respect of Underlying$_3$ and Underlying$_4$, means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general to effect transactions in, or obtain market values for: (i) any Component Security on the Exchange in respect of such Component Security; or (ii) futures or options contracts relating to the Index on the Related Exchange.

| | |
|---|---|
| Early Closure: | In respect of Underlying$_1$ and Underlying$_2$, as defined in the Equity Definitions. |

In respect of Underlying$_3$ and Underlying$_4$, means the closure on any Exchange Business Day of the Exchange in respect of any Component Security or the Related Exchange prior to its Scheduled Closing Time unless such earlier closing is announced by such Exchange or Related Exchange (as the case may be) at least one hour prior to the earlier of: (i) the actual closing time for the regular trading session on such Exchange or Related Exchange (as the case may be) on such Exchange Business Day; and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the relevant Valuation Time on such Exchange Business Day.

| | |
|---|---|
| **Commodity Disruption Event:** | In relation to Underlying$_5$, the following Market Disruption Events as defined in Section 7.4(c) of the Commodity Definitions (each, a "Commodity Disruption Event") shall apply:<br>(a) Price Source Disruption;<br>(b) Trading Disruption; |

(c) Disappearance of Commodity Reference Price;
(d) Material Change in Formula;
(e) Material Change in Content; and
(f) Tax Disruption.

In relation to Underlying$_6$, the following Commodity Disruption Events shall apply:

(a) Price Source Disruption;
(b) Trading Disruption;
(c) Disappearance of Commodity Reference Price; and
(d) Tax Disruption.

**Index Adjustment Event:**

Index Cancellation:                        Cancellation and Payment

Index Modification:                        Calculation Agent Adjustment

Index Disruption:                          Calculation Agent Adjustment

**Additional Disruption Events:**

Change in Law:                             Applicable; provided that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction".

Hedging Disruption:                        Applicable.   Section 12.9(a)(v) of the Equity Definitions is replaced in its entirety as follows: "Hedging Disruption" means that a Hedging Party is unable, after using commercially reasonable efforts, to either (i) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity price risk (or any other relevant price risk including, but not limited to, the currency risk) of entering into and performing its obligations with respect to this Transaction, or (ii) freely realize, recover, receive, repatriate, remit or transfer the proceeds of Hedge Positions or this Transaction between accounts within the jurisdiction of the Hedge Positions (the "Affected Jurisdiction") or from accounts within the Affected Jurisdiction to accounts outside of the Affected Jurisdiction. For the purposes of Section 12.9(b)(iii) of the Equity Definitions, the reference to "the Hedging Party" shall be deemed to be a reference to

|  | the Hedging Party affected by the Hedging Disruption (the "Affected Hedging Party") (or if both parties are Affected Hedging Parties, to an Affected Hedging Party) and the reference to the "Non-Hedging Party" shall be deemed to be a reference to the other party (even if such party is also an Affected Hedging Party). |
|---|---|
| Hedging Party: | Party A |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Determining Party: | Party A |

**Additional Representations, Agreements and Acknowledgments:**

| Non-Reliance: | Applicable |
|---|---|
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Index Disclaimer: | Applicable |
| Additional Acknowledgments: | Applicable |

**Convertibility Event:**

An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country.

| Relevant Country: | Republic of Korea |
|---|---|
| Relevant Currency: | The lawful currency of the Relevant Country |

| Consequences of a Convertibility Event: | If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Settlement Currency, then: |
|---|---|

(A) the determination of any amount that may be payable by Party A, or any early termination amount, as the case may be, shall be postponed to the Business Day which occurs after the day the Convertibility Event ceases to exist (the "New Determination Date"); and

(B) Party A's obligation to pay such amount to Party B shall be postponed to the last Business Day of the Postponement Duration.

Where:

"Postponement Duration" means the period from the New Determination Date to X Business Days after the New Determination Date; and

"X" means same number of Business Days the Cash Settlement Payment Date was originally scheduled to occur after the relevant Valuation Date.

For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or

other sum shall accrue to Party B in the event that any payment is postponed.

**Unwinding:**

Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event.

In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD10,000), Party A will provide an Indicative Market Value determined by Party A acting in good faith with a bid offer spread of 1.0%.

Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, acting in good faith as soon as practicable depending on prevailing market conditions, will notify Party B:

1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound; and
2) the identity of the party liable for such payment.

Such amount will be paid by the party liable for such payment to the other party on the third Currency Business Day following the day on which the above mentioned notice is sent by Party A to Party B.

**Representations:**

Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g)   ***No Reliance.***   It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction.   No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(h)   ***Assessment and Understanding.***   It is capable

of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(i)  *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of this Transaction.

(j)  *No Agency.* It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**

Party B represents to Party A (which representations will be deemed to be repeated by Party B at all times that this Transaction is outstanding) that:

(i) **Professional Investor**. It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance; and

(ii) **FETR**. This Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

**Additional Termination Event:**

Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):-

(i) **Sovereign Event**. Party B is not able to discharge its obligations with respect to this Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii) **Non-Convertibility Event**. Party A has determined in its sole discretion that either of the following has occurred and that any such occurrence

has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Korea or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Adequate Assurances.** Party B fails to give Party A adequate assurances of Party B's ability to perform any of its obligations under this Transaction within one (1) Local Business Day of a written request to do so. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Material Adverse Change.** Party A has determined in its sole discretion that Party B has experienced or is experiencing a material adverse change in its business, assets, operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Events of Default and Termination Events:**    <u>Section 5(a)(i)</u> of the ISDA Form is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

<u>Section 5(a)(vi)</u> of the ISDA Form shall apply to both parties. For purposes hereof, "**Specified Indebtedness**" will have the meaning specified in <u>Section 14</u> of the ISDA Form; "**Threshold Amount**" means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 10 million and (ii) two percent (2%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency); and "**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with

generally accepted accounting principles consistently applied.

