IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN re:
LEHMAN BROTHERS HOLDINGS INC., *et al*

    Debtors

CHAPTER 11
CASE NO. 08-13555 (SCC)
(Jointly Administered)

WOORI 2 STAR DERIVATIVES FUND KW-8
CREDITOR

**CREDITOR'S RESPONSE AND OPPOSITION TO DEBTOR'S
FOUR HUNDRED NINETY-SIXTH OMNIBUS OBJECTION TO
CLAIMS OF WOORI 2 STAR DERIVATIVES FUND KW-8**

## CREDITOR'S RESPONSE TO DEBTOR'S OBJECTION

Woori 2 Star Derivatives Fund KW-8, creditor in this bankruptcy (the "Creditor") objects to Debtor's Four Hundred Ninety-Sixth Omnibus Objection to Claims. Creditor asserts its right to pursue its claim against Lehman Brothers Holdings Inc., *et al* (the "Debtor") for amounts payable in respect of the early termination of swap transactions governed by the ISDA Master Agreement entered into between the Creditor and Lehman Brothers Commercial Corporation Asia Limited (hereinafter "LBCCA"). The Creditor refers to the secretary's certificate certifying that the primary obligor LBCCA is an indirect wholly-owned and fully guaranteed subsidiary of Lehman Brothers Holdings Inc., Debtor. The Creditor asserts that it knew of, and relied on, the guarantee by the Debtor of LBCCA's obligations to the Creditor.

For the reasons stated above, the claims of Creditor Woori 2 Star Derivatives Fund KW-8 should not be dismissed.

Respectfully submitted, this    20th    day of April, 2015.

WOORI 2 STAR DERIVATIVES FUND KW-8,
CREDITOR

By :    _____

Name: Su Young, Yun

Title: CEO

## CERTIFICATE OF SERVICE

The undersigned does herby certify that I have served a true and correct copy of the foregoing document upon the following by delivery at the addresses below:

Chambers of the Honorable Shelley C. Chapman
One Bowling Green
New York, New York 10004
Courtroom 621

Weil, Gotshal & Manges, LLP
Attorneys for Debtors
767 Fifth Avenue
New York, New York 10153
Attn: Garrett A. Fail, Esq. and Katherine Doorley, Esq.

Office of the United States Trustee for Region 2
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, New York 10014
    Attn: William K. Harrington, Esq., Susan Golden, Esq. and Andrea B. Schwartz, Esq.

This the 20th day of April, 2015

Name: Su Young, Yun
Title: CEO

## SECRETARY'S CERTIFICATE

The undersigned, an Assistant Secretary of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), does hereby certify that Lehman Brothers Commercial Corporation Asia Limited is an indirect wholly-owned and fully guaranteed subsidiary of the Corporation and that such information is true and correct as of the date hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Corporation's seal this 27th day of August, 2004.

SEAL

**Lehman Brothers Holdings Inc.**

By: _[signature]_

Name: Anna Walters

Title: Assistant Secretary

# LEHMAN BROTHERS

## Transaction

Date:        29 June, 2007

To:          Hana Bank as trustee for the account of "Woori 2 Star Derivatives Fund KW-8"

             Woori Credit Suisse Asset Management Co., Ltd.

From:        Lehman Brothers Commercial Corporation Asia Limited
             c/o Lehman Brothers Asia Limited
             Confirmations Group
             Facsimile:    (+1) 646-758-6317 (United States of America)
             E-Mail:       aseqdisrconf@lehman.com

Effort Id:   1451039
Global Id:   3148248

Dear Sir or Madam:

The purpose of this communication (this "Confirmation"), entered into by Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, Hana Bank ("Trustee") as trustee for the account of "Woori 2 Star Derivatives Fund KW-8" (the "Trust") ("Party B") and Woori Credit Suisse Asset Management Co., Ltd. ("Investment Manager") as Investment Manager for the account of "Woori 2 Star Derivatives Fund KW-8" ("Party C"), is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Party A and Party B on the Trade Date shown below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

