## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

IN re:

**LEHMAN BROTHERS HOLDINGS INC.,** *et al*

**Debtors**

**CHAPTER 11**

**CASE NO. 08-13555 (SCC)**

**(Jointly Administered)**

**WOORI 2 STAR DERIVATIVES FUND KH-3**
**CREDITOR**

## CREDITOR'S RESPONSE AND OPPOSITION TO DEBTOR'S FOUR HUNDRED NINETY-SIXTH OMNIBUS OBJECTION TO CLAIMS OF WOORI 2 STAR DERIVATIVES FUND KH-3

### CREDITOR'S RESPONSE TO DEBTOR'S OBJECTION

Woori 2 Star Derivatives Fund KH-3, creditor in this bankruptcy (the "Creditor") objects to Debtor's Four Hundred Ninety-Sixth Omnibus Objection to Claims. Creditor asserts its right to pursue its claim against Lehman Brothers Holdings Inc., *et al* (the "Debtor") for amounts payable in respect of the early termination of swap transactions governed by the ISDA Master Agreement entered into between the Creditor and Lehman Brothers Commercial Corporation Asia Limited (hereinafter "LBCCA"). The Creditor refers to the secretary's certificate certifying that the primary obligor LBCCA is an indirect wholly-owned and fully guaranteed subsidiary of Lehman Brothers Holdings Inc., Debtor. The Creditor asserts that it knew of, and relied on, the guarantee by the Debtor of LBCCA's obligations to the Creditor.

For the reasons stated above, the claims of Creditor Woori 2 Star Derivatives Fund KH-3 should not be dismissed.

Respectfully submitted, this 20th day of April, 2015.

WOORI 2 STAR DERIVATIVES FUND KH-3,
CREDITOR

By : _____

Name: Su Young, Yun
Title: CEO

## CERTIFICATE OF SERVICE

The undersigned does herby certify that I have served a true and correct copy of the foregoing document upon the following by delivery at the addresses below:

Chambers of the Honorable Shelley C. Chapman
One Bowling Green
New York, New York 10004
Courtroom 621

Weil, Gotshal & Manges, LLP
Attorneys for Debtors
767 Fifth Avenue
New York, New York 10153
Attn: Garrett A. Fail, Esq. and Katherine Doorley, Esq.

Office of the United States Trustee for Region 2
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, New York 10014
Attn: William K. Harrington, Esq., Susan Golden, Esq. and Andrea B. Schwartz, Esq.

This the 20th day of April, 2015

Name: Su Young, Yun
Title: CEO

## SECRETARY'S CERTIFICATE

The undersigned, an Assistant Secretary of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), does hereby certify that Lehman Brothers Commercial Corporation Asia Limited is an indirect wholly-owned and fully guaranteed subsidiary of the Corporation and that such information is true and correct as of the date hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Corporation's seal this 27th day of August, 2004.

SEAL

**Lehman Brothers Holdings Inc.**

By: _Anna Walters_

Name: Anna Walters

Title: Assistant Secretary

*11/16*

# LEHMAN BROTHERS

**Transaction**

Date:        29 September, 2006

To:          Hana Bank ("Trustee") AS TRUSTEE FOR THE ACCOUNT OF "Woori 2 Star
             Derivatives Fund KH-3" ("the Trust")

             Woori Credit Suisse Asset Management Co., Ltd. ("Investment Manager")

From:        Lehman Brothers Commercial Corporation Asia Limited
             c/o Lehman Brothers Asia Limited
             Confirmations Group
             Facsimile:        (+1) 646-885-9548 (United States of America)

Effort Id:   1068442
Global Id:   2672486

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation"), entered into by Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, Hana Bank as trustee for the account of the Woori 2 Star Derivatives Fund KH-3 ("Party B") and Woori Credit Suisse Asset Management Co., Ltd. as Investment Manager for the account of the Woori 2 Star Derivatives Fund KH-3 ("Party C"), is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Party A and Party B on the Trade Date shown below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Commercial Corporation Asia Limited
26/F Two International Finance Center 8 Finance street Central Hong Kong

