WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------------ x

## NOTICE OF MOTION FOR SUMMARY JUDGMENT REGARDING
## CLAIM 67707 FILED BY SPANISH BROADCASTING SYSTEM, INC.

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law,

and the annexed the Statement of Undisputed Material Facts in Support of its Motion for

Summary Judgment and the exhibits thereto,  including the Declaration of Ralph I. Miller and

the exhibits thereto, Lehman Brothers Holdings Inc. (the "Plan Administrator"),[1] as Plan

Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers*

*Holdings Inc. and Its Affiliated Debtors* (ECF No. 22737), on behalf of  Lehman Commercial

Paper Inc., by their undersigned counsel, hereby move before the Honorable Shelley C.

Chapman, United States Bankruptcy Judge of the United States Bankruptcy Court for the

Southern District of New York, One Bowling Green, New York, New York 10004, for an order,

pursuant to Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the memorandum of law in support of this motion.

proceeding by Rules 9014 and 7056 of the Federal Rules of Bankruptcy Procedure, finding that

(a) the Damages Waiver is a valid and enforceable waiver of all consequential and special

damages, and (b) the EBITDA Damages and the Swap Damages constitute consequential

damages that have been waived.  The Plan Administrator consents to the Court's entry of a final

order and judgment.  A hearing to consider the motion for summary judgment shall be held on

the omnibus hearing schedule for **September 21, 2015 at 10:00 a.m.**

Dated:   June 18, 2015
         New York, New York

                     */s/ Ralph I. Miller*                 
                     WEIL, GOTSHAL & MANGES LLP
                     Ralph I. Miller
                     Jacqueline Marcus
                     767 Fifth Avenue
                     New York, New York 10153
                     Telephone:  (212) 310-8000
                     Facsimile:   (212) 310-8007

                     *Attorneys for Lehman Brothers Holdings Inc.*
                     *and Certain of Its Affiliates*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------- x

## STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT REGARDING CLAIM 67707 FILED BY SPANISH BROADCASTING SYSTEM, INC.

Pursuant to Local Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York, Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (ECF No. 22737), on behalf of Lehman Commercial Paper Inc. ("LCPI"), hereby submits this Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment and respectfully states as follows:

## I.    The Credit Agreement

1.    On or about June 10, 2005, LCPI, as administrative agent and lender, and Spanish Broadcasting System, Inc. ("Spanish Broadcasting"), as borrower, entered into a Credit Agreement (the "Credit Agreement").[1]  *See* Ex. B, Claim No. 67707 of Spanish Broadcasting (without exhibits) (the "Claim").[2]

2.    Pursuant to the Credit Agreement, LCPI and certain other lenders agreed to collectively make a term loan to Spanish Broadcasting in the amount of $325 million (the "Term Loan") on the closing date, which the Credit Agreement defines as June 10, 2005.  *See* Ex. B, Credit Agreement §§ 2.1(a), 1.1 (definitions of "Closing Date," "Term Loan" and "Term Loan Commitment").

3.    The Credit Agreement provided for a revolving credit facility under which Spanish Broadcasting, as borrower, had the right to request that the lenders loan it a total of $25 million, with each lender responsible for a portion of the $25 million (the "Revolving Credit Facility").  *Id.* §§ 2.4(a), 1.1 (definition of "Revolving Credit Loan").

---

[1] Attached hereto as Exhibit A is the Declaration of Ralph I. Miller in Support of the Motion for Summary Judgment (the "Miller Declaration"), which authenticates various documents produced by the Plan Administrator to Spanish Broadcasting in connection with this contested matter.

[2] Attached to the Claim were the Credit Agreement and a report from Capstone Advisory Group, LLC (the "Capstone Report"), but for ease of reference, they are separately attached hereto as Exhibit C and Exhibit D, respectively.

4.       At all relevant times, LCPI's credit commitment under the Revolving Credit Facility was $10 million.  *See* Miller Decl. Ex. 2.

5.       As administrative agent, LCPI had the additional responsibility of facilitating the funding of loans to Spanish Broadcasting under the Revolving Credit Facility. *See* Ex. C § 2.5.

6.       Spanish Broadcasting agreed to repay the aggregate outstanding principal balance of the Term Loan no later than June 10, 2012, (*id.* §§ 2.3, 1.1 (definition of "Term Loan Maturity Date")), and to repay all amounts loaned to it under the Revolving Credit Facility no later than June 10, 2010.  *Id.* §§ 1.1 (definition of "Revolving Credit Termination Date"); 2.8(a). Spanish Broadcasting agreed to repay each of the loans, together with interest at a specified rate. *Id.* § 2.15.

7.       Section 10.12(a) of the Credit Agreement refers to "any legal action or proceeding relating to this Agreement and the other Loan Documents to which [Spanish Broadcasting] is a party."  *Id.* § 10.12(a).

8.       This contested matter qualifies as "a legal action or proceeding referred to in [Section 10.12]" of the Credit Agreement.

9.       Section 10.12(e) of the Credit Agreement provides:

> The Borrower [*e.g.* Spanish Broadcasting] hereby irrevocably and unconditionally . . . waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

*Id.* § 10.12(e).

10.       On the closing date defined by the Credit Agreement, the lenders under the Credit Agreement—including LCPI—loaned Spanish Broadcasting $325 million as required by the Credit Agreement.  *See* Reply of Spanish Broadcasting, ECF No. 34175 ¶ 5.

3

## II.        The Bankruptcy Filings and Draw Request

11.        On September 15, 2008, LBHI commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  *See* Case No. 08-13555, ECF No. 1.

12.        On October 3, 2008, Spanish Broadcasting requested an advance of the full $25 million available under the Revolving Credit Facility (the "Draw Request").  *See* Miller Decl. Ex. 1 (the "Notice of Borrowing").

13.        The Notice of Borrowing sent by Spanish Broadcasting to LCPI, as administrative agent, states that the "Business Day of the proposed Loan is October 6, 2008," meaning that Spanish Broadcasting requested that the $25 million loan be provided to Spanish Broadcasting on October 6, 2008.  *Id.*

14.        On October 5, 2008, LCPI commenced a voluntary case under chapter 11 of the Bankruptcy Code.  *See* Case No. 08-13900, ECF No. 1.

15.        LCPI did not fund its $10 million portion of the Draw Request.  *See* Miller Decl. Ex. 2.

16.        As administrative agent under the Credit Agreement, LCPI facilitated the funding of the $15 million due from the other lenders to Spanish Broadcasting.  *Id.*

17.        Spanish Broadcasting received $15 million of the $25 million it requested pursuant to the Draw Request.  *See* ECF No. 34549-1, Ex. E ¶ 4 ("[T]he other lenders under the Credit Agreement funded $15 million of the $25 million [D]raw [R]equest."); Miller Decl. Ex. 2.

## III.        The Claim

18.        On November 3, 2011, Spanish Broadcasting filed the Claim.  *See* Ex. B.

4

19.    The Claim amends proof of claim number 15941, filed in an unliquidated amount against LCPI on September 18, 2009, which claim was expunged pursuant to the *Order Granting Debtors' Two Hundred Thirty-Seventh Omnibus Objection to Claims (Amended and Superseded Claims)*, dated January 26, 2012. *See* ECF No. 24682.

20.    In the Claim, Spanish Broadcasting seeks $55,462,228.33. *See* Ex. B.

21.    Attached to the Claim were the Credit Agreement and the Capstone Report detailing the various components of Spanish Broadcasting's alleged damages. *See* Exs. C & D.

22.    The Capstone Report states that Spanish Broadcasting suffered $39.6 million in damages stemming from an "expected" decline in its total invested capital, which Spanish Broadcasting defined as "the market value of common equity, preferred equity, long-term debt, cash, and minority interest." Ex. D at 1, 2.

23.    The Capstone Report states Spanish Broadcasting suffered $9.9 million in damages (the "Swap Damages") as a result of its alleged inability to terminate an ISDA Master Agreement, dated June 28, 2005 (the "Swap"), that it had entered into with LCPI's affiliate, Lehman Brothers Special Financing Inc. ("LBSF"). *See id.* at 1, 15; Miller Decl. Ex. 3.

24.    The Capstone Report states that Spanish Broadcasting is entitled to $273,333.33, representing the "financing and unfunded revolver fees" that it paid to LCPI in its capacity as administrative agent, over the life of the Credit Agreement (the "Fee Damages"). Ex. D at 1, 16.

25.    The Capstone Report states that Spanish Broadcasting seeks to recover approximately $5.7 million for what it cost Spanish Broadcasting to replace LCPI's $10 million commitment under the Revolving Credit Facility (the "Replacement Cost Damages"). *Id.* at 1,

5

17.  Spanish Broadcasting later withdrew the Replacement Cost Damages from its Claim.  *See*

Feb. 13, 2013 Hr'g Tr. at 134:25–135:5, ECF No. 34990 (Ms. Primoff: . . . On the $5.7 million,

I believe we previously communicated to Lehman that we are withdrawing that element of the

claim.  So that's – that's not – that's not an issue.").

## IV.    The Payoff Letter

26.    On or about February 7, 2012, Spanish Broadcasting and LCPI executed a

letter terminating the Credit Agreement (the "Payoff Letter").  *See* Miller Decl. Ex. 4 (the

"Payoff Letter").

27.    In connection with the negotiations of the Payoff Letter, Spanish

Broadcasting was represented by Kaye Scholer LLP and LCPI was represented by Weil, Gotshal

& Manges LLP.  *See* Miller Decl. ¶ 6.

28.    Section 1(a) of the Payoff Letter states:

> Effective as of the Effective Date (defined below) . . . all
> outstanding Loans and all other amounts owing by [Spanish
> Broadcasting] under the Credit Agreement (including all principal,
> accrued interest and fees) shall be paid in full and the Credit
> Agreement and all obligations of [Spanish Broadcasting] and the
> other Loan Parties thereunder and under the other Loan Documents
> shall be terminated (other than contingent obligations which
> expressly survive the terms of the Credit Agreement or such other
> Loan Documents, including without limitation, Section 10.5 of the
> Credit Agreement).

Miller Decl. Ex. 4 § 1(a).

29.    The Payoff Letter states that "[c]apitalized terms used but not defined

herein shall have the meanings given such terms in the Credit Agreement."  *Id.* at 1.  The Credit

Agreement defines "Loan" as "any loan made by any Lender pursuant to this Agreement."  Ex. C

§ 1.1.  The Credit Agreement defines "Loan Parties" as "[Spanish Broadcasting] and each

Subsidiary of [Spanish Broadcasting] that is a party to a Loan Document."  *Id.*  The Credit

6

Agreement defines "Loan Documents" as the "[First Lien Credit Agreement, as amended, supplemented, replaced or otherwise modified from time to time], the Security Documents, the Intercreditor Agreement, the Fee Letter, the Applications and the Notes." *Id.*

30.    Section 4 of the Payoff Letter is entitled "Release" and states:

> Except as set forth in the last sentence of this paragraph, [Spanish Broadcasting], on behalf of itself and the other Loan Parties, hereby unconditionally and irrevocably waives all claims, suits, debts, liens, losses, causes of action, demands, rights, damages or costs, or expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, which any of them may have or claim to have against [LCPI] (whether in its capacity as an agent, lender, hedging counterparty or otherwise) or its agents, employees, officers, affiliates, directors, representatives, attorneys, successors and assigns (collectively, the "Released Parties") to the extent arising out of or in connection with the Loan Documents including, without limitation, any failure by the Lehman [sic] or its affiliates to fund any Loan required to be funded by it under the Credit Agreement (collectively, the "Claims").  Except as set forth in the last sentence of this paragraph, each of [Spanish Broadcasting] and the other Loan Parties further agree forever to refrain from commencing, instituting or prosecuting any lawsuit, action or other proceeding against any Released Parties with respect to any and all of the foregoing described waived, released, acquitted and discharged Claims and from exercising any right of recoupment or setoff that it may have under a master netting agreement or otherwise against any Released Party with respect to Obligations under the Loan Documents.  Each of the Released Parties shall be a third party beneficiary of this letter agreement.  The foregoing release shall not apply to [the Claim] (as such claim may be amended in accordance with applicable law).

Miller Decl. Ex. 4 § 4.

31.    The Payoff Letter does not contain a release of claims or defenses by LCPI.

## V.    <u>Discovery</u>

32.    On October 14, 2014, the Court entered the *Claims Litigation Schedule With Respect to Claim No. 67707 Filed by Spanish Broadcasting System, Inc. and the Objection*

7

*Interposed by Lehman Brothers Holdings Inc.*, as amended from time to time, which was

negotiated by the parties and called for the exchange of document requests and interrogatories,

among other discovery devices.  *See* ECF No. 46498.

33.    The interrogatories served by the Plan Administrator on Spanish

Broadcasting included Interrogatory No. 23, which requested that Spanish Broadcasting

"[d]escribe in detail the amount and computation of damages that Spanish Broadcasting is

seeking in this matter."  *See* Miller Decl. Ex. 5 ¶ 23.

34.    In its response (Miller Decl. Ex. 6) to LBHI Interrogatory No. 23, Spanish

Broadcasting provided the following description of its damages:

(a)    Damages in an amount of approximately $30.3 million in impacted
EBITDA resulting from Lehman's failure to fund the Draw;

(b)    [the Swap Damages] in an amount of approximately $17.2 million
relating to Spanish Broadcasting's inability to terminate the Swap;

(c)    [Fee Damages] in the amount of $273,333.33 on account of the fees
that Spanish Broadcasting paid to Lehman for the portion of the
Draw that Lehman failed to fund;

(d)    Interest on the foregoing; and

(e)    Spanish Broadcasting's costs, expenses and reasonable attorneys'
fees relating to [this dispute], including, without limitation, all
costs, expenses and fees relating to Spanish Broadcasting's
testifying and non-testifying experts.

*Id.* at 23–24.

35.    Spanish Broadcasting has confirmed that it has produced "a universe of

documents that . . . demonstrates [its] damages".  Miller Decl. Ex. 7, Apr. 27, 2015 Hr'g Tr. at

14:25–15:4.

8

## VI.        **EBITDA Damages**

36.    On February 11, 2013, Spanish Broadcasting filed the declaration of

Joseph A. Garcia in support of the Claim, attached hereto as Exhibit E.

37.    Spanish Broadcasting alleges that it suffered "another level of lost market

value due to the resulting forced reduction in its productions and revenue generating activities."

Ex. E ¶ 10.  Specifically, Spanish Broadcasting alleges that its lack of $10 million "prevented [it]

from operating at its current and budgeted levels at the time, and therefore forced Spanish

Broadcasting to immediately take steps to cut costs and preserve cash. . . . Spanish

Broadcasting's ability to produce programming and generate revenue were reduced as a result,

and Spanish Broadcasting was not able to achieve budgeted financial levels." *Id.* ¶ 9.

## VII.       **Swap Damages**

38.    Spanish Broadcasting and LBSF entered into that certain 1992 form ISDA

Master Agreement and schedule governing swap transactions, dated as of June 28, 2005 (the

"Master Agreement").  *See* Miller Decl. Ex. 3.

39.    Spanish Broadcasting and LBSF executed a confirmation on June 29,

2005, pursuant to which the parties entered into an interest rate swap transaction.  *See* Miller

Decl. Ex. 3 (the "Swap").

40.    Pursuant to the Master Agreement, LBHI served as "Credit Support

Provider" for LBSF.  Miller Decl. Ex. 3, Swap Sched. Pt. 4(g).  The Master Agreement provided

that, upon the bankruptcy of LBHI or LBSF, Spanish Broadcasting was entitled to terminate all

transactions outstanding under the Master Agreement, including the Swap.  Miller Decl. Ex. 3,

Master Agreement §§ 5(a)(vii), 6.

9

41.     Spanish Broadcasting did not terminate the Swap upon the commencement of the chapter 11 cases of LBHI or LBSF.  Rather, the Swap was terminated pursuant to that certain confidential Hedge Amendment and Settlement Agreement between LBSF and Spanish Broadcasting, dated as of June 17, 2010.  *See* Ex. D at 1.

42.     Because it did not receive $10 million, Spanish Broadcasting asserts it "[u]ltimately . . . paid $9,886,745 more in damages to [LBSF] for termination of the Swap than it would have been required to pay had it been able to terminate the Swap in October 2008 as contemplated.  Ex. E ¶ 8.

43.     Spanish Broadcasting asserts that, if LCPI had funded its *pro rata* share of the Draw Request, Spanish Broadcasting would have paid "somewhere between $5 and $6 million" to LBSF to terminate the Swap it had entered into with LBSF.  *Id.* ¶ 7.  *Compare* Ex. D at 1 (estimating that Spanish Broadcasting would have been required to pay $6,008,991.58 to terminate the Swap on October 3, 2008).

Dated:   June 18, 2015
         New York, New York

                              */s/ Ralph I. Miller*
                              WEIL, GOTSHAL & MANGES LLP
                              Ralph I. Miller
                              Jacqueline Marcus
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              *Attorneys for Lehman Brothers Holdings Inc.*
                              *and Certain of Its Affiliates*

10

## Exhibit A

Declaration of Ralph I. Miller
in Support of Motion for Summary Judgment

WEIL:\95368310\5\58399.0011

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------------- x

## DECLARATION OF RALPH I. MILLER IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT REGARDING
## CLAIM 67707 FILED BY SPANISH BROADCASTING SYSTEM, INC.

I, Ralph I. Miller, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am a member of the firm Weil, Gotshal & Manges LLP, which maintains an office for the practice of law at 767 Fifth Avenue, New York, New York 10153.  I am an attorney at law, duly admitted and in good standing to practice in the State of New York and the United States District Court for the Southern District of New York.

2.    I submit this Declaration in support of the Motion of Lehman Brothers Holdings Inc. (the "Plan Administrator"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (ECF No. 22737), on behalf of Lehman Commercial Paper Inc. ("LCPI"), for Summary Judgment Regarding Claim No. 67707 (the "Claim") filed by Spanish Broadcasting System, Inc. ("Spanish Broadcasting"), filed concurrently herewith in the above-captioned adversary proceeding.

3.    Attached as Exhibit 1 hereto is a true and correct copy, from the business records of LCPI, of Spanish Broadcasting's Notice of Borrowing, dated October 3, 2008 (the "Notice of Borrowing"), pursuant to which Spanish Broadcasting requested a $25 million loan (the "Draw Request") from the several lenders, including LCPI, under that certain First Lien Credit Agreement, dated as of June 10, 2005 (the "Credit Agreement").

4.    Attached as Exhibit 2 hereto is a true and correct copy, from the business records of LCPI, of an electronic response from LCPI to Spanish Broadcasting stating that LCPI will remit $15 million of the Draw Request and that LCPI would not fund its $10 million portion of the Draw Request (the "Response to Notice of Borrowing").

5.    Attached as Exhibit 3 hereto is a true and correct copy, from the business records of LBSF, of that certain 1992 form ISDA Master Agreement, dated as of June 28, 2005,

that Spanish Broadcasting entered into with Lehman Brothers Special Financing Inc. ("LBSF"), LCPI's affiliate (together with the schedule, guarantee and the confirmation exchanged pursuant thereto).

6.       Attached as Exhibit 4 hereto is a true and correct copy, from the business records of LCPI, of the February 7, 2012 letter agreement between Spanish Broadcasting and LCPI (the "Payoff Letter").   During the negotiations of the Payoff Letter, Spanish Broadcasting was represented by Kaye Scholer LLP, and LCPI was represented by Weil, Gotshal & Manges LLP.

7.       Attached as Exhibit 5 hereto is a true and correct copy of the Plan Administrator's Interrogatories to Spanish Broadcasting, dated November 3, 2014.

8.       Attached as Exhibit 6 hereto is a true and correct copy of the Objections and Responses of Spanish Broadcasting to the Plan Administrator's Interrogatories to Spanish Broadcasting, dated December 8, 2014.

9.       Attached as Exhibit 7 hereto is a true and correct copy of the transcript of the hearing held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District, held on April 27, 2015 (the "April 27 Transcript").   Weil, Gotshal & Manges LLP received a copy of the April 27 Transcript from Veritext Legal Solutions on or about April 29, 2015.

10.      Attached as Exhibit 8 hereto is a true and correct copy of excerpts of the Form 10-K for Spanish Broadcasting for the fiscal year ended December 31, 2008, which was retrieved from the Securities and Exchange Commission Electronic Data Gathering, Analysis, and Retrieval system (https://www.sec.gov/edgar).

2

11.     Attached as <u>Exhibit 9</u> hereto is a true and correct copy of excerpts of the

form 10-Q for Spanish Broadcasting for the quarterly period ended September 30, 2008, which

was retrieved from the Securities and Exchange Commission Electronic Data Gathering,

Analysis, and Retrieval system (https://www.sec.gov/edgar).

12.     I hereby declare under penalty of perjury that the foregoing statements are

true and correct to the best of my knowledge, information, and belief.

Dated:    June 18, 2015
          New York, New York

                              */s/ Ralph I. Miller*                              
                              Ralph I. Miller

                              WEIL, GOTSHAL & MANGES LLP
                              Ralph I. Miller
                              Robert J. Lemons
                              Garrett A. Fail
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone:  (212) 310-8000
                              Facsimile:  (212) 310-8007

                              *Attorneys for Lehman Brothers Holdings Inc.*
                              *and Certain of Its Affiliates*

WEIL:\95369636\2\58399.0011

## **Exhibit 1**

Notice of Borrowing



## NOTICE OF BORROWING

October 3, 2008

*VIA FEDERAL EXPRESS & FACSIMILE (212) 520-0885*

Attention: Lindsey Jones
Lehman Commercial Paper Inc.
745 7th Avenue
New York, NY 10019

<u>Spanish Broadcasting System, Inc.</u>

Ladies and Gentlemen:

Pursuant to Section 2.5 of that certain First Lien Credit Agreement, dated as of June 10, 2005 (as amended, supplemented, replaced or otherwise modified from time to time, the "<u>Credit Agreement</u>"; capitalized terms used but not defined herein having the meanings given such terms in the Credit Agreement), among Spanish Broadcasting System, Inc., a Delaware corporation (the "<u>Borrower</u>"), each lender from time to time party thereto, the documentation agent named therein, the syndication agent named therein and Lehman Commercial Paper Inc., as administrative agent (the "<u>Administrative Agent</u>"), the Borrower hereby gives the Administrative Agent irrevocable notice that the Borrower hereby requests a Loan under the Credit Agreement, and in that connection sets forth below the information relating to such Loan:

     (i)     The Business Day of the proposed Loan is <u>October 6, 2008</u>.

     (ii)    The Type of the proposed Loan is a <u>Base Rate Loan</u>.

     (iii)   The aggregate amount of the proposed Loan is <u>$25,000,000</u>.

The Borrower hereby certifies that the following statements are true and correct on the date hereof, and will be true and correct on the date of the proposed Loan:

(b)     Each of the representation and warranties made by any Loan Party in or pursuant to the Loan Documents is true and correct in all material respects on and as of the date hereof as if made on and as of the date hereof (except to the extent that they relate expressly to an earlier date).

(c)     No Default or Event of Default has occurred and is continuing on the date hereof, or would result from the proposed Loan or the application of the proceeds thereof.

Very truly yours,

SPANISH BROADCASTING SYSTEM, INC.

By: _____
Name: Joseph Garcia
Title:  Chief Financial Officer

cc:     Ritam Bhalla (*via e-mail ritam.bhalla@lehman.com*)

CONFIDENTIAL

LBHI-SBS_0052056

## **Exhibit 2**

Response to Notice of Borrowing

TO: SPANISH BROADCASTING SYSTEMS, INC.
ATTN: Jose Molina
 Fax: 786-513-8000
  Re: SPANISH BROADCASTING - FIRST LIEN REVOLVER
Description: Base Rate Option Borrowing


Effective: 6-Oct-2008 Spanish Broadcasting Systems, Inc. has elected to borrow under the
Base Rate Option  USD 25,000,000.00.

Please see details below.

Deal CUSIP: 84642SAD8
Facility CUSIP: 84642SAE6



The base rate is: 5.000000%
The spread is: 1.000000%
The all-in rate is: 6.000000%


We will remit your funds USD 15,000,000.00 (25,000,000 less Lehman's share of
10,000,000) on the effective date as follows:


For: Spanish Broadcasting Systems, Inc.
To:
Bank of Commerce
      ABA
122235821

 Attn:
·Chagal Communications
Account Number
164301151878
Bank To Bank Info:
  Reference: SPANISH BROADCASTING - FIRST LIEN ,Base Rate Option Borrowing



     Thanks and regards,

LINDSEY JONES
Telephone #: 212-526-6590
Fax #: 212-526-6643


Mar 08, 2010 - 2:57:47 PM                                                         1

CONFIDENTIAL                                                        LBHI-SBS_0051029

## **Exhibit 3**

Swap

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of June 28, 2005

| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **SPANISH BROADCASTING SYSTEM, INC.** |
|---|---|

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

CONFIDENTIAL                                                                    LBHI-SBS_0053248

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax*.

    (i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2    ISDA® 1992

CONFIDENTIAL    LBHI-SBS_0053249

(ii) *Liability*. If —

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(c) *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a) *Basic Representations*.

(i) *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii) *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

ISDA® 1992

CONFIDENTIAL                                                    LBHI-SBS_0053250

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4    ISDA® 1992

CONFIDENTIAL    LBHI-SBS_0053251

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.   Events of Default and Termination Events**

(a)   ·*Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)   *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)   *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)   *Credit Support Default*.

(1)   Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)   the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)   the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)   *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)   *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)   *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5                                                         **ISDA® 1992**

CONFIDENTIAL                                                                                    LBHI-SBS_0053252

described) in respect of such party, any Credit Support Provider of such party or any applicable
Specified Entity of such party under one or more agreements or instruments relating to Specified
Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than
the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified
Indebtedness becoming, or becoming capable at such time of being declared, due and payable under
such agreements or instruments, before it would otherwise have been due and payable or (2) a default
by such party, such Credit Support Provider or such Specified Entity (individually or collectively)
in making one or more payments on the due date thereof in an aggregate amount of not less than the
applicable Threshold Amount under such agreements or instruments (after giving effect to any
applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified
Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes
insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay
its debts as they become due; (3) makes a general assignment, arrangement or composition
with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding
seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or
insolvency law or other similar law affecting creditors' rights, or a petition is presented for its
winding-up or liquidation, and, in the case of any such proceeding or petition instituted or
presented against it, such proceeding or petition (A) results in a judgment of insolvency or
bankruptcy or the entry of an order for relief or the making of an order for its winding-up or
liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days
of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official
management or liquidation (other than pursuant to a consolidation, amalgamation or merger);
(6) seeks or becomes subject to the appointment of an administrator, provisional liquidator,
conservator, receiver, trustee, custodian or other similar official for it or for all or substantially
all its assets; (7) has a secured party take possession of all or substantially all its assets or has
a distress, execution, attachment, sequestration or other legal process levied, enforced or sued
on or against all or substantially all its assets and such secured party maintains possession, or
any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days
thereafter; (8) causes or is subject to any event with respect to it which, under the applicable
laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1)
to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval
of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party
consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets
to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party
or such Credit Support Provider under this Agreement or any Credit Support Document to
which it or its predecessor was a party by operation of law or pursuant to an agreement
reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the
other party) to the performance by such resulting, surviving or transferee entity of its
obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit
Support Provider of such party or any Specified Entity of such party of any event specified below constitutes
an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax
Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                          ISDA® 1992

CONFIDENTIAL                                                          LBHI-SBS_0053253

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) · *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)  *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)  *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying · to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or .

(v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

7                                                       ISDA® 1992

CONFIDENTIAL                                                              LBHI-SBS_0053254

#### 6.  Early Termination

(a)  *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)  *Right to Terminate Following Termination Event.*

(i)  *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)  *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)  *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)  *Right to Terminate.* If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                                                    ISDA® 1992

CONFIDENTIAL                                                            LBHI-SBS_0053255

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions. .

(c) **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) **Calculations.**

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. -

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                    ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

10                                          ISDA® 1992

CONFIDENTIAL                                                               LBHI-SBS_0053257

## 7.   Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)   a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)   a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.   Contractual Currency

(a)   *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)   *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment in respect of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)   *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)   *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

11                                        ISDA® 1992

CONFIDENTIAL                                             LBHI-SBS_0053258

**9.    Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

    (i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

CONFIDENTIAL                    LBHI-SBS_0053259

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

·(i)   if in writing and delivered in person or by courier, on the date it is delivered;

.·(ii)  if sent by telex, on the date the recipient's answerback is received;

.·(iii) if sent by facsimile transmission, on the date that transmission is received by a responsible . employee of the recipient in legible form (it being agreed that the burden of proving receipt will be · on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

·(iv) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt : requested), on the date that mail is delivered or its delivery is attempted; or

·.(v)  if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    ·*Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    ·Governing Law and Jurisdiction**

(a)   · *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)   .·*Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)  submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed ·by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the ·United States District Court located in the Borough of Manhattan in New York City, if this ·Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings ·brought in any such court, waives any claim that such Proceedings have been brought in an ·inconvenient forum and further waives the right to object, with respect to such Proceedings, that :such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

13                                                    ISDA® 1992

CONFIDENTIAL                                                    LBHI-SBS_0053260

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

### 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                                                                ISDA® 1992

CONFIDENTIAL                                                                        LBHI-SBS_0053261

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15                                    ISDA® 1992

CONFIDENTIAL                                              LBHI-SBS_0053262

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)  the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)  such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

16                                    ISDA® 1992

CONFIDENTIAL                                                                LBHI-SBS_0053263

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Currency*" has the meaning specified in the Schedule.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

"*Termination Event*" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17    ISDA® 1992

CONFIDENTIAL    LBHI-SBS_0053264

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*(Name of Party)*

By _____
Name:
Title:
Date:          Allyson M. Carine
               Authorized Signatory

**SPANISH BROADCASTING SYSTEM, INC.**

*(Name of Party)*

By: _____
Name:
Title:
Date:

18

CONFIDENTIAL                                                    LBHI-SBS_0053265

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*(Name of Party)*

**SPANISH BROADCASTING SYSTEM, INC.**
*(Name of Party)*

By: _____
Name:
Title:
Date:

By: _____
Name:
Title:           EVP & CFO
Date:    6 / 28 / 05

18

LBHI-SBS_0053266

**SCHEDULE**
to the
**Master Agreement**
dated as of June 28, 2005
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**SPANISH BROADCASTING SYSTEM, INC.** ("Party B"),
a corporation organized under the laws of
the State of Delaware

**Part 1: Termination Provisions**

In this Agreement:-

(a)     "Specified Entity" means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Finance, S.A. |
| | Lehman Brothers Commercial Corporation |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)     "Specified Transaction" will have the meaning specified in Section 14 of this Agreement.

(c)     The "Cross Default" provisions of Section 5(a)(vi) will apply to Party A and Party B, provided, however, that notwithstanding Section 5(a)(vi) of this Agreement, an Event of Default shall not occur under either (1) or (2) of such Section 5(a)(vi) if the event or condition referred to in Section 5(a)(vi)(1) or the failure to pay referred to in Section 5(a)(vi)(2) is a failure to pay caused by an error or omission of an administrative or operational nature and funds were available to such party to enable it to make the relevant payment when due, and the error or omission is rectified within three Business Days after written notice of failure to pay is sent to the party.

The following provisions apply:-

"Specified Indebtedness" will have the meaning specified in Section 14 of this Agreement.

"Threshold Amount" means the lesser of (i) USD 75 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and USD 10 million, in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

For purposes hereof, "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers

19

CONFIDENTIAL                                                     LBHI-SBS_0053267

Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"). In the event of a split rating, the lower rating shall be determinative.

(e)   The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)   Payments on Early Termination. For the purpose of Section 6(e) of this Agreement, "Close-out Amount" (as defined in Part 5 (o) of the Schedule) will apply.

(g)   "Termination Currency" means USD.

(h)   Additional Termination Events will apply. The following shall constitute an Additional Termination Event:

> Party A as a Secured Party. At any time (1) Party A ceases to be one of the Secured Parties other than as a result of Party A's transfer of this Agreement pursuant to Part 5(h)(2) hereof, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under this Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loans under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Secured Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents For the purpose of the foregoing Termination Event, Party B shall be the Affected Party .

**Part 2: Tax Representations**

(a)   Payer Tax Representations. For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)   Payee Tax Representations. For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware.

20

CONFIDENTIAL                                                                      LBHI-SBS_0053268

(c)     **Tax Representations in Confirmations.** For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

## Part 3: Agreement to Deliver Documents

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:-

(a)     Tax forms, documents or certificates to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered |
|---|---|---|
| Party A and Party B | Forms and/or documents described in Section 4(a)(iii) of the Agreement. | Upon reasonable demand by the other party. |

(b)     Other documents to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Providers, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request at any time that Party A or an Affiliate of Party A is not a lender or participant under the Credit Agreement or any of Party B's syndicated bank facilities. | Yes |

21

CONFIDENTIAL                                                          LBHI-SBS_0053269

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Providers, prepared in accordance with generally accepted accounting principles consistently applied. | Upon request at any time that Party A or an Affiliate of Party A is not a lender or participant under the Credit Agreement or any of Party B's syndicated bank facilities. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party B | Compliance Certificate, as of the end of the fiscal quarter or fiscal year of Party B, certified by a Responsible Officer, in accordance with the Credit Agreement. | Upon request at any time that Party A or an Affiliate of Party A is not a lender or participant under the Credit Agreement or any of Party B's syndicated bank facilities. | Yes |
| Party B | An executed copy of the Credit Agreement and the Security Documents, certified by a secretary or assistant secretary of Party B. | Upon execution of this Agreement or upon request | No |

## Part 4: Miscellaneous

(a)

Address for notices or communications to **Party A**:

Address:    Lehman Brothers Special Financing Inc.
            c/o Lehman Brothers Inc.
            Corporate Advisory Divsion
            Transaction Management Group
            745 Seventh Avenue
            New York, NY 10019

Attention:        Documentation Manager
Telephone No.:    (212) 526-7187
Facsimile No.:    (212) 526-7672

For all purposes.

Address for notices or communications to **Party B**:

Address:    Spanish Broadcasting System, Inc.
            2601 South Bayshore Drive, PH II
            Coconut Grove, Florida 33133

Attention:        Joseph A. Garcia
Telephone No.:    (305) 441-6901

22

CONFIDENTIAL                                                                    LBHI-SBS_0053270

Facsimile No.:    (305) 441-7861

For all purposes.

(b)    **Process Agent.** For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent:    Not applicable.

Party B appoints as its Process Agent:    Not applicable.

(c)    **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)    **Calculation Agent.** The Calculation Agent is Party A.

(f)    **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation as if set forth in full in this Agreement or such Confirmation:-

In the case of **Party A**:

Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of **Party B**:

Each of the Security Documents.

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:  Holdings

Credit Support Provider means in relation to Party B:  Other than Party B, each of the Loan Parties party to the Security Documents.

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.).

(i)    **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

(j)    **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transaction.

(k)    "**Affiliate**" will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

23

CONFIDENTIAL    LBHI-SBS_0053271

**Part 5: Other Provisions**

**Miscellaneous:**

(a)  **General Conditions.** Section 2(a)(iii) is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occurred and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(b)  **Accuracy of Specified Information.** Section 3(d) is hereby amended by inserting in the third line thereof after the words "in every material respect" and before the period the phrase "or, in the case of audited or unaudited financial statements, a fair presentation, in all material respects, of the financial condition of the relevant person."

(c)  **No Violation or Conflict Representation.** Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to any and all resolutions, investment policies, guidelines, procedures or restrictions)."

(d)  **Representations.** Section 3 is hereby amended by adding the following subsections after subsection (f) thereof:

   (g)  **No Agency.** It is entering into this Agreement, any Credit Support Document to which it is a party, and each Transaction, and any other documentation relating to this Agreement or any Transaction, as principal (and not as agent or in any other capacity, fiduciary or otherwise).

   (h)  **Eligible Contract Participant.** It is an "eligible contract participant" as that term is defined in the Commodity Exchange Act, as amended.

   (i)  **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into each Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

   (j)  **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

   (k)  **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(e)  **Additional Representations of Party B.** Party B represents to Party A in accordance with Section 3 of the Agreement (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that:

   (1)  **Portfolio Management.** This Agreement and each Transaction have been, and will be, entered into not for the purpose of speculation but solely in connection with portfolio management, asset, risk, and liability management and hedging activities of Party B.

   (2)  **Compliance with Laws.** It is in compliance, in all respects, with all applicable laws, rules, regulations, interpretations, guidelines, procedures, and policies of applicable regulatory

24

LBHI-SBS_0053272

authorities affecting Party B, this Agreement, the Transactions, or the performance of Party B's obligations hereunder except to the extent that any such compliance does not have a material adverse effect on Party A under this Agreement or any Transaction hereunder or on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder.

(3)   **Constitutional Documents.** Party B is in compliance, in all respects, with each and every provision in its constitutional documents (including, but not limited to, any and all resolutions, investment policies, guidelines, procedures or restrictions) and each Transaction contemplated hereunder is and will be an authorized and permitted transaction thereunder except to the extent that any such compliance does not have a material adverse effect on Party A under this Agreement or any Transaction hereunder or on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder..

(4)   **Contractual Obligations.** This Agreement (and each Transaction hereunder) is entered into by Party B in accordance with and as permitted by the Contractual Obligations of Party B, and this Agreement (and each Transaction hereunder) does not and will not violate or conflict with any Contractual Obligation of Party B nor result in any breach of or constitute a default in respect thereof except to the extent that any such violation or conflict does not have a material adverse effect on Party A under this Agreement or any Transaction hereunder or on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder..

(5)   **Credit Support Documents.** The Credit Support Documents of Party B were duly executed and delivered by each of its Credit Support Providers and the obligations under each Credit Support Document constitute the legal, valid and binding obligations of each Credit Support Provider that is a party to such Credit Support Document, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)) except to the extent that any such unenforceability does not have a material adverse effect on Party A under this Agreement or any Transaction hereunder or on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder.

(6)   **Credit Support Providers.** The execution, delivery and performance of each Credit Support Document by each Credit Support Provider that is a party to such Credit Support Document do not violate or conflict with (i) any law applicable to such Credit Support Provider, (ii) any provision of the constitutional documents of such Credit Support Provider, (iii) any order or judgment of any court or other agency applicable to such Credit Support Provider, or (iv) any Contractual Obligation of such Credit Support Provider nor result in any breach of or constitute a default in respect thereof except to the extent that any such breach, violation or conflict does not have a material adverse effect on Party A under this Agreement or any Transaction hereunder or on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder. .

(7)   **Specified Hedge Agreement.** (i) Party A is one of the Secured Parties, (ii) this Agreement (and each Transaction entered into thereunder) is a Specified Hedge Agreement and (iii) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents constitute the Secured Obligations of the Loan Parties and rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents.

(f)   **Additional Obligations of Party B.** Party B agrees with Party A (so long as each of Party A and Party B has or may have any obligation under this Agreement) that:

(1)   **Representations.** Party B will not take any action that may render any of the representations and warranties in this Agreement untrue, incorrect or incomplete, and if any event or condition should occur that would render any such representations and warranties untrue, incorrect or incomplete, then Party B shall promptly give written notice thereof to Party A.

(g)   **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)   *Set-off.*

25

(i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(h)    **Transfer.** Notwithstanding anything to the contrary in Section 7 of the Agreement, Party A may assign its rights and obligations under the Agreement, in whole or in part, (1) to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor, or (2) to any entity with the same or higher long term senior unsecured debt rating (as determined by S&P or Moody's) as Holdings at the time of such transfer.

(i)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(j)    **Service of Process.** The third sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(k)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(l)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(m)    **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not

26

CONFIDENTIAL

LBHI-SBS_0053274

released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(n)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(o)    **Close-out Amount.**

    i.    The terms of Section 6(d)(i) of the Agreement are amended in their entirety as follows:

        "(d)    **Calculations; Payment Date.**

            (i)    **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data."

    ii.    The terms of Section 6(e) of the Agreement are amended in their entirety as follows:

        "(e)    **Payments on Early Termination.** If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "Early Termination Amount") will be determined pursuant to this Section 6(e) and will be subject to any Set-off.

            (i)    **Events of Default.** If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of the Early Termination Amount to the Defaulting Party.

            (ii)    **Termination Events.** If the Early Termination Date results from a Termination Event:—

                (1)    **One Affected Party.** If there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i), except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

                (2)    **Two Affected Parties.** If there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for

27

each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

(iii)  *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate.* The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions."

iii. The term "Termination Currency Equivalent" in Section 14 of the Agreement is hereby amended by replacing "Market Quotation or Loss (as the case may be)" with "Close-out Amount".

iv.   The following terms in Section 14 of the Agreement are deleted in their entirety: *"Loss"*, *"Market Quotation"*, *"Reference Market-makers"* and *"Settlement Amount"*.

If any of these terms are used in any Annex or Schedule to the Agreement or a Confirmation, the 1994 ISDA Equity Option Definitions, the 1996 ISDA Equity Derivatives Definitions, the 2002 ISDA Equity Derivatives Definitions, the 1997 ISDA Government Bond Option Definitions, the 1998 FX and Currency Option Definitions, the 2003 ISDA Credit Derivatives Definitions or any other ISDA document incorporated by reference or executed by the parties hereto, the terms will have the respective meanings ascribed to them in the standard form 1992 ISDA Master Agreement (Multicurrency-Cross Border).

(p)   **Recording of Conversations.** Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, and (ii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.

(q)   **Additional Definitions.** Section 14 is hereby amended by adding the following definitions in their appropriate alphabetical order:

"**Close-out Amount**" means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in Section 2(a)(iii)) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

28

CONFIDENTIAL                                                                    LBHI-SBS_0053276

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may in good faith consider any relevant information, including, without limitation, one or more of the following types of information:—

(i)    quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)    information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)    information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilised. Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:—

(1) application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

(2) application of different valuation methods to Terminated Transactions or groups of Terminated Transactions depending on the type, complexity, size or number of the Terminated Transactions or group of Terminated Transactions.

"Collateral" shall have the meaning assigned to such term in the Security Documents.

29

CONFIDENTIAL

LBHI-SBS_0053277

"**Contractual Obligation**" means with respect to Party B and each of its Credit Support Providers, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound (including, but not limited to, the Loan Documents).

"**Credit Agreement**" means the First Lien Credit Agreement, dated as of June __, 2005 (as amended, supplemented, waived or otherwise modified from time to time), by and among Party B, , the Lenders from time to time party thereto, Lehman Commercial Paper, Inc., as administrative agent and collateral agent, as the same exists on the date of execution of this Agreement and without regard to (1) any termination or cancellation thereof, whether by reason of payment of all indebtedness incurred thereunder or otherwise, or (2) unless consented to in writing by Party A, any amendment, modification, addition, waiver or consent thereto or thereof.

"**Determining Party**" means the party determining a Close-out Amount.

"**Early Termination Amount**" has the meaning specified in Section 6(e).

"**Holdings**" means Lehman Brothers Holdings Inc.

"**Lien**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loans**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loan Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loan Parties**" shall have the meaning assigned to such term in the Credit Agreement.

"**Moody's**" means Moody's Investor Services, Inc.

"**Non-affected Party**" means, so long as there is only one Affected Party, the other party.

"**Person**" shall have the meaning assigned to such term in the Credit Agreement.

"**Responsible Officer**" shall have the meaning assigned to such term in the Credit Agreement.

"**S&P**" means Standard & Poor's Ratings Services.

"**Secured Obligations**" shall have the meaning assigned to such term in the Security Documents.

"**Secured Parties**" shall have the meaning assigned to such term in the Security Documents.

"**Security Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Specified Hedge Agreement**" shall have the meaning assigned to such term in the Credit Agreement.

"**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

"**USD**" means United States Dollars.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

30

CONFIDENTIAL

LBHI-SBS_0053278

**LEHMAN BROTHERS**
**SPECIAL FINANCING INC.**
*Party A*

By: _____
Name:
Title:
Date:

Allyson M. Carine
Authorized Signatory

**SPANISH BROADCASTING SYSTEM, INC.**

*Party B*

By: _____
Name:
Title:
Date:

31

CONFIDENTIAL

LBHI-SBS_0053279

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*Party A*

SPANISH BROADCASTING SYSTEM, INC.

*Party B*

By: _____
Name:
Title:
Date:

By: _____
Name:
Title:
Date: 6/28/05

31

CONFIDENTIAL

LBHI-SBS_0053280

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and SPANISH BROADCASTING SYSTEM, INC. ("Party B") have entered into a Master Agreement dated as June 28, 2005, (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f) Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

CONFIDENTIAL    LBHI-SBS_0053281

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, New York 10022 USA with a copy to

Lehman Brothers Special Financing Inc., c/o Lehman Brothers Inc., Corporate Advisory Division, Attention: Transaction Management Group, 745 Seventh Avenue, New York, New York 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:  James J. Killerlane III
Title:      Vice President
Date: July 19, 2005

CONFIDENTIAL

LBHI-SBS_0053282

# LEHMAN BROTHERS
**Transaction**

| | |
|---|---|
| Date: | 29 June, 2005 |
| To: | Spanish Broadcasting System, Inc.<br>Attention:     Documentation Unit |
| From: | Lehman Brothers Special Financing Inc.<br>Mandy Lee - Transaction Management Group<br>Facsimile:     646-885-9551 (United States of America)<br>Telephone:     212-526-9257 |

Ref. Numbers: Risk ID: 976349L / Effort ID: N673529 / Global Deal ID: 2198261

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Spanish Broadcasting System, Inc. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 28 June, 2005, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

## General Terms:

| | |
|---|---|
| Trade Date: | 28 June, 2005 |
| Effective Date: | 30 June, 2005 |
| Termination Date: | 30 June, 2010, subject to adjustment in accordance with the Modified Following Business Day Convention. |

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

| | |
|---|---|
| Notional Amount: | USD324,187,500.00 – subject to adjustment in accordance with Appendix A attached hereto. |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The last calendar day of each March, June, September, and December, from and including 30 September, 2005 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA, provided, however, that the Relevant Rate shall be rounded to two (2) decimal places, provided, further that, in the event the Relevant Rate does not appear on the Telerate Page 3750, the rate for that Reset Date will be the Eurodollar Base Rate as defined hereunder. For the purposes of this Confirmation, reference to "USD-LIBOR-Reference Banks" shall be deleted from the Definition of "USD-LIBOR-BBA". |
| | Eurodollar Base Rate" means with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Page 3750 of the Telerate screen as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on Page 3750 of the Telerate screen (or otherwise on such screen), the "Eurodollar Base Rate" for purposes of this definition shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent as defined in the Credit Agreement. |
| | "Credit Agreement" means the First Lien Credit Agreement, dated as of June 10, 2005 (as amended, supplemented, waived or otherwise modified from time to time), by and among Party B, the Lenders from time to time party thereto, Lehman Commercial Paper, Inc., as administrative agent and collateral agent, as the same exists on the date of execution of this Agreement and without regard to (1) any termination or cancellation thereof, whether by reason of payment of all indebtedness incurred thereunder or otherwise, or (2) unless consented to in writing by Party A, any amendment, modification, addition, waiver or consent thereto or thereof. |
| Designated Maturity: | 3 months |

CONFIDENTIAL

LBHI-SBS_0053284

| | |
|---|---|
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Floating Rate for initial Calculation Period: | 3.49% |
| Reset Dates: | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The last calendar day of each March, June, September, and December, from and including 30 September, 2005 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.23% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

**Business Days:**               London; New York

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number 646-885-9551 (United States of America), Attention: Documentation.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers Special Financing Inc.              Spanish Broadcasting System, Inc.

Anatoly Kozlov

Lehman Brothers Special Financing Inc.

By:
Name:
Title:

CONFIDENTIAL

LBHI-SBS_0053285

| Appendix A | | | |
|---|---|---|---|
| *Calculation Periods up to but excluding the Payment Date scheduled to occur on: | Outstanding Notional Amount at beginning of Calculation Period: | Amortization: | Outstanding Notional Amount at end of Calculation Period: |
| 9/30/2005 | 324,187,500 | 812,500 | 323,375,000 |
| 12/31/2005 | 323,375,000 | 812,500 | 322,562,500 |
| 3/31/2006 | 322,562,500 | 812,500 | 321,750,000 |
| 6/30/2006 | 321,750,000 | 812,500 | 320,937,500 |
| 9/30/2006 | 320,937,500 | 812,500 | 320,125,000 |
| 12/31/2006 | 320,125,000 | 812,500 | 319,312,500 |
| 3/31/2007 | 319,312,500 | 812,500 | 318,500,000 |
| 6/30/2007 | 318,500,000 | 812,500 | 317,687,500 |
| 9/30/2007 | 317,687,500 | 812,500 | 316,875,000 |
| 12/31/2007 | 316,875,000 | 812,500 | 316,062,500 |
| 3/31/2008 | 316,062,500 | 812,500 | 315,250,000 |
| 6/30/2008 | 315,250,000 | 812,500 | 314,437,500 |
| 9/30/2008 | 314,437,500 | 812,500 | 313,625,000 |
| 12/31/2008 | 313,625,000 | 812,500 | 312,812,500 |
| 3/31/2009 | 312,812,500 | 812,500 | 312,000,000 |
| 6/30/2009 | 312,000,000 | 812,500 | 311,187,500 |
| 9/30/2009 | 311,187,500 | 812,500 | 310,375,000 |
| 12/31/2009 | 310,375,000 | 812,500 | 309,562,500 |
| 3/31/2010 | 309,562,500 | 812,500 | 308,750,000 |
| 6/30/2010 | 308,750,000 | 812,500 | 307,937,500 |

*subject to adjustment in accordance with the Modified Following Business Day Convention.

Risk ID: 976349L / Effort ID: 673529 / Global Deal ID: 2198261

CONFIDENTIAL                                                                                                    LBHI-SBS_0053286

## **Exhibit 4**

Payoff Letter

**LEHMAN COMMERCIAL PAPER INC.**
**1271 Avenue of the Americas**
**New York, NY 10020**

February 7, 2012

Spanish Broadcasting System, Inc.
2601 South Bayshore Drive, PH II
Coconut Grove, FL 33133

Re:    Payoff Letter

Ladies and Gentlemen:

Reference is made to that certain First Lien Credit Agreement, dated as of June 10, 2005 (as amended, supplemented, replaced or otherwise modified from time to time, the "Credit Agreement"), by and among Spanish Broadcasting System, Inc., a Delaware corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time party thereto, Wachovia Bank, National Association, as documentation agent, Merrill Lynch, Pierce Fenner & Smith Incorporated, as syndication agent and Lehman Commercial Paper Inc. ("Lehman"), as administrative agent (in such capacity, the "Administrative Agent"). Capitalized terms used but not defined herein have the meanings given such terms in the Credit Agreement.

1.    Payoff and Lien Termination.  Effective as of the Effective Date (as defined below):

(a)    all outstanding Loans and all other amounts owing by the Borrower under the Credit Agreement (including all principal, accrued interest and fees) shall be paid in full and the Credit Agreement and all obligations of the Borrower and the other Loan Parties thereunder and under the other Loan Documents shall be terminated (other than contingent obligations which expressly survive by the terms of the Credit Agreement or such other Loan Documents, including without limitation, Section 10.5 of the Credit Agreement); and

(b)    all liens and security interests in favor of the Administrative Agent or the Secured Parties in and to any and all properties and assets of the Borrower, and the other Loan Parties, whether personal, real or mixed, tangible or intangible, granted under or pursuant to the Loan Documents, or the Security Documents securing their Obligations in favor of the Secured Parties shall automatically be, without further action, discharged, released and terminated.

2.    Effectiveness.  This payoff letter (this "Payoff Letter") shall become effective as of the date (the "Effective Date") the following conditions precedent have been satisfied:

(a)    the Administrative Agent shall have received this Payoff Letter, duly acknowledged by the Borrower; and

(b)    the Administrative Agent shall have received, in immediately available funds, the Total Payoff Amount referred to on Exhibit A attached hereto in the accounts specified thereon (including any per diem amounts, if applicable, as provided on Exhibit A).

US_ACTIVE:\43910283\05\73683.4025

CONFIDENTIAL

3. _Further Assurances_. The Administrative Agent agrees to promptly deliver to the Borrower all Collateral (or to any person designated by the Borrower), and all certificates or agreements representing Collateral, in the possession of the Administrative Agent including, without limitation, the originals of the promissory notes, stock and other equity certificates, together with any allonges, stock powers and other equity powers, currently held by it as Collateral. In addition, the Administrative Agent agrees to furnish, at the Borrower's expense, additional releases, termination statements and such other documents, instruments and agreements as may be reasonably requested by the Borrower in order to effect and evidence more fully the matters covered hereby including, without limitation, mortgage releases, account control agreement terminations and intellectual property security interest terminations. The Administrative Agent authorizes the Borrower (and any other person designated by the Borrower) to file releases of all financing statements filed by the Administrative Agent showing Borrower or any other Loan Party as debtor including, without limitation, such UCC financing statement releases and terminations under the Uniform Commercial Code in the offices and jurisdictions that the Borrower deems necessary or appropriate to evidence the matters referred to herein.

4. _Release_. Except as set forth in the last sentence of this paragraph, the Borrower, on behalf of itself and the other Loan Parties, hereby unconditionally and irrevocably waives all claims, suits, debts, liens, losses, causes of action, demands, rights, damages or costs, or expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, which any of them may have or claim to have against Lehman (whether in its capacity as an agent, lender, hedging counterparty or otherwise) or its agents, employees, officers, affiliates, directors, representatives, attorneys, successors and assigns (collectively, the "Released Parties") to the extent arising out of or in connection with the Loan Documents including, without limitation, any failure by the Lehman or its affiliates to fund any Loan required to be funded by it under the Credit Agreement (collectively, the "Claims"). Except as set forth in the last sentence of this paragraph, each of the Borrower and the other Loan Parties further agree forever to refrain from commencing, instituting or prosecuting any lawsuit, action or other proceeding against any Released Parties with respect to any and all of the foregoing described waived, released, acquitted and discharged Claims and from exercising any right of recoupment or setoff that it may have under a master netting agreement or otherwise against any Released Party with respect to Obligations under the Loan Documents. Each of the Released Parties shall be a third party beneficiary of this letter agreement. The foregoing release shall not apply to Proof of Claim (Claim Number 67707) filed against Lehman on November 3, 2011 (as such claim may be amended in accordance with applicable law).

5. _Acknowledgement_. By its acknowledgement, the Borrower confirms its agreement to the terms and conditions hereof and agrees that except as expressly set forth herein, there shall be no further obligations under or in respect of the Loan Documents to any Loan Party under the Credit Agreement.

6. _GOVERNING LAW, ETC._ THIS PAYOFF LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS PAYOFF LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7. _Miscellaneous_. This Payoff Letter may be executed in counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Payoff Letter by facsimile transmission shall be effective as delivery of an original counterpart of this Payoff Letter. The headings and titles of the paragraphs above are for convenience only and have no substantive meaning herein.

[SIGNATURE PAGES FOLLOW]

CONFIDENTIAL                                                                LBHI-SBS_0074155

Very truly yours,

LEHMAN COMMERCIAL PAPER INC., as
Administrative Agent

By:_____
Name:_____
Title:_____        **AHUVA SCHWAGER**
                  **AUTHORIZED SIGNATORY**

[SIGNATURE PAGE TO SPANISH BROADCASTING PAYOFF LETTER

CONFIDENTIAL

LBHI-SBS_0074156

Acknowledged and
Agreed to as of the date
first written above:

SPANISH BROADCASTING SYSTEM, INC., as Borrower

By: _____

Name: Joseph A. Garcia
Title: Senior Executive Vice President, Chief Financial
Officer, Chief Administrative Officer and Secretary

[SIGNATURE PAGE TO SPANISH BROADCASTING PAYOFF LETTER

CONFIDENTIAL

LBHI-SBS_0074157

Exhibit A

Payoff Amounts

| | |
|---|---|
| Principal: | $303,062,500.00 |
| Interest: | $119,036.22 |
| Fees: | $0 |
| Agent Payoff Amount: | $303,181,536.22 |
| Counsel Fees: | $176,584.00 |
| Counsel Expenses: | $48,010.41 |
| Counsel Payment Amount: | $224,594.41 |
| Total Payoff Amount: | $303,406,130.63 |

| | |
|---|---|
| Per Diem (payable if payment is received after 2:00 p.m. (NY time) on February 7, 2012 and on each day thereafter): | $17,005.17 |

Wire Transfer Information for Agent Payoff Amount:

Citibank
ABA: 021-000-089
A/C: LCPI Bank Loans Agency
Acct # 30434141

Wire Transfer Information for Counsel Payment Amount:

JP Morgan Chase Bank
ABA: 021-000-021
A/C: Weil Gotshal & Manges LLP
Acct# 0158-37-430
Ref: 73683.4025

US_ACTIVE:\43910283\05\73683.4025

CONFIDENTIAL

## Exhibit 5

The Plan Administrator's Interrogatories

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

**LEHMAN BROTHERS HOLDINGS INC.'S INTERROGATORIES TO**
**SPANISH BROADCASTING INC. PURSUANT TO RULES 7026 AND 7033**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Pursuant to Rule 33(a)(1) of the Federal Rules of Civil Procedure (the "Federal

Rules"), made applicable by Rule 7033 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as

Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and its Affiliated Debtors* [ECF No. 22737] (the "Plan") pursuant to the

Claims Litigation Schedule With Respect to Claim No. 67707 Filed by Spanish Broadcasting

System, Inc. and the Objection Interposed by Lehman Brothers Holdings Inc., dated October 14,

2014 [ECF No. 46498] (the "Claims Litigation Schedule"), hereby request that Spanish

Broadcasting System, Inc. ("Spanish Broadcasting") respond to the Interrogatories set forth

below (each, an "Interrogatory" and collectively, the "Interrogatories") under oath, in writing, in

accordance with the definitions and instructions set forth herein, no later than [].

## I.    DEFINITIONS

1.    The definitions and rules of construction contained in Federal Rule 34 and Rule 26.3 of the Local Rules of the Southern District of New York (as made applicable by Local Rule 7026-1 of the United States Bankruptcy Court for the Southern District of New York) are incorporated herein.

2.    The term "all" shall be construed as all, each, any and every.

3.    The terms "and" and "or" shall be construed both disjunctively and conjunctively so as to bring within the scope of the Request all documents which might otherwise be construed to be outside of its scope.

4.    The term "concerning" shall mean relating to, referring to, describing, evidencing or constituting.

5.    "Credit Agreement" means that certain First Lien Credit Agreement, dated as of June 10, 2005, as amended, supplemented, replaced or otherwise modified from time to time, between Spanish Broadcasting (defined herein), the several banks and other financial institutions or entities from time to time party thereto, Wachovia Bank, N.A., as documentation agent, Merrill Lynch, Pierce Fenner & Smith Inc., as syndication agent and LCPI (defined herein), as administrative agent.

6.    "Draw Request" means that certain request allegedly made by Spanish Broadcasting on October 3, 2008, for a revolving credit advance of $25,000,000 under the Credit Agreement.

7.    The phrase "Discoverable Matter" shall have the same meaning as in Rule 26(b)(1) of the Federal Rules, made applicable hereto by Rule 7026 of the Bankruptcy Rules.

2

8.      The word "each" shall mean both "each" and "every", and the word "every" mean both "each" and "every," as appropriate in order to bring within the scope of these Requests, documents which might otherwise be beyond their scope.

9.      The term "identify" with respect to any Individual(s) shall be consistent with the definition set forth in Local Civil Rule 26.3 and shall mean to state, to the extent known, the following; (i) the person's full name; (ii) the present or last known business address and telephone number; and, (iii) when referring to a natural person, additionally, (a) the present or last known home address and telephone number; (b) the present or last known place of employment and telephone number, and (c) the job title or position held at the last known place of employment.

10.     "Individual" shall mean and include all natural persons and all entities, governmental units, partnerships, firms, corporations, associations, joint ventures, any other form of business organization or arrangement, or any form of public, private or legal entity.

11.     The word "including" shall mean including, but not limited to.

12.     "LBSF" shall mean Lehman Brothers Special Financing Inc.

13.     "LCPI" shall mean Lehman Commercial Paper Inc.

14.     "Payoff Letter" shall mean that certain letter, dated February 7, 2012, signed by LCPI and acknowledged by Spanish Broadcasting, concerning the pay off of all outstanding loans under the Credit Agreement.

15.      "Swap Agreement" shall mean that certain ISDA Master Agreement, dated as of June 28, 2005, between Spanish Broadcasting and LBSF, together with all schedules, annexes and exhibits, and confirmations exchanged pursuant thereto.

3

16.    "You" and "Your" shall mean you, as well as any other person currently or formerly acting or purporting to act on your behalf for any purpose whatsoever.

17.    The singular form of a word shall be construed to include the plural, and the plural form of a word shall include the singular.

## II.    INSTRUCTIONS

1.    Each Interrogatory and each subpart of each Interrogatory shall be accorded a separate answer.  Each answer shall first set forth verbatim the Interrogatory to which it is responsive.  Interrogatories or subparts thereof shall not be combined for the purpose of supplying a common answer.  The answer to an Interrogatory or a subpart should not be supplied by referring to the answer to another Interrogatory or subpart thereof unless the Interrogatory or subpart referred to supplies a complete and accurate answer to the Interrogatory or subpart being answered.  Unless otherwise expressly provided, each Interrogatory shall be construed independently and without reference to any other Interrogatory.  Limitations in one Interrogatory shall not limit another.

2.    If You object to any Interrogatory or part thereof, the objection shall be stated in accordance with the Bankruptcy Rules and the Federal Rules, and as per the manner described in the Claims Litigation Schedule.

3.    If You object to any Interrogatory on the grounds that a complete and accurate answer would require disclosure of information protected by privilege, work product protection, or other immunity from disclosure (collectively, "privilege"), answer the Interrogatory to the fullest extent possible without disclosure of such information and state (i) the privilege asserted, (ii) the basis for the claim of privilege, (iii) the subject matter of the withheld information, (iv) the parties to the communication, if any, and the employment and title of such parties, and (v) the date of the communication.

4

4.      The singular form of a word should be read in the plural and vice versa so as to bring within the scope of the Interrogatories all information which might otherwise be construed to be outside the scope of the Interrogatories.  An interrogatory need not specify "all," "any," "each" or "every" to be understood to encompass all relevant items.

5.      The Interrogatories are continuing in nature.  Accordingly, if subsequent to serving an answer to any Interrogatory or any part thereof, You obtain or otherwise become aware of additional information responsive to such interrogatories, You are obligated to supplement Your answers to these Interrogatories pursuant to Federal Rule 26(e) and Bankruptcy Rule 7026.

### III.    <u>INTERROGATORIES</u>

1.      Identify and state the location of all Individuals who know of any Discoverable Matter concerning the damages Spanish Broadcasting alleges it suffered because LCPI did not loan Spanish Broadcasting any funds in response to the Draw Request, and describe the subject matter of each Individual's relevant knowledge and the basis for each Individual's knowledge.

2.      Identify and state the location of all Individuals who participated on behalf of Spanish Broadcasting in the negotiation, drafting and/or execution of the Credit Agreement.

3.      Identify and state the location of all Individuals who participated on behalf of Spanish Broadcasting in the negotiation, drafting and/or execution of the Payoff Letter.

4.      Identify and state the location of all Individuals who know of any Discoverable Matter concerning the reasons why Spanish Broadcasting made the Draw Request, and describe the basis for each Individual's knowledge.

5

5.       Identify and state the location of all Individuals who know of any Discoverable Matter concerning the reasons for the downgrade in Spanish Broadcasting's credit rating in 2008 and describe the basis for each Individual's knowledge.

6.       Identify and state the location of all Individuals who know of any Discoverable Matter concerning the financial condition and business operations of Spanish Broadcasting from 2005 through the present, including, but not limited to, the launch and operations of Mega TV and the refinancing of Spanish Broadcasting's debt in 2012, and describe the subject matter of each Individual's relevant knowledge and the basis for each Individual's knowledge.

7.       Identify and state the location of all Individuals who know of any Discoverable Matter concerning Spanish Broadcasting's decision whether or not to terminate the Swap Agreement, including, but not limited to, the basis for Spanish Broadcasting's decision, and describe the basis for each Individual's knowledge.

8.       Identify and state the location of all Individuals who know of any Discoverable Matter concerning Spanish Broadcasting's attempts to mitigate its damages under the Swap Agreement, including, but not limited to, any attempts by Spanish Broadcasting to replace the transactions outstanding pursuant to the Swap Agreement.

9.       Identify and state the location of all Individuals who You will be calling as fact witnesses at an evidentiary hearing in this matter and describe the subject matter of each Individual's relevant knowledge.

10.       Identify and state the location of all Individuals who You will be calling as expert witnesses at an evidentiary hearing in this matter and describe the subject matter of each Individual's relevant knowledge.

6

11.     Describe in detail all of the attempts made by Spanish Broadcasting to obtain alternate or replacement financing after LCPI did not loan Spanish Broadcasting the funds requested pursuant to the Draw Request.

12.     Describe in detail all of the attempts made by Spanish Broadcasting to replace the transactions outstanding under the Swap Agreement from September 1, 2008 through 2010.

13.     Describe in detail the amount and computation of damages that Spanish Broadcasting is seeking in this matter.

14.     Identify and state the location of all Individuals who answered or provided assistance in answering these Interrogatories.

Dated:    November 3, 2014
          New York, New York

/s/ Ralph I. Miller

Ralph I. Miller
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates.*

7

**<u>Exhibit 6</u>**

Spanish Broadcasting's Responses to Interrogatories

KAYE SCHOLER LLP
Madlyn Gleich Primoff, Esq.
Joseph Otchin, Esq.
250 West 55th Street
New York, New York 10019-9710
(212) 836-8000
madlyn.primoff@kayescholer.com
joseph.otchin@kayescholer.com

*Attorneys for Spanish Broadcasting System, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

 ------------------------------------------------------------------------x

In re                                                            Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*,          Case No. 08-13555 (SCC)

                                    Debtors.          Jointly Administered

 ------------------------------------------------------------------------x

**OBJECTIONS AND RESPONSES OF SPANISH BROADCASTING SYSTEM, INC.
TO LEHMAN BROTHERS HOLDINGS INC.'S INTERROGATORIES TO
SPANISH BROADCASTING INC. PURSUANT TO RULES 7026 AND 7033
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Spanish Broadcasting System, Inc. ("Spanish Broadcasting"), by its undersigned attorneys, for its objections and responses to Lehman Brothers Holdings Inc.'s Interrogatories to Spanish Broadcasting Inc. Pursuant to Rules 7026 and 7033 of the Federal Rules of Bankruptcy Procedure, dated November 3, 2014 (the "Interrogatories"), served by Lehman Brothers Holdings Inc. ("LBHI"), respectfully states as follows:

Spanish Broadcasting's objections and responses to the Interrogatories (including the definitions and instructions contained in the Interrogatories) incorporate and are subject to the general objections (the "General Objections") and the objections to specific definitions and instructions (the "Objections to Definitions and Instructions") set forth below. These General

Objections (which also apply to the definitions and instructions contained in the Interrogatories) and the Objections to Definitions and Instructions (collectively, the "Global Objections") form a part of the response to each Interrogatory and are set forth here to avoid the duplication and repetition of restating them within each response.  While these Global Objections may be referred to specifically in response to individual Interrogatories for purposes of clarity, the failure to specifically incorporate a Global Objection should not be construed as a waiver of the objection.  Likewise, any response and/or specific objection to an Interrogatory should not be construed as a waiver of these Global Objections.

### GENERAL OBJECTIONS

1.       Spanish Broadcasting objects to each Interrogatory to the extent that it is unduly burdensome, overly broad, vague, ambiguous or not reasonably calculated to lead to the discovery of admissible evidence.  Spanish Broadcasting also objects to each Interrogatory to the extent that it imposes extreme hardship and/or seeks information that is not relevant to the claim litigation dispute (the "Claim Litigation Dispute") between Spanish Broadcasting and LBHI, as well as to the extent that responding thereto would impose an undue burden on Spanish Broadcasting in the form of an excessive expenditure of time and money.

2.       Spanish Broadcasting objects to each Interrogatory that purports to vary Spanish Broadcasting's rights and obligations under the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Federal Rules of Civil Procedure (the "Federal Rules"), the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") or any other applicable statute, rule, law or order, including, without limitation, Local Rule 7033-1(a), which restricts interrogatories to "those questions seeking names of witnesses with knowledge or information relevant to the subject matter of the action, the computation of each category of

2

damage alleged, and the existence, custodian, location, and general description of relevant documents . . . ."

3.       Spanish Broadcasting's use of a particular definition provided by LBHI in responding to the Interrogatories is not an admission of the accuracy of the particular definition. Spanish Broadcasting further reserves its right to (a) dispute LBHI's interpretations, definitions and characterizations of terms and/or events and (b) assert its own interpretations, definitions and characterizations to such terms and/or events.   Any response or objection by Spanish Broadcasting with respect to any Interrogatory is without prejudice to this objection and Spanish Broadcasting's right to dispute facts asserted and legal conclusions assumed or presupposed in the Interrogatories.

4.       Spanish Broadcasting objects to each Interrogatory to the extent that it seeks information not presently in the possession, custody or control of Spanish Broadcasting.

5.       Spanish Broadcasting objects to each Interrogatory to the extent that it seeks information that never existed or no longer exists.

6.       Spanish Broadcasting objects to each Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, work product doctrine or any other applicable privilege, immunity or protection (whether based upon statute, common law, stipulation or request).   Such information will not be disclosed, and nothing contained in these objections and responses to the Interrogatories is intended to be, or in any way should be deemed to be, a waiver of any privilege or discovery protection.

7.       Any inadvertent disclosure of information that is protected by the attorney-client privilege, prepared in anticipation of litigation or trial, or otherwise protected or immune from discovery shall not constitute a waiver of any privilege or immunity with respect to such

3

information.  All information provided is solely for use in the Claim Litigation Dispute, and for

no other purpose, and is to be subject to and governed by the terms of (a) a protective order in

form and substance acceptable to Spanish Broadcasting to be entered in the Claim Litigation

Dispute; and (b) the so ordered Claims Litigation Schedule with Respect to Claim No. 67707

Filed By Spanish Broadcasting System, Inc. and the Objection Interposed by Lehman Brothers

Holdings Inc., dated October 14, 2014 [Dkt No. 46498] (the "Claims Litigation Schedule").

8.      Spanish Broadcasting objects to the Interrogatories insofar as they seek

information that contains confidential or proprietary commercial, business or personal

information.

9.      Spanish Broadcasting objects to each Interrogatory to the extent that it requires

Spanish Broadcasting to seek publicly available information or information that is equally

available to LBHI.

10.      Without in any way obligating itself to do so, Spanish Broadcasting reserves the

right to modify or supplement its objections and responses to the Interrogatories with

information it may subsequently discover.  Spanish Broadcasting also reserves the right to use or

rely on, at any time, subsequently discovered information or information omitted from these

objections and responses as a result of mistake, error, oversight, or inadvertence.   Spanish

Broadcasting reserves the right at any time to revise, correct, supplement, amend or clarify any

of these objections and responses.

11.      Spanish Broadcasting objects to each Interrogatory to the extent that it contains

factual or legal misrepresentations and to the extent that it seeks legal conclusions or requires

Spanish Broadcasting to make a legal conclusion in order to respond.

4

12.     Spanish Broadcasting objects to the Interrogatories, on the grounds that they are unreasonably cumulative and duplicative, to the extent they seek information that can be more efficiently ascertained or derived from documents that Spanish Broadcasting has produced or will produce in this Claim Litigation Dispute.

13.     Spanish Broadcasting objects to the Interrogatories to the extent that they require or call for the creation of new documents, reports, spreadsheets or data compilations.

14.     Spanish Broadcasting's objections and responses to the Interrogatories are made while expressly reserving and without waiving its right (i) to object on any ground to the use of any information at any stage of this Claim Litigation Dispute; (ii) to object on any ground to other requests for disclosure that involve or relate to the subject matter of the Interrogatories; (iii) to assert future objections as to the discoverability, relevance, materiality, competency, authenticity or admissibility of any response or document; and (iv) to revise, correct, supplement or clarify any of the objections or responses set forth herein.

15.     Spanish Broadcasting objects to the Interrogatories to the extent that they are interposed for improper purposes including, without limitation, to annoy, harass, unduly burden, delay, embarrass, or increase expense.

16.     Spanish Broadcasting objects to the Interrogatories to the extent that they require the production of expert discovery at this time.  The procedure for expert discovery is expressly set forth in the Claims Litigation Schedule, and Spanish Broadcasting will conduct and complete expert discovery in accordance with paragraphs 4 through 6 and the other provisions of the Claims Litigation Schedule.

17.     Nothing contained herein may be construed as an admission or indication regarding the existence or non-existence of any responsive information.

62402918_1

18.    Spanish Broadcasting incorporates by reference the objections made in its Objections and Responses of Spanish Broadcasting System, Inc. to Plan Administrator's First Set of Document Requests to Spanish Broadcasting Pursuant to Rules 7026 and 7034 of the Federal Rules of Bankruptcy Procedure, dated December 1, 2014.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

19.    Spanish Broadcasting objects to the "Definitions" provided with the Interrogatories to the extent that they are vague, ambiguous, overly broad, unintelligible and seek to impose obligations beyond those required by the Bankruptcy Rules, the Federal Rules, the Local Rules or any other applicable statute, rule, law or order.

20.    Without waiving objections to any of the "Definitions" not specifically mentioned herein, Spanish Broadcasting objects to each Interrogatory to the extent that it seeks "any" or "all" information, or information regarding "each" or "all" individuals, under circumstances in which production of a subset of the sought information would be sufficient to show the pertinent information, on the grounds that such Interrogatories are overly broad and unduly burdensome. In identifying individuals in response to the Interrogatories, Spanish Broadcasting will provide information regarding the individuals who are most knowledgeable of the relevant subject matter.

21.    Spanish Broadcasting objects to the definition of "Identify" (with respect to a person) in Definition 9 of the "Definitions" section of the Interrogatories on the ground that it is broader than and does not conform to the definition of "Identify" set forth in Local Rule 7026-1 and Local Civil Rule 26.3(c)(3).    As used in Spanish Broadcasting's responses to the Interrogatories, the term "Identify," unless otherwise specified, has the meaning ascribed to it in Local Rule 7026-1 and Local Civil Rule 26.3(c)(3).

6

22.     Spanish Broadcasting objects to the definitions of "You" and "Your" in Definition 16 of the "Definitions" section of the Interrogatories on the grounds that they are overly broad, vague, ambiguous and unduly burdensome.  In addition, Spanish Broadcasting objects to the extent the definition improperly imposes obligations upon persons and entities that are not parties to this Claim Litigation Dispute or imposes a duty upon Spanish Broadcasting to provide information, documents or things that are not within its possession, custody or control. In responding to the Interrogatories, Spanish Broadcasting will construe the terms "You" and "Your" to mean only Spanish Broadcasting, and not any other person or entity including, without limitation, Kaye Scholer LLP or any other outside counsel or Capstone Advisory Group, LLC or any other testifying or non-testifying experts.

23.     Spanish Broadcasting objects to the "Instructions" provided with the Interrogatories to the extent that they are vague, ambiguous, overbroad, unintelligible, and unduly burdensome and seek to impose obligations beyond those required by the Federal Rules, the Bankruptcy Rules, the Local Rules or any other applicable statute, rule, law or order.

24.     Instruction No. 3 states:  "If You object to any Interrogatory on the grounds that a complete and accurate answer would require disclosure of information protected by privilege, work product protection, or other immunity from disclosure (collectively, "privilege"), answer the Interrogatory to the fullest extent possible without disclosure of such information and state (i) the privilege asserted, (ii) the basis for the claim of privilege, (iii) the subject matter of the withheld information, (iv) the parties to the communication, if any, and the employment and title of such parties, and (v) the date of the communication."  Without waiving objections to any of the "Instructions" not specifically mentioned herein, Spanish Broadcasting objects to Instruction No. 3 on the grounds that it is overly broad, vague, ambiguous and unduly burdensome, and to

the extent that it requires the production of a privilege log that contains fields not contemplated by Local Rule 7033-1, the Bankruptcy Rules, the Federal Rules or the Claims Litigation Schedule.  Spanish Broadcasting will comply with its obligations under Local Rule 7033-1, the Bankruptcy Rules, the Federal Rules and the Claims Litigation Schedule.

**SPECIFIC RESPONSES AND**
**OBJECTIONS TO INTERROGATORIES**

## INTERROGATORY NO. 1

Identify and state the location of all Individuals who know of any Discoverable Matter concerning the damages Spanish Broadcasting alleges it suffered because LCPI did not loan Spanish Broadcasting any funds in response to the Draw Request, and describe the subject matter of each Individual's relevant knowledge and the basis for each Individual's knowledge.

## RESPONSE TO INTERROGATORY NO. 1

Spanish Broadcasting incorporates by reference its Global Objections set forth above. Spanish Broadcasting further objects to Interrogatory No. 1 on the grounds that the Interrogatory is overbroad, vague, ambiguous and unduly burdensome.  Spanish Broadcasting further objects to the Interrogatory on the ground that it exceeds the bounds of Local Rule 7033-1(a).  Spanish Broadcasting further objects on the ground that the Interrogatory seeks information regarding "all" individuals when less than all suffices to provide LBHI with reasonable discovery.  Spanish Broadcasting further objects on the ground that the Interrogatory seeks information protected by the attorney-client privilege and/or attorney work-product doctrine.   Subject to and without waiving the foregoing objections or the Global Objections, the principal current or former representatives of Spanish Broadcasting who have personal knowledge or information of the damages at issue in the Claim Litigation Dispute (excluding outside counsel and testifying or non-testifying experts) are:

| **Individual** | **Contact Information** |
| --- | --- |
| Raúl Alarcón, Jr., President, Chairman and CEO, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Joseph A. Garcia, CFO, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Jose Molina, Vice President of Finance, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Albert Rodriguez, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Alex Aleman, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Frank Soricelli, Corporate Controller, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Robert Castro, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Juan Garcia | Last known contact information:<br>Gables International Plaza<br>2655 Le Jeune Road<br>Suite 802<br>Coral Gables, Florida 33134<br>(305) 442-9270 |

**INTERROGATORY NO. 2**

Identify and state the location of all Individuals who participated on behalf of Spanish Broadcasting in the negotiation, drafting and/or execution of the Credit Agreement.

**RESPONSE TO INTERROGATORY NO. 2**

Spanish Broadcasting incorporates by reference its Global Objections set forth above. Spanish Broadcasting further objects to Interrogatory No. 2 on the grounds that the Interrogatory is overbroad, vague, ambiguous and unduly burdensome, including but not limited to the terms "participated" and "on behalf of."  Spanish Broadcasting further objects to the Interrogatory on the ground that it exceeds the bounds of Local Rule 7033-1(a).  Spanish Broadcasting further objects on the ground that the Interrogatory seeks information regarding "all" individuals when less than all suffices to provide LBHI with reasonable discovery.  Subject to and without waiving the foregoing objections or the Global Objections, the principal current or former representatives of Spanish Broadcasting who have personal knowledge or information of the negotiation, drafting and/or execution of the Credit Agreement are:

| Individual | Contact Information |
|---|---|
| Raúl Alarcón, Jr., President, Chairman and CEO, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Joseph A. Garcia, CFO, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Jose Molina, Vice President of Finance, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |

62402918_1

| | |
|---|---|
| Frank Soricelli, Corporate Controller, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Melanie Montenegro, former General Counsel, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Juan Garcia | Last known contact information:<br>Gables International Plaza<br>2655 Le Jeune Road<br>Suite 802<br>Coral Gables, Florida 33134<br>(305) 442-9270 |
| Scott Herlily, Latham & Watkins LLP | Last known contact information:<br>555 Eleventh Street, NW<br>Suite 1000<br>Washington, DC 20004<br>(202) 637-2200 |
| Christopher Brown, Latham & Watkins LLP | Last known contact information:<br>555 Eleventh Street, NW<br>Suite 1000<br>Washington, DC 20004<br>(202) 637-2200 |
| James Ritter, formerly at Latham & Watkins LLP | Last known contact information:<br>2099 Pennsylvania Avenue, N.W.<br>Suite 100<br>Washington, DC 20006-6801<br>(202) 747-1900<br>JRitter@sheppardmullin.com |

**INTERROGATORY NO. 3**

Identify and state the location of all Individuals who participated on behalf of Spanish Broadcasting in the negotiation, drafting and/or execution of the Payoff Letter.

**RESPONSE TO INTERROGATORY NO. 3**

Spanish Broadcasting incorporates by reference its Global Objections set forth above.

Spanish Broadcasting further objects to Interrogatory No. 3 on the grounds that the Interrogatory

is overbroad, vague, ambiguous and unduly burdensome, including but not limited to the terms

11

"participated" and "on behalf of."  Spanish Broadcasting further objects to the Interrogatory on the ground that it exceeds the bounds of Local Rule 7033-1(a).  Spanish Broadcasting further objects on the ground that the Interrogatory seeks information regarding "all" individuals when less than all suffices to provide LBHI with reasonable discovery.  Subject to and without waiving the foregoing objections or the Global Objections, the principal current or former representatives of Spanish Broadcasting who have personal knowledge or information of the negotiation, drafting and/or execution of the Payoff Letter are:

| **Individual** | **Contact Information** |
|---|---|
| Joseph A. Garcia, CFO, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Jose Molina, Vice President of Finance, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Melanie Montenegro, former General Counsel, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Sheryl Gittlitz, Partner, Kaye Scholer LLP | Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |

## INTERROGATORY NO. 4

Identify and state the location of all Individuals who know of any Discoverable Matter concerning the reasons why Spanish Broadcasting made the Draw Request, and describe the basis for each Individual's knowledge.

## RESPONSE TO INTERROGATORY NO. 4

Spanish Broadcasting incorporates by reference its Global Objections set forth above.

Spanish Broadcasting further objects to Interrogatory No. 4 on the grounds that the Interrogatory

12

is overbroad, vague, ambiguous and unduly burdensome, including but not limited to the terms

"reasons," "why" and "made." Spanish Broadcasting further objects to the Interrogatory on the

ground that it exceeds the bounds of Local Rule 7033-1(a). Spanish Broadcasting further objects

on the ground that the Interrogatory seeks information regarding "all" individuals and "any"

Discoverable Matter when less than all or any suffices to provide LBHI with reasonable

discovery. Spanish Broadcasting further objects on the ground that the Interrogatory seeks

information protected by the attorney-client privilege and/or attorney work-product doctrine.

Subject to and without waiving the foregoing objections or the Global Objections, the following

individuals have personal knowledge or information of Spanish Broadcasting's decision to

submit the Draw Request (excluding Spanish Broadcasting's outside counsel and testifying or

non-testifying experts):

| **Individual** | **Contact Information** |
| --- | --- |
| Raúl Alarcón, Jr., President, Chairman and CEO, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Joseph A. Garcia, CFO, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Jose Molina, Vice President of Finance, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Melanie Montenegro, former General Counsel, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |

| Michelle Rosolinsky, LBHI | Last known contact information:<br>1271 Sixth Avenue<br>New York, New York 10020<br>michelle.rosolinsky@lamcollc.com |
| Lindsey Jones, LCPI | Last known contact information:<br>745 Seventh Avenue<br>New York, New York 10019<br>lindsey.jones@barclayscapital.com |
| Ritam Bhalla, LCPI | Last known contact information:<br>ritam.bhalla@barclayscapital.com |
| Francis Chang | Last known contact information:<br>WCAS Fraser Sullivan Investment<br>Management<br>400 Madison Avenue<br>Suite 9A<br>New York, New York 10017<br>212-339-5400 |

## INTERROGATORY NO. 5

Identify and state the location of all Individuals who know of any Discoverable Matter concerning the reasons for the downgrade in Spanish Broadcasting's credit rating in 2008 and describe the basis for each Individual's knowledge.

## RESPONSE TO INTERROGATORY NO. 5

Spanish Broadcasting incorporates by reference its Global Objections set forth above.

Spanish Broadcasting further objects to Interrogatory No. 5 on the grounds that the Interrogatory

is overbroad, vague, ambiguous and unduly burdensome, including but not limited to the terms

"reasons" and "the downgrade." Spanish Broadcasting further objects to the Interrogatory on the

ground that it exceeds the bounds of Local Rule 7033-1(a). Spanish Broadcasting further objects

on the ground that the Interrogatory seeks information regarding "all" individuals and "any"

Discoverable Matter when less than all or any suffices to provide LBHI with reasonable

discovery. Spanish Broadcasting further objects on the ground that the Interrogatory seeks

information that is not in Spanish Broadcasting's possession, custody or control and is more

readily available from third parties such as the rating agencies. Spanish Broadcasting further

62402918_1

objects on the ground that the Interrogatory calls for Spanish Broadcasting to speculate about the

reasons for conduct taken by the rating agencies.

## INTERROGATORY NO. 6

Identify and state the location of all Individuals who know of any Discoverable Matter concerning the financial condition and business operations of Spanish Broadcasting from 2005 through the present, including, but not limited to, the launch and operations of Mega TV and the refinancing of Spanish Broadcasting's debt in 2012, and describe the subject matter of each Individual's relevant knowledge and the basis for each Individual's knowledge.

## RESPONSE TO INTERROGATORY NO. 6

Spanish Broadcasting incorporates by reference its Global Objections set forth above.

Spanish Broadcasting further objects to Interrogatory No. 6 on the grounds that the Interrogatory

is overbroad, vague, ambiguous and unduly burdensome, including but not limited to the terms

"financial condition," "business operations," "launch" and "operations" and "debt."  Spanish

Broadcasting further objects to the Interrogatory on the ground that it exceeds the bounds of

Local Rule 7033-1(a).  Spanish Broadcasting further objects on the ground that the Interrogatory

seeks information regarding "all" individuals and "any" Discoverable Matter when less than all

or any suffices to provide LBHI with reasonable discovery.  Spanish Broadcasting further objects

on the ground that the Interrogatory seeks information protected by the attorney-client privilege

and/or attorney work-product doctrine.  Spanish Broadcasting further objects on the ground that

the Interrogatory seeks confidential or proprietary commercial, business or personal information.

Subject to and without waiving the foregoing objections or the Global Objections, the following

individuals have personal knowledge or information regarding the financial condition and

business operations of Spanish Broadcasting from 2005 through the present (excluding Spanish

Broadcasting's outside counsel (except with respect to the refinancing of Spanish Broadcasting's

debt in 2012) and testifying or non-testifying experts):

| Individual | Contact Information |
|---|---|
| Raúl Alarcón, Jr., President, Chairman and CEO, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Joseph A. Garcia, CFO, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Jose Molina, Vice President of Finance, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Albert Rodriguez, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Alex Aleman, Spanish Broadcasting | Contact through:<br>Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Juan Garcia | Last known contact information:<br>Gables International Plaza<br>2655 Le Jeune Road<br>Suite 802<br>Coral Gables, Florida 33134<br>(305) 442-9270 |
| Roopesh Shah, Managing Director, Goldman Sachs | Last known contact information:<br>200 West Street<br>New York, New York 10282<br>212-855-7786<br>roopesh.shah@gs.com |
| Greg Berube, Vice President, Goldman Sachs | Last known contact information:<br>200 West Street<br>New York, New York 10282<br>212-357-0486<br>gregory.berube@gs.com |

16

| Stephen Goldstein, Managing Director, Lazard | Last known contact information:<br>30 Rockefeller Plaza<br>New York, New York 10020<br>212-632-6000<br>stephen.goldstein@lazard.com |
| Brendan Hayes, Vice President, Lazard | Last known contact information:<br>30 Rockefeller Plaza<br>New York, New York 10020<br>212-632-6000<br>brendan.hayes@lazard.com |
| Edmond Gabbay, Kaye Scholer LLP | Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Alan Glantz, Kaye Scholer LLP | Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |
| Marci Settle, Kaye Scholer LLP | Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>(212) 836-8000 |

## INTERROGATORY NO. 7

Identify and state the location of all Individuals who know of any Discoverable Matter concerning Spanish Broadcasting's decision whether or not to terminate the Swap Agreement, including, but not limited to, the basis for Spanish Broadcasting's decision, and describe the basis for each Individual's knowledge.

## RESPONSE TO INTERROGATORY NO. 7

Spanish Broadcasting incorporates by reference its Global Objections set forth above.

Spanish Broadcasting further objects to Interrogatory No. 7 on the grounds that the Interrogatory

is overbroad, vague, ambiguous and unduly burdensome, including but not limited to the terms

"decision" and "basis." Spanish Broadcasting further objects to the Interrogatory on the ground

that it exceeds the bounds of Local Rule 7033-1(a). Spanish Broadcasting further objects on the

ground that the Interrogatory seeks information regarding "all" individuals and "any"

Discoverable Matter when less than all or any suffices to provide LBHI with reasonable

discovery. Subject to and without waiving the foregoing objections or the Global Objections, the

following individuals have personal knowledge or information regarding information called for

by Interrogatory No. 7 (excluding counsel at Kaye Scholer LLP):

| **Individual** | **Contact Information** |
| --- | --- |
| Raúl Alarcón, Jr., President, Chairman and CEO, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Joseph A. Garcia, CFO, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Jose Molina, Vice President of Finance, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Melanie Montenegro, former General Counsel, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Juan Garcia | Last known contact information: Gables International Plaza 2655 Le Jeune Road Suite 802 Coral Gables, Florida 33134 (305) 442-9270 |
| Carlos Alvarez, Latham & Watkins | Last known contact information: 885 Third Avenue New York, New York 10022 (212) 906-1269 |
| Manay Patel, Lehman | Last known contact information: (212) 526-1412 manay.patel@barclayscapital.com |
| Bob Powers, Wachovia | Last known contact information: One Wachovia Center 301 S. College Street Charlotte, North Carolina 28288 (877) 549-1428 |

18

## INTERROGATORY NO. 8

Identify and state the location of all Individuals who know of any Discoverable Matter concerning Spanish Broadcasting's attempts to mitigate its damages under the Swap Agreement, including, but not limited to, any attempts by Spanish Broadcasting to replace the transactions outstanding pursuant to the Swap Agreement.

## RESPONSE TO INTERROGATORY NO. 8

Spanish Broadcasting incorporates by reference its Global Objections set forth above.

Spanish Broadcasting further objects to Interrogatory No. 8 on the grounds that the Interrogatory

is overbroad, vague, ambiguous and unduly burdensome, including but not limited to the terms

"attempts," "mitigate," "its," "damages under the Swap Agreement" and "replace."  Spanish

Broadcasting further objects to the Interrogatory to the extent that it calls for a legal conclusion.

Spanish Broadcasting further objects to the Interrogatory on the ground that it exceeds the

bounds of Local Rule 7033-1(a).  Spanish Broadcasting further objects on the ground that the

Interrogatory seeks information regarding "all" individuals and "any" Discoverable Matter when

less than all or any suffices to provide LBHI with reasonable discovery.  Subject to and without

waiving the foregoing objections or the Global Objections, the following individuals have

personal knowledge or information regarding information called for by Interrogatory No. 8

(excluding counsel at Kaye Scholer LLP):

| Individual | Contact Information |
|---|---|
| Raúl Alarcón, Jr., President, Chairman and CEO, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Joseph A. Garcia, CFO, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |

19

| | |
|---|---|
| Jose Molina, Vice President of Finance, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Melanie Montenegro, former General Counsel, Spanish Broadcasting | Contact through: Kaye Scholer LLP 250 West 55th Street New York, New York 10019-9710 (212) 836-8000 |
| Juan Garcia | Last known contact information: Gables International Plaza 2655 Le Jeune Road Suite 802 Coral Gables, Florida 33134 (305) 442-9270 |
| Manay Patel, Lehman | Last known contact information: (212) 526-1412 manay.patel@barclayscapital.com |
| Bob Powers, Wachovia | Last known contact information: One Wachovia Center 301 S. College Street Charlotte, North Carolina 28288 (877) 549-1428 |
| Carlos Alvarez, Latham & Watkins LLP | Last known contact information: 885 Third Avenue New York, New York 10022 (212) 906-1269 |
| Scott Herlily, Latham & Watkins LLP | Last known contact information: 555 Eleventh Street, NW Suite 1000 Washington, DC 20004 (202) 637-2200 |
| Christopher Brown, Latham & Watkins LLP | Last known contact information: 555 Eleventh Street, NW Suite 1000 Washington, DC 20004 (202) 637-2200 |

**INTERROGATORY NO. 9**

Identify and state the location of all Individuals who You will be calling as fact witnesses at an evidentiary hearing in this matter and describe the subject matter of each Individual's relevant knowledge.

20

## RESPONSE TO INTERROGATORY NO. 9

Spanish Broadcasting incorporates by reference its Global Objections set forth above. Spanish Broadcasting further objects to Interrogatory No. 9 on the grounds that the Interrogatory is overbroad and unduly burdensome.  Spanish Broadcasting further objects to the Interrogatory on the ground that it exceeds the bounds of Local Rule 7033-1(a).  Spanish Broadcasting further objects to the Interrogatory on the ground that it prematurely seeks the disclosure of information in contravention of the express provisions of the Claim Litigation Schedule.  Paragraph 7 of the Claims Litigation Schedule expressly provides that:  "Within 10 days after the completion of discovery, the parties shall attempt to jointly recommend to the Court proposed procedures for resolving this contested matter, including, but not limited to, dates for dispositive motions and a merits hearing."  Spanish Broadcasting will comply with the procedures set forth in the Claims Litigation Schedule with respect to, *inter alia*, the disclosure of witnesses to be called at any evidentiary hearing in the Claim Litigation Dispute.

## INTERROGATORY NO. 10

Identify and state the location of all Individuals who You will be calling as expert witnesses at an evidentiary hearing in this matter and describe the subject matter of each Individual's relevant knowledge.

## RESPONSE TO INTERROGATORY NO. 10

Spanish Broadcasting incorporates by reference its Global Objections set forth above. Spanish Broadcasting further objects to Interrogatory No. 10 on the grounds that the Interrogatory is overbroad and unduly burdensome.  Spanish Broadcasting further objects to the Interrogatory on the ground that it exceeds the bounds of Local Rule 7033-1(a).  Spanish Broadcasting further objects to the Interrogatory on the ground that it prematurely seeks the production of expert discovery in contravention of the express provisions of the Claims Litigation Schedule.  The procedure for expert discovery is expressly set forth in the Claims

21

Litigation Schedule, and Spanish Broadcasting will conduct and complete expert discovery in accordance with paragraphs 4 through 6 and the other provisions of the Claims Litigation Schedule.

## INTERROGATORY NO. 11

Describe in detail all of the attempts made by Spanish Broadcasting to obtain alternate or replacement financing after LCPI did not loan Spanish Broadcasting the funds requested pursuant to the Draw Request.

## RESPONSE TO INTERROGATORY NO. 11

Spanish Broadcasting incorporates by reference its Global Objections set forth above. Spanish Broadcasting further objects to Interrogatory No. 11 on the grounds that the Interrogatory is overbroad, vague, ambiguous and unduly burdensome, including but not limited to the terms "attempts" and "alternate or replacement financing." Spanish Broadcasting further objects to the Interrogatory on the ground that it exceeds the bounds of Local Rule 7033-1(a). Spanish Broadcasting further objects on the ground that the Interrogatory seeks information regarding "all" attempts when less than all suffices to provide LBHI with reasonable discovery. Spanish Broadcasting further objects on the ground that the Interrogatory seeks information protected by the attorney-client privilege and/or attorney work-product doctrine.

## INTERROGATORY NO. 12

Describe in detail all of the attempts made by Spanish Broadcasting to replace the transactions outstanding under the Swap Agreement from September 1, 2008 through 2010.

## RESPONSE TO INTERROGATORY NO. 12

Spanish Broadcasting incorporates by reference its Global Objections set forth above. Spanish Broadcasting further objects to Interrogatory No. 12 on the grounds that the Interrogatory is overbroad, vague, ambiguous and unduly burdensome, including but not limited to the terms "attempts" and "replace." Spanish Broadcasting further objects to the Interrogatory

on the ground that it exceeds the bounds of Local Rule 7033-1(a).  Spanish Broadcasting further

objects on the ground that the Interrogatory seeks information regarding "all" attempts when less

than all suffices to provide LBHI with reasonable discovery.  Spanish Broadcasting further

objects on the ground that the Interrogatory seeks information protected by the attorney-client

privilege and/or attorney work-product doctrine.

## INTERROGATORY NO. 13

Describe in detail the amount and computation of damages that Spanish Broadcasting is
seeking in this matter.

## RESPONSE TO INTERROGATORY NO. 13

Spanish Broadcasting incorporates by reference its Global Objections set forth above.

Subject to and without waiving the Global Objections, Spanish Broadcasting responds as

follows:

A detailed computation of damages is premature at this time.  Any calculation of

damages caused by the conduct of LBHI and its affiliates ("Lehman") will require expert

testimony.  Spanish Broadcasting will conduct and complete expert discovery in accordance with

paragraphs 4 through 6 and the other provisions of the Claims Litigation Schedule.

Notwithstanding the above, the damages claimed by Spanish Broadcasting in this Claim

Litigation Dispute are in a total amount in excess of $47.8 million and include the following:

(1)    Damages in an amount of approximately $30.3 million in impacted EBITDA

resulting from Lehman's failure to fund the Draw;

(2)    Damages in an amount of approximately $17.2 million relating to Spanish

Broadcasting's inability to terminate the Swap;

(3)    Damages in an amount of $273,333.33 on account of the fees that Spanish

Broadcasting paid to Lehman for the portion of the Draw that Lehman failed to

fund;

(4)     Interest on the foregoing; and

(5)     Spanish Broadcasting's costs, expenses and reasonable attorneys' fees relating to

the Claim Litigation Dispute, including, without limitation, all costs, expenses and

fees relating to Spanish Broadcasting's testifying and non-testifying experts.

## INTERROGATORY NO. 14

Identify and state the location of all Individuals who answered or provided assistance in answering these Interrogatories.

**RESPONSE TO INTERROGATORY NO. 14**

Spanish Broadcasting incorporates by reference its Global Objections set forth above. Spanish Broadcasting further objects to Interrogatory No. 14 on the grounds that the Interrogatory is overbroad, vague, ambiguous and unduly burdensome. Spanish Broadcasting further objects to the Interrogatory on the ground that it exceeds the bounds of Local Rule 7033-1(a). Spanish Broadcasting further objects on the ground that the Interrogatory seeks information protected by the attorney-client privilege and/or attorney work-product doctrine. Spanish Broadcasting further objects on the grounds that the Interrogatory is not relevant and not reasonably calculated to lead to the discovery of admissible evidence.

Dated:  New York, New York
            December 8, 2014

                                    KAYE SCHOLER LLP

                            By:  _____
                                    Madlyn Gleich Primoff, Esq.
                                    Joseph Otchin, Esq.
                                    250 West 55th Street
                                    New York, New York 10019-9710
                                    (212) 836-8000
                                    madlyn.primoff@kayescholer.com
                                    joseph.otchin@kayescholer.com

                                    *Attorneys for Spanish Broadcasting System,
                                    Inc.*

## **Exhibit 7**

April 27 Transcript

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    Adv. Case No. 08-01420-scc

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7    LEHMAN BROTHERS, INC.,

8            Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   SECURITIES INVESTOR PROTECTION CORPORATION, et al.,

11              Plaintiffs

12        v.

13   LEHMAN BROTHERS, INC.,

14              Defendant.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - x

16

17              U.S. Bankruptcy Court

18              One Bowling Green

19              New York, New York

20

21              April 27, 2015

22              2:03 PM

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    Hearing re:  Spanish Broadcasting Discovery Conference

2

3    Hearing re:  Doc#29323 Three Hundred Twenty-eighth Omnibus

4    Objection to Claims (No Liability Claim) Solely as to

5    Certain Claim

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Nicole Yawn

Page 3

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES, LLP

3         Attorneys for the Plan Administrator, Lehman Brothers

4         1300 Eye Street, NW

5         Suite 900

6         Washington DC 20005-3314

7

8    BY:  RALPH I. MILLER, ESQ.

9         DENISE ALVAREZ, ESQ.

10        ALEXANDER NO. WOOLVERTON, ESQ.

11        JACQUELINE MARCUS, ESQ.

12

13   KAYE SCHOLER, LLP

14        Attorney for Spanish Broadcasting

15        250 West 55th Street

16        New York, NY 10019-9710

17

18   BY:  MADLYN GLEICH PRIMOFF, ESQ.

19

20   ALSO APPEARING:

21   JOSEPH OTCHIN

22

23

24

25

Page 4

```
 1                    P R O C E E D I N G S

 2              UNIDENTIFIED SPEAKER:  Good to see you, Jess.

 3              THE COURT:  First of all, again, I'm so sorry for

 4    the law firm's loss --

 5              UNIDENTIFIED SPEAKER:  Thank you.

 6              UNIDENTIFIED SPEAKER:  Thank you.

 7              THE COURT:  -- today.  And thank you for coming

 8    down nonetheless.

 9              So I've read everything that you had to say.  And

10    I really want to try to take it above the level of the

11    bickering that is obvious in terms of who's responsible for

12    the delay, because I don't know where we'd go with that.  So

13    I want to try to just have a productive, definitive

14    resolution of the issues with a firm deadline to complete.

15              I don't really know what else to do with the past.

16    We could reiterate it.  It does seem as -- the one thing --

17    so, having said that, now I'll lead into it.

18              I don't understand.  There were agreed search

19    terms.  And then, -- right?  There were agreed search terms,

20    right?

21              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

22              THE COURT:  Yeah.  And then, -- no?

23              MS. PRIMOFF:  My colleague, Mr. Joe Otchin is

24    going to handle the hearing.

25              THE COURT:  Okay.
```

Page 5

1          MS. PRIMOFF:  But I will address it.

2          THE COURT:  At one point, there were agreed terms

3     for the (indiscernible).

4          MS. PRIMOFF:  But the agreement was always subject

5     to a condition that, if the search turned out to be

6     problematic --

7          THE COURT:  Okay.  But then, we get -- okay.  So

8     that's point one.

9          Point two is we get into the length of time.  To

10    me, if you agree on -- tentatively agree on -- search terms

11    on day one, on days seven to ten, you should come back and

12    say those search terms were (indiscernible).  It then

13    appeared that there was a very long period of time that it

14    took to get back and say those search terms were wrong (ph).

15    So that's problematic.

16          UNIDENTIFIED SPEAKER:  Yes.

17          MR. MILLER:  Your Honor, if we could sort of set

18    the table, as you say, a little bit.  Because I think the

19    plan administrator -- well, first of all, I appreciate your

20    time today.

21          For the record, I'm Ralph Miller, from --

22          THE COURT:  Okay.  And I do -- unfortunately, I'm

23    going to have a hard stop in a half an hour.

24          MR. MILLER:  Okay.

25          THE COURT:  Because I have to go up and do

Page 6

1     Judge River's (ph) class at Columbia.

2               MR. MILLER:  Okay.  We can be very quick,

3     Your Honor.  And, to actually move things faster, we pulled

4     together a few extras of what we think are key points about

5     this matter.

6               THE COURT:  Do these folks have it?

7               MR. MILLER:  They're getting copies of them right

8     this minute.

9               THE COURT:  Okay.

10              MR. MILLER:  But these are all things from the

11    record.  Tab 1 of this, Your Honor, is a supplemental brief

12    that outlines what the claims components are because there

13    are different issues here --

14              THE COURT:  Correct.

15              MR. MILLER:  -- on these different components.

16              THE COURT:  Sure.

17              MR. MILLER:  There is a -- the largest component

18    is this $39.6 million --

19              THE COURT:  Right.

20              MR. MILLER:  -- for diminution in investment

21    capital.  And then, there's about 10 million in damages.

22              THE COURT:  In the classic swap settlement amount

23    of damages, right?

24              MR. MILLER:  Yeah.  Well, actually, this is a

25    little more complicated.  They owed money to LBSF, another

Page 7

1    Lehman debtor.

2            THE COURT:  Right.

3            MR. MILLER:  And they said they would have paid $6

4    million if they'd gotten this $10 million draw, which is

5    what this case is all about in 2008.  And instead, for the

6    next 18 months, they let that ride, and it got to be worth a

7    lot more money.

8            The important point, though, Judge, is they're

9    saying that 6 million of the 10 million is going to be used

10   on the swap and 4 million that was left over was what

11   produced this almost $40 million in loss.  So they have a

12   ten to one multiplier effect that they are seeking here on

13   this not having $4 million for a particular period of time.

14           And to pay it back.  It's not a gift.

15           So, if you look at the next tab, this was --

16           UNIDENTIFIED SPEAKER:  Excuse me.

17           MR. MILLER:  We're looking at these exhibits,

18   which we're now seeing for the first time sitting here.

19   These have nothing to do with the discovery of this

20   (indiscernible).  We --

21           THE COURT:  Okay.  Here's the thing.  Okay?  From

22   the papers, it seemed to me that the fact that SBS is

23   claiming the 39 million in damages creates an expanded scope

24   of discovery.  It's a consequential damage claim.

25           MR. MILLER:  We don't concede that.  We --

1          THE COURT:  Well, it's not a swap termination.

2          MR. MILLER:  Of course not.  No, no, we're not

3   here on --

4          THE COURT:  So I'm not seeking to attach

5   significance -- if the sticking point is characterizing it

6   as consequential damages because you don't want to concede

7   the legal argument about that, then I'll call it something

8   else.

9          MR. MILLER:  Okay.

10          THE COURT:  Okay?

11          MR. MILLER:  Yes.

12          THE COURT:  If that makes it easier.

13          MR. MILLER:  Yes.

14          THE COURT:  I'm not seeking to do that.  The other

15   damages --

16          MR. MILLER:  Yes, okay.

17          THE COURT:  You're seeking other damages.  So you

18   need to produce documents that relate to the other damages.

19          MR. MILLER:  Yes.

20          THE COURT:  Okay.  Right?

21          MR. MILLER:  Yes, Your Honor.  And again, moving

22   very quickly through this, Judge Peck recognized this in the

23   excerpt we had here.

24          And I'm just going to go to the bottom of the

25   highlight here, where he said that if this ever gets to an

Page 9

1    evidentiary hearing, Spanish Broadcasting will have an

2    extraordinarily difficult time proving causation.  And that

3    is the issue about which we are having trouble in discovery

4    is the discovery on the proof of causation.

5            Tab 3, which we can skip quickly, is the 2 prior

6    extensions, which were -- 3 prior -- 2 prior extensions,

7    which were agreed to, Your Honor.  And then, clearly, Tab 4

8    was the declaration of Mr. Garcia, the CFO.  And he explains

9    that this is a diminution by comparison claim.

10            He says that they're going to compare their

11    performance with the performance of their competitors.  And

12    everything that's left over is going to be because they

13    didn't have this $4 million in 2008.

14            Well, gee whiz, there's a lot of good news and a

15    lot of bad news in the financial condition of this company.

16    And that's what we're trying to understand.

17            They made decisions not to buy things.  They made

18    decisions where to spend money.

19            THE COURT:  Sure.

20            MR. MILLER:  They had a lot of money on their

21    books.  For all those reasons, for them to now say well, gee

22    whiz, this is a lot of documents we're having to produce --

23    the point is they've asked for this, Your Honor.  And

24    they're going to get 68 percent already.  This is their

25    third -- Tab 5.

Page 10

1           This particular debtor, Lehman Commercial Paper,

2    is going to distribute over 68 and a fraction percent of

3    claims that are allowed.  When you multiply that by the 39.6

4    million, it's a little over $27 million.  So we're talking

5    about a $27 million cash claim.

6           And what essentially Spanish Broadcasting has said

7    -- go to the next Tab 6 -- is that they got a search term,

8    which is the key search term, by the way, that produced

9    several hundred thousand preliminary hits.  Now, this is

10   before people have looked at them to eliminate the pizza

11   menus and the other junk.

12          And a lot of it is signature lines.

13          THE COURT:  So that's what I want to go to.  I

14   mean, you say that 80 percent is irrelevant.  How do you

15   know that?

16          MR. OTCHIN:  Your Honor, we sampled random

17   documents that were retrieved by the search term, and, based

18   on the sampling of the document that we sampled, 80 percent

19   were irrelevant and 20 percent we determined were

20   responsive.

21          THE COURT:  Okay.  So when did you do that?

22          MR. OTCHIN:  We sampled it -- well, after we had

23   reached agreement on the search term, working with Spanish

24   Broadcasting's outside vendor, you know, it was, you know,

25   within several weeks of that agreement.

Page 11

1            THE COURT:  Well, if you agreed on the search

2      terms on March 5th -- now it's almost the beginning of May.

3      So I'm just -- I'm not accounting for the time.

4            MR. OTCHIN:  Well, beyond, you know, taking the

5      search terms and, you know, getting to the end point with

6      those documents to review, there was technical issues with

7      respect to what Spanish Broadcasting could process in-house

8      versus, you know, what the vendor had to come in and

9      retrieve -- extract documents and then, you know, run the

10     terms.  And, you know, there was a certain technical

11     process.

12            THE COURT:  But this is where you're going to have

13     to help me.  I mean, if you agree that the search is

14     producing junk, then you have to come back and tell

15     Mr. Miller how you're going to refine the search that will

16     still produce -- to be clear, I agree with the plan

17     administrator about the documents to which they're entitled.

18            You're making a hugely sweeping claim.  You're

19     essentially opening -- you're making a claim that implicates

20     the performance of the bank during a particular period of

21     time.  So you've got to produce documents that show that.

22            It can't be producing what you --

23            MR. OTCHIN:  No, no, we don't disagree with that

24     at all, Your Honor.

25            THE COURT:  Yeah.  So how do you get that?

Page 12

1              MR. OTCHIN:  So, starting at March 5th, which is

2      when we had agreement on the search terms, --

3              THE COURT:  Right.

4              MS. PRIMOFF:  -- they originally thought that in-

5      house they would be able to do this.  We look at the search

6      terms.  They turned out to be incredibly complicated and

7      beyond the capabilities of Spanish Broadcasting's internal

8      people.

9              So then, they retained a vendor to run the

10     searches.  Until the vendor downloaded the stuff from

11     people's email servers as well as the shared drive, that

12     took a bit of time.  They ran the searches.

13             It turned out to be problematic over a course of a

14     whole bunch of terms.  But there's this one term in

15     particular.

16             THE COURT:  What's the term?

17             MS. PRIMOFF:  It's in --

18             UNIDENTIFIED SPEAKER:  It's in this tab,

19     Your Honor.  It's highlighted here.

20             MR. MILLER:  Do you have the letter that we sent

21     to you today?

22             THE COURT:  Yeah.

23             MR. MILLER:  If you have the letter that we sent

24     to you today, --

25             THE COURT:  Right.

Page 13

1              MR. MILLER:  It's in Footnote 1 for page 2.

2              THE COURT:  Okay.  All right.  So --

3              MR. MILLER:  So that term alone has returned in

4    excess of 300,000 documents.

5              THE COURT:  Right.  But here's the part I don't

6    understand.  Just because it returns a large number of

7    documents doesn't mean that it's a bad search term.

8              MS. PRIMOFF:  We agree.  So we sampled the

9    documents.  But 80 percent of the documents are completely

10   non-responsive and irrelevant.  So we worked with the vendor

11   to modify -- to see whether we could develop a modified term

12   that would reduce the number of irrelevant and non-

13   responsive documents.

14             And that modified term is set forth in Footnote 2.

15   And this is what we --

16             THE COURT:  Footnote 2 to what?

17             MS. PRIMOFF:  To the letter that was sent to

18   Your Honor this morning.

19             THE COURT:  Okay.  Modified terms step two?

20             MS. PRIMOFF:  Consistent with two-step search.

21   And even that search retrieves nearly 40 percent non-

22   responsive documents.  But we can't seem to do any better

23   than that.  So we accept that that's what it needs to be.

24             But the difference between 40 percent non-

25   responsive and 80 percent non-responsive is enormous.  We

Page 14

1    think that the term that's set out in Footnote 2 is an

2    appropriate term.

3            MR. MILLER:  The problem with the modified search

4    term, Your Honor, is all the not terms in it.  Not terms

5    remove very valuable things.  If you take out not present

6    (ph) of operations, correct (ph) of operations or

7    consolidated operations or operations manager, you've

8    essentially excluded certain custodians.

9            And the same is true not value or evaluate, not

10   viable, be viable condition or liquid (ph).  I mean, you

11   know, one of those -- if you have nots on all of those

12   terms, you're punching holes in the search that only humans

13   can deal with.

14           I mean, a computer can only do so much.  And,

15   frankly, a 20 percent yield in a $27 million case on a key

16   search term is not junk.  We're not talking five percent or

17   seven percent.  We're talking one out of five.

18           And they're the plaintiff.  And this is their

19   central damage claim.  So we just don't think that this is

20   unreasonable.

21           THE COURT:  I just don't -- you're going to have

22   the burden to prove your damages.

23           MS. PRIMOFF:  Yes.

24           THE COURT:  So do you have a universe of documents

25   -- let's try to back into this.  Do you have a universe of

Page 15

1    documents that you think demonstrates your damages?

2              MS. PRIMOFF:  Yes.

3              THE COURT:  Have you produced those?

4              MS. PRIMOFF:  Yes.

5              THE COURT:  Do you have those, Mr. Miller?

6              MR. MILLER:  We have a production, and the point

7    of whether they show the damages -- what we understand, as I

8    say, that they're doing is a diagnosis by elimination.  They

9    are saying, essentially, you know, we didn't do as well as

10   our peers did.  Therefore, it must have been the $4 million.

11             What we don't have is the -- we don't believe that

12   the documents of all the problems they have.  That's what we

13   have to get.  And that's what we think these search terms

14   are going to be able to help us find.

15             We need to understand what their difficulties

16   were.  We also need to understand how much other cash they

17   had.

18             One important point --

19             THE COURT:  So an alternative theory of causation

20   for the damages that they (indiscernible)?

21             MR. MILLER:  Yes.  And also, Your Honor, they

22   withdrew any damages based on seeking alternate financing.

23   That's the normal direct damages for a failure to fund is so

24   you had funding at five percent.  And you had to go out and

25   get funding at seven percent.  So you got two percent

Page 16

1      increase in damages.  That's fine.

2               They've withdrawn that.  They didn't seek

3      alternate claims (ph).  We think that's because they didn't

4      actually need the financing, because they have a lot of

5      assets.

6               They were not capital starved.  They had other

7      problems.  So it is an alternate theory.

8               Yes, they didn't perform as well as it appears.

9               THE COURT:  Well, but --

10              MS. PRIMOFF:  Well, we did seek alternate

11     financing.  It wasn't available in the marketplace.  And I

12     think, respectfully, that Mr. Miller misstates the law.

13              The law is not that we produce 1 out of 5 -- or,

14     in this case, 20 percent when 80 percent are non-responsive.

15     That's a classic case for caution.  We have demonstrated

16     through sampling that 80 percent of the documents are non-

17     responsive.  You have to weigh the burden.

18              THE COURT:  But you -- but the terms -- I mean, my

19     immediate reaction was to -- if you're going to carve out

20     financial officer (ph), you're going to carve out those

21     terms.  You're --

22              MS. PRIMOFF:  But anytime that somebody has a

23     signature block, Your Honor, that says V.P. of operations,

24     that comes up on the original search.  Okay?

25              THE COURT:  But I don't -- again, this is not -- I

Page 17

1   am not an expert in VSI discovery.  But it seems to me that

2   there has to be a way of dealing with that problem, isn't

3   there?

4            MR. MILLER:  There is, and Mr. Woolverton is here

5   with us, supervised our review.  When stuff pops up on the

6   screen and contract attorneys look at it and they're very

7   fast at being able to zap documents, because it's obviously

8   trash.

9            But, if it's a long document and it's discussing

10  their financial operations, it needs to go over into a stack

11  and be considered responsive.  That's what we're talking

12  about here.

13           And the fact that I get, again, some higher yield

14  because of signature blocks, I can deal with that.

15           THE COURT:  Understood.  I do not understand how

16  it could be appropriate to carve these terms out.  And you

17  are gutting the production.

18           MS. PRIMOFF:  Well, it's the guidance here,

19  Your Honor.  And, in that balance thing, we're not obligated

20  to, you know, review a document set that's retrieving 80

21  percent non-responsive documents.

22           The idea is to have electronic search terms that

23  lead to responsive documents.  So it's a balancing and

24  questioning is warranted in circumstances like this if they

25  insist on that level.

Page 18

1          (Pause)

2              MR. MILLER:  Your Honor, one other issue that we

3    want to stress --

4              THE COURT:  I mean, what's going on, though, is

5    that -- I mean, in the letter that came in today, you say

6    Spanish Broadcasting has produced 600,000 pages of

7    documents, 3 times more than the 200,000 that Lehman has

8    filed (ph).  That's completely irrelevant.

9              The relative number of the documents that you've

10   produced is completely irrelevant.  But I think that that's

11   part of what's going on is that you feel that the burden is

12   greater on you.  But --

13             MS. PRIMOFF:  No, no, we accept that the burden --

14   the documents are what they are.

15             THE COURT:  You're making an enormous claim with a

16   very -- with a theory that is, by its nature, somewhat

17   broad.  I have no idea of the merits.

18             And the fix for the over-broad seems to me to be

19   it's not a scalpel.  I mean, it's a really big knife.  And I

20   hear you on the balancing, but I don't understand -- then

21   they will then search only the documents --

22             MR. MILLER:  Only what's in step one.  And all not

23   terms recorded (ph).

24             THE COURT:  Right.  So that's narrowing it

25   further.

Page 19

1          MR. MILLER:  Your Honor, you mentioned a scalpel.

2     There is a potential scalpel here.

3          THE COURT:  Well, I'm looking for the scalpel

4     because that's why --

5          MR. MILLER:  Okay.  Well, it's not --

6          THE COURT:  -- (indiscernible).

7          MR. MILLER:  -- something that we've all

8     discussed.  But the scalpel is this consequential damage

9     waiver.  The only documents that are really relevant to

10    that, we think, are documents between these law firms over a

11    so-called payoff letter.  And that would have been the

12    drafts.

13         And we agree in principle to a protocol for

14    exchanging those.  And, if those do not reveal ambiguity in

15    this payoff letter, which they say did away with the

16    consequential damages waiver, then the plan administrator

17    believes it could come to the Court with a letter seeking a

18    summary judgment.

19         If the Court granted summary judgment on that, --

20         THE COURT:  Then we're done.

21         MR. MILLER:  -- then we don't have to look at the

22    650,000 documents.  We don't have to look at any of this

23    stuff, because we think at that point, we're done.  So

24    that's the scalpel, if the Court wants to consider a

25    scalpel.

Page 20

1          MS. PRIMOFF:  They've made this argument to

2    Judge Peck already in connection with their motion to

3    dismiss.  And they didn't prevail on this argument.  So

4    we're entitled to discovery.

5          MR. MILLER:  No.

6          MS. PRIMOFF:  Let's talk about the discovery.

7    And, if Your Honor believes that we should --

8          THE COURT:  Was there a motion to dismiss?

9          MS. PRIMOFF:  Yes.  And with Judge Peck?

10          THE COURT:  No, no, no.

11          MS. PRIMOFF:  No, no, no.  Judge Peck -- we have

12    judge --

13          THE COURT:  The sufficiency hearing.

14          MS. PRIMOFF:  The sufficiency hearing, which the

15    footnotes in your document said was to be determined under

16    the standard of a motion to dismiss.

17          MR. MILLER:  And, if you look on the second tab,

18    page 1.3 at the bottom, what Judge Peck said was, "I am not

19    going to rule today on the waiver consequential damages,

20    even though I might be able to.  Given the benefit of the

21    doubt fully to Spanish Broadcasting under 12(b)(6) standard,

22    they will get their day in court, or we will deal with this

23    on dispositive motions after discovery."

24          Now, I suggest that we are now at the point after

25    discovery.  If you just get the discovery on this issue,

Page 21

```
 1    that a dispositive motion comes around (ph).  And so, I

 2    don't think Judge Peck ruled that it was not a summary

 3    judgment.  He ruled he was not going to do it on 12(b)(6),

 4    just to be precise.

 5              THE COURT:  Thank you.  Sounds good to me.

 6              MS. PRIMOFF:  I don't agree with that at all.  He

 7    denied their motion.  He said that we were entitled to

 8    discovery.  He talked about expert discovery.  And to do

 9    this piecemeal, --

10              THE COURT:  No, but expert discovery is about the

11    amount of damages.

12              MS. PRIMOFF:  Yes.

13              MR. MILLER:  Right.

14              THE COURT:  Right.

15              MS. PRIMOFF:  And he ruled that we were entitled

16    to prove our amount of damages.

17              THE COURT:  He didn't.  He said I am not going to

18    rule on the waiver of consequential damages.

19              MS. PRIMOFF:  He was reserving it.

20              THE COURT:  He gave -- he denied the 12(b)(6) and

21    said they will get their day in court, or we'll deal with

22    this on dispositive motions after discovery.  So what

23    Mr. Miller is saying is there has been discovery around the

24    threshold issue.  There's a factual issue.  Was there a

25    waiver, right?
```

1            And now, he wants -- he's saying we'll put in a

2     summary judgment motion saying there are no issues of

3     material disputed fact around that issue.  That's what this

4     says, that you, on the 12(b)(6), you'd have the benefit of

5     the doubt on what you pleaded.  Right?

6            You survived the motion to dismiss.  You stated

7     the claim.  Discovery.  Next thing that happens is trial or

8     summary judgment.

9            He's saying summary judgment in favor of the plan

10    administrator on the issue that there was a waiver, right?

11            MR. MILLER:  That's right.  And that will take

12    out, essentially, everything that amounts to anything in

13    this case, we believe.  It will take out -- now, I

14    understand they say it's direct damages.  But whether it's

15    direct damages or consequential damages is not a part of

16    discovery.

17            THE COURT:  It doesn't matter if it's -- right.

18            MR. MILLER:  And so, you know -- and, by the way,

19    the fee issue is really a tiny flea on the dog.  There's a

20    fee at issue of 300.

21            They asked for 273,000.  We think it's really

22    13,000.  Whatever it is, we think the fees we can take care

23    of.  They get it.  They would get a refund of any unearned

24    fees that they would try to (indiscernible).

25            There's nothing left if consequential damages is

Page 23

1    resolved, including no need to have discovery on this whole

2    damage area.  No need to have experts, which everybody is

3    retaining and is very expensive.

4            THE COURT:  Judge peck's comments are in the same

5    paragraph.  His beginning thought was on the waiver of

6    consequential damages.  So it wasn't discovery -- it wasn't

7    going to be all dispositive motions after globally

8    discovery.

9            It seems to me the context seems to suggest that

10   it would be dispositive motions on that threshold issue.  So

11   we already did that.

12           MS. PRIMOFF:  But, Your Honor, you know, I'm

13   assuming that the transcript in front of Judge Peck was at

14   least 144 pages, of which we have here 4 selected pages.

15           THE COURT:  If you want to send me the whole

16   transcript and I'll review the whole transcript and --

17           MS. PRIMOFF:  I do have it here.

18           THE COURT:  -- if it changes my mind, --

19           MS. PRIMOFF:  Okay.

20           THE COURT:  -- I'm happy to do that.  But, I mean,

21   this is this chicken and egg problem that we all have in

22   these situations.  And this seems to me one in which I want

23   to at least explore the ability to do -- dispose of it on

24   the summary judgment.

25           And I'm not -- you know, I think that these folks

Page 24

1   -- you're not here as often.  I'm not a big fan of summary

2   judgment motions, because I think most of the time they're

3   not meritorious.

4            But this one seems to me to be a good candidate

5   for it, because then I don't have to go, among other

6   reasons, among other reasons, we don't have to go through

7   all that.

8            He may not convince me.  In which case we're going

9   to be back to fighting over search terms.

10           But it's inconsistent with the general theme of

11  you're dragging your feet, let's go.  Would there not be a

12  suggestion let's do a dispositive motion.  So that's why I'm

13  giving it weight, because I think that it wouldn't be

14  suggested if it was something that was designed to just, you

15  know, delay.

16           They're against delay.  They say you're in favor

17  of delay.

18           MS. PRIMOFF:  You're not in favor of delay.  We're

19  entitled to $50 million (indiscernible).

20           THE COURT:  Sure, you are.

21           MS. PRIMOFF:  Sure, we're entitled to delay.  No,

22  we don't want delay.

23           THE COURT:  (Indiscernible.)

24           MS. PRIMOFF:  We want money.

25           THE COURT:  Right.  But I'm happy to review the

1    whole transcript.

2         MS. PRIMOFF:  I mean, the other thing is that

3    typically, there's one summary judgment motion.  So, if

4    they're going to make their one, this should be the one.

5         THE COURT:  Well, there is one -- I mean, there's

6    not always just one.  There's one on the threshold issue of

7    whether or not your legal entitlement was waived.

8         Thank you.

9         MR. MILLER:  There's two copies for you and -- and

10   this is actually -- well, this is the excerpt on this part

11   of the hearing.  There was other things that day, I think.

12        I think, obviously, you're not going to get it

13   now.  But, just for convenience, let me give a copy to him.

14        THE COURT:  Okay.  So, I mean, it's not a written

15   (ph) page (ph).

16        MR. MILLER:  I don't know what --

17        THE COURT:  It's numbered, but that's because

18   there are probably other matters on the calendar.

19        MR. MILLER:  Okay.

20        THE COURT:  Okay?

21        MR. MILLER:  All right.  I know you have to go,

22   Your Honor, but --

23        THE COURT:  I think we ought to do that.  I mean,

24   if there's something in here in the rest of the transcript

25   that you think undercuts what it seems to me Judge Peck

Page 26

1  clearly said -- but just independently, whatever -- even if

2  he didn't say that, it seems to me that, if there's a

3  dispositive motion that says here's what happened between

4  the parties.  We've all had discovery on that.  They waive

5  their claim.

6          MS. PRIMOFF:  This is dated February 2013.  I

7  would like to go back and have the opportunity to review it,

8  Your Honor.

9          THE COURT:  Sure, that's fine.

10          MS. PRIMOFF:  And, if that's how Your Honor wants

11  to proceed, then naturally, we'll proceed as you want.

12          MR. MILLER:  I think that makes sense, Your Honor.

13          THE COURT:  I think that's a better way.  Mind

14  you, I have no idea how it's going to turn out.  I mean,

15  I've expressed my general skepticism about summary judgment

16  motions.  But sometimes they work.  Sometimes they don't.

17          But, in general, without making a decision, I

18  mean, I think that when there's a damage here like this,

19  it's going to be very hard to deal with the discovery issue,

20  because it's so raw (ph).  And one answer might be to, you

21  know, have a group of contract attorneys, whoever it is that

22  you're hiring, you know, wallow (ph) through it.

23          I know it's a lot of documents, but cutting it off

24  this way would seem to me to be not using a scalpel and

25  would create a risk that things were missed.  And I'm not

Page 27

1   doubting the good faith proffer with respect to sampling,

2   but I'm a sampling skeptic.

3            You have to demonstrate to me that your sampling

4   technique -- you know what I'm talking about, don't you,

5   Mr. Miller?

6            MR. MILLER:  Yes, I -- we get a lot of sampling

7   cases.

8            THE COURT:  Right.  You have to demonstrate to me

9   that you are validly sampling.

10           I understand statistical sampling is a valid means

11  of taking a smaller segment and predicting.  But, before you

12  say, "Oh, we sampled and look, this is what happened," you

13  have to demonstrate to me that your sampling was valid,

14  right?

15           So I don't get there by simply being told based on

16  our sample, this is no good.  I'm not suggesting that it was

17  anything but in good faith.

18           Do you understand?

19           MS. PRIMOFF:  Yeah, we're not complaining about

20  reviewing a lot of documents.

21           THE COURT:  Yeah.

22           MS. PRIMOFF:  We're complaining about reviewing a

23  lot of --

24           THE COURT:  Valid.  Guess what?  You're

25  complaining about reviewing a lot of --

Page 28

```
 1              MS. PRIMOFF:  Irrelevant documents.  But, if we

 2     need to give you better sampling, we'll give you better

 3     evidence of sampling.

 4              THE COURT:  Okay.  Well, maybe we won't have to

 5     get there at all.

 6              Now, you don't think that you've got -- there is

 7     no cross-motion for summary judgment?

 8              MR. MILLER:  Your Honor?

 9              THE COURT:  You couldn't --

10              MR. MILLER:  You know, first of all, we rejected

11     the contract.

12              THE COURT:  Right.

13              MR. MILLER:  So we're not saying that we have a

14     defense to whatever damages there are.

15              THE COURT:  Sure, right.

16              MR. MILLER:  We admit liability, if you will.

17              THE COURT:  Yes.

18              MR. MILLER:  We just believe that the only damages

19     are about $15,000 if all she -- all they get is direct

20     damages.

21              THE COURT:  I'm just confirming that we're going

22     to not leave.  And then, I was going to get correspondence

23     saying we'll cross move for summary judgment.  There is no

24     cross-motion for summary judgment.  There is their motion

25     saying, as a matter of law, you're not entitled -- an
```

Page 29

1     undisputed fact you're not entitled to your greater damage

2     claim, right?

3              MR. MILLER:  That's right, Your Honor.

4              THE COURT:  You're not going to file a motion back

5     that says, as a matter of law, we're entitled to X amount of

6     damages.  If the plan administrator doesn't knock you out

7     entirely, we'll come back to this.

8              MS. PRIMOFF:  Understood.

9              THE COURT:  Yeah, that's right.  That's right.

10             MS. MARCUS:  One more thing I think we need to

11    deal with, Your Honor.

12             THE COURT:  Yes.  Well, the 29th?  No, not even.

13             MS. MARCUS:  The parties have agreed with respect

14    to the discovery items on the waiver.  But I don't think

15    we've actually exchanged those documents yet.  So we should

16    talk about how much time --

17             MR. MILLER:  We need --

18             MS. MARCUS:  (Indiscernible.)

19             MR. MILLER:  We have a deadline for that exchange.

20             MS. MARCUS:  Okay.  And everything else is stayed

21    pending this.

22             UNIDENTIFIED SPEAKER:  Everything else --

23             MS. MARCUS:  Pending this.

24             MR. MILLER:  Okay.

25             What do you think?  Two weeks?  Three weeks?

Page 30

1                   I mean, what we've agreed, Your Honor, --

2      actually, we have an exchange of emails.  But what we

3      proposed was email exchanges externally between these firms

4      and their attachments so that we can see what drafts were

5      sent in the payoff letter.  And this is about the payoff

6      letter, which is --

7                   THE COURT:  Right.

8                   MR. MILLER:  -- the document that they set aside

9      --

10                  THE COURT:  Right.  So there aren't attorney sign

11     (ph) issues?

12                  MR. MILLER:  Well, because these have been

13     external emails, Your Honor.  They're all -- we sent them

14     what they sent us.  These are (indiscernible) and produce

15     our sets in the attachments.

16                  THE COURT:  Okay.

17                  MR. MILLER:  And then, we'll have all the drafts

18     of the payoff letter.  We'll have all the emails back and

19     forth on the payoff letter.

20                  THE COURT:  External, not internal?

21                  MR. MILLER:  And we -- external, not internal.

22                  THE COURT:  Not internal?  Oh, great.

23                  MR. MILLER:  And we think that's -- we think we

24     can look at that and determine whether there is a summary

25     judgment or not.

Page 31

```
 1                THE COURT:  Okay.  So that's --

 2                MR. MILLER:  And we've looked at our --

 3                THE COURT:  -- one step better.

 4                MR. MILLER:  Yes.

 5                THE COURT:  I mean, you're saying you're not --

 6      you think there is, but you're not sure.

 7                MR. MILLER:  Yes, Your Honor, until we complete

 8      this exchange -- and they said they wanted to -- although

 9      they agreed in principle, they felt that that should wait

10      until the general extension and be governed by general

11      (indiscernible) discovery.

12                THE COURT:  I gotcha.

13                MS. PRIMOFF:  But we've agreed.

14                THE COURT:  I gotcha.  Okay.  No, but there's a

15      fine point to what you're saying, which I like, which is

16      that you think that you'll have a summary judgment motion.

17                MR. MILLER:  Yes, Your Honor.

18                THE COURT:  And, in good faith, you're going to

19      review the documents.

20                MR. MILLER:  Yes.

21                THE COURT:  And, after you do that, if there's a

22      --

23                MR. MILLER:  And we'll let the Court know very

24      promptly if we decide there's not.

25                THE COURT:  All right.  And then, we'll have to
```

Page 32

1   either -- we'll have to agree on this, or we'll have to

2   reconvene.

3           MR. MILLER:  Yes.  But the question, I guess, is

4   can we get agreement on how long we're going to take to

5   exchange those emails.

6           THE COURT:  Right, right.  Do you not --

7           MR. OTCHIN:  I think two weeks we should be able

8   to do it.

9           THE COURT:  Two weeks?

10          MR. MILLER:  I'm saying (indiscernible).

11          THE COURT:  Right.

12          MR. MILLER:  But we can get ours in two weeks,

13  right?  I think we've actually pulled ours, right?

14          Okay?  So that's good.  In two weeks.

15          THE COURT:  Okay.

16          MR. MILLER:  And we can very promptly, within,

17  say, two weeks, advise the Court on when we're going to be

18  seeking.  And we'll send a letter, as we are supposed to, --

19          THE COURT:  Right.

20          MR. MILLER:  -- requesting summary judgment.

21          THE COURT:  So this will -- but this can suffice

22  as a 756(1) conference.  You could just make a formal

23  letter.

24          MR. MILLER:  Okay.

25          THE COURT:  Just letting us know what the schedule

Page 33

1    is (indiscernible).

2            MR. MILLER:  Okay.

3            THE COURT:   (Indiscernible) a schedule

4    (indiscernible) a hearing (indiscernible).

5            MR. MILLER:  Great.

6            THE COURT:  All right.  So that's a good thing.

7    Okay.

8            MS. PRIMOFF:  Okay.

9            THE COURT:  Okay.

10           MR. MILLER:  Thank you, Your Honor.

11           THE COURT:  Thank you very much.  I'm going to --

12           MR. OTCHIN:  Thank you, Your Honor.

13           THE COURT:  Can I keep all this?

14           MR. MILLER:  Of course.

15           I appreciate you making time for us, Your Honor.

16           THE COURT:  Sure, sure.

17       (Proceedings were concluded at 2:34 PM)

18

19

20

21

22

23

24

25

Page 34

1           C E R T I F I C A T I O N

2

3    I, Nicole Yawn certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

    _____

8

    Nicole Yawn

9

10

11

    Date:  April 29, 2015

12

13

14

15

16

17

18

19

20

21

    Veritext

22

    330 Old Country Road

23

    Suite 300

24

    Mineola, NY 11501

25

| **&** | **4** | **al** 1:10 | **bankruptcy** 1:1,17 |
|---|---|---|---|

**&**

**&**   3:2

**0**

**08-01420**   1:4
**08-13555**   1:3

**1**

**1**   6:11 13:1 16:13
  32:22
**1.3**   20:18
**10**   6:21 7:4,9
**10019-9710**   3:16
**11501**   34:24
**12**   20:21 21:3,20
  22:4
**13,000**   22:22
**1300**   3:4
**144**   23:14
**15,000**   28:19
**18**   7:6

**2**

**2**   9:5,6 13:1,14,16
  14:1
**20**   10:19 14:15
  16:14
**200,000**   18:7
**20005-3314**   3:6
**2008**   7:5 9:13
**2013**   26:6
**2015**   1:21 34:11
**250**   3:15
**27**   1:21 10:4,5 14:15
**273,000**   22:21
**29**   34:11
**29323**   2:3
**29th**   29:12
**2:03**   1:22
**2:34**   33:17

**3**

**3**   9:5,6 18:7
**300**   22:20 34:23
**300,000**   13:4
**330**   34:22
**39**   7:23
**39.6**   6:18 10:3

**4**

**4**   7:10,13 9:7,13
  15:10 23:14
**40**   7:11 13:21,24

**5**

**5**   9:25 16:13
**50**   24:19
**55th**   3:15
**5th**   11:2 12:1

**6**

**6**   7:3,9 10:7 20:21
  21:3,20 22:4
**600,000**   18:6
**650,000**   19:22
**68**   9:24 10:2

**7**

**756**   32:22

**8**

**80**   10:14,18 13:9,25
  16:14,16 17:20

**9**

**900**   3:5

**a**

**ability**   23:23
**able**   12:5 15:14
  17:7 20:20 32:7
**accept**   13:23 18:13
**accounting**   11:3
**accurate**   34:4
**address**   5:1
**administrator**   3:3
  5:19 11:17 19:16
  22:10 29:6
**admit**   28:16
**adv**   1:4
**advise**   32:17
**agree**   5:10,10 11:13
  11:16 13:8 19:13
  21:6 32:1
**agreed**   4:18,19 5:2
  9:7 11:1 29:13 30:1
  31:9,13
**agreement**   5:4
  10:23,25 12:2 32:4

**al**   1:10
**alexander**   3:10
**allowed**   10:3
**alternate**   15:22
  16:3,7,10
**alternative**   15:19
**alvarez**   3:9
**ambiguity**   19:14
**amount**   6:22 21:11
  21:16 29:5
**amounts**   22:12
**answer**   26:20
**anytime**   16:22
**appeared**   5:13
**appearing**   3:20
**appears**   16:8
**appreciate**   5:19
  33:15
**appropriate**   14:2
  17:16
**april**   1:21 34:11
**area**   23:2
**argument**   8:7 20:1
  20:3
**aside**   30:8
**asked**   9:23 22:21
**assets**   16:5
**assuming**   23:13
**attach**   8:4
**attachments**   30:4
  30:15
**attorney**   3:14 30:10
**attorneys**   3:3 17:6
  26:21
**available**   16:11

**b**

**b**   1:23 20:21 21:3
  21:20 22:4
**back**   5:11,14 7:14
  11:14 14:25 24:9
  26:7 29:4,7 30:18
**bad**   9:15 13:7
**balance**   17:19
**balancing**   17:23
  18:20
**bank**   11:20

**bankruptcy**   1:1,17
  1:25
**based**   10:17 15:22
  27:15
**beginning**   11:2 23:5
**believe**   15:11 22:13
  28:18
**believes**   19:17 20:7
**benefit**   20:20 22:4
**better**   13:22 26:13
  28:2,2 31:3
**beyond**   11:4 12:7
**bickering**   4:11
**big**   18:19 24:1
**bit**   5:18 12:12
**block**   16:23
**blocks**   17:14
**books**   9:21
**bottom**   8:24 20:18
**bowling**   1:18
**brief**   6:11
**broad**   18:17,18
**broadcasting**   2:1
  3:14 9:1 10:6 11:7
  18:6 20:21
**broadcasting's**
  10:24 12:7
**brothers**   1:7,13 3:3
**bunch**   12:14
**burden**   14:22 16:17
  18:11,13
**buy**   9:17

**c**

**c**   1:24 3:1 4:1 34:1,1
**calendar**   25:18
**call**   8:7
**called**   19:11
**candidate**   24:4
**capabilities**   12:7
**capital**   6:21 16:6
**care**   22:22
**carve**   16:19,20
  17:16
**case**   1:3,4 7:5 14:15
  16:14,15 22:13 24:8
**cases**   27:7

cash   10:5 15:16
causation   9:2,4
   15:19
caution   16:15
central   14:19
certain   2:5 11:10
   14:8
certify   34:3
cfo   9:8
changes   23:18
chapman   1:24
characterizing   8:5
chicken   23:21
circumstances
   17:24
claim   2:4,5 7:24 9:9
   10:5 11:18,19 14:19
   18:15 22:7 26:5
   29:2
claiming   7:23
claims   2:4 6:12 10:3
   16:3
class   6:1
classic   6:22 16:15
clear   11:16
clearly   9:7 26:1
colleague   4:23
columbia   6:1
come   5:11 11:8,14
   19:17 29:7
comes   16:24 21:1
coming   4:7
comments   23:4
commercial   10:1
company   9:15
compare   9:10
comparison   9:9
competitors   9:11
complaining   27:19
   27:22,25
complete   4:14 31:7
completely   13:9
   18:8,10
complicated   6:25
   12:6
component   6:17

components   6:12
   6:15
computer   14:14
concede   7:25 8:6
concluded   33:17
condition   5:5 9:15
   14:10
conference   2:1
   32:22
confirming   28:21
connection   20:2
consequential   7:24
   8:6 19:8,16 20:19
   21:18 22:15,25 23:6
consider   19:24
considered   17:11
consistent   13:20
consolidated   14:7
context   23:9
contract   17:6 26:21
   28:11
convenience   25:13
convince   24:8
copies   6:7 25:9
copy   25:13
corporation   1:10
correct   6:14 14:6
correspondence
   28:22
country   34:22
course   8:2 12:13
   33:14
court   1:1,17 4:3,7
   4:22,25 5:2,7,22,25
   6:6,9,14,16,19,22
   7:2,21 8:1,4,10,12
   8:14,17,20 9:19
   10:13,21 11:1,12,25
   12:3,16,22,25 13:2
   13:5,16,19 14:21,24
   15:3,5,19 16:9,18
   16:25 17:15 18:4,15
   18:24 19:3,6,17,19
   19:20,24 20:8,10,13
   20:22 21:5,10,14,17
   21:20,21 22:17 23:4
   23:15,18,20 24:20

24:23,25 25:5,14,17
   25:20,23 26:9,13
   27:8,21,24 28:4,9
   28:12,15,17,21 29:4
   29:9,12 30:7,10,16
   30:20,22 31:1,3,5
   31:12,14,18,21,23
   31:25 32:6,9,11,15
   32:17,19,21,25 33:3
   33:6,9,11,13,16
create   26:25
creates   7:23
cross   28:7,23,24
custodians   14:8
cutting   26:23

## d

d   4:1
damage   7:24 14:19
   19:8 23:2 26:18
   29:1
damages   6:21,23
   7:23 8:6,15,17,18
   14:22 15:1,7,20,22
   15:23 16:1 19:16
   20:19 21:11,16,18
   22:14,15,15,25 23:6
   28:14,18,20 29:6
date   34:11
dated   26:6
day   5:11 20:22
   21:21 25:11
days   5:11
dc   3:6
deadline   4:14 29:19
deal   14:13 17:14
   20:22 21:21 26:19
   29:11
dealing   17:2
debtor   1:8 7:1 10:1
decide   31:24
decision   26:17
decisions   9:17,18
declaration   9:8
defendant   1:14
defense   28:14
definitive   4:13

delay   4:12 24:15,16
   24:17,18,21,22
demonstrate   27:3,8
   27:13
demonstrated
   16:15
demonstrates   15:1
denied   21:7,20
denise   3:9
designed   24:14
determine   30:24
determined   10:19
   20:15
develop   13:11
diagnosis   15:8
difference   13:24
different   6:13,15
difficult   9:2
difficulties   15:15
diminution   6:20 9:9
direct   15:23 22:14
   22:15 28:19
disagree   11:23
discovery   2:1 7:19
   7:24 9:3,4 17:1
   20:4,6,23,25,25
   21:8,8,10,22,23
   22:7,16 23:1,6,8
   26:4,19 29:14 31:11
discussed   19:8
discussing   17:9
dismiss   20:3,8,16
   22:6
dispose   23:23
dispositive   20:23
   21:1,22 23:7,10
   24:12 26:3
disputed   22:3
distribute   10:2
district   1:2
doc   2:3
document   10:18
   17:9,20 20:15 30:8
documents   8:18
   9:22 10:17 11:6,9
   11:17,21 13:4,7,9,9
   13:13,22 14:24 15:1

15:12 16:16 17:7,21
17:23 18:7,9,14,21
19:9,10,22 26:23
27:20 28:1 29:15
31:19
**doesn't**  13:7
**dog**  22:19
**doing**  15:8
**doubt**  20:21 22:5
**doubting**  27:1
**downloaded**  12:10
**drafts**  19:12 30:4
30:17
**dragging**  24:11
**draw**  7:4
**drive**  12:11

**e**

**e**  1:23,23 3:1,1 4:1,1
34:1
**easier**  8:12
**effect**  7:12
**egg**  23:21
**eighth**  2:3
**either**  32:1
**electronic**  17:22
**eliminate**  10:10
**elimination**  15:8
**email**  12:11 30:3
**emails**  30:2,13,18
32:5
**enormous**  13:25
18:15
**entirely**  29:7
**entitled**  11:17 20:4
21:7,15 24:19,21
28:25 29:1,5
**entitlement**  25:7
**esq**  3:8,9,10,11,18
**essentially**  10:6
11:19 14:8 15:9
22:12
**et**  1:10
**evaluate**  14:9
**everybody**  23:2
**evidence**  28:3
**evidentiary**  9:1

**excerpt**  8:23 25:10
**excess**  13:4
**exchange**  29:19
30:2 31:8 32:5
**exchanged**  29:15
**exchanges**  30:3
**exchanging**  19:14
**excluded**  14:8
**excuse**  7:16
**exhibits**  7:17
**expanded**  7:23
**expensive**  23:3
**expert**  17:1 21:8,10
**experts**  23:2
**explains**  9:8
**explore**  23:23
**expressed**  26:15
**extension**  31:10
**extensions**  9:6,6
**external**  30:13,20
30:21
**externally**  30:3
**extract**  11:9
**extraordinarily**  9:2
**extras**  6:4
**eye**  3:4

**f**

**f**  1:23 34:1
**fact**  7:22 17:13 22:3
29:1
**factual**  21:24
**failure**  15:23
**faith**  27:1,17 31:18
**fan**  24:1
**fast**  17:7
**faster**  6:3
**favor**  22:9 24:16,18
**february**  26:6
**fee**  22:19,20
**feel**  18:11
**fees**  22:22,24
**feet**  24:11
**felt**  31:9
**fighting**  24:9
**file**  29:4
**filed**  18:8

**financial**  9:15 16:20
17:10
**financing**  15:22
16:4,11
**find**  15:14
**fine**  16:1 26:9 31:15
**firm**  4:14
**firm's**  4:4
**firms**  19:10 30:3
**first**  4:3 5:19 7:18
28:10
**five**  14:16,17 15:24
**fix**  18:18
**flea**  22:19
**folks**  6:6 23:25
**footnote**  13:1,14,16
14:1
**footnotes**  20:15
**foregoing**  34:3
**formal**  32:22
**forth**  13:14 30:19
**fraction**  10:2
**frankly**  14:15
**front**  23:13
**fully**  20:21
**fund**  15:23
**funding**  15:24,25
**further**  18:25

**g**

**g**  4:1
**garcia**  9:8
**gee**  9:14,21
**general**  24:10 26:15
26:17 31:10,10
**getting**  6:7 11:5
**gift**  7:14
**give**  25:13 28:2,2
**given**  20:20
**giving**  24:13
**gleich**  3:18
**globally**  23:7
**go**  4:12 5:25 8:24
10:7,13 15:24 17:10
24:5,6,11 25:21
26:7
**going**  4:24 5:23 7:9
8:24 9:10,12,24

10:2 11:12,15 14:21
15:14 16:19,20 18:4
18:11 20:19 21:3,17
23:7 24:8 25:4,12
26:14,19 28:21,22
29:4 31:18 32:4,17
33:11
**good**  4:2 9:14 21:5
24:4 27:1,16,17
31:18 32:14 33:6
**gotcha**  31:12,14
**gotshal**  3:2
**gotten**  7:4
**governed**  31:10
**granted**  19:19
**great**  30:22 33:5
**greater**  18:12 29:1
**green**  1:18
**group**  26:21
**guess**  27:24 32:3
**guidance**  17:18
**gutting**  17:17

**h**

**half**  5:23
**handle**  4:24
**happened**  26:3
27:12
**happens**  22:7
**happy**  23:20 24:25
**hard**  5:23 26:19
**hear**  18:20
**hearing**  2:1,3 4:24
9:1 20:13,14 25:11
33:4
**help**  11:13 15:14
**higher**  17:13
**highlight**  8:25
**highlighted**  12:19
**hiring**  26:22
**hits**  10:9
**holes**  14:12
**hon**  1:24
**honor**  4:21 5:17 6:3
6:11 8:21 9:7,23
10:16 11:24 12:19
13:18 14:4 15:21
16:23 17:19 18:2

19:1 20:7 23:12
25:22 26:8,10,12
28:8 29:3,11 30:1
30:13 31:7,17 33:10
33:12,15
**hour** 5:23
**house** 11:7 12:5
**hugely** 11:18
**humans** 14:12
**hundred** 2:3 10:9

**i**

**idea** 17:22 18:17
26:14
**immediate** 16:19
**implicates** 11:19
**important** 7:8
15:18
**including** 23:1
**inconsistent** 24:10
**increase** 16:1
**incredibly** 12:6
**independently** 26:1
**indiscernible** 5:3,12
7:20 15:20 19:6
22:24 24:19,23
29:18 30:14 31:11
32:10 33:1,3,4,4
**insist** 17:25
**internal** 12:7 30:20
30:21,22
**investment** 6:20
**investor** 1:10
**irrelevant** 10:14,19
13:10,12 18:8,10
28:1
**issue** 9:3 18:2 20:25
21:24,24 22:3,10,19
22:20 23:10 25:6
26:19
**issues** 4:14 6:13
11:6 22:2 30:11
**items** 29:14

**j**

**jacqueline** 3:11
**jess** 4:2

**joe** 4:23
**joseph** 3:21
**judge** 1:25 6:1 7:8
8:22 20:2,9,11,12
20:18 21:2 23:4,13
25:25
**judgment** 19:18,19
21:3 22:2,8,9 23:24
24:2 25:3 26:15
28:7,23,24 30:25
31:16 32:20
**junk** 10:11 11:14
14:16

**k**

**kaye** 3:13
**keep** 33:13
**key** 6:4 10:8 14:15
**knife** 18:19
**knock** 29:6
**know** 4:12,15 10:15
10:24,24 11:4,5,8,9
11:10 14:11 15:9
17:20 22:18 23:12
23:25 24:15 25:16
25:21 26:21,22,23
27:4 28:10 31:23
32:25

**l**

**large** 13:6
**largest** 6:17
**law** 4:4 16:12,13
19:10 28:25 29:5
**lbsf** 6:25
**lead** 4:17 17:23
**leave** 28:22
**left** 7:10 9:12 22:25
**legal** 8:7 25:7
**lehman** 1:7,13 3:3
7:1 10:1 18:7
**length** 5:9
**letter** 12:20,23
13:17 18:5 19:11,15
19:17 30:5,6,18,19
32:18,23
**letting** 32:25

**level** 4:10 17:25
**liability** 2:4 28:16
**lines** 10:12
**liquid** 14:10
**little** 5:18 6:25 10:4
**llp** 3:2,13
**long** 5:13 17:9 32:4
**look** 7:15 12:5 17:6
19:21,22 20:17
27:12 30:24
**looked** 10:10 31:2
**looking** 7:17 19:3
**loss** 4:4 7:11
**lot** 7:7 9:14,15,20
9:22 10:12 16:4
26:23 27:6,20,23,25

**m**

**madlyn** 3:18
**making** 11:18,19
18:15 26:17 33:15
**manager** 14:7
**manges** 3:2
**march** 11:2 12:1
**marcus** 3:11 29:10
29:13,18,20,23
**marketplace** 16:11
**material** 22:3
**matter** 1:6 6:5
22:17 28:25 29:5
**matters** 25:18
**mean** 10:14 11:13
13:7 14:10,14 16:18
18:4,5,19 23:20
25:2,5,14,23 26:14
26:18 30:1 31:5
**means** 27:10
**mentioned** 19:1
**menus** 10:11
**meritorious** 24:3
**merits** 18:17
**miller** 3:8 5:17,21
5:24 6:2,7,10,15,17
6:20,24 7:3,17,25
8:2,9,11,13,16,19
8:21 9:20 11:15
12:20,23 13:1,3
14:3 15:5,6,21

16:12 17:4 18:2,22
19:1,5,7,21 20:5,17
21:13,23 22:11,18
25:9,16,19,21 26:12
27:5,6 28:8,10,13
28:16,18 29:3,17,19
29:24 30:8,12,17,21
31:20,23 32:3,10,12
32:16,20,24 33:2,5
33:10,14
**million** 6:18,21 7:4
7:4,9,9,10,11,13,23
9:13 10:4,4,5 14:15
15:10 24:19
**mind** 23:18 26:13
**mineola** 34:24
**minute** 6:8
**missed** 26:25
**misstates** 16:12
**modified** 13:11,14
13:19 14:3
**modify** 13:11
**money** 6:25 7:7
9:18,20 24:24
**months** 7:6
**morning** 13:18
**motion** 20:2,8,16
21:1,7 22:2,6 24:12
25:3 26:3 28:7,24
28:24 29:4 31:16
**motions** 20:23
21:22 23:7,10 24:2
26:16
**move** 6:3 28:23
**moving** 8:21
**multiplier** 7:12
**multiply** 10:3

**n**

**n** 3:1 4:1 34:1
**narrowing** 18:24
**naturally** 26:11
**nature** 18:16
**nearly** 13:21
**need** 8:18 15:15,16
16:4 23:1,2 28:2
29:10,17

**needs** 13:23 17:10
**new** 1:2,19,19 3:16
**news** 9:14,15
**nicole** 2:25 34:3,8
**non** 13:10,12,21,24
    13:25 16:14,16
    17:21
**normal** 15:23
**nots** 14:11
**number** 13:6,12
    18:9
**numbered** 25:17
**nw** 3:4
**ny** 3:16 34:24

**o**

**o** 1:23 4:1 34:1
**objection** 2:4
**obligated** 17:19
**obvious** 4:11
**obviously** 17:7
    25:12
**officer** 16:20
**oh** 27:12 30:22
**okay** 4:25 5:7,7,22
    5:24 6:2,9 7:21,21
    8:9,10,16,20 10:21
    13:2,19 16:24 19:5
    23:19 25:14,19,20
    28:4 29:20,24 30:16
    31:1,14 32:14,15,24
    33:2,7,8,9
**old** 34:22
**omnibus** 2:3
**opening** 11:19
**operations** 14:6,6,7
    14:7 16:23 17:10
**opportunity** 26:7
**original** 16:24
**originally** 12:4
**otchin** 3:21 4:23
    10:16,22 11:4,23
    12:1 32:7 33:12
**ought** 25:23
**outlines** 6:12
**outside** 10:24
**owed** 6:25

**p**

**p** 3:1,1 4:1
**page** 13:1 20:18
    25:15
**pages** 18:6 23:14,14
**paid** 7:3
**paper** 10:1
**papers** 7:22
**paragraph** 23:5
**part** 13:5 18:11
    22:15 25:10
**particular** 7:13
    10:1 11:20 12:15
**parties** 26:4 29:13
**pause** 18:1
**pay** 7:14
**payoff** 19:11,15
    30:5,5,18,19
**peck** 8:22 20:2,9,11
    20:18 21:2 23:13
    25:25
**peck's** 23:4
**peers** 15:10
**pending** 29:21,23
**people** 10:10 12:8
**people's** 12:11
**percent** 9:24 10:2
    10:14,18,19 13:9,21
    13:24,25 14:15,16
    14:17 15:24,25,25
    16:14,14,16 17:21
**perform** 16:8
**performance** 9:11
    9:11 11:20
**period** 5:13 7:13
    11:20
**ph** 5:14 6:1 14:6,6
    14:10 16:3,20 18:8
    18:23 21:1 25:15,15
    26:20,22 30:11
**piecemeal** 21:9
**pizza** 10:10
**plaintiff** 14:18
**plaintiffs** 1:11
**plan** 3:3 5:19 11:16
    19:16 22:9 29:6

**pleaded** 22:5
**pm** 1:22 33:17
**point** 5:2,8,9 7:8 8:5
    9:23 11:5 15:6,18
    19:23 20:24 31:15
**points** 6:4
**pops** 17:5
**potential** 19:2
**precise** 21:4
**predicting** 27:11
**preliminary** 10:9
**present** 14:5
**prevail** 20:3
**primoff** 3:18 4:23
    5:1,4 12:4,17 13:8
    13:17,20 14:23 15:2
    15:4 16:10,22 17:18
    18:13 20:1,6,9,11
    20:14 21:6,12,15,19
    23:12,17,19 24:18
    24:21,24 25:2 26:6
    26:10 27:19,22 28:1
    29:8 31:13 33:8
**principle** 19:13
    31:9
**prior** 9:5,6,6
**probably** 25:18
**problem** 14:3 17:2
    23:21
**problematic** 5:6,15
    12:13
**problems** 15:12
    16:7
**proceed** 26:11,11
**proceedings** 33:17
    34:4
**process** 11:7,11
**produce** 8:18 9:22
    11:16,21 16:13
    30:14
**produced** 7:11 10:8
    15:3 18:6,10
**producing** 11:14,22
**production** 15:6
    17:17
**productive** 4:13

**proffer** 27:1
**promptly** 31:24
    32:16
**proof** 9:4
**proposed** 30:3
**protection** 1:10
**protocol** 19:13
**prove** 14:22 21:16
**proving** 9:2
**pulled** 6:3 32:13
**punching** 14:12
**put** 22:1

**q**

**question** 32:3
**questioning** 17:24
**quick** 6:2
**quickly** 8:22 9:5

**r**

**r** 1:23 3:1 4:1 34:1
**ralph** 3:8 5:21
**ran** 12:12
**random** 10:16
**raw** 26:20
**reached** 10:23
**reaction** 16:19
**read** 4:9
**really** 4:10,15 18:19
    19:9 22:19,21
**reasons** 9:21 24:6,6
**recognized** 8:22
**reconvene** 32:2
**record** 5:21 6:11
    34:4
**recorded** 18:23
**reduce** 13:12
**refine** 11:15
**refund** 22:23
**reiterate** 4:16
**rejected** 28:10
**relate** 8:18
**relative** 18:9
**relevant** 19:9
**remove** 14:5
**requesting** 32:20
**reserving** 21:19

[resolution - terms]                                                          Page 6

**resolution**  4:14
**resolved**  23:1
**respect**  11:7 27:1
  29:13
**respectfully**  16:12
**responsible**  4:11
**responsive**  10:20
  13:10,13,22,25,25
  16:14,17 17:11,21
  17:23
**rest**  25:24
**retained**  12:9
**retaining**  23:3
**retrieve**  11:9
**retrieved**  10:17
**retrieves**  13:21
**retrieving**  17:20
**returned**  13:3
**returns**  13:6
**reveal**  19:14
**review**  11:6 17:5,20
  23:16 24:25 26:7
  31:19
**reviewing**  27:20,22
  27:25
**ride**  7:6
**right**  4:19,20 6:7,19
  6:23 7:2 8:20 12:3
  12:25 13:2,5 18:24
  21:13,14,25 22:5,10
  22:11,17 24:25
  25:21 27:8,14 28:12
  28:15 29:2,3,9,9
  30:7,10 31:25 32:6
  32:6,11,13,13,19
  33:6
**risk**  26:25
**river's**  6:1
**road**  34:22
**rule**  20:19 21:18
**ruled**  21:2,3,15
**run**  11:9 12:9

**s**

**s**  3:1 4:1
**sample**  27:16
**sampled**  10:16,18
  10:22 13:8 27:12

**sampling**  10:18
  16:16 27:1,2,3,6,9
  27:10,13 28:2,3
**saying**  7:9 15:9
  21:23 22:1,2,9
  28:13,23,25 31:5,15
  32:10
**says**  9:10 16:23
  22:4 26:3 29:5
**sbs**  7:22
**scalpel**  18:19 19:1,2
  19:3,8,24,25 26:24
**scc**  1:3,4
**schedule**  32:25 33:3
**scholer**  3:13
**scope**  7:23
**screen**  17:6
**search**  4:18,19 5:5
  5:10,12,14 10:7,8
  10:17,23 11:1,5,13
  11:15 12:2,5 13:7
  13:20,21 14:3,12,16
  15:13 16:24 17:22
  18:21 24:9
**searches**  12:10,12
**second**  20:17
**securities**  1:10
**see**  4:2 13:11 30:4
**seeing**  7:18
**seek**  16:2,10
**seeking**  7:12 8:4,14
  8:17 15:22 19:17
  32:18
**segment**  27:11
**selected**  23:14
**send**  23:15 32:18
**sense**  26:12
**sent**  12:20,23 13:17
  30:5,13,14
**servers**  12:11
**set**  5:17 13:14 14:1
  17:20 30:8
**sets**  30:15
**settlement**  6:22
**seven**  5:11 14:17
  15:25

**shared**  12:11
**shelley**  1:24
**show**  11:21 15:7
**sign**  30:10
**signature**  10:12
  16:23 17:14
**significance**  8:5
**simply**  27:15
**sitting**  7:18
**situations**  23:22
**skeptic**  27:2
**skepticism**  26:15
**skip**  9:5
**smaller**  27:11
**solely**  2:4
**somebody**  16:22
**somewhat**  18:16
**sorry**  4:3
**sort**  5:17
**sounds**  21:5
**southern**  1:2
**spanish**  2:1 3:14 9:1
  10:6,23 11:7 12:7
  18:6 20:21
**speaker**  4:2,5,6,21
  5:16 7:16 12:18
  29:22
**spend**  9:18
**stack**  17:10
**standard**  20:16,21
**starting**  12:1
**starved**  16:6
**stated**  22:6
**states**  1:1
**statistical**  27:10
**stayed**  29:20
**step**  13:19,20 18:22
  31:3
**sticking**  8:5
**stop**  5:23
**street**  3:4,15
**stress**  18:3
**stuff**  12:10 17:5
  19:23
**subject**  5:4
**suffice**  32:21

**sufficiency**  20:13,14
**suggest**  20:24 23:9
**suggested**  24:14
**suggesting**  27:16
**suggestion**  24:12
**suite**  3:5 34:23
**summary**  19:18,19
  21:2 22:2,8,9 23:24
  24:1 25:3 26:15
  28:7,23,24 30:24
  31:16 32:20
**supervised**  17:5
**supplemental**  6:11
**supposed**  32:18
**sure**  6:16 9:19
  24:20,21 26:9 28:15
  31:6 33:16,16
**survived**  22:6
**swap**  6:22 7:10 8:1
**sweeping**  11:18

**t**

**t**  34:1,1
**tab**  6:11 7:15 9:5,7
  9:25 10:7 12:18
  20:17
**table**  5:18
**take**  4:10 14:5
  22:11,13,22 32:4
**talk**  20:6 29:16
**talked**  21:8
**talking**  10:4 14:16
  14:17 17:11 27:4
**technical**  11:6,10
**technique**  27:4
**tell**  11:14
**ten**  5:11 7:12
**tentatively**  5:10
**term**  10:7,8,17,23
  12:14,16 13:3,7,11
  13:14 14:1,2,4,16
**termination**  8:1
**terms**  4:11,19,19
  5:2,10,12,14 11:2,5
  11:10 12:2,6,14
  13:19 14:4,4,12
  15:13 16:18,21
  17:16,22 18:23 24:9

**[thank - zap]**                                                                                    Page 7

**thank**  4:5,6,7 21:5
  25:8 33:10,11,12
**theme**  24:10
**theory**  15:19 16:7
  18:16
**thing**  4:16 7:21
  17:19 22:7 25:2
  29:10 33:6
**things**  6:3,10 9:17
  14:5 25:11 26:25
**think**  5:18 6:4 14:1
  14:19 15:1,13 16:3
  16:12 18:10 19:10
  19:23 21:2 22:21,22
  23:25 24:2,13 25:11
  25:12,23,25 26:12
  26:13,18 28:6 29:10
  29:14,25 30:23,23
  31:6,16 32:7,13
**third**  9:25
**thought**  12:4 23:5
**thousand**  10:9
**three**  2:3 29:25
**threshold**  21:24
  23:10 25:6
**time**  5:9,13,20 7:13
  7:18 9:2 11:3,21
  12:12 24:2 29:16
  33:15
**times**  18:7
**tiny**  22:19
**today**  4:7 5:20
  12:21,24 18:5 20:19
**told**  27:15
**transcribed**  2:25
**transcript**  23:13,16
  23:16 25:1,24 34:3
**trash**  17:8
**trial**  22:7
**trouble**  9:3
**true**  14:9 34:4
**try**  4:10,13 14:25
  22:24
**trying**  9:16
**turn**  26:14
**turned**  5:5 12:6,13

**twenty**  2:3
**two**  5:9 13:19,20
  15:25 25:9 29:25
  32:7,9,12,14,17
**typically**  25:3

**u**

**u.s.**  1:17,25
**undercuts**  25:25
**understand**  4:18
  9:16 13:6 15:7,15
  15:16 17:15 18:20
  22:14 27:10,18
**understood**  17:15
  29:8
**undisputed**  29:1
**unearned**  22:23
**unfortunately**  5:22
**unidentified**  4:2,5,6
  4:21 5:16 7:16
  12:18 29:22
**united**  1:1
**universe**  14:24,25
**unreasonable**  14:20

**v**

**v**  1:12
**v.p.**  16:23
**valid**  27:10,13,24
**validly**  27:9
**valuable**  14:5
**value**  14:9
**vendor**  10:24 11:8
  12:9,10 13:10
**veritext**  34:21
**versus**  11:8
**viable**  14:10,10
**vsi**  17:1

**w**

**wait**  31:9
**waive**  26:4
**waived**  25:7
**waiver**  19:9,16
  20:19 21:18,25
  22:10 23:5 29:14
**wallow**  26:22
**want**  4:10,13 8:6
  10:13 18:3 23:15,22

  24:22,24 26:11
**wanted**  31:8
**wants**  19:24 22:1
  26:10
**warranted**  17:24
**washington**  3:6
**way**  10:8 17:2 22:18
  26:13,24
**we've**  19:7 26:4
  29:15 30:1 31:2,13
  32:13
**weeks**  10:25 29:25
  29:25 32:7,9,12,14
  32:17
**weigh**  16:17
**weight**  24:13
**weil**  3:2
**west**  3:15
**whiz**  9:14,22
**withdrawn**  16:2
**withdrew**  15:22
**woolverton**  3:10
  17:4
**work**  26:16
**worked**  13:10
**working**  10:23
**worth**  7:6
**written**  25:14
**wrong**  5:14

**x**

**x**  1:5,9,15 29:5

**y**

**yawn**  2:25 34:3,8
**yeah**  4:22 6:24
  11:25 12:22 27:19
  27:21 29:9
**yield**  14:15 17:13
**york**  1:2,19,19 3:16

**z**

**zap**  17:7

## **Exhibit 8**

Excerpts from Spanish Broadcasting Form 10-K
For the Fiscal Year Ended December 31, 2008

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☑  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the fiscal year ended December 31, 2008**

   Or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the transition period from            to**

   **Commission file number 000-27823**



# Spanish Broadcasting System, Inc.
*(Exact name of registrant as specified in its charter)*

| **Delaware** | **13-3827791** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**2601 South Bayshore Drive, PH II**
**Coconut Grove, Florida 33133**
*(Address of principal executive offices and zip code)*

Registrant's telephone number, including area code: **(305) 441-6901**

Former name, former address and former fiscal year, if changed since last report: **None**

Securities registered pursuant to Section 12(b) of the Act: **None**

Securities registered pursuant to Section 12(g) of the Act:

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| **Class A common stock, par value $0.0001 per share** | **The NASDAQ Global Market** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required

to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

   Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

## Table of Contents

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 21 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 33 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 35 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 36 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 8. | Financial Statements and Supplementary Data | 48 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 48 |
| Item 9A(T). | Controls and Procedures | 49 |
| Item 9B. | Other Information | 49 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 50 |
| Item 11. | Executive Compensation | 50 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 50 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 50 |
| Item 14. | Principal Accountant Fees and Services | 50 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 50 |
| EX-21.1 | | |
| EX-23.1 | | |
| EX-31.(I)1 | | |
| EX-31.(I)2 | | |
| EX-32.1 | | |
| EX-32.2 | | |

**SPANISH BROADCASTING SYSTEM, INC.**
**AND SUBSIDIARIES**
Consolidated Balance Sheets
December 31, 2008 and 2007
(In thousands, except share data)

|  | 2008 | 2007 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $  32,852 | 61,122 |
| Receivables: | | |
| Trade | 29,083 | 38,934 |
| Barter | 172 | 524 |
|  | 29,255 | 39,458 |
| Less allowance for doubtful accounts | 1,675 | 3,623 |
| Net receivables | 27,580 | 35,835 |
| Prepaid expenses and other current assets | 4,426 | 4,515 |
| Total current assets | 64,858 | 101,472 |
| Property and equipment, net | 52,411 | 43,739 |
| FCC broadcasting licenses | 331,224 | 749,864 |
| Goodwill | 32,806 | 32,806 |
| Other intangible assets, net of accumulated amortization of $178 in 2008 and $142 in 2007 | 1,256 | 1,292 |
| Deferred financing costs, net of accumulated amortization of $3,956 in 2008 and $2,860 in 2007 | 3,646 | 4,803 |
| Other assets | 3,066 | 2,153 |
| Total assets | $ 489,267 | 936,129 |
| **Liabilities and Stockholders' (Deficit) Equity** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $  15,428 | 19,640 |
| Accrued interest | 486 | 246 |
| Unearned revenue | 560 | 4,015 |
| Deferred commitment fee | — | 300 |
| Other liabilities | 66 | 84 |
| Current portion of the senior credit facility term loan due 2012 | 3,250 | 3,250 |
| Current portion of other long-term debt | 438 | 430 |
| Series B cumulative exchangeable redeemable preferred stock dividends payable | 2,068 | 2,014 |
| Total current liabilities | 22,296 | 29,979 |
| Unearned revenue, less current portion | — | 305 |
| Other liabilities, less current portion | 139 | 187 |
| Derivative instruments | 12,541 | 3,582 |
| Senior credit facility revolver due 2010 | 15,000 | — |
| Senior credit facility term loan due 2012, less current portion | 309,563 | 312,813 |
| Other long-term debt, less current portion | 7,052 | 7,490 |
| Non-interest bearing promissory note payable, net of unamortized discount of $1,410 in 2007 | — | 17,090 |
| Deferred income taxes | 68,082 | 170,148 |
| Total liabilities | 434,673 | 541,594 |

Commitments and contingencies (notes 12, 14, and 16)

Cumulative exchangeable redeemable preferred stock:

| | | |
|---|---:|---:|
| 10 $^3/_4$% Series B cumulative exchangeable redeemable preferred stock, $0.01 par value, liquidation value $1,000 per share. Authorized 280,000 shares; 92,349 and 89,932 shares issued and outstanding at December 31, 2008 and 2007, respectively | 92,349 | 89,932 |

Stockholders' (deficit) equity:

| | | |
|---|---:|---:|
| Series C convertible preferred stock, $0.01 par value and liquidation value. Authorized 600,000 shares; 380,000 shares issued and outstanding at December 31, 2008 and 2007, respectively | 4 | 4 |
| Class A common stock, 0.0001 par value. Authorized 100,000,000 shares; 41,445,222 and 40,777,805 shares issued and outstanding at December 31, 2008 and 2007, respectively | 4 | 4 |
| Class B common stock, 0.0001 par value. Authorized 50,000,000 shares; 23,403,500 and 24,003,500 shares issued and outstanding at December 31, 2008 and 2007, respectively | 2 | 2 |
| Additional paid-in capital | 524,722 | 524,030 |
| Accumulated other comprehensive loss | (8,187) | (3,582) |
| Accumulated deficit | (554,300) | (215,855) |
| Total stockholders' (deficit) equity | (37,755) | 304,603 |
| Total liabilities and stockholder's (deficit) equity | $ 489,267 | 936,129 |

See accompanying notes to consolidated financial statements.

53

**<u>Exhibit 9</u>**

Excerpts of Spanish Broadcasting Form 10-Q
For the Quarterly Period Ended September 30, 2008

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-Q

**(Mark One)**

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2008

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from        to

**Commission file number 33-82114**



# Spanish Broadcasting System, Inc.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3827791** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

_____

**2601 South Bayshore Drive, PH II**
**Coconut Grove, Florida 33133**
*(Address of principal executive offices) (Zip Code)*

**(305) 441-6901**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting"

company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐    Accelerated filer ☑        Non-accelerated filer ☐        Smaller reporting company ☑
(Do not check if a smaller reporting company)

Indicate by a check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐ No ☑

As of November 7, 2008, 41,445,222 shares of Class A common stock, par value $0.0001 per share, 23,403,500 shares of Class B common stock, par value $0.0001 per share and 380,000 shares of Series C convertible preferred stock, $0.01 par value per share, which are convertible into 7,600,000 shares of Class A common stock, were outstanding.

# SPANISH BROADCASTING SYSTEM, INC.

## INDEX

|  | Page |
|---|---|
| **PART I. FINANCIAL INFORMATION** | |
| ITEM 1. Financial Statements — Unaudited | 4 |
| Unaudited Condensed Consolidated Balance Sheets as of September 30, 2008 and December 31, 2007 | 4 |
| Unaudited Condensed Consolidated Statements of Operations for the Three- and Nine-Months Ended September 30, 2008 and 2007 | 5 |
| Unaudited Condensed Consolidated Statement of Changes in Stockholders' (Deficit) Equity and Comprehensive Loss for the Nine-Months Ended September 30, 2008 | 6 |
| Unaudited Condensed Consolidated Statements of Cash Flows for the Nine-Months Ended September 30, 2008 and 2007 | 7 |
| Notes to Unaudited Condensed Consolidated Financial Statements | 8 |
| ITEM 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| ITEM 3. Quantitative and Qualitative Disclosures About Market Risk | 26 |
| ITEM 4. Controls and Procedures | 26 |
| **PART II. OTHER INFORMATION** | |
| ITEM 1. Legal Proceedings | 27 |
| ITEM 1A. Risk Factors | 27 |
| ITEM 5. Other Information | 27 |
| ITEM 6. Exhibits | 28 |
| EX-31.1 | |
| EX-31.2 | |
| EX-32.1 | |
| EX-32.2 | |

Table of Contents

## 12. Subsequent Events

### Draw Down of Revolving Credit Facility

On October 3, 2008, we requested to draw down $25.0 million from our $25.0 million revolver facility under the senior secured credit facility agreement, dated as of June 10, 2005, among us, Merrill Lynch, Pierce Fenner & Smith, Incorporated, as syndication agent, Wachovia Bank, National Association, as documentation agent, Lehman Commercial Paper Inc. ("Lehman"), as administrative agent, and various lenders from time to time. On October 8, 2008, we only received an aggregate of $15.0 million of the $25.0 million revolver as a result of Lehman's failure to fund its $10.0 million portion of the facility due to its bankruptcy filing.

The $15.0 million drawn on October 8, 2008 currently bears interest at a rate equal to 1.0% over the base prime rate unless converted to a LIBOR-based term rate. As of October 8, 2008, the applicable margin of the revolving credit facility was (i) 2.00% per annum for Eurodollar loans and (ii) 1.00% per annum for base rate loans.

On October 24, 2008, the draw down on the revolver was used, with other funds, to repay the non-interest bearing secured promissory note of $18.5 million. Please refer to the "Early Extinguishment of the $18.5 million Non-interest Bearing Promissory Note" section below for further details.

We are exploring options to replace Lehman's commitment within the revolver, but we cannot guarantee that we will be able to obtain such replacement from others. However, we believe that we have sufficient liquidity to conduct our normal operations and do not believe that the potential reduction in available capacity under this revolver will have a material impact on our short-term liquidity.

### Dividend Payment on the Series B Preferred Stock

Under the terms of our Series B preferred stock, we are required to pay dividends at a rate of 10 $^3/_4$ % per year of the $1,000 liquidation preference per share of Series B preferred stock. From October 30, 2003 to October 15, 2008, we had the option to pay these dividends in either cash or additional shares of Series B preferred stock. On October 15, 2008, we paid our quarterly dividend in additional shares of our Series B preferred stock. After October 15, 2008, we are required to pay the quarterly dividends on our Series B preferred stock in cash.

### NASDAQ Delisting Letter and Temporary Postponement

On October 22, 2008, we received a notification letter (the "Letter") from The Nasdaq Stock Market ("NASDAQ"), notifying us that NASDAQ has suspended, for a three-month period, effective October 16, 2008, the enforcement of the rule requiring a minimum bid price and market value of publicly held shares (the "Rule"). NASDAQ has said that it will not take any action to delist any security for these concerns during the suspension period. NASDAQ has stated that, given the current extraordinary market conditions, this suspension will remain in effect through Friday, January 16, 2009 and that the Rule will be reinstated on Monday, January 19, 2009, and the first relevant trade date will be Tuesday, January 20, 2009.

We previously received a Staff Deficiency Letter from NASDAQ on August 20, 2008 indicating that the minimum bid price of our common stock had fallen below $1.00 for 30 consecutive trading days, and that it was therefore not in compliance with NASDAQ Marketplace Rule 4450(b). The notice further provided that in accordance with the NASDAQ Marketplace Rules, we would be provided 180 calendar days, or until February 17, 2009, to regain compliance with the minimum bid price requirement.

We had 124 calendar days remaining in our compliance period as of October 16, 2008, the effective date of NASDAQ's suspension. Upon reinstatement of the rules on January 19, 2009, we will have the same number of days remaining, or until May 26, 2009, to regain compliance. We may regain compliance, either during the suspension or during the compliance period resuming after the suspension, by achieving a $1.00 closing bid price for a minimum of 10 consecutive trading days.

During this interim period, our common stock is expected to continue to trade on The NASDAQ Global Market. If compliance with Marketplace Rule 4450(b) cannot be demonstrated by May 26, 2009, our common stock will be subject to delisting from The NASDAQ Global Market.

## **Exhibit B**

Claim No. 67707
of Spanish Broadcasting System, Inc.

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
| Lehman Brothers Holdings Inc., et al. | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| Lehman Commercial Paper Inc. | 08-13900 |

# PROOF OF CLAIM

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.

08-13555 (JMP)          0000067707

**THIS SPACE IS FOR COURT USE ONLY**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)
Spanish Broadcasting System, Inc.
2601 S. Bayshore Dr., PH2
Coconut Grove, FL 33133
Attn: Joseph A. Garcia, Chief Financial Officer
cc: William Wallace, Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Telephone number: 786-470-1602          Email Address:

[✓] Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** 15941
*(If known)*

Filed on: Sept. 18, 2009

Name and address where payment should be sent (if different from above)

[ ] Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

[ ] Check this box if you are the debtor or trustee in this case.

Telephone number:          Email Address:

1. **Amount of Claim as of Date Case Filed:** $ See Attachment.

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

[ ] Check this box if all or part of your claim is based on a Derivative Contract.*
[ ] Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

[ ] Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** First Lien Credit Agreement
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   3a. **Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff: [ ] Real Estate   [ ] Motor Vehicle   [ ] Other
   Describe: _____
   Value of Property: $_____ Annual Interest Rate _____%
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $_____ Basis for perfection: _____
   **Amount of Secured Claim:** $_____ **Amount Unsecured:** $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

[ ] Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

[ ] Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

[ ] Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

[ ] Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

[ ] Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

[ ] Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain:

**FOR COURT USE ONLY**

**FILED / RECEIVED**

NOV 0 3 2011

EPIQ BANKRUPTCY SOLUTIONS, LLC

Date: 11/3/2011

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

## ___DEFINITIONS___

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
**Lehman Brothers Holdings Claims Processing**
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

## ___INFORMATION___

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| LEHMAN COMMERCIAL PAPER INC., | : | Case No. 08-13900 |
| *et al.* | : |  |
|  | : | Jointly Administered |
| Debtors. | : |  |

---------------------------------------------------------------x

## ATTACHMENT TO AMENDED PROOF OF CLAIM OF
## SPANISH BROADCASTING SYSTEM, INC.

　　1.　　Spanish Broadcasting System, Inc. ("SBS" or "Claimant") hereby files this amended proof of claim (the "Amended Claim") against Lehman Commercial Paper Inc. (the "Debtor") seeking payment on funds guaranteed under that certain First Lien Credit Agreement, dated as of June 10, 2005, among Claimant, Merrill Lynch, Pierce Fenner & Smith, Incorporated, as syndication agent, Wachovia Bank, National Association, as documentation agent, Lehman Commercial Paper Inc., as administrative agent, and various lenders from time to time party thereto (the "First Lien Credit Agreement"), attached hereto as **Exhibit A**. On October 3, 2008, Claimant requested a draw down of $25.0 million from its $25.0 million revolving facility under the First Lien Credit Agreement. On October 8, 2008, Claimant only received $15.0 million of the $25.0 million requested as a result of the Debtor's failure to fund its $10.0 million portion of the revolving facility. The Amended Claim is for all damages incurred by the Claimant as a result of the Debtor's failure to fund, as detailed on **Exhibit B**.

　　2.　　Claimant expressly reserves the right to amend or supplement this Amended Claim for any purpose whatsoever, including but not limited to the purposes of increasing the amount of its claim hereunder, fixing or liquidating any claims stated herein, specifying claims for ongoing obligations of the Debtor that are not expressly described herein, asserting new claims, and supplementing this Amended Claim with any relevant documents.

　　3.　　Claimant may have post-petition administrative expense claims against the Debtor. By filing this Amended Claim, Claimant does not waive any of its post-petition claims against the Debtor, and expressly reserves all of its rights in connection with such claims.

　　4.　　To the best of Claimant's knowledge, no judgment has been rendered on the claims set forth herein.

　　5.　　To the best of Claimant's knowledge, all payments made by the Debtor in connection with the claims asserted herein have been credited and deducted for the purposes of making this Amended Claim.

6.      Claimant does not waive any right of action that it has or may have against the Debtor or any other person or entity which may be liable for all or any part of the claims claimed herein.

7.      The filing of this Amended Claim is not (a) a waiver of the right to withdraw the reference with respect to the subject matter of these claims; (b) a waiver of Claimant's right to trial by jury in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as core proceedings pursuant to 11 U.S.C. §157(b)(2), and whether such jury right is pursuant to statute or the United States Constitution; or (c) a waiver or release of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge.

8.      In filing this Amended Claim, Claimant does not submit itself to the jurisdiction of this Court for any purpose other than with respect to this Amended Claim.

9.      The filing of this Amended Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present or future defaults or events of default under any agreements between Claimant and the Debtor.

10.     All notices and communications concerning this Amended Claim should be sent to the addresses listed on the proof of claim form.

# KAYE SCHOLER LLP

Laurie Schwall
212.836.7019
Lschwall@kayescholer.com

425 Park Avenue
New York, New York 10022-3598
212.836.8000
Fax 212.836.6462
www.kayescholer.com

<u>Hand Delivery</u>

November 3, 2011

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, New York  10017

Re:     *In re Lehman Brothers Holdings Inc., et al.*, 08-13555 (JMP)
         *In re Lehman Commercial Paper Inc.*, 08-13900 (JMP)

Dear  Sir or Madam:

    Enclosed please find an original and one file copy version of the Amended Proof of
Claim in respect of Spanish Broadcasting System, Inc's certain claim against Lehman
Commercial Paper, Inc.

Very truly yours,

Laurie Schwall
Paralegal

60480198.DOCX

CHICAGO · FRANKFURT · LONDON · LOS ANGELES · NEW YORK · PALO ALTO · SHANGHAI · WASHINGTON, DC · WEST PALM BEACH

**H
A
N
D

D
E
L
I
V
E
R
Y**

```
┌─────────────────────────┐
│    FILED / RECEIVED     │
│  ┌───────────────────┐  │
│  │   NOV 0 3 2011     │  │
│  └───────────────────┘  │
│ EPIQ BANKRUPTCY SOLUTIONS, LLC │
└─────────────────────────┘
```

_L. Rodriguez_
**RECEIVED BY:**

**DATE**

_5:12pm_
**TIME**

**<u>Exhibit C</u>**

Credit Agreement
(attached as Exhibit A to Claim No. 67707)

$350,000,000

# FIRST LIEN CREDIT AGREEMENT

AMONG

SPANISH BROADCASTING SYSTEM, INC.,
AS BORROWER,
THE LENDERS
FROM TIME TO TIME PARTY HERETO,

AND

MERRILL LYNCH, PIERCE FENNER & SMITH, INCORPORATED
AS SYNDICATION AGENT,

AND

WACHOVIA BANK, NATIONAL ASSOCIATION
AS DOCUMENTATION AGENT,

AND

LEHMAN COMMERCIAL PAPER INC.,
AS ADMINISTRATIVE AGENT
DATED AS OF JUNE 10, 2005

---

LEHMAN BROTHERS INC.
LEAD ARRANGER AND SOLE MANAGER,

AND

LEHMAN BROTHERS INC.,
MERRILL LYNCH, PIERCE FENNER & SMITH, INCORPORATED,
AND

WACHOVIA CAPITAL MARKETS, LLC
AS ARRANGERS

9380120.19.BUSINESS

# TABLE OF CONTENTS

**Page**

SECTION 1.     DEFINITIONS .................................................................................. 1
   1.1.   Defined Terms .......................................................................... 1
   1.2.   Other Definitional Provisions ................................................. 31

SECTION 2.     AMOUNT AND TERMS OF COMMITMENTS ......................................... 31
   2.1.   Term Loan Commitments ....................................................... 31
   2.2.   Procedure for Term Loan Borrowing ..................................... 31
   2.3.   Repayment of Term Loans ...................................................... 32
   2.4.   Revolving Credit Commitments ............................................. 32
   2.5.   Procedure for Revolving Credit Borrowing ........................... 32
   2.6.   Swing Line Commitment ........................................................ 33
   2.7.   Procedure for Swing Line Borrowing; Refunding of Swing Line Loans ............ 33
   2.8.   Repayment of Loans; Evidence of Indebtedness .................... 35
   2.9.   Commitment Fees, etc ........................................................... 36
   2.10.  Termination or Reduction of Revolving Credit Commitments ............ 36
   2.11.  Optional Prepayments ........................................................... 36
   2.12.  Mandatory Prepayments and Commitment Reductions .......... 37
   2.13.  Conversion and Continuation Options .................................... 38
   2.14.  Minimum Amounts and Maximum Number of Eurodollar Tranches ................. 39
   2.15.  Interest Rates and Payment Dates .......................................... 39
   2.16.  Computation of Interest and Fees .......................................... 40
   2.17.  Inability to Determine Interest Rate ....................................... 40
   2.18.  Pro Rata Treatment and Payments ......................................... 41
   2.19.  Requirements of Law ............................................................. 42
   2.20.  Taxes ...................................................................................... 44
   2.21.  Indemnity ............................................................................... 46
   2.22.  Illegality ................................................................................ 46
   2.23.  Change of Lending Office ...................................................... 47
   2.24.  Replacement of Lenders under Certain Circumstances .......... 47

SECTION 3.     LETTERS OF CREDIT .................................................................... 47
   3.1.   L/C Commitment .................................................................... 47

# TABLE OF CONTENTS
(continued)

Page

3.2. Procedure for Issuance of Letter of Credit........................................................... 48

3.3. Fees and Other Charges ............................................................................ 48

3.4. L/C Participations ..................................................................................... 49

3.5. Reimbursement Obligation of the Borrower.............................................. 50

3.6. Obligations Absolute ................................................................................ 50

3.7. Letter of Credit Payments ......................................................................... 51

3.8. Applications .............................................................................................. 51

SECTION 4.   REPRESENTATIONS AND WARRANTIES................................. 51

4.1. Financial Condition................................................................................... 51

4.2. No Change ................................................................................................. 52

4.3. Existence; Compliance with Law ............................................................. 52

4.4. Power; Authorization; Enforceable Obligations....................................... 52

4.5. No Legal Bar............................................................................................. 53

4.6. No Material Litigation .............................................................................. 53

4.7. No Default................................................................................................. 53

4.8. Ownership of Property; Liens................................................................... 53

4.9. Intellectual Property.................................................................................. 53

4.10. Taxes ........................................................................................................ 53

4.11. Federal Regulations .................................................................................. 54

4.12. Labor Matters............................................................................................ 54

4.13. ERISA ....................................................................................................... 54

4.14. Investment Company Act; Other Regulations........................................... 55

4.15. Subsidiaries............................................................................................... 55

4.16. Use of Proceeds........................................................................................ 55

4.17. Environmental Matters.............................................................................. 55

4.18. Accuracy of Information, etc .................................................................... 56

4.19. Security Documents .................................................................................. 57

4.20. Solvency.................................................................................................... 57

4.21. Insurance ................................................................................................... 57

4.22. Permits and Licenses................................................................................. 58

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| SECTION 5. | CONDITIONS PRECEDENT | 59 |
| 5.1. | Conditions to Initial Extension of Credit | 59 |
| 5.2. | Conditions to Each Extension of Credit | 61 |
| SECTION 6. | AFFIRMATIVE COVENANTS | 62 |
| 6.1. | Financial Statements | 62 |
| 6.2. | Certificates; Other Information | 62 |
| 6.3. | Conduct of Business and Maintenance of Existence, FCC Licenses, etc | 64 |
| 6.4. | Maintenance of Property; Insurance | 64 |
| 6.5. | Inspection of Property; Books and Records; Discussions | 65 |
| 6.6. | Notices | 65 |
| 6.7. | Environmental Laws | 66 |
| 6.8. | Broadcast License Subsidiaries | 66 |
| 6.9. | Additional Collateral, etc | 67 |
| 6.10. | Use of Proceeds | 69 |
| 6.11. | Further Assurances | 69 |
| 6.12. | Interest Rate Protection | 69 |
| 6.13. | Bond Redemption | 69 |
| 6.14. | Puerto Rico Legal Opinion | 69 |
| SECTION 7. | NEGATIVE COVENANTS | 70 |
| 7.1. | Merger, Consolidation, or Sale of Assets | 70 |
| 7.2. | Incurrence of Indebtedness and Issuance of Preferred Stock | 71 |
| 7.3. | Liens | 74 |
| 7.4. | Restricted Payments | 74 |
| 7.5. | Dividend and Other Payment Restrictions Affecting Subsidiaries | 77 |
| 7.6. | Asset Sales | 77 |
| 7.7. | Transactions with Affiliates | 79 |
| 7.8. | Limitation on Sale and Leaseback Transactions | 79 |
| 7.9. | Limitation on Optional Prepayment of Second Lien Term Loan Obligations | 80 |

## TABLE OF CONTENTS
### (continued)

Page

SECTION 8.       EVENTS OF DEFAULT ........................................................................... 80
SECTION 9.       THE AGENTS AND ARRANGERS ........................................................... 83
    9.1.       Appointment ......................................................................................... 83
    9.2.       Delegation of Duties ............................................................................ 84
    9.3.       Exculpatory Provisions ........................................................................ 84
    9.4.       Reliance by Agents .............................................................................. 84
    9.5.       Notice of Default.................................................................................. 85
    9.6.       Non-Reliance on Agents and Other Lenders ....................................... 85
    9.7.       Indemnification.................................................................................... 85
    9.8.       Arrangers and Agents in Their Individual Capacities.......................... 86
    9.9.       Successor Administrative Agent........................................................... 86
    9.10.      Authorization to Release Liens............................................................ 87
    9.11.      The Arrangers, Syndication Agent and Documentation Agent ........... 87
SECTION 10.      MISCELLANEOUS ................................................................................ 87
    10.1.      Amendments and Waivers.................................................................... 87
    10.2.      Notices ................................................................................................. 89
    10.3.      No Waiver; Cumulative Remedies ....................................................... 90
    10.4.      Survival of Representations and Warranties......................................... 90
    10.5.      Payment of Expenses ........................................................................... 90
    10.6.      Successors and Assigns; Participations and Assignments.................... 91
    10.7.      Adjustments; Set-off............................................................................ 94
    10.8.      Counterparts......................................................................................... 94
    10.9.      Severability .......................................................................................... 95
    10.10.     Integration............................................................................................ 95
    10.11.     GOVERNING LAW.............................................................................. 95
    10.12.     Submission To Jurisdiction; Waivers .................................................. 95
    10.13.     Acknowledgments................................................................................ 96
    10.14.     Confidentiality ..................................................................................... 96
    10.15.     Release of Collateral and Guarantee Obligations ............................... 96
    10.16.     Accounting Changes ............................................................................ 97

**TABLE OF CONTENTS**
(continued)

Page

10.17.  Delivery of Lender Addenda ................................................................ 97

10.18.  Construction.......................................................................................... 97

10.19.  WAIVERS OF JURY TRIAL ............................................................... 97

10.20.  Designated Senior Debt ....................................................................... 97

SCHEDULES:

4.3        Compliance With Law
4.6        Litigation
4.9        Intellectual Property
4.10       Taxes
4.15       Subsidiaries
4.17       Environmental
4.19       UCC Filing Jurisdictions

ANNEXES

Annex A    Pricing Grid

EXHIBITS

A          Form of Compliance and Pricing Certificate
B          Form of Guarantee and Collateral Agreement
C          Form of Lender Addendum
D          Form of Notice of Borrowing
E          Form of Solvency Certificate
F-I        Form of Term Note
F-2        Form of Revolving Credit Note
F-3        Form of Swing Line Note
G          Form of Exemption Certificate
H          Form of Closing Certificate
I          Form of Assignment and Acceptance

9380120.19.BUSINESS

FIRST LIEN CREDIT AGREEMENT, dated as of June 10, 2005, among SPANISH BROADCASTING SYSTEM, INC., a Delaware corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time party to this Agreement (the "Lenders"), MERRILL LYNCH, PIERCE FENNER & SMITH, INCORPORATED, as syndication agent (in such capacity, the "Syndication Agent"), WACHOVIA BANK, NATIONAL ASSOCIATION, as documentation agent (in such capacity, the "Documentation Agent") and LEHMAN COMMERCIAL PAPER INC., as administrative agent (in such capacity, the "Administrative Agent").

WITNESSETH:

WHEREAS, the Borrower has requested that the Lenders make (a) a term loan credit facility available to the Borrower in order to (i) repay Borrower's obligations under the Credit Agreement dated as of October 30, 2003 among Borrower, the lenders from time to time party thereto, Merrill Lynch, Pierce Fenner & Smith Incorporated, as documentation agent, Lehman Commercial Paper Inc., as syndication agent and as administration agent (the "Existing Credit Agreement"), (ii) finance (along with amounts borrowed under the Second Lien Term Loan Agreement (as defined below)) a portion of the redemption of all of the Senior Subordinated Notes (as defined below) and to pay all accrued interest thereon and call or other premiums payable in connection with the redemption of the Senior Subordinated Notes, and (iii) pay costs and expenses incurred in connection with the Facilities (as defined below) and (b) a revolving credit facility available to the Borrower for the working capital needs and general corporate purposes of the Borrower and its Subsidiaries (collectively, the "Refinancing"); and

WHEREAS, the Lenders are willing to make such credit facilities available upon and subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

SECTION 1. DEFINITIONS

1.1.    Defined Terms. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Acquired Debt": with respect to any specified Person, (i) Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Subsidiary of such specified Person, including, without limitation, Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Subsidiary of such specified Person and (ii) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Acquisition Indebtedness": Indebtedness incurred by the Borrower or by a Restricted Subsidiary in connection with or, the proceeds of which are used for, the acquisition of a Permitted Business and related facilities and assets or for the construction of a facility.

9380120.19.BUSINESS

"Administrative Agent": as defined in the preamble hereto.

"Affiliate": of any specified Person means any other Person which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; provided that (a) beneficial ownership of at least 10% of the Voting Stock of a Person shall be deemed to be control and (b) for purposes of the "Transactions with Affiliates" covenant contained in Section 7.7, for so long as Raúl Alarcón Sr. or Raúl Alarcón Jr. are directors, officers or shareholders of the Borrower, they, their respective spouses, lineal descendants and any Person controlled by any of them shall be Affiliates of the Borrower and its Subsidiaries.

"Affiliate Transaction": as defined in Section 7.7.

"Additional Extensions of Credit": as defined in Section 10.1.

"Agents": the collective reference to the Administrative Agent, the Syndication Agent and the Documentation Agent.

"Aggregate Exposure": with respect to any Lender at any time, an amount equal to (a) prior to termination of the Term Loan Commitments, the aggregate amount of such Lender's Commitments then in effect and (b) thereafter, the sum of (i) the principal amount of such Lender's Term Loans then outstanding and (ii) the amount of such Lender's Revolving Credit Commitment then in effect or, if the Revolving Credit Commitments have terminated, the principal amount of such Lender's Revolving Extensions of Credit then outstanding.

"Aggregate Exposure Percentage": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"Agreement": this First Lien Credit Agreement, as amended, supplemented, replaced or otherwise modified from time to time.

"Applicable Margin": for each Type of Loan, the rate per annum set forth under the relevant column heading below:

|  | Base Rate Loans | Eurodollar Loans |
|---|---|---|
| Term Loans | 1.00% | 2.00% |
| Revolving Credit Loans and Swing Line Loans | 1.00% | 2.00% |

-2-



; _provided_ that, on and after the Grid Effective Date, the Applicable Margin with respect to Revolving Credit Loans and Swing Line Loans will be determined pursuant to the Pricing Grid; and _provided_ further that, if the Borrower on or prior to the first anniversary of the Closing Date applies the proceeds from of the LA Asset Sale to prepay the Term Loan Obligations or the Second Lien Term Loan Obligations, the Applicable Margin for the Term Loans shall be reduced by 0.25%.

"Application": an application, in such form as the Issuing Lender may specify from time to time, requesting the Issuing Lender to open a Letter of Credit.

"Arrangers": as defined in Section 9.11.

"Asset Sale": (i) the sale, lease (other than an operating lease entered into in the ordinary course of business), conveyance or other disposition of any assets or rights (including, without limitation, by way of a sale and leaseback), excluding sales of services and goods in the ordinary course of business consistent with past practices (provided that the sale, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by the provisions of Section 7.1 hereof and not by the provisions of Section 7.6 hereof) and (ii) the issue or sale by the Borrower or any of its Subsidiaries of Equity Interests of any of the Borrower's Subsidiaries, in the case of either clause (i) or (ii), whether in a single transaction or a series of related transactions (a) that have a fair market value in excess of $7.5 million or (b) for net proceeds in excess of $7.5 million.

Notwithstanding the foregoing, the following items will not be deemed to be Asset Sales: (i) a transfer of assets by the Borrower to a Subsidiary Guarantor or by a Subsidiary Guarantor to the Borrower or to another Subsidiary Guarantor or by a Subsidiary that is not a Guarantor to the Borrower or a Subsidiary Guarantor, (ii) an issuance of Equity Interests by a Subsidiary Guarantor to the Borrower or to another Subsidiary Guarantor, (iii) the sale, lease or other disposition of equipment or other assets in the ordinary course of business (including, without limitation, the disposition of obsolete or worn out property), (iv) the sale and leaseback of any assets within 180 days of the acquisition of such assets, (v) a Restricted Payment that is permitted by Section 7.4 hereof or a Permitted Investment, (vi) a transfer of any FCC License to a Broadcast License Subsidiary, (vii) the non-exclusive licensing of Intellectual Property in the ordinary course of business, (viii) the disposition of Cash Equivalents, and (ix) discounts or forgiveness of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof.

"Asset Sale Offer": as defined in Section 7.6.

"Asset Sale Mandatory Prepayment Date": as defined in Section 2.12.

"Asset Sale Prepayment Amount": as defined in Section 2.12.

"Asset Sale Prepayment Option Notice": as defined in Section 2.12.

"Assignee": as defined in Section 10.6(c).

"Assignment and Acceptance": as defined in Section 10.6(c).

"Assignor": as defined in Section 10.6(c).

"Attributable Debt": in respect of a sale and leaseback transaction means, at the time of determination, the present value (discounted at the rate of interest implicit in such transaction, determined in accordance with GAAP) of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction (including any period for which such lease has been extended or may, at the option of the lessor, be extended).

"Available Revolving Credit Commitment": as to any Revolving Credit Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Revolving Credit Commitment then in effect over (b) such Lender's Revolving Extensions of Credit then outstanding; provided that in calculating any Lender's Revolving Extensions of Credit for the purpose of determining such Lender's Available Revolving Credit Commitment pursuant to Section 2.9(a), the aggregate principal amount of Swing Line Loans then outstanding shall be deemed to be zero.

"Base Rate": for any day, a rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%. For purposes hereof: "Prime Rate": the prime lending rate as set forth in the British Bankers Telerate Page 5 (or, if the British Bankers Telerate ceases quoting a prime lending rate of the type described, the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15(519) entitled "Selected Interest Rates" as the bank prime loan rate or its equivalent).

"Base Rate Loans": Loans for which the applicable rate of interest is based upon the Base Rate.

"Basket Period": as defined in Section 7.4(c).

"Beneficial Owner": has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person," as such term is used in Section 13(d)(3) of the Exchange Act, such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition.

"Benefited Lender": as defined in Section 10.7.

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors": the Board of Directors of the Borrower or a Restricted Subsidiary, as applicable, or any authorized committee of such Board of Directors.

-4-

"Borrower": as defined in the preamble hereto.

"Borrowing Date": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lender(s) to make Loans hereunder.

"Broadcast License Subsidiary": a Wholly Owned Restricted Subsidiary of the Borrower that owns no material assets (except as permitted hereunder) other than FCC Licenses and related rights and has no liabilities other than (i) liabilities arising under the Guarantee and Collateral Agreement and the Second Lien Term Loan Documents and (ii) trade payables incurred in the ordinary course of business and tax liabilities incidental to ownership of such rights.

"Business Day": (i) for all purposes other than as covered by clause (ii) below, a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"Calculation Date": as defined in Section 1.1 in the definition of "Debt to Cash Flow Ratio".

"Capital Lease Obligation": at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease (attributable to principal) that would at such time be required to be capitalized on a balance sheet in accordance with GAAP.

"Capital Stock": (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited) and (iv) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Cash Equivalents": (i) United States dollars, (ii) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof having maturities of not more than one year from the date of acquisition, (iii) certificates of deposit and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding six months and overnight bank deposits, in each case with any domestic commercial bank having capital and surplus in excess of $500.0 million and a Thompson Bank Watch Rating of "B" or better, (iv) repurchase obligations with a term of not more than fourteen days for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in clause (iii) above and (v) commercial paper having the highest rating obtainable from Moody's Investors Service, Inc. or Standard & Poor's Corporation and in each case

-5-

maturing within 270 days after the date of acquisition and (vi) money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (i) - (v) of this definition.

"Change in Law": as defined in 2.19.

"Change of Control": the occurrence of any of the following: (i) the sale, lease, transfer, conveyance or other disposition (or by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Borrower and its Subsidiaries taken as a whole as such term is used in Section 13(d)(3) of the Exchange Act) other than the Principal or a Related Party of the Principal, (ii) the adoption of a plan relating to the liquidation or dissolution of the Borrower, (iii) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as defined above), other than the Principal and his Related Parties, becomes the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of the Borrower, (iv) the Principal ceases to be the Beneficial Owner, directly or indirectly, of a majority of the voting power of Voting Stock of the Borrower (measured by voting power rather than number of shares) as a result of any direct or indirect transfer of securities by the Principal, or (v) the first day on which a majority of the members of the Board of Directors of the Borrower are not Continuing Directors.

"Closing Date": June 10, 2005.

"Code": the Internal Revenue Code of 1986, as amended from time to time and the regulations issued thereunder.

"Collateral": all Property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, including the Intellectual Property Collateral.

"Commitment": as to any Lender, the sum of the Term Loan Commitment and the Revolving Credit Commitment of such Lender.

"Commitment Fee Rate": 0.5% per annum.

"Commitment Letter": the amended and restated commitment letter, dated May 31, 2005, by and among the Administrative Agent, the Arrangers, the Documentation Agent, the Syndication Agent and the Borrower, as amended, modified or supplemented from time to time.

"Commonly Controlled Entity": an entity, whether or not incorporated, which is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Communications Act": The Communications Act of 1934, as amended.

-6-

"Compliance and Pricing Certificate":    a certificate duly executed by a Responsible Officer substantially in the form of Exhibit A.

"Confidential Information Memorandum":    the information memorandum furnished to the Persons invited in the syndication of the Facilities to become Lenders.

"Consolidated Cash Flow":    with respect to any Person for any period, the Consolidated Net Income of such Person for such period plus, without duplication, (i) an amount equal to any extraordinary loss plus any net loss realized in connection with an Asset Sale, to the extent such losses were deducted in computing such Consolidated Net Income, plus (ii) provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was deducted in computing such Consolidated Net Income, plus (iii) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued and whether or not capitalized (including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net payments (if any) pursuant to Hedging Obligations), to the extent that any such expense was deducted in computing such Consolidated Net Income, plus (iv) depreciation expense for such period, to the extent the same was deducted in computing such Consolidated Net Income, plus (v) all amortization expense and other non-cash expenses (excluding any such non-cash expense to the extent that it represents an accrual of or reserve for cash expenses in any future period) for such period, to the extent the same was deducted in computing such Consolidated Net Income, minus (vi) non-cash items increasing such Consolidated Net Income for such period.

Consolidated Cash Flow shall be calculated on a pro forma basis after giving effect to any acquisition as if such acquisition (including any Consolidated Cash Flow associated with such acquisition) occurred on the first day of the most recently ended four quarter period, giving pro forma effect to any non-recurring expenses, non-recurring costs and cost reductions within the first year after such acquisition which the Borrower anticipates if the Borrower delivers to the Administrative Agent an Officer's Certificate certifying to and describing and quantifying with reasonable specificity such non-recurring expenses, non-recurring costs and cost reductions.

"Consolidated Indebtedness":    with respect to any Person as of any date of determination, the sum, without duplication, of (i) the total amount of Indebtedness and Attributable Debt of such Person and its Restricted Subsidiaries, plus (ii) the total amount of Indebtedness and Attributable Debt of any other Person, to the extent that such Indebtedness or Attributable Debt has been guaranteed by the referent Person or by one or more of its Restricted Subsidiaries or is secured by a Lien on assets of the referent Person or any of its Restricted Subsidiaries, plus (iii) the aggregate liquidation value of all Disqualified Stock of such Person and all preferred stock of Restricted Subsidiaries of such Person, in each case, determined on a consolidated basis in accordance with GAAP.

"Consolidated Interest Expense": with respect to any Person for any period, the sum of: (i) the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued (including, without limitation, amortization of original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letters of credit or bankers' acceptance financing, and net payments (if any) pursuant to Hedging Obligations); and (ii) the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period; and (iii) any interest expense on Indebtedness or Attributable Debt of another Person that is guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries (whether or not such guarantee or Lien is called upon).

"Consolidated Net Income": with respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; provided that (i) except as otherwise provided in clause (v) below, the positive Net Income of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid in cash to the referent Person or a Restricted Subsidiary thereof, (ii) the Net Income of any Restricted Subsidiary shall be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, (iii) the Net Income of any Person acquired in a pooling of interests transaction for any period prior to the date of such acquisition shall be excluded, (iv) the cumulative effect of a change in accounting principles shall be excluded and (v) the Net Income of any Unrestricted Subsidiary shall be excluded, whether or not distributed to the Borrower or one of its Restricted Subsidiaries.

"Continuing Directors": as of any date of determination, any member of the Board of Directors of the Borrower who (i) was a member of such Board of Directors on the Closing Date, (ii) was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election, or (iii) was nominated for election to such Board of Directors by the Principal.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Control Agreement": each Control Agreement to be executed and delivered by each Loan Party party thereto, as required pursuant to the terms of the Guarantee and Collateral Agreement in form as is reasonably acceptable to the Administrative Agent, in

-8-

each case as the same may be amended, supplemented, replaced or otherwise modified from time to time in accordance with this Agreement.

"Control Investment Affiliate": as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Copyright Security Agreement Supplement": as defined in the Guarantee and Collateral Agreement.

"Debt to Cash Flow Ratio": with respect to any Person as of any date of determination (the "Calculation Date"), the ratio of (a) the Consolidated Indebtedness of such Person as of such date to (b) the Consolidated Cash Flow of such Person for the four most recent full fiscal quarters ending immediately prior to such date for which internal financial statements are available, determined on a pro forma basis after giving effect to all acquisitions and dispositions of assets made by such Person and its Restricted Subsidiaries from the beginning of such four-quarter period through and including such date of determination (including any related financing transactions) as if such acquisitions and dispositions had occurred at the beginning of such four-quarter period. For purposes of making the computation referred to above, (i) any acquisitions or dispositions that have been made by such Person or any of its Restricted Subsidiaries, including through mergers or consolidations, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date (including the incurrence, assumption, repayment or retirement of any Indebtedness and also including any Consolidated Cash Flow associated with such acquisition or disposition) shall be deemed to have occurred on the first day of the four-quarter reference period and Consolidated Cash Flow for such reference period shall be calculated without giving effect to clause (iii) of the proviso set forth in the definition of Consolidated Net Income, and (ii) any incurrence (and any application of any proceeds therefrom), repayment or retirement of any Indebtedness by such Person or its Restricted Subsidiaries, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date shall be deemed to have occurred on the first day of the four-quarter reference period.

"Default": any of the events specified in Section 8, whether or not any requirement set forth therein for the giving of notice, the lapse of time, or both, has been satisfied.

"Disqualified Stock": any Capital Stock that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 91 days

-9-

after the maturity date of the Second Lien Term Loans (or if the Second Lien Term Loans have been paid in full, the Term Loan Maturity Date), provided, however, that any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Borrower to repurchase such Capital Stock upon the occurrence of a Change of Control or an Asset Sale shall not constitute Disqualified Stock if the terms of such Capital Stock provide that the Borrower may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption is permitted hereunder including without limitation Section 7.4.  For the avoidance of doubt, the Series B Preferred Stock by its terms as in effect on the date hereof shall not constitute Disqualified Stock.

"Documentation Agent":  as defined in the preamble hereto.

"Dollars" and "$":  dollars in lawful currency of the United States of America.

"Domestic Subsidiary":  any Subsidiary of the Borrower organized under the laws of the District of Columbia or any state within the United States of America other than WCMA Licensing, Inc., WMEG Licensing, Inc. and WZET Licensing, Inc.

"Eligible Assignee":  commercial banks, finance companies, insurance companies or other financial institutions or any Person (other than a natural Person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Environmental Laws":  any and all laws, rules, orders, regulations, statutes, ordinances, codes, decrees or other legally enforceable requirements (including common law), of the United States, or any state, local, municipal or other Governmental Authority, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment, as has been, is now, or at any time hereafter is, in effect.

"Environmental Permits":  any and all permits, licenses, approvals, registrations, notifications, exemptions and any other authorization required under any Environmental Law.

"Equity Interests":  Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations issued thereunder.

"ERISA Event":  as defined in Section 6.2(d).

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto) dealing with reserve

-10-

requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D) maintained by a member bank of the Federal Reserve System. Eurodollar Loans shall be deemed to constitute Eurocurrency Liabilities and to be subject to such reserve requirements without benefit or credit for proration, exceptions or offsets that may be available from time to time to any Lender under Regulation D.

"Eurodollar Base Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Page 3750 of the Telerate screen as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on Page 3750 of the Telerate screen (or otherwise on such screen), the "Eurodollar Base Rate" for purposes of this definition shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Tranche":  the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default":  any of the events specified in Section 8, provided that any requirement set forth therein for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Amount":  as defined in Section 2.12(b).

"Excess LA Asset Sale Proceeds":  in the event of a prepayment of the Second Lien Term Loan Lenders pursuant to Section 2.12(c), any proceeds from the LA Asset Sale that are not applied to the prepayment of the Second Lien Term Loan Lenders pursuant to such Section 2.12(c).

"Excess Proceeds":  as defined in Section 7.6.

"Exchange Act":  means the Securities Exchange Act of 1934, as amended.

"Excluded Assets": as defined in the Guarantee and Collateral Agreement.

"Excluded Foreign Subsidiary": any Foreign Subsidiary other than (a) any Foreign Subsidiary that has elected to be taxed as a partnership or a disregarded entity pursuant to Section 301.7701-3 of the United States Treasury Regulations and (b) any Foreign Subsidiary that has guaranteed or is required to guarantee any Indebtedness of the Borrower.

"Existing Credit Agreement": as defined in the preamble hereto.

"Existing Indebtedness": Indebtedness in existence on the date hereof (other than Indebtedness under Second Lien Term Loan Agreement) until such Indebtedness is repaid. Existing Indebtedness shall not include the Senior Subordinated Notes.

"Facility": each of (a) the Term Loan Commitments and the Term Loans made thereunder (the "Term Loan Facility") and (b) the Revolving Credit Commitments and the extensions of credit made thereunder (the "Revolving Credit Facility").

"FCC": the Federal Communications Commission (or any successor).

"FCC Licenses": any licenses, permits and authorizations issued by the FCC for the operation of stations.

"Federal Funds Effective Rate": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter": the Amended and Restated Senior Secured Credit Facilities Fee Letter, dated as of May 31, 2005, among the Borrower, the Administrative Agent, the Arrangers, the Documentation Agent, and the Syndication Agent as the same may be amended, supplemented, replaced or otherwise modified from time to time in accordance with this Agreement.

"Foreign Subsidiary": any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Funding Office": the office specified from time to time by the Administrative Agent as its funding office by notice to the Borrower and the Lenders.

"GAAP": generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have

-12-

been approved by a significant segment of the accounting profession, which are in effect from time to time (subject to Section 10.16).

"Governing Documents": collectively, as to any Person, the articles or certificate of incorporation and bylaws, any shareholders agreement, certificate of formation, limited liability company agreement, partnership agreement or other formation or constituent documents of such Person.

"Governmental Authority": any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial or regulatory functions of or pertaining to government.

"Grid Effective Date": the date of delivery to the Administrative Agent of the Borrower's financial statements for the first fiscal quarter that ends following the Closing Date.

"Guarantee and Collateral Agreement": the First Lien Guarantee and Collateral Agreement to be executed and delivered by the Borrower and each Subsidiary Guarantor, substantially in the form of Exhibit B, as the same may be amended, supplemented, replaced or otherwise modified from time to time in accordance with this Agreement.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar indemnity, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof, provided, however, that the term "Guarantee Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary contractual indemnities related to the sale of goods and services entered into in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum

-13-



reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantor": each signatory to the Guarantee and Collateral Agreement (together with any other entity that may become a party to the Guarantee and Collateral Agreement as provided therein).

"Hedge Agreements": all interest rate swaps, caps, collar agreements, foreign exchange agreements, commodity contracts, currency swaps or similar arrangements entered into by the Borrower or any of its Subsidiaries providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies, as each may be amended, supplemented, replaced or otherwise modified from time to time in accordance with this Agreement.

"Hedging Obligations": with respect to any Person, the obligations of such Person under (i) interest rate swap agreements, interest rate cap agreements and interest rate collar agreements and (ii) other agreements or arrangements designed to protect such Person against fluctuations in interest rates or currency rates.

"Immaterial Subsidiary": any Subsidiary of the Borrower, the net assets and net income of which, individually or in the aggregate, does not exceed $5.0 million at any time; provided that the aggregate of the net assets and income of all Immaterial Subsidiaries shall not exceed $10.0 million at any time (such net income and net assets to be determined as reported on the most recent financial statements of the Borrower or any such Subsidiary, as applicable).

"Indebtedness": with respect to any Person, without duplication, (i) any indebtedness of such Person, whether or not contingent, in respect of borrowed money or evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof) or banker's acceptances or representing Capital Lease Obligations or Attributable Debt or the balance deferred and unpaid of the purchase price of any property or representing any Hedging Obligations, except any such balance that constitutes an accrued expense or trade payable, if and to the extent any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of such Person prepared in accordance with GAAP, (ii) all indebtedness of others secured by a Lien on any asset of such Person (whether or not such indebtedness is assumed by such Person) and (iii) to the extent not otherwise included, the guarantee by such Person of any indebtedness of any other Person. Notwithstanding the foregoing, the term "Indebtedness" shall not include Non-Recourse Debt or indebtedness that constitutes "Indebtedness" merely by virtue of a pledge of Equity Interests of an Unrestricted Subsidiary. The amount of any Indebtedness outstanding as of any date shall be (A) the accreted value thereof, in the case of any Indebtedness issued with original issue discount, (B) the principal amount of the Indebtedness secured, together with any interest thereon that is more than 30 days past due, in the case of any Indebtedness of the type described in clause (ii) above, (C) the principal amount of the Indebtedness guaranteed, together with any interest thereon

-14-

that is more than 30 days past due, in the case of any Indebtedness of the type described in clause (iii) above, (D) the amount of the net settlement payment payable on termination, in the case of any Indebtedness constituting a Hedging Obligation (assuming for this purpose that the Hedging Obligation was terminated on the date as of which the calculation of the amount of Indebtedness is being made), and (E) the principal amount thereof, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness.

"Indemnified Liabilities": as defined in Section 10.5.

"Indemnitee": as defined in Section 10.5.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Multiemployer Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, state, multinational or foreign laws or otherwise, including copyrights, patents, trademarks, service-marks, technology, know-how and processes, recipes, formulas, trade secrets, or licenses (under which the applicable Person is licensee) relating to any of the foregoing and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intellectual Property Collateral": all Intellectual Property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by the Intellectual Property Security Agreements or the Guarantee and Collateral Agreement.

"Intellectual Property Security Agreements": as defined in the Guarantee and Collateral Agreement.

"Intercreditor Agreement": means the Intercreditor Agreement, dated as of the Closing Date, among the Administrative Agent, the Second Lien Agent and the Borrower.

"Interest Payment Date": (a) as to any Base Rate Loan, the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Loan (other than any Revolving Credit Loan that is a Base Rate Loan (unless all Revolving Credit Loans are being repaid in full in immediately available funds and the Revolving Credit Commitments terminated) and any Swing Line Loan), the date of any repayment or prepayment made in respect thereof.

-15-

"Interest Period": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its Notice of Borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six, or if agreed by all of the Lenders of the applicable Facility, nine or twelve months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not less than three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(i) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii) any Interest Period that would otherwise extend beyond the Revolving Credit Termination Date or beyond Term Loan Maturity Date shall end on the Revolving Credit Termination Date or the Term Loan Maturity Date, as applicable;

(iii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

(iv) the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"Investments": with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the forms of direct or indirect loans (including guarantees of Indebtedness or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. If the Borrower or any Subsidiary of the Borrower sells or otherwise disposes of any Equity Interests of any direct or indirect Subsidiary of the Borrower such that, after giving effect to any such sale or disposition, such Person is no longer a Subsidiary of the Borrower, the Borrower shall be deemed to have made an Investment on the date of any such sale or disposition equal to the fair market value of the Equity Interests of such Subsidiary not sold or disposed of in an amount determined as provided in the third paragraph of Section 7.4 hereof.

-16-

"Irrevocable Redemption Notice": as defined in Section 5.1(r).

"Issuing Lender": any Revolving Credit Lender that is appointed by the Borrower, with the consent of the Administrative Agent, to act as Issuing Lender under this Agreement, if such Revolving Credit Lender is willing to act as such and has confirmed in writing its acceptance of such appointment.

"LA Asset Sale": means the sale of the assets of radio stations KZAB-FM and KZBA-FM.

"LA Asset Sale Optional Prepayment Period": as defined in Section 2.12(c).

"L/C Commitment": at any time, the lesser of (a) $2,500,000 and (b) the Total Revolving Credit Commitments at such time.

"L/C Fee Payment Date": the last day of each March, June, September and December and the last day of the Revolving Credit Commitment Period.

"L/C Obligations": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants": the collective reference to all the Revolving Credit Lenders other than the Issuing Lender.

"Lead Arranger": as defined in Section 9.11.

"Lehman Entity": any of Lehman Commercial Paper Inc. or any of its affiliates.

"Lender Addendum": with respect to any initial Lender, a Lender Addendum, substantially in the form of Exhibit C, to be executed and delivered by such Lender on the Closing Date as provided in Section 10.17.

"Lenders": as defined in the preamble hereto and includes the Issuing Lender.

"Letters of Credit": as defined in Section 3.1(a).

"Lien": with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction).

"Loan": any loan made by any Lender pursuant to this Agreement.

"Loan Documents": this Agreement, the Security Documents, the Intercreditor Agreement, the Fee Letter, the Applications and the Notes.

"Loan Parties": the Borrower and each Subsidiary of the Borrower that is a party to a Loan Document (including pursuant to Section 6.9).

"Material Adverse Effect": a material adverse effect on or affecting (a) the business, assets, property or financial condition of the Loan Parties taken as a whole, (b) the validity or enforceability of this Agreement or any of the other Loan Documents, (c) the validity, enforceability or priority of the Liens purported to be created by the Security Documents on a material portion of the Collateral, or (d) the rights or remedies of any Secured Party hereunder or under any of the other Loan Documents.

"Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity, and any other substances or forces of any kind, whether or not any such substance or force is defined as hazardous or toxic under any Environmental Law, that is regulated pursuant to or could give rise to liability under any Environmental Law.

"Multiemployer Plan": a Plan that is a multiemployer plan as defined in Section 3(37) or 4001 (a)(3) of ERISA.

"Net Income": with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends, excluding, however, (i) any gain (but not loss), together with any related provision for taxes on such gain (but not loss), realized in connection with (a) any Asset Sale (including, without limitation, dispositions pursuant to sale and leaseback transactions) or (b) the disposition of any securities by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries and (ii) any extraordinary gain (but not loss), together with any related provision for taxes on such extraordinary gain (but not loss).

"Net Proceeds": the aggregate cash proceeds received by the Borrower or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of the direct costs relating to such Asset Sale or disposition (including, without limitation, legal, accounting and investment banking fees, and sales commissions) and any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied to the repayment of Indebtedness secured by a Lien on the asset or assets that were the subject of such Asset Sale and any reserve for indemnities, reimbursements or adjustment in respect of the sale price of such asset or assets established in accordance with GAAP.

"Non-Consenting Lender": as defined in Section 10.1.

"Non-Excluded Taxes": as defined in Section 2.20(a).

-18-

"Non-Recourse Debt": means Indebtedness: (i) as to which neither the Borrower nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable (as a guarantor or otherwise) or (c) constitutes the lender; and (ii) no default with respect to which (including any rights that the holders thereof may have to take enforcement action against an Unrestricted Subsidiary) would permit (upon notice, lapse of time or both) any holder of any other Indebtedness (other than the Notes being offered hereby) of the Borrower or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity.

"Non-U.S. Lender": as defined in Section 2.20(f).

"Notes": the collective reference to the Revolving Credit Notes, the Term Notes and the Swing Line Notes, if any, evidencing Loans.

"Notice of Borrowing": a notice duly executed by a Responsible Officer of the Borrower substantially in the form of Exhibit D.

"Obligations": the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of the Loan Parties to the Arranger, to any Agent, to any Lender (or, in the case of Specified Hedge Agreements, any Qualified Counterparty) or to any Indemnitee, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, the Letters of Credit, any Specified Hedge Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Arranger, to any Agent or to any Lender that are required to be paid by any Loan Party pursuant hereto or to any other Loan Document) or otherwise; provided that (a) Obligations of the Borrower or any other Loan Party under any Specified Hedge Agreement shall be secured and guaranteed pursuant to the Security Documents only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Subsidiary Guarantors effected in the manner permitted by this Agreement shall require the consent only of the Lenders as set forth in Section 10.1.

"Officer": with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer or the Chief Financial Officer of such Person.

"Officers' Certificate": a certificate signed on behalf of the Borrower by an Officer of the Borrower.

-19-

"Other Taxes": any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Participant": as defined in Section 10.6(b).

"Patent Security Agreement Supplement": as defined in the Guarantee and Collateral Agreement.

"Payment Amount": as defined in Section 3.5.

"Payment Office": the office of the Administrative Agent specified in Section 10.2 or as otherwise specified from time to time by the Administrative Agent as its payment office by notice to the Borrower and the Lenders.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permits": the collective reference to (a) Environmental Permits and (b) any and all other franchises, licenses, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, and other rights, privileges and approvals required for the operation of the Borrower's business under any Requirement of Law.

"Permitted Business": the media business and any business reasonably similar, complementary, ancillary, incidental or related thereto, including without limitation, the operation of latin music web sites and internet portals.

"Permitted Debt": as defined in Section 7.2.

"Permitted Investments": (i) any Investment in the Borrower or in a Restricted Subsidiary; (ii) any Investment in Cash Equivalents; (iii) any Investment by the Borrower or any Restricted Subsidiary of the Borrower in a Person engaged in a Permitted Business, if (a) as a result of, or concurrently with, such Investment such Person becomes a Restricted Subsidiary or (b) as a result of, or concurrently with, such Investment such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Borrower or a Restricted Subsidiary; or (c) the Borrower or a Restricted Subsidiary has entered into a binding agreement to acquire such Person or all or substantially all of the assets of such Person, which agreement is in effect on the date of such Investment, and such Person becomes a Restricted Subsidiary or such transaction is consummated, in each case, within 180 days of the date of such Investment; (iv) any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 7.6 hereof; (v) any obligations or shares of Capital Stock received in connection with or as a result of a bankruptcy, workout or reorganization of the issuer of such obligations or shares of Capital Stock; (vi) any Investment received involuntarily; (vii) any acquisition of assets solely in exchange for the issuance of Equity Interests (other

-20-

than Disqualified Stock) of the Borrower; (viii) other Investments in Persons engaged in Permitted Businesses (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (viii) that are at the time outstanding, not to exceed $15.0 million; (ix) Investments by the Borrower or any of its Restricted Subsidiaries in any other person pursuant to the terms of a "local marketing agreement" or similar arrangement relating to a radio station owned or licensed by such Person; (x) Hedging Obligations; (xi) the incurrence by the Borrower or any of its Restricted Subsidiaries of performance, bid or advance payment bonds, surety bonds, custom bonds, utility bonds and similar obligations arising in the ordinary course of business; (xii) endorsements of instruments for collection or deposit in the ordinary course of business; (xiii) loans and advances to employees not to exceed $5.0 million outstanding in the aggregate at any time; (xiv) loans to employees, directors and officers in connection with the purchase by such Persons of Equity Interests of the Borrower; (xv) pledges and deposits made in the ordinary course of business (including earnest money) and in connection with Permitted Liens; (xvi) Investments in a Foreign Subsidiary to the extent such Investment is substantially and contemporaneously repaid with a dividend or other distribution; (xv) investments in account debtors received in connection with the bankruptcy or reorganization, or in settlement of delinquent obligations, of customers; (xvi) investments in existence on the date of this Agreement; and (xvii) any acquisition of assets used or useful in a Permitted Business solely in exchange for the issuance of Indebtedness incurred under clause (xiii) of the definition of Permitted Debt.

"Permitted Liens":  (i) Liens pursuant to any Loan Document; (ii) Liens securing Second Lien Term Loan Obligations; (iii) Liens in favor of the Borrower or any of its Restricted Subsidiaries; (iv) Liens on property of a Person existing at the time such Person is merged into or consolidated with the Borrower or any Restricted Subsidiary of the Borrower; provided that such Liens were not incurred in contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with the Borrower; (v) Liens on property existing at the time of acquisition thereof by the Borrower or any Restricted Subsidiary of the Borrower, provided that such Liens were in existence prior to the contemplation of such acquisition; (vi) Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business; (vii) Liens existing on the date hereof (other than Liens which are to be released on the date hereof); (viii) Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded, provided that any reserve or other appropriate provision as shall be required in conformity with GAAP shall have been made therefor; (ix) Liens incurred in the ordinary course of business of the Borrower or any Restricted Subsidiary of the Borrower with respect to obligations that do not exceed $10.0 million at any one time outstanding; (x) Liens securing industrial revenue bonds; (xi) Liens to secure Purchase Money Indebtedness that is otherwise permitted under this Agreement, provided that (a) any such Lien is created solely for the purpose of securing Indebtedness representing, or incurred to finance, refinance or refund, the cost (including sales and excise taxes, installation and delivery charges and other direct costs of, and other direct expenses paid or charged in connection with, such

-21-

purchase or construction) of such Property, (b) the principal amount of the Indebtedness secured by such Lien does not exceed 100% of such costs, and (c) such Lien does not extend to or cover any Property other than such item of Property and any improvements on such item; (xii) Liens securing Acquisition Indebtedness, provided that such Liens do not extend to or cover any Property other than the Property acquired with the proceeds of such Acquisition Indebtedness and any improvements thereto; (xiii) Liens securing Permitted Refinancing Indebtedness which was secured by Permitted Liens so long as the collateral securing such Permitted Refinancing Indebtedness is not changed; (xiv) Liens to secure Indebtedness (including Capital Lease Obligations) permitted to be incurred by clause (iv) of the definition of Permitted Debt covering only the assets acquired with such Indebtedness; (xv) zoning restrictions, easements, licenses, covenants and other similar restrictions and encumbrances affecting the use of real property not interfering in any material respect with the ordinary conduct of business of the Borrower and its Restricted Subsidiaries; (xvi) judgment liens not giving rise to an Event of Default; (xvii) Liens, rights to setoff and credit balances with respect to deposit accounts and other Cash Equivalents to the extent permitted by the Control Agreement; (xviii) deposits with the owner or lessor of premises leased and operated in the ordinary course of business; (xix) nonconsensual liens that do not individually or in the aggregate detract materially from the value of transferability of the assets of the Borrower or any of its Restricted Subsidiaries, or impair materially the use of any such assets in the operation of the respective businesses of the Borrower and its Restricted Subsidiaries; (xx) any interest or title of a lessor, sublessor, licensor or licensee under any lease or license entered into by the Borrower or any Subsidiary in the ordinary course of business; (xxi) Liens attaching solely to earnest money deposits in connection with an Investment permitted hereunder; (xxii) Liens on insurance policies and the proceeds thereof securing the financing of the insurance premiums in respect thereto; (xxiii) Liens encumbering customary initial deposits and margin deposits and similar Liens attaching to the commodity trading accounts or other brokerage accounts incurred in the ordinary course of business; (xxiv) Liens in favor of customs and revenues authorities which secure payment of customs duties in connection with the importation of goods; (xxv) Liens on any assets that are the subject of an agreement for a disposition thereof permitted hereunder that arise pursuant to such agreement; (xxvi) Liens in favor of any Qualified Counterparty to secure Hedging Obligations; (xxvii) Liens securing Indebtedness of Foreign Subsidiaries which constitute Permitted Debt in an amount not to exceed $5.0 million in the aggregate; and (xxviii) Liens securing other Indebtedness of Borrower and its Subsidiary Guarantors in an amount not to exceed $100.0 million in the aggregate less the aggregate outstanding principal amount of the Second Lien Term Loan Obligations.

"Permitted Refinancing Indebtedness": any Indebtedness of the Borrower or any of its Restricted Subsidiaries or any Disqualified Stock of the Borrower issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of the Borrower or any of its Restricted Subsidiaries; provided that: (i) the principal amount (or accreted value or liquidation preference, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount of (or accreted value, if applicable), plus accrued interest on, the Indebtedness so extended, refinanced, renewed, replaced, defeased or refunded (plus the amount of reasonable expenses incurred and premiums paid in connection therewith); (ii)

-22-

such Permitted Refinancing Indebtedness has a final maturity date the same as or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded; (iii) if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is pari passu with the Loans, such Permitted Refinancing Indebtedness is pari passu with or subordinated in right of payment to the Loans or is Disqualified Stock; (iv) if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of payment to the Loans, such Permitted Refinancing Indebtedness is subordinated in right of payment to the Loans on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded or is Disqualified Stock; and (v) such Indebtedness is incurred either by the Borrower or by the Restricted Subsidiary that is the obligor on the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded, or such Disqualified Stock is issued by the Borrower, as applicable.

"Person":  any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or agency or political subdivision thereof (including any subdivision or ongoing business of any such entity or substantially all of the assets of any such entity, subdivision or business).

"Plan":  at a particular time, any employee benefit plan that is covered by ERISA and that the Borrower or any Commonly Controlled Entity maintains, administers, contributes to or is required to contribute to or under which the Borrower or any Commonly Controlled Entity could incur any liability.

"Pricing Grid":  the pricing grid attached hereto as Annex A.

"Preferred Stock Exchange Notes":  the Borrower's $10^3/4\%$ Subordinated Exchange Notes due 2013 issuable in exchange for Series B Preferred Stock in accordance with the terms of the Series B Preferred Stock, which shall be designated as "Subordinated Debt" for purposes of this Agreement.

"Preferred Stock Exchange Notes Indenture":  the indenture among the Borrower, the guarantors named therein and Wachovia Bank, N.A., as trustee, under which the Preferred Stock Exchange Notes are issuable, and which designates this Agreement as a "Senior Credit Facility" and the Loans hereunder as "Designated Senior Debt" as such terms are defined therein.

"Prime Rate":  as defined in Section 1.1 in the definition of "Base Rate".

"Principal":  Raúl Alarcón, Jr.

"Pro Forma Balance Sheet":  as defined in Section 4.1(a).

"Property":  of any Person means all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent consolidated balance sheet of such Person and its Subsidiaries under GAAP.

-23-

"Purchase Money Indebtedness":  any Indebtedness incurred by a Person to finance or refinance or refund the cost (including the cost of construction) of an item of property, the principal amount of which Indebtedness does not exceed the sum of (i) 100% of such cost and (ii) reasonable fees and expenses of such Person incurred in connection therewith.

"Qualified Counterparty":  with respect to any Hedge Agreement, a Lehman Entity, any Lender or any affiliate of a Lender, in each case, approved by the Administrative Agent, any lender under the Second Lien Term Loan Agreement or any affiliate of a lender under the Second Lien Term Loan Agreement, in each case, approved by the Second Lien Agent.

"Qualified Supporting Letter of Credit":  with respect to any Letter of Credit, a back-to-back letter of credit, issued by a bank acceptable to the Issuing Lender of such Letter of Credit and to the Administrative Agent and in form and substance acceptable to such Issuing Lender and the Administrative Agent, and as to which such Issuing Lender is the beneficiary and in an amount equal to not less than 105% of the undrawn and available amount of such Letter of Credit at the time of issuance of such letter of credit.

"Redemption Date": as defined in Section 5.1(r).

"Redemption Funds": as defined in Section 5.1(r).

"Refinancing": as defined in the preamble hereto.

"Refunded Swing Line Loans":  as defined in Section 2.7(b).

"Register":  as defined in Section 10.6(d).

"Regulation D":  Regulation D of the Board as in effect from time to time (and any successor to all or a portion thereof).

"Regulation T":  Regulation T of the Board as in effect from time to time (and any successor to all or a portion thereof).

"Regulation U":  Regulation U of the Board as in effect from time to time (and any successor to all or a portion thereof).

"Regulation X":  Regulation X of the Board as in effect from time to time (and any successor to all or a portion thereof).

"Reimbursement Obligation":  the obligation of the Borrower to reimburse the Issuing Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit.

"Related Fund":  with respect to any Lender that is a fund that invests in loans, any other fund that is managed by the same investment advisor as such Lender or by an Affiliate of such Lender or investment advisor.

-24-

"Related Party":  with respect to the Principal means (i) any spouse or immediate family member of the Principal or (ii) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding an 50% or more controlling interest of which consist of the Principal and/or such other Persons referred to in the immediately preceding clause (i).

"Related Person":  as to each of the Arranger, the Agents and the Lenders, each of its officers, directors, stockholders, members, partners, employees, agents, attorneys and other advisors, controlling persons and Affiliates.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived by regulation.

"Required Lenders":  at any time, the holders of more than 50% of (a) until the Closing Date, the Commitments and (b) thereafter, the sum of (i) the aggregate unpaid principal amount of the Term Loans then outstanding and (ii) the Total Revolving Credit Commitments then in effect or, if the Revolving Credit Commitments have terminated, the Total Revolving Extensions of Credit then outstanding.

"Requirement of Law":  as to any Person, the Governing Documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer":  as to any Person, the chief executive officer, president or chief financial officer of such Person, but in any event, with respect to financial matters, the chief financial officer of such Person.  Unless otherwise qualified, all references to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"Restricted Investment":  an Investment other than a Permitted Investment.

"Restricted Payments":  as defined in Section 7.4.

"Restricted Subsidiary":  of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"Revolving Credit Commitment":  as to any Lender, the obligation of such Lender, if any, to make Revolving Credit Loans and/or participate in Swing Line Loans and Letters of Credit, in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Credit Commitment" opposite such Lender's name on Schedule 1 to the Lender Addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate principal amount of the Revolving Credit Commitments is $25,000,000.

-25-

"Revolving Credit Commitment Period":  the period from and including the Closing Date to the Revolving Credit Termination Date.

"Revolving Credit Facility":  as defined in Section 1.1 in the definition of "Facility".

"Revolving Credit Lender":   each Lender that has a Revolving Credit Commitment or that is the holder of Revolving Credit Loans.

"Revolving Credit Loans":  as defined in Section 2.4(a).

"Revolving Credit Notes":  as defined in Section 2.8(e).

"Revolving Credit Percentage":  as to any Revolving Credit Lender at any time, the percentage that such Lender's Revolving Credit Commitment then constitutes of the Total Revolving Credit Commitments (or, at any time after the Revolving Credit Commitments have terminated, the percentage which the aggregate principal amount of such Lender's Revolving Extensions of Credit then outstanding constitutes of the aggregate principal amount of the Total Revolving Extensions of Credit then outstanding).

"Revolving Credit Termination Date":  the earlier of (a) the date that is five (5) years following the Closing Date, (b) the date of termination of the Revolving Credit Lenders' obligations to make Revolving Credit Loans pursuant to the last paragraph of Section 8 and (c) the date of (i) the payment in full in cash by the Borrower of any outstanding Revolving Credit Loans, (ii) the cancellation and return (or stand-by guarantee) of all Letters of Credit and (iii) the permanent reduction of all Revolving Credit Commitments to zero Dollars ($0) pursuant to Section 2.10.

"Revolving Extensions of Credit":  as to any Revolving Credit Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Credit Loans then outstanding to such Lender, (b) such Lender's Revolving Credit Percentage of the L/C Obligations then outstanding and (c) such Lender's Revolving Credit Percentage of the aggregate principal amount of Swing Line Loans then outstanding.

"SEC":  the United States Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"Second Lien Agent":  Lehman Commercial Paper Inc., as agent under the Second Lien Term Loan Agreement.

"Second Lien Term Loans":  all loans made pursuant to the Second Lien Term Loan Agreement.

"Second Lien Term Loan Agreement":  the Second Lien Term Loan Agreement dated as of the date hereof among Borrower, the several banks and other financial institutions or entities from time to time party thereto, Merrill Lynch Capital Corporation,

-26-

as syndication agent, Wachovia Bank, National Association, as documentation agent and Lehman Commercial Paper Inc., as administrative agent.

"Second Lien Term Loan Documents":  the Loan Documents referred to in the Second Lien Term Loan Agreement.

"Second Lien Term Loan Obligations":  the unpaid principal of and interest on (including interest accruing after the maturity of the loan provided under the Second Lien Term Loan Agreement and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any loan party under the Second Lien Term Loan Agreement whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Second Lien Term Loans and all other obligations and liabilities of the loan parties to the arranger thereunder, to any agent thereunder, to any lender thereunder, or to any Indemnitee thereunder, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with the Second Lien Term Loan Agreement, any other loan document referred to therein or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to such arranger, to any such agent or to any such lender that are required to be paid by any such loan party pursuant the Second Lien Term Loan Agreement or to any other loan document referred to therein) or otherwise.

"Secured Parties":  collectively, the Arrangers, the Agents, the Lenders, each Indemnitee and, with respect to any Specified Hedge Agreement, any Qualified Counterparty.

"Security Documents":  the collective reference to the Guarantee and Collateral Agreement, the Intellectual Property Security Agreements, the Control Agreements and all other pledge and security documents hereafter delivered to the Administrative Agent granting a Lien on any Property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Senior Subordinated Notes":  the unsecured $9^5/_8\%$ Senior Subordinated Notes due 2009 issued and outstanding under the Senior Subordinated Note Indentures.

"Senior Subordinated Note Indentures":  collectively, (a) the Indenture dated as of June 8, 2001 between the Borrower, each of the entities listed on the signature pages thereto and The Bank of New York, as Trustee and (b) the Indenture dated as of November 2, 1999 between the Borrower, each of the entities listed on the signature pages thereto and the Bank of New York, as Trustee, in each case in connection with the Senior Subordinated Notes.

"Series B Preferred Stock":  the Borrower's $10\frac{3}{4}\%$ Series B Cumulative Exchangeable Redeemable Preferred Stock.

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Solvency Certificate": the Solvency Certificate of the Borrower to be executed on its behalf by the chief financial officer of the Borrower, substantially in the form of Exhibit E, which certificate shall address the Solvency of the Borrower and its Subsidiaries after giving effect to the consummation of the Facilities, the repayment of the Indebtedness under the Existing Credit Facility and the Senior Subordinated Notes and any other transactions contemplated by the Loan Documents.

"Solvent": when used with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business and (d) such Person will be able to pay its debts as they mature; and the term "Solvency" shall have a correlative meaning. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

"Specified Hedge Agreement": any Hedge Agreement entered into by (i) the Borrower or any of its Subsidiaries and (ii) any Qualified Counterparty.

"Stated Maturity": with respect to any installment of interest or principal on any series of Indebtedness, the date on which such payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"Stations": all radio and television broadcasting facilities owned by one or more Loan Parties for which licenses, permits and authorizations have been issued by the FCC.

"Subsidiary": with respect to any Person, any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person (or a combination thereof) unless otherwise qualified all reference to a

-28-

"Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor":  each Subsidiary of the Borrower other than (i) any Excluded Foreign Subsidiary and (ii) JuJu Media, Inc.

"Swing Line Commitment":  at any time, the lesser of (a) $5,000,000 and (b) the aggregate amount of the Revolving Credit Commitments at such time.

"Swing Line Lender":  Lehman Commercial Paper Inc., in its capacity as the lender of Swing Line Loans.

"Swing Line Loans":  as defined in Section 2.6(a).

"Swing Line Notes":  as defined in Section 2.8(e).

"Swing Line Participation Amount":  as defined in Section 2.7(c).

"Syndication Agent":  as defined in the preamble hereto.

"Term Loan":  as defined in Section 2.1(a).

"Term Loan Commitment":  as to any Term Loan Lender, the obligation of such Lender to make a Term Loan to the Borrower hereunder on the Closing Date in a principal amount not to exceed the amount set forth under the heading "Term Loan Commitment" opposite such Lender's name on Schedule 1 to the Lender Addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate amount of the Term Loan Commitments is $325,000,000.

"Term Loan Lender":  each Lender that has a Term Loan Commitment or is the holder a Term Loan.

"Term Loan Maturity Date":  the date that is seven (7) years following the Closing Date.

"Term Loan Percentage":  as to any Term Loan Lender at any time, the percentage which such Lender's Term Loan Commitment bears to the aggregate Term Loan Commitments at such time.

"Term Notes":  as defined in Section 2.8(e).

"Total Revolving Credit Commitments":  at any time, the aggregate amount of the Revolving Credit Commitments then in effect; provided that the amount of the Total Revolving Credit Commitments on the Closing Date shall be $25,000,000.

-29-

"Total Revolving Extensions of Credit": at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Credit Lenders outstanding at such time.

"Trademark Security Agreement Supplement": as defined in the Guarantee and Collateral Agreement.

"Transferee": as defined in Section 10.14.

"Trustee": as defined in the Senior Subordinated Note Indentures.

"Type": as to any Loan, its nature as a Base Rate Loan or a Eurodollar Loan.

"Unfunded Pension Liability": means the excess of a Single Employer Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that plan's assets, determined in accordance with the assumptions used for funding such Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unrestricted Subsidiary": (i) any Subsidiary that is designated by the Board of Directors as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary: (a) has no Indebtedness other than Non-Recourse Debt; (b) is not party to any agreement, contract, arrangement or understanding with the Borrower or any Restricted Subsidiary unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Borrower or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Borrower; (c) is a Person with respect to which neither the Borrower nor any of its Restricted Subsidiaries has any direct or indirect obligation (1) to subscribe for additional Equity Interests or (2) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and (d) has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Borrower or any of its Restricted Subsidiaries. As of the Closing Date, JuJu Media, Inc. shall be an Unrestricted Subsidiary.

"Voting Stock": of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity": when applied to any Indebtedness at any date, the number of years obtained by dividing (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment, by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Restricted Subsidiary": of any Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares) shall at the time be owned by

-30-

such Person or by one or more Wholly Owned Restricted Subsidiaries of such Person and one or more Wholly Owned Restricted Subsidiaries of such Person.

1.2.    Other Definitional Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have such defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to the Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    The expressions "payment in full," "paid in full" and any other similar terms or phrases when used herein with respect to the Obligations shall mean the payment in full, in immediately available funds, of all of the Obligations.

(f)    The term "including" is not limiting and means "including without limitation."

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS

2.1.    Term Loan Commitments.

(a)    Subject to the terms and conditions hereof, each Term Loan Lender severally agrees to make term loans (each a "Term Loan") to the Borrower in a single funding on the Closing Date in an aggregate amount not to exceed the amount of the Term Loan Commitment of such Lender.

(b)    The Term Loan Commitments shall terminate as to each Term Loan Lender upon funding of its Term Loan. Term Loans that are repaid may not be reborrowed.

2.2.    Procedure for Term Loan Borrowing. The Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent prior to 1:00 P.M., New York City time, one Business Day prior to the anticipated Closing Date if the Term Loans are funded as Base Rate Loans or three Business Days prior to the anticipated Closing Date if the Term Loans are funded as Eurodollar Loans) requesting that the Term Loan Lenders make the Term Loans on such anticipated Closing Date and specifying the

-31-

amount to be borrowed, which shall be equal to the aggregate amount of the Term Loan Commitments of all Term Loan Lenders. Upon receipt of such notice, the Administrative Agent shall promptly notify each Term Loan Lender thereof. Not later than 2:00 P.M., New York City time, on such anticipated Closing Date, each Term Loan Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Term Loan or Term Loans to be made by such Lender.

2.3. <u>Repayment of Term Loans</u>. The Borrower shall pay the principal amount of the Term Loans in twenty-eight (28) consecutive quarterly installments commencing on June 30, 2005 and continuing on the last day of each December, March, June and September of each year thereafter through and including March 31, 2012, and the amount of the quarterly installment due on each such payment date shall be equal to 0.25% of the original principal balance of all Term Loans funded on the Closing Date. Notwithstanding the foregoing, the aggregate outstanding principal balance of the Term Loans shall be due and payable in immediately available funds on the Term Loan Maturity Date, if not sooner paid in full.

2.4. <u>Revolving Credit Commitments</u>.

(a) Subject to the terms and conditions hereof, each Revolving Credit Lender severally agrees to make revolving credit loans (each a "<u>Revolving Credit Loan</u>") to the Borrower in one or more fundings during the Revolving Credit Commitment Period in an aggregate principal amount at any one time outstanding which, when added to such Lender's Revolving Credit Percentage of the sum of (i) the L/C Obligations then outstanding and (ii) the aggregate principal amount of the Swing Line Loans then outstanding, does not exceed the amount of such Lender's Revolving Credit Commitment. During the Revolving Credit Commitment Period the Borrower may use the Revolving Credit Commitments by borrowing, prepaying the Revolving Credit Loans in whole or in part and reborrowing, all in accordance with the terms and conditions hereof. The Revolving Credit Commitments shall terminate on the Revolving Credit Termination Date. The Revolving Credit Loans may from time to time be Eurodollar Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.5 and 2.13, provided that no Revolving Credit Loan shall be made as a Eurodollar Loan after the day that is one month prior to the Revolving Credit Termination Date.

(b) The Borrower shall repay all outstanding Revolving Credit Loans on the Revolving Credit Termination Date.

2.5. <u>Procedure for Revolving Credit Borrowing</u>. The Borrower may borrow under the Revolving Credit Commitments during the Revolving Credit Commitment Period on any Business Day; <u>provided</u> that the Borrower shall give the Administrative Agent irrevocable notice in a Notice of Borrowing (which Notice of Borrowing must be received by the Administrative Agent prior to 1:00 P.M., New York City time, (a) three Business Days prior to the requested Borrowing Date, in the case of Eurodollar Loans or (b) one Business Day prior to the requested Borrowing Date, in the case of Base Rate Loans, specifying (i) the amount and Type of Revolving Credit Loans to be borrowed, (ii) the requested Borrowing Date and (iii) in the case of Eurodollar Loans, the length of the initial Interest Period therefor. Any Revolving Credit Loans made on the Closing Date shall initially be Base Rate Loans, and no Revolving

-32-

08-13555-mp   Doc 50032-7   Filed 06/06/15   Entered 06/06/15 18:14:23   Main Document
Pg 203 of 301

Credit Loan may be made as, converted into or continued as a Eurodollar Loan having an Interest Period in excess of one month prior to the date which is 60 days after the Closing Date. Each borrowing under the Revolving Credit Commitments shall be in an amount equal to (x) in the case of Base Rate Loans, $1,000,000 or a whole multiple thereof (or, if the then aggregate Available Revolving Credit Commitments are less than $1,000,000, such lesser amount) and (y) in the case of Eurodollar Loans, $1,000,000 or a whole multiple of $1,000,000 in excess thereof; provided that the Swing Line Lender may request, on behalf of the Borrower, borrowings under the Revolving Credit Commitments that are Base Rate Loans in other amounts pursuant to Section 2.7. Upon receipt of any such Notice of Borrowing from the Borrower, the Administrative Agent shall promptly notify each Revolving Credit Lender thereof. Each Revolving Credit Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 12:00 noon, New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent in like funds as received by the Administrative Agent.

### 2.6.    Swing Line Commitment.

(a)    Subject to the terms and conditions hereof, the Swing Line Lender agrees to make a portion of the credit otherwise available to the Borrower under the Revolving Credit Commitments from time to time during the Revolving Credit Commitment Period by making swing line loans ("Swing Line Loans") to the Borrower; provided that (i) the aggregate principal amount of Swing Line Loans outstanding at any time shall not exceed the Swing Line Commitment then in effect (notwithstanding that the Swing Line Loans outstanding at any time, when aggregated with the Swing Line Lender's other outstanding Revolving Credit Loans hereunder, may exceed the Swing Line Commitment then in effect) and (ii) the Borrower shall not request, and the Swing Line Lender shall not make, any Swing Line Loan if, after giving effect to the making of such Swing Line Loan, the aggregate amount of the Available Revolving Credit Commitments would be less than zero. During the Revolving Credit Commitment Period, the Borrower may use the Swing Line Commitment by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof. Swing Line Loans shall be Base Rate Loans only.

(b)    The Borrower shall repay all outstanding Swing Line Loans on the Revolving Credit Termination Date.

### 2.7.    Procedure for Swing Line Borrowing; Refunding of Swing Line Loans.

(a)    Whenever the Borrower desires that the Swing Line Lender make Swing Line Loans it shall give the Swing Line Lender irrevocable written notice (which written notice must be received by the Swing Line Lender not later than 1:00 P.M., New York City time, on the proposed Borrowing Date) specifying (i) the amount to be borrowed and (ii) the requested Borrowing Date (which shall be a Business Day during the Revolving Credit Commitment Period). Each borrowing under the Swing Line Commitment shall be in an amount equal to $500,000 or a whole multiple of $100,000 in excess thereof. Not later than 3:00 P.M., New York City time, on the Borrowing Date specified in a notice in respect of Swing Line Loans, the

-33-

Swing Line Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the amount of the Swing Line Loan to be made by the Swing Line Lender. The Administrative Agent shall make the proceeds of such Swing Line Loan available to the Borrower on such Borrowing Date in immediately available funds.

(b)    The Swing Line Lender, at any time and from time to time in its sole and absolute discretion may, on behalf of the Borrower (which hereby irrevocably directs the Swing Line Lender to act on its behalf), on one Business Day's notice given by the Swing Line Lender no later than 1:00 P.M., New York City time, request each Revolving Credit Lender to make, and each Revolving Credit Lender hereby agrees to make, a Revolving Credit Loan, in an amount equal to such Revolving Credit Lender's Revolving Credit Percentage of the aggregate amount of the Swing Line Loans (the "Refunded Swing Line Loans") outstanding on the date of such notice, to repay the Swing Line Lender. Each Revolving Credit Lender shall make the amount of such Revolving Credit Loan available to the Administrative Agent at the Funding Office in immediately available funds, not later than 1:00 P.M., New York City time, one Business Day after the date of such notice. The proceeds of such Revolving Credit Loans shall be immediately made available by the Administrative Agent to the Swing Line Lender for application by the Swing Line Lender to the repayment of the Refunded Swing Line Loans. The Borrower irrevocably authorizes the Swing Line Lender to charge the Borrower's accounts with the Administrative Agent (up to the amount available in each such account) in order to immediately pay the amount of such Refunded Swing Line Loans to the extent amounts received from the Revolving Credit Lenders are not sufficient to repay in full such Refunded Swing Line Loans.

(c)    If prior to the time a Revolving Credit Loan would have otherwise been made pursuant to Section 2.7(b), one of the events described in Section 8(f) shall have occurred and be continuing with respect to the Borrower or if for any other reason, as determined by the Swing Line Lender in its sole discretion, Revolving Credit Loans may not be made as contemplated by Section 2.7(b), each Revolving Credit Lender shall, on the first Business Day following demand by the Swing Line Lender therefor, purchase for cash an undivided participating interest in the then outstanding Swing Line Loans by paying to the Swing Line Lender an amount (the "Swing Line Participation Amount") equal to (i) such Revolving Credit Lender's Revolving Credit Percentage times (ii) the sum of the aggregate principal amount of Swing Line Loans then outstanding.

(d)    Whenever, at any time after the Swing Line Lender has received from any Revolving Credit Lender such Lender's Swing Line Participation Amount, the Swing Line Lender receives any payment on account of the Swing Line Loans, the Swing Line Lender will distribute to such Revolving Credit Lender its Swing Line Participation Amount (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Credit Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Revolving Credit Lender's pro rata portion of such payment if such payment is not sufficient to pay the principal of and interest on all Swing Line Loans then due); provided, however, that in the event that such payment received by the Swing Line Lender is required to be returned, such Revolving Credit Lender will return to the Swing Line Lender any portion thereof previously distributed to it by the Swing Line Lender.

-34-

08-13555-mp   Doc 50092   Filed 06/18/15   Entered 06/18/15 18:14:23   Main Document
Pg 205 of 301

(e)     Each Revolving Credit Lender's obligation to make the Loans referred to in Section 2.7(b) and to purchase participating interests pursuant to Section 2.7(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right which such Revolving Credit Lender or the Borrower may have against the Swing Line Lender, the Borrower or any other Person for any reason whatsoever; (ii) the occurrence or continuation of any Default or the failure to satisfy any of the other conditions precedent specified in Section 5; (iii) any adverse change in the condition (financial or otherwise) of the Borrower; (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other Revolving Credit Lender; or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

2.8.     Repayment of Loans; Evidence of Indebtedness.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Lender (i) the then unpaid principal amount of each Revolving Credit Loan on the Revolving Credit Termination Date (or such earlier date on which the Loans become due and payable pursuant to Section 8), (ii) the then unpaid principal amount of each Swing Line Loan on the Revolving Credit Termination Date (or such earlier date on which the Loans become due and payable pursuant to Section 8) and (iii) the principal amount of each Term Loan in installments or at maturity as set forth in Section 2.3 (or on such earlier date on which the Loans become due and payable pursuant to Section 8). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.15.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing Indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 10.6(d), and a subaccount therein for each Lender, and shall record therein (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type thereof and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.8(b) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

-35-




(e)     The Borrower agrees that, upon the request to the Administrative Agent of any Lender, the Borrower will execute and deliver to such Lender a promissory note of the Borrower evidencing any Term Loans, Revolving Credit Loans or Swing Line Loans, as the case may be, of such Lender, substantially in the forms of Exhibits F-1, F-2 or F-3, respectively, with appropriate insertions as to date and principal amount (such notes, respectively, "Term Notes", "Revolving Credit Notes" and "Swing Line Notes").

2.9.    Commitment Fees, etc.

(a)     The Borrower agrees to pay to the Administrative Agent, for the account of each Revolving Credit Lender, a commitment fee for the period from and including the Closing Date to the last day of the Revolving Credit Commitment Period, computed at the Commitment Fee Rate determined from day to day on the average daily amount of the Available Revolving Credit Commitment of such Lender during the period for which payment is made, payable quarterly in arrears on the last day of each March, June, September and December and on the Revolving Credit Termination Date, commencing on the first of such dates to occur after the date hereof.

(b)     The Borrower agrees to pay to each Agent the fees in the amounts and on the dates from time to time agreed to in writing by the Borrower pursuant to the Fee Letter.

2.10.   Termination or Reduction of Revolving Credit Commitments.   The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Revolving Credit Commitments or, from time to time, to reduce the amount of the Revolving Credit Commitments; provided that no such termination or reduction of Revolving Credit Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Credit Loans and Swing Line Loans made on the effective date thereof, the Total Revolving Extensions of Credit would exceed the Total Revolving Credit Commitments. Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Revolving Credit Commitments then in effect.

2.11.   Optional Prepayments. The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent at least three Business Days prior thereto in the case of Eurodollar Loans and at least one Business Day prior thereto in the case of Base Rate Loans, which notice shall (a) designate whether the Borrower is prepaying Revolving Credit Loans, Term Loans or both and (b) specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or Base Rate Loans; provided that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (but which notice may be subject to funding under one or more replacement facilities), together with (except in the case of Revolving Credit Loans (unless all Revolving Credit Loans are being repaid and the Revolving Credit Commitments terminated) that are Base Rate Loans and Swing Line Loans) accrued interest to such date on the amount prepaid. Optional prepayments of Term Loans shall be applied pro rata against the remaining installments thereof. Optional partial

-36-

prepayments of Term Loans and Revolving Credit Loans shall be in an aggregate principal amount of $1,000,000 or any integral multiple of $500,000 in excess thereof. Optional partial prepayments of Swing Line Loans shall be in an aggregate principal amount of $100,000 or a whole multiple thereof. To the extent set forth therein, amounts prepaid pursuant to this Section 2.11 shall be applied as set forth in Section 2.12(b).

2.12. Mandatory Prepayments and Commitment Reductions.

(a) Subject to Section 2.12(c), within 10 Business Days of any day on which Excess Proceeds exist pursuant to Section 7.6 requiring an Asset Sale Offer (such amount of Excess Proceeds, the "Asset Sale Prepayment Amount"), the Borrower shall give the Administrative Agent written notice requesting that the Administrative Agent prepare and provide to each Term Loan Lender a notice (each, an "Asset Sale Prepayment Option Notice") as described below in this paragraph. As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Term Loan Lender an Asset Sale Prepayment Option Notice, which will include an offer by the Borrower to prepay, at par, without premium or penalty on the date that is 15 Business Days following the date of the Asset Sale Prepayment Option Notice, the Loan of such Term Loan Lender by an amount equal to such Term Loan Lender's Term Loan Percentage of the Asset Sale Prepayment Amount. Each Term Loan Lender shall return a completed Asset Sale Prepayment Option Notice to the Administrative Agent no later than 5 Business Days prior to the mandatory prepayment date specified in the applicable Asset Sale Prepayment Option Notice (each an "Asset Sale Mandatory Prepayment Date"), with the failure to so return such notice being deemed to constitute a rejection of the relevant prepayment offer. On each Asset Sale Mandatory Prepayment Date, the Borrower shall pay to the Lenders the aggregate amount necessary to prepay that portion of the outstanding Term Loans in respect of which such Lenders have accepted prepayment as described above in this paragraph on a pro rata basis. To the extent the Term Loan Lenders reject the relevant prepayment offer, or there remains Excess Proceeds after prepayment of the Term Loan Lenders as set forth in this Section 2.12(a), then Borrower shall make an offer to the Second Lien Term Loan Lenders to prepay the Second Lien Term Loans in accordance with Section 2.12(a) of the Second Lien Term Loan Agreement. To the extent the Second Lien Term Loan Lenders do not accept the prepayment offer or there remains Excess Proceeds after prepayment of the Second Lien Term Loans, Borrower shall be entitled to keep any remaining Excess Proceeds; provided however, if the Term Loans and the Second Lien Term Loans have each been repaid in full, then Borrower shall first request that Administrative Agent prepare and provide to each Revolving Credit Lender an Asset Sale Prepayment Option Notice to reduce the First Lien Revolving Credit Facility Commitments as set forth in Section 2.12(b) on a pro rata basis (which shall be made and accepted or rejected on the same basis as the offer to the Term Lenders as set forth above).

(b) Subject to Section 2.12(c), any reduction of the Revolving Credit Commitments pursuant to Section 2.12(a) and this Section 2.12(b) shall be accompanied by prepayment of the Revolving Credit Loans and/or Swing Line Loans to the extent, if any, that the Total Revolving Extensions of Credit exceed the amount of the Total Revolving Credit Commitments as so reduced, provided that if the aggregate principal amount of Revolving Credit Loans and Swing Line Loans then outstanding is less than the amount of the Total Revolving Credit Commitments as so reduced (because L/C Obligations constitute a portion thereof), the

-37-

Borrower shall, to the extent of the balance of such excess (the "Excess Amount"), replace outstanding Letters of Credit and/or deposit an amount in immediately available funds in a cash collateral account established with the Administrative Agent for the benefit of the Secured Parties on terms and conditions reasonably satisfactory to the Administrative Agent (and the Borrower hereby grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a continuing security interest in all amounts at any time on deposit in such cash collateral account to secure all L/C Obligations from time to time outstanding and all other Obligations). If at any time the Administrative Agent determines that any funds held in such cash collateral account are subject to any right or claim of any Person which is superior to that of the Administrative Agent and the Secured Parties or that the total amount of such funds is less than the Excess Amount, the Borrower shall, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited and held in such cash collateral account, an amount equal to the excess of (A) the Excess Amount over (B) the total amount of funds, if any, then held in such cash collateral account that the Administrative Agent determines to be free and clear of any such right and claim.  Notwithstanding any of the foregoing, the amount on deposit in the applicable cash collateral account shall be released and returned to Borrower to the extent the Excess Amount is reduced to zero (or less than zero).  The application of any prepayment pursuant to Section 2.11 and this Section 2.12 shall be made, first, to Base Rate Loans and, second, to Eurodollar Loans.  Each prepayment of the Loans under Section 2.11 and this Section 2.12 (except in the case of Revolving Credit Loans (unless the Revolving Credit Loans are being repaid in full and the Revolving Credit Commitments terminated) that are Base Rate Loans and Swing Line Loans) shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.   All prepayments and Commitment reductions made pursuant to this Section 2.12 shall be made without penalty or premium, provided that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21.

(c)   Notwithstanding anything to the contrary contained in Sections 2.11, 2.12(a) or 2.12(b), if during the period commencing on the Closing Date and ending 365 days after the Closing Date (the "LA Asset Sale Optional Prepayment Period") the Borrower shall receive Net Proceeds from the LA Asset Sale, the Borrower may from time to time during such LA Asset Sale Optional Prepayment Period give the Administrative Agent written notice that the Borrower will prepay all or a portion of the Second Lien Term Loans in accordance with Section 2.12(c) of the Second Lien Term Loan Agreement.  To the extent there remains Excess LA Asset Sale Proceeds after prepayment of the Second Lien Term Loans as set forth in this Section 2.12(c), then, on the date which is 365 days after Borrower's receipt of such Net Proceeds, any remaining Excess LA Asset Sale Proceeds which have not been used as contemplated in the third paragraph of Section 7.6 (including, without limitation, in one or more subsequent offers to Second Lien Term Loan Lenders) shall constitute Excess Proceeds for purposes of Section 2.12(a) above and Section 2.12(a) of the Second Lien Term Loan Agreement.

2.13.   Conversion and Continuation Options.

(a)   The Borrower may elect from time to time to convert Eurodollar Loans to Base Rate Loans by giving the Administrative Agent at least two Business Days' prior irrevocable notice of such election, provided that any such conversion of Eurodollar Loans may

-38-

only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert Base Rate Loans to Eurodollar Loans by giving the Administrative Agent at least three Business Days' prior irrevocable notice of such election (which notice shall specify the length of the initial Interest Period therefor), provided that no Base Rate Loan under a particular Facility may be converted into a Eurodollar Loan (i) when any Event of Default has occurred and is continuing if the Administrative Agent or the Required Lenders in respect of such Facility have determined in its or their sole discretion not to permit such conversions or (ii) after the date that is one month prior to the final scheduled termination or maturity date of such Facility. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b) Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan under a particular Facility may be continued as such (i) when any Event of Default has occurred and is continuing if the Administrative Agent or the Required Lenders in respect of such Facility have determined in its or their sole discretion not to permit such continuations or (ii) after the date that is one month prior to the final scheduled termination or maturity date of such Facility, and provided, further, that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso, such Loans shall be automatically converted to Base Rate Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.14. **Minimum Amounts and Maximum Number of Eurodollar Tranches.** Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions, continuations and optional prepayments of Eurodollar Loans hereunder and all selections of Interest Periods hereunder shall be in such amounts and be made pursuant to such elections so that (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $1,000,000 or a whole multiple of $1,000,000 in excess thereof and (b) no more than 8 Eurodollar Tranches shall be outstanding at any one time.

2.15. **Interest Rates and Payment Dates.**

(a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b) Each Base Rate Loan shall bear interest at a rate per annum equal to the Base Rate plus the Applicable Margin.

(c) (i) If all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount of the Loans and Reimbursement Obligations shall bear interest at a rate per annum that is equal to (x) in the case of the Loans, the rate that

would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2.0% per annum or (y) in the case of Reimbursement Obligations, the rate applicable to Base Rate Loans under the Revolving Credit Facility plus 2.0% per annum and (ii) if all or a portion of any interest payable on any Loan or Reimbursement Obligation or any commitment fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to Base Rate Loans under the relevant Facility plus 2.0% per annum (or, in the case of any such other amounts that do not relate to a particular Facility, the rate then applicable to Base Rate Loans under the Revolving Credit Facility plus 2.0% per annum), in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(d)    Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

2.16.    Computation of Interest and Fees.

(a)    Interest, fees and commissions payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to Base Rate Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365-day (or 366-day, as the case may be) year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the Base Rate or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate. Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower or any Lender, deliver to the Borrower or such Lender a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.15(a).

2.17.    Inability to Determine Interest Rate. If prior to the first day of any Interest Period:

(a)    the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower in the absence of manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)    the Administrative Agent shall have received notice from the Required Lenders in respect of the relevant Facility that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

-40-

(c)    the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter.  If such notice is given (i) any Eurodollar Loans under the relevant Facility requested to be made on the first day of such Interest Period shall be made as Base Rate Loans, (ii) any Loans under the relevant Facility that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as Base Rate Loans and (iii) any outstanding Eurodollar Loans under the relevant Facility shall be converted, on the last day of the then current Interest Period with respect thereto, to Base Rate Loans.  If adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for a future Interest Period and the Eurodollar Rate determined or to be determined for such Interest Period will adequately and fairly reflect the cost to such Lenders (as conclusively determined by such Lenders) then such Lenders shall promptly direct the Administrative Agent to withdraw such notice.  Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans under the relevant Facility shall be made or continued as such, nor shall the Borrower have the right to convert Loans under the relevant Facility to Eurodollar Loans.

2.18.    Pro Rata Treatment and Payments.

(a)    Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any commitment fee and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective Term Loan Percentages or Revolving Credit Percentages, as the case may be, of the relevant Lenders.  Subject to Section 2.18(c), each payment (other than prepayments) in respect of principal or interest in respect of the Loans, and each payment in respect of fees or expenses payable hereunder shall be applied to the amounts of such obligations owing to the Lenders pro rata according to the respective amounts then due and owing to the Lenders.  The application of any prepayment pursuant to this Section 2.18 shall be made, first, to Base Rate Loans and, second, to Eurodollar Loans.

(b)    Except as otherwise provided in Section 2.12, each prepayment to be applied to Term Loans shall be allocated among the Term Loan Lenders holding such Term Loans pro rata based on the principal amount of the Term Loans held by each Term Loan Lender and shall be applied to the remaining scheduled quarterly installments due on the Term Loans pursuant to Section 2.3 pro rata.

(c)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Revolving Credit Loans shall be made pro rata according to the respective outstanding principal amounts of the Revolving Credit Loans then held by the Revolving Credit Lenders.

(d)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 1:00 P.M., New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Payment Office, in Dollars and in immediately available funds.  The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day

-41-

other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to Base Rate Loans under the relevant Facility, on demand, from the Borrower.

(f)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment being made hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days of such required date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

2.19.   Requirements of Law.

(a)     If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof, in each case after the date hereof, or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority first made subsequent to the date hereof (collectively, a "Change in Law"):

(i)     shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any Application or any Eurodollar Loan

-42-

made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.20 and net income taxes, capital taxes, branch profit taxes and franchise taxes (imposed in lieu of income taxes) of such Lender);

       (ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate hereunder; or

       (iii)    shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans or issuing or participating in Letters of Credit in each case hereunder, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, within 30 days after receipt by the Borrower of a reasonably detailed invoice therefor, any additional amounts necessary to compensate such Lender on an after-tax basis for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this Section, such Lender shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

       (b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof, in each case after the date hereof, or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority first made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount reasonably deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a reasonably detailed written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such reduction.

       (c)    A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

       (d)    Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's

right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than 90 days prior to the date that such Lender notifies the Borrower of any such Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefore (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 90-day period referred to above shall be extended to include the period of retroactive effect thereof).

2.20.   Taxes.

(a)     Except as otherwise required by applicable law, all payments made by the Borrower under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes, capital taxes, branch profits taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Arranger, any Agent or any Lender as a result of a present or former connection between the Arranger, such Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Arranger's, such Agent's or such Lender's having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document).  Subject to the provisions of Section 2.20(f), if any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes"), including Other Taxes, are required to be withheld from any amounts payable to the Arrangers, any Agent or any Lender hereunder, the amounts so payable to the Arrangers, such Agent or such Lender shall be increased to the extent necessary to yield to the Arrangers, such Agent or such Lender (after payment of all Non-Excluded Taxes, including Other Taxes) interest or any such other amounts that would have been received hereunder had such withholding not been required after taking into account all tax deductions and credits the Arranger, Agent or Lender actually recognizes as a result of the payment of such amounts.  The Borrower or the applicable Subsidiary Guarantor shall make any required withholding and pay the full amount withheld to the relevant tax authority or other Governmental Authority in accordance with applicable Requirements of Law.

(b)     The Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)     Subject to Section 2.20(f), the Borrower shall indemnify each Arranger, each Agent and each Lender for the full amount of Non-Excluded Taxes or Other Taxes arising in connection with payments made under this Agreement (including any Non-Excluded Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.20) paid by each Arranger, such Agent or Lender or any of their respective Affiliates and any liability (including penalties, additions to tax interest and expenses) arising therefrom or with respect thereto.  Payment under this indemnification shall be made within 20 days after the date any Arranger, any Agent or any Lender or any of their respective Affiliates makes a written demand therefore accompanied by either (i) a copy of the receipt issued by a Governmental Authority evidencing the Arranger's, Agent's or Lender's payment of such indemnified taxes, interest or

-44-

penalties, or (ii) if the Arranger, Agent, or Lender determines that it is unable to provide a copy of such receipt without making its tax returns available to the Borrower, a certificate signed by an officer of the Arranger, Agent or Lender (as the case may be) as to the amount of such payment or liability prepared in good faith.

(d)    Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for the account of the relevant Arranger or the relevant Agent or Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof.

(e)    The agreements in this Section 2.20 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(f)    Each Lender (or Transferee) that is not a citizen or resident of the United States of America, or a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof) (a "Non-U.S. Lender") shall deliver to the Borrower and the Administrative Agent (and, in the case of a Participant, to the Lender from which the related participation shall have been purchased) (i) two copies of accurate and complete, duly signed original forms of either U.S. Internal Revenue Service Form W-8BEN, Form W-8ECI or Form W-8IMY (or any successor forms), or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a duly signed and certified statement substantially in the form of Exhibit G to the effect that such Lender is eligible for a complete exemption from withholding of U.S. taxes under Section 871(h) or 881(c) of the Code and a Form W-8BEN, or any subsequent versions thereof or successors thereto, and (ii) any other form or certificate required by a taxing authority (including a certificate required under the Code) that is requested by the Borrower or the Administrative Agent in writing, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from U.S. federal withholding tax on all payments by the Borrower under this Agreement and the other Loan Documents. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Each Non-U.S. Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver. For any period with respect to which a Lender (or Transferee) has failed to provide the Borrower with the appropriate forms described in this Section 2.20(f) (other than if such failure is due to a change in law occurring subsequent to the date on which a form originally was required to be provided), such Lender (or Transferee) shall not be entitled to additional payments under the penultimate sentence of Section 2.20 or indemnification under Section 2.20 with respect to Non-Excluded Taxes that would have been avoided but for such failure. Any Lender (or Transferee) that is a United States person as defined in section 7701(a)(30) of the Code shall deliver to the Borrower a statement signed by an authorized signatory of such Lender (or Transferee) that it is a United States person and, if necessary to avoid U.S. backup

-45-

withholding, two copies of a complete and accurate, duly signed Internal Revenue Service Form W-9 (or successor form) establishing that the Lender (or Transferee) is organized under the laws of the United States and is not subject to backup withholding.

(g)     If and to the extent that any Lender is able, in its sole opinion, to obtain a tax refund or to apply or otherwise take advantage of any offsetting tax credit or other similar tax benefit arising out of or in conjunction with any deduction or withholding which gives rise to an obligation on the Borrower to pay any Non-Excluded Taxes or Other Taxes pursuant to Section 2.20 then such Lender shall, to the extent that in its sole opinion it can do so without prejudice to the retention of such tax refund or the amount of such credit or benefit and without any other adverse tax consequences for such Lender, reimburse to the Borrower at such time as such tax refund or such tax credit or benefit shall have actually been received by such Lender such amount as such Lender shall, in its sole opinion, have determined to be attributable to such tax refund or the relevant deduction or withholding and as will leave such Lender in no better or worse position than it would have been in if the payment of such Non-Excluded Taxes or Other Taxes had not been required.  Nothing in this Section 2.20(g) shall oblige any Lender to disclose to the Borrower or any other person any information regarding its tax affairs or tax computations or interfere with the right of any Lender to arrange its tax affairs in whatever manner it thinks fit and, in particular, no Lender shall be under any obligation to claim relief from its corporate profits or similar tax liability in credits or deductions available to it and, if it does claim, the extent, order and manner in which it does so shall be at its absolute discretion.

2.21.   Indemnity.  The Borrower agrees to indemnify each Lender and to hold each Lender harmless from any loss or expense (other than any loss of Applicable Margin) that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment or conversion of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market and any receipt of any Commitment Fee that would not have occurred absent the circumstances described above.  A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error.  This Section 2.21 shall survive the termination of this Agreement and the payment of the Loans and Letters of Credit and all other amounts payable hereunder.

2.22.   Illegality.  Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall

-46-

make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, (a) the commitment of such Lender hereunder to make Eurodollar Loans, continue Eurodollar Loans as such and convert Base Rate Loans to Eurodollar Loans shall forthwith be suspended for as long as is required by law and (b) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to Base Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law.  If any such conversion of a Eurodollar Loan occurs on a day that is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.21.

2.23.  Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.19, 2.20(a), 2.20(c) or 2.22 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of any Borrower or the rights of any Lender pursuant to Section 2.19, 2.20(a), 2.20(c) or 2.22.

2.24.  Replacement of Lenders under Certain Circumstances.  The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.19, 2.20(a) or is affected under 2.22 or (b) defaults in its obligation to make Loans hereunder, with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (iv) the Borrower shall be liable to such replaced Lender under Section 2.21 (as though Section 2.21 were applicable) if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (v) the replacement financial institution, if not already a Lender or an Agent, shall be reasonably satisfactory to the Administrative Agent, (vi) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (vii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.19, 2.20(a) or 2.20(c), as the case may be, and (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

SECTION 3.  LETTERS OF CREDIT

3.1.  L/C Commitment.

(a)  Subject to the terms and conditions hereof, the Issuing Lender, in reliance on the agreements of the other Revolving Credit Lenders set forth in Section 3.4(a), agrees to issue standby letters of credit ("Letters of Credit") for the account of the Borrower on any Business Day during the Revolving Credit Commitment Period in such form as may be approved

-47-

from time to time by the Issuing Lender; provided that the Issuing Lender shall not issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations would exceed the L/C Commitment or (ii) the aggregate amount of the Available Revolving Credit Commitments would be less than zero. Each Letter of Credit shall (i) be denominated in Dollars and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date which is five Business Days prior to the date specified in clause (a) of the definition of Revolving Credit Termination Date, provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (y) above).

(b)     The Issuing Lender shall not at any time be obligated to issue any Letter of Credit hereunder if such issuance would conflict with, or cause the Issuing Lender to exceed any limits imposed by, any applicable Requirement of Law.

3.2.     <u>Procedure for Issuance of Letter of Credit</u>.  The Borrower may from time to time request that the Issuing Lender issue a Letter of Credit by delivering to the Issuing Lender at its address for notices specified herein (with a copy to the Administrative Agent) an Application therefor, completed to the reasonable satisfaction of the Issuing Lender, and such other certificates, documents and other papers and information as the Issuing Lender may reasonably request.  Upon receipt of any Application, the Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall the Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto unless the Issuing Lender agrees in its sole discretion) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by the Issuing Lender and the Borrower.  The Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower promptly following the issuance thereof.  The Issuing Lender shall promptly furnish to the Administrative Agent, which shall in turn promptly furnish to the Lenders, notice of the issuance of each Letter of Credit (including the amount thereof).

3.3.     <u>Fees and Other Charges</u>.

(a)     The Borrower will pay a fee on the aggregate drawable amount of each outstanding Letter of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the Revolving Credit Facility, shared ratably among the Revolving Credit Lenders and payable quarterly in arrears on each L/C Fee Payment Date after the issuance date of such Letter of Credit.  In addition, the Borrower shall pay to the Issuing Lender for its own account a fronting fee as agreed between the Issuing Lender and the Borrower.

(b)     In addition to the foregoing fees, the Borrower shall pay or reimburse the Issuing Lender for such normal and customary costs and expenses as are incurred or charged by the Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

-48-

### 3.4.    L/C Participations.

(a)    The Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce the Issuing Lender to issue Letters of Credit hereunder, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from the Issuing Lender, on the terms and conditions hereinafter stated, for such L/C Participant's own account and risk an undivided interest equal to such L/C Participant's Revolving Credit Percentage in the Issuing Lender's obligations and rights under each Letter of Credit issued hereunder and the amount of each draft paid by the Issuing Lender thereunder.    Each L/C Participant unconditionally and irrevocably agrees with the Issuing Lender that, if a draft is paid under any Letter of Credit for which the Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of this Agreement, such L/C Participant shall pay to the Administrative Agent, for the account of the Issuing Lender, upon demand at the Administrative Agent's Payment Office (and thereafter the Administrative Agent shall promptly pay to the Issuing Lender), regardless of the occurrence or continuance of a Default or the failure to satisfy any of the other conditions specified in Section 5, on the first Business Day after demand, an amount equal to such L/C Participant's Revolving Credit Percentage of the amount of such draft, or any part thereof, that is not so reimbursed.

(b)    If any amount required to be paid by any L/C Participant to the Administrative Agent, for the account of the Issuing Lender pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by the Issuing Lender under any Letter of Credit is not paid to the Issuing Lender within three Business Days after the date such payment is due, the Issuing Lender shall so notify the Administrative Agent, who shall so notify such L/C Participant and such L/C Participant shall pay to the Administrative Agent, for the account of the Issuing Lender on demand (and thereafter the Administrative Agent shall promptly pay to the Issuing Lender) an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to the Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360.    If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the Administrative Agent, for the account of the Issuing Lender by such L/C Participant within three Business Days after the date such payment is due, Administrative Agent, on behalf of the Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to Base Rate Loans under the Revolving Credit Facility.    A certificate the Administrative Agent submitted on behalf of the Issuing Lender submitted to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c)    Whenever, at any time after the Issuing Lender has made payment under any Letter of Credit and has received from the Administrative Agent or any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a), the Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by the Issuing Lender), or any payment of interest on account thereof, the Issuing Lender will distribute to the Administrative Agent, for the account of such L/C Participant (and thereafter the Administrative Agent shall promptly pay

-49-

such L/C Participant) its pro rata share thereof; provided, however, that in the event that any such payment received by the Issuing Lender shall be required to be returned by the Issuing Lender, such L/C Participant shall return to the Administrative Agent, for the account of the Issuing Lender (and thereafter the Administrative Agent shall promptly pay to the Issuing Lender), the portion thereof previously distributed by the Issuing Lender.

    3.5.   Reimbursement Obligation of the Borrower. The Borrower agrees to reimburse the Issuing Lender on each date on which the Issuing Lender notifies the Borrower of the date and amount of a draft presented under any Letter of Credit and paid by the Issuing Lender for the amount of (a) such draft so paid and (b) any taxes, fees, charges or other reasonable costs or expenses incurred by the Issuing Lender in connection with such payment (the amounts described in the foregoing clauses (a) and (b) in respect of any drawing, collectively, the "Payment Amount"). Each such payment shall be made to the Issuing Lender at its address for notices specified herein in lawful money of the United States of America and in immediately available funds. Interest shall be payable on each Payment Amount from the date of the applicable drawing until payment in full at the rate set forth in (i) until the second Business Day following the date of the applicable drawing, Section 2.15(b) and (ii) thereafter, Section 2.15(c). Each drawing under any Letter of Credit shall (unless an event of the type described in clause (i) or (ii) of Section 8(f) shall have occurred and be continuing with respect to the Borrower, in which case the procedures specified in Section 3.4 for funding by L/C Participants shall apply) constitute a request by the Borrower to the Administrative Agent for a borrowing pursuant to Section 2.5 of Base Rate Loans (or, at the option of the Administrative Agent and the Swing Line Lender in their sole discretion, a borrowing pursuant to Section 2.7 of Swing Line Loans) in the amount of such drawing. The Borrowing Date with respect to such borrowing shall be the first date on which a borrowing of Revolving Credit Loans (or, if applicable, Swing Line Loans) could be made, pursuant to Section 2.5 (or, if applicable, Section 2.7), if the Administrative Agent had received a notice of such borrowing at the time of such drawing under such Letter of Credit.

    3.6.   Obligations Absolute. The Borrower's obligations under this Section 3 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Borrower may have or have had against the Issuing Lender, any beneficiary of a Letter of Credit or any other Person. The Borrower also agrees with the Issuing Lender that the Issuing Lender shall not be responsible for, in the absence of willfull misconduct or gross negligence of the Issuing Lender, and the Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such transferee. The Issuing Lender shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions resulting from the Issuing Lender's willfull misconduct or gross negligence. The Borrower agrees that any action taken or omitted by the Issuing Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in accordance with the standards or care specified in the Uniform Commercial Code of the State of New York,

-50-

shall be binding on the Borrower and shall not result in any liability of the Issuing Lender to the Borrower.

3.7.    <u>Letter of Credit Payments</u>.    If any draft shall be presented for payment under any Letter of Credit, the Issuing Lender shall promptly notify the Borrower of the date and amount thereof. The responsibility of the Issuing Lender to the Borrower in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

3.8.    <u>Applications</u>.    To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 3, the provisions of this Section 3 shall apply.

SECTION 4.    REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to induce the Lenders to make the Loans and issue or participate in the Letters of Credit, the Borrower hereby represents and warrants to the Agents and Lenders that:

4.1.    <u>Financial Condition</u>.

(a)    The unaudited pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at December 31, 2004 (including the notes thereto, if any), copies of which have heretofore been furnished to the Administrative Agent for distribution to each Lender, has been prepared giving effect (as if such events had occurred on such date) to (i) the consummation of the Refinancing (including without limitation the application of the proceeds hereof pursuant to Section 4.16) and (ii) the payment of fees and expenses in connection with the foregoing (including such adjustments, the "<u>Pro Forma Balance Sheet</u>"). The Pro Forma Balance Sheet has been prepared in good faith as of the date of delivery thereof, and presents fairly on a pro forma basis the estimated financial position of Borrower and its consolidated Subsidiaries as at December 31, 2004, assuming that the events specified in the preceding sentence had actually occurred at such date.

(b)    The audited consolidated balance sheets of the Borrower and its Subsidiaries as at December 31, 2004, and the related consolidated statements of income and of cash flows for such fiscal year, ended on such date, reported on and accompanied by an unqualified report from KPMG LLP, present fairly in all material respects the consolidated financial condition of the Borrower and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for such fiscal year. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein). The unaudited consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal quarter ended March 31, 2005, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal quarter, certified on behalf of the Borrower by its chief financial officer were

-51-

prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject in each case to the absence of footnotes and to normal year-end audit adjustments.  As of the Closing Date, the Borrower and its Subsidiaries have no material Guarantee Obligations, material contingent liabilities or material liabilities for taxes, or any material long-term leases or material unusual forward or material long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph, to the extent same are required to be so reflected.  During the period from December 31, 2004 to and including the Closing Date there has not been any sale, lease, license sale and lease back, assignment, conveyance transfer or other disposition by any of the Borrower or its Subsidiaries of any material part of its business or Property.

4.2.    <u>No Change</u>.  Since December 31, 2004, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

4.3.    <u>Existence; Compliance with Law</u>.  Except as set forth in <u>Schedule 4.3</u>, each of the Borrower and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the corporate or other applicable organizational power and authority, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged except where the failure to do so could not reasonably be expected to have a Material Adverse Effect, (c) is duly qualified as a foreign corporation and in good standing under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4.    <u>Power; Authorization; Enforceable Obligations</u>.  Each Loan Party has the corporate or other applicable organizational power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder.  Each Loan Party has taken all necessary corporate action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the borrowings on the terms and conditions of this Agreement.  No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the borrowings hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) consents, authorizations, filings and notices that have been obtained or made and are in full force and effect except as could not reasonably be expected to have a Material Adverse Effect and (ii) the filings referred to in Section 4.19.  The Loan Documents and the Second Lien Term Loan Documents have been duly executed and delivered on behalf of each Loan Party party thereto.  This Agreement constitutes, and each other Loan Document and the Second Lien Term Loan Documents constitutes or upon execution will constitute, a legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be

-52-

limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

4.5. <u>No Legal Bar</u>. The execution, delivery and performance of this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate any material Requirement of Law or any material Contractual Obligation of the Borrower or any of its Subsidiaries and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents).

4.6. <u>No Material Litigation</u>. Except as set forth on <u>Schedule 4.6</u>, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened in writing by or against the Borrower or any of its Subsidiaries or against any of their respective properties or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby or (b) that could reasonably be expected to have a Material Adverse Effect.

4.7. <u>No Default</u>. No Default has occurred and is continuing.

4.8. <u>Ownership of Property; Liens</u>. Each of the Borrower and its Subsidiaries has good, marketable and insurable title in fee simple to, or a valid leasehold interest in, all its material real property, and good title to, or a valid leasehold interest in or adequate rights to use, all its other material Property except as could not reasonably be expected to have a Material Adverse Effect, and none of such material Property is subject to any Lien except as permitted by Section 7.3.

4.9. <u>Intellectual Property</u>. The Borrower and each of its Subsidiaries owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted except where the failure to own or license such Intellectual Property could not reasonably be expected to have a Material Adverse Effect. Except as set forth on <u>Schedule 4.9</u>, no claim has been asserted or is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, except where such claim could not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, the use of Intellectual Property by the Borrower and its Subsidiaries does not infringe on the rights of any Person in any respect that could reasonably be expected to have a Material Adverse Effect.

4.10. <u>Taxes</u>. Other than as set forth on <u>Schedule 4.10</u> hereof, each of the Borrower and its Subsidiaries has filed or caused to be filed all Federal, state and other material tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its Property and all other material fees or other charges imposed on it or any of its Property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which any reserves required under GAAP have been

provided on the books of the Borrower or its Subsidiaries, as the case may be except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

4.11. Federal Regulations. No part of the proceeds of the Loans or Letters of Credit will be used for purchasing or carrying any "margin stock" (within the meaning of Regulation U). None of the transactions contemplated by this Agreement (including the direct and indirect use of proceeds of the Loans and Letters of Credit) will violate or result in a violation of Regulation T, Regulation U or Regulation X. If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 referred to in Regulation U.

4.12. Labor Matters. There are no strikes, stoppages, slowdowns or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge the Borrower, threatened that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect. Hours worked by and payment made to employees of the Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect. All payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect if not paid have been paid or accrued as a liability on the books of the Borrower or the relevant Subsidiary.

4.13. ERISA. Neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period ending on the date on which this representation is made or deemed made with respect to any Single Employer Plan. Each Single Employer Plan (and to the knowledge of the Borrower, each a Multiemployer Plan) has complied and has been administered in all material respects with all applicable provisions of ERISA and the Code. During such five-year period, (i) no termination of a Single Employer Plan has occurred, (ii) no filing of any notice of intent to terminate a Single Employer Plan has been made, (iii) the PBGC has not instituted any proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Single Employer Plan and (iv) no Lien in favor of the PBGC or a Plan has arisen with respect to any Plan. There exists no Unfunded Pension Liability (determined as of the last applicable annual valuation date prior to the date on which this representation is made or deemed made) with respect to any Single Employer Plans which, taken alone or together with all other Single Employer Plans with Unfunded Pension Liability, could reasonably be expected to be material to the Borrower or any Commonly Controlled Entity. Each Single Employer Plan (and to the knowledge of the Borrower, each Multiemployer Plan) which is intended to be qualified under Section 401 (a) of the Code has been determined by the IRS to be so qualified, and, nothing has occurred since the date of such determination that could reasonably be expected to adversely affect such determination. There has been no failure to make a required contribution to any Single Employer Plan that would result in the imposition of an encumbrance under Section 412 of the Code or Section 302 of ERISA and there has been no filing of any request for a minimum funding waiver under Section 412 of the Code with respect to any Single Employer Plan. No non-exempt prohibited transaction within the meaning of

-54-

Section 4975 of the Code or Section 406 of ERISA has occurred with respect to any Plan that has resulted or could reasonably be expected to result in a material liability to the Borrower or any Subsidiary. Neither the Borrower nor any Commonly Controlled Entity has incurred any liability under Title IV of ERISA with respect to any Single Employer Plan (other than premiums due and not delinquent under Section 4007 of ERISA). There are no delinquent contributions under Section 515 of ERISA to any Multiemployer Plan. Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA, and to the knowledge of the Borrower, neither the Borrower nor any Commonly Controlled Entity would become subject to any material liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made. To the knowledge of the Borrower, no such Multiemployer Plan is in Reorganization or Insolvent.

4.14. <u>Investment Company Act; Other Regulations</u>. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

4.15. <u>Subsidiaries</u>.

(a) The Subsidiaries listed on <u>Schedule 4.15</u> constitute all the Subsidiaries of the Borrower as of the Closing Date. <u>Schedule 4.15</u> sets forth as of the Closing Date the name and jurisdiction of formation of each Subsidiary and, as to each such Subsidiary, the percentage and number of each class of Capital Stock thereof owned by the Borrower and its Subsidiaries.

(b) As of the Closing Date, none of the Borrower or any of its Subsidiaries has issued, or authorized the issuance of, any Disqualified Stock.

4.16. <u>Use of Proceeds</u>.

(a) The proceeds of the Term Loans shall be used solely to (i) repay the Borrower's obligations under the Existing Credit Agreement and to finance (along with amounts borrowed under the Second Lien Term Loan Facility) a portion of the redemption of all of the Senior Subordinated Notes and to pay all accrued interest thereon and call, or other premiums payable in connection therewith, and (ii) pay costs and expenses incurred in connection with the Facilities.

(b) The proceeds of the Revolving Credit Loans, the Swing Line Loans and the Letters of Credit shall be used for working capital purposes, capital needs and general corporate purposes of the Borrower and its Subsidiaries including Investments permitted hereunder.

4.17. <u>Environmental Matters</u>. Other than exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:

-55-

(a)    The Borrower and its Subsidiaries are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws.

(b)    Materials of Environmental Concern are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by the Borrower or any of its Subsidiaries, or at any other location (including any location to which Materials of Environmental Concern have been sent for re-use or recycling or for treatment, storage, or disposal) which could reasonably be expected to (i) give rise to liability of the Borrower or any of its Subsidiaries under any applicable Environmental Law, or (ii) interfere with the Borrower's or any of its Subsidiaries' continued operations.

(c)    There is no judicial, administrative or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which the Borrower or any of its Subsidiaries is, or to the knowledge of the Borrower will be, named as a party that is pending or, to the knowledge of the Borrower, threatened.

(d)    Neither the Borrower nor any of its Subsidiaries has received any written request for information, or been notified in writing that it is a potentially responsible party under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any Materials of Environmental Concern.

(e)    Neither the Borrower nor any of its Subsidiaries has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)    Neither the Borrower nor any of its Subsidiaries has assumed or retained, by contract or operation of law, any liabilities under any Environmental Law or with respect to any Material of Environmental Concern.

4.18.    Accuracy of Information, etc.  No statement or information (other than budget, pro forma financial information and projections) contained in this Agreement, any other Loan Document or any other certificate or written statement furnished by a Responsible Officer to any Arranger, any Agent or any Lender by or on behalf of the Borrower or any of its Subsidiaries and relating thereto for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, when taken as a whole and together with the Borrower's most recent 10-K and 10-Q filed with the SEC prior to the Closing Date and any 8-K filed with the SEC after the filing of the most recent 10-Q and prior to the Closing Date, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which they were made.  The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as

-56-

fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

4.19. <u>Security Documents.</u>

(a)     The Guarantee and Collateral Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  In the case of the Pledged Securities (described, and as defined, in the Guarantee and Collateral Agreement), when any certificates, notes or other instruments representing such Pledged Securities are delivered to the Administrative Agent, and in the case of the other Collateral described in the Guarantee and Collateral Agreement (other than Intellectual Property, which is addressed in paragraph (b) of this Section 4.19), when financing statements in appropriate form are filed in the offices specified on Schedule 4.19, the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof which can be perfected by filing a financing statement as security for the Obligations, in each case prior and superior in right to any other Person, except, in the case of Collateral other than Pledged Securities, Liens permitted by Section 7.3.

(b)     The Intellectual Property Security Agreements are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Intellectual Property Collateral described therein and proceeds thereof.  Upon the filing of (i) the Patent Security Agreement Supplement and the Trademark Security Agreement Supplement in the appropriate indexes of the United States Patent and Trademark Office relative to patents and trademarks, respectively (within three (3) months after the Closing Date), and the Copyright Security Agreement Supplement in the appropriate indexes of the United States Copyright Office relative to copyrights (within thirty (30) days after the Closing Date), together with provision for payment of all requisite fees, and (ii) financing statements in appropriate form for filing in the offices specified on Schedule 4.19, the Intellectual Property Security Agreements shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Intellectual Property Collateral and the proceeds and products thereof which can be perfected by such filings, as security for the Obligations, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on any After-Acquired Intellectual Property (as defined in the Guarantee and Collateral Agreement)), except Liens permitted by Section 7.3.

4.20. <u>Solvency.</u> Each Loan Party is, and after giving effect to the incurrence of all Indebtedness and obligations being incurred in connection with the Loan Documents and the Second Lien Term Loan Documents will be Solvent.

4.21. <u>Insurance.</u> Each of the Borrower and its Subsidiaries is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which it is engaged; and none of the Borrower or any of its Subsidiaries has received notice from any insurer or agent of such insurer that substantial capital improvements or other material expenditure, in each case, that could



reasonably be expected to have a Material Adverse Effect, will have to be made in order to continue such insurance. The Administrative Agent, as agent for the Lenders, has been named as loss payee on all property and casualty insurance policies for the benefit of any Loan Party and as additional insured on all liability insurance policies for the benefit of any Loan Party.

4.22. Permits and Licenses.

(a)     The FCC Licenses held by the Borrower and its Subsidiaries constitute all of the material licenses, permits and other authorizations issued by the FCC that are necessary for the Borrower and its Subsidiaries to conduct their business in the manner in which it is currently being conducted.

(b)     All material FCC Licenses relating to the business of the Borrower and its Subsidiaries are in full force and effect.. As of the Closing Date, (i) neither the Borrower nor any Subsidiary has received any notice of apparent liability, notice of violation, order to show cause or other writing from the FCC that may lead to any material liability or sanction by the FCC and (ii) there is no proceeding pending by or before the FCC relating to the Borrower or any Subsidiary or any Station, nor, to the best knowledge of the Borrower or any Subsidiary, is any such proceeding threatened and no complaint or investigation is pending or threatened by or before the FCC (other than rulemaking proceedings of general applicability to which the Borrower and its Subsidiaries and the Stations are not parties).     The Borrower and its Subsidiaries have timely filed all required reports and notices with the FCC and have paid all amounts due in timely fashion on account of fees and charges to the FCC except where the failure to do so could not materially adversely affect the Borrower's or any of its Subsidiaries' material FCC Licenses.

(c)     All FCC Licenses relating to the business of the Borrower and its Subsidiaries (except, to the extent elected by the Borrower, FCC Licenses that are owned solely by one or more of the Excluded Foreign Subsidiaries and relate solely to the business conducted by any of the Excluded Foreign Subsidiaries) are held by one or more Broadcast License Subsidiaries.

(d)     Other than exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (i) each of the Borrower and its Subsidiaries has obtained and holds all Permits required for any property owned, leased or otherwise operated by such Person and for the operation of each of its businesses as presently conducted, (ii) all such Permits are in full force and effect, and each of the Borrower and its Subsidiaries has performed all requirements of such Permits, (iii) no event has occurred which allows or results in, or after notice or lapse of time would allow or result in, revocation or termination by the issuer thereof or in any other impairment of the rights of the holder of any such Permit and, (iv) none of such Permits contain any restrictions, either individually or in the aggregate, that are materially burdensome to the Borrower or any of its Subsidiaries, or to the operation of any of their respective businesses or any property owned, leased or otherwise operated by such Person.

(e)     No consent or authorization of, filing with or Permit from, or other act by or in respect of, any Governmental Authority is required in connection with the execution,

delivery, performance, validity or enforceability of this Agreement and the other Loan Documents other than (i) FCC approval of the transfer of FCC Licenses to Broadcast License Subsidiaries, which (except in the case of FCC Licenses owned solely by one or more of the Excluded Foreign Subsidiaries and relating solely to the business conducted by any of the Excluded Foreign Subsidiaries that the Borrower has not transferred to a Broadcast License Subsidiary) has been obtained and (ii) other than the requirement under the Communications Act that certain Loan Documents be filed with the FCC.

## SECTION 5.   CONDITIONS PRECEDENT

     5.1.   <u>Conditions to Initial Extension of Credit</u>.   The agreement of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction or waiver, prior to or concurrently with the making of such extension of credit on the Closing Date and in any event on or before June 10, 2005, of the following conditions precedent:

     (a)   <u>Loan Documents</u>.   The Administrative Agent shall have received (i) this Agreement, executed and delivered by a duly authorized officer of the Borrower, (ii) the Guarantee and Collateral Agreement, executed and delivered by a duly authorized officer of the Borrower and each Subsidiary Guarantor, (iii) each Intellectual Property Security Agreement, executed and delivered by a duly authorized officer of the Borrower and each Subsidiary Guarantor and (iv) if requested by any Lender, for the account of such Lender, Notes conforming to the requirements hereof and executed and delivered by a duly authorized officer of the Borrower.

     (b)   <u>Pro Forma Balance Sheet; Financial Statements</u>.   The Lenders shall have received (i) the Pro Forma Balance Sheet, (ii) audited consolidated financial statements of the Borrower and its Subsidiaries for the 2004 and 2003.

     (c)   <u>Approvals</u>.   All governmental and third-party approvals necessary in connection with the transactions contemplated hereby shall have been obtained and be in full force and effect.

     (d)   <u>Fees</u>.   The Arrangers, the Agents and the Lenders shall have received all amounts payable under the Fee Letter on or before the Closing Date, and the Administrative Agent shall have received, to the extent payable under this Agreement or the Commitment Letter, reimbursement of all reasonable out-of-pocket expenses of the Arrangers and the Administrative Agent invoiced to and payable by the Borrower on or prior to the Closing Date in connection with the transactions contemplated by the Facilities.

     (e)   <u>Solvency</u>.   The Lenders shall have received a Solvency Certificate executed on behalf of the Borrower by the chief financial officer of the Borrower.

     (f)   <u>Lien Searches</u>.   The Administrative Agent shall have received the results of recent lien searches in each of the jurisdictions or offices (including in the United States Patent and Trademark Office and the United States Copyright Office) in which Uniform Commercial Code financing statements or other filings or recordations should be made to evidence or perfect security interests in the Collateral, which results reveal no Liens on any of the Property of the Borrower or any of its Subsidiaries other than Liens permitted by Section 7.3

or Liens to be discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Administrative Agent.

(g)     Closing Certificate.   The Administrative Agent shall have received a certificate of each Loan Party, dated as of the Closing Date, substantially in the form of Exhibit H, with appropriate insertions and attachments.

(h)     Other Certifications.   The Administrative Agent shall have received the following:

(i)     a copy of the Governing Documents of each Loan Party, certified (as of a date reasonably near the Closing Date) as being a true and correct copy thereof by the Secretary of State or other applicable Governmental Authority of the jurisdiction in which such Loan Party is organized;

(ii)    a copy of a good standing certificate of the Secretary of State or other applicable Governmental Authority of the jurisdiction in which each Loan Party is organized, dated reasonably near the Closing Date, and

(iii)   as requested by the Administrative Agent, a copy of a good standing certificate of the Secretary of State or other applicable Governmental Authority of any jurisdiction in which the Borrower or any of its Subsidiaries is qualified as a foreign corporation or entity, dated reasonably near the Closing Date.

(i)     Legal Opinions.   The Lenders shall have received the legal opinion of Latham & Watkins LLP, counsel to the Borrower and its Subsidiaries, and of local counsel for the Borrower, in each case, covering such customary matters incident to the transactions contemplated by this Agreement as the Administrative Agent may reasonably require and in form and substance reasonably satisfactory to the Administrative Agent.

(j)     Pledged Collateral.   Subject to the requirements of the Intercreditor Agreement, the Administrative Agent shall have received the certificates, notes and other instruments representing the Pledged Securities pledged pursuant to the Guarantee and Collateral Agreement, all endorsed in blank (or accompanied by an executed transfer form in blank satisfactory to the Administrative Agent) by the pledgor thereof.

(k)     Filings, Registrations and Recordings.   The Administrative Agent shall have received, in proper form for filing, registration or recordation, each document (including Uniform Commercial Code financing statements) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to evidence or perfect the Liens granted to the Administrative Agent in the Security Documents.

(l)     Insurance.   The Administrative Agent shall have received insurance certificates satisfying the requirements of Section 6.4(b).

(m)    PATRIOT Act.  The Lenders shall have received, sufficiently in advance of the Closing Date, all documentation and other information reasonably required by the Lenders as required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the United States PATRIOT Act.

(n)    Second Lien Secured Loans.  The Second Lien Term Loans shall have been made to the Borrower, on terms reasonably acceptable to the Arrangers.

(o)    Intercreditor Agreement.  The Administrative Agent shall have received counterparts of the Intercreditor Agreement, duly executed by the parties thereto.

(p)    Ratings.  Each of the Facilities shall have been rated by S&P and Moody's.

(q)    Existing Credit Agreement.  All amounts owing under the Existing Credit Agreement shall be repaid concurrently with and the Existing Credit Agreement and all commitments thereunder shall be terminated.

(r)    Bond Redemption.  Borrower shall have (i) caused the Trustee to mail an irrevocable notice of redemption to each of the holders of the Senior Subordinated Notes pursuant to Section 3.03 of the Senior Subordinated Note Indentures specifying that such redemption shall occur no later than on the 45th day following the mailing of such redemption notice (the "Irrevocable Redemption Notice"), (ii) concurrently with the Closing, deposited with the Trustee amounts borrowed under the First Lien Credit Facility and the Second Lien Credit Facility sufficient to redeem all of the outstanding Senior Subordinated Notes and to pay all accrued interest thereon, and call or other premiums payable in connection therewith (collectively, the "Redemption Funds") on the redemption date specified on the Irrevocable Redemption Notice (the "Redemption Date"), and (iii) concurrently with the deposit of the Redemption Funds with the Trustee, delivered to the Trustee (with a copy to the Administrative Agent) a written irrevocable letter of instruction (in form and substance satisfactory to the Administrative Agent) executed by the Borrower, directing the Trustee (A) to hold the Redemption Funds in escrow until the Redemption Date and (B) release and disburse the Redemption Funds on the Redemption Date in accordance with the Senior Subordinated Note Indentures for purposes of effecting the redemption of all of the outstanding Senior Subordinated Notes on such date.

5.2.    Conditions to Each Extension of Credit.  The agreement of each Lender to make any extension of credit requested to be made by it on any date (including its initial extension of credit) is subject to the satisfaction of the following conditions precedent:

(a)    Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date except for such representations and warranties expressly stated to be made as of an earlier date (in which case such representations and warranties shall be true and correct as of such earlier date).

-61-

(b)   No Default.  No Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

SECTION 6.  AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as any of the Commitments remain in effect, any Letter of Credit remains outstanding or any of the principal of or interest on any Loan or Reimbursement Obligation is outstanding (other than contingent or indemnification obligations), the Borrower shall and shall cause each of its Subsidiaries to:

6.1.   Financial Statements.  Furnish to the Administrative Agent for distribution to each Lender, and the Administrative Agent shall thereafter make available to each Lender:

(a)   as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by KPMG LLP or other independent certified public accountants of nationally recognized standing; and

(b)   as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified on behalf of the Borrower by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes).

6.2.   Certificates; Other Information.  Furnish to the Administrative Agent for distribution to each Lender, and the Administrative Agent shall thereafter make available to each Lender:

(a)   concurrently with the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of a Responsible Officer on behalf of the Borrower stating that, to the best of such Responsible Officer's knowledge, that such Responsible Officer has obtained no knowledge of any continuing Default except as specified in such certificate, (ii) in the case of quarterly or annual financial statements, a Compliance and Pricing Certificate containing (A) all information and calculations necessary for determining compliance by the Borrower and its Subsidiaries with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the Borrower, as the case may be, (B) a certification that each Loan Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it and (C) a certification that all times during such prior quarter, not less than 50% of all cash and Cash Equivalents of Borrower and the Subsidiary Guarantors at any one time have been subject to a

-62-

perfected Lien in favor of the Administrative Agent pursuant to Control Agreements to the extent required by Section 6.9(b); and (iii) in the case of annual financial statements, to the extent not previously disclosed to the Administrative Agent in writing, a listing of any Intellectual Property acquired by any Loan Party since the date of the most recent list delivered pursuant to this clause (iii) (or, in the case of the first such list so delivered, since the Closing Date);

(b)    within 45 days after the end of each fiscal quarter of the Borrower (i) the information required to be set forth in a quarterly report on Form 10-Q filed pursuant to Section 13 of the Securities Exchange Act of 1934, as amended;

(c)    within five Business Days after the same are sent, copies of all financial statements and reports that the Borrower or any of its Subsidiaries sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrower or any of its Subsidiaries may make to, or file with, the SEC;

(d)    (i) promptly and in any event within fifteen Business Days after the Borrower, any Subsidiary or any Commonly Controlled Entity files a Schedule B (or such other schedule as contains actuarial information) to IRS Form 5500 in respect of any Plan with Unfunded Pension Liabilities, a copy of such IRS Form 5500 (including the Schedule B);

(i)    promptly and in any event within thirty days after the Borrower, any Subsidiary or any Commonly Controlled Entity knows or has reason to know that any event described in Section 8(g) (an "ERISA Event") that, individually or when aggregated with any other ERISA Event, could reasonably be expected to have a Material Adverse Effect has occurred, the written statement of a Responsible Officer of such Person, as applicable, describing such ERISA Event and the action, if any, that it proposes to take with respect thereto and a copy of any notice filed with the PBGC or the IRS pertaining thereto; and

(ii)    promptly and in any event within thirty days after the Borrower, any Subsidiary or any Commonly Controlled Entity becoming aware of any of the following a detailed written description thereof from a Responsible Officer of such Person:  (w) a material increase in the aggregate Unfunded Pension Liabilities, of all Single Employer Plans, (x) the existence of potential withdrawal liability under Section 4201 of ERISA, if the Borrower and the Commonly Controlled Entities were to completely or partially withdraw from all Multiemployer Plans, (y) the adoption of, or the commencement of contributions to, any Plan subject to Section 412 of the Code by Borrower, any Subsidiary or any Commonly Controlled Entity or (z) the adoption of any amendment to a Plan subject to Section 412 of the Code that could result in a material increase in contribution obligations of Borrower or any Commonly Controlled Entity;

(e)    promptly, such additional financial and other information concerning the Borrower or any Subsidiary as the Administrative Agent may from time to time reasonably request;

(f)     not less than ten days prior to a change in type of organization, jurisdiction or other legal structure of the Borrower or any Guarantor, written notice from the Borrower or such Guarantor;

(g)     not less than ten days prior to any change in name of the Borrower or any Guarantor, prior written notice from the Borrower or such Guarantor;

(h)     not less than ten days prior to a change in an organizational number of the Borrower or any Guarantor, prior written notice from the Borrower or such Guarantor; and

(i)     promptly after the Borrower or any Guarantor that does not have an organizational number obtains one, written notification of such organizational number from the Borrower or such Guarantor.

6.3.    <u>Conduct of Business and Maintenance of Existence, FCC Licenses, etc.</u>

(a)     Preserve, renew and keep in full force and effect its corporate existence and take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except as otherwise permitted by Section 7.1 and except to the extent that failure to take any such action could not reasonably be expected to have a Material Adverse Effect; and

(b)     (i) Operate all of the Stations in material compliance with the Communications Act and the FCC's rules, regulations and written policies promulgated thereunder and with the terms of the FCC Licenses, (ii) timely file all required reports and notices with the FCC and pay all amounts due in timely fashion on account of fees and charges to the FCC, (iii) timely file and prosecute all applications for renewal or for extension of time with respect to all of the FCC Licenses, except in the case of each of (i), (ii) and (iii) where a failure to do so could not reasonably be expected to have a Material Adverse Effect, and (iv) advise the Administrative Agent of any deviation from the foregoing and of any written communication from the FCC outside the ordinary course.

6.4.    <u>Maintenance of Property; Insurance.</u>

(a)     Keep all material Property and systems useful and necessary in its business in good working order and condition, ordinary wear and tear and damage by casualty excepted except where a failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)     Maintain with financially sound and reputable insurance companies insurance on all its material Property in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business; and furnish to the Administrative Agent, upon written reasonable request, full information as to the insurance carried. All insurance shall provide that no cancellation shall be effective until at least 30 days (10 days in the case of non-payment) after receipt by the Administrative Agent of written notice thereof. The Administrative Agent for its own benefit and for the benefit of the Lenders shall be named as additional insured on all such liability

insurance policies, and the Administrative Agent shall be named as loss payee on all property and casualty insurance policies.

(c)     Deliver to the Administrative Agent (i) upon request of the Administrative Agent from time to time, full information as to the insurance carried and (ii) promptly (A) notice of any cancellation or nonrenewal of coverage of any material insurance policy and (B) notice of any material reduction in amount or material change in coverage of any insurance carried.

6.5.     Inspection of Property; Books and Records; Discussions.

(a)     Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings as required by GAAP and transactions in relation to its business and activities; and

(b)     permit representatives of the Administrative Agent or any Lender (with respect to visits by any Lender more frequent than once in any calendar year, if no Default is continuing, at such Lender's expense) to visit and inspect any of its properties (including the location of any Collateral) and examine and, at the Borrower's expense, make abstracts from any of its books and records at any reasonable time, upon reasonable notice and as often as may reasonably be desired and to discuss the business, operations, Properties and financial and other condition of the Borrower and its Subsidiaries with officers and employees of the Borrower and its Subsidiaries and with their respective independent certified public accountants.

6.6.     Notices.  Promptly give notice to the Administrative Agent for distribution to each Lender, and the Administrative Agent shall thereafter make available to each Lender, of:

(a)     the occurrence of any Default or Event of Default;

(b)     the occurrence of any "Event of Default" or term of similar meaning under any Second Lien Term Loan Document;

(c)     any termination, amendment or modification of, or other change in any Second Lien Term Loan Document in each case, which is adverse to the Lenders or any material default thereunder by any party thereto;

(d)     any (i) default or event of default under any other Contractual Obligation of the Borrower or any of its Subsidiaries or (ii) litigation, investigation or proceeding that may exist at any time between the Borrower or any of its Subsidiaries and any Governmental Authority, that in either case could reasonably be expected to have a Material Adverse Effect;

(e)     any litigation or proceeding affecting the Borrower or any of its Subsidiaries in which the amount involved is $10,000,000 or more and not covered by insurance or in which injunctive or similar relief is sought;

(f)     the following events, as soon as possible and in any event within 30 days after the Borrower or any of its Subsidiaries knows or has reason to know thereof:  (i) the occurrence of any Reportable Event with respect to any Single Employer Plan, or to the knowledge of the Borrower, any Multiemployer Plan, a failure to make any required contribution

-65-

to a Single Employer Plan or, to the knowledge of the Borrower, any Multiemployer Plan, the creation of any Lien in favor of the PBGC or a Plan against the Borrower or any Subsidiary or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan, in each case in connection with or involving an amount that could reasonably be expected to have a Material Adverse Effect, or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Plan; and

        (g)     any other development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement on behalf of the Borrower by a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower or the relevant Subsidiary proposes to take with respect thereto.

        6.7.    <u>Environmental Laws</u>.  In each of the following cases, except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

        (a)     Comply in all material respects with, and use commercially reasonable efforts to ensure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws and Environmental Permits, and obtain, maintain and comply in all material respects with and maintain, and use commercially reasonable efforts to ensure that all tenants and subtenants obtain, maintain and comply in all material respects with and maintain, any and all Environmental Permits.

        (b)     Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required by Governmental Authorities under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

        6.8.    <u>Broadcast License Subsidiaries</u>.

        (a)     Cause all FCC Licenses (except, at the option of the Borrower, FCC Licenses that are owned solely by one or more of the Excluded Foreign Subsidiaries and relate solely to the business conducted by any of the Excluded Foreign Subsidiaries) to be owned and held at all times by one or more Broadcast License Subsidiaries.

        (b)     Ensure that each Broadcast License Subsidiary engages only in the business of holding FCC Licenses and rights related thereto and that such restriction is set forth in the Governing Documents of such Broadcast License Subsidiary.

        (c)     Ensure that the Property of each Broadcast License Subsidiary is not commingled with the Property of the Borrower and any Subsidiary other than Broadcast License Subsidiaries and otherwise remains clearly identifiable.

(d)    Ensure that no Broadcast License Subsidiary has any Indebtedness or other liabilities except under the Guarantee and Collateral Agreement and liabilities permitted to be incurred hereunder including, without limitation, the Second Lien Term Loan Documents.

6.9.    <u>Additional Collateral, etc.</u>

(a)    With respect to any Property (other than (i) motor vehicles, (ii) Intellectual Property then required to be disclosed hereunder the perfection of a security interest in which required a filing outside the United States, (iii) Collateral that constitutes equipment subject to a certificate of title statute, fixtures, farm products, as-extracted collateral and cash, (iv) deposit accounts not subject to Control Agreements entered into pursuant to Section 6.9(b) of the Credit Agreement, (v) letter of credit rights with respect to letters of credit individually not exceeding $5,000,000, (vi) any lease, license, contract, property rights or agreement to which the Borrower or any Subsidiary Guarantor is a party, any of Borrower's or any Subsidiary Guarantor's rights or interests thereunder or any property to which Borrower or any Subsidiary Guarantor has any right, title or interest which is subject to such lease, license, contract, property right or agreement if and for so long as the grant of such security interest shall, pursuant to the terms of such lease, license, contract, property right or agreement, constitute or result in a default, breach, right of recoupment, claim, defense, termination, right of termination or remedy and such terms are effective under Sections 9-406, 9-407 or 9-408 of the Uniform Commercial Code as in effect in the state of New York from time to time), (vii) equity interests issued by an issuer organized outside of the U.S., the perfection of a security interest in which requires action to be taken outside the U.S. if the cost of taking such action as determined by the Administrative Agent in its reasonable discretion is excessive in relation to the value of such equity interests, and (viii) all real property acquired after the Closing Date by the Borrower or any of its Restricted Subsidiaries (other than (x) any Property described in paragraphs (b), (c) or (d) of this Section, (y) any Excluded Assets and (z) Property acquired by a Restricted Subsidiary that is not a Subsidiary Guarantor) as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly (and, in any event, within 90 days following the date of such acquisition) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Administrative Agent deems reasonably necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in such Property and (ii) take all actions reasonably necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in such Property (subject only to Liens permitted by Section 7.3) including, but not limited to, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Administrative Agent.

(b)    Borrower shall and shall cause the Subsidiary Guarantors to, at any time on or after the Closing Date, have at all times, not less than 50% of all cash and Cash Equivalents of Borrower and the Subsidiary Guarantors at any one time subject to a perfected Lien in favor of the Administrative Agent pursuant to the applicable Control Agreements, provided that to the extent not previously delivered, the Borrower shall and shall cause the Subsidiary Guarantors to, obtain and deliver to the Administrative Agent, within ninety (90) days after the Closing Date (or such other time as the Administrative Agent in its sole discretion shall agree) the Control Agreements required hereunder.

-67-



(c)     With respect to each Person that now is or hereafter becomes a Subsidiary of the Borrower (except JuJu Media, Inc. and any Excluded Foreign Subsidiary) and with respect to each Subsidiary that ceases to be an Excluded Foreign Subsidiary (but continues to be a Subsidiary), promptly (and, in any event, within 90 days following such creation or the date of such acquisition) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent deems reasonably necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by the Borrower or any of its Restricted Subsidiaries, (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such Restricted Subsidiary, as the case may be, (iii) cause such new Subsidiary if it is a Restricted Subsidiary (A) to become a party to the Guarantee and Collateral Agreement and the Intellectual Property Security Agreements and (B) to take such actions reasonably necessary to grant to the Administrative Agent for the benefit of the Secured Parties a perfected first priority security interest (subject only to Liens permitted by Section 7.3) in the Collateral described in the Guarantee and Collateral Agreement and the Intellectual Property Security Agreements with respect to such new Subsidiary, including the recording of instruments in the United States Patent and Trademark Office and the United States Copyright Office, the execution and delivery by all necessary Persons of any necessary Control Agreements and the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the Intellectual Property Security Agreements or by law or as may be requested by the Administrative Agent, and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent customary legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(d)     With respect to any new Excluded Foreign Subsidiary created or acquired after the Closing Date by the Borrower or any of its Subsidiary Guarantors, promptly (and, in any event, within 90 days following such creation or the date of such acquisition) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent deems reasonably necessary in order to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by the Borrower or any of its Subsidiary Guarantors (provided that in no event shall more than 65% of the total outstanding Capital Stock of any such new Subsidiary be required to be so pledged), (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such Restricted Subsidiary, as the case may be, and take such other action as may be necessary or, if reasonably requested by the Administrative Agent to perfect the Lien of the Administrative Agent thereon and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, reasonably satisfactory to the Administrative Agent.

(e)     Notwithstanding anything to the contrary in this Section 6.9, paragraphs (a), (b), (c) and (d) of this Section 6.9 shall not apply to any Property, new Subsidiary or new Excluded Foreign Subsidiary created or acquired after the Closing Date, as applicable, as to which the Administrative Agent has determined in its sole discretion that the collateral value

-68-

thereof is insufficient to justify the difficulty, time and/or expense of obtaining a perfected Lien thereon.

6.10.   Use of Proceeds.   Use the proceeds of the Loans lawfully, in accordance with this Agreement and only for the purposes specified in Section 4.16.

6.11.   Further Assurances.   From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Administrative Agent may reasonably request, for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, which are necessary to perfect the rights of the Administrative Agent and the Secured Parties with respect to the Collateral in accordance with the Guarantee and Collateral Agreement (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other Property or assets hereafter acquired that may be deemed to be part of the Collateral in accordance with Section 6.9) pursuant hereto or thereto.   Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents that requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from the Borrower or any of its Subsidiaries for such governmental consent, approval, recording, qualification or authorization; provided that any of the foregoing actions which relate to the FCC need to be taken only if such action is permitted by applicable FCC regulations.

6.12.   Interest Rate Protection.   Within 90 days after the Closing Date, Borrower shall enter into Hedge Agreements to the extent necessary to provide that at least 40% of the total amount of the Term Loans outstanding from time to time is subject to either fixed interest rate or interest rate protection for a period of not less than 2 years, which Hedge Agreements shall have terms and conditions satisfactory to the Administrative Agent.

6.13.   Bond Redemption.   Borrower shall deposit and maintain with the Trustee the Redemption Funds and shall cause the Trustee to redeem 100% of the outstanding Senior Subordinated Notes, pursuant to the terms of the Senior Subordinated Note Indentures.

6.14.   Puerto Rico Legal Opinion.   Within 10 Business Days after the Closing Date (or such longer period as the Administrative Agent shall agree), Borrower shall deliver to the Lenders a legal opinion, in form and substance reasonably satisfactory to the Administrative Agent, from local counsel for the Borrower in Puerto Rico covering the perfection of the pledge of the Capital Stock of Spanish Broadcasting System of Puerto Rico, Inc., a Puerto Rico corporation, and Spanish Broadcasting System Holding Company, Inc., a Puerto Rico corporation, to the Administrative Agent, for the benefit of the Lenders, pursuant to the Guarantee and Collateral Agreement.

-69-

SECTION 7. NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any of the Commitments remain in effect, any Letter of Credit remains outstanding or any of the principal of or interest on any Loan or Reimbursement Obligation is outstanding:

       7.1.   Merger, Consolidation, or Sale of Assets.

       (a)    The Borrower shall not, consolidate or merge with or into (whether or not the Borrower is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, another Person unless (i) the Borrower is the surviving Person or the Person formed by or surviving any such consolidation or merger (if other than the Borrower) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation organized or existing under the laws of the United States, any state thereof or the District of Columbia; (ii) the Person formed by or surviving any such consolidation or merger (if other than the Borrower) or the Person to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made assumes by an assignment and assumption agreement in form reasonably satisfactory to the Administrative Agent all the obligations of the Borrower under the Notes, this Agreement and all other Loan Documents; (iii) immediately after such transaction no Default or Event of Default exists; and (iv) except in the case of a merger of the Borrower with or into a Wholly Owned Restricted Subsidiary of the Borrower, the Borrower or the Person formed by or surviving any such consolidation or merger (if other than the Borrower), or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made would, both immediately prior to and immediately after giving pro forma effect thereto as if such transaction had occurred at the beginning of the applicable four-quarter period, be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Debt to Cash Flow Ratio test set forth in Section 7.2 hereof.

       (b)    Successor Corporation Substituted.

       Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Borrower in accordance with Section 7.1(a) hereof, the successor corporation formed by such consolidation or into or with which the Borrower is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Borrower" shall refer instead to the successor corporation and not to the Borrower), and may exercise every right and power of the Borrower under this Agreement with the same effect as if such successor Person had been named as the Borrower herein; provided, however, that the predecessor Borrower shall not be relieved from the obligation to pay the principal of and interest on the Loans except in the case of a sale of all of the Borrower's assets that meets the requirements of Section 7.1(a) hereof.

       (c)    No Subsidiary Guarantor shall consolidate with or merge with or into (whether or not the Subsidiary Guarantor is the surviving Person) another Person whether or not affiliated with such Subsidiary Guarantor unless: subject to Section 10.5 hereof, (i) the Person

-70-

formed by or surviving any such consolidation or merger (if other than a Subsidiary Guarantor) assumes all of the Obligations of such Subsidiary Guarantor pursuant to assignment and assumption agreement(s) in form and substance reasonably satisfactory to the Administrative Agent to the Security Documents; and (ii) immediately after giving effect to such transaction, no Default or Event of Default exists.

(d)     In the case of any such consolidation, merger, sale or conveyance of a Subsidiary Guarantor in accordance with clause (c) above and upon the assumption by the successor Person of the Obligations by amendment(s) of the Security Documents and the due and punctual performance of all of the covenants and conditions of the Loan Documents to be performed by the Subsidiary Guarantor, such successor Person shall succeed to and be substituted for the Subsidiary Guarantor with the same effect as if it had been named herein as a Subsidiary Guarantor.

(e)     Except as set forth in Sections 6 and 7 hereof, and notwithstanding clauses (c) and (d) above, nothing contained in this Agreement or in any of the other Loan Documents shall prevent any consolidation or merger of a Subsidiary Guarantor with or into the Borrower or another Subsidiary Guarantor, or shall prevent any sale or conveyance of the property of a Subsidiary Guarantor as an entirety or substantially as an entirety to the Borrower or to another Subsidiary Guarantor.

7.2.    Incurrence of Indebtedness and Issuance of Preferred Stock.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness (including Acquired Debt) or issue any shares of Disqualified Stock and will not permit any of its Restricted Subsidiaries to issue any shares of preferred stock; provided, however, that the Borrower may incur Indebtedness (including Acquired Debt) or issue shares of Disqualified Stock and the Guarantors may incur Indebtedness (including Acquired Debt) or issue shares of preferred stock if, in each case, the Borrower's Debt to Cash Flow Ratio at the time of incurrence of such Indebtedness or the issuance of such Disqualified Stock or preferred stock, as the case may be, after giving pro forma effect to such incurrence or issuance as of such date and to the use of the proceeds therefrom as if the same had occurred at the beginning of the most recently ended four full fiscal quarter period of the Borrower for which internal financial statements are available, would have been no greater than 7.0 to 1.0.

The provisions of the first paragraph of this Section 7.2 will not apply to the incurrence of any of the following (collectively, "Permitted Debt"):

(i)     Indebtedness under the Loan Documents;

(ii)     the incurrence by the Borrower and the guarantee thereof by the Guarantors of Indebtedness represented by the Second Lien Term Loan Obligations in an aggregate principal amount at any time outstanding not to exceed $100.0 million (plus any accumulated or capitalized interest therein) less the aggregate amount of all mandatory repayments of any Indebtedness under

-71-

such Second Lien Term Loan facility pursuant to Section 2.12 thereof; provided that such Indebtedness is subject to the Intercreditor Agreement;

(iii)     the incurrence by the Borrower and its Restricted Subsidiaries of the Existing Indebtedness;

(iv)     the incurrence by the Borrower or its Restricted Subsidiaries of Indebtedness represented by Capital Lease Obligations, mortgage financings or Purchase Money Indebtedness, in each case incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property, plant or equipment used in the business of the Borrower or such Restricted Subsidiary, in an aggregate amount not to exceed $20.0 million at any time outstanding, including all Permitted Refinancing Indebtedness incurred pursuant to clause (v) below to refund, replace or refinance any Indebtedness incurred pursuant to this clause (iv);

(v)     the incurrence by the Borrower or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than intercompany Indebtedness) that was permitted by this Agreement to be incurred by the first paragraph of this Section 7.2, or by clauses (iii), (iv), (v), (vii), (viii), (ix), (x), (xi) (xii) or (xiii) of this paragraph;

(vi)     the incurrence of Indebtedness between or among the Borrower and any of its Restricted Subsidiaries; provided, however, that (a) if the Borrower is the obligor on such Indebtedness, such Indebtedness is expressly subordinated to the prior payment in full of all Obligations with respect to this Agreement and (b) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Borrower or a Restricted Subsidiary, and any sale or other transfer of any such Indebtedness to a Person that is not either the Borrower or a Restricted Subsidiary, shall be deemed, in each case, to constitute an incurrence of such Indebtedness by the Borrower or such Restricted Subsidiary, as the case may be;

(vii)     the incurrence by the Borrower or any of its Restricted Subsidiaries of Hedging Obligations that are incurred for the purpose of fixing or hedging interest rate risk with respect to any floating rate Indebtedness that is permitted by the terms of this Agreement to be outstanding;

(viii)     the guarantee by the Borrower or any Restricted Subsidiary of Indebtedness that was permitted to be incurred by another provision of this Section 7.2;

(ix)     the accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on

-72-

Disqualified Stock in the form of additional shares of the same class of Disqualified Stock;

(x)    the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness consisting of performance, bid or advance payment bonds, surety bonds, custom bonds, utility bonds and similar obligations arising in the ordinary course of business;

(xi)    the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, in each case incurred or assumed in connection with the disposition of any business, asset or Subsidiary of the Borrower, provided that the maximum assumable Indebtedness shall at no time exceed the gross proceeds actually received by the Borrower and its Restricted Subsidiaries in connection with the disposition of any business, asset or Subsidiary of the Borrower;

(xii)    the incurrence by the Borrower of Indebtedness in respect of Preferred Stock Exchange Notes issued as payment in kind interest on Preferred Stock Exchange Notes, to the extent such interest payments are made pursuant to the terms of the Preferred Stock Exchange Notes Indenture;

(xiii)    the incurrence by the Borrower or any of its Restricted Subsidiaries of additional Indebtedness in an aggregate principal amount at any time outstanding, including all Permitted Refinancing Indebtedness incurred pursuant to clause (v) above to refund, refinance or replace any Indebtedness incurred pursuant to this clause (xiii), not to exceed $35.0 million;

(xiv)    the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness in the form of customary obligations under indemnification, incentive, non-compete, consulting, deferred compensation, earn-out or other similar arrangement incurred in connection with a Permitted Investment; and

(xv)    the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness incurred in connection with the customary financing of insurance premiums.

For purposes of determining compliance with this Section 7.2, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) through (xv) above or is entitled to be incurred pursuant to the first paragraph of this Section 7.2, the Borrower shall, in its sole discretion, classify and reclassify such item of Indebtedness in whole or in part in any manner that complies with this Section 7.2 and such item of Indebtedness will be treated as having been incurred pursuant to such clauses or pursuant to the first paragraph hereof. Accrual of interest, the accretion of accreted value, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms and the payment of dividends on Disqualified Stock in the form of additional shares of the

-73-

same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of Section 7.2.

7.3.    <u>Liens</u>.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien securing Indebtedness or trade payables on any asset now owned or hereafter acquired, or any income or profits therefrom or assign or convey any right to receive income therefrom, except Permitted Liens.

7.4.    <u>Restricted Payments</u>.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, (i) declare or pay any dividend or make any other payment or distribution on account of the Borrower's or any of its Restricted Subsidiary's Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Borrower or any Restricted Subsidiary) or to any direct or indirect holders of the Borrower's Equity Interests in their capacity as such (other than dividends or distributions (a) payable in Equity Interests (other than Disqualified Stock) of the Borrower or (b) to the Borrower or any Wholly Owned Restricted Subsidiary of the Borrower); (ii) purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Borrower) any Equity Interests of the Borrower or any of its Restricted Subsidiaries or any direct or indirect parent of the Borrower (other than any such Equity Interests owned by the Borrower or any Restricted Subsidiary of the Borrower or Permitted Investments); (iii) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Borrower or any Restricted Subsidiary that is subordinated to the Obligations or any guarantee of the Obligations, except a payment of interest or principal at Stated Maturity; or (iv) make any Restricted Investment (all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "<u>Restricted Payments</u>"), unless, at the time of and after giving effect to such Restricted Payment:

(a)    no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof; and

(b)    the Borrower would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least $1.00 of additional Indebtedness pursuant to the Debt to Cash Flow Ratio test set forth in the first paragraph of Section 7.2 hereof; and

(c)    such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Borrower and its Restricted Subsidiaries after the date of this Agreement (excluding Restricted Payments permitted by clauses (ii), (iii), (iv) and (vii) of the next succeeding paragraph), is less than the sum, without duplication, of (i) an amount equal to the Consolidated Cash Flow of the Borrower for the period (taken as one accounting period) from June 8, 2001 to the end of the Borrower's most recently ended full fiscal quarter for which

-74-



financial statements have been provided to the Lenders pursuant to Section 6.1 (the "Basket Period") less the product of 1.4 times the Consolidated Interest Expense of the Borrower for the Basket Period, plus (ii) 100% of the aggregate net cash proceeds received by the Borrower as a contribution to its common equity capital or from the issue or sale since June 8, 2001 of Equity Interests of the Borrower (other than Disqualified Stock) or from the issue or sale of Disqualified Stock or debt securities of the Borrower that have been converted into such Equity Interests (other than Equity Interests (or Disqualified Stock or convertible debt securities) sold to a Subsidiary of the Borrower and other than Disqualified Stock or convertible debt securities that have been converted into Disqualified Stock), plus (iii) to the extent that any Restricted Investment that was made after the date of this Agreement is sold for cash or otherwise liquidated or repaid for cash, the lesser of (A) the cash return of capital with respect to such Restricted Investment (less the cost of disposition, if any) and (B) the initial amount of such Restricted Investment, plus (iv) the aggregate cash dividends received by the Borrower from Unrestricted Subsidiaries (to the extent such dividends otherwise are not included in the Borrower's Consolidated Net Income) plus (v) to the extent that any Unrestricted Subsidiary of the Borrower designated as such after the Closing Date is redesignated as a Restricted Subsidiary after the Closing Date, the fair market value (as determined in good faith by the Board of Directors of the Borrower) of the Borrower's Investment in such Subsidiary as of the date of such redesignation.

The foregoing provisions will not prohibit (i) the payment of any dividend or the consummation of an irrevocable redemption within 60 days after the date of declaration thereof or the giving of the notice of redemption, as the case may be, if at the date of declaration or notice of redemption such payment would have complied with the provisions of this Agreement; (ii) the redemption, repurchase, retirement, defeasance or other acquisition or retirement for value of any Equity Interests of Borrower or subordinated Indebtedness of the Borrower or any Guarantor in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Borrower) of, other Equity Interests of the Borrower (other than any Disqualified Stock); provided that the amount of any such net cash proceeds that are utilized for any such redemption, repurchase, retirement, defeasance or other acquisition shall be excluded from clause (c)(ii) of the preceding paragraph; and, provided further, that no Default or Event of Default shall have occurred and be continuing immediately after such transaction; (iii) the defeasance, redemption, repurchase or other acquisition or retirement for value of subordinated Indebtedness with the net cash proceeds from an incurrence of Permitted Refinancing Indebtedness; provided that no Default or Event of Default shall have occurred and be continuing immediately after such transaction; (iv) the payment of any dividend or other distribution by a Restricted Subsidiary of the Borrower to the holders of Equity Interests on a pro rata basis; (v) the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Borrower or any Restricted Subsidiary of the Borrower held by any current or former officer, director or employee of the Borrower's or any of its Restricted Subsidiaries' pursuant to any management equity subscription agreement, stock option agreement or other similar agreement; provided that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests shall not exceed $5.0 million (excluding for purposes of calculating such amounts during any period, loans incurred to finance the purchase of such Equity Interests that are repaid contemporaneously) in any twelve-month period and no Default or Event of Default shall have occurred and be continuing immediately after such transaction; (vi) repurchases of stock deemed to have occurred by virtue of the

-75-

exercise of stock options; (vii) so long as no Default or Event of Default shall have occurred and be continuing, (A) on or prior to October 15, 2008, scheduled cash dividend payments on the Series B Preferred Stock (provided that, the Borrower's Debt to Cash Flow Ratio at the time of any such payment, after giving proforma effect thereto as if such payment had been made at the beginning of the most recently ended four full fiscal quarter period of the Borrower for which internal financial statements are available, would have been no greater than 6.0 to 1.0) and (B) commencing after October 15, 2008, scheduled cash dividend payments on the Series B Preferred Stock; (viii) so long as no Default or Event of Default shall have occurred and be continuing, (A) repurchases of shares of Series B Preferred Stock and (B) on or prior to October 15, 2008, scheduled cash dividend payments on the Series B Preferred Stock, in an aggregate amount not to exceed $25.0 million in the case of all such repurchases and cash dividends pursuant to the foregoing clauses (A) and (B) of this clause (viii) and (ix) other Restricted Payments in an aggregate amount not to exceed $10.0 million in any twelve-month period so long as no Default or Event of Default shall have occurred and be continuing.

The amount of all Restricted Payments (other than cash) shall be the fair market value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Borrower or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The fair market value of any non-cash Restricted Payment shall be determined in good faith by the Board of Directors whose resolution with respect thereto shall be delivered to the Administrative Agent. Not later than the date of making any Restricted Payment, the Borrower shall deliver to the Administrative Agent an Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which any calculation required by this Section 7.4 were computed.

The Board of Directors may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if such designation would not cause a Default. For purposes of making such determination, the aggregate fair market value of all outstanding Investments by the Borrower and its Restricted Subsidiaries in the Subsidiary so designated will be deemed to be an Investment made at the time of such designation and will reduce the amount available for Restricted Payments under the first paragraph of this Section 7.4 or under one or more clauses of the definition of Permitted Investments, as determined by the Borrower. Such designation will only be permitted if such Investment would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

Any such designation by the Board of Directors shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certified copy of the resolutions of the Board of Directors giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing conditions. If, at any time, any Unrestricted Subsidiary would fail to meet the definition of an Unrestricted Subsidiary, it shall thereafter cease to be an Unrestricted Subsidiary for purposes of this Agreement and any Indebtedness of such Subsidiary shall be deemed to be incurred by a Restricted Subsidiary of the Borrower as of such date (and, if such Indebtedness is not permitted to be incurred as of such date under Section 7.2 hereof, the Borrower shall be in default). The Board of Directors of the Borrower may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary; provided that such designation shall be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Borrower of any outstanding Indebtedness of such Unrestricted Subsidiary and such

-76-

designation shall only be permitted if (i) such Indebtedness is permitted under Section 7.2 hereof, calculated on a pro forma basis as if such designation had occurred at the beginning of the four-quarter reference period and (ii) no Default or Event of Default would be in existence immediately following such designation.

7.5.    Dividend and Other Payment Restrictions Affecting Subsidiaries.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to (a)(i) pay dividends or make any other distributions to the Borrower or any of its Restricted Subsidiaries (A) on its Capital Stock or (B) with respect to any other interest or participation in, or measured by, its profits or (ii) pay any indebtedness owed to the Borrower or any of its Restricted Subsidiaries, (b) make loans or advances to the Borrower or any of its Restricted Subsidiaries or (c) transfer any of its properties or assets to the Borrower or any of its Restricted Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) Existing Indebtedness as in effect on the date hereof, (ii) the Second Lien Term Loan Agreement and any other agreement governing or relating to Second Lien Term Loan Obligations as in effect on the date hereof, (iii) this Agreement as in effect on the date hereof, and the Guarantee and Collateral Agreement, (iv) applicable law, (v) any instrument governing Indebtedness or Capital Stock of a Person acquired by the Borrower or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness was incurred in connection with or in anticipation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired, provided that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Agreement to be incurred, (vi) by reason of customary non-assignment provisions in leases and other agreements entered into in the ordinary course of business and consistent with past practices, (vii) Purchase Money Indebtedness (including Capital Lease Obligations) for property acquired in the ordinary course of business that impose restrictions of the nature described in clause (c) above on the property so acquired, (viii) Permitted Refinancing Indebtedness, provided that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are no more restrictive, taken as a whole than those contained in the agreements governing the Indebtedness being refinanced, (ix) secured Indebtedness otherwise permitted to be incurred pursuant to the provisions of Sections 7.2 and 7.3 hereof that limits the right of the debtor to dispose of the assets securing such Indebtedness, (x) provisions with respect to the disposition or distribution of assets or property in joint venture agreements and other similar agreements entered into in the ordinary course of business, (xi) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business, and (xii) any agreement for the sale or other disposition of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending its sale or other disposition.

7.6.    Asset Sales.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless (i) the Borrower or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (as

-77-

determined in good faith by the Board of Directors of the Borrower or such Restricted Subsidiary and evidenced by an Officer's Certificate to be promptly delivered to the Administrative Agent) of the assets or Equity Interests issued or sold or otherwise disposed of and (ii) at least 75% of the consideration received in the Asset Sale by the Borrower or such Restricted Subsidiary is in the form of cash or Cash Equivalents; provided that the amount of (a) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet) of the Borrower or such Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Loans or any guarantee thereof) that are assumed by the transferee of any such assets pursuant to a customary novation agreement that releases the Borrower or such Restricted Subsidiary from further liability, and (b) any securities, notes or other obligations received by the Borrower or such Restricted Subsidiary from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash (to the extent of the cash received) within 90 days following the closing of such Asset Sale, shall be considered cash for purposes of this clause (ii).

Notwithstanding the immediately preceding paragraph, the Borrower and its Restricted Subsidiaries will be permitted to consummate an Asset Sale without complying with such paragraph if (i) the Borrower or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value of the assets or Equity Interests issued or sold or otherwise disposed of (as determined in good faith by the Board of Directors of the Borrower or the Restricted Subsidiary and set forth in an Officers' Certificate delivered to the Administrative Agent) and (ii) at least 75% of the consideration for such Asset Sale constitutes a controlling interest in a Permitted Business, assets that are not classified as current assets used or useful in a Permitted Business and/or cash or Cash Equivalents; provided that any cash or Cash Equivalents received by the Borrower or any of its Restricted Subsidiaries in connection with any Asset Sale permitted to be consummated under this paragraph shall constitute Net Proceeds subject to the provisions of the next succeeding paragraph.

Within 365 days of the receipt of any Net Proceeds from an Asset Sale, the Borrower may apply such Net Proceeds, at its option, (i) to prepay the Loans in accordance with the terms of Section 2.11 including, without limitation, the prepayment of the Second Lien Term Loans pursuant to Section 2.12(c) (and to correspondingly reduce commitments with respect thereto in the case of revolving borrowings), (ii) to the acquisition of a controlling interest in a Permitted Business, or (iii) to the making of a capital expenditure or the acquisition of other assets that are not classified as current assets used or useful in a Permitted Business. Pending the final application of any such Net Proceeds, the Borrower may prepay the Revolving Credit Loans or otherwise invest such Net Proceeds in any manner that is not prohibited by this Agreement. Any Net Proceeds from Asset Sales that are not applied or invested as provided in the first sentence of this paragraph shall be deemed to constitute "Excess Proceeds". When the aggregate amount of Excess Proceeds exceeds $10.0 million, the Borrower shall be required to prepay the Loans in accordance with the terms of Section 2.12 (an "Asset Sale Offer"). Upon completion of an Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

7.7.    Transactions with Affiliates.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (each of the foregoing, an "Affiliate Transaction"), unless (i) such Affiliate Transaction is on terms that are no less favorable to the Borrower or such Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Borrower or such Restricted Subsidiary with an unrelated Person and (ii) the Borrower delivers to the Administrative Agent (a) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $5.0 million, a resolution of the Board of Directors set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (i) above and that such Affiliate Transaction has been approved by a majority of the members of the Board of Directors that are disinterested as to such Affiliate Transaction and (b) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $10.0 million, an opinion as to the fairness to the Borrower of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing; provided that (1) any transaction approved by the Board of Directors of the Borrower, with an officer or director of the Borrower or of any of its Subsidiaries in his or her capacity as an officer or director entered into in the ordinary course of business; (2) transactions between or among the Borrower and/or its Restricted Subsidiaries; (3) payment of reasonable directors fees to the Board of Directors of the Borrower and of its Restricted Subsidiaries; (4) fees and compensation paid to, and indemnity provided on behalf of, officers, directors or employees of the Borrower or any of its Restricted Subsidiaries, as determined in good faith by the Board of Directors of the Borrower or of any such Restricted Subsidiary, to the extent the same are reasonable and customary; (5) any Restricted Payment that is permitted by Section 7.4; and (6) agreements in effect on the date of this Agreement and any modification thereto or any transaction contemplated thereby (including pursuant to any modification thereto) in any replacement agreement therefor so long as such modification or replacement is not more disadvantageous to the Lenders in any material respect than the original agreement as in effect on the date of this Agreement, in each case, shall not be deemed to be Affiliate Transactions.

7.8.    Limitation on Sale and Leaseback Transactions.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any sale and leaseback transaction; provided that the Borrower and the Guarantors may enter into a sale and leaseback transaction if (i) the Borrower or such Guarantor could have (a) incurred Indebtedness in an amount equal to the Attributable Debt relating to such sale and leaseback transaction pursuant to the Debt to Cash Flow Ratio test set forth in the first paragraph of Section 7.2 hereof and (b) incurred a Lien to secure such Attributable Debt pursuant to Section 7.3 hereof, (ii) the gross cash proceeds of such sale and leaseback transaction are at least equal to the fair market value (as determined in good faith by the Board of Directors in good faith) of the property that is the subject of such sale and leaseback transaction and (iii) the transfer of assets in such sale and leaseback transaction is permitted by, and the proceeds of such transaction are applied in compliance with Section 7.6 hereof.

7.9.   Limitation on Optional Prepayment of Second Lien Term Loan
Obligations.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to,
except prior to 365 days following the Closing Date from proceeds of the LA Asset Sale
pursuant to Section 2.12(c), make any optional prepayment, redemptions or acquisitions of the
Second Lien Term Loan Obligations until the Term Loans have been paid in full.

SECTION 8.   EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)   The Borrower shall fail to pay any principal of any Loan or
Reimbursement Obligation when due in accordance with the terms hereof; or the Borrower shall
fail to pay when due any interest on any Loan or Reimbursement Obligation, or any other
amount payable hereunder or under any other Loan Document, within five days after such
interest or other amount becomes due in accordance with the terms hereof; or

(b)   Any representation or warranty made or deemed made by any Loan Party
herein or in any other Loan Document or that is contained in any certificate, document or
financial or other statement furnished by it at any time under or in connection with this
Agreement or any such other Loan Document shall prove to have been inaccurate in any material
respect on or as of the date made or deemed made; or

(c)   Any Loan Party shall default in the observance or performance of any
agreement contained in (i) Section 7 or (ii) Section 6.3(a) (with respect to the Borrower only); or

(d)   Any Loan Party shall default in the observance or performance of any
other covenant or agreement contained in this Agreement or any other Loan Document (other
than as provided in paragraphs (a) through (c) of this Section), and such default shall continue
unremedied for a period of thirty (30) days after notice thereof from the Administrative Agent or
any Lender to the Borrower; or

(e)   The Borrower or any of its Subsidiaries shall (i) default in making any
payment of any principal of any Indebtedness for borrowed money or default in making any
payment of principal under Hedge Agreements (including any Guarantee Obligation, but
excluding the Loans), after the expiration of any grace period with respect thereto; or (ii) default
in making any payment of any interest on any such Indebtedness beyond the period of grace, if
any, provided in the instrument or agreement under which such Indebtedness for borrowed
money or default in making any payment of interest under Hedge Agreements was created; or
(iii) default in the observance or performance of any other agreement or condition relating to any
such Indebtedness for borrowed money or in respect of Hedge Agreements or contained in any
instrument or agreement evidencing, securing or relating thereto, the effect of which default is to
cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf
of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness
for borrowed money or in respect of Hedge Agreements to become due prior to its stated
maturity or (in the case of any such Indebtedness for borrowed money or in respect of Hedge
Agreements constituting a Guarantee Obligation) to become payable; provided that a default,

-80-

event described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness for borrowed money or in respect of Hedge Agreements the outstanding principal amount of which exceeds in the aggregate $10,000,000; or .

(f)     (i) The Borrower or any of its Subsidiaries (other than Immaterial Subsidiaries) shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any of its Subsidiaries (other than Immaterial Subsidiaries) shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Borrower or any of its Subsidiaries (other than Immaterial Subsidiaries) any case, proceeding or other action of a nature referred to in clause (1) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against the Borrower or any of its Subsidiaries (other than Immaterial Subsidiaries) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Borrower or any of its Subsidiaries (other than Immaterial Subsidiaries) shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any of its Subsidiaries (other than Immaterial Subsidiaries) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g)     (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower, any of its Subsidiaries or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower or any Subsidiary shall, or in the reasonable opinion of the Required Lenders is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan; (vi) the Borrower, any of its Subsidiaries or any Commonly Controlled Entity shall be required to make during any fiscal year of the Borrower payments pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees (or their dependents) that, in the aggregate, exceed $10,000,000, (vii) the Borrower, any of its Subsidiaries or any Commonly Controlled Entity shall be required to make during any fiscal year of the Borrower contributions to any defined benefit pension plans subject to Title IV of ERISA (including any Multiemployer Plan) that, in the aggregate, exceed

-81-

$10,000,000, (viii) an Unfunded Pension Liability shall exist, (ix) any potential withdrawal liability under Section 4201 of ERISA, if the Borrower, its Subsidiaries or any Commonly Controlled Entity were to completely or partially withdraw from a Multiemployer Plans shall exist or (x) any other similar event or condition shall occur or exist with respect to a Plan and in each case in clauses (i) through (x) above, such event or condition, either in and of itself or together with all other such events or conditions, if any, could, in the sole judgment of the Required Lenders, reasonably be expected to have a Material Adverse Effect; or

        (h)     One or more judgments or decrees shall be entered against the Borrower or any of its Subsidiaries involving for the Borrower and its Subsidiaries taken as a whole a liability (to the extent not paid or covered by insurance in the reasonable opinion of the Borrower if the Borrower provides evidence of such coverage to the Administrative Agent) of $10,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

        (i)     Any of the Security Documents shall cease, for any reason (other than pursuant to the terms thereof), to be in full force and effect, or any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby in each case with respect to a material amount of Collateral, in each case, except as otherwise permitted by the Intercreditor Agreement; or

        (j)     The guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason (other than pursuant to the terms thereof), to be in full force and effect or any Loan Party shall so assert; or

        (k)     Such provisions of any subordinated debt that provide that the Obligations are senior thereto shall cease, for any reason, to be in full force and effect or any Loan Party shall so assert; or

        (l)     A Change of Control shall occur; or

        (m)     (i) Any FCC License necessary for the conduct of any business or activity at any time conducted by the Borrower or any of its Subsidiaries shall be revoked, annulled, cancelled or (ii) the FCC takes any action with respect to any FCC License in the case of each of (i) and (ii), the effect of which would reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect; or

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to any Loan Party, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken:   (i) upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder

-82-

(with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable. Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent and the Lenders shall be entitled to exercise any and all remedies available under the Security Documents, including the Guarantee and Collateral Agreement, or otherwise available under applicable law or otherwise. With respect to each Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph, the Borrower shall at such time either (i) deposit in a cash collateral account opened by the Administrative Agent an amount in immediately available funds equal to the aggregate then undrawn and unexpired amount of such Letters of Credit (and the Borrower hereby grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a continuing security interest in all amounts at any time on deposit in such cash collateral account to secure the undrawn and unexpired amount of such Letters of Credit and all other Obligations) or (ii) provide to the Issuing Lender with respect to such Letter of Credit a Qualified Supporting Letter of Credit. If at any time the Administrative Agent determines that any funds held in such cash collateral account are subject to any right or claim of any Person which is superior to that of the Administrative Agent and the Secured Parties or that the total amount of such funds is less than the aggregate undrawn and unexpired amount of outstanding Letters of Credit, the Borrower shall, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited and held in such cash collateral account, an amount equal to the excess of (a) such aggregate undrawn and unexpired amount over (b) the total amount of funds, if any, then held in such cash collateral account that the Administrative Agent determines to be free and clear of any such right and claim. Amounts held in such cash collateral account shall be applied by the Administrative Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Loan Parties hereunder and under the other Loan Documents. After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Loan Parties hereunder and under the other Loan Documents shall have been paid in full, the balance, if any, in such cash collateral account shall be returned to the Loan Parties (or such Person as may be lawfully entitled thereto).

SECTION 9.  THE AGENTS AND ARRANGERS

9.1.    Appointment.  Each Lender hereby irrevocably designates and appoints Lehman Commercial Paper Inc. as the Administrative Agent under this Agreement and the other Loan Documents, and each Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.

-83-

9.2.    <u>Delegation of Duties</u>.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys in-fact selected by it with reasonable care.

9.3.    <u>Exculpatory Provisions</u>.  Neither any Arranger, nor any Agent nor any of their respective Related Persons shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except for any liability imposed by law, but then only if and to the extent found by a final and nonappealable decision of a court of competent jurisdiction to have resulted solely from its or any of its Related Persons' personal gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Arrangers or the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party party thereto to perform its obligations hereunder or thereunder or for the creation, validity, legality, enforceability, perfection, priority, maintenance or enforcement of any guaranty or Lien required or purporting to be created under any of the Loan Documents or any other collateral security for the Obligations.  As against any Secured Party, any matter required herein to be satisfactory to, found acceptable by or otherwise approved by the Administrative Agent may be approved or disapproved by it in its sole discretion, acting as it may see fit given any interest that it or its Affiliates may have and without any duty whatsoever to any other Lender.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

9.4.    <u>Reliance by Agents</u>.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex, teletype or e-mail message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Loan Parties), independent accountants and other experts selected by such Agent.  The Agents may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders or the requisite Lenders required under Section 10.1 to authorize or require such action (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders or the requisite Lenders under Section 10.1 to authorize or require such action

-84-

(or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Obligations.

9.5.   Notice of Default.   The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default hereunder unless it has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default".   In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.   The Administrative Agent shall take such action with respect to such Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders), except that (a) the Administrative Agent shall not be required to take any such action that it in good faith determines may be unlawful or that it in good faith believes may be imprudent or may expose it to liability, (b) the Administrative Agent shall not be required to take any such action unless it receives indemnity satisfactory to it from the Persons directing such action, and (c) unless and until the Administrative Agent shall have received such direction, the Administrative Agent may decline to act or may (but shall not be obligated to) take any action that it deems advisable.

9.6.   Non-Reliance on Agents and Other Lenders.   Each Lender expressly acknowledges that neither any of the Arrangers nor any of the Agents nor any of their respective officers, directors, employees, agents, attorneys and other advisors, partners, attorneys-in-fact or Affiliates have made any representations or warranties to it and that no act by any Arranger or any Agent hereinafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Arranger or any Agent to any Lender.   Each Lender represents to the Arrangers and the Agents that it has, independently and without reliance upon any Arranger or any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition, prospects and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Loans (and in the case of the Issuing Lender, its Letters of Credit) hereunder and enter into this Agreement.   Each Lender also represents that it will, independently and without reliance upon any Arranger or any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition, prospects and creditworthiness of the Loan Parties and their affiliates.   Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither any Arranger nor any Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of such Arranger or such Agent or any of its officers, directors, employees, agents, attorneys and other advisors, partners, attorneys-in-fact or Affiliates.

9.7.   Indemnification.   The Lenders agree to indemnify each Arranger and each Agent in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Aggregate

-85-



Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against such Arranger or such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Arranger or such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted solely from such Arranger's or such Agent's gross negligence or willful misconduct. The agreements in this Section 9.7 shall survive the payment of the Loans and Letters of Credit and all other amounts payable hereunder.

        9.8.     <u>Arrangers and Agents in Their Individual Capacities</u>. Each Arranger and each Agent and their respective Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Arranger was not the Arranger and such Agent was not an Agent. With respect to its Loans made or renewed by it and with respect to any Letter of Credit issued or participated in by it, each Arranger and each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Arranger or an Agent, as the case may be, and the terms "Lender" and "Lenders" shall include each Arranger and each Agent in their respective individual capacities.

        9.9.     <u>Successor Administrative Agent</u>. The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders and the Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 8(a) or Section 8(f) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans or Letters of Credit. If no successor agent has accepted appointment as Administrative Agent by the date that is 30 days following a retiring Administrative Agent's notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed), appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank with a combined capital and surplus of $500,000,000; provided however, if the Borrower does not consent to the appointment of such

successor Administrative Agent and an Event of Default under Section 8(f) with respect to the Borrower shall have occurred and be continuing, then after the date that is 30 days following the date on which Borrower refused to give its consent to such appointment, the Administrative Agent may resign as Administrative Agent under this Agreement and the other Loan Documents and, upon the Administrative Agent's resignation, the Borrower may appoint any Lender willing to act as successor Administrative Agent as Administrative Agent under this Agreement and the other Loan Documents. After any retiring Administrative Agent's resignation as such, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

9.10. <u>Authorization to Release Liens</u>. Upon the consummation of an Asset Sale or other disposition of property permitted hereunder, the Administrative Agent is hereby irrevocably authorized by each of the Lenders to release any Lien covering any Property of the Borrower or any of its Subsidiaries that the Administrative Agent in good faith believes to be permitted by this Agreement or to have been consented to in accordance with Section 10.1 or to be owned by any Subsidiary of the Borrower the Capital Stock of which was transferred, in any such Asset Sale, to a Person who is not an Affiliate of the Borrower.

9.11. <u>The Arrangers, Syndication Agent and Documentation Agent</u>. The parties acknowledge and agree that (a) Lehman Brothers Inc. (in such capacity, the "Lead Arranger") shall be credited as and may publicize that it is the sole advisor, sole lead arranger and sole book runner of the financing contemplated hereby, (b) each of Merrill Lynch, Pierce Fenner & Smith, Incorporated and Wachovia Capital Markets, LLC (collectively with the Lead Arranger, the "Arrangers") shall be credited as and may publicize that it is one of the arrangers of the financing contemplated hereby, (c) Merrill Lynch Capital Corporation shall be credited as and may publicize that it is the Syndication Agent of such financing and (d) Wachovia Bank, National Association shall be credited as and may publicize that it is the Documentation Agent of such financing. Each Arranger, Syndication Agent and Documentation Agent (i) shall not, by reason of their designation as such or the provisions of this Section 9 or any action taken or omitted in such capacity, have any power, duty, responsibility or liability whatsoever under this Agreement or any other Loan Document (other than the Commitment Letter) or in respect of the financing contemplated hereby and (ii) shall nevertheless be entitled to all of the rights, immunities, indemnities and benefits granted to them herein.

SECTION 10. MISCELLANEOUS

10.1. <u>Amendments and Waivers</u>. Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1. The Required Lenders and each Loan Party party to the relevant Loan Document may, or (with the written consent of the Required Lenders) the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Default and its

-87-

consequences; <u>provided, however,</u> that no such waiver and no such amendment, supplement or modification shall (i) reduce or forgive the principal amount or extend the final scheduled date of maturity of any Loan or Reimbursement Obligation, extend the scheduled date of any amortization payment in respect of any Term Loan, directly reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Commitment of any Lender, in each case without the consent of each Lender directly and adversely affected thereby; (ii) amend, modify or waive any provision of this Section or reduce any percentage specified in the definition of "<u>Required Lenders</u>", consent to the assignment or transfer by any Loan Party of any of its rights and obligations under this Agreement and the other Loan Documents (other than as a result of a transaction otherwise permitted hereunder), release all or substantially all of the Collateral or release all or substantially all of the Subsidiary Guarantors from their guarantee obligations under the Guarantee and Collateral Agreement (except as permitted by the Loan Documents), in each case without the consent of all Lenders; (iii) amend, modify or waive any provision of Section 9 without the consent of any Arranger or any Agent directly and adversely affected thereby; (iv) amend, modify or waive any provision of Section 2.6 or 2.7 without the written consent of the Swing Line Lender; (v) amend, modify or waive any provision of Section 2.18(a), (b) or (c) without the consent of each Lender directly and adversely affected thereby; or (vi) amend, modify or waive any provision of Section 3 without the consent of the Issuing Lender. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents, the Arrangers and all existing and future holders of the Obligations. In the case of any waiver, the Loan Parties, the Lenders, the Arrangers and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default, or impair any right consequent thereon.   Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section; <u>provided</u> that delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof. For the avoidance of doubt, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Arrangers, the Agents and the Borrower (x) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof (collectively, the "<u>Additional Extensions of Credit</u>") to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and Revolving Extensions of Credit and the accrued interest and fees in respect thereof and (y) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

If a Lender (such Lender a "<u>Non-Consenting Lender</u>") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of this Section 10.1 requires the consent of all of the Lenders affected thereby and with respect to which the Required Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans, and its Commitments hereunder to one or more assignees, which assignees if not already Lenders hereunder, shall be reasonably acceptable to the Administrative Agent, <u>provided</u> that: (a) all Obligations, including

-88-

indemnity obligations pursuant to Section 2.21, of the Borrower owing to such Non-Consenting Lender being replaced shall be repaid in full to such Non-Consenting Lender concurrently with such assignment, and (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon. In connection with any such assignment the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 10.6.

10.2. <u>Notices</u>. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid or, in the case of telecopy notice, when received, addressed (a) in the case of the Borrower, the Arrangers and the Agents, as follows and (b) in the case of the Lenders, as set forth on <u>Schedule 1</u> to the Lender Addendum to which such Lender is a party or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Acceptance, in such Assignment and Acceptance or (c) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

| | |
|---|---|
| The Borrower: | Spanish Broadcasting System, Inc.<br>2601 South Bayshore Drive, PH II<br>Coconut Grove, Florida 33133<br>Attention: Joseph A. Garcia<br>Telecopy: (305) 441-7861<br>Telephone: (305) 441-6901 |
| with a copy to: | Kaye Scholer LLP<br>425 Park Avenue<br>New York, New York 10022<br>Attention: William E. Wallace, Esq.<br>Telecopy: (212) 836-3598<br>Telephone: (212) 836-8556 |
| Lehman Commercial Paper Inc.: | Lehman Commercial Paper Inc.<br>745 Seventh Avenue<br>New York, New York 10019<br>Attention: Paul Arzouian<br>Telecopy: (646) 758-4980<br>Telephone: (212) 526-5803 |
| with a copy to: | Dechert LLP<br>30 Rockefeller Plaza<br>New York, New York 10112<br>Attention: Bonnie Barsamian, Esq.<br>Telecopy: (212) 698-3599<br>Telephone: (212) 698-3520 |

-89-

|                     |                                                    |
|---------------------|----------------------------------------------------|
| The Lead Arranger:  | Lehman Brothers Inc.                               |
|                     | 745 Seventh Avenue                                 |
|                     | New York, New York 10019                          |
|                     | Attention: Maritza Ospina                         |
|                     | Telecopy: (646) 758-4648                          |
|                     | Telephone: (212) 526-6590                         |
|                     |                                                    |
| With a copy to:     | Dechert LLP                                        |
|                     | 30 Rockefeller Plaza                              |
|                     | New York, New York 10112                          |
|                     | Attention: Bonnie Barsamian, Esq.                 |
|                     | Telecopy: (212) 698-3599                          |
|                     | Telephone: (212) 698-3520                         |
|                     |                                                    |
| Issuing Lender:     | As notified by the Issuing Lender to the          |
|                     | Administrative Agent and the Borrower             |
|                     | provided that any notice, request or demand       |
|                     | to or upon any Agent or any Lender shall          |
|                     | not be effective until received.                  |

10.3.   No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of any Arranger, any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4.   Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5.   Payment of Expenses. The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Lead Arranger promptly following receipt of a reasonably detailed invoice therefor for all reasonable out-of-pocket expenses, including the reasonable fees, disbursements and other charges of one set of counsel (which may include local counsel), incurred in connection with the Facilities and the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby provided, however, that notwithstanding the foregoing, the obligations of Borrower under this clause (a) in respect of such out-of-pocket expenses incurred by the Lead Arranger and Administrative Agent through the Closing Date shall be limited as provided in the Fee Letter (it being understood that nothing herein limits the Borrower's obligation to make the payments to the Lenders and the Arrangers agreed to in the Fee Letter), (b) to pay or reimburse each Lender, the Lead Arranger and the Administrative Agent for all its costs and expenses incurred in connection with the enforcement

-90-

of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of counsel (including the allocated fees and disbursements and other charges of in-house counsel) to each Lender and of counsel to the Lead Arranger and the Administrative Agent, (c) to pay, indemnify, and hold each Lender, the Arrangers and the Agents harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold each Lender, each Arranger and each Agent, and each of their respective Related Persons (each of the Lenders, Arrangers and Agents and their Related Persons, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, costs, expenses or disbursements of any kind or nature whatsoever arising in connection with any action, litigation, proceeding, investigation or judgment with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or Letters of Credit or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Loan Party or any of the Properties and the reasonable fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower hereunder (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee or any Related Person of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries so to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee, except as a result of the gross negligence or willful misconduct of any such Indemnitee. All amounts due under this Section shall be payable not later than 30 days after receipt of a reasonably detailed written invoice therefor. Statements payable by the Borrower pursuant to this Section shall be submitted to the Borrower in accordance with Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section shall survive repayment of the Loans and Letters of Credit and all other amounts payable hereunder.

> 10.6.    Successors and Assigns; Participations and Assignments.

(a)    This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lenders, the Arrangers, the Agents, all other holders of the Obligations and their respective successors and assigns, except that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Arrangers, the Agents and each Lender.

-91-

(b)    Any Lender may, without the consent of the Borrower or any other
Person, in accordance with applicable law, at any time sell to one or more Eligible Assignees
(each, a "Participant") participating interests in any Loan owing to such Lender, in any
Commitment of such Lender or any other economic interest of such Lender hereunder and under
the other Loan Documents.  In the event of any such sale by a Lender of a participating interest
to a Participant, such Lender's obligations under this Agreement to the other parties to this
Agreement shall remain unchanged, such Lender shall remain solely responsible for the
performance thereof, such Lender shall remain the holder of any such Loan for all purposes
under this Agreement and the other Loan Documents, and the Borrower and the Administrative
Agent shall continue to deal solely and directly with such Lender in connection with such
Lender's rights and obligations under this Agreement and the other Loan Documents.  In no
event shall any Participant under any such participation have any right to approve any
amendment or waiver of any provision of any Loan Document, or any consent to any departure
by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would
reduce the principal of, or interest on, the Loans or any fees payable hereunder, or postpone the
date of the final maturity of the Loans, in each case to the extent subject to such participation.
The Borrower also agrees that each Participant shall be entitled to the benefits of Sections 2.19,
2.20 and 2.21 with respect to its participation in the Commitments and the Loans outstanding
from time to time as if it was a Lender; provided that, in the case of Section 2.20, such
Participant shall have complied with the requirements of said Section; and provided, further, that
no Participant shall be entitled to receive any greater amount pursuant to any such Section than
the transferor Lender would have been entitled to receive in respect of the amount of the
participation transferred by such transferor Lender to such Participant had no such transfer
occurred.

(c)    Any Lender (an "Assignor") may, in accordance with applicable law, upon
written notice to the Administrative Agent, at any time and from time to time assign to any
Lender or any Affiliate, Related Fund or Control Investment Affiliate thereof or, with the
consent of the Borrower (which consent shall not be unreasonably withheld or delayed, it being
understood that the Borrower may withhold its consent if any such assignment is to be made to a
competitor of Borrower) and the Administrative Agent and, in the case of any assignment of
Revolving Credit Commitments, the written consent of the Issuing Lender and the Swing Line
Lender (which, in each case, shall not be unreasonably withheld or delayed) (provided that (x) no
such consent need be obtained if (i) the Assignee is another Lender or an Affiliate of a Lender or
(ii) the assignment is by a Lender to a Related Fund of any Lender, and (y) except with respect to
any assignment to a competitor of the Borrower, in any event the consent of the Borrower need
not be obtained with respect to any assignment to an Eligible Assignee at any time when an
Event of Default is continuing), to an additional Eligible Assignee (an "Assignee") all or any part
of its rights and obligations under this Agreement pursuant to an Assignment and Acceptance,
substantially in the form of Exhibit I, executed by such Assignee and such Assignor (an
"Assignment and Acceptance") (and, where the consent of the Borrower, the Administrative
Agent or the Issuing Lender or the Swing Line Lender is required pursuant to the foregoing
provisions, by the Borrower and such other Persons) and delivered to the Administrative Agent
for its acceptance and recording in the Register; provided that no such assignment to an Assignee
(other than any Lender or, with respect to such Lender, any Affiliate, Control Investment
Affiliate or Related Fund) shall be in an aggregate principal amount of less than $1,000,000 (in
the case of the Term Loan) and $5,000,000 (in the case of the Revolving Credit Commitment or

-92-

Revolving Credit Loans) and, after giving effect thereto, the Assignor shall retain an Aggregate Exposure of no less than $1,000,000 ($5,000,000 in the case of the Revolving Credit Commitment or Revolving Credit Loans) (other than in the case of an assignment of all of a Lender's interests under such Agreement), in each case unless otherwise agreed by the Borrower and the Administrative Agent. Any such assignment need not be ratable as among the Facilities. Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with a Commitment and/or Loans as set forth therein, and (y) the Assignor thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be party hereto as a Lender).

(d)     The Administrative Agent shall, on behalf of the Borrower, maintain at its address referred to in Section 10.2 a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Loans owing to, each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Loans and any Notes evidencing such Loans recorded therein for all purposes of this Agreement. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide). Any assignment or transfer of all or part of a Loan evidenced by a Note shall be registered on the Register only upon surrender for registration of assignment or transfer of the Note evidencing such Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Notes in the same aggregate principal amount shall be issued to the designated Assignee, and the old Notes shall be returned by the Administrative Agent to the Borrower marked "canceled". The Register shall be available for inspection by the Borrower or any Lender (with respect to any entry relating to such Lender's Commitment and Loans) at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of an Assignment and Acceptance executed by an Assignor and an Assignee (and, in any case where the consent of any other Person is required by Section 10.6(c), by each such other Person) together with payment to the Administrative Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable (x) in connection with an assignment by a Lender to, with respect to such Lender, an Affiliate, a Control Investment Affiliate or a Related Fund, (y) in connection with an assignment by or to a Lehman Entity or (z) in the case of an Assignee that is already a Lender or is an Affiliate of a Lender or a Person under common management with a Lender), the Administrative Agent shall promptly accept such Assignment and Acceptance and record the information contained therein in the Register and give notice of such acceptance and recordation to the Borrower. On or prior to such effective date, the Borrower, at its own expense, upon request, shall execute and deliver to the Administrative Agent (in exchange for any Revolving Credit Note and/or Term Notes, as the case may be, of the assigning Lender) a new Revolving Credit Note and/or Term Notes, as the case may be, to such Assignee or its registered assigns in

-93-

an amount equal to the Revolving Credit Commitment and/or Term Loans, as the case may be, assumed or acquired by it pursuant to such Assignment and Acceptance and, if the Assignor has retained a Revolving Credit Commitment and/or Term Loans, as the case may be, upon request, a new Revolving Credit Note and/or Term Notes, as the case may be, to the Assignor or its registered assigns in an amount equal to the Revolving Credit Commitment and/or applicable Term Loans, as the case may be, retained by it hereunder. Such new Note or Notes shall be dated the Closing Date and shall otherwise be in the form of the Note or Notes replaced thereby.

(f)      For the avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests, including any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law.

10.7.   Adjustments; Set-off.

(a)      Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)      In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower (any such notice being expressly waived by the Borrower to the extent permitted by applicable law), upon any amount becoming due and payable (after all applicable grace periods have expired) by the Borrower hereunder (whether at stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final, but excluding fiduciary accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower. Each Lender agrees to notify promptly the Borrower and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.8.   Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an

-94-

executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9. Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10. Integration. This Agreement and the other Loan Documents represent the agreement of the Borrower, the Agents, the Arrangers and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by any Loan Party, any Arranger, any Agent or any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

10.11. GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

10.12. Submission To Jurisdiction; Waivers. The Borrower hereby irrevocably and unconditionally:

(a) submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York situated in the County of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

-95-

10.13. <u>Acknowledgments</u>. The Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    neither any Arranger, nor any Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Arrangers, the Agents and the Lenders, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of participants in a debtor and creditor transaction; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Arrangers, the Agents and the Lenders or between the Borrower and any of them.

10.14. <u>Confidentiality</u>. Each of the Arrangers, the Agents and the Lenders agrees to keep confidential all non-public information provided to it by any Loan Party pursuant to this Agreement; <u>provided</u> that nothing herein shall prevent any Arranger, any Agent or any Lender from disclosing any such information (a) to any Arranger, any Agent, any other Lender or any affiliate of any thereof, (b) to any Participant or Assignee (each, a "<u>Transferee</u>") or prospective Transferee that agrees to comply with the provisions of this Section or substantially equivalent provisions, (c) to any of its employees, directors, agents, attorneys, accountants and other professional advisors involved in the evaluation or administration of the credit facilities contemplated hereby to the extent that such advisor shall agree to comply with the provisions of this section, (d) upon the request or demand of any Governmental Authority having jurisdiction over it, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed other than in breach of this Section, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (i) to the extent necessary in connection with the exercise of any remedy hereunder or under any other Loan Document.

10.15. <u>Release of Collateral and Guarantee Obligations</u>.

(a)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any disposition of property permitted by the Loan Documents, the Administrative Agent shall (without notice to or vote or consent of any Lender, or any affiliate of any Lender that is a party to any Specified Hedge Agreement) take such actions as shall be required to release its security interest in any Collateral being disposed of in such disposition of property, and to release any Guarantee Obligations of any Person being disposed of in such disposition of property, to the extent necessary to permit consummation of such disposition of property in accordance with the Loan Documents; provided that the Borrower shall have delivered to the Administrative Agent, at least five Business Days prior to the date of the proposed release, a written request for release identifying the relevant

-96-

Collateral being disposed of in such disposition of property and the terms of such disposition of property.

(b)    The Administrative Agent shall be, and hereby is, irrevocably authorized and empowered to release any and all of the Collateral and take any and all actions necessary therefor or reasonably incidental thereto, upon request of the Borrower and without notice to or consent of any Lender or any other holder of Obligations, when all Commitments have terminated, all Letters of Credit have been discharged, the principal of and interest on all Loans and Reimbursement Obligations have been paid in full and the Administrative Agent has received payment in full, or payment security satisfactory to it, as to all other Obligations that are claimed by the Administrative Agent or in respect of which the Administrative Agent has received, reasonably in advance of such release, written notice that any payment is due or any claim is pending.

10.16.  Accounting Changes.  In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Account Changes had not occurred.  "Accounting Changes" refers to changes in accounting principles required or permitted by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants, or, if applicable, the SEC.

10.17.  Delivery of Lender Addenda.  Each initial Lender shall become a party to this Agreement by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, the Borrower and the Administrative Agent.

10.18.  Construction.  Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant.  Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

10.19.  WAIVERS OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

10.20.  Designated Senior Debt.  The Obligations (including the Guarantee Obligations of each Subsidiary Guarantor under the Guarantee and Collateral Agreement) are hereby designated as "Designated Senior Debt" for the purposes of and as defined in the

-97-

Preferred Stock Exchange Notes Indenture and any indenture governing Preferred Stock Exchange Notes or Indebtedness incurred in any Permitted Refinancing under clause (1) of the definition of such term.

*[Remainder of page left blank intentionally; signatures follow.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

SPANISH BROADCASTING SYSTEM, INC.

By: _____
      Name:
      Title:


LEHMAN COMMERCIAL PAPER INC., as
      Administrative Agent


By: _____
      Name:
      Title:


MERRILL LYNCH, PIERCE, FENNER & SMITH,
                  INCORPORATED, as  Syndication Agent


By: _____
      Name:
      Title:


WACHOVIA BANK, NATIONAL ASSOCIATION, as
      Documentation Agent


By: _____
      Name:
      Title:


SPANISH BROADCASTING SYSTEM, INC.
FIRST LIEN CREDIT AGREEMENT
SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

SPANISH BROADCASTING SYSTEM, INC.

By: _____
    Name:
    Title:

LEHMAN COMMERCIAL PAPER INC., as
   Administrative Agent

By: _____
    Name: V. Paul Arakulan
    Title: Authorized Signatory

MERRILL LYNCH, PIERCE, FENNER & SMITH,
          INCORPORATED, as Syndication Agent

By: _____
    Name:
    Title:

WACHOVIA BANK, NATIONAL ASSOCIATION, as
   Documentation Agent

By: _____
    Name:
    Title:

SPANISH BROADCASTING SYSTEM, INC.
FIRST LIEN CREDIT AGREEMENT
SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

SPANISH BROADCASTING SYSTEM, INC.

By: _____
      Name:
      Title:

LEHMAN COMMERCIAL PAPER INC., as
   Administrative Agent

By: _____
      Name:
      Title:

MERRILL LYNCH, PIERCE, FENNER & SMITH,
   INCORPORATED, as  Syndication Agent

By: _____
      Name: _____
      Title:

WACHOVIA BANK, NATIONAL ASSOCIATION, as
   Documentation Agent

By: _____
      Name:
      Title:

SPANISH BROADCASTING SYSTEM, INC.
FIRST LIEN CREDIT AGREEMENT
SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

SPANISH BROADCASTING SYSTEM, INC.

By: _____
    Name:
    Title:

LEHMAN COMMERCIAL PAPER INC., as
   Administrative Agent

By: _____
    Name:
    Title:

MERRILL LYNCH, PIERCE, FENNER & SMITH,
          INCORPORATED, as Syndication Agent

By: _____
    Name:
    Title:

WACHOVIA BANK, NATIONAL ASSOCIATION, as
   Documentation Agent

By: _____
    Name: _RUSS LYONS_
    Title: _DIRECTOR_

SPANISH BROADCASTING SYSTEM, INC.
FIRST LIEN CREDIT AGREEMENT
SIGNATURE PAGE

# FIRST LIEN LENDER ADDENDUM

Reference is made to the First Lien Credit Agreement, dated as of June _10_, 2005 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among SPANISH BROADCASTING SYSTEM, INC., a Delaware corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time party thereto (the "Lenders"), WACHOVIA BANK, NATIONAL ASSOCIATION, as documentation agent (in such capacity, the "Documentation Agent"), MERRILL LYNCH, PIERCE FENNER & SMITH, INCORPORATED, as syndication agent (in such capacity, the "Syndication Agent") and LEHMAN COMMERCIAL PAPER INC., as administrative agent (in such capacity, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Upon execution and delivery of this Lender Addendum by the parties hereto as provided in Section 10.17 of the Credit Agreement, the undersigned hereby becomes a Lender thereunder having the commitment set forth in Schedule I hereto, effective as of the Closing Date.

THIS LENDER ADDENDUM SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

This Lender Addendum may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page hereof by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Lender Addendum to be duly executed and delivered by their proper and duly authorized officers as of this _10th_ day of June, 2005.

LEHMAN COMMERCIAL PAPER INC.

By: _____
    Name:
    Title:

Accepted and agreed:

SPANISH BROADCASTING SYSTEM, INC.

By: _____
    Name: Joseph A. Garcia
    Title: EVP & CFO

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

By: _____
    Name:
    Title:

## FIRST LIEN LENDER ADDENDUM

Reference is made to the First Lien Credit Agreement, dated as of June _10_, 2005 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among SPANISH BROADCASTING SYSTEM, INC., a Delaware corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time party thereto (the "Lenders"), WACHOVIA BANK, NATIONAL ASSOCIATION, as documentation agent (in such capacity, the "Documentation Agent"), MERRILL LYNCH, PIERCE FENNER & SMITH, INCORPORATED, as syndication agent (in such capacity, the "Syndication Agent") and LEHMAN COMMERCIAL PAPER INC., as administrative agent (in such capacity, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Upon execution and delivery of this Lender Addendum by the parties hereto as provided in Section 10.17 of the Credit Agreement, the undersigned hereby becomes a Lender thereunder having the commitment set forth in Schedule I hereto, effective as of the Closing Date.

THIS LENDER ADDENDUM SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

This Lender Addendum may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page hereof by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Lender Addendum to be duly executed and delivered by their proper and duly authorized officers as of this _10th_ day of June, 2005.

LEHMAN COMMERCIAL PAPER INC.

By: _____
Name:
Title:       RITAM BHALLA
             Authorized Signatory

Accepted and agreed:

SPANISH BROADCASTING SYSTEM, INC.

By: _____
Name:
Title:

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

By: _____
Name:       RITAM BHALLA
Title:       Authorized Signatory

30097.2.BUSINESS

**Lehman Commercial Paper Inc.**

**First Lien Commitment**

| | Amount | % of total amount of such Commitment from all Lenders |
|---|---|---|
| ...m Loan Commitment | $227,500,000 | 70% |
| ...volving Credit Commitment | $15,230,000 | 60.92% |

## **Exhibit D**

Capstone Report
(attached as Exhibit B to Claim No. 67707)

**Spanish Broadcasting System, Inc.**

**Summary of Claim Amounts**

**Diminution in Value and Damages**

| | |
|---|---:|
| 1. The expected decline in total invested capital ("TIC"), as defined by the market value of common equity, preferred equity, long-term debt, cash, and minority interest, versus the actual decline in TIC that Spanish Broadcasting System, Inc. ("SBS") experienced. | $   39,600,000.00 |
| 2. Settlement Amounts (as defined in the Hedge Amendment and Settlement Agreement dated June 17, 2010 (the "Swap Settlement Agreement")) in excess of $6,008,991.58[1] that SBS paid or is obligated to pay Lehman Brothers Special Financing, Inc. ("LBSF"). Lehman Commercial Paper, Inc. ("LCPI") failed to fund the $10,000,000 revolver draw, the proceeds of which were intended to be used to terminate the ISDA Agreement. | $   9,886,745.00 |
| 3. Financing and unfunded revolver fees SBS paid to LCPI for the $10,000,000 revolver commitment that LCPI did not make available to SBS to draw. | $   273,333.33 |
| 4. SBS's cost to replace the LCPI $10,000,000 revolver commitment that LCPI failed to fund. | $   5,702,150.00 |

Total  $    55,462,228.33

[1] *$6,008,991.58 is the estimated amount that would have been required for SBS to close out that certain ISDA Master Agreement, dated as of June 28, 2005, (the "ISDA Agreement") with LBSF on October 3, 2008.*

**1. The expected decline in total invested capital ("TIC"), as defined by the market value of common equity, preferred equity, long-term debt, cash, and minority interest, versus the actual decline in TIC that SBS experienced.[1]**

| ($ in millions) Comparable Companies: | Total Invested Capital ("TIC") | | Percent Decline |
|---|---|---|---|
| | *Sept. 30, 2008* | *Dec. 31, 2008* | |
| Beasley Broadcast Group Inc. | $       189.5 | $       155.1 | (18.1%) |
| Cumulus Media Inc. | 802.1 | 535.1 | (33.3%) |
| Entercom Comm. Corp. | 930.0 | 626.7 | (32.6%) |
| Entravision Comm. Corp. | 751.1 | 477.5 | (36.4%) |
| Fisher Comm. Inc. | 514.0 | 327.6 | (36.3%) |
| Radio One Inc. | 738.7 | 502.0 | (32.0%) |
| Saga Comm. Inc. | 233.0 | 126.2 | (45.9%) |
| Salem Comm. Corp. | 336.7 | 261.2 | (22.4%) |
| | | Median | (33.0%) |

| *Expected Change in SBS TIC:* | |
|---|---|
| TIC as of September 30, 2008 | $       298.3 |
| Expected Percentage Decline | (33.0%) |
| Expected TIC | 200.0 |
| Actual TIC Value 12/31/2008 | 160.4 |
| Underperformance (rounded) | $       (39.6) |

*(1) Supporting documentation is voluminous. SBS will provide the information upon request.*

**Spanish Broadcasting System, Inc.**
**SBS Expected Decline in Total**
**Invested Capital**
*($ in millions)*

| | Beasley Broadcast Group Inc. | | Cumulus Media Inc. | | Entercom Communications Corp. | |
|---|---|---|---|---|---|---|
| | *Sept. 30, 2008* | *Dec. 31, 2008* | *Sept. 30, 2008* | *Dec. 31, 2008* | *Sept. 30, 2008* | *Dec. 31, 2008* |
| Price per Share | $ 1.69 | $ 1.80 | $ 4.26 | $ 2.49 | $ 5.02 | $ 1.23 |
| Shares Outstanding | 23.7 | 22.7 | 43.0 | 42.5 | 36.4 | 36.4 |
| **Market Value of Equity** | **40.1** | **40.9** | **183.2** | **105.8** | **182.6** | **44.7** |
| | | | | | | |
| Face Value of Debt | 179.1 | 179.1 | 724.7 | 696.0 | 875.2 | 849.0 |
| FMV of Debt as % of Face | 80.6% | 61.9% | 76.9% | 54.1% | 85.2% | 68.0% |
| **Fair Market Value of Debt** | **144.4** | **110.8** | **557.6** | **376.3** | **745.5** | **577.7** |
| Cash | 5.0 | 3.5 | 61.3 | 53.0 | 1.9 | 4.3 |
| Preferred Stock | - | - | - | - | - | - |
| Minority Interest | - | - | - | - | - | - |
| **Total Invested Capital** | $ **189.5** | $ **155.1** | $ **802.1** | $ **535.1** | $ **930.0** | $ **626.7** |
| | | | | | | |
| Percent Decline | | (18.1%) | | (33.3%) | | (32.6%) |

**Spanish Broadcasting System, Inc.**
**SBS Expected Decline in Total**
**Invested Capital**
*($ in millions)*

| | Entravision Communications Corp. | | Fisher Communications Inc. | | Radio One Inc. | |
|---|---|---|---|---|---|---|
| | *Sept. 30, 2008* | *Dec. 31, 2008* | *Sept. 30, 2008* | *Dec. 31, 2008* | *Sept. 30, 2008* | *Dec. 31, 2008* |
| Price per Share | $ 2.69 | $ 1.56 | $ 39.40 | $ 20.64 | $ 0.75 | $ 0.22 |
| Shares Outstanding | 89.8 | 86.8 | 8.7 | 8.7 | 99.8 | 92.6 |
| **Market Value of Equity** | **241.6** | **135.5** | **344.1** | **180.3** | **74.8** | **20.4** |
| | | | | | | |
| Face Value of Debt | 473.0 | 429.7 | 150.0 | 150.0 | 765.1 | 678.3 |
| FMV of Debt as % of Face | 82.9% | 64.6% | 100.5% | 77.0% | 82.6% | 61.3% |
| **Fair Market Value of Debt** | **391.9** | **277.7** | **150.8** | **115.5** | **632.4** | **415.9** |
| Cash | 117.6 | 64.3 | 19.2 | 31.8 | 30.4 | 22.3 |
| Preferred Stock | - | - | - | - | - | - |
| Minority Interest | - | - | - | - | 1.1 | 43.4 |
| **Total Invested Capital** | **$ 751.1** | **$ 477.5** | **$ 514.0** | **$ 327.6** | **$ 738.7** | **$ 502.0** |
| | | | | | | |
| Percent Decline | | (36.4%) | | (36.3%) | | (32.0%) |

**Spanish Broadcasting System, Inc.**
**SBS Expected Decline in Total**
**Invested Capital**
*($ in millions)*

| | Saga Communications Inc. | | Salem Communications Corp. | | Spanish Broadcasting System Inc. | |
|---|---|---|---|---|---|---|
| | *Sept. 30, 2008* | *Dec. 31, 2008* | *Sept. 30, 2008* | *Dec. 31, 2008* | *Sept. 30, 2008* | *Dec. 31, 2008* |
| Price per Share | $ 22.80 | $ 6.60 | $ 1.25 | $ 0.75 | $ 3.80 | $ 0.97 |
| Shares Outstanding | 4.9 | 4.2 | 23.7 | 23.7 | 7.2 | 7.2 |
| **Market Value of Equity** | **112.2** | **27.8** | **29.6** | **17.8** | **27.5** | **7.0** |
| Face Value of Debt | 134.4 | 135.4 | 335.9 | 333.3 | 339.4 | 347.8 |
| FMV of Debt as % of Face | 83.9% | 67.5% | 91.4% | 72.5% | 58.0% | 28.0% |
| **Fair Market Value of Debt** | **112.8** | **91.4** | **307.0** | **241.6** | **196.8** | **97.4** |
| Cash | 8.0 | 7.0 | 0.2 | 1.9 | 34.0 | 32.9 |
| Preferred Stock | - | - | - | - | 39.9 | 23.1 |
| Minority Interest | - | - | - | - | - | - |
| **Total Invested Capital** | $ **233.0** | $ **126.2** | $ **336.7** | $ **261.2** | $ **298.3** | $ **160.4** |
| Percent Decline | | (45.9%) | | (22.4%) | | (46.2%) |

**Spanish Broadcasting System, Inc.**
**Calculation of Market Value as %**
**of Face for Debt Instruments**
*($ in millions)*

| Company | Balance 9/30/2008 | Balance 12/31/2008 | Maturity |
|---|---|---|---|
| Beasley Broadcast Group Inc. | | | |
| Revolving credit loan | $ 55.5 | $ 55.5 | 30-Jun-15 |
| Term loan | 123.6 | 119.0 | 30-Jun-15 |
| Total | $ 179.1 | $ 174.5 | |
| | | | |
| Cumulus Media Inc. | | | |
| Revolving credit loan | $ - | $ - | 7-Jun-12 |
| Term loan | 724.7 | 696.0 | 11-Jun-14 |
| Total | $ 724.7 | $ 696.0 | |
| | | | |
| Entercom Comm. Corp. | | | |
| Revolver | $ 383.0 | $ 350.0 | 30-Jun-12 |
| Term Loan A | 400.0 | 400.0 | 30-Jun-12 |
| 7.625% Senior Subordinated Note | 92.0 | 83.5 | 1-Mar-14 |
| Total | $ 875.0 | $ 833.5 | |
| | | | |
| Entravision Comm. Corp. | | | |
| Revolver | $ 2.0 | $ 1.3 | 29-Mar-12 |
| Term Loan | 470.0 | 403.5 | 29-Mar-13 |
| Total | $ 472.0 | $ 404.8 | |
| | | | |
| Fisher Comm. Inc. | | | |
| 8.625% senior notes | $ 150.0 | $ 150.0 | 15-Sep-14 |
| Total | $ 150.0 | $ 150.0 | |
| | | | |
| Radio One Inc. | | | |
| $8 \frac{7}{8}$% Senior Subordinated Notes | $ 248.9 | $ 104.0 | 1-Jul-11 |
| $6 \frac{3}{8}$% Senior Subordinated Notes | 200.0 | 200.0 | 15-Feb-13 |
| Credit facilities | 315.9 | 371.2 | 1-Jan-11 |
| Total | $ 764.8 | $ 675.2 | |
| | | | |
| Saga Comm. Inc. | | | |
| Revolver | $ 133.4 | $ 134.4 | 29-Jul-12 |
| Total | $ 133.4 | $ 134.4 | |
| | | | |
| Salem Comm. Corp. | | | |
| Term Loan B | $ 72.0 | $ 71.6 | 31-Mar-10 |
| Term Loan C | 161.7 | 160.9 | 30-Jun-12 |
| Revolver under Credit Facility | - | - | 31-Mar-09 |
| 7¾% Senior Subordinated Notes | 100.0 | 90.6 | 15-Dec-10 |
| Total | $ 333.7 | $ 323.1 | |

**Spanish Broadcasting System, Inc.**
**Calculation of Market Value as %**
**of Face for Debt Instruments**
*($ in millions)*

| | Credit Rating | | Spread | | Contractual Rate | |
| | | | | | 9/30/2008 | 12/31/2008 |
| Company | 9/30/2008 | 12/31/2008 | 9/30/2008 | 12/31/2008 | LIBOR + | LIBOR + |
|---|---|---|---|---|---|---|
| **Beasley Broadcast Group Inc.** | | | | | | |
| Revolving credit loan | BB | BB | L+577 | L+1198 | 1.000% | 1.000% |
| Term loan | BB | BB | L+577 | L+1198 | 1.000% | 1.000% |
| Total | | | | | | |
| | | | | | | |
| **Cumulus Media Inc.** | | | | | | |
| Revolving credit loan | B | B | L+875 | L+2006 | 2.000% | 2.000% |
| Term loan | B | B | L+875 | L+2006 | 1.750% | 1.750% |
| Total | | | | | | |
| | | | | | | |
| **Entercom Comm. Corp.** | | | | | | |
| Revolver | BB- | B+ | L+726 | L+1602 | 1.130% | 1.130% |
| Term Loan A | BB- | B+ | L+726 | L+1602 | 1.130% | 1.130% |
| 7.625% Senior Subordinated Note | BB- | B+ | L+726 | L+1602 | 6.176% | 5.509% |
| Total | | | | | | |
| | | | | | | |
| **Entravision Comm. Corp.** | | | | | | |
| Revolver | B+ | B+ | L+726 | L+1602 | 2.000% | 2.000% |
| Term Loan | B+ | B+ | L+726 | L+1602 | 1.500% | 1.500% |
| Total | | | | | | |
| | | | | | | |
| **Fisher Comm. Inc.** | | | | | | |
| 8.625% senior notes | | | | | | |
| Total | | | | | | |
| | | | | | | |
| **Radio One Inc.** | | | | | | |
| 8 7/8% Senior Subordinated Notes | | | | | | |
| 6 3/8% Senior Subordinated Notes | | | | | | |
| Credit facilities | BB- | BB- | L+726 | L+1602 | 2.250% | 2.250% |
| Total | | | | | | |
| | | | | | | |
| **Saga Comm. Inc.** | | | | | | |
| Revolver | BB- | BB- | L+726 | L+1602 | 1.250% | 1.250% |
| Total | | | | | | |
| | | | | | | |
| **Salem Comm. Corp.** | | | | | | |
| Term Loan B | B+ | B | L+726 | L+2006 | 1.750% | 1.750% |
| Term Loan C | B+ | B | L+726 | L+2006 | 1.750% | 1.750% |
| Revolver under Credit Facility | B+ | B | L+726 | L+2006 | 2.000% | 2.000% |
| 7¾% Senior Subordinated Notes | B+ | B | L+726 | L+2006 | 7.116% | 6.266% |
| Total | | | | | | |

**Spanish Broadcasting System, Inc.**
**Calculation of Market Value as %**
**of Face for Debt Instruments**
*($ in millions)*

| Company | Stated Spread | Repay Assumption | Price | LIBOR | Spread |
|---|---|---|---|---|---|
| | | **September 30, 2008 Calculation** | | | |
| Beasley Broadcast Group Inc. | | | | | |
| Revolving credit loan | 100.0bp | 6.7 yr | 80.65 | 4.05% | L+577.0 |
| Term loan | 100.0bp | 6.7 yr | 80.65 | 4.05% | L+577.0 |
| Total | | | | | |
| | | | | | |
| Cumulus Media Inc. | | | | | |
| Revolving credit loan | 200.0bp | 3.7 yr | 83.10 | 4.05% | L+875.0 |
| Term loan | 175.0bp | 5.7 yr | 76.95 | 4.05% | L+875.0 |
| Total | | | | | |
| | | | | | |
| Entercom Comm. Corp. | | | | | |
| Revolver | 113.0bp | 3.7 yr | 83.87 | 4.05% | L+726.0 |
| Term Loan A | 113.0bp | 3.7 yr | 83.87 | 4.05% | L+726.0 |
| 7.625% Senior Subordinated Note | 617.6bp | 5.4 yr | 96.36 | 4.05% | L+726.0 |
| Total | | | | | |
| | | | | | |
| Entravision Comm. Corp. | | | | | |
| Revolver | 200.0bp | 3.5 yr | 86.83 | 4.05% | L+726.0 |
| Term Loan | 150.0bp | 4.5 yr | 82.84 | 4.05% | L+726.0 |
| Total | | | | | |
| | | | | | |
| Fisher Comm. Inc. | | | | | |
| 8.625% senior notes | | | | | |
| Total | | | | | |
| | | | | | |
| Radio One Inc. | | | | | |
| 8 7/8% Senior Subordinated Notes | | | | | |
| 6 3/8% Senior Subordinated Notes | | | | | |
| Credit facilities | 225.0bp | 2.3 yr | 91.00 | 4.05% | L+726.0 |
| Total | | | | | |
| | | | | | |
| Saga Comm. Inc. | | | | | |
| Revolver | 125.0bp | 3.8 yr | 83.95 | 4.05% | L+726.0 |
| Total | | | | | |
| | | | | | |
| Salem Comm. Corp. | | | | | |
| Term Loan B | 175.0bp | 1.5 yr | 92.94 | 4.05% | L+726.0 |
| Term Loan C | 175.0bp | 3.7 yr | 85.50 | 4.05% | L+726.0 |
| Revolver under Credit Facility | 200.0bp | 0.5 yr | 97.52 | 4.05% | L+726.0 |
| 7¾% Senior Subordinated Notes | 711.6bp | 2.2 yr | 99.75 | 4.05% | L+726.0 |
| Total | | | | | |

**Spanish Broadcasting System, Inc.**
**Calculation of Market Value as %**
**of Face for Debt Instruments**
*($ in millions)*

| Company | Stated Spread | Repay Assumption | Price | LIBOR | Spread |
|---|---|---|---|---|---|
| | | December 31, 2008 Calculation | | | |
| Beasley Broadcast Group Inc. | | | | | |
| Revolving credit loan | 100.0bp | 6.5 yr | 61.88 | 1.43% | L+1198.0 |
| Term loan | 100.0bp | 6.5 yr | 61.88 | 1.43% | L+1198.0 |
| Total | | | | | |
| | | | | | |
| Cumulus Media Inc. | | | | | |
| Revolving credit loan | 200.0bp | 3.4 yr | 64.32 | 1.43% | L+2006.0 |
| Term loan | 175.0bp | 5.4 yr | 54.06 | 1.43% | L+2006.0 |
| Total | | | | | |
| | | | | | |
| Entercom Comm. Corp. | | | | | |
| Revolver | 113.0bp | 3.5 yr | 67.66 | 1.43% | L+1602.0 |
| Term Loan A | 113.0bp | 3.5 yr | 67.66 | 1.43% | L+1602.0 |
| 7.625% Senior Subordinated Note | 550.9bp | 5.2 yr | 71.45 | 1.43% | L+1602.0 |
| Total | | | | | |
| | | | | | |
| Entravision Comm. Corp. | | | | | |
| Revolver | 200.0bp | 3.2 yr | 70.97 | 1.43% | L+1602.0 |
| Term Loan | 150.0bp | 4.2 yr | 64.61 | 1.43% | L+1602.0 |
| Total | | | | | |
| | | | | | |
| Fisher Comm. Inc. | | | | | |
| 8.625% senior notes | | | | | |
| Total | | | | | |
| | | | | | |
| Radio One Inc. | | | | | |
| 8 7/8% Senior Subordinated Notes | | | | | |
| 6 3/8% Senior Subordinated Notes | | | | | |
| Credit facilities | 225.0bp | 2.0 yr | 79.57 | 1.43% | L+1602.0 |
| Total | | | | | |
| | | | | | |
| Saga Comm. Inc. | | | | | |
| Revolver | 125.0bp | 3.6 yr | 67.48 | 1.43% | L+1602.0 |
| Total | | | | | |
| | | | | | |
| Salem Comm. Corp. | | | | | |
| Term Loan B | 175.0bp | 1.2 yr | 82.01 | 1.43% | L+2006.0 |
| Term Loan C | 175.0bp | 3.5 yr | 63.44 | 1.43% | L+2006.0 |
| Revolver under Credit Facility | 200.0bp | 0.2 yr | 95.77 | 1.43% | L+2006.0 |
| 7¾% Senior Subordinated Notes | 626.6bp | 2.0 yr | 81.01 | 1.43% | L+2006.0 |
| Total | | | | | |

**Spanish Broadcasting System, Inc.**
**Calculation of Market Value as %**
**of Face for Debt Instruments**
*($ in millions)*

| Company | 9/30/2008 | | | 12/31/2008 | | |
|---|---|---|---|---|---|---|
| | *Face* | *FMV* | *% of Face* | *Face* | *FMV* | *% of Face* |
| Beasley Broadcast Group Inc. | | | | | | |
| Revolving credit loan | 55.5 | 44.8 | 80.6% | 55.5 | 34.3 | 61.9% |
| Term loan | 123.6 | 99.6 | 80.6% | 119.0 | 73.6 | 61.9% |
| Total | 179.1 | 144.4 | 80.6% | 174.5 | 108.0 | 61.9% |
| | | | | | | |
| Cumulus Media Inc. | | | | | | |
| Revolving credit loan | - | - | | - | - | |
| Term loan | 724.7 | 557.6 | 76.9% | 696.0 | 376.3 | 54.1% |
| Total | 724.7 | 557.6 | 76.9% | 696.0 | 376.3 | 54.1% |
| | | | | | | |
| Entercom Comm. Corp. | | | | | | |
| Revolver | 383.0 | 321.2 | 83.9% | 350.0 | 236.8 | 67.7% |
| Term Loan A | 400.0 | 335.5 | 83.9% | 400.0 | 270.7 | 67.7% |
| 7.625% Senior Subordinated Note | 92.0 | 88.7 | 96.4% | 83.5 | 59.7 | 71.4% |
| Total | 875.0 | 745.3 | 85.2% | 833.5 | 567.1 | 68.0% |
| | | | | | | |
| Entravision Comm. Corp. | | | | | | |
| Revolver | 2.0 | 1.7 | 86.8% | 1.3 | 0.9 | 71.0% |
| Term Loan | 470.0 | 389.4 | 82.8% | 403.5 | 260.7 | 64.6% |
| Total | 472.0 | 391.1 | 82.9% | 404.8 | 261.6 | 64.6% |
| | | | | | | |
| Fisher Comm. Inc. | | | | | | |
| 8.625% senior notes | 150.0 | 150.8 | 100.5% | 150.0 | 115.5 | 77.0% |
| Total | | | | | | |
| | | | | | | |
| Radio One Inc. | | | | | | |
| 8 7/8% Senior Subordinated Notes | 248.9 | 206.6 | 83.0% | 104.0 | 51.6 | 49.6% |
| 6 3/8% Senior Subordinated Notes | 200.0 | 138.0 | 69.0% | 200.0 | 67.0 | 33.5% |
| Credit facilities | 315.9 | 287.5 | 91.0% | 371.2 | 295.4 | 79.6% |
| Total | 764.8 | 632.1 | 82.6% | 675.2 | 414.0 | 61.3% |
| | | | | | | |
| Saga Comm. Inc. | | | | | | |
| Revolver | 133.4 | 111.9 | 83.9% | 134.4 | 90.7 | 67.5% |
| Total | | | | | | |
| | | | | | | |
| Salem Comm. Corp. | | | | | | |
| Term Loan B | 72.0 | 66.9 | 92.9% | 71.6 | 58.7 | 82.0% |
| Term Loan C | 161.7 | 138.2 | 85.5% | 160.9 | 102.1 | 63.4% |
| Revolver under Credit Facility | - | - | | - | - | |
| 7¾% Senior Subordinated Notes | 100.0 | 99.7 | 99.7% | 90.6 | 73.4 | 81.0% |
| Total | 333.7 | 304.9 | 91.4% | 323.1 | 234.2 | 72.5% |

**Spanish Broadcasting System, Inc.**
**LCD Loan Data[1] for Required Rates of Return**

| Date | BB Loans per LCD Comps | | B Loans per LCD Comps | | Average B/BB per LCD Comps | |
|---|---|---|---|---|---|---|
| | Avg Bid | Spread-to-Maturity | Avg Bid | Spread-to-Maturity | Avg Bid | Spread-to-Maturity |
| 6/29/2007 | 99.96 | L+205 | 99.88 | L+266 | 99.92 | L+236 |
| 7/31/2007 | 95.97 | L+287 | 95.37 | L+356 | 95.67 | L+322 |
| 8/31/2007 | 95.77 | L+295 | 94.70 | L+373 | 95.24 | L+334 |
| 9/28/2007 | 97.03 | L+270 | 96.01 | L+346 | 96.52 | L+308 |
| 10/26/2007 | 97.36 | L+267 | 96.25 | L+341 | 96.81 | L+304 |
| 11/30/2007 | 95.45 | L+312 | 94.19 | L+396 | 94.82 | L+354 |
| 12/28/2007 | 95.18 | L+320 | 93.65 | L+409 | 94.42 | L+365 |
| 1/31/2008 | 91.96 | L+400 | 89.28 | L+517 | 90.62 | L+459 |
| 2/29/2008 | 89.60 | L+467 | 86.24 | L+599 | 87.92 | L+533 |
| 3/28/2008 | 89.81 | L+461 | 84.61 | L+652 | 87.21 | L+556 |
| 4/30/2008 | 92.91 | L+388 | 87.91 | L+566 | 90.41 | L+477 |
| 5/30/2008 | 93.18 | L+381 | 88.43 | L+556 | 90.80 | L+469 |
| 6/27/2008 | 92.90 | L+390 | 88.16 | L+567 | 90.53 | L+479 |
| 7/31/2008 | 92.04 | L+418 | 86.57 | L+615 | 89.31 | L+517 |
| 8/29/2008 | 91.83 | L+422 | 85.86 | L+640 | 88.85 | L+531 |
| 9/30/2008 | 86.32 | L+577 | 78.78 | L+875 | 82.55 | L+726 |
| 10/24/2008 | 74.77 | L+976 | 66.66 | L+1400 | 70.72 | L+1188 |
| 10/31/2008 | 75.53 | L+952 | 66.20 | L+1414 | 70.86 | L+1183 |
| 11/7/2008 | 76.51 | L+919 | 65.79 | L+1435 | 71.15 | L+1177 |
| 11/14/2008 | 76.15 | L+935 | 64.69 | L+1493 | 70.42 | L+1214 |
| 11/21/2008 | 72.82 | L+1076 | 60.11 | L+1750 | 66.46 | L+1413 |
| 11/28/2008 | 72.12 | L+1110 | 58.94 | L+1826 | 65.53 | L+1468 |
| 12/5/2008 | 70.42 | L+1189 | 57.46 | L+1930 | 63.94 | L+1560 |
| 12/12/2008 | 69.27 | L+1251 | 55.71 | L+2060 | 62.49 | L+1655 |
| 12/19/2008 | 68.82 | L+1275 | 55.46 | L+2087 | 62.14 | L+1681 |
| 12/26/2008 | 69.48 | L+1243 | 55.58 | L+2084 | 62.53 | L+1663 |
| 12/31/2008 | 70.50 | L+1198 | 56.84 | L+2006 | 63.67 | L+1602 |
| 1/2/2009 | 70.65 | L+1193 | 56.94 | L+2005 | 63.79 | L+1599 |

*(1) Leveraged Commentary & Data ("LCD"), a unit of Standard & Poor's, is a provider of leveraged finance news and analysis, including pricing, trends,*
*secondary levels/analysis, credit stats, default analysis; US and European Loan Indexes.*

**Spanish Broadcasting System, Inc.**
**SBS Comparable Companies Selection Methodology**


**CapitalIQ Screening Criteria**
1) **Industry Classifications:** Radio (Primary)
2) **Geographic Locations:** United States of America (Primary)
3) **Company Type:** Public Company
4) **Company Status:** Operating


*Selected Companies*

| Company Name | Exchange: Ticker | Reason for Inclusion | Summary Business Description |
|---|---|---|---|
| Spanish Broadcasting System Inc. | NasdaqGM:SBSA | Subject Company | Subject company |
| Beasley Broadcast Group Inc. | NasdaqGM:BBGI | Primarily a radio broadcasting company. Operates in multiple markets across the country | Owns 42 stations along the east coast. |
| Cumulus Media Inc. | NasdaqGS:CMLS | Primarily a radio broadcasting company. Operates in multiple markets across the country | Owns and operates 312 radio stations in 60 mid-sized markets across the U.S. |
| Entercom Communications Corp. | NYSE:ETM | Primarily a radio broadcasting company. Operates in multiple markets across the country | Owns 100 radio stations in 23 metro markets around the country. |
| Entravision Communications Corp. | NYSE:EVC | Spanish language media company. | Spanish language media company.  Owns 53 TV stations and 43 radio stations. |

**Spanish Broadcasting System, Inc.**
**SBS Comparable Companies Selection Methodology**

*Selected Companies*

| Company Name | Exchange: Ticker | Reason for Inclusion | Summary Business Description |
|---|---|---|---|
| Fisher Communications Inc. | NasdaqGS:FSCI | Primarily a radio and TV broadcasting company.  Operates in multiple markets across the country. | Primarily TV. Owns 8 radio stations and 20 TV stations in the NW. |
| Radio One Inc. | NasdaqGM:ROIA.K | Primarily a radio broadcasting company. Operates in multiple markets across the country | Owns and operates 53 radio stations located in 16 urban markets in the United States. The company also has approximately 36% ownership interest in TV One, LLC, an African-American targeted cable television network; and a 51% ownership interest in Reach Media, Inc., which operates the Tom Joyner Morning Show. |
| Saga Communications Inc. | AMEX:SGA | Primarily a radio broadcasting company. Operates in multiple markets across the country | Owns 61 FM stations, 30 AM stations, and 9 TV channels in 23 markets across the country. |
| Salem Communications Corp. | NasdaqGM:SALM | Primarily a radio broadcasting company. Operates in multiple markets across the country | Christian media company.  Owns 95 radio stations in 37 metro markets and 2 satellite radio stations.  Also creates syndicated programming . |

**Spanish Broadcasting System, Inc.**
**SBS Comparable Companies Selection Methodology**

*Excluded Companies*

| Company Name | Exchange: Ticker | Reason for Exclusion | Summary Business Description |
|---|---|---|---|
| CBS Corporation | NYSE:CBS | Diverse business. Only 20% of its revenue comes from the operation of radio stations. | Operates network and cable TV stations, radio stations, outdoor advertising, publishing, internet website and film production companies. |
| CC Media Holdings, Inc. | OTCPK:CCMO | 50% of its revenue is generated through outdoor advertising (i.e., billboards). 30% of its revenue is generated outside of the U.S. | Owns 892 radio stations in 150 markets across the U.S., 188,000 outdoor advertising displays in the U.S. and 634,000 outdoor advertising displays around the country. |
| Emerging Media Holdings, Inc. | OTCBB:EMDH.D | Does not operate in the US. | Radio and Television Broadcasting in Moldova. |
| Ludwig Enterprises Inc. | OTCPK:LUDG | Too small compared to the Subject Company. | Ethnic radio stations |

**2. Settlement Amounts in excess of $6,008,991.58[1] that SBS paid or is obligated to pay LBSF. LCPI failed to fund the $10,000,000 revolver draw, the proceeds of which were intended to be used to terminate the ISDA Agreement.[2]**

| | | |
|---|---|---:|
| December-08 | $ | 368,684 |
| March-09 | | 2,166,227 |
| June-09 | | 2,373,887 |
| September-09 | | 2,886,783 |
| December-09 | | 3,125,131 |
| March-10 | | 3,072,408 |
| June-10 | | 1,015,874 |
| Total Settlement Amounts | | 15,008,992 |
| Plus: Interest on Settlement Amounts | | 386,745 |
| | | 15,395,737 |
| Minus: January 15, 2010 wire transfer payment | | (6,008,992) |
| | | 9,386,745 |
| Plus: estimated legal and other costs | | 500,000 |
| **Damages from not funding the Revolver** | $ | **9,886,745** |

*(1) $6,008,991.58 is the estimated amount that would have been required for SBS to terminate the ISDA Agreement on October 3, 2008.*

*(2) Based upon information and belief, the Swap Settlement Agreement and the ISDA Agreement and related wire transfer payment documentation are already in possession of the Debtor. SBS will provide copies upon request.*

**3. Financing and unfunded revolver fees SBS paid to LCPI for the $10,000,000 revolver commitment that LCPI did not make available to SBS to draw.[1]**

*Financing Fees*

| Date | Revolver Commitment | Fee % | Funding Commitment % | Amounts Paid to Lehman |
|---|---|---|---|---|
| June-11 | $ 10,000,000 | 1.75% | 60% | $ 105,000 |

*Unfunded Revolver Fees*

| Quarters Ended | Revolver Commitment | Rate | Days Outstanding | Amounts Paid to Lehman |
|---|---|---|---|---|
| 6/30/2005 | $ 10,000,000 | 0.50% | 20 | $ 2,778 |
| 9/30/2005 | 10,000,000 | 0.50% | 92 | 12,778 |
| 12/31/2005 | 10,000,000 | 0.50% | 91 | 12,639 |
| 3/31/2006 | 10,000,000 | 0.50% | 91 | 12,639 |
| 6/30/2006 | 10,000,000 | 0.50% | 91 | 12,639 |
| 9/30/2006 | 10,000,000 | 0.50% | 91 | 12,639 |
| 12/31/2006 | 10,000,000 | 0.50% | 91 | 12,639 |
| 3/31/2007 | 10,000,000 | 0.50% | 91 | 12,639 |
| 6/30/2007 | 10,000,000 | 0.50% | 91 | 12,639 |
| 9/30/2007 | 10,000,000 | 0.50% | 91 | 12,639 |
| 12/31/2007 | 10,000,000 | 0.50% | 94 | 13,056 |
| 3/31/2008 | 10,000,000 | 0.50% | 91 | 12,639 |
| 6/30/2008 | 10,000,000 | 0.50% | 91 | 12,639 |
| 9/30/2008 | 10,000,000 | 0.50% | 92 | 12,778 |
| 10/4/2008 | $ 10,000,000 | 0.50% | 4 | 556 |
| | | | | $ 168,333 |

**Total Fees paid to Lehman related to the Revolver**   $ 273,333

(1) *Based upon information and belief, the May 31, 2005 Amended and Restated Fee Letter and the May 31, 2005 Amended and Restated Commitment Letter and related wire transfer payment documentation are already in possession of the Debtor. SBS will provide copies upon request.*

16

**4. SBS's cost to replace the LCPI $10,000,000 revolver commitment that LCPI failed to fund.**

**SBS's cost of financing the $10,000,000 revolver had LCPI funded versus
SBS's cost of financing a $10,000,000 revolver at market rates**

| Periods | 3-mth LIBOR Set Rate | SBS Revolver Spread | Estimated Rate | Unfunded Revolver | Quarterly Financing Cost |
|---|---|---|---|---|---|
| Oct 3, 2008 - Dec 2008 | 3.77% | 2.00% | 5.77% | 10,000,000 | $ 142,647 |
| Jan 2009 - March 2009 | 1.46% | 2.00% | 3.46% | 10,000,000 | 86,500 |
| April 2009 - June 2009 | 1.22% | 2.00% | 3.22% | 10,000,000 | 80,500 |
| July 2009 - Sept 2009 | 0.60% | 2.00% | 2.60% | 10,000,000 | 65,000 |
| Oct 2009 - Dec 2009 | 0.29% | 2.00% | 2.29% | 10,000,000 | 57,250 |
| Jan 2010 - March 2010 | 0.26% | 2.00% | 2.26% | 10,000,000 | 56,500 |
| April 2010 - June 2010 | 0.30% | 2.00% | 2.30% | 10,000,000 | 57,500 |
| SBS's cost of financing the $10,000,000 revolver had LCPI funded | | | | | $ 545,897 |

| Periods | 3-mth LIBOR Set Rate | SBS Revolver Spread | Estimated Rate | Unfunded Revolver | Quarterly Financing Cost |
|---|---|---|---|---|---|
| Oct 3, 2008 - Dec 2008 | 3.77% | 32.06% | 35.83% | 10,000,000 | $ 885,797 |
| Jan 2009 - March 2009 | 1.46% | 32.06% | 33.52% | 10,000,000 | 838,000 |
| April 2009 - June 2009 | 1.22% | 32.06% | 33.28% | 10,000,000 | 832,000 |
| July 2009 - Sept 2009 | 0.60% | 32.06% | 32.66% | 10,000,000 | 816,500 |
| Oct 2009 - Dec 2009 | 0.29% | 32.06% | 32.35% | 10,000,000 | 808,750 |
| Jan 2010 - March 2010 | 0.26% | 32.06% | 32.32% | 10,000,000 | 808,000 |
| April 2010 - June 2010 | 0.30% | 32.06% | 32.36% | 10,000,000 | 809,000 |
| SBS's cost of financing a $10,000,000 revolver at market rates | | | | | $ 5,798,047 |

| | |
|---|---|
| SBS's cost of financing a $10,000,000 revolver at market rates | $ 5,798,047 |
| Plus: estimated legal and other costs | 450,000 |
| | 6,248,047 |
| Minus: SBS's cost of financing the $10,000,000 revolver had LCPI funded | (545,897) |
| SBS's cost to replace the LCPI $10,000,000 revolver commitment that LCPI failed to fund | $ 5,702,150 |

# Spanish Broadcasting Loan Spread Calculation

| As of October 03, 2008 | S&P - Calculation | Back of the Envelope | S&P - Calculation (IRR) |
|---|---|---|---|
| Stated Spread (in bps) | 175.0bp | 175.0bp | 175.0bp |
| Repay Assumption (in yrs.) | 3.7 yr | 3.7 yr | 3.7 yr |
| Price (cents on the dollar) | 63.00 | 63.00 | 63.00 |
| LIBOR (Yield) | 4.33% | 4.33% | 4.33% |
| **Yield (No Floor)** | **25.577%** | **16.113%** | **20.662%** |
| **Spread (No Floor)** | **L+2124.7** | **L+1178.3** | **L+1633.2** |

| As of October 31, 2008 | S&P - Calculation | Back of the Envelope | S&P - Calculation (IRR) |
|---|---|---|---|
| Stated Spread (in bps) | 175.0bp | 175.0bp | 175.0bp |
| Repay Assumption (in yrs.) | 3.6 yr | 3.6 yr | 3.6 yr |
| Price (cents on the dollar) | 39.33 | 39.33 | 39.33 |
| LIBOR (Yield) | 3.03% | 3.03% | 3.03% |
| **Yield (No Floor)** | **54.873%** | **21.582%** | **35.030%** |
| **Spread (No Floor)** | **L+5184.3** | **L+1855.2** | **L+3200.0** |

| As of November 28, 2008 | S&P - Calculation | Back of the Envelope | S&P - Calculation (IRR) |
|---|---|---|---|
| Stated Spread (in bps) | 175.0bp | 175.0bp | 175.0bp |
| Repay Assumption (in yrs.) | 3.5 yr | 3.5 yr | 3.5 yr |
| Price (cents on the dollar) | 32.33 | 32.33 | 32.33 |
| LIBOR (Yield) | 2.22% | 2.22% | 2.22% |
| **Yield (No Floor)** | **71.503%** | **23.117%** | **41.095%** |
| **Spread (No Floor)** | **L+6928.3** | **L+2089.7** | **L+3887.5** |

| As of December 31, 2008 | S&P - Calculation | Back of the Envelope | S&P - Calculation (IRR) |
|---|---|---|---|
| Stated Spread (in bps) | 175.0bp | 175.0bp | 175.0bp |
| Repay Assumption (in yrs.) | 3.5 yr | 3.5 yr | 3.5 yr |
| Price (cents on the dollar) | 30.00 | 30.00 | 30.00 |
| LIBOR (Yield) | 1.41% | 1.41% | 1.41% |
| **Yield** | **77.200%** | **23.160%** | **42.443%** |
| **Spread** | **L+7579.0** | **L+2175.0** | **L+4103.3** |

| | Blend Average Rate Spread | L+3206.0 |
|---|---|---|

18

**<u>Exhibit E</u>**

Declaration of Joseph A. Garcia
in Support of Amended Proof of Claim of Spanish
Broadcasting System, Inc. and in Response to Lehman's Reply (ECF No. 34549-1)

Madlyn Gleich Primoff, Esq.
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
(212) 836-8000
mprimoff@kayescholer.com

*Attorneys for Spanish Broadcasting System, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

In re:                                                    Chapter 11

LEHMAN BROTHERS HOLDINGS INC., et al.,                    Case No. 08-13555 (JMP)

                                        Debtors.          Jointly Administered

-------------------------------------------------------------------x

**DECLARATION OF JOSEPH A. GARCIA IN SUPPORT OF AMENDED PROOF OF
CLAIM OF SPANISH BROADCASTING SYSTEM, INC. AND IN RESPONSE TO
LEHMAN'S REPLY**

        I, Joseph A. Garcia, hereby declare:

        1.      I am the Chief Financial Officer of Spanish Broadcasting System, Inc. ("Spanish

Broadcasting"). I submit this declaration in support of the Amended Proof of Claim of Spanish

Broadcasting System, Inc. and in opposition to Lehman's Reply to Response of Spanish

Broadcasting dated January 24, 2013 (docket no. 34175).

        2.      Spanish Broadcasting is the largest publicly traded Hispanic-controlled media and

entertainment company in the United States. Spanish Broadcasting owns and/or operates more

than 21 radio and television stations located in the top U.S. Hispanic markets of New York, Los

Angeles, Miami, Chicago, San Francisco and Puerto Rico.

61110128.DOCX

3.　Spanish Broadcasting and Lehman Commercial Paper Inc. ("Lehman") were parties to that certain First Lien Credit Agreement (the "Credit Agreement"), dated as of June 10, 2005, among, *inter alia*, Spanish Broadcasting, as borrower, and Lehman, as administrative agent and lender.  The Credit Agreement included a term loan facility of $325,000,000 and a revolving credit facility of $25 million in the aggregate.  Section 4.16(b) of the Credit Agreement provided that the proceeds of the revolving credit facility "shall be used for working capital purposes, capital needs and general corporate purposes of the Borrower and its Subsidiaries . . . ."

4.　On October 3, 2008, Spanish Broadcasting submitted a draw request in accordance with the terms of the Credit Agreement for the entire $25 million of availability under the revolving credit facility.  While the other lenders under the Credit Agreement funded $15 million of the $25 million draw request ("Draw"), Lehman failed to fund its $10 million portion of the Draw.  Upon information and belief, Lehman commenced its case under chapter 11 of the Bankruptcy Code on or about October 5, 2008.  Lehman never funded its $10 million portion of Spanish Broadcasting's Draw.

5.　As a result of Lehman's failure to fund, S&P and Moody's both downgraded Spanish Broadcasting.  In doing so, they specifically cited Lehman's failure to fund as the reason for the downgrade as well as concerns about Spanish Broadcasting's liquidity position.  S&P's report stated that "the ratings downgrade is based on [S&P's] continued liquidity concerns regarding cash depletion, which are further heightened by the company's inability to draw down fully on its $25 million revolving credit facility."

6.　Spanish Broadcasting suffered damages as a direct result of Lehman's failure to fund its $10 million portion of the Draw.  Spanish Broadcasting had planned on using almost the

2

61110128.DOCX

entire $25 million Draw under the revolving credit facility to pay off an $18.5 million note maturing in January 2009.

7.     Spanish Broadcasting also planned to use the Draw to terminate and close out its obligations under a swap agreement with Lehman's affiliate (the Swap). At the time, we estimated that the termination of the Swap would result in a termination payment to Lehman's affiliate of somewhere between $5 and $6 million.

8.     Because Lehman did not fund its $10 million share of the Draw, Spanish Broadcasting was compelled to to use the entire $15 million it did receive from the Draw, plus $3.5 million of its already low cash reserves, to make the $18.5 million payment on the maturing note. In addition, Lehman's failure to fund the Draw left Spanish Broadcasting without the capital necessary to terminate the Swap. Ultimately, Spanish Broadcasting paid $9,886,745 more in damages to Lehman's affiliate for termination of the Swap than it would have been required to pay had it been able to terminate the Swap in October 2008 as contemplated.

9.     Lehman's failure to fund the Draw Request caused Spanish Broadcasting to lack essential funds necessary for general corporate purposes and, according to the Report of Capstone Advisory Group annexed as Exhibit B to Spanish Broadcasting's Amended Proof of Claim dated November 3, 2011, suffer a diminution in the market value of Spanish Broadcasting's common equity, preferred equity, long-term debt, cash, and minority interests (the "Total Invested Capital"). The reduction in liquidity caused by Lehman's failure to fund the Draw and the inability to obtain other financing prevented Spanish Broadcasting from operating at its current and budgeted levels at the time, and therefore forced Spanish Broadcasting to immediately take steps to cut costs and preserve cash. This included a severe reduction in staff and overall business expenses. Spanish Broadcasting's ability to produce programming and

61110128.DOCX

generate revenue were reduced as a result, and Spanish Broadcasting was not able to achieve budgeted financial levels.

10.     While the lack of capital forced Spanish Broadcasting to cut back on its production and revenue generating projects, its competitors were not experiencing any similar internal capital raising problems. It is recognized that this was a very difficult time for all businesses, including Spanish Broadcasting and its competitors, and market values decreased significantly during this time frame, but the failure to fund the Draw caused Spanish Broadcasting to suffer another level of lost market value due to the resulting forced reduction in its productions and revenues generating activities. Thus, as set forth in the Capstone Report, Spanish Broadcasting incurred approximately $39.6 million in damages is based on the excess of the actual diminution in value of Total Invested Capital suffered by Spanish Broadcasting as a result of Lehman's failure to fund its $10 million piece of the $25 million revolving Draw as compared with the diminution in value Spanish Broadcasting should have suffered based on the experience of its various competitors in the marketplace.

11.     Spanish Broadcasting was unable to obtain $10 million of replacement financing elsewhere because alternate financing was simply not available in the marketplace. Based on our understanding of the financial markets at the time of the credit crisis and Lehman's bankruptcy filing, we recognized that alternate financing simply was not an option. We were in regular communications with Lehman personnel in the days leading up to and following Spanish Broadcasting's issuance of the Draw and Lehman's failure to fund its share. Lehman was well aware of Spanish Broadcasting's need for Lehman's $10 million and well aware that Spanish Broadcasting could not obtain funds elsewhere.

4

61110128.DOCX

12.     Spanish Broadcasting's leverage ratios at September 30, 2008 and December 31, 2008 (of 14.77 and 16.87 respectively) show that no lender would have lent money to it in the last quarter of 2008.

13.     Given that Spanish Broadcasting is a public company and in view of Lehman's material breach of its obligation to fund, Spanish Broadcasting filed an 8-K on October 10, 2008 -- several days after Lehman's failure to fund -- disclosing that Lehman failed to fund. Despite this public disclosure, nobody came forward to make a replacement loan.

14.     Spanish Broadcasting incurred $273,333.33 in additional damages on account of the fees that Spanish Broadcasting paid to Lehman for the $10 million revolver commitment that Lehman failed to fund.

15.     If Spanish Broadcasting is not permitted to pursue the Total Invested Capital Damages, the Swap Termination Damages and the Fee Damages as set forth in the Amended Proof of Claim, then it is my view that our remedies under the Credit Agreement will have failed of their essential purpose.

16.     I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      January 29, 2013

                                Joseph A. Garcia

61110128.DOCX

5