WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------------- x

**MEMORANDUM OF LAW OF**
**LEHMAN BROTHERS HOLDINGS INC. IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO**
**RULE 7056 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**<u>REGARDING CLAIM 67707 FILED BY SPANISH BROADCASTING SYSTEM, INC.</u>**

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................................1

Jurisdiction .............................................................................................................................3

Background .............................................................................................................................3

    I.      The Credit Agreement and the Draw Request ...............................................3

    II.     The Claim.........................................................................................................5

    III.    The Payoff Letter .............................................................................................7

    IV.   The Objection and Subsequent Briefing ........................................................8

    V.     ADR Proceeding ..............................................................................................9

    VI.   Discovery and Subsequent Proceedings ......................................................10

Legal Standard .....................................................................................................................12

Analysis................................................................................................................................14

    I.      Spanish Broadcasting Explicitly and Irrevocably Waived Any Right to
Consequential Damages ................................................................................14

         A.    The Damages Waiver is Enforceable..................................................14

         B.    Termination of the Credit Agreement Did Not Affect the Damages
Waiver................................................................................................15

             i.     Spanish Broadcasting's Waiver of Consequential Damages Cannot
Be Terminated.........................................................................15

             ii.    The Payoff Letter Terminated Only Prospective, Not Retroactive,
Obligations .............................................................................16

         C.    LCPI Did Not Waive Its Right to Enforce the Damages Waiver in the
Payoff Letter .....................................................................................19

    II.     The Plan Administrator is Entitled to Judgment as a Matter of Law on the
Characterization of the EBITDA Damages and the Swap Damages ............20

         A.    Summary Judgment is Appropriate on the Characterization of Spanish
Broadcasting's Asserted Damages.....................................................20

         B.    The EBITDA Damages and the Swap Damages Are Consequential
Damages that Have Been Waived by Spanish Broadcasting.............21

             i.     The EBITDA Damages are Consequential Damages That Have
Been Waived ...........................................................................26

             ii.    The Swap Damages are Consequential Damages That Have Been
Waived .....................................................................................27

Conclusion ...........................................................................................................................29

WEIL:\95349864\16\58399.0011

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Abate v. Bushwick Savs. Bank,*
    138 N.Y.S.2d 140 (City Ct. 1955) ..................................................................................24

*Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co. Inc.,*
    676 N.Y.S.2d 559 (1st Dep't 1998) ...............................................................................22

*AGR Fin., L.L.C. v. Ready Staffing, Inc.,*
    99 F. Supp. 2d 399 (S.D.N.Y. 2000)...............................................................................18

*In re Allegiance Telecom, Inc.,*
    356 B.R. 93 (Bankr. S.D.N.Y. 2006) ..............................................................................17

*Altman v. Curtiss-Wright Corp.,*
    124 F.2d 177 (2d Cir. 1941)............................................................................................13

*Am. List Corp. v. U.S. News & World Report, Inc.,*
    549 N.E.2d 1161 (N.Y. 1989).........................................................................................22

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).........................................................................................................13

*Avalon Constr. Corp. v. Kirch Holding Co., Inc.,*
    175 N.E. 651 (N.Y. 1931)..........................................................................................24, 25

*Bond St. Knitters v. Peninsula Nat'l Bank,*
    42 N.Y.S.2d 744 (1st Dep't 1943) ..................................................................................24

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
    262 F. Supp. 2d 204 (S.D.N.Y. 2003).............................................................................15

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
    372 F.3d 471 (2d Cir. 2004)................................................................................15, 16, 19

*Caribbean Trading & Fidelity Corp. v. Nigerian Nat'l Petroleum Co.,*
    No. 90 Civ. 4169 (JFK), 1993 WL 541236 (S.D.N.Y. Dec. 28, 1993) ..........................13

*In re CCT Commc'ns, Inc.,*
    464 B.R. 97 (Bankr. S.D.N.Y. 2011)......................................................................14, 22, 27

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).................................................................................................12, 13

*Cent. Coordinates, Inc. v. Morgan Guar. Trust Co.,*
    494 N.Y.S.2d 602, 604 (Sup. Ct. 1985)..........................................................................24

WEIL:\95349864\16\58399.0011

*Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*,
650 F. Supp. 2d 314 (S.D.N.Y. 2009) .........................................................................20, 22, 23

*Congregation Darech Amuno v. Blasof*,
640 N.Y.S.2d 564 (1st Dep't 1996) ...............................................................................16

*Diaz v. Lexington Exclusive Corp.*,
874 N.Y.S.2d 77 (1st Dep't 2009) .................................................................................17

*DLJ Mortg. Capital Corp. v. Fairmont Funding, Ltd.*,
920 N.Y.S.2d 1 (1st Dep't 2011) ..............................................................................19, 20

*DynCorp v. GTE Corp.*,
215 F. Supp. 2d 308 (S.D.N.Y. 2002)............................................................................14

*E. Brass & Copper Co. v. Gen. Elec. Supply Corp.*,
101 F. Supp. 410 (S.D.N.Y. 1951) ...........................................................................20, 21

*Elijah Ragira/VIP Lodging Grp., Inc. v. VIP Lodging Grp., Inc.*,
301 S.W.3d 747 (Tex. App. 2009)..................................................................................25

*Gilbert Frank Corp. v. Fed. Ins. Co.*,
520 N.E.2d 512 (N.Y. 1988).........................................................................................19

*Graham v. Henderson*,
89 F.3d 75 (2d Cir. 1996)..............................................................................................13

*Grant v. Aerodraulics Co.*,
204 P.2d 683 (Cal. Dist. Ct. App. 1949)........................................................................18

*Greenfield v. Philles Records, Inc.*,
780 N.E.2d 166 (N.Y. 2002)..........................................................................................17

*Holcomb v. Iona College*,
521 F.3d 130 (2d Cir. 2008)..........................................................................................12

*Kalisch-Jarcho, Inc. v. City of N.Y.*,
448 N.E.2d 413 (N.Y. 1983)..........................................................................................14

*Lester v. Resolution Trust Corp.*,
125 B.R. 528 (N.D. Ill. 1991) .....................................................................................8, 25

*Linc Equip. Servs., Inc. v. Signal Med. Servs., Inc.*,
319 F.3d 288 (7th Cir. 2003) ...........................................................................................9

*Litton Fin. Printing Div. v. N.L.R.B.*,
501 U.S. 190 (1991).................................................................................................17, 18

iii

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
    643 N.E.2d 504 (N.Y. 1994)......................................................................................14

*Morlee Sales Corp. v. Mfrs. Trust Co.*,
    172 N.E.2d 280 (N.Y. 1961)......................................................................................17

*In re MPM Silicones, LLC*,
    Case No. 14-22503 (RDD), 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014).................17

*My Play City, Inc. v. Conduit Ltd.*,
    589 Fed. App'x 559 (2d Cir. 2014).............................................................................14

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.*,
    436 N.E.2d 1265 (N.Y. 1982)....................................................................................15

*Phoenix Warehouse of Calif., LLC v. Townley, Inc.*,
    No. 08 Civ. 2856 (NRB), 2011 WL 1345134 (S.D.N.Y. Mar. 29, 2011)...............................20

*PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*,
    __ F. Supp. 3d __, No. 12 Civ. 8570 (PAE), 2014 WL 7146357
    (S.D.N.Y. Dec. 15, 2014).........................................................................12, 13, 20

*Premier Corp. v. Econ. Research Analysts, Inc.*,
    578 F.2d 551 (4th Cir. 1978) ...................................................................................18

*Primex Int'l Corp. v. Wal-Mart Stores, Inc.*,
    679 N.E.2d 624 (N.Y. 1997)......................................................................................16

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000)......................................................................................22

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007).........................................................................22, 23, 26, 28

*In re Transact, Inc.*,
    No. SACV 13-1512-MWF, 2014 WL 3888230 (C.D. Cal. Aug. 6, 2014)..............................25

*In re Vivaro Corp.*,
    No. 12-13810, 2014 WL 486288 (Bankr. S.D.N.Y. Feb. 6, 2014)................................. *passim*

*Vt. Teddy Bear Co, Inc. v. 538 Madison Realty Co.*,
    807 N.E.2d 876 (N.Y. 2004)......................................................................................17

*Welles v. Turner Entmt. Co.*,
    503 F.3d 728 (9th Cir. 2007) ................................................................................17, 18

