Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   Adv. Case No. 08-01420-scc

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC.,

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  LEHMAN BROTHERS HOLDINGS INC.,

12              Plaintiff,

13          v.

14  LEHMAN BROTHERS INC.,

15              Defendants.

16  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

17              U.S. Bankruptcy Court

18              One Bowling Green

19              New York, NY  10004

20

21              June 9, 2015

22              11:06 AM

23  B E F O R E :

24  HON SHELLEY C. CHAPMAN

25  U.S. BANKRUPTCY JUDGE

1    Hearing re:   State of the Estate Presentation

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for the Debtor

 5         767 Fifth Avenue

 6         New York, NY  10153

 7

 8    BY:  JACQUEINE MARCUS

 9         CANDACE ARTHUR

10

11    LEHMAN BROTHERS

12         Debtor

13         1271 Avenue of the Americas, 40th Floor

14         New York, NY  10020

15

16    BY:  MATTHEW A. CANTOR

17

18

19

20

21

22

23

24

25
```

Page 4

1                    P R O C E E D I N G S

2              THE COURT:  Have a seat.  Have a seat.  How are

3     you, Ms. Marcus?

4              MS. MARCUS:  Fine, Your Honor.  Good morning, Your

5     Honor, Jacqueline Marcus.

6              THE COURT:  These people are here for you -- to

7     hear you talk?

8              MS. MARCUS:  Excuse me?

9              THE COURT:  Are these people all here for you?

10             MS. MARCUS:  I expect not.  We'll see.  Jacqueline

11    Marcus from Weil, Gotshal & Manges on behalf of Lehman

12    Brothers Holdings Inc.  Your Honor, we have a very short

13    agenda this morning, actually only one item on the agenda.

14             THE COURT:  Okay.

15             MS. MARCUS:  And Matthew Cantor, the chief legal

16    officer for Lehman Brothers Holdings Inc. is going to make

17    the presentation to you.

18             THE COURT:  Okay.  Thank you very much.

19             MR. CANTOR:  Good morning, Your Honor.

20             THE COURT:  Good morning.  How are you?

21             MR. CANTOR:  I'm good.  I'm hoping everybody's

22    here for your confirmation hearing and NII.

23             THE COURT:  I don't know. I think all these people

24    are here for you.

25             MR. CANTOR:  May I approach the bench with a

1    presentation?

2              THE COURT:  Please.  Thank you.  Thank you.

3              MR. CANTOR:  We brought a few extra copies if

4    anybody's interested.

5              THE COURT:  I'm reserving my rights to ask you for

6    more at a certain point as well.  All right?

7              MR. CANTOR:  Yes.  We have as many as you like.

8              THE COURT:  Okay.

9              MR. CANTOR:  Good morning, Your Honor.  I'm

10   Matthew Cantor.  I'm the chief legal officer at Lehman

11   Brothers Holdings, the plan administrator for the Lehman

12   wind-down. We had a brief -- put together a small deck here

13   for Your Honor.

14             THE COURT:  Right.

15             MR. CANTOR:  To just get a sense of what's going

16   on with the estate.  I'm going to start on the cover page,

17   because I know we had docketed this as the State of the

18   Estate.  Historically, that's what it was in this case.  But

19   the presentation is really more about what's going on in

20   terms of the claims resolutions and the litigation

21   recoveries.

22             THE COURT:  Okay.

23             MR. CANTOR:  And there's not a lot in this

24   presentation about all the work that's going on on the

25   business side, the asset recovery side.  And that's --

Page 6

1    information is -- can be -- to the extent investors and

2    others are interested, they can see it in our public

3    filings.

4            THE COURT:  I understand.

5            MR. CANTOR:  But for the purpose of this

6    presentation -- so, I actually changed the front page from

7    what I originally had, "State of the Estate."  It's more

8    like a plan administration update.

9            THE COURT:  Plan administration update.  Okay.

10   So, just to -- so, what's not being reported here also

11   involves additional things that will be on -- possibly on

12   the Court's agenda going forward.

13           MR. CANTOR:  Yes.  There are some other things

14   that may be on the Court's agenda going forward, for sure.

15   And what also isn't described in here is the amount of work

16   --

17           THE COURT:  LBI.

18           MR. CANTOR:  LBI, of course, which is an entirely

19   different bankruptcy.

20           THE COURT:  Right.

21           MR. CANTOR:  Many people have come up to me and

22   said, "I see you settled with Barclays."  And I say, "No, we

23   didn't settle with Barclays.  LBI settled with Barclays."

24   But yes, that's a whole different birch tree.

25           So, starting on page three, after the -- so,

Page 7

1    needless to say, Lehman was an immense case.  But even the

2    wind-down, from this point going forward, is the equivalent

3    of a mega-case.  It's as big as any case Your Honor is going

4    to have.  We have more than $15 billion of assets remaining

5    across the estate, and that includes cash and cash in the

6    disputed claims reserve and real estate, interest in private

7    equity investments, recoveries from foreign-controlled

8    former affiliates, net of the future operating expenses and

9    excluding the litigation recoveries, which --

10              THE COURT:  Right.

11              MR. CANTOR:  We --

12              THE COURT:  Which is the footnote there.

13              MR. CANTOR:  When we report our assets, we

14    generally exclude all litigation recoveries.

15              Contested matters:  we're seeking many billions of

16    dollars of additional recoveries for the benefit of our

17    creditors through dozens of legal actions that will require

18    significant allocation of Court time and Court resources

19    going forward.  There are approximately 2400 remaining

20    claims that are disputed.  They're either unliquidated or

21    contingent or otherwise unresolved.

22              The filed amount of those claims that need to be

23    resolved is $68 billion, plus or minus.  And, again, the

24    resolution of those claims is going to likely require

25    substantial Court time and resources.

Page 8

1              Just so Your Honor is aware, the plan

2     administrator's focus is on allowing appropriately sized

3     claims.  And when we face counterparties who seek inflated

4     claims, we're duty-bound to object to those claims.

5     Obviously we need to balance the expense of opposing those

6     claims and the time that it takes to resolve those claims.

7              I know the Court's aware, throughout the case,

8     since the beginning -- and we've maintained this tradition -

9     - we have spent tremendous efforts resolving claims

10    consensually, either through B-to-B conversations or

11    mediation processes.  Some were Court-mandated or Court-

12    approved.  Others we generally instigate on our own, even if

13    they're not Court-mandated, because, obviously, we do our

14    best to try and resolve everything consensually.

15             We're at the point in time in the liquidation --

16    I'm down to 2400 claims from the over 66,000 that we are --

17    have been resolved.  These are the more intractable

18    counterparties.  So, at this point in the case, we're

19    getting to Court.  Understand it's -- it has not been

20    without good faith efforts to resolve these things, again,

21    on a B-to-B basis or through a mediation.

22             You know, and a lot of times these are

23    counterparties who may have invested in claims, come up with

24    some legal theory, good or bad, thinking there's an

25    opportunity to make money on an investment.  Oddly enough,

Page 9

1    the deeper you go, as an investor, with these types of

2    investments, the harder it is to sort of give in for less.

3    So, the motivation is to sort of, "Let's run this out to a

4    Court resolution."

