Hearing Date and Time:  August 4, 2015 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time:  July 28, 2015 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Richard L. Levine
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
|  |  |
|---|---|
| In re | : Chapter 11 Case No. |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : 08-13555 (SCC) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| | : |

------------------------------------------------------------------x

**NOTICE OF MOTION PURSUANT TO RULE**
**9019 OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY**
**CODE FOR APPROVAL OF SETTLEMENT AGREEMENT**
**AMONG PUTNAM STRUCTURED PRODUCT CDO 2002-1 LTD.,**
**PUTNAM STRUCTURED PRODUCT CDO 2002-1 LLC, U.S. BANK**
**NATIONAL ASSOCIATION, AS SUCCESSOR TRUSTEE, LEHMAN BROTHERS**
**SPECIAL FINANCING INC., AND LEHMAN BROTHERS HOLDINGS INC.**

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated July 6, 2015 (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, on behalf of itself and Lehman Brothers Special Financing Inc. ("LBSF"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 105(a) of title 11 of the United States Code for approval of a settlement agreement among the Plan Administrator, on behalf of LBHI and LBSF,

Putnam Structured Product CDO 2002-1 Ltd., as issuer (the "Putnam Issuer"), Putnam

Structured Product CDO 2002-1 LLC, as co-issuer (the "Putnam Co-Issuer", and together with

the Putnam Issuer, "Putnam"), U.S. Bank National Association ("U.S. Bank"), not individually

but as successor trustee under the Amended and Restated Trust Deed, dated May 29, 2003,

among U.S. Bank and Putnam, dated October 8, 2003, all as more fully described in the Motion,

will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the

United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 623, One

Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **August 4, 2015 at**

**10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy

Court for the Southern District of New York, shall set forth the name of the objecting party, the

basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court

electronically in accordance with General Order M-242 (which can be found at

*www.nysb.uscourts.gov*) by registered users of the Bankruptcy Court's case filing system and by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with two hard copies

delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable

Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 623;

(ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:

Richard L. Levine, Esq. and Jacqueline Marcus, Esq., attorneys for the Plan Administrator;

(iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201

Varick Street, Suite 1006, New York, New York 10014, Attn:  William K. Harrington, Esq.,

WEIL:\95307235\6\58399.0011

Susan Golden, Esq. and Andrea B. Schwartz, Esq.; (iv) Chapman and Cutler LLP, 111 West Monroe Street, Chicago, Illinois 60603, Attn: Franklin H. Top, III, attorneys for U.S. Bank; and (v) Bingham McCutchen LLP, 399 Park Avenue New York, NY 10022-4689, Attn: Joshua Dorchak, attorneys for Putnam, so as to be so filed and received by no later than **July 28, 2015 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing and failure to appear may result in relief being granted or denied upon default.

Dated: July 6, 2015
        New York, New York

/s/ Jacqueline Marcus
Richard L. Levine
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc.*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc. and*
*Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| ------------------------------------------------------------x | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| | : | |
| ------------------------------------------------------------x | | |

**MOTION PURSUANT TO RULE**
**9019 OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY**
**CODE FOR APPROVAL OF SETTLEMENT AGREEMENT**
**AMONG PUTNAM STRUCTURED PRODUCT CDO 2002-1 LTD.,**
**PUTNAM STRUCTURED PRODUCT CDO 2002-1 LLC, U.S. BANK**
**NATIONAL ASSOCIATION, AS SUCCESSOR TRUSTEE, LEHMAN BROTHERS**
**SPECIAL FINANCING INC., AND LEHMAN BROTHERS HOLDINGS INC.**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers*

*Holdings Inc. and Its Affiliated Debtors* (the "Plan"), on behalf of itself and Lehman Brothers

Special Financing Inc. ("LBSF"), files this motion (the "Motion") and respectfully represents:

## Relief Requested

1.       By this Motion, the Plan Administrator, on behalf of LBHI and LBSF,

seeks approval, pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and section 105(a) of title 11 of the United States Code ("the Bankruptcy

Code"), of a settlement, the terms of which are reflected in a settlement agreement (the

"Settlement Agreement"), and requests that such approval be immediately effective and

enforceable.  The Settlement Agreement provides for the resolution of all disputes between the

parties thereto relating to:  (a) the interest of Putnam Structured Product CDO 2002-1 Ltd., as

Issuer (the "Putnam Issuer") and Putnam Structured Product CDO 2002-1 LLC, as Co-Issuer (the

"Putnam Co-Issuer," and together with the Putnam Issuer, "Putnam") in certain notes issued for

(x) the account of the Series 2007-1 Segregated Portfolio by ALTA CDO SPC (the "Alta 2007-1

Issuer") and ALTA CDO LLC (the "Alta 2007-1 Co-Issuer"), and (y) the account of the Series

2007-2 Segregated Portfolio by ALTA CDO SPC (the "Alta 2007-2 Issuer" and together with the

Alta 2007-1 Issuer, the "Alta Issuers") and ALTA CDO LLC (the "Alta 2007-2 Co-Issuer" and

together with the Alta 2007-2 Co-Issuer, the "Alta Co-Issuers"), and (b) LBSF's claims against

Putnam for amounts allegedly owed in connection with the early termination of certain credit

derivative swap transactions (the "Swaps") entered into among the Alta Issuers and the Alta Co-

Issuers (together "Alta"), LBSF, and LBHI.  The Plan Administrator has determined, in the

exercise of its sound business judgment, that the Settlement Agreement is in the best interests of

LBSF, LBHI, their estates, and their creditors.  Entry of an order approving and authorizing the

Settlement Agreement is a condition precedent to the effectiveness of most provisions of the

Settlement Agreement.[1]

---

[1] In keeping with the confidentiality provisions of the Settlement Agreement, and due to LBHI's and LBSF's desire
to keep the economic terms of the Settlement Agreement confidential, the Settlement Agreement is  not included as

WEIL:\95307235\6\58399.0011

## Procedural Background

2.        Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including LBSF, commenced with this Court voluntary cases (together, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.

3.        On September 17, 2009, the Court entered the *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors under Derivatives Contracts* [ECF No. 5207] (the "ADR Procedures Order"), as subsequently amended by orders of the Court, most recently entered on October 2, 2013 [ECF No. 40267] .

4.        On September 14, 2010, LBSF commenced Adversary Proceeding No. 10-03547, captioned *Lehman Bros. Special Fin. Inc. v. Bank of Am. National Ass'n, et al.* (*In re Lehman Bros. Holdings Inc.*, *et al.*), Case No. 08-13547 (SCC) (the "Adversary Proceeding"), challenging, among other things, (a) the enforceability of certain provisions in the contracts governing Alta and the Alta Notes (as defined below) purporting to modify LBSF's right to receive payment upon early termination of the Swaps solely as a result of LBSF's or LBHI's bankruptcy filings, and (b) Alta's distribution of funds to Putnam and others related to their interest in the Alta Notes (as defined below).  LBSF named Alta as an "SPV Issuer Defendant" and the Putnam Issuer as a "Noteholder Defendant" in the Adversary Proceeding.

---

an exhibit to this Motion. The Plan Administrator will provide the Settlement Agreement to the Court, the U.S. Trustee, and the attorneys for the official committee of unsecured creditors appointed in these cases. Holders of the Notes issued by Putnam (the "Noteholders") pursuant to the Amended and Restated Trust Deed (the "Putnam Trust Deed"), dated May 29, 2003, entered between Putnam and LaSalle Bank National Association, as original trustee and securities administrator may contact the Putnam Trustee (as defined below) for copies of the Settlement Agreement and, before receiving any such copy, such Noteholders will be required to execute an agreement binding them to the confidentiality restrictions of the Settlement Agreement, including paragraph 13 of the SPV ADR Procedures Order (as defined below).  The Putnam Trustee (as defined below) may, in the ordinary course of performing its duties and responsibilities under the Putnam Trust Deed, provide a copy of the Settlement Agreement to The Putnam Advisory Company, LLC (the "Putnam Collateral Manager").

WEIL:\95307235\6\58399.0011

5.     On October 20, 2010, the Court entered the *Order Staying Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1)* [ECF No. 12199], thereby staying, among other things, certain litigation, including the Adversary Proceeding, to allow parties to the Adversary Proceeding and other similar actions time to explore the possibility of resolving their disputes without the need for litigation (the "Stay").  The Stay has been subsequently extended by orders of the Court, most recently pursuant to the *Order Extending Stay of Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1)*, dated January 31, 2014 [ECF No. 42417], which extended the Stay until the later of (i) May 20, 2014 or (ii) thirty (30) days after the date on which the Court enters a scheduling order governing the adversary proceedings defined as the "Distributed Actions" and identified on Exhibit A of the order.  On July 14, 2014, the Court entered a scheduling order governing the Distributed Actions, including the Adversary Proceeding.  *See* Adv. Proc. No. 10-03547 (SCC) [ECF No. 794] (the "Scheduling Order").  The Scheduling Order sets forth a schedule for litigation of various issues in the Adversary Proceeding.  As a result of the Stay and the Scheduling Order, Putnam, Alta, the Putnam Trustee (as defined below), and the Alta Trustees (as defined below) have not answered or otherwise moved for any relief in the Adversary Proceeding.

6.     On July 18, 2012, the Court entered the *Amended Order Providing for Alternative Dispute Resolution Procedures for Affirmative Claims of the Debtors Under Derivatives Transactions with Special Purpose Vehicle Counterparties* [ECF No. 29507] (the "SPV ADR Procedures Order").

WEIL:\95307235\6\58399.0011

7.      On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.

## Jurisdiction

8.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## The Swap Agreement and the Alta Indentures

9.      LBSF, LBHI, and the Alta 2007-1 Issuer, a special purpose vehicle and collateralized debt obligation or "CDO", entered into a 1992 form (Multicurrency-Cross Border) ISDA Master Agreement dated as of April 3, 2007 (the "Alta 2007-1 Master Agreement," and along with the annexed "Schedule," the relevant swap "Confirmations," and related documents, the "Alta 2007-1 Swap Agreement").  A copy of the Alta 2007-1 Swap Agreement is annexed hereto as "Exhibit A".  Also on April 3, 2007, the Alta 2007-1 Issuer and the Alta 2007-1 Co-Issuer, along with their trustee, U.S. Bank National Association (in this capacity, the "Alta 2007-1 Trustee"), entered into a series indenture subject to certain standard terms (together, the "Alta Series 2007-1 Indenture").

10.     On October 9, 2007, LBSF, LBHI, and the Alta 2007-2 Issuer, a special purpose vehicle and collateralized debt obligation or "CDO", entered into a 1992 form (Multicurrency-Cross Border) ISDA Master Agreement (the "Alta 2007-2 Master Agreement," and along with the annexed "Schedule," the relevant swap "Confirmations," and related documents, the "Alta 2007-2 Swap Agreement" and, together with the Alta 2007-1 Swap Agreement, the "Swap Agreements").  A copy of the Alta 2007-2 Swap Agreement is annexed hereto as "Exhibit B".  Under the Swaps issued pursuant to the Swap Agreements, the Alta Issuers sold "credit protection" to LBSF on a portfolio of diverse entities (collectively, the

"Reference Entities") in exchange for periodic premium payments by LBSF to the respective Alta Issuer.

11.     Also on October 9, 2007, the Alta 2007-2 Issuer and the Alta 2007-2 Co-Issuer, along with the their trustee, U.S. Bank National Association (in this capacity, the "Alta 2007-2 Trustee" and together with the Alta 2007-1 Trustee, the "Alta Trustees"), entered into a series indenture subject to certain standard terms (together the "Alta Series 2007-2 Indenture" and, together with the Alta 2007-1 Indenture, the "Alta Indentures").[2]  The Alta Indentures, among other things, govern the Alta Issuers' and the Alta Co-Issuers' respective payment obligations on certain notes (the "Alta Notes") they issued and sold to investors (the "Alta Noteholders"), such as Putnam.[3]  Alta used the money it received through the sale of the Alta Notes to acquire specific assets (the "Permitted Investments") that served as collateral for, first, Alta's obligations to LBSF under the Swap Agreements and, thereafter, for Alta's obligations under the Alta Notes. LBSF was a "secured party" under and "an express third-party beneficiary" of each of the Alta Indentures.

12.     The Alta Indentures provide that the Alta Noteholders will receive interest payments on the Alta Notes from, *inter alia*, LBSF's premium payments under the Swaps, and that they will be repaid principal from the available proceeds of the Permitted Investments but only *after* payment of any amounts due to LBSF as a result of credit events with

---

[2] The Alta Indentures are voluminous and have not been attached hereto.  The Plan Administrator will furnish a copy of the Alta Indentures upon request by a party in interest.

[3] Pursuant to the Putnam Trust Deed, the Putnam Issuer and the Putnam Co-Issuer issued certain notes (the "Notes") and a trust was created for administering the Notes.  The trust subsequently acquired $20,000,000 in principal amount of Alta Notes series A-0212454AA3 and $22,500,000 in principal amount of Alta Notes series A-1-81753CAA0 (collectively, the "Putnam Owned Notes").  U.S. Bank National Association is the successor trustee under the Putnam Trust Deed (in this capacity, the "Putnam Trustee").  The Putnam Trust Deed is voluminous and has not been attached hereto.  The Plan Administrator will furnish a copy of the Putnam Trust Deed upon request by a party in interest.

respect to the Reference Entities.  Indeed, the principal amount of the Alta Notes automatically is reduced by any such amounts paid to LBSF.  Therefore, if Alta did not need to pay out on the Swaps (either in the ordinary course or at termination) because the Reference Entities remained healthy, then the Putnam Issuer, like all Alta Noteholders, would benefit.  *But*, if credit events occurred with respect to the Reference Entities, then the Putnam Issuer was at risk of losing some or all of its investment in the Putnam Owned Notes, given LBSF's senior payment priority position under the Alta Indentures.

13.    Specifically, LBSF contends that under the "Priority of Payments" — or payment "waterfall"— in section 5(iii) of each Alta Indenture, if LBSF has a claim against the applicable Alta Issuer under the Swap Agreement, LBSF's right to payment has priority over any claims of Alta Noteholders.

14.    LBSF further contends that this payment arrangement was subject to modification under the terms of the Alta Indentures if LBSF was in default under the Swap Agreements.  Upon a default by LBSF, such as a bankruptcy filing by LBSF or LBHI, the Alta Indentures provide that LBSF must transfer its right to senior payment priority to the Alta Noteholders (the so-called the "Priority Flip").  In that circumstance, the Priority Flip changes LBSF's position to junior payment priority for any early termination payment due under the Swaps.  Provisions similar to the Priority Flip have been found to be unenforceable *ipso facto* provisions by this Court.  *See, e.g., Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. et al. (In re Lehman Bros. Holdings Inc.)*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011) ("*Ballyrock*"); *Lehman Bros. Special Fin. Inc. v. BNY Corp. Trust Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) ("*BNY*").  The Plan Administrator maintains in the Adversary Proceeding that such precedent, as well as other legal theories, allow

WEIL:\95307235\6\58399.0011

LBSF to collect from the Putnam Trustee and Putnam the funds that the Alta Trustees distributed to the Putnam Issuer or the Putnam Trustee, as discussed below.  The Alta Trustees, the Putnam Trustee, and Putnam dispute LBSF's and LBHI's contention that LBSF can recover the funds that the Alta Trustees paid to the Alta Noteholders, including Putnam, instead of to LBSF.

### Alta's Early Termination of the Swaps and Distribution of Funds to Putnam

15.    LBHI's chapter 11 filing constituted an "Event of Default" under the Swap Agreements.  Based thereon, the Alta Trustees designated September 18, 2008, as the "Early Termination Date" "in respect of all outstanding Transactions" under the Swap Agreements.  As a result of that early termination, LBSF asserts that it was owed a very significant early termination payment by Alta given LBSF's "in the money" position in the Swaps at the time.

16.    Nevertheless, purportedly in reliance on the Priority Flip, on October 21, 2008, well after LBSF's chapter 11 filing, Alta made distributions of interest and principal in excess of $25 million to the Alta Noteholders, including over $20 million to the Putnam Issuers or the Putnam Trustees, and none to LBSF.  If the Priority Flip had not been effected, LBSF believes that Putnam would not have received approximately $15.8 million of the amount it actually received from the ALTA Trustees.

### The ADR Process and the Resulting Settlement Agreement

17.    On May 13, 2013, while the Adversary Proceeding was stayed, LBSF initiated an ADR proceeding relating to this dispute pursuant to the SPV ADR Procedures Order by serving SPV Derivatives ADR Notice No. 847 (the "<u>SPV ADR Notice</u>"), on the Putnam Issuer.  On July 29, 2013, the Putnam Trustee responded to the SPV ADR Notice on behalf of the Putnam Issuer.  The Putnam Trustee subsequently has participated in the Court-mandated

WEIL:\95307235\6\58399.0011

ADR process.  On February 12, 2015, the Plan Administrator on behalf of LBSF and LBHI, the

Putnam Trustee, and The Putnam Advisory Company, LLC, the collateral manager for Putnam

(the "Putnam Collateral Manager"), engaged in mediation pursuant to the SPV ADR Procedures

Order, ultimately resulting in entry into the Settlement Agreement described immediately

below.[4]

18.    Under the Settlement Agreement, the parties have agreed to the payment

of a confidential settlement amount to LBSF (the "Settlement Amount").  The other salient terms

of the Settlement Agreement are as follows:[5]

> Payment:  The Putnam Trustee shall deposit the Principal Proceeds (as
> defined in the Putnam Trust Deed) on each Payment Date (as defined in
> the Putnam Trust Deed) into an escrow account (the "Settlement Escrow")
> until the Settlement Escrow holds the Settlement Amount.  Within three
> business days of the Approval Date (as defined in the Settlement
> Agreement), the Putnam Trustee shall pay all funds in the Settlement
> Escrow to LBSF by wire transfer.  If the amount of funds in the Settlement
> Escrow is insufficient at that time to pay the full Settlement Amount to
> LBSF, the Putnam Trustee shall pay all available Principal Proceeds
> within three business days after each subsequent Payment Date (as defined
> in the Putnam Trust Deed) directly to LBSF until LBSF has received the
> full Settlement Amount.
>
> Dismissal of Claims:  Upon payment in full of the Settlement Amount to
> LBSF, LBSF shall promptly dismiss with prejudice any and all claims
> against the Putnam Issuer, the Putnam Co-Issuer, the Putnam Collateral
> Manager, and U.S. Bank, individually and/or as the Putnam Trustee,
> arising under, related to, or in connection with the Putnam Owned Notes,
> including, if applicable, any such claims made in the Adversary
> Proceeding.
>
> Releases:  Upon payment in full of the Settlement Amount to LBSF,
> LBSF, LBHI, and the Plan Administrator shall release U.S. Bank,
> individually and as Putnam Trustee, any and all prior trustees under the

---

[4] The Putnam Trustee will file an affidavit detailing its attempts to contact other holders of Notes issued pursuant to the Putnam Trust Deed in advance of the hearing on this Motion.

[5] This summary is qualified in its entirety by the provisions of the Settlement Agreement.  In the event that there is any inconsistency between the description provided in this Motion and the actual terms of the Settlement Agreement, the Settlement Agreement shall control.

WEIL:\95307235\6\58399.0011

Putnam Trust Deed, the Putnam Issuer, the Putnam Co-Issuer, the Putnam Collateral Manager, and any and all former, current, or future holders of Notes issued pursuant to the Putman Indenture, from any and all claims arising from, related to, or in connection with the Putnam Owned Notes and the Putnam Trust Deed, and shall covenant never to commence a proceeding regarding the same.

Partial Releases:  Upon payment in full of the Settlement Amount to LBSF pursuant to the Settlement Agreement or as a result of payments received by LBSF from Putnam or the Putnam Trustee with the consent of any Noteholder, LBSF, LBHI, and the Plan Administrator shall release U.S. Bank, individually and as the Alta Trustees, the Alta Issuers, the Alta Co-Issuers, and any and all former, current or future Alta Noteholders, from any and all claims, arising from (i) any amounts distributed by, or on behalf of, the Alta Trustees to, or for the benefit of, Putnam or the Putnam Trustee on account of the Putnam Owned Notes or (ii) any amounts, including, without limitation, prejudgment interest, claimed under or in connection with the SPV ADR Notice, and shall covenant never to commence a proceeding regarding the same.

19.    Although the Plan Administrator believes that LBSF's claims against the Putnam Issuer are valid and meritorious, the Plan Administrator has determined in its informed business judgment that the terms of the Settlement Agreement are in the best interest of LBSF's estate.  Absent consummation of the Settlement Agreement, LBSF, LBHI, Putnam, and the Putnam Trustee likely would proceed with litigation, which could include time-consuming and expensive legal proceedings, including potential appeals, as well as the risks inherent in any litigation.  The Settlement Agreement will enable LBSF and LBHI to avoid expending further resources in connection with this dispute, while recovering a substantial portion of the amount in dispute.

### The Settlement Agreement is in
### LBSF's Best Interests and Should Be Approved

20.    The Plan Administrator, on behalf of LBHI and LBSF, submits that the Settlement Agreement is in the best interests of LBHI and LBSF and should be approved under Rule 9019 of the Bankruptcy Rules.  Bankruptcy Rule 9019(a) provides "[o]n motion by the

trustee and after notice and a hearing, the court may approve a compromise and settlement."

Fed. R. Bankr. R. 9019(a). This rule empowers bankruptcy courts to approve settlements "if

they are in the best interests of the estate." *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R.

499, 505 (Bankr. S.D.N.Y. 1991). The settlement need not result in the best possible outcome

for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." *Id.*;

*accord Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re

Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

21.     Compromises are "a normal part of the process of reorganization." *Prot.

Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424

(1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

Compromises may be effected separately during the reorganization proceedings or in the body of

the plan itself. *Drexel Burnham*, 138 B.R. at 758. The decision to approve a particular

compromise lies within the sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165

B.R. 115, 123 (S.D.N.Y. 1994). The court's discretion may be exercised "in light of the general

public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr.

S.D.N.Y. 1998). A proposed compromise settlement implicates the issue of whether it is "fair

and equitable, and in the best interest of the [debtor's] estate." *In re Best Products*, 165 B.R. 35,

50 (Bankr. S.D.N.Y. 1994) (internal citations omitted). The court must apprise itself "of all

relevant facts necessary for an intelligent and objective opinion of the probabilities of ultimate

success should the claim be litigated." *Prot. Comm. for Indep. Stockholders of TMT Trailer

Ferry, Inc.*, 390 U.S. at 424.

22.     Courts typically consider the following factors in determining whether a

settlement should be approved: (i) the probability of success in litigation, with due consideration

11

for the uncertainty in fact and law; (ii) the difficulties of collecting any litigated judgment;

(iii) the complexity and likely duration of the litigation and any attendant expense,

inconvenience, and delay; (iv) the proportion of creditors who do not object to, or who

affirmatively support, the proposed settlement; (v) the competence and experience of counsel

who support the settlement; (vi) the relative benefits to be received by members of any affected

class; (vii) the extent to which the settlement is truly the product of arm's-length bargaining and

not the product of fraud or collusion; and (viii) the debtor's informed judgment that the

settlement is fair and reasonable.  *See Id.*; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr.

S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. at 50.

          23.     While a court must "evaluate . . . all . . . factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *Cosoff v. Rodman (In re

W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), or conduct a full independent investigation,

*Drexel Burnham*, 134 B.R. at 496.  Moreover, in reviewing a proposed global compromise, the

court need not be aware of or decide the particulars of each individual claim resolved by the

settlement or "assess the minutia of each and every claim"; rather, the court "need only canvass

the issues and see whether the settlement falls 'below the lowest point in the range of

reasonableness.'"  *Shugrue*, 165 B.R. at 123.  As one court explained in assessing a global

settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement *in its

entirety* is appropriate for the . . . estate."  *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust

Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d

Cir. 1993) (emphasis added).

WEIL:\95307235\6\58399.0011

24.     Here, the Settlement Agreement will benefit LBHI, LBSF and their creditors.  First, the Settlement Agreement will result in a substantial payment to LBSF's estate that the Plan Administrator has determined, in the exercise of its business judgment, will adequately compensate LBSF's estate for the early termination value of the Swaps in light of the risks and costs of further litigation.  Second, entry into the Settlement Agreement will avoid future disputes and litigation concerning the Putnam Owned Notes.

25.     For the reasons stated above, and in the Plan Administrator's informed business judgment, the compromises set forth in the Settlement Agreement are a "fair and equitable" resolution of the parties' dispute, well within the "range of reasonableness," and are in the best interests of LBHI, LBSF, and their respective estates and creditors.   Accordingly, the Plan Administrator requests that the Settlement Agreement be approved, effective immediately upon entry of an Order granting the relief requested herein.

### The Bankruptcy Court Has Authority Pursuant to Section 105(a) of the Bankruptcy Code to Approve the Settlement Agreement

26.     The Plan Administrator also seeks approval of the Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code.  This Court has authority under the broad equitable powers of the Bankruptcy Code set forth in section 105(a) to approve the Settlement Agreement.  *See, e.g.*, *In re A.H. Robbins*, 880 F.2d 769, 776 (4th Cir. 1989) (section 105(a) authorizes the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code); *In re Joint Eastern and Southern Districts Asbestos Litigation,* 878 F. Supp. 473 (E.D.N.Y. & S.D.N.Y. 1995) and 129 B.R. 710 (E.D.N.Y. & S.D.N.Y. 1991) (holding that section 105(a) of the Bankruptcy Code authorizes the federal courts in bankruptcy cases to approve a settlement modifying distributions, obligations, and payment procedures under a trust).

13

27.     This Court has granted similar relief in these chapter 11 cases pursuant to section 105(a) of the Bankruptcy Code.  Indeed, this Court has previously granted similar relief with respect to a settlement agreement resolving other amounts distributed by the Alta 2007-1 Trustee to Putnam. *Order for Approval of Settlement Agreement Among Putnam Structured Product Funding 2003-1 Ltd., Putnam Structured Product Funding 2003-1 LLC, U.S. Bank National Association, as Successor Trustee, Lehman Brothers Special Financing Inc., and Lehman Brothers Holdings Inc.* [ECF No. 46854]; *see also Order Approving the Settlement Agreement Relating to Restructured Asset Certificates with Enhanced Returns, Series 2006-20AT Credit Default Swap Agreement and Trust Agreement* [ECF No. 49408]; *Order Approving the Settlement Agreement Relating to Exum Ridge CBO 2007-2 Credit Default Swap Agreement and Indenture* [ECF No. 48318]; *Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy Code for Approval of Partial Settlement Agreement Relating to SGS HY Credit Fund I (Exum Ridge CBO 2006-3) Swap Agreement and Indenture* [ECF No. 45451]; *Order Approving Partial Settlement Agreements Relating to Certain Credit Default Swap Agreements and Trust Agreements* [ECF No. 39624]; *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Partial Settlement Agreement Relating to Airlie CDO I, Ltd.* [ECF No. 39017]; *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Partial Settlement Agreement Relating to Pebble Creek LCDO 2007-3, Ltd.* [ECF No. 36867]; *Order Approving Settlement Agreement and Indemnity Between Lehman Brothers Special Financing Inc. and Deutsche Bank Trust Company Americas, as Trustee, Relating to Credit Default Swap Agreement* [ECF No. 30096].

14

28.     The use of the Court's equitable authority is justified and appropriate here.

First, LBSF is entitled to the Settlement Amount under the Swaps given its capacity as swap

counterparty to Alta and, as a result, payment of the Settlement Amount to LBSF is appropriate.

Second, all Noteholders that would have received a payment of Principal Proceeds under the

Putnam Trust Deed but for the Settlement Agreement, were made aware of the terms of the terms

of the Settlement Agreement prior to the filing of this Motion and have not posed any objection.

Third, any interested parties that may object to the terms of the Settlement Agreement will have

the opportunity to lodge an objection with and be heard by this Court.

### Notice

29.     No trustee has been appointed in these chapter 11 cases.  The Plan

Administrator has served notice of this Motion in accordance with the procedures set forth in the

second amended order entered on June 17, 2010, governing case management and administrative

procedures for these cases [ECF No. 9635] on (i) the U.S. Trustee; (ii) the Securities and

Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the

Southern District of New York; (v) the attorneys for Putnam; (vi) the attorneys for the Putnam

Trustee; and (vii) all parties who have requested notice in the Chapter 11 Cases.  The Plan

Administrator submits that no other or further notice need be provided.

15

30.     No previous request for the relief sought herein has been made by the Plan Administrator to this or any other Court.

WHEREFORE the Plan Administrator, on behalf of LBHI and LBSF, respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:   July 6, 2015
          New York, New York

                                        /s/ Jacqueline Marcus
                                        Richard L. Levine
                                        Jacqueline Marcus
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007

                                        *Attorneys for Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc.*

16

**Exhibit A**

Alta 2007-1 Master Agreement

**(Multicurrency-Cross Border)**



International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of 03 April, 2007

| | |
|---|---|
| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **ALTA CDO SPC for the account of the Series 2007-1 Segregated Portfolio** |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap and Derivatives Association, Inc.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| **LEHMAN BROTHERS**<br>**SPECIAL FINANCING INC.** | **ALTA CDO SPC for the account of the Series**<br>**2007-1 Segregated Portfolio** |
|---|---|

Name:                                               Name:
Title:                                                Title:
Date:                                               Date:

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td><strong>LEHMAN BROTHERS<br>SPECIAL FINANCING INC.</strong></td><td><strong>ALTA CDO SPC for the account of the Series<br>2007-1 Segregated Portfolio</strong></td></tr>
<tr><td></td><td>\Mv/</td></tr>
<tr><td>Name:<br>Title:<br>Date:</td><td>Name:   <strong>Wendy Ebanks</strong><br>Title:   Director<br>Date:</td></tr>
</table>

18

**SCHEDULE**
to the Master Agreement
dated as of 03 April, 2007

between

**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under
the laws of the State of Delaware
and

ALTA CDO SPC for the account of the Series 2007-1 Segregated Portfolio ("Party B"),
a segregated portfolio company with limited liability incorporated under
the laws of the Cayman Islands

*All capitalized terms used and not otherwise defined are given the meaning ascribed to them in the indenture, dated as of 03 April, 2007, among Party B, as Issuer, ALTA CDO LLC, as Co-Issuer and U.S. Bank National Association, as Trustee (as amended, supplemented or otherwise modified from time to time) (the "Indenture").*

Part 1. Termination Provisions

In this Agreement:-

    (a)    **"Specified Entity"** means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

    and in relation to Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

    (b)    **"Specified Transaction"** will have the meaning specified in <u>Section 14</u> of this Agreement.

    (c)    **Payments on Early Termination.**

        (i)    If an Early Termination Date is designated hereunder, Loss and Second Method shall be used to calculate any termination payment owing by either party in respect of such Early Termination Date.

        (ii)    Notwithstanding anything in the Agreement or this Schedule to the contrary, the aggregate of the termination payments owing by Party A hereunder in respect of an Early Termination Date shall not exceed the lesser of (i) the termination amount calculated hereunder with respect to Party A and (ii) the amount by which unpaid interest and principal on the outstanding Notes on the Early Termination Payment Date exceeds Collections for the Early Termination Payment Date (excluding any termination amount paid by Party A upon an early termination hereunder).

(d) The following shall be specified as an "Additional Termination Event" pursuant to Section 5(b)(v):

(i)  **Event of Default Under the Indenture.**  An Event of Default under the Indenture has occurred and is continuing and the Trustee has proceeded to liquidate the Collateral, or has proceeded to redeem the Notes prior to the Scheduled Final Payment Date, and in each case such acceleration or redemption, as applicable, is no longer capable of being rescinded or revoked.  For the purpose of this Additional Termination Event (1) subject to the last sentence of this Part 1(d)(i) the Affected Party shall be Party B, (2) all Transactions shall be Affected Transactions, and (3) any amount payable in respect of such event shall be payable on the immediately following Payment Date or the date that would have been such Payment Date if not for the litigation or redemption described above. Party A shall be the Affected Party if the Event of Default under the Indenture was directly and exclusively caused by a Failure to Pay resulting from Party A's non-payment of Fixed Amounts under the Transactions and such non-payment has not been subsequently cured by Party A.

(e)  The provisions of <u>Section 6(e)</u> (as modified by (c) above) will apply to Party A and to Party B as follows:-

| Section 5(a) | | **Party A** | **Party B** |
|---|---|---|---|
| (i) | "Failure to Pay or Deliver" | Applicable. | Applicable. |
| (ii) | "Breach of Agreement" | Not Applicable. | Not Applicable. |
| (iii) | "Credit Support Default" | Applicable. | Not Applicable. |
| (iv) | "Misrepresentation" | Not Applicable. | Not Applicable. |
| (v) | "Default under Specified Transaction" | Not Applicable. | Not Applicable. |
| (vi) | "Cross Default" | Not Applicable. | Not Applicable. |
| (vii) | "Bankruptcy" | Applicable. | Applicable. |
| (viii) | "Merger Without Assumption" | Not Applicable. | Not Applicable. |

provided that clause (2) of the **"Bankruptcy"** provision of <u>Section 5(a)(vii)</u> will not apply to Party B.

| Section 5(b) | | **Party A** | **Party B** |
|---|---|---|---|
| (i) | "Illegality" | Applicable. | Applicable. |
| (ii) | "Tax Event" | Not Applicable. | Not Applicable. |
| (iii) | "Tax Event Upon Merger" | Not Applicable. | Not Applicable. |
| (iv) | "Credit Event Upon Merger" | Not Applicable. | Not Applicable. |
| (v) | "Additional Termination Event" | Applicable. | Applicable. |

(f)  **"Termination Currency"** means United States Dollars ("<u>USD</u>").

(g)  **Failure to Pay or Deliver.**  Section 5(a)(i) is hereby amended by deleting the words "on or before the third Local Business Day after notice of such failure is given to the party" and substituting therefor "in the case of any such failure by Party A, on or before the fifth Local Business Day after notice of such failure is given to Party A, or in the case of any such failure by Party B, on or before the third Local Business Day after notice of such failure is given to Party B;"

Part 2. Tax Representations.

(A)  **Payer Tax Representations.**  For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B each make the following representations:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Section 2(e)</u>, 6(d)(ii), or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i)

-2-

the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement, and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on this clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(B)     **Payee Tax Representations.**  For the purpose of Section 3(f) of this Agreement, Party A and Party B make the following representations:

    (i)     The following representation applies to Party A:-

    Party A is a corporation organized under the laws of the State of Delaware.

    (ii)     The following representations apply to Party B:-

        (a)     Party B is treated as a corporation for U.S. federal income tax purposes.

        (b)     Party B is a "non-U.S. branch of a foreign person" for purposes of sections 1.1441-4(a)(3)(ii) and is a foreign person for purposes of section 1.6041-4(a)(4) of the U.S. Treasury Regulations.

        (c)     No payment received or to be received by Party B in connection with this Agreement will be effectively connected with a conduct of a trade or business in the United States.

        (d)     Party B is not (i) a bank that has entered into this Agreement in the ordinary course of its trade or business of making loans, as described in section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) a 10% shareholder of Party A within the meaning of Code section 871(h)(3)(B), or (iii) a controlled foreign corporation with respect to Party A within the meaning of Code section 881(c)(3)(C).

(C)     **Tax Representations in Confirmations.**  For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

Part 3. Agreement to Deliver Documents.

For the purpose of Section 4(a)(i) and Section 4(a)(ii) of this Agreement, Party A and Party B each agrees to deliver the following documents, as applicable:-

    (a)     Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered |
| --- | --- | --- |
| Party B | A correct, complete and executed U.S. Internal Revenue Service Form W-8BEN (or any successor thereto), that eliminates U.S. federal withholding and backup withholding tax on payments under this Agreement. | (i) Before the first Payment Date under this Agreement, (ii) before December 31 of each third succeeding calendar year, (iii) promptly upon reasonable demand by Party A, and (iv) promptly upon learning that any such |

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered |
| --- | --- | --- |
| | | Form previously provided by Party B has become obsolete or incorrect. |

(b)      Other documents to be delivered are:

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
| --- | --- | --- | --- |
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit A to this Schedule. | Upon execution of this Agreement. | No |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party A | A guarantee of Lehman Brothers Holdings Inc. ("Holdings") substantially in the form of Exhibit C to this Schedule. | Upon execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit B to this Schedule. | Upon execution of this Agreement. | No |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of the resolution or resolutions (the "Authorizing Resolution") of the Board of Directors or loan committee of Party B, certified by a secretary, or an assistant secretary of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by Party B to Party A) and, with respect to each Transaction not covered by a previously furnished Authorizing Resolution, within five Local Business Days of the Trade Date. | Yes |
| Party B | A copy of all reports provided by Party B to the Noteholders, or the Ratings Agencies under the Indenture. | On the date that any such report is required to be provided to either the Noteholders or S&P under the Indenture. | Yes |
| Party B | A certified copy of the Indenture and each amendment thereof. | Upon execution of this Agreement and on the date of each amendment thereof. | Yes |

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | A copy of the letter of acceptance of Party B's Process Agent. | Upon execution of this Agreement. | No |

Part 4. Miscellaneous.

(a)     **Addresses for Notices.**  For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to Party A:-

| | |
|---|---|
| Address: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Inc. |
| | Collateralized Debt Obligation |
| | 745 Seventh Avenue |
| | New York, New York 10019 |
| Attention: | Documentation Manager |
| Telephone: | (212) 526-5410 |
| Facsimile: | (212) 885-9476 |

For all purposes.

With copies to:

| | |
|---|---|
| Address: | Lehman Brothers Inc. |
| | 745 Seventh Avenue |
| | New York, New York 10019 |
| Attention: | Structured Products Transaction Management Group/ Jonathan Lai |
| Telephone: | (212) 526-0806 |
| | (212) 652-0556 |

Facsimile:

Address for notices or communications to Party B:-

| | |
|---|---|
| Address: | ALTA CDO SPC for the account of the Series 2007-1 Segregated Portfolio |
| | c/o Maples Finance Limited |
| | P.O. Box 1093GT |
| | Queensgate House |
| | South Church Street |
| | Grand Cayman, Cayman Islands |
| Attention: | The Directors – Alta CDO SPC |
| Facsimile No: | +1 (345) 945-7100 |

For all purposes.

Address for notices or communications to:

| | |
|---|---|
| Address: | Maples and Calder |
| | P.O. Box 309 GT |
| | Ugland House |
| | South Church Street |
| | Grand Cayman, Cayman Islands |

Attention:     Simon Firth
Telephone:     (345) 949-8066
Facsimile No:  (345) 949-8080

Address for notices or communications to Standard & Poor's Investments Services:

Address:       Standard & Poor's Ratings Services
               55 Water Street, 41st Floor
               New York, New York 10041-0003

Attention:     scdo_surveillance@sandp.com

(b)   **Process Agent.**  For the purpose of <u>Section 13(c)</u> of this Agreement:-

Party A appoints as its Process Agent:        Not Applicable.

Party B appoints as its Process Agent:        Corporation Service Company
                                              1133 Avenue of the Americas, Suite 1300
                                              New York, New York 10036
                                              Ref: ALTA CDO SPC for the account of the Series
                                              2007-1 Segregated Portfolio

(c)   **Offices.**  The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)   **Multibranch Party.**  For the purpose of <u>Section 10(c)</u> of this Agreement:-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)   **Calculation Agent.**  The Calculation Agent is Party A.

