Hearing Date and Time: July 22, 2015, at 10:00 a.m.
Objection Date and Time: July 10, 2015, at 4:00 p.m.

**COLE SCHOTZ P.C.**
900 Third Avenue, 16th Floor
New York, NY 10022
Telephone (212) 752-8000
Facsimile (212) 752-8393
Ilana Volkov, Esq.

-and-

**COLE SCHOTZ P.C.**
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
(817) 810-5250
(817) 810-5255 (Fax)
Michael D. Warner, Esq.

*Attorneys for Creditor Highland CDO Opportunity*
*Master Fund, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : **Chapter 11** |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : **Case No. 08-13555 (SCC)** |
| | : |
| Debtors. | : **(Jointly Administered)** |
| | : |

**OPPOSITION OF HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.**
**TO MOTION PURSUANT TO SECTIONS 8.4, 9.3, AND 14.1 OF THE**
**MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF**
**LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**
**TO ESTIMATE CLAIMS FOR RESERVE AND DISTRIBUTION PURPOSES**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Highland CDO Opportunity Master Fund, L.P. ("Highland"), by and through its counsel,

Cole Schotz P.C., hereby files this opposition ("Opposition") to the motion pursuant to Section

8.4, 9.3, and 14.1 of the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors to estimate claims for reserve and distribution purposes [Docket No. 49954] (the "Estimation Motion"), and respectfully states as follows:

# I.
## INTRODUCTION

1.     Premised on a stark and egregious lack of candor with the Court, the Estimation Motion improperly seeks to estimate the Highland/LBHI Claim (as defined below) for reserve and distribution purposes at zero.  In the Estimation Motion, LBHI mistakenly contends that:

(a)     the Highland/LBHI Claim will be paid in full from Lehman Brothers International (Europe) ("LBIE");

(b)     the Plan (as defined below) and applicable case law authorize estimation of the Highland/LBHI Claim, which is based on a guarantee by LBHI of LBIE's liabilities and obligations; and

(c)     estimation of the Highland/LBHI Claim is necessary to avoid undue delay in the administration of these cases.

2.     As set forth in greater detail below, LBHI's contrived and broad-brush arguments completely miss the mark with respect to the Highland/LBHI Claim.  First and foremost, Highland will not be made whole from the LBIE insolvency estate on account of the Highland/LBHI Claim – a fact known to LBHI since the fall of 2014.  Therefore, LBHI's first reason for estimation of the Highland/LBHI Claim is flawed.[1]

3.     Next, the Highland/LBHI Claim is not contingent or unliquidated.  Rather, due to LBIE's default under the GMRA (as defined below), LBHI's obligation to Highland under the

---

[1] Moreover, because Highland will not be paid in full on account of the Highland/LBHI Claim from LBIE, LBHI's hyperbolic concerns about a duplicate recovery or adequate assurance of the ability to disgorge funds by Highland do not apply to the Highland/LBHI Claim.

LBHI Guaranty (as defined below) has ripened fully.  Additionally, as reflected in the claims register maintained by LBHI's claims agent (Epiq Systems), Highland currently asserts a claim in the liquidated amount of $5,011,075.11.  Therefore, estimation of the Highland/LBHI Claim pursuant to Section 502(c) of the Bankruptcy Code is wholly inappropriate under the <u>correct</u> legal authority, including this Court's decision in <u>In re LightSquared Inc. et al.</u>, 2014 WL 5488413 (Bankr. S.D.N.Y. 2014), which LBHI fails to cite.  Thus, LBHI's second reason for estimation of the Highland/LBHI Claim similarly lacks merit.

4.    Furthermore, administration of these cases will not be unduly delayed if the Highland/LBHI Claim is not estimated but, rather, is subjected to an appropriate claims adjudication process (including discovery and an evidentiary hearing).  As reported to the Court in connection with the "State of the Estate" hearing on June 9, 2015, LBHI has made substantial progress in the administration of these cases, including with respect to the claims process and distribution to creditors.  <u>See</u> Lehman Brothers Holding Inc., et al. Plan Administration Update, Docket No. 49950.  Indeed, only 2,400 claims remain unresolved as a result of LBHI's efforts. <u>Id.</u> at p. 3.  Moreover, since that hearing, LBHI has filed several more claims objections to move the case forward.  <u>See</u>, <u>e.g.</u>, Docket Nos. 49999, 50000, 50014, and 50146.  In any event, any delay in the adjudication of the Highland/LBHI Claim is of LBHI's own doing.  The Highland/LBHI Claim was filed almost six years ago and LBHI conducted discovery with respect to the claim in 2013.[2]  Highland has been asking for several years to have its day in court

---

[2] In January 2013, counsel for LBHI issued a subpoena *duces tecum*, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, demanding that Highland produce documents related to the Highland/LBHI Claim.  On March 1, 2013, counsel for LBHI issued a subpoena *ad testificandum*, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, seeking an examination of the person at Highland with the most knowledge of the Highland/LBHI Claim.  On August 20, 2013, LBHI deposed a Highland representative in Dallas, Texas.

with respect to the Highland/LBHI Claim, to no avail, <u>see</u> Docket Nos. 41089 and 49916, and now, LBHI has an additional 18 months to torture Highland if the Estimation Motion is disallowed, <u>see</u> Docket No. 50211. Simply put, LBHI's contrived "undue delay" does not, in fact, exist here. Therefore, LBHI's third reason for estimation of the Highland/LBHI Claim fails.

5.      In sum, the Estimation Motion has no basis in fact or in law and should be denied summarily as to the Highland/LBHI Claim. To the extent LBHI disputes the extent and validity of the Highland/LBHI Claim, LBHI should follow the correct procedures by filing an objection to the Highland/LBHI Claim in accordance with the applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and discharge its burden of proof.

## II.
## BACKGROUND

6.      On September 15, 2008 and at various times thereafter (collectively, the "<u>Petition Dates</u>"), LBHI and certain of its subsidiaries (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief pursuant to Chapter 11 of Title 11, United States Code (the "<u>Bankruptcy Code</u>"). On September 15, 2008 (the "<u>Administration Date</u>"), LBIE, a subsidiary of LBHI, was placed into administration in the United Kingdom.

7.      On December 6, 2011, the Court entered an order [Docket No. 23023] confirming the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "<u>Plan</u>").

8.      Before the Commencement Dates and Administration Date, Highland and LBIE entered into that certain Global Master Repurchase Agreement (2000 version) dated as of May 31, 2007, as amended and supplemented from time to time (the "<u>GMRA</u>"), pursuant to which LBIE sold certain securities to Highland, and simultaneously agreed to repurchase those securities at a later date and an agreed price.

4

9.      All of LBIE's obligations, including those under the GMRA, were fully and unconditionally guaranteed by LBHI pursuant to that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. dated as of June 9, 2005 (the "LBHI Guarantee").   The LBHI Guarantee provides, in relevant part, as follows:

> **WHEREAS**, the Corporation [LBHI] wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,
>
> **\*\*\*\*\*\***
>
> **RESOLVED**, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the [Corporation's] Code [of Authorities].

10.     Schedule A to the LBHI Guarantee lists LBIE as a Guaranteed Subsidiary.

11.     On September 17, 2008, Highland issued a Default Notice declaring an Event of Default under Paragraphs 10(a)(vi) of the GMRA (the "Default Notice").   Pursuant to Paragraph 10(b) of the GMRA, the Default Notice declared September 15, 2008 as the Repurchase Date for all Transactions under the GMRA.

12.     On September 26, 2008, Highland provided to LBIE its Default Valuation Notice Under Global Master Repurchase Agreement, as amended by that certain **\*\*Amendment\*\*** Default Valuation Notice Under Global Master Repurchase Agreement (collectively, the "Valuation Statement").

13.     On or about December 11, 2008, Highland submitted a claim in the LBIE Administration in the amount of $10,026,061.00 based on LBIE's breach of the GMRA (the "Highland/LBIE Claim").

5

14.     On September 18, 2009, Highland filed a proof of claim in this bankruptcy case [Claim No. 16838] based upon the LBHI Guarantee in the amount of $10,026,061.00 (the "Highland/LBHI Claim").  A true copy of the Highland/LBHI Claim is attached as **Exhibit 1**. The Highland/LBHI Claim contains copies of the GMRA, the Guarantee, the Default Notice, and the Valuation Statement as Exhibits A, B, C, and D, respectively.

15.     On or about July 30, 2014, Highland and the LBIE (by and through its joint administrators) entered into a Claims Determination Deed (the "Claims Determination Deed"). Pursuant to the Claims Determination Deed, the parties settled their dispute regarding the Highland/LBIE Claim by the allowance thereof in an amount less than the amount asserted in the Valuation Notice and the Highland/LBIE Claim.

16.     Thus, while certain of LBIE's unsecured creditors may have received 100% on account of their claims against LBIE, see Estimation Motion, ¶¶ 12, 14, Highland will not be made whole by LBIE on account of the Highland/LBIE Claim.  That is because pursuant to the Claims Determination Deed, other than the retention of what is known as a "Currency Conversion Claim" against LBIE, Highland will receive no further distributions from LBIE with respect to the Highland/LBIE Claim.

17.     In the fall of 2014, Highland's counsel advised LBHI's counsel and claims' agent of the resolution of the Highland/LBIE Claim pursuant to the Claims Determination Deed and the concomitant reduction of the Highland/LBHI Claim.  As a result, the official claims register in this case now reflects the amount of the Highland/LBHI Claim as $5,011,075.10.

76332/0044-12001462v1

## III.
## LEGAL ARGUMENT

### The Estimation Motion Is Without Merit And Should Be Denied

18.     Section 502(c) of the Bankruptcy Code governs the estimation of claims and

provides, in relevant part as follows:

> (c)     There shall be estimated for purposes of allowance under
> this section -
>
>> (1) <u>any contingent or unliquidated claim</u>, the fixing or
>> liquidation of which, as the case may be, would unduly
>> delay the administration of the case…

11 U.S.C. § 502(c)(1) (emphasis supplied).

19.     In support of its request for estimation of the Highland/LBHI Claim, LBHI relies

on Sections 8.4 and 9.3 of the Plan.  Those sections, however, confer no greater authority on this

Court than Section 502(c) of the Bankruptcy Code.  As acknowledged in the Estimation Motion,

Section 9.3 of the Plan allows LBHI to request the estimation of a contingent, unliquidated, or

Disputed Claim <u>to the extent permitted by the Bankruptcy Code and Bankruptcy Rules</u>.  Section

8.4 of the Plan simply states that LBHI can reserve for Disputed Claims in "the amount

determined … by the Bankruptcy Court…. " <u>See</u> Estimation Motion, ¶ 21 (emphasis supplied).

20.     LBHI also relies on Section 105(a) of the Bankruptcy Code to support the request

for estimation.  That statute, however, is unavailing here.  It is well established that Section

105(a) "cannot trump specific provisions of the Bankruptcy Code, but must instead be exercised

within the parameters of the Code itself." <u>Schwartz v. Aquatic Dev. Grp., Inc. (In re Aquatic</u>

<u>Dev. Grp., Inc.)</u>, 352 F.3d 671, 680 (2d Cir. 2003); <u>see also</u> <u>Law v. Siegel</u>, 134 S.Ct. 1188, 1194

(2014) ("We have long held that whatever equitable powers remain in the bankruptcy courts

must and can only be exercised within the confines of the Bankruptcy Code") (internal quotes

omitted); <u>In re Headlee Mgmt. Corp.</u>, 519 B.R. 452, 459 (Bankr. S.D.N.Y. 2014) ("Nor can the

7

court use § 105(a) to fashion a remedy where the Bankruptcy Code provides one"); In re Schuessler, 386 B.R. 458, 492 (Bankr. S.D.N.Y. 2008). Therefore, LBHI's attempt to rely on Section 105(a) to support estimation of the Highland/LBHI Claim, where the request otherwise is unavailable under Section 502(c), also must fail.

21.    LBHI next argues that in addition to the referenced Plan sections and Section 105(a) of the Bankruptcy Code, the estimation request is appropriate with respect to the Highland/LBHI Claim because this Court already has used the procedures of Section 502(c) to estimate other Disputed Claims filed against LBHI and because "[o]ther courts have also recognized the ability to estimate disputed claims." See Estimation Motion, ¶ 22. LBHI then cites the following cases in support of this generic proposition: In re Enron Corp., No. 01-16034, 2006 WL 544463, at *13-15 (Bankr. Jan. 17, 2006); JP Morgan Chase Bank v. U.S. Nat'l Bank Ass'n. (In re Oakwood Homes Corp.), 329 B.R. 19, 22 (D.Del. 2005); In re Wallace's Bookstores, Inc., 317 B.R. 720, 724 (Bankr. E.D. Ky. 2004); In re Adelphia Bus. Solutions, Inc., 341 B.R. 415, 422- 423 (Bankr. S.D.N.Y. 2003). Id.

22.    These cases, however, are inapposite and do not warrant granting the Estimation Motion. In Enron, the request to estimate was made solely to establish an amount to maintain as a reserve for a claim that already had been disallowed. The issue was whether, because the disallowance order was on appeal, the subject claim should be estimated at zero or something more for reserve purposes. The request to estimate was not made for claim allowance purposes, as LBHI seeks to do here. Moreover, the claim at issue was not a guaranty claim that had ripened because of the primary obligor's default to the creditor.

23.    In Oakwood Homes, the Delaware District Court had to decide whether the bankruptcy court erred in establishing a cash reserve of zero for a disallowed claim whose holder

appealed the decision. The District Court held that the Bankruptcy Court's decision was not erroneous. Strikingly, the District Court's decision does not discuss estimation of the subject claim under Section 502(c) of the Bankruptcy Code. Therefore, <u>Oakwood Homes</u> is inapplicable.

24.      <u>Wallace's Bookstore</u> also is futile. There, the Bankruptcy Court for the Eastern District of Kentucky found that the express terms of the estimation provision of the confirmed plan of liquidation either expanded Section 502(c) or otherwise barred the creditor's arguments in opposition to the estimation request. Therefore, the Bankruptcy Court allowed estimation of a claim for distribution purposes. As set forth above, the provisions of the Plan that authorize LBHI to request estimation of claims do not expand the scope of Section 502(c). Therefore, LBHI's reliance on <u>Wallace's Bookstore</u> is misplaced.

25.      Finally, <u>Adelphia</u> (also known as <u>ABIZ</u>) altogether contravenes LBHI's arguments. In <u>ABIZ</u>, Judge Gerber expressly found that while estimation is appropriate for plan feasibility purposes, it is <u>not</u> a proper tool for claims allowance purposes. <u>Adelphia</u>, 341 B.R. at 423. Judge Gerber cited with approval the significant due process concerns raised by Judge Leif Clark, "one of the country's most respected bankruptcy judges," in the <u>MacDonald</u> case, when addressing a request to estimate claims for allowance. <u>Id.</u> at 423-424. Specifically, Judge Clark said:

> The better rules seems to be that estimation primarily serves to assist the court and parties in interest in evaluating the feasibility of a given plan under Section 1129(a)(11). In addition, the estimation process may fulfill the allowance requirement for purposes of Section 1129(a)(9), but will not … set the "outer limits of a claimant's right to recover." Rather, the ultimate allowance of the claim will set that right.

MacDonald, 128 B.R. at 167-68 (cited in ABIZ, 341 B.R. at 423-424).

26.    In ABIZ, Judge Gerber also rejected the plan proponents' request to estimate the

amount of the DIP financing claim, which was liquidated.  ABIZ, 341 B.R. at 424.  Although the

plan proponents did not dispute the amount due on the DIP loan, they argued that their defenses

to the repayment of the loan rendered the claim unliquidated.  Id.  In response, Judge Gerber

said:

> I cannot agree that at any time one disputes an otherwise liquidated
> claim, or asserts a counterclaim, that makes that claim
> unliquidated.  When it is time to determine the allowance of the
> DIP claim, we'll have to do it in the normal way, which is by the
> litigation of a contested matter.

Id. (emphasis supplied).   Therefore, because the DIP claim was in a liquidated amount, Judge

Gerber refused to estimate it.  Id. at 425.

27.    In In re Chemtura Corp., et al., 448 B.R. 635, 649 n. 46 (Bankr. S.D.N.Y. 2011),

Judge Gerber reiterated his grave concern about using estimation for claims allowance purposes:

> Using estimation for claims allowance purposes, while permissible
> (and, indeed, expressly mentioned in section 502(c)(1)), can
> sometimes raise due process concerns, and for that reason, in
> *ABIZ*, I used estimation solely for purposes of gauging feasibility,
> and not for determining ultimate claims allowance.  *See* 341 B.R.
> at 418; *MacDonald*, 128 B.R. at 164 (using estimation of
> administrative claim to determine feasibility, but not ultimate
> allowance).

28.    LBHI's reliance on ABIZ to support estimation of the Highland/LBHI Claim is

simply wrong.  Indeed, application of ABIZ to the facts here requires a complete denial of the

Estimation Motion as to the Highland/LBHI Claim and the filing of a formal objection to the

Highland/LBHI Claim to commence a contested matter.

29.    To support LBHI's specific argument that the Highland/LBHI Claim should be

estimated at zero dollars for reserve and distribution purposes, LBHI relies on a 1998 Chapter 7

case from the Bankruptcy Court in South Dakota, In re Teigen, 228 B.R. 720 (Bankr. D. S.D. 1998).  In Teigen, the court found that the subject claims – one based on a guarantee and one based on an indemnification – were unliquidated and, therefore, subject to estimation under Section 502(c).  Id. at 723.  The court reasoned that, although specific repayment amounts have been approved pursuant to the primary obligor's confirmed plan of reorganization, the amounts that actually will be paid to the creditors were unknown.  Id.  Therefore, the amount of the claims at issue were not liquidated.  As discussed below, this Court has rejected the application of Teigen to facts similar to the case *sub judice*.

30.    LBHI also relies on Enron, which as set forth above is inapplicable here, and on In re Genesis Health Ventures, Inc., 272 B.R. 558 (Bankr. D. Del. 2002), *aff'd* 112 Fed. Appx. 140 (3d Cir. 2004), which provides no guidance here.  In Genesis Health, it appears the debtors sought to estimate a certain proof of claim at zero by way of motion for summary judgment.  Id. at 560.  The claim was based on an allegation that the debtors, as pharmaceutical providers, defrauded the Medicaid program by not crediting Medicaid for pharmaceuticals ordered for Medicaid patients and returned to the debtors for resale.  Id.  Neither the Bankruptcy Court's nor the Third Circuit's opinions dealt with estimation under Section 502(c).  Accordingly, Genesis Health is irrelevant to the Estimation Motion.

31.    Most glaringly, the request to estimate the Highland/LBHI Claim is squarely at odds with this Court's decision in In re LightSquared Inc. et al., 2014 WL 5488413 (Bankr. S.D.N.Y. 2014) and other actually applicable case law, which inexplicably and unacceptably, LBHI failed to bring to the attention of this Court or the claimants whose claims LBHI seeks to estimate.

11

32.     In <u>LightSquared</u>, this Court was asked to expunge a guaranty claim or, in the alternative, to estimate that claim at zero for purposes of allowance. <u>Id.</u> at *1.  There, certain lenders (the "<u>LP Lenders</u>") provided a term loan to LightSquared LP (the "<u>Borrower</u>") in the total principal amount of $1.5 billion (the "<u>Term Loan</u>").  <u>Id.</u>  The Term Loan was guaranteed by specified parent guarantors and subsidiary guarantors (collectively, the "<u>Guarantors</u>").  <u>Id.</u>  The commencement of the Chapter 11 cases triggered an Event of Default under the loan documents. <u>Id.</u> at *2.  Two plans of reorganization were filed, but the so-called "LP Only Plan" was withdrawn.  <u>Id.</u>  Harbinger Capital Partners LLC ("<u>Harbinger</u>") was the sponsor of the so-called "Inc. Plan."  <u>Id.</u>  Confirmation of the "Inc. Plan" was conditioned on the expungement or estimation at zero of the LP Lenders' claim against the Guarantors (the "<u>Guaranty Claim</u>").  <u>Id.</u> The Inc. Plan provided that the estimated amount of a claim that has not yet been allowed shall constitute either the allowed amount of such claim or the maximum limitation on such claim.  <u>Id.</u>

33.     In support of its motion to estimate the Guaranty Claim at zero, Harbinger argued that the LP Lenders will be paid in full under the Inc. Plan by virtue of the proposed surrender of certain equity interests to the LP Lenders, the value of which Harbinger contended exceeded the amount of the LP Lenders' secured claim.  <u>Id.</u>  In turn, Harbinger argued, once the LP Lenders are paid in full, the Guaranty Claim would be discharged.  <u>Id.</u>

34.     As a threshold matter, quoting Judge Gerber in <u>In re Adelphia Commc'ns Corp.</u>, 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007), this Court noted that, "when estimating claims, bankruptcy courts may use whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization 'must be accomplished quickly and efficiently.'"  <u>Id.</u> at *3.  This Court cautioned, however, that estimation is not appropriate unless the "gating requirements" for estimation are

satisfied, *to wit*, the subject claim must be contingent or unliquidated and the delay associated with the fixing or liquidation of such claim would be "undue." Id. (*quoting* In re Dow Corning Corp., 211 B.R. 545, 562-63 (Bankr. E.D. Mich. 1997)).

35.    In LightSquared, this Court flatly rejected Harbinger's argument that the Guaranty Claim was contingent. Id. This Court explained that although the Bankruptcy Code does not define the term "contingent" for purposes of Section 502(c), courts uniformly hold that "a claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event" and the "occurrence or happening of [such] extrinsic event … will trigger … liability." Id. (*quoting* Mazzeo v. U.S. (In re Mazzeo), 131 F. 3d 295, 303 (2nd Cir. 1997)). When the principal obligor defaults on the underlying obligation, the guarantor's obligation becomes fixed and no longer contingent "because all predicates to enforcement have occurred." Id. (*citing* In re Rhead, 179 B.R. 169, 172 (Bankr. D. Ariz. 1994) (stating that, "but for the bankruptcy, SKW could seek a judgment against the Rheads for the full amount guaranteed, without the occurrence of any future event"); In re F.B.F. Indus., Inc., 165 B.R. 544, 548-49 (Bankr. E.D. Penn. 1994) ("[t]he law is clear that a guaranty or surety claim is not contingent after a default by the primary obligor has occurred.")).

36.    Thus, this Court found that because the Term Loan is "now indisputably due and payable," and remains extant, the Guarantors' liability to pay the Term Loan "is no longer contingent upon any future event." Id. Indeed, if the Guarantors were not in bankruptcy, the LP Lenders could demand payment in full, in cash, from them. Id.

37.    This Court also rejected Harbinger's argument that the Borrower's potential ability to satisfy the claim rendered the Guaranty Claim contingent. Id. at *4. In doing so, the Court relied on Rhead and F.B.F. and rejected Harbinger's reliance on case law in which the

13

guarantees had not yet been triggered.  Id.  In Rhead, the debtors sought to estimate a guarantee claim.  Rhead, 179 B.R. at 172.  They argued that because the principal's obligation is secured by real property, the agreed value of which exceeds the amount of the debt, the creditor's guarantee claim should be estimated at zero because it will be paid in full from the real property.  Id.  The court disagreed, stating that "[a]dmittedly, it is possible, perhaps even probable, that the obligation due under the guarantee will be paid from another source.  However, that fact alone does not make the debt either unliquidated nor contingent."  Id.  Similarly, in F.B.F., the court stated that, in estimating a guarantee claim of secured creditor, the court will not look to the collateral or the financial resources of other obligors.  F.B.F., 165 B.R. at 552.

38.    Similarly, here, LBIE's default under the GMRA triggered LBHI's obligation under the LBHI Guarantee.  Therefore, as LightSquared and the other cases cited herein teach, the Highland/LBHI Claim is not contingent.  The cases on which LBHI relies in the Estimation Motion to argue that the Highland/LBHI Claim is contingent are of no moment and should be rejected by the Court.

39.    In LightSquared, this Court also found that the Guarantee Claim was not unliquidated.  Harbinger contended that the likelihood that the LP Lenders will be repaid in full under the Inc. Plan rendered the Guarantee Claim unliquidated.  LightSquared, 2014 WL 5488413 at *5.  This Court flatly rejected Harbinger's reliance on New York law and Teigen, supra, to support this argument.  First, Harbinger argued that under New York law, the value of any consideration paid on account of a debt by one obligor must be credited to a co-obligator.  Id.  Therefore, the Guarantee Claims must be reduced by the value the LP Lenders receive under the Inc. Plan.  Id.  However, because the amount of the value to be distributed under the Inc. Plan remains to be seen, the amount of the reduction of the Guarantee Claim is not yet known.  Id.

Consequently, the Guarantee Claim is unliquidated.  Id.  Harbinger relied on Teigen to buttress

this argument.  Id.

40.      Noting the non-binding nature of Teigen, this Court also found that case

unpersuasive and distinguishable because of the absence of a confirmed plan from which a

concrete source of payments would reduce the Guarantee Claim.  Id.  Furthermore, this Court

noted that:

> … Harbinger's circular argument that payment through surrender
> of the collateral creates a contingency that renders the Guaranty
> Claim unliquidated confuses and conflates the principles of
> "contingent" and "unliquidated."  The Court has found that the
> Guaranty Claim is not contingent, as there is no future event that
> must occur to trigger the Guarantor's obligation to pay the LP
> Debt.  Further … there is no dispute regarding the amount and
> enforceability of the Guaranty Claim that renders such non-
> contingent claim unliquidated.  Courts have held that "where the
> claim is determinable by reference to an agreement or by a simple
> computation" and where "the value of a claim is easily
> ascertainable," the claim is generally viewed as liquidated.

Id. at *5 (internal citations omitted).

41.      Here, the Highland/LBHI Claim is liquidated.   It was originally filed in a

liquidated amount; it has since been reduced to the liquidated amount of $5,011,075.11 as a

result of Highland's entry into the Claims Determination Deed with LBIE.  The value of the

Highland/LBHI Claim can be ascertained by computation.  See, e.g., LightSquared, 2014 WL

5488413 at *5.  Simply because LBHI disputes the amount or the validity of the claim does not

transform the Highland/LBHI Claim into an unliquidated claim.  See, e.g., ABIZ, 341 B.R. at

424.  Therefore, estimation is not appropriate with respect to the Highland/LBHI Claim.

42.      Lastly, in LightSquared, this Court rejected Harbinger's "bootstrap reasoning" in

the "undue delay analysis."  There, Harbinger argued that estimation will assist to "avoid future

gamesmanship and provide clarity to the parties that will ease the path to exit."  LightSquared,

2014 WL 5488413 at *5.  As this Court aptly noted, however, the purported delay is, in fact, the

inability to confirm the Inc. Plan without the expungement or estimation at zero of the Guaranty

Claim.  Id.  Therefore,

> [w]hile the Court recognizes and shares the desire of all parties in
> interest to bring these cases to a successful conclusion as soon as
> possible, it declines to consider the failure to meet the parties' self-
> imposed deadlines and conditions to confirmation of the Plan as an
> appropriate factor to be considered in an undue delay analysis.
> Delay, undue or otherwise, is not a justification for ignoring
> applicable law or undermining the settled expectations of parties
> who transact every day in reliance on the belief, for example, that
> credit documents such as guarantees mean what they say.

LightSquared, 2014 WL 5488413 at *5.

43.    As in LightSquared, LBHI here has designed its own claims objection timeline.

The Highland/LBHI Claim was filed almost six years ago.  The Plan was confirmed more than

four years ago.  Discovery with respect to the Highland/LBHI Claim was conducted two years

ago.  Yet, LBHI did nothing to advance the ball with respect to the adjudication of the

Highland/LBHI Claim until the filing of the Estimation Motion.  Moreover, LBHI has obtained

another 18 month extension of time – until March 2017 – within which to file requests for

estimation or objections to claims.  While this Court has noted that LBHI can address disputed

claims in the method and timeframe it chooses, surely the Court cannot allow LBHI to use its

own deferral in the evaluation of the Highland/LBHI Claim to argue now that estimation of that

claim will avoid undue delay to other creditors.  Such transparently self-serving argument was

not accepted by this Court in LightSquared, is not the kind of circumstances the "undue" delay

consideration is intended to redress, see, e.g., In re Lionel L.L.C., et al., 2007 WL 2261539

(Bankr. S.D.N.Y. 2007), and should be rejected here.

16

# IV.
## CONCLUSION

WHEREFORE, for all the arguments and authorities set forth herein, Highland respectfully requests that the Court deny the Estimation Motion and grant Highland such other relief as the Court deems just and appropriate under the circumstances, including, but not limited to, requiring LBHI to promptly commence a contested matter with respect to the Highland/LBHI Claim.

Dated: New York, New York
      July 10, 2015

Respectfully submitted,

COLE SCHOTZ P.C.

/s/ *Ilana Volkov*
Ilana Volkov, Esq.
900 Third Avenue, 16th Floor
New York, New York 10022
(212) 752-8000 (Phone)
(212) 752-8393 (Fax)

-and-

COLE SCHOTZ P.C.
Michael D. Warner, Esq.
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
(817) 810-5250
(817) 810-5255 (Fax)

*Attorneys for Creditor Highland CDO*
*Opportunity Master Fund, L.P.*

17

# EXHIBIT 1

ORIGINAL

| United States Bankruptcy Court/Southern District of New York | PROOF OF CLAIM |
|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: Lehman Brothers Holdings Inc., et al., Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) | UNIQUE IDENTIFICATION NUMBER: |
|---|---|---|
| Name of Debtor Against Which Claim is Held Lehman Brothers Holdings Inc. | Case No. of Debtor 08-13555 | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side).

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Scott Everett
Highland CDO Opportunity Master Fund, L.P Haynes and Boone, LLP
13455 Noel Road, Suite 800      2323 Victory Ave., Suite 700
Dallas, TX 75240                Dallas, TX 75219
(972) 628-4100                  (214) 651-5000
                                scott.everett@haynesboone.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

Telephone number:          Email Address:

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:          Email Address:

1. Amount of Claim as of Date Case Filed: $ 10,026,061.00

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete Item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☒ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

2. Basis for Claim: See attached Addendum
(See Instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____
3a. Debtor may have scheduled account as: _____
(See Instruction #3a on reverse side.)

4. Secured Claim (See Instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe: _____
Value of Property: $ _____   Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$ _____   Basis for perfection: _____
Amount of Secured Claim: $ _____   Amount Unsecured: $ _____

6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $ _____
(See Instruction...)

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$ _____

7. Creditor: The...
8. Documents: ...
orders, invoices, it...
Attach redacted cop...
on reverse side.) If t...
DO NOT SEND O...
SCANNING.
If the documents ar...

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000016838

...ng this proof of claim.
...ary notices, purchase
...urity agreements.
...definition of "redacted"
...ROYED AFTER

FOR COURT USE ONLY
**FILED / RECEIVED**

SEP 18 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

Date:
9/15/09    [signature]

...authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Patrick Boyce
CFO

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re                                                        :
                                                             :
LEHMAN BROTHERS HOLDINGS, INC.                               :       Case No. 08-13555
                                                             :
                                          Debtor.            :
-----------------------------------------------------------x

### ADDENDUM TO PROOF OF CLAIM OF HIGHLAND
### CDO OPPORTUNITY MASTER FUND, L.P.

1.      On September 15, 2008, Lehman Brothers Holdings, Inc. ("***LBHI***") filed its voluntary petition for bankruptcy protection under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the Bankruptcy Court for the Southern District of New York (the "***Court***"). Additionally, on September 15, 2008 (the "***Administration Date***"), LBHI subsidiary, Lehman Brothers International (Europe) ("***LBIE***") was placed into administration in the United Kingdom.

2.      Prior to the Commencement and Administration Dates, LBIE and Highland CDO Opportunity Master Fund, L.P. ("***Highland CDO***") entered into that certain Global Master Repurchase Agreement (2000 version) dated as of May 31, 2007, and each of the Annexes related thereto and all Confirmations and Transactions thereunder, in each case, as such documents were amended and supplemented from time to time (collectively, the "***Agreement***") with LBIE.[1] A copy of the Agreement is attached hereto as **Exhibit A**.

3.      LBIE's obligations under the Agreement are guaranteed by LBHI pursuant to that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. dated as of June 9, 2005, attached hereto as **Exhibit B**.

---

[1] Capitalized terms not otherwise defined shall have the meanings given in the Agreement.

4.      On September 17, 2008, Highland CDO issued the Default Notice (the *"Default Notice"*) whereby Highland CDO declared an Event of Default under Paragraphs 10(a)(vi) and (b) of the Agreement. A copy of the Default Notice is attached hereto as **Exhibit C**. Through the Default Notice, Highland CDO designated September 15, 2008 as the Repurchase Date for all Transactions under the Agreement.

5.      On September 26, 2008, Highland CDO provided to LBIE its Default Valuation Notice Under Global Master Repurchase Agreement (the *"Original Valuation Statement"*), as amended by that certain Amendment Default Valuation Notice Under Global Master Repurchase Agreement (together with the Original Valuation Statement, the *"Valuation Statement"*), pursuant to Paragraph 10(c)(i) of the Agreement as a result of the early designation of the Repurchase Date. A copy of the Valuation Statement and supporting documents are attached hereto as **Exhibit D**.

6.      Pursuant to Paragraph 10(c) of the Agreement, the amount of $10,026,061.00 is due and payable from LBIE as described in the Valuation Statement.

7.      Highland CDO is filing this proof of claim with full reservation of rights, including the right to further amend or supplement the proof of claim at a later date.

8.      Nothing provided for herein shall limit Highland CDO's rights under the Agreement.

D-1787106_1.DOC

# EXHIBIT A

D-1787106_1.DOC



**The Bond Market Association**
New York •Washington •London
www.bondmarkets.com



**I S M A**

International Securities Market Association
Rigistrasse 60, P.O. Box, CH-8033, Zürich
www.isma.org

**2000 VERSION**

## TBMA/ISMA

# GLOBAL MASTER REPURCHASE AGREEMENT

May 31, 2007

**Between:**

**Lehman Brothers International (Europe)**          **("Party A")**

**and**

**Highland CDO Opportunity Master Fund LP**          **("Party B")**

## 1.    Applicability

(a)    From time to time the parties hereto may enter into transactions in which one party, act-ing through a Designated Office, ("Seller") agrees to sell to the other, acting through a Designated Office, ("Buyer") securities and financial instruments ("Securities") (subject to paragraph 1(c), other than equities and Net Paying Securities) against the payment of the purchase price by Buyer to Seller, with a simultaneous agreement by Buyer to sell to Seller Securities equivalent to such Securities at a date certain or on demand against the payment of the repurchase price by Seller to Buyer.

(b)    Each such transaction (which may be a repurchase transaction ("Repurchase Transac-tion") or a buy and sell back transaction ("Buy/Sell Back Transaction")) shall be referred to herein as a "Transaction" and shall be governed by this Agreement, including any sup-plemental terms or conditions contained in Annex I hereto, unless otherwise agreed in writing.

(c)    If this Agreement may be applied to -

(i)    Buy/Sell Back Transactions, this shall be specified in Annex I hereto, and the provisions of the Buy/Sell Back Annex shall apply to such Buy/Sell Back Trans-actions;

October 2000

-1-

(ii)     Net Paying Securities, this shall be specified in Annex I hereto and the provisions of Annex I, paragraph 1(b) shall apply to Transactions involving Net Paying Securities.

(d)     If Transactions are to be effected under this Agreement by either party as an agent, this shall be specified in Annex I hereto, and the provisions of the Agency Annex shall apply to such Agency Transactions.

## 2.     Definitions

(a)     "Act of Insolvency" shall occur with respect to any party hereto upon –

(i)     its making a general assignment for the benefit of, entering into a reorganisation, arrangement, or composition with creditors; or

(ii)     its admitting in writing that it is unable to pay its debts as they become due; or

(iii)     its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, receiver or liquidator or analogous officer of it or any material part of its property; or

(iv)     the presentation or filing of a petition in respect of it (other than by the counterparty to this Agreement in respect of any obligation under this Agreement) in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition (except in the case of a petition for winding-up or any analogous proceeding, in respect of which no such 30 day period shall apply) not having been stayed or dismissed within 30 days of its filing; or

(v)     the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such party or over all or any material part of such party's property; or

(vi)     the convening of any meeting of its creditors for the purposes of considering a voluntary arrangement as referred to in section 3 of the Insolvency Act 1986 (or any analogous proceeding);

(b)     "Agency Transaction", the meaning specified in paragraph 1 of the Agency Annex;

(c)     "Appropriate Market", the meaning specified in paragraph 10;

(d)     "Base Currency", the currency indicated in Annex I hereto;

(e)     "Business Day" –

(i)     in relation to the settlement of any Transaction which is to be settled through Clearstream or Euroclear, a day on which Clearstream or, as the case may be, Euroclear is open to settle business in the currency in which the Purchase Price and the Repurchase Price are denominated;

(ii)     in relation to the settlement of any Transaction which is to be settled through a settlement system other than Clearstream or Euroclear, a day on which that settlement system is open to settle such Transaction;

(iii)     in relation to any delivery of Securities not falling within (i) or (ii) above, a day on which banks are open for business in the place where delivery of the relevant Securities is to be effected; and

(iv)     in relation to any obligation to make a payment not falling within (i) or (ii) above, a day other than a Saturday or a Sunday on which banks are open for business in the principal financial centre of the country of which the currency in

which the payment is denominated is the official currency and, if different, in the place where any account designated by the parties for the making or receipt of the payment is situated (or, in the case of a payment in euro, a day on which TARGET operates);

(f)    "Cash Margin", a cash sum paid to Buyer or Seller in accordance with paragraph 4;

(g)    "Clearstream", Clearstream Banking, société anonyme, (previously Cedelbank) or any successor thereto;

(h)    "Confirmation", the meaning specified in paragraph 3(b);

(i)    "Contractual Currency", the meaning specified in paragraph 7(a);

(j)    "Defaulting Party", the meaning specified in paragraph 10;

(k)    "Default Market Value", the meaning specified in paragraph 10;

(l)    "Default Notice", a written notice served by the non-Defaulting Party on the Defaulting Party under paragraph 10 stating that an event shall be treated as an Event of Default for the purposes of this Agreement;

(m)    "Default Valuation Notice", the meaning specified in paragraph 10;

(n)    "Default Valuation Time", the meaning specified in paragraph 10;

(o)    "Deliverable Securities", the meaning specified in paragraph 10;

(p)    "Designated Office", with respect to a party, a branch or office of that party which is specified as such in Annex I hereto or such other branch or office as may be agreed to by the parties;

(q)    "Distributions", the meaning specified in sub-paragraph (w) below;

(r)    "Equivalent Margin Securities", Securities equivalent to Securities previously transferred as Margin Securities;

(s)    "Equivalent Securities", with respect to a Transaction, Securities equivalent to Purchased Securities under that Transaction. If and to the extent that such Purchased Securities have been redeemed, the expression shall mean a sum of money equivalent to the proceeds of the redemption;

(t)    Securities are "equivalent to" other Securities for the purposes of this Agreement if they are: (i) of the same issuer; (ii) part of the same issue; and (iii) of an identical type, nominal value, description and (except where otherwise stated) amount as those other Securities, provided that -

    (A)    Securities will be equivalent to other Securities notwithstanding that those Securities have been redenominated into euro or that the nominal value of those Securities has changed in connection with such redenomination; and

    (B)    where Securities have been converted, subdivided or consolidated or have become the subject of a takeover or the holders of Securities have become entitled to receive or acquire other Securities or other property or the Securities have become subject to any similar event, the expression "equivalent to" shall mean Securities equivalent to (as defined in the provisions of this definition preceding the proviso) the original Securities together with or replaced by a sum of money or Securities or other property equivalent to (as so defined) that receivable by holders of such original Securities resulting from such event;

(u)    "Euroclear", Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear System or any successor thereto;

(v)    "Event of Default", the meaning specified in paragraph 10;

(w)    "Income", with respect to any Security at any time, all interest, dividends or other distributions thereon, but excluding distributions which are a payment or repayment of principal in respect of the relevant securities ("Distributions");

(x)    "Income Payment Date", with respect to any Securities, the date on which Income is paid in respect of such Securities or, in the case of registered Securities, the date by reference to which particular registered holders are identified as being entitled to payment of Income;

(y)    "LIBOR", in relation to any sum in any currency, the one month London Inter Bank Offered Rate in respect of that currency as quoted on page 3750 on the Bridge

Telerate Service (or such other page as may replace page 3750 on that service) as of 11:00 a.m., London time, on the date on which it is to be determined;

(z)    "Margin Ratio", with respect to a Transaction, the Market Value of the Purchased Securities at the time when the Transaction was entered into divided by the Purchase Price (and so that, where a Transaction relates to Securities of different descriptions and the Purchase Price is apportioned by the parties among Purchased Securities of each such description, a separate Margin Ratio shall apply in respect of Securities of each such description), or such other proportion as the parties may agree with respect to that Transaction;

(aa)    "Margin Securities", in relation to a Margin Transfer, Securities reasonably acceptable to the party calling for such Margin Transfer;

(bb)    "Margin Transfer", any, or any combination of, the payment or repayment of Cash Margin and the transfer of Margin Securities or Equivalent Margin Securities;

(cc)    "Market Value", with respect to any Securities as of any time on any date, the price for such Securities at such time on such date obtained from a generally recognised source agreed to by the parties (and where different prices are obtained for different delivery dates, the price so obtainable for the earliest available such delivery date) (provided that the price of Securities that are suspended shall (for the purposes of paragraph 4) be nil unless the parties otherwise agree and (for all other purposes) shall be the price of those Securities as of close of business on the dealing day in the relevant market last preceding the date of suspension) plus the aggregate amount of Income which, as of such date, has accrued but not yet been paid in respect of the Securities to the extent not included in such price as of such date, and for these purposes any sum in a currency other than the Contractual Currency for the Transaction in question shall be converted into such Contractual Currency at the Spot Rate prevailing at the relevant time;

(dd)    "Net Exposure", the meaning specified in paragraph 4(c);

(ee)    the "Net Margin" provided to a party at any time, the excess (if any) at that time of (i) the sum of the amount of Cash Margin paid to that party (including accrued interest on such Cash Margin which has not been paid to the other party) and the Market Value of Margin Securities transferred to that party under paragraph 4(a) (excluding any Cash Margin which has been repaid to the other party and any Margin Securities in respect of which Equivalent Margin Securities have been transferred to the other party) over (ii) the sum of the amount of Cash Margin paid to the other party (including accrued interest on such Cash Margin which has not been paid by the other party) and the Market Value of Margin Securities transferred to the other party under paragraph 4(a) (excluding any Cash Margin which has been repaid by the other party and any Margin Securities in respect of which Equivalent Margin Securities have been transferred by the other party) and for this purpose any amounts not denominated in the Base Currency shall be converted into the Base Currency at the Spot Rate prevailing at the relevant time;

(ff)    "Net Paying Securities", Securities which are of a kind such that, were they to be the subject of a Transaction to which paragraph 5 applies, any payment made by Buyer under paragraph 5 would be one in respect of which either Buyer would or might be required to make a withholding or deduction for or on account of taxes or duties or Seller might be required to make or account for a payment for or on account of taxes or duties (in each case other than tax on overall net income) by reference to such payment;

(gg)    "Net Value", the meaning specified in paragraph 10;

(hh)    "New Purchased Securities", the meaning specified in paragraph 8(a);

(ii)    "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction (on a 360 day basis or 365 day basis in accordance with the applicable ISMA convention, unless otherwise agreed between the parties for the Transaction), for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of calculation or, if earlier, the Repurchase Date;

(jj)    "Pricing Rate", with respect to any Transaction, the per annum percentage rate for calculation of the Price Differential agreed to by Buyer and Seller in relation to that Transaction;

(kk)    "Purchase Date", with respect to any Transaction, the date on which Purchased Securities are to be sold by Seller to Buyer in relation to that Transaction;

(ll)    "Purchase Price", on the Purchase Date, the price at which Purchased Securities are sold or are to be sold by Seller to Buyer;

(mm)    "Purchased Securities", with respect to any Transaction, the Securities sold or to be sold by Seller to Buyer under that Transaction, and any New Purchased Securities transferred by Seller to Buyer under paragraph 8 in respect of that Transaction;

(nn)    "Receivable Securities", the meaning specified in paragraph 10;

(oo)    "Repurchase Date", with respect to any Transaction, the date on which Buyer is to sell Equivalent Securities to Seller in relation to that Transaction;

(pp)    "Repurchase Price", with respect to any Transaction and as of any date, the sum of the Purchase Price and the Price Differential as of such date;

(qq)    "Special Default Notice", the meaning specified in paragraph 14;

(rr)    "Spot Rate", where an amount in one currency is to be converted into a second currency on any date, unless the parties otherwise agree, the spot rate of exchange quoted by Barclays Bank PLC in the London inter-bank market for the sale by it of such second currency against a purchase by it of such first currency;

(ss)    "TARGET", the Trans-European Automated Real-time Gross Settlement Express Transfer System;

(tt)    "Term", with respect to any Transaction, the interval of time commencing with the Purchase Date and ending with the Repurchase Date;

(uu)    "Termination", with respect to any Transaction, refers to the requirement with respect to such Transaction for Buyer to sell Equivalent Securities against payment by Seller of the Repurchase Price in accordance with paragraph 3(f), and reference to a Transaction having a "fixed term" or being "terminable upon demand" shall be construed accordingly;

(vv)    "Transaction Costs", the meaning specified in paragraph 10;

(ww)    "Transaction Exposure", with respect to any Transaction at any time during the period
from the Purchase Date to the Repurchase Date (or, if later, the date on which Equivalent
Securities are delivered to Seller or the Transaction is terminated under paragraph 10(g)
or 10(h)), the difference between (i) the Repurchase Price at such time multiplied by the
applicable Margin Ratio (or, where the Transaction relates to Securities of more than one
description to which different Margin Ratios apply, the amount produced by multiplying
the Repurchase Price attributable to Equivalent Securities of each such description by the
applicable Margin Ratio and aggregating the resulting amounts, the Repurchase Price be-
ing for this purpose attributed to Equivalent Securities of each such description in the
same proportions as those in which the Purchase Price was apportioned among the Pur-
chased Securities) and (ii) the Market Value of Equivalent Securities at such time. If
(i) is greater than (ii), Buyer has a Transaction Exposure for that Transaction equal to that
excess. If (ii) is greater than (i), Seller has a Transaction Exposure for that Transaction
equal to that excess; and

(xx)    except in paragraphs 14(b)(i) and 18, references in this Agreement to "written" commu-
nications and communications "in writing" include communications made through any
electronic system agreed between the parties which is capable of reproducing such com-
munication in hard copy form.

**3.    Initiation; Confirmation; Termination**

(a)    A Transaction may be entered into orally or in writing at the initiation of either Buyer or
Seller.

(b)    Upon agreeing to enter into a Transaction hereunder Buyer or Seller (or both), as shall
have been agreed, shall promptly deliver to the other party written confirmation of such
Transaction (a "Confirmation").

The Confirmation shall describe the Purchased Securities (including CUSIP or ISIN or
other identifying number or numbers, if any), identify Buyer and Seller and set forth -

(i)    the Purchase Date;

(ii)    the Purchase Price;

(iii)   the Repurchase Date, unless the Transaction is to be terminable on demand (in
which case the Confirmation shall state that it is terminable on demand);

(iv)   the Pricing Rate applicable to the Transaction;

(v)    in respect of each party the details of the bank account[s] to which payments to
be made hereunder are to be credited;

(vi)   where the Buy/Sell Back Annex applies, whether the Transaction is a Repurchase
Transaction or a Buy/Sell Back Transaction;

(vii)  where the Agency Annex applies, whether the Transaction is an Agency Transac-
tion and, if so, the identity of the party which is acting as agent and the name,
code or identifier of the Principal; and

(viii) any additional terms or conditions of the Transaction;

and may be in the form of Annex II hereto or may be in any other form to which the par-
ties agree.

The Confirmation relating to a Transaction shall, together with this Agreement, constitute
prima facie evidence of the terms agreed between Buyer and Seller for that Transaction,
unless objection is made with respect to the Confirmation promptly after receipt thereof.
In the event of any conflict between the terms of such Confirmation and this Agreement,
the Confirmation shall prevail in respect of that Transaction and those terms only.

(c)    On the Purchase Date for a Transaction, Seller shall transfer the Purchased Securities to Buyer or its agent against the payment of the Purchase Price by Buyer.

(d)    Termination of a Transaction will be effected, in the case of on demand Transactions, on the date specified for Termination in such demand, and, in the case of fixed term Transactions, on the date fixed for Termination.

(e)    In the case of on demand Transactions, demand for Termination shall be made by Buyer or Seller, by telephone or otherwise, and shall provide for Termination to occur after not less than the minimum period as is customarily required for the settlement or delivery of money or Equivalent Securities of the relevant kind.

(f)    On the Repurchase Date, Buyer shall transfer to Seller or its agent Equivalent Securities against the payment of the Repurchase Price by Seller (less any amount then payable and unpaid by Buyer to Seller pursuant to paragraph 5).

**4.    Margin Maintenance**

(a)    If at any time either party has a Net Exposure in respect of the other party it may by notice to the other party require the other party to make a Margin Transfer to it of an aggregate amount or value at least equal to that Net Exposure.

(b)    A notice under sub-paragraph (a) above may be given orally or in writing.

(c)    For the purposes of this Agreement a party has a Net Exposure in respect of the other party if the aggregate of all the first party's Transaction Exposures plus any amount payable to the first party under paragraph 5 but unpaid less the amount of any Net Margin provided to the first party exceeds the aggregate of all the other party's Transaction Exposures plus any amount payable to the other party under paragraph 5 but unpaid less the amount of any Net Margin provided to the other party; and the amount of the Net Exposure is the amount of the excess. For this purpose any amounts not denominated in the Base Currency shall be converted into the Base Currency at the Spot Rate prevailing at the relevant time.

(d)    To the extent that a party calling for a Margin Transfer has previously paid Cash Margin which has not been repaid or delivered Margin Securities in respect of which Equivalent Margin Securities have not been delivered to it, that party shall be entitled to require that such Margin Transfer be satisfied first by the repayment of such Cash Margin or the delivery of Equivalent Margin Securities but, subject to this, the composition of a Margin Transfer shall be at the option of the party making such Margin Transfer.

(e)    Any Cash Margin transferred shall be in the Base Currency or such other currency as the parties may agree.

(f)    A payment of Cash Margin shall give rise to a debt owing from the party receiving such payment to the party making such payment. Such debt shall bear interest at such rate, payable at such times, as may be specified in Annex I hereto in respect of the relevant currency or otherwise agreed between the parties, and shall be repayable subject to the terms of this Agreement.

(g)    Where Seller or Buyer becomes obliged under sub-paragraph (a) above to make a Margin Transfer, it shall transfer Cash Margin or Margin Securities or Equivalent Margin Securities within the minimum period specified in Annex I hereto or, if no period is there specified, such minimum period as is customarily required for the settlement or delivery of money, Margin Securities or Equivalent Margin Securities of the relevant kind.

(h)    The parties may agree that, with respect to any Transaction, the provisions of sub-paragraphs (a) to (g) above shall not apply but instead that margin may be provided separately in respect of that Transaction in which case –

(i)    that Transaction shall not be taken into account when calculating whether either party has a Net Exposure;

(ii)    margin shall be provided in respect of that Transaction in such manner as the parties may agree; and

(iii)    margin provided in respect of that Transaction shall not be taken into account for the purposes of sub-paragraphs (a) to (g) above.

(i)    The parties may agree that any Net Exposure which may arise shall be eliminated not by Margin Transfers under the preceding provisions of this paragraph but by the repricing of Transactions under sub-paragraph (j) below, the adjustment of Transactions under sub-paragraph (k) below or a combination of both these methods.

(j)    Where the parties agree that a Transaction is to be repriced under this sub-paragraph, such repricing shall be effected as follows –

(i)    the Repurchase Date under the relevant Transaction (the "Original Transaction") shall be deemed to occur on the date on which the repricing is to be effected (the "Repricing Date");

(ii)    the parties shall be deemed to have entered into a new Transaction (the "Repriced Transaction") on the terms set out in (iii) to (vi) below;

(iii)    the Purchased Securities under the Repriced Transaction shall be Securities equivalent to the Purchased Securities under the Original Transaction;

(iv)    the Purchase Date under the Repriced Transaction shall be the Repricing Date;

(v)    the Purchase Price under the Repriced Transaction shall be such amount as shall, when multiplied by the Margin Ratio applicable to the Original Transaction, be equal to the Market Value of such Securities on the Repricing Date;

(vi)    the Repurchase Date, the Pricing Rate, the Margin Ratio and, subject as aforesaid, the other terms of the Repriced Transaction shall be identical to those of the Original Transaction;

(vii)    the obligations of the parties with respect to the delivery of the Purchased Securities and the payment of the Purchase Price under the Repriced Transaction shall be set off against their obligations with respect to the delivery of Equivalent Securities and payment of the Repurchase Price under the Original Transaction and accordingly only a net cash sum shall be paid by one party to the other. Such net cash sum shall be paid within the period specified in sub-paragraph (g) above.

(k)    The adjustment of a Transaction (the "Original Transaction") under this sub-paragraph shall be effected by the parties agreeing that on the date on which the adjustment is to be made (the "Adjustment Date") the Original Transaction shall be terminated and they shall enter into a new Transaction (the "Replacement Transaction") in accordance with the following provisions –

(i)    the Original Transaction shall be terminated on the Adjustment Date on such terms as the parties shall agree on or before the Adjustment Date;

(ii)    the Purchased Securities under the Replacement Transaction shall be such Securities as the parties shall agree on or before the Adjustment Date (being Securities the aggregate Market Value of which at the Adjustment Date is substantially equal to the Repurchase Price under the Original Transaction at the Adjustment Date multiplied by the Margin Ratio applicable to the Original Transaction);

(iii)    the Purchase Date under the Replacement Transaction shall be the Adjustment Date;

(iv)   the other terms of the Replacement Transaction shall be such as the parties shall agree on or before the Adjustment Date; and

(v)    the obligations of the parties with respect to payment and delivery of Securities on the Adjustment Date under the Original Transaction and the Replacement Transaction shall be settled in accordance with paragraph 6 within the minimum period specified in sub-paragraph (g) above.

**5.    Income Payments**

Unless otherwise agreed –

(i)    where the Term of a particular Transaction extends over an Income Payment Date in respect of any Securities subject to that Transaction, Buyer shall on the date such Income is paid by the issuer transfer to or credit to the account of Seller an amount equal to (and in the same currency as) the amount paid by the issuer;

(ii)   where Margin Securities are transferred from one party ("the first party") to the other party ("the second party") and an Income Payment Date in respect of such Securities occurs before Equivalent Margin Securities are transferred by the second party to the first party, the second party shall on the date such Income is paid by the issuer transfer to or credit to the account of the first party an amount equal to (and in the same currency as) the amount paid by the issuer;

and for the avoidance of doubt references in this paragraph to the amount of any Income paid by the issuer of any Securities shall be to an amount paid without any withholding or deduction for or on account of taxes or duties notwithstanding that a payment of such Income made in certain circumstances may be subject to such a withholding or deduction.

**6.    Payment and Transfer**

(a)    Unless otherwise agreed, all money paid hereunder shall be in immediately available freely convertible funds of the relevant currency. All Securities to be transferred hereunder (i) shall be in suitable form for transfer and shall be accompanied by duly executed instruments of transfer or assignment in blank (where required for transfer) and such other documentation as the transferee may reasonably request, or (ii) shall be transferred through the book entry system of Euroclear or Clearstream, or (iii) shall be transferred through any other agreed securities clearance system or (iv) shall be transferred by any other method mutually acceptable to Seller and Buyer.

(b)    Unless otherwise agreed, all money payable by one party to the other in respect of any Transaction shall be paid free and clear of, and without withholding or deduction for, any taxes or duties of whatsoever nature imposed, levied, collected, withheld or assessed by any authority having power to tax, unless the withholding or deduction of such taxes or duties is required by law. In that event, unless otherwise agreed, the paying party shall pay such additional amounts as will result in the net amounts receivable by the other party (after taking account of such withholding or deduction) being equal to such amounts as would have been received by it had no such taxes or duties been required to be withheld or deducted.

(c)    Unless otherwise agreed in writing between the parties, under each Transaction transfer of Purchased Securities by Seller and payment of Purchase Price by Buyer against the transfer of such Purchased Securities shall be made simultaneously and transfer of Equivalent Securities by Buyer and payment of Repurchase Price payable by Seller against the transfer of such Equivalent Securities shall be made simultaneously.

(d)    Subject to and without prejudice to the provisions of sub-paragraph 6(c), either party may from time to time in accordance with market practice and in recognition of the practical difficulties in arranging simultaneous delivery of Securities and money waive in relation

to any Transaction its rights under this Agreement to receive simultaneous transfer and/or payment provided that transfer and/or payment shall, notwithstanding such waiver, be made on the same day and provided also that no such waiver in respect of one Transaction shall affect or bind it in respect of any other Transaction.

(e)   The parties shall execute and deliver all necessary documents and take all necessary steps to procure that all right, title and interest in any Purchased Securities, any Equivalent Securities, any Margin Securities and any Equivalent Margin Securities shall pass to the party to which transfer is being made upon transfer of the same in accordance with this Agreement, free from all liens, claims, charges and encumbrances.

(f)   Notwithstanding the use of expressions such as "Repurchase Date", "Repurchase Price", "margin", "Net Margin", "Margin Ratio" and "substitution", which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, all right, title and interest in and to Securities and money transferred or paid under this Agreement shall pass to the transferee upon transfer or payment, the obligation of the party receiving Purchased Securities or Margin Securities being an obligation to transfer Equivalent Securities or Equivalent Margin Securities.

(g)   Time shall be of the essence in this Agreement.

(h)   Subject to paragraph 10, all amounts in the same currency payable by each party to the other under any Transaction or otherwise under this Agreement on the same date shall be combined in a single calculation of a net sum payable by one party to the other and the obligation to pay that sum shall be the only obligation of either party in respect of those amounts.

(i)   Subject to paragraph 10, all Securities of the same issue, denomination, currency and series, transferable by each party to the other under any Transaction or hereunder on the same date shall be combined in a single calculation of a net quantity of Securities transferable by one party to the other and the obligation to transfer the net quantity of Securities shall be the only obligation of either party in respect of the Securities so transferable and receivable.

(j)   If the parties have specified in Annex I hereto that this paragraph 6(j) shall apply, each obligation of a party under this Agreement (other than an obligation arising under paragraph 10) is subject to the condition precedent that none of those events specified in paragraph 10(a) which are identified in Annex I hereto for the purposes of this paragraph 6(j) (being events which, upon the serving of a Default Notice, would be an Event of Default with respect to the other party) shall have occurred and be continuing with respect to the other party.

**7.    Contractual Currency**

(a)   All the payments made in respect of the Purchase Price or the Repurchase Price of any Transaction shall be made in the currency of the Purchase Price (the "Contractual Currency") save as provided in paragraph 10(c)(ii). Notwithstanding the foregoing, the payee of any money may, at its option, accept tender thereof in any other currency, provided, however, that, to the extent permitted by applicable law, the obligation of the payer to pay such money will be discharged only to the extent of the amount of the Contractual Currency that such payee may, consistent with normal banking procedures, purchase with such other currency (after deduction of any premium and costs of exchange) for delivery within the customary delivery period for spot transactions in respect of the relevant currency.

(b)   If for any reason the amount in the Contractual Currency received by a party, including amounts received after conversion of any recovery under any judgment or order expressed in a currency other than the Contractual Currency, falls short of the amount in the

Contractual Currency due and payable, the party required to make the payment will, as a separate and independent obligation, to the extent permitted by applicable law, immediately transfer such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall.

(c) If for any reason the amount in the Contractual Currency received by a party exceeds the amount of the Contractual Currency due and payable, the party receiving the transfer will refund promptly the amount of such excess.

**8.**   **Substitution**

(a) A Transaction may at any time between the Purchase Date and Repurchase Date, if Seller so requests and Buyer so agrees, be varied by the transfer by Buyer to Seller of Securities equivalent to the Purchased Securities, or to such of the Purchased Securities as shall be agreed, in exchange for the transfer by Seller to Buyer of other Securities of such amount and description as shall be agreed ("New Purchased Securities") (being Securities having a Market Value at the date of the variation at least equal to the Market Value of the Equivalent Securities transferred to Seller).

(b) Any variation under sub-paragraph (a) above shall be effected, subject to paragraph 6(d), by the simultaneous transfer of the Equivalent Securities and New Purchased Securities concerned.

(c) A Transaction which is varied under sub-paragraph (a) above shall thereafter continue in effect as though the Purchased Securities under that Transaction consisted of or included the New Purchased Securities instead of the Securities in respect of which Equivalent Securities have been transferred to Seller.

(d) Where either party has transferred Margin Securities to the other party it may at any time before Equivalent Margin Securities are transferred to it under paragraph 4 request the other party to transfer Equivalent Margin Securities to it in exchange for the transfer to the other party of new Margin Securities having a Market Value at the time of transfer at least equal to that of such Equivalent Margin Securities. If the other party agrees to the request, the exchange shall be effected, subject to paragraph 6(d), by the simultaneous transfer of the Equivalent Margin Securities and new Margin Securities concerned. Where either or both of such transfers is or are effected through a settlement system in circumstances which under the rules and procedures of that settlement system give rise to a payment by or for the account of one party to or for the account of the other party, the parties shall cause such payment or payments to be made outside that settlement system, for value the same day as the payments made through that settlement system, as shall ensure that the exchange of Equivalent Margin Securities and new Margin Securities effected under this sub-paragraph does not give rise to any net payment of cash by either party to the other.

**9.**   **Representations**

Each party represents and warrants to the other that -

(a) it is duly authorised to execute and deliver this Agreement, to enter into the Transactions contemplated hereunder and to perform its obligations hereunder and thereunder and has taken all necessary action to authorise such execution, delivery and performance;

(b) it will engage in this Agreement and the Transactions contemplated hereunder (other than Agency Transactions) as principal;

(c) the person signing this Agreement on its behalf is, and any person representing it in entering into a Transaction will be, duly authorised to do so on its behalf;

(d)   it has obtained all authorisations of any governmental or regulatory body required in connection with this Agreement and the Transactions contemplated hereunder and such authorisations are in full force and effect;

(e)   the execution, delivery and performance of this Agreement and the Transactions contemplated hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected;

(f)   it has satisfied itself and will continue to satisfy itself as to the tax implications of the Transactions contemplated hereunder;

(g)   in connection with this Agreement and each Transaction -

  (i)   unless there is a written agreement with the other party to the contrary, it is not relying on any advice (whether written or oral) of the other party, other than the representations expressly set out in this Agreement;

  (ii)  it has made and will make its own decisions regarding the entering into of any Transaction based upon its own judgment and upon advice from such professional advisers as it has deemed it necessary to consult;

  (iii) it understands the terms, conditions and risks of each Transaction and is willing to assume (financially and otherwise) those risks; and

(h)   at the time of transfer to the other party of any Securities it will have the full and unqualified right to make such transfer and that upon such transfer of Securities the other party will receive all right, title and interest in and to those Securities free of any lien, claim, charge or encumbrance.

On the date on which any Transaction is entered into pursuant hereto, and on each day on which Securities, Equivalent Securities, Margin Securities or Equivalent Margin Securities are to be transferred under any Transaction, Buyer and Seller shall each be deemed to repeat all the foregoing representations. For the avoidance of doubt and notwithstanding any arrangements which Seller or Buyer may have with any third party, each party will be liable as a principal for its obligations under this Agreement and each Transaction.

**10.   Events of Default**

(a)   If any of the following events (each an "Event of Default") occurs in relation to either party (the "Defaulting Party", the other party being the "non-Defaulting Party") whether acting as Seller or Buyer -

  (i)   Buyer fails to pay the Purchase Price upon the applicable Purchase Date or Seller fails to pay the Repurchase Price upon the applicable Repurchase Date, and the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

  (ii)  if the parties have specified in Annex I hereto that this sub-paragraph shall apply, Seller fails to deliver Purchased Securities on the Purchase Date or Buyer fails to deliver Equivalent Securities on the Repurchase Date, and the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

  (iii) Seller or Buyer fails to pay when due any sum payable under sub-paragraph (g) or (h) below, and the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

  (iv)  Seller or Buyer fails to comply with paragraph 4 and the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

  (v)   Seller or Buyer fails to comply with paragraph 5 and the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

(vi)    an Act of Insolvency occurs with respect to Seller or Buyer and (except in the case of an Act of Insolvency which is the presentation of a petition for winding-up or any analogous proceeding or the appointment of a liquidator or analogous officer of the Defaulting Party in which case no such notice shall be required) the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

(vii)    any representations made by Seller or Buyer are incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, and the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

(viii)    Seller or Buyer admits to the other that it is unable to, or intends not to, perform any of its obligations hereunder and/or in respect of any Transaction and the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

(ix)    Seller or Buyer is suspended or expelled from membership of or participation in any securities exchange or association or other self regulating organisation, or suspended from dealing in securities by any government agency, or any of the assets of either Seller or Buyer or the assets of investors held by, or to the order of, Seller or Buyer are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation and the non-Defaulting Party serves a Default Notice on the Defaulting Party; or

(x)    Seller or Buyer fails to perform any other of its obligations hereunder and does not remedy such failure within 30 days after notice is given by the non-Defaulting Party requiring it to do so, and the non-Defaulting Party serves a Default Notice on the Defaulting Party;

then sub-paragraphs (b) to (f) below shall apply.

(b)    The Repurchase Date for each Transaction hereunder shall be deemed immediately to occur and, subject to the following provisions, all Cash Margin (including interest accrued) shall be immediately repayable and Equivalent Margin Securities shall be immediately deliverable (and so that, where this sub-paragraph applies, performance of the respective obligations of the parties with respect to the delivery of Securities, the payment of the Repurchase Prices for any Equivalent Securities and the repayment of any Cash Margin shall be effected only in accordance with the provisions of sub-paragraph (c) below).

(c)    (i)    The Default Market Values of the Equivalent Securities and any Equivalent Margin Securities to be transferred, the amount of any Cash Margin (including the amount of interest accrued) to be transferred and the Repurchase Prices to be paid by each party shall be established by the non-Defaulting Party for all Transactions as at the Repurchase Date; and

(ii)    on the basis of the sums so established, an account shall be taken (as at the Repurchase Date) of what is due from each party to the other under this Agreement (on the basis that each party's claim against the other in respect of the transfer to it of Equivalent Securities or Equivalent Margin Securities under this Agreement equals the Default Market Value therefor) and the sums due from one party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the party having the claim valued at the lower amount pursuant to the foregoing) and such balance shall be due and payable on the next following Business Day. For the purposes of this calculation, all sums not denominated in the Base Currency shall be converted into the Base Currency on the relevant date at the Spot Rate prevailing at the relevant time.

(d)    For the purposes of this Agreement, the "Default Market Value" of any Equivalent Securities or Equivalent Margin Securities shall be determined in accordance with sub-paragraph (e) below, and for this purpose –

    (i)    the "Appropriate Market" means, in relation to Securities of any description, the market which is the most appropriate market for Securities of that description, as determined by the non-Defaulting Party;

    (ii)    the "Default Valuation Time" means, in relation to an Event of Default, the close of business in the Appropriate Market on the fifth dealing day after the day on which that Event of Default occurs or, where that Event of Default is the occurrence of an Act of Insolvency in respect of which under paragraph 10(a) no notice is required from the non-Defaulting Party in order for such event to constitute an Event of Default, the close of business on the fifth dealing day after the day on which the non-Defaulting Party first became aware of the occurrence of such Event of Default;

    (iii)    "Deliverable Securities" means Equivalent Securities or Equivalent Margin Securities to be delivered by the Defaulting Party;

    (iv)    "Net Value" means at any time, in relation to any Deliverable Securities or Receivable Securities, the amount which, in the reasonable opinion of the non-Defaulting Party, represents their fair market value, having regard to such pricing sources and methods (which may include, without limitation, available prices for Securities with similar maturities, terms and credit characteristics as the relevant Equivalent Securities or Equivalent Margin Securities) as the non-Defaulting Party considers appropriate, less, in the case of Receivable Securities, or plus, in the case of Deliverable Securities, all Transaction Costs which would be incurred in connection with the purchase or sale of such Securities;

    (v)    "Receivable Securities" means Equivalent Securities or Equivalent Margin Securities to be delivered to the Defaulting Party; and

    (vi)    "Transaction Costs" in relation to any transaction contemplated in paragraph 10(d) or (e) means the reasonable costs, commission, fees and expenses (including any mark-up or mark-down) that would be incurred in connection with the purchase of Deliverable Securities or sale of Receivable Securities, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out the transaction;

(e)    (i)    If between the occurrence of the relevant Event of Default and the Default Valuation Time the non-Defaulting Party gives to the Defaulting Party a written notice (a "Default Valuation Notice") which –

    (A)    states that, since the occurrence of the relevant Event of Default, the non-Defaulting Party has sold, in the case of Receivable Securities, or purchased, in the case of Deliverable Securities, Securities which form part of the same issue and are of an identical type and description as those Equivalent Securities or Equivalent Margin Securities, and that the non-Defaulting Party elects to treat as the Default Market Value -

    (aa)    in the case of Receivable Securities, the net proceeds of such sale after deducting all reasonable costs, fees and expenses incurred in connection therewith (provided that, where the Securities sold are not identical in amount to the Equivalent Securities or Equivalent Margin Securities, the non-Defaulting Party may either (x) elect to treat such net proceeds of sale divided by the amount of Securities sold and multiplied by the amount of the Equivalent Securities or Equivalent Margin Securities as

the Default Market Value or (y) elect to treat such net proceeds of sale of the Equivalent Securities or Equivalent Margin Securities actually sold as the Default Market Value of that proportion of the Equivalent Securities or Equivalent Margin Securities, and, in the case of (y), the Default Market Value of the balance of the Equivalent Securities or Equivalent Margin Securities shall be determined separately in accordance with the provisions of this paragraph 10(e) and accordingly may be the subject of a separate notice (or notices) under this paragraph 10(e)(i)); or

(bb)    in the case of Deliverable Securities, the aggregate cost of such purchase, including all reasonable costs, fees and expenses incurred in connection therewith (provided that, where the Securities purchased are not identical in amount to the Equivalent Securities or Equivalent Margin Securities, the non-Defaulting Party may either (x) elect to treat such aggregate cost divided by the amount of Securities sold and multiplied by the amount of the Equivalent Securities or Equivalent Margin Securities as the Default Market Value or (y) elect to treat the aggregate cost of purchasing the Equivalent Securities or Equivalent Margin Securities actually purchased as the Default Market Value of that proportion of the Equivalent Securities or Equivalent Margin Securities, and, in the case of (y), the Default Market Value of the balance of the Equivalent Securities or Equivalent Margin Securities shall be determined separately in accordance with the provisions of this paragraph 10(e) and accordingly may be the subject of a separate notice (or notices) under this paragraph 10(e)(i));

(B)    states that the non-Defaulting Party has received, in the case of Deliverable Securities, offer quotations or, in the case of Receivable Securities, bid quotations in respect of Securities of the relevant description from two or more market makers or regular dealers in the Appropriate Market in a commercially reasonable size (as determined by the non-Defaulting Party) and specifies -

(aa)    the price or prices quoted by each of them for, in the case of Deliverable Securities, the sale by the relevant market marker or dealer of such Securities or, in the case of Receivable Securities, the purchase by the relevant market maker or dealer of such Securities;

(bb)    the Transaction Costs which would be incurred in connection with such a transaction; and

(cc)    that the non-Defaulting Party elects to treat the price so quoted (or, where more than one price is so quoted, the arithmetic mean of the prices so quoted), after deducting, in the case of Receivable Securities, or adding, in the case of Deliverable Securities, such Transaction Costs, as the Default Market Value of the relevant Equivalent Securities or Equivalent Margin Securities; or

(C)    states –

(aa)    that either (x) acting in good faith, the non-Defaulting Party has endeavoured but been unable to sell or purchase Securities in accordance with sub-paragraph (i)(A) above or to obtain quotations in accordance with sub-paragraph (i)(B) above (or both) or (y) the non-Defaulting Party has determined that it would not be commercially reasonable to obtain such quotations, or that it would not be commercially reasonable to use any quotations which it has obtained under sub-paragraph (i)(B) above; and

(bb)   that the non-Defaulting Party has determined the Net Value of the relevant Equivalent Securities or Equivalent Margin Securities (which shall be specified) and that the non-Defaulting Party elects to treat such Net Value as the Default Market Value of the relevant Equivalent Securities or Equivalent Margin Securities,

then the Default Market Value of the relevant Equivalent Securities or Equivalent Margin Securities shall be an amount equal to the Default Market Value specified in accordance with (A), (B)(cc) or, as the case may be, (C)(bb) above.

(ii)   If by the Default Valuation Time the non-Defaulting Party has not given a Default Valuation Notice, the Default Market Value of the relevant Equivalent Securities or Equivalent Margin Securities shall be an amount equal to their Net Value at the Default Valuation Time; provided that, if at the Default Valuation Time the non-Defaulting Party reasonably determines that, owing to circumstances affecting the market in the Equivalent Securities or Equivalent Margin Securities in question, it is not possible for the non-Defaulting Party to determine a Net Value of such Equivalent Securities or Equivalent Margin Securities which is commercially reasonable, the Default Market Value of such Equivalent Securities or Equivalent Margin Securities shall be an amount equal to their Net Value as determined by the non-Defaulting Party as soon as reasonably practicable after the Default Valuation Time.

(f)   The Defaulting Party shall be liable to the non-Defaulting Party for the amount of all reasonable legal and other professional expenses incurred by the non-Defaulting Party in connection with or as a consequence of an Event of Default, together with interest thereon at LIBOR or, in the case of an expense attributable to a particular Transaction, the Pricing Rate for the relevant Transaction if that Pricing Rate is greater than LIBOR.

(g)   If Seller fails to deliver Purchased Securities to Buyer on the applicable Purchase Date Buyer may –

(i)   if it has paid the Purchase Price to Seller, require Seller immediately to repay the sum so paid;

(ii)   if Buyer has a Transaction Exposure to Seller in respect of the relevant Transaction, require Seller from time to time to pay Cash Margin at least equal to such Transaction Exposure;

(iii)   at any time while such failure continues, terminate the Transaction by giving written notice to Seller. On such termination the obligations of Seller and Buyer with respect to delivery of Purchased Securities and Equivalent Securities shall terminate and Seller shall pay to Buyer an amount equal to the excess of the Repurchase Price at the date of Termination over the Purchase Price.

(h)   If Buyer fails to deliver Equivalent Securities to Seller on the applicable Repurchase Date Seller may –

(i)   if it has paid the Repurchase Price to Buyer, require Buyer immediately to repay the sum so paid;

(ii)   if Seller has a Transaction Exposure to Buyer in respect of the relevant Transaction, require Buyer from time to time to pay Cash Margin at least equal to such Transaction Exposure;

(iii)   at any time while such failure continues, by written notice to Buyer declare that that Transaction (but only that Transaction) shall be terminated immediately in accordance with sub-paragraph (c) above (disregarding for this purpose references in that sub-paragraph to transfer of Cash Margin and delivery of Equivalent

Margin Securities and as if references to the Repurchase Date were to the date on which notice was given under this sub-paragraph).

(i)    The provisions of this Agreement constitute a complete statement of the remedies available to each party in respect of any Event of Default.

(j)    Subject to paragraph 10(k), neither party may claim any sum by way of consequential loss or damage in the event of a failure by the other party to perform any of its obligations under this Agreement.

(k)    (i)    Subject to sub-paragraph (ii) below, if as a result of a Transaction terminating before its agreed Repurchase Date under paragraphs 10(b), 10(g)(iii) or 10(h)(iii), the non-Defaulting Party, in the case of paragraph 10(b), Buyer, in the case of paragraph 10(g)(iii), or Seller, in the case of paragraph 10(h)(iii), (in each case the "first party") incurs any loss or expense in entering into replacement transactions, the other party shall be required to pay to the first party the amount determined by the first party in good faith to be equal to the loss or expense incurred in connection with such replacement transactions (including all fees, costs and other expenses) less the amount of any profit or gain made by that party in connection with such replacement transactions; provided that if that calculation results in a negative number, an amount equal to that number shall be payable by the first party to the other party.

(ii)    If the first party reasonably decides, instead of entering into such replacement transactions, to replace or unwind any hedging transactions which the first party entered into in connection with the Transaction so terminating, or to enter into any replacement hedging transactions, the other party shall be required to pay to the first party the amount determined by the first party in good faith to be equal to the loss or expense incurred in connection with entering into such replacement or unwinding (including all fees, costs and other expenses) less the amount of any profit or gain made by that party in connection with such replacement or unwinding; provided that if that calculation results in a negative number, an amount equal to that number shall be payable by the first party to the other party.

(l)    Each party shall immediately notify the other if an Event of Default, or an event which, upon the serving of a Default Notice, would be an Event of Default, occurs in relation to it.

## 11.    Tax Event

(a)    This paragraph shall apply if either party notifies the other that –

(i)    any action taken by a taxing authority or brought in a court of competent jurisdiction (regardless of whether such action is taken or brought with respect to a party to this Agreement); or

(ii)    a change in the fiscal or regulatory regime (including, but not limited to, a change in law or in the general interpretation of law but excluding any change in any rate of tax),

has or will, in the notifying party's reasonable opinion, have a material adverse effect on that party in the context of a Transaction.

(b)    If so requested by the other party, the notifying party will furnish the other with an opinion of a suitably qualified adviser that an event referred to in sub-paragraph (a)(i) or (ii) above has occurred and affects the notifying party.

(c)    Where this paragraph applies, the party giving the notice referred to in sub-paragraph (a) may, subject to sub-paragraph (d) below, terminate the Transaction with effect from a

date specified in the notice, not being earlier (unless so agreed by the other party) than 30 days after the date of the notice, by nominating that date as the Repurchase Date.

(d)     If the party receiving the notice referred to in sub-paragraph (a) so elects, it may override that notice by giving a counter-notice to the other party. If a counter-notice is given, the party which gives the counter-notice will be deemed to have agreed to indemnify the other party against the adverse effect referred to in sub-paragraph (a) so far as relates to the relevant Transaction and the original Repurchase Date will continue to apply.

(e)     Where a Transaction is terminated as described in this paragraph, the party which has given the notice to terminate shall indemnify the other party against any reasonable legal and other professional expenses incurred by the other party by reason of the termination, but the other party may not claim any sum by way of consequential loss or damage in respect of a termination in accordance with this paragraph.

(f)     This paragraph is without prejudice to paragraph 6(b) (obligation to pay additional amounts if withholding or deduction required); but an obligation to pay such additional amounts may, where appropriate, be a circumstance which causes this paragraph to apply.

**12.     Interest**

To the extent permitted by applicable law, if any sum of money payable hereunder or under any Transaction is not paid when due, interest shall accrue on the unpaid sum as a separate debt at the greater of the Pricing Rate for the Transaction to which such sum relates (where such sum is referable to a Transaction) and LIBOR on a 360 day basis or 365 day basis in accordance with the applicable ISMA convention, for the actual number of days during the period from and including the date on which payment was due to, but excluding, the date of payment.

**13.     Single Agreement**

Each party acknowledges that, and has entered into this Agreement and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that all Transactions hereunder constitute a single business and contractual relationship and are made in consideration of each other. Accordingly, each party agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, and (ii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder.

**14.     Notices and Other Communications**

(a)     Any notice or other communication to be given under this Agreement –

(i)     shall be in the English language, and except where expressly otherwise provided in this Agreement, shall be in writing;

(ii)     may be given in any manner described in sub-paragraphs (b) and (c) below;

(iii)     shall be sent to the party to whom it is to be given at the address or number, or in accordance with the electronic messaging details, set out in Annex I hereto.

(b)     Subject to sub-paragraph (c) below, any such notice or other communication shall be effective –

(i)     if in writing and delivered in person or by courier, at the time when it is delivered;

(ii)     if sent by telex, at the time when the recipient's answerback is received;

(iii)    if sent by facsimile transmission, at the time when the transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), at the time when that mail is delivered or its delivery is attempted;

(v)    if sent by electronic messaging system, at the time that electronic message is received;

except that any notice or communication which is received, or delivery of which is attempted, after close of business on the date of receipt or attempted delivery or on a day which is not a day on which commercial banks are open for business in the place where that notice or other communication is to be given shall be treated as given at the opening of business on the next following day which is such a day.

(c)    If –

(i)    there occurs in relation to either party an event which, upon the service of a Default Notice, would be an Event of Default; and

(ii)    the non-Defaulting Party, having made all practicable efforts to do so, including having attempted to use at least two of the methods specified in sub paragraph (b)(ii), (iii) or (v), has been unable to serve a Default Notice by one of the methods specified in those sub-paragraphs (or such of those methods as are normally used by the non-Defaulting Party when communicating with the Defaulting Party),

the non-Defaulting Party may sign a written notice (a "Special Default Notice") which -

(aa)    specifies the relevant event referred to in paragraph 10(a) which has occurred in relation to the Defaulting Party;

(bb)    states that the non-Defaulting Party, having made all practicable efforts to do so, including having attempted to use at least two of the methods specified in sub paragraph (b)(ii), (iii) or (v), has been unable to serve a Default Notice by one of the methods specified in those sub-paragraphs (or such of those methods as are normally used by the non-Defaulting Party when communicating with the Defaulting Party);

(cc)    specifies the date on which, and the time at which, the Special Default Notice is signed by the non-Defaulting Party; and

(dd)    states that the event specified in accordance with sub-paragraph (aa) above shall be treated as an Event of Default with effect from the date and time so specified.

On the signature of a Special Default Notice the relevant event shall be treated with effect from the date and time so specified as an Event of Default in relation to the Defaulting Party, and accordingly references in paragraph 10 to a Default Notice shall be treated as including a Special Default Notice. A Special Default Notice shall be given to the Defaulting Party as soon as practicable after it is signed.

(d)    Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

15.   **Entire Agreement; Severability**

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for Transactions. Each provision and agreement herein shall be treated as separate from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

16.   **Non-assignability; Termination**

(a)   Subject to sub-paragraph (b) below, neither party may assign, charge or otherwise deal with (including without limitation any dealing with any interest in or the creation of any interest in) its rights or obligations under this Agreement or under any Transaction without the prior written consent of the other party. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

(b)   Sub-paragraph (a) above shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under paragraph 10(c) or (f) above.

(c)   Either party may terminate this Agreement by giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(d)   All remedies hereunder shall survive Termination in respect of the relevant Transaction and termination of this Agreement.

(e)   The participation of any additional member State of the European Union in economic and monetary union after 1 January 1999 shall not have the effect of altering any term of the Agreement or any Transaction, nor give a party the right unilaterally to alter or terminate the Agreement or any Transaction.

17.   **Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of England. Buyer and Seller hereby irrevocably submit for all purposes of or in connection with this Agreement and each Transaction to the jurisdiction of the Courts of England.

Party A hereby appoints the person identified in Annex I hereto as its agent to receive on its behalf service of process in such courts. If such agent ceases to be its agent, Party A shall promptly appoint, and notify Party B of the identity of, a new agent in England.

Party B hereby appoints the person identified in Annex I hereto as its agent to receive on its behalf service of process in such courts. If such agent ceases to be its agent, Party B shall promptly appoint, and notify Party A of the identity of, a new agent in England.

Each party shall deliver to the other, within 30 days of the date of this Agreement in the case of the appointment of a person identified in Annex I or of the date of the appointment of the relevant agent in any other case, evidence of the acceptance by the agent appointed by it pursuant to this paragraph of such appointment.

Nothing in this paragraph shall limit the right of any party to take proceedings in the courts of any other country of competent jurisdiction.

18.   **No Waivers, etc.**

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such modification, waiver or con-

sent shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to paragraph 4(a) hereof will not constitute a waiver of any right to do so at a later date.

19.    **Waiver of Immunity**

Each party hereto hereby waives, to the fullest extent permitted by applicable law, all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction, attachment (both before and after judgment) and execution to which it might otherwise be entitled in any action or proceeding in the Courts of England or of any other country or jurisdiction, relating in any way to this Agreement or any Transaction, and agrees that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding.

20.    **Recording**

The parties agree that each may electronically record all telephone conversations between them.

21.    **Third Party Rights**

No person shall have any right to enforce any provision of this Agreement under the Contracts (Rights of Third Parties) Act 1999.

**LEHMAN BROTHERS INTERNATIONAL
(EUROPE)**

By_____

Title_____ANDREE WATT_____

Date_____AUTHORISED SIGNATORY____

12/06/2007

**HIGHLAND CDO OPPORTUNITY MASTER
FUND LP**

By_____

Title_____

Date_____

## ANNEX 1

### Supplemental Terms or Conditions
### To the TBMA/ISMA Master Repurchase Agreement

#### Dated as of May 31, 2007

Between

#### LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A")
a company incorporated with unlimited liability under the laws of England and Wales

and

#### Highland CDO Opportunity Master Fund LP("Party B")
a limited partnership organized under the laws of the State of Delaware

Paragraph references are to paragraphs in the Agreement.

1.   The following elections shall apply

(a)   **paragraph 1(c)(i).** Buy/Sell Back Transactions may be effected under this Agreement, and accordingly the Buy/Sell Back Annex shall apply.

(b)   **paragraph 1(c)(ii).** Transactions in Net Paying Securities may be effected under this Agreement, and accordingly the provisions of sub paragraphs (i) and (ii) below shall apply.

    (i)   The phrase "other than equities and Net Paying Securities" in paragraph 1(a) shall be replaced by the phrase "other than equities".

    (ii)   In the Buy/Sell Back Annex the following words shall be added to the end of the definition of the expression "IR": "and for the avoidance of doubt the reference to the amount of Income for these purposes shall be to an amount paid without withholding or deduction for or on account of taxes or duties notwithstanding that a payment of such Income made in certain circumstances may be subject to such a withholding or deduction".

(c)   **paragraph 1(d).** Agency Transactions may not be effected under this Agreement, and accordingly the Agency Annex shall not apply.

In addition, the following Annexes shall also apply with respect to relevant Transactions:

    — Equities Annex
    — Italian Annex
    — Gilts Annex
    — Japanese Securities Annex
    — U.S. Securities Addendum

(d)   **paragraph 2(d).** The Base Currency shall be:

    (i)   for the purposes of paragraph 4, United States Dollars
    (ii)   for the purposes of paragraph 10, where the Defaulting Party is Party B, United States Dollars and, where the Defaulting Party is Party A, United States Dollars.

(e)   **paragraph 2(p).** list Buyer's and Seller's Designated Offices.

    Party A: London and Frankfurt.

Party B: Delaware

(f)    **paragraph 2(cc).** The pricing source for calculation of Market Value shall be: Market Value will be calculated in accordance with market practice prevailing in the principal market for the relevant securities as reasonably determined by Party A or as otherwise agreed in writing by the parties.

(g)    **paragraph 2(rr).** Spot rate to be: as specified in paragraph 2(rr).

(h)    **paragraph 3(b).** both Seller and Buyer to deliver Confirmation.

(i)    **paragraph 4(f).**

    (i)    Interest rate on Cash Margin to be Fed Funds Open for USD (available on Telerate page 5), EONIA for Euro (available on Bloomberg page EBF) and SONIA for GBP (available on Bloomberg page BBAM).

    (ii)    Interest to be payable upon redelivery of any Cash Margin.

(j)    **paragraph 4(g).** Delivery period for margin calls to be:

    (i)    For Cash Margin, Margin Securities or Equivalent Margin Securities the same day if the request is made by 10 a.m. (New York time) on a Business Day and, if requested after such time, on the next Business Day.

(k)    **paragraph 6(j).** Paragraph 6(j) shall apply, and the events specified in paragraph 10(a) identified for the purposes of paragraph 6(j) shall be those set out in sub-paragraphs (i) and (iii) through (x) of paragraph 10(a) of this Agreement.

(l)    **paragraph 10(a)(ii).** Paragraph 10(a)(ii) shall not apply.

(m)    **paragraph 14.** For the purposes of paragraph 14 of this Agreement

    (i)    Address for notices and other communications for Party A

    (a)    Address: **Lehman Brothers International (Europe) – Head Office**
    25 Bank Street, London E14 5LE
    Attention:

    For trading issues: Trading Manager, Central Funding Desk
    Telephone: 44 (20) 7260 2333
    e-mail: cfueurope@exeulon.lehman.com

    For confirmation issues: Trade Support / Operations
    Telephone: 44 (20) 7102 3002/2971
    Facsimile: 44 (20) 7102 3022/2518
    e-mail: fidfinancing@exeulon.lehman.com

    For margin issues: Global Margin Europe
    Telephone: 44 (20) 701 1 7290
    Facsimile: 44 (20) 7260 1324
    e-mail: repofutmargin@exeulon.lehman.com

    For documentation issues: Transaction Management (London)
    Telephone: 44 (20) 7102 1730
    Facsimile: 44 (20) 7102 2044
    e-mail: vsharp@lehman.com; gtarry@lehman.com

    (b)    Address: **Lehman Brothers International (Europe) – Frankfurt Branch**
    Rathenauplatz 1, D-60313 Frankfurt am Main, Germany
    Attention:

For trading issues: Trading Manager, Central Funding Desk
Telephone: 44 (20) 7260 2333
e-mail: cfueurope@exeulon.lehman.com

For confirmation issues: Trade Support / Operations
Telephone: 44 (20) 7120 3002/2971
Facsimile: 44 (20) 7120 3022/2518
e-mail: fidfinancing@exeulon.lehman.com

For margin issues: Global Margin Europe (London)
Telephone: 44 (20) 7011 7290
Facsimile: 44 (20) 7260 1324
e-mail: repofutmargin@exeulon.lehman.com

For documentation issues: Transaction Management (London)
Telephone: 44 (20) 7102 1730
Facsimile: 44 (20) 7102 2044
e-mail: : vsharp@lehman.com; gtarry@lehman.com

(ii)    Address for notices and other communications for Party B

Address:  c/o Highland Capital Management, L.P.
          13445 Noel Road
          Two Gallerial Tower, Suite 1300
          Dallas, TX 75241
Attention:  Philip Braner

Telephone:     972-628- 4100

Facsimile: 972-628-4147

E-mail:  PBraner@hcmlp.com

**paragraph 17.** For the purposes of paragraph 17 of this Agreement

(iii)   Party A is not required to appoint an agent for service of process.

(iv)    Party B appoints as its agent for service of process: Highland Capital
        Management Europe Ltd., 130 Jermyn Street, London SW1Y 4UP

**2.     The following supplemental terms and conditions shall apply.**

(a)     Existing Transactions. All Repurchase Transactions and Buy/Sell Back Transactions
        entered into by the parties prior to the date of this Agreement which are outstanding at the
        date of the Agreement, shall be deemed to be entered into pursuant to this Agreement and
        shall be governed by the terms of this Agreement.

(b)     Forward Transactions. The parties agree that Forward Transactions (as defined in sub
        paragraph (i)(A) below) may be effected under this Agreement, and accordingly the
        provisions of sub paragraphs (i) to (iv) below shall apply.

        (i)     The following definitions shall apply

                (A)     "Forward Transaction", a Transaction in respect of which the Purchase
                        Date is at least three Business Days after the date on which the
                        Transaction was entered into and has not yet occurred;

(B)    "Forward Repricing Date", with respect to any Forward Transaction, the date which is such number of Business Days before the Purchase Date as is equal to the minimum period for the delivery of margin applicable under paragraph 4(g).

(ii)    The Confirmation relating to any Forward Transaction may describe the Purchased Securities by reference to a type or class of Securities, which, without limitation, may be identified by issuer or class of issuers and a maturity or range of maturities. Where this paragraph applies, the parties shall agree the actual Purchased Securities not less than two Business Days before the Purchase Date and Buyer or Seller (or both), as shall have been agreed, shall promptly deliver to the other party a Confirmation which shall describe such Purchased Securities.

(iii)    At any time between the Forward Repricing Date and the Purchase Date for any Forward Transaction the parties may agree either

(A)    to adjust the Purchase Price under that Forward Transaction; or

(B)    to adjust the amount of Purchased Securities to be sold by Seller to Buyer under that Forward Transaction.

(iv)    Where the parties agree to an adjustment under paragraph (iii) above, Buyer or Seller (or both), as shall have been agreed, shall promptly deliver to the other party a Confirmation of the Forward Transaction, as adjusted under paragraph (iii) above.

(v)    With respect to any Forward Transaction, paragraphs 2 and 4 of the Agreement are amended as follows.

(A)    Paragraph 2(ww) is deleted and replaced by the following

"(ww) Transaction Exposure means

(1)    with respect to any Forward Transaction at any time between the Forward Repricing Date and the Purchase Date, the difference between (A) the Market Value of the Purchased Securities at the relevant time and (B) the Purchase Price;

(2)    with respect to any Transaction at any time during the period (if any) from the Purchase Date to the date on which the Purchased Securities are delivered to Buyer or, if earlier, the date on which the Transaction is terminated under paragraph 10(g), the difference between (A) the Market Value of the Purchased Securities at the relevant time and (B) the Repurchase Price at the relevant time;

(3)    with respect to any Transaction at any time during the period from the Purchase Date (or, if later, the date on which the Purchased Securities are delivered to Buyer or the Transaction is terminated under paragraph 10(g)) to the Repurchase Date (or, if later, the date on which Equivalent Securities are delivered to Seller or the Transaction is terminated under paragraph 10(h)), the difference between (A) the Repurchase Price at the relevant time multiplied by the applicable Margin Ratio (or, where the Transaction relates to Securities of more than one description to which different Margin Ratios apply, the amount produced by multiplying the Repurchase Price attributable to Equivalent Securities of each such description by the applicable Margin

Ratio and aggregating the resulting amounts, the Repurchase Price being for this purpose attributed to Equivalent Securities of each such description in the same proportions as those in which the Purchase Price was apportioned among the Purchased Securities) and (B) the Market Value of Equivalent Securities at the relevant time.

In each case, if (A) is greater than (B), Buyer has a Transaction Exposure for that Transaction equal to the excess, and if (B) is greater than (A), Seller has a Transaction Exposure to Buyer equal to the excess."

    **(B)**    In paragraph 4(c)

        (1)    the words "any amount payable to the first party under paragraph 5 but unpaid" are deleted and replaced by "any amount which will become payable to the first party under paragraph 5 during the period after the time at which the calculation is made which is equal to the minimum period for the delivery of margin applicable under paragraph 4(g) or which is payable to the first party under paragraph 5 but unpaid"; and

        (2)    the words "any amount payable to the other party under paragraph 5 but unpaid" are deleted and replaced by "any amount which will become payable to the other party under paragraph 5 during the period after the time at which the calculation is made which is equal to the minimum period for the delivery of margin applicable under paragraph 4(g) or which is payable to the other party under paragraph 5 but unpaid".

(c)    <u>Intermediation by Party A Affiliates.</u>

    (i)    From time to time, Lehman Brothers Inc. or other affiliate of Lehman Brothers International (Europe) may act as agent on behalf of Lehman Brothers International (Europe), with such agency taking the form of, among other things and without limitation, the execution of transactions on behalf of Lehman Brothers International (Europe), delivery of Confirmations on behalf of the same, and communications with Party B.

    (ii)    For the avoidance of doubt, Lehman Brothers International (Europe) shall remain as principal in regards to all Transactions, and shall be bound as "Buyer" or "Seller", as the case may be, pursuant to the terms of this Agreement.

(d)    <u>This paragraph applies where a party to the Agreement is incorporated in Germany or has a branch located in Germany.</u>  In this paragraph – "Insolvenzordnung" means the Insolvency Act, which came into force in Germany on 1 January 1999. "Insolvenzverfahren" means insolvency proceedings instituted under that Act and "Insolvenzverwalter" means as Insolvenzverwalter appointed under that Act.

    (i)    Without limiting any other provision of Paragraph 2(a) or Paragraph 10 of the Agreement, in the case of a party incorporated in Germany or has a branch located in Germany:

        (aa)    the reference to an analogous officer in Paragraph 2(a)(iii) and (v) shall include *Insolvenzverwalter*;

        (bb)    the reference to any analogous proceeding in Paragraph 2(a)(iv) shall include an *Insolvenzverfahren*; and

(cc)   an Event of Default shall for the purposes of Paragraph 10 of the Agreement occur immediately, and without the need for the service of a Default Notice, if an application is made for the institution of an *Insolvenzverfahren* **or if measures are taken pursuant to §§ 46 or 46a para.1 of the German Banking Act (Kreditwesengesetz).**

(e)   <u>Form of Agreement.</u> The Party (the "Relevant Party") who has prepared the text of this Agreement for execution warrants and undertakes to the other Party that such text conforms exactly to the text of the standard form Global Master Repurchase Agreement published by The Bond Market Association in October 2000, except as notified by the Relevant Party to the other Party in writing prior to the execution of this Agreement.

(f)   <u>Counterparts:</u> This Agreement may be executed in counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a mutually signed counterpart hereof.

**ANNEX II**
**Form of Confirmation**

To:

From:

Date:          [DATE]

Subject:       [Repurchase][Buy/Sell Back]* Transaction
               (Reference Number:          )

Dear Sirs,

The purpose of this [letter / facsimile / telex], a "Confirmation"" for the purposes of the Agreement, is to set forth the terms and conditions of the above repurchase transaction entered into between us on the Contract Date referred to below.

This Confirmation supplements and forms part of, and is subject to, the Global Master Repurchase Agreement as entered into between us as of [          ] as the same may be amended from time to time (the "Agreement"). All provisions contained in the Agreement govern this Confirmation except as expressly modified below. Words and phrases defined in the Agreement and used in this Confirmation shall have the same meaning herein as in the Agreement.

1.     Contract Date:

2.     Purchased Securities [state type[s] and nominal value[s]]:

3.     CUSIP, ISIN or other identifying number[s]:

4.     Buyer:

5.     Seller:

6.     Purchase Date:

7.     Purchase Price:

8.     Contractual Currency:

9.     Repurchase Date]:*

10.    Terminable on demand]:*

11.    Pricing Rate:

[12.   Sell Back Price:]*

13.    Buyers Bank Account[s] Details:

14.    Sellers Bank Account[s] Details:

[15.   The Transaction is an Agency Transaction. [Name of Agent] is acting as agent for [name or identifier of Principal]]:*

[16.   Additional Terms]:*


Yours faithfully,

* Delete as appropriate


October 2000

-29-

## TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)

### GILTS ANNEX

**Supplemental terms and conditions where repurchase transactions are to be effected in UK gilt-edged securities**

**1.    Interpretation**

1.1    In this Part of this Annex -

(a)    the **Agreement** means the Agreement dated May 31, 2007 substantially in the form of the TBMA/ISMA Global Master Repurchase Agreement (2000 Version) of which this Annex forms part;

(b)    **CREST** means the computer-based system and associated clerical procedures established by CRESTCo Limited to facilitate the transfer of gilt-edged securities and other uncertificated securities;

(c)    **CHAPS system** means the same day payment system operated by the CHAPS Clearing Company Limited;

(d)    **gilt-edged securities** means securities which are gilt-edged securities for the purposes of section 50 (7) of the Income and Corporation Taxes Act 1988.

1.2    Terms to which a defined meaning is given in the Agreement have the same meanings in this Annex.

**2.    Scope**

2.1    The parties have agreed that the Transactions to which the Agreement applies may include Transactions in respect of gilt-edged securities.

2.2    The terms and conditions set out in this Annex apply to Transactions in respect of gilt-edged securities and, to the extent and in the circumstances provided in paragraph 3.3(c) below, Transactions wholly or partly in respect of such other securities as are referred to in that paragraph.

**3.    CREST**

3.1    CREST shall be an agreed securities clearance system for the purposes of paragraph 6(a)(iii) of the Agreement.

3.2    Where under the rules and procedures of the CREST the delivery of any Securities from a securities account in the name of one party or its nominee or agent (the transferor) to a securities account in the name of the other party or its nominee or agent (the transferee) gives rise to an assured payment obligation by which the settlement bank acting for the transferee is obliged to make a payment to the settlement bank acting for the transferor, the creation of that assured payment obligation shall for the purposes of the Agreement and any Transaction be treated as a payment from the transferee to the transferor of an amount equal to the amount of the assured payment obligation.

3.3    (a)    Subject to and in accordance with the following provisions of the sub-paragraph, the parties may agree to enter into an overnight sale and repurchase transaction (a DBV Transaction) to be effected under the "delivery-by-value" facility of CREST.

(b)    The Confirmation relating to a DBV Transaction -

October 2000

-30-

     (i)     shall specify the Transaction as a DBV Transaction;

     (ii)    shall not describe the Purchased Securities;

     (iii)   shall specify as the Purchase Price the consideration to be input in respect of the delivery of the Purchased Securities through CREST;

     (iv)   shall specify the pricing rate for that DBV Transaction.

(c)     The Purchased Securities under a DBV Transaction shall be such Securities (which may include Securities which are not gilt-edged securities) as shall be selected and delivered by CREST on the apportionment of securities to the relevant delivery in accordance with the rules and procedures of CREST.

(d)     The amount by which the Repurchase Price under a DBV Transaction exceeds the Purchase Price shall be paid by Seller to Buyer on the Repurchase Date on or as soon as practicable after the delivery of Equivalent Securities through CREST from a securities account of Buyer to a securities account of Seller. Such payment shall be made through CREST or outside CREST in same day funds.

(e)     If on the Repurchase Date of a DBV Transaction Equivalent Securities are not delivered to Seller by reason of the fact that either party's membership of CREST has been terminated or suspended then, unless before the latest time for delivery of such Equivalent Securities under the rules and procedures of CREST an Event of Default has occurred under paragraph 10 of the Agreement in respect of either party, such non-delivery shall be deemed to constitute -

     (i)     where Buyer's membership of CREST has been terminated or suspended, a failure by Buyer to deliver Equivalent Securities on the Repurchase Date.

     (ii)    where Seller's membership of CREST has been terminated or suspended, a failure by Seller to pay the Repurchase Price on the Repurchase Date.

(f)     If on the Repurchase Date of a DBV Transaction Equivalent Securities are not delivered to Seller by reason of the fact that there are insufficient Securities of the relevant description standing to the credit of Buyer's account to enable delivery of the Equivalent Securities or there is insufficient cash standing to the credit of Seller's account to enable payment of the Repurchase Price then, unless before the latest time for delivery of such Equivalent Securities under the rules and procedures of CREST an Event of Default has occurred under paragraph 10 of the Agreement in respect of either party, such non-delivery shall be deemed to constitute –

     (i)     where there are insufficient Securities of the relevant description standing to the credit of Buyer's account to enable delivery of the Equivalent Securities, a failure by Buyer to deliver Equivalent Securities on the Repurchase Date;

     (ii)    where there is insufficient cash standing to the credit of Seller's account to enable payment of the Repurchase Price, a failure by Seller to pay Repurchase Price on the Repurchase Date.

(g)     If after an Event of Default has occurred under paragraph 10 of the Agreement Equivalent Securities to the Purchased Securities are delivered to a securities account of Seller against the creation of an assured payment obligation in accordance with the rules and procedures of CREST notwithstanding the termination of the relevant DBV Transaction, such delivery shall give rise to the following obligations, each of which shall be conditional on the simultaneous performance of the other –

     (i)     an obligation on Seller to deliver to Buyer on demand securities equivalent to the securities so delivered; and

    (ii)    an obligation on Buyer to pay to Seller on demand a sum equal to the assured payment obligation so created.

3.4    (a)    The parties may agree to enter into a series of DBV Transactions to be confirmed by a single Confirmation, each such DBV Transaction being for the same Purchase Price and each such DBV Transaction other than the first commencing on the Repurchase Date of the previous Transaction. Such a series DBV Transactions is in the paragraph referred to as -

    (i)    an Open DBV Repo if the Repurchase Date of the last Transaction in the series is not specified in the Confirmation but it is instead provided that, if either party gives to the other notice of not less than a stated period, the DBV Transaction which will be due for Termination on the date specified in the notice will be the last Transaction in the series and the series will be limited accordingly;

    (ii)    a Term DBV Repo if the date on which the last Transaction in the series is due for Termination is specified in the Confirmation.

(b)    Subject to the following provisions of this sub-paragraph, paragraph 3.3 above shall apply in respect of each DBV Transaction forming part of an Open DBV Repo or a Term DBV Repo.

(c)    It shall not be necessary for any Transaction forming part of an Open DBV Repo or a Term DBV Repo to be evidenced by a separate Confirmation and, subject to sub-paragraph 3.4(d) below, each such Transaction shall be deemed to be entered into on the Repurchase Date of the preceding such Transaction.

(d)    Notwithstanding the preceding provisions of this sub-paragraph, a transaction which would otherwise be deemed to be entered into on any day and would form part of an Open DBV Repo or a Term DBV Repo shall be deemed not to be entered into if before the parties have taken the steps necessary to effect delivery of the Purchased Securities under that Transaction on that day in accordance with the rules and procedures of the CREST -

    (i)    an Event of Default has occurred in relation to either party; or

    (ii)    an earlier Transaction forming part of that Open DBV Repo or Term DBV Repo has been terminated under paragraph 10(g) or 10(h) of the Agreement.

(e)    In any case where sub-paragraph 3.4(d) above applies, no further Transaction forming part of the relevant Open DBV Repo or Term DBV Repo shall arise.

(f)    Subject to sub-paragraph 3.4(h) below, and save in so far as the Confirmation relating to an Open DBV Repo or Term DBV Repo may otherwise provide, that part (if any) of the Repurchase Price in respect of each Transaction in the relevant series (other than the last such Transaction) which exceeds the Purchase Price shall not be payable on the Repurchase Date, but shall instead be deferred until, and shall be payable on, the Repurchase Date of the last Transaction in the series. Such payments shall be made through CREST or outside CREST in same day funds.

(g)    Any amount payable in respect of a Transaction forming part of an Open DBV Repo or Term DBV Repo payment of which has been deferred under sub-paragraph 3.4(f) above shall, until it is paid or the relevant Transaction is terminated under any provision of paragraph 10 of the Agreement, be treated for the purposes of paragraph 4(c) of the Agreement as if it were an amount payable under paragraph 5 of the Agreement.

(h)    If any Transaction forming part of an Open DBV Repo or Term DBV Repo is terminated under any provision of paragraph 10 of the Agreement, any amounts payable in respect of any earlier Transactions forming part of that Open DBV Repo or Term DBV Repo pay-

ment of which has been deferred under sub-paragraph 3.4(f) above shall become due and payable immediately.

**4.    Transactions in partly-paid Securities**

4.1    This paragraph applies where -

(a)    the Purchased Securities under a Transaction are Securities on which a call or instalment remains to be paid; and

(b)    the due date for the payment of any such call or instalment occurs before the Termination of the Transaction.

4.2    Seller shall pay to Buyer, for value on or before the due date of the call or instalment, an amount equal to the call or instalment payable on that date in respect of Securities equivalent to the Purchased Securities.

4.3    No adjustment to the Repurchase Price shall be made in consequence of the call or instalment or of the payment made by Seller under paragraph 4.2 above.

4.4    On and from the due date for the payment of the call or instalment the expression "Equivalent Securities" shall with respect to that Transaction be taken to mean Securities of the same issuer, forming part of the same issue and being of an identical type, nominal value, description and amount as the Purchased Securities but after payment of the call or instalment in question.

**5.    Exercise of rights of conversion**

5.1    This paragraph applies where the Purchased Securities under a Transaction are Securities in respect of which a right of conversion (whether arising under the terms of issue of the Securities or under a conversion offer made after such issue) becomes exercisable before the Termination of the Transaction.

5.2    Seller may, not later than a reasonable period before the latest time for the exercise of the right of conversion, give to Buyer written notice to the effect that, on Termination of the Transaction, it wishes to receive Securities in such form as will arise if the right of conversion is exercised or, in the case of a right of conversion which may be exercised in more than one manner, is exercised in such manner as is specified in the notice.

5.3    With effect from the latest time for the exercise of the right of conversion the expression "Equivalent Securities" shall be taken to mean -

(a)    if a notice has been given under paragraph 5.2 above not later than the time specified in that sub-paragraph, such amount of such Securities of such description as fall to be held by a holder of Securities of the same issuer, forming part of the same issue and being of an identical type, nominal value, description and amount as the Purchased Securities if he has exercised the right of conversion in the manner specified in the notice;

(b)    in any other case, such amount of Securities of such description as fall to be held by a holder of Securities of the same issuer, forming part of the same issue and being of an identical type, nominal value, description and amount as the Purchased Securities if he has not exercised the right of conversion.

October 2000

-33-

**6.     Termination of on demand Transactions**

6.1     Paragraph 3(e) of the Agreement shall not apply, but shall be replaced by the following -

"(e)     In the case of on demand Transactions, demand for Termination shall be made by Buyer or Seller, by telephone or otherwise, and shall provide for Termination to occur as soon as reasonably practicable after such demand or on such date (being at least one Business Day after that on which the demand is made) as may be specified in the demand: provided that, unless otherwise agreed between the parties, a demand which is made before 10 a.m. on a Business Day may provide for Termination to occur not later than the close of business on that day."

**7.     Dividend entitlements: effect on margin provisions**

7.1     This paragraph applies where -

(a)     the ex-dividend date for the payment of any dividend on any Purchased Securities occurs before the Termination of the relevant Transaction; or

(b)     the ex-dividend date for the payment of any dividend on any gilt-edged securities which have been delivered to a party as Margin Securities occurs before Equivalent Margin Securities have been delivered to the other party.

7.2     For the purposes of paragraph 4 of the Agreement -

(a)     where paragraph 7.1(a) above applies, from the period from the ex-dividend date until the Termination of the Transaction, Buyer shall be deemed to have received a payment of Cash Margin equal to the amount of the dividend payable on the Purchased Securities by reference to that ex-dividend date;

(b)     where paragraph 7.1(b) above applies, the party which has received those Margin Securities shall, from the period from the ex-dividend date until Equivalent Margin Securities are delivered to the other party, be deemed to have received a payment of Cash Margin equal to the amount of the dividend payable on those Margin Securities by reference to that ex-dividend date.

October 2000

## TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)

## EQUITIES ANNEX

### Supplemental terms and conditions for transactions in equities

This Annex constitutes an Annex to the TBMA/ISMA Global Master Repurchase Agreement dated May 31, 2007 between Lehman Brothers International (Europe) and Highland CDO Opportunity Master Fund LP (the "Agreement").

**1.**    Scope

(a)    The parties have agreed that

    (i)    the Transactions to which this Agreement applies may include Transactions in respect of which the Purchased Securities consist of or include equities; and

    (ii)    a transfer of Margin Securities may consist of or include equities,

and the terms and conditions of this Annex shall apply to such Transactions and transfers of Margin Securities.

(b)    In relation to Transactions and transfers of Margin Securities to which this Annex applies, the Agreement shall be construed as if it had been amended and supplemented as set out in paragraphs 3 to 5 of this Annex.

**2.**    **Interpretation**

(a)    In this Annex

    (i)    "equities" and "equity securities" include shares or stock in the share capital of a corporation, whether ordinary shares or preference shares or other kinds of shares or stock;

    (ii)    "Equivalent Margin Securities" and "Equivalent Securities" mean, in relation to Margin Securities and Purchased Securities which are equity securities and which are partly paid, or have been converted, sub divided, consolidated, redeemed, made the subject of a takeover, capitalisation issue, rights issue or event similar to any of the foregoing –

        (A)    in the case of conversion, sub division or consolidation, securities equivalent to the securities into which the relevant Securities have been converted, sub divided or consolidated; provided that, if appropriate, notice has been given in accordance with paragraph 4 (a) of this Annex;

        (B)    in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

        (C)    in the case of takeover, a sum of money or securities equivalent to the consideration or alternative consideration of which notice has been given in accordance with paragraph 4(a) of this Annex;

        (D)    in the case of a call on partly paid securities, securities equivalent to the paid up securities; provided that, in the case of Equivalent Securities, Seller or, in the case of Equivalent Margin Securities, the party which transferred the relevant Margin Securities shall have paid to the other party a sum of money equal to the sum due in respect of the call;

        (E)    in the case of a capitalisation issue, securities equivalent to the relevant Securities together with the securities allotted by way of bonus thereon;

October 2000

-35-

(F)     in the case of a rights issue, securities equivalent to the relevant Securities to-gether with the securities allotted thereon; provided that notice has been given to the other party in accordance with paragraph 4(a) of this Annex;

(G)     in the event that income in the form of securities, or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities is distributed, securities equivalent to the relevant Securities together with securities or a certificate or an entitlement equivalent to those allotted; provided that notice has been given in accordance with paragraph 4(a) of this Annex;

(H)     in the case of any event similar to any of the foregoing, securities equivalent to the relevant Securities together with or replaced by a sum of money or securities or other property equivalent to that received in respect of such Securities result-ing from such event.

(b)     In the event of any conflict between the terms of this Annex and the Agreement the terms of this Annex shall prevail.

**3.     Income Payments**

(a)     Subject as otherwise provided in this Annex or as otherwise agreed between the parties, where the Income paid or distributed by the issuer of Purchased Securities or Margin Securities is not in the form of money but is in the form of other property, the obligation of a party under paragraph 5 of the Agreement to pay to the other party an amount equal to the amount paid by the issuer shall be construed as an obligation to transfer property equivalent to that distributed by the issuer.

(b)     The existing paragraph 5 of the Agreement shall be replaced by the following

**"5.     Income Payments**

(a)     Unless otherwise agreed

(i)     where the Term of a particular Transaction extends over an Income Payment Date in respect of any Securities subject to that Transaction which are not equi-ties, Buyer shall on the date such Income is paid by the issuer transfer to or credit to the account of Seller an amount equal to (and in the same currency as) the amount paid by the issuer;

(ii)    where Margin Securities which are not equities are transferred from one party ("the first party") to the other party ("the second party") and an Income Payment Date in respect of such Securities occurs before Equivalent Margin Securities are transferred by the second party to the first party, the second party shall on the date such Income is paid by the issuer transfer to or credit to the account of the first party an amount equal to (and in the same currency as) the amount paid by the issuer,

and for the avoidance of doubt references in this sub paragraph to the amount of Income paid by the issuer of any Securities shall be to an amount paid without any withholding or deduction for or on account of taxes or duties notwithstanding that a payment of such In-come made in certain circumstances may be subject to a withholding or deduction.

(b)     (i)     Unless otherwise agreed, where the Purchased Securities the subject of a Trans-action consist of or include equities in respect of which an Income Payment Date would, but for this provision, occur during the Term of such Transaction, Seller shall seek to effect a substitution of such equities in accordance with para-graph 8(a) before the Notice Date referred to in sub-paragraph (b)(iii), but if such a substitution has not been effected by that date then Termination of such Trans-action shall, provided that Seller has notified Buyer of such Termination in ac-

cordance with sub-paragraph (b)(iii), occur on, and, accordingly, the Repurchase Date of such Transaction shall fall on, the Business Day immediately preceding such Income Payment Date.

(ii)    Unless otherwise agreed and except to the extent that Equivalent Margin Securities in respect of the relevant Margin Securities have already been transferred, where one party (the "transferor") has transferred Margin Securities which are equities to the other (the "transferee") then, on the Business Day preceding the next Income Payment Date in respect of such Margin Securities, the transferee shall transfer to the transferor Equivalent Margin Securities in respect of such Margin Securities in exchange for new Margin Securities as if such transfers were made pursuant to a request under paragraph 8(d) to which the transferee had agreed; provided that (aa) the transferor has given notice to the transferee in accordance    with    sub-paragraph (b)(iii)    of    the    application    of    this sub-paragraph (b)(ii) and (bb) the transferor has provided reasonable details to the transferee of the Margin Securities in question, the relevant Income Payment Date and the new Margin Securities to be exchanged for such Equivalent Margin Securities and the transferee has indicated to the transferor that such new Margin Securities are acceptable to it.

(iii)    Any notice given pursuant to sub-paragraphs (b)(i) or (b)(ii) above shall not be valid unless given so as to be effective, at the latest, one hour before the close of business on the last Business Day (the "Notice Date") on which the recipient would customarily be required to initiate settlement of the securities to be transferred by it pursuant to such notice in order for settlement to take place on the Business Day immediately preceding the relevant Income Payment Date.

(iv)    Nothing in this sub-paragraph (b) shall prejudice any entitlement of either party to terminate a Transaction in any other manner permitted by the Agreement.

(c)    Unless otherwise agreed between the parties, where (notwithstanding, and without prejudice to, sub-paragraph (b) above) Equivalent Securities in respect of Purchased Securities which are equities or, as the case may be, Equivalent Margin Securities in respect of Margin Securities which are equities have not been transferred by Buyer to Seller or the transferee to the transferor prior to an Income Payment Date in respect of such Securities, sub-paragraph (a) above shall not apply in respect of such Securities, but instead Buyer shall or, as the case may be, the transferee shall, on the date Income is paid by the issuer of those Securities, transfer to or credit to the account of Seller or, as the case may be, the transferor

(i)    an amount equal to (and in the same currency as) so much of such Income attributable to such Securities as is (if it is the holder of such Securities on such Income Payment Date) or would have been (if it had been the holder of such Securities on such Income Payment Date) paid in cash by the issuer to the holder; and

(ii)    an amount equal to such amount, if any, in respect of tax or tax benefit as Buyer or the transferee is (if it is the holder of such Securities on such Income Payment Date) or would have been (if it had been the holder of such Securities on such Income Payment Date) entitled to claim or recover in cash from the issuer's jurisdiction in respect of such Income payment;

provided that, unless otherwise agreed between the parties, if Buyer or, as the case may be, the transferee has failed to make reasonable efforts to transfer the relevant Equivalent Securities or Equivalent Margin Securities prior to such Income Payment Date in circum-

stances where the proviso to sub-paragraph (b)(i) above or, as the case may be, sub-paragraph (b)(ii) has been satisfied, then, instead of transferring or crediting the amount referred to in sub-paragraphs (i) and (ii) of this sub-paragraph (c), Buyer or, as the case may be, the transferee shall indemnify Seller or, as the case may be, the transferor in respect of any cost, loss (including for the avoidance of doubt the amount of Income that would have been paid to Seller or, as the case may be, the transferor if it had been the holder of such Securities on such Income Payment Date) or damage (excluding, for the avoidance of doubt, any consequential loss or damage) suffered by such person which it would not have suffered had the relevant Equivalent Securities or Equivalent Margin Securities been transferred prior to such Income Payment Date.

 (d) Where Buyer or, as the case may be, the transferee is required by law to make any transfer or credit pursuant to sub-paragraph (c)(i) or (ii)[1] above subject to withholding or deduction of taxes or duties, and as a result would, but for this sub-paragraph, be required to pay additional amounts under paragraph 6(b) of the Agreement, unless otherwise agreed between the parties, it shall only be obliged to pay such additional amounts to the extent that it could, in the relevant circumstances, have avoided, satisfied or off-set the relevant obligation to withhold or deduct (or to account for the tax withheld or deducted) by utilising any available tax credit in respect of the relevant Securities (or transactions relating to them).".

## 4. Corporate actions and voting

 (a) In relation to Purchased Securities or Margin Securities which are equities (and in respect of which Equivalent Securities or, as the case may be, Equivalent Margin Securities have not been transferred) Buyer, in the case of Purchased Securities, or the transferee, in the case of Margin Securities, shall notify the other party within a reasonable time after the date on which a holder of such Securities would in the normal course have received such notice from the issuer of any notice issued by the issuer of such Securities to the holders of such Securities relating to any proposed conversion, sub division, consolidation, takeover, pre-emption, option or other similar right or event affecting such Securities or of any Income payment declared in respect of such Securities. Whether or not such notice is received from the first party, the other party may

  (i) where the relevant Securities are Purchased Securities, cause the Transaction to be terminated in accordance with paragraphs 3(d), (e) and (f) of the Agreement as if the Transaction were an on demand Transaction or, where the relevant Securities are Margin Securities, request that Equivalent Margin Securities be transferred in respect of such Securities to paragraph 8(d) of the Agreement; and/or (as appropriate);

  (ii) within a reasonable time before the latest time for the exercise of the right or option give written notice to the first party that on redelivery of Equivalent Securities or Equivalent Margin Securities, as the case may be, it wishes to receive Equivalent Securities or Equivalent Margin Securities in such form as will arise if the right is exercised or, in the case of a right which may be exercised in more than one manner, is exercised as is specified in such written notice; provided that if any sum is required to be paid by a holder of the securities to the issuer or any other person in order to exercise such rights, the other party shall pay to the first party an amount equal to such sum.

 (b) Where any voting rights fall to be exercised in relation to any Purchased Securities or Margin Securities which are equities and in respect of which Equivalent Securities or, as the case may be, Equivalent Margin Securities have not been transferred, neither Buyer, in the case of Purchased Securities, nor the transferee, in the case of Margin Securities, shall have any obligation to ar-

---

[1] Note: this is intended to make clear that the disapplication of the gross-up provision does not apply where the buyer/transferee has failed to co-operate with the seller/transferor – in these circumstances there is no transfer under (c)(i) or (ii) and the indemnity in (c) applies.

range for voting rights of that kind to be exercised in accordance with the instructions of the other party in relation to such Purchased Securities or Margin Securities, unless otherwise agreed between the parties.

**5.    Transfer**

(a)    Seller shall promptly pay and account for any transfer or similar duties or taxes chargeable in connection with the transfer of Purchased Securities which are equities and any Equivalent Securities in respect thereof and shall reimburse to Buyer the amount of any liability incurred by it as a result of Seller's failure to do so.

(b)    Where Margin Securities which are equities are transferred by one party to the other, the transferor (the first party) shall promptly pay and account for any transfer or similar duties or taxes chargeable in connection with such transfer as well as in connection with any subsequent transfer by the transferee (the second party) of Equivalent Margin Securities in respect thereof to the first party and shall reimburse to the second party the amount of any liability incurred by the second party as a result of the first party's failure to do so.

(c)    In relation to Transactions to which this Annex applies and unless otherwise agreed, where any Purchased Securities, Equivalent Securities, Margin Securities or Equivalent Margin Securities are transferred through a settlement system which automatically generates a mandatory payment or delivery, or a mandatory obligation to pay or deliver, against the transfer of such Securities, then

(i)    such automatically generated payment, delivery or obligation shall be treated as a payment or delivery by the transferee to the transferor, and except to the extent that it is applied to discharge an obligation of the transferee to effect a payment or delivery, such payment or delivery, or obligation to pay or deliver, shall be deemed to be a Margin Transfer made by the transferee; and

(ii)    unless the parties shall have agreed otherwise, the party receiving such Margin Transfer shall cause to be made to the other party for value the same day either, where such Margin Transfer is a payment, an irrevocable payment in the amount of such Margin Transfer or, where such Margin Transfer is a delivery, an irrevocable delivery of Securities (or other property, as the case may be) equivalent thereto.

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**
**BUY/SELL BACK ANNEX**

### Supplemental terms and conditions for Buy/Sell Back Transactions

This Annex constitutes an Annex to the TBMA/ISMA Global Master Repurchase Agreement dated **May 31, 2007** between **Lehman Brothers International (Europe)** and **Highland CDO Opportunity Master Fund LP** (the "Agreement").

**1.**    Scope

(a)    The parties have agreed that the Transactions to which this Agreement applies may include Buy/Sell Transactions.

(b)    In relation to Buy/Sell Back Transactions, the Agreement shall be construed as if it had been amended and supplemented as set out in paragraphs 3 to 5 of this Annex.

**2.**    **Interpretation**

(a)    In this Annex

(i)    "Accrued Interest', with respect to any Purchased Securities subject to a Buy/Sell Back Transaction, unpaid Income that has accrued during the period from (and including) the issue date or the last Income Payment Date (whichever is the later) in respect of such Purchased Securities to (but excluding) the date of calculation. For these purposes unpaid Income shall be deemed to accrue on a daily basis from (and including) the issue date or the last Income Payment Date (as the case may be) to (but excluding) the next Income Payment Date or the maturity date (whichever is the earlier);

(ii)    "Sell Back Differential", with respect to any Buy/Sell Back Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Buy/Sell Back Transaction (on a 360 day basis or 365 day basis in accordance with the applicable ISMA convention, unless otherwise agreed between the parties for the Transaction) to the sum of (a) the Purchase Price and (b) Accrued Interest paid on the Purchase Date for such Transaction for the actual number of days during the period commencing on (and including) the Purchase Date for such Buy/Sell Back Transaction and ending on (but excluding) the date of calculation;

(iii)    "Sell Back Price", with respect to any Buy/Sell Back Transaction, means

(x)    in relation to the date originally specified by the parties as the Repurchase Date pursuant to paragraph 3(b)(iii) of the Agreement, the price agreed by the Parties in relation to that Buy/Sell Back Transaction, and

(y)    in any other case (including for the purposes of the application of paragraph 4 (margin maintenance) o paragraph 10 (Events of Default) of the Agreement), the product of the formula (P + Al +D) - (IR + C), where

P    =    the Purchase Price
Al    =    the amount, equal to Accrued Interest at the Purchase Date, paid under paragraph 3(f) of this Annex
D    =    the Sell Back Differential
IR    =    the amount of any income in respect of the Purchased Securities payable by the issuer on or, in the case of registered Securities, by reference to, any date falling between the Purchase Date and the Repurchase Date

C = the aggregate amount obtained by daily application of the Pricing Rate for such Buy/Sell Back Transaction to any such Income from (and including) the date of payment by the issuer to (but excluding) the date of calculation

(b)    References to "Repurchase Price" throughout the Agreement shall be construed as references to "Repurchase Price or the Sell Back Price, as the case may be".

(c)    In Paragraph 10(c)(i) of the Agreement (relating to Events of Default), the reference to the "Repurchase Prices" shall be construed as a reference to "Repurchase Prices and Sell Back Prices".

(d)    In the event of any conflict between the terms of this Annex III and any other term of the Agreement, the terms in this Annex shall prevail.

**3.    Initiation; Confirmation; Termination**

(a)    Each Transaction shall be identified at the time it is entered into and in the Confirmation relating to it as either a Repurchase Transaction or a Buy/Sell Back Transaction.

(b)    In the case of a Buy/Sell Back Transaction the Confirmation delivered in accordance with paragraph 3 of the Agreement may consist of a single document in respect of both of the transactions which together form the Buy/Sell Back Transaction or separate Confirmations may be delivered in respect of each such transaction. Such Confirmations may be in the form of Annex 11 to the Agreement except that, subject to sub paragraph (c) below, such Confirmations shall not include the item specified in paragraph 10 of Annex 11.

(c)    When entering into a Buy/Sell Back Transaction the parties shall also agree the Sell Back Price and the Pricing Rate to apply in relation to that Transaction on the scheduled Repurchase Date. The parties shall record the Pricing Rate in at least one Confirmation applicable to that Buy/Sell Back Transaction.

(d)    Buy/Sell Back Transactions shall not be terminable on demand.

(e)    In the case of a Buy/Sell Back Transaction, the Purchase Price shall be quoted exclusive of Accrued Interest to the Purchase Date on the Purchased Securities and the Sell Back Price shall be quoted exclusive of Accrued Interest.

(f)    For the purposes of paragraph 3(c) of the Agreement, in the case of a Buy/Sell Back Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the payment of the Purchase Price plus an amount equal to Accrued Interest to the Purchase Price on such Purchased Securities.

(g)    In the case of a Buy/Sell Back Transaction, paragraph 3(f) of the Agreement shall not apply. Termination of such a Transaction will be effected on the Repurchase Date by transfer to Seller or its agent of Equivalent Securities against the payment by Seller of (i) in a case where the Repurchase Date is the date originally scheduled by the parties pursuant to paragraph 3(b)(iii) of the Agreement, the Sell Back Price referred to in paragraph 2(iii)(x) of this Annex plus an amount equal to Accrued Interest to the Repurchase Date; and (ii) in any other case, the Sell Back Price referred to in paragraph 2(iii)(y) of this Annex.

**4.    Margin maintenance: "repricing"**

If the parties agree that a Buy/Sell Back Transaction is to be repriced in accordance with paragraph 4(i) of the Agreement, they shall at the time of such repricing agree the Purchase Price, the Sell Back Price and the Pricing Rate applicable to the Repriced Transaction.

**5.    Income Payments**

Paragraph 5 of the Agreement (relating to Income payments) shall not apply to Buy/Sell Back Transactions.

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**

**AGENCY ANNEX**

**Supplemental terms and conditions for Agency Transactions**

This Annex constitutes an Annex to the TBMA/ISMA Global Master Repurchase Agreement dated **May 31, 2007** between **Lehman Brothers International (Europe)** and **Highland CDO Opportunity Master Fund LP** (the "Agreement")

**1.**    Scope and interpretation

(a)    The parties have agreed that the Transactions to which this Agreement applies may include Agency Transactions.

(b)    Subject to the following provisions of this Annex, either party may enter into Transactions as agent for a third person (a "Principal"), whether as custodian or investment manager or otherwise (a Transaction so entered into being an "Agency Transaction"). In this Annex the party entering into an Agency Transaction as agent is referred to as the "Agent" and the other party is referred to as the "other party".

(c)    In relation to Agency Transactions, the Agreement shall be construed as if it had been amended and supplemented as set out in paragraphs 2 to 5 of this Annex.

**2.**    **Initiation; Confirmation**

(a)    A party may enter into an Agency Transaction if, but only if

    (i)    it specifies that Transaction as an Agency Transaction at the time when it enters into it and in the Confirmation;

    (ii)    it enters into that Transaction on behalf of a single Principal whose identity is disclosed to the other party (whether by name or by reference to a code or identifier which the parties have agreed will be used to refer to a specified Principal) at the time when it enters into the Transaction; and

    (iii)    it has at the time when the Transaction is entered into actual authority to enter into the Transaction on behalf of that Principal and to perform on behalf of that Principal all of that Principal's obligations under the Agreement.

(b)    A transaction shall not be entered into under the Agreement and this Annex if both parties specify that they propose to enter into that transaction as an agent.

**3.**    **Notification**

Each party undertakes that, if it enters as agent into an Agency Transaction, forthwith upon becoming aware

    (i)    of any event which constitutes an Event of Default with respect to the relevant Principal; or

    (ii)    of any breach of any of the warranties given in paragraph 5(c) below or of any event or circumstance which has the result that any such warranty would be untrue if repeated by reference to the current facts;

it will inform the other party of that fact and will, if so required by the other party, furnish the other party with such additional information as the other party may reasonably request.

**4.    Separate agreement**

(a)    Each Agency Transaction shall be a transaction between the relevant Principal and the other party and no person other than the relevant Principal and the other party shall be a party to or have any rights or obligations under an Agency Transaction. Without limiting the foregoing, the Agent shall not be liable as principal for the performance of an Agency Transaction, but this is without prejudice to any liability of the Agent under any other provision of this Annex.

(b)    All the provisions of the Agreement shall apply separately as between the other party and each Principal for whom the Agent has entered into an Agency Transaction or Agency Transactions as if each such Principal were a party to a separate agreement with the other party in all respects identical with the Agreement as supplemented by the provisions of this Annex other than this paragraph, but with the following additions and modifications –

    (i)    if there occurs in relation to the Agent an Event of Default or an event which would constitute an  Event of Default if the other party served a Default Notice or other written notice under any sub paragraph of paragraph 10 of the Agreement, the other party shall be entitled by giving written notice to the Principal (which notice shall be validly given if given to the Agent in accordance with paragraph 14 of the Agreement) to declare that by reason of that event an Event of Default is to be treated as occurring in relation to the Principal. If the other party gives such a notice then an Event of Default shall be treated as occurring in relation to the Principal at the time when the notice is deemed to be given in accordance with paragraph 14 of the Agreement;

    (ii)    if the Principal is neither incorporated nor has established a place of business in Great Britain, the Principal shall for the purposes of paragraph 17 of the Agreement as so applicable be deemed to have appointed as its agent to receive on its behalf service of process in the Courts of England the Agent, or if the Agent is neither incorporated nor has established a place of business in the United Kingdom, the person appointed by the Agent under paragraph 17 of the Agreement, or such other person as the Principal may from time to time specify in a written notice given to the other party.

(c)    The Agent shall do all such things and provide the other party with all such information as may be necessary to identify any Transaction Exposure which may arise in respect of any Principal.

(d)    The foregoing provisions do not affect the operation of the Agreement as between the other party and the Agent in respect of any Transactions into which the Agent may enter on its own account as a principal.

**5.    Representations and warranties**

(a)    Paragraph 9(b) of the Agreement shall be deleted and replaced by the following:

    "(b)    it will engage in this Agreement and the Transactions contemplated hereunder as principal or, subject to and in accordance with the terms of the Agency Annex hereto, as agent and the conditions referred to in the Agency Annex hereto will be fulfilled in respect of each Transaction into which it enters as an agent;".

(b)    At the beginning of the last sentence of paragraph 9 of the Agreement there shall be added the words "Subject to the Agency Annex hereto,".

(c)    Each party warrants to the other that it will, on every occasion on which it enters or purports to enter into a transaction as an Agency Transaction, be duly authorised to enter into that transaction on behalf of the person whom it specifies as the Principal in respect of that transaction and to perform on behalf of that person all the obligations of that person under the Agreement.

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**

**ITALIAN ANNEX**

**Supplemental terms and conditions for transactions in
Italian Domestic Purchased Securities or Italian Bonds**

**1.**     Scope

In the event of Repurchase Transactions or Buy/Sell Back Transactions in Domestic Purchased Securities (as defined below) or in Italian Bonds (as defined below) whether or not such Italian Bonds fall within the definition of Domestic Purchased Securities, the following provisions shall apply and, where in conflict with any other term of the Agreement or of the Buy/Sell Back Annex, they shall prevail.

**2.**     **Interpretation**

(a)     The following definition shall be added to paragraph 2 of the Agreement-

"Domestic Purchased Securities" means Purchased Securities which are issued in Italy whether or not the issuer thereof is incorporated in Italy or has a presence in Italy.

(b)     The following definitions shall replace the corresponding definitions contained in paragraph 2 of the Buy/Sell Back Annex-

(i)     "Accrued Interest", with respect to any Domestic Purchased Securities unpaid Income that has accrued during the period from (and excluding) the issue date or the last Income Payment Date (whichever is the later) in respect of such Domestic Purchased Securities to (and including) the date of calculation. For these purposes unpaid Income shall be deemed to accrue on a daily basis from (and excluding) the issue date or the last Income Payment Date (as the case may be) to (and including) the next Income Payment Date or the maturity date (whichever is the earlier).

(ii)     "Sell Back Differential", with respect to any Transaction in Domestic Purchased Securities as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction (on a 360 day basis unless otherwise agreed between the parties for the Transaction) to the sum of (a) the Purchase Price and (b) Accrued Interest paid on the Purchase Date for such Transaction for the actual number of days during the period commencing on (and excluding) the Purchase Date for such Transaction and ending on (and including), the date of calculation.

(c)     References to "Repurchase Price" and to "Sell Back Price" throughout this Annex shall be construed as references to "Repurchase Price or the Sell Back Price, as the case may be".

**3.**     **Settlement method**

The settlement method in relation to Transactions in Domestic Purchased Securities shall be "in the counter" (giornaliera titoli) unless the parties in the relevant Confirmation agree that such settlement method shall be "over the counter" (Conto Accentrato Titoli (CAT) copertura giornaliera) (such terms having the meanings specified in the relevant regulations issued by the Bank of Italy).

**4.**     **Late delivery**

(a)     In connection with a Transaction in Domestic Purchased Securities, if seller fails to deliver Domestic Purchased Securities to Buyer on the Purchase Date or Buyer fails to deliver Securities equivalent to Domestic Purchased Securities on the Repurchase Date and Buyer or, as the case may be, Seller (the "affected party") elects to terminate the Transaction in accordance with paragraph 10(g)(iii) or, as the case may be paragraph 10(h)(iii) of the Agreement, the parties agree that for the purposes of paragraph 10(c) –

(i)    If the affected party has at any time in the period beginning on the date on which the failure occurred and ending at the Default Valuation Time, purchased, whether by way of a repurchase transaction, buy and sell back transaction or otherwise, Securities forming part of the same issue and being of an identical type and description as those Purchased Securities or Equivalent Securities, the affected party shall, to the extent that it does not fall within paragraph 10(e), treat the cost of such purchase (including all Transaction Costs) as the Default Market Value of those Securities;

(ii)    in calculating the Default Market Value, Transaction Costs incurred in connection with a purchase of Securities under paragraph 10(e)(i)(A)(aa) or (bb) shall include-

    (aa)    any costs imposed by the Bank of Italy as a result of the failure; and

    (bb)    an amount equal to interest on the amount of any deposit which the affected party is required to make with the Bank of Italy at the greater of the Pricing Rate for the relevant Transaction and EURIBOR (on a 360 day basis unless otherwise agreed by the parties to the Transaction) which shall be payable by the other party to the affected party.

(b)    If buyer fails to deliver Equivalent Securities to Seller on the applicable Repurchase Date, Seller may by written notice to the other party, elect to adjust the Transaction in accordance with sub-paragraph (c) below.

(c)    The adjustment of a Transaction (the "Original Transaction") under this subparagraph shall be effected as follows.  The Original Transaction shall be terminated on the Repurchase Date for the Original Transaction and the parties shall be deemed to enter into a new Transaction (the "Replacement Transaction") in accordance with the following provisions-

(i)    the Purchase Date under the Replacement Transaction shall be the Repurchase Date under the Original Transaction;

(ii)    the Purchased Securities under the Replacement Transaction shall be Securities equivalent to the Purchased Securities under the Original Transaction;

(iii)    the Purchase Price under the Replacement Transaction shall, unless otherwise agreed, be the Market Value of the Purchased Securities for that Transaction on the Purchase Date for the Replacement Transaction as determined by Seller;

(iv)    the Pricing Rate under the Replacement Transaction shall, unless otherwise agreed, be minus five per cent;

(v)    the Repurchase Date under the Replacement Transaction shall be the Business Day following the Purchase Date under the Replacement Transaction;

(vi)    the Margin Ratio and, subject as aforesaid, the other terms of the Replacement Transaction shall, unless otherwise agreed, be identical to those of the Original Transaction; and

(vii)    the obligations of the parties with respect to the delivery of the Purchased Securities and the payment of the Purchase Price under the Replacement Transaction shall be set off against their obligations with respect to the delivery of Equivalent Securities and payment of the Repurchase Price under the Original Transaction and accordingly only a net cash sum be paid by one party to the other.  If such net sum is payable by Seller to Buyer, that sum shall be payable on the Repurchase Date under the Replacement Transaction.

(d)    If the Repurchase Date for any Transaction Buyer delivers to Seller part only of the Equivalent Securities which it should have delivered (the "Delivered Securities" and the part of the Equivalent Securities which Buyer has failed to deliver being the "Undelivered Securities") Seller shall not be obliged to accept delivery of the Delivered Securities but instead may elect to terminate that Transaction in accordance with paragraph 10(h)(iii) of the Agreement, in which case sub-paragraph (a) above shall apply.  If Seller elects to accept delivery of the Delivered Securi-

October 2000

-45-

ties, the Transaction shall be terminated and Buyer and Seller shall be deemed to enter into a new Transaction in respect of the Undelivered Securities in accordance with the provisions of sub-paragraph (e) below.

(e)    Where this paragraph applies, the Transaction (the "Terminated Transaction") shall be terminated. Upon such termination, Buyer shall transfer to Seller or its agent the Delivered Securities against payment by Seller of the proportion of the Repurchase Price which corresponds to the Delivered Securities and the parties shall be deemed to enter into a new Transaction on the following terms-

(i)    the Purchase Date under the new Transaction shall be the Repurchase Date under the Terminated Transaction;

(ii)    the Purchased Securities under the new Transaction shall be Securities equivalent to the Undelivered Securities;

(iii)    the Purchase Price under the new Transaction shall be the Market Value of the Undelivered Securities at the Purchase Date under the new Transaction as determined by Seller;

(iv)    the Repurchase Date under the new Transaction shall be the Business Day following the Purchase Date under the new Transaction;

(v)    the Pricing Rate under the new Transaction shall, unless otherwise agreed, be minus five per cent;

(vi)    the Margin Ratio and, subject as aforesaid, the other terms of the New Transaction shall, unless otherwise agreed, be identical to those of the Terminated Transaction; and

(vii)    the obligations of the parties with respect to the delivery of the Undelivered Securities and the payment of that part of the Repurchase Price which corresponds to the Undelivered Securities under the Terminated Transaction shall be set off against their obligations with respect to the delivery of the Purchased Securities and the payment of the Purchase Price under the new Transaction and accordingly only a net cash sum shall be paid by Seller to Buyer. If such net sum is payable by Seller to Buyer, that sum shall be payable on the Repurchase Date under the new Transaction.

**5.    Withholding tax**

(a)    Transactions in Domestic Purchased Securities between an Italian resident and a counterparty which is not resident in Italy for Italian tax purposes (but excluding the foreign branches of entities incorporated in Italy) where the non-Italian party is Buyer, are subject to the then applicable withholding tax in accordance with the following formula which provides the adjustment of the originally agreed Pricing Rate (such adjustment expressed as a percentage, the "Pricing Rate Adjustment") in such a manner which reduces the Pricing Rate by a percentage equal to the relevant applicable withholding tax rate on any capital gains realised on the relevant Domestic Purchased Securities unless otherwise provided in any applicable tax treaty.

Pricing Rate Adjustment = (Pssnt – Pssnp) x Awtr x (360/gg) x (100/Pssnp)

| | | |
|---|---|---|
| Pssnt = | Prezzo supersecco netto a termine | Sell Back Price net of accrued interest and matured original issue discount |
| Pssnp = | Prezzo supersecco netto a pronti | Purchase price net of accrued interest and matured original issue discount |
| Awtr = | Tasso della ritenuta d'imposta applicabile | Applicable withholding tax rate |

| gg = | giorni di durata della Transaction | number of days in the Transaction (excluding the Purchase Date and including the Repurchase Date). |
|---|---|---|

To the extent that the withholding tax referred to above is applicable to Buyer and Seller is required to pay the amount of such withholding tax to the Italian tax authorities, Seller shall be entitled to deduct the amount of such tax from the Repurchase Price as adjusted in accordance with the Pricing Rate Adjustment or, within ten days of the demand of Seller to make the relevant payment, Buyer shall reimburse Seller in respect of the amount required to be paid by it. Seller shall, upon demand by Buyer, provide Buyer with appropriate evidence of the amount of tax deducted and paid to the Italian tax authorities as Buyer may reasonably require to obtain any tax relief under any applicable tax treaty or to obtain any tax credit in respect of its income in the country in which it is resident or out of which it is acting.

(b)    Should Buyer be-

    (i)    resident in a country with which Italy has entered into a double tax treaty which recognises the Italian tax authorities' right to exchange information with the tax authorities of such country; or

    (ii)    a supranational entity

no withholding tax shall apply pursuant to Article 26bis of Presidential Decree no.600 of 29th September, 1973.

**6.    Construction of Buy/Sell Back Annex**

The provisions of the Buy/Sell Back Annex shall apply to Buy/Sell Back Transactions in Domestic Purchased Securities as if –

(a)    references to Buy/Sell Back Transactions shall be construed as references to Buy/Sell Back Transactions in Domestic Purchased Securities; and

(b)    references to Purchased Securities shall be construed as references to Domestic Purchased Securities.

**7.    Income**

(a)    Unless otherwise agreed –

    (i)    paragraph 5 of the Agreement shall apply without modification in respect of any payment of Income in respect of Italian Bonds which could be received without a withholding or deduction on account of Italian tax being made at source by an owner of such Italian Bonds which is a body corporate resident in Italy or in one of the jurisdictions listed in Decree of the Minister of Finance of the Republic of Italy dated 4th September, 1996 issued pursuant to Legislative Decree no. 239 of 1st April, 1996 having an appropriate double tax treaty with Italy (whether or not either of the parties is such a body corporate);

    (ii)    paragraph 5 of the Agreement shall be modified, in its application to any payment of Income in respect of Italian Bonds other than such a payment falling within sub-paragraph (i) above, by deducting from the amount required to be transferred or credited under that paragraph an amount equal to any amount which would, on the assumption that Buyer owned the Italian Bonds at the relevant Income Payment Date, be withheld or deducted at source on account of Italian tax;

    (iii)    in relation to Buy/Sell Back Transactions in Italian Bonds, the amount "IR" in the formula for computing the Sell Back Price pursuant to paragraph 2(iii)(y) of the Buy/Sell Annex shall be calculated on the same basis as the amount required to be transferred or credited pursuant to paragraph 5 is calculated in accordance with sub-paragraphs (i) and (ii) above;

(iv)     without prejudice to the provisions set out in the final sentence of sub-paragraph 5(a) above, neither party shall be obliged to deliver or transfer to the other, or to account to the other for, any tax credits or refunds to which it may become entitled in respect of Income on Italian Bonds; and

(v)     paragraph 11 of the Agreement (Tax Event) shall not apply to any Transaction by virtue of any Italian Bonds ceasing to be Securities in respect of which a deduction or withholding on account of Italian tax is required to be made in respect of a payment of Income to such an owner as is referred to in sub-paragraph (i) above.

(b)     For the purposes of this paragraph "Italian Bonds" means any Securities which are issued by the Italian government or local authorities (or the Securities which for Italian tax purposes are treated likewise) or by other entities and to which the provisions of Legislative Decree no. 239 of 1st April, 1996, as amended, granting a special tax treatment will apply.

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**

**JAPANESE SECURITIES ANNEX**

**Supplemental terms and conditions for Transactions in Japanese Securities**

This Annex constitutes an Annex to the TBMA/ISMA Global Master Repurchase Agreement dated **May 31, 2007** between **Lehman Brothers International (Europe)** and **Highland CDO Opportunity Master Fund LP** (the "**Agreement**").

1.    Scope

Paragraphs 2 and 3 of this Annex apply to all Transactions involving Securities issued in Japan ("Japanese Securities"), but not to other Transactions in other Securities. Paragraphs 2 and 4 of this Annex apply where (a) one of the parties is, and the other party is not, resident in Japan for tax purposes and (b) where the parties have agreed that the Purchased Securities for Transactions will comprise or include Exempt Securities. For the purpose of this Annex "Exempt Securities" means Securities which are specified in the Tax Special Measurement Law (sozei tokubetsu sochi hou) and the Cabinet Order of the Tax Special Measurement Law for the purpose of the exemption from the withholding of the interests received from certain Japanese financial institutions as specified in the Tax Special Measurement Law, with respect to the transactions of sale and repurchase of, or those of the sale and purchase with buy/sell back conditions of, the certain securities; provided that such transactions meet the requirements as provided in the relevant laws and regulations.

**2.    Interpretation**

(a)    Paragraph references are to paragraphs in the Agreement unless otherwise set out herein.

(b)    In the event of any conflict in the terms and conditions of this Annex and any other term of the Agreement or any Annex to the Agreement, the terms in this Annex shall prevail.

**3.    Amendments to Agreement**

(a)    In respect of Japanese Securities, paragraph 2(t) is amended by deleting the word "and" after the phrase "(ii) part of the same issue;" in line 2 and inserting the following phrase immediately after the word "amount" in line 3:

"; and (iv) of the same treatment relating to the withholding or deduction of taxes or duties"

(b)    In respect of Japanese Securities, the following phrase is inserted at the end of paragraph 2(aa) after "such Margin Transfer" in line 2:

"but excluding Net Paying Securities issued in Japan".

(c)    For the avoidance of doubt, "Net Paying Securities" defined in paragraph 2(ff) includes Japanese Securities in respect of which a transferee would, on the Income Payment Date following a transfer to it, be subject to a withholding on account of income tax on all or part of the Income that has accrued during the calculation period ending on that Income Payment Date due to any facts or circumstances existing prior to the transfer to the transferee.

(d)    Paragraph 6(a) is amended as follows:

Unless otherwise agreed, all money paid hereunder (i) shall be settled through the Bank of Japan Financial Network System ("BOJ Net"), or (ii) shall be immediately available, freely convertible funds of the relevant currency. All securities to be transferred hereunder (i) shall be transferred through the BOJ Net, or (ii) shall be in suitable form for transfer and shall be accompanied by duly executed instruments of transfer or assignment in blank (where required for transfer) and such other documentation as the transferee may reasonably request, or (iii) shall be transferred through the book entry system of Euroclear or Clearstream, or (iv) shall be transferred through

any other agreed securities clearance system, or (v) shall be transferred by any other method mutually acceptable to Seller and Buyer.

(e) Paragraph 6(h) shall not apply with respect to payments in connection with the transfer of Japanese Securities.

(f) Paragraph 6(i) shall not apply with respect to the transfer of Japanese Securities.

**4.    Act of Insolvency**

(a) Notwithstanding paragraph 2(a)(iv), an "Act of Insolvency" shall occur with respect to any party hereto immediately upon the filing of a petition in respect of it (including by the counterparty to the Agreement in respect of any obligation under the Agreement) with any court in Japan for the bankruptcy (hasan), corporate reorganisation (kaisha kosei) or civil rehabilitation (minji saisei) of such party, regardless of the "not having been stayed or dismissed within 30 days of its filing" provision.

(b) Notwithstanding paragraph 10(a)(vi), the occurrence with respect to Seller or Buyer of an Act of Insolvency identified in the preceding paragraph 4(a) of this Annex shall constitute an Event of Default without the service of a Default Notice on the Defaulting Party; provided, however, that any party hereto who has become aware of such an Act of Insolvency shall immediately notify the other party of such occurrence.

Except as amended herein, the Agreement shall continue to have full force and effect in all respects.

## U.S. ADDENDUM

This U.S. Addendum constitutes an Annex to the TBMA/ISMA Global Master Repurchase Agreement dated as of May 31, 2007 between Lehman Brothers International (Europe) and Highland CDO Opportunity Master Fund LP (the "Agreement").

**1.      Scope.**

(a)      The parties have agreed that –

      (i)      The Transactions to which this Agreement applies may include Transactions in respect of which the Purchased Securities consist of or include U.S. Securities; and

      (ii)      A transfer of Margin Securities may consist of or include U.S. Securities,

and the terms and conditions of this Addendum shall apply to such Transactions and transfers of Margin Securities.

**2.      Interpretation.**

In this Addendum, U.S. Securities shall include U.S. Treasury instruments, U.S. Agencies, U.S. corporate bonds and any other securities that are cleared primarily through a clearance facility in the United States.

**3.      Amendments to the Agreement.**

(a)      Paragraph 6(a) is amended by the addition of the words "or a Federal Reserve Bank" after the words "or Clearstream" in subparagraph (ii) thereof.

(b)      Tax Forms.

      (i)      With respect to Income Payments, the following is inserted after the phrase "to such a withholding or deduction" at the end of paragraph 5 of the Agreement:

      ", subject to the Seller (for the purpose of paragraph 5(i)), or the first party (for the purposes of paragraph 5(ii)), validly completing and delivering to the Buyer or the second party, as the case may be, the appropriate W-8 or W-9 form (and such other documentation as may reasonably be requested).  In the event that the Seller or the first party, as the case may be, does not provide such forms and other relevant documentation, the Buyer or second party, as the case may be, may deduct such amounts as may be required by applicable law and shall not be required to pay to  or to indemnify the Seller or first party, as the case may be, in respect of such amounts deducted."

      (ii)      With respect to Payment and Transfer, the following is inserted at the end of paragraph 6(b) of the Agreement:

      "Such money payable and additional amounts will only be payable where the receiving party has validly completed and delivered to the paying party the appropriate W-8 or W-9 form (and such other documentation as may reasonably be requested) as the case may be. In the event that the receiving party does not deliver to the paying party such forms and other documentation, the paying party may deduct such amounts as may be required by applicable law and shall not be required to pay to or to indemnify the receiving party in respect of such amounts deducted."

**4.      Additional Provisions.**

(a)      Subsections (b) through (e) of this Section 4 will apply separately or cumulatively as follows:

      (i)      Subsections (b) and (c) of this Section 4 will apply in the event either party to the Agreement resides, has a domicile or a place of business or property in the United States.

(ii)    Subsections (d) and (e) will apply in the event that either party to the Agreement is a broker or dealer registered with the SEC (as defined in Sub-section (d)(i)) under Section 15 of the 1934 Act (as defined in Sub-section (d)(i)).

(iii)    In the event that either or both of Subsections (a)(i) or (a)(ii) of this Section 4 applies, Paragraph 17 is amended by the addition of the following after the word "England" in the first line thereof:

",except that all terms and phrases which are used in this Agreement and which expressly refer to statutory provisions of the United States of America or any State thereof shall be governed by and construed in accordance with the federal laws of the United States of America and the laws of such State without giving effect to the conflict of law principles thereof."

(b)    <u>Intent</u> –

(i)    The parties recognise that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Codes, as amended (except insofar as the type of Securities subject to such Transaction or the term of such transaction would render such definition inapplicable).

(ii)    It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder, or to exercise any other remedies pursuant to Paragraph 10 hereof, is a contractual right to liquidate such Securities as described in Sections 555 and 559 of Title of the United States Code, as amended."

(c)    <u>Security Interest</u>.  Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Party B shall be deemed to have pledged to Party A as security for the performance by Party B of its obligations under each such Transaction, and shall be deemed to have granted to Party A a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

(d)    <u>Disclosures Relating to Certain Federal Protections</u>.

(i)    The parties acknowledge that they have been advised that in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(ii)    in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(iii)    in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

(e)    <u>Segregation of Purchased Securities</u>.

(i)    To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as

October 2000

-52-

subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

(ii)     Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they may be subject to liens granted by Seller to third parties and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy any lien or to obtain substitute securities.

October 2000

-53-

# EXHIBIT B

## UNANIMOUS WRITTEN CONSENT OF THE

## EXECUTIVE COMMITTEE OF THE

## BOARD OF DIRECTORS OF

## LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

WHEREAS, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

WHEREAS, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

WHEREAS, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

WHEREAS, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

WHEREAS, Management wishes to establish additional Guaranteed Subsidiaries,

WHEREAS, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

WHEREAS, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

NOW THEREFORE BE IT,

05-09-05   11:31   JDK INVESTMENTS                 ID=2923589294              P.02
                                                                    NO.293   004
                                                                    NO.504   002

RESOLVED, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

RESOLVED, that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, provided that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

RESOLVED, that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

RESOLVED, that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

FURTHER RESOLVED, that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 7, 2005

Richard S. Fuld, Jr.                          John D. Macomber

2

06/08/2005    16:41    LEHMAN → 916467582553                    NO.504    P03

Schedule A
to LBHI Unanimous Written Consent
dated June 9 , 2005

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

3

# EXHIBIT C



Highland CDO Opportunity Master Fund, L.P.
c/o Highland Capital Management, L.P.
13445 Noel Road
Two Galleria Tower, Suite 800
Dallas, TX 75241

September 17, 2008

VIA COURIER, FACSIMILE AND EMAIL

Lehman Brothers International (Europe) – Head Office
25 Bank Street
London E14 5LE
England
Attention: Transaction Management (London)
Facsimile:  44 (20) 7102 2044
email:  vsharp@lehman.com; gtarry@lehman.com

## DEFAULT NOTICE

Re: TBMA/ISMA Global Master Repurchase Agreement (2000 Version) between Lehman Brothers
International (Europe) ("you") and Highland CDO Opportunity Master Fund, L.P. ("we") dated May 31,
2007 (including all Annexes thereto, and as may be amended, supplemented or modified from time to
time, the "Agreement").  Capitalized terms used herein and not otherwise defined herein shall have the
meanings ascribed to them in the Agreement.

This letter serves as a Default Notice to you that an Event of Default has occurred with respect to you
under Paragraph 10(a)(vi) of the Agreement and that, pursuant to Paragraph 10(b) of the Agreement, the
Repurchase Date for all Transactions under the Agreement has occurred as of September 15, 2008.  We
will notify you of the balance due under the Agreement in accordance with Paragraph 10(c) of the
Agreement.

HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.

By: Highland CDO Opportunity Fund GP, L.P., its general partner

By: Highland CDO Opportunity Fund GP, LLC, its general partner

By: Highland Capital Management, L.P. its sole member

By: Strand Advisors, Inc., its general partner

By: _____
Name: _Todd Travers_
Title: _Asst. Secretary_

# EXHIBIT D

## DEFAULT VALUATION NOTICE UNDER
## GLOBAL MASTER REPURCHASE AGREEMENT

| | |
|---|---|
| To: | Lehman Brothers International (Europe) – Head Office ("**Party A**") |
| Address: | 25 Bank Street, London E14 5LE, England |
| Attention: | Transaction Management (London) |
| Phone: | 44 (20) 7102 1730 |
| Facsimile: | 44 (20) 7102 2044 |
| Email: | vsharp@lehman.com; gtarry@lehman.com |

| | |
|---|---|
| From: | Highland CDO Opportunity Master Fund, L.P. c/o Highland Capital Management, L.P ("**Party B**") |
| | 13455 Noel Road |
| | Two Galleria Tower, Suite 800 |
| | Dallas, TX 75241 |
| Phone: | 972-628-4100 |
| Facsimile: | 972-628-4147 |

| | |
|---|---|
| Date: | September 26, 2008 |

| | |
|---|---|
| Re: | BMA Global Master Repurchase Agreement (2000 Version) dated as of May 31, 2007 between Party A and Party B and each of the Annexes related thereto and all Confirmations and Transactions thereunder, in each case, as such documents are amended and supplemented from time to time (collectively, the "**Agreement**") |

Pursuant to paragraph 10(c)(i) of the Agreement, Party B hereby provides to Party A this Default Valuation Notice setting forth amounts due and payable as a result of the early designation of the Repurchase Date in respect of all Transactions under the Agreement pursuant to the Notice of Termination provided by Party B to Party A effective September 15, 2008 following an Event of Default in relation to Party A.

Party B hereby demands payment from Party A in the amount of $8,753,248.22 as calculated pursuant to Annex A hereto (the "Payment Amount"). The Payment Amount is due and payable on the Business Day immediately following receipt of this calculation statement by Party A pursuant to Section 10(c)(ii) of the Agreement, and shall be paid by Party A in immediately available funds to the following account:

Payment to:
The Bank of New York
ABA #: 021 000 018
For credit to GLA: 211551
FFC Account #: 771898
Attention: Marisela Rodriguez, 713-483-6604
Reference: (Borrower Name, Type of Payment/description)
Email: mariselarodriguez@bankofny.com

Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in the Agreement.

**HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.**

By: Highland CDO Opportunity Fund GP, L.P., its general partner

By: Highland CDO Opportunity Fund GP, LLC, its general partner

By: Highland Capital Management, L.P. its sole member

By: Strand Advisors, Inc., its general partner

By: _____

Name: _Mark Okada_____

Title: _Executive Vice President_____

### Annex A to Calculation Statement

**Default Market Value of Equivalent Securities**

Determined pursuant to paragraph 10(e)(i) –

1 -  In respect of those Deliverable Securities or Receivable Securities that since the occurrence of the Event of Default in respect of Party A, Party B has sold, in the case of Receivable Securities, or purchased, in the case of Deliverable Securities, Securities which form part of the same issue and are of an identical type and description as those Equivalent Securities or Equivalent Margin Securities, and that the non-Defaulting Party elects to treat as the Default Market Value the amount calculated by Party B pursuant to paragraph 10(e)(i)(A) as follows:

Default Market Value of Deliverable Securities

$_____0_____

Default Market Value of Receivable Securities

$_____0_____

2 - In respect of those Deliverable Securities or Receivable Securities that Part B has received, in the case of Deliverable Securities, offer quotations or, in the case of Receivable Securities, bid quotations in respect of Securities of the relevant description from two or more market makers or regular dealers in the Appropriate Market in a commercially reasonable size, that Party B elects to treat the price so quoted (or, where more than one price is so quoted, the arithmetic mean of the prices so quoted), after deducting, in the case of Receivable Securities, or adding, in the case of Deliverable Securities, such Transaction Costs, as the Default Market Value of the relevant Equivalent Securities or Equivalent Margin Securities pursuant to paragraph 10(e)(i)(B)(cc).

Default Market Value of Deliverable Securities

$_____0_____

Default Market Value of Receivable Securities

$_____0_____

3 - In respect of those Deliverable Securities or Receivable Securities, that either (x) acting in good faith, Party B has endeavoured but been unable to sell or purchase Securities in accordance with paragraph 10(i)(A) of the Agreement or to obtain quotations in accordance with paragraph 10(i)(B) of the Agreement (or both) or (y) Party B has determined that it would not be commercially reasonable to obtain such quotations, or that it would not be commercially reasonable to use any quotations which it has obtained under paragraph 10(i)(B) of the Agreement, that Party B has determined the Net Value of the relevant Equivalent Securities or Equivalent Margin Securities (which shall be specified) and that the non-Defaulting Party elects to treat such Net Value as the Default Market Value of the relevant Equivalent Securities or Equivalent Margin Securities as follows:

Net Value of Receivable Securities

$\underline{\hspace{1.5cm} 0 \hspace{1.5cm}}$

*minus* Transaction Costs

$\underline{\hspace{1.5cm} 0 \hspace{1.5cm}}$

Net Value of Deliverable Securities

$\underline{\hspace{0.3cm} 8,552,387.52 \hspace{0.3cm}}$

*plus* Transaction Costs

$\underline{\hspace{1.5cm} 0 \hspace{1.5cm}}$

**Cash Margin**

$\underline{\hspace{0.3cm} 194,664.02 \hspace{0.3cm}}$

**Expenses and Interest**

| | |
|---|---|
| $ -10,735.47 | All in term Repo Financing value |
| $ 10,000.00 | Legal Expense – Schulte Roth & Zabel |
| $ 1,050.00 | Legal Expense – Brian Albert |
| $ 5,882.15 | Net amount interest 9/15/08-9/22/08 |

Amounts incurred by Party B and payable by Party A pursuant to paragraph 10(f) of the Agreement by way of Expenses, Interest and otherwise.

**Expenses and Costs of Replacement Transactions and Hedging Transactions**

$\underline{\hspace{1.5cm} 0 \hspace{1.5cm}}$ Amounts incurred by Party B and payable by Party A pursuant to paragraph 10(k)(1) and (2) of the Agreement.

**Total Net Amount Now Due to Party B    $\underline{\hspace{0.3cm} 8,753,248.22 \hspace{1cm}}$**

Subject to accrual interest at default rate of LIBOR from date due to date paid in full

*Calculations details are attached hereto on the following pages.*



Highland CDO Opportunity Master Fund, L.P.
Value Date: 8/17/05

| Cusip | Security | Par | Lehman Security Roll Price | Lehman Security Mark to Market Price (BBG68) | Marked Security Price | Security Market Value | All in Term Financing Value | Repo Loan Amount | Current Bond Coupon | Repriming Coupon Accrue Date | Accrued Interest Underlying Bond | Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 533294439 | LGSAT 2006-5A A | 9,500,000 | 65.9000 | 65.9002 | 65.9002 | 6,590,623.00 | (5,429,535) | 3,500,720.00 | 3.51% | 6/11/2008 | 34,205.68 | 2,293,990.61 |
| 553483475 | MSPB 2007-1A C | 12,000,000 | 79.0000 | 79.0000 | 78.6548 | 7,935,460.00 | (2,053,131) | 5,573,000.00 | 4.70% | 7/21/2008 | 77,111.81 | 2,937,079.56 |
| 553483473 | MSPB 2007-1A D | 4,000,000 | 75.1000 | 75.1000 | 71.0965 | 5,724,740.00 | (1,885,993) | 3,600,000.00 | 6.04% | 7/21/2008 | 77,900.56 | 2,195,039.56 |
| 553483A43 | MSPB 2007-1A E | 4,000,000 | 72.4000 | 71.5000 | 65.4491 | 2,617,940.00 | (2,075,682) | 1,174,650.00 | 6.25% | 7/7/2008 | 53,430.28 | 1,491,438.66 |
| 96824UAC2 | WITEH 2006-4A B | 2,000,000 | 64.2000 | 64.2000 | 65.8624 | 1,317,248.00 | (972,171) | 775,400.00 | 3.54% | 7/18/2008 | 11,970.72 | 543,169.85 |
| | | | | | | | | | | | | 9,541,631.81 |

Cash Collateral Posted    194,451.00
Interest due on Cash Collateral    20,592
Total Cash Collateral and Interest    194,644.42

Net Value    13,726,316.07

**Jason Post**

| | |
|---|---|
| **From:** | Ryan Grateke |
| **Sent:** | Wednesday, September 17, 2008 9:31 AM |
| **To:** | Jason Post |
| **Subject:** | CDO Fund Wire Instructions |

The Bank of New York

███████████████████

Attention: Marisela Rodriguez, 713-483-6604
Reference: (Borrower Name, Type of Payment/description)
Email: mariselarodriguez@bankofny.com

Ryan Grateke
Highland Capital Management, LP
13455 Noel Road, Suite 800
Dallas, TX 75240
Office: 972-628-4168
Fax: 972-628-4142
www.hcmlp.com

1





Forecast Rates

| Month | LIBOR_1MO | LIBOR_2MO | LIBOR_1MO | LIBOR_3MO | LIBOR_6MO | PRIME |
|---|---|---|---|---|---|---|
| 1 | 3.03 | 3.049 | 3.063 | 3.252 | | 5 |

| # | | | | |
|---|---|---|---|---|
| 322 | 4.513196 | 4.520762 | 4.523354 | 4.55128 |
| 323 | 4.511361 | 4.519037 | 4.520637 | 4.549963 |
| 324 | 4.509558 | 4.517443 | 4.524753 | 4.547037 |
| 325 | 4.507767 | 4.515931 | 4.522052 | 4.547739 |
| 326 | 4.506049 | 4.513853 | 4.521294 | 4.546502 |
| 327 | 4.504244 | 4.511929 | 4.519501 | 4.544335 |
| 328 | 4.502673 | 4.510289 | 4.517953 | 4.543268 |
| 329 | 4.501007 | 4.508675 | 4.516348 | 4.541076 |
| 330 | 4.499436 | 4.507096 | 4.515201 | 4.539201 |
| 331 | 4.49787 | 4.505533 | 4.514763 | 4.537960 |
| 332 | 4.496242 | 4.504017 | 4.513223 | 4.536464 |
| 333 | 4.494651 | 4.502554 | 4.511721 | 4.535604 |
| 334 | 4.493098 | 4.5011 | 4.510227 | 4.536303 |
| 335 | 4.491693 | 4.4997 | 4.508832 | 4.533202 |
| 336 | 4.490509 | 4.4934 | 4.507447 | 4.532051 |
| 337 | 4.489272 | 4.497918 | 4.505101 | 4.529651 |
| 338 | 4.487975 | 4.497975 | 4.504784 | 4.528391 |
| 339 | 4.486718 | 4.499727 | 4.503528 | 4.527183 |
| 340 | 4.485501 | 4.498718 | 4.502302 | 4.525909 |
| 341 | 4.484325 | 4.492134 | 4.501117 | 4.524776 |
| 342 | 4.483189 | 4.491016 | 4.499974 | 4.523591 |
| 343 | 4.482097 | 4.490943 | 4.498875 | 4.522553 |
| 344 | 4.481052 | 4.489919 | 4.497823 | 4.521664 |
| 345 | 4.480055 | 4.488944 | 4.496810 | 4.520726 |
| 346 | 4.479162 | 4.487018 | 4.495855 | 4.519834 |
| 347 | 4.478212 | 4.487544 | 4.494902 | 4.518988 |
| 348 | 4.477365 | 4.486518 | 4.494109 | 4.518163 |
| 349 | 4.476568 | 4.485534 | 4.4933 | 4.517417 |
| 350 | 4.475804 | 4.484602 | 4.492829 | 4.516686 |
| 351 | 4.475071 | 4.483703 | 4.491084 | 4.515599 |
| 352 | 4.474380 | 4.482375 | 4.490409 | 4.515341 |
| 353 | 4.473696 | 4.481718 | 4.489771 | 4.514752 |
| 354 | 4.473052 | 4.481102 | 4.489164 | 4.514239 |
| 355 | 4.472437 | 4.480539 | 4.488537 | 4.513816 |
| 356 | 4.47198 | 4.479324 | 4.488328 | 4.513816 |
| 357 | 4.471625 | 4.478807 | 4.488008 | 4.513468 |
| 358 | 4.471347 | 4.479608 | 4.487828 | |
| 359 | 4.471206 | 4.471206 | | |
| 360 | 4.471168 | 4.471168 | | |

LIBOR_1MO_+.25

Cash Reinvest Rate

Customize reports

Generated on Sep 17, 2008 at 17:41 for
Paul Ross of Highland Capital
Management Information provided herein is
believed by INTEX to be accurate, but
INTEX cannot guarantee accuracy. Content
is for informational purposes only and is not
an offer, recommendation or solicitation to
purchase, hold, or sell any security.

Intex Solutions, Inc. +1 781-449-6222 in
Europe +44 20 7002 1055 in Japan +81 3
5117-6370



































Jason Post

| | |
|---|---|
| From: | Chiara, Michael [michael.chiara@lehman.com] |
| Sent: | Thursday, September 11, 2008 9:19 AM |
| To: | Clifford Stoops; Oxana Brown; Ryan Grateke; Paul Roos; Scott Crowell |
| Cc: | DelliCarpini, Gianna |
| Subject: | 9/12 REPO ROLLS |
| Attachments: | CDO Roll 09-12-08.xls |

Good Morning

2 trades are set to roll tomorrow.
Details are attached, same HC and spread as last month.
Please let us know if you would like to roll 1m.
Thx
Mike


<<CDO Roll 09-12-08.xls>>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product,
an official confirmation of any transaction, or as an official statement of Lehman Brothers.
Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as
such.  All information is subject to change without notice.


- - - - - - - -

IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication
(including any attachments) is not intended or written to be used and cannot be used for the
purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.



| Cusip | Description | Factor | Par | Start | End | PX | HC | LOAN | BASE | SPREAD | REPO RATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 553683AD5 | MSPB 2007-1A C | 1.00 | 10,000,000 | 9/12/2008 | 10/14/2008 | 79.6 | 130.00 | 5,572,000.00 | 2.48 | 1.00 | 3.48 |
| 553683AE3 | MSPB 2007-1A D | 1.00 | 8,000,000 | 9/12/2008 | 10/14/2008 | 75 | 140.00 | 3,600,000.00 | 2.48 | 1.25 | 3.73 |

Jason Post

| | |
|---|---|
| From: | Chiara, Michael [michael.chiara@lehman.com] |
| Sent: | Monday, September 08, 2008 6:21 AM |
| To: | Ryan Grateke; Jenna Bridges; Paul Roos; Scott Crowell |
| Cc: | DelliCarpini, Gianna |
| Subject: | 9-8 rolls |
| Attachments: | CDO Roll 09-08-08.xls |

Good Morning

2 repos are set to roll off today.
We can roll at the same spread and HC as last month.
Lightpoint was marked up, Whitehorse was marked down.
Please let us know if you would like to roll as per the attached.
Thanks
<<CDO Roll 09-08-08.xls>>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product,
an official confirmation of any transaction, or as an official statement of Lehman Brothers.
Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as
such.  All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication
(including any attachments) is not intended or written to be used and cannot be used for the
purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

1

| Cusip | Par | Start | End | px | hc | loan | base | spread | repo rate | RATING | DEAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 53225VAE9 | 9,500,000 | 9/8/2008 | 10/8/2008 | 68.9600 | 40% | 3,930,720.00 | 2.49 | 1.00 | 3.49 | A | CSFB |
| 96524UAC2 | 2,000,000 | 9/8/2008 | 10/8/2008 | 64.2000 | 40% | 770,400.00 | 2.49 | 1.00 | 3.49 | A | CSFB |

Jason Post

| | |
|---|---|
| From: | Chiara, Michael [michael.chiara@lehman.com] |
| Sent: | Tuesday, September 02, 2008 3:42 PM |
| To: | Ryan Grateke; Jenna Bridges; Paul Roos; Scott Crowell |
| Cc: | DelliCarpini, Gianna |
| Subject: | CDO Rolls 09-02-08.xls |
| Attachments: | CDO Rolls 09-02-08.xls |

Afternoon
We have 2 repo trades that matured today.  Apologies for not sending
roll details earlier.
We can roll at the same terms (HC and spread) as last month.
The marks are within 1 pt of last month's marks.
Pls let us know if you would like to roll as per the attached.
Thanks
Mike


<<CDO Rolls 09-02-08.xls>>


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product,
an official confirmation of any transaction, or as an official statement of Lehman Brothers.
Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as
such.  All information is subject to change without notice.


- - - - - - - -
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication
(including any attachments) is not intended or written to be used and cannot be used for the
purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

| Cusip | Par | Start | End | HC | PRICE | LOAN | BASE | SPREAD | REPO RATE |
|---|---|---|---|---|---|---|---|---|---|
| 95736XAG3 | 9,500,000 | 9/2/2008 | 10/2/2008 | 50% | 64.39 | 3,058,525.00 | 2.49 | 1.75 | 4.24 |

| Cusip | Par | Start | End | HC | PRICE | LOAN | BASE | SPREAD | REPO RATE |
|---|---|---|---|---|---|---|---|---|---|
| 553682AA3 | 4,000,000 | 9/2/2008 | 10/2/2008 | 60% | 73.43 | 1,174,880.00 | 2.49 | 1.75 | 4.24 |

HTR

Mtge **HTR**

# HISTORICAL TOTAL RETURN

1   1

LIGHT 2006-5A B SUB,FLT          3.513%   Original Face:   9,500,000.00

| SUMMARY | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|---------|--------|-------------|-------|---------------|-------------|
| | | | | | 9,500,000.00 |
| Start: ████ | Aug | 9,500,000.00 | ████ | | |
| End: ████ | Aug | 9,500,000.00 | ████ | .00 | 9,534,295.66 |

Trade Basis
**3.636% CBE RETURN**
0.361% holding period return

Mode: **1** B-Book, T-Trade
Method: **2** 1-CD, 2-CBE

Reinv
Reinv to ████  Same?█
9/17/08

| Date | CMO Balance | Principal | Interest | Total P+I |
|------|-------------|-----------|----------|-----------|

Australia 61 2 9777 8600  Brazil 5511 3048 4500  Europe 44 20 7330 7500  Germany 49 69 9204 1210  Hong Kong 852 2977 6000
Japan 81 3 3201 8900       Singapore 65 6212 1000      U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                              G743-717-1 18-Sep-2008 07:28:17

**Bloomberg**
TERMINAL

553683AD5 Mtge HTR

Mtge **HTR**

# HISTORICAL TOTAL RETURN

1    1

MSPB 2007-1A C MEZ,FLT          4.786%    Original Face: ▓▓▓,▓▓▓,▓▓▓.▓▓

| SUMMARY | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|---------|--------|-------------|-------|---------------|-------------|
|         |        |             |       |               | 10,000,000.00 |
| Start: ▓/▓▓/08 | Jul | 10,000,000.00 | ▓▓.▓▓▓▓ |  | 10,000,000.00 |
| End: ▓/▓▓/08 | Jul | 10,000,000.00 | ▓▓.▓▓▓▓ | .00 | 10,077,111.81 |

Trade Basis
### 5.000% CBE RETURN
0.771% holding period return

Mode: ▓ B-Book, T-Trade
Method: ▓ 1-CD, 2-CBE

Y=constant,N=Reinv@100
S=Historic,L=LIBOR

Reinv
Reinv to  9/17/08  Same?▓

| Date | CMO Balance | Principal | Interest | Total P+I |
|------|-------------|-----------|----------|-----------|

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
G743-717-1 18-Sep-2008 07:29:04

**Bloomberg**
TERMINAL

HTR

Mtge **HTR**

# HISTORICAL TOTAL RETURN

MSPB 2007-1A D MEZ,FLT          6.036%   Original Face:   8,000,000.00

| SUMMARY | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|---------|--------|-------------|-------|---------------|-------------|
| | | | | | 8,000,000.00 |
| Start: 7/21/08 | Jul | 8,000,000.00 | 100 | | |
| End: 9/15/08 | Jul | 8,000,000.00 | 100 | .00 | 8,077,800.56 |

Trade Basis

## 6.319% CBE RETURN
0.973% holding period return

Mode: **1** B-Book, T-Trade
Method: **2** 1-CD, 2-CBE

Reinv
Reinv to   9/17/08   Same? N

| Date | CMO Balance | Principal | Interest | Total P+I |
|------|-------------|-----------|----------|-----------|

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
6743-717-0 18-Sep-2008 08:15:18

**Bloomberg**
TERMINAL

553682AA3 Mtge HTR

Mtge **HTR**

# HISTORICAL TOTAL RETURN

MSPB 2007-1A E MEZ,FLT              8.286%   Original Face: ▓▓▓▓▓▓▓▓

| SUMMARY | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|---------|--------|-------------|-------|---------------|-------------|
| Start: ▓▓▓ | Jul | 4,000,000.00 | ▓▓▓ | | 4,000,000.00 |
| End: ▓▓▓ | Jul | 4,000,000.00 | ▓▓▓ | .00 | 4,053,400.28 |

Trade Basis
## 8.710% CBE RETURN
1.335% holding period return

Mode: ▓ B-Book, T-Trade
Method: ▓ 1-CD, 2-CBE

Reinv ▓
Reinv to ▓▓▓
9/17/08  Same?▓

| Date | CMO Balance | Principal | Interest | Total P+I |
|------|-------------|-----------|----------|-----------|

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                    6743-717-1 18-Sep-2008 07:29:58

**Bloomberg**
TERMINAL

HTR

Mtge **HTR**

# HISTORICAL TOTAL RETURN

|  |  |  |  | 1 | 1 |

WITEH 2006-4A B SUB,FLT          3.535%   Original Face: 2,000,000.00

| SUMMARY | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|---------|--------|-------------|-------|---------------|-------------|
| Start: 7/18/08 | Jul | 2,000,000.00 | 100.00 |  | 2,000,000.00 |
| End: 9/17/08 | Jul | 2,000,000.00 | 100.00 | .00 | 2,011,979.72 |

Trade Basis
**3.677% CBE RETURN**
0.599% holding period return

Mode: **1** B-Book, T-Trade
Method: **2** 1-CD, 2-CBE

Y=Constant N=Per Period
S=Historical DISC

Reinv
Reinv to 9/25
9/17/08 Same? Y

| Date | CMO Balance | Principal | Interest | Total P+I |
|------|-------------|-----------|----------|-----------|

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
G743-717-0 18-Sep-2008 08:16:07

**Bloomberg**
TERMINAL



| Portfolio_Name | Issuer_Name | Asset_Name | Security (Cusip) | Spread | Financing | Final Mark | Face Amount | Loan Amount | Begin Date | Term Date |
|---|---|---|---|---|---|---|---|---|---|---|
| RightLend CDO Fixed - Repro Lehman | Light 2006-2A B | Floating - 20070310-B-554723/K19 | 55185DAD9 | 100 | 3.40% | 69.84 | 8,500,000.00 | 3,933,750.00 | 8/4/2008 | |
| RightLend CDO Fixed - Repro Lehman | MAPS 2007-1A C | Class C | 55185DAF4 | 100 | 3.40% | 78.50 | 10,000,000.00 | 5,572,000.00 | 9/12/2008 | |
| RightLend CDO Fixed - Repro Lehman | MAPS 2007-1A D | Class D | 55185DAG2 | 125 | 3.75% | 75.00 | 8,000,000.00 | 3,600,000.00 | 9/12/2008 | |
| RightLend CDO Fixed - Repro Lehman | MAPS 2007-1A E | Class E | 55185DAH0 | 175 | 4.25% | 73.43 | 4,000,000.00 | 1,174,000.00 | 9/12/2008 | |
| RightLend CDO Fixed - Repro Lehman | VICTLI 2006-4A | Floating - 01/2020-B-5657/RUC2 | 56330RAC2 | 100 | 3.40% | 84.20 | 2,000,000.00 | 770,400.00 | 9/8/2008 | |

# LEHMAN BROTHERS  ‖  Fixed Income Financing MTM Statement

| | |
|---|---|
| **TO:** | HIGHLAND CDO OPP MASTER |
| **A/C #:** | 1759230 |
| **PHONE:** | |
| **C/P NAME:** | HIGHLAND CDO OPPORTUNITY MASTER FUND LP |
| **FAX:** | |
| **EMAIL:** | highland.cdo.collateral@hedgefundservices.com |

| | |
|---|---|
| **DATE:** | 09-Sep-2008 |
| **COB VALUATION DATE:** | 08-Sep-2008 |
| **REPORTING CCY:** | USD |

*POSITIVE NUMBERS = LEHMAN RECEIVABLE*
*NEGATIVE NUMBERS = LEHMAN PAYABLE*

| | |
|---|---|
| **FROM:** | LEHMAN BROTHERS INTERNATIONAL (EUROPE) |
| **PHONE:** | TRACY AGARD |
| **FAX:** | 212-526-2170 |
| **EMAIL:** | 917-522-0252 |
| | ovg@lehman.com |

| Summary | |
|---|---|
| Economic Exposure | (9,537,895) |
| Margin/Haircut Amount | 9,735,169 |
| Margin Exposure | (287,856) |
| Cash Free Collateral | (485,129) |
| Security Free Collateral | 0 |
| Portfolio Margin Requirement | 0 |

## Detail

### Deal Type: RR

| ISIN/CUSIP / Deal ID | MatDate / Account | Coupon / Description | Original Face | Off Date | Factor | Mkt Price | On Date/ Off Date | Fin. Rate | Fin. Interest | Coupon/ Interest | Loan | Market Value | Mgrn / Hrct | Mgrn/Hrct Amt | Margin Exposure (USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 553082AA3 / 9220230 | 7/20/19 / 1759230 | 8.32 MSPB 2007-1A E | 4,000,000 | | 1.000000 | 71.5066 | 9/2/08 10/2/08 | 4.240 | 969 | (45,284) | 1,174,880.00 | (2,880,263) | 160.000 | 1,743,328 | 13,630 |
| 53226VAE9 / 981C800 | 8/5/19 / 1759230 | 3.81 LIGHT 2005-5A B | 9,500,000 | | 1.000000 | 69.5632 | 9/8/08 10/8/08 | 3.490 | 381 | (29,126) | 3,930,720.00 | (6,551,502) | 140.000 | 2,632,252 | (17,277) |
| 98524UAC2 / 981C500 | 1/17/20 / 1759230 | 4.70 WITEH 2006-4A B | 2,000,000 | | 1.000000 | 64.2000 | 9/8/08 10/8/08 | 3.490 | 75 | (13,842) | 770,400.00 | (1,284,000) | 140.000 | 519,137 | (8,231) |
| 55968SAD5 / 881R440 | 7/20/16 / 1759230 | 4.82 MSPB 2007-1A C | 10,000,000 | | 1.000000 | 79.6000 | 8/13/08 9/12/08 | 3.460 | 14,884 | (65,572) | 5,735,800.00 | (7,960,000) | 130.000 | 2,407,671 | 132,764 |
| 55968SAE3 / 881R470 | 7/22/19 / 1759230 | 6.07 MSPB 2007-1A D | 8,000,000 | | 1.000000 | 75.1985 | 8/13/08 9/12/08 | 3.710 | 10,338 | (96,068) | 3,715,200.00 | (6,015,882) | 140.000 | 2,432,780 | 76,367 |
| RR Total | | | 33,500,000 | | | | | | 26,647 | (219,894) | 15,327,000.00 | (24,671,647) | | 9,734,169 | 191,273.00 |
| Grand Total | | | 33,500,000 | | | | | | 26,647 | (219,894) | 15,327,000.00 | (24,671,647) | | 9,734,169 | 191,273.00 |

## Free Collateral

| Type | ISIN/CUSIP | Deal Id | On Date | Off Date | Description | Coupon | Maturity Date | Quantity | Price | Market Value (USD) | Margin Value (USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR | CASH COLL | | | | UNITED STATES DOLLARS | 0.0000 | | (482,451) | | (482,451) | (485,129) |
| Totals | | | | | | | | (482,451) | | (482,451) | (485,129) |

*"F" Denotes Free Collateral Fail*

## Disclaimer

The above estimated value[s] are as of the date indicated and do not represent actual bids or offers by Lehman Brothers. There can be no assurance that actual trades could be completed at such value[s]. Unless otherwise specified, the above valuations represent mid-market valuations. Mid-market values attempt to approximate the current economic value of a given position using prices and rates at the average of the bid and offer for the respective underlying asset(s) or reference rate(s). The bid-side is the estimated amount a party would pay to purchase the asset.

Discussions of the trade values in general, and indicative or firm price quotations and actual trade prices in particular, may vary significantly from these written estimated values as a result of various factors, which may include (but are not limited to) prevailing credit spreads, market liquidity, position size, transaction and financing costs, hedging costs and risks and use of capital and profit. These estimates may not be representative of any theoretical or actual internal valuations employed by us for our own purposes, may vary during the course of any particular day and may vary significantly from the estimates or quotations that would be given by another dealer. You should consult with your own accounting or other advisors as to the adequacy of this information for your purposes.

As a condition for providing these estimates, you agree that Lehman Brothers makes no representation and shall have no liability in any way arising therefrom to you or any other entity for any loss or damage, direct or indirect, arising from the use of this information. Lehman Brothers International (Europe) is regulated by the Financial Services Authority.

Jason Post

| | |
|---|---|
| From: | Wybolt, Andrew S [andrew.wybolt@lehman.com] |
| Sent: | Tuesday, September 09, 2008 8:36 AM |
| To: | Ryan Grateke; highland.otc.collateral@hedgefundservices.com |
| Subject: | RE: FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO OPP MASTER |

Yes, I can wire you back 288K.

~~And all of your pending interest~~

841.74 for Aug
838.39 for July
779.82 for June

Please confirm

Andrew Wybolt
LEHMAN BROTHERS | Repo Margin
1301 Avenue of the Americas
New York, NY 10019
*    212.320.7747    F:  646.758.3023
* andrew.wybolt@lehman.com
* repomargin@lehman.com

-----Original Message-----
From: Ryan Grateke [mailto:RGrateke@hcmlp.com]
Sent: Tuesday, September 09, 2008 9:31 AM
To: Wybolt, Andrew S; 'highland.otc.collateral@hedgefundservices.com'
Subject: RE: FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO
OPP MASTER

Can we pull back any of this margin?  Thanks.

-----Original Message-----
From: andrew.wybolt@lehman.com [mailto:andrew.wybolt@lehman.com]
Sent: Tuesday, September 02, 2008 2:06 PM
To: Jennifer Jurrius; Margin; Morton Wendell; Scott Crowell; Ryan
Grateke; highland.otc.collateral@hedgefundservices.com;
matthew.d.walsh@jpmchase.com
Cc: andrew.wybolt@lehman.com
Subject: FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO OPP
MASTER

- - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an

1

offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers.  Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such.  All information is
subject to change without notice.


Highland Capital Management is growing.  Check out Careers at
www.hcmlp.com.
------------------------------------------------------------------
------------------------------------------------------
DISCLAIMER- This email is intended for the recipient(s) only and should
not be copied or reproduced without explicit permission. The material
provided herein is for informational purposes only and does not
constitute an offer or commitment, a solicitation of an offer, or any
advice or recommendation, to enter into or conclude any transaction.  It
may contain confidential, proprietary or legally privileged information.
If you receive this message in error, please immediately delete it.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product,
an official confirmation of any transaction, or as an official statement of Lehman Brothers.
Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as
such.  All information is subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication
(including any attachments) is not intended or written to be used and cannot be used for the
purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

## Highland CDO Opportunity Master Fund, L.P.

| Date | Collateral Principal Amount | Rate | Daily Interest |
|---|---|---|---|
| 9/1/2008 | $ 194,451.00 | 2.1250% | 11.48 |
| 9/2/2008 | 194,451.00 | 2.1250% | 11.48 |
| 9/3/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/4/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/5/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/6/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/7/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/8/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/9/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/10/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/11/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/12/2008 | 194,451.00 | 2.1250% | 11.48 |
| 9/13/2008 | 194,451.00 | 2.1250% | 11.48 |
| 9/14/2008 | 194,451.00 | 2.1250% | 11.48 |
| 9/15/2008 | 194,451.00 | 3.5000% | 18.90 |
| 9/16/2008 | 194,451.00 | 3.7500% | 20.26 |
| 9/17/2008 | 194,451.00 | 3.0000% | 16.20 |
| Total | | | $ 213.02 |

**Jason Post**

| | |
|---|---|
| **From:** | Ryan Grateke |
| **Sent:** | Wednesday, September 17, 2008 8:58 AM |
| **To:** | Jason Post |
| **Subject:** | FW: Lehman Support |
| **Attachments:** | 9/12 REPO ROLLS; 9-8 rolls; CDO Rolls 09-02-08.xls; FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO OPP MASTER; RE: FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO OPP MASTER; Highland CDO Opportunity Master Fund, LP - Cash Flow.xls |

**From:** Ryan Grateke
**Sent:** Monday, September 15, 2008 3:47 PM
**To:** Brian Lohrding
**Subject:** Lehman Support

Here is everything for Lehman. I can confirm Scott's spreadsheet is correct for the face amount, financing mark, and loan amount per support we received from Lehman and his calculations appear correct for the rest of it. I attached the support that we received from Lehman.

**Attached support for repos:**
"CDO Rolls 9-02-08" –   MSPB E  (553682AA3)
"9-8 rolls"–  Light,  WITEH
"9/12 REPO ROLLS" –   MSPB C, MSPB D

**Attached support for collateral:**
"FIN – Interest Accrual....." (x2)

I attached two emails:  1 has the 8/31 collateral statement which shows the principal balance as $482,451. The other is from our contact at Lehman confirming he sent us back $288,000 of principal and all of our interest owed through 8/31. I also attached our BONY cash sheet which shows the $288,000 and the interest amounts being returned on 9/9.

Collateral balance = $194,451 + interest from 9/1 onward.

**Ryan Grateke**
Highland Capital Management, LP
13455 Noel Road, Suite 800
Dallas, TX 75240
Office: 972-628-4168
Fax: 972-628-4142
www.hcmlp.com

1

# LEHMAN BROTHERS || Interest Accrual On Cash Collateral

| TO: | HIGHLAND CDO OPP MASTER |
| | 1759230 |
| | RYAN GRATEKE |
| PHONE: | 972-628-4151 972-628-4158 |
| FAX: | |
| EMAIL: | |
| FROM: | LEHMAN BROTHERS INTERNATIONAL (EUROPE) |
| | ANDREW WYBOLT |
| PHONE: | 212-526-1210 |
| FAX: | 646-758-5023 |
| EMAIL: | andrew.wybolt@lehman.com |
| DUE DATE: | 09/01/2008 |

From  08/01/2008  To  08/31/2008  [inclusive]

| Date | CCY | Principal | Interest Calc Amt | Rate | Accrued Int |
|------|-----|-----------|-------------------|------|-------------|
| 08/01/2008 | USD | 482,451.00 | -28.68 | 2.140 | -28.68 |
| 08/02/2008 | USD | 482,451.00 | -28.68 | 2.140 | -28.68 |
| 08/03/2008 | USD | 482,451.00 | -28.01 | 2.090 | -28.01 |
| 08/04/2008 | USD | 482,451.00 | -26.67 | 1.990 | -26.67 |
| 08/05/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/06/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/07/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/08/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/09/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/10/2008 | USD | 482,451.00 | -26.67 | 1.990 | -26.67 |
| 08/11/2008 | USD | 482,451.00 | -26.67 | 1.990 | -26.67 |
| 08/12/2008 | USD | 482,451.00 | -27.07 | 2.020 | -27.07 |
| 08/13/2008 | USD | 482,451.00 | -28.14 | 2.100 | -28.14 |
| 08/14/2008 | USD | 482,451.00 | -28.81 | 2.150 | -28.81 |
| 08/15/2008 | USD | 482,451.00 | -28.81 | 2.150 | -28.81 |
| 08/16/2008 | USD | 482,451.00 | -28.81 | 2.150 | -28.81 |
| 08/17/2008 | USD | 482,451.00 | -28.14 | 2.100 | -28.14 |
| 08/18/2008 | USD | 482,451.00 | -26.27 | 1.960 | -26.27 |
| 08/19/2008 | USD | 482,451.00 | -25.60 | 1.910 | -25.60 |
| 08/20/2008 | USD | 482,451.00 | -26.67 | 1.990 | -26.67 |
| 08/21/2008 | USD | 482,451.00 | -26.94 | 2.010 | -26.94 |
| 08/22/2008 | USD | 482,451.00 | -26.94 | 2.010 | -26.94 |
| 08/23/2008 | USD | 482,451.00 | -26.94 | 2.010 | -26.94 |
| 08/24/2008 | USD | 482,451.00 | -26.80 | 2.000 | -26.80 |
| 08/25/2008 | USD | 482,451.00 | -27.20 | 2.030 | -27.20 |
| 08/26/2008 | USD | 482,451.00 | -26.94 | 2.010 | -26.94 |
| 08/27/2008 | USD | 482,451.00 | -27.20 | 2.030 | -27.20 |
| 08/28/2008 | USD | 482,451.00 | -26.80 | 2.000 | -26.80 |
| 08/29/2008 | USD | 482,451.00 | -26.80 | 2.000 | -26.80 |
| 08/30/2008 | USD | 482,451.00 | -26.80 | 2.000 | -26.80 |
| 08/31/2008 | | | | | |

Total Interest Due: -841.74

Lehman will pay to the following settlement instructions.

| Intermediary | Institution | Beneficiary | Special |
|--------------|-------------|-------------|---------|
| | FW021000018 | 211551 | /BNF/771898 |

ANNEX 1

Supplemental Terms or Conditions
To the TBMA/ISMA Master Repurchase Agreement

Dated as of May 31, 2007

Between

LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A")
a company incorporated with unlimited liability under the laws of England and Wales

and

Highland CDO Opportunity Master Fund LP ("Party B")
a limited partnership organized under the laws of the State of Delaware

Paragraph references are to paragraphs in the Agreement.

1.    The following elections shall apply

(a)    paragraph 1(c)(i). Buy/Sell Back Transactions may be effected under this Agreement,
       and accordingly the Buy/Sell Back Annex shall apply.

(b)    paragraph 1(c)(ii). Transactions in Net Paying Securities may be effected under this
       Agreement, and accordingly the provisions of sub-paragraphs (i) and (ii) below shall
       apply.

       (i)     The phrase "other than equities and Net Paying Securities" in paragraph 1(a)
               shall be replaced by the phrase "other than equities".

       (ii)    In the Buy/Sell Back Annex the following words shall be added to the end of the
               definition of the expression "IR": "and for the avoidance of doubt the reference
               to the amount of income for these purposes shall be to an amount paid without
               withholding or deduction for or on account of taxes or duties notwithstanding
               that a payment of such income made in certain circumstances may be subject to
               such a withholding or deduction".

(c)    paragraph 1(d). Agency Transactions may not be effected under this Agreement, and
       accordingly the Agency Annex shall not apply.

       In addition, the following Annexes shall also apply with respect to relevant Transactions:

       —— Equities Annex
       —— Italian Annex
       —— Gilts Annex
       —— Japanese Securities Annex
       —— U.S. Securities Addendum

(d)    paragraph 2(d). The Base Currency shall be:

       (i)     for the purposes of paragraph 4, United States Dollars.
       (ii)    for the purposes of paragraph 10, where the Defaulting Party is Party B, United
               States Dollars and, where the Defaulting Party is Party A, United States Dollars.

(e)    paragraph 2(p). list Buyer's and Seller's Designated Offices.

       Party A: London and Frankfurt.

OHS East:160231565.1
8043-22 RK6/RK6

Party B: Delaware

(f)  **paragraph 2(cc).** The pricing source for calculation of Market Value shall be: Market Value will be calculated in accordance with market practice prevailing in the principal market for the relevant securities as reasonably determined by Party A or as otherwise agreed in writing by the parties.

(g)  **paragraph 2(rr).** Spot rate to be: as specified in paragraph 2(rr).

(h)  **paragraph 3(b).** both Seller and Buyer to deliver Confirmation.

(i)  **paragraph 4(f).**

   (i)  Interest rate on Cash Margin to be Fed Funds Open for USD (available on Telerate page 5), EONIA for Euro (available on Bloomberg page EBF) and SONIA for GBP (available on Bloomberg page BBAM).

   (ii)  Interest to be payable upon redelivery of any Cash Margin.

(j)  **paragraph 4(g).** Delivery period for margin calls to be:

   (i)  For Cash Margin, Margin Securities or Equivalent Margin Securities the same day if the request is made by 10 a.m. (New York time) on a Business Day and, if requested after such time, on the next Business Day.

(k)  **paragraph 6(j).** Paragraph 6(j) shall apply, and the events specified in paragraph 10(a) identified for the purposes of paragraph 6(j) shall be those set out in sub-paragraphs (i) and (iii) through (x) of paragraph 10(a) of this Agreement.

(l)  **paragraph 10(a)(ii).** Paragraph 10(a)(ii) shall not apply.

(m)  **paragraph 14.** For the purposes of paragraph 14 of this Agreement

   (i)  Address for notices and other communications for Party A

   (a)  Address: **Lehman Brothers International (Europe) – Head Office**
      25 Bank Street, London E14 5LE
      Attention:

      For trading issues: Trading Manager, Central Funding Desk
      Telephone: 44 (20) 7260 2333
      e-mail: cfueurope@exeulon.lehman.com

      For confirmation issues: Trade Support / Operations
      Telephone: 44 (20) 7102 3002/2971
      Facsimile: 44 (20) 7102 3022/2518
      e-mail: fidfinancing@exeulon.lehman.com

      For margin issues: Global Margin Europe
      Telephone: 44 (20) 7011 7290
      Facsimile: 44 (20) 7260 1324
      e-mail: repofutmargin@exeulon.lehman.com

      For documentation issues: Transaction Management (London)
      Telephone: 44 (20) 7102 1730
      Facsimile: 44 (20) 7102 2044
      e-mail: vsharp@lehman.com; gfarry@lehman.com

   (b)  Address: **Lehman Brothers International (Europe) – Frankfurt Branch**
      Rathenauplatz 1, D-60313 Frankfurt am Main, Germany
      Attention:

For trading issues: Trading Manager, Central Funding Desk
Telephone: 44 (20) 7260 2333
e-mail: cfueurope@exeulon.lehman.com

For confirmation issues: Trade Support / Operations
Telephone: 44 (20) 7120 3002/2971
Facsimile: 44 (20) 7120 3022/2518
e-mail: fidfinancing@exeulon.lehman.com

For margin issues: Global Margin Europe (London)
Telephone: 44 (20) 7011 7290
Facsimile: 44 (20) 7260 1324
e-mail: repofutmargin@exeulon.lehman.com

For documentation issues: Transaction Management (London)
Telephone: 44 (20) 7102 1730
Facsimile: 44 (20) 7102 2044
e-mail: vsharp@lehman.com; gtarry@lehman.com

(ii)    Address for notices and other communications for Party B

Address:  c/o Highland Capital Management, L.P.
          13445 Noel Road
          Two Galleria Tower, Suite 1300
          Dallas, TX 75241

Attention: Philip Braner

Telephone:    972-628- 4100

Facsimile: 972-628-4147

E-mail: PBraner@hcmlp.com

paragraph 17.  For the purposes of paragraph 17 of this Agreement

(iii)   Party A is not required to appoint an agent for service of process.

(iv)    Party B appoints as its agent for service of process: Highland Capital
        Management Europe Ltd., 130 Jermyn Street, London SW1Y 4UP

2.      The following supplemental terms and conditions shall apply.

(a)     Existing Transactions. All Repurchase Transactions and Buy/Sell Back Transactions
        entered into by the parties prior to the date of this Agreement which are outstanding at the
        date of the Agreement, shall be deemed to be entered into pursuant to this Agreement and
        shall be governed by the terms of this Agreement.

(b)     Forward Transactions. The parties agree that Forward Transactions (as defined in sub
        paragraph (i)(A) below) may be effected under this Agreement, and accordingly the
        provisions of sub paragraphs (i) to (iv) below shall apply.

        (i)     The following definitions shall apply

                (A)     "Forward Transaction", a Transaction in respect of which the Purchase
                        Date is at least three Business Days after the date on which the
                        Transaction was entered into and has not yet occurred;

# CLOSE/MID/YIELD

for explanation.

Range ▮▮▮▮▮ to ▮▮▮▮▮   Period D Daily

Index HP

HI 3.7500   ON 9/16/08
AVE 2.2221
LOW 2.0000   ON 8/21/08

| DATE | YIELD | DATE | YIELD | DATE | YIELD |
|------|-------|------|-------|------|-------|
| 9/18 | 2.5000 | 8/29 | 2.1250 | 8/ 8 | 2.0625 |
| 9/17 | 3.0000 | 8/28 | 2.0625 | 8/ 7 | 2.0625 |
| 9/16 H | 3.7500 | 8/27 | 2.0625 | 8/ 6 | 2.0625 |
| 9/15 | 3.5000 | 8/26 | 2.0625 | 8/ 5 | 2.1250 |
|  |  | 8/25 | 2.0625 | 8/ 4 | 2.1250 |
| 9/12 | 2.1250 | 8/22 | 2.0625 | 8/ 1 | 2.1875 |
| 9/11 | 2.0625 | 8/21 L | 2.0000 | 7/31 | 2.1875 |
| 9/10 | 2.0625 | 8/20 | 2.0000 | 7/30 | 2.1875 |
| 9/ 9 | 2.0625 | 8/19 | 2.0625 | 7/29 | 2.1875 |
| 9/ 8 | 2.0625 | 8/18 | 2.1250 | 7/28 | 2.1875 |
| 9/ 5 | 2.0625 | 8/15 | 2.1875 | 7/25 | 2.0625 |
| 9/ 4 | 2.0625 | 8/14 | 2.0625 | 7/24 | 2.0000 |
| 9/ 3 | 2.0625 | 8/13 | 2.0625 | 7/23 | 2.0000 |
| 9/ 2 | 2.0625 | 8/12 | 2.0625 | 7/22 | 2.0000 |
| 9/ 1 | 2.1250 | 8/11 | 2.0625 | 7/21 | 2.0000 |

Australia 61 2 9777 8600  Brazil 5511 3048 4500  Europe  44 20 7330 7500  Germany 49 69 9204 1210  Hong Kong 852 2977 6000
Japan 81 3 3201 8900  Singapore 65 6212 1000  U.S. 1 212 318 2000  Copyright 2008 Bloomberg Finance L.P.
H146-739-0 19-Sep-08  9:40:41

<HELP> for explanation.

Index **HP**

# CLOSE/ASK/YIELD

US0001M   LIBOR-USD Fix   1 Month                                    Page 1

Range 3/25/08 to 9/22/08    Period D Daily

| HI 3.19000 | ON 9/19/08 |
| AVE 2.56195 | |
| LOW 2.37875 | ON 5/27/08 |

| DATE | YIELD | DATE | YIELD | DATE | YIELD |
|------|-------|------|-------|------|-------|
| 9/22 | 3.17625 | 9/5 | 2.48688 | 8/15 | 2.46563 |
| 9/19 H | 3.19000 | 9/4 | 2.48688 | 8/14 | 2.46563 |
| 9/18 | 3.18750 | 9/3 | 2.48750 | 8/13 | 2.46688 |
| 9/17 | 3.03000 | 9/2 | 2.48563 | 8/12 | 2.46375 |
| 9/16 | 2.74750 | 9/1 | 2.48563 | 8/11 | 2.46375 |
| 9/15 | 2.49688 | 8/29 | 2.48563 | 8/8 | 2.46063 |
| 9/12 | 2.48813 | 8/28 | 2.48625 | 8/7 | 2.46313 |
| 9/11 | 2.48750 | 8/27 | 2.48750 | 8/6 | 2.46188 |
| 9/10 | 2.48688 | 8/26 | 2.46875 | 8/5 | 2.46250 |
| 9/9 | 2.48875 | 8/25 | 2.47000 | 8/4 | 2.46125 |
| 9/8 | 2.48813 | 8/22 | 2.47188 | 8/1 | 2.46000 |
| | | 8/21 | 2.47188 | 7/31 | 2.46125 |
| | | 8/20 | 2.47188 | 7/30 | 2.46375 |
| | | 8/19 | 2.47125 | 7/29 | 2.46313 |
| | | 8/18 | 2.47063 | 7/28 | 2.46250 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
H1 462-7399-1 22-Sep-08 17:30:17

**Jason Post**

| | |
|---|---|
| **From:** | Jason Post |
| **Sent:** | Monday, September 22, 2008 12:24 PM |
| **To:** | Jason Post |
| **Subject:** | FW: Billings on Lehman GMRA |

Per discussion with Brian Albert, $2,100 split down the middle between Highland CDO Opportunity Master Fund, L.P and Highland Financial Corporation.

**From:** Brian Albert [mailto:brian.albert@gmail.com]
**Sent:** Monday, September 22, 2008 12:04 PM
**To:** Jason Post
**Subject:** Billings on Lehman GMRA

There are about $2100 in billings attributable to the Lehman GMRA.  Let me know if you need additional back up on this.

Brian

--
Brian G. Albert, Esq.
Phone: 323-384-3631
brian.albert@gmail.com

**Highland CDO Opportunity Master Fund, L.P.**

| Date | Rate | Total Net Amount Less Interest | Daily Interest |
|------|------|-------------------------------|----------------|
| 9/15/2008 | 2.496880% | 8,747,366.07 | $  606.70 |
| 9/16/2008 | 2.747500% | 8,747,366.07 | 667.59 |
| 9/17/2008 | 3.030000% | 8,747,366.07 | 736.24 |
| 9/18/2008 | 3.187500% | 8,747,366.07 | 774.51 |
| 9/19/2008 | 3.190000% | 8,747,366.07 | 775.11 |
| 9/20/2008 | 3.190000% | 8,747,366.07 | 775.11 |
| 9/21/2008 | 3.190000% | 8,747,366.07 | 775.11 |
| 9/22/2008 | 3.176250% | 8,747,366.07 | 771.77 |
| Total Interest | | | $  5,882.15 |

| | |
|---|---|
| $  8,552,387.52 | Net Value of Receivable Securities |
| 194,664.02 | Cash Margin |
| (10,735.47) | All in Term Repo Financing Value |
| 10,000.00 | Legal Expense - Schulte Roth & Zabel |
| 1,050.00 | Legal Expense - Brian Albert |
| $  8,747,366.07 | Total |

## **\*\*AMENDMENT\*\*DEFAULT VALUATION NOTICE UNDER GLOBAL MASTER REPURCHASE AGREEMENT**

| | |
|---|---|
| To: | Lehman Brothers International (Europe) – Head Office ("**Party A**") |
| Address: | 25 Bank Street, London E14 5LE, England |
| Attention: | Transaction Management (London) |
| Phone: | 44 (20) 7102 1730 |
| Facsimile: | 44 (20) 7102 2044 |
| Email: | vsharp@lehman.com; gtarry@lehman.com |

| | |
|---|---|
| From: | Highland CDO Opportunity Master Fund, L.P. c/o Highland Capital Management, L.P ("**Party B**") |
| | 13455 Noel Road, Suite 800 |
| | Dallas, TX 75240 |
| Phone: | (972) 628-4100 |
| Facsimile: | (972) 628-4147 |

| | |
|---|---|
| Date: | October 10, 2008 |
| Re: | BMA Global Master Repurchase Agreement (2000 Version) dated as of May 31, 2007 between Party A and Party B and each of the Annexes related thereto and all Confirmations and Transactions thereunder, in each case, as such documents are amended and supplemented from time to time (collectively, the "**Agreement**") |

---

This **Amended** Calculation Statement is an addition to and amends the calculation statement provided by Party B to Party A on September 26, 2008 (the "Original Calculation Statement") in respect of the early designation by Party B of the Repurchase Date in respect of all Transactions under the Agreement. This Amended Calculation Statement sets forth additional amounts determined by Party B to be due and payable by Party A not included in the Original Calculation Statement.

Party B hereby demands payment from Party A in a total amount of $10,026,060.81 as calculated pursuant to Annex A hereto (the "Payment Amount"). This total Payment Amount is due and payable immediately upon receipt of this Amended Calculation Statement by Party A pursuant to Section 10 (c)(ii) of the Agreement and includes amounts due in respect of the Original Calculation Statement as well as all additional amounts calculated hereunder, and shall be paid by Party A in immediately available funds to the following account:

Payment to:
    Highland CDO Opportunity Master Fund, L.P.
    The Bank of New York

FFC Account #: ██████
Attention: Marisela Rodriguez, 713-483-6604
Reference: (Borrower Name, Type of Payment/description)
Email: mariselarodriguez@bankofny.com

Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in the Agreement.

HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.


By: Highland CDO Opportunity Fund GP, L.P., its general partner

By: Highland CDO Opportunity Fund GP, LLC, its general partner

By: Highland Capital Management, L.P. its sole member

By: Strand Advisors, Inc., its general partner

By: _____
Name: Patrick Boyce
Title: Treasurer

<u>**Annex A to Calculation Statement**</u>

**Default Market Value of Equivalent Securities**

Determined pursuant to paragraph 10(e)(i) –

1 -  In respect of those Deliverable Securities or Receivable Securities that since the occurrence of the Event of Default in respect of Party A, Party B has sold, in the case of Receivable Securities, or purchased, in the case of Deliverable Securities, Securities which form part of the same issue and are of an identical type and description as those Equivalent Securities or Equivalent Margin Securities, and that the non-Defaulting Party elects to treat as the Default Market Value the amount calculated by Party B pursuant to paragraph 10(e)(i)(A) as follows:

Default Market Value of Deliverable Securities

$\qquad$ \$_____0_____

Default Market Value of Receivable Securities

$\qquad$ \$_____0_____

2 - In respect of those Deliverable Securities or Receivable Securities that Part B has received, in the case of Deliverable Securities, offer quotations or, in the case of Receivable Securities, bid quotations in respect of Securities of the relevant description from two or more market makers or regular dealers in the Appropriate Market in a commercially reasonable size, that Party B elects to treat the price so quoted (or, where more than one price is so quoted, the arithmetic mean of the prices so quoted), after deducting, in the case of Receivable Securities, or adding, in the case of Deliverable Securities, such Transaction Costs, as the Default Market Value of the relevant Equivalent Securities or Equivalent Margin Securities pursuant to paragraph 10(e)(i)(B)(cc).

Default Market Value of Deliverable Securities

$\qquad$ \$_____0_____

Default Market Value of Receivable Securities

$\qquad$ \$_____0_____

3 - In respect of those Deliverable Securities or Receivable Securities, that either (x) acting in good faith, Party B has endeavoured but been unable to sell or purchase Securities in accordance with paragraph 10(i)(A) of the Agreement or to obtain quotations in accordance with paragraph 10(i)(B) of the Agreement (or both) or (y) Party B has determined that it would not be commercially reasonable to obtain such quotations, or that it would not be commercially reasonable to use any quotations which it has obtained under paragraph 10(i)(B) of the Agreement, that Party B has determined the Net Value of the relevant Equivalent Securities or Equivalent Margin Securities (which shall be specified) and that the non-Defaulting Party elects

to treat such Net Value as the Default Market Value of the relevant Equivalent Securities or Equivalent Margin Securities as follows:

Net Value of Receivable Securities

$_____0_____

*minus* Transaction Costs

$_____0_____

Net Value of Deliverable Securities

$ 9,707,970.52

*plus* Transaction Costs

$_____0_____

**Cash Margin**

$   194,451.00 Cash Collateral
$   213.02 Cash Collateral

$   194,664.02 Total Cash Collateral

**Expenses and Interest**

$  -10,735.47      All in term Repo Financing value
$  4,411.75      Legal Expense – Schulte Roth & Zabel
$  1,050.00      Legal Expense – Brian Albert
$  103,052.05      Missing coupon payments
$  25,647.94      Net amount interest 9/15/08-10/10/08

$123,426.27      Total

Amounts incurred by Party B and payable by Party A pursuant to paragraph 10(f) of the Agreement by way of Expenses, Interest and otherwise.

**Expenses and Costs of Replacement Transactions and Hedging Transactions**

$_____0_____Amounts incurred by Party B and payable by Party A pursuant to paragraph 10(k)(1) and (2) of the Agreement.

**Total Net Amount Now Due to Party B**     $_____**10,026,060.81**_____

Subject to accrual interest at default rate of LIBOR from date
due to date paid in full

*Calculations details are attached hereto on the following pages.*

<u>Net Value of Deliverable Securities</u>

$    9,707,970.52

<u>Cash Margin</u>

$    194,664.02

<u>Expenses</u>

$    103,052.05    **Missing coupon payments

     (10,735.47)   All in Term Repo Financing Value

       4,411.75    *Legal Expense - Schulte Roth & Zabel

       1,050.00    Legal Expense - Brian Albert

$     97,778.33

$   **10,000,412.87**   Total claim amount

$     25,647.94    Interest 9/15/08-10/10/08

$   **10,026,060.81**   Total claim amount plus interest 9/15/08-10/10/08

*amended item
**added item

Highland CDO Opportunity Master Fund, L.P.

Value Date: 9/17/08

| Cusip | Security | Par | Lehman Security Roll Price | Lehman Security Mark to Market Price (9/8/08) | Highland Security Price | Security Market Value | All In Term Financing Value |
|---|---|---|---|---|---|---|---|
| 53225VAE9 | LIGHT 2006-5A B | 9,500,000 | 68.9600 | 68.9032 | 67.4047 | 6,403,446.50 | (3,429.55) |
| 55385SAD5 | MSPB 2007-1A C | 10,000,000 | 79.8000 | 79.6000 | 76.1022 | 7,610,020.00 | (2,663.13) |
| 55385SAE3 | MSPB 2007-1A C | 8,000,000 | 75.0000 | 75.1895 | 75.7187 | 6,057,496.00 | (1,895.50) |
| 55382AA3 | MSPB 2007-1A E | 4,000,000 | 73.4320 | 71.5066 | 72.6540 | 2,905,160.00 | (2,075.92) |
| 96524UAC2 | WITEH 2006-4A B | 2,000,000 | 64.2000 | 64.2000 | 66.2130 | 1,324,260.00 | (972.17) |
| | | | | | | | (10,735.47) |

| Repo Loan Amount | Current Bond Coupon | Beginning Coupon Accrue Date | Accrued Interest Underlying Bond | Value | Value Less Accrued Interest |
|---|---|---|---|---|---|
| 3,930,720.00 | 3.51% | 8/11/2008 | 34,295.66 | 2,503,592.51 | 2,507,022.16 |
| 5,572,000.00 | 4.79% | 7/27/2008 | 77,111.81 | 2,572,438.68 | 2,315,131.81 |
| 3,600,000.00 | 6.04% | 7/21/2008 | 77,600.56 | 2,530,431.50 | 2,535,295.59 |
| 1,174,880.00 | 8.29% | 7/21/2008 | 53,400.28 | 1,782,604.66 | 1,784,680.28 |
| 770,400.00 | 3.54% | 7/18/2008 | 11,979.72 | 585,167.95 | 555,893.72 |
|  |  |  |  | $  9,697,235.05 $ | 9,707,976.52 |

Cash Collateral Posted 194,451.00
Interest due on Cash Collateral 213.02
Total Cash Collateral and Interest $  194,664.02

Net Value $  9,891,899.07

**Highland CDO Opportunity Master Fund, L.P.**

| Date | Rate | Total Net Amount Less Interest | Daily Interest |
|------|------|-------------------------------|----------------|
| 9/15/2008 | 2.496880% | 10,000,412.87 | $ 693.61 |
| 9/16/2008 | 2.747500% | 10,000,412.87 | 763.23 |
| 9/17/2008 | 3.030000% | 10,000,412.87 | 841.70 |
| 9/18/2008 | 3.187500% | 10,000,412.87 | 885.45 |
| 9/19/2008 | 3.190000% | 10,000,412.87 | 886.15 |
| 9/20/2008 | 3.190000% | 10,000,412.87 | 886.15 |
| 9/21/2008 | 3.190000% | 10,000,412.87 | 886.15 |
| 9/22/2008 | 3.176250% | 10,000,412.87 | 882.33 |
| 9/23/2008 | 3.206880% | 10,000,412.87 | 890.84 |
| 9/24/2008 | 3.428750% | 10,000,412.87 | 952.47 |
| 9/25/2008 | 3.708750% | 10,000,412.87 | 1,030.25 |
| 9/26/2008 | 3.708750% | 10,000,412.87 | 1,030.25 |
| 9/27/2008 | 3.708750% | 10,000,412.87 | 1,030.25 |
| 9/28/2008 | 3.708750% | 10,000,412.87 | 1,030.25 |
| 9/29/2008 | 3.720000% | 10,000,412.87 | 1,033.38 |
| 9/30/2008 | 3.926250% | 10,000,412.87 | 1,090.67 |
| 10/1/2008 | 4.002500% | 10,000,412.87 | 1,111.85 |
| 10/2/2008 | 4.045000% | 10,000,412.87 | 1,123.66 |
| 10/3/2008 | 4.110000% | 10,000,412.87 | 1,141.71 |
| 10/4/2008 | 4.110000% | 10,000,412.87 | 1,141.71 |
| 10/5/2008 | 1.110000% | 10,000,412.87 | 308.35 |
| 10/6/2008 | 4.092500% | 10,000,412.87 | 1,136.85 |
| 10/7/2008 | 4.140000% | 10,000,412.87 | 1,150.05 |
| 10/8/2008 | 4.293750% | 10,000,412.87 | 1,192.76 |
| 10/9/2008 | 4.512500% | 10,000,412.87 | 1,253.52 |
| 10/10/2008 | 4.587500% | 10,000,412.87 | 1,274.36 |
| Total Interest | | | $ 25,647.94 |

GRAB

# CLOSE/ASK/YIELD

US0001M  LIBOR-USD Fix   1 Month
Range 4/10/08 to 10/10/08   Period D Daily

Index HP
Page 1/3

HI 4.58750   ON 10/10/08
AVE 2.70028
LOW 2.37875  ON 5/27/08

| DATE | | YIELD | DATE | YIELD | DATE | YIELD |
|---|---|---|---|---|---|---|
| F | 10/10 H | 4.58/50 | 9/19 | 3.19000 | 8/29 | 2.48563 |
| F | 10/9 | 4.51250 | 9/18 | 3.18750 | 8/28 | 2.48625 |
| Th | 10/8 | 4.29375 | 9/17 | 3.03000 | 8/27 | 2.46875 |
| T | 10/7 | 4.14000 | 9/16 | 2.74750 | 8/26 | 2.47000 |
| M | 10/6 | 4.09250 | 9/15 | 2.49688 | 8/25 | |
| F | 10/3 | 4.11000 | 9/12 | 2.48813 | 8/22 | 2.47188 |
| T | 10/2 | 4.04500 | 9/11 | 2.48750 | 8/21 | 2.47188 |
| W | 10/1 | 4.00250 | 9/10 | 2.48688 | 8/20 | 2.47188 |
| | 9/30 | 3.92625 | 9/9 | 2.48875 | 8/19 | 2.47125 |
| | 9/29 | 3.72000 | 9/8 | 2.48813 | 8/18 | 2.47063 |
| F | 9/26 | 3.70375 | 9/5 | 2.48688 | 8/15 | 2.46563 |
| T | 9/25 | 3.70875 | 9/4 | 2.48688 | 8/14 | 2.46563 |
| W | 9/24 | 3.42875 | 9/3 | 2.48750 | 8/13 | 2.46688 |
| T | 9/23 | 3.20688 | 9/2 | 2.48563 | 8/12 | 2.46375 |
| M | 9/22 | 3.17625 | 9/1 | 2.48563 | 8/11 | 2.46375 |

LightPoint CLO V (with its collateral
reporting as of September 11, 2008

| | | | | | | | on-the-run Yield Curve | | 1 mo | 3 mo | 6 mo | 2 yr | 5 yr | 10 yr | 30 yr | as of |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | The Yield Curve controls the pricing spreads, not the cashflows. Cashflows can be controlled in forward rates; assumptions section 'CLASS=PCIdepition' | | | | | | | | | Oct 03 2008 10:20 EDT |
| Transfer | B (S3223-meeS) | Orig Face $ | FULL | Settle Date | 9/17/2008 | | | | 0.001 | 0.693 | 1.197 | 1.808 | 2.854 | 3.43 | 4.154 | |

Forecast Assumptions

| | Strat | | Units | Solver | Detail | 1 ar > | 2 ar > | | 3 ar > | 4 ar > | 5 ar > | 7 ar > |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

No Rate Shocks
Prenav using CPR
Default using CDR              10
Loss Recovery %               3
Default using CDR             30

Asset Loss Bond
Loss Recovery %              3
Loan                         70
Collat Reinvestment - per model
per model - Reinvest from Interest
per model - Liquidation Price
Triggers per model
Calls per model

Analytic Results

Results Table

| | | | | 9/100 Yield |
|---|---|---|---|---|
| | | Disc Margin 600 | | 57.8470 10.3031 |
| Cashflows | 595 | | | 57.4047 10.2882 |
| Deal Loss | 595 | | | 57.1635 10.4132 |
| Waterfall | | | | |
| Index Results | | | | |
| Forecasted Triggers | | | | |

Additional
Analytics

|| 9.5
5.17
Feb18 - Mar18

WAL
WAL of Interest Payments                          0.00%
Principal Withdrawn                               0
Principal Withdrawn Percentage
Accrual Int Shortfall                             116
Accrual Coup Cap Shortfall                        0.669
Min Credit Support Pct                            0.912
Maturity Amos                                     32,374,663.70
Mod Durn                                          0.50%
Mod Convexity                                     32,374,663.70
Net Asset Loss                                    0.50%
Net Asset Loss Percentage                         100,829,414.89
Net Asset Loss (+ Historical) Percentage          18.43%
Net Asset Liquidation Percentage

Rates Forecast

| Forecast Rates Month | LIBOR 1MO | LIBOR 3MO | LIBOR 3MO | LIBOR 6MO | PRIME |
|---|---|---|---|---|---|
| 1 | 4.045 | 4.106 | | 4.207 | 4.052 | 5 |
| 2 | 4.153001 | 4.273564 | 4.197632 | 4.029085 | |
| 3 | 4.278033 | 4.14242 | 4.002262 | 3.994453 | |
| 4 | 3.890020 | 3.816222 | 3.856410 | 3.905083 | |
| 5 | 3.841501 | 3.820103 | 3.840283 | 3.961154 | |
| 6 | 3.793336 | 3.83735 | 3.89858 | 3.898037 | |
| 7 | 3.902668 | 3.833202 | 3.81251 | 3.913668 | |
| 8 | 3.848849 | 3.815072 | 3.904135 | 3.875488 | |
| 9 | 3.876541 | 3.855735 | 3.868478 | 3.780124 | |
| 10 | 3.849478 | 3.84402 | 3.868547 | 3.840536 | |
| 11 | 3.834265 | 3.86329 | 3.889520 | 3.499302 | |
| 12 | 3.819918 | 3.765074 | 3.659485 | 3.248535 | |
| 13 | 3.843336 | 3.53771 | 3.33421 | 2.876999 | |
| 14 | 3.360703 | 3.243268 | 3.095562 | 2.713156 | |
| 15 | 3.069294 | 2.84780? | 2.811601 | 2.472893 | |
| 16 | 2.765916 | 2.68624 | 2.6441 | 2.271826 | |
| 17 | 2.523968 | 2.411139 | 2.36887 | 2.122187 | |
| 18 | 2.289448 | 2.194037 | 2.11691 | 2.038446 | |
| 19 | 2.069948 | 2.029768 | 1.896915 | 2.031551 | |
| 20 | 1.960105 | 1.822629 | 1.82539 | 2.111396 | |
| 21 | 1.894789 | 1.90510 | 1.943564 | 2.372131 | |
| 22 | 1.912902 | 1.970567 | 2.060905 | 2.501330 | |
| 23 | 2.026183 | 2.139190 | 2.336196 | 2.783195 | |
| 24 | 2.145412 | 2.41213 | 2.634014 | 3.096472 | |
| 25 | 2.33163 | 2.749667 | 2.821632 | 3.424391 | |
| 26 | 2.810057 | 2.993342 | 3.231558 | 3.738193 | |
| 27 | 3.236112 | 3.425603 | 3.36674 | 4.028951 | |
| 28 | 3.565522 | 3.749007 | 3.846453 | 4.282608 | |
| 29 | 3.895673 | 4.043130 | 4.190730 | 4.519520 | |
| 30 | 4.177703 | 4.309012 | 4.428410 | 4.685892 | |
| 31 | 4.403112 | 4.527979 | 4.624110 | 4.807241 | |
| 32 | 4.602750 | 4.720706 | 4.790246 | 4.869033 | |
| 33 | 4.780161 | 4.860385 | 4.903206 | 4.841964 | |
| 34 | 4.805646 | 4.910136 | 4.903526 | 4.841664 | |
| 35 | 4.927544 | 4.915814 | 4.890457 | 4.771613 | |
| 36 | 4.992167 | 4.85206 | 4.867002 | 4.818511 | |
| 37 | 4.797446 | 4.749436 | 4.70159 | 4.57016 | |
| 38 | 4.601720 | 4.627041 | 4.596345 | 4.4646# | |
| 39 | 4.533697 | 4.524316 | 4.495656 | 4.406241 | |
| 40 | 4.741272 | 4.438012 | 4.404853 | 4.227318 | |
| 41 | 4.383592 | 4.353095 | 4.224612 | 4.266027 | |
| 42 | 4.304998 | 4.218587 | 4.256770 | 4.224326 | |
| 43 | 4.236588 | 4.217546 | 4.203303 | 4.199173 | |
| 44 | 4.163231 | 4.171563 | 4.166056 | 4.100751 | |
| 45 | 4.149945 | 4.143485 | 4.147724 | 4.200258 | |
| 46 | 4.138158 | 4.134344 | 4.14930 | 4.223735 | |
| 47 | 4.137726 | 4.145322 | 4.171721 | 4.231814 | |
| 48 | 4.150781 | 4.170043 | 4.209197 | 4.266651 | |
| 49 | 4.183418 | 4.223605 | 4.253952 | 4.342806 | |
| 50 | 4.238375 | 4.265560 | 4.290031 | 4.340011 | |
| 51 | 4.284207 | 4.313079 | 4.342807 | 4.427027 | |
| 52 | 4.327701 | 4.356053 | 4.384984 | 4.437185 | |
| 53 | 4.369646 | 4.307785 | 4.423368 | 4.504578 | |
| 54 | 4.406027 | 4.437102 | 4.460903 | 4.524854 | |
| 55 | 4.445231 | 4.474246 | 4.500014 | 4.527341 | |
| 56 | 4.484545 | 4.509281 | 4.533605 | 4.602402 | |
| 57 | 4.51755 | 4.541715 | 4.564663 | 4.623155 | |
| 58 | 4.54955 | 4.571406 | 4.53337 | 4.654755 | |
| 59 | 4.575814 | 4.566151 | 4.615643 | 4.77837 | |
| 60 | 4.601536 | 4.621637 | 4.641576 | 4.706709 | |
| 61 | 4.624054 | 4.643588 | 4.66238 | 4.727351 | |
| 62 | 4.646072 | 4.664502 | 4.682657 | 4.73670 | |
| 63 | 4.664676 | 4.68332 | 4.701648 | 4.752645 | |
| 64 | 4.683559 | 4.701467 | 4.719096 | 4.30682 | |
| 65 | 4.701069 | 4.718449 | 4.735437 | 4.33430 | |
| 66 | 4.717349 | 4.73415 | 4.750585 | 4.391509 | |
| 67 | 4.732347 | 4.748536 | 4.764338 | 4.90211? | |
| 68 | 4.746808 | 4.761502 | 4.77566? | 4.392482 | |
| 69 | 4.759009 | 4.782055 | 4.39065 | 4.865235 | |
| 70 | 4.77042 | 4.791920 | 4.811182 | 4.840120 | |
| 71 | 4.781185 | 4.798274 | 4.816314 | 4.657952 | |
| 72 | 4.793446 | 4.805414 | 4.824596 | 4.86552? | |
| 73 | 4.799013 | 4.813229 | 4.931974 | 4.87289 | |
| 74 | 4.813234 | 4.820502 | 4.83006 | 4.880563 | |
| 75 | 4.816781 | 4.633283 | 4.847007 | 4.889002 | |
| 76 | 4.827419 | 4.841170 | 4.855133 | 4.866004 | |
| 77 | 4.835663 | 4.848513 | 4.861574 | 4.87289 | |
| 78 | 4.843534 | 4.825622 | 4.83320K | 4.880063 | |
| 79 | 4.850781 | 4.833283 | 4.84700? | 4.889002 | |
| 80 | 4.8403 | 4.858302 | 4.812649 | 4.918341 | |
| 81 | 4.853103 | 4.863758 | 4.80787 | 4.915603 | |
| 82 | 4.887748 | 4.877753 | 4.903040 | 4.939565 | |
| 83 | 4.877011 | 4.888391 | 4.903991 | 4.85011 | |

Cash Reinvest Rate

LIBOR_1MO +.25

Generated on Oct 2, 2008 at 10:22 for Paul
Rioce of Highland Capital Management
Information provided herein is believed by
INTEX to be accurate, but INTEX cannot
guarantee accuracy. Content is for
informational purposes only and is not an
offer, recommendation or solicitation to
purchase, hold, or sell any security.

Intex Solutions, Inc. +1 781-449-0222 in
Europe +44 20 7002 1055 in Japan +81 3
5117-0370

MSIM Peconic Bay (adverts collateral)
recording as of September 8, 2008

| | | | | | | | The Yield Curve controls the pricing spreads, not the cashflows. CashFlows can be controlled in forward rates assumption section." CLASS#CHClsticks> | 1 mo | 3 mo | 6 mo | 2 yr | 5 yr | 10 yr | 20 yr | as of |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tranche | C (SICM03usfB) | | Orig Face $ | FULL | Series Code | 07/31/2008 | | 0.681 | 0.593 | 1.107 | 1.608 | 2.854 | 3.63 | 4.154 | Oct 02 2008 10:52 CDT |

Forecast Assumptions

| | Strat | | Units | Solver | Detail | 1 mo+ | 2 mo+ | | 3 mo+ | 4 mo+ | 5 mo+ | 6 mo+ | 7 mo+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | No Rate Shocks | | | | | | | | | | |
| | | | Prepay value CPR | | | 10 | | | | | | | |
| | | | Default value CDR | | | 3 | | | | | | | |
| Asset True Bond | | | Loss Recovery % | | | 30 | | | | | | | |
| | | | Default value CDR | | | 3 | | | | | | | |
| Loan | | | Loss Recovery % | | | 70 | | | | | | | |
| | | | Collat Reinvestment - per model | | | | | | | | | | |
| | | | per model - Liquidation Price | | | | | | | | | | |
| | | | Triggers per model | | | | | | | | | | |
| | | | Calls per model | | | | | | | | | | |

Analytic Results

Results Table                           $/100 Yield
                                        78.3341 10.1823
                        505   Disc Margin 600   76.1002 10.2334
Cashflows                               77.8651 10.3345
Deal Loss
                  605
Waterfall
Index Results
Forecasted Triggers

Additional
Analytics                               II    7.64
                                              4.70
                                        Jul16 - Jul16
                                              0
WAL                                           0
WAL of Interest Payments                      0.00%
Principal Window                              0
Principal Writedown
Principal Writedown Percentage                96
Accrue Int Shortfall                          9.042
Assem Coup Cap Shortfall                      9.43
Min Credit Support Pd                         10,172,280.22
Maturity Price                                4.03%
Mod Durn                                      10,172,280.22
Mod Convexity                                 4.04%
Net Asset Loss                                64,549,470.71
Net Asset Loss Percentage                     18.01%
Net Asset Loss (+ Notional)
Net Asset Loss (+ Notional) Percentage
Rate returned to N% Rate Liquidation
Net Asset Liquidation Percentage

Rates Forecast

| Forecast Rates Month | LIBOR 1MO | LIBOR 2MO | | LIBOR 3MO | LIBOR 6MO | PRIME |
|---|---|---|---|---|---|---|
| 1 | 4.045 | 4.106 | | 4.207 | 4.053 | 5 |
| 2 | 4.153061 | 4.272594 | | 4.187422 | 4.229085 | |
| 3 | 4.378033 | 4.14563 | | 4.052282 | 3.994563 | |
| 4 | 3.895603 | 3.870202 | | 3.856419 | 3.966383 | |
| 5 | 3.841931 | 3.835169 | | 3.992303 | 3.901154 | |
| 6 | 3.798356 | 3.86725 | | 3.89658 | 3.895807 | |
| 7 | 3.903560 | 3.032222 | | 3.92235 | 3.915008 | |
| 8 | 3.946640 | 3.919672 | | 3.904255 | 3.075488 | |
| 9 | 3.876541 | 3.886735 | | 3.665470 | 3.792714 | |
| 10 | 3.649436 | 3.84402 | | 3.856047 | 3.647028 | |
| 11 | 3.834255 | 3.66329 | | 3.695533 | 3.468302 | |
| 12 | 3.679918 | 3.135074 | | 3.639456 | 3.244515 | |
| 13 | 3.676336 | 2.82771 | | 3.28431 | 2.976996 | |
| 14 | 3.388733 | 3.24215B | | 3.099852 | 3.711158 | |
| 15 | 3.088734 | 2.847357 | | 2.741895 | 2.472853 | |
| 16 | 2.786815 | 2.56634 | | 2.5441 | 2.371826 | |
| 17 | 2.507966 | 2.411119 | | 2.36687 | 2.122787 | |
| 18 | 2.376448 | 2.184097 | | 2.11801 | 2.038446 | |
| 19 | 2.006948 | 2.023768 | | 1.884919 | 2.021551 | |
| 20 | 1.960165 | 1.020020 | | 1.82058 | 2.111396 | |
| 21 | 1.594729 | 1.00519 | | 1.847066 | 2.127131 | |
| 22 | 1.910382 | 1.870597 | | 2.065255 | 2.001333 | |
| 23 | 2.028163 | 2.109196 | | 2.256196 | 2.383198 | |
| 24 | 2.249412 | 2.41723 | | 2.584014 | 3.068472 | |
| 25 | 2.27163 | 2.746667 | | 2.921052 | 3.424391 | |
| 26 | 2.616057 | 3.060342 | | 3.261568 | 3.738163 | |
| 27 | 3.258710 | 3.425063 | | 3.58974 | 4.022651 | |
| 28 | 3.563033 | 3.740087 | | 3.886653 | 4.268063 | |
| 29 | 3.695013 | 4.043136 | | 4.160738 | 4.510026 | |
| 30 | 4.177703 | 4.009617 | | 4.439419 | 4.685602 | |
| 31 | 4.426112 | 4.537079 | | 4.634116 | 4.807241 | |
| 32 | 4.632368 | 4.728706 | | 4.790246 | 4.869625 | |
| 33 | 4.796161 | 4.680055 | | 4.889235 | 4.877684 | |
| 34 | 4.896645 | 4.819136 | | 4.932026 | 4.841434 | |
| 35 | 4.907344 | 4.916814 | | 4.896407 | 4.713813 | |
| 36 | 4.880197 | 4.85209 | | 4.807925 | 4.676091 | |
| 37 | 4.791445 | 4.745438 | | 4.70199 | 4.57918 | |
| 38 | 4.641733 | 4.631041 | | 4.595365 | 4.4484 | |
| 39 | 4.675657 | 4.534518 | | 4.495838 | 4.400241 | |
| 40 | 4.478273 | 4.409012 | | 4.454583 | 4.237318 | |
| 41 | 4.363092 | 4.353055 | | 4.324913 | 4.208021 | |
| 42 | 4.304468 | 4.216587 | | 4.256739 | 4.024336 | |
| 43 | 4.236488 | 4.177128 | | 4.205563 | 4.166172 | |
| 44 | 4.183331 | 4.111865 | | 4.156206 | 4.190785 | |
| 45 | 4.145045 | 4.143485 | | 4.147734 | 4.290168 | |
| 46 | 4.125796 | 4.154344 | | 4.14935 | 4.223735 | |
| 47 | 4.127725 | 4.162382 | | 4.171721 | 4.257914 | |
| 48 | 4.150781 | 4.178343 | | 4.299187 | 4.284863 | |
| 49 | 4.163418 | 4.223030 | | 4.202902 | 4.342305 | |
| 50 | 4.239375 | 4.285239 | | 4.298071 | 4.286011 | |
| 51 | 4.254207 | 4.315678 | | 4.342807 | 4.427537 | |
| 52 | 4.327791 | 4.366563 | | 4.384964 | 4.457165 | |
| 53 | 4.309646 | 4.247155 | | 4.425568 | 4.504078 | |
| 54 | 4.406927 | 4.427102 | | 4.445360 | 4.530554 | |
| 55 | 4.446323 | 4.474348 | | 4.508014 | 4.573178 | |
| 56 | 4.494045 | 4.500271 | | 4.533985 | 4.591422 | |
| 57 | 4.511536 | 4.541715 | | 4.564903 | 4.628755 | |
| 58 | 4.54655 | 4.571490 | | 4.36827 | 4.654165 | |
| 59 | 4.676814 | 4.588151 | | 4.616948 | 4.677687 | |
| 60 | 4.601508 | 4.627837 | | 4.641576 | 4.666799 | |
| 61 | 4.634204 | 4.645508 | | 4.642718 | 4.719412 | |
| 62 | 4.645072 | 4.664002 | | 4.662557 | 4.73678 | |
| 63 | 4.664375 | 4.68332 | | 4.761398 | 4.732045 | |
| 64 | 4.683556 | 4.701453 | | 4.713989 | 4.736402 | |
| 65 | 4.700668 | 4.719149 | | 4.725443 | 4.823474 | |
| 66 | 4.717249 | 4.72418 | | 4.730588 | 4.797508 | |
| 67 | 4.703247 | 4.746526 | | 4.794336 | 4.806211 | |
| 68 | 4.740008 | 4.781502 | | 4.770682 | 4.814922 | |
| 69 | 4.756377 | 4.772143 | | 4.787572 | 4.823474 | |
| 70 | 4.709099 | 4.783258 | | 4.79695 | 4.536324 | |
| 71 | 4.77942 | 4.791522 | | 4.804883 | 4.843909 | |
| 72 | 4.796185 | 4.799874 | | 4.811782 | 4.850941 | |
| 73 | 4.722646 | 4.685414 | | 4.818314 | 4.887462 | |
| 74 | 4.709172 | 4.81929 | | 4.824996 | 4.865235 | |
| 75 | 4.806625 | 4.818716 | | 4.831874 | 4.87388 | |
| 76 | 4.812334 | 4.828227 | | 4.838296 | 4.880261 | |
| 77 | 4.818781 | 4.833230 | | 4.847607 | 4.889022 | |
| 78 | 4.827419 | 4.841178 | | 4.850136 | 4.894554 | |
| 79 | 4.835483 | 4.849516 | | 4.862137 | 4.908167 | |
| 80 | 4.84422 | 4.854302 | | 4.872949 | 4.918341 | |
| 81 | 4.652103 | 4.857756 | | 4.862587 | 4.923888 | |
| 82 | 4.862746 | 4.877752 | | 4.893049 | 4.935665 | |
| 83 | 4.873011 | 4.888351 | | 4.903991 | 4.95011 | |
| 84 | 4.883934 | 4.896585 | | 4.915094 | 4.960212 | |
| 85 | 4.895307 | 4.90688 | | 4.926317 | 4.978318 | |
| 86 | 4.906849 | 4.921909 | | 4.844652 | 4.983215 | |
| 87 | 4.915671 | 4.930394 | | 4.944582 | 4.953734 | |
| 88 | 4.924142 | 4.93481 | | 4.952597 | 4.991104 | |
| 89 | 4.933653 | 4.922509 | | 4.959553 | 4.997324 | |
| 90 | 4.939525 | 4.950668 | | 4.963356 | 5.001795 | |
| 91 | 4.845349 | 4.957832 | | 4.919192 | 5.006918 | |
| 92 | 4.956115 | 4.962164 | | 4.972978 | 5.006918 | |

| | | | | |
|---|---|---|---|---|
| 93 | 4.953778 | 4.965274 | 4.973418 | 5.000842 |
| 94 | 4.956309 | 4.967232 | 4.977397 | 5.004584 |
| 95 | 4.957578 | 4.969007 | 4.978359 | 5.006891 |
| 96 | 4.967453 | 4.967726 | 4.977738 | 5.000287 |
| 97 | 4.967516 | 4.968766 | 4.977458 | 5.000066 |
| 98 | 4.958723 | 4.967111 | 4.977775 | 5.011580 |
| 99 | 4.957521 | 4.967781 | 4.978838 | 5.013947 |
| 100 | 4.956059 | 4.960719 | 4.980695 | 5.011178 |
| 101 | 4.956588 | 4.971472 | 4.983384 | 5.021334 |
| 102 | 4.962547 | 4.974587 | 4.986982 | 5.326443 |
| 103 | 4.56026 | 4.973811 | 4.961508 | 5.022013 |
| 104 | 4.970683 | 4.985520 | 4.967519 | 5.339757 |
| 105 | 4.976612 | 4.989078 | 4.982016 | 5.000382 |
| 106 | 4.982453 | 4.996617 | 5.003063 | 5.247557 |
| 107 | 4.99063 | 5.064754 | 5.019766 | 5.261697 |
| 108 | 4.995053 | 5.013614 | 5.20365 | 5.270521 |
| 109 | 5.000274 | 5.022707 | 5.336685 | 5.075581 |
| 110 | 5.016434 | 5.030297 | 5.043772 | 5.065896 |
| 111 | 5.03191 | 5.036312 | 5.340032 | 5.065584 |
| 112 | 5.033345 | 5.040753 | 5.052455 | 5.064518 |
| 113 | 5.031835 | 5.043416 | 5.054348 | 5.083042 |
| 114 | 5.03379 | 5.044422 | 5.26444 | 5.062904 |
| 115 | 5.033998 | 5.043668 | 5.35272 | 5.070253 |
| 116 | 5.032299 | 5.042894 | 5.049106 | 5.060711 |
| 117 | 5.032572 | 5.333479 | 5.243256 | 5.061654 |
| 118 | 5.032251 | 5.02004 | 5.20617 | 5.063217 |
| 119 | 5.015648 | 5.031817 | 5.331819 | 5.042774 |
| 120 | 5.00646 | 5.011283 | 5.01542 | 5.02291 |
| 121 | 4.995494 | 5.000537 | 5.005930 | 5.003425 |
| 122 | 4.984529 | 4.990338 | 4.995918 | 5.014756 |
| 123 | 4.974577 | 4.989771 | 4.988559 | 5.007925 |
| 124 | 4.962878 | 4.972157 | 4.978706 | 5.000277 |
| 125 | 4.953378 | 4.964225 | 4.975501 | 4.294555 |
| 126 | 4.950718 | 4.957528 | 4.960258 | 4.955904 |
| 127 | 4.944542 | 4.953142 | 4.960711 | 4.953300 |
| 128 | 4.930403 | 4.94751 | 4.960012 | 5.333956 |
| 129 | 4.935313 | 4.943872 | 4.950626 | 4.982565 |
| 130 | 4.933346 | 4.941974 | 4.961278 | 4.953246 |
| 131 | 4.933526 | 4.943558 | 4.950563 | 4.962231 |
| 132 | 4.929924 | 4.940278 | 4.95079 | 4.953022 |
| 133 | 4.923777 | 4.940624 | 4.951577 | 4.934139 |
| 134 | 4.931312 | 4.941873 | 4.952343 | 4.955046 |
| 135 | 4.932255 | 4.945845 | 4.953939 | 4.997343 |
| 136 | 4.932548 | 4.944454 | 4.955478 | 4.960392 |
| 137 | 4.93327 | 4.945199 | 4.95727 | 4.97633 |
| 138 | 4.930844 | 4.948821 | 4.955535 | 4.994649 |
| 139 | 4.933578 | 4.950291 | 4.961056 | 4.956019 |
| 140 | 4.941157 | 4.952581 | 4.964273 | 4.999923 |
| 141 | 4.943778 | 4.956412 | 4.967157 | 5.003496 |
| 142 | 4.949965 | 4.958493 | 4.973439 | 5.006784 |
| 143 | 4.940837 | 4.961827 | 4.973548 | 5.007911 |
| 144 | 4.955365 | 4.965302 | 4.977001 | 5.005113 |
| 145 | 4.956897 | 4.96831 | 4.972248 | 5.000234 |
| 146 | 4.958238 | 4.969692 | 4.80305 | 5.007204 |
| 147 | 4.960047 | 4.969417 | 4.87827 | 5.004071 |
| 148 | 4.960287 | 4.969348 | 4.975609 | 4.999857 |
| 149 | 4.950019 | 4.96514 | 4.972938 | 4.8933 |
| 150 | 4.955902 | 4.96020 | 4.967242 | 4.881792 |
| 151 | 4.947108 | 4.953206 | 4.959536 | 4.273432 |
| 152 | 4.939739 | 4.945316 | 4.950252 | 4.901317 |
| 153 | 4.930573 | 4.93318 | 4.92019 | 4.945158 |
| 154 | 4.919572 | 4.923209 | 4.991447 | 4.934725 |
| 155 | 4.20073 | 4.909338 | 4.931507 | 4.921647 |
| 156 | 4.820362 | 4.894019 | 4.896908 | 4.81637 |
| 157 | 4.791156 | 4.879187 | 4.892124 | 4.901559 |
| 158 | 4.882209 | 4.860822 | 4.877271 | 4.894066 |
| 159 | 4.831608 | 4.837014 | 4.86449 | 4.85201 |
| 160 | 4.843694 | 4.831319 | 4.86846 | 4.202278 |
| 161 | 4.832248 | 4.843208 | 4.854581 | 4.866148 |
| 162 | 4.827843 | 4.848547 | 4.86042 | 4.905413 |
| 163 | 4.830738 | 4.852147 | 4.865168 | 4.914256 |
| 164 | 4.843056 | 4.858104 | 4.874607 | 4.933582 |
| 165 | 4.853756 | 4.869742 | 4.887023 | 4.945573 |
| 166 | 4.866045 | 4.882902 | 4.9003 | 4.994204 |
| 167 | 4.881964 | 4.901751 | 4.933168 | 4.993479 |
| 168 | 4.901540 | 4.922843 | 4.904455 | 5.002371 |
| 169 | 4.944308 | 4.946625 | 4.982967 | 5.033069 |
| 170 | 4.96525 | 4.961408 | 4.998838 | 5.045039 |
| 171 | 4.979053 | 4.985949 | 5.072393 | 5.054533 |
| 172 | 4.992131 | 5.007699 | 5.022393 | 5.060934 |
| 173 | 5.002457 | 5.016654 | 5.024945 | 5.06406 |
| 174 | 5.009965 | 5.022745 | 5.24561 | 5.064127 |
| 175 | 5.014329 | 5.025908 | 5.04245 | 5.061191 |
| 176 | 5.010101 | 5.02507 | 5.04668 | 5.064924 |
| 177 | 5.014315 | 5.022571 | 5.05078 | 5.047336 |
| 178 | 5.014393 | 5.017142 | 5.22896 | 5.33365 |
| 179 | 5.003908 | 5.00319 | 5.017376 | 5.033258 |
| 180 | 5.003051 | 4.99717 | 5.00255 | 5.017374 |
| 181 | 4.989971 | 4.985171 | 5.000427 | 5.006443 |
| 182 | 4.980975 | 4.991031 | 4.965908 | 4.995848 |
| 183 | 4.966232 | 4.978568 | 4.970041 | 4.954513 |
| 184 | 4.940233 | 4.968110 | 4.970045 | 4.947310 |
| 185 | 4.949593 | 4.954422 | 4.958140 | 4.973599 |
| 186 | 4.93568 | 4.945851 | 4.943470 | 4.932697 |
| 187 | 4.928129 | 4.933270 | 4.937251 | 4.952063 |
| 188 | 4.917557 | 4.923111 | 4.927067 | 4.941302 |
| 189 | 4.906068 | 4.911004 | 4.915160 | 4.920852 |
| 190 | 4.906063 | 4.911024 | 4.918301 | 4.890042 |
| 191 | 4.903418 | 4.90023 | 4.86439 | 4.888660 |
| 192 | 4.886513 | 4.590181 | | |
| 193 | 4.885114 | 4.890026 | 4.874514 | 4.888115 |
| 194 | 4.894521 | 4.899012 | 4.894218 | 4.878432 |
| 195 | 4.844505 | 4.949208 | 4.85097 | 4.828244 |
| 196 | 4.304474 | 4.333172 | 4.842887 | 4.858157 |
| 197 | 4.224433 | 4.824133 | 4.833893 | 4.845177 |
| 198 | 4.814481 | 4.818204 | 4.822943 | 4.338309 |
| 199 | 4.804543 | 5.326374 | 4.814129 | 4.82836 |
| 200 | 4.794907 | 4.799555 | 4.80443 | 4.818936 |
| 201 | 4.792039 | 4.790002 | 4.794851 | 4.809442 |
| 202 | 4.775777 | 4.793672 | 4.785268 | 4.806584 |
| 203 | 4.758327 | 4.773219 | 4.775078 | 4.790533 |
| 204 | 4.757140 | 4.702 | 4.766891 | 4.2518 |
| 205 | 4.748232 | 4.753211 | 4.757849 | 4.773250 |
| 206 | 4.734059 | 4.745497 | 4.748957 | 4.784132 |
| 207 | 4.730235 | 4.730205 | 4.342219 | 4.735543 |
| 208 | 4.715623 | 4.728379 | 4.731942 | 4.747120 |
| 209 | 4.713051 | 4.715117 | 4.722531 | 4.738886 |
| 210 | 4.704704 | 4.730023 | 4.314992 | 4.720023 |
| 211 | 4.696528 | 4.705703 | 4.706091 | 4.722195 |
| 212 | 4.686524 | 4.693192 | 4.696053 | 4.711368 |
| 213 | 4.683108 | 4.686008 | 4.691365 | 4.703912 |
| 214 | 4.673378 | 4.683811 | 4.683811 | 4.708345 |
| 215 | 4.665641 | 4.670377 | 4.676576 | 4.693491 |
| 216 | 4.658369 | 4.662914 | 4.669433 | 4.685657 |
| 217 | 4.651369 | 4.656590 | 4.662021 | 4.680948 |
| 218 | 4.644545 | 4.650222 | 4.655468 | 4.673071 |
| 219 | 4.637945 | 4.643706 | 4.649543 | 4.88753 |
| 220 | 4.631567 | 4.637419 | 4.64335 | 4.66153 |
| 221 | 4.625419 | 4.631366 | 4.637294 | 4.855970 |
| 222 | 4.619465 | 4.625552 | 4.631578 | 4.89057 |
| 223 | 4.613635 | 4.619979 | 4.626227 | 4.645419 |
| 224 | 4.608404 | 4.81465 | 4.620563 | 4.640228 |
| 225 | 4.602218 | 4.60957 | 4.615023 | 4.635500 |
| 226 | 4.596253 | 4.604745 | 4.611206 | 4.631565 |
| 227 | 4.585604 | 4.500179 | 4.606552 | 4.627516 |
| 228 | 4.589187 | 5.595483 | 4.602585 | 4.623771 |
| 229 | 4.585044 | 4.331873 | 4.599915 | 4.82234 |
| 230 | 4.581109 | 4.56817 | 5.595236 | 4.617231 |
| 231 | 4.575865 | 4.564782 | 5.593017 | 4.614434 |
| 232 | 4.574448 | 4.561115 | 5.58923 | 4.611920 |
| 233 | 4.571694 | 4.578976 | 4.56514 | 4.90972 |
| 234 | 4.56899 | 4.576559 | 4.564224 | 4.607773 |
| 235 | 4.568741 | 4.574424 | 4.562197 | 4.906079 |
| 236 | 4.564735 | 4.272023 | 4.58041 | 4.60402 |
| 237 | 4.562956 | 5.570603 | 4.570448 | 4.50338 |
| 238 | 4.561426 | 4.509417 | 5.57324 | 4.602201 |
| 239 | 4.560083 | 4.568219 | 4.61943 | 4.601202 |
| 240 | 4.55903 | 4.567243 | 4.919407 | 4.600385 |
| 241 | 4.558148 | 4.566388 | 4.574545 | 4.586527 |
| 242 | 4.557316 | 4.565552 | 4.573660 | 4.598676 |
| 243 | 4.556482 | 4.564714 | 4.572860 | 4.597821 |
| 244 | 4.555647 | 4.563834 | 4.57174 | 4.596100 |
| 245 | 4.554930 | 4.563233 | 4.571249 | 4.596156 |
| 246 | 4.552971 | 4.56319 | 4.570749 | 4.596249 |
| 247 | 4.553313 | 4.561345 | 4.569379 | 4.594389 |
| 248 | 4.552238 | 4.5606 | 4.568729 | 4.593528 |
| 249 | 4.551445 | 4.559653 | 5.63978 | 4.592665 |
| 250 | 4.5506 | 4.558804 | 4.567055 | 4.591501 |

Cash Reinvest Rate

LIBOR_1MO +.25

Generated on Oct 2, 2009 at 18:24 for Paul
Hoos of Highland Capital Management.
Information provided herein is believed by
INTEX to be accurate, but INTEX cannot
guarantee accuracy. Content is for
informational purposes only and is not an
offer, recommendation or solicitation to
purchase, hold, or sell any security.

Intex Solutions, Inc. +1 781-449-6222 in
Europe +44 20 7002 1050 in Japan +81 3
                    5117-0370

MSIM Peconic Bay newmarccollateral
reporting as of September 5, 2008

Lease Loss
Lease Tax
Lease PO#

| | | | | | | | | on-the-run Yield Curve | | | | | 1 mo | 3 mo | 6 mo | 2 yr | 5 yr | 10 yr | 30 yr | as of |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | The Yield Curve controls the pricing spreads, not the cashflows. Cashflows can be controlled in forward rates assumptions section." CLASS=PDScalable= | | | | | 0.681 | 0.930 | 1.197 | 1.668 | 2.654 | 3.83 | 4.154 | Oct 03 2008 10:52 EDT |
| | Tranche | | D (50363ae3) | | Orig Face $ | | FULL | Settle Date | 8/17/2008 | | | | | | | | | | | |

Forecast Assumptions

| | Strat | | Units | Solver | Detail | 1 mo = | 2 mo = | | 3 mo = | 4 mo = | 5 mo = | 6 mo = | 7 mo = |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | No Rate Shocks | | | | | | | | | | | |
| | | Precov value CPR | | | | 10 | | | | | | | |
| | | Default value COR | | | | 3 | | | | | | | |
| | Asset Extra fund | Loss Recovery % | | | | 30 | | | | | | | |
| | | Default value COR | | | | 3 | | | | | | | |
| | Loan | Loss Recovery % | | | | 70 | | | | | | | |
| | | Collat Reinvestment - per model | | | | | | | | | | | |
| | | per model - Liquidation Price | | | | | | | | | | | |
| | | Triggers per model | | | | | | | | | | | |
| | | Calls per model | | | | | | | | | | | |

Analysis Results

Results Table

| | | | $/100 Yield | |
|---|---|---|---|---|
| | 795 | | 75.9336 12.2167 | |
| | | | 75.7197 12.2880 | |
| | | Disc Margin 800 | 75.5045 12.3593 | |
| Cashflows | | | | |
| Deal Loss | 805 | | | |
| Waterfall | | | | |
| Index Results | | | | |
| Forecasted Triggers | | | | |

Additional
Analytics

| | | | |
|---|---|---|---|
| | | II | 7.34 |
| | | | 4.15 |
| | | | Jul06 - Jul06 |
| WAL | | | 0 |
| WAL of Interest Payments | | | 0.00% |
| Principal Window | | | 0 |
| Principal Writedown | | | |
| Principal Writedown Percentage | | | |
| Accum Int Shortfall | | | 95 |
| Accum Group Gap Shortfall | | | -5.45 |
| Min Credit Support Pct | | | 0.369 |
| Maturity Price | | | 19,172,259.22 |
| Mod Durn | | | 4.25% |
| Mod Convexity | | | 19,172,259.22 |
| Net Asset Loss | | | 4.94% |
| Net Asset Loss Percentage | | | 94,049,476.71 |
| Net Asset Loss (= historical) Percentage | | | 59.61% |
| Net Asset Loss Liquidation | | | |
| Net Asset Liquidation Percentage | | | |

Rates Forecast

| Forecast Rates Month | LIBOR 1MO | LIBOR 2MO | LIBOR 3MO | LIBOR 6MO | PRIME |
|---|---|---|---|---|---|
| 1 | 4.345 | 4.195 | 4.207 | 4.063 | |
| 2 | 4.152391 | 4.273594 | 4.157422 | 4.206668 | |
| 3 | 4.273103 | 4.14463 | 4.052362 | 3.894563 | |
| 4 | 3.895063 | 3.870232 | 3.538419 | 3.906382 | |
| 5 | 3.841561 | 3.828158 | 3.880393 | 3.901164 | |
| 6 | 3.796236 | 3.53725 | 3.59658 | 3.696657 | |
| 7 | 3.903888 | 3.933292 | 3.02251 | 3.913649 | |
| 8 | 3.949848 | 3.910072 | 3.004355 | 3.875486 | |
| 9 | 3.875541 | 3.803728 | 3.856479 | 3.780124 | |
| 10 | 3.849476 | 3.54422 | 3.603947 | 3.647836 | |
| 11 | 3.634255 | 3.83323 | 3.809533 | 3.468362 | |
| 12 | 3.879910 | 3.755074 | 3.659406 | 3.246815 | |
| 13 | 3.573135 | 3.52771 | 3.34431 | 3.879999 | |
| 14 | 3.391530 | 3.492258 | 3.09562 | 2.713162 | |
| 15 | 3.28029# | 2.847667 | 2.511001 | 2.472862 | |
| 16 | 3.759816 | 2.56634 | 2.5441 | 2.271828 | |
| 17 | 2.537960 | 2.411119 | 2.30687 | 2.122787 | |
| 18 | 2.280448 | 2.194297 | 2.1891 | 2.202446 | |
| 19 | 2.295848 | 2.229798 | 1.956915 | 2.031551 | |
| 20 | 1.969165 | 1.203029 | 1.92569 | 2.111396 | |
| 21 | 1.834799 | 1.90519 | 1.947066 | 2.272131 | |
| 22 | 1.915342 | 1.870987 | 2.066635 | 2.641333 | |
| 23 | 2.09193 | 2.13910 | 2.256196 | 2.783195 | |
| 24 | 2.243413 | 2.41313 | 2.504074 | 3.098472 | |
| 25 | 2.20103 | 2.149667 | 2.831530 | 3.424391 | |
| 26 | 2.910057 | 3.090342 | 3.251504 | 3.726193 | |
| 27 | 3.236172 | 3.425463 | 3.54914 | 4.023951 | |
| 28 | 3.565023 | 3.749087 | 3.803632 | 4.288998 | |
| 29 | 3.806013 | 4.043138 | 4.192738 | 4.510520 | |
| 30 | 4.177760 | 4.309612 | 4.429419 | 4.685693 | |
| 31 | 4.403112 | 4.537879 | 4.654118 | 4.827341 | |
| 32 | 4.603766 | 4.720706 | 4.704748 | 4.860453 | |
| 33 | 4.296161 | 4.540255 | 4.898235 | 4.871964 | |
| 34 | 4.590846 | 4.919130 | 4.923328 | 4.841454 | |
| 35 | 4.807344 | 4.916814 | 4.806407 | 4.771013 | |
| 36 | 4.302197 | 4.68209 | 4.607405 | 4.678911 | |
| 37 | 4.792446 | 4.749438 | 4.70150 | 4.57910 | |
| 38 | 4.501732 | 4.631841 | 4.595345 | 4.49484 | |
| 39 | 4.575697 | 4.534519 | 4.495656 | 4.490241 | |
| 40 | 4.419373 | 4.406012 | 4.404953 | 4.537218 | |
| 41 | 4.355103 | 4.302055 | 4.324613 | 4.358027 | |
| 42 | 4.304908 | 4.276547 | 4.256739 | 4.224220 | |
| 43 | 4.226368 | 4.217545 | 4.205320 | 4.189173 | |
| 44 | 4.183321 | 4.171805 | 4.168386 | 4.190585 | |
| 45 | 4.145945 | 4.134344 | 4.14729 | 4.223725 | |
| 46 | 4.137728 | 4.143362 | 4.131721 | 4.253814 | |
| 47 | 4.150781 | 4.192343 | 4.209197 | 4.296863 | |
| 48 | 4.193410 | 4.223835 | 4.232960 | 4.340305 | |
| 49 | 4.239315 | 4.289330 | 4.299011 | 4.369011 | |
| 50 | 4.254237 | 4.313679 | 4.342967 | 4.427337 | |
| 51 | 4.227191 | 4.356353 | 4.354494 | 4.407165 | |
| 52 | 4.306648 | 4.397765 | 4.425388 | 4.504458 | |
| 53 | 4.409827 | 4.437102 | 4.442383 | 4.539834 | |
| 54 | 4.449221 | 4.474248 | 4.500014 | 4.572178 | |
| 55 | 4.494045 | 4.509201 | 4.533905 | 4.602402 | |
| 56 | 4.517955 | 4.541715 | 4.564962 | 4.629150 | |
| 57 | 4.546083 | 4.583427 | 4.59627 | 4.654165 | |
| 58 | 4.379333 | 4.621037 | 4.791600 | 4.752945 | |
| 59 | 4.601938 | 4.619769 | 4.730998 | 4.705582 | |
| 60 | 4.604924 | 4.643340 | 4.602718 | 4.718472 | |
| 61 | 4.649072 | 4.664002 | 4.662637 | 4.70472 | |
| 62 | 4.604915 | 4.68332 | 4.781468 | 4.752945 | |
| 63 | 4.602936 | 4.701487 | 4.73549 | 4.705582 | |
| 64 | 4.701068 | 4.733443 | 4.718472 | 4.59430 | |
| 65 | 4.717090 | 4.742532 | 4.41806 | 4.702502 | |
| 66 | 4.728930 | 4.793480 | 4.25023 | 4.755291 | |
| 67 | 4.732347 | 4.735536 | 4.797002 | 4.709221 | |
| 68 | 4.744958 | 4.781452 | 4.716490 | 4.705582 | |
| 69 | 4.764227 | 4.773143 | 4.79695 | 4.305524 | |
| 70 | 4.77842 | 4.761532 | 4.804983 | 4.842909 | |
| 71 | 4.788155 | 4.759574 | 4.81172 | 4.856041 | |
| 72 | 4.783648 | 4.805414 | 4.818314 | 4.837062 | |
| 73 | 4.799013 | 4.811020 | 4.824969 | 4.665236 | |
| 74 | 4.808626 | 4.816316 | 4.831634 | 4.873068 | |
| 75 | 4.813534 | 4.822222 | 4.837289 | 4.862592 | |
| 76 | 4.818446 | 4.827458 | 4.842909 | 4.854703 | |
| 77 | 4.828198 | 4.837754 | 4.847967 | 4.855136 | |
| 78 | 4.835483 | 4.845656 | 4.853287 | 4.906187 | |
| 79 | 4.844453 | 4.858302 | 4.872848 | 4.918341 | |
| 80 | 4.853103 | 4.867758 | 4.882887 | 4.928885 | |
| 81 | 4.862748 | 4.877583 | 4.892040 | 4.939565 | |
| 82 | 4.871011 | 4.888391 | 4.900341 | 4.951 | |
| 83 | 4.883939 | 4.899563 | 4.915094 | 4.902252 | |
| 84 | 4.895307 | 4.910685 | 4.926151 | 4.969705 | |
| 85 | 4.906049 | 4.921806 | 4.935717 | 4.978318 | |
| 86 | 4.916011 | 4.930304 | 4.944052 | 4.985716 | |
| 87 | 4.925533 | 4.932810 | 4.956524 | 4.992134 | |
| 88 | 4.936069 | 4.952737 | 4.961966 | 5.001705 | |
| 89 | 4.945349 | 4.957932 | 5.004915 | 4.970310 | |
| 90 | 4.956115 | 4.962164 | 4.973870 | 5.009918 | |

| | | | | |
|---|---|---|---|---|
| 93 | 4.953773 | 4.965274 | 4.970418 | 5.000042 |
| 94 | 4.954309 | 4.967232 | 4.977787 | 5.006594 |
| 95 | 4.955073 | 4.968097 | 4.978059 | 5.008291 |
| 96 | 4.955855 | 4.967726 | 4.977758 | 5.009591 |
| 97 | 4.957118 | 4.967159 | 4.977458 | 5.019900 |
| 98 | 4.956723 | 4.967111 | 4.977775 | 5.011582 |
| 99 | 4.955721 | 4.967781 | 4.978338 | 5.013847 |
| 100 | 4.956059 | 4.969219 | 4.980095 | 5.017178 |
| 101 | 4.956588 | 4.971472 | 4.982394 | 5.021134 |
| 102 | 4.955547 | 4.965687 | 4.988482 | 5.022640 |
| 103 | 4.955669 | 4.976811 | 4.991568 | 5.022513 |
| 104 | 4.955603 | 4.933383 | 4.997019 | 5.038737 |
| 105 | 4.978012 | 4.988879 | 5.003562 | 5.047507 |
| 106 | 4.982485 | 4.966617 | 5.011183 | 5.055569 |
| 107 | 4.990005 | 4.994784 | 5.019786 | 5.063397 |
| 108 | 4.968690 | 5.013814 | 5.22865 | 5.070523 |
| 109 | 5.003074 | 5.027787 | 5.036888 | 5.078501 |
| 110 | 5.018454 | 5.036207 | 5.043712 | 5.086906 |
| 111 | 5.023191 | 5.035572 | 5.048922 | 5.083566 |
| 112 | 5.025365 | 5.042103 | 5.052495 | 5.084918 |
| 113 | 5.031535 | 5.043419 | 5.059340 | 5.083243 |
| 114 | 5.23379 | 5.044422 | 5.06444 | 5.082964 |
| 115 | 5.033898 | 5.045000 | 5.05272 | 5.076253 |
| 116 | 5.033209 | 5.049684 | 5.049136 | 5.069717 |
| 117 | 5.033072 | 5.036479 | 5.243624 | 5.081654 |
| 118 | 5.022238 | 5.30004 | 5.22817 | 5.052774 |
| 119 | 5.015448 | 5.021017 | 5.226846 | 5.042774 |
| 120 | 5.00648 | 5.011288 | 5.21842 | 5.32391 |
| 121 | 4.995494 | 5.006537 | 5.005838 | 5.023425 |
| 122 | 4.984329 | 4.999236 | 4.999618 | 5.014736 |
| 123 | 4.974377 | 4.992771 | 4.988658 | 5.007025 |
| 124 | 4.965979 | 4.987187 | 4.978706 | 5.000277 |
| 125 | 4.957876 | 4.984325 | 4.971501 | 4.994505 |
| 126 | 4.950758 | 4.957829 | 4.968258 | 4.993904 |
| 127 | 4.944542 | 4.952143 | 4.960111 | 4.992064 |
| 128 | 4.939392 | 4.94751 | 4.954012 | 4.993958 |
| 129 | 4.933313 | 4.942072 | 4.963028 | 4.982568 |
| 130 | 4.932245 | 4.941574 | 4.95123 | 4.982041 |
| 131 | 4.930536 | 4.945232 | 4.950503 | 4.98225 |
| 132 | 4.928924 | 4.949278 | 4.95079 | 4.963022 |
| 133 | 4.926377 | 4.943654 | 4.951037 | 4.964199 |
| 134 | 4.931212 | 4.941573 | 4.953063 | 4.985645 |
| 135 | 4.932156 | 4.943045 | 4.955938 | 4.987243 |
| 136 | 4.935648 | 4.944454 | 4.955478 | 4.995302 |
| 137 | 4.33507 | 4.941591 | 4.95727 | 4.991533 |
| 138 | 4.935844 | 4.940021 | 4.959325 | 4.994049 |
| 139 | 4.934379 | 4.950291 | 4.961656 | 4.996608 |
| 140 | 4.941157 | 4.952961 | 4.964273 | 4.999833 |
| 141 | 4.943779 | 4.950412 | 4.967197 | 5.002390 |
| 142 | 4.949565 | 4.954483 | 4.970409 | 5.000764 |
| 143 | 4.949837 | 4.961227 | 4.973844 | 5.001701 |
| 144 | 4.953369 | 4.960362 | 4.97001 | 5.005112 |
| 145 | 4.958307 | 4.96621 | 4.978146 | 5.009024 |
| 146 | 4.958338 | 4.966002 | 4.84005 | 5.007244 |
| 147 | 4.960047 | 4.959917 | 4.81927 | 5.004031 |
| 148 | 4.958287 | 4.966346 | 4.975689 | 4.990057 |
| 149 | 4.956919 | 4.96514 | 4.972906 | 4.9923 |
| 150 | 4.962024 | 4.96603 | 4.967042 | 4.882702 |
| 151 | 4.947160 | 4.953060 | 4.959538 | 4.873402 |
| 152 | 4.939789 | 4.943319 | 4.940253 | 4.901317 |
| 153 | 4.930573 | 4.93518 | 4.92915 | 4.848196 |
| 154 | 4.919571 | 4.922209 | 4.919107 | 4.834725 |
| 155 | 4.09072 | 4.908068 | 4.911597 | 4.81027 |
| 156 | 4.892065 | 4.894019 | 4.896956 | 4.81027 |
| 157 | 4.879158 | 4.879127 | 4.883124 | 4.901109 |
| 158 | 4.863309 | 4.866832 | 4.872271 | 4.894968 |
| 159 | 4.854666 | 4.857524 | 4.86949 | 4.89201 |
| 160 | 4.845659 | 4.851319 | 4.859806 | 4.882375 |
| 161 | 4.329244 | 4.844250 | 4.856481 | 4.896145 |
| 162 | 4.307842 | 4.848547 | 4.8804 | 4.963413 |
| 163 | 4.306710 | 4.852147 | 4.865703 | 4.914236 |
| 164 | 4.345016 | 4.820194 | 4.874007 | 4.910542 |
| 165 | 4.832758 | 4.809742 | 4.861623 | 4.945872 |
| 166 | 4.942645 | 4.820263 | 4.8031 | 4.904354 |
| 167 | 4.831964 | 4.961751 | 4.223568 | 4.803429 |
| 168 | 4.391588 | 4.822843 | 4.931087 | 4.902171 |
| 169 | 4.223973 | 5.044327 | 4.964405 | 5.018331 |
| 170 | 4.944908 | 4.964225 | 4.942047 | 5.033903 |
| 171 | 4.90322 | 4.891408 | 4.994326 | 5.045819 |
| 172 | 4.979053 | 4.995949 | 5.010903 | 5.054322 |
| 173 | 4.992131 | 5.007609 | 5.022323 | 5.000506 |
| 174 | 5.002457 | 5.016054 | 5.22941 | 5.06406 |
| 175 | 5.009905 | 5.022145 | 5.034181 | 5.04137 |
| 176 | 5.014385 | 5.025906 | 5.23246 | 5.061181 |
| 177 | 5.016281 | 5.02907 | 5.024572 | 5.005624 |
| 178 | 5.014916 | 5.023171 | 5.030276 | 5.047838 |
| 179 | 5.010483 | 5.017742 | 5.022396 | 5.02805 |
| 180 | 5.002998 | 5.00818 | 5.013278 | 5.028288 |
| 181 | 4.992557 | 4.997027 | 5.002385 | 5.011784 |
| 182 | 4.981871 | 4.988821 | 4.991721 | 5.006427 |
| 183 | 4.971094 | 4.975168 | 4.980072 | 4.995495 |
| 184 | 4.960232 | 4.965192 | 4.970405 | 4.984574 |
| 185 | 4.949522 | 4.954422 | 4.959216 | 4.973599 |
| 186 | 4.93856 | 4.943541 | 4.948304 | 4.962553 |
| 187 | 4.928109 | 4.932578 | 4.937751 | 4.952383 |
| 188 | 4.917557 | 4.922311 | 4.927568 | 4.941352 |
| 189 | 4.906958 | 4.911894 | 4.916433 | 4.930682 |
| 190 | 4.896408 | 4.901329 | 4.906855 | 4.920077 |
| 191 | 4.885914 | 4.890622 | 4.895339 | 4.909543 |
| 192 | 4.875481 | 4.880181 | 4.8848 | 4.899088 |
| 193 | 4.865114 | 4.865606 | 4.874514 | 4.888715 |
| 194 | 4.854221 | 4.859513 | 4.864218 | 4.878432 |
| 195 | 4.844055 | 4.849268 | 4.854007 | 4.868244 |
| 196 | 4.834474 | 4.839172 | 4.843887 | 4.858187 |
| 197 | 4.824433 | 4.839138 | 4.833360 | 4.848177 |
| 198 | 4.814487 | 4.819204 | 4.822564 | 4.838306 |
| 199 | 4.804642 | 4.809374 | 4.814199 | 4.82850 |
| 200 | 4.794967 | 4.299055 | 4.80443 | 4.818930 |
| 201 | 4.785233 | 4.790002 | 4.794351 | 4.809442 |
| 202 | 4.775777 | 4.780572 | 4.785368 | 4.800684 |
| 203 | 4.766267 | 4.771219 | 4.776018 | 4.790650 |
| 204 | 4.757146 | 4.7502 | 4.766591 | 4.7818 |
| 205 | 4.748032 | 4.753021 | 4.751848 | 4.772580 |
| 206 | 4.739056 | 4.743987 | 4.743057 | 4.294132 |
| 207 | 4.730235 | 4.735205 | 4.740218 | 4.755543 |
| 208 | 4.721563 | 4.726579 | 4.731642 | 4.747126 |
| 209 | 4.713048 | 4.718117 | 4.723321 | 4.728888 |
| 210 | 4.704704 | 4.709822 | 4.714990 | 4.730028 |
| 211 | 4.696528 | 4.701703 | 4.706931 | 4.72236 |
| 212 | 4.688526 | 4.693702 | 4.699053 | 4.715235 |
| 213 | 4.660709 | 4.656303 | 4.691365 | 4.703912 |
| 214 | 4.673018 | 4.678444 | 4.663831 | 4.700545 |
| 215 | 4.665441 | 4.671077 | 4.676378 | 4.693491 |
| 216 | 4.654422 | 4.643014 | 4.666443 | 4.686657 |
| 217 | 4.651389 | 4.65090 | 4.662021 | 4.680049 |
| 218 | 4.644549 | 4.65022 | 4.655909 | 4.672851 |
| 219 | 4.637845 | 4.643706 | 4.649543 | 4.66753 |
| 220 | 4.631562 | 4.637419 | 4.64338 | 4.66762 |
| 221 | 4.625459 | 4.631366 | 4.637294 | 4.654908 |
| 222 | 4.619507 | 4.625420 | 4.631478 | 4.66267 |
| 223 | 4.613635 | 4.619579 | 4.625207 | 4.645418 |
| 224 | 4.606454 | 4.61455 | 4.620563 | 4.640528 |
| 225 | 4.603218 | 4.60957 | 4.616102 | 4.635906 |
| 226 | 4.596283 | 4.604745 | 4.61129 | 4.631556 |
| 227 | 4.593604 | 4.600179 | 4.606832 | 4.627518 |
| 228 | 4.583187 | 4.595683 | 4.602485 | 4.622771 |
| 229 | 4.585044 | 4.591973 | 4.58851 | 4.62054 |
| 230 | 4.581196 | 4.55017 | 4.583235 | 4.614256 |
| 231 | 4.577065 | 4.584352 | 4.583177 | 4.614434 |
| 232 | 4.574448 | 4.563715 | 4.561523 | 4.615025 |
| 233 | 4.571554 | 4.339375 | 4.565514 | 4.60972 |
| 234 | 4.56599 | 4.566569 | 4.58422 | 4.607773 |
| 235 | 4.560341 | 4.574424 | 4.582197 | 4.606079 |
| 236 | 4.555634 | 4.572521 | 4.580405 | 4.60422 |
| 237 | 4.548566 | 4.570853 | 4.5735b4 | 4.602201 |
| 238 | 4.561408 | 4.568417 | 4.575524 | 4.601252 |
| 239 | 4.559073 | 4.566219 | 4.57343 | 4.601262 |
| 240 | 4.56002 | 4.567243 | 4.570441 | 4.600385 |
| 241 | 4.556148 | 4.565388 | 4.574545 | 4.595427 |
| 242 | 4.557216 | 4.565552 | 4.572605 | 4.594075 |
| 243 | 4.556482 | 4.564714 | 4.572962 | 4.587021 |
| 244 | 4.556647 | 4.563674 | 4.572118 | 4.599965 |
| 245 | 4.554929 | 4.563033 | 4.571214 | 4.590106 |
| 246 | 4.553971 | 4.56219 | 4.570427 | 4.595249 |
| 247 | 4.56313 | 4.561340 | 4.569939 | 4.594399 |
| 248 | 4.55238 | 4.5606 | 4.568720 | 4.593028 |
| 249 | 4.551445 | 4.559653 | 4.567839 | 4.592065 |
| 250 | 4.5508 | 4.558804 | 4.567029 | 4.591001 |

Cash Relevant Rate

LIBOR_1MO - 25

Generated on Oct 2, 2008 at 10:25 for Paul
Rove of Highland Capital Management.
Information provided herein is believed by
INTEX to be accurate, but INTEX cannot
guarantee accuracy. Content is for
informational purposes only and is not an
offer, recommendation or solicitation to
purchase, hold, or sell any security.

Intex Solutions, Inc. +1 781-449-6222 in
Europe +44 20 7002 1055 in Japan +81 3
5117-6370

MSIM Pecoris Bay (asset+collateral
reserves as of September 5, 2008

| | | | | | | | on-the-run Yield Curve | | 1 mo | 3 mo | 6 mo | 2 yr | 5 yr | 10 yr | 30 yr | as of |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | The Yield Curve contains the pricing spreads, not the cashflows. CashKnow can be consulted in lowest rates assumptions section: CLASS=PClickable+ | | | | | | | | | |
| Tranche | E (SS3682xx3) | | Orig Face $ | FULL | Settle Date | 9/17/2008 | | | 0.691 | 0.923 | 1.197 | 1.608 | 3.654 | 2.83 | 4.164 | Oct 02 2004 10:52 EDT |

Forecast Assumptions

| Strat | | | Units | Solver | Detail | 1 mo+ | 2 mo+ | | 3 mo+ | 4 mo+ | 5 mo+ | 6 mo+ | 7 mo+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | No Rate Shocks | | | | 10 | | | | | | | |
| | | Prepay using CPR | | | | 3 | | | | | | | |
| | | Default using CDR | | | | 30 | | | | | | | |
| Asset Loss Level | | Default using CDR | | | | 3 | | | | | | | |
| Loss | | Loss Recovery % | | | | 70 | | | | | | | |
| | | Collat Reinvestment - per model | | | | | | | | | | | |
| | | per model - Liquidation Price | | | | | | | | | | | |
| | | Triggers per model | | | | | | | | | | | |
| | | Calls per model | | | | | | | | | | | |

Analytic Results

| Results Table | | | | | | 6/100 Yield | |
|---|---|---|---|---|---|---|---|
| | | | | | | 72.8345 15.3990 | |
| | | Disc Margin 1150 | | | | 72.9340 15.0008 | |
| | Cashflows | 1145 | | | | 72.4792 15.0025 | |
| | Deal Loss | | | | | | |
| | Waterfall | 1155 | | | | | |
| | Index Results | | | | | | |
| | Forecasted Triggers | | | | | | |

Additional Analytics

| | | II 7.84 |
|---|---|---|
| | | 4.11 |
| | | Jul16 - Jul16 |
| WAL | | 0 |
| WAL of Interest Payments | | 0.00% |
| Principal Window | | |
| Principal Writedown | | |
| Principal Writedown Percentage | | 95 |
| Accrue Int Shortfall | | 4.814 |
| Accum Coup Gap Shortfall | | 0.335 |
| Min Credit Support Pct | | 19,172,250.27 |
| Maturity Bmark | | 4.33% |
| Mod Dum | | 10,172,250.27 |
| Mod Convexity | | 4.01% |
| Net Asset Loss | | 04,549,470.71 |
| Net Asset Loss Percentage | | 16.51% |
| Net Asset Loss (+ Historical) Percentage | | |
| Name referring to SPA Agent Liquidation | | |
| Net Asset Liquidation Percentage | | |

Rates Forecast

| Forecast Rates Month | LIBOR 1MO | LIBOR 2MO | LIBOR 3MO | LIBOR 6MO | LIBOR 9MO | PRIME |
|---|---|---|---|---|---|---|
| 1 | 4.045 | 4.308 | | 4.207 | 4.053 | 5 |
| 2 | 4.153001 | 4.273564 | | 4.197852 | 4.039085 | |
| 3 | 4.379032 | 4.14563 | | 4.053262 | 3.064460 | |
| 4 | 3.690002 | 3.810232 | | 3.854419 | 3.900303 | |
| 5 | 3.841691 | 3.826168 | | 3.660383 | 3.801194 | |
| 6 | 3.798256 | 3.55725 | | 3.89658 | 3.606887 | |
| 7 | 3.803888 | 3.833282 | | 3.92255 | 3.813589 | |
| 8 | 3.843840 | 3.819672 | | 3.904285 | 3.375486 | |
| 9 | 3.815541 | 3.868725 | | 3.86547B | 3.780124 | |
| 10 | 3.841418 | 3.81589 | | 3.864947 | 3.647638 | |
| 11 | 3.834265 | 3.82329 | | 3.866533 | 3.469782 | |
| 12 | 3.879918 | 3.355074 | | 3.659405 | 3.245315 | |
| 13 | 3.675336 | 3.83771 | | 3.30431 | 3.970099 | |
| 14 | 3.368783 | 3.342368 | | 3.090502 | 2.713150 | |
| 15 | 3.082294 | 3.841657 | | 2.811901 | 2.473353 | |
| 16 | 2.796815 | 2.56634 | | 2.5441 | 2.271826 | |
| 17 | 2.527965 | 2.411159 | | 2.30357 | 2.122737 | |
| 18 | 2.369448 | 2.194097 | | 2.11851 | 2.036445 | |
| 19 | 2.095946 | 2.022738 | | 1.840515 | 2.021681 | |
| 20 | 1.969165 | 1.920029 | | 1.82559 | 2.111590 | |
| 21 | 1.884759 | 1.90518 | | 1.841906 | 2.232131 | |
| 22 | 1.810362 | 1.075557 | | 2.095525 | 2.361333 | |
| 23 | 2.076183 | 2.139196 | | 2.256196 | 2.703198 | |
| 24 | 2.248413 | 2.41233 | | 2.634014 | 3.068472 | |
| 25 | 2.67162 | 2.744667 | | 3.021562 | 3.424301 | |
| 26 | 2.916057 | 3.090042 | | 3.291558 | 3.726103 | |
| 27 | 3.254712 | 3.420663 | | 3.58974 | 4.028551 | |
| 28 | 3.565523 | 3.744067 | | 3.83056 | 4.256066 | |
| 29 | 3.856013 | 4.043538 | | 4.160734 | 4.510526 | |
| 30 | 4.117703 | 4.309612 | | 4.428419 | 4.685492 | |
| 31 | 4.428152 | 4.527978 | | 4.634118 | 4.807341 | |
| 32 | 4.552756 | 4.720706 | | 4.79024B | 4.880635 | |
| 33 | 4.790161 | 4.882069 | | 4.882225 | 4.877064 | |
| 34 | 4.698549 | 4.819138 | | 4.803529 | 4.841484 | |
| 35 | 4.827344 | 4.818814 | | 4.690457 | 4.771013 | |
| 36 | 4.892197 | 4.83209 | | 4.827625 | 4.670811 | |
| 37 | 4.782446 | 4.740436 | | 4.72050 | 4.57918 | |
| 38 | 4.681753 | 4.837541 | | 4.595385 | 4.48484 | |
| 39 | 4.575697 | 4.524519 | | 4.495858 | 4.40041 | |
| 40 | 4.427973 | 4.430012 | | 4.404952 | 4.327318 | |
| 41 | 4.385392 | 4.353255 | | 4.321612 | 4.206027 | |
| 42 | 4.304656 | 4.278357 | | 4.256779 | 4.224225 | |
| 43 | 4.239566 | 4.217545 | | 4.233393 | 4.198173 | |
| 44 | 4.163221 | 4.171565 | | 4.195306 | 4.190705 | |
| 45 | 4.145948 | 4.143485 | | 4.147734 | 4.200266 | |
| 46 | 4.126766 | 4.134044 | | 4.14926 | 4.223738 | |
| 47 | 4.107728 | 4.148262 | | 4.151721 | 4.257814 | |
| 48 | 4.150781 | 4.178342 | | 4.20197 | 4.286651 | |
| 49 | 4.193418 | 4.223605 | | 4.253992 | 4.342805 | |
| 50 | 4.238375 | 4.269056 | | 4.299071 | 4.366011 | |
| 51 | 4.284267 | 4.313678 | | 4.342367 | 4.422637 | |
| 52 | 4.327201 | 4.356663 | | 4.384984 | 4.467165 | |
| 53 | 4.369645 | 4.397765 | | 4.425348 | 4.504675 | |
| 54 | 4.409527 | 4.437302 | | 4.463363 | 4.535854 | |
| 55 | 4.446601 | 4.474348 | | 4.500614 | 4.572419 | |
| 56 | 4.484345 | 4.509291 | | 4.535685 | 4.602402 | |
| 57 | 4.517855 | 4.541715 | | 4.564953 | 4.629785 | |
| 58 | 4.54965 | 4.571406 | | 4.59327 | 4.654755 | |
| 59 | 4.570814 | 4.598181 | | 4.618048 | 4.677687 | |
| 60 | 4.601930 | 4.621827 | | 4.641535 | 4.698799 | |
| 61 | 4.624204 | 4.643566 | | 4.662718 | 4.718412 | |
| 62 | 4.645072 | 4.664002 | | 4.682657 | 4.73079 | |
| 63 | 4.664815 | 4.68332 | | 4.701468 | 4.752945 | |
| 64 | 4.683506 | 4.701497 | | 4.719096 | 4.76982 | |
| 65 | 4.701968 | 4.718449 | | 4.735822 | 4.78436 | |
| 66 | 4.717345 | 4.73415 | | 4.750565 | 4.797500 | |
| 67 | 4.732341 | 4.748530 | | 4.764336 | 4.808211 | |
| 68 | 4.746908 | 4.761552 | | 4.776623 | 4.818402 | |
| 69 | 4.756277 | 4.773143 | | 4.787573 | 4.824434 | |
| 70 | 4.769099 | 4.783255 | | 4.78955 | 4.834524 | |
| 71 | 4.77842 | 4.791622 | | 4.804382 | 4.841009 | |
| 72 | 4.786155 | 4.808414 | | 4.811782 | 4.850041 | |
| 73 | 4.790943 | 4.819920 | | 4.816314 | 4.857012 | |
| 74 | 4.809028 | 4.831629 | | 4.821994 | 4.868202 | |
| 75 | 4.818334 | 4.818716 | | 4.831874 | 4.87269 | |
| 76 | 4.818304 | 4.822522 | | 4.83796 | 4.880563 | |
| 77 | 4.819781 | 4.833250 | | 4.847007 | 4.885502 | |
| 78 | 4.827416 | 4.841178 | | 4.855155 | 4.888554 | |
| 79 | 4.835483 | 4.849516 | | 4.852787 | 4.900167 | |
| 80 | 4.84435 | 4.858362 | | 4.872949 | 4.918341 | |
| 81 | 4.853101 | 4.867788 | | 4.881587 | 4.925889 | |
| 82 | 4.862748 | 4.877753 | | 4.893049 | 4.939565 | |
| 83 | 4.872011 | 4.888391 | | 4.902991 | 4.96011 | |
| 84 | 4.883508 | 4.899565 | | 4.916004 | 4.960282 | |
| 85 | 4.895307 | 4.910665 | | 4.925825 | 4.969155 | |
| 86 | 4.906945 | 4.921569 | | 4.935717 | 4.978215 | |
| 87 | 4.916471 | 4.930594 | | 4.944652 | 4.987315 | |
| 88 | 4.924743 | 4.93681 | | 4.955567 | 4.992124 | |
| 89 | 4.932633 | 4.945225 | | 4.959592 | 4.997534 | |
| 90 | 4.939512 | 4.952929 | | 4.965398 | 5.001705 | |
| 91 | 4.943349 | 4.957032 | | 4.970160 | 5.004615 | |
| 92 | 4.950115 | 4.962164 | | 4.972476 | 5.009918 | |

| | | | | |
|---|---|---|---|---|
| 251 | 4.549754 | 4.587093 | 4.566172 | 4.590036 |
| 252 | 4.542007 | 4.567103 | 4.566313 | 4.59007 |
| 253 | 4.543559 | 4.556251 | 4.564422 | 4.589203 |
| 254 | 4.54721 | 4.555399 | 4.562655 | 4.588325 |
| 255 | 4.545339 | 4.554544 | 4.562747 | 4.587456 |
| 256 | 4.545768 | 4.553669 | 4.561553 | 4.586597 |
| 257 | 4.544555 | 4.552833 | 4.560729 | 4.585726 |
| 258 | 4.543620 | 4.551970 | 4.560103 | 4.584855 |
| 259 | 4.542345 | 4.551119 | 4.560037 | 4.583983 |
| 260 | 4.542393 | 4.55028 | 4.558445 | 4.53311 |
| 261 | 4.541238 | 4.549401 | 4.557585 | 4.582237 |
| 262 | 4.540382 | 4.548542 | 4.55872 | 4.581364 |
| 263 | 4.539526 | 4.547682 | 4.556656 | 4.58049 |
| 264 | 4.538569 | 4.546822 | 4.554953 | 4.579616 |
| 265 | 4.537811 | 4.545961 | 4.554128 | 4.578742 |
| 266 | 4.536954 | 4.5451 | 4.553264 | 4.577867 |
| 267 | 4.536096 | 4.544238 | 4.552399 | 4.576993 |
| 268 | 4.535237 | 4.543377 | 4.551534 | 4.576118 |
| 269 | 4.534379 | 4.542515 | 4.550669 | 4.575243 |
| 270 | 4.533521 | 4.541653 | 4.549804 | 4.574368 |
| 271 | 4.532663 | 4.540792 | 4.548939 | 4.573494 |
| 272 | 4.531804 | 4.53993 | 4.548074 | 4.572619 |
| 273 | 4.530945 | 4.539068 | 4.547211 | 4.571743 |
| 274 | 4.530087 | 4.538207 | 4.546345 | 4.570872 |
| 275 | 4.529229 | 4.537345 | 4.545481 | 4.569998 |
| 276 | 4.528371 | 4.536465 | 4.544617 | 4.569123 |
| 277 | 4.527514 | 4.535623 | 4.543754 | 4.568253 |
| 278 | 4.526657 | 4.534760 | 4.542891 | 4.567381 |
| 279 | 4.5258 | 4.533908 | 4.542229 | 4.56651 |
| 280 | 4.524944 | 4.533046 | 4.541157 | 4.565638 |
| 281 | 4.524089 | 4.532150 | 4.540306 | 4.56477 |
| 282 | 4.523234 | 4.53133 | 4.539445 | 4.563861 |
| 283 | 4.52238 | 4.530474 | 4.538588 | 4.563033 |
| 284 | 4.521527 | 4.529618 | 4.537727 | 4.562166 |
| 285 | 4.520675 | 4.528762 | 4.536889 | 4.5619 |
| 286 | 4.519823 | 4.527908 | 4.536012 | 4.560435 |
| 287 | 4.518972 | 4.527055 | 4.535156 | 4.558971 |
| 288 | 4.518123 | 4.526202 | 4.534301 | 4.558708 |
| 289 | 4.517275 | 4.525352 | 4.533445 | 4.557847 |
| 290 | 4.516428 | 4.524502 | 4.532595 | 4.556987 |
| 291 | 4.515582 | 4.523654 | 4.531744 | 4.556128 |
| 292 | 4.514737 | 4.522806 | 4.530895 | 4.555271 |
| 293 | 4.513894 | 4.521961 | 4.530046 | 4.554416 |
| 294 | 4.513052 | 4.521116 | 4.5292 | 4.553562 |
| 295 | 4.512211 | 4.520273 | 4.528334 | 4.55271 |
| 296 | 4.511372 | 4.519432 | 4.527511 | 4.551639 |
| 297 | 4.510535 | 4.518593 | 4.526667 | 4.55101 |
| 298 | 4.509690 | 4.517754 | 4.525826 | 4.550103 |
| 299 | 4.508855 | 4.516918 | 4.524989 | 4.549318 |
| 300 | 4.508035 | 4.516084 | 4.524153 | 4.548475 |
| 301 | 4.507220 | 4.515251 | 4.523319 | 4.547634 |
| 302 | 4.506374 | 4.51421 | 4.522488 | 4.546795 |
| 303 | 4.505548 | 4.513592 | 4.521656 | 4.545956 |
| 304 | 4.504723 | 4.512766 | 4.520827 | 4.545121 |
| 305 | 4.502901 | 4.511941 | 4.520001 | 4.544282 |
| 306 | 4.503081 | 4.511118 | 4.519177 | 4.543452 |
| 307 | 4.502253 | 4.510299 | 4.518355 | 4.542620 |
| 308 | 4.501441 | 4.509432 | 4.517535 | 4.541788 |
| 309 | 4.500634 | 4.508667 | 4.516719 | 4.540958 |
| 310 | 4.499823 | 4.507854 | 4.515904 | 4.540156 |
| 311 | 4.499015 | 4.507044 | 4.515093 | 4.539351 |
| 312 | 4.498209 | 4.506236 | 4.514283 | 4.538537 |
| 313 | 4.497406 | 4.505431 | 4.513476 | 4.537725 |
| 314 | 4.496605 | 4.504629 | 4.512672 | 4.536917 |
| 315 | 4.495807 | 4.50383 | 4.511871 | 4.536111 |
| 316 | 4.495012 | 4.503033 | 4.511073 | 4.535309 |
| 317 | 4.494219 | 4.502239 | 4.510278 | 4.534509 |
| 318 | 4.49343 | 4.501448 | 4.509468 | 4.533713 |
| 319 | 4.492644 | 4.50066 | 4.508696 | 4.532919 |
| 320 | 4.49186 | 4.499876 | 4.50791 | 4.52213 |
| 321 | 4.49109 | 4.499094 | 4.507125 | 4.531343 |
| 322 | 4.490300 | 4.498316 | 4.506348 | 4.530566 |
| 323 | 4.48953 | 4.497541 | 4.505572 | 4.52978 |
| 324 | 4.488759 | 4.49677 | 4.504799 | 4.529004 |
| 325 | 4.487992 | 4.496002 | 4.50433 | 4.528231 |
| 326 | 4.487229 | 4.495237 | 4.503304 | 4.527461 |
| 327 | 4.486468 | 4.494475 | 4.502541 | 4.526695 |
| 328 | 4.485711 | 4.493717 | 4.501743 | 4.525933 |
| 329 | 4.484957 | 4.492962 | 4.500946 | 4.525173 |
| 330 | 4.484207 | 4.49221 | 4.500234 | 4.524422 |
| 331 | 4.48345 | 4.491462 | 4.499480 | 4.523673 |
| 332 | 4.482718 | 4.490721 | 4.498743 | 4.522929 |
| 333 | 4.48190 | 4.489983 | 4.498095 | 4.522189 |
| 334 | 4.481248 | 4.489225 | 4.497272 | 4.521418 |
| 335 | 4.480252 | 4.488332 | 4.496543 | 4.520572 |
| 336 | 4.479797 | 4.487799 | 4.495818 | 4.519999 |
| 337 | 4.479072 | 4.487078 | 4.495096 | 4.519275 |
| 338 | 4.478332 | 4.486338 | 4.494378 | 4.518553 |
| 339 | 4.479545 | 4.486441 | 4.493564 | 4.517830 |
| 340 | 4.47503 | 4.484922 | 4.492833 | 4.517091 |
| 341 | 4.478218 | 4.484207 | 4.492218 | 4.516383 |
| 342 | 4.478563 | 4.483492 | 4.491509 | 4.515607 |
| 343 | 4.474763 | 4.482787 | 4.490835 | 4.515006 |
| 344 | 4.474068 | 4.482068 | 4.490123 | 4.514342 |
| 345 | 4.47342 | 4.481427 | 4.489458 | 4.513635 |
| 346 | 4.47273 | 4.480772 | 4.488811 | 4.513025 |
| 347 | 4.472118 | 4.480138 | 4.488179 | 4.512302 |
| 348 | 4.471494 | 4.479519 | 4.487545 | 4.511556 |
| 349 | 4.47083 | 4.47888 | 4.486887 | 4.510925 |
| 350 | 4.47022 | 4.478207 | 4.486189 | 4.510190 |
| 351 | 4.469636 | 4.477489 | 4.485445 | 4.509585 |
| 352 | 4.468758 | 4.476728 | 4.484657 | 4.508841 |
| 353 | 4.468015 | 4.476018 | 4.483920 | 4.507975 |
| 354 | 4.467192 | 4.475603 | 4.483047 | 4.507424 |
| 355 | 4.466302 | 4.474321 | 4.482271 | 4.507029 |
| 356 | 4.465668 | 4.473729 | 4.481873 | |
| 357 | 4.46517 | 4.473331 | 4.481573 | |
| 358 | 4.46467 | 4.473128 | 4.491489 | |
| 359 | 4.46477 | 4.473122 | | |
| 360 | 4.464863 | | | |

Generated on Oct 2, 2008 at 19:36 for Paul Rioce of Highland Capital Management Information provided herein is believed by INTEX to be accurate, but INTEX cannot guarantee accuracy. Content is for informational purposes only and is not an offer, recommendation or solicitation to purchase, hold, or sell any security.

Intex Solutions, Inc. +1 781-449-6222 in Europe +44 20 3002 1055 in Japan +813
5117-6310

Whitehorse IV (WHMSB collateral)
reporting as of September 9, 2008

Losses Low
Losses Low
Losses PDF

| | | | | | | on-the-run Yield Curve | | 1 mo | 3 mo | 6 mo | 2 yr | 5 yr | 10 yr | 30 yr | as of |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | The Yield Curve controls the pricing spreads, not the cashflows. Cashflows can be controlled in forward rates assumptions section: CLASS=PClickable= | | 0.867 | 0.958 | 1.193 | 1.50 | 2.662 | 3.581 | 4.105 | |
| Timothe | B (WDT4zup2) | Grid Force S | FULL | Settle Date | 9/17/2008 | | | | | | | | | | |

Forecast Assumptions

| | Steal | | Units | Solver | Detail | 1 mo - | 2 mo - | | 3 mo - | 4 mo - | 5 mo - | 7 mo - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Asset Loss Sand | | | No Rate Shocks | | | | | | | | | |
| | | | Prepay using CPR | | 10 | | | | | | |
| | | | Default using CDR | | 3 | | | | | | |
| Loan | | | Loss Recovery % | | 30 | | | | | | |
| | | | Default using CDR | | 3 | | | | | | |
| | | | Loss Recovery % | | 70 | | | | | | |
| | | | CoKof Reinvestment - per model | | | | | | | | |
| | | | per model - Liquidation Price | | | | | | | | |
| | | | Triasers per model | | | | | | | | |
| | | | Calls per model | | | | | | | | |

Analytic Results

Results Table

| | | | | $100 Yield | |
|---|---|---|---|---|---|
| | 645 | | | 56.4410 16.7563 | |
| | | Disc Margin 550 | | 55.2120 18.6255 | |
| | 655 | | | 55.3953 19.3006 | |

Cashflows
Deal Loss
Waterfall
Index Results
Forecasted Triggers

Additional Analytics    II

| | |
|---|---|
| WAL | 8.06 |
| WAL of Interest Payments | 4.50 |
| Principal Window | Jul17 - Jan15 |
| Principal Withdrawn | 0 |
| Principal Withdrawn Percentage | 0.00% |
| Accion Int Shortfall | 0 |
| Accum Coop Cap Shortfall | |
| Min Coinid Support Pct | |
| Maturity Bmos | 113 |
| Mod Durn | 6.877 |
| Mod Convexity | 0.56 |
| Net Asset Loss | 27,544,083.07 |
| Net Asset Loss Percentage | 6.37% |
| Net Asset Loss (= historical) | 27,544,083.07 |
| Net Asset Loss (= historical) Percentage | 6.37% |
| Net Asset Liquidation | 90,420,651.31 |
| Net Asset Liquidation Percentage | 20.75% |

Rates Forecast

Rates corrected for OID at Prgt Lead

PRTPVR floor

| Forecast Month | LIBOR 1MO | LIBOR 2MO | LIBOR 3MO | PRIME |
|---|---|---|---|---|
| 1 | 4.11 | 4.200 | 4.234 | 5 |
| 2 | 4.287315 | 4.430524 | 4.274328 | |
| 3 | 4.688040 | 4.252103 | 4.135245 | |
| 4 | 3.821423 | 3.309144 | 3.685090 | |
| 5 | 3.874153 | 3.550503 | 3.640380 | |
| 6 | 3.814547 | 3.841505 | 3.400415 | |
| 7 | 3.855307 | 3.871044 | 3.68574 | |
| 8 | 3.874273 | 3.868434 | 3.693909 | |
| 9 | 3.690035 | 3.555158 | 3.681274 | |
| 10 | 3.867753 | 3.504360 | 3.685239 | |
| 11 | 3.848560 | 3.881451 | 3.638045 | |
| 12 | 3.901823 | 3.791523 | 3.64578 | |
| 13 | 3.689306 | 3.506320 | 3.340002 | |
| 14 | 3.337107 | 3.15581 | 3.066144 | |
| 15 | 3.660147 | 2.822753 | 3.686067 | |
| 16 | 2.654004 | 2.50004 | 2.358560 | |
| 17 | 2.341097 | 2.205603 | 2.009001 | |
| 18 | 2.003279 | 1.854474 | 1.855248 | |
| 19 | 1.640402 | 1.702149 | 1.310565 | |
| 20 | 1.681315 | 1.543139 | 1.930561 | |
| 21 | 1.502055 | 1.011960 | 1.057611 | |
| 22 | 1.519060 | 1.063274 | 1.390174 | |
| 23 | 1.745137 | 1.071033 | 2.027682 | |
| 24 | 1.895377 | 2.1729 | 2.273040 | |
| 25 | 2.360497 | 2.590529 | 3.750090 | |
| 26 | 2.751149 | 2.947446 | 3.140232 | |
| 27 | 3.136060 | 3.327149 | 3.511236 | |
| 28 | 3.508455 | 3.680382 | 3.800066 | |
| 29 | 3.855010 | 4.024101 | 4.176064 | |
| 30 | 4.176754 | 4.224194 | 4.456551 | |
| 31 | 4.456104 | 4.580007 | 4.606841 | |
| 32 | 4.587563 | 4.784443 | 4.868247 | |
| 33 | 4.86230 | 4.827571 | 4.906592 | |
| 34 | 4.872206 | 9.000601 | 5.067323 | |
| 35 | 5.003403 | 4.990581 | 4.956179 | |
| 36 | 4.942447 | 4.912563 | 4.856396 | |
| 37 | 4.843503 | 4.780570 | 4.73235 | |
| 38 | 4.711454 | 4.65457 | 4.607025 | |
| 39 | 4.567245 | 4.538326 | 4.493512 | |
| 40 | 4.472211 | 4.423625 | 4.396596 | |
| 41 | 4.380066 | 4.332247 | 4.300552 | |
| 42 | 4.278560 | 4.250573 | 4.226153 | |
| 43 | 4.207085 | 4.187362 | 4.174618 | |
| 44 | 4.153119 | 4.143850 | 4.142433 | |
| 45 | 4.133333 | 4.122777 | 4.13331 | |
| 46 | 4.111105 | 4.129529 | 4.15153 | |
| 47 | 4.127812 | 4.19175 | 4.195029 | |
| 48 | 4.172634 | 4.215026 | 4.236207 | |
| 49 | 4.242450 | 4.265825 | 4.307877 | |
| 50 | 4.31301 | 4.350174 | 4.394942 | |
| 51 | 4.300609 | 4.410571 | 4.497743 | |
| 52 | 4.442335 | 4.410421 | 4.510982 | |
| 53 | 4.467950 | 4.531132 | 4.562161 | |
| 54 | 4.547202 | 4.607107 | 4.604564 | |
| 55 | 4.560561 | 4.615204 | 4.606352 | |
| 56 | 4.624251 | 4.640477 | 4.638084 | |
| 57 | 4.656072 | 4.666584 | 4.66334 | |
| 58 | 4.666503 | 4.58178 | 4.691767 | |
| 59 | 4.610602 | 4.565172 | 4.690547 | |
| 60 | 4.67528 | 4.819303 | 4.443443 | |
| 61 | 4.66517 | 4.568893 | 4.623194 | |
| 62 | 4.65452 | 4.550033 | 4.664165 | |
| 63 | 4.645527 | 4.650940 | 4.657008 | |
| 64 | 4.638411 | 4.644537 | 4.653300 | |
| 65 | 4.633304 | 4.640594 | 4.649430 | |
| 66 | 4.630504 | 4.659546 | 4.645302 | |
| 67 | 4.630534 | 4.642772 | 4.653345 | |
| 68 | 4.633133 | 4.644979 | 4.657742 | |
| 69 | 4.638712 | 4.662365 | 4.666665 | |
| 70 | 4.647403 | 4.502017 | 4.679030 | |
| 71 | 4.656065 | 4.675595 | 4.6948 | |
| 72 | 4.675539 | 4.694124 | 4.712756 | |
| 73 | 4.694419 | 4.713004 | 4.73135 | |
| 74 | 4.713152 | 4.731307 | 4.749232 | |
| 75 | 4.730601 | 4.749270 | 4.705091 | |
| 76 | 4.747155 | 4.764761 | 4.781565 | |
| 77 | 4.753123 | 4.77361 | 4.790172 | |
| 78 | 4.777552 | 4.73407 | 4.809401 | |
| 79 | 4.790723 | 4.80629 | 4.821473 | |
| 80 | 4.802573 | 4.817018 | 4.831124 | |
| 81 | 4.8153 | 4.827583 | 4.841404 | |
| 82 | 4.822563 | 4.836193 | 4.845368 | |
| 83 | 4.830411 | 4.843330 | 4.855650 | |
| 84 | 4.836707 | 4.849127 | 4.661372 | |

Cash Reinvest Rate

LIBOR_1MO +.25

Generated on Oct 3, 2008 at 07:02 for Paul Risca of Highland Capital Management. Information provided herein is believed by INTEX to be accurate, but INTEX cannot guarantee accuracy. Content is for informational purposes only and is not an offer, recommendation or solicitation to purchase, hold, or sell any security.

Intex Solutions, Inc. +1 781-449-6222 in Europe +44 20 7002 1055 in Japan +81 3 5117-6370

Invoice No. UG 1090459

Michael Colvin, Esq.
Galleria Tower II
Highland Capital Management, L.P.
12455 Noel Road - Suite 800
Dallas, TX 75240

Invoice Date: 09/30/2008
Client Number : 041579
Matter Number: 0024

Employer Identification
Number 13-2633996

# Schulte Roth & Zabel LLP
919 Third Avenue, New York, NY 10022

Re: REPO

FOR PROFESSIONAL SERVICES RENDERED through September 30, 2008,
in connection with Lehman REPO as more fully described on the attached detailed billing report:

Total Fees                                      $9,333.50

TOTAL AMOUNT OF THIS INVOICE          $9,333.50

SRZ-10760500.1

041579      Highland Capital Management L.P.                 Invoice No. UG 1090459
0024        REPO                                             Page 2
09/30/2008

| Date | Timekeeper | | Hours |
|------|-----------|---|-------|
| 08/05/08 | D.M. Hillman | Review bankruptcy issues; telephone conference with Udi Grofman. | 0.3 |
| 08/14/08 | C. Ruiz | Finished revising Chart related to repos. | 0.3 |
| 08/22/08 | C. Ruiz | Finished adding grace periods chart to MRA & GMRA and other definitions; Telephone call from Highland (Jason) re other FTP file of documents. | 1.0 |
| 09/14/08 | L.V. Gelber | T/c's, correspondence re: broker/dealer insolvency issues. | 0.8 |
| 09/14/08 | U. Grofman | Call and prepare for call re LEH | 0.3 |
| 09/15/08 | B. Busineau | Review and analysis of GMRA re event of default process; conference with K. Boggiano re same. | 2.5 |
| 09/15/08 | K. Boggiano | Conference call to discuss agreements and review and analysis of GMRA process; review and revisions to the notice of eod. | 4.0 |
| 09/15/08 | R. Feldman | Lehman-GMRA query; call with client. Lehman query; call with client. | 1.0 |
| 09/16/08 | C. Stein | Tc on repo process. | 0.5 |
| 09/17/08 | B. Busineau | Communications with K. Boggiano and J. Post re GMRA default notice and calculations. | 0.3 |
| 09/19/08 | K. Boggiano | Outline of process of valuation under GMRA; multiple discussions with client regarding mechanics of unwind of gmra. | 2.2 |
| 09/21/08 | M.G. Insalaco | Attention to repo review in respect of Highland Floating Rate Advantage Fund, Highland Floating Rate Fund, Highland Floating Rate LLC, Highland Distressed Opportunities Fund, Inc., Highland Credit Strategies Fund; | 1.0 |
| 09/22/08 | K. Boggiano | Discussions related to gmra; internal discussions; review of agreement for treatment; additional review of default provisions of agreement | 1.8 |

TOTAL HOURS     16.0

TIMEKEEPER TIME SUMMARY:

| Timekeeper | Hours | | Rate | | Value |
|-----------|-------|---|------|---|-------|
| C. Stein | 0.5 | at | 755.00 | = | 377.50 |
| L.V. Gelber | 0.8 | at | 695.00 | = | 556.00 |
| D.M. Hillman | 0.3 | at | 695.00 | = | 208.50 |
| U. Grofman | 0.3 | at | 695.00 | = | 208.50 |

SRZ-10760500.1

041579    Highland Capital Management L.P.                Invoice No. UG 1090459
0024      REPO                                                           Page 3
09/30/2008

| Timekeeper | Hours | | Rate | | Value |
|---|---|---|---|---|---|
| K. Boggiano | 8.0 | at | 625.00 | = | 5,000.00 |
| M.G. Insalaco | 1.0 | at | 510.00 | = | 510.00 |
| B. Busineau | 2.8 | at | 550.00 | = | 1,540.00 |
| R. Feldman | 1.0 | at | 595.00 | = | 595.00 |
| C. Ruiz | 1.3 | at | 260.00 | = | 338.00 |
| Totals | 16.0 | at | | = | 9,333.50 |

CURRENT FEES                                              $9,333.50


TOTAL AMOUNT OF THIS INVOICE                              $9,333.50

SRZ-10760500.1

**Highland CDO Opportunity Master Fund, L.P.**
Missing Coupon Payments

| Issuer Name | Asset Name | Holder | Commitment | Global | % Ownership | Global Pmt | CDO Pmt | Interest | Date Due |
|---|---|---|---|---|---|---|---|---|---|
| Light 2006-5A B | Floating - 09/2019 - B - 53225^ | Lehman | 9,500,000 | 34,500,000 | 27.54% | 89,935.59 | 85,439.76 | $ 85,439.76 | 8/9/2008 |
| WITEH 2006 - 4A B | Floating - 01/2020 - B - 985241 | Lehman | 2,000,000 | 25,000,000 | 8.00% | 88,061.46 | 17,612.29 | 17,612.29 | 7/18/2008 |
| | | | | | | | Total | $ 103,052.05 | |

**Jason Post**

| | |
|---|---|
| **From:** | Ryan Grateke |
| **Sent:** | Wednesday, October 01, 2008 3:08 PM |
| **To:** | Jason Post |
| **Subject:** | FW: CDO Fund P&I |

Here is the one for the $85k.

**From:** DelliCarpini, Gianna [mailto:gianna.dellicarpini@lehman.com]
**Sent:** Monday, August 18, 2008 9:55 AM
**To:** CouponsMumbai; Ryan Grateke
**Cc:** REPO SALES SUPPORT
**Subject:** RE: CDO Fund P&I

Sushil,

I believe the customer accounts are MTS 1759230, 1759260
Thanks
Gianna

**From:** Tripathi, Sushilkumar **On Behalf Of** CouponsMumbai
**Sent:** Monday, August 18, 2008 10:44 AM
**To:** 'Ryan Grateke'; CouponsMumbai
**Cc:** REPO SALES SUPPORT; DelliCarpini, Gianna
**Subject:** RE: CDO Fund P&I

Hi,

Can you pls confirm the paydate for the below coupon and the account against which the trade has been settled.

Thanks,
Sushil

**From:** DelliCarpini, Gianna
**Sent:** Monday, August 18, 2008 8:07 PM
**To:** 'Ryan Grateke'; CouponsMumbai
**Cc:** REPO SALES SUPPORT
**Subject:** RE: CDO Fund P&I

Coupons Mumbai,

Ryan is looking for payment on the below coupons.  Is someone able to assist in confirming?

53225VAE9 – $85,439.76
Westchester Pref – $1,299,707.75

Thanks
Gianna

**From:** Ryan Grateke [mailto:RGrateke@hcmlp.com]
**Sent:** Monday, August 18, 2008 10:28 AM
**To:** DelliCarpini, Gianna

**Cc:** REPO SALES SUPPORT
**Subject:** RE: CDO Fund P&I

Yes.

---

**From:** DelliCarpini, Gianna [mailto:gianna.dellicarpini@lehman.com]
**Sent:** Monday, August 18, 2008 8:56 AM
**To:** Ryan Grateke
**Cc:** REPO SALES SUPPORT
**Subject:** RE: CDO Fund P&I

Hi Ryan,

Is this for a coupon payment?

Thanks
Gianna

---

**From:** Ryan Grateke [mailto:RGrateke@hcmlp.com]
**Sent:** Monday, August 18, 2008 9:46 AM
**To:** DelliCarpini, Gianna
**Subject:** CDO Fund P&I

Hi Gianna – you should have received the following on our behalf.  Please send to the following.  Thanks.

53225VAE9 - $85,439.76
Westchester Pref - $1,299,707.75


The Bank of New York

██████████████████████

**Attention:** Marisela Rodriguez, 713-483-6604
**Reference:** (Borrower Name, Type of Payment/description)
**Email:** mariselarodriguez@bankofny.com


**Ryan Grateke**
Highland Capital Management, LP
13455 Noel Road, Suite 800
Dallas, TX 75240
Office: 972-628-4168
Fax: 972-628-4142
www.hcmlp.com

---

Highland Capital Management is growing. Check out Careers at www.hcmlp.com.
---------------------------------------------
DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is

2

strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice. -------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice. -------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Jason Post

| | |
|---|---|
| From: | Chiara, Michael [michael.chiara@lehman.com] |
| Sent: | Thursday, September 11, 2008 9:19 AM |
| To: | Clifford Stoops; Oxana Brown; Ryan Grateke; Paul Roos; Scott Crowell |
| Cc: | DelliCarpini, Gianna |
| Subject: | 9/12 REPO ROLLS |
| Attachments: | CDO Roll 09-12-08.xls |

Good Morning

2 trades are set to roll tomorrow.
Details are attached, same HC and spread as last month.
Please let us know if you would like to roll 1m.
Thx
Mike

    <<CDO Roll 09-12-08.xls>>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product,
an official confirmation of any transaction, or as an official statement of Lehman Brothers.
Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as
such.  All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication
(including any attachments) is not intended or written to be used and cannot be used for the
purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

1



| Cusip | Description | Factor | Par | Start | End | PX | HC | LOAN | BASE | SPREAD | REPO RATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 553663AD5 | MSPB 2007-1A C | 1.00 | 10,000,000 | 9/12/2008 | 10/14/2008 | 79.06 | 30.00 | 5,572,000.00 | 2.48 | 1.00 | |
| 553663AE3 | MSPB 2007-1A D | 1.00 | 8,000,000 | 9/12/2008 | 10/14/2008 | 45 | 40.00 | 3,600,000.00 | 2.48 | 1.25 | |

Jason Post

| | |
|---|---|
| **From:** | Chiara, Michael [michael.chiara@lehman.com] |
| **Sent:** | Monday, September 08, 2008 6:21 AM |
| **To:** | Ryan Grateke; Jenna Bridges; Paul Roos; Scott Crowell |
| **Cc:** | DelliCarpini, Gianna |
| **Subject:** | 9-8 rolls |
| **Attachments:** | CDO Roll 09-08-08.xls |

Good Morning

2 repos are set to roll off today.
We can roll at the same spread and HC as last month.
Lightpoint was marked up, Whitehorse was marked down.
Please let us know if you would like to roll as per the attached.
Thanks
   <<CDO Roll 09-08-08.xls>>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product,
an official confirmation of any transaction, or as an official statement of Lehman Brothers.
Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as
such.  All information is subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication
(including any attachments) is not intended or written to be used and cannot be used for the
purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.



| Cusip | Par | Start | End | px | hc | loan | base | spread | repo rate | RATING | DEAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 53225VAE9 | 9,500,000 | 9/8/2008 | 10/8/2008 | 68.9600 | 40% | 3,930,720.00 | 2.49 | 1.00 | 3.49 | A | CSFB |
| 96524UAC2 | 2,000,000 | 9/8/2008 | 10/8/2008 | 64.2000 | 40% | 770,400.00 | 2.49 | 1.00 | 3.49 | A-1 | CSFB |

Jason Post

| | |
|---|---|
| From: | Chiara, Michael [michael.chiara@lehman.com] |
| Sent: | Tuesday, September 02, 2008 3:42 PM |
| To: | Ryan Grateke; Jenna Bridges; Paul Roos; Scott Crowell |
| Cc: | DelliCarpini, Gianna |
| Subject: | CDO Rolls 09-02-08.xls |
| Attachments: | CDO Rolls 09-02-08.xls |

Afternoon

We have 2 repo trades that matured today.  Apologies for not sending
roll details earlier.
We can roll at the same terms (HC and spread) as last month.
The marks are within 1 pt of last month's marks.
Pls let us know if you would like to roll as per the attached.
Thanks
Mike


<<CDO Rolls 09-02-08.xls>>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product,
an official confirmation of any transaction, or as an official statement of Lehman Brothers.
Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not
represent that this information is complete or accurate and it should not be relied upon as
such.  All information is subject to change without notice.


- - - - - - - -
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication
(including any attachments) is not intended or written to be used and cannot be used for the
purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

| Cusip | Par | Start | End | HC | PRICE | LOAN | BASE | SPREAD | REPO RATE |
|---|---|---|---|---|---|---|---|---|---|
| 95736XAG3 | 9,500,000 | 9/2/2008 | 10/2/2008 | 50% | 64.39 | 3,058,525.00 | 2.49 | 1.75 | 4.24 |

| Cusip | Par | Start | End | HC | PRICE | LOAN | BASE | SPREAD | REPO RATE |
|---|---|---|---|---|---|---|---|---|---|
| 553682AA3 | 4,000,000 | 9/2/2008 | 10/2/2008 | 60% | 73.43 | 1,174,880.00 | 2.49 | 1.75 | 4.24 |

HTR

Mtge **HTR**

# HISTORICAL TOTAL RETURN

LIGHT 2006-5A B SUB,FLT          3.513%   Original Face:  ▓▓▓▓▓▓▓   1   1

Total Value  9,500,000.00

| SUMMARY | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|---------|--------|-------------|-------|---------------|-------------|
| Start: | ▓▓▓ Aug | 9,500,000.00 | ▓▓▓ | | 9,500,000.00 |
| End: | ▓▓▓ Aug | 9,500,000.00 | ▓▓▓ | .00 | 9,534,295.66 |

Trade Basis
**3.636% CBE RETURN**
0.361% holding period return

Mode: ▓ B-Book, T-Trade
Method: ▓ 1-CD, 2-CBE

Reinv to   Reinv
9/17/08    Same?▓

| Date | CMO Balance | Principal | Interest | Total P+I |
|------|-------------|-----------|----------|-----------|

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900       Singapore 65 6212 1000      U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                              G743-717-1 18-Sep-2008 07:28:17

**Bloomberg**
.TERMINAL

553683AD5 Mtge HTR                                        Mtge **HTR**

**HISTORICAL TOTAL RETURN**                                    1    1

MSPB 2007-1A C MEZ,FLT          4.786%  Original Face: ▓▓▓▓▓▓▓▓▓▓  10,000,000.00

| SUMMARY | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|---------|--------|-------------|-------|---------------|-------------|
| Start: ▓▓▓▓▓ | Jul | 10,000,000.00 | ▓▓▓▓▓▓▓ | | 10,000,000.00 |
| End: ▓▓▓▓▓▓ | Jul | 10,000,000.00 | ▓▓▓▓▓▓▓ | .00 | 10,077,111.81 |

Trade Basis                                ▓▓▓▓▓▓▓▓▓▓▓▓▓

**5.000% CBE RETURN**

Mode: ▓ B-Book, T-Trade        0.771% holding period return              Reinv
Method: ▓ 1-CD, 2-CBE                                        Reinv to    ▓▓
                                                            9/17/08  Same?▓

Date        CMO Balance      Principal      Interest    Total P+I

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900        Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                            G743-717-1 18-Sep-2008 07:29:04

**Bloomberg**
TERMINAL

Mtge **HTR**

HTR

# HISTORICAL TOTAL RETURN

MSPB 2007-1A D MEZ,FLT          6.036%   Original Face: ▓▓▓▓▓▓▓

| SUMMARY | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|---------|--------|-------------|-------|---------------|-------------|
| Start:  | ▓▓▓▓ Jul | 8,000,000.00 | ▓▓▓▓ |  | 8,000,000.00 |
| End:    | ▓▓▓▓ Jul | 8,000,000.00 |  | .00 | 8,077,800.56 |

Trade Basis
## 6.319% CBE RETURN
0.973% holding period return

Mode: ▓ B-Book, T-Trade
Method: ▓ 1-CD, 2-CBE

Reinv to   Reinv
9/17/08   Same?▓

| Date | CMO Balance | Principal | Interest | Total P+I |
|------|-------------|-----------|----------|-----------|

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
6743-717-0 18-Sep-2008 08:15:18

**Bloomberg**
TERMINAL

553682AA3 Mtge HTR                                             Mtge  **HTR**

# HISTORICAL TOTAL RETURN                    1    1

MSPB 2007-1A E MEZ,FLT          8.286%  Original Face: ▓▓▓▓▓

| SUMMARY: | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|----------|--------|-------------|-------|---------------|-------------|
|          |        |             |       |               | 4,000,000.00 |
| Start: ▓▓▓▓ | Jul | 4,000,000.00 |       |               | 4,000,000.00 |
| End: ▓▓▓▓ | Jul | 4,000,000.00 | ▓▓▓▓ | .00 | 4,053,400.28 |

Trade Basis
**8.710% CBE RETURN**
1.335% holding period return

Mode: ▓ B-Book, T-Trade
Method: ▓ 1-CD, 2-CBE

Reinv▓
Reinv to  ▓▓▓▓
9/17/08  Same?▓

| Date | CMO Balance | Principal | Interest | Total P+I |
|------|-------------|-----------|----------|-----------|

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000     U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
                                                                              G743-717-1 18-Sep-2008 07:29:58

**Bloomberg**
TERMINAL

HTR

Mtge **HTR**

## HISTORICAL TOTAL RETURN    1    1

WITEH 2006-4A B SUB,FLT        3.535%  Original Face: ▓▓▓▓

| SUMMARY | Factor | Tranche Bal | Price | P + I + Reinv | Total Value |
|---|---|---|---|---|---|
| | | | | | 2,000,000.00 |
| Start: | ▓▓▓ Jul | 2,000,000.00 | ▓▓▓ | | 2,011,979.72 |
| End: | ▓▓▓ Jul | 2,000,000.00 | ▓▓▓ | .00 | |

Trade Basis
**3.677% CBE RETURN**
0.599% holding period return

Mode: ▓ B-Book, T-Trade
Method: ▓ 1-CD, 2-CBE

Reinv
Reinv to ▓▓▓
9/17/08   Same?▓

| Date | CMO Balance | Principal | Interest | Total P+I |
|---|---|---|---|---|

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000    U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
6743-717-0 18-Sep-2008 08:16:07

**Bloomberg**
TERMINAL

# LEHMAN BROTHERS ‖ Fixed Income Financing MTM Statement

TO: HIGHLAND CDO OPP MASTER
A/C#: 476230
C/P NAME: HIGHLAND CDO OPPORTUNITY MASTER FUND L.P.
PHONE:
FAX:
EMAIL: highland.collateral@hedge.fund.services.com

DATE: 09-Sep-2008
COB VALUATION DATE: 08-Sep-2008
REPORTING CCY: USD

*POSITIVE NUMBERS = LEHMAN RECEIVABLE*
*NEGATIVE NUMBERS = LEHMAN PAYABLE*

| Summary | |
|---|---|
| Economic Exposure | (958,699) |
| Margin/Default Amount | 9,735/(89) |
| Margin Exposure | (287,856) |
| Clean Trade Collateral | 485,291 |
| Stability Free Collateral | 0 |
| Political Margin Requirement | 0 |

FROM: LEHMAN BROTHERS INTERNATIONAL (EUROPE)
PHONE: TRACY AGARD / 212-526-2174
FAX: 917-522-0262
EMAIL: joy@lehman.com

## Detail

### Deal Type: RR

| ISIN/CUSIP Deal ID | Maturity Date | Coupon | Original Description | Face Amount | Factor | Mkt Price | On Date Off Date | Fill Amt | Coupon Interest | Loan Amount | Market Value from Hist... | Weighted Amt | Margin Exposure (USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 553682AA3 9200230 | 7/20/19 | 8.32 | MSPB 2007-1A E | 4,000,000 | 1.000000 | 71.5066 | 9/2/08 10/2/08 | 4,240 | 869 | (45,264) | 1,174,880.00 | (2,860,263) | 160,000 | 1,743,328 | 13,650 |
| 592WVA36 B1C800 1758230 | | | LGHT2006-5A B | 9,500,000 | 1.000000 | 60.8692 | 9/8/08 10/8/08 | 8,490 | 381 | (29,128) | 5,807,700.00 | (5,915,502) | 346,000 | 2,853,225 | (8,231) |
| 98524UAC2 9B1C800 1758230 | 1/17/20 | 4.70 | WITEH 2006-4A B | 2,000,000 | 1.000000 | 64.2000 | 9/8/08 10/8/08 | 3,490 | 75 | (13,842) | 772,400.00 | (1,284,000) | 140,000 | 519,137 | |
| 55588BAB5 553682AC1 1758230 | 7/20/19 | | MSPB2007-1A C | 40,000,000 | 1.000000 | | | | 841 | (66,172) | 55,736,800.00 | (39,600,000) | 2,300,000 | 2,407,671 | 826,744 |
| 55588BAE3 6B1R4x70 1758230 | 7/20/19 | 6.07 | MSPB 2007-1A D | 8,000,000 | 1.000000 | 75.1865 | 8/12/08 9/12/08 | 3,710 | 10,336 | (66,068) | 3,715,200.00 | (6,015,882) | 140,000 | 2,432,780 | 75,367 |

## Free Collateral

| Type | ISIN/CUSIP | Clearing Date | Off Date | Description | Coupon Maturity Date | Quantity | Price | Market Value (USD) | Margin Value (USD) |
|---|---|---|---|---|---|---|---|---|---|
| VAR | CASH CCLL | | | UNITED STATES DOLLARS | 0.0000 | (482,451) | | (482,451) | (485,129) |
| Totals | | | | | | | | (482,451) | (485,129) |

*F* Denotes Free Collateral Fail

**Disclaimer**

The above estimated value[s] are as of the date indicated and do not represent actual bids or offers by Lehman Brothers. There can be no assurance that actual trades could be completed at such value[s]. Unless otherwise specified, the above valuations represent mid-market valuations. Mid-market values attempt to approximate the current economic value of a given position using prices and rates at the average of the bid and offer for the respective underlying asset(s) or reference rate(s). The bid-side is the estimated amount a party would pay to purchase the asset.

Discussions of the trade values in general, and indicative or firm price quotations and actual trade prices in particular, may vary significantly from these written estimated values as a result of various factors, which may include (but are not limited to) prevailing credit spreads, market liquidity, position size, transaction and financing costs, hedging costs and risks and use of capital and profit. These estimates may not be representative of any theoretical or actual internal valuations employed by us for our own purposes, may vary during the course of any particular day and may vary significantly from the estimates or quotations that would be given by another dealer. You should consult with your own accounting or other advisors as to the adequacy of this information for your purposes.

As a condition for providing these estimates, you agree that Lehman Brothers makes no representation and shall have no liability in any way arising therefrom to you or any other entity for any loss or damage, direct or indirect, arising from the use of this information. Lehman Brothers International (Europe) is regulated by the Financial Services Authority.

Jason Post

| | |
|---|---|
| From: | Wybolt, Andrew S [andrew.wybolt@lehman.com] |
| Sent: | Tuesday, September 09, 2008 8:36 AM |
| To: | Ryan Grateke; highland.otc.collateral@hedgefundservices.com |
| Subject: | RE: FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO OPP MASTER |

Yes, I can wire you back 288K.

~~And all of your pending interest~~

841.74 for Aug
838.39 for July
779.82 for June

Please confirm

Andrew Wybolt
LEHMAN BROTHERS | Repo Margin
1301 Avenue of the Americas
New York, NY 10019
*   212.320.7747   F:  646.758.3023
* andrew.wybolt@lehman.com
* repomargin@lehman.com

-----Original Message-----
From: Ryan Grateke [mailto:RGrateke@hcmlp.com]
Sent: Tuesday, September 09, 2008 9:31 AM
To: Wybolt, Andrew S; 'highland.otc.collateral@hedgefundservices.com'
Subject: RE: FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO
OPP MASTER

Can we pull back any of this margin?  Thanks.

-----Original Message-----
From: andrew.wybolt@lehman.com. [mailto:andrew.wybolt@lehman.com]
Sent: Tuesday, September 02, 2008 2:06 PM
To: Jennifer Jurrius; Margin; Morton Wendell; Scott Crowell; Ryan
Grateke; highland.otc.collateral@hedgefundservices.com;
matthew.d.walsh@jpmchase.com
Cc: andrew.wybolt@lehman.com
Subject: FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO OPP
MASTER


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - -

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an

1

offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

Highland Capital Management is growing. Check out Careers at www.hcmlp.com.

------------------------------------------------------------------------

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

--------

IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

## Highland CDO Opportunity Master Fund, L.P.

| Date | Collateral Principal Amount | Rate | Daily Interest |
|------|------------------------------|---------|----------------|
| 9/1/2008 | $  194,451.00 | 2.1250% | 11.48 |
| 9/2/2008 | 194,451.00 | 2.1250% | 11.48 |
| 9/3/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/4/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/5/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/6/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/7/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/8/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/9/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/10/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/11/2008 | 194,451.00 | 2.0625% | 11.14 |
| 9/12/2008 | 194,451.00 | 2.1250% | 11.48 |
| 9/13/2008 | 194,451.00 | 2.1250% | 11.48 |
| 9/14/2008 | 194,451.00 | 2.1250% | 11.48 |
| 9/15/2008 | 194,451.00 | 3.5000% | 18.90 |
| 9/16/2008 | 194,451.00 | 3.7500% | 20.26 |
| 9/17/2008 | 194,451.00 | 3.0000% | 16.20 |
| Total | | | $   213.02 |



Jason Post

**From:** Ryan Grateke
**Sent:** Wednesday, September 17, 2008 8:58 AM
**To:** Jason Post
**Subject:** FW: Lehman Support
**Attachments:** 9/12 REPO ROLLS; 9-8 rolls; CDO Rolls 09-02-08.xls; FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO OPP MASTER; RE: FIN - Interest Accrual Statement for LBIE - HIGHLAND CDO OPP MASTER; Highland CDO Opportunity Master Fund, LP - Cash Flow.xls

**From:** Ryan Grateke
**Sent:** Monday, September 15, 2008 3:47 PM
**To:** Brian Lohrding
**Subject:** Lehman Support

Here is everything for Lehman. I can confirm Scott's spreadsheet is correct for the face amount, financing mark, and loan amount per support we received from Lehman and his calculations appear correct for the rest of it. I attached the support that we received from Lehman.

Attached support for repos:
"CDO Rolls 9-02-08" –  MSPB E  (553682AA3)
"9-8 rolls"–  Light,  WITEH
"9/12 REPO ROLLS" –   MSPB C, MSPB D

Attached support for collateral:
"FIN – Interest Accrual….." (x2)

I attached two emails: 1 has the 8/31 collateral statement which shows the principal balance as $482,451. The other is from our contact at Lehman confirming he sent us back $288,000 of principal and all of our interest owed through 8/31. I also attached our BONY cash sheet which shows the $288,000 and the interest amounts being returned on 9/9.

Collateral balance = $194,451 + interest from 9/1 onward.

**Ryan Grateke**
Highland Capital Management, LP
13455 Noel Road, Suite 800
Dallas, TX 75240
Office: 972-628-4168
Fax: 972-628-4142
www.hcmlp.com

1

# LEHMAN BROTHERS    || Interest Accrual On Cash Collateral

| | |
|---|---|
| TO: | HIGHLAND CDO OPP MASTER F... |
| | 1739230 |
| | RYAN O'RATTKE |
| PHONE: | 972-628-4154 972-628-4168 |
| FAX: | |
| EMAIL: | |
| FROM: | LEHMAN BROTHERS INTERNATIONAL (EUROPE) |
| | ANDREW WBOLT |
| PHONE: | 212-526-1210 |
| FAX: | 646-758-5023 |
| EMAIL: | andrew.wbolt@lehman.com |
| DUE DATE: | 09/01/2008 |

From  08/01/2008  To  08/31/2008  [inclusive]

| Date | CCY | Principal | Interest Calc Amt | Rate | Accru. Amount |
|---|---|---|---|---|---|
| | | 482,451.00 | -28.58 | 2.140 | -28.58 |
| 08/01/2008 | USD | 482,451.00 | -28.58 | 2.140 | -28.58 |
| 08/02/2008 | USD | 482,451.00 | -28.58 | 2.140 | -28.58 |
| 08/03/2008 | USD | 482,451.00 | -28.01 | 2.090 | -28.01 |
| 08/04/2008 | USD | 482,451.00 | -25.57 | 1.990 | -25.57 |
| 08/05/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/06/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/07/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/08/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/09/2008 | USD | 482,451.00 | -26.00 | 1.940 | -26.00 |
| 08/10/2008 | USD | 482,451.00 | -26.67 | 1.990 | -26.67 |
| 08/11/2008 | USD | 482,451.00 | -26.67 | 1.990 | -26.67 |
| 08/12/2008 | USD | 482,451.00 | -27.07 | 2.020 | -27.07 |
| 08/13/2008 | USD | 482,451.00 | -28.14 | 2.100 | -28.14 |
| 08/14/2008 | USD | 482,451.00 | -28.81 | 2.150 | -28.81 |
| 08/15/2008 | USD | 482,451.00 | -28.81 | 2.150 | -28.81 |
| 08/16/2008 | USD | 482,451.00 | -28.14 | 2.100 | -28.14 |
| 08/17/2008 | USD | 482,451.00 | -28.14 | 2.100 | -28.14 |
| 08/18/2008 | USD | 482,451.00 | -25.57 | 1.990 | -25.57 |
| 08/19/2008 | USD | 482,451.00 | -25.60 | 1.910 | -25.60 |
| 08/20/2008 | USD | 482,451.00 | -25.57 | 1.990 | -25.57 |
| 08/21/2008 | USD | 482,451.00 | -26.94 | 2.010 | -26.94 |
| 08/22/2008 | USD | 482,451.00 | -26.94 | 2.010 | -26.94 |
| 08/23/2008 | USD | 482,451.00 | -26.94 | 2.010 | -26.94 |
| 08/24/2008 | USD | 482,451.00 | -26.80 | 2.000 | -26.80 |
| 08/25/2008 | USD | 482,451.00 | -27.20 | 2.030 | -27.20 |
| 08/26/2008 | USD | 482,451.00 | -27.20 | 2.030 | -27.20 |
| 08/27/2008 | USD | 482,451.00 | -27.20 | 2.030 | -27.20 |
| 08/28/2008 | USD | 482,451.00 | -26.80 | 2.000 | -26.80 |
| 08/29/2008 | USD | 482,451.00 | -26.80 | 2.000 | -26.80 |
| 08/30/2008 | USD | 482,451.00 | -26.80 | 2.000 | -26.80 |
| 08/31/2008 | USD | 482,451.00 | -26.80 | 2.000 | -26.80 |

| Total Interest Due: -841.... | | | |
|---|---|---|---|
| Lehman will pay to the following settlement instructions: | | | |
| Intermediary | Institution | Beneficiary | Special |
| | FW021000018 | 211551 | /BNF/771898 |

ANNEX 1

Supplemental Terms or Conditions
To the TBMA/ISMA Master Repurchase Agreement

Dated as of May 31, 2007

Between

LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A")
a company incorporated with unlimited liability under the laws of England and Wales

and

Highland CDO Opportunity Master Fund LP ("Party B")
a limited partnership organized under the laws of the State of Delaware

Paragraph references are to paragraphs in the Agreement.

1.    The following elections shall apply

(a)    paragraph 1(c)(i). Buy/Sell Back Transactions may be effected under this Agreement, and accordingly the Buy/Sell Back Annex shall apply.

(b)    paragraph 1(c)(ii). Transactions in Net Paying Securities may be effected under this Agreement, and accordingly the provisions of sub-paragraphs (i) and (ii) below shall apply.

   (i)    The phrase "other than equities and Net Paying Securities" in paragraph 1(a) shall be replaced by the phrase "other than equities".

   (ii)    In the Buy/Sell Back Annex the following words shall be added to the end of the definition of the expression "IR": "and for the avoidance of doubt the reference to the amount of Income for these purposes shall be to an amount paid without withholding or deduction for or on account of taxes or duties notwithstanding that a payment of such Income made in certain circumstances may be subject to such a withholding or deduction".

(c)    paragraph 1(d). Agency Transactions may not be effected under this Agreement, and accordingly the Agency Annex shall not apply.

In addition, the following Annexes shall also apply with respect to relevant Transactions:

— Equities Annex
— Italian Annex
— Gilts Annex
— Japanese Securities Annex
— U.S. Securities Addendum

(d)    paragraph 2(d). The Base Currency shall be:

   (i)    for the purposes of paragraph 4, United States Dollars.

   (ii)    for the purposes of paragraph 10, where the Defaulting Party is Party B, United States Dollars and, where the Defaulting Party is Party A, United States Dollars.

(e)    paragraph 2(p). list Buyer's and Seller's Designated Offices.

Party A: London and Frankfurt.

OHS East:160231565.1
8043-22 RK6/RK6

Party B: Delaware

(f)    paragraph 2(ee): The pricing source for calculation of Market Value shall be: Market Value will be calculated in accordance with market practice prevailing in the principal market for the relevant securities as reasonably determined by Party A or as otherwise agreed in writing by the parties.

(g)    paragraph 2(rr): Spot rate to be: as specified in paragraph 2(rr).

(h)    paragraph 3(b): both Seller and Buyer to deliver Confirmation.

(i)    paragraph 4(f):

    (i)    Interest rate on Cash Margin to be Fed Funds Open for USD (available on Telerate page 5), EONIA for Euro (available on Bloomberg page EBF) and SONIA for GBP (available on Bloomberg page BBAM).

    (ii)    Interest to be payable upon redelivery of any Cash Margin.

(j)    paragraph 4(g): Delivery period for margin calls to be:

    (i)    For Cash Margin, Margin Securities or Equivalent Margin Securities the same day if the request is made by 10 a.m. (New York time) on a Business Day and, if requested after such time, on the next Business Day.

(k)    paragraph 6(j): Paragraph 6(j) shall apply, and the events specified in paragraph 10(a) identified for the purposes of paragraph 6(j) shall be those set out in sub-paragraphs (i) and (ii) through (x) of paragraph 10(a) of this Agreement.

(l)    paragraph 10(a)(ii): Paragraph 10(a)(ii) shall not apply.

(m)    paragraph 14: For the purposes of paragraph 14 of this Agreement

    (i)    Address for notices and other communications for Party A

    (a)    Address: Lehman Brothers International (Europe) – Head Office
              25 Bank Street, London E14 5LE
              Attention:

              For trading issues: Trading Manager, Central Funding Desk
              Telephone: 44 (20) 7260 2333
              e-mail: cfueurope@exeulon.lehman.com

              For confirmation issues: Trade Support / Operations
              Telephone: 44 (20) 7102 3002/2971
              Facsimile: 44 (20) 7102 3022/2518
              e-mail: fidfinancing@exeulon.lehman.com

              For margin issues: Global Margin Europe
              Telephone: 44 (20) 7011 7290
              Facsimile: 44 (20) 7260 1324
              e-mail: repofutmargin@exeulon.lehman.com

              For documentation issues: Transaction Management (London)
              Telephone: 44 (20) 7102 1730
              Facsimile: 44 (20) 7102 2044
              e-mail: vsharp@lehman.com; otarty@lehman.com

    (b)    Address: Lehman Brothers International (Europe) – Frankfurt Branch
              Rathenauplatz 1, D-60313 Frankfurt am Main, Germany
              Attention:

For trading issues: Trading Manager, Central Funding Desk
Telephone: 44 (20) 7260 2333
e-mail: cfueurope@exeuion.lehman.com

For confirmation issues: Trade Support / Operations
Telephone: 44 (20) 7120 3002/2971
Facsimile: 44 (20) 7120 3022/2518
e-mail: fidfinancing@exeuion.lehman.com

For margin issues: Global Margin Europe (London)
Telephone: 44 (20) 7011 7290
Facsimile: 44 (20) 7260 1324
e-mail: repofundmargin@exeuion.lehman.com

For documentation issues: Transaction Management (London)
Telephone: 44 (20) 7102 1730
Facsimile: 44 (20) 7102 2044
e-mail: ysharp@lehman.com; gtarry@lehman.com

(ii)    Address for notices and other communications for Party B

Address:  c/o Highland Capital Management, L.P.
          13445 Noel Road
          Two Galleria Tower, Suite 1300
          Dallas, TX 75241
          Attention: Philip Braner

          Telephone:    972-628-4100

          Facsimile: 972-628-4147

          E-mail: PBraner@hcmlp.com

          paragraph 17: For the purposes of paragraph 17 of this Agreement

(iii)   Party A is not required to appoint an agent for service of process.

(iv)    Party B appoints as its agent for service of process: Highland Capital
        Management Europe Ltd., 130 Jermyn Street, London SW1Y 4UP

2.      The following supplemental terms and conditions shall apply.

(a)     Existing Transactions. All Repurchase Transactions and Buy/Sell Back Transactions
        entered into by the parties prior to the date of this Agreement which are outstanding at the
        date of the Agreement, shall be deemed to be entered into pursuant to this Agreement and
        shall be governed by the terms of this Agreement.

(b)     Forward Transactions. The parties agree that Forward Transactions (as defined in sub
        paragraph (i)(A) below) may be effected under this Agreement, and accordingly the
        provisions of sub paragraphs (i) to (iv) below shall apply.

        (i)     The following definitions shall apply

                (A)     "Forward Transaction", a Transaction in respect of which the Purchase
                        Date is at least three Business Days after the date on which the
                        Transaction was entered into and has not yet occurred.

Jason Post

| | |
|---|---|
| From: | Jason Post |
| Sent: | Monday, September 22, 2008 12:24 PM |
| To: | Jason Post |
| Subject: | FW: Billings on Lehman GMRA |

Per discussion with Brian Albert, $2,100 split down the middle between Highland CDO Opportunity Master Fund, L.P and Highland Financial Corporation.

**From:** Brian Albert [mailto:brian.albert@gmail.com]
**Sent:** Monday, September 22, 2008 12:04 PM
**To:** Jason Post
**Subject:** Billings on Lehman GMRA

There are about $2100 in billings attributable to the Lehman GMRA.  Let me know if you need additional back up on this.

Brian

--
Brian G. Albert, Esq.
Phone: 323-384-3631
brian.albert@gmail.com

# Submission Confirmation

Thank you for completing your submission.

Your submission details are shown below along with your confirmation number. Please print off a copy of this page or note d
your confirmation number for future reference.

| Print Confirmation | Exit System |
|---|---|

**Confirmation Date:**        12/11/2008 17:16:56
**Confirmation Reference:**   A11933DE-2F50-4922-A58A-7942FF21AAAC

## Primary Contact Details

| | | | |
|---|---|---|---|
| Regulatory Role Reference | V61457025 | Building Number/Name | Galleria Tower II - Nexbank |
| Contact Title | Mr. | Street | 13455 Noel Rd, Suite 800 |
| Contact First Name | Jason | Town/City | Dallas |
| Contact Surname | Post | County/State | TX |
| Telephone Number | 1-972-419-4459 | Post Code/ZIP | 75240 |
| Position/Authority | Finance | Country | United States of America |
| Email Address | jpost@hcmlp.com | | |

## Securities Financing

### Repo/Reverse Repo Agreements

| Date of Agreement (DD MMM YYYY) | Type of Agreement | Is it closed out? | USD Amount due (from)/to LBI |
|---|---|---|---|
| 31 May 2007 | GMRA | ☑ | -10,026,061 |
| | | ☐ | 0 |
| | | ☐ | 0 |

### Stock Borrow/Lending Agreements

| Date of Agreement (DD MMM YYYY) | Type of Agreement | Is it closed out? | USD Amount due (from)/to LBI |
|---|---|---|---|
| | | ☐ | 0 |
| | | ☐ | 0 |
| | | ☐ | 0 |

| | USD |
|---|---|
| **Total claim due (from)/to LBIE** | -10,026,061 |

**Please enter any additional comments/information:**

Above figure due from Lehman will continue to accrue for interest and additional expenses incurred (Legal fees,
etc)

## OTC Derivatives

**ISDA Master Agreements**

| Date of Agreement (DD MMM YYYY) | Is it closed out? | USD Amount due (from)/to LBIE |
|---|---|---|
| | ☐ | 0 |
| | ☐ | 0 |
| | ☐ | 0 |

**Long Form Confirmations**

| Number of Confirmations | Are they closed out? | USD Amount due (from)/to LBIE |
|---|---|---|
| 0 | ☐ | 0 |

| | USD |
|---|---|
| **Total claim due (from)/to LBIE** | 0 |

Please enter any additional comments/information:

_____

# Prime Broker

**Cash Balances**

| | USD |
|---|---|
| Cash due (from) LBIE (other than client money) | 0 |
| Loans payable to LBIE | 0 |
| Net cash | 0 |

**Securities**

| | USD |
|---|---|
| Long security close out value (including rehypothecated assets) | 0 |
| Short security close out value (borrowed securities) | 0 |
| Net security close out value | 0 |

**CFD**

| | USD |
|---|---|
| Long CFD close out value | 0 |
| Short CFD close out value | 0 |
| Net CFD close out value | 0 |

| | USD |
|---|---|
| **Total claim due (from)/to LBIE** | 0 |

**Comments**

_____

# Unsettled DVP/RVP Transactions

**DVP**

| | USD |
|---|---|
| Value of securities due (from) LBIE | 0 |
| Cash due to LBIE | 0 |

| Net due (from)/to LBIE | 0 |
|---|---|

| RVP | USD |
|---|---|
| Cash due (from) LBIE | 0 |
| Value of securities due to LBIE | 0 |
| Net due (from)/to LBIE | 0 |

| | USD |
|---|---|
| **Total claim due (from)/to LBIE** | 0 |

**Comments**

|  |
|---|

## Exposures on Exchange Traded Derivatives Across all Accounts

| **Closed Out / Known Claims** | USD |
|---|---|
| Net liquidating value excluding collateral due (from) LBIE | 0 |
| ˙ (client accounts which are not subject to FSA client money protection/segregation) | |
| Collateral value due to LBIE | 0 |

| | USD |
|---|---|
| **Total claim due (from)/to LBIE** | 0 |

**Comments**

|  |
|---|

## Other Balances

| **Description** | USD |
|---|---|
| No Other Balances exist | |

*haynesboone*

September 17, 2009

**VIA FEDERAL EXPRESS**

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, NY 10017

Re:    Lehman Brothers Holdings Inc.
       Case No. 08-13555

Dear Sir or Madam:

Enclosed for filing in the above-referenced case please find the original and one (1) copy of the following proofs of claim:

1.    Highland CDO Opportunity Master Fund, L.P in the amount of $10,026,061.00;

2.    Highland Crusader Offshore Partners, L.P. in the amount of $17,306,000.00;

3.    Highland Credit Strategies Master Fund, L.P. in the amount of $12,132,200.00;

4.    Highland Financial Corporation in the amount of $3,649,330.0;

5.    Highland Credit Strategies Fund in the amount of $1,198,045.38; and

6.    Highland Credit Strategies Fund in the amount of $832,109.39.

Please return a file-stamped copy of each to our office in the enclosed Federal Express envelope.

Sincerely,

Dian Gwinnup
Paralegal
Direct Phone Number: (214) 651-5930
Direct Fax Number: (214) 200-0507
dian.gwinnup@haynesboone.com

FILED / RECEIVED
SEP 1 8 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

D_1789062_1.DOC

**Haynes and Boone, LLP**
**Attorneys and Counselors**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Phone: 214.651.5000
Fax: 214.651.5940
www.haynesboone.com

# EXHIBIT "A"