# EXHIBIT A

**Response Deadline:  January 2, 2015 at 5:00 p.m. (Prevailing Eastern Time)**[1]
**Hearing Date and Time:  January 15, 2015 at 10:00 a.m. (Prevailing Eastern Time)**

David J. Molton
Andrew Dash
Howard S. Steel
Jacob T. Beiswenger
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone:  212-209-4800
Facsimile:  212-209-4801

*Counsel for Newport Global Opportunities Fund LP*
*and Newport Global Credit Fund (Master) LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **Case No. 08-13555 (SCC)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------------ x

### RESPONSE OF NEWPORT GLOBAL OPPORTUNITIES FUND LP AND NEWPORT GLOBAL CREDIT FUND (MASTER) LP TO THE FOUR HUNDRED EIGHTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS

---

[1]    The Response Deadline was extended by agreement with the Plan Administrator.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND ....................................................................................................... 6

RESPONSE TO OBJECTION ................................................................................. 20

I.   THE CLAIMS SHOULD BE ALLOWED OR,
     AT A MINIMUM, REQUIRE DISCOVERY AND A MERITS HEARING.................. 20

     A.   The Objection Is Insufficient To Overcome
          The *Prima Facie* Validity Of The Claims. ........................................... 20

     B.   At The Very Least, The Claims Require
          Discovery And A Merits Hearing. ....................................................... 23

II.  THE PRIME BROKERAGE AGREEMENT DOES NOT RELEASE
     THE DEBTORS FROM LIABILITY FOR THE NEWPORT FUNDS' CLAIMS. ........ 24

     A.   The Claims Are Not Barred By Section 29
          Of The Prime Brokerage Agreement. ................................................. 25

     B.   The Claims Are Not Barred By Section 30
          Of The Prime Brokerage Agreement. ................................................. 29

III. THE CLAIMS STATE VALID BREACH OF CONTRACT CLAIMS
     FOR WHICH THE DEBTORS ARE JOINTLY AND SEVERALLY LIABLE............. 35

     A.   The Claims State *Prima Facie* Valid Claims For Breach of Contract.................. 35

     B.   The Debtors Are Jointly And Severally Liable
          For The Claims Under The Prime Brokerage Agreement. .................................. 40

IV.  THE CLAIMS SHOULD BE ALLOWED IN FULL
     SUBJECT TO THE SINGLE-SATISFACTION RULE. ................................................. 43

CONCLUSION.......................................................................................................... 44

## TABLE OF AUTHORITIES

**Page(s)**

C ASES

Abundance Partners LP v. Quamtel, Inc.,
    840 F. Supp. 2d 758 (S.D.N.Y. 2012)..........................................................................42

Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.),
    94 F.3d 772 (2d Cir. 1996)..........................................................................................21

Arjent Ltd. v. EZE Castle Integration, Inc.,
    No. 0603543/2007, 2008 N.Y. Misc. LEXIS 8331
    (N.Y. Sup. Ct., N.Y. Cnty. Feb. 27, 2008)..................................................................34

Ash v. New York Univ. Dental Ctr.,
    564 N.Y.S.2d 308 (1st Dep't 1990) .............................................................................25

Banc of Am. Secs. LLC v. Solow Bldg. Co. II, L.L.C.,
    847 N.Y.S.2d 49 (1st Dep't 2007) ...............................................................................25

Battery Assocs., Inc. v. J & B Battery Supply, Inc.,
    944 F. Supp. 171 (E.D.N.Y. 1996) .........................................................................40, 41

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)......................................................................................................23

Deutsche Lufthansa AG v. Boeing Co.,
    2007 U.S. Dist. LEXIS 9519 (S.D.N.Y. Feb. 2, 2007).............................................34

Edgewater Growth Capital Partners, L.P. v. Greenstar N. Am. Holdings, Inc.,
    Case No. 108641/08, 2013 WL 9057379 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 2, 2013) ...............40

Fed. Deposit Ins. Corp. v. Shea & Gould,
    No. 95 Civ. 5491, 1997 WL 401822 (S.D.N.Y. July 17, 1997) ..............................................24

Fein ex rel. Estate of Fein v. Chi. Ins. Co.,
    No. 01 Civ. 11386, 2003 WL 21688239 (S.D.N.Y. July 16, 2003) ........................................30

Gens v. Resolution Trust Corp.,
    112 F.3d 569 (1st Cir. 1997), cert. denied, 522 U.S. 931 (1997) ......................................20, 21

In re Allegheny Int'l, Inc.,
    954 F.2d 167 (3d Cir. 1992)..........................................................................................21, 22

In re BI-LO, LLC,
    No. 7:11-cv-00177, 2011 WL 4549150 (D.S.C. Sept. 30, 2011) ...........................................21

In re Del Biaggio,
    496 B.R. 600 (Bankr. N.D. Cal. 2012) ...................................................................44

In re John B. Rose Co.,
    275 F. 409 (2d Cir. 1921).........................................................................................43

In re King,
    305 B.R. 152 (Bankr. S.D.N.Y. 2004) ....................................................................22

In re LightSquared, Inc.,
    No. 12-12080-SCC, 2014 WL 5488413 (Bankr. S.D.N.Y. Oct. 30, 2014) .............43

In re MF Global, Inc.,
    515 B.R. 434 (Bankr. S.D.N.Y. 2014)...........................................................5, 27, 28

In re Motors Liquidation Co.,
    447 B.R. 142 (Bankr. S.D.N.Y. 2011).....................................................................30

In re O'Malley,
    252 B.R. 451 (Bankr. N.D. Ill. 1999) ......................................................................21

In re Nat'l Energy & Gas Trans., Inc.,
    492 F.3d 297 (4th Cir. 2007), cert. denied, 552 U.S. 1231 (2008)....................43, 44

In re Residential Capital, LLC,
    No. 12-12020, 2014 WL 1058921 (Bankr. S.D.N.Y. Mar. 17, 2014) .....................22

In re WorldCom, Inc.,
    No. 02-13533, 2005 WL 3832065 (Bankr. S.D.N.Y. Dec. 29, 2005) ...............21, 22

Ivanhoe Building & Loan Ass'n of Newark, N.J. v. Orr,
    295 U.S. 243 (1935).................................................................................................43

JPMorgan Chase Bank N.A. v. Baupost Grp., LLC
    (In re Enron Creditors Recovery Corp.),
    380 B.R. 307 (S.D.N.Y. 2008).............................................................................30, 32

Kel Kim Corp. v. Cent. Mkts., Inc.,
    519 N.E.2d 295 (N.Y. 1987).....................................................................................26

Kranze v. Cinecolor Corp.,
    96 F. Supp. 728 (S.D.N.Y. 1951) .............................................................................42

Liona Corp. v. PCH Assocs. (In re PCH Assocs.),
    949 F.2d 585 (2d Cir. 1991)......................................................................................21

Litwin v. Blackstone Grp., L.P.,
    634 F.3d 706 (2d Cir. 2011), cert. denied, 132 S. Ct. 242 (2011) ...........................23

Norton v. S. Utah Wilderness Alliance,
    542 U.S. 55 (2004)...................................................................................................32

Packer & Klein v. I. Frank & Sons,
    196 N.Y.S. 289 (1st Dep't 1922) ......................................................................41, 42

Phillips P.R. Core, Inc. v. Tradax Petrol., Ltd.,
    782 F.2d 314 (2d Cir. 1985)......................................................................................26

Robin Bay Assocs., LLC v. Merrill Lynch & Co.,
    No. 07 Civ. 376, 2008 WL 2275902 (S.D.N.Y. June 3, 2008)...............................33

Rochester Gas & Elec. Corp. v. Delta Star, Inc.,
    No. 06-CV-6155, 2009 WL 368508 (W.D.N.Y. Feb. 13, 2009) ............................26

S. Rafael Jewels Corp. v. Nezaj,
    Case No. 107336/11, 2014 WL 2106250 (N.Y. Sup. Ct. N.Y. Cnty. May, 15 2014) ............36

Sommer v. Fed. Signal Corp.,
    593 N.E.2d 1365 (N.Y. 1992)...................................................................................28

Soroof Trading Dev. Co., Ltd. v. GE Fuel Cells Sys. LLC,
    842 F. Supp. 2d 502 (S.D.N.Y. 2012)................................................................28, 29

Starr v. Sony BMG Music Entm't,
    592 F.3d 314 (2d Cir. 2010)......................................................................................23

Terwillinger v. Terwillinger,
    206 F.3d 240 (2d Cir. 2000)......................................................................................35

Topever Corp. v. ENE Grp. LLC,
    No. 12-cv-869, 2013 WL 822378 (S.D.N.Y. Mar. 6, 2013)....................................24

Travelers Indem. Co. of Conn. v. The Losco Grp.,
    136 F. Supp. 2d 253 (S.D.N.Y. 2001).......................................................................33

Travelers Indem. Co. of Conn. v. The Losco Grp., Inc.,
    204 F. Supp. 2d 639 (S.D.N.Y. 2002).......................................................................33

Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.,
    802 N.Y.S.2d 411 (1st Dep't 2005), leave to appeal denied, 7 N.Y.3d 703 (2006)................40

**STATUTES**

11 U.S.C. § 502(a) ............................................................................................................21

Fed. R. Bankr. P. 3001 ......................................................................................................21

Fed. R. Bankr. P. 3001(a) .................................................................................................21

Fed. R. Bankr. P. 3001(f) ........................................................................21

Fed. R. Bankr. P. 7012(b) .......................................................................22

Fed. R. Bankr. P. 9019 ...........................................................................17

Fed. R. Civ. P. 8 ....................................................................................22

Fed. R. Civ. P. 12(b)(6) ....................................................................3, 22

N.Y. U.C.C. Law § 8-511(a) ...................................................................36

**REGULATIONS**

12 C.F.R. Part 220 .........................................................................7, 13, 35

17 C.F.R. § 220.15c3-3 ...............................................................7, 12, 13, 35

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Newport Global Opportunities Fund LP ("**NGOF**") and Newport Global Credit Fund (Master) LP ("**NGCF**" and, together with NGOF, the "**Newport Funds**"), by and through their undersigned attorneys, hereby file this response (the "**Response**") to the *Four Hundred Eighty-Eighth Omnibus Objection to Claims (No Liability Claims)* (the "**Objection**"), dated December 1, 2014 [Docket No. 47101], filed by Lehman Brothers Holdings Inc. ("**LBHI**" and, together with its affiliated Chapter 11 debtors, the "**Debtors**"), as Plan Administrator (the "**Plan Administrator**"), objecting to the Newport Funds' proofs of claim listed on Exhibit A of the Objection (the "**Claims**").[2]  In support of this Response, the Newport Funds respectfully state as follows:

## PRELIMINARY STATEMENT

1.     The Newport Funds are investment funds with hundreds of millions of dollars of assets under management and a significant number of public pension investors.  They were also, unfortunately, prime brokerage customers of Lehman Brothers.[3]

---

[2]     On December 29, 2014, the Plan Administrator filed its *Notice of Withdrawal of Four Hundred Eighty-Eighth Omnibus Objection To Claims (No Liability Claims) Solely As To Certain Claims*, withdrawing the Objection to, *inter alia*, the Newport Funds' guarantee claims against LBHI (Claim Nos. 29235 and 26372).  See Docket No. 47564.  The Notice, which is denominated as being "without prejudice," does not specify a basis for or cause of the withdrawal.  The Plan Administrator should not be permitted to continue a strategic delay instead of simply allowing otherwise allowable claims.  The Newport Funds should not face the continued prejudice of additional delay (after waiting over six years to date), and the Court should schedule a prompt merits hearing on the Newport Funds' guarantee claims, to the extent those claims continue to be disputed by the Plan Administrator.  For purposes of this Response, references to "Claims" shall not include the guarantee claims that are no longer subject to the Objection.

[3]     Throughout this Response, the Newport Funds use "Lehman Brothers" as referred to in the Prime Brokerage Agreement (defined below) and where Lehman Brothers was held out to the Newport Funds as a joint enterprise incapable of being separated into specific Lehman Brothers entities by the Newport Funds.  See Declaration of Roger May, Senior Managing Director, CFO, and COO of Newport Global Advisors, ¶ 12, attached hereto as **Exhibit A** (the "**May Declaration**").

1

2. The Newport Funds hold direct claims against the Debtors, as parties to the Prime Brokerage Agreement, and guarantee claims against LBHI, as guarantor of the debts of Lehman Brothers International (Europe) ("**LBIE**") (as a party to the Prime Brokerage Agreement).

3. The Claims arise from Lehman Brothers' reckless failure to follow the Newport Funds' instructions pre-bankruptcy and transfer the Newport Funds' securities to a third-party broker dealer in breach of the Prime Brokerage Agreement.

4. Lehman Brothers' failure amounts to gross negligence and willful misconduct because Lehman Brothers confirmed that they would complete the transfer at least a day prior to the LBHI bankruptcy filing and LBIE's administration order, and Lehman Brothers had the ability to timely perform the transfer, but did not do so in total derogation of the Newport Funds' rights.

5. As a result of the Newport Funds' unique circumstances, the Newport Funds have been active participants in these Chapter 11 proceedings from day one. However, in what can only be described as an unjust war of attrition, the Newport Funds have been barred for over six years from obtaining any significant discovery and a day in Court on the substantive merits of their Claims (with further unreasonable delay now with respect to their guarantee claims).

6. The Objection seeks disallowance of the Claims. The crux of the Objection is that, (i) despite the Newport Funds' instructions to Lehman Brothers prior to the bankruptcy filing to transfer the Newport Funds' securities to Credit Suisse Securities (USA) LLC ("**Credit Suisse**") as required under the Prime Brokerage Agreement, (ii) despite Lehman Brothers' confirmation that it would transfer the securities in advance of what was to become the LBHI bankruptcy filing date, and (iii) despite Lehman Brothers' clear ability to do so, the Newport Funds somehow fail to state allowable claims against the Debtors for breach of contract for not

complying with the Newport Funds' pre-bankruptcy instruction to transfer their securities to a financially secure custodian.

7.       To make matters worse, in a striking example of overreach and procedural gamesmanship, the Plan Administrator seeks to dictate that the Claims be heard as part of a "Sufficiency Hearing" akin to the dismissal standard of Rule 12(b)(6) of the Federal Rules of Civil Procedure.

8.       The Claims, however, state entirely plausible claims for breach of contract and the Objection should be overruled and the Claims allowed.  At minimum, the Claims more than clear the hurdle under a "sufficiency"/motion to dismiss review, as the Objection at most raises triable issues of fact for which the record must be further developed.

9.       As will be demonstrated, the Plan Administrator's reliance on the purported exculpatory provisions in the Prime Brokerage Agreement is unavailing.

10.      The Plan Administrator's reliance on Section 29 of the Prime Brokerage Agreement (a "force majeure" clause) does not relieve the Debtors of liability.  Indeed that provision is simply irrelevant here.  The Claims are not based on actions or events beyond Lehman Brothers' control.

11.      More specifically, there is no evidence of any government restrictions, suspensions of trading or other conditions beyond Lehman Brothers' control as of September 14, 2008—the date the transfer of the Newport Funds' securities should have been made.  In fact, on information and belief, Lehman Brothers was able to transfer customer accounts and settle

trades, both in a significant number, on the eve of LBHI's bankruptcy filing and the LBIE administration order and shortly thereafter.[4]

12.     Even if Section 29 were applicable, it cannot exculpate the Debtors for gross negligence or willful misconduct as exculpations for gross negligence or willful misconduct are invalid as a matter of governing New York law.

13.     Similarly, the Plan Administrator cannot rely on Section 30 of the Prime Brokerage Agreement to avoid liability for the Claims. The Claims arise from Lehman Brothers' failure to comply with the Newport Funds' instructions to transfer the Newport Funds' securities, not "the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action." Prime Brokerage Agreement § 30. The Claims do not fit within the limited list of protected acts enumerated in Section 30 of the Prime Brokerage Agreement.

14.     Section 30 of the Prime Brokerage Agreement also contains an explicit carve-out for gross negligence and willful misconduct. Lehman Brothers' failure to effectuate the transfer of the Newport Funds' securities was an act of gross negligence and willful misconduct. At a minimum, it was extremely careless with a reckless disregard for the Newport Funds' rights; at worst, it was part of a bad faith and illegal scheme to cover up LBIE's wrongful conversion of customer securities. At the very least, whether the Debtors' course of conduct constitutes gross negligence or willful misconduct is an issue of fact that is not properly subject to resolution on a "sufficiency" challenge.

---

[4]     See *The Trustee's Position Statement Regarding the Omnibus Customer Claim of Lehman Brothers International (Europe)*, ¶ 3, In re Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Jan. 13, 2012) [Docket No. 4865] ("During the five-day period of September 15-19, 2008 . . . approximately 190,000 trades by the LBIE Clients were due to settle. LBI settled or partially settled approximately 95% of these trades with third parties while the remaining trades failed."); *see also Trustee's First Interim Report For The Period September 19, 2008 Through May 29, 2009*, ¶ 10, In re Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA, (Bankr. S.D.N.Y. May 29, 2009) [Docket No. 1151] (acknowledging that LBI transferred over 110,000 customer accounts under 15 U.S.C. § 78fff-2(f)).

15.     Unquestionably, the facts here are far more murky than those presented in In re MF Global, Inc., 515 B.R. 434 (Bankr. S.D.N.Y. 2014), which the Plan Administrator over-hypes as nearly identical to the Claims.  Unlike the customers in MF Global, the Newport Funds' securities should have been transferred prior to LBHI's Chapter 11 filing, the LBIE administration order and the commencement of the LBI SIPA proceeding.  For that factual distinction and other reasons set forth below, MF Global should have no bearing on the resolution of the Claims.

16.     Perhaps cognizant that the contractual exculpation provisions are not available to the Debtors (and they are not), the Plan Administrator tries to cast all blame and liability for the Claims on LBI as prime broker under Section 21 of the Prime Brokerage Agreement.  The Plan Administrator does so despite the fact that the Debtors are directly obligated with respect to the breaches of the Prime Brokerage Agreement by the terms of the Prime Brokerage Agreement as set forth in the Claims.  Furthermore, the Debtors are, as a matter of contract, jointly and severally liable among themselves, LBI and LBIE for the breaches of the Prime Brokerage Agreement as set forth in the Claims.

17.     In this regard, the Objection fails to rebut the presumption that obligations under multi-party contracts are joint unless the contract contains adequate severing language, which the Prime Brokerage Agreement does not.  The Debtors were named parties to the Prime Brokerage Agreement and enjoyed the benefits of the Prime Brokerage Agreement and were and are bound to share in its burdens.

18.     At the very least, to the extent the Court does not find the Debtors jointly and severally liable to the Newport Funds under the Prime Brokerage Agreement as a matter of law,

the resulting ambiguity raises triable issues of fact regarding whether the Debtors were intended to be jointly and severally liable under the Prime Brokerage Agreement.

19. Finally, while LBIE has made distributions to the Newport Funds, the Claims do not seek double recovery. Specifically, distributions to date from LBIE have not satisfied the Claims in full in accordance with Sections 8.13(a) and 8.13(d) of the Plan. As set forth in this Response, the current shortfall is over $13 million dollars.

20. Accordingly, each of the Claims should be allowed at 100 percent of the underlying liability (NGOF - $163,334,098.49 (USD); NGCF - $38,327,041.04 (USD)), plus currently unliquidated amounts to be determined, provided that the Newport Funds cannot collect from the Debtors' estates more than the amount of the total liability.

21. In sum, the Objection should be overruled. At most, it raises disputed issues of fact that cannot properly be resolved on a sufficiency/motion to dismiss review.

## BACKGROUND

### A. General Overview.

22. Lehman Brothers aggressively represented to the Newport Funds that they would "deliver the firm" to the Newport Funds if they became prime brokerage customers of Lehman Brothers.[5] In marketing materials and discussions with representatives held out as employees of Lehman Brothers, the constant refrain was that the Newport Funds could rely on the Lehman Brothers enterprise as a whole in connection with Lehman Brothers' prime broker services. At a minimum, there was never any question that the Newport Funds, as prime brokerage customers, would have the full benefit of an LBHI guarantee. It was the "deliver the firm"/guarantee package that the Newport Funds relied on when executing their Prime Brokerage Agreements

---

[5] See May Decl. ¶ 13.

and entrusting over one hundred million dollars of securities to Lehman Brothers to their detriment.

23.     Unbeknownst to the Newport Funds at the time, "delivering the firm" in the eyes of Lehman Brothers meant a license for Lehman Brothers to use the Newport Funds' securities as it wished.  And it appears that is what Lehman Brothers recklessly did.  In particular, LBIE rehypothecated the Newport Funds' securities at an alarming rate and in apparent contravention of the Prime Brokerage Agreement, Federal Reserve Board Regulation T, 12 C.F.R. Part 220, and SEC Rule 15c3-3, 17 C.F.R. § 220.15c3-3—the "Customer Protection Rule."

24.     As evidence mounted concerning Lehman Brothers' financial instability, the Newport Funds determined their securities were at risk.  Accordingly, five days prior to the LBHI bankruptcy filing and LBIE administration order and over a week prior to the commencement of LBI's SIPA proceeding, the Newport Funds instructed Lehman Brothers to transfer their securities to Credit Suisse.

25.     Under the Prime Brokerage Agreement, and Lehman Brothers' confirmation of the Newport Funds' instruction (not to mention industry custom and practice), the transfer should have been completed no later than the day before the LBHI Chapter 11 filing and LBIE administration order.  Instead, there was a blatant—and epic—fail by Lehman Brothers.

26.     Lehman Brothers scrambled to call back the Newport Funds' securities that—unbelievably—could not be fully accounted for by the Newport Funds' prime broker.  Then, Lehman Brothers failed to, or refused to, "push the button" and transfer the Newport Funds' securities, despite evidence that Lehman Brothers had the ability to do so.  Six years later, the Newport Funds are still seeking to be made whole for Lehman Brothers' gross negligence and reckless conduct.

**B.**     **The Newport Funds' Relationship With Lehman Brothers.**

27.     The Newport Funds are and at all relevant times were investment funds managing hundreds of millions of dollars of assets, primarily focused on distressed investment opportunities.  See May Decl. ¶ 6.

