Allan S. Brilliant
Shmuel Vasser
Stephen M. Wolpert
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

*Attorneys for Stonehill Institutional Partners, L.P.*
*and Stonehill Offshore Partners Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x

In re                                                                    :   Chapter 11 Case No.
                                                                         :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                                  :   08-13555 (SCC)
                                                                         :
                                              Debtors.                    :   (Jointly Administered)

------------------------------------------------------------------------ x

**STONEHILL'S RESPONSE TO THE PLAN ADMINISTRATOR'S**
**FIVE HUNDREDTH OMNIBUS OBJECTION TO CLAIMS**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

SUMMARY OF ARGUMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 5

ARGUMENT ...................................................................................................................... 7

I.  THE AMENDED PROOFS OF CLAIM ALLEGE FACTS WITH
    PARTICULARITY SUFFICIENT TO SURVIVE A MOTION TO DISMISS .............. 7

II. STONEHILL ALLEGED ACTIONABLE MISREPRESENTATIONS ...................... 10

    A.  The Present Fact Statements and Affirmative Reassurances are Actionable
        Even if Considered Statements of Opinion .......................................................... 10

    B.  The Amended Proofs of Claim Contain Allegations of Present Fact ................. 13

    C.  The Amended Proofs of Claim Contain Allegations of Actionable
        Affirmative Reassurances ................................................................................... 16

    D.  The Plan Administrator Relies on Inapplicable Case Law ................................. 18

III. STONEHILL ALLEGED REASONABLE RELIANCE ................................................ 21

IV. STONEHILL ADEQUATELY PLEADED CAUSATION ........................................... 31

    A.  Transaction Causation ......................................................................................... 31

    B.  Loss Causation .................................................................................................... 33

V.  STONEHILL ADEQUATELY ALLEGED RECOVERABLE DAMAGES ................ 38

VI. STONEHILL ALLEGED THAT WICKHAM HAD AUTHORITY TO BIND
    ALL OF THE LEHMAN ENTITIES ........................................................................... 43

# TABLE OF AUTHORITIES

CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,*
    888 F. Supp. 2d 431 (S.D.N.Y. 2012)..............................................................8, 18

*ACA Financial Guaranty Corp. v. Goldman Sachs & Co.,*
    25 N.Y.3d 1043 (2015) ..............................................................21, 23, 24

*Acticon AG v. China North East Petroleum Holdings Ltd.,*
    692 F.3d 34 (2d Cir. 2012)..............................................................34, 42

*Allied Irish Banks, P.L.C. v. Bank of Am., N.A.,*
    2006 WL 278138 (S.D.N.Y. Feb. 2, 2006)..............................................................28

*Allstate Ins. Co. v. Sidakis,*
    2014 WL 5698854 (E.D.N.Y. November 5, 2014)..............................................................9

*Alpert v. Shea Gould Climenko & Casey,*
    160 A.D.2d 67 (1st Dep't 1990) ..............................................................41

*Alpert v. Shea Gould Climenko & Casey,*
    559 N.Y.S.2d 312 (1st Dep't 1990) ..............................................................40

*Alvin S. Schwartz, M.S., P.A. Employer/Employee Profit Sharing Plan v. O'Grady,*
    No. 86 CIV. 4243 (JMC), 1990 WL 156274 (S.D.N.Y. Oct. 12, 1990)..............................................................36

*Am. Food & Vending Corp. v. Int'l Bus. Machines Corp.,*
    667 N.Y.S.2d 545 (4th Dep't 1997)..............................................................19

*Amusement Indus., Inc. v. Stern,*
    693 F. Supp. 2d 327 (S.D.N.Y. 2010)..............................................................31, 45

*Aris Multi-Strategy Offshore Fund, Ltd. v Devaney,*
    26 Misc. 3d 1221(A), slip op. at 19 (N.Y. Sup. Ct. 2009)..............................................................21

*Aris Multi-Strategy Offshore Fund, Ltd. v. Devaney,*
    907 N.Y.S.2d 98 (N.Y. Sup. Ct. 2009) ..............................................................12

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,*
    2006 WL 1493132 (S.D.N.Y. May 31, 2006) ..............................................................44

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..............................................................9

*AUSA Life Ins. Co. v. Ernst & Young,*
    206 F.3d 202 (2d Cir. 2000)..............................................................passim

21184640

*Bank Hapoalim B.M. v. WestLB AG,*
   995 N.Y.S.2d 7 (1st Dep't 2014) ......................................................................40

*Barberan v. Nationpoint,*
   706 F. Supp. 2d 408 (S.D.N.Y. 2010) ...............................................................22

*Basquiat v. Sakura Int'l,*
   2005 WL 1639413 (S.D.N.Y. July 5, 2005) .......................................................18

*Bavaria Int'l Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.,*
   2003 WL 21767739 (S.D.N.Y. July 30, 2003) ....................................................19

*Beach v. Citigroup Alternative Investments LLC,*
   No. 12 CIV. 7717 PKC, 2014 WL 904650 (S.D.N.Y. Mar. 7, 2014)....................40

*Belin v. Weissler,*
   1998 WL 391114 (S.D.N.Y. July 14, 1998) ..................................................24, 25

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)..............................................................................................9

*Bennett v. U.S. Trust Co.,*
   770 F.2d 308 (2d Cir. 1985)................................................................................37

*Bernstein v. Kelso & Co.,*
   231 A.D.2d 314 (1st Dep't 1997) .......................................................................39

*C.E. Towers Co. v. Trinidad and Tobago (BWIA Intern.) Airways Corp.,*
   903 F. Supp. 515 (S.D.N.Y. 1995) ...............................................................45, 46

*Carbon Capital Mgmt., LLC v. Am. Exp. Co.,*
   88 A.D.3d 933 (1st Dep't 2011) .........................................................................27

*Castellano v. Young & Rubicam, Inc.,*
   257 F.3d 171 (2d Cir. 2001)................................................................................31

*Cayuga Harvester, Inc. v. Allis-Chalmers Corp.,*
   95 A.D.2d 5 (4th Dep't 1983) .............................................................................39

*Cohen v. Koenig,*
   25 F.3d 1168 (2d Cir. 1994)................................................................................12

*Cohen v. PrudentialBache Sec., Inc.,*
   713 F. Supp. 653 (S.D.N.Y. 1989) .....................................................................17

*Cohen v. Stevanovich,*
   722 F.Supp.2d 416 (S.D.N.Y. 2010)...................................................................34

*Cohen v. Sudler & Hennessey,*
LLC, No. 10 CIV 4321, 2010 WL 3431534 (S.D.N.Y. Aug. 31, 2010)................................38

*Commercial Financial Servs. Inc. v. Great American Ins. Co. of New York,*
381 F. Supp. 2d 291 (S.D.N.Y. 2005)......................................................................45

*Compudyne Corp. v. Shane,*
453 F. Supp. 2d 807 (S.D.N.Y. 2006)......................................................................8

*Continental Ins. Co. v. Mercadante,*
225 N.Y.S. 488 (1st Dep't. 1927) ........................................................36, 37, 40

*CPC Intl., Inc. v. McKesson Corp.,*
70 N.Y.2d 268 (N.Y. 1987) ..............................................................................12

*Cristallina S.A. v Christie, Manson & Woods Intl.,*
502 N.Y.S.2d 165 (1st Dep't 1986) ..................................................................12

*Davis v. CCF Capital Corp.,*
717 N.Y.S.2d 207 (2d Dep't. 2000)....................................................................17

*DDJ Mgt., LLC v. Rhone Group L.L.C.,*
15 N.Y.3d 147 (2010) ....................................................................21, 28, 30, 31

*DH Cattle Holdings Co. v. Smith,*
607 N.Y.S.2d 227 (1st Dep't 1994) ....................................................................19

*Doehla v. Wathne Ltd., Inc.,*
No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1999) ..............................26

*Dow Corning Corp. v. Merrill Lynch & Co. (In re Merrill Lynch Auction Rate Sec.
Litig.),*
2011 WL 1330847 (S.D.N.Y. Mar. 30, 2011) ..................................27, 29, 34, 35

*Dura Pharm., Inc. v. Broudo,*
544 U.S. 336 (2005).......................................................................................34

*E*Trade Fin. Corp. v. Deutsche Bank AG,*
2008 WL 2428225 (S.D.N.Y. June 13, 2008) ....................................................28

*Eaves v. Designs for Fin., Inc.,*
785 F. Supp. 2d 229 (S.D.N.Y. 2011)................................................................18

*Elbit Systems, Ltd. v. Credit Suisse Group,*
917 F. Supp. 2d 217 (S.D.N.Y. 2013)................................................................45

*Ernst Haas Studio, Inc. v. Palm Press, Inc.,*
164 F.3d 110 (2d Cir. 1999)............................................................................44

*ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC,*
   858 N.Y.S.2d 94 (1st Dep't 2008) ........................................................19

*Fait v. Regions Fin. Corp.,*
   655 F.3d 105 (2d Cir. 2011) ..................................................................18

*Fezzani v. Bear, Stearns & Co, Inc.,*
   592 F. Supp. 2d 410 (S.D.N.Y. 2008) ....................................................8

*Financial Guaranty Insurance Company v. Putnam Advisory Co., LLC,*
   783 F.3d 395 (2d Cir. 2015) ...............................................3, 9, 30, 34

*Freudenberg v. E*Trade Fin. Corp.,*
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................17

*Fugazy Intern. Travel Group, Inc. v. Stargazer, Ltd.,*
   2003 WL 115220 (S.D.N.Y. 2003) ........................................................47

*Geary v. Hunton & Williams,*
   257 A.D.2d 482 (1st Dep't 1999) ..........................................................41

*Gelles v. TDA Indus., Inc.,*
   1991 WL 39673 (S.D.N.Y. Mar. 18, 1991) ........................................7, 8

*Gilroy v. Am. Broad. Co.,*
   58 A.D.2d 533, 395 N.Y.S.2d 658 (1977) .............................................43

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,*
   17 F. Supp. 2d 275 (S.D.N.Y 1998) ................................................24, 27

*Grimes v. Fremont Gen. Corp.,*
   933 F. Supp. 2d 584 (S.D.N.Y. 2013) ...................................................19

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,*
   95 F. Supp. 2d 169 (S.D.N.Y. 2000) .......................................................8

*Heredia v. United States,*
   887 F. Supp. 77 (S.D.N.Y. 1995) ..........................................................46

*Hotaling v. A.B. Leach & Co.,*
   126 Misc. 845, 214 N.Y.S. 452 (Mun. Ct. 1926) .................................43

*Hotaling v. Leach & Co., Inc.,*
   247 N.Y. 84 (1928) ................................................................................39

*In re B. & R. Glove Corp.,*
   279 F. 372 (2d Cir. 1922) ......................................................................31

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ......................................................................8

*In re Citigroup Inc. Sec. Litig.*,
  753 F.Supp.2d 206 (S.D.N.Y.2010) ........................................................................34

*In re Fairway Group Holding Corp. Sec. Litig.*,
  2015 WL 249508 (S.D.N.Y. January 20, 2015) ......................................................17

*In re Lehman Bros. Holdings Inc.*,
  Case No. 08-13555 (SCC) (Bankr. S.D.N.Y. Jun. 19, 2014) ...................................6

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................................12, 13

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
  404 F. Supp. 2d 605 (D.N.J. 2005) ...................................................................40, 41

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ......................................................................8

*Isr. Discount Bank v. NCC Sportswear, Corp.*,
  859 N.Y.S.2d 895, slip op. at 3 (N.Y. Sup. Ct. N.Y. Cnty. Feb. 21, 2008)............19

*JBCHoldings NY, LLC v. Pakter*,
  931 F. Supp. 2d 514 (S.D.N.Y. 2013).......................................................................8

*Kensington Pub. Corp. v. Kable News Co.*,
  100 A.D.2d 802 (1st Dep't 1984) ...........................................................................41

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (1996) ......................................................................................38, 41

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006).....................................................................18

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
  108 F.3d 1531 (2d Cir. 1997)...........................................................24, 25, 26, 28

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir.2005).....................................................................................34

*Longo v. Butler Equities II, L.P.*,
  718 N.Y.S.2d 30 (1st Dep't 2000) ..........................................................................19

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ..................................................................................34

*M&T Bank Corp. v. LaSalle Bank Nat'l Ass'n*,
 852 F. Supp. 2d 324 (W.D.N.Y. 2012) ...................................................................19

*Maloul v. Berkowitz*,
 2008 WL 2876532 (S.D.N.Y. July 23, 2008) .........................................................21

*Mandarin Trading Ltd. v. Wildenstein*,
 16 N.Y.3d 173 (N.Y. 2011) ...................................................................................20

*Marbury Mgmt., Inc. v. Kohn*,
 629 F.2d 705 (2d Cir. 1980).............................................................................36, 40

*Matana v. Merkin*,
 989 F. Supp. 2d 313 (S.D.N.Y. 2013)..........................................................32, 33, 40

*Merrill Lynch, Pierce, Fenner & Smith v. Wise Metals Grp.*,
 798 N.Y.S.2d 14 (lst Dep't 2005) .........................................................................12

*N. Valley Partners, LLC v. Jenkins*,
 885 N.Y.S.2d 712, slip op. at 7 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 14, 2009)...........19

*Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 89 F. App'x. 287 (2d Cir. 2004) ............................................................................27

*Newman v. L.F. Rothschild*,
 662 F. Supp. 957 (S.D.N.Y. 1987) ........................................................................18

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
 135 S. Ct. 1318 (2015)........................................................................1, 10, 11, 12

*Oriental Commercial & Shipping v. Rosseel N.V.*,
 702 F. Supp. 1005 (S.D.N.Y. 1988).......................................................................46

*Page v. Clark*,
 119 Misc. 110, 195 N.Y.S. 529 (Sup. Ct. 1922)....................................................41

*Peltz v. SHB Commodities, Inc.*,
 115 F.3d 1082 (2d Cir. 1997)................................................................................47

*Precedo Capital Grp. Inc. v. Twitter Inc.*,
 33 F. Supp. 3d 245 ...............................................................................................47

*Pullman v. Alpha Media Pub., Inc.*,
 2013 WL 1290409 (S.D.N.Y. Jan. 11, 2013) ..........................................................7

*Rather v. CBS Corp.*,
 68 A.D.3d 49 (1st Dep't 2009) ..............................................................................41

vii

*Rizkallah v. Forward Air, Inc.*,
    2009 WL 3029309 (S.D.N.Y. Sept. 22, 2009).......................................................19

*Robinson v. Deutsche Bank Trust Co. Americas*,
    572 F. Supp. 2d 319 (S.D.N.Y. 2008)...................................................................22

*S.E.C. v. Gruss*,
    859 F. Supp. 2d 653 (S.D.N.Y. 2012).....................................................................8

