# EXHIBIT A

| United States Bankruptcy Court/Southern District of New York<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | | **PROOF OF CLAIM** |
|---|---|---|
| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) | |
| Name of Debtor Against Which Claim is Held<br>Lehman Brothers Holdings Inc | Case No. of Debtor<br>08-13555 | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)
Stonehill Offshore Partners Limited
c/o Stonehill Capital Management LLC
885 Third Avenue, 30th Floor
New York, NY 10022
Attn: Paul D. Malek, Esq.

Telephone number: 212-739-7474    Email Address: pmalek@stonehillcap.com

[✓] Check this box to indicate that this claim supersedes a previously filed claim.

Court Claim Number: 68188
(If known)

Filed on: 08/05/2014

Name and address where payment should be sent (if different from above)

[ ] Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

[ ] Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ 86,659,892.26
   If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
   If all or part of your claim is entitled to priority, complete Item 5.
   If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
   [ ] Check this box if all or part of your claim is based on a Derivative Contract.*
   [ ] Check this box if all or part of your claim is based on a Guarantee.*
   *IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.
   [ ] Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** Prime brokerage agreement (see attachment)
   (See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   3a. Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff: [ ] Real Estate   [ ] Motor Vehicle   [ ] Other
   Describe: _____
   Value of Property: $_____   Annual Interest Rate _____%
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $_____   Basis for perfection: _____
   Amount of Secured Claim: $_____   Amount Unsecured: $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

   Specify the priority of the claim:
   [ ] Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
   [ ] Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
   [ ] Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
   [ ] Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
   [ ] Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
   [ ] Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

   Amount entitled to priority:
   $_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
   (See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

Date: 04/09/15

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.
John Motulsky
Partner

FOR COURT USE ONLY

**FILED / RECEIVED**

APR 1 0 2015

Epiq Bankruptcy Solutions, LLC

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| Case No. | Debtor | Case No. | Debtor |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
**Lehman Brothers Holdings Claims Processing**
**c/o Epiq Bankruptcy Solutions, LLC**
**FDR Station, PO Box 5076**
**New York, NY 10150- 5076**

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code <u>shall not be considered</u> a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

ATTACHMENT TO AMENDED PROOF OF CLAIM OF
STONEHILL OFFSHORE PARTNERS LIMITED

Stonehill Offshore Partners Limited ("**Claimant**") hereby files this claim (the Proof of Claim Form together with this Attachment are referred to herein as the "**Claim**") in the chapter 11 cases of Lehman Brothers Holdings Inc. ("**LBHI**") and its affiliated debtor entities ("the "**Debtors**," and collectively with Lehman Brothers, Inc. ("**LBI**"), the "**Lehman Entities**" or "**Lehman**"), and in support of the Claim, represents as follows:

Introduction

1.  Claimant was at all relevant times, and remains, a private investment fund organized as an exempted company under the laws of the Cayman Islands. Stonehill Capital Management LLC ("**SCM**") was at all relevant times, and remains, Claimant's investment adviser and an authorized signatory for Claimant.

2.  Prior to the commencement of these chapter 11 cases, Claimant had various business relationships with and was a party to a number of agreements with the Lehman Entities. A description of certain of these business relationships and agreements and the claims of Claimant against the Debtor arising thereunder is set forth below.[1]

3.  This Claim amends Claim No. 68188 (the "**Dismissed Claim**"), and such amendment is made consistent with the Bankruptcy Court Order, dated March 10, 2015 [Dkt. No. 48791] (the "**Order**"). The amendment of the Dismissed Claim, including the deletion of facts and allegations included in the Dismissed Claim is without prejudice to Claimant's rights to appeal the Order.

---

[1] SCM acted as an authorized signatory for Claimant for various agreements in its capacity as investment adviser.

