**<u>EXHIBIT E</u>**

(Multicurrency-Cross Border)

**SCHEDULE**
to the
**Master Agreement**
dated as of 12th May 2008,
between
LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A"),
a company incorporated with unlimited liability under the laws of England and Wales
and
SRM FUND GENERAL PARTNER LIMITED, in its capacity as general partner of, and acting on behalf of, SRM
GLOBAL MASTER FUND  LIMITED PARTNERSHIP ("Party B")
an Exempted Limited Partnership organized under the laws of
the Cayman Islands

**Part 1: Termination Provisions**

In this Agreement:

(a)     **"Specified Entity"** means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement with the addition of the words "credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell back transaction" after the word "currency option" in the eighth line.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means three percent (3%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and three percent (3%) of the aggregate Net Asset Value of Party B in the case of Party B as reported in its most recent monthly statement of Net Asset Value (or its equivalent in any other currency).

For the purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers

19

Holdings Inc. or the resulting, surviving or transferee entity of Lehman Brothers Holdings Inc., as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Services, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services ("S&P").

(e)    The "**Automatic Early Termination**" provision of <u>Section 6(a)</u> will not apply to Party A and will not apply to Party B.

(f)    **Payments on Early Termination**. For the purpose of <u>Section 6(e)</u> of this Agreement, Loss and the Second Method will apply.

(g)    "**Termination Currency**" means United States Dollars ("USD").

(h)    **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event:-

    (i)    **Material Amendment.** Any provision within an Operative Document (as hereinafter defined) of Party A relating to either (i) the legal structure of Party A or (ii) the rights of investors to redeem their interests has been amended or modified in a manner which, in the reasonable judgment of Party B, may have a materially adverse effect on Party B under this Agreement or any Transaction hereunder or on the ability or authority of Party A to perform its obligations under this Agreement or any Transaction hereunder. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

    (ii)    **Change in Management or Control.** The Investment Advisor has any of its registrations, authorizations, licenses or memberships with any federal or state governmental or regulatory authority compulsorily revoked, suspended, terminated, limited or qualified. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

    (iii)    **Change of Investment Advisor.** Investment Advisor ceases to be the Investment Advisor to Party B provided Party A in its reasonable discretion determines that Party B is unable to **materially** perform its obligations under this Agreement. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

    (iv)    **Decline in Net Asset Value.** On any day during the term hereof, Party A determines that Party B (A) has failed to maintain a Net Asset Value in an amount equal to the greater of USD 500,000,000 or (B) has experienced a decline in its Net Asset Value during any one-month period preceding such date, of 20 percent or more, or (C) has experienced a decline in its Net Asset Value during any three-month period preceding such date, of 30 percent or more, or (D) has experienced a decline in its Net Asset Value during any twelve-month period preceding such date, of 40 percent or more. For the avoidance of doubt, Party A may use the NAV Statement or any other financial performance or Net Asset Value information provided by Party B pursuant to Part 3(b) or Part 5(d)(iii) hereof in making a determination hereunder. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

    (v)    **Failure to Deliver Financial Statements.** Party B fails to deliver or provide its audited annual financial statements, its NAV Statement within the timeframe specified in Part 3(b) hereof. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

    (vi)    **Key Person.** One or more of the following occurs with respect to a Key Person (as defined in Part 5 hereof): (A) an Incompetency Event; (B) death or incarceration; or (C) the Key Person ceases to exercise a significant influence over the management of all of Party B, its investment manager and its investment adviser. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

    (vii)    **Plan Assets.** At any time during the term of this Agreement, the assets of Party B are subject to Title I of ERISA or Section 4975 of the Code, or if any investor in Party B is a governmental plan, Party B is subject to any law, regulation, policy or procedure which is similar to Section 406 of ERISA or Section 4975 of the Code and that is applicable to Party B by reason of such

governmental plan's investment in Party B. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Part 2: Tax Representations**

(a)    **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement, Party A represents that it is a company incorporated with unlimited liability under the laws of England and Wales and Party B represents that it is the general partner of, and acting on behalf of, an Exempted Limited Partnership duly organized and validly existing under the laws of the Cayman Islands.

(c)    **Tax Representations in Confirmations.** For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in Section 4(a)(iii) of the Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A, Party B and Investment Advisor | An incumbency certificate with respect to the signatories of this Agreement and the Credit Support Documents, if any. | Upon execution of this Agreement. | Yes |

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | A copy of the resolutions or other actions of (i) in the case of Party A, the board of directors of Party A, and (ii) in the case of Party B, the board of directors or loan committee of Party B, its General Partner, certified by a secretary or assistant secretary of the relevant entity, pursuant to which such party is authorized to enter into this Agreement, the relevant Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | The earlier of (i) within 180 days after fiscal year-end and (ii) upon request (but such request to be effective no earlier than 90 days from the end of the fiscal year to which such annual audited accounts relate). | Yes, but solely with respect to audited financial statements, the phrase "true, accurate and complete in every material respect" in Section 3(d) shall be deleted and the phrase "a fair presentation, in all material respects, of the financial condition of the relevant person" inserted in lieu thereof. |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of the Schedule. | Upon execution of this Agreement. | No |
| Party B | Monthly statement which includes the Net Asset Value of Party B and the performance of Party B for the preceding month ("NAV Statement"). | Within 15 calendar days from the last Local Business Day in each calendar month. | Yes |
| Party B | Operative Documents specified in Part 5(q) hereof. | Upon execution of this Agreement. | Yes |

**Part 4: Miscellaneous**

(a)    **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to Party A:

Address:    Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

England

For all purposes except for notices in respect of CFD Transactions for purposes of Part 7, Section 15.1 Termination.

