Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS INC.,

7            Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9    ADV. PROC. NO.: 15-01112-scc

10   LEHMAN BROTHERS HOLDINGS INC., ET AL.,

11           Plaintiffs

12   v

13   U.S. BANK NATIONAL ASSOCIATION, ET AL.,

14           Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16               U.S. Bankruptcy Court

17               One Bowling Green

18               New York, New York

19

20               July 1, 2015

21               9:03 AM

22

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    Adversary proceeding: 15-01112-scc Lehman Brothers Holdings

2    Inc. et al v. U.S. Bank National Association et al

3    Doc #2 Motion of Lehman Brothers Holdings Inc. and

4    Structured Asset Securities Corporation for an Order to

5    Enforce the Modified Third Amended Joint Chapter 11 Plan of

6    Lehman Brothers Holdings Inc. and Its Affiliated Debtors and

7    Stay a Related Third-Party Action

8

9    Adversary proceeding: 15-01112-scc Lehman Brothers Holdings

10   Inc. et al v. U.S. Bank National Association et al

11   Doc #3 Lehman's Motion for Entry of an Order (A) Authorizing

12   the Filing of Certain Information Under Seal in Connection

13   with Lehman's Adversary Proceeding Against U.S. Bank N.A.,

14   Syncora Guarantee, Inc., and GreenPoint Mortgage Funding,

15   Inc., and Lehman's Motion for Stay of the GreenPoint

16   Litigation, and (B) Granting Related Relief

17

18   Doc #49703 Motion for Approval of Settlement Agreement

19   Relating to Airlie LCDO I (Aviv LCDO 2006-3) Credit Default

20   Swap Agreement and Indenture

21

22   Doc #49709 Motion of Lehman Brothers Holdings Inc. for

23   Extension of the Period to File Objections to and Requests

24   to Estimate Claims

25   Transcribed by:  Sherri L. Breach

1    A P P E A R A N C E S :

2    NIXON PEABODY, LLP

3         Attorneys for Indenture Trustee

4         437 Madison Avenue

5         New York, New York10022

6

7    BY:   CONSTANCE M. BOLAND, ESQ.

8         AMNICA BIANCO, ESQ.

9

10   WILLKIE, FARR & GALLAGHER, LLP

11        Attorneys for Debtors

12        787 Seventh Avenue

13        New York, New York 10019

14

15   BY:   TODD G. COSENZA, ESQ.

16        PAUL V. SHALHOUB, ESQ.

17        TIM MCGINN, ESQ.

18

19   JONES & KELLER, P.C.

20        Attorneys for Debtors

21        1999 Broadway, Suite 3150

22        Denver, Colorado 80202

23

24   BY:   MICHAEL A. ROLLIN, ESQ.

25        MARITZA DOMINGUEZ BRASWELL, ESQ.

Page 4

1    WEIL, GOTSHAL & MANGES, LLP

2          Attorneys for Debtors

3          767 Fifth Avenue

4          New York, New York 10153

5

6    BY:  ALEXANDER WOOLVERTON, ESQ.

7          GARRETT FAIL, ESQ.

8          JACQUELINE MARCUS, ESQ.

9

10   CAHILL GORDON & REINDEL, LLP

11         Attorneys for GreenPoint Mortgage Funding

12         80 Pine Street

13         New York, New York 10005

14

15   BY:  KEVIN J. BURKE, ESQ.

16         JOEL H. LEVITIN, ESQ.

17

18   MURPHY & MCGONIGLE, P.C.

19         Attorneys for GreenPoint Mortgage Funding

20         4870 Sadler Road, Suite 301

21         Glen Allen, Virginia 23060

22

23   BY:  JAMES A. MURPHY, ESQ.

24

25

1    ALLEGAERT BERGER & VOGEL, LLP

2         Attorneys for Syncora Guarantee, Inc.

3         111 Broadway, 20th Floor

4         New York, New York 10006

5

6    BY:  MICHAEL S. VOGEL, ESQ.

7         JOHN S. CRAIG, ESQ.

8         LAUREN PINCUS, ESQ.

9

10   CHAPMAN AND CUTLER, LLP

11        Attorneys for U.S. Bank National Association as Trustee

12        111 West Monroe Street

13        Chicago, Illinois 60603

14

15   BY:  FRANKLIN H. TOP, III, ESQ.

16

17   COLE SCHOTZ

18        Attorneys for Highland CDO Opportunity Master Fund, LP

19        Court Plaza North

20        25 Main Street

21        Hackensack, New Jersey 07601

22

23   BY:  ILANA VOLKOV, ESQ.

24

25

1   ALSO APPEARING:

2   TOM FRENCH

3   JAMES PECK (TELEPHONIC)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                     P R O C E E D I N G S

2                THE COURT:  All right.  We're ready when you are.

3                MR. COSENZA:  Your Honor --

4                THE COURT:  Yes.

5                MR. COSENZA:  -- Todd Cosenza from Willkie, Farr &

6        Gallagher.  I'm here with my partner, Paul Shalhoub and Tim

7        McGinn --

8                THE COURT:  Okay.

9                MR. COSENZA:  -- and we represent the plan

10       administrator, Lehman Brothers Holdings, Inc.

11               THE COURT:  All right.  Good morning.

12               MR. BURKE:  Good morning, Your Honor.  Kevin Burke

13       from Cahill, Gordon & Reindel representing GreenPoint

14       Mortgage funding.  With me is Joel Levitin, also from Cahill

15       Gordon, and James Murphy from the McGonigle Murphy firm --

16       Murphy McGonigle firm representing GreenPoint as well.

17               THE COURT:  Okay.  Good morning.

18               MR. VOGEL:  Good morning, Your Honor.  Michael

19       Vogel from Allegaert Berger & Vogel.  I'm representing

20       Syncora Guarantee, and I'm here with my partner, John Craig,

21       and my colleague, Lauren Pincus.

22               THE COURT:  All right.  Very good.  Thank you.

23               MS. BOLAND:  Good morning, Your Honor.

24               THE COURT:  Good morning.

25               MS. BOLAND:  Connie Boland of Nixon Peabody

Page 8

1    representing U.S. Bank as Indenture Trustee.  And I have my

2    colleague Amnica Bianco with me.

3                 THE COURT:  Okay.  Very nice.

4                 Okay.  Mr. Cosenza.

5                 MR. COSENZA:  Your Honor, may I approach?

6                 THE COURT:  Sure.

7                 MR. COSENZA:  Good morning, Your Honor.  May it

8    please the Court.

9                 Before getting to the details of the motion that's

10   pending before the Court --

11                THE COURT:  I -- as you know and everybody should

12   know I've read everything.  So don't --

13                MR. COSENZA:  Sure.

14                THE COURT:  -- feel obligated to go over what's in

15   the papers.

16                MR. COSENZA:  I do want to give just an overall

17   sense of --

18                THE COURT:  Sure.

19                MR. COSENZA:  -- how the plan administrator is

20   viewing the claims that are pending against Lehman Brothers

21   and sort of give an assessment of where this all fits in so

22   you --

23                THE COURT:  Sure.

24                MR. COSENZA:  -- can bet a better understanding of

25   why we're here today.

1              So this case concerns three massive proof of

2      claims, two that have been brought by U.S. Bank; one that's

3      been brought by Syncora.  The plan administrator views it

4      as, in essence, a single claim involving one transfer or

5      trust.  U.S. Bank was the trustee for that trust and

6      Syncora, which at this point controls the trustee, acted as

7      the insurer for losses incurred by that trust.

8              We are bringing this action and seeking a

9      temporary stay of the New York action involving GreenPoint

10     and U.S. Bank because Lehman has little choice here, Your

11     Honor.

12             As a plan administrator there are massive claims

13     pending before the Bankruptcy Court that are going to be

14     directly impacted by what's -- what's happening in the New

15     York action, and we've become aware of sort of the

16     motivations and what's been going on in the New York action

17     really over the last year as to how it's going to impact the

18     estate.

19             And Lehman, as the plan administrator, believes

20     this is the best forum to adjudicate the dispute for all the

21     claims brought by all the parties.  And that includes

22     GreenPoint, U.S. Bank, Syncora and the plan administrator.

23             U.S. Bank, as the holder of two of the massive

24     claims that were brought in the Bankruptcy Court, has

25     admitted in its New York State Court action against

Page 10

1    GreenPoint that Lehman would not be liable if U.S. Bank

2    succeeds there against GreenPoint.

3              Lehman, nonetheless, nevertheless is stuck in the

4    middle of U.S. Bank and Syncora's dispute with GreenPoint,

5    and U.S. Bank, as they indicate in their objection, they

6    would like to have that remain that way indefinitely.  They

7    are basically treating the claim that's pending in the New

8    York Court as insurance.  And actually -- I'm sorry --

9              THE COURT:  You don't agree with that, though?

10             MR. COSENZA:  Sorry.

11             THE COURT:  You don't agree with that?

12             MR. COSENZA:  No.  No, we don't.

13             THE COURT:  I mean, and you make that clear, I --

14             MR. COSENZA:  Yes.

15             THE COURT:  -- think, in a footnote in your papers

16    --

17             MR. COSENZA:  Correct.

18             THE COURT:  -- right?

19             MR. COSENZA:  And -- and, Your Honor, we, at this

20    point, as a plan administrator need to become unstuck and we

21    need to have the claims that have been brought here by U.S.

22    Bank and Syncora, we need to have those claims moved forward

23    as best we can as the plan administrator.

24             If, as U.S. Bank -- just to give you a rough

25    overview of how we view this.  If U.S. Bank as it admits

Page 11

1    elsewhere, if Lehman isn't liable and GreenPoint is, the

2    U.S. Bank claim should be disallowed because U.S. Bank will

3    be able to recover against GreenPoint.

4          If Lehman, as the plan administrator, is liable,

5    U.S. Bank's claim should go through the RMBS protocol that

6    was set up in December as one of the transferred trusts as

7    the Court has ordered other put-back litigation involving

8    U.S. Bank.  And if that's the case, whatever the damages

9    that flow after those -- after the -- this trust is put

10   through the protocol Lehman will then pursue whatever

11   indemnification rights it has against GreenPoint.

12         And that would leave whatever is left as -- of the

13   Syncora claim.  We believe the Syncora claim is largely

14   duplicative of the U.S. Bank claim.  But to the extent there

15   are additional damages that are being sought by Syncora, we

16   would like for them to state exactly what they are and with

17   some specificity as to what they're seeking in addition to

18   the losses that were incurred by U.S. Bank as the trustee

19   for the trust.

20         At this point there is $600 million reserved for

21   the Syncora claim and, I mean, as the plan administrator we

22   believe that that $600 million reserve is very, very -- is

23   over -- we basically over-reserved for that amount.  That's

24   sort of our view.  And we believe that Syncora's damages are

25   much lower than that and they're here and they can tell us

1    -- tell you exactly what their losses are.  But we believe

2    they are several hundred million dollars lower than the $600

3    million reserve.

4              So we're asking this Court to stay the GreenPoint

5    litigation so that a couple of threshold issues can be

6    resolved here first so that the plan administrator can

7    understand exactly the extent that the claims that U.S. Bank

8    and Syncora have brought here and what the value of those

9    claims are.

10             And that's -- that's why we're here today, Your

11   Honor.

12             There are several bases in which we believe, and

13   we outlined these in our papers, that we believe the Court

14   can issue -- you know, can enjoin the State Court action.

15             THE COURT:  So let -- before we get to that, so go

16   back to the -- to the statement you just made, issues that I

17   will resolve first if the State Court action were stayed.

18   What would those issues be?

19             MR. COSENZA:  So those would be whether or not

20   there's certain definition as to what a -- I may get the

21   exact defined term wrong -- securitization transaction is,

22   and that would indicate whether or not U.S. -- basically

23   resolving that issue would determine whether not U.S. Bank's

24   claim against GreenPoint is valid; that GreenPoint has moved

25   for summary judgment saying that that -- that, you know,

Page 13

1   whatever happened in terms of the assignments doesn't allow

2   U.S. Bank to pursue GreenPoint.  There is basically a --

3           THE COURT:  That -- that's what's people -- what

4   folks call the standing issue?

5           MR. COSENZA:  Correct.

6           THE COURT:  So -- okay.  So then my next question

7   is even if the State Court were to decide that issue

8   tomorrow and decide it in a way that was not the way Lehman

9   wanted it decided.

10          MR. COSENZA:  Uh-huh.

11          THE COURT:  Lehman's not a party to that

12  litigation --

13          MR. COSENZA:  Correct.

14          THE COURT:  -- right?  I could do whatever I want

15  when the issue came before me.

16          MR. COSENZA:  That is correct, Your Honor.

17          THE COURT:  Okay.

18          MR. COSENZA:  We wouldn't be bound by that,

19  whatever determination.  Obviously, I think we would hear

20  from GreenPoint.

