KAYE SCHOLER LLP
Madlyn Gleich Primoff, Esq.
250 West 55th Street
New York, New York 10019-9710
(212) 836-8000
madlyn.primoff@kayescholer.com

*Attorneys for Spanish Broadcasting System, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
|  |  |
|---|---|
| In re | : Chapter 11 |
|  | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No. 08-13555 (SCC) |
|  | : |
| Debtors. | : Jointly Administered |
------------------------------------------------------------------------x

**MEMORANDUM OF LAW OF SPANISH BROADCASTING SYSTEM, INC. IN
OPPOSITION TO MOTION BY LEHMAN BROTHERS HOLDINGS INC. FOR
SUMMARY JUDGMENT PURSUANT TO RULE 7056 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE REGARDING CLAIM 67707
<u>FILED BY SPANISH BROADCASTING SYSTEM, INC.</u>**

# TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ................................................................ 1

II.     STATEMENT OF FACTS ................................................................... 4

Spanish Broadcasting's Capital Structure.................................................... 4

Spanish Broadcasting's Draw and Lehman's Failure to Fund...................... 7

Spanish Broadcasting Could Not Obtain Alternative Financing Following Lehman's
Failure to Fund the Draw ............................................................................ 8

Spanish Broadcasting Suffered Damages As a Direct Result of Lehman's Breach of Its
Obligation to Fund the Revolver................................................................... 9

The Payoff Letter Negotiations Between Lehman and Spanish Broadcasting Demonstrate
That the Parties Did Not Intend for the Alleged Consequential Damages Waiver to Be
Effective Following the Termination of the Credit Agreement...................... 10

Based on the Terms of the Payoff Letter, the Alleged Consequential Damages Waiver
Contained in the Credit Agreement Is Not Enforceable ............................... 16

Lehman's Objection to the Proof of Claim................................................... 17

III.     ARGUMENT AND LEGAL STANDARD ................................... 18

IV.     DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY
JUDGMENT ON THE ENFORCEABILITY OF THE ALLEGED WAIVER OF
CONSEQUENTIAL DAMAGES ................................................... 19

      A.     Spanish Broadcasting Will Demonstrate At Trial That the Parties Did Not
Intend for the Alleged Waiver to be Effective or Enforceable Following
the Parties' Entry Into the Payoff Letter ............................................ 20

      B.     Lehman's Arguments Regarding the Enforceability of the Alleged Waiver
Are Unavailing................................................................................... 23

           1.     Spanish Broadcasting and Lehman Were Capable of Terminating
the Alleged Waiver .................................................................. 23

           2.     The Payoff Letter Did Not Terminate Only Future Obligations of
Spanish Broadcasting............................................................... 24

           3.     Lehman Did Not Preserve Its Defenses Under the Alleged Waiver......... 25

Page

V.    DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY
      JUDGMENT ON THE CHARACTERIZATION OF SPANISH
      BROADCASTING'S DAMAGES AS CONSEQUENTIAL DAMAGES
      RATHER THAN DIRECT DAMAGES ........................................................................ 26

      A.    The Question of Whether Damages Are Direct or Consequential Is a
            Question of Fact .................................................................................................. 28

      B.    Spanish Broadcasting Will Demonstrate At Trial That the Impacted
            EBITDA Damages Are Direct Damages ............................................................. 29

      C.    Spanish Broadcasting Will Demonstrate At Trial That the Swap Damages
            Are Direct Damages ............................................................................................ 33

CONCLUSION ..................................................................................................................... 34

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. List Corp. v. U.S. News & World Report, Inc.*,
  75 N.Y.2d 38 (N.Y. 1989) ...............................................................................26, 27

*American Elec. Power Co. v. Westinghouse Elec. Corp.*,
  418 F. Supp. 435 (S.D.N.Y. 1976) .........................................................................27

*Beatty v. Guggenheim Exploration Co.*,
  225 N.Y. 380 (N.Y. 1919) (Cardozo, J.).................................................................23

*In re Caldor, Inc.*,
  217 B.R. 121 (Bankr. S.D.N.Y. 1998)....................................................................20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................18

*Combustion Sys. Servs, Inc. v. Schuykill Energy Res., Inc.*,
  No. CIV. A. 92-4228, 1993 WL 496946 (E.D. Pa. Nov. 19, 1993) .......................27

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
  650 F. Supp. 2d 314 (S.D.N.Y. 2009).....................................................................28

*In re Dana Corp.*,
  574 F.3d 129 (2d Cir. 2009)...............................................................................18, 19

*E. Brass & Copper Co. v. Gen. Elec. Supply Corp.*,
  101 F.Supp. 410 (S.D.N.Y. 1951) ..........................................................................28

*Echelon Int'l Corp. v. Am. W. Airlines, Inc.*,
  85 F. Supp. 2d 313 (S.D.N.Y. 2000).......................................................................25

*Employees' Retirement System of Alabama v. RTC*,
  840 F.Supp. 972 (S.D.N.Y. 1993) ..........................................................................31

*FDIC v. Parkway Exec. Office Ctr.*,
  No. 96–121, 1998 WL 18204 (E.D. Pa. Jan. 9, 1998) ...........................................31

*Indus. Window Corp. v. Fed. Ins. Co.*,
  609 F. Supp. 2d 329 (S.D.N.Y. 2009).....................................................................22

*KSW Mech. Servs. v. Johnson Controls, Inc.*,
  992 F. Supp. 2d 135 (E.D.N.Y. 2014) ....................................................................26

Page(s)

*Latham Land I, LLC v. TGI Friday's, Inc.*,
  96 A.D.3d 1327 (N.Y. App. Div. 3d Dep't June 28, 2012) ........................................26, 31, 32

*Litton Fin. Printing Div. v. N.L.R.B.*,
  501 U.S. 190 (1991) ..............................................................................................................25

*Martin v. Peyton*,
  246 N.Y. 213 (N.Y. 1927) .....................................................................................................23

*In re Miraj and Sons, Inc.*,
  192 B.R. 297 (Bankr. D. Mass. 1996) ...................................................................................31

*NetTech Solutions, L.L.C. v. ZipPark.com*,
  No. 01 CIV. 2683 (SAS), 2001 WL 1111966 (S.D.N.Y. Sept. 20, 2001) ..................19, 20, 25

*New York & Suburban Fed. Sav. & Loan Ass'n v. Inter-Island Mortgagee Corp.*,
  54 A.D.2d 583, 387 N.Y.S.2d 155 (N.Y. App. Div. 2nd Dep't 1976) ...................................24

*Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*,
  No. 88–CV–819, 1992 WL 121726 (N.D.N.Y. May 23, 1992) .......................................27, 28

*Phoenix Warehouse of Calif., LLC v. Townley, Inc.*,
  No. 08 Civ. 2856 (NRB), 2011 WL 1345134 (S.D.N.Y. Mar. 29, 2011) ..............................28

*PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*,
  No. 12 Civ. 8570 (PAE), 2014 WL 7146357 (S.D.N.Y. Dec. 15, 2014) ...............................28

*Ramseur v. Chase Manhattan Bank*,
  865 F.2d 460 (2d Cir. 1989) ..................................................................................................18

*Rodriguez v. City of New York*,
  72 F.3d 1051 (2d Cir. 1995) ......................................................................................18, 19, 20

*Scientific Components Corp. v. Raytheon Co.*,
  No. M 82 (HB), (2005 U.S. Dist. LEXIS 13087 (S.D.N.Y. June 29, 2005) ..........................23

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
  592 F.3d 329 (2d Cir. 2010) ............................................................................................31, 32

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007) ....................................................................................................27

*Twitchell v. Town of Pittsford*,
  106 A.D.2d 903 (N.Y. App. Div. 4th Dep't 1984), *aff'd*, 66 N.Y.2d 824 (N.Y.
  1985) .....................................................................................................................................23

*U.S. v. Am. Society of Composers, Authors & Publishers*,
  No. Civ. 13-95 (WCC), 1989 U.S. Dist. LEXIS 16907 .........................................................23

Page(s)

*In re Vivaro Corp.*,
  No. 12-01928 (MG), 2014 WL 486288 (Bankr. S.D.N.Y. Feb. 6, 2014)...............................28

**Statutes**

U.C.C. § 2-714(2) ....................................................................................................................32

U.C.C. § 2-715(2) ....................................................................................................................32

**Rules**

Fed. R. Civ. P. 56(a) ..........................................................................................................18, 19

F.R.E. 704 ................................................................................................................................30

Local Bankruptcy Rule 7056-1 .................................................................................................4

**Other Authorities**

8-40 Corbin on Contracts § 40.13...........................................................................................23

Glenn D. West, Sara G. Duran, *Reassessing the "Consequences" of
  Consequential Damage Waivers in Acquisition Agreements*, 63 Bus. Law. 777
  (May 2008)..............................................................................................................................32

Spanish Broadcasting System, Inc. ("Spanish Broadcasting"), by and through its

undersigned attorneys, for its opposition to the summary judgment motion (the "Motion") [Dkt

No. 50033], dated June 18, 2015, filed by Lehman Brothers Holdings Inc. (together with its

affiliates, "Lehman") with respect to Spanish Broadcasting's proof of claim number 67707 (the

"Proof of Claim"), respectfully states as follows:

## I.    PRELIMINARY STATEMENT

The issue at the heart of Lehman's Motion concerns the enforceability (or lack thereof) of

an alleged waiver of consequential damages (the "Alleged Waiver") contained in the Credit

Agreement (as defined below) to which Lehman and Spanish Broadcasting were parties.

