UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

In re:

LEHMAN BROTHERS HOLDINGS INC., et al.,

                          Debtors.

Chapter 11

Case No. 08-13555 (SCC)

Jointly Administered

-------------------------------------------------------------------x

**DECLARATION OF JOSEPH A. GARCIA IN SUPPORT OF SPANISH BROADCASTING SYSTEM, INC.'S OPPOSITION TO MOTION BY LEHMAN BROTHERS HOLDINGS INC. FOR SUMMARY JUDGMENT PURSUANT TO RULE 7056 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE REGARDING CLAIM 67707 FILED BY SPANISH BROADCASTING SYSTEM, INC.**

I, Joseph A. Garcia, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.    I am the Chief Financial Officer of Spanish Broadcasting System, Inc. ("Spanish Broadcasting").  I submit this declaration in support of Spanish Broadcasting's opposition to the summary judgment motion (the "Motion"), dated June 18, 2015 [Dkt No. 50033], filed by Lehman Brothers Holdings Inc. (together with its affiliates, "Lehman") with respect to Spanish Broadcasting's proof of claim number 67707 (the "Proof of Claim").

**Lehman Was Spanish Broadcasting's Longstanding Trusted Advisor**

2.    Spanish Broadcasting is the largest publicly traded Hispanic-controlled media and entertainment company in the United States.  Spanish Broadcasting owns 20 radio stations located in the top U.S. Hispanic markets of New York, Los Angeles, Miami, Chicago, San Francisco and Puerto Rico, airing the Spanish Tropical, Regional Mexican, Spanish Adult Contemporary, Top 40 and Latin Rhythmic format genres.  Spanish Broadcasting also operates AIRE Radio Network, a national radio platform which creates, distributes and markets leading Spanish-language radio programming to over 100 affiliated stations reaching 88% of the U.S.

62771976_2

Hispanic audience. In addition, Spanish Broadcasting owns Mega TV, a television operation with over-the-air, cable and satellite distribution and affiliates throughout the U.S. and Puerto Rico. Spanish Broadcasting also produces live concerts and events and owns 21 bilingual websites, including www.LaMusica.com, an online destination and mobile app providing content related to Latin music, entertainment, news and culture.

3. Dating back to Spanish Broadcasting's IPO in 1999, Lehman had a longstanding business relationship with Spanish Broadcasting as Spanish Broadcasting's trusted financial advisor and arranger of financings. Whenever Spanish Broadcasting needed to raise money, it turned to Lehman for help.

4. For a number of years, a senior managing director of Lehman sat on Spanish Broadcasting's board of directors. Not only did Spanish Broadcasting view Lehman as part of its company, but Lehman itself likewise considered its relationship with Spanish Broadcasting to be a "partnership." Lehman described the relationship as a "partnership" in the presentation it made to Spanish Broadcasting in order to induce Spanish Broadcasting to enter into that certain First Lien Credit Agreement (the "Credit Agreement"), dated as of June 10, 2005, among, *inter alia*, Spanish Broadcasting, as borrower, and Lehman Commercial Paper Inc. ("LCPI"), as Administrative Agent and Lender. See Exhibit A hereto, Lehman presentation materials dated April 7, 2005.

5. Lehman regularly made presentations to Spanish Broadcasting, offering advice on the refinancing of Spanish Broadcasting's preferred stock, advice on that certain ISDA Master Agreement (the "Swap"), dated as of June 28, 2005, between Spanish Broadcasting and Lehman Brothers Special Financing, Inc., advice on the possibility of "going private," information and advice about potential acquisitions and combinations, and information and advice on various other general business matters. Spanish Broadcasting was guided by Lehman's advice and

counsel in a number of transactions and potential transactions, and relied on Lehman as a trusted advisor. Lehman collected fees from Spanish Broadcasting in excess of **$30 million**.

