# **EXHIBIT G**

```
<DOCUMENT>
<TYPE>EX-4.2
<SEQUENCE>5
<FILENAME>g85714exv4w2.txt
<DESCRIPTION>EX-4.2 CERTIFICATE OF DESIGNATION
<TEXT>
<PAGE>
```

Exhibit 4.2

CERTIFICATE OF DESIGNATIONS SETTING FORTH THE
VOTING POWER, PREFERENCES AND RELATIVE,
PARTICIPATING, OPTIONAL AND
OTHER SPECIAL RIGHTS
AND QUALIFICATIONS, LIMITATIONS
AND RESTRICTIONS
OF THE
10 3/4% SERIES B CUMULATIVE EXCHANGEABLE
REDEEMABLE PREFERRED STOCK
OF
SPANISH BROADCASTING SYSTEM, INC.

-------------------------------------

Pursuant to Section 151
of the General Corporation Law
of the State of Delaware

-------------------------------------

Spanish Broadcasting System, Inc. (the "Company"), a corporation
organized and existing under the General Corporation Law of the State of
Delaware, does hereby certify that, pursuant to authority conferred upon the
board of directors of the Company (the "Board of Directors") by its Certificate
of Incorporation, as amended and restated (the "Certificate of Incorporation"),
and pursuant to the provisions of Section 151 of the General Corporation Law of
the State of Delaware, the Board of Directors, on October 28, 2003 duly approved
and adopted the following resolution (the "Resolution"):

RESOLVED, that, pursuant to the authority vested in the Board of
Directors by its Certificate of Incorporation, the Board of Directors does
hereby designate, create, authorize and provide for the issuance of 10 3/4%
Series B Cumulative Exchangeable Redeemable Preferred Stock, par value $.01 per
share, with a liquidation preference of $1,000.00 per share, consisting of
280,000 shares, having the designations, preferences, relative, participating,
optional and other special rights and the qualifications, limitations and
restrictions thereof that are set forth in the Certificate of Incorporation and
in this Resolution as follows:

1.      DESIGNATION.

        (a)      There is hereby created out of the authorized and unissued
                 shares of preferred stock of the Company a series of preferred
                 stock designated as the "10 3/4% Series B Cumulative
                 Exchangeable Redeemable Preferred Stock." The number of shares
                 constituting such series shall be 280,000 and are referred to
                 as the "Series B Preferred Stock." The liquidation preference
                 of the Series B Preferred Stock shall be $1,000.00 per share.

        (b)      Shares of Series B Preferred Stock that have been issued and

reacquired in any manner, including shares purchased or
redeemed or exchanged, shall (upon compliance with any
applicable provisions of the laws of Delaware) have the status
of authorized and unissued shares of preferred stock
undesignated as to series and may be redesignated and reissued
as part of any series of preferred stock; provided that any
issuance of such shares as Series B Preferred Stock must be in
compliance with the terms hereof.

<PAGE>
2.      CERTAIN DEFINITIONS.

        Unless the context otherwise requires, the terms defined in this
Section 2 shall have, for all purposes of this resolution, the meanings herein
specified (with terms defined in the singular having comparable meanings when
used in the plural).

        "Acquired Debt" means, with respect to any specified Person, (i)
Indebtedness of any other Person existing at the time such other Person is
merged with or into or became a Subsidiary of such specified Person, including,
without limitation, Indebtedness incurred in connection with, or in
contemplation of, such other Person merging with or into or becoming a
Subsidiary of such specified Person; and (ii) Indebtedness secured by a Lien
encumbering any asset acquired by such specified Person.

        "Affiliate" of any specified Person means any other Person which
directly or indirectly through one or more intermediaries controls, or is
controlled by, or is under common control with, such specified Person. For the
purposes of this definition, "control" (including, with correlative meanings,
the terms "controlling," "controlled by," and "under common control with"), as
used with respect to any Person, means the possession, directly or indirectly,
of the power to direct or cause the direction of the management or policies of
such Person, whether through the ownership of voting securities, by agreement or
otherwise; provided that (a) beneficial ownership of at least 10% of the Voting
Stock of a Person shall be deemed to be control and (b) for purposes of the
"Transactions with Affiliates" covenant contained in Section 11(d), for so long
as Pablo Raul Alarcon, Sr., Raul Alarcon, Jr. or Jose Grimalt are directors,
officers or shareholders of the Company, they, their respective spouses, lineal
descendants and any Person controlled by any of them shall be Affiliates of the
Company and its Subsidiaries.

        "Affiliate Transaction" has the meaning set forth in Section 11(d).

        "Applicable Redemption Price" means a price per share equal to the
following redemption prices specified below (expressed as a percentage of the
Liquidation Preference thereof), plus, without duplication, an amount in cash
equal to all accumulated and unpaid dividends per share, if any, to but
excluding the Redemption Date (including an amount equal to the pro rated
dividend for the period from the Dividend Payment Date immediately prior to the
Redemption Date to but excluding the Redemption Date) if redeemed during the
12-month period commencing on October 15 of each of the years set forth below:

<TABLE>
<S>                                                      <C>
2008..............................................       105.375%
2009..............................................       103.583%
2010..............................................       101.792%
2011 and thereafter...............................       100.000%
</TABLE>

        "Asset Sale" means (i) the sale, lease, conveyance or other disposition

of any assets or rights (including, without limitation, by way of a sale and leaseback), excluding sales of services and goods in the ordinary course of business consistent with past practices and (ii) the issue or sale by the Company or any of its Subsidiaries of Equity Interests of any of the Company's Subsidiaries, in the case of either clause (i) or (ii), whether in a single transaction or a series of related transactions (a) that have a fair market value in excess of $5.0 million or (b) for net proceeds in excess of $5.0 million.

Notwithstanding the foregoing, the following items will not be deemed to be Asset Sales: (i) a transfer of assets by the Company to a Wholly Owned Restricted Subsidiary or by a Wholly Owned Restricted Subsidiary to the Company or to another Wholly Owned Restricted Subsidiary, (ii) an issuance of Equity Interests by a Wholly Owned Restricted Subsidiary to the Company or to another Wholly

-2-

<PAGE>
Owned Restricted Subsidiary, (iii) the sale, lease or other disposition of equipment or other assets in the ordinary course of business, (iv) the sale and leaseback of any assets within 90 days of the acquisition of such assets, (v) a Restricted Payment that is permitted by Section 11(a) hereof, (vi) a transfer of any FCC License to a Non-Guarantor Subsidiary, described in clause (i) of the definition thereof, (vii) an Asset Swap, and (viii) the sale or other disposition by the Company or its Subsidiaries of the Company's radio stations KLEY-FM and KSAH-AM serving the San Antonio, Texas market, and radio station KPTI-FM serving the San Francisco, California market.

"Asset Swap" means the execution of a definitive agreement, subject only to regulatory approval and other customary closing conditions, that the Company in good faith believes will be satisfied, for a substantially concurrent purchase and sale, or exchange, of assets used or useful in a Permitted Business between the Company or any of its Restricted Subsidiaries and another person or group of affiliated persons; provided that any amendment to or waiver of any closing conditions which individually or in the aggregate is material to the Asset Swap shall be deemed to be a new Asset Swap.

"Attributable Debt" in respect of a sale and leaseback transaction means, at the time of determination, the present value (discounted at the rate of interest implicit in such transaction, determined in accordance with GAAP) of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction (including any period for which such lease has been extended or may, at the option of the lessor, be extended).

"Basket Period" has the meaning set forth in Section 11(a).

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person," as such term is used in Section 13(d)(3) of the Exchange Act, such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banking institutions in the City of New York or at a place of payment are authorized by law, regulation or executive order to remain closed. If any payment, redemption, repurchase or exchange shall be required by the terms hereof to be made on a day that is not a Business Day, such payment, redemption,

repurchase or exchange shall be made on the immediately succeeding Business Day.

"Capital Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized on a balance sheet in accordance with GAAP.

"Capital Stock" means (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited) and (iv) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Cash Equivalents" means (i) United States dollars, (ii) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof having maturities of not more than one year from the date of acquisition, (iii) certificates of deposit and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding six months and overnight bank deposits, in each case with any

-3-

<PAGE>
domestic commercial bank having capital and surplus in excess of $500.0 million and a Thompson Bank Watch Rating of "B" or better, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in clause (iii) above and (v) commercial paper having the highest rating obtainable from Moody's Investors Service, Inc. or Standard & Poor's Corporation and in each case maturing within 270 days after the date of acquisition and (vi) money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (i) through (v) of this definition.

"Certificate of Designations" means this Certificate of Designations setting forth the voting power, preferences and relative, participating, optional and other special rights and qualifications, limitations and restrictions of the Series B Preferred Stock.

"Certificated Shares" has the meaning set forth in Section 14(b).

"Change of Control" means the occurrence of any of the following: (i) the sale, lease, transfer, conveyance or other disposition (or by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any "person" (as such term is used in Section 13(d)(3) of the Exchange Act) other than the Principal or a Related Party of the Principal, (ii) the adoption of a plan relating to the liquidation or dissolution of the Company, (iii) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as defined above), other than the Principal and his Related Parties, becomes the "Beneficial Owner," directly or indirectly, of more than 35% of the Voting Stock of the Company, (iv) the Principal ceases to be the Beneficial Owner, directly or indirectly, of a majority of the voting power of Voting Stock of the Company (measured by voting power rather than number of shares) as a result of any direct or indirect transfer of securities by the Principal, or (v) the first day on which a majority of the members of the Board of Directors of the Company are

not Continuing Directors.

"Change of Control Offer" has the meaning set forth in Section 10(a).

"Change of Control Payment" has the meaning set forth in Section 10(a).

"Change of Control Payment Date" has the meaning set forth in Section 10(d).

"Company" means Spanish Broadcasting System, Inc., a Delaware corporation, and any and all successors thereto.

"Company Notice" has the meaning set forth in Section 7(b).

"Consolidated Cash Flow" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period plus, without duplication, (i) an amount equal to any extraordinary loss plus any net loss realized in connection with an Asset Sale, to the extent such losses were deducted in computing such Consolidated Net Income, plus (ii) provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was deducted in computing such Consolidated Net Income, plus (iii) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued and whether or not capitalized (including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of

-4-

<PAGE>
letter of credit or bankers' acceptance financings, and net payments (if any) pursuant to Hedging Obligations), to the extent that any such expense was deducted in computing such Consolidated Net Income, plus (iv) depreciation expense for such period, to the extent the same was deducted in computing such Consolidated Net Income, plus (v) all amortization expense and other non-cash expenses (excluding any such non-cash expense to the extent that it represents an accrual or reserve for cash expenses in any future period) for such period, to the extent the same was deducted in computing such Consolidated Net Income, minus (vi) non-cash items increasing such Consolidated Net Income for such period.

Consolidated Cash Flow shall be calculated on a pro forma basis after giving effect to any acquisition as if such acquisition (including any Consolidated Cash Flow associated with such acquisition) occurred on the first day of the most recently ended four quarter period, giving pro forma effect to any non-recurring expenses, non-recurring costs and cost reductions within the first year after such acquisition which the Company anticipates if the Company delivers to the Transfer Agent an officer's certificate executed by its chief financial or accounting officer certifying to and describing and quantifying with reasonable specificity such non-recurring expenses, non-recurring costs and cost reductions.

"Consolidated Indebtedness" means, with respect to any Person as of any date of determination, the sum, without duplication, of (i) the total amount of Indebtedness and Attributable Debt of such Person and its Restricted Subsidiaries, plus (ii) the total amount of Indebtedness and Attributable Debt of any other Person, to the extent that such Indebtedness or Attributable Debt has been guaranteed by the referent Person or by one or more of its Restricted

Subsidiaries or is secured by a Lien on assets of the referent Person or any of its Restricted Subsidiaries, plus (iii) the aggregate liquidation value of all Disqualified Stock of such Person and all preferred stock of Restricted Subsidiaries of such Person, in each case, determined on a consolidated basis in accordance with GAAP.

