# EXHIBIT 2

**EXPERT REPORT OF CHRISTOPHER J. KEARNS**

## I. INTRODUCTION AND QUALIFICATIONS

I am a Managing Director in the restructuring practice of Berkeley Research Group, LLC ("BRG"). I have been engaged by Kaye Scholer LLP ("Counsel") on behalf of its client, Spanish Broadcasting System, Inc. ("Spanish Broadcasting," "SBS" or "the Company"), to prepare this expert report and provide expert testimony (if necessary) on damages suffered by Spanish Broadcasting as a result of the failure of Lehman Commercial Paper, Inc. ("LCPI" and, together with Lehman Brothers Holdings, Inc. ("LBHI"), "Lehman") to fund its $10 million portion of Spanish Broadcasting's $25 million draw request (the "Draw Request") made pursuant to that certain $350,000,000 First lien Credit Agreement (the "Credit Agreement" or "Senior Credit Facilities") dated as of June 10, 2015, among, *inter alia*, Spanish Broadcasting, as borrower, and LCPI, as Administrative Agent and Lender.

I am a Certified Public Accountant, a Certified Insolvency and Restructuring Advisor, a Certified Turnaround Professional, and a Certified Fraud Examiner. I have over 35 years of financial experience as an auditor, corporate officer and, for approximately the past 24 years, as an advisor or crisis manager in bankruptcy and turnaround matters.

On June 1, 2015, I and virtually all of the professionals and staff of Capstone Advisory Group, LLC ("Capstone") joined BRG and now provide services under the BRG service line known as "BRG Capstone". The services provided by BRG Capstone include consultation in business turnaround and restructuring situations, workouts and reorganization, bankruptcy matters, crisis management, transaction advisory and due diligence services, forensic accounting, valuation, and dispute resolution services. Prior to June 1, 2015 and from its formation in 2004, I was one of the founding members of Capstone, a financial services consulting firm, which provided the same services as provided by BRG Capstone to a vast array of businesses. Prior to co-founding Capstone, from 1991 to 2004, I was a senior managing director of FTI Consulting, Inc. ("FTI") (and predecessor firms) and was co-leader of FTI's New York office. My

experience and client assignments during that period were substantially similar to the assignments I have performed at BRG Capstone and at Capstone.

Prior to 1991, I was employed by Bristol-Myers Squibb Company for approximately three years (including serving as Assistant Corporate Controller) and a major international public accounting firm for ten years in the mergers and acquisitions group and in the audit practice. I also have served as a testifying expert witness in matters concerning solvency, valuation, contract breach, lost profits and various financial/business issues in bankruptcy and restructuring. I have served as a principal financial advisor in numerous complex bankruptcies and restructurings. A copy of my curriculum vitae which, among other things, details my professional experience, case work, litigation-related assignments, expert testimony experience, and recent speaking engagements, is attached hereto as Exhibit A.

Additionally, I have relied extensively on the knowledge and experience that I have gained through my consultancy and work experience including in the areas of business turnaround and restructuring situations, out-of-court workouts, bankruptcy matters, crisis management, transaction advisory and due diligence services and dispute resolution.

A list of the materials I considered in preparing this report is set forth as Exhibit B. In preparing this expert report, I relied upon the expert report (the "Trautman Report"), dated July 23, 2015, of James Trautman ("Trautman"), who specializes in the analysis of media market trends, including trends in media consumption patterns, audience ratings and the effects of those ratings on the advertising market and advertising sales performance.

My current billing rate for this assignment is $895 per hour. I was assisted by others at BRG Capstone, who worked at my direction and under my supervision. BRG Capstone's compensation for this matter is in no way contingent upon the outcome of these proceedings.

## II.    SUMMARY OF OPINIONS

In my opinion:

- Between September 30, 2008 and December 31, 2008, there was no marketplace for corporate debt yielding rates of return comparable to that of the capital Spanish Broadcasting needed to replace due to Lehman's failure to fund.  As a result, Spanish Broadcasting could not have obtained financing to replace the $10 million that Lehman failed to fund or refinance its capital structure during the time period between September 30, 2008 and December 31, 2008.

- The intended uses of the $25 million of proceeds requested by Spanish Broadcasting in the Draw Request are consistent with the use of Revolver proceeds permitted pursuant to the Credit Agreement "for working capital purposes, capital needs and general corporate purposes" of Spanish Broadcasting.

- Spanish Broadcasting suffered damages as a direct result of Lehman's failure to fund in an amount of (a) $24,500,000 of diminution in value to the enterprise for impacted EBITDA damages (the "Impacted EBITDA Damages") resulting from Spanish Broadcasting's lack of funds for Marketing Expenses (defined below); (b) $17,054,558 of damages (the "Swap Damages") due to Spanish Broadcasting's lack of funds to terminate the Swap (defined below) in October 2008; and (c) $343,333 of damages (the "Fee Damages") on account of fees Spanish Broadcasting paid Lehman for the $10 million Revolver commitment that Lehman failed to fund.

- The damages that Spanish Broadcasting suffered were the natural and probable consequence of Lehman's failure to fund the Draw Request.

## III.    BACKGROUND

In June, 2005, Lehman arranged the Credit Agreement, which included a revolving credit facility of $25 million (the "Revolver"), the proceeds of which were to be used for working capital purposes, capital needs and general corporate purposes of Spanish Broadcasting.[1] Thus, the very essence of the Revolver was to provide funds that Spanish Broadcasting needed to operate its business.

---

[1] Credit Agreement, paragraph 4.16(b).

Lehman was contractually obligated to fund 40% of the revolver, or up to $10 million, upon submission of a draw request by Spanish Broadcasting.[2]    Spanish Broadcasting submitted the Draw Request to draw the full $25 million Revolver on October 3, 2008, which the Company intended to use, together with cash on hand, to: (a) pay off the $18.5 million Mega TV Note, which had a maturity date of January 2, 2009; (b) terminate that certain ISDA Master Agreement (the "Swap"), dated as of June 28, 2005, between Spanish Broadcasting and Lehman Brothers Special Financing, Inc. ("LBSF") and close out approximately $6 million of obligations thereunder; (c) fund $4 million of Spanish Broadcasting's operational expenses, specifically advertising, promotional and other marketing expenses (collectively, "Marketing Expenses"); and (d) pay the $5 million December interest payment under the Credit Agreement.[3]    The other lenders under the Credit Agreement funded $15 million of the Draw Request, but Lehman failed to fund its $10 million portion.   Because of Lehman's failure to fund the $10 million, Spanish Broadcasting was compelled to use the entire $15 million it did receive from the Draw Request, plus cash on hand, to make the $18.5 million payment on the maturing Mega TV Note.[4]    Critically, in the fourth quarter of 2008, Spanish Broadcasting was unable to fund (i) the planned Marketing Expenses and (ii) termination of the Swap, causing the Company to suffer substantial damages.   Below is a summary of planned and actual sources and uses of funds in connection with the Draw Request:[5]

---

[2] Declaration of Joseph A. Garcia dated July 23, 2015 ("Garcia Declaration"), paragraph 9.

[3] Garcia Declaration, paragraph 14.

[4] Garcia Declaration, paragraph 16.

[5] At September 30, 2008, SBS held approximately $34 million in cash.  As guarantor of a note between SBS Miami Broadcast Center, Inc. and Wachovia Bank, National Association, SBS was required to hold $8.5 million in cash, which left $25.5 million of available cash.  SBS determined that, in view of the impending maturity of the $18.5 million Mega TV Note on January 2, 2009, SBS would have been left with $7 million of cash (without taking into account the $5 million December interest payment), a dangerously low cash level.  Accordingly, SBS determined that it needed to draw the full $25 million available under the revolver (Garcia Declaration, paragraphs 11, 13 and 16).

| ($ in millions) | Planned | Actual |
|---|---|---|
| Sources: | | |
| Draw Request | $    25.0 | $    15.0 |
| Cash on Hand needed to fund uses | 8.5 | 8.5 |
| | 33.5 | 23.5 |
| Uses: | | |
| Payoff Mega TV Note | (18.5) | (18.5) |
| Swap Obligations | (6.0) | - |
| Marketing Expenses | (4.0) | - |
| December Interest Payment under the Credit Agreement | (5.0) | (5.0) |
| | (33.5) | (23.5) |

## IV.    SPANISH BROADCASTING COULD NOT HAVE OBTAINED REPLACEMENT FINANCING

Using the fair value marks, contractual interest rates and contractual maturities of Spanish Broadcasting's Senior Credit Facilities and Preferred Stock one can calculate the implied yield-to-maturity. The yield-to-maturity is the rate of return that would be earned by a purchaser of the Senior Credit Facilities or Preferred Stock at their current market value if held until maturity. It considers both the interest payments that the investor would receive as well as any gain from purchasing the security for less than par value. Below is a calculation of yields-to-maturity both pre and post Lehman's failure to fund[6]:

| | September 30, 2008 | | December 31, 2008 | |
|---|---|---|---|---|
| | Senior Credit Facilities | Preferred Stock | Senior Credit Facilities | Preferred Stock |
| Par | $    100.00 | $    1,000.00 | $    100.00 | $    1,000.00 |
| Fair Value Mark | $    58.00 | $    434.17 | $    28.01 | $    250.27 |
| Coupon | 5.53% | 10.75% | 3.59% | 10.75% |
| Maturity (yrs) | 3.69 | 5.04 | 3.44 | 4.79 |
| Yield-to-Maturity | 23.02% | 35.73% | 48.74% | 59.13% |

---

[6] BRG calculated the yield-to-maturity based on the fair value of the Senior Credit Facilities and Preferred Stock disclosed by SBS in Spanish Broadcasting System, Inc. Form 10-K for fiscal year ended December 31, 2008, p. 63 and Form 10-Q for quarter ended September 30, 2008, p. 16.

