KAYE SCHOLER LLP
Madlyn Gleich Primoff, Esq.
250 West 55th Street
New York, New York 10019-9710
(212) 836-8000
madlyn.primoff@kayescholer.com

*Attorneys for Spanish Broadcasting System, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
In re                                                    : Chapter 11 Case No.
                                                         :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                 : 08-13555 (SCC)
                                                         :
                                     Debtors.            : (Jointly Administered)
------------------------------------------------------------------------x

**SPANISH BROADCASTING SYSTEM, INC.'S (a) RESPONSE TO
LEHMAN BROTHERS HOLDINGS INC.'S STATEMENT OF UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT REGARDING CLAIM 67707 FILED
BY SPANISH BROADCASTING SYSTEM, INC.; AND (b) COUNTERSTATEMENT OF
ADDITIONAL MATERIAL FACTS AS TO WHICH THERE IS A
<u>GENUINE ISSUE TO BE TRIED</u>**

Pursuant to Rule 7056-1(c) of the Local Bankruptcy Rules for the Southern District of New York, Spanish Broadcasting System, Inc. ("Spanish Broadcasting"), by its undersigned attorneys, submits this (a) response to the Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1 in Support of Motion for Summary Judgment Regarding Claim 67707 Filed by Spanish Broadcasting System, Inc. (the "Lehman Rule 7056 Statement") [Dkt No. 50032], dated June 18, 2015, filed by Lehman Brothers Holdings Inc. (together with its affiliates, "Lehman"); and (b) counterstatement of additional material facts as to which there is a genuine issue to be tried.

## SPANISH BROADCASTING'S RESPONSE TO THE LEHMAN RULE 7056 STATEMENT

### I.    The Credit Agreement

1.      On or about June 10, 2005, LCPI, as administrative agent and lender, and Spanish Broadcasting System, Inc. ("Spanish Broadcasting"), as borrower, entered into a Credit Agreement (the "Credit Agreement").  *See* Ex. B, Claim No. 67707 of Spanish Broadcasting (without exhibits) (the "Claim").

**Response to No. 1:  Undisputed.**

2.      Pursuant to the Credit Agreement, LCPI and certain other lenders agreed to collectively make a term loan to Spanish Broadcasting in the amount of $325 million (the "Term Loan") on the closing date, which the Credit Agreement defines as June 10, 2005.  *See* Ex. B, Credit Agreement §§ 2.1(a), 1.1 (definitions of "Closing Date," "Term Loan" and "Term Loan Commitment").

**Response to No. 2:  Undisputed.**

3.      The Credit Agreement provided for a revolving credit facility under which Spanish Broadcasting, as borrower, had the right to request that the lenders loan it a total of $25

million, with each lender responsible for a portion of the $25 million (the "Revolving Credit Facility"). *Id.* §§ 2.4(a), 1.1 (definition of "Revolving Credit Loan").

**Response to No. 3: Disputed. Each lender under the Credit Agreement was responsible for a specified portion of the $25 million Revolving Credit Facility. See declaration (the "Garcia Declaration") of Joseph A. Garcia, dated July 23, 2015, Ex. B (Credit Agreement), §§ 1.1 (definition of "Revolving Credit Commitment"), 2.4(a).**

4.      At all relevant times, LCPI's credit commitment under the Revolving Credit Facility was $10 million. *See* Miller Decl. Ex. 2.

**Response to No. 4: Undisputed.**

5.      As administrative agent, LCPI had the additional responsibility of facilitating the funding of loans to Spanish Broadcasting under the Revolving Credit Facility. *See* Ex. C § 2.5.

**Response to No. 5: Disputed. Section 2.5 of the Credit Agreement did not state that LCPI had the "responsibility" for "facilitating" the funding of loans. See Garcia Declaration, Ex. B (Credit Agreement), § 2.5. Section 2.5 of the Credit Agreement did provide, among other things, that "[e]ach Revolving Credit Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent [*i.e.*, Lehman] for the account of the Borrower" and that "[s]uch borrowing will then be made available to the Borrower by the Administrative Agent in like funds as received by the Administrative Agent." *Id.***

6.      Spanish Broadcasting agreed to repay the aggregate outstanding principal balance of the Term Loan no later than June 10, 2012, (*id.* §§ 2.3, 1.1 (definition of "Term Loan Maturity Date")), and to repay all amounts loaned to it under the Revolving Credit Facility no later than June 10, 2010. *Id.* §§ 1.1 (definition of "Revolving Credit Termination Date"); 2.8(a). Spanish

Broadcasting agreed to repay each of the loans, together with interest at a specified rate. *Id.* § 2.15.

**Response to No. 6:  Undisputed.**

7.    Section 10.12(a) of the Credit Agreement refers to "any legal action or proceeding relating to this Agreement and the other Loan Documents to which [Spanish Broadcasting] is a party." *Id.* § 10.12(a).

**Response to No. 7:  Undisputed that the quoted text, except for the words in brackets, appeared in Section 10.12(a) of the Credit Agreement.**

8.    This contested matter qualifies as "a legal action or proceeding referred to in [Section 10.12]" of the Credit Agreement.

**Response to No. 8:  Undisputed that this contested matter relates to the Credit Agreement.**

9.    Section 10.12(e) of the Credit Agreement provides:

> The Borrower [*e.g.* Spanish Broadcasting] hereby irrevocably and unconditionally . . . waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

*Id.* § 10.12(e).

**Response to No. 9:  Undisputed that the quoted text, except for the words in brackets, appeared in Section 10.12 of the Credit Agreement, but disputed to the extent that it implies that Section 10.12(e) of the Credit Agreement (the "<u>Alleged Waiver</u>") remains effective and enforceable.  The Alleged Waiver did not remain effective following the termination of the Credit Agreement pursuant to the payoff letter (the "<u>Payoff Letter</u>"), dated February 7, 2012, between Spanish Broadcasting and Lehman.  See declaration (the "<u>Gittlitz Declaration</u>") of Sheryl Gittlitz, dated July 23, 2015, ¶¶ 6-7, 22-**

24; Garcia Declaration, ¶ 37. **Spanish Broadcasting respectfully refers the Court to the Gittlitz Declaration and the Garcia Declaration, which are being filed contemporaneously herewith.**

10.    On the closing date defined by the Credit Agreement, the lenders under the Credit Agreement—including LCPI—loaned Spanish Broadcasting $325 million as required by the Credit Agreement. *See* Reply of Spanish Broadcasting, ECF No. 34175 ¶ 5.

**Response to No. 10: Undisputed.**

## II.    The Bankruptcy Filings and Draw Request

11.    On September 15, 2008, LBHI commenced a voluntary case under chapter 11 of tittle 11 of the United States Code (the "Bankruptcy Code"). *See* Case No. 08-13555, ECF No. 1.

**Response to No. 11: Undisputed.**

12.    On October 3, 2008, Spanish Broadcasting requested an advance of the full $25 million available under the Revolving Credit Facility (the "Draw Request"). *See* Miller Decl. Ex. 1 (the "Notice of Borrowing").

