JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Jayant W. Tambe
Ryan J. Andreoli
Kristen R. Vogel

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                             :
In re:                                                       :   Chapter 11
                                                             :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                     :   Case No. 08-13555 (SCC)
                                                             :
            Debtors.                                         :   (Jointly Administered)
                                                             :
------------------------------------------------------------ X
                                                             :
LEHMAN BROTHERS HOLDINGS INC., in its                        :
capacity as Plan Administrator on behalf of                  :   Adv. Proc. No. 15-_____
LEHMAN BROTHERS SPECIAL FINANCING                            :
INC.,                                                        :
                                                             :
            Plaintiff,                                       :
                                                             :
    -against-                                                :
                                                             :
COMMONWEALTH OF MASSACHUSETTS,                               :
                                                             :
            Defendant.                                       X
-------------------------------------------------------------

## ADVERSARY COMPLAINT

Plaintiff Lehman Brothers Holdings Inc. ("LBHI" or "Plaintiff"), in its capacity as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan"), and on behalf of Lehman Brothers Special

Financing Inc. ("LBSF"), by and through its attorneys, Jones Day, for its complaint hereby

alleges as follows:

### NATURE OF THE ACTION

1.      This action arises out of the termination of six interest rate swaps between the

Commonwealth of Massachusetts ("Commonwealth") and LBSF (collectively, the

"Transactions"), and the Commonwealth's improper calculation of the amounts due to LBSF in

connection with that termination.

2.      After LBSF filed its chapter 11 petition on October 3, 2008, the Commonwealth

terminated the Transactions.  The Commonwealth then proceeded to calculate the amounts due

to LBSF in connection with the termination, as there was no dispute that LBSF was "in-the-

money" on the Transactions on the termination dates.

3.      The Commonwealth did not, however, comply with its obligations under the

ISDA Master Agreements governing the Transactions (collectively, the "Agreements") in

calculating the amounts due to LBSF.  Instead, the Commonwealth and its financial advisor

Swap Financial Group ("Swap Financial") deliberately manipulated the "Market Quotation"

process selected by the parties to determine such early termination payments in an improper

attempt to reduce the amounts owed by the Commonwealth to LBSF.

4.      As a result of this manipulation, the Commonwealth's calculation under the

Market Quotation method did not come close to reflecting the economic value of the

Transactions on the termination dates, as evidenced by the fact that it was millions of dollars less

than the amount of upfront cash payments the Commonwealth received when it entered into

replacement transactions on those very same dates.  Thus, the Commonwealth's calculation

under the Market Quotation method did not produce a "commercially reasonable" result, and the

Commonwealth was required by the Agreements to determine the amounts payable to LBSF using the "Loss" method.

5.      Under the "Loss" method, the Commonwealth was required to pay LBSF the full amount of the gains it realized in connection with terminating the Transactions, which totaled approximately $10.3 million more than the amount it actually paid LBSF.

6.      In addition, under the Agreements, LBSF is entitled to recover interest on the total amount owed by the Commonwealth from the date the Agreements were terminated until the present, as well as the costs and fees it has incurred in connection with enforcing its rights under the Agreements.

## PARTIES

7.      Plaintiff LBHI is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020.  On September 15, 2008, LBHI commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute litigation claims on behalf of the estates.

8.      LBSF is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020.  On October 3, 2008, LBSF commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  LBSF's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

9.      Defendant the Commonwealth of Massachusetts, acting through its Department of the State Treasurer, has a usual place of business at One Ashburton Place, Boston, Massachusetts, 02108.

## JURISDICTION AND VENUE

10.      The statutory predicates for the relief requested herein are sections 105, 541 and 542 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

11.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding constitutes a non-core proceeding under 28 U.S.C. § 157(b). This is a civil proceeding related to a bankruptcy case as authorized under 28 U.S.C. § 1334(b). LBHI and LBSF consent to the entry of final orders and judgment by the Bankruptcy Court.

12.      This Court has personal jurisdiction over the Commonwealth for purposes of this adversary proceeding because the Commonwealth irrevocably submitted to the jurisdiction of this Court with respect to all suits, actions or proceedings relating to the Agreements. The Commonwealth also waived its sovereign immunity in connection with entering into the Agreements.

13.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because the chapter 11 cases of LBHI and LBSF are pending in this district and because the parties to the Agreements irrevocably waived any objection to this venue.

