**<u>EXHIBIT C</u>**



<u>Neutral Citation Number: [2014] EWHC 704 (Ch)</u>

<u>Case No: Nos 7942 and 7945 of 2008 and No. 429 of 2009</u>

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

<u>Royal Courts of Justice</u>
<u>Rolls Building</u>
<u>Fetter Lane, London, EC4A 1NL</u>

<u>Date: 14/03/2014</u>

**Before** :

<u>**MR JUSTICE DAVID RICHARDS**</u>
- - - - - - - - - - - - - - - - - - - -

**IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)**

**AND IN THE MATTER OF LEHMAN BROTHERS LIMITED (IN ADMINISTRATION)**

**AND IN THE MATTER OF LB HOLDINGS INTERMEDIATE 2 LIMITED (IN ADMINISTRATION)**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**William Trower QC and Daniel Bayfield** (instructed by **Linklaters LLP**) for the **Joint Administrators of Lehman Brothers International (Europe)**
**David Wolfson QC and Nehali Shah** (instructed by **DLA Piper UK LLP**) for the **Joint Administrators of Lehman Brothers Limited**
**Anthony Trace QC, Louise Hutton and Rosanna Foskett** (instructed by **Dentons UKMEA LLP**) for the **Joint Administrators of LB Holdings Intermediate 2 Limited**
**Barry Isaacs QC and Mark Arnold QC** (instructed by **Weil, Gotshal & Manges**) for **Lehman Brothers Holdings, Inc**
**Antony Zacaroli QC and David Allison** (instructed by **Allen & Overy LLP**) for **Lydian Overseas Partners Master Fund Limited**

Hearing dates: 12-15, 18-20 November 2013
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE DAVID RICHARDS

**Mr Justice David Richards :**

*Introduction*

1.     This is an application by the joint administrators of three companies in the Lehman Brothers group. The circumstances which give rise to the application are both unexpected and unusual.

2.     The circumstances are unexpected because when the Lehman Brothers group collapsed in September 2008, it was not anticipated that there would be any surplus of assets once the general body of unsecured creditors of any of the principal companies had been paid. The principal trading company within the group in the United Kingdom and Europe was Lehman Brothers International (Europe) (LBIE) and it is now anticipated that it is likely to have a significant surplus once all unsubordinated proved debts have been paid in full.

3.     The circumstances are unusual because LBIE is an unlimited company. It has two members, both other companies in the group. Both have ordinary unsecured claims against LBIE and one of them has a very large claim as a subordinated loan creditor. Issues arise as to the potential liability of the members for the liabilities of LBIE, and in particular its subordinated liabilities, and the relationship between their liability, if any, as members and their claims as creditors.

4.     The purpose of the application is to determine the claims which may be made against the surplus before any return to members and the order in which such claims rank for payment, and to resolve the existence and extent of the potential liability of the members. These broadly stated issues involve a number of novel and important questions.

5.     The applicants are the respective joint administrators of LBIE and of its two members, Lehman Brothers Limited (LBL) and Lehman Brothers Holdings Intermediate 2 Limited (LBHI2). LBIE and LBL have been in administration since September 2008 and LBHI2 since January 2009.

6.     Lehman Brothers Holdings, Inc (LBHI) and Lydian Overseas Partners Master Fund Limited (Lydian) were joined as respondents. LBHI is the ultimate parent of the Lehman Brothers group. On 15 September 2008, it commenced Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York, from which it emerged on 6 March 2012. It is an indirect creditor of many companies in the group and the ultimate shareholder of all of them. Its primary interest on this application relates to LBHI2's right to recover subordinated loans made by it to LBIE and issues relating to such subordinated loans. Although there are in some respects important differences between the positions adopted by LBL, LBHI2 and LBHI, they have made common cause on most issues, while in some instances advancing different submissions in support of the same conclusions. For convenience, I will call them "the other Lehman companies" when referring to them collectively.

7.     Lydian is an unsecured unsubordinated creditor of LBIE and its position is aligned with the submissions which have been advanced on behalf of the administrators of

LBIE. They have avoided duplication of submissions and Lydian has concentrated on issues relating to foreign currency conversion claims.

8.      The parties have agreed a statement of facts and there have been no contested issues of fact. The entire argument has been directed to legal issues.

9.      The parties cooperated to produce an agreed list of issues, divided into 22 questions, some of which are further subdivided. The oral and written submissions of the parties were not primarily directed to each of those questions, but rather were made by reference to a number of principal issues. I have adopted the same course in this judgment and do not attempt to provide answers to each of the questions in the list of issues.

*Background*

10.     LBIE was incorporated on 10 September 1990 under the Companies Act 1985 as a company limited by shares. On 21 December 1992, it was re-registered as an unlimited company. It appears that this step was taken for US tax reasons. Re-registration of LBIE as an unlimited company enabled it to be treated as a branch of its then parent company for US tax purposes, thereby enabling losses in LBIE to be set off against profits in the parent.

11.     The share capital of LBIE comprises 6,273,113,999 ordinary shares of $1 each, 2 million 5% redeemable Class A preference shares of $1000 each, and 5.1 million 5% redeemable Class B shares of £1000 each. All these shares, except for 1 ordinary share, are held by LBHI2. The two classes of preference shares result from capital restructurings of LBIE in 2006 and 2007, to which I shall refer below. The remaining ordinary share is held by LBL.

12.     The sole function of LBHI2 was to act as the immediate holding company of LBIE.

13.     LBL was the service company for the operations of the group in the UK, Europe and the Middle East, and as regards companies based in the UK, was the principal employer, seconding employees to other companies within the group, maintained the IT systems and was the lessee of many of the group's premises. It became a shareholder in November 1994, holding a single ordinary share denominated in sterling. In May 1997 all the sterling shares were cancelled and replaced by shares denominated in US dollars and LBL has at all times since then been the holder of a single ordinary share of $1. There is no documentary evidence that LBL held the dollar share as nominee for the other shareholder. This judgment does not deal with the relationship between LBL and LBHI2 as members of LBIE, and whether LBL has any right of indemnity against LBHI2.

14.     The administrations of these companies have involved the realisation of their assets to best advantage, rather than the preservation of the companies as going concerns. Paragraph 65 of schedule B1 to the Insolvency Act 1986 (IA 1986) permits the administrator of a company to make distributions to creditors of the company, with the permission of the court where the creditors are neither secured nor preferential. Once an administrator gives notice of an intention to make a distribution, the administration is commonly referred to as a distributing administration. Detailed provisions related to the making of distributions to creditors by administrators are

contained in rules 2.68-2.105 of the Insolvency Rules 1986 (the Insolvency Rules), which for the most part reflect the equivalent provisions in rules 4.73-4.99 applicable in a winding up. With the permission of the court, the administrators of LBIE declared and paid a first interim dividend of 25.2 pence in the pound in November 2012, totalling some £1.611 billion.

*Ranking of claims*

15.    Central to many of the issues arising on this application are the claims which may be made against the available assets of LBIE after payment of all its general unsecured unsubordinated creditors and the ranking of those claims. In *In re Nortel GmbH* [2013] UKSC 52, [2013] 3 WLR 504 (*Re Nortel*) Lord Neuberger of Abbotsbury PSC said at [39]:

> "*In a liquidation of a company and in an administration (where there is no question of trying to save the company or its business), the effect of the insolvency legislation..., as interpreted and extended by the courts, is that the order of priority for payment out of the company's assets is, in summary terms, as follows:*
>
> *(1) Fixed charge creditors;*
>
> *(2) Expenses of the insolvency proceedings;*
>
> *(3) Preferential creditors;*
>
> *(4) Floating charge creditors;*
>
> *(5) Unsecured provable debts;*
>
> *(6) Statutory interest;*
>
> *(7) Non-provable liabilities; and*
>
> *(8) Shareholders.*"

The categories relevant to the issues on this application are, principally, statutory interest and non-provable liabilities.

16.    Provable debts rank equally between themselves and are paid in full unless the assets are insufficient to meet them, in which case they abate in equal proportions between themselves: rule 2.69. Rules 2.72-2.80 provide the machinery for proving debts, including the submission of a proof, its admission or rejection by the administrator and appeals against the administrator's decision. Rule 2.81 provides for the administrator to estimate the value of any debt which, by reason of its being subject to any contingency or for any other reason, does not bear a certain value and provides that he may revise any estimate previously made, if he thinks fit by reference to any change of circumstances or to any information becoming available to him. The amount provable in the administration in such a case is the estimate for the time being. Rule 2.85 provides for set-off. Rule 2.86 provides for the conversion of foreign currency debts into sterling, a rule to which I shall later return. Rule 2.89 provides that

a creditor may prove for a debt of which payment was not yet due on the date when the company entered administration, but subject to rule 2.105 which adjusts the dividend where payment is not due at the date of the declaration of dividend.

17.     The claims of creditors which are provable as debts in an administration, as well as in a liquidation, are governed by rules 12.3 and 13.12.

18.     The sixth category, statutory interest, in the order of priority set out in Lord Neuberger's judgment, is governed in the case of an administration by rule 2.88. Provisions in very similar terms apply in a liquidation and are contained in section 189 IA 1986 and in rule 4.93. Rule 2.88 was amended with effect from 6 April 2010 so as to apply to administrations commencing on or after that date. LBIE entered administration in September 2008, so that rule 2.88, as amended in 2005, applies to it. Rule 2.88(1) in the form applicable to the administration of LBIE provides that where a debt proved in the administration bears interest, the interest is provable as part of the debt except insofar as it is payable in respect of any period after it entered administration or, if the administration was immediately preceded by a winding-up, any period after the date of liquidation. Rule 2.88(3)-(4) in the form applicable to LBIE provides for the payment of interest in respect of periods before the relevant date in certain circumstances which are not directly material to the issues on this application. The provisions of rule 2.88(7)-(9) for the payment of interest in respect of periods after the relevant date are critical to some of the issues and, in the form applicable to LBIE, are as follows:

> "(7) … any surplus remaining after payment of the debts proved shall, before being applied for any purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company entered administration.
>
> (8) All interest payable under paragraph (7) ranks equally whether or not the debts on which it is payable rank equally.
>
> (9) The rate of interest payable under paragraph (7) is whichever is the greater of the rate specified under paragraph (6) or the rate applicable to the debt apart from the administration."

The rate specified under rule 2.88(6) is the rate specified in section 17 of the Judgments Act 1838 on the date on which the company entered administration. The rate at the commencement of the administration of LBIE was 8%. It is relevant to note that this rate is significantly in excess of market rates since 2008, which explains why unsecured claims against LBIE have been trading at a substantial premium to par since it became apparent that there may be a surplus of assets available after the payment of all unsubordinated proved debts.

19.     The effect of rule 2.88 is that contractual interest for periods up to the commencement of the administration is provable but post-administration contractual interest is not. Instead, interest is payable on all proved debts, whether or not they carried any entitlement to interest, from the commencement of administration to the date of payment or payments of the proved debts. It is this latter category of interest which is

termed "statutory interest" and it is payable out of the surplus remaining after payment of the debts proved before such surplus is applied for any purpose.

*Non-provable liabilities*

20.    The seventh category in the order of priority, non-provable liabilities, requires some explanation and is indeed the subject of some controversy on this application. In *Re Nortel*, the issue was whether liabilities arising under contribution notices issued under the Pensions Act 2004 against companies after they had gone into administration ranked as expenses of the administration or provable debts or neither. At first instance and in the Court of Appeal it was held that they ranked as expenses. Reversing these decisions, the Supreme Court held that they were provable debts. The possibility that the liability created by a contribution notice issued in these circumstances could be neither an expense nor a provable debt was explicitly contemplated by the Supreme Court. In those circumstances it would fall within category (7): see *Re Nortel* at [54] and [115].

21.    Although the clear trend of insolvency legislation since the nineteenth century has been to expand the category of debts which may be the subject of proof, there have until very recently been some well-recognised categories of debt which were not capable of proof in an administration or liquidation. First, claims in tort could not be proved unless the cause of action had accrued by the commencement of the administration or liquidation, until rule 13.12 was amended to reverse the effect of the decision in *In re T&N Ltd* [2005] EWHC 2870 (Ch), [2006] 1 WLR 1728. By virtue of the amendment, such claims may be proved provided that "all the elements necessary to establish the cause of action exist at [the commencement of the administration or liquidation] except for actionable damage." Secondly, costs awarded against a company in administration, albeit in proceedings commenced before the administration and in respect of costs incurred prior to the commencement of the administration, were held not to be provable debts in a long line of cases, which were overruled by the Supreme Court in *Re Nortel*.

22.    Mr Isaacs QC, on behalf of LBHI, submitted that following the decision of the Supreme Court in *Re Nortel*, it is no longer possible for any claims to fall within category (7) except as expressly provided by provisions in the legislation. Rule 12.3(2)(b) provides that obligations arising under confiscation orders made under certain legislation relating to criminal offences and any obligation arising from a payment out of the social fund under social security legislation by way of crisis loan or budgeting loan are not provable in an administration or liquidation. Mr Isaacs submits that these are the claims to which category (7) is confined, together with any other claims which by future legislation may not be provable.

23.    I do not accept this submission. In the context of the issue under consideration in *Re Nortel*, I feel no doubt that Lord Neuberger intended the category to include such claims of creditors as could not, by virtue of the relevant legislation, constitute provable debts but which would remain as liabilities of the company, payable in the event that there were sufficient assets available for the purpose. Given that the other items in the order of priority achieve their respective rankings by reason of express provisions in the legislation, it appears to me that when Lord Neuberger referred to the legislation "as interpreted and extended by the courts" he was referring, if not solely then primarily, to "non-provable liabilities" falling within category (7). The

Supreme Court did not decide that there could be no such non-provable liabilities. On the contrary, Lord Neuberger stated at [77] that the mere fact that a company could become under a liability pursuant to a provision in a statute which was in force before the insolvency event could not mean that, where the liability arises after the insolvency event, it falls within rule 13.12(1)(b) and is therefore provable. Lord Sumption made the same point at [130]. Lord Neuberger noted at [90] the submission of counsel that the legislature had progressively widened the definition of provable debts and *narrowed* the class of non-provable liabilities and referred at [93] to the "notion that all possible liabilities *within reason* should be provable" (emphasis added).

24.    It may also be noted that certain provable debts are postponed to all other liabilities. Rule 12.3(2A) so provides in respect of certain claims arising by virtue of section 382 of the Financial Services and Markets Act 2000. Section 74(2)(f) of the IA 1986 provides for the postponement of any "sum due to any member of the company (in his character of a member) by way of dividends, profits or otherwise". It is common ground that no issue arises under these provisions on this application.

*Issues irrespective of LBIE's status as an unlimited company*

25.    The issues which arise, irrespective of the status of LBIE as an unlimited company, are:

i)    Does the claim of LBHI2 as the holder of the subordinated loan debt rank ahead of or behind statutory interest?

ii)    Does LBHI2's claim as the subordinated debt holder rank ahead of or behind the claims, if they exist as a matter of law, of those foreign currency creditors who have suffered a currency loss as a result of conversion of their debts into sterling as at the date of the commencement of the administration for the purposes of proof?

iii)    Are such foreign currency conversion claims capable, as a matter of law, of being asserted against LBIE so as to be payable out of available assets?

iv)    Is contractual interest provable, or statutory interest payable, for the period of an administration if it is immediately followed by a liquidation?

26.    Before addressing these issues directly, I will set out the circumstances in which the subordinated loan debt was created, the regulatory background against which it was created and its material terms.

*Subordinated loan debt*

27.    LBHI2 was at the date of the commencement of LBIE's administration and continues to be the holder of $2.225 billion of subordinated loan debt, in respect of which it has lodged a claim in the administration for £1,254,165,598.48. LBHI2 accepts that its claim ranks behind provable debts, but it contends that it ranks ahead of all other claims, including the claims of unsecured creditors for statutory interest.

28.    Prior to a capital restructuring of LBIE in 2006, LBIE had three subordinated loan facilities: a €3 billion long term facility, a $4.5 billion long term facility and a $8 billion short term loan facility. Each of the facilities was provided by its then immediate parent company.

29.    In 2006, in order to utilise LBIE's foreign tax credits for US tax purposes, it was decided to improve its profitability, in part by restructuring its regulatory capital base so as to replace some subordinated debt with share capital and so reduce its interest payments. LBHI2 was interposed as the immediate holding company of LBIE and $2 billion of existing subordinated debt was replaced with $2 billion of preference shares issued to LBHI2. The existing subordinated loan facility agreements were cancelled and replaced with similar facility agreements with LBHI2 and $4.7 billion of subordinated debt was drawn down by LBIE.

30.    As part of a further restructuring in May 2007, $5.1 billion of subordinated debt was converted into $5.1 billion of preference shares.

31.    The amount outstanding under the subordinated facilities fluctuated, with both drawdowns and repayments. Drawdowns in the course of 2007 led to a peak balance of $4.775 billion, reducing to $2.225 billion at the commencement of the administration.

32.    Considerable work has been undertaken to determine whether that balance represents drawings under the long term or short term dollar facilities but no firm conclusion has been reached by the administrators of LBIE and I am not asked to determine that issue. For present purposes at least, it is not significant because the subordination provisions in the agreements are materially the same.

33.    The subordinated loans formed part of LBIE's regulatory capital. Under capital adequacy rules made by regulators, banks and other financial institutions are required to hold capital of a certain amount, which depends in broad terms on the extent of their business and their risk exposures. The purpose of capital adequacy rules is so far as possible to ensure that firms provide financial resources to protect their customers and other stakeholders against failure and enable them to withstand some level of loss.

34.    There is a significant international background to the capital adequacy rules applicable in the UK. Mr Isaacs QC on behalf of LBHI took me carefully through some of its principal elements.

*Capital adequacy rules*

35.    In July 1988, the Basel Committee on Banking Supervision, comprising representatives of the central banks and supervisory authorities of the Group of Ten countries, published the first Basel Accord, entitled International Convergence of Capital Measurement and Capital Standards (Basel I). It was agreed by all its members and endorsed by the central bank governors of the Group of Ten countries. It set out the details of the agreed framework for measuring capital adequacy and the minimum standard to be achieved which the national supervisory authorities represented on the Committee intended to implement in their respective countries. The fundamental objectives, as stated in Basel I, were, first, that the new framework should serve to strengthen the soundness and stability of the international banking

system and, secondly, that the framework should have a high degree of consistency in its application to banks in different countries. While the framework established by Basel I was mainly directed towards assessing capital in relation to credit risk (the risk of counterparty failure), it emphasised that other risks, such as interest rate risk and investment risk, needed to be taken into account by supervisors in assessing overall capital adequacy.

36.    Basel I addressed subordinated term debt in paragraph 23:

> "*The Committee is agreed that subordinated term debt instruments have significant deficiencies as constituents of capital in view of their fixed maturity and inability to absorb losses except in a liquidation. These deficiencies justify an additional restriction on the amount of such debt capital which is eligible for inclusion within the capital base.*"

37.    Effect was given to Basel I within the EC by the Council Directive of 17 April 1989 on the own funds of credit institutions (89/299/EEC). Article 2.1 provided that the unconsolidated own funds of credit institutions could consist of a number of items, including equity share capital and "fixed-term cumulative preferential shares and subordinated loan capital as referred to in article 4(3)." Article 4(3) provided that member states could include fixed-term cumulative preferential shares and subordinated loan capital in own funds,

> "*if binding agreements exist under which, in the event of the bankruptcy or liquidation of the credit institution, they rank after the claims of all other creditors and are not to be repaid until all other debts outstanding at the time have been settled.*"

Article 4(3) went on to provide that subordinated loan capital had to fulfil certain further criteria, including that the loans had an original maturity of at least 5 years and were repaid early only if "the solvency of the credit institution in question [was] not affected".

38.    Of direct relevance to LBIE was Council Directive of 15 March 1993 on the capital adequacy of investment firms and credit institutions (93/6/EEC), which provided for capital adequacy requirements for investment firms and capital adequacy rules for credit institutions related to market risk. Annex V provided that the own funds of investment firms and credit institutions were defined in accordance with Directive 89/299/EEC, subject to certain modifications.

39.    In June 2006, the Basel Committee on Banking Supervision published a revised Accord (Basel II). Paragraph 49(xii) repeated what had been said about subordinated term debt in Basel I, but an additional tier of capital was introduced (tier 3) consisting of short-term subordinated debt for the sole purpose of meeting a proportion of the capital requirements for market risks. The minimum original maturity of such short-term subordinated debt was 2 years but to be eligible as tier 3 capital, it needed "if circumstances demand, to be capable of becoming part of a bank's permanent capital and thus be available to absorb losses in the event of insolvency."

