## EXHIBIT D



Neutral Citation Number: [2015] EWCA Civ 485

Case No: A2/2014/1833, 1822,1826 & 1839

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT, CHANCERY DIVISION, COMPANIES COURT**
**MR JUSTICE DAVID RICHARDS**
**7942 AND 7495 OF 2008 AND 429 OF 2009**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 14 May 2015

**Before :**

**LORD JUSTICE MOORE-BICK, VICE PRESIDENT OF THE COURT OF APPEAL**
**LORD JUSTICE LEWISON**
and
**LORD JUSTICE BRIGGS**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **(1) THE JOINT ADMINISTRATORS OF LB HOLDINGS INTERMEDIATE 2 LIMITED (IN ADMINISTRATION)** | **Appellants** |
| **(2) LEHMAN BROTHERS HOLDINGS INC** | |
| **(3) THE JOINT ADMINISTRATORS OF LEHMAN BROTHERS LIMITED (IN ADMINISTRATION)** | |

- and -

| | |
|---|---|
| **(1) ANTHONY VICTOR LOMAS** | **Respondents** |
| **(2) STEVEN ANTHONY PEARSON** | |
| **(3) PAUL DAVID COPLEY** | |
| **(4) RUSSELL DOWNS** | |
| **(5) JULIAN GUY PARR** | |

(in their capacity as Joint Administrators of Lehman Brothers International
(Europe) (In Administration)

**(6) CVI GVI (LUX) MASTER SARL**
(joined by order of Patten LJ dated 2 September 2014)

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr William Trower QC, Mr Daniel Bayfield  & Mr Stephen Robins & Mr
Alexander Riddiford** (instructed by Linklaters LLP) for the LBIE **Joint
Administrators**
**Mr David Wolfson QC, Ms Nehali Shah** (instructed by DLA Piper UK LLP) for the
**The LBL Joint Administrators**
**Mr Richard Snowden QC, Ms Louise Hutton & Ms Rosanna Foskett** (instructed by
Dentons Ukmea LLP) for LBHI2 **Joint Administrators**

**Mr Barry Isaacs QC** (instructed by **Weil, Gotshal & Manges**) for LBHI
**Mr Robin Dicker QC, Mr Richard Fisher & Ms Charlotte Cooke** (instructed by **Freshfields Bruckhaus Deringer LLP**) for CVI GVF (Lux) Master Sarl

Hearing dates : 23rd -27[th] March 2015

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

Lehman Brothers

**Lord Justice Lewison:**

## Introduction and background

1.    The collapse of Lehman Brothers in September 2008 sent shock waves round the financial world. Now it turns out that Lehman Brothers' main trading company in Europe ("LBIE") is able to repay all its external creditors in full. That is the background against which this appeal from David Richards J comes before this court. His judgment is at [2014] EWHC 704 (Ch), [2015] Ch 1. The judge set out the essential factual background clearly and concisely, and there is no need to do more than repeat his description.

2.    LBIE was incorporated on 10 September 1990 under the Companies Act 1985 as a company limited by shares. On 21 December 1992, it was re-registered as an unlimited company. It appears that this step was taken for US tax reasons. Re-registration of LBIE as an unlimited company enabled it to be treated as a branch of its then parent company for US tax purposes, thereby enabling losses in LBIE to be set off against profits in the parent.

3.    The share capital of LBIE consists of 6,273,113,999 ordinary shares of $1 each, 2 million 5% redeemable Class A preference shares of $1000 each, and 5.1 million 5% redeemable Class B shares of £1000 each. All these shares, except for 1 ordinary share, are held by Lehman Brothers Holdings Intermediate 2 Ltd ("LBHI2"). The two classes of preference shares result from capital restructurings of LBIE in 2006 and 2007. The remaining ordinary share is held by Lehman Brothers Ltd ("LBL").

4.    The sole function of LBHI2 was to act as the immediate holding company of LBIE.

5.    LBL was the service company for the operations of the group in the UK, Europe and the Middle East, and, as regards companies based in the UK, was the principal employer, seconding employees to other companies within the group, maintained the IT systems and was the lessee of many of the group's premises. It became a shareholder in November 1994, holding a single ordinary share denominated in sterling. In May 1997 all the sterling shares were cancelled and replaced by shares denominated in US dollars and LBL has at all times since then been the holder of a single ordinary share of $1. There is no documentary evidence that LBL held the dollar share as nominee for the other shareholder.

6.    LBIE and LBL have been in administration since September 2008 and LBHI2 since January 2009. The administrations of these companies have involved the realisation of their assets to best advantage, rather than the preservation of the companies as going concerns. Paragraph 65 of schedule B1 to the Insolvency Act 1986 permits the administrator of a company to make distributions to creditors of the company, with the permission of the court, where the creditors are neither secured nor preferential. Once an administrator gives notice of an intention to make a distribution, the administration is commonly referred to as a distributing administration. Detailed provisions related to the making of distributions to creditors by administrators are contained in rules 2.68 to 2.105 of the Insolvency Rules 1986, which for the most part reflect the equivalent provisions in rules 4.73 to 4.99 applicable in a winding up. With

Lehman Brothers

the permission of the court, the administrators of LBIE declared and paid a first interim dividend of 25.2 pence in the pound in November 2012, totalling some £1.611 billion.

7.      Lehman Brothers Holdings, Inc ("LBHI") is the ultimate parent of the Lehman Brothers group. On 15 September 2008, it commenced Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York, from which it emerged on 6 March 2012. It is an indirect creditor of many companies in the group and the ultimate shareholder of all of them. Its primary interest relates to LBHI2's right to recover subordinated loans made by it to LBIE and issues relating to those subordinated loans.

8.      In February 2013 the administrators of LBIE, LBL and LBHI2 commenced proceedings seeking the decision of the court on a number of questions arising out of the administrations. On 14 March 2014 David Richards J delivered a formidable judgment running to over 250 paragraphs in which he dealt with the various points raised for his consideration. By an order dated 19 May 2014 set out in the appendix to this judgment he granted the ten declarations, all of which are now the subject of appeals to this court. It is convenient to address the questions by reference to the numbered paragraphs of that order.

## Subordinated debt – paragraph (i)

9.      The first question raised by the appeal concerns the ranking in the administration and any subsequent liquidation of the subordinated debt owed by LBIE to LBHI2.

10.     LBHI2 was at the date of the commencement of LBIE's administration and continues to be the holder of $2.225 billion of subordinated loan debt, in respect of which it has lodged a claim in the administration for £1,254,165,598.48. Before a capital restructuring of LBIE in 2006, LBIE had three subordinated loan facilities: a €3 billion long term facility, a $4.5 billion long term facility and a $8 billion short term loan facility. Each of the facilities was provided by its then immediate parent company.

11.     In 2006, in order to use LBIE's foreign tax credits for US tax purposes, it was decided to improve its profitability, in part by restructuring its regulatory capital base so as to replace some subordinated debt with share capital and so reduce its interest payments. LBHI2 was interposed as the immediate holding company of LBIE and $2 billion of existing subordinated debt was replaced with $2 billion of preference shares issued to LBHI2. The existing subordinated loan facility agreements were cancelled and replaced with similar facility agreements with LBHI2 and $4.7 billion of subordinated debt was drawn down by LBIE.

12.     As part of a further restructuring in May 2007, $5.1 billion of subordinated debt was converted into $5.1 billion of preference shares.

13.     The amount outstanding under the subordinated facilities fluctuated, with both drawdowns and repayments. Drawdowns in the course of 2007 led to a peak balance of $4.775 billion, reducing to $2.225 billion at the commencement of the administration.

Lehman Brothers

14.    Considerable work has been undertaken to determine whether that balance represents drawings under the long term or short term dollar facilities, but no firm conclusion has been reached by the administrators of LBIE.

**The insolvency code**

15.    The statutory code relating to insolvency is contained in the Insolvency Act 1986 and the Insolvency Rules 1986. Subsequent references to sections are to sections in that Act and subsequent references to rules are to those rules. The original enactment of the 1986 Act followed the recommendations of the Cork Committee (although not all its recommendations were accepted). One of the principles that the Cork Committee identified at [1289] was:

> "It is a basic principle of the law of insolvency that every debt or liability capable of being expressed in money terms should be eligible for proof in the insolvency proceedings, so that the insolvency administration should deal comprehensively with, and in one way and another, discharge, all such debts and liabilities."

16.    Thus one of the aims of the law of insolvency is the discharge of debts by proof and payment.

17.    As David Richards J explained in his scholarly judgment in *Re T & N Ltd* [2005] EWHC 2870 (Ch), [2006] 1 WLR 1728 the law of insolvency began with personal bankruptcy and was only later extended to corporations. The range of claims that could be dealt with by proof expanded over the years, so as to include unliquidated and contingent claims. Previous insolvency regimes applicable to corporations simply incorporated by reference the provisions applicable in personal bankruptcy.

18.    In *Re Nortel GmbH* [2013] UKSC 52, [2014] AC 209 ("*Nortel*") Lord Neuberger of Abbotsbury PSC said at [39]:

> "In a liquidation of a company and in an administration (where there is no question of trying to save the company or its business), the effect of the insolvency legislation..., as interpreted and extended by the courts, is that the order of priority for payment out of the company's assets is, in summary terms, as follows:
>
> (1) Fixed charge creditors;
>
> (2) Expenses of the insolvency proceedings;
>
> (3) Preferential creditors;
>
> (4) Floating charge creditors;
>
> (5) Unsecured provable debts;
>
> (6) Statutory interest;

(7) Non-provable liabilities; and

(8) Shareholders."

19.  This order of priority has been described as the waterfall. It is apparent that subordinated debt does not feature in Lord Neuberger's waterfall. The issue between the parties is whether it should rank immediately after unsecured provable debts (as category (5A)) or immediately after non-provable liabilities (as category (7A)).

20.  "Proving" a debt is a technical term in the Insolvency Rules. It is dealt with by rule 4.73. In the case of a winding up by the court "a person claiming to be a creditor of the company and wishing to recover his debt in whole or in part" must submit his claim in writing to the liquidator. In the case of a voluntary winding up the liquidator may require "a person claiming to be a creditor of the company and wishing to recover his debt in whole or in part" to submit his claim in writing. Rule 4.73 (3) says:

> "A creditor who claims (whether or not in writing) is referred
> to as "proving" his debt; and a document by which he seeks to
> establish his claim is his "proof"."

21.  There are similar provisions applicable to administrations (rule 2.72) and personal insolvency (rule 6.96). It is also necessary to refer to rule 12.3 which deals with provable debts. Rule 12.3(1) provides:

> "Subject as follows, in administration, winding up and
> bankruptcy, all claims by creditors are provable as debts against
> the company or, as the case may be, the bankrupt, whether they
> are present or future, certain or contingent, ascertained or
> sounding only in damages."

22.  There are certain specified exceptions to this broad definition. Liabilities under confiscation orders made in criminal proceedings are not provable debts. Other liabilities are postponed for the purposes of proof until all creditors have been paid in full (together with statutory interest). But rule 12.3(3) makes it clear that those specific cases are not exhaustive. It is also necessary to refer to rule 13.12 which contains expansive definitions of "debt" and "liability". Rule 13.12, as it stood at the relevant time, provided:

> "(1) "Debt", in relation to the winding up of a company, means
> (subject to the next paragraph) any of the following—
>
> (a) any debt or liability to which the company is subject at the
> date on which it goes into liquidation;
>
> (b) any debt or liability to which the company may become
> subject after that date by reason of any obligation incurred
> before that date; and
>
> (c) any interest provable as mentioned in Rule 4.93(1).
>
> ..."

Lehman Brothers

(3) For the purposes of references in any provision of the Act or the Rules about winding up to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent, or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in any such provision to owing a debt are to be read accordingly.

(4) In any provision of the Act or the Rules about winding up, except in so far as the context otherwise requires, "liability" means (subject to paragraph (3) above) a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment, and any liability arising out of an obligation to make restitution.

(5) This Rule shall apply where a company is in administration and shall be read as if references to winding-up were a reference to administration."

23.  The two rules, when read together, are "strikingly wide": *Re Nortel* at [66]. This is consonant with the general principle of insolvency law that every debt or liability capable of being expressed in money terms should be eligible for proof; and the principle that all possible liabilities within reason should be provable helps achieve equal justice to all creditors and potential creditors in any insolvency: *Nortel* at [92] and [93].

24.  Given the very broad definition of "provable debts" in rule 12.3, and the approach of the court to bringing "all possible liabilities within reason" within the concept of "provable debts," one might be forgiven for thinking that the class of non-provable debts must be small. One supposed example in the books is *Re Kentish Homes Ltd* [1993] BCC 212. That was a case in which the company incurred a liability to pay community charge but only after it went into liquidation. Sir Donald Nicholls V-C held that the liability was not a provable debt because the liability did not exist at the date when the company went into liquidation; and the liability which arose post-liquidation was not the consequence of an obligation incurred before the commencement of the liquidation, but arose because the company was the freehold owner of the empty but completed flats on each day throughout the relevant periods. However, the decision in that case was overruled by the House of Lords in *Re Toshoku Finance UK plc* [2002] UKHL 6, [2002] 1 WLR 671 on the ground that the liability in question was an expense of the insolvency. Another, until reversed by a change in the rules, was an inchoate claim in tort: *Re T & N Ltd* [2005] EWHC 2870 (Ch), [2006] 1 WLR 1728. A third was the liability to pay costs under an order of the court made after the date of entry into insolvency. But that was overruled by the Supreme Court in *Nortel*.

25.  Thus the clear trend both in legislation and in judicial decision has been progressively to widen the class of claims which can be the subject of proof in an insolvency. The evident intention of the legislature has been to eliminate, so far as possible, non-provable claims. Nevertheless some non-provable claims remain.

26.     As Lord Neuberger explained in *Nortel*, in order to give effect to *pari passu* distribution it is necessary to have a cut-off date by reference to which claims are admitted to proof thus entitling the claimants to participate in the *pari passu* distribution. It is necessary for another reason as well: namely to enable a company to be wound up within a reasonable time. But there may be liabilities which arise after the cut-off date which are not provable, and which do not count as expenses of the insolvency. One example discussed in argument was this. Suppose that an administrator continues to keep the company trading in the hope of rescuing it. During the course of the administration an employee of the company injures a pedestrian as a result of his negligent driving of a company vehicle. The pedestrian will have a claim for damages for personal injury. But because all the facts giving rise to the claim happened after the cut–off date the claim is not a provable claim (although in some cases payment of the claim might rank as a necessary disbursement and thus count as an administration expense). Another example (which features in *Re R-R Realisations Ltd* [1980] 1 WLR 805) is the claims of victims of an air crash which occurred after the company's entry into liquidation and which was alleged to have been caused by faulty engines originally manufactured by the insolvent company. These claims are, nevertheless, liabilities of the company.

27.     In addition to non-provable claims there are claims which are simply unenforceable against the company. Examples of such claims include foreign revenue debts and statute-barred claims.

**The extent of subordination**

28.     The subordinated loans formed part of LBIE's regulatory capital. Under capital adequacy rules made by regulators, banks and other financial institutions are required to hold capital of a certain amount, which depends in broad terms on the extent of their business and their risk exposures. The purpose of capital adequacy rules is so far as possible to ensure that firms provide financial resources to protect their customers and other stakeholders against failure and enable them to withstand some level of loss.

29.     Many of the arguments in the appeal (and parts of the judge's judgment) proceeded on the basis that LBHI2 was no more than a member of LBIE; but in my judgment that is fallacious. LBHI2 is a *creditor* of LBIE, albeit a subordinated one. The extent to which the debt owed by LBIE to LBHI2 has been subordinated depends on the interpretation of the loan agreement. The loan agreement is made on a form approved by the Financial Services Authority ("FSA"). It is printed as part of the *Interim Prudential Sourcebook (INPRU)* which sets out the financial resources requirements applicable to LBIE from 31 December 2006 until it entered administration. The general rule contained in rule 10-62(1) is that:

> "A firm must, at all times, maintain financial resources in
> excess of its financial resources requirement as detailed in rule
> 10-70 below."

30.     Rule 10-62(2) provides that a firm must calculate its financial resources in accordance with Table 10-62(2)A, subject to certain exceptions. The Table allowed financial resources to include ordinary share capital, reserves excluding revaluation reserves, externally verified net profits, preference shares and short term subordinated loans.

All these went onto the credit side of the balance. The Table also provided for deductions to go onto the debit side of the balance. Rule 10-63(1) provided that:

> "A firm may take into account subordinated loan capital in its financial resources in accordance with Tables 10-62(2) A, B and C subject to (2) to (12) below."

31.    Rule 10-63(2) (a) required a subordinated loan agreement to be drawn up in accordance with the standard forms obtained from the FSA. That was the form used in our case. The approved forms were printed in Schedules to the rules. The long-term subordinated loan agreement began by reciting that:

> "... the Borrower wishes to use the Loan, or each Advance under the Facility (as those expressions are defined in the Standard Terms) in accordance with FSA rule IPRU(INV) 10-63..."

32.    The variable terms set out the amount of the facility (which was a revolving credit facility) and the interest rate, which was one week LIBOR plus LBHI's long term debt spread, compounded at intervals. Paragraph 9 of the variable terms provided for repayment "subject always to paragraphs 4(3) ... and 5 ... of the Standard Terms."

33.    Schedule 2 of the agreement contained the Standard Terms. It began with a series of definitions which included the following:

> "Excluded Liabilities" means Liabilities which are expressed to be, and in the opinion of the Insolvency Officer of the Borrower, do, rank junior to the Subordinated Liabilities in any Insolvency of the Borrower

> "Insolvency" means and includes liquidation, winding up, bankruptcy, sequestration, administration, rehabilitation and dissolution (whichever term may apply to the Borrower) or the equivalent in any other jurisdiction to which the Borrower may be subject

> "Insolvency Officer" means and includes any person duly appointed to administer and distribute assets of the Borrower in the course of the Borrower's Insolvency

> "Liabilities" means all present and future sums, liabilities and obligations payable or owing by the Borrower (whether actual or contingent, jointly or severally or otherwise howsoever)

> "Senior Liabilities" means all Liabilities except the Subordinated Liabilities and Excluded Liabilities

> "Subordinated Liabilities" means all Liabilities to the Lender in respect of each Advance made under this Agreement and all interest payable thereon"

Judgment Approved by the court for handing down.                                   Lehman Brothers

34.     Paragraph 4 of the standard terms, which dealt with repayment was expressed to be
        "subject in all respects" to paragraph 5. Paragraph 4(4) provided that in the event of
        certain defaults in repayment the Lender might:

                "... enforce payment by instituting proceedings for the
                Insolvency of the Borrower after giving seven Business Days'
                prior written notice to the FSA..."

35.     Paragraph 4(5) also gave the Lender the right to institute proceedings for the
        Insolvency of the Borrower in certain events. Paragraph 4(7) provided that:

                "No remedy against the Borrower other than as specifically
                provided by this paragraph 4 shall be available to the Lender
                whether for the recovery of amounts owing under this
                Agreement or in respect of any breach by the Borrower of any
                of its obligations under this Agreement."

36.     Paragraph 5 contains the subordination provisions and says:

                "(1) Notwithstanding the provisions of paragraph 4, the rights
                of the Lender in respect of the Subordinated Liabilities are
                subordinated to the Senior Liabilities and accordingly payment
                of any amount (whether principal, interest or otherwise) of the
                Subordinated Liabilities is conditional upon –

                (a) (if an order has not been made or an effective resolution
                passed for the Insolvency of the Borrower and, being a
                partnership, the Borrower has not been dissolved) the Borrower
                being in compliance with not less than 120% of its Financial
                Resources Requirement immediately after payment by the
                Borrower and accordingly no such amount which would
                otherwise fall due for payment shall be payable except to the
                extent that –

                (i) paragraph 4(3) has been complied with; and

                (ii) the Borrower could make such payment and still be in
                compliance with such Financial Resources Requirement; and

                (b) the Borrower being "solvent" at the time of, and
                immediately after, the payment by the Borrower and
                accordingly no such amount which would otherwise fall due for
                payment shall be payable except to the extent that the Borrower
                could make such payment and still be "solvent".

                (2) For the purposes of sub-paragraph (1)(b) above, the
                Borrower shall be "solvent" if it is able to pay its Liabilities
                (other than the Subordinated Liabilities) in full disregarding –

                (a) obligations which are not payable or capable of being
                established or determined in the Insolvency of the Borrower,
                and

Judgment Approved by the court for handing down.

(b) the Excluded Liabilities.

(3) Interest will continue to accrue at the rate specified pursuant to paragraph 3 on any payment which does not become payable under this paragraph 5.

(4) For the purposes of sub-paragraph (1)(b) above, a report given at any relevant time as to the solvency of the Borrower by its Insolvency Officer, in form and substance acceptable to the FSA, shall in the absence of proven error be treated as accepted by the FSA, the Lender and the Borrower as correct and sufficient evidence of the Borrower's solvency or Insolvency.

(5) Subject to the provisions of sub-paragraphs (6), (7) and (8) below, if the Lender shall receive from the Borrower payment of any sum in respect of the Subordinated Liabilities –

(a) when any of the terms and conditions referred to in sub-paragraph (1) above is not satisfied, or

(b) where such payment is prohibited under paragraph 4(3),

(6) Any sum referred to in sub-paragraph (5) above shall be received by the Lender upon trust to return it to the Borrower.

(7) Any sum so returned shall then be treated for the purposes of the Borrower's obligations hereunder as if it had not been paid by the Borrower and its original payment shall be deemed not to have discharged any of the obligations of the Borrower hereunder.

(8) A request to the Lender for return of any sum referred to in sub-paragraph (5) shall be in writing and shall be made by or on behalf of the Borrower or, as the case may be, its Insolvency Officer."

37.    Paragraph 7 contained undertakings by the Lender not without the consent of the FSA to:

"(d) attempt to obtain repayment of any of the Subordinated Liabilities otherwise than in accordance with the terms of this Agreement;

(e) take or omit to take any action whereby the subordination of the Subordinated Liabilities or any part of them to the Senior Liabilities might be terminated, impaired or adversely affected"

38.    There are a number of different ways in which subordination agreements can be drawn. Three are relevant for present purposes. The first is an agreement that if the subordinated creditor receives any payment in part satisfaction of its subordinated debt it will hold the receipt on trust for the senior creditors. This form of agreement is

Lehman Brothers

reflected in clause 5(6) of the agreement in our case. The second is an agreement which expresses the subordinated creditor's right to repayment as being contingent on the satisfaction of a condition or conditions. In our case the right to repayment arises under clause 4, but that is subject to clause 5. Clause 5 imposes conditions on the right to repayment. If no insolvency process has begun then the condition in clause 5(1)(a) must be satisfied. Whether or not an insolvency process has begun, the condition in clause 5(1)(b) must also be satisfied. In my judgment clause 5(1) means that the right to repayment of the subordinated debt is a contingent right, contingent on the satisfaction of clause 5(1)(b) and, if appropriate, clause 5(1)(a) as well. The third method of subordinating loans, of which the clause in *Re SSSL Realisations Ltd* [2006] Ch 610 is an example, contains a contractual provision precluding the subordinated creditor from proving in the insolvency of the debtor until all other creditors have been paid. This is described by Goode on *Legal Problems of Credit and Security*, 4th Ed at p.210 as the "most controversial form" of subordination agreement, although a clause of this kind has been held not to infringe the *pari passu* principle and hence is legally valid.

39.    There is no express prohibition in clause 5 on the subordinated creditor's lodging a proof of debt in the insolvency of the borrower. Given that (a) the only remedy available to the subordinated creditor under clause 4 is the institution of proceedings for the insolvency of the borrower and (b) the only way of obtaining payment of a debt in an insolvency is by proving it in accordance with the rules, it must in my judgment have been envisaged that the subordinated creditor would be entitled to prove for its debt. The judge considered that clause 7(d) and/or clause 7(e) had the effect of precluding the lodging of a proof. I do not agree. Clause 7(d) says that the subordinated creditor must not attempt to obtain repayment "otherwise than in accordance with the terms of this Agreement". If the agreement permits the lodging of a proof, then clause 7(d) cannot take away that entitlement. If, on the other hand, the agreement does not permit the lodging of a proof, then there is nothing on which clause 7(d) can bite. So in my judgment clause 7(d) is entirely neutral. Clause 7(e) prohibits the taking of any action that would impair or adversely affect the subordination of the Subordinated Liabilities to the Senior Liabilities, but in order to decide whether any action would have that effect it is necessary to decide the extent of the subordination, and that is to be found in clause 5, not in clause 7.

40.    It is also clear that the regulators had no objection to a subordinated creditor proving for its debt in the insolvency of the debtor. Although INPRU did not specifically refer to proof of debt, its successor GENPRU rule 2.2.159 did. It said that the remedies available to a subordinated creditor had to be limited to "petitioning for the winding up of the firm or proving for the debt in the liquidation or administration." These were the rules in force when LBIE entered administration. Moreover it is difficult to suppose that in its standard form the regulator chose to adopt what the leading authority described as the most controversial form of subordination agreement.

41.    In addition, I do not consider that it matters whether or not a proof is lodged. What matters is the subject matter of the proof. I would accept Mr Snowden QC's argument that the subordinated debt is a contingent debt. It is contingent not because of its position in the rankings in insolvency but because the subordination agreement itself provides that repayment is not due until certain conditions have been satisfied. Mr Snowden said, correctly in my judgment, that when the proof is lodged one would

expect the office holder to value it at "nil" and then to revalue it once it becomes clear that the contingencies have been satisfied. But that still begs the question: what are the contingencies? Again that depends on the meaning of clause 5.

42.     The starting point is the definition of "Liabilities". As the judge said, it is difficult to think of a wider definition. There are two categories of payment with which we are primarily concerned: statutory interest and non-provable liabilities; i.e. items (6) and (7) in Lord Neuberger's list. Both need a little explanation.

43.     Statutory interest may become payable in an administration or in a liquidation. In the former case it is payable because of rule 2.88 (7) and in the latter case because of section 189 (2). Rule 2.88 (7) provides:

> "… any surplus remaining after payment of the debts proved shall, before being applied for any other purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company entered administration."

44.     Section 189 (2) provides:

> "Any surplus remaining after the payment of the debts proved in a winding up shall, before being applied for any other purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company went into liquidation."

45.     The first argument deployed on behalf of the subordinated lenders is that the obligation to pay interest out of the surplus is not a sum "payable or owing by the Borrower". It is no more than a direction to the administrator or liquidator (as the case may be) about how to deal with a fund under his control. Despite Mr Snowden's usual persuasiveness I reject that submission. First, neither the rule nor the section is expressed as a direction to the office holder. It is a statutory statement of how the fund is to be dealt with; and I do not see why one should read in a limitation confining its legal effect to the office holder. Second, conformably with Schedule B1 paragraph 69, an administrator acts as the agent of the company. Thus any payment of interest that he procures is procured on behalf of the company. Although a liquidator is not usually an agent of the company, the position should be no different. Third, legal title to the assets which constitute the surplus remains vested in the company whether it is in administration or liquidation. In either case therefore interest will be paid out of the company's bank account. Thus the interest is in fact paid by the Borrower. If it is paid by the Borrower, it is only a short step to saying that it is also payable by the Borrower. Fourth, in interpreting an agreement intended for use across many jurisdictions, I do not consider that it is appropriate to adopt such a narrow interpretation of the words.

46.     The subordinated lenders relied on the decision of Mervyn Davies J in *Re Lines Bros Ltd* [1984] BCLC 215. That was not a decision about section 189 or rule 2.88. The judge was concerned with section 317 of the Companies Act 1985 which applied the bankruptcy rules to corporate insolvency. Thus the judge was required to interpret section 33 (8) of the Bankruptcy Act 1914. He began by saying that in the absence of

Lehman Brothers

authority he would have concluded that statutory interest was payable. However, having considered the predecessors of section 317 and a number of authorities, he came to the conclusion that it was not. In the course of his discussion he considered cases on section 10 of the Supreme Court of Judicature Act 1875 which imported the bankruptcy rules when a company's assets were insufficient to pay "its debts and liabilities". He said at 223:

> "This is not a debt or liability within s 10 for two reasons: (1) the section speaks of 'its' debts and liabilities. At no stage can statutory interest be regarded as a debt or liability of the company. A liquidator's obligation under s 33(8) to pay interest out of a surplus is pursuant to a statutory direction to him, being an obligation which is part of the statutory scheme for dealing with a company's assets which comes into operation at the outset of the winding up. ... (2) it is not right to consider 'insufficiency' (or insolvency) by reference to any obligation to pay statutory interest under s 33(8) because that is to presuppose that s 33(8) applies in the winding up. The true position is that one decides whether or not the winding up is the winding up of an insolvent company before one takes account of the rules that will be brought into account if it is insolvent."

47.    I would accept that section 33 (8) of the Bankruptcy Act 1914 is a direction to the trustee in bankruptcy. But that is because in a bankruptcy, unlike a corporate insolvency, the bankrupt's property vests in the trustee. So the only person liable to pay the statutory interest is the trustee. In a regime which applied the bankruptcy rule directly to a corporate insolvency it is not surprising that Mervyn Davies J felt obliged to adopt the same interpretation. That is no longer the case. The rules about statutory interest now operate independently of the bankruptcy regime. We do not need to decide whether *Re Lines Bros Ltd* was right or wrong; it is distinguishable. In addition I agree with the judge at [73] that:

> "...the context of the decision in *Re Lines Bros Ltd* is so different from the present context that it is not in my judgment of assistance in the construction of the subordination provisions in the subordinated loan agreements."

48.    In my judgment therefore statutory interest falls within the contractual definition of "Liabilities". That is not the end of the story, however, because clause 5(2)(a) must have been intended to exclude something which would otherwise have fallen within that definition.

49.    The subordinated lenders' next argument was that both statutory interest and non-provable claims could be disregarded because neither species of Liability (as defined) was "payable or capable of being established or determined in the Insolvency of the Borrower". "Insolvency" includes a process leading to dissolution of the company.

50.    In the case of a voluntary liquidation the liquidator's duties are laid down by section 107:

> "Subject to the provisions of this Act as to preferential payments, the company's property in a voluntary winding up shall on the winding up be applied in satisfaction of the company's liabilities pari passu and, subject to that application, shall (unless the articles otherwise provide) be distributed among the members according to their rights and interests in the company."

51.     In the case of a compulsory liquidation they are laid down by section 143(1):

> "The functions of the liquidator of a company which is being wound up by the court are to secure that the assets of the company are got in, realised and distributed to the company's creditors and, if there is a surplus, to the persons entitled to it."

52.     In relation to section 107 the subordinated lenders rely heavily on the decision of this court in *Re Danka Business Systems plc* [2013] EWCA Civ 92, [2013] Ch 506. That was a case of a voluntary liquidation. The applicants had contingent claims for indemnities against liability to tax. They lodged a proof in the liquidation. The liquidators valued the contingent claims and, having done so, gave notice of intention to make a final distribution. The applicants argued that the liquidators were obliged to set aside a reserve fund calculated on the basis that the contingency would be fulfilled. As Patten LJ pointed out at [27], the applicants had proved for their claim and:

> "The only issue is whether it can insist upon a retention to ensure that once crystallised they are paid in full."

53.     At [29] he said:

> "We are concerned in this case with how the liquidators should process existing, known contingent claims which have been admitted to proof and which have been valued by the liquidator."

54.     Clearly, then, the court was not concerned either with non-provable claims or with statutory interest. At [37] he said:

> "There may be cases where the contingency is so imminent that the liquidator can sensibly wait for the event to occur rather than expending time (and possibly money) in a valuation of the chances of the claim ultimately materialising. Even where such a degree of imminency does not exist, the valuation of contingent claims remains open to variation in the light of subsequent events under rule 4.84 right up to the completion of the liquidation in accordance with section 107 of the 1986 Act. But there are, I think, real difficulties in seeing how a liquidator who has already valued the contingent claims and so admitted them to proof in the amount of the valuation comes under a legal duty to provide for the contingency in full by making a reserve against any distribution to members. The reference to

Lehman Brothers

> the company's liabilities in section 107 must be to the liabilities
> as determined in accordance with the 1986 Rules. Otherwise
> they serve no useful purpose."

55.    And at [38]:

> "The liquidator is entitled to proceed to a distribution to
> members on the basis of the debts admitted to proof."

56.    Like all judicial pronouncements these passages must be read in the context of the
issue that was before the court. They cannot be read as if they laid down an
independent rule. Nor can they be taken literally, not least because it is clear that post-
liquidation interest payable by virtue of section 189 must be paid before any
distribution to members, and that interest is not a provable debt. The same applies to
non-provable claims, as explained by Lord Neuberger in *Nortel*. Accordingly, in my
judgment the heavy reliance placed on *Re Danka Business Systems* on this point is
misplaced.

57.    So the question, then, is whether statutory interest and non-provable claims are
"payable or capable of being established or determined in the Insolvency of the
Borrower". So far as statutory interest is concerned, I do not see any problem.
Statutory interest is payable only because of section 189 or rule 2.88 and therefore
forms part of the insolvency code. Its quantification is also carried out in accordance
with the code. In my judgment that means that it is both payable in the Insolvency of
the Borrower and also capable of being established or determined in the Insolvency of
the Borrower. It follows that repayment of the subordinated debt is postponed to the
payment of statutory interest.

58.    Mr Snowden submitted that this conclusion would contradict rule 2.88(8) which
provided that:

> "All interest payable under paragraph (7) ranks equally whether
> or not the debts on which it is payable rank equally."

59.    That argument takes as its starting point the proposition that statutory interest is
payable to compensate creditors for being kept out of their money. A subordinated
creditor is just as much affected by being kept out of its money as a senior creditor.
There is no reason to suppose, therefore, that the regulator (whose standard form this
was) intended that a subordinated creditor should be denied participation in this
compensation. Accordingly, this pointed towards the subordinated loans not being
subordinated to the payment of statutory interest, but to their ranking immediately
after other provable debts. However, I find it difficult to suppose that the regulator
intended that subordinated creditors of this kind should rank before non-provable
claims or, indeed before those claims which are provable but which are expressly said
to rank after provable claims and statutory interest. Mr Snowden's submission, in my
judgment, would let the tail wag the dog. Since there is no inherent vice in a creditor's
agreeing that its debt should be postponed, I do not consider that the provision for the
payment of interest in rule 2.88(8) has the decisive effect that Mr Snowden urged
upon us.

60.    So far as non-provable claims are concerned, the position is a little more complex. To revert to the example discussed in argument, the injured pedestrian would, in the ordinary way, apply to the administrator (or the court) under Schedule B1 paragraph 43(6), or (in the case of a liquidation) to the court under section 130(2), for permission to issue a claim form in the county court or the Queen's Bench Division. The court would then adjudicate on the claim, both as to liability and quantum, and the injured pedestrian would emerge with a judgment debt. However, that judgment debt would still not be a provable debt. It seems to me therefore that the injured pedestrian's claim is neither determined nor established in the Insolvency of the Borrower. However, the liquidator's duties continue until the moment comes to make a distribution to members whether under section 107 or section 143(1). As Lord Neuberger explained in *Nortel*, non-provable claims rank higher than members. That being so, the liquidator must pay those claims before making a distribution to members. As Mr Trower QC pointed out, the definition of "liabilities" in rule 13.12(4) both expressly includes liability in tort and, unlike rule 13.12(1) which defines "debt", does not contain any temporal restriction on when the liability arises. This reinforces the point that the liquidator must discharge the company's liabilities as defined by rule 13.12(4) before making a distribution to members, and hence he does so in the insolvency itself.

61.    Accordingly, I consider that non-provable claims, once established or determined outside the Insolvency of the Borrower, are nevertheless payable within it. Broadly speaking this corresponds with the view that David Richards J took in *Re T & N Ltd* [2005] EWHC 2870 (Ch), [2006] 1 WLR 1728 at [107] and I agree with him.

62.    I conclude, therefore, that the subordinated debt is repayable on contingencies that include (a) payment of statutory interest and (b) payment of any non-provable liabilities. Any valuation of the contingent debt must take account of both contingencies. In that way the lodging of a proof will not adversely affect the subordination.

63.    For these reasons I would dismiss the appeal against paragraph (i) of the judge's order.

**Currency conversion claims - paragraphs (ii) and (iii)**

64.    Many of LBIE's creditors were owed debts payable in foreign currencies. Those foreign currencies were the currencies of account, but the administration (and any subsequent liquidation) will take place in England. Accordingly, sterling is the currency of payment. As the judge correctly said at [88]:

        "Until the decision of the House of Lords in *Miliangos v George Frank (Textiles) Ltd* [1976] AC 443, the established position in English law was that a creditor with a debt contractually payable in a foreign currency could not obtain judgment in an English court in the foreign currency but only a judgment in sterling converted as at the date when payment was due under the contract. The same position applied as regards proofs of debt in a liquidation: see *In re United Railways of Havana and Regla Warehouses Ltd* [1961] AC 1007. The power of the English courts to give judgment in a foreign

> currency established by *Miliangos* quickly led to a
> reconsideration of the position in a liquidation. The particular
> difficulty is that in order to undertake a *pari passu* distribution
> of assets among creditors it is necessary to convert all claims to
> a single currency. The issue was the date at which such
> conversion should take place. The question came before
> Oliver J in *In re Dynamics Corporation of America* [1976] 1
> WLR 757. He held that in a compulsory winding up of an
> insolvent company, a creditor's claim for a debt in a foreign
> currency, and any set-off in a foreign currency against such a
> debt, must be converted into sterling as at the date of the
> winding up order."

65.   At the time when these cases were decided the rules were silent on the question of
      currency conversion. But the question was considered by the Cork Committee which
      reported on 30 April 1981, although the report was not published until June 1982. At
      [1308] they referred to two cases which had held that the relevant date for the
      conversion of foreign currency debts into sterling was the date of the winding up
      order. Those two cases were *Dynamics* and *Re Lines Bros Ltd* (although it is not clear
      whether the latter was the decision at first instance or on appeal). Both are of
      considerable importance. They continued at [1309]:

> "We are firmly of the view that the principles stated in the two
> most recent cases provide an appropriate solution to the
> problem of the conversion of foreign money claims into
> sterling in the context of insolvency proceedings. We strongly
> recommend that any future Insolvency Act should expressly
> provide that the conversion of debts in foreign currencies
> should be effected as at the date of the commencement of the
> relevant insolvency proceedings. Furthermore, we take the
> same view as the Law Commission (Working Paper No. 80)
> that conversion as at that date should continue to apply, even if
> the debtor is subsequently found to be solvent. To apply a later
> conversion date only in the case where the exchange rate has
> moved to the advantage of the creditor, but (necessarily) not
> where it had moved against him, would, in our view, be
> discriminatory and unacceptable."

66.   In *Dynamics* at 763G-H Oliver J referred to the twin objectives of fixing a date by
      reference to which debts and other liabilities are to be ascertained. They are (a) for the
      purpose of placing all creditors on an equal footing and (b) for the purpose of properly
      conducting the winding up of the affairs of the company. At 764-5, having referred to
      the fundamental feature of *pari passu* distribution he said:

> "Now the moment that you start introducing into this scheme of
> things different dates for the ascertainment of the value of the
> claims of individual creditors or classes of creditors, you
> introduce, as it seems to me, potential inequalities and thus the
> possibility of that which the Act impliedly prohibits, that is to
> say a distribution of the property of the company otherwise
> than *pari passu*."

Lehman Brothers

67.    At 766H he rejected the contention that a claim for payment in a foreign currency was a contingent claim, and held at 767C that the foreign currency creditor's right is to receive the stipulated amount in foreign currency. At 767 he considered the function of lodging a proof in a winding up and said:

> "If the purpose of the dollar creditor in submitting his proof is to estimate the value of his claim at some other time than that of the winding up order, then he is doing something which involves (a) not merely a variation of, but a radical departure from, the statutory form of proof, and (b) the assertion of a basis for valuation which not only is not available to any other creditor but which contradicts the whole line of authorities going back over a hundred years, upon which both the winding up rules and the bankruptcy rules have been based. If, on the other hand, what he is seeking to do is, indeed, to value his claim at the date of the winding up order, then the only appropriate value can, as I see it, be the rate of exchange prevailing at that date, for that is the value which it actually would have if it were then paid."

68.    He concluded at 768D-F:

> "There is, as I see it, no doubt about what the obligation of the company is at the date of the winding up order: *it is not an obligation to pay to the dollar creditor whatever may be the sterling equivalent of his debt at some time, possibly a year or more hence, when the liquidator has time to consider and adjudicate the proof of debt. It is an obligation to pay whatever is the sterling equivalent at that date*; and to adjust it subsequently to reflect an altered rate of exchange, whether up or down at the time when the proof falls to be adjudicated is not simply the ascertainment of what was the debt at the date of the winding up order but the substitution for the ascertained (or at least readily ascertainable) value at that date of a new and quite different value ascertained at a different date." (Emphasis added)

69.    This, as it seems to me, is a very clear statement that the company's obligation to pay in foreign currency is substantively replaced by an obligation to pay the sterling equivalent at the date of the winding up. In other words, the conversion into sterling is not merely procedural: it affects substantive rights.

70.    On 11 February 1982 the Court of Appeal decided *In Re Lines Bros Ltd (In Liquidation)* [1983] Ch 1. The company in that case went into liquidation owing Lloyds Bank International 18,500,000 Swiss francs. The liquidators converted the debt into sterling at the date of the resolution to wind up. They made a number of distributions, as a result of which sterling creditors had been paid their provable debts in full. Lloyds had also been paid its debt in full, but only if the amount payable had been fixed by reference to the exchange rate at the date of the resolution. In fact in the interim sterling had declined in value against the Swiss franc, with the result that, expressed in Swiss francs, the bank had only been paid 58 per cent of its debt. The

liquidators had a surplus in their hands of some £2 million. The question before the court was whether they should apply that surplus in paying the bank's currency loss, or in paying interest to all creditors. It was common ground that the surplus was not large enough to enable the liquidators to do both. All three members of the court held that the bank was not entitled to payment in priority to the payment of interest. Lawton LJ pointed out that a liquidation is a process of collective enforcement. He summarised part of the analysis put forward by the liquidators (which the bank did not dispute) as follows:

> "Being a form of collective enforcement, the beginning of a winding up was in its legal nature the equivalent of the court giving leave to enforce a judgment; and just as a judgment in a foreign currency could not be enforced until it was converted into sterling so a liquidator could not apply the property of a company in satisfaction of its liabilities *pari passu* until he had put a value in sterling on any claims made in a foreign currency. The liquidator has to compare like with like and a Swiss franc cannot be compared with a £ until the sterling value is known."

71.     As he said subsequently:

> "Liabilities are what the court will enforce. It will not enforce judgments for debts in Swiss francs but their equivalents in sterling at the dates when leave to enforce is given."

72.     As I read this judgment Lawton LJ favoured a once-for-all conversion of the debt from the foreign currency into sterling, treating the making of the winding up order as the equivalent of authorisation of execution in accordance with the *Miliangos* principle. Brightman LJ began by saying:

> "We are concerned with a creditors' voluntary winding up. It would, however, be unrealistic to disregard the fact that the identical issue can arise in the liquidation of a prosperous company which has more than enough assets to answer its full contractual indebtedness. Further, there can be no reason for any distinction between a voluntary liquidation and a compulsory liquidation."

73.     He went on to say that the policy underlying the decision in the *Miliangos* case was that:

> "…the foreign currency debtor should not be entitled to impose on the foreign currency creditor the risk of a fall in the value of sterling. Justice demands that the risk shall be borne by the debtor, who is the party in default. Hence the justice of the re-interpretation of the law, that the debtor in default is not to be excused from his contractual obligation by payment of anything less than the sterling equivalent of the money contractually due at the date of payment."

Lehman Brothers

74.    That policy, however, could not apply as between different classes of creditor, none of whom was in default vis-à-vis any other. It was not right that one class of creditor should underwrite the currency risk undertaken by another. Accordingly the principle of equal treatment meant that statutory interest rather than currency losses should be paid. As he put it:

> "The just course, as it seems to me, is to value the foreign debt *once and for all at an appropriate date, and to keep to that rate of conversion throughout the liquidation until all debts have been paid in full. The loss and the benefit from changes in exchange rates will then lie where they fall.* In terms of sterling, if that is the currency of the liquidation, the amount of the debts will be unaffected by movements on the foreign exchange market. In the case of a debt expressed in a depreciating currency the other creditors will stand to gain nothing from a protracted liquidation. In the case of a debt expressed in an appreciating currency, the liquidator will not be faced with the question whether expedited payment of such foreign debt, if that can be effected, might be to the advantage of sterling creditors. All the creditors will be treated alike. No re-calculations will have to be made of the company's indebtedness, and no forecasts of distributions will need to be revised on account of exchange factors. The position will be stabilised and all creditors will be treated alike." (Emphasis added)

75.    The passage I have highlighted contemplates that the once for all conversion will remain in being until the debts are paid in full. Thus Brightman LJ must have been contemplating more than a case of a mere dividend. Moreover his phrase was that the "debts" have been paid in full. That can only mean payment in full by reference to the sterling amount. In that event (i.e. payment of the debts in full) both currency gains and currency losses "lie where they fall." This seems to me to be an entirely general proposition. He also drew the analogy with the enforcement of a judgment in a foreign currency against a solvent debtor. The judgment is converted into sterling at the beginning of the process of execution. I should also note that Brightman LJ specifically endorsed the reasoning of Oliver J in *Dynamics*, a decision that has been approved on many occasions since: e.g. *Stein v Blake* [1996] AC 243, 252; *Wight v Eckhardt Marine GmbH* [2003] UKPC 37, [2004] 1 AC 147 at [28].

76.    He did, however, briefly consider the question of a "wholly solvent" company in an obiter part of his judgment. As Mr Wolfson QC submitted, it is crucial to an understanding of this passage to place it in the context of the problem that Brightman LJ was dealing with. The submission that provoked his observations was based on the proposition that the foreign currency creditor might have the worst of all worlds because the liquidator might choose to pay the debt in foreign currency if sterling appreciated against the foreign currency, but that if sterling depreciated against the foreign currency he would pay in sterling. Thus it was argued that:

> "… the foreign currency creditor will get the worst of both worlds; he will gain nothing if the exchange rate moves against

> the currency of the contract, and he will lose if it moves in
> favour of the currency of the contract."

77.    It was in that context that Brightman LJ said:

> "It may well be the duty of the liquidator, in the case of a
> wholly solvent liquidation, if a foreign currency creditor has
> been paid less than his full contractual foreign currency debt, to
> make good the shortfall before he pays anything to the
> shareholders. I do not say that this is necessarily the solution to
> the problem posed, but I have not heard any convincing
> objection to that solution."

78.    I agree with Mr Wolfson that the intervention of the rules providing for currency
conversion have removed the premise upon which the proposed solution depends. It is
not open to an office holder to manipulate exchange rates to the detriment of the
foreign currency creditor in the way that was submitted to the Court of Appeal in
*Lines Bros*. The office holder must pay foreign currency debts in sterling at the rate of
exchange prevailing at the date of conversion, whether the exchange rate moves for or
against the foreign creditor. In addition under the law then in force the principles
applicable in bankruptcy only applied to the winding up of an *insolvent* company.
Accordingly, in speaking of a "wholly solvent" company Brightman LJ must have
been dealing with a case that was outside any form of insolvency code. Now, by
contrast, currency conversion under the Rules applies both to solvent and insolvent
companies that go into liquidation.

79.    In *Lines Bros* Oliver LJ seems to me to have adhered to his reasoning in *Dynamics*.
Thus at 25 he said:

> "Now the amount of a liability is to be measured by that which
> the person liable can be compelled in the currency of the forum
> in which he is so compelled to pay in order to discharge his
> obligation. Suppose, for the sake of example, that the price of
> gold at the date of winding up is £200 per ounce and the
> company's obligation is to deliver an ounce of gold or to pay a
> sum of £150. If one is asked to quantify the company's
> "liability" at that date, the answer must be £150, for *that is the*
> *sum which would provide a discharge of the obligation.*
> Similarly, as it seems to me, if the position be that the rate of
> exchange for the U.S. $ is two to the £ and a creditor for $1000
> issues a writ on the day of the winding up for that sum, the
> "liability" of the debtor ascertained at that date is £500. If he
> pays £500 and the costs on the receipt of the writ the action
> could not, quite apart from the liquidation, properly proceed. It
> does not seem to me to be right, with respect, to assume, as Mr.
> Stubbs has to found his argument, that because a creditor at the
> date of winding up is owed $1000 the company's liability at
> that date is and remains $1000. *Its liability in the sense of what,*
> *at that date, it can be compelled or is entitled to pay, is*
> *whatever sum in sterling will then discharge the debt*; and the
> ascertainment of that liability does not appear to me to depend,

> except as a matter of instantaneous measurement, upon the currency of the contract or the currency in which the creditor chooses to express his proof of debt." (Emphasis added)

80.    If, as Oliver LJ clearly said, payment of the sterling equivalent discharges the debt, it must follow that after payment there is no longer any debt, and that the underlying obligation to pay in foreign currency is extinguished. Oliver LJ was rather more tentative about what might happen in the event that the company turned out to be solvent. He said:

> "Mr. Stubbs submits, and rightly submits, that the measurement of liability at the date of winding up produces curious and unfair results in the winding up of a solvent company in the absence of any express provision for making up any shortfall before distribution among the shareholders. It may, however, be added that his own solution may produce equally curious and unfair results if, for instance, sterling has appreciated against the currency of the contract between the date of the winding up and the date of distribution. But that may be merely to say that the statutory scheme of distribution does not produce wholly fair results in all circumstances."

81.    However, he concluded:

> "We are not, however, here concerned with a solvent company and the point must be left for decision when it arises. Certainly for my part I do not dissent from the proposition that the answer to Mr. Stubbs's criticism may well be found in the way suggested in the judgment of Brightman LJ."

82.    In October 1983 the Law Commission published its report on Foreign Money Liabilities, following the consultation paper to which the Cork Committee had referred. In paragraph 2.23 they referred to Brightman LJ's obiter view that where the debtor was solvent the foreign currency creditor "might well" be entitled to be paid his full contractual debt before shareholders receive anything. In paragraph 3.34 they referred to the view expressed by the Cork Committee and noted specifically in footnote 207 that the Committee had endorsed their own view that conversion as at the date of entry into insolvency should continue to apply even if the debtor was later found to be solvent. At the end of paragraph 3.36 they said:

> "We remain of the view which we expressed in the working paper."

83.    The conclusion in paragraph 3.37, which the judge quoted, was:

> "The present law relating to the conversion into sterling of foreign-currency claims in relation to solvent and insolvent companies and to bankruptcy is satisfactory."

84.    The judge commented at [109]:

> "This conclusion rather neatly leaves the point open. The Report endorses the conversion of foreign currency debts into sterling as at the date of liquidation for the purposes of proof. As the Court of Appeal had left open the question whether creditors could advance currency conversion claims in the event of a surplus of assets after the payment of all proved debts and interest, the effect of the Report is also to leave open that issue."

85.   I think, with respect, that this does not fully reflect the Law Commission's overall view. They had specifically referred to the Cork Commission's agreement with their view that conversion should remain fixed even if the debtor turned out to be solvent, and had said that they remained of the view expressed in their working paper. If they had felt any doubt about the view expressed then, they would surely have said so.

86.   In February 1984 the Government published a White Paper on Insolvency Law. Paragraph 4 of the paper set out six objectives of the changes. The third of those objectives was:

> "To simplify wherever possible corporate and personal insolvency procedures."

87.   It was against this background that when the law of insolvency was transformed by the Insolvency Act 1986 the insolvency rules made provision for the conversion of foreign debts into sterling. Rule 4.91 provided:

> "For the purpose of proving a debt incurred or payable in a currency other than sterling, the amount of the debt shall be converted into sterling at the official exchange rate prevailing on the date when the company went into liquidation [or, if the liquidation was immediately preceded by an administration, on the date that the company entered administration]."

88.   The words in square brackets were added with effect from 1 April 2005 following the introduction in 2003 of the power of administrators to make distributions to creditors. Similar provision was made for administrations in 2003, and amended in 2005, in rule 2.86(1):

> "For the purpose of proving a debt incurred or payable in a currency other than sterling, the amount of the debt shall be converted into sterling at the official exchange rate prevailing on the date when the company entered administration or, if the administration was immediately preceded by a winding up, on the date that the company went into liquidation."

89.   Similar provision in relation to personal insolvency is contained in rule 6.111.

90.   The essence of the judge's reasoning is as follows:

i)   Currency conversion is carried out solely for the purpose of proving debts at a time when distributions are made *pari passu*;

Lehman Brothers

ii)    The *pari passu* distribution does not extinguish the underlying contractual obligation;

iii)    If a creditor owed money in a foreign currency receives less than the sterling equivalent of the value of the foreign debt at the date of payment, he has suffered a loss;

iv)    Once the statutory *pari passu* distribution regime has run its course there can be no objection to a foreign creditor pressing so much of his claim as has been unsatisfied;

v)    Although there should not be discrimination as between creditors, once all debts and interest have been paid issues of discrimination between creditors do not arise;

vi)    Accordingly currency conversion claims can be advanced as non-provable claims against a company which has paid in full all proved claims and statutory interest.

91.    The argument in favour of the existence of the currency conversion claims is, in essence, threefold. The first strand is heavily reliant on the theory of "reversion to contract". This is expressed by Giffard LJ in *Re Humber Ironworks and Shipbuilding Company* (1869) LR 4 Ch App 643, 647:

> "For these reasons I am of opinion that dividends ought to be paid on the debts as they stand at the date of the winding-up; for when the estate is insolvent this rule distributes the assets in the fairest way; and where the estate is solvent, it works with equal fairness, because, as soon as it is ascertained that there is a surplus, the creditor whose debt carries interest is remitted to his rights under his contract; and, on the other hand, a creditor who has not stipulated for interest does not get it."

92.    It is to be noted that the "reversion to contract" theory was said in that case to apply to a non-provable claim. There is no suggestion that it applied to a provable claim which had been paid in full. Moreover, in my judgment the "reversion to contract" theory no longer applies to statutory interest payable under the insolvency code, because even those creditors who have not contracted for interest are entitled to interest at the Judgments Act rate. However it is argued that in residual cases the "reversion to contract" theory still applies. In support of that argument reliance is placed on the decision of the Privy Council in *Wight v Eckhardt Marine*.

93.    *Wight v Eckhardt Marine* was a case in which a creditor lodged a proof of debt in the liquidation of the company, but after the date of the winding up the debt was transferred to another company. The question was whether the original creditor remained entitled to prove. The Privy Council held that it was not. In the course of his opinion Lord Hoffmann said at [27]:

> "The winding up leaves the debts of the creditors untouched. It only affects the way in which they can be enforced. When the order is made, ordinary proceedings against the company are

> stayed (although the stay can be enforced only against creditors subject to the personal jurisdiction of the court). The creditors are confined to a collective enforcement procedure that results in *pari passu* distribution of the company's assets. The winding up does not either create new substantive rights in the creditors or destroy the old ones. Their debts, if they are owing, remain debts throughout. They are discharged by the winding up only to the extent that they are paid out of dividends. But when the process of distribution is complete, there are no further assets against which they can be enforced. There is no equivalent of the discharge of a personal bankrupt which extinguishes his debts. When the company is dissolved, there is no longer an entity which the creditor can sue. But even then, discovery of an asset can result in the company being restored for the process to continue."

94.   Accordingly, the foreign currency creditors argue that their foreign currency debts remain outstanding except to the extent that they have been discharged by a payment in sterling at the exchange rate prevailing at the date of the conversion. To paraphrase Lord Hoffmann, this argument was skilfully deployed, but I think that it is wrong. First, Lord Hoffmann's broad statement cannot be taken entirely literally. He himself had held in *Stein v Blake* [1996] AC 243 that insolvency set-off (unlike other forms of set-off) did have substantive effect on the underlying debt. Another example in the insolvency code is the disclaimer of onerous property. If onerous property is disclaimed the creditor's right to future payments (say payment of future rent) is converted into a right to prove in the insolvency for loss; and that loss is assessed as if it were a claim for damages. Once the loss has been assessed in that way, that is all that the creditor is entitled to. A third example is a future debt. A future debt may be proved for in the full amount, but any payment is discounted in accordance with the formula contained in the rules. Once discounted in accordance with the formula contained in the rules, payment of the amount thus ascertained discharges the debt. Although Mr Dicker QC suggested for the first time in oral argument that this was not the case, I did not find the submission convincing and he produced no authority in support of it. Second, in the course of his opinion Lord Hoffmann twice referred to *Dynamics* with approval: see [24] and [28]. As I have said, my reading of *Dynamics* is that Oliver J held in terms that the effect of currency conversion was to substitute one obligation for another.

95.   Mr Dicker also relied on an analogy with contingent debts. He argued that even if a contingent creditor had proved for his contingent debt and had been paid its estimated value in full, he could still come back for more if the contingency eventuated. So he can, but I do not consider that this advances the argument on foreign currency claims. He is entitled to come back for more because of the "hindsight principle" which Lord Hoffmann explained in *Wight v Eckhardt Marine* at [31] and [32]. In addition, the way in which the contingent creditor comes back for more is by lodging an additional proof, as Patten LJ said in *Danka Business Services* at [37]. Rules 2.79 and 4.84 make express provision for this. What the contingent creditor does not do is pursue a non-provable claim. I do not, therefore, consider that the "reversion to contract" theory applies to provable debts.

96.    The judge held that there was no injustice in a "reversion to contract" because once *pari passu* distribution had run its course the only remaining contest was between the foreign currency creditors and the members. But in my judgment that is not quite correct. The contest is, in the first place, between the foreign currency creditors who have been paid their provable claims in full with statutory interest, and creditors with non-provable claims, such as the injured pedestrian. It does not seem to me to be in accordance with the prevailing legislative and judicial policy to widen the class of putative creditors with non-provable claims. In order to achieve equality between different kinds of non-provable creditors it would be necessary to value their claims in a common currency for exactly the same reason that provable debts must be valued in a common currency. There would therefore have to be a second conversion of foreign currency claims. But that is contrary to the substantive decision in *Re Lines Bros*; it is not provided for in the rules, and it is impossible to see what would be the appropriate date in order to do justice as between different classes of non-provable claim. Mr Dicker suggested that the foreign claims should be valued at the date of payment, but that is open to all the objections articulated by Oliver J in *Dynamics*. Nor is there any reason to impose the risk of currency fluctuations on creditors with non-provable claims. These considerations, in my judgment, point against the existence of a non-provable foreign currency conversion claim.

97.    The second strand in the argument takes as its starting point the proposition that a winding up is a collective enforcement process. The argument is that the underlying debt is unaffected by the enforcement process, just as a judgment debt is unaffected by the enforcement process. If one method of enforcement turns out to realise insufficient to satisfy the judgment, it remains unsatisfied and the judgment creditor may turn to another form of execution. I consider that this line of argument is difficult to square with *Lines Bros*. I have already quoted the passage from Lawton LJ in which the very nature of the collective enforcement persuaded him that the correct conversion date was the date of the winding up. Brightman LJ said at 20:

> "The liquidation of an insolvent company is a process of collective enforcement of debts for the benefit of the general body of creditors. Although it is not a process of execution, because it is not for the benefit of a particular creditor, it is nevertheless akin to execution because its purpose is to enforce, on a pari passu basis, the payment of the admitted or proved debts of the company. When, therefore, a company goes into liquidation a process is initiated which, for all creditors, is similar to the process which is initiated, for one creditor, by execution. If the commencement of the process of execution is the correct date for the conversion of a foreign currency debt in the case of a defendant whose affairs are under his own control, it seems to me entirely consistent that the date of liquidation should be the due date for conversion in the case of a company whose affairs are committed to a liquidator."

98.    The comparator he used, namely "a defendant whose affairs are under his own control," must surely refer to a solvent defendant.

99.    The third strand in the argument is that the payment of the debts and liabilities of a company before any distribution to members is divided into two stages. Stage 1 is the

payment of provable debts. Stage 2 is the payment of non-provable claims. Both rule 2.86 and rule 4.91 open with the words "[f]or the purpose of proving a debt". Accordingly it is argued that the conversion of the foreign currency debt into sterling is applicable only to stage 1 leaving any residual foreign currency loss to be dealt with as an unprovable liability at stage 2.

100. We have seen that both the courts and Parliament have progressively expanded the range of claims that fall within the insolvency code as laid down in the Act and the rules. There is only one contractual obligation; and the liability created by that obligation is provable in accordance with the rules. I agree with Mr Snowden that it is impossible to suppose that when rule 2.86(1) and rule 4.91(1) were introduced Parliament intended to split a unitary obligation to pay a sum in a foreign currency into two claims, one of which was provable and the other of which was not. That conclusion would run counter to the whole history of the gradual expansion of the range of claims that fall within the insolvency code. It would also entail the proposition that Parliament had positively created a non-provable claim when, again, the history of the legislation shows that Parliament has done its best to eliminate non-provable claims. Second, it would entail the rejection of the advice of the Cork Committee and, as I read it, the conclusion of the Law Commission. Third, it would contradict the Government's stated aim of simplifying insolvency procedures. Fourth, it would contradict the conclusion of the Court of Appeal in *Lines Bros* that there should be a "once-for-all" conversion of a foreign currency claim even if debts were paid in full. Fifth, it would contradict Oliver J's conclusion in *Dynamics* that the company's obligation was changed from an obligation to pay in foreign currency into an obligation to pay the sterling equivalent at the date of the winding up, and his statement in *Lines Bros* that payment in sterling discharges the debt. Sixth, one must consider the position of a creditor whose debt has been converted from some foreign currency into sterling at the date of the winding up but against which sterling has appreciated between the date of the winding up and the date of payment. No one suggests that his debt should be revalued to reflect the prevailing exchange rate at the date of payment. The problem becomes all the more acute if one postulates a creditor who has claims in more than one currency (say dollars, euros and roubles) which have moved in different directions against sterling. It is not suggested that such a creditor should give credit for his currency gains against his currency losses. This is in marked contrast to the obligations to repay contained in rules 2.101(3) (alterations and withdrawals of proof) and rule 2.102(2) (revaluation of security). How can this be justified? Surely it can only be justified if, as Oliver J said in *Dynamics*, the original obligation to pay in foreign currency has been converted into an obligation to pay whatever is the sterling equivalent at the date of the winding up. In other words, the conversion is substantive, not merely procedural. Seventh, rule 4.91 applies in all cases of winding up, including a members' voluntary winding up where the directors have made the statutory declaration of solvency required by section 89; in other words to what Brightman LJ called a "wholly solvent company". Thus a "wholly solvent company" is now within the insolvency code. If there is no question but that the company can pay all its debts and statutory interest, it is difficult to see the point of requiring foreign currency debts to be converted unless it is a once for all conversion. Eighth, it would run counter to *Danka Business Systems* in which this court held that, at least in the case of provable debts, a liquidator is entitled to make a distribution to members on the basis of provable debts having been proved in full and valued in accordance with the rules. Ninth, one of the fundamental principles of an insolvency

law, as the Cork Committee said, is that the system should "deal comprehensively with, and in one way and another, *discharge*", all provable debts. Payment of a provable debt in full should discharge it if that principle is to be respected. Lastly, as Oliver LJ said in *Lines Bros*, the insolvency code produces winners and losers, and even in a liquidation of a wholly solvent company some creditors do not receive their full contractual entitlement.

101.    In my judgment, therefore, and in respectful disagreement with the judge whose experience in this field is unrivalled, and with Briggs and Moore-Bick LJJ who take a contrary view, I would hold that there are no foreign currency conversion claims. I would therefore allow the appeal against paragraphs (ii) and (iii) of the judge's order.

## Post-administration interest - paragraph (iv)

102.    The argument relating to post-administration interest takes as its factual premise the proposition that there is in the hands of the administrators a surplus on which interest is payable under rule 2.88 (7).

103.    The main question is whether the right to statutory interest which has accrued during the administration will be lost if the company goes into liquidation. Rule 2.88 (7) provides:

> "Any surplus remaining after payment of the debts proved shall, before being applied for any purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company entered administration."

104.    Section 189 (2) provides:

> "Any surplus remaining after the payment of the debts proved in a winding up shall, before being applied for any other purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company went into liquidation."

105.    The judge thought that a straightforward reading of these two provisions led to the conclusion that:

> "… where an administration is followed by a liquidation, interest on interest-bearing debts is provable in respect of the period down to the commencement of the administration, but statutory interest is payable out of a surplus only from the date of the liquidation. On this basis, if LBIE were to go into liquidation, creditors would not receive interest in respect of the period from September 2008 when it went into administration until the date it goes into liquidation."

106.    Although the judge could find no policy reason that would justify that conclusion, he nevertheless felt compelled to reach it, leaving it to Parliament to correct what he undoubtedly saw as an anomaly. Mr Trower argued (as he did before us) that the

Lehman Brothers

direction to pay interest in rule 2.88(7) survived the transition from administration to liquidation. The judge rejected that argument at [125]:

> "There are, as I see it, a number of serious difficulties with this submission. First, on a natural reading of 2.88(7) it applies to a surplus in the hands of the administrator rather than in the hands of a subsequent liquidator. Read in its context, it seems to direct the administrator as to the application of the surplus which he holds. Secondly, if it were to bear the meaning for which Mr Trower contends, it could I think apply only to a surplus in the hands of the administrator which he transferred to the liquidator. I do not see how it could apply to a surplus which arises for the first time in the hands of the liquidator. Rule 2.88(7) requires the surplus remaining after the payment of debts proved to be applied in payment of interest on those debts in respect of the periods during which they have been outstanding since the company entered administration "before being applied for any purpose". That is impossible to reconcile with the equivalent provision in section 189(2) which requires the surplus remaining in the hands of the liquidator to be applied in paying interest on proved debts in respect of the periods during which they have been outstanding since the company went into liquidation "before being applied for any other purpose". Thirdly, if rule 2.88(7) is restricted to the surplus in the hands of the administrator, its effect is limited, first, to the amount of that surplus and, secondly, to the creditors who have lodged a proof in the administration. It therefore only goes a limited way to meeting the problem. Fourthly, in any event, it is a construction which provides no assistance in the case of an administration which has not become a distributing administration. It may be thought more likely that it is in such circumstances that a company will go into liquidation following an administration and the absence of any provision which could deal with interest for the period of an administration in such a case is in my view very telling."

107.    I agree that rule 2.88(7) applies to a surplus which arises (or can be shown to have arisen) in the course of the administration. But I do not consider that the requirement to pay interest is limited to a direction to the administrator. It is a statutory instruction that the surplus cannot be applied for any purpose other than paying statutory interest. In the course of argument a number of analogues in private law were suggested, including a form of statutory charge on the fund, or a statutory obligation in the nature of a *Quistclose* trust which binds the assets themselves into whosoever hands they come. Mr Snowden argued that where the insolvency code intended to create a charge it did so expressly: see Schedule B1 paragraph 99 (creating charges securing a former administrator's expenses and remuneration and certain other obligations). In post-hearing written submissions he and Mr Wolfson argued that there could be no *Quistclose* trust because at least in the case of a liquidation the company retained no beneficial interest in the assets. That may well be so, but we still need to give a meaning to the statutory instruction that the surplus arising in an administration must

Lehman Brothers

be applied in paying interest before it is applied for any other purpose. I do not consider that we should become bogged down in selecting a suitable private law label by which to describe this statutory instruction. If the surplus in the hands of the administrator is burdened in this way, there is no conflict with section 189. Section 189 is itself concerned with a surplus in a liquidation, but that begs the question: what is the surplus? If a fund comes into the hands of the liquidator already burdened by an obligation to pay interest to creditors who proved in the administration, so much of the fund as must be applied for that purpose will not count in the liquidation as making up part of any future surplus.

108.    I agree also with the judge that rule 2.88(7) applies only to a surplus which arises, or which can be retrospectively shown to have arisen, in the course of the administration. But the factual premise on which we are working is that all creditors who have proved in the administration have been paid their debts (barring post-administration interest) in full. So I do not see why this is a real objection. I agree also that rule 2.88(7) can only entitle those who have proved in the administration to statutory interest. But that, as it seems to me, is an accrued statutory right which should not be allowed to disappear into a black hole. It may well be, as the judge said, that it goes only a limited way to meet the problem, but a limited solution is better than no solution at all.

109.    Lastly, I agree with the judge that this interpretation of rule 2.88(7) will only have practical effect in relation to an administration that has become a distributing administration. But once again, I consider that a limited solution is better than no solution at all. A more complete solution will have to await the intervention of Parliament.

110.    The judge's solution was to hold that an entitlement to statutory interest could be pursued in a liquidation as an independent non-provable claim. However, as I have said the prevailing policy, both legislative and judicial, is to discourage and where possible to eliminate non-provable claims. I do not consider that the invention of a new species of non-provable claim is the right solution.

111.    Once again, in respectful disagreement with the judge, I would hold that accrued rights to statutory interest under rule 2.88(7) survive the transition from administration to liquidation. I would therefore allow the appeal against paragraph (iv) of the judge's order.

**Recovery of administration interest as a non-provable claim - paragraph (v)**

112.    In view of my conclusion in relation to the preceding issue, this question does not arise. It follows that I would allow the appeal against paragraph (v) of the judge's order.

**Liability under section 74 - paragraph (viii)**

113.    I have read Briggs LJ's judgment in draft. I agree with his conclusion on this question. Although I do not think that it matters on this issue, I have reservations whether in the case of an unlimited company the court's power to call upon contributories to contribute to the assets of the company is itself the property of the company. *Webb v Whiffin* (1872) LR 5 HL 711 was considered by this court in *Re*

*Pyle Works* (1889) 44 Ch D 534 and I consider that we are bound by the interpretation placed upon *Webb v Whiffin* in *Re Pyle Works*. At 574 Cotton LJ said:

> "In the case of an unlimited or of a guarantee company, what can be called for in the winding-up may not be, and I think is not, considered as part of the capital of the company; but in the case of a limited company, although there is a special provision in sect. 38, sub-s. 4, as to what is to be done when there is a winding-up, yet that is merely giving the power to call for that part of the capital of the company which has not been called up."

114.   At 575 he said:

> "Of course, in the case of a company which is a going company there is only a certain part of the capital called up from time to time by the directors, and there are usually restrictions put on the time within which the call shall be made; but that is done away with as regards the liquidator where a company is being wound up,.for in that case the call is not payable to the directors of the company, but to the liquidator, who is freed from those restrictions which exist when the company is a going company."

115.   At 582 Lindley LJ said:

> "A power conferred by the articles of a company to call up or to mortgage or otherwise deal with its capital extends to its nominal capital and (unless restricted in terms) to the whole of such capital. But such a power does not extend to other moneys which, although raiseable in the event of a winding-up, form no part of the capital of the company."

116.   Having referred to a number of sections of the 1862 Act he continued:

> "The general effect of these sections is to render each member liable to pay the full amount of his shares, and, in the case of unlimited companies and companies limited by guarantee, a further sum in the event of a winding-up, but only in that event."

117.   Lindley LJ then derived a series of propositions from the 1862 Act of which the second was:

> "That the Companies Act, 1862, does not say when or by whom the uncalled-up capital is to be called up before the company is in liquidation. The Act leaves this matter to be regulated by the company's articles of association. But after a liquidator is appointed he is the person to exercise the power of calling it up."

118.   At 584 he said:

> "Those moneys which are payable only on a winding-up, and
> which by the Act are excluded from the capital of the company,
> are never under the control of the directors, and cannot, I
> apprehend, be dealt with in any way by them. Those moneys
> form a statutory fund which only comes into existence when
> the company is in liquidation—that is to say, when the powers
> of the directors have ceased. But uncalled-up capital is in a
> totally different position."

119.   He then added that in his view *Webb v Whiffin* supported his analysis. Lopes LJ
referred to an earlier decision by Lord Selborne and continued at 588:

> "I cannot help thinking that Lord Selborne , when he used those
> words, intended to express an opinion that there could be no
> anticipation of future calls in any case so as to alter the
> administration of assets under a winding-up."

120.   In addition, if a call is made on contributories solely for the purpose of adjusting
rights between themselves, it is difficult to see how that is an asset of the company
rather than being a right to contribution as between the contributories themselves.

121.   That said, I agree with Briggs LJ that a contributory's liability under section 74
extends to all the liabilities of the company at all stages of the waterfall. If (as section
74 expressly provides) that liability extends to adjusting the rights of contributories,
which are at the bottom of the waterfall, the logic is inescapable that the
contributory's liability encompasses liabilities that are higher up the waterfall. It must
necessarily follow that the liability encompasses the creation of a surplus out of which
to pay statutory interest since that ranks higher than both non-provable claims and
also the rights of contributories as between themselves. I would therefore dismiss the
appeal against paragraph (viii) of the judge's order.

**Proof of the contingent liability under section 74**

122.   I have found this an exceptionally difficult issue on which I have changed my mind
more than once. In the end, however, I have come to the same conclusion as Briggs
LJ.

123.   Section 150(1) provides:

> "The court may, at any time after making a winding-up order,
> and either before or after it has ascertained the sufficiency of
> the company's assets, make calls on all or any of the
> contributories for the time being settled on the list of the
> contributories to the extent of their liability, for payment of any
> money which the court considers necessary to satisfy the
> company's debts and liabilities, and the expenses of winding
> up, and for the adjustment of the rights of the contributories
> among themselves, and make an order for payment of any calls
> so made."

Lehman Brothers

124.    Section 160(1) enables rules to be made delegating the power to make calls to the
        liquidator. Section 160(2) provides:

> "But the liquidator shall not, without the special leave of the
> court, rectify the register of members, and shall not make any
> call without either that special leave or the sanction of the
> liquidation committee."

125.    Rules were duly made and are contained in rules 4.202 to 4.205. Rule 4.202 delegates
        the court's power to make calls to the liquidator "as an officer of the court subject to
        the court's control". The rules then provide for the obtaining of consent either from
        the liquidation committee or the court, and conclude in rule 4.205 (2) by saying:

> "Payment of the amount due from any contributory may be
> enforced by order of the court."

126.    I agree with Briggs LJ that, for the reasons he gives, a contributory's liability falls
        within stages (a) and (b) of the *Nortel* test. The real question to my mind (as, I think,
        to his) is whether stage (c) is satisfied. The "regime under which the liability is
        imposed" is the insolvency code itself. Within that code there are conflicting
        indications. I return to *Re Pyle Works*. That case appears to say:

i)      That capital capable of being raised only in a winding up is not part of the
        capital of the company in the ordinary sense;

ii)     That the liquidator is the only person empowered to make the call;

iii)    That the statutory fund created by the call comes into existence only when the
        company is in liquidation;

iv)     That when paid the call is payable to the liquidator as an officer of the court,
        and not to the company;

v)      That there can be no anticipation of future calls.

127.    On the face of it these considerations point in favour of the conclusion that an
        administrator cannot prove for a call that could only be made by a liquidator. So, too,
        do the statutory provisions which give the power to make the calls to the court and, by
        delegation, to the liquidator as an officer of the court. As Briggs LJ rightly says, if an
        administrator can prove for a call that can only be made by a liquidator, what is to
        stop the directors of a company from doing so before it enters administration? If, as
        *Re Pyle Works* suggests, a call cannot be anticipated, that too would suggest that a
        future call cannot be proved for as a contingent debt, because that would be to
        anticipate the call. As Briggs LJ points out in his discussion of the scope of the
        contributory rule, this problem could be solved by putting the company into
        liquidation, and then the call could be made by the liquidator.

128.    On the other hand, the insolvency code both as drafted and as interpreted by the courts
        seeks to enlarge the scope of provable claims as far as possible, and to eliminate non-
        provable claims. If, at the time when a contributory enters an insolvency process
        (either administration or liquidation) a potential future call cannot be proved, then
        such a claim, when it materialises, would not rank as a provable claim but would be

relegated to the dwindling category of non-provable claims, because the cut-off date would have been missed. That would run counter to the clear trend of expansion of provable claims and reduction of non-provable claims that have characterised the development of the insolvency code since *Re Pyle Works* was decided.

129.   I agree also with Briggs LJ that it would be a defect in the insolvency code if members of a contributory were entitled to be paid out before a claim under section 74 could be made. To conclude that an administrator can prove for such a claim as a contingent liability before the appointment of a liquidator does at least enable the company to get a foot in the door, leaving the way open for a subsequent revaluation of its contingent debt.

130.   So far as a proof by directors is concerned, although this is a problem in the abstract, it may not in the end be a real one. At the stage when the proving company is still under the control of its directors any proof in the insolvency of the contributory is no more than a contingent debt. Unless the proving company is on the brink of insolvency itself, in practice the directors would not be able to lay their hands on any money. The proof would only become valuable if and when the proving company itself went into liquidation.

131.   After a good deal of hesitation I have come to the conclusion that the policy of the insolvency code in favour of the expansion of provable claims is to be preferred. To put the point another way, it is "consistent with the regime under which the liability is imposed to conclude that the step or combination of steps gave rise to an obligation under rule 13.12(1)(b)." Accordingly for these reasons, as well as those given by Briggs LJ, I conclude that the administrator is entitled to prove in the insolvency of a contributory for the contingent liability to answer a call made by a liquidator. I would therefore dismiss the appeal in relation to paragraph (viii) of the judge's order.

## The contributory rule

132.   I agree with the reasoning and conclusion of Briggs LJ on this issue and have nothing to add. I would therefore dismiss the appeal against paragraph (vii) of the judge's order.

## Lord Justice Briggs :

133.   With one exception, I agree with my Lord's conclusions on the issues raised by declarations (i) to (v) in the judge's Order, and with the reasons which he gives for those conclusions. I would therefore agree with the orders he proposes in relation to appeal against those paragraphs of the judge's order.

134.   In relation to the subordination issue, I have had less difficulty than my Lord in concluding that non-provable claims are capable of being "established or determined in the Insolvency", within the meaning of clause 5(2)(a) of the subordinated loan agreement.   As will become apparent when I address the question whether a contributory's liability includes the satisfaction of non-provable liabilities, I consider that their establishment is part of the insolvency process, and that establishing them by litigation outside that process is not required unless they are disputed.  But I agree with my Lord that non-provable claims are in any event payable within the Insolvency

Lehman Brothers

within the meaning of clause 5(2), so that this difference in our analysis has no effect upon the outcome.

135.  In relation to the issue about statutory interest accruing during an administration I would only add that, for my part, I have found the *Quistclose*-type trust analysis of the effect of rule 2.88(7) to be the best way, in legal terms, of giving effect to the clear legislative intent embodied in that provision. It does not provide a complete answer to the puzzling lacuna thrown up by the combined effect of section 189(2) of the Act and rule 4.93, where administration precedes liquidation. There will be many combinations of administration and liquidation where no surplus is thrown up during the administration to which rule 2.88(7) can attach, but where the statutory scheme gives rise to an inexplicable gap between the ending of the period for which contractual interest can be proved and the beginning of the period for which statutory interest is payable. In particular, this lacuna will continue to affect all non-distributing administrations which are followed by liquidation. I agree with my Lord that the sooner this inexplicable gap between contractual and statutory interest is remedied by amendment to the Act or to the rules, the better.

### Currency Conversion Claims – paragraphs (ii) and (iii)

136.  My respectful disagreement with my Lord is limited to his conclusion that currency conversion claims do not constitute, or therefore rank as, non-provable liabilities. In my view they do. I consider that the conversion into sterling of foreign currency debts as at the cut-off date is, as both rule 2.86 and rule 4.91 make clear, for the purpose of proof and, under rule 4.90(6), for the purpose of set-off. Apart from that, there is nothing in the Act or in the rules which prevents the foreign currency creditor reverting to his contractual rights, once the process of proof (and payment of statutory interest) has run its course, if there is then a surplus. If those rules have the effect contended for by the appellants, then a £1.3 billion contractual shortfall in what LBIE has thus far paid to its US Dollar creditors will go entirely unpaid, even though there are assets from which to do so, and this injustice will happen for reasons entirely unconnected with ensuring *pari passu* distribution of assets against provable debts.

137.  I accept Mr Dicker QC's submission that a currency conversion claim is not a separate or new claim arising from the effect of the two conversion rules. It is simply the balance of the creditor's original contractual claim which has not been discharged by the process of early conversion, proof and dividend under the relevant part of the insolvency scheme. The creditor bargained for payment in the specified currency. What he received was payment in sterling, by reference to a conversion date years earlier than payment. He would have no claim to be the victim of injustice merely by being paid sterling rather than the specified currency if a conversion date equivalent, or near equivalent, to the payment date was used. The injustice arises entirely from his exposure to currency risk during the potentially long period between conversion and payment, contrary to the contract, which placed that risk squarely on the company in liquidation or (here) distributing administration. It is not a risk against which the creditor can easily hedge, since (even if while unpaid he has the financial resources) he does not know when, or how much, he will eventually be paid.

138.  The starting point is to focus on insolvency law as it was immediately prior to 1986. For present purposes the important features are as follows. First, the regime for winding up companies only imported from bankruptcy law the statutory insolvency

code if and for as long as the company actually was insolvent: see section 317 of the Companies Act 1948, as explained by Mervyn Davies J in *re Lines Brothers Ltd* [1984] BCLC 215. A liquidation might affect a company which was solvent throughout (such as a winding-up on the petition of a shareholder, who could only petition if he could show that there would be a surplus for members). Alternatively a liquidation might begin on the basis of insolvency but turn out to be solvent as realisations of assets exceeded provable liabilities, as in the case of LBIE's administration.

139.   In either case non-provable liabilities still had to be settled before distributions could be made to members. This originally included interest: see the *Humber Ironworks* case. The basic principle upon which non-provable liabilities were dealt with was by reference to the creditor's full claim, whether under contract by reference to the concept of 'reversion to contract' used in that case, or in tort, where the liability was not provable. To the general principle that the insolvency code did not affect the underlying debt, explained by Lord Hoffmann in *Wight v Eckhardt Marine,* there were then no exceptions except for disclaimer, which was first applied to companies in liquidation (solvent and insolvent) in 1929.

140.   The rules by which distribution of the assets of a solvent company (solvent in the sense that provable debts could be paid in full) was effected were almost entirely judge-made. These included the 'reversion to contract' rule which I have just described. They also included the principle that any non-provable liabilities had themselves to be satisfied *pari passu* if there was a shortfall of assets. Finally, distribution to members was also *pari passu* in proportion to the size of each member's shareholding.

141.   Notwithstanding the statutory code set out in the succession of Bankruptcy Acts, judge-made rules continued to form an important part of bankruptcy law and, more importantly for present purposes, the law of corporate insolvency. Examples are set-off, the anti-deprivation rule, the rule against double proof and the contributory rule. Bankruptcy law was therefore a mix of statutory and judge-made provisions, not a self-contained statutory code.

142.   *Re Dynamics* and *Re Lines Brothers* need to be understood in that context. Both cases sought to fashion a judge-made rule to deal with the establishment in *Miliangos* of the principle that English law both could and should recognise the injustice of converting a foreign currency obligation into sterling at the date of the commencement of proceedings. They did so as an adjunct to the law of bankruptcy, which was applicable to the winding-up of insolvent companies, by requiring that, as an exception to the *Miliangos* principle, proof of the debt constituted by a foreign currency obligation required conversion into sterling at the cut-off date, so that all proving creditors could be treated equally, in a single unit of account. In particular that adjunct was a judge-made part of the legal process of proof of debts. It had no wider purpose.

143.   The obiter passages in the judgments of Brightman and Oliver LJJ to which my Lord has referred make it clear that neither of them thought that, by adding this element to the applicable law about proof in an insolvent liquidation, they were deciding anything about how to deal with foreign currency liabilities in a solvent winding-up. Their cautious view that the 'reversion to contract' principle would continue to apply

was the natural result of their appreciation of the force of that principle in solvent liquidation, as explained in *Humber Ironworks,* and the injustice which might flow if a cut-off date conversion was rigidly applied. With respect to my Lord's contrary view, they cannot have thought that the conversion for the purpose of proof in insolvency which they were approving meant that the conversion operated as a substantive alteration of the creditor's rights for all purposes. Leaving aside disclaimer, such an alteration was unknown in those days, since statutory insolvency set-off had not by then been introduced.

144.    The 1986 insolvency legislation made fundamental changes to the structure which I have described. First, it introduced a bespoke version for companies of the *pari passu* based scheme previously cross-applied from bankruptcy law. Secondly, it applied that scheme both for insolvent and solvent companies in liquidation. Thirdly, it introduced for the first time certain provisions which permanently affected creditors' rights. As my Lord has noted, the most important example is set-off. Disclaimer had been part of the winding up scheme for many years. But, despite its greater detail, it was still not a complete statutory code. Important judge-made principles continued to be applicable, such as the rule against double proof, the contributory rule and the anti-deprivation principle.

145.    More importantly, the new legislation did not purport to deal with non-provable claims, which remained, even after 1986, a much wider class than they are now, including for example all claims in tort for unliquidated damages, such as the asbestosis claims considered in *Re T&N.* Even now there remain important classes of non-provable claims, such as those of the victims of the crash of the airliner powered by Rolls Royce engines after the old company of that name went into liquidation, or my Lord's example of the pedestrian injured by a company van while trading during administration. While it may be assumed that Parliament specifically intended them not to be provable liabilities in a liquidation, there can be no basis for inferring a legislative intent that they could not be pursued in a liquidation in the event of a surplus after payment of provable debts and statutory interest. In short, the 1986 legislation simply passed them by, leaving them to be pursued, in the rare event of a surplus, by reference to the pre-existing judge-made law.

146.    Thus, although the legislation provided for the first time that, in a solvent liquidation, a *pari passu* process of distribution against proved claims would be the first stage, distribution of any surplus (after statutory interest) would continue to require the liquidator to treat non-provable claimants as having an entitlement ranking prior to that of the members, applying legal principles not to be found set out in detail anywhere in the legislation.

147.    Against that background it is of course a question of construction whether or not the Insolvency Rules provide that claims in foreign currency can only be pursued by the process of conversion and proof set out in Rules 2.86 and 4.91, so that proof followed by payment leaves them wholly exhausted, or whether, as the judge concluded, those rules merely provide a means of quantifying the amount of the proof, for the purposes of proof, but leave any residue of the original contractual entitlement intact, and capable of being pursued in the event of a surplus.

148.    To my mind the language of the two rules points firmly in the direction identified by the judge. They each use the same formula; "for the purpose of proving...". The

Lehman Brothers

effect of each rule is simply to provide an exchange rate for the necessary conversion of the face value of the foreign currency debt into sterling so that the creditor can prove for a specific sterling amount. This was exactly what the judge-made rule had done, also (and only) for the purpose of proof.

149.    It is clear that the draftsman had in mind the concept of a rule being applied for a specific limited purpose. For example, rules 2.105(2) and 11.13(2) (relating to future debts) both begin: "for the purpose of dividend (and no other purpose)". It might be asked why the same phrase "and for no other purpose" was not included in rules 2.86 and 4.91 by way of emphasis. The answer may be that conversion into sterling does operate for one other purpose, namely insolvency set-off: see rule 4.90(6).

150.    If conversion into sterling were to operate for all purposes as a permanent alteration to the foreign currency creditor's contractual rights, then the phrase "for the purpose of proving" would appear to be otiose. So would rule 4.90(6). More generally the regime for insolvency set-off in rule 4.90 provides by way of contrast a useful example of a rule which does have substantive permanent effect, and it is couched in terms which make no mention of any limited purpose. Rule 4.90(3) simply provides that set-off as there specified should occur wherever a company goes into liquidation, solvent or otherwise. Similarly section 178 of the 1986 Act makes provision for disclaimer in similarly unqualified terms, as did its predecessor in the 1948 Act.

151.    But not every provision designed to facilitate the process of proof is substantive or permanent in effect. For example, the valuation for the proof of a contingent debt under rule 4.86(1) is expressed to be capable of revision by reference to any relevant change of circumstances or fresh information. Discount for the futurity of debts is expressed to be solely for the purposes of dividend.

152.    There is to my mind no logical reason why a provision for conversion into sterling of a foreign currency amount by reference to a historical date should necessarily operate as a substantive permanent alteration of the creditor's contractual rights, except only to the extent that set-off is involved. No injustice is involved in its permanent effect for that purpose because set-off is self-executing at the moment of the conversion, when the foreign currency amount is worth exactly the same as the sterling equivalent. The creditor's foreign currency debt is treated as paid in whole or in part by any sterling debt which it owes the company, or a debt in any currency for that matter, converted to sterling for that purpose. Again, the application of currency conversion to set-off is necessary, if statutory set-off is to work.

153.    The potential for injustice caused by the permanent conversion of a foreign currency debt into sterling is entirely the result of the inevitable gap in time between the conversion date and the payment of dividends, during which the risk of depreciation in sterling is thrown, contrary to the contract, upon the creditor. But absent set-off there is no reason why the conversion for the purpose of proof should be anything more than a means of part-payment which is fair as between all proving creditors, leaving the foreign currency creditor with a remedy against a surplus if (but only if) sterling has depreciated in the meantime, and after all proving creditors have been paid in full with statutory interest.

154.    My Lord gives ten reasons for his preference for a permanent substantive effect as the true construction of the two conversion rules. I must briefly explain why they have

not persuaded me. His first, second, third and ninth reasons are, in summary, that the construction which gives rise to non-provable debts after currency conversion would run counter to the trend in modern insolvency legislation to include and deal fully with liabilities within the process of proof as far as possible, and counter to the recommendations of the Cork Committee and the Law Commission. I agree that, generally, the legislation should be construed so as to admit to proof rather than exclude from proof as many liabilities as possible, and to deal with them as fully as possible. That was my view in *Re Nortel* at first instance (*Bloom v Pensions Regulator* [2010] EWHC 3010 (Ch) at paragraphs 102-103), but it required the Supreme Court to reinforce this principle by overruling a series of contrary authorities in this court, which had prevented the liability in question from being admitted to proof. But this general principle is fully achieved by treating the currency conversion rules as being only 'for the purposes of proof' (and set-off). It admits foreign currency debts to proof and deals with them as fully as is consistent with a *pari passu* distribution of the assets of an insolvent company. But it is no part of the purpose of that policy to disentitle a creditor from the enforcement of a contractual right to the fullest extent where the debtor company has a relevant surplus after payment of provable debts and statutory interest. As is illustrated by the very unusual facts of this case, that would merely cause a wholly unnecessary injustice, unsupported by the need to fulfil any policy requirement.

155.    Nor in my view can legitimate recourse be had to any requirements of simplicity or tidiness. The history of cases about the insolvency scheme since 1986 is littered with examples of cases where the Act and rules either fail to prescribe at all for particular situations, or do so in a confusing or messy way that gives rise to long and complex litigation about their meaning and effect, followed sometimes by amendment. The *T&N* case is an example in point, as is the *Nortel* case. Nor, as I have sought to explain, is the statutory regime anything like a complete code, even now.

156.    I would agree with my Lord that if this question of construction turned purely on the written recommendations and commentary of the Cork Committee and the Law Commission then there would be grounds, on balance, for favouring the Appellants' construction of the conversion rules. But this is a case where there is legislative language to be construed which directly addresses the issue under consideration, namely the repeated phrase 'for the purpose of proving'. Furthermore the Appellants' construction produces an undoubted injustice, running in this case to more than a billion pounds, which is simply not addressed in those commentaries. No reason is given for the view that conversion at the cut-off date is satisfactory for solvent liquidation, nor is this court's *obiter* reasoning to the contrary in *Re Lines Bros* specifically addressed.

157.    My Lord's fourth, fifth and sixth reasons all suggest that the judge's construction (which I prefer) would run counter to the reasoning in *Re Lines Bros* and *Dynamics.* But with respect I cannot see how that can be so, in the light of the readiness of both Oliver and Brightman LJJ to envisage (albeit *obiter*) a reversion to contract approach applying in the event that the company being wound up turned out to be solvent. I consider that the whole of the analysis in those two cases which supports conversion at the cut-off date is predicated upon the need to depart from the creditor's contractual entitlement for the purposes of proof, but not for any other purpose. If (as usually happens) there is no surplus after paying provable debts in full (with statutory

interest), then the effect of conversion will in practice be permanent and substantive in effect, but not otherwise.

158.   In particular I am not persuaded by Mr Wolfson QC's submission that the *obiter* observations of Oliver and Brightman LJJ lose their force if (as now) a liquidator cannot choose to pay a proving creditor in a depreciating foreign currency. That may have been part of the mischief which the *obiter* remarks were addressing, but what matters is that they both envisaged that the reversion to contract principle established in the *Humber Ironworks* case was the principled solution to any injustice caused to a foreign currency creditor of a company which was, or turned out to be, solvent.

159.   My Lord's sixth reason relates to a situation where sterling appreciates against the contractual currency, or where the creditor has debts owed in a basket of currencies. Taking those in turn, I accept that both competing constructions of the conversion rules give a non-contractual benefit to such a creditor, if he is paid in full, in sterling and with interest. But this is a necessary consequence of the *pari passu* scheme of distribution against provable claims, which generally entitles a creditor to keep what had been distributed by dividend, even if some other creditor's claim later turns out to have been undervalued. I am not persuaded that this occasional benefit should lead to the conclusion that the injustice inherent in the Appellants' construction should therefore be treated as a necessary consequence, where it occurs.

160.   As for multi-currency claims, the question whether the creditor must bring into account depreciation in one currency against appreciation in others is likely to turn on the contractual structure between the creditor and the company, and the rules as to insolvency set-off. If all the debts arise from a single contract there may be an express or implied requirement to account, but not otherwise. Subject to that, there is to my mind no real injustice in permitting a creditor to pursue to the full a particular contractual entitlement against a debtor, merely because he has been fully compensated (or more than fully compensated) in relation to some quite different contract. But these are matters which, if they arise in fact, may well call for more careful consideration than has been appropriate on this appeal. I do not regard them as impacting significantly on this issue of construction.

161.   The seventh reason arises from the undoubted fact that the currency conversion rules apply, like all the other rules about proof of debts, both to solvent and insolvent winding up. This was a major change wrought by the 1986 legislation, as I have described. The statutory part of the insolvency scheme is now applied to all companies in liquidation. It is by no means confined to the currency conversion rules, but applies also to the whole body of rules which focus on the cut-off date, to the exclusion from proof of post cut-off date liabilities, as well as to set-off.

162.   In the context of an undoubtedly solvent company it is not easy to see why any of those rules should be applied, where the undoubted consequence is that there has then to be a two stage process, first of proof and then of the satisfaction of non-provable liabilities. But there are equally unsatisfactory aspects of the old regime, in which bankruptcy law was applied only to insolvent companies. Parliament had a choice to make between two alternatives, neither of which can be said to have been ideal. Perhaps the main justification (apart from uniformity) of the choice actually made is that companies may move into and out of insolvency during a liquidation or distributing administration, so that it is better to deal by a single process first with the

claims of all those entitled on insolvency, leaving until later the just distribution of any surplus, if there turns out to be one in fact. A second obvious reason is that insolvent liquidation or administration is overwhelmingly the main target of the legislation, as the name of both the Act and the rules makes clear.

163.    However that may be, I do not regard that choice as saying much about the construction of the currency conversion rules, all the more so because they are prefaced by the phrase 'for the purpose of proving'. They are merely one provision which, (like the cut off-date itself) is not the end of the story if there is a relevant surplus to be distributed to those entitled to it.

164.    I do not, with respect, understand why the judge's construction runs counter to the *Danka Business Systems* case. The question in that case was whether the liquidator of a solvent company should be required to set aside a fund to meet contingent claims, where they had already been valued and paid, before distributing a surplus to members. Patten LJ acknowledged (at paragraph 38) that any contingency which occurred before actual distribution to members could be the subject of a late proof, and that a liquidator might delay distribution if a relevant contingency appeared to be on the point of occurring. There is nothing contingent about currency conversion claims, viewed on any particular date before actual distribution. Nor were there in that case non-provable liabilities of any kind.

165.    Finally, I agree that the insolvency scheme occasionally produces winners and losers. It does so where that is a necessary consequence of the need for *pari passu* distribution of a fund which is insufficient to pay all liabilities in full. I also agree that where the surplus after payment of provable debts and statutory interest is insufficient to pay non-provable liabilities in full, then a further process of *pari passu* distribution is then called for, as between those with non-provable claims, as would also be required at the very end of the waterfall, as between members. This may require the imposition by the liquidator, at the direction of the court, of a further cut-off date, including a date for currency conversion. But I do not see why the winners and losers concept should be applied where it is unnecessary to do so, and I do not regard the very occasional requirement to conduct a *pari passu* distribution as between non-provable liabilities as a reason just to disregard the unfulfilled contractual entitlements of currency conversion claimants, running here to over a billion pounds. This is *par excellence* an area where the judges will have to cope, since the statutory provisions do not condescend at all to the detail of dealing with the undoubted need to recognise non-provable liabilities as having priority to the claims of members to a surplus. The Chancery Division is well equipped to deal with such issues as they arise, having been doing so in relation to the administration of estates for centuries.

166.    The result is that, in respectful disagreement with my Lord, I consider that the judge was correct to regard currency conversion claims as non-provable liabilities falling to be dealt with as such in the event of a surplus after payment of provable debts and statutory interest. The language of both relevant rules contains a clear direction to treat conversion as being for the limited purpose of proof of debts, and a separate sub-rule applies the conversion rules for the additional purpose of set-off. Great injustice will be caused in ultimately solvent liquidations if those rules are given a wider effect than expressly prescribed, and there is in my view no convincing reason why that should be so. I would therefore dismiss the appeal against paragraphs (ii) and (iii) of the judge's order.

**The consequences of LBIE being an unlimited company**

167.   The unlimited company has, for the last hundred years at least, been such an extremely rare species that the issues thrown up by LBIE's re-registration as such in December 1992 have involved both the judge and this court navigating in waters which are either uncharted or for which the available charts are very old indeed. As the judge said, the most recent case dealing with issues about calls was decided in 1917 and even then most of the reported cases concerned partly paid shares, rather than the liabilities of members of unlimited companies.

168.   To some extent, the difficulties thrown up by having to use very old charts are mitigated by the fact that the statutory provisions about the liabilities of members of unlimited companies have not significantly changed since they were first introduced in the Companies Act 1862. As will appear, I have found the analysis of the purpose and effect of those provisions set out in some of the earliest cases which followed the passing of that Act to be of considerable assistance in resolving the issues which I must now describe.

**The issues**

169.   As presented to the judge, the issues arising in connection with the liability of LBIE's contributories are as follows:

   i)   The extent of the liability arising under section 74 of the Act (paragraph (vi) of the judge's order);

   ii)   The application of the contributory rule (paragraph (vii) of the judge's order);

   iii)   Whether, and if so when, a liability for future calls can be the subject of proof in the administration or liquidation of a corporate contributory (paragraph (viii) of the judge's order);

   iv)   The effect of set-off in the administration or liquidation of a corporate contributory (paragraph (ix) of the judge's order) ;

   v)   The effect of set-off in the administration or liquidation of the company (paragraph (x) of the judge's order).

170.   On appeal, the issues (iv) and (v) fell away, because it was common ground that, if the contingent s.74 liability for future calls was provable in the administration or liquidation of the corporate contributory, then set-off would be applicable as declared by the judge.   Furthermore, it became clear during the course of argument in this court that greater clarity is achieved by taking issue (iii) before (ii). This is, again, mainly because of the consequences of the common ground about set-off.

171.   Mr. Trower accepted that if (like the judge) we were to conclude that liability for future calls can be the subject of proof by LBIE's administrators in the administration or liquidation of its members LBHI2 and LBL, then, on authorities binding at least on this court, statutory set-off will apply as between that proof and any claims by those two members of LBIE by way of proof in LBIE's administration. Mr Trower further concedes that, where statutory set-off applies, this must oust the contributory rule.

**The extent of the liability arising under section 74 of the Act (paragraph (vi))**

172.    Section 74 of the Act provides, so far as is relevant, as follows:

> "(1)    When a company is wound up, every present and past member is liable to contribute to its assets to any amount sufficient for payment of its debts and liabilities, and the expenses of winding up, and for the adjustment of the rights of the contributories among themselves."

> On its face this broad provision applies to all registered companies, but sub-section (2) provides limitations on the liability of past members and, in sub-sub-section (2)(d), that no contribution is required from any member exceeding the amount unpaid on shares, where the company is limited by shares. Sub-section (3) provides protection from unlimited liability of members of companies limited by guarantee.

173.    The specific issue under section 74(1) is whether the phrase "its debts and liabilities" means only the provable debts of the company being wound up, or includes (under "liabilities") statutory interest and non-provable liabilities. The judge concluded that the phrase included both of those. By their appeals, LBHI2 and LBL maintain that neither is included.

174.    It is convenient to begin with some common ground. First, calls upon members of an unlimited company can only be made by the liquidator after the company has gone into liquidation. The position may be otherwise in respect of partly-paid shares, but that is of no relevance for present purposes. Secondly, calls under section 74 may be made in respect of any of the items numbered (1) to (5) and (8) of Lord Neuberger's waterfall in *Re Nortel* ("the waterfall"). In particular, the express reference in section 74(1) to the "adjustment of the rights of the contributories among themselves" is an aspect of the final stage (8) of the waterfall.

175.    Secondly, it is common ground that the word "debts" does not include statutory interest or non-provable liabilities, but rather refers only to provable debts. Mr. Trower made this concession to the judge, on the basis of rules 12.3 and 13.12. The judge accepted that it was rightly made, and no argument to the contrary was advanced in this court.

176.    Thirdly, there is no limit to the number of calls which a liquidator may make against members of an unlimited company.

177.    Fourthly, the power to make calls on contributories is vested in the court, but delegated to the liquidator, both in compulsory and voluntary liquidations.

178.    The main thrust of the appellants' submissions on this issue may, at some risk of over-simplification, be summarised as follows. First, the liability of members under section 74 is circumscribed by the extent and purposes of the power to make calls, which exists only for the specified purposes of the statutory insolvency scheme. Leaving aside expenses and the adjustment of the rights of contributories, those purposes are confined to the payment of provable debts. The payment of non-provable liabilities is not within the statutory scheme.

179.    Secondly, although the payment of statutory interest is of course part of the statutory scheme, it is not a liability of the company. Nor, since it was only introduced in 1986, can it have been within the meaning and intent of the statutory liability of contributories, which has remained substantially unaltered since the mid-nineteenth century.

180.    Thirdly, since the payment of statutory interest depends upon there first being identified a surplus, the notion that contributories can be required to create such a surplus is akin to a person hauling himself up by his own bootstraps. In the absence of such a surplus, there is simply no provision for statutory interest which can be made the subject of a call.

181.    These arguments, though presented at length and with admirable sophistication, did not persuade the judge. Nor have they persuaded me.

## Analysis

182.    To my mind, the starting point is an appreciation of the purposes for which the system of calls upon contributories made in liquidation was first introduced, by the 1862 Act. Prior to that legislation (which as the judge noted has been described as the "Magna Carta of co-operative enterprise"), the unlimited liability of members of joint stock companies was enforced against them directly by the company's creditors in the much same way as against partners. The provision for winding up, and the making of calls upon contributories, was a substitute for direct enforcement by creditors against members, but was in no way intended to limit the extent of members' liability, unless specifically limited in the ways now set out in sub-sections (2) and (3) of section 74. In *Oakes v Turquand* (1867) LR 2 HL 325, at 364, Lord Chelmsford said, of the new mode in which the creditor was to seek his remedy, that:

> "It plainly left every shareholder subject to all previous liabilities, except only that a line or boundary was fixed, beyond which his obligations could not be extended."

That "line or boundary" was a reference to liability limited by shares or by guarantee, the implication being that the member of an unlimited company was liable to the same extent as he would have been prior to the 1862 Act, but by a different route of enforcement.

183.    The original ancestor of section 74 was section 38 of the 1862 Act, which spoke in exactly the same terms of the "debts and liabilities of the company". *Webb v Whiffin* (1872) LR 5 HL 711 was another case about the construction of section 38 of the 1862 Act. It decided, in the clearest terms, that contributions made by shareholders following a call under section 38 became part of the assets of the company. True it is that the calls were made against the holders of partly paid shares in a limited company, and that their Lordships' reasoning was in part based upon a perception that the liabilities were part of the company's capital, which is probably not the case in relation to calls in respect of unlimited companies: see *Re Pyle Works* (1889) 44 Ch D 534, at 574. Nonetheless, the thrust of the reasoning in *Webb v Whiffin* seems to me as applicable to unlimited companies as it is to partly paid shares in a limited company: see per Lord Hatherley LC at 717-8 and 720-1, Lord Chelmsford at 724 and

Lord Cairns at 734-5.  Perhaps the most telling dictum is Lord Cairns' rhetorical question, at 735:

> "Whose property are they, if they are not the property of the company"

184.   It is convenient next to focus upon non-provable liabilities.  It has in my view always been part of the duties of a liquidator to pay the company's non-provable liabilities, to the extent that there are assets available for that purpose after payment of provable debts and (now) statutory interest.   Thus for example in *Re Humber Ironworks* contractual interest falling due after the date of the winding up was payable out of any surplus.  Furthermore, there were, prior to recent statutory amendments and before the re-casting of the test for provable debts in the *Nortel* case, wide categories of non-provable liabilities, with which it was the duty of the liquidator to deal, before making payments of any surplus to members.

185.   I consider that Mr. Snowden's submission that the payment of non-provable liabilities is no part of the winding-up scheme is simply wrong.  True it is that, in sharp contrast with provable debts and statutory interest, the statutory scheme provides no detailed machinery for dealing with such liabilities; they have always been dealt with in accordance with judge-made principles.  But the general scheme of the 1986 Act nonetheless includes dealing with non-provable liabilities as part of the liquidator's duties.  For example, section 107 provides, in relation to creditors' and members' voluntarily winding-up, that:

> "Subject to the provisions of this Act as to preferential payments, the company's property in a voluntary winding up shall on the winding up be applied in satisfaction of the company's liabilities *pari passu* and, subject to that application, shall, unless the articles otherwise provide, be distributed among the members according to their rights and interests in the company."

Since it is plainly not the case (and never has been) that the liquidator may distribute to members without regard to non-provable liabilities, it is clear that the word "liabilities" in S.107 must include them.  That does not of course mean that the non-provable claimants share *pari passu* with proving creditors.  But it does mean, in the event of a surplus after payment of provable debts and statutory interest, which is insufficient to pay non-provable liabilities in full, that those liabilities are themselves settled *pari passu*.

186.   The word "liabilities" in section 107 cannot in any event be limited to provable debts since, as is common ground, statutory interest payable under section 189 in relation to the period after the commencement of the winding up is not a provable debt, but must be paid in priority to shareholders.  Statutory interest must therefore fall within the word "liabilities" as it is used in that section.

187.   Mr. Snowden submitted that non-provable liabilities fall entirely outside the winding-up scheme, and can only be pursued by those to whom they are payable by taking legal proceedings, obtaining judgment and executing against the company's surplus, before it is paid to shareholders under the statutory scheme.  In this respect Mr.

Snowden derived some support from the analysis of David Richards J in *Re T&N Limited* [2006] 1 WLR 1728.   Speaking of non-provable asbestosis claims (subsequently admissible to proof by statutory amendment) he said, at paragraphs 106-107, that, in the event of a surplus otherwise available to shareholders, the court would not restrain the asbestosis claimant from obtaining and then executing a judgment, but he left open the question how a surplus insufficient to meet all such claims would fairly be distributed.

188.    In my judgment, David Richards J did not thereby mean to say either that dealing with such non-provable claims fell outside the scope of the liquidator's duties, or that the only means whereby they could be recognised and paid was by each claimant pursuing litigation to judgment. Litigation is a means of dealing with disputed claims, and may (with the court's permission) be resorted to even in relation to disputed claims which, if established, would be provable claims.   It is in my view wholly unnecessary for a liquidator to force a non-provable claimant to obtain a judgment before paying it out of a surplus available for that purpose. If litigation were the only route for such claimants, this would lead to an unholy rush to judgment, the waste of costs and court time, and even a race between non-provable claimants and shareholders seeking a distribution. I consider that section 107 makes it clear that it is part of a voluntary liquidator's duty to deal with non-provable liabilities of the company, *pari passu* if a shortfall makes that necessary, before distribution to members.

189.    The provision which most nearly reflects section 107, in the context of a compulsory liquidation, is section 143(1) which provides that:

> "The functions of a liquidator of a company which is being wound up by the Court are to secure that the assets of the company are got in, realised and distributed to the company's creditors and, if there is a surplus, to the persons entitled to it."

There is neither a reference to liabilities nor to the *pari passu* principle.  But these differences are, in my view, no more than historical accidents in drafting.  No-one doubts that the *pari passu* principle applies as much to compulsory as to voluntary liquidation.  Nor does it matter whether non-provable liabilities are to be satisfied on the basis that they are owed to the company's creditors, or on the basis that the persons to whom those liabilities are owed are among the persons entitled to the surplus.   Plainly, the "persons entitled" include the members, if the surplus is sufficient to permit distribution to them.  Since the members are not entitled to the assets of a company in liquidation in priority to those with non-provable claims, it follows in my view that payment of non-provable liabilities is as much a part of the compulsory liquidator's duty as it is part of the voluntary liquidator's duty.

190.    Turning to statutory interest, it is not suggested by the appellants that payment of statutory interest is not part of the winding-up scheme. Plainly it is.  Rather, the submissions are first, that statutory interest is not a liability of the company in liquidation and second, that, since it is payable only out of a surplus, the use of a call to create such a surplus would fall foul of the bootstraps argument. Thirdly, they say that the payment of statutory interest (when introduced in 1986) could have been, but was not, added to the items in section 74(1) in respect of which members are liable to contribute.

191.  I shall address each of these arguments in turn, but to my mind the starting point is that they must be of sufficient collective weight to displace the apparent anomaly that, although members are liable under section 74(1) to contribute to the payment of expenses, provable debts, non-provable liabilities and adjustments between contributories, they are for some reason not liable to contribute to the only other item in the waterfall, namely statutory interest, which lies ahead of non-provable liabilities and contributories in the order of priority.

192.  There is some authority supportive of the view that statutory interest is not a liability of the company in liquidation.    Statutory interest was first introduced as an entitlement of proving creditors in an insolvent corporate liquidation by section 10 of the Supreme Court of Judicature Act 1875, which cross-applied the "Law of Bankruptcy" to the winding up of any registered company "whose assets may prove to be insufficient for the payment of its debts and liabilities and the costs of winding up…".    By 1983, the statutory successor to section 10 was section 317 of the Companies Act 1948, which cross-applied the bankruptcy regime "in the winding-up of an insolvent company registered in England…".    By then, statutory interest in a bankruptcy was provided for by section 33(8) of the Bankruptcy Act 1914, which provided that:

> "If there is any surplus after payment of the foregoing debts, it shall be applied in payment of interest from the date of the receiving order at the rate of £4 percentum per annum on all debts proved in the bankruptcy."

The reference to "foregoing debts" was a reference to provable debts.    A series of cases had established that the question whether a company was insolvent within the meaning of section 317 was the same as the question, under section 10 of the 1875 Act, whether the assets of the company were insufficient for the payment of its debts and liabilities and the costs of winding up.

193.  In *Re Lines Bros Limited* [1984] BCLC 215 the issue was whether the proving creditors of a company in creditor's voluntary winding up were entitled to statutory interest, in circumstances where the winding-up had produced a surplus after payment of provable debts and expenses.    Mervyn Davies J had to decide (*inter alia*) whether statutory or contractual interest falling due after the commencement of the winding up formed part of the debts and liabilities of the company for the purposes of the section 10 test, in order to determine whether the company was still insolvent within the meaning of section 317.    At page 223, he said this in relation to statutory interest:

> "This is not a debt or liability within S.10 for two reasons: (1) the section speaks of 'its' debts and liabilities. At no stage can statutory interest be regarded as a debt or liability of the company. The liquidator's obligation under S.33(8) to pay interest out of the surplus is pursuant to a statutory direction to him, being an obligation which is part of the statutory scheme for dealing with a company's assets which comes into operation at the outset of the winding up…"

194.  There is an obvious linguistic similarity between the phrase "the payment of its debts and liabilities and the cost of winding up" in section 10 of the 1875 Act and "its debts

and liabilities, and the expenses of the winding up..." in section 74(1) of the 1986 Act. But the purposes of the two provisions are entirely different. Section 10 was designed to serve as a solvency test, so as to identify the circumstances when the bankruptcy regime (including the payment of statutory interest) would be applicable to a company in winding up. By contrast, section 74(1) is concerned to identify the items for which contributories are liable to contribute to payment, when the company is in liquidation. By 1986, the entitlement to statutory interest no longer depended on whether the company was solvent or not: see section 189(2) and (for administration) rule 2.88.

195.   The question whether Mervyn Davies J's conclusion, namely that statutory interest is left out of the solvency analysis under section 317, is right or not does not arise on this appeal. Furthermore, as the judge noted, the passage which I have quoted above was only one of Mervyn Davies J's reasons for reaching that conclusion. But in the very different context of contributories' liabilities under section 74, I am by no means persuaded that, merely because payment of statutory interest in a liquidation may be capable of being described as a direction given to the liquidator, statutory interest is not therefore a liability of the company. In sharp contrast with bankruptcy (where the assets of the bankrupt vest in his trustee) statutory interest is, in general, payable out of the assets of the company to persons with a statutory right to receive it. Furthermore, neither section 189 nor rule 2.88 speaks in express terms of a direction to the liquidator or administrator. Both merely provide (as indeed did section 33(8) of the Bankruptcy Act 1914) that statutory interest "shall be" paid. I can see no good reason why a statutory requirement for payment of a sum out of the assets of a company to persons entitled to it should not be regarded as a liability of the company, at least for the purposes of section 74. The contrary view would give rise directly to the anomaly of an apparent gap in the middle of the waterfall to which the fruits of a call on contributories could be applied, which I have already described.

196.   The bootstraps argument packs a powerful initial punch. If the liability to pay statutory interest depends on there being a surplus, why should contributories be liable to create the very surplus upon which that liability depends?

197.   The judge's answer (at paragraph 165) was that since the right to make calls was itself an asset of the company, where the aggregation of that right with the other assets of the company disclosed a surplus, then the making of the call, together with payment by contributories in response to it, merely enabled statutory interest to be distributed, rather than created the surplus in the first place. As will later appear, I agree with the judge that the right to make calls, or rather the members' liability to contribute under section 74(1), is an asset of the company, so that his answer to the bootstraps argument is in my view correct.

198.   There is I think a further reason why the bootstraps argument is wrong, in addition of course to the anomalous gap in the waterfall which it would create. In my view, the use in section 189, rule 2.88 and elsewhere in the statutory code of the concept of payment out of a surplus is merely a convenient way of identifying liabilities which fall lower than other liabilities in the priorities encapsulated in the waterfall. No class within the waterfall receives anything unless there is a surplus after payment in full of the prior class or classes. No-one doubts that provable debts are liabilities of the company, but they are payable only if there is a surplus after payment of floating

Lehman Brothers

charge creditors. Statutory interest is by the same token a liability of the company, payable only if there is a surplus after payment of provable debts.

199.   The appellants' final argument on this point was that, when statutory interest was introduced into the corporate insolvency scheme, section 74(1) was not amended so as to add it to the burden upon contributories. In his skeleton argument, Mr. Snowden added that:

> "It would be surprising if the legislative creation of statutory interest in 1986 imposed, without specific discussion in the Cork Report or legislative materials, an unheralded obligation on contributories to contribute to pay for it."

200.   It is of course true that, when what is now section 74(1) was originally introduced in 1862, there was no provision for payment of statutory interest in winding-up. But contractual interest remained a liability of the company, provable until the commencement of winding up, and a non-provable liability thereafter, payable out of any relevant surplus, before distribution to members: see the *Humber Ironworks* case. Furthermore, statutory interest was introduced into corporate insolvency, albeit by the cross-application of bankruptcy law, as long ago as 1914.

201.   Nonetheless, my main reason for rejecting this submission is that, once it is recognised that statutory interest is a liability of the company, section 74(1) needed no amendment in order to make contributories liable in respect of it.

202.   I have already mentioned the anomaly which would arise if contributories were liable in relation to the lowest item in the waterfall, namely the adjustment of contributories' rights among themselves, yet not liable for the two items above it, namely statutory interest and non-provable liabilities. It was submitted for the appellants that there was no necessary anomaly of this kind, since the liquidator could make a call, and set aside its fruits, specifically for adjusting rights between contributories, without calling or using the fruits of a call for statutory interest or for the settlement of non-provable liabilities. In my judgment this theory is misconceived in the light of the analysis of the process of making calls set out in *Webb v Whiffin*, to which I have already referred. All the proceeds of a call become part of the assets of the company, available for whichever liabilities remain to be satisfied in the waterfall.

203.   So, for all those reasons, which do not differ in substance from those given by the judge, I conclude that the section 74(1) obligation of contributories does extend to statutory interest and non-provable liabilities. I reach that conclusion with some relief, since the contrary would suggest an inexplicable element of irrationality in the statutory scheme.

204.   I would therefore dismiss the appeal against paragraph (vi) of the judge's order.

**Is the contingent liability for calls capable of proof in the administration or liquidation of a member? (paragraph (viii))**

205.   This is a more difficult question. The underlying facts which give rise to it are as follows. LBIE went into administration in September 2008. LBL, which owns 1 share in LBIE, went into administration on the same day. LBHI2, which owns the

remaining shares in LBIE, went into administration in January 2009. Both LBIE and LBL are in distributing administration, but LBHI2 is not, at least not yet. Both LBL and LBHI2, as members of LBIE, are vulnerable to any calls which, if and when LBIE goes into liquidation, its liquidator may decide to make. In the meantime, LBL is proving for £363 million as an unsecured creditor of LBIE. LBHI2 is proving for £3 million as an unsecured creditor and has subordinated debt claims of approximately £1.2 billion against LBIE.

206.  The issue is whether LBIE can, by its administrators, prove in the administration of LBL, and in the administration of LBHI2 if and when it becomes a distributing administration, in respect of those companies' contingent liabilities under section 74 (1) as contributories of LBIE.

207.  It is common ground that, once a call is made, the liquidator may prove it as a debt in a member's liquidation or distributing administration. This is because section 80 of the Act now provides that:

> "the liability of a contributory creates a debt (in England and Wales in the nature of an ordinary contract debt) accruing due from him at the time when his liability commenced, but payable at the times when calls are made for enforcing the liability."

In relation to liabilities arising prior to 1 October 2009, section 80 contained, in place of the phrase "an ordinary contract debt", the words "a specialty".

208.  The debt thereby created is provable under the combination of rules 12.3 and 13.12(1)(a), at least if the call precedes the onset of the contributory's administration. If the call follows that date then no-one suggested that it would not be provable under rule 13.12(1)(b).

209.  Both before this court, and below, the debate about provability of a future call arose not really because of the futurity or contingency of the call, but because proof is sought to be made by LBIE's administrators, rather than by a liquidator. Mr Isaacs QC, who undertook the primary burden of arguing this part of the appeal, submitted that proof by LBIE's administrators in respect of a possible future call was objectionable upon two main grounds. The first was that the right to make a call (as distinct from the fruits of a call once made) was not an asset of the company, so that the administrators had no standing in relation to it. It was, he submitted, purely a right of the liquidator, as an officer of the court, even though the proceeds of its exercise would, as section 74(1) makes clear, consist of an addition to the assets of the company. Secondly he submitted that, in any event, the liability of LBL and LBHI2 to meet a future call fell outside rule 13.12(1)(b), applying the three stage test in relation to statutory liabilities laid down by the Supreme Court in *Re Nortel*. In his oral submissions, Mr Isaacs focused mainly upon that second argument. In my view he was right to do so because, like the judge, I consider that his first argument is clearly wrong.

210.  It is convenient to deal first with the question whether the right to make a call, or rather the benefit of the contributory's liability to contribute, is an asset of the company. I have already referred to section 80 of the Act which, in language only

slightly different from its original predecessor (section 75 of the 1862 Act) provides that the liability of a contributory creates a debt which is due prior to the making of a call, even if it only becomes payable when a call is made. As the judge said, it is a statutory liability which commences with the contract of membership: see paragraphs 143 and 215 of the Judgment, and the authorities cited by the judge at paragraph 143. That much was not in dispute on appeal.

211.    Where there is an existing debt, it seems to me, as it did to the judge, that there must also be a creditor: see his paragraph 213. Indeed, at one point in his oral submissions on this appeal Mr Isaacs appeared to concede that the company is to be regarded as the creditor in respect of the debt constituted by the member's liability to contribute. The only other candidate for the status of creditor would be the liquidator as an officer of the court, but this makes no sense in the context of an unlimited company prior to going into liquidation which has contributories whose liabilities as such are deemed to be debts from the moment they become members.  Prior to liquidation there is no such liquidator who can be the creditor.

212.    Furthermore, even though not conclusive on this issue, I consider that the undoubted fact that the fruits of a call constitute assets of the company points strongly to the conclusion that the liability of the contributory prior to the making of a call is itself an asset of the company.  The fact that the right can only be turned into money by a liquidator acting as an officer of the court is, to my mind, neither here nor there.  The liability of the contributory of an unlimited company is not part of the capital of the company (as is the amount unpaid on shares), but it is an asset of the company nonetheless.

213.    I turn therefore to Mr Isaacs' second argument. Rule 12.3(1) provides that, subject to irrelevant exceptions:

> "… in administration, winding up and bankruptcy, all claims by creditors are provable as debts against the company or, as the case may be, the bankrupt, whether they are present or future, certain or contingent, ascertained or sounding only in damages"

Rule 13.12(1)(b) provides that "debt" (in relation both to winding up and administration) includes:

> "any debt or liability to which the company may become subject after that date by reason of any obligation incurred before that date;"

The phrase "that date" means, in relation to the administration of LBHI2 and LBL, the dates when those companies entered administration, at least in relation to proofs made while they remain in administration. I will continue to call it the cut-off date.

Lehman Brothers

214.    While overruling a series of decisions of this court about the effect of rule
13.12(1)(b), Lord Neuberger set out in *Re Nortel* a new three-fold test for provability
of statutory liabilities under that rule. It is set out in paragraph 77 of his judgment, as
follows:

> "However, the mere fact that a company could become under a
> liability pursuant to a provision in a statute which was in force
> before the insolvency event, cannot mean that, where the
> liability arises after the insolvency event, it falls within rule
> 13.12(1)(b). It would be dangerous to try and suggest a
> universally applicable formula, given the many different
> statutory and other liabilities and obligations which could exist.
> However, I would suggest that, at least normally, in order for a
> company to have incurred a relevant "obligation" under rule
> 13.12(1)(b), it must have taken, or been subjected to, some step
> or combination of steps which (a) had some legal effect (such
> as putting it under some legal duty or into some legal
> relationship), and which (b) resulted in it being vulnerable to
> the specific liability in question, such that there would be a real
> prospect of that liability being incurred. If these two
> requirements are satisfied, it is also, I think, relevant to
> consider (c) whether it would be consistent with the regime
> under which the liability is imposed to conclude that the step or
> combination of steps gave rise to an obligation under rule
> 13.12(1)(b)."

215.    Before applying that test, it is important to note that, in relation to contractual
liabilities, rule 13.12(1)(b) would be satisfied in every case where the date of the
contract preceded the cut-off date. He said:

> "Where a liability arises after the insolvency event as a result of
> a contract entered into by a company, there is no real problem.
> The contract, in so far as it imposes any actual or contingent
> liabilities on the company, can fairly be said to impose the
> incurred obligation. Accordingly, in such a case the question
> whether the liability falls within para (b) will depend on
> whether the contract was entered into before or after the
> insolvency event."

216.    It was, I think, the unspoken assumption of all counsel involved in the argument about
this aspect of the appeal that the *Re Nortel* test for statutory liabilities was that which
fell to be applied to the liability of contributories, rather than the contractual test, even
though section 80 of the Act now describes such a liability as creating a "debt ... in
the nature of an ordinary contract debt". The authorities on section 75 of the 1862 Act
(which, together with section 80 of the 1986 Act until it was amended in 2009, refers
to the debt as a specialty) make it clear that the liability arises from the contract of
membership between the contributory and the company. It is the pre-2009 version of
section 80 which applies to the liabilities of LBIE's contributories.

217.    Where a debt is the creature of statute (as the liability to contribute under section 74 clearly is) I consider that it is appropriate to adopt the statutory test laid down in *Nortel*, rather than the contractual test. Nonetheless, the fact that the statute in question now describes the debt as if it were contractual must be a factor of some weight when applying stage (c) in Lord Neuberger's analysis. A specialty usually arises from a deed but here, even before 2009, it is the essentially contractual nature of membership that gives rise to the liability.

218.    Turning directly to that three-stage test, I agree with the judge that stages (a) and (b) are plainly satisfied. The obligation to contribute under section 74 (in the case of an unlimited company) arises because the member enters into a legal relationship with the company, namely the relationship constituted by membership of an unlimited company. In my view, stage (b) was satisfied from the outset, precisely because the legal relationship of membership made the member vulnerable to the liability to contribute. In any event, it cannot be said that there was not a real prospect of that liability being incurred, viewed immediately prior to LBIE's descent into insolvent administration. The real battle-ground arises in relation to stage (c).

219.    For the appellants, Mr Isaacs identified a series of features of the section 74(1) statutory liability which, he said, would make it inconsistent with the statutory regime if the liability could, in any way, be turned into money prior to the company going into liquidation. Those features were concisely summarised in his skeleton argument, as follows, namely that monies paid in respect of the contributory's liability:

    i)      are payable only on a winding up of the company;

    ii)     are never under the control of the directors of the company and cannot be charged, disposed of or in any way dealt with by them;

    iii)    are not part of the capital of the company;

    iv)     form a statutory fund which only comes into existence when the company is wound up; and

    v)      may be called for only by the liquidator to meet the special demands of the fund.

220.    By contrast, he submitted, if the statutory liability was provable in advance of liquidation under rule 13.12(1)(b), then:

    i)      It could be turned into money by the company's directors, once a member went into an insolvency process, without any requirement upon the directors to use the fruits of the proof (i.e. the dividend) for the statutory purposes set out in section 74. The money could simply be used to further the trading activities of the company.

    ii)     If administrators could prove, then they could use the dividends otherwise than for the section 74 statutory purposes, for example by paying their expenses or by taking steps to restore the company to health as a trading concern.

    iii)    Any process for turning the contingent section 74 liability into money ahead of the commencement of a winding up of the unlimited company would

undermine the protection given to contributories, for example by ceasing to be a member of the unlimited company (see section 74(2)(a), (b) and (c)). Further, it would imperil the ability of the insolvent contributory to seek an adjustment between itself and other contributories, particularly if the unlimited company never moved from administration into winding-up.

221.   Objections of a similar kind were made by Mr. Isaacs to the judge, but without success. In his view, the potential for contributories to obtain protection (for example by ceasing to be a member) before the onset of liquidation could be reflected in the contingency valuation of the debt, and the uncertainty whether the company would ever go into liquidation would in most cases, particularly where the company was still a going concern, mean that the contingent debt would be valued at nil after proof in the insolvency of the contributory. Subject to that, the judge thought that directors of the unlimited company could indeed cause the company to prove for future calls in the insolvency of the contributory so that, in his view, it would be all the more surprising if that which the directors could do should be found to be out-with the powers of an administrator acting in accordance with the same statutory scheme as that which gave rise to the contributory's statutory liability in the first place.

222.   The judge was reinforced in his conclusion by *Re McMahon* [1900] 1 Ch 173, in which directors of a company which was a going concern were held to be entitled to prove in the insolvent estate of a deceased shareholder for the estimated value of the liability to future calls in respect of the deceased's shares. That was a case where the contributory's liability arose in respect of partly paid shares, not because he was a member of an unlimited company. To some extent the authority is therefore not wholly in point, not least because the amount unpaid on shares is part of a company's capital, and because directors may in certain circumstances call for payment: see *Re Pyle Works* (1889) 44 Ch D 534, at 574-5, per Cotton LJ, and at 582, per Lindley LJ. But this distinction does not appear to have played any part in Stirling J's reasoning in *Re McMahon*. Section 75 of the 1862 Act (the predecessor of section 80 of the 1986 Act) specifically permitted proof of a contributory's statutory liability in a contributory's bankruptcy, both in relation to present and future calls. On its face, section 75 was concerned with proof by a liquidator, rather than proof when the company entitled to the benefit of the contributory's liability was a going concern. At page 178, Stirling J identified the general policy of the bankruptcy legislation as being:

> "not confined... to certain specified kinds of contingent debts and liabilities, but they are expressed in general terms, so as... to indicate, prima facie at all events, that 'it was the object of the Legislature to discharge the bankrupt from every possible liability.'"

He continued:

> "Sect.75 of the Companies Act 1862, may, I think, be regarded as a step by the Legislature toward the attainment of this object rather than as affording an inference that going companies should not enjoy a right of proof within the terms of s.37 of the Bankruptcy Act 1883."

223.   *Re Nortel* may be regarded as a new start in the search for a comprehensive test for the identification of provable future liabilities. To that extent *Re McMahon* might be regarded as having passed its shelf life. It is in any event not binding on this court. Nonetheless, the reason why the Supreme Court found it necessary to overrule a series of Court of Appeal authorities in relation to this question was precisely because of the need to give full effect to the legislative policy to which Stirling J refers in *Re McMahon*, albeit in the context of corporate insolvency, rather than individual bankruptcy. At paragraph 90 Lord Neuberger said:

> "I have little concern about overruling those earlier decisions, although they are long-standing. ... they were decided at a time when the Legislature and the courts were less anxious than currently for an insolvency to clear all the liabilities of a bankrupt (as they were all concerned with individual insolvencies). ... Over the past 300 years, "the Legislature has progressively widened the definition of provable debt and narrowed the case of non-provable liabilities"... ."

At paragraph 92 he referred to the following passage in the Cork Report, at paragraph 1289, which described it as a

> "basic principle of the law of insolvency that every debt or liability capable of being expressed in money terms should be eligible for proof... so that the insolvency administration should deal comprehensively with, and in one way or another discharge, all such debts and liabilities."

It seems to me therefore that, if the Supreme Court had needed to consider *Re McMahon*, their Lordships would firmly have approved of Stirling J's reasoning for his conclusion that the contingent liability to meet a future call could be proved by a company while it was a going concern, in the insolvency of the contributory.

224.   The policy reason why future and contingent liabilities should be susceptible to proof in the winding up or distributing administration of a company is that, if they are not, the assets of the company will be realised and distributed, to other creditors or, in a solvent winding up, to members, and the future or contingent creditors will receive nothing when (or if) their debts become payable. It is a different policy reason for the same principle in bankruptcy, but no less compelling, when viewed from the perspective of the future or contingent creditors.

225.   Despite all that, Mr. Isaacs' objections do give rise to real concern about the question whether the statutory regime for contributory liability is consistent with proof of such liabilities ahead of liquidation. I broadly accept Mr. Isaacs' five-point summary, set out above, of the characteristics of monies paid in respect of a statutory liability to meet a call, although I consider that his focus upon the monies paid rather than on the liability to contribute slightly begs the question. To my mind, the making of a call merely realises the asset constituted by the liability to contribute which, as is clear from section 80, is a liability which falls due from the moment when the contributory becomes a member. Mr. Isaacs fortified his five propositions by sufficient reference to statute and authority, and they were not significantly in dispute.

226.    Turning to Mr. Isaacs' suggested consequences, I am not myself persuaded by those
        which amount to little more than saying that proof of a contributory's future liability
        enables it to be realised earlier than as provided for in section 74, namely upon
        liquidation of the unlimited company and the making of a call. Proof for a future or
        contingent debt in a liquidation or administration always realises the relevant asset
        earlier than it would otherwise be realisable and, to that extent, may be said to cause
        an injustice as between the creditor and the debtor. But that injustice is outweighed
        by the policy that all debts and liabilities should, as far as possible, be dealt with in
        any process for the winding-up or distributing administration of the debtor.

227.    Nor have I been persuaded that the judge's response to those consequences, which
        might at first sight appear to detract from the protection afforded to contributories,
        was wrong. They are, in my view, all capable of being reflected in the reduced (or
        even nominal) value attributed to the contingent section 74 liability. Thus, if the
        contributory can show that he has a good chance of ceasing to be a member more than
        a year before any call could be made, or that there are contributories who will remain
        members for longer, with the resources to meet any future calls, then this is likely, as
        the judge said, to yield a nil valuation of the contingent liability. Similarly, if the
        unlimited company is a going concern, with no particular likelihood of going into
        liquidation in the near or medium-term future (or, specifically, in less than a year)
        then again, the contingency may well be valued at nil. Even where the unlimited
        company is in administration, there may be a sufficient prospect that it will be
        rescued, rather than put into liquidation, so as greatly to reduce, or even to extinguish,
        the value of the contingent liability. Finally, any contribution to the future call which
        might be expected to be made by other contributories will go to reduce the amount at
        which the insolvent contributory's contingent liability is valued.

228.    I am rather more concerned about the apparent inconsistency between the statutory
        scheme for contributory liability and the fact that, while the unlimited company is a
        going concern, or even in administration, the fruits of a proof in relation to future calls
        would fall into the hands of someone other than the company's liquidator, with no
        apparent constraint upon the use which may be made of them. It is only if (as here)
        the company is in distributing administration that the use of such proceeds is bound to
        reflect the use specified in section 74(1), and even then the first call upon it will be the
        expenses of the administration which, literally at least, falls outside section 74(1)
        because that section refers only to the expenses of the winding-up. To that extent, the
        waterfall applicable in administration is slightly different from that in winding-up, at
        least in form, although not, I think, in substance.

229.    In this respect Mr. Isaacs sought to bolster his submissions by reference, by way of
        analogy, to other powers available only in liquidation, such as the power to set aside a
        preference, where the proceeds of a liquidator's application under section 214 are to
        be held on trust for creditors: see *Re Yagerphone Limited* [1935] 1 Ch 392, at 396. I
        do not consider that these analogies offer much assistance, one way or the other. On
        the one hand they may show, as Mr. Isaacs submitted, that the early turning into
        money of an asset ordinarily realisable only by a liquidator should not be permitted.
        Alternatively, they may show that, if that asset is turned into money before
        liquidation, then the proceeds of its realisation must be held on trust, as in *Re
        Yagerphone*, for the persons entitled to the benefit of it, namely those ranking in the
        winding-up waterfall. We do not need to decide whether any such trust should affect

the fruits of a proof in this case, because the recipient will be bound to apply them for the purposes of the waterfall.

230.    I consider also that it is rather formalistic to describe the contributory liability of a member of an unlimited company as something which has no effect or consequence for that member until the company goes into liquidation. In the real world (to the very limited extent that it is now populated by unlimited companies) the unlimited liability of the contributory is something of real economic or commercial consequence to the member throughout his or its membership of the company, as is indeed reflected by section 80. The best contemporary analogy is that of the traditional partnership, where the members of the firm are under an unlimited liability in respect of its debts. Not only do those considering giving credit to the firm while it is a going concern naturally rely upon their perceptions as to the creditworthiness of its partners, but the partners themselves may be persuaded by the firm's management to contribute to its assets for the very purpose of avoiding it having to be wound up. To say, therefore, of an insolvent contributory that it is an injustice for its liability to contribute to be realised before the winding up of the unlimited company is not, to my mind, consistent with commercial reality. As outlined earlier, making calls upon contributories in the winding up of unlimited companies was, in 1862, only a revised mechanism of requiring them to meet the same liabilities as would have affected them prior to the passing of that Act as members of joint stock companies or as partners.

231.    The same considerations serve to reduce the significance of the *prima facie* inconsistency inherent in the apparent ability of directors or even administrators to require a company to use the fruits of a proof in respect of a future or contingent call for purposes otherwise than those specified in section 74(1). Just as the management of a partnership which persuades its members to contribute to stave off an insolvent winding up will use such contributions to prop up its business, so the directors of a company which proves in respect of future calls (in circumstances where the risk of insolvent liquidation is sufficient to mean that the contingency will be given a real value) may reasonably be expected to use the fruits of that proof to keep the wolf from the door.

232.    There is a limit to the extent to which refinement of analysis usefully contributes to a reliable answer to the consistency question raised by stage (c) in the *Re Nortel* analysis of the scope of rule 13.12(1)(b), in relation to statutory liabilities. Although I have found the answer to that question very much more difficult than it seems to have appeared to the judge, I have come to the conclusion that he was right in considering that stage (c) is satisfied. In my judgment, the policy that the members of an unlimited company are required to make their resources available to the fullest possible extent to ensure that their company discharges all its liabilities means that it is not inconsistent for that policy objective to be achieved, in relation to an insolvent contributory (and *a fortiori* a solvent contributory being wound up), by recognising that its future or contingent liability to meet a call is a provable liability within the meaning of Rule 13.12(1)(b). The force of that clear policy (in relation to which rule 13.12(1)(b) and section 74 are parts of the same statutory scheme) outweighs in my estimation the undoubted difficulties in valuing the contingency ahead of winding-up, the risks that the contributory will pay more than it might have done if it had waited for a call, and the risk that the company may use the proceeds of proof otherwise than in the winding-up waterfall specified in section 74. Furthermore, that policy runs

hand in hand with the policy of the same statutory scheme to ensure as far as possible that all the liabilities of a company (here the contributory) are dealt with in its insolvency before it is dissolved.

233.   That conclusion is an easier one in the present case, where LBIE is already in a distributing administration, than it might have been if it were a going concern, or in an administration designed to put it back on its feet. In this case, the administrators have already made distributions to the unsecured creditors, and have already presumably provided for their expenses in advance of receiving the fruits of any such proof. It follows that there is no significant risk that the fruits of such proof will be used for anything other than the purposes specified in section 74(1) regardless whether, in the event, LBIE is caused to be wound up. The real alternatives to winding-up now appear to be forms of consensual settlement between LBIE's stakeholders by way of a scheme or a CVA, all of which, it may be assumed, would broadly reflect, but at reduced expense, the outcome which would be achieved by pursuing a winding-up to the bitter end.

234.   For these reasons I would dismiss the appeal against paragraph (viii) of the judge's order.

**The contributory rule (paragraph (vii))**

235.   Set-off issues (paragraphs (ix) and (x) of the judge's order) having been dealt with by common ground, the final issue in this appeal is whether the contributory rule, which prevents a contributory from recovering anything in a liquidation until he has fully discharged his liability as a contributory, should be extended to apply in a distributing administration. I put the issue in what may initially appear to be that rather loaded way because Mr Trower frankly and realistically conceded that an extension of the rule was what was required if LBIE's cross-appeal on this issue were to succeed.

236.   My conclusion that LBIE may prove in the distributing administration of LBL (and of LBHI2 if it becomes a distributing administration) takes much of the steam out of this issue, because of the common ground that (at least upon authority binding on this court) mandatory set-off would apply as between such a proof and those companies' provable claims against LBIE. But the issue still remains live in relation at least to LBHI2's unsubordinated claim against LBIE which, if the contributory rule does not apply, it can pursue by way of proof in LBIE's distributing administration and recover by way of a 100% distribution, while remaining heavily insolvent if and when LBIE goes into liquidation and the liquidator makes a call. The amount of LBHI2's unsubordinated claim is £3 million, a mere bagatelle in the context of other issues valued in billions of pounds, but the issue is nonetheless one of principle, albeit only in the thinly populated world of unlimited companies, or companies with only partly paid shares.

237.   The judge decided that the contributory rule did not apply in a distributing administration, not merely because there was (unsurprisingly) no case which decided that it did, but because the cases on the rule showed that it did not even apply, during a liquidation, to the contingent liability of a contributory to meet future calls. It only applied to prevent any recovery by the contributory prior to meeting in full any calls already made. Thus, in *Grissell's Case* (1866) LR 1 Ch App 528, the liquidator made a call for £10 per partly paid share, leaving a further £25 per share to be called in the

future if necessary. It was held that the contributory shareholder had to pay the £10 already called before receiving anything as a creditor, but that the non-payment of the remaining £25 for which he had yet to be called was no impediment to him: see the judge's lucid explanation of the case in paragraphs 190-1 of the Judgment.

238.    Mr Trower did not challenge the accuracy of the judge's analysis of the admittedly very old cases, which were all decided long before the introduction of administration, let alone distributing administration. None of them, he said, dealt with the very real problem of the insolvent contributory being able to prove in the distributing administration, but then having empty pockets (or even having been dissolved) when a call is made in the company's subsequent liquidation. The judge's view was that there could be no special rule inhibiting insolvent contributories. The same rule had to apply to solvent and insolvent contributories.

239.    It would in my view (and that of the judge) be a serious injustice to a solvent contributory to be disabled from ever proving in a distributing administration because, in the absence of a call, there was nothing which he could pay to free himself from the shackles of the rule. The company might (and usually would) distribute all its assets to its creditors without ever going into liquidation, leaving the contributory high and dry, even though its liability as a contributory might be very small, and its claim as a creditor very large. But for its insolvency, LBL might be regarded as a case in point. It owns only a single share in LBIE, while being an unsubordinated creditor for some £363 million.

240.    Mr Trower's starting point was that the contributory rule was one of a number of judge-made rules designed to serve the purposes of the *pari passu* principle in insolvency. He relied on the following passage from Lord Chelmsford's judgment in *Grissell's Case*, at page 534:

> "... the primary intention of the Legislature in the provisions relating to the winding-up of companies must be regarded. That intention...being that "the property of the company shall be applied in satisfaction of its liabilities *pari passu*...""

241.    To the same effect is Lord Selborne LC's judgment in *Black's Case* (1872) LR 8 Ch App 254, at 262, where proof by a contributory as a creditor without first paying his liability on a call was described as tantamount to a preference.

242.    Mr Trower submitted that, like other judge-made rules such as the rule against double proof, the anti-deprivation principle and (until codified) the law on fraudulent preferences, the contributory rule should be developed by the court wherever an inroad on the *pari passu* principle would otherwise go unchecked. The arrival on the scene of distributing administrations created just such an inroad, where an unlimited company had an insolvent contributory with a large claim as a creditor. Administration was no less concerned with achieving *pari passu* distribution than liquidation, said Mr Trower, so that there was no good reason why the rule should not be extended to a distributing administration, coupled if necessary with a discretion in the court to permit a solvent contributory to prove, where there was no real risk as to his ability to meet a future call.

243. If the inapplicability of the contributory rule to a distributing administration really meant that an inroad into the *pari passu* principle would thereby go unchecked, I would have found Mr Trower's submission compelling. But there is, as it seems to me, a readily available means whereby a distributing administrator can fend off any such inroad at the outset. All that needs to be done is to put the company into liquidation, and thereby enable the liquidator to make a call upon the insolvent contributory. The contributory rule would then disable the insolvent contributory from receiving anything in that liquidation until the call had been fully paid, while the solvent contributory would suffer no injustice, being able first to meet the call in full, and then prove as a creditor.

244. Mr Trower's only challenge to that solution was that there might be other reasons why a distributing administration was still a better means of serving the creditors' interests than a liquidation. I agree that there is likely to be a judgment to be made by the administrator, but there are many respects in which the two processes for distribution may have pros and cons, viewed as against each other. Bearing in mind that liquidation and distributing administration remain alternative options, I can see no reason why the court should go out of its way to make a radical extension of a judge-made rule about liquidation so as to apply it to administration, where to do so would risk serious injustice to solvent contributories, and where the administrator has it within his power to choose the liquidation route if, at any stage, it appears to be in the interests of creditors to have the protection of the rule in its existing form.

245. For those reasons, together with the reasoning of the judge with which I fully agree, I would dismiss the appeal against paragraph (vii) of the judge's order.

## Lord Justice Moore-Bick :

246. In relation to paragraphs (i) and (iv) - (x) of the judge's order I agree with the conclusions of my Lords, Lewison and Briggs L.JJ. I would only add that I too have little difficulty in accepting that non-provable claims are capable of being "established or determined in the Insolvency", within the meaning of clause 5(2)(a) of the subordinated loan agreement. Having regard to the regulatory context in which the agreement was made, I am satisfied that its purpose was to ensure that in an insolvency the subordinated creditors should rank behind all those whose claims would have to be recognised in the insolvency. In my view they include the unprovable claims which it would be the duty of any liquidator or administrator to discharge before making a distribution to the members. I agree with Briggs L.J. that establishing those claims can, and usually will, occur within the insolvency process without the need for litigation, but the question for determination is what the parties intended by using this particular expression in the loan agreement. For the reasons I have given, I am persuaded that they intended to ensure that the claims of the lenders were subordinated to the claims of all third parties.

## Currency conversion claims – paragraphs (ii) and (iii)

247. In their respective judgments Lewison and Briggs L.JJ. have considered this question in detail and in doing so have set out at length the various arguments for and against the conclusion reached by the judge. In those circumstances I propose to express my own conclusions rather more shortly.

Lehman Brothers

248.    At the heart of the debate lies the question whether the requirement of rules 2.86(1) and 4.91 of the Insolvency Rules that "for the purpose of proving a debt incurred or payable in a currency other than sterling" the amount in question is to be converted into sterling at the rate prevailing on the date of the order for the winding-up or administration of the company. Ultimately this involves the interpretation of the rules themselves, but like all such provisions they have to be understood both in the context of the Rules themselves, the Insolvency Act 1986 and the decided cases.

249.    It is helpful, in my view, to begin with certain observations of Lord Hoffmann in *Wight v Eckhardt Marine G.m.b.H.* [2003] UKPC 37, [2004] 1 A.C. 147. In paragraph 26 Lord Hoffmann said:

> "26.    It is first necessary to remember that a winding up order is not the equivalent of a judgment against the company which converts the creditor's claim into something juridically different, like a judgment debt. Winding up is, as Brightman LJ said in *In re Lines Bros Ltd* [1983] Ch 1, 20, "a process of collective enforcement of debts" . . .
>
> 27.    The winding up leaves the debts of the creditors untouched. It only affects the way in which they can be enforced. When the order is made, ordinary proceedings against the company are stayed (although the stay can be enforced only against creditors subject to the personal jurisdiction of the court). The creditors are confined to a collective enforcement procedure that results in pari passu distribution of the company's assets. The winding up does not either create new substantive rights in the creditors or destroy the old ones. Their debts, if they are owing, remain debts throughout. They are discharged by the winding up only to the extent that they are paid out of dividends. But when the process of distribution is complete, there are no further assets against which they can be enforced."

250.    With respect to Lewison L.J., I find it difficult to reconcile these observations with the proposition that the conversion of a foreign currency debt into sterling for the purposes of proof has a substantive effect and operates so as to substitute an obligation in sterling for what had previously been an obligation in a foreign currency. To say that these observations cannot be taken at face value because they are inconsistent with what Lord Hoffmann said in *Stein v Blake* [1996] AC 243 fails to take sufficient account of the fact that that case was concerned with the effect of a statutory set-off. Such a set-off operates by reference to the value of the claim and cross-claim at the date of the winding up order and is effective to discharge the company's debt pro tanto. As a result the foreign creditor obtains full value for his debt at the time of payment, albeit through the mechanism of conversion into sterling (as indeed he would if he were to execute on assets held in this country). It does not follow that the outstanding portion of the obligation should cease to be denominated in the relevant foreign currency.

Lehman Brothers

251.    The importance of Lord Hoffmann's observations for the present case is that they
        support the conclusion that the company's obligations are not replaced in a winding
        up by new obligations and (subject to set-off) that they are discharged only to the
        extent that they are discharged by payment out of dividends. It is not surprising,
        therefore, that a creditor who has a non-provable claim should be able to recover from
        the company if there are sufficient assets available after the satisfaction of all
        provable claims to enable it to do so. The decision of this court in *Re Humber
        Ironworks and Shipbuilding Company* (1869) 4 Ch. App. 643, to which my Lords
        have referred, supports the conclusion that in principle he can do so. If the foreign
        currency debt has not been fully discharged by payment out of dividends, therefore,
        there is no reason why the creditor should not recover the balance as an unprovable
        claim, unless he is precluded from doing so because his foreign currency obligation
        has been replaced by a sterling obligation.

252.    Before turning to the other main authorities bearing on the question, principally *Re
        Dynamics Corporation of America* [1976] 1 W.L.R. 757 and *Re Lines Brothers Ltd*
        1983] 1 Ch. 1, it is worth standing back for moment to consider where the justice of
        the case lies. Following the decision of the House of Lords in *Miliangos v George
        Frank Textiles Ltd* [1976] A.C. 443 English law has recognised that a foreign
        currency creditor should be entitled to recover judgment in the proper currency of the
        obligation on which he sues. This recognition of the need to give effect to the
        essential nature of foreign currency obligations suggests that, taken as a whole, the
        insolvency procedure should allow a foreign currency creditor to recover the true
        value of his debt, save to the extent that the demands of a pari passu distribution make
        that impossible. In my view in a case of a solvent company they do not. Proof of the
        debt in the amount of its sterling equivalent does not demand the substitution of a
        sterling obligation for the foreign currency obligation and there is no reason why, as
        between the creditor and the company, the obligation cannot be discharged pro tanto
        by set-off or out of distributions at the rate prevailing at the time it occurs. Nor is
        there any reason in principle why any balance outstanding after all proved debts have
        been paid in full should not be the subject of an unprovable claim. Difficulties in
        ensuring that unprovable claims are paid pari passu may arise whenever currencies of
        account differ among claims, but I agree with Briggs L.J. that it should be possible to
        develop suitable principles as and when such cases arise.

253.    It is therefore necessary to consider whether the terms of the Insolvency Rules
        themselves or the decided cases prevent us reaching what I consider in principle to be
        the right answer in this case. Rule 4.91 begins with the words "for the purpose of
        proving a debt" and does not in my view point to the conclusion that the effect of
        conversion is to change the essential nature of the debt from a foreign currency debt
        to a sterling debt. On this I agree with Briggs L.J. The strength of the case to the
        contrary lies principally in *Re Dynamics*.

254.    In *Re Dynamics* the issue for decision was the date at which a dollar debt should be
        converted into sterling for the purposes of proving in the liquidation. That was held
        to be the date of the winding up order, but the court did not have to consider whether the
        conversion thus undertaken was required only for the purposes of proving in the
        winding up or was to apply thereafter for all purposes between the creditor and the
        company. It was unnecessary to consider the position that arises in this case, that is,
        one in which a company which was initially thought to be insolvent turns out to have

Lehman Brothers

such a surplus that a distribution to the members may be possible. It was not necessary to decide whether the conversion affected the creditor's substantive rights against the company and I am not persuaded that the judge's remarks should be taken as dealing with that question or as excluding the possibility that a shortfall resulting from a depreciation of sterling might be recovered as an unprovable claim for the balance of the debt.

255.    The problem we have to consider was, however, touched on, albeit in a rather cautious manner, in *Re Lines Brothers*. The question for decision in that case was whether a liquidator should pay foreign currency claims by reference to the sterling equivalent at the date of the winding up or at the date of payment. This court (Lawton, Brightman and Oliver L.JJ.) affirmed the decision in *Re Dynamic* and held that payments were to be made by reference to the value of the claim in sterling at the date of winding up. Again, the question that arises in the present case did not arise for decision, but, since it had been raised in argument, Brightman L.J. expressed a tentative view about it in the following terms at page 21F:

> "It may well be the duty of the liquidator, in the case of a wholly solvent liquidation, if a foreign currency creditor has been paid less than his full contractual foreign currency debt, to make good the shortfall before he pays anything to the shareholders. I do not say that this is necessarily the solution to the problem posed, but I have not heard any convincing objection to that solution."

256.    Oliver J. expressed cautious assent at page 26F as follows:

> "Certainly for my part I do not dissent from the proposition that the answer to Mr. Stubbs's criticism [sc. that unless the foreign currency creditor could recover exchange losses he would get the worst of both worlds] may well be found in the way suggested in the judgment of Brightman L.J."

257.    I, too, have given anxious consideration to Lewison L.J.'s ten reasons for preferring the view that no claim for currency conversion losses can be made. At its root that conclusion depends on accepting that the conversion required for the purposes of proof has a substantive effect by substituting a sterling obligation for the original foreign currency obligation. As I have already made clear, that is not a conclusion I can accept. Of my Lord's ten reasons the first initially caused me most concern, but in the end I am not persuaded that it is of any substance. The fact that the debt is provable, and therefore ranks alongside other debts for participation pari passu in dividends in accordance with its sterling value at the date of winding up, does not mean that any amount unpaid as a result of the depreciation in the value of sterling cannot be recoverable against the company as a non-provable claim. It does not in my view involve accepting that Parliament has created a non-provable claim, merely that in order to enable a fair distribution of the company's assets to be achieved as between creditors generally the sterling value of the debt is to be taken as its true value for the purposes of proof. On this point, as in relation to his second, third and ninth reasons I agree with Briggs L.J.

258.    As to his fourth and fifth reasons, the question is whether the conversion is "once and for all" in the sense that it effects a substantive change in the nature of the obligation. That question did not arise for decision in *Dynamics* or *Re Lines* Brothers but the very fact that Brightman L.J. felt able to contemplate the solution now under consideration strongly suggests that neither he nor Oliver L.J. considered that conversion for the purpose of proof did have that effect. As to his sixth reason, I accept that if the foreign currency has depreciated against sterling the creditor is not expected to refund the balance and that as a consequence in such a case (no doubt relatively unusual) he will recover more than the true value of his debt. However, that is simply the result of the statutory procedure for ensuring a distribution among creditors pari passu, which requires their claims be valued in a common currency for the purposes of equitable distribution. It does not in my view exclude the possibility of a non-provable claim against the company for any loss resulting from the operation of that machinery.

259.    As to my Lord's seventh reason, it is quite true that rule 4.91 applies to all cases of winding up, but the explanation may lie simply in the fact that it was thought preferable for the same regime to apply in all cases. The fact that currency conversion is required even in the case of a wholly solvent company does not, in my view, tell one much about its substantive effect. As to the eighth, like my Lord, Briggs L.J., I do not consider that the recognition of a right to claim for currency conversion losses as a non-provable claim would be inconsistent with the decision in *Re Danka Business Systems Plc* [2013] EWCA Civ 92, [2013] Ch 506. That case concerned the question whether the liquidator of a solvent company could be required, before making a distribution to other creditors, to set aside a fund for the purposes of meeting certain contingent claims. Foreign currency claims are not contingent claims, however, even though their value in terms of sterling may vary over the course of time. Moreover, it is not suggested in this case that the liquidator should be obliged to protect the future value of the claim by setting aside part of the assets that would otherwise be available for distribution to creditors in general. The only question is whether, the proving creditors having received 100 pence in the pound, the foreign currency creditor should be entitled to make a claim against the company for any unpaid balance of his contractual entitlement. Finally, the fact that the statutory mechanism may produce both winners and losers seems to me to be more in the nature of a comment on what is an unfortunate inevitability rather than a justification for refusing relief in relation to a loss where it has in fact occurred.

260.    For these reasons I would dismiss the appeal in relation to paragraphs (ii) and (iii) of the judge's order.

Lehman Brothers

## DECLARATIONS MADE BY DAVID RICHARDS J.

(i)  The claims of LB Holdings Intermediate 2 Limited ("LBHI2") under its subordinated loan agreements with Lehman Brothers International (Europe) ("LBIE") are subordinated to provable debts, statutory interest and non-provable liabilities, all of which (other than the claims of LBHI2 under its subordinated loan agreements and statutory interest thereon, if any) must be paid in full before (a) LBHI2 is entitled to prove and require the LBIE Administrators to admit such proof in respect of its claims under its subordinated loan agreements with LBIE and (b) such claims are available for insolvency set-off resulting from the giving of notice by the LBIE Administrators, on 4 December 2009, that they proposed to make a distribution to LBIE's unsecured creditors.

(ii) Creditors of LBIE whose provable contractual or other claims are denominated in a foreign currency, the amount of which was converted into sterling as at the date of the commencement of the administration of LBIE for the purpose of proving a debt, are entitled to claim against LBIE for any currency loses suffered by them as a result of a decline in the value of sterling as against the currency of the claim between the date of the commencement of the administration of LBIE and the date or dates of payment or payments of distributions to them in respect of their claims, giving such credit, if any, as may be required, for benefits received under the insolvency regime (as to which no declaration is made) (such claim a "currency conversion claim").

(iii) Currency conversion claims rank in LBIE's administration as non-provable liabilities, payable only after the payment in full of all proved debts and statutory interest on those debts.

(iv) If the administration of LBIE is immediately followed by a liquidation, any interest in respect of the period of the administration which has not been paid before the commencement of the liquidation will not be provable as a debt in the liquidation, nor will it be payable as statutory interest under either rule 2.88 of the Insolvency Rules 1986 (the "Rules") or section 189 of the Insolvency Act 1986 (the "Act").

(v)  Those creditors of LBIE entitled to interest on their provable debts otherwise than under rule 2.88(7) of the Rules or section 189 of the Act will be entitled to claim in a liquidation of LBIE, which immediately follows the administration, for interest which accrued due during the period of the administration, as a non-provable claim against LBIE, payable after the payment in full of all proved debts and statutory interest on such debts.

(vi) The obligation of members to contribute under section 74(1) of the Act extends to provide for proved debts, such statutory interest on those debts as is payable under section 189 of the Act, and non-provable liabilities.

(vii) Neither the contributory rule (that is, the rule that a contributory of a company in liquidation cannot recover anything in respect of the claims he may have as a creditor until he has fully discharged his obligations as a contributory) nor the equitable rule in *Cherry v Boultbee* has any application in an administration (including the administration of LBIE) so as to permit the administrator to refuse to admit a proof of debt by a member or to refuse to pay dividends on such proof on the grounds that, if the

company went into liquidation, the member would or might become liable to calls under section 74(1).

(viii) Subject to (ix) below, LBIE, acting by its administrators, will be entitled to lodge a proof in a distributing administration or a liquidation of Lehman Brothers Limited ("LBL") or LBHI2 in respect of those companies' contingent liabilities under section 74(1) of the Act. The valuation of such claims would be a matter of estimation under the provisions of the Rules.

(ix) In the administration of LBIE, the contingent liabilities of LBL and LBHI2 as contributories are the subject of mandatory insolvency set-off against such claims of LBL and LBHI2 as creditors of LBIE as are provable, save that nothing in this declaration determines whether or the extent to which the claims of LBHI2 under its subordinated loan agreements with LBIE have been or are to be included in the mandatory set-off account.

(x) Subject to (ix) above, in a future distributing administration or liquidation of LBL or LBHI2, any claims of those companies respectively as creditors of LBIE will be the subject of mandatory set-off against the provable claims of LBIE in respect of those companies' contingent liabilities as contributories, save that nothing in this declaration determines whether or the extent to which the claims of LBHI2 under its subordinated loan agreements with LBIE are to be included in the mandatory set-off account.