## **EXHIBIT E**

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

No. 7942 of 2008

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)

AND IN THE MATTER OF THE INSOLVENCY ACT 1986



ELEVENTH WITNESS STATEMENT

OF

ANTHONY VICTOR LOMAS

I, **Anthony Victor Lomas** of PricewaterhouseCoopers LLP ("**PwC**") of 7 More London Riverside, London, SE1 2RT say as follows:

1.    I am a Partner in the firm of PwC of the above address and am one of the joint administrators (the "**Joint Administrators**") of Lehman Brothers International (Europe) (in administration) ("**LBIE**").

2.    I make this statement in relation to the application for directions issued on 12 June 2014 on behalf of the Joint Administrators pursuant to paragraph 63 of Schedule B1 to the Insolvency Act 1986 (the "**Act**"), as described below (the "**Application**") and further to paragraph 8 of the Order of the Honourable Mr Justice David Richards in this matter dated 25 June 2014 (the "**Order**"). I am authorised to make this statement on behalf of the Joint Administrators.

3.    There is now produced and shown to me marked "**AVL11**" a paginated bundle of documents, to which I shall refer. Save where otherwise stated, page references in this statement are to the contents of this exhibit.

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

References to a "Rule" are to a provision of the Insolvency Rules 1986. Terms capitalised but not otherwise defined have the meaning given to them in the Application.

4.    Save where otherwise stated, this witness statement is made from facts and matters that are within my own knowledge. The financial information and analysis, including the examples and illustrations, in this witness statement and in Exhibit AVL11 have been prepared by the staff working for the Joint Administrators on the LBIE administration (the **"Administration"**). Nothing that I say in this witness statement is intended to be a waiver of any privilege to which LBIE and/or the Joint Administrators are entitled and no such privilege is waived.

5.    Certain background to the Application is set out in my ninth and tenth witness statements dated 11 June 2014 (my **"Ninth Statement"**) and 25 July 2014 (my **"Tenth Statement"**). I do not repeat in this witness statement the matters already set out in those witness statements.

## A.    BACKGROUND AND PURPOSE OF THE WITNESS STATEMENT

6.    On 10 October 2014, as required by paragraph 4 of the Order, the Joint Administrators filed their position paper (the **"Administrators' Position Paper"**). The Administrators' Position Paper identified various areas in which the Joint Administrators consider the Court and the other parties to the Application may be assisted by evidence as to the context in which an issue in the Application arises and/or the impact a particular outcome would have on the LBIE estate as a whole and/or particular types of creditors and claims. The purpose of this witness statement is to provide such evidence.

7.    On 10 October 2014, the Joint Administrators published their Twelfth Progress Report, relating to the period 15 March 2014 to 14 September 2014 (the **"Twelfth Progress Report"**). The Twelfth Progress Report contains the most up-to-date published data in relation to the

A18892736

Administration. A copy of the Twelfth Progress Report is at **pages 1 to 50 of AVL11.**

8.  In this witness statement I refer at various points to the Twelfth Progress Report or figures derived from it. The Twelfth Progress Report includes, amongst other things, high and low scenarios for the indicative final outcome for the Administration and the various component elements that feed into that. These scenarios are given by reference to:

    8.1  a "low case", being a less advantageous estimated outcome for the LBIE estate (the "**Low Case**"); and

    8.2  a "high case", being a more advantageous estimated outcome for the LBIE estate (the "**High Case**").

    As noted generally in the Joint Administrators' progress reports, the Low Case and High Case range are intended to illustrate a range of outcomes, but do not necessarily represent the worst and best potential outcomes for creditors.

9.  At this, relatively late, stage of the Administration the difference between the Low Case and the High Case is reducing. However, in this witness statement, when providing figures for the purposes of illustrating the context in which an issue arises, or the impact of a possible outcome on the LBIE estate, I have not provided figures based on both the Low Case and High Case. Instead, with a view to illustrating the issues more clearly and based on a single set of numbers, I provide figures based only on the High Case. This should not be taken to suggest that the Joint Administrators consider that the final outcome in the Administration is likely to be closer to the High Case.

10. At various points in this witness statement I provide information as to the potential impact of issues (and their possible outcomes) on the amount of Statutory Interest that will be payable in the Administration, whether across the LBIE estate as a whole, to a particular group of creditors or to a hypothetical individual creditor. When doing so, it is in some cases convenient, for illustrative purposes, to assume that Statutory Interest will

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

be paid on a particular date. For this purpose I have used, in this witness statement, the date of 15 September 2016. The use of this date is for illustrative purposes only and does not reflect any projection on the part of the Joint Administrators as to when and how Statutory Interest will in fact be paid to creditors, not least as that depends in large part on the outcome of the Application itself.

11. Throughout this statement, examples have been provided either to explain and illustrate how particular issues arise or to indicate the potential impact of an issue on a hypothetical claim and/or the LBIE estate as a whole. Such examples are purely for illustrative purposes and are not intended to be representative of any real individual claims. Where an example includes certain assumptions with a view to simplifying the example and/or limiting its scope to the issue at hand, such assumptions are specific to, and should not be taken to apply more broadly than, that example.

12. The illustrative financial analysis contained in this witness statement is predominantly based on information contained in the Twelfth Progress Report. Page one of the Twelfth Progress Report (see **page 3 of AVL11**) contains an "*Important Notice*" which sets out caveats to creditors and third parties in relation to the information provided in the report. That report also provides additional detail in relation to the figures and the assumptions underpinning them. These caveats and assumptions also apply, to the extent relevant, to the illustrative financial information contained in this witness statement and in Exhibit AVL11.

B. **IMPACT OF APPLYING DIVIDENDS FIRST TO PRINCIPAL OR STATUTORY INTEREST**

13. Issue 2 in the Application concerns whether creditors' entitlements to Statutory Interest are to be calculated on the basis of allocating dividends already paid to creditors:

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

13.1    first to the reduction of principal amounts and then to the payment of accrued Statutory Interest (the "**Principal First Approach**"); or

13.2    first to the payment of accrued Statutory Interest as at the date of the relevant dividends and then in reduction of principal (the "**Interest First Approach**").

14.    The impact of these two approaches can usefully be illustrated through the example of a single hypothetical creditor. For example, a creditor with a claim of £10 million, due and payable on the Date of Administration, that was admitted and paid in full on 15 September 2014 would (on the basis of an entitlement only to Statutory Interest at the Judgments Act Rate):

14.1    if the Principal First Approach is applied, be entitled to Statutory Interest on its claim in the sum of £4.8 million as at 15 September 2016; but

14.2    if the Interest First Approach is applied, be entitled to Statutory Interest on its claim in the sum of £5.6 million as at 15 September 2016.

15.    This example is set out in further detail at **page 51 of AVL11**. The outcome of this issue will clearly have a significant impact on the amount of the Surplus that the Joint Administrators will be required to apply to pay Statutory Interest and, therefore, the amount of the Surplus (if any) that will remain to pay Currency Conversion Claims, any other non-provable claims and subordinated debt. Specifically, the Joint Administrators estimate that (assuming all Statutory Interest is paid at a rate of 8% simple per annum):

15.1    if the Principal First Approach is applied, as at 15 September 2016, the total amount of Statutory Interest payable on admitted claims will be c.£5.1 billion; but

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

15.2    if the Interest First Approach is applied, as at 15 September 2016, the total amount of Statutory Interest payable on admitted claims will be c.£6.4 billion.

A graph illustrating the accumulation of Statutory Interest over time on these two bases is at **page 52 of AVL11**.

16.    Depending upon the amount of Statutory Interest that is ultimately payable in the Administration (based on both the period for which it accrues before it is paid and the scale of claims for rates in excess of the Judgments Act Rate), it is possible that the calculation of Statutory Interest on the basis that dividends are treated as having been applied first to the payment of interest would mean that LBIE has insufficient assets to allow for the payment of principal debts in full following the payment of Statutory Interest.

## C.    ACCRUAL OF COMPOUND INTEREST FOLLOWING PAYMENT OF PRINCIPAL IN FULL

17.    Having set out our position on Issue 3, at paragraph 31 of the Administrators' Position Paper, the Joint Administrators identified a sub-issue on which the determination of the Court is required in order to facilitate the distribution of the Surplus. That issue is, where a creditor has a contractual or other entitlement to receive compound interest:

17.1    whether accrued Statutory Interest continues to compound following the payment in full of the principal amount; and

17.2    if not, whether the creditor has a non-provable claim in respect of interest that would have continued to compound on a contractual or other basis following the payment in full of the principal amount.

18.    It can be seen that this sub-issue only arises in practice if the Court holds that the Principal First Approach (described at paragraph 13 above) in

6

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

Issue 2 is the correct approach, otherwise there would not be interest still to pay after the point at which principal has been paid in full.

19.    The financial impact of this sub-issue can be illustrated through the example of a hypothetical creditor with:

19.1    a claim of £10 million, due and payable at the Date of Administration, which was admitted and paid in full on 15 September 2014; and

19.2    a contractual entitlement to compound interest at a rate of 8% per annum (compounding daily).

20.    During the period from the Date of Administration to 15 September 2014, the claim will have accrued £6.2 million of Statutory Interest. If the answer to the sub-issue identified by the Joint Administrators is that interest does continue to compound following the payment of principal (whether such amount ranks as Statutory Interest or as a non-provable claim), the creditor's Statutory Interest of £6.2 million would accrue further interest in the amount of £1.1 million by 15 September 2016. This example is set out in further detail at **page 53 of AVL11.**

21.    The impact of this issue on the LBIE estate as a whole can be illustrated with reference to the approximately £4.1 billion of claims against LBIE made pursuant to ISDA Master Agreements (which provide for compounding of interest). Applying, for illustrative purposes, a daily compounding interest rate of 8% per annum across such claims, the ongoing compounding of interest following payment of principal would lead to such claims accruing further interest in the amount of approximately £450 million by 15 September 2016. Interest would thereafter continue to accrue, at an increasing rate (due to the effect of compounding), starting at c.£17 million per month in September 2016 and, by way of example, increasing to some c.£19 million per month by September 2017, assuming there had been no payment of any Statutory Interest by that point. This illustration is set out in further detail at **page 54 of AVL11.**

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

### D.    OVERVIEW OF KEY JURISDICTIONS AND GOVERNING LAWS

22.    Issue 4 in the Application concerns whether the words *"the rate applicable to the debt apart from the administration"* in Rule 2.88(9) are apt to include (and, if so, in what circumstances) a foreign judgment rate of interest or other statutory interest rate.

23.    At paragraph 35 of the Administrators' Position Paper, the Joint Administrators indicated that they would file evidence as to the circumstances in which a foreign judgment rate of interest may be said to satisfy the definition of a *"rate applicable to the debt apart from the administration"* set out in Rule 2.88(9).

24.    To illustrate the issue, the Joint Administrators have conducted a review of the financial trading agreements between LBIE and its counterparties to identify the range of foreign jurisdictions and governing laws to which claims into the LBIE estate may be subject. Set out at **page 55 of AVL11** is a summary breakdown, by number and value, of such agreements according to the jurisdiction and/or governing law to which they are subject.

25.    It can be seen that the foreign jurisdiction which affects the largest number of agreements is New York. There are also a material number of agreements with jurisdiction clauses in favour of France and Germany. While there are other agreements with jurisdiction clauses in favour of other foreign jurisdictions, they are not considered material in the context of the LBIE estate. I am informed by Linklaters LLP (the solicitors acting for the Joint Administrators) that the judgment rates applicable in those jurisdictions are as described below:

25.1    for New York, a rate of 9% per annum simple;

25.2    for France the legal interest rate, as at the date of this statement, is 0.04% per annum simple. Interest accrues at this rate for the first two months post-judgment, before increasing by 5%   per

A18892736

**Party: Applicant**
**Witness: Anthony Victor Lomas**
**Statement No: 11**
**Exhibit: "AVL11"**
**Date: 31 October 2014**

annum simple thereafter (i.e. to 5.04% under the current French legal interest rate). It is in the French court's discretion to apply the rate on a compound basis[1]; and

25.3    for Germany, 8% per annum simple above the German base rate (which, as at the date of this statement, is a negative rate of -0.73%).

26.    Save for one judgment obtained post-Administration by a creditor in Milan (which related to proceedings ultimately settled using a CDD), the Joint Administrators are not aware of any money judgments having been obtained against LBIE in foreign jurisdictions.

### E.    COMPARING RATES FOR THE PURPOSES OF RULE 2.88(9)

27.    Issue 5 in the Application concerns whether, for the purposes of establishing, as required under Rule 2.88(9), which is the greater of the Judgments Act Rate and a rate that would have applied to a debt but for the administration, the comparison required is of the total amounts of interest that would be payable based on each method of calculation or based only on the numerical rates themselves, and in either case, how the total amount of interest is to be calculated where the rate that would apply but for the administration varies from time to time.

28.    The Joint Administrators would face significant practical difficulties if they were required to compare the amount of interest that would accrue on the basis of a simple interest rate against the amount of interest that would accrue on the basis of a fluctuating compound interest rate if and to the extent that the comparison requires a separate assessment of the rates on a daily basis over the period that a given debt was outstanding. In particular, in order to assess whether a fluctuating interest rate that compounds on a daily basis delivers a greater or lesser amount than a simple interest rate would entail a binary comparison between the two on

---

[1]    The figures noted in paragraph 25.2 above, rather than those contained in paragraph 34.4 of the Administrator's Position Paper, are the correct ones; the latter were included in error.

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

the first day of the relevant period and, on each subsequent day, an exponentially increasing number of calculations based on the possible outcomes arising from preceding days (so that four calculations would be required on the second day, eight calculations on the third day, and so on). Even over a relatively short period, therefore, the comparison would become unwieldy. For example, a daily comparison of the interest that would accrue using the two rates over a period of just 14 days would require 16,384 individual calculations. After 28 days, 268,435,456 calculations would be required. Performing such a comparison for a period of some years would therefore clearly be impracticable.

29.   At paragraph 40 of the Administrators' Position Paper, the Joint Administrators identified a further related issue to be resolved, in relation to a proved debt only part of which arises from a contract (or contracts) conferring on the creditor a right to interest (or which gives rise to a rate of interest in excess of the Judgments Act Rate). The issue is whether, in those circumstances, for the purposes of establishing *"whichever is the greater of the rate specified under paragraph (6) and the rate applicable to the debt apart from the administration"* under Rule 2.88(9), the comparison to be made is:

29.1   between the amount of Judgments Act Rate interest and the amount of contractual interest in respect of each constituent element of the admitted claim (the "**Disaggregated Approach**"); or

29.2   between the total amount of Judgments Act Rate interest which would accrue on the whole of the admitted claim and the total amount of contractual interest which would accrue on the whole of the proved debt (the "**Aggregated Approach**").

30.   The context in which this issue arises, and its potential economic significance to certain creditors and the LBIE estate as a whole, can be illustrated by examining the impact of the two approaches on the Statutory Interest entitlement of a creditor with a claim of £10 million, due

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

and payable at the Date of Administration, that was admitted and paid in full on 15 September 2014 which consists of:

(i)   a £6 million claim under a contract which does not make any provision for the payment of interest ("**Contract I**"); and

(ii)  a £4 million claim under another contract which provides for interest at a simple rate of 10% per annum ("**Contract II**").

31.   Applying the Disaggregated Approach, the creditor would, by 15 September 2014, be entitled to receive:

31.1  10% per annum interest on its claim under Contract II (since 10% is greater than the Judgments Act Rate) being £2.4 million; and

31.2  8% per annum interest on its claim under Contract I (since the Judgments Act Rate is greater than no interest rate), being £2.9 million.

The creditor would therefore be entitled to receive Statutory Interest in the amount of £5.3 million applying the Disaggregated Approach.

32.   Applying the Aggregated Approach, the creditor would be entitled to receive Statutory Interest only at the Judgments Act Rate on the entirety of its claim, being £4.8 million. This is because the contractual interest entitlement on the whole of the claim is a lesser amount of £2.4 million, being 10% per annum on its claim under Contract II and 0% per annum on its claim under Contract I. If the Joint Administrators are not required, when carrying out the comparison, to disaggregate the elements of the creditor's proof (and assuming the Court considers that the Joint Administrators' position on Issue 5 is the correct one, i.e., one looks at the total amount of interest payable based on each method of calculation), the comparison leads to the application of the Judgments Act Rate pursuant to Rule 2.88(9). The creditor would therefore be entitled to receive Statutory Interest in the amount of £4.8 million applying the Aggregated Approach.

A18892736

**Party: Applicant**
**Witness: Anthony Victor Lomas**
**Statement No: 11**
**Exhibit: "AVL11"**
**Date: 31 October 2014**

33.    This comparison is set out in more detail at **page 56 of AVL11**. It can be seen that applying the Disaggregated Approach will result in a creditor receiving the same or a higher entitlement to Statutory Interest than the Aggregated Approach, because it preserves a creditor's right to receive a contractual rate higher than the Judgments Act Rate (where one applies) and provides a "floor" of the Judgments Act Rate where a contractual rate is lower than the Judgments Act Rate.

F.    **IMPACT OF DATE FROM WHICH CONTINGENT CLAIMS ACCRUE STATUTORY INTEREST**

34.    Issue 7 in the Application concerns whether, where a claim is contingent as at the Date of Administration and only becomes due and payable on a later date (a "**Contingent Claim**"), the claim accrues Statutory Interest from:

    (i)    the Date of Administration;

    (ii)   the date the claim ceased to be contingent and became due and payable; or

    (iii)  another date.

35.    The outcome of this issue will have a significant impact on the amount of the Surplus that the Joint Administrators will be required to apply to pay Statutory Interest in respect of Contingent Claims.

36.    In the Administration, Contingent Claims broadly fall into two categories:

    36.1   claims to Net Financial Claims (as defined in the CRA) as crystallised by the effect of the CRA (as more fully described at Section B of my Tenth Statement) ("**CRA Contingent Claims**"); and

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

36.2    claims arising from the termination of financial contracts after the Date of Administration (whether automatically or at the instigation of the creditor or LBIE) ("**Other Contingent Claims**").

A more detailed overview of such claims, including the range of termination dates and the value of such claims, can be found at **page 57 of AVL11.**

37.    If the answer to Issue 7 is that Statutory Interest is payable on Contingent Claims from the Date of Administration rather than the date such claims became due and payable, the amount of Statutory Interest payable in respect of Contingent Claims will obviously be higher than if Statutory Interest only accrues from the (later) date a Contingent Claim becomes due and payable.

38.    This can be illustrated first by looking at the example of a hypothetical creditor. Assuming that Statutory Interest accrues only from the date a Contingent Claim becomes due and payable, a creditor with a Contingent Claim for £10 million would (if its claim accrues Statutory Interest at the Judgments Act Rate and assuming its claim was admitted and paid in full on 15 September 2014), be entitled to Statutory Interest of:

38.1    £4.0 million if the Contingent Claim fell due on 15 September 2009;

38.2    £3.2 million if the Contingent Claim fell due on 15 September 2010; and

38.3    £2.4 million if the Contingent Claim fell due on 15 September 2011.

39.    By contrast, if Statutory Interest is payable from the Date of Administration, the same creditor's claim (again, assuming repayment of principal on 15 September 2014), accrues Statutory Interest of £4.8 million.

40.    Similarly, if the answer to Issue 7 is that Statutory Interest is payable on Contingent Claims from the Date of Administration rather than the date

13

**Party: Applicant**
**Witness: Anthony Victor Lomas**
**Statement No: 11**
**Exhibit: "AVL11"**
**Date: 31 October 2014**

such claims became contractually due and payable, the amount of Statutory Interest payable in respect of all Contingent Claims across the estate will be higher. Specifically:

40.1    a further c.£0.2 billion would be payable in respect of CRA Contingent Claims; and

40.2    a further c.£0.3 billion would be payable in respect of Other Contingent Claims.

This analysis is set out in more detail at **page 58 of AVL11**.

41.    At paragraph 45 of the Administrators' Position Paper, the Joint Administrators indicated that they would also provide evidence as to the potential, if the answer to Issue 7 is that Statutory Interest is payable in respect of a Contingent Claim from the Date of Administration, for a creditor to receive, in respect of the period between the Date of Administration and the date the debt became due and payable, both the benefit of coupon amounts received pursuant to the underlying agreement (such that the value of its proved claim is higher when terminated than it would have been had it been terminated earlier in the Administration) and Statutory Interest calculated on the basis of that increased claim.

42.    This issue can be illustrated by the following example:

42.1    a creditor has a claim under a single agreement with LBIE which is admitted and paid in full on 15 September 2014;

42.2    had the agreement closed out as at the Date of Administration, the close-out amount payable by LBIE to the creditor would have been £10 million (the **"15/09/08 Valuation"**);

42.3    however, had the agreement closed out at 15 September 2012, the close-out amount payable by LBIE to the creditor would have been £12 million, due to (for instance) the impact of the creditor's entitlements in respect of coupon and dividend payments that accrued pursuant to the agreement between the Date of

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

Administration and 15 September 2012 (the "**15/09/12 Valuation**").

43.    Assuming that Statutory Interest is only payable in respect of a Contingent Claim from the date the debt becomes due and payable, the above creditor by 15 September 2016 (on the basis of Statutory Interest at the Judgments Act Rate):

43.1    based on the 15/09/08 Valuation (i.e. if it had closed out immediately following LBIE's entry into administration), would have been entitled to Statutory Interest of £4.8 million on its principal claim of £10 million, giving a total recovery of £14.8 million;

43.2    based on the 15/09/12 Valuation (i.e. if it closed out on 15 September 2012) ("**Option A**"), would be entitled to Statutory Interest of £1.9 million on its principal claim of £12 million, giving a total recovery of £13.9 million.

44.    It can be seen in this example that the creditor obtains a marginally lower overall recovery as a result of the increase in the value of its principal claim being less than the impact of the lower amount of Statutory Interest payable as a result of the claim having been due and payable for a shorter period of time. (Other examples would produce a greater recovery as a result of the increase in the value of the principal claim being greater than the impact of the reduced amount of Statutory Interest payable as a result of the claim having been due and payable for a shorter period of time.)

45.    If, instead, Statutory Interest is payable in respect of a Contingent Claim from the Date of Administration ("**Option B**"), the same creditor would be entitled, based on the (higher) 15/09/12 Valuation, to Statutory Interest of £5.8 million on its principal claim of £12 million, giving a total recovery of £17.8 million.

46.    The above scenario demonstrates the financial impact of the creditor receiving not only a higher principal amount as a result of the agreement

15

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

not closing out until four years after the Date of Administration but also Statutory Interest calculated on that higher amount and payable not from the close-out date, but instead from the Date of Administration.

47.     The above scenarios are set out in more detail at **page 59 of AVL11**.


G.     **CALCULATION OF APPLICABLE RATE WHERE STATUTORY INTEREST ACCRUES FROM THE DATE OF ADMINISTRATION ON CONTINGENT CLAIMS**

48.     Issue 6 in the Application concerns how, if the answer to Issue 7 is that Statutory Interest accrues from the Date of Administration in respect of a Contingent Claim, one is to perform the comparison of the Judgments Act Rate and the rate applicable to the debt apart from the Administration. In particular, it is unclear whether, for the purposes of that comparison, a contractual rate applicable to the Contingent Claim is also to be applied from the Date of Administration or only from the date the Contingent Claim became contractually due and payable.

49.     The following example assists in illustrating how this issue arises:

49.1     a creditor has a claim against LBIE under a single agreement which provides for an interest rate of 10% simple per annum;

49.2     the agreement terminates on 15 September 2010, leaving an amount payable from LBIE to the creditor of £10 million; and

49.3     the principal amount is admitted and paid in full on 15 September 2014.

50.     The question arises in this scenario how one is to perform the calculation, required under Rule 2.88(9), comparing the Judgments Act Rate and the rate applicable to the debt apart from the Administration. Specifically, the Joint Administrators have identified the possible approaches set out below:

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

50.1    One possibility ("**Option A**") is that, for the period prior to the debt becoming contractually due and payable, the creditor is entitled to Statutory Interest (but only at the Judgments Act Rate) and that, thereafter, a simple comparison is required between the Statutory Interest that would accrue applying the Judgments Act Rate and the contractual rate of 10% for the period from 15 September 2010 to 15 September 2014. An illustration of this comparison is at **page 60 of AVL11**.

50.2    A second possibility ("**Option B**") is that the creditor is only entitled to receive Statutory Interest at a rate applicable apart from the Administration:

    (i)    in respect of the period from the date the debt became contractually due and payable; and

    (ii)    only where interest due under the contract calculated at that rate for that period exceeds the amount of interest that would be payable from the Date of Administration at the Judgments Act Rate.

In this case, the comparison required would be between the amount of interest accruing at the Judgments Act Rate between the Date of Administration and 15 September 2014 and the amount of interest accruing at the rate of 10% per annum between 15 September 2010 and 15 September 2014. An illustration of this comparison is at **page 60 of AVL11**.

50.3    A third possibility ("**Option C**") is that the creditor is entitled to receive Statutory Interest at a rate applicable apart from the Administration from the Date of Administration, notwithstanding the later point from which the creditor was contractually entitled to interest, such that the comparison required is simply between the interest that would accrue between the Date of Administration and 15 September 2014 using the Judgments Act Rate and the rate of

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

10% (which would, clearly, be the latter). An illustration of this is at **page 60 of AVL11**.

## H.    REDUCTION OF CURRENCY CONVERSION CLAIMS TO ACCOUNT FOR STATUTORY INTEREST RECEIVED

51.    Issue 28 in the Application concerns whether the calculation of a Currency Conversion Claim should take into account the Statutory Interest paid to the relevant creditor. In particular, the Application seeks the Court's determination as to whether the amount of a Currency Conversion Claim should be reduced to reflect the amount of Statutory Interest a creditor has received in excess of the amount of interest to which it would have been entitled but for the Administration. The issue is particularly pertinent given the relatively low levels of current market interest rates when compared with the Judgments Act Rate.

52.    The context in which the question arises can be illustrated by the following example:

52.1    a creditor which was owed an amount under a contract denominated in US dollars, which was converted into sterling as at the Date of Administration as required by Rule 2.86(1);

52.2    the claim is admitted and paid in full on 15 September 2014, which sterling amount, when converted back into US dollars, does not discharge the debt in US dollars in full; and

52.3    the creditor was entitled under its contract to an interest rate of 4% per annum and thus receives Statutory Interest on its claim at the Judgments Act Rate, for example on 15 September 2016 (that being greater than the rate applicable to the debt apart from the Administration).

53.    In this scenario, the creditor has not been paid its full contractual entitlement as a result of the failure of the sterling dividends received, when converted back into US dollars, to discharge the underlying US

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

dollar debt in full. This is caused by the impact of the insolvency legislation that requires the US dollar debt to be converted into sterling and dividends to be paid in sterling against that sterling amount. Thus, the creditor has a Currency Conversion Claim in respect of the amount of the US dollar claim that remains unsatisfied.

54.    The question arises whether the Joint Administrators, when calculating the amount of the Currency Conversion Claim, are required to take into account the fact that the creditor has, as a result of the operation of the insolvency legislation, received interest at a higher rate (that is, the Judgments Act Rate) than the rate of 4% per annum to which it was entitled under its contract.

55.    The Joint Administrators' most recent estimate of the amount of Currency Conversion Claims that might arise across the LBIE estate is c.£1.3 billion. The Joint Administrators estimate that, if the Currency Conversion Claims of creditors were to be reduced to reflect the amounts of Statutory Interest they may receive in excess of a contractual interest rate, the Currency Conversion Claims facing the LBIE estate would be reduced by c.£0.9 billion to c.£0.4 billion. A table illustrating this point is at **page 61 of AVL11**.

I.    **POTENTIAL FURTHER CURRENCY CONVERSION CLAIM**

56.    At paragraph 129 of the Administrators' Position Paper, in the context of Issue 30, the Joint Administrators identified a further scenario in which a claim akin to a Currency Conversion Claim might arise. Specifically, it is possible that the total amount of interest received by a creditor on a sterling admitted claim, calculated at the Judgments Act Rate, when converted into the relevant foreign currency on the date (or dates) of payment, will be less than the amount of interest which would have accrued applying a lower *"rate applicable to the debt apart from the administration"* to the original foreign currency claim. This scenario is not provided for in the questions currently set out in the Application, because

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

Issue 30 asks only whether there may be a claim akin to a Currency Conversion Claim where the total amount of interest received by a creditor applying a *"rate applicable to the debt apart from the administration"* on a sterling claim, when converted into the relevant foreign currency on the date of payment, is less than the amount of interest which would accrue applying the *"rate applicable to the debt apart from the administration"* to the original foreign currency claim. It therefore does not anticipate the possibility that such a claim may arise where the amount of interest received was calculated at the Judgments Act Rate.

57.    This issue can be illustrated by the following example:

57.1    a creditor has a contractual claim for US$17.9 million;

57.2    the US dollar claim attracts a contractual interest rate of 7% per annum simple;

57.3    the US dollar claim is admitted in full on 15 September 2014 and converted into sterling at the exchange rate of US$1.79 to the pound as at the Date of Administration as required by Rule 2.86(1), giving a sterling claim of £10 million;

57.4    the creditor is paid the full sterling principal amount of its claim on 15 September 2014. If, for the purposes of simplification, the exchange rate as at that date is assumed to remain at US$1.79 to the pound, then no Currency Conversion Claim arises in respect of the principal amount;

57.5    on 15 September 2016 the creditor is paid Statutory Interest at the Judgments Act Rate (8% being a higher rate over the relevant period than 7% simple), being £4.8 million;

57.6    the exchange rate as at 15 September 2016 is US$1.50 to the pound such that, when converted into US dollars, the Statutory Interest the creditor receives is worth US$7.20 million;

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

57.7    applying the contractual rate of 7% simple to the underlying dollar debt of US$17.9 million would have given an interest amount of US$7.52 million;

57.8    the creditor therefore receives US$0.32 million less Statutory Interest applying the Judgments Act Rate to the sterling admitted claim than it is contractually entitled to by applying the rate of 7% to the underlying dollar debt.

58.    The above example is set out in more detail at **page 62 of AVL11.**

## J.    POST-ADMINISTRATION CONTRACTS

59.    Terms capitalised in this Section J that are not defined in the Application have the meaning given to them in my Tenth Statement.

60.    Issues 34 and 35 in the Application concern the impact of Post-Administration Contracts on creditors' claims to Statutory Interest and Currency Conversion Claims. Certain background in relation to the Post-Administration Contracts is set out in my Ninth Statement and Tenth Statement. In particular, the development of the CDDs used for third party financial trading creditors, including the addition of the Statutory Interest Language and the CCC Language, at the relevant times, is explained in paragraphs 47 to 80 of my Tenth Statement. For completeness I note that the agreements reached in respect of affiliate, non-trading and employee unsecured claims are not addressed in this witness statement.

61.    As stated at paragraph 139.2 of the LBIE Position Paper, the templates exhibited to my Tenth Statement, which deal with third party financial trading creditors, were the most recent versions of each template as at the date of that witness statement (i.e. 25 July 2014). Accordingly, those templates will generally include the Statutory Interest Language and the CCC Language. At paragraphs 153 and 162 of their Position Paper, Wentworth note that their arguments in relation to Issues 34 and 35 focus

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

on CDDs executed without language dealing with either Statutory Interest or Currency Conversion Claims.

62. It is apparent from the explanation given in my Tenth Statement as to the development of the CDDs over time and the introduction of language first to address Statutory Interest and, thereafter, Currency Conversion Claims that CDDs executed by creditors over the course of the Administration will fall into one of the following categories:

62.1 CDDs containing no language dealing with either Statutory Interest or Currency Conversion Claims;

62.2 CDDs containing the Statutory Interest Language (including CDDs incorporating the Interim Statutory Interest Language) but without any language dealing with Currency Conversion Claims; or

62.3 CDDs containing both the Statutory Interest Language (including CDDs incorporating the Interim Statutory Interest Language) and the CCC Language (including CDDs incorporating the Interim CCC Language).

63. In respect of Client Money Supplemental Deeds executed during the course of the Administration, these will fall into one of the following two categories:

63.1 Client Money Supplemental Deeds containing no language dealing with either Statutory Interest or Currency Conversion Claims; or

63.2 Client Money Supplemental Deeds containing the Client Money Statutory Interest Language but without any language dealing with Currency Conversion Claims.

64. In order to give the Court further context in relation to the population of executed CDDs and Client Money Supplemental Deeds within each of the aforementioned categories, I set out in the table below (prepared by the staff working for the Joint Administrators on the Administration) both

22

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

the approximate number and aggregate value of CDDs and Client Money Supplemental Deeds that have been executed as at 14 September 2014 in each of these categories. The table also cites the approximate number of unsecured claims of financial trading creditors admitted other than by way of a CDD and their approximate aggregate value.

| Part A - CDDs | | | |
|---|---|---|---|
| **Contract** | **Agreed Claim Currency** | **Number of Deeds Executed** | **Aggregate Quantum £bn** |
| CDDs with no language dealing with either Statutory Interest or Currency Conversion Claims <br> *Including Original Tiered CDDs c.10/£0.1bn* | GBP <br><br> Non-GBP | c.400 <br><br> c.250 | 1.2 <br><br> 2.2 |
| CDDs with the Statutory Interest Language (but without the CCC Language) <br><br> *Including Original Tiered CDDs c.50/ £1.0bn* <br><br> *Including Additional Tiered CDDs entered into by counterparties that had previously entered into an Original Tiered CDD without the Statutory Interest or CCC Language c.5 /£5m* | GBP <br><br> Non-GBP | c.450 <br><br> c.100 | 3.5 <br><br> 1.5 |
| CDDs with both the Statutory Interest Language and the CCC Language (including CDDs containing the Interim CCC Language) <br><br> *Including Additional Tiered CDDs entered into by counterparties that had previously entered into an Original Tiered CDD that included the Statutory Interest Language but not the CCC Language c.40/£70m* <br><br> *Including Additional Tiered CDDs entered into by counterparties that had previously entered into an Original Tiered CDD without the Statutory Interest Language  or the CCC Language c.5/£3m* | GBP <br><br> Non-GBP | c.300 <br><br> c.100 | 0.8 <br><br> 0.7 |
| **Total CDDs** | | **c.1,600** | **9.9** |

Note: Client Money Supplemental Deeds cited below in Part B of the table relate to CDDs included within the population cited in Part A of the table above.

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

| Part B - Client Money Supplemental Deeds | Number of Deeds Executed | Aggregate Quantum £bn |
|---|---|---|
| Contract | | |
| Client Money Supplemental Deeds with no language dealing with either Statutory Interest or Currency Conversion Claims | c.60 | 0.5 |
| Client Money Supplemental Deeds with the CM Statutory Interest Language (but without the CCC Language) *Including Counterparties who had previously executed a CDD without the Statutory Interest or CCC Language c.200/ £1.9bn* | c.400 | 4.0 |
| Total | c.460 | 4.5 |

Note: In addition there are c.50 claims unilaterally admitted by admittance letters totalling c.£0.4bn excluding Affiliates, non-trading and employee claims.

65. In addition, the table above also includes the number and aggregate value of CDDs (each an "**Original Tiered CDD**") executed by creditors which contain a tiered release structure, for the purpose of agreeing and/or admitting certain claims that had been determined/ascertained at that point in time whilst preserving certain other pending claims (such claims arising due to the particular circumstances of that creditor), in circumstances where a further CDD (an "**Additional Tiered CDD**") was subsequently entered into by the creditor. The table identifies those instances in which an Additional Tiered CDD, which was entered into by the creditor in order to agree and determine certain claims that had been preserved in its Original Tiered CDD (such as asset shortfall claims and/or claims relating to trades pending at the Date of Administration), contains the Statutory Interest Language and/or the CCC Language in circumstances where such language was not included in the release clause in the creditor's Original Tiered CDD. I note that this table does not seek to identify Original Tiered CDDs where no subsequent Additional Tiered CDD has been entered into by the creditor, nor does it identify Additional Tiered CDDs in circumstances where the inclusion or omission (as the case may be) of the Statutory Interest Language and/or

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

the CCC Language in the Additional Tiered CDD mirrors that in the Original Tiered CDD.

## K.    DISAGGREGATION OF MULTIPLE CLAIMS AGREED UNDER A CDD

66.    Issue 37 in the Application concerns how claims in respect of Statutory Interest and Currency Conversion Claims are to be calculated where a CDD or other post-administration agreement compromises a number of claims, with differing rates of interest applicable and/or in different currencies, without indicating how the agreed or admitted claim amount in the CDD (or other agreement) derives from and relates to those underlying claims.

67.    Paragraph 157 of the Administrators' Position Paper indicated that the Joint Administrators would file further evidence to illustrate the contexts in which this issue arises.

68.    As more fully explained at Section D of my Tenth Statement, CDDs provide for a single Agreed Claim which is admitted for dividends in the Administration. In the vast majority of cases where a CDD agreed and/or compromised a number of underlying claims, LBIE and the creditor did not agree how the Agreed Claim related to and derived from such underlying claims. This gives rise to the question of how, to the extent that claims agreed and/or compromised under the CDD would potentially give a creditor claims to Statutory Interest at a contractual rate and/or Currency Conversion Claims, the Joint Administrators are to determine the amount of such claims that were, or should be deemed to have been, part of the Agreed Claim amount.

69.    The Agreed Claim contained in a CDD may reflect (i) the creditor's claim as set out in its proof of debt (a "PoD" and the "PoD View"), or (ii) the Joint Administrators' view of the claim as informed primarily by LBIE's books and records and by its valuation of the component parts of the claim on the relevant dates (the "House View"), or (iii) a compromise between the two.

25

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

70.    One possible means of disaggregating an Agreed Claim amount in a CDD is by reference to the PoD View. In other words, the Joint Administrators could, for the purposes of determining a creditor's entitlements in respect of Statutory Interest and Currency Conversion Claims, assume that the various component parts of the claim as set out in the proof of debt were admitted pro rata (or, where the Agreed Claim equals the total of the sum claimed in the proof, that each component part was itself admitted in full), and therefore pro-rate the Agreed Claim amount across the various component claims set out in the proof of debt in order, in turn, to identify the elements entitling the creditor to a claim to interest and/or a Currency Conversion Claim. An illustration of how applying the PoD View might work is at **page 63 of AVL11**.

71.    However, using the PoD View in this way would itself give rise to further issues, including:

71.1    how the Joint Administrators should treat items within a proof of debt which clearly (for example as a matter of law) cannot form part of a creditor's admitted claim, for example where a creditor has purported to include in its proof of debt a claim for Statutory Interest;

71.2    how the Joint Administrators should treat items recorded in a proof of debt which, in their view, could not have formed part of the Agreed Claim, for example on the basis of manifest error on the part of the creditor;

71.3    how the Joint Administrators should treat items in a proof of debt which they consider have a mistake as to allocation (e.g. a claim under a prime brokerage agreement is allocated to a box relating to ISDA claims), whether such mistake comes from a clear error by the creditor or where the Joint Administrators' view as to allocation differs (but the total quantum of the claim might still be accepted); and

A18892736

**Party: Applicant**
**Witness: Anthony Victor Lomas**
**Statement No: 11**
**Exhibit: "AVL11"**
**Date: 31 October 2014**

71.4    how, if at all, the PoD View can be used where the proof of debt
does not split out the constituent components of a claim.

72.    An alternative would be to disaggregate Agreed Claims by reference to
the House View. The House View has been used previously as part of
the process of agreeing claims in the Administration.

72.1    As part of Project Canada (more fully described at paragraphs 42
to 46 of my Tenth Statement), LBIE made an offer to relevant
creditors of the lower of the House View and the "clean" PoD
View (being the PoD View amended by the Joint Administrators to
correct obvious errors and to remove non-provable amounts).

72.2    As part of Project Alaska, which is a bilateral claims agreement
process between LBIE and individual creditors involving further
analysis by LBIE of the PoD View and supporting documents and
information, LBIE made offers to creditors on the basis of the
House View as adjusted (if necessary) by reference to further
information provided by the creditor.

73.    Since the House View (or the adjusted House View pursuant to Project
Alaska) represents the Joint Administrators' view as to the true value of a
claim, the Joint Administrators' preference would be to use the House
View as the basis for disaggregating Agreed Claims. However, in doing
so the Joint Administrators would face the difficulty that creditors might
not agree that the House View represents the proper breakdown of their
Agreed Claim between underlying component parts. This difficulty arises
particularly where the Agreed Claim represents a compromise between
the PoD View and the House View.

74.    Whichever means is used to disaggregate multiple claims agreed in a
CDD, the disaggregation will give rise to further practical difficulties for
the purposes of calculating entitlements in respect of Statutory Interest
and Currency Conversion Claims. These include:

74.1    where an Agreed Claim amount reflects the existence of an
underlying receivable owing from the creditor to LBIE (which has

27

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

therefore been set off against the creditor's claims against LBIE), at what date and against which underlying component(s) of the claim that receivable is to be treated as having been set off (including whether, for the purposes of calculating Currency Conversion Claims, receivables are to be treated as having been set off first against amounts in the same currency); and

74.2    where an Agreed Claim amount included (or may have included) an amount of client money and that part of the claim has been assigned by the creditor to Laurifer (the company set up for the purpose by LBIE), how the assignment affects the attribution of the Agreed Claim amount across the remaining elements of the claim.

75.    Illustrations of some of the above practical difficulties are set out at **pages 64 and 65 of AVL11.**

## L.    ISSUES 10-18 AND 27: COST OF FUNDING

76.    Issues 10 to 18 in the Application concern the proper construction and effect of the contractual right to interest under the ISDA Master Agreements (the **"Default Rate"**). As a significant proportion of LBIE's debts arise under ISDA Master Agreements, the outcome of these issues will have a significant impact on the amount of the Surplus the Joint Administrators will be required to distribute in respect of Statutory Interest where the Default Rates claimed are in excess of the Judgments Act Rate but also potentially has a wider application in respect of non-provable claims and Currency Conversion Claims.

77.    At paragraphs 61.3 and 72 of the Administrators' Position Paper, the Joint Administrators indicated an intention to provide material that we considered may assist the Court, provide the context in which the issues arose in the Administration and illustrate the likely practical consequences of applying the respective positions of the Senior Creditor Group and Wentworth on these issues to the Administration.

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

78.     In that regard, I set out below:

78.1    the practical context in which the Court's determinations will be
        implemented and illustrations of the material issues that will arise
        for the Joint Administrators if the competing positions of the
        Senior Creditors Group and Wentworth are adopted;

78.2    an analysis of the various Default Rates that have been submitted
        in the Administration in valuation statements under the provisions
        of the ISDA Master Agreements and PoDs; and

78.3    an illustration of the potential financial impact on the LBIE estate
        of various Default Rates in excess of the Judgments Act Rate
        being applied to the claims of different proportions of creditors.

### Practical context and material issues

79.     As stated at paragraph 73 of the Administrators' Position Paper, it is of
        significant practical importance for the efficient distribution of any surplus
        from the LBIE Administration that the Joint Administrators receive clear
        guidance on how they should evaluate the cost of funding self-certified by
        ISDA creditors for the purposes of calculating their respective Default
        Rates. For example:

79.1    Guidance is required as to what documentation will constitute a
        certificate for these purposes and in what circumstances will it be
        appropriate for the Joint Administrators to question whether a
        document is a certificate.

79.2    If the Court determines that the self-certification is not conclusive
        (Issue 14), the Joint Administrators will need directions on how
        they are to analyse the certificate, including the circumstances in
        which it is permissible and the extent to which they are permitted
        and/or required, to request additional detail or supporting
        documentation or otherwise investigate the claimed cost of
        funding.

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

79.3    The Joint Administrators will need to satisfy themselves that the self-certified cost of funding has not been calculated in bad faith or irrationally. In circumstances where the cost of funding is certified without reference to a benchmark index, such assessment will be onerous and costly for the Administration if it is necessary for this determination to take into consideration, in respect of each certificate, the way in which the applicable rate has fluctuated over time because the Court has determined that the cost of funding should be calculated *"on a fluctuating basis taking into account any changes in the relevant circumstances"* (Issue 13). Further, if this is the Court's determination, it may be necessary for many ISDA creditors to re-certify their cost of funding as they may not have applied this construction of the Default Rate to their certificate, resulting in a delay to the distribution of the Surplus.

79.4    If the Court determines that an ISDA creditor's cost of funding is assessed solely by reference to the asset being funded (Issues 11 to 13 in particular), the Joint Administrators may be able to apply a single cost of funding as a comparator against which to evaluate all certificates for ISDA creditors using the same currency. However, if the Court reaches a different determination in this regard, a more complex analysis will be required of the Joint Administrators and we may therefore need additional detailed guidance on how to assess the ISDA creditors' claims for interest at their respective Default Rates.

### *Analysis of claimed Default Rates*

80.    With a view to understanding better the Default Rates in fact claimed in the Administration, the Joint Administrators and our staff have carried out an analysis, described in further detail below, using information available to us from the Administration, namely:

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

80.1   Valuation statements submitted by original ISDA counterparties providing details of the calculation of their claims for early termination payments (including any interest claimed to be accruing on such amounts at the Default Rate) under the provisions of the relevant ISDA Master Agreement where a relevant event of default triggering the payment was cited (e.g. LBIE entering into administration). Approximately 1,400 such valuation statements were reviewed for this purpose, the majority of which were received in the first three to six months following the Date of Administration.

80.2   1,511 PoDs submitted in the Administration by either (i) original counterparties to LBIE OTC derivative products or (ii) subsequent assignees. The vast majority of these PoDs were submitted in the period from the Date of Administration up to the date of the first distribution at the end of November 2012, with a small number submitted thereafter.

81.   Of those 1,511 creditors who submitted PoDs, as set out in detail in the table at **page 66 of AVL11**, 502 were excluded because they were non-ISDA creditors, the PoDs were outside the scope of the analysis, primarily because the PoD was subsequently withdrawn or rejected, or was a duplicate of another PoD. Therefore, the population of PoDs upon which our analysis was based is 1,009 (the "**Sample Population**"). Corresponding valuation statements were identified for each PoD that comprises the Sample Population.

*Disclosure and calculation of Default Rates from the Sample Population*

82.   The assumptions we applied to our analysis of the Sample Population to ascertain the Default Rates disclosed by or imputed from the data in the PoDs and valuation statements are set out at **page 67 of AVL11** and the table setting out the detailed results are at **page 68 of AVL11**.

31

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

83.    As can be seen in the table on **page 68 of AVL11**, of the Sample Population, 41% of ISDA creditors submitted a PoD and 37% submitted a valuation statement that:

83.1    disclosed, or provided data from which it was possible to impute, a Default Rate as an absolute numerical interest rate (e.g. 8% per annum); or

83.2    disclosed a Default Rate as a benchmark index such as EONIA or LIBOR plus or minus a spread, or referenced this source as the cost of funding from which to derive the Default Rate. Where this was the case, for illustrative purposes two average rates were calculated for each benchmark: one for the period from the Date of Administration to 31 December 2008 (**"Period 1"**) and another for the period from the Date of Administration to 30 April 2014 (**"Period 2"**), in order to determine the relevant Default Rates over these periods. The Period 2 average benchmarks are more representative of the period of the Administration as a whole since they cover the five and a half year period of the Administration to 30 April 2014. In all cases, the Period 2 average benchmarks are significantly lower than the Period 1 averages.

84.    The remaining 59% of PoDs and 63% of valuation statements in the Sample Population contained no information as to the Default Rate or the cost of funding in respect of the claim and did not otherwise contain enough data to enable the Default Rate to be imputed.

85.    On the basis of the assumptions set out in detail at **page 69 of AVL11**, we have calculated that a Default Rate (averaged across LBIE's ISDA creditors and averaged over the period from the Date of Administration to 30 April 2014) in the region of 6.6% per annum compounded daily (the **"Threshold Rate"**) is broadly comparable to the Judgments Act Rate. An ISDA creditor would (all other things being equal) be theoretically indifferent to whether the Statutory Interest on their claim is calculated at the Judgments Act Rate or the Threshold Rate because they will receive approximately the same quantum of interest on their claim.

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

86.    Once the Default Rates had (where possible) been obtained from the
Sample Population, we conducted four streams of analysis on that data,
which are outlined in the following sections.

87.    Wentworth's position paper refers to a report exhibited to the witness
statement of Robert Sabin Bingham served on its behalf (the "**Zolfo
Cooper Report**") in respect of a similar analysis undertaken at
Wentworth's instruction of material from publicly available sources of the
Default Rates claimed by ISDA creditors in the context of the insolvency
processes of various Lehman Brothers group companies. Albeit based on
a significantly smaller sample population, the Zolfo Cooper Report
reaches broadly the same conclusions as those resulting from the Joint
Administrators' analysis.

*(i) Default Rate stratification and comparison with the Threshold Rate*

88.    As shown in the tables **at pages 70 and 71 of AVL11**:

88.1    Of the valuation statements and PoDs in the Sample Population
that disclosed an absolute Default Rate: 47 valuation statements
and 49 PoDs disclosed a Default Rate equal to or in excess of the
Threshold Rate of approximately 6.6% per annum. 42 of these 47
valuation statements were received in the period from the Date of
Administration to the end of February 2009, when interest rates
were relatively high (as discussed at paragraph 83.2 above). 38
of the 49 PoDs match the Default Rates referred to in the
corresponding valuation statement. In a number of cases the
PoDs simply refer to the attached valuation statement.

88.2    Of the valuation statements and PoDs in the Sample Population
that referred to a benchmark index: seven valuation statements
and six PoDs for Period 1 and two valuation statements and three
PoDs for Period 2 disclosed and/or implied a Default Rate equal
to or in excess of the Threshold Rate. Of these, one creditor
referred to a benchmark index based on the South African Rand

33

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

(the ZAR Sabor Overnight index). The Period 1 and Period 2 averages for this benchmark were 11.7% and 6.2% respectively.

89.    The details of the highest Default Rates submitted by ISDA creditors are set out in the table at **page 72 of AVL11**. For all creditors who submitted absolute Default Rates in excess of 8%, we have been unable to identify any explanation or calculation of how these rates were arrived at.

*(ii) Analysis of average Default Rate*

90.    As discussed at paragraph 88.2 above, for those ISDA creditors who referenced a Default Rate based on a spread above or below a benchmark index, it has been possible to calculate an average Default Rate for Period 1, which assists in comparisons with absolute Default Rate notifications made early in the Administration. In addition, a further calculation has been performed to determine an average Default Rate for Period 2, on the assumption that the same benchmark and spread would have been applied by those creditors throughout the period of the Administration. We also calculated the average of the Default Rates disclosed as an absolute numerical interest rate.

91.    A summary of this analysis is set out in the table below. A more detailed analysis is set out in the table at **page 73 of AVL11**.

|  | Valuation Statement | PoD |
|---|---|---|
| Creditors referencing an absolute rate only | 5.8% | 5.9% |
| Creditors referencing a benchmark (Period 1) | 3.4% | 3.9% |
| Creditors referencing a benchmark (Period 2) | 1.8% | 1.9% |

*(iii) Comparison of Default Rates claimed by original ISDA counterparties in valuation statements and PoDs*

A18892736

92.  As shown in the table at **page 74 of AVL11**, the Sample Population was also analysed to compare the differences between valuation statements and PoDs submitted by a single creditor for the same claim:

92.1  125 such claims were identified where an absolute numerical rate was disclosed as the Default Rate, 14 of which did not reference the same rate in both the valuation statement and the PoD.

92.2  140 such claims were identified where a benchmark was referenced for the Default Rate, three of which did not reference the same benchmark.

92.3  245 claims had different approaches to the determination of the Default Rate in their valuation statements and PoDs; for example, a benchmark or absolute numerical rate was referenced in one source while the other was silent as to the Default Rate.

*(iv) Comparison of Default Rates claimed by original ISDA counterparties and subsequent assignees*

93.  As shown in the table at **page 75 of AVL11**, of the 88 PoDs that were removed from the Sample Population because they duplicated another PoD for the same claim, 72 were duplicates because both the original ISDA counterparty and a subsequent assignee submitted a PoD in respect of the same claim.

94.  Of this subset it is of note that:

94.1  there is only one instance where the subsequent assignee claimed a higher Default Rate than that claimed by the original counterparty: absolute numerical rate of 2.59% per annum compared with 2.20% per annum; and

94.2  there was one claim where the PoD submitted by the original counterparty based its Default Rate on EONIA (which for Period 2 did not exceed 5.7% including the 1% uplift) whereas the PoD from the subsequent assignee referred to an absolute Default Rate of 5.28% per annum.

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

*Potential financial impact of higher Default Rates*

95.    As stated in paragraph 15 above, the Joint Administrators estimate that, if
       the Principal First Approach (as described at paragraph 13 above) is
       applied, as at 15 September 2016, the amount of Statutory Interest
       payable on proved debts at the Judgments Act Rate applied on a simple
       basis with all interest calculated from the Date of Administration will be
       c.£5.1 billion.

96.    However, as stated in paragraph 47 of my Ninth Statement, some LBIE
       creditors have indicated that they can establish claims to Default Rates
       under ISDA Master Agreements that are significantly in excess of the
       Judgments Act Rate. The Joint Administrators estimate that the High
       Case proved debts referable to ISDA Master Agreements to which
       interest based on a Default Rate may apply total approximately £4.1
       billion. There are a further c.£0.3 billion of other OTC claims which have
       similar characteristics giving a total of c.£4.4 billion (the "**ISDA/OTC
       Claim Base**").

97.    As noted in paragraph 85 above, applying the Threshold Rate (i.e.
       approximately 6.6% per annum compounding daily) to an ISDA/OTC
       claim is roughly equivalent to the Judgments Act Rate (i.e. 8% per annum
       simple); in each case, the total amount of interest payable by the LBIE
       estate on proven debts at that rate will be c.£5.1 billion. However, if
       Statutory Interest is applied to the ISDA/OTC Claim Base using Default
       Rates in excess of the Threshold Rate, the total amount of Statutory
       Interest payable from the LBIE estate will, of course, increase above
       c.£5.1 billion.

98.    The graph at **page 76 of AVL11** illustrates the potential impact of daily
       compounded Default Rates of between 8% and 20% per annum to the
       whole ISDA/OTC Claim Base (i.e. assuming that all ISDA/OTC creditors
       are entitled to claims for interest at those rates). The table showing the
       detailed calculations behind this graph is at **page 77 of AVL11**.

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

99. However, the impact on the estate will depend both on the Default Rate claimed in excess of the Threshold Rate and the number of creditors who are able successfully to prove that higher rate. It seems to the Joint Administrators (including on the basis of the data described above) unlikely that all ISDA/OTC creditors will make such a claim or that all such claims in fact made would be successful, so the Joint Administrators have prepared an illustration of how the total amount of interest payable at different Default Rates in excess of the Threshold Rate varies by reference to the proportion of the ISDA/OTC Claim Base population entitled to such interest rates.

100. We set out in the tables at **page 77 of AVL11** and in the graph at **page 78 of AVL11** this illustration of the potential financial impact of the different compound rates at different percentages of success. As can be seen from the tables and the graph:

100.1 If 25% of ISDA/OTC creditors were successful in claiming Default Rates of 12% per annum applied on a compound basis and the remaining ISDA/OTC creditors and non-ISDA/OTC creditors receive the Judgments Act Rate, the total amount of Statutory Interest payable would increase by c.£0.5 billion to c.£5.6 billion.

100.2 Based on the forecast High Case surplus quantum of c.£7.4 billion (as recorded in the Twelfth Progress Report and subject to the assumptions and caveats in that report), there will be insufficient surplus available to meet creditor entitlements to Statutory Interest where there are higher percentage success rates of claimed higher Default Rates eg if 75% of ISDA/OTC creditors are successful in claiming Default Rates of 14% per annum, the total amount of Statutory Interest payable would increase by c.£2.4 billion to c.£7.5 billion.

**Party: Applicant**
**Witness: Anthony Victor Lomas**
**Statement No: 11**
**Exhibit: "AVL11"**
**Date: 31 October 2014**

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

Dated 31 October 2014

..............................................

**Anthony Victor Lomas**

38

A18892736

Party: Applicant
Witness: Anthony Victor Lomas
Statement No: 11
Exhibit: "AVL11"
Date: 31 October 2014

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

---

**EXHIBIT "AVL11" TO
ELEVENTH WITNESS STATEMENT OF
ANTHONY VICTOR LOMAS**

---

This is the exhibit marked "AVL11" referred to in the Eleventh Witness Statement of Anthony Victor Lomas dated 31 October 2014.

Signed ...................................

A18892736

**Party: Applicant**
**Witness: Anthony Victor Lomas**
**Statement No: 11**
**Exhibit: "AVL11"**
**Date:  31 October 2014**

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

**IN THE MATTER OF LEHMAN BROTHERS**

**INTERNATIONAL (EUROPE) (IN**

**ADMINISTRATION)**

**AND IN THE MATTER OF THE INSOLVENCY ACT**

**1986**

---

**ELEVENTH WITNESS
STATEMENT**

**OF**

**ANTHONY VICTOR LOMAS**

---

Linklaters LLP
One Silk Street
London EC2Y 8HQ

Tel:  (44-20) 7456 2000
Fax: (44-20) 7456 2222
Solicitors for the Claimant
Ref: Tony Bugg/Euan Clarke/Jared Oyston