Section 5(b)(iv) of the ISDA Form shall apply to both parties; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

**Additional Events of Default:**

Section 5(a) of the ISDA Form shall be amended by inserting the following additional sub-sections (ix), (x), (xi) and (xii) as follows:

"(ix)    The voluntary or involuntary suspension of all or substantially all of Party B's business activities or the issuance of a court order or an administrative or other similar order to suspend or revoke any of its business licenses in whole or in part;

(x)    A court of the Republic of Korea or the governmental authorities of the Republic of Korea issue an attachment order or a provisional attachment order against any payment or delivery owed to Party B under this Transaction;

(xi)    Party B is disqualified from a bill clearing house in the Republic of Korea; or

(xii)    The net capital ratio of Party B as defined in the Regulation on Supervision of Securities Business of the Republic of Korea falls below 150%. Such net capital ratio shall be calculated in accordance with the Regulation on Supervision of Securities Business in effect as of the Trade Date, provided, however, that Party A may elect, in its sole discretion, to calculate the net capital ratio in accordance with (i) any revised Regulation on Supervision of Securities Business that may be in effect from time to time after the Trade Date or (ii) any successor law, rule or regulation that may be adopted by the Republic of Korea."

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |
| Transfer: | Notwithstanding anything to the contrary in Section 7 of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Waiver of Trial by Jury: | Insofar as is permitted by law, Party A and Party B irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                      Accepted and agreed to:

**Lehman Brothers Commercial Corporation**          **Mirae Asset Securities Co., Ltd.**
**Asia Limited**


By: _____              By: _____
Name: Lokki Woo                                       Name:
Title: Authorized Signatory                           Title:

Execution time will be furnished upon Counterparty's written request.

**Appendix I**

| | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 |
|---|---|---|---|---|---|---|
| i | Underlying (Index / Commodity) | Bloomberg code | Exchange | Related Exchange | Initial Reference Level | Index Weight |
| 1 | Nikkei 225 Stock Average Index (an "Index") | NKY Index | Tokyo Stock Exchange | Osaka Securities Exchange | 16,505.63 | 15% |
| 2 | Hang Seng China Enterprise Index (an "Index") | HSCEI Index | The Stock Exchange of Hong Kong | Hong Kong Futures Exchange | 19,548.49 | 10% |
| 3 | Dow Jones EURO STOXX 50 (an "Index") | SX5E Index | In respect of each component security of the index (each, a "*Component Security*"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent | Eurex | 4,440.23 | 15% |
| 4 | S & P Global Water Index – Price Return (Euros) (an "Index") | SPGTAQUE Index | In respect of each component security of the index (each, a "*Component Security*"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent | All Exchanges | 1,686.86 | 20% |
| 5 | WTI Crude Oil (a "Commodity") | CL1 Comdty | The New York Mercantile Exchange (the "NYMEX") | Not Applicable | 91.86 | 20% |
| 6 | Gold (a "Commodity") | GOLDLNPM Index | The London Bullion Market Association (the "LBMA") | Not Applicable | 779.15 | 20% |

*DLS 53, 56?*

# LEHMAN BROTHERS

### Revised Transaction

| | |
|---|---|
| Date: | 25 February, 2008 |
| To: | MIRAE ASSET SECURITIES CO LTD |
| | Attention:      Documentation Unit |
| From: | Lehman Brothers Commercial Corporation Asia Limited |
| | c/o Lehman Brothers Asia Limited |
| | Confirmations Group |
| | Facsimile:      (+1) 646-758-6317 (United States of America) |
| | E-Mail:      aseqdstrconf@lehman.com |
| Effort Id: | 1837374 |
| Global Id: | 3582552 |

Dear Sir or Madam:

The purpose of this revised communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, and MIRAE ASSET SECURITIES CO., LTD. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below. This Confirmation replaces, restates and supersedes in its entirety all previous Confirmations relating to this Transaction.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions"), the 2005 ISDA Commodity Definitions (the "Commodity Definitions") and the 2006 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions and the Commodity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions, the Commodity Definitions and the Swap Definitions, the first listed below shall govern: (i) the Equity Definitions; (ii) the Commodity Definitions; and (iii) the Swap Definitions. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 11 January 2008 |
| Termination Date: | **13 January 2009** |
| Option Style: | European |
| Option Type: | Call |
| Seller: | Party A |
| Buyer: | Party B |
| Basket: | The basket of six indices as specified in Column 1 of Appendix I, as further identified by the code specified in Column 2 of Appendix I (each, an $Index_i$, where $i$ = 1 to 6) |
| Notional Amount: | KRW4,957,200,000 |
| Premium: | USD212,050.05 |
| Premium Payment Date: | 17 January 2008 |
| Exchange: | For $Index_1$, in respect of each component commodity then included in $Index_1$ (each, a "*Component Commodity*"), the organized exchange or market of trading on which futures contracts for such Component Commodity is traded, as determined by the Calculation Agent, and any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the Component Commodity has temporarily relocated (provided that the Calculation Agent has determined that there is comparative liquidity to the Component Commodity on such temporary substitute exchange or quotation system as on the original exchange or |

market of trading).

For each other Index in the Basket, as specified in Column 3 of Appendix I.

Related Exchange:  For each Index in the Basket, as specified in Column 4 of Appendix I.

Scheduled Trading Day:  In respect of Index$_1$, Index$_5$ and Index$_6$, any day on which: (i) the relevant Index Sponsor is scheduled to publish the level of the Index; and (ii) the Related Exchange for such Index (if applicable) is scheduled to be open for trading for its regular trading session.

In respect of Index$_2$, Index$_3$ and Index$_4$, as defined in the Equity Definitions.

Exchange Business Day:  In respect of Index$_1$, Index$_5$ and Index$_6$, any Scheduled Trading Day on which: (i) the relevant Index Sponsor publishes the level of the Index; and (ii) the Related Exchange (if applicable) for such Index is open for trading during its regular trading session, notwithstanding the Related Exchange closing prior to its Scheduled Closing Time.

In respect of Index$_2$, Index$_3$ and Index$_4$, as defined in the Equity Definitions.

**Procedure for Exercise:**

Expiration Time:  The Valuation Time

Expiration Date:  The Valuation Date

Multiple Exercise:  Not Applicable

Automatic Exercise:  Applicable

**Valuation:**

Valuation Time:  For purposes of Index$_1$, Index$_5$ and Index$_6$, means: (i) for the purposes of determining whether a Market Disruption Event has occurred: (a) in respect of any Component Security or Component Commodity (as the case may be), the Scheduled Closing Time on the Exchange in respect of such Component Security or Commodity, and (b) in respect of option contracts or futures contracts on the Index, the close of trading on the Related Exchange (if applicable); and (ii) in all other circumstances, the time at which the official closing level of the Index is calculated and published by the Index Sponsor.

In respect of Index$_2$, Index$_3$ and Index$_4$, the close of trading on the Exchange without regard to pre-open or after hours trading outside of such regular trading session.

| | |
|---|---|
| Valuation Date: | 9 January 2009, provided that if such day is not a Scheduled Trading Day, then the immediately following Scheduled Trading Day shall be the Valuation Date, subject to the provisions under the "Consequences of a Disrupted Day" below. |
| Observation Date: | 11 April 2008, 11 July 2008, 10 October 2008, and the Valuation Date. |
| | If an Observation Date is not a Scheduled Trading Day, then such Observation Date shall be next following Scheduled Trading Day, subject to the provisions under the "Consequences of a Disrupted Day" below. |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the Final KRW Exchange Rate by the Calculation Agent in a commercially reasonable manner). |
| Cash Settlement Payment Date: | The Termination Date |
| Option Cash Settlement Amount: | Notwithstanding Section 8.2 of the Equity Definitions, "Option Cash Settlement Amount" means, in respect of the Valuation Date, an amount in the Settlement Currency as determined by the Calculation Agent as below: |

Maximum of {0, Basket Performance} x PR x Notional Amount / Final KRW Exchange Rate

where:

"Basket Performance" means the percentage value (rounded up or down to the nearest 4th decimal point) equal to the aggregate sum of the value of each Index derived from the following:

Index Weight of each $Index_i$ x Index Performance of each $Index_i$;

"Index Weight" is specified in Column 6 of Appendix I;

"Index Performance" means the arithmetic average of the official closing level of $Index_i$ on each Observation Date / Initial Reference Level of such $Index_i$ – 1.0;

"Initial Reference Level" is specified in Column 5 of Appendix I;

"PR" means 70%;

"Final KRW Exchange Rate" means the spot KRW/USD exchange rate, expressed as the amount

of Korean Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters Page "KFTC 18" at around 4:00 p.m. (Seoul time) on the first Currency Business Day following the Valuation Date, as applicable. Provided that if it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in its sole and absolute discretion.

**Currency Business Day:**

Section 1.32 of the Equity Definitions shall be amended by adding the words "and in Seoul" after the words "in the principal financial center for the relevant currency" in the first sentence thereof.

**Disrupted Day:**

In respect of $Index_1$, $Index_5$ and $Index_6$, means any Scheduled Trading Day on which: (i) the Index Sponsor fails to publish the level of the relevant Index; (ii) the relevant Related Exchange (if applicable) fails to open for trading during its regular trading session; or (iii) a Market Disruption Event has occurred. The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the parties or other party, as the case may be, of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day, would have been a Valuation Date, Observation Date or an Expiration Date. Without limiting the obligation of the Calculation Agent to notify the parties as set forth in the preceding sentence, failure by the Calculation Agent to notify the parties of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day on this Transaction.

In respect of $Index_2$, $Index_3$ and $Index_4$, as defined in the Equity Definitions

**Consequences of a Disrupted Day:**

If there is a Disrupted Day in relation to an Index in the Basket on any date which would otherwise have been a Valuation Date or an Observation Date (as the case may be), then such Valuation Date or Observation Date (as the case may be) shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day in relation to that Index in the Basket, unless there is a Disrupted Day relating to that Index in the Basket on each of the five Scheduled Trading Days immediately following the date that, but for the failure to open for trading during its regular trading session or the Market Disruption Event, would have

been such Valuation Date or Observation Date (as the case may be). In that case:

(a)    that fifth following Scheduled Trading Day shall be deemed to be the Valuation Date or Observation Date (as the case may be) in relation to such Index in the Basket notwithstanding it is a Disrupted Day; and

(b)  the Calculation Agent shall determine its good faith estimate of the Index in the Basket that would have prevailed but for that Disruption Day as of the Scheduled Closing Time on the relevant Exchange on that fifth following Scheduled Trading Day.

**Market Disruption Event:**

In respect of $Index_1$, means one or more of the following occurs or exists in respect of any Component Commodity:
(1)    a Commodity Trading Disruption;
(2)    a Commodity Price Disruption; OR
(3)    a Disappearance of Commodity Price.

In respect of $Index_2$, $Index_3$ and $Index_4$, as defined in the Equity Definitions.

In respect of $Index_5$ and $Index_6$, means either:

(i)    (a)    the occurrence or existence, in respect of any Component Security, of:

(1)    a Trading Disruption in respect of such Component Security, which the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the relevant Exchange on which such Component Security is principally traded;

(2)    an Exchange Disruption in respect of such Component Security, which the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the relevant Exchange on which such Component Security is principally traded; OR

(3)    an Early Closure in respect of such Component Security; AND

(b)    the aggregate of all Component Securities in respect of which a Trading Disruption, an Exchange Disruption and/or an Early Closure occurs or exists comprises 20 per cent. or more of the level of the Index; OR

(ii)    the occurrence or existence, in respect of

futures or options contracts relating to the relevant Index, of: (a) a Trading Disruption; (b) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the Valuation Time in respect of the Related Exchange; or (c) an Early Closure, in each case in respect of such futures or options contracts.

For the purposes of determining whether the condition in (i)(b) above has been satisfied, the relevant percentage contribution of each Component Security to the level of the Index shall be based on a comparison of (x) the portion of the level of the Index attributable to that Component Security to (y) the overall level of the Index, in each case using the official opening weightings as published by the Sponsor as part of the market "opening data".

| | |
|---|---|
| Commodity Trading Disruption: | In respect of $Index_1$, means any material suspension of, or material limitation imposed on trading in the futures contracts in respect of the Component Commodity on the relevant Exchange and for these purposes, (A) the suspension or limitation shall be deemed material only if: (i) all trading on the relevant Exchange is suspended for the entire Exchange Business Day; or all trading is suspended subsequent to the opening of trading on the Exchange Business Day, trading does not recommence prior to the regularly scheduled closed of trading on such Exchange Business Day and such suspension is announced less than one hour preceding its commencement; and (B) a limitation of trading shall be deemed material only if the relevant Exchange establishes limits on the range within which the price of the futures contracts in respect of the relevant Component Commodity may fluctuate and the closing or settlement price on such day is at the upper or lower limit of that range. |
| Commodity Price Disruption: | In respect of $Index_1$, means the settlement price of any futures contracts on the relevant Exchange has increased or decreased by an amount equal to the maximum permitted price change from the previous day's settlement price as specified by the relevant Exchange. |

| | |
|---|---|
| Disappearance of Commodity Price: | In respect of $Index_1$, means the settlement price of futures contracts for the relevant Component Commodity is not published by the relevant Exchange. Notwithstanding the foregoing, the following shall not constitute Market Disruption Events: (i) a limitation on the hours in an Exchange Business Day and/or number of Exchange Business Days, if it results from an announced change in the regular business hours of the relevant Exchange; or (ii) a decision to permanently discontinue trading in the futures contracts in respect of a Component Commodity then included in $Index_1$. |
| Trading Disruption: | In respect of $Index_2$, $Index_3$ and $Index_4$, as defined in the Equity Definitions. |
| | In respect of $Index_5$ and $Index_6$, means any suspension of, or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise: (i) relating to any Component Security on the Exchange in respect of such Component Security; or (ii) in futures or options contracts relating to the Index on the Related Exchange. |
| Exchange Disruption: | In respect of $Index_2$, $Index_3$ and $Index_4$, as defined in the Equity Definitions. |
| | In respect of $Index_5$ and $Index_6$, means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general to effect transactions in, or obtain market values for: (i) any Component Security on the Exchange in respect of such Component Security; or (ii) futures or options contracts relating to the Index on the Related Exchange. |
| Early Closure: | In respect of $Index_2$, $Index_3$ and $Index_4$, as defined in the Equity Definitions. |
| | In respect of $Index_5$ and $Index_6$, means the closure on any Exchange Business Day of the Exchange in respect of any Component Security or the Related Exchange prior to its Scheduled Closing Time unless such earlier closing is announced by such Exchange or Related Exchange (as the case may be) at least one hour prior to the earlier of: (i) the actual closing time |

| | |
|---|---|
| | for the regular trading session on such Exchange or Related Exchange (as the case may be) on such Exchange Business Day; and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the relevant Valuation Time on such Exchange Business Day. |
| **Index Adjustment Event:** | Insofar as Section 11.1 of the Equity Definitions apply to $Index_i$, the phrase "constituent stock and capitalization" in Section 11.1(b) shall be read as "constituent commodities futures contract"; and the word "securities" in Section 11.1(b)(A) shall be read as "commodities futures contracts". |
| Index Cancellation: | Cancellation and Payment |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |
| **Additional Disruption Events:** | |
| Change in Law: | Applicable; _provided_ that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction". |
| Hedging Disruption: | Applicable.    Section 12.9(a)(v) of the Equity Definitions is replaced in its entirety as follows: "Hedging Disruption" means that a Hedging Party is unable, after using commercially reasonable efforts, to either (i) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity price risk (or any other relevant price risk including, but not limited to, the currency risk) of entering into and performing its obligations with respect to this Transaction, or (ii) freely realize, recover, receive, repatriate, remit or transfer the proceeds of Hedge Positions or this Transaction between accounts within the jurisdiction of the Hedge Positions (the "Affected Jurisdiction") or from accounts within the Affected Jurisdiction to accounts outside of the Affected Jurisdiction. For the purposes of Section 12.9(b)(iii) of the Equity Definitions, the reference to "the Hedging Party" shall be deemed to be a reference to |

the Hedging Party affected by the Hedging Disruption (the "Affected Hedging Party") (or if both parties are Affected Hedging Parties, to an Affected Hedging Party) and the reference to the "Non-Hedging Party" shall be deemed to be a reference to the other party (even if such party is also an Affected Hedging Party).

| | |
|---|---|
| Hedging Party: | Party A |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Determining Party: | Party A |

**Additional Representations, Agreements and Acknowledgments:**

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Index Disclaimer: | Applicable |
| Additional Acknowledgments: | Applicable |

**Convertibility Event:**

An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country.

| | |
|---|---|
| Relevant Country: | Republic of Korea |
| Relevant Currency: | The lawful currency of the Relevant Country |

| Consequences of a Convertibility Event: | If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Settlement Currency, then: |
|---|---|

(A) the determination of any amount that may be payable by Party A, or any early termination amount, as the case may be, shall be postponed to the Business Day which occurs after the day the Convertibility Event ceases to exist (the "New Determination Date"); and

(B) Party A's obligation to pay such amount to Party B shall be postponed to the last Business Day of the Postponement Duration.

Where:

"Postponement Duration" means the period from the New Determination Date to X Business Days after the New Determination Date; and

"X" means the same number of Business Days as the Cash Settlement Payment Date was originally scheduled to occur after the relevant Valuation Date.

For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or

other sum shall accrue to Party B in the event that any payment is postponed.

**Unwinding:**

Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event.

In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD10,000), Party A will provide an Indicative Market Value determined by Party A acting in good faith with a bid offer spread of 1.0%.

Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, acting in good faith as soon as practicable depending on prevailing market conditions, will notify Party B:

1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound; and
2) the identity of the party liable for such payment.

Such amount will be paid by the party liable for such payment to the other party on the third Currency Business Day following the day on which the above mentioned notice is sent by Party A to Party B.

**Representations:**

Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g)    *No Reliance.*    It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(h)   *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(i)   *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of this Transaction.

(j)   *No Agency.* It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**

Party B represents to Party A (which representations will be deemed to be repeated by Party B at all times that this Transaction is outstanding) that:

(i) **Professional Investor.** It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance; and

(ii) **FETR.** This Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

**Additional Termination Event:**

Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):-

(i) **Sovereign Event.** Party B is not able to discharge its obligations with respect to this Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii) **Non-Convertibility Event.** Party A has determined in its sole discretion that either of the

following has occurred and that any such occurrence has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Korea or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Adequate Assurances.** Party B fails to give Party A adequate assurances of Party B's ability to perform any of its obligations under this Transaction within one (1) Local Business Day of a written request to do so. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Material Adverse Change.** Party A has determined in its sole discretion that Party B has experienced or is experiencing a material adverse change in its business, assets, operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Events of Default and Termination Events:**    Section 5(a)(i) of the ISDA Form is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

Section 5(a)(vi) of the ISDA Form shall apply to both parties. For purposes hereof, "Specified Indebtedness" will have the meaning specified in Section 14 of the ISDA Form; "Threshold Amount" means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 10 million and (ii) two percent (2%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency); and "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury

stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

Section 5(b)(iv) of the ISDA Form shall apply to both parties; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

**Additional Events of Default:**

Section 5(a) of the ISDA Form shall be amended by inserting the following additional sub-sections (ix), (x), (xi) and (xii) as follows:

"(ix) The voluntary or involuntary suspension of all or substantially all of Party B's business activities or the issuance of a court order or an administrative or other similar order to suspend or revoke any of its business licenses in whole or in part;

(x) A court of the Republic of Korea or the governmental authorities of the Republic of Korea issue an attachment order or a provisional attachment order against any payment or delivery owed to Party B under this Transaction;

(xi) Party B is disqualified from a bill clearing house in the Republic of Korea; or

(xii) The net capital ratio of Party B as defined in the Regulation on Supervision of Securities Business of the Republic of Korea falls below 150%. Such net capital ratio shall be calculated in accordance with the Regulation on Supervision of Securities Business in effect as of the Trade Date, provided, however, that Party A may elect, in its sole discretion, to calculate the net capital ratio in accordance with (i) any revised Regulation on Supervision of Securities Business that may be in effect from time to time after the Trade Date or (ii) any successor law, rule or regulation that may be adopted by the Republic of Korea."

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |
| Transfer: | Notwithstanding anything to the contrary in <u>Section 7</u> of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Waiver of Trial by Jury: | Insofar as is permitted by law, Party A and Party B irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Accepted and agreed to:

**Lehman Brothers Commercial Corporation Asia Limited**

**Mirae Asset Securities Co., Ltd.**

By:

Name: Lokki Woo
Title: Authorized Signatory

By:
Name:
Title:    YOO WON HWANG
           Head Manager

EUN AH CHO
Manager

Execution time will be furnished upon Counterparty's written request.

Risk ID: 1772251A / Effort ID: 1837374 / Global Deal ID: 3582552

**Appendix I**

| i | Column 1<br>Underlying<br>(Index) | Column 2<br>Bloomberg<br>code | Column 3<br>Exchange | Column 4<br>Related<br>Exchange | Column 5<br>Initial<br>Reference<br>Level | Column 6<br>Index<br>Weight |
|---|---|---|---|---|---|---|
| 1 | Lehman Brothers Commodity Excess Return Index | LBCIER Index | As defined above. | Not Applicable | 104.5944 | 17.50% |
| 2 | S&P BRIC40 Index (EURO) | SBE Index | Chicago Mercantile Exchange | Not Applicable | 2,684.82 | 15.00% |
| 3 | Kospi200 Index | KOSPI2 Index | Korea Exchange | Not Applicable | 224.41 | 15.00% |
| 4 | Nikkei 225 Stock Average Index | NKY Index | Tokyo Stock Exchange | Osaka Securities Exchange | 14,110.79 | 12.50% |
| 5 | S & P Global Infrastructure Index | SPGTINFR Index | In respect of each component security of the index (each, a "*Component Security*"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent | Not Applicable | 2,796.40 | 20.00% |
| 6 | S & P Global Water Index – Price Return (USD) | SPGTAQUA Index | In respect of each component security of the index (each, a "*Component Security*"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent | Not Applicable | 2,562.75 | 20.00% |

DLS 59元

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 14 March, 2008 |
| To: | MIRAE ASSET SECURITIES CO LTD |
| | Attention:    Documentation Unit |

| | |
|---|---|
| From: | Lehman Brothers Commercial Corporation Asia Limited |
| | c/o Lehman Brothers Asia Limited |
| | Confirmations Group |
| | Facsimile:    (+1) 646-758-6317 (United States of America) |
| | E-Mail:    aseqdstrconf@lehman.com |

| | |
|---|---|
| Effort Id: | 1933572 |
| Global Id: | 3681728 |

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, and MIRAE ASSET SECURITIES CO., LTD. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions"), the 2005 ISDA Commodity Definitions (the "Commodity Definitions") and the 2006 ISDA Definitions (the "Swap Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA"); and the 1998 ISDA FX and Currency Option Definitions, as published by ISDA, the Emerging Markets Traders Association and the Foreign Exchange Committee (the "FX Definitions", and together with the Equity Definitions, the Commodity Definitions and the Swap Definitions, the "Definitions") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions, the Commodity Definitions, FX Definitions and the Swap Definitions, the first listed below shall govern: (i) the Equity Definitions; (ii) the Commodity Definitions; (iii) the FX Definitions and (iv) the Swap Definitions. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 29 February 2008 |
| Termination Date: | The Cash Settlement Payment Date |
| Option Style: | European |
| Option Type: | Call |
| Seller: | Party A |
| Buyer: | Party B |
| Basket: | The basket of four indices, one commodity and one currency exchange rate as specified in Column 1 of Appendix I, as further identified by the code specified in Column 2 of Appendix I (each, an $Index_i$ where $i = 1$ to 6) |
| Notional Amount: | KRW4,687,000,000 |
| Premium: | USD227,692.47 |
| Premium Payment Date: | 6 March 2008 |
| Exchange: | For $Index_1$, $Index_2$, $Index_3$ and $Index_4$, as specified in Column 3 of Appendix I. |
| | For $Index_5$, in respect of each component commodity then included in $Index_5$ (each, a "*Component Commodity*"), the organized exchange or market of trading on which futures contracts for such Component Commodity is traded, as determined by the Calculation Agent, and any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the Component Commodity has temporarily relocated |

(provided that the Calculation Agent has determined that there is comparative liquidity to the Component Commodity on such temporary substitute exchange or quotation system as on the original exchange or market of trading).

For $Index_6$, not applicable.

**Related Exchange:**

For each $Index_i$ in the Basket, as specified in Column 4 of Appendix I.

**Scheduled Trading Day:**

Any day on which it is a Scheduled Trading Day for each $Index_i$ in the Basket. Scheduled Trading Day for the respective $Index_i$ has the following meaning:–

In respect of $Index_1$, $Index_2$, $Index_3$ and $Index_5$, any day on which: (i) the relevant Index Sponsor is scheduled to publish the level of the $Index_i$; and (ii) the Related Exchange for such $Index_i$ (if applicable) is scheduled to be open for trading for its regular trading session.

In respect of $Index_4$, as defined in the Equity Definitions.

In respect of $Index_6$, any day scheduled to be a Business Day as defined in Section 1.1(d) of the FX Definitions.

**Exchange Business Day:**

In respect of $Index_1$, $Index_2$, $Index_3$ and $Index_5$, any Scheduled Trading Day on which: (i) the relevant Index Sponsor publishes the level of the Index; and (ii) the Related Exchange (if applicable) for such Index is open for trading during its regular trading session, notwithstanding the Related Exchange closing prior to its Scheduled Closing Time.

In respect of $Index_4$, as defined in the Equity Definitions.

In respect of $Index_6$, a Business Day.

**Procedure for Exercise:**

  Expiration Time:

The Valuation Time

  Expiration Date:

The Valuation Date

  Multiple Exercise:

Not Applicable

  Automatic Exercise:

Applicable

**Valuation:**

  Valuation Time:

In respect of $Index_1$, $Index_2$, $Index_3$, and $Index_5$, means: (i) for the purposes of determining whether a Market Disruption Event has occurred: (a) in respect of any Component Security or Component Commodity (as the case may be), the Scheduled

Closing Time on the Exchange in respect of such Component Security or Component Commodity, and (b) in respect of option contracts or futures contracts on Index$_i$ the close of trading on the Related Exchange (if applicable); and (ii) in all other circumstances, the time at which the official closing level of Index$_i$ is calculated and published by the Index Sponsor.

In respect of Index$_4$ and Index$_6$, not applicable.

| | |
|---|---|
| Valuation Date: | 24 February 2009, provided that if such day is not a Scheduled Trading Day, then the immediately following Scheduled Trading Day shall be the Valuation Date, subject to the provisions under the "Consequences of a Disrupted Day" below. |
| Observation Date: | 29 May 2008, 29 August 2008, 28 November 2008, and the Valuation Date. |

If an Observation Date is not a Scheduled Trading Day, then such Observation Date shall be next following Scheduled Trading Day, subject to the provisions under the "Consequences of a Disrupted Day" below.

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the Final KRW Exchange Rate by the Calculation Agent in a commercially reasonable manner). |
| Cash Settlement Payment Date: | 4 Currency Business Days immediately following the Valuation Date. |
| Option Cash Settlement Amount: | Notwithstanding Section 8.2 of the Equity Definitions, "Option Cash Settlement Amount" means, in respect of the Valuation Date, an amount in the Settlement Currency as determined by the Calculation Agent as below: |

Maximum of {0, Basket Performance} x PR x Notional Amount / Final KRW Exchange Rate

where:

"Basket Performance" means the percentage value (rounded up or down to the nearest 4th decimal point) equal to the aggregate sum of the value of each Index$_i$ derived from the following:

Index Weight of each Index$_i$ x Index Performance of each Index$_i$;

"Index Weight" is specified in Column 6 of Appendix

I;

"Index Performance" means the arithmetic average of the Closing Level of an $Index_i$ on each Observation Date / Initial Reference Level of such $Index_i$ − 1.0;

"Closing Level" means, in the case of $Index_1$, $Index_2$, $Index_3$, and $Index_5$, the level of such $Index_i$ as published by the Index Sponsor; in the case of $Index_4$, the Commodity Reference Price; and in the case of $Index_6$, the Settlement Rate.

"Initial Reference Level" is specified in Column 5 of Appendix I;

"PR" means 70%;

"Final KRW Exchange Rate" means the spot KRW/USD exchange rate, expressed as the amount of Korean Won per one U.S. Dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters Page "KFTC 18" at around 4:00 p.m. (Seoul time) on the second Currency Business Day following the Valuation Date, as applicable. Provided that if it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in its sole and absolute discretion.

| | |
|---|---|
| Currency Business Day: | Section 1.32 of the Equity Definitions shall be amended by adding the words "and in Seoul" after the words "in the principal financial center for the relevant currency" in the first sentence thereof. |
| Commodity Reference Price: | GOLD-P.M. FIX, where "Pricing Date" means each Observation Date. |
| Settlement Rate: | 1 / CNY SAEC (CNY01), where "Rate Calculation Date" means each Observation Date. |

For clarity, the Settlement Rate is expressed as the amount of U.S. Dollar per one Chinese Renminbi.

**Disrupted Day:**     In respect of $Index_1$, $Index_2$, $Index_3$, and $Index_5$, means any Scheduled Trading Day on which: (i) the Index Sponsor fails to publish the level of the relevant $Index_i$; (ii) the relevant Related Exchange (if applicable) fails to open for trading during its regular trading session; or (iii) a Market Disruption Event has occurred.

In respect of $Index_4$, means any Scheduled Trading Day on which the following Market Disruption Events as defined in Section 7.4(c) of the Commodity

Definitions has occurred or exists: (i) Price Source Disruption; (ii) Trading Disruption; (iii) Disappearance of Commodity Reference Price; and (iv) Tax Disruption (each, a "Commodity Disruption Event").

In respect of $Index_6$, means any Scheduled Trading Day on which the Calculation Agent determines in good faith that a Disruption Event as defined in Section 5.1(d) of the FX Definitions has occurred or exists.

The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the parties or other party, as the case may be, of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day, would have been a Valuation Date, Observation Date or an Expiration Date. Without limiting the obligation of the Calculation Agent to notify the parties as set forth in the preceding sentence, failure by the Calculation Agent to notify the parties of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day on this Transaction.

**Consequences of a Disrupted Day:**

Notwithstanding Section 6.6 of the Equity Definitions, in the case of $Index_1$, $Index_2$, $Index_3$, and $Index_5$, if there is a Disrupted Day in relation to an $Index_i$ on any date which would otherwise have been a Valuation Date, Observation Date or Expiration Date (as the case may be), then such Valuation Date, Observation Date or Expiration Date (as the case may be) shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day in relation to that $Index_i$, unless there is a Disrupted Day relating to that $Index_i$ on each of the five Scheduled Trading Days immediately following the date that, but for the failure to open for trading during its regular trading session or the Market Disruption Event, would have been such Valuation Date, Observation Date or Expiration Date (as the case may be). In that case:

(a) that fifth following Scheduled Trading Day shall be deemed to be the Valuation Date, Observation Date or Expiration Date (as the case may be) in relation to such $Index_i$ notwithstanding it is a Disrupted Day; and

(b) the Calculation Agent shall determine its good faith estimate of the $Index_i$ that would have prevailed but for that Disruption Day as of the Scheduled Closing Time on the relevant Exchange on that fifth

following Scheduled Trading Day.

In the case of $Index_4$, if there is a Disrupted Day in relation to $Index_4$ on any date which would otherwise have been a Valuation Date, Observation Date or Expiration Date (as the case may be) for this index, then such date shall be the first succeeding Scheduled Trading Day on which the Commodity Disruption Event ceases to exist, provided however, that, where the relevant Commodity Disruption Event has been in existence for <u>five</u> consecutive Scheduled Trading Days from the date of the first Disrupted Day, the Calculation Agent shall determine the Commodity Reference Price (or a method for determining the Commodity Reference Price) for $Index_4$, taking into consideration the latest available quotation for the Commodity Reference Price and any other information that in good faith it deems relevant.

In the case of $Index_6$, if there is a Disrupted Day in relation to $Index_6$ on any date which would otherwise have been a Valuation Date, Observation Date or Expiration Date (as the case may be) for this index, then the Calculation Agent shall determine the Settlement Rate for $Index_6$, taking into consideration the latest available quotation for the Settlement Rate and any other information that in good faith it deems relevant.

**Market Disruption Event:**    In respect of $Index_1$, $Index_2$ and $Index_3$, means either:

(i)    (a)    the occurrence or existence, in respect of any Component Security, of:

(1)    a Trading Disruption in respect of such Component Security, which the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the relevant Exchange on which such Component Security is principally traded;

(2)    an Exchange Disruption in respect of such Component Security, which the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the relevant Exchange on which such Component Security is principally traded; OR

(3)    an Early Closure in respect of such Component Security; AND

(b)    the aggregate of all Component Securities in respect of which a Trading Disruption, an Exchange Disruption and/or an Early Closure occurs or exists

comprises 20 per cent. or more of the level of the Index; OR

(ii) . the occurrence or existence, in respect of futures or options contracts relating to the relevant Index, of: (a) a Trading Disruption; (b) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the Valuation Time in respect of the Related Exchange; or (c) an Early Closure, in each case in respect of such futures or options contracts.

For the purposes of determining whether the condition in (i)(b) above has been satisfied, the relevant percentage contribution of each Component Security to the level of the Index shall be based on a comparison of (x) the portion of the level of the Index attributable to that Component Security to (y) the overall level of the Index, in each case using the official opening weightings as published by the Sponsor as part of the market "opening data".

In respect of $Index_5$, means any of the following event, as determined in good faith by the Calculation Agent: (A) the termination or suspension of, or material limitation or disruption in the trading of futures contracts in respect of the Component Commodity on the relevant Exchange; (B) the settlement price on an Exchange of a Component Commodity has increased or decreased by an amount equal to the maximum permitted price change from the previous day's settlement price; or (C) the settlement price of a Component Commodity is not published by the relevant Exchange.

Notwithstanding the foregoing, the following events will not constitute Market Disruption Event in relation to $Index_5$: (1) a limitation on the hours in an Exchange Business Day and/or number of days of trading, if it results from an announced change in the regular business hours of the relevant Exchange; or (2) a decision to permanently discontinue trading in the futures contracts relating to a Component Commodity then included in $Index_5$.

Trading Disruption:    In respect of $Index_1$, $Index_2$ and $Index_3$, means any suspension of, or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise: (i) relating to any

|  |  |
|---|---|
|  | Component Security on the Exchange in respect of such Component Security; or (ii) in futures or options contracts relating to the Index on the Related Exchange. |
| Exchange Disruption: | In respect of Index$_1$, Index$_2$ and Index$_3$, means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general to effect transactions in, or obtain market values for: (i) any Component Security on the Exchange in respect of such Component Security; or (ii) futures or options contracts relating to the Index on the Related Exchange. |
| Early Closure: | In respect of Index$_1$, Index$_2$ and Index$_3$, means the closure on any Exchange Business Day of the Exchange in respect of any Component Security or the Related Exchange prior to its Scheduled Closing Time unless such earlier closing is announced by such Exchange or Related Exchange (as the case may be) at least one hour prior to the earlier of: (i) the actual closing time for the regular trading session on such Exchange or Related Exchange (as the case may be) on such Exchange Business Day; and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the relevant Valuation Time on such Exchange Business Day. |
| Index Adjustment Event: | Insofar as Section 11.1 of the Equity Definitions apply to Index$_5$, the phrase "constituent stock and capitalization" in Section 11.1(b) shall be read as "constituent commodities futures contract"; and the word "securities" in Section 11.1(b)(A) shall be read as "commodities futures contracts". |
| Index Cancellation: | Cancellation and Payment |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |
| Additional Disruption Events: |  |
| Change in Law: | Applicable; provided that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or |

|  | regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction". |
|---|---|
| Hedging Disruption: | Applicable. Section 12.9(a)(v) of the Equity Definitions is replaced in its entirety as follows: "Hedging Disruption" means that a Hedging Party is unable, after using commercially reasonable efforts, to either (i) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity price risk (or any other relevant price risk including, but not limited to, the currency risk) of entering into and performing its obligations with respect to this Transaction, or (ii) freely realize, recover, receive, repatriate, remit or transfer the proceeds of Hedge Positions or this Transaction between accounts within the jurisdiction of the Hedge Positions (the "Affected Jurisdiction") or from accounts within the Affected Jurisdiction to accounts outside of the Affected Jurisdiction. For the purposes of Section 12.9(b)(iii) of the Equity Definitions, the reference to "the Hedging Party" shall be deemed to be a reference to the Hedging Party affected by the Hedging Disruption (the "Affected Hedging Party") (or if both parties are Affected Hedging Parties, to an Affected Hedging Party) and the reference to the "Non-Hedging Party" shall be deemed to be a reference to the other party (even if such party is also an Affected Hedging Party). |
| Hedging Party: | Party A |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Determining Party: | Party A |
| **Additional Representations, Agreements and Acknowledgments:** | |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Index Disclaimer: | Applicable |
| Additional Acknowledgments: | Applicable |

**Convertibility Event:**

An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country.

**Relevant Country:**

Republic of Korea

**Relevant Currency:**

The lawful currency of the Relevant Country

**Consequences of a Convertibility Event:**

If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Settlement Currency, then:

(A) the determination of any amount that may be payable by Party A, or any early termination amount, as the case may be, shall be postponed to the Business Day which occurs after the day the Convertibility Event ceases to exist (the "New Determination Date"); and

(B) Party A's obligation to pay such amount to Party

B shall be postponed to the last Business Day of the Postponement Duration.

Where:

"Postponement Duration" means the period from the New Determination Date to X Business Days after the New Determination Date; and

"X" means the same number of Business Days as the Cash Settlement Payment Date was originally scheduled to occur after the relevant Valuation Date.

For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or other sum shall accrue to Party B in the event that any payment is postponed.

**Unwinding:**

Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event.

In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD10,000), Party A will provide an Indicative Market Value determined by Party A acting in good faith with a bid offer spread of 1.0%.

Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, acting in good faith as soon as practicable depending on prevailing market conditions, will notify Party B:

1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound; and
2) the identity of the party liable for such payment.

Such amount will be paid by the party liable for such payment to the other party on the third Currency Business Day following the day on which the above mentioned notice is sent by Party A to Party B.

**Representations:**

Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g) *No Reliance.* It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(h) *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(i) *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of this Transaction.

(j) *No Agency.* It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**

Party B represents to Party A (which representations will be deemed to be repeated by Party B at all times that this Transaction is outstanding) that:

(i) **Professional Investor.** It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance; and

(ii) **FETR.** This Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the

Risk ID: 1831907A / Effort ID: 1933572 / Global Deal ID: 3681728

Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

**Additional Termination Event:**

Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):–

**(i) Sovereign Event.** Party B is not able to discharge its obligations with respect to this Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**(ii) Non-Convertibility Event.** Party A has determined in its sole discretion that either of the following has occurred and that any such occurrence has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Korea or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**(iii) Adequate Assurances.** Party B fails to give Party A adequate assurances of Party B's ability to perform any of its obligations under this Transaction within one (1) Local Business Day of a written request to do so. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**(iv) Material Adverse Change.** Party A has determined in its sole discretion that Party B has experienced or is experiencing a material adverse change in its business, assets, operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected

Party.

**Events of Default and Termination Events:**

Section 5(a)(i) of the ISDA Form is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

Section 5(a)(vi) of the ISDA Form shall apply to both parties. For purposes hereof, "**Specified Indebtedness**" will have the meaning specified in Section 14 of the ISDA Form; "**Threshold Amount**" means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 10 million and (ii) two percent (2%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency); and "**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

Section 5(b)(iv) of the ISDA Form shall apply to both parties; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB– as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

**Additional Events of Default:**

Section 5(a) of the ISDA Form shall be amended by inserting the following additional sub-sections (ix), (x), (xi) and (xii) as follows:

"(ix)  The voluntary or involuntary suspension of all or substantially all of Party B's business activities or the issuance of a court order or an administrative or other similar order to suspend or revoke any of its business licenses in whole or in part;

(x)  A court of the Republic of Korea or the governmental authorities of the Republic of Korea issue an attachment order or a

provisional attachment order against any payment or delivery owed to Party B under this Transaction;

(xi)   Party B is disqualified from a bill clearing house in the Republic of Korea; or

(xii)  The net capital ratio of Party B as defined in the Regulation on Supervision of Securities Business of the Republic of Korea falls below 150%. Such net capital ratio shall be calculated in accordance with the Regulation on Supervision of Securities Business in effect as of the Trade Date, provided, however, that Party A may elect, in its sole discretion, to calculate the net capital ratio in accordance with (i) any revised Regulation on Supervision of Securities Business that may be in effect from time to time after the Trade Date or (ii) any successor law, rule or regulation that may be adopted by the Republic of Korea."

**Miscellaneous:**

Calculation Agent:       Party A

Office:                  For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

Transfer:                Notwithstanding anything to the contrary in Section 7 of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc.

Governing Law:           The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Waiver of Trial by Jury: Insofar as is permitted by law, Party A and Party B irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction.

Termination Currency:    USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Risk ID: 1831907A / Effort ID: 1933572 / Global Deal ID: 3681728

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,                          Accepted and agreed to:

**Lehman Brothers Commercial Corporation**      **Mirae Asset Securities Co., Ltd.**
**Asia Limited**


By: _____            By: _____
Name: Lokki Woo                          Name:
Title: Authorized Signatory              Title:

Execution time will be furnished upon Counterparty's written request.

Risk ID: 1831907A / Effort ID: 1933572 / Global Deal ID: 3681728

## Appendix I

| | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 |
|---|---|---|---|---|---|---|
| i | Underlying (Index) | Bloomberg code | Exchange | Related Exchange | Initial Reference Level | Index Weight |
| 1 | S&P BRIC40 Index (EURO) | SBE Index | In respect of each component security of the index (each, a "*Component Security*"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent | Not Applicable | 2,418.61 | 15.00% |
| 2 | FTSE/JSE Top 40 Index | TOP40 Index | In respect of each component security of the index (each, a "*Component Security*"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent | Not Applicable | 28,347.86 | 10.00% |
| 3 | Eastern Europe Index | CECEEUR Index | In respect of each component security of the index (each, a "*Component Security*"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent | Not Applicable | 2,465.83 | 10.00% |
| 4 | Gold Index | GOLDLNPM Index | The London Bullion Market Association | Not Applicable | 971.50 | 20.00% |
| 5 | LBCI Pure Beta Index Excess Return | LBPBER Index | As defined above | Not Applicable | 129.25 | 25.00% |
| 6 | CNY/USD Inverse | CNYUSD Currency | Not Applicable | Not Applicable | 0.1406 | 20.00% |