Party B represents that it is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer(s) and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 22 June 2007 |
| Effective Date: | 28 June 2007 |
| Termination Date: | 21 June 2010, subject to adjustment in accordance with the Following Business Day Convention and subject to early termination in accordance with the Knock-out Event provisions below. |
| Basket: | The basket of Shares specified in Row 1 of Appendix I, as further identified by the stock code specified in Row 2 of Appendix 1. |
| Exchange(s): | For each Share in the Basket, as specified in Row 3 of Appendix I. |
| Related Exchange(s): | All Exchanges |
| Initial Reference Price: | For each Share in the Basket, as specified in Row 4 of Appendix I ($P_{i,0}$) |
| Initial Payment: | USD29,962,927.46 to be paid by Party B to Party A on the Effective Date, subject to adjustment in accordance with the Following Business Day Convention. For the avoidance of doubt, the Initial Payment is calculated in accordance with the following formula: |
| | (Equity Notional Amount / Initial Exchange Rate) x |

| | |
|---|---|
| Initial Exchange Percentage | where; |
| | Equity Notional Amount has the meaning as defined below; |
| | "Initial Exchange Rate" means KRW926.40/USD1.00; and |
| | "Initial Exchange Percentage" means 98.40%. |
| Knock-out Event: | Upon the occurrence of a Knock-out Event, Party A shall pay to Party B the relevant Knock-out Settlement Amount on the relevant Knock-out Settlement Date and all the other rights and obligations of Party A and Party B in respect of the Transaction shall be terminated. |
| | A "Knock-out Event" occurs where the Closing Prices of all Knock-out Reference Securities in the Basket on any Knock-out Determination Day are equal to or greater than their respective Knock-out Prices. |
| Knock-out Price: | For each Share in the Basket, as specified in Row 5 to 8 of Appendix I. |
| Knock-out Reference Securities: | The Shares in the Basket. |
| Knock-out Determination Days: | Each date as specified in Column 2 of Appendix II, subject to adjustment in accordance with the Following Business Day Convention. |
| Knock-out Valuation Time: | The Scheduled Closing Time on the Exchange on the Knock-out Determination Days. |
| Knock-out Settlement Amount: | The amount in USD, as determined using the relevant formula specified in Column 4 of Appendix II; |
| | where, |
| | "Annual Return" means 12.00%; |
| | "FX" means the Exchange Rate on the first Business Day following the Knock-out Determination Day in the relevant Period (as specified in Column 1 of Appendix II); |
| | "Exchange Rate" means the spot KRW/USD exchange rate, expressed as the amount of Korean Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters page "KFTC18" at around 4:00 p.m. (Seoul time). If it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in good faith and in a |

commercially reasonable manner.

| | |
|---|---|
| Knock-out Settlement Date: | For the avoidance of doubt, the Business Days for Initial Payment and Knock-out Settlement Date shall be used for determining the Business Days for Exchange Rate. |
| | The third Business Day immediately following the Knock-out Determination Day, and which are currently expected to fall on the dates set out in Column 3 of Appendix II. |
| Knock-in Event: | Notwithstanding Section 1.44 of the Equity Definitions, "Knock-in Event" means an event where one or more Shares in the Basket trade on the relevant Exchange at a price which is less than their respective Knock-in Prices, at any time during regular trading hours on any Scheduled Trading Day from (and including) the Trade Date to (and including) the Valuation Date. |
| Knock-in Price: | Notwithstanding Section 1.42 of the Equity Definitions, each Share in the Basket shall have the Knock-in Price as specified in Row 9 of Appendix I. |
| Business Days for Knock-out Determination Day(s): | Seoul |
| Business Days for Initial Payment and Knock-out Settlement Date: | Seoul and New York |
| Closing Price: | means, in relation to any Share in the Basket, the official closing price of such Share, calculated and published at the Valuation Time by the relevant Exchange or if there is no official closing price, the mid-market price per such Share as determined by the Calculation Agent. |

**Equity Amounts payable by Party A:**

| | |
|---|---|
| Equity Amount Payer: | Party A |
| Equity Amount Receiver: | Party B |
| Equity Notional Amount: | KRW28,209,000,000 |

Equity Amounts payable by Party A:

Notwithstanding Section 8.6 of the Equity Definitions, an amount in USD determined in accordance with the following formula:

(1) If the Closing Price of the Worst Performing Share "X" (as defined below) in the Basket on the Valuation Date is equal to or greater than its Knock-out Price, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount × (100% + 3 × Annual Return) / $FX_F$

(2) Or, if the Closing Price of the Worst Performing Share "X" in the Basket on the Valuation Date is less than its Knock-out Price and a Knock-in Event has occurred, then Party A Equity Amounts shall be calculated in accordance with the following formula:

Equity Notional Amount × $P_{X,F}$ / [100% × $P_{X,0}$ × $FX_F$]

(3) Or, if the Closing Price of the Worst Performing Share "X" in the Basket on the Valuation Date is less than its Knock-out Price and a Knock-in Event has not occurred, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount × 115% / $FX_F$

where,

"$P_{X,F}$" means the Closing Price of the Worst Performing Share "X" in the Basket on the Valuation Date;

"$P_{X,0}$" means the Initial Reference Price of Worst Performing Share "X";

"Worst Performing Share "X"" means, as determined by the Calculation Agent in good faith and in a commercially reasonable manner, the Share in the Basket which has the lowest value on the Valuation Date according to the following formula:

$(P_{1,F} / P_{1,0}) − 1$

with "$P_{1,F}$" being the Closing Price of the relevant Share in the Basket on the Valuation Date;

"$FX_F$" means the Exchange Rate on the first Business Day following the Valuation Date.

| | |
|---|---|
| Valuation Date: | 16 June 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Equity Notional Reset: | Not Applicable |
| Business Day for Valuation Date: | Seoul |
| **Settlement Terms:** | |
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the Exchange Rate by the Calculation Agent in a commercially reasonable manner) |
| Cash Settlement Payment Dates: | 21 June 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Business Days for Settlement Date: | Seoul and New York |
| **Share Adjustments:** | |
| Method of Adjustment: | Calculation Agent Adjustment |
| **Extraordinary Events:** | |
| **Consequences of Merger Events:** | |
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| **Tender Offer:** | Applicable |
| **Consequences of Tender Offers:** | |
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| Tender Offers: | The definition of "Tender Offer" in Section 12.1 of the Equity Definitions will be amended by replacing the phrase "outstanding voting shares of the Issuer" in |

For the avoidance of doubt, in the event that the Calculation Agent determines the above formula produces two or more Shares in the Basket with the same performance on the relevant Valuation Date, then the Calculation Agent shall, in its sole discretion (acting reasonably and in a commercially reasonable manner) select one of such Shares to be the Worst Performing Share "X".

**Composition of Combined Consideration:** | the fourth line thereof with "outstanding Shares".

**Nationalization, Insolvency or Delisting:** | Not Applicable

**Additional Disruption Events:**

Change in Law: | Applicable; provided that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction".

Insolvency Filing: | Applicable

The definition of "Insolvency Filing" in Section 12.9 of the Equity Definitions shall be amended by deleting the clause "provided that such proceedings instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing" at the end of such definition and replacing it with the following: ", or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen days of the institution or presentation thereof."

Section 12.9(b)(i) of the Equity Definitions is hereby amended by adding the following sentence at the end: "If neither party elects to terminate the Transaction, the Calculation Agent may adjust the terms of the Transaction upon the occurrence of such an event pursuant to Modified Calculation Agent Adjustment (as if such event were a Tender Offer)."

Hedging Disruption: | Applicable. For the purpose of this Transaction, "Hedging Disruption" means that, at any time from and including the Trade Date, Party A or any of its affiliates (the "Hedging Party"), is or will become unable to or prevented from acquiring, establishing, re-establishing, substituting, maintaining, unwinding or disposing of, in whole or in part, any transaction(s) or the Hedging Party deems necessary to hedge the

**Cancellation and Payment (Calculation Agent Determination)**

| | |
|---|---|
| Hedging Party: | Party A |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Determining Party: | Party A |

**Additional Representations, Agreements and Acknowledgments:**

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

Additional Provision:

If a Merger Date or Tender Offer Date is scheduled to be after, in respect of an Option Transaction, the Expiration Date or, in respect of any other Transaction, the Valuation Date, the Calculation Agent will determine the economic effect on the theoretical value of the Transaction of the announcement of a potential Merger Event or Tender Offer Event (including without limitation any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) from the Announcement Date to the Expiration Date or the Valuation Date, as applicable. If such economic effect is material, the Calculation Agent will adjust the terms of the Transaction to reflect such economic effect.

Convertibility Event:

equity price risk of entering into and performing Party A's obligations with respect to the Transaction, acting through customary legal channels (including but not limited to purchasing, holding, selling or otherwise disposing of any Shares, any options or future contracts on the Shares or any other instruments or assets) for any reason whatsoever including without limitation any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country or any other such prohibition or restriction on transactions in the Shares, options and/or future contracts on the Shares or on other instruments or assets of any type whatsoever by non-residents of the Relevant Country.

Relevant Country: Republic of Korea

Relevant Currency: The lawful currency of the Relevant Country

Consequences of a Convertibility Event: If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Settlement Currency, then the determination of any amount that may be payable by Party A, or any early termination amount, as the case may be, and/or Party A's obligation to pay such amount, as the case may be, to Party B shall be postponed until the Business Day which falls the same number of Business Days after the Business Day on which such Convertibility Event ceases to exist as the Cash Settlement Payment Date was originally scheduled to be after the relevant Valuation Date.

An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country.

For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or other sum shall accrue to Party B in the event that any payment is postponed.

**Unwinding:**

Under normal market conditions, and upon request from Party B, Party A shall provide an indicative unwind price (in respect of all or part of the Equity Notional Amount of this Transaction). Any full or partial unwind of this Transaction will be subject to final agreement between Party A and Party B.

**Representations:**

Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g)  *No Reliance.*  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(h)  *Assessment and Understanding.*  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(i)  *Status of Parties.*  The other party is not acting as a fiduciary for or an advisor to it in respect of this Transaction.

(j)  *No Agency.*  It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**

Party B represents to Party A in accordance with Section 3 of the ISDA Form (which representations will be deemed to be repeated by Party B at all times that this Transaction is outstanding) that:

(i) The Trust Deed is in full force and effect.

(ii) It is acting for the account of the Trust, and at all times is acting on the duly authorized instructions of the Investment Manager and within the scope of its authority under the AMBA, the Trust Deed and the Operative Documents. The Investment Manager is acting as an asset manager pursuant to the AMBA and Trust Deed and has full discretionary power and authority to make investment decisions for, in the name of and on behalf of Party B including without limitation the power and authority to advise and direct Party B (a) to enter into this Transaction for the account of the Trust and (b) to execute and deliver Confirmations in connection therewith. Party A is entitled to rely conclusively upon any request, instruction, certificate, opinion, or other document which Party A reasonably believes to be genuinely furnished to Party A by an employee or agent of the Investment Manager in connection with this Transaction as though such request, instruction, certificate, opinion, or other document were given directly by Party B.

(iii) As at the Trade Date it has (x) notified the Bank of Korea of its intention to execute this Transaction and to obtain all required approvals for this Transaction under the Foreign Exchange Transaction Regulations of the Republic of Korea ("the Approval"); and (y) provided the Bank of Korea with all required information which it is able to provide as at the Trade Date.

(iv) It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance.

Party B agrees that it will, directly or through the services of the Investment Manager:—

**FETR**

(i) obtain the Approval prior to the payment of the Premium on the Premium Payment Date;

(ii) prior to the payment of the Premium on the Premium Payment Date, provide Party A with notice in writing that it has obtained the Approval; and

(iii) provide Party A with a certified copy of the Approval within thirty (30) days after the Effective Date.

Party B agrees to indemnify and hold harmless Party A from and against any and all liabilities, claims, damages, costs, losses or expenses (including, without limitation, legal fees, costs and expenses) incurred as a result of or in connection with the failure of Party B to obtain the Approval in a timely manner.

**Additional Termination Event:**

Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):—

(i) **Receipt of Notice.** Party A receives notice that the Investment Manager has ceased to be registered as an asset management company under the AMBA or is subject to an adverse order by the Korean Financial Supervisory Service or other regulatory body. For the purposes of the foregoing Termination Event, Party B shall be the Affected Party.

(ii) **Breach of Law.** There occurs a material breach by Party B or the Investment Manager of the AMBA or related regulations affecting this Transaction. For the purposes of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Cessation of Authority.** Either of the following events occur:-

    (a) The license of Party B or the Investment Manager to carry on business under the AMBA is suspended, terminated, revoked, removed, withdrawn or otherwise interrupted; or

    (b) The Trust Deed is terminated or ceases to be in full force and effect for any reason.

For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Failure to give notice of Approval.** Party B fails to give Party A, prior to payment of the Initial Exchange Amount on the Effective Date, written notice that it has obtained the Approval. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(v) **Failure to provide certificate of Approval.** Party B fails to provide Party A with a certified copy of the Approval within thirty (30) days of the Effective Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Representations of Investment Manager:**

The Investment Manager represents to Party A in accordance with Section 3 of the ISDA Form (as if the Investment Manager is a party to this Transaction, and which representation will be deemed to be repeated at all times that this Transaction is outstanding):

(i)    it is duly organized and validly existing under the laws of the Republic of Korea;

(ii)    it is acting as investment manager to the Trust pursuant to the AMBA, and has made independent decisions as to whether to instruct the Trustee to enter into this Transaction and as to whether this Transaction is appropriate or proper for the account of the Trust based upon its own judgment and upon advice from such advisers as it deems necessary;

(iii)    it has all necessary power and authority and all required licenses to act as investment manager for the Trust and perform its obligations hereunder;

(iv)    it is duly authorized to act as an investment manager for the Trust in all respects, including, but not limited to, instructing the Trustee to enter into and confirm this Transaction and to receive notices addressed to the Trustee;

(v)    it is not relying on any communication (written or oral) of Party A as investment advice or as a recommendation for the Trustee to enter into this Transaction; it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation for the Trustee to enter into this Transaction. No communication (written or oral) received from Party A shall be deemed to be an assurance or guarantee as to the expected results of this Transaction; and

(vi)    it is capable of assessing the merits of (on its own behalf and on behalf of Trustee for the account of the Trust), and understands and accepts, the terms, conditions and risks of this Transaction.

**Obligations of Investment Manager:**

The Investment Manager agrees so long as Party A, Party B or the Investment Manager has or may have any obligation under this Transaction:-

(a)    it will comply with the terms of the Trust Deed and all Korean laws, rules and regulations, including without limitation the AMBA.

(b)    it will inform Party A immediately in writing if it ceases to be registered as an asset management company under the AMBA or is subject to any adverse order by the Financial Supervisory Service or any other regulatory body of the Republic of Korea.

(c)    it agrees to indemnify and hold harmless Party A from and against any and all liabilities, claims, damages, costs, losses or expenses (including, without limitation, legal fees, costs and expenses) incurred as a result of or in connection with (i) the breach by it of any of the warranties, representations, promises or undertakings given hereunder, (ii) any failure to perform any of its obligation with respect to this Transaction; or (iii) any failure to comply with any applicable and relevant laws and regulations applicable to this Transaction.

**Indemnity:**

Party B and the Investment Manager jointly and severally agree to indemnify and hold harmless Party A from and against any and all liabilities, claims, damages, costs, losses or expenses (including, without limitation, legal fees, costs and expenses) incurred as a result of or in connection with the failure of Party B or the Investment Manager to obtain the Approval in a timely manner.

**Additional Definitions:**

Section 14 of the ISDA Form is hereby amended by adding the following definitions in their appropriate alphabetical order:

"AMBA" means the Indirect Investment Asset Management Business Act of the Republic of Korea, as amended from time to time.

"Investment Manager" means Woori Credit Suisse Asset Management Co., Ltd.

"Operative Documents" means the operative documents of Party B and the Investment Manager, including, without limitation, (i) the Prospectus (*Tuja Solmyungseo*); (ii) the Investment Trust Management Report (*Jasan Wunyoung Bogoso*) (any and all such reports issued by the Investment Manager); and (iii)

the Trust Deed.

"Trust Deed" means the trust deed entered into between the Investment Manager and the Trustee with respect to the Trust.

**Miscellaneous:**

FETR

Party B represents to Party A (which representation will be deemed to be repeated by Party B at all times until the termination of this Transaction) that this Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

Calculation Agent:    Party A

Office:    For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

Transfer:    Notwithstanding anything to the contrary in Section 7 of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc.

Governing Law:    The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Waiver of Trial by Jury:    Insofar as is permitted by law, Party A, Party B and the Investment Manager irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction.

Termination Currency:    USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Lehman Brothers Commercial
Corporation Asia Limited

By:
Name: Lokki Woo
Title: Authorized Signatory

Execution time will be furnished upon Counterparty's written request.

Accepted and agreed to:

Hana Bank as trustee for the account of
"Woori 2 Star Derivatives Fund KW-8"

By:
Name: Ji, Chang-Ho
Title: Deputy General Manager

Accepted and agreed to:

Woori Credit Suisse Asset Management
Co., Ltd. in its individual capacity in
respect of the obligations agreed to and
representations made by the Investment
Manager herein.

By:
Name: Sun OK Park
Title: Head of Trusty Team

## Appendix I

| | | 1 | 2 |
|---|---|---|---|
| Row 1 | Shares (i) | Korea Electric Power Corp | Woori Finance Holdings Co Ltd |
| Row 2 | Bloomberg Code | 015760 KS Equity | 053000 KS Equity |
| Row 3 | Exchange | Korea Exchange | Korea Exchange |
| Row 4 | Initial Reference Price (KRW), $P_{i,0}$ | 41,133.00 | 23,633.00 |
| Row 5 | Knock-out Price for Period 1 and Period 2 Knock-out Determination Days (KRW), 90% x $P_{i,0}$ | 37,019.70 | 21,269.70 |
| Row 6 | Knock-out Price for Period 3 and Period 4 Knock-out Determination Days (KRW), 85% x $P_{i,0}$ | 34,963.05 | 20,088.05 |
| Row 7 | Knock-out Price for Period 5 Knock-out Determination Day (KRW), 80% x $P_{i,0}$ | 32,906.40 | 18,906.40 |
| Row 8 | Knock-out Price for Valuation Date (KRW), 80% x $P_{i,0}$ | 32,906.40 | 18,906.40 |
| Row 9 | Knock-in Price (KRW), 55% x $P_{i,0}$ | 22,623.15 | 12,998.15 |

## Appendix II

| Column 1 Period | Column 2 Knock-out Determination Day | Column 3 Knock-out Settlement Date | Column 4 Knock-out Settlement Amount (in USD) |
|---|---|---|---|
| 1 | 14 December 2007 | 19 December 2007 | Equity Notional Amount x (100% + 0.5 x Annual Return) / FX, |
| 2 | 16 June 2008 | 19 June 2008 | Equity Notional Amount x (100% + 1.0 x Annual Return) / FX, |
| 3 | 16 December 2008 | 19 December 2008 | Equity Notional Amount x (100% + 1.5 x Annual Return) / FX, |
| 4 | 16 June 2009 | 19 June 2009 | Equity Notional Amount x (100% + 2.0 x Annual Return) / FX, |
| 5 | 16 December 2009 | 21 December 2009 | Equity Notional Amount x (100% + 2.5 x Annual Return) / FX, |

# LEHMAN BROTHERS

## Partial Termination Agreement

Date:        14 July, 2008

To:          Hana Bank as trustee for the account of "Woori 2 Star Derivatives Fund KW-8"

             Woori Credit Suisse Asset Management Co., Ltd. ("Party C" or "Investment Manager")

From:        Lehman Brothers Commercial Corporation Asia Limited
             c/o Lehman Brothers Asia Limited
             Confirmations Group
             Facsimile:     (+1) 646-758-6317 (United States of America)
             E-Mail:        asecqdstrconf@lehman.com

Effort ID:   Termination 2192702
Global ID:   3148248

Dear Sir or Madam:

Reference is made to the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal Hana Bank ("Trustee") as trustee for the account of "Woori 2 Star Derivatives Fund KW-8" ("the Trust") ("Party B") on 22 June, 2007, further details of which are specified below. This communication (the "Partial Termination Agreement") confirms Party A's, Party B's and Party C's agreement on 09 July, 2008 to partially terminate the Transaction with respect to all rights, obligations and liabilities of Party A, Party B and Party C in relation to the Equity Notional Amount terminated (as defined below) (except in respect of any payment or delivery due on or before the "Termination Effective Date" under the Transaction which remain unsatisfied) effective from 09 July, 2008 (the "Termination Effective Date").

This Partial Termination Agreement incorporates by reference the confirmation of the Transaction (the "Confirmation"). Capitalized terms not defined herein have the meanings specified in the Confirmation.

In the event of any inconsistency between the provisions of this Partial Termination Agreement and the Confirmation, this Partial Termination Agreement will prevail.

Party B represents that it is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer(s) and was not in possession of any such information at the time of placing any order with respect to the partial termination of this Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

The terms of the original Transaction to which this Partial Termination Agreement relates are as follows:

Reference Number:       1451039

Trade Date:             22 June, 2007

Termination Date:

21 June, 2010, subject to adjustment in accordance with the Following Business Day Convention and subject to early termination in accordance with the Knock-out Event provisions

Equity Notional Amount:

KRW28,209,000,000

Basket:

The basket of Shares specified in Row 1 of Appendix 1, as further identified by the stock code specified in Row 2 of Appendix 1.

The Transaction has been previously adjusted resulting in an outstanding balance of KRW 28,132,000,000 Equity Notional Amount.

Effective from the Termination Effective Date, the current Equity Notional Amount shall be reduced by KRW 29,000,000 (the "Terminated Equity Notional Amount") resulting in a remaining Equity Notional Amount KRW 28,103,000,000.

Any consideration for the partial termination of the Transaction shall be determined by the Calculation Agent, who shall promptly notify the relevant party of such determination.

This Partial Termination Agreement constitutes the entire agreement and understanding of the parties with respect to the partial termination of the Transaction.

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the partial termination of the Transaction by signing in the space provided below and sending a copy of the executed Partial Termination Agreement to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Lehman Brothers Commercial
Corporation Asia Limited

By:
Name: LoKei Woo
Title:  Authorized Signatory

Execution time will be furnished upon Counterparty's written request.

Accepted and agreed to:

Hana Bank as trustee for the account of
"Woori 2 Star Derivatives Fund KW-8"

By:
Name:
Title:

Ji, Chang-Ho
Deputy General Manager

Accepted and agreed to:

Woori Credit Suisse Asset Management
Co., Ltd. in its individual capacity in
respect of the obligations agreed to  and
representations made by the Investment
Manager herein.

By:
Name:     Park, Sangwoo
Title:     Head of AI Division

검 남 인

보 낸 사 람: Wai, Plato [plato.wai@lehman.com]
보 낸 날 짜: 2008년 9월 10일 수요일 오후 4:23
받 는 사 람: 이강호; seungjae_huh@wcssam.com; 은예지; 김 남 인
참조:          Korea Equity Derivatives: Tokyo Equity Derivative Settlements
제목:          Confirmation of unwind of 3 year Callable Equity Linked Swap on a Basket of two Korean stocks, denominated in US
              dollars on 9Sep08.

Dear All,

This is to confirm the following trade was partially unwound on 9Sep08:

**3 year Callable Equity Linked Swap on a Basket of two Korean stocks, denominated in US dollars**

| | |
|---|---|
| Client: | Woori Credit Suisse Asset Management / Trustee Bank:Hana Bank |
| Original Trade Date: | 22Jun07 |
| Underlying: | 015760.KS + 053000.KS |
| Unwind date: | 9Sep08 |
| Unwind amount: | 20,000,000.00 |
| Unwind Price: | 65.00% |
| Settlement amount (KRW): | 13,000,000.00 |
| **Settlement amount (USD):** | **11,929.89** |
| FX fixing: | 1089.7 |
| **Settlement Date:** | **12Sep08** |

Regards,

EQUITY DERIVATIVES SALES
LEHMAN BROTHERS
26/F, TWO INTERNATIONAL FINANCE CENTRE,
8 FINANCE STREET, CENTRAL, HONG KONG
DESK TEL: +852 2252 6689
DESK EMAIL: HkEquityDerivativesSales@lehman.com

(Disclaimer: Please check with the Sales Desk to confirm prices. Indicative valuations are provided for your information only. Unless otherwise specified, indicative valuations are based upon a good faith estimate of the bid side market value for the transaction at approximately the time specified, and there is no representation that any transaction can or could have been effected at that price. Indicative valuations may not reflect the valuation you would obtain by using pricing models available from Lehman Brothers or from any other source, or which you would receive from another dealer, and they are not necessarily indicative of values carried on Lehman Brothers' books and records. © 2005 Lehman Brothers Inc. All rights reserved.)

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – This
message is intended only for the personal and confidential use of the designated recipient(s) named
above. If you are not the intended recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly prohibited. This communication is
for information purposes only and should not be regarded as an offer to sell or as a solicitation of
an offer to buy any financial product, an official confirmation of any transaction, or as an official
statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or accurate and it should not be
relied upon as such. All information is subject to change without notice.