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

Party B represents that it is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer(s) and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 20 September, 2006 |
| Effective Date: | 26 September, 2006 |
| Termination Date: | 17 September 2009, subject to adjustment in accordance with the Following Business Day Convention and subject to early termination in accordance with the Knock-out Event provisions below. |
| Basket: | The basket of Shares specified in Column 1 of Appendix I, as further identified by the stock code specified in Column 2 of Appendix I. |
| Exchange(s): | For each Share in the Basket, as specified in Column 3 of Appendix I. |
| Related Exchange(s): | All Exchanges |
| Initial Reference Price: | For each Share in the Basket, as specified in Column 4 of Appendix I ($P_{i,0}$) |
| Initial Payment: | USD19,608,798.98 to be paid by Party B to Party A on the Effective Date, subject to adjustment in accordance with the Following Business Day Convention. For information only, the Initial Payment is calculated in accordance with the following |

formula:

(Equity Notional Amount / Initial Exchange Rate) x Initial Exchange Percentage

where:

Initial Exchange Rate is KRW944.20/USD1.00; and

Initial Exchange Percentage is 98.20%.

Knock-out Event:    Knock-out Event means the Closing Prices of all Knock-out Reference Securities in the Basket on any Knock-out Determination Day are equal to or greater than their respective Knock-out Prices.

Upon the occurrence of a Knock-out Event, Party A shall pay to Party B the relevant Knock-out Settlement Amount on the relevant Knock-out Settlement Date and all the other rights and obligations of Party A and Party B in respect of the Transaction shall be terminated.

| Column 1 Period | Column 2 Knock-out Determination Days: | Column 3 Knock-out Settlement Date: | Column 4 Knock-out Settlement Amount (in USD): |
|---|---|---|---|
| 1 | 14 March 2007 | 19 March 2007 | Equity Notional Amount x (100% + 0.5 x Annual Return) / $FX_t$ |
| 2 | 14 September 2007 | 19 September 2007 | Equity Notional Amount x (100% + 1.0 x Annual Return) / $FX_t$ |
| 3 | 14 March 2008 | 19 March 2008 | Equity Notional Amount x (100% + 1.5 x Annual Return) / $FX_t$ |
| 4 | 12 September 2008 | 18 September 2008 | Equity Notional Amount x (100% + 2.0 x Annual Return) / $FX_t$ |
| 5 | 16 March 2009 | 19 March 2009 | Equity Notional Amount x (100% + 2.5 x Annual Return) / $FX_t$ |

Knock-out Price:    For each Share in the Basket, as specified in Column 5 to 10 of Appendix I.

Knock-out Reference Securities:    Shares in the Basket.

Knock-out Determination Days:    Each date as specified above, subject to adjustment in accordance with the Following Business Day Convention.

Knock-out Valuation Time:    Scheduled Closing Time on the Exchange on the Knock-out Determination Days.

Knock-out Settlement Amount:    The amount in USD, as determined using the relevant formula specified in Column 4 of the table above:

where,

Annual Return means 11.50%;

"FX," means the Exchange Rate on the first Business Day following the Knock-out Determination Day in the relevant Period;

"Exchange Rate" means the spot KRW/USD exchange rate, expressed as the amount of Korea Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters page "KFTC18" at around 4:00 p.m.(Seoul time). Provided that if it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in good faith and in a commercially reasonable manner.

For avoidance of doubt, the Business Days for Initial Payment and Knock-out Settlement Date shall be used for determining the Business Days for Exchange Rate.

| | |
|---|---|
| Knock-out Settlement Date: | The third Business Day immediately following the Knock-out Determination Day, and is currently expected to fall on the dates set out in Column 3 of the table above. |
| Knock-in Event: | Notwithstanding Section 1.44 of the Equity Definitions, Knock-in Event means an event where one or more Shares in the Basket trade on the relevant Exchange at a price which is less than their respective Knock-in Prices, at any time during regular trading hours on any Scheduled Trading Day from (and including) the Trade Date to (and including) the Valuation Date. |
| Knock-in Price: | Notwithstanding Section 1.42 of the Equity Definitions, for each Share in the Basket, as specified in Column 11 of Appendix I. |
| Business Days for Knock-out Determination Day(s): | Seoul |
| Business Days for Initial Payment and Knock-out Settlement Date: | Seoul and New York |
| Closing Price: | means, in relation to any Share in the Basket, the official closing price of such Share, calculated and published at the Valuation Time by the relevant Exchange or if there is no official closing price, the mid-market price per such Share as determined by the Calculation Agent. |

**Equity Amounts payable by Party A:**

| | |
|---|---|
| Equity Amount Payer: | Party A |
| Equity Amount Receiver: | Party B |
| Equity Notional Amount: | KRW18,854,000,000 |
| Equity Amounts payable by Party A: | Notwithstanding Section 8.6 of the Equity Definitions, an amount in USD determined in accordance with the following formula: |

(1) If the Closing Price of the Worst Performing Share "X" (as defined below) in the Basket on the Valuation Date is equal to or greater than its respective Knock-out Price, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x $(100\% + 3 \times$ Annual Return$)$ / $FX_F$

(2) Or, if the Closing Price of the Worst Performing Share "X" in the Basket on the Valuation Date is less than its Knock-out Price and a Knock-in Event has occurred, then Party A Equity Amounts shall be calculated in accordance with the following formula:

Equity Notional Amount x $P_{X,F}$ / $[100\% \times P_{X,0} \times FX_F]$

(3) Or, if the Closing Price of the Worst Performing Share "X" in the Basket on the Valuation Date is less than its Knock-out Price and a Knock-in Event has not occurred, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x $100\%$ / $FX_F$

where,

"$P_{X,F}$" means the Closing Price of the Worst Performing Share "X" in the Basket on the Valuation Date;

"$P_{X,0}$" means the Initial Reference Price of Worst Performing Share "X";

"Worst Performing Share "X"" means, as determined by the Calculation Agent in good faith and in a commercially reasonable manner, the Share in the Basket which has the worst value on the Valuation Date according to the following formula:

$(P_{i,F} / P_{i,0}) - 1$

with $P_{i,F}$ being the Closing Price of the relevant Share in the Basket on the Valuation Date;

"$FX_F$" means the Exchange Rate on the first Business Day following the Valuation Date.

For the avoidance of doubt, in the event that the Calculation Agent determines the above formula produces two or more Shares in the Basket with the same worst performance on the relevant Valuation Date, then the Calculation Agent shall, in its sole discretion (acting reasonably and in a commercially reasonable manner) select one of such Shares to be the Share with the worst performance.

| | |
|---|---|
| Valuation Date: | 14 September 2009, subject to adjustment in accordance with the Following Business Day Convention. |
| Equity Notional Reset: | Not Applicable |
| Business Day for Valuation Date: | Seoul |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the prevailing foreign exchange rate determined and in a commercially reasonable manner by the Calculation Agent as defined above) |
| Cash Settlement Payment Dates: | 17 September 2009, subject to adjustment in accordance with the Following Business Day Convention. |
| Business Days for Settlement Date: | Seoul and New York |

**Share Adjustments:**

| | |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment |

**Extraordinary Events:**

**Consequences of Merger Events:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |

**Tender Offer:**                    Applicable

**Consequences of Tender Offers:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| New Shares: | The definition of "New Shares" in Section 12.1 of the Equity Definitions shall be amended by deleting subsection (i) in its entirety and replacing it with the following: "(i) publicly quoted, traded or listed on an exchange or quotation system located in the same country as the Exchange". |
| Tender Offers: | The definition of "Tender Offer" in Section 12.1 of the Equity Definitions will be amended by replacing the phrase "outstanding voting shares of the Issuer" in the fourth line thereof with "outstanding Shares". |
| **Composition of Combined Consideration:** | Not Applicable |
| **Nationalization, Insolvency or Delisting:** | Cancellation and Payment (Calculation Agent Determination) |
| Determining Party: | Party A |
| Delisting: | The definition of "Delisting" in Section 12.6 of the Equity Definitions shall be deleted in its entirety and replaced with the following: ""Delisting" means that the Exchange announces that pursuant to the rules of such Exchange, the Shares cease (or will cease) to be listed, traded or publicly quoted on the Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in the same country as the Exchange". |
| **Additional Disruption Events:** | |
| Change in Law: | Applicable; provided that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction". |
| Insolvency Filing: | Applicable |
| | The definition of "Insolvency Filing" in Section 12.9 of the Equity Definitions shall be amended by deleting the clause "provided that such proceedings |

|  |  |
|---|---|
|  | instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing" at the end of such definition and replacing it with the following: "; or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen days of the institution or presentation thereof." |
| Hedging Disruption: | Applicable. For the purpose of this Transaction, "Hedging Disruption" means that, at any time from and including the Trade Date, Party A or any of its affiliates (the "Hedging Party"), is or will become unable to or prevented from acquiring, establishing, re-establishing, substituting, maintaining, unwinding or disposing of, in whole or in part, any transaction(s) the Hedging Party deems necessary to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction, acting through customary legal channels (including but not limited to purchasing, holding, selling or otherwise disposing of any Shares, any options or future contracts on the Shares or any other instruments or assets) for any reason whatsoever including without limitation any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country or any other such prohibition or restriction on transactions in the Shares, options and/or future contracts on the Shares or on other instruments or assets of any type whatsoever by non-residents of the Relevant Country. |
| Hedging Party: | Party A |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Determining Party: | Party A |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

Additional Provision:

If a Merger Date or Tender Offer Date is scheduled to be after, in respect of an Option Transaction, the Expiration Date or, in respect of any other Transaction, the Valuation Date, the Calculation Agent will determine the economic effect on the theoretical value of the Transaction of the announcement of a potential Merger Event or Tender Offer Event (including without limitation any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) from the Announcement Date to the Expiration Date or the Valuation Date, as applicable. If such economic effect is material, the Calculation Agent will adjust the terms of the Transaction to reflect such economic effect.

Convertibility Event:

An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country.

Relevant Country:

Republic of Korea

Relevant Currency:

The lawful currency of the Relevant Country

Consequences of a Convertibility Event:

If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as

such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Settlement Currency, then the determination of the any amount that may be payable by Party A, or any early termination amount, as the case may be, and/or Party A's obligation to pay such amount, as the case may be, to Party B shall be postponed until the Business Day which falls the same number of Business Days after the Business Day on which such Convertibility Event ceases to exist as the Cash Settlement Payment Date was originally scheduled to be after the relevant Valuation Date.

For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or other sum shall accrue to Party B in the event that any payment is postponed.

**Unwinding:**

Under normal market conditions, and upon request from Party B, Party A shall provide an indicative unwind price (in respect of all or part of the Equity Notional Amount of this Transaction). Any full or partial unwind of this Transaction will be subject to final agreement between Party A and Party B.

**Representations:**

Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g) *No Reliance.* It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party

will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(h) *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(i) *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of this Transaction.

(j) *No Agency.* It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**

Party B represents to Party A in accordance with Section 3 of the ISDA Form (which representations will be deemed to be repeated by Party B at all times that this Transaction is outstanding) that:

(i) The Trust Deed is in full force and effect.

(ii) It is acting for the account of the Trust, and at all times is acting on the duly authorized instructions of the Investment Manager and within the scope of its authority under the AMBA, the Trust Deed and the Operative Documents. The Investment Manager is acting as an asset manager pursuant to the AMBA and Trust Deed and has full discretionary power and authority to make investment decisions for, in the name of and on behalf of Party B including without limitation the power and authority to advise and direct Party B (a) to enter into this Transaction for the account of the Trust and (b) to execute and deliver Confirmations in connection therewith. Party A is entitled to rely conclusively upon any request, instruction, certificate, opinion, or other document which Party A reasonably believes to be genuinely furnished to Party A by an employee or agent of the Investment Manager in connection with this Transaction as though such request, instruction, certificate, opinion, or other document were given directly by Party B.

(iii) As at the Trade Date it has (x) notified the Bank

of Korea of its intention to execute this Transaction and to obtain all required approvals for this Transaction under the Foreign Exchange Transaction Regulations of the Republic of Korea ("the Approval"); and (y) provided the Bank of Korea with all required information which it is able to provide as at the Trade Date.

(iv) It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance.

**FETR**

Party B agrees that it will, directly or through the services of the Investment Manager:-

(i) obtain the Approval prior to the payment of the Premium on the Premium Payment Date;

(ii) prior to the payment of the Premium on the Premium Payment Date, provide Party A with notice in writing that it has obtained the Approval; and

(iii) provide Party A with a certified copy of the Approval within thirty (30) days after the Effective Date.

Party B agrees to indemnify and hold harmless Party A from and against any and all liabilities, claims, damages, costs, losses or expenses (including, without limitation, legal fees, costs and expenses) incurred as a result of or in connection with the failure of Party B to obtain the Approval in a timely manner.

**Additional Termination Event:**

Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):-

(i) **Receipt of Notice.** Party A receives notice that the Investment Manager has ceased to be registered as an asset management company under the AMBA or is subject to an adverse order by the Korean Financial Supervisory Service or other regulatory body. For the purposes of the foregoing Termination Event, Party B shall be the Affected Party.

(ii) **Breach of Law.** There occurs a material breach by Party B or the Investment Manager of the AMBA or related regulations affecting this Transaction. For the purposes of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Cessation of Authority.** Either of the following events occur:-

    (a) The license of Party B or the Investment Manager to carry on business under the AMBA is suspended, terminated, revoked, removed, withdrawn or otherwise interrupted; or

    (b) The Trust Deed is terminated or ceases to be in full force and effect for any reason.

    For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Failure to give notice of Approval.** Party B fails to give Party A, prior to payment of the Initial Exchange Amount on the Effective Date, written notice that it has obtained the Approval. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(v) **Failure to provide certificate of Approval.** Party B fails to provide Party A with a certified copy of the Approval within thirty (30) days of the Effective Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Representations of Investment Manager:** The Investment Manager represents to Party A in accordance with Section 3 of the ISDA Form (as if the Investment Manager is a party to this Transaction, and which representation will be deemed to be repeated at all times that this Transaction is outstanding):

(i)    it is duly organized and validly existing under the laws of the Republic of Korea;

(ii)    it is acting as investment manager to the Trust pursuant to the AMBA, and has made independent decisions as to whether to instruct the Trustee to enter into this Transaction and as to whether this Transaction is appropriate or proper for the account of the Trust based upon its own judgment and upon advice from such advisers as it deems necessary;

(iii)    it has all necessary power and authority and all required licenses to act as investment manager for the Trust and perform its obligations hereunder;

(iv)    it is duly authorized to act as an investment manager for the Trust in all respects, including, but not limited to, instructing the Trustee to enter into and confirm this Transaction and to receive notices addressed to the Trustee;

(v)    it is not relying on any communication (written or oral) of Party A as investment advice or as a recommendation for the Trustee to enter into this Transaction; it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation for the Trustee to enter into this Transaction. No communication (written or oral) received from Party A shall be deemed to be an assurance or guarantee as to the expected results of this Transaction; and

(vi)    it is capable of assessing the merits of (on its own behalf and on behalf of Trustee for the account of the Trust), and understands and accepts, the terms, conditions and risks of this Transaction.

**Obligations of Investment Manager:**    The Investment Manager agrees so long as Party A, Party B or the Investment Manager has or may have any obligation under this Transaction:-

(a)  it will comply with the terms of the Trust Deed and all Korean laws, rules and regulations, including without limitation the AMBA.

(b)  it will inform Party A immediately in writing if it ceases to be registered as an asset management company under the AMBA or is subject to any adverse order by the Financial Supervisory Service or any other regulatory body of the Republic of Korea.

(c)  it agrees to indemnify and hold harmless Party A from and against any and all liabilities, claims, damages, costs, losses or expenses (including, without limitation, legal fees, costs and expenses) incurred as a result of or in connection with (i) the breach by it of any of the warranties, representations, promises or undertakings given hereunder; (ii) any failure to perform any of its obligation with respect to this Transaction; or (iii) any failure to comply with any applicable and relevant laws and regulations applicable to this Transaction.

**Indemnity:**                   Party B and the Investment Manager jointly and severally agree to indemnify and hold harmless Party A from and against any and all liabilities, claims, damages, costs, losses or expenses (including, without limitation, legal fees, costs and expenses) incurred as a result of or in connection with the failure of Party B or the Investment Manager to obtain the Approval in a timely manner.

**Additional Definitions:**      Section 14 of the ISDA Form is hereby amended by adding the following definitions in their appropriate alphabetical order:

"**AMBA**" means the Indirect Investment Asset Management Business Act of the Republic of Korea, as amended from time to time.

"**Investment Manager**" means Woori Credit Suisse Asset Management Co., Ltd.

"**Operative Documents**" means the operative documents of Party B and the Investment Manager, including, without limitation, (i) the Prospectus (*Tuja Solmyungso*); (ii) the Investment Trust Management Report (*Jasan Wunyoung Bogoso*) (any and all such reports issued by the Investment Manager); and (iii)

the Trust Deed.

**"Trust Deed"** means the trust deed entered into between the Investment Manager and the Trustee with respect to the Trust.

**Miscellaneous:**

FETR

Party B represents to Party A (which representation will be deemed to be repeated by Party B at all times until the termination of this Transaction) that this Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

Calculation Agent:

Party A

Office:

For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

Transfer:

Notwithstanding anything to the contrary in Section 7 of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings").

Governing Law:

The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Waiver of Trial by Jury:

Insofar as is permitted by law, Party A, Party B and the Investment Manager irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction.

Termination Currency:

USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9548, Attention: Documentation.

Yours sincerely,

**Lehman Brothers Commercial Corporation Asia Limited**

By:
Name:
Title:
**Chan, Yuet Hung**
**Alternative Director for Sarah Rose Bower**

Accepted and agreed to:

**Hana Bank**

By:
Name: Lee Bae Keum
Title: Deputy General Manager

Accepted and agreed to:

**Woori Credit Suisse Asset Management Co., Ltd.**

By:
Name: Park, Sun Ok
Title: Head of Trading Team

Page 17 of 18
Risk ID: T06094066 / 7 / Effort ID: 1068442 / Global Deal ID: 2672486

## Appendix I

| | | 1 | 2 |
|---|---|---|---|
| Column 1 | Shares (i) | Korea Electric Power Corp | Hyundai Motor Co |
| Column 2 | Bloomberg Code | 015760. KS | 005380.KS |
| Column 3 | Exchange | Korea Exchange | Korea Exchange |
| Column 4 | Initial Reference Price (KRW), $P_{i,0}$ | 37,550.00 | 82,600.00 |
| Column 5 | Knock-out Price for Period 1 Knock-out Determination Days (KRW), 85% x $P_{i,0}$ | 31,917.50 | 70,210.00 |
| Column 6 | Knock-out Price for Period 2 Knock-out Determination Days (KRW), 85% x $P_{i,0}$ | 31,917.50 | 70,210.00 |
| Column 7 | Knock-out Price for Period 3 Knock-out Determination Days (KRW), 80% x $P_{i,0}$ | 30,040.00 | 66,080.00 |
| Column 8 | Knock-out Price for Period 4 Knock-out Determination Days (KRW), 80% x $P_{i,0}$ | 30,040.00 | 66,080.00 |
| Column 9 | Knock-out Price for Period 5 Knock-out Determination Days (KRW), 75% x $P_{i,0}$ | 28,162.50 | 61,950.00 |
| Column 10 | Knock-out Price for Valuation Date (KRW), 75% x $P_{i,0}$ | 28,162.50 | 61,950.00 |
| Column 11 | Knock-in Price (KRW), 60% x $P_{i,0}$ | 22,530.00 | 49,560.00 |

# LEHMAN BROTHERS

### Partial Termination Agreement

| | |
|---|---|
| Date: | 15 August, 2008 |
| To: | Hana Bank as trustee for the account of "Woori 2 Star Derivatives Fund KH-3" |
| | Woori Credit Suisse Asset Management Co., Ltd. ("Party C" or "Investment Manager") |
| From: | Lehman Brothers Commercial Corporation Asia Limited<br>c/o Lehman Brothers Asia Limited<br>Confirmations Group<br>Facsimile:    (+1) 646-758-6317 (United States of America)<br>E-Mail:       aseqdstrconf@lehman.com |
| Effort ID: | Termination 2244045 |
| Global ID: | 2672436 |

Dear Sir or Madam:

Reference is made to the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal and Hana Bank as trustee for the account of "Woori 2 Star Derivatives Fund KH-3"("Party B") on 20 September, 2006, further details of which are specified below. This communication (the "Partial Termination Agreement") confirms Party A's, Party B's and Party C's agreement on 12 August, 2008 to partially terminate the Transaction with respect to all rights, obligations and liabilities of Party A, Party B and Party C in relation to the Equity Notional Amount terminated (as defined below) (except in respect of any payment or delivery due on or before the "Termination Effective Date" under the Transaction which remain unsatisfied) effective from 12 August, 2008 (the "Termination Effective Date").

This Partial Termination Agreement incorporates by reference the confirmation of the Transaction (the "Confirmation"). Capitalized terms not defined herein have the meanings specified in the Confirmation.

In the event of any inconsistency between the provisions of this Partial Termination Agreement and the Confirmation, this Partial Termination Agreement will prevail.

Party B represents that it is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer(s) and was not in possession of any such information at the time of placing any order with respect to the partial termination of this Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

The terms of the original Transaction to which this Partial Termination Agreement relates are as follows:

| | |
|---|---|
| Reference Number: | 1068442 |
| Trade Date: | 20 September, 2006 |
| Termination Date: | 17 September, 2009, subject to adjustment in accordance with the Following Business Day Convention and subject to early termination in accordance with the Knock-out Event provisions |

Equity Notional Amount:          KRW18,854,000,000

Basket:                          The basket of Shares specified in Column 1 of
                                 Appendix I, as further identified by the stock code
                                 specified in Column 2 of Appendix I.

The Transaction has been previously adjusted resulting in an outstanding balance of KRW 18,025,000,000 Equity Notional Amount.

Effective from the Termination Effective Date, the current Equity Notional Amount shall be reduced by KRW 93,000,000 (the "Terminated Equity Notional Amount") resulting in a remaining Equity Notional Amount KRW 17,932,000,000.

Any consideration for the partial termination of the Transaction shall be determined by the Calculation Agent, who shall promptly notify the relevant party of such determination.

This Partial Termination Agreement constitutes the entire agreement and understanding of the parties with respect to the partial termination of the Transaction.

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the partial termination of the Transaction by signing in the space provided below and sending a copy of the executed Partial Termination Agreement to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Lehman Brothers Commercial
Corporation Asia Limited

By: _____
Name: Lokki Woo
Title:  Authorized Signatory

Execution time will be furnished upon Counterparty's written request.

Accepted and agreed to:

**Hana Bank as trustee for the account of**
**"Woori 2 Star Derivatives Fund KH-3"**

By: _____
Name:                       Ji, Chang-Ho
Title:                       Deputy General Manager

Accepted and agreed to:

**Woori Credit Suisse Asset Management**
**Co., Ltd. in its individual capacity in**
**respect of the obligations agreed to  and**
**representations made by the Investment**
**Manager herein.**

By: _____
Name:     Park, Sangwoo
Title:     Head of AI Division