*Y.W.C.A. v. HMC Entm't*,
    No. 91 Civ. 7943 (KMW), 1992 WL 279361 (S.D.N.Y. Sept. 25, 1992) ..............................18

iv

*Zelazny v. Pilgrim Funding Corp.*,
    244 N.Y.S.2d 810 (Dist. Ct. 1963) ........................................................................25

**Statutes**

28 U.S.C. § 157(b) ..........................................................................................................3

28 U.S.C. § 1334 ............................................................................................................3

**Other Authorities**

Fed. R. Civ. P. 56 ....................................................................................................12, 13

Fed. R. Bankr. P. 9014 ..................................................................................................12

Fed. R. Bankr. P. 7056 ..................................................................................................12

Local Bankruptcy Rule 7056-1 .......................................................................................3

17B C.J.S. Contracts § 610 ...........................................................................................18

11-59 Corbin on Contracts § 59.3 (rev. ed. 2014) ........................................................25

1-3 Lender Liab. Law & Litig. § 3.06............................................................................27

25 Williston on Contracts § 66:101 ...............................................................................24

3 Dobbs Law of Remedies § 12.2(3) (2d ed. 1993).......................................................23

BLACK'S LAW DICTIONARY (10th ed. 2014) ..................................................................3

WEIL:\95349864\16\58399.0011

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (ECF No. 22737) (the "Plan"), on behalf of Lehman Commercial Paper Inc. ("LCPI"), files this memorandum of law in support of its motion for summary judgment on the Three Hundred Twenty-Eighth Omnibus Objection to Claims (No Liability Claims), dated July 10, 2012 (ECF No. 29323, the "Objection"), to, among other claims, Claim No. 67707 (the "Claim") filed by Spanish Broadcasting System, Inc. ("Spanish Broadcasting"). In support of the motion, the Plan Administrator respectfully represents as follows:

## PRELIMINARY STATEMENT

Spanish Broadcasting has no right to anything but a *de minimis* portion of the damages it seeks because it unambiguously and irrevocably waived its right to seek such damages from LCPI. In its Claim, Spanish Broadcasting seeks to recover over $47.8 million for LCPI's failure to loan Spanish Broadcasting $10 million the day after LCPI commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Plan Administrator does not dispute that LCPI breached its obligation to loan Spanish Broadcasting $10 million as required by the Credit Agreement (defined below) between the parties. The Credit Agreement, however, provides that Spanish Broadcasting "irrevocably and unconditionally waives" the right to recover "any special, exemplary, punitive or consequential damages." And $47.5 of the $47.8 million sought by Spanish Broadcasting relates to injuries allegedly suffered in connection with collateral business arrangements, and not caused directly (if at all) by LCPI's failure to loan $10 million. Such damages are the quintessential example of

consequential damages under New York law.  As such, their recovery is barred by the Damages

Waiver (defined below) in the Credit Agreement.

There can be no genuine dispute that the Damages Waiver is enforceable.

Spanish Broadcasting "irrevocably and unconditionally" waived its right to recover

consequential damages at the time the Credit Agreement was executed.  Under New York law,

contractual provisions limiting the recovery of damages are enforceable absent some egregious

or malicious conduct, particularly where the parties are sophisticated entities that were

represented by counsel in the negotiations.  Spanish Broadcasting argues that the Damages

Waiver—but not the Claim—was retroactively terminated when the Credit Agreement was paid

off and terminated.  None of the documents relied upon by Spanish Broadcasting, however,

supports the baseless argument that LCPI's defense to the Claim was nullified, while the Claim

itself survived.  In fact, LCPI did not waive any of its matured rights under the Credit

Agreement, including its right to enforce the Damages Waiver.

Spanish Broadcasting's attempt to characterize the damages it seeks as direct

damages also fails.  Spanish Broadcasting's own descriptions of its damages—in the Capstone

Report (defined below), the Garcia Declaration (defined below), and in Spanish Broadcasting's

responses to the Plan Administrator's interrogatories—fall squarely within the well-settled

definition of consequential damages when a party breaches an obligation to lend money.  In such

cases, the injured party may recover as direct damages the incremental interest expense it bears

by replacing the loan.  Additional consequential damages are recoverable under limited

circumstances, but only absent a contractual bar.  Here, Spanish Broadcasting does not seek the

cost of replacement financing, and has expressly waived its right to recover, among other things,

any consequential or special damages.  Accordingly, the Court should grant summary judgment

to the Plan Administrator on Spanish Broadcasting's Claim for the EBITDA Damages and the

Swap Damages (both defined below) as a matter of law.[1]

<div align="center">**JURISDICTION AND VENUE**</div>

This Court has subject matter jurisdiction to consider and determine this matter

pursuant to 28 U.S.C. § 1334 and section 14.1(b) of the Plan.  This is a core proceeding pursuant

to 28 U.S.C. § 157(b).

<div align="center">**BACKGROUND**</div>

**I.    The Credit Agreement and the Draw Request**

On or about June 10, 2005, LCPI, as administrative agent and lender, and Spanish

Broadcasting, as borrower, entered into a Credit Agreement (the "Credit Agreement"), pursuant

to which LCPI and certain other lenders agreed to collectively make a term loan to Spanish

Broadcasting in the amount of $325 million (the "Term Loan") on the closing date, which was

June 10, 2005.  Rule 7056-1 Stmt. ("7056-1 Statement") ¶¶ 1–2, Ex. C §§ 2.1(a), 1.1 (definitions

of "Closing Date," "Term Loan" and "Term Loan Commitment").[2]  In addition to the Term

Loan, the Credit Agreement provided for a revolving credit facility under which Spanish

Broadcasting, as borrower, had the right to request that the lenders loan it a total of $25 million,

with each lender responsible for a portion of the $25 million (the "Revolving Credit Facility").

*Id.* ¶ 3, Ex. C §§ 2.4(a), 1.1 (definition of "Revolving Credit Loan").  At all relevant times,

LCPI's credit commitment under the Revolving Credit Facility was $10 million.  *See* 7056-1

Stmt. ¶ 4, Ex. A, Decl. of Ralph I. Miller in Support of Mot. for Summ. J. ("Miller Declaration")

---

[1]  "EBITDA" is an acronym for "earnings before interest, taxes, depreciation, and amortization, and is "used as an indicator of a company's profitability and ability to service its debt."  BLACK'S LAW DICTIONARY (10th ed. 2014).

[2]  "Rule 7056-1 Statement" refers to the Plan Administrator's Statement of Undisputed Material Facts (and exhibits attached thereto) in Support of Its Motion for Summary Judgment, pursuant to Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York.

<div align="center">3</div>

Ex. 2.  As administrative agent, LCPI had the additional responsibility of facilitating the funding of loans to Spanish Broadcasting under the Revolving Credit Facility.  *See* 7056-1 Stmt. ¶ 5, Ex. C § 2.5.

Spanish Broadcasting agreed to repay the aggregate outstanding principal balance of the Term Loan no later than June 10, 2012.  *Id.* ¶ 6, Ex. C §§ 1.1 (definition of "Term Loan Maturity Date"), 2.3.  Additionally, the Credit Agreement required Spanish Broadcasting to repay all amounts loaned to it under the Revolving Credit Facility no later than June 10, 2010. *Id.* Ex. C §§ 1.1 (definition of "Revolving Credit Termination Date"); 2.8(a).  Spanish Broadcasting agreed to repay each of the loans, together with interest at the specified rate.  *Id.* ¶ 6, Ex. C § 2.15.

Spanish Broadcasting explicitly waived the right to seek anything other than direct damages resulting from breach of the Credit Agreement.  Specifically, section 10.12 of the Credit Agreement states:

> [Spanish Broadcasting] hereby ***irrevocably and unconditionally*** . . . (e) ***waives,*** to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section[3] ***any special, exemplary, punitive or consequential damages.***

*Id.* ¶ 9, § 10.12(e) (the "Damages Waiver") (emphasis added).  On the closing date, the lenders under the Credit Agreement—including LCPI—loaned Spanish Broadcasting $325 million as required by the Credit Agreement.  *Id.* ¶ 10.

On October 3, 2008, just two weeks after LCPI's parent company, LBHI, commenced a voluntary case under chapter 11 of the Bankruptcy Code, (*see id.* ¶ 11), Spanish

---

[3] Section 10.12 of the Credit Agreement refers to "any legal action or proceeding relating to this Agreement and the other Loan Documents to which [Spanish Broadcasting] is a party." 7056-1 Stmt. Ex. C § 10.12(a).  Given that Claim 67707 arises under the Credit Agreement, this contested matter qualifies as "a legal action or proceeding referred to in [Section 10.12]."

WEIL:\95349864\16\58399.0011

Broadcasting requested an advance of the full $25 million available under the Revolving Credit

Facility (the "Draw Request").  *See id.* ¶ 12; Miller Decl. Ex. 1.  As required by the Credit

Agreement, the Notice of Borrowing sent by Spanish Broadcasting to LCPI, as administrative

agent, requested that the $25 million loan be provided to Spanish Broadcasting on October 6,

2008.  7056-1 Stmt. ¶ 13; Miller Decl. Ex. 1.  On October 5, 2008, LCPI commenced a voluntary

case under chapter 11 of the Bankruptcy Code.  7056-1 Stmt. ¶ 14.  As a result, LCPI did not

fund its $10 million portion of the Draw Request.  *Id.* ¶ 15; Miller Decl. Ex. 2.  It is undisputed

that, as administrative agent under the Credit Agreement, LCPI did fulfill its obligation to

facilitate the funding of the $15 million balance due from the other lenders.  7056-1 Stmt. ¶ 17.

## II.    The Claim

On November 3, 2011, Spanish Broadcasting filed proof of claim number 67707

against LCPI seeking $55,462,228.33 that it claimed to have suffered because LCPI did not loan

it $10 million.[4]  *Id.* ¶ 18, Ex. B.  Attached to the Claim were the Credit Agreement and a report

from Capstone Advisory Group, LLC (the "Capstone Report") detailing the various components

of Spanish Broadcasting's alleged damages.  *See id.* ¶ 21, Exs. C & D.  The Capstone Report

identifies four components to justify the staggering amount sought by Spanish Broadcasting.

First, the Capstone Report states that Spanish Broadcasting suffered $39.6 million in damages

stemming from an "expected" decline in its total invested capital (the "TIC Damages"), which

the Capstone Report defines as "the market value of common equity, preferred equity, long-term

debt, cash, and minority interest."  *Id.* ¶ 22, Ex. D at 1, 2.

---

[4] The Claim amends proof of claim number 15941, filed in an unliquidated amount against LCPI on September 18, 2009, which claim was expunged pursuant to the *Order Granting Debtors' Two Hundred Thirty-Seventh Omnibus Objection to Claims (Amended and Superseded Claims)*, dated January 26, 2012 (ECF No. 24682).

WEIL:\95349864\16\58399.0011

Second, the Capstone Report states that Spanish Broadcasting suffered $9.9 million in damages (the "Swap Damages") as a result of its alleged inability to terminate an ISDA Master Agreement, dated June 28, 2005 (the "Swap"), that it had entered into with LCPI's affiliate, Lehman Brothers Special Financing Inc. ("LBSF").  *See id.* ¶ 23, Ex. D at 1, 15; Miller Decl. Ex. 3.  Although LBHI's bankruptcy filing constituted an "Event of Default" under the Swap that entitled Spanish Broadcasting to terminate the Swap, doing so would have required Spanish Broadcasting to make a termination payment to LBSF, which Spanish Broadcasting contends would have been $6,008,991.58 as of October 3, 2008.  7056-1 Stmt. ¶ 43, Ex. D at 1, 15; Miller Decl. Ex. 3.  Spanish Broadcasting alleges that it was unable to make that payment without LCPI's $10 million portion of the Draw Request, resulting in higher payments and additional costs to Spanish Broadcasting when it terminated the Swap in 2010.  *See* 7056-1 Stmt. ¶¶ 42–43, Ex. E; *see also* ECF Nos. 30907 ¶ 21; 34549 ¶ 15.[5]

Third, the Capstone Report states that Spanish Broadcasting was entitled to $273,333.33, representing the "financing and unfunded revolver fees" that it paid to LCPI in its capacity as administrative agent, over the life of the Credit Agreement (the "Fee Damages").  7056-1 Stmt. ¶ 24, Ex. D at 1, 16.  Although LCPI disputes that Spanish Broadcasting is entitled to recover a significant portion of these fees, the Fee Damages are not the subject of this motion.

Fourth, the Capstone Report states that Spanish Broadcasting sought to recover approximately $5.7 million for what it cost Spanish Broadcasting to replace LCPI's $10 million commitment under the Revolving Credit Facility (the "Replacement Cost Damages").  *Id.* ¶ 25,

---

[5] The Swap was terminated pursuant to that certain confidential Hedge Amendment and Settlement Agreement between LBSF and Spanish Broadcasting, dated as of June 17, 2010, following an ADR proceeding pursuant to the Bankruptcy Court's *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts.*  (ECF No. 5207).  7056-1 Stmt. ¶ 41.  Spanish Broadcasting argues that it incurred nearly $9.9 million in additional costs under the settlement that it would not have incurred had it terminated the Swap in October 2008.  *Id.* Ex. D at 15.

Ex. D at 1, 17. Spanish Broadcasting later withdrew the Replacement Cost Damages from its

Claim. *See* Feb. 13, 2013 Hr'g Tr. at 134:25–135:5 (ECF No. 34990) (MS. PRIMOFF: . . . On the

$5.7 million, I believe we previously communicated to Lehman that we are withdrawing that

element of the claim. So that's – that's not – that's not an issue.").

## III.    **The Payoff Letter**

On or about February 7, 2012, and following negotiations during which they were

represented by counsel, Spanish Broadcasting and LCPI executed a letter terminating the Credit

Agreement (the "Payoff Letter"). *See* 7056-1 Stmt. ¶ 26; Miller Decl. Ex. 4. Specifically, the

Payoff Letter provides that all amounts owed by Spanish Broadcasting under the Credit

Agreement were to be paid in full and further stated that "all obligations of [Spanish

Broadcasting] and the other Loan Parties[6] thereunder and under the other Loan Documents shall

be terminated (other than contingent obligations which expressly survive the terms of the Credit

Agreement or such other Loan Documents, including without limitation, Section 10.5 of the

Credit Agreement)." Miller Decl. Ex. 4 § 1(a). Additionally, section 4 of the Payoff Letter (the

"Release") contains a one-way release by Spanish Broadcasting which states:

> [***Spanish Broadcasting***] . . . hereby unconditionally and
> irrevocably waives all claims, suits, debts, liens, losses, causes of
> action, demands, rights, damages or costs, or expenses of any kind,
> character or nature whatsoever, known or unknown, fixed or
> contingent, which any of them may have or claim to have against
> [LCPI] (whether in its capacity as an agent, lender, hedging
> counterparty or otherwise) or its agents, employees, officers,
> affiliates, directors, representatives, attorneys, successors and
> assigns . . . to the extent arising out of or in connection with the
> Loan Documents including, without limitation, any failure by

---

[6] The Payoff Letter provides that "[c]apitalized terms used but not defined herein shall have the meanings given such terms in the Credit Agreement." The Credit Agreement defines Loan Parties as "[Spanish Broadcasting] and each Subsidiary of [Spanish Broadcasting] that is a party to a Loan Document." 7056-1 Stmt. Ex. C § 1.1. The Credit Agreement defines Loan Documents as the "[First Lien Credit Agreement, as amended, supplemented, replaced or otherwise modified from time to time], the Security Documents, the Intercreditor Agreement, the Fee Letter, the Applications and the Notes." *Id.*

WEIL:\95349864\16\58399.0011

> [LCPI] or its affiliates to fund any Loan required to be funded by it
> under the Credit Agreement . . .  The ***foregoing release*** shall not
> apply to [the Claim] . . . .

*Id.* § 4 (emphasis added).  LCPI did not release any of its matured rights against Spanish

Broadcasting in the Payoff Letter including, but not limited to, its right to enforce the Damages

Waiver.

## IV.    The Objection and Subsequent Briefing

On July 10, 2012, the Plan Administrator filed the Objection.  Through the

Objection, the Plan Administrator sought, among other things, to disallow the TIC Damages and

the Swap Damages on the basis that they are barred by the Damages Waiver.  Obj. ¶ 16.[7]

Spanish Broadcasting filed a response to the Objection, dated September 13, 2012, arguing in

part, that the TIC Damages and the Swap Damages constitute direct and not consequential

damages, and thus, that their recovery is not barred by the Damages Waiver.  ECF No. 30907

¶ 2.  LBHI filed a reply to Spanish Broadcasting's response, dated January 24, 2013,

demonstrating that such damages are at best, consequential damages, and that the proper measure

of direct damages for a breach of contract to loan money is the incremental cost of alternate

financing.  ECF No. 34175 ¶ 16.

Spanish Broadcasting filed a supplemental brief, dated February 11, 2013, again

arguing that its damages are direct damages, and citing case law for the proposition that damages

other than the cost of alternate financing are recoverable.  ECF No. 34549 ¶ 3 n.3, ¶ 13.  The

cited cases, however, do not support Spanish Broadcasting's position.[8]  Spanish Broadcasting

---

[7] The Plan Administrator also sought to disallow the Fee Damages on the basis that LCPI earned all of the fees, and "Spanish Broadcasting does not have a right to recover fees it previously paid to LCPI that LCPI has fully earned." Obj. ¶ 17.

[8] Indeed, these cases do not expressly distinguish between direct and consequential damages, but describe consequential damages. *Compare Lester v. Resolution Trust Corp.*, 125 B.R. 528, 532 (N.D. Ill. 1991) (holding, under Illinois law, that damages beyond the cost of alternate financing are only recoverable if "it is foreseeable to

also argued that the Payoff Letter terminated the Credit Agreement, retroactively rendering the Damages Waiver unenforceable.  *See* ECF No. 34549 ¶¶ 10–11.

On February 13, 2013, the Court held a hearing to consider the Objection (the "Sufficiency Hearing").  During the Sufficiency Hearing, Spanish Broadcasting argued that its asserted damages "are direct damages" whose allowability must "be determined at trial ***or on a properly developed summary judgment record*** in any event."  Feb. 13, 2013 Hr'g Tr. at 134:16–19 (emphasis added).  After listening to Spanish Broadcasting's argument, the Court observed: "The claims being asserted here are bloated, excessive, and probably not allowable."  *Id.* at 143:17–18.  Nevertheless, the Court decided to "[g]iv[e] the benefit of the doubt fully to Spanish Broadcasting, under a Rule 12(b)(6) standard" and held that "they will get their day in court, or we'll deal with this on dispositive motions after discovery."  *Id.* at 143:24–144:2 (emphasis added).  Accordingly, the Court decided not to rule on the Objection at the Sufficiency Hearing, but rather, urged the parties to settle the Claim.  *Id.* at 143:19–21 ("THE COURT: . . . I'm providing indication of direction to counsel.  This matter should be settled, and should have been settled a while ago.").

## V.    ADR Proceeding

On March 11, 2013, the Plan Administrator commenced an ADR proceeding with respect to Spanish Broadcasting's Claim pursuant to the *Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors* (the "ADR Order") entered by the Court (ECF No. 8474) on April 19,

---

the lender that substitute financing will not be available") (emphasis added) *with Linc Equip. Servs., Inc. v. Signal Med. Servs., Inc.*, 319 F.3d 288, 289–90 (7th Cir. 2003) (holding, under Illinois law, that consequential damages are "compensable only if reasonably foreseeable") (emphasis added) (internal quotation marks omitted).

9

2010 and amended on December 13, 2012 (ECF No. 32791).  The mediation with Spanish

Broadcasting took place in July 2013.  Ultimately, the parties were unable to reach a consensual

agreement.

## VI.    Discovery and Subsequent Proceedings

On October 14, 2014, the Court entered the *Claims Litigation Schedule With*

*Respect to Claim No. 67707 Filed by Spanish Broadcasting System, Inc. and the Objection*

*Interposed by Lehman Brothers Holdings Inc.* (as amended, the "Claims Litigation Schedule"),

which was negotiated by the parties (ECF No. 46498).  Pursuant to the Claims Litigation

Schedule, the Plan Administrator and Spanish Broadcasting exchanged numerous interrogatories

and document requests.  The Plan Administrator's interrogatories and document requests were

directed, in part, to obtaining documents and information concerning Spanish Broadcasting's

alleged damages.  Miller Decl. Ex. 5.  For example, the Plan Administrator's Interrogatory No.

23 requested that Spanish Broadcasting "[d]escribe in detail the amount and computation of

damages that Spanish Broadcasting is seeking in this matter." *Id.* Ex. 5 ¶ 13; 7056-1 Stmt. ¶ 33.

In its response (the "Interrogatory Response"), Spanish Broadcasting provided the following

description of its damages:

> (1)    Damages in an amount of approximately $30.3 million in impacted EBITDA resulting from Lehman's failure to fund the Draw;[9]
>
> (2)    [The Swap Damages] in an amount of approximately $17.2 million relating to Spanish Broadcasting's inability to terminate the Swap;
>
> (3)    [The Fee Damages] in the amount of $273,333.33 on account of the fees that Spanish Broadcasting paid to Lehman for the portion of the Draw that Lehman failed to fund;
>
> (4)    Interest on the foregoing; and

---

[9] These damages, together with the TIC Damages, are collectively referred to herein as the "EBITDA Damages."

      (5)      Spanish Broadcasting's costs, expenses and reasonable attorneys' fees relating to [this dispute], including, without limitation, all costs, expenses and fees relating to Spanish Broadcasting's testifying and non-testifying experts.

Miller Decl. Ex. 6 at 23–24; *see also* 7056-1 Stmt. ¶ 34.[10]

      Spanish Broadcasting and the Plan Administrator also exchanged numerous document requests, many of which related to Spanish Broadcasting's alleged damages. The parties have completed their production of documents in response to the requests, except with respect to two disputes, the resolution of which is unnecessary for purposes of this motion.[11] Indeed, when the Court inquired whether Spanish Broadcasting had produced "a universe of documents that . . . demonstrates [its] damages" Spanish Broadcasting confirmed that it had. Miller Decl. Ex. 7, Apr. 27, 2015 Hr'g Tr. at 14:25–15:4; 7056-1 Stmt. ¶ 35. Because the deadline to serve requests for the production passed on October 27, 2014 (*see* ECF No. 48418), all document production necessary to resolve this motion is complete.

      The Court held a status conference on April 27, 2015 (the "April 27 Conference") in an attempt to resolve the pending discovery disputes, including Spanish Broadcasting's refusal to review documents resulting from search terms that it contends are "unduly burdensome." In order to avoid the necessity of Spanish Broadcasting reviewing such documents, the Court ruled

---

[10] The Interrogatory Response also identified a significant change in Spanish Broadcasting's description of the principal portion of its damages. *Compare* 7056-1 Stmt. Ex. B (asserting TIC Damages) *to* Miller Decl. Ex. 6 (asserting EBITDA Damages). Additionally, the amount of the Swap Damages increased dramatically and without explanation. As discussed herein, the discrepancy in these amounts does not affect this motion.

[11] There are two pending disputes with regard to document production. One is whether Spanish Broadcasting must review and produce documents resulting from search terms that it contends are unduly burdensome. Because the agreed-upon search terms to which Spanish Broadcasting objects relate to the measure of Spanish Broadcasting's asserted damages, not their characterization, the resolution of this issue is unnecessary at this stage. The second dispute relates to the Plan Administrator's objection to Spanish Broadcasting's request for documents relating to "any entity that terminated a swap with Lehman and entered into a replacement swap from and after September 30, 2008." Although it appears the parties have made progress resolving this dispute, its resolution is unnecessary for purposes of this motion because the documents requested are not relevant to the characterization of Spanish Broadcasting's asserted damages. Moreover, neither of the pending disputes concerns documents related to the enforceability of the Damages Waiver, further confirming that this matter is ripe for summary judgment.

WEIL:\95349864\16\58399.0011

that the parties would engage in limited additional discovery and that the Plan Administrator

could file a motion for summary judgment as to the enforceability of the Damages Waiver after

such discovery was completed.  Miller Decl. Ex. 7 at 19:7–25.  The parties completed such

discovery on May 11, 2015.  On April 29, 2015, through a letter to the Court (the "April 29

Letter"), Spanish Broadcasting urged the Court to reconsider its decision.  ECF No. 49336 at 1.

During a conference on May 12, 2015, the Court overruled Spanish Broadcasting's objection and

granted the Plan Administrator's request to file a motion for summary judgment "both on the

issue of whether there is a valid waiver of consequential, special and other non-general or direct

damages" and whether the damages claimed by Spanish Broadcasting "are within the definition

of general damages or whether they are barred by the [Damages Waiver]."  May 12, 2015 Hr'g

Tr. at 20–25 (statement of R. Miller).

Accordingly, the Plan Administrator files this motion for summary judgment

seeking an order declaring that (i) the Damages Waiver was a valid and enforceable waiver of all

consequential and special damages; and (ii) the EBITDA Damages and the Swap Damages are

barred by the Damages Waiver.  For the reasons discussed more fully below, the Court should

grant the motion.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 applies in contested matters.  *See* Fed R.

Bankr. P. 9014(c), 7056.  Under Rule 56(c), summary judgment is appropriate where the movant

has demonstrated, based on the pleadings, discovery, and materials on file, that there is an

"absence of a genuine issue of material fact," and it is entitled to judgment as a matter of law.

*Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986)); *PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, __ F. Supp.

3d __, No. 12 Civ. 8570 (PAE), 2014 WL 7146357, at *5 (S.D.N.Y. Dec. 15, 2014) (quoting

Fed. R. Civ. P. 56(a)).

> Where, as here, the movant demonstrates the absence of any genuine dispute of material fact and the existence of a valid defense to the claims asserted, the burden shifts to the non-moving party to show that there is a material issue precluding summary judgment. *See id.* (citing *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)); s*ee also, e.g.*, *Altman v. Curtiss-Wright Corp.*, 124 F.2d 177, 180 (2d Cir. 1941) (affirming summary judgment for defendant on the basis that the claim asserted had been released) (Hand, J.); *Caribbean Trading & Fidelity Corp. v. Nigerian Nat'l Petroleum Co.*, No. 90 Civ. 4169 (JFK), 1993 WL 541236, at *3 (S.D.N.Y. Dec. 28, 1993) ("Dismissal of an action by summary judgment may be appropriate where the claims that are the basis of the action have been settled or otherwise discharged.") (citing *Curtiss-Wright*, 124 F.2d at 180).  An issue is material when it "matters," *i.e.*, when it "concerns facts that can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (quoting *Anderson*, 477 U.S. at 248); s*ee also PNC Bank*, 2014 WL 7146357, at *6 ("Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.") (quoting *Anderson*, 477 U.S. at 248).  Thus, where there is no genuine dispute as to the material facts and those facts establish a valid defense for the movant, the movant is entitled to judgment as a matter of law.

## ANALYSIS

I.    **Spanish Broadcasting Explicitly and Irrevocably Waived Any Right to Consequential Damages**

A.    **The Damages Waiver is Enforceable**

The Damages Waiver, which was part of the bargain struck between Spanish Broadcasting and LCPI when they entered into the Credit Agreement, is a complete and effective bar to Spanish Broadcasting's ability to recover the EBITDA Damages and the Swap Damages. Under New York law, contractual provisions limiting the liability of one party in the event of a breach are enforceable. Such provisions "represent[] the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 507 (N.Y. 1994) (enforcing a broad waiver of consequential damages); *see also, e.g.*, *My Play City, Inc. v. Conduit Ltd.*, 589 Fed. App'x 559, 562 (2d Cir. 2014) (enforcing limitation of liability clause); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 317–18 (S.D.N.Y. 2002) (holding, on motion to dismiss, that broad damages waiver was enforceable); *In re CCT Commc'ns, Inc.*, 464 B.R. 97, 107–09 (Bankr. S.D.N.Y. 2011) (Bernstein, J.) (enforcing broad waiver of consequential damages).[12]

Spanish Broadcasting's only argument in support of setting aside the Damages Waiver is that section 1(a) of the Payoff Letter retroactively renders it unenforceable. But, the plain language of the Payoff Letter clearly shows that it had no effect on the Damages Waiver.

---

[12] Spanish Broadcasting does not contest the validity of the Damages Waiver at the time the Credit Agreement was executed or contend that LCPI engaged in egregious or malicious behavior. *See, e.g.*, *Kalisch-Jarcho, Inc. v. City of N.Y.*, 448 N.E.2d 413, 416 (N.Y. 1983) (damages waiver can be set aside only if "the misconduct for which it would grant immunity smacks of intentional wrongdoing" and there has been some malicious or sinister behavior); *CCT Comm'cns*, 464 B.R. at 106 ("willful misconduct does not include the voluntary and intentional failure or refusal to perform a contract for economic reasons").

WEIL:\95349864\16\58399.0011

Further, LCPI never waived its right to assert the Damages Waiver as a defense to the Claim.

Accordingly, the Court should find that the Damages Waiver is enforceable.

### B.    Termination of the Credit Agreement Did Not Affect the Damages Waiver

The termination of the Credit Agreement pursuant to the Payoff Letter had no

legal effect on the enforceability of the Damages Waiver.  Spanish Broadcasting's arguments to

the contrary (*see* ECF No. 34549 ¶¶ 10–11), are without merit.  The plain language of section

1(a) of the Payoff Letter—the provision terminating the Credit Agreement—makes clear that

section 1(a) has no effect on the Damages Waiver.  The Payoff Letter states, in pertinent part:

> all outstanding Loans and all other amounts owing by [Spanish
> Broadcasting] under the Credit Agreement (including all principal,
> accrued interest and fees) shall be paid in full and the Credit
> Agreement ***and all obligations of [Spanish Broadcasting] and the
> other Loan Parties thereunder and under the other Loan
> Documents shall be terminated*** (other than contingent obligations
> which expressly survive by the terms of the Credit Agreement or
> such other Loan Documents, including without limitation, Section
> 10.5 of the Credit Agreement) . . . .

Miller Decl. Ex. 4 § 1(a) (emphasis added); *see also id.* § 5 (clarifying that "there shall be no

***further*** obligations under or in respect of the Loan Documents to any Loan Party under the

Credit Agreement.") (emphasis added).

> #### i.    Spanish Broadcasting's Waiver of Consequential Damages Cannot Be Terminated

The Damages Waiver, which was part of the bargained-for exchange in the

negotiating the Credit Agreement, was a past event that occurred upon the execution of the

Credit Agreement.  As such, it was not capable of being terminated by the Payoff Letter.  *See*

*Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204, 211 (S.D.N.Y. 2003) ("a

waiver, to the extent that it has been executed, cannot be expunged or recalled") (citing *Nassau*

*Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1270 (N.Y. 1982)), *aff'd in*

*part, rev'd on other grounds in part by*, 372 F.3d 471 (2d Cir. 2004). Indeed, section 10.12 of

the Credit Agreement specifically states, without exception, that Spanish Broadcasting

"irrevocably and unconditionally" waives its right to recover consequential damages. 7056-1

Stmt. Ex. C § 10.12. Accordingly, Spanish Broadcasting's argument that the Damages Waiver

could somehow be undone is without merit.

<div style="padding-left:2em">

ii.      The Payoff Letter Terminated Only Prospective, Not Retroactive,
Obligations

</div>

Under New York rules of construction, the phrase "shall be" applies

prospectively, so that the term "all obligations" must be interpreted to mean future obligations.

*See, e.g.*, *Congregation Darech Amuno v. Blasof*, 640 N.Y.S.2d 564, 565 (1st Dep't 1996)

(arbitration clause providing that certain controversies "shall be" subject to arbitration "was

clearly intended to apply prospectively"); *see also Primex Int'l Corp. v. Wal-Mart Stores, Inc.*,

679 N.E.2d 624, 627 (N.Y. 1997) (later agreement with merger clause did not establish parties'

intent to retroactively revoke agreement to submit to arbitration disputes arising under earlier

agreement despite the expiration of both agreements). If the parties had intended the Payoff

Letter to retroactively nullify the Damages Waiver which, based on the plain text of the

agreement, they did not, the Payoff Letter would have expressly stated as much. Indeed, as

demonstrated below, the termination of a contract has no retroactive effect on pre-existing rights

and obligations.

Rather, section 1(a) of the Payoff Letter terminated the Credit Agreement and any

obligations thereunder on a ***prospective*** basis, leaving intact the parties' existing rights and past

obligations. Nowhere does the Payoff Letter state that prior rights and obligations are

extinguished as if the Credit Agreement never existed. Where an "agreement on its face is

reasonably susceptible to only one meaning," as the Payoff Letter is here, "that meaning

governs." *See In re MPM Silicones, LLC*, Case No. 14-22503 (RDD), 2014 WL 4436335 at *3

(Bankr. S.D.N.Y. Sept. 9, 2014) (Drain, J.) (citing *Greenfield v. Philles Records, Inc.*, 780

N.E.2d 166, 171 (N.Y. 2002)); *see also Diaz v. Lexington Exclusive Corp.*, 874 N.Y.S.2d 77, 78

(1st Dep't 2009) (emphasis removed) (quoting *Morlee Sales Corp. v. Mfrs. Trust Co.*, 172

N.E.2d 280, 282 (N.Y. 1961)) ("It is axiomatic that a contract is to be interpreted so as to give

effect to the intention of the parties as expressed in the unequivocal language employed.").  This

is particularly true under the circumstances here, where the Payoff Letter was negotiated by

sophisticated business parties represented by counsel. *See* 7056-1 Stmt. ¶ 27; Miller Decl. ¶ 6;

*see also In re Allegiance Telecom, Inc.*, 356 B.R. 93, 98 (Bankr. S.D.N.Y. 2006) (holding that

the plain meaning of a contract governs particularly when the contract "was negotiated between

sophisticated, counseled business people negotiating at arm's length") (quoting *Vt. Teddy Bear*

*Co, Inc. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004)).[13]

   Moreover, courts consistently hold that the termination of a contract releases "all

its parties from their respective contractual obligations, except obligations already fixed under

the contract but as yet unsatisfied," and thus the contract remains enforceable with respect to

claims that arose during the life of the agreement.  *Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S.

190, 206 (1991);  *see also Welles v. Turner Entm't Co.*, 503 F.3d 728, 738 (9th Cir. 2007)

(holding that "a termination or cancellation of a contract abrogates only executory rights held

under the terminated and cancelled contract" and finding that, under California law, a

termination agreement terminated Orson Welles' right to royalties from *Citizen Kane*, but did not

---

[13] Spanish Broadcasting's argument that the Payoff Letter and the Credit Agreement contain provisions providing that certain obligations survive the termination of the Credit Agreement (*see* ECF No. 34549 ¶ 10), does not alter this conclusion.  Each of the provisions identified by Spanish Broadcasting refers to the survival of certain rights and obligations on a prospective basis.  *Id.* (referring to the survival of future contingent obligations, Spanish Broadcasting's right to pursue the Claim in the future, future indemnity obligations, and future obligations to pay certain taxes).  Neither the Credit Agreement nor the Payoff Letter refers to the survival of matured rights under the Credit Agreement.

rescind copyright in *Citizen Kane* RKO received pursuant to the prior agreement); *Premier Corp. v. Economic Research Analysts, Inc.*, 578 F.2d 551, 553–54 (4th Cir. 1978) (ruling that the expiration of a brokerage contract did not discharge a broker's indemnity obligation for illegal sales it made prior to expiration, when the indemnity action was brought subsequent to expiration); *AGR Fin., L.L.C. v. Ready Staffing, Inc.*, 99 F. Supp. 2d 399, 402 (S.D.N.Y. 2000); *Y.W.C.A. v. HMC Entm't*, No. 91 Civ. 7943 (KMW), 1992 WL 279361, at *4 (S.D.N.Y. Sept. 25, 1992); 17B C.J.S. Contracts § 610 ("[T]ermination will usually have prospective operation only, and it will discharge both parties from their contractual duty to perform promises that are still wholly executory, but will not discharge the duty to make reparation for breaches that have already occurred.").

Indeed, in a variety of contexts, courts routinely have permitted parties to assert pre-existing rights under contracts that have been terminated.  *See, e.g.*, *Litton*, 501 U.S. at 205–06 (holding arbitration clauses are enforceable with respect to disputes arising under the contract but after termination of the contract); *Ready Staffing*, 99 F. Supp. 2d at 402 (holding that forum selection clause is enforceable in breach of contract action even assuming the contract had been properly terminated); *HMC Entm't*, 1992 WL 279361, at *4 (enforcing forum selection clause because, "[e]ven though the contract [has] expired . . . plaintiff's action arises pursuant to the contract.").[14]

Thus, the evidence is clear that the parties' agreement to terminate the Credit Agreement extinguished prospective rights and obligations only; not waivers that had already occurred.  Spanish Broadcasting's argument to the contrary has no basis in fact or law.

---

[14] In contrast, the rescission of a contract "conveys a retroactive effect," and "restore[s] the parties to their former position."  *Welles*, 503 F.3d at 738 (citing *Grant v. Aerodraulics Co.*, 204 P.2d 683, 686 (Cal. Dist. Ct. App. 1949)). Given that Spanish Broadcasting is asserting a claim under the Credit Agreement, Spanish Broadcasting cannot claim that the same Credit Agreement, which contains the Damages Waiver, has been rescinded.

Accordingly, there is no genuine dispute as to any material fact regarding the Payoff Letter and

the Court should conclude that the Damages Waiver is enforceable as a matter of law.

### C.    LCPI Did Not Waive Its Right to Enforce the Damages Waiver in the Payoff Letter

The only provision of the Payoff Letter with any retroactive application is the

Release, which is a release *by* Spanish Broadcasting and *in favor of* LCPI.  The Release states:

> The Borrower [*i.e., Spanish Broadcasting*] . . . hereby
> unconditionally and irrevocably waives all claims, suits, debts,
> liens, losses, causes of action, demands, rights, damages or costs,
> or expenses of any kind, character or nature whatsoever, known or
> unknown, fixed or contingent, which any of them may have or
> claim to have against [LCPI] (whether in its capacity as an agent,
> lender, hedging counterparty or otherwise) or its agents,
> employees, officers, affiliates, directors, representatives, attorneys,
> successors and assigns . . . to the extent arising out of or in
> connection with the Loan Documents including, without limitation,
> any failure by [LCPI] or its affiliates to fund any Loan required to
> be funded by it under the Credit Agreement . . .  The *foregoing
> release* shall not apply to [the Claim] . . . .

Miller Decl. Ex. 4 § 4 (emphasis added).  As the plain language of the Release makes clear,

Spanish Broadcasting released all potential claims it may have against LCPI arising out of or in

connection with the Credit Agreement except for the Claim at issue in this matter, which Spanish

Broadcasting filed prior to the execution of the Payoff Letter.  LCPI did not release or waive *any*

of its rights under the Credit Agreement, including any defenses it may have to the Claim.

"Under New York law, a claim of waiver requires proof of an *intentional

relinquishment* of a known right with both knowledge of its existence and an intention to

relinquish it."  *Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 482 (2d Cir. 2004)

(internal citation omitted) (emphasis added); *see also Gilbert Frank Corp. v. Fed. Ins. Co.*, 520

N.E.2d 512, 514 (N.Y. 1988) ("Waiver is an intentional relinquishment of a known right and

should not be lightly presumed.") (internal citations omitted); *DLJ Mortg. Capital Corp. v.*

19

*Fairmont Funding, Ltd.*, 920 N.Y.S.2d 1, 2 (1st Dep't 2011) ("Waiver requires a clear manifestation of an intent by a party to relinquish a known right.").

Section 1(a) of the Payoff Letter does not manifest an intentional relinquishment by LCPI of any of its matured rights under the Credit Agreement—including its right to enforce the Damages Waiver.  Section 1(a) of the Payoff Letter merely provides for the termination of the Credit Agreement, and that certain contingent obligations will remain enforceable.  The only right relinquished by LCPI was the right to enforce most of Spanish Broadcasting's executory obligations.  Thus, LCPI's right to enforce the Damages Waiver has been fully preserved and constitutes a valid defense to the Claim.

## II.    The Plan Administrator is Entitled to Judgment as a Matter of Law on the Characterization of the EBITDA Damages and the Swap Damages

### A.    Summary Judgment is Appropriate on the Characterization of Spanish Broadcasting's Asserted Damages

Spanish Broadcasting's asserted EBITDA Damages and Swap Damages are paradigmatic examples of consequential damages where a party breaches an obligation to lend money.  Here, the evidence revealed in discovery demonstrates that there is no genuine dispute of material fact that would affect the characterization of these damages.  Indeed, "[c]ourts in this District have often determined, at the summary judgment stage, whether damages claims are general or consequential."  *PNC Bank*, 2014 WL 7146357, at *12 (holding, on summary judgment and upon review of the complaint, plaintiff's Rule 26 disclosures, plaintiff's responses to interrogatories, and letter from plaintiff's CEO describing plaintiff's damages, that the alleged damages constitute consequential damages barred by waiver) (citing *Phoenix Warehouse of Calif., LLC v. Townley, Inc.*, No. 08 Civ. 2856 (NRB), 2011 WL 1345134 (S.D.N.Y. Mar. 29, 2011); *Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009); and *E. Brass & Copper Co. v. Gen. Elec. Supply Corp.*, 101 F. Supp. 410, 413–

14 (S.D.N.Y. 1951)); *see also In re Vivaro Corp.*, No. 12-13810, 2014 WL 486288, at * 3–4

(Bankr. S.D.N.Y. Feb. 6, 2014) (Glenn, J.) (holding, on motion for judgment on the pleadings,

that lost profits associated with alleged breach of distribution agreement constitute consequential

damages barred by waiver).  Accordingly, the Court should rule, as a matter of law, that the

EBITDA Damages and the Swap Damages are consequential damages barred by the Damages

Waiver.

> **B.    The EBITDA Damages and the Swap Damages Are Consequential Damages that Have Been Waived by Spanish Broadcasting**[15]

For Spanish Broadcasting, the direct and immediate fruits of the Credit

Agreement were the ability to borrow $325 million plus another $25 million at an agreed-upon

interest rate.  LCPI's failure to loan Spanish Broadcasting its portion of the Draw Request

deprived Spanish Broadcasting of the right to a fixed sum of money at the agreed-upon rate.

Spanish Broadcasting's direct damages, if any, would be quantified by the increased interest rate

it would have had to pay a third party to borrow that $10 million.

By contrast, Spanish Broadcasting's asserted damages (*i.e.*, the EBITDA

Damages and the Swap Damages) were not the direct and immediate fruits of the Credit

Agreement.  Rather, they represent attenuated losses in connection with collateral business

arrangements based on the assumption that Spanish Broadcasting would have used the $10

million to (1) avoid $17.2 million in alleged losses in connection with the Swap; and (2) generate

$30.3 million in additional EBITDA.[16]  These damages, on their face, constitute consequential

---

[15] The Plan Administrator reserves its right to contest on alternative grounds the amount and recoverability of the EBITDA Damages and the Swap Damages, including, but not limited to, causation.

[16] These asserted damages are based on the information provided by Spanish Broadcasting in response to the Plan Administrator's Interrogatories.  As explained in note 7, *supra*, they differ in amount and description from the damages identified by Spanish Broadcasting in the Claim.  The differences, however, do not affect the analysis.

damages under New York law.  As such, both the EBITDA Damages and the Swap Damages are barred by the Damages Waiver.

Under New York law, which governs the Credit Agreement,[17] general or direct damages are damages that are considered the "the value of the very performance promised." *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000) (internal citation omitted); *see also Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989) (money a defendant undertook to pay under a contract constitute general damages that are the "natural and probable consequence of the breach"); *Vivaro*, 2014 WL 486288, at *3 ("General damages flow naturally and probably from the breach, while consequential damages flow from the benefits that performance would have produced.") (internal quotation marks omitted); *CCT Commc'ns*, 464 B.R. at 117 (consequential damages "'compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach.'") (quoting *Schonfeld*, 217 F.3d at 176).[18]

Lost profits may be recovered as direct damages **only** when they represent amounts a breaching party agreed to pay under a contract.  *See Compania Embotelladora*, 650 F. Supp. 2d at 322.  For example, in *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, the parties' contract expressly stated the non-defaulting party was entitled to damages equal to "the present value of the economic loss (exclusive of [c]osts) resulting from the termination of the [a]greement."  487 F.3d 89, 108 n.19 (2d Cir. 2007).  The Second Circuit stated that

---

[17] *See* 7056-1 Stmt. Ex. C § 10.11 (stating the Credit Agreement and the rights and obligations of the parties thereunder shall be "governed by, and construed and interpreted in accordance with, the law of the State of New York.").

[18] New York courts use the terms "special" and "consequential" interchangeably.  *See, e.g.*, *Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co. Inc.*, 676 N.Y.S.2d 559, 564 (1st Dep't 1998) ("Under New York law, compensatory damages are either general (direct) damages or special (consequential) damages such as a third-party's lost profits.") (internal quotation marks omitted).  When not waived, consequential and special damages "are recoverable only upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made."  *Am. List*, 549 N.E.2d at 1164.

WEIL:\95349864\16\58399.0011

plaintiff's damages claim was "essentially a claim for lost profits." *Id.* at 109. Nevertheless, the

court held the damages were properly characterized as direct damages because they were

provided for by the express terms of the contract and were "precisely what the non-breaching

party bargained for." *Id.* at 109–10. Under such circumstances, the lost profits were "the direct

and immediate fruits of the contract." *Tractebel*, 487 F.3d at 109 n.20. On the other hand, lost

profits constitute consequential damages when, as here:

> as a result of the breach, the non-breaching party suffers ***loss of
> profits on collateral business arrangements.*** In the typical case,
> the ability of the non-breaching party to operate his business, and
> thereby generate profits on collateral transactions, is contingent on
> the performance of the primary contract. When the breaching
> party does not perform, the non-breaching party's business is in
> some way hindered, and the profits from potential collateral
> exchanges are 'lost.'

*Tractebel*, 487 F.3d at 109 (emphasis added); *see also* 3 Dobbs Law of Remedies § 12.2(3) (2d

ed. 1993) ("The clear case of damages truly based on lost profits that also count as consequential

damages is the case of lost operating profits of a business.").

In *Compania Embotelladora*, the plaintiff was "seeking to recover lost profits

from lost sales to third-parties that [were] not governed" by the contract. 650 F. Supp. 2d at 322.

The court held that such damages were "properly characterized as consequential damages,

because, as a result of [defendant's] alleged breach, [plaintiff] suffered lost profits on collateral

business arrangements." *Id.* Similarly, in *Vivaro*, the bankruptcy court found that the plaintiff

sought "to recover lost profits from unmade sales to third-parties in collateral transactions, none

of which would have been governed by the contract between" the parties. 2014 WL 486288, at

*4. Accordingly, the bankruptcy court held that such damages were properly characterized as

consequential damages.

WEIL:\95349864\16\58399.0011

As described above, Spanish Broadcasting allegedly expected to use the $10 million portion of the Draw Request to avoid losses under the Swap and to generate a significant amount of earnings.  These actions, while potentially beneficial to Spanish Broadcasting, are not the direct and immediate fruits of the Credit Agreement.  Indeed, if the Court permits Spanish Broadcasting to continue pursuing the EBITDA Damages and the Swap Damages, Spanish Broadcasting will have the nearly impossible task of proving that it in fact would have used the $10 million as it alleges and that its business would have improved as a result.

In the case of a breach of contract to lend money, the value of the performance promised, *i.e.*, direct damages, is best represented by the incremental cost of alternate financing. Other damages are, at best, consequential damages.  *See Avalon Constr. Corp. v. Kirch Holding Co., Inc.*, 175 N.E. 651, 652–53 (N.Y. 1931); *Bond St. Knitters v. Peninsula Nat'l Bank*, 42 N.Y.S.2d 744, 744 (1st Dep't 1943) (*per curiam*); *accord* 25 Williston on Contracts § 66:101 (upon breach of an agreement to make a loan, lost profits may be recovered, as consequential damages, "if they are capable of reasonable ascertainment and are not too speculative");  *cf. Cent. Coordinates, Inc. v. Morgan Guar. Trust Co.*, 494 N.Y.S.2d 602, 604 (Sup. Ct. 1985) (under New York UCC, "[a] bank's failure to transfer funds . . . can result in direct or general damages (*e.g.* the loss of the funds themselves, the interest thereon and any fee paid for the failed transfer); or consequential or special damages," such as lost profits) (internal citations omitted); *Abate v. Bushwick Savs. Bank*, 138 N.Y.S.2d 140, 144 (City Ct. 1955) (granting summary judgment for the defendant-bank where plaintiff alleged bank failed to turn over deposited funds because the asserted damages—for the down-payment made on certain property and legal fees incurred in a real estate matter—constitute consequential damages as a matter of law).

24

In *Avalon*, the plaintiff conveyed to the defendant real property that was subject to a first and second mortgage.  175 N.E. at 651–52.  In exchange, the plaintiff received, among other things, a third mortgage on the property.  *Id.* at 652.  The parties agreed that, subject to certain conditions, the plaintiff would repay the second and third mortgages, and receive a security interest in the property in an amount equal to the amount of those mortgages.  *Id.*  The plaintiff failed to perform, which caused the second and third mortgages to go into default.  *Id.*  The defendant counterclaimed against the plaintiff for damages resulting from the plaintiff's failure to advance the agreed-upon sum.  *Id.*  In determining that the asserted diminution-in-value damages were consequential or special, the New York Court of Appeals held, "[t]he utmost liability of a person who breaches his contract to loan money, in the absence of notice of special circumstances, is for the increased interest the other person was obliged to pay."  *Id.* at 653.  Thus, secondary costs or damages—other than being forced to borrow at a higher rate— constitute special or consequential damages under New York law.  *See e.g.*, *Zelazny v. Pilgrim Funding Corp.*, 244 N.Y.S.2d 810, 816 (Dist.  Ct. 1963) (holding "special damages which an inability to obtain money under the peculiar circumstances of his case has actually caused [the plaintiff]" are recoverable as consequential damages").[19]

---

[19] It is the longstanding and widely-accepted law of both New York and other jurisdictions that the measure of direct damages where a party breaches an obligation to lend money is limited to the difference between the contract rate and the rate of interest which the borrower, because of the breach, must pay to obtain the money.  *See, e.g.*, *In re Transact, Inc.*, No. SACV 13-1512-MWF, 2014 WL 3888230, at *21–22 (C.D. Cal. Aug. 6, 2014) ("in a breach of contract to lend money, the proper measure of damages is the cost of obtaining alternative financing" and a borrower may recover consequential damages 'so far as the defendant had reason to foresee such injury when the contract was made.'") (quoting 11-59 Corbin on Contracts § 59.3 (rev. ed. 2014)); *Resolution Trust Corp.*, 125 B.R. at 532.  In contrast, lost profits and other expenses constitute consequential damages.  *See, e.g.*, *Transact, Inc.*, 2014 WL 3888230, at *21–22; *Resolution Trust*, 125 B.R. at 532; *Elijah Ragira/VIP Lodging Grp., Inc. v. VIP Lodging Grp., Inc.*, 301 S.W.3d 747, 756 (Tex. App. 2009) (citation omitted).

WEIL:\95349864\16\58399.0011

> i.    The EBITDA Damages are Consequential Damages That Have Been Waived

The alleged impact to Spanish Broadcasting's EBITDA is a hallmark example of consequential damages. *See Tractebel*, 487 F.3d at 109. Spanish Broadcasting claims that its EBITDA was impacted by $30.3 million because LCPI breached its obligation to loan Spanish Broadcasting $10 million. Miller Decl. Ex. 6. Specifically, Spanish Broadcasting alleges that LCPI's breach impaired Spanish Broadcasting's ability to generate revenue, and thus, its ability to generate profits on collateral transactions. *See* 7056-1 Stmt. Ex. E, Declaration of Joseph A. Garcia (the "Garcia Declaration") ¶ 9 ("Spanish Broadcasting's ability to produce programming and generate revenue were [sic] reduced as a result [not receiving $10 million], and Spanish Broadcasting was not able to achieve budgeted financial levels."). Spanish Broadcasting, therefore, effectively has acknowledged that the alleged impact in Spanish Broadcasting's earnings is the result of its own failure to generate profits on collateral business arrangements, not the direct result of not receiving $10 million. *See* 7056-1 Stmt. Ex. E ¶ 8–10.[20] This is a textbook example of consequential damages that, as in *Vivaro* and *CCT Communications*, "flow from the benefits that performance [by LCPI] would have produced," rather than from the breach itself. *Vivaro*, 2014 WL 486288, at *3. This conclusion is buttressed by the Capstone Report, which fails to identify how an absence of $10 million caused over $30 million in alleged damages. *See* 7056-1 Stmt. D at 2–14 (supporting Spanish Broadcasting's claim for EBITDA Damages by comparing Spanish Broadcasting's EBITDA to other media companies, and not by showing how Spanish Broadcasting's failure to receive the $10 million loan affected its

---

[20] In fact, given Spanish Broadcasting's claim that it would have used approximately $6 million of the $10 million requested from LCPI to terminate the Swap (*see* 7056-1 Stmt. Ex. D at 1, 15), Spanish Broadcasting is actually asserting that LCPI's failure to loan $4 million caused it over $30 million in EBITDA Damages.

WEIL:\95349864\16\58399.0011

EBITDA); *accord* 1-3 Lender Liab. Law & Litig. § 3.06 (stating that lost profits constitute

consequential damages in failure to fund loan cases).

The attenuated and consequential nature of the EBITDA Damages is further

demonstrated by the fact that, as of the December 31, 2008, Spanish Broadcasting had

approximately $32.8 million in cash and cash equivalents. *See* Miller Decl. Ex. 8. Indeed, in its

quarterly report filed on November 11, 2008, Spanish Broadcasting stated, "we believe that we

have sufficient liquidity to conduct our normal operations and do not believe that the potential

reduction in available capacity under [the Revolving Credit Facility] will have a material impact

on our short-term liquidity." Miller Decl. Ex. 9. Clearly, LCPI's failure to loan Spanish

Broadcasting $10 million did not directly impact Spanish Broadcasting's EBITDA. Tracing a

causal linkage (if any) would be an extraordinarily complex process, further confirming that the

EBITDA Damages constitute, at best, alleged "additional losses . . . incurred as a result of"

LCPI's breach. *CCT Commc'ns*, 464 B.R. at 117. Accordingly, there can be no genuine dispute

that the EBITDA Damages are consequential damages as a matter of law.

   ii.  <u>The Swap Damages are Consequential Damages That Have Been Waived</u>

Similarly, there can be no genuine dispute that the Swap Damages constitute

losses in connection with a collateral business relationship with LBSF—an affiliate of LCPI.

The Swap Damages do not constitute "the value of the very performance promised" in

connection with the Revolving Credit Facility (*i.e.,* direct damages) because the Swap Damages

bear no relation to the Revolving Credit Facility. Accordingly, they are, at best, consequential

damages.

Pursuant to the terms of the Swap, LBHI served as the "Credit Support Provider"

for LBSF, meaning it acted as LBSF's guarantor. *See* Miller Decl. Ex. 3. When LBHI

commenced its chapter 11 case, Spanish Broadcasting was entitled to terminate the Swap based

<div align="center">27</div>

upon a bankruptcy "Event of Default" by LBHI. *Id.* Spanish Broadcasting, however, claims that it could not terminate the Swap because it did not receive $10 million from LCPI, which it would have used to terminate the Swap. *See* 7056-1 Stmt. Ex. E ¶¶ 7–8. Thus, Spanish Broadcasting insists its only alternative was to allow the Swap to continue as a live trade until Spanish Broadcasting and LBSF terminated the Swap by an agreement dated as of June 17, 2010, and that it suffered approximately $17.2 million in damages as a result. *See* 7056-1 Stmt. Ex. E ¶ 8; Miller Decl. Ex. 6 at 23.[21]

Although Spanish Broadcasting attempts to avoid the contractual bar by insisting that the Swap Damages are direct damages, there is no question that the Swap Damages do not constitute "the direct and immediate fruits of" the Revolving Credit Facility, which entitled Spanish Broadcasting to a $10 million advance from LCPI. *Tractebel*, 487 F.3d at 109 n.20. To establish causation, Spanish Broadcasting would need to show that it would have terminated the Swap in October 2008 had it received $10 million from LCPI, that without the loan it had no alternative but to keep the Swap in place (even though it received $15 million from other lenders and had $32.8 million in cash and cash equivalents on hand as of December 31, 2008), and that it was unable to mitigate its damages. This would be another complex process, further demonstrating that the Swap Damages are not the "natural and probable consequence" of LCPI's breach. Rather, they are another classic example of alleged "benefits that [LCPI's] performance would have [allegedly] produced." *Vivaro*, 2014 WL 486288, at *3. As such, the Swap Damages constitute consequential damages barred by the Damages Waiver.

Accordingly, for the reasons stated, the motion should be granted.

---

[21] Although the Claim initially sought approximately $9.9 million in Swap Damages, Spanish Broadcasting later increased that amount to $17.2 million without explanation. *See, supra*, notes 5 and 10.

WEIL:\95349864\16\58399.0011

## CONCLUSION

For the reasons set forth herein, the Plan Administrator respectfully requests that the Court (a) find that the Damages Waiver is a valid and enforceable waiver of all consequential and special damages, (b) find that the EBITDA Damages and Swap Damages constitute consequential damages that have been waived, and (c) grant such other and further relief as is just and appropriate.

Dated:    June 18, 2015
        New York, New York

                                       */s/ Ralph I. Miller*
                                         WEIL, GOTSHAL & MANGES LLP
                                         Ralph I. Miller
                                         Jacqueline Marcus
                                         767 Fifth Avenue
                                         New York, New York 10153
                                         Telephone:  (212) 310-8000
                                         Facsimile:  (212) 310-8007

                                         *Attorneys for Lehman Brothers Holdings Inc.*
                                         *and Certain of Its Affiliates*

WEIL:\95349864\16\58399.0011