5              Unfortunately for the Court and for us, and for

6    the estate, it will likely -- these claims, the remaining

7    stub, are going to require more time and more resources, and

8    be more difficult to resolve.  I'm also finding --

9              THE COURT:  So, it's -- for those who aren't aware

10   of these predicate facts that you're outlining, it's

11   counterintuitive because of the -- if you're following the

12   time course out from the date of the filing, day of the

13   confirmation, one wouldn't naturally expect there to be, you

14   know, this volume and this degree of difficulty.  But it is

15   -- it's not surprising when you lay out the predicate facts

16   the way you have.

17             MR. CANTOR:  Yes.  And, you know, certainly with a

18   -- you know, in smaller cases, it happens.  But the tail,

19   although it's tougher, usually isn't this big.  This is --

20   was a massive, massive case.

21             THE COURT:  Right.  Right.

22             MR. CANTOR:  And, as we get deeper into, you know,

23   more intractable counterparties, you know, just from the

24   plan administrator's perspective, obviously we're looking to

25   compensate for losses and appropriately, you know, size the

Page 10

1    allowed claims.

2            And when we go into these negotiations, we

3    generally -- you know, we're tethered to sort of taking a

4    position that's reasonable, and maybe we negotiate a little

5    bit from there.  When you're in a negotiation with a

6    counterparty who might be at the more extreme end to make

7    some bigger recovery, it makes the simple Solomonic

8    resolution -- it doesn't work. So, sometimes it makes the

9    negotiations go a little slow.

10           But, back to page three, to your point that you

11   just made, since the bankruptcy plan was confirmed in

12   December of 2011, there have been -- this is a very exact

13   number -- 26,813 docket entries.

14           THE COURT:  Is that just in the main case, or does

15   that count all the adversaries?

16           MR. CANTOR:  I'm going to look to my counsel.

17   That's just the main case, Candace?

18           THE COURT:  That's just -- so that's just the main

19   case.

20           MR. CANTOR:  Yes.  And those were -- you know,

21   14,500 of those were transfers and dockets, but for 37,000

22   claims that have changed hands.  So, while Lehman has been

23   very successful in alternative dispute resolution, ADR,

24   processes and compromising claims, the remaining matters, by

25   their nature, are those least likely to resolve without some

Page 11

1    intervention by the Court.

2            Future distributions, as the assets in the estate

3    begin to wane, become increasingly dependent on the

4    resolution of contested matters.  So, we're going to

5    increasingly require -- be required to join issues for Your

6    Honor to consider, engage in some discovery to help develop

7    the facts and move the parties closer to having to face Your

8    Honor on a decision, and potentially look for a resolution

9    of legal disputes.  And, you know, I'm going to talk more

10   about that a little later.

11           So, accordingly, the wind-down is entering a phase

12   during which increasingly more Court resources will be

13   required to advance the process and provide final resolution

14   and distribution to creditors, and which you had observed is

15   a little counterintuitive at this stage of the game.

16           So, flipping to the next page, just so you get a

17   picture, this is just a chart that shows the distributions

18   that the estate has made.  And you can see our last

19   distribution in April was about a $6 billion distribution.

20   So, we've made great progress on getting cash out the door.

21           On the next page, you can see there have been --

22   what this chart shows, the dollars are filed claims amounts

23   that have been resolved in each period, or remain to be

24   resolved in each period.  I apologize, remain to be resolved

25   in each period.  You can see, all the way at the right, as

Page 12

1   of April 2nd, there was $68 billion of claims filed that

2   need -- that we -- that are either disputed or contingent or

3   unliquidated, that need to be resolved before we can get

4   reserves out the door.

5           I think we've made good progress since, you know,

6   we marked -- since the end of D4, since October of '13.  We

7   have resolved 74 -- 73 -- 74 billion, round number, since

8   then.

9           THE COURT:  So, just to keep underscoring this

10  point and making sure I understand it, this is filed claims,

11  claims by creditors, alleged creditors, against the estate?

12          MR. CANTOR:  That have not --

13          THE COURT:  So, these numbers do -- does not

14  include affirmative litigation by the estate against third

15  parties?

16          MR. CANTOR:  Correct, Your Honor.  These are claim

17  amounts.

18          THE COURT:  Claim amounts.

19          MR. CANTOR:  To which -- they have not been

20  allowed.

21          THE COURT:  Right.

22          MR. CANTOR:  And we need to find some resolution.

23  Yes, they're substantial billions of dollars.  Well, those

24  are the claims right here.  There's a substantial amount of

25  recovery litigation.

1          THE COURT:  Right.

2          MR. CANTOR:  That, you know, we don't have a

3   number attributed to that.

4          THE COURT:  Got it.

5          MR. CANTOR:  So, to the next page, just some

6   progress.  And what I think is -- you'll see that the claims

7   litigation that you've seen, which we've identified here,

8   give you some indication of the amount of work that it's

9   taking to get some of the resolutions done.  So, as to the

10  first bullet, although the plan administrator continues to

11  settle claims successfully, resolution increasingly requires

12  joining of issues and some progress in litigation.

13          The key matters that we settled, some of which

14  you've seen, some of which you didn't need to see because

15  you were here and we were marching towards you --

16          THE COURT:  (indiscernible) trial.

17          MR. CANTOR:  Yes.  In the Washington Tobacco

18  litigation --

19          THE COURT:  Right.

20          MR. CANTOR:  You know, I think that case was -- it

21  was expensive and time-consuming.

22          THE COURT:  It was a week-long trial.

23          MR. CANTOR:  And it was absolutely critical to go

24  through that trial to get a resolution, and we ended up,

25  obviously, settling after going through that.  You know,

Page 14

1    Canary Wharf was a very meaningful claims resolution.  It

2    was a $780 million claim that we were able to resolve.

3              THE COURT:  Giants Stadium.

4              MR. CANTOR:  Giants Stadium.  And, you know, there

5    were a lot of discovery disputes and other matters that came

6    before Your Honor before we were able to get a resolution of

7    that.  There was some make-whole litigation with the

8    Financial Security Assurance folks, and we were able to

9    resolve that.  And FHLB Pittsburg, we were able to get that

10   resolved.

11             But all those matters, unlike many of the prior

12   claims, required an awful lot of not only time and effort by

13   estate professionals but, you know, Court time.  Looking

14   forward, I expect to see more of that.

15             So, to the next page, highly -- the ADR programs,

16   we've had some highly successful Court-approved mandatory

17   ADR, you know, processes, and ADR processes for setting

18   discovery procedures, because, as you know, in all these

19   litigations, not only do we have actual litigation of the

20   merits, but there's a fair bit of arm-wrestling in discovery

21   disputes.  And that's going to take Court time.

22             And it's something the estate needs to pursue

23   because, from what I'm learning an awful lot of information

24   that we get doesn't come consensually, particularly as we

25   get down to the short straws here, but only we get to see in

Page 15

```
 1   the discovery.  And we'll give you some examples of that

 2   later.

 3            But since the inception of the protocol, the

 4   estate's received -- achieved 410 settlements with 527

 5   counterparties, resulting in approximately $2.9 billion of

 6   resolutions.  Since the last date of the estate, we've

 7   achieved 91 settlements with 109 counterparties, and we've

 8   resolved about $740 million of claims.

 9            The mediation process, which has been in place for

10   a long time, relating to derivatives matters, as of just

11   recently, June 5th, we're at 94 percent of the Tier One ADRs

12   that have been through that process have been resolved

13   without requiring to go to Your Honor.  But, obviously, when

14   you have a big number to start with, even a small percentage

15   leaves an awful lot of work that ends up in Court.

16            THE COURT:  Right, but that's a remarkable number,

17   the 94 percent, in terms of a successful process.

18            MR. CANTOR:  Thank you, Your Honor.  Within the

19   past year, we've established two new ADR protocols:  the

20   private label protocol, dealing with the RMBS claims, which

21   I'll talk a little bit more about; and then we have the

22   downstream, you know, pursuing the recoveries to the

23   indemnifications of the losses that we suffered facing the

24   GSEs.  And those processes move forward, creaky at times,

25   but they're working.
```

Page 16

1          We -- you know, the other process we have, we call

2     the SPV, you know, Phase Two.  I'm sure Your Honor's heard,

3     but Judge Failla --

4          THE COURT:  Yes.

5          MR. CANTOR:  Had determined, in the motion

6     withdrawing the references related to that matter, that the

7     referent should remain with Your Honor.

8          THE COURT:  Right, including for the determination

9     of the class certification issues.

10          MR. CANTOR:  Including the determination of class

11     certification issues.  I think, just from listening to the

12     judge reading the ruling, certainly concluded that the main

13     issues there were bankruptcy issues.  Some of the other

14     issues were more like maybe the non-bankruptcy issues were

15     the tail wagging the dog.

16          That being said, the judge felt that the

17     Bankruptcy Court certainly could handle all the issues

18     there, the issues relating to the Ballyrock and

19     (indiscernible) decisions, and the applicability of those

20     decisions certainly should remain with Your Honor.  And she,

21     you know, recognized the Bankruptcy Court is the appropriate

22     forum for sort of making some determination as to what those

23     decisions mean as they relate to the Phase Two matters.

24          So, needless to say, we're happy with that

25     decision and look forward to moving forward with that

Page 17

1    process.

2                THE COURT:  I think that there are -- probably

3    can't count them on one hand, the number of motions to

4    withdraw.  I think, by my count, they've all come back at

5    you.  Virtually all of them have come back down here.  I'm

6    not aware of any additional ones that are still pending and

7    unresolved at this point.  But I could be missing something,

8    but.  If you could keep your voice up a little bit, I'm

9    getting feedback, Mr. Cantor.

10               MR. CANTOR:  Got it.

11               THE COURT:  That folks on the phone cannot hear

12   every word that you're saying.

13               MR. CANTOR:  I will do that.  So, remaining

14   matters, on page eight.

15               THE COURT:  Right.

16               MR. CANTOR:  So, as I mentioned, there's more than

17   66,000 -- there have been more than 66,000 disputed claims

18   that have been resolved.  There's 2400 claims that are

19   seeking to recover more than 68 billion that need to be

20   resolved.

21               We have a game plan on how we want to address

22   these claims.  We've been implementing a game plan at least

23   since the company emerged from bankruptcy.  The new board,

24   and acting as plan administrator, we have a game plan on how

25   we want to approach this.  We have been prioritizing issues

1    for Your Honor.  We've -- and we're going to continue to do

2    that, trying to bring forward the things that we think will

3    be most effective in resolving the remaining issues.

4    Constant --

5            THE COURT:  I think it's also -- and I'd like to

6    point out a large majority of your focus is what I call the

7    big ticket, complex items, which I understand.  But also

8    remaining, which I've seen a large number of, are individual

9    claims, with individuals who may or may not be represented

10   by counsel, a lot of not represented by counsel, and who

11   have claims that have not only a monetary component but have

12   an emotional component.

13           And it's very important -- and I've tried very

14   hard to make each and every one of them, when their turn

15   comes, to feel that they've been heard and that they've been

16   given a fair treatment, you know, win or lose.  And I think

17   that's important for them to feel that the Court has heard

18   them, but also that the folks working for the plan

19   administrator have heard them.

20           And I think, pretty consistently, they feel that

21   their needs and concerns have been responded to, and a lot

22   of patience and resources have been spent.  So, I'm

23   appreciative of that.  And I think it's just worth noting

24   that, in those remaining claims, I would guess there are

25   undoubtedly, you know, some of those folks.

Page 19

1              MR. CANTOR:  Yeah.

2              THE COURT:  And that's true in the LBHI estate,

3       and it's also true in the LBI estate.

4              MR. CANTOR:  Yes, Your Honor, which is -- and the

5       next point I was going to make was, obviously, in

6       prioritizing things, just so the Court understands, on the -

7       - but, by expressing that, you know -- we are constantly

8       engaged in a process with our creditors, trying to resolve

9       things consensually, constantly sharing information,

10      listening to our counterparties' thoughts on the appropriate

11      resolutions.

12             And really we spend an awful lot of time trying to

13      get things done in a way that it really feels like they have

14      an opportunity to be heard by the plan administrator, their

15      thoughts have been considered.  And, you know, to the extent

16      we can compromise, we do, within reasonable limits.

17             And I know one of the issues that has been, you

18      know, our interest in sometimes bringing to Your Honor legal

19      issues that we think will break logjams in major

20      litigations.  And we have heard, loudly and clearly, and we

21      think the Court has appropriately indicated, you know, most

22      of the time, disputes need to be all resolved at once, at

23      the end, either by the Judge or by the parties.  And there's

24      a disinclination to deal with one-off legal issues.  And we

25      recognize that.

1          And we're also appreciative, in those special

2    circumstances, we're able to get some jurisprudence on legal

3    issues, because there are a fair number of novel legal

4    issues in the disputes we have.  And sometimes it makes it

5    hard to get a resolution, when you're facing investors who

6    have a thesis that it needs to come out a particular way to

7    make a return.

8          So, currently, there are about 550 claims subject

9    to pending objections.  So, the major obstacles that we've

10   laid out here that we see going forward is we have, I had

11   mentioned, opportunistic counterparties.  Maybe the words

12   could have been a little softer.

13          But there is some tension out there where

14   counterparties recognize we're trying to get money out the

15   door while at the same time get fair results.  And

16   sometimes, folks hold their breath, hoping they'll get

17   better than they're entitled to.  And that's really a

18   tension we wrestle with, and we hope we can get through the

19   Court process as fast and as efficiently as possible.

20          With the remaining derivatives claims -- and

21   you'll see, with the big bank litigation, I mean, there's

22   very meaningful valuation disputes.  You saw that in the

23   Washington Tobacco litigation.  When those types of matters

24   have to resolve by the Court, those are trials.  Very

25   specific facts, can be expensive and time-consuming.

1          Lastly, I think we're at the point in time in the

2     case that there are contingent claims, either contingencies

3     where the estate's exposure will be reduced or eliminated

4     because there's another counterparty who will be paying, or

5     there's some subsequent event that we have to wait for.  And

6     I know the Bankruptcy Code empowers the Court to help us

7     resolve those things without waiting for the contingencies

8     to occur.

9          THE COURT:  Right.

10          MR. CANTOR:  We're going to begin bringing those

11     matters before Your Honor for consideration, in the hope

12     that we can clean up those remaining claims, because, like I

13     said, our goal is to get the claims done and be done.

14          So, I've -- for the remainder of the presentation,

15     I have broken up the five broad categories, the last

16     category being "Other."  So, if we flip to the next page,

17     there's the derivatives book, which is, you know, sort of

18     like the Washington Tobacco litigation and those types of

19     litigations.

20          So, there are 22 pending adversary proceedings or

21     objections on the docket involving the estate's derivatives

22     counterparties.  There are at least 15 additional

23     derivatives counterparties that are likely to be brought

24     before the Court to require some judicial interaction.

25     They're based upon our -- you know, we're constantly

Page 22

1    negotiating with these folks, and, you know, our best

2    estimate is about 15 additional ones we're going to need to

3    get into Court and have some help from the Court.

4              Each derivatives dispute involves millions of

5    dollars.  Each of these are factually unique, involving

6    anywhere between one derivatives transaction and up to tens

7    of thousands of transactions.

8              In many cases, we're facing counterparties who've

9    employed a variety of methods to inflate their claims

10   relative to other comparable claims and make a profit from

11   the bankruptcy.  The types of things we're seeing with

12   counterparties who submit loss calculations that generate

13   claims in amounts far in excess of their actual loss.

14             And again, we're focusing -- because the law here

15   is somewhat open or novel, we try at the estate to get a

16   sense of what was the actual loss the counterparty suffered.

17   Obviously, we have counterparties that may have a view as a

18   matter of law there's a liquidated damage that entitles them

19   to more, and that's sometimes where the majority dispute is.

20   We're trying to limit the estate's exposure to what the

21   losses were.

22             We have counterparties that, you know, calculate

23   the close-out, supplying a time of day or a date that

24   maximizes their loss regardless of when the actual

25   termination occurred, or when they chose to terminate -- the

Page 23

```
 1    date that they chose to terminate the trades, or how they

 2    actually managed their portfolios.  We have counterparties

 3    who make claims based on hypothetical loss calculations,

 4    even though they replaced the trades, in an effort to

 5    withhold proceeds.

 6          I think we have a couple -- there's one -- I think

 7    it's Alexandria, Lcor Alexandria.  We filed our complaint.

 8    You'll see there, there was an effort to sort of fabricate

 9    some trades to make the -- to make some profits on the

10    terminations.

11          THE COURT:  Or so you allege.

12          MR. CANTOR:  Or so alleged.  The other one -- you

13    know, we had this FHLB New York.  It's not just investors,

14    but it's sort of bigger agencies where we've found that

15    claims were presented showing us the losses, but didn't

16    really come forward with trades that made profits.  So,

17    they're going to attempt to maybe collect on the losses but

18    not show where the money was made.  And --

19          THE COURT:  Again, so you allege.

20          MR. CANTOR:  So we allege.  And that was -- you

21    know, that was an example of a situation we didn't really --

22    weren't able to find that out until we ended up in

23    discovery.  But those are the kind of things that we're

24    bringing forward, counterparties that net offsetting trades

25    and related risks in the ordinary course of business but
```

1    don't want to net it out when they show us the claims, so we

2    allege.

3              This is one of the places where we're going to see

4    a constant tension between the -- what a litigant might see

5    as the efficiency of dealing with a discrete legal issue and

6    a judge might see the value of requiring the parties to go

7    through a whole process and reach (indiscernible)

8    resolution.  And I think, you know, you may hear more from

9    us on that.

10             THE COURT:  Okay.

11             MR. CANTOR:  And we completely respect Your

12   Honor's jurisprudence on that.

13             THE COURT:  Okay.

14             MR. CANTOR:  But it's case-specific.

15             THE COURT:  Then the next page, 10, looks like

16   it's the backup to the 22 number.

17             MR. CANTOR:  Yes.  So, on page 10 is the backup

18   for the 22.  And, again, you can just see just how many --

19   and, you know, each one of these, if you remember how much

20   time and effort the Washington Tobacco case took.

21             THE COURT:  I do.

22             MR. CANTOR:  So, there you have 22, potentially

23   more.  Obviously, each one is unique and different.

24             Turning to page 11, the next group are the -- what

25   we call the big bank litigation.  And so, those are massive

Page 25

1    derivatives-related and securities valuation disputes.  So,

2    within each one of those three, right, there's more than --

3    well, in total, there's more than 125,000 trades.

4            So, you know, not only do we have the prospect of

5    three Washington Tobacco trials times thousands, but it'll

6    be three potentially all at the same time.  So, you know,

7    while we are working hard to resolve those matters, that

8    could be a massive requirement on the Court's time and

9    resources.

10           Now, these were -- you know, in 2011, there were

11   originally 13 of these big bank trades.

12           THE COURT:  Right.

13           MR. CANTOR:  In 2011, the estate was able to

14   settle 10 of them.  The big bank counterparties is you have

15   Citibank, JPMorgan, and Credit Suisse.  They were all

16   offered the same opportunity to settle the other banks, and

17   they didn't take it. One --

18           THE COURT:  So, we're just -- we're already in

19   2015.  We're halfway through 2015, astonishingly, right?

20           MR. CANTOR:  Yes.

21           THE COURT:  So -- and I know I've begun to see

22   2016 and 2017 dates.  So, that's -- we're looking at 2016,

23   2017, and beyond, (indiscernible).

24           MR. CANTOR:  Well, yeah, I mean --

25           THE COURT:  I mean just in terms of the sheer fact

Page 26

1   that there are only 24 hours in a day and 365 days in the

2   year.

3            MR. CANTOR:  Yes.  I mean, current schedules,

4   dispositive motions in the Citi and JPM cases will happen

5   around the summer, second half of 2016.

6            THE COURT:  Right.

7            MR. CANTOR:  So, unless we run the board and win

8   that, the dispositive motions, you know, it'll be longer

9   than that.

10            THE COURT:  Okay.

11            MR. CANTOR:  So, unlike the other big banks, you

12   know, Citi and JPM, they were in receipt of billions of

13   dollars of Lehman's prepetition cash, against which they

14   assert security interests.  So, having had the cash, maybe

15   that's one reason why it didn't settle.  You know, when we

16   get there, you'll -- you know, issues of comparing actual

17   losses against liquidated damages are going to be really

18   meaningful there, where the estate's going to stay focused

19   on actual losses.

20          And then I guess it's not shocking that the

21   counterparties' claims grew to just about where their cash

22   collateral was.  And certainly that'll be an issue we're

23   going to present. But, again, there's a lot of novel issues

24   of law that are going to need to be resolved if we don't get

25   those things settled.

Page 27

1              Turning to page 12, if you might indulge me, so,

2     in the JPM case, we have multiple claims objections, and

3     those are pending before Your Honor.  The plan administrator

4     contests the amount of JPM's claims, the validity of its

5     collateral security, the methods by which it liquidated

6     collateral security, among other things.  The plan

7     administrator has also asserted affirmative claims against

8     JPM, but those are pending before Judge Sullivan in the

9     District Court.

10             The plan administrator seeks a multibillion-dollar

11    claim reduction/recovery -- since, right, these creditors

12    have our cash -- in each of the two largest and most complex

13    objections.  In particular, the plan administrator's

14    objected to JPM's $2.3 billion derivatives claim relating to

15    the termination of a 75,000-trade portfolio.  This objection

16    is going to require massive discovery effort, which is now

17    underway.

18             In addition, the plan administrator has objected

19    to JPM's deficiency claim, which alleges that tens of

20    billions of dollars that JPM held in LBI collateral --

21    that's the -- right, the other estate -- was insufficient to

22    satisfy its credits extension for clearing, and required the

23    provisional application of over $6 billion of holdings cash

24    collateral that was posted.

25             We're challenging the adequacy of the credit that

Page 28

1    JPM gave to LBI for approximately 4,000 securities that JPM

2    held as collateral.  This will also involve a massive

3    discovery effort and lengthy hearing if it can't be settled.

4         And the plan administrator has also objected to

5    several miscellaneous claims, including JPM's closeout of a

6    secured lending, where it applied over $2 billion in cash

7    collateral.  And while the estate is attempting to resolve

8    these objections consensually, it's likely that some of it

9    is going to require the Court's time and resources.

10        Based on the current schedules, dispositive

11   motions in the derivatives case -- that's the objection on

12   the derivatives claim -- will be filed around June of next

13   year.  And dispositive motions in the (indiscernible) case

14   will be filed around September next year.

15        The next big bank matter is Lehman Brothers

16   Holdings against Citi.  And there, Citi demanded and

17   received more than $2 billion from Lehman prior to the

18   bankruptcy.  I know Your Honor's heard most of this.  The

19   connection with our objections relates to post-petition

20   interest.

21        THE COURT:  Right.

22        MR. CANTOR:  And they also sought to seek off that

23   cash against claims.  The plan administrator contests Citi's

24   claims and the validity of its right to set off of its

25   entitlements post-petition interest.  The litigation is well

Page 29

1    underway.  Depositions are ongoing.  We're seeking to

2    recover more than $2 billion from Citi.  And based upon the

3    scheduling order, dispositive motions will occur by the

4    summer of 2016, just about the same time in the JPM case.

5            Lastly is Credit Suisse.  They filed claims -- it

6    filed claims totaling approximately $1.2 billion relating to

7    nearly 30,000 derivatives trades with Lehman.  We contend

8    that Credit Suisse failed to properly determine the closeout

9    amounts because of the early termination date and filed

10   inflated claims.  We're seeking to reduce those claims, and

11   we actually seek an affirmative recovery.  Dispositive

12   motions are also due in -- will be due in January of 2017.

13           So, that's the big bank litigation.  The next

14   major, major matter is the private legal RMBS dispute, which

15   I know Your Honor is very familiar with.  I wanted to lay it

16   out for you, where we are.

17           So, right, various trustees asserted claims in the

18   aggregate of more than $37 billion against LBHI and SASCo,

19   based upon the trusts' alleged right to put back to Lehman

20   mortgages with material and adverse breaches.  And those are

21   405 trusts that filed those claims.  Pursuant to an agreed

22   order, after a lengthy hearing before Your Honor, the plan

23   administrator maintains a $5 billion disputed claim reserve.

24           In December of 2014, the Court approved a protocol

25   to resolve the claims.  Under the protocol, the trustees

Page 30

1    have indicated they will review approximately 200,000

2    mortgage files and deliver files containing material and

3    adverse breaches.  The first 50,000 files were due to be

4    delivered by the trustees by June 30, 2015.  We'll be having

5    a status conference -- I think it's on next month, to give a

6    report on how it's going.

7              THE COURT:  I think it is, yes.

8              MR. CANTOR:  The protocol allows a five-phase

9    process, four of which will be out of the Court's purview,

10   although I suspect there'll be some disputes now and again

11   that will require us to come back.  And each of these things

12   require considerable time and expense.  Step five of that

13   process will require the Court to review and approve the

14   amounts of claims that would be posed by the claim

15   facilitator after we have an opportunity to go through a B-

16   to-B process --

17             THE COURT:  Right.

18             MR. CANTOR:  With the trustees, then the

19   mediation.  The entire review by the RMBS trustees is due to

20   be completed by March 31, 2016.  The Court -- Your Honor

21   will review the amount of any RMBS claim that is subject to

22   an objection via the plan administrator of the trustee.  And

23   that'll be allowance -- subject to allowance by the Court.

24             THE COURT:  So, entirely hypothetically, there

25   could be 200,000 of them.

Page 31

1           MR. CANTOR:  Yes.  And, you know, I'm hoping we

2    can get that resolved.  But if not, it could be a -- you

3    know, a massive, massive project.  And what's interesting is

4    this is going on in Courts all over the country.

5           THE COURT:  All over the country, correct.

6           MR. CANTOR:  In lots of different matters.

7           THE COURT:  Right.

8           MR. CANTOR:  And, you know, in this case, I think

9    we're going to be facing some issues that are going to have

10   real meaning across the country, because, you know, in the

11   process that we've set up, you know, the trustees need to go

12   identify the claims or the breaches, and they need to show

13   us those claim files.  We have an opportunity to test

14   whether or not the information that supports the breach is

15   there.

16          You know, we're also going to test the trustees'

17   ability not only to pull a file that they say has a breach

18   in it, but to also pull a file and test where there's a

19   breach in it, and also determine whether or not there's

20   enough proof to go become a burden of persuasion to even

21   present a claim.  You know, it's one thing to say that it

22   looks like there was a breach there.  It's another thing to

23   present a claim and a claim file and present evidence that

24   you need to bring prima facie to the Court to collect.

25          And then there's the whole other issue --

Page 32

```
 1              THE COURT:  Well, it's -- to your point about

 2      these cases pending all over the country, they are pending

 3      all over the country.  And it should come as no surprise

 4      that I -- whenever I see the report of one of them, whether

 5      it's in the Southern District or elsewhere, whether it's

 6      involving Lehman or not, I'm attempting to keep up with the

 7      jurisprudence as it develops, because it's incredibly

 8      complex, I think.

 9              MR. CANTOR:  I do, too, Your Honor.  You know, one

10      of the issues with these three words, "material and

11      adverse," and, you know, we just saw it -- you know, you see

12      Courts thinking about what that means in the context of

13      causality, in terms of, you know, does the breach lead to

14      the loss, or should it lead to the loss?

15              You know, I think back in terms of the way I'd

16      been thinking about it is whether or not -- you know, in

17      contract law, we lean into that.  We think about: is the

18      loss reasonably foreseeable from the breach?  You know, and

19      maybe we're able to get away from the words "causality."

20              But we're going to -- if we can't resolve this, we

21      have, I think, some very interesting ways to look at this

22      that only -- you know, not only, but that bankruptcy lawyers

23      and practitioners think about loss and think about fair

24      outcomes and think about what someone's entitled to recover,

25      and maybe get away from sort of the law of bigger numbers.
```

Page 33

1    But these are going to be massive legal issues, and which

2    we're going to do our best to resolve it consensually.

3            So, the second-to-last bullet, in view of the

4    magnitude of the dollars at risk, the legal and factual

5    issues in dispute, and the failure of a prior mediation --

6    we have tried to mediate this before with the trustees, and

7    we continue to try to resolve this -- the matter is likely

8    to require a significant amount of the Judge's -- Your

9    Honor's time.

10           We anticipate, following the claims review of the

11   parties and initial efforts to resolve disputes through the

12   ADR process, the number of specific legal and of factual

13   disputes will need to be submitted to the Court for

14   determination before the parties can make further progress

15   toward settlement.

16           In the context of the -- you know, the private

17   label process, we have the follow-on from the Fannie Mae and

18   Freddie Mac settlement, which is the downstream process,

19   which I know Your Honor is familiar with.  Your Honor set up

20   the ADR process to try and help us engage in a process with

21   counterparties to resolve these things, or these claims,

22   these recoveries.

23           THE COURT:  Right.

24           MR. CANTOR:  Without the need for Court time.

25   We've actually -- there's -- at that time, there were

Page 34

1    approximately 3,000 parties estimated to be in that

2    protocol.  We are having some success resolving things

3    consensually.

4         But to my original point about having some

5    intractable counterparties, we've seen some counterparties

6    willing to spend thousands and thousands of dollars to try

7    and get out of a mediation process, rather than spend fewer

8    thousands to come try and work it out with us.  I suspect

9    we'll probably see more.

10         But, you know, the two examples we -- I laid out

11    here for Your Honor was the Home Trust and the LHM attempts

12    to undo the process by challenging our rights to recover

13    based upon expiration of statute of limitations or attacking

14    the validity of our assignments.

15         THE COURT:  The standing.  Right.

16         MR. CANTOR:  And hopefully --

17         THE COURT:  Well, in that case, to your point

18    about that 40 minutes go, there was a decision that was

19    rendered disposing of those issues.

20         MR. CANTOR:  And I think that's gone a long way to

21    help get everybody in a room to work these things out.  But

22    these things are also likely to require a lot more of your

23    time.

24         Potentially, I guess there might be downstream

25    claims that came out of the private label resolution, which

Page 35

```
 1    might look a little like the GSE litigation, or it might

 2    not.  And I certainly want to make it crystal clear that

 3    there's no clear view on how that rock rolls down the hill.

 4            So, on page 16, this is the contingent claims I

 5    was talking about.  We're going to file a motion tomorrow to

 6    begin kicking off our attempt to deal with that part of the

 7    tail in this case.

 8            THE COURT:  Okay.

 9            MR. CANTOR:  So, a huge portfolio of the remaining

10    claims relate to guarantee claims that relate to claims

11    allowed against affiliates, right?  The holding company --

12            THE COURT:  Mm hmm.

13            MR. CANTOR:  Counterparties allege guaranteed

14    things.  Maybe it did; maybe it didn't.  So, those claim

15    allowances were not under the administration of this plan

16    administrator or your Court's oversight.  We call those non-

17    controlled affiliates.

18            So, we have about $11.6 billion in claims filed,

19    representing about 1600 claims.  So, we have solvent non-

20    controlled affiliates.

21            THE COURT:  Right.

22            MR. CANTOR:  At LBIE being one of them.  So, the

23    largest remaining group of claims against the estate are

24    contingent claims lodged against LBHI for this guarantee of

25    LBIE estate's obligations.
```

Page 36

1

2          Now, LBIE has already paid the full principal

3    amount of these guaranteed claims -- allegedly guaranteed

4    claims, and has the wherewithal to pay post-bankruptcy

5    interest on these claims.  I think the public market for

6    these claims, if you look at your Bloomberg screen, the way

7    you could trade these things, you could sell for more than

8    your (indiscernible) interest.

9          So, we're going to suggest they would -- the

10   estate's obligation really is nothing, because a creditor

11   holding that claim, the -- can be paid in full, or has been

12   paid in full, has, you know, no entitlement here.  And we're

13   going to ask the Court to estimate those claims.  I'm sure

14   there will be an objection here and there to the estimation

15   of those claims.

16          THE COURT:  I'd imagine so.

17          MR. CANTOR:  And there may not be on some.  For

18   the -- for understanding what we may need of the Court's

19   time and resources, absent an estimation of those claims,

20   were we to have to deal with each of those claims, there's

21   going to be discovery, investigation, and then potentially

22   litigation over the validity of the guarantees, the alleged

23   guarantees.

24          And that's going to be complicated, because huge

25   volume and frequency of trading these claims over the years.

Page 37

```
1     And to the extent guarantees are alleged, as to one

2     counterparty, when they trade it away, there'll be issues

3     about who has the rights.

4           Then there's going to be an issue about the

5     determination about the allowable amount of these claims.

6     And while they may have been resolved in another Court

7     proceeding, I'm not altogether sure that means they're

8     allowed here.

9           Then there's going to be an -- since we have no

10    real visibility into the amount that these counterparties

11    received on account of these claims, since we're -- the

12    estate's not going to be certainly responsible for paying

13    more for these (indiscernible) to be paid in full, we're

14    going to have to have some discovery about what they got

15    from those other cases.

16          And then, to the extent that -- were there to be a

17    determination that there was a guarantee and an allowed

18    claim, and there was a comfort that we knew how much a

19    counterparty was paid, then there's going to be some

20    litigation if the estate is going to pay a counterparty that

21    we have a satisfactory assurance that any overpayments that

22    that counterparty receives, after we pay, come back to us.

23          So, I don't know how, again, that rock rolls down

24    the hill.  But there's certainly a real risk of a need for

25    Court time and resources, depending upon how the estimation
```

1    process goes.

2            Similarly, there are non-controlled affiliates

3    that are insolvent, where there is an entitlement if a valid

4    guarantee is paid.  And, you know, LBF -- it's the Swiss

5    liquidation, we're going to need to resolve claims asserted

6    in this case, potentially valuation disputes, because,

7    again, we're not a party to or in agreement with the

8    allowance of that claim in the context of the foreign

9    proceeding, we're going to likely challenge it here if we

10   can't get a claim value that we think is appropriate.

11           When I drafted this deck, every time I sent it

12   around for a comment, everybody said I need to put this in

13   core litigation, which is the next bullet on the RMBS page.

14   And I would say, "No, I put it there for a reason."

15           So, we filed our Syncora papers.  I know we were

16   here over a year ago, trying to deal with the reserve on

17   account of that claims for subordination motion.  We spent

18   the better part, since then -- better part of time since

19   then trying to resolve this matter.

20           It is extremely complicated, because it not only

21   is fundamentally an issue of an allowance of a put-back

22   claim, but it also raises the issues that I just described

23   in this Libby guarantee issue, which is Syncora, who's

24   lodged, I think it's down -- we're reserving at 600 million

25   bucks, thereabouts -- in all likelihood, if there is a valid

Page 39

```
 1    put-back claim, that put-back claim is against the

 2    originator of that loan, Greenpoint Mortgage, who the

 3    trustee, U.S. Bank, for the trust that Syncora wrapped, has

 4    sued in New York State Supreme.

 5           So, at least within the estate, we're looking at

 6    reserving against the $600 million claim, where there is,

 7    first and foremost, if there is a valid claim, the

 8    likelihood of recovery from Greenpoint, which would mean

 9    Lehman shouldn't be reserving anything. And if Lehman is on

10    the hook, we have a $5 billion reserve against all the

11    trusts -- and, again, if there's an allowance and a payment

12    on account of this claim.

13           So, we're sort of reserved in a bunch of different

14    ways that relate to this claim.  But it is very complicated,

15    because we're -- you know, many of the -- at least the most

16    important issue as to whether or not Greenpoint's on the

17    hook, that's been placed in front of a New York State judge.

18    But it's a fundamental, an essential, to determining the

19    estate's obligation in this bankruptcy case.

20           So, all of that will be before Your Honor.  I

21    think we're back in here on next Thursday, on the 18th, to

22    begin dealing with that.

23           And, again, you know, the reason why this is last

24    and I called it my Post-it job, because there's also issues

25    that, although the claim is being shown at 600, from going
```

1    through Syncora's publicly disclosed financial information,

2    I think we'll be able to show that the actual exposure, even

3    if it were reserved twice and should be estimated, is way in

4    excess of any exposure they're going to have, because their

5    risk has been commuted.  But we'll get to that.

6              But, you know, I end with Syncora because that's a

7    perfect example of, again, one of the largest remaining

8    claims, disputed claims, which is delaying the plan

9    administrator from distributing reserve cash, is Syncora's

10   claim for losses experienced in connection with the private

11   label trust, matters currently pending before Your Honor.

12   It's going to require significant judicial time and

13   resources.

14             But, again, although the underlying dispute

15   relates to losses relating to the private label trust there,

16   the plan administrator views this as a contingent claim,

17   which the reserve is unnecessary.

18             The last page is some pending other claims, to

19   which you had alluded to, beyond the four big buckets that I

20   think is, you know, the way we --

21             THE COURT:  Right.

22             MR. CANTOR:  Which is, you know, we have the

23   Spanish Broadcasting dispute.

24             THE COURT:  Yeah.

25             MR. CANTOR:  And I won't go into --

Page 41

1                   THE COURT:  Right.

2                   MR. CANTOR:  Great detail.  You have the Stonehill

3        claim, which has been --

4                   THE COURT:  Yeah.

5                   MR. CANTOR:  Bit back with another position.

6                   THE COURT:  Right.  Right, and the (indiscernible)

7        interest, post-petition interest issue.

8                   MR. CANTOR:  Right, the post interest issue.  I

9        didn't list -- you know, there was Dr. (indiscernible), who

10       came with a late claim on big numbers, maybe not big numbers

11       in Lehman land, but big numbers in reality.  There were some

12       tail preference claims and other little actions here and

13       there.

14                  But suffice to say there's an awful lot left here.

15       I don't want to minimize how much has been done, because

16       there's really a tremendous amount done.  But that's the --

17                  THE COURT:  No, I think that it's (indiscernible)

18       -- that there not be any sort of a takeaway from here that

19       there hasn't been an enormous amount done.  But I think that

20       there's been an enormous amount done.  There's been an

21       enormous amount of success and recovery for the

22       constituencies of the estate.

23                  Your familiarity with the detail, not to embarrass

24       you, is remarkable in the sense that it -- I think it's a

25       reflection of what an enormous process it is and how well

Page 42

1    it's managed.  And it's not simply, as it may have been in

2    the beginning, just the Weil firm, although I certainly

3    still see the Weil firm on a regular basis.  But there are a

4    number of firms obviously handling the litigation, a number

5    of professionals.

6              And it's evident to me that there's good

7    communication between and among them, which my staff very

8    much appreciates, because we like to run a smooth ship to

9    the extent that we can.  And we try our very best to

10   accommodate you folks and the LBI folks.  Sometimes there

11   are an alarming number of days on my little calendar that

12   say Lehman.

13             But I hope you agree with my perspective that we

14   are -- we always try to accommodate you, even though there's

15   only one of me and so many of you.  We always try to

16   accommodate you and manage things within reason.

17             There are, on my watch -- I'm going to stumble on

18   the current count, but I think in the realm of about only

19   three decisions that are sub judice.  So, we try very hard

20   to keep up and not have there be a backlog in terms of

21   having a matter and getting it out to you.

22             Sometimes matters are tried, as was the case with

23   the Washington State Tobacco settlement, that they're

24   already tried and then goes into mediation.  So, those may

25   get put on hold.  Sometimes things get tried and there's a

Page 43

1   delay with their final presentation.

2           But, for our part, I just think it's important to

3   communicate to you that, notwithstanding, you know, the

4   limitations on our resources, we are -- our commitment to

5   you is to move as quickly as you move so that you can

6   continue to make distributions to the creditors.

7           I will tell you, which you may have heard through

8   the grapevine, I guess this being a season of change,

9   generally, in ways that are -- cause us to reflect, Ms.

10  (indiscernible) will be leaving me at the end of the month.

11  I don't think she's here.

12          MR. CANTOR:  No, I think that's --

13          THE COURT:  I think she's with Judge Garrity this

14  morning.

15          MR. CANTOR:  Right.

16          THE COURT:  Was that Ms. Eisen losing color in her

17  face?  Ms. (indiscernible) will be leaving the Court after

18  serving here under Judge Peck, I think, since the second

19  year of the Lehman proceeding, probably has more knowledge

20  of the Lehman case than anyone.  Anyway, she will be moving

21  on to something else.  Possibly I will be able to retain

22  some part of her.  I'm trying my best.  And, you know, I

23  give you my promise that it will not cause any disruption in

24  the conduct of the case.

25          But to say that I'm going to miss her is an

Page 44

1    enormous understatement, and I will try my best to have her

2    here at what would be her final hearing so that I can

3    embarrass her while she sits here.  But I'm sure you've had

4    -- you've all had a lot of interactions with her.

5              MR. CANTOR:  Yes, she's been awesome.  I'd like to

6    check on your --

7              THE COURT:  The stream of paper is remarkable on a

8    daily basis.

9              MR. CANTOR:  Yeah, and just we've both been doing

10   this for a long time.  It's two things.  It was remarkable

11   to me to see the -- not only is it sort of a -- there's a

12   decent number of people at the estate, but the quality and

13   intensity of the work effort of the remaining people at

14   Lehman is amazing.  And the analytical abilities and care

15   with which they deal with every claim and every matter is

16   really extraordinary and something I've never seen before.

17   The folks that came on the board have been extremely

18   energetic and very quickly learned everything about this

19   estate, and have also done a great job.

20             But I would say, again, with a lot of judges and a

21   lot of chambers, and over the years -- but yes, your

22   chambers has been extraordinarily helpful in helping us move

23   this thing forward, have been there all hours of the day and

24   night, at any time, to help us move things forward.  And we

25   greatly appreciate that.

Page 45

```
 1            THE COURT:  One thing, also, that I'm sure you're

 2   aware of, a propos of my comment earlier about the smaller

 3   creditors:  many of them have the perception that it's them

 4   against, quote/unquote, "Lehman."  And one of the things

 5   that it's important to always remind them and explain to

 6   them is there is no Lehman.  There's just the Lehman

 7   creditors.

 8            And I think where you started and where I'll

 9   invite you to finish, since I have the rest of these folks

10   waiting to get started, is that you said at the top that's

11   your job now, is managing the assets, managing the

12   recoveries, managing the claims, in order to ensure that

13   everybody gets their fair distribution out of the assets.

14   And, you know, you are certainly Lehman, but there is no

15   Lehman in that sense.

16            I often tell them, you know, Lehman doesn't always

17   win, Lehman doesn't always lose, and I explain this to them.

18   And it's clear that many of them simply don't -- you know,

19   don't understand that, whereas of course the sophisticated

20   parties do understand that, so.  Is there anything else?

21            MR. CANTOR:  No, and I won't read the conclusion

22   page to you.  It's there.  But, again, we're very grateful

23   for your time and effort.

24            THE COURT:  You can read it if you like.

25            MR. CANTOR:  And, no, I don't need to do it, I
```

Page 46

1      don't think. Do I?

2             THE COURT:  Okay.  I very much appreciate you

3      taking time out of everything else that you do to put this

4      together.

5             MR. CANTOR:  Yeah, I appreciate the Court giving

6      us the time.

7             THE COURT:  It's very helpful to us here at the

8      Court in order to anticipate staffing needs and to try to

9      keep up and keep ahead.  So, thank you.  Thank you very

10     much.

11            MR. CANTOR:  Thank you, Judge.

12            THE COURT:  We'll see you in a couple weeks.  All

13     right.  For NIIH, we'll give you some time to get set up, if

14     you're here, and someone will come and check to see when

15     you're ready.

16            (Whereupon these proceedings were concluded at

17     12:12 PM)

18

19

20

21

22

23

24

25

Page 47

1                C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya
     Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.06.10 15:56:27 -04'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  June 10, 2015