(f)   **Credit Support Document.**  Details of any Credit Support Document:-

In the case of Party A, a guarantee (the "Swap Guarantee") of Party A's obligations hereunder substantially in the form of <u>Exhibit C</u> attached to this Schedule.  Any amendment, modification or waiver of the Swap Guarantee shall require, prior to its effectiveness, a Rating Agency Confirmation with respect to such amendment, modification or waiver.

In the case of Party B, not applicable.

(g)   **Credit Support Provider.**

Credit Support Provider means in relation to Party A:  Holdings.

Credit Support Provider means in relation to Party B:  Not Applicable.

(h)   **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York including all matters of construction, validity and performance (including Sections 5-1401 and 5-1402 of the New York General Obligations Law but excluding all other choice-of-law and conflicts-of-law rules).

(i)   **Netting of Payments.**  Section 2(c)(ii) will not apply to any Transactions.

(j)   **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement, except that the only Affiliate of Party B shall be the Co-Issuer; <u>provided</u>, <u>however</u>, that with respect to Party A, such

-6-

definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)     **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and deleting the final paragraph thereof.

(l)     **Set-off.** Set-off does not apply to either Party A or Party B

Part 5. Other Provisions.

(a)     **Confirmation.** Each Confirmation supplements, forms part of, and will be read and construed as one with the Agreement.

(b)     **Representations.** Section 3 is hereby amended by adding the following additional subsections:

(i)     **No Agency.** It is entering into this Agreement, each Transaction, and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(ii)    **Eligible Contract Participant.** It is an "eligible contract participant" as that term is defined in the Commodity Exchange Act, as amended.

(iii)   **No Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communications (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(iv)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(v)     **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(c)     **No Bankruptcy Petition.** Party A irrevocably and unconditionally agrees that it will not, prior to the date that is one day following the payment in full of all the Notes issued pursuant to the Indenture, as applicable, and the expiration of all applicable preference periods under the laws of the United States, the Cayman Islands or any other jurisdiction relating to any such payment, acquiesce, petition or otherwise invoke or cause Party B to invoke the process of any governmental authority for the purpose of commencing or sustaining a case (whether voluntary or involuntary) against Party B under any bankruptcy, reorganization arrangement, insolvency, moratorium, liquidation or similar law or proceeding or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Party B or any substantial part of its property or ordering the winding-up or liquidation of the affairs of Party B; provided that this provision shall not restrict or prohibit Party A from joining any other person, including, without limitation, the Trustee, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings already commenced or other analogous proceedings already commenced under applicable laws. This Part 5(c) shall survive the termination of the Transaction. Notwithstanding anything herein to the contrary, the non-petition provisions contained herein shall apply with respect to the Series 2007-1 Segregated Portfolio of ALTA CDO SPC and with respect to any other series either now or hereinafter created with respect to ALTA CDO SPC.

(d) **Transfer.** Section 7 is hereby amended by: (i) adding the words "(which consent may not be unreasonably withheld)" after the words "consent" on the second line thereof, (ii) adding the words "(and notice of the transferee to)" after the word "of" on the third line thereof, (iii) adding the words "(subject to providing written notice of the transferee to the other party)" after the word "transfer" on the fourth and seventh line thereof, and (iv) deleting the words "(Subject to Section 6(b)(ii) and)" in the first line thereof. No transfer or assignment by Party A or Party B of its rights and obligations hereunder may be made unless the Rating Agency Confirmation is received with respect to such transfer and no transfer or assignment by Party A or Party B of its rights and obligations hereunder may be made unless (i) as of the date of such transfer neither the transferee nor the transferor will be required to withhold or deduct on account of any Tax from any payments under this Agreement in excess of what would have been required to be withheld or deducted in the absence of such transfer; (ii) with respect to Party A, each of the transferor and transferee will be a dealer in notional principal contracts as that term is used in U.S. Treasury Regulations Section 1.1001-4(a); and (iii) the transferring Party will be responsible for any costs or expenses (including any Stamp Tax) incurred by the Trustee or the other Party (or its agents) in connection with such transfer. Notwithstanding anything to the contrary in Section 7 of this Agreement, pursuant to Rating Agency Confirmation, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate such guarantee to be substantially the same as the guarantee of the obligations of the transferor then in effect.

(e) **Amendments to Section 9 of this Agreement.** Section 9(b) of this Agreement is hereby amended by adding the following after the word "system" in the last line thereof:

"; provided, however, notwithstanding anything to the contrary in Section 9(b) of this Agreement, that no material amendment, modification or waiver in respect of this Agreement will be effective unless the Rating Agencies shall receive prior written notice of all such amendments, modifications or waivers; provided, further, that each such amendment, modification or waiver shall require, prior to its effectiveness, the Rating Agency Confirmation with respect to such amendments, modifications or waivers.

(f) **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(g) **Indenture.** Without the providing ten (10) days' prior written notice to Party A and obtaining prior written consent of Party A, Party B will not enter into any indenture supplemental to the Indenture or any other instrument that would amend, modify or change the Indenture, if such supplemental indenture, amendment, modification or change would, in Party A's reasonable judgment, have an adverse effect on the interests of Party A hereunder or under the Indenture. Party B will furnish to Party A a copy of each proposed and each executed supplemental indenture to the Indenture and copies of any related Rating Agency Confirmation in accordance with the terms of the Indenture.

(h) **Limited Recourse.** Notwithstanding anything in this Agreement or any Confirmation hereunder to the contrary, all amounts, payable or expressed to be payable by Party B on, under or in respect of its obligations and liabilities under this Agreement and any Confirmation hereunder shall be recoverable only from and to the extent of sums in respect of, or calculated by reference to, the Collateral that are received by Party B pursuant to the terms and conditions thereof and the proceeds of any realization of enforcement of any Collateral, subject in any case to the Priority of Payments set out in the Indenture. Upon final realization of such sums and proceeds, neither Party A nor any person acting on its behalf shall be entitled to take any further steps against Party B to recover any sums due but still unpaid and all claims in respect of such sums due but still unpaid shall be extinguished. No recourse shall be had for the payment of any amounts owing in respect of this Agreement against any officer, director, employee, stockholder, preference shareholder or incorporator of Party B. This Part 5(h) shall survive the termination of the Transaction. Notwithstanding anything herein to the contrary, this provision shall apply with respect to the Collateral of the Series 2007-1 Segregated

Portfolio of ALTA CDO SPC only and not with respect to any other series either now or hereinafter created with respect to ALTA CDO SPC. Any claims not paid and extinguished with respect to any other series issued by the ALTA CDO SPC shall have no recourse with respect to the Series 2007-1 Segregated Portfolio of ALTA CDO SPC.

(i)     Reserved.

(j)     **No Gross Up.** Notwithstanding anything to the contrary in the Agreement, including Section 2(d) of the Master Agreement, no Tax shall be an Indemnifiable Tax with respect to payments made by Party A and therefore Party A shall have no obligation to pay an additional amount otherwise required under Section 2(d)(i)(4) of the Master Agreement.

(k)     **Excise Tax Resulting From Change in Law.** All references in Section 2(d) to deduction or withholding for or on account of any Tax shall include the payment of any excise tax, including any excise tax imposed on Party A as a result of a Change in Tax Law, in respect of payments under this Agreement. For avoidance of doubt, in the event that any excise tax is imposed on Party A as a result of a Change in Tax Law, any payment to which Party B is otherwise entitled under this Agreement shall be reduced by the amount of the excise tax and the excise tax shall not be an Indemnifiable Tax.

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law, treaty, rule or regulation (or in the application or interpretation of any law, treaty, rule or regulation whether by official or informal means) that occurs on or after the date on which this Transaction is entered into."

(l)     **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(m)     **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(n)     **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding (i) in the first line thereof after the word "information" the words "other than audited or unaudited financial statements or balance sheets" and (ii) in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(o)     **Non-Confidential.** Notwithstanding anything to the contrary contained in this Agreement, all persons may disclose to any and all persons, without limitations of any kind, the U.S. federal, state or local tax treatment of any Transaction, any fact that may be relevant to understanding the U.S. federal, state or local tax treatment of any Transaction, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state or local tax treatment and that may be relevant to understanding such U.S. federal, state or local tax treatment, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, and any pricing terms or other nonpublic business or financial information that is unrelated to the U.S. federal, state or local tax treatment of the Transaction to the taxpayer and is not relevant to understanding the U.S. federal, state or local tax treatment of the Transaction to the taxpayer.

(p)     **Additional Representations of Party B.** Party B represents to Party A in accordance with Section 3 of the Agreement (which representations will be deemed to be repeated by Party B at all times until termination of this Agreement) that:

(i)     **Approved Credit Swap Counterparty.** Party A is an approved Credit Swap Counterparty under the Indenture.

(ii)     **Secured Party.** Party A is a Secured Party under the Indenture.

(iii)    **Constitutional Documents.** Party B is in compliance, in all material respects, with its constitutional documents (including, but not limited to, the Indenture, as amended from time-to-time, and any and all resolutions, investment policies, guidelines, procedures or restrictions), and each Transaction contemplated hereunder is and will be an authorized and permitted transaction thereunder.

(iv)     **Third-Party Beneficiary.** Party A shall be an express third-party beneficiary of the Indenture.

(v)      **ERISA Representation.** Party B continuously represents that it is not (i) an employee benefit plan (hereinafter, an "**ERISA Plan**"), as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), subject to Title I of ERISA or a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**"), or subject to any other statute, regulation, procedure or restriction that is materially similar to Section 406 of ERISA or Section 4975 of the Code (together with ERISA Plans, "**Plans**"), (ii) a person acting on behalf of a Plan or (iii) a person any of the assets of whom constitute assets of a Plan. It will provide notice to the other party in the event that it is aware that it is in breach of any aspect of this representation or is aware that with the passing of time, giving of notice or expiry of any applicable grace period it will breach this representation.

(vi)     **Arms'-Length Transaction.** Party B acknowledges and agrees that Party A has had and will have no involvement in and, accordingly Party A accepts no responsibility for: (i) the establishment, structure, or choice of assets of Party B; (ii) the selection of any person performing services for or acting on behalf of Party B; (iii) the selection of Party A as the Counterparty; (iv) the terms of the Notes; (v) the preparation of or passing on the disclosure and other information contained in any offering circular or similar document for the Notes, the Indenture, or any other agreements or documents used by Party B or any other party in connection with the marketing and sale of the Notes; (vi) the ongoing operations and administration of Party B, including the furnishing of any information to Party B which is not specifically required under this Agreement; or (vii) any other aspect of Party B's existence.

(q)     **General Conditions.** Section 2(a)(iii) is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occurred and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(r)     **No Violation or Conflict Representation.** Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to, the Indenture, as amended, and any and all resolutions, investment policies, guidelines, procedures or restrictions)."; provided, such amendment shall be applicable only with respect to the Representations of Party B.

(s)     **Severability.** If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement; provided, however, that this severability provision shall not be applicable if any provision of Section 2, 5, 6 or 13 (or any definition or provision in Section 14 to the extent it relates to, or is used in or connection with any such Section) shall be held to be invalid or unenforceable.

-10-

(t)      **Additional Definitions.**   Section 14 is hereby amended by adding the following definitions in their appropriate alphabetical order:

"**Moody's**"  means Moody's Investor Services, Inc.

"**Ratings Agencies**" means S&P and Moody's

"**Rating Agency Confirmation**" means, with respect to any particular proposed act or omission to act hereunder, that the party acting or failing to act has consulted with each Rating Agency then providing a rating of any Class of Notes and has received from each Rating Agency a written confirmation that the proposed action or inaction would not cause such Rating Agency to downgrade or withdraw its then-current rating of any Class of Notes.

"**S&P**" means Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: _____

    Name:

    Title:

**ALTA CDO SPC, for the account of the Series 2007-1 Segregated Portfolio.**

By: _____

    Name:

    Title:

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

    Name:

    Title:

ALTA CDO SPC, for the account of the Series 2007-1 Segregated Portfolio.

By:_____

    Name:

    Title: **Wendy Ebanks**
          Director

EXHIBIT A to Schedule

FORM OF OPINION OF COUNSEL FOR PARTY A

A-1

<u>EXHIBIT B to Schedule</u>

<u>FORM OF OPINION OF COUNSEL FOR PARTY B</u>

B-1

EXHIBIT C to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

D-1

**Class A Confirmation**

DATE:        April 3, 2007

TO:           Alta CDO SPC, for the account of the Series 2007-1 Segregated Portfolio

FROM:       Lehman Brothers Special Financing Inc.

RE:          Credit Derivative Transaction

The purpose of this letter (this "**Confirmation**") is to confirm the terms and conditions of the Credit Derivative Transaction entered into between Lehman Brothers Special Financing Inc. ("**Party A**") and Alta CDO SPC, for the account of the Series 2007-1 Segregated Portfolio ("**Party B**") on the Trade Date specified below (the "**Transaction**"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1        The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions and, where so indicated in the Registry in respect of a Reference Entity, the Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (published on January 21, 2005), and solely with respect to Reference Entities JSC Gazprom and JSC Vneshtorgbank, the Additional Provisions for LPN Reference Entities (published on October 3, 2006), each as published by the International Swaps and Derivatives Association, Inc., (collectively, the "**Credit Derivatives**") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern. Capitalized terms used herein but not otherwise defined herein or in the Credit Derivatives Definitions shall have the meanings ascribed to such terms in the Indenture.

2        This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency – Cross Border) dated as of April 3, 2007, as amended and supplemented from time to time (the "**Agreement**"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

3        Party A will enter into the Transaction and exercise its rights and perform its obligations hereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of Party B, the holders of the Class A Notes or any other person.

4        Party A may or may not have a credit exposure to any Reference Entity and may or may not have exposure to any Reference Obligation(s) or the Benchmark Obligation designated by Party A in respect of any Reference Entity.

5        The parties agree and acknowledge that the Transaction to which this Confirmation relates contemplates more than one Reference Entity and multiple Credit Event Notices, and that, accordingly, there may be more than one Credit Event and more than one Cash Settlement Amount, and that the Credit Derivatives Definitions (and in particular the provisions which modify and relate to the "Termination Date") should, for the purposes of this Confirmation, be interpreted accordingly.

6        Each Reference Entity listed on the Reference Registry to this Confirmation constitutes a separate confirmation for purposes of this Confirmation. Accordingly, references herein to this Confirmation and the Reference Portfolio are to a portfolio of confirmations, each of which references a single Reference Entity.

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**
30775-00043 NY:2091709.5

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | March 13, 2007. |
| Effective Date: | April 3, 2007. |
| Scheduled Termination Date: | June 20, 2017 (adjusted in accordance with the Business Day Convention). |
| Termination Date: | (A) the Scheduled Termination Date; or (B) if the Contingency Amount with respect to the Class A Notes is greater than zero on the Scheduled Termination Date, the last Deferred Redemption Date with respect to the Class A Notes. |
| | Section 1.7 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Floating Rate Payer: | Party B (the "**Seller**") |
| Fixed Rate Payer: | Party A (the "**Buyer**") |
| Calculation Agent: | Party A |
| Business Day: | London and New York. |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Each entity specified in the reference registry established by Party A as of April 3, 2007 and attached hereto as Annex A (the "**Reference Registry**"); provided, however, that any Successor to a Reference Entity shall be identified pursuant to Section 2.2. of the Credit Derivatives Definitions, as modified herein. |

Party A shall be responsible for maintaining the Reference Registry. The Reference Registry shall contain, as to each Reference Entity, the following information:

(i)     the legal name of such Reference Entity;

(ii)    whether Restructuring applies with respect to such Reference Entity;

(iii)   its jurisdiction;

(iv)    its S&P Long-Term Rating;

(v)     its S&P Industry Group;

(vi)    its Moody's Senior Unsecured Rating;

(vii)   its Moody's Industry Category;

-2-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

(viii) the Benchmark Obligation (if any) applicable to such Reference Entity;

(ix) the coupon of the Benchmark Obligation (if any) applicable to such Reference Entity;

(x) the legal maturity date of the Benchmark Obligation (if any) applicable to such Reference Entity;

(xi) whether the Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (published on January 21, 2005) are applicable to such Reference Entity;

(xii) whether the Benchmark Obligation (if any) applicable to Reference Entity is subordinated to other obligations of such Reference Entity; and

(xiii) the Reference Entity Calculation Amount in respect of such Reference Entity.

The information contained in the Reference Registry has been obtained by Party A from the following third party sources: Bloomberg, the website maintained by the Securities and Exchange Commission and the website maintained by S&P and Moody's. While the information obtained from such sources is believed to be accurate, neither Party A nor any of its affiliates makes any representation or warranty, expressed or implied, regarding the adequacy, correctness or completeness of the information obtained from such sources. If any of the information received from such sources is incorrect, (i) the corresponding information in the Reference Registry will likewise be incorrect, and (ii) the Reference Registry shall be amended (or deemed amended) to reflect the correct information. Under no such circumstance shall Party A be required to remove (i) the relevant Reference Entity from the Reference Portfolio, or (ii) the relevant Benchmark Obligation from the Reference Registry. Neither Party A nor any of its affiliates shall be liable to Party B, any holder of Notes or any other Person for any losses, costs, expenses or potential lost profits resulting from or related to any such incorrect information obtained from such sources.

| | |
|---|---|
| Reference Portfolio: | All of the Reference Entities included in the Reference Registry on the relevant date of determination. |
| Reference Entity Calculation Amount: | The Reference Entity Calculation Amount in respect of each Reference Entity shall be the amount set forth in Annex B hereto, as adjusted from time to time in accordance with "**Adjustments**" below. |
| Class A Increase Adjustment Variable: | With respect to each Additional Issuance of the Class A Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class A Notes immediately after giving effect to such Additional Issuance, and (b) the Aggregate Outstanding Amount of the Class A Notes immediately prior to giving effect to such Additional Issuance. |
| Class A Reduction Adjustment Variable: | With respect to each Optional Reduction of the Class A Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class A Notes |

-3-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

immediately after giving effect to such Optional Reduction, and (b) the denominator of which is the Aggregate Outstanding Amount of the Class A Notes immediately prior to giving effect to such Optional Reduction.

Adjustments:

Notwithstanding anything herein to the contrary, if an Additional Issuance of the Class A Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class A Loss Threshold Amount, the Class A Loss Cap Amount and the Class A Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity Loss Amount determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class A Increase Adjustment Variable.

Notwithstanding anything to the contrary, if an Optional Reduction of the Class A Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class A Loss Threshold Amount, the Class A Loss Cap Amount and the Class A Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity Loss Amount determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class A Reduction Adjustment Variable.

Reference Obligation(s):

In respect of each Reference Entity for which a Credit Event Notice has been delivered, Party A must deliver a separate notice to Party B (with a copy to the Trustee) (each, a "**Reference Obligation Identification Notice**").    Each Reference Obligation Identification Notice must identify either (i) the obligation, if any, specified for such Reference Entity in the Reference Registry (the "**Benchmark Obligation**"), or (ii) an obligation or obligations of such Reference Entity (each of (i) and (ii), a "**Reference Obligation**").    Each obligation identified under clause (ii) must satisfy the Reference Obligation Category and the Reference Obligation Characteristics at the time of its designation. For purposes of this Confirmation, Benchmark Obligations may include obligations issued by an affiliate of the relevant Reference Entity included in the Reference Portfolio.    Benchmark Obligations may be subordinated to other obligations of the Reference Entity.

The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity may not exceed the Reference Entity Calculation Amount of such Reference Entity.

The definitions of Section 2.20 of the Credit Derivatives Definitions shall apply to each Reference Obligation as if it were a Deliverable Obligation.

Party A must deliver each Reference Obligation Identification Notice no later than the New York Business Day immediately preceding the relevant Valuation Date.

Each Reference Obligation Identification Notice must contain a description of each applicable Reference Obligation and its Reference Obligation Notional Amount that is sufficient for purposes of

-4-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

30775-00043 NY:2091709.5

determining the Final Price of such Reference Obligation pursuant to the provisions contained herein.

A Reference Obligation, other than a Benchmark Obligation which shall always be considered to be an eligible Reference Obligation, that satisfies the Reference Obligation Category and the Reference Obligation Characteristics at the time of designation will continue to be an eligible Reference Obligation even if it does not fall into the Reference Obligation Category or lacks any or all Reference Obligation Characteristics at any time thereafter.

Notwithstanding anything to the contrary, each of the obligations specified in Annex E shall be a Reference Obligation in respect of JSC Vneshtorgbank.

The provisions of Section 2.2(d) and Section 2.30 of the Definitions shall not apply to a Reference Obligation (other than a Benchmark Obligation designated by Party A).

For the purposes of the provisions of Section 2.2(d) and Section 2.30 of the Credit Derivatives Definitions, a Benchmark Obligation shall constitute a Reference Obligation under such Sections.

|  |  |
|---|---|
| Reference Obligation Notional Amount: | With respect to each Reference Obligation, the amount, expressed in U.S. dollars, specified as such in the relevant Reference Obligation Identification Notice. |
| Reference Obligation Category: | In respect of each Reference Entity, the Reference Obligation Category (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the matrix attached hereto in Annex D (the "**Credit Event Matrix**"). Each Benchmark Obligation will be deemed to satisfy the Reference Obligation Category. |
| Reference Obligation Characteristics: | In respect of each Reference Entity, the Reference Obligation Characteristics (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix. Each Benchmark Obligation will be deemed to satisfy the Reference Obligation Characteristics. |
| **Fixed Payments:** | |
| Class A Fixed Amount: | The positive difference between (A) the Class A Interest Distribution Amount relating to the immediately succeeding Payment Date or the first Distribution Date to occur (as and to the extent applicable and without duplication), and (B) an amount equal to the Class A Relevant Proportion on such Payment Date or Distribution Date of the interest due and payable with respect to the Permitted Long-Term Investment during the Accrual Period with respect to such Payment Date or Distribution Date (as applicable). |

-5-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

| | |
|---|---|
| Class A Relevant Proportion: | The proportion which the Aggregate Outstanding Amount of the Class A Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes and (ii) the Aggregate Outstanding Amount of the Class B Notes. |
| Party A Additional Payments | On each Deferred Interest Payment Date, Party A shall pay to Party B an amount equal to the Class A Deferred Interest Amount (if any) with respect to the Class A Notes. |
| Fixed Rate Payer Payment Dates: | The Business Day immediately preceding (as and to the extent applicable and without duplication) (i) each Payment Date and (ii) the first Distribution Date to occur. |
| | Section 2.10 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Collateral Requirements: | On the Effective Date, Party A shall post $91,611.11 with the Trustee (the "**Credit Swap Posted Amount**") in cash or money market instruments rated AAAm (by S&P) and Aa1 (by Moody's). |
| | The Credit Swap Posted Amount will be held by the Trustee on behalf of Party B, pursuant to the terms of the Series Indenture, until the first Distribution Date to occur (the "**Posted Amount Release Date**"). The Credit Swap Posted Amount together with any interest accrued thereon shall be released to Party A on the Posted Amount Release Date. |
| | There will be a proportional increase of the Credit Swap Posted Amount in connection with an Additional Issuance with respect to the Class A Notes. |
| | There will be a proportional reduction of the Credit Swap Posted Amount in connection with (i) an Optional Reduction of the Class A Notes, and (ii) any reduction in the Aggregate Outstanding Amount of the Class A Notes following the determination of a Cash Settlement Amount hereunder. An amount equal to such reduction shall be released to Party A on the date of such Optional Reduction or the date on which such Cash Settlement Amount is determined. |
| | Neither Party B nor the Trustee may take any actions with respect to the Credit Swap Posted Amount (or any interest earned thereon) unless Party A fails to pay to Party B any amounts owed to Party B under this Transaction (a "**Failure to Fund**"). Upon a Failure to Fund, Party B may exercise its remedies under the Agreement, including liquidating the Credit Swap Posted Amount. Party B shall apply the proceeds of any such liquidation toward Interest Collections for distribution in accordance with the Priority of Payments; *provided that* any liquidation proceeds in excess of the amounts owed by Party A shall be paid by Party B to Party A and shall not be available to make any payments in respect of the Notes. |

**Floating Payment:**

Floating Rate Payer

-6-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Calculation Amount:

In respect of each Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, the Reference Entity Calculation Amount of such Reference Entity.

**Terms relating to Settlement:**

Conditions to Settlement:

In respect of each Reference Entity:

Credit Event Notice

Notifying Party:  Buyer

Notice of Publicly Available Information:  Applicable

For the avoidance of doubt, the parties agree that the "Conditions to Settlement" may be satisfied more than once in respect of this Transaction, but only once with respect to any Reference Entity, except pursuant to Section 3.9 of the Credit Derivatives Definitions, when applicable and as modified herein.

The Conditions to Settlement with respect to a Reference Entity may be satisfied on any day during the period from (and including) the Effective Date through (and including) the end of the Notice Delivery Period.

A copy of each Credit Event Notice shall be sent by Party A to the Rating Agencies promptly following the delivery thereof to the Issuer.

Credit Events:

In respect of each Reference Entity, the Credit Events (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix.  The Credit Events may include one or more of the following:  (i) Bankruptcy, (ii) Failure to Pay, (iii) Obligation Acceleration, (iv) Repudiation/Moratorium, and (v) Restructuring (if specified as applicable in the Reference Registry).

Obligation(s):

Obligation Category:

In respect of each Reference Entity, the Obligation Category (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix.  Each Benchmark Obligation will be deemed to satisfy the Obligation Category.

Obligation Characteristics:

In respect of each Reference Entity, the Obligation Characteristics (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix.  Each Benchmark Obligation will be deemed to satisfy the Obligation Characteristics.

**Settlement Terms:**

Settlement Method:

Cash Settlement, as modified herein

Terms Relating
  to Cash Settlement:

-7-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Valuation Date:

The provisions of Sections 7.7(a) and (b) of the Credit Derivatives Definitions shall not apply to this Transaction and are replaced with the following:

"Valuation Date" means any New York Business Day designated by the Calculation Agent between (and including) the 30th and the 120th New York Business Day following the relevant Event Determination Date.

If the aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity does not exceed $20,000,000, Single Valuation Date (as defined in Section 7.8(a) of the Credit Derivatives Definitions); otherwise Multiple Valuation Dates (as defined in Section 7.8(b) of the Credit Derivatives Definitions). The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A shall not be less than $1,000,000. If Multiple Valuation Dates applies, the total number of Valuation Dates shall be equal to the quotient of (a) the Reference Entity Calculation Amount and (b) $20,000,000. For the avoidance of doubt, the aggregate of the Reference Obligation Notional Amounts in respect of Reference Obligations designated by Party A shall not exceed $20,000,000 on any Valuation Date.

The Calculation Agent shall attempt to obtain Full Quotations with respect to the Valuation Date from five or more Independent Dealers. If the Calculation Agent is unable to obtain two or more Full Quotations on the Valuation Date from Independent Dealers, then on the 7th New York Business Day following the Valuation Date the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers and, if two or more Full Quotations are not available on such day from Independent Dealers, then on the 15th New York Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers.

For purposes of obtaining Full Quotations from Independent Dealers on the 7th New York Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain two or more Full Quotations from Independent Dealers that were not solicited on the Valuation Date (and, if the Calculation Agent elects to obtain Full Quotations from only five Independent Dealers on such day, such new Independent Dealers shall replace those Independent Dealers (if any) who did not submit Full Quotations on the Valuation Date).

If Full Quotations have been requested from the requisite number of Independent Dealers on the Valuation Date or any other applicable day, the Calculation Agent shall also be permitted to obtain Full Quotations from Party A and its affiliates on such date or day.

If multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Calculation Agent shall attempt to obtain Full Quotations on the Valuation Date and each applicable date

-8-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

thereafter for the Reference Obligations as a whole (rather than the individual components).

If two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th New York Business Day following the Valuation Date, then the Calculation Agent must select an Independent Dealer to determine the Independently Estimated Price within five (5) New York Business Days after such day. The Independently Estimated Price must be determined by such Independent Dealer within ten (10) New York Business Days after such day.

Notwithstanding anything herein to the contrary, if the Valuation Date or any other date on which the Calculation Agent is required to attempt to obtain Full Quotations is not also a Business Day, the Calculation Agent shall request Full Quotations on the next following Business Day.

| | |
|---|---|
| Valuation Time: | Any time during the hours that Dealers customarily quote prices for the relevant Reference Obligation(s) |
| Quotation Method: | Bid |
| Quotation Amount: | (A) the Reference Obligation Notional Amount of the relevant Reference Obligation (as specified in the related Reference Obligation Identification Notice); or |
| | (B) if multiple Reference Obligations of such Reference Entity are specified in the related Reference Obligation Identification Notice, the aggregate of the Reference Obligation Notional Amounts of such Reference Obligations (as specified in the related Reference Obligation Identification Notice). |
| Quotations: | Exclude Accrued Interest |
| Valuation Method: | If Single Valuation Date applies, Highest. |
| | If Multiple Valuation Dates applies, weighted average of the Highest. |
| | Section 7.5(b)(ii) of the Credit Derivatives Definitions is hereby amended by inserting the word "Full" before the word "Quotation". |
| Dealers: | Citigroup Global Markets Inc., JP Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Credit Suisse First Boston Inc., Deutsche Bank, AG, Bear Stearns & Co. Inc., Prudential Securities Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co. and Salomon Smith Barney Inc., Lehman Brothers International (Europe), UBS AG, Dresdner Bank AG, and any affiliate thereof. Additional dealers may be selected by the Calculation Agent from time to time. |
| Independent Dealers: | Any Dealer that is not affiliated with any other Dealer; *provided that* Party A and its affiliates shall not be considered Independent Dealers. |
| Final Price: | |

-9-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

(a)    If Single Valuation Date applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent Dealers on the Valuation Date or any other applicable day, the Final Price shall be the Highest Full Quotation (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such date or day;

(b)    if Multiple Valuation Dates applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent Dealers on each Valuation Date or other applicable days, the Final Price shall be the weighted average of the Highest Full Quotations (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such Valuation Dates or such other days; and

(c)    if two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th New York Business Day following the Valuation Date, then the Final Price shall be the Independently Estimated Price.

The first sentence of Section 7.4 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| Independently Estimated Price: | In respect of the relevant Reference Obligation, a price (expressed as a percentage rounded to four decimal places, exclusive of accrued interest) determined by any Independent Dealer selected by the Calculation Agent on such basis as the Independent Dealer considers fair and reasonable under the circumstances; *provided that* if multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Independently Estimated Price shall be the price for the Reference Obligations in the aggregate (rather than the individual components). |
| Settlement Currency: | The lawful currency of the United States of America ("USD" or "$" or "US$"). |
| Reference Entity Loss Amount: | In respect of each Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, an amount equal to the greater of (i) the product of (A) the Reference Price *minus* the Final Price and (B) the Reference Entity Calculation Amount with respect to such Reference Entity (or, if such Credit Event is Restructuring, the Exercise Amount specified in the Credit Event Notice with respect to such Reference Entity), and (ii) zero, as adjusted from time to time in accordance with **"Adjustments"** above. |
| Final Valuation Notice: | In respect of a Credit Event for which the Conditions to Settlement have been satisfied, the Calculation Agent shall provide written notification to Party B and the Trustee of the Final Price and the related Reference Entity Loss Amount no later than the earlier of (i) three (3) New York Business Days following the determination of such Final Price, and (ii) the first Distribution Date to occur, in each case, as |

-10-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

evidenced by the Trustee's prompt written acknowledgment of receipt thereof.

Each Final Valuation Notice shall identify the Reference Obligation(s) used and include a list of the Full Quotations obtained (including the date the Full Quotation was obtained but not the identity of any of the Dealers).

Each Final Valuation Notice shall include a written computation in reasonable detail showing the Calculation Agent's calculation of (i) the Final Price and the related Reference Entity Loss Amount, (ii) the Class A Aggregate Loss Amount on the date of delivery of such Final Valuation Notice (increased to reflect such Reference Entity Loss Amount), and (iii) the relevant Class A Cash Settlement Amount (after giving effect to the increase in Aggregate Loss Amount as provided in clause (ii) above).

The Final Valuation Notice shall include a representation and warranty that the Full Quotations were obtained (a) consistent with the terms of this Confirmation, (b) on the applicable Valuation Date or day, and (c) in respect of the Reference Obligation(s) specified in the related Reference Obligation Identification Notice.

| | |
|---|---|
| Class A Aggregate Loss Amount: | On the date on which a Final Valuation Notice is delivered to Party B, the sum of (x) the Reference Entity Loss Amount specified in such Final Valuation Notice, *plus* (y) the aggregate of the Reference Entity Loss Amounts specified in prior Final Valuation Notices which were delivered to Party B.  On the Effective Date, the Class A Aggregate Loss Amount shall be zero. |
| Class A Loss Threshold Amount: | $80,800,000, as adjusted from time to time in accordance with "**Adjustments**" above. |
| Class A Loss Cap Amount: | $100,800,000 as adjusted from time to time in accordance with "**Adjustments**" above. |
| Class A Cash Settlement Amount: | On the date on which a Final Valuation Notice which relates to the Class A Notes is delivered to Party B, an amount equal to: |

(i)    if the Class A Aggregate Loss Amount on such date is less than or equal to the Class A Loss Threshold Amount, zero;

(ii)   if the Class A Aggregate Loss Amount on such date is greater than the Class A Loss Threshold Amount but less than the sum of the Class A Loss Threshold Amount and the Class A Loss Cap Amount, (A) the Class A Aggregate Loss Amount *minus* (B) the sum of (x) the Class A Loss Threshold Amount and (y) the aggregate of any Class A Cash Settlement Amounts determined prior to such date of delivery; and

(iii)  if the Class A Aggregate Loss Amount on such date is greater than or equal to the sum of the Class A Loss Threshold Amount and the Class A Loss Cap Amount, (A) the Class A Loss Cap Amount *minus* (B) the aggregate of any Class A Cash Settlement Amounts determined prior to such date of delivery.

-11-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

| Actions With Respect to<br>Class A Cash Settlement Amounts: | On the date on which a Class A Cash Settlement Amount is determined, the Aggregate Outstanding Amount of the Class A Notes shall be reduced by an amount equal to such Class A Cash Settlement Amount until the Aggregate Outstanding Amount of the Class A Notes is reduced to zero. |
|---|---|

Class A Cash Settlement Date:    The Scheduled Termination Date and each Deferred Redemption Date.

On the Scheduled Termination Date, Party B shall pay to Party A an amount equal to the sum of the aggregate of the Class A Cash Settlement Amounts (if any) that have been determined on or prior to the Scheduled Termination Date and on each Deferred Redemption Date occurring after the Scheduled Termination Date, Party B shall pay to Party A an amount equal to the aggregate of the Class A Cash Settlement Amounts (if any) that have been determined in the period from (but excluding) the immediately preceding Deferred Redemption Date, or in the case of the first Deferred Redemption Date to occur, the Scheduled Termination Date to (and including) such Deferred Redemption Date (each such amount, the "**Class A Credit Protection Payment Amount**").

The provisions of Section 7.2 of the Credit Derivatives Definitions shall not apply to this Transaction.

**Additional Terms:**

Modifications to Certain
Defined Terms
and Provisions Related
to Determinations of
a Successor:                In respect of this Transaction:

(i)     Sections 2.2(a)(i) and (ii) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for the entire Credit Derivative Transaction" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(ii)    Sections 2.2(a)(iii) and (iv) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for a New Credit Derivative Transaction determined in accordance with the provisions of Section 2.2(e)" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(iii)   Section 2.2(d) of the Credit Derivatives Definitions shall be amended by:

(a)   the deletion from sub-section (i) of the words "Credit Derivative Transaction" and their replacement with the words "Reference Entity";

-12-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

(b) the insertion in sub-section (iii) of the words "specified in relation to the relevant Reference Entity" after the words "the Reference Obligation" ; and

(c) the deletion following sub-section (iii) of the words "Credit Derivative Transaction" and their replacement with the word "Successor";

(iv) Section 2.2(e) of the Credit Derivatives Definitions shall be replaced in its entirety by the following: "Where, pursuant to Section 2.2 (a) above, one or more Successors have been identified in relation to a particular Reference Entity:"

(a) each such Successor will be a Reference Entity (a "Successor Reference Entity") for the purposes of this Credit Derivative Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(b) the Reference Entity Calculation Amount in respect of each such Successor Reference Entity shall be the Reference Entity Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities."

|  |  |
|---|---|
| Merger of Reference Entity and Seller: | Section 2.31 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Modifications to Definition of Not Subordinated: | In respect of this Transaction, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be amended by the insertion of (a) the words "of the relevant Reference Entity" immediately after the words "most senior Reference Obligation" in the second line thereof; (b) the words "with respect to such Reference Entity" immediately after the words "Reference Obligation is specified" in the third line thereof; and (c) the word "relevant" immediately before the words "Reference Entity" in the fifth line thereof. |

If (A) a Benchmark Obligation is specified in the Reference Registry, (B) a Credit Event occurs with respect to a Reference Entity, and (C) the Reference Obligation(s) identified by Party A in the applicable Reference Obligation Identification Notice is <u>not</u> the Benchmark Obligation of such Reference Entity, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be further amended by deleting the words "the most senior Reference Obligation" in the second line thereof and replacing such words with "the Benchmark Obligation of the relevant Reference Entity".

|  |  |
|---|---|
| Modifications to Certain Defined Terms and Provisions Related to Determinations in respect of Restructuring: | In respect of this Transaction, Section 3.9 of the Credit Derivatives Definitions shall be deleted in its entirety and replaced by the following |

-13-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

language: "Upon the occurrence of a Restructuring Credit Event with respect to a Reference Entity during the Term of the Credit Derivative Transaction:

(a) the Notifying Party may deliver multiple Credit Event Notices with respect to such Reference Entity, each such Credit Event Notice setting forth the amount of the Reference Entity Calculation Amount for such Reference Entity to which such Credit Event Notice applies (the "Exercise Amount");

(b) if the Notifying Party has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the then Reference Entity Calculation Amount for such Reference Entity (after taking into account any previous Exercise Amounts in relation to such Reference Entity), upon satisfaction of the Conditions to Settlement with respect to the Credit Event specified in such Credit Event Notice, settlement will occur in accordance with the applicable Settlement Method as if the Reference Entity Calculation Amount were the Exercise Amount with respect to such Reference Entity, and upon satisfaction of such Conditions to Settlement, without prejudice to the foregoing provisions of this paragraph, the Reference Entity Calculation Amount will be an amount equal to the Reference Entity Calculation Amount outstanding prior to such Credit Event Notice *minus* the Exercise Amount to which the current Credit Event Notice relates;

(c) the Exercise Amount in connection with any Credit Event Notice describing a Credit Event in relation to a Reference Entity other than a Restructuring must be equal to the then outstanding Reference Entity Calculation Amount for such Reference Entity (and not a portion thereof); and

(d) the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount that is at least 1,000,000 units of the Settlement Currency or an integral multiple thereof or an amount equal to the Reference Entity Calculation Amount less the sum of each prior Exercise Amount (if any) with respect to such Reference Entity."

**Amendment to Section 9.1 of the Credit Derivatives Definitions:**

Additional Representations:                Section 9.1 of the Credit Derivatives Definitions is hereby amended by adding the following additional representations to such Section:

"(c) Buyer and Seller shall each be deemed to represent to the other party on the Trade Date that:

(i)    it is duly authorized to enter into this Transaction.

-14-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

(ii) it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom.

(iii) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

(iv) it is acting for its own account and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. It has not received from the other party any assurance or guarantee as to the expected results of the Transaction.

(v) it is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

(vi) it is capable of assuming, and assumes, the financial and other risks of the Transaction.

(vii) the other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

(viii) it is acting as principal in respect of this Confirmation and the Transaction and not as agent or in any other capacity, fiduciary or otherwise.

(ix) that upon due execution and delivery of this Confirmation, such Confirmation shall constitute its legal, valid and binding obligation, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or in law)."

**Interpretation;**
   **No Need to Suffer a Loss:**

Interpretation:                         Each reference to the singular shall include the plural and vice versa.

-15-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

| No Need to Suffer a Loss: | Neither Party A nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by Party B with respect to this Transaction are not conditional on Party A (or any of its affiliates) sustaining or being exposed to a risk of loss. The payments to be made by Party B with respect to this Transaction are due from Party B whether or not Party A (or any of its affiliates) actually suffers a loss. |
| --- | --- |
| Additional Provisions: | See Annex C attached hereto for additional provisions that apply to this Transaction. |

**Certain Additional Defined Terms:**

| Class A Notes: | $20,000,000 Notes issued by Party B and the Co-Issuer under the Indenture. |
| --- | --- |
| Co-Issuer: | Alta CDO LLC. |
| Indenture: | The Series Indenture and the Standard Terms, collectively. |
| New York Business Day: | A day on which commercial banks and foreign exchange markets settle payments in The City of New York. |
| Person: | An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof. |
| Series Indenture: | The Series Indenture, dated as of April 3, 2007, among Party B, the Co-Issuer and the Trustee, which supplements and incorporates the Standard Terms. |
| Standard Terms: | The Standard Terms for Indentures, dated as of April 3, 2007. |

**Notice and Account Details:**

| Telephone and Facsimile Numbers and Contact Details for Notices: | |
| --- | --- |
| Party A: | Lehman Brothers Special Financing Inc. Telephone Number: (212) 526-5410 Facsimile Number: (646) 83402734 Attn: Eric Del Monaco |
| | With a copy of all notices to: |
| | Transaction Management Telephone Number: 212-526-0806 Facsimile Number: 212-652-0556 Attn: Jonathan Lai |

-16-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

30775-00043 NY:2091709.5

Party B:                           Alta CDO SPC, for the Account of the Series 2007-1 Segregated
                                   Portfolio
                                   c/o Maples Finance Limited
                                   P.O. Box 1093GT
                                   Queensgate House
                                   South Church Street
                                   Grand Cayman, Cayman Islands
                                   Facsimile Number: (345) 945-7100
                                   Attn: The Directors

                                   With a copy of all notices to:

                                   U.S. Bank National Association, as Trustee
                                   1 Federal Street, 3rd Floor
                                   Mail Station EX-MA-FED
                                   Boston, Massachusetts 02110
                                   Telephone Number: (617) 603-6479/6480
                                   Facsimile Number: (503) 258-5975
                                   Attn: Corporate Trust Services/CDO Administration

**Account Details:**

        Payments to Party A

        Account for payments:      Lehman Brothers Inc. (SLHIUS3X)
                                   with further credit to Lehman Brothers Special Financing
                                   (SLHIUS3S)
                                   The Chase Manhattan Bank, New York
                                   A/C Lehman Brothers Special Financing
                                   A/C # 066-143-543

        Payments to Party B

        Account for payments:      U.S. Bank National Association
                                   Minneapolis, MN
                                   ABA # 091-000-022
                                   DDA # 173103321464
                                   Account # 112046-201
                                   Name: Alta 2007-1 Interest Collections Payment Account

-17-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of
a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular
circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and
does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
    Name:
    Title:

Confirmed as of the date first written:

ALTA CDO SPC, for the account of the
SERIES 2007-1 SEGREGATED PORTFOLIO

By:_____
    Name:
    Title:

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name:

Title:

Confirmed as of the date first written:

ALTA CDO SPC, for the account of the
SERIES 2007-1 SEGREGATED PORTFOLIO

By:_____

Name:

Title:          **Wendy Ebanks**
                Director

Alta – Class A Confirmation

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

## LEHMAN BROTHERS

### ANNEX A

| Reference Entity | Restructuring | Jurisdiction | Reference Entity Calculation Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|---|
| 3M Company | Applicable | North America | 18,867,925 | Conglomerates | Diversified/Conglomerate Manufacturing | US604059AE52 | 6.38% | 2/15/2028 | | |
| AKZO Nobel N.V. | Applicable | Europe | 18,867,925 | Chemical/Plastics | Chemicals, Plastics and Rubber | XS0170265341 | 4.25% | 6/14/2011 | | |
| Ambac Assurance Corporation | Applicable | North America | 18,867,925 | Insurance | Insurance | XS0124212738 | 5.90% | 2/22/2021 | Applicable | |
| American International Group, Inc. | Applicable | North America | 18,867,925 | Insurance | Insurance | US026874AP25 | 0.00% | 11/9/2031 | Applicable | |
| Anheuser-Busch Companies, Inc. | Applicable | North America | 18,867,925 | Beverage and Tobacco | Beverage, Food and Tobacco | US03522QAC96 | 5.63% | 10/1/2010 | | |
| AT&T Inc. | Applicable | North America | 18,867,925 | Telecommunications/cellular communications | Telecommunications | US78387GAK94 | 5.88% | 8/15/2012 | | |
| Alinta Ltd. | Applicable | Australia | 18,867,925 | Utilities | Utilities | USQ09680AR24 | 5.30% | 9/25/2015 | | |
| Avon Products, Inc. | Applicable | North America | 18,867,925 | Cosmetics/toiletries | Personal and Non Durable Consumer Products (Manufacturing Only) | US054303AM47 | 7.15% | 11/15/2009 | | |
| Bank of America Corporation | Applicable | North America | 18,867,925 | Financial Intermediaries | Banking | US060505AG97 | 7.40% | 1/15/2011 | | Subordinate |
| Berkshire Hathaway Inc. | Applicable | North America | 18,867,925 | Conglomerates | Insurance | US084664AD30 | 4.63% | 10/15/2013 | Applicable | |
| BRUNSWICK CORPORATION | Applicable | North America | 18,867,925 | Leisure goods/activities/movies | Leisure, Amusement, Entertainment | US117043AG45 | 7.13% | 8/1/2027 | | |
| Cargill, Incorporated | Applicable | North America | 18,867,925 | Farming/agriculture | Farming and Agriculture | US141781AC86 | 7.38% | 10/1/2025 | | |
| CenturyTel, Inc. | Applicable | North America | 18,867,925 | Telecommunications/cellular communications | Telecommunications | US156700AG13 | 7.88% | 8/15/2012 | | |
| CIT Group Inc. | Applicable | North America | 18,867,925 | Financial Intermediaries | Banking | US125581AB41 | 7.75% | 4/2/2012 | | |
| Citigroup Inc. | Applicable | North America | 18,867,925 | Financial Intermediaries | Banking | US172967BC45 | 6.50% | 1/18/2011 | | |
| Clariant AG | Applicable | Europe | 18,867,925 | Chemical/Plastics | Chemicals, Plastics and Rubber | CH0010519475 | 4.25% | 3/15/2008 | | |
| Computer Sciences Corporation | Applicable | North America | 18,867,925 | Business Equipment and Services | Electronics | US205363AE42 | 7.38% | 6/15/2011 | | |
| Cooperatieve Centrale Raffeisen-Boerenleenbank B.A. | Applicable | Europe | 18,867,925 | Financial Intermediaries | Banking | XS0075088913 | 6.00% | 4/15/2009 | | |
| Costco Wholesale Corporation | Applicable | North America | 18,867,925 | Retailers (except food and drug) | Retail Stores | US22160KAA34 | 5.50% | 3/15/2007 | | |
| CSR LIMITED | Applicable | Australia | 18,867,925 | Building and development | Buildings and Real Estate | AU300CSRL019 | 6.00% | 3/17/2009 | | |
| Darden Restaurants, Inc. | Applicable | North America | 18,867,925 | Food Service | Personal, Food and Miscellaneous Services | US237194AB19 | 7.13% | 2/1/2016 | | |
| DBS BANK LTD. | Applicable | Singapore | 18,867,925 | Financial Intermediaries | Banking | USY20337AJ30 | 7.13% | 5/15/2011 | | Subordinate |
| Dell Inc. | Applicable | North America | 18,867,925 | Electronics/electric | Electronics | US247025AD11 | 6.55% | 4/15/2008 | | |

| Reference Entity | Restructuring | Jurisdiction | Reference Entity Calculation Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|---|
| European Aeronautic Defence and Space Company EADS N.V. | Applicable | Europe | 18,867,925 | Aerospace and Defense | Aerospace and Defense | XS0163822488 | 4.63% | 3/3/2010 | | |
| Exxon Mobil Corporation | Applicable | North America | 18,867,925 | Oil and Gas | Oil and Gas | US607059AT90 | 8.63% | 8/15/2021 | | |
| Federal Home Loan Mortgage Corporation | Applicable | North America | 18,867,925 | U.S. Agency (Explicitly Guaranteed) | Sovereign | US3134A4EW03 | 5.88% | 3/21/2011 | | Subordinate |
| Federal National Mortgage Association | Applicable | North America | 18,867,925 | U.S. Agency (Explicitly Guaranteed) | Sovereign | US31359MNU35 | 5.25% | 8/1/2012 | | Subordinate |
| Federal Republic of Germany | Applicable | Europe | 18,867,925 | Sovereign | Sovereign | DE0001134468 | 6.00% | 6/20/2016 | | |
| Financial Security Assurance Inc | Applicable | North America | 18,867,925 | Insurance | Insurance | XS0112914907 | 6.11% | 6/29/2015 | Applicable | |
| FIRST DATA CORPORATION | Applicable | North America | 18,867,925 | Business Equipment and Services | Electronics | US319963AF10 | 5.63% | 11/1/2011 | | |
| Gaz de France (G.D.F.), Service National | Applicable | Europe | 18,867,925 | Utilities | Utilities | FR0000472334 | 5.13% | 2/19/2018 | | |
| GAZPROM | Applicable | Emerging European Corporate | 18,867,925 | Oil and Gas | Oil and Gas | XS0146655104 | 9.13% | 4/25/2007 | | |
| General Electric Capital Corporation | Applicable | North America | 18,867,925 | Conglomerates | Banking | US36962GYY42 | 6.00% | 6/15/2012 | | |
| GlobalSantaFe Corporation | Applicable | North America | 18,867,925 | Oil and Gas | Oil and Gas | US37943TAB44 | 5.00% | 2/15/2013 | | |
| GUS PLC | Applicable | Europe | 18,867,925 | Retailers (except food and drug) | Retail Stores | XS0099323999 | 6.38% | 7/16/2009 | | |
| HSBC Finance Corporation | Applicable | North America | 18,867,925 | Financial Intermediaries | Banking | US441812JY13 | 7.00% | 5/15/2012 | | |
| ING Bank N.V. | Applicable | Europe | 18,867,925 | Financial Intermediaries | Banking | NL0000113140 | 5.25% | 1/4/2013 | | Subordinate |
| Ingersoll-Rand Company | Applicable | North America | 18,867,925 | Industrial Equipment | Machinery (Non-Agriculture, Non-Construction, Non-Electronic) | US456866AG74 | 9.00% | 8/15/2021 | | |
| ISLANDSBANKI HF | Applicable | Europe | 18,867,925 | Financial Intermediaries | Banking | XS0210555578 | 3.92% | 1/27/2010 | | |
| ITALIAN REPUBLIC | Applicable | Europe | 18,867,925 | Sovereign | Sovereign | US465410AH18 | 6.88% | 9/27/2023 | | |
| Johnson & Johnson | Applicable | North America | 18,867,925 | Drugs | Healthcare, Education and Childcare | US478160AM65 | 3.80% | 5/15/2013 | | |
| JPMorgan Chase & Co. | Applicable | North America | 18,867,925 | Financial Intermediaries | Banking | US46625HCE80 | 4.75% | 3/1/2015 | | |
| Kaupthing banki hf. | Applicable | Europe | 18,867,925 | Financial Intermediaries | Banking | XS0206352824 | 5.51% | 12/1/2009 | | |
| KELDA GROUP PLC | Applicable | Europe | 18,867,925 | Utilities | Utilities | XS0109437441 | 6.63% | 4/17/2031 | | |
| Kimberly-Clark Corporation | Applicable | North America | 18,867,925 | Cosmetics/toiletries | Personal and Non Durable Consumer Products (Manufacturing Only) | US494368AQ68 | 6.88% | 2/15/2014 | | |
| Kingdom of Thailand | Applicable | Asia Sovereign | 18,867,925 | Sovereign | Sovereign | US88322KAC53 | 7.75% | 4/15/2007 | | |

| Reference Entity | Restructuring | Jurisdiction | Reference Entity Calculation Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|---|
| Koninklijke DSM N.V. | Applicable | Europe | 18,867,925 | Chemical/Plastics | Chemicals, Plastics and Rubber | XS0235117891 | 4.00% | 11/10/2015 | | |
| Liz Claiborne, Inc. | Applicable | North America | 18,867,925 | Clothing/Textiles | Textiles and Leather | XS0260255160 | 5.00% | 7/8/2013 | | |
| LLOYDS TSB BANK PLC. | Applicable | Europe | 18,867,925 | Financial Intermediaries | Banking | XS0146601272 | 5.07% | 2/7/2007 | | |
| MBIA Insurance Corporation | Applicable | North America | 18,867,925 | Insurance | Insurance | US55266MCH51 | 5.41% | 10/6/2010 | Applicable | |
| Merrill Lynch & Co., Inc. | Applicable | North America | 18,867,925 | Brokers/Dealers/Investment houses | Finance | US590188JP48 | 6.00% | 2/17/2009 | | |
| MGIC Investment Corporation | Applicable | North America | 18,867,925 | Insurance | Insurance | US552845AF69 | 6.00% | 3/15/2007 | Applicable | |
| Morgan Stanley | Applicable | North America | 18,867,925 | Brokers/Dealers/Investment houses | Finance | US617446HC69 | 6.60% | 4/1/2012 | | |
| Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen | Applicable | Europe | 18,867,925 | Insurance | Insurance | XS0166965797 | 6.75% | 6/21/2023 | Applicable | Subordinate |
| Nabors Industries, Inc. | Applicable | North America | 18,867,925 | Oil and Gas | Oil and Gas | US629568AF37 | 0.00% | 2/5/2021 | | |
| Nestle S.A. | Applicable | Europe | 18,867,925 | Food Products | Beverage, Food and Tobacco | XS0144994232 | 4.75% | 9/25/2007 | | |
| NEXT PLC | Applicable | Europe | 18,867,925 | Retailers (except food and drug) | Retail Stores | XS0169287124 | 5.25% | 9/30/2013 | | |
| Novartis AG | Applicable | Europe | 18,867,925 | Drugs | Healthcare, Education and Childcare | XS0158284801 | 3.75% | 12/6/2007 | | |
| NTT DoCoMo, Inc. | Applicable | Japan | 18,867,925 | Telecommunications/cellular communications | Telecommunications | JP316565A221 | 1.64% | 12/20/2011 | | |
| NUCOR CORPORATION | Applicable | North America | 18,867,925 | Steel | Mining, Steel, Iron and Non Precious Metals | US670346AC90 | 4.88% | 10/1/2012 | | |
| PEARSON plc | Applicable | Europe | 18,867,925 | Publishing | Printing and Publishing | XS0102793642 | 7.00% | 10/27/2014 | | |
| Pfizer Inc. | Applicable | North America | 18,867,925 | Drugs | Healthcare, Education and Childcare | US717081AQ68 | 4.65% | 3/1/2018 | | |
| Pitney Bowes Inc. | Applicable | North America | 18,867,925 | Business Equipment and Services | Home and Office Furnishings, Housewares and Durable Consumer Products | US724479AF75 | 4.63% | 10/1/2012 | | |
| PPG Industries, Inc. | Applicable | North America | 18,867,925 | Chemical/Plastics | Chemicals, Plastics and Rubber | US693506AY35 | 7.05% | 8/15/2009 | | |
| R.R. Donnelley & Sons Company | Applicable | North America | 18,867,925 | Publishing | Printing and Publishing | US257867AM36 | 4.95% | 4/1/2014 | | |
| Radian Group Inc. | Applicable | North America | 18,867,925 | Insurance | Insurance | US750236AB78 | 7.75% | 6/1/2011 | Applicable | |
| Republic of Hungary | Applicable | Emerging European & Middle Eastern Sovereign | 18,867,925 | Sovereign | Sovereign | US633712AG90 | 8.88% | 11/1/2013 | | |

| Reference Entity | Restructuring | Jurisdiction | Reference Entity Calculation Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|---|
| REUTERS GROUP PLC | Applicable | Europe | 18,867,925 | Business Equipment and Services | Printing and Publishing | XS0180277393 | 4.63% | 11/19/2010 | | |
| Ryder System, Inc. | Applicable | North America | 18,867,925 | Equipment leasing | Cargo Transport | US783549AZ16 | 6.95% | 12/1/2025 | | |
| Sara Lee Corporation | Applicable | North America | 18,867,925 | Food Products | Beverage, Food and Tobacco | US803111AM56 | 6.13% | 11/1/2032 | | |
| Siemens Aktiengesellschaft | Applicable | Europe | 18,867,925 | Conglomerates | Electronics | XS0131224155 | 5.75% | 7/4/2011 | | |
| Singapore Power Limited | Applicable | Singapore | 18,867,925 | Utilities | Utilities | SG5184892288 | 4.05% | 5/4/2013 | | |
| SINGAPORE TELECOMMUNICATIONS LIMITED | Applicable | Singapore | 18,867,925 | Telecommunications/cellular communications | Telecommunications | USY79985AC46 | 6.38% | 12/1/2011 | | |
| SINGTEL OPTUS PTY LIMITED | Applicable | Australia | 18,867,925 | Telecommunications/cellular communications | Telecommunications | USQ19460AC00 | 8.00% | 6/22/2010 | | |
| SLM Corporation | Applicable | North America | 18,867,925 | Financial Intermediaries | Banking | US78442FAB40 | 5.13% | 8/27/2012 | | |
| SOCIETE GENERALE | Applicable | Europe | 18,867,925 | Financial Intermediaries | Banking | XS0110673950 | 6.63% | 4/27/2015 | | Subordinate |
| Southwest Airlines Co. | Applicable | North America | 18,867,925 | Air Transport | Personal Transportation | US844741AV08 | 6.50% | 3/1/2012 | | |
| Spectra Energy Capital, LLC | Applicable | North America | 18,867,925 | Oil and Gas | Utilities | US26439RAJ59 | 6.25% | 2/15/2013 | | |
| STANLEY WORKS, THE (INC) | Applicable | North America | 18,867,925 | Industrial Equipment | Machinery (Non-Agriculture, Non-Construction, Non-Electronic) | US854616AJ88 | 4.90% | 11/1/2012 | | |
| State of Israel | Applicable | Emerging European & Middle Eastern Sovereign | 18,867,925 | Sovereign | Sovereign | US46513EHJ47 | 5.13% | 3/1/2014 | | |
| State of Qatar | Applicable | Emerging European & Middle Eastern Sovereign | 18,867,925 | Sovereign | Sovereign | XS0113419690 | 9.75% | 6/15/2030 | | |
| STATOIL ASA | Applicable | Europe | 18,867,925 | Oil and Gas | Oil and Gas | XS0099213547 | 5.13% | 6/30/2011 | | |
| STMicroelectronics N.V. | Applicable | Europe | 18,867,925 | Electronics/electric | Electronics | XS0173918011 | 0.00% | 7/5/2013 | | |
| SUEZ | Applicable | Europe | 18,867,925 | Utilities | Utilities | FR0000495848 | 5.88% | 10/13/2009 | | |
| Swiss Reinsurance Company | Applicable | Europe | 18,867,925 | Insurance | Insurance | XS0138467401 | 3.25% | 11/21/2021 | Applicable | Subordinate |
| TELECOM CORPORATION OF NEW ZEALAND LIMITED | Applicable | New Zealand | 18,867,925 | Telecommunications/cellular communications | Telecommunications | XS0140346171 | 6.75% | 12/14/2011 | | |
| TeliaSonera Aktiebolag | Applicable | Europe | 18,867,925 | Telecommunications/cellular communications | Telecommunications | XS0101443538 | 5.50% | 9/10/2010 | | |
| TELUS CORPORATION | Applicable | North America | 18,867,925 | Telecommunications/cellular communications | Telecommunications | US87971MAC73 | 8.00% | 6/1/2011 | | |
| The Bear Stearns Companies Inc. | Applicable | North America | 18,867,925 | Brokers/Dealers/Investment houses | Finance | US073902KF49 | 5.30% | 10/30/2015 | | |

| Reference Entity | Restructuring | Jurisdiction | Reference Entity Calculation Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|---|
| The Black & Decker Corporation | Applicable | North America | 18,867,925 | Industrial Equipment | Home and Office Furnishings, Housewares and Durable Consumer Products | US091797AJ96 | 7.13% | 6/1/2011 | | |
| The Goldman Sachs Group, Inc. | Applicable | North America | 18,867,925 | Brokers/Dealers/Investment houses | Finance | US38141GBU76 | 6.60% | 1/15/2012 | | |
| The Home Depot, Inc. | Applicable | North America | 18,867,925 | Retailers (except food and drug) | Retail Stores | US437076AL65 | 3.75% | 9/15/2009 | | |
| The PMI Group, Inc. | Applicable | North America | 18,867,925 | Insurance | Insurance | US69344MAH43 | 6.00% | 9/15/2016 | Applicable | |
| TOTAL SA | Applicable | Europe | 18,867,925 | Oil and Gas | Oil and Gas | XS0184119898 | 4.88% | 12/23/2010 | | |
| TOYOTA MOTOR CORPORATION | Applicable | Japan | 18,867,925 | Automotive | Automobile | JP363340A296 | 1.33% | 9/20/2012 | | |
| U.S. Bancorp | Applicable | North America | 18,867,925 | Financial Intermediaries | Banking | US91159HGG92 | 3.13% | 3/15/2008 | | |
| UBS AG | Applicable | Europe | 18,867,925 | Financial Intermediaries | Banking | CH0009367886 | 3.50% | 8/27/2008 | | |
| Unilever N.V. | Applicable | Europe | 18,867,925 | Food Products | Personal and Non Durable Consumer Products (Manufacturing Only) | US904764AG27 | 7.13% | 11/1/2010 | | |
| United Parcel Service, Inc. | Applicable | North America | 18,867,925 | Surface Transport | Cargo Transport | US911308AB04 | 8.38% | 4/1/2030 | | |
| UNITED UTILITIES PLC | Applicable | Europe | 18,867,925 | Utilities | Utilities | US91311QAC96 | 6.88% | 8/15/2028 | | |
| VINCI | Applicable | Europe | 18,867,925 | Building and development | Buildings and Real Estate | XS0151548616 | 5.88% | 7/22/2009 | | |
| Vneshtorgbank | Applicable | Emerging European Corporate | 18,867,925 | Financial Intermediaries | Banking | XS0223715920 | 6.25% | 6/30/2035 | | |
| Wachovia Corporation | Applicable | North America | 18,867,925 | Financial Intermediaries | Banking | US381317AQ93 | 4.75% | 10/1/2012 | | |
| Wells Fargo & Company | Applicable | North America | 18,867,925 | Financial Intermediaries | Banking | US949746NA59 | 5.56% | 10/28/2015 | | |
| Whirlpool Corporation | Applicable | North America | 18,867,925 | Home Furnishings | Home and Office Furnishings, Housewares and Durable Consumer Products | US963320AH94 | 7.75% | 7/15/2016 | | |
| Wolters Kluwer N.V. | Applicable | Europe | 18,867,925 | Publishing | Printing and Publishing | XS0181273342 | 5.13% | 1/27/2014 | | |

**LEHMAN BROTHERS**

**ANNEX B**

| Class of Notes | Size of the Reference Portfolio | Loss Threshold Amount | | Loss Cap Amount | | Reference Entity Calculation Amount | |
|---|---|---|---|---|---|---|---|
| Class A Notes | $2,000,000,000 | $80,800,000 | 4.04% | $100,800,000 | 5.04% | $18,867,925 | 0.943% |

**LEHMAN BROTHERS**

**ANNEX C**

. **Additional Terms**

(a) **Additional Agreements.** Each party agrees as set out below for so long as either party has or may have any obligation under this Transaction:

  (i)   The Seller acknowledges and agrees that this Transaction constitutes a credit default swap transaction and, accordingly, the Buyer may, following the occurrence of a Credit Event in respect of a Reference Entity and subject to the terms specified herein, demand and receive payment in full of the appropriate Cash Settlement Amount on the date such amount shall be payable without being required to make any prior demand or to take prior proceedings against the relevant Reference Entity or any other person which is a surety for or which has granted the Buyer any form of credit protection or credit insurance or entered into any credit default swap or similar transaction with the Buyer in respect of such Reference Entity. The Buyer shall be under no obligation to account to the Seller or to any of its affiliates for any payment or sums, if any, recovered from a Reference Entity or any third party.

  (ii)  Each party, the Calculation Agent and their respective affiliates may, whether by virtue of the types of relationships described herein or otherwise, at the date hereof or at any time hereafter, be in possession of information in relation to any Reference Entity that is or may be material in the context of this Transaction and that may or may not be publicly available or known to the aforementioned persons. Apart from the obligations of the Calculation Agent set out in this Confirmation, this Transaction does not create any obligation on the part of any such person or its affiliates to disclose to the other party any such relationship or information (whether or not confidential).

  (iii) The parties agree that, in entering into this Transaction, neither the Buyer nor the Seller intends to enter into a contract of surety, guarantee, insurance, assurance or indemnity, and the parties' obligations hereunder are not conditional or dependent upon or subject to the Buyer having any title, ownership or interest (whether legal, equitable or economic) in any Reference Entity.

  (iv)  The parties shall be obliged to perform this Transaction without regard to whether the Buyer or any affiliate of the Buyer has any credit exposure in respect of a Reference Entity. Neither the Buyer nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by the Seller under this Transaction are not conditional on the Buyer (or any of its affiliates) sustaining or being exposed to a risk of loss.

  (v)   The Seller acquires no rights, either direct or indirect or by way of subrogation, against any Reference Entity or in respect of any Reference Obligation thereof as a result of entering into or performing its obligations under this Transaction.

(b) **The Calculation Agent.**

  (1) The Calculation Agent shall be responsible for:

  (i)   Determining a successor as Calculation Agent (if necessary) after agreement with the Seller;

  (ii)  Determining a Successor to any Reference Entity in accordance with the Definitions;

  (iii) Obtaining Full Quotations in accordance with the Confirmation;

  (iv)  Selecting Dealers where required in accordance with the Confirmation;

  (v)   Determining Reference Entity Loss Amounts, Final Prices, Class A Cash Settlement Amounts and each Class A Credit Protection Payment Amount;

(vi)    Determining (i) a hypothetical Reference Entity Loss Amount for each Class A Adjustment Reference Entity based on a Final Price of zero, and (ii) a hypothetical Class A Cash Settlement Amount for such Class A Adjustment Reference Entity;

(vii)    Determining any Class A Adjustment Amount, any Class A Adjustment Reference Entity, the Contingency Amount with respect to the Class A Notes, the Contingency Cash Settlement Amount with respect to the Class A Notes, any relevant Deferred Interest Cut-off Date, any relevant Deferred Redemption Cut-off Date, any relevant Deferred Redemption Date, any Deferred Redemption Amount with respect to the Class A Notes and the Outstanding Adjustment Amount with respect to each Class A Adjustment Reference Entity; and

(viii)    To the extent not provided for by sub-paragraphs (i) to (vii) above, making the calculations and determinations and giving the notices as set out and contemplated hereunder.

(2)  Whenever the Calculation Agent is required to act or to exercise judgment, it shall do so in good faith and in a commercially reasonable manner.  Its calculations and determinations shall be binding in the absence of bad faith or manifest error.

(3)  Each party agrees that the Calculation Agent is not acting as a fiduciary for or as an advisor to either party in respect of its duties as Calculation Agent in connection with this Transaction.

(4)  In connection with any requests for quotations or estimates pursuant to the provisions set forth in this Confirmation under "Settlement Terms", the Calculation Agent:  (a) may, but shall not be required to, inform the relevant Dealers of the Publicly Available Information in its possession regarding the occurrence and the nature of the relevant Credit Event; and (b) shall not disclose any information that would give rise to a contravention by the Buyer of its obligations under applicable secrecy laws.

**LEHMAN BROTHERS**

**ANNEX D**

**Credit Event Matrix**

| Transaction Type | NORTH AMERICAN CORPORATE | EUROPEAN CORPORATE | AUSTRALIA CORPORATE | NEW ZEALAND CORPORATE | JAPAN CORPORATE |
|---|---|---|---|---|---|
| Business Days: | If the Floating Rate Payer Calculation Amount is denominated in<br>USD: London & New York<br>EUR: London, New York & TARGET<br>GBP: London<br>JPY: London & Tokyo<br>CHF: London & Zurich | If the Floating Rate Payer Calculation Amount is denominated in<br>EUR: London & TARGET<br>USD: London & New York<br>GBP: London<br>JPY: London & Tokyo<br>CHF: London & Zurich | If the Floating Rate Payer Calculation Amount is denominated in<br>USD: London, New York & Sydney<br>AUD: London, New York & Sydney<br>EUR: London, New York, TARGET & Sydney | If the Floating Rate Payer Calculation Amount is denominated in<br>USD: London, New York & Auckland<br>AUD: London, New York, Sydney & Auckland<br>EUR: London, New York, TARGET & Auckland<br>NZD: London, New York & Auckland | If the Floating Rate Payer Calculation Amount is denominated in<br>USD: London, New York & Tokyo<br>JPY: London, New York & Tokyo<br>EUR: London, New York, Tokyo & TARGET |
| All Guarantees: | Not Applicable | Applicable | Applicable | Applicable | Applicable |
| Conditions to Settlement: | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Section 3.9 of the Definitions shall be excluded Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time" Notice of Publicly Available Information Applicable |
| Credit Event: | Bankruptcy<br>Failure to Pay<br>Restructuring, if specified as applicable in the relevant Confirmation<br>Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy<br>Failure to Pay<br>Restructuring<br>Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation Applicable | Bankruptcy<br>Failure to Pay<br>Restructuring<br>Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy<br>Failure to Pay<br>Restructuring<br>Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy<br>Failure to Pay<br>Payment Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 100,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay.<br>Restructuring<br>Multiple Holder Obligation: Not Applicable<br>Default Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 1,000,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. |
| Obligation Category: | Borrowed Money | Borrowed Money | Borrowed Money | Borrowed Money | Borrowed Money |
| Obligation Characteristics: | None | None | None | None | Not Subordinated |
| Deliverable Obligation Category: | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan |
| Deliverable Obligation Characteristics: | Not Subordinated<br>Specified Currency<br>Not Contingent<br>Assignable Loan<br>Consent Required Loan<br>Transferable<br>Maximum Maturity: 30 years<br>Not Bearer | Not Subordinated<br>Specified Currency<br>Not Contingent<br>Assignable Loan<br>Consent Required Loan<br>Transferable<br>Maximum Maturity: 30 years<br>Not Bearer | Not Subordinated<br>Specified Currency: Standard Specified Currencies & Domestic Currency<br>Not Contingent<br>Assignable Loan<br>Consent Required Loan<br>Transferable<br>Maximum Maturity: 30 years<br>Not Bearer | Not Subordinated<br>Specified Currency: Standard Specified Currencies & Domestic Currency<br>Not Contingent<br>Assignable Loan<br>Consent Required Loan<br>Transferable<br>Maximum Maturity: 30 years<br>Not Bearer | Not Subordinated<br>Specified Currency<br>Not Contingent<br>Assignable Loan<br>Consent Required Loan<br>Transferable<br>Maximum Maturity: 30 years<br>Not Bearer |
| Escrow: | Applicable | Applicable | Applicable | Applicable | Applicable |
| 60 Business Day Cap on Settlement: | Applicable | Applicable | Applicable | Applicable | Applicable |
| Additional Provisions for Physically Settled Default Swaps – Monoline Insurer as Reference Entity (January 21, 2005) | Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Russian Federation (August 17, 2004) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Republic of Hungary (February 14, 2005) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Argentine Republic: Excluded Obligations and Excluded Deliverable Obligations (December 21, 2005) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for a Secured Deliverable Obligation Characteristic (June 16, 2006) | Not Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for Reference Entities with Delivery Restrictions (February 1, 2007) | Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Investment Grade & High Yield |  |  |  |  |  |

All references to "Definitions" mean the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions, and the 2005 Matrix Supplement to the 2003 ISDA Credit Derivatives Definitions, as published by the International Swaps and Derivatives Association, Inc. Capitalized terms used in this Credit Derivatives Physical Settlement Matrix and not defined here have the meanings given to such terms in the Definitions.

| Transaction Type: | SINGAPORE CORPORATE | ASIA CORPORATE | EMERGING EUROPEAN CORPORATE | LATIN AMERICA CORPORATE B | LATIN AMERICA CORPORATE BL |
|---|---|---|---|---|---|
| Business Days: | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Singapore EUR: London, New York, TARGET & Singapore | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London, New York & TARGET EUR: London, Target | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London, New York & TARGET |
| All Guarantees: | Applicable | Applicable | Applicable | Applicable | Applicable |
| Conditions to Settlement: | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable |
| Credit Events: | Bankruptcy Failure to Pay Restructuring | Bankruptcy Failure to Pay Restructuring | Bankruptcy Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation: a) Not Applicable with respect to Obligation Category "Bonds" b) Applicable with respect to Obligation Category "Loans" | Bankruptcy Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation: Not Applicable | Bankruptcy Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring |
| Obligation Category: | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
| Obligation Characteristics: | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Sovereign Lender | Not Subordinated Not Sovereign Lender Not Domestic Currency Not Domestic Issuance Not Domestic Law | Not Subordinated Not Domestic Law Not Domestic Currency Not Domestic Issuance | Not Subordinated Not Domestic Law Not Domestic Law | Not Subordinated Not Sovereign Lender Not Domestic Currency Not Domestic Law Not Domestic Issuance |
| Deliverable Obligation Category: | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
| Deliverable Obligation Characteristics: | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Sovereign Lender Not Contingent Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Sovereign Lender Not Domestic Law Not Contingent Not Domestic Issuance Transferable Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Domestic Issuance Not Contingent Transferable Not Bearer Assignable Loan Consent Required Loan Not Domestic Law | Not Subordinated Specified Currency Not Domestic Law Not Domestic Issuance Transferable Not Bearer | Not Subordinated Specified Currency Not Sovereign Lender Not Domestic Law Not Contingent Not Domestic Issuance Assignable Loan Consent Required Loan Transferable Not Bearer |
| Escrow: | Applicable | Applicable | Applicable | Applicable | Applicable |
| 60 Business Day Cap on Settlement: | Applicable | Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (January 21, 2005): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Russian Federation (August 13, 2004): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Republic of Hungary (February 14, 2005): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Argentine Republic: Excluded Obligations and Excluded Deliverable Obligations (December 21, 2005): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for a Secured Deliverable Obligation Characteristic (June 16, 2006): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for Reference Entities with Delivery Restrictions (February 1, 2007): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| [1] Investment Grade & High Yield | | | | | |
| [2] All references to "Definitions" mean the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions, and the 2005 Matrix Supplement to the 2003 ISDA Credit Derivatives Definitions, as published by the International Swaps and Derivatives Association, Inc. Capitalized terms | | | | | |

D-3

| Transaction Type | ASIA SOVEREIGN | EMERGING EUROPEAN & MIDDLE EASTERN SOVEREIGN | JAPAN SOVEREIGN | AUSTRALIA SOVEREIGN | NEW ZEALAND SOVEREIGN | SINGAPORE SOVEREIGN | LATIN AMERICA SOVEREIGN | WESTERN EUROPEAN SOVEREIGN |
|---|---|---|---|---|---|---|---|---|
| Business Days: | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London & TARGET GBP: London | If the Floating Rate Payer Calculation Amount is denominated in JPY: London, New York & Tokyo USD: London, New York & Tokyo EUR: London, New York, Tokyo & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Sydney EUR: London, New York, Sydney & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Auckland EUR: London, New York, Auckland & TARGET | If the Floating Rate Payer Calculation Amount is denominated in SGD: London, New York & Singapore USD: London, New York & Singapore EUR: London, New York, Singapore & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London & TARGET |
| All Guarantees: | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable |
| Conditions to Settlement: | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Section 3.9 of the Definitions shall be excluded Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time" Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable |
| Credit Event: | Failure to Pay Repudiation/Moratorium Restructuring | Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation: Not Applicable | Failure to Pay Payment Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 100,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. Repudiation/Moratorium Restructuring Multiple Holder Obligation: Not Applicable Default Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 1,000,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. | Failure to Pay Repudiation/Moratorium Restructuring Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Failure to Pay Repudiation/Moratorium Restructuring Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Failure to Pay Repudiation/Moratorium Restructuring | Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation: Not Applicable | Failure to Pay Repudiation/Moratorium Restructuring |
| Obligation Category: | Bond or Loan | Bond | Borrowed Money | Borrowed Money | Borrowed Money | Bond or Loan | Bond | Borrowed Money |
| Obligation Characteristics: | Not Subordinated Not Sovereign Lender Not Domestic Currency Not Domestic Law Not Domestic Issuance | Not Subordinated Not Domestic Currency Not Domestic Law Not Domestic Issuance | None | None | None | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Sovereign Lender | Not Subordinated Not Domestic Currency Not Domestic Law Not Domestic Issuance | None |
| Deliverable Obligation Category: | Bond or Loan | Bond | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
| Deliverable Obligation Characteristics: | Not Subordinated Specified Currency Not Sovereign Lender Not Domestic Law Not Contingent Not Domestic Issuance Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Domestic Law Not Contingent Not Domestic Issuance Transferable Not Bearer | Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Specified Currencies & Domestic Currency Not Sovereign Lender Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Domestic Law Not Contingent Not Domestic Issuance Transferable Not Bearer | Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer |
| Escrow: | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable |
| 60 Business Day Cap on Settlement: | Applicable | Not Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable |
| Additional Provisions for the Russian Federation (August 13, 2004): | Not Applicable | Applicable if the Reference Entity is the Russian Federation, otherwise Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Republic of Hungary (February 14, 2005): | Not Applicable | Applicable if the Reference Entity is the Republic of Hungary, otherwise Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Argentine Republic: Excluded Obligations and Excluded Deliverable Obligations (December 21, 2005): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Applicable if the Reference Entity is the Argentine Republic, otherwise Not Applicable | Not Applicable |
| Additional Provisions for a Secured Deliverable Obligation Characteristic (June 16, 2006): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for Reference Entities with Delivery Restrictions (February 1, 2007): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |

D-4

**LEHMAN BROTHERS**

**ANNEX E**

**JSC Vneshtorgbank Reference Obligations**

| Reference Obligation | ISIN |
| --- | --- |
| 2.90% LPNs due 30 July 2007 | XS0197141285 |
| 0.75% LPNs due 21 September 2007 | US92909MAC47 / XS0239043655 |
| 6.875% LPNs due 11 December 2008 | XS0182007830 |
| 7.50% LPNs due 12 October 2011 | US92909MAA80 / XS0202919667 |
| 6.25% LPNs due 30 June, 2035 | US92909MAB63 / Reg S XS0223715920 |

**Class B Confirmation**

**DATE:**        April 3, 2007

**TO:**          Alta CDO SPC, for the account of the Series 2007-1 Segregated Portfolio

**FROM:**        Lehman Brothers Special Financing Inc.

**RE:**          Credit Derivative Transaction

The purpose of this letter (this "**Confirmation**") is to confirm the terms and conditions of the Credit Derivative Transaction entered into between Lehman Brothers Special Financing Inc. ("**Party A**") and Alta CDO SPC, for the account of the Series 2007-1 Segregated Portfolio ("**Party B**") on the Trade Date specified below (the "**Transaction**"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1        The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions and, where so indicated in the Registry in respect of a Reference Entity, the Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (published on January 21, 2005), and solely with respect to Reference Entities JSC Gazprom and JSC Vneshtorgbank, the Additional Provisions for LPN Reference Entities (published on October 3, 2006), each as published by the International Swaps and Derivatives Association, Inc., (collectively, the "**Credit Derivatives**") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern. Capitalized terms used herein but not otherwise defined herein or in the Credit Derivatives Definitions shall have the meanings ascribed to such terms in the Indenture.

2        This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency – Cross Border) dated as of April 3, 2007, as amended and supplemented from time to time (the "**Agreement**"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

3        Party A will enter into the Transaction and exercise its rights and perform its obligations hereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of Party B, the holders of the Class B Notes or any other person.

4        Party A may or may not have a credit exposure to any Reference Entity and may or may not have exposure to any Reference Obligation(s) or the Benchmark Obligation designated by Party A in respect of any Reference Entity.

5        The parties agree and acknowledge that the Transaction to which this Confirmation relates contemplates more than one Reference Entity and multiple Credit Event Notices, and that, accordingly, there may be more than one Credit Event and more than one Cash Settlement Amount, and that the Credit Derivatives Definitions (and in particular the provisions which modify and relate to the "Termination Date") should, for the purposes of this Confirmation, be interpreted accordingly.

6        Each Reference Entity listed on the Reference Registry to this Confirmation constitutes a separate confirmation for purposes of this Confirmation. Accordingly, references herein to this Confirmation and the Reference Portfolio are to a portfolio of confirmations, each of which references a single Reference Entity.

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**
30775-00043 NY:2091879.3

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | March 13, 2007. |
| Effective Date: | April 3, 2007. |
| Scheduled Termination Date: | June 20, 2017 (adjusted in accordance with the Business Day Convention). |
| Termination Date: | (A) the Scheduled Termination Date; or (B) if the Contingency Amount with respect to the Class B Notes is greater than zero on the Scheduled Termination Date, the last Deferred Redemption Date with respect to the Class B Notes. |
| | Section 1.7 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Floating Rate Payer: | Party B (the "**Seller**") |
| Fixed Rate Payer: | Party A (the "**Buyer**") |
| Calculation Agent: | Party A |
| Business Day: | London and New York. |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Each entity specified in the reference registry established by Party A as of April 3, 2007 and attached hereto as Annex A (the "**Reference Registry**"); provided, however, that any Successor to a Reference Entity shall be identified pursuant to Section 2.2. of the Credit Derivatives Definitions, as modified herein. |

Party A shall be responsible for maintaining the Reference Registry. The Reference Registry shall contain, as to each Reference Entity, the following information:

(i)   the legal name of such Reference Entity;

(ii)  whether Restructuring applies with respect to such Reference Entity;

(iii) its jurisdiction;

(iv)  its S&P Long-Term Rating;

(v)   its S&P Industry Group;

(vi)  its Moody's Senior Unsecured Rating;

(vii) its Moody's Industry Category;

-2-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

(viii) the Benchmark Obligation (if any) applicable to such Reference Entity;

(ix) the coupon of the Benchmark Obligation (if any) applicable to such Reference Entity;

(x) the legal maturity date of the Benchmark Obligation (if any) applicable to such Reference Entity;

(xi) whether the Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (published on January 21, 2005) are applicable to such Reference Entity;

(xii) whether the Benchmark Obligation (if any) applicable to Reference Entity is subordinated to other obligations of such Reference Entity; and

(xiii) the Reference Entity Calculation Amount in respect of such Reference Entity.

The information contained in the Reference Registry has been obtained by Party A from the following third party sources: Bloomberg, the website maintained by the Securities and Exchange Commission and the website maintained by S&P and Moody's. While the information obtained from such sources is believed to be accurate, neither Party A nor any of its affiliates makes any representation or warranty, expressed or implied, regarding the adequacy, correctness or completeness of the information obtained from such sources. If any of the information received from such sources is incorrect, (i) the corresponding information in the Reference Registry will likewise be incorrect, and (ii) the Reference Registry shall be amended (or deemed amended) to reflect the correct information. Under no such circumstance shall Party A be required to remove (i) the relevant Reference Entity from the Reference Portfolio, or (ii) the relevant Benchmark Obligation from the Reference Registry. Neither Party A nor any of its affiliates shall be liable to Party B, any holder of Notes or any other Person for any losses, costs, expenses or potential lost profits resulting from or related to any such incorrect information obtained from such sources.

| | |
|---|---|
| Reference Portfolio: | All of the Reference Entities included in the Reference Registry on the relevant date of determination. |
| Reference Entity Calculation Amount: | The Reference Entity Calculation Amount in respect of each Reference Entity shall be the amount set forth in Annex B hereto, as adjusted from time to time in accordance with **"Adjustments"** below. |
| Class B Increase Adjustment Variable: | With respect to each Additional Issuance of the Class B Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class B Notes immediately after giving effect to such Additional Issuance, and (b) the Aggregate Outstanding Amount of the Class B Notes immediately prior to giving effect to such Additional Issuance. |
| Class B Reduction Adjustment Variable: | With respect to each Optional Reduction of the Class B Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class B Notes |

-3-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

immediately after giving effect to such Optional Reduction, and (b) the denominator of which is the Aggregate Outstanding Amount of the Class B Notes immediately prior to giving effect to such Optional Reduction.

Adjustments:

Notwithstanding anything herein to the contrary, if an Additional Issuance of the Class B Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class B Loss Threshold Amount, the Class B Loss Cap Amount and the Class B Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity Loss Amount determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class B Increase Adjustment Variable.

Notwithstanding anything to the contrary, if an Optional Reduction of the Class B Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class B Loss Threshold Amount, the Class B Loss Cap Amount and the Class B Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity Loss Amount determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class B Reduction Adjustment Variable.

Reference Obligation(s):

In respect of each Reference Entity for which a Credit Event Notice has been delivered, Party A must deliver a separate notice to Party B (with a copy to the Trustee) (each, a "**Reference Obligation Identification Notice**"). Each Reference Obligation Identification Notice must identify either (i) the obligation, if any, specified for such Reference Entity in the Reference Registry (the "**Benchmark Obligation**"), or (ii) an obligation or obligations of such Reference Entity (each of (i) and (ii), a "**Reference Obligation**"). Each obligation identified under clause (ii) must satisfy the Reference Obligation Category and the Reference Obligation Characteristics at the time of its designation. For purposes of this Confirmation, Benchmark Obligations may include obligations issued by an affiliate of the relevant Reference Entity included in the Reference Portfolio. Benchmark Obligations may be subordinated to other obligations of the Reference Entity.

The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity may not exceed the Reference Entity Calculation Amount of such Reference Entity.

The definitions of Section 2.20 of the Credit Derivatives Definitions shall apply to each Reference Obligation as if it were a Deliverable Obligation.

Party A must deliver each Reference Obligation Identification Notice no later than the New York Business Day immediately preceding the relevant Valuation Date.

Each Reference Obligation Identification Notice must contain a description of each applicable Reference Obligation and its Reference Obligation Notional Amount that is sufficient for purposes of

-4-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

determining the Final Price of such Reference Obligation pursuant to the provisions contained herein.

A Reference Obligation, other than a Benchmark Obligation which shall always be considered to be an eligible Reference Obligation, that satisfies the Reference Obligation Category and the Reference Obligation Characteristics at the time of designation will continue to be an eligible Reference Obligation even if it does not fall into the Reference Obligation Category or lacks any or all Reference Obligation Characteristics at any time thereafter.

Notwithstanding anything to the contrary, each of the obligations specified in Annex E shall be a Reference Obligation in respect of JSC Vneshtorgbank.

The provisions of Section 2.2(d) and Section 2.30 of the Definitions shall not apply to a Reference Obligation (other than a Benchmark Obligation designated by Party A).

For the purposes of the provisions of Section 2.2(d) and Section 2.30 of the Credit Derivatives Definitions, a Benchmark Obligation shall constitute a Reference Obligation under such Sections.

| | |
|---|---|
| Reference Obligation Notional Amount: | With respect to each Reference Obligation, the amount, expressed in U.S. dollars, specified as such in the relevant Reference Obligation Identification Notice. |
| Reference Obligation Category: | In respect of each Reference Entity, the Reference Obligation Category (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the matrix attached hereto in Annex D (the "**Credit Event Matrix**"). Each Benchmark Obligation will be deemed to satisfy the Reference Obligation Category. |
| Reference Obligation Characteristics: | In respect of each Reference Entity, the Reference Obligation Characteristics (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix. Each Benchmark Obligation will be deemed to satisfy the Reference Obligation Characteristics. |

**Fixed Payments:**

| | |
|---|---|
| Class B Fixed Amount: | The positive difference between (A) the Class B Interest Distribution Amount relating to the immediately succeeding Payment Date or the first Distribution Date to occur (as and to the extent applicable and without duplication), and (B) an amount equal to the Class B Relevant Proportion on such Payment Date or Distribution Date of the interest due and payable with respect to the Permitted Long-Term Investment during the Accrual Period with respect to such Payment Date or Distribution Date (as applicable). |

-5-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

30775-00043 NY:2091879.3

| | |
|---|---|
| Class B Relevant Proportion: | The proportion which the Aggregate Outstanding Amount of the Class B Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A Notes and (ii) the Aggregate Outstanding Amount of the Class B Notes. |
| Party A Additional Payments | On each Deferred Interest Payment Date, Party A shall pay to Party B an amount equal to the Class B Deferred Interest Amount (if any) with respect to the Class B Notes. |
| Fixed Rate Payer Payment Dates: | The Business Day immediately preceding (as and to the extent applicable and without duplication) (i) each Payment Date and (ii) the first Distribution Date to occur. |
| | Section 2.10 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Collateral Requirements: | On the Effective Date, Party A shall post $44,458.33 with the Trustee (the "**Credit Swap Posted Amount**") in cash or money market instruments rated AAAm (by S&P) and Aa1 (by Moody's). |
| | The Credit Swap Posted Amount will be held by the Trustee on behalf of Party B, pursuant to the terms of the Series Indenture, until the first Distribution Date to occur (the "**Posted Amount Release Date**"). The Credit Swap Posted Amount together with any interest accrued thereon shall be released to Party A on the Posted Amount Release Date. |
| | There will be a proportional increase of the Credit Swap Posted Amount in connection with an Additional Issuance with respect to the Class B Notes. |
| | There will be a proportional reduction of the Credit Swap Posted Amount in connection with (i) an Optional Reduction of the Class B Notes, and (ii) any reduction in the Aggregate Outstanding Amount of the Class B Notes following the determination of a Cash Settlement Amount hereunder.  An amount equal to such reduction shall be released to Party A on the date of such Optional Reduction or the date on which such Cash Settlement Amount is determined. |
| | Neither Party B nor the Trustee may take any actions with respect to the Credit Swap Posted Amount (or any interest earned thereon) unless Party A fails to pay to Party B any amounts owed to Party B under this Transaction (a "**Failure to Fund**").  Upon a Failure to Fund, Party B may exercise its remedies under the Agreement, including liquidating the Credit Swap Posted Amount.  Party B shall apply the proceeds of any such liquidation toward Interest Collections for distribution in accordance with the Priority of Payments; *provided that* any liquidation proceeds in excess of the amounts owed by Party A shall be paid by Party B to Party A and shall not be available to make any payments in respect of the Notes. |

**Floating Payment:**

Floating Rate Payer

-6-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

| | |
|---|---|
| Calculation Amount: | In respect of each Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, the Reference Entity Calculation Amount of such Reference Entity. |

**Terms relating to Settlement:**

| | |
|---|---|
| Conditions to Settlement: | In respect of each Reference Entity: |

> Credit Event Notice
>
> Notifying Party: Buyer
>
> Notice of Publicly Available Information: Applicable

For the avoidance of doubt, the parties agree that the "Conditions to Settlement" may be satisfied more than once in respect of this Transaction, but only once with respect to any Reference Entity, except pursuant to Section 3.9 of the Credit Derivatives Definitions, when applicable and as modified herein.

The Conditions to Settlement with respect to a Reference Entity may be satisfied on any day during the period from (and including) the Effective Date through (and including) the end of the Notice Delivery Period.

A copy of each Credit Event Notice shall be sent by Party A to the Rating Agencies promptly following the delivery thereof to the Issuer.

| | |
|---|---|
| Credit Events: | In respect of each Reference Entity, the Credit Events (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix. The Credit Events may include one or more of the following: (i) Bankruptcy, (ii) Failure to Pay, (iii) Obligation Acceleration, (iv) Repudiation/Moratorium, and (v) Restructuring (if specified as applicable in the Reference Registry). |

**Obligation(s):**

| | |
|---|---|
| Obligation Category: | In respect of each Reference Entity, the Obligation Category (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix. Each Benchmark Obligation will be deemed to satisfy the Obligation Category. |
| Obligation Characteristics: | In respect of each Reference Entity, the Obligation Characteristics (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix. Each Benchmark Obligation will be deemed to satisfy the Obligation Characteristics. |

**Settlement Terms:**

| | |
|---|---|
| Settlement Method: | Cash Settlement, as modified herein |
| Terms Relating to Cash Settlement: | |

-7-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

30775-00043 NY:2091879.3

Valuation Date:

The provisions of Sections 7.7(a) and (b) of the Credit Derivatives Definitions shall not apply to this Transaction and are replaced with the following:

"Valuation Date" means any New York Business Day designated by the Calculation Agent between (and including) the 30th and the 120th New York Business Day following the relevant Event Determination Date.

If the aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity does not exceed $20,000,000, Single Valuation Date (as defined in Section 7.8(a) of the Credit Derivatives Definitions); otherwise Multiple Valuation Dates (as defined in Section 7.8(b) of the Credit Derivatives Definitions).  The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A shall not be less than $1,000,000.  If Multiple Valuation Dates applies, the total number of Valuation Dates shall be equal to the quotient of (a) the Reference Entity Calculation Amount and (b) $20,000,000. For the avoidance of doubt, the aggregate of the Reference Obligation Notional Amounts in respect of Reference Obligations designated by Party A shall not exceed $20,000,000 on any Valuation Date.

The Calculation Agent shall attempt to obtain Full Quotations with respect to the Valuation Date from five or more Independent Dealers. If the Calculation Agent is unable to obtain two or more Full Quotations on the Valuation Date from Independent Dealers, then on the 7th New York Business Day following the Valuation Date the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers and, if two or more Full Quotations are not available on such day from Independent Dealers, then on the 15th New York Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers.

For purposes of obtaining Full Quotations from Independent Dealers on the 7th New York Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain two or more Full Quotations from Independent Dealers that were not solicited on the Valuation Date (and, if the Calculation Agent elects to obtain Full Quotations from only five Independent Dealers on such day, such new Independent Dealers shall replace those Independent Dealers (if any) who did not submit Full Quotations on the Valuation Date).

If Full Quotations have been requested from the requisite number of Independent Dealers on the Valuation Date or any other applicable day, the Calculation Agent shall also be permitted to obtain Full Quotations from Party A and its affiliates on such date or day.

If multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Calculation Agent shall attempt to obtain Full Quotations on the Valuation Date and each applicable date

-8-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

thereafter for the Reference Obligations as a whole (rather than the individual components).

If two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th New York Business Day following the Valuation Date, then the Calculation Agent must select an Independent Dealer to determine the Independently Estimated Price within five (5) New York Business Days after such day. The Independently Estimated Price must be determined by such Independent Dealer within ten (10) New York Business Days after such day.

Notwithstanding anything herein to the contrary, if the Valuation Date or any other date on which the Calculation Agent is required to attempt to obtain Full Quotations is not also a Business Day, the Calculation Agent shall request Full Quotations on the next following Business Day.

| | |
|---|---|
| Valuation Time: | Any time during the hours that Dealers customarily quote prices for the relevant Reference Obligation(s) |
| Quotation Method: | Bid |
| Quotation Amount: | (A) the Reference Obligation Notional Amount of the relevant Reference Obligation (as specified in the related Reference Obligation Identification Notice); or |
| | (B) if multiple Reference Obligations of such Reference Entity are specified in the related Reference Obligation Identification Notice, the aggregate of the Reference Obligation Notional Amounts of such Reference Obligations (as specified in the related Reference Obligation Identification Notice). |
| Quotations: | Exclude Accrued Interest |
| Valuation Method: | If Single Valuation Date applies, Highest. |
| | If Multiple Valuation Dates applies, weighted average of the Highest. |
| | Section 7.5(b)(ii) of the Credit Derivatives Definitions is hereby amended by inserting the word "Full" before the word "Quotation". |
| Dealers: | Citigroup Global Markets Inc., JP Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Credit Suisse First Boston Inc., Deutsche Bank, AG, Bear Stearns & Co. Inc., Prudential Securities Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co. and Salomon Smith Barney Inc., Lehman Brothers International (Europe), UBS AG, Dresdner Bank AG, and any affiliate thereof. Additional dealers may be selected by the Calculation Agent from time to time. |
| Independent Dealers: | Any Dealer that is not affiliated with any other Dealer; *provided that* Party A and its affiliates shall not be considered Independent Dealers. |
| Final Price: | |

-9-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00043 NY:2091879.3

(a) If Single Valuation Date applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent Dealers on the Valuation Date or any other applicable day, the Final Price shall be the Highest Full Quotation (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such date or day;

(b) if Multiple Valuation Dates applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent Dealers on each Valuation Date or other applicable days, the Final Price shall be the weighted average of the Highest Full Quotations (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such Valuation Dates or such other days; and

(c) if two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th New York Business Day following the Valuation Date, then the Final Price shall be the Independently Estimated Price.

The first sentence of Section 7.4 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| Independently Estimated Price: | In respect of the relevant Reference Obligation, a price (expressed as a percentage rounded to four decimal places, exclusive of accrued interest) determined by any Independent Dealer selected by the Calculation Agent on such basis as the Independent Dealer considers fair and reasonable under the circumstances; *provided that* if multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Independently Estimated Price shall be the price for the Reference Obligations in the aggregate (rather than the individual components). |
| Settlement Currency: | The lawful currency of the United States of America ("USD" or "$" or "US$"). |
| Reference Entity Loss Amount: | In respect of each Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, an amount equal to the greater of (i) the product of (A) the Reference Price *minus* the Final Price and (B) the Reference Entity Calculation Amount with respect to such Reference Entity (or, if such Credit Event is Restructuring, the Exercise Amount specified in the Credit Event Notice with respect to such Reference Entity), and (ii) zero, as adjusted from time to time in accordance with **"Adjustments"** above. |
| Final Valuation Notice: | In respect of a Credit Event for which the Conditions to Settlement have been satisfied, the Calculation Agent shall provide written notification to Party B and the Trustee of the Final Price and the related Reference Entity Loss Amount no later than the earlier of (i) three (3) New York Business Days following the determination of such Final Price, and (ii) the first Distribution Date to occur, in each case, as |

-10-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

evidenced by the Trustee's prompt written acknowledgment of receipt thereof.

Each Final Valuation Notice shall identify the Reference Obligation(s) used and include a list of the Full Quotations obtained (including the date the Full Quotation was obtained but not the identity of any of the Dealers).

Each Final Valuation Notice shall include a written computation in reasonable detail showing the Calculation Agent's calculation of (i) the Final Price and the related Reference Entity Loss Amount, (ii) the Class B Aggregate Loss Amount on the date of delivery of such Final Valuation Notice (increased to reflect such Reference Entity Loss Amount), and (iii) the relevant Class B Cash Settlement Amount (after giving effect to the increase in Aggregate Loss Amount as provided in clause (ii) above).

The Final Valuation Notice shall include a representation and warranty that the Full Quotations were obtained (a) consistent with the terms of this Confirmation, (b) on the applicable Valuation Date or day, and (c) in respect of the Reference Obligation(s) specified in the related Reference Obligation Identification Notice.

Class B Aggregate Loss Amount: On the date on which a Final Valuation Notice is delivered to Party B, the sum of (x) the Reference Entity Loss Amount specified in such Final Valuation Notice, *plus* (y) the aggregate of the Reference Entity Loss Amounts specified in prior Final Valuation Notices which were delivered to Party B.  On the Effective Date, the Class B Aggregate Loss Amount shall be zero.

Class B Loss Threshold Amount: $16,250,000, as adjusted from time to time in accordance with "**Adjustments**" above.

Class B Loss Cap Amount: $21,250,000 as adjusted from time to time in accordance with "**Adjustments**" above.

Class B Cash Settlement Amount: On the date on which a Final Valuation Notice which relates to the Class B Notes is delivered to Party B, an amount equal to:

(i)  if the Class B Aggregate Loss Amount on such date is less than or equal to the Class B Loss Threshold Amount, zero;

(ii)  if the Class B Aggregate Loss Amount on such date is greater than the Class B Loss Threshold Amount but less than the sum of the Class B Loss Threshold Amount and the Class B Loss Cap Amount, (A) the Class B Aggregate Loss Amount *minus* (B) the sum of (x) the Class B Loss Threshold Amount and (y) the aggregate of any Class B Cash Settlement Amounts determined prior to such date of delivery; and

(iii)  if the Class B Aggregate Loss Amount on such date is greater than or equal to the sum of the Class B Loss Threshold Amount and the Class B Loss Cap Amount, (A) the Class B Loss Cap Amount *minus* (B) the aggregate of any Class B Cash Settlement Amounts determined prior to such date of delivery.

-11-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

| | |
|---|---|
| Actions With Respect to<br>Class B Cash Settlement Amounts: | On the date on which a Class B Cash Settlement Amount is determined, the Aggregate Outstanding Amount of the Class B Notes shall be reduced by an amount equal to such Class B Cash Settlement Amount until the Aggregate Outstanding Amount of the Class B Notes is reduced to zero. |
| Class B Cash Settlement Date: | The Scheduled Termination Date and each Deferred Redemption Date. |

On the Scheduled Termination Date, Party B shall pay to Party A an amount equal to the sum of the aggregate of the Class B Cash Settlement Amounts (if any) that have been determined on or prior to the Scheduled Termination Date and on each Deferred Redemption Date occurring after the Scheduled Termination Date, Party B shall pay to Party A an amount equal to the aggregate of the Class B Cash Settlement Amounts (if any) that have been determined in the period from (but excluding) the immediately preceding Deferred Redemption Date, or in the case of the first Deferred Redemption Date to occur, the Scheduled Termination Date to (and including) such Deferred Redemption Date (each such amount, the "**Class B Credit Protection Payment Amount**").

The provisions of Section 7.2 of the Credit Derivatives Definitions shall not apply to this Transaction.

**Additional Terms:**

Modifications to Certain
  Defined Terms
  and Provisions Related
  to Determinations of
  a Successor:

In respect of this Transaction:

(i)    Sections 2.2(a)(i) and (ii) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for the entire Credit Derivative Transaction" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(ii)   Sections 2.2(a)(iii) and (iv) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for a New Credit Derivative Transaction determined in accordance with the provisions of Section 2.2(e)" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(iii)  Section 2.2(d) of the Credit Derivatives Definitions shall be amended by:

(a)  the deletion from sub-section (i) of the words "Credit Derivative Transaction" and their replacement with the words "Reference Entity";

-12-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

(b) the insertion in sub-section (iii) of the words "specified in relation to the relevant Reference Entity" after the words "the Reference Obligation" ; and

(c) the deletion following sub-section (iii) of the words "Credit Derivative Transaction" and their replacement with the word "Successor";

(iv) Section 2.2(e) of the Credit Derivatives Definitions shall be replaced in its entirety by the following: "Where, pursuant to Section 2.2 (a) above, one or more Successors have been identified in relation to a particular Reference Entity:"

(a) each such Successor will be a Reference Entity (a "Successor Reference Entity") for the purposes of this Credit Derivative Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(b) the Reference Entity Calculation Amount in respect of each such Successor Reference Entity shall be the Reference Entity Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities."

| | |
|---|---|
| **Merger of Reference Entity and Seller:** | Section 2.31 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| **Modifications to Definition of Not Subordinated:** | In respect of this Transaction, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be amended by the insertion of (a) the words "of the relevant Reference Entity" immediately after the words "most senior Reference Obligation" in the second line thereof; (b) the words "with respect to such Reference Entity" immediately after the words "Reference Obligation is specified" in the third line thereof; and (c) the word "relevant" immediately before the words "Reference Entity" in the fifth line thereof. |
| | If (A) a Benchmark Obligation is specified in the Reference Registry, (B) a Credit Event occurs with respect to a Reference Entity, and (C) the Reference Obligation(s) identified by Party A in the applicable Reference Obligation Identification Notice is <u>not</u> the Benchmark Obligation of such Reference Entity, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be further amended by deleting the words "the most senior Reference Obligation" in the second line thereof and replacing such words with "the Benchmark Obligation of the relevant Reference Entity". |
| **Modifications to Certain Defined Terms and Provisions Related to Determinations in respect of Restructuring:** | In respect of this Transaction, Section 3.9 of the Credit Derivatives Definitions shall be deleted in its entirety and replaced by the following |

-13-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00043 NY:2091879.3

language: "Upon the occurrence of a Restructuring Credit Event with respect to a Reference Entity during the Term of the Credit Derivative Transaction:

(a) the Notifying Party may deliver multiple Credit Event Notices with respect to such Reference Entity, each such Credit Event Notice setting forth the amount of the Reference Entity Calculation Amount for such Reference Entity to which such Credit Event Notice applies (the "Exercise Amount");

(b) if the Notifying Party has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the then Reference Entity Calculation Amount for such Reference Entity (after taking into account any previous Exercise Amounts in relation to such Reference Entity), upon satisfaction of the Conditions to Settlement with respect to the Credit Event specified in such Credit Event Notice, settlement will occur in accordance with the applicable Settlement Method as if the Reference Entity Calculation Amount were the Exercise Amount with respect to such Reference Entity, and upon satisfaction of such Conditions to Settlement, without prejudice to the foregoing provisions of this paragraph, the Reference Entity Calculation Amount will be an amount equal to the Reference Entity Calculation Amount outstanding prior to such Credit Event Notice *minus* the Exercise Amount to which the current Credit Event Notice relates;

(c) the Exercise Amount in connection with any Credit Event Notice describing a Credit Event in relation to a Reference Entity other than a Restructuring must be equal to the then outstanding Reference Entity Calculation Amount for such Reference Entity (and not a portion thereof); and

(d) the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount that is at least 1,000,000 units of the Settlement Currency or an integral multiple thereof or an amount equal to the Reference Entity Calculation Amount less the sum of each prior Exercise Amount (if any) with respect to such Reference Entity."

**Amendment to Section 9.1 of the Credit Derivatives Definitions:**

Additional Representations:

Section 9.1 of the Credit Derivatives Definitions is hereby amended by adding the following additional representations to such Section:

"(c) Buyer and Seller shall each be deemed to represent to the other party on the Trade Date that:

(i) it is duly authorized to enter into this Transaction.

-14-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

    (ii)   it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom.

    (iii)  it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

    (iv)  it is acting for its own account and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction.  It has not received from the other party any assurance or guarantee as to the expected results of the Transaction.

    (v)   it is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

    (vi)  it is capable of assuming, and assumes, the financial and other risks of the Transaction.

    (vii) the other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

    (viii)it is acting as principal in respect of this Confirmation and the Transaction and not as agent or in any other capacity, fiduciary or otherwise.

    (ix)  that upon due execution and delivery of this Confirmation, such Confirmation shall constitute its legal, valid and binding obligation, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or in law)."

**Interpretation;**
  **No Need to Suffer a Loss:**

Interpretation:                        Each reference to the singular shall include the plural and vice versa.

-15-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

| | |
|---|---|
| No Need to Suffer a Loss: | Neither Party A nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by Party B with respect to this Transaction are not conditional on Party A (or any of its affiliates) sustaining or being exposed to a risk of loss. The payments to be made by Party B with respect to this Transaction are due from Party B whether or not Party A (or any of its affiliates) actually suffers a loss. |
| Additional Provisions: | See Annex C attached hereto for additional provisions that apply to this Transaction. |

**Certain Additional Defined Terms:**

| | |
|---|---|
| Class B Notes: | $5,000,000 Notes issued by Party B and the Co-Issuer under the Indenture. |
| Co-Issuer: | Alta CDO LLC. |
| Indenture: | The Series Indenture and the Standard Terms, collectively. |
| New York Business Day: | A day on which commercial banks and foreign exchange markets settle payments in The City of New York. |
| Person: | An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof. |
| Series Indenture: | The Series Indenture, dated as of April 3, 2007, among Party B, the Co-Issuer and the Trustee, which supplements and incorporates the Standard Terms. |
| Standard Terms: | The Standard Terms for Indentures, dated as of April 3, 2007. |

**Notice and Account Details:**

> Telephone and
> Facsimile Numbers and
> Contact Details for
> Notices:

| | |
|---|---|
| Party A: | Lehman Brothers Special Financing Inc.<br>Telephone Number: (212) 526-5410<br>Facsimile Number: (646) 834 2734<br>Attn: Eric Del Monaco |
| | With a copy of all notices to: |
| | Transaction Management<br>Telephone Number: 212-526-0806<br>Facsimile Number: 212-652-0556<br>Attn: Jonathan Lai |

-16-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Party B:                        Alta CDO SPC, for the Account of the Series 2007-1 Segregated
                                Portfolio
                                c/o Maples Finance Limited
                                P.O. Box 1093GT
                                Queensgate House
                                South Church Street
                                Grand Cayman, Cayman Islands
                                Facsimile Number: (345) 945-7100
                                Attn: The Directors

                                With a copy of all notices to:

                                U.S. Bank National Association, as Trustee
                                1 Federal Street, 3rd Floor
                                Mail Station EX-MA-FED
                                Boston, Massachusetts 02110
                                Telephone Number: (617) 603-6479/6480
                                Facsimile Number: (503) 258-5975
                                Attn: Corporate Trust Services/CDO Administration

**Account Details:**

Payments to Party A

Account for payments:           Lehman Brothers Inc. (SLHIUS3X)
                                with further credit to Lehman Brothers Special Financing
                                (SLHIUS3S)
                                The Chase Manhattan Bank, New York
                                A/C Lehman Brothers Special Financing
                                A/C # 066-143-543

Payments to Party B

Account for payments:           U.S. Bank National Association
                                Minneapolis, MN
                                ABA # 091-000-022
                                DDA # 173103321464
                                Account # 112046-201
                                Name: Alta 2007-1 Interest Collections Payment Account

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of
a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular
circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and
does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

30775-00043 NY:2091879.3

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
    Name:
    Title:

Confirmed as of the date first written:

ALTA CDO SPC, for the account of the
SERIES 2007-1 SEGREGATED PORTFOLIO

By: _____
    Name:
    Title:

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

     Name:
     Title:

Confirmed as of the date first written:

ALTA CDO SPC, for the account of the
SERIES 2007-1 SEGREGATED PORTFOLIO

By:_____

     Name:   **Wendy Ebanks**
     Title:     **Director**

**Class B CDS Confirmation**

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

# LEHMAN BROTHERS

## ANNEX A

| Reference Entity | Restructuring | Jurisdiction | Reference Entity Calculation Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|---|
| 3M Company | Applicable | North America | 4,716,981 | Conglomerates | Diversified/Conglomerate Manufacturing | US604059AE52 | 6.38% | 2/15/2028 | | |
| AKZO Nobel N.V. | Applicable | Europe | 4,716,981 | Chemical/Plastics | Chemicals, Plastics and Rubber | XS0170265341 | 4.25% | 6/14/2011 | | |
| Ambac Assurance Corporation | Applicable | North America | 4,716,981 | Insurance | Insurance | XS0124212738 | 5.90% | 2/22/2021 | Applicable | |
| American International Group, Inc. | Applicable | North America | 4,716,981 | Insurance | Insurance | US026874AP25 | 0.00% | 11/9/2031 | Applicable | |
| Anheuser-Busch Companies, Inc. | Applicable | North America | 4,716,981 | Beverage and Tobacco | Beverage, Food and Tobacco | US03522QAC96 | 5.63% | 10/1/2010 | | |
| AT&T Inc. | Applicable | North America | 4,716,981 | Telecommunications/cellular communications | Telecommunications | US78387GAK94 | 5.88% | 8/15/2012 | | |
| Alinta Ltd. | Applicable | Australia | 4,716,981 | Utilities | Utilities | USQ09680AR24 | 5.30% | 9/25/2015 | | |
| Avon Products, Inc. | Applicable | North America | 4,716,981 | Cosmetics/toiletries | Personal and Non Durable Consumer Products (Manufacturing Only) | US054303AM47 | 7.15% | 11/15/2009 | | |
| Bank of America Corporation | Applicable | North America | 4,716,981 | Financial Intermediaries | Banking | US060505AG97 | 7.40% | 1/15/2011 | | Subordinate |
| Berkshire Hathaway Inc. | Applicable | North America | 4,716,981 | Conglomerates | Insurance | US084664AD30 | 4.63% | 10/15/2013 | Applicable | |
| BRUNSWICK CORPORATION | Applicable | North America | 4,716,981 | Leisure goods/activities/movies | Leisure, Amusement, Entertainment | US117043AG45 | 7.13% | 8/1/2027 | | |
| Cargill, Incorporated | Applicable | North America | 4,716,981 | Farming/agriculture | Farming and Agriculture | US141781AC86 | 7.38% | 10/1/2025 | | |
| CenturyTel, Inc. | Applicable | North America | 4,716,981 | Telecommunications/cellular communications | Telecommunications | US156700AG13 | 7.88% | 8/15/2012 | | |
| CIT Group Inc. | Applicable | North America | 4,716,981 | Financial Intermediaries | Banking | US125581AB41 | 7.75% | 4/2/2012 | | |
| Citigroup Inc. | Applicable | North America | 4,716,981 | Financial Intermediaries | Banking | US172967BC45 | 6.50% | 1/18/2011 | | |
| Clariant AG | Applicable | Europe | 4,716,981 | Chemical/Plastics | Chemicals, Plastics and Rubber | CH0010519475 | 4.25% | 3/15/2008 | | |
| Computer Sciences Corporation | Applicable | North America | 4,716,981 | Business Equipment and Services | Electronics | US205363AE42 | 7.38% | 6/15/2011 | | |
| Cooperatieve Centrale Raffeisen-Boerenleenbank B.A. | Applicable | Europe | 4,716,981 | Financial Intermediaries | Banking | XS0075088913 | 6.00% | 4/15/2009 | | |
| Costco Wholesale Corporation | Applicable | North America | 4,716,981 | Retailers (except food and drug) | Retail Stores | US22160KAA34 | 5.50% | 3/15/2007 | | |
| CSR LIMITED | Applicable | Australia | 4,716,981 | Building and development | Buildings and Real Estate | AU300CSRL019 | 6.00% | 3/17/2009 | | |
| Darden Restaurants, Inc. | Applicable | North America | 4,716,981 | Food Service | Personal, Food and Miscellaneous Services | US237194AB19 | 7.13% | 2/1/2016 | | |
| DBS BANK LTD. | Applicable | Singapore | 4,716,981 | Financial Intermediaries | Banking | USY20337AJ30 | 7.13% | 5/15/2011 | | Subordinate |
| Dell Inc. | Applicable | North America | 4,716,981 | Electronics/electric | Electronics | US247025AD11 | 6.55% | 4/15/2008 | | |

| Reference Entity | Restructuring | Jurisdiction | Reference Entity Calculation Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|---|
| European Aeronautic Defence and Space Company EADS N.V. | Applicable | Europe | 4,716,981 | Aerospace and Defense | Aerospace and Defense | XS0163822488 | 4.63% | 3/3/2010 | | |
| Exxon Mobil Corporation | Applicable | North America | 4,716,981 | Oil and Gas | Oil and Gas | US607059AT90 | 8.63% | 8/15/2021 | | |
| Federal Home Loan Mortgage Corporation | Applicable | North America | 4,716,981 | U.S. Agency (Explicitly Guaranteed) | Sovereign | US3134A4EW03 | 5.88% | 3/21/2011 | | Subordinate |
| Federal National Mortgage Association | Applicable | North America | 4,716,981 | U.S. Agency (Explicitly Guaranteed) | Sovereign | US31359MNU35 | 5.25% | 8/1/2012 | | Subordinate |
| Federal Republic of Germany | Applicable | Europe | 4,716,981 | Sovereign | Sovereign | DE0001134468 | 6.00% | 6/20/2016 | | |
| Financial Security Assurance Inc | Applicable | North America | 4,716,981 | Insurance | Insurance | XS0112914907 | 6.11% | 6/29/2015 | Applicable | |
| FIRST DATA CORPORATION | Applicable | North America | 4,716,981 | Business Equipment and Services | Electronics | US319963AF10 | 5.63% | 11/1/2011 | | |
| Gaz de France (G.D.F.), Service National | Applicable | Europe | 4,716,981 | Utilities | Utilities | FR0000472334 | 5.13% | 2/19/2018 | | |
| GAZPROM | Applicable | Emerging European Corporate | 4,716,981 | Oil and Gas | Oil and Gas | XS0146655104 | 9.13% | 4/25/2007 | | |
| General Electric Capital Corporation | Applicable | North America | 4,716,981 | Conglomerates | Banking | US36962GYY42 | 6.00% | 6/15/2012 | | |
| GlobalSantaFe Corporation | Applicable | North America | 4,716,981 | Oil and Gas | Oil and Gas | US37943TAB44 | 5.00% | 2/15/2013 | | |
| GUS PLC | Applicable | Europe | 4,716,981 | Retailers (except food and drug) | Retail Stores | XS0099323999 | 6.38% | 7/16/2009 | | |
| HSBC Finance Corporation | Applicable | North America | 4,716,981 | Financial Intermediaries | Banking | US441812JY13 | 7.00% | 5/15/2012 | | |
| ING Bank N.V. | Applicable | Europe | 4,716,981 | Financial Intermediaries | Banking | NL0000113140 | 5.25% | 1/4/2013 | | Subordinate |
| Ingersoll-Rand Company | Applicable | North America | 4,716,981 | Industrial Equipment | Machinery (Non-Agriculture, Non-Construction, Non-Electronic) | US456866AG74 | 9.00% | 8/15/2021 | | |
| ISLANDSBANKI HF | Applicable | Europe | 4,716,981 | Financial Intermediaries | Banking | XS0210555578 | 3.92% | 1/27/2010 | | |
| ITALIAN REPUBLIC | Applicable | Europe | 4,716,981 | Sovereign | Sovereign | US465410AH18 | 6.88% | 9/27/2023 | | |
| Johnson & Johnson | Applicable | North America | 4,716,981 | Drugs | Healthcare, Education and Childcare | US478160AM65 | 3.80% | 5/15/2013 | | |
| JPMorgan Chase & Co. | Applicable | North America | 4,716,981 | Financial Intermediaries | Banking | US46625HCE80 | 4.75% | 3/1/2015 | | |
| Kaupthing banki hf. | Applicable | Europe | 4,716,981 | Financial Intermediaries | Banking | XS0206352824 | 5.51% | 12/1/2009 | | |
| KELDA GROUP PLC | Applicable | Europe | 4,716,981 | Utilities | Utilities | XS0109434741 | 6.63% | 4/17/2031 | | |
| Kimberly-Clark Corporation | Applicable | North America | 4,716,981 | Cosmetics/toiletries | Personal and Non Durable Consumer Products (Manufacturing Only) | US494368AQ68 | 6.88% | 2/15/2014 | | |
| Kingdom of Thailand | Applicable | Asia Sovereign | 4,716,981 | Sovereign | Sovereign | US88322KAC53 | 7.75% | 4/15/2007 | | |

| Reference Entity | Restructur ing | Jurisdiction | Referenc e Entity Calculati on Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmar k Obligation Coupon | Benchmar k Obligation Maturity | Monolin e Provisio ns | Subordina tion |
|---|---|---|---|---|---|---|---|---|---|---|
| Koninklijke DSM N.V. | Applicable | Europe | 4,716,98 1 | Chemical/Plastics | Chemicals, Plastics and Rubber | XS023511789 1 | 4.00% | 11/10/2015 | | |
| Liz Claiborne, Inc. | Applicable | North America | 4,716,98 1 | Clothing/Textiles | Textiles and Leather | XS026025516 0 | 5.00% | 7/8/2013 | | |
| LLOYDS TSB BANK PLC. | Applicable | Europe | 4,716,98 1 | Financial Intermediaries | Banking | XS014660127 2 | 5.07% | 2/7/2007 | | |
| MBIA Insurance Corporation | Applicable | North America | 4,716,98 1 | Insurance | Insurance | US55266MC H51 | 5.41% | 10/6/2010 | Applicabl e | |
| Merrill Lynch & Co., Inc. | Applicable | North America | 4,716,98 1 | Brokers/Dealers/In vestment houses | Finance | US590188JP4 8 | 6.00% | 2/17/2009 | | |
| MGIC Investment Corporation | Applicable | North America | 4,716,98 1 | Insurance | Insurance | US552845AF 69 | 6.00% | 3/15/2007 | Applicabl e | |
| Morgan Stanley | Applicable | North America | 4,716,98 1 | Brokers/Dealers/In vestment houses | Finance | US617446HC 69 | 6.60% | 4/1/2012 | | |
| Muenchener Rueckversicheru ngs-Gesellschaft Aktiengesellschaf t in Muenchen | Applicable | Europe | 4,716,98 1 | Insurance | Insurance | XS016696579 7 | 6.75% | 6/21/2023 | Applicab le | Subordinat e |
| Nabors Industries, Inc. | Applicable | North America | 4,716,98 1 | Oil and Gas | Oil and Gas | US629568AF 37 | 0.00% | 2/5/2021 | | |
| Nestle S.A. | Applicable | Europe | 4,716,98 1 | Food Products | Beverage, Food and Tobacco | XS014499423 2 | 4.75% | 9/25/2007 | | |
| NEXT PLC | Applicable | Europe | 4,716,98 1 | Retailers (except food and drug) | Retail Stores | XS016928712 4 | 5.25% | 9/30/2013 | | |
| Novartis AG | Applicable | Europe | 4,716,98 1 | Drugs | Healthcare, Education and Childcare | XS015828480 1 | 3.75% | 12/6/2007 | | |
| NTT DoCoMo, Inc. | Applicable | Japan | 4,716,98 1 | Telecommunicatio ns/cellular communications | Telecommunications | JP316565A22 1 | 1.64% | 12/20/2011 | | |
| NUCOR CORPORATION | Applicable | North America | 4,716,98 1 | Steel | Mining, Steel, Iron and Non Precious Metals | US670346AC 90 | 4.88% | 10/1/2012 | | |
| PEARSON plc | Applicable | Europe | 4,716,98 1 | Publishing | Printing and Publishing | XS010279364 2 | 7.00% | 10/27/2014 | | |
| Pfizer Inc. | Applicable | North America | 4,716,98 1 | Drugs | Healthcare, Education and Childcare | US717081AQ 68 | 4.65% | 3/1/2018 | | |
| Pitney Bowes Inc. | Applicable | North America | 4,716,98 1 | Business Equipment and Services | Home and Office Furnishings, Housewares and Durable Consumer Products | US724479AF 75 | 4.63% | 10/1/2012 | | |
| PPG Industries, Inc. | Applicable | North America | 4,716,98 1 | Chemical/Plastics | Chemicals, Plastics and Rubber | US693506AY 35 | 7.05% | 8/15/2009 | | |
| R.R. Donnelley & Sons Company | Applicable | North America | 4,716,98 1 | Publishing | Printing and Publishing | US257867A M36 | 4.95% | 4/1/2014 | | |
| Radian Group Inc. | Applicable | North America | 4,716,98 1 | Insurance | Insurance | US750236AB 78 | 7.75% | 6/1/2011 | Applicabl e | |
| Republic of Hungary | Applicable | Emerging European & Middle Eastern Sovereign | 4,716,98 1 | Sovereign | Sovereign | US633712AG 90 | 8.88% | 11/1/2013 | | |
| REUTERS GROUP PLC | Applicable | Europe | 4,716,98 1 | Business Equipment and Services | Printing and Publishing | XS018027739 3 | 4.63% | 11/19/2010 | | |

| Reference Entity | Restructuring | Jurisdiction | Reference Entity Calculation Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|---|
| Ryder System, Inc. | Applicable | North America | 4,716,981 | Equipment leasing | Cargo Transport | US783549AZ16 | 6.95% | 12/1/2025 | | |
| Sara Lee Corporation | Applicable | North America | 4,716,981 | Food Products | Beverage, Food and Tobacco | US803111AM56 | 6.13% | 11/1/2032 | | |
| Siemens Aktiengesellschaft | Applicable | Europe | 4,716,981 | Conglomerates | Electronics | XS0131224155 | 5.75% | 7/4/2011 | | |
| Singapore Power Limited | Applicable | Singapore | 4,716,981 | Utilities | Utilities | SG5184892288 | 4.05% | 5/4/2013 | | |
| SINGAPORE TELECOMMUNICATIONS LIMITED | Applicable | Singapore | 4,716,981 | Telecommunications/cellular communications | Telecommunications | USY79985AC46 | 6.38% | 12/1/2011 | | |
| SINGTEL OPTUS PTY LIMITED | Applicable | Australia | 4,716,981 | Telecommunications/cellular communications | Telecommunications | USQ19460AC00 | 8.00% | 6/22/2010 | | |
| SLM Corporation | Applicable | North America | 4,716,981 | Financial Intermediaries | Banking | US78442FAB40 | 5.13% | 8/27/2012 | | |
| SOCIETE GENERALE | Applicable | Europe | 4,716,981 | Financial Intermediaries | Banking | XS0110673950 | 6.63% | 4/27/2015 | | Subordinate |
| Southwest Airlines Co. | Applicable | North America | 4,716,981 | Air Transport | Personal Transportation | US844741AV08 | 6.50% | 3/1/2012 | | |
| Spectra Energy Capital, LLC | Applicable | North America | 4,716,981 | Oil and Gas | Utilities | US26439RAJ59 | 6.25% | 2/15/2013 | | |
| STANLEY WORKS, THE (INC) | Applicable | North America | 4,716,981 | Industrial Equipment | Machinery (Non-Agriculture, Non-Construction, Non-Electronic) | US854616AJ88 | 4.90% | 11/1/2012 | | |
| State of Israel | Applicable | Emerging European & Middle Eastern Sovereign | 4,716,981 | Sovereign | Sovereign | US46513EHJ47 | 5.13% | 3/1/2014 | | |
| State of Qatar | Applicable | Emerging European & Middle Eastern Sovereign | 4,716,981 | Sovereign | Sovereign | XS0113419690 | 9.75% | 6/15/2030 | | |
| STATOIL ASA | Applicable | Europe | 4,716,981 | Oil and Gas | Oil and Gas | XS0099213547 | 5.13% | 6/30/2011 | | |
| STMicroelectronics N.V. | Applicable | Europe | 4,716,981 | Electronics/electric | Electronics | XS0173918017 | 0.00% | 7/5/2013 | | |
| SUEZ | Applicable | Europe | 4,716,981 | Utilities | Utilities | FR00004958481 | 5.88% | 10/13/2009 | | |
| Swiss Reinsurance Company | Applicable | Europe | 4,716,981 | Insurance | Insurance | XS0138467401 | 3.25% | 11/21/2021 | Applicable | Subordinate |
| TELECOM CORPORATION OF NEW ZEALAND LIMITED | Applicable | New Zealand | 4,716,981 | Telecommunications/cellular communications | Telecommunications | XS0140346171 | 6.75% | 12/14/2011 | | |
| TeliaSonera Aktiebolag | Applicable | Europe | 4,716,981 | Telecommunications/cellular communications | Telecommunications | XS0101443538 | 5.50% | 9/10/2010 | | |
| TELUS CORPORATION | Applicable | North America | 4,716,981 | Telecommunications/cellular communications | Telecommunications | US87971MAC73 | 8.00% | 6/1/2011 | | |
| The Bear Stearns Companies Inc. | Applicable | North America | 4,716,981 | Brokers/Dealers/Investment houses | Finance | US073902KF49 | 5.30% | 10/30/2015 | | |
| The Black & Decker Corporation | Applicable | North America | 4,716,981 | Industrial Equipment | Home and Office Furnishings, Housewares and Durable Consumer Products | US091797AJ96 | 7.13% | 6/1/2011 | | |

| Reference Entity | Restructuring | Jurisdiction | Reference Entity Calculation Amount | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity | Monoline Provisions | Subordination |
|---|---|---|---|---|---|---|---|---|---|---|
| The Goldman Sachs Group, Inc. | Applicable | North America | 4,716,981 | Brokers/Dealers/Investment houses | Finance | US38141GBU76 | 6.60% | 1/15/2012 | | |
| The Home Depot, Inc. | Applicable | North America | 4,716,981 | Retailers (except food and drug) | Retail Stores | US437076AL65 | 3.75% | 9/15/2009 | | |
| The PMI Group, Inc. | Applicable | North America | 4,716,981 | Insurance | Insurance | US69344MAH43 | 6.00% | 9/15/2016 | Applicable | |
| TOTAL SA | Applicable | Europe | 4,716,981 | Oil and Gas | Oil and Gas | XS0184119898 | 4.88% | 12/23/2010 | | |
| TOYOTA MOTOR CORPORATION | Applicable | Japan | 4,716,981 | Automotive | Automobile | JP363340A296 | 1.33% | 9/20/2012 | | |
| U.S. Bancorp | Applicable | North America | 4,716,981 | Financial Intermediaries | Banking | US91159HGG92 | 3.13% | 3/15/2008 | | |
| UBS AG | Applicable | Europe | 4,716,981 | Financial Intermediaries | Banking | CH0009367886 | 3.50% | 8/27/2008 | | |
| Unilever N.V. | Applicable | Europe | 4,716,981 | Food Products | Personal and Non Durable Consumer Products (Manufacturing Only) | US904764AG27 | 7.13% | 11/1/2010 | | |
| United Parcel Service, Inc. | Applicable | North America | 4,716,981 | Surface Transport | Cargo Transport | US911308AB04 | 8.38% | 4/1/2030 | | |
| UNITED UTILITIES PLC | Applicable | Europe | 4,716,981 | Utilities | Utilities | US91311QAC96 | 6.88% | 8/15/2028 | | |
| VINCI | Applicable | Europe | 4,716,981 | Building and development | Buildings and Real Estate | XS0151548616 | 5.88% | 7/22/2009 | | |
| Vneshtorgbank | Applicable | Emerging European Corporate | 4,716,981 | Financial Intermediaries | Banking | XS0223715920 | 6.25% | 6/30/2035 | | |
| Wachovia Corporation | Applicable | North America | 4,716,981 | Financial Intermediaries | Banking | US381317AQ93 | 4.75% | 10/1/2012 | | |
| Wells Fargo & Company | Applicable | North America | 4,716,981 | Financial Intermediaries | Banking | US949746NA59 | 5.56% | 10/28/2015 | | |
| Whirlpool Corporation | Applicable | North America | 4,716,981 | Home Furnishings | Home and Office Furnishings, Housewares and Durable Consumer Products | US963320AH94 | 7.75% | 7/15/2016 | | |
| Wolters Kluwer N.V. | Applicable | Europe | 4,716,981 | Publishing | Printing and Publishing | XS0182173342 | 5.13% | 1/27/2014 | | |

**LEHMAN BROTHERS**

**ANNEX B**

| Class of Notes | Size of the Reference Portfolio | Loss Threshold Amount | | Loss Cap Amount | | Reference Entity Calculation Amount | |
|---|---|---|---|---|---|---|---|
| Class B Notes | $500,000,000 | $16,250,000 | 3.25% | $21,250,000 | 4.25% | $4,716,981 | 0.943% |

# LEHMAN BROTHERS

## ANNEX C

### Additional Terms

(a) **Additional Agreements.** Each party agrees as set out below for so long as either party has or may have any obligation under this Transaction:

    (i)    The Seller acknowledges and agrees that this Transaction constitutes a credit default swap transaction and, accordingly, the Buyer may, following the occurrence of a Credit Event in respect of a Reference Entity and subject to the terms specified herein, demand and receive payment in full of the appropriate Cash Settlement Amount on the date such amount shall be payable without being required to make any prior demand or to take prior proceedings against the relevant Reference Entity or any other person which is a surety for or which has granted the Buyer any form of credit protection or credit insurance or entered into any credit default swap or similar transaction with the Buyer in respect of such Reference Entity. The Buyer shall be under no obligation to account to the Seller or to any of its affiliates for any payment or sums, if any, recovered from a Reference Entity or any third party.

    (ii)    Each party, the Calculation Agent and their respective affiliates may, whether by virtue of the types of relationships described herein or otherwise, at the date hereof or at any time hereafter, be in possession of information in relation to any Reference Entity that is or may be material in the context of this Transaction and that may or may not be publicly available or known to the aforementioned persons. Apart from the obligations of the Calculation Agent set out in this Confirmation, this Transaction does not create any obligation on the part of any such person or its affiliates to disclose to the other party any such relationship or information (whether or not confidential).

    (iii)    The parties agree that, in entering into this Transaction, neither the Buyer nor the Seller intends to enter into a contract of surety, guarantee, insurance, assurance or indemnity, and the parties' obligations hereunder are not conditional or dependent upon or subject to the Buyer having any title, ownership or interest (whether legal, equitable or economic) in any Reference Entity.

    (iv)    The parties shall be obliged to perform this Transaction without regard to whether the Buyer or any affiliate of the Buyer has any credit exposure in respect of a Reference Entity. Neither the Buyer nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by the Seller under this Transaction are not conditional on the Buyer (or any of its affiliates) sustaining or being exposed to a risk of loss.

    (v)    The Seller acquires no rights, either direct or indirect or by way of subrogation, against any Reference Entity or in respect of any Reference Obligation thereof as a result of entering into or performing its obligations under this Transaction.

(b) **The Calculation Agent.**

  (1) The Calculation Agent shall be responsible for:

    (i)    Determining a successor as Calculation Agent (if necessary) after agreement with the Seller;

    (ii)    Determining a Successor to any Reference Entity in accordance with the Definitions;

    (iii)    Obtaining Full Quotations in accordance with the Confirmation;

    (iv)    Selecting Dealers where required in accordance with the Confirmation;

    (v)    Determining Reference Entity Loss Amounts, Final Prices, Class B Cash Settlement Amounts and each Class B Credit Protection Payment Amount;

(vi)   Determining (i) a hypothetical Reference Entity Loss Amount for each Class B Adjustment Reference Entity based on a Final Price of zero, and (ii) a hypothetical Class B Cash Settlement Amount for such Class B Adjustment Reference Entity;

(vii)  Determining any Class B Adjustment Amount, any Class B Adjustment Reference Entity, the Contingency Amount with respect to the Class B Notes, the Contingency Cash Settlement Amount with respect to the Class B Notes, any relevant Deferred Interest Cut-off Date, any relevant Deferred Redemption Cut-off Date, any relevant Deferred Redemption Date, any Deferred Redemption Amount with respect to the Class B Notes and the Outstanding Adjustment Amount with respect to each Class B Adjustment Reference Entity; and

(viii) To the extent not provided for by sub-paragraphs (i) to (vii) above, making the calculations and determinations and giving the notices as set out and contemplated hereunder.

(2)  Whenever the Calculation Agent is required to act or to exercise judgment, it shall do so in good faith and in a commercially reasonable manner.  Its calculations and determinations shall be binding in the absence of bad faith or manifest error.

(3)  Each party agrees that the Calculation Agent is not acting as a fiduciary for or as an advisor to either party in respect of its duties as Calculation Agent in connection with this Transaction.

(4)  In connection with any requests for quotations or estimates pursuant to the provisions set forth in this Confirmation under "Settlement Terms", the Calculation Agent:  (a) may, but shall not be required to, inform the relevant Dealers of the Publicly Available Information in its possession regarding the occurrence and the nature of the relevant Credit Event; and (b) shall not disclose any information that would give rise to a contravention by the Buyer of its obligations under applicable secrecy laws.

# LEHMAN BROTHERS

## ANNEX D

### Credit Event Matrix

| Transaction Type | NORTH AMERICAN CORPORATE | EUROPEAN CORPORATE | AUSTRALIA CORPORATE | NEW ZEALAND CORPORATE | JAPAN CORPORATE |
|---|---|---|---|---|---|
| Business Days: | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London, New York & TARGET GBP: London JPY: London & Tokyo CHF: London & Zurich | If the Floating Rate Payer Calculation Amount is denominated in EUR: London & TARGET USD: London & New York GBP: London JPY: London & Tokyo CHF: London & Zurich | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Sydney AUD: London, New York & Sydney EUR: London, New York, TARGET & Sydney | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Auckland AUD: London, New York, Sydney & Auckland NZD: London, New York, TARGET & Auckland NZD: London, New York & Auckland | If the Floating Rate Payer Calculation Amount is denominated in JPY: London, New York & Tokyo USD: London, New York & Tokyo EUR: London, New York, Tokyo & TARGET |
| All Guarantees: | Not Applicable | Applicable | Applicable | Applicable | Applicable |
| Conditions to Settlement: | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Section 3.9 of the Definitions shall be excluded Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time" Notice of Publicly Available Information Applicable |
| Credit Events: | Bankruptcy Failure to Pay Restructuring, if specified as applicable in the relevant Confirmation Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy Failure to Pay Restructuring Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation Applicable | Bankruptcy Failure to Pay Restructuring Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy Failure to Pay Restructuring Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Bankruptcy Failure to Pay Payment Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 100,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. Restructuring Multiple Holder Obligation: Not Applicable Default Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 1,000,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. |
| Obligation Category: | Borrowed Money | Borrowed Money | Borrowed Money | Borrowed Money | Borrowed Money |
| Obligation Characteristics: | None | None | None | None | Not Subordinated |
| Deliverable Obligation Category: | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan |
| Deliverable Obligation Characteristics: | Not Subordinated Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency; Standard Specified Currencies & Domestic Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency; Standard Specified Currencies & Domestic Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer |
| Escrow: | Applicable | Applicable | Applicable | Applicable | Applicable |
| 60 Business Day Cap on Settlement: | Not Applicable | Applicable | Applicable | Applicable | Applicable |
| Additional Provisions for Physically Settled Default Swaps / Monoline Insurer as Reference Entity (January 21, 2005): | Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Russian Federation (August 17, 2004): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Republic of Hungary (August 14, 2006): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Argentine Republic: Excluded Obligations and Excluded Deliverable Obligations (December 21, 2005): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for a Secured Deliverable Obligation Characteristic (June 16, 2006): | Not Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for Reference Entities with Delivery Restrictions (February 1, 2007): | Not Applicable unless otherwise specified as Applicable in the relevant Confirmation | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Investment Grade & High Yield | | | | | |

¹ All references to "Definitions" mean the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions, and the 2005 Matrix Supplement to the 2003 ISDA Credit Derivatives Definitions, as published by the International Swaps and Derivatives Association, Inc. Capitalized terms used in this Credit Derivatives Physical Settlement Matrix and not defined here have the meanings given to such terms in the Definitions.

| Transaction Type | SINGAPORE CORPORATE | ASIA CORPORATE | EMERGING EUROPEAN CORPORATE | LATIN AMERICA CORPORATE B | LATIN AMERICA CORPORATE BL |
|---|---|---|---|---|---|
| Business Days: | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Singapore EUR: London, New York, TARGET & Singapore | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York EUR: London, Target | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London, New York & TARGET |
| All Guarantees: | Applicable | Applicable | Applicable | Applicable | Applicable |
| Conditions to Settlement: | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable |
| Credit Events: | Bankruptcy Failure to Pay Restructuring | Bankruptcy Failure to Pay Restructuring | Bankruptcy Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation: a) Not Applicable with respect to Obligation Category "Bonds" b) Applicable with respect to Obligation Category "Loans" | Bankruptcy Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation: Not Applicable | Bankruptcy Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring |
| Obligation Category: | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
| Obligation Characteristics: | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Sovereign Lender | Not Subordinated Not Sovereign Lender Not Domestic Currency Not Domestic Law Not Domestic Issuance | Not Subordinated Not Domestic Currency Not Domestic Law Not Domestic Issuance | Not Subordinated Not Domestic Law | Not Subordinated Not Sovereign Lender Not Domestic Currency Not Domestic Law Not Domestic Issuance |
| Deliverable Obligation Category: | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
| Deliverable Obligation Characteristics: | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Sovereign Lender Not Contingent Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Sovereign Lender Not Domestic Law Not Contingent Not Domestic Issuance Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Domestic Issuance Not Contingent Transferable Not Bearer Assignable Loan Consent Required Loan Not Domestic Law | Not Subordinated Specified Currency Not Domestic Law Not Contingent Not Domestic Issuance Transferable Not Bearer | Not Subordinated Specified Currency Not Sovereign Lender Not Domestic Law Not Contingent Not Domestic Issuance Consent Required Loan Transferable Not Bearer |
| Escrow: | Applicable | Applicable | Applicable | Applicable | Applicable |
| 60 Business Day Cap on Settlement: | Applicable | Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (January 21, 2005) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Russian Federation (August 13, 2004): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Republic of Hungary (February 14, 2005): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Argentine Republic: Excluded Obligations and Excluded Deliverable Obligations (December 21, 2005): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for a Secured Deliverable Obligation Characteristic (June 16, 2006): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for Reference Entities with Delivery Restrictions (February 1, 2007) | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |

[1] Investment Grade & High Yield

[2] All references to "Definitions" mean the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions, and the 2005 Matrix Supplement to the 2003 ISDA Credit Derivatives Definitions, as published by the International Swaps and Derivatives Association, Inc. Capitalized terms

| Transaction Type | ASIA SOVEREIGN | EMERGING EUROPEAN & MIDDLE EASTERN SOVEREIGN | JAPAN SOVEREIGN | AUSTRALIA SOVEREIGN | NEW ZEALAND SOVEREIGN | SINGAPORE SOVEREIGN | LATIN AMERICA SOVEREIGN | WESTERN EUROPEAN SOVEREIGN |
|---|---|---|---|---|---|---|---|---|
| Business Days: | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London & TARGET GBP: London | If the Floating Rate Payer Calculation Amount is denominated in JPY: London, New York & Tokyo USD: London, New York & Tokyo EUR: London, New York, Tokyo & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Sydney EUR: London, New York, Sydney & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Auckland EUR: London, New York, Auckland & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York & Singapore USD: London, New York & Singapore EUR: London, New York, Singapore & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London, New York EUR: London, New York & TARGET | If the Floating Rate Payer Calculation Amount is denominated in USD: London & New York EUR: London & TARGET |
| All Guarantees: | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable |
| Conditions to Settlement: | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Section 3.9 of the Definitions shall be excluded Section 3.3 of the Definitions shall be amended by replacing "Greenwich Mean Time" with "Tokyo time" Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable | Notice of Publicly Available Information Applicable |
| Credit Event: | Failure to Pay Repudiation/Moratorium Restructuring | Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation: Not Applicable | Failure to Pay Payment Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 100,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. Repudiation/Moratorium Restructuring Multiple Holder Obligation: Not Applicable Default Requirement: If the Floating Rate Payer Calculation Amount is in JPY, JPY 1,000,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. | Failure to Pay Repudiation/Moratorium Restructuring Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Failure to Pay Repudiation/Moratorium Restructuring Restructuring Maturity Limitation and Fully Transferable Obligation Applicable | Failure to Pay Repudiation/Moratorium Restructuring | Failure to Pay Grace Period Extension: Applicable Obligation Acceleration Repudiation/Moratorium Restructuring Multiple Holder Obligation: Not Applicable | Failure to Pay Repudiation/Moratorium Restructuring |
| Obligation Category: | Bond or Loan | Bond | Borrowed Money | Borrowed Money | Borrowed Money | Bond or Loan | Bond | Borrowed Money |
| Obligation Characteristics: | Not Subordinated Not Sovereign Lender Not Domestic Currency Not Domestic Law Not Domestic Issuance | Not Subordinated Not Domestic Currency Not Domestic Law Not Domestic Issuance | None | None | None | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Sovereign Lender | Not Subordinated Not Domestic Currency Not Domestic Law Not Domestic Issuance | None |
| Deliverable Obligation Category: | Bond or Loan | Bond | Bond or Loan | Bond or Loan | Bond or Loan | Bond or Loan | Bond | Bond or Loan |
| Deliverable Obligation Characteristics: | Not Subordinated Specified Currency Not Sovereign Lender Not Domestic Law Not Contingent Not Domestic Issuance Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Domestic Law Not Contingent Not Domestic Issuance Transferable Not Bearer | Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency: Standard Specified Currencies & Domestic Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Specified Currencies & Domestic Currency Not Sovereign Lender Not Contingent Assignable Loan Transferable Maximum Maturity: 30 years Not Bearer | Not Subordinated Specified Currency Not Domestic Law Not Contingent Not Domestic Issuance Transferable Not Bearer | Specified Currency Not Contingent Assignable Loan Consent Required Loan Transferable Maximum Maturity: 30 years Not Bearer |
| Escrow: | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable | Applicable |
| 60 Business Day Cap on Settlement: | Applicable | Not Applicable | Applicable | Applicable | Applicable | Applicable | Not Applicable | Applicable |
| Additional Provisions for the Russian Federation (August 13, 2004): | Not Applicable | Applicable if the Reference Entity is the Russian Federation, otherwise Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Republic of Hungary (February 14, 2005): | Not Applicable | Applicable if the Reference Entity is the Republic of Hungary, otherwise Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for the Argentine Republic: Excluded Obligations and Excluded Deliverable Obligations (December 21, 2005): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Applicable if the Reference Entity is the Argentine Republic, otherwise Not Applicable | Not Applicable |
| Additional Provisions for a Secured Deliverable Obligation Characteristic (June 16, 2006): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Additional Provisions for Reference Entities with Delivery Restrictions (February 1, 2007): | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |

**LEHMAN BROTHERS**

**ANNEX E**

**JSC Vneshtorgbank Reference Obligations**

| Reference Obligation | ISIN |
| --- | --- |
| 2.90% LPNs due 30 July 2007 | XS0197141285 |
| 0.75% LPNs due 21 September 2007 | US92909MAC47 / XS0239043655 |
| 6.875% LPNs due 11 December 2008 | XS0182007830 |
| 7.50% LPNs due 12 October 2011 | US92909MAA80 / XS0202919667 |
| 6.25% LPNs due 30 June, 2035 | US92909MAB63 / Reg S XS0223715920 |

**Exhibit B**

Alta 2007-2 Master Agreement

**(Multicurrency-Cross Border)**



International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of 09 October, 2007

**LEHMAN BROTHERS
INTERNATIONAL (EUROPE)**

**ALTA CDO SPC, for the
account of the Series 2007-2 Segregated
Portfolio**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to  (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap and Derivatives Association, Inc.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| LEHMAN BROTHERS INTERNATIONAL (EUROPE) | ALTA CDO SPC for the account of the Series 2007-2 Segregated Portfolio |
|---|---|

Name:  **Matthew Brazier**
Title:  **Authorised Signatory**
Date:

Name:
Title:
Date:

ISDA Master (Put Option) – Alta 2007-2

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** | **ALTA CDO SPC for the account of the Series 2007-2 Segregated Portfolio** |
|---|---|

Name:                                Name:  **Wendy Ebanks**
Title:                                   Title:  Director
Date:                                   Date:

**SCHEDULE**
to the Master Agreement
dated as of 09 October, 2007

between

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** ("Party A"),
a company incorporated with unlimited liability
under the laws of England and Wales and
**ALTA CDO SPC, for the**
**account of the Series 2007-2 Segregated Portfolio**  ("Party B"),
a segregated portfolio company with limited liability incorporated under
the laws of the Cayman Islands

*All capitalized terms used and not otherwise defined are given the meaning ascribed to them in the indenture, dated as of 09 October, 2007, among Party B, as Issuer, ALTA CDO LLC, as Co-Issuer and U.S. Bank National Association, as Trustee.*

Part 1. Termination Provisions

In this Agreement:-

(a)    **"Specified Entity"** means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

and in relation to Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

(b)    **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)    **Payments on Early Termination.**

(i)    If an Early Termination Date is designated hereunder, Loss and Second Method shall be used to calculate any termination payment owing by either party in respect of such Early Termination Date.

(ii)    Notwithstanding anything in the Agreement or this Schedule to the contrary, the aggregate of the termination payments owing by Party A hereunder in respect of an Early Termination Date shall not exceed the lesser of (i) the termination amount calculated hereunder with respect to Party A and (ii) the amount by which unpaid interest and principal on the outstanding Notes

on the Early Termination Payment Date exceeds Collections for the Early Termination Payment Date (excluding any termination amount paid by Party A upon an early termination hereunder).

(d) The following shall be specified as an "Additional Termination Event" pursuant to Section 5(b)(v):

**Event of Default Under the Indenture.** An Event of Default under the Indenture has occurred and is continuing and the Trustee has proceeded to liquidate the Collateral, or has proceeded to redeem the Notes prior to the Scheduled Final Payment Date, and in each case such acceleration or redemption, as applicable, is no longer capable of being rescinded or revoked. For the purpose of this Additional Termination Event (1) subject to the last sentence of this Part 1(d)(i) the Affected Party shall be Party B, (2) all Transactions shall be Affected Transactions, and (3) any amount payable in respect of such event shall be payable on the immediately following Payment Date or the date that would have been such Payment Date if not for the litigation or redemption described above. Party A shall be the Affected Party if the Event of Default under the Indenture was directly and exclusively caused by a Party A's non-payment of amounts owed under the Transactions which were not subsequently cured by Party A.

(e)    The provisions of <u>Section 5(a)</u> and <u>Section 5(b)</u> will apply to Party A and to Party B as follows:-

| <u>Section 5(a)</u> | | <u>Party A</u> | <u>Party B</u> |
|---|---|---|---|
| (i) | "Failure to Pay or Deliver" | Applicable. | Applicable. |
| (ii) | "Breach of Agreement" | Applicable. | Not Applicable. |
| (iii) | "Credit Support Default" | Applicable. | Not Applicable. |
| (iv) | "Misrepresentation" | Applicable. | Not Applicable. |
| (v) | "Default under Specified Transaction" | Not Applicable. | Not Applicable. |
| (vi) | "Cross Default" | Not Applicable. | Not Applicable. |
| (vii) | "Bankruptcy" | Applicable. | Applicable. |
| (viii) | "Merger Without Assumption" | Not Applicable. | Not Applicable. |

provided that clause (2) of the **"Bankruptcy"** provision of <u>Section 5(a)(vii)</u> will not apply to Party B.

| <u>Section 5(b)</u> | | <u>Party A</u> | <u>Party B</u> |
|---|---|---|---|
| (i) | "Illegality" | Applicable. | Applicable. |
| (ii) | "Tax Event" | Not Applicable. | Not Applicable. |
| (iii) | "Tax Event Upon Merger" | Not Applicable. | Not Applicable. |
| (iv) | "Credit Event Upon Merger" | Not Applicable. | Not Applicable. |
| (v) | "Additional Termination Event" | Applicable. | Applicable. |

(f)    **"Termination Currency"** means United States Dollars ("<u>USD</u>").

(g)    **Failure to Pay or Deliver**. Section 5(a)(i) is hereby amended by deleting the words "on or before the third Local Business Day after notice of such failure is given to the party" and substituting therefor "in the case of any such failure by Party A, on or before the fifth Local Business Day after notice of such failure is given to Party A, or in the case of any such failure by Party B, on or before the third Local Business Day after notice of such failure is given to Party B;"

Part 2.  Tax Representations.

(A)    **Payer Tax Representations**.  For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B each make the following representations:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Section 2(e)</u>, 6(d)(ii), or 6(e) of this Agreement) to be made by it to the other party under this Agreement.    In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction of the agreement of the other party contained in <u>Section 4(a)(i)</u> or 4(a)(iii) of this Agreement, and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, <u>provided</u> that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.

(B)    **Payee Tax Representations**.  For the purpose of <u>Section 3(f)</u> of this Agreement, Party A and Party B make the following representations:

(i)    The following representation applies to Party A:-

Party A is a company incorporated with unlimited liability under the laws of England and Wales.

(ii)    The following representations apply to Party B:-

(A)    Each beneficial owner of Party B is either (i) a United States person for U.S. federal income tax purposes; (ii) a "non-U.S. branch of a foreign person" for purposes of sections 1.1441-4(a)(3)(ii) and is a foreign person for purposes of section 1.6041-4(a)(4) of the U.S. Treasury Regulations; or (iii) each payment received or to be received by the beneficial owner of Party B in connection with this Agreement is effectively connected with its conduct of a trade or business in the United States.

(B)    Party B and each beneficial owner of Party B is not (i) a bank that has entered into this Agreement in the ordinary course of its trade or business of making loans, as described in section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) a 10% shareholder of Party A within the meaning of Code section 871(h)(3)(B), or (iii) a controlled foreign corporation with respect to Party A within the meaning of Code section 881(c)(3)(C).

-3-

(C)    **Tax Representations in Confirmations**.  For purposes of <u>Sections 2(d)(i)(4)</u> and <u>3(f)</u>, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

Part 3.  Agreement to Deliver Documents.

For the purpose of <u>Section 4(a)(i)</u> and Section <u>4(a)(ii)</u> of this Agreement, Party A and Party B each agrees to deliver the following documents, as applicable:-

(a)    Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered |
|---|---|---|
| Party B | A correct, complete and executed U.S. Internal Revenue Service Form W-8IMY (or any successor thereto), including appropriate attachments, that eliminates U.S. federal withholding and backup withholding tax on payments under this Agreement. | (i)  Before the first Payment Date under this Agreement, (ii) before December 31 of each third succeeding calendar year, (iii) promptly upon reasonable demand by Party A, and (iv) promptly upon learning that any such Form previously provided by Party B has become obsolete or incorrect. |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | An opinion of counsel to Party A substantially in the form of <u>Exhibit A</u> to this Schedule. | Upon execution of this Agreement. | No |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party A | A guarantee of Lehman Brothers Holdings Inc. (London Branch) ("Holdings") substantially in the form of <u>Exhibit C</u> to this Schedule. | Upon execution of this Agreement. | No |

-4-

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit B to this Schedule. | Upon execution of this Agreement. | No |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of the resolution or resolutions (the "Authorizing Resolution") of the Board of Directors or loan committee of Party B, certified by a secretary, or an assistant secretary of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by Party B to Party A) and, with respect to each Transaction not covered by a previously furnished Authorizing Resolution, within five Local Business Days of the Trade Date. | Yes |
| Party B | A copy of all reports provided by Party B to the Noteholders, or the Ratings Agencies under the Indenture. | On the date that any such report is required to be provided to either the Noteholders or S&P under the Indenture. | Yes |
| Party B | A certified copy of the Indenture and each amendment thereof. | Upon execution of this Agreement and on the date of each amendment thereof. | Yes |
| Party B | A copy of the letter of acceptance of Party B's Process Agent. | Upon execution of this Agreement. | No |

Part 4. Miscellaneous.

(a)    **Addresses for Notices.**  For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to Party A:-

Address:    Lehman Brothers International (Europe)
c/o Lehman Brothers Inc.

Collateralized Debt Obligation
745 Seventh Avenue
New York, New York 10019
Attention:        Eric Del Monaco
Telephone:        (212) 526-5410
Facsimile:        (212) 885-9476


For all purposes.

With copies to:

Address:          Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019
Attention:        Structured Products Transaction Management Group
Telephone:        (212) 526-0806
Facsimile:        (646) 834-2732


Address for notices or communications to Party B:-
Address:          ALTA CDO SPC, for the account of the Series 2007-2 Segregated Portfolio
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
Grand Cayman, Cayman Islands

Attention:        The Directors
Facsimile No:    (345) 945-7100

For all purposes.


Address for notices or communications to:
Address:          Maples and Calder
P.O. Box 309 GT
Ugland House
South Church Street
Grand Cayman, Cayman Islands

Attention:        Dale Crowley
Telephone:        (345) 949-8066
Facsimile No:    (345) 949-8080

Address for notices or communications to Standard & Poor's Investments Services:

Address:          Standard & Poor's Ratings Services
55 Water Street, 41st Floor
New York, New York 10041-0003

Attention:        scdo_surveillance@sandp.com


-6-

Address for notices or communications to Moody's Investors Services, Inc.:

Address:          Moody's Investors Services, Inc.
                  7 World Trade Center,
                  New York, NY, 10007

E-mail:           cdomonitoring@moodys.com

Attention:        CDO Monitoring - Structured Finance - Derivatives

(b)     **Process Agent.**  For the purpose of <u>Section 13(c)</u> of this Agreement:-
Party A appoints as its Process Agent:    Not Applicable.

Party B appoints as its Process Agent:    Corporation Service Company
                                          1133 Avenue of the Americas, Suite 3100
                                          New York, NY 10036
                                          Ref: ALTA CDO SPC, for the account of the Series
                                          2007-2 Segregated Portfolio

(c)     **Offices.**  The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)     **Multibranch Party.**  For the purpose of <u>Section 10(c)</u> of this Agreement:-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)     **Calculation Agent.**  The Calculation Agent is Party A.

(f)     **Credit Support Document.**  Details of any Credit Support Document:-

In the case of Party A, a guarantee (the "Swap Guarantee") of Party A's obligations hereunder substantially in the form of <u>Exhibit C</u> attached to this Schedule.  Any amendment, modification or waiver to such Swap Guarantee shall require, prior to its effectiveness, a Rating Agency Confirmation with respect to such amendment, modification or waiver.

In the case of Party B, not applicable.

(g)     **Credit Support Provider.**

Credit Support Provider means in relation to Party A:  Holdings.

Credit Support Provider means in relation to Party B:  Not Applicable.

(h)     **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York including all matters of construction, validity and performance (including Sections 5-1401 and 5-1402 of the New York General Obligations Law but excluding all other choice-of-law and conflicts-of-law rules).

(i)     **Netting of Payments.**  Section 2(c)(ii) will apply to all Transactions.

(j)     **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement, except that the only Affiliate of Party B shall be the Co-Issuer; <u>provided</u>, <u>however</u>, that with respect to Party

A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)　**Jurisdiction.**　Section 13(b) is hereby amended by:　(i) deleting in the second line of subparagraph (i) thereof the word "non-"; and deleting the final paragraph thereof.

(l)　**Set-off.**　Set-off does not apply to either Party A or Party B

Part 5. Other Provisions**.**

(a)　**Confirmation.**　Each Confirmation supplements, forms part of, and will be read and construed as one with the Agreement.

(b)　**Representations**.　Section 3 is hereby amended by adding the following additional subsections:

(i)　**No Agency.**　It is entering into this Agreement, each Transaction, and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(ii)　**Eligible Contract Participant.**　It is an "eligible contract participant" as that term is defined in the Commodity Exchange Act, as amended.

(iii)　**No Reliance.**　It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communications (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(iv)　**Assessment and Understanding.**　It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(v)　**Status of Parties.**　The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(c)　**No Bankruptcy Petition.**　Party A irrevocably and unconditionally agrees that it will not, prior to the date that is one day following the payment in full of all the Notes issued pursuant to the Indenture, as applicable, and the expiration of all applicable preference periods under the laws of the United States, the Cayman Islands or any other jurisdiction relating to any such payment, acquiesce, petition or otherwise invoke or cause Party B to invoke the process of any governmental authority for the purpose of commencing or sustaining a case (whether voluntary or involuntary) against Party B under any bankruptcy, reorganization arrangement, insolvency, moratorium, liquidation or similar law or proceeding or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Party B or any substantial part of its property or ordering the winding-up or liquidation of the affairs of Party B; provided that this provision shall not

-8-

restrict or prohibit Party A from joining any other person, including, without limitation, the Trustee, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings already commenced or other analogous proceedings already commenced under applicable laws. This Part 5(c) shall survive the termination of the Transaction. Notwithstanding anything herein to the contrary, the non-petition provisions contained herein shall apply with respect to the Series 2007-2 Segregated Portfolio of ALTA CDO SPC and with respect to any other series either now or hereinafter created with respect to ALTA CDO SPC.

(d)     **Transfer.**  Section 7 is hereby amended by:  (i) adding the words "(which consent may not be unreasonably withheld)" after the words "consent" on the second line thereof, (ii) adding the words "(and notice of the transferee to)" after the word "of" on the third line thereof, (iii) adding the words "(subject to providing written notice of the transferee to the other party)" after the word "transfer" on the fourth and seventh line thereof, and (iv) deleting the words "(Subject to Section 6(b)(ii) and)" in the first line thereof.   No transfer or assignment by Party A or Party B of its rights and obligations hereunder may be made unless the Rating Agency Confirmation is received with respect to such transfer.  Notwithstanding anything to the contrary in Section 7 of this Agreement, pursuant to Rating Agency Confirmation, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate such guarantee to be substantially the same as the guarantee of the obligations of the transferor then in effect.

(e)     **Amendments to Section 9 of this Agreement.**  Section 9(b) of this Agreement is hereby amended by adding the following after the word "system" in the last line thereof:

"; provided, however, notwithstanding anything to the contrary in Section 9(b) of this Agreement, that no material amendment, modification or waiver in respect of this Agreement will be effective unless the Rating Agencies shall receive prior written notice of all such amendments, modifications or waivers; provided, further, that each such amendment, modification or waiver shall require, prior to its effectiveness, the Rating Agency Confirmation with respect to such amendments, modifications or waivers."

(f)     **Reserved.**

(g)     **Waiver of Trial By Jury.**  Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)     **Indenture**.  Without the providing ten (10) days' prior written notice to Party A and obtaining prior written consent of Party A, Party B will not enter into any indenture supplemental to the Indenture or any other instrument that would amend, modify or change the Indenture, if such supplemental indenture, amendment, modification or change would, in Party A's reasonable judgment, have an adverse effect on the interests of Party A hereunder or under the Indenture.  Party B will furnish to Party A a copy of each proposed and each executed supplemental indenture to the Indenture and copies of any related Rating Agency Confirmation in accordance with the terms of the Indenture.

(i)     **Limited Recourse.**  Notwithstanding anything in this Agreement or any Confirmation hereunder to the contrary, all amounts, payable or expressed to be payable by Party B on, under or in respect of its obligations and liabilities under this Agreement and any

-9-

Confirmation hereunder shall be recoverable only from and to the extent of sums in respect of, or calculated by reference to, the Collateral that are received by Party B pursuant to the terms and conditions thereof and the proceeds of any realization of enforcement of any Collateral, subject in any case to the Priority of Payments set out in the Indenture.  Upon final realization of such sums and proceeds, neither Party A nor any person acting on its behalf shall be entitled to take any further steps against Party B to recover any sums due but still unpaid and all claims in respect of such sums due but still unpaid shall be extinguished.  No recourse shall be had for the payment of any amounts owing in respect of this Agreement against any officer, director, employee, stockholder, preference shareholder or incorporator of Party B.  This Part 5(i) shall survive the termination of the Transaction.  Notwithstanding anything herein to the contrary, this provision shall apply with respect to the Collateral of the Series 2007-1 Segregated Portfolio of ALTA CDO SPC only and not with respect to any other series either now or hereinafter created with respect to ALTA CDO SPC.  Any claims not paid and extinguished with respect to any other series issued by the ALTA CDO SPC shall have no recourse with respect to the Series 2007-1 Segregated Portfolio of ALTA CDO SPC.

(j)    **No Gross Up.**  Notwithstanding anything to the contrary in the Agreement, including Section 2(d) of the Master Agreement, no Tax shall be an Indemnifiable Tax with respect to payments made by Party A and therefore Party A shall have no obligation to pay an additional amount otherwise required under Section 2(d)(i)(4) of the Master Agreement.

(k)    **Excise Tax Resulting From Change in Law**.  All references in Section 2(d) to deduction or withholding for or on account of any Tax shall include the payment of any excise tax, including any excise tax imposed on Party A as a result of a Change in Tax Law, in respect of payments under this Agreement.  For avoidance of doubt, in the event that any excise tax is imposed on Party A as a result of a Change in Tax Law, any payment to which Party B is otherwise entitled under this Agreement shall be reduced by the amount of the excise tax and the excise tax shall not be an Indemnifiable Tax.

"***Change in Tax Law***" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law, treaty, rule or regulation (or in the application or interpretation of any law, treaty, rule or regulation whether by official or informal means) that occurs on or after the date on which this Transaction is entered into."

(l)    **Notices.**  For the purposes of <u>subsections (iii)</u> and <u>(v)</u> of <u>Section 12(a)</u>, the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(m)    **Service of Process.**  The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(n)    **Accuracy of Specified Information.**  Section 3(d) is hereby amended by adding (i) in the first line thereof after the word "information" the words "other than audited or unaudited financial statements or balance sheets" and (ii) in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

-10-

(o)    **Non-Confidential.**  Notwithstanding anything to the contrary contained in this Agreement, all persons may disclose to any and all persons, without limitations of any kind, the U.S. federal, state or local tax treatment of any Transaction, any fact that may be relevant to understanding the U.S. federal, state or local tax treatment of any Transaction, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state or local tax treatment and that may be relevant to understanding such U.S. federal, state or local tax treatment, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, and any pricing terms or other nonpublic business or financial information that is unrelated to the U.S. federal, state or local tax treatment of the Transaction to the taxpayer and is not relevant to understanding the U.S. federal, state or local tax treatment of the Transaction to the taxpayer.

(p)    **Additional Representations of Party B.**  Party B represents to Party A in accordance with Section 3 of the Agreement (which representations will be deemed to be repeated by Party B at all times until termination of this Agreement) that:

(i)    **Secured Party**.  Party A is a Secured Party under the Indenture.

(ii)    **Constitutional Documents.**  Party B is in compliance, in all material respects, with its constitutional documents (including, but not limited to, the Indenture, as amended from time-to-time, and any and all resolutions, investment policies, guidelines, procedures or restrictions), and each Transaction contemplated hereunder is and will be an authorized and permitted transaction thereunder.

(iii)    **Third-Party Beneficiary.**  Party A shall be an express third-party beneficiary of the Indenture.

(iv)    **ERISA Representation**.  Party B continuously represents that it is not (i) an employee benefit plan (hereinafter, an "**ERISA Plan**"), as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), subject to Title  I of ERISA or a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**"), or subject to any other statute, regulation, procedure or restriction that is materially similar to Section 406 of ERISA or Section 4975 of the Code (together with ERISA Plans, "**Plans**"), (ii) a person acting on behalf of a Plan or (iii) a person any of the assets of whom constitute assets of a Plan.  It will provide notice to the other party in the event that it is aware that it is in breach of any aspect of this representation or is aware that with the passing of time, giving of notice or expiry of any applicable grace period it will breach this representation.

(v)    **Arms'-Length Transaction**.  Party B acknowledges and agrees that Party A has had and will have no involvement in and, accordingly Party A accepts no responsibility for: (i) the establishment, structure, or choice of assets of Party B; (ii) the selection of any person performing services for or acting on behalf of Party B; (iii) the selection of Party A as the Counterparty; (iv) the terms of the Notes; (v) the preparation of or passing on the disclosure and other information contained in any offering circular or similar document for the Notes, the Indenture, or any other agreements or documents used by Party B or any other party in connection with the marketing and sale of the Notes; (vi) the ongoing operations and administration of Party B, including the furnishing of any information to Party B which is not specifically required under this Agreement; or (vii) any other aspect of Party B's existence.

-11-

(q)    **General Conditions**.    Section 2(a)(iii) is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occurred and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(r)    **No Violation or Conflict Representation.**    Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to, the Indenture, as amended, and any and all resolutions, investment policies, guidelines, procedures or restrictions)."; provided, such amendment shall be applicable only with respect to the Representations of Party B.

(s)    **Severability.**    If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement; provided, however, that this severability provision shall not be applicable if any provision of Section 2, 5, 6 or 13 (or any definition or provision in Section 14 to the extent it relates to, or is used in or connection with any such Section) shall be held to be invalid or unenforceable.

**(t)**    **Additional Definitions.**    Section 14 is hereby amended by adding the following definitions in their appropriate alphabetical order:

"**Indenture**" means the Indenture, dated as of 09 October, 2007 among Party B as Issuer, and ALTA CDO LLC, as Co-Issuer and U.S. Bank National Association as Trustee (as amended, supplemented, waived or otherwise modified from time to time).

"**Moody's**" means Moody's Investor Services, Inc.

**Ratings Agencies**" means S&P and Moody's.

"**Rating Agency Confirmation**" means, with respect to any particular proposed act or omission to act hereunder, that the party acting or failing to act has consulted with each Rating Agency then providing a rating of any Class of Notes and has received from each Rating Agency a written confirmation that the proposed action or inaction would not cause such Rating Agency to downgrade or withdraw its then-current rating of any Class of Notes.

"**S&P**" means Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

-12-

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____

Name:
Title:    **Matthew Brazier**
          **Authorised Signatory**

ALTA CDO SPC, for the account of the Series 2007-2 Segregated Portfolio.

By: _____

Name:
Title:

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By:_____
    Name:
    Title:

ALTA CDO SPC, for the account of the Series 2007-2 Segregated Portfolio.

By:_____
    Name:
    Title:   **Wendy Ebanks**
            Director

ISDA Schedule (Put Opion) – Alta 2007-2

EXHIBIT A to Schedule

FORM OF OPINION OF COUNSEL FOR PARTY A

EXHIBIT B to Schedule

FORM OF OPINION OF COUNSEL FOR PARTY B

EXHIBIT C to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

**Class A-1 Confirmation**

**DATE:**          October 9, 2007

**TO:**            Alta CDO SPC, for the account of the Series 2007-2 Segregated Portfolio

**FROM:**          Lehman Brothers Special Financing Inc.

**RE:**            Credit Derivative Transaction

The purpose of this letter (this **"Confirmation"**) is to confirm the terms and conditions of the Credit Derivative Transaction entered into between Lehman Brothers Special Financing Inc. (**"Party A"**) and Alta CDO SPC, for the account of the Series 2007-2 Segregated Portfolio (**"Party B"**) on the Trade Date specified below (the **"Transaction"**).  This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1        The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions and, where so indicated in the Registry in respect of a Reference Entity, the Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (published on January 21, 2005), each as published by the International Swaps and Derivatives Association, Inc., (collectively, the **"Credit Derivatives Definitions"**) are incorporated into this Confirmation.  In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern.  Capitalized terms used herein but not otherwise defined herein or in the Credit Derivatives Definitions shall have the meanings ascribed to such terms in the Indenture.

2        This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency – Cross Border) dated as of  October 9, 2007, as amended and supplemented from time to time (the **"Agreement"**), between you and us.  All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

3        Party A will enter into the Transaction and exercise its rights and perform its obligations hereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of Party B, the holders of the Class A-1 Notes or any other person.

4        Party A may or may not have a credit exposure to any Reference Entity and may or may not have exposure to any Reference Obligation(s) or the Benchmark Obligation designated by Party A in respect of any Reference Entity.

5        The parties agree and acknowledge that the Transaction to which this Confirmation relates contemplates more than one Reference Entity and multiple Credit Event Notices, and that, accordingly, there may be more than one Credit Event and more than one Cash Settlement Amount, and that the Credit Derivatives Definitions (and in particular the provisions which modify and relate to the "Termination Date") should, for the purposes of this Confirmation, be interpreted accordingly.

6        Each Reference Entity listed on the Reference Registry to this Confirmation constitutes a separate confirmation for purposes of this Confirmation.  Accordingly, references herein to this Confirmation and the Reference Portfolio are to a portfolio of confirmations, each of which references a single Reference Entity.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**
30775-00055 NY:2749658.15

**Class A-2 Confirmation**

**DATE:**        October 9, 2007

**TO:**          Alta CDO SPC, for the account of the Series 2007-2 Segregated Portfolio

**FROM:**        Lehman Brothers Special Financing Inc.

**RE:**          Credit Derivative Transaction

The purpose of this letter (this **"Confirmation"**) is to confirm the terms and conditions of the Credit Derivative Transaction entered into between Lehman Brothers Special Financing Inc. (**"Party A"**) and Alta CDO SPC, for the account of the Series 2007-2 Segregated Portfolio (**"Party B"**) on the Trade Date specified below (the **"Transaction"**). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1        The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions and, where so indicated in the Registry in respect of a Reference Entity, the Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (published on January 21, 2005), each as published by the International Swaps and Derivatives Association, Inc., (collectively, the **"Credit Derivatives Definitions"**) are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern. Capitalized terms used herein but not otherwise defined herein or in the Credit Derivatives Definitions shall have the meanings ascribed to such terms in the Indenture.

2        This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency – Cross Border) dated as of October 9, 2007, as amended and supplemented from time to time (the **"Agreement"**), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

3        Party A will enter into the Transaction and exercise its rights and perform its obligations hereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of Party B, the holders of the Class A-2 Notes or any other person.

4        Party A may or may not have a credit exposure to any Reference Entity and may or may not have exposure to any Reference Obligation(s) or the Benchmark Obligation designated by Party A in respect of any Reference Entity.

5        The parties agree and acknowledge that the Transaction to which this Confirmation relates contemplates more than one Reference Entity and multiple Credit Event Notices, and that, accordingly, there may be more than one Credit Event and more than one Cash Settlement Amount, and that the Credit Derivatives Definitions (and in particular the provisions which modify and relate to the "Termination Date") should, for the purposes of this Confirmation, be interpreted accordingly.

6        Each Reference Entity listed on the Reference Registry to this Confirmation constitutes a separate confirmation for purposes of this Confirmation. Accordingly, references herein to this Confirmation and the Reference Portfolio are to a portfolio of confirmations, each of which references a single Reference Entity.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**
30775-00055 NY:2790244.11

**General Terms:**

| | |
|---|---|
| Trade Date: | October 9, 2007. |
| Effective Date: | October 9, 2007. |
| Scheduled Termination Date: | The later of (a) June 20, 2012 (adjusted in accordance with the Business Day Convention); and (b) the Delayed Final Payment Date (as defined in the Indenture), if any. |
| Termination Date: | (A) the Scheduled Termination Date; or (B) if the Contingency Amount with respect to the Class A-2 Notes is greater than zero on the Scheduled Termination Date, the last Deferred Redemption Date with respect to the Class A-2 Notes. |
| | Section 1.7 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Floating Rate Payer: | Party B (the **"Seller"**) |
| Fixed Rate Payer: | Party A (the **"Buyer"**) |
| Calculation Agent: | Party A |
| Business Day: | London and New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Each entity specified in the reference registry established by Party A as of October 9, 2007 and attached hereto as Annex A (the **"Reference Registry"**). Any Successor to a Reference Entity shall be identified pursuant to Section 2.2 of the Credit Derivatives Definitions, as modified herein, provided that, notwithstanding Section 2.2. of the Credit Derivatives Definitions, if one or more successors has been determined by CDX IndexCo LLC (or its successor) in respect of any the Reference Entities that are contained in the CDX.NA.HY Series 8 index pursuant to Section 2.2 of the Credit Derivatives Definitions, each such successor shall be deemed to be a Successor for the purposes of the Transaction to which this Confirmation relates. |
| | Party A shall be responsible for maintaining the Reference Registry. The Reference Registry shall contain, as to each Reference Entity, the following information: |

(i)     the legal name of such Reference Entity;

(ii)    its Reference Entity Calculation Amount in respect of such Reference Entity;

(iii)   its Reference Entity Calculation Percentage;

(iv)    the Benchmark Obligation (if any) applicable to such Reference Entity;

-2-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

(v)     whether the Benchmark Obligation (if any) applicable to Reference Entity is subordinated to other obligations of such Reference Entity; and

(vi)    whether the Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (published on January 21, 2005) are applicable to such Reference Entity.

The information contained in the Reference Registry has been obtained by Party A from the following third party sources: Bloomberg, the website maintained by the Securities and Exchange Commission and the websites maintained by S&P and Moody's. While the information obtained from such sources is believed to be accurate, neither Party A nor any of its affiliates makes any representation or warranty, expressed or implied, regarding the adequacy, correctness or completeness of the information obtained from such sources. If any of the information received from such sources is incorrect, (i) the corresponding information in the Reference Registry will likewise be incorrect, and (ii) the Reference Registry shall be amended (or deemed amended) to reflect the correct information. Under no such circumstance shall Party A be required to remove (i) the relevant Reference Entity from the Reference Portfolio, or (ii) the relevant Benchmark Obligation from the Reference Registry. Neither Party A nor any of its affiliates shall be liable to Party B, any holder of Notes or any other Person for any losses, costs, expenses or potential lost profits resulting from or related to any such incorrect information obtained from such sources.

| | |
|---|---|
| Reference Portfolio: | All of the Reference Entities included in the Reference Registry on the relevant date of determination. |
| Reference Entity Calculation Amount: | The Reference Entity Calculation Amount in respect of each Reference Entity shall be the amount set forth in Annex B hereto, as adjusted from time to time in accordance with **"Adjustments"** below. |
| Class A-2 Increase Adjustment Variable: | With respect to each Additional Issuance of the Class A-2 Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class A-2 Notes immediately after giving effect to such Additional Issuance, and (b) the Aggregate Outstanding Amount of the Class A-2 Notes immediately prior to giving effect to such Additional Issuance. |
| Class A-2 Reduction Adjustment Variable: | With respect to each Optional Reduction of the Class A-2 Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class A-2 Notes immediately after giving effect to such Optional Reduction, and (b) the denominator of which is the Aggregate Outstanding Amount of the Class A-2 Notes immediately prior to giving effect to such Optional Reduction. |
| Adjustments: | Notwithstanding anything herein to the contrary, if an Additional Issuance of the Class A-2 Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class A-2 Loss Threshold Amount, the Class A-2 Loss Cap Amount and the Class A-2 Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity |

-3-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

Loss Amount determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class A-2 Increase Adjustment Variable.

Notwithstanding anything to the contrary, if an Optional Reduction of the Class A-2 Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class A-2 Loss Threshold Amount, the Class A-2 Loss Cap Amount and the Class A-2 Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity Loss Amount determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class A-2 Reduction Adjustment Variable.

| | |
|---|---|
| Reference Obligation(s): | In respect of each Reference Entity for which a Credit Event Notice has been delivered, Party A must deliver a separate notice to Party B (with a copy to the Trustee) (each, a "**Reference Obligation Identification Notice**").   Each Reference Obligation Identification Notice must identify either (i) the obligation, if any, specified for such Reference Entity in the Reference Registry (the "**Benchmark Obligation**"), or (ii) an obligation or obligations of such Reference Entity (each of (i) and (ii), a "**Reference Obligation**").   Each obligation identified under clause (ii) must satisfy the Reference Obligation Category and the Reference Obligation Characteristics at the time of its designation.  For purposes of this Confirmation, Benchmark Obligations may include obligations issued by an affiliate of the relevant Reference Entity included in the Reference Portfolio.  Benchmark Obligations may be subordinated to other obligations of the Reference Entity, and for the avoidance of doubt, Benchmark Obligations (if applicable) may only be specified on the Closing Date. |

The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity may not exceed the Reference Entity Calculation Amount of such Reference Entity.

The definitions of Section 2.20 of the Credit Derivatives Definitions shall apply to each Reference Obligation as if it were a Deliverable Obligation.

Party A must deliver each Reference Obligation Identification Notice no later than the New York Business Day immediately preceding the relevant Valuation Date.

Each Reference Obligation Identification Notice must contain a description of each applicable Reference Obligation and its Reference Obligation Notional Amount that is sufficient for purposes of determining the Final Price of such Reference Obligation pursuant to the provisions contained herein.

A Reference Obligation, other than a Benchmark Obligation which shall always be considered to be an eligible Reference Obligation, that satisfies the Reference Obligation Category and the Reference Obligation Characteristics at the time of designation will continue to be an eligible Reference Obligation even if it does not fall into the

-4-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

Reference Obligation Category or lacks any or all Reference Obligation Characteristics at any time thereafter.

The provisions of Section 2.2(d) and Section 2.30 of the Credit Derivatives Definitions shall not apply to a Reference Obligation (other than a Benchmark Obligation designated by Party A).

For the purposes of the provisions of Section 2.2(d) and Section 2.30 of the Credit Derivatives Definitions, a Benchmark Obligation shall constitute a Reference Obligation under such Sections.

Reference Obligation
  Notional Amount:

With respect to each Reference Obligation, the amount, expressed in U.S. dollars, specified as such in the relevant Reference Obligation Identification Notice.

Reference Obligation
  Category:

Bond or Loan.

Reference Obligation
  Characteristics:

Not Subordinated
Specified Currency
Not Contingent
Assignable Loan
Consent Required Loan
Transferable
Maximum Maturity: 30 years
Not Bearer.

**Fixed Payments:**

Class A-2 Fixed Amount:

The positive difference between (A) the Class A-2 Interest Distribution Amount relating to the immediately succeeding Payment Date or the first Distribution Date to occur (as and to the extent applicable and without duplication), and (B) an amount equal to the Class A-2 Relevant Proportion on such Payment Date or Distribution Date of the interest due and payable with respect to the Permitted Long-Term Investment during the Accrual Period with respect to such Payment Date or Distribution Date (as applicable).

Class A-2 Relevant Proportion:

The proportion which the Aggregate Outstanding Amount of the Class A-2 Notes bears to the aggregate of (i) the Aggregate Outstanding Amount of the Class A-1 Notes and (ii) the Aggregate Outstanding Amount of the Class A-2 Notes.

Party A Additional Payments

On each Deferred Interest Payment Date, Party A shall pay to Party B an amount equal to the Class A-2 Deferred Interest Amount (if any) with respect to the Class A-2 Notes.

Fixed Rate Payer Payment
  Dates:

The Business Day immediately preceding (as and to the extent applicable and without duplication) (i) each Payment Date and (ii) the first Distribution Date to occur.

-5-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

|  | Section 2.10 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
|---|---|
| Party A Additional Payments | On each Deferred Interest Payment Date, Party A shall pay to Party B an amount equal to the Class A-2 Deferred Interest Amount (if any) with respect to the Class A-2 Notes. |
| Collateral Requirements: | On the Effective Date, Party A shall post $157,013.89 with the Trustee (the "**Credit Swap Posted Amount**") in cash or money market instruments rated AAAm (by S&P) and Aaa and MR1+ (by Moody's). |

The Credit Swap Posted Amount will be held by the Trustee on behalf of Party B, pursuant to the terms of the Series Indenture, until the first Distribution Date to occur (the "**Posted Amount Release Date**"). The Credit Swap Posted Amount together with any interest accrued thereon shall be released to Party A on the Posted Amount Release Date.

There will be a proportional increase of the Credit Swap Posted Amount in connection with an Additional Issuance with respect to the Class A-2 Notes.

There will be a proportional reduction of the Credit Swap Posted Amount in connection with (i) an Optional Reduction of the Class A-2 Notes, and (ii) any reduction in the Aggregate Outstanding Amount of the Class A-2 Notes following the determination of a Cash Settlement Amount hereunder. An amount equal to such reduction shall be released to Party A on the date of such Optional Reduction or the date on which such Cash Settlement Amount is determined.

Neither Party B nor the Trustee may take any actions with respect to the Credit Swap Posted Amount (or any interest earned thereon) unless Party A fails to pay to Party B any amounts owed to Party B under this Transaction (a "**Failure to Fund**"). Upon a Failure to Fund, Party B may exercise its remedies under the Agreement, including liquidating the Credit Swap Posted Amount. Party B shall apply the proceeds of any such liquidation toward Interest Collections for distribution in accordance with the Priority of Payments; *provided that* any liquidation proceeds in excess of the amounts owed by Party A shall be paid by Party B to Party A and shall not be available to make any payments in respect of the Notes.

**Floating Payment:**

Floating Rate Payer
  Calculation Amount:

In respect of each Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, the Reference Entity Calculation Amount of such Reference Entity.

-6-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

**Terms relating to Settlement:**

Conditions to Settlement:

In respect of each Reference Entity:

Credit Event Notice

Notifying Party:  Buyer

Notice of Publicly Available Information:  Applicable

For the avoidance of doubt, the parties agree that the "Conditions to Settlement" may be satisfied more than once in respect of this Transaction, but only once with respect to any Reference Entity, except pursuant to Section 3.9 of the Credit Derivatives Definitions, when applicable and as modified herein.

The Conditions to Settlement with respect to a Reference Entity may be satisfied on any day during the period from (and including) the Effective Date through (and including) the end of the Notice Delivery Period.

A copy of each Credit Event Notice shall be sent by Party A to the Rating Agencies promptly following the delivery thereof to the Issuer.

Credit Events:

Bankruptcy
Failure to Pay

Obligation(s):

Obligation Category:

Borrowed Money.

Obligation Characteristics:

None.

**Settlement Terms:**

Settlement Method:

Cash Settlement, as modified herein.

Terms Relating
   to Cash Settlement:

Valuation Date:

The provisions of Sections 7.7(a) and (b) of the Credit Derivatives Definitions shall not apply to this Transaction and are replaced with the following:

"Valuation Date" means any New York Business Day designated by the Calculation Agent between (and including) the 30th and the 120th New York Business Day following the relevant Event Determination Date; provided that if the Calculation Agent becomes aware that a payment is to be made to holders of the relevant Reference Obligation, the Calculation Agent shall use reasonable efforts to designate a Valuation Date that occurs prior to any such payment.

If the aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity does not exceed $20,000,000, Single Valuation Date (as defined in Section 7.8(a) of the Credit Derivatives Definitions); otherwise

-7-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

Multiple Valuation Dates (as defined in Section 7.8(b) of the Credit Derivatives Definitions). The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A shall not be less than $1,000,000. If Multiple Valuation Dates applies, the total number of Valuation Dates shall be equal to the quotient of (a) the Reference Entity Calculation Amount and (b) $20,000,000. For the avoidance of doubt, the aggregate of the Reference Obligation Notional Amounts in respect of Reference Obligations designated by Party A shall not exceed $20,000,000 on any Valuation Date.

The Calculation Agent shall attempt to obtain Full Quotations with respect to the Valuation Date from five or more Independent Dealers. If the Calculation Agent is unable to obtain two or more Full Quotations on the Valuation Date from Independent Dealers, then on the 7th New York Business Day following the Valuation Date the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers and, if two or more Full Quotations are not available on such day from Independent Dealers, then on the 15th New York Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers.

For purposes of obtaining Full Quotations from Independent Dealers on the 7th New York Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain two or more Full Quotations from Independent Dealers that were not solicited on the Valuation Date (and, if the Calculation Agent elects to obtain Full Quotations from only five Independent Dealers on such day, such new Independent Dealers shall replace those Independent Dealers (if any) who did not submit Full Quotations on the Valuation Date).

If Full Quotations have been requested from the requisite number of Independent Dealers on the Valuation Date or any other applicable day, the Calculation Agent shall also be permitted to obtain Full Quotations from Party A and its affiliates on such date or day.

If multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Calculation Agent shall attempt to obtain Full Quotations on the Valuation Date and each applicable date thereafter for the Reference Obligations as a whole (rather than the individual components).

If two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th New York Business Day following the Valuation Date, then the Calculation Agent must select an Independent Dealer to determine the Independently Estimated Price within five (5) New York Business Days after such day. The Independently Estimated Price must be determined by such Independent Dealer within ten (10) New York Business Days after such day.

Notwithstanding anything herein to the contrary, if the Valuation Date or any other date on which the Calculation Agent is required to attempt

-8-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

|  | to obtain Full Quotations is not also a Business Day, the Calculation Agent shall request Full Quotations on the next following Business Day. |
|---|---|
| Valuation Time: | Any time during the hours that Dealers customarily quote prices for the relevant Reference Obligation(s). |
| Quotation Method: | Bid |
|  | Where a Quotation is sought in respect of a Reference Obligation which is a Consent Required Loan, the Calculation Agent shall, to the extent practicable in connection with any requests for quotations in respect of such Reference Obligation, inform the Dealers of the identity of the debtor, the governing law and jurisdiction of the relevant loan documentation, details of any guarantee and/or security, the main covenants contained within the relevant loan documentation, the maturity date of the loan and any amortisation, the interest rate of the loan, whether the loan is a revolving loan or a term loan, the amounts if any drawn down under the loan, any conditions to transfer and the date of the relevant loan agreement subject to not thereby breaching any duty of confidentiality the Calculation Agent or any Affiliate thereof may owe in respect of such Consent Required Loan. Any firm bid quotations received from Dealers in respect of such Reference Obligation shall be treated as firm bid quotations notwithstanding that the Dealers express such firm bid quotations as being subject to the loan documentation.. |
| Quotation Amount: | (A) the Reference Obligation Notional Amount of the relevant Reference Obligation (as specified in the related Reference Obligation Identification Notice); or |
|  | (B) if multiple Reference Obligations of such Reference Entity are specified in the related Reference Obligation Identification Notice, the aggregate of the Reference Obligation Notional Amounts of such Reference Obligations (as specified in the related Reference Obligation Identification Notice). |
| Quotations: | Exclude Accrued Interest |
| Valuation Method: | If Single Valuation Date applies, Highest. |
|  | If Multiple Valuation Dates applies, weighted average of the Highest. |
|  | Section 7.5(b)(ii) of the Credit Derivatives Definitions is hereby amended by inserting the word "Full" before the word "Quotation". |
| Dealers: | Citigroup Global Markets Inc., JP Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Credit Suisse, Deutsche Bank AG, Bear Stearns & Co. Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co., Lehman Brothers International (Europe), UBS AG, Dresdner Bank AG, and any affiliate thereof. Additional dealers may be selected by the Calculation Agent from time to time. |

-9-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

| | |
|---|---|
| Independent Dealers: | Any Dealer that is not affiliated with any other Dealer; *provided that* Party A and its affiliates shall not be considered Independent Dealers. |
| Final Price: | (a) If Single Valuation Date applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent Dealers on the Valuation Date or any other applicable day, the Final Price shall be the Highest Full Quotation (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such date or day; |

(b) if Multiple Valuation Dates applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent Dealers on each Valuation Date or other applicable days, the Final Price shall be the weighted average of the Highest Full Quotations (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such Valuation Dates or such other days; and

(c) if two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th New York Business Day following the Valuation Date, then the Final Price shall be the Independently Estimated Price.

Notwithstanding the foregoing, if the Calculation Agent determines that a Settlement Protocol exists in respect of a Reference Entity and a Credit Event, then the Calculation Agent shall (a) determine the Final Price in respect of each relevant Reference Obligation in accordance with such Settlement Protocol (without the need to poll Dealers) and (b) amend any other terms of the Transaction to be consistent with the provisions of such Settlement Protocol.

For the purposes of the immediately preceding paragraph, "**Settlement Protocol**" means, as determined by the Calculation Agent in respect of a Reference Entity and a Credit Event, a market protocol that has been established by ISDA or any other internationally recognized organization or association for the purposes of amending the terms of one or more types of similar transactions similar to the Transaction with the intention that a Final Price in respect of the Reference Entity be determined in accordance with such market protocol and be used to determine the amounts payable by and/or rights and obligations of the parties under such transactions which relate to the relevant Reference Entity.

The first sentence of Section 7.4 of the Credit Derivatives Definitions shall not apply to this Transaction.

| | |
|---|---|
| Independently Estimated Price: | In respect of the relevant Reference Obligation, a price (expressed as a percentage rounded to four decimal places, exclusive of accrued interest) determined by any Independent Dealer selected by the Calculation Agent on such basis as the Independent Dealer considers fair and reasonable under the circumstances; *provided that* if multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Independently Estimated Price shall be the |

-10-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

|  |  |
|---|---|
|  | price for the Reference Obligations in the aggregate (rather than the individual components). |
| Settlement Currency: | The lawful currency of the United States of America ("USD" or "$" or "US$"). |
| Reference Entity<br>  Loss Amount: | In respect of each Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, an amount equal to the greater of (a) the product of (i) the Reference Price *minus* the Final Price and (ii) the Reference Entity Calculation Amount with respect to such Reference Entity (or, if such Credit Event is Restructuring, the Exercise Amount specified in the Credit Event Notice with respect to such Reference Entity), and (b) zero, as adjusted from time to time in accordance with "**Adjustments**" above. |
| Final Valuation Notice: | In respect of a Credit Event for which the Conditions to Settlement have been satisfied, the Calculation Agent shall provide written notification to Party B and the Trustee of the Final Price and the related Reference Entity Loss Amount no later than the earlier of (a) three (3) New York Business Days following the determination of such Final Price, and (b) the first Distribution Date to occur, in each case, as evidenced by the Trustee's prompt written acknowledgment of receipt thereof. |
|  | Each Final Valuation Notice shall identify the Reference Obligation(s) used and include a list of the Full Quotations obtained (including the date the Full Quotation was obtained but not the identity of any of the Dealers). |
|  | Each Final Valuation Notice shall include a written computation in reasonable detail showing the Calculation Agent's calculation of (i) the Final Price and the related Reference Entity Loss Amount, (ii) the Class A-2 Aggregate Loss Amount on the date of delivery of such Final Valuation Notice (increased to reflect such Reference Entity Loss Amount), and (iii) the relevant Class A-2 Cash Settlement Amount (after giving effect to the increase in Aggregate Loss Amount as provided in clause (ii) above). |
|  | The Final Valuation Notice shall include a representation and warranty that the Full Quotations were obtained (a) consistent with the terms of this Confirmation, (b) on the applicable Valuation Date or day, and (c) in respect of the Reference Obligation(s) specified in the related Reference Obligation Identification Notice. |
| Class A-2 Aggregate Loss Amount: | On the date on which a Final Valuation Notice is delivered to Party B, the sum of (a) the Reference Entity Loss Amount specified in such Final Valuation Notice, and (b) the aggregate of the Reference Entity Loss Amounts specified in prior Final Valuation Notices which were delivered to Party B. On the Effective Date, the Class A-2 Aggregate Loss Amount shall be zero. |
| Class A-2 Loss Threshold Amount: | $14,000,000, as adjusted from time to time in accordance with "**Adjustments**" above. |

-11-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

Class A-2 Loss Cap Amount:

$10,000,000, as adjusted from time to time in accordance with "**Adjustments**" above.

Class A-2 Cash Settlement Amount:

On the date on which a Final Valuation Notice which relates to the Class A-2 Notes is delivered to Party B, an amount equal to:

(a)  if the Class A-2 Aggregate Loss Amount on such date is less than or equal to the Class A-2 Loss Threshold Amount, zero;

(b)  if the Class A-2 Aggregate Loss Amount on such date is greater than the Class A-2 Loss Threshold Amount but less than the sum of the Class A-2 Loss Threshold Amount and the Class A-2 Loss Cap Amount, (i) the Class A-2 Aggregate Loss Amount *minus* (ii) the sum of (A) the Class A-2 Loss Threshold Amount and (B) the aggregate of any Class A-2 Cash Settlement Amounts determined prior to such date of delivery; and

(c)  if the Class A-2 Aggregate Loss Amount on such date is greater than or equal to the sum of the Class A-2 Loss Threshold Amount and the Class A-2 Loss Cap Amount, (i) the Class A-2 Loss Cap Amount *minus* (ii) the aggregate of any Class A-2 Cash Settlement Amounts determined prior to such date of delivery.

Actions With Respect to
   Class A-2 Cash Settlement Amounts:

On the date on which a Class A-2 Cash Settlement Amount is determined, the Aggregate Outstanding Amount of the Class A-2 Notes shall be reduced by an amount equal to such Class A-2 Cash Settlement Amount until the Aggregate Outstanding Amount of the Class A-2 Notes is reduced to zero.

Class A-2 Cash Settlement Date:

The Scheduled Termination Date and each Deferred Redemption Date.

On the Scheduled Termination Date, Party B shall pay to Party A an amount equal to the sum of the aggregate of the Class A-2 Cash Settlement Amounts (if any) that have been determined on or prior to the Scheduled Termination Date and on each Deferred Redemption Date occurring after the Scheduled Termination Date, Party B shall pay to Party A an amount equal to the aggregate of the Class A-2 Cash Settlement Amounts (if any) that have been determined in the period from (but excluding) the immediately preceding Deferred Redemption Date, or in the case of the first Deferred Redemption Date to occur, the Scheduled Termination Date to (and including) such Deferred Redemption Date (each such amount, the "**Class A-2 Credit Protection Payment Amount**").

The provisions of Section 7.2 of the Credit Derivatives Definitions shall not apply to this Transaction.

-12-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

**Additional Terms:**

Modifications to Certain
Defined Terms
and Provisions Related
to Determinations of
a Successor:

In respect of this Transaction:

(i)     Sections 2.2(a)(i) and (ii) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for the entire Credit Derivative Transaction" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(ii)    Sections 2.2(a)(iii) and (iv) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for a New Credit Derivative Transaction determined in accordance with the provisions of Section 2.2(e)" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(iii)   Section 2.2(d) of the Credit Derivatives Definitions shall be amended by:

    (a)    the deletion from sub-section (i) of the words "Credit Derivative Transaction" and their replacement with the words "Reference Entity";

    (b)    the insertion in sub-section (iii) of the words "specified in relation to the relevant Reference Entity" after the words "the Reference Obligation" ; and

    (c)    the deletion following sub-section (iii) of the words "Credit Derivative Transaction" and their replacement with the word "Successor";

(iv)    Section 2.2(e) of the Credit Derivatives Definitions shall be replaced in its entirety by the following:  "Where, pursuant to Section 2.2 (a) above, one or more Successors have been identified in relation to a particular Reference Entity:"

    (a)    each such Successor will be a Reference Entity (a "Successor Reference Entity") for the purposes of this Credit Derivative Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

    (b)    the Reference Entity Calculation Amount in respect of each such Successor Reference Entity shall be the Reference Entity Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities."

-13-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

| | |
|---|---|
| Merger of Reference Entity and Seller: | Section 2.31 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |

| | |
|---|---|
| Modifications to Definition of Not Subordinated: | In respect of this Transaction, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be amended by the insertion of (a) the words "of the relevant Reference Entity" immediately after the words "most senior Reference Obligation" in the second line thereof; (b) the words "with respect to such Reference Entity" immediately after the words "Reference Obligation is specified" in the third line thereof; and (c) the word "relevant" immediately before the words "Reference Entity" in the fifth line thereof.
If (A) a Benchmark Obligation is specified in the Reference Registry, (B) a Credit Event occurs with respect to a Reference Entity, and (C) the Reference Obligation(s) identified by Party A in the applicable Reference Obligation Identification Notice is <u>not</u> the Benchmark Obligation of such Reference Entity, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be further amended by deleting the words "the most senior Reference Obligation" in the second line thereof and replacing such words with "the Benchmark Obligation of the relevant Reference Entity". |

| | |
|---|---|
| Modifications to Certain Defined Terms and Provisions Related to Determinations in respect of Restructuring: | In respect of this Transaction, Section 3.9 of the Credit Derivatives Definitions shall be deleted in its entirety and replaced by the following language: "Upon the occurrence of a Restructuring Credit Event with respect to a Reference Entity during the Term of the Credit Derivative Transaction: |

    (a) the Notifying Party may deliver multiple Credit Event Notices with respect to such Reference Entity, each such Credit Event Notice setting forth the amount of the Reference Entity Calculation Amount for such Reference Entity to which such Credit Event Notice applies (the "Exercise Amount");

    (b) if the Notifying Party has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the then Reference Entity Calculation Amount for such Reference Entity (after taking into account any previous Exercise Amounts in relation to such Reference Entity), upon satisfaction of the Conditions to Settlement with respect to the Credit Event specified in such Credit Event Notice, settlement will occur in accordance with the applicable Settlement Method as if the Reference Entity Calculation Amount were the Exercise Amount with respect to such Reference Entity, and upon satisfaction of such Conditions to Settlement, without prejudice to the foregoing provisions of this paragraph, the Reference Entity Calculation Amount will

-14-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

be an amount equal to the Reference Entity Calculation Amount outstanding prior to such Credit Event Notice *minus* the Exercise Amount to which the current Credit Event Notice relates;

(c)  the Exercise Amount in connection with any Credit Event Notice describing a Credit Event in relation to a Reference Entity other than a Restructuring must be equal to the then outstanding Reference Entity Calculation Amount for such Reference Entity (and not a portion thereof); and

(d)  the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount that is at least 1,000,000 units of the Settlement Currency or an integral multiple thereof or an amount equal to the Reference Entity Calculation Amount less the sum of each prior Exercise Amount (if any) with respect to such Reference Entity."

**Amendment to Section 9.1 of the Credit Derivatives Definitions:**

Additional Representations:

Section 9.1 of the Credit Derivatives Definitions is hereby amended by adding the following additional representations to such Section:

"(c)  Buyer and Seller shall each be deemed to represent to the other party on the Trade Date that:

(i)  it is duly authorized to enter into this Transaction.

(ii)  it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom.

(iii)  it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

(iv)  it is acting for its own account and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction.  It has not received from the other party any assurance or guarantee as to the expected results of the Transaction.

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

(v)   it is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

(vi)   it is capable of assuming, and assumes, the financial and other risks of the Transaction.

(vii)  the other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

(viii) it is acting as principal in respect of this Confirmation and the Transaction and not as agent or in any other capacity, fiduciary or otherwise.

(ix)  that upon due execution and delivery of this Confirmation, such Confirmation shall constitute its legal, valid and binding obligation, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or in law)."

**Interpretation;**
   **No Need to Suffer a Loss:**

Interpretation:            Each reference to the singular shall include the plural and vice versa.

No Need to Suffer a Loss:         Neither Party A nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by Party B with respect to this Transaction are not conditional on Party A (or any of its affiliates) sustaining or being exposed to a risk of loss. The payments to be made by Party B with respect to this Transaction are due from Party B whether or not Party A (or any of its affiliates) actually suffers a loss.

Additional Provisions:       See Annex C attached hereto for additional provisions that apply to this Transaction.

**Certain Additional Defined Terms:**

Class A-2 Notes:          $10,000,000 Notes issued by Party B and the Co-Issuer under the Indenture.

Co-Issuer:               Alta CDO LLC.

Indenture:              The Series Indenture and the Standard Terms, collectively.

New York Business Day:      A day on which commercial banks and foreign exchange markets settle payments in The City of New York.

Person:                  An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock

-16-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

<table>
<tr><td></td><td>company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof.</td></tr>
</table>

|  |  |
|---|---|
| Series Indenture: | The Series Indenture, dated as of October 9, 2007, among Party B, the Co-Issuer and the Trustee, which supplements and incorporates the Standard Terms. |
| Standard Terms: | The Standard Terms for Indentures, dated as of October 9, 2007. |

**Notice and Account Details:**

Telephone and
Facsimile Numbers and
Contact Details for
Notices:

Party A:

Lehman Brothers Special Financing Inc.
Telephone Number:  212-526-5410
Facsimile Number:  646-758-2170
Attn:  Eric Del Monaco

With a copy of all notices to:

Transaction Management
Telephone Number:  212-526-0806
Facsimile Number:  212-652-0556
Attn:  Jonathan Lai

Party B:

Alta CDO SPC, for the Account of the Series 2007-2 Segregated Portfolio
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
Grand Cayman, Cayman Islands
Facsimile Number:  345-945-7100
Attn:  The Directors

With a copy of all notices to:

U.S. Bank National Association, as Trustee
1 Federal Street, 3rd Floor
Mail Station EX-MA-FED
Boston, Massachusetts 02110
Telephone Number: (617) 603-6479/6480
Facsimile Number: (503) 258-5975
Attn:  Corporate Trust Services/CDO Administration

**Account Details:**

Payments to Party A

-17-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

| Account for payments: | Lehman Brothers Inc. (SLHIUS3X) |
| | with further credit to Lehman Brothers Special Financing |
| | (SLHIUS3S) |
| | The Chase Manhattan Bank, New York |
| | A/C Lehman Brothers Special Financing |
| | A/C # 066-143-543 |

Payments to Party B

| Account for payments: | U.S. Bank National Association |
| | Minneapolis, MN |
| | ABA # 091-000-022 |
| | DDA # 173103321464 |
| | Account # 118700-202 |
| | Name: Alta 2007-2 Interest Collections Payment Account |

-18-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2790244.11

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:

    Name:
    Title:

Confirmed as of the date first written:

ALTA CDO SPC, for the account of the
SERIES 2007-2 SEGREGATED PORTFOLIO

By:

    Name:
    Title:

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
    Name:
    Title:

Confirmed as of the date first written:

ALTA CDO SPC, for the account of the
SERIES 2007-2 SEGREGATED PORTFOLIO

By:_____
    Name:
    Title:   **Wendy Ebanks**
           Director

Class A-2 Confirm – Alta 2007-2

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

**LEHMAN BROTHERS**

**ANNEX A**

**LONG REFERENCE PORTFOLIO**

| Reference Entity | Reference Entity Calculation Amount | Reference Entity Calculation Percentage | Restructuring | Monoline Provisions | Subordination | Transaction Type | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ABITIBI-CONSOLIDATED INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Forest Products | Printing and Publishing | US003669AJ70 | 8.375% | 4/1/2015 |
| ADVANCED MICRO DEVICES, INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electric | Electronics | US007903AJ69 | 7.750% | 11/1/2012 |
| AK Steel Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Steel | Mining, Steel, Iron and Non Precious Metals | US001546AG50 | 7.750% | 6/15/2012 |
| Allegheny Energy Supply Company, LLC | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US017363AE25 | 8.250% | 4/15/2012 |
| Allied Waste North America, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Ecological services and equipment | Ecological | US01958XBH98 | 7.375% | 4/15/2014 |
| AMERICAN AXLE & MANUFACTURING, INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US02406PAE07 | 5.250% | 2/11/2014 |
| Amkor Technology, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electric | Electronics | US031652AM26 | 9.250% | 2/15/2008 |
| AMR Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Air Transport | Personal Transportation | US001765AU07 | 9.000% | 8/1/2012 |
| ARAMARK CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Food service | Diversified/Conglomerate Service | US038521AA81 | 5.000% | 6/1/2012 |
| ARVINMERITOR, INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US043353AC58 | 8.125% | 9/15/2015 |
| Avis Budget Car Rental, LLC | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Equipment leasing | Personal Transportation | US053773AB35 | 7.750% | 5/15/2016 |
| Beazer Homes USA, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Building and development | Buildings and Real Estate | US07556QAJ40 | 6.500% | 11/15/2013 |
| BOMBARDIER INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Aerospace & Defense | Aerospace & Defense | USC10602AG20 | 6.750% | 5/1/2012 |

| CELESTICA INC. | 404,040 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Electronics/electric | Electronics | US15101QAC24 | 7.625% | 7/1/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CHARTER COMMUNICATIONS HOLDINGS, LLC | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Broadcasting and Entertainment | US16117PAK66 | 10.000% | 4/1/2009 |
| Chesapeake Energy Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US165167BE60 | 6.875% | 1/15/2016 |
| CITIZENS COMMUNICATIONS COMPANY | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications | Telecommunications | US17453BAP67 | 6.250% | 1/15/2013 |
| CLEAR CHANNEL COMMUNICATIONS, INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Radio & Television | Broadcasting & Entertainment | US184502AP71 | 5.750% | 1/15/2013 |
| CMS Energy Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US125896AZ35 | 6.875% | 12/15/2015 |
| COOPER TIRE & RUBBER COMPANY | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US216831AE76 | 8.000% | 12/15/2019 |
| CSC Holdings, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Cable and satellite television | Broadcasting and Entertainment | US126304AK02 | 7.625% | 7/15/2018 |
| Delhaize America, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Food/drug retailers | Grocery | US246688AF27 | 9.000% | 4/15/2031 |
| Dillard's, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food and drug) | Retail Stores | US254067AH46 | 7.130% | 8/1/2018 |
| Dole Food Company, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Food Products | Beverage, Food and Tobacco | US256605AJ55 | 8.625% | 5/1/2009 |
| DOMTAR INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Forest products | Printing & Publishing | US257561AW09 | 7.125% | 8/15/2015 |
| Dynegy Holdings Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US26816LAD47 | 6.875% | 4/1/2011 |
| EASTMAN KODAK COMPANY | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electrical | Chemicals, Plastics & Rubber | US277461BD00 | 7.250% | 11/15/2013 |
| EchoStar DBS Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Cable and satellite television | Broadcasting and Entertainment | US27876GAY44 | 6.625% | 10/1/2014 |
| El Paso Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US28336LAE92 | 7.875% | 6/15/2012 |
| FAIRFAX FINANCIAL HOLDINGS LIMITED | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Insurance | Insurance | US303901AN27 | 7.750% | 4/26/2012 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FLEXTRONICS INTERNATIONAL LTD. | 404,040 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Electronics/electric | Electronics | US33938EAJ64 | 6.500% | 5/15/2013 |
| FORD MOTOR COMPANY | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US345370BX76 | 6.500% | 8/1/2018 |
| FOREST OIL CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US346091AU50 | 7.750% | 5/1/2014 |
| Freescale Semiconductor, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electric | Electronics | US35687MAH07 | 9.569% | 12/15/2014 |
| GENERAL MOTORS CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US370442BS34 | 7.125% | 7/15/2013 |
| Georgia-Pacific Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Forest Products | Printing and Publishing | US373298BR83 | 7.750% | 11/15/2029 |
| HARRAH'S OPERATING COMPANY, INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Lodging & casinos | Hotels, Motels, Inns & Gaming | US413627AU44 | 5.625% | 6/1/2015 |
| HCA INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Health care | Healthcare, Education & Childcare | US404119AE97 | 6.950% | 5/1/2012 |
| HOST HOTELS & RESORTS, L.P. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Lodging & casinos | Buildings & Real Estate | US44108EAS72 | 7.125% | 11/1/2013 |
| Huntsman International LLC | 404,040 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | XS0207734210 | 7.500% | 1/1/2015 |
| IDEARC INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Publishing | Printing & Publishing | US451663AA68 | 8.000% | 11/15/2016 |
| IKON Office Solutions, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Business Equipment and Services | Home and Office Furnishings, Housewares and Durable Consumer Products | US451713AE15 | 7.750% | 9/15/2015 |
| INTELSAT, LTD. | 404,040 | 1.01% | Not Applicable | | | | Telecommunications | Telecommunications | US45820EAH53 | 6.500% | 11/1/2013 |
| Iron Mountain Incorporated | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Business Equipment and Services | Diversified/Conglomerate Service | US462846AB23 | 7.750% | 1/15/2015 |
| K. Hovnanian Enterprises, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Building and development | Buildings and Real Estate | US442488AQ54 | 6.500% | 1/15/2014 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KB Home | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Building and development | Buildings and Real Estate | US48666KAH23 | 5.750% | 2/1/2014 |
| L-3 Communications Corporation | 404,040 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Aerospace and Defense | Telecommunications | US502413AJ62 | 7.625% | 6/15/2012 |
| LEAR CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US521865AJ40 | 5.750% | 8/1/2014 |
| Level 3 Communications, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Telecommunications | US52729NBK54 | 3.500% | 6/15/2012 |
| Levi Strauss & Co. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Clothing/Textiles | Textiles and Leather | US52736RAN26 | 12.250% | 12/15/2012 |
| LIBERTY MEDIA LLC | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Cable & satellite television | Broadcasting & Entertainment | US530718AC96 | 5.700% | 5/15/2013 |
| Lucent Technologies Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Telecommunications | US549463AC10 | 6.500% | 1/15/2028 |
| Lyondell Chemical Company | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | US552078AV91 | 10.500% | 6/1/2013 |
| Massey Energy Company | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Nonferrous metals/minerals | Mining, Steel, Iron and Non Precious Metals | US576203AH62 | 6.875% | 12/15/2013 |
| MEDIACOM LLC | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Cable and satellite television | Broadcasting and Entertainment | US58445MAJ18 | 9.500% | 1/15/2013 |
| MGM MIRAGE | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Lodging and Casinos | Hotels, Motels, Inns and Gaming | US552953AG66 | 5.875% | 2/27/2014 |
| MIRANT NORTH AMERICA, LLC | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US60467XAA54 | 7.375% | 12/31/2013 |
| Nalco Company | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | US629855AE71 | 7.750% | 11/15/2011 |
| Nortel Networks Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Telecommunications | US656568AB83 | 4.250% | 9/1/2008 |
| NOVA CHEMICALS CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | US66977WAF68 | 6.500% | 1/15/2012 |
| NRG Energy, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Utilities | US629377AT99 | 7.250% | 2/1/2014 |
| Owens-Illinois, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Containers and Glass Products | Containers, Packaging and Glass | US690768BF28 | 7.800% | 5/15/2018 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Parker Drilling Company | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US701081AM33 | 9.625% | 10/1/2013 |
| PolyOne Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | US73179PAB22 | 8.875% | 5/1/2012 |
| Pride International, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US74153QAF90 | 7.375% | 7/15/2014 |
| QUEBECOR WORLD INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Publishing | Printing & Publishing | US7481F1AD86 | 6.125% | 11/15/2013 |
| Qwest Capital Funding, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Telecommunications | US74913EAH36 | 7.250% | 2/15/2011 |
| R.H. DONNELLEY CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Publishing | Printing & Publishing | US74955WAG42 | 8.875% | 1/15/2016 |
| RADIOSHACK CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food & drug) | Retail Stores | US750438AB90 | 7.375% | 5/15/2011 |
| Reliant Energy, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US75952BAN55 | 7.625% | 6/15/2014 |
| Reynolds American Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Beverage and Tobacco | Beverage, Food and Tobacco | US761713AP14 | 7.250% | 6/1/2012 |
| Rite Aid Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Food/drug retailers | Retail Stores | US767754AJ35 | 7.700% | 2/15/2027 |
| ROYAL CARIBBEAN CRUISES LTD. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Lodging & casinos | Leisure, Amusement, Entertainment | US780153AP78 | 6.875% | 12/1/2013 |
| SABRE HOLDINGS CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Business equipment & services | Personal Transportation | US785905AB66 | 8.350% | 3/15/2016 |
| Saks Incorporated | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food and drug) | Retail Stores | US79377WAK45 | 2.000% | 3/15/2024 |
| Sanmina-SCI Corporation | 404,040 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Electronics/electric | Electronics | US800907AK37 | 8.125% | 3/1/2016 |
| Six Flags, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Leisure goods/activities/movies | Leisure, Amusement, Entertainment | US83001PAF62 | 9.750% | 4/15/2013 |
| Smithfield Foods, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Food Products | Beverage, Food and Tobacco | US832248AH17 | 7.750% | 5/15/2013 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Smurfit-Stone Container Enterprises, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Forest Products | Containers, Packaging and Glass | US47508XAD75 | 7.500% | 6/1/2013 |
| Solectron Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electric | Electronics | US834182AS67 | 0.500% | 2/15/2034 |
| Standard Pacific Corp. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Building and development | Buildings and Real Estate | US85375CAT80 | 7.000% | 8/15/2015 |
| SunGard Data Systems Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Business Equipment and Services | Electronics | US867363AH61 | 9.125% | 8/15/2013 |
| TEMBEC INDUSTRIES INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Forest Products | Printing and Publishing | US87971KAE73 | 7.750% | 3/15/2012 |
| TENET HEALTHCARE CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Healthcare | Healthcare, Education and Childcare | US88033GAY61 | 7.375% | 2/1/2013 |
| Tesoro Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US881609AU51 | 6.500% | 6/1/2017 |
| The AES Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US00130HBC88 | 7.750% | 3/1/2014 |
| The Goodyear Tire & Rubber Company | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US382550AU59 | 9.000% | 7/1/2015 |
| THE HERTZ CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Equipment leasing | Personal Transportation | US428040BZ11 | 8.875% | 1/1/2014 |
| The Mosaic Co | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | USU61946AA42 | 7.375% | 12/1/2014 |
| The Neiman Marcus Group, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food and drug) | Retail Stores | US640204AB95 | 7.125% | 6/1/2028 |
| The Williams Companies, Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Oil and Gas | US969457AW06 | 7.625% | 7/15/2019 |
| TOYS "R" US, INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food & drug) | Retail Stores | US892335AL43 | 7.375% | 10/15/2018 |
| TRW Automotive Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US87264MAA71 | 7.000% | 3/15/2014 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| TXU CORP. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US873168AL29 | 5.550% | 11/15/2014 |
| Unisys Corporation | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Business Equipment and Services | Electronics | US909214BK33 | 8.500% | 10/15/2015 |
| United Rentals (North America), Inc. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Equipment leasing | Buildings and Real Estate | US911365AN42 | 6.500% | 2/15/2012 |
| UNIVISION COMMUNICATIONS INC. | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Radio & Television | Telecommunications | US914906AB87 | 7.850% | 7/15/2011 |
| VISTEON CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US92839UAC18 | 7.000% | 3/10/2014 |
| WINDSTREAM CORPORATION | 404,040 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications | Telecommunications | US97381WAC82 | 8.125% | 8/1/2013 |

**LEHMAN BROTHERS**

**ANNEX B**

| Class of Notes | Size of the Reference Portfolio | Loss Threshold Amount | | Loss Cap Amount | | Reference Entity Calculation Amount | |
|---|---|---|---|---|---|---|---|
| Class A-2 Notes | $40,000,000 | $14,000,000 | 35% | $10,000,000 | 25% | $404,040 | 1.01% |

**LEHMAN BROTHERS**

**ANNEX C**

**Additional Terms**

(a) **Additional Agreements.** Each party agrees as set out below for so long as either party has or may have any obligation under this Transaction:

(i)     The Seller acknowledges and agrees that this Transaction constitutes a credit default swap transaction and, accordingly, the Buyer may, following the occurrence of a Credit Event in respect of a Reference Entity and subject to the terms specified herein, demand and receive payment in full of the appropriate Cash Settlement Amount on the date such amount shall be payable without being required to make any prior demand or to take prior proceedings against the relevant Reference Entity or any other person which is a surety for or which has granted the Buyer any form of credit protection or credit insurance or entered into any credit default swap or similar transaction with the Buyer in respect of such Reference Entity.  The Buyer shall be under no obligation to account to the Seller or to any of its affiliates for any payment or sums, if any, recovered from a Reference Entity or any third party.

(ii)    Each party, the Calculation Agent and their respective affiliates may, whether by virtue of the types of relationships described herein or otherwise, at the date hereof or at any time hereafter, be in possession of information in relation to any Reference Entity that is or may be material in the context of this Transaction and that may or may not be publicly available or known to the aforementioned persons.  Apart from the obligations of the Calculation Agent set out in this Confirmation, this Transaction does not create any obligation on the part of any such person or its affiliates to disclose to the other party any such relationship or information (whether or not confidential).

(iii)   The parties agree that, in entering into this Transaction, neither the Buyer nor the Seller intends to enter into a contract of surety, guarantee, insurance, assurance or indemnity, and the parties' obligations hereunder are not conditional or dependent upon or subject to the Buyer having any title, ownership or interest (whether legal, equitable or economic) in any Reference Entity.

(iv)    The parties shall be obliged to perform this Transaction without regard to whether the Buyer or any affiliate of the Buyer has any credit exposure in respect of a Reference Entity.  Neither the Buyer nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by the Seller under this Transaction are not conditional on the Buyer (or any of its affiliates) sustaining or being exposed to a risk of loss.

(v)     The Seller acquires no rights, either direct or indirect or by way of subrogation, against any Reference Entity or in respect of any Reference Obligation thereof as a result of entering into or performing its obligations under this Transaction.

(b) **The Calculation Agent.**

(1)  The Calculation Agent shall be responsible for:

(i)     Determining a successor as Calculation Agent (if necessary) after agreement with the Seller;

(ii)    Determining a Successor to any Reference Entity in accordance with the Definitions;

(iii)   Obtaining Full Quotations in accordance with the Confirmation;

(iv)    Selecting Dealers where required in accordance with the Confirmation;

(v)     Determining Reference Entity Loss Amounts, Final Prices, Class A-2 Cash Settlement Amounts and each Class A-2 Credit Protection Payment Amount;

(vi)      Determining (i) a hypothetical Reference Entity Loss Amount for each Class A-2 Adjustment Reference Entity based on a Final Price of zero, and (ii) a hypothetical Class A-2 Cash Settlement Amount for such Class A-2 Adjustment Reference Entity;

(vii)     Determining any Class A-2 Adjustment Amount, any Class A-2 Adjustment Reference Entity, the Contingency Amount with respect to the Class A-2 Notes, the Contingency Cash Settlement Amount with respect to the Class A-2 Notes, any relevant Deferred Interest Cut-off Date, any relevant Deferred Redemption Cut-off Date, any relevant Deferred Redemption Date, any Deferred Redemption Amount with respect to the Class A-2 Notes and the Outstanding Adjustment Amount with respect to each Class A-2 Adjustment Reference Entity; and

(viii)    To the extent not provided for by sub-paragraphs (i) to (vii) above, making the calculations and determinations and giving the notices as set out and contemplated hereunder.

(2)  Whenever the Calculation Agent is required to act or to exercise judgment, it shall do so in good faith and in a commercially reasonable manner.  Its calculations and determinations shall be binding in the absence of bad faith or manifest error.

(3)  Each party agrees that the Calculation Agent is not acting as a fiduciary for or as an advisor to either party in respect of its duties as Calculation Agent in connection with this Transaction.

(4)  In connection with any requests for quotations or estimates pursuant to the provisions set forth in this Confirmation under "Settlement Terms", the Calculation Agent:  (a) may, but shall not be required to, inform the relevant Dealers of the Publicly Available Information in its possession regarding the occurrence and the nature of the relevant Credit Event; and (b) shall not disclose any information that would give rise to a contravention by the Buyer of its obligations under applicable secrecy laws.

**General Terms:**

| | |
|---|---|
| Trade Date: | October 9, 2007. |
| Effective Date: | October 9, 2007. |
| Scheduled Termination Date: | The later of (a) June 20, 2012 (adjusted in accordance with the Business Day Convention); and (b) the Delayed Final Payment Date (as defined in the Indenture), if any. |
| Termination Date: | (A) the Scheduled Termination Date; or (B) if the Contingency Amount with respect to the Class A-1 Notes is greater than zero on the Scheduled Termination Date, the last Deferred Redemption Date with respect to the Class A-1 Notes. |
| | Section 1.7 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Floating Rate Payer: | Party B (the **"Seller"**) |
| Fixed Rate Payer: | Party A (the **"Buyer"**) |
| Calculation Agent: | Party A |
| Business Day: | London and New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Each entity specified in the reference registry established by Party A as of October 9, 2007 and attached hereto as Annex A (the **"Reference Registry"**). Any Successor to a Reference Entity shall be identified pursuant to Section 2.2 of the Credit Derivatives Definitions, as modified herein, provided that, notwithstanding Section 2.2. of the Credit Derivatives Definitions, if one or more successors has been determined by CDX IndexCo LLC (or its successor) in respect of any the Reference Entities that are contained in the CDX.NA.HY Series 8 index pursuant to Section 2.2 of the Credit Derivatives Definitions, each such successor shall be deemed to be a Successor for the purposes of the Transaction to which this Confirmation relates. |
| | Party A shall be responsible for maintaining the Reference Registry. The Reference Registry shall contain, as to each Reference Entity, the following information: |

(i)      the legal name of such Reference Entity;

(ii)      its Reference Entity Calculation Amount in respect of such Reference Entity;

(iii)      its Reference Entity Calculation Percentage;

(iv)      the Benchmark Obligation (if any) applicable to such Reference Entity;

-2-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

(v)    whether the Benchmark Obligation (if any) applicable to Reference Entity is subordinated to other obligations of such Reference Entity; and

(vi)    whether the Additional Provisions for Physically Settled Default Swaps - Monoline Insurer as Reference Entity (published on January 21, 2005) are applicable to such Reference Entity.

The information contained in the Reference Registry has been obtained by Party A from the following third party sources:  Bloomberg, the website maintained by the S&P and Exchange Commission and the websites maintained by S&P and Moody's.  While the information obtained from such sources is believed to be accurate, neither Party A nor any of its affiliates makes any representation or warranty, expressed or implied, regarding the adequacy, correctness or completeness of the information obtained from such sources.  If any of the information received from such sources is incorrect, (i) the corresponding information in the Reference Registry will likewise be incorrect, and (ii) the Reference Registry shall be amended (or deemed amended) to reflect the correct information.  Under no such circumstance shall Party A be required to remove (i) the relevant Reference Entity from the Reference Portfolio, or (ii) the relevant Benchmark Obligation from the Reference Registry.  Neither Party A nor any of its affiliates shall be liable to Party B, any holder of Notes or any other Person for any losses, costs, expenses or potential lost profits resulting from or related to any such incorrect information obtained from such sources.

Reference Portfolio:    All of the Reference Entities included in the Reference Registry on the relevant date of determination.

Reference Entity
   Calculation Amount:    The Reference Entity Calculation Amount in respect of each Reference Entity shall be the amount set forth in Annex B hereto, as adjusted from time to time in accordance with **"Adjustments"** below.

Class A-1 Increase Adjustment Variable:    With respect to each Additional Issuance of the Class A-1 Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class A-1 Notes immediately after giving effect to such Additional Issuance, and (b) the Aggregate Outstanding Amount of the Class A-1 Notes immediately prior to giving effect to such Additional Issuance.

Class A-1 Reduction Adjustment Variable:    With respect to each Optional Reduction of the Class A-1 Notes, the quotient of (a) the Aggregate Outstanding Amount of the Class A-1 Notes immediately after giving effect to such Optional Reduction, and (b) the denominator of which is the Aggregate Outstanding Amount of the Class A-1 Notes immediately prior to giving effect to such Optional Reduction.

Adjustments:    Notwithstanding anything herein to the contrary, if an Additional Issuance of the Class A-1 Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class A-1 Loss Threshold Amount, the Class A-1 Loss Cap Amount and the Class A-1 Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity

-3-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

Loss Amount determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class A-1 Increase Adjustment Variable.

Notwithstanding anything to the contrary, if an Optional Reduction of the Class A-1 Notes occurs, (i) each of the Reference Entity Calculation Amount, the Class A-1 Loss Threshold Amount, the Class A-1 Loss Cap Amount and the Class A-1 Aggregate Loss Amount as of the date of such Additional Issuance and (ii) each Reference Entity Loss Amount determined on or prior to the date of such Additional Issuance, shall be amended to be equal to the product of such amount and the Class A-1 Reduction Adjustment Variable.

| Reference Obligation(s): | In respect of each Reference Entity for which a Credit Event Notice has been delivered, Party A must deliver a separate notice to Party B (with a copy to the Trustee) (each, a **"Reference Obligation Identification Notice"**).  Each Reference Obligation Identification Notice must identify either (i) the obligation, if any, specified for such Reference Entity in the Reference Registry (the **"Benchmark Obligation"**), or (ii) an obligation or obligations of such Reference Entity (each of (i) and (ii), a **"Reference Obligation"**).  Each obligation identified under clause (ii) must satisfy the Reference Obligation Category and the Reference Obligation Characteristics at the time of its designation.  For purposes of this Confirmation, Benchmark Obligations may include obligations issued by an affiliate of the relevant Reference Entity included in the Reference Portfolio.  Benchmark Obligations may be subordinated to other obligations of the Reference Entity, and for the avoidance of doubt, Benchmark Obligations (if applicable) may only be specified on the Closing Date. |
|---|---|

The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity may not exceed the Reference Entity Calculation Amount of such Reference Entity.

The definitions of Section 2.20 of the Credit Derivatives Definitions shall apply to each Reference Obligation as if it were a Deliverable Obligation.

Party A must deliver each Reference Obligation Identification Notice no later than the New York Business Day immediately preceding the relevant Valuation Date.

Each Reference Obligation Identification Notice must contain a description of each applicable Reference Obligation and its Reference Obligation Notional Amount that is sufficient for purposes of determining the Final Price of such Reference Obligation pursuant to the provisions contained herein.

A Reference Obligation, other than a Benchmark Obligation which shall always be considered to be an eligible Reference Obligation, that satisfies the Reference Obligation Category and the Reference Obligation Characteristics at the time of designation will continue to be an eligible Reference Obligation even if it does not fall into the

-4-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2749658.15

Reference Obligation Category or lacks any or all Reference Obligation Characteristics at any time thereafter.

The provisions of Section 2.2(d) and Section 2.30 of the Credit Derivatives Definitions shall not apply to a Reference Obligation (other than a Benchmark Obligation designated by Party A).

For the purposes of the provisions of Section 2.2(d) and Section 2.30 of the Credit Derivatives Definitions, a Benchmark Obligation shall constitute a Reference Obligation under such Sections.

Reference Obligation
Notional Amount:

With respect to each Reference Obligation, the amount, expressed in U.S. dollars, specified as such in the relevant Reference Obligation Identification Notice.

Reference Obligation
Category:

Bond or Loan.

Reference Obligation
Characteristics:

Not Subordinated
Specified Currency
Not Contingent
Assignable Loan
Consent Required Loan
Transferable
Maximum Maturity: 30 years
Not Bearer.

**Fixed Payments:**

Fixed Rate Payer Calculation Amount:

In respect of each Accrual Period, the Weighted Average Outstanding Principal Amount of the Class A-1 Notes.

Fixed Rate:

1.52 per cent. per annum, provided that in respect of the last five calendar days of the final Fixed Rate Payer Calculation Period, the Fixed Rate shall be 1.82 per cent. per annum and the Fixed Amount in respect of such Fixed Rate Payer Calculation Period shall be determined by reference to the weighted average Fixed Rate for such Fixed Rate Payer Calculation Period.

Fixed Rate Payer Payment
Dates:

The Business Day immediately preceding (as and to the extent applicable and without duplication) (i) each Payment Date and (ii) the first Distribution Date to occur.

Section 2.10 of the Credit Derivatives Definitions shall not apply in respect of this Transaction.

Fixed Rate Day Count Fraction:

30/360

Party A Additional Payments

On each Deferred Interest Payment Date, Party A shall pay to Party B an amount equal to the Class A-1 Deferred Interest Amount (if any) with respect to the Class A-1 Notes.

-5-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

| | |
|---|---|
| Collateral Requirements: | On the Effective Date, Party A shall post $1,342,464 with the Trustee (the "**Credit Swap Posted Amount**") in cash or money market instruments rated AAAm (by S&P) and Aaa and MR1+ (by Moody's). |

The Credit Swap Posted Amount will be held by the Trustee on behalf of Party B, pursuant to the terms of the Series Indenture, until the first Distribution Date to occur (the "**Posted Amount Release Date**"). The Credit Swap Posted Amount together with any interest accrued thereon shall be released to Party A on the Posted Amount Release Date.

There will be a proportional increase of the Credit Swap Posted Amount in connection with an Additional Issuance with respect to the Class A-1 Notes.

There will be a proportional reduction of the Credit Swap Posted Amount in connection with (i) an Optional Reduction of the Class A-1 Notes, and (ii) any reduction in the Aggregate Outstanding Amount of the Class A-1 Notes following the determination of a Cash Settlement Amount hereunder. An amount equal to such reduction shall be released to Party A on the date of such Optional Reduction or the date on which such Cash Settlement Amount is determined.

Neither Party B nor the Trustee may take any actions with respect to the Credit Swap Posted Amount (or any interest earned thereon) unless Party A fails to pay to Party B any amounts owed to Party B under this Transaction (a "**Failure to Fund**"). Upon a Failure to Fund, Party B may exercise its remedies under the Agreement, including liquidating the Credit Swap Posted Amount. Party B shall apply the proceeds of any such liquidation toward Interest Collections for distribution in accordance with the Priority of Payments; *provided that* any liquidation proceeds in excess of the amounts owed by Party A shall be paid by Party B to Party A and shall not be available to make any payments in respect of the Notes.

**Floating Payment:**

| | |
|---|---|
| Floating Rate Payer<br>  Calculation Amount: | In respect of each Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, the Reference Entity Calculation Amount of such Reference Entity. |

-6-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

**Terms relating to Settlement:**

| | |
|---|---|
| Conditions to Settlement: | In respect of each Reference Entity: |

        Credit Event Notice

        Notifying Party:  Buyer

        Notice of Publicly Available Information:  Applicable

For the avoidance of doubt, the parties agree that the "Conditions to Settlement" may be satisfied more than once in respect of this Transaction, but only once with respect to any Reference Entity, except pursuant to Section 3.9 of the Credit Derivatives Definitions, when applicable and as modified herein.

The Conditions to Settlement with respect to a Reference Entity may be satisfied on any day during the period from (and including) the Effective Date through (and including) the end of the Notice Delivery Period.

A copy of each Credit Event Notice shall be sent by Party A to the Rating Agencies promptly following the delivery thereof to the Issuer.

| | |
|---|---|
| Credit Events: | Bankruptcy<br>Failure to Pay |
| Obligation(s): | |
| Obligation Category: | Borrowed Money. |
| Obligation Characteristics: | None. |

**Settlement Terms:**

| | |
|---|---|
| Settlement Method: | Cash Settlement, as modified herein |
| Terms Relating<br>  to Cash Settlement: | |
| Valuation Date: | The provisions of Sections 7.7(a) and (b) of the Credit Derivatives Definitions shall not apply to this Transaction and are replaced with the following: |

 "Valuation Date" means any New York Business Day designated by the Calculation Agent between (and including) the 30th and the 120th New York Business Day following the relevant Event Determination Date; provided that if the Calculation Agent becomes aware that a payment is to be made to holders of the relevant Reference Obligation, the Calculation Agent shall use reasonable efforts to designate a Valuation Date that occurs prior to any such payment.

If the aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A in respect of a Reference Entity does not exceed $20,000,000, Single Valuation Date (as defined in Section 7.8(a) of the Credit Derivatives Definitions); otherwise

-7-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

Multiple Valuation Dates (as defined in Section 7.8(b) of the Credit Derivatives Definitions). The aggregate of the Reference Obligation Notional Amounts of Reference Obligations designated by Party A shall not be less than $1,000,000. If Multiple Valuation Dates applies, the total number of Valuation Dates shall be equal to the quotient of (a) the Reference Entity Calculation Amount and (b) $20,000,000. For the avoidance of doubt, the aggregate of the Reference Obligation Notional Amounts in respect of Reference Obligations designated by Party A shall not exceed $20,000,000 on any Valuation Date.

The Calculation Agent shall attempt to obtain Full Quotations with respect to the Valuation Date from five or more Independent Dealers. If the Calculation Agent is unable to obtain two or more Full Quotations on the Valuation Date from Independent Dealers, then on the 7th New York Business Day following the Valuation Date the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers and, if two or more Full Quotations are not available on such day from Independent Dealers, then on the 15th New York Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain Full Quotations with respect to such day from five or more Independent Dealers.

For purposes of obtaining Full Quotations from Independent Dealers on the 7th New York Business Day following the Valuation Date, the Calculation Agent shall attempt to obtain two or more Full Quotations from Independent Dealers that were not solicited on the Valuation Date (and, if the Calculation Agent elects to obtain Full Quotations from only five Independent Dealers on such day, such new Independent Dealers shall replace those Independent Dealers (if any) who did not submit Full Quotations on the Valuation Date).

If Full Quotations have been requested from the requisite number of Independent Dealers on the Valuation Date or any other applicable day, the Calculation Agent shall also be permitted to obtain Full Quotations from Party A and its affiliates on such date or day.

If multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Calculation Agent shall attempt to obtain Full Quotations on the Valuation Date and each applicable date thereafter for the Reference Obligations as a whole (rather than the individual components).

If two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th New York Business Day following the Valuation Date, then the Calculation Agent must select an Independent Dealer to determine the Independently Estimated Price within five (5) New York Business Days after such day. The Independently Estimated Price must be determined by such Independent Dealer within ten (10) New York Business Days after such day.

Notwithstanding anything herein to the contrary, if the Valuation Date or any other date on which the Calculation Agent is required to attempt

-8-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

|  |  |
|---|---|
|  | to obtain Full Quotations is not also a Business Day, the Calculation Agent shall request Full Quotations on the next following Business Day. |
| Valuation Time: | Any time during the hours that Dealers customarily quote prices for the relevant Reference Obligation(s). |
| Quotation Method: | Bid |
|  | Where a Quotation is sought in respect of a Reference Obligation which is a Consent Required Loan, the Calculation Agent shall, to the extent practicable in connection with any requests for quotations in respect of such Reference Obligation, inform the Dealers of the identity of the debtor, the governing law and jurisdiction of the relevant loan documentation, details of any guarantee and/or security, the main covenants contained within the relevant loan documentation, the maturity date of the loan and any amortisation, the interest rate of the loan, whether the loan is a revolving loan or a term loan, the amounts if any drawn down under the loan, any conditions to transfer and the date of the relevant loan agreement subject to not thereby breaching any duty of confidentiality the Calculation Agent or any Affiliate thereof may owe in respect of such Consent Required Loan. Any firm bid quotations received from Dealers in respect of such Reference Obligation shall be treated as firm bid quotations notwithstanding that the Dealers express such firm bid quotations as being subject to the loan documentation. |
| Quotation Amount: | (A) the Reference Obligation Notional Amount of the relevant Reference Obligation (as specified in the related Reference Obligation Identification Notice); or |
|  | (B) if multiple Reference Obligations of such Reference Entity are specified in the related Reference Obligation Identification Notice, the aggregate of the Reference Obligation Notional Amounts of such Reference Obligations (as specified in the related Reference Obligation Identification Notice). |
| Quotations: | Exclude Accrued Interest |
| Valuation Method: | If Single Valuation Date applies, Highest. |
|  | If Multiple Valuation Dates applies, weighted average of the Highest. |
|  | Section 7.5(b)(ii) of the Credit Derivatives Definitions is hereby amended by inserting the word "Full" before the word "Quotation". |
| Dealers: | Citigroup Global Markets Inc., JP Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Credit Suisse, Deutsche Bank AG, Bear Stearns & Co. Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co., Lehman Brothers International (Europe), UBS AG, Dresdner Bank AG, and any affiliate thereof. Additional dealers may be selected by the Calculation Agent from time to time. |

-9-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

| | |
|---|---|
| Independent Dealers: | Any Dealer that is not affiliated with any other Dealer; *provided that* Party A and its affiliates shall not be considered Independent Dealers. |

Final Price:

(a) If Single Valuation Date applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent Dealers on the Valuation Date or any other applicable day, the Final Price shall be the Highest Full Quotation (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such date or day;

(b) if Multiple Valuation Dates applies and two or more Full Quotations for the related Reference Obligation(s) are received from Independent Dealers on each Valuation Date or other applicable days, the Final Price shall be the weighted average of the Highest Full Quotations (expressed as a percentage rounded to four decimal places) obtained by the Calculation Agent from all Dealers on such Valuation Dates or such other days; and

(c) if two or more Full Quotations for the related Reference Obligation are not available from Independent Dealers on the 15th New York Business Day following the Valuation Date, then the Final Price shall be the Independently Estimated Price.

Notwithstanding the foregoing, if the Calculation Agent determines that a Settlement Protocol exists in respect of a Reference Entity and a Credit Event, then the Calculation Agent shall (a) determine the Final Price in respect of each relevant Reference Obligation in accordance with such Settlement Protocol (without the need to poll Dealers) and (b) amend any other terms of the Transaction to be consistent with the provisions of such Settlement Protocol.

For the purposes of the immediately preceding paragraph, "**Settlement Protocol**" means, as determined by the Calculation Agent in respect of a Reference Entity and a Credit Event, a market protocol that has been established by ISDA or any other internationally recognized organization or association for the purposes of amending the terms of one or more types of similar transactions similar to the Transaction with the intention that a Final Price in respect of the Reference Entity be determined in accordance with such market protocol and be used to determine the amounts payable by and/or rights and obligations of the parties under such transactions which relate to the relevant Reference Entity.

The first sentence of Section 7.4 of the Credit Derivatives Definitions shall not apply to this Transaction.

Independently Estimated Price:

In respect of the relevant Reference Obligation, a price (expressed as a percentage rounded to four decimal places, exclusive of accrued interest) determined by any Independent Dealer selected by the Calculation Agent on such basis as the Independent Dealer considers fair and reasonable under the circumstances; *provided that* if multiple Reference Obligations have been designated in a Reference Obligation Identification Notice, the Independently Estimated Price shall be the

-10-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

price for the Reference Obligations in the aggregate (rather than the individual components).

| | |
|---|---|
| Settlement Currency: | The lawful currency of the United States of America ("USD" or "$" or "US$"). |

**Reference Entity Loss Amount:**

In respect of each Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, an amount equal to the greater of (a) the product of (i) the Reference Price *minus* the Final Price and (ii) the Reference Entity Calculation Amount with respect to such Reference Entity (or, if such Credit Event is Restructuring, the Exercise Amount specified in the Credit Event Notice with respect to such Reference Entity), and (b) zero, as adjusted from time to time in accordance with "**Adjustments**" above.

**Final Valuation Notice:**

In respect of a Credit Event for which the Conditions to Settlement have been satisfied, the Calculation Agent shall provide written notification to Party B and the Trustee of the Final Price and the related Reference Entity Loss Amount no later than the earlier of (a) three (3) New York Business Days following the determination of such Final Price, and (b) the first Distribution Date to occur, in each case, as evidenced by the Trustee's prompt written acknowledgment of receipt thereof.

Each Final Valuation Notice shall identify the Reference Obligation(s) used and include a list of the Full Quotations obtained (including the date the Full Quotation was obtained but not the identity of any of the Dealers).

Each Final Valuation Notice shall include a written computation in reasonable detail showing the Calculation Agent's calculation of (i) the Final Price and the related Reference Entity Loss Amount, (ii) the Class A-1 Aggregate Loss Amount on the date of delivery of such Final Valuation Notice (increased to reflect such Reference Entity Loss Amount), and (iii) the relevant Class A-1 Cash Settlement Amount (after giving effect to the increase in Aggregate Loss Amount as provided in clause (ii) above).

The Final Valuation Notice shall include a representation and warranty that the Full Quotations were obtained (a) consistent with the terms of this Confirmation, (b) on the applicable Valuation Date or day, and (c) in respect of the Reference Obligation(s) specified in the related Reference Obligation Identification Notice.

**Class A-1 Aggregate Loss Amount:**

On the date on which a Final Valuation Notice is delivered to Party B, the sum of (a) the Reference Entity Loss Amount specified in such Final Valuation Notice, and (b) the aggregate of the Reference Entity Loss Amounts specified in prior Final Valuation Notices which were delivered to Party B. On the Effective Date, the Class A-1 Aggregate Loss Amount shall be zero.

**Class A-1 Loss Threshold Amount:**

$463,680,000, as adjusted from time to time in accordance with "**Adjustments**" above.

-11-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2749658.15

| | |
|---|---|
| Class A-1 Loss Cap Amount: | $331,200,000, as adjusted from time to time in accordance with "**Adjustments**" above. |

Class A-1 Cash Settlement Amount:

On the date on which a Final Valuation Notice which relates to the Class A-1 Notes is delivered to Party B, an amount equal to:

(a)  if the Class A-1 Aggregate Loss Amount on such date is less than or equal to the Class A-1 Loss Threshold Amount, zero;

(b)  if the Class A-1 Aggregate Loss Amount on such date is greater than the Class A-1 Loss Threshold Amount but less than the sum of the Class A-1 Loss Threshold Amount and the Class A-1 Loss Cap Amount, (i) the Class A-1 Aggregate Loss Amount *minus* (ii) the sum of (A) the Class A-1 Loss Threshold Amount and (B) the aggregate of any Class A-1 Cash Settlement Amounts determined prior to such date of delivery; and

(c)  if the Class A-1 Aggregate Loss Amount on such date is greater than or equal to the sum of the Class A-1 Loss Threshold Amount and the Class A-1 Loss Cap Amount, (i) the Class A-1 Loss Cap Amount *minus* (ii) the aggregate of any Class A-1 Cash Settlement Amounts determined prior to such date of delivery.

Actions With Respect to
 Class A-1 Cash Settlement Amounts:

On the date on which a Class A-1 Cash Settlement Amount is determined, the Aggregate Outstanding Amount of the Class A-1 Notes shall be reduced by an amount equal to such Class A-1 Cash Settlement Amount until the Aggregate Outstanding Amount of the Class A-1 Notes is reduced to zero.

Class A-1 Cash Settlement Date:

The Scheduled Termination Date and each Deferred Redemption Date.

On the Scheduled Termination Date, Party B shall pay to Party A an amount equal to the sum of the aggregate of the Class A-1 Cash Settlement Amounts (if any) that have been determined on or prior to the Scheduled Termination Date and on each Deferred Redemption Date occurring after the Scheduled Termination Date, Party B shall pay to Party A an amount equal to the aggregate of the Class A-1 Cash Settlement Amounts (if any) that have been determined in the period from (but excluding) the immediately preceding Deferred Redemption Date, or in the case of the first Deferred Redemption Date to occur, the Scheduled Termination Date to (and including) such Deferred Redemption Date (each such amount, the "**Class A-1 Credit Protection Payment Amount**").

The provisions of Section 7.2 of the Credit Derivatives Definitions shall not apply to this Transaction.

-12-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

**Additional Terms:**

Modifications to Certain
   Defined Terms
   and Provisions Related
   to Determinations of
   a Successor:

In respect of this Transaction:

(i)    Sections 2.2(a)(i) and (ii) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for the entire Credit Derivative Transaction" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(ii)    Sections 2.2(a)(iii) and (iv) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for a New Credit Derivative Transaction determined in accordance with the provisions of Section 2.2(e)" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(iii)    Section 2.2(d) of the Credit Derivatives Definitions shall be amended by:

(a)    the deletion from sub-section (i) of the words "Credit Derivative Transaction" and their replacement with the words "Reference Entity";

(b)    the insertion in sub-section (iii) of the words "specified in relation to the relevant Reference Entity" after the words "the Reference Obligation" ; and

(c)    the deletion following sub-section (iii) of the words "Credit Derivative Transaction" and their replacement with the word "Successor";

(iv)    Section 2.2(e) of the Credit Derivatives Definitions shall be replaced in its entirety by the following:   "Where, pursuant to Section 2.2 (a) above, one or more Successors have been identified in relation to a particular Reference Entity:"

(a)    each such Successor will be a Reference Entity (a "Successor Reference Entity") for the purposes of this Credit Derivative Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(b)    the Reference Entity Calculation Amount in respect of each such Successor Reference Entity shall be the Reference Entity Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities."

-13-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2749658.15

| | |
|---|---|
| Merger of Reference Entity and Seller: | Section 2.31 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |

Modifications to Definition of
   Not Subordinated:

In respect of this Transaction, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be amended by the insertion of (a) the words "of the relevant Reference Entity" immediately after the words "most senior Reference Obligation" in the second line thereof; (b) the words "with respect to such Reference Entity" immediately after the words "Reference Obligation is specified" in the third line thereof; and (c) the word "relevant" immediately before the words "Reference Entity" in the fifth line thereof.

If (A) a Benchmark Obligation is specified in the Reference Registry, (B) a Credit Event occurs with respect to a Reference Entity, and (C) the Reference Obligation(s) identified by Party A in the applicable Reference Obligation Identification Notice is <u>not</u> the Benchmark Obligation of such Reference Entity, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be further amended by deleting the words "the most senior Reference Obligation" in the second line thereof and replacing such words with "the Benchmark Obligation of the relevant Reference Entity".

Modifications to Certain
   Defined Terms
   and Provisions Related
   to Determinations in respect
   of Restructuring:

In respect of this Transaction, Section 3.9 of the Credit Derivatives Definitions shall be deleted in its entirety and replaced by the following language:  "Upon the occurrence of a Restructuring Credit Event with respect to a Reference Entity during the Term of the Credit Derivative Transaction:

(a) the Notifying Party may deliver multiple Credit Event Notices with respect to such Reference Entity, each such Credit Event Notice setting forth the amount of the Reference Entity Calculation Amount for such Reference Entity to which such Credit Event Notice applies (the "Exercise Amount");

(b) if the Notifying Party has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the then Reference Entity Calculation Amount for such Reference Entity (after taking into account any previous Exercise Amounts in relation to such Reference Entity), upon satisfaction of the Conditions to Settlement with respect to the Credit Event specified in such Credit Event Notice, settlement will occur in accordance with the applicable Settlement Method as if the Reference Entity Calculation Amount were the Exercise Amount with respect to such Reference Entity, and upon satisfaction of such Conditions to Settlement, without prejudice to the foregoing provisions of this paragraph, the Reference Entity Calculation Amount will

-14-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2749658.15

be an amount equal to the Reference Entity Calculation Amount outstanding prior to such Credit Event Notice *minus* the Exercise Amount to which the current Credit Event Notice relates;

(c)  the Exercise Amount in connection with any Credit Event Notice describing a Credit Event in relation to a Reference Entity other than a Restructuring must be equal to the then outstanding Reference Entity Calculation Amount for such Reference Entity (and not a portion thereof); and

(d)  the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount that is at least 1,000,000 units of the Settlement Currency or an integral multiple thereof or an amount equal to the Reference Entity Calculation Amount less the sum of each prior Exercise Amount (if any) with respect to such Reference Entity."

**Amendment to Section 9.1 of the Credit Derivatives Definitions:**

Additional Representations:    Section 9.1 of the Credit Derivatives Definitions is hereby amended by adding the following additional representations to such Section:

"(c)  Buyer and Seller shall each be deemed to represent to the other party on the Trade Date that:

(i)  it is duly authorized to enter into this Transaction.

(ii)  it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom.

(iii)  it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

(iv)  it is acting for its own account and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. It has not received from the other party any assurance or guarantee as to the expected results of the Transaction.

-15-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

(v)  it is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

(vi)  it is capable of assuming, and assumes, the financial and other risks of the Transaction.

(vii)  the other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

(viii)  it is acting as principal in respect of this Confirmation and the Transaction and not as agent or in any other capacity, fiduciary or otherwise.

(ix)  that upon due execution and delivery of this Confirmation, such Confirmation shall constitute its legal, valid and binding obligation, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or in law)."

**Interpretation;**
   **No Need to Suffer a Loss:**

Interpretation:

Each reference to the singular shall include the plural and vice versa.

No Need to Suffer a Loss:

Neither Party A nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by Party B with respect to this Transaction are not conditional on Party A (or any of its affiliates) sustaining or being exposed to a risk of loss.  The payments to be made by Party B with respect to this Transaction are due from Party B whether or not Party A (or any of its affiliates) actually suffers a loss.

Additional Provisions:

See Annex C attached hereto for additional provisions that apply to this Transaction.

**Certain Additional Defined Terms:**

Class A-1 Notes:

$331,200,000 Notes issued by Party B and the Co-Issuer under the Indenture.

Co-Issuer:

Alta CDO LLC.

Indenture:

The Series Indenture and the Standard Terms, collectively.

New York Business Day:

A day on which commercial banks and foreign exchange markets settle payments in The City of New York.

Person:

An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock

-16-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances.  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof.

Series Indenture:

The Series Indenture, dated as of October 9, 2007, among Party B, the Co-Issuer and the Trustee, which supplements and incorporates the Standard Terms.

Standard Terms:

The Standard Terms for Indentures, dated as of October 9, 2007.

**Notice and Account Details:**

Telephone and Facsimile Numbers and Contact Details for Notices:

Party A:

Lehman Brothers Special Financing Inc.
Telephone Number: 212-526-5410
Facsimile Number: 646-758-2170
Attn: Eric Del Monaco

With a copy of all notices to:

Transaction Management
Telephone Number: 212-526-0806
Facsimile Number: 212-652-0556
Attn: Jonathan Lai

Party B:

Alta CDO SPC, for the Account of the Series 2007-2 Segregated Portfolio
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
Grand Cayman, Cayman Islands
Facsimile Number: 345-945-7100
Attn: The Directors

With a copy of all notices to:

U.S. Bank National Association, as Trustee
1 Federal Street, 3rd Floor
Mail Station EX-MA-FED
Boston, Massachusetts 02110
Telephone Number: (617) 603-6479/6480
Facsimile Number: (503) 258-5975
Attn: Corporate Trust Services/CDO Administration

**Account Details:**

Payments to Party A

-17-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2749658.15

Account for payments:        Lehman Brothers Inc. (SLHIUS3X)
with further credit to Lehman Brothers Special Financing
(SLHIUS3S)
The Chase Manhattan Bank, New York
A/C Lehman Brothers Special Financing
A/C # 066-143-543

Payments to Party B

Account for payments:        U.S. Bank National Association
Minneapolis, MN
ABA # 091-000-022
DDA # 173103321464
Account # 118700-202
Name: Alta 2007-2 Interest Collections Payment Account

-18-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

30775-00055 NY:2749658.15

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

    Name:

    Title:

Confirmed as of the date first written:

ALTA CDO SPC, for the account of the
SERIES 2007-2 SEGREGATED PORTFOLIO

By:_____

    Name:

    Title:

Class A-1 Confirm – Alta 2007-2

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
     Name:
     Title:

Confirmed as of the date first written:

ALTA CDO SPC, for the account of the
SERIES 2007-2 SEGREGATED PORTFOLIO

By:_____
   Name:
   Title:  **Wendy Ebanks**
        Director

Class A-1 Confirm – Alta 2007-2

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances. Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

**LEHMAN BROTHERS**

**ANNEX A**

**LONG REFERENCE PORTFOLIO**

| Reference Entity | Reference Entity Calculation Amount | Reference Entity Calculation Percentage | Restructuring | Monoline Provisions | Subordination | Transaction Type | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ABITIBI-CONSOLIDATED INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Forest Products | Printing and Publishing | US003669AJ70 | 8.375% | 4/1/2015 |
| ADVANCED MICRO DEVICES, INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electric | Electronics | US007903AJ69 | 7.750% | 11/1/2012 |
| AK Steel Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Steel | Mining, Steel, Iron and Non Precious Metals | US001546AG50 | 7.750% | 6/15/2012 |
| Allegheny Energy Supply Company, LLC | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US017363AE25 | 8.250% | 4/15/2012 |
| Allied Waste North America, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Ecological services and equipment | Ecological | US01958XBH98 | 7.375% | 4/15/2014 |
| AMERICAN AXLE & MANUFACTURING, INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US02406PAE07 | 5.250% | 2/11/2014 |
| Amkor Technology, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electric | Electronics | US031652AM26 | 9.250% | 2/15/2008 |
| AMR Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Air Transport | Personal Transportation | US001765AU07 | 9.000% | 8/1/2012 |
| ARAMARK CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Food service | Diversified/Conglomerate Service | US038521AA81 | 5.000% | 6/1/2012 |
| ARVINMERITOR, INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US043353AC58 | 8.125% | 9/15/2015 |
| Avis Budget Car Rental, LLC | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Equipment leasing | Personal Transportation | US053773AB35 | 7.750% | 5/15/2016 |
| Beazer Homes USA, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Building and development | Buildings and Real Estate | US07556QAJ40 | 6.500% | 11/15/2013 |
| BOMBARDIER INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Aerospace & Defense | Aerospace & Defense | USC10602AG20 | 6.750% | 5/1/2012 |

| Reference Entity | Reference Entity Calculation Amount | Reference Entity Calculation Percentage | Restructuring | Monoline Provisions | Subordination | Transaction Type | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CELESTICA INC. | 13,381,818 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Electronics/electric | Electronics | US15101QAC24 | 7.625% | 7/1/2013 |
| CHARTER COMMUNICATIONS HOLDINGS, LLC | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Broadcasting and Entertainment | US16117PAK66 | 10.000% | 4/1/2009 |
| Chesapeake Energy Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US165167BE60 | 6.875% | 1/15/2016 |
| CITIZENS COMMUNICATIONS COMPANY | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications | Telecommunications | US17453BAP67 | 6.250% | 1/15/2013 |
| CLEAR CHANNEL COMMUNICATIONS, INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Radio & Television | Broadcasting & Entertainment | US184502AP71 | 5.750% | 1/15/2013 |
| CMS Energy Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US125896AZ35 | 6.875% | 12/15/2015 |
| COOPER TIRE & RUBBER COMPANY | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US216831AE76 | 8.000% | 12/15/2019 |
| CSC Holdings, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Cable and satellite television | Broadcasting and Entertainment | US126304AK02 | 7.625% | 7/15/2018 |
| Delhaize America, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Food/drug retailers | Grocery | US246688AF27 | 9.000% | 4/15/2031 |
| Dillard's, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food and drug) | Retail Stores | US254067AH46 | 7.130% | 8/1/2018 |
| Dole Food Company, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Food Products | Beverage, Food and Tobacco | US256605AJ55 | 8.625% | 5/1/2009 |
| DOMTAR INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Forest products | Printing & Publishing | US257561AW09 | 7.125% | 8/15/2015 |
| Dynegy Holdings Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US26816LAD47 | 6.875% | 4/1/2011 |
| EASTMAN KODAK COMPANY | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electrical | Chemicals, Plastics & Rubber | US277461BD00 | 7.250% | 11/15/2013 |
| EchoStar DBS Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Cable and satellite television | Broadcasting and Entertainment | US27876GAY44 | 6.625% | 10/1/2014 |
| El Paso Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US28336LAE92 | 7.875% | 6/15/2012 |

| Reference Entity | Reference Entity Calculation Amount | Reference Entity Calculation Percentage | Restructuring | Monoline Provisions | Subordination | Transaction Type | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FAIRFAX FINANCIAL HOLDINGS LIMITED | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Insurance | Insurance | US303901AN27 | 7.750% | 4/26/2012 |
| FLEXTRONICS INTERNATIONAL LTD. | 13,381,818 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Electronics/electric | Electronics | US33938EAJ64 | 6.500% | 5/15/2013 |
| FORD MOTOR COMPANY | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US345370BX76 | 6.500% | 8/1/2018 |
| FOREST OIL CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US346091AU50 | 7.750% | 5/1/2014 |
| Freescale Semiconductor, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electric | Electronics | US35687MAH07 | 9.569% | 12/15/2014 |
| GENERAL MOTORS CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US370442BS34 | 7.125% | 7/15/2013 |
| Georgia-Pacific Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Forest Products | Printing and Publishing | US373298BR83 | 7.750% | 11/15/2029 |
| HARRAH'S OPERATING COMPANY, INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Lodging & casinos | Hotels, Motels, Inns & Gaming | US413627AU44 | 5.625% | 6/1/2015 |
| HCA INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Health care | Healthcare, Education & Childcare | US404119AE97 | 6.950% | 5/1/2012 |
| HOST HOTELS & RESORTS, L.P. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Lodging & casinos | Buildings & Real Estate | US44108EAS72 | 7.125% | 11/1/2013 |
| Huntsman International LLC | 13,381,818 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | XS0207734210 | 7.500% | 1/1/2015 |
| IDEARC INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Publishing | Printing & Publishing | US451663AA68 | 8.000% | 11/15/2016 |
| IKON Office Solutions, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Business Equipment and Services | Home and Office Furnishings, Housewares and Durable Consumer Products | US451713AE15 | 7.750% | 9/15/2015 |
| INTELSAT, LTD. | 13,381,818 | 1.01% | Not Applicable | | | | Telecommunications | Telecommunications | US45820EAH53 | 6.500% | 11/1/2013 |

| Reference Entity | Reference Entity Calculation Amount | Reference Entity Calculation Percentage | Restructuring | Monoline Provisions | Subordination | Transaction Type | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Iron Mountain Incorporated | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Business Equipment and Services | Diversified/Conglomerate Service | US462846AB23 | 7.750% | 1/15/2015 |
| K. Hovnanian Enterprises, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Building and development | Buildings and Real Estate | US442488AQ54 | 6.500% | 1/15/2014 |
| KB Home | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Building and development | Buildings and Real Estate | US48666KAH23 | 5.750% | 2/1/2014 |
| L-3 Communications Corporation | 13,381,818 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Aerospace and Defense | Telecommunications | US502413AJ62 | 7.625% | 6/15/2012 |
| LEAR CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US521865AJ40 | 5.750% | 8/1/2014 |
| Level 3 Communications, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Telecommunications | US52729NBK54 | 3.500% | 6/15/2012 |
| Levi Strauss & Co. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Clothing/Textiles | Textiles and Leather | US52736RAN26 | 12.250% | 12/15/2012 |
| LIBERTY MEDIA LLC | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Cable & satellite television | Broadcasting & Entertainment | US530718AC96 | 5.700% | 5/15/2013 |
| Lucent Technologies Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Telecommunications | US549463AC10 | 6.500% | 1/15/2028 |
| Lyondell Chemical Company | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | US552078AV91 | 10.500% | 6/1/2013 |
| Massey Energy Company | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Nonferrous metals/minerals | Mining, Steel, Iron and Non Precious Metals | US576203AH62 | 6.875% | 12/15/2013 |
| MEDIACOM LLC | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Cable and satellite television | Broadcasting and Entertainment | US58445MAJ18 | 9.500% | 1/15/2013 |
| MGM MIRAGE | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Lodging and Casinos | Hotels, Motels, Inns and Gaming | US552953AG66 | 5.875% | 2/27/2014 |
| MIRANT NORTH AMERICA, LLC | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US60467XAA54 | 7.375% | 12/31/2013 |
| Nalco Company | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | US629855AE71 | 7.750% | 11/15/2011 |

| Reference Entity | Reference Entity Calculation Amount | Reference Entity Calculation Percentage | Restructuring | Monoline Provisions | Subordination | Transaction Type | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nortel Networks Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Telecommunications | US656568AB83 | 4.250% | 9/1/2008 |
| NOVA CHEMICALS CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | US66977WAF68 | 6.500% | 1/15/2012 |
| NRG Energy, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Utilities | US629377AT99 | 7.250% | 2/1/2014 |
| Owens-Illinois, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Containers and Glass Products | Containers, Packaging and Glass | US690768BF28 | 7.800% | 5/15/2018 |
| Parker Drilling Company | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US701081AM33 | 9.625% | 10/1/2013 |
| PolyOne Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | US73179PAB22 | 8.875% | 5/1/2012 |
| Pride International, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US74153QAF90 | 7.375% | 7/15/2014 |
| QUEBECOR WORLD INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Publishing | Printing & Publishing | US7481F1AD86 | 6.125% | 11/15/2013 |
| Qwest Capital Funding, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications/cellular communications | Telecommunications | US74913EAH36 | 7.250% | 2/15/2011 |
| R.H. DONNELLEY CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Publishing | Printing & Publishing | US74955WAG42 | 8.875% | 1/15/2016 |
| RADIOSHACK CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food & drug) | Retail Stores | US750438AB90 | 7.375% | 5/15/2011 |
| Reliant Energy, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US75952BAN55 | 7.625% | 6/15/2014 |
| Reynolds American Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Beverage and Tobacco | Beverage, Food and Tobacco | US761713AP14 | 7.250% | 6/1/2012 |
| Rite Aid Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Food/drug retailers | Retail Stores | US767754AJ35 | 7.700% | 2/15/2027 |

| Reference Entity | Reference Entity Calculation Amount | Reference Entity Calculation Percentage | Restructuring | Monoline Provisions | Subordination | Transaction Type | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ROYAL CARIBBEAN CRUISES LTD. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Lodging & casinos | Leisure, Amusement, Entertainment | US780153AP78 | 6.875% | 12/1/2013 |
| SABRE HOLDINGS CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Business equipment & services | Personal Transportation | US785905AB66 | 8.350% | 3/15/2016 |
| Saks Incorporated | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food and drug) | Retail Stores | US79377WAK45 | 2.000% | 3/15/2024 |
| Sanmina-SCI Corporation | 13,381,818 | 1.01% | Not Applicable | | Subordinate | North American Corporate | Electronics/electric | Electronics | US800907AK37 | 8.125% | 3/1/2016 |
| Six Flags, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Leisure goods/activities/movies | Leisure, Amusement, Entertainment | US83001PAF62 | 9.750% | 4/15/2013 |
| Smithfield Foods, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Food Products | Beverage, Food and Tobacco | US832248AH17 | 7.750% | 5/15/2013 |
| Smurfit-Stone Container Enterprises, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Forest Products | Containers, Packaging and Glass | US47508XAD75 | 7.500% | 6/1/2013 |
| Solectron Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Electronics/electric | Electronics | US834182AS67 | 0.500% | 2/15/2034 |
| Standard Pacific Corp. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Building and development | Buildings and Real Estate | US85375CAT80 | 7.000% | 8/15/2015 |
| SunGard Data Systems Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Business Equipment and Services | Electronics | US867363AH61 | 9.125% | 8/15/2013 |
| TEMBEC INDUSTRIES INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Forest Products | Printing and Publishing | US87971KAE73 | 7.750% | 3/15/2012 |
| TENET HEALTHCARE CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Healthcare | Healthcare, Education and Childcare | US88033GAY61 | 7.375% | 2/1/2013 |
| Tesoro Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Oil and Gas | Oil and Gas | US881609AU51 | 6.500% | 6/1/2017 |
| The AES Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US00130HBC88 | 7.750% | 3/1/2014 |

| Reference Entity | Reference Entity Calculation Amount | Reference Entity Calculation Percentage | Restructuring | Monoline Provisions | Subordination | Transaction Type | S&P Industry | Moody's Industry | Benchmark Obligation Identifier | Benchmark Obligation Coupon | Benchmark Obligation Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| The Goodyear Tire & Rubber Company | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US382550AU59 | 9.000% | 7/1/2015 |
| THE HERTZ CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Equipment leasing | Personal Transportation | US428040BZ11 | 8.875% | 1/1/2014 |
| The Mosaic Co | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Chemical/Plastics | Chemicals, Plastics and Rubber | USU61946AA42 | 7.375% | 12/1/2014 |
| The Neiman Marcus Group, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food and drug) | Retail Stores | US640204AB95 | 7.125% | 6/1/2028 |
| The Williams Companies, Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Oil and Gas | US969457AW06 | 7.625% | 7/15/2019 |
| TOYS "R" US, INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Retailers (except food & drug) | Retail Stores | US892335AL43 | 7.375% | 10/15/2018 |
| TRW Automotive Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US87264MAA71 | 7.000% | 3/15/2014 |
| TXU CORP. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Utilities | Utilities | US873168AL29 | 5.550% | 11/15/2014 |
| Unisys Corporation | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Business Equipment and Services | Electronics | US909214BK33 | 8.500% | 10/15/2015 |
| United Rentals (North America), Inc. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Equipment leasing | Buildings and Real Estate | US911365AN42 | 6.500% | 2/15/2012 |
| UNIVISION COMMUNICATIONS INC. | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Radio & Television | Telecommunications | US914906AB87 | 7.850% | 7/15/2011 |
| VISTEON CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Automotive | Automobile | US92839UAC18 | 7.000% | 3/10/2014 |
| WINDSTREAM CORPORATION | 13,381,818 | 1.01% | Not Applicable | | | North American Corporate | Telecommunications | Telecommunications | US97381WAC82 | 8.125% | 8/1/2013 |

**LEHMAN BROTHERS**

**ANNEX B**

| Class of Notes | Size of the Reference Portfolio | Loss Threshold Amount | | Loss Cap Amount | | Reference Entity Calculation Amount | |
|---|---|---|---|---|---|---|---|
| Class A-1 Notes | $1,324,800,000 | $463,680,000 | 35% | $331,200,000 | 25% | $13,381,818 | 1.01% |

**LEHMAN BROTHERS**

**ANNEX C**

**Additional Terms**

(a) **Additional Agreements.**  Each party agrees as set out below for so long as either party has or may have any obligation under this Transaction:

(i) The Seller acknowledges and agrees that this Transaction constitutes a credit default swap transaction and, accordingly, the Buyer may, following the occurrence of a Credit Event in respect of a Reference Entity and subject to the terms specified herein, demand and receive payment in full of the appropriate Cash Settlement Amount on the date such amount shall be payable without being required to make any prior demand or to take prior proceedings against the relevant Reference Entity or any other person which is a surety for or which has granted the Buyer any form of credit protection or credit insurance or entered into any credit default swap or similar transaction with the Buyer in respect of such Reference Entity.  The Buyer shall be under no obligation to account to the Seller or to any of its affiliates for any payment or sums, if any, recovered from a Reference Entity or any third party.

(ii) Each party, the Calculation Agent and their respective affiliates may, whether by virtue of the types of relationships described herein or otherwise, at the date hereof or at any time hereafter, be in possession of information in relation to any Reference Entity that is or may be material in the context of this Transaction and that may or may not be publicly available or known to the aforementioned persons.  Apart from the obligations of the Calculation Agent set out in this Confirmation, this Transaction does not create any obligation on the part of any such person or its affiliates to disclose to the other party any such relationship or information (whether or not confidential).

(iii) The parties agree that, in entering into this Transaction, neither the Buyer nor the Seller intends to enter into a contract of surety, guarantee, insurance, assurance or indemnity, and the parties' obligations hereunder are not conditional or dependent upon or subject to the Buyer having any title, ownership or interest (whether legal, equitable or economic) in any Reference Entity.

(iv) The parties shall be obliged to perform this Transaction without regard to whether the Buyer or any affiliate of the Buyer has any credit exposure in respect of a Reference Entity.  Neither the Buyer nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by the Seller under this Transaction are not conditional on the Buyer (or any of its affiliates) sustaining or being exposed to a risk of loss.

(v) The Seller acquires no rights, either direct or indirect or by way of subrogation, against any Reference Entity or in respect of any Reference Obligation thereof as a result of entering into or performing its obligations under this Transaction.

(b) **The Calculation Agent.**

(1) The Calculation Agent shall be responsible for:

(i) Determining a successor as Calculation Agent (if necessary) after agreement with the Seller;

(ii) Determining a Successor to any Reference Entity in accordance with the Definitions;

(iii) Obtaining Full Quotations in accordance with the Confirmation;

(iv) Selecting Dealers where required in accordance with the Confirmation;

(v) Determining Reference Entity Loss Amounts, Final Prices, Class A-1 Cash Settlement Amounts and each Class A-1 Credit Protection Payment Amount;

(vi)     Determining (i) a hypothetical Reference Entity Loss Amount for each Class A-1 Adjustment Reference Entity based on a Final Price of zero, and (ii) a hypothetical Class A-1 Cash Settlement Amount for such Class A-1 Adjustment Reference Entity;

(vii)    Determining any Class A-1 Adjustment Amount, any Class A-1 Adjustment Reference Entity, the Contingency Amount with respect to the Class A-1 Notes, the Contingency Cash Settlement Amount with respect to the Class A-1 Notes, any relevant Deferred Interest Cut-off Date, any relevant Deferred Redemption Cut-off Date, any relevant Deferred Redemption Date, any Deferred Redemption Amount with respect to the Class A-1 Notes and the Outstanding Adjustment Amount with respect to each Class A-1 Adjustment Reference Entity; and

(viii)   To the extent not provided for by sub-paragraphs (i) to (vii) above, making the calculations and determinations and giving the notices as set out and contemplated hereunder.

(2)  Whenever the Calculation Agent is required to act or to exercise judgment, it shall do so in good faith and in a commercially reasonable manner.  Its calculations and determinations shall be binding in the absence of bad faith or manifest error.

(3)  Each party agrees that the Calculation Agent is not acting as a fiduciary for or as an advisor to either party in respect of its duties as Calculation Agent in connection with this Transaction.

(4)  In connection with any requests for quotations or estimates pursuant to the provisions set forth in this Confirmation under "Settlement Terms", the Calculation Agent:  (a) may, but shall not be required to, inform the relevant Dealers of the Publicly Available Information in its possession regarding the occurrence and the nature of the relevant Credit Event; and (b) shall not disclose any information that would give rise to a contravention by the Buyer of its obligations under applicable secrecy laws.

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                  :
In re                                             :    **Chapter 11 Case No.**
                                                  :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,      :    **08-13555 (SCC)**
                                                  :
                          **Debtors.**            :    **(Jointly Administered)**
                                                  :
                                                  :
-------------------------------------------------------------------x

## ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY CODE APPROVING SETTLEMENT AGREEMENT AMONG PUTNAM STRUCTURED PRODUCT CDO 2002-1 LTD., PUTNAM STRUCTURED PRODUCT CDO 2002-1 LLC, U.S. BANK NATIONAL ASSOCIATION, AS SUCCESSOR TRUSTEE, LEHMAN BROTHERS SPECIAL FINANCING INC., AND LEHMAN BROTHERS HOLDINGS INC.

Upon the motion, dated July 6, 2015 (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors*, on behalf of itself and Lehman Brothers Special Financing Inc. ("LBSF"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") for approval of the Settlement Agreement among Putnam Structured Product CDO 2002-1 Ltd., as Issuer (the "Putnam Issuer"), Putnam Structured Product CDO 2002-1 LLC, as Co-Issuer (the "Putnam Co-Issuer", and together with the Putnam Issuer, "Putnam"), U.S. Bank National Association, not individually but as successor trustee under the Putnam Trust Deed (the "Putnam Trustee" and, in its individual capacity, "U.S. Bank"), LBSF and LBHI, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012

(Preska, C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

accordance with the procedures set forth in the amended order entered June 17, 2010 governing

case management and administrative procedures [ECF No. 9635] to (i) the U.S. Trustee;[1] (ii) the

Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States

Attorney for the Southern District of New York; (v) the attorneys for Putnam; (vi) the attorneys

for the Putnam Trustee; and (vii) all parties who have requested notice in the Chapter 11 Cases;

and  the Putnam Trustee having provided reasonable notice to the Noteholders; and a hearing

having been held to consider the relief requested in the Motion; and the Court having found and

determined that the relief sought in the Motion is in the best interests of LBSF, LBHI, their

estates and creditors, and all parties in interest and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Settlement Agreement is

approved; and it is further

ORDERED that LBSF and LBHI, acting through the Plan Administrator, are

authorized to execute, deliver, implement and fully perform any and all obligations, instruments,

documents and papers and to take any and all actions reasonably necessary or appropriate to

consummate the Settlement Agreement and perform any and all obligations contemplated

therein; and it is further

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Motion.

WEIL:\95307235\6\58399.0011

ORDERED that, pursuant to section 105(a) of the Bankruptcy Code, the Putnam Trustee is authorized and directed to take such actions as it reasonably deems necessary or appropriate to consummate the Settlement Agreement and to perform any and all obligations contemplated therein, including, without limitation, to pay the Settlement Amount thereunder using proceeds held by the Putnam Trustee under the Putnam Trust Deed; and it is further

ORDERED that this Order is binding and effective on the Plan Administrator, LBHI, LBSF, Putnam, and all current and future Noteholders, as well as the Putnam Trustee, the Putnam Collateral Manager and any successors thereto.  The Plan Administrator, LBHI, LBSF, and U.S. Bank, in its individual capacity and as the Putnam Trustee, Putnam, and the Putnam Collateral Manager, and all of their respective current and former officers, directors, shareholders, employees, agents, attorneys, successors and assigns, shall be and hereby are, fully exculpated and shall not have liability to each other, LBSF, LBHI, or the Noteholders arising out of, relating to, or in connection with the Motion, the Settlement Agreement or this Order, except to the extent of any obligations set forth in the Settlement Agreement that have not been performed; and it is further

ORDERED that the terms of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

3

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order.

Dated:  August __, 2015
        New York, New York

 

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\95307235\6\58399.0011