28.     At all relevant times, Newport Global Advisors LP ("**NGA**") managed the Newport Funds.  See id. ¶ 3.

29.     The key employees of NGA have extensive credit management backgrounds and at all relevant times were particularly concerned about the credit protection of the prime broker for the Newport Funds.  See id. ¶ 7.

30.     Prior to entering into the Prime Brokerage Agreement, the Newport Funds had extensive discussions with Lehman Brothers' representatives about Lehman Brothers' prime broker services and creditworthiness.  See id. ¶ 8.

31.     As was the case throughout the Newport Funds' relationship with Lehman Brothers, its representatives often identified themselves to the Newport Funds as employees of Lehman Brothers as a whole, not specific Lehman Brothers entities.  See id. ¶ 9.

32.     For example, Lehman Brothers' marketing materials provided to the Newport Funds prior to entering into the Prime Brokerage Agreement listed the Lehman Brothers' representatives who were to provide prime broker customer support for the Newport Funds. Each such representative was identified as an employee of "Lehman Brothers," not as an employee of a specific Lehman Brothers entity.  See id. ¶ 10.

33.     Additionally, the Lehman Brothers' representatives who interacted with the Newport Funds on a day-to-day basis held themselves out as representatives of "Lehman

Brothers" and never distinguished themselves as employees of specific Lehman Brothers entities. See id. ¶ 11.

34.     In communications and marketing documentation sent to the Newport Funds prior to the Newport Funds entering into the Prime Brokerage Agreement, Lehman Brothers stressed to the Newport Funds that, by partnering with Lehman Brothers as prime brokerage customers, Lehman Brothers would "deliver the firm" and that the Newport Funds could rely on "direct access to all resources and levels of" the Lehman Brothers enterprise. See id. ¶ 13.

35.     Lehman Brothers' commitment to "deliver the firm" and to provide "direct access to all resources and levels of" the Lehman Brothers enterprise was part of the overall creditworthiness that induced the Newport Funds to choose Lehman Brothers as their prime broker and upon which the Newport Funds relied to transact with Lehman Brothers. See id. ¶ 15.

36.     Subsequently, all of the Newport Funds' requests to purchase or sell securities were placed with, and confirmed by, representatives who held themselves out as Lehman Brothers' representatives. See id. ¶ 14. Indeed, the Newport Funds never spoke with a representative of LBIE until after the Lehman Brothers' insolvency filings. See id.

     ***i.***       ***The 2005 LBHI Guarantee.***

37.     On June 9, 2005, the Executive Committee of the Board of Directors of LBHI executed the Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (the "**2005 LBHI Guarantee**"). See id. ¶ 16-17.

38.     The 2005 LBHI Guarantee provides that "[Lehman Brothers Holdings Inc.] hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for

purposes of the [LBHI Code of Authorities]." 2005 LBHI Guarantee at 2 (attached as Exhibit D to the May Decl.).

39.    Schedule A of the 2005 LBHI Guarantee includes LBIE among the list of Guaranteed Subsidiaries. See id. at 3.

40.    Roger May, as manager of the Newport Funds, had knowledge of, and reviewed, the 2005 LBHI Guarantee prior to the Newport Funds entering into the Prime Brokerage Agreement and such knowledge is imputed, by law, to the Newport Funds. See May Decl. ¶ 20.

41.    To the Newport Funds, the 2005 LBHI Guarantee was a guarantee by LBHI of Lehman Brothers' prime broker services under the Prime Brokerage Agreement—including, without limitation, those obligations of LBIE, which the Newport Funds understood to be a party to the Prime Brokerage Agreement. See id. ¶ 21.

42.    The 2005 LBHI Guarantee was part of the overall creditworthiness that induced the Newport Funds to choose Lehman Brothers as their prime broker and upon which the Newport Funds relied when executing the Prime Brokerage Agreement and entering into transactions with Lehman Brothers, including entrusting the Newport Funds' securities to Lehman Brothers. See id. ¶ 22-23.

*ii.*    ***The Prime Brokerage Agreement.***

43.    In 2006, with knowledge of and in reliance on, *inter alia*, the 2005 LBHI Guarantee, NGOF and NGCF each entered into a Prime Brokerage Customer Account Agreement (each a "**Prime Brokerage Agreement**"), with LBI and other Lehman Brothers Entities (as defined in the Prime Brokerage Agreement). See May Decl. ¶ 24-25; Proof of Claim ¶ 1.

44.    The Prime Brokerage Agreement is governed by New York law.  <u>See</u> Prime Brokerage Agreement § 24 (attached as Exhibit E to the May Decl.).

45.    The Prime Brokerage Agreement expressly provides that the parties to the Agreement:

> shall consist of [the Fund] and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns . . . (each such entity or person being referred to hereinafter as "Lehman Brothers" or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers").

<u>Id.</u> § 1(a).

46.    LBI counter-signed the Prime Brokerage Agreement as "signatory for itself and as agent for the affiliates named herein."  <u>Id.</u> at 11.

47.    The Prime Brokerage Agreement provides that:  "This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers . . . will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer."  <u>Id.</u> at Preamble.

48.    Pursuant to the Prime Brokerage Agreement, a prime brokerage account was to be opened at LBI for each of NGOF and NGCF.  <u>See id.</u> § 1(a) ("A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc.").

49.     All transactions under the Prime Brokerage Agreement are "subject to the applicable laws, rules and regulations of all U.S. . . . federal, state and self-regulatory authorities." Id. § 2.[6]

50.     Moreover, Section 21(*l*) of the Prime Brokerage Agreement, which does not distinguish between LBI and other Lehman Brothers entities, requires that the prime brokerage services be "provided in a manner consistent with the SEC Letter." Id. § 21(*l*).

51.     The "SEC Letter," in turn, refers to SEC Rule 15c3-3—the Customer Protection Rule—which sets out a broker-dealer's duty to return securities to customers on demand. See 17 C.F.R. § 220.15c3-3.

### iii.     *The Margin Lending Agreement.*

52.     In connection with entering into the Prime Brokerage Agreement, Lehman Brothers induced each of NGOF and NGCF to enter into a Margin Lending Agreement (each an "**MLA**") with LBI and LBIE, pursuant to which LBIE agreed to make loans to the Newport Funds in connection with transactions under the Prime Brokerage Agreement. See May Decl. ¶ 27-28; Proof of Claim ¶ 2.

---

[6]     Section 2 of the Prime Brokerage Agreement states as follows:

> 2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY. All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

> Prime Brokerage Agreement § 2.

53.     Upon information and belief, Lehman Brothers chose to use LBIE for potential financing for its prime brokerage customers to increase its own borrowing base and to seek to avoid requirements under Federal Reserve Board Regulation T, 12 C.F.R. Part 220.

54.     Under the MLA, the Newport Funds authorized LBIE—within the limits of applicable laws, rules, and regulations (*i.e.*, U.S. securities laws and New York law)—to lend either to itself or to others "any or all Collateral," which could then be "pledged, repledged, hypothecated or rehypothecated . . . for any amounts due to [LBIE] thereon or for a greater sum." MLA § 5(c) (attached as Exhibit F to the May Decl.).

55.     As of September 15, 2008, the date LBIE was placed into administration proceedings under English law and the date on which the first of the instant Debtors sought protection under Chapter 11, the Newport Funds did not have any indebtedness to LBIE under the MLAs. See id. ¶ 32.

56.     However, on information and belief, Lehman Brothers improperly transferred to LBIE or permitted LBIE to retain or assert rights in and/or to the Newport Funds' securities, prior to the LBIE administration, without the Newport Funds' consent, and in breach of the Prime Brokerage Agreement, Margin Lending Agreement, Federal Reserve Regulation T, 12 C.F.R. Part 220, and the Customer Protection Rule (SEC Rule 15c3-3), 17 C.F.R. § 220.15c3-3.

*iv.*     *Lehman Brothers' Assurances To The*
        *Newport Funds Regarding Its Creditworthiness.*

57.     In late 2007-2008, the capital markets experienced significant distress, including the failure of Bear Stearns.

58.     As a result, the Newport Funds sought additional assurances from Lehman Brothers with respect to Lehman Brothers' creditworthiness and the safety of the Newport Funds' securities entrusted to Lehman Brothers. See id. ¶ 33.

59.     In March 2008, as part of a series of ongoing communications between the Newport Funds and Lehman Brothers about Lehman Brothers' financial well-being, Roger May, as manager of the Newport Funds, spoke with Donald DeGraff and John Gatsos of Lehman Brothers, who verbally assured him that the Newport Funds benefitted from an LBHI parent guarantee.  See id. ¶ 34.

60.     In further support of its verbal statements, Lehman Brothers assured the Newport Funds of its creditworthiness by, *inter alia*, pointing to and providing the Newport Funds with a Customer Asset Protection Overview from November 2007 (the "**2007 Credit Protection Overview**").  See id. ¶ 35-36.

61.     The 2007 Credit Protection Overview provides an overview of Lehman Brothers' creditworthiness, including, *inter alia*, stating that "LBIE has the benefit of a full parent guarantee from LBHI."  2007 Credit Protection Overview at 7 (attached as Exhibit G to the May Decl.).

62.     The Newport Funds, through Roger May, as manager of the Newport Funds, understood the "full parent guarantee from LBHI" to include the 2005 LBHI Guarantee.  See May Decl. ¶ 38.

63.     On account of Lehman Brothers' representations of financial stability, including, without limitation, the 2007 Credit Protection Overview and its reference to the full parent guarantee from LBHI, the Newport Funds continued to transact with Lehman Brothers and entrust their securities to Lehman Brothers.  See id. ¶ 39.

*v.*     ***The 2008 LBHI Guarantee.***

64.     On January 4, 2008, LBHI executed the Guarantee of Lehman Brothers Holdings Inc. (the "**2008 LBHI Guarantee**" and, together with the 2005 LBHI Guarantee, the "**LBHI Guarantees**").  See id. ¶ 40-41.

65.     The 2008 LBHI Guarantee states:  "We, Lehman Brothers Holdings Inc., do hereby absolutely and unconditionally guarantee the payment by Lehman Brothers International (Europe) ("Affiliate") of all of Affiliate's liabilities, obligations and commitments (the "Guaranteed Obligations") to any counterparty of Affiliate and such counterparty's successors, endorsees and assigns . . . ."  2008 LBHI Guarantee at 1 (attached as Exhibit H to the May Decl.).

66.     Roger May, as manager for the Newport Funds, had knowledge of and reviewed the 2008 LBHI Guarantee at or around the time of its publication.  See May Decl. ¶ 43.

67.     The Newport Funds understood the 2008 LBHI Guarantee to be a guarantee by LBHI of Lehman Brothers' prime broker services under the Prime Brokerage Agreement—including, without limitation, the obligations of LBIE, which the Newport Funds understood to be a party to the Prime Brokerage Agreement—and part of Lehman Brothers' commitment to "deliver the firm" to the Newport Funds as a prime brokerage customer of Lehman Brothers. See id. ¶ 44.

68.     Accordingly, the LBHI Guarantees were relied on by the Newport Funds as a core element of Lehman Brothers' overall creditworthiness and as a basis to continue transacting with Lehman Brothers under the Prime Brokerage Agreement during tumultuous economic times. See id. ¶ 45.

**C.    The Newport Funds' Instructions To**
      **Transfer Their Securities From Lehman Brothers.**

69.    As is standard in the securities industry, and as required under the Prime Brokerage Agreement, Lehman Brothers was obligated to comply with the instructions of the Newport Funds regarding their securities entrusted to Lehman Brothers.  See id. ¶ 46; Prime Brokerage Agreement §§ 2, 21.

70.    Despite Lehman Brothers' assurances of their creditworthiness, by September 2008, the Newport Funds made the decision to transfer their securities out of Lehman Brothers.

71.    On September 10, 2008, the Newport Funds instructed Lehman Brothers to transfer all of the Newport Funds' securities to Credit Suisse, which was to assume the duties as the Newport Funds' prime broker.  See May Decl. ¶ 47.

72.    The transfer request was acknowledged by Lehman Brothers on September 11, 2008.  See id. ¶ 48.

73.    On September 12, 2008, at Lehman Brothers' request, the Newport Funds forwarded Letters of Authorization to Lehman Brothers to facilitate the transfer of their securities.  See id. ¶ 49.

74.    Upon receipt of the Letters of Authorization, the transfer of the Newport Funds' securities was booked by Lehman Brothers on September 12, 2008, and Lehman Brothers informed the Newport Funds that "[a]ny transfers initiated [on September 12, 2008] will need to be T+2 settlement."  See id. ¶ 50-51.

75.    As such, the transfer of the Newport Funds' securities should have been completed no later than September 14, 2008, *one day prior* to the commencement of LBHI's Chapter 11 proceeding and LBIE's administration order, and *five days prior* to commencement of LBI's SIPA proceeding.  See id. ¶ 52.

16

76.     On September 15, 2008, the Newport Funds were advised by Lehman Brothers that it had "lost access" to the Newport Funds' securities.  See May Decl. ¶ 53.

77.     To this date, the Newport Funds' securities have never been transferred by Lehman Brothers per the Newport Funds' instructions to Credit Suisse or any other replacement prime broker.  See id. ¶ 54.

**D.     Lehman Brothers' Insolvency Proceedings.**

78.     Commencing on September 15, 2008, and periodically thereafter, the Debtors filed with the Court voluntary petitions for relief under Chapter 11 of title 11 of the United States Code.

79.     On September 15, 2008, LBIE was placed into administration under English law.

80.     On September 19, 2008, LBI's SIPA proceeding was commenced.

**E.     The Newport Funds' Claims Against LBI And LBIE.**

81.     The Newport Funds timely filed claims against LBI and LBIE asserting damages for, inter alia, breaches of the Prime Brokerage Agreement.

82.     In both the LBI SIPA proceeding and the LBIE administration, the Newport Funds actively sought the return of their securities and discovery related to their Claims.

83.     The Newport Funds achieved mixed results—with efforts to compel the prompt return of their securities denied, discovery limited, and the Newport Funds' customer claims against LBI disallowed as part of a global settlement between LBI and LBIE approved under Bankruptcy Rule 9019.

84.     Under the global settlement between LBI and LBIE, LBIE's omnibus customer claim against LBI on behalf of purported LBIE customers was allowed, and an omnibus trust

was ultimately formed that included customer securities and dividends to be distributed by LBIE to holders of allowed trust asset claims.

85.     Subsequently the Newport Funds were granted allowed trust asset claims against LBIE in the following amounts:  (i) NGOF - $58,282,872.38 (USD); (ii) NGCF - $38,327,041.04 (USD).

86.     Additionally, NGOF was granted an allowed general unsecured claim against LBIE in the amount of £58,566,776.00 at an exchange rate of 1.79370 U.S. Dollars to British Pound Sterling, fixing the liquidated value of this claim at $105,051,226.11 (USD).

87.     To date, LBIE has made distributions on the Newport Funds' allowed trust asset claims and unsecured claim, but as set forth below, the Claims have not yet been fully satisfied under the Plan.

**F.     The Newport Funds' Claims Against the Debtors.**

88.     On September 22, 2009, the Newport Funds timely filed the Claims.

89.     The Claims seek to recover against the Debtors for breaches of the Prime Brokerage Agreement seeking damages for, *inter alia*:

- the value of the Newport Funds' securities held by Lehman Brothers pursuant to the Prime Brokerage Agreement that have not been otherwise returned to the Newport Funds, see Proof of Claim ¶ 4; Prime Brokerage Agreement §§ 2, 3;

- all damages and losses resulting from Lehman Brothers' failure to comply with the Newport Funds' instruction on September 10, 2008 to transfer the Newport Funds' securities to Credit Suisse, see Proof of Claim ¶ 5; Prime Brokerage Agreement § 2;

- the value of all post-commencement date dividends and interest in respect of the Newport Funds' securities held by Lehman Brothers, see Proof of Claim ¶ 6; Prime Brokerage Agreement § 19(b);

- all damages in an amount presently unknown for the loss of the Newport Funds' ability to participate in certain corporate events as a direct result of

> Lehman Brothers' breach of the Prime Brokerage Agreement, <u>see</u> Proof of Claim ¶ 8; Prime Brokerage Agreement §§ 10, 11; and

- damages to the Newport Funds on account of Lehman Brothers' misrepresentations and failure to properly capitalize the Customer Asset Protection Company ("**CAPCO**"), <u>see</u> Proof of Claim ¶¶ 3, 10; Prime Brokerage Agreement § 2.

90.     The Claims assert liquidated damages in the aggregate amount of no less than $163,334,098.49 (USD) for NGOF and $38,327,041.04 (USD) for NGCF against each of the Debtors for direct breaches of the Prime Brokerage Agreement and against LBHI under the LBHI Guarantees.

91.     The Newport Funds also assert unliquidated claims against the Debtors and LBHI for, *inter alia*, damages relating to their inability to participate in corporate events connected to their securities while under Lehman Brothers' control in breach of Sections 10 and 11 of the Prime Brokerage Agreement and damages relating to the loss of investment opportunities given Lehman Brothers' failure to promptly return the Newport Funds' securities in breach of, *inter alia*, Section 2 of the Prime Brokerage Agreement.

**G.     The Debtors' Chapter 11 Plan.**

92.     On December 6, 2011 (the "**Confirmation Date**"), the Court entered its *Order Confirming Modified Third Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc. And Its Affiliated Debtors* [Docket No. 23023] (the "**Confirmation Order**").  A copy of the *Modified Third Amended Plan Of Lehman Brothers Holdings Inc. And Its Affiliated Debtors* (the "**Plan**") is attached as Exhibit A to the Confirmation Order.

93.     The Plan became effective on March 6, 2012.  <u>See</u> Docket No. 26039.

94.     The Plan provides that, "[f]or purposes of determining whether an Allowed Claim has been satisfied in full in accordance with <u>Section 8.13(a)</u> of the Plan, all Distributions or other consideration provided by a Primary Obligor in a currency other than the U.S. Dollar shall be

08-13555-scc    Doc 47624    Filed 07/10/15    Entered 07/10/15 16:40:03    Main Document
Pg 26 of 51

converted to the U.S. Dollar applying the existing exchange rate derived from Reuters existing at approximately 3:00 p.m. GMT on the Confirmation Date." Plan § 8.13(d).[7]

95.     The then existing exchange rate from British Pound Sterling to U.S. Dollars on the Confirmation Date was approximately 1.5643.[8]

96.     Accordingly, as of today's date, NGOF has received distributions from LBIE of approximately $91,616,007.70 based upon the exchange rate as of the Confirmation Date.  See Plan § 8.13(d).

97.     Therefore, under Section 8.13(d) of the Plan, at least $13,435,218.41, plus unliquidated amounts are owed by each of the Debtors to NGOF, subject to the single-satisfaction rule.  Likewise, to date, NGCF's Claims have not been fully satisfied under the Plan.

## RESPONSE TO OBJECTION

### I.   The Claims Should Be Allowed Or, At A Minimum, Require Discovery And A Merits Hearing.

#### A.   The Objection Is Insufficient To Overcome The *Prima Facie* Validity Of The Claims.

98.     Proofs of claim are notice pleadings and are not required to satisfy the pleading requirements under the Federal Rules of Civil Procedure.  See Gens v. Resolution Trust Corp., 112 F.3d 569, 575 (1st Cir. 1997), cert. denied, 522 U.S. 931 (1997) ("[A] [proof of claim] need

---

[7]     The full text of Section 8.13(d) of the Plan reads as follows:

> For purposes of determining whether an Allowed Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, all Distributions or other consideration provided by a Primary Obligor in a currency other than the U.S. Dollar shall be converted to the U.S. Dollar applying the existing exchange rate derived from Reuters existing at approximately 3:00 p.m. GMT on the Confirmation Date.  Nothing contained in this provision shall affect the applicable exchange rate for determining the Allowed amount of any Claim under section 502(b) of the Bankruptcy Code.

Plan § 8.13(d).

[8]     See Currency Converter, Yahoo! Finance, http://finance.yahoo.com/currency-converter/#from=GBP; to=USD;amt=1 (last visited Dec. 29, 2014) (utilized given precise historical data from Reuters could not be obtained).

only provide adequate notice of the existence, nature, and amount of the claim as well as the

creditor's intent to hold the estate liable.").

99.     As notice pleadings, proofs of claim need only "ensure that all those involved in

the proceedings will be made aware of the claims against the debtor's estate and will have an

opportunity to contest those claims."  Liona Corp. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d

585, 605 (2d Cir. 1991).

100.    The pleading requirements for proofs of claim are governed by Bankruptcy Rule

3001 and Official Form 10.  See, e.g., Fed. Bankr. R. 3001(a) ("A proof of claim is a written

statement setting forth a creditor's claim [and] . . . shall conform substantially to the appropriate

Official Form."); In re BI-LO, LLC, No. 7:11-cv-00177, 2011 WL 4549150, at *7 (D.S.C. Sept.

30, 2011) (Official Form 10 "only requires the creditor to include basic facts as to the identity of

the claimant, and the amount, nature, and basis of the claim").

101.    Neither Bankruptcy Rule 3001 nor Official Form 10 incorporates the pleading

standard under Rule 8 of the Federal Rules of Civil Procedure.  See Fed. R. Bankr. P. 3001; In re

O'Malley, 252 B.R. 451, 456 (Bankr. N.D. Ill. 1999) ("A claim in bankruptcy need not meet the

foregoing tests of litigation pleading [under Rules 8(a) and 9(b)] of the Federal Rules of Civil

Procedure."); see also Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d

772, 777 (2d Cir. 1996) (holding that a proof of claim need only be "sufficiently specific" on its

face to give "notice" of the claim); In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992)

("a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the

claimant's initial obligation to go forward").

102.    Accordingly, a properly filed proof of claim is *prima facie* evidence of the

validity of that claim.  See 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f); In re WorldCom, Inc.,

No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) ("A proof of claim is deemed *prima facie* valid.").

103.    To overcome the presumptive validity of a duly filed proof of claim, "'the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.'"  In re King, 305 B.R. 152, 164 (Bankr. S.D.N.Y. 2004) (quoting In re Allegheny Int'l, Inc., 954 F.2d at 173-74).

104.    The burden shifts back to the claimant only when the objector refutes the validity of the claimant's proof of claim.  See In re Residential Capital, LLC, No. 12-12020, 2014 WL 1058921, at *4 (Bankr. S.D.N.Y. Mar. 17, 2014) (overruling debtor's claim objection where it "did not present evidence specifically addressing the [claimant's] contentions—contained in the proof of claim—that they were unable to deposit funds into the frozen account").

105.    The Plan Administrator concedes that it bears the burden to rebut the presumptive validity of the Claims.  See Objection ¶ 19.  As set forth in this Response, the Plan Administrator has failed to meet its burden to rebut the *prima facie* validity of the Claims and the Claims should be allowed.

106.    The same result should be reached if the Court undertakes a Rule 12(b)(6) analysis and applies the pleading standards under the Federal Rules of Civil Procedure to the Claims as the Claims satisfy Federal Rule of Civil Procedure 8.

107.    The Claims clearly contain "a short plain statement of the claim showing that the [Newport Funds are] entitled to relief; and [make] a demand for the relief sought" against the Debtors.  See Fed. R. Civ. P. 8(a)(2)-(3).

108.    Under Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b), this Court must accept the factual allegations contained in the Claims, this Response and the May Declaration as

true and draw all favorable inferences in the Newport Funds' favor.  See Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715 (2d Cir. 2011), cert. denied, 132 S. Ct. 242 (2011).  The Newport Funds are required to allege "only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

109.    The plausibility requirement does not impose a "probability requirement [on the Claims] at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the conduct alleged."  Starr v. Sony BMG Music Entm't, 592 F.3d 314, 322 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 556).

110.    Accepting all factual allegations set forth in the Claims as true, the Newport Funds have established plausible claims for breaches of the Prime Brokerage Agreement, gross negligence and willful misconduct by the Debtors, and the joint and several liability of the Debtors under the Prime Brokerage Agreement.    Accordingly, the Objection should be overruled.

###     B.    At The Very Least, The Claims Require Discovery And A Merits Hearing.

111.    On April 19, 2010, the Court entered its *Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against the Debtors* (the "**Claims Procedures Order**") [Docket No. 8474].

112.    Under the Claims Procedures Order, all hearings "to address the legal sufficiency of [a] particular Contested Claim and whether [a] Contested Claim states a claim against the asserted Debtor under Bankruptcy Rule 7012" are considered "Sufficiency Hearings" when the Plan Administrator fails to serve the "holder of a Contested Claim (each, a 'Claimant') with a . . . Notice of Merits Hearing."  Claims Procedures Order, Exhibit A ¶ 4(a).

113.    The Plan Administrator has not served the Newport Funds with a Notice of Merits Hearing.  Accordingly, the Objection triggers only a Sufficiency Hearing.

114.    Under the Claims Procedures Order, Sufficiency Hearings do not include the right to discovery, unless otherwise ordered by the Court.  Id. at 2-3.

115.    At the very least, the Court should overrule the Objection and permit the Newport Funds limited discovery as the Objection raises material issues of fact.  See Topever Corp. v. ENE Grp. LLC, No. 12-cv-869, 2013 WL 822378, at *4 (S.D.N.Y. Mar. 6, 2013) (denying motion to dismiss breach of contract claim and finding that plaintiff alleged sufficient facts even though complaint was missing information); Fed. Deposit Ins. Corp. v. Shea & Gould, No. 95 Civ. 5491, 1997 WL 401822, at *8, *15 (S.D.N.Y. July 17, 1997) (denying motion to dismiss breach of contract claim and ordering parties to complete discovery).

116.    For example, the Court cannot find that the Claims are barred under Paragraph 29 or 30 of the Prime Brokerage Agreement on the current record based on the Plan Administrator's conclusory pronouncement that the Debtors' actions or inactions with respect to the Newport Funds' securities did not constitute gross negligence or willful misconduct.

117.    Moreover, it would be improper to credit—without any discovery—the Plan Administrator's selective disclaimer of the Debtors' liability under the Prime Brokerage Agreement.  At the very least, the Court should permit discovery to determine the scope of LBI's agency and the benefits and burdens undertaken by the Debtors as parties to the Prime Brokerage Agreement.

## II.    The Prime Brokerage Agreement Does Not Release The Debtors From Liability For The Newport Funds' Claims.

118.    As a preliminary matter, New York courts interpret exculpatory provisions narrowly against parties attempting to insulate themselves from liability based upon "the long-

settled general proposition that the law frowns upon an agreement intended to exculpate a party from the consequences of its own [conduct]." <u>Ash v. New York Univ. Dental Ctr.</u>, 564 N.Y.S.2d 308, 310 (1st Dep't 1990) ("Because exculpation provisions are not favored by the law, they are strictly construed against the party relying on them and must be unambiguously expressed in unmistakable language that is clear and explicit in communicating the intention to absolve from negligence the party seeking to be insulated from liability.") (citation omitted).

119.    Indeed, under New York law, exculpatory clauses are generally "'disfavored by the law . . . closely scrutinized by the courts,'" and are only recognized when they do not offend public policy.  <u>Banc of Am. Secs. LLC v. Solow Bldg. Co. II, L.L.C.</u>, 847 N.Y.S.2d 49, 53 (1st Dep't 2007) (citation omitted).

**A.      The Claims Are Not Barred By
         Section 29 Of The Prime Brokerage Agreement.**

120.    Section 29 of the Prime Brokerage Agreement states:

> You agree that Lehman Brothers will not be liable for any loss caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, including but not limited to earthquakes, hurricanes and tornadoes, or other conditions beyond Lehman Brothers' control.  In the event that any communications network, data processing system, or computer system Lehman Brothers uses is rendered inoperable, Lehman Brothers will not be liable to you for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom.

Prime Brokerage Agreement § 29.[9]

121.    By its terms, Section 29 is a force majeure exculpation clause that is not applicable to the Claims.  This provision relieves the Debtors of liability only from the

---

[9]    In the Prime Brokerage Agreement executed by NGOF, Sections 29 and 30 are contained within Sections 28 and 29, respectively.

consequences of events over which they had no control—not unilateral decisions by Lehman Brothers not to comply with contractual obligations to follow prime brokerage customers' instructions.

122.  New York courts, moreover, interpret force majeure provisions narrowly and excuse performance "only if the force majeure clause specifically includes the event that actually prevents a party's performance." See Kel Kim Corp. v. Cent. Mkts., Inc., 519 N.E.2d 295, 296-96 (N.Y. 1987) (clause limiting liability for events "beyond the control" of a party did not excuse performance under the contract where "the events listed in the force majeure clause . . . [were] different in kind and nature" from the alleged inability to honor the contract's terms); see also Rochester Gas & Elec. Corp. v. Delta Star, Inc., No. 06-CV-6155, 2009 WL 368508, at *8 (W.D.N.Y. Feb. 13, 2009) (holding that performance could not be excused under force majeure clause where it did "not specifically mention" the alleged impossibility).

123.  The burden of demonstrating whether a force majeure occurred is "on the party seeking to have its performance excused" and a "non-performing party must demonstrate its efforts to perform its contractual duties despite the occurrence of the event that it claims constituted force majeure." Phillips P.R. Core, Inc. v. Tradax Petrol., Ltd., 782 F.2d 314, 319-20 (2d Cir. 1985) (breaching party was not excused from performance under force majeure clause where purported force majeure did not prevent the party from carrying out its obligations under the contract). The Plan Administrator has not come near to sustaining this burden.

124.  The Plan Administrator has offered no evidence of any event applicable here that could release the Debtors from liability under Section 29—which plainly addresses the acts of third parties and does not include failure to follow instructions from customers or insolvency as events that release the Debtors from liability.

125.    The Plan Administrator's conclusory assertions that the initiation of the Debtors' Chapter 11 proceedings, the LBIE administration order, and the commencement of LBI's SIPA proceeding relieved the Debtors of liability under the Prime Brokerage Agreement is unsupported by any facts, pleadings or orders to that effect. See Objection ¶¶ 12, 36.

126.    Indeed, Lehman Brothers had more than sufficient time to transfer the Newport Funds' securities prior to LBHI's Chapter 11 bankruptcy filing, the LBIE administration order and the commencement of LBI's SIPA proceeding, as the Newport Funds directed Lehman Brothers to transfer their securities to Credit Suisse five days prior to the LBHI Chapter 11 filing and LBIE administration order, and nine days prior to the commencement of LBI's SIPA proceeding. The Plan Administrator fails to offer any evidence that the transfer of the Newport Funds' securities could not have been completed in accordance with the Prime Brokerage Agreement and the Newport Funds' instruction.

127.    Moreover, contrary to the Plan Administrator's assertion, the facts in In re MF Global, Inc., 515 B.R. 434 (Bankr. S.D.N.Y. 2014) are not nearly identical to the facts presented here. Accordingly, MF Global does not support the contention that the Claims are barred by Section 29 of the Prime Brokerage Agreement.

128.    The exculpatory provision in the MF Global customer agreement covered the precise harm for which the plaintiffs sought to recover:  contract losses "caused directly or indirectly by,' inter alia, (1) '**any Applicable Law, or any order of any court**;' (2) '**suspension or termination of trading**,' and (3) 'any other causes beyond [MFGI's] control.'" Id. (emphasis added). In holding that the claims were barred because the customer agreement expressly exculpated the debtor from liability for losses caused by and after "a suspension of trading," the Court reasoned that the commencement of the SIPA proceeding "led to the freezing of [the]

27

customer accounts; an automatic result from the commencement of the case (the liquidation order specifically ordered all accounts to be "frozen") and a cause beyond [the debtor's] control." <u>Id.</u> at 441.

129.   The issues presented to this Court by the Claims are fundamentally different than those presented in <u>MF Global</u>.   Unlike the case in <u>MF Global</u>, Lehman Brothers received the Newport Funds' instruction to transfer the securities to Credit Suisse five days before LBHI's Chapter 11 filing and the LBIE administration order, and nine days before commencement of LBI's SIPA proceeding.   Thus, Lehman Brothers was contractually obligated to transfer the Newport Funds' securities prior to the commencement of each respective insolvency proceeding and, on information and belief, no court order prevented Lehman Brothers from doing so.

130.   Moreover, Section 29 of the Prime Brokerage Agreement does not include insolvency proceedings or court orders as events that could relieve the Debtors of liability.   Here, the Claims arise directly from Lehman Brothers' failure to transfer the Newport Funds' securities as duly instructed before any insolvency proceedings were initiated, not from the initiation of bankruptcy proceedings or other court order.

131.   Further, the absence of a carve-out for acts of gross negligence or willful misconduct in Section 29 does not insulate the Debtors from liability for their failure to transfer the Newport Funds' securities, which amounts to gross negligence or willful misconduct.

132.   Exemptions from liability for willful or grossly negligent acts have long been viewed as wholly void under governing New York law.   <u>See</u> <u>Sommer v. Fed. Signal Corp.</u>, 593 N.E.2d 1365, 1370 (N.Y. 1992) ("It is the public policy of [New York] . . . that a party may not insulate itself from damages caused by grossly negligent conduct."); <u>Soroof Trading Dev. Co., Ltd. v. GE Fuel Cells Sys. LLC</u>, 842 F. Supp. 2d 502, 516 (S.D.N.Y. 2012) ("[A]n exculpatory

agreement, no matter how flat and unqualified in terms, will not exonerate a party from liability

under all circumstances.").

133.    Accordingly, the Court should not bar the Claims under Section 29 because they

allege acts of gross negligence or willful misconduct by the Debtors.   At the very least, the

Objection raises issues of fact for which the Court should permit discovery.

**B.      The Claims Are Not Barred By
      Section 30 Of The Prime Brokerage Agreement.**

134.    Section 30 of the Prime Brokerage Agreement states:

> Lehman Brothers shall not be liable in connection with the
> execution, clearing, handling, purchasing or selling of securities,
> commodities or other property, or other action, except for gross
> negligence or willful misconduct on Lehman Brothers' part.  You
> understand that certain securities may be held outside the United
> States by unaffiliated, foreign agent banks and depositories.
> Lehman Brothers will not be liable to you for any loss, liability or
> expense incurred by you in connection with these arrangements
> except to the extent that any such loss, liability or expense results
> from Lehman Brothers' gross negligence or willful misconduct.  In
> no event will either party be liable for any special, indirect,
> incidental or consequential damages arising out of this Agreement.

Prime Brokerage Agreement § 30.

135.    Section 30 does not bar the Claims for two reasons:  <u>first</u>, the Claims fall outside

the  scope  of  the  transactions  covered  by  this  provision;  <u>second</u>,  the  Claims  assert  gross

negligence or willful misconduct by Lehman Brothers, which are expressly carved out of Section

30, and, at the very least, by their nature raise material issues of fact that require discovery.

**i.      *The Claims Are Not Barred By Section 30
      Because They Are Outside The Scope Of Its Terms.***

136.    The  Claims  are  not  covered  by  Section  30  of  the  Prime  Brokerage  Agreement

because the language of Section 30 is limited in scope to specific enumerated transactions (none

of which are applicable here).  By its terms, Section 30 does not extend to Lehman Brothers'

failure to follow the Newport Funds' instruction to transfer their securities to another prime broker. Section 30 does not refer to "transferring," "returning," or "following instructions." If the intent was to release Lehman Brothers for such a failure, such language would be included in the Prime Brokerage Agreement. But no such language was included in the Prime Brokerage Agreement. Accordingly, the Objection must fail.

137.    That the Plan Administrator cannot stretch Section 30 to cover the Claims is also confirmed by the canon of construction *noscitur a sociis*, which requires that "the meaning of a word in a series of words be determined 'by the company it keeps.'" <u>JPMorgan Chase Bank N.A. v. Baupost Grp., LLC (In re Enron Creditors Recovery Corp.)</u>, 380 B.R. 307, 322 (S.D.N.Y. 2008) ("Terms in a provision are construed in accordance with the meaning of the words that are associated with them."); <u>In re Motors Liquidation Co.</u>, 447 B.R. 142, 148 (Bankr. S.D.N.Y. 2011) (two words in a series, "accidents" and "incidents," "should be given related meaning" under *noscitur a sociis*).

138.    Applying this canon of construction, Section 30 does not extend to the Claims because the exculpated transactions, by their plain terms, relate to the process of purchasing or selling securities—not the failure to follow the Newport Funds' instruction regarding the transfer of their securities to Credit Suisse.

139.    At the very least, any ambiguity in the scope of Section 30 must be interpreted against the Debtors, given that the Prime Brokerage Agreement was drafted by Lehman Brothers. <u>See</u> <u>Fein ex rel. Estate of Fein v. Chi. Ins. Co.</u>, No. 01 Civ. 11386, 2003 WL 21688239, at *6 (S.D.N.Y. July 16, 2003) (ambiguous contracts should be "'construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language.'" (quoting <u>Jacobson v. Sassower</u>, 499 N.Y.S.2d 381, 382 (1985))).

140.   The Court should also reject the Plan Administrator's proposed interpretation of Section 30, which attempts to force the Claims into its purview by alleging that "the Claims seek to recover damages [i] related to the 'handling' of the Account assets or [ii] for other alleged losses incurred 'in connection with [the] arrangements' under the Prime Brokerage Agreement." Objection ¶ 31.  The Plan Administrator offers no supporting explanation or details as to why or how the Claims should fall within Section 30 of the Prime Brokerage Agreement.

141.   <u>First</u>, the term "handling" must be interpreted in association with the terms surrounding it in Section 30—none of which relate to the transfer or return of the securities to the Newport Funds, or Lehman Brothers' compliance with its customers' instructions.

142.   Further, given the lack of insight as to:  (i) where the Newport Funds' securities were located when the Newport Funds requested their transfer; (ii) where the securities were located at the time of the Chapter 11 bankruptcy filing; and (iii) the Debtors' "handling" of the Newport Funds' securities at any time, the Plan Administrator's reliance on Section 30's reference to "handling" should fail.

143.   <u>Second</u>, this Court should reject the Plan Administrator's assertion that Section 30 of the Prime Brokerage Agreement bars the Claims because they "allege[] losses incurred 'in connection with [the] arrangements' under the Prime Brokerage Agreement."  Objection ¶ 31.

144.   The Plan Administrator takes the term "arrangements" in the last sentence of Section 30 out of context in an apparent effort to expand its application to all arrangements relating to the Newport Funds' securities under the Prime Brokerage Agreement.  <u>Id.</u>  But, in fact, the "arrangements" referenced in Section 30 relate only to potential losses caused by the Debtors' arrangements with third-party banks and depositories.  <u>See</u> Prime Brokerage Agreement § 30.

145.   Indeed, Section 30 expressly states that "Lehman Brothers will not be liable . . . for any loss, liability or expense . . . in connection with **these arrangements**" in reference to the very arrangements described in the preceding sentence (which are not applicable here).  See id. (emphasis added).   Thus, the scope of this sentence cannot be expanded to apply to all "arrangements" under the Prime Brokerage Agreement as the Plan Administrator contends.

146.   The Plan Administrator also cannot avoid liability for the Claims by reference to the "other action" language in Section 30.  The canon of construction *ejusdem generis* attributes to the last item in a sequence of items "the same characteristic of discreteness shared by all the preceding items."  Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 62-63 (2004) (limiting the interpretation of the last word in a list based upon the characteristics of those items preceding it); see also In re Enron Creditors Recovery Corp., 380 B.R. at 323 ("The canon of *ejusdem generis* is employed to limit 'broad catch-all terms' in a manner consistent with the other listed terms that are more specific.").

147.   Accordingly, the phrase "other action" must be interpreted to cover items and actions similar to those listed before it, which do not include the failure to comply with the Newport Funds' instructions to transfer their securities to Credit Suisse.

148.   Thus, the terms of Section 30 do not bar the Claims and the Objection should be overruled on this point.

> ***ii.***        ***At The Very Least, Reliance On Section 30
> To Object To The Claims Raises Issues Of
> Fact That Cannot Be Resolved Without Discovery.***

149.   Section 30 of the Prime Brokerage Agreement contains an express carve-out for gross negligence and willful misconduct.  See Prime Brokerage Agreement § 30 ("Lehman

Brothers shall not be liable . . . except for gross negligence or willful misconduct on Lehman Brothers' part.").

150.   Under New York law, to state a claim for gross negligence, a party must allege that the breaching party:  (i) breached a duty owed to the non-breaching party; (ii) which proximately caused; (iii) the non-breaching party's damages; and (iv) "the act or omission [is] of an aggravated character."  Travelers Indem. Co. of Conn. v. The Losco Grp., Inc., 204 F. Supp. 2d 639, 644 (S.D.N.Y. 2002) (quoting Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998)).

151.   Further, under New York law, the determination as to whether acts or omissions constitute gross negligence is reserved for the trier of fact and should not be determined prior to discovery.  See Travelers Indem. Co. of Conn. v. The Losco Grp., 136 F. Supp. 2d 253, 256-57 (S.D.N.Y. 2001) (denying motion to dismiss claims for gross negligence because they could not "be fully established until discovery is completed"); see also Robin Bay Assocs., LLC v. Merrill Lynch & Co., No. 07 Civ. 376, 2008 WL 2275902, at *6 (S.D.N.Y. June 3, 2008) (denying motion to dismiss on grounds that plaintiff had stated a cause of action for breach of contract and because the court was "reluctant to terminate the proceedings . . . without allowing the parties to conduct formal discovery" given "the subtle distinctions that differentiate gross negligence from negligence").

152.   Here, the Newport Funds have sufficiently stated claims for gross negligence and willful misconduct as Lehman Brothers' failure to abide by the terms of the Prime Brokerage Agreement, applicable laws, rules and regulations, and standard practices in the industry, all while having the capacity to do so, is a failure of aggravated character.

153.   Lehman Brothers simply could have "pressed the button" and transferred the Newport Funds' securities no later than a day prior to the LBHI bankruptcy filing or LBIE

administration order (or within the next week prior to the commencement of LBI's SIPA proceeding). Lehman Brothers' failure to do so constituted gross negligence and willful misconduct.

154. The two cases cited by the Plan Administrator in support of expunging the Claims at the motion to dismiss stage are inapposite here. In <u>Arjent Ltd. v. EZE Castle Integration, Inc.</u>, No. 0603543/2007, 2008 N.Y. Misc. LEXIS 8331, at *8-10 (N.Y. Sup. Ct., N.Y. Cnty. Feb. 27, 2008), the court held that two short telephone service outages suffered by the plaintiff were insufficient to qualify as gross negligence. There, the defendant service provider had sent a technician to repair the outage shortly after it occurred. <u>Id.</u> Even though the issue was not immediately resolved, the court found that the curative steps taken by the service provider precluded a finding of gross negligence.

155. The Plan Administrator's reliance on <u>Deutsche Lufthansa AG v. Boeing Co.</u>, 2007 U.S. Dist. LEXIS 9519 (S.D.N.Y. Feb. 2, 2007) is also off-base. In <u>Deutsche Lufthansa AG</u>, the court found that the defendant's conduct did not amount to gross negligence largely on account of plaintiffs' counsel's concession that he was unaware of any facts that constituted a reckless disregard for the plaintiff's contractual rights. <u>Id.</u> at *7, *11.

156. Here the Newport Funds have alleged that Lehman Brothers received its instruction to transfer the securities, acknowledged the instruction, and still failed to complete the transfer after the transfer was booked, despite having the means to do so. <u>See</u> May Decl. ¶ 46-52.

157. Lehman Brothers' failure to transfer the Newport Funds' securities in the days prior to the LBHI bankruptcy, LBIE administration order, and LBI SIPA proceeding, despite having the means to do so, was gross negligence and willful misconduct.

158.    This is particularly so given that, upon information and belief, the Newport Funds' securities were rehypothecated by LBIE in violation of the Prime Brokerage Agreement, Margin Lending Agreement, Federal Reserve Board Regulation T, 12 C.F.R. Part 220, and Customer Protection Rule, 17 C.F.R. § 220.15c3-3, and were not under appropriate control by Lehman Brothers as required of a prime broker at the time of the Newport Funds' transfer request.

159.    Accordingly, to the extent the Court does not allow the Claims at this time, the factual record should be developed further with respect to the Debtors' gross negligence or willful misconduct.

### III.    The Claims State Valid Breach of Contract Claims For Which The Debtors Are Jointly and Severally Liable.

#### A.    The Claims State *Prima Facie* Valid Claims For Breach of Contract.

160.    The Plan Administrator asserts that the Debtors have no liability for the Claims because they never "agreed to perform" the prime brokerage services under the Prime Brokerage Agreement.  Objection ¶ 44.  As such, the Plan Administrator asserts that "the Claims fail because they do not identify specific obligations created by the Prime Brokerage Agreement that each LBHI Estate assumed and subsequently breached."  Objection ¶ 47.

161.    There are three elements that must be established as part of a breach of contract claim under New York law:  (i) existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach.  See Terwillinger v. Terwillinger, 206 F.3d 240, 245-46 (2d Cir. 2000).

162.    The Claims identify several breaches of the Prime Brokerage Agreement for which each of the Debtors is liable.

163. Specifically, the Debtors are liable for "the value of [the Newport Funds'] assets held pursuant to the Agreements in the Account[s] that have not been otherwise returned to [the Newport Funds]." Proof of Claim ¶ 4.

164. Under Section 3 of the Prime Brokerage Agreement, the Newport Funds' securities were "held by or through any Lehman Brothers Entity . . . as collateral by such Lehman Brothers Entity as agent and bailee for itself and all other Lehman Brothers Entities . . . ." Prime Brokerage Agreement § 3.

165. It is well established under New York law that a bailee must return bailed property on demand. See S. Rafael Jewels Corp. v. Nezaj, Case No. 107336/11, 2014 WL 2106250, at *2 (N.Y. Sup. Ct. N.Y. Cnty. May, 15 2014) ("It is well-established law in [New York] that the failure on the part of a bailee to return bailed property on demand raises a presumption of negligence in the case of a mutual bailment or bailment for hire.").

166. Additionally, the failure of the Debtors to return the Newport Funds' securities on demand was a breach of the Debtors' obligations under Article 8 of the Uniform Commercial Code, which protects a security owner—whose securities are held with a securities intermediary—from the securities intermediary's other creditors. See, e.g., N.Y. U.C.C. Law § 8-511(a) (with respect to competing interests in securities held by a securities intermediary "the claims of entitlement holders, other than the creditor, have priority over the claim of the creditor").

167. Under Section 3 of the Prime Brokerage Agreement "[the Newport Funds] and Lehman Brothers agree that all such Assets held in or credited to any account will be treated as financial assets under Article 8 of the Uniform Commercial Code as in effect in the State of New York (the 'UCC') and that any account maintained by [the Newport Funds] with any Lehman

Brothers Entity shall be a securities account under Article 8 of the UCC." Prime Brokerage Agreement § 3.

168. In contravention of the protections afforded to the Newport Funds under Article 8 of New York's Uniform Commercial Code, Lehman Brothers' failure to return the Newport Funds' securities favored other creditors over the Newport Funds' to the Newport Funds' detriment.

169. Accordingly, the Debtors are liable for breach of the Prime Brokerage Agreement for the failure to return the Newport Funds' securities in accordance with New York law.

170. Relatedly, the Debtors are liable to the Newport Funds "for all damages and losses resulting from Lehman's failure to comply with [the Newport Funds'] instruction on September 10, 2008 to transfer securities held under the Agreements to Credit Suisse." Proof of Claim ¶ 5.

171. Under Section 2 of the Prime Brokerage Agreement, Lehman Brothers agreed that "[a]ll transactions under this Agreement shall be subject to applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities." Prime Brokerage Agreement § 2.

172. Accordingly, because Lehman Brothers agreed to comply with all applicable laws, rules and regulations, the Debtors are liable for breach of the Prime Brokerage Agreement for their failure to transfer the Newport Funds' securities to Credit Suisse in contravention of applicable U.S. law, including, without limitation, applicable New York law, the SEC Letter, SEC Rule 15c3-3, and Regulation T.

173. The Debtors are further liable to the Newport Funds for "the value of all Distributions received postpetition, and any such future dividend and interest distributions

received (including payment-in-kind distributions) on account of [the Newport Funds'] assets held pursuant to the Agreements in the Account." Proof of Claim ¶ 6.

174.    Specifically, Section 19(b) of the Prime Brokerage Agreement provides that "[u]nless otherwise agreed by Lehman Brothers and [the Newport Funds], [the Newport Funds] will be entitled to receive all distributions . . . made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent . . . ." Prime Brokerage Agreement § 19(b); see also Proof of Claim ¶ 6.

175.    Given that the Newport Funds' securities were never returned to the Newport Funds by Lehman Brothers, numerous post-petition distributions wrongfully flowed to and were retained by Lehman Brothers for which the Debtors are jointly and severally liable as asserted in the Claims.

176.    Furthermore, the Debtors are liable for "the loss of [the Newport Funds'] ability to participate in certain rights offering(s) [and other corporate events], as a direct result of Lehman's post-petition breaches of the Agreements." Proof of Claim ¶ 8.

177.    Section 10 of the Prime Brokerage Agreement provides that, "if Lehman Brothers receives notice from you that you wish to act on any [rights issue, among other things] . . . Lehman Brothers will act in accordance with your wishes." Prime Brokerage Agreement § 10.

178.    Additionally, Section 11 of the Prime Brokerage Agreement provides that "[i]f any right to vote arises with respect to securities in [the Newport Funds'] account, [the Newport Funds] may inform Lehman Brothers that [they] wish to exercise such right as [they] specify . . . [and Lehman Brothers] will act in accordance with [the Newport Funds'] wishes." Id. § 11.

179.    Accordingly, the Debtors are jointly and severally liable for this obligation because Lehman Brothers failed to transfer the Newport Funds' securities and as a direct result

the Newport Funds lost the ability to participate in various post-petition corporate events connected to the Newport Funds' securities. The Debtors cannot avoid liability by claiming that the Newport Funds failed to provide LBIE with an indemnity that has no basis under the Prime Brokerage Agreement and was not commercially reasonable.

180.    Finally, the Debtors are liable for their failure to properly capitalize CAPCO and for all losses and damages to the Newport Funds on account of their reliance on Lehman Brothers' fraudulent or negligent misrepresentations about CAPCO. See Proof of Claim ¶ 10.

181.    For example, in the 2007 Credit Protection Overview, Lehman Brothers represented to the Newport Funds that "LBI maintains a surety bond issued by the Customer Asset Protection Company ('CAPCO') . . . [and that the] same persons that would be considered 'customers' under SIPA are eligible for protection under CAPCO's bond which, with certain limitations, covers the full amount of the unsatisfied portion of the customer's net equity claim." 2007 Credit Protection Overview, May Decl. Exhibit G, at 5.

182.    Lehman Brothers also represented that "LBIE also maintains a surety bond issued by CAPCO . . . [which] covers the unsatisfied portion of a customer's net equity claim not otherwise provided by LBIE's assets or the LBHI guarantee." Id. at 7.

183.    The Newport Funds relied on Lehman Brothers' fraudulent or negligent misrepresentations in the 2007 Credit Protection Overview that the Newport Funds could rely on CAPCO surety bonds in transacting with Lehman Brothers and entrusting their securities to Lehman Brothers, and the Newport Funds were damaged by Lehman Brothers' fraudulent or negligent misrepresentations to that effect.

184.    Accordingly, the Claims state prima facie breach of contract claims and other claims for which the Debtors are liable. At the very least, the Claims are plausible, and the

Newport Funds are entitled to discovery and a Merits Hearing (as defined in the Claims Procedure Order) on the Claims.

**B. The Debtors Are Jointly And Severally Liable For The Claims Under The Prime Brokerage Agreement.**

185. The Plan Administrator asserts that "joint and several liability is only applicable where two or more parties to a contract have promised the same performance or undertaken the same obligation" and that here, the Debtors did not specifically assume the obligation to perform the prime brokerage services because only LBI is mentioned under Section 21 of the Prime Brokerage Agreement. See Objection ¶ 40

186. This effort to evade liability fails because, as shown above, the Claims identify several breaches of the Prime Brokerage Agreement for which the Debtors are directly liable under the Prime Brokerage Agreement, and, as shown below, the Debtors are jointly and severally liable for all obligations to the Newport Funds under the Prime Brokerage Agreement.

187. In a multi-party contract under New York law, "contractual rights and responsibilities are presumed to be joint unless the contract includes severing language." Edgewater Growth Capital Partners, L.P. v. Greenstar N. Am. Holdings, Inc., Case No. 108641/08, 2013 WL 9057379, at *9-10 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 2, 2013) (parties to stock purchase agreement were jointly and severally liable where the agreement did not contain language limiting liability); see also Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp., 802 N.Y.S.2d 411, 414 (1st Dep't 2005) (contract contained no limiting language that could overcome the presumption of joint liability), leave to appeal denied, 7 N.Y.3d 703 (2006).

188. Moreover, under New York law, "the requisite intent to be jointly and severally bound may be found where the [contract] is worded in the singular." Battery Assocs., Inc. v. J & B Battery Supply, Inc., 944 F. Supp. 171, 178 (E.D.N.Y. 1996) (finding that the contract

imposed joint and several liability on the co-signatory defendants when the contract was worded in the singular by using terms such as "the undersigned," "himself," and "his").

189. The Prime Brokerage Agreement states that it "sets forth the terms and conditions under which Lehman Brothers . . . will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer." Prime Brokerage Agreement at Preamble.

190. Two Debtors are specifically named parties to the Prime Brokerage Agreement (LBHI and Lehman Brothers Special Financing Inc.), and the other Debtors are parties to the Prime Brokerage Agreement as "subsidiaries" or "affiliates" of the named parties.

191. LBI acted as agent for, and signed on behalf of, the other Lehman Brothers entities in that capacity, reflecting the intent that all Lehman Brothers entities would be jointly and severally liable under the multi-party Prime Brokerage Agreement.

192. LBI and each of the Debtors are defined as and referred to throughout the Prime Brokerage Agreement collectively and interchangeably as the "Lehman Entities" and "Lehman Brothers."

193. The Prime Brokerage Agreement does not contain any clear, express severing language at all. To the contrary, the use of "Lehman Brothers," "it," and "its" throughout the Prime Brokerage Agreement indicates that the obligations under the Prime Brokerage Agreement were intended to be obligations of all the Lehman Brothers entities that were parties to the Agreement, including the Debtors. See, e.g., Prime Brokerage Agreement §§ 11, 17.

194. Further, the Debtors are joint and severally liable under the principle that a party may not accept the benefits of the bargain and avoid the obligations thereunder. See Packer & Klein v. I. Frank & Sons, 196 N.Y.S. 289, 290 (1st Dep't 1922) (holding that a corporation

which had "knowingly accepted the benefit of a contract . . . could not accept the benefits of the arrangement and repudiate the incident obligation").

195.     It is undisputed that the Prime Brokerage Agreement provides Lehman Brothers with numerous benefits.  See, e.g., Prime Brokerage Agreement § 19 (permitting "Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of [the Newport Fund's] accounts."); id. § 21(j) (providing for an indemnity in favor of Lehman Brothers).

196.     Accordingly, it is clear that the Debtors reaped the benefits of the Prime Brokerage Agreement and therefore remain bound by the obligations and liabilities thereunder.

197.     Further, the two cases relied upon by the Plan Administrator in this regard are distinguishable and should not be given weight by the Court on this issue.  First, in Abundance Partners LP v. Quamtel, Inc., 840 F. Supp. 2d 758, 769 (S.D.N.Y. 2012), the payment obligation was created in a prior agreement that was not expressly assumed by the new party in the amended agreement under which the plaintiff sought to enforce a claim.  Conversely, here, all of the obligations were created under the same instrument with Lehman Brothers as a whole (including the Debtors) as parties to, and benefitting from, the Prime Brokerage Agreement.

198.     Second, in Kranze v. Cinecolor Corp., 96 F. Supp. 728, 730 (S.D.N.Y. 1951), the parties were named as separate entities throughout the agreement and none of the separate benefits or obligations overlapped with any other party.  Conversely, here, the Prime Brokerage Agreement refers to Lehman Brothers throughout, and all of the Lehman Brothers entities enjoyed the benefits of the Prime Brokerage Agreement.

199.    In sum, the Objection fails to rebut the presumption that obligations under multi-party contracts are joint and several unless the contract contains adequate severing language, which is not present in the Prime Brokerage Agreement.

200.    At the very least, the issue of whether the parties intended the Prime Brokerage Agreement to sever the Debtors' liability for the Claims is a question of fact that requires discovery and is outside the scope of a Sufficiency Hearing.  See In re John B. Rose Co., 275 F. 409, 414-15 (2d Cir. 1921) (intention to bifurcate liability must be "determined by the language used and by intention of the parties as gathered from all the circumstances of the case.").

## IV.    The Claims Should Be Allowed In Full Subject To The Single-Satisfaction Rule.

201.    The Court should allow the Claims in the liquidated amounts set forth above and permit discovery as to the value of the unliquidated amounts of the Claims.

202.    It is well established that a creditor is permitted to assert the full value of its claim against a debtor co-obligor, subject only to the "single-satisfaction rule" that the creditor cannot retain value beyond payment in full.  See Ivanhoe Building & Loan Ass'n of Newark, N.J. v. Orr, 295 U.S. 243, 245-46 (1935) (holding that a creditor may recover from non-debtor parties without reducing the value of its claim against a bankruptcy estate); see also In re LightSquared, Inc., No. 12-12080-SCC, 2014 WL 5488413, at *6-7 (Bankr. S.D.N.Y. Oct. 30, 2014) ("[E]ach [claimant] continues to hold a claim against every [debtor co-obligor] . . . for any amount that is unpaid when due, and each of the . . . claims continues to exist until the [obligation] is paid, in full.").

203.    This principle does not change where a creditor has received distributions from other sources—the creditor is still permitted an allowed claim for the full asserted amount.  See In re Nat'l Energy & Gas Trans., Inc., 492 F.3d 297, 301 (4th Cir. 2007) (allowing full value of

creditor's claim despite creditor having already received $140 million in payments on the claim), cert. denied, 552 U.S. 1231 (2008); In re Del Biaggio, 496 B.R. 600 (Bankr. N.D. Cal. 2012) (holding that a proof of claim need not be reduced by amounts already recovered from a third party unless the creditor would otherwise reap a double recovery).

204.    Accordingly, under applicable law, the Newport Funds retain the right to assert the full value of their Claims and the Claims should be allowed in the full value asserted subject to the single-satisfaction rule.

205.    As the Newport Funds are not seeking a double recovery, the Objection should be overruled on this issue.

## CONCLUSION

206.    The Debtors have delayed and deferred confronting the Newport Funds' Claims for years, apparently hoping that their war of attrition would exhaust the Newport Funds from pursuing full relief for their Claims.  The Newport Funds should not have to bear more costs and risk at this stage of the proceedings when the Claims should have been allowed long ago.  The Objection should be seen for what it is—another unreasonable procedural hurdle by the Debtors to delay the rightful allowance of the Claims.  The Objection should be overruled.

WHEREFORE, for all the reasons set forth in this Response, the Newport Funds respectfully request that the Court: (i) overrule the Objection; (ii) allow the Claims in the aggregate amounts of: (a) $163,334,098.49 (USD) for NGOF, plus currently unliquidated amounts to be determined; and (b) $38,327,041.04 (USD) for NGCF, plus currently unliquidated amounts to be determined; (iii) permit the Newport Funds limited discovery with respect to the unliquidated amounts of the Claims and schedule a Merits Hearing related thereto; and (iv) grant such other and further relief as is just and proper.

Dated: January 2, 2015
      New York, New York

              **BROWN RUDNICK LLP**

              */s/ Howard S. Steel*
              David J. Molton
              Andrew Dash
              Howard S. Steel
              Jacob T. Beiswenger
              Seven Times Square
              New York, New York 10036
              Telephone: 212-209-4800
              Facsimile: 212-209-4801

              *Counsel for Newport Global Opportunities Fund LP and Newport Global Credit Fund (Master) LP*

# EXHIBIT A

## (ROGER MAY DECLARATION)

08-13555-scc    Doc 47621-1    Filed 04/02/15    Entered 04/02/15 16:40:03    Exhibit A
Pg 54 of 125

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x

In re                                            :        Chapter 11 Case No.
                                                 :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,     :        08-13555 (SCC)
                                                 :
            **Debtors.**                         :        (Jointly Administered)

--------------------------------------------------------------------x

## DECLARATION OF ROGER MAY IN SUPPORT OF
## THE RESPONSE OF NEWPORT GLOBAL OPPORTUNITIES
## FUND LP AND NEWPORT GLOBAL CREDIT FUND (MASTER) LP TO THE
## FOUR HUNDRED AND EIGHTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS

I, Roger May, declare as follows:

1.      I am a Senior Managing Director and the Chief Financial Officer and Chief Operating Officer of Newport Global Advisors LP ("**NGA**").

2.      I submit this declaration in support of the *Response of Newport Global Opportunities Fund LP and Newport Global Credit Fund (Master) LP to the Four Hundred Eighty-Eighth Omnibus Objection to Claims* (the "Response").[1]

3.      At all relevant times, NGA managed Newport Global Opportunities Fund LP ("**NGOF**") and Newport Global Credit Fund (Master) LP ("**NGCF**" and, together with NGOF, the "**Newport Funds**").

4.      As Senior Managing Director, Chief Financial Officer and Chief Operating Officer of NGA, I administered the Newport Funds' relationship with Lehman Brothers.

5.      I have personal knowledge of the matters set forth in this Declaration.  If called to testify, I could and would testify as follows:

---

[1]    Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in the Response.

**A.    The Newport Funds' Relationship With Lehman Brothers.**

6.    The Newport Funds are, and at all relevant times were, investment funds managing hundreds of millions of dollars of assets and are primarily focused on distressed investment opportunities.

7.    The key employees of NGA have extensive credit management backgrounds and at all relevant times were particularly concerned about the credit protection of the prime broker for the Newport Funds.

8.    Prior to entering into the Prime Brokerage Agreement, the Newport Funds had extensive discussions with Lehman Brothers' representatives about Lehman Brothers' prime broker services and creditworthiness.

9.    As was the case throughout the Newport Funds' relationship with Lehman Brothers, Lehman Brothers' representatives often identified themselves to the Newport Funds as employees of Lehman Brothers, not employees of specific Lehman Brothers entities.

10.    For example, Lehman Brothers' marketing materials provided to the Newport Funds prior to entering into the Prime Brokerage Agreement listed the Lehman Brothers' representatives who were to provide prime broker customer support for the Newport Funds. Each such representative was identified as an employee of "Lehman Brothers," not as an employee of a specific Lehman Brothers entity.    See Lehman Brothers' marketing documentation titled "Global Prime Broker Coverage for Newport," a true and accurate copy of which is attached hereto as **Exhibit A**.

11.    Additionally, the Lehman Brothers' representatives who interacted with the Newport Funds on a day-to-day basis held themselves out as representatives of "Lehman Brothers" and never identified themselves as an employee of a specific Lehman Brothers entity.

2

08-13555-scc    Doc 47621-1    Filed 04/02/15    Entered 04/02/15 16:40:03    Exhibit
Pg 56 of 125

See, e.g., E-mail from Jackelyn Day, Equity Finance / Prime Brokerage, Lehman Brothers, to Roger May, Senior Managing Director, Chief Financial Officer and Chief Operating Officer, NGA (Mar. 30, 2006 11:59 EST) (on file with recipient), a true and accurate copy of which is attached hereto as **Exhibit B** (example of communication where representative is held out as an employee of "Lehman Brothers").

12.     Moreover, throughout the Newport Funds' relationship with Lehman Brothers, services were often held out to the Newport Funds as part of a joint Lehman Brothers enterprise incapable of being separated into specific Lehman Brothers entities for purposes of its relationship with the Newport Funds.

13.     In communications and marketing documentation sent to the Newport Funds prior to the Newport Funds entering into the Prime Brokerage Agreement, Lehman Brothers stressed to the Newport Funds that, by partnering with Lehman Brothers as a prime brokerage customer, Lehman Brothers would "deliver the firm" and that the Newport Funds could rely on "direct access to all resources and levels of" the Lehman Brothers enterprise.  See Lehman Brothers' Global Client Services marketing documentation, a true and accurate copy of relevant portions thereof is attached hereto as **Exhibit C**.

14.     All of the Newport Funds' requests to purchase or sell securities were placed with, and confirmed by, representatives who held themselves out as Lehman Brothers' representatives (indeed, neither I nor any other representative of the Newport Funds ever spoke with a representative of LBIE until after the Lehman Brothers' insolvency filings).

15.     Lehman Brothers' commitment to "deliver the firm" and to provide "direct access to all resources and levels of" the Lehman Brothers enterprise was part of the overall

creditworthiness that induced the Newport Funds to choose Lehman Brothers as their prime broker and upon which the Newport Funds relied to transact with Lehman Brothers.

     **_i._**       **_The 2005 LBHI Guarantee._**

16.     On June 9, 2005, the executive committee of the board of directors of LBHI executed the Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (the "**2005 LBHI Guarantee**").

17.     A true and accurate copy of the 2005 LBHI Guarantee is attached hereto as **Exhibit D**.

18.     The 2005 LBHI Guarantee provides at page two that "[Lehman Brothers Holdings Inc.] hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the [LBHI's Code of Authorities]."

19.     Schedule A of the 2005 LBHI Guarantee includes LBIE among the list of Guaranteed Subsidiaries.

20.     Prior to the Newport Funds entering into the Prime Brokerage Agreement, I had knowledge of and reviewed the 2005 LBHI Guarantee.

21.     I understood the 2005 LBHI Guarantee to be a guarantee by LBHI of Lehman Brothers' prime broker services under the Prime Brokerage Agreement—including, without limitation, those obligations of LBIE, which the Newport Funds understood to be a party to the Prime Brokerage Agreement—and part of Lehman Brothers' commitment to "deliver the firm" to the Newport Funds as a prime brokerage customer of Lehman Brothers.

22.     The 2005 LBHI Guarantee was part of the overall creditworthiness that induced the Newport Funds to choose Lehman Brothers as their prime broker.

23.     The Newport Funds relied upon the 2005 LBHI Guarantee when they entered into transactions with Lehman Brothers, including executing the Prime Brokerage Agreement and entrusting the Newport Funds' securities with Lehman Brothers.

### ii.     *The Prime Brokerage Agreement.*

24.     In 2006, with knowledge of and in reliance on, *inter alia*, the 2005 LBHI Guarantee, NGA executed two Prime Brokerage Customer Account Agreements (each a "**Prime Brokerage Agreement**") with LBI and the other Lehman Brothers Entities (as defined in the Prime Brokerage Agreement), one on behalf of NGOF and the other on behalf of NGCF.

25.     A true and accurate copy of a representative Prime Brokerage Agreement is attached hereto as **Exhibit E**.

26.     The credit protection provided by the 2005 LBHI Guarantee was among the reasons the Newport Funds chose to enter into the Prime Brokerage Agreement.

### iii.     *The Margin Lending Agreement.*

27.     In connection with entering into the Prime Brokerage Agreement, Lehman Brothers caused each of NGOF and NGCF to enter into a Margin Lending Agreement (each an "**MLA**") with LBI and LBIE, pursuant to which LBIE agreed to make loans to the Newport Funds in connection with their transactions under the Prime Brokerage Agreement.

28.     A true and accurate copy of a representative MLA is attached hereto as **Exhibit F**.

29.     Under Section 5(c) of the MLA, the Newport Funds authorized LBIE—within the limits of applicable law and regulations (*i.e.*, U.S. securities laws and New York law)—to lend either to itself or to others "any or all Collateral," which could then be "pledged, repledged, hypothecated or rehypothecated . . . for any amounts due to [LBIE] thereon or for a greater sum."

08-13555-scc    Doc 47621    Filed 01/02/15    Entered 01/02/15 16:40:03
Pg 59 of 125

30.    However, the Newport Funds did not authorize LBIE or any Lehman Brothers entity to transfer, lend, re-lend, pledge, repledge, hypothecate, or rehypothecate the Newport Funds' securities in amounts exceeding Federal Reserve Board Regulation T, 12 CFR Part 220, or to avoid the "Customer Protection Rule," 17 C.F.R. § 220.15c3-3.

31.    As of September 15, 2008, the date LBIE was placed into administration proceedings under English law and the date on which certain of the instant Debtors commenced their Chapter 11 cases, the Newport Funds did not have any indebtedness to LBIE under the MLAs.

iv.    ***Lehman Brothers' Assurances To The Newport Funds Regarding Its Creditworthiness.***

32.    In late 2007-2008, the capital markets experienced significant distress, including the failure of Bear Stearns.

33.    As a result, the Newport Funds sought additional assurances from Lehman Brothers with respect to Lehman Brothers' creditworthiness and the safety of the Newport Funds' securities entrusted to Lehman Brothers.

34.    In March 2008, as part of a series of ongoing communications between the Newport Funds and Lehman Brothers about Lehman Brothers' financial well-being, I spoke with Donald DeGraff and John Gatsos of Lehman Brothers, who verbally assured me that the Newport Funds benefitted from an LBHI parent guarantee.

35.    In further support of its verbal statements, Lehman Brothers assured the Newport Funds of its creditworthiness by, *inter alia*, pointing to and providing the Newport Funds with a Customer Asset Protection Overview from November 2007 (the "**2007 Credit Protection Overview**").

36.     A true and accurate copy of the 2007 Credit Protection Overview is attached hereto as **Exhibit G**.

37.     The 2007 Credit Protection Overview provides an overview of Lehman Brothers' creditworthiness, including, *inter alia*, stating at page seven that "LBIE has the benefit of a full parent guarantee from LBHI."

38.     The Newport Funds at the time understood the "full parent guarantee from LBHI" to include the 2005 LBHI Guarantee.

39.     On account of Lehman Brothers' representations of financial stability, including, without limitation, the 2007 Credit Protection Overview and its reference to a full parent guarantee from LBHI, the Newport Funds continued to transact with Lehman Brothers and entrust their securities with Lehman Brothers.

   *v.*          *The 2008 LBHI Guarantee.*

40.     On January 4, 2008, LBHI executed the Guarantee of Lehman Brothers Holdings Inc. (the "**2008 LBHI Guarantee**" and, together with the 2005 LBHI Guarantee, the "**LBHI Guarantees**").

41.     A true and accurate copy of the 2008 LBHI Guarantee is attached hereto as **Exhibit H**.

42.     The 2008 LBHI Guarantee states:  "We, Lehman Brothers Holdings Inc., do hereby absolutely and unconditionally guarantee the payment by Lehman Brothers International (Europe) ("Affiliate") of all of Affiliate's liabilities, obligations and commitments (the "Guaranteed Obligations") to any counterparty of Affiliate and such counterparty's successors, endorsees and assigns . . . ."

43.    I had knowledge of and reviewed the 2008 LBHI Guarantee at or around the time of its publication.

44.    I understood the 2008 LBHI Guarantee to be a guarantee by LBHI of Lehman Brothers' prime broker services under the Prime Brokerage Agreement—including, without limitation, the obligations of LBIE, which I understood to be a party to the Prime Brokerage Agreement—and part of Lehman Brothers' commitment to "deliver the firm" to the Newport Funds as a prime brokerage customer of Lehman Brothers.

45.    Accordingly, the LBHI Guarantees were relied on by the Newport Funds as a core element of Lehman Brothers' overall creditworthiness and as a basis to continue transacting with Lehman Brothers under the Prime Brokerage Agreement during tumultuous economic times.

**B.    The Newport Funds' Instructions To
Transfer Their Securities From Lehman Brothers**

46.    As is standard in the securities industry and required under the Prime Brokerage Agreement, Lehman Brothers was obligated to comply with the instructions of the Newport Funds regarding their securities entrusted to Lehman Brothers.

47.    On September 10, 2008, in my capacity as manager and authorized representative of the Newport Funds, I instructed Lehman Brothers to transfer all of the Newport Funds' securities to Credit Suisse Securities (USA) LLC ("**Credit Suisse**"), which was to assume the duties as the Newport Funds' prime broker.

48.    The transfer request was acknowledged by Mizan Rahman of Lehman Brothers on September 11, 2008.  See E-mail from Mizan Rahman, Capital Markets Prime Services, Lehman Brothers, to Roger May, Senior Managing Director, Chief Financial Officer and Chief Operating Officer, NGA (Sept. 11, 2008, 11:18 EDT) (on file with recipient), a true and accurate copy of which is attached hereto as **Exhibit I**.

49.     On September 12, 2008, at the request of Lehman Brothers' representative Mizan Rahman, I forwarded Letters of Authorization by e-mail to Lehman Brothers to facilitate the transfer of the Newport Funds' securities to Credit Suisse.  See E-mail from Roger May, Senior Managing Director, Chief Financial Officer and Chief Operating Officer, NGA, to Mizan Rahman, Capital Markets Prime Services, Lehman Brothers (Sept. 12, 2008, 12:05 EDT) (on file with author), a true and accurate copy of which is attached hereto as **Exhibit J**.

50.     Upon receipt of the Letters of Authorization, the transfer of the Newport Funds' securities was "booked [by Lehman] on September 12, 2008."  E-mail from Mizan Rahman, Capital Markets Prime Services, Lehman Brothers, to Roger May, Senior Managing Director, Chief Financial Officer and Chief Operating Officer, NGA (Sept. 23, 2008, 13:35 EDT) (on file with recipient), a true and accurate copy of which is attached hereto as **Exhibit K**.

51.     Lehman Brothers told the Newport Funds that "[a]ny transfers initiated [on September 12, 2008] will need to be T+2 settlement."  See E-mail from Mizan Rahman, Capital Markets Prime Services, Lehman Brothers, to Roger May, Senior Managing Director, Chief Financial Officer and Chief Operating Officer, NGA (Sept. 12, 2008, 8:04 EDT) (on file with recipient), a true and accurate copy of which is attached hereto as **Exhibit L**.

52.     As such, Lehman Brothers confirmed that the transfer of the Newport Funds' securities would be completed *no later than September 14, 2008*.

53.     On September 15, 2008, the Newport Funds were advised by Lehman Brothers that it had "lost access" to the Newport Funds' securities.  See E-mail from Mizan Rahman, Capital Markets Prime Services, Lehman Brothers, to Roger May, Senior Managing Director, Chief Financial Officer and Chief Operating Officer, NGA (Sept. 15, 2008, 21:34 EDT) (on file with recipient), a true and accurate copy of which is attached hereto as **Exhibit M**.

9

54.    To this date, the Newport Funds' securities have never been transferred by Lehman Brothers per the Newport Funds' instructions to Credit Suisse or any other replacement prime broker.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 2, 2015.                              _____*/s/ Roger May*_____
                                                                                ROGER MAY

# EXHIBIT A

# Global Prime Broker Coverage For Newport

**LEHMAN BROTHERS** | Global Client Services

## Client Integration

### Sales and Marketing

**Sandy Fleischmann**
Head GCS Global Sales - New York
Phone: 212.526.8259
Email: sfleisch@lehman.com

**Don DeGraff**
Sales and Marketing
Phone: 212.526.6548
Email: ddegraff@lehman.com

**Chris Healey**
Sales and Marketing
Phone: 212.526.6876
Email: chealey@lehman.com

### Client Service

**Monty Forrest**
Co-Head  Global Client Service
Phone: 212.528.0713
Email: mforrest@lehman.com

**David Aronow**
US Head - GCS Client Service
Phone: 212.528.9813
Email: daronow@lehman.com

**Josh Kurek**
Client Service Team Leader
Phone: 212.526.6272
Email: Jkurek@lehman.com

**Bryant Ho**
Client Service Representative
Phone: 212.526.2243
Email: bho@lehman.com

### Business Advisory Services

**Jeffery Kollin**
Business Advisory Services
Phone: 212.526.2569
Email: jkollin@lehman.com

**Jackelyn Day**
Transition Manager
Phone: 212.526.9234
Email: jaday@lehman.com

### Securities Lending/Trading

**Geoff Allen**
GCS Sales Trading - Fixed Income New York
Phone: 212.526.6824
Email: ghallen@lehman.com

6

**LEHMAN BROTHERS**

# EXHIBIT B

## Roger May

| | |
|---|---|
| **From:** | Day, Jackelyn [jaday@lehman.com] |
| **Sent:** | Thursday, March 30, 2006 11:59 AM |
| **To:** | Roger May |
| **Cc:** | Rent, Joshua; Healey, Christopher; DeGraff, Donald C |
| **Subject:** | Newport Coverage Team |

**Attachments:**   GCS Coverage Sheet - Newport.pdf



GCS Coverage
Sheet - Newport....

        Hello Roger

Please find attached information on your Lehman Brothers coverage team.
We look forward to introducing you to Josh Rent who will be your primary day to day
contact on our call at 10am ET tomorrow.

Please do not hesitate to contact me if  there is anything else you need as I'll be
continuing to co-ordinate the transition of your account into Lehman Brothers.

Kind regards

 <<GCS Coverage Sheet  - Newport.pdf>>

Jackelyn Day
> LEHMAN BROTHERS
> Equity Finance / Prime Brokerage
Telephone: 212 526 9234
Fax:  646-758-3569


-----------------------------------------------------------------------------
This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not
be regarded as an offer to sell or as a solicitation of an offer to buy any financial
product, an official confirmation of any transaction, or as an official statement of
Lehman Brothers.  Email transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or accurate and it should
not be relied upon as such.  All information is subject to change without notice.

# EXHIBIT C

## Delivering the Firm

**Through Global Client Services, clients gain direct access to the entire firm at the highest levels. With only 270 Clients, our client focused approach to business guarantees immediate and direct access to all resources and levels of the firm.**



LEHMAN BROTHERS

6

LEHMAN BROTHERS | Global Client Services

# Business Advisory
## Systems Overview

The diagram below illustrates all the components which should be considered in building out your operational platform to support your business.  You need to consider the following set of core functions:

- Order Management
- Risk Reporting
- P/L Reporting
- Portfolio/Partnership Accounting
- Execution System

A key step in getting your business operational is to define and prioritize all the integrated systems which will be required to run the fund.





# Global Client Services

Derivative Servicing

# LEHMAN BROTHERS

This material has been prepared by GCS and is not a product of Lehman Brothers Research Department. It is for information purposes only. All levels and prices are indications only and do not represent firm market levels. Changes in market conditions since the issuance of this document may affect some or all of the levels and prices listed. For firm levels and prices please call the desk.

# EXHIBIT D

# UNANIMOUS WRITTEN CONSENT OF THE

# EXECUTIVE COMMITTEE OF THE

# BOARD OF DIRECTORS OF

# LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

WHEREAS, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

WHEREAS, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

WHEREAS, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

WHEREAS, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

WHEREAS, Management wishes to establish additional Guaranteed Subsidiaries,

WHEREAS, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

WHEREAS, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

NOW THEREFORE BE IT,

RESOLVED, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

RESOLVED, that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, provided that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

RESOLVED, that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

RESOLVED, that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

FURTHER RESOLVED, that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 7, 2005

Richard S. Fuld, Jr.

John D. Macomber

2

06/08/2005    16:41    LEHMAN BROTHERS/382653                    NO.504    P03

<u>Schedule A</u>
<u>to LBHI Unanimous Written Consent</u>
<u>dated June 9 , 2005</u>

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

# EXHIBIT E

# Customer Account Agreement Prime Brokerage

**LEHMAN BROTHERS INC.**

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019
(212) 526-7000

| Title: Newport Global Credit Fund (Master) LP | Account (and Group) No.: |
|---|---|
| | |

## Please Read Carefully, Sign and Return

This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers (as defined below) will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer. Throughout this Agreement references to "you" and "your" refer to you as our customer.

In consideration of Lehman Brothers opening a prime brokerage account for you, you agree to the following:

**1. PARTIES.** (a) A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc. ("LBI"). All transactions, agreements and contracts between you and Lehman Brothers have been entered into in consideration of each other. You hereby agree that the parties to this Agreement shall consist of you and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns (each such entity or person being referred to hereinafter as Lehman Brothers or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers"). Unless you advise Lehman Brothers in writing to the contrary, you represent that you are not an affiliate (as defined in Rule 144(a)(1) under the U.S. Securities Act of 1933 as may be amended, modified or supplemented) of the issuer of any security held in any account opened hereby.

(b) You represent and warrant to Lehman Brothers that you are either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and you covenant and agree that any successor Investment Advisor (or Investment Manager or General Partner, as the case may be) appointed by you will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and you will provide Lehman Brothers with a Investment Advisor Representation Letter .

**2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY.** All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

**3. SECURITY INTEREST AND LIEN; REGISTRATION OF SECURITIES.** As security for the payment and performance of all of your obligations and liabilities from time to time outstanding to any Lehman Brothers Entity, whether under this Agreement or otherwise, each Lehman Brothers Entity shall have a continuing lien and first priority security interest in all your Assets, defined as (i) all property which you now have or hereafter acquire an interest which is now or hereafter held by or through any Lehman Brothers Entity, including, but not limited to, any and all securities, accounts, instruments, documents, contract rights, contracts (including, but not limited to, open transactions, securities purchase or sale contracts, agreements to lend cash or securities,

commodity contracts, futures contracts, forward contracts, repurchase agreements, swap agreements, contracts for differences or any other agreement, without regard to the form of such agreement which may include oral agreements or agreements confirmed or signed by only one party to the agreement and agreements entered into or signed by a Lehman Brothers Entity on your behalf) (hereinafter "Contracts"), commercial paper and other securities, monies, deposit accounts and general intangibles (including all security entitlements in respect thereof, all income and profits thereon, all dividends, interest and other payments and distributions with respect thereto and all proceeds from any of the foregoing), and (ii) any and all rights, claims or causes of action you may now or hereafter have against any Lehman Brothers Entity. The continuing lien and first priority security interest shall apply to all such Assets, which from time to time may be deposited or credited to any account you may have with a Lehman Brothers Entity, be held or carried by a Lehman Brothers Entity for you, be due from a Lehman Brothers Entity to you, or be delivered to or in a Lehman Brothers Entity's possession or control for any purpose, including safekeeping. Such continuing lien and first priority security interest shall apply irrespective of whether or not Lehman Brothers has made advances in connection with such Assets, the number of accounts you have with Lehman Brothers or which particular Lehman Brothers Entity holds such Assets. You hereby acknowledge and agree that all such Assets held by or through any Lehman Brothers Entity are held as collateral by such Lehman Brothers Entity as agent and bailee for itself and all other Lehman Brothers Entities and, as such, each Lehman Brothers Entity shall comply with any orders or instructions originated by any other Lehman Brothers Entity with respect to or in connection with such collateral without your further consent. You and Lehman Brothers agree that all such Assets held in or credited to any account will be treated as financial assets under Article 8 of the Uniform Commercial Code as in effect in the State of New York (the "UCC") and that any account maintained by you with any Lehman Brothers Entity shall be a securities account under Article 8 of the UCC. In the event of a breach or default by you, a Lehman Brothers Entity shall have, in addition to the rights and remedies provided in this Agreement, all rights and remedies available to a secured creditor under the UCC and any other applicable law. You represent that all of the above-described Assets shall at all times be free and clear of all liens, claims and encumbrances of any nature other than the security interest created hereby. Assets consisting of securities shall be delivered in good deliverable form (or Lehman Brothers shall have the unrestricted power to place such securities in good deliverable form) in accordance with the requirements of the primary market for these securities. In addition, in order to satisfy any of your outstanding liabilities or obligations to any Lehman Brothers Entity, each Lehman Brothers Entity may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to you, use, apply or transfer any and all securities or other property or Assets (including, without limitation, fully-paid securities and cash). You hereby agree that, except as otherwise specifically agreed in writing, each Lehman Brothers Entity may register and hold the securities and other property or Assets in your accounts in its name or the name of its designee. You shall execute such documents and take such other action as such Lehman Brothers Entity shall reasonably request in order to perfect its rights with respect to any of the Assets. In addition, you appoint Lehman Brothers as your attorney-in-fact to act on your behalf to sign, seal, execute and deliver all documents and do all such acts as may be required to realize upon any of Lehman Brothers' rights in the Assets.

**4.  BREACH, BANKRUPTCY OR DEFAULT.** If you shall:

(i) breach, repudiate or default under this Agreement or any Contract with any Lehman Brothers Entity, whether heretofore or hereafter entered into;

(ii) make or repeat any misrepresentations in connection with this Agreement or any Contract with any Lehman Brothers Entity;

(iii) state that you will not perform any obligation to any Lehman Brothers Entity;

(iv) apply for, consent to or be the subject of an application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar persons of yourself or of all of or a substantial part of your property;

(v) admit in writing your inability, or become generally unable, to pay your debts as such debts become due or give Lehman Brothers other grounds for insecurity, as determined by Lehman Brothers in its sole and absolute discretion (including, without limitation, death; mental incompetence; dissolution; the appointment of a receiver by or against you, any guarantor, co-signer or other party liable on or providing security for your obligations to any Lehman Brothers Entity

2

or the attachment against your or such other party's account(s) with any Lehman Brothers Entity; or any indication of your refusal or inability to satisfy promptly any Margin Call (as defined below) or other obligation);

(vi) make a general assignment for the benefit of your creditors; or

(vii) file or be subject of the filing or entry of a petition or order for relief or be subject of the commencement of a proceeding regarding reorganization, bankruptcy, liquidation, dissolution or insolvency;

then, any such event shall constitute, at Lehman Brothers' election, a default by you under this Agreement and any or all Contracts you may then have with any Lehman Brothers Entity, whether heretofore or hereafter entered into. In the event of any such default, each Lehman Brothers Entity shall have all of the rights of a secured party upon default under the UCC and other applicable laws, rules and regulations, including, without limitation, the right, without prior notice to you, to sell any and all Assets in which you have an interest (including without limitation this Agreement and any Contract) held by or through any Lehman Brothers Entity (either individually or jointly with others), to buy any or all property which may have been sold short, to exercise any and all options and other rights, to accelerate, cancel, terminate, liquidate, close out and net the settlement payments and/or delivery obligations under any or all outstanding transactions and/or to purchase or sell any other securities or property to offset market risk, and to set off or offset any obligation owing by any Lehman Brothers Entity to you against any obligations owing by you to any Lehman Brothers Entity, after which you shall be liable to Lehman Brothers for any remaining deficiency, loss, costs or expenses incurred or sustained by Lehman Brothers in connection therewith. Such purchases and/or sales may be effected publicly or privately without notice or advertisement in such manner as Lehman Brothers may in its sole discretion determine. At any such sale or purchase, any Lehman Brothers Entity may purchase or sell the property to or from itself or third parties free of any right of redemption and you shall remain liable to Lehman Brothers for any deficiency; it being understood that a prior tender, demand or call of any kind from Lehman Brothers, or prior notice from Lehman Brothers, of the time and place of such sale or purchase shall not be considered a waiver of Lehman Brothers' right to buy or sell any securities, commodities or other property or Asset held by Lehman Brothers, or which you may owe to Lehman Brothers. In addition, each Lehman Brothers Entity shall have the right, at any time and from time to time, to set off and otherwise apply any and all amounts owing by such Lehman Brothers Entity to you or for your account against any and all amounts now or hereafter owing by you to any Lehman Brothers Entity (including, without limitation, any indebtedness in your accounts), whether matured or unmatured, fixed, contingent or otherwise and irrespective of whether any Lehman Brothers Entity shall have made any demand therefor. Lehman Brothers agrees to notify you of any such set-off and application, provided, however, that the failure to give such notice shall not affect the validity of any such set-off and application. You agree that any obligation of a Lehman Brothers Entity to you shall be subject to there being no breach, repudiation, misrepresentation or default (however characterized) by you which is continuing under any Contract with a Lehman Brothers Entity. You and Lehman Brothers intend this Agreement to be a master netting agreement.

**5. ADEQUATE ASSURANCES.** Subject to, and not as a limitation of, the rights of Lehman Brothers under this Agreement, if at any time Lehman Brothers has reasonable grounds for insecurity with respect to your performance of any of your obligations, Lehman Brothers may demand, and you shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lehman Brothers demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lehman Brothers may include, but shall not be limited to, the delivery by you of additional property as collateral.

**6. EXECUTION FEES AND SERVICE CHARGES.** You understand that your account(s) will be charged brokerage commissions or mark-ups/mark-downs in connection with the execution of transactions ("Execution Fees") and may be charged certain other fees for custody and other services furnished to you ("Service Fees"). You further understand that Execution Fees may be changed from time to time upon prior written notice to you and that Service Fees may be changed from time to time upon prior written notice to you and, in each case, you agree to be bound thereby.

**7. AMOUNTS OWED; TRUTH-IN-LENDING.** You hereby acknowledge receipt of Lehman Brothers' Truth-in-Lending disclosure statement. You understand that interest will be charged on any amount you owe in your account(s) in accordance with the methods described in such statement or in any amendment or revision thereto which may be provided to you. Any amount due which is not paid at the close of an interest period will be added to the opening balance for the next interest period.

3

**8. COLLECTION AND OTHER ACCOUNT-RELATED COSTS.** You hereby agree to pay, on demand, all reasonable costs, liabilities and damages incurred by Lehman Brothers (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with (i) enforcing its rights hereunder, (ii) any investigation, litigation or proceeding involving your account or any property therein (including, without limitation, claims to such property by third parties), (iii) your use of or access to any Lehman Brothers or third-party system or (iv) Lehman Brothers' acting in reliance upon instructions, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail, from you or your authorized agents (including investment managers or advisers). In each case and whether or not demand has been made therefor, you hereby authorize Lehman Brothers to charge your account(s) for any and all such costs, liabilities and damages, including, without limitation, those incurred in connection with the liquidation of any of your Assets.

**9. IMPARTIAL LOTTERY ALLOCATION.** You agree that, in the event Lehman Brothers holds on your behalf securities in its name, in the name of its designee or in bearer form which are called in part, you will participate in the impartial lottery allocation system for such called securities in accordance with the rules of The New York Stock Exchange, Inc. or any other appropriate self-regulatory organization. When any such call is favorable, no allocation will be made to any account in which, to the knowledge of Lehman Brothers, any officer, director or employee of Lehman Brothers has any financial interest until all other customers have been satisfied on an impartial lottery basis.

**10. SECURITIES EVENTS.** Lehman Brothers shall inform you if Lehman Brothers becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities in your account(s): conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to Section 19 herein, if Lehman Brothers receives notice from you that you wish to act on any of the events referenced in this section and such notice is received by Lehman Brothers within a reasonable time for Lehman Brothers to act on such event, Lehman Brothers will act in accordance with your wishes. You represent that you review all prospectuses and offering statements that you may receive and understand the risks inherent with your securities transactions, including any risks associated with the above-described securities events.

**11. VOTING RIGHTS.** If any right to vote arises with respect to securities in your account, you may inform Lehman Brothers that you wish to exercise such right as you specify. Subject to Section 19 hereof, if Lehman Brothers receives this notice within a reasonable time to act, it will act in accordance with your wishes. If Lehman Brothers does not receive such timely notice from you, it will use its discretion to decide whether and how to vote such securities.

**12. WAIVER, ASSIGNMENT AND NOTICES.** Neither Lehman Brothers' failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lehman Brothers of any of its rights or privileges hereunder. Any purported assignment of your rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lehman Brothers shall be null and void. Each Lehman Brothers Entity reserves the right to assign any of its rights or obligations hereunder or under any Contract to any other Lehman Brothers Entity without prior notice to you. Notices and other communications to you (including, without limitation, Margin Calls) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by you, shall, until the respective Lehman Brothers Entity has received notice in writing of a different address or number, be deemed to have been personally delivered to you. Margin Calls may also be communicated orally, without subsequent written confirmation.

**13. FREE CREDIT BALANCES.** You hereby authorize Lehman Brothers to use any free credit balance awaiting investment or reinvestment in your account(s) in accordance with all applicable rules and regulations and to pay interest thereon at such rate or rates and under such conditions as are established from time to time by Lehman Brothers for such account(s) and for the amounts of cash so used.

**14. RESTRICTIONS ON ACCOUNT.** You understand that Lehman Brothers, in its sole and absolute discretion, may restrict or prohibit trading of securities or other property in your account(s) and may terminate your account(s), and you shall nevertheless remain liable for all of your obligations to the Lehman Brothers Entities under

4

this Agreement or any Contract. In the event that Lehman Brothers, in its sole and absolute discretion, determines to impose such restrictions on your account(s) due to credit, margin, legal, regulatory, money laundering or other concerns, Lehman Brothers shall be under no obligation to provide you with prior notice of such restriction.

**15. CREDIT INFORMATION AND INVESTIGATION.** You authorize Lehman Brothers, in its discretion, at any time and from time to time, to make or obtain reports concerning your credit standing and business conduct (including, but not limited to, obtaining audited account statements, if such are available). You may make a written request for a description of the nature and scope of the reports made or obtained by Lehman Brothers and the same will be provided to you within a reasonable period of time.

**16. SHORT AND LONG SALES.** In placing any sell order for a short sale, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "short". You are required to and will comply with all applicable rules and regulations relating to short sale transactions. In placing any sell order for a long order, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "long". The designation of a sell order as being long shall constitute a representation by you that you own the security with respect to which the order has been placed, that such security is not restricted under Rules 144 and/or 145 under the U.S. Securities Act of 1933 (as may be amended, modified or supplemented) or any other applicable law, rule or regulation and, as such, may be sold without restriction in the open market and that, if Lehman Brothers does not have the security in its possession at the time you place the order, you shall deliver the security by settlement date in good deliverable form or pay to Lehman Brothers any losses and expenses it may incur or sustain as a result of your failure to make delivery on a timely basis.

**17. MARGIN ACCOUNTS.** All Loans made hereunder are demand loans. You hereby agree to deposit and maintain such cash or collateral as margin in your margin accounts, if any, as Lehman Brothers may in its sole discretion require, and you agree to pay forthwith on demand any amount owing with respect to any of your margin accounts to satisfy Lehman Brothers' demand for such payment (a "Margin Call"). In addition, you further agree to deposit promptly and maintain such other collateral with Lehman Brothers as is required by any Contract you may have with any Lehman Brothers Entity. Upon your failure to make any such payment or deposit, or if at any time Lehman Brothers, in its sole discretion, deems it necessary for its protection, whether with or without prior demand, call or notice, Lehman Brothers shall be entitled to exercise all rights and remedies provided herein. No demands, calls, tenders or notices that Lehman Brothers may have made or given in the past in any one or more instances shall invalidate your waiver of the requirement to make or give the same in the future.

**18. SECURITIES CONTRACTS.** You acknowledge and agree that any positions in your account(s) shall be deemed "securities contracts" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code.

**19. CONSENT TO LOAN OR PLEDGE OF SECURITIES IN MARGIN ACCOUNTS.**

(a) Except as noted in subparagraph (b) below, within the limits of applicable law and regulations, you hereby authorize Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of your accounts, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such property as collateral for its general loans. Any such property, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lehman Brothers thereon or for a greater sum, and Lehman Brothers shall have no obligation to retain a like amount of similar property in its possession and control. You hereby acknowledge that, as a result of such activities, Lehman Brothers may receive and retain certain benefits to which you will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations or rehypothecations may limit, in whole or in part, your ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. You agree to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation.

(b) Unless otherwise agreed by Lehman Brothers and you, you will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned,

pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent you would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

**20. OPTIONS.** You are aware of and agree to be bound by the Rules of the applicable Options Exchange or Association as well as The Options Clearing Corporation (OCC). You represent and warrant not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions and risks as set out in the Characteristics and Risks of Standardized Options booklet and applicable supplements. You understand that short options positions are assigned on an automated random basis and may be assigned on the day written. You understand that the official closing price may be determined some time after the close of trading for purposes of this section. You understand that listed equity options may be automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise listed options that are out-of-the-money by any amount, at-the-money, or in-the-money but are not subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You will notify Lehman Brothers of your intention not to exercise an option that is in-the-money, and subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You understand that listed options on an underlying index are automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise any option early or not to exercise an option on an underlying index which is in-the-money no later than 15 minutes prior to the close of trading for that option on that day. If notification is not given to Lehman Brothers within the times noted, Lehman Brothers is under no obligation to take action but will endeavor to comply with your instructions. Except as required by the OCC Rules, Lehman Brothers has no obligation to exercise any option absent specific instructions from you to that effect. You agree to not violate, whether acting alone or in concert with others, the position or exercise limits of the applicable listed options exchange.

**21. PRIME BROKERAGE SERVICES.** Under the terms and conditions of this Agreement, LBI will act as a prime broker for you in accordance with the no-action letter of the Securities and Exchange Commission dated January 25, 1994, as such letter may be amended, modified or supplemented from time to time (the "SEC Letter") and the provisions set forth below:

(a)      LBI will, subject to the terms and conditions of this Agreement, accept for clearance and settlement trades executed on your behalf by such executing brokers as you may designate from time to time and who have received LBI's prior approval and who have previously executed an agreement with LBI setting forth the terms and conditions under which such executing brokers will be authorized to accept orders from you for settlement by LBI (the "Executing Brokerage Agreement").

(b)      LBI shall be responsible for settling trades executed on your behalf by your executing broker(s) and reported to LBI by you and your executing broker(s) provided that you have reported to LBI on trade date, by the time designated to you by LBI, all the details of such trades including, but not limited to, the contract amount, the security involved, the number of shares or the number of units and whether the transaction was a long or short sale or a purchase, and further provided that LBI has either affirmed or not "DK'd" ("indicated it does not know") and has not subsequently disaffirmed such trades. In the event that LBI determines not to settle a trade, LBI shall not have settlement responsibility for such trade and shall, instead, send you a cancellation notification to offset the notification sent to you under sub-paragraph (c) of this paragraph. You shall be solely responsible and liable to your executing broker(s) for settling such trade. In addition, LBI may be required to cease providing prime brokerage services to you in accordance with the Executing Brokerage Agreement.

(c) On the day following each transaction, LBI shall send you a confirmation of each trade placed with an executing broker in accordance within the SEC Letter based upon the information you provided to LBI. Any confirmations issued by LBI as prime broker shall identify the executing broker and provide you with the information required by the SEC Letter. Confirmations of the execution of orders and other activity in your account(s) which have been provided or made available to you by 10:00 a.m. (New York time) on the business day immediately following the trade date shall be conclusive if not objected to by 2:00 p.m. (New York time) on such business day or, if such reports are provided or made available to you after 10:00 a.m. (New York time) on such business day, then such confirmations shall be conclusive if not objected to within four (4) hours after such

confirmations have been provided or made available to you. Monthly statements shall be sent to you in accordance with the SEC Letter. Information contained in monthly statements of account, to the extent not included in an activity report, shall be conclusive if not objected to within ten (10) days after such statements have been provided or made available to you. LBI may send communications to your address of record or another address provided to LBI in writing. All communications sent to such address, whether by mail, facsimile, telegraph, messenger, electronic means or otherwise, shall be deemed to have been given to you personally as of the date and time sent, whether actually received or not.

(d) In the event of: (i) the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against your executing broker, (ii) the termination of your executing broker's registration and the cessation of business by it as a broker-dealer, or (iii) your executing broker's failure, inability or refusal, for any reason whatsoever or for no reason at all, to settle a trade, and if LBI agrees to settle any trades executed on your behalf by such executing broker, regardless of whether LBI either affirmed or did not DK and did not disaffirm such trades, you shall be solely responsible, and liable to LBI, for any losses arising out of or incurred in connection with LBI's agreement to settle such trades.

(e) You shall maintain in your account with LBI such minimum net equity in cash or securities as LBI, in its sole discretion, may require from time to time (the "Lehman Brothers Net Equity Requirements"), which shall in no event be less than the minimum net equity required by the SEC Letter (the "SEC Net Equity Requirements"). In the event your account falls below the SEC Net Equity Requirements, you hereby authorize LBI to notify promptly all executing brokers with whom it has an Executing Brokerage Agreement on your behalf of such event. Moreover, if you fail to restore your account to compliance with the SEC Net Equity Requirements within the time specified in the SEC Letter, LBI shall, without notice to you: (i) notify all such executing brokers that LBI is no longer acting as your prime broker and (ii) either not affirm or "DK" ("indicate that it does not know") all prime brokerage transactions on your behalf with a trade date after the business day on which such notification was sent. In the event : (i) your account falls below the Lehman Brothers Net Equity Requirements, (ii) LBI determines in its sole discretion that there would not be enough cash in your account to settle such transactions or that a maintenance Margin Call may be required as a result of settling such transactions, or (iii) LBI determines in its sole discretion that the continuation of prime brokerage services to you presents an unacceptable risk to Lehman Brothers taking into consideration all the facts and circumstances, then LBI may disaffirm all your prime brokerage transactions and/or cease to act as your prime broker. In any such case, LBI shall send a cancellation notification to you, and you understand that you must settle outstanding trades directly with the relevant executing broker and that you authorize LBI to provide the executing broker with any information useful to settle such trades. You further agree that LBI will not be bound to make any investigation into the facts surrounding any transaction to which you are a party and that immediately upon notice to you and, if required, to the executing brokers, LBI may cease acting as your prime broker.

(f) If you have instructed your executing broker(s) to send confirmations to you in care of LBI, as your prime broker, the confirmation sent by such executing broker is available to you promptly from LBI (once received), at no additional charge.

(g) If your account is managed on a discretionary basis, you hereby acknowledge that your prime brokerage transactions may be aggregated with those of other accounts of your adviser, according to your adviser's instructions, for execution by your executing broker(s) in a single bulk trade and for settlement in bulk by LBI. You understand that no part of any transaction may be allocated to any other account where such other account's net equity is below the minimum levels established in the SEC Letter and that, should such a net equity deficiency occur in any such other account, LBI must disaffirm the entire transaction. In the event any trade is disaffirmed, as soon as practicable thereafter, LBI shall supply your executing broker(s) with the allocation of the bulk trade, based upon information provided by your adviser.

(h) You hereby authorize LBI to disclose your name, address and tax I.D. number to your executing broker(s) to enable such executing broker to establish on its books an account for you to be used in the event transactions are disaffirmed by LBI.

(i) Lehman Brothers will not be responsible or liable for any acts or omissions of any executing broker or its employees. You understand that Lehman Brothers does not act as investment adviser or solicit orders, that Lehman

7

Brothers does not advise prime brokerage customers, perform any analysis, or make any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment.

(j) You agree to indemnify and hold Lehman Brothers harmless from any loss, claim or expense, including attorneys' fees, incurred by Lehman Brothers in connection with Lehman Brothers acting or declining to act as prime broker for you and to fully reimburse Lehman Brothers for any legal or other expenses (including the cost of any investigation and preparation) which Lehman Brothers may incur in connection with any claim, action, proceeding or investigation arising out of or in connection with this Agreement or any transactions hereunder.

(k) You represent and warrant that you are currently in compliance, and during the term of this Agreement will remain in compliance, with all applicable requirements of the SEC Letter, including, but not limited to, the requirement that you execute an agreement with each executing broker.

(l) The prime brokerage services hereunder shall be provided in a manner consistent with the SEC Letter.

**22. LEGALLY BINDING.** You hereby agree that this Agreement and all of the terms hereof shall be binding upon you and your estate, heirs, executors, administrators, personal representatives, successors and assigns. You further agree that all purchases and sales shall be for your account(s) in accordance with your oral or written instructions. You hereby waive any and all defenses that any oral instruction was not in writing as may be required by any applicable law, rule or regulation. With respect to any of your accounts maintained in connection with this Agreement, you hereby authorize Lehman Brothers to act and rely on any instructions (including, without limitation, instructions to transfer cash or securities, purchase or sell securities, enter into derivative or other transactions or borrow money or securities) received by Lehman Brothers from any of the persons listed on Exhibit A, as such list may be amended by you from time to time. In addition, you hereby authorize Lehman Brothers to act and rely on any instructions received by Lehman Brothers from any of your employees or agents (including any investment manager or adviser) that Lehman Brothers reasonably believes is authorized to so act on your behalf.

**23. AMENDMENT.** You agree that Lehman Brothers may modify the terms of this Agreement at any time upon prior written notice to you. By continuing to accept services from Lehman Brothers thereafter, you will have indicated your acceptance of any such modification. If you do not accept such modification, you must notify Lehman Brothers in writing; your account may then be terminated by Lehman Brothers, after which you will remain liable to Lehman Brothers for all outstanding liabilities and obligations. Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lehman Brothers.

**24. GOVERNING LAW.** THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

**25. JURISDICTION; WAIVER OF JURY TRIAL.** The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

**26. WAIVER OF IMMUNITIES.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or

8

after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

**27. TRANSFERS.** Lehman Brothers shall have the right to transfer Assets between any account in order to satisfy any of your obligations to Lehman Brothers. When giving instructions to transfer Assets from your accounts to any bank or other entity, you agree that all such requests will have been approved by an authorized signatory and you agree to provide Lehman Brothers with an accurate account number designating the account to receive such Assets. You agree to indemnify and hold Lehman Brothers harmless from and against all liabilities arising from the provision of an inaccurate account number or any other liabilities arising as a result of the transfer at your request.

**28. PROVISION OF DATA.** With respect to any market data or other information that Lehman Brothers or any third party service provider provide to you, (i) Lehman Brothers and any such provider are not responsible or liable if any such data or information is inaccurate or incomplete in any respect; (ii) Lehman Brothers and any such provider are not responsible or liable for any actions that you take or do not take based on such data or information; (iii) you will use such data or information solely for the purposes set forth in this Agreement and any other agreement between us; (iv) such data or information is proprietary to Lehman Brothers and any such provider and you will not retransmit or disclose such data or information to third parties except as required by applicable law or regulation; and (v) you will use such data or information solely in compliance with applicable laws, rules and regulations.

**29. EXTRAORDINARY EVENTS.** You agree that Lehman Brothers will not be liable for any loss caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, including but not limited to earthquakes, hurricanes and tornadoes, or other conditions beyond Lehman Brothers' control. In the event that any communications network, data processing system, or computer system Lehman Brothers uses is rendered inoperable, Lehman Brothers will not be liable to you for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom.

**30. LIMITATION OF LIABILITY.** Lehman Brothers shall not be liable in connection with the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action, except for gross negligence or willful misconduct on Lehman Brothers' part. You understand that certain securities may be held outside the United States by unaffiliated, foreign agent banks and depositories. Lehman Brothers will not be liable to you for any loss, liability or expense incurred by you in connection with these arrangements except to the extent that any such loss, liability or expense results from Lehman Brothers' gross negligence or willful misconduct. In no event will Lehman Brothers be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.

**31. HEADINGS; COUNTERPARTS.** The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder. This Agreement may be executed in counterparts, each of which shall be deemed an original.

**32. TELEPHONE CONVERSATIONS.** For the protection of both you and Lehman Brothers, and as a tool to correct misunderstandings, you hereby authorize Lehman Brothers, at Lehman Brothers' discretion and without prior notice to you, to monitor and/or record any or all telephone conversations or electronic communications between you and Lehman Brothers or any of Lehman Brothers' employees or agents. You acknowledge that Lehman Brothers may determine not to make or keep any of such recordings and that such determination shall not in any way affect any party's rights.

**33. CUMULATIVE RIGHTS; ENTIRE AGREEMENT.** The rights, remedies, benefits and protections afforded to each Lehman Brothers Entity under this Agreement and under any Contract you may have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that any Lehman Brothers Entity may have. To the extent that the provisions of any Contracts you have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the Contracts or within a single Contract), the conflict shall be resolved in favor of the provision which affords Lehman Brothers with the maximum rights, remedies, benefits or

9

protections. You hereby appoint Lehman Brothers as your agent and attorney-in-fact to take any action (including, but not limited to, the filing of financing statements) necessary or desirable to perfect and protect the security interest granted herein or to otherwise accomplish the purposes of this Agreement. Except as set forth above, this Agreement represents the entire agreement and understanding between you and Lehman Brothers concerning the subject matter hereof.

**34. CAPACITY TO CONTRACT; ANTI-MONEY LAUNDERING; AFFILIATIONS.** You represent that you have the capacity and authority to enter into this Agreement. You represent to the best of your knowledge that you do not maintain or transact business for or with nor will you introduce individuals or entities to Lehman Brothers that the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") has listed as "Specially Designated Nationals and Blocked Persons" nor with any client in an embargoed country as determined by OFAC. Furthermore, you represent that you have conducted thorough due diligence with respect to all of your clients, and you do not know or have any reason to suspect that the monies used to fund the account have been or will be derived from or related to any illegal activities, including but not limited to, money laundering activities. You agree to provide Lehman Brothers with any information that it may require in relation to compliance with any applicable money laundering regulations. Each representation or warranty made by you in this Agreement will be deemed to be repeated by you on each date on which a transaction occurs hereunder.

You represent that you are of legal age and that, unless you have notified Lehman Brothers to the contrary, neither you nor any member of your immediate family is: (i) an employee or member of any exchange, (ii) an employee or member of the National Association of Securities Dealers, Inc. or any of its affiliates, (iii) an individual or an employee of any corporation or firm engaged in the business of dealing, as broker or principal, in securities, options or futures or (iv) an employee of any bank, trust company or insurance company. If you are signing on behalf of others, you hereby represent that the persons(s) or entity(ies) on whose behalf you are signing is/are authorized to enter into this Agreement and that you are duly authorized to sign this Agreement and make the representations contained herein in the name and on behalf of such other person(s) or entity(ies) and you agree to indemnify and hold Lehman Brothers harmless from any claim or claims arising from your unauthorized execution of this Agreement on the behalf of such other person(s) or entity(ies). You hereby authorize Lehman Brothers to accept faxed copies of this or any other document or instruction as if it were the original and further to accept signatures on said faxes as if they were original.

**35. ERISA.** The investment manager or advisor for Customer represents that Customer is not benefit plan an ERISA Plan as defined in Section 3(3) of ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The investment manager further represents and warrants that Customer is not a person acting on behalf of an ERISA Plan and that the Customer's assets do not constitute assets of an ERISA Plan.

*PLEASE COMPLETE THIS INFORMATION AND SIGN THE APPROPRIATE SPACE BELOW:*

**THIS AGREEMENT IS DATED AS OF** _____, 200_

Newport Global Credit Fund (Master) LP
*Name of Customer*

21 Waterway Ave, Suite 150          USA
*Address*                                    *Country*

The Woodlands, TX          77380
*City, State*                    *Zip Code + 4*

**BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE THAT:**

**YOU HAVE RECEIVED A COPY OF THIS AGREEMENT AND AGREE TO ITS TERMS AND
CONDITIONS.**

**CUSTOMER
NAME:**                 Newport Global Credit Fund (Master) LP
                        *Individual or Printed Name of Company*

**SIGNATURE:**          _____
                        *Signature of Authorized Person*

**PRINT NAME:**         Timothy T. Janszen    Authorized officer of
                        Ultimate General Partner
                        *Printed Name and Title of Signatory or Name of General
                        Partner if Signer is a Partnership*

**BY:**                 _____
                        *Authorized Signatory and Title of General Partner if Above
                        Signer is a Partnership Otherwise Blank*

**ACKNOWLEDGED AND AGREED**

**BY: Newport Global Advisors LP solely for the purposes of the representation in Section 35**

**By:**     _____

Name: Timothy T. Janszen

Title: CEO

**ACCEPTED AND AGREED TO:**

_____

Lehman Brothers Inc., as signatory for itself and as agent for the affiliates
named herein

11

EXHIBIT A
AUTHORIZED PERSONS

Name

Roger A. May

Thomas Reeg

Ryan Langdon

Specimen Signature

Roger A. May

06-13555-scc    Doc 47621-1    Filed 01/02/15    Entered 01/02/15 16:40:03    Exhibit Pg 90 of 125

# EXHIBIT F

# Margin Lending Agreement

## LEHMAN BROTHERS INTERNATIONAL (EUROPE)

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE
United Kingdom

| Borrower: Newport Global Credit Fund (Master) LP | Reference No.: |
|---|---|

This Margin Lending Agreement (this "Agreement") by and among Lehman Brothers International (Europe) ("Lender") and the above-listed borrower ("Borrower") is arranged by Lehman Brothers Inc. ("Agent"), a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") under the U.S. Securities and Exchange Act of 1934, as amended, and governs all loans (the "Loans") of money or securities that Lender may, from time to time in its sole and absolute discretion, agree to make to Borrower in connection with transactions entered into by Borrower in the Lehman Brothers Inc. Customer Account Agreement – Prime Brokerage dated _____, as amended from time to time (the "LBI Account Agreement").

1. **AGENT AS AGENT OF LENDER AND BORROWER.**

(a) Lender and Borrower (the "Principals") each appoints Agent to act as agent with regard to any and all actions necessary to effect Loans as described in this Agreement and Agent acknowledges and accepts such appointment.

(b) As agent of each of the Principals and in compliance with all applicable regulations, Agent will arrange all Loans.

(c) In connection with each Loan, Agent acts solely in its capacity as agent for the Principals pursuant to instructions from the Principals. Agent shall have no responsibility or personal liability to either Principal arising from any failure by a Principal to pay or perform any obligation hereunder. Notwithstanding anything herein to the contrary, Agent shall not have any responsibility for or any obligation or liability to either Principal with respect to the monitoring of margin maintenance hereunder. Each Principal agrees to proceed solely against the other to collect or recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of, any Loan. The Principals acknowledge that Agent is acting solely as an agent hereunder, and the Principals agree to hold Agent harmless from all liability except for losses or damages caused by Agent's gross negligence or wilful misconduct.

(d) Each Principal and Agent hereby agree that any and all notices, demands, communications, payments or deliveries of any kind relating to any Loan may be delivered or made solely through Agent.

2. **PURPOSE OF THE LOANS.** Unless notice is provided to Lender in advance of a Loan, the proceeds of each Loan shall be utilized by Borrower solely to satisfy its payment or delivery obligations under the LBI Account Agreement from time to time in effect between Borrower and Agent.

3. **LOAN TERMS.**

(a) Subject to all other applicable provisions of this Agreement, all Loans that are loans of securities shall be governed by the terms of a standard-form Global Master Securities Lending Agreement (May 2000 version), as modified and supplemented by the Schedule to GMSLA and 2000 UK Tax Addendum attached thereto (collectively, the "GMSLA"), which terms are hereby incorporated into this Agreement as if set forth fully herein. In the event of any conflict between the terms of the GMSLA incorporated herein and the terms expressly set forth herein, the terms expressly set forth herein shall control. In furtherance of the foregoing (and not by way of limitation), Lender,

## LEHMAN BROTHERS

Borrower and Agent agree that: (i) the fees payable by Borrower with respect to Loans of securities will be governed by this Agreement (including the TCR (as defined in Section 4 hereof)), not by Paragraph 7 of the GMSLA; (ii) the collateralization and margin requirements and procedures relating to Loans of securities will be governed by this Agreement (including the TCR), not by Paragraph 5 of the GMSLA; (iii) the obligations of Borrower to Lender and Agent will be secured by a first priority security interest in certain property of Borrower (as set forth herein and in the LBI Account Agreement), not by Borrower transferring title in certain property pursuant to the GMSLA, including Paragraphs 2.3 and 4.2 of the GMSLA; and (iv) the term Posted Collateral (as used in Paragraph 9.1 of the GMSLA) will be deemed to be a reference to the collateral held by Lender and Agent pursuant to this Agreement and the LBI Account Agreement.

(b) All Loans are demand loans. Immediately upon Lender's demand from time to time, Borrower shall repay outstanding amounts under any or all Loans of money (together with all accrued interest) and/or redeliver Equivalent Securities (as defined in the GMSLA) under any or all Loans of securities. The inclusion of Section 6 hereof and of provisions in the GMSLA relating to Events of Default (as defined therein) shall not affect the status of the Loans as demand loans or Borrower's obligations set forth in the preceding sentence.

4. **INTEREST AND LOAN FEES.** Borrower agrees that interest and fees will accrue on all outstanding Loans of money and securities in accordance with the methods described in a terms and conditions rider that has been separately provided to it or in any amendment or revision thereto which may be provided to it (the "TCR"). Borrower agrees that all such accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.

5. **COLLATERAL.**

(a) Lender may from time to time, in its sole and absolute discretion, demand that Borrower deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are determined by Lender in its sole discretion. Borrower shall immediately comply with any such demand and any failure to immediately comply shall constitute a default under this Agreement. Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash and securities lent under outstanding Loans and (ii) the margin requirement determined by Lender from time to time in its sole and absolute discretion and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i) with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its sole and absolute discretion); and

(ii) with respect to securities, the price for such securities obtained from a source selected by Lender in its sole and absolute discretion; provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Lender in its sole and absolute discretion. Market Value is determined by Lender solely for the purposes of determining Margin Requirements and should not be relied on by Borrower for any other purposes.

(b) As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), Lender shall have a lien on and a continuing first priority security interest in all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral"), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property. All Collateral shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates), and Borrower will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates. Borrower agrees that any Collateral may be registered and held in the name of Agent or its designee. Borrower shall execute such documents and take such other action as

LEHMAN BROTHERS                                   2

Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, Borrower hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement. In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to Borrower, use, apply or transfer any and all Collateral.

(c) Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower hereby authorizes Lender to lend either to itself or to others any or all Collateral, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such Collateral as collateral for its general loans. Any Collateral, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Borrower hereby acknowledges that, as a result of such activities, Lender may receive and retain certain benefits to which Borrower will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations and rehypothecations may limit, in whole or in part, Borrower's ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. Borrower agrees to waive its right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation. Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

(d) Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower the Collateral.

(e) Borrower authorizes and requests Agent, as agent for Borrower, to transfer cash or securities from the account(s) of Borrower opened and maintained pursuant to the LBI Account Agreement (the "LBI Customer Account(s)") to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also (i) is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under any other agreement or (ii) is required to deliver day trading margin to LBI for the benefit of any of its LBI Customer Account(s), then Borrower authorizes and requests Lender to transfer such excess collateral to itself (or to LBI, as the case may be) on Borrower's behalf in order to satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under such other agreement (or, in the case of the LBI Customer Account(s), to deliver day trading margin in compliance with New York Stock Exchange regulations). If Lender or Agent makes a delivery on Borrower's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

6.    **EVENTS OF DEFAULT.** The occurrence of each of the following is an "Event of Default" hereunder:

(i) any "Event of Default" (as defined in the GMSLA);

(ii) any event of the type described in Section 4 of the LBI Account Agreement;

(iii) Borrower's failure to maintain collateral as required by Section 5 hereof;

(iv) Borrower's failure to make any payment or delivery when required hereunder;

(v) Borrower's failure to comply with or perform any other agreement or obligation hereunder;

(vi) the occurrence of an Act of Insolvency (as defined in the GMSLA) with respect to Borrower or with respect to any general partner, managing member or analogous representative entity of Borrower;

**LEHMAN BROTHERS**                    3

(vii) any representation made or deemed to have been made by Borrower shall be incorrect or untrue in any respect when made or deemed made;

(viii) Borrower is suspended or expelled from or surrenders its membership or participation in any securities exchange or association or other self-regulatory organization or is suspended from dealing in securities by any governmental agency, or any of the assets of Borrower or the assets of an investor held by, or to the order of, Borrower are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation;

(ix) Borrower states that it is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

(x) there is a material adverse change in the business affairs of Borrower;

(xi) any event of default or equivalent event occurs under any other agreement between Borrower and Lender or Agent or any of their affiliates; or

(xii) any material document or constitutive document of Borrower is modified in a manner which, in the sole and absolute discretion of Lender, may have a material adverse effect on any Loan or Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

Upon the occurrence of an Event of Default, all Loans shall become immediately due and payable and Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, all rights set forth in the GMSLA arising upon an "Event of Default" thereunder and all rights arising under the LBI Account Agreement after a default thereunder or under a Contract (as defined therein) including, without limitation, the right, without prior notice to Borrower, to cancel any outstanding commitments for or relative to any Loans and/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan); after which Borrower shall be liable to Lender and Agent for any remaining deficiency, loss, costs or expenses incurred or sustained by Lender or Agent in connection therewith. Such purchases and/or sales may be effected by Lender (or Agent, as its agent) publicly or privately without notice or advertisement in such manner as Lender may in its sole discretion determine. At any such sale or purchase, Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself or third parties free of any right of redemption. Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such manner as it may determine, in its sole discretion, to be commercially reasonable.

### 7. MISCELLANEOUS.

(a) Capacity to Contract. Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral. Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

(b) ERISA. (i) Borrower represents and warrants to Lender and Agent that it is either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and it covenants and agrees that any successor Investment Manager or General Partner appointed by it will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and it will provide Lender and Agent with a Investment Advisor Representation Letter.

LEHMAN BROTHERS                    4

(ii) The investment manager or advisor for Borrower represents that Borrower is not an ERISA Plan as defined in Section 3(3) ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The investment manager further represents and warrants that Borrower is not a person acting on behalf of an ERISA Plan and that the Borrower's assets do not constitute assets of an ERISA Plan.

(c) Compliance with Regulations. All Loans are subject to the laws, rules and regulations of the United States, England and any other applicable jurisdiction and applicable regulatory and self-regulatory authorities, including but not limited to the SEC, The Financial Services Authority of England and Wales (the "FSA"), all relevant securities and commodities exchanges and the Board of Governors of the Federal Reserve System.

(d) FSA Customer Protections. Lender is authorised by the FSA and is regulated by its rules (the "Rules"). Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules. Lender and Borrower acknowledge and agree that cash held for Borrower hereunder is received as collateral with full ownership under a collateral arrangement and is subject to the security interest contained herein. Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash. Notwithstanding the choice of law provision as set forth in Clause (m) in this Section 7 below, this Clause (d) of Section 7 shall be construed in accordance with the laws of England.

(e) Adequate Assurances. Subject to, and not as limitation of, the rights of Lender under this Agreement, if at any time Lender has reasonable grounds for insecurity with respect to Borrower's performance of any Obligation, Lender may demand, and Borrower shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lender demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lender may include, but shall not be limited to, the delivery by Borrower of additional property as Collateral.

(f) Costs and Expenses. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with enforcing their rights hereunder or incurred or charged for custody of the Collateral. In each case and whether or not demand has been made therefor, Borrower hereby authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

(g) Securities Events. Lender shall inform Borrower if Lender becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender: conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes. Borrower represents that it will review all prospectuses and offering statements that it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(h) Voting Rights. If any right to vote arises with respect to securities pledged to Lender, Borrower may inform Lender that Borrower wishes to exercise such right as Borrower specifies. Subject to 5(c), above, if Lender receives this notice within a reasonable time to act, it will act in accordance with Borrower's wishes. If Lender does not receive such timely notice from Borrower, it will use its discretion to decide whether and how to vote such securities.

(i) Waiver, Assignment and Notices. Neither Lender's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lender of any of its rights or privileges hereunder. Any purported assignment of your

**LEHMAN BROTHERS**                                    5

rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lender and Agent shall be null and void. Lender and Agent each reserves the right to assign any of its rights or obligations hereunder or under any agreement with Borrower to any of their affiliates without prior notice to Borrower. Notices and other communications to you (including without limitation demands for collateral) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by Borrower, shall, until Agent has received notice in writing of a different address or number, be deemed to have been personally delivered to Borrower. Demands for additional Collateral may also be communicated orally, without subsequent written confirmation.

(j) Securities Contract; Margin Payment; Settlement Payment. Borrower acknowledges and agrees that each Loan shall be deemed to be a "securities contract" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code and each payment or delivery hereunder, including each payment or delivery of collateral, shall be deemed to be a "margin payment" or "settlement payment" (each as defined in Section 101 and 741 of the U.S. Bankruptcy Code) made to and held by a "stockbroker" within the meaning of Sections 362 and 546 of the U.S. Bankruptcy Code.

(k) Legally Binding. Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns. Borrower hereby waives any and all defences that any oral instruction was not in writing as may be required by any applicable law, rule or regulation. Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any investment manager or advisor that Lender and/or Agent believe is authorized to act on Borrower's behalf. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(l) Amendment. Borrower agrees that Lender may modify the terms of this Agreement at any time upon prior written notice to Borrower. By failing to immediately discharge all of its Obligations upon delivery of any such notice, Borrower will have indicated its acceptance of any such modification. If Borrower does not accept such modification, Borrower must notify Lender in writing; Lender may then demand immediate discharge of all of Borrower's Obligations. Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lender.

(m) GOVERNING LAW. THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF, SAVE FOR CLAUSE (D) IN THIS SECTION 7 WHICH SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF ENGLAND.

(n) JURISDICTION; WAIVER OF JURY TRIAL. The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

(o) NO CONSEQUENTIAL DAMAGES. IN NO EVENT WILL LENDER OR AGENT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT.

LEHMAN BROTHERS                                        6

(p) Waiver of Immunities. Lender and Borrower each irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

(q) Headings. The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(r) Cumulative Rights; Entire Agreement. The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have. To the extent that the provisions of any agreements Borrower has with Lender or Agent, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the agreements or within a single agreement), the conflict shall be resolved in favor of the provision which affords Lender or Agent (as applicable) with the maximum rights, remedies, benefits or protections. Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

LEHMAN BROTHERS                    7

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the _____ day of _____

Lender:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____

Name: David Swenson

Title: Managing Director

Borrower:

NEWPORT GLOBAL CREDIT FUND (MASTER) LP

By: _____

Name: Timothy T. Janszen

Title: Authorized Officer of Ultimate General Partner

Investment Advisor (for the sole purpose of agreeing to and acknowledging the representation contained in Section 7 (b) (ii))

By: _____

Name: Timothy T. Janszen

Title: CEO

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

LEHMAN BROTHERS INC.

By: _____

Name:

Title:

LEHMAN BROTHERS                                    8

# EXHIBIT G

| Capital Markets Prime Services



## Customer Asset Protection Overview

**November 2007**

LEHMAN BROTHERS



## LEHMAN BROTHERS

# Capital Markets Prime Services

This document summarizes the regulatory, surety bond and other protections available to prime brokerage customers of Lehman Brothers Inc. (LBI) and Lehman Brothers International (Europe) (LBIE), for their prime brokerage accounts and trading done with Lehman Brothers entities.  As this is a summary, it does not purport to be a complete discussion of the rules and arrangements that are mentioned here.  Any complete discussion will depend on the facts and circumstances of each customer's account and its relationship to Lehman Brothers.  This summary is not intended as legal advice; please consult your own legal advisors.

### Overview
This summary of the  protections provided to prime brokerage customers is divided into three categories: (1) those available only to customers of LBI as a registered U.S. broker-dealer regulated by the  Securities and Exchange Commission (SEC) with respect to its customer activity, (2) those available to customers of LBIE, a company authorized and regulated by the Financial Services Authority (FSA) of the U.K. with respect to its customer activity, and (3) those applicable to other transactions that are considered to be outside the traditional scope of customer activity.

### General Creditworthiness of Lehman Brothers – Available Information
As of the date of this publication LBI's long term senior debt has credit ratings of AA- by Fitch, Aa3 by Moody's and AA- by Standard & Poor's (S&P).  Its parent, Lehman Brothers Holdings Inc. (LBHI), currently has long term senior debt credit ratings of AA-  by Fitch, A1 by Moody's, and A by Standard & Poor's (S&P).  These ratings may change from to time and you are encouraged to review them periodically.  Please see the following websites for current rating information: www.fitchratings.com; www.moodys.com; and www.standardandpoors.com.  LBHI is a reporting company under the Securities Exchange Act of 1934 (1934 Act) and files periodic reports with the SEC, including an annual report on Form10-K and quarterly reports on Form10-Q, which are available for review on EDGAR at the SEC's website *www.sec.gov*.  LBHI also operates under the SEC's rules governing Consolidated Supervised Entities.  LBI also makes periodic filings of its financial condition by means of FOCUS reports that are filed with the SEC and available, in part, to the public.  LBI is examined by the FINRA (the successor to the NYSE and NASD regulatory functions) at least annually and by the SEC periodically.

### Applicable Rules and Regulations for LBI Customer Activity
LBI is subject to various SEC and FINRA rules and regulations that protect customer assets held with LBI in the unlikely event of a credit problem associated with LBI.  The descriptions below are summaries of some of the relevant rules and regulations and do not constitute a full analysis.  Please consult your own legal advisors as to how these rules would apply to your situation.

### Customer Protection Rules
Rule 15c3-3 of the 1934 Act details the procedures that a broker-dealer must observe to protect customer assets that the broker-dealer holds. There are two main principles of customer asset protection: (1) the required segregation of customer cash balances in a special reserve bank account, and (2) possession and control of customer securities by the broker-dealer.

### *Cash Reserve Account*
Under Rule 15c3-3, broker-dealers are required to deposit unencumbered cash with a bank (or banks) in a "Special Reserve Bank Account for the Exclusive Benefit of Customers".  These accounts are required to be separate from any other bank account of the broker-dealer.  Under the Rule, the broker-dealer must perform a weekly calculation and deposit in the reserve account an amount of cash and/or "qualified securities" (e.g.: a security issued by the United States, or a

2

08-13555-scc    Doc 5476?-11    Filed 07/10/25    Entered 07/10/25 16:40:03    Exhibit
?.?102 of 125

# Capital Markets Prime Services



security in which the principal and interest are guaranteed by the United States) equal to the amount required under the reserve formula specified in the Rule.

The principal calculation under the reserve formula is the determination of the consolidated customer cash balance across all customer accounts of the broker-dealer.  This amount is the difference between the aggregate indebtedness of customers' accounts to the broker-dealer (including securities borrowed for the account of customers) (Total Debits) and the aggregate customer free credit balances held in customer accounts at the broker-dealer (including money received from the broker-dealer from using customer securities) (Total Credits).  If Total Credits exceed Total Debits, then not less than that net amount must be held in the reserve account.  LBI Prime Brokerage customers, as well as other customers of LBI, are covered by this protective calculation.

*Possession and Control of Securities*

Under Rule15c3-3, fully paid customer securities and "excess margin securities" may not be rehypothecated or otherwise used by the broker-dealer in its business.  Pursuant to Rule 15c3-3 the broker-dealer must physically possess or otherwise control such fully-paid and excess margin securities.

## Rehypothecation Rules

Rules 8c-1 and 15c2-1 of the 1934 Act require that a broker-dealer must have customer consent to commingle with other customer assets the customer securities that the broker-dealer is permitted to rehypothecate (e.g.: those in the margin account) and may not pledge or otherwise use customer assets for a sum greater than the aggregate indebtedness owed to the broker-dealer by all of its customers.  These rules also prohibit a broker-dealer from commingling customer securities with the broker-dealer's own securities.

In general the LBI Prime Brokerage margin agreements grant LBI the right to rehypothecate customer securities when the customer pledges or hypothecates their securities to the broker-dealer to support a margin debit.  Under Rule 15c3-3, LBI may use an amount up to 140% of the customer's debit balance.  Money received from the rehypothecation of customer securities will require additional deposits to be made to the reserve account as required by the reserve formula.

Rehypothecation of a client's securities (as described above) is not a factor in determining that customer's net equity claim, or its recovery (full or pro rata) on its claim in a SIPA proceeding.

The above described rules are designed to ensure that the broker-dealer always has enough protected assets to make all customers whole with respect to their net equity claims against the broker-dealer.

## Net Capital and Broker-Dealer Notification Rules

A key protection to customers is the "net capital rule" or Rule 15c3-1 of the 1934 Act, which requires that a broker-dealer maintain a minimum level of net capital in order to continue operations.  A broker-dealer must calculate its net capital in accordance with the Rule and must file reports regarding its capital levels with the SEC and NASD regularly (i.e.: the FOCUS reports described above).  In determining net capital, assets must be valued conservatively, with most financial assets having their value discounted.

LBI has elected to calculate minimum net capital in accordance to Appendix E of the net capital rule which establishes alternative net capital requirements for broker-dealers that are part of a

LEHMAN BROTHERS

# Capital Markets Prime Services



consolidated supervised entity ("CSE"). For regulatory purposes, LBHI and its subsidiaries are collectively a CSE. CSEs are supervised and examined by the SEC, which requires minimum capital standards on a consolidated basis. In addition to meeting the alternative net capital requirements, LBI is required to maintain tentative net capital in excess of $1 billion and net capital in excess of $500 million. LBI is also required to notify the SEC in the event that its tentative net capital is less than $5 billion. As of August 31, 2007, LBI had tentative net capital in excess of $6.1 billion, and had net capital of $3.1 billion, which exceeded the minimum net capital requirement by $2.6 billion.

Under Rule 17a-11 of the 1934 Act, a broker-dealer must provide both the SEC and FINRA with same-day notice if its capital level drops below the level mandated by the Rule and it must notify both within 24 hours of a net capital decrease to the "early warning level". The "early warning level" is intended to act as that, an early warning of stress, and it is significantly above the level at which a broker-dealer would be out of business. The SEC and FINRA are required by law to alert SIPC to any situation in which a broker-dealer is in or approaching financial difficulty. The SEC is also authorized to apply for an order requiring SIPC to act under SIPA.

### Customer Activity with LBI
Protections available to Prime Brokerage customers of LBI differ depending on whether the customer carries its accounts on the books of LBI, as well as whether the customer is a "customer" under the Securities Investor Protection Act of 1970 (SIPA). In general, the protections described below relate to traditional customer activity, such as purchases and sales of securities (long and short) and margin loans and not to securities lending, repurchase transactions or other creditor relationships that may exist between a customer and LBI.

### Definition of a Customer
Under SIPA, a "customer" is defined as any person who has a claim on account of securities received, acquired, or held by a debtor broker-dealer in ordinary course of its business as a SEC registered broker-dealer from, or for the securities accounts of, such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. It does not cover all possible activities between the customer and LBI.

### Securities Investor Protection Act of 1970
SIPA sets out the way by which a Securities Investor Protection Corporation ("SIPC") trustee would administer the liquidation of SIPC member, such as LBI. SIPC is a non-profit corporation established to protect investors in the event that a broker-dealer becomes unable to comply with the Rule 15c3-1 or is insolvent.

• The SIPC trustee generally seeks to sell or transfer accounts to another SIPC member, or grant a customer's request that the SIPC trustee approve a transfer of their customer accounts to another firm.

• Unless sold or transferred, the SIPC trustee will return all "customer name securities" (i.e.: physical certificates registered in customer name for which the broker-dealer holds no stock or bond power) to the customer. There is no dollar limit as to the amount of customer name securities that can be returned to a customer. Note, however, that the definition of customer name securities is intended to be very narrow.

4



## LEHMAN BROTHERS

# Capital Markets Prime Services

• "Customer property" is the next source of customer satisfaction of customer claims and generally reflects the pool of customer assets held in the name of the broker-dealer or other securities intermediary's name.  The distribution from this asset pool will be based on the customer's net equity claim (i.e.: the difference between the obligations owed by the customer to the broker-dealer and what the broker-dealer owes the customer (in cash and securities)) if all positions had been liquidated on the "filing date".

– This "filing date" is generally the date when SIPC (upon notice to the broker-dealer) files an application for a protective decree with any court of competent jurisdiction.  The "filing date" could be adjusted in the event of other forms of litigation.

• Rehypothecation of a customer's securities (as described above) is not a factor in determining that customer's net equity claim, or its recovery (full or pro rata) on its claim in a SIPA proceeding. General unsecured creditors of the liquidating broker-dealer cannot access customer assets until customers' net equity claims are paid in full, that is customer claims are senior to the claims of all other general unsecured creditors.  In the event the broker-dealer does not have sufficient assets to meet customers' net equity claims, SIPC will pay from its own SIPC Fund (i.e.: customer protection funds) to meet any shortfall, to a maximum of $500,000 per customer ($100,000 limit for cash).

Not all investments held in customer accounts are protected by SIPC.  In general, SIPC covers notes, stocks, bonds, mutual funds and other investment company shares, and other SEC registered securities.  It does not cover instruments such as unregistered investment contracts (such as limited partnership interests), fixed annuity contracts that are not registered with the SEC, foreign exchange, interests in  precious metals (either in physical or futures contract form), or other commodity futures contracts or commodity options on futures.  Note, however, that under the Commodities Exchange Act and the rules thereunder the assets of a customer of a futures contract merchant (FCM) must be segregated and may not be used in the FCM's business.  Note also that cash held at any bank affiliate of LBI, including any segregated cash, is not covered by SIPC.

Please see the SIPC website, www.sipc.org for additional information regarding the SIPA, SIPC, a list of SIPC member firms, frequently asked questions, claim forms and resources for protection against fraud.

### CAPCO Surety Bond– Excess SIPC Coverage
LBI maintains a surety bond issued by the Customer Asset Protection Company ("CAPCO"), an insurance company licensed by the State of Vermont.  It was formed in late 2003 to provide institutional and individual brokerage accounts of certain securities firms with protection in excess of the protection limits currently provided by SIPC.  CAPCO was capitalized by its original fifteen member firms, and has a reinsurance program consisting of two monoline financial guaranty reinsurers, each of which is currently rated AAA by Standard & Poor's.

The same persons that would be considered "customers" under SIPA are eligible for protection under CAPCO's bond which, with certain limitations, covers the full amount of the unsatisfied portion of the customer's net equity claim not otherwise provided by LBI's assets and SIPC coverage.  The CAPCO surety bond has no aggregate limit except the full amount of a customer's unsatisfied net equity claim.  Note that the types of assets that are not protected under SIPA are also not covered by the CAPCO surety bond.  CAPCO is currently rated an A+ for financial strength by S&P, and this rating must be reaffirmed annually subject to a full review by S&P.  There have not been any Excess SIPC claims made against CAPCO to date.

# Capital Markets Prime Services



Each CAPCO surety bond has a one-year term, and requires an annual underwriting review. A confirmation letter from CAPCO for LBI's Surety Bond can be obtained upon request.

As a newly formed company, CAPCO has no experience responding to Excess SIPC protections claims. Accordingly, CAPCO retains service providers with claims experience in many other lines of insurance to assist in the event a claim is incurred. In order to facilitate an orderly and timely claims process in the event of a claim, CAPCO and its advisors have designed a comprehensive claim form, available for customer review on its website.

Claims filed under the surety bond may be submitted as late as six months after the underlying SIPC proceeding is closed. CAPCO will make payment or deliver replacement securities promptly after all distributions are made by the SIPC trustee and by the broker-dealer in connection with the SIPA proceeding, subject to satisfaction of all terms and conditions of the Surety Bond.

More information about CAPCO can be found on its website:

www.capcoexcess.com/USA/index.html.

This website includes a CAPCO Excess SIPC Surety Bond example and the CAPCO Excess SIPC Surety Bond Claim Form, as well as frequently asked questions and a list of participant firms.

## Customer Activity with Lehman Brothers International (Europe)

Lehman Brothers provides certain margin financing, clearing, settlement, stock borrowing and foreign exchange facilities under Prime Brokerage margin agreements between customers and LBIE, as arranged by LBI. LBI may also utilize LBIE, other members of the Lehman Brothers group of companies and other brokers and dealers for the purpose of executing transactions for a customer. LBIE is a company incorporated in England and is authorized and regulated by the FSA.

When a customer holds assets with LBIE pursuant to a Prime Brokerage margin agreement, its assets are segregated from those of LBIE, unless and until LBIE rehypothecates the customer's assets. The level of rehypothecation may be subject to a regulatory or contractually agreed limit. While assets are segregated they are held by LBIE as custodian. To the extent that LBIE rehypothecates a customer's assets, LBIE may use the assets freely

Irrespective of which choice the customer makes, LBIE must maintain adequate records of the cash or investments received from or held on behalf of the customer, in order to verify the value of equivalent assets that are returnable to the customer.

With respect to a customer's investments held in the custody of LBIE through an affiliated or third-party nominee or a third-party sub-custodian, LBIE must require that such nominee or sub-custodian identify in its books and records that the right, title and interest in and to the custodied investments belong to a customer of LBIE. The nominee or sub-custodian must ensure that such investments can be identified at any time as belonging to a customer of LBIE and are separately identifiable from LBIE's own investments. Such investments should therefore be unavailable to creditors of LBIE.

6

# Capital Markets Prime Services



Generally, the majority of customers for whom LBIE holds or receives cash choose that their cash is treated as collateral against their obligations to LBIE. Any cash held in this way is not held separately from LBIE's and will be used by LBIE in the course of its investment business. Customers will therefore rank as unsecured creditors in relation to this cash.

If a customer has opted not to provide cash collateral but instead to provide cash that is to be treated as "client money" under the FSA rules, the amount of cash in excess of that required by LBIE for margin purposes (calculated in compliance with FSA rules) is segregated on a daily basis by LBIE either in a bank account away from LBIE or in a "qualifying money market fund," as defined in FSA rules. Interest paid on protected balances will differ from that paid on monies not protected. Cash placed in bank accounts away from LBIE is held on statutory trust for the benefit of all customers who have client money placed with LBIE. On any insolvency of LBIE, proceeds from the trust would be distributed in ratable amounts to such customers. Cash placed in a qualifying money market fund in effect becomes a customer asset that LBIE must hold under the FSA custody rules.

As security for the payment and discharge of a customer's liabilities to LBIE, LBIE will have a security interest over all investments and cash held in custody or segregation by LBIE. Subject to applicable law or regulation, a customer's investments may be rehypothecated by LBIE for its own purposes. A customer has the right to request the recall of securities which have been rehypothecated by LBIE. In the event that a customer does recall such securities, LBIE will be obligated to promptly return such securities to a customer. Any claim against LBIE for return of securities which have been rehypothecated will be an unsecured claim against LBIE.

The FSA rules relating to collateral, custody and client money can be found at http://fsahandbook.info/FSA/html/handbook/CASS. (The relevant chapters collateral, custody and client money are 3, 6 and 7, respectively.) As part of the annual review and audit of LBIE's financial statements, Ernst & Young are required to review LBIE's compliance with these FSA rules and make a direct report to the FSA.

*LBHI Guarantee*

LBIE has the benefit of a full parent guarantee from LBHI.

*CAPCO*

As with LBI, LBIE also maintains a surety bond issued by CAPCO. As SIPA coverage is not available to customers of LBIE, the CAPCO bond does not provide SIPA excess coverage but instead covers the unsatisfied portion of a customer's net equity claim not otherwise provided by LBIE's assets or the LBHI guarantee. Each CAPCO surety bond has a one-year term, and requires an annual underwriting review. A confirmation letter from CAPCO for LBIE's Surety Bond can be obtained upon request.

More information can be found on the CAPCO website:

http://www.capcoexcess.com/UK/aboutCAPCO.html

08-13555-scc   Doc 47621-1   Filed 07/02/15   Entered 07/02/15 16:40:03   Exhibit
Pg 107 of 125

**LEHMAN BROTHERS**

# Capital Markets Prime Services



### Other Customer Activity with Lehman Brothers Entities
With respect to transactions other than traditional customer activity with LBI or LBIE, the availability of any protection will depend on the nature of the transaction and the Lehman Brothers entity with which the customer is contracting or through whom the customer is executing. The examples below attempt to address many common products, but there may be different transactions in which prime brokerage customers are engaged that are not discussed. Please consult your legal advisors for a discussion of the examples and for transactions in which you may have engaged that are not discussed herein

### Equity Swaps, on U.S. and non-U.S. Securities and Credit Default and other Fixed Income Swaps
Swap contracts and activity generally are not executed with SEC registered broker-dealers; therefore, collateral pledged by the customer to the Lehman Brothers entity as counterparty would not be customer property and not covered by SIPC or the CAPCO surety bond.  Lehman Brothers counterparties for swaps and derivatives activity include Lehman Brothers Special Finance, (LBSF) and LBIE.  Both LBSF and LBIE have the guaranty of LBHI.  The close-out and netting rights for a customer for these products are generally contained in a governing ISDA Master Agreement, which may benefit from certain protections under relevant bankruptcy regimes.

### Listed Options on U.S. Securities
U.S. listed and NASDAQ options held through LBI in a Prime Brokerage account are considered securities and thus customer property covered by SIPC and the CAPCO surety bond.

LBI is required to post collateral for short option positions with the Options Clearing Corporation and/or option exchanges in relation to listed option customer activity.  Customer assets may be posted to these entities as collateral for margin.

### Foreign Exchange Spots and Forwards
Foreign exchange spots and forward contracts are not securities, and therefore not considered customer property covered by SIPC.

### Futures Contracts
Futures contracts on indices, commodities, and other underlying instruments are not subject to customer property protection under the 1934 Act or the rules discussed above. While executed with LBI, in its FCM capacity, futures is a product type excluded from SIPC and CAPCO surety bond protection. Customer assets are required to be segregated under the Commodity Exchange Act and the rules thereunder.

### Repurchase Agreements (Repos) and Stock Loan Agreements
Repos are specifically excluded from coverage under the CAPCO surety bond.  SIPC takes the view that a repo counterparty is not a "customer" for SIPA purposes and that any securities underlying the repo are not subject to SIPA coverage. SIPC has taken a similar position with respect to securities lending transactions.

### Money Market shares
Money market shares held at LBI and for which LBI is the intermediary between the customer and the fund will be considered securities of the customer held at LBI for SIPC and CAPCO purposes and not as cash, thus entitling them to SIPC coverage of up to $500,000.

LEHMAN BROTHERS

# Capital Markets Prime Services



If the customer may redeem the fund by direct contact with the issuer, carrier, distributor, transfer agent or other third party (other than LBI), the fund shares would not be covered under SIPC or


Excess SIPC.  In this instance, the customer could recover the asset directly from the fund in the event of LBI's insolvency.

*DISCLAIMER:*
*This document is based on information from sources believed to be reliable, but no representation is made that it is accurate or complete. Lehman Brothers disclaims any and all liability relating to this information, including, without limitation, any express or implied representations or warranties for statements or errors contained in, or omissions from, these materials. The foregoing has been prepared solely for informational purposes and is subject to change without notice. This document is not an offer to buy or sell or a solicitation of an offer to buy or sell any security or instrument or to participate in any particular trading strategy, nor is it legal advice. You should consult with your own tax, legal, and investment adviser for guidance.*

# EXHIBIT H

FEB-17-2009 11:51 From:                           To:Goldman Sachs   Co   P.1/2

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

To:   **Standard & Poor's Rating Services**
      **55 Water Street**
      **New York, NY 10041**

We, Lehman Brothers Holdings Inc., do hereby absolutely and unconditionally guarantee the payment by Lehman Brothers International (Europe) ("Affiliate") of all of Affiliate's liabilities, obligations and commitments (the "Guaranteed Obligations") to any counterparty of Affiliate and such counterparty's successors, endorsees and assigns (collectively, the "Beneficiaries"), as the same shall respectively become due, together with accrued interest and charges, if any, and we agree to reimburse each Beneficiary for all expenses including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof.

This Guarantee is absolute and unconditional without limitation as to monetary amount or duration, irrespective of the validity, regularity or enforceability of any agreement or document setting forth a Guaranteed Obligation (each a "Borrower Agreement") against Affiliate (other than as a result of the unenforceability of the applicable Borrower Agreement against the Beneficiary), any waiver or consent by any Beneficiary with respect to any provisions thereof or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defenses of payment and statute of limitations, neither of which is waived); provided, however, that we shall be entitled to exercise any right that Affiliate could have exercised under the applicable Borrower Agreement to cure any default in respect of its obligations under the Borrower Agreement or to setoff, counterclaim or withhold payment in respect of any event of default or similar event in respect of a Beneficiary, but only to the extent such right is provided to Affiliate under the Borrower Agreement. We shall have no right of subrogation with respect to any payments we make under this Guarantee in connection with a Borrower Agreement until all Guaranteed Obligations of Affiliate under that Borrower Agreement are paid in full.

This Guarantee is a guarantee of payment, and not of collection, and each Beneficiary may exercise its rights hereunder against us without first having to take any action against Affiliate, or any other guarantor. We hereby waive diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee.

This Guarantee shall be binding upon us, our successors and assigns.

We further agree that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation or interest thereon is rescinded or must otherwise be restored by or is recovered from a Beneficiary as a preference or fraudulent transfer under the federal Bankruptcy Code or any similar applicable state or foreign law.

FEB-17-2009 11:51 From:    To:Goldman Sachs    Co    P.2/2

hereunder to us shall be to Lehman Brothers Holdings Inc., Attention: Treasurer, at 745 Seventh Avenue, New York, New York (Facsimile No. 646-758-3334).

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the conflicts of laws principles thereof.

**IN WITNESS WHEREOF,** I have hereunto set my hand on January 4, 2008.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: James J. Killerlane III
Title:  Vice President

2

# EXHIBIT I

**Bridges, L. Shannon**

---

From: Rahman, Mizan (NY)
Sent: Thursday, September 11, 2008 11:18 AM
To: Roger May
Cc: Prime Newport
Subject: Transfer to CSFB


Hi Roger,

I called but got your voice mail.

I need a Letter of Authorization (LOA), just like the ones you send to
move money.  You need to tells us the following:

A/C
Security
Price
Quantity
Trade Date
Settlement Date (should be T+2)
Destination PB (CSFB) - Settlement Instruction

I have been advised the transfer has to be versus payment.

---

Mizan Rahman
LEHMAN BROTHERS
Capital Markets Prime Services
745 Seventh Avenue : New York : NY10019
212 528 9004 : mizan@lehman.com

------------------------------------------------

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

------

IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# EXHIBIT J

████████████████

| | |
|---|---|
| **From:** | Roger May |
| **Sent:** | Friday, September 12, 2008 12:05 PM |
| **To:** | Rahman, Mizan (NY); Prime Newport |
| **Cc:** | Banas, Kimberly; Goodwin, Rachel; Tsonos, Nicholas |
| **Subject:** | Security Transfer Request for NGOF and NGC |
| **Attachments:** | MX-2300N_20080912_112124.pdf |

<<MX-2300N_20080912_112124.pdf>> Mizan,

Attached are two requests with attachments to transfer securities from Lehman to CS.  Please contact me with any questions, thanks.

Roger

**Newport Global Advisors**
21 Waterway Avenue
Suite 150
The Woodlands, Texas 77380
713 559 7400 Office
713 559 7499 Fax

## NEWPORT GLOBAL ADVISORS

| | |
|---|---|
| To: | Mizan Rahman |
| Company: | Lehman Brothers |
| Phone: | 212-528-9004 |
| Fax: | 646-758-5178 |

### Letter of Authorization

**Date:**     09/12/08

**RE:**     Newport Global Opportunity Fund a/c- 5601775
Account Number:     306-35-285

**Dear Mizan:**

**Please consider this as authorization to move the securities attached in the following spreadsheet as Exhibit 1.**

Any questions please contact Roger May at 713-559-7403.  Thank you.

**Funds Authorized By:**     _Roger A May_

**Newport Global Advisors**
21 Waterway Avenue
Suite 150
The Woodlands, Texas 77380
713 559 7400 Office
713 559 7499 Fax

## NEWPORT GLOBAL ADVISORS

| | |
|---|---|
| To: | Mizan Rahman |
| Company: | Lehman Brothers |
| Phone: | 212-528-9004 |
| Fax: | 646-758-5178 |

### Letter of Authorization

**Date:**   09/12/08

**RE:**   Newport Global Credit a/c- 5601773
Account Number:     306-35-285

**Dear Mizan:**

**Please consider this as authorization to move the securities attached in the following spreadsheet as Exhibit 1.**

Any questions please contact Roger May at 713-559-7403.  Thank you.

**Funds Authorized By:**  _Roger A May_

06-13555-scc    Doc 47621-1    Filed 04/02/15    Entered 04/02/15 16:40:03    Exhibit

# EXHIBIT K

08-13555-scc   Doc 49594-1621   Filed 04/20/14   Entered 04/20/14 15:18:40   Main Document
Pg 120 of 125

**From:** Steel, Howard S.
**Sent:** Tuesday, April 22, 2014 12:41 PM
**To:** Molino, Elizabeth A.

Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
908.670.0056 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

-----Original Message-----

-----Original Message-----
From: Rahman, Mizan (NY) [mailto:mizan@lehman.com]
Sent: Tuesday, September 23, 2008 1:35 PM
To: Roger May
Cc: Prime Newport
Subject: Transfer booking confirmation

Hi Roger,

I can confirm your attached request for transfer to CSFB was booked on 09/12.  Also, please note some items could not
be booked because some bonds were due to mature on 09/15 and couple of items were delisted.
These items I have highlighted in red. The booking time stamp can be viewed in column "Q".

Request:
 <<Security Transfer Request for NGOF and NGC>>

Booking confirmation:
 <<BookingConfirmation.xls>>
_____
Mizan Rahman

1

LEHMAN BROTHERS
Capital Markets Prime Services
745 Seventh Avenue : New York : NY10019
212 528 9004 : mizan@lehman.com



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

This message is intended only for the personal and confidential use of the designated recipient(s) named above.  If you
are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or
copying of this message is strictly prohibited.  This communication is for information purposes only and should not be
regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers.  Email transmission cannot be guaranteed to be secure or
error-free.
Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such.
All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any
attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related
penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# EXHIBIT L

## Bridges, L. Shannon

| | |
|---|---|
| **From:** | Rahman, Mizan (NY) [mizan@lehman.com] |
| **Sent:** | Friday, September 12, 2008 8:04 AM |
| **To:** | Roger May |
| **Cc:** | Prime Newport |

**Subject:** RE: Transfer to CSFB

Good morning Roger,

Any transfers initiated today will need to be T+2 settlement.

---------------------------

Regards
Mizan

# EXHIBIT M

**Storey, Kelly**

| | |
|---|---|
| **From:** | Rahman, Mizan (NY) [mizan@lehman.com] |
| **Sent:** | 15 September 2008 21:34 |
| **To:** | Roger May; Jake Mase; Almon, Bridget; Santos, David; Woodworth, John |
| **Cc:** | Prime Newport |
| **Subject:** | *** HIGH *** LBIE Accounts |
| **Importance:** | High |
| **Attachments:** | Fax Image.TIF |

Hello everyone,

I am sorry to advise, all accounts under the LBIE entity are under lockdown and we have lost access to them. The administrators for the receivership is PriceWaterhouseCoopers and they will advise us in due course on the road plan of the current situation.

Your LOA (attached below of reference) instructions to transfer funds to Bank of America have been received and logged for processing. At present these wires cannot be processed until the administrators give the instructions to do so. Will update on the progress of this.

<<Fax Image.TIF>>

Mizan Rahman
LEHMAN BROTHERS
Capital Markets Prime Services
745 Seventh Avenue : New York : NY 10019
212 528 9004 : mizan@lehman.com

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

- - - - - - - -

IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

24/09/2008