*Sawabeh Info. Servs. Co. v. Brody*,
    832 F. Supp. 2d 280 (S.D.N.Y. 2011)...................................................................38

*Scone Invs., L.P. v. American Third Mkt. Corp.*,
    1998 WL 205338 (S.D.N.Y. April 28, 1998) ............................................................8

*Scutti Enters., LLC v. Park Place Entm't Corp.*,
    322 F.3d 211 (2d Cir. 2003)....................................................................................9

*Shoecraft v. BBS Auto. Grp., Inc.*,
    48 A.D.3d 786, 853 N.Y.S.2d 125 (2008) .............................................................43

*Sigmon v. Parker Chapin Flattau & Klimpl*,
    901 F. Supp. 667 (S.D.N.Y. 1995) ........................................................................44

*Somerville v. Major Exploration, Inc.*,
    576 F. Supp. 902 (S.D.N.Y. 1983) ..........................................................................8

*Sommer v. PMEC Assoc. & Co. Ltd.*,
    1992 WL 196748 (S.D.N.Y. Aug. 5, 1992).............................................................18

*Starr Foundation v. American International Group, Inc.*,
    901 N.Y.S.2d 246 (1st Dep't 2010) ................................................................39, 40

*STMicroelectronics v. Credit Suisse Grp.*,
    775 F. Supp. 2d 525 (E.D.N.Y. 2011) ...................................................................46

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1930)...............................................................................................43

*Stuart Silver Associates v. Baco Development Corp.*,
    665 N.Y.S.2d 415 (1st Dep't. 1997) ........................................................24, 25, 27

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001).................................................................................31, 32

*Tradex Global Master Fund SPC LTD v. Titan Capital Grp. III, LP*,
    944 N.Y.S.2d 527 (1st Dep't 2012) .......................................................................40

*UPS Store, Inc. v. Hagan,*
　　2015 WL 1456654 (S.D.N.Y. Mar. 24, 2015) .......................................................19

*USHA Holdings, LLC v. Franchise India Holdings Ltd.,*
　　11 F. Supp. 3d 244 ................................................................................................47

*UST Private Equity Investors Fund v. Salomon Smith Barney,*
　　733 N.Y.S.2d 385 (1st Dep't. 2001) ...............................................................24, 27

*Van Dongen v. CNinsure Inc.,*
　　951 F. Supp. 2d 457 (S.D.N.Y. 2013)...................................................................34

*Van Kleeck v. Hammond,*
　　811 N.Y.S.2d 452 (3d Dep't 2006)................................................................20, 21

*Varghese v. China Shenghuo Pharm. Holdings,*
　　672 F. Supp. 2d 596 (S.D.N.Y. 2009).........................................................9, 39, 40

*Waksman v. Cohen,*
　　No. 00 Civ. 9005, 2002 WL 31466417 (S.D.N.Y. Nov. 4, 2002) ..............24, 25, 26

*Warner Theatre Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co.,*
　　149 F.3d 134 (2d Cir. 1998)..................................................................................28

*Xcellence, Inc. v. Arkin Kaplan Rice LLP,*
　　No. 10 CIV. 3304 (HB), 2011 WL 1002419 (S.D.N.Y. Mar. 15, 2011) ...............38

*Yoder v. Orthomolecular Nutrition Institute,*
　　751 F.2d 555 (2d Cir. 1985)....................................................................................7

*Yusin Brake Corp. v. Motorcar Parts of Am., Inc.,*
　　2014 WL 2560612 (S.D.N.Y. June 6, 2014) ...................................................28, 29

*Zanani v. Savad,*
　　630 N.Y.S.2d 89 (2nd Dep't 1995).......................................................................15

*Zucker v. Waldmann,*
　　993 N.Y.S.2d 647 (N.Y. Sup. Ct. Kings Cnty. June 12, 2014) .............................19

## OTHER AUTHORITIES

Fed. R. Civil P. 9(b) .............................................................................................. passim

Fed. R. Civil P. Rule 8 .......................................................................................34, 45

Fed. R. Civil P. Rule 8(a)..........................................................................................7

Fed. R. Civil P. Rule 8(a)(2) ...................................................................................34

Fed. R. Civil P. Rule 12(b)(6)........................................................................................7, 8

x

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Stonehill Institutional Partners, L.P. ("**Stonehill Institutional**") and Stonehill

Offshore Partners Limited ("**Stonehill Offshore**" and, together with Stonehill Institutional,

"**Stonehill**"), through its undersigned counsel, hereby file this response (the "**Response**") to the

objection [ECF No. 49764] (the "**Objection**") of Lehman Brothers Holdings Inc. ("**LBHI**" and

together with its affiliated chapter 11 debtors the "**Debtors**"), as Plan Administrator (the "**Plan**

**Administrator**" or "**LBHI**"), to Stonehill's amended proofs of claim (each an "**Amended Proof**

**of Claim**" and together the "**Amended Proofs of Claim**" or "**Amended Claims**").[1]  In support

of this Response, Stonehill respectfully states as follows:

## SUMMARY OF ARGUMENT

1.      The crux of the Objection, that Mr. Wickham's representations were mere

statements of opinion that cannot support a fraud claim, fail in light of the Supreme Court

opinion in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135

S. Ct. 1318 (2015), which, although decided approximately two months prior to the filing of the

Objection, is not even mentioned in it.  In *Omnicare*, the Supreme Court held that securities

fraud, as well as traditional common law claims, can be based on a statement of opinion if the

opinion is not honestly held.  Stonehill alleges that Mr. Wickham's statements were intentionally

false and misleading, and the Plan Administrator does not even argue that Mr. Wickham honestly

believed in those statements.  Thus, even if Mr. Wickham's statements constituted only

statements of belief, *Omnicare* mandates denial of the Objection.

---

[1]      A sample Amended Proof of Claim is attached to the Objection as **Exhibit A**.  Each capitalized term
used but not defined herein shall have the meaning ascribed to it in the Proofs of Claim.

2.      In any event, some of the statements made by Mr. Wickham are unquestionably
statements of fact and are alleged to have been made knowingly and with the intent to deceive
Stonehill.

3.      The question of reasonable reliance is factual and not amenable to resolution at
the motion to dismiss stage.  The Plan Administrator, however, argues that Stonehill's reliance
was unreasonable as a matter of law because it did not perform due diligence to confirm Mr.
Wickham's oral representations.  This argument is belied by the specific allegations in the
Amended Proofs of Claim that Stonehill, being aware of the news reports regarding Lehman,
reviewed the Lehman Entities' publicly-available financial statements and third parties' analyses
thereof.  These documents painted a false picture of financial strength that was confirmed by Mr.
Wickham, who, among other things, asserted that the public news reports overstated problems
with Lehman's financial condition.  Case law is crystal clear that Stonehill was not required to
conduct detailed audits in an attempt to confirm the representations of a high-ranking executive
and, in fact, was reasonable in relying on them.  Nothing more is required at the motion to
dismiss stage.

4.      The Plan Administrator further argues that Stonehill's reliance could not have
been reasonable because it was on notice of facts such as a precipitous drop in LBHI's share
price.  It was precisely for this reason, however, that Stonehill approached the Lehman Entities
with questions regarding their stability.  Rather than warn Stonehill, the Lehman Entities
reassured it.  Thus, the Lehman Entities cannot be heard to argue that Stonehill did not exercise
due care.

5.      Similarly, Stonehill's allegations regarding causation are more than adequate at
the motion to dismiss stage.  To adequately plead transaction causation, a claimant need only

2

plead that the misrepresentations in question were a "but for" cause of the claimant's actions.

Stonehill has alleged that, but for the Lehman Entities' misrepresentations, it would not have

maintained its relationship with the Lehman Entities. In that case, Stonehill would not have lost

access to its property while it declined in value. Distilled to its essence, the Objection asks this

Court to hold that as a matter law, the Lehman Entities have no exposure for fraudulently

causing Stonehill to be "handcuffed" and preventing it from having even the *ability* to liquidate

some or all of its positions in accordance with its business judgment based on prevailing values

and market conditions, thereby minimizing its losses. This argument is reminiscent of the old

story of the son who murdered his parents and then sought mercy from the court for being an

orphan.

6.       Moreover, once again, the Plan Administrator ignores very recent authority, this

time from the Second Circuit in *Financial Guaranty Insurance Company*,[2] holding that all that is

required to plead loss causation is allegations of particular facts that, when read as a whole,

plausibly allege that the misrepresentations and omissions caused *at least some* of the economic

harm. Stonehill has alleged that the Lehman Entities' misrepresentations accomplished their

intended purpose, which was to prevent Stonehill from moving its prime brokerage business and

terminating certain counterparty relationships, resulting in Stonehill's inability to access its

securities during a period of calamitous market conditions and therefore, at the very least,

contributing to Stonehill's economic loss. No more is required.

7.       Stonehill also adequately alleged an economic loss caused by the fraud—the

decline in value of its securities between the commencement of the LBI SIPA proceeding and the

date its securities were returned to it. Contrary to the Plan Administrators' arguments, this

---

[2]      *Financial Guaranty Insurance Company v. Putnam Advisory Co., LLC*, 783 F.3d 395 (2d Cir. 2015)

economic loss is not undeterminable or speculative.  Rather, it is simple and straightforward.

Stonehill does not seek damages that courts have held to be non-compensable as a matter of law,

such as lost profits or the benefit of alternative contractual bargains.  Further, the Plan

Administrator's argument that, where a fraud causes a decline in the value of property, the

injured party must sell the property before seeking damages is unsupported by any authority, and

is plainly wrong.  Stonehill has alleged a non-speculative economic loss, which is all that is

required at this stage of the proceedings.

8.      The Plan Administrator does not dispute that Messrs. Kirk and Wickham worked

for Lehman, yet the Objection seeks to dismiss the claims against all of the Lehman Entities.

Since their employment with Lehman is undisputed, Stonehill, at a minimum, is entitled to

discovery on the scope of their employment and authority.  In any event, although the Plan

Administrator unsuccessfully attempts to refute Stonehill's allegations that Mr. Wickham had

*apparent* authority to act on behalf of the Lehman Entities, it does not dispute the allegations that

Mr. Wickham acted with *actual* authority.  Even conclusory allegations of actual authority are

sufficient to survive a motion to dismiss, and Stonehill has, at the very least, satisfied that

threshold.

9.      Even if Mr. Wickham did not have actual authority (which, even if disputed

by the Plan Administrator, would give rise a factual dispute that cannot be decided on a motion

to dismiss), Stonehill adequately pleaded that the actions of Mr. Kirk—whom the Plan

Administrator does not dispute had authority to speak for all of the Lehman Entities—in

directing Mr. Wickham to return Mr. Motulsky's voicemail, gave rise to the appearance that Mr.

Wickham also had that authority.  Thus, in addition to the apparently undisputed actual authority,

Stonehill has adequately pleaded apparent authority.

4

## BACKGROUND

10.    Commencing on September 15, 2008 and periodically thereafter, the Debtors filed with the Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

11.    On July 2, 2009, the Court entered an order [ECF No. 4271] establishing September 22, 2009 at 5:00 p.m. (ET) as the bar date for filing proofs of claim.

12.    In September 2009, Stonehill Institutional and Stone Offshore timely filed their original proofs of claim (collectively, the "**Original Proofs of Claim**").

13.    On December 6, 2011, the Court entered an order confirming the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [ECF No. 23023] (the "**Plan**").  The Plan became effective on March 6, 2012.

14.    On February 20, 2014, the Plan Administrator filed its Motion to Establish Single Reserve For Duplicative Claims [ECF No. 42959] (the "**Reserve Motion**"), which asked the Court to establish a single reserve for Stonehill's Original Proofs of Claim.  On February 27, 2014, Stonehill filed its objection to the Reserve Motion [ECF No. 43335].

15.    After a hearing on the Reserve Motion, the Plan Administrator and Stonehill agreed on a consent order [ECF No. 43571] (the "**Consent Order**") which, among other things, allowed Stonehill to file a motion by April 15, 2014 to either (a) amend, liquidate, or supplement its Original Claims, or (b) file late claims.  The Court entered the Consent Order on March 18, 2014.

16.    On April 15, 2014, in accordance with the Consent Order, Stonehill filed its Motion to Re-File Proofs of Claim to Fix Previously Unliquidated Claim Amounts or Alternatively for Leave to File Amended Claims [ECF No. 43988].

17.     On June 19, 2014, at hearing to consider Stonehill's motion to re-file or amend its

Original Proofs of Claim, the Court granted Stonehill permission to re-file its Original Proofs of

Claim in light of the "unique set of facts and circumstances."  Hr'g Tr. at 170:11, 172:23-25, *In*

*re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (SCC) (Bankr. S.D.N.Y. Jun. 19, 2014).

18.     On August 5, 2014, the Plan Administrator and Stonehill entered into a stipulation

and order to supersede the Original Proofs of Claim with the re-filed proofs of claim (the "**Re-**

**filed Proofs of Claim**") [ECF No. 45573].

19.     On October 31, 2014, the Plan Administrator filed its objection to the Re-filed

Proofs of Claim, which it styled as the *Four Hundred Eighty-Third Omnibus Objection to Claims*

*(No Liability Claims)* [ECF No. 46785] (the "**Objection to Re-filed Claims**").  On December

15, 2014, Stonehill filed its response to the Objection to Re-filed Claims [ECF No. 47388].

20.     At the February 11, 2015 hearing on the Re-Filed Proofs of Claim, the Court

dismissed each of the claims in the Re-filed Proofs of Claim except for "Wickham conversation

type claims"—claims stemming from the September 2008 conversation between Mr. Motulsky

and Mr. John Wickham—which the Court allowed to be re-pleaded "consistent with the

deficiencies that have been identified by [the Plan Administrator] and to afford Stonehill a full

opportunity consistent with its due process rights under the procedures that have been followed

in this case to file an amended pleading that complies with the requirements of Rule 9(b) if not

specifically applicable, but at that level for the purpose of being able to get to the next stage in

these proceedings."  *See* Tr. Hrg. February 11, 2015 at 95:22-96:16.  The Court's ruling was

memorialized in an order entered March 10, 2015 [ECF No. 48791] (the "**March 10 Order**").

21.     Pursuant to the March 10 Order, Stonehill filed the Amended Proofs of Claim re-

pleading the "Wickham conversation type claims" on April 10, 2015.

**ARGUMENT**

I.   **The Amended Proofs of Claim Allege Facts with
     Particularity Sufficient to Survive a Motion to Dismiss**

22.   Throughout the Objection, the Plan Administrator misguidedly attempts to
obscure the standard applied under Rule 9(b) of the Federal Rules of Civil Procedure (the "**Civil
Rules**"), essentially arguing that the Amended Proofs of Claim should be dismissed because they
do not list every conceivable factual detail or describe every piece of evidence supporting
Stonehill's right to recovery on its fraud claims.   The true standard, however, is much less
exacting than the Plan Administrator urges, and Stonehill easily meets it.   Further, the Amended
Proofs of Claim contain more than adequate factual allegations upon which the Court may
reasonably infer that the Lehman Entities are liable for fraud.   Thus, the Amended Proofs of
Claim are sufficient to survive the Objection, which is essentially a motion to dismiss under Rule
12(b)(6) of the Civil Rules.

23.   Rule 9(b) of the Civil Rules requires that fraud claims be pleaded with
particularity, which requirement "is satisfied by allegations that identify who made the
misstatement, the occasions on which these were made and the content of the misstatements."
*Gelles v. TDA Indus., Inc.*, 1991 WL 39673, at *5 (S.D.N.Y. Mar. 18, 1991) (quoting *Yoder v.
Orthomolecular Nutrition Institute*, 751 F.2d 555, 561 (2d Cir. 1985)).   The Rule's "underlying
rationale" is merely "to put defendants on notice of the precise misconduct alleged so that they
can properly defend themselves against potentially spurious charges affecting their reputations,"
and the "particularity requirement must always be harmonized with Rule 8(a)'s flexibility in
pleading."   *Pullman v. Alpha Media Pub., Inc.*, 2013 WL 1290409, at *14 (S.D.N.Y. Jan. 11,
2013) (magistrate report and recommendation adopted in its entirety by district court, *see
Pullman v. Alpha Media Pub., Inc.*, 2013 WL 1286144 (S.D.N.Y. March 28, 2013)).   Thus, "the

7

application of Rule 9(b). . . must not abrogate the concept of notice pleading." *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 485 (S.D.N.Y. 2011) (quoting *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 397 (S.D.N.Y. 2005)).[3] Rule 9(b) does not require "the pleading of detailed evidentiary matter." *Id.*; *see also Somerville v. Major Exploration, Inc.*, 576 F. Supp. 902, 909 (S.D.N.Y. 1983) ("Rule 9(b) [does not require] a plaintiff to recite the evidence or plead detailed evidentiary matter."). The complaint need not include "the detail of a desk calendar or a street map. Nor should the word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud allegation brought in a federal court." *S.E.C. v. Gruss*, 859 F. Supp. 2d 653, 669 (S.D.N.Y. 2012) (citing *Gelles*, 1991 WL 39673, at *6).

24.    The Amended Proofs of Claim contain more than sufficient factual detail—*i.e.* the "who, what, where, when and why" of the Debtors' fraud, *see Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 174 (S.D.N.Y. 2000)—to put the Plan Administrator on notice of the precise misconduct alleged, which is all that is required by Rule 9(b).

25.    Moreover, in ruling on a motion to dismiss under Rule 12(b)(6) of the Civil Rules, a "court must accept all well-pleaded factual allegations in the complaint as true, and draw all

---

3    In this Response, Stonehill cites to various opinions regarding securities fraud claims brought pursuant to 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 because "it is well-established that opinions interpreting federal securities laws are helpful to courts analyzing New York common law fraud claims." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 455-56 (S.D.N.Y. 2012). New York common-law fraud claims arise from the same elements as claims for securities fraud. *See, e.g.*, *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 532 (S.D.N.Y. 2013) ("These elements [of fraud under New York law] are essentially the same as those which must be alleged in order to establish a claim under Section 10(b) of the Securities Exchange Act of 1934."); *Fezzani v. Bear, Stearns & Co, Inc.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008) ("Courts in the Second Circuit have found that the 'elements of common law fraud ar)e essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b-5.'") (quoting *Scone Invs., L.P. v. American Third Mkt. Corp.*, 1998 WL 205338, at *10 (S.D.N.Y. April 28, 1998)); *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 832 (S.D.N.Y. 2006) (elements for pleading common law fraud are "essentially identical to those for pleading a violation of Rule 10b-5.").

reasonable inferences in the plaintiff's favor." *Varghese v. China Shenghuo Pharm. Holdings*, 672 F. Supp. 2d 596, 604 (S.D.N.Y. 2009). Under this standard, a plaintiff merely needs to plead "'factual content that allows the court to draw the reasonable inference that the defendant is liable[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the allegations must give rise to a "plausible" scenario for recovery, the court does not, at this early stage, act as a fact-finder and weigh the relative merits of the allegations. *See Varghese*, 672 F. Supp. 2d at 604. Rather, a complaint is sufficient if the claim is "facially plausible," a determination that is based upon the court's "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A court may not dismiss a complaint "unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Allstate Ins. Co. v. Sidakis*, 2014 WL 5698854, *2 (E.D.N.Y. November 5, 2014) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 214 (2d Cir. 2003)).

26.     The facts alleged in the Amended Proofs of Claim present, at the very least, a plausible claim that the Lehman Entities "(1) [made] a material misrepresentation or omission of fact; (2) which [the Lehman Entities] knew to be false; (3) which [the Lehman Entities] made with the intent to defraud; (4) upon which [Stonehill] reasonably relied; and (5) which caused injury to [Stonehill]." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015). Thus, the Court should find that the Amended Proofs of Claim survive the Plan Administrator's motion to dismiss.

9

## II.    Stonehill Alleged Actionable Misrepresentations

### A.    The Present Fact Statements and Affirmative Reassurances are Actionable Even if Considered Statements of Opinion

27.    Assuming, as the Plan Administrator urges in its lead argument, that the statements Mr. Wickham made to Mr. Motulsky during a phone call in September 2008 were mere expressions of opinion (which, as discussed below, they were not),  they are still actionable misrepresentations under a body of case law that the Plan Administrator inexplicably ignores.  In *Omnicare*—a Supreme Court opinion published two months before the filing of the Objection— the court held that statements of opinion could be considered actionable misrepresentations of fact if the speaker does not actually hold the stated belief.  *See Omnicare*, 135 S. Ct. at 1326.[4]

28.    In several places in the Amended Proofs of Claim, Stonehill alleges that Mr. Wickham's statements were—and Mr. Wickham knew them to be—false, misleading, and intended to defraud or mislead Stonehill.  *See* Amended Proof of Claim at ¶¶ 27, 32, 34, 36, 37. Further, the Amended Proofs of Claim allege specific reasons why the Lehman Entities, and Mr. Wickham, a high-ranking Lehman executive, could not have believed that the representations conveyed to Mr. Motulsky were anything but misleading.  To list a few examples, the Lehman Entities and Mr. Wickham knew that (i) the Lehman Entities had only $2 billion of unencumbered cash in early September 2008 (Amended Proof of Claim at ¶ 27), (ii) the

---

[4]    In *Omnicare*, the defendant represented in a registration statement for a public stock offering that it believed certain of its contracts were "legally valid" and "in compliance with the applicable and federal and state laws."  *Omnicare*, 135 S. Ct. at 1325.  After the defendant was sued by the Federal Government for violations of anti-kickback laws in connection with their contractual arrangements, the plaintiff brought a cause of action for fraud.  *Id.* at 1324.  The Sixth Circuit found that the plaintiff's complaint survived a motion to dismiss because the plaintiff had to allege only that the stated belief was objectively false, and not that the defendant disbelieved the opinion.  *Id.*  The Supreme Court reversed, holding that a statement of belief is actionable only where the belief is not actually held, or the statement is supported by embedded statements of fact that are untrue.  *Id.* at 1325-27.  Here, however, Stonehill has alleged both that Mr. Wickham did not sincerely hold any statements of belief and that his statements are accompanied by statements of fact that were untrue.

10

devaluation of assets had an adverse effect on availability of committed financing (*id.* at ¶ 28),
(iii) the Lehman Entities did not engage in matched funding (*id.* at ¶ 29), (iv) the Secretary of the
Treasury relayed to the Lehman Entities that the collapse of Bear Stearns jeopardized the
Lehman Entities' existence (*id.*), (v) the Lehman Entities' ability to deleverage by selling assets
was significantly limited by lack of liquidity and depressed asset prices (*id.* at 32), and (vi) LBI
was running out of cash (*id.*).

29.     Stonehill also alleges that, at the time, misleading investors as to the Lehman
Entities' true financial condition and instability of operations was an institutional policy. *See*
Amended Proofs of Claim at ¶ 29 ("The Lehman Entities' 'fix' [for the Secretary of Treasury's
warning that their existence was in jeopardy] was to mislead Claimant and investors generally as
to their true financial condition by manipulating their balance sheet and net leverage numbers.");
¶ 31 (Wickham statements appeared to be "based on 'talking points' prepared by or on behalf of
LBHI and the Lehman enterprise."). Accordingly, the Amended Proofs of Claim adequately
allege that Mr. Wickham's representations, to the extent they could be considered opinions, were
not sincerely held opinions.

30.     Moreover, the Supreme Court held that statements of opinion that contain
embedded facts are actionable misrepresentations. *Omnicare*, 135 S. Ct. at 1327. In doing so,
the Supreme Court considered a hypothetical statement in which a CEO says "I believe our TVs
have the highest resolution available because we use patented technology to which our
competitors do not have access," and found that such statement would be actionable "not only if
the speaker did not hold the belief she professed but also if the supporting fact she supplied were
untrue." *Id*. Thus, even if Mr. Wickham's assurance that Stonehill "should not worry" and
"should be comfortable" continuing its prime brokerage and other relationships with the Lehman

11

Entities can be considered an opinion, and even if Mr. Wickham sincerely held that opinion, the

statement is supported by factual statements—such as that Lehman Entities' utilized a banking

practice known as matched funding and had $12 billion in surplus cash—that were patently

untrue.  Accordingly, based on the Supreme Court's reasoning in *Omnicare*, Mr. Wickham's

statements are clearly actionable misrepresentations.

31.      Prior to *Omnicare*, courts in this Circuit enforced the same rules regarding alleged

statements of opinion.  For example, in *In re Oxford Health Plan, Inc.*, the S.D.N.Y. district

court found a defendant's suggestion that "factual assertions are puffery and opinion that no

reasonable investor could reasonably rely on for their truth simply because [defendant] claims

only to have stated that it believes in their truth" disingenuous, because (i) statements regarding

future performance may be actionable if they are supported by specific statements of fact or if

the speaker does not genuinely or reasonably believe them,[5] and (ii) an opinion may be

actionable if it is without a basis in fact or if the speakers were aware of *any* facts undermining

the accuracy of the statements.  *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y.

---

[5]    New York State Courts have held that "[a]n expression or prediction as to some future event, known
by the author to be false or made despite the anticipation that the event will not occur 'is deemed a
statement of a material existing fact, sufficient to support a fraud action.'" *Merrill Lynch, Pierce,
Fenner & Smith v. Wise Metals Grp.*, 798 N.Y.S.2d 14, 16 (lst Dep't 2005) (citing *Cristallina S.A. v
Christie, Manson & Woods Intl.*, 502 N.Y.S.2d 165 (1st Dep't 1986)).  In *Merrill Lynch*, for example,
the fraud claim was properly pleaded based on representations "that a market existed for the proposed
debt instruments, knowing that financing could not be obtained under the proposed terms." *Id.*; *see
also CPC Intl., Inc. v. McKesson Corp.*, 70 N.Y.2d 268 (N.Y. 1987) (fraud claim stated where
"[p]laintiff allege[d] that defendants made the [financial] projections knowing that they were false
and unreasonable and that they were not based on [the corporation's] actual financial condition.");
*Aris Multi-Strategy Offshore Fund, Ltd. v. Devaney*, 907 N.Y.S.2d 98, at *17-18 (N.Y. Sup. Ct. 2009)
("[T]he statements concerning the [fund's] ability to prosper during a continued downturn, as well as
the statements concerning the measures defendants had in place to reduce risk, also are actionable
because the defendants allegedly did not have the measures in place to reduce the risk that they
claimed they had."); *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (defendant's alleged
intentional overstatements of its net income and the value of its current and capital assets were
actionable as fraud because "a relatively concrete representation as to a company's future
performance, if made at a time when the speaker knows that the represented level of performance
cannot be achieved, may ground a claim of fraud").

1999) (citations omitted) (emphasis added).  In holding that the defendant's statements were actionable, the court found:

> Several of the statements dubbed by the defendants as "beliefs" rely on factual assertions. The statement "The silver lining is that we are a better company for the challenge we overcame" rests on the factual assertion that the company has overcome the challenge. Oxford's "belief" that it is "a very solid company" is supported by the following statement of fact: "We're one of the most financially secure health plans anywhere on the planet." Moreover, inserting the word "belief" before stating, "The fundamentals of our business remain strong," "our business remains profitable," and "Our customers can take comfort in a strong balance sheet with no indebtedness, and with cash and marketable securities and shareholder' equity," does not change the assertive nature of the statements.

*Id*.  These statements are analogous to Mr. Wickham's representations, and include terms and phrases, such as "strong," "solid," "comfort," and "better company," that are similar to the terms used in the Amended Proofs of Claim and labeled by the Plan Administrator as vague or overly broad.  *See* Objection at ¶ 22.  In fact, the court rejected the defendant's "puffery" arguments, even though the *Oxford* statements, unlike the Wickham statements, actually used the word "belief."  This Court should similarly reject the Plan Administrator's argument because Stonehill clearly alleged that Mr. Wickham, acting on behalf of the Lehman Entities, was aware of facts undermining the accuracy of the representations at issue, and thus he could not have genuinely or reasonably believed in their truth.

### B.    The Amended Proofs of Claim Contain Allegations of Present Fact

32.    In any event, the Amended Proofs of Claim contain allegations that, in a phone call from Mr. Wickham to Mr. Motulsky during the first week of September 2008, Mr. Wickham made various specific misrepresentations of past and present fact—not mere expressions of opinion—on behalf of the Lehman Entities.  These misrepresentations included certain assertions by Mr. Wickham regarding the Lehman Entities' past and continuing use of a particular banking

13

practice known as matched funding, as well as the Lehman Entities' present liquidity and asset

coverage.  *See* Amended Proof of Claim at ¶¶ 22-25.  Specifically, the Amended Proofs of Claim

allege that Mr. Wickham told Mr. Motulsky that:

- Lehman had adequate liquidity because:

  - unlike Bear Stearns, Lehman had financed its customers with matched funding (Amended Proof of Claim at ¶ 26);[6]

  - Lehman had committed financing sufficient to meet its obligations for a year without new financing (Amended Proof of Claim at ¶ 26);

  - Lehman had $12 billion in surplus cash (Amended Proof of Claim at ¶ 26); and

  - Lehman's unrealized appreciation in various assets (including Neuberger Berman, half of which Mr. Wickham represented might soon be sold) was more than sufficient to cover possible unrealized losses in its portfolio and provide incremental equity that would be required for a planned spinout of most of Lehman's commercial real estate portfolio (Amended Proof of Claim at ¶ 30).

33.    As Stonehill alleges, each of these statements of past or present fact (collectively,

the "**Present Fact Statements**") were false at the time they were made.  *See* Amended Proof of

Claim at ¶ 27 (alleging that statements regarding a $12 billion cash surplus were false because, at

the time, Lehman had only $2 billion of unencumbered cash), ¶ 28 (alleging that statements

regarding access to financing were false because the devaluation of the Lehman Entities' pledged

assets had an adverse impact on borrowing availability); ¶ 29 (alleging the Lehman Entities did

not engage in matched funding but rather that their business model was founded on having long

term assets and short term liabilities and thus required the Lehman Entities to borrow billions of

dollars on a daily basis); ¶ 32 (alleging that statements regarding asset coverage were false

---

[6]    "Matched funding" is "a banking practice of matching a loan, an asset from the bank's viewpoint, with a deposit, a liability, of the same maturity."  PETER MOLES AND NICHOLAS TERRY, THE HANDBOOK OF INTERNATIONAL FINANCIAL TERMS, 346 (Oxford University Press 2002) (1997).

because the Lehman Entities ability to deleverage by selling assets was significantly limited by lack of liquidity and depressed prices of the assets they sought to sell); ¶ 34 (statements that Lehman could operate for a year without additional financing were false).  Thus, the Amended Proofs of Claim plainly allege misrepresentations relating to past or existing facts, which are actionable in fraud.  *See Zanani v. Savad*, 630 N.Y.S.2d 89, 90 (2nd Dep't 1995) (where alleged misrepresentations relate to past or existing facts they constitute actionable statements of fact).

34.     Stonehill does not allege that Mr. Wickham qualified any of the Present Fact Statements with phrases such as "I believe" or it is "my opinion."  Despite this, the Plan Administrator makes a disingenuous argument that the Present Fact Statements are non-actionable statements of opinion and puffery, relying on its assertion that most of the words and phrases used in the Amended Proofs of Claim are "vague and broad."  *See* Objection at ¶ 22.  The Amended Proofs of Claim, however, make clear that the discussion at issue stemmed from Mr. Motulsky's questions regarding the Lehman Entities' current stability in the face of growing concern in the market, particularly in connection with the Lehman Entities' prime brokerage and other commercial relationships with Stonehill and its affiliates.  *See* Amended Proof of Claim at ¶ 22-26.  Thus, when read in the context of the Amended Proofs of Claim, terms such as "adequate" and "sufficient" cannot be considered vague or overly broad.

35.     For instance, when Mr. Wickham, in response to Mr. Motulsky's questions, asserted that the Lehman Entities had "adequate" liquidity, and committed financing "sufficient" to continue operating for a year, he was representing that the liquidity and financing were "adequate" and "sufficient" *to ensure the current stability of operations*, including the prime brokerage business.  Those statements were not vague or ambiguous.

15

36.     Mr. Wickham's statement that the unrealized appreciation in various assets was more than sufficient to cover possible unrealized losses in Lehman's portfolio conveyed that the Lehman Entities (i) knew the extent of potential losses in the portfolio, and (ii) knew that the unrealized appreciation in various assets, if sold, would cover any such losses.  The Plan Administrator's mischaracterization of the terms and phrases used by Mr. Wickham as "vague and broad" does not change the fact that Mr. Wickham intended to, and in fact did, convey to Mr. Motulsky the statement of present fact that the Lehman Entities' asset coverage was sufficient *to ensure the current stability of operations*.

37.     The Plan Administrator absurdly attempts to turn an unequivocal statement of present fact—that the Lehman Entities had $12 billion in surplus cash—into a statement of opinion based on its view that the term "surplus" is vague.  "Surplus," however, is commonly understood to mean "the amount that remains when use or need is satisfied." *See* Merriam-Webster Dictionary, http://www.merriam-webster.com (definition of "surplus").  Thus, "surplus cash" is (and is understood by business professionals to be) cash remaining and available for use after the costs of operations have been satisfied.  Thus, the Amended Proofs of Claim unambiguously allege that Mr. Wickham misrepresented that the Lehman Entities' *operations were currently stable* because they had $12 billion in available cash, over and above the amounts needed for operations, to weather adverse conditions.

**C.     The Amended Proofs of Claim Contain Allegations of Actionable Affirmative Reassurances**

38.     The Amended Proofs of Claim further allege that Mr. Wickham, on behalf of the Lehman Entities, made certain affirmative reassurances (collectively, the "**Affirmative Reassurances**") such as:

- Lehman Brothers, including its prime brokerage operations, would continue operating in the normal course (Amended Proof of Claim ¶ 30);

16

- Stonehill should be comfortable continuing its customer and counterparty relationship with Lehman Brothers (Amended Proof of Claim ¶ 30), and that it should not worry about continuing that relationship (Amended Proof of Claim ¶ 26); and

- The market was mistaken about various risks to Lehman Brothers, and steps were being taken to address those misplaced concerns (Amended Proof of Claim ¶ 30).

39.     The Amended Proofs of Claim make clear that the Affirmative Reassurances were based on the Present Fact Statements.  In other words, Mr. Wickham affirmatively states that operations would continue in the normal course, that Stonehill should be comfortable continuing its relationship, and that the market was mistaken about the risks *because* of the Lehman Entities' prudent banking practices, ample liquidity, and sufficient asset coverage.

40.     Courts have held that affirmative statements regarding current corporate strength and the probable future of a company or investment—similar to the Affirmative Reassurances and including those that use arguably vague terms—are actionable statements of fact and not mere puffery.  *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190-91 (S.D.N.Y. 2010) (rejecting puffery defense where defendant misrepresented "risk management, discipline, monitoring and credit quality" by offering statements about "the 'lack of decline in asset quality,'" "seeing significant organic growth in cash, assets and credit" and the company being "ideally positioned to capitalize on ... growth trends," among other things); *see also In re Fairway Group Holding Corp. Sec. Litig.*, 2015 WL 249508, *9 (S.D.N.Y. January 20, 2015) (statement that company's infrastructure was "scalable" and had capacity greater than provided for were assurances that company had the present capacity to support its growth plan, and were not puffery or forward looking optimism); *Davis v. CCF Capital Corp.*, 717 N.Y.S.2d 207, 209 (2d Dep't. 2000) (holding as actionable the false representation that an investment was "low risk, high yield, secure, safe, sound, and suitable"); *Cohen v. PrudentialBache Sec., Inc.*, 713 F. Supp.

17

653, 658 (S.D.N.Y. 1989) (finding that the promise of specific percentage return without risk

precluded a finding of puffery); *Newman v. L.F. Rothschild*, 662 F. Supp. 957, 959 (S.D.N.Y.

1987) (same).

### D.    The Plan Administrator Relies on Inapplicable Case Law.

41.    The Plan Administrator's argument that the Present Fact Statements and

Affirmative Reassurances are not actionable is based entirely on the faulty premise that those

statements and assurances are vague statements of opinion.  Moreover, rather than confront the

Supreme Court and other precedent regarding actionable statements of opinion discussed above,[7]

the Plan Administrator attempts to bolster its defective argument by citing a litany of inapposite

case law involving statements that bear no resemblance to the Present Fact Statements and

Affirmative Reassurances.  *See* Objection at ¶ 23.

42.    For example, the Plan Administrator cites several cases in which the statements at

issue were short, simple statements of optimism, opinion, or future expectation that were

unaccompanied by any reference to supporting facts or details, or that were belied by other facts

---

[7]    *See also, e.g., Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 455 (S.D.N.Y. 2012) ("[O]pinions 'may be actionable if they misstate the opinions or belief held ... and are false or misleading with respect to the underlying subject matter they address.'") (quoting *Fait*, 655 F.3d at 111); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 256 (S.D.N.Y. 2011) ("[S]tatements of opinion may support a fraud claim when a plaintiff alleges that the defendant did not genuinely or reasonably believe the opinions at the time the defendant made them."); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) ("[O]ptimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (*i.e.*, the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements), or that the opinions imply certainty."); *Basquiat v. Sakura Int'l*, 2005 WL 1639413, at *5 (S.D.N.Y. July 5, 2005) (statements were not puffery where they included specific detail and were alleged to be knowingly false because "if, as plaintiff alleges, defendant made false statements knowing they were false, New York law indicates that those statements are actionable.") (citing *Sommer v. PMEC Assoc. & Co. Ltd.*, 1992 WL 196748, at *5 (S.D.N.Y. Aug. 5, 1992)).

available to the plaintiff.[8]  Further, none of the cases discuss any allegations that the speaker did

not believe in the truth of the statements at the time.[9]  Although generic statements about the

strength of a company or investment and vague expressions of future intention[10] cannot form the

---

[8]  *See DH Cattle Holdings Co. v. Smith*, 607 N.Y.S.2d 227, 231 (1st Dep't 1994) ("The *only* misrepresentation alleged is the statement by defendant's former agents that it was a 'safe investment.'") (emphasis added); *Isr. Discount Bank v. NCC Sportswear, Corp.*, 859 N.Y.S.2d 895, slip op. at 3 (N.Y. Sup. Ct. N.Y. Cnty. Feb. 21, 2008) (sole alleged statement was that "the company was doing well financially;" no indication that there were allegations of supporting factual detail); *N. Valley Partners, LLC v. Jenkins*, 885 N.Y.S.2d 712, slip op. at 7 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 14, 2009) (sole statement attributed to particular defendant was that "the company and its managements were strong;" no indication that there were allegations of supporting factual detail);
*ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC*, 858 N.Y.S.2d 94, 95 (1st Dep't 2008) (only alleged representation was that "Southeast Cruise was a great project;" no indication that there were allegations of supporting factual detail); *Longo v. Butler Equities II, L.P.*, 718 N.Y.S.2d 30, 31 (1st Dep't 2000) (complaint alleged misrepresentation that "company was seriously undervalued and could be profitably broken up" with no allegation that the statement was untrue, and that "investors would be 'in and out' in not more than one year," which was belied by the terms of the L.P. agreement); *Bavaria Int'l Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.*, 2003 WL 21767739, at *6 (S.D.N.Y. July 30, 2003) (statements were that "FD was financially sound" and that "Bavaria had nothing to worry about;" no indication that there were allegations of supporting factual detail); *Grimes v. Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 606 (S.D.N.Y. 2013) (statement that plaintiff would be able to refinance mortgage was non-actionable expression of future expectation; no indication that there were allegations of supporting factual detail); *UPS Store, Inc. v. Hagan,* 2015 WL 1456654, at *6 (S.D.N.Y. Mar. 24, 2015) (statement of UPS executive that UPS and the plaintiff "had reached 'common ground to improve the value of [their] network collectively'" was a vague, non-actionable statement; no indication that there were allegations of supporting factual detail); *Rizkallah v. Forward Air, Inc.*, 2009 WL 3029309, at *9, 10 (S.D.N.Y. Sept. 22, 2009) (defendant's offer to "work with" plaintiff to restore property, without more, was too indefinite).

[9]  For example, in *Am. Food & Vending Corp. v. Int'l Bus. Machines Corp.*, 667 N.Y.S.2d 545, 546 (4th Dep't 1997), IBM voluntarily disclosed to the plaintiff during negotiations that it was considering a national bid package for vending services, but that a national vending contract was "most unlikely" and "there was nothing to worry about," which the court found to be non-actionable opinions.  There is no indication in the decision that the plaintiff alleged that the opinions expressed were not sincerely held, which distinguishes the plaintiff's allegations from Stonehill's.

[10]  The Plan Administrator's reliance upon *M&T Bank Corp. v. LaSalle Bank Nat'l Ass'n*, 852 F. Supp. 2d 324 (W.D.N.Y. 2012) and *Zucker v. Waldmann*, 993 N.Y.S.2d 647 (N.Y. Sup. Ct. Kings Cnty. June 12, 2014) is unavailing.  Both cases involve statements describing how a specific business arrangement *may* (not *will*) unfold.  For example, in *M&T*, defendants offered an interpretation of how an event of default could affect the payment of certain subordinated notes, highlighting a scenario in which the notes would be paid.  And in *Zucker*, the defendant represented that the plaintiff would receive a percentage of profits from the rental or sale of all portions of the property in question. In *M&T* and in *Zucker*, the statements assumed conditions precedent—in *M&T*, the decision of the issuer to pay the subordinated notes, and in *Zucker*, the success of the underlying real estate investment.  Here, as shown above, Wickham made broad-ranging untrue statements concerning

basis of a fraud claim (unless the statements reflected opinions or expectations that were not sincerely held), Stonehill alleges misrepresentations that were far more extensive than simple statements that the Lehman Entities were doing well financially without reference to factual detail.   As discussed above, Mr. Wickham supported any Affirmative Assertions such as expressions of optimism and future intent with the Present Fact Statements regarding the Lehman Entities' then-current banking practices, liquidity, and asset coverage.   Moreover, Stonehill alleges that such expressions could not have been sincere.

43.    Other cases cited by the Plan Administrator relied heavily on circumstances other than the vagueness of the statements at issue—circumstances not present here.   Although the Court in *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (N.Y. 2011) stated that the defendant's alleged misstatements were mere opinions, the court dismissed the fraud claims because the statements regarding a painting's value were in a letter from the defendant to an unknown individual, and no inference could be drawn that the defendant intended that the unknown individual would transfer the information to the plaintiff.   *Id.   Mandarin* is clearly distinguishable, as Mr. Wickham's misrepresentations were transmitted directly to Mr. Motulsky with the intent of convincing Stonehill to continue the ongoing business relationship.

44.    Similarly, the court in *Van Kleeck v. Hammond*, 811 N.Y.S.2d 452 (3d Dep't 2006) held that there was no reasonable reliance where defendant Board members made "vague" and "indefinite" assurances to plaintiff, a full-time police chief, that they would abolish the full time position and appoint him part-time police chief after he retired.   *Id.* at 454-55.   The statement that there would be "no problem" with the plaintiff's appointment was not a "present, but undisclosed, intent not to perform," but merely a "vague assurance which was a promise

---

present facts with no conditions precedent, and his representations were not couched as "possibilities."

20

regarding a future act." *Id.* at 454. The court, however, also relied on the expression by one of the Board members to plaintiff prior to his retirement that she did not intend to abolish the full-time chief position. *Id.* Here, Wickham was aware of undisclosed facts that contradicted his statements, and, unlike the Board member in *Van Kleeck*, Wickham conveyed nothing to Stonehill that could have undermined his rosy description of the Lehman Entities' current stability.

45.    Accordingly, Wickham's statements are actionable misrepresentations, either as statements of past or present facts, opinions not sincerely, or opinions supported by facts known to be untrue.

## III.    Stonehill Alleged Reasonable Reliance

46.    In a nutshell, the Plan Administrator argues that Stonehill could not have reasonably relied on Mr. Wickham's misrepresentations because it did not conduct due diligence. This assertion, however, is plainly contradicted by the allegations on the face of the Amended Proofs of Claim. At best, the Plan Administrator's argument creates a factual dispute to be determined at trial. As the New York Court of Appeals held two months ago, reasonable reliance is a factual question that is not amenable to resolution at the motion to dismiss stage of a proceeding. *See ACA Financial Guaranty Corp. v. Goldman Sachs & Co.*, 25 N.Y.3d 1043, 1045 (2015) ("[T]he question of what constitutes reasonable reliance is not generally a question to be resolved as a matter of law on a motion to dismiss.") (citing *DDJ Mgt., LLC v. Rhone Group L.L.C.,* 15 N.Y.3d 147, 156 (2010)); *see also Aris Multi-Strategy Offshore Fund, Ltd. v Devaney*, 26 Misc. 3d 1221(A), slip op. at 19 (N.Y. Sup. Ct. 2009) ("issues of reasonable reliance 'are not subject to summary disposition' and should not be disposed of on a motion to dismiss"); *Maloul v. Berkowitz*, 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008) ("Whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is

21

intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss."); *Robinson v. Deutsche Bank Trust Co. Americas,* 572 F. Supp. 2d 319, 324 (S.D.N.Y. 2008) (denying motion to dismiss, *inter alia,* "given the fact-specific nature of the reasonableness of reliance").

47.     The Amended Proofs of Claim contain numerous specific factual allegations relating to Stonehill's reliance on the Wickham conversations, including:

- In mid-2008 (in the midst of the worst financial crisis since the Great Depression), Stonehill reviewed the Lehman Entities' publically available financial statements and third parties' analysis thereof, to gauge the Lehman Entities' creditworthiness (Amended Proof of Claim at ¶ 17);

- Due to the financial statements' false and misleading portrayal of the Lehman Entities' financial health, Stonehill maintained its securities with LBI as prime broker (Amended Proof of Claim at ¶ 20);

- During the first week of September 2008, Mr. Motulsky questioned whether Stonehill should terminate its relationship with the Lehman Entities based on growing public concern about the Lehman Entities' stability (which did not harmonize with the portrayal of strength in the financial statements) (Amended Proof of Claim at ¶ 21);[11]

---

[11] There is no inconsistency between Stonehill's allegations that (i) "Claimant reasonably relied on the Lehman Entities' financial statements in maintaining its securities with LBI and not demanding the return of its securities, or terminating its open transactions with LBI, prior to the Lehman Entities' collapse," Amended Proof of Claim at ¶ 20, and (ii) "[d]uring the first week of September 2008 … John Motulsky … was on the verge of deciding that Stonehill should change its prime broker and terminate various open transactions with LBI as a result of growing concern about the Lehman Entities." Amended Proof of Claim at ¶ 21. Statement (i) refers to a broad, indefinite time period, *i.e.* prior to the Lehman Entities' collapse, while statement (ii) refers to a narrow, specific time period, *i.e.* the first week of September 2008. Further, it is undisputed that Stonehill did not terminate its relationships with the Lehman Entities prior to the Lehman Entities' collapse. Thus, it is perfectly reasonable for Mr. Motulsky to have been on the verge of terminating Stonehill's relationship with the Lehman Entities based on growing concern (in the press, for example), but deciding not to do so in reliance on Mr. Wickham's representations confirming the false strength portrayed in the financial statements. Thus, the statements are easily harmonized. A finding of internal inconsistency at the motion to dismiss phase of litigation requires the plaintiff to simultaneously allege a proposition and its opposite. *See, e.g. Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 424 (S.D.N.Y. 2010) (discussing an internal contradiction whereby the plaintiffs simultaneously alleged the parties "did not make the loan" and that the plaintiffs "kept the loan paid current, up until they rescinded it"). Statements (i) and (ii) are not opposites.

- Before doing so, however, Mr. Motulsky decided to approach Mr. Kirk—a very senior executive who Mr. Motulsky knew had personal knowledge of the Lehman Entities' true financial condition and whom Mr. Motulsky thought he could trust—to obtain an explanation regarding the Lehman Entities' stability (Amended Proof of Claim at ¶ 22-23);

- Mr. Wickham, Global Head of Equity Derivatives for the Lehman Entities, returned Mr. Motulsky's voicemail to Mr. Kirk, and responded to Mr. Motulsky's questions with specific factual misrepresentations regarding the Lehman Entities' business practices, liquidity, and asset coverage, and assured Mr. Motulsky that (consistent with the financial statements' portrayal) the market was mistaken about various risks and that the prime brokerage business would continue in the normal course. (Amended Proof of Claim at ¶¶ 24-32)

48.    Stonehill has alleged that the Lehman Entities, through Mr. Wickham, affirmatively misrepresented their financial condition with the intent to induce Stonehill to maintain its relationships with those entities and that, after reviewing the means of verification available to it (*i.e.* the financial statements),[12] Stonehill relied on those misrepresentations.

49.    In *ACA Financial Guaranty Corp.*, a New York Court of Appeals decision published three weeks before the filing of the Objection, the plaintiff alleged that Goldman "fraudulently concealed the fact that its hedge fund client Paulson & Co., which selected most of the portfolio investment securities in ABACUS, planned to take a 'short' position in ABACUS, thereby intentionally exposing plaintiff to substantial liability." *ACA Financial Guaranty Corp.*, 25 N.Y.3d at 1044. The Court of Appeals found that plaintiff's allegations that it "sought assurances from defendant about Paulson's role in ABACUS," and that in response to emails

---

[12]    The Plan Administrator makes much of the inclusion of references to the Lehman Entities' financial statements in the Amended Proofs of Claim, and expends considerable effort in arguing that Stonehill is precluded by this Court's prior orders from asserting claims based on its reliance on the financial statements. *See* Objection at ¶¶ 24-30, 37-38. Stonehill, however, is not attempting to assert an independent fraud claim based on misrepresentations in the financial statements. Rather, Stonehill included references to the financial statements to bolster its fraud claim based on the Wickham misrepresentations by showing that Stonehill exercised due care in reviewing the information available to it. The inclusion of references to the financial statements is "consistent with the deficiencies that have been identified by [the Plan Administrator]," and thus is allowed pursuant to the March 10 Order.

requesting information regarding how Paulson intended to participate in the transaction,

Goldman "affirmatively misrepresented to plaintiff that Paulson would be the equity investor in

ABACUS," were sufficient to allege justifiable reliance at the motion to dismiss stage.  *Id.* at

1046.  The allegations in the Amended Proofs of Claim are consistent with the allegations the

New York Court of Appeals found actionable in *ACA*: Stonehill sought assurances regarding the

Lehman Entities' stability, and the Lehman Entities misrepresented that stability.  Accordingly,

the Plan Administrator's assertion that the Court can and should decide the question of justifiable

reliance as a matter of law is erroneous.

50.    The Plan Administrator relies on several cases in which courts have held that

plaintiffs failed to exercise due care by relying on oral representations without reviewing

conflicting information that could be found in documents available to them.  *See* Objection at ¶¶

32-36.[13]   These cases are entirely inapposite.  Having "reviewed the Lehman Entities' publicly

available financial statements and third parties' analysis thereof," Amended Proofs of Claim at ¶

17, Stonehill performed all the diligence it reasonably could have under the circumstances, and

thus exercised due care in deciding to maintain its relationships with the Lehman Entities.

Further, nothing in the financial statements or third party analyses of them contained accurate

information that would have contradicted Mr. Wickham's statements, and thus Stonehill had no

independent means of determining the truth.

---

[13]    Citing *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531 (2d Cir. 1997); *Waksman v. Cohen,* No. 00 Civ. 9005, 2002 WL 31466417 (S.D.N.Y. Nov. 4, 2002); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275 (S.D.N.Y 1998); *Belin v. Weissler*, 1998 WL 391114 (S.D.N.Y. July 14, 1998); *UST Private Equity Investors Fund v. Salomon Smith Barney,* 733 N.Y.S.2d 385, 386 (1st Dep't. 2001); *Stuart Silver Associates v. Baco Development Corp.,* 665 N.Y.S.2d 415 (1st Dep't. 1997).

51.     Several of the cases cited by the Plan Administrator involved situations in which the plaintiffs and defendants engaged in active negotiations regarding a settlement,[14] investment,[15] or asset purchase.[16]  In those situations, the plaintiffs would have had an expectation of access to diligence materials related to the transaction on demand.  Here, any documentation that may have contradicted Mr. Wickham's statements—such as internal communications or financial analyses unaffected by accounting gimmicks—was not publicly available (if available at all, a fact which is outside the evidence that may be considered on a motion to dismiss).  Nor were Stonehill and the Lehman Entities involved in litigation through which Stonehill could have expected access to discovery.  Simply stated, there is no evidence before the Court that Stonehill had access to any documentation beyond the Lehman Entities' public financial statements.

52.     The facts here are vastly different from those in *Belin* and *Lazard*, where the plaintiffs alleged that the defendants misled them about the contents of certain documents that the plaintiffs easily could have reviewed.  For example, in *Belin*, the plaintiff allegedly relied on the defendant's representation that an insurance policy in the amount of $5.8 million was in effect.  *Belin*, 1998 WL 391114 at *5-8.  In fact, the insurance policy was only in the amount of $3.5 million.  *Id*. at *4-6. The court held that the plaintiff had an obligation to secure and review a copy of the insurance policy upon which his investment decision was premised.  *Id*. at 16-17.  Further, in *Lazard*, the plaintiff entered into a written confirmation for the purchase of bank debt

---

[14]     *See Waksman*, 2002 WL 31466417 at *6-10 (transaction in question was settlement and release of claims).

[15]     *See Belin*, 1998 WL 391114 at *4-8 (transaction in question was plaintiff's investment in limited partnership formed to produce a musical play); *Stuart Silver Associates* 665 N.Y.S.2d at 96 (transaction in question was investment as limited partner in real estate venture).

[16]     *See Lazard*, 108 F.3d at 1534-35 (transaction in question was purchase of bank debt).

relying on the defendant's representations regarding the contents of a report describing the debt. The plaintiff, however, did not review the report before signing the confirmation. *Lazard*, 108 F.3d at 1534-35.  The Second Circuit held that, although the plaintiff was not in possession of the report at the time it signed the written confirmation, it could easily have insisted on examination of the report as a condition to closing, and thus did not justifiably rely on the defendant's representations. *Id*. at 1543.  Here, Mr. Wickham made no representations regarding the contents of any document, such that Stonehill could have easily debunked those representations simply by requesting and reviewing the document.[17]

53.    As the Second Circuit recognized in *Lazard*, the most important factor in the cases in which courts found no justifiable reliance as a matter of law was that "the relevant facts were *easily* accessible to the relying party." *Lazard* 108 F.3d at 1542 (emphasis added).  The Plan Administrator points to no document readily available to Stonehill, or that the Lehman Entities would have disclosed to Stonehill upon request, that would have alerted Stonehill that Mr. Wickham's statements were fraudulent.  Nor would reliance on any such hypothetical documents be appropriate at the motion to dismiss stage.  *See Doehla v. Wathne Ltd., Inc.,* No. 98 Civ. 6087, 1999 WL 566311, at *12 (S.D.N.Y. Aug. 3, 1999) ("[N]o authority to which I am directed requires a pleading to contain affirmative allegations detailing the investigative efforts of a claimant in the circumstances underlying this case: where the means of access—and the possibility of discovery that such access would have yielded—is not abundantly clear, and no suggestion of red flags or other circumstances exist making the plaintiff's inactivity

---

[17]    In *Lazard*, the Second Circuit found that cases regarding fraud by omission or fraudulent concealment are of limited importance in cases of fraud by affirmative misrepresentation, because they are different causes of action that demand different elements of proof under New York law. *Lazard*, 108 F.3d at 1542.  Accordingly, the Plan Administrator's heavy reliance on *Waksman*, which is a fraudulent concealment case, is misplaced.

*unquestionably unreasonable.*").[18]   The Plan Administrator's mere suggestion that Stonehill

should have done more cannot form the basis for dismissal of the Amended Proofs of Claim.

Whether additional information was available or would have been disclosed, and whether that

information would have shown Wickham's statements to be fraudulent are, at best, questions of

fact for trial.

54.       By reviewing and analyzing all of the information regarding the Lehman Entities'

stability that was reasonably available to it, Stonehill's actions are distinguishable from those of

other "sophisticated investors" such as the plaintiffs in *Stuart Silver Associates* (sophisticated

parties who invested in a real estate venture without visiting the project cites, investigating the

general partner's history, or requesting supporting documentation for the financial projections in

the project summary), *Granite Partners* (investment advisor that purchased securities on the

recommendation of broker without performing any of its own analysis of the securities' value in

breach of its fiduciary duties to its investors), and *UST* (institutional investors that were

presented with a chronology referencing certain documents but failed to obtain and review the

documents before closing on security sale).  And, contrary to the Plan Administrator's

suggestion, "'[s]ophisticated' entities *can* justifiably rely on fraudulent statements."  *Nat'l W.*

*Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 89 F. App'x. 287, 294 (2d Cir.

2004) (emphasis added); *see also Carbon Capital Mgmt., LLC v. Am. Exp. Co.*, 88 A.D.3d 933,

---

[18]   That there were "red flags" regarding the Lehman Entities' stability at the time was the precise reason
that Stonehill contacted the Lehman Entities in the first place.  And, Mr. Wickham specifically
addressed those "red flags" in a false statement that "the market was mistaken about various risks and
steps were being taken to address those misplaced concerns."  Amended Proof of Claim at ¶ 30.
Stonehill's reliance on the reassurance of a principal of the Lehman Entities (which confirmed the
financial statements' portrayal of stability) over press reports and market perceptions was reasonable.
*See Dow Corning Corp. v. Merrill Lynch & Co. (In re Merrill Lynch Auction Rate Sec. Litig.)*, 2011
WL 1330847, at *10 (S.D.N.Y. Mar. 30, 2011) (finding misrepresentations actionable where they
were "made in response to Plaintiffs' inquiries when Plaintiffs attempted to do their due diligence …
and Defendants reassured Plaintiffs rather than warned them.").

938 (1st Dep't 2011) ("We further reject [defendant's] contention that the fraud cause of action

should have been dismissed on the ground that [plaintiff] was a sophisticated investor.").

55.     "The[] expectations on sophisticated businesses notwithstanding, 'when matters

are held to be peculiarly within defendant's knowledge, it is said plaintiff may rely without

prosecuting an investigation, as he has no independent means for ascertaining the truth.'" *Allied*

*Irish Banks, P.L.C. v. Bank of Am., N.A.*, 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006)

(quoting *Lazard*, 108 F.3d at 1542). "Information is peculiarly within the other party's

knowledge 'where a party would face high costs in determining the truth or falsity of an oral

representation and those costs are sufficiently great to render reliance upon the representation

reasonable.'" *Yusin Brake Corp. v. Motorcar Parts of Am., Inc.*, 2014 WL 2560612, at *8

(S.D.N.Y. June 6, 2014) (citing *Warner Theatre Assocs. Ltd. P'ship v. Metropolitan Life Ins.

Co.*, 149 F.3d 134, 136 (2d Cir. 1998)). Notwithstanding the sophisticated party's duty to protect

itself, "even sophisticated plaintiffs are not required as a matter of law to 'conduct their own

audit' or 'subject [their counterparties] to detailed questioning.'" *Id.* at *21-22 (citing *DDJ*

*Mgmt.*, 15 N.Y.3d at 156). What investigation would have been adequate, what such

hypothetical investigation would have revealed, the associated costs and expenses, and their

reasonableness under the circumstances are questions of fact not to be decided on a motion to

dismiss.

56.     Moreover, after Mr. Wickham confirmed Stonehill's understanding of the

Lehman Entities' stability, Stonehill was not on notice of any material facts that would have

made its reliance unquestionably unreasonable. *See E*Trade Fin. Corp. v. Deutsche Bank AG*,

2008 WL 2428225, at *22 (S.D.N.Y. June 13, 2008) (rejecting defendant's argument that

sophisticated parties' alleged reliance was unreasonable and stating that "[t]he only time a

28

party's reliance is not reasonable is if it has been put on notice of the existence of material facts

which have not been documented") (citations and quotations omitted).  Accordingly, even as a

"sophisticated investor," Stonehill performed reasonable diligence and was justified in relying on

Mr. Wickham's representations.  *See Merrill Lynch Auction Rate Sec. Litig.*, 2011 WL 1330847

at *11 (where misrepresentations were made in response to Plaintiffs' inquiries "Defendants will

not be heard to say that Plaintiffs were not trying to exercise at least minimal diligence").

57.     *Yusin* is particularly on point.  There, plaintiffs sold automotive parts to defendant

and its subsidiary.  *Yusin*, 2014 WL 2560612 at *8.  When the defendant and its subsidiary

defaulted on payments, plaintiff's representatives met with defendant's chairman, president and

Chief Executive Officer, who "represented that [defendant] was raising capital to pay for all

outstanding amounts owed to Plaintiffs at that time, that [the subsidiary] was in a strong financial

position going forward, and that [defendant] stood behind [the subsidiary] and was committed to

paying Plaintiffs the outstanding amounts owed."  *Id.* at *5.  Based on these representations,

plaintiffs continued to deliver parts to Defendant and its subsidiary.  *Id.*  In fact, at the time of the

meeting, the subsidiary was on the verge of bankruptcy.  *Id.*  The court held that plaintiff

adequately pleaded reasonable reliance, even despite an SEC filing highlighting the subsidiary's

financial difficulties, because the information regarding the financial position of the subsidiary

was in the peculiar knowledge of the defendant, plaintiff would face high costs in verifying the

accuracy of CEO's statements, and reliance on the statements of the CEO of a parent company

with respect to a subsidiary did not reflect a lack of due care.  *Id*. at *22.  Here, the Lehman

Entities' financial statements provided no notice of the impending collapse, and Stonehill was

reassured by a high ranking executive that the market's perception of the Lehman Entities'

stability was mistaken.  There was no lack of due care on Stonehill's part.

29

58.     Finally, the Plan Administrator argues that Stonehill's reliance could not have

been reasonable during the week of September 8, 2008, "when the value of LBHI's common

stock decreased over 75%."  *See* Objection ¶ 36.  During that time, however, many financial

stocks had lost tremendous value, and the falling stock price did not necessarily contradict the

assurances of a high-ranking insider that the Lehman Entities' prime brokerage activities would

continue in the normal course.  Further, although LBHI filed its Chapter 11 case prior to the

commencement of LBI's SIPA proceeding, LBHI's filing did not necessarily indicate that LBI

would end up in a SIPA proceeding restricting Stonehill's access to its securities.

59.     Stonehill performed diligence, including its questioning of Mr. Wickham, and

made the judgment to maintain its relationship with Lehman in reliance on Mr. Wickham's

statements and based on its analysis of the limited public information available to it.  In

hindsight, those judgments were mistaken.  The Plan Administrator is free to argue that Stonehill

contributed to its own damages, and the Court, as the trier of fact, will determine whether that

argument has merit.  Stonehill, however, is not required to establish on the face of the Amended

Proofs of Claim that the Lehman Entities' fraud was the *only* factor causing its damages,

especially at the motion to dismiss stage.  *See Financial Guaranty Insurance Company*, 783 F.3d

at 404 (alleged misrepresentations and omissions need only cause "at least some" of the

economic harm).  The Plan Administrator's assertion that Stonehill's reliance could not have

been reasonable past a certain date does not establish that Stonehill should be denied recovery

for the Lehman Entities' fraud as a matter of law, but rather simply raises a question of the

allocation of damages to other potential contributing factors.  *See DDJ Mgmt.*, 15 N.Y.3d at 154

(where "a plaintiff has taken reasonable steps to protect itself against deception, it should not be

denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred.").[19]

## IV.    **Stonehill Adequately Pleaded Causation**

### A.    **Transaction Causation**

60.    "Transaction causation means that the [fraud] in question caused the [plaintiff] to engage in the transaction in question."    *AUSA*, 206 F.3d at 209.  It "is based upon the plaintiff's reliance [on] the defendants' deceptive statements or omissions; that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment."[20]  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001).  "[T]ransaction causation is generally understood as reliance," *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001), and it "is demonstrated when a defendant's misrepresentations induce a plaintiff to act … and the plaintiff would not have acted without the defendant's misrepresentation." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 351 (S.D.N.Y. 2010).  A misrepresentation need not be the only basis for transaction causation, "as an injury to a party may have arisen from multiple 'but for' causes." *Id*. at 352.

61.    The transaction in question here is Stonehill's "maintaining its securities with LBI and not demanding the return of its securities, or terminating its open transactions with LBI,

---

[19]    The Plan Administrator, citing *In re B. & R. Glove Corp.*, 279 F. 372 (2d Cir. 1922), essentially argues that no party may justifiably rely on financial statements during a financial crisis.  As the Second Circuit in *B. & R. Glove* made clear, however, the creditor's error was relying *exclusively* on the nine month old financial statements in continuing to sell to a company without making inquiries regarding the company's change in financial condition.  *Id*. at 377.  Stonehill, of course, did exactly what the creditor in *B. & R. Glove* did not: make inquiries about the financial statements to test their validity and relevance in the face of changed market conditions.

[20]    Although the Amended Claims meet Rule 9(b), Stonehill is aware of no precedent subjecting transaction causation to Rule 9(b).  Being in the nature of reliance, however, it is a factual question not to be resolved as a matter of law on a motion to dismiss.  *See ACA Financial Guaranty Corp.*, 25 N.Y.3d at 1045.

prior to the Lehman Entities' collapse." Amended Proof of Claim at ¶ 20.  Put another way,

maintaining its securities at LBI is the act that, but for the Lehman Entities' misrepresentations,

Stonehill would not have done to its detriment.  *See Suez Equity*, 250 F.3d at 96.  In *AUSA*,

transaction causation was held present where the plaintiff relied on the defendant's certifications

of the financial soundness of a note issuer "both in making their note purchases *and in*

*continuing to hold the notes*."  *AUSA*, 206 F.3d at 209 (emphasis added).  Here, Stonehill relied

on the Lehman Entities' misrepresentations regarding their financial soundness in continuing its

relationships with the Lehman Entities.

62.    The Plan Administrator cites a single case, *Matana v. Merkin*, 989 F. Supp. 2d

313, 325 (S.D.N.Y. 2013), in support of its argument that Stonehill failed to plead transaction

causation.[21]   In *Matana*, the plaintiff, an investor in an off-shore hedge fund managed by the

defendants, brought a state law fraud claim on the basis that it retained its investment with the

hedge fund due to misrepresentations in the financial statements that concealed the firm's

connection to Bernard Madoff.  *Matana*, 989 F. Supp. 2d at 317.  The court found that the

plaintiff "did not plead facts that supply a plausible basis from which a factfinder could infer

that, but for these representations, [the plaintiff] would have initiated a redemption."  *Id.* at 325.

The court then listed examples of hypothetical facts (not requirements) that, if pleaded in that

specific situation, would have allowed the complaint to survive a motion to dismiss on the issue

of transaction causation.  The Plan Administrator relies on certain of these hypothetical examples

that it argues are not included in the Amended Proofs of Claim.[22]  The Plan Administrator

---

[21]   In arguing that there was no transaction causation, the Plan Administrator relies on a characterization
of Stonehill's securities as "illiquid."  Objection at ¶¶ 48-49.  Nowhere in the Amended Proofs of
Claim, however, does Stonehill allege that its securities were "illiquid."

[22]   In particular, the Plan Administrator argues that Stonehill does not allege that it had "in place a
specific investment philosophy and standards" that, absent the alleged fraud, "would have triggered a

neglects to mention, however, the allegations in the Amended Proofs of Claim that are consistent

with certain other statements that the court in *Matana* found would be sufficient to survive a

motion to dismiss.

63.    For example, Stonehill alleged that the purpose of Mr. Motulsky's questioning of

Lehman executives was to gauge the stability of the Lehman Entities' operations because he was

on the verge of terminating the prime brokerage and other relationships, Amended Proof of

Claim at ¶¶ 21-22, and that Stonehill decided not to transfer its securities based on the

misrepresentations.  Amended Proof of Claim at ¶ 38.  If Mr. Wickham had revealed the true

financial condition of the Lehman Entities at the time of his conversation with Mr. Motulsky, it

would have triggered a decision within Stonehill to exit its relationship with the Lehman Entities,

and the misrepresentations were the main inducement to Stonehill's decision to refrain from

doing so.  These are consistent with the *Matana* court's hypothetical allegations "that financial

statements that lacked [certain] representations would have triggered a decision within [the

plaintiff] to exit that fund," and that "the challenged representations factored into [plaintiff's]

decision to continue to hold."  The Plan Administrator's argument that the Amended Proofs of

Claim did not plead transaction causation because Stonehill did not match all of the *Matana*

court's hypotheticals is unavailing.

### B.    Loss Causation

64.    According to the Second Circuit, the relevant question with respect to loss

causation is whether there was a reasonable probability that the fraud actually accomplished the

---

decision" within Stonehill to liquidate its securities.  Objection at ¶ 49.  Further, it argues that
Stonehill does not allege that "there were meetings or discussions within [Stonehill] as to whether to
retain [its securities] position, and that the challenged representations factored into [it]s decision to
continue to hold" those securities.  *Id.*  As discussed herein, however, Stonehill did allege that the
challenged representations factored into its decision to continue its relationship with the Lehman
Entities.

result it was intended to bring about. *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 213

(2d Cir. 2000). "The purpose of the loss causation element is to require a plaintiff to provide a

defendant with some indication of the loss and the causal connection that the plaintiff has in

mind, not to make a conclusive proof of that causal link." *Financial Guaranty Insurance

Company*, 783 F.3d at 404 (internal quotation marks and citations omitted). "[T]he [loss

causation] requirement is not intended to 'impose a great burden' on a plaintiff." *Id.* at 404

(quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 247 (2005)). To adequately plead loss

causation, the plaintiff need only allege "particular facts that, when considered as a whole,

plausibly allege that [the defendant's] alleged misrepresentations and omissions caused *at least

some* of the economic harm it suffered." *Id.* (emphasis added). In other words, the plaintiff need

only plead that the "'risk that caused the loss was within the zone of risk concealed by the

misrepresentations and omissions alleged by a disappointed investor.'" *Merrill Lynch Auction

Rate Sec. Litig.*, 2011 WL 1330847 at *11 (quoting *Lentell v. Merrill Lynch & Co.,* 396 F.3d

161, 173 (2d Cir.2005)).[23]

65.    Here, the risk presented—the collapse of the Lehman Entities' prime brokerage

and other operations causing Stonehill to lose access to its securities and the ability to novate its

in-the-money foreign exchange contracts—was precisely the risk concealed by the Lehman

---

[23]    The Second Circuit has not ruled definitively on the question of whether loss causation must be
pleaded with particularity under Rule 9(b), and there is a split among U.S. Courts of Appeals on the
issue. *See Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 58 (2d Cir. 2012)
(explaining split between Fourth and Fifth Circuits). The majority rule in this District is that loss
causation is subject only to the ordinary pleading standards of Rule 8, not the particularity
requirements of Rule 9(b). *See, e.g., Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 469
(S.D.N.Y. 2013) ("Loss causation is not subject to the heightened pleading standards of Rule 9(b) or
the PSLRA. Instead, a short and plain statement suffices, as required under Rule 8 of the Federal
Rules of Civil Procedure.") (internal citations omitted); *In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d
206, 234 (S.D.N.Y.2010) ("Loss causation need not be pled with particularity."); *but see Cohen v.
Stevanovich*, 722 F.Supp.2d 416, 423 n.9 (S.D.N.Y. 2010). The better view is that Rule 9(b) does not
apply to loss causation, but, in any event, Stonehill has pleaded sufficient facts to meet Rule 9(b) with
respect to that issue.

Entities' misrepresentations.  Stonehill clearly alleged that the Lehman Entities'
misrepresentations were intended to avoid losses of customer relationships, Amended Proof of
Claim at ¶ 42, and thus that the Lehman Entities intended that Stonehill rely on the
misrepresentations by not moving its prime brokerage and other business, resulting in damages.
Amended Proof of Claim at ¶¶ 34, 40.  Further, Stonehill alleges that, while they were reassuring
Stonehill as to the stability of their operations, the Lehman Entities were aware that their collapse
was imminent.  *See* Amended Proof of Claim at ¶¶ 27-29, 32-36.

66.    Despite this, the Plan Administrator argues that if Stonehill's securities decreased
in value as a result of normal market fluctuations or conditions of the issuer, it cannot plead loss
causation based on the Lehman Entities' misrepresentations.  Objection at ¶ 41.  This argument
was expressly rejected in *Merrill Lynch Auction Rate Sec. Litig.*  There, the defendants argued
that the value of the plaintiff's auction rate securities would have been impaired due to market
phenomena even absent the defendants' conduct.  *Merrill Lynch Auction Rate Sec. Litig.*, 2011
WL 1330847 at *11.  In rejecting this argument, the court held that "[t]he law does not impose[]
on plaintiffs the heavy burden of pleading facts sufficient to exclude other non-fraud
explanations."  *Id*.  Further, in *AUSA*, the Second Circuit found that defendants could be held
liable for the plaintiff's decision not to sell the securities, applying the following reasoning:

> The defendants intended that their misrepresentations should cause the
> plaintiffs to keep their bonds, desist from further inquiry, and remain
> passive.... Where [the defendant] accomplishes his dishonest purpose, and
> his misrepresentation can fairly be said to have contributed to this result,
> he should compensate for the loss which he intended to cause, and which
> by fraudulent conduct he induced. *The test should not be whether the
> defrauded party might conceivably still have lost, had the fraud not been
> practiced*, but whether there was a reasonable probability that the fraud
> actually accomplished the result it was intended to bring about.

*AUSA*, 206 F.3d at 212 (quoting *Continental Ins. Co. v. Mercadante*, 225 N.Y.S. 488, 493-94 (1st Dep't. 1927) and stating "[t]his line of reasoning can be extended to our situation.") (emphasis added).

67.     This reasoning was also adopted by the Second Circuit in *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 708 (2d Cir. 1980), in which the defendant who induced the plaintiffs to purchase securities and continue to hold them was not a licensed "security analyst" and "portfolio management specialist" as he represented to the plaintiffs.  The Second Circuit acknowledged that the securities did not "lose value because [the defendant] was not a registered representative" but rather because the value of the security collapsed due to market forces.  *Id.* When the plaintiffs inquired about the poor performance of the securities, the defendant advised them that their prices would go up, *see id.* at 708 n.2, and the plaintiffs' misgivings were overcome by the defendant's supposed expertise.  *See id.* at 708.  Citing, among other cases, *Continental*, the Second Circuit explained that a defendant's false representation of a fact such as his expertise must be analyzed in the same way as a fraudulent representation about the intrinsic worth of a security, and found loss causation where the misrepresentations induced the plaintiffs' retention of the securities.  *See id.* at 708, 710; *see also Alvin S. Schwartz, M.S., P.A. Employer/Employee Profit Sharing Plan v. O'Grady*, No. 86 CIV. 4243 (JMC), 1990 WL 156274, at *14 (S.D.N.Y. Oct. 12, 1990) ("it was foreseeable that plaintiffs would be induced to retain their investments in reliance on the allegedly false monthly statements indicating that their investments were profitable. Accordingly, the Court finds that a genuine issue of material fact exists as to loss causation.").

68.     Here, although the Lehman Entities' misrepresentations did not relate to the value of Stonehill's securities, but rather Stonehill's decision to maintain its prime brokerage and other

relationships with the Lehman Entities, the rationale of *AUSA, Marbury,* and *Continental* is applicable.  Whether the securities lost value due to market fluctuations is not relevant.  Rather, the relevant question is whether the Lehman Entities' misrepresentations accomplished their intended purpose, which was to induce Stonehill to remain passive and thereby retain its relationship.  Stonehill has adequately alleged that the misrepresentations did accomplish their intended purpose and that they contributed to Stonehill's loss.  Thus, Stonehill has more than adequately pleaded loss causation.

69.    The Plan Administrator's heavy reliance on *Bennett v. U.S. Trust Co.*, 770 F.2d 308 (2d Cir. 1985), is misplaced.  There, the plaintiffs brought an action under Exchange Act Section 10(b) and Rule 10b-5 based on the decline in the market value of public utility stocks they purchased, *id.* at 313, and the misrepresentation at issue was the erroneous statement that the Federal Reserve's margin lending rules did not apply the plaintiff's accounts.  *Id.* at 310.  As the Plan Administrator points out, the Second Circuit found that the plaintiffs failed to allege the requisite loss causation because the defendant's alleged misrepresentation regarding margin rules had *nothing* to do with the investment value of the plaintiff's securities, and thus nothing to do with the plaintiff's loss.  Objection at ¶ 45.

70.    Here, unlike in *Bennett*, Stonehill need not allege that the Lehman Entities' misrepresentations were related to the value of particular securities to succeed on its common law fraud cause of action.  Further, unlike misrepresentations concerning the applicability of margin rules to the decline in value of a security, the Lehman Entities' misrepresentations were not incidental to the damage caused.  Although the measure of damages happens to be based on the decline in value of securities, those damages were due to Stonehill's lack of access to the

securities directly caused by the Lehman Entities' fraudulent misrepresentations that induced

Stonehill to continue their business relationship.

71.     Stonehill has sufficiently alleged both transaction causation and loss causation to

survive a motion to dismiss.  Thus, the Objection should be denied.

**V.      Stonehill Adequately Alleged Recoverable Damages**

72.     Stonehill alleges that, due to the Lehman Entities' misrepresentations, it was

deprived of access to its securities during one of the worst financial crises in history.  Stonehill

further alleges that, due to that lack of access, it suffered a decline in the value of its securities

portfolio, as well as the value of its in-the-money currency exchange contracts.  Taking all

factual allegations in the complaint as true, and drawing all reasonable inferences in the

Stonehill's favor, Stonehill has presented a plausible claim for economic damages, which is

sufficient to survive a motion to dismiss.[24]

73.     The damages alleged by Stonehill are perfectly consistent with the "out-of-

pocket" rule articulated by the New York Court of Appeals in *Lama Holding Co. v. Smith*

*Barney Inc.*, 88 N.Y.2d 413 (1996), upon which the Plan Administrator heavily relies.  Under the

"out-of-pocket" rule, "[d]amages are to be calculated to compensate plaintiffs for what they lost

because of the fraud, not to compensate them for what they might have gained."  *Id.* at 421.  It is

difficult to conceive of a simpler or more straightforward way to allege an economic loss than to

---

[24]    Stonehill is not required to plead damages with particularity.  *Sawabeh Info. Servs. Co. v. Brody*, 832
F. Supp. 2d 280, 305 (S.D.N.Y. 2011) ("Although defendants argue that plaintiffs have failed to
allege damages, '[r]ule 9(b) does not require that claimants plead injury with particularity in fraud
claims.'  In fact, plaintiffs have alleged all that is required of them in this case—that they have
suffered compensable damages in an amount to be proven at trial.") (quoting *Xcellence, Inc. v. Arkin
Kaplan Rice LLP*, No. 10 CIV. 3304 (HB), 2011 WL 1002419, at *5 (S.D.N.Y. Mar. 15, 2011));
*Cohen v. Sudler & Hennessey*, LLC, No. 10 CIV 4321, 2010 WL 3431534, at *2 (S.D.N.Y. Aug. 31,
2010) ("[Defendant] argues that the heightened particularity requirements for fraud claims set forth in
Rule 9(b) . . . apply to the element of damages. Under Rule 9(b), however, a plaintiff must only allege
with particularity the circumstances of the fraud.").  In any event, Stonehill pleaded more than ample
facts to meet Rule 9(b).

state that, on the date on which a party lost access to its property due to fraud, that property had a certain value, and on the date that the party regained access to the property, it had a lower value. Nor is there a simpler way to allege the magnitude of a loss than by reference to available data regarding market prices on the relevant dates. This is what Stonehill has done, and it is all that is required to survive a motion to dismiss. *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596 (S.D.N.Y. 2009) (allegation that "when [defendant] issued its corrective disclosure on August 20, 2008, its share price fell from $2.33 per share to $1.89 a share" was a sufficient showing of loss causation and economic damages to survive a motion to dismiss).

74.     The Plan Administrator's cases regarding lost profits and replacement transactions are inapplicable since Stonehill does not seek damages for lost profits or, as the Plan Administrator puts it, the prevention of a hypothetical sale.[25]  The Amended Proofs of Claim clearly seek only diminution of the securities' value and lost value with respect to the FX contracts, *see* Amended Proof of Claim at ¶ 14, and do not attempt to capture any hypothetical appreciation of those assets that might have occurred absent the fraud. Thus, the concerns regarding the degree of speculation voiced in the Plan Administrator's block quote from *Starr*

---

[25]     Even if Stonehill's claims contained some component of profit, that would not preclude recovery on a fraud theory. *See Cayuga Harvester, Inc. v. Allis-Chalmers Corp.*, 95 A.D.2d 5, 24 (4th Dep't 1983) (rejecting defendants' invitation to adopt an "inflexible rule categorically precluding damages based on the market value of plaintiff's lost crops because such value would include some element of profit"); *Hotaling v. Leach & Co., Inc.*, 247 N.Y. 84, 92 (1928) ("Proximate damages may not be fixed by arbitrary rule. Sometimes other damages flow from fraud in inducing a purchase, besides the difference between the price paid and the value of the article received. Consequential damages may also be awarded."). Indeed, a plaintiff may seek fraud damages on a transaction in which the plaintiff actually earned a profit. *See Bernstein v. Kelso & Co.*, 231 A.D.2d 314, 322 (1st Dep't 1997) (reinstating plaintiff's common-law fraud claim to "recover the difference between the price he received in the sale of the company and the price he would have received had [the defendants] not deceived him").

*Foundation v. American International Group, Inc.*, 901 N.Y.S.2d 246 (1st Dep't 2010),

Objection at ¶ 54, are not present here. [26]

75.    Finally, Stonehill does not allege that it should "recover the benefit of an alternative agreement overlooked in favor of the fraudulent one."  Objection at ¶ 53 (quoting *Alpert v. Shea Gould Climenko & Casey*, 559 N.Y.S.2d 312, 315 (1st Dep't 1990).  To the contrary, Stonehill's loss is based on its inability to access its own property, and thus to enjoy the benefits of the agreement that it already had with the Lehman Entities.  Stonehill's claim does not depend on a hypothetical "alternative contractual bargain," as Stonehill is not seeking to recover profits from hypothetical potential investments that could have been generated by its

---

[26]    The cases cited by the Plan Administrator finding that certain "holder claims" are not actionable are inapplicable to Stonehill's claims.  First, "holder claims" are claims that a plaintiff chose to retain a security due to misrepresentations or omissions of facts that affect the value of the security itself.  *See Starr*, 901 N.Y.S.2d at 26-27 (alleged fraud was failure of AIG to accurately disclose the risk in its CDS portfolio, resulting in plaintiff's decision not to sell AIG stock); *Tradex Global Master Fund SPC LTD v. Titan Capital Grp. III, LP*, 944 N.Y.S.2d 527 (1st Dep't 2012) (plaintiffs claimed misrepresentation caused them to hold shares instead of redeeming them); *Bank Hapoalim B.M. v. WestLB AG*, 995 N.Y.S.2d 7 (1st Dep't 2014) (alleged fraud was concealment of net asset value of a structured investment vehicle).  Stonehill does not claim that it voluntarily held a security based on faulty information propping up the security's value.  Rather, Stonehill asserts that it was fraudulently induced into continuing a business relationship that resulted in an involuntary restriction of access to its securities portfolio between the commencement of the SIPA proceeding and the date the securities were returned.  Thus, Stonehill's claims are not "holder claims."  Second, as the *Matana* case, on which the Plan Administrator heavily relies, explains, the New York Court of Appeals had not addressed whether "holder claims" are barred.  *Matana*, 989 F. Supp. 2d at 321.  Further, *Starr* and *Tradex* did not hold that all holder claims are non-actionable, but rather only "holder claims" that seek lost profits, as opposed to out-of-pocket losses.  *Id.* at 322-323; *see also Beach v. Citigroup Alternative Investments LLC*, No. 12 CIV. 7717 PKC, 2014 WL 904650, at *17 (S.D.N.Y. Mar. 7, 2014) ("Absent a contrary indication from the New York Court of Appeals, the Court tentatively concludes that holder claims of the particular type alleged here are still viable under New York law.").  Further, *Matana* points out that *Starr* contrasted its facts with *Continental*, which, as discussed above, *supra* at ¶¶ 53-54, found that holders of securities can recover for losses of the value of their investment due to fraud.  *Id.* at 322.  Finally, in the context of claims under federal securities law, the S.D.N.Y. District Court has recognized "decades of precedent" that "plaintiffs holding shares at the time of a suit have not been precluded from maintaining securities fraud actions," *Varghese*, 672 F. Supp. 2d at 611, which precedent would include the Second Cirucit's *AUSA* and *Marbury* opinions.  In doing so, the court cited *In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605, 607 (D.N.J. 2005), which held that, to plead and prove economic loss, a plaintiff is not necessarily required to sell the subject securities.

liquidation of the securities held at LBI, but rather, damages resulting from its inability to stem

the losses by simply obtaining market prices for its securities during the period it was not able to

access the securities.  Thus, Stonehill's claim does not suffer from the infirmities that made the

damages in *Lama*,[27] or the other cases cited by the Plan Administrator[28] too "undeterminable and

speculative."

76.    The Plan Administrator further argues that Stonehill failed to allege an actual loss

because it did not state that it sold any of the securities that declined in value.  *See* Objection ¶

52.  The Plan Administrator cites no case in support of the proposition that a party seeking

damages for economic loss due to a fraud that causes a decline in the value of its property must

sell the property before it may be compensated for that loss, and Stonehill is not aware of any

such case.  The contrary is true.  *See In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d

605, 607 (D.N.J. 2005) (held; to plead and prove economic loss, a plaintiff is not necessarily

required to sell the subject securities.); *Page v. Clark*, 119 Misc. 110, 195 N.Y.S. 529, 529-30

---

[27]    In *Lama*, the plaintiff alleged that, absent the fraud, it could have exercised a right to force Primerica to withdraw from its merger with Smith Barney and accept plaintiff's pre-merger proposal to structure the merger in a manner that would be more tax-advantageous to plaintiff.  The court rejected this argument, as the plaintiff's did not allege that Primerica's pre-merger refusal to accept plaintiff's offer was because of the fraud rather than Primerica's independent business decision.  *See Lama*, 88N.Y.2d at 422.

[28]    *See Alpert v. Shea Gould Climenko & Casey*, 160 A.D.2d 67, 72 (1st Dep't 1990) (rejecting plaintiffs' argument that "but for the fraud they would have invested in some other tax shelter"); *Rather v. CBS Corp.*, 68 A.D.3d 49, 58 (1st Dep't 2009) (rejecting plaintiff's claim, "based on his value and the value of similar professionals in the industry, that he would have been paid $4 million annually from 2005 through 2010"); *Kensington Pub. Corp. v. Kable News Co.*, 100 A.D.2d 802, 474 (1st Dep't 1984) (affirming dismissal of plaintiff's claim "alleg[ing] fraudulent representation by defendant that the rate contained in the agreement between the parties was the best rate defendant paid to any other publisher, and that had defendant adhered to its representation, plaintiff would have received additional funds by reason of the sale of its books"); *Geary v. Hunton & Williams*, 257 A.D.2d 482, 482 (1st Dep't 1999) (affirming dismissal of "Plaintiff's fraudulent inducement cause of action, which seeks recovery for the loss of enhanced earning potential that plaintiff allegedly would have realized had defendant's banking litigation practice been as substantial as allegedly represented, or if he had accepted a job with a different employer").

(Sup. Ct. 1922) (where majority shareholder of a company brought an action to recover damages against defendants alleged to have fraudulently induced her to vote her shares in favor of filing bankruptcy, court held that plaintiff was entitled to damages based on the depreciation in the value of her stock and the relevant inquiry was the comparison of the value of the stock prior to the fraud versus the value after the fraud had been consummated, even though plaintiff never disposed of the stock).

77.     The Plan Administrator suggests that market increases may have mitigated or eliminated Stonehill's damages because it did not sell all of its securities at a low value. Objection at ¶ 52.  The Second Circuit, however, has recognized that a party may recover damages for securities fraud even if the value of the securities eventually rebounded.  In *Acticon*, the plaintiff alleged that the defendant misled investors about its reported earnings, oil reserves, and internal controls, and that after the defendant revealed this information through a series of corrective disclosures, the Defendant's stock price dropped.  The defendant argued that those allegations were not sufficient to allege economic loss because the share price rebounded on certain days after the final disclosure to the point that plaintiff could have sold its holdings and avoided a loss.  *Acticon*, 692 F.3d at 36.  The Second Circuit disagreed with the defendant, and found that the rebound in the stock price did not preclude a finding of out-of-pocket damages. *Id*.

78.     The court noted that at the motion to dismiss stage, "we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains. We thus do not know whether it is proper to offset the price recovery against Acticon's losses in determining Acticon's economic loss.  Accordingly, the recovery does not negate the inference that Acticon has suffered an economic loss." *Id*. at 41.

Thus, the Second Circuit made clear that a holder of securities should survive a motion to

dismiss on the issue of damages if it alleges that the fraud caused an economic loss measured by

the decline in the value of the securities, even if the value eventually received for the securities is

greater than the value at the time of the fraud.  Here, Stonehill has alleged a loss caused by fraud,

which is all that is required at this motion to dismiss stage.  The calculation of the loss is not

speculative or uncertain; it is simply the decline in the overall value of the securities portfolio,

and the decline in value of its in-the-money FX forward contracts, during a definite time

period.[29]  At this stage, Stonehill is not required to address any factors that may have mitigated

its loss. While the Plan Administrator is free to argue that Stonehill's losses should be offset, the

issue is for the Court, as the trier of fact, to determine based on the evidence presented at trial.

## VI.    Stonehill Alleged That Wickham Had Authority to Bind All of the Lehman Entities

79.    Swinging for the fences, the Plan Administrator does not concede that *any*

Lehman Entity is liable for the fraud alleged by Stonehill.  It cannot be disputed, nor does the

Plan Administrator dispute, that Messrs. Kirk and Wickham worked for *one or more* of the

Lehman Entities as alleged in the Amended Proofs of Claim.  Having that information in its

possession, the Plan Administrator seeks, without discovery and failing to disclose facts that are

uniquely within its control, to dismiss the claims against all of the Lehman Entities based on a

---

[29]  Even if there were a potential difficulty in calculating Stonehill's damages (which there is not), that is
no reason to find that Stonehill did not plead damages as a matter of law.  *See, e.g.*, *Shoecraft v. BBS
Auto. Grp., Inc.*, 48 A.D.3d 786, 787, 853 N.Y.S.2d 125, 126-27 (2008) (applying the maxim that
"[r]ecovery will not be denied merely because the quantum of damages is uncertain or difficult to
ascertain" to reinstate plaintiff's fraud claim); *Gilroy v. Am. Broad. Co.*, 58 A.D.2d 533, 534, 395
N.Y.S.2d 658, 660 (1977) ("Where the tort itself is of such a nature as to preclude the ascertainment
of the amount of damages with certainty, it would be a perversion of fundamental principles of justice
to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for
his acts.") (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563
(1930)); *Hotaling v. A.B. Leach & Co.*, 126 Misc. 845, 852, 214 N.Y.S. 452, 460 (Mun. Ct. 1926)
(awarding fraud damages despite stating that "the exact amount of damage suffered in cases of this
kind cannot be estimated with accuracy or precision").

43

lack of authority argument, without acknowledging that at least *some* of the Lehman Entities (*i.e.*

the entities that formally employed Kirk and Wickham) are liable.  Facing such a complex and

large institution, Stonehill is entitled to discovery as to the employment status of Messrs. Kirk

and Wickham and the authority they wielded in the normal course of business vis-a-vis the

Lehman enterprise.

80.    The Plan Administrator takes issue with Stonehill's assertion that Mr. Wickham

made his representations with *apparent* authority to act on behalf of the Lehman Entities, but

does not even address the allegations in the Amended Proofs of Claim that Mr. Wickham acted

with *actual* authority.[30]   For example, Stonehill alleges:

- Within approximately one business day after Mr. Motulsky's call to Mr. Kirk, Mr. John Wickham, **acting on behalf of the Lehman Entities, including LBHI, as a Lehman senior executive and representative**, called Mr. Motulsky in response to Mr. Motulsky's voicemail message to Mr. Kirk.

- It was Mr. Motulsky's understanding that Mr. Wickham called him **on behalf of**, and had apparent authority to act for LBHI and for the other Lehman Entities, **and was in fact acting on behalf of all of the Lehman Entities**.  (Amended Proof of Claim at ¶ 24);

- These statements were false, misleading and **were made by or on behalf of LBHI and the other Lehman Entities** either with intent to defraud or mislead Claimant, or with reckless disregard of the truth.  (Amended Proof of Claim at ¶ 27);

---

[30]    Because it did not address actual authority in the Objection, the Plan Administrator has waived the right to raise that argument in its reply brief.  *See, e.g. Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (holding that "new arguments may not be made in a reply brief" and declining to "entertain arguments made for the first time in the Reply Brief"); *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 677 n.5 (S.D.N.Y. 1995) ("The Court need not consider defendant's argument that plaintiff has not met the second element of a prima facie case.  Defendant raised this argument for the first time in its reply brief.  Arguments may not be made for the first time in a reply brief."); *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 2006 WL 1493132, at *6 (S.D.N.Y. May 31, 2006) ("Because the Bondholders make this argument for the first time in its reply, the Court will disregard it.").

- Mr. Wickham's statements were materially false and misleading, and **were made by and on behalf of the Lehman Entities** either with intent to defraud or mislead Claimant, or with reckless disregard. (Amended Proof of Claim at ¶ 32);

- LBHI and the other Lehman Entities, **acting through Mr. Wickham**, knew or should have known that the statements made in his phone call to Mr. Motulsky were false and misleading. (Amended Proof of Claim at ¶ 36); and

- LBHI and the other Lehman Entities, **acting through Mr. Wickham**, made the false and misleading statements to Mr. Motulsky deliberately, intentionally (or with reckless disregard) and with the motive to dissuade the Claimant from terminating its prime-broker relationship with LBI and demanding the transfer of Claimant's securities to a different broker-dealer and from terminating or reducing their other counterparty exposure to LBI. (Amended Proof of Claim at ¶ 37).[31]

81.    Either actual or apparent authority is sufficient under New York law to hold the Lehman Entities liable for Wickham's fraudulent misrepresentations. *See C.E. Towers Co. v. Trinidad and Tobago (BWIA Intern.) Airways Corp.*, 903 F. Supp. 515, 523 (S.D.N.Y. 1995). Where, as here, the agency relationship between a principal (here, the Lehman Entities) and the agent (here, Mr. Wickham) is not itself alleged to have been a fraud, ordinary pleading standards, rather than the Rule 9(b) standards, apply to the allegations of alleged agency. *See Elbit Systems, Ltd. v. Credit Suisse Group*, 917 F. Supp. 2d 217, 225 (S.D.N.Y. 2013). "Conclusory allegation[s] of actual authority, express or implied, [are] sufficient under the federal pleading rules." *Commercial Financial Servs. Inc. v. Great American Ins. Co. of New York*, 381 F. Supp. 2d 291, 304 (S.D.N.Y. 2005); *see also Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 344 (S.D.N.Y. 2010) ("An outsider will not be privy to the details of what conversation or conduct took place between a principal and the agent," and thus plaintiff need only raise a sufficient

---

[31]    Actual or apparent authority is subject to the pleading requirements of Rule 8. Stonehill is aware of no authority requiring that apparent or actual authority be pleaded with particularity under Rule 9(b) and subjecting it to Rule 9(b) would be contrary to the plain language of Rules 8 and 9(b). But even if the Rule did apply, Stonehill alleged more than sufficient facts to meet it.

inference that some sort of agency relationship existed between the purported principal and agent) (citations omitted).

82.     Disputes over agency turn on questions of fact that should be addressed by a factfinder at a post-discovery phase of litigation.  *See, e.g. Heredia v. United States*, 887 F. Supp. 77, 80 (S.D.N.Y. 1995) ("[Q]uestions as to the existence and scope of the agency are issues of fact and are not properly the basis of a motion to dismiss."); *see also STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 540 (E.D.N.Y. 2011) ("Although [plaintiff's] agency theory may prove unfounded . . . [t]he bones are enough for now; discovery may provide the meat.").

83.     "Actual authority is the result of the principal's consent manifested *to the agent*." *C.E. Towers Co.*, 903 F. Supp. at 523 (quoting *Oriental Commercial & Shipping v. Rosseel N.V.*, 702 F. Supp. 1005, 1014 (S.D.N.Y. 1988) (emphasis added).  Actual authority may be expressly given by the principal or the authority may be implied.  *Id.*  Implied authority arises when the principal, by its acts, reasonably gives the appearance of authority to the agent.  *Id.*  If a principal empowers its agent either expressly or impliedly to act, the principal is bound by the agent's actions.  *Id.*

84.     Stonehill has alleged sufficient indicia that raise a reasonable inference that Mr. Wickham had actual authority to speak on behalf of all of the Lehman Entities.  Those allegations include that (i) the Lehman Entities (a) constituted an integrated enterprise acting under the Lehman Brothers name, (b) were principally operated through business segments rather than through separate legal entities, (c) had employees that held themselves out as employees of a single enterprise, (d) were supervised by and under the direction of a single Executive Committee, (e) had a single Finance and Risk Committee, (f) had a single Asset-

46

Liability Committee, and (g) generally held themselves out as a single resource to potential and

existing clients and customers, Amended Proof of Claim at ¶¶ 8-13, (ii) Mr. Wickham was the

Global Head of Equity Derivatives for (and thus a principal of) the Lehman Entities,[32] who acted

on behalf of the Lehman Entities as a senior executive and representative, Amended Proof of

Claim at ¶ 24, and (iii) Mr. Wickham appeared to be speaking based on "talking points" prepared

by or on behalf of the entire Lehman enterprise to be delivered on behalf of the Lehman

enterprise's management.  Amended Proof of Claim at ¶ 31.  Together, these allegations give rise

to a reasonable inference that Mr. Wickham, as a high-ranking executive and representative of an

enterprise that held itself out as, and in fact was, fully integrated, spoke with express actual

authority for the entire enterprise.  Further, even if his title was not enough, by allegedly

providing Mr. Wickham with "talking points," the Lehman Entities acted in a manner that gave

Mr. Wickham implied actual authority to speak on their behalf.  Thus, although the Plan

Administrator expends considerable effort addressing the extent of Wickham's apparent

authority to act for the Lehman Entities, Stonehill's allegation of actual authority is sufficient.

85.    In any event, the Plan Administrator's arguments regarding Mr. Wickham's

apparent authority fail.  "Apparent authority exists when a principal, either intentionally or by

lack of ordinary care, induces [a third party] to believe that an individual has been authorized to

act on its behalf." *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997).  A

plaintiff adequately pleads apparent authority if it alleges that the principal's conduct led the

plaintiff to reasonably believe that the agent had the authority to act on the principal's behalf.

---

[32]  *See USHA Holdings, LLC v. Franchise India Holdings Ltd.*, 11 F. Supp. 3d 244, 267 (E.D.N.Y. 2014)
(where individual was a principal and managing director of certain entities, he could not plausibly
argue that he lacked actual authority to enter into contracts on behalf of those entities); *Fugazy Intern.
Travel Group, Inc. v. Stargazer, Ltd.*, 2003 WL 115220, *3 (S.D.N.Y. 2003) (denying motion to
dismiss where individuals' alleged positions and conduct as corporate officer or manager "placed
them in a role that may presage a potential liability.").

*See Precedo Capital Grp. Inc. v. Twitter Inc.*, 33 F. Supp. 3d 245, 254 (S.D.N.Y. 2014) (finding the complaint deficient where the plaintiffs conceded that their apparent authority allegation was not based on the principal's words or conduct).

86.     Mr. Motulsky decided to approach Mr. Kirk for information and left a voice mail message making reference to his concerns with respect to Lehman's "stability" and Stonehill's "prime brokerage relationship" with Lehman.  Amended Proof of Claim at ¶ 22.  The next day, Mr. Motulsky received a return phone call from Mr. Wickham.  Amended Proof of Claim at ¶ 24.  Mr. Wickham would not have known to call Mr. Motulsky unless he was asked to do so by Mr. Kirk.  Thus, it is Mr. Kirk's conduct in directing Mr. Wickham to return the phone call that led Mr. Motulsky to reasonably believe that Mr. Wickham was acting on Mr. Kirk's behalf with authority to do so.

87.     Stonehill alleges that both Mr. Kirk and Mr. Wickham were principals of all the Lehman Entities with actual authority to speak on their behalf.  Even if, however, Wickham did not have that actual authority, Kirk's conduct in requesting that Wickham return Mr. Motulsky's call led Stonehill to believe that Kirk had authorized Wickham to act on behalf of all of the Lehman Entities.  In the Objection, the Plan Administrator does not appear to dispute that Mr. Kirk was a principal of the Lehman Entities with authority to bind them, and therefore to delegate that authority to Mr. Wickham.

88.     The Plan Administrator's contention that 20 separate principals are needed to bind the 20 Lehman Entities simply creates a factual dispute.  Whether Mr. Kirk or Mr. Wickham were principals of all of the Lehman Entities acting with actual authority, and whether Mr. Wickham acted with apparent authority, are questions of fact inappropriate for adjudication on a 12(b)(6) motion.  The facts alleged in Stonehill's Amended Claim, taken as true at this stage in

48

the litigation, along with the inferences those facts give rise to viewed in the light most favorable

to Stonehill, sufficiently allege that Mr. Wickham was acting with the actual or apparent

authority of the Lehman Entities.

89.     Further, given that Mr. Wickham had actual or apparent authority to bind all of

the Lehman Entities, resulting in the imposition of a joint and several liability on the Lehamn

Entities, the Plan Administrator's arguments that Stonehill cannot assert veil piercing, alter-ego,

or single enterprise theories to impute liability on the Debtors is a red herring, as it is not

necessary for Stonehill to do so to survive a motion to dismiss.

WHEREFORE, Stonehill respectfully requests that the Court deny the Objection in its entirety and grant it such other relief as the Court deems just and proper.

Dated:  New York, New York
       July 13, 2015

DECHERT LLP

By:    /s/ Allan S. Brilliant   
Allan S. Brilliant
Shmuel Vasser
Stephen M. Wolpert
1095 Avenue of the Americas
New York, New York 10036
Tel. (212) 698-3500
Fax. (212) 698-3599

*Attorneys for Stonehill Institutional Partners, LP and Stonehill Offshore Partners Limited*