20870233

Background

4.     LBI, an affiliate of the Debtors, is currently in a liquidation proceeding (the "**SIPA Proceeding**") under the Securities Investment Protection Act of 1970, as amended ("**SIPA**"), and was Claimant's prime broker until September 17, 2008, two days before commencement of the SIPA Proceeding. Claimant was party to a Customer Account Prime Brokerage Agreement (Account No.: 732-40125) (the "**PB Agreement**") between Claimant and the Lehman Entities. A copy of the PB Agreement was attached to the Dismissed Claim as Exhibit A, incorporated by reference herein.

5.     As Claimant's prime broker and pursuant to the PB Agreement, LBI had custody of a substantial portion of Claimant's assets, including both cash and securities, and was "responsible for settling trades executed on [Claimant's] behalf by [Claimant's] executing broker(s)." (PB Agreement, Paragraph 21(b)). In addition, the PB Agreement authorized "Lehman Brothers[2] to lend either to itself or to others any securities held by Lehman Brothers in any of [Claimant's] accounts" but subject to the provision that Claimant "will be entitled to receive all distributions, including, but not limited to, cash . . . made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities." (PB Agreement Paragraph 19). As a regulated broker dealer and by virtue of course of conduct among the parties, industry practice and custom, and an implied duty of good faith and fair dealing, LBI also had obligations implied by law to Claimant not specifically enumerated in the PB

---

[2] The term "Lehman Brothers" was defined in the PB Agreement as "Lehman Brothers. Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc., and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereinafter created, including successors and assigns (each of such entity or person being referred to hereinafter as Lehman Brothers or a 'Lehman Brothers Entity,' unless otherwise specified, and all such entities or persons being referred to hereinafter as 'Lehman Brothers')."

2

Agreement. The failure of LBI to return Claimant's cash and securities therefore constituted a breach of the PB Agreement and also violated other duties that LBI owed to Claimant.

6. On January 26, 2009, Claimant filed a proof of claim in LBI's SIPA Proceeding asserting various claims – categorized as "components" of the claim against LBI under SIPA (the "**SIPA Claim**"). A copy of the SIPA Claim was attached to the Dismissed Claim as Exhibit B, incorporated by reference herein. Between the commencement date of the SIPA Proceeding and the date of this Amendment, virtually all of Claimant's securities and cash held at LBI have been returned to Claimant pursuant to a Notice of SIPA Trustee's Determination of Claim (SIPA Claim No. 900002114) dated March 23, 2010 (as corrected on June 4, 2010), Schedule A to the SIPA Trustee's Distribution Notice dated June 27, 2013 (as corrected on August 22, 2013), and a Declaration, Release and Assignment entered into by Claimant on September 5, 2013 (collectively, the "**SIPA Claim Determination**").[3]

7. The Lehman Entities referred to themselves collectively as, and were operated as, the fourth largest investment bank in the United States.

8. The Lehman Entities held themselves out as, and in fact were, an integrated enterprise acting under the Lehman Brothers name, and principally operated through business segments, *i.e.* capital markets, investment banking and investment management, rather than through the legal entities forming the various parts of Lehman.

---

[3] Pursuant to the SIPA Claim Determination, all of the components of the SIPA Claim have been resolved other than Component 8, which represents an aggregate of $6,135,929.26 in losses as of September 19, 2008, on foreign currency hedges entered into under the PB Agreement which were in the money in favor of the Claimant prior to the commencement of the bankruptcy case (the "**FX Damage Claim**"), and component 10, pursuant to which Claimant fully reserved the right to seek interest that may be payable or claimable on cash balances, additional misdirected wires, and/or other amounts that may have been received by LBI or other Lehman Entities. The FX Damage Claim has not yet been admitted as a general unsecured claim in LBI's SIPA proceeding.

3

9. Nearly all of SCM's interactions with Lehman Entities' personnel were with personnel located at the Lehman Entities' worldwide headquarters in New York City and without regard to the formal legal entity such personnel were employed by. The Lehman Entities personnel that SCM interacted with usually, if not exclusively, identified themselves generally and generically as Lehman Brothers employees. As such, SCM believed and had a reasonable basis to believe that such Lehman Entities' personnel had apparent authority to, and did in fact act for and represent LBHI, LBI and the other Lehman Entities.

10. The entirety of the Lehman Entities' business operations were supervised by and under the direction of a single Executive Committee which was intimately involved in the Lehman Entities' response to Bear Stearns' collapse and the efforts to save the Lehman Entities from a similar fate.

11. Similarly, the Lehman Entities had one Finance and Risk Committee, a sub-committee of LBHI's board, to address and supervise the various risk management matters facing the Lehman Entities. The Lehman Entities maintained a risk management system which was operated by the Global Risk Management Group responsible for the Lehman Entities' various business lines. The Lehman Entities' Credit Risk Management Department had global responsibility for overall credit risk management issues covering all such entities.

12. From or around August 2007, in order to monitor the Lehman Entities' combined liquidity, a single committee was formed, the Asset-Liability Committee, to monitor the Lehman Entities' liquidity on a day to day basis.

13. The Lehman Entities intentionally and to their own strategic advantage, presented themselves to the market, investors and counterparties as an integrated group and

4

their marketing materials generally held the entire firm out as a single resource to potential and existing clients/customers of LBI.

## Claim

14.  Claimant hereby asserts a claim against the Debtors for damages representing the diminution in value of the securities held by LBI under the PB Agreement from the date when LBI's SIPA Proceeding was commenced through the date that such securities were returned to Claimant (the "**Diminution Claim**") and the FX Damage Claim (*see* fn. 3 *supra*). The PB Agreement obligated LBI to provide services consistent with the SEC's guidelines on prime brokerage relationships (PB Agreement Paragraph 21(l)). It is an established element of the brokerage relationship that a broker-dealer must promptly return the clients' securities upon request.

15.  The Diminution Claim has been calculated by Claimant to be at least $80,523,963. The calculation of this amount is shown on the spreadsheet attached to the Dismissed Claim as Exhibit C,[4] incorporated by reference herein.

### *Debtors' Fraud and Willful Misrepresentations*

16.  The Debtors are liable for the Diminution Claim and FX Damage Claim as a result of false, fraudulent and/or willful misrepresentations of material facts made by and/or on behalf of the Debtors regarding their financial condition and related matters, which were made with the intent to deceive Claimant and dissuade Claimant from demanding the return of its securities held at LBI and termination of its commercial transactions with LBI.

---

[4] The diminution in value claim is based on the difference in value of securities held at LBI as of the close of business on September 12, 2008, the last business day before the commencement of these cases and the last date on which Claimant was able to obtain its securities from LBI, and the date such securities were returned. Claimant does not mark its portfolio on a daily basis and prices for the securities in Claimant's portfolio, other than those that trade on public markets, are not available on a daily basis. Therefore, other than with respect to publicly traded securities, Claimant used the value of the securities as of the last valuation date prior to September 12, 2008 and the date of return, as applicable.

5

Claimant relied upon the false, fraudulent and/or willful misrepresentations of the Debtors in deciding not to transfer its securities held at LBI to a different broker-dealer and novate its in-the-money foreign exchange contracts, and suffered damages as a proximate result thereof.

*The Lehman Entities' Fraudulent/Materially Misleading Financial Statements*

17. Both before and after entry into the PB Agreement in September 2007, and through the bankruptcy filing, Claimant reviewed the Lehman Entities' publicly available financial statements and third-parties' analysis thereof, to gauge the Lehman Entities' creditworthiness. These financial statements were false and misleading.

18. For example, the Lehman Entities used an accounting gimmick named "Repo 105" to remove $50 billion of assets of their balance sheet at the end of the first and second quarters of 2008 to manipulate their balance sheet and report materially false and misleading lower net leverage numbers.

19. The Lehman Entities intentionally and deliberately manipulated their financial statements and net leverage numbers in order to influence rating agencies and prevent significant additional erosion in counterparties' confidence in Lehman.

20. The Lehman Entities' 2008 financial statements created a false and misleading portrayal of their true financial health. Claimant reasonably relied on the Lehman Entities' financial statements in maintaining its securities with LBI and not demanding the return of its securities, or terminating its open transactions with LBI, prior to the Lehman Entities' collapse.

*Wickham Fraudulent/Material Misrepresentations*

21. During the first week of September 2008, shortly before LBHI's chapter 11 filing and the commencement of the SIPA Proceeding, John Motulsky, the Senior Managing

Member of SCM, was on the verge of deciding that Stonehill should change its prime broker and terminate various open transactions with LBI as a result of growing concern about the Lehman Entities.

22. Before convening his colleagues to make the decision, on or about September 5, 2008, Mr. Motulsky called Mr. Alex Kirk, the Lehman Entities' Global Head of Principal Business from July 2008 to September 2008 and Co-Chief Operating Officer of the Fixed Income Division from October 2007 to January 2008, and left a voice message asking Mr. Kirk to return the call to discuss the Lehman Entities' stability, making reference to concerns about Stonehill's prime brokerage relationship.

23. Mr. Motulsky called Mr. Kirk because he had known Mr. Kirk for many years; knew that Mr. Kirk had become a very senior executive and representative of the Lehman Entities; and believed that Mr. Kirk would be knowledgeable about the Lehman Entities' stability, would be honest and would not mislead him. Mr. Kirk, was personally involved with efforts to avoid the Lehman Entities' collapse in the weeks and months preceding the chapter 11 filing and had personal knowledge of the Lehman Entities' true financial condition.

24. Within approximately one business day after Mr. Motulsky's call to Mr. Kirk, Mr. John Wickham, acting on behalf of the Lehman Entities, including LBHI, as a Lehman senior executive and representative, called Mr. Motulsky in response to Mr. Motulsky's voicemail message to Mr. Kirk. Upon publicly available information, Mr. Wickham was the LBHI's (and therefore the Lehman Entities') Global Head of Equity Derivatives and as well as Global Head of Derivatives and Prime Brokerage at LBI. It was Mr. Motulsky's understanding that Mr. Wickham called him on behalf of, and had apparent authority to act

for LBHI and for the other Lehman Entities, and was in fact acting on behalf of all of the Lehman Entities.

25. During the phone call between Mr. Motulsky and Mr. Wickham, Mr. Motulsky informed Mr. Wickham that Stonehill was considering changing its prime brokerage and terminating its open transactions with LBI as a result of growing concern about the financial condition of the Lehman Entities. Mr. Wickham addressed Mr. Motulsky's concerns regarding the Lehman Entities' financial stability, specifically in connection with the Lehman Entities' prime brokerage and other commercial relationships with Claimant and its affiliates. Mr. Wickham stated to Mr. Motulsky, with the apparent intent to convince Stonehill not to terminate its prime brokerage and other relationships with LBI, that Stonehill and SCM (which was acting on behalf of Claimant) should not worry about maintaining and continuing their commercial relationship with the Lehman Entities.

26. Mr. Wickham also reassured Claimant (through SCM and Mr. Motulsky) regarding the Lehman Entities' financial condition, liquidity and the stability of its prime brokerage operation. Mr. Wickham stated that Lehman had adequate liquidity because unlike Bear Stearns, which nearly collapsed because of liquidity problems induced by sudden customer and counterparty flight, Lehman had prudently financed its customers with matched funding and had sufficient committed financing from stable sources it believed to be reliable to meet all of its obligations for a year even if no new financing was available, and further that it had a cushion of $12 billion of surplus cash.

27. These statements were false, misleading and were made by or on behalf of LBHI and the other Lehman Entities either with intent to defraud or mislead Claimant, or with reckless disregard of the truth. First, while on September 10, 2008 the Lehman Entities

announced that they had a liquidity pool of $40 billion, from June 2008 and thereafter, the Lehman Entities' "surplus" cash was increasingly encumbered and was in rapid decline. The Lehman Entities used that cash as comfort deposits with their clearing banks and by August 2008 a significant portion of the cash was pledged such that on September 12, 2008, out of $40 billion in alleged liquidity, only $2 billion was unencumbered.

28. Second, the devaluation of the Lehman Entities' pledged assets had an adverse impact on its borrowing availability and the reduced availability actually forced the Lehman Entities to draw on its liquidity pool.

29. Third, unbeknown to the Claimant and SCM, the matched funding explanation was contrary to the Lehman Entities' business operations. In truth, the Lehman Entities' business model was founded on having long term assets and short term liabilities and thus required the Lehman Entities to borrow billions of dollars on a daily basis in order to be able to fund their operations. The confidence crisis that followed the collapse of Bear Sterns in March of 2008 actually put the existence of the Lehman Entities at jeopardy, a fact relayed to the Lehman Entities by the Secretary of the Treasury. The Lehman Entities' "fix" was to mislead Claimant and investors generally as to their true financial condition by manipulating their balance sheet and net leverage numbers.

30. Mr. Motulsky also recalls that Mr. Wickham stated that Lehman's unrealized appreciation in various assets (one of which was Neuberger Berman, half of which Mr. Wickham stated on the phone call might soon be sold at a substantial profit to realize value and substantially add to tangible equity) was more than sufficient to cover possible unrealized losses in its portfolio and provide incremental equity that would be required for a planned spinout of most of Lehman's commercial real estate portfolio, and stated that the

market was mistaken about various risks and that steps were being taken to address those misplaced concerns. Mr. Wickham also stated that Lehman Brothers, including its prime brokerage operations, would continue operating in the normal course, and that Claimant should be comfortable continuing its customer and counterparty relationship with Lehman Brothers.

31. Based on the specificity contained in Mr. Wickham's statements and the organized manner of their delivery, Mr. Motulsky reasonably inferred that Mr. Wickham's statements were, to a large degree, based on "talking points" prepared by or on behalf of LBHI and the Lehman enterprise to be delivered on behalf of LBHI's and Lehman's management. The fact that the information appeared to have been carefully prepared by Lehman for external use, reinforced Mr. Motulsky's reasonable belief that Mr. Wickham's statements were reliable and trustworthy. Indeed, on or about September 17, 2009, Mr. Wickham told Mr. Motulsky that during the September 2008 conversation referred to above, he had conveyed information given to him by Lehman.

32. Mr. Wickham's statements were materially false and misleading, and were made by and on behalf of the Lehman Entities either with intent to defraud or mislead Claimant, or with reckless disregard. Throughout 2007 and 2008 LBHI and the other Lehman Entities knew that their ability to deleverage by selling assets was significantly limited by lack of liquidity and depressed prices of the assets they sought to sell. And LBI, the prime brokerage arm of Lehman, was running out of cash such that on the commencement of the SIPA Proceeding, LBI had no cash available to fund its daily operations.

33. During the days surrounding the time that Mr. Wickham had the telephone conversation with Mr. Motulsky, LBHI, LBI and the other Lehman Entities were either insolvent, or in the zone of insolvency.

34. The statements that Lehman could continue to operate for a year even without additional financing and that LBI would continue to operate in the ordinary course of business, were false at the time they were made, inconsistent with the true financial condition of LBHI, LBI and the other Lehman Entities, and were intentionally false or, at best, were made with recklessness and/or with disregard of truth known to Lehman and its management. LBHI and the other Lehman Entities intended that the Claimant would rely on these statements and not move their prime brokerage and other business.

35. A little over a week after this conversation, LBHI commenced this chapter 11 case and a few days later the SIPA Proceeding was commenced.

36. LBHI and the other Lehman Entities, acting through Mr. Wickham, knew or should have known that the statements made in his phone call to Mr. Motulsky were false and misleading.

37. LBHI and the other Lehman Entities, acting through Mr. Wickham, made the false and misleading statements to Mr. Motulsky deliberately, intentionally (or with reckless disregard) and with the motive to dissuade the Claimant from terminating its prime-broker relationship with LBI and demanding the transfer of Claimant's securities to a different broker-dealer and from terminating or reducing their other counterparty exposure to LBI.

38. Mr. Motulsky and Claimant reasonably relied on the false statements and assurances relayed by LBHI and the other Lehman Entities through Mr. Wickham and based

upon such statements Claimant decided not to transfer its securities held at LBI to a different broker-dealer and novate its in-the-money foreign exchange contracts.

39. LBHI's and the other Lehman Entities' fraudulent and/or willful misrepresentations to Claimant were not isolated instances. Beginning with the collapse of Bear Stearns in March 2008, LBHI and the other Lehman Entities engaged in a pattern of behavior involving institutional misrepresentation of their financial condition to the market, rating agencies and counterparties.

40. The damages suffered by the Claimant, reflecting the Diminution Claim, were proximately caused by the false, fraudulent and misleading statements made by LBHI and the other Lehman Entities acting through Mr. Wickham, and the Claimant reasonable reliance thereon.

*All of the Debtors Are Jointly and Severally Liable*

41. The fraudulent representations and misrepresentations made to Claimant as described herein were made by and on behalf of LBHI as well as the other Lehman Entities, as a global enterprise and misrepresented the financial condition of LBI, LBHI and the other Lehman Entities as global enterprise, with the intent and design to fraudulently and/or recklessly induce Claimant not seek the transfer of its securities from LBI.

42. It was critically important to LBHI and the other Lehman Entities individually and as a global enterprise to dissuade Claimant (and as many other clients of LBI as possible) from terminating or reducing their commercial relationships with the Lehman Entities and to keep their securities with LBI, as mass losses of customer relationships would have damaged their business and franchise and might have precipitated the failure of LBI, LBHI and the entire Lehman firm.

43. Thus, the fraudulent and willful (or reckless) misrepresentations were made at the behest of all of the Lehman Entities, all the Lehman Entities were the intended as well the actual beneficiaries of such intentional and/or reckless conduct and therefore, all of the Lehman Entities are liable for the damages resulting as the proximate cause thereof.

## Reservation of Rights

44. No payments have been made to Claimant on account of the Diminution Claim.

45. Claimant reserves all of its rights to supplement or amend this Claim in any and all respects, including to liquidate amounts which are presently unliquidated or estimated.

46. In the event that the Debtor or any of the other debtors assert or Claimant shall determine that another debtor or other party is obligated or liable for any of the categories of claims and amounts set forth herein, this Claim shall be deemed to have been asserted against such other debtor or other party for such category and amount.

47. To the extent not set forth in this Claim, Claimant also makes claim for all direct, indirect, nominal or consequential damages, interest, costs, attorneys' fees, and other amounts owed or owing to it, to the extent recoverable under the applicable agreement and/or applicable law, whether or not liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, in law or equity, secured or unsecured, directly or indirectly related to the matters discussed in this Claim. Claims for amounts asserted herein which are or could be deemed to be post-petition interest under the Bankruptcy Code are asserted to the extent allowed under the Bankruptcy Code and applicable non-bankruptcy law.

48. Neither the substance nor the act of filing this claim, nor any later appearance, pleading, claim, or action in these cases, is intended or shall be deemed to be a waiver, release,

or modification by Claimant of its (a) right to have final orders in non-core matters entered after *de novo* review by a District Judge; (b) right to trial by jury in any proceeding so triable in this case or any case, controversy or proceeding related to these cases; (c) rights under the applicable safe harbor provisions of the Bankruptcy Code; (d) right to seek to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; or (e) other rights, remedies, claims, actions, defenses, setoffs or recoupments to which Claimant is or may be entitled, all of which are hereby expressly reserved.