Address for notices or communications to Party B:

Address:        SRM Advisers (Monaco) SAM
                6th Floor
                Monte Carlo Palace
                7 Boulevard des Moulins
                MC 9800
                Monaco

Attention:      Andrew Mortimer (Operations Department) and Philip Price (Legal Department)
Email:          Andrew.mortimer@srmglobalfund.com AND Philip.price@srmglobalfund.com

For all purposes except for notices in respect of CFD Transactions for purposes of Part 7, Section 15.1 Termination.

(b)    **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

Party A appoints as its Process Agent:

<u>LBIE</u>:                        Not applicable.

Party B appoints as its Process Agent:    Clifford Chance Secretaries Limited, 10 Upper Bank Street,
                                          London E14 5JJ United Kingdom

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is a Multibranch Party and may act through its head office in London and the following Offices: Amsterdam, Frankfurt, Madrid, Milan, Paris, Stockholm, and Zurich.

Party B is not a Multibranch Party.

(e)    **Calculation Agent.** The Calculation Agent is Party A unless otherwise specified in a Confirmation in relation to the relevant Transaction or unless a Bankruptcy Event (as per Section 5(a)(vii)) has occurred and is continuing with relation to Party A, in which case Party B shall be the Calculation Agent until the discontinuance of such Bankruptcy Event with respect to Party A. All calculations and determinations by the Calculation Agent shall be made in good faith and in a commercially reasonable manner.

(f)    **Credit Support Document.**

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of Party B, Part 7, Section 10 Margin of the Schedule to the Master Agreement.

23

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:    Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:    Not applicable.

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of England and Wales.

(i)    **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will <u>not</u> apply to any Transactions.

(j)    **"Affiliate"** will have the meaning specified in Section 14 of this Agreement; provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

**Part 5: Other Provisions**

(a) **Representations.** <u>Section 3</u> of this Agreement is hereby amended by adding the following additional subsections:

    (g) *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

    (h) *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

    (i) *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

    (j) *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

    (l) Party B and Investment Advisor each represents, warrant and covenant that Party A, or any of its affiliates, has not provided any service for purposes of ERISA to Party B in connection with this Agreement and each Transaction entered into hereunder.

(b) **Additional Representations of Party B.** Party B represents to Party A in accordance with <u>Section 3</u> of the Agreement (which representations will be deemed to be repeated by Party B at all times until termination of this Agreement) that:

    (i) **Reliance on the Investment Advisor.** Pursuant to the Trading Authorization, Party B has granted the Investment Advisor full discretionary power and authority to make investment decisions for, in the name of, and on behalf of, Party B, including without limitation the power and authority to enter into Transactions as the agent for Party B and to advise and direct Party B to enter into this Agreement and Transactions and to execute and deliver Confirmations in connection therewith. In connection with Party B's entering into this Agreement and any Transactions hereunder, Party A will be entitled to rely conclusively upon any request, instruction, certificate, opinion, or other document which Party A reasonably believes to be genuinely furnished to Party A by an employee or agent of the Investment Advisor in connection with this Agreement and the Transactions as though such request, instruction, certificate, opinion, or other document were given directly by Party B, until such time that Party B affirmatively, and upon written notice to Party A, revokes, terminates, or modifies the Trading Authorization.

    (ii) The following shall be true on each date on which this Agreement and any Transaction entered into hereunder remains outstanding Party B on which the assets of Party B are subject to Title I of ERISA or Section 4975 of the Code:

        (A) Party B represents and warrants to Party A (which representations and warranties will be deemed repeated by Party B as of each date this Agreement and/or any Transaction is outstanding under this Agreement) that Investment Advisor is the fiduciary of Party B as contemplated by ERISA, and has full power and authority to make all investment decisions for and on behalf of Party B with respect to this Agreement and each Transaction, including without limitation executing and

delivering this Agreement, entering into Transactions hereunder, and performing and causing Party B to perform its obligations hereunder;

(B)    Party B represents, covenants, and agrees that as of the date hereof and at all times until the termination of this Agreement, it will be in full compliance with the governing documents of Party B, that the Transactions contemplated hereunder are and will be authorized transactions thereunder, and that the constituent documents of Party B do not prohibit Party B from entering into transactions in the cash market instruments on which any Transactions under this Agreement are based; and

(C)    Party B represents, warrants, and covenants to Party A that as of the date hereof and as of each date while this Agreement and/or any Transaction is outstanding under this Agreement that the entering into and performance of this Agreement, each Transaction and any Credit Support Document entered into hereunder does not and will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code by reason of PTCE 84-14 or another applicable exemption.

(iii)    **Transactions.** With respect to each Option Transaction, Party B represents to Party A:

(1)    understands that the Option Transactions have not been registered under the Securities Act of 1933, as amended (the "Securities Act") and are being offered and sold in reliance on the exemption to the registration requirements of the Securities Act provided under Section 4(2) thereof:

(2)    understands and acknowledges that Party A has no obligation to register the Option Transactions under the Securities Act or any other United States federal or state securities law, and that the Option Transactions must be held indefinitely by the purchaser thereof unless subsequently registered under such securities laws or an exemption from such registration is available;

(3)    agrees that in the event that at some future time it wishes to dispose of the Option Transactions in whole or in part (such disposition currently not being foreseen or contemplated), it will not transfer the same except in a transaction exempt from or not subject to the registration requirements of the Securities Act; and

(4)    understands that each Confirmation may bear a legend to substantially the following effect:

**THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; AND SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.**

(c)    **Representations of the Investment Advisor.** The Investment Advisor represents to Party A in accordance with Section 3 of the Agreement (as if the Investment Advisor is a party to this Agreement and which representation will be deemed to be repeated by the Investment Advisor at all times until termination of this Agreement) that:

(i)    **Due Authorization.** The Investment Advisor is duly authorized to act as Party B's agent in all respects with respect to this Agreement and any Transaction hereunder, including, but not limited to, entering into and confirming each Transaction and receiving notices addressed to Party B.

(ii) **Compliance with Applicable Investment Policies.** Any Transaction shall be entered into in accordance with the applicable investment policies of Party B then in effect.

(iii) **Non-Reliance.** The Investment Advisor is acting for Party B's account, and it has made its own independent decisions to enter into each Transaction and as to whether that Transaction is appropriate or proper for Party B based upon its own judgment and upon advice from such advisers as it has deemed necessary. The Investment Advisor is not relying on any communication (written or oral) of Party A as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from Party A shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(iv) **Assessment and Understanding.** The Investment Advisor is capable of assessing the merits of and understanding (on its own behalf, on behalf of Party B or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. Party B is capable of assuming, and assumes, the risks of that Transaction.

(v) **Status of Parties.** Party A is not acting as a fiduciary for or an adviser to the Investment Advisor or Party B in respect of that Transaction.

(vi) **Certain ERISA Matters.** The following shall be true on each date on which this Agreement and any Transaction entered into by Party B hereunder remains outstanding and on which the assets of Party B are subject to Title I of ERISA or Section 4975 of the Code

   (a) Investment Advisor represents and warrants to Party A (which representations and warranties will be deemed repeated as of each date this Agreement and/or any Transaction is outstanding under this Agreement) that Investment Advisor is the fiduciary of Party B as contemplated by ERISA, and has full power and authority to make all investment decisions for and on behalf of Party B with respect to this Agreement and each Transaction, including without limitation executing and delivering this Agreement, entering into Transactions hereunder, and performing and causing Party B to perform its obligations hereunder.

   (b) Investment Advisor represents, warrants, and covenants to Party A that as of the date hereof and as of each date while this Agreement and/or any Transaction is outstanding under this Agreement that (a) Investment Advisor will be a "qualified professional asset manager" within the meaning of Part V(a) of PTCE 84-14, (b) Party B and Investment Advisor intend to use PTCE 84-14 to exempt any Transaction entered into hereunder that would be prohibited under Section 406 of ERISA and/or Section 4975 of the Code, and (c) the entering into and performance of this Agreement, each Transaction and any Credit Support Document entered into hereunder does not and will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code by reason of PTCE 84-14 or another applicable exemption. .

   (c) Investment Advisor represents, warrants and covenants to Party A that it will enter into any Transaction and any Credit Support Document hereunder only if and to the extent it has independently concluded that Party B will receive no less nor pay no more than "adequate consideration" in connection with any such Transaction within the meaning of Section 408(b)(17) of ERISA and Section 4975(f)(10) of the Code, and in reaching such determination, Investment Advisor will consult with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it deems necessary, and solely on such basis will make its own independent conclusion and not upon any view expressed by either Party A or any Affiliate of Party A

   (d) Investment Advisor agrees that any assets pledged as collateral by Party B in connection with this Agreement, any Transaction or any Credit Support Document entered into hereunder do not and will not constitute "plan assets" within the meaning of Title I of ERISA or Section 4975 of the Code.

27

(d) **Additional Obligations of Party B and the Investment Advisor.** Each of Party B and to the extent applicable, the Investment Advisor, agrees with Party A (so long as Party A, Party B and the Investment Advisor has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party) that:

    (i) **Obligations Relating to Representations.** It will not take any action during the term of this Agreement that may render any of the representations and warranties in this Agreement (including this Schedule) untrue, incorrect or incomplete, and, if any event or condition should occur that would render any such representations and warranties untrue, incorrect or incomplete, then Party B will immediately give written notice thereof to Party A.

    (ii) **Notice of Certain Events.** It will provide Party A, promptly upon becoming aware of the same, with written notice of: (A) any pending or threatened litigation, action, claim, or proceeding that may adversely affect the ability of Party B to perform its obligations under this Agreement or any Transaction; or (B) the Investment Advisor's impending resignation or termination as investment adviser to Party B's investment manager, or any other facts or developments that may adversely affect the status of Party B or the Investment Advisor with respect to this Agreement.

    (iii) **Net Asset Value.** It will provide Party A, promptly upon request (and in no event more than two local Business Days after such request), with a verbal estimate of its Net Asset Value.

(e) **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

    (f) *Set-off.*

    (i) In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

    (ii) For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

    (iii) If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

    (iv) This provision shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(f) **Transfer.** Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(g) **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent. Notwithstanding anything to the contrary in Section 12(a) of this Agreement, in respect of CFD Transactions (as defined in Part [7] hereof), notices under Section 5 may be sent by facsimile or electronic messaging system, and such notice shall be effective for all purposes under the Agreement.

(h)     **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(i)     **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(j)     **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(k)     **No Violation or Conflict.** Section 3(a)(iii) is hereby amended by inserting the words "or investment policies, or guidelines, procedures, or restrictions" immediately following the words "documents".

(l)     **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

(m)     **Default Under Specified Transaction.** Section 5(a)(v) is hereby amended to read as follows:

(v)     *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(1)     defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)     defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)     defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)     disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(n)     **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow

arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(o)   **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(p)   **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

(q)   **Additional Definitions.** Section 14 is hereby amended by adding the following definitions in their appropriate alphabetical order:

"**Code**" means Internal Revenue Code of 1986, as amended, or any successor statute.

"**ERISA**" means Employee Retirement Income Security Act of 1974, as amended, or any successor statute.

"**Incompetency Event**" means the declaration by a court of competent jurisdiction that a Key Person is incompetent due to a physical, mental or emotional condition resulting from injury, sickness, disease or other cause.

"**Investment Advisor**" means SRM Advisers (Monaco) SAM, an entity established under the laws of Monaco.

"**Key Person**" means Jon Woods.

"**Net Asset Value**" of Party B shall be equal to the gross assets of Party B less the aggregate amount of all liabilities of Party B (including all absolute and contingent liabilities of any kind) and shall be determined in accordance with generally accepted accounting principles in the country in which Party B is organized and on a basis consistent with prior periods.

"**Operative Documents**" means the Private Placement Memorandum dated as of 1st March 2007.

"**Trading Authorization**" means the Investment Advisory Agreement dated as of 16 August 2006 between Party B's investment manager and the Investment Advisor authorizing the Investment Advisor to act on behalf of Party B.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)     **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i)     <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

    (ii)     <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made to the 1998 Definitions:

Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

**Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)     **Confirmations**. Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)     **Netting and Related Provisions**. Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

    (i)     <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

    (ii)     <u>Netting, Discharge and Termination with Respect to Currency Option Transactions</u>. The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)     **Inconsistencies**. In the event of any conflict between:

    (i)     the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this

Agreement shall supersede;

(ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

Part 7    Additional terms for CFD Transactions

**General**

     1.1    Each transaction entered into under this Part 7 (a "***CFD Transaction***") shall be a Transaction under this Agreement, an Equity Swap Transaction for the purposes of the 2002 ISDA Equity Derivatives Definitions (the "***Equity Definitions***") and a Swap Transaction for purposes of the 2000 ISDA Definitions (the "***Swap Definitions***"), each of which are published by the International Swaps and Derivatives Association, Inc., as amended, supplemented or revised from time to time.

     1.2    The Equity Definitions, the Swap Definitions and the Terms as defined below are hereby incorporated by reference with respect to any CFD Transaction, except as otherwise specifically provided herein or in a CFD Transaction confirmation or other written document stipulating relevant terms in relation to a CFD Transaction sent by Party A to Party B and stipulating in respect of that CFD Transaction the Initial Price and any other relevant terms (the "**Confirmation**"). The parties agree that, upon receipt of the Confirmation by electronic means or otherwise, Party B shall have two Local Business Days to object to the terms contained therein, failing which such terms shall be deemed accepted by Party A and Party B absent clear error. The parties further agree that electronic delivery may include electronic mail or any other electronic means that the parties may agree. The requirement in this Agreement that the parties exchange confirmations shall for all purposes be deemed satisfied by a Confirmation sent and the terms therein accepted or deemed accepted as provided herein.

     1.3    If, in relation to any CFD Transaction, there is any inconsistency between the Equity Definitions, the Swap Definitions, this Part 7, this Agreement (other than this Part 7) and the related Confirmation and the Terms, the following will prevail for purposes of such CFD Transaction in the order of precedence indicated: (i) such Confirmation; (ii) the Terms; (iii) this Part 7; (iv) the Equity Definitions; (v) the Swap Definitions; and (vi) this Agreement (other than this Part 7).

**2.**    **DEFINITIONS**

"**Asset**" means a relevant asset listed in an Asset Supplement attached hereto, and as supplemented from time to time;

"**Calculation Agent**" means Party A unless otherwise specified in a Confirmation in relation to the relevant Transaction and unless a Bankruptcy Event (as per Section 5(a)(vii)) has occurred and is continuing with respect to Party A, in which case Party B shall be the Calculation Agent for so long as such Bankruptcy Event continues. Whenever the Calculation Agent is required to act or exercise judgment in any way, it will do so in good faith and in a commercially reasonable manner;

"**Cash Balance**" means an account of the payments made and received by Party B under this Part 7;

"**Local Business Day**" means, for purposes of any CFD Transaction, a day which is a London Business Day and a Monaco Business Day;

"**Long**" means, in respect of a CFD Transaction and a relevant Asset, that the economic effect for Party B of entering into that CFD Transaction is analogous to Party B buying notional units of the Asset in an amount equal to the relevant number of Assets underlying the relevant CFD Transaction (such number, the "Number of Assets") at the Initial Price;

"**Margin Call**" means a notification by Party A to Party B of Party B's obligation to deliver margin in order to eliminate a Margin Deficit;

"**Margin Deficit**" means the amount by which the Net Equity is less than the Margin Requirement as determined by the Calculation Agent;

"**Margin Excess**" means the amount by which the Net Equity is greater than the Margin Requirement as determined by the Calculation Agent;

"**Margin Requirement**" means the amount calculated by Party A in its sole and absolute discretion acting in good faith from time to time as the Margin Requirement including, without limitation, any initial and subsequent Margin Requirement notified to Party B by means of any Terms;

**"Market Value"** means

(a)     with respect to cash, the amount of such cash (converted, if necessary, into the Termination Currency at the rate of exchange at which the Calculation Agent would be able, acting in good faith, to purchase the relevant amount of the Termination Currency prevailing at the time); and

(b)     with respect to securities, the price for such securities obtained from a source selected by the Calculation Agent (acting in good faith and in its commercially reasonable discretion); provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by the Calculation Agent (acting in good faith and in its commercially reasonable discretion). Market Value is determined by the Calculation Agent solely for the purposes of determining Net Equity hereunder and should not be relied on by Party B for any other purposes.

**"Market Value Equivalent"** means, in respect of cash or securities as of any time on any day as determined by the Calculation Agent (acting in good faith and in its commercially reasonable discretion), an amount equal to the Market Value of such cash or securities;

**"Net Equity"** has the meaning given in paragraph 10.2 of this Part 7;

**"Rules"** means the rules of the Financial Services Authority;

**"Securities Balance"** means an account reflecting the Market Value Equivalent of Assets which are the subject of CFD Transactions;

**"Short"** means, in respect of a CFD Transaction, that the economic effect for Party B of entering into that CFD Transaction is analogous to Party B selling the Assets in the relevant Number of Assets at the Initial Price and being obliged to purchase the Number of Assets on the Valuation Date at the Final Price;

**"Termination Date"** means in respect of any CFD Transaction, the date, being a Local Business Day and an Exchange Business Day in respect of the relevant Assets, on which such CFD Transaction is terminated; as determined by the Calculation Agent in accordance with paragraph 15 of this Part 7; and

**"Terms"** means any terms notified by Party A to Party B setting out the fees, interest rates, the Floating Rate Option, the Spread, the Floating Rate Day Count Fraction, and Margin Requirement which Party A in its absolute discretion will apply to the CFD Transactions, as amended from time to time and applicable to all transactions as set out therein, and if more than one, the last terms provided by Party A to Party B.

3.     TYPE OF RETURN

3.1     The Type of Return for all CFD Transactions shall be Total Return, and Re-investment of Dividends shall not apply.

4.     EXCHANGE AND RELATED EXCHANGES

4.1     In respect of any CFD Transaction, **"*Exchange*"** means the exchange on which the specified Assets are principally traded and have their primary listing, as determined by the Calculation Agent.

4.2     In respect of any CFD Transaction, **"*Related Exchange*"** shall be All Exchanges.

5.     EQUITY AMOUNT PAYER

5.1     The Equity Amount Payer shall be:

(a)     For a Long CFD Transaction, Party A; and

(b)     For a Short CFD Transaction, Party B.

and the Equity Amount Receiver shall be the other party.

34

6.    EQUITY NOTIONAL AMOUNT

    6.1    The "**Equity Notional Amount**" for any CFD Transaction on the Trade Date shall be the Number of Assets multiplied by the Initial Price.

7.    FINAL PRICE

    7.1    The "**Final Price**" for any CFD Transaction shall be the price per Asset or, as the case may be, the level per Asset, as determined by the Calculation Agent as of the Valuation Time on the Valuation Date (or if the Calculation Agent determines that more than 1 Exchange Business Day is required to unwind any relevant hedge position, the price per Asset or, as the case may be, the level per Asset for each Exchange Business Day on which any relevant hedge position was unwound, weighted for the proportion of the hedge position unwound on that day). The Final Price will be set out in the relevant document evidencing the termination of the CFD.

8.    VALUATION DATE AND CASH SETTLEMENT PAYMENT DATE

    8.1    In respect of any CFD Transaction, "*Valuation Time*" shall have the meaning ascribed thereto in Section 6.1 of the Equity Definitions.

    8.2    In respect of any CFD Transaction, "*Valuation Date*" means the date specified as such by the Calculation Agent, following the giving of notice of termination under paragraph 15.1 of this Part 7 ("*Applicable Notice*") and such Valuation Date being no later than the next Scheduled Trading Day following receipt from Party B by Party A of the Applicable Notice, or delivery by Party A to Party B of the Applicable Notice in accordance with paragraph 15 provided that any Scheduled Trading Day is not a Disrupted Day.

9.    SETTLEMENT

    9.1    Cash Settlement shall apply for all CFD Transactions.

    9.2    In respect of each CFD Transaction, the Cash Settlement Payment Date shall be the Termination Date.

10.    MARGIN

    10.1    The provisions of paragraph 10 of this Part 7 shall apply only in respect of CFD Transactions. For the avoidance of doubt, (a) the Calculation Agent shall have regard to no other Transactions or amounts payable by or to Party B under this Agreement when determining the Net Equity, and (b) CFD Transactions shall not be "Transactions" for the purposes of any Credit Support Annex to this Agreement. This Paragraph 10 of this Part 7 is a Credit Support Document.

    10.2    For the purpose of this Part 7, *Net Equity* means the aggregate of –

(a)    the sum of –

    (i)    the absolute value of all credit balances in respect of Cash Balances; and

    (ii)    the Market Value Equivalent of all Assets comprised in all debit balances in the Securities Balances;

(b)    less the sum of –

    (i)    the absolute value of all debit balances in respect of Cash Balances; and

    (ii)    the Market Value Equivalent of all Assets comprised in all credit balances in the Securities Balances.

10.3   *Intentionally left blank*

10.4   If, for the purposes of determining the credit or debit balances on the Cash Balances or the Securities Balances (including for the purposes of calculating the Net Equity), the relevant cash or Assets are denominated in a currency other than US dollars, then the Calculation Agent may convert such currencies as are necessary for the purposes of such determination into US dollars at the rate of exchange at which the Calculation Agent would be able, acting in good faith, to purchase the relevant amount of US dollars.

10.5   When calculating the value of any balance on any account for the purposes of paragraph 10.2 of this Part 7, the Calculation Agent may take into account any variation or potential variation in the value of cash or Assets due to the availability, liquidity, solvency or market volatility of such asset or other market variable applicable to that asset.

10.6   If at any time there is a Margin Deficit, Party B shall, upon being notified of such Margin Deficit by Party A (either pursuant to the terms of a cross margining and netting agreement between the parties or otherwise), pay or deliver pursuant to a Margin Call to Party A such cash as will ensure that, following such payment or delivery, such Margin Deficit will be eliminated.

10.7   In the event of a Margin Call, Party B shall make such payment or delivery not later than close of business on the Local Business Day following that on which the Margin Call is made. The parties agree that any failure to make such payment or deliver in accordance with the provisions of this paragraph 10.7 will be an Event of Default in accordance with Section 5(a)(iii)(1) of this Agreement.

10.8   Provided that no Potential Event of Default, Event of Default or Termination Event, in each case, with respect to Party B has occurred, and is continuing, if, at any time, the Net Equity exceeds the Margin Requirement, Party B may by notice to Party A request Party A to pay the amount of such Margin Excess to Party B. Any such payment shall be made no later than the close of business on the Local Business Day following that on which notice is given provided always that such Margin Excess subsists immediately prior to the payment. If only a lesser Margin Excess subsists, the amount thereof will instead be paid upon further direction or instruction amending such request from Party B.

10.9   Party A shall pay interest to Party B on any credit balance on a Cash Balance. Party B shall pay interest to Party A on any debit balances on a Cash Balance. Such interest shall be at such rates as may be notified by Party A to Party B from time to time (including by means of the Terms).

10.10   Party A may from time to time specify margin rates which it intends to adopt in connection with its calculation of the Margin Requirement applicable to CFD Transactions. Such specified information may be notified by Party A to Party B in such manner as Party A considers appropriate including, without limitation, by means of any Terms.

11.   **ADDITIONAL DISRUPTION EVENTS**

11.1   *"Change in Law"*, *"Hedging Disruption"*, *"Increased Cost of Hedging"*, **"Insolvency Filing"** **and** *"Loss of Stock Borrow"* will apply to each CFD Transaction. Notwithstanding the foregoing, for purposes of this Part 7:

Section 12.9(a)(ii) of the Equity Definitions is replaced in its entirety by the words: '*Change in Law*' means that, on or after the Trade Date of a CFD Transaction (A) due to the adoption of or any change in any applicable law or regulation (including, without limitation, any tax law), or (B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal for a party to this Transaction to hold, acquire or dispose of Hedge Positions relating to such CFD Transaction, provided that this Section 12.9(a)(ii) shall not apply if the Calculation Agent determines that such party could have taken reasonable steps to avoid such illegality.

Section 12.9(a)(iv) of the Equity Definitions shall be amended by deleting the following wording in the definition of *"Insolvency Filing"*: "provided that such proceedings instituted or petitions presented by

creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing" and replacing it with the following: "; or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen days of the institution or presentation thereof."

Section 12.9(b)(i) of the Equity Definitions is hereby amended by adding the following sentence at the end: "If neither party elects to terminate the Transaction, the Calculation Agent may adjust the terms of the Transaction upon the occurrence of such an event pursuant to Modified Calculation Agent Adjustment (as if such event were a Tender Offer)."

Section 12.9(a)(vii) of the Equity Definitions is replaced in its entirety by the words: '*Loss of Stock Borrow*' means that the Hedging Party is unable to immediately borrow (or maintain a borrowing of) Assets with respect to a CFD Transaction in an amount equal to the Hedging Shares (not to exceed the number of Assets underlying the CFD Transaction) at a rate equal to or less than the Maximum Stock Loan Rate.

Notwithstanding Section 12.9(b)(iv) & (vii) of the Equity Definitions, in the event of a Loss of Stock Borrow, the Hedging Party shall treat the Loss of Stock Borrow in all respects as a Hedging Disruption in accordance with Section 12.9(b)(iii).

In respect of an Extraordinary Event that is an Additional Disruption Event, Section 12.8(e) shall be replaced in its entirety by the words:

"Without duplication of amounts calculated based on information described in Section 12.8(c)(i), 12.8(c)(ii) or 12.8(c)(iii) above, or other relevant information, and when commercially reasonable to do so, the Determining Party may in addition consider in calculating a Cancellation Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to such CFD Transaction (or any gain resulting from any of them) from and including the date on which the relevant Additional Disruption Event occurred as determined by the Determining Party in its reasonable discretion".

Section 12.9(a)(x) is replaced with ""Hedging Shares" means the number of Assets that the Hedging Party (acting in good faith and in a commercially reasonable manner) deems necessary to hedge the equity price risk of entering into an performing its obligations with respect to a Transaction to which "Loss of Stock Borrow" or "Increased Cost of Stock Borrow" is applicable;".

11.2   The "*Hedging Party*" and "*Determining Party*" shall be Party A.

12.   **FLOATING AMOUNT PAYMENTS**

12.1   The "*Floating Amount Payer*" in respect of each CFD Transaction shall be:

(i)   For a Long CFD Transaction, Party B; and

(ii)   For a Short CFD Transaction Party A.

12.2   The "*Notional Amount*" in respect of each CFD Transaction shall be the Equity Notional Amount for that CFD Transaction.

12.3   The "*Payment Date*" for Floating Amount Payments in respect of each CFD Transaction shall be the first Local Business Day of each month and in relation to a terminated CFD Transaction the Floating Amount Payment Date will be the Cash Settlement Payment Date for that CFD Transaction.

13.  **PAYMENTS**

13.1   Party A will effect the payment of any Equity Amount, Dividend Amount, Floating Rate Amounts and any other amounts payable by one party to the other under or in respect of any CFD Transaction by making the appropriate entries to the relevant accounts of Party B. Upon the making of such an entry, the relevant payment obligation shall be discharged.

13.2   Party B acknowledges and agrees that cash held by Party A will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules.  Such cash held by Party A will not be segregated from the money of  Party A or any other counterparty of Party A and will be held free and clear of all trusts.  Party B further agrees that Party A will use such cash in the course of its business and that Party B will, therefore, rank as a general creditor of Party A in respect of such cash.

14.  **FEES**

14.1   Party B will pay Party A such fees as may be notified to Party B by means of any Terms from time to time.

15.  **TERMINATION**

15.1   Either Party may terminate a CFD Transaction at any time by giving notice to the other Party; provided that Party A shall be obliged to give no less than 90 calendar days' notice to Party B of any termination under this clause 15.1. For the avoidance of doubt, this clause 15.1 is without prejudice to any rights of either party to terminate any CFD Transaction under clause 11 (*Additional Disruption Events*) above, pursuant to which clause 11, such 90 calendar day notice period shall not be applicable.

15.2   Upon the giving or receipt of a notice of termination, under Paragraph 15.1 of this Part 7, the Calculation Agent will in its sole discretion determine the Valuation Date, the Termination Date, the Equity Amount and the Floating Amount.

16.  **REPRESENTATIONS**

16.1   In addition to the other representations made under this Agreement, Party B represents and warrants to Party A on the date of this Agreement and each date on which it enters into a CFD Transaction that:

(i)   its entry into a CFD Transaction does not constitute or form part of market abuse for the purposes of Section 118(1) of the Financial Services and Markets Act 2000; and

(ii)   it is neither a "United States person" nor a "foreign person controlled by a United States person" as such terms are defined in Regulation X of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 224 (Regulation X defines (1) "United States person" to include "a person which is organised or exists under the laws of any state of the United States of America or, in the case of a natural person, a citizen or resident of the United States; a domestic estate; or a trust in which one or more of the foregoing persons has a cumulative direct or indirect beneficial interest in excess of 50% of the value of the trust" and (2) "foreign person controlled by a United States person" to include "any non corporate entity in which United States persons directly or indirectly have more than a 50% beneficial interest, and any corporation in which one or more United States persons, directly or indirectly, own stock possessing more than 50% of the total combined voting power of all classes of stock entitled to vote, or more than 50% of the total value of shares of all classes of stock").

16.2   Agreements and Acknowledgements Regarding Hedging Activities shall apply.

16.3   Additional Acknowledgements shall apply.

16.4   Non-Reliance shall apply.

17.    RELIANCE ON INSTRUCTIONS

17.1    Party A may rely on any communications in any form which purport to have been given, and which Party A accepts in good faith and acting in a commercially reasonable manner, as having been given by Party B or on its behalf. Party B will be bound by any CFD Transaction entered into or other steps taken in consequence of or in connection with such communication.

### Asset Supplement

All assets listed below shall be "Assets" as the term is used in Part 7 to the Schedule and all additional provisions relating thereto shall be incorporated accordingly.

| Asset | Additional Provisions |
|---|---|
| Shares | **18.    DIVIDEND AMOUNTS**<br><br>18.1    In respect of a CFD Transaction, the Dividend Amount shall be the product of the Ex Amount and the Number of Assets.<br><br>18.2    In respect of any Dividend Amount, the Dividend Payment Date shall be the day that the Dividend Amount is paid by the Issuer and received by Party A or if such day is not a Local Business Day, the next Local Business Day.<br><br>18.3    Dividend Period means the Second Period for all CFD Transactions.<br><br>**19.    METHOD OF ADJUSTMENT**<br><br>19.1    For all CFD Transactions, the Method of Adjustment shall be Calculation Agent Adjustment.<br><br>**20.    EXTRAORDINARY EVENTS**<br><br>20.1    **Consequences of Merger Events:**<br><br>The consequences of Merger Events shall be as follows:<br><br>(i)    Share-for-Share:    Alternative Obligation.<br><br>(ii)    Share-for-Other:    Cancellation and Payment or, at the option of Party A: (i) with respect to the portion of Other Consideration which consists of, Cash, Cancellation and Payment; and (ii) with respect to the portion of Other Consideration which is not Cash, Alternative Obligation.<br><br>(iii)    Share-for-Combined:    Component |

| | |
|---|---|
| | Adjustment. |
| | **21.    NATIONALISATION, INSOLVENCY OR DELISTING**<br><br>21.1    The consequences of Nationalisation, Insolvency or Delisting shall be Cancellation and Payment. |
| **Index** | **22.REPRESENTATIONS**<br><br>Index Disclaimer shall apply.<br><br>**23.INDEX ADJUSTMENT EVENTS**<br><br>**23.1 *Index Cancellation***: Calculation Agent Adjustment, provided however, at the discretion of the Calculation Agent, "Cancellation and Payment" shall apply, in which case the provisions of Section 11.1(b)(C) of the Equity Definitions shall apply.<br><br>**23.2 *Index Modification***: Calculation Agent Adjustment<br><br>**23.3 *Index Disruption***: Calculation Agent Adjustment |
| | |

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
*Party A*

By:
Name: ANDREE WATT
Title: AUTHORISED SIGNATORY
Date: 12/05/2008

SRM FUND GENERAL PARTNER LIMITED, in its capacity as general partner of, and acting on behalf of, SRM GLOBAL MASTER FUND LIMITED PARTNERSHIP
*Party B*

By:
Name: PHILIP PRICE    IAN BARCLAY
Title: AUTHORISED SIGNATORIES
Date: 9/5/08

By: SRM Advisers (Monaco) SAM in its individual capacity in respect of (i) the obligations agreed to by the Investment Adviser in Part 3(b) Other Documents To Be Delivered, (ii) the representations made by the Investment Adviser in Part 5(c) Representations of the Investment Adviser, and (iii) Part 5(d) Additional Obligations of Party B and the Investment Adviser of this Schedule to the Master Agreement

By:
Name:
Title:
Date:

By:
Name: PHILIP PRICE
Title: AUTHORISED SIGNATORY/DIRECTOR
Date: 9/5/08

41

# LEHMAN BROTHERS

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC. (London Branch)

LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A") and SRM GLOBAL MASTER FUND LP ("Party B") have entered into a Master Agreement dated as of [date], as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)   Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)   Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)   Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement , the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)   This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)   Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)   Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)   Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

1

# LEHMAN BROTHERS

(h)     Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

i.     Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

ii.     Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

iii.     no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

iv.     this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

v.     the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i)     Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j)     No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(k)     If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

2

# LEHMAN BROTHERS

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**
**(London Branch)**

By: _____

Name:

Title:

Date:

3