21          THE COURT:  I mean --

22          MR. COSENZA:  Yeah.

23          THE COURT:  -- just let me say out loud, I'll say

24  it 16 times because try as you might, things that get said

25  in courtrooms get taken out of context.  So let nothing that

Page 14

1   I say today reflect any negative thought, inference or

2   anything of the kind vis-à-vis what's happening in the State

3   Court.

4           MR. COSENZA:  Okay.  Correct.

5           THE COURT:  So that's very important that

6   everybody understand that.  I mean, the relief that you're

7   requesting is that I stay a State Court action.  So

8   necessarily we're going to be talking about it, but I don't

9   want there to be any --

10          MR. COSENZA:  But --

11          THE COURT:  -- negative inference taken out --

12          MR. COSENZA:  Sure.

13          THE COURT:  -- out of context.

14          MR. COSENZA:  Your Honor, and the issue we're

15  asking you -- we would ask to tee up before you would be a

16  limited issue, and assuming we were to prevail on that

17  issue, that would basically permit the disallowance of the

18  U.S. Bank claim because U.S. Bank would have whatever relief

19  they would have against GreenPoint.  GreenPoint is a party

20  here and that issue would be resolved.  And that would be a

21  -- obviously, a very helpful result for the plan

22  administrator in terms of trying to understand the magnitude

23  of these claims because then all we would have to deal with

24  at that point is the Syncora claim, which at this point is

25  somewhat of an amorphous claim that we're trying to wrap our

Page 15

1    arms around.  At that point we could try to get more

2    specificity as to what Syncora is seeking in addition to

3    what U.S. Bank was seeking.

4         We believe that Syncora's claims are basically the

5    same as the U.S. Bank claim, so we will argue that if the

6    U.S. Bank claim goes away and in essence U.S. Bank can only

7    pursue GreenPoint, the Syncora claim would be subsumed

8    within that.  So we would -- and we would argue that before

9    you.

10        But obviously that would then eliminate three

11   massive claims for the estate just resolving one threshold

12   issue, and that's why we're here today.

13        THE COURT:  And remind me what the history is with

14   respect to how these reserve amounts were either ordered or

15   agreed upon?

16        MR. COSENZA:  Sure.  Your Honor, I wasn't privy to

17   those, but my understanding is initially there was a reserve

18   that was set up for over a billion dollars for this when

19   this first was being discussed.  And I think there -- there

20   was a motion made by Lehman, maybe it was a little over a

21   year ago, to subordinate the Syncora claim.  I think as part

22   of that motion, which was, you know, teed up, I think there

23   was an agreement to table -- to table that action and to

24   lower the reserve to $600 million.

25        I don't think we've ever been in a position, at

Page 16

1    least in a judicial proceeding, to understand the value of

2    Syncora's claim.

3              THE COURT:  Okay.

4              MR. COSENZA:  So that's the background to that.

5              But, Your Honor, one other thing I would like to

6    sort of go through is -- and it's a big point in the papers

7    that were put forward before you -- that Lehman is a massive

8    estate.  There are lots of issues that are sort of, you

9    know, that we deal -- that Lehman and Matt Cantor (ph), who

10   is the general chief legal officer of Lehman, deal with on a

11   daily basis.

12             It's only become clear to us within the last year

13   as to how Syncora and others are sort of viewing their claim

14   against the estate, sort of leaving in the background seeing

15   what happens in the GreenPoint litigation.  And the

16   statements made in September of 2014 to the State Court

17   judge talking about how the claims against Lehman basically

18   would go away if U.S. Bank proceeds against -- wins against

19   GreenPoint.  Those are statements only made in September of

20   2014.  And those, for us, really highlighted sort of the

21   issue, you know, basically elevated it to us, figuring out

22   we need to take some sort of action.

23             In addition, the protocol was that basically

24   subsumes the other U.S. Bank proof of claim was only

25   approved in December.  So there's a lot of comments made

Page 17

1    about our delay, but really there have been a series of

2    events over the last six months that have led us to coming

3    before you today.  And we have made a lot of efforts over

4    the last few months trying to mediate these -- this dispute

5    to avoid coming before you.  And, unfortunately, those

6    efforts were unsuccessful.

7            So we're here today seeking a stay.

8            Your Honor, I know you've read the papers.  I can

9    go through --

10            THE COURT:  So -- so --

11            MR. COSENZA:  -- so --

12            THE COURT:  -- so then let's go to the question of

13    -- and I think this was raised by at least one of the

14    objecting parties, which is on the one hand you want to move

15    forward, you want a resolution and they say, what would

16    staying the State Court action accomplish.  On its face that

17    seems contrary to your goal, your stated goal of moving

18    things along.

19            So if a stay were to be entered, how does that

20    help?

21            MR. COSENZA:  Well, it helps in this regard, Your

22    Honor.  We've quickly briefed the issues before you that we

23    think are important to the estate.  We do believe, because

24    we're not a party to the New York State Court action, the

25    summary judgment motion has been pending for quite some

1    time.  Regardless of the outcome of that motion, the New

2    York State Court system, as you know, allows for

3    interlocutory appeals.  That process will take at least

4    another year if not much longer.  So the estate is going to

5    be tied up waiting for a final determination in the New York

6    State Court proceedings for quite some time.

7            THE COURT:  But that's the part that I don't

8    understand.

9            MR. COSENZA:  Yes.

10           THE COURT:  The part that I don't understand is --

11   and you confirmed that seven minutes ago; that I've got lots

12   of tools in my toolbox --

13           MR. COSENZA:  Uh-huh.

14           THE COURT:  -- that I can employ to lower the

15   reserve, make rulings on dispositive issues, compel parties

16   to engage in ADR protocols, et cetera.  I just need someone

17   to ask me.  I won't --

18           MR. COSENZA:  We would ask --

19           THE COURT:  I won't volunteer it.

20           MR. COSENZA:  We would ask for all of those, Your

21   Honor.

22       (Laughter)

23           MR. COSENZA:  Those are all very valuable tools

24   for the plan administrator.

25           THE COURT:  Sure.  But my -- my main -- when I

1    read the papers the implication was that somehow those tools

2    weren't available to me and I needed to stay the State Court

3    litigation so that I could open my toolbox.  And I don't

4    think that that's necessarily the case.

5              MR. COSENZA:  Well, Your Honor, there's also a

6    general concern by the plan administrator, which has

7    somewhat been alleviated by your comments, that a

8    determination in the State Court proceedings where we're not

9    a party will really be used as heavy evidence against us in

10   this action.  And I think your comments that, you know --

11             THE COURT:  Again, with -- with the utmost respect

12   --

13             MR. COSENZA:  Yeah.

14             THE COURT:  -- to the -- whoever is determine --

15   making that determination, whichever way it comes out, the

16   rules of collateral estoppel, res judicata, and all that

17   other good stuff, you're not a party.  So you're not bound.

18   Frankly, you know, it is what it is.

19             I don't know if -- I'm not going to give you an

20   advance ruling on what weight it would be entitled to, but

21   it's -- it would just be something that occurred out there

22   and I don't know that it would have any effect at all.  I'm

23   going to -- I would hear -- if there were a factual issue,

24   there would be a record.  I would hear evidence that I would

25   hear and I can interpret the law myself.

Page 20

1           MR. COSENZA:  Sure.

2           THE COURT:  And that's what I would do.  So --

3           MR. COSENZA:  Your Honor, I can caucus my client,

4    but in terms of the tools that you mentioned that are

5    available to you, I think all of those we would request be

6    put into play.

7           One, we would ask for, you know, some swift

8    determination on this assignment issue or as you described

9    it the standing issue.  I think it's a pure legal issue that

10   can be decided looking at the underlying documents.

11          THE COURT:  I mean, I --

12          MR. COSENZA:  The --

13          THE COURT:  -- I'm not well versed in the nitty

14   gritty of the legal point.

15          MR. COSENZA:  Yes.

16          THE COURT:  But we've been faced with so-called

17   assignment standing issues in other contexts and we've dealt

18   with them pretty quickly.

19          MR. COSENZA:  Uh-huh.

20          THE COURT:  So that's -- that's not a problem.

21          MR. COSENZA:  So that would be number one.

22          Number two would be the issue of the Syncora

23   reserve, which we think at this point is -- you know, should

24   be lowered and we can find out from -- they're here, as to

25   what their actual losses are.  And any other mechanism that

Page 21

1    we use to get the parties sort of moving would also be

2    greatly appreciated by the plan administrator.

3              THE COURT:  Okay.  All right.

4              MR. COSENZA:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              MR. BURKE:  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              MR. BURKE:  Kevin Burke of Cahill, Gordon &

9    Reindel for GreenPoint Mortgage Funding.

10             Mr. Cosenza has just made out a great case for why

11   the adversary proceeding is appropriate, but he has not made

12   out any case for why a stay is appropriate.

13             THE COURT:  Well, he was busy answering my

14   questions.  So --

15        (Laughter)

16             MR. BURKE:  True.  But the papers don't make out

17   any case for a stay either.

18             What we have here is a case that is proceeding to

19   decision on summary judgment motions that have been argued,

20   briefed, argued and are now sub judice before the judge.

21   The determination will come when it comes, but as conceded

22   by the debtors, it's not a determination that will be

23   binding on the debtors or on Lehman in any way.

24             So letting that proceed may inform your -- Your

25   Honor on similar issues.  It may provide some background of

Page 22

1    what a New York State judge thinks of the law in that area,

2    but as you pointed out, you will be able to make your own

3    determination.

4             So what --

5             THE COURT:  But isn't it the case that -- and Mr.

6    Cosenza I -- makes the point, which I -- which we all know.

7    I mean, there will be an appeal.  One way or the other there

8    will be an appeal.  There will be a --

9             MR. BURKE:  So --

10            THE COURT:  -- multiple appeals.

11            MR. BURKE:  Sure.

12            THE COURT:  It could take another couple of years.

13            MR. BURKE:  Sure.

14            THE COURT:  Won't you, in some way, seek to use

15   that -- won't the parties who are opposing the debtors'

16   motion seek to use all of that in some way to convince me

17   that, for example, I can't cut down the amount of the

18   reserve?

19            MR. BURKE:  Your Honor, they may try to convince

20   you of that, but there's no binding effect.  So staying all

21   of that, all that does is reduce the amount of information

22   that's available to Your Honor about what the legal issues

23   are.  It doesn't enhance the debtors or Lehman's ability to

24   pursue the remedies that they've suggested:  Reducing the

25   type of -- the amount of the reserve, getting a

Page 23

1   determination standing issues, none of that is deterred and

2   all that can go ahead here as it should under the -- in the

3   adversary proceeding in the ordinary course following the

4   rules for the adversary proceeding; following rules for

5   estimation; following whatever rules that -- whatever the

6   toolbox is that is available to Your Honor for all of those

7   issues.

8          Stopping it, all that does is makes sure that

9   there isn't a ruling that might go their way.  If it goes

10  their way, yes, there might be appeals, but at least there's

11  a determination.  And, of course, they would argue as to our

12  client or as to -- or let's say U.S. Bank would then say,

13  okay, we won that -- that point.  It's over.

14         GreenPoint is not a party to this bankruptcy.

15  We've not been here before.  We've not -- don't have any

16  proof of claim.  We are a true non-party to this process but

17  for the adversary.  And so we think that there's no basis

18  for the Court to exercise its jurisdiction over the State

19  Court since there's so limited a connection between what's

20  going on in the State Court and what Your Honor could do

21  here.

22         If we look at what Lehman has asserted its

23  prejudices here, what the connection is.  They say

24  inconsistent determination is a problem.  Not for them.

25  It's not binding on them.  Your Honor will be free to

Page 24

1    determine whatever you wish to determine when you look at

2    the facts and the law.   That was on -- it will probably be

3    page 2.   And they conceded that it's not binding on them in

4    the reply brief in paragraph 12.

5            The second thing they say is that a stay would

6    defeat GreenPoint's efforts to keep this Court from deciding

7    the validity of Lehman Bank's assignment to Lehman Brothers

8    Holding and assessing its responsibility as mortgage

9    originator to indemnify Lehman in the event Lehman is liable

10   to one of the other defendants.

11           Well, that's at reply brief page 3.   What efforts

12   are they talking about?   We haven't been here.   We haven't

13   made any efforts to limit the scope of indemnification.

14   Whatever they are they are and they'll be determined in the

15   ordinary -- in the course of the proceedings.

16           And prior to this -- the filing of this adversary

17   proceeding we've not been here to take any positions.   If

18   they're talking about some position that was taken in the

19   settlement discussion that's not appropriate here anyway.

20           But as our objection makes clear, in the State

21   Court the issue of Lehman's entitlement to indemnification

22   has never been raised, will not be decided there, not at

23   all, not later in the case, not ever in the case.   That's

24   just not there.

25           The third point Lehman makes is that they -- they

Page 25

1   need to stay this action because Syncora and U.S. Bank

2   continue to impose the specter of direct impact on at least

3   600 million of reserves.  That's reply brief paragraph 2.

4          As stated above -- earlier, Your Honor has ample

5   tools to deal with the reserves, either on a final basis, on

6   an estimation basis, on all sorts of bases you can deal with

7   the reserves.  The State Court cannot.  The State action

8   does not have any issue in it about the reserves in this

9   bankruptcy case.  Only Your Honor can address those issues.

10          And whether Syncora has a right to rely on the

11   Lehman representations is also not present in the State

12   Court action.  Syncora is not even a party there.  They've

13   been dismissed as a party in that case.  So that's not going

14   to be determined in the State Court case.

15          And then the last point that Lehman makes is

16   whether Lehman and creditors have and will continue to be

17   harmed by the manner in which the GreenPoint litigation

18   which accounting for certain appeals will continue

19   indefinitely.  That's the point Your Honor raised earlier.

20   And that has given Syncora and U.S. Bank the strategic

21   opportunity to try and extract an unwarranted recovery from

22   Lehman.  That's precisely what Your Honor can deal with with

23   the toolbox available to you.  You don't need a stay of a

24   judge's decision that is fully briefed and argued.  There's

25   nothing else going on in that case.  That case is stayed

Page 26

1    pending that decision.

2            If, after that decision, there's something going

3    on that's somehow actually does affect Lehman or its estate,

4    they can come back to Your Honor for the stay.  But we don't

5    expect that to happen and there's certainly nothing in the

6    motion that's before the judge currently that has any impact

7    other than potential stare decisis persuasive impact on Your

8    Honor's decision that warrants a stay.

9            THE COURT:  Okay.  Thank you.

10       (Pause)

11           THE COURT:  Good morning.

12           MR. VOGEL:  Good morning.  Excuse me.  Good

13   morning, Your Honor.  Michael Vogel for Syncora Guarantee.

14           I had prepared this morning to talk to you about

15   what I thought was a very clear, practical consideration

16   that staying a summary judgment proceeding that has been sub

17   judice since October was not a very practical way to lead to

18   a faster resolution of the issue.  It seems to me that issue

19   is amply clear to Your Honor so I won't -- I won't belabor

20   that point, although I --

21           THE COURT:  Well, I don't know.  You can never

22   assume that my questions mean that I'm leaning to a

23   particular way.

24           MR. VOGEL:  Well, I will tell you -- I will tell

25   you my views on that, but then I do want to --

Page 27

1           THE COURT:  Okay.

2           MR. VOGEL:  -- address a few things that -- that

3    Lehman specifically raised.

4           So as I said, Your Honor --

5           THE COURT:  I mean, my overarching point is that

6    as in any litigation time is somebody's friend and time is

7    somebody's enemy.

8           Here the plan administrator entirely appropriately

9    wants to do his job and administer the estate, wants to give

10   money to people who have been waiting for years and years to

11   get money.  So anything that looms as a significant

12   impediment to doing that is of concern here.

13          So to the extent that there is -- there are

14   massive claims that are seen to be -- being the resolution

15   of which is being delayed by other stuff, you know, that's a

16   -- that's a legitimate concern.  Reserves are meant to be

17   protective and conservative.  But at a certain point when --

18   if and when it becomes clear that there are duplicative or

19   over-reserves, those ought to come down because we're not

20   talking about, you know, tens of thousands of dollars.

21   We're talking about hundreds of millions of dollars and

22   that's -- that's real money to real folks who are waiting to

23   be paid.

24          So the nexus between the two actions is important

25   and is of interest to me, and I think that it's not a

Page 28

1    thousand percent clear that it ought not be stayed.  It --

2    this is like a -- I hate to use the word Rubik's cube, but

3    there's a Rubik's cube aspect to it.

4          So, anyway, so say -- say what would you like.

5          MR. VOGEL:  Okay.  Okay.  Fair enough, Your Honor.

6    And I would only say in response to those comments I think

7    one -- one point that appears to me clear here is that we're

8    all in agreement since the plan administrator seems to think

9    standing is delaying those legitimate goals, I think we're

10   therefore all in agreement that we would like standing to be

11   resolved quickly.  I think all four of the attorneys here

12   will say that to Your Honor.

13         And our view is that we don't think that staying a

14   proceeding that's sub judice, was argued in September, you

15   know, we're -- I hate to tell you 12 briefs on that as well

16   as a letter brief, so 13 briefs, 275 exhibits, expert

17   affidavits, it's a big record that we -- we would be

18   providing Your Honor plus whatever Lehman would want to put

19   in.  I don't know that staying that -- and then post-

20   argument, I would add we do have some direct evidence that

21   Justice Freedman was working on it because she came back

22   with specific questions and the parties submitted something

23   subsequent to argument jointly on that.

24         So I am concerned that stopping that when, as you

25   say, the decision could come down tomorrow, we don't think

1    is a practical way to lead to a quicker resolution.

2              Now Your Honor raised the issue of Your Honor also

3    addressing the standing issue.  That's not something we

4    object to.  We're in favor of a quick resolution of the

5    standing issue.  We feel strongly that U.S. Bank has a

6    position that it's going to prevail on that and we're --

7              THE COURT:  So --

8              MR. VOGEL:  -- not objecting to that.

9              THE COURT:  So tell me what's the alleged amount

10   of Syncora's claim against LBHI?

11             MR. VOGEL:  Syncora's claim, I think the reserve

12   is about 600 million now and that is based on principally

13   Syncora's paid out costs under its insurance policy.  There

14   are some other things.  There are attorneys' fees, et

15   cetera.  But that's -- that's the biggest piece of it.

16             There is going to be some --

17             THE COURT:  Wait.  So let me understand this.  So

18   Syncora has already gone out of pocket 600 million?

19             MR. VOGEL:  That -- that I believe is the

20   approximate amount of what its paid plus what it anticipates

21   paying based on the current -- based on the current --

22             THE COURT:  Hold on.  I'm -- I'm --

23             MR. VOGEL:  May I finish?

24             THE COURT:  There's about to be an objection.

25             MR. COSENZA:  No, Your Honor.  I just -- this is

Page 30

1    -- it's -- I'm sorry to interrupt.  But this is sort of one,

2    I think, a threshold issue that needs to be set forward by

3    Syncora.  This amount keeps on, you know --

4              THE COURT:  Well, that's why I'm asking --

5              MR. VOGEL:  Well --

6              THE COURT:  -- the question.  So I --

7              MR. VOGEL:  -- and -- and I --

8              THE COURT:  -- I'm trying to -- this is not

9    evidence.

10             MR. VOGEL:  No.

11             THE COURT:  I am just trying to understand what's

12   going on.

13             MR. VOGEL:  It -- it's --

14             THE COURT:  So --

15             MR. VOGEL:  -- not evidence and if I may add it's

16   based on not having reviewed these numbers in preparation

17   for this particular hearing.  So --

18             THE COURT:  Okay.

19             MR. VOGEL:  -- I hope you'll understand if any of

20   this might need --

21             THE COURT:  That's fine.

22             MR. VOGEL:  -- to be --

23             THE COURT:  That's fine.  I --

24             MR. VOGEL:  -- corrected.

25             THE COURT:  -- would like to know what's going on.

1    So --

2              MR. VOGEL:  But --

3              THE COURT:  -- it seems to me one important thing

4    for me to understand is what your claim is.

5              MR. VOGEL:  Absolutely.  And all these numbers, I

6    hope you would understand we would --

7              THE COURT:  Of course.

8              MR. VOGEL:  -- give you precise numbers.

9              THE COURT:  It's not evidence.

10             MR. VOGEL:  Conceptually, though, it's insurance

11   payments.  It's anticipated future insurance payments.  It's

12   legal fees.  Now there are -- I do need to disclose to Your

13   Honor conceptually there are post-closing of the

14   securitization transactions -- I assume that's why Lehman is

15   standing up -- that were a benefit to Syncora and that --

16   Lehman, I'm sure, is going to take the position mitigate

17   that damages number.

18             That's an issue that Your Honor is going to have

19   to resolve because that -- that will be --

20             THE COURT:  Okay.  But you --

21             MR. VOGEL:  -- briefed.

22             THE COURT:  But you don't have the ability to

23   differentiate between out of pocket already paid versus what

24   you anticipate?

25             MR. VOGEL:  Not -- not standing here.  My

Page 32

1    recollection is more of it is already paid than to be paid

2    in the future by a substantial amount, but I --

3              THE COURT:  And paid -- and paid to whom?

4              MR. VOGEL:  Paid into the trust which then --

5              THE COURT:  Okay.

6              MR. VOGEL:  -- pays it under the --

7              THE COURT:  Right.

8              MR. VOGEL:  -- trust documents.

9              THE COURT:  So -- so to the extent that you paid,

10   U.S. Bank doesn't get a double dip, right?

11             MR. VOGEL:  Well, U.S. Bank is made whole by our

12   payments to U.S. Bank.

13             THE COURT:  Yes.

14             MR. VOGEL:  But --

15             THE COURT:  So, therefore, to the extent that U.S.

16   Bank is made whole, they don't get to go to Lehman and say,

17   pay me again, right?

18             MR. VOGEL:  U -- well, no, because U.S. Bank has

19   liabilities including to us.  It's a little bit complicated

20   and I apologize that that -- that wasn't something that I

21   prepared to explain.  It's something that I --

22             THE COURT:  Okay.

23             MR. VOGEL:  -- would request the opportunity to

24   explain how that all works.

25             THE COURT:  Sure.  I'm not -- this is all

Page 33

1    background.

2            MR. VOGEL:  But -- yeah.  And, also -- but since

3    we're in that area of background, I do object to the idea

4    that Syncora's claim and the U.S. Bank's claim are identical

5    or close to identical.

6            Your Honor is correct.  There cannot be double

7    payment and there will be circumstances in which a recovery

8    to U.S. Bank would reduce Syncora's claim, and there will be

9    circumstances in which a recovery to Syncora's claim will

10   reduce U.S. Bank's claim.  But it's -- and it's not quite as

11   simple as just saying these are identical claims.  And in

12   the Southern Circuit in the In re: Delta case explains that

13   the way you deal with that, when you have two related, but

14   different claims -- and these are very different claims.

15   One is for repurchase and --

16           THE COURT:  Sure.  I understand.

17           MR. VOGEL:  -- one is for indemnification.  When

18   you have those two different claims they proceed and then

19   you have to, you know, work it out so that you don't have

20   double recovery.  And we're not seeking double recovery to

21   be clear.

22           But it's not very simple to just stand here today

23   and say --

24           THE COURT:  Sure.

25           MR. VOGEL:  -- here's what's black --

1              THE COURT:  I understand.  I understand.

2              MR. VOGEL:  Okay.  And even just to add a little

3     bit to that, it may depend literally on which loans are

4     found to be breaching, which reps and warranties vis-à-vis

5     my client are found to be breaching.  It's not simply I can

6     say this is the theory.  It kind of has to be litigated and

7     played out.

8              Staying for a moment with the -- I think I've

9     actually said what I've had to say about the practical

10    considerations of staying the State Court action.  I think

11    the only other thing I wanted to identify from what Lehman

12    said is they spoke today at oral argument.  They also spoke

13    in some depth about the "admission" of U.S. Bank at oral

14    argument.

15             THE COURT:  Yeah.  So let's talk about that.

16             MR. VOGEL:  And let -- let me address it since I

17    was counsel to U.S. Bank in that action so I -- I'm actually

18    the person who supposedly made that admission.

19             THE COURT:  Okay.

20             MR. VOGEL:  And I would ask if Your Honor were to

21    read the transcript there I think I was actually very clear

22    as to what I was saying, which is that the principal part of

23    U.S. Bank's claim against GreenPoint, those reps and

24    warranties are indeed canceled as to Lehman because they are

25    overlapping.

1            So to that extent they are -- Lehman is correct as

2    it characterizes --

3            THE COURT:  Talking about the -- right, as opposed

4    to the -- what I -- the gap reps.

5            MR. VOGEL:  Yes.  However, gap reps isn't the

6    totality of it.  That's what's significant.  Gap refers to

7    the period of time between when --

8            THE COURT:  Yeah.

9            MR. VOGEL:  -- the loans go from GreenPoint to

10   Lehman.  However, there's another category of reps which are

11   specifically and expressly non-cancelable reps, and this is

12   in the transcript.  You'll see this in the summary judgment

13   argument.  Those non-cancelable reps, which are the

14   minority, but are still -- because we're talking about such

15   dollars still substantial --

16           THE COURT:  Right.

17           MR. VOGEL:  -- those are ones as to which both

18   Lehman and GreenPoint are liable.  I think U.S. counsel may

19   address this as well.  But that's the basic point.

20           And then I would simply add that --

21           THE COURT:  So you're -- the state -- so what

22   you're saying is that your statement was limited to what I

23   think of as the wish go down to laying reps, just the reps

24   that were -- the reps that were repeated, but that -- but

25   that weren't taken on.

```
 1              MR. VOGEL:  Well, I  --

 2              THE COURT:  Just --

 3              MR. VOGEL:  -- I would say that --

 4              THE COURT:  The first category of reps that you

 5    described to me --

 6              MR. VOGEL:  I think in the --

 7              THE COURT:  -- right?

 8              MR. VOGEL:  -- statement I very clearly delineated

 9    that there were some involved --

10              THE COURT:  Okay.

11              MR. VOGEL:  -- and I think I said, or least

12    intended to say and I would say to you the majority of them

13    are canceled and Lehman is correct.  But a substantial

14    minority is in the --

15              MR. VOGEL:  All right.  So there's three buckets.

16    There's what you call the canceled reps.  There's the gap

17    reps, and then there's the non-cancelable reps.

18              MR. VOGEL:  Correct.  And then --

19              THE COURT:  Okay.

20              MR. VOGEL:  And then just to tab -- tab another

21    bucket, and since we've been talking about it here today

22    it's not a surprise, an overarching rep is that the remedies

23    were transferred into the trust.  Lehman -- Lehman said this

24    deal was going to work and GreenPoint now claims it didn't

25    work.  And that obviously is something that it would have an
```

Page 37

1    overarching securitization-wide liability to Syncora and

2    U.S. Bank for.

3            THE COURT:  Okay.

4            MR. VOGEL:  Thank you, Your Honor.

5            THE COURT:  All right.  Thank you.

6            MS. BOLAND:  Good morning, Your Honor.

7            THE COURT:  Good morning.

8            MS. BOLAND:  Connie Boland on behalf of U.S. Bank

9    as indenture trustee.  And I was remiss, Your Honor.  I

10   neglected to mention that Frank Top from Chapman & Cutler is

11   also in the courtroom on behalf of U.S. Bank as indenture

12   trustee.

13           So the indenture trustee joins in the arguments

14   made by GreenPoint with respect to the lack of jurisdiction

15   of this Court and the commodity and federalism arguments,

16   and it joins in the arguments articulated by Syncora this

17   morning.

18           What I would like to emphasize to Your Honor --

19           THE COURT:  I don't know if I agree that I lack

20   jurisdiction, but I'm not going to argue with you about it.

21           MS. BOLAND:  I -- I didn't think that you would

22   agree with me on that point, Your Honor.

23           THE COURT:  Whether or not I -- I should exercise

24   discretion to do something is different from whether or not

25   I have jurisdiction.  So --

Page 38

1            MS. BOLAND:  And --

2            THE COURT:  -- we can just -- but we can move that

3     past that.

4            MS. BOLAND:  We can, Your Honor.  And I think that

5     some of the reasons why Your Honor should not exercise your

6     discretion to stay the State Court action because of the

7     irreparable harm to the indenture trustee.

8            The indenture trustee should have the right to

9     pursue its prosecution of the State Court claim in the venue

10    of its choice as it sees fit.  This is a state law issue

11    before a State Court.  It's a breach of contract action, and

12    it's between two non-debtors.  It has, you know, nothing to

13    do with -- and everything to do with the indenture trustee's

14    right to secure its bargained for remedy.

15           The harm that Lehman claims is speculative at

16    best.  It says that without a stay it's not going to be able

17    to distribute assets.  Well, with a stay, as Your Honor

18    noted earlier this morning, it's not necessarily going to

19    result in the more expeditious distribution --

20            THE COURT:  Well --

21            MS. BOLAND:  -- of assets.

22            MR. VOGEL:  -- so let's talk about that.  So I

23    asked counsel for Syncora how much their claim is.  Let me

24    ask you, how much is your claim?

25            MS. BOLAND:  Well, Your Honor, let's get back to

Page 39

1    the issue of the canceled and non-canceled reps.

2              THE COURT:  Sure.

3              MS. BOLAND:  The non-canceled reps and the gap

4    reps need to be valued and Your Honor has jurisdiction over

5    it.  I do not have the information to value that -- those

6    pieces of the -- of the reps.

7              THE COURT:  Are you -- am I -- are -- is the state

8    reserving money for your claim in an amount that either

9    overlaps in whole or in part with amounts that you've

10   already received from Syncora?

11             MS. BOLAND:  No, Your Honor.  I don't believe that

12   it is.

13             THE COURT:  An amount that's --

14             MS. BOLAND:  I know that there is a reserve --

15             THE COURT:  An amount that's duplicative of what

16   has been reserved for Syncora because surely -- surely a

17   double reserve is not something that is appropriate, right?

18             MS. BOLAND:  A double reserve -- a double -- well,

19   a double award is not appropriate and I'm not advocating --

20             THE COURT:  Why is a double reserve --

21             MS. BOLAND:  -- here today --

22             THE COURT:  -- appropriate?

23             MS. BOLAND:  I'm not saying it is, Your Honor.

24   But I -- what I am saying is that at this juncture we just

25   have to take into consideration the distinctions between

Page 40

1   Syncora's claim and the indenture trustee's claim.  I mean,

2   the indenture trustee is here representing the noteholders

3   and the insurers, and that's an S plural.  There is another

4   insurer, CIFG, that is represented only by the indenture

5   trustee through the trust.  And there are noteholders that

6   are not represented by Syncora that are only represented by

7   the indenture trustee through the trust.

8           And so their right --

9           THE COURT:  I --

10          MS. BOLAND:  -- their rights are there.

11          THE COURT:  I understand that it's complicated.

12          MS. BOLAND:  Yeah.  It is.

13          THE COURT:  Okay.  Everything in this room is

14   complicated.

15          MS. BOLAND:  That's right, Your Honor.

16          THE COURT:  Okay.  If that were the test, I

17   wouldn't get out of bed in the morning.  Okay.  So it's

18   complicated.  I get that.  But that doesn't mean that the

19   plan administrator has to sit still for years and years and

20   years until it all gets sorted out.

21          So if you're going to tell me that I really

22   shouldn't mess with what's going on in the State Court while

23   this very complicated thing gets sorted out, you have to

24   also tell me what you're willing to do to advance the ball

25   here.

Page 41

1           MS. BOLAND:  Well, Your Honor, I mean, we -- our

2    proof of claim is before the Court and the proof of claim is

3    within your jurisdiction.  And the reps -- our claim for

4    breach of reps and warranties is before the Court.  We've

5    objected to, you know, estimating it or valuing it at this

6    point.  But we can deal with it.  I mean, it's pending here.

7           I am not -- I do not have information as to answer

8    your question directly as to what the value of the indenture

9    trustee's claims are for this particular trust.  There are

10   numerous trusts as Your Honor know -- knows in which U.S.

11   Bank is the trustee.  So I don't know whether all of those

12   details have been ferreted out yet in this very large

13   estate.

14          THE COURT:  You know, I find that a little hard to

15   believe.  You know, I just find it hard to believe that

16   given the stakes here and the complexity that there isn't --

17   that that isn't known.  Whether you know it standing here

18   today, I'm not going -- this is not an ambush.

19          MS. BOLAND:  Okay.  Well --

20          THE COURT:  That --

21          MS. BOLAND:  -- I honestly don't, Your Honor.  So

22   I'm --

23          THE COURT:  That's fine.

24          MS. BOLAND:  -- sorry I can't answer your

25   question.

Page 42

```
 1              THE COURT:  That's fine.  I don't like to ask

 2    unfair questions.  But I do believe that there's probably

 3    substantial learning that could be accessed so that we could

 4    better sort out the relationship and the amounts and deal

 5    with that.

 6              MS. BOLAND:  Well, I mean, I -- other issues that

 7    should be considered into the mix, Your Honor, is that I

 8    just want to emphasize as we emphasize in the papers, that

 9    Lehman did delay; that Lehman has known about this

10    GreenPoint State Court litigation for almost six years and

11    not once did they make any move to intervene or stay.  And,

12    indeed, the indenture trustee was completely taken by

13    surprise when it was served with these papers.

14              And we believe that Your Honor should decline to

15    exercise your discretion because the case in the State Court

16    is sub judice.

17              If Your Honor has no other questions I'll rest on

18    the papers.

19              THE COURT:  Thank you very much.

20              MR. COSENZA:  May I just make a few points --

21              THE COURT:  Of course.

22              MR. COSENZA:  -- real quick?

23              Your Honor sort of highlighted one issue that's of

24    concern to the plan administrator.  There is a $600 million

25    reserve that's set up for the Syncora claim.  But --
```

Page 43

1           THE COURT:  For only the Syncora claim?

2           MR. COSENZA:  Yes.  And then in addition --

3           THE COURT:  Okay.

4           MR. COSENZA:  -- Your Honor, there's the $5

5    billion in reserve that's set up for all of the U.S. Bank

6    claims --

7           THE COURT:  Right.

8           MR. COSENZA:  -- as trustee.

9           THE COURT:  Right.

10          MR. COSENZA:  So, in essence, there are --

11          THE COURT:  Right.  So there's 5 billion --

12          MR. COSENZA:  -- two --

13          THE COURT:  -- for U.S. Bank across --

14          MR. COSENZA:  Yes.

15          THE COURT:  -- lots of securitizations.

16          MR. COSENZA:  Including this --

17          THE COURT:  Including this --

18          MR. COSENZA:  -- this trust.  So you do have a

19   double reserve issue that needs to be sorted out pretty

20   promptly from the plan administrator's perspective.

21          Your Honor, I also wanted to touch very quickly,

22   I'm not an expert on synthetic commutations and what was

23   done with Syncora.  My colleague, Tom French, is an expert

24   --

25          THE COURT:  Okay.

Page 44

1          MR. COSENZA:  -- on that area, so he may want to

2     come up here and correct me if I sort of take a misstep

3     here.

4          THE COURT:  Okay.

5          MR. COSENZA:  But we have heard that Syncora paid

6     X dollars into the trust and that the trust then pays that

7     out on a waterfall.  We think through the mitigation efforts

8     referred to in the papers and discussed today that there's a

9     substantial amount that's round-tripped that, you know, goes

10    into the trust and then gets paid out to Syncora.  So

11    there's some level of double recovery here.  And we're just

12    having a tough time understanding --

13         THE COURT:  Sure.

14         MR. COSENZA:  -- what the exact number is that is

15    actually being --

16         THE COURT:  Right.  So that doesn't --

17         MR. COSENZA:  -- incurred.

18         THE COURT:  -- that -- that's something that --

19    and we're all kind of a little bit unprepared for this and

20    that's my fault because you couldn't have known I was going

21    to talk about this.  But -- so that would be something that

22    we would want to get to the bottom of in connection with an

23    effort to reduce the double reserve.

24         MR. COSENZA:  Correct.

25         I don't know, Tom, if you want to add anything

1    else?

2            If Tom could just talk for two minutes just to

3    make sure I didn't --

4            THE COURT:  That's fine.  Just give us your

5    appearance for the record, please.

6            MR. FRENCH:  Good morning, Your Honor.

7            THE COURT:  Good morning.

8            MR. FRENCH:  Tom French, Willkie, Farr & Gallagher

9    on behalf of the estate.

10           My colleague substantially correctly characterized

11   a synthetic commutation.  The principle is that an insurer

12   such -- a commutation itself, not a synthetic one, is where

13   an insurer goes out and pays for effectively the cancelation

14   of a policy.

15           A synthetic commutation, in contrast, is a

16   transaction in which an insurer goes out and buys all or a

17   substantial portion of the underlying securities so that

18   when it makes payments on the policies, as Todd said, the

19   money effectively will roundtrip.

20           The estate believes that while the $600 million

21   past and future claims number is a gross number and the

22   effect of the round-tripping process, we believe, is about a

23   fraction of that number.  And from our standpoint that is

24   the starting point.  We then look at the gap reps and the

25   other issues that have been raised today.  That's, you know,

Page 46

1    just the starting point from where you evaluate the claims

2    outstanding.

3              THE COURT:  So the -- let me absorb what you're

4    saying for a minute.

5              So the use of this synthetic commutation device

6    Lehman says reduces its exposure to Syncora --

7              MR. FRENCH:  Correct.

8              THE COURT:  -- correct?

9              MR. FRENCH:  It -- that's right.

10             THE COURT:  That -- that Lehman gets to tap the

11   benefit of the use of that device because it's an out of

12   pocket damages calculation that we're looking --

13   determination that we're looking at.

14             MR. FRENCH:  Yeah.  I think our view is that

15   that's actually a high water mark.  But then when you look

16   at the actual merits of the underlying claims and the gap

17   reps and everything else --

18             THE COURT:  That -- right.  I --

19             MR. FRENCH:  But, yes.  But --

20             THE COURT:  That --

21             MR. FRENCH:  -- that is correct.

22             THE COURT:  Right.

23             MR. FRENCH:  Yeah.  That's correct.

24             THE COURT:  Right.  All right.  Okay.  Well, we've

25   gone a little bit far afield from whether or not a State

Page 47

```
 1    Court action should be stayed, but I think all of this is
 2    very, very important.
 3                So I think Mr. Cosenza wants to take --
 4                MR. FRENCH:  Thank you.
 5                THE COURT:  -- another shot.
 6                MR. COSENZA:  Your Honor, just a couple of other
 7    wrap-up points --
 8                THE COURT:  Just let me say again, none of this is
 9    evidence.  This is beyond what you could have reasonably
10    anticipated we were going to talk about today.  So I'm not
11    taking this as gospel.  This is just the barest and
12    preliminary introductions to some of the complicated issues
13    that we're going to have to face.
14                So nobody should get nervous.  Nobody's clients
15    should yell at them for not correcting what are later said
16    to be inaccurate statements.
17                MR. COSENZA:  Sure.
18                THE COURT:  Okay.
19                MR. COSENZA:  Your Honor, just to comment that
20    you've made several times today which is very important to
21    the plan administrator, and that is that any decision in New
22    York Court is not binding on Lehman.  We've heard
23    confirmation of that from GreenPoint.
24                I would also like to make sure that --
25                THE COURT:  Well, it's not -- it's just -- it's
```

Page 48

1        more than that.  I want to put --

2                MR. COSENZA:  Yeah.

3                THE COURT:  -- a little bit more to the point.  As

4        a matter of plain letter black law it's not binding.  But,

5        also, I will say that to the extent that in subsequent

6        proceedings, for example, on reducing the reserves or

7        anything I'm really not going to be interested in hearing

8        about what happened in the State Court proceeding as

9        something that should put the thumb on the scale for

10       anybody's benefit.  I mean, that's -- that's kind of the

11       quid pro quo part of -- not a quid pro quo, but part of what

12       I'm trying to communicate is I'm not going to be very open

13       to an argument that says, but in the State Court X, Y or Z,

14       whatever it is.

15               These claims are here.  I'm going to decide them.

16       And the reserve is here established by an order of this

17       Court if it's going to be modified.  I'm going to -- I'm

18       going to decide it based on predicate facts, not on

19       something that happened somewhere else.

20               Obviously, I do answer to, you know, the Second

21       Circuit --

22               MR. COSENZA:  Yes.

23               THE COURT:  -- and the Supreme Court to name a

24       few, but -- so I -- so, yes.  I agree with your point.

25               MR. COSENZA:  Just a couple of other -- just give

Page 49

1      me two more minutes --

2              THE COURT:  Sure.

3              MR. COSENZA:  -- Your Honor, and I'll be done.

4              We heard several times from -- I think I counted

5      six different major questions that will not be addressed in

6      the New York Court proceedings that will -- that need to be

7      addressed in the Bankruptcy Court.  We heard that from

8      GreenPoint's counsel.

9              I think that almost supports our point as the plan

10     administrator that this is the only forum that actually can

11     hear a lot of these complicated issues.  The New York action

12     in some ways is subsumed within this much broader action

13     that's in the Bankruptcy Court.

14             So we think just from a judicial efficiency

15     perspective it makes a lot of sense to stay the New York

16     action and to go forward here.

17             THE COURT:  Whose efficiency are you worried

18     about?

19         (Laughter)

20             THE COURT:  I mean, I'm going to have to do it.

21             MR. COSENZA:  Yes.  You're going to have to do it.

22             THE COURT:  I'm going to have to do it one way --

23             MR. COSENZA:  Yes.

24             THE COURT:  -- one way or the other.  So --

25             MR. COSENZA:  And, Your Honor, just to the point

Page 50

1    that you raised earlier, we've raised in our complaint a

2    number of the tools that you've raised that you have at your

3    disposal.

4              First, we've asked Your Honor to disallow the

5    Syncora and U.S. Bank claims.  We've asked you to estimate

6    the claims for reserve purposes.  We've asked you to put the

7    claims for U.S. Bank through the RMBS protocol.  We've asked

8    you to determine that the assignment here or the standing

9    issue that's been discussed is, you know, whatever the

10   proper, you know, --

11             THE COURT:  Right.

12             MR. COSENZA:  -- declaration is on that issue.  So

13   we've asked for those, you know, various counts of our

14   complaint.  We've asked Your Honor to assist us with that.

15   We really don't have an ax to grind here.  We just need to

16   get this done as quickly as possible.  And as I mentioned

17   before, there are various different permutations in how

18   different legal decisions or determinations will impact the

19   estate.  And as the plan administrator we just need to get

20   this moving very quickly in that regard.

21             THE COURT:  So does it makes sense for me to

22   direct essentially a meet and confer where the parties

23   attempt to agree to a scheduling --

24             MR. COSENZA:  Yeah.  And I think --

25             THE COURT:  -- order with respect to all the

Page 51

1   above?

2            MR. COSENZA:  Correct.

3            THE COURT:  And then to the extent that you

4   succeed or don't succeed, that I pen -- I take this under

5   advisement; that you folks have those conversations.  You

6   come back.  You let me know to what extent you have an

7   agreement.  The plan administrator tells me to what extent

8   it wishes to continue to ask me to stay the State Court

9   litigation and we -- and we go from there.

10           MR. COSENZA:  Yeah.  And --

11           THE COURT:  Does that make sense --

12           MR. COSENZA:  Yes.

13           THE COURT:  -- as a game plan?

14           MR. COSENZA:  And let me just confer with my

15   client, but I do think there's two other -- two things --

16   two issues that I want to highlight which I've mentioned

17   several times.  I think the reserve issue needs to be teed

18   up and that should be one of the threshold, you know, next

19   issues to be --

20           THE COURT:  Right.

21           MR. COSENZA:  -- teed up.  And second is --

22           THE COURT:  But, I mean, I have a --

23           MR. COSENZA:  -- the assignment --

24           THE COURT:  -- I have a good memory --

25           MR. COSENZA:  Yeah.

Page 52

1            THE COURT:  -- right, so if the folks at this

2    table, when you try to tee something up, tell me ten reasons

3    why it can't go forward, you know, I will remember this day.

4    So, you know, things are going to have to move.

5            MR. COSENZA:  If I can just caucus my client for

6    one --

7            THE COURT:  Sure.

8            MR. COSENZA:  -- minute and --

9            THE COURT:  We can take a break if you would like.

10   Would you like to take a break or --

11           MR. COSENZA:  Yeah.  Sure.  We'll take a five-

12   minute break --

13           THE COURT:  Okay.

14           MR. COSENZA:  -- Your Honor.

15           THE COURT:  So we've been going for quite a while.

16   So why don't we come back at -- and maybe you folks could

17   talk to each other as well.  Why don't we come back at ten

18   minutes after the hour --

19           MR. COSENZA:  Great.

20           THE COURT:  -- and we can finish up then?

21           MR. COSENZA:  Thank you. Your Honor.

22           THE COURT:  All right.

23       (Recess taken at 9:53 a.m.; resume at 10:14 a.m.)

24           THE COURT:  Be seated.

25           Okay.

1         MR. COSENZA:  Your Honor, may I approach?

2         THE COURT:  Sure.

3         MR. COSENZA:  So I think we have, from our

4    perspective, from the plan administrator's perspective the

5    two issues we want to tee up promptly.

6         THE COURT:  Okay.

7         MR. COSENZA:  One is the issue that's been briefed

8    before in New York Supreme Court on, you know, the

9    assignment and standing issue.  From our perspective we

10   think that everything could be fully submitted to Your Honor

11   within -- probably by the middle of August.

12        THE COURT:  Okay.

13        MR. COSENZA:  We think that --

14        THE COURT:  And that -- with the idea being that I

15   work for the rest of August on it?

16        MR. COSENZA:  Well, whatever, you know, it's all

17   subject to Your Honor's schedule.  But I think from our

18   perspective we would like to get an opportunity to look at

19   the underlying record.  We think the record is complete.

20   I'm not sure if Lehman will put in an additional submission.

21        But I understand from Syncora and U.S. Bank's

22   counsel that some of the materials are redacted, so there

23   may be an issue we need to work out --

24        THE COURT:  That have --

25        MR. COSENZA:  -- and see if Your Honor is --

Page 54

1          THE COURT:  -- been filed in redacted form in the

2     State Court?

3          MR. COSENZA:  Correct.  Correct.  So we'll need to

4     ask -- maybe submit an order to Your Honor so we can gain

5     access to that.

6          THE COURT:  Okay.  That sounds like an easy one.

7          MR. COSENZA:  But beyond that I think everything

8     is fully submitted there and I think, you know, maybe even

9     ready for Your Honor even before that we get the materials

10    quickly.

11         THE COURT:  Okay.

12         MR. COSENZA:  The second --

13         THE COURT:  Does this reflect your folks' view or

14    have you spoken to --

15         MR. COSENZA:  I have spoken --

16         THE COURT:  -- these folks as well?

17         MR. COSENZA:  I mean, U.S. Bank and Syncora's

18    counsel can correct me.  I think they're on board with this.

19    GreenPoint said they needed to check with their client.  So

20    that -- we can hear from them if --

21         THE COURT:  Okay.

22         MR. COSENZA:  -- they have a different view.

23         THE COURT:  All right.

24         MR. COSENZA:  And Syncora and U.S. Bank can

25    correct me if I've misstated anything.

```
 1                 THE COURT:  Okay.

 2                 MR. COSENZA:  The second issue is the reserve

 3      issue.  We're going to make a motion to lower the Syncora

 4      reserve.  We think, as we told you before, it's inflated by

 5      several hundred million dollars.  And we're going to need

 6      some accounting from Syncora, so we're going to try to move

 7      that --

 8                 THE COURT:  So there's going to be some --

 9                 MR. COSENZA:  -- forward.

10                 THE COURT:  -- discovery so to speak that will be

11      --

12                 MR. COSENZA:  Yeah.  And I think we need some form

13      of an accounting of some sort to figure out what exactly the

14      losses are, what --

15                 THE COURT:  Along the lines of --

16                 MR. COSENZA:  -- they're out of pocket --

17                 THE COURT:  -- the questions that I was asking

18      earlier.

19                 MR. COSENZA:  Correct.  And we need that for both

20      us and maybe for the Court as well to understand what the

21      claim is worth.  So we'll move that forward as quickly as we

22      can --

23                 THE COURT:  Okay.

24                 MR. COSENZA:  -- and hopefully have that fully

25      briefed maybe by the end of August.  We'll --
```

1                 THE COURT:  Okay.

2                 MR. COSENZA:  -- try to work out a briefing

3      schedule and start also communicating with Syncora's counsel

4      to see if we can get some of this information and do what we

5      can to try to resolve these even consensually.

6                 THE COURT:  Okay.  And in the meantime I will

7      carry the motion.

8                 MR. COSENZA:  Correct.

9                 THE COURT:  Okay.  And are you going to reduce

10     this to some sort of a writing or shall I so order the

11     record?  What did you have in mind?

12                MR. COSENZA:  I think from our perspective so

13     ordering the record and then we'll confer with counsel on

14     the briefing schedule for the two separate issues.  I think

15     I just would treat them as two separate sort of briefing

16     schedules.

17                THE COURT:  Okay.  I think that -- I don't know

18     that there's anything really in the record that I can so

19     order.  I think that what you ought to do is allow folks to

20     make sure that their clients are signed off and that you

21     have all the details straight, and then I'm indifferent as

22     to whether or not it's a stipulation or you sent me a joint

23     letter telling me --

24                MR. COSENZA:  Okay.

25                THE COURT:  -- what the schedule is.  Whatever is

Page 57

1    most efficient for you, just as long as it's clear so --

2            MR. COSENZA:  Yes.

3            THE COURT:  -- so that there's clarity.

4            MR. COSENZA:  No.  That makes sense from our

5    perspective and I think we've laid sort of the general

6    framework of what we think.

7            THE COURT:  Sure.  Okay.

8            MR. COSENZA:  So thank you, Your Honor.

9            THE COURT:  All right.  Okay.

10           MR. BURKE:  Your Honor, Kevin Burke for GreenPoint

11   again.

12           We -- we don't agree with the idea of just marking

13   this and carrying this motion forward.  The State Court

14   judge has been advised by the parties of the existence of

15   this motion --

16           THE COURT:  Okay.  Well, I am taking the motion

17   under advisement.  So you can advise the State Court judge

18   that I have the motion under advisement.

19           MR. BURKE:  Okay.

20           THE COURT:  It doesn't affect -- I'm not entering

21   a stay.  I'm offering no view whatsoever.  Nothing that I've

22   said or done here today or am going to do going forward is

23   or should be seen as an impediment in any way to anything

24   that folks are pursuing in the State Court.  So it's the --

25   it's -- I think people get used to my delivering decisions

Page 58

1    from the bench, but sometimes when matters are larger and

2    more complicated I take them under advisement, and that's

3    essentially what I'm doing today.

4              MR. BURKE:  Thank you, Your Honor.

5              THE COURT:  All right.  Yes.

6              MR. VOGEL:  Very briefly, Your Honor.

7              THE COURT:  Sure.

8              MR. VOGEL:  Syncora is in agreement as I

9    understand U.S. Bank is with what Lehman's counsel said

10   regarding the prompt submission of the standing issue to

11   Your Honor subject to resolving the issues concerning

12   confidentiality.  And I only wanted to say with respect to

13   the reserve which we understand they're going to be bringing

14   a motion on, that we hadn't talked to them about a time

15   frame.  And that would be something --

16             THE COURT:  Sure.

17             MR. VOGEL:  -- to discuss.

18             THE COURT:  We're not going to -- you know, moving

19   expeditiously is not equal to cutting corners or cutting off

20   people's rights to due process and adequate time to respond

21   and all of that.  So that's why I said rather than so

22   ordering anything, you're going to work out a schedule.  It

23   is the summertime and people have vacations and commitments

24   and, you know, those shouldn't be run rough shot over for

25   the sake of meeting, you know, a particular deadline.

Page 59

```
 1              MR. VOGEL:  Very good, Your Honor.  That was the

 2   point I wanted to make.

 3              THE COURT:  Okay.

 4              MR. VOGEL:  Thank you.

 5              THE COURT:  All right.   Okay.  Hold on one

 6   second.

 7         (Pause)

 8              MR. BURKE:  I do have one housekeeping matter

 9   after we get --

10              THE COURT:  Sure.

11              MR. BURKE: -- to this.

12         (Pause)

13              MR. COSENZA:  Your Honor, one last item.  I

14   touched this before, but maybe we can ask for -- make a more

15   formal request.

16              The material in the State Court proceeding, we

17   understand from my co-counsel, is redacted and we want to

18   figure out some way of making sure we gain access to --

19              THE COURT:  Right.

20              MR. COSENZA:  -- the materials and --

21              THE COURT:  I mean, you've already raised that so

22   I think you're going to work that out.  I don't think that

23   anybody's going to take the position that you have to flag

24   line with respect to what's in the documents; that they will

25   -- there's going to have to be appropriate agreements,
```

Page 60

1    sealing orders, et cetera.  I mean, my concept is not

2    exactly that you're going to take lock, stock and barrel of

3    the entire State Court record and just kind of deliver it to

4    my front door.  I mean, maybe you'll do that.  But certainly

5    look at it with fresh eyes I would say.

6              MR. COSENZA:  Okay.

7              THE COURT:  I mean --

8              MR. COSENZA:  Thank --

9              THE COURT:  -- if it ends up being that, then it

10   is --

11             MR. COSENZA:  Sure.

12             THE COURT:  -- what it is.

13             MR. COSENZA:  Okay.  Thank you, Your Honor.

14             THE COURT:  Is there something I'm missing?

15             MR. COSENZA:  Yeah.  We may need a court order at

16   some point.

17             THE COURT:  Of course.  Yeah.  Someone -- and I

18   can't remember who -- someone already said that.

19             MR. COSENZA:  I --

20             THE COURT:  So you'll have to make a sealing

21   motion --

22             MR. COSENZA:  Yes.

23             THE COURT:  -- that complies with all the usual

24   rules and to the --

25             MR. COSENZA:  Absolutely.

Page 61

1          THE COURT:  -- extent that everybody's in

2    agreement on that, that makes it that much easier.  But,

3    yes.  I --

4          MR. COSENZA:  Okay.

5          THE COURT:  I agree with you.

6          Just based on the timing that folks are talking

7    about today, it doesn't seem likely that you're going to ask

8    for a hearing date at the end of August.  I'm generally not

9    inclined to give out hearing dates at the end of August.  So

10   then we'll be into September and --

11         MR. COSENZA:  Absolutely.

12         THE COURT:  -- you know, it's always -- and then

13   we get into various religious holidays and whatnot.

14         MR. COSENZA:  Uh-huh.

15         THE COURT:  But we'll move it forward.

16         MR. COSENZA:  We will coordinate with you and --

17         THE COURT:  But no one should anticipate that

18   you're going to have hearing dates at the end of August.

19         MR. COSENZA:  Okay.

20         THE COURT:  Okay.  Any last licks?  Anyone else?

21         MR. COSENZA:  That's all.  Thank you, Your Honor.

22         MR. BURKE:  Unrelated, but a housekeeping matter.

23         THE COURT:  Okay.

24         MR. BURKE:  Actually, two housekeeping matters.

25         One is that the defendants in this -- in the

Page 62

1    adversary have not yet seen the full complaint because there

2    were redactions in it and I believe an order has been

3    submitted to Your Honor --

4              THE COURT:  Right.

5              MR. BURKE: -- on the sealing --

6              THE COURT:  So we had a sealing -- we had a

7    sealing motion with respect to the complaint that was on

8    today.  We will enter that.  I need to take another look at

9    it.  And now that we're -- just give me a moment to think

10   out loud.

11             Now that we are embarked on this additional path,

12   perhaps you folks can take a look at that sealing order and

13   maybe we could have -- kill two birds with one stone and

14   bake into that sealing order -- it may not work.  That may

15   be more cumbersome than it's worth.  But, sure, you get to

16   see everything, and just let us know when you take another

17   look at the sealing order whether you want to amend it or --

18   to complete this new additional path or whether we should do

19   those things separately.

20             I can see you trying to think -- trying to keep up

21   with me here, Mr. Cosenza.  You don't know what the answer

22   is.  I don't know what the right answer is either.  It may

23   be simplest just for me to enter the sealing order so that

24   that enables these folks to -- for you to file the redacted

25   version and that they then get a copy of the unredacted.

Page 63

1          MR. COSENZA:  Your Honor, we'll take a quick look

2     at this and see if there's some way of combining it and it

3     may be --

4          THE COURT:  Okay.

5          MR. COSENZA:  -- for efficiency purposes --

6          THE COURT:  I'm not trying to make it more

7     complicated, just less.  But they need to be able to see

8     what they need to see.  Okay.

9          MR. BURKE:  Second housekeeping matter, Your

10    Honor, there's a initial pretrial conference scheduled in

11    this adversary for the 22nd at 10 a.m.  I personally have to

12    be before Judge Glenn at that exact time on that exact day

13    and I would like to, if it's possible, to move that.

14         THE COURT:  So are we going to continue to do that

15    in light of what we've talked about here today?

16         MR. COSENZA:  Your Honor, I think it would depend

17    on how things play out over the next week or so with --

18         THE COURT:  Okay.  Well, certainly we shouldn't --

19    we shouldn't force counsel to have to tell Judge Glenn that

20    he can't be there because --

21       (Laughter)

22         THE COURT:  -- Judge Glenn will be unhappy with

23    me.

24         MR. COSENZA:  Our hopes are that that conference

25    may not be necessary, but --

Page 64

1              THE COURT:  Right.

2              MR. COSENZA:  -- it really depends on how things

3       play out in terms of reaching the scheduling on --

4              THE COURT:  Okay.

5              MR. COSENZA:  -- the two issues we phrased.

6              THE COURT:  So how should we -- but how should we

7       leave that?

8              MR. COSENZA:  We can just -- is there a different

9       day in July that -- late July that works for Your Honor?

10         (Pause)

11             THE COURT:  Yeah.  That day is a whole Lehman day,

12      so I -- depending on how long you're going to be before

13      Judge Glenn.

14             MR. BURKE:  I would hope to be done by noon.

15             THE COURT:  Okay.  Then we could just -- we could

16      just push it back to noon to the extent that the parties

17      believe that it's still something that we should do because

18      that is a Lehman omni day.  All right.

19             MR. COSENZA:  That makes sense.

20             THE COURT:  Okay.  All right.  Thank you very

21      much.

22             MR. COSENZA:  Thank you.

23             THE COURT:  We'll be back at 11:00 for the

24      remainder of the Lehman calendar.

25         (Recess taken at 10:25 a.m.; resume at 11:03 a.m.)

1          THE COURT:  Good morning.  How are you?

2          MR. WOOLVERTON:   Good morning, Your Honor.  I'm

3     well.  Thank you.

4          For the record Alexander Woolverton with Weil,

5     Gotshal & Manges on behalf of the plan administrator.

6          Your Honor, this is a continuation of this

7     morning's calendar in Lehman Brothers Holdings, Inc., and as

8     the agenda reflects there are two items remaining for this

9     morning.

10         THE COURT:  Okay.

11         MR. WOOLVERTON:  The second item on the agenda,

12    Your Honor, is the motion pursuant to Rule 9019 of the

13    Federal Rules of Bankruptcy Procedure and Section 105(a) of

14    the Bankruptcy Code seeking approval of the settlement

15    agreement related to the Airlie LCDO (Aviv LCDO 2006-3)

16    credit default swap agreement and indenture.  That appears

17    at Docket Entry 49703.

18         The Court has been provided a copy of the

19    confidential settlement agreement and the plan administrator

20    has filed the declaration of Lawrence Brandman (ph) in

21    support of the proposed settlement agreement, and that can

22    be found at Docket Entry 49996.  Due to a scheduling

23    conflict, Your Honor, Mr. Brandman could not be present in

24    court today.

25         Finally, Your Honor, U.S. Bank as trustee has

Page 66

1    filed a declaration on June 15, 2015 in connection with the

2    proposed settlement agreement and that can be found at

3    Docket Entry 49989.  And counsel for U.S. Bank is present in

4    court today.

5              THE COURT:  Okay.

6              MR. WOOLVERTON:  The motion was filed on May 20th,

7    year 2015, and the objection deadline was established as

8    June 11th, 2015.  That deadline has, of course, passed and

9    there have been no objections filed.

10             As stated in the motion the proposed settlement

11   agreement provides for the resolution of yet another SPV

12   flip clause dispute. Beginning in 2010 the parties were

13   engaged in an ADR process and this process ultimately

14   resulted in the execution of a termination agreement in

15   respect of the transaction at issue.

16             As a result the collateral was liquidated and U.S.

17   Bank, as trustee, holds approximately $841,000 for the

18   benefit of the holders of the so-called remaining notes.

19             This proposed settlement agreement, Your Honor,

20   provides for full resolution of the dispute as to the

21   balance of those funds.  Additionally, the proposed

22   settlement agreement provides for the dismissal of Airlie as

23   well as the co-issuer under the notes and U.S. Bank, both

24   individually and as trustee from the adversary proceeding

25   Number 10-03542 commenced in connection with this

Page 67

1    transaction.

2              Your Honor, the relief sought by the parties is

3    unopposed.  Additionally, as supported by the declaration of

4    Mr. Brandman, the plan administrator submits the -- that the

5    proposed settlement agreement is in the best interest of

6    LBHI and LBSF's estates and their creditors.

7              Accordingly, unless the Court has any questions,

8    the plan administrator respectfully request that the motion

9    be granted and the settlement agreement be approved.

10             THE COURT:  All right.  Thank you very much.

11             Does anyone wish to be heard?

12             MR. TOP:  Your Honor, Frank Top --

13             THE COURT:  Yes.

14             MR. TOP:  -- from Chapman & Cutler on behalf of

15   U.S. Bank.

16             THE COURT:  How are you?

17             MR. TOP:  I'm doing very well.

18             We received no objections from any noteholders in

19   connection --

20             THE COURT:  Okay.

21             MR. TOP:  -- with this matter, and you'll be very

22   happy to know that the number of transactions in which U.S.

23   Bank is involved in in the non-distributed fund adversary is

24   dwindling.

25        (Laughter)

Page 68

1          THE COURT:  Good news -- good news for all

2    concerned.

3          MR. TOP:  That is true.  Thank you --

4          THE COURT:  Very good.

5          MR. TOP:  -- Your Honor.

6          THE COURT:  Thank you.

7          All right.  With that I'm happy to approve the

8    settlement.  It clearly is in the best interest of the

9    estate and complies with the relevant standards under Rule

10   9019 of the Bankruptcy Rules, and we will entertain an order

11   and enter it later today.

12         All right.  Next.

13         MR. FAIL:  Thank you, Your Honor.  Good morning.

14   For the record, Garrett Fail, Weil, Gotshal & Manges for the

15   plan administrator.

16         The next item on the agenda is a motion for

17   extension of the period to file objections to and request to

18   estimate claims.

19         The Court entered an order yesterday granting the

20   motion as to all of the more than 2,300 disputed claims for

21   which no objection was filed.  The plan administrator

22   requests that the Court grant the motion with respect to the

23   claim of Highlands CDO Opportunity Master Fund, L.P. today.

24         Causes exists to extend the objection deadline.

25   As described at the status conference earlier this month,

Page 69

1    tremendous progress has been made in the claims process and

2    significant work remains to be done.  Court approved

3    procedures granting discretion to the plan administrator

4    have fostered this success and efficiency of the progress to

5    date.

6            Earlier this month the plan administrator filed a

7    motion to estimate Highland's claim and 1,147 others at zero

8    for reserve and distribution purposes.  If Highland objects

9    to that motion, entry of a final order determining that

10   motion with respect to Highland's claim in particular may

11   not be -- may not occur prior to the expiration of the

12   current objection deadline.

13           It's premature today to predict whether any

14   further action with respect to Highland's claim will be

15   required, but there is no basis to distinguish the objection

16   period for Highland's claim from the period for other

17   claims.  Limiting the objection period for any claim would

18   only force the plan administrator to choose between

19   incurring unnecessary expenses and allowing meritless or

20   inflated claims.

21           The plan administrator requests that the Court

22   overrule Highland's objection and grant the motion.  Ms.

23   Volkov is present on behalf of Highlands and I'll yield the

24   podium to her --

25           THE COURT:  Okay.

Page 70

1          MR. FAIL:  -- unless Your Honor has any questions.

2          THE COURT:  All right.  That's fine.  Thank you.

3          MR. FAIL:  Thank you.

4          MS. VOLKOV:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MS. VOLKOV:  Ilana Volkov, Cole Schotz on behalf

7   of Highland CDO Opportunity Master Fund.  It's a pleasure to

8   appear for the first time before Your Honor.

9          THE COURT:  Welcome.

10          MS. VOLKOV:  Thank you.

11          So, Your Honor, several facts are undisputed.

12          THE COURT:  Well, wait.  Let's start --

13          MS. VOLKOV:  Sure.

14          THE COURT:  -- let's start very specifically

15   because a number of things happened, I believe, after you

16   filed your opposition.  And one of the main themes of your

17   opposition this time around and indeed before was lack of

18   transparency, lack of movement, and the like.

19          So now you know.  So the plan administrator wasn't

20   delaying for the cause of delay.  There was a logic to the

21   path that they were pursuing.  So now you have the benefit

22   of that and I -- I cannot understand what it is that you

23   think ought to happen next.

24          MS. VOLKOV:  Sure.

25          THE COURT:  And it is worth pointing out.  Your

Page 71

1   client -- you're the only objector.  Everybody else gets it

2   and is satisfied that the plan administrator, in good faith,

3   is proceeding in a logical and indeed expeditious fashion.

4          So I -- I just -- I don't understand why now with

5   the plan administrator having filed the motion to estimate

6   the claims, why there remains anything to talk about.

7          MS. VOLKOV:  Well, actually Your Honor raises a

8   very good point because we actually believe that the motion

9   is now moot.  Now that the plan administrator has declared a

10  process, the process being a claims estimation process, and

11  that motion was filed within the deadline that Judge Peck

12  set, we actually believe that the motion is moot.

13         THE COURT:  Well, but we're not -- we're not

14  wholly connecting them because, first of all, if you want to

15  consent to the estimation at zero, I'm sure the plan

16  administrator will be delighted and we could call it a day.

17  But I don't think that's what you're here to tell me.

18         MS. VOLKOV:  No.

19         THE COURT:  Okay.  So to the extent that you're

20  not going to agree to that or that there's not a disposition

21  consistent with what the plan administrator's requesting,

22  then the plan administrator has and is seeking, I believe,

23  to retain its rights to object to the claim on other

24  grounds.

25         MS. VOLKOV:  Correct.  And that's --

Page 72

```
 1              THE COURT:  And then simply order in logically the

 2    order in which it pursues those.  So it doesn't make sense

 3    now for the plan administrator to hypothetically, if you

 4    will, object to the Highland claim on those other grounds

 5    because depending upon what happens in the estimation, we

 6    may never get to it.

 7              So I -- I just -- I'm at a loss to understand what

 8    you're telling me.

 9              MS. VOLKOV:  Okay.

10              THE COURT:  I mean, it can't be -- I'm not going

11    to deprive the plan administrator of a potential further

12    substantive ground to object to the claim if that's the

13    direction that it goes.  I have no idea.  I obviously

14    haven't looked at the estimation motion yet.  But I'm

15    generally familiar and the general concept is that the

16    claimants are going to get the -- the guarantee claimants

17    are going to get paid in whole by the primary obligor,

18    Libby, and, therefore, there's nothing left to be paid.

19              But -- and I'm totally aware of all the law that

20    says that you have a full claim until it's paid in full.  I

21    get all that.  But I don't see the point of forcing the plan

22    administrator before the disposition of that action to file

23    what would be a completely hypothetical objection to

24    Highland's claim.

25              MS. VOLKOV:  Well, Your Honor, as I said, we think
```

Page 73

1    that the motion is moot.  Certainly, at least with respect

2    to the relief that seeks to extend the deadline to estimate

3    claims.  The plan administrator has filed the motion to

4    estimate claims.  So that part of the relief is now moot.

5              To the extent that the administrator still wants

6    to object to the claim, if the estimation motion is denied,

7    which we believe is frankly, Your Honor, highly prejudicial

8    to our client --

9              THE COURT:  What's prejudicial?

10             MS. VOLKOV:  -- the way -- well, the way that the

11   administrator has the timeline, the administrator has

12   embarked upon as well as the fact that --

13             THE COURT:  I don't --

14             MS. VOLKOV:  -- we could be --

15             THE COURT:  I don't understand that.

16             MS. VOLKOV:  Well, I'm trying to explain it.

17             THE COURT:  Okay.

18             MS. VOLKOV:  As well as the fact that Highlands

19   could be litigating with the plan administrator for years

20   and years and years to come.

21             So the plan --

22             THE COURT:  Wait.  Wait.  Wait.  Stop.  Stop.

23   Stop.  I -- it sounds terrible, but it's not true.  There's

24   going to be a disposition of the estimation motion, I don't

25   know what the time frame is --

Page 74

1          MS. VOLKOV:  It's in three weeks.

2          THE COURT:  Okay.

3          MS. VOLKOV:  Right.

4          THE COURT:  Right.

5          MS. VOLKOV:  Right.  So --

6          THE COURT:  So -- yes?

7          MS. VOLKOV:  Okay.  So --

8          THE COURT:  Well --

9          MS. VOLKOV:  -- if the -- if the estimation --

10         THE COURT:  -- I --

11         MS. VOLKOV:  -- motion is granted, Your Honor,

12    let's play this out.

13         THE COURT:  But I -- it might be being heard in

14    three weeks, but that doesn't mean I'm going to decide it in

15    three weeks.

16         MS. VOLKOV:  Understood.  But why -- why is the

17    relief -- why is the relief that the plan administrator

18    seeks to extend the deadline for entry of a final order

19    granting the estimation motion?  That's where I'm a little

20    bit lost with respect to the relief that the plan

21    administrator seeks because the way that the motion is

22    presented and was presented 18 months ago was an extension

23    of the deadline to file an estimation request.  It was not

24    an extension of the deadline to seek entry of a final and

25    non-appealable order either granting an estimation motion or

Page 75

1    allowing or disallowing a claim.

2              So I think there's perhaps a bit of a disconnect

3    here and that's why I say, Your Honor, I think with respect

4    to the -- at least with respect to the portion that seeks to

5    extend the plan administrator's deadline to file an

6    estimation motion, that motion is moot because that's

7    exactly what the plan administrator has done.

8              THE COURT:  Yeah.  Well, I'll let Mr. Fail respond

9    to that.  I don't know that I agree, but he can put his

10   words around --

11             MS. VOLKOV:  Okay.

12             THE COURT:  -- why I think -- I don't think that

13   is even accurate.  I fundamentally do not understand what

14   this fight is about.

15             MS. VOLKOV:  Well, the fight is about the fact

16   that --

17             THE COURT:  You want -- do you want to litigate --

18   you want to litigate on the merits of your claim --

19             MS. VOLKOV:  That's exactly what we've been asking

20   for.

21             THE COURT:  -- when I might estimate it at zero?

22             MS. VOLKOV:  Well, Your Honor, we -- that motion

23   is moot as to the estimation relief.  Okay.  That's the

24   first thing.

25             The second thing, Your Honor --

Page 76

1              THE COURT:  They might --

2              MS. VOLKOV:  Okay.  But can I just -- can I just

3      finish?  The other thing that I would like to see happen is

4      -- and this is actually a request that I had made to Mr.

5      Fail on several occasions after the estimation motion was

6      filed -- is the estimation motion is going to be heard in

7      three weeks.  I have no idea and Your Honor has no idea

8      what's going to happen in three weeks.  We have no idea who

9      else is going to object besides my client.

10             But it seems prudent to me to adjourn the motion

11     today and it's only obviously as to the Highland claim until

12     July, I think it's 22nd, which is the return date of the

13     estimation motion so that we have a much better picture as

14     to exactly what Your Honor is going to rule.  Your Honor may

15     deny the motion.

16             THE COURT:  I'm not going -- I'm not going to do

17     that.  I -- we're going to have the estimation motion.  I'm

18     going to do whatever it is I do either across the board or

19     individually or in some way to categorize the claims.  I

20     have no idea because I haven't looked at it yet.  If you

21     were here for my 10:00 calendar you heard my message loud

22     and clear that I'm going to move things along.

23             It makes no sense to proceed to litigate on the

24     merits of what I would call second level or second tier

25     potential objections to Highland's claim when it might may

Page 77

1    be resolved fully by the disposition of the estimation

2    motion which will proceed expeditiously.  There's no mystery

3    around it and it doesn't cause anybody to have to waste

4    resources litigating or even writing an objection on a piece

5    of paper.

6            I suppose the plan administrator could satisfy

7    your request by writing -- by putting the word objection on

8    a piece of paper and writing the words that to the extent

9    that the motion to estimate the Highland claim at zero is

10   denied, the plan administrator objects to the claim on

11   additional grounds.  That's -- what's the point of that?

12           MS. VOLKOV:  Well, but, Your Honor, the plan

13   administrator is not willing to do that.  The plan

14   administrator is not willing to do that so, perhaps, perhaps

15   and, you know, I haven't had a discussion with Mr. Fail

16   about it, but perhaps I can get a better understanding as to

17   exactly what they're seeking on July 22nd by way --

18           THE COURT:  They're seeking to estimate the claim

19   --

20           MS. VOLKOV:  I know.  But --

21           THE COURT:  -- at zero.

22           MS. VOLKOV:  But by way of due process.  Are we

23   having a substantive hearing on the merits of all these

24   claims on July 22nd or are we going to be embarking on

25   perhaps discovery and an actual hearing as to the estimation

Page 78

1    of the claim?  Maybe we will seek relief to say that the

2    claim should be estimated at $5 million, which is exactly

3    what the claim is valued today.  In other words, that's the

4    claim amount today was originally $10 million.  It's now

5    been reduced to $5 million.

6            So perhaps we can get a better understanding as to

7    whether this is essentially a summary judgment motion on

8    July 22nd --

9            THE COURT:  This is not a hearing on the motion to

10   estimate.  This is a hearing on one objection to a logical

11   and reasonable request by the plan administrator to continue

12   to proceed logically and expeditiously to deal with claims

13   in a manner that makes sense rather than object on grounds

14   that may not be relevant because the claim may be disposed

15   upon -- disposed of on other grounds.  It doesn't make sense

16   for anybody, including Highland, to force a litigation that

17   may not have to occur.

18           The premise of the estimation motion is that the

19   claims are being satisfied by other parties.  So to the

20   extent that you want to have a conversation with Mr. Fail,

21   he will be most happy, I'm sure, to discuss that with you.

22   Nothing's going to happen by ambush on the 22nd.

23           But the whole tone and theme of all your

24   objections thus far have been lack of transparency, Judge

25   Peck insisted on transparency, we have to know what's

Page 79

1   happening.  Now you know what's happening.  There's a motion

2   to estimate it at zero on the grounds that are set forth in

3   the motion.  There's going to be a hearing.  I actually

4   don't know what the contours of that hearing look like.  Mr.

5   Fail will tell you.  If you have a problem with that, you

6   can contact me.  I will move it along.

7            But I'm not going to insist that the plan

8   administrator file a claims objection that at this juncture

9   is unnecessary either to advance the ball or to inform your

10  client and proceed down a litigation path that may be wholly

11  unnecessary.

12           If the estimation motion doesn't succeed with

13  respect to -- with respect to your client, I'll hold their

14  feet to the fire to file an objection expeditiously on

15  whatever grounds that may remain.

16           MS. VOLKOV:  Okay.  I appreciate that, Your Honor,

17  and I still would, you know, respectfully request the Court

18  to rule that the -- at least the request to estimate the

19  claim or to extend --

20           THE COURT:  Well --

21           MS. VOLKOV:  -- has been rendered moot.

22           THE COURT:  -- I'll let Mr. Fail respond to that.

23  I think I know what his answer is going to be, but --

24           MS. VOLKOV:  Thank you.

25           THE COURT:  -- but let me hear what he has to say.

Page 80

1           MR. FAIL:  Thank you, Your Honor, and I won't take

2      much time to --

3           THE COURT:  Okay.  So --

4           MR. FAIL:  -- to go over points --

5           THE COURT:  -- with respect to the point about the

6      extension of the time to make a motion to estimate, what's

7      the response?

8           MR. FAIL:  It's not moot at all, Your Honor.  As

9      Your Honor identified, there are many claims that are

10     subject to the motion.  There are no objections on file yet.

11     We don't know what the contours of any hearing will be.

12          THE COURT:  But counsel's point is that you wanted

13     an extension of time to make a motion to estimate.  You've

14     now made a motion to estimate, so why do you need an

15     extension of time?

16          MR. FAIL:  The same reason that we -- that we

17     sought the extension the last time from -- for claims that

18     were pending an objection.  In the event that a summary

19     objection is not granted at a sufficiency hearing, at a

20     sufficiency level hearing, the plan administrator has not

21     yet or may not have yet analyzed each of the claims.

22          For example, in this one case in particular it's

23     based on -- I think a master repurchase agreement with

24     Libby.  The plan administrator -- there is no specific

25     guarantee so for the plan administrator to value a

Page 81

1   transaction which it doesn't believe is a guarantee, that's

2   a threshold issue that we would -- we would have a

3   sufficiency hearing on, whether or not they asserted a claim

4   that's even a valid claim before we value repurchase

5   agreements.

6           We would also --

7           THE COURT:  And that --

8           MR. FAIL:  -- and under the --

9           THE COURT:  And that in and of itself would be --

10          MR. FAIL:  That's --

11          THE COURT:  -- an estimation hearing or --

12          MR. FAIL:  Well, no, Your Honor.

13          THE COURT:  -- a sufficiency hearing.

14          MR. FAIL:  That could be a sufficiency hearing.

15          Also, the estimation motion points out in order

16  for a party to receive a distribution, you know, it cannot

17  have received from Libby.  Ms. Volkov hasn't stated how much

18  of the $5 million Highland has already received from Libby.

19          You know, there's also other issues, it's a

20  Bermudian company:  Does it have assets; is it one of the

21  Highland funds that was in -- that became insolvent in '08,

22  '09; can it repay enough.  There's a lot that can have to

23  follow from an estimation hearing before we move onto an

24  objection and spend resources and divert the court's time.

25          And the only last thing that I would add is, Your

Page 82

1   Honor, in terms of, you know, Highland or any other party

2   moving to, you know, bring their claim forward, the claims

3   process was designed to give the plan administrator the

4   discretion in order to allow the plan administrator to

5   schedule a sufficiency hearing before discovery is taken, in

6   order for the plan administrator to put a matter into an ADR

7   process before burdening the Court, and allowing any one

8   creditor to jump the line to -- with respect to its claim

9   because it believes it's more important than any of the

10  billions of others, you know, we think would be the wrong

11  message to send to creditors.  And it would be --

12          THE COURT:  Well, to the extent that -- and I'm

13  not going to turn this into a hearing on the motion to

14  estimate.  But to respond to counsel's concern about having

15  a full and better understanding of what you anticipate or

16  expect or tee up on the hearing, you should have a

17  conversation with counsel.

18          MR. FAIL:  Absolutely.

19          THE COURT:  And -- but it's a two-way conversation

20  because to the extent that the plan administrator is seeking

21  to understand the amount that has already been paid by Libby

22  on the -- with respect to the claim, that informs the

23  process going forward --

24          MR. FAIL:  Certainly.

25          THE COURT:  -- and could substantially narrow the

Page 83

1   field.

2           So it is -- it is a two-way street.  And I think

3   you both ought to talk to each other and see if there's a

4   more cooperative way to move this forward.

5           MR. FAIL:  Absolutely, Your Honor.

6           THE COURT:  All right.  All right.  Anything

7   further from Highland?

8           MS. VOLKOV:  I mean, I -- Your Honor, I'm sorry.

9   I didn't really hear a response, but I'm not going to

10  belabor the point.  Your Honor will do --

11          THE COURT:  What do you mean you didn't hear a

12  response?

13          MS. VOLKOV:  I didn't hear a direct response to

14  the question of why they need additional time to seek to

15  estimate Highland's claim.

16          THE COURT:  Because there --

17          MS. VOLKOV:  So --

18          THE COURT:  Because there may be further

19  proceedings that are required.

20          MS. VOLKOV:  Right.  But the further proceedings

21  are all going to be encompassed either under 502(c) or to

22  the extent Your Honor denies that motion, they are going to

23  be filing, again, a sufficiency or an objection, whatever

24  you want to call it.  But it's either, in my mind, an

25  estimation or it's a claim objection.

1            So, again, I don't want to belabor the record,

2     Your Honor, but I'm still sort of at a loss as to why --

3            THE COURT:  You want to try it one more time, Mr.

4     Fail.

5            MS. VOLKOV:  That part of the relief --

6            MR. FAIL:  The plan administrator -- what -- I

7     think what Highland wants us to say in a couple of different

8     ways is that we've analyzed -- and which I'm not willing to

9     do -- is that we've analyzed the claim fully; that we know

10    the valuations; that we're prepared to lodge every either

11    objection or motion to estimate.  And the plan administrator

12    isn't prepared to do that because it doesn't want to spend

13    the resources to, you know, swat a fly 20 times if the first

14    time killed it.

15            THE COURT:  So let me restate that.  So there

16    might be an additional motion to estimate --

17            MR. FAIL:  There may very well be additional

18    motions to estimate.

19            THE COURT:  That's his point.  Okay.  That's the

20    point.  That's what my surmise was before Mr. Fail spoke the

21    first time.  That's what I understood him to be saying.  But

22    the fundamental point that I'm going to come back to, and I

23    think we've already belabored this enough, is that this is

24    not a case of the plan administrator keeping a party in the

25    dark and refusing to budge.

Page 85

1          I understand that we are as many years out as we

2    are.  But it -- there's a logic to the manner in which it's

3    moving forward.  It is moving forward.  And we've now opened

4    a dialogue and there's going to have to be a dialogue with

5    respect to anybody who is interested in dialoging that will

6    move things forward.

7          So the objection is overruled with respect to

8    Highland and the extension of time will be granted across

9    the board.

10          MS. VOLKOV:  Thank you.

11          THE COURT:  All right.

12          MR. FAIL:  Thank you, Your Honor.

13          THE COURT:  Thank you very much.

14          Is there anything else, Mr. Fail?

15          MR. FAIL:  Your Honor, there is one more item that

16    is not -- was not on the agenda.

17          On behalf of the Chapter 11 estates and its

18    professionals, I would like to take a moment to acknowledge

19    and thank Ms. Stacy Lutkiss (ph) for her years of service as

20    a judicial clerk to the court.

21          To add some historical context, Ms. Lutkiss's

22    first day on the -- with the Court was in April of 2009 on a

23    day when Weil and other professionals were first filing

24    their first interim fee applications in these cases.  The

25    docket was 3,342, more than 46,800 docket entries ago.

1           It was before the bar date and the subsequent

2   filing of 69,000 claims.  Ms. Lutkiss was there through the

3   filing in 2010 of a subcon (sic) plan and the filings of a

4   non-con plan and the historic confirmation of Lehman's

5   compromised plan in 2011.

6           Ms. Lutkiss served the Court through hearings to

7   consider complex adversary proceedings, contested matters,

8   sales, settlements, protocols and orders in aid of execution

9   of the confirmed plan.

10           As importantly, Your Honor, for years Ms. Lutkiss

11   was the everyday resource for both the estate's

12   professionals and all parties in interest in these cases,

13   ensuring that all parties' voices were heard and all matters

14   received the attention they were due.

15           Her dedication and availability were undeterred by

16   weather, natural disaster, personal illness or personal

17   travel.  Her dedication to the Court in these cases in

18   particular cannot be understated and was not unnoticed.

19   All creditors in these cases have benefited from her

20   service.

21           As a small token of tremendous appreciation, and

22   with the understanding that a clean break from Lehman can be

23   difficult, with the Court's permission I would like to

24   present Ms. Lutkiss with some abandoned property.

25           THE COURT:  I assume that any such items and the

Page 87

1   giving of them to Ms. Lutkiss are consistent with applicable

2   ethical guidelines --

3              MR. FAIL:  They are.

4              THE COURT:  -- that are --

5              MR. FAIL:  They are non-failable and there's no

6   market value for these goods.

7              The first item is a vintage 2008 edition Lehman

8   Brothers hat.  We have some Lehman luggage tags for your

9   travel, and a Lehman mouse pad for her success in future

10  desktop endeavors.  And with your permission, Your Honor,

11  I'll present it to Ms. Lutkiss.

12             THE COURT:  Yes.  You may approach, Mr. Fail.

13       (Pause)

14             MR. FAIL:  Thank you, Your Honor.  That's all .

15             THE COURT:  Thank you.

16             MR. FAIL:  That's all that we have.

17             THE COURT:  Does anyone else wish to be heard?

18             MR. PECK:  Oh, excuse me, Your Honor.  Excuse me.

19  And I apologize for interrupting.

20             THE COURT:  Sir --

21             MR. PECK:  My name is --

22             THE COURT:  -- can I help you?

23             MR. PECK:  My name is -- yeah.  My name is James

24  M. Peck.

25             THE COURT:  Yes.

1          MR. PECK:  I am admitted to practice in the

2    Southern District of New York.  I'm requesting this

3    opportunity to be heard now.

4          THE COURT:  But aren't you located --

5          MR. PECK:  I'm just --

6          THE COURT:  -- in --

7          MR. PECK:  I'm just a --

8          THE COURT:   Aren't you located in Manhattan, Mr.

9    Peck?

10         THE COURT:  I'm sorry.  I'm just a short subway

11   ride away.  But for cause shown I request -- I would humbly

12   request your indulgence and waiver of chambers rule to

13   appear by telephone so I can say a few words of warm

14   appreciation regarding Stacy Lutkiss.  Would that be okay?

15         THE COURT:  Just this once.  Yes, you may proceed,

16   Mr. Peck.

17         MR. PECK:  Thank you.  Thank you, Your Honor.

18         May it please the Court?  I am the former United

19   States Bankruptcy Court Judge who presided in this Court

20   over the Lehman bankruptcy cases from September 15, 2008

21   until my retirement in January of 2014.

22         I was truly fortunate that Stacy Lutkiss was my

23   law clerk for the last five years of my judicial tenure.

24   She was and remains an enormously valuable asset to the

25   Court and helped me to research and write some of the most

Page 89

1     important decisions that were issued in the Lehman cases.

2          She served me and the parties who appeared before

3     me in cases large and small very well.  And she provided

4     wise counsel and thoughtful, always dependable assistance to

5     me in managing the largest and most complex insolvency cases

6     in history.

7          She is a person of uncommonly good humor and sound

8     judgment, and she is a trusted colleague.  I wish her great

9     success and personal satisfaction as she leaves the familiar

10    surroundings of One Bowling Green for the green, not

11    necessarily greener, academic quadrangles of upstate New

12    York.

13         Stacy, many thanks for your outstanding service

14    and best of luck to you.

15         THE COURT:  Thank you, Mr. Peck.

16         MR. PECK:  Thank you, Your Honor.

17         THE COURT:  Thank you.  Have a good day.

18         I think we're adjourned.

19         MR. FAIL:  Thank you, Your Honor.

20         THE COURT:  Thank you very much.

21    (Whereupon, these proceedings concluded at 11:32 a.m.)

22

23

24

25

Page 90

1                        I N D E X

2

3                         RULINGS

4    DESCRIPTION                              PAGE      LINE

5    Doc #2 Motion of Lehman Brothers Holdings

6    Inc. and Structured Asset Securities

7    Corporation for an Order to Enforce the

8    Modified Third Amended Joint Chapter 11

9    Plan of Lehman Brothers Holdings Inc. and

10   Its Affiliated Debtors and Stay a Related

11   Third-Party Action                       --        --

12

13   Doc #3 Lehman's Motion for Entry of an

14   Order (A) Authorizing the Filing of Certain

15   Information Under Seal in Connection with

16   Lehman's Adversary Proceeding Against U.S.

17   Bank N.A., Syncora Guarantee, Inc., and

18   GreenPoint Mortgage Funding, Inc., and

19   Lehman's Motion for Stay of the GreenPoint

20   Litigation, and (B) Granting Related Relief  --      --

21

22   Doc #49703 Motion for Approval of Settlement

23   Agreement Relating to Airlie LCDO I

24   (Aviv LCDO 2006-3) Credit Default Swap

25   Agreement and Indenture                  68        7

Page 91

1                               I N D E X

2

3                                RULINGS

4    DESCRIPTION                                 PAGE       LINE

5    Doc #49709 Motion of Lehman Brothers

6    Holdings Inc. for Extension of the Period

7    to File Objections to and Requests to

8    Estimate Claims                              85          7

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 92

1                        C E R T I F I C A T I O N

2

3      I, Sherri L. Breach, certify that the foregoing transcript

4      is a true and accurate record of the proceedings.

5

6      Sherri L          Digitally signed by Sherri L Breach
       Breach            DN: cn=Sherri L Breach, o, ou,
                         email=digital1@veritext.com, c=US
7      _____  Date: 2015.07.02 14:46:15 -04'00'

8      SHERRI L. BREACH

9      AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10

11

12     DATE:  July 2, 2015

13

14

15

16

17

18

19

20

21

22     Veritext Legal Solutions

23     330 Old Country Road

24     Suite 300

25     Mineola, NY 11501