Lehman contends that the Alleged Waiver bars Spanish Broadcasting from recovering the

damages it suffered as a result of Lehman's breach of the Credit Agreement.    Lehman's

contention is erroneous, however, for at least two reasons.    One, for the reasons set forth below

and in the accompanying declaration (the "Gittlitz Declaration") of Sheryl Gittlitz, the Alleged

Waiver of consequential damages is ineffective and unenforceable based on the terms of the

payoff letter (the "Payoff Letter"), dated February 7, 2012, entered into between Lehman and

Spanish Broadcasting, which Payoff Letter terminated the Credit Agreement, including the

Alleged Waiver.

Two, even if the Alleged Waiver were enforceable (which it is not), the damages sought

pursuant to Spanish Broadcasting's Proof of Claim (including but not limited to the Impacted

EBITDA Damages and the Swap Damages (each as defined below)) constitute direct damages

rather than consequential damages, for the reasons discussed at length below and in the

accompanying (a) declaration (the "Garcia Declaration") of Joseph A. Garcia, Spanish

Broadcasting's CFO; (b) expert report (the "Trautman Report") of James Trautman of Bortz

Media & Sports Group, Inc., Spanish Broadcasting's media expert; and (c) expert report (the

"Kearns Report") of Christopher J. Kearns of Berkeley Research Group, LLC ("BRG"), Spanish

Broadcasting's financial advisor.[1]

At the April 27, 2015 conference before the Court, Lehman sought authorization from the

Court to file its Motion for summary judgment, and requested discovery solely with respect to

documents of Kaye Scholer LLP ("Kaye Scholer") and Weil, Gotshal & Manges LLP ("Weil"),

as counsel for Spanish Broadcasting and Lehman, respectively, regarding the negotiation and

execution of the Payoff Letter.  See Garcia Declaration, Ex. K (transcript of April 27, 2015

conference), at 30:18-35 ("We'll have all the emails back and forth on the payoff letter. . . .  And

we think that's -- we think we can look at that and determine whether there is a summary

judgment [sic] or not.").  After the parties exchanged the requested discovery, Lehman asserted

that it had a sufficient basis to proceed with its Motion for summary judgment.  See Garcia

Declaration, Ex. M (May 15, 2015 email from Weil to Kaye Scholer stating that "[w]e have

reviewed the production Kaye Scholer made on Monday, and concluded that LBHI has a

sufficient basis to move for summary judgment.").

Notwithstanding that Lehman sought the discovery from Weil and Kaye Scholer

regarding the details of the parties' negotiations concerning the Payoff Letter, Lehman's Motion,

tellingly, contains no discussion whatsoever about the communications surrounding the

negotiation and execution of the Payoff Letter.  It is little wonder why Lehman chose to

disregard this substantial documentary record.  Indeed, the communications between Kaye

Scholer and Weil either firmly establish that the Alleged Waiver did not survive the termination

of the Credit Agreement or, at a minimum, make clear that a genuine issue of material fact exists

---

[1]  The former members and senior professionals at Capstone Advisory Group, LLC joined BRG
on June 1, 2015.

as to whether the parties intended for the Alleged Waiver to be ineffective and unenforceable following the parties' entry into the Payoff Letter. Either situation <u>mandates</u> the denial of Lehman's Motion.

As set forth at length below and in the Gittlitz Declaration, Spanish Broadcasting and Lehman carefully negotiated the terms of the Payoff Letter over a nine day period between January 30, 2012 and February 7, 2012. The Gittlitz Declaration discusses at length the facts surrounding the parties' negotiations, including the negotiations surrounding the two survival provisions in the Payoff Letter, neither of which provide for the survival of the Alleged Waiver. More particularly, Section 1(a) of the Payoff Letter provides that all of Spanish Broadcasting's "obligations" under the Credit Agreement (including Spanish Broadcasting's obligation to waive its right to claim or recover consequential damages pursuant to the Alleged Waiver) would terminate, except where the Credit Agreement "**expressly**" provided for survival. Section 4 of the Payoff Letter provides for the survival of Spanish Broadcasting's Proof of Claim. Ms. Gittlitz would testify at trial that the parties intended for the Proof of Claim to survive but not for the Alleged Waiver to survive.

Viewing the facts in the light most favorable to Spanish Broadcasting and drawing all inferences in favor of Spanish Broadcasting – as the Court is required to do on this Motion for summary judgment – Lehman has failed to meet its burden of proving that there is no genuine dispute as to any material fact and that Lehman is entitled to judgment as a matter of law. Accordingly, the Motion for summary judgment should be denied in its entirety.

Even assuming, without conceding, that the Alleged Waiver were effective and enforceable (which it is not), the Motion should be denied for the independent reason that there exist numerous disputed issues of material fact concerning the characterization of Spanish

Broadcasting's damages as direct or consequential, as discussed more fully below and in the
Garcia Declaration, the Trautman Report and the Kearns Report.  As set forth at length below,
the question of whether damages are direct or consequential is a question of fact that must be
reserved for trial.  Accordingly, there are disputed issues of material fact regarding the proper
characterization of Spanish Broadcasting's damages which preclude summary judgment as a
matter of law.

## II.   STATEMENT OF FACTS[2]

### Spanish Broadcasting's Capital Structure

Spanish Broadcasting is the largest publicly traded Hispanic-controlled media and
entertainment company in the United States.  See Garcia Declaration, ¶ 2.  Spanish Broadcasting
owns 20 radio stations located in the top U.S. Hispanic markets of New York, Los Angeles,
Miami, Chicago, San Francisco and Puerto Rico, airing the Spanish Tropical, Regional Mexican,
Spanish Adult Contemporary, Top 40 and Latin Rhythmic format genres.  *Id.*  Spanish
Broadcasting also operates AIRE Radio Network, a national radio platform which creates,
distributes and markets leading Spanish-language radio programming to over 100 affiliated
stations reaching 88% of the U.S. Hispanic audience.  *Id.*  In addition, Spanish Broadcasting
owns Mega TV, a television operation with over-the-air, cable and satellite distribution and
affiliates throughout the U.S. and Puerto Rico.  *Id.*  Spanish Broadcasting also produces live

---

[2]  The relevant facts are set forth at length in the following documents that Spanish Broadcasting
is filing contemporaneously herewith:  (a) the Garcia Declaration; (b) the Gittlitz Declaration;
(c) the Trautman Report, a copy of which is attached as Exhibit 1 to the accompanying
declaration (the "Primoff Declaration") of Madlyn Gleich Primoff, dated July 23, 2015; (d) the
Kearns Report, a copy of which is attached as Exhibit 2 to the Primoff Declaration; and
(e) Spanish Broadcasting's response to Lehman's statement of facts pursuant to Local
Bankruptcy Rule 7056-1 and counterstatement of additional material facts as to which there is a
genuine issue to be tried (the "Rule 7056 Counterstatement").

concerts and events and owns 21 bilingual websites, including www.LaMusica.com, an online destination and mobile app providing content related to Latin music, entertainment, news and culture. *Id.*

Dating back to Spanish Broadcasting's IPO in 1999, Lehman had a longstanding business relationship with Spanish Broadcasting as Spanish Broadcasting's trusted financial advisor and arranger of financings. *Id.* at ¶¶ 3-6.

As Spanish Broadcasting's trusted advisor, Lehman was well aware of the financial needs of Spanish Broadcasting and structured the financial arrangements under and in connection with the Credit Agreement accordingly. *Id.* at ¶ 8. To that end, Lehman arranged for Spanish Broadcasting to enter into the Credit Agreement, which included a first lien term loan facility of $325,000,000, required (at Lehman's insistence) that Spanish Broadcasting enter into the Swap with Lehman Brothers Special Financing, Inc., and also included, with Lehman's advice and counsel, a revolving credit facility of $25 million. *Id.* Lehman's counsel drafted the Credit Agreement. *Id.*

Lehman worked with Spanish Broadcasting to put the revolving credit facility in place. *Id.* at ¶ 9. Lehman plainly understood and, indeed, advised Spanish Broadcasting that it should have the revolving credit facility to support the ongoing working capital needs of Spanish Broadcasting. *Id.* Indeed, Section 4.16(b) of the Credit Agreement provided that the proceeds of the revolving credit facility "**shall be used for working capital purposes, capital needs and general corporate purposes**" of Spanish Broadcasting. See Garcia Declaration, ¶ 9, Ex. B (Credit Agreement), § 4.16(b) (emphasis added). Lehman took on the obligation to fund 40 percent (*i.e.*, $10 million) of the $25 million revolving credit facility. *Id.* at ¶ 9. At the time the parties entered into the Credit Agreement and thereafter, Lehman understood that if it failed to

fund the revolver, Spanish Broadcasting would be left without the funds it needed for "working capital purposes, capital needs and general corporate purposes," and Spanish Broadcasting would suffer damages as a result. *Id.*

As of October 2008, Spanish Broadcasting's capital structure also included $18.5 million in indebtedness under a secured promissory note (the "Mega TV Note"), dated March 1, 2006, among, *inter alia*, Spanish Broadcasting, as maker, and BC Media Funding Company II, LLC, as holder and assignee. *Id.* at ¶ 10, Ex. C (Mega TV Note), Ex. D (Security Agreement). The Mega TV Note had an impending maturity date of January 2, 2009. *Id.* The lender under the Mega TV Note was unwilling to extend the maturity date. *Id.* As a business matter, Spanish Broadcasting could not risk a default on the Mega TV Note because such a default would have triggered a cross-default under the Credit Agreement. *Id.* at ¶ 10, Ex. B (Credit Agreement), §§ 1.1 (definition of "Event of Default"), 8(e). It was essential that Spanish Broadcasting not take any action that would cause a default under the Credit Agreement because, among other things, the Credit Agreement had a below-market interest rate. *Id.* at ¶ 10.

In addition, Spanish Broadcasting was a guarantor under a note (the "MBC Note"), dated January 4, 2007, between SBS Miami Broadcast Center, Inc. and Wachovia Bank, National Association. See *Id.* at ¶ 11, Ex. E (MBC Note), Ex. F (Unconditional Guaranty (the "MBC Guaranty")). The MBC Guaranty required Spanish Broadcasting to hold cash equal to at least 1.2 times the outstanding principal balance under the MBC Note. *Id.* at ¶ 11, Ex. F (MBC Guaranty), at 6. As of September 30, 2008, $7.1 million remained outstanding under the MBC Note; therefore, Spanish Broadcasting was required to hold $8.5 million in cash. *Id.* at ¶ 11.

Spanish Broadcasting also issued certain preferred stock (the "Preferred Stock") pursuant to a Certificate of Designations, dated October 29, 2003 (the "Certificate of Designations"). See

*id.* at ¶ 12, Ex. G (Certificate of Designations).  The Certificate of Designations provided for the payment of quarterly cash dividends in the amount of $2.5 million, commencing on January 15, 2009.  *Id.* at ¶ 12.  Pursuant to the Certificate of Designations, Spanish Broadcasting could not incur additional indebtedness in October 2008 because its Debt to Cash Flow Ratio (as defined in the Certificate of Designations) was greater than 7 to 1.  *Id.* at ¶ 12, Ex. G (Certificate of Designations), § 11(b).

## Spanish Broadcasting's Draw and Lehman's Failure to Fund

Spanish Broadcasting held approximately $34 million in cash as of September 30, 2008. *Id.* at ¶ 13.  Of that amount, Spanish Broadcasting was required to hold $8.5 million in cash pursuant to the MBC Guaranty, as set forth above, which left $25.5 million of available cash.  *Id.* In view of the impending maturity of the $18.5 million Mega TV Note on January 2, 2009, Spanish Broadcasting would have remaining cash of only $7 million -- without even taking into account the $5 million December interest payment under the Credit Agreement and presuming that Spanish Broadcasting made the $2.5 million dividend payment on the Preferred Stock in kind rather than in cash (such in kind payment was made on October 15, 2008).  *Id.* Accordingly, Spanish Broadcasting determined that it needed to draw the full $25 million available under the revolver for working capital.  *Id.*

On October 3, 2008, Spanish Broadcasting submitted a draw request (the "Draw") in accordance with the terms of the Credit Agreement for the entire $25 million of availability under the revolver.  *Id.* at ¶ 14.  Spanish Broadcasting intended to use the $25 million Draw plus a portion of cash on hand in order to (a) pay off the $18.5 million Mega TV Note, which had a maturity date of January 2, 2009; (b) terminate the Swap with Lehman and close out approximately $6 million of obligations thereunder; (c) fund $4 million of Spanish Broadcasting's operational expenses, specifically advertising, promotional and other marketing

expenses (collectively, "Marketing Expenses"); and (d) pay the $5 million December interest payment under the Credit Agreement. *Id.*

LCPI commenced its case under chapter 11 of the Bankruptcy Code on or about October 5, 2008. *Id.* at ¶ 15. While the other lenders under the Credit Agreement funded $15 million of the Draw, Lehman failed to fund its $10 million portion of the Draw. *Id.* The lenders who did fund $15 million of the $25 million Draw chose not to fund the $10 million portion that Lehman failed to fund, despite the fact that Spanish Broadcasting explicitly asked the lenders to do so. *Id.*

Because Lehman did not fund its $10 million portion of the Draw, Spanish Broadcasting was compelled to use the entire $15 million it did receive from the Draw, plus $3.5 million of its already low cash reserves, to make the $18.5 million payment on the maturing Mega TV Note. *Id.* at ¶ 16. Spanish Broadcasting was left with dangerously low cash reserves as a result of Lehman's failure to fund and, as a result, Spanish Broadcasting did not have the approximately $6 million it needed to terminate the Swap and the $4 million it needed for Marketing Expenses. *Id.*

Lehman's breach of its obligation to fund the Draw left Spanish Broadcasting undercapitalized. *Id.* at ¶¶ 17-18. S&P and Moody's each downgraded Spanish Broadcasting expressly as a result of Lehman's failure to fund the Draw. *Id.* at ¶ 17, Ex. H (S&P report), Ex. I (Moody's report).

**Spanish Broadcasting Could Not Obtain Alternative Financing Following Lehman's Failure to Fund the Draw**

Following Lehman's failure to fund the Draw in October 2008, Spanish Broadcasting was unable to obtain alternate financing of the $10 million for several reasons, including but not limited to the following:

(1)   The incurrence of any additional indebtedness was barred under the terms of the Certificate of Designations for the Preferred Stock because Spanish Broadcasting's Debt to Cash Flow Ratio (as defined in the Certificate of Designations) was greater than 7 to 1;

(2)   No lender would have agreed to provide fresh capital on a basis that was *pari passu* with the Credit Agreement because Spanish Broadcasting's existing indebtedness under the Credit Agreement was trading in the marketplace at or below 58 cents on the dollar in the fourth quarter of 2008;

(3)   A refinancing of the entire Credit Agreement was not at all feasible, because Spanish Broadcasting already had below-market financing in place and no company raised capital in the fourth quarter of 2008 at rates of return even close to those required by third-party investors in Spanish Broadcasting's senior credit facilities;

(4)   The incurrence of indebtedness on a priming basis to the lenders under the Credit Agreement would have required unanimous consent of the Credit Agreement lenders, which would not have been forthcoming; and

(5)   Lehman itself, in its capacity as Administrative Agent and a Lender under the Credit Agreement, had imposed such arduous conditions on obtaining a third party loan that those conditions made it impracticable (if not impossible) for Spanish Broadcasting to find an alternate lender.

See *id.* at ¶¶ 19-26.

**Spanish Broadcasting Suffered Damages As a Direct Result of Lehman's
Breach of Its Obligation to Fund the Revolver**

As set forth in the Garcia Declaration, Spanish Broadcasting was in regular communications with Lehman personnel in the days leading up to and following Spanish Broadcasting's issuance of the Draw and Lehman's failure to fund its share. *Id.* at ¶ 27. Lehman was well aware of Spanish Broadcasting's need for Lehman's $10 million and well aware that Spanish Broadcasting could not obtain funds elsewhere. *Id.* The failure of Lehman to fund the Draw caused Spanish Broadcasting to suffer substantial damages. *Id.* On November 3, 2011, Spanish Broadcasting filed the Proof of Claim against LCPI in order to recover the damages that Spanish Broadcasting suffered as a direct result of Lehman's failure to fund. *Id.*

As set forth in Garcia Declaration, the Kearns Report and the Trautman Report, the failure of Lehman to fund the Draw caused Spanish Broadcasting to suffer damages in the aggregate amount of $41.9 million, which is comprised of (a) damages in an amount of $24,500,000 (the "Impacted EBITDA Damages") resulting from Spanish Broadcasting's lack of $4 million in funds needed for Marketing Expenses; (b) damages in an amount of $17,054,558 (the "Swap Damages") resulting from Spanish Broadcasting's lack of capital to terminate and close out the Swap in October 2008; and (c) damages in an amount of $343,333 (the "Fee Damages") on account of fees that Spanish Broadcasting paid to Lehman for the $10 million revolver commitment that Lehman failed to fund. Garcia Declaration, ¶¶ 27-36; Trautman Report (*passim*); Kearns Report (*passim*).

**The Payoff Letter Negotiations Between Lehman and Spanish Broadcasting Demonstrate That the Parties Did Not Intend for the Alleged Consequential Damages Waiver to Be Effective Following the Termination of the Credit Agreement**

The Payoff Letter as well as the Credit Agreement, which were both drafted by Lehman's counsel, were explicit as to which provisions of the Credit Agreement survived termination. See Gittlitz Declaration, ¶ 6. More particularly, when Lehman wanted to provide that a provision of the Credit Agreement would remain effective following the termination of the Credit Agreement, it did so with specificity in the Payoff Letter and/or the Credit Agreement. See *id.* at ¶ 6, Ex. A (Payoff Letter), ¶ 1(a) (providing for survival of contingent obligations pursuant to Section 10.5 of the Credit Agreement), ¶ 4 (providing for survival of Spanish Broadcasting's Proof of Claim); Garcia Declaration, Ex. B (Credit Agreement), § 2.19(c) (survival of provision regarding certificate of additional amounts payable), § 2.20(e) (survival of provision regarding taxes), § 2.21 (survival of indemnity provision), § 9.7 (survival of indemnification provision), § 10.5 (survival of provision regarding payment of expenses). Through their respective attorneys at

Kaye Scholer and Weil, Spanish Broadcasting and Lehman carefully and extensively negotiated those provisions of the Credit Agreement that would remain effective following the parties' entry into the Payoff Letter terminating the Credit Agreement.  See Gittlitz Declaration, ¶ 6.

Neither the Credit Agreement nor the Payoff Letter provides for the survival of the Alleged Waiver contained in Section 10.12(e) of the Credit Agreement.  See *Id.* at ¶ 7; Garcia Declaration, Ex. B (Credit Agreement), § 10.12(e).

Sheryl Gittlitz of Kaye Scholer represented Spanish Broadcasting in its extensive negotiations with Lehman between January 30, 2012 and February 7, 2012 concerning the terms of the Payoff Letter.  Gittlitz Declaration, ¶ 8.  During that time, the parties, through their respective attorneys, carefully negotiated the two survival provisions contained in the Payoff Letter, *i.e.*, Sections 1(a) and 4 thereof.  *Id.*  The evolution of the parties' agreement over those precise terms of the Payoff Letter that would remain effective following the termination of the Credit Agreement is summarized below.

On January 30, 2012, Kaye Scholer, as counsel for Spanish Broadcasting, emailed Weil, as counsel for Lehman, to inquire as to when Weil would circulate a draft of the Payoff Letter.  See *id.* at ¶ 9, Ex. B (email dated January 30, 2012).

On January 31, 2012, Weil sent Kaye Scholer an email attaching a draft of the Payoff Letter (the "January 31 Lehman Draft").  See *id.* at ¶ 10.  Section 1(a) of the January 31 Lehman Draft provided that as of the effective date of the Payoff Letter,

> all outstanding Loans and all other amounts owing by the Borrower [*i.e.*, Spanish Broadcasting] under the Credit Agreement . . . shall be paid in full and the Credit Agreement and **all obligations** of the Borrower and the other Loan Parties thereunder and under the other Loan Documents shall be terminated (other than contingent obligations which survive by the terms of the Credit Agreement or such other Loan Documents, including without limitation, Section 10.5 of the Credit Agreement).

See *id.* at ¶ 10, Ex. C (email from Weil dated January 31, 2012), Ex. D (January 31 Lehman Draft), ¶ 1(a) (emphasis added).  This language provides that all of Spanish Broadcasting's "obligations" under the Credit Agreement would not survive the termination of the Credit Agreement, except where the Credit Agreement provides for survival.  See *id.* at ¶ 10. Significantly, Section 1(a) of the January 31 Lehman Draft did not use the capitalized term "Obligation," which was a defined term under Section 1.1 of the Credit Agreement.  *Id.*  Instead, Section 1(a) of the January 31 Lehman Draft used the lower-case term "obligation" in its ordinary meaning, *i.e.* "the action of obligating oneself to a course of action (as by a promise or vow)."  *Id.* (quoting Merriam-Webster's Collegiate Dictionary (11th ed. 2004)).  The Alleged Waiver was clearly an "obligation" of Spanish Broadcasting, since it required Spanish Broadcasting to waive its right to claim or recover consequential damages.  *Id.*  Therefore, Lehman, who drafted the Payoff Letter, provided from the outset that the Alleged Waiver would <u>not</u> survive the termination of the Credit Agreement.  *Id.*

In addition, Section 4 of the January 31 Lehman Draft provided that Spanish Broadcasting would release "all claims" that it had against Lehman arising out of or in connection with the Credit Agreement.  See *id.* at ¶ 11, Ex. D (January 31 Lehman Draft), ¶ 4. Section 4 of the January 31 Lehman Draft did not carve out Spanish Broadcasting's Proof of Claim from the release.  *Id.* at ¶ 11.  Thus, the January 31 Lehman Draft provided that Spanish Broadcasting would release its claims against Lehman contained in the Proof of Claim filed on November 3, 2011.  *Id.*

The January 31 Lehman Draft was not acceptable to Spanish Broadcasting because (a) the language in Section 1(a) was not sufficiently explicit as to which provisions of the Credit

Agreement would survive termination; and (b) Spanish Broadcasting was not willing to release its claims against Lehman that were the subject of its Proof of Claim. *Id.* at ¶ 12.

Accordingly, on January 31, 2012, Kaye Scholer sent Weil an email, attaching Spanish Broadcasting's comments (the "January 31 SB Comments") to the January 31 Lehman Draft that Weil had circulated earlier that day. *Id.* at ¶ 13. With respect to Section 1(a), Spanish Broadcasting changed the phrase "other than contingent obligations which survive by the terms of the Credit Agreement" to "other than contingent obligations which **expressly** survive by the terms of the Credit Agreement." See *id.* at ¶ 13, Ex. E (email from Kaye Scholer to Weil dated January 31, 2012), Ex. F (January 31 SB Comments), ¶ 1(a) (emphasis added). The intent of this comment was to make clear that all of the obligations under the Credit Agreement (including Spanish Broadcasting's obligation to waive its right to claim or recover consequential damages under Section 10.12(e) of the Credit Agreement) would terminate, except where the Credit Agreement expressly provided for survival. *Id.* at ¶ 13. Since the Credit Agreement did not expressly provide for the survival of the Alleged Waiver, Spanish Broadcasting intended this comment to make clear that the Alleged Waiver would <u>not</u> be effective or enforceable following the termination of the Credit Agreement. *Id.* With respect to the release contained in Section 4 of the January 31 Lehman Draft, Spanish Broadcasting deleted the release in its entirety. See *id.* at ¶ 13, Ex F (January 31 SB Comments), ¶ 4.

On February 2, 2012, Weil sent Kaye Scholer an email, attaching a revised draft of the Payoff Letter (the "February 2 Lehman Draft"). *Id.* at ¶ 14. This time, Lehman incorporated Spanish Broadcasting's language in Section 1(a), as set forth in the January 31 SB Comments. *Id.* Thus, the agreed upon language in Section 1(a) provided that Spanish Broadcasting's obligations under the Credit Agreement shall be terminated, "other than contingent obligations

which **expressly** survive by the terms of the Credit Agreement." See *id.* at ¶ 14, Ex. G (February 2, 2012 email from Weil); Ex. H (February 2 Lehman Draft), ¶ 1(a) (emphasis added). With respect to Section 4, Lehman restored the release of claims that Spanish Broadcasting had deleted in its January 31 SB Comments. See *id.* at ¶ 14, Ex. H (February 2 Lehman Draft), ¶ 4.

On February 3, 2012, Weil sent Kaye Scholer an email, attaching a further revised draft of the Payoff Letter (the "February 3 Lehman Draft"). *Id.* at ¶ 15. The release in Section 4 of the February 3 Lehman Draft included a carve-out for the Proof of Claim. *Id.* More particularly, the final sentence of Section 4 of the February 3 Lehman Draft provided that: "The foregoing release shall not apply to Proof of Claim (Claim Number 67707) filed against Lehman on September 18, 2009 (as such claim may be amended in accordance with applicable law)." See *id.* at ¶ 15, Ex. I (February 3, 2012 email from Weil); Ex. J (February 3 Lehman Draft), ¶ 4.

On February 3, 2012, Kaye Scholer sent Weil an email, stating that the language at the end of the release in Section 4 of the Payoff Letter should be revised to provide that:

> The foregoing release shall not apply to the Proof of Claim (Claim Number 67707) filed against Lehman on September 18, 2009, as amended on November 3, 2011 (as such claim may be further amended in accordance with applicable law or in accordance with the Attachment to Amended Proof of Claim of Spanish Broadcasting System, Inc., as filed with the United States Bankruptcy Court/Southern District of New York on November 3, 2011).

See *id.* at ¶ 16, Ex. K (February 3, 2012 email from Kaye Scholer).

On February 3, 2012, Kaye Scholer sent Weil a further email, stating that the phrase "Except as set forth in the last sentence of this paragraph" should be added in two places in Section 4 of the Payoff Letter. See *id.* at ¶ 17, Ex. L (February 3, 2012 additional email from Kaye Scholer).

On February 6, 2012, Weil sent Kaye Scholer an email, stating that the language that Kaye Scholer proposed adding to Section 4 "does not work for us." See *id.* at ¶ 18, Ex. M

(February 6, 2012 email from Weil).   Weil invited Kaye Scholer to speak with Lehman's

bankruptcy counsel "to discuss this further."  See *id.* at ¶ 18.

On February 6, 2012, Kaye Scholer sent Weil an email, attaching revised comments to

Section 4 of the Payoff Letter.  *Id.* at ¶ 19.  More specifically, Kaye Scholer removed a reference

to Spanish Broadcasting's proof of claim filed on September 18, 2009, and replaced it with a

reference to the Proof of Claim filed on November 3, 2011.  See *id.* at ¶ 19, Ex. N (February 6,

2012 email from Kaye Scholer).

On February 6, 2012, Weil sent Kaye Scholer an email, attaching a further revised draft

of the Payoff Letter (the "February 6 Lehman Draft") that incorporated Spanish Broadcasting's

comments to Section 4.  I*d.* at ¶ 20.  More particularly, Section 4 of the February 6 Lehman Draft

provided that:

> **Except as set forth in the last sentence of this paragraph**, the Borrower, on
> behalf of itself and the other Loan Parties, hereby unconditionally and irrevocably
> waives all claims, suits, debts, liens, losses, causes of action, demands, rights,
> damages or costs, or expenses of any kind, character or nature whatsoever, known
> or unknown, fixed or contingent, which any of them may have or claim to have
> against Lehman (whether in its capacity as an agent, lender, hedging counterparty
> or otherwise) or its agents, employees, officers, affiliates, directors,
> representatives, attorneys, successors and assigns (collectively, the "Released
> Parties") to the extent arising out of or in connection with the Loan Documents
> including, without limitation, any failure by the Lehman or its affiliates to fund
> any Loan required to be funded by it under the Credit Agreement (collectively,
> the "Claims").  **Except as set forth in the last sentence of this paragraph**, each
> of the Borrower and the other Loan Parties further agree forever to refrain from
> commencing, instituting or prosecuting any lawsuit, action or other proceeding
> against any Released Parties with respect to any and all of the foregoing described
> waived, released, acquitted and discharged Claims and from exercising any right
> of recoupment or setoff that it may have under a master netting agreement or
> otherwise against any Released Party with respect to Obligations under the Loan
> Documents.  Each of the Released Parties shall be a third party beneficiary of this
> letter agreement.  **The foregoing release shall not apply to Proof of Claim
> (Claim Number 67707) filed against Lehman on November 3, 2011 (as such
> claim may be amended in accordance with applicable law).**

See *id.* at ¶ 20, Ex. O (February 6 email from Weil); Ex. P (February 6 Lehman Draft), ¶ 4 (emphasis added). This agreed upon language was ultimately incorporated in the version of the Payoff Letter that the parties executed on February 7, 2012. See *id.* at ¶ 20. As set forth in the Gittlitz Declaration, the foregoing examination of the negotiating history of the Payoff Letter demonstrates that the intent of the parties was that Spanish Broadcasting did not waive its claims against Lehman arising out of Lehman's failure to fund the Draw, which claims were the subject of the Proof of Claim. *Id.*

On February 7, 2012, Spanish Broadcasting and Lehman executed the Payoff Letter that contained the parties' agreed upon survival provisions in Sections 1(a) and 4. See *id.* at ¶ 21, Ex. Q (February 7, 2012 email from Kaye Scholer); Ex. A (fully executed Payoff Letter).

**Based on the Terms of the Payoff Letter, the Alleged Consequential Damages Waiver Contained in the Credit Agreement Is Not Enforceable**

The negotiations surrounding the Payoff Letter took place under highly unusual circumstances in which a borrower and a lender negotiated the termination of a credit agreement after the <u>lender</u> had defaulted and the borrower had asserted claims against the lender for failing to fund its obligations under the credit agreement. See Gittlitz Declaration, ¶ 22. In the context of these unusual circumstances, Lehman and Spanish Broadcasting carefully and extensively negotiated expressly which provisions of the Credit Agreement would survive termination thereof pursuant to the provisions of the Payoff Letter. *Id.* At no point during Ms. Gittlitz's negotiations with Lehman's counsel did Lehman take the position that the Alleged Waiver would survive the termination of the Credit Agreement. *Id.* Indeed, Section 1(a) of the January 31 Lehman Draft and all subsequent versions of the Payoff Letter (including the execution version) provided that all of Spanish Broadcasting's "obligations" under the Credit Agreement (including

the Alleged Waiver) would terminate, except where the Credit Agreement provided for survival.

*Id.*

Nor did Lehman take the position during the negotiations that Spanish Broadcasting had waived its claims against Lehman that it asserted in the Proof of Claim.  *Id.* at ¶ 23.  On the contrary, Lehman agreed to carve out the Proof of Claim from the release set forth in Section 4 of the Payoff Letter.  *Id.*

In its Motion, Lehman takes the position that the Alleged Waiver remains effective and enforceable, despite the fact that neither the Credit Agreement nor the Payoff Letter provides for the survival of the Alleged Waiver.  *Id.* at ¶ 24.  However, based on the extensive negotiations between Spanish Broadcasting's counsel and Lehman's counsel, the parties to the Payoff Letter did <u>not</u> intend for the Alleged Waiver to remain effective following the termination of the Credit Agreement.  *Id.*  On the contrary, if Lehman had intended for the Alleged Waiver to survive, it would have expressly provided for the survival of the Alleged Waiver in the Payoff Letter.  *Id.* Lehman chose not to do so.  *Id.*

### **Lehman's Objection to the Proof of Claim**

On July 10, 2012, Lehman filed an Objection to the Proof of Claim.  See Garcia Declaration, ¶ 38.  In its Objection, Lehman argued that most of the damages set forth in the Proof of Claim are barred by the Alleged Waiver.  *Id.*

On February 13, 2013, the Bankruptcy Court (Peck, J.) conducted the Sufficiency Hearing with respect to Lehman's Objection to the Proof of Claim.  *Id.* at ¶ 40.  Spanish Broadcasting prevailed at the Sufficiency Hearing and the Bankruptcy refused to disallow any of Spanish Broadcasting's claims.  *Id.*

On April 27, 2015, the Court held a conference (the "April 27 Conference") at which Lehman proposed that (a) it should be permitted to file a summary judgment motion on the issue

of whether the Alleged Waiver survived the termination of the Credit Agreement pursuant to the Payoff Letter; and (b) discovery should proceed solely with respect to documents of Kaye Scholer and Weil regarding the Payoff Letter.  See *id.* at ¶ 42, Ex. K (transcript of April 27 Conference).

On or about May 11, 2015, the parties exchanged discovery with respect to the negotiation of the Payoff Letter.  *Id.* at ¶ 43.  On May 15, 2015, Weil sent Kaye Scholer an email, stating that "[w]e have reviewed the production Kaye Scholer made on Monday, and concluded that LBHI has a sufficient basis to move for summary judgment."  See *id.* at ¶ 44, Ex. M (May 15, 2015 email from Weil).

On May 22, 2015, the Court entered the Stipulated Order Regarding Briefing Schedule Regarding Claim 67707 of Spanish Broadcasting System, Inc. [Dkt No. 49706].  *Id.* at ¶ 45.

## III.   ARGUMENT AND LEGAL STANDARD

Summary judgment should be denied unless the movant has established that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009).  "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought."  *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) (citations omitted); *see Celotex*, 477 U.S. at 331 n.2 ("Summary judgment should not be granted unless it is clear that a trial is unnecessary, and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party."); *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual

assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion.").

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez*, 72 F.3d at 1060-61; *e.g.*, *Celotex*, 477 U.S. at 331. In ruling on a motion for summary judgment, the function of the Court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *In re Dana Corp.*, 574 F.3d at 151 (citation omitted). "'[W]hen the party against whom summary judgment is sought comes forth with affidavits or other material obtained through discovery that generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate.'" *Id.* (citation omitted).

Here, the factual record in this contested matter – including, without limitation, the Garcia Declaration, the Gittlitz Declaration, the Trautman Report and the Kearns Report – conclusively demonstrate that a multitude of genuine issues of material fact exist. See generally the Rule 7056 Counterstatement. Accordingly, Lehman has not and cannot satisfy its burden for summary judgment under Fed. R. Civ. P. 56(a).

## IV. DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ENFORCEABILITY OF THE ALLEGED WAIVER OF CONSEQUENTIAL DAMAGES

In its Motion, Lehman seeks, *inter alia*, an order declaring that the Alleged Waiver contained in Section 10.12(e) of the Credit Agreement is an enforceable waiver of consequential damages. Pursuant to Fed. R. Civ. P. 56(a), Lehman bears the heavy burden of establishing "that no genuine issue of material fact exists" with respect to the enforceability of the Alleged Waiver, and that "the undisputed facts establish [Lehman's] right to judgment as a matter of law." *See Rodriguez*, 72 F.3d at 1060-61. Lehman has failed to meet this heavy burden. As discussed

more fully below, there are several genuine issues of material fact concerning the enforceability

of the Alleged Waiver that preclude summary judgment.

> **A.**      **Spanish Broadcasting Will Demonstrate At Trial That the Parties Did Not Intend for the Alleged Waiver to be Effective or Enforceable Following the Parties' Entry Into the Payoff Letter**

The existence of a waiver is a question of fact that depends on the intention of the parties.

*See NetTech Solutions, L.L.C. v. ZipPark.com*, No. 01 CIV. 2683 (SAS), 2001 WL 1111966, at

*6 (S.D.N.Y. Sept. 20, 2001) ("Waiver is 'essentially a matter of intention' and '[i]t is long

established that, under New York law, the question of waiver is one of fact.'") (citations

omitted).  Waiver is "'generally ill-suited for summary adjudication.'"  *Id.* (*quoting In re Caldor,*

*Inc.*, 217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998)).  Here, Spanish Broadcasting has put forward

substantial factual support for its position that the parties did <u>not</u> intend for the Alleged Waiver

to remain effective and enforceable following the termination of the Credit Agreement pursuant

to the Payoff Letter.  In contrast, Lehman (which bears the burden of proof on its summary

judgment motion)[3] has failed to put forth any countervailing evidence regarding the intention of

the parties with respect to the enforceability of the Alleged Waiver.  The Gittlitz Declaration

demonstrates that there is a genuine issue of material fact regarding whether the parties intended

the Alleged Waiver to be ineffective and unenforceable following the parties' entry into the

Payoff Letter.

At the April 27 Conference, Lehman requested discovery with respect to the

communications between Kaye Scholer and Weil, as counsel for Spanish Broadcasting and

Lehman, respectively, regarding the negotiation and execution of the Payoff Letter.  Based on

---

[3]  *See Rodriguez*, 72 F.3d at 1060-61 (party seeking summary judgment bears the burden of proof).

that discovery, Lehman asserted that it had a basis to proceed with its Motion. Tellingly, the Motion contains no discussion whatsoever about the communications surrounding the negotiation and execution of the Payoff Letter. It is little wonder why Lehman chose to disregard this substantial documentary record. Indeed, the communications between Kaye Scholer and Weil either firmly establish that the Alleged Waiver did not survive the termination of the Credit Agreement or, at a minimum, make clear that a genuine issue of material fact exists as to whether the parties intended for the Alleged Waiver to be ineffective and unenforceable following the parties' entry into the Payoff Letter. Either situation mandates the denial of Lehman's Motion.

Spanish Broadcasting and Lehman carefully negotiated the terms of the Payoff Letter over a nine day period between January 30, 2012 and February 7, 2012. The Gittlitz Declaration discusses at length the facts surrounding the parties' negotiations, including the negotiations surrounding the two survival provisions in the Payoff Letter, namely Section 1(a) and Section 4 thereof. Section 1(a) of the Payoff Letter provides that all of Spanish Broadcasting's "obligations" under the Credit Agreement (including Spanish Broadcasting's obligation to waive its right to claim or recover consequential damages under Section 10.12(e) of the Credit Agreement) would terminate, except where the Credit Agreement "expressly" provided for survival. See Gittlitz Declaration, ¶¶ 10-14. Spanish Broadcasting added the word "expressly" in its January 31 SB Comments, and Lehman accepted Spanish Broadcasting's comment. *Id.* at ¶¶ 13-14. Ms. Gittlitz would testify at trial that Spanish Broadcasting intended this comment to make clear that the Alleged Waiver would not be effective or enforceable following the termination of the Credit Agreement. *Id.* at ¶ 14.

Section 4 of the Payoff Letter provides for the survival of Spanish Broadcasting's Proof of Claim.  See *id.* at ¶¶ 15-20.  Significantly, in the January 31 Lehman Draft, Section 4 of the Payoff Letter included a release by Spanish Broadcasting of all of its claims against Lehman arising out of or in connection with the Credit Agreement.  See *id.* at ¶ 11, Ex. D (January 31 Lehman Draft).  Spanish Broadcasting was not willing to release the claims that were the subject of the Proof of Claim and, after extensive negotiations, Lehman and Spanish Broadcasting agreed to carve out the Proof of Claim from the release in Section 4.  See *id.* at ¶¶ 11-20.  Ms. Gittlitz would testify at trial that the parties intended for the Proof of Claim to survive but not for the Alleged Waiver to survive.

In contrast to the substantial factual record set forth in the Gittlitz Declaration, Lehman has not alleged any facts that could establish that the parties to the Payoff Letter intended for the Alleged Waiver to remain effective and enforceable, even though neither the Credit Agreement nor the Payoff Letter provided for the survival of the Alleged Waiver following the termination of the Credit Agreement.  Viewing the facts in the light most favorable to Spanish Broadcasting and drawing all inferences in favor of Spanish Broadcasting – as the Court is required to do on this Motion for summary judgment – Spanish Broadcasting respectfully submits that Lehman has failed to meet its burden of proving there is no genuine dispute as to any material fact and that Lehman is entitled to judgment as a matter of law.  *See Indus. Window Corp. v. Fed. Ins. Co.*, 609 F. Supp. 2d 329, 343 (S.D.N.Y. 2009) ("[B]ecause genuine issues of material fact remain as to whether Beys waived the contractual prohibition of oral waiver for extra work, Hill's motion for summary judgment in this respect must be denied.").

### B.    Lehman's Arguments Regarding the Enforceability of the Alleged Waiver Are Unavailing

In the Motion, Lehman raises three arguments regarding the effect of the Payoff Letter on the Alleged Waiver:  (1) the parties to the Payoff Letter were not capable of terminating the Alleged Waiver; (2) the Payoff Letter terminated only prospective, not retroactive, obligations; and (3) Lehman did not waive its right to enforce the Alleged Waiver.  All of Lehman's arguments are unavailing and should be rejected in their entirety.

### 1.    Spanish Broadcasting and Lehman Were Capable of Terminating the Alleged Waiver

Lehman's assertion that the parties to the Payoff Letter could not terminate the Alleged Waiver is wholly without merit.  Parties to a contract are free to modify their rights and obligations thereunder.  Indeed, it is a matter of hornbook law that "[p]arties to a contract cannot, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement."  8-40 Corbin on Contracts § 40.13; *e.g.*, *Martin v. Peyton*, 246 N.Y. 213, 218 (N.Y. 1927) ("An existing contract may be modified later by subsequent agreement, oral or written. . . .  And again, that the original agreement has been so modified may be proved by circumstantial evidence—by showing the conduct of the parties."); *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 387 (N.Y. 1919) (Cardozo, J.) ("Those who make a contract may unmake it.").

The fact that the survival provisions of the Credit Agreement and the Payoff Letter did not include the Alleged Waiver supports Spanish Broadcasting's position that the Alleged Waiver is not enforceable.  As the District Court for the Southern District of New York has explained:

> Ordinarily, contract provisions do not continue to bind the parties after the contract has been terminated.  Consequently, if one of the parties wishes a

contract term to remain in effect after the contract ends, the contract must say so explicitly.

*U.S. v. Am. Society of Composers, Authors & Publishers*, No. Civ. 13-95 (WCC), 1989 U.S. Dist. LEXIS 16907, at *33-*34 (citation omitted); *see Twitchell v. Town of Pittsford*, 106 A.D.2d 903, 904 (N.Y. App. Div. 4th Dep't 1984), *aff'd*, 66 N.Y.2d 824 (N.Y. 1985) ("When a contract is terminated, such as by expiration of its own terms, the rights and obligations thereunder cease.") (citations omitted).   Consistent with this principle, courts have repeatedly held that a contractual waiver did not survive the termination of the contract.   *See Am. Society of Composers*, 1989 U.S. Dist. LEXIS 16907; *Scientific Components Corp. v. Raytheon Co.*, No. M 82 (HB), 2005 U.S. Dist. LEXIS 13087 (S.D.N.Y. June 29, 2005) (where a waiver of consequential damages was not included in the section listing which sections of the sale contract at issue would survive termination, an arbitration panel found that the consequential damages waiver did <u>not</u> survive termination of the contract, and the District Court confirmed the arbitration award in its entirety, holding that the panel had made a "reasoned conclusion based on its interpretation of the contract between the parties.").   Thus, under fundamental principles of contract law, Spanish Broadcasting and Lehman had the capacity to terminate the Alleged Waiver.

### 2.    The Payoff Letter Did Not Terminate Only Future Obligations of Spanish Broadcasting

Section 1(a) of the Payoff Letter provides that all obligations of Spanish Broadcasting shall be terminated on the effective date, except for those obligations that expressly survive under the Credit Agreement.   In the Motion, Lehman argues that because Section 1(a) uses the phrase "shall be," the only obligations that were terminated were future obligations.   Lehman's tortured reading of the Payoff Letter must be rejected.   The use of the phrase "shall be" in Section 1(a) of the Payoff Letter mirrors the language in Section 1(b) of the Payoff Letter, which

provides that all liens "granted under" the Credit Agreement "**shall automatically be**" discharged and terminated.  See Gittlitz Declaration, Ex. A (Payoff Letter), § 1(b).  Under Lehman's interpretation of the Payoff Letter – in which the phrase "shall be" applies prospectively – Section 1(b) terminated only <u>future</u> liens granted after the termination of the Credit Agreement.  That interpretation would be nonsensical because on its face, Section 1(b) terminated liens that were "granted" (in the past) to the lenders.

Even if Lehman's interpretation of the Payoff Letter were plausible (which it is not), any ambiguity must be construed against Lehman, which drafted the Payoff Letter.  *See New York & Suburban Fed. Sav. & Loan Ass'n v. Inter-Island Mortgage Corp.*, 54 A.D.2d 583, 387 N.Y.S.2d 155 (N.Y. App. Div. 2nd Dep't 1976) ("[I]f there be any ambiguity in a written instrument, it should be resolved against its author.") (citation omitted).  The existence of conflicting contract interpretations also militates against the granting of summary judgment.  *See Echelon Int'l Corp. v. Am. W. Airlines, Inc.*, 85 F. Supp. 2d 313, 318 (S.D.N.Y. 2000) ("If two legitimate interpretations of the contract exist . . . then this matter cannot be resolved by summary judgment.").[4]

### 3.    Lehman Did Not Preserve Its Defenses Under the Alleged Waiver

Lehman contends that when it entered into the Payoff Letter, it "did not release or waive . . . any defenses it may have to the [Proof of] Claim."  Motion, at 19.  To the extent that Lehman alleges that it preserved its defenses under the Alleged Waiver, Lehman's statement is wholly

---

[4]  Lehman cites the U.S. Supreme Court decision in *Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S. 190 (1991) for the proposition that parties may assert pre-existing rights under contracts that have terminated.  However, the holding in *Litton* involves an arbitration clause in a collective bargaining agreement that is plainly inapposite here.  The other cases that Lehman relies on are similarly unavailing and do not involve the survival of a damages waiver following the termination of a credit agreement.

unsupported by the factual record and, indeed, is contradicted by the facts contained in the

Gittlitz Declaration.   More particularly, since the Alleged Waiver is ineffective and

unenforceable, Lehman has not preserved its right to invoke the Alleged Waiver as a defense.

In any event, whether Lehman released or waived its defenses under the Alleged Waiver

is a question of fact that should not be resolved on summary judgment.   *See NetTech Solutions,*

2001 WL 1111966, at *6.   Rather, Spanish Broadcasting should have the opportunity to

introduce evidence demonstrating that Lehman did not preserve its defenses under the Alleged

Waiver.

In view of the foregoing, there exist numerous disputed issues of material fact concerning

the enforceability (or lack thereof) of the Alleged Waiver.   Thus, the inquiry ends here.   Lehman

is not entitled to summary judgment and the Motion should be denied in its entirety.

## V.   DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE CHARACTERIZATION OF SPANISH BROADCASTING'S DAMAGES AS CONSEQUENTIAL DAMAGES RATHER THAN DIRECT DAMAGES

In its Motion, Lehman seeks an order declaring that Spanish Broadcasting's Impacted

EBITDA Damages and Swap Damages are barred by the Alleged Waiver as consequential

damages.   The Court need not reach the question of whether those categories of damages

constitute direct damages or consequential damages because, as discussed above, there exist

disputed issues of material fact regarding the Alleged Waiver that preclude summary judgment.

Even assuming, without conceding, that the Alleged Waiver were effective and enforceable

(which it is not), the Motion should be denied for the independent reason that there exist

numerous disputed issues of material fact concerning the characterization of Spanish

Broadcasting's damages as direct or consequential.

Direct (or general) damages are "those which are the natural and probable consequence of the breach" of contract. *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 42-43 (N.Y. 1989); *Latham Land I, LLC v. TGI Friday's, Inc.*, 96 A.D.3d 1327, 1332 (N.Y. App. Div. 3d Dep't June 28, 2012).  In contrast, consequential (or special) damages "are extraordinary in that they do not so directly flow from the breach." *Am. List Corp.*, 75 N.Y.2d at 43; *Latham Land I, LLC*, 96 A.D.3d at 1331.  Direct damages "are typically expectation damages, measured by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract." *Latham Land I, LLC*, 96 A.D.3d at 1330-31 (internal citations omitted); *KSW Mech. Servs. v. Johnson Controls, Inc.*, 992 F. Supp. 2d 135, 145 (E.D.N.Y. 2014) (same); *e.g.*, *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109-10 (2d Cir. 2007) ("[I]n this case, the lost profits are the direct and probable consequence of the breach" where they "are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed.") (*citing Am. List Corp.*, 75 N.Y.2d at 43)).

As discussed more fully below, the Motion should be denied because (a) the question of whether damages are direct or consequential is a question of fact; (b) Spanish Broadcasting will demonstrate at trial that the Impacted EBITDA Damages are direct damages; and (b) Spanish Broadcasting will demonstrate at trial that the Swap Damages are direct damages.[5]

---

[5] In the Motion, Lehman does not seek summary judgment on Spanish Broadcasting's claim for Fee Damages.  Spanish Broadcasting respectfully submits that it is entitled to recover the Fee Damages in full, and Spanish Broadcasting will prove its Fee Damages (as well as its Impacted EBITDA Damages and Swap Damages) on a fully developed evidentiary record.

### A.    The Question of Whether Damages Are Direct or Consequential Is a Question of Fact

The question of whether damages are direct or consequential is a question of fact that must be reserved for trial. *See American Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459-60 (S.D.N.Y. 1976) ("In general, the precise demarcation between direct and consequential damages is a question of fact . . . [that] must be left for resolution at trial."); *e.g.*, *Combustion Sys. Servs., Inc. v. Schuykill Energy Res., Inc.*, No. CIV. A. 92-4228, 1993 WL 496946, at *2 (E.D. Pa. Nov. 19, 1993) ("The characterization of a particular claim for damages as either direct or consequential is an issue of fact which is generally reserved for trial.") (citations omitted); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, No. 88–CV–819, 1992 WL 121726, at *28 (N.D.N.Y. May 23, 1992) ("Generally, whether damages are direct or consequential is an issue of fact which must be reserved for trial."). The district court in *Niagara* denied the defendant's motion for summary judgment, which motion was predicated on a contractual waiver of consequential damages, because the question of "whether damages (of any kind) are consequential is a fact issue." *Niagara Mohawk Power*, 1992 WL 121726, at *28-*29, *42. Based on these authorities, Spanish Broadcasting respectfully submits that this Court should not rule on the direct or consequential nature of Spanish Broadcasting's damages until it has conducted an evidentiary hearing and has had "an opportunity to review the fully developed trial record," *id.* at *29, including but not limited to testimony from Spanish Broadcasting's officers and experts.

In its Motion, Lehman contends that the Court should rule on the characterization of Spanish Broadcasting's damages at the summary judgment stage of the proceedings. However, the cases that Lehman cites in support of its position are readily distinguishable from this case. Lehman's cases do not involve contracts for revolving credit facilities to fund the working

capital needs of an operating business.   Rather, Lehman's cases deal with simple sale and

distribution agreements that have no relevance here.   *See PNC Bank, Nat. Ass'n v. Wolters*

*Kluwer Fin. Servs., Inc.*, No. 12 Civ. 8570 (PAE), 2014 WL 7146357, at *13 (S.D.N.Y. Dec. 15,

2014) (case involved a "'**a simple resale contract**, where one party buys a product at a set price

to sell at whatever the market may bear.'") (emphasis added); *Phoenix Warehouse of Calif., LLC*

*v. Townley, Inc.,* No. 08 Civ. 2856 (NRB), 2011 WL 1345134 (S.D.N.Y. Mar. 29, 2011) (case

involved a contract to provide warehousing and distribution services for cosmetics); *Compania*

*Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,* 650 F. Supp. 2d 314 (S.D.N.Y. 2009) (case

involved a contract for exclusive bottling rights in a specified territory); *E. Brass & Copper Co.*

*v. Gen. Elec. Supply Corp.,* 101 F.Supp. 410 (S.D.N.Y. 1951) (case involved contract for the

delivery of electrical equipment); *In re Vivaro Corp.*, No. 12-01928 (MG), 2014 WL 486288

(Bankr. S.D.N.Y. Feb. 6, 2014) (case involved a distribution agreement for prepaid calling

cards).   Given the highly complex and fact-specific nature of the contractual arrangements

between Lehman and Spanish Broadcasting under the Credit Agreement, summary judgment on

the characterization of Spanish Broadcasting's damages should be denied.[6]

### B.    Spanish Broadcasting Will Demonstrate At Trial That the Impacted EBITDA Damages Are Direct Damages

In the Motion, Lehman asserts, without any factual support or citation to evidence in the

record, that Spanish Broadcasting's Impacted EBITDA Damages are "not the direct and

---

[6]  In the Motion, Lehman incorrectly states that for a contract to lend money, "the value of the performance promised, *i.e.*, direct damages, is best represented by the incremental cost of alternate financing." Motion, at 24.  Lehman's statement does not apply to the facts of this case because alternate financing was not available to Spanish Broadcasting following Lehman's failure to fund the Draw.  See Garcia Declaration, ¶¶ 19-25; Kearns Report, at 3-7  Further, Lehman was Spanish Broadcasting's longtime trusted financial advisor and it was well aware of Spanish Broadcasting's need for the Draw and the damages that Spanish Broadcasting would suffer in the event of a breach.  See Garcia Declaration, ¶¶ 8-9, 27.

immediate fruits of the Credit Agreement" and that they represent "losses in connection with collateral business arrangements." See Motion, at 21. Contrary to Lehman's assertions, the Trautman Report and the Kearns Report expressly state, based on an in-depth analysis of Spanish Broadcasting's damages, that the Impacted EBITDA Damages are the natural and probable consequence of Lehman's failure to fund the Draw.

In the Trautman Report, Mr. Trautman explains that as a result of its decline in marketing and promotional expenditures, Spanish Broadcasting experienced declines in audience ratings accompanied by a decline in advertising revenue performance in relation to competing radio stations in its most competitive markets. See Trautman Report, ¶¶ 7, 12-22. Further, Mr. Trautman states that such a decline was the natural and probable consequence of the reduction in marketing and promotional expenditures in the affected markets caused by Lehman's failure to fund. *Id.* at ¶¶ 7-9. Mr. Trautman estimates that the aggregate loss in revenue for Spanish Broadcasting in calendar year 2010 attributable to the reduced marketing and promotional spending (*i.e.*, compared to the position Spanish Broadcasting would have been in had Lehman performed under the contract) amounted to on the order of $13 million. *Id.* at ¶¶ 7, 20-21. Moreover, Mr. Trautman specifically ties the $4 million of Marketing Expenses that Lehman failed to fund to the $13 million of lost revenue in 2010. *Id.* at ¶¶ 6-7, 21. Mr. Trautman further states that the effects of the reduction in spending on Spanish Broadcasting's market position and advertising sales performance have been <u>ongoing</u>, since lost awareness and/or loyalty would only be "recoverable" as a result of an exceptional (and <u>costly</u>) promotional effort to recapture it. *Id.* at ¶¶ 7, 22.

In the Kearns Report, Mr. Kearns states that Spanish Broadcasting could not have obtained financing to replace the $10 million that Lehman failed to fund or refinance its capital

structure during the time period between September 30, 2008 and December 31, 2008. See Kearns Report, at 3-7. Mr. Kearns further states that the intended uses of the $25 million Draw are consistent with the use of revolving credit facility proceeds permitted pursuant to the Credit Agreement "for working capital purposes, capital needs and general corporate purposes" of Spanish Broadcasting. *Id.* at 3, 8. Mr. Kearns further states that the damages that Spanish Broadcasting suffered were the natural and probable consequence of Lehman's failure to fund the Draw Request. *Id.* at 3, 15. More particularly, Mr. Kearns states that Spanish Broadcasting suffered the Impacted EBITDA Damages, the Swap Damages and the Fee Damages as a direct result of Lehman's failure to fund the Draw. *Id.*

Pursuant to Rule 704 of the Federal Rules of Evidence, Messrs. Trautman and Kearns are permitted to opine on ultimate issues of fact. See F.R.E. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."). Therefore, since the question of whether Spanish Broadcasting's damages are direct or consequential is a question of fact, the opinions regarding Spanish Broadcasting's damages set forth in the Trautman Report and the Kearns Report comply with the applicable evidentiary standards. Consistent with their expert reports, Messrs. Trautman and Kearns will testify at trial that the Impacted EBITDA Damages are direct damages.

The applicable legal authorities support Spanish Broadcasting's position that the Impacted EBITDA Damages are direct damages, since the Impacted EBITDA Damages constitute diminution in value damages. See Kearns Report, at 3, 10-11. Courts have held repeatedly that diminution in value damages are direct damages. *See Latham Land I*, 96 A.D.3d at 1332 (holding that "the diminution in value of the actual property defendant promised to improve and lease" were direct damages); *e.g.*, *FDIC v. Parkway Exec. Office Ctr.*, No. CIV.A. 96–121, 1998 WL 18204, at *6 (E.D. Pa. Jan. 9, 1998) (holding that diminution in value of

building caused by lender's failure to fund constituted actual direct compensatory damages) (*discussing Employees' Retirement Sys. of Ala. v. Resolution Trust Corp.*, 840 F.Supp. 972, 988 (S.D.N.Y. 1993) (holding that loss in market value of bonds caused by defendant's repudiation constituted actual direct compensatory damages)); *In re Miraj and Sons, Inc.*, 192 B.R. 297, 312 (Bankr. D. Mass. 1996) (holding that diminution in value of condominium units caused by lender's failure to fund constituted actual direct compensatory damages).

The United States Court of Appeals for the Second Circuit recognized the distinction between diminution in value damages (such as the Impacted EBITDA Damages here) and consequential damages in *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329 (2d Cir. 2010). In that case, a seller of goods challenged an arbitrator's award of diminution in value damages to a buyer where the parties were contractually barred from recovering consequential damages. *Id.* at 333. The Second Circuit concluded that "the arbitrator reasonably interpreted New York law to permit [the buyer] to recover the diminution in value" of the goods "notwithstanding the parties' contractual bar on consequential damages." *Id.* at 340. In this connection, the Second Circuit observed that, "The fact that the N.Y. U.C.C. addresses consequential damages [U.C.C. § 2-715(2)] in a separate section from diminution-in-value damages [U.C.C. § 2-714(2)] supports the inference that these two measures of damages are not necessarily equivalent." *Id.* The Court of Appeals thus held that a consequential damages waiver does not prevent a buyer from recovering diminution in value damages. *Id.*

In *Latham Land*, the plaintiff established that the defendant lessee breached its contractual obligation to construct and operate (for at least 10 years) a restaurant on plaintiff's real property. With respect to damages, plaintiff introduced evidence that the value of its property following defendant's breach was lower than it would have been had defendant honored

the lease agreement.  Plaintiff asserted that the difference in those values was a proper measure

of damages.  *Latham Land I, LLC*, 96 A.D.3d at 1331.  The New York Supreme Court rejected

this measure of damages and the Appellate Division reversed.  The Appellate Division held as

follows:

> Plaintiff seeks to recover for expectation damages flowing from defendants'
> breach, *i.e.*, the loss of the benefit of its bargain.  In our view, these are direct
> damages "which are the natural and probable consequence of the breach."

*Id.* at 1332 (internal quotation marks and citations omitted).

Additionally, in an article on the subject of direct versus consequential damages,

Lehman's counsel has expressly conceded that "[d]iminution in value is the **bedrock** of direct or

general damages for breach of contract."  See Glenn D. West, Sara G. Duran [both of Weil],

*Reassessing the "Consequences" of Consequential Damage Waivers in Acquisition Agreements*,

63 Bus. Law. 777, 806 (May 2008) (emphasis added).  Lehman's counsel expressly

recommended in their article that parties not include "'diminution in value damages'" as part of a

consequential damages waiver provision because the inclusion of "diminution in value damages"

could bar "market-measured direct damages," which are "not consequential damages."  *Id.* at

779.  Here, the Alleged Waiver makes no reference whatsoever to "diminution in value

damages."  Therefore, the Impacted EBITDA Damages are not barred by the Alleged Waiver.

### C.    Spanish Broadcasting Will Demonstrate At Trial That the Swap Damages Are Direct Damages

As with the Impacted EBITDA Damages, Lehman alleges that the Swap Damages are

consequential damages because they relate to "collateral business arrangements."  See Motion, at

21.  Lehman's allegation is contradicted by the Garcia Declaration.  See Garcia Declaration, ¶ 36

(Spanish Broadcasting suffered damages "directly in connection with the Credit Agreement"

rather than with "collateral business arrangements").  More specifically, Lehman required

Spanish Broadcasting to enter into the Swap in connection with the Credit Agreement. *Id.* at ¶¶ 8, 30. Accordingly, the Swap Damages did not arise from "collateral business arrangements." At a minimum, the Garcia Declaration demonstrates that there remain disputed issues of material fact regarding the characterization of the Swap Damages.

Further, the Kearns Report expressly states that the Swap Damages are the natural and probable consequence of Lehman's failure to fund the Draw. See Kearns Report, at 3, 8. Thus, viewing the facts in a light most favorable to Spanish Broadcasting, there are disputed issues of material fact regarding the proper characterization of Spanish Broadcasting's damages which preclude summary judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, Spanish Broadcasting respectfully requests that this Court enter an order denying Lehman's Motion and granting Spanish Broadcasting such other and further relief as is just and proper.

Dated: New York, New York
      July 23, 2015

KAYE SCHOLER LLP

By: _Madlyn Gleich Primoff_

Madlyn Gleich Primoff, Esq.
250 West 55th Street
New York, New York 10019-9710
(212) 836-8000
madlyn.primoff@kayescholer.com

*Attorneys for Spanish Broadcasting System, Inc.*