6. Lehman was the lead underwriter on Spanish Broadcasting's IPO in 1999. Following the IPO, Lehman continued to serve as Spanish Broadcasting's principal financial advisor through a number of financings and refinancings as a participant, lender and administrative agent, among other roles, up until the filing of the Lehman bankruptcy in 2008. Lehman has served, among other things, as (i) Lead Manager of Spanish Broadcasting's IPO in November 1999, (ii) Lead Manager of Spanish Broadcasting's Senior Subordinated Notes issued in November 1999, (iii) Sole Lead Manager of Spanish Broadcasting's Senior Subordinated Notes Add-On issued in June 2001, (iv) Sole Book-Running Manager of Spanish Broadcasting's Preferred Stock Offering in October 2003, (v) Sole Lead Arranger of Spanish Broadcasting's Senior Credit Facilities in October 2003, (vi) Lead Arranger, Sole Manager and Administrative Agent of Spanish Broadcasting's two Senior Credit Facilities in June 2005, (vii) Advisor on Spanish Broadcasting's acquisition of Rodriguez Communications in May 2000, (viii) Advisor on Spanish Broadcasting's proposed merger with Hispanic Broadcasting in 2001-June 2002, and (ix) lender with respect to several of the financings referred to above.

7. Lehman breached the Credit Agreement in October 2008, as discussed more fully below, and the relationship between Spanish Broadcasting and Lehman subsequently deteriorated. Lehman has pursued a protracted campaign against Spanish Broadcasting. For example, on February 14, 2013, Lehman commenced an action against Spanish Broadcasting in the Court of Chancery of the State of Delaware in connection with certain preferred stock (the "Preferred Stock") that Spanish Broadcasting issued. Spanish Broadcasting prevailed in the Delaware action and on February 24, 2014, the Court of Chancery entered a decision dismissing

Lehman's claims in their entirety. On December 11, 2014, the Supreme Court of the State of Delaware affirmed the Court of Chancery's dismissal of Lehman's claims.

**Spanish Broadcasting's Capital Structure**

8. As Spanish Broadcasting's trusted advisor, Lehman was well aware of the financial needs of Spanish Broadcasting and structured the financial arrangements under and in connection with the Credit Agreement accordingly. To that end, Lehman arranged for Spanish Broadcasting to enter into the Credit Agreement, a copy of which is attached hereto as Exhibit B. The Credit Agreement included a first lien term loan facility of $325,000,000, required (at Lehman's insistence) that Spanish Broadcasting enter into the Swap with Lehman Brothers Special Financing, Inc., and also included, with Lehman's advice and counsel, a revolving credit facility of $25 million.[1] Lehman's counsel drafted the Credit Agreement.

9. Lehman worked with Spanish Broadcasting to put the revolving credit facility in place. Lehman plainly understood and, indeed, advised Spanish Broadcasting that it should have the revolving credit facility to support the ongoing working capital needs of Spanish Broadcasting. Indeed, Section 4.16(b) of the Credit Agreement provided that the proceeds of the revolving credit facility "**shall be used for working capital purposes, capital needs and general corporate purposes**" of Spanish Broadcasting. See Ex. B, Credit Agreement, § 4.16(b) (emphasis added). Lehman took on the obligation to fund 40 percent (*i.e.*, $10 million) of the $25 million revolving credit facility. I believe that at the time the parties entered into the Credit Agreement and thereafter, Lehman plainly understood that if it failed to fund the revolver, Spanish Broadcasting would be left without the funds it needed for "working capital purposes, capital needs and general corporate purposes," and Spanish Broadcasting would suffer damages as a result.

---

[1] Concurrently, Lehman arranged for a separate second lien loan facility of $100,000,000.

10. As of October 2008, Spanish Broadcasting's capital structure also included $18.5 million in indebtedness under a secured promissory note (the "Mega TV Note"), dated March 1, 2006, among, *inter alia*, Spanish Broadcasting, as maker, and BC Media Funding Company II, LLC, as holder and assignee. See Ex. C, Mega TV Note; Ex. D, Security Agreement. The Mega TV Note had an impending maturity date of January 2, 2009. The lender under the Mega TV Note was unwilling to extend the maturity date. As a business matter, Spanish Broadcasting could not risk a default on the Mega TV Note because such a default would have triggered a cross-default under the Credit Agreement. See Ex. B, Credit Agreement, §§ 1.1 (definition of "Event of Default"), 8(e). It was essential that Spanish Broadcasting not take any action that would cause a default under the Credit Agreement because, among other things, the Credit Agreement had a below-market interest rate.

11. In addition, Spanish Broadcasting was a guarantor under a note (the "MBC Note"), dated January 4, 2007, between SBS Miami Broadcast Center, Inc. and Wachovia Bank, National Association. See Ex. E, MBC Note; Ex. F, Unconditional Guaranty (the "MBC Guaranty"). The MBC Guaranty required Spanish Broadcasting to hold cash equal to at least 1.2 times the outstanding principal balance under the MBC Note. See Ex. F, MBC Guaranty, at 6. As of September 30, 2008, $7.1 million remained outstanding under the MBC Note; therefore, Spanish Broadcasting was required to hold $8.5 million in cash.

12. Spanish Broadcasting also issued the Preferred Stock pursuant to a Certificate of Designations, dated October 29, 2003 (the "Certificate of Designations"). See Ex. G, Certificate of Designations. The Certificate of Designations provided for the payment of quarterly cash dividends in the amount of $2.5 million, commencing on January 15, 2009. Pursuant to the Certificate of Designations, Spanish Broadcasting could not incur additional indebtedness in

October 2008 because its Debt to Cash Flow Ratio (as defined in the Certificate of Designations) was greater than 7 to 1.  See *id.* at § 11(b).

**Spanish Broadcasting's Draw and Lehman's Failure to Fund**

13.     Spanish Broadcasting held approximately $34 million in cash as of September 30, 2008.  Of that amount, Spanish Broadcasting was required to hold $8.5 million in cash pursuant to the MBC Guaranty, as set forth above, which left $25.5 million of available cash.  In view of the impending maturity of the $18.5 million Mega TV Note on January 2, 2009, Spanish Broadcasting would have remaining cash of only $7 million -- without even taking into account the $5 million December interest payment under the Credit Agreement and presuming that Spanish Broadcasting made the $2.5 million dividend payment on the Preferred Stock in kind rather than in cash (such in kind payment was made on October 15, 2008).  Accordingly, Spanish Broadcasting determined that it needed to draw the full $25 million available under the revolver for working capital.

14.     On October 3, 2008, Spanish Broadcasting submitted a draw request (the "Draw") in accordance with the terms of the Credit Agreement for the entire $25 million of availability under the revolver.  Spanish Broadcasting intended to use the $25 million Draw plus a portion of cash on hand in order to (a) pay off the $18.5 million Mega TV Note, which had a maturity date of January 2, 2009; (b) terminate the Swap with Lehman and close out approximately $6 million of obligations thereunder; (c) fund $4 million of Spanish Broadcasting's operational expenses, specifically advertising, promotional and other marketing expenses (collectively, "Marketing Expenses"); and (d) pay the $5 million December interest payment under the Credit Agreement.

15.     LCPI commenced its case under chapter 11 of the Bankruptcy Code on or about October 5, 2008.  While the other lenders under the Credit Agreement funded $15 million of the Draw, Lehman failed to fund its $10 million portion of the Draw.  The lenders who did fund $15

million of the $25 million Draw chose not to fund the $10 million portion that Lehman failed to fund, despite the fact that Spanish Broadcasting explicitly asked the lenders to do so.

16. Because Lehman did not fund its $10 million portion of the Draw, Spanish Broadcasting was compelled to use the entire $15 million it did receive from the Draw, plus $3.5 million of its already low cash reserves, to make the $18.5 million payment on the maturing Mega TV Note.[2] Spanish Broadcasting was left with dangerously low cash reserves as a result of Lehman's failure to fund and, as a result, Spanish Broadcasting did not have the approximately $6 million it needed to terminate the Swap and the $4 million it needed for Marketing Expenses.

17. Lehman's breach of its obligation to fund the Draw left Spanish Broadcasting undercapitalized. S&P and Moody's each downgraded Spanish Broadcasting _expressly_ as a result of Lehman's failure to fund the Draw. See Ex. H, S&P report; Ex. I, Moody's report. Lehman's failure to fund clearly precipitated the downgrades. S&P's report stated that "the ratings downgrade is based on [S&P's] continued liquidity concerns regarding cash depletion, which are further heightened by the company's inability to draw down fully on its $25 million revolving credit facility." See Ex. H. Tellingly, Moody's and S&P downgraded Spanish Broadcasting on October 14 and October 16, 2008 respectively -- mere days after the occurrence of Lehman's failure to fund the Draw.

18. Other third parties besides the rating agencies, such as analysts and investors, also expressed concern regarding Spanish Broadcasting's financial condition. For example, GE (a Lender under the Credit Agreement) insisted that a collateral audit of Spanish Broadcasting be

---

[2] The lender under the $18.5 million Mega TV Note would not extend the January 2, 2009 maturity date. The lender was nervous about the prospects for repayment and gave Spanish Broadcasting a $150,000 discount on the principal amount in exchange for Spanish Broadcasting repaying the Mega TV Note on October 24, 2008.

62771976_2                                                        7

conducted. Moreover, the trading price of Spanish Broadcasting's stock fell from $3.80 per share at September 30, 2008 to $2.40 per share at October 31, 2008 to $1.50 per share at November 30, 2008 to $0.97 per share at December 31, 2008.

**Spanish Broadcasting Could Not Obtain Alternative Financing Following Lehman's Failure to Fund the Draw**

19. Lehman's bankruptcy unleashed a global financial crisis on a magnitude not seen since the Great Depression. The impact of Lehman's collapse on the financial markets cannot be overstated. Following the commencement of the Lehman bankruptcy proceedings, the financial markets became further paralyzed and investment activity ground to a halt. Commercial loans were simply not available in the marketplace.

20. Following Lehman's failure to fund the Draw in October 2008, Spanish Broadcasting was unable to obtain alternate financing of the $10 million for several reasons, including but not limited to the following: (1) the incurrence of any additional indebtedness was barred under the terms of the Certificate of Designations for the Preferred Stock; (2) no lender would have agreed to provide fresh capital on a basis that was *pari passu* with the Credit Agreement because Spanish Broadcasting's existing indebtedness under the Credit Agreement was trading in the marketplace at or below 58 cents on the dollar in the fourth quarter of 2008; (3) a refinancing of the entire Credit Agreement was not at all feasible, because Spanish Broadcasting already had below-market financing in place and no company raised capital in the fourth quarter of 2008 at rates of return even close to those required by third-party investors in Spanish Broadcasting's Senior Credit Facilities; (4) the incurrence of indebtedness on a priming basis to the lenders under the Credit Agreement would have required unanimous consent of the Credit Agreement lenders, which would not have been forthcoming; and (5) Lehman itself, in its capacity as Administrative Agent and a Lender under the Credit Agreement, had imposed such

arduous conditions on obtaining a third party loan that those conditions made it impracticable (if not impossible) for Spanish Broadcasting to find an alternate lender.

21. The analysis under the Certificate of Designations for the Preferred Stock is straightforward as well as objective and demonstrates that Spanish Broadcasting could not obtain alternate financing. Pursuant to Section 11(b) of the Certificate of Designations, Spanish Broadcasting could not obtain the $10 million of alternate financing because its Debt to Cash Flow Ratio (as defined in the Certificate of Designations) was greater than 7 to 1.

22. Nor would any lender have provided the $10 million of financing under the Credit Agreement (or outside of the Credit Agreement on a *pari passu* basis with the Credit Agreement) in the fourth quarter of 2008, because Spanish Broadcasting's indebtedness under the Credit Agreement could be acquired in the marketplace at or below 58 cents on the dollar in the fourth quarter of 2008. Indeed, it is my understanding from Spanish Broadcasting's financial advisor, Berkeley Research Group, LLC ("BRG"),[3] that the fair value mark of the debt under the Credit Agreement at September 30, 2008 (*i.e.* 58 cents) and December 31, 2008 (*i.e.* 28 cents) shows that purchasers of the debt were requiring a yield to maturity of 23.02% at September 30, 2008 and 48.74% at December 31, 2008. Based on BRG's review of 114 corporate debt issues identified by S&P Capital IQ that occurred between September 30 and December 31, 2008, not one of these debt issuances offered a rate of return higher than 18.50% -- *i.e.*, no company raised capital at rates even close to those required by third party investors in Spanish Broadcasting's debt under the Credit Agreement, as set forth in the accompanying expert report (the "Kearns Report") of Christopher J. Kearns of BRG. See Kearns Report, at 5-6. Thus, Mr. Kearns would testify and opine that there was no marketplace for corporate debt issues yielding rates of return

---

[3] The former members and senior professionals at Capstone Advisory Group, LLC joined BRG on June 1, 2015.

comparable to that of the capital Spanish Broadcasting needed to replace because of Lehman's failure to fund.[4]  *Id.*

23.     In order for Spanish Broadcasting to obtain a loan that was senior to the loans under the Credit Agreement, Spanish Broadcasting required the unanimous consent of the existing lenders under the Credit Agreement as well as Lehman in its capacity as Administrative Agent.  See Ex. B, Credit Agreement, §§ 1.1, 7.2, 7.3, 10.1.  As of October 1, 2008, there were 34 lenders under the Credit Agreement -- including hedge funds and distressed debt funds. Given the state of the financial markets, Spanish Broadcasting could not have obtained unanimous consent from the lender group to obtain financing on a senior basis.

24.     Nor was it feasible for Spanish Broadcasting to refinance the entire $350 million credit facility in the fourth quarter of 2008.  A refinancing of the entire Credit Agreement would not have made business sense -- and arguably would have been a breach of Spanish Broadcasting's fiduciary duties -- because the Credit Agreement was a deeply below-market facility.  It simply would not have made sense to refinance $327.8 million of indebtedness then outstanding under the Credit Agreement at face value when the fair value of that indebtedness was only $91.8 million based on public marks.  Even if a lender were willing to lend $10 million to Spanish Broadcasting during the last quarter of 2008, it would have been impractical (if not impossible) to do so because (i) it would have taken months and months to identify a lender and consummate a deal; (ii) the original issue discount and transaction costs would have been prohibitive for a $10 million issuance; and (iii) the interest rate would have been astronomical.

25.     With regard to the need for Lehman's consent as Administrative Agent, in early 2009, Spanish Broadcasting inquired into whether Lehman would consent to Spanish

---

[4]  Spanish Broadcasting's leverage ratios at September 30, 2008 and December 31, 2008 (of 14.77 and 16.87 respectively) further demonstrate that no lender would have lent money to it in the last quarter of 2008.

62771976_2                                                                10

Broadcasting's obtaining a third party loan. Lehman informed Spanish Broadcasting that it would be willing to grant consent, provided that Spanish Broadcasting (i) release Lehman from its duties as Administrative Agent, (ii) release Lehman from its $10 million revolver commitment, and (iii) amend and reprice the deeply below market $350 million Credit Agreement. See Ex. J, credit investment news article regarding Lehman. Spanish Broadcasting rejected these options because we determined that they were not in the best interests of debt holders and shareholders, since they would have forced Spanish Broadcasting into bankruptcy.

26. Even if Spanish Broadcasting could have found a lender willing to lend it $10 million in the fourth quarter of 2008 (which it could not, for the reasons set forth above), it would have been impractical to do so. It likely would have taken months for Spanish Broadcasting to identify a lender and consummate a deal, time that Spanish Broadcasting did not have during its liquidity crisis. For example, it took more than half a year for Spanish Broadcasting to complete a refinancing in 2012. In addition, the transaction costs of completing a capital raise would have been prohibitive for an issuance of $10 million. We estimated that the due diligence costs alone could have been as much as $500,000, *i.e.*, 5% of the offering amount.

**Spanish Broadcasting Suffered Damages As a Direct Result of Lehman's
Breach of Its Obligation to Fund the Revolver**

27. Spanish Broadcasting was in regular communications with Lehman personnel in the days leading up to and following Spanish Broadcasting's issuance of the Draw and Lehman's failure to fund its share. Lehman was well aware of Spanish Broadcasting's need for Lehman's $10 million and well aware that Spanish Broadcasting could not obtain funds elsewhere. The failure of Lehman to fund the Draw caused Spanish Broadcasting to suffer substantial damages. On November 3, 2011, Spanish Broadcasting filed the Proof of Claim against LCPI in order to recover the damages that Spanish Broadcasting suffered as a direct result of Lehman's failure to fund.

62771976_2                                          11

28. As set forth in the Kearns Report and the accompanying expert report (the "Trautman Report") of James Trautman of Bortz Media & Sports Group, Inc., Spanish Broadcasting's media expert, and as discussed in summary form below, the failure of Lehman to fund the Draw caused Spanish Broadcasting to suffer damages in the aggregate amount of $41.9 million, which is comprised of (a) damages in an amount of $24,500,000 (the "Impacted EBITDA Damages") resulting from Spanish Broadcasting's lack of $4 million in funds needed for Marketing Expenses; (b) damages in an amount of $17,054,558 (the "Swap Damages") resulting from Spanish Broadcasting's lack of capital to terminate and close out the Swap in October 2008; and (c) damages in an amount of $343,333 (the "Fee Damages") on account of fees that Spanish Broadcasting paid to Lehman for the $10 million revolver commitment that Lehman failed to fund.

A.   **Impacted EBITDA Damages**

29. If Lehman had funded the Draw, then Spanish Broadcasting would have spent approximately $4 million on Marketing Expenses. Instead, Spanish Broadcasting was forced essentially to curtail its expenditures for advertising, promotional other marketing needs by $4 million, thereby directly impacting Spanish Broadcasting's EBITDA, as set forth in the Trautman Report. This decline in EBITDA resulted in a diminution in the value of Spanish Broadcasting's business and Spanish Broadcasting suffered the Impacted EBITDA Damages as a result, as set forth in the Kearns Report.

B.   **Swap Damages**

30. In connection with the Credit Agreement, pursuant to an affirmative covenant imposed by Lehman, Spanish Broadcasting was required to enter into a swap agreement. The purpose of such swap agreement was to hedge against fluctuations in the interest rate on the term

loans under the Credit Agreement. On June 28, 2005, on Lehman's advice and insistence, Spanish Broadcasting entered into the Swap with Lehman.

31.     If Lehman had funded the Draw, then Spanish Broadcasting would have terminated the Swap for a close-out amount of $6,008,991.58, based on the three-month LIBOR forward curve as of October 3, 2008. However, as a direct result of Lehman's failure to fund the Draw, Spanish Broadcasting was unable to terminate the Swap and make the termination payment in October 2008. Spanish Broadcasting ultimately paid $10,311,965 in Swap settlement amounts in excess of the $6,008,991.58 that it would have paid if it had been able to terminate the Swap in October 2008, including $425,000 in investment banker fees and $500,000 in estimated legal and other costs in connection with the termination of the Swap in 2010.

32.     In addition, if Spanish Broadcasting had not paid $10,311,965 of direct swap damages resulting from Lehman's failure to fund the Draw, then Spanish Broadcasting would have borrowed $264,688,035 in February 2012, or $10,311,965 less than the $275 million that Spanish Broadcasting actually borrowed in February 2012 when the Lehman-agented Credit Agreement was eventually refinanced. Based on my understanding from potential lenders prior to the refinancing, Spanish Broadcasting would have had a lower cost of funds by 0.25% if Spanish Broadcasting had a lower leverage at that time. If the amount of the facility were $264.7 million and if the interest rate were 25 basis points less, then Spanish Broadcasting would have saved $3,302,571.

33.     As a result of Lehman's failure to fund the Draw, Spanish Broadcasting suffered the Swap Damages in a total amount of $17,054,558, as set forth in the Kearns Report.

### C. Fee Damages

34. In addition, Spanish Broadcasting suffered Fee Damages in an amount of $343,333 on account of fees that Spanish Broadcasting paid to Lehman for the $10 million revolver commitment that Lehman failed to fund, as set forth in the Kearns Report.

35. The damages that Spanish Broadcasting seeks are measured by what it would take to put Spanish Broadcasting in the same position that it would have been in if Lehman had funded the Draw.

36. The Impacted EBITDA Damages, the Swap Damages and the Fee Damages relate to the injuries that Spanish Broadcasting suffered directly in connection with the Credit Agreement. These were not "collateral business arrangements," as Lehman alleges in its Motion. Rather, the purpose of the revolving credit facility, as Lehman described it in presentations to Spanish Broadcasting and in Section 4.16(b) of the Credit Agreement, was to provide Spanish Broadcasting with funds needed for "working capital purposes, capital needs and general corporate purposes." The damages that Spanish Broadcasting suffered flowed directly from Spanish Broadcasting's lack of funds that it required for its "working capital purposes, capital needs and general corporate purposes" as a result of Lehman's failure to fund the Draw.

**The Parties Did Not Intend for the Alleged Consequential Damages Waiver
to Be Effective Following the Termination of the Credit Agreement**

37. On February 7, 2012, Lehman and Spanish Broadcasting entered into a payoff letter (the "Payoff Letter") that terminated the Credit Agreement. A copy of the Payoff Letter is attached as Exhibit A to the Declaration of Sheryl Gittlitz (the "Gittlitz Declaration") filed contemporaneously herewith. The Payoff Letter as well as the Credit Agreement, which were both drafted by Lehman's counsel, were explicit as to which provisions of the Credit Agreement survived termination. Following careful and extensive negotiations between the parties regarding the terms of the Payoff Letter, as detailed at length in the Gittlitz Declaration, neither

62771976_2                                    14

the Credit Agreement nor the Payoff Letter provides for the survival of Section 10.12(e) of the Credit Agreement (the "Alleged Waiver"). Based on my understanding of the outcome of the negotiations surrounding the Payoff Letter at the time that I signed it on behalf of Spanish Broadcasting, I do not believe that the parties intended for the Alleged Waiver to be effective following the termination of the Credit Agreement pursuant to the Payoff Letter.

**Lehman's Objection to the Proof of Claim**

38. On July 10, 2012, Lehman filed an Objection to the Proof of Claim. In its Objection, Lehman argued that most of the damages set forth in the Proof of Claim are barred by the Alleged Waiver under Section 10.12(e) of the Credit Agreement.

39. On September 13, 2012, Spanish Broadcasting filed its Response to the Objection. On January 24, 2013, Lehman filed its Reply. On February 11, 2013, Spanish Broadcasting filed its Supplemental Brief in response to Lehman's Reply.

40. On February 13, 2013, the Bankruptcy Court (Peck, J.) conducted the Sufficiency Hearing with respect to Lehman's Objection to the Proof of Claim. Spanish Broadcasting prevailed at the Sufficiency Hearing. The Bankruptcy Court ruled in favor of Spanish Broadcasting and refused to disallow any of Spanish Broadcasting's claims. At the same time, the Bankruptcy Court encouraged the parties to settle.

41. On March 11, 2013, Lehman sent Spanish Broadcasting an ADR notice, requiring Spanish Broadcasting to submit to mediation pursuant to the Bankruptcy Court's order regarding claims procedures, dated April 19, 2010 [Dkt No. 8474)]. Although the parties engaged in mediation, they were unable to resolve consensually Lehman's Objection to the Proof of Claim.

42. On April 27, 2015, the Court held a conference (the "April 27 Conference") at which Lehman proposed that (a) it should be permitted to file a summary judgment motion on the issue of whether the Alleged Waiver survived the termination of the Credit Agreement

pursuant to the Payoff Letter; and (b) discovery should proceed solely with respect to documents of Kaye Scholer LLP and Weil, Gotshal & Manges LLP regarding the Payoff Letter. See Ex. K, transcript of April 27 Conference. On April 29, 2015, Spanish Broadcasting submitted a letter to the Court, requesting that the Court reject Lehman's proposal from the April 27 Conference.

43. On or about May 11, 2015, the parties exchanged discovery with respect to the negotiation of the Payoff Letter. On May 12, 2015, the Court held a further conference (the "May 12 Conference"), at which time the Court stated that it would allow Lehman to proceed with its proposal. See Ex. L, transcript of May 12 Conference.

44. On May 15, 2015, Weil sent Kaye Scholer an email, stating that "[w]e have reviewed the production Kaye Scholer made on Monday, and concluded that LBHI has a sufficient basis to move for summary judgment." See Ex. M, May 15, 2015 email from Weil.

45. On May 22, 2015, the Court entered the Stipulated Order Regarding Briefing Schedule Regarding Claim 67707 of Spanish Broadcasting System, Inc. [Dkt No. 49706].

46.  I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       July 13, 2015

_____
Joseph A. Garcia