"Consolidated Interest Expense" means, with respect to any Person for any period, the sum of: (i) the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued (including, without limitation, amortization of original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letters of credit or bankers' acceptance financing, and net payments (if any) pursuant to Hedging Obligations); and (ii) the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period; and (iii) any interest expense on Indebtedness or Attributable Debt of another Person that is guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries (whether or not such guarantee or Lien is called upon).

"Consolidated Net Income" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; provided that (i) except as otherwise provided in clause (v) below, the positive Net Income of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid in cash to the referent Person or a Restricted Subsidiary thereof, (ii) the Net Income of any Restricted Subsidiary shall be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, (iii) the Net Income of any Person acquired in a pooling of interests transaction for any period prior to the date of such acquisition shall be excluded, (iv) the cumulative effect of a change in accounting principles shall be excluded and (v) the Net Income

-5-

<PAGE>
of any Unrestricted Subsidiary shall be excluded, whether or not distributed to the Company or one of its Restricted Subsidiaries.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Company who (i) was a member of such Board of Directors on the Issue Date or (ii) was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board at the time of such nomination or election.

"Credit Facility" or "Credit Facilities" means one or more debt facilities (including, without limitation, the Senior Credit Facilities) or commercial paper facilities with banks or other institutional lenders providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables) or letters of credit, in each case, as now in effect or at any time hereafter entered into and as amended,

restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time. Indebtedness under Credit Facilities outstanding on the Issue Date shall be deemed to have been incurred on such date in reliance on the exception provided by clause (i) of the definition of Permitted Debt.

"Debt to Cash Flow Ratio" means, with respect to any Person as of any date of determination (the "Calculation Date"), the ratio of (a) the Consolidated Indebtedness of such Person as of such date to (b) the Consolidated Cash Flow of such Person for the four most recent full fiscal quarters ending immediately prior to such date for which internal financial statements are available, determined on a pro forma basis after giving effect to all acquisitions and dispositions of assets made by such Person and its Restricted Subsidiaries from the beginning of such four-quarter period through and including such date of determination (including any related financing transactions) as if such acquisitions and dispositions had occurred at the beginning of such four-quarter period. For purposes of making the computation referred to above, (i) acquisitions that have been made by such Person or any of its Restricted Subsidiaries, including through mergers or consolidations and including any related financing transactions, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date shall be deemed to have occurred on the first day of the four-quarter reference period and Consolidated Cash Flow for such reference period shall be calculated without giving effect to clause (iii) of the proviso set forth in the definition of Consolidated Net Income and (ii) the Consolidated Cash Flow attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses disposed of by the Company or any of its Restricted Subsidiaries prior to the Calculation Date, shall be excluded.

"Disqualified Stock" means any Capital Stock (other than the Series A Preferred Stock or the Series B Preferred Stock) that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 91 days after October 15, 2013, provided, however, that any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Company to repurchase such Capital Stock upon the occurrence of a Change of Control or an Asset Sale shall not constitute Disqualified Stock if the terms of such Capital Stock provide that the Company may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with Section 11(b) hereof.

"Dividend Payment Date" has the meaning set forth in Section 4(a).

-6-

<PAGE>

"Dividend Shares" means shares of Series B Preferred Stock paid by the Company to Holders of then outstanding shares of Series B Preferred Stock as dividends on such outstanding shares in accordance with this Certificate of Designations.

"DTC" has the meaning set forth in Section 14(a).

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Equity Offering" means (i) any public or private sale of the common stock of the Company pursuant to which the Company receives net proceeds of at

least $15.0 million other than issuances of common stock of the Company pursuant
to employee benefits plans or as compensation to employees or (ii) the issuance
of shares of the Company's Class A common stock, par value $.0001 per share,
upon exercise of the warrants granted to International Church of the FourSquare
Gospel pursuant to which the Company receives net proceeds of at least $5.0
million.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange Date" has the meaning set forth in Section 8(c).

"Exchange Indenture" has the meaning set forth in Section 8(a).

"Exchange Notes" means the Company's 10 3/4% Subordinated Exchange
Notes due 2013 issued in exchange for the Series A Preferred Stock and Series B
Preferred Stock, as the case may be.

"Exchange Notes Trustee" has the meaning set forth in Section 8(a).

"Exchange Notice" has the meaning set forth in Section 8(c).

"Existing Indebtedness" means Indebtedness in existence on the Issue
Date (other than Indebtedness under Credit Facilities), until such Indebtedness
is repaid.

"GAAP" means generally accepted accounting principles set forth in the
opinions and pronouncements of the Accounting Principles Board of the American
Institute of Certified Public Accountants and statements and pronouncements of
the Financial Accounting Standards Board or in such other statements by such
other entity as have been approved by a significant segment of the accounting
profession, which are in effect from time to time.

"Global Preferred Share" has the meaning set forth in Section 14(a).

"Global Restricted Share Legend" shall have the meaning set forth in
Section 14(a).

"Global Shares Legend" has the meaning set forth in Section 14(a).

"Hedging Obligations" means, with respect to any Person, the
obligations of such Person under (i) interest rate swap agreements, interest
rate cap agreements and interest rate collar agreements and (ii) other
agreements or arrangements designed to protect such Person against fluctuations
in interest rates.

"Holder" means a holder in whose name a share of Series A Preferred
Stock or Series B Preferred Stock, as the case may be, is registered.

-7-

<PAGE>

"Holder Repurchase Notice" has the meaning set forth in Section 7(b).

"incur" has the meaning set forth in Section 11(b).

"Indebtedness" means, with respect to any Person, without duplication,
(i) any indebtedness of such Person, whether or not contingent, in respect of
borrowed money or evidenced by bonds, notes, debentures or similar instruments
or letters of credit (or reimbursement agreements in respect thereof) or
banker's acceptances or representing Capital Lease Obligations or the balance
deferred and unpaid of the purchase price of any property or representing any

Hedging Obligations, except any such balance that constitutes an accrued expense or trade payable, if and to the extent any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of such Person prepared in accordance with GAAP, (ii) all indebtedness of others secured by a Lien on any asset of such Person (whether or not such indebtedness is assumed by such Person) and (iii) to the extent not otherwise included, the guarantee by such Person of any indebtedness of any other Person of the sort described in clause (i) of this definition. Notwithstanding the foregoing, the term "Indebtedness" shall not include Non-Recourse Debt or indebtedness that constitutes "Indebtedness" merely by virtue of a pledge of Equity Interests of an Unrestricted Subsidiary. Furthermore, for the avoidance of doubt, "Indebtedness" shall not include any Capital Stock or any liabilities in respect of Capital Stock. The amount of any Indebtedness outstanding as of any date shall be (A) the accreted value thereof, in the case of any Indebtedness issued with original issue discount, (B) the principal amount of the Indebtedness secured, together with any interest thereon that is more than 30 days past due, in the case of any Indebtedness of the type described in clause (ii) above, (C) the principal amount of the Indebtedness guaranteed, together with any interest thereon that is more than 30 days past due, in the case of any Indebtedness of the type described in clause (iii) above, (D) the amount of the net settlement payment payable on termination, in the case of any Indebtedness constituting a Hedging Obligation (assuming for this purpose that the Hedging Obligation was terminated on the date as of which the calculation of the amount of Indebtedness is being made), and (E) the principal amount thereof, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the forms of direct or indirect loans (including guarantees of Indebtedness or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. If the Company or any Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Subsidiary of the Company, the Company shall be deemed to have made an Investment on the date of any such sale or disposition equal to the fair market value of the Equity Interests of such Subsidiary not sold or disposed of in an amount determined as provided in the third paragraph of Section 11(a) hereof. "Investments" does not include the defeasance, redemption or repurchase of Indebtedness that is cancelled and not acquired or held as an investment.

"Issue Date" means October 30, 2003.

"Junior Securities" has the meaning set for in Section 3(a).

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or

-8-

<PAGE>
agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction).

"Liquidation Preference" means $1,000 per share of Series B Preferred Stock.

"Net Income" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends, excluding, however, (i) any gain (but not loss), together with any related provision for taxes on such gain (but not loss), realized in connection with (a) any Asset Sale (including, without limitation, dispositions pursuant to sale and leaseback transactions) or (b) the disposition of any securities by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries and (ii) any extraordinary gain (but not loss), together with any related provision for taxes on such extraordinary gain (but not loss).

"Non-Guarantor Subsidiaries" means (i) those single-purpose Restricted Subsidiaries of the Company created or acquired after the Issue Date which own one or more FCC Licenses and related rights and no other material assets, (ii) those Subsidiaries of the Company created or acquired after the Issue Date that are not incorporated under the laws of the United States of America or a state of the United States of America, and (iii) Subsidiaries of the Company that are not required to become and are not guarantors of the Senior Subordinated Notes.

"Non-Recourse Debt" means Indebtedness: (i) as to which neither the Company nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable (as a guarantor or otherwise) or (c) constitutes the lender; (ii) no default with respect to which (including any rights that the holders thereof may have to take enforcement action against an Unrestricted Subsidiary) would permit (upon notice, lapse of time or both) any holder of any other Indebtedness (other than the Exchange Notes) of the Company or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity; and (iii) as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of the Company or any of its Restricted Subsidiaries.

"Obligations" means any principal, interest, prepayment or make-whole premium, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness or any guarantee thereof.

"Officer" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Person.

"Officers' Certificate" means a certificate signed by two officers at least one of whom shall be the principal executive officer, principal accounting officer or principal financial officer of the Company.

"Parity Securities" has the meaning set forth in Section 3(a).

"Paying Agent" means Wachovia Bank, National Association, a national banking association, and its successors.

"Payment Default" has the meaning set forth in Section 9(b).

-9-

<PAGE>
        "Permitted Business" means the media business and any business
reasonably similar, complementary, ancillary or related thereto, including, the
operation of Latin music Web sites and internet portals.

        "Permitted Debt" has the meaning set forth in Section 11(b).

        "Permitted Investments" means (i) any Investment in the Company or in a
Restricted Subsidiary; (ii) any Investment in Cash Equivalents; (iii) any
Investment by the Company or any Restricted Subsidiary of the Company in a
Person engaged in a Permitted Business, if (a) as a result of, or concurrently
with, such Investment such Person becomes a Restricted Subsidiary or (b) as a
result of, or concurrently with, such Investment such Person is merged,
consolidated or amalgamated with or into, or transfers or conveys substantially
all of its assets to, or is liquidated into, the Company or a Restricted
Subsidiary; or (c) the Company or a Restricted Subsidiary has entered into a
binding agreement to acquire such Person or all or substantially all of the
assets of such Person, which agreement is in effect on the date of such
Investment, and such Person becomes a Restricted Subsidiary or such transaction
is consummated, in each case, within 180 days of the date of such Investment;
(iv) any Restricted Investment made as a result of the receipt of non-cash
consideration from an Asset Sale; (v) any obligations or shares of Capital Stock
received in connection with or as a result of a bankruptcy, workout or
reorganization of the issuer of such obligations or shares of Capital Stock;
(vi) any Investment received involuntarily; (vii) any acquisition of assets
solely in exchange for the issuance of Equity Interests (other than Disqualified
Stock) of the Company; (viii) other Investments in Persons engaged in Permitted
Businesses (measured on the date each such Investment was made and without
giving effect to subsequent changes in value), when taken together with all
other Investments made pursuant to this clause (viii) that are at the time
outstanding, not to exceed $7.5 million; (ix) Investments by the Company or any
of its Restricted Subsidiaries in any other person pursuant to the terms of a
"local marketing agreement" or similar arrangement relating to a radio station
owned or licensed by such Person; (x) Hedging Obligations; (xi) the incurrence
by the Company or any of its Restricted Subsidiaries of performance, bid or
advance payment bonds, surety bonds, custom bonds, utility bonds and similar
obligations arising in the ordinary course of business; (xii) endorsements of
instruments for collection or deposit in the ordinary course of business; (xiii)
loans and advances to employees and officers not to exceed $2.5 million
outstanding in the aggregate at any time; (xiv) loans to employees, directors
and officers in connection with the purchase by such Persons of Equity Interests
of the Company; (xv) investments in account debtors received in connection with
the bankruptcy or reorganization, or in settlement of delinquent obligations, of
customers; and (xvi) investments in existence on the Issue Date.

        "Permitted Refinancing Indebtedness" means any Indebtedness of the
Company or any of its Restricted Subsidiaries or any Disqualified Stock of the
Company issued in exchange for, or the net proceeds of which are used to extend,
refinance, renew, replace, defease or refund other Indebtedness of the Company
or any of its Restricted Subsidiaries; provided that: (i) the principal amount
(or accreted value or liquidation preference, if applicable) of such Permitted
Refinancing Indebtedness does not exceed the principal amount of (or accreted
value, if applicable), plus accrued interest on, the Indebtedness so extended,
refinanced, renewed, replaced, defeased or refunded (plus the amount of
reasonable expenses and premiums incurred in connection therewith); (ii) such
Permitted Refinancing Indebtedness has a final maturity date later than the
final maturity date of, and has a Weighted Average Life to Maturity equal to or
greater than the Weighted Average Life to Maturity of, the Indebtedness being
extended, refinanced, renewed, replaced, defeased or refunded; (iii) if the
Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded

is or would be pari passu with the Exchange Notes, such Permitted Refinancing Indebtedness is or would be pari passu with or subordinated in right of payment to the Exchange Notes or is Disqualified Stock; (iv) if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is or would be subordinated in right of payment to the Exchange Notes, such Permitted Refinancing Indebtedness is or would be subordinated in

                              -10-
<PAGE>
right of payment to the Exchange Notes on terms at least as favorable to the Holders of Exchange Notes as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded or is Disqualified Stock; and (v) such Indebtedness is incurred either by the Company or by the Restricted Subsidiary that is the obligor on the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded, or such Disqualified Stock is issued by the Company, as applicable.

          "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or any agency or political subdivision thereof (including any subdivision or ongoing business of any such entity or substantially all of the assets of such entity, subdivision or business).

          "Principal" means Raul Alarcon, Jr.

          "Purchase Date" has the meaning set forth in Section 7(a).

          "Purchase Price" has the meaning set forth in Section 7(a).

          "Purchase Money Indebtedness" means any Indebtedness incurred in the ordinary course of business by a Person to finance the cost (including the cost of construction) of an item of property, the principal amount of which Indebtedness does not exceed the sum of (i) 100% of such cost and (ii) reasonable fees and expenses of such Person incurred in connection therewith.

          "Record Date" has the meaning set forth in Section 4(a).

          "Redemption Date" has the meaning set forth in Section 6(c).

          "Registration Default" has the meaning set forth in the Registration Rights Agreement.

          "Registration Rights Agreement" means the Registration Rights Agreement, dated as of October 30, 2003, by and among the Company, Lehman Brothers Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and Deutsche Bank Securities Inc.

          "Related Party" with respect to the Principal means (i) any spouse or immediate family member of the Principal or (ii) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding an 50% or more controlling interest of which consist of the Principal and/or such other Persons referred to in the immediately preceding clause (i).

          "Restricted Investment" means an Investment other than a Permitted Investment.

          "Restricted Payment" has the meaning set forth in Section 11(a).

"Restricted Subsidiary" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"SEC" means the Securities and Exchange Commission.

"Senior Credit Facilities" means the senior secured credit facilities contemplated to be entered into among the Company, Lehman Brothers Inc., Lehman Commercial Paper Inc., Merrill Lynch, Pierce Fenner & Smith Incorporated, Deutsche Bank Securities Inc., Merrill Lynch Capital Corporation and

-11-

<PAGE>
Deutsche Bank Trust Company Americas, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"Senior Debt" means (i) all Indebtedness outstanding under Credit Facilities and all Hedging Obligations with respect thereto, (ii) all Indebtedness of the Company that is senior to Exchange Notes (including the Senior Subordinated Notes), (iii) any other Indebtedness of the Company or any Restricted Subsidiary permitted to be incurred under the terms of this Cerificate of Designations, unless the instrument under which such Indebtedness is incurred expressly provides that it is on a parity with or subordinated in right of payment to the Exchange Notes and (iv) all Obligations of the Company or any Restricted Subsidiary with respect to the foregoing. Notwithstanding anything to the contrary in the foregoing, Senior Debt will not include (a) any liability for federal, state, local or other taxes owed or owing by the Company, (b) any Indebtedness of the Company or any Restricted Subsidiary to any of its Subsidiaries or other Affiliates, (c) any trade payables or (d) any Indebtedness that is incurred in violation of this Certificate of Designations; provided that Indebtedness under Credit Facilities will not cease to be Senior Debt if incurred based upon a written certificate from a purported officer of the Company to the effect that such Indebtedness was permitted by this Certificate of Designations to be incurred.

"Senior Subordinated Notes" mean the Company's 9 5/8% Senior Subordinated Notes due 2009.

"Series A Preferred Stock" means the Company's 10 3/4% Series A Cumulative Exchangeable Redeemable Preferred Stock, par value $.01 per share.

"Series B Preferred Stock" has the meaning set forth in Section 1(a).

"Significant Subsidiary" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the date hereof.

"Subsidiary" means, with respect to any Person, any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person (or a combination thereof).

"Surviving Entity" has the meaning set forth in Section 11(c).

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date on which this Indenture is qualified under the TIA, except as provided by Section 9.03 hereof.

"Transfer Agent" means Wachovia Bank, National Association, a national banking association, and its successors.

"Undesignated Shares" means shares of the preferred stock of the Company which are authorized under its Certificate of Incorporation, are not issued and outstanding, and have not been assigned to a series of preferred stock.

"Unrestricted Subsidiary" means (i) any Subsidiary that is designated by the Board of Directors as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary: (a) has no Indebtedness other than Non-Recourse Debt; (b) is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Subsidiary unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the

                                -12-

<PAGE>
Company or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company; (c) is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (1) to subscribe for additional Equity Interests or (2) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; (d) has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Company or any of its Restricted Subsidiaries; and (e) has at least one director on its board of directors that is not a director or executive officer of the Company or any of its Restricted Subsidiaries and has at least one executive officer that is not a director or executive officer of the Company or any of its Restricted Subsidiaries.

"Voting Rights Amendment" means an amendment to the By-laws of the Company providing for an increase in the size of the Board of Directors of the Company to, at all times, accommodate the appointment of a sufficient number of directors designated by the Holders of Series A Preferred Stock and Series B Preferred Stock in compliance with Section 9(b).

"Voting Rights Triggering Event" has the meaning set forth in Section 9(b).

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment, by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Restricted Subsidiary" of any Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Restricted Subsidiaries of such Person and one or more Wholly Owned Restricted Subsidiaries of such Person.

3.      RANKING.

      (a)      The Series B Preferred Stock shall, with respect to dividend distributions and distributions upon the liquidation, winding-up and dissolution of the Company, rank (i) senior to all classes of common stock of the Company and to each other class of Capital Stock or series of preferred stock of the Company created after the Issue Date by the Board of Directors of the Company the terms of which do not expressly provide that it ranks on a parity with the Series B Preferred Stock as to dividend distributions and distributions upon the liquidation, winding-up or dissolution of the Company (collectively referred to, together with all classes of common stock of the Company, as "Junior Securities"); and (ii) subject to certain conditions described below, on a parity with the Series A Preferred Stock and any Capital Stock or each other series of preferred stock created after the Issue Date by the Board of Directors of the Company, the terms of which expressly provide that such class or series will rank on a parity with the Series B Preferred Stock as to dividend distributions and distributions upon the liquidation, winding-up and dissolution of the Company (collectively referred to as "Parity Securities").

-13-

<PAGE>

      (b)      The Company shall not authorize or issue any new class or series of Parity Securities (or amend the provisions of any existing class or series of Capital Stock of the Company to make such class or series of Capital Stock Parity Securities) without the affirmative vote or consent of the holders of at least a majority of the shares of Series A Preferred Stock and Series B Preferred Stock then outstanding, voting or consenting, as the case may be, together as one class, in accordance with Section 9(f); provided, however, that, without the approval of Holders of the Series A Preferred Stock and Series B Preferred Stock, the Company may (i) issue Dividend Shares in accordance with the terms hereof, and (ii) issue and have outstanding shares of Parity Securities issued from time to time in exchange for, or the proceeds of which are used to redeem or repurchase, any or all of the shares of the Series B Preferred Stock or other Parity Securities then outstanding.

4.      DIVIDENDS.

      (a)      The Holders of the outstanding shares of the Series B Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors out of funds of the Company legally available therefor, dividends on the Series B Preferred Stock, which shall accrue at a rate per annum equal to 10.75% of the Liquidation Preference. If at any time dividends on the Series B Preferred Stock are in arrears and unpaid for four consecutive quarterly dividend periods, holders of Series B Preferred Stock will be entitled to the voting rights specified in Section 9 of this Certificate of Designations. All dividends will be cumulative, whether or not earned or declared, on a daily basis, from the Issue Date and will be payable quarterly in arrears on October 15, January 15, April 15 and July 15 of each year, commencing on January

15, 2004, or, if any such date is not a Business Day, on the
next succeeding Business Day (each a "Dividend Payment Date")
to the Holders on October 1, January 1, April 1 and July 1
immediately preceding the relevant Dividend Payment Date
(each, a "Record Date"). On or before October 15, 2008, the
Company may, at its option, pay dividends in cash or in
Dividend Shares (including fractional shares; provided that
the Company may, at its option, pay cash in lieu of issuing
fractional shares) having an aggregate Liquidation Preference
equal to the amount of such dividends. On or after October 15,
2008, dividends shall be paid only in cash. The issuance of
such Dividend Shares shall constitute "payment" of the related
dividend for all purposes of this Certificate of Designations.
Dividends payable on the Series B Preferred Stock will be
computed on the basis of a 360-day year consisting of twelve
30-day months and the number of days actually elapsed and will
be deemed to accrue on a daily basis.

(b)     No full dividends shall be declared or paid or funds set apart
for the payment of dividends on any Parity Securities for any
period unless full cumulative dividends shall have been or
contemporaneously are declared and paid in full or declared
and, if payable in cash, a sum in cash sufficient for such
payment set apart for such payment on the Series B Preferred
Stock. If full dividends are not so paid, the Series B
Preferred Stock will share dividends pro rata with the Parity
Securities. Unless full cumulative dividends on all
outstanding shares of Series B Preferred Stock for all past
dividend periods shall have been declared and paid, or
declared and a sufficient sum for the payment thereof set
apart, then: (i) no dividend (other than a dividend on Junior
Securities payable solely in shares of any Junior Securities)
shall be declared or paid upon, or any sum set apart for the
payment of dividends upon, any shares of Junior Securities;
(ii) no shares of Junior Securities or Parity Securities shall
be repurchased, redeemed or otherwise acquired or retired by
the Company or any of its Subsidiaries hereof; and (iii) no
monies shall be paid into or set apart or made available for a
sinking or other like fund for the purchase,

                          -14-

<PAGE>

redemption or other acquisition or retirement for value of any
shares of Junior Securities or Parity Securities by the
Company or any of its Subsidiaries. Dividends on account of
arrears for any past dividend period and dividends in
connection with any optional redemption may be declared and
paid at any time, without reference to any regular Dividend
Payment Date, to holders of record of the Series B Preferred
Stock on such date, not more than 45 days prior to the payment
thereof, as may be fixed by the Board of Directors of the
Company.

5.     LIQUIDATION PREFERENCE.

       Upon any voluntary or involuntary liquidation, dissolution or
winding-up of the Company, Holders of Series B Preferred Stock shall be entitled
to payment, out of the assets of the Company available for distribution to
stockholders, the Liquidation Preference per share of Series B Preferred Stock,
plus, without duplication, an amount in cash equal to all accumulated and unpaid

dividends thereon to but excluding the date fixed for liquidation, dissolution
or winding-up (including an amount equal to a prorated dividend for the period
from the last Dividend Payment Date to the date fixed for liquidation,
dissolution or winding-up), before any distribution is made on any Junior
Securities, including, without limitation, common stock of the Company. If, upon
any voluntary or involuntary liquidation, dissolution or winding-up of the
Company, the amounts payable with respect to the Series B Preferred Stock and
all other Parity Securities are not paid in full, the Holders of the Series B
Preferred Stock and the Parity Securities shall share equally and ratably in any
distribution of assets of the Company in proportion to the full liquidation
preference to which each is entitled. After payment of the full amount of the
Liquidation Preference and accumulated and unpaid dividends to which they are
entitled, the Holders of shares of Series B Preferred Stock shall not be
entitled to any further participation in any distribution of assets of the
Company. However, neither the sale, conveyance, exchange or transfer (for cash,
shares of stock, securities or other consideration) of all or substantially all
of the property or assets of the Company nor the consolidation or merger of the
Company with or into one or more Persons shall be deemed to be a liquidation,
dissolution or winding-up of the Company, unless such sale, conveyance, exchange
or transfer shall be in connection with a liquidation, dissolution or winding-up
of the business of the Company.

6.      OPTIONAL REDEMPTION BY THE COMPANY.

        (a)      The Series B Preferred Stock shall not be redeemed for cash at
                 the option of the Company prior to October 15, 2008. On or
                 after October 15, 2008, Series B Preferred Stock may be
                 redeemed (subject to contractual and other restrictions with
                 respect thereto, to the legal availability of funds therefor
                 and to Section 170 of the DGCL) at any time, in whole or from
                 time to time in part, at the option of the Company, at the
                 Applicable Redemption Price. In addition, at any time prior to
                 October 15, 2006, the Company may, at its option, redeem
                 shares of Series B Preferred Stock in whole or from time to
                 time in part having an aggregate Liquidation Preference of up
                 to 40% of the aggregate Liquidation Preference of the Series B
                 Preferred Stock (whether initially issued or issued as
                 Dividend Shares) from the net cash proceeds of one or more
                 Equity Offerings at a price equal to 110.75% of the aggregate
                 Liquidation Preference thereof, plus, without duplication, an
                 amount in cash equal to all accumulated and unpaid dividends,
                 if any, to but excluding the Redemption Date (including an
                 amount in cash equal to a prorated dividend for the period
                 from the Dividend Payment Date immediately prior to the
                 Redemption Date), subject to the right of Holders of record on
                 the relevant Record Date to receive dividends due on a
                 Dividend Payment Date; provided, that a number of shares
                 representing at least 60% of the aggregate Liquidation
                 Preference of the Series B Preferred Stock (whether initially
                 issued or issued as Dividend Shares) remains

                                      -15-

<PAGE>
                 outstanding immediately following the occurrence of such
                 redemption and provided, further that, any such redemption
                 must be made within 90 days after the date of the closing of
                 such Equity Offerings.

        (b)      In the event of partial redemptions of Series B Preferred
                 Stock, the shares to be redeemed will be determined pro rata

or by lot, as determined by the Company; provided that the Company may redeem such shares held by any holders of fewer than 100 shares (or shares held by Holders who would hold less than 100 shares as a result of such redemption), without regard to any pro rata redemption requirement.

(c)     Notice of any redemption shall be sent by or on behalf of the Company not less than 30 nor more than 60 days prior to the date specified for redemption in such notice (the "Redemption Date"), by first class mail, postage prepaid, to all Holders of record of the Series B Preferred Stock at their registered address. In addition to any information required by law or by the applicable rules of any exchange upon which Series B Preferred Stock may be listed or admitted to trading, such notice shall state: (i) the Redemption Date; (ii) the redemption price; (iii) if less than all the outstanding shares of Series B Preferred Stock are to be redeemed, the Liquidation Preference of, and the accrued and unpaid dividends on, the shares of Series B Preferred Stock to be redeemed; (iv) that on the Redemption Date the redemption price shall become due and payable upon each share of Series B Preferred Stock to be redeemed; and (v) the place or places where shares are to be surrendered for payment of the redemption price. Upon the mailing of any such notice of redemption, the Company shall become obligated to redeem at the time of redemption specified thereon all shares called for redemption.

(d)     If notice has been mailed in accordance with Section 6(c) above and, provided that on or before the Redemption Date specified in such notice, all funds necessary for such redemption shall have been segregated and irrevocably set apart by the Company, in trust for the pro rata benefit of the Holders of the shares so called for redemption, so as to be, and to continue to be available therefor, then, on and after the Redemption Date, unless the Company defaults in the payment of the applicable redemption price, dividends on the shares of the Series B Preferred Stock so called for redemption shall cease to accumulate and all rights of the Holders of such shares shall terminate except for the right to receive from the Company the redemption price, without interest; provided, however, that if a notice of redemption shall have been given and the funds necessary for redemption (including an amount in respect of all dividends that will accrue to the Redemption Date) shall have been segregated and irrevocably set apart by the Company, in trust for the pro rata benefit of the Holders of the shares called for redemption, dividends shall cease to accumulate on the Redemption Date on the shares to be redeemed and, at the close of business on the day on which such funds are segregated and set apart, such shares of Series B Preferred Stock shall no longer be deemed to be outstanding and the Holders of the shares to be redeemed shall cease to be stockholders of the Company and shall be entitled only to receive the redemption price for such shares. New certificates of Series B Preferred Stock having an aggregate Liquidation Preference equal to the unredeemed portion of the Series B Preferred Stock shall be issued in the name of the Holder thereof upon cancellation of the original shares of Series B Preferred Stock without cost to the Holder thereof. Upon surrender, in accordance with said

notice, of the certificates for any shares so redeemed
(properly endorsed or assigned for transfer, if the Company
shall so require and the notice shall so state), such shares
shall be redeemed by the Company at the applicable redemption
price. Shares of Series B Preferred Stock issued and
reacquired by the Company pursuant to this Section 6 shall,

-16-

<PAGE>

upon compliance with the applicable requirements of Delaware
law, have the status of Undesignated Shares of the Company,
and may, with any and all other Undesignated Shares of the
Company, be designated or redesignated, and issued or
reissued, as the case may be, as part of any series of
preferred stock of the Company, except that any issuance or
reissuance of shares of Series B Preferred Stock must be in
compliance with this Certificate of Designations.

(e)    Any deposit of funds with a bank or trust company for the
purpose of redeeming Series B Preferred Stock shall be
irrevocable except that:

(i)    the Company shall be entitled to receive from such
bank or trust company the interest or other earnings,
if any, earned on any money so deposited in trust,
and the Holders of any shares redeemed shall have no
claim to such interest or other earnings; and

(ii)   any balance of monies so deposited by the Company and
unclaimed by the Holders of the Series B Preferred
Stock entitled thereto at the expiration of two years
from the applicable Redemption Date shall be repaid,
together with any interest or other earnings earned
thereon, to the Company, and after any such
repayment, the holders of the shares entitled to the
funds so repaid to the Company shall look only to the
Company for payment without interest or other
earnings.

(f)    No Series B Preferred Stock may be redeemed except with funds
legally available for the purpose. The Company shall take all
actions required or permitted under the DGCL to permit any
redemption which the Company elects pursuant to clause (a)
above.

(g)    No optional redemption may be authorized or made (i) unless
prior thereto or contemporaneously therewith full unpaid
cumulative dividends shall have been paid or a sum set apart
for such payment on the Series B Preferred Stock or (ii) at a
price less than 101% of the Liquidation Preference of the
Series B Preferred Stock at any time when the company is
making an offer to purchase shares of Series B Preferred Stock
under a Change of Control Offer in accordance with Section 10.

7.    REPURCHASE AT THE OPTION OF HOLDER

(a)    On October 15, 2013 (the "Purchase Date"), each Holder of
shares of Series B Preferred Stock will have the right to
require the Company to repurchase (subject to the legal
availability of funds therefor and to Section 170 of the DGCL)

all or a portion of the Series B Preferred Stock held by such
Holder at a purchase price equal to 100% of the Liquidation
Preference thereof, plus all accumulated and unpaid dividends
to the date of repurchase (the "Purchase Price"), in
accordance with the procedures set forth below.

(b)      The Company shall give notice (the "Company Notice") not less
than 30 days and not more than 60 days before the Purchase
Date by first class mail, postage prepaid, to all Holders of
record of the Series B Preferred Stock at their registered
address. In addition to any information required by law or by
the applicable rules of any exchange upon which Series B
Preferred Stock may be listed or admitted to trading, such
Company Notice shall state: (i) the Purchase Date and the
Purchase Price, (ii) that any Holder who elects to have the
Company repurchase any shares of Series B Preferred Stock held
by such Holder must complete and sign the notice (the "Holder
Repurchase Notice") that the

                                -17-

<PAGE>

Company shall include with the Company Notice and surrender
any such shares of Series B Preferred Stock to the Paying
Agent, (iii) that the Holder Repurchase Notice may be
withdrawn prior to the close of business on the Purchase Date
by delivering a written notice of withdrawal in accordance
with this Section 7, and (iv) that the repurchase right
described in this Section 7 is the only such right of Holders
to elect to have the Company repurchase such Holder's Series B
Preferred Stock and Holders that do not elect to have the
Company repurchase their shares of Series B Preferred Stock or
withdraw such election will have no other such right.

(c)      The Holder Repurchase Notice shall: (i) identify the Series B
Preferred Stock to be delivered by the Holder thereof for
repurchase by the Company and (ii) state, if a Holder elects
to have only a portion of the shares of Series B Preferred
Stock held by such Holder, the number of shares to be
repurchased.

(d)      Any notice of withdrawal shall: (i) identify the shares of
Series B Preferred Stock in respect of which such notice of
withdrawal is being delivered, (ii) state the number of shares
of Series B Preferred Stock with respect to which such notice
of withdrawal is being submitted, and (iii) state the number
of shares of Series B Preferred Stock which shall remain
subject to the Purchase Notice.

(e)      If on or prior to the Purchase Date, all funds necessary for
any repurchases to be made on the Purchase Date shall have
been segregated and irrevocably set apart by the Company, in
trust for the benefit of the Holders of the shares of Series B
Preferred Stock that have delivered and not withdrawn a Holder
Repurchase Notice to the Company, so as to be, and to continue
to be available therefor, then, on and after the Purchase
Date, unless the Company defaults in the payment of the
applicable Purchase Price, dividends on the shares of the
Series B Preferred Stock to be repurchased shall cease to
accumulate and all rights of the Holders of such shares shall
terminate except for the right to receive from the Company the

Purchase Price, without interest; provided, however, that if the funds necessary for repurchase pursuant to this Section 7 (including an amount in respect of all dividends that will accrue to the Purchase Date) shall have been segregated and irrevocably set apart by the Company, in trust for the benefit of the Holders of the shares to be repurchased, dividends shall cease to accumulate on the Purchase Date on the shares to be repurchased and, at the close of business on the day on which such funds are segregated and set apart, such shares of Series B Preferred Stock shall no longer be deemed to be outstanding and the Holders of the shares to be repurchased shall cease to be stockholders of the Company and shall be entitled only to receive the Purchase Price for such shares. New certificates of Series B Preferred Stock having an aggregate Liquidation Preference equal to the unpurchased portion of the Series B Preferred Stock shall be issued in the name of the Holder thereof upon cancellation of the original shares of Series B Preferred Stock without cost to the Holder thereof. Upon surrender, in accordance with the provisions of this Section 7, of the certificates for any shares so repurchased (properly endorsed or assigned for transfer, if the Company shall so require), such shares shall be repurchased by the Company at the Purchase Price. Shares of Series B Preferred Stock issued and reacquired by the Company pursuant to this Section 7 shall, upon compliance with the applicable requirements of Delaware law, have the status of Undesignated Shares of the Company, and may, with any and all other Undesignated Shares of the Company, be designated or redesignated, and issued or reissued, as the case may be, as part of any series of preferred stock of the Company, except that any issuance or reissuance of shares of Series B Preferred Stock must be in compliance with this Certificate of Designations.

-18-

<PAGE>
    (f)    Any deposit of funds with a bank or trust company for the purpose of repurchasing Series B Preferred Stock pursuant to this Section 7 shall be irrevocable except that:

        (i)    the Company shall be entitled to receive from such bank or trust company the interest or other earnings, if any, earned on any money so deposited in trust, and the Holders of any shares repurchased shall have no claim to such interest or other earnings;

        (ii)   the Company shall be entitled to receive from such bank or trust company the amount of any funds deposited with respect to shares of Series B Preferred Stock for which the Company has received a valid notice of withdrawal; and

        (iii)  any balance of monies so deposited by the Company and unclaimed by the Holders of the Series B Preferred Stock entitled thereto at the expiration of two years from the Purchase Date shall be repaid, together with any interest or other earnings earned thereon, to the Company, and after any such repayment, the holders of the shares entitled to the funds so repaid to the Company shall look only to the Company for payment without interest or other earnings.

(g)     No Series B Preferred Stock may be repurchased except with funds
        legally available for the purpose. The Company shall take all
        actions required or permitted under the DGCL to permit any
        repurchase pursuant to this Section 7.

(h)     Payments of the Purchase Price shall only be made after delivery of
        a Purchase Notice and surrender of the applicable shares of Series B
        Preferred Stock (together with necessary endorsements) to the Paying
        Agent. Payment of the Purchase Price shall be made promptly
        following the later of the Purchase Date and the time of delivery of
        shares of Series B Preferred Stock for surrender.

8.    EXCHANGE OF SERIES B PREFERRED STOCK FOR EXCHANGE NOTES.

(a)     The Company may at its option, on any scheduled Dividend Payment
        Date prior to October 15, 2013, exchange all but not less than all
        of the then outstanding shares of Series B Preferred Stock for the
        Exchange Notes to be issued under an indenture (the "Exchange
        Indenture") in the form attached hereto as Exhibit A to be entered
        into between the Company and Wachovia Bank, National Association
        (the "Exchange Notes Trustee"); provided, that on the date of such
        exchange: (i) there are no contractual impediments to such exchange;
        (ii) such exchange would comply with the DGCL; (iii) immediately
        after giving effect to such exchange, no Default or Event of Default
        (each as defined in the Exchange Indenture) would exist under the
        Exchange Indenture and no default or event of default would exist
        under the Senior Credit Facilities, the indenture for the Senior
        Subordinated Notes, or any other material instrument governing
        Indebtedness outstanding at the time; (iv) the Company has paid all
        accumulated dividends on the Series B Preferred Stock (including the
        dividends payable on the date of Exchange Date); (v) the Exchange
        Indenture has been qualified under the TIA, to the extent such
        qualification is necessary at the time of the exchange and (vi) the
        Company shall have delivered to the Transfer Agent and the Exchange
        Notes Trustee a written opinion of counsel, dated the date of
        exchange, as to the due authorization, execution and delivery and
        enforceability of the Exchange Notes Indenture and the Exchange
        Notes and to the effect that all conditions to be satisfied prior to
        such exchange have been satisfied.

                                    -19-

<PAGE>
(b)     Upon any exchange of Series B Preferred Stock for Exchange Notes on
        the Exchange Date pursuant to clause (a) of this Section 8, Holders
        of outstanding shares of Series B Preferred Stock shall be entitled
        to receive, subject to the second succeeding sentence, $1.00 of
        principal amount of Exchange Notes for each $1.00 of the Liquidation
        Preference of Series B Preferred Stock held by them. The Exchange
        Notes shall be issued in registered form, without coupons. Exchange
        Notes issued in exchange for Series B Preferred Stock shall be
        issued in principal amounts of $1,000 and integral multiples
        thereof; provided, that the Company may issue Exchange Notes in
        principal amounts of less than $1,000 to the extent necessary so
        that each Holder of Series B Preferred Stock shall receive Exchange
        Notes in a principal amount equal to the amount to which such
        Holder's shares of Series B Preferred Stock entitle such Holder; and
        provided, further that the Company, at its option, may pay cash in
        lieu of issuing an Exchange Note in a principal amount less than
        $1,000. On and after the Exchange Date, provided that the conditions

of Section 8(a)(i)-(vi) and 8(f) have been satisfied, dividends will cease to accumulate on the outstanding shares of Series B Preferred Stock, and all rights of the Holders of Series B Preferred Stock (except the right to receive the Exchange Notes, an amount in cash, to the extent applicable, equal to the accumulated and unpaid dividends to the Exchange Date and if the Company so elects, cash in lieu of any Exchange Note that is in a principal amount less than $1,000) shall terminate. The person entitled to receive the Exchange Notes issuable upon such exchange shall be treated for all purposes as the registered holder of such Exchange Notes.

(c)    The Company shall send a written notice (the "Exchange Notice") of exchange by mail to each Holder of record of Series B Preferred Stock, which notice shall state: (i) that the Company is exercising its option to exchange the Series B Preferred Stock for Exchange Notes pursuant to this Certificate of Designations; (ii) the date fixed for exchange (the "Exchange Date"), which date shall not be less than 30 days nor more than 60 days following the date on which the Exchange Notice is mailed; (iii) that the Holder is to surrender to the Company, at the place or places where shares of Series B Preferred Stock are to be surrendered for exchange in the manner designated in the Exchange Notice, the shares of Series B Preferred Stock to be exchanged; (iv) that dividends on the shares of Series B Preferred Stock to be exchanged shall cease to accrue on the Exchange Date whether or not the shares of Series B Preferred Stock are surrendered for exchange on the Exchange Date unless the Company shall default in the delivery of Exchange Notes; and (v) that interest on the Exchange Notes shall accrue from the Exchange Date whether or not the shares of Series B Preferred Stock are surrendered for exchange on the Exchange Date. On the Exchange Date, if the conditions set forth in Sections 8(a)(i) through 8(a)(vi) above and Section 8(f) below are satisfied, the Company shall issue Exchange Notes in exchange for the Series B Preferred Stock as provided in this Section 8.

(d)    A Holder delivering Series B Preferred Stock for exchange shall not be required to pay any taxes or duties in respect of the issue or delivery of Exchange Notes on exchange but shall be required to pay any tax or duty that may be payable in respect of any transfer involved in the issue or delivery of the Exchange Notes in a name other than that of the Holder of the Series B Preferred Stock. Certificates representing Exchange Notes shall not be issued or delivered unless all taxes and duties, if any, payable by the Holder have been paid.

(e)    On or before the Exchange Date, each Holder of Series B Preferred Stock shall surrender the shares of Series B Preferred Stock, in the manner and at the place designated in the Exchange Notice. The Company shall cause the Exchange Notes to be executed on the

-20-

<PAGE>

Exchange Date and, upon surrender, in accordance with the Exchange Notice, of the shares of Series B Preferred Stock so exchanged (properly endorsed or assigned for transfer, if the notice shall so state), such shares shall be exchanged by the Company for Exchange Notes. The Company shall pay dividends, if any, on the Exchange Notes at the rate and on the dates specified therein from the Exchange Date.

(f)    After the Exchange Notice has been mailed in accordance with Section
       8(c), the conditions set forth in Section 8(a)(i) through 8(a)(vi)
       have been satisfied, and before the Exchange Date (i) the Exchange
       Indenture shall have been duly executed and delivered by the Company
       and the Exchange Notes Trustee; (ii) all Exchange Notes necessary
       for such exchange shall have been duly executed and authenticated by
       the Company and delivered to the Exchange Notes Trustee with
       irrevocable instructions to authenticate the Exchange Notes
       necessary for such exchange; and (iii) an amount in cash, set aside
       by the Company, separate and apart from its other funds in trust, or
       additional Series B Preferred Stock (as applicable) equal to all
       accumulated and unpaid dividends thereon to the Exchange Date shall
       have been deposited with the Exchange Notes Trustee, then on and
       after the close of business on the Exchange Date, dividends on the
       shares of Series B Preferred Stock so exchanged shall cease to
       accumulate, such shares of Series B Preferred Stock shall no longer
       be deemed to be outstanding and all rights of the Holders of such
       shares shall terminate except for the right to receive from the
       Company the Exchange Notes, cash, if any, and all accrued interest,
       if any, thereon to the Exchange Date. Shares of Series B Preferred
       Stock issued and reacquired by the Company pursuant to this Section
       8 shall, upon compliance with the applicable requirements of
       Delaware law, have the status of Undesignated Shares of the Company,
       and may, with any and all other authorized but unissued Undesignated
       Shares of the Company, be designated or redesignated, and issued or
       reissued, as the case may be, as part of any series of preferred
       stock of the Company, but not as Series B Preferred Stock.

(g)    The Company shall comply with the provisions of Rule 13e-4
       promulgated pursuant to the Exchange Act in connection with any
       exchange, to the extent applicable.

9.    VOTING RIGHTS.

(a)    The Holders of shares of the Series B Preferred Stock shall have no
       voting rights, except as required by non-waivable provisions of
       Delaware law and as hereinafter provided in this Section 9. It is
       the intention of this Section 9(a) to deny voting rights to holders
       of shares of Series B Preferred Stock except (i) as specifically
       granted in Sections 9(b) through 9(i), and (ii) to the extent that
       non-waivable provisions of Delaware law preclude the denial of
       voting rights to holders of shares of Series B Preferred Stock.

(b)    If:

       (i)    at any time, dividends on the outstanding Series B Preferred
              Stock are in arrears and unpaid (and in the case of dividends
              payable after October 15, 2008, are not paid in cash) for four
              (4) consecutive quarterly dividend periods;

       (ii)   the Company fails to discharge any redemption or repurchase
              obligation with respect to the Series B Preferred Stock
              (whether or not the Company is permitted to do so by the terms
              of the Senior Credit Facilities, the Senior Subordinated
              Notes, the DGCL, or any other obligation of the Company);

                              -21-

<PAGE>

       (iii)  the Company fails to make a Change of Control Offer on the

terms and in accordance with the provisions described below in Section 10 hereof (whether or not the Company is permitted to do so by the terms of the Senior Credit Facilities, the Senior Subordinated Notes or any other obligation of the Company) or fails to purchase shares of Series B Preferred Stock from Holders who elect to have such shares purchased pursuant to the Change of Control Offer;

(iv)    the Company breaches or violates any of the other covenants or agreements set forth in Section 11 and such breach or violation continues for a period of 60 days or more after the Company receives notice thereof specifying the default from the Holders of at least 25% of the shares of Series B Preferred Stock then outstanding; or

(v)    the Company or any Significant Subsidiary defaults under the terms of any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Significant Subsidiaries (or the payment of which is guaranteed by the Company or any of its Significant Subsidiaries) whether such Indebtedness or guarantee now exists, or is created after the Issue Date, which default (A) is caused by a failure to pay principal of or premium, if any, or interest on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a "Payment Default") or (B) results in the acceleration of such Indebtedness prior to its express maturity and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there is then existing a Payment Default or the maturity of which has been so accelerated, aggregates $5.0 million or more (each of the events described in clauses (i), (ii), (iii), (iv) and (v) being referred to herein as a "Voting Rights Triggering Event"); then, in each case, the number of directors constituting the Board of Directors of the Company will be adjusted to permit the holders of the majority of the then outstanding Series A Preferred Stock and Series B Preferred Stock, voting together as one class, to elect two directors.

(c)    Whenever the foregoing voting rights shall have vested, such rights may be exercised initially either at a special meeting of the Holders of Series A Preferred Stock and Series B Preferred Stock, called as hereinafter provided, or at any annual meeting of stockholders held for the purpose of electing directors, and thereafter at such annual meetings or by the written consent of the Holders of Series A Preferred Stock and Series B Preferred Stock. Such right of the Holders of Series A Preferred Stock and Series B Preferred Stock to elect directors may be exercised until (i) all dividends in arrears shall have been paid in full (and in the case of dividends payable after October 15, 2008, paid in cash) and (ii) all other failures, breaches or defaults giving rise to such Voting Rights Triggering Event are remedied or waived by the Holders of at least a majority of the shares of the then outstanding Series A Preferred Stock and Series B Preferred Stock, taken together, at which time the term of such directors previously elected pursuant to the provisions of this Section 7(c) shall thereupon terminate, and such directors shall be deemed to have resigned.

(d)    At any time when the foregoing voting rights shall have vested in
the Holders of Series A Preferred Stock and Series B Preferred Stock
and if such rights shall not already have

                                -22-

<PAGE>

been initially exercised, a proper officer of the Company shall,
upon the written request of Holders of record of 10% or more of the
then outstanding Series A Preferred Stock and Series B Preferred
Stock, taken together, addressed to the Secretary of the Company,
call a special meeting of Holders of Series A Preferred Stock and
Series B Preferred Stock. Such meeting shall be held at the earliest
practicable date based upon the number of days of notice required
for annual meetings of stockholders at the place for holding annual
meetings of stockholders of the Company or, if none, at a place
designated by the Secretary of the Company. If such meeting shall
not be called by the proper officers of the Company within 30 days
after the personal service of such written request upon the
Secretary of the Company, or within 30 days after mailing the same
within the United States, by registered mail, addressed to the
Secretary of the Company at its principal office (such mailing to be
evidenced by the registry receipt issued by the postal authorities),
then the Holders of record of 10% of the shares of the then
outstanding Series A Preferred Stock and Series B Preferred Stock,
taken together, may designate in writing a Holder of Series B
Preferred Stock or Series B Preferred Stock to call such meeting at
the expense of the Company, and such meeting may be called by such
person so designated upon the number of days of notice required for
annual meetings of stockholders and shall be held at the place for
holding annual meetings of the Company or, if none, at a place
designated by such Holder. Any Holder of Series B Preferred Stock
that would be entitled to vote at such meeting shall have access to
the stock books of the Company for the purpose of causing a meeting
of stockholders to be called pursuant to the provisions of this
Section 9. Notwithstanding the provisions of this Section 9(d)
however, no such special meeting shall be called if any such request
is received less than 90 days before the date fixed for the next
ensuing annual meeting of stockholders.

(e)    If any director so elected by the Holders of Series A Preferred
Stock and Series B Preferred Stock shall cease to serve as a
director before his term shall expire, the Holders of the then
outstanding Series A Preferred Stock and Series B Preferred Stock,
voting together as one class, may, at a special meeting of the
Holders called as provided above, elect a successor to hold office
for the unexpired term of the director whose place shall be vacant.

(f)    The Company shall not, without the affirmative vote or consent of
the Holders of at least a majority of the shares of Series A
Preferred Stock and Series B Preferred Stock then outstanding (with
shares held by the Company or any of its Affiliates not being
considered to be outstanding for this purpose) voting or consenting,
as the case may be, together as one class (i) merge, consolidate or
sell all or substantially all of the assets of the Company except as
permitted pursuant to Section 11(c) or (ii) authorize or issue any
new class or series of Parity Securities (or amend the provisions of
any existing class or series of Capital Stock to make such class of
Capital Stock Parity Securities); provided, however, that, without
the approval of Holders of the Series A Preferred Stock and Series B

Preferred Stock, the Company may (A) issue Dividend Shares in accordance with the terms hereof, and (B) issue and have outstanding shares of Parity Securities issued from time to time in exchange for, or the proceeds of which are used to redeem or repurchase, any or all of the shares of the Series B Preferred Stock or other Parity Securities then outstanding.

(g)    In addition to the matters set forth in clause (f) above, except as stated above under Section 3, the Company shall not, without the affirmative vote or consent of holders of at least a majority of the shares of Series B Preferred Stock then outstanding (with shares

-23-

<PAGE>

held by the Company or any of its Affiliates not being considered to be outstanding for this purpose), voting or consenting, as the case may be, as one class:

(i)    amend the Certificate of Designations so as to adversely affect the specified rights, preferences, privileges or voting rights of holders of shares of the Series B Preferred Stock (including any rights set forth in the Exchange Indenture), or

(ii)   increase the number of authorized shares of the Company designated as Series B Preferred Stock.

(h)    Without the consent of each Holder affected, an amendment or waiver of the Company's Certificate of Incorporation or of this Certificate of Designations may not (with respect to any shares of Series B Preferred Stock held by a non-consenting Holder):

(i)    alter the voting rights with respect to the Series B Preferred Stock (provided, however, that the consent of Holders of Series B Preferred Stock shall not be required to approve the Voting Rights Amendment) or reduce the number of shares of Series B Preferred Stock whose holders must consent to an amendment, supplement or waiver;

(ii)   reduce the Liquidation Preference of or change the Purchase Date of any share of Series B Preferred Stock or alter the provisions with respect to the redemption of the Series B Preferred Stock (except as provided with respect to Section 10 hereof);

(iii)  reduce the rate or change the time for payment of dividends on any share of Series B Preferred Stock;

(iv)   waive the consequences of any failure to pay dividends on the Series B Preferred Stock;

(v)    make any share of Series B Preferred Stock payable in any form other than that stated in this Certificate of Designations;

(vi)   make any change in the provisions of this Certificate of Designations relating to waivers of the rights of holders of Series B Preferred Stock to receive the Liquidation Preference and dividends on the Series B Preferred Stock;

(vii)  waive a redemption payment with respect to any share of Series

B Preferred Stock (except as provided with respect to Section
10 hereof); or

(viii) make any change in the foregoing amendment and waiver
       provisions.

(i)   The Company in its sole discretion may, without the vote or consent
      of any Holders the Series B Preferred Stock, amend or supplement
      this Certificate of Designations:

      (i)    to cure any ambiguity, defect or inconsistency;

      (ii)   except as set forth in clauses (f) and (g) above, create,
             authorize or issue any shares of Junior Securities or Parity
             Securities;

                                -24-

<PAGE>
      (iii)  to decrease the amount of authorized capital stock of any
             class, including any Series B Preferred Stock;

      (iv)   to increase the amount of authorized capital stock of any
             class of Junior Securities; or

      (v)    to make any change that would provide any additional rights or
             benefits to the Holders of the Series B Preferred Stock or
             that does not adversely affect the legal rights under this
             Certificate of Designations (including the Exchange Indenture)
             of any such Holder.

10.   CHANGE OF CONTROL.

      (a)    Upon the occurrence of a Change of Control, the Company shall make
             an offer (the "Change of Control Offer") to each Holder of shares of
             Series B Preferred Stock to repurchase all or any part (but not, in
             the case of any Holder requiring the Company to purchase less than
             all of the shares of Series B Preferred Stock held by such Holder,
             any fractional shares) of such Holder's Series B Preferred Stock at
             an offer price in cash equal to 101% of the aggregate Liquidation
             Preference thereof plus, without duplication, an amount in cash
             equal to all accumulated and unpaid dividends (including an amount
             in cash equal to a pro rata dividend for the period from the
             Dividend Payment Date immediately prior to the Change of Control
             Date), if any, thereon to but excluding the date of purchase (the
             "Change of Control Payment") (subject to the right of Series B
             Preferred Stock Holders of record on the relevant Record Date to
             receive dividends due on the relevant Dividend Payment Date);
             provided, however, that notwithstanding the occurrence of a Change
             of Control, the Company shall not be obligated to purchase the
             Series B Preferred Stock pursuant to this Section 10 in the event
             that it has exercised its right to redeem all of the Series B
             Preferred Stock pursuant to Section 7(b).

      (b)    The Change of Control Offer shall include all instructions and
             materials necessary to enable Holders to tender their shares of
             Series B Preferred Stock and a full description of the circumstances
             and relevant facts and financial information regarding such Change
             of Control.

(c)    The Company shall comply, to the extent applicable, with the
requirements of Section 14(e) of the Exchange Act and any other
securities laws and regulations in connection with the repurchase of
the Series B Preferred Stock as a result of a Change of Control. To
the extent that the provisions of any securities laws or regulations
conflict with provisions of this Section 10, the Company will comply
with the applicable securities laws and regulations and will not be
deemed to have breached its obligations under this paragraph by
virtue thereof. The Change of Control Offer shall contain
information concerning the business of the Company and its
Subsidiaries which the Company in good faith believes will enable
such Holders to make an informed decision with respect to the Change
of Control Offer (which at a minimum will include (i) the most
recent annual and quarterly financial statements, (ii) a description
of material developments in the Company's business subsequent to the
date of the latest of such financial statements referred to in
clause (i) (including a description of the events requiring the
Company to make the Change of Control Offer) and (iii) if
applicable, appropriate pro forma financial information concerning
the Offer to Purchase).

-25-

<PAGE>
(d)    Within 30 days following any Change of Control (or at the Company's
option, prior to such Change of Control but after the public
announcement thereof), the Company shall mail a notice to each
Holder stating:

(i)    that a Change of Control has occurred or will occur (and
describing the transaction or transactions that constitute
such Change of Control) and that the Change of Control Offer
is being made pursuant to this Section 10 and that all shares
of Series B Preferred Stock tendered shall be accepted for
payment;

(ii)   the amount of the Change of Control Payment and the purchase
date, which shall be not earlier than 30 days nor later than
60 days from the date such notice is mailed (the "Change of
Control Payment Date");

(iii)  that any share of Series B Preferred Stock not tendered shall
continue to accumulate dividends;

(iv)   the place or places where Series B Preferred Stock are to be
surrendered for tender pursuant to the Change of Control
Offer;

(v)    that, on the Change of Control Payment Date, the purchase
price shall become due and payable upon each share of Series B
Preferred Stock accepted for payment pursuant to the Change of
Control Offer and, unless the Company fails to pay the Change
of Control Payment on the Change of Control Payment Date, all
shares of Series B Preferred Stock accepted for payment
pursuant to the Change of Control Offer shall cease to
accumulate dividends after the Change of Control Payment Date;

(vi)   that Holders electing to have any shares of Series B Preferred
Stock purchased pursuant to a Change of Control Offer will be
required to surrender the shares of Series B Preferred Stock,

with the form entitled "Option of Holder to Elect Purchase"
which shall be included with the notice of Change of Control
completed, to the Paying Agent at the address specified in the
notice prior to the close of business on the third Business
Day preceding the Change of Control Payment Date;

(vii)   that, if such Offer is made prior to such Change of Control,
        payment is conditioned on the occurrence of such Change of
        Control; and

(viii)  that the Holder may tender all or any portion of the shares
        of Series B Preferred Stock held by such Holder and that in
        the case of any Holder whose shares are to be purchased only
        in part, the Company shall execute, authorize and deliver to
        the Holder, without service charge, a new certificate as
        requested by such Holder, for the unpurchased portion of his
        shares of Series B Preferred Stock.

(e)   On the Change of Control Payment Date, the Company shall, to the
      extent lawful, (i) accept for payment all shares of Series B
      Preferred Stock or portions thereof properly tendered pursuant to
      the Change of Control Offer, (ii) deposit with the Paying Agent an
      amount equal to the Change of Control Payment in respect of all
      shares of Series B Preferred Stock or portions thereof so tendered
      and (iii) deliver or cause to be delivered to the Transfer Agent the
      shares of Series B Preferred Stock so accepted together with an
      Officers' Certificate stating the aggregate Liquidation Preference
      of the shares of Series

                                -26-

<PAGE>

B Preferred Stock or portions thereof being purchased by the
Company. The Paying Agent shall promptly mail to each holder of
Series B Preferred Stock so tendered the Change of Control Payment
for such Series B Preferred Stock, and the Transfer Agent shall
promptly authenticate and mail (or cause to be transferred by book
entry) to each holder a new certificate representing the shares of
Series B Preferred Stock equal in Liquidation Preference amount to
any unpurchased portion of the shares of the shares of Series B
Preferred Stock represented by the certificates so surrendered. The
Company shall publicly announce the results of the Change of Control
Offer on or as soon as practicable after the Change of Control
Payment Date.

(f)   If, at the time of a Change of Control, the Company is restricted or
      prohibited by the terms of any Credit Facilities or Senior Debt from
      purchasing shares of Series B Preferred Stock that may be tendered
      by holders pursuant to a Change of Control Offer, prior to complying
      with the provisions of Section 10(a), but in any event within 30
      days following a Change of Control (unless the Company has exercised
      its right to redeem all the Series B Preferred Stock pursuant to
      Section 7(b)), the Company shall use commercially reasonable efforts
      to (i) repay in full all outstanding Obligations under such Credit
      Facilities or Senior Debt or offer to repay in full all outstanding
      Obligations under such Credit Facilities or Senior Debt and repay
      the Obligations of each lender who has accepted such offer or (ii)
      obtain the requisite consent under such Credit Facilities or Senior
      Debt to permit the repurchase of the Series B Preferred Stock
      required by this Section 10.

(g)    The Company shall not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 10 applicable to a Change of Control Offer made by the Company and purchases all shares of Series B Preferred Stock validly tendered and not withdrawn under such Change of Control Offer.

11.    CERTAIN COVENANTS.

(a)    Restricted Payments.

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i)    declare or pay any dividend or make any other payment or distribution on account of any Junior Securities, other than dividends or distributions payable in Junior Securities (other than Disqualified Stock);

(ii)    purchase, redeem or otherwise acquire or retire for value Junior Securities; or

(iii)    make any Restricted Investment (all such payments and other actions set forth in clauses (i) through (iii) above being collectively referred to as "Restricted Payments"), unless, at the time of and after giving effect to such Restricted Payment:

(1) no Voting Rights Triggering Event shall have occurred and be continuing or would occur as a consequence thereof;

-27-

<PAGE>

(2) all dividends on the Series B Preferred Stock that have accrued and become payable on or after October 15, 2008 have been declared and paid in cash;

(3) the Company would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least $1.00 of additional Indebtedness pursuant to the Debt to Cash Flow Ratio test set forth in the first paragraph of Section 11(b) hereof, and

(4) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries after the Issue Date (excluding Restricted Payments permitted by clauses (ii), (iii) and (iv) of the next succeeding paragraph), is less than the sum, without duplication, of (i) an amount equal to the Consolidated Cash Flow of the Company for the period (taken as one accounting period) from June 8, 2001 to the end of the Company's most recently ended full fiscal quarter for which financial statements have been filed with the SEC (the "Basket Period") less the product of 1.4 times the Consolidated Interest Expense of the Company for the Basket Period), plus (ii) 100% of the aggregate net cash proceeds received by the Company as a contribution to its common equity capital or from the issue or sale since June 8, 2001 of Equity Interests of the Company (other than Disqualified Stock) or from the issue or sale of Disqualified Stock or debt securities of the Company that have been converted into such Equity Interests

(other than Equity Interests (or Disqualified Stock or convertible debt
securities) sold to a Subsidiary of the Company and other than Disqualified
Stock or Convertible debt securities that have been converted into Disqualified
Stock), plus (iii) to the extent that any Restricted Investment that was made
after the Issue Date is sold for cash or otherwise liquidated or repaid for
cash, the lesser of (A) the cash return of capital with respect to such
Restricted Investment (less the cost of disposition, if any) and (B) the initial
amount of such Restricted Investment.

The foregoing provisions will not prohibit (i) the payment of any dividend
within 60 days after the date of declaration thereof, if at the date of
declaration such payment would have complied with the provisions of this
Certificate of Designations; (ii) the redemption, repurchase, retirement or
other acquisition of any Junior Securities of the Company in exchange for, or
out of the net cash proceeds of the substantially concurrent sale (other than to
a Subsidiary of the Company) of, other Junior Securities or Parity Securities of
the Company (other than any Disqualified Stock); provided that the amount of any
such net cash proceeds that are utilized for any such redemption, repurchase,
retirement or other acquisition shall be excluded from clause (4)(ii) of the
preceding paragraph; and, provided further, that no Voting Rights Triggering
Event shall have occurred and be continuing immediately after such transaction;
(iii) the payment of any dividend by a Restricted Subsidiary of the Company to
the holders of its Equity Interests on a pro rata basis; (iv) the repurchase,
redemption or other acquisition or retirement for value of any Equity Interests
of the Company or any Restricted Subsidiary of the Company held by any member of
the Company's (or any of its Restricted Subsidiaries') management or board of
directors pursuant to any management equity subscription agreement, stock option
agreement or other similar agreement; provided that the aggregate price paid for
all such repurchased, redeemed, acquired or retired Equity Interests shall not
exceed $5.0 million (excluding for purposes of calculating such amounts during
any period, loans incurred to finance the purchase of such Equity Interests that
are repaid contemporaneously) in any twelve-month period and no Voting Rights
Triggering Event shall have occurred and be continuing immediately after such
transaction; (v) repurchases of stock deemed to have occurred by virtue of the
exercise of stock options; and (vi) other Restricted Payments in an aggregate
amount not to exceed $5.0 million in any twelve-month period so long as no
Voting Rights Triggering Event shall have occurred and be continuing.

The amount of all Restricted Payments (other than cash) shall be the fair
market value on the date of the Restricted Payment of the asset(s) or securities
proposed to be transferred or issued by the Company or such Restricted
Subsidiary, as the case may be, pursuant to the Restricted Payment. The fair

-28-

<PAGE>
market value of any non-cash Restricted Payment shall be determined in good
faith by the Board of Directors. Not later than the date of making any
Restricted Payment, the Company shall deliver to the Board of Directors an
Officers' Certificate stating that such Restricted Payment is permitted and
setting forth the basis upon which any calculation required by this Section
11(a) were computed.

The Board of Directors may designate any Restricted Subsidiary to be an
Unrestricted Subsidiary if such designation would not cause a Voting Rights
Triggering Event. For purposes of making such determination, the aggregate fair
market value of all outstanding Investments by the Company and its Restricted
Subsidiaries in the Subsidiary so designated will be deemed to be a Restricted
Payment at the time of such designation and will reduce the amount available for
Restricted Payments under the first paragraph of this Section 11(a). Such

designation will only be permitted if such Restricted Payment would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

    (b) Incurrence Of Indebtedness And Issuance Of Preferred Stock.

    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness (including Acquired Debt) or issue any shares of Disqualified Stock and will not permit any of its Restricted Subsidiaries to issue any shares of preferred stock; provided, however, that, so long as no Voting Rights Triggering Event has occurred and is continuing, the Company may incur Indebtedness (including Acquired Debt) or issue shares of Disqualified Stock and its Restricted Subsidiaries may issue shares of preferred stock if, in each case, the Company's Debt to Cash Flow Ratio at the time of incurrence of such Indebtedness or the issuance of such Disqualified Stock or preferred stock, as the case may be, after giving pro forma effect to such incurrence or issuance as of such date and to the use of the proceeds therefrom as if the same had occurred at the beginning of the most recently ended four full fiscal quarter period of the Company for which internal financial statements are available, would have been no greater than 7.0 to 1.0.

    So long as no Voting Rights Triggering Event shall have occurred and be continuing or should be caused thereby, the provisions of the first paragraph of this Section 11(b) will not apply to the incurrence of any of the following (collectively, "Permitted Debt"):

    (i)    the incurrence by the Company (and the guarantee thereof by any Restricted Subsidiary) of Indebtedness and letters of credit under one or more Credit Facilities in an aggregate principal amount at any time outstanding not to exceed $175.0 million (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and the Restricted Subsidiaries thereunder), less the aggregate amount of all mandatory repayments of the principal of any term Indebtedness under a Credit Facility that have been made since the Issue Date (other than from the proceeds of any other Credit Facility);

    (ii)    the incurrence by the Company and its Restricted Subsidiaries of the Existing Indebtedness;

    (iii)    the incurrence by the Company or its Restricted Subsidiaries of Indebtedness represented by Capital Lease Obligations, mortgage financings or Purchase Money Indebtedness, in each case incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property, plant or equipment used in the business of the Company or such Restricted Subsidiary, in an aggregate amount not to exceed $5.0 million at any time outstanding;

-29-

<PAGE>
    (iv)    the incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness or the issuance by the Company of Disqualified Stock in exchange for, or the net proceeds of which are used to refund, refinance or replace Indebtedness or Disqualified Stock (other than intercompany Indebtedness) that was permitted by this Certificate of Designations to be incurred by the

first paragraph of this Section 11(b), or by clauses (ii), (iii), (iv), (vi), (vii), (viii), (ix), (x), (xi) or (xii) of this paragraph;

(v)     the incurrence of Indebtedness between or among the Company and any of its Restricted Subsidiaries; provided, however, that (a) if the Company is the obligor on such Indebtedness, such Indebtedness is expressly subordinated to the prior payment in full of all Obligations with respect to the Exchange Notes and (b) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Restricted Subsidiary, and any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Restricted Subsidiary, shall be deemed, in each case, to constitute an incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be;

(vi)    the incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations that are incurred for the purpose of fixing or hedging interest rate risk with respect to any floating rate Indebtedness that is permitted by the terms of this Certificate of Designations to be outstanding;

(vii)   the guarantee by the Company or any Restricted Subsidiary of Indebtedness that was permitted to be incurred by another provision of this Section 11(b);

(viii)  the accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock;

(ix)    the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness consisting of performance, bid or advance payment bonds, surety bonds, custom bonds, utility bonds and similar obligations arising in the ordinary course of business;

(x)     the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, in each case incurred or assumed in connection with the disposition of any business, asset or Subsidiary of the Company; provided that the maximum assumable Indebtedness shall at no time exceed the gross proceeds actually received by the Company and its Restricted Subsidiaries in connection with the disposition of any business, asset or Subsidiary of the Company;

(xi)    the incurrence by the Company of Indebtedness in respect of Series B Preferred Stock issued as payment in kind interest on the Series B Preferred Stock outstanding on the Issue Date or issued subsequent to the Issue Date as dividends permitted by this clause (xi), to the extent such dividends are made pursuant to the terms of this Certificate of Designations, on any preferred stock issued in exchange for the Series B Preferred Stock, or any dividends on such preferred stock issued in exchange for the Series B Preferred Stock, or any dividends on such preferred stock to the extent such dividends are made pursuant to the terms of the certificate of designations of such preferred stock; and

-30-

<PAGE>
      (xii) the incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness in an aggregate principal amount at any time outstanding, including all Permitted Refinancing Indebtedness incurred pursuant to clause (v) above to refund, refinance or replace any Indebtedness incurred pursuant to this clause (xii), not to exceed $10.0 million.

For purposes of determining compliance with this Section 11(b), in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) through (xii) above or is entitled to be incurred pursuant to the first paragraph of this Section 11(b), the Company shall, in its sole discretion, classify and reclassify such item of Indebtedness in whole or in part in any manner that complies with this Section 11(b) and such item of Indebtedness will be treated as having been incurred pursuant to such clauses or pursuant to the first paragraph hereof.

      (c)    Merger, Consolidation, or Sale of Assets.

      The Company may not consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to another Person, and the Company may not permit any of its Restricted Subsidiaries to enter into any such transaction or series of transactions if such transaction or series of transactions would, in the aggregate, result in a sale, assignment, transfer, lease, conveyance, or other disposition of all or substantially all of the properties or assets of the Company to another Person unless (i) the Company is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made (the "Surviving Entity") is a corporation organized or existing under the laws of the United States, any state thereof or the District of Columbia; (ii) the Series B Preferred Stock shall be converted into or exchanged for and shall become shares of the Surviving Entity, having in respect of such successor, transferee or resulting corporation substantially the same powers, preferences and relative participating, optional or other special rights, and the qualifications, limitations or restrictions thereon that the Series B Preferred Stock had immediately prior to such transaction; (iii) immediately after such transaction, no Voting Rights Triggering Event, and no event that after the giving of notice or lapse of time or both would become a Voting Rights Triggering Event, shall have occurred and be continuing; and (iv) the Company or the Surviving Entity will, at the time of such transaction or series of transactions and after giving pro forma effect thereto as if such transaction or series of transactions had occurred at the beginning of the applicable four-quarter period, be permitted to incur at least $1.00 of additional Indebtedness pursuant to the test set forth in the first paragraph of Section 11(a). Notwithstanding the restrictions described in the foregoing clause (iv), any Restricted Subsidiary may consolidate with, merge into or transfer all or part of its properties and assets to the Company, and any Wholly Owned Restricted Subsidiary may consolidate with, merge into or transfer all or part of its properties and assets to another Wholly Owned Restricted Subsidiary.

    (d)    Transactions With Affiliates.

    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (each of the foregoing,

-31-

<PAGE>

an "Affiliate Transaction"), unless (i) such Affiliate Transaction is on terms that are no less favorable to the Company or such Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person (ii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $2.5 million, such Affiliate Transaction or series of Affiliated Transactions has been approved by a majority of the members of the Board of Directors that are disinterested as to such Affiliate Transaction or series of Affiliated Transactions and (iii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $10.0 million, an opinion as to the fairness to the Company of such Affiliate Transaction or series of Affiliated Transactions from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing; provided that (1) any transaction approved by the Board of Directors of the Company, with an officer or director of the Company or of any of its Subsidiaries in his or her capacity as an officer or director entered into in the ordinary course of business; (2) transactions between or among the Company and/or its Restricted Subsidiaries; (3) payment of reasonable directors fees to the Board of Directors of the Company and of its Restricted Subsidiaries; (4) fees and compensation paid to, and indemnity provided on behalf of, officers, directors or employees of the Company or any of its Restricted Subsidiaries, as determined in good faith by the Board of Directors of the Company or of any such Restricted Subsidiary, to the extent the same are reasonable and customary; (5) any Restricted Payment that is permitted by Section 11(a); and (6) agreements in effect on the Issue Date and any modification thereto or any transaction contemplated thereby (including pursuant to any modification thereto) in any replacement agreement therefor so long as such modification or replacement is not more disadvantageous to the Holders in any material respect than the original agreement as in effect on the Issue Date, in each case, shall not be deemed to be Affiliate Transactions.

    (e)    Reports.

    Whether or not required by the rules and regulations of the Commission, so long as any shares of Series B Preferred Stock are outstanding, the Company will make available to the Holders, upon request, (i) all quarterly and annual financial information that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Company were required to file such Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of the Company and its consolidated Subsidiaries (showing in reasonable detail, either on the face of the financial statements or in the footnotes thereto and in Management's Discussion and Analysis of Financial Condition and Results of Operations, the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial information and results of operations of the Unrestricted Subsidiaries

of the Company) and, with respect to the annual information only, a report thereon by the Company certified independent accountants and (ii) all current reports that would be required to be filed with the Commission on Form 8-K if the Company was required to file such reports, in each case within the time periods set forth in the Commission's rules and regulations. In addition, whether or not required by the rules and regulations of the Commission, the Company will file a copy of such information and reports with the Commission for public availability within the time periods set forth in the Commission's rules and regulations (unless the Commission will not accept such filing).

12.   AMENDMENT.

     Notwithstanding anything to the contrary in the DGCL, unless otherwise provided in Section 3(b) or 9, neither this Certificate of Designations nor the Certificate of Incorporation shall be amended in any manner that would increase or decrease the par value of the shares of the Series B Preferred Stock class or alter or change the powers, preferences or special rights of the Series B Preferred Stock so as to affect the

                                   -32-

<PAGE>
Holders thereof adversely without the affirmative vote of the Holders of a majority of the outstanding Series B Preferred Stock voting separately as a class.

13.   PAYMENT

     (a)   All amounts payable in cash with respect to the Series B Preferred Stock shall be payable in United States dollars at the office or agency of the Company maintained for such purpose within the City and State of New York or, at the option of the Company, payment of cash dividends (if any) may be made by check mailed to the Holders of the Series B Preferred Stock at their respective registered addresses, provided that all cash payments with respect to the Global Preferred Shares and Certificated Shares the Holders of which have given wire transfer instructions to the Company shall be required to be made by wire transfer of immediately available funds to the accounts specified by the Holders thereof.

     (b)   The Company has initially appointed the Transfer Agent to act as the "Paying Agent." The Company may at any time terminate the appointment of any Paying Agent and appoint additional or other Paying Agents, provided that until the Series B Preferred Stock has been delivered to the Company for cancellation, or moneys sufficient to pay the Liquidation Preference and accumulated but unpaid dividends on the Series B Preferred Stock have been made available for payment and either paid or returned to the Company as provided in this Certificate of Designation, it shall maintain an office or agency in the Borough of Manhattan, the City of New York for any payments under this Certificate of Designations, for surrender of Series B Preferred Stock or for exchange of the Series B Preferred Stock for Exchange Notes.

14.   FORM.

     (a)   The Series B Preferred Stock shall initially be issued in the form of one or more permanent global shares of Series B Preferred Stock in fully registered form with the global legend in the form set forth on Exhibit B (the "Global Shares Legend") and the "Schedule of

Exchanges for Global Security" set forth on Exhibit C (the "Global Preferred Shares"). The Global Preferred Shares shall be deposited on the Issue Date with the Transfer Agent as custodian for The Depository Trust Company ("DTC") and registered in the name of DTC or its nominee (DTC or such nominee, the "Global Share Holder"). The Series B Preferred Stock may have additional notations, legends or endorsements required by law, stock exchange rule or usage.

(b)   Any person having a beneficial interest in a Global Preferred Share may, upon request by prior written notice given to the Transfer Agent by or on behalf of DTC, exchange such beneficial interest for Series B Preferred Stock in the form of registered definitive certificates ("Certificated Shares"). Upon any such issuance, the Company shall register such Certificated Shares in the name of, and cause the same to be delivered to, such person or persons (or the nominee of any thereof). If (i)(A) DTC is unwilling or unable to continue as Depositary for the Global Preferred Share and the Company does not appoint a qualified replacement for DTC within 90 days or (B) DTC ceases to be a "Clearing Agency" registered under the Exchange Act; (ii) the Company, at its option, notifies the Transfer Agent in writing that the Company elects to cause the issuance of Certificated Shares; or (C) there shall have occurred and be continuing a Voting Rights Triggering Event, then, upon surrender by the Global Share Holder of its Global Preferred Shares, Certificated Securities will be issued to each person that the Global

-33-

<PAGE>

Share Holder identifies as being the beneficial owner of the related Series B Preferred Stock. Certificated Shares shall not bear the Global Shares Legend and shall not include the "Schedule of Exchanges for Global Security."

(c)   Notwithstanding any provision to the contrary herein, so long as a Global Preferred Share remains outstanding and is held by or on behalf of DTC, transfers of a Global Preferred Share, in whole or in part, or of any beneficial interest therein, shall only be made in accordance with this Certificate of Designations and the applicable procedures of DTC; provided, however, that beneficial interests in a Global Preferred Share may be transferred to persons who take delivery thereof in the form of a beneficial interest in the same or a different Global Preferred Share in accordance with the transfer restrictions set forth in the Global Restricted Shares Legend; and provided further that the transferor such certification and opinions of counsel as may be reasonably requested by the Transfer Agent.

15.   EXCLUSION OF OTHER RIGHTS.

Except as may otherwise be required by law, the shares of Series B Preferred Stock shall not have any voting powers, preferences and relative, participating, optional or other special rights, other than those specifically set forth in this Certificate of Designations (as such Certificate of Designations may be amended from time to time in accordance with the terms hereof) and in the Certificate of Incorporation. The shares of Series B Preferred Stock shall have no preemptive or subscription rights.

16.   HEADINGS OF SECTIONS.

The headings of the various sections and subsections hereof are for convenience of reference only and shall not affect the interpretation of any of the provisions hereof.

17.    SEVERABILITY OF PROVISIONS.

    If any voting powers, preferences and relative, participating, optional and other special rights of the Series B Preferred Stock and qualifications, limitations and restrictions thereof set forth in this Certificate of Designations (as this Certificate of Designations may be amended from time to time) is invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other voting powers, preferences and relative, participating, optional and other special rights of Series B Preferred Stock and qualifications, limitations and restrictions thereof set forth in this Certificate of Designations (as so amended) which can be given effect without the invalid, unlawful or unenforceable voting powers, preferences and relative, participating, optional and other special rights of Series B Preferred Stock and qualifications, limitations and restrictions thereof shall, nevertheless, remain in full force and effect, and no voting powers, preferences and relative, participating, optional or other special rights of Series B Preferred Stock and qualifications, limitations and restrictions thereof herein set forth shall be deemed dependent upon any other such voting powers, preferences and relative, participating, optional or other special rights of Series B Preferred Stock and qualifications, limitations and restrictions thereof unless so expressed herein.

-34-

<PAGE>
    IN WITNESS WHEREOF, Spanish Broadcasting System, Inc. has caused this Certificate of Designations setting forth the voting power, preferences and relative, participating, optional and other special rights and qualifications, limitations and restrictions of the Company's 10 3/4% Series B Cumulative Exchangeable Redeemable Preferred Stock to be duly executed by its authorized officer this 29th day of October, 2003.

                                SPANISH BROADCASTING SYSTEM, INC.


                    By:    /s/  Joseph A. Garcia
                           -------------------------------
                           Name:  Joseph A. Garcia
                           Title: Chief Financial Officer,
                                  Executive Vice President
                                  and Secretary
<PAGE>
                                                          EXHIBIT A

                        FORM OF INDENTURE
<PAGE>


====================================================================================


                        SPANISH BROADCASTING SYSTEM, INC.