The above calculation indicates that on September 30, 2008 third-party investors were requiring rates of return of 23.02% and 35.73% to invest in the Senior Credit Facilities and Preferred Stock, respectively. As of December 31, 2008, after Lehman's failure to fund and in the midst of the financial crisis, the rates of return required by investors increased to 48.74% and 59.13% for the Senior Credit Facilities and Preferred Stock, respectively.

To determine if any debt was issued in the fourth quarter of 2008 at rates of return equal to or higher than rates of return required by a third-party investor in the Senior Credit Facilities or the Preferred Stock, BRG Capstone used S&P Capital IQ to identify corporate debt issued between September 30, 2008 and December 31, 2008 greater than $1 million in the U.S. by issuers that were not classified as financial institutions (see Exhibit C). Of the 114 corporate debt issues identified by S&P Capital IQ – none offered a rate of return higher than 18.50%; i.e. no company raised capital in the fourth quarter of 2008 at rates of return even close to those required by third-party investors in Spanish Broadcasting's Senior Credit Facilities (see Exhibit D). Thus, at the time there was no marketplace for corporate debt yielding rates of return comparable to rates of return required by investors in Spanish Broadcasting's Senior Credit Facilities.

Spanish Broadcasting could not have obtained financing to replace the $10 million that Lehman failed to fund or refinance its capital structure during the time period between September 30, 2008 and December 31, 2008. Considering market conditions at the time, the only way a new lender would have funded under the circumstances would have been if the terms of the new money loan provided for a substantial rate of return and liens on SBS's collateral that primed the liens on the Senior Credit Facilities. This superpriority position would have required the approval of 100% of the holders of the Senior Credit Facilities and it is highly unlikely that they would have ceded additional collateral to a new lender – i.e. they

would not have willingly been primed.  Additionally, it should be noted that the lenders who did fund $15 million of the $25 million Draw Request chose not to fund the $10 million portion that Lehman failed to fund, despite the fact that Spanish Broadcasting explicitly asked the lenders to do so.[7]

Refinancing the entire capital structure during the time period between September 30, 2008 and December 31, 2008 instead of obtaining an incremental $10 million would have been even more impractical because Spanish Broadcasting already had below market bank financing in-place.  Even if Spanish Broadcasting could have found a willing lender, a refinancing in Q4 2008 would have been impractical (or virtually impossible) for the following reasons:

- It likely would have taken months to identify a lender and consummate a deal, time that Spanish Broadcasting did not have during its liquidity crisis. For example, it took more than half a year for Spanish Broadcasting to complete a refinancing in 2012 in a much different credit market environment.[8]

- The transaction costs of completing a capital raise would have been prohibitive for an issuance of $10 million.  Management has estimated that the due diligence costs alone could have been as much as $500,000 – 5% of the offering amount.[9]

- Contractual provisions may have prevented Spanish Broadcasting from issuing debt senior or even pari passu to the Preferred Stock[10].

- In early 2009 Lehman informed Spanish Broadcasting that it would be willing to grant consent to Spanish Broadcasting obtaining a third party loan, provided that Spanish Broadcasting (i) release Lehman from its duties as Administrative Agent, (ii) release Lehman from its $10 million revolver commitment, and (iii) amend and reprice the deeply below market $350 million Credit Agreement.  Spanish Broadcasting rejected these options because they determined that were not in the best interests of debt holders and shareholders, since they would have forced Spanish Broadcasting into bankruptcy.[11]

---

[7] Garcia Declaration, paragraph 15

[8] Garcia Declaration, paragraph 26.

[9] Ibid.

[10] SBS needed the Preferred Stockholders approval to take on new debt if its leverage ratio was over 7 to 1 (Garcia Declaration, paragraph 21).

[11] Garcia Declaration, paragraph 25.

## V.     SPANISH BROADCASTING'S INTENDED USE OF PROCEEDS

In my opinion, Spanish Broadcasting's intended use of proceeds of the Draw Request (summarized in Section II) to repay the $18.5 million Mega TV Note, terminate the Swap, fund Marketing Expenses and pay the December interest payment was consistent with use of Revolver proceeds permitted pursuant to the Credit Agreement for working capital purposes, capital needs and general corporate purposes, as provided for in the Credit Agreement.

## VI.     IMPACTED EBITDA DAMAGES

As a result of Lehman's failure to fund and Spanish Broadcasting's resulting inability to continue to adequately fund the Marketing Expenses after the failure to fund, Trautman has determined that Spanish Broadcasting experienced a decline in its audience ratings in its five key radio markets and a related decline in its advertising revenue in comparison to competing radio stations.[12]  The Trautman Report states: *"effective marketing/promotion is an essential element of radio station success in attracting and retaining listeners (which translates into audience ratings that form the basis for the sale of advertising), as well as in establishing and maintaining a strong brand identity among advertisers.  Whether for SBS or any other owner of radio stations, limitations on the ability to adequately market/promote would be* <u>*expected*</u> *to eventually result in declining ratings and brand awareness/identity – which would in turn be expected to result in poor advertising sales performance in relation to competing stations.  Further, such limitations would be expected to have* <u>*increasing*</u> *impacts in the time following the lack of promotion…"*[13]

I also have observed from the Trautman Report that there are time lags, first between the Company's expenditures on promotions/prizes/advertising and any subsequent reduced

---

[12] Trautman Report, paragraph 7.
[13] Trautman Report, paragraph 8.

ratings and, second, between any ratings changes and the advertisers' ad buying reflecting their responses to any ratings changes. Trautman analyzed Spanish Broadcasting market ratings in its five key markets, New York, Los Angeles, Miami, Chicago and San Francisco, and determined that the *"aggregate five-market SBS station ratings increased in Fall 2008 (the last quarter that was preceded by a "pre-Lehman" marketing budget) as well as the next quarter, were stable in Spring 2009, and then declined substantially over the next year before stabilizing in the Summer of 2010. Significant ratings declines occurred in each quarter from Q3 2009 through Q2 2010. SBS ratings have fluctuated quarterly after 2010, but were approximately the same in Fall 2012 as in Fall 2010.[14] "*

Trautman notes that Spanish Broadcasting's most severe ratings drops in its five key markets occurred from Q3 2009 through Q2 2010. These ratings drops and resulting loss of market position in these three quarters subsequently caused a significant decrease in revenue of 8.6% during the four quarters of 2010 per the SBS Market Pacing Comparison in its five key markets.[15] Trautman Report Table 2 uses the market data to quantify total lost revenues of $12.686 million due to the lack of capital to spend on Marketing Expenses.

I used the Trautman estimate of lost revenue in 2010 to quantify the damages caused by Lehman's failure to fund.[16] Earnings Before Interest, Taxes and Depreciation ("EBITDA") is an established and accepted metric for measuring a company's profitability. I determined from SBS's audited financial statements that Spanish Broadcasting had an EBITDA margin

---

[14] Trautman Report, paragraph 13.

[15] Trautman Report, Table 1.

[16] While I quantify damages based on 2010 lost revenue per Trautman, note that he states that going forward, revenue impacts would be expected to approximate the quarterly impacts reflected in 2010 (Trautman Report, paragraph 22).

of 28.6%[17] in 2010.  Applying that profit margin to the Trautman estimate of $12.686 million of lost revenue yields a corresponding loss of EBITDA of $3.634 million in 2010.

In situations where an event, in this case Lehman's failure to fund, results in lost revenue that would have generated positive contribution margin (as was the case for SBS) the value of the subject company (SBS) is diminished accordingly.  Impacted EBITDA can be used to derive a diminution in value damage calculation.  To convert lost EBITDA to diminution in value damages suffered by SBS as a result of the failure to fund, I applied the Guideline Company method of the Market Approach to valuation (the "Market Approach").  The Market Approach states that an indication of value can be reached by applying financial performance ratios, such as EBITDA, of similar public companies to the entity being analyzed.  To derive a guideline companies group, I used the following screening criteria in Capital IQ:

1.   Company operates primarily in the radio industry

2.   Company's primary location is in the United States

3.   Company must be public as of the Valuation Date

4.   Company's closing price as of December 31, 2010 is greater than $1.00

From the universe of 16 companies that fit the above screening criteria in Capital IQ, I reviewed the information provided by Capital IQ and additional market penetration data from the business overview presented in the companies' Forms 10-K for the fiscal year ended 2010 and selected eight companies that were the most comparable to Spanish Broadcasting for this analysis, as described in Exhibit G (the "Guideline Companies")[18].

---

[17] See Exhibit E for Spanish Broadcasting Income Statement for fiscal year ended December 31, 2010.

[18] See Exhibit F for the business descriptions of the Guideline Companies and Exhibit G for the Guideline Companies selection methodology.

Next, I calculated the EBITDA multiples of the Guideline Companies[19] for 2010, the same period in which Trautman identified more than $12 million of reduced sales as a result of Lehman's failure to fund.[20]  To reflect the differences I noted between the Guideline Companies and Spanish Broadcasting, namely its poor market perception[21], higher leverage[22], smaller size[23] and niche market position[24], I discounted that average public company EBITDA multiple of 9.0[25] times by 25%.  Applying the resulting discounted multiple of 6.75 times to the lost EBITDA of $3.634 million indicates a calculated direct loss of value of $24.5 million that would not have occurred had the Lehman funding been completed.  This analysis is summarized in the table below

### Impacted EBITDA Damages

| | |
|---|---|
| Lost Revenues from Trautman's Report | $ 12,686,000 |
| 2010 EBITDA Margin | 28.6% |
| Estimated Lost EBITDA | $  3,634,264 |
| | |
| (x) EBITDA Multiple - Latest Fiscal Year | 9.0X |
| Discount to the multiple % | *25%* |
| Adjusted Multiple | **6.75X** |
| | |
| **Estimated Damages Based on the Impact to EBITDA (rounded)** | **$ 24,500,000** |

---

19 See Exhibit I for the list of Guideline Companies EBITDA multiples as of December 31, 2010.

20  Trautman Report, paragraph 21.

21  S&P and Moody's each downgraded Spanish Broadcasting expressly as a result of Lehman's failure to fund the Draw Request, thus drawing market attention to this funding problem.   In 2010, New Constructs LLC issued two analyst reports on April 3, 2010 and July 3, 2010 where it was noted that "SBSA has an overall Risk/Reward Rating of Dangerous because the stock offers more downside risk than upside potential."

22 See Exhibit H for the comparable analysis of the Guideline Companies which illustrates that overall, SBS was more levered than the median of the Guideline Companies. Specifically, SBS was more levered than (i) five of the Guideline Companies in terms of total debt to equity and (ii) six of the eight Guideline Companies in terms of total debt to EBITDA.

23 See Exhibit H for the comparable analysis of the Guideline Companies which illustrates that SBS was smaller than six of the eight Guideline Companies in terms of revenues.

24 See Exhibit G for the Guideline Companies matrix which demonstrates that only SBS and Entravision Communications Corp. operate in the niche Spanish language radio broadcasting markets, but SBS has a smaller market reach than Entravision and the comparable Guideline Companies that serve broader English-speaking markets.

25 I selected the average multiple, rounded, instead of the median multiple as the average multiple would derive a more conservative value.

## VII.    SWAP DAMAGES

LCPI's failure to fund the $10,000,000 revolver Draw Request, the proceeds of which were intended to be used in part to terminate the Swap, caused SBS $17,054,558 of damages in two subcategories, as set forth below:

### Total Swap Damages

| | | |
|---|---|---|
| Direct LBSF Swap Damages (including investment banking, legal and other costs) | $ 10,311,965 | (i) |
| Present Value of Cash Savings due to increased borrowing | 6,742,593 | (ii) |
| **Total Swap Damages** | **$ 17,054,558** | |

(i)    At the time LCPI failed to fund, Spanish Broadcasting and LBSF, another Lehman subsidiary, had an outstanding interest rate swap that was out-of-the-money to SBS in the amount of $6,008,992.[26]   Had LCPI funded the Draw Request, Spanish Broadcasting would have settled the swap for $6,008,992.  Due to the failure to fund, the Company was unable to settle the Swap.  Ultimately SBS paid LBSF $15,395,737 to terminate the Swap[27] and incurred investment banker fees, legal and other costs in connection with the Swap Settlement Agreement, as set forth below:

---

[26]Garcia Declaration, paragraph 31.

[27]  The Swap was terminated on June 17, 2010 pursuant to the Hedge Amendment and Settlement Agreement, as amended, among SBS, LBSF and LBHI (the "Swap Settlement Agreement").

**Costs Related to the Swap Termination**

| | |
|---|---:|
| January 2010 SBS Swap payment to LCPI | $ 6,008,992 |
| Swap Settlement Agreement amount | 9,000,000 |
| Interest on Swap Settlement Agreement amount | 386,745 |
| Amount SBS paid to settle the Swap | 15,395,737 |
| Less amount due on the Swap at the time of the failure to fund | (6,008,992) |
| Damages due to failure to fund paid to Lehman | 9,386,745 |
| Additional Swap damages incurred to terminate the Swap (per Management): | |
|    Investment banker fees | 425,220 |
|    Estimated legal and other costs | 500,000 |
| **Total costs to settle the Swap due to the failure to fund** | **$ 10,311,965** |

(ii)     In February 2012, the Company closed an offering of $275 million in aggregate principal amount of 12.5% senior secured notes due 2017 (the "Notes") at an issue price of 97% of the principal amount.  The Company used the $266.8 million of net proceeds from the offering, together with cash on hand, to repay its outstanding $303.1 million Lehman agented credit facility and to pay approximately $17.5 million of transaction costs related to the offering.[28]  As discussed above, if Lehman had funded in October 2008, SBS would have avoided $10,311,965 of cash costs, which would have reduced the Company's borrowing needs in the Notes offering.  Borrowing $10,311,965 more in February 2012 resulted in additional gross original issue discount ("OID") and interest costs.  These costs, after applying a present value factor, result in $6,742,593 of additional damages to SBS (see Exhibit J).

---

[28] SBS Form 10-Q for the quarterly period ended June 30, 2012, pages 8 and 23.

## VIII.   FEE DAMAGES

I have identified damages in an amount of $343,333 on account of fees SBS paid Lehman for the $10 million Revolver commitment that Lehman failed to fund.  The Credit Agreement provided that SBS pay a commitment fee of 0.5% of the undrawn balance of the Revolver. The $10 million Lehman Revolver commitment was undrawn from the closing of the Credit Agreement in 2005 until October 2008, when SBS issued the Draw Request.  The amended and restated fee letter dated May 31, 2005 provided that SBS pay an underwriting fee of 1.75% on the $10 million portion of the Revolver that Lehman failed to fund.   The underwriting fee was paid upon the initial funding of the Senior Credit Facilities.  In total, SBS paid $343,333 of commitment and underwriting fees on the Lehman $10 million that Lehman failed to fund upon request.

|  | Quarter | Revolver Commitment | Fee % | Days in Quarter | Amount Paid to Lehman |
|---|---|---|---|---|---|
| Commitment fee | 6/30/2005 | $  10,000,000 | 0.50% | 20 | $     2,778 |
|  | 9/30/2005 | 10,000,000 | 0.50% | 92 | 12,778 |
|  | 12/31/2005 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 3/31/2006 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 6/30/2006 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 9/30/2006 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 12/31/2006 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 3/31/2007 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 6/30/2007 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 9/30/2007 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 12/31/2007 | 10,000,000 | 0.50% | 94 | 13,056 |
|  | 3/31/2008 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 6/30/2008 | 10,000,000 | 0.50% | 91 | 12,639 |
|  | 9/30/2008 | 10,000,000 | 0.50% | 92 | 12,778 |
|  | 10/4/2008 | 10,000,000 | 0.50% | 4 | 556 |
|  |  |  |  |  | 168,333 |
| Underwriting fee | n/a | $  10,000,000 | 1.75% |  | 175,000 |
| **Total fees paid to Lehman related to the $10 million Lehman failed to fund** |  |  |  |  | **$   343,333** |

IX.   **SPANISH BROADCASTING'S DAMAGES WERE THE NATURAL AND PROBABLE CONSEQUENCE OF LEHMAN'S FAILURE TO FUND**

It is my understanding that direct damages are the "natural and probable consequence" of a breach of contract.   It is also my understanding that direct damages are typically expectation damages measured by what it would take to put the non-breaching party in the same position that it would have been in had the breaching party performed as promised under the contract.   It is my opinion that the damages that Spanish Broadcasting suffered were the natural and probable consequence of Lehman's failure to fund the Draw Request. More particularly, it is my opinion that the Impacted EBITDA Damages, the Swap Damages and the Fee Damages flowed directly from Lehman's failure to fund and are indicative of a measure of what it would take to put Spanish Broadcasting in the same position had Lehman not failed to fund the Revolver and provided the requested $10 million.

## X.    RIGHT TO SUPPLEMENT

I reserve the right to supplement or amend my report based on any new information that may come to my attention that is relevant to the opinions contained herein.

Respectfully submitted,

Christopher J. Kearns

New York, New York

July 23, 2015

## Christopher J. Kearns

Managing Director
BRG Capstone
104 W 40th Street, 16th Floor
New York, NY 10018
212-782-1409
CKearns@thinkbrg.com

### SUMMARY

Mr. Kearns is a Managing Director in the restructuring practice of Berkeley Research Group ("BRG"). Prior to joining BRG in June 2015, he was a Member of the Firm and co-founder of Capstone Advisory Group, LLC ("Capstone" or the "Firm"). He is a CPA, a Certified Turnaround Professional, a Certified Insolvency and Restructuring Advisor and a Certified Fraud Examiner. He specializes in providing financial restructuring advisory services and crisis management services in the troubled company environment. He has represented all parties-in-interest in various complex matters and has rendered expert testimony on various issues.

### PROFESSIONAL EXPERIENCE

**Berkeley Research Group – June 2015 - Present**

Managing Director

**Capstone Advisory Group, LLC – January 2004 – June 2015**

Managing Member of the Firm

**FTI Consulting, Inc. (and predecessor firms) – 1991 – January 2004**

Senior Managing Director

At BRG, Capstone, FTI and predecessor firms provided financial advisory and crisis management services in the troubled company environment. Assignments have included service as Chief Executive Officer, Chief Restructuring Officer, Responsible Officer, Receiver and Trustee. Also he has rendered expert testimony in various jurisdictions on matters involving valuation, lost profits, liquidation and recovery analysis, and other issues regarding distressed situations. Sample assignments include:

- *Gleacher & Company, Inc. (2013 – present)* – Chief Executive and Chief Restructuring Officer for a publicly traded financial services business and broker dealer

- *Extended Stay Hotels (2009-2010)* – Financial advisor to the Operating Advisor in a $7 billion CMBS structure in a Chapter 11 proceeding for a hotel chain, including sale of the assets

- *Archstone* – Financial advisor to major stakeholders for a large multi-family dwelling platform in major markets in connection with a debt for equity swap and related valuation.

- *Nortel (ongoing)* – Financial advisor to the Unsecured Creditors Committee in a Chapter 11 proceeding for a multinational telecommunications company.

- *MF Global (2011-2013)* – Financial advisor to the Statutory Creditors' Committee in a Chapter 11 proceeding for a failed multinational broker dealer.

- *Dynegy Holdings LLC (2011-2013)* – Financial advisor to the Indenture Trustee, Roseton and Danskammer

- *Eastman Kodak  (2012-2013)* – Financial advisor to ad hoc noteholders on intellectual property matters

- *Centro Group (2007-2009)* – Financial advisor to US lenders (debt of approximately $2.2 billion) in connection with the restructuring of a multinational commercial real estate company.

- *Energy Future Intermediate Holdings (2013*-present) – Financial advisory to ad hoc group of First Lien lenders to a holdco with a significant interest in a regulated electric transmission company

- *Mirant* Corporation (2004-2006) – Financial advisor to Unsecured Creditors Committee in Chapter 11 proceeding for a multinational energy company with generation capacity of 18,000 megawatts. Reorganization value upon emergence $11.5 to $12.0 billion.

- *SEMGroup (2008-2009)* – Financial advisor to Secured Lenders (aggregate indebtedness of nearly $3 billion) in a Chapter 11 proceeding for a company engaged in the transport, storage and distribution of petroleum products in the North American energy corridor.

- *NRG Energy* (2002-2003) – Financial advisor to Global Lenders (aggregate indebtedness of over $3 billion) in a Chapter 11 proceeding for a multinational energy company.

- *Calpine entities* (2005-2007) – Financial advisor to various ad hoc groups, including Calgen noteholders, CCFC noteholders, and Broad River/ Southpoint / Rockgen stakeholders.

## Christopher J. Kearns

### (continued)

- *Xerox* (2002) – Financial advisor to the Lenders in connection with the successful restructuring of a $7 billion credit facility for this multinational company.

- *Superior Essex Communications LLC (f/k/a Superior Telecommunications)* (2001-2002) – Financial advisor to the Lenders (debt of approximately $1 billion) in a Chapter 11 proceeding for a manufacturer of wire and cable.

- *Schwinn/GT* (2001) - Financial advisor to the Debtor in a Chapter 11 proceeding for a manufacturer and distributor of bicycle and fitness products.

- *Heilig-Meyers and The RoomStore* (2001-2005) – Financial advisor to the Debtors in a Chapter 11 proceeding for a furniture retailer.

- *Starter Corporation* (1999) – Financial advisor to the Debtor in a Chapter 11 proceeding for an apparel and retail company.


**Other restructuring and bankruptcy assignments include:**

- aaiPharmaceutical – Advisor to the Lenders

- Aerospace contractor – Advisor to the Lenders

- Advanced Glassfiber Yarns – Advisor to the Lenders

- Aircraft parts and maintenance company – Advisor to the Lenders

- Allied Holdings – Advisor to the Company and Lenders (separate matters)

- Altegrity Inc. – Advisor to Unsecured Creditors Committee

- American Asphalt – Advisor to the Lenders

- APA Trucking – Advisor to the Company

- Biofuel company – Advisor to the Lenders

- Boscov's – Advisor to the Debtor

- Bridge and tunnel construction company – Advisor to the Lenders

- Buddy L, Inc. – Advisor to the Debtor and Trustee

- Building products company – Advisor to the Company

- Caesars Entertainment Operating Company Inc. – Advisor to ad hoc secured noteholders

- Countrywide – Litigation consultant regarding mortgage put backs

**Christopher J. Kearns**

**(continued)**

- Channel Master – Advisor to the Debtor

- Chemtura Corporation – Advisor to the Lenders

- Credit card company and private bank – Advisor to the Company

- Direct marketing company – Advisor to the Lenders

- Doral Financial Corporation – Advisor to Unsecured Creditors Committee

- Downey – Litigation consultant and advisor to the Trustee

- G3K Display, LLC - Receiver

- Gas importer/retailer – Advisor to the Lenders

- Kasper A.S.L. – Advisor to the Lenders

- Privately owned hotel chain – Advisor to the Lenders

- KPNQwest – Advisor to the Lenders

- Maxxim Medical – Advisor to the Lenders

- Marvel Avoidance Litigation Trust – Trustee

- Mid-stream oil and gas company – Advisor to Lenders

- Mid-stream oil and gas company – Advisor to Lenders

- Mid-stream gas company – Advisor to the Company

- Monet Group – Advisor to the Debtor

- Multinational manufacturer – Advisor to the Company

- New York Waterways – Advisor to the Company

- Non-public business development company – Advisor to the Lenders

- Non-public Specialty Chemicals company – Advisor to the Lenders

- Non-public multinational bulk shipping company – Adviser to the Lenders

- Nutritionals manufacturer – Advisor to the Company

- Pathnet – Advisor to the Debtor

- PCB manufacturer – Advisor to the Lenders

- Pharmaceutical company – Advisor to the Company

- Pharmaceutical company – Advisor to the Lenders

**Christopher J. Kearns**

**(continued)**

- Privately owned pharmaceutical and contract research company – Lenders
- Puerto Rico Electric Power Authority – Advisor to Lender
- Quicksilver Resources Inc. – Advisor to the Unsecured Creditors Committee
- Real estate / hotel company – Advisor to the Noteholders
- Real estate / hotel company – Advisor to the CMBS Mezzanine Lender
- Real estate development company – Advisor to Lenders
- Rhodia Inc. – Advisor to the Lenders
- Schein Pharmaceutical – Advisor to the Lenders
- Sharp International – Responsible Officer
- Singer Company – Advisor to the Unsecured Creditors Committee
- Sirius XM – Advisor to the Lenders
- Spanish Broadcasting System, Inc. – Advisor to the Company
- SLM International – Advisor to the Company
- Specialty chemical company – Advisor to the Lenders
- Spiegel – Advisor to the Lenders
- Sub-prime auto lender – Responsible Officer
- Sub-prime mortgage lender – Advisor to the Company
- Transportation company – Advisor to the Company
- Transportation company – Advisor to the Lenders
- Winter Group – Chief Restructuring Officer
- Women's apparel manufacturer – Advisor to the Company

**Litigation related assignments / Expert testimony:**

Arbitrator, American Arbitration Association

Testimony (dates are approximate)

- 2015: In re Energy Future Intermediate Holding Company LLC – make whole determination and analysis of reinvestment risk for senior secured noteholders

**Christopher J. Kearns**

**(continued)**

- 2014:  Marblegate Asset Management, LLC et al vs. Education Management Corp et al – analysis of available liquidity under various restructuring scenarios as directed by counsel

- 2014: In re MPM Silicones et al (Momentive) – market efficiency, credit analysis and valuation in connection with a cram down of secured notes pursuant to a plan of reorganization; make whole determination and analysis for senior noteholders

- 2013: In re Getty Marketing, Inc. v. Lukoil Americas Corporation et al – valuation analysis and determination of "reasonably equivalent value" in a fraudulent transfer matter

- 2013: In re School Specialty, Inc. – make whole determination for the senior secured lender

- 2011: In re Lyondell Litigation Trust vs. Lyondell directors and officers, Blavatnik et al – solvency and valuation analysis, including issues related to alleged fraudulent transfer

- 2010: In re Premier Entertainment Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) (Southern District of MS) – make whole / no call determination for noteholders including analysis of reinvestment risk

- 2009: In re Lyondell Chemical Company, et al; Official Committee of Unsecured Creditors v. Citibank N.A., et al – solvency and valuation analysis, including issues related to alleged fraudulent transfer

- 2007: Phar-Mor vs. McKesson – solvency and valuation analysis

- 2007: Northwestern Corporation – rebuttal on structured finance and restructuring related matters

- 2007: In re Calpine Corporation (Southern District of NY) – solvency analysis and make whole / no call determination for certain noteholders

- 2006 and 2007: In re: Enron Securities Litigation – rebuttal on solvency and valuation matters

- 2005: Maxxim Medical, Inc. vs. Professional Hospital Supply (Plaintiff – Middle District of Florida) – lost profits and business valuation

## Christopher J. Kearns
### (continued)

- 2001 and 2005: Heilig-Meyers and The RoomStore (Virginia) – KERP program, asset sales, business valuation and for plan proponent
- 2001: Schwinn/GT (Colorado) – KERP program, liquidation analysis and creditor recoveries, sale of assets, and for plan proponent
- 2000: Monet Group (Delaware) – Sale of assets and for plan proponent
- 2000: Nature's Best Group Inc. v. Best Foods et al (Nassau County, NY State) – Deposition testimony for defendant; lost profits and business valuation
- 1999: Starter Corp. (Delaware) – KERP program, liquidation and creditor recoveries analysis, and for plan proponent
- 1998: Fletcher et al v. Liggett Group Inc. (Defendant - Alabama) – business valuation, bankruptcy and restructuring recoveries, and intellectual property analysis
- 1995: Buddy L, Inc. (Delaware) – for Chapter 11 plan proponent

**Recent Speaking Engagements**

- 2012 – American Bankruptcy Institute – mid-level professionals conference, panelist
- 2012 – Distressed Investors Conference – Schulte Roth & Zabel LLP, panelist
- 2011 – Energy Industry Conference – Cadwalader Wickersham & Taft, panelist
- 2011 – American Bankruptcy Institute – young professionals conference, panelist

**Bristol-Myers Company – 1988-1991**

**Assistant Controller: 1990-1991**

- Responsible for SEC reporting for the corporation and internal reporting and analysis for senior management
- Principal corporate financial interface with accounting and finance function for major divisions /subsidiaries
- Managed all corporate disbursements

**Christopher J. Kearns**

**(continued)**

**Director – Internal Audit: 1988-1990**

- Managed audits and special projects at corporate and multinational subsidiary levels for the Company's pharmaceutical, healthcare and consumer products businesses

**Arthur Andersen & Company – 1978-1988**

**Manager: 1983-1988**

- Managed numerous audit engagements, including overall engagement responsibility for ITT Corporation, Grumman Corporation and Signal Companies
- Advised major investment banks in connection with merger and acquisition structure and techniques

**BOARDS OF DIRECTORS**

**Corporate**

- aaiPharmaceutical, Inc. 2006-2009
- Outsourcing Solutions, Inc. 2003-2005
- Supradur Company – 1992-1993

**Non-profit**

Leukemia and Lymphoma Society

- National Board of Representatives 2005 – 2010
- NY Chapter - Chairman Emeritus, past President and Trustee 1995- 2010
- Long Island Chapter Board of Trustees 2014 - present

Make-A-Wish Foundation of Metro New York – 1992-1994

Turnaround Management Association – NY Chapter past President

Friends of Mercy Medical Center, Long Island NY – Past President and Executive Committee 2008 - 2014

8

**Christopher J. Kearns**

**(continued)**

**MEMBERSHIPS**

- Turnaround Management Association

- Association of Certified Insolvency and Restructuring Advisors

- American Institute of Certified Public Accountants

- NY State Society of CPA's

- National Association of Certified Fraud Examiners

**EDUCATION AND PROFESSIONAL CERTIFICATIONS**

- Iona College – BBA Accounting with honors 1978

- Certified Public Accountant

- Certified Turnaround Professional

- Certified Insolvency and Restructuring Advisor

- Certified Fraud Examiner

**Documents Considered**

| | Descriptions |
|---|---|
| 1 | Declaration of Joseph A. Garcia dated July 23, 2015 |
| 2 | Memorandum of Law of Lehman Brothers Holdings Inc. |
| 3 | Expert Report of James Trautman dated July 23, 2015 |
| 4 | First Lien Spanish Broadcasting Credit Agreement among Spanish Broadcasting Systems, Inc. and Merrill Lynch, Pierce Fenner & Smith, Wachovia Bank and Lehman Commercial Paper Inc. dated June 10, 2005 |
| 5 | Direct damages and consequential damages case law summaries provided by Kaye Scholer |
| 6 | Spanish Broadcasting System, Inc. Form 10-K for fiscal year ended December 31, 2008 |
| 7 | Spanish Broadcasting System, Inc. Form 10-K for fiscal year ended December 31, 2010 |
| 8 | Spanish Broadcasting System, Inc. Form 10-Q for quarter ended September 30, 2008 |
| 9 | ISDA Master Agreement dated as of June 28, 2005 between Lehman Brothers Special Financing Inc. and Spanish Broadcasting System, Inc. |
| 10 | Mega TV Security Agreement dated March 1, 2006 between Mega Media Holdings, Inc. and WDLP Licensing Inc. and WDLP Broadcasting Company, LLC. |
| 11 | Hedge Amendment and Settlement Agreement dated June 17, 2010 between Spanish Broadcasting Systems, Inc. and Lehman Brothers Special Financing Inc. and Lehman Brothers Holdings Inc. |
| 12 | Spanish Broadcasting Preferred Stock Series B |
| 13 | Standard & Poor's Research Update dated August 15, 2008 |
| 14 | Moody's Global Credit Research Rating Action for SBS dated February 24, 2009 |
| 15 | Moody's Rating Action for SBS dated November 19, 2010 |
| 16 | Moody's Credit Opinion for SBS dated November 22, 2010 |
| 17 | SBS Powerpoint slide "Summary of Ratings as of August 6, 2008" |
| 18 | SBS Powerpoint slide "Summary of Ratings as of August 18, 2008" |
| 19 | SBS Powerpoint slide "Summary of Ratings as of October 14, 2008" |
| 20 | SBS Powerpoint slide "Summary of Ratings as of October 16, 2008" |

21      SBS Draw Request to Lehman

22      Spanish Broadcasting System, Inc. Form 10-Q for quarter ended June 30, 2012

23      Moody's Rating Action dated October 14, 2008

24      Moody's Credit Opinion dated October 15, 2008

25      Standard & Poor's Research Update: Spanish Broadcasting System 'B-' Rating Outlook
        Revised to Negative dated October 15, 2008

26      Standard & Poor's Research Update: Spanish Broadcasting System Rating Lowered to
        'CCC+'; Outlook Negative dated October 16, 2008

27      New Constructs Company Snapshot for SBS dated April 3, 2010

28      New Constructs Company Snapshot for SBS dated July 3, 2010

29      Beasley Broadcast Group, Inc. 2010 SEC Form 10-K, page 3

30      Cumulus Media Inc. 2010 SEC Form 10-K, page 3

31      Entercom Communications Corp. 2010 SEC Form 10-K, page 1

32      Entravision Communications Corporation 2010 SEC Form 10-K, page 2

33      Fisher Communications, Inc. 2010 SEC Form 10-K, page 1

34      Radio One, Inc. 2010 SEC Form 10-K, page 1

35      Saga Communications, Inc. 2010 SEC Form 10-K, page 4

36      Salem Communications Corporation 2010 SEC Form 10-K, page 2

37      CBS Corporation 2010 SEC Form 10-K, page 1-1

38      Discovery Communications, Inc. 2010 SEC Form 10-K, page 3

39      iHeartMedia, Inc. (fka CC Media Holdings) 2010 SEC Form 10-K, page 1

40      International Speedway Corp. 2010 SEC Form 10-K, page 4

41      Radioio, Inc. 2010 SEC Form 10-K, page 4

42      The Walt Disney Company 2010 SEC Form 10-K, page 1

43      Final Amended and Restated Commitment Letter

44      Final Amended and Restated Fee Letter

**Exhibit C**

**Number of Corporate Debt Issues from 9/30/08 to 12/31/08**

**(by yields)**



**Exhibit D**

**Offering Amounts from 9/30/08 to 12/31/08**

**(by yields)**



Exhibit E

## Spanish Broadcasting Systems, Inc.

## Income Statement as of Fiscal Year Ended December 31, 2010

| Income Statement | |
| --- | --- |
| **For the Fiscal Period Ending** | **12 months Dec-31-2010** |
| Revenue | $    136.1 |
| Other Revenue | - |
| **Total Revenue** | **136.1** |
| | |
| Cost Of Goods Sold | 40.0 |
| **Gross Profit** | **96.2** |
| | |
| Selling General & Admin Exp. | 57.2 |
| R & D Exp. | - |
| Depreciation & Amort. | 5.8 |
| Other Operating Expense/(Income | - |
| | |
| **Other Operating Exp., Total** | **63.0** |
| | |
| **Operating Income** | **33.2** |
| | |
| Interest Expense | (13.8) |
| Interest and Invest. Income | 0.0 |
| **Net Interest Exp.** | **(13.8)** |
| | |
| Other Non-Operating Inc. (Exp.) | 5.9 |
| **EBT Excl. Unusual Items** | **25.3** |
| | |
| Restructuring Charges | (3.0) |
| Impairment of Goodwill | - |
| Gain (Loss) On Sale Of Assets | (0.2) |
| Asset Writedown | - |
| Other Unusual Items | - |
| **EBT Incl. Unusual Items** | **22.0** |
| | |
| Income Tax Expense | 7.0 |
| **Earnings from Cont. Ops.** | **15.0** |
| | |
| Earnings of Discontinued Ops. | - |
| Extraord. Item & Account. Change | - |
| **Net Income to Company** | **15.0** |
| | |
| Minority Int. in Earnings | - |
| **Net Income** | **$    15.0** |
| | |
| EBITDA | 39.0 |
| **EBITDA Margin %** | **28.6%** |

Source:  Capital IQ and Spanish Broadcasting Systems, Inc. Form 10-K for fiscal year ended 12/31/2010

## Guideline Companies Descriptions

| Guideline Company | Descriptions |
| --- | --- |
| **Beasley Broadcast Group Inc.** | Beasley Broadcast Group, Inc., a radio broadcasting company, operates radio stations in the United States. As of March 11, 2015, the company owned and operated 53 stations, including 33 FM stations and 20 AM stations located in 12 large- and mid-size markets in the United States. Beasley Broadcast Group, Inc. was founded in 1961 and is headquartered in Naples, Florida. |
| **Cumulus Media Inc.** | Cumulus Media Inc. owns and operates radio stations in the United States. It sells commercial advertising time to local, national, and network clients on its radio stations. The company owns and operates approximately 460 stations in 90 United States media markets; and approximately 8,500 broadcast radio affiliates' and various digital channels. As of December 31, 2014, it provided sales and marketing services for 11 radio stations in the United States under local marketing agreements. The company was founded in 1997 and is headquartered in Atlanta, Georgia. |
| **Entercom Communications Corp.** | Entercom Communications Corp. operates as a radio broadcasting company in the United States. The company owns and operates radio stations in various formats, such as news, talk, classic rock, adult contemporary, alternative, country, and others. It operates approximately 125 radio stations in 26 markets, including San Francisco, Atlanta, Boston, Miami, Seattle, San Diego, Denver, Portland, Sacramento, Kansas City, Indianapolis, Milwaukee, Austin, Norfolk, Buffalo, New Orleans, Memphis, Providence, Greensboro, Greenville/Spartanburg, Rochester, Madison, Wichita, Wilkes-Barre/Scranton, Springfield (MA), and Gainesville/Ocala. The company was founded in 1968 and is based in Bala Cynwyd, Pennsylvania. |
| **Entravision Communications Corporation** | Entravision Communications Corporation, operates as a diversified media company that utilizes a combination of television, radio, and digital media properties to reach Hispanic consumers in the United States and the border markets of Mexico. The company operates in three segments: Television Broadcasting, Radio Broadcasting, and Digital Media. It owns and operates television stations that broadcast drama shows, talk shows, novellas, entertainment magazines, news magazines, national news, specials, late news, children's programs, sports, reality, comedy shows, and movies. The company also owns and operates radio stations that broadcast advertising, news, traffic, weather, promotions, and community events. In addition, it operates a proprietary technology and data platform that delivers digital advertising solutions in various advertising formats. As of December 31, 2014, the company owned and/or operated 58 primary television stations located primarily in California, Colorado, Connecticut, Florida, Kansas, Massachusetts, Nevada, New Mexico, Texas, and Washington, D.C.; and 49 operational radio stations consisting of 38 FM and 11 AM in 19 markets located primarily in Arizona, California, Colorado, Florida, Nevada, New Mexico, and Texas. Entravision Communications Corporation was founded |

| Guideline Company | Descriptions |
|---|---|
| | in 1996 and is headquartered in Santa Monica, California. |
| **Radio One Inc.** | Radio One, Inc., together with its subsidiaries, operates as an urban-oriented multi-media company in the United States. The company operates through four segments: Radio Broadcasting, Reach Media, Internet, and Cable Television. The Radio Broadcasting segment includes radio broadcasting operations that primarily target African-American and urban listeners. As of December 31, 2014, it owned and/or operated 54 broadcast stations located in 16 urban markets in the United States, with approximately 13.8 million weekly national listeners. The Reach Media segment operates Tom Joyner Morning Show; and other syndicated programming assets, including the Rickey Smiley Morning Show, the Yolanda Adams Morning Show, the Russ Parr Morning Show, and the DL Hughley Show. The Internet segment is involved in online business, including the operation of Interactive One, an online platform serving the African-American community through social content, news, information, and entertainment Websites, including News One, TheUrbanDaily, and HelloBeautiful; and online social networking Websites, including BlackPlanet and MiGente. The Cable Television segment includes the operation of TV One, an African-American targeted cable television network. Radio One, Inc. was founded in 1980 and is based in Silver Spring, Maryland. |
| **Saga Communications, Inc.** | Saga Communications, Inc., a broadcast company, acquires, develops, and operates broadcast properties in the United States. The company operates through two segments, Radio and Television. It owns and/or operates television stations, low-power television stations, radio information networks, and radio stations. The company's radio stations employ various programming formats, including classic hits, adult contemporary, classic rock, news/talk, and country. It also develops local programming, such as local news franchise in each of its television markets. As of March 10, 2015, the company owned or operated broadcast properties, including 62 FM and 30 AM radio stations, 1 state radio network, 4 television stations, and 5 low-power television stations in 25 markets. Saga Communications, Inc. was founded in 1986 and is headquartered in Grosse Pointe Farms, Michigan. |
| **Salem Media Group, Inc.** | Salem Media Group, Inc. operates as a multi-media company in the United States. It operates in three segments: Broadcast, Digital Media, and Publishing. The company owns and operates radio networks, which produce and distribute talk, news, and music programming to radio stations in the United States, as well as sell commercial airtime to national advertisers and independent radio station affiliates. It also provides Christian and conservative-themed content, audio and video streaming, and other resources digitally through Christian content Websites, such as OnePlace.com, Christianity.com, Crosswalk.com, GodVine.com, Jesus.org, and BibleStudyTools.com; and conservative opinion Websites, such as Townhall.com, HotAir.com, Twitchy.com, HumanEvents.com, and RedState.com. The company also issues digital newsletters, including Eagle Financial Publications that provide market analysis and investment advice for individual subscribers; and operates Church product Websites, such as WorshipHouseMedia.com, |

| Guideline Company | Descriptions |
|---|---|
| | SermonSpice.com, and ChurchStaffing.com that offer downloads and service platforms; and e-commerce sites, including Salem Consumer Products, an e-commerce business that sells books, DVD's, and editorial content, and Eagle Wellness, an online site offering complimentary health advice and nutritional products. In addition, it publishes conservative books, such as Ann Coulter, Newt Gingrich, Michelle Malkin, David Limbaugh, Ed Klein, Laura Ingraham, Mark Steyn, and Dinesh D'Souza; and produces and distributes Christian and conservative opinion print magazines, including Homecoming The Magazine, YouthWorker Journal, Singing News, FaithTalk Magazine, and Preaching Magazine, as well as Xulon Press, a print-on-demand self-publishing service for Christian authors. The company was formerly known as Salem Communications Corporation and changed its name to Salem Media Group, Inc. in February 2015. Salem Media Group, Inc. was founded in 1986 and is headquartered in Camarillo, California. |
| **Fisher Communications, Inc.** | Fisher Communications, Inc., an integrated media company, engages in television and radio broadcasting businesses. The company owns and operates 20 network-affiliated television stations, including a 50%-owned station; and Internet business, as well as 3 Seattle radio stations and 1 managed radio station in the western United States. Its television stations reach 4.5 million households. The company also operates Websites associated with its television and radio stations; 115 hyperlocal Websites focusing on news, information, and entertainment in the Seattle-Tacoma, Portland, Eugene, Bakersfield, and Boise market areas; and entertainment and lifestyle Websites. Fisher Communications, Inc. was founded in 1910 and is based in Seattle, Washington. As of August 8, 2013, Fisher Communications, Inc. operates as a subsidiary of Sinclair Broadcast Group Inc. |

Source:  Capital IQ

**Exhibit G**

# Guideline Companies Selection Methodology

*Selected Companies*

| Company Name | Exchange: Ticker | Reason for Inclusion | Summary Business Description |
|---|---|---|---|
| **Spanish Broadcasting System Inc.** | **NasdaqGM:SBSA** | **Subject Company** | **Subject company** |
| Beasley Broadcast Group Inc. | NasdaqGM:BBGI | Primarily a radio broadcasting company.  Operates in multiple markets across the country. | Owns 42 radio stations in multiple markets primarily along the east coast. |
| Cumulus Media Inc. | NasdaqGS:CMLS | Primarily a radio broadcasting company.  Operates in multiple markets across the country. | Owns and operates 312 radio stations in 60 mid-sized markets across the U.S. |
| Entercom Communications Corp. | NYSE:ETM | Primarily a radio broadcasting company.  Operates in multiple markets across the country. | Owns 100 radio stations in 23 metro markets around the country. |
| Entravision Communications Corp. | NYSE:EVC | Spanish language media company operating numerous radio stations across the country. | Spanish lanuage media company. Owns 53 TV stations and 48 radio stations. |
| Fisher Communications Inc. | NasdaqGS:FSCI | Primarily a radio and TV broadcasting company.  Operates in multiple markets across the country. | Owns 10 radio stations and 20 TV stations in the northwest. |
| Radio One Inc. | NasdaqGM:ROIA.K | Primarily a radio broadcasting company.  Operates in multiple markets across the country. | Owns 53 radio stations in 16 urban markets across the country. |
| Saga Communications Inc. | AMEX:SGA | Primarily a radio broadcasting company.  Operates in multiple markets across the country. | Owns 61 FM stations, 30 AM stations, and 9 TV channels in 23 markets across the country. |
| Salem Communications Corp. | NasdaqGM:SALM | Primarily a radio broadcasting company.  Operates in multiple markets across the country. | Christian media company.  Owns 95 radio stations in 37 metro markets and 2 satellite radio stations. |

Note:  Fisher Communications Inc. was originally in our Guideline Companies group at the start of this case.  The company is no longer public as of the report date, but was public as of December 31, 2010.  I included Fisher Communications Inc. as part of the Guideline Companies group for the EBITDA damages calculation.

Source: Capital IQ 1; Beasley Broadcast Group, Inc. 2010 SEC Form 10-K, page 3; Cumulus Media Inc. 2010 SEC Form 10-K, page 3; Entercom Communications Corp. 2010 SEC Form 10-K, page 1; Entravision Communications Corporation 2010 SEC Form 10-K, page 2; Fisher Communications, Inc. 2010 SEC Form 10-K, page 1; Radio One, Inc. 2010 SEC Form 10-K, page 1; Saga Communications, Inc. 2010 SEC Form 10-K, page 4; Salem Communications Corporation 2010 SEC Form 10-K, page 2

*Excluded Companies*

| Company Name | Exchange: Ticker | Reason for Inclusion | Summary Business Description |
|---|---|---|---|
| Company Name | Exchange: Ticker | Reason for Exclusion | Summary Business Description |
| iHeartMedia, Inc. | OTCPK:IHRT | Half of the business is internet and mobile radio and the other half is outdoor advertising. Too big with over $5B in sales in 2010. | Diversified media and entertainment company in the United States. |
| The Walt Disney Company | NYSE:DIS | Company operates primarily in the movies and entertainment industry with revenues in 2010 exceeding $40B. | International entertainment company operating in media, parks and resorts, studio entertainment, consumer products, and interactive. |
| International Speedway Corp. | NasdaqGS:ISCA | Operates primarily in the leisure facilities with revenues over $600M in FY 2010. | Promotes motorsports themed entertainment activities in the United States |
| IFinix Corporation | OTCPK:INIX | Company operates primarily in the Investment Banking and Brokerage news and is too small with 2010 revenues of less than $1M. | Diversified information technology services and solutions company offering streaming, real-time market data, news, and analytics. |
| Radioio, Inc. | OTCPK:RAIO | Primarily an internet media company with approx $0.8M in 2010 revenues. | Operates an Internet media platform that provides streamed music to targeted audiences |
| Discovery Communications, Inc. | NasdaqGS:DISC.A | Only 2/3rds of 2010 revenues were generated from US operations. 2010 revenues were $3.7B. | Owns and operates television networks under various brands. |
| CBS Corporation | NYSE:CBS | Diverse business. Only 20% of its revenue comes from local broadcasting on television and radio stations. $13.5B in 2010 revenues. | Operates network and cable TV stations, radio stations, outdoor advertising, publishing, internet website and film production companies. |
| Ludwig Enterprises Inc. | OTCPK:LUDG | Too small compared to the Subject Company. No revenues in FY 2010. | Operates as an ethnic radio broadcasting company in the United States. |

Source: Capital IQ; CBS Corporation 2010 SEC Form 10-K, page 1-1; Discovery Communications, Inc. 2010 SEC Form 10-K, page 3;

iHeartMedia, Inc. (fka CC Media Holdings) 2010 SEC Form 10-K, page 1; International Speedway Corp. 2010 SEC Form 10-K, page 4; Radioio,

Inc. 2010 SEC Form 10-K, page 4; The Walt Disney Company 2010 SEC Form 10-K, page 1

**Exhibit H**

## Guideline Companies Analysis as of December 31, 2010

| ($ in millions)<br>Fiscal Year Ended | Spanish Broadcasting System Inc.<br>12/31/2010 | Median Guideline Companies<br>12/31/2010 | Beasley Broadcast Group Inc.<br>12/31/2010 | Cumulus Media Inc.<br>12/31/2010 | Entercom Communications Corp.<br>12/31/2010 | Entravision Communications Corporation<br>12/31/2010 | Radio One Inc.<br>12/31/2010 | Saga Communications, Inc.<br>12/31/2010 | Salem Media Group, Inc.<br>12/31/2010 | Fisher Communications, Inc.<br>12/31/2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Size** | | | | | | | | | | |
| Revenue | $ 136 | $ 203 | $ 98 | $ 237 | $ 391 | $ 200 | $ 279 | $ 126 | $ 206 | $ 174 |
| Gross Profit | $ 96 | $ 97 | $ 33 | $ 91 | $ 133 | $ 116 | $ 205 | $ 35 | $ 68 | $ 104 |
| EBITDA, including equity income from affiliates | $ 39 | $ 57 | $ 26 | $ 73 | $ 109 | $ 63 | $ 74 | $ 36 | $ 50 | $ 34 |
| EBIT, including equity income from affiliates | $ 33 | $ 40 | $ 23 | $ 64 | $ 98 | $ 43 | $ 57 | $ 28 | $ 37 | $ 20 |
| Net Income | $ 15 | $ 9 | $ 8 | $ 29 | $ 46 | $ (18) | $ (29) | $ 15 | $ 2 | $ 10 |
| **Growth Rates** | | | | | | | | | | |
| Historical Revenue Annual Growth Rates | | | | | | | | | | |
| FY | -2.3% | 3.9% | 1.3% | -7.6% | 5.1% | 5.9% | 2.7% | 4.2% | 3.6% | 31.7% |
| Historical EBITDA Annual Growth Rates, including Equity Income from Affiliates | | | | | | | | | | |
| FY | 1.8% | 16.8% | 33.7% | 8.8% | 16.2% | 17.3% | -12.2% | 32.5% | -4.1% | 371.1% |
| Historical EBIT Annual Growth Rates including Equity Income from Affiliates | | | | | | | | | | |
| FY | 3.6% | 19.1% | 41.1% | 14.1% | 24.1% | 38.7% | -10.6% | 55.0% | -3.9% | -408.6% |
| **Profitability** | | | | | | | | | | |
| EBITDA %, including equity income from affiliates | 28.6% | 27.3% | 26.1% | 30.9% | 28.0% | 31.5% | 26.6% | 28.3% | 24.3% | 19.6% |
| EBIT %, including equity income from affiliates | 24.4% | 21.9% | 23.4% | 27.1% | 25.0% | 21.4% | 20.3% | 22.4% | 17.9% | 11.3% |
| Net Income % | 11.1% | 6.9% | 8.2% | 12.4% | 11.9% | -9.0% | -10.3% | 12.0% | 0.9% | 5.6% |
| **Liquidity** | | | | | | | | | | |
| Current Ratio | 2.0 | 1.9 | 2.1 | 1.4 | 0.4 | 3.1 | 1.5 | 2.0 | 1.8 | 3.6 |
| Quick Ratio | 2.0 | 1.6 | 1.9 | 1.3 | 0.4 | 2.9 | 1.3 | 1.8 | 1.3 | 3.1 |
| **Leverage/Coverage Ratios** | | | | | | | | | | |
| Total Debt / Equity % | 215% | 182% | 129% | 353% | 175% | 189% | 723% | 93% | 395% | 54% |
| Total Debt / Book Value of Total Invested Capital % | 70% | 71% | 70% | 235% | 80% | 97% | 72% | 55% | 61% | 38% |
| Total Debt / EBITDA (EBITDA including equity income from affiliates) | 8.0 | 6.1 | 5.6 | 8.1 | 6.1 | 6.3 | 8.7 | 2.7 | 6.1 | 3.0 |
| Net Debt / EBITDA (EBITDA including equity income from affiliates) | 6.6 | 5.6 | 5.2 | 7.9 | 6.1 | 5.1 | 8.6 | 2.3 | 6.1 | 1.4 |
| EBITDA / Int. Expense (EBITDA including equity income from affiliates) | 2.8 | 3.0 | 2.6 | 4.7 | 3.6 | 2.6 | 1.6 | 6.3 | 1.7 | 3.4 |

Source: Capital IQ

Exhibit I

## Guideline Companies Multiples as of December 31, 2010

| | Beasley Broadcast Group Inc. | Cumulus Media Inc. | Entercom Communications Corp. | Entravision Communications Corporation | Radio One Inc. | Saga Communications, Inc. | Salem Media Group, Inc. | Fisher Communications, Inc. | Average | Median |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Invested Capital to EBITDA**[1] Latest Year | 10.0 | 10.4 | 9.6 | 9.6 | 9.9 | 5.6 | 7.6 | 8.4 | 8.9 | 9.6 |

Note (1): includes equity income from affiliates

Source: Capital IQ

**Present Value of Cash Savings if Direct LBSF Swap Damages were not Paid to LBSF**

If Lehman had funded in October 2008, SBS would have avoided $10,311,965 of cash costs and would have only had to borrow $264,688,035.



| Amount Borrowed at Last Refinancing (A) | Cash Proceeds that would have reduced the borrowed amount (B) | Assumed Net Amount Borrowed (A-B)=C |
|---|---|---|
| $ 275,000,000 | $ (10,311,965) | $ 264,688,035 |

Borrowing $10,311,965 less in February 2012 would have saved SBS $6,997,814 in gross original issue discount ("OID") and interest costs, which, after applying a present value factor described on the next page, resulted in $6,742,593 of direct damages to SBS as calculated below:

| OID/Interest Payment Date | Days of Interest | Rate [1] | OID and Interest on $10,311,965 | Present Value ("PV") Factor [2] | PV of OID and Interest on $10,311,965 |
|---|---|---|---|---|---|
| February 7, 2012 | N/A - OID | 3.0% | 309,359 | 1.000 | 309,359 |
| April 15, 2012 | 68 | 12.5% | 243,477 | 1.000 | 243,477 |
| October 15, 2012 | 180 | 12.5% | 644,498 | 1.000 | 644,498 |
| April 15, 2013 | 180 | 12.5% | 644,498 | 1.000 | 644,498 |
| October 15, 2013 | 180 | 12.5% | 644,498 | 1.000 | 644,498 |
| April 15, 2014 | 180 | 12.5% | 644,498 | 1.000 | 644,498 |
| October 15, 2014 | 180 | 12.5% | 644,498 | 1.000 | 644,498 |
| April 15, 2015 | 180 | 12.5% | 644,498 | 1.000 | 644,498 |
| October 15, 2015 | 180 | 12.5% | 644,498 | 0.973 | 627,096 |
| April 15, 2016 | 180 | 12.5% | 644,498 | 0.923 | 594,871 |
| October 15, 2016 | 180 | 12.5% | 644,498 | 0.876 | 564,580 |
| April 15, 2017 | 180 | 12.5% | 644,498 | 0.832 | 536,222 |
| Totals | | | $ 6,997,814 | | $ 6,742,593 |

Note:

1. The terms of the 12.5% senior secured notes called for 3.0% original issue discount and a 12.5% interest rate payable semi-annually.

2. The PV factor is calculated based on the Weighted Average Cost of Capital Calculation of 11.0% as shown on the next page.

### Weighted Average Cost of Capital calculation for the Present Value Factor

In order to calculate the present value of OID and interest expense SBS incurred because SBS had to borrow an additional $10,311,965 because Lehman failed to fund the Draw Request, I needed to derive a discount rate, which I did using the weighted cost of capital ("WACC") method.  For this analysis, the discount rate was determined by developing a WACC through application of the capital asset pricing model.  Using this method, the overall weighted average cost of capital of the subject company is comprised of the weighted costs of the various components of permanent financing, that is, the weighted costs of both debt and equity. The return on debt is adjusted to reflect that interest payments are deductible for tax purposes. Because there are no tax deductions on dividend payments, no such adjustments are necessary on the return on equity. The formula to determine the weighted average cost of capital can be written as follows:

$$WACC = K(d) (1 - T) (D/TC) + K(e) (E/TC)$$

*where:*

| | | |
|---|---|---|
| WACC | = | Weighted Average Cost of Capital |
| K(d) | = | Cost of debt |
| T | = | Tax Rate |
| D/TC | = | Debt/Total Capital |
| K(e) | = | Cost of Equity |
| E/TC | = | Equity/Total Capital |

Using the information derived from the Guideline Companies, I arrived at a WACC of 11.0 % for this analysis.

2

**Spanish Broadcasting System**
**Weighted Average Cost of Capital**
**As of July 10, 2015**

| | Guideline Companies | Ticker Symbol | Book Debt /TIC | Debt / Equity | Tax Rate Last FY | 5 Year Weekly Observed Beta (a) | 5 Year Unlevered Beta | 5 Year Weekly Relevered Beta |
|---|---|---|---|---|---|---|---|---|
| 1 | Beasley Broadcast Group Inc. | NasdaqGM:BBGI | 47.0% | 88.5% | 34.7% | 0.73 | 0.46 | 0.76 |
| 2 | Cumulus Media Inc. | NasdaqGS:CMLS | 83.4% | 503.7% | 46.6% | 1.34 | 0.36 | 0.60 |
| 3 | Entercom Communications Corp. | NYSE:ETM | 52.1% | 108.8% | 42.6% | 2.14 | 1.32 | 2.18 |
| 4 | Entravision Communications Corporation | NYSE:EVC | 33.1% | 49.5% | 40.5% | 2.23 | 1.72 | 2.84 |
| 5 | Radio One Inc. | NasdaqCM:ROIA.K | 68.2% | 214.6% | 35.0% | 1.10 | 0.46 | 0.76 |
| 6 | Saga Communications, Inc. | AMEX:SGA | 13.8% | 16.0% | 40.3% | 1.32 | 1.21 | 1.99 |
| 7 | Salem Media Group, Inc. | NasdaqGM:SALM | 64.3% | 180.4% | 46.5% | 0.96 | 0.49 | 0.81 |
| | Average for Guideline Companies | | 51.7% | 165.9% | 40.9% | 1.40 | 0.86 | 1.42 |
| | Median for Guideline Companies | | 52.1% | 108.8% | 40.5% | 1.32 | 0.49 | 0.81 |
| | Data Selected for Subject | | **52.1%** | **108.8%** | **40.5%** | **1.32** | **0.49** | **0.81** |

**After-Tax Cost of Equity**

| | | |
|---|---|---|
| | Relevered Beta Using Selected Data for Subject Company | 0.81 |
| x | Market Risk Premium (b) | 6.21% |
| + | Risk Free Rate:  Long Term Treasury Bonds (c) | 2.91% |
| = | Sub-Total After-Tax Cost of Equity | 7.9% |
| + | Size Premium (d) | 5.78% |
| + | Unsystematic Risk Factor (e) | 5.00% |
| | **After-Tax Cost of Equity** | **18.7%** |

**After-Tax Cost of Debt**

| | | |
|---|---|---|
| | Pretax Cost of Debt (f) | 5.6% |
| x (1 - | Estimated Future Effective Tax Rate) | 40% |
| | **After-Tax Cost of Debt** | **3.3%** |

**Weighted Average Cost of Capital:**

| Type of Capital | % of Total (g) | After-Tax Return | Weighted Return |
|---|---|---|---|
| Equity | 47.9% | 18.7% | 8.96% |
| Debt | 52.1% | 3.3% | 1.74% |
| | 100.0% | | 10.70% |
| | | **WACC (Rounded):** | **11.0%** |

Notes:

(a) Source:  Capital IQ; Betas calculated vs. S&P.

(b) Source:  2015 Valuation Handbook by Duff & Phelps, Long-horizon expected equity risk premium (supply side).

(c) Yield on 20 Year US Treasury Bond, Capital IQ, as of 7/10/2015

(d) Source:  2015 Valuation Handbook by Duff & Phelps, size premium for companies with market capitalization below $300.725 million

(e) Reflecting risks specific to subject company.  The 5% unsystematic risk factors equate approximately a 27% discount to the after tax cost of
equity.  This is in line with the 25% discount that BRG applied to the multiple in our EBITDA damages calculation.

(f) Bloomberg's US composite B-/B/B+ rated 5 year yield as of 7/10/15. SBS's rating on its outstanding notes was CCC+ as of 7/10/15.
Bloomberg does not provide yields for ratings below B-.  This composite represents non-investment grade and highly speculative bond yields.

(g) Reflect the industry's median capital structure

(h) Fisher Communications Inc. was originally part of the Guideline Companies.  As of the report date, the company is no longer public so it was
removed from the WACC calculation.