**Response to No. 12: Undisputed.**

13.    The Notice of Borrowing sent by Spanish Broadcasting to LCPI, as administrative agent, states that the "Business Day of the proposed Loan is October 6, 2008," meaning that Spanish Broadcasting requested that the $25 million loan be provided to Spanish Broadcasting on October 6, 2008. *Id.*

**Response to No. 13: Undisputed that the quoted text appears in the Notice of Borrowing. Pursuant to Section 2.5(b) of the Credit Agreement, Spanish Broadcasting was required to submit the Notice of Borrowing one business day prior to the borrowing date for the proposed loan under the Revolving Credit Facility. See Garcia Declaration, Ex. B**

(Credit Agreement), § 2.5(b). **Spanish Broadcasting submitted the $25 million Draw Request on Friday, October 3, 2008, which was one business day prior to the October 6, 2008 borrowing date specified in the Notice of Borrowing. See Garcia Declaration, ¶ 14.**

14.    On October 5, 2008, LCPI commenced a voluntary case under chapter 11 of the Bankruptcy Code. *See* Case No. 08-13900, ECF No. 1.

**Response to No. 14: Undisputed.**

15.    LCPI did not fund its $10 million portion of the Draw Request. *See* Miller Decl. Ex. 2.

**Response to No. 15: Undisputed.**

16.    As administrative agent under the Credit Agreement, LCPI facilitated the funding of the $15 million due from the other lenders to Spanish Broadcasting. *Id.*

**Response to No. 16: Undisputed that the lenders under the Credit Agreement other than Lehman funded $15 million of the Draw Request. See Garcia Declaration, ¶ 15.**

17.    Spanish Broadcasting received $15 million of the $25 million it requested pursuant to the Draw Request. *See* ECF No. 34549-1, Ex. E ¶ 4 ("[T]he other lenders under the Credit Agreement funded $15 million of the $25 million [D]raw [R]equest."); Miller Decl. Ex. 2.

**Response to No. 17: Undisputed.**

**III.    The Claim**

18.    On November 3, 2011, Spanish Broadcasting filed the Claim. *See* Ex. B.

**Response to No. 18: Undisputed.**

19.    The Claim amends proof of claim number 15941, filed in an unliquidated amount against LCPI on September 18, 2009, which claim was expunged pursuant to the *Order Granting Debtors' Two Hundred Thirty-Seventh Omnibus Objection to Claims (Amended and Superseded Claims)*, dated January 26, 2012. *See* ECF No. 24682.

**Response to No. 19:  Undisputed.**

20.      In the Claim, Spanish Broadcasting seeks $55,462,228.33.  *See* Ex. B.

**Response to No. 20:  Disputed that Spanish Broadcasting currently seeks to recover damages in a total amount of $55,462,228.33.  Spanish Broadcasting expressly listed the categories of damages that it seeks to recover in its response to Lehman's Interrogatory No. 13.  See Lehman Rule 7056 Statement, Ex. A ( the "Miller Declaration"), Ex. 6 (Spanish Broadcasting's responses to Lehman's interrogatories).  Spanish Broadcasting's damages are also described at length in the accompanying (a) Garcia Declaration (b) expert report (the "Trautman Report") of James Trautman of Bortz Media & Sports Group, Inc., Spanish Broadcasting's media expert, and (c) expert report (the "Kearns Report") of Christopher J. Kearns of Berkeley Research Group, LLC ("BRG"), Spanish Broadcasting's financial advisor.[1]  Spanish Broadcasting respectfully refers the Court to the Garcia Declaration, the Kearns Report and the Trautman Report, which are being filed contemporaneously herewith.**

21.      Attached to the Claim were the Credit Agreement and the Capstone Report detailing the various components of Spanish Broadcasting's alleged damages.  *See* Exs. C & D.

**Response to No. 21:  Disputed that all of the damages that Spanish Broadcasting seeks to recover are set forth in the attachments to Spanish Broadcasting's proof of claim number 67707 (the "Proof of Claim").  The damages that Spanish Broadcasting seeks to recover are described in detail in (a) Spanish Broadcasting's response to Lehman's Interrogatory No. 13; (b) the Garcia Declaration; (c) the Kearns Report; and (d) the**

---

[1] The former members and senior professionals at Capstone Advisory Group, LLC joined BRG on June 1, 2015.

Trautman Report.    **See Miller Declaration, Ex. 6 (interrogatory responses); Garcia**

**Declaration, ¶¶ 27-36; Trautman Report (*passim*); Kearns Report (*passim*).**

22.    The Capstone Report states that Spanish Broadcasting suffered $39.6 million in

damages stemming from an "expected" decline in its total invested capital, which Spanish

Broadcasting defined as "the market value of common equity, preferred equity, long-term debt,

cash, and minority interest."  Ex. D at 1, 2.

**Response to No. 22:    Undisputed that the quoted text appears in the Capstone**

**Report attached to the Proof of Claim, but disputed to the extent that Lehman has quoted**

**language out of context and omitted words in a manner that materially alters and**

**misinterprets its original meaning.    Spanish Broadcasting seeks, *inter alia*, direct damages**

**resulting from a diminution in the value of Spanish Broadcasting caused by Lehman's**

**failure to fund.  See Kearns Report, at 3, 10-11.  The damages that Spanish Broadcasting**

**seeks to recover are described in detail in (a) Spanish Broadcasting's response to Lehman's**

**Interrogatory No. 13; (b) the Garcia Declaration; (c) the Kearns Report; and (d) the**

**Trautman Report.    See Miller Declaration, Ex. 6 (interrogatory responses); Garcia**

**Declaration, ¶¶ 27-36; Trautman Report (*passim*); Kearns Report (*passim*).**

23.    The Capstone Report states Spanish Broadcasting suffered $9.9 million in

damages (the "Swap Damages") as a result of its alleged inability to terminate an ISDA Master

Agreement, dated June 28, 2005 (the "Swap"), that it had entered into with LCPI's affiliate,

Lehman Brothers Special Financing Inc. ("LBSF").  *See id.* at 1, 15; Miller Decl. Ex. 3.

**Response to No. 23:    Disputed that all of the damages that Spanish Broadcasting**

**seeks to recover are set forth in the attachments to the Proof of Claim.  The damages that**

**Spanish Broadcasting seeks to recover are described in detail in (a) Spanish Broadcasting's**

response to Lehman's Interrogatory No. 13; (b) the Garcia Declaration; (c) the Trautman Report; and (d) the Kearns Report.  See Miller Declaration, Ex. 6 (interrogatory responses); Garcia Declaration, ¶¶ 27-36; Trautman Report; (*passim*); Kearns Report (*passim*).

24.     The Capstone Report states that Spanish Broadcasting is entitled to $273,333.33, representing the "financing and unfunded revolver fees" that it paid to LCPI in its capacity as administrative agent, over the life of the Credit Agreement (the "Fee Damages").  Ex. D at 1, 16.

**Response to No. 24:  Disputed that all of the damages that Spanish Broadcasting seeks to recover are set forth in the attachments to the Proof of Claim.  The damages that Spanish Broadcasting seeks to recover are described in detail in (a) Spanish Broadcasting's response to Lehman's Interrogatory No. 13; (b) the Garcia Declaration; (c) the Trautman Report; and (d) the Kearns Report.  See Miller Declaration, Ex. 6 (interrogatory responses); Garcia Declaration, ¶¶ 27-36; Trautman Report; (*passim*); Kearns Report (*passim*).**

25.     The Capstone Report states that Spanish Broadcasting seeks to recover approximately $5.7 million for what it cost Spanish Broadcasting to replace LCPI's $10 million commitment under the Revolving Credit Facility (the "Replacement Cost Damages").  *Id.* at 1, 17.  Spanish Broadcasting later withdrew the Replacement Cost Damages from its Claim.  *See* Feb. 13, 2013 Hr'g Tr. at 134:25–135:5, ECF No. 34990 (MS. PRIMOFF:  . . . On the $5.7 million, I believe we previously communicated to Lehman that we are withdrawing that element of the claim.  So that's – that's not – that's not an issue.").

**Response to No. 25:     Undisputed that Spanish Broadcasting withdrew the Replacement Cost Damages prior to the February 13, 2013 Sufficiency Hearing before Judge Peck.**

## IV.     The Payoff Letter

26.     On or about February 7, 2012, Spanish Broadcasting and LCPI executed a letter terminating the Credit Agreement (the "Payoff Letter").  *See* Miller Decl. Ex. 4 (the "Payoff Letter").

**Response to No. 26:  Undisputed.**

27.     In connection with the negotiations of the Payoff Letter, Spanish Broadcasting was represented by Kaye Scholer LLP and LCPI was represented by Weil, Gotshal & Manges LLP.  *See* Miller Decl. ¶ 6.

**Response to No. 27:  Undisputed.**

28.     Section 1(a) of the Payoff Letter states:

> Effective as of the Effective Date (defined below) . . . all outstanding Loans and all other amounts owing by [Spanish Broadcasting] under the Credit Agreement (including all principal, accrued interest and fees) shall be paid in full and the Credit Agreement and all obligations of [Spanish Broadcasting] and the other Loan Parties thereunder and under the other Loan Documents shall be terminated (other than contingent obligations which expressly survive the terms of the Credit Agreement or such other Loan Documents, including without limitation, Section 10.5 of the Credit Agreement).

Miller Decl. Ex. 4 § 1(a).

**Response to No. 28:  Undisputed that the quoted text, except for the words in brackets, appears in Section 1(a) of the Payoff Letter.**

29.     The Payoff Letter states that "[c]apitalized terms used but not defined herein shall have the meanings given such terms in the Credit Agreement."  *Id.* at 1.  The Credit Agreement

defines "Loan" as "any loan made by any Lender pursuant to this Agreement." Ex. C § 1.1. The

Credit Agreement defines "Loan Parties" as "[Spanish Broadcasting] and each Subsidiary of

[Spanish Broadcasting] that is a party to a Loan Document." *Id.* The Credit Agreement defines

"Loan Documents" as the "[First Lien Credit Agreement, as amended, supplemented, replaced or

otherwise modified from time to time], the Security Documents, the Intercreditor Agreement, the

Fee Letter, the Applications and the Notes." *Id.*

**Response to No. 29:  Disputed to the extent that the first sentence misquotes the**

**Payoff Letter by adding the word "shall."  Undisputed that the remainder of the quoted**

**text, except for the words in brackets, appears in the Credit Agreement.**

    30.    Section 4 of the Payoff Letter is entitled "Release" and states:

> Except as set forth in the last sentence of this paragraph, [Spanish
> Broadcasting], on behalf of itself and the other Loan Parties,
> hereby unconditionally and irrevocably waives all claims, suits,
> debts, liens, losses, causes of action, demands, rights, damages or
> costs, or expenses of any kind, character or nature whatsoever,
> known or unknown, fixed or contingent, which any of them may
> have or claim to have against [LCPI] (whether in its capacity as an
> agent, lender, hedging counterparty or otherwise) or its agents,
> employees, officers, affiliates, directors, representatives, attorneys,
> successors and assigns (collectively, the "Released Parties") to the
> extent arising out of or in connection with the Loan Documents
> including, without limitation, any failure by the Lehman [sic] or its
> affiliates to fund any Loan required to be funded by it under the
> Credit Agreement (collectively, the "Claims").  Except as set forth
> in the last sentence of this paragraph, each of [Spanish
> Broadcasting] and the other Loan Parties further agree forever to
> refrain from commencing, instituting or prosecuting any lawsuit,
> action or other proceeding against any Released Parties with
> respect to any and all of the foregoing described waived, released,
> acquitted and discharged Claims and from exercising any right of
> recoupment or setoff that it may have under a master netting
> agreement or otherwise against any Released Party with respect to
> Obligations under the Loan Documents.  Each of the Released
> Parties shall be a third party beneficiary of this letter agreement.
> The foregoing release shall not apply to [the Claim] (as such claim
> may be amended in accordance with applicable law).

Miller Decl. Ex. 4 § 4.

**Response to No. 30:  Undisputed that the quoted text, except for the words in brackets, appears in Section 4 of the Payoff Letter.**

31.    The Payoff Letter does not contain a release of claims or defenses by LCPI.

**Response to No. 31:  Disputed to the extent that it implies that the Alleged Waiver remains effective and enforceable.  The Alleged Waiver did not remain effective following the termination of the Credit Agreement pursuant to the Payoff Letter.  See Gittlitz Declaration, ¶¶ 6-7, 22-24; Garcia Declaration, ¶ 37.**

## V.    Discovery

32.    On October 14, 2014, the Court entered the *Claims Litigation Schedule With Respect to Claim No. 67707 Filed by Spanish Broadcasting System, Inc. and the Objection Interposed by Lehman Brothers Holdings Inc.*, as amended from time to time, which was negotiated by the parties and called for the exchange of document requests and interrogatories, among other discovery devices.  *See* ECF No. 46498.

**Response to No. 32:  Undisputed.**

33.    The interrogatories served by the Plan Administrator on Spanish Broadcasting included Interrogatory No. 23, which requested that Spanish Broadcasting "[d]escribe in detail the amount and computation of damages that Spanish Broadcasting is seeking in this matter."  *See* Miller Decl. Ex. 5 ¶ 23.

**Response to No. 33:  Disputed.  Lehman did not interpose any Interrogatory No. 23 on Spanish Broadcasting.  See Miller Declaration, Ex. 5.  The quoted text appears in Lehman's Interrogatory No. 13.  *Id.***

34.    In its response (Miller Decl. Ex. 6) to LBHI Interrogatory No. 23, Spanish Broadcasting provided the following description of its damages:

(a)    Damages in an amount of approximately $30.3 million in impacted EBITDA resulting from Lehman's failure to fund the Draw;

(b)    [the Swap Damages] in an amount of approximately $17.2 million relating to Spanish Broadcasting's inability to terminate the Swap;

(c)    [Fee Damages] in the amount of $273,333.33 on account of the fees that Spanish Broadcasting paid to Lehman for the portion of the Draw that Lehman failed to fund;

(d)    Interest on the foregoing; and

(e)    Spanish Broadcasting's costs, expenses and reasonable attorneys' fees relating to [this dispute], including, without limitation, all costs, expenses and fees relating to Spanish Broadcasting's testifying and non-testifying experts.

*Id.* at 23–24.

**Response to No. 34:  Disputed.  Lehman did not interpose any Interrogatory No. 23 on Spanish Broadcasting.  See Miller Declaration, Ex. 5.  The quoted text, except for the language in brackets, appears in Spanish Broadcasting's response to Lehman's Interrogatory No. 13.  See Miller Declaration, Ex. 6 (interrogatory responses), at 23-24.**

35.    Spanish Broadcasting has confirmed that it has produced "a universe of documents that . . . demonstrates [its] damages".  Miller Decl. Ex. 7, Apr. 27, 2015 Hr'g Tr. At 14:25–15:4.

**Response to No. 35:  Undisputed that the quoted text appears in the transcript of the April 27, 2015 hearing, but disputed to the extent that Lehman has quoted language out of context and omitted words in a manner that materially alters and misinterprets its original meaning.  Spanish Broadcasting respectfully refers the Court to the transcript of the April 27, 2015 hearing.  In addition, it is undisputed that discovery has not been completed in this contested matter.  See Lehman's summary judgment motion (the "<u>Motion</u>"), dated June**

**18, 2015 [Dkt No. 50033], at 11 n.11 (noting that there exist "pending disputes with regard to document production.").**

VI.    **EBITDA Damages**

36.    On February 11, 2013, Spanish Broadcasting filed the declaration of Joseph A. Garcia in support of the Claim, attached hereto as <u>Exhibit E</u>.

**Response to No. 36:  Undisputed.**

37.    Spanish Broadcasting alleges that it suffered "another level of lost market value due to the resulting forced reduction in its productions and revenue generating activities."  Ex. E ¶ 10.  Specifically, Spanish Broadcasting alleges that its lack of $10 million "prevented [it] from operating at its current and budgeted levels at the time, and therefore forced Spanish Broadcasting to immediately take steps to cut costs and preserve cash. . . . Spanish Broadcasting's ability to produce programming and generate revenue were reduced as a result, and Spanish Broadcasting was not able to achieve budgeted financial levels."  *Id.* ¶ 9.

**Response to No. 37:  Undisputed that the quoted text, except for the words in brackets, appears in the Declaration of Joseph A. Garcia dated February 11, 2013 (the "2013 Garcia Declaration"), but disputed to the extent that Lehman has quoted language out of context and omitted words in a manner that materially alters and misinterprets its original meaning.  Spanish Broadcasting respectfully refers the Court to the 2013 Garcia Declaration.**

VII.    **Swap Damages**

38.    Spanish Broadcasting and LBSF entered into that certain 1992 form ISDA Master Agreement and schedule governing swap transactions, dated as of June 28, 2005 (the "<u>Master Agreement</u>").  *See* Miller Decl. Ex. 3.

**Response to No. 38: Disputed to the extent that it implies that Spanish Broadcasting entered into the ISDA Master Agreement for reasons unrelated to the Credit Agreement. In connection with the Credit Agreement, pursuant to an affirmative covenant imposed by Lehman, Spanish Broadcasting was required to enter into the swap agreement. See Garcia Declaration, ¶¶ 8, 30.**

39.    Spanish Broadcasting and LBSF executed a confirmation on June 29, 2005, pursuant to which the parties entered into an interest rate swap transaction. *See* Miller Decl. Ex. 3 (the "Swap").

**Response to No. 39: Disputed to the extent that it implies that Spanish Broadcasting entered into the Swap for reasons unrelated to the Credit Agreement. In connection with the Credit Agreement, pursuant to an affirmative covenant imposed by Lehman, Spanish Broadcasting was required to enter into the swap agreement. See Garcia Declaration, ¶¶ 8, 30.**

40.    Pursuant to the Master Agreement, LBHI served as "Credit Support Provider" for LBSF. Miller Decl. Ex. 3, Swap Sched. Pt. 4(g). The Master Agreement provided that, upon the bankruptcy of LBHI or LBSF, Spanish Broadcasting was entitled to terminate all transactions outstanding under the Master Agreement, including the Swap. Miller Decl. Ex. 3, Master Agreement §§ 5(a)(vii), 6.

**Response to No. 40: Undisputed.**

41.    Spanish Broadcasting did not terminate the Swap upon the commencement of the chapter 11 cases of LBHI or LBSF. Rather, the Swap was terminated pursuant to that certain confidential Hedge Amendment and Settlement Agreement between LBSF and Spanish Broadcasting, dated as of June 17, 2010. *See* Ex. D at 1.

**Response to No. 41:  Undisputed that the Swap was terminated pursuant to the Hedge Amendment and Settlement Agreement, but disputed to the extent it implies that Spanish Broadcasting had sufficient available cash to terminate the Swap following Lehman's failure to fund the Revolving Credit Facility.  Spanish Broadcasting was left with dangerously low cash reserves as a result of Lehman's failure to fund the Revolving Credit Facility and, as a result, Spanish Broadcasting did not have the approximately $6 million it needed to terminate the Swap.  See Garcia Declaration, ¶¶ 16, 31; Kearns Report, at 3-4, 12.**

42.    Because it did not receive $10 million, Spanish Broadcasting asserts it "[u]ltimately . . . paid $9,886,745 more in damages to [LBSF] for termination of the Swap than it would have been required to pay had it been able to terminate the Swap in October 2008 as contemplated.  Ex. E ¶ 8.

**Response to No. 42:  Undisputed that the quoted text appears in the 2013 Garcia Declaration, but disputed that all of the damages that Spanish Broadcasting seeks to recover (including, without limitation, Swap Damages in amount of $17,054,558) are set forth in the 2013 Garcia Declaration.  The damages that Spanish Broadcasting seeks to recover are described in detail in (a) Spanish Broadcasting's response to Lehman's Interrogatory No. 13; (b) the Garcia Declaration; (c) the Trautman Report; and (d) the Kearns Report.    See Miller Declaration, Ex. 6 (interrogatory responses);  Garcia Declaration, ¶¶ 27-36; Trautman Report; (*passim*); Kearns Report (*passim*).**

Spanish Broadcasting asserts that, if LCPI had funded its *pro rata* share of the Draw Request, Spanish Broadcasting would have paid "somewhere between $5 and $6 million" to LBSF to terminate the Swap it had entered into with LBSF.  *Id.* ¶ 7.  *Compare* Ex. D at 1

(estimating that Spanish Broadcasting would have been required to pay $6,008,991.58 to terminate the Swap on October 3, 2008).

**Response to No. 43:  Undisputed that if Lehman had funded the Draw, then Spanish Broadcasting would have terminated the Swap for a close-out amount of $6,008,991.58, based on the three-month LIBOR forward curve as of October 3, 2008.   See Garcia Declaration, ¶ 31; Kearns Report, at 12-13.**

**SPANISH BROADCASTING'S COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED**

**Lehman Was Spanish Broadcasting's Longstanding Trusted Advisor**

1.      Dating back to Spanish Broadcasting's IPO in 1999, Lehman had a longstanding business relationship with Spanish Broadcasting as Spanish Broadcasting's trusted financial advisor and arranger of financings.  Garcia Declaration, ¶¶ 3-6.  Whenever Spanish Broadcasting needed to raise money, it turned to Lehman for help.  *Id.* at ¶ 3.

2.      For a number of years, a senior managing director of Lehman sat on Spanish Broadcasting's board of directors.  *Id.* at ¶ 4.  Not only did Spanish Broadcasting view Lehman as part of its company, but Lehman itself likewise considered its relationship with Spanish Broadcasting to be a "partnership."  *Id.*  Lehman described the relationship as a "partnership" in the presentation it made to Spanish Broadcasting in order to induce Spanish Broadcasting to enter the Credit Agreement.  See *id.* at ¶ 4, Ex. A (Lehman presentation materials dated April 7, 2005).

3.      Lehman regularly made presentations to Spanish Broadcasting, offering advice on the refinancing of Spanish Broadcasting's preferred stock, advice on the Swap, dated as of June 28, 2005, between Spanish Broadcasting and Lehman Brothers Special Financing, Inc., advice on the possibility of "going private," information and advice about potential acquisitions and combinations, and information and advice on various other general business matters.  See *id.* at ¶ 5.  Spanish Broadcasting was guided by Lehman's advice and counsel in a number of transactions and potential transactions, and relied on Lehman as a trusted advisor.  *Id.*  Lehman collected fees from Spanish Broadcasting in excess of **$30 million**.  *Id.*

4.      Lehman was the lead underwriter on Spanish Broadcasting's IPO in 1999.  *Id.* at

¶ 6.  Following the IPO, Lehman continued to serve as Spanish Broadcasting's principal

financial advisor through a number of financings and refinancings as a participant, lender and

administrative agent, among other roles, up until the filing of the Lehman bankruptcy in 2008.

*Id.*

## Spanish Broadcasting's Capital Structure

5.      As Spanish Broadcasting's trusted advisor, Lehman was well aware of the

financial needs of Spanish Broadcasting and structured the financial arrangements under and in

connection with the Credit Agreement accordingly.  *Id.* at ¶ 8.  To that end, Lehman arranged for

Spanish Broadcasting to enter into the Credit Agreement, which included a first lien term loan

facility of $325,000,000, required (at Lehman's insistence) that Spanish Broadcasting enter into

the Swap with Lehman Brothers Special Financing, Inc., and also included, with Lehman's

advice and counsel, the Revolving Credit Facility of $25 million.  *Id.*  Lehman's counsel drafted

the Credit Agreement.  *Id.*

6.      Lehman worked with Spanish Broadcasting to put the Revolving Credit Facility

in place.  *Id.* at ¶ 9.  Lehman plainly understood and, indeed, advised Spanish Broadcasting that

it should have the Revolving Credit Facility to support the ongoing working capital needs of

Spanish Broadcasting.  *Id.*  Indeed, Section 4.16(b) of the Credit Agreement provided that the

proceeds of the Revolving Credit Facility "**shall be used for working capital purposes, capital**

**needs and general corporate purposes**" of Spanish Broadcasting.  See Garcia Declaration, ¶ 9,

Ex. B (Credit Agreement), § 4.16(b) (emphasis added).  Lehman took on the obligation to fund

40 percent (*i.e.*, $10 million) of the $25 million Revolving Credit Facility.  Garcia Declaration,

¶ 9.  At the time the parties entered into the Credit Agreement and thereafter, Lehman plainly

understood that if it failed to fund the revolver, Spanish Broadcasting would be left without the funds it needed for "working capital purposes, capital needs and general corporate purposes," and Spanish Broadcasting would suffer damages as a result.  *Id.*

7.     As of October 2008, Spanish Broadcasting's capital structure also included $18.5 million in indebtedness under a secured promissory note (the "Mega TV Note"), dated March 1, 2006, among, *inter alia*, Spanish Broadcasting, as maker, and BC Media Funding Company II, LLC, as holder and assignee.  Garcia Declaration, ¶ 10, Ex. C (Mega TV Note); Ex. D (Security Agreement).  The Mega TV Note had an impending maturity date of January 2, 2009.  Garcia Declaration, ¶ 10.  The lender under the Mega TV Note was unwilling to extend the maturity date.  *Id.*  As a business matter, Spanish Broadcasting could not risk a default on the Mega TV Note because such a default would have triggered a cross-default under the Credit Agreement. *Id.*; Garcia Declaration, Ex. B (Credit Agreement), §§ 1.1 (definition of "Event of Default"), 8(e).  It was essential that Spanish Broadcasting not take any action that would cause a default under the Credit Agreement because, among other things, the Credit Agreement had a below-market interest rate.  Garcia Declaration, ¶ 10.

8.     In addition, Spanish Broadcasting was a guarantor under a note (the "MBC Note"), dated January 4, 2007, between SBS Miami Broadcast Center, Inc. and Wachovia Bank, National Association.  *Id.* at ¶ 11, Ex. E (MBC Note), Ex. F (Unconditional Guaranty (the "MBC Guaranty")).  The MBC Guaranty required Spanish Broadcasting to hold cash equal to at least 1.2 times the outstanding principal balance under the MBC Note.  See *id.*, Ex. F (MBC Guaranty), at 6.  As of September 30, 2008, $7.1 million remained outstanding under the MBC Note; therefore, Spanish Broadcasting was required to hold $8.5 million in cash.  *Id.* at ¶ 11.

9.      Spanish Broadcasting also issued certain preferred stock (the "Preferred Stock") pursuant to a Certificate of Designations, dated October 29, 2003 (the "Certificate of Designations").  *Id.* at ¶ 12, Ex. G (Certificate of Designations).  The Certificate of Designations provided for the payment of quarterly cash dividends in the amount of $2.5 million, commencing on January 15, 2009.  *Id.* at ¶ 12.  Pursuant to the Certificate of Designations, Spanish Broadcasting could not incur additional indebtedness in October 2008 because its Debt to Cash Flow Ratio (as defined in the Certificate of Designations) was greater than 7 to 1.  See *id.* at ¶ 12, Ex. G, § 11(b).

### Spanish Broadcasting's Draw and Lehman's Failure to Fund

10.     Spanish Broadcasting held approximately $34 million in cash as of September 30, 2008.  *Id.* at ¶ 13.  Of that amount, Spanish Broadcasting was required to hold $8.5 million in cash pursuant to the MBC Guaranty, as set forth above, which left $25.5 million of available cash.  *Id.*  In view of the impending maturity of the $18.5 million Mega TV Note on January 2, 2009, Spanish Broadcasting would have remaining cash of only $7 million -- without even taking into account the $5 million December interest payment under the Credit Agreement and presuming that Spanish Broadcasting made the $2.5 million dividend payment on the Preferred Stock in kind rather than in cash (such in kind payment was made on October 15, 2008).  *Id.*  Accordingly, Spanish Broadcasting determined that it needed to draw the full $25 million available under the revolver for working capital.  *Id.*

11.     On October 3, 2008, Spanish Broadcasting submitted the Draw in accordance with the terms of the Credit Agreement for the entire $25 million of availability under the revolver.  *Id.* at ¶ 14.  Spanish Broadcasting intended to use the $25 million Draw plus a portion of cash on hand in order to (a) pay off the $18.5 million Mega TV Note, which had a maturity date of January 2, 2009; (b) terminate the Swap with Lehman and close out approximately $6 million of obligations thereunder; (c) fund $4 million of Spanish Broadcasting's operational expenses, specifically advertising, promotional and other marketing expenses (collectively, "Marketing Expenses"); and (d) pay the $5 million December interest payment under the Credit Agreement.  *Id.*  After Lehman failed to fund the Draw, the lenders who did fund $15 million of the $25 million Draw chose not to fund the $10 million portion that Lehman failed to fund, despite the fact that Spanish Broadcasting explicitly asked the lenders to do so.  *Id.* at ¶ 15.

12.     Because Lehman did not fund its $10 million portion of the Draw, Spanish Broadcasting was compelled to use the entire $15 million it did receive from the Draw, plus $3.5 million of its already low cash reserves, to make the $18.5 million payment on the maturing Mega TV Note.  *Id.* at ¶ 16.  Spanish Broadcasting was left with dangerously low cash reserves as a result of Lehman's failure to fund and, as a result, Spanish Broadcasting did not have the approximately $6 million it needed to terminate the Swap and the $4 million it needed for Marketing Expenses.  *Id.*

13.     Lehman's breach of its obligation to fund the Draw left Spanish Broadcasting undercapitalized.  *Id.* at ¶¶ 17-18.  S&P and Moody's each downgraded Spanish Broadcasting expressly as a result of Lehman's failure to fund the Draw.  See *id.* at ¶ 17, Ex. H (S&P report), Ex. I (Moody's report).

**Spanish Broadcasting Could Not Obtain Alternative Financing Following Lehman's Failure to Fund the Draw**

14.    Following Lehman's failure to fund the Draw in October 2008, Spanish Broadcasting was unable to obtain alternate financing of the $10 million for several reasons, including but not limited to the following:  (1) the incurrence of any additional indebtedness was barred under the terms of the Certificate of Designations for the Preferred Stock; (2) no lender would have agreed to provide fresh capital on a basis that was *pari passu* with the Credit Agreement because Spanish Broadcasting's existing indebtedness under the Credit Agreement was trading in the marketplace at or below 58 cents on the dollar in the fourth quarter of 2008; (3) a refinancing of the entire Credit Agreement was not at all feasible, because Spanish Broadcasting already had below-market financing in place and no company raised capital in the fourth quarter of 2008 at rates of return even close to those required by third-party investors in Spanish Broadcasting's senior credit facilities; (4) the incurrence of indebtedness on a priming basis to the lenders under the Credit Agreement would have required unanimous consent of the Credit Agreement lenders, which would not have been forthcoming; and (5) Lehman itself, in its capacity as Administrative Agent and a Lender under the Credit Agreement, had imposed such arduous conditions on obtaining a third party loan that those conditions made it impracticable (if not impossible) for Spanish Broadcasting to find an alternate lender.  *See id.* at ¶¶ 19-26.

**Spanish Broadcasting Suffered Damages As a Direct Result of Lehman's Breach of Its Obligation to Fund the Revolver**

15.    Spanish Broadcasting was in regular communications with Lehman personnel in the days leading up to and following Spanish Broadcasting's issuance of the Draw and Lehman's failure to fund its share.  See Garcia Declaration, ¶ 27.  Lehman was well aware of Spanish

Broadcasting's need for Lehman's $10 million and well aware that Spanish Broadcasting could not obtain funds elsewhere.  *Id.*

16.    The failure of Lehman to fund the Draw caused Spanish Broadcasting to suffer damages in the aggregate amount of $41.9 million, which is comprised of (a) damages in an amount of $24,500,000 (the "Impacted EBITDA Damages") resulting from Spanish Broadcasting's lack of $4 million in funds needed for Marketing Expenses; (b) damages in an amount of $17,054,558 (the "Swap Damages") resulting from Spanish Broadcasting's lack of capital to terminate and close out the Swap in October 2008; and (c)  damages in an amount of $343,333 (the "Fee Damages") on account of fees that Spanish Broadcasting paid to Lehman for the $10 million revolver commitment that Lehman failed to fund.  See *id.* at ¶¶ 27-35; Trautman Report (*passim*); Kearns Report (*passim*).

17.    The damages that Spanish Broadcasting suffered were the natural and probable consequence of Lehman's failure to fund the Draw.  See Trautman Report, ¶¶ 4-9; Kearns Report, at 3, 15.  More particularly, the Impacted EBITDA Damages, the Swap Damages and the Fee Damages flowed directly from Lehman's failure to fund the Revolving Credit Facility and are indicative of a measure of what it would take to put Spanish Broadcasting in the same position it would have been in if Lehman had funded the Revolving Credit Facility.   See Trautman Report, ¶¶ 4-9, 19; Kearns Report, at 15.

18.    In addition, the Impacted EBITDA Damages, the Swap Damages and the Fee Damages relate to the injuries that Spanish Broadcasting suffered directly in connection with the Credit Agreement, and not with "collateral business arrangements," as Lehman alleges in its Motion.  See Garcia Declaration, ¶ 36.

**The Payoff Letter Negotiations Between Lehman and Spanish Broadcasting Demonstrate That the Parties Did Not Intend for the Alleged Consequential Damages Waiver to Be Effective Following the Termination of the Credit Agreement**

19.     The Payoff Letter as well as the Credit Agreement, which were both drafted by Lehman's counsel, were explicit as to which provisions of the Credit Agreement survived termination.  See Gittlitz Declaration, ¶ 6.  More particularly, when Lehman wanted to provide that a provision of the Credit Agreement would remain effective following the termination of the Credit Agreement, it did so with specificity in the Payoff Letter and/or the Credit Agreement.  See *id.* at ¶ 6, Ex. A (Payoff Letter), ¶ 1(a) (providing for survival of contingent obligations pursuant to Section 10.5 of the Credit Agreement), ¶ 4 (providing for survival of Spanish Broadcasting's Proof of Claim); Garcia Declaration, Ex. B, Credit Agreement § 2.19(c) (survival of provision regarding certificate of additional amounts payable), § 2.20(e) (survival of provision regarding taxes), § 2.21 (survival of indemnity provision), § 9.7 (survival of indemnification provision), § 10.5 (survival of provision regarding payment of expenses).  Through their respective attorneys at Kaye Scholer LLP ("Kaye Scholer") and Weil, Gotshal & Manges LLP ("Weil"), Spanish Broadcasting and Lehman carefully and extensively negotiated those provisions of the Credit Agreement that would remain effective following the parties' entry into the Payoff Letter, which terminated the Credit Agreement.  See Gittlitz Declaration, ¶ 6.

20.     Neither the Credit Agreement nor the Payoff Letter provides for the survival of the Alleged Waiver contained in Section 10.12(e) of the Credit Agreement.   See Gittlitz Declaration, ¶ 7; Garcia Declaration, Ex. B, Credit Agreement, § 10.12(e).

21.     Sheryl Gittlitz of Kaye Scholer represented Spanish Broadcasting in its extensive negotiations with Lehman between January 30, 2012 and February 7, 2012 concerning the terms of the Payoff Letter.  See Gittlitz Declaration, ¶ 8.  During that time, the parties, through their

respective attorneys, carefully negotiated the two survival provisions contained in the Payoff

Letter, *i.e.*, Sections 1(a) and 4 thereof. *Id.* The evolution of the parties' agreement over those

precise terms of the Payoff Letter that would remain effective following the termination of the

Credit Agreement is summarized below. *Id.*

22.    On January 30, 2012, Kaye Scholer, as counsel for Spanish Broadcasting, emailed

Weil, as counsel for Lehman, to inquire as to when Weil would circulate a draft of the Payoff

Letter. See *id.* at ¶ 9, Ex. B (email dated January 30, 2012).

23.    On January 31, 2012, Weil sent Kaye Scholer an email attaching a draft of the

Payoff Letter (the "January 31 Lehman Draft"). See *id.* at ¶ 10. Section 1(a) of the January 31

Lehman Draft provided that as of the effective date of the Payoff Letter,

> all outstanding Loans and all other amounts owing by the Borrower [*i.e.*, Spanish
> Broadcasting] under the Credit Agreement . . . shall be paid in full and the Credit
> Agreement and **all obligations** of the Borrower and the other Loan Parties
> thereunder and under the other Loan Documents shall be terminated (other than
> contingent obligations which survive by the terms of the Credit Agreement or
> such other Loan Documents, including without limitation, Section 10.5 of the
> Credit Agreement).

See *id.* at ¶ 10, Ex. C (email from Weil dated January 31, 2012), Ex. D (January 31 Lehman

Draft), ¶ 1(a) (emphasis added). This language provides that all of Spanish Broadcasting's

"obligations" under the Credit Agreement would not survive the termination of the Credit

Agreement, except where the Credit Agreement provides for survival. See *id.* at ¶ 10.

Significantly, Section 1(a) of the January 31 Lehman Draft did not use the capitalized term

"Obligation," which was a defined term under Section 1.1 of the Credit Agreement. *Id.* Instead,

Section 1(a) of the January 31 Lehman Draft used the lower-case term "obligation" in its

ordinary meaning, *i.e.* "the action of obligating oneself to a course of action (as by a promise or

vow)." *Id.* (quoting Merriam-Webster's Collegiate Dictionary (11th ed. 2004)). The Alleged

Waiver was clearly an "obligation" of Spanish Broadcasting, since it required Spanish Broadcasting to waive its right to claim or recover consequential damages.  *Id.*  Therefore, Lehman, who drafted the Payoff Letter, provided from the outset that the Alleged Waiver would <u>not</u> survive the termination of the Credit Agreement.  *Id.*

24.    In addition, Section 4 of the January 31 Lehman Draft provided that Spanish Broadcasting would release "all claims" that it had against Lehman arising out of or in connection with the Credit Agreement.  See *id.* at ¶ 11, Ex. D (January 31 Lehman Draft), ¶ 4.  Section 4 of the January 31 Lehman Draft did not carve out Spanish Broadcasting's Proof of Claim from the release.  *Id.* at ¶ 11.  Thus, the January 31 Lehman Draft provided that Spanish Broadcasting would release its claims against Lehman contained in the Proof of Claim filed on November 3, 2011.  *Id.*

25.    The January 31 Lehman Draft was not acceptable to Spanish Broadcasting because (a) the language in Section 1(a) was not sufficiently explicit as to which provisions of the Credit Agreement would survive termination; and (b) Spanish Broadcasting was not willing to release its claims against Lehman that were the subject of its Proof of Claim.  *Id.* at ¶ 12.

26.    Accordingly, on January 31, 2012, Kaye Scholer sent Weil an email, attaching Spanish Broadcasting's comments (the "<u>January 31 SB Comments</u>") to the January 31 Lehman Draft that Weil had circulated earlier that day.  *Id.* at ¶ 13.  With respect to Section 1(a), Spanish Broadcasting changed the phrase "other than contingent obligations which survive by the terms of the Credit Agreement" to "other than contingent obligations which **<u>expressly</u>** survive by the terms of the Credit Agreement."  See *id.* at ¶ 13, Ex. E (email from Kaye Scholer to Weil dated January 31, 2012), Ex. F (January 31 SB Comments), ¶ 1(a) (emphasis added).  The intent of this comment was to make clear that all of the obligations under the Credit Agreement (including

Spanish Broadcasting's obligation to waive its right to claim or recover consequential damages under Section 10.12(e) of the Credit Agreement) would terminate, except where the Credit Agreement expressly provided for survival.  *Id.* at ¶ 13.  Since the Credit Agreement did not expressly provide for the survival of the Alleged Waiver, Spanish Broadcasting intended this comment to make clear that the Alleged Waiver would <u>not</u> be effective or enforceable following the termination of the Credit Agreement.  *Id.*  With respect to the release contained in Section 4 of the January 31 Lehman Draft, Spanish Broadcasting deleted the release in its entirety.  See *id.* at ¶ 13, Ex F (January 31 SB Comments), ¶ 4.

27.    On February 2, 2012, Weil sent Kaye Scholer an email, attaching a revised draft of the Payoff Letter (the "<u>February 2 Lehman Draft</u>").  *Id.* at ¶ 14.  This time, Lehman incorporated Spanish Broadcasting's language in Section 1(a), as set forth in the January 31 SB Comments.  *Id.*  Thus, the agreed upon language in Section 1(a) provided that Spanish Broadcasting's obligations under the Credit Agreement shall be terminated, "other than contingent obligations which **expressly** survive by the terms of the Credit Agreement."  See *id.* at ¶ 14, Ex. G (February 2, 2012 email from Weil); Ex. H (February 2 Lehman Draft), ¶ 1(a) (emphasis added).  With respect to Section 4, Lehman restored the release of claims that Spanish Broadcasting had deleted in its January 31 SB Comments.  See *id.* at ¶ 14, Ex. H (February 2 Lehman Draft), ¶ 4.

28.    On February 3, 2012, Weil sent Kaye Scholer an email, attaching a further revised draft of the Payoff Letter (the "<u>February 3 Lehman Draft</u>").  *Id.* at ¶ 15.  The release in Section 4 of the February 3 Lehman Draft included a carve-out for the Proof of Claim.  *Id.*  More particularly, the final sentence of Section 4 of the February 3 Lehman Draft provided that:  "The foregoing release shall not apply to Proof of Claim (Claim Number 67707) filed against Lehman

08-13555-mg   Doc 50422   Filed 07/23/15   Entered 07/23/15 17:13:37   Main Document
Pg 29 of 32

on September 18, 2009 (as such claim may be amended in accordance with applicable law)."

See *id.* at ¶ 15, Ex. I (February 3, 2012 email from Weil); Ex. J (February 3 Lehman Draft), ¶ 4.

29.     On February 3, 2012, Kaye Scholer sent Weil an email, stating that the language

at the end of the release in Section 4 of the Payoff Letter should be revised to provide that:

> The foregoing release shall not apply to the Proof of Claim (Claim Number
> 67707) filed against Lehman on September 18, 2009, as amended on November 3,
> 2011 (as such claim may be further amended in accordance with applicable law or
> in accordance with the Attachment to Amended Proof of Claim of Spanish
> Broadcasting System, Inc., as filed with the United States Bankruptcy
> Court/Southern District of New York on November 3, 2011).

See *id.* at ¶ 16, Ex. K (February 3, 2012 email from Kaye Scholer).

30.     On February 3, 2012, Kaye Scholer sent Weil a further email, stating that the

phrase "Except as set forth in the last sentence of this paragraph" should be added in two places

in Section 4 of the Payoff Letter.  See *id.* at ¶ 17, Ex. L (February 3, 2012 additional email from

Kaye Scholer).

31.     On February 6, 2012, Weil sent Kaye Scholer an email, stating that the language

that Kaye Scholer proposed adding to Section 4 "does not work for us."  See *id.* at ¶ 18,  Ex. M

(February 6, 2012 email from Weil).   Weil invited Kaye Scholer to speak with Lehman's

bankruptcy counsel "to discuss this further."  See *id.* at ¶ 18.

32.     On February 6, 2012, Kaye Scholer sent Weil an email, attaching revised

comments to Section 4 of the Payoff Letter.   *Id.* at ¶ 19.   More specifically, Kaye Scholer

removed a reference to Spanish Broadcasting's proof of claim filed on September 18, 2009, and

replaced it with a reference to the Proof of Claim filed on November 3, 2012.  See *id.* at ¶ 19, Ex.

N (February 6, 2012 email from Kaye Scholer).

33.     On February 6, 2012, Weil sent Kaye Scholer an email, attaching a further revised

draft  of  the  Payoff  Letter  (the  "<u>February 6 Lehman Draft</u>")  that  incorporated  Spanish

Broadcasting's comments to Section 4. *Id.* at ¶ 20. More particularly, Section 4 of the February

6 Lehman Draft provided that:

> **Except as set forth in the last sentence of this paragraph**, the Borrower, on behalf of itself and the other Loan Parties, hereby unconditionally and irrevocably waives all claims, suits, debts, liens, losses, causes of action, demands, rights, damages or costs, or expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, which any of them may have or claim to have against Lehman (whether in its capacity as an agent, lender, hedging counterpart or otherwise) or its agents, employees, officers, affiliates, directors, representatives, attorneys, successors and assigns (collectively, the "Released Parties") to the extent arising out of or in connection with the Loan Documents including, without limitation, any failure by the Lehman or its affiliates to fund any Loan required to be funded by it under the Credit Agreement (collectively, the "Claims"). **Except as set forth in the last sentence of this paragraph**, each of the Borrower and the other Loan Parties further agree forever to refrain from commencing, instituting or prosecuting any lawsuit, action or other proceeding against any Released Parties with respect to any and all of the foregoing described waived, released, acquitted and discharged Claims and from exercising any right of recoupment or setoff that it may have under a master netting agreement or otherwise against any Released Party with respect to Obligations under the Loan Documents. Each of the Released Parties shall be a third party beneficiary of this letter agreement. **The foregoing release shall not apply to Proof of Claim (Claim Number 67707) filed against Lehman on November 3, 2011 (as such claim may be amended in accordance with applicable law).**

See *id.* at ¶ 20, Ex. O (February 6 email from Weil); Ex. P (February 6 Lehman Draft), ¶ 4

(emphasis added). This agreed upon language was ultimately incorporated in the version of the

Payoff Letter that the parties executed on February 7, 2012. See *id.* at ¶ 20. The foregoing

examination of the negotiating history of the Payoff Letter demonstrates that the intent of the

parties was that Spanish Broadcasting did not waive its claims against Lehman arising out of

Lehman's failure to fund the Draw, which claims were the subject of the Proof of Claim. *Id.*

34.    On February 7, 2012, Spanish Broadcasting and Lehman executed the Payoff

Letter that contained the parties' agreed upon survival provisions in Sections 1(a) and 4. See *id.*

at ¶ 21, Ex. Q (February 7, 2012 email from Kaye Scholer); Ex. A (fully executed Payoff Letter).

**Based on the Terms of the Payoff Letter, the Alleged Consequential Damages**
**Waiver Contained in the Credit Agreement Is Not Enforceable**

35.    The negotiations surrounding the Payoff Letter took place under highly unusual circumstances in which a borrower and a lender negotiated the termination of a credit agreement after the <u>lender</u> had defaulted and the borrower had asserted claims against the lender for failing to fund its obligations under the credit agreement.  See Gittlitz Declaration, ¶ 22.  In the context of these unusual circumstances, Lehman and Spanish Broadcasting carefully and extensively negotiated expressly which provisions of the Credit Agreement would survive termination thereof pursuant to the provisions of the Payoff Letter.  *Id.*  At no point during Ms. Gittlitz's negotiations with Lehman's counsel did Lehman take the position that the Alleged Waiver would survive the termination of the Credit Agreement.  *Id.*  Indeed, Section 1(a) of the January 31 Lehman Draft and all subsequent versions of the Payoff Letter (including the execution version) provided that all of the Spanish Broadcasting's "obligations" under the Credit Agreement (including the Alleged Waiver) would terminate, except where the Credit Agreement provided for survival. *Id.*

36.    Nor did Lehman take the position during the negotiations that Spanish Broadcasting had waived its claims against Lehman that it asserted in the Proof of Claim.  *Id.* at ¶ 23.  On the contrary, Lehman agreed to carve out the Proof of Claim from the release set forth in Section 4 of the Payoff Letter.  *Id.*

37.    In its Motion, Lehman takes the position that the Alleged Waiver remains effective and enforceable, despite the fact that neither the Credit Agreement nor the Payoff Letter provides for the survival of the Alleged Waiver. *Id.* at ¶ 24.  However, based on the extensive negotiations between Spanish Broadcasting's counsel and Lehman's counsel, the parties to the Payoff Letter did <u>not</u> intend for the Alleged Waiver to remain effective following the termination of the Credit Agreement. *Id.*  On the contrary, if Lehman had intended for the Alleged Waiver to survive, it would have expressly provided for the survival of the Alleged Waiver in the Payoff Letter. *Id.*  Lehman chose not to do so.  *Id.*

Dated:  July 23, 2015
         New York, New York

KAYE SCHOLER LLP

By: _____
         Madlyn Greich Primoff, Esq.
         250 West 55th Street
         New York, New York 10019-9710
         (212) 836-8000
         madlyn.primoff@kayescholer.com

*Attorneys    for    Spanish    Broadcasting System, Inc.*