## BACKGROUND

*The 1998 Agreement*

14.      On August 27, 1998, Lehman Brothers Derivative Products Inc. ("LBDP") and the Commonwealth entered into an interest rate swap transaction (the "1998 Transaction")

4

referencing approximately $300 million notional of the Commonwealth's General Obligation Refunding Bonds, 1998 Series A and 1998 Series B (the "1998 Bonds").  The 1998 Transaction was governed by a single integrated agreement between the Commonwealth and LBDP that consisted of a 1992 ISDA Master Agreement, together with the accompanying Schedule and Confirmation (collectively, the "1998 Agreement").

15.    Under the 1998 Transaction, the Commonwealth was required to make monthly fixed-rate payments of 4.174% per annum to LBDP and LBDP was required to pay a floating rate of interest equal to the weighted average rate of interest paid by the Commonwealth on the 1998 Bonds.  The Confirmation for the 1998 Transaction also included two alternative floating rate options that could be applied if certain events occurred.

16.    Part 1(g) of the Schedule to the 1998 Agreement provided that if LBHI filed a petition for bankruptcy prior to the maturity of the 1998 Transaction, the 1998 Agreement would terminate and LBDP would determine the amounts payable in connection with the termination using the "mid-market" value of the transaction on the termination date.

17.    However, when LBHI filed its chapter 11 petition on September 15, 2008, the parties elected not to terminate the 1998 Agreement.  Instead, the Commonwealth, LBDP and LBSF entered into an Assignment and Amendment Agreement, dated September 16, 2008 (the "Assignment"), pursuant to which LBDP assigned all of its rights, duties and obligations under the 1998 Agreement to LBSF.

18.    The Assignment provided that in the event that LBSF filed a petition for bankruptcy, the Commonwealth was entitled to terminate the 1998 Transaction and determine the amounts payable upon termination according to "Market Quotation and the Second Method."

19.    Both the 1998 Agreement and the Assignment expressly provide that they are to

5

be governed by and construed in accordance with New York law.

### The 2003 Agreement

20.     On February 27, 2003, LBSF entered into a separate 1992 ISDA Master

Agreement (Local Currency-Single Jurisdiction) with the Commonwealth, together with the

accompanying Schedule and Credit Support Annex (collectively, the "2003 Agreement").  Under

the Schedule and Credit Support Annex to the 2003 Agreement, LBHI agreed to serve as the

Credit Support Provider[1] to LBSF.  In that capacity, LBHI agreed to guarantee LBSF's

obligations under the 2003 Agreement.

21.     LBSF and the Commonwealth entered into five interest rate swaps under the 2003

Agreement, one of which was executed on February 27, 2003 (the "2003 Transaction"), and the

remaining four of which were executed on May 8, 2007 (the "2007 Transactions").  LBSF and

the Commonwealth entered into separate Confirmations for each of the transactions executed

under the 2003 Agreement.

22.     Under the 2003 Transaction, the Commonwealth was required to make

semiannual fixed-rate payments of 4.50% per annum to LBSF, and LBSF was required to make

inflation adjusted semiannual floating-rate payments – linked to the non-seasonally adjusted U.S.

City Average All Items Consumer Price Index for all Urban Consumers – to the Commonwealth.

Both sets of payments were based on an original notional amount of $10 million.

23.     Each of the 2007 Transactions was a standard fixed-for-floating interest rate swap

in which the Commonwealth agreed to make quarterly fixed-rate payments (varying from a low

of 3.936% per annum to a high of 4.42% per annum) and LBSF agreed to make quarterly

---

[1]        All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the
respective agreements governing the Transactions.

6

floating-rate payments (all linked to USD-LIBOR-BBA).  The notional amounts on which the

parties' respective payments were based varied from approximately $32 million in the smallest

of the 2007 Transactions to $400 million in the largest of the 2007 Transactions.

### Overview of Relevant Contractual Provisions

24.     On October 3, 2008, LBSF filed a voluntary petition for relief under chapter 11 of

the Bankruptcy Code.  This was an Event of Default under Section 5(a)(vii) of each of the

Master Agreements, which entitled the Commonwealth to designate an Early Termination Date.

25.     Section 6(c)(ii) of the Master Agreements provided that "[u]pon the occurrence or

effective designation of an Early Termination Date . . . [t]he amount, if any, payable in respect of

an Early Termination Date shall be determined pursuant to Section 6(e) [of the Master

Agreement]."

26.     Section 6(e) of the Master Agreements included a menu of methodologies for

calculating termination payments upon the occurrence of an Early Termination Date.  In Part 1(f)

of the Schedule to each of the Master Agreements, the parties elected and agreed upon "Market

Quotation and the Second Method" as the methodology for calculating termination payments

upon the occurrence of an Early Termination Date (the "Early Termination Payment").

27.     Section 6(e)(i)(3) of the Master Agreements set out the equation for calculating

the Early Termination Payment where Second Method and Market Quotation apply:

> . . . an amount will be payable equal to (A) the sum of the
> Settlement Amount (determined by the Non-defaulting Party) in
> respect of the Terminated Transactions and the Unpaid Amounts
> owing to the Non-defaulting Party less (B) the Unpaid Amounts
> owing to the Defaulting Party. . . . *if it is a negative number, the*
> *Non-defaulting Party will pay the absolute value of that amount to*
> *the Defaulting Party.*

(emphasis added).  In other words, if upon the Early Termination Date the Non-defaulting Party

(i.e., the Commonwealth) enjoyed a gain, it would be required to pay the amount of the gain to

the Defaulting Party (i.e., LBSF).

28.     The term "Settlement Amount" was defined in Section 12 of the Master

Agreements as an amount equal to the sum of the Market Quotations procured by the

Commonwealth for each of the Transactions outstanding as of the Early Termination Date – in

instances where a Market Quotation could be determined.  The term "Unpaid Amounts," in turn,

was defined in Section 12 of the Master Agreements as amounts owing to any party that "became

payable . . . on or prior to [the] Early Termination Date and which remain unpaid as at [the]

Early Termination Date."

29.     "Market Quotation" likewise was expressly defined in Section 12 of the Master

Agreements.  In that provision, the Master Agreements specified that the Non-defaulting Party

would solicit quotations from "Reference Market-makers," which in turn was defined to mean

"*four* leading dealers in the relevant market selected by the party determining a Market

Quotation in good faith . . ."  (emphasis added).[2]  The definition of Market Quotation in the

Master Agreements further provided that:

> If more than three quotations are provided [by Reference Market-makers],
> the Market Quotation will be the arithmetic mean of the quotations,
> without regard to the quotations having the highest and lowest values.  If
> exactly three such quotations are provided, the Market Quotation will be
> the quotation remaining after disregarding the highest and lowest
> quotations. . . . If fewer than three quotations are provided, it will be
> deemed that the Market Quotation in respect of such Terminated
> Transaction or group of Terminated Transactions cannot be determined.

---

[2]     As noted above, the Schedule to the 1998 Agreement initially identified a different method (the
"mid-market" method) for determining the Market Quotation for a Terminated Transaction.  However, the
Assignment modified the Schedule and directed the parties to use the standard methodology for determining Market
Quotation (found in Section 6 of the 1998 Master Agreement) if the 1998 Transaction was terminated due to a
bankruptcy filing by LBSF.

30.    The Master Agreements also specifically contemplated in Sections 6(e)(iv) and 12 the possibility that Market Quotations might not, in certain circumstances, serve as a "reasonable pre-estimate of loss" or "produce a commercially reasonable result."  In such circumstances, the Master Agreements provided that the Settlement Amount would equal the Non-defaulting Party's "Loss."

31.    "Loss" was also expressly defined in Section 12 of the Master Agreements.  In calculating Loss, the Non-defaulting Party was required not only to calculate its total losses and costs in connection with the Terminated Transaction(s); its calculation also had to include what it "reasonably determine[d] in good faith to be its total … *gain*, in which case expressed as a negative number . . . ."  (emphasis added).

***The Termination of the Transactions and the Commonwealth's Improper Manipulation of the Market Quotation Process***

32.    In the wake of LBSF's bankruptcy filing on October 3, 2008, the Commonwealth notified LBSF that it intended to terminate the Transactions and designated an Early Termination Date for each of the Agreements.  Shortly thereafter, the Commonwealth delivered calculation statements to LBSF reflecting the amounts it had determined it owed LBSF under the Market Quotation method (the "Calculation Statements").

33.    The Commonwealth's Market Quotation process, however, was manipulated in significant ways by the Commonwealth's financial advisor, Swap Financial, in a transparent attempt to minimize the Commonwealth's liability to LBSF under the Agreements.

34.    With the aid of Swap Financial, the Commonwealth first solicited quotations from an improper number of dealers, and then manipulated the outcome of its Market Quotation calculation by opportunistically selecting which bids to include in that calculation.

35.     Most notably, in a clear effort to understate the amounts due to LBSF under the
Market Quotation method, the Commonwealth: (i) completely ignored, and then improperly
concealed from LBSF, actionable quotations it received from two of the dealers it solicited; and
(ii) calculated, with the benefit of hindsight (i.e., after all bids had been received), the total
amount due to LBSF on a trade-by-trade basis rather than a portfolio basis.

36.     The only excuse the Commonwealth has been able to offer for ignoring the quotes
it received from two dealers is that those dealers did not provide quotations for all of the
transactions in the portfolio.  That excuse is utterly at odds, however, with the Commonwealth's
decision to calculate the amount owed to LBSF on a transaction-by-transaction basis (rather than
a portfolio basis).  If the Commonwealth did not intend to calculate LBSF's recovery using the
full quotation provided by each dealer on all of the transactions in the aggregate, there was
simply no legitimate explanation for its refusal to consider the bids it received from the two
dealers who did not bid on all of the transactions.

37.     The omission of these competitive bids alone improperly reduced the outcome of
the Market Quotation calculation by millions of dollars, and insured that the Commonwealth's
calculation did not reflect the true economic value of the Transactions.

38.     The Commonwealth's decision to calculate the amounts due to LBSF on a
transaction-by-transaction basis (rather than a portfolio basis), with the sole purpose of
benefitting itself at LBSF's expense, further manipulated the Market Quotation process and
rendered its outcome even more inaccurate and unreliable.

***The Millions of Dollars of Gains Realized by the Commonwealth that Must Be Paid to LSBF
under the Loss Method***

39.     At the same time Swap Financial was manipulating the Market Quotation process,
it was also assisting the Commonwealth in entering into transactions to replace its Transactions

with LBSF (the "Replacement Transactions").  In connection with entering into the Replacement

Transactions (two of which were executed with a dealer whose bids the Commonwealth had

refused to consider for purposes of its Market Quotation calculation, and each of which was

executed on the applicable Early Termination Date), the Commonwealth and its agents received

upfront cash payments of approximately $9 million more than the Commonwealth claimed it was

obligated to pay LBSF under the Market Quotation process.  This substantial difference in the

amount the Commonwealth actually recovered in connection with replacement trades and the

amount it sought to pay LBSF under the Agreements demonstrates that its Market Quotation

process did not yield a "commercially reasonable" result.[3]

40.      As a result of the Commonwealth's improper manipulation of the Market

Quotation process, and the fact that the process failed to achieve a "commercially reasonable"

outcome, the appropriate method for calculating the amounts due to LBSF under the Agreements

was the "Loss" method.

41.      Under the "Loss" method, the Commonwealth was obligated to turn over to LBSF

the total amount of the gains it realized in connection with terminating the Transactions.

42.      Those gains necessarily included both the substantial upfront payments generated

by the Replacement Transactions and the $1.25 million in missed payments and accruals that the

Commonwealth unquestionably owed but failed to pay LBSF upon termination.[4]

---

[3]      An industry standard discounted cash flow analysis of the parties' respective future payment
obligations under the Agreements (if the swaps had continued to maturity) reveals that the Transactions had an
economic value on the Early Termination Dates of approximately $18 million more than the Commonwealth paid
LBSF.  This further demonstrates that the Commonwealth's Market Quotation process did not yield a
"commercially reasonable" result.

[4]      The Commonwealth is required to pay the amount of these missed payments and accruals under
the Agreements regardless of whether the Market Quotation or Loss method applies.

***The Commonwealth Should Not Be Permitted to Use the Excessive Fees It Purportedly
Incurred in Connection with Terminating and Replacing the Transactions to Reduce the
Amounts It Owes LBSF***

43.     In the Calculation Statements, the Commonwealth purported to deduct from the
amounts due to LBSF hundreds of thousands of dollars in swap advisory fees invoiced by Swap
Financial.

44.     In that regard, the Calculation Statement for the 2003 Agreement sought to deduct
$260,000 in swap advisory fees purportedly incurred by the Commonwealth from the total
amount owed to LBSF.  Similarly, the Calculation Statement for the 1998 Agreement sought to
deduct $150,000 in swap advisory fees from the total amount owed to LBSF.

45.     The vast majority of such fees were not, however, incurred in connection with
enforcing or protecting the Commonwealth's rights under the Agreements.  Thus, such fees
plainly should not have been included in the Calculation Statements.

46.     More importantly, the Commonwealth did not even pay the swap advisory fees it
improperly deducted from the amounts owed to LBSF.  Instead, the Commonwealth's new swap
counterparties paid those fees, as the documentation for the Replacement Transactions makes
clear.

47.     Thus, the Commonwealth's assertion that it incurred those advisory fees is a
blatant misrepresentation designed to deprive LBSF of approximately $410,000 that it was
unquestionably owed.

48.     The Commonwealth therefore breached the Agreements by deducting the amount
of such fees (which it did not even pay, and which in any event were excessive) from the
amounts it owed LBSF, and it should be required to reimburse LBSF for those deductions now
(with interest).

12

## FIRST CAUSE OF ACTION

### (Breach of the 1998 Agreement)

49.     Plaintiff hereby incorporates the foregoing paragraphs as if fully restated herein.

50.     The 1998 Agreement constituted a valid contract between the Commonwealth and LBDP, and the Assignment by LBDP to LBSF was valid and enforceable.[5]

51.     LBDP and LBSF performed all of their obligations under the 1998 Agreement and the Assignment prior to receiving notice of termination from the Commonwealth on or about November 17, 2008.

52.     The Commonwealth breached the 1998 Agreement by failing to calculate the amounts payable to LBSF upon termination of the 1998 Transaction in accordance with the procedures set forth in the 1998 Agreement and the Assignment.

53.     In particular, the Commonwealth breached the 1998 Agreement by, among other things, improperly manipulating the Market Quotation process to minimize the amounts owed to LBSF, failing to calculate the amounts due to LBSF under the Loss method when the Market Quotation method yielded a commercially unreasonable result, and improperly deducting from the amounts due to LBSF the excessive fees charged by Swap Financial (which were not incurred in connection with enforcing or protecting the Commonwealth's rights under the 1998 Agreement, and which, in any event, the Commonwealth did not pay).

---

[5]     LBHI and LBSF continue to believe that the provision of the Assignment that allowed the Commonwealth to use the Market Quotation process in the event of a bankruptcy filing by LBSF is an illegal *ipso facto* clause.  LBHI and LBSF understand that the Court has ruled otherwise in a different adversary proceeding, but nonetheless reserve all of their rights on that issue.  LBHI also reserves all of its rights and remedies against the Commonwealth in its capacity as LBSF's largest creditor, including but not limited to potential fraudulent conveyance claims.

54.     Under the Loss method, the Commonwealth was required to pay LBSF for any and all gains it enjoyed as a result of termination of the 1998 Agreement.  The Commonwealth has improperly retained a significant portion of those gains since November 2008.

55.     As a direct and proximate result of the Commonwealth's breach of the 1998 Agreement, LBSF has been deprived of a substantial sum of money in an amount to be determined at trial not less than $3.6 million.

56.     Pursuant to Section 6(d)(ii) of the 1998 Master Agreement, LBSF is also entitled to recover interest on the amounts owed by the Commonwealth from the Early Termination Date designated by the Commonwealth until the present.

## SECOND CAUSE OF ACTION

### (Breach of the 2003 Agreement)

57.     Plaintiff hereby incorporates the foregoing paragraphs as if fully restated herein.

58.     The 2003 Agreement constituted a valid contract between the Commonwealth and LBSF.

59.     LBSF performed all of its obligations under the 2003 Agreement prior to receiving notice of termination from the Commonwealth on or about October 8, 2008.

60.     The Commonwealth breached the 2003 Agreement by failing to calculate the amounts payable to LBSF upon termination of the 2003 Transaction and the 2007 Transactions in accordance with the procedures set forth in the 2003 Agreement.

61.     In particular, the Commonwealth breached the 2003 Agreement by, among other things, improperly manipulating the Market Quotation process to minimize the amounts owed to LBSF, failing to calculate the amounts due to LBSF under the Loss method when the Market Quotation method yielded a commercially unreasonable result, and improperly deducting from

14

the amounts due to LBSF the excessive fees charged by Swap Financial (which were not

incurred in connection with enforcing or protecting the Commonwealth's rights under the 2003

Agreement, and which, in any event, the Commonwealth did not pay).

62.    Under the Loss method, the Commonwealth was required to pay LBSF for any

and all gains it enjoyed as a result of termination of the 2003 Agreement.  The Commonwealth

has improperly retained a significant portion of those gains since October 2008.

63.    As a direct and proximate result of the Commonwealth's breach of the 2003

Agreement, LBSF has been deprived of a substantial sum of money in an amount to be

determined at trial not less than $6.6 million.

64.    Pursuant to Section 6(d)(ii) of the 2003 Master Agreement, LBSF is also entitled

to recover interest on the amounts owed by the Commonwealth from the Early Termination Date

designated by the Commonwealth until the present.

### THIRD CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and
Fair Dealing under the 1998 Agreement)**

65.    Plaintiff hereby incorporates the foregoing paragraphs as if fully restated herein.

66.    The 1998 Agreement constituted a valid contract between the Commonwealth and

LBDP, and the Assignment by LBDP to LBSF was valid and enforceable.

67.    The 1998 Agreement and the associated Assignment are governed by New York

law.

68.    Under New York law, every contract has an implied covenant of good faith and

fair dealing.

69.    The Commonwealth and its financial advisor Swap Financial intentionally

manipulated the Market Quotation process to minimize the amounts owed to LBSF in connection

with the termination of the 1998 Agreement, and improperly relied on the commercially

unreasonable result of that process. The Commonwealth also improperly deducted from the

amounts due to LBSF the excessive fees charged by Swap Financial, which the Commonwealth

did not pay. These actions were in direct contravention of the words, intent and purpose of the

1998 Agreement, and deprived LBSF of the fruits of its contractual bargain.

70.     As a direct and proximate result of the Commonwealth's breach of the implied

covenant of good faith and fair dealing, LBSF has been deprived of a substantial sum of money

in an amount to be determined at trial not less than $3.6 million.

71.     Pursuant to Section 6(d)(ii) of the 1998 Master Agreement, LBSF is also entitled

to recover interest on the amounts owed by the Commonwealth from the Early Termination Date

designated by the Commonwealth until the present.

## FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing under the 2003 Agreement)

72.     Plaintiff hereby incorporates the foregoing paragraphs as if fully restated herein.

73.     The 2003 Agreement constituted a valid contract between the Commonwealth and

LBSF.

74.     The 2003 Agreement is governed by New York law.

75.     Under New York law, every contract has an implied covenant of good faith and

fair dealing.

76.     The Commonwealth and its financial advisor Swap Financial intentionally

manipulated the Market Quotation process to minimize the amounts owed to LBSF in connection

with the termination of the 2003 Agreement, and improperly relied on the commercially

unreasonable result of that process. The Commonwealth also improperly deducted from the

16

amounts due to LBSF the excessive fees charged by Swap Financial, which the Commonwealth did not pay.  These actions were in direct contravention of the words, intent and purpose of the 2003 Agreement, and deprived LBSF of the fruits of its contractual bargain.

77.    As a direct and proximate result of the Commonwealth's breach of the implied covenant of good faith and fair dealing, LBSF has been deprived of a substantial sum of money in an amount to be determined at trial not less than $6.6 million.

78.    Pursuant to Section 6(d)(ii) of the 2003 Master Agreement, LBSF is also entitled to recover interest on the amounts owed by the Commonwealth from the Early Termination Date designated by the Commonwealth until the present.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered against the Commonwealth as follows:

(1)    Determining that the Commonwealth has breached the Agreements and owes LBSF damages and applicable interest (from the Early Termination Date to the date of Judgment at the Default Rate) in an amount to be determined at trial;

(2)    Determining that the Commonwealth has breached the covenant of good faith and fair dealing implied in every contract governed by New York law;

(3)    Awarding LBSF reasonable attorneys' fees, costs, and expenses;

(4)    Granting such further relief as the Court deems just and proper.

Dated:  July 24, 2015
        New York, New York

                                        /s/ Jayant W. Tambe
                                        Jayant W. Tambe
                                        Ryan J. Andreoli
                                        Kristen R. Vogel
                                        JONES DAY
                                        222 East 41st Street
                                        New York, New York 10017
                                        Telephone: (212) 326-3939
                                        Facsimile: (212) 755-7306

                                        *Attorneys for Lehman Brothers Holdings
                                        Inc. and Lehman Brothers Special
                                        Financing Inc.*