40.  Effect was given to Basel II in the EU by the Directives of 14 June 2006 relating to the taking up and pursuit of the business of credit institutions (2006/48/EC) and on the capital adequacy of investment firms and credit institutions (2006/49/EC). So far as relevant, the first of these Directives repeated the definition of own funds contained in Directive 89/299/EEC and repeated the requirement that subordinated loan capital could be included only if "binding agreements exist under which, in the event of the bankruptcy or liquidation of the credit institution, they rank after the claims of all other creditors and are not to be repaid until all other debts outstanding at the time have been settled": article 64(3).

41.  The financial regulator for LBIE at all relevant times was the Financial Services Authority (FSA), which has since been replaced for these purposes by the Prudential Regulation Authority.

42.  On 31 December 2006, the FSA introduced the General Prudential Sourcebook (GENPRU) which set out the capital adequacy requirements applicable to LBIE from that date until it went into administration. The purpose of these rules, as stated in paragraph 1.2.26, was to ensure that a regulated firm would "at all times maintain overall financial resources, including capital resources and liquidity resources, which are adequate, both as to amount and quality, to ensure that there is no significant risk that its liabilities cannot be met as they fall due." Based on Basel II and the relevant Directives, three tiers of capital were specified, which a firm was required to identify separately in its regulatory capital reporting to the FSA.

43.  The characteristics of tier 1 capital were that it was able to absorb losses, it was permanent, it ranked for repayment upon winding up, administration or similar procedures after all other debts and liabilities and it had no fixed costs, such as an obligation to pay dividends or interest. The most common example of tier 1 capital is ordinary share capital.

44.  Tier 2 capital was capital which did not meet the requirements of permanency and lack of fixed costs which were required for tier 1 capital. There were two types of tier 2 capital. Upper tier 2 capital was capital which was perpetual but which carried servicing costs which could not be waived at the firm's option. It specifically included cumulative preference shares. Lower tier 2 capital was capital which was either not perpetual or had fixed servicing costs that could not generally be waived or deferred. It was required generally to have an original maturity of at least 5 years and specifically included medium to long-term subordinated debt.

45.  Tier 3 capital was described by GENPRU as forms of capital conforming less well to the characteristics of tier 1 capital. It specifically included subordinated debt of short maturity.

46.  Subordination was a characteristic of all three tiers of capital.

47.  The amount of capital that a firm could designate as tier 2 capital was restricted to a value no greater than 50% of its tier 1 capital, with any excess capital being designated as tier 3 capital. The $2 billion of preference shares issued by LBIE in 2006 constituted lower tier 2 capital. Because of the limits on the amount of capital which could be held as tier 2 capital, a substantial amount of the preference shares

was classified as tier 3 capital. All the subordinated debt was classified as tier 3 capital.

*Subordinated debt agreements*

48.     As mentioned above, all the subordinated debt agreements contain essentially the same subordination provision. Each agreement, including in particular the subordination provisions, was based heavily on templates provided by the FSA. There is no evidence to suggest that anyone in the Lehman Brothers group gave any consideration to how these provisions would operate in the event of an insolvency of LBIE and indeed the recollection of several witnesses in interviews which have been conducted suggests that it is highly unlikely that any such consideration was given.

49.     Each agreement contains schedule 1, setting out variable terms, and schedule 2, setting out standard terms. Clause 8 of the variable terms provides for the payment of interest on a monthly basis. Clause 9 provides for repayment, with a specified repayment date and provisions for prepayment. The entire clause is expressed to be "subject always to 4(3) (restrictions on repayment) and 5 (subordination) of the Standard Terms".

50.     Clause 1(1) of the Standard Terms contains a number of definitions. "Financial Resources Requirement" is defined as having the meaning given to it in the FSA Handbook. "Insolvency" is defined to mean and include liquidation, administration and other similar procedures. "Liabilities" means "all present and future sums, liabilities and obligations payable or owing by the Borrower (whether actual or contingent, jointly or severally or otherwise howsoever)". "Senior Liabilities" means "all liabilities except the Subordinated Liabilities and Excluded Liabilities." "Subordinated Liabilities" is defined to mean "all Liabilities to the Lender in respect of each Advance made under this Agreement and all interest payable thereon." "Excluded Liabilities" is defined to mean "Liabilities which are expressed to be, and in the opinion of the Insolvency Officer of the Borrower, do, rank junior to the Subordinated Liabilities in any Insolvency of the Borrower."

51.     Clause 4 provides for repayment, but "subject in all respects to the provisions of paragraph 5 (subordination)": clause 4(1). Clause 4(3) contains restrictions on the ability of LBIE to effect early repayment of any loan or to pay interest by reference to its Financial Resources Requirement.

52.     The effect of clause 4(4)-(7) is that the only remedy available to the lender for repayment of any advances or enforcement of the terms of the loan facility agreements is to institute proceedings for the Insolvency of LBIE. This is a standard term of subordinated loan agreements and precludes the lender from obtaining judgment and executing or otherwise enforcing the judgment, thereby avoiding the subordination provisions.

53.     Clause 5 contains the subordination provisions:

>       *"(1) Notwithstanding the provisions of paragraph 4, the rights of the Lender in respect of the Subordinated Liabilities are subordinated to the Senior Liabilities and accordingly payment*

*of any amount (whether principal, interest or otherwise) of the Subordinated Liabilities is conditional upon –*

*(a) (if an order has not been made or an effective resolution passed for the Insolvency of the Borrower and, being a partnership, the Borrower has not been dissolved) the Borrower being in compliance with not less than 120% of its Financial Resources Requirement immediately after payment by the Borrower and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that –*

*(i) paragraph 4(3) has been complied with; and*

*(ii) the Borrower could make such payment and still be in compliance with such Financial Resources Requirement; and*

*(b) the Borrower being "solvent" at the time of, and immediately after, the payment by the Borrower and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that the Borrower could make such payment and still be "solvent".*

*(2) For the purposes of sub-paragraph (1)(b) above, the Borrower shall be "solvent" if it is able to pay its Liabilities (other than the Subordinated Liabilities) in full disregarding –*

*(a) obligations which are not payable or capable of being established or determined in the Insolvency of the Borrower, and*

*(b) the Excluded Liabilities.*

*(3) Interest will continue to accrue at the rate specified pursuant to paragraph 3 on any payment which does not become payable under this paragraph 5.*

*(4) For the purposes of sub-paragraph (1)(b) above, a report given at any relevant time as to the solvency of the Borrower by its Insolvency Officer, in form and substance acceptable to the FSA, shall in the absence of proven error be treated as accepted by the FSA, the Lender and the Borrower as correct and sufficient evidence of the Borrower's solvency or Insolvency.*

*(5) Subject to the provisions of sub-paragraphs (6), (7) and (8) below, if the Lender shall receive from the Borrower payment of any sum in respect of the Subordinated Liabilities –*

> *(a) when any of the terms and conditions referred to in sub-paragraph (1) above is not satisfied, or*
>
> *(b) where such payment is prohibited under paragraph 4(3),*
>
> *(6) Any sum referred to in sub-paragraph (5) above shall be received by the Lender upon trust to return it to the Borrower.*
>
> *(7) Any sum so returned shall then be treated for the purposes of the Borrower's obligations hereunder as if it had not been paid by the Borrower and its original payment shall be deemed not to have discharged any of the obligations of the Borrower hereunder.*
>
> *(8) A request to the Lender for return of any sum referred to in sub-paragraph (5) shall be in writing and shall be made by or on behalf of the Borrower or, as the case may be, its Insolvency Officer."*

54.    Clause 7 contains undertakings by LBHI2 as Lender not to take any of the steps specified in clause 7 without the prior written consent of the FSA. These undertakings are designed to prevent any action which might subvert the subordinated status of the Liabilities. In particular, in sub-clauses (d) and (e), the Lender undertook not without the prior written consent of the FSA to:

> *"(d) attempt to obtain repayment of any of the Subordinated Liabilities otherwise than in accordance with the terms of this Agreement;*
>
> *(e) take or omit to take any action whereby the subordination of the Subordinated Liabilities or any part of them to the Senior Liabilities might be terminated, impaired or adversely affected."*

*Submissions on the subordinated debt agreements*

55.    It is the submission of the administrators of LBIE, supported by Lydian and the administrators of LBL, that the subordinated debt ranks after statutory interest and non-provable debts. They rely on what they submit is a straightforward application of the express terms of the subordinated loan facility agreements. Clause 5(1) of the Standard Terms provides that "the rights of the Lender in respect of the Subordinated Liabilities are subordinated to the Senior Liabilities" and provides further (in clause 5(1)(b)) that payment of any amount of the Subordinated Liabilities is conditional upon "the Borrower" being solvent at the time of, and immediately after, the payment by the Borrower and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that the Borrower could make such payment and still be "solvent"." Clause 5(2) defines what is meant by the borrower being "solvent". It means that LBIE is "able to pay its liabilities (other than the Subordinated Liabilities)" in full disregarding the obligations and liabilities referred to in subparagraphs (a) and (b).

56. "Senior Liabilities" means all Liabilities except the Subordinated Liabilities and Excluded Liabilities. "Liabilities" are defined to mean "all present and future sums, liabilities and obligations payable or owing by the Borrower (whether actual or contingent, jointly or severally or otherwise howsoever)".

57. The administrators of LBIE submit that the obligation to pay statutory interest is a liability or obligation of LBIE within the meaning of "Liabilities" in the subordinated debt agreements. It follows, they submit, that the subordinated loan debts rank behind statutory interest as being "subordinated to the Senior Liabilities". The only exclusions, whether under the definition of "Senior Liabilities" or under clause 5(2) are, first, "obligations which are not payable or capable of being established or determined in the Insolvency of the Borrower" and, secondly, the Excluded Liabilities (as defined). The obligation to pay interest is, they submit, clearly payable in the Insolvency of LBIE and does not therefore fall within the first of those exclusions. "Excluded Liabilities" are defined as "liabilities which are expressed to be and, in the opinion of the Insolvency Officer of [LBIE], do, rank junior to the Subordinated Liabilities in any Insolvency of [LBIE]." They submit that this definition refers most obviously to other subordinated loans or other debts which are expressly, by their terms, subordinated to the subordinated claims arising under the Subordinated Facility Agreements to which LBHI2 was a party. The right to statutory interest is not expressed to rank junior to those subordinated loan debts.

58. The administrators of LBHI2, and LBHI, seek to meet these submissions in a number of ways in support of their case that the subordinated loan debts rank ahead of statutory interest.

59. Mr Trace QC on behalf of LBHI2 and Mr Isaacs QC on behalf of LBHI submit that the subordinated loan facility agreements must be construed in the context of their regulatory purpose and of the insolvency regime which applies to LBIE in the event that it goes into administration or liquidation. The latter follows, they submit, from the many references in the agreements to the insolvency of the Borrower and the clear contemplation that the subordination provisions should apply in an insolvency. The relevant provisions of the applicable insolvency regime are, for present purposes, the provisions in the Insolvency Rules for the proof of debts and the provisions of rule 2.88 as they apply to statutory interest. They submit that "Liabilities" means all provable and proved liabilities. As it is not in doubt that LBHI2 is entitled to prove for its claim under the subordinated facility agreements, the purpose of the subordinated provisions is to rank the subordinated debt within the general class of provable unsecured claims and to rank the subordinated debt behind the unsubordinated unsecured debts. This construction is consistent with rule 2.88(7), providing that "Any surplus remaining *after payment of the debts proved* shall, before being applied for any purpose, be applied in paying interest on those debts…". As LBHI2 is entitled to prove and has lodged a proof for its subordinated loan debts, they are "debts proved" which must be paid before there arises any surplus out of which statutory interest is to be paid. Moreover, the language of rule 2.88(7) shows that it does not create a liability or obligation in favour of the creditors whose debts have been proved and paid but constitutes only a direction to the administrator as to how he is to apply the surplus in those circumstances. It is a direction, not a liability or obligation "payable or owing by the Borrower".

MR JUSTICE DAVID RICHARDS
Approved Judgment

*Issues on the subordinated debt agreements: discussion*

60.     In approaching the issues of construction of the subordinated facility agreements, it is clearly right to have regard to their regulatory context. It is common ground that they are largely based on templates provided by the FSA and that the subordination and other provisions contained in the Standard Terms are not tailor-made to LBIE or the particular facilities into which it entered but are generally applicable to all subordinated loans which are relied on by institutions to meet their capital adequacy requirements. Although subordinated loans may rank only as lower tier 2 or even tier 3 capital, they are nonetheless to be treated as part of the capital or own funds of the institution for the purposes of providing protection to those dealing with the institutions and for the purpose of absorbing losses.

61.     I do not accept the submissions made by Mr Isaacs QC that the capital adequacy regime is concerned to protect only particular categories of creditor, including in particular trading counterparties. The requirement contained in the various Directives earlier referred to is that there should exist binding agreements under which in the event of the liquidation of the institution subordinated loan capital is to "rank after the claims of all other creditors and are not be repaid until all other debts outstanding at the time have been settled". There is nothing there to suggest any limit on the categories of creditors to which the loan capital is subordinated. On the contrary the references are to "all other creditors" and "all other debts". Nor do I accept the submission made that the absorption of losses is a purpose of subordinated debt only where the institution is a going concern. Both Basel I (paragraph 23) and Basel II (paragraphs 49(xii) and 49(xiv)) refer expressly to the absorption of losses by subordinated debt in a liquidation.

62.     The wording of the requirements contained in the Directives for binding agreements whereby subordinated loan capital ranks "after the claims of all other creditors and are not to be repaid until all other debts outstanding at the time have been settled" militates strongly against the suggested restriction of the meaning of "Liabilities" in the subordinated facility agreements to provable debts. The reference to "the claims of all other creditors" would suggest that the definition of "Liabilities" is to be given the widest meaning, which is indeed consistent with the express terms of the definition. The requirement that subordinated loan capital is not to be repaid "until all other debts outstanding at the time have been settled" is in my judgment equally consistent with the widest possible interpretation. To be consistent with the construction put forward on behalf of LBHI2 and LBHI, the words "outstanding at the time" would have to refer to the commencement of the liquidation. In my judgment they refer not to that time but to the time when the subordinated loan capital might otherwise be repaid.

63.     All of this is consistent with the concept that subordinated loan capital qualifying as part of the institution's regulatory capital is, as against creditors, to be treated as part of the "capital" of the institution. It is not of course part of the share capital of the company and it ranks ahead of any share capital in terms of repayment.

64.     In any event, there seems no reason as a matter of construction, looking only at the terms of the agreements, to restrict "Liabilities" to provable debts. There is nothing in the definition or in the rest of the agreement which, in my view, suggests that any such restriction is to apply.

65.     Mr Trace and Mr Isaacs submit that the subordination provisions must be read in the
        context of the English statutory provisions applicable to an insolvency of LBIE. The
        precise wording of rule 2.88(7), and the counterpart provision applicable to a
        liquidation in section 189(2), is an important part of this submission.

66.     Before looking at the detailed wording of rule 2.88(7), it is right to sound a note of
        caution about too detailed a recourse to UK insolvency legislation. As earlier
        observed, "Insolvency" is defined for the purposes of the subordinated loan
        agreements to include not only insolvency proceedings in the UK but "the equivalent
        in any other jurisdiction to which the Borrower may be subject". The Standard Terms
        are intended to apply in the context of insolvency proceedings in any jurisdiction. It is
        almost certainly the case that formal insolvency proceedings in all jurisdictions likely
        to be relevant involve a realisation and distribution of assets, on a largely pari passu
        basis, among creditors and a procedure for establishing the claims to be admitted for
        the purposes of such distribution.

67.     There can, however, be no such confidence that the precise terms of the insolvency
        laws of different countries relating to the debts and liabilities which are to be admitted
        to this process and the date as at which they are to be assessed or valued are the same
        as those contained in UK legislation. For example, it would not be an irrational
        insolvency law which provided that the available assets should be distributed amongst
        creditors proportionately to their claims including interest from the commencement of
        the insolvency process to the date of payment. Nor would it be an irrational
        insolvency law which made provision for the payment of foreign currency losses,
        whether or not on a subordinated basis. An insolvency law could well provide that all
        claims arising after the commencement of the insolvency process, and not qualifying
        as expenses, should be the subject of proof or its equivalent, again payable on a
        subordinated or unsubordinated basis. These considerations support the view that it is
        not appropriate to construe the subordination provisions in the agreements strictly by
        reference to the relevant provisions of the UK insolvency legislation.

68.     In any event, I do not consider that the terms of rule 2.88(7) and section 189(2)
        provide the support for which Mr Trace and Mr Isaacs contend. Rule 2.88(7) provides
        that "Any surplus remaining *after payment of the debts proved* shall, before being
        applied for any purpose, be applied in paying interest…" (emphasis added). The
        phrase "the debts proved" must mean all the debts proved, and so Mr Trace submits
        those debts include LBHI2's proof for its subordinated debt. Accordingly, he submits,
        it follows that any statutory interest is payable only after the debts proved, including
        the subordinated claim, have been paid.

69.     The answer to this point lies in my judgment, as Mr Trower for the administrators of
        LBIE submits, in the provisions of clause 7(d) and (e). I have earlier quoted these
        provisions. The expression "the debts proved" means all of those debts admitted
        to proof by the administrator, because it is only those debts which will be paid out of the
        available assets. In my judgment, the lodging of a proof in respect of the subordinated
        loan debts coupled with an attempt to require the administrator to admit the proof
        would be both an attempt to obtain repayment of subordinated liabilities otherwise
        than in accordance with the terms of the agreement, within the meaning of clause
        7(d), and the taking of action whereby the subordination of those liabilities to the
        Senior Liabilities might be impaired or adversely affected, within the meaning of
        clause 7(e). In my view, an attempt to rely on provisions of the applicable insolvency

law to advance the subordinated liabilities above Senior Liabilities is well within the intended scope of paragraphs (d) and (e) of clause 7.

70.    A further point made by Mr Trace and Mr Isaacs was that the language of rule 2.88(7) and section 189(2) sets out a mechanism directing the office holder how to apply the surplus in his hands, and does not impose any obligation or liability on the company. Accordingly those provisions do not create a liability falling within the meaning of Liabilities in the subordinated loan agreements. They further submitted in this connection that rule 2.88(7) presupposes a surplus and it is impossible for a direction as to the application of a surplus to constitute a debt or liability.

71.    I do not accept this submission. First, the surplus to which rule 2.88(7) applies is a surplus of assets over proved debts. It is not and does not purport to be a surplus after the discharge of all liabilities. As to whether rule 2.88(7) creates a debt or liability, it is no doubt true to say that it constitutes a direction to the administrator. It does not follow that it does not create a debt or liability of the company for the purposes of the subordination agreement. The assets constituting the surplus to which rule 2.88(7) applies are assets of the company in administration, albeit that their beneficial ownership is or may well be in suspense: *HMRC v The Football League Ltd* [2012] EWHC 1372 (Ch), [2012] Bus LR 1539 at [101]-[102]. The effect of the direction in rule 2.88(7) is to create a right in favour of creditors to have the relevant surplus applied in the payment of statutory interest. It does not create a proprietary or equitable interest in the surplus in favour of those creditors. It is in my judgment in no sense a misuse of language to say that it creates a concomitant liability or obligation. The definition of Liabilities includes liabilities and obligations "payable or owing by the Borrower". If the rule creates a liability or obligation, it is in my judgment rightly characterised as a right or obligation of the borrower for the purposes of this agreement.

72.    In this connection, reliance was placed on statements made by Mervyn Davies J in *In re Lines Bros Ltd* [1984] BCLC 215. The issue in that case was quite different from the question of construction of the subordinated loan agreements which I am presently considering. The issue was whether the provisions then contained in the Bankruptcy Act 1914 for the payment of interest on debts proved in a bankruptcy were applicable to the winding up of the company in that case, by reason of the provisions of section 317 of the Companies Act 1948 which applied only in "the winding-up of an insolvent company". The question was whether the company was for these purposes insolvent in circumstances where there was a surplus of assets over all proved debts. In the light of previous authorities to the same effect, the judge held that the company was not insolvent for the purposes of section 317 once its debts and liabilities as existing at the date of the commencement of the winding up had been paid or met in full: see p.225h-i.

73.    In reaching that decision, the judge went further back into the relevant statutory history to section 10 of the Supreme Court of Judicature Act 1875, as judges in previous cases had done. The question was whether post-liquidation interest, statutory or contractual, constituted "debts and liabilities" for the purposes of that section. The judge concluded that neither statutory nor contractual post-liquidation interest fell within that expression for the purposes of section 10. In reaching this conclusion, Mervyn Davies J gave two reasons, the first of which is the passage on which reliance is placed by Mr Isaacs:

> "*This is not a debt or liability within s10 for two reasons:*
>
> *(1) the section speaks of "its" debts and liabilities. At no stage can statutory interest be regarded as a debt or liability of the company. A liquidator's obligation under s33(8) to pay interest out of a surplus is pursuant to a statutory direction to him, being an obligation which is part of the statutory scheme for dealing with a company's assets which comes into operation at the outset of the winding up.*"

This is but one of the reasons given by Mervyn Davies J for his overall conclusion and it is not one which featured in the earlier cases, for example the judgment of Pennycuick V-C in *In re Rolls-Royce Co Ltd* [1974] 1 WLR 1584. More importantly, the context of the decision in *Re Lines Bros Ltd* is so different from the present context that it is not in my judgment of assistance in the construction of the subordination provisions in the subordinated loan agreements.

74. Mr Trace, but not Mr Isaacs, submitted that if, contrary to his submission, statutory interest fell within the definition of Liabilities in the subordinated debt agreements, it constituted an "Excluded Liability" and did not therefore rank ahead of the subordinated debt, by reason of clause 5(2)(b) of the agreements. Mr Trace submitted that, given that the definition of Excluded Liabilities is based on the ranking of claims in an Insolvency of the Borrower, the reference to "Liabilities which are expressed to… rank junior to the Senior Liabilities" must mean, or at least include, liabilities which rank junior by operation of express provisions of the applicable insolvency legislation. As rule 2.88(7) expressly provides for statutory interest to be payable only after payment of the proved debts, which include the subordinated debts, it follows that statutory interest is expressed to rank junior to the Subordinated Liabilities.

75. I do not accept this submission. Statutory interest is not expressed to rank junior to the Subordinated Liabilities, but only to the debts proved. It seems to me that the obvious purpose of the exclusion of such Liabilities is to cater for the situation in which a borrower issues further debt on terms that it is expressed to rank junior to the subordinated liabilities created by these subordinated debt agreements. It is, and was at the date of these agreements, a real possibility that a Borrower might wish to issue such debt and the purpose of this provision is simply to ensure that such junior subordination is effective. It is relevant in this context also to bear in mind that different insolvency regimes could well treat interest accruing after the commencement of the insolvency process in different ways, and not necessarily in terms which could even arguably suggest that it was subordinated. The purpose of the template agreements, giving effect as they do to EU Directives, is to provide a uniform system of subordination. No inconsistency with that purpose arises if particular debts are created on express terms that they rank junior to the Subordinated Liabilities under these agreements.

76. Mr Isaacs advanced a number of additional arguments in support of the overall submission that the subordinated loan debt ranked ahead of statutory interest. He submitted that the definition of "Liabilities" could not carry an all-embracing meaning. Applied literally, it would mean that the full amount of future debts and the maximum possible amount of contingent debts would have to be paid in an administration or in a liquidation, notwithstanding the provisions of the Insolvency

MR JUSTICE DAVID RICHARDS
Approved Judgment

Rules providing for an estimation of the value of contingent debts and a discounting of future debts. Further, he submitted that a broad construction of Liabilities would include the return of any surplus to shareholders, and it was clear that it could not possibly extend that far.

77.    As to these points, it is in my view clear that the payment of the estimated value of contingent debts and the discounted value of future debts in an administration or liquidation is payment of those debts in full. The contractual right of a contingent creditor is not to a payment of the maximum amount which may become payable but is a right to payment if but only if the contingency occurs. The rules provide a mechanism for placing a present value on that right. Likewise, the contractual right of a creditor with a future debt is to payment on the due date, but not before it. In order to bring administrations and liquidations to a conclusion as quickly as practicable, future debts are discounted. The creditor receives the full present value of the debt, calculated as provided by the Insolvency Rules. The contractual rights of contingent and future creditors are clearly compromised by the insolvency process but their claims are, for the reasons I have given, properly regarded as paid in full. As to the return of any surplus to shareholders, the obligation on the administrator or liquidator to make such a return is in my view clearly not a liability or obligation payable or owing by the Borrower for the purposes of the subordinated debt agreements. None of these points suggests that statutory interest is not to fall within the meaning of Liabilities.

78.    Mr Isaacs submitted that it was significant that the word "solvent" was used in clause 5(1)(b). Relying on what Lord Hoffmann said in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101 at [17], Mr Isaacs submitted that the use of the word "solvent" as the defined expression was indicative of its intended meaning. Although the term is defined in clause 5(2), the choice of that term shows that it was not intended to include statutory interest within Liabilities because the obligation to pay statutory interest arises only when the company is solvent and there is a surplus. With respect, I do not think that there is anything in this point. The existence of the surplus out of which statutory interest is payable does not mean that the company is solvent, it means only that the company has been able to pay its proved debts in full. If a company is under an obligation to pay statutory interest to its creditors but has insufficient assets to do so in full, so there is in any event no surplus available for a return to shareholders, it is in no sense a misuse of language to say that the company is not solvent.

79.    If, contrary to his principal submissions, "Liabilities" do include statutory interest, Mr Isaacs submitted that statutory interest was excluded by reason of clause 5(2)(a). Mr Isaacs submitted that the words "not payable or capable of being established or determined in the Insolvency of the Borrower" referred to the process of paying proved debts or establishing the status and amount of a debt for the purpose of deciding whether it was capable of proof, and if so, in what amount. This process of construction would have the effect of restricting Liabilities to provable debts, even though its definition was wider. I see no reason to restrict the ordinary meaning of clause 5(2)(a) in the way suggested by Mr Isaacs. Statutory interest is payable in the administration or liquidation of LBIE and is not therefore, in my view, excluded by paragraph (a).

80.  Finally, Mr Trace submitted that if the effect of the subordination provisions was indeed to subordinate the relevant debts to statutory interest and non-provable debts, such an agreement was not as a matter of law permissible and was therefore void. The agreement would be an impermissible attempt to contract out of the mandatory effect of rule 2.88(7) and section 189(2). Mr Isaacs did not support this submission.

81.  It was once widely considered that a purely contractual subordination of a debt intended to take effect in an insolvency was void as being an attempt to contract out of the mandatory requirement for a pari passu distribution among all creditors admitted to proof. The mandatory character of this provision formed a basis of the decision of the House of Lords in *British Eagle International Airlines Ltd v Cie National Air France* [1975] 1 WLR 758. For this reason, subordination was usually effected by the creation of a trust, whereby the subordinated creditors agreed to hold distributions received by them in respect of their subordinated debts on trust for the other creditors: see, for example, *In re British & Commonwealth Holdings plc (No.3)* [1992] BCC 58.

82.  The validity of a purely contractual subordination provision arose for consideration in *In re Maxwell Communication Corporation plc* [1993] 1 WLR 1402 (*Re Maxwell*). Vinelott J held that there were no principles of insolvency legislation or public policy which precluded the making of a contract  between a company and a creditor whereby, in the event of the company's insolvency, the debt was to be subordinated to the payment of debts owed to other unsecured creditors.

83.  Mr Trace did not question the correctness of Vinelott J's decision. He submitted, however, that it was authority only for the proposition that within the overall class of provable claims it was permissible for one creditor to agree with the company on a purely contractual basis to subordinate its debt to other unsecured debts. He submitted that it did not follow that it was permissible for a creditor with a provable debt to agree to a subordination lower down the order of priority, for example after statutory interest. This would run counter to the express mandatory terms of rule 2.88(7) and section 189(2).

84.  I cannot see why, if the mandatory statutory provisions for a pari passu distribution do not prevent a contractual subordination of one debt to other proved debts, rule 2.88(7) and section 189(2) should prevent a contractual subordination of a provable debt to a ranking below statutory interest. Since such a subordination could be achieved through the use of a trust, as was done in *In re British & Commonwealth Holdings plc (No 3)* (see p.65D), a prohibition of a contractual subordination would "represent a triumph of form over substance" just as much as Vinelott J thought it did in the circumstances of *Re Maxwell*: see p.1417A. Further, in *Re Maxwell*, Vinelott J expressly contemplated that a preferential creditor could agree that his debt would rank equally with the unsecured non-preferential debts, notwithstanding that the payment of preferential debts in priority to the general body of unsecured debts is itself the subject of provisions expressed in mandatory terms: section 175(1) IA 1986 (liquidation), which applies also in an administration: para.65(2) of schedule B1 to the IA 1986.

85.  My overall conclusion on this issue is, therefore, that the subordinated debt ranks below statutory interest in the order of priority of distribution of assets of LBIE. This conclusion involves no contortions in the construction of the express terms of the

subordinated debt agreements and appears to me to be consistent with the regulatory background to the agreements.

86.     The policy behind statutory interest is to compensate creditors for the delay in payment to them of their debts on account of the insolvency process, even where they had no contractual or other legal right to interest. If it were not for the insolvency process, creditors would be entitled to seek to enforce their debts against the debtor company and its property. If the subordinated debts are, as it is accepted, subordinated to the principal amounts of such unsecured debts, there is nothing surprising in their subordination to the payment of statutory interest on those debts. It would be a greater cause of surprise if they were not so subordinated. Moreover the contrary view is capable of some significantly inconsistent results. It was accepted by Mr Trace and Mr Isaacs that while a Borrower was a going concern, a subordinated debt could not be paid unless the Borrower could pay all its debts in full including any contractual or other enforceable interest. Such interest ceases to be payable from the date of the commencement of the insolvency process, and is in effect replaced by the right to the payment of statutory interest out of the surplus remaining after the payment in full of proved debts. The result would be somewhat inconsistent if the subordinated debts did not rank junior to such statutory interest. Unsubordinated creditors with a contractual or other entitlement to interest would find that the subordination provisions worked to their disadvantage once the Borrower entered an insolvency process.

87.     All or almost all of the arguments addressed above appear to me to support the conclusion also that the effect of the subordination provisions is to subordinate the relevant debts to rank junior to any non-provable debts, as well as statutory interest. Such liabilities are as much liabilities of the Borrower as provable liabilities. Subordinated debt forming part of the regulatory capital of the Borrower would, consistently with the requirements of the Directives, rank behind such non-provable liabilities as much as behind provable liabilities. Just as in the case of statutory interest, a contrary conclusion would produce surprising results. If, as was entirely possible, the Supreme Court had held in *Re Nortel* that the liability created by a contribution notice issued after the commencement of an administration or liquidation was neither an expense nor a provable debt, it would have constituted a non-provable debt payable after statutory interest in the order of priority set out in the judgment of Lord Neuberger. If a contribution notice were served before the commencement of an administration or liquidation, it is clear that the subordinated debt would rank junior to the liability so created and could not be paid under the terms of the subordinated debt agreements unless the Borrower was able to pay such liability under the contribution notice in full. It is hard to see why the subordination provisions should not have the same effect in the event of the issue of a contribution notice after the commencement of an administration or liquidation.

*Currency conversion claims*

88.     Until the decision of the House of Lords in *Miliangos v George Frank (Textiles) Ltd* [1976] AC 443, the established position in English law was that a creditor with a debt contractually payable in a foreign currency could not obtain judgment in an English court in the foreign currency but only a judgment in sterling converted as at the date when payment was due under the contract. The same position applied as regards proofs of debt in a liquidation: see *In re United Railways of Havana and Regla Warehouses Ltd* [1961] AC 1007. The power of the English courts to give judgment

in a foreign currency established by *Miliangos* quickly led to a reconsideration of the position in a liquidation. The particular difficulty is that in order to undertake a pari passu distribution of assets among creditors it is necessary to convert all claims to a single currency. The issue was the date at which such conversion should take place. The question came before Oliver J in *In re Dynamics Corporation of America* [1976] 1 WLR 757. He held that in a compulsory winding up of an insolvent company, a creditor's claim for a debt in a foreign currency, and any set-off in a foreign currency against such a debt, must be converted into sterling as at the date of the winding up order.

89.  The question arose again in *In re Lines Bros Ltd* [1983] Ch 1. The Court of Appeal approved the decision of Oliver J in *In re Dynamics Corporation of America* and held that, in the case of a voluntary liquidation, the foreign currency debts should be proved according to their sterling value as at the date of the commencement of the winding up. In that case, there was a surplus of assets available after paying all the proved debts. There was an insufficiency of assets to pay all claims to post-liquidation interest in full and the issue effectively before the court was whether the available surplus should be applied in the payment of interest or, as the foreign currency claimants asserted, in payment of their claims converted as at a date later than the commencement of the winding up. It was held that the foreign currency creditors had no claim to *prove* for more than the sterling equivalent of their debts as at the date of the commencement of the liquidation and that the right of creditors with contractual claims to interest ranked next in the distribution of the available assets.

90.  The foreign currency creditors relied on the injustice, recognised by the House of Lords in *Miliangos*, of the creditor, not the debtor, taking the risk of changes adverse to him in the exchange rate between the contractual currency and sterling. In considering this submission and its application in an insolvent liquidation, Brightman LJ said at p.16:

> "*The policy behind the decision [in Miliangos]...was that the foreign currency debtor should not be entitled to impose on the foreign currency creditor the risk of a fall in the value of sterling. Justice demands that the risk shall be borne by the debtor, who is the party in default. Hence the justice of the reinterpretation of the law, that the debtor in default is not to be excused from his contractual obligation by payment of anything less than the sterling equivalent of the money contractually due at the date of payment.*
>
> *If this statement of the reasoning behind the Miliangos decision is correct, clearly it has no role to play in the distribution of the assets of an insolvent company. The sterling creditors are not in default vis à vis the foreign currency creditors. Therefore, there is no obvious reason why the risk of depreciation in the value of sterling pending distribution of the assets should be borne by the sterling creditors. The company is the wrongdoer towards both the sterling creditors and the foreign currency creditors. There is no particular reason, in the field of abstract justice, why the currency risk should be borne by one description of creditor rather than by another description of*

> *creditor when they are all directed to rank pari passu. They do not rank pari passu if the sterling creditors are required to underwrite the exchange rate of the pound for the benefit of the foreign currency creditors. The just course, as it seems to me, is to value the foreign debt once and for all at an appropriate date, and to keep to that rate of conversion throughout the liquidation until all debts have been paid in full.*"

This underlying rationale loses its force once all the proved debts and post-liquidation interest have been paid. If there remains a surplus, any competition lies not with other creditors but with the company as the debtor, or rather the shareholders who stand behind it. In this situation, the claims of justice underpinning the decision in *Miliangos* re-assert themselves.

91.    Because there would be no funds available after the payment of post-liquidation interest on proved debts, the issue whether foreign currency creditors would then have a further claim against the assets of the company in respect of currency losses suffered between the date of liquidation and the date of payment of the dividend in full on their proved claims, did not arise for decision. It was nonetheless a matter which was the subject of argument and Brightman LJ commented on it at pp 20-21 in a passage which I should set out in full:

> "*We were much pressed in argument by the bank with the injustice which might arise, on the liquidators' submission, in the case of a wholly solvent company. Take a simple example. A company has English assets of £1m. and has borrowed 100,000 Swiss francs from a Swiss bank in Switzerland repayable on demand under a Swiss contract in the same currency. If the company for some reason declined to repay on demand, judgment could be recovered against it in Swiss francs in England, and could be executed against the assets in an equivalent sum of sterling converted as at the date when execution is authorised. Suppose, however, that the company goes into voluntary liquidation, Suppose that sterling is devalued by 10 per cent. before the liquidator can discharge the debt. The Swiss creditor, it is said, would on the liquidators' argument receive less than his due entitlement in Swiss francs, and the profit on the exchange caused by the company's default would enure for the benefit of the undeserving shareholders. Per contra, if sterling had been revalued upwards, it would (it is said) be open to the liquidator, like any other foreign currency debtor, to discharge the company's obligation in the currency of the contract. So, in the end, the foreign currency creditor will get the worst of both worlds; he will gain nothing if the exchange rate moves against the currency of the contract, and he will lose if it moves in favour of the currency of the contract.*
>
> *This is not a problem with which we are directly concerned, and I wish to guard against expressing any concluded view upon it. But when the problem arises for decision, it may be*

> *relevant to observe that the view has been repeatedly expressed in relation to interest that, once the provable debts have been satisfied in full, so that the company has in that sense a surplus of assets, the duty of the liquidator is to discharge the contractual indebtedness of the company in respect of such debts to the extent that the contractual indebtedness exceeds the provable indebtedness. "[A]s soon as it is ascertained that there is a surplus, the creditor whose debt carries interest is remitted to his rights under his contract;..." per Giffard L.J. in In re Humber Ironworks and Shipbuilding Co, L.R. 4 Ch.App. 643, 647; and Selwyn L.J. to the same effect, at p. 645.*

> *It is on that principle that a creditor may claim post-liquidation interest. He does this on the basis that obligations under the contract are not necessarily discharged despite the fact that all provable debts have been paid at 100 pence in the pound. It may be the duty of the liquidator, in the case of a wholly solvent liquidation, if a foreign currency creditor has been paid less than his full contractual foreign currency debt, to make good the shortfall before he pays anything to the shareholders. I do not say that this is necessarily the solution to the problem posed, but I have not heard any convincing objection to that solution."*

92.    Oliver LJ, who was also a member of the Court, said as regards this issue at p.26:

> *"We are not, however, here concerned with a solvent company and the point must be left for decision when it arises. Certainly for my part I do not dissent from the proposition that the answer to Mr Stubbs' criticism may well be found in the way suggested in the judgment of Brightman LJ."*

93.    At this time there was no express provision in the legislation dealing with foreign currency claims. With the reform of insolvency law undertaken in the IA 1986 and the Insolvency Rules, it was clear that some provision would need to be made. Rule 4.91(1) provided:

> *"For the purpose of proving a debt incurred or payable in a currency other than sterling, the amount of the debt shall be converted into sterling at the official exchange rate prevailing on the date when the company went into liquidation [or, if the liquidation was immediately preceded by an administration, on the date that the company entered administration]."*

The words in square brackets were added with effect from 1 April 2005 following the introduction in 2003 of the power of administrators to make distributions to creditors. Similar provision was made for administrations in 2003, and amended in 2005, in rule 2.86(1):

> *"For the purpose of proving a debt incurred or payable in a currency other than sterling, the amount of the debt shall be*

> *converted into sterling at the official exchange rate prevailing*
> *on the date when the company entered administration or, if the*
> *administration was immediately preceded by a winding up, on*
> *the date that the company went into liquidation.*"

94.     In submitting that foreign currency creditors who have suffered an exchange loss as a result of their debt being paid in sterling as at the rate prevailing at the date of the commencement of the liquidation or administration have a non-provable claim for such currency losses, Mr Zacaroli QC lays emphasis on the words included in both rules "for the purpose of proving a debt…". He submits, supported by Mr Trower, that these words make clear that currency conversion is effected solely for the purposes of proving debts and therefore for the purpose of achieving the pari passu distribution amongst proved debts required by the legislation. It gives effect to the position established by the Court of Appeal in *In re Lines Bros Ltd*. But it does no more than that and it does not suggest or imply that, in circumstances where assets are otherwise available for distribution among shareholders, foreign currency creditors are not entitled to make claims for their exchange losses. They submit that the arguments in favour of allowing such claims, acknowledged by Brightman LJ with some support from Oliver LJ, establish the case for allowing such claims. Relying on *In re Humber Ironworks and Shipbuilding Co* (1869) LR 4 Ch App 643 and *Wight v Eckhardt Marine GmbH* [2004] 1 AC 147 per Lord Hoffmann at [26]-[27], they submit that the process of proof and distribution amongst creditors with admitted proofs does not extinguish the underlying contractual obligation.

95.     In opposing these submissions, Mr Wolfson submitted, first, that there could be no non-provable currency conversion claim because there was no provision for it in the legislation. He at first submitted that rule 12.3(2) is an exhaustive statement of non-provable claims, but later accepted that it could not be treated as comprehensive. I have already dealt with this issue and held that there is no legislative or other bar on the making of non-provable claims against a company in liquidation, once all provable claims have been dealt with (subject to the application of the contributory rule and any contractual or other subordination of provable claims).

96.     Secondly, Mr Wolfson drew attention to the position which would exist in the following circumstances. A foreign currency debt is payable on 1 January but is not paid. The company goes into liquidation on 1 March. The debt is converted into sterling at the rate prevailing on 1 March, which is more favourable to the creditor than the rate prevailing on 1 January. When the liquidator later makes a distribution among the creditors with proved claims, say 1 July, sterling has depreciated against the contractual currency and the amount that the creditor receives in sterling is then worth less than his foreign currency debt. As it seems to me, the creditor has suffered a loss. He was entitled to be paid in the foreign currency and, when finally he was paid albeit in sterling, he received less than the foreign currency amount to which he was entitled. Accordingly, he has not received his full contractual entitlement.

97.     Mr Wolfson did not dispute that in these circumstances the foreign currency creditor would not have received his full contractual entitlement, but he contrasted that with a situation where sterling appreciates against the relevant foreign currency between 1 March and 1 July, so that the creditor receives in sterling an amount which when converted at the prevailing exchange rate is greater than the amount to which he was contractually entitled. There is no suggestion by anyone that in those circumstances

the foreign currency creditor must refund the amount of the excess to the company in liquidation. It followed, Mr Wolfson submitted, that the claim to a non-provable currency conversion loss was in effect a one-way bet.

98.    This leads on to the submission made by Mr Wolfson and other counsel that in a liquidation there are in a number of circumstances winners and losers. The purpose of a liquidation is to achieve a broad justice, and in achieving that some creditors may find themselves in a worse position but equally other creditors may find themselves in a better position than their strict contractual rights. I accept that this is so, and that it is necessary in order to achieve the pari passu distribution of assets amongst creditors with proved claims. But I do not understand why it should prevent those creditors who have not received their contractual entitlement from pressing their claims against the company once the statutory regime for pari passu distributions has run its course. It is no answer to a creditor with a contractual claim which has not been met to say either that, in other circumstances, he might have done better, or that other creditors have in fact done better. As Brightman LJ made clear in *In re Lines Bros Ltd*, individual creditors may not achieve their full contractual rights when they are in competition with other creditors, but there is no justice in them not doing so when they are in competition only with the debtor.

99.    Mr Wolfson further took the example of a foreign currency creditor with a contractual payment due in the future and carrying a low contractual rate of interest. His foreign currency claim would be converted for the purposes of proof at the exchange rate prevailing at the date of commencement of the liquidation or administration, and he would then benefit from the statutory 5% discount rate on the amount of his provable debt on which he would receive dividends, which may be a significantly more advantageous discount rate to him than the real market discount rate calculated by reference to the contractual interest rate. Added to that, he would benefit from statutory interest at a rate of 8% on the full amount of his provable debt. I do not doubt that, as in many cases, there may be some difficulties in working out the consequences of allowing particular claims. It may well be that in asserting a non-provable currency conversion claim the creditor in this example might have to give credit for the benefits which he has received under the insolvency regime. The existence of these possible difficulties, and I do not accept that they are any more than that, does not in my judgment provide a sound basis for saying that there can be no currency conversion claims arising out of the contractual rights of creditors.

100.    In addition to supporting the submissions of Mr Wolfson, Mr Isaacs advanced further reasons why in his submission the currency conversion claims could not exist.

101.    First, he submitted that because the foreign currency debt was converted into sterling at the prevailing rate of exchange as at the date of the commencement of the liquidation, any currency conversion claim was by definition contingent as at that date. The contingency is, of course, a movement in the exchange rate adverse to the position of the creditor. Accordingly, Mr Isaacs submitted, if a currency conversion claim exists at all, it is a contingent debt which could be the subject of proof. Mr Isaacs is of course right that any currency conversion claim is, as at the date of the commencement of the liquidation, contingent. It is however clearly not a provable contingent claim. The scheme of the legislation is, as set out in the relevant rules, to convert foreign currency debts into sterling for the purposes of proof as at the date of the commencement of the liquidation. That is the full extent of any provable claim in

respect of the foreign currency debt. It cannot in my judgment follow that there can be no claim against the company based on the creditor's contractual rights, capable of being advanced after the payment in full of all provable debts and statutory interest. The point is that the contingent claim which Mr Isaacs identifies is not provable.

102.    Secondly, Mr Isaacs submitted that the availability of a currency conversion claim would render unworkable the provisions for set-off where there is a foreign currency creditor. In an administration, the account necessary for set-off is taken between what is due between the company and a creditor as at the date of the notice by the administrator of an intention to make a distribution: rule 2.85(3). Rule 2.85(6) applies, so far as concerns set-off involving one or more foreign currency debts, the conversion required by rule 2.86(1). Accordingly the foreign currency debt is converted into sterling at the official exchange rate prevailing on the date when the company went into administration.

103.    On that basis, Mr Isaacs gave the example of a debt of £100 million owed by a creditor to the company. The creditor is owed $100 million by the company which as at the administration date converts into £70 million. The effect of the set-off would be to leave the creditor owing £30 million to the company. The creditor would be treated as having paid £70 million to the company. If changes occur in the exchange rates between the date of the commencement of the administration and the date as at which the set-off is effected, such that the £70 million paid by way of set-off would convert to $90 million, the creditor would continue to have an obligation to pay £30 million to the company but, if currency conversion claims are permitted, would have a currency conversion claim for $10 million. Mr Isaacs submitted that there would then need to be a second conversion and a second set-off, neither of which is recognised by the rules, thus demonstrating that no such currency conversion claim may lie.

104.    In answer to this, Mr Zacaroli submitted that there would need to be no such second conversion or second set-off. He accepts that there is no set-off of the currency conversion claim and he accepts that set-off is applicable only in relation to provable claims. If the creditor sought to rely on set-off against the currency conversion claim, he would be interfering with the rights of other creditors and with the pari passu distribution of assets. Mr Zacaroli accepts that this is not permitted but submits that that is no reason why a currency conversion claim should not lie as a non-provable claim once all provable debts and statutory interest have been paid. In my judgment Mr Zacaroli provides a complete answer to the submission made by Mr Isaacs.

105.    Mr Isaacs further submitted that the existence of currency conversion claims could create significant difficulties for the officeholder in determining the time at which to make distributions. The precise choice of date of distributions would affect the currency conversion claims, if any, which could be made by different groups of creditors depending on the contractual currency of payment. At the same time, delays in the date of distribution to mitigate the effect of such claims would have the effect of increasing the amount of statutory interest payable. As it seems to me, it is the duty of the office holder to proceed to make distributions as soon as he reasonably can. If he is otherwise in a position to make a distribution, it could not be right to delay doing so in the hope that it would mitigate the effect of currency conversion claims. In any event, as conversion rates often fluctuate unpredictably, any attempt by an officeholder to time distributions by reference to the currency markets is liable to back-fire.

106.   I was referred to reports published by the Law Commission and the Review Committee on Insolvency Law and Practice chaired by Sir Kenneth Cork (the Cork Report) between 1981 and 1983. In 1981, the Law Commission published its Working Paper No 80 on Private International Law Foreign Money Liabilities, in the wake of the *Miliangos* decision. In paras 3.39-3.47, the Law Commission addressed the issue as it affected the liquidation of companies and the bankruptcy of individuals. This followed the decision of Oliver J in *In re Dynamics Corporation of America*, but before the decisions at first instance and in the Court of Appeal in *In re Lines Bros Ltd*. The Law Commission endorsed the approach adopted by Oliver J of fixing the date of the winding up order as the date on which foreign currency debts should be converted into sterling for the purposes of proof. In paragraph 33.46, the Law Commission considered the position in the "small minority of cases" where the company is found to be solvent. The report identified that this raised a third question, "whether in such cases foreign currency creditors should be compensated from the assets of the company or the bankrupt for adverse exchange fluctuations between the date of the relevant order and the date of actual payment." This, the working paper stated, would involve a second, later, conversion of these debts as at the date of actual payment, or as close thereto as is practicable. The paper expressed a view against a later conversion date where a change in the relative value had been adverse to the creditor in question on the grounds that "it would involve a discrimination between foreign currency debts depending on whether the exchange rates have moved to the advantage or disadvantage of the creditors."

107.   The Cork Report was published in 1982. The question of foreign currency liabilities was considered in paragraphs 1306-1309. In para 1308, the report referred to two decisions in which it had been held that conversion should be effected as at the date of the winding up. These were presumably *In re Dynamics Corporation of America* and *In re Lines Bros Ltd* at first instance. The report supported this conclusion and recommended that any future Insolvency Act should expressly provide that the conversion of debts in foreign currencies should be effected as at the date of the commencement of the relevant insolvency proceedings. The report continued:

> "*Furthermore, we take the same view as the Law Commission (Working Paper No.80) that conversion as at that date should continue to apply, even if the debtor is subsequently found to be solvent. To apply a later conversion date only in the case where the exchange rate has moved to the advantage of the creditor, but (necessarily) not where it had moved against him, would, in our view, be discriminatory and unacceptable.*"

Although the judgment of the Court of Appeal in *In re Lines Bros Ltd* was given in February 1982, the Cork Report does not appear to have taken account of it in relation to claims for currency losses. If the Committee had been aware of the views expressed by Brightman LJ on this topic, with some support from Oliver LJ, they would be almost certain to have considered and addressed them.

108.   In the Law Commission's final Report published in October 1983, reference was made to the position in a liquidation or bankruptcy in paras 2.22-2.23 and 3.34-3.37. The decision of the Court of Appeal was by then reported and reference was made in para 2.23 to the discussion in that case concerning the position if the company is solvent. The conclusion expressed in para 3.37 was:

> *"The present law relating to the conversion into sterling of foreign-currency claims in relation to solvent and insolvent companies and to bankruptcy is satisfactory."*

109.   This conclusion rather neatly leaves the point open. The Report endorses the conversion of foreign currency debts into sterling as at the date of liquidation for the purposes of proof. As the Court of Appeal had left open the question whether creditors could advance currency conversion claims in the event of a surplus of assets after the payment of all proved debts and interest, the effect of the Report is also to leave open that issue.

110.   In any event, I do not consider that these reports take the matter very far. The first two take no account of the discussion in the judgment of Brightman LJ and express concern based on the possibility of discrimination. However, as Brightman LJ makes clear in his judgment in passages which I have earlier cited, the issue of discrimination arises between different creditors, all of whom are innocent for these purposes. Once all proved debts and interest on them have been paid, issues of discrimination as between creditors do not arise. The question then, as Brightman LJ observed, is whether the debtor should take the advantage or the benefit of the decline in the value of sterling. In my judgment, it would be contrary to principle and justice that the debtor, or the shareholders receiving the surplus, should be able to deny the foreign currency claimants their full contractual rights. Those contractual rights are compromised by the insolvency regime only for the purpose of achieving justice among creditors through a pari passu distribution.

111.   Accordingly, I hold that currency conversion claims can be advanced as non-provable claims against a company which has paid in full all proved claims and statutory interest on those claims, except only those proved claims which by contract or otherwise are subordinated or which, in a liquidation, are subject to the contributory rule.

*Is interest accruing during an administration provable or payable in a subsequent liquidation?*

112.   The amount of statutory interest payable on the debts proved in the administration of LBIE is very substantial. LBIE has been in administration since September 2008 and statutory interest has been accruing at the rate of 8% or the contractual rate of interest, whichever is the higher, since then. The administrators of LBIE may take steps to place LBIE into liquidation, particularly with a view to making calls on its members and with a view to invoking the contributory rule, which I deal with later in this judgment. One of the issues which I later consider is whether the members are liable, in a liquidation, to make contributions for the purposes of funding the payment of statutory interest pursuant to their liability under section 74(1) of the IA 1986. I conclude that they are. It is accordingly an issue of some significance whether statutory interest accruing during the period of the administration is provable or payable in a subsequent liquidation.

113.   Provisions relating to interest as they apply to an administration and to a liquidation are largely the same, except in one important respect. As regards administration, rule 2.88(1) provides:

> *"Where a debt proved in the administration bears interest, that interest is provable as part of the debt except insofar as it is payable in respect of any period after the company entered administration or, if the administration was immediately preceded by a winding up, any period after the date that the company went into liquidation."*

This is the version of the rule in force between 1 April 2005 and 5 April 2010 and, by virtue of the transitional arrangements, applies to the administration of LBIE because it commenced during that period. Where, therefore, a debt bears interest before the commencement of the administration by reason of contractual terms, the Judgments Act or otherwise, the interest is provable for the period up to the commencement of the administration or the commencement of an earlier liquidation.

114.    In respect of the period following the commencement of the administration, rule 2.88(7) provided during the period 1 April 2005 to 5 April 2010 as follows:

> *"Any surplus remaining after payment of the debts proved shall, before being applied for any purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company entered administration."*

This entitlement to statutory interest ranks immediately after the proved debts. The provision for statutory interest in rule 2.88(7) did not completely dovetail with the provision in rule 2.88(1) because, if there were an earlier liquidation, interest during the period of that earlier liquidation fell within neither rule. The same was, to an extent, true in respect of some other provisions of rule 2.88 which it is not necessary to detail. These inconsistencies were cured by amendments made to rule 2.88 with effect from 6 April 2010. The position is now that interest is provable up to the date when the company went into administration or, if earlier, liquidation and statutory interest is payable in respect of the period since the earlier of those two dates.

115.    The provisions applicable to interest in a liquidation are contained in both the IA 1986 and the Insolvency Rules. As regards proving for interest, rule 4.93 in the form in force between 1 April 2005 and 5 April 2010 provided:

> *"Where a debt proved in the liquidation bears interest, that interest is provable as part of the debt except insofar as it is payable in respect of any period after the company went into liquidation or, if the liquidation was immediately preceded by an administration, any period after the date that the company entered administration."*

The terms of rule 4.93 have been amended consistently with the amendments to rule 2.88 but not in a way which has altered their effect.

116.    The provision for statutory interest is contained in section 189 of the IA 1986, which has not been amended. Section 189 includes the following:

> *"(1) In a winding up interest is payable in accordance with this section on any debt proved in the winding up, including so much of any such debt as represents interest on the remainder.*
>
> *(2) Any surplus remaining after the payment of the debts proved in a winding up shall, before being applied for any other purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company went into liquidation."*

In the provisions applicable both in an administration and in a liquidation, all such interest ranks equally, whether or not the debts on which it is payable rank equally, and the rate of interest payable is the greater of the rate payable on judgments (8% at all material times) and the rate applicable apart from the administration or winding up (normally the contractual rate).

117.    The provisions are therefore broadly the same. Interest on interest-bearing debts may be proved for any period before the company enters either administration or liquidation, whichever is the earlier. Until the amendments made with effect from 6 April 2010, statutory interest was payable out of any surplus remaining after the payment in full of proved debts from the date that the company entered administration, or from the date that it went into liquidation, but without in either case provision for the period of an earlier liquidation or administration respectively. By reason of the amendments made to rule 2.88 with effect from 6 April 2010, it is clear that statutory interest is payable out of any surplus with effect from the commencement of an earlier liquidation. No similar amendment was made to section 189.

118.    On the basis of the terms of these provisions, the other Lehman companies submit that where an administration is followed by a liquidation, interest on interest-bearing debts is provable in respect of the period down to the commencement of the administration, but statutory interest is payable out of a surplus only from the date of the liquidation. On this basis, if LBIE were to go into liquidation, creditors would not receive interest in respect of the period from September 2008 when it went into administration until the date it goes into liquidation.

119.    On a straightforward reading of the relevant provisions, this appears to be their effect. It is, however, very difficult indeed to understand what policy could have justified this result. It has always been clear that in the case of either a distributing administration or a liquidation, not preceded by an earlier liquidation or administration (as the case may be), interest is provable on interest-bearing debts for the period up to the commencement of the relevant insolvency proceeding and statutory interest is payable out of the surplus on all debts for the period from the commencement of the relevant insolvency proceeding. There would seem to be no purpose served in a denial of any interest during the period of an immediately preceding administration or liquidation. That there was no policy justifying such denial would appear to be demonstrated by the amendments made to rule 2.88 with effect from 6 April 2010 which ensure that in an administration which has been immediately preceded by a liquidation, statutory interest is payable in respect of the period since the commencement of the earlier liquidation.

120.    Mr Trace rose to the challenge of suggesting some policy justifications. First he
suggested that it achieved simplicity. Secondly he suggested that the possibility of a
distributing administration being followed by a liquidation was sufficiently unlikely to
make it unnecessary to make provision for statutory interest dating back to the start of
the earlier administration. He suggested that a distributing administration was seen as
an alternative, rather than a precursor, to a liquidation. These do not appear to me to
be convincing reasons. Rule 4.73(8) provides that where a winding up is immediately
preceded by an administration, a creditor proving in the administration shall be
deemed to have proved in the winding up and therefore demonstrates that a move
from a distributing administration to a liquidation is contemplated. More importantly,
the lack of any provision for interest during the period of a preceding administration
applies to all administrations which are immediately followed by a liquidation,
whether or not the administrator has given notice of an intention to make
distributions.

121.    It is, I think, significant that changes were made in 2005 and 2010 to the Rules, but
not to section 189 of the IA 1986, the only relevant provision to be contained in
primary legislation. The Rules are made and may be amended by statutory instrument
made by the Lord Chancellor with the concurrence of the Secretary of State and, in
the case of rules affecting court procedure, with the concurrence of the Lord Chief
Justice or a judicial officeholder nominated by him. Any such statutory instrument is
subject to annulment in pursuance of a resolution of either House of Parliament. The
rules and their amendments are not therefore made by Parliament and may obviously
be made very much more easily than amendments to the primary legislation contained
in the IA 1986. Given that there is no rational justification for providing that interest
for the period of an administration which is immediately followed by a liquidation is
neither provable or payable as statutory interest, I can only conclude that either the
terms of section 189 were overlooked or, more probably, it was thought that in some
way the amendments to the Rules avoided the need to amend the primary legislation.

122.    The question is therefore whether the amended rules can be construed in a way which
allows interest for the period of the administration to be proved or paid as statutory
interest in the later liquidation. Or are their terms such that this conclusion is
impossible?

123.    Mr Trower and Mr Zacaroli did not submit that there was any means by which the
rules could be construed so as to provide that in the event of a liquidation immediately
preceded by an administration, interest on interest-bearing debts could be proved for
the period up to the commencement of the liquidation. It is, I think, common ground
that in such circumstances interest is not capable of proof for the period of the earlier
administration.

124.    Mr Trower submitted that, on a proper construction of rule 2.88(7), the right to the
payment of statutory interest out of a surplus remaining after the payment of the
proved debts survives the conversion of the administration into a liquidation and
entitles those who proved their debts in the administration to interest out of such
surplus for the period from the commencement of the administration. Any creditor
proving for the first time in the liquidation would not be so entitled, nor would it be
entitled to prove for interest during the period of the administration.

125. There are, as I see it, a number of serious difficulties with this submission. First, on a natural reading of 2.88(7) it applies to a surplus in the hands of the administrator rather than in the hands of a subsequent liquidator. Read in its context, it seems to direct the administrator as to the application of the surplus which he holds. Secondly, if it were to bear the meaning for which Mr Trower contends, it could I think apply only to a surplus in the hands of the administrator which he transferred to the liquidator. I do not see how it could apply to a surplus which arises for the first time in the hands of the liquidator. Rule 2.88(7) requires the surplus remaining after the payment of debts proved to be applied in payment of interest on those debts in respect of the periods during which they have been outstanding since the company entered administration "before being applied for any purpose". That is impossible to reconcile with the equivalent provision in section 189(2) which requires the surplus remaining in the hands of the liquidator to be applied in paying interest on proved debts in respect of the periods during which they have been outstanding since the company went into liquidation "before being applied for any other purpose". Thirdly, if rule 2.88(7) is restricted to the surplus in the hands of the administrator, its effect is limited, first, to the amount of that surplus and, secondly, to the creditors who have lodged a proof in the administration. It therefore only goes a limited way to meeting the problem. Fourthly, in any event, it is a construction which provides no assistance in the case of an administration which has not become a distributing administration. It may be thought more likely that it is in such circumstances that a company will go into liquidation following an administration and the absence of any provision which could deal with interest for the period of an administration in such a case is in my view very telling.

126. I am driven to the conclusion that the effect of the relevant legislation is that, in a case where an administration is immediately followed by a liquidation, interest for the period of the administration is neither provable nor payable as statutory interest in the liquidation. This result would be avoided only if and to the extent that the administrator was able to pay statutory interest under rule 2.88(7) before the company went into liquidation.

127. In those circumstances, consistently with what I have earlier held as regards non-provable liabilities, I see no reason why creditors whose debts carried interest prior to the administration, whether by way of contract, judgment interest or otherwise, should not in the liquidation be entitled to claim interest at such rate for the period of the administration as a non-provable liability. In my judgment, the reasoning in *In re Humber Ironworks & Shipbuilding Co* applies and, as Giffard LJ put it, "the creditor whose debt carries interest is remitted to his rights under his contract" or, as I would add, any other rights to interest which he may enjoy.

*LBIE as an unlimited company*

128. The remaining issues arise out of the status of LBIE as an unlimited company.

129. Modern company law began with the Companies Act 1862, a statute described by Sir Francis Palmer as the "magna carta of co-operative enterprise." Among the many reforms which the Companies Act 1862 introduced or consolidated was a simple process of registration of companies. It provided for the three types of registered company, which remain today with little amendment. They are companies limited by shares, companies limited by guarantee and unlimited companies.

130.    These three types of registered company are distinguished by the differences in the liabilities of their members. In no case, do the members have any direct liability to creditors of the company. In this respect, they are importantly different from partnerships, unincorporated joint stock companies (usually formed by a deed of settlement), companies incorporated under the Joint Stock Companies Act 1844 (which provided for the registration and incorporation of companies but made the members liable without limit to creditors as if they were partners) and Scottish partnerships, where the partners are secondarily liable to creditors. The liability of members of a registered company, whether limited or unlimited, is exclusively to provide funds to the company or to its liquidator. In the case of companies limited by shares, the liability of a member is limited to the amount unpaid on the shares registered in the name of the member. In the case of a company limited by guarantee, the liability of the member is limited to the amount stated in the memorandum of association of the company. There is no stated limit on the liability of the members of unlimited companies.

131.    It is now very unusual for companies limited by shares to have shares in issue which are not fully paid. Almost invariably, shares are fully paid up on their issue. This was not, however, the case in the second half of the nineteenth century and the first twenty or so years of the twentieth century. There are many reported cases dealing with the issues that arise when calls are made on shares, whether by the directors while the company is a going concern or by the liquidator in a winding up. The last of these cases to which I have been referred was decided in 1917. The only subsequent cases giving any consideration to these issues are *In re White Star Line Ltd* [1938] 1 Ch 458, and *In re Kaupthing, Singer and Friedlander Ltd (in administration) (No.2)* [2012] 1 AC 804 (*Re Kaupthing*), in which Lord Walker of Gestingthorpe considered an important aspect of the liability of members by way of analogy with the issue in that case.

132.    As the limited liability of members, together with a simple process of registration and incorporation, were the principal advantages of the mid-nineteenth century reforms, it is not surprising that there has been only a sparse use of unlimited companies. It appears that their introduction by the Companies Act 1862 was to compensate for the prohibition of partnerships or joint stock companies with more than twenty members or, in the case of banks, ten members. If members wished to have an association which most closely resembled the old joint stock company, the unlimited company was introduced for that purpose. There remained in some circles some stigma attached to limited liability and there were a number of businesses, including banks and building societies, which were incorporated as unlimited companies. A number of cases, though far fewer than those concerned with limited companies, dealt with issues arising out of the liability of members of unlimited companies. The use of unlimited companies, never great, declined during the nineteenth century. In the twentieth century, their principal advantage was an exemption from ad valorem stamp duty, and later capital duty, payable on the issue of new capital by a company. For this reason, their principal use for many years was as estate or investment companies, where estates or other property were transferred to companies in exchange for shares issued to or owned for the benefit of the families owning them. For the same reason, they were sometimes used in complex corporate restructurings and transactions. As appears from the facts of the present case, unlimited companies have found a place in corporate planning for US tax purposes.

133.    An unlimited company may, but is not required to, have a share capital. At the date of the appointment of the administrators, the issued share capital of LBIE was $13,273,114,000 divided into 6,273,114,000 ordinary shares of $1 each, 2 million class A preference shares of $1000 each and 5.1 million class B shares of $1000 each. LBHI2 is the registered holder of all the shares except for one ordinary share registered in the name of LBL. All the shares were fully paid up at the date of the appointment of the administrators.

134.    The liability of members arises in two distinct ways, which it is important to differentiate. First, the holders of shares, whether in a limited or unlimited company, are liable to pay up their shares either in accordance with the terms of issue or when made the subject of calls by the company. It is the liability to meet calls for unpaid capital which has a bearing on the issues in this case. The provisions governing calls are contained in the articles of association of the company and apply to calls made by the company before it goes into liquidation.

135.    By way of example, the last version of Table A articles applying to companies limited by shares (contained in the schedule to the Companies (Tables A to F) Regulations 1985), reflecting or repeating provisions contained in earlier versions of Table A, provided in regulation 12 that subject to the terms of allotment, directors were empowered to make calls upon the members in respect of any moneys unpaid on their shares, whether in respect of nominal value or premium, and each member was, subject to receiving at least 14 days' notice, required to pay to the company as required by the notice the amount called on his shares. Regulations 13 to 22 contained further provisions relating to calls and to the remedies in respect of a failure to pay calls, including the final sanction of forfeiture of the shares. The standard form articles for an unlimited company contained in Table E incorporated by reference the relevant provisions of Table A, as do the articles of LBIE.

136.    In a winding up of a company, a separate regime applies to both calling up unpaid capital on shares and making other calls on the members of unlimited companies and of companies limited by guarantee. The relevant provisions are now contained in the IA 1986 and the Insolvency Rules (as amended), but it should be noted that before 1986 the relevant provisions were contained in successive Companies Acts and the Winding-up Rules. The relevant provisions, even those contained in the Companies Act 1862, have not changed radically over the years. All the authorities to which I shall refer are dealing with provisions contained in the Companies Acts but I shall endeavour to indicate also their counterpart in the present legislation. The provisions applicable to the making of calls in a liquidation replace the provisions in the articles of companies for making calls on shares.

137.    For convenience, in this judgment, I shall refer to the liabilities of members arising before a liquidation as contractual and those arising in a liquidation as statutory. Being statutory, it is not possible to contract out of the latter provisions.

*Liability of members in a liquidation*

138.    Section 74 of the IA 1986 sets out the liability of present and past members in a liquidation. It provides:

*"(1) When a company is wound up, every present and past member is liable to contribute to its assets to any amount sufficient for payment of its debts and liabilities, and the expenses of the winding up, and for the adjustment of the rights of the contributories among themselves.*

*(2) This is subject as follows—*

*(a) a past member is not liable to contribute if he has ceased to be a member for one year or more before the commencement of the winding up;*

*(b) a past member is not liable to contribute in respect of any debt or liability of the company contracted after he ceased to be a member;*

*(c) a past member is not liable to contribute, unless it appears to the court that the existing members are unable to satisfy the contributions required to be made by them;*

*(d) in the case of a company limited by shares, no contribution is required from any member exceeding the amount (if any) unpaid on the shares in respect of which he is liable as a present or past member;*

*(e) nothing in the Companies Acts or this Act invalidates any provision contained in a policy of insurance or other contract whereby the liability of individual members on the policy or contract is restricted, or whereby the funds of the company are alone made liable in respect of the policy or contract;*

*(f) a sum due to any member of the company (in his character of a member) by way of dividends, profits or otherwise is not deemed to be a debt of the company, payable to that member in a case of competition between himself and any other creditor not a member of the company, but any such sum may be taken into account for the purpose of the final adjustment of the rights of the contributories among themselves.*

*(3) In the case of a company limited by guarantee, no contribution is required from any member exceeding the amount undertaken to be contributed by him to the company's assets in the event of its being wound up; but if it is a company with a share capital, every member of it is liable (in addition to the amount so undertaken to be contributed to the assets), to contribute to the extent of any sums unpaid on shares held by him."*

139.    The scheme of section 74 is, in sub-section (1), to impose a general liability on every present and past member and then in sub-sections (2) and (3) to qualify the liability. The liability of past members is qualified by the terms of sub-section (2)(a), (b) and (c). The limitation on the liability of members of a company limited by shares is provided by sub-section (2)(d), which limits a member's liability to the amount unpaid, if any, on the shares in respect of which the member is liable. The equivalent qualification for members of a company limited by guarantee is provided by sub-section (3). Sub-section (2)(f) is somewhat misplaced. It is not concerned with the liability of members but provides for the postponement of debts due to members in their character as such. The unlimited liability of the members of an unlimited company is achieved by the absence of any qualification in sub-sections (2) or (3) to the general provision in sub-section (1).

140.    Throughout the remaining provisions of IA 1986, the term "contributory" is used to describe those past and present members on whom a liability is placed by section 74, and other persons liable to contribute under section 76: see section 79 for the definition of "contributory".

141.    Sections 80-83 contain further provisions in relation to contributories and their liability, two of which are relevant to the issues in this case.

142.    Section 80 provides:

> *"The liability of a contributory creates a debt (in England and Wales in the nature of an ordinary contract debt) accruing due from him at the time when his liability commenced, but payable at the times when calls are made for enforcing the liability."*

The words "an ordinary contract debt" replaced the words "a specialty" with effect from 1 October 2009. This is not material to the issues in this case.

143.    Material to this case are the words in section 80 "accruing due from him at the time when his liability commenced." It has been held that the liability of a member as a contributory commences for the purposes of this section when he becomes a member: *Ex parte Canwell* (1864) 4 De G, J & S 539, *Williams v Harding* (1866) LR 1 HL 9 at 29, and see *Buckley on the Companies Acts* (14th ed 1981) p.507. The liability of a member to pay calls made before a winding up and in a winding up are therefore both created at the same time.

144.    Section 82 deals with the effect of the bankruptcy of a contributory. It provides:

> *"(1) The following applies if a contributory becomes bankrupt, either before or after he has been placed on the list of contributories.*
>
> *(2) His trustee in bankruptcy represents him for all purposes of the winding up, and is a contributory accordingly.*
>
> *(3) The trustee may be called on to admit to proof against the bankrupt's estate, or otherwise allow to be paid out of the bankrupt's assets in due course of law, any money due from the*

> *bankrupt in respect of his liability to contribute to the company's assets.*
>
> *(4) There may be proved against the bankrupt's estate the estimated value of his liability to future calls as well as calls already made."*

145.    It was submitted by Mr Wolfson that the presence of the provisions permitting proof in sub-sections (3) and (4), without any corresponding provisions relating to proof in the administration or liquidation of a corporate contributory, demonstrated that there could be no proof in the latter case in respect of a liability as a contributory. This submission misunderstands the purpose of those sub-sections. Sub-section (2) makes the trustee in bankruptcy the contributory in respect of the shares registered in the name of the bankrupt. Without further provision any claim in respect of calls would therefore lie against the trustee in bankruptcy. Sub-sections (3) and (4) provide that claims in respect of future calls are not to be made against the trustee personally but are to be admitted to proof in the bankrupt's estate. Without those provisions, the bankrupt's estate would have no liability in respect of future calls and therefore no proof in respect of them could be made. In the case of an administration or liquidation of a corporate contributory, the shares remain registered in the name of the company and there is therefore no need for any provision to the effect that proofs in respect of future calls may be made in the administration or liquidation.

146.    Section 148 of the IA 1986 provides that the court shall as soon as may be after the making of a winding up order settle a list of contributories, unless it appears that it will not be necessary to make calls on or adjust the rights of contributories. By section 150, the court may, either before or after it has ascertained the sufficiency of the company's assets, make calls on all or any of the contributories to the extent of their liability "for payment of any money which the court considers necessary to satisfy the company's debts and liabilities, and the expenses of winding up, and for the adjustment of the rights of the contributories among themselves, and make an order for payment of any calls so made." Section 154 provides that the court shall adjust the rights of the contributories among themselves and distribute any surplus among the persons entitled to it. Section 160 provides that provision may be made by rules for enabling or requiring the powers and duties of the court in respect of settling the list of contributories and the making of calls to be exercised or performed by the liquidator as an officer of the court and subject to the court's control. Provision is so made in the Insolvency Rules, to which I refer below. As regards a voluntary winding up, section 165(4) provides that a liquidator may exercise the court's powers of settling a list of contributories and making calls.

147.    The provisions in the Insolvency Rules delegating the duties and powers of the court with regard to settling the list of contributories and making calls to the liquidator as an officer of the court, subject to the court's control, are contained in rules 4.195-4.201 and 4.202-4.205 respectively. None of them calls for special comment for the purposes of the present case.

148.    There are other provisions of the IA 1986 and the Insolvency Rules which are relevant, such as provisions dealing with the proof of debts and set-off, but I shall refer to those provisions when dealing with the particular issues to which they relate.

*Issues*

149.    The issues which arise in connection with the liability of the contributories of LBIE
are:

    i)    The extent of the liability arising under section 74 of the IA 1986.

    ii)    The application of the "contributory rule" and the equitable rule in
*Cherry v Boultbee* (1838) 2 Keen 319, (1839) 4 My&Co 442.

    iii)    Whether and, if so, when can a liability for future calls be the subject
of proof in the administration or liquidation of a corporate
contributory.

    iv)    The effect of set-off in the administration or liquidation of a corporate
contributory.

    v)    The effect of set-off in the administration or liquidation of the
company.

*The extent of liability under section 74 IA 1986.*

150.    The issue is whether the liability to contribute to the assets of a company in
liquidation under section 74(1) extends to providing the funds needed to pay statutory
interest and any non-provable liabilities or, whether as the other Lehman companies
submit, it is limited to the funds required to pay the debts and liabilities proved in the
liquidation. On either basis, the liability also extends to the provision of funds for the
payment of the expenses of the winding up and for the adjustment of the rights of
contributories among themselves.

151.    The issue turns on the proper construction of section 74(1) and of the provisions
creating the liability to pay statutory interest – section 189 in the case of a liquidation
and rule 2.88(7) in the case of an administration. Before coming to the detailed points
of drafting on which the case of the contributories is largely based, there are some
general points to make.

152.    First, the purpose of a liquidation is to realise to best advantage all the assets of the
company and to distribute the proceeds of sale among those entitled to them in the
order of priority in which they are entitled to receive them. As the liquidation of a
company ends with its dissolution, nothing as a matter of principle should be left
unresolved for the future. This is in contrast to individuals, who are discharged from
bankruptcy and who can therefore, for example, continue to be liable for such pre-
bankruptcy liabilities as the law may prescribe. It is the purpose of a liquidation to pay
all the liabilities of the company, including those which are not capable of proof. The
payment or compromise of non-provable tort claims in *In re T&N Ltd* [2006] 1 WLR
1728 was as much a purpose of the administrations of the T&N companies as the
payment of their provable debts. In *In re R-R Realisations Ltd* [1980] 1 WLR 805, the
final distribution to members was delayed while provision was made for tort claims
made by the estates of persons killed in the crash of an aircraft powered by Rolls
Royce engines which occurred well into the liquidation. It is clear from the waterfall

set out in Lord Neuberger's judgment in *Re Nortel* that a liquidation, or in that case a distributing administration, has this comprehensive purpose.

153.    Secondly, while acknowledging that of course the extent of any liability is a matter of construction of the relevant statutory provisions, one might suppose that if a member of an unlimited company is to be liable to contribute to the assets of the company for the payment of its debts and liabilities without limit, such liability would extend to all its debts and liabilities, whether or not they were capable of proof. Many un-provable liabilities are, or at least until the decision in *Re Nortel* were, incapable of proof not by virtue of their very nature but by virtue of when the liability arose. Until rule 13.12 was amended in 2010, tort claims were provable only if the cause of action were complete by the time of the liquidation. Following the amendment, the cause of action must by then be complete save for the occurrence of actionable damage. Obligations to make payments pursuant to the exercise of discretionary powers, for example orders for costs in litigation or the issue of contribution notices in respect of pension fund deficits, were before the decision of the Supreme Court in *Re Nortel* provable only if the power had been exercised before the commencement of the liquidation but not otherwise.

154.    The obligation to pay statutory interest in a liquidation is of a different character, because it can arise only in the event of a liquidation. It is worth bearing in mind the position which exists prior to the liquidation. The company, particularly for example a bank, may have many liabilities which carry interest. To the extent that such interest accrued due for payment after the commencement of the liquidation, it was never provable but, under the law as it existed before the IA 1986, it was payable once all provable debts had been paid: see *In re Humber Ironworks & Shipbuilding Co* (1869) LR 4 Ch App 643. It is difficult to see the policy which would make members of an unlimited company liable to contribute for the purposes of paying the principal amount of such contractual debts but not require them also to provide funds for the payment of contractual interest, all the more so when on any basis they had to do so for contractual interest accruing due before the commencement of the liquidation. It might be thought surprising if the substitution under the insolvency legislation of statutory interest for non-provable contractual interest reduced the liability of members.

155.    Turning to the express terms of section 74(1), the liability is to contribute "to any amount sufficient for payment of its debts and liabilities." Nowhere in section 74, or in any other provision, is there any express provision that the liability is restricted to amounts sufficient for the payment of *provable* debts and liabilities.

156.    Mr Trower submitted that, while the defined meaning of "debts" is restricted to provable debts, the defined meaning of "liabilities" is not so restricted. Rule 12.3 makes provision for "provable debts":

> "(1) Subject as follows, in administration, winding up and bankruptcy, all claims by creditors are provable as debts against the company or, as the case may be, the bankrupt, whether they are present or future, certain or contingent, ascertained or sounding only in damages."

Part 13 of the Insolvency Rules (Interpretation and Application) contains in rule 13.12 definitions of "debt" and "liability" for the purposes of a liquidation and administration. "Debt" is defined in rule 13.12(1), a provision which was subject to close scrutiny in *Re Nortel*. It sets out the pre-conditions which must be satisfied for a debt to be the subject of proof. Rule 13.12(2) is concerned with the circumstances in which a liability in tort is "a debt provable in the winding up". These provisions, in my view, make good Mr Trower's submission that the word "debt" is used to mean provable debt.

157.    Rule 13.12(4) defines "liability":

"*In any provision of the Act or the Rules about winding up, except insofar as the context otherwise requires, "liabilities" means (subject to paragraph (3) above) a liability to pay money or moneys worth including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment, and any liability arising out of an obligation to make restitution.*"

As Mr Trower emphasised, this sub-rule is not linked to the status of a liability as a provable debt. In terms it applies "in any provision of the Act or the Rules about winding up", which by virtue of sub-rule (5) applies also to an administration.

158.    Section 74 requires members to contribute sums sufficient not only for the payment of the debts and liabilities of the company but also "for the adjustment of the rights of the contributories among themselves." Mr Trower relies on this as support for his submission that "debts and liabilities" are to be given a broad meaning, encompassing all the liabilities of the company, whether provable or not. As the adjustment of the rights of the contributories among themselves lies almost at the bottom of the waterfall, above only a return of capital to members, it suggests that the contributions required from contributories are to be applied in discharge of the liabilities which rank below provable debts but above the adjustment of rights among contributories. Counsel for the other Lehman companies submitted that this did not follow and that there was no difficulty in the liquidator either ringfencing out of a larger call the amount required for the adjustment of rights among contributories after provable debts had been paid in full, or making a further call specifically for the purpose of the adjustment of the rights of contributories.

159.    There is, however, no provision in the IA 1986 or the Insolvency Rules for any such segregation or separate call. The legislation proceeds on the basis that funds received by the liquidator will be applied in accordance with the order of priority established by the legislation and case-law. If it had been intended that sums from calls after the discharge of provable debts should be held by the liquidator on, in effect, a purpose trust, it is to be expected that the legislation would have made appropriate provision. It is no answer to say that such provision is implicit, because this presupposes the question to be answered, whether the obligation of contributories is limited to making contributions for the payment of provable debts.

160.    Mr Trower derived further support for his submission from the provisions of two other sections in the IA 1986. First, section 89(1) provides for a statutory declaration of solvency to be made by the directors of a company if its voluntary winding up is to

proceed as a members' voluntary winding up, not a creditors' voluntary winding up. The principal difference between the two types of voluntary winding up is that in the former the members have powers of control, while in the latter it is the creditors who have such powers. The declaration requires the directors to state that they have formed the opinion that "the company will be able to pay its debts in full, together with interest at the official rate" within a period not exceeding 12 months from the commencement of the winding up. Secondly, section 149(3) is more closely linked to the liability under section 74:

> "*In the case of any company, whether limited or unlimited, when all the creditors are paid in full (together with interest at the official rate), any money due on any account whatever to a contributory from the company may be allowed to him by way of set-off against any subsequent call.*"

While not decisive, this provision is more consonant with the liability under section 74 extending to statutory interest, rather than excluding it.

161. The principal submissions on behalf of the other Lehman companies, were, first, that rule 2.88(7) and section 189(2) which provide for the payment of statutory interest do not create liabilities of the company and, secondly, that the meaning of "its debts and liabilities" in section 74(1) is restricted to provable debts and liabilities.

162. The submission that the right of creditors to receive statutory interest is not a liability of the company in liquidation is substantially the same argument as was made on behalf of LBHI2 and LBHI in respect of the construction of the subordinated loan agreements, a submission which I have earlier rejected. It is, however, necessary to consider this submission in the different context of section 74. The same points are made that section 189(2) is not a provision that creates a liability, but is an instruction or direction to the liquidator as to how to apply a surplus remaining in his hands after payment of the debts proved. The obligation arises only if there is such a surplus. Unless a call is made, there is no such surplus and it is no part of the function of the liquidator to make calls for the purpose of creating the surplus which is the necessary pre-condition to the obligation to pay statutory interest. Reliance is again placed on the decision of Mervyn Davies J in *In re Lines Brothers Ltd* [1984] BCLC 215.

163. The issue is whether, as a matter of construction of section 74(1), the obligation created by section 189(2) is a liability of the company. I see the linguistic argument for saying that the terms of section 189(2) constitute a direction to the liquidator, rather than creating a liability of the company. I do not, however, accept that the way in which section 189(2) is expressed has the effect, or is intended to have the effect, of excluding statutory interest from the obligations of contributories under section 74. I find it impossible to discern the policy reason for saying that members are liable to contribute assets for the payment of the principal amount of provable debts, but are not liable for the interest on those debts which is payable to compensate the creditors for being kept out of their money until a distribution is made in the liquidation. The justification for statutory interest, even in those cases where the debts do not already carry a right to interest, is that the creditors are prevented by the liquidation regime from obtaining judgment against the company which would then carry interest at judgment rate. If a judgment were obtained before the commencement of the liquidation, interest at the judgment rate is provable down to the commencement of

the liquidation. Members are liable to contribute in respect of such interest. There is no plausible policy reason why they should cease to be so liable in respect of interest accruing due after the commencement of the liquidation. The fact that such interest, at the same rate, becomes payable under section 189(2) rather than under the Judgments Act provides no sound reason for distinguishing between them.

164.  There is, moreover, the point which I have already made, that until the introduction of section 189(2) contractual interest was payable in a liquidation but was not provable in competition with other debts. I do not find it plausible that the use of language in section 189(2) was intended to have the effect that what was previously clearly a liability of the company should cease to be so for the purposes of section 74(1). Further, the non-provable liabilities which rank behind statutory interest are, on any footing, liabilities of the company, although not provable debts. If section 74(1) extends to making calls for the payment of non-provable liabilities, ranking behind statutory interest, it makes no sense at all that calls cannot be made in order to fund the payment of statutory interest. The submission that statutory interest is excluded from section 74(1) because of the wording of section 189(2) can make sense only if the meaning of "its debts and liabilities" is restricted to provable debts.

165.  A further point arising out of the terms of section 189(2) was made on behalf of the other Lehman companies. Payment of statutory interest under that provision is to be made out of "any surplus remaining after the payment of the debts proved in a winding up". There must be a surplus of assets available for distribution before any statutory interest becomes payable. It was submitted that the surplus would arise only if and to the extent that the liquidator made calls and the contributories had made payments in response to those calls. In my judgment, this submission is misconceived. The assets available to a liquidator to meet the claims of creditors, including statutory interest and non-provable debts, includes the right to make calls. Clearly no distribution can in fact be made except to the extent that, so far as calls are concerned, payments are made in response to those calls. If, on its proper construction, the liability of contributories under section 74 extends to providing funds for the payment of statutory interest and non-provable debts, the liquidator by making calls for that purpose is not creating a surplus, and so causing the obligation to pay statutory interest to arise, but is making calls in response to the requirement to pay statutory interest.

166.  A number of submissions were made in support of the proposition that, on its proper construction, the phrase "its debts and liabilities" in section 74(1) was restricted to provable debts.

167.  First, no right to statutory interest exists outside a liquidation or administration. All other liabilities, including non-provable liabilities, exist or may exist independently of the liquidation. While true, this does not seem to me to advance the position of the other Lehman companies. Like the obligation to pay statutory interest, the obligation of contributories under section 74(1) arises only in a liquidation. I see no good reason why an obligation to contribute which arises only in a liquidation should not extend to obligations to make payments to creditors which arise only in a liquidation. The submission seeks to put a gloss on section 74(1) which is not present either in the wording of the section or in the definition of "liabilities".

168.   Secondly, it was submitted that where the expression "debts and liabilities" or similar expressions are used elsewhere in the IA 1986, they do not include statutory interest. In this context, Mr Isaacs gave a number of examples.

169.   The first examples were sections 95(4), 99 and 131(2) which make provision for statements of affairs in a members' voluntary liquidation, a creditors' voluntary liquidation and a compulsory liquidation respectively. The statements of affairs required by sections 95 and 99 must show, amongst other things, "particulars of the company's assets, debts and liabilities". The first point to note is that there is no express provision restricting these particulars to provable debts. The requirement is to make a statement as to the affairs of the company, and in principle its affairs will extend to its debts and liabilities which are not provable as well as to those which are provable. Even though not provable, they are liabilities of the company and are payable if there are funds available to do so. Mr Isaacs submitted that statutory interest could not be included in these statements of affairs, for two reasons. First, it would require an assumption that a company which is insolvent would be able to pay its proved debts in full and, secondly, it would require matters to be known which could not possibly be known, such as the amount of the surplus and the length of time before proved debts were paid. I am bound to say that I do not consider that much light will be shed on section 74 by whether or not statutory interest is usually or can be included in these statements of affairs. Having said that, I cannot see that the fact that there may not be funds available to pay any statutory interest means that no provision for it could or should be made. Provision will be made for the full amount of provable debts, and I would suggest non-provable liabilities, notwithstanding that there may be insufficient funds to pay all of the former or any of the latter. As to the amount of statutory interest being incapable of calculation, while this is true, it is not impossible to make a provision, just as provisions would need to be made for contingent liabilities. It may further be noted that the requirement imposed by section 95 to prepare a statement of affairs arises "where the liquidator is of the opinion that the company will be unable to pay its debts in full (together with interest at the official rate)" within the year after the commencement of a members' voluntary winding up. It may be the inability to pay statutory interest in full which triggers the requirement for a statement of affairs.

170.   The second provision relied on was section 123 which deals with the inability of a company to pay its debts for the purposes of the jurisdiction of the court to wind up the company. Mr Isaacs relied in particular on section 123(2) which provides that a company is deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of its assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities. He accepted that future contractual interest might be included for these purposes, but he submitted that it could not include statutory interest. I entirely agree with this proposition. A creditor clearly cannot rely on the inability of the company to pay a liability which arises only in a liquidation for asserting the insolvency of the company for the purposes of obtaining an order to wind up the company. This does not, however, shed light on the extent of the obligation imposed by section 74(1) which itself only arises in the liquidation.

171.   Thirdly, Mr Isaacs relied on section 214(6). Section 214 imposes liability on directors and others for wrongful trading. It applies where a company has gone into insolvent liquidation and the respondent knew or ought to have concluded that there was no

reasonable prospect that it would avoid going into insolvent liquidation. Section 214(6) provides that for the purposes of the section a company goes into insolvent liquidation if it does so "at a time when its assets are insufficient for the payment of its debts and other liabilities and the expenses of the winding up." I do not think that this assists Mr Isaacs' submission. First, as Mr Trower submitted, the reference to "its debts and other liabilities" suggests that it is intended to include non-provable liabilities. In any event, I can see no good reason why non-provable liabilities should not be taken into account for the purposes of applying this sub-section. Further, a company will avoid going into creditors' voluntary winding up, rather than members' voluntary winding up, only if the directors are able to declare that the company will be able to pay its debts in full together with statutory interest.

172.     Fourthly, Mr Isaacs relied on section 272 which sets out the grounds on which a debtor may present his own bankruptcy petition. The only grounds are inability to pay debts and the petition must be accompanied by a statement of the debtor's affairs containing, amongst other things, prescribed particulars of "his debts and other liabilities". However, there is no reason to consider that "other liabilities" is restricted to provable debts. On the contrary, a debtor's inability to pay his debts is as much established when he can show that he is unable to pay his debts, whether provable or un-provable, as well as in those circumstances where he is unable to pay only his provable debts.

173.     Reference to these various statutory provisions does not, in my judgment, establish or suggest that the liability under section 74(1) is restricted to provable debts. In some instances, these sections tend to suggest the contrary.

174.     Mr Isaacs relied on four provisions as showing that, where it was intended to include statutory interest, express reference was made. The provisions in question are section 89(1), section 149(3), section 215(4) and rule 12.3(2A). In none of these provisions, however, is reference made to interest or statutory interest in addition to the phrase "debts and liabilities". They are all cases where the reference is either to "debts" or to what are clearly claims by creditors in respect of provable debts.

175.     Overall, I consider that Mr Trower is correct in his submission that where the legislation refers to "liabilities" instead of or in addition to "debts", it does so because a reference only to provable debts would not be appropriate.

176.     Mr Isaacs repeated in this context the submissions he had made in the context of the subordinated loan agreements that the expression "debts and liabilities" could not be read literally, because of the provisions relating to future debts, contingent liabilities and non-provable liabilities. I reject these submissions for the same reasons as earlier given in relation to the subordinated loan agreements.

177.     As a final submission, assuming his prior submissions were wrong, Mr Isaacs submitted that LBIE could not claim against LBHI2 for statutory interest in respect of any period after the commencement of LBHI2's administration. He submitted that it would be contrary to rule 2.88(1) which has the effect that, where a debt proved in an administration bears interest, the interest is not provable as part of the debt in respect of any period after the commencement of the administration. I do not accept this submission. Rule 2.88(1) is concerned with claims for principal plus interest. A claim for a contribution under section 74 is not such a claim but is a single claim for the

amount due under section 74. It is nothing to the point that a constituent element of the claim is statutory interest payable in the liquidation of LBIE. Mr Isaacs relied on the decision in *In re International Contract Company, Hughes' Claim* (1872) LR 13 Eq 623. A nominee shareholder lodged a proof in the liquidation of the beneficial owner of the shares for an indemnity against calls on the shares and interest on those calls. The interest had accrued due since the commencement of the winding up of the beneficial owner, and the indemnity was held not to be provable to the extent of such interest by reason of what was then the common law rule that post-liquidation interest was not provable but only payable out of any available surplus. The issue, as Wickens VC saw it, was whether that rule should be extended to the case before him on the grounds that it was analogous to cases falling within the rule but was not actually one of them. He concluded that the rule should be extended to include this analogous case. Now that the rule is enacted in rule 2.88(1), it is the terms of the rule and nothing else which governs the circumstances in which a sum representing interest may be proved. A claim under section 74 is not a claim for interest on a proved debt.

178.   Accordingly, I conclude that members are liable to contribute to the assets for the payment of not only provable debts but also statutory interest and non-provable liabilities.

*The contributory rule*

179.   A series of cases in the nineteenth century, beginning with *In re Overend Gurney & Co; Grissell's Case* (1866) LR 1 Ch App 528 (*Grissell's Case*), established the principle that a person could recover nothing as a creditor of a company until he had discharged all his liability as a contributory. A classic statement of this principle was given by Buckley J in *In re West Coast Gold Fields Ltd* [1905] Ch 597 at 602:

> "*The right view is that the person liable as contributory must discharge himself in that character before he can set up that, as a creditor, he is entitled to receive anything and a fortiori, as it seems to me, before he can set up that, as a contributory, he is entitled to receive anything.*"

His decision was upheld by the Court of Appeal: [1906] 1 Ch 1.

180.   This principle was conveniently referred to in the course of submissions as "the contributory rule" and I will use the same description in this judgment.

181.   The passage from the judgment of Buckley J was cited by Lord Walker in *Re Kaupthing* at [20], in his discussion of this principle by way of analogy with the issue arising for decision in that case. Referring further to this principle, Lord Walker said at [52]:

> "*The situation in this line of authority is that a shareholder is a creditor of an insolvent company, but his shares are not fully paid up, so that he is liable as a contributory. Suppose he has 10,000 £1 shares, 10p paid, and is owed £15,000, but the dividend prospectively payable is only 30p in the pound. If the liquidator calls on him for £9,000 to make his shares fully paid up, he has no right of set-off, and to that extent he is*

> *disadvantaged (that is In re Auriferous Properties Ltd [1898] 1
> Ch 691). If he seeks to prove in the liquidation, the liquidator
> can rely on the equitable rule as it applies in a case of this sort
> – that is, that he can receive nothing until he has paid
> everything that he owes as a contributory. That is In re
> Auriferous Properties Ltd (No 2) [1898] 2 Ch 428. The rule is
> also very clearly stated by Buckley J in In re West Coast Gold
> Fields Ltd [1905] 1 Ch 597, 602 (affirmed [1906] 1 Ch 1, and
> cited in paragraph 20 above). Payment of the call is a
> condition precedent to the shareholder's participation in any
> distribution, and again the shareholder is to that extent
> disadvantaged."*

182.    The issue in *Re Kaupthing* was whether the rule against double proof took priority
over and excluded the equitable rule, commonly known as the rule in *Cherry v
Boultbee*. The Supreme Court held that, just as the principle established in *Grissell's
Case* takes priority over the rule in *Cherry v Boultbee*, so too does the rule against
double proof. The contributory rule was developed by the courts on the basis of the
statutory provisions relating to the liability of contributories. It is a rule dictated by
the nature and the purpose of the obligation imposed on contributories by the
legislation in a winding up. It may bear some relation to the rule in *Cherry v Boultbee*
but, as the decision in *Re Kaupthing* makes clear, it is in important respects distinct
from it.

183.    In *Re Kaupthing*, Lord Walker described the rule in *Cherry v Boultbee* at [8] as:

> *"...basically a simple technique of netting-off reciprocal
> monetary obligations, even where there is no room for legal
> set-off, developed and used by masters in the Court of
> Chancery giving directions for the administration of the estates
> of deceased persons."*

It produces a netting-off effect that is similar to set-off and applies in circumstances
where set-off itself is not applicable, because there is not the necessary similarity in
claims. The rule applies to net off a person's claim as a beneficiary of an estate
against the estate's claim against him as a debtor. Lord Walker cited at [13] the
statement of the rule by Kekewich J in *In re Akerman* [1891] 3 Ch 212 at 219:

> *"A person who owes an estate money, that is to say, who is
> bound to increase the general mass of the estate by a
> contribution of his own, cannot claim an aliquot share given to
> him out of that mass without first making the contribution
> which completes it. Nothing is in truth retained by the
> representative of the estate; nothing is in strict language set-
> off; but the contributor is paid by holding in his own hand a
> part of the mass, which, if the mass were completed, he would
> receive back."*

184.    It is common ground that if LBIE went into liquidation and if the liquidator were to
make calls on LBHI2 and LBL, those companies would be unable to make any claim
as creditors in the liquidation, whether in respect of unsubordinated or subordinated

claims, until they had discharged in full their liability as contributories. The issue in this case is whether the same principle applies before a call is made and, specifically, while a company is in administration but after the administrators have given notice of an intention to make distributions.

185.    Mr Trower submits that the contributory rule is a firmly established rule to protect the position of those entitled as creditors to a distribution out of a company's assets. It prevents a contributory from claiming or proving in competition with them, until such time as he has discharged his obligations to contribute to the full extent of his liability. He points out that a distributing administration, as much as a liquidation, involves a pari passu distribution among creditors and involves the protection of the interests of all creditors, including those whose debts may not be provable. A distributing administration, like a liquidation, may end with the dissolution of the company. In these circumstances, it is, he says, entirely adventitious from the perspective of the members of LBIE that it happens to be in administration, rather than liquidation. It is in administration, rather than liquidation, because the joint administrators consider that it continues to be in the best interests of the estate as a whole that it should remain in administration, and the court has endorsed that view. In these circumstances, he submits that it is very difficult to see any sensible policy reason why the contributory should be able to prove in an administration but not in a liquidation. The mischief which the rule prevents, that of removing from the creditors all or part of the fund which should be available to pay their debts, is present equally in an administration and a liquidation.

186.    Mr Trower submits therefore that the contributory rule applies once an administrator gives notice of an intended distribution. It applies to any member who is subject to a potential liability under section 74 if the company were wound up and who seeks to prove in the administration. If the company is limited by shares and there is unpaid capital on shares, the company in most cases has its contractual right to make calls while still a going concern. An administrator succeeds to the authority of the directors to make such calls. Whether the contributory could in those circumstances set off his liability to pay the calls against any liability of the company to him as a creditor is a question which does not arise for decision on this application. The issue on this application arises in circumstances where the liability of the member is exclusively the statutory liability imposed on a member as a contributory in a liquidation.

187.    Mr Trower of course accepts that no call can be made on LBHI2 or LBL while LBIE remains in administration. The power arises only in a liquidation. He submits that the absence of any provision for calls in an administration should not prevent the courts from developing the contributory rule so as to apply in an administration, in order to protect the very interests which it exists to protect in a liquidation. The rule should be developed to meet the changes in insolvency procedures made by the introduction of administrations, and in particular the power to wind up the affairs of the company and to distribute the proceeds of realisations of assets among creditors in an administration.

188.    The fundamental difficulty in applying the contributory rule in an administration is precisely because there is no statutory mechanism for making calls on contributories in an administration. While LBIE remains in administration, there can be no calls and therefore nothing that LBHI2 and LBL as members could do to put themselves in a position where they could prove as creditors in respect of their subordinated and

unsubordinated claims. Yet this would be the result of applying the contributory rule to a company in administration. It is no answer to say, as Mr Trower does, that in this case LBHI2 and LBL would be unable by virtue of their own insolvency to meet any calls. The rule, if it is to apply, must apply equally to solvent and insolvent contributories. If the affairs of LBIE are fully wound up in the course of its distributing administration, culminating in the dissolution of the company without a liquidation, LBHI2 and LBL, even if they were fully solvent, would have no opportunity of participating as creditors in any distribution. It might be that this effect could be mitigated by a retention by the administrators of sufficient funds to pay dividends on the proofs by LBHI2 and LBL as creditors, and to pay such dividends to them as and when it became clear that no liquidation would follow. There is however no legislative mechanism or justification for adopting such a procedure. In my judgment, if it was contemplated or intended that the contributory rule should apply in a distributing administration, either administrators would have been given the same power to make calls as liquidators or provisions of the sort just mentioned would have been spelt out in the legislation.

189.   Mr Zacaroli submitted that the absence of an equivalent provision to section 74 for a company in administration appeared to be the result of an oversight rather than a deliberate policy decision. It is not particularly useful to speculate why no provision has been made for calls in an administration, but I would be surprised if it were an oversight. It may be that it was considered that there were so few companies where calls on members could be called only in a liquidation that it was not thought worthwhile to include the elaborate provisions which apply in a liquidation. The view may have been taken that, for those few cases where this was a live issue, the company could proceed to liquidation, rather than remaining in a distributing administration. This is simply speculation on my part. The important point is that there is no provision for calls to be made by administrators of the sort provided in section 74(1).

190.   There is no case in which the contributory rule has been invoked except in relation to calls already made by the liquidator. If Mr Trower's submissions were well-founded, it would follow that the rule could be relied on in the period between the commencement of the liquidation and the making of any call. In *Grissell's Case*, the issue was whether, in the case of a contributory who was also a creditor, there should be set-off for "so much of his debt as is equal to the amount of calls which have been made upon, but not paid by, him" (p.534). Lord Chelmsford LC, sitting with Knight Bruce LJ and Turner LJ, held that there could be no such set-off. Lord Chelmsford said at p.536:

> *"Taking the Act as a whole, the call is to come into the assets of the company, to be applied with the other assets in payment of debts. To allow a set-off against the call would be contrary to the whole scope of the Act. In support of this view it will be sufficient to refer again to the 133rd section as to the satisfaction of the liabilities of the company pari passu. And the argument against the allowance of a set-off, addressed to the Court on behalf of the official liquidators, is extremely strong – that if a debt due from the company to one of its members should happen to be exactly equal to the call made upon him,*

> *he would in this way be paid 20 shillings in the pound upon his debt, while the other creditors might, perhaps, receive a small dividend, or even nothing at all.*"

Lord Chelmsford added that it necessarily followed that "the amount of such call must be paid before there can be any right to receive a dividend with the other creditors."

191.    The shares in *Grissell's Case* had a nominal value of £50 each, on each of which £15 had been paid up before the commencement of the liquidation. The liquidators made a call of £10 per share and this was the call which was in issue. This left £25 uncalled on each share. There was no issue whether payment of a dividend on the contributory's claim as a creditor should be deferred until either a call was made in respect of the uncalled capital or until it became clear that no such call would be made. Lord Chelmsford did however address this issue at p.535:

> "*In the first place, I think that they cannot be required to pay up the full amount remaining unpaid upon their shares. The 75th section of the Act enacts, that the liability of any person to contribute to the assets of a company, in the event of it being wound up, "shall be deemed to create a debt accruing due from such person at the time when his liability commenced, but payable at the time or respective times when calls are made as herein after mentioned for enforcing such liability." Until the call is made, there is nothing more than a liability to contribute. This, indeed, creates a debt, but the debt does not accrue due until the call is made. The power to make calls is only to satisfy the debts and liabilities of the company, and the costs, charges, and expenses of winding it up, and for the adjustment of the rights of the contributories amongst themselves. But if the whole of the amount unpaid upon the shares were required to be paid up, more might be raised than would be requisite for these purposes, and it might be that a contributory thus paying in advance might lose all that he had so paid in the event any of his own contributories becoming insolvent.*"

In the concluding paragraph of his judgment at pp.536-537 he said:

> "*The amount of the call being paid, the member of the company stands exactly on the footing of the other creditors with respect to a dividend upon the debt due to him from the company. The dividend will be of course on the whole debt, and the member of the company will from time to time, when dividends are declared, receive them in like manner when either no call has been made, or, having been made, when he has paid the amount of it.*"

192.    It is clear from the judgment of Buckley J in *In re West Coast Gold Fields Ltd* that he understood the effect of *Grissell's Case* to be that a contributory could not receive any payment out of the estate as a creditor until he had satisfied "all his obligations as a

shareholder and contributory, by paying into the common fund all sums due from him in respect of calls" (p.600).

193. The position as regards the rule in *Cherry v Boultbee* is the same. It is well-established that the rule does not apply where the debt to the estate is not presently payable, even if it is a future debt that will become payable. It was held in *In re Abrahams* [1908] 2 Ch 69 that a beneficiary who owed a debt payable by instalments to the estate was entitled to receive his share of the residue immediately and that the executors were not entitled to retain it as against the future instalments. Mr Trower placed some reliance on the decision of Swinfen Eady J in *In re Rhodesia Goldfields Ltd* [1910] 1 Ch 239. The decision and reasoning in that case is, however, consistent with *In re Abrahams*. The amount of the debt due from the beneficiary to the fund had not been established or ascertained but there was no dispute that, if an amount was due, it was presently payable. In those circumstances it was held that, pending ascertainment of the amount if any due, the share of the fund for which payment was sought should be retained. The decision in *In re Abrahams* was stated to be correct by Lord Walker in *Re Kaupthing* at [45].

194. I conclude therefore that neither the contributory rule nor the rule in *Cherry v Boultbee* has any application in an administration of an insolvent company. The administrator is not permitted to refuse to admit a proof of debt by a member or to refuse to pay dividends on such proof on the grounds that, if the company went into liquidation, the member would or might become liable to calls under section 74(1).

*Proof in the administration or liquidation of a member in respect of a contingent liability for calls*

195. It is not in dispute that, if a liquidator has made calls in respect of the liability under section 74(1), he may prove for the amount of such calls in the liquidation, administration or bankruptcy of the contributory. The call creates a presently payable debt and there is no reason why it should not form the subject of a proof. Paragraph 8 of schedule 4 to the IA 1986 expressly gives power to a liquidator to prove in the bankruptcy or insolvency of any contributory for any balance against his estate. The issue is whether a proof may be lodged by an administrator of a company in the insolvency of a member in respect of a contingent liability under section 74(1), which is contingent on the company going into liquidation and on calls being made by the liquidator. The administrators of neither LBHI2 nor LBL have yet given notice of an intention to declare dividends, but the issue will become live if the administrators of either or both of those companies give such notices.

196. It is, in my judgment, clear that the contingent liability of a member to pay calls which may be made in a future winding up of the company satisfies the general characteristics necessary for a provable debt in the insolvency of the member. I have earlier referred to the authorities which establish that such liability commences with the contract by which he became a member. In the case of a corporate member, there is no difficulty in applying the definition of "debts" in rule 13.12(1) to this liability. It is a "debt or liability to which the company may become subject after [the date on which the company went into liquidation or prior administration] by reason of any obligation incurred before that date": rule 13.12(1)(b). In view of the contractual basis of the obligation, giving rise to the statutory liability, this would be the case even before the decision of the Supreme Court in *Re Nortel*. There can be no room for

doubt on this conclusion, given the very broad meaning given to that provision by the Supreme Court.

197.    In *Re Nortel*, Lord Neuberger said at [75]:

> "*Where a liability arises after the insolvency event as a result of a contract entered into by a company, there is no real problem. The contract, insofar as it imposes any actual or contingent liabilities on the company, can fairly be said to impose the incurred obligation. Accordingly, in such a case the question whether the liability falls within paragraph (b) will depend on whether the contract was entered into before or after the insolvency event.*"

This paragraph largely, but not completely, covers the present case. The statutory liability commences with the contract of membership but the liability is not imposed by the contract, but by the statute.

198.    Lord Neuberger went on to consider the case of obligations arising other than under a contract. He said at [76]:

> "*Where the liability arises other than under a contract, the position is not necessarily so straightforward. There can be no doubt but that an arrangement other than a contractual one can give rise to an "obligation" for the purposes of paragraph (b). That seems to follow from rule 13.12(4).*"

199.    At [77] Lord Neuberger specifically considered statutory liabilities:

> "*However, the mere fact that a company could become under a liability pursuant to a provision in a statute which was enforced before the insolvency event, cannot mean that, where the liability arises after the insolvency event, it falls within rule 13.12(1)(b). It would be dangerous to try and suggest a universally applicable formula, given the many different statutory and other liabilities and obligations which could exist. However, I would suggest that, at least normally, in order for a company to have incurred a relevant "obligation" under rule 13.12(1)(b), it must have taken, or been subjected to, some step or combination of steps which (a) had some legal effect (such as putting it under some legal duty or into some legal relationship), and which (b) resulted in it being vulnerable to the specific liability in question, such that there would be a real prospect of that liability being incurred. If these two requirements are satisfied, it is also, I think, relevant to consider (c) whether it would be consistent with the regime under which the liability is imposed to conclude that the step or combination of steps gave rise to an obligation under rule 13.12(1)(b).*"

200.    There can in my view be no doubt at all that the liability of a member to calls under the statute in a winding up satisfies requirements (a) and (b) set out by Lord Neuberger. The issue is therefore whether the requirement in (c) is satisfied.

201.    Mr Wolfson submitted that for two reasons the administrators of LBIE cannot seek to prove in an administration or liquidation of LBL.

202.    First, Mr Wolfson relied on the provisions of section 82 of the IA 1986, expressly permitting a proof in respect of future calls in the bankruptcy of an individual debtor. He submitted that the presence of these express provisions and the absence of any equivalent provisions permitting proof in the administration or liquidation of a corporate member showed that proof for a liability to future calls was incapable of proof in the latter. I reject this submission for the reasons already given when earlier discussing this section. The particular incidents of personal bankruptcy made it necessary to introduce these express provisions. Their purpose is not to create a right of proof in a personal bankruptcy which is not present in a corporate insolvency.

203.    Secondly, Mr Wolfson submitted that administrators have no power to prove in respect of a contingent liability for calls. He relied on paragraph 8 of schedule 4 to the IA 1986 to which I have already referred, conferring an express power on a liquidator to prove in the bankruptcy or insolvency of a contributory, and the absence of any equivalent power for an administrator, as showing that administrators had no such power and as further showing that there was no provable liability until a call was made.

204.    This submission appears to involve two points. The first, more general, point is that only calls which have been made can be the subject of a proof. It follows that even in a liquidation, the liquidator could not lodge a proof in the insolvency of a contributory until a call had been made and then only for the amount of the call. I do not see how this point can be spelt out of the power conferred expressly by paragraph 8 of schedule 4. It cannot, by an implication which is not by any means necessary, displace the effect of rule 13.12, as interpreted by the Supreme Court in *Re Nortel*. Support for the proposition that a contingent liability to pay calls is not capable of proof must be found elsewhere.

205.    The second, narrower, point is that an administrator lacks power to submit a proof in the insolvency of a contributory, by reason of the absence of an express power, in contrast to the power expressly conferred on a liquidator. The first point to make here is that, if a contingent liability for calls is a provable debt, it is open to a company which is not in administration or liquidation to prove for such liability. It is true that in many cases the only estimate which could be given of such contingent liability is nil, but there would be cases of companies whose solvency was in doubt where it might be appropriate to put an estimate, even a substantial estimate, on the contingent liability. The company, acting by its directors, would not need express statutory authority to lodge a proof in the insolvency of a member.

206.    If that is right of the company before it is in administration, it must also be right of a company in administration. There can be no sense in a regime which deprives the company of this right just at the moment when it is likely to acquire a substantial value. Even in an administration, the power of the company could be exercised by the directors, if necessary with the consent of the administrator under paragraph 64(1) of

schedule B1 to the IA 1986. In my view, the administrator has the necessary power under paragraph 59(1), as being something which is "necessary or expedient for the management of the affairs, business and property of the company." Further, paragraph 20 of schedule 1 to the IA 1986 confers power on an administrator to "rank and claim in the bankruptcy, insolvency, sequestration or liquidation of any person indebted to the company." Mr Wolfson submitted that there was no indebtedness in respect of a call until the call was made, but this simply restates the first proposition that only an actual call can give rise to a provable debt. There can be no doubt that paragraph 20 enables an administrator to claim in the insolvency of any person, which must include a member, for any provable debt, including contingent debts.

207.    Mr Isaacs submitted, supported by Mr Wolfson, that there could be no provable debt before the company went into liquidation because the liability was owed not to the company but to its liquidator. The company therefore had no status as a creditor to submit a proof in respect of calls, whether contingent, future or present. As the creditor was the liquidator, only the liquidator had such status. It was in that sense that paragraph 8 of schedule 4 to the IA 1986 was consistent with there being no provable debt prior to the liquidation of the company.

208.    Mr Isaacs relied on the decision of Sir George Jessel MR in *In re Whitehouse & Co* (1878) 9 Ch D 595. The issue was whether a contributory was entitled to set off a debt due to him from the company against calls made against him both by the company before the commencement of its liquidation and by the liquidator after the commencement of its liquidation. Speaking of the statutory liability to calls made by a liquidator for the purpose of enforcing the liability under section 38 of the Companies Act 1862 (now section 74 of the IA 1986), Sir George Jessel said at pp 599-600:

> "*That is a new liability; he is to contribute; it is a new contribution. It is a mistake to call that a debt due to the company. It is no such thing. It is not, as has been supposed, in any shape or way a debt due to the company, but it is a liability to contribute to the assets of the company; and when we look further into the Act, it will be seen that it is a liability to contribution to be enforced by the liquidator. It is quite true that a call made before the winding up – and in the case before me a call was made before the winding up – is a debt due to the company, but that does not affect this new liability to contribution.*"

He had earlier described the section as giving rise to a "debt due to the liquidator" which could not therefore be the subject of set-off against a debt due from the company.

209.    These observations were disapproved by Cotton LJ and Lindley LJ in *In re Pyle Works* (1889) 44 Ch D 534. The case concerned a mortgage of the uncalled amounts on some partly paid shares and all the present and future property of company. The issue was whether the mortgages extended to the calls to be made by the liquidator in the winding up of the company, so giving the mortgagees priority over the unsecured creditors. The Court of Appeal, affirming the decision at first instance, held that the calls to be made by the liquidator were subject to the mortgages. As regards *In re Whitehouse & Co*, Cotton LJ said at p.575:

> "*Although the decision of the Master of the Rolls was right, yet in my opinion his observations upon the position of the liquidator, as regards a call made in the winding up upon a shareholder who is also a creditor of the company and claims a right to set-off his debt against the call, were, though unintentionally, erroneous; for he disallowed the set-off in that case, not on the true ground put by the Court of Appeal in Black & Co's Case, but on the ground that a call is something that accrues to the liquidator, and is not a sum which is really due to the company, and that the shareholder's debt is a debt due to him from the company and not from the liquidator.*"

The same view was expressed by Lindley LJ at pp 585-586.

210.    Mr Isaacs invited me to say that the views of Sir George Jessel should be preferred. Even if it were open to me to do so, I would not prefer his views to those of Cotton LJ and Lindley LJ, which have not subsequently been doubted.

211.    *In re Pyle Works*, like *In re Whitehouse & Co*, was concerned with a call by a liquidator of amounts unpaid on shares in a limited company. They were therefore calls which could have been made by the directors before the company went into liquidation, but were instead made by the liquidator under his statutory powers. This was remarked on by Cotton LJ and Lindley LJ as relevant to the issue whether the uncalled capital could be the subject of a mortgage created by the company prior to its liquidation. There is in this respect a distinction between such calls and calls which can only be made in a winding up. At p.574, Cotton LJ said:

> "*But it was said that calls which are made after the winding up has commenced are not to be considered as part of the capital of this company. I cannot agree to that. It was argued that the liability to "contribute to the assets of the company", in the 38th section of the Act, is something entirely different from a call made by the directors before the winding up, and that a call made after the winding up has commenced is not to be considered as a call of part of the capital of the company. In my opinion, that view is wrong as regards a case like this. We are considering the case of a call made in the winding up of a limited company – not of a company limited by guarantee nor of an unlimited company. In the case of an unlimited or of a guarantee company, what can be called for in the winding up, may not be, I think is not, considered as part of the capital of the company; but in the case of a limited company, although there is a special provision in section 38, sub-s.4 as to what is to be done when there is a winding up, yet that is merely giving the power to call for that part of the capital of the company which has not been called up.*"

A similar distinction was made by Lindley LJ at p.584. He referred to the moneys which are payable only on a winding up as forming "a statutory fund which only comes into existence when the company is in liquidation".

212.    I do not consider that this distinction can justify the conclusion that, for the purposes of proof in the insolvency of a member, a distinction should be drawn between a liability under section 74(1) of the IA 1986 to pay uncalled capital on shares and a liability under that section of a member of a company limited by guarantee or of an unlimited company. In all cases, the liability stems from the contract of membership and commences with that contract and, in all cases, it constitutes a liability under the section to contribute to the assets of the company in order to fund the payment of its liabilities.

213.    To say that the company is not a creditor in respect of such a contingent liability under section 74, is to say that although there is a liability, before a liquidation, there is no creditor. The consequence would be that the bankruptcy or liquidation of a member could proceed to a conclusion without the possibility of any proof in respect of this liability already undertaken by the member. It would in my view be extraordinary if a liability could be avoided in this way. To suggest, as some counsel did, that this result could be avoided by a company placing itself in liquidation, even though that was both unnecessary and undesirable, does not strike me as an adequate response.

214.    Mr Isaacs relied on Fry J in *Ex parte Branwhite* (1879) 40 LT 652 at 653:

> "*It appears to me to be clear that the liability to contribute to the assets of the company while it is a going concern, and the liability to contribute to the assets of the company when it is being wound up, are separate and distinct liabilities – the one created in effect by the articles of association of the company and the deed of settlement and its registration under the 16th section of the Act; the other arising only in the event of the company being wound up. Those two liabilities appear to me to be very different in their nature. The one requires payment of the amount of the calls to the company, the other requires payment of the amount of the calls to the liquidator or officer of the court; if a voluntary winding up to the liquidator. In the one case the payment must be made according to the discretion of the directors, and in the other not, but under the direction of the court or the voluntary liquidator. One is for the general purposes of the company, and the other is to meet the special demands of the fund created by the statute.*"

In *In re White Star Line Ltd*, the Court of Appeal said that they could see no flaw in the reasoning in this judgment. While obviously accepting the distinct characters of the two liabilities, this passage does not in my judgment justify a conclusion that prior to the liquidation of a company there can be no proof in the insolvency of a member of the contingent liability to meet calls which can only be made in a liquidation.

215.    Mr Isaacs found it difficult to reconcile his submissions with the authorities that establish that the statutory liability, even for calls which can be made only in a winding up, commence with the contract of membership. He submitted that until there is a winding up, the statutory liability has no existence whatsoever, but once there is a winding up "it springs back and it originates from the time when the member becomes a member." He did not accept that there was a statutory liability that existed "in any

meaningful sense" before the commencement of the liquidation. I do not find that a convincing explanation.

216.    Mr Isaacs submitted that, even if conditions (a) and (b) stated in *Re Nortel* at [77] were satisfied, the precondition in (c) would not be satisfied. He submitted that it would not be consistent with the regime under which the liability in section 74(1) is imposed to conclude that an obligation under rule 13.12(1)(b) arises, at any rate prior to the commencement of the liquidation of the company and probably not until a call is actually made. Mr Isaacs relied on three grounds for this submission.

217.    First, he relied on the many provisions to the effect that a call can be made and enforced only by a liquidator under the powers of the court delegated to him by the legislation. Unlike the liability arising on the issue of a contribution notice which was in issue in *Re Nortel*, the liability in issue in this case can arise only in the liquidation of the company. I have addressed this submission when concluding above that the company can properly be regarded as the creditor for the purposes of proof in the insolvency of a member prior to the liquidation of the company.

218.    Secondly, Mr Isaacs relied on the provisions which exist for the protection of contributories when the liquidator settles a list of contributories and makes calls: see rules 4.196, 4.198, 4.199 and 4.202. These protections are not operable in circumstances where the company, whether acting by its directors or an administrator, lodges a proof in the insolvency of a member. I am not persuaded by this. It is true that rule 4.198 enables a person entered on a list of contributories to object, but the trustee or liquidator or administrator of an insolvent member would be entitled to reject a proof. Likewise, I do not follow why any other objections which could arise in the event of a liquidation could not also be taken in considering a proof of debt. Insofar as the member would be entitled to look to other members to share in the liability in the event of calls made in a liquidation, this can be factored into the estimate of the member's contingent liability for the purposes of proof.

219.    Thirdly, Mr Isaacs submitted that there would be some surprising results if a proof for a contingent liability was possible before the company went into liquidation.

220.    It was said, first, that it could involve the imposition of a greater liability than that provided by section 74, because the administrator of the company would use the proceeds of proof in the payment of the costs and expenses of the administration and the payment of its debts and, if the company were then to go into liquidation, further calls could be made by reference to the amount of the costs of the liquidation and the debts requiring payment. As an administrator is the agent of the company, most if not all expenses of the administration are also liabilities of the company, for which a member with unlimited liability will be liable.

221.    Secondly, a past member has no liability to contribute under section 74 if he ceases to be a member for one year or more before the commencement of the winding up. This, it seems to me, would be one of the factors taken into account in estimating the amount of the liability.

222.    Thirdly, if a company in administration could prove in the insolvency of a member, it should also be able to do so before it goes into administration but, said Mr Isaacs, this is an odd result for a company which is not even in any insolvency regime. This no

doubt would mean in many cases that the contingent liability would be estimated to have a value of nil but it does not mean that in principle the liability is incapable of proof.

223.    Fourthly, the member would not be able to take advantage of the rights conferred on it by the legislation in the event of a call in a liquidation, in particular the right to share in any adjustment of the rights as between contributories. Again, this appears to me to be a matter which can be taken account of in estimating the value of the claim, having regard to the amount which the company would be likely to be able to recover from other contributories.

224.    Fifthly, Mr Isaacs relied on the effects of section 82 of the IA 1986, when read with *Martin's Patent Anchor Co Ltd v Morton* (1868) LR 3 QB 306. In that case, a former bankrupt who had received his discharge but retained partly paid shares sought to rely on section 75 of the Companies Act 1862, the predecessor to section 82(4), to argue that he was released from any liability to pay up the shares because a proof could have been lodged in his bankruptcy in respect of future calls. Such a result would, in the words of Blackburn J at p.311 be "a monstrous injustice". It was avoided because what is now section 82(4) applies only where the bankruptcy is still pending when the winding up takes place. Mr Isaacs submitted that it would be strange if there were a different result if the member were a company in administration or liquidation. I do not consider that it would be strange if there were different consequences, in view of the very different circumstances of a distributing administration or liquidation of a company, as opposed to the bankruptcy of an individual. It is the fact that an individual may be discharged from bankruptcy, still holding his partly paid shares, which creates a real difference in circumstances. No such possibility exists in relation to an insolvent company in a distributing administration or liquidation.

225.    In any event, section 82 applies only where the company is itself in liquidation. It has no bearing on whether a company which is not in liquidation may prove for a contingent liability in respect of future calls in the administration or liquidation of a corporate member. It was held in *In re McMahon* [1900] 1 Ch 173 that a company, while a going concern, was entitled to prove in the administration of the insolvent estate of a deceased shareholder for the estimated value of the liability to future calls in respect of the shares registered in the name of the deceased. Accepting that the proof was in respect of a liability in respect of calls which could be made before the company was in liquidation, it nonetheless establishes that there is no restriction on a proof for future calls to those cases where the insolvency of the company and of the contributory are concurrent. It is also worth observing, as did Stirling J in his judgment at p.178, that at the time when section 75 of the Companies Act 1862 was enacted and when *Martin's Patent Anchor Co Ltd v Morton* was decided, the right of proof in a bankruptcy did not generally extend to contingent liabilities. Stirling J regarded section 75 of the Companies Act 1862 as a step by the Legislature towards the widening of the circumstances in which contingent liabilities could be proved, rather than as providing an inference that companies, while going concerns, did not enjoy a right of proof within the terms of the later bankruptcy legislation.

226.    I conclude, therefore, that LBIE, acting by its administrators, is entitled to prove in an administration or liquidation of LBL or LBHI2 for their contingent liability arising in a liquidation of LBIE under section 74(1).

*Set-off in the administration or liquidation of the members*

227. If, as I have held, the administrators or subsequent liquidators of LBIE are entitled to prove in the administration or subsequent liquidation of LBL and LBHI2, the question arises whether, by reason of the mandatory application of insolvency set-off in the administrations or liquidations of LBL and LBHI2, the claims of those companies against LBIE as creditors should be set off against LBIE's claim against them as contributories.

228. Free from any authority, I would conclude that mandatory insolvency set-off applied in these circumstances. It is displaced in the liquidation of the company whose liquidator is making the calls because of the contributory rule. As discussed earlier, the contributory rule prevents a contributory from sharing in a distribution of the estate as a creditor until he contributes the amount which he is liable to pay. This flows from the statutory regime applying to the company in liquidation. The contributory rule, as applied to the liquidation of the company whose liquidator is making calls, has no obvious application in the administrations or liquidations of the contributories. So far as the other persons interested in the winding up of their estates, the creditors, LBIE is simply another creditor.

229. This has long been established as the position in the bankruptcy of a contributory. The point arose in *In re Duckworth* (1867) LR 2 Ch App 578. The debtor was the holder of 100 shares in a company and was also a creditor of that company. The company was ordered to be wound up and six months later the debtor executed a deed of assignment to trustees for the benefit of his creditors which was duly registered under the relevant legislation. The liquidator made a call on the shares and applied to the Court of Bankruptcy for an order that the trustees pay the dividend on this claim due under the deed of assignment. Giving a judgment with which Turner LJ agreed, Lord Cairns LJ held that the bankruptcy of the contributory was subject to the bankruptcy statutes. The contributory rule, as laid down in *Grissell's Case* decided only nine months earlier, had no application. *Grissell's Case* would, of course, apply in the liquidation of the company if the debtor's trustees had sought to prove his debt in that liquidation. This decision was taken as correct by the Court of Appeal in *In re G.E.B, a Debtor* [1903] 2 KB 340 (see, for example, Romer LJ at p.352) and it has never been doubted. I find it difficult to see why the same reasoning would not apply in the liquidation of a corporate contributory.

230. However, Wright J held in *In re Auriferous Properties Ltd (No 1)* [1898] 1 Ch 691 (*Re Auriferous (No 1)*) that the liquidator of the company was entitled to prove in the winding up of a corporate contributory for the whole amount due by way of calls on the shares without set-off. The liquidator of the corporate contributory could prove in the winding up of the company for a debt due to the corporate contributory, but could receive no dividends in respect of such proof until the full amount of the calls had been paid. The requirement to pay calls in full before receiving a dividend on the proof in the liquidation of the company was decided by Wright J in *In re Auriferous Properties Ltd (No 2)* [1898] 2 Ch 428, on a straightforward application of *Grissell's Case*. Mr Wolfson submitted that *Re Auriferous (No 1)* was wrongly decided and should not be followed. Mr Trower submitted that it was correctly decided and that it is *In re Duckworth* which is anomalous. Mr Trower pointed out that *Re Auriferous (No 1)* was cited by Lord Walker in the passage at [52] in *Re Kaupthing* which I have earlier set out.

231.    It is necessary therefore to look with some care at the judgment of Wright J in *Re Auriferous (No 1)*. The facts were that African Gold Properties Ltd (the Gold Company) held shares in Auriferous Properties Ltd (the Auriferous Company). In January 1896, the Auriferous Company became indebted to the Gold Company in the sum of £2,775. Two calls were made by the directors of the Auriferous Company in January and June 1896, making the Gold Company liable in the sum of £1,250. In December 1896, the Auriferous Company was wound up by order of the court. In January 1898 the Gold Company went into creditors' voluntary winding up. The Gold Company lodged a proof for its debt in the winding up of the Auriferous Company. Acting by its liquidator, it issued a summons in the winding up of the Auriferous Company, raising for decision the question whether the debt owing to it by the Auriferous Company could be set off by the calls due by it to the Auriferous Company. The summons was subsequently amended by also being entitled in the matter of the winding up of the Gold Company.

232.    When reading the report, I was initially puzzled as to whether the issue raised by the liquidator of the Gold Company related to the winding up of the Auriferous Company, rather than the winding up of the Gold Company. Taking out the summons in the winding up of the Auriferous Company suggested that it was this question which was being raised. Although much of the argument of counsel for both parties is at least ambiguous on this, it is clear from the last sentence of the report of the argument of counsel for the Gold Company and from the terms of the judgment of Wright J, particularly at p. 697, that the question did indeed relate to the winding up of the Gold Company.

233.    At the start of his judgment at p. 696, Wright J observed that if the Gold Company had not been in liquidation it could not have set off its claim for money lent against its liability for the amount of the call. He referred to *Grissell's Case* and continued:

> "*The ground of the rule is that all contributions from shareholders enforceable in the liquidation are by the Companies Acts made applicable for the payment of the company's creditors pari passu...and that a person who is a creditor and also a contributory cannot be allowed to do what might amount to paying his own claim in full out of a fund which ought to be distributed rateably...*"

He continued by observing that the amount due in respect of the calls was enforceable by the liquidator of the Auriferous Company by a balance order as a contribution to be made in the winding up of the Auriferous Company and could not be the subject of set-off. The judgment thus far focused on what would happen in the winding up of the Auriferous Company.

234.    Wright J continued by saying that "in the present case it happens that the Gold Company is also in liquidation, and the question is, What is the effect of this?" He then summarised the effect of *In re Duckworth*:

> "*If the Gold Company had been a bankrupt individual instead of being a company in liquidation, the liquidator of the Auriferous Company must have enforced his claim in the bankruptcy and according to bankruptcy law, which even*"

> *before and apart from the Judicature Act would have allowed the set-off.*"

235.    He continued that in the case before him the creditor-contributory was not a bankrupt individual but a company in liquidation and "therefore, the particular ground on which *In re Duckworth* was decided is not applicable." He said that it was not therefore the bankruptcy legislation which applied, but the Companies Acts as administered in the Chancery Division. He continued:

> "*And the simple question is whether s. 10 of the Judicature Act, 1875, has introduced into the law of the winding-up of companies the bankruptcy rules as to set-ff, so as to allow a set-off against liability for the amount of unpaid calls in the case of a company constituted with limited liability. It seems to me that this question is decided in effect in the negative by Gill's Case, which was cited with approval in the Court of Appeal in In re Washington Diamond Mining Co.; and that the liquidator of the Auriferous Company is entitled to prove in the winding-up of the Gold Company for the whole amount still due upon the shares, leaving the liquidator of the Gold Company to his right of proof in the winding-up of the Auriferous Company for the money lent. It is true that in Gill's Case the creditor-contributory was not a company in liquidation, but that circumstance does not prevent it from being in point as a decision that the bankruptcy law of set-off is not imported by the Judicature Act into the law of companies so as to allow a set-off against calls; though for other purposes there may be the same right as in bankruptcy (see in Ex parte Theys) to a set-off of cross-claims as existing at the time of the bankruptcy. In re Duckworth has, therefore, no application.*"

236.    As appears from that passage, it was reliance on the decision in *In re General Works Co, Gill's Case* (1879) 12 Ch D 755 which led Wright J to hold that there could be no set-off, not only in the liquidation of the company but also in the liquidation of the corporate contributory. In this way he distinguished the position of an individual contributory in bankruptcy.

237.    In *Gill's Case*, Mr Gill had obtained a judgment for £501 against the General Works Company Limited before it was wound up by order of the court. Mr Gill was the holder of unpaid shares, on which a call was made by the liquidator giving rise to a liability on his part of £220. Mr Gill claimed the right to set off his debt of £501 against the call and to prove in the winding up for the balance. The liquidator issued a summons to enforce payment of the call which Mr Gill defended on the basis of the right to set-off which he claimed. Bacon V.C. decided the case on a straightforward application of *Grissell's Case*. He said at p.757:

> "*The law vests in the liquidator the control of all the assets of the company, and the assets of the company in this case consist of, amongst others, a sum which Mr. Gill undertook to contribute to the assets of the company, whatever might happen. Though he has become a creditor, he must permit the*

> *assets to be realised, including the calls on him. Even if he has obtained a judgment against the company, he can not levy any execution under it so as to get at assets in the hands of the official liquidator....Mr. Gill is nothing better than a partner in a concern which has become insolvent, and if I were to adopt his contention, the result would be to allow one creditor only to recover 20s. in the pound, while all the other creditors had to be satisfied with little or nothing.*"

238.    I do not see how the decision in *Gill's Case* can assist in the conclusion that there is no set-off in the liquidation of a corporate contributory. It was concerned with the winding up of the company, not the corporate contributory. After the passage in his judgment at p.697 which I have cited above, Wright J continued that the view which he took "seems to be consistent with all the decisions on section 101 of the Act of 1862 since the Judicature Act" and he cited *Ex parte Pelly* (1882) 21 Ch D 492 at 509 and *In re Pyle Works* per Lindley LJ. Those cases support the application of *Grissell's Case* to the liquidation of the company making the calls. Neither case is concerned with the position as regards set-off in the liquidation of a corporate contributory and I am not aware of any other case before *Re Auriferous (No 1)* which dealt with that point.

239.    What is the effect of the citation of *Re Auriferous (No 1)* by Lord Walker at [52] in *Re Kaupthing*? The first point to note is that Lord Walker was not concerned to examine the position which would apply in the liquidation of a corporate contributory. He was concerned with the application of the contributory rule in the liquidation of the company in which the calls were made. At the start of [52], Lord Walker instanced the case of a shareholder with partly paid shares who is also a creditor of the insolvent company. He cited *Re Auriferous (No 1)* as authority for this proposition:

> "*Suppose he has 10,000 £1 shares, 10p paid, and is owed £15,000, but the dividend prospectively payable is only 30p in the pound. If the liquidator calls on him for £9,000 to make his shares fully paid up, he has no right of set-off, and to that extent he is disadvantaged.* "

He went on to cite *Re Auriferous (No 2)* as authority for the proposition that if the creditor-contributory seeks to prove in the liquidation, the liquidator can rely on the contributory rule so that the creditor-contributory can receive nothing until he has paid everything that he owes as a contributory.

240.    It seems to me clear that Lord Walker is dealing with two closely related but separate issues. The first is the unavailability of set-off, and the second is the requirement for the creditor-contributory to pay everything he owes as a contributory before he can receive anything as a creditor. Both issues relate to the position in the liquidation of the company, not the contributory. The entire first page of the judgment of Wright J in *Re Auriferous (No 1)* supports that first proposition as it applies to the liquidation of the company making the calls. Lord Walker was not concerned with the position in the liquidation of a corporate contributory and there is certainly no indication that any argument was advanced to the Supreme Court as to the position in those circumstances and as to whether *Re Auriferous (No 1)* was correctly decided. I

conclude that the citation by Lord Walker of *Re Auriferous (No 1)* does not amount to an endorsement of the actual decision in that case.

241.  My clear view is that *Re Auriferous (No 1)* was wrongly decided. In my judgment, it seeks to apply the principle in *Grissell's Case* to the wrong liquidation and it wrongly seeks to distinguish the position in the bankruptcy of an individual contributory, as held by the Court of Appeal in *In re Duckworth*. I note that the view is taken in *Derham on the Law of Set-off* (4th ed) that *Re Auriferous (No 1)* is questionable: see paras 8.74 and 11.09 (fn 36). I appreciate of course that the decision is 114 years old, but it is in an area of the law which has lain dormant for all but 20 years of that period. It has never been approved by a higher court nor, so far as I am aware, applied in any other case.

242.  My conclusion is, therefore, that in the administration or liquidation of LBHI2 or LBL set-off will apply between any claim by LBIE for an actual or contingent liability under section 74(1) and those companies' claims against LBIE.

*Set-off in the administration of LBIE*

243.  If, as I have held, the contributory rule does not apply outside a liquidation and therefore does not apply in the administration of LBIE, the question arises whether insolvency set-off applies in the administration of LBIE between the claims of LBL and LBHI2 admitted to proof and the contingent claim of LBIE to calls which may be made in a subsequent liquidation of LBIE. I have held that such contingent claims exist and may be the subject of proof and set-off in the administrations or liquidations of LBL and LBHI2. As there are therefore cross-claims between LBIE on the one hand and its members on the other, it would follow that the mandatory insolvency set-off applicable in a distributing administration by virtue of rule 2.85 would apply.

244.  The question is therefore whether, given the particular characteristics of a liability to pay calls, there are reasons of principle or policy to displace the application of set-off, just as the contributory rule displaces set-off in a liquidation. Mr Wolfson submits that, as there can be no set-off in a liquidation of an actual liability to pay calls against a debt due to the company due to the contributory, it follows that there cannot in an administration be a set-off of the contingent claim in respect of a possible call in a future liquidation against debts due by the company to the member. He submitted that the effect of set-off was to discharge the relevant liabilities to the extent of the set-off, so reducing or eliminating the liability of the member to pay calls in a future liquidation. He submitted that such a reduction or elimination would be contrary to the contributory rule as set out in *Grissell's Case* and subsequent cases, because it would mean that the members received either full payment or a greater payment in respect of their debts than other creditors and that the company was deprived, in a subsequent liquidation, of its right to obtain contributions for the purposes of making distributions among creditors.

245.  These submissions have a number of notable features. First, as Mr Wolfson I think later accepted, the effect of a set-off of a contingent liability is not to discharge the actual liability should the contingency occur. A contingent claim is admitted to proof in an estimated amount. To the extent of that amount, a payment or set-off will discharge the underlying liability. But if the chances of the contingency occurring subsequently increase or if the contingency in fact occurs, the rules provide for the

estimate to be increased, if appropriate to the full amount. Set-off against a contingent claim in respect of future calls may therefore reduce the amount which may be recovered in respect of those calls but it will not eliminate it. Secondly, this takes no account of the particular circumstance in this case that the liability of the members is unlimited. I return to this point below. Thirdly, as Mr Trower submitted, the effect of Mr Wolfson's reliance on the contributory rule was to turn it on its head. The purpose of the contributory rule is to protect creditors, so that contributories must pay the amount due from them to constitute the fund for distribution among creditors before they are entitled to participate in the distribution themselves as creditors. Reliance on this principle to enable a member with a potential liability to pay calls to prove for the full amount of his claim as a creditor in an administration without set-off is a curious application of the rule and a curious way in which to protect the interests of the other creditors.

246.    The only basis on which it might be argued that mandatory set-off in an administration should be displaced would be that the set-off reduced or extinguished the value of the right to make calls in a subsequent liquidation, were it to occur. This is not a result which could follow in the case of an unlimited company. However large the amount of set-off allowed against the member's claim as a creditor in the administration, the member, or his successor in title, would be liable without limit to calls in a subsequent liquidation.

247.    The position as regards a company limited by shares may be more complicated. The liability of the member is limited to the amount unpaid on his shares. Allowing a set-off of a contingent claim in respect of a future call would therefore reduce the amount recoverable on a subsequent call made by a liquidator exercising his statutory powers. There is, however, some unreality about this. The liability of a member to pay up his shares is enforceable by the company under the powers contained in its articles of association before the company goes into liquidation. As I have earlier held, those powers are exercisable directly or indirectly by an administrator, as much as by directors when the company is under their control. The administrator of such a company would therefore be able to call up the amount unpaid on issued shares. Whether a set-off would then be permissible against sums due to the relevant members as creditors is not a matter which I am required to decide on this application. Mr Trower submitted that set-off would not be permissible in those circumstances. If that is right, the concern on which Mr Wolfson based his argument would be met. If, however, set-off were permitted, Mr Wolfson's concerns lack legal foundation. If a set-off is permitted against a present liability to pay calls whether before an administration or in an administration, there can be no obvious objection to permitting a set-off against a contingent liability to pay calls.

248.    Mr Wolfson sought to meet this point by submitting that, in the case of a contributory which goes into administration before the company goes into distributing administration or liquidation, what falls to be brought into account in a set-off is not the full value of the proof against the contributory but rather only the dividend payable in the administration or liquidation of the contributory. LBIE would not therefore be able to claim against LBL for more than the dividend payable in the latter's insolvency on a proof by LBIE in respect of the contingent liability to calls. In support of this submission, Mr Wolfson relied on the authorities cited by Lord Walker at [15]-[19] in *Re Kaupthing* and Lord Walker's analysis of them. Those were all

cases involving individuals who were either liable to a fund to which the rule in *Cherry v Boultbee* applied or were contributories in a company. The right to receive no more than the dividend arose where the individual had died or become bankrupt before the relevant fund was constituted by either a will taking effect or a company going into liquidation. In those circumstances, the person entitled to the benefit of a share in the fund or a share in the company was not the individual but his executor or trustee in bankruptcy and the amount due from them was no more than the dividend payable from the estate of the deceased or bankrupt. No such principle can apply where the contributory or member is a company. In those circumstances there is no change in the ownership of the right to participate in the fund or the share in the company. The set-off which is required is a set-off of the full value of the debts between the relevant parties.

249.    I therefore conclude that in the administration of LBIE, insolvency set-off will apply as between the claims of LBL and LBHI2 as creditors and the contingent claim by LBIE in respect of calls in a possible future liquidation of LBIE. It is, of course, only if the value of such contingent claims are estimated at more than nil that any set-off will occur.

*Summary of conclusions*

250.    My conclusions on the issues dealt with in this judgment are:

i)    The claims of LBHI2 under its subordinated loan agreements with LBIE are subordinated not only to provable debts but also to statutory interest and un-provable liabilities.

ii)    Creditors of LBIE whose contractual or other claims are denominated in a foreign currency are entitled to claim against LBIE for any currency losses suffered by them as a result of a decline in the value of sterling as against the currency of the claim between the date of the commencement of the administration of LBIE and the date or dates of payment or payments of distributions to them in respect of their claims. Such currency conversion claims rank as un-provable liabilities, payable only after the payment in full of all proved debts and statutory interest on those debts.

iii)    If the administration of LBIE is immediately followed by a liquidation, any interest in respect of the period of the administration which has not been paid before the commencement of the liquidation will not be provable as a debt in the liquidation nor will it be payable as statutory interest under either rule 2.88 of the Insolvency Rules or section 189 of the IA 1986.

iv)    Those creditors of LBIE with debts which carry interest by reason of contract, judgment or other reasons unconnected with the administration or liquidation of LBIE will be entitled to claim in a liquidation of LBIE, which immediately follows the administration, for interest which accrued due during the period of the administration, as an un-provable claim against LBIE, payable after the payment in full of all proved debts and statutory interest on such debts.

v)      The obligation of members to contribute under section 74(1) of the IA 1986 extends not only to provide for proved debts but also for statutory interest on those debts and un-provable liabilities.

vi)     The contributory rule (that is, the rule that a contributory of a company in liquidation cannot recover anything in respect of any claims he may have as a creditor until he has fully discharged his obligations as a contributory) applies only in a liquidation. It does not apply in an administration, including the administration of LBIE. The equitable rule in *Cherry v Boultbee* also does not apply.

vii)    LBIE, acting by its administrators, will be entitled to lodge a proof in a distributing administration or a liquidation of either LBL or LBHI2 in respect of those companies' contingent liabilities under section 74(1) of the IA 1986 which may arise if LBIE were to go into liquidation. The valuation of such claims would be a matter of estimation under the provisions of the Insolvency Rules.

viii)   In a distributing administration or liquidation of LBL or LBHI2, the claims of those companies respectively as creditors of LBIE would be the subject of mandatory set-off against the claims of LBIE in respect of those companies' contingent liabilities as contributories. I have reached the conclusion that the decision in *In re Auriferous Properties Limited (No 1)* [1898] 1 Ch 691 was wrong and should not be followed.

ix)     In the administration of LBIE the contingent liabilities of LBL and LBHI2 as contributories will be the subject of mandatory set-off against the admitted proofs of debt of those companies as creditors of LBIE.

251.    I must end by recording my thanks to counsel and their instructing solicitors for the quality of their written and oral submissions and the diligence of their research into important legal issues of complexity and, in some instances, obscurity. I will invite the parties to agree, if possible, a form of order which gives effect to this judgment.