Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In re:

5

6    LEHMAN BROTHERS HOLDINGS

7    INC.,

8                              Case No. 08-13555(SCC)

9         Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - x

11    LEHMAN BROTHERS INC.        Adv. Case No. 08-01420(SCC)

12    - - - - - - - - - - - - - - - - - - - - - - - - - x

13    LEHMAN BROTHERS HOLDINGS

14    INC., ET AL.,

15              Plaintiffs,

16         v.                    Adv. Case No. 15-01112(SCC)

17    U.S. BANK NATIONAL

18    ASSOCIATION, ET AL.,

19              Defendants.

20    - - - - - - - - - - - - - - - - - - - - - - - - - x

21

22

23

24

25

Page 2

1    LEHMAN BROTHERS HOLDINGS

2    INC., IN ITS CAPACITY AS,

3                    Plaintiff,

4          v.                    Adv. Case No. 14-02409(SCC)

5    UUTAH HOUSING CORPORATION

6    (F/K/A UTAH HOUSING

7    FINANCE),

8                    Defendant.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   MOORE MACRO FUND, LP, ET AL.,

11                  Plaintiffs,

12         v.                    Adv. Case No. 14-02021(SCC)

13   LEHMAN BROTHERS HOLDINGS

14   INC., ET AL.,

15                  Defendants.

16   - - - - - - - - - - - - - - - - - - - - - - - - - - x

17

18                  U.S. Bankruptcy Court

19                  One Bowling Green

20                  New York, New York

21

22                  July 22, 2015

23                  10:03 AM

24

25

Page 3

1     B E F O R E :

2     HON SHELLEY C. CHAPMAN

3     U.S. BANKRUPTCY JUDGE

4

5

6

7

8     Hearing re:  08-13555 - Doc #47569 Status Conference

9     Regarding Order Establishing a Protocol to resolve Claims

10    Filed by Trustees on Behalf of Certain Issuers of

11    Residential Mortgage-Backed Securities

12

13    Hearing re:  Doc #49382 Four Hundred Ninety-Ninth Omnibus

14    Objection to Claims (No Liability Claims)(Claims 20328 &

15    21368)

16

17    Hearing re:  Adv. 08-01420 - Doc #12409 Eighteenth

18    Application of Hughes Hubbard & Reed LLP for Allowance of

19    Interim Compensation for Services Rendered and Reimbursement

20    of Actual and Necessary Expenses Incurred from January 1,

21    2015 through April 30, 2015

22

23    Hearing re:  Adv. 08-01420 - Doc #12408 Joint Notice of

24    Presentment of Eighth Amended Order Establishing Procedures

25    Governing Interim Monthly Compensation of Trustee and Hughes

Page 4

1    Hubbard & Reed LLP

2

3    Hearing re:  Adv. 08-01420 - Doc #12143 Trustee's

4    Supplemental Objection to the Amended and Supplemental

5    Pleading to Proofs of Claim Subject to the Two Hundred

6    Seventy Omnibus Objection (No Liability Claims)

7

8    Hearing re:  Adv. 15-01112 - Pre-trial Conference

9

10   Hearing re:  Adv. 14-02409 - Doc #15 Motion to Dismiss

11   Adversary Proceeding

12

13   Hearing re:  Adv. 14-02021 - Doc #52 Motion to Compel

14   Document Discovery filed by Bennette D. Kramer on behalf of

15   JR Moore, LP, et al.

16

17   Hearing re:  Adv. 14-02021 - Doc #66 Motion to Compel

18   Production of Documents and for Future Relief filed by

19   Stephen Patrick Farrelly on behalf of Lehman Brothers

20   Commercial Corporation, et al.

21

22

23

24   Transcribed by:  Dawn South, Tracey Williams, Lisa Beck, and

25   Leigh David

Page 5

```
 1   A P P E A R A N C E S :

 2   WEIL, GOTSHAL & MANGES

 3        Attorneys for the Debtor

 4        767 Fifth Avenue

 5        New York, NY 10153-0119

 6

 7   BY:  MAURICE HORWITZ, ESQ.

 8        JACQUELINE MARCUS, ESQ.

 9        CHRISTOPHER J. COX, ESQ.

10

11   HUGHES HUBBARD & REED LLP

12        Attorney for the SIPA Trustee

13        One Battery Park Plaza

14        New York, NY 10004-1482

15

16   BY:  JAMES B. KOBAK, JR., ESQ.

17        JEFFREY S. MARGOLIN, ESQ.

18        STUART N. MITCHELL, ESQ.

19

20   JONES & KELLER

21        Attorney for Ontario Teachers' Pension Plan Board

22        1999 Broadway, Suite 3150

23        Denver, CO 80202

24

25   BY:  MICHAEL A. ROLLIN, ESQ.
```

Page 6

1    SHERMAN & STERLING LLP

2         Attorney for Ontario Teachers' Pension Plan Board

3         599 Lexington Avenue

4         New York, NY 10022-6069

5

6    BY:  WILLIAM J.F. ROLL, III, ESQ.

7

8    BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI LLP

9         Attorneys for Claimants

10        299 Park Avenue

11        New York, NY 10171

12

13   BY:  ROBIN L. ALPERSTEIN, ESQ.

14        CHESTER B. SALOMON, ESQ.

15        ALEC P. OSTROW, ESQ.

16

17   SEWARD & KISSEL LLP

18        Attorneys for Law Debenture Trust Company of New York

19        One Batter Park Plaza

20        New York NY 10004

21

22   BY:  M. WILLIAM MUNNO, ESQ.

23        DAN GUZMAN, ESQ.

24

25

Page 7

1    WILLKIE FARR & GALLAGHER LLP

2         787 Seventh Avenue

3         New York, NY 10019-6099

4

5    BY:  TODD G. COSENZA, ESQ.

6

7    CHAPMAN AND CUTLER LLP

8         Attorney for U.S. Bank National Association, as

9         Trustee

10        111 West Monroe Street

11        Chicago, IL 60603-4080

12

13   BY:  FRANKLIN H. TOPP III, ESQ.

14

15   NIXON PEABODY LLP

16        Attorneys for Deutsch Bank, as Trustee

17        100 Summer Street

18        Boston, MA 02110-2131

19

20   BY:  RICHARD C. PEDONE, ESQ.

21        CONSTANCE M. BOLAND, ESQ.

22

23

24

25

Page 8

1   SECURITIES INVESTOR PROTECTION CORPORATION

2        Attorney for SIPC

3        805 15th Street, Suite 800

4        Washington, DC 20005-2215

5

6   BY:  KENNETH J. CAPUTO, ESQ.

7

8   MURPHY & MCGONIGLE

9        Attorney for Greenpoint Mortgage

10       1185 Avenue of the Americas

11       Floor 21

12       New York, NY 10036

13

14  BY:  JAMES GFAB, ESQ.

15

16  BALLARD SPAHR LLP

17       Attorney for Utah Housing

18       1735 Market Street

19       51st Floor

20       Philadelphia, PA 19103-7599

21

22  BY:  WILLIAM A. SLAUGHTER, ESQ.

23

24

25

Page 9

1    CAHILL GORDON & REINDEL LLP

2         Attorney for Greenpoint Mortgage Funding, Inc.

3         80 Pine Street

4         New York, NY 10005

5

6    BY:  KEVIN J. BURKE, ESQ.

7

8    JONES DAY

9         222 East 41st Street

10        New York, NY 10017-6702

11

12   BY:  TRACY V. SCHAFFER, ESQ.

13        JAYANT W. TAMBE, ESQ.

14

15   SCHLAM STONE & DOLAN LLP

16        Attorney for Moore Capital

17        26 Broadway

18        New York, NY 10004

19

20   BY:  ERIK S. GROSSTHUIS, ESQ.

21

22

23

24

25

Page 10

1   ALLEGAERT BERGER & VOGEL LLP

2        111 Broadway, 20th Floor

3        New York, NY 10006

4

5   BY:  JOHN S. CRAIG, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  How is everyone today?  Ready when you

3     are.

4              MR. KOBAK:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. KOBAK:  James Kobak, Hughes Hubbard & Reed,

7     for Mr. Giddens, the SIPA Trustee.

8              By agreement with Holdings we have two

9     uncontested --

10             THE COURT:  Yes.

11             MR. KOBAK:  -- fee matters, so we agreed to put

12    those on first.

13             THE COURT:  Right.

14             MR. KOBAK:  The first is my firm's eighteenth

15    interim fee application, which covers the four-month period,

16    January of this year through April 30th, reflects a total

17    amount of hours of over 20,000 hours, including

18    approximately 250 hours by the trustee.  We also request

19    reimbursement of expenses in the amount of $142,543.85.

20             There's no opposition to this motion, and it's

21    supported by SIPC.  And as Your Honor knows, Mr. Caputo is

22    here today, and of course SIPC's recommendation is entitled

23    to considerable reliance.

24             As usual our application reflects our customary

25    ten percent public interest discount.

Page 12

1       In addition to that, based on our own review and

2  on SIPC's review, there were further reductions, which are

3  detailed in the application of both fees and expenses, which

4  total over $400,000.

5       This was a very active period.  There was

6  considerable progress made on the claims side by Ms. Grag

7  (ph) and her team, and in addition we completed or undertook

8  the second interim distribution, which Your Honor recognized

9  was very unanticipated when this case started, and as Your

10  Honor knows, we're about to embark on a third one, which is

11  even more unanticipated.

12       So, I think all the documentation and so forth is

13  in the motion and my affidavit, and as I say, the motion is

14  unopposed.  And unless Your Honor has any questions we'd ask

15  you to enter an order approving the application.

16       THE COURT:  All right.  Thank you.

17       Does anyone wish to be heard with respect to the

18  application of allowance for compensation?

19       All right.  I agree with your characterization on

20  the progress that has been, and of course recognize the

21  deference that's to be afforded to SIPC, and I'm happy to

22  enter the proposed order.

23       MR. KOBAK:  Thank you, Your Honor.

24       THE COURT:  Thank you.

25       MR. KOBAK:  And the second matter is -- it's

1    actually here on presentment, and again it's unopposed.

2    It's a joint motion by SIPC and the trustee to amend the

3    seventh interim compensation order to make it the eighth

4    interim compensation order.

5            And essentially what this asks for is a release of

6    held-back fees for the period from September 2014 through

7    April 15.  There still will be a remaining holdback of

8    $1 million.

9            THE COURT:  All right.  Does anyone wish to be

10    heard with respect to the second application?

11            All right.  It too will be granted.  Thank you

12    very much.

13            MR. KOBAK:  Thank you very much, Your Honor.

14            THE COURT:  It's nice to see you.

15            All right.  We're going to move onto the LBHI

16    agenda, please.

17            The first matter is the status conference

18    regarding the protocol to resolve claims filed by the RMBS

19    trustees.

20        (Pause)

21            THE COURT:  Hello everyone, how are you?  You've

22    been very busy.

23            UNIDENTIFIED SPEAKER:  Indeed.

24            THE COURT:  Very busy.  I'm very happy to read

25    about it.  Who would like to make comments first?

Page 14

1          MR. COSENZA:  Good morning, Your Honor, Todd

2      Consenza.  I think (indiscernible) status reports admission.

3      I think we'll have the trustees sort of start and then I'll

4      have some follow-up points.

5          THE COURT:  Excellent.  All right.  Thank you.

6          MR. TOP:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. TOP:  My name is Frank Top, from Chapman and

9      Cutler on behalf of U.S. Bank National Association, as

10     Trustee.  With me today is Rick Pedone, representing

11     Deutsche Bank, he's from Nixon & Peabody.  We have Bill

12     Munno and Dan Guzman from Seward & Kissel on behalf of Law

13     Debenture, and then Kit Whitenauer (ph) and Jason Solomon,

14     here on behalf of the Wilmington Trust entities.

15         THE COURT:  Okay.

16         MR. TOP:  We did file on Friday afternoon a status

17     report to give you, you know, how we've complied with the

18     various aspects of the protocol.  I think we're doing

19     actually a better job than I've expected, thanks to a lot of

20     the efforts of Mr. Munno getting loan files.  I mean --

21         THE COURT:  You're doing a better job than you had

22     expect -- that you all had expected.

23         MR. TOP:  I think that's true.

24         THE COURT:  And I think -- and was very pleased to

25     see that.

Page 15

1          MR. TOP:  Right.

2          THE COURT:  And I appreciate it and it's obviously

3    been a lot of work that's been pursued with a lot of

4    diligence.

5          MR. TOP:  Yeah.  And that's not to suggest that we

6    don't have some problems that remain outstanding, obviously

7    we're still trying to get about 38,000 loans.  In London

8    since we've had to issue a subpoena for a relatively small

9    number of loans, in other cases there have been some

10   servicers that can't really match up their identification

11   numbers with what we presented them, so we're giving them

12   additional information which to help them find some loan

13   files, and then, you know, obviously there's the issue with

14   that one and, you know, we've agreed on a timeline within

15   which they're going to produce 11,000 of their loan files

16   within the next two months.  And then there's the GMAC

17   loans, which right now are kind of the wild card, but you

18   know, a decision by Judge Glenn recently has required ResCap

19   to produce those loan files to Oqwin (ph).  And so hopefully

20   that will be the end of that matter.

21          THE COURT:  Okay.

22          MR. TOP:  So that part of it's going pretty well.

23          We've obviously met our March deadline of 10,000

24   loans that we either submitted claims for or decided not to

25   submit claims for, and met our deadline of June 30th to

Page 16

1    submit over 50,000 claims.  Again, not all -- to review

2    50,000 loans rights --

3              THE COURT:  Right.

4              MR. TOP:  -- half of which we've submitted claims

5    for, the other half of which we decided, you know, it was

6    either not something that we thought was a big deal, or in

7    other cases there just wasn't a claim to make at all, so.

8              THE COURT:  Right.  The loans were -- and I think

9    you said in --

10             MR. TOP:  That's right.

11             THE COURT:  -- about approximately 7,000 instances

12   the loans had been fully paid.

13             MR. TOP:  That's right.

14             So -- and then the another thing I just I suppose

15   I wanted to mention and then I'll open it up for any

16   questions you might have about the process, is you know,

17   again, we had the file proceedings in Minnesota, it's more

18   trust administrative type of a deal in that some of these

19   trusts had limitations on what we could spend, and there was

20   a concern that if we didn't seek permission from, you know,

21   a court that had jurisdiction over these trusts to increase

22   -- to allow us to do this outside of the cap that, you know,

23   we would not be able to -- someone might come back and

24   challenge it later or something like that.  So we went to

25   the court in Minnesota to do that.

1            If Your Honor is interested in any of those papers

2    happy to give you a copy of them, happy not to give you a

3    copy of them, but --

4            THE COURT:  Unless I need to see them I have

5    plenty of paper --

6            MR. TOP:  Yeah.  So any way --

7            THE COURT:  -- in this case and others to look at.

8            MR. TOP:  To that end we've been very proactive.

9            THE COURT:  You have to do what you have to --

10   what you have to do, so.

11           MR. TOP:  Yeah, exactly.  Exactly.  So if you have

12   any questions happy to answer them, if not I'm happy to sit

13   down.

14           THE COURT:  All right.  Why don't you take a seat.

15   Thank you.

16           MR. COSENZA:  Hey, Your Honor.

17           THE COURT:  Good morning, Mr. Cosenza, how are

18   you?

19           MR. COSENZA:  Good morning.  Your Honor, I'm going

20   to start with the Minnesota proceed at this point.

21           Part of this process that's been set up is for

22   there to be open disclosure, open exchange of information --

23           THE COURT:  Right.

24           MR. COSENZA:  -- the protocol has many steps as

25   part of the process.  The next few steps in the protocol

Page 18

1    after their review of the first 50,000 files is frankly

2    going to be a very close review of the claims they put

3    forward.  I think the trustee has not surprisingly put

4    forward a wide number of claims.  They had a really broad

5    definition of what a breach is, any claim with, you know, a

6    certain very low threshold that's been a loss they put

7    forward to us.  So there's going to be a very, very

8    significant number of files that are going have to go

9    through our review -- the next step of the protocol --

10            THE COURT:  Right.

11            MR. COSENZA:  -- which will be sort of a meet and

12   confer session, and then through the claims facilitation

13   process, and hopefully that will eliminate most of the

14   claims before having to come to you.

15            THE COURT:  So before you get to that point though

16   what Mr. Top indicated, and I didn't get a sense of the

17   numbers, was that a number of claims didn't make -- a number

18   of files didn't make it out of the starting box and become

19   claims.  In other words they had concluded that there wasn't

20   a claim either because it was paid -- the loan was paid in

21   full or some other reason.  And I didn't ask Mr. Top, I'll

22   ask you.  Is there any sense of the order of magnitude of

23   that in terms of absolute numbers or a percentage?

24            MR. COSENZA:  I think they would have the

25   percentage.  I've been told that they've been putting

Page 19

1   forward basically claims that -- with a very -- with any

2   losses a very low threshold, and they've also put forward to

3   us claims on loans that actually have been performing.  So

4   there's a large number of files that are, you know --

5            THE COURT:  I see.

6            MR. COSENZA:  -- coming down on our end.

7            So there are a number of files that they've put to

8   the side where they think they -- that are performing loans

9   that they're basically able to -- you know, there's no need

10  for them because they're actually being --

11           THE COURT:  Right.  I guess in a simplistic way --

12           MR. COSENZA:  -- those loans have been very

13  profitable.

14           THE COURT:  -- I'm just -- I'm looking to have a

15  total number and to definitively know that that number has

16  been reduced by --

17           MR. COSENZA:  X percent.

18           THE COURT:  -- X.  But in the status report it

19  indicates that with respect to 7,000 --

20           MR. COSENZA:  Yes.

21           THE COURT:  -- files they're fully paid.

22           So someone is rising behind you, perhaps they have

23  something of an answer of that question.

24           MR. ROLLIN:  Michael Rollin from Jones & Keller.

25           Your Honor, as we understand it the -- what

1    they're -- the loans that they review but don't submit to us

2    as claim breaches are loans in which they just don't find

3    breach at all or there's a dollar threshold but they're not

4    even reviewing beyond what the dollar threshold is.

5              THE COURT:  Right.  And they don't find the breach

6    either because --

7              MR. ROLLIN:  Everything else --

8              THE COURT:  -- it's been paid or they otherwise

9    don't find the breach.

10             MR. ROLLIN:  Or they otherwise don't find a

11   breach.  Otherwise they're throwing a fairly large number of

12   claims, and subject to our review, many of which we disagree

13   with.

14             THE COURT:  Sure.  No, I understand that, that

15   we're only at the very beginning.  I'm just again

16   simplistically trying to take the 210,000 file number that

17   we start at and say completely off the table are 20,000 or

18   30,000 files.

19             MR. TOP:  Yeah, so and just a little tweak to what

20   Mr. Rollin said is, it's not just loans that have no

21   breaches at all that we're getting rid of, I mean there

22   might be what we deem not to be an insignificant breach that

23   we're also not passing along.  So just because a loan file

24   has a breach if we don't believe it's, you know --

25             THE COURT:  Meets the standard.

Page 21

1              MR. TOP:  -- raises to a certain level, we're not

2      passing those things off.

3              THE COURT:  Okay.  It is what it is.  You know, if

4      there's no answer that's fine, it's just my curiosity.

5              MR. TOP:  So in terms of numbers though we've

6      reviewed a little bit more than 50,000 loans, and it's about

7      50/50.  We're not submitting things on half, and we're

8      submitting claims on the other half.

9              THE COURT:  That's the number that I'm looking

10     for, right?  So whether that's predictive -- you know,

11     again, not to go back to our old friend the sampling topic

12     -- whether that hit rate, so to speak, is predictive of

13     what's to come, I have no way of knowing, you probably have

14     no way of knowing, but right now facts on the ground if only

15     50 percent of the reviewed files have made it over, that's a

16     number that's interesting.  That was the number that I was

17     looking for.

18             MR. ROLLIN:  So that Your Honor has some clarity

19     and context around that number, that's still 50 percent

20     though may be still a very substantial number of

21     insignificant claims.

22             THE COURT:  I hear you, but to the extent that

23     there are claims that didn't make it over, that's -- those

24     are claims that don't have to be considered by the trustee

25     or me.  So we'll call it progress.

Page 22

1            MR. COSENZA:  Yes.  So, I guess that's leading

2      until I think the next status conference --

3            THE COURT:  Next steps, right.

4            MR. COSENZA:  -- we'll have a better step to sort

5      of work through and get you a better sense as to what we're

6      looking at on our end in terms of our review.

7            THE COURT:  And the trustee -- and I'm sorry, the

8      estate is prepared to proceed consistent with the protocol

9      and do what it's now required to do --

10           MR. COSENZA:  Correct.

11           THE COURT:  -- having received --

12           MR. COSENZA:  Correct.

13           THE COURT:  -- the files.

14           MR. COSENZA:  I think the next deadline for us is

15     August 31 to start, you know, responding back to these

16     claims that have been put forward.

17           THE COURT:  Okay.

18           MR. COSENZA:  But, Your Honor, still I wanted to

19     go back to --

20           THE COURT:  To Minnesota?

21           MR. COSENZA:  -- to the Minnesota proceedings.

22           We've had a series of weekly calls with the

23     trustees and their counsel, we had a long lengthy meet and

24     confer with them last week to go through how the protocol is

25     working.  The Minnesota proceeding was, you know, not

Page 23

1    mentioned to at least, you know, counsel.  We weren't made

2    aware of what happened in Minnesota.  You know, this really

3    impacts the certificate holders here, they potentially could

4    receive a payout from the trust.  So we actually want some

5    insight into what happened in Minnesota.

6                THE COURT:  So can you explain that to me?

7    Because the way I was looking at it was that it was just

8    simply something administrative that the trustees needed to

9    do, but that wouldn't necessarily impact anything.  So could

10   you explain that a little more?

11               MR. COSENZA:  Sure.  I don't have full insight

12   into Minnesota --

13               THE COURT:  Right.

14               MR. COSENZA:  -- but my understanding is this

15   happens that the trusts and the trustees have expense

16   caps --

17               THE COURT:  Right.

18               MR. COSENZA:  -- and they were trying to lift

19   those caps to comply with the protocol.

20               THE COURT:  Right.

21               MR. COSENZA:  And obviously --

22               THE COURT:  Well they have to comply with the

23   protocol.

24               MR. COSENZA:  Correct.

25               THE COURT:  The question as far as I can tell is

Page 24

1    how they're going to get paid for doing that.  But there's

2    nothing in the protocol --

3                MR. COSENZA:  Correct.

4                THE COURT:  -- that says that they only have to

5    comply up to $200,000.  One of the issues that was raised at

6    the stage at which we implemented the protocol was the

7    expense.

8                MR. COSENZA:  Uh-huh.

9                THE COURT:  So --

10               MR. COSENZA:  So, I guess I don't know what's

11   happened in Minnesota or how it impacts certificate holders,

12   how it impacts the protocol, but I would have expected to at

13   least been, you know, for us and the Court to be sort of

14   kept abreast as to what was going on in Minnesota to see how

15   it impacts the protocol, how it actually impacts the

16   ultimate recovery to the certificate holders.

17               I've made a request for the trustees' counsel and

18   they're going to provide me with data and some of the

19   pleadings from the Minnesota case, I just don't want to put

20   an end in that issue so we can sort of from our perspective

21   understand that and figure out what happened to see if

22   there's any issue that needs to be raised to you, if any.  I

23   just don't have any insight as to what happened in

24   Minnesota.

25               I would have expected that there would have been

Page 25

```
1     some more dialogue and, you know, at least brought us a

2     little more notice and transparency as to what happened in

3     Minnesota, because the protocol is predicated on us working

4     together and sort of figuring out these issues.  We may not

5     have any issue with Minnesota, but I just need to know, we

6     just need to sort of be in a position to understand what

7     happened.

8              THE COURT:  Okay.  All right.  So do you folks

9     have any issue with that?

10             MR. TOP:  Your Honor --

11             THE COURT:  I mean I don't think --

12             MR. TOP:  Well first of all we don't necessarily

13    believe that what happened in Minnesota has anything to do

14    with the estate, but we're more than happy to give him

15    copies of whatever he wants as it relates to those

16    proceedings.

17             Those proceedings were -- first of all we believe

18    that some people at the estate knew about that we were in

19    fact doing this, so I don't -- I take a little bit of -- I

20    differ a little bit from Mr. Cosenza in that I do think that

21    people on the estate side knew that we were filing these

22    Minnesota proceedings.  Whether they knew it or not really

23    doesn't matter.  We're more than happy to give them --

24             THE COURT:  Okay.

25             MR. TOP:  -- all of those materials and he can
```

Page 26

1    take a look at it and do whatever he would like with those

2    things.

3           Again, but it's -- you know, we needed to get

4    relief from the cap so that we could actually pay these loan

5    review firms, you know, for their work and reviewing these

6    loans, and so that was the sole purpose of going up there.

7           THE COURT:  Okay.  I guess the easiest -- the most

8    cooperative thing to do, which is in keeping with the spirit

9    of the protocol, is total transparency, and to the extent

10   that there's any hint of an issue you can talk it out.

11          I certainly don't want to be in the position of

12   having something happen in Minnesota that could be viewed as

13   being a cross-purposes with what we're doing here.  I would

14   -- you know, I -- judges around the country may not agree on

15   the merits or the approach on all of these cases, but to the

16   extend that you -- that court has jurisdiction over you and

17   I have jurisdiction over this I'd certainly want to be

18   coordinated, if you will, and not have either of us be

19   surprised by what the other one is doing, and I think the

20   best way to do that is not for me to be kept in the loop,

21   but for the estate to be kept in the estate, and then you

22   can let me know if there's any issue, which I totally don't

23   see at all.

24          MR. TOP:  No.  We -- substantive items were not

25   addressed as the relate to these particular claims, so

1    obviously --

2              THE COURT:  Right.

3              MR. TOP:  -- in order to get relief from a court

4    you have to say why you need to get relief, right?

5              THE COURT:  Understood.

6              MR. TOP:  So we have to tell the court, you know,

7    obviously we expect (indiscernible) amount of money, and

8    from our perspective we're expecting to get recoveries that

9    are worth a certain amount.  They may agree with them, they

10   may not agree with them, but nonetheless we have to make our

11   case --

12             THE COURT:  Sure.

13             MR. TOP:  -- before that Minnesota court.

14             THE COURT:  I understand.

15             MR. TOP:  So -- but again, it's not like the court

16   in Minnesota said, oh, yes, you guys are going to get this

17   amount of money in terms of claims and recoveries.  No, that

18   didn't happen.  It's just merely to remove that --

19             THE COURT:  Or why is that crazy judge in New York

20   making you review 200,000 files?

21      (Laughter)

22             MR. TOP:  They did not say that.

23             MR. COSENZA:  Your Honor, just one final -- last

24   point on this.

25             They brought the claims against the Lehman estate

Page 28

1    in this court, I mean the Bankruptcy Court has exclusive

2    jurisdiction.

3              THE COURT:  I do.  No, I do, but that's why just

4    in the spirit of, you know, courts liking to be coordinated

5    --

6              MR. COSENZA:  Yes.

7              THE COURT:  -- with each other and not stepping on

8    each other's toes.

9              Yes, I absolutely have exclusive jurisdiction over

10   these claims, they're not disputing that, they need to do

11   what they need to do in terms of their organic documents,

12   that sounds like that's all they're doing, no more, no less.

13   The best solution is you be kept in the loop so that you can

14   satisfy yourself that there's nothing untoward --

15             MR. COSENZA:  Sure.

16             THE COURT:  -- that's going on.  So --

17             MR. COSENZA:  Your Honor, so one other -- I guess

18   one last issue and then a follow up.

19             There's also discussion by Mr. Top they have made

20   efforts to reach out to some of the loan servicers.

21             There were -- we had during our meet and confer

22   session last week they were very open in describing the

23   progress that they've made.  There seemed to be two or three

24   loan servicers that there have been issues with.  I think

25   subsequent to our meeting and at our request they've now

Page 29

1    served a subpoena on one of those servicers, but I do think

2    there may be one or two others that have been slow in

3    responding to the trustees' request, and you know, we've

4    been urging the trustees and their counsel to use -- at your

5    direction use the Court's subpoena power and direct some of

6    the servicers to, you know, be more proactive -- you know,

7    be more vigorous in terms of responding to requests.

8              THE COURT:  Okay.

9              MR. COSENZA:  So that's another issue that may

10   come up again down the road.  Their servicers remain slow in

11   turning over files.

12             THE COURT:  Right.  So that's an issue for them as

13   they continue to proceed towards the next milestones.

14             MR. COSENZA:  Correct.  And the last issue, Your

15   Honor, (indiscernible) again as I mentioned before, there's

16   a -- this is a helpful start, there's lots of work that's

17   going to be done to the next few steps of the protocol we

18   expect.  A large number of the files that we're receiving to

19   go back to the trustees, and this is going to be part of the

20   meet and confer process the business efforts, and then if

21   there's no resolution there onto the claims facilitation

22   process.

23             So the protocol is working.  I hope the next steps

24   continue to -- continues to work as it goes along, and it's

25   going along I think as we had hoped for in December, and

Page 30

1    hope the next steps continue along that path.

2              THE COURT:  Okay.  All right.

3              MR. COSENZA:  Thank you.

4              THE COURT:  Anything else?  All right.  Thank you

5    all for coming in.

6         (A chorus of thank you)

7              THE COURT:  Enjoy the rest of your summer.

8         (Pause)

9              MR. HOROWITZ:  Good morning, Your Honor, Maurice

10   Horowitz, Weil, Gotshal & Manges on behalf of --

11             THE COURT:  Good morning.

12             MR. HOROWITZ:  -- Lehman Brothers Holdings Inc.,

13   as plan administrator.

14             The plan administrator is now going forward on the

15   four hundred and ninety-ninth omnibus objection to claims

16   with respect to claim number 67738, which amends claim

17   65647.

18             The claim was filed on November 20th, 2009 -- the

19   superseding claims with you filed on November 20th, which is

20   59 days after the bar date in these cases.

21             The claim was filed by Ontario Teachers' Pension

22   Plan Board against LBHI.  It asserts that the claimant is

23   owes $12.6 million based on LBHI guarantee of a transaction

24   between the claimant and Lehman Brothers Finance SA, one of

25   the -- one of LBHI's Swiss affiliates.

1       The claimant asserts that it's entitled to have

2  its claim deemed timely filed on a finding of excusable

3  neglect, which is an equitable determination, as this Court

4  knows, it requires consideration of all irrelevant

5  circumstances, including danger of prejudice to the debtor,

6  the length of the delay, the reason for the delay, and

7  whether the claimant acted in good faith.

8       The Second Circuit and this Court have

9  consistently taken a hard line in applying the Pioneer test

10  and focused on the reason for the delay.

11       Other factors which generally weigh in favor of

12  the claimant are only relevant in closer cases.  This is not

13  a close case, Your Honor.

14       The excuse given by the claimant is that it was --

15  that it made a mistake or was confused about the existence

16  of the LBHI guarantee.  It is the same excuse that's been

17  given by other claimants in the past.  It's the exact same

18  excuse given by two of the claimants in this Court's

19  published decision at 433 B.R. 113, which was later affirmed

20  by the District Court at 445 B.R. 137.

21       These two claimants, as we cite in our papers,

22  said that they were trying to file a guarantee claim based

23  on a Libby guarantee, they said they were unaware of the

24  existence of the guarantee until after the bar date, the

25  Court rejected that as a basis for finding excusable neglect

1    and said that creditors bear the responsibility of

2    investigate and performing reasonable diligence to identify

3    the claims that they have against the debtors in this

4    bankruptcy.

5           This is a case where the claimant could certainly

6    have ascertained the existence of the guarantee.  The

7    claimants ultimately sent a copy of the guarantee to its

8    counsel in preparing their (indiscernible) questionnaire --

9    the guarantee questionnaire which was required by the bar

10   date, to possess the guarantee, and it could have conducted

11   diligence to locate it and determine that it should be filed

12   with the LBF -- together with the LBF transaction.

13          So for this reason, Your Honor, we would request

14   that the Court expunge the claim with prejudice.  We have no

15   other -- nothing else to add to our papers unless the Court

16   has any questions.

17          THE COURT:  All right.  Thank you very much.

18          Good morning.

19          MR. ROLLIN:  Good morning, Your Honor.  William

20   Roll of Sherman & Sterling, appearing on behalf of Ontario

21   Teachers' Pension Plan Board.  It's nice to be back here.

22          THE COURT:  Welcome back.

23          MR. ROLL:  Your Honor, three things are happening

24   here as I hear counsel.  First LBHI is engaging in what I

25   would consider an overly restrictive reading of the cases

1     governing the situation here.  Secondly --

2                THE COURT:  How is that?

3                MR. ROLL:  Well because they're -- the application

4     of the Pioneer factors, the delineation of what can

5     constitute excusable neglect with respect to late-filed

6     claims.  They would have it that the only thing that matters

7     is that is -- and the only thing that would constitute

8     excusable neglect would be circumstances beyond the control

9     of the creditor.

10               They poo poo the fact that a mistake can

11    constitute excusable neglect, but Pioneer itself made it

12    clear that it is not just something outside the creditors'

13    control.  It can be a mistake, it can be a foul up, it can

14    be carelessness, it can be negligence in the classic sense,

15    any of those can constitute excusable neglect in the right

16    case.

17               It referred to that standard as an elastic concept

18    and it said -- the Supreme Court said that at root this is

19    an equitable determination.

20               So despite what the Second Circuit might have said

21    -- and we'll get to that in a second -- and despite what

22    this Court in earlier instances might have said, it's still

23    the Supreme Court's words that govern the determination of

24    this, and the Supreme Court itself has said you can have

25    excusable neglect when you have a simple mistake, you have a

Page 34

1   simple overlooking of something, it doesn't have to be a

2   bolt out of the blue that constitutes an intervening

3   circumstance.  And the court said in addition you have to

4   look at all relevant circumstances.  So that's the standard.

5              THE COURT:  But so let's stay there though.

6              MR. ROLL:  Uh-huh.

7              THE COURT:  Because Ontario possessed the

8   guarantee, they had the guarantee, they filed the claim in

9   LBF's case --

10             MR. ROLL:  Right.

11             THE COURT:  -- and they filed two other proofs of

12  claim in these cases.

13             MR. ROLL:  They did.  They did.  Which --

14             THE COURT:  So --

15             MR. ROLL:  Well that goes to one of the facts that

16  I think is actually pertinent here that the plan

17  administrator overlooks, and is that we have -- we

18  consciously -- the creditor here consciously endeavored to

19  comply with the bar date.  Not just here but in the Swiss

20  proceeding as well.

21             THE COURT:  Right.  But then -- so okay.  So

22  that's what you did, and then later on other or different or

23  the same lawyers think of something else, and they say,

24  let's go file that --

25

Page 35

```
 1              MR. ROLL:  Uh-huh.

 2              THE COURT:  -- we missed it the first time we

 3    looked at the claim.

 4              There's no way with integrity and consistency and

 5    equitably to say that if you in good faith have the

 6    documents, do an analysis, file claims, but you miss a

 7    theory or you miss something that you then can't assert as

 8    an amendment, because we all know what the rules are --

 9              MR. ROLL:  Uh-huh.

10              THE COURT:  -- with respect to amendment and

11    relation back, that that's okay.  And that -- and I'm not a

12    fan of the slippery slope argument.

13              MR. ROLL:  Right.

14              THE COURT:  But if ever there were a slippery

15    slope argument and it's in a case like this there have been

16    any number of claimants in this exact situation.

17              MR. ROLL:  Right.

18              THE COURT:  Do I feel bad?  Yeah, I feel bad,

19    okay?  It's a teacher' pension fund.  But I've said it on

20    many occasions, that can't be the driver, right, nor can it

21    be the driver that it's just quote/unquote an X million

22    dollar claim, a tiny, you know, minnow in the giant pond of

23    Lehman.  There have to be rules consistently applied to

24    everybody, otherwise it doesn't work.

25              MR. ROLL:  I fully agree, Your Honor.  But one of
```

Page 36

1    the rules to be applied here is the application of the four

2    Pioneer factors.  The plan administrator itself concedes

3    that two of those, that we acted in good faith and the

4    length of the delay not being over the (indiscernible), here

5    it was 59 days, favor us.  So those are off the table.

6              THE COURT:  Agreed.

7              MR. ROLL:  We've satisfied those.  So --

8              THE COURT:  Right.

9              MR. ROLL:  -- what we have left is the reason for

10   the delay, which we we've been talking about, and then

11   secondly whether there's the risk of prejudice to the

12   debtor, prejudice to the process.  And on that there's no

13   evidence in this record that allowing this claim to go

14   forward will actually result in that or would have changed

15   they things.  They were aware of this.

16             THE COURT:  But think of -- but I have had, I

17   won't be able to remember the claimant now, but I have had

18   claims just like this one --

19             MR. ROLL:  Uh-huh.

20             THE COURT:  -- where in-house counsel or a person

21   acting on behalf of a governmental authority missed a claim.

22             MR. ROLL:  Right.

23             THE COURT:  Missed a claim, misunderstood how to

24   read -- one that I can recall -- how to read the bar notice,

25   didn't believe, or so it asserted, that it applied to claims

Page 37

1    arising from executory contracts, it believed it had an

2    executory contract, they were simply wrong and further

3    diligence would have revealed that they should have filed

4    the claim.

5              So there is a process point that is very important

6    to apply the rules and the parameters consistently even if

7    -- and this is different -- the floodgates argument is

8    different from the slippery slope -- even if there were no

9    floodgates, right, because we're on the four hundred and

10   ninety-ninth --

11             MR. ROLL:  Uh-huh.

12             THE COURT:  -- omnibus objection, right?  Even if

13   there were no floodgates there's still a consistency

14   argument that the rules need to be consistently applied by

15   the Court with respect to each claimant who says I missed

16   it, excusable neglect.

17             MR. ROLL:  Understood.  But to take Your Honor's

18   point a little further.

19             What that would really mean is that in every

20   circumstance there has to be a bright line determination.

21   That's different from what is Supreme Court has said.

22   That's different even from what the Second Circuit said.

23             THE COURT:  But I agree with you.  I'm certainly

24   going to follow what the Supreme Court said, so I'm

25   listening to the facts as you --

Page 38

1             MR. ROLL:  Right.

2             THE COURT:  -- tell them to me and I'll make a

3     determination.

4             MR. ROLL:  And here are the facts, and I started

5     to elude to this.

6             This claim that was missed -- missed the bar date

7     by 59 days was known to the debtors months and months and

8     months before the claims reconciliation process even

9     started.  Months and months and months before the plan

10    negotiation process started.  There was nothing about the

11    late filing of the claim that impeded the process

12    (indiscernible) large, and that's one of the principal

13    considerations that the Supreme Court says you look at.  You

14    look at the risk of prejudice to the debtor, you also look

15    at the risk of prejudice to the process.  None of that

16    occurred here.

17            Secondly, we were not -- and I eluded to this

18    earlier too, but let me flesh it out.  We were not

19    attempting to -- the creditor was not attempting to game the

20    system or find some strategic advantage, there was outright

21    confusion over whether and to what extent this had to be

22    filed here, had to be filed in Switzerland --

23            THE COURT:  Okay.  But Mr. Roll, let's be very

24    blunt, okay?  You know, and I know you know, that when it

25    comes to bar dates the rule is you file the claim.

Page 39

1              MR. ROLL:  Yes.

2              THE COURT:  When it comes to bar dates the rule is

3      you have a question about filing a claim, you don't resolve

4      that against filing the claim, you file the claim.  You file

5      four claims and you get three of them expunged.  You file

6      the claim because bar dates are bar dates, they're not

7      aspirational goals, they're not guidelines, they're meant to

8      mean something.

9              MR. ROLL:  I understand, Your Honor.

10             THE COURT:  Right?

11             MR. ROLL:  And we adhere to that principal by

12     dutifully filing and duly filing the two claims here that

13     were timely where we did have all the things in front of us,

14     and the one in Switzerland, which was also timely.

15             So it was -- I know Your Honor knows that I know

16     what bar dates are all about, and I agree with that

17     generally, but there is flexibility in the cases and in the

18     statute.  Bankruptcy Rule 906(b) allows for flexibility.

19     You wouldn't have that concept of excusable neglect if there

20     weren't some allowance built into the process for --

21             THE COURT:  Sure, but --

22             MR. ROLL:  -- a situation like this where nobody

23     gets hurt.

24             THE COURT:  Right.  Right.  But this is different

25     from a situation in which Ontario, for example, reasonably

Page 40

1    had an attorney that was engaged to do this, it was not a

2    bad choice of an attorney, the attorney was otherwise, you

3    know, reasonable and competent and there was a failure to

4    receive notice or there was an illness that prevented him

5    from complying or there was a snowstorm that prevented the

6    FedEx from delivering the proof of claim to the claims

7    agent.  I could name -- I could go on for an hour coming up

8    with things that would be right in the wheelhouse of

9    excusable neglect, and this one is we missed the claim.  We

10   had the documents, we thought about it, we didn't file the

11   claim, now we've thought better of it, and that's --

12           MR. ROLL:  We came across -- we collectively, we

13   counsel -- and it's all different people by the way, because

14   we're five years down the road -- and I'll come back to that

15   too in a second -- but we just found the document in the

16   course of complying with other aspects of the bar date

17   order.  It was in the course of doing a questionnaire for

18   the LBHI guarantee with respect to the LBSF claim.

19           Actually I should pause a minute because the plan

20   administrator's paper suggest that we had this document in

21   hand at the time we filed the other two claims that we're

22   talking about.  That's not correct.  We did not.  We came

23   across this document, we, collectively counsel and the

24   creditor came across this particular guarantee at the time

25   we were putting together the questionnaire with respect to

Page 41

1    the LBHI guarantee to the LBSF claim, which was timely

2    filed.

3              THE COURT:  I'm sorry, now I'm confused.  The

4    reply filed by the estate says that OTPPB possessed a copy

5    of the LBF guarantee prior to the bar date and managed to

6    file a timely claim against LBF in LBF's insolvency

7    proceeding.

8              MR. ROLL:  And there's -- we don't know that.  And

9    what I'm saying to Your Honor, what we do know, what

10   Mr. Torkin, who's no longer with my firm, said in his

11   declaration five years ago, which is the only thing we can

12   rely on today, what he says is it was in the course of

13   preparing the questionnaire.  The second step following the

14   bar date with respect to these derivative claims.  The

15   questionnaire with respect to the one that was timely filed

16   we realized that the guarantee we were given was a different

17   guarantee.

18             THE COURT:  When was the claim -- was the claim

19   filed in LBF's case filed before the bar date in this case?

20             MR. ROLL:  I think it was roughly around the same

21   time.  I'm not sure of the exact date.  I'm not familiar

22   with the bar date itself in --

23             THE COURT:  Well, I mean if you want to rely on

24   the notion that there was a missing document that

25   notwithstanding diligence you didn't have that's something

Page 42

1    that you would need to establish, and now all I have, I have

2    the estate telling me that you had the guarantee prior to

3    the bar date, and that's uncontroverted as of this moment.

4              MR. ROLL:  Well not really.  If you look at

5    Mr. Torkin's declaration what he says is in the course of

6    doing the questionnaire for the LBSF -- the LBHI guarantee

7    of the LBSF claim we realized we had this.

8              THE COURT:  Okay.  You're not --

9              MR. ROLL:  So that doesn't mean --

10             THE COURT:  -- answering my question.  Did you

11   have the LBF guarantee prior to the bar date in these cases?

12             MR. ROLL:  I don't know the answer to that, Your

13   Honor.

14             THE COURT:  Well --

15             MR. ROLL:  And we -- part of the problem here is

16   we're five years and four hundred and fifty-nine omnibus

17   objections to claims later than when that first came up.  So

18   the people at my firm who did this are no longer around or

19   accessible to us, or easily accessible to us, there's been

20   turnover at the client.  So it's --

21             THE COURT:  But the burden is on you --

22             MR. ROLL:  -- hard to determine this kind of

23   thing.

24             THE COURT:  -- to establish excusable neglect.

25             MR. ROLL:  I understand that.

```
 1              THE COURT:  So therefore in support of that

 2    establishing that in fact you didn't have the document

 3    before the bar date despite reasonable diligence would be a

 4    good fact, but you haven't established that.

 5              MR. ROLL:  But -- well we've established that we

 6    don't -- that we have no -- nothing suggests to us that we

 7    did have it before the bar date, we came across it after the

 8    bar date.  I think Mr. Torkin, because he was under oath,

 9    and I can understand this, he didn't want to say

10    definitively we didn't have it, we had a bunch of papers,

11    but we did not have what we believed to be -- what we

12    thought necessary to use at the time.  We didn't have that.

13    Because if we'd had it -- if we knew we had it we would have

14    filed it at that point.

15              THE COURT:  Well but this is -- you're not

16    testifying.

17              MR. ROLL:  I understand that.

18              THE COURT:  So I -- so the record as it exists is

19    you haven't established that you didn't have the guarantee

20    prior to the bar date.  That doesn't necessarily mean that

21    that fact would be dispositive because the Lehman filing

22    occasioned -- you know, there was a big gap between the

23    filings and the bar date, and it occasioned the mad scramble

24    of people finding all of their Lehman documents, and that's

25    the reason you give notice of a bar date is so people can
```

1     find all their Lehman documents.

2              MR. ROLL:  I understand, Your Honor, and I

3     apologize for not being crisper on this in responding to

4     this earlier, but I'm now looking at Mr. Torkin's

5     declaration.  If one looks at paragraphs 14, 15, and 16 --

6     and this is a declaration attached to our original --

7              THE COURT:  Uh-huh.

8              MR. ROLL:  -- objection back in 2010, he says in

9     paragraph 14, "On or about October 27, 2009 ..."

10             THE COURT:  Right.

11             MR. ROLL:  Bar date is September 22nd.  "On about

12    October 27 it came to my attention that an LBHI/LBF

13    guarantee might exist.  I immediately contacted OTPPB to

14    confirm its existence."

15             In the next paragraph he then asks the Ms.

16    Sheridan, the associate working with him at the time, to

17    review her files to determine whether the firm is in

18    possession of a guarantee.  And she told him, as it says in

19    paragraph 16, "That following bar date ..." --

20             THE COURT:  Okay.  Hold on.

21             MR. ROLL:  "Following the bar date."

22             THE COURT:  When was the bar date?

23             MR. ROLL:  September 22nd, 2009.  Torkin learns of

24    it on October 27th, as he says here, he then asks Sheridan

25    to check into it, she checks into it and says she doesn't

Page 45

1    have it in her files.  Well after reviewing the files she

2    tells him that she was sent a copy in connection with the

3    completion of the guarantee questionnaire for the LBHI/LBSF

4    guarantee.

5           So that's the fact -- that's an uncontroverted

6    fact, and it's that fact that the plan administrator

7    actually slides past in its position here.  And again, I

8    apologize for not being a little more forceful about this, I

9    had forgotten about that particular exchange myself.  But

10   Mr. Torkin in his declaration here establishes as an

11   uncontroverted fact that we did have it after the bar date,

12   or he believes and the associate working with him believed

13   at the time this first came up that we didn't have this

14   until after the bar date, and that as soon as we got it we

15   went out and filed it and we let them know and we began

16   negotiations over all the claims, et cetera, et cetera, as

17   it is recounted in the rest of the declaration.  And again,

18   that was months before the plan reconciliation process.

19          Now -- and what happened, they objected in the

20   forty -- what was it, the fortieth omnibus objection to

21   claims, we responded, as you see here with Mr. Torkin's

22   declaration, they withdraw objection to the claim without

23   prejudice so they could evaluate our position.  That was

24   five years ago.  So five years and --

25          THE COURT:  But you're -- go back to the beginning

Page 46

1    of the declaration.  After the LBHI case started --

2           MR. ROLL:  Uh-huh.

3           THE COURT:  -- there was a lawsuit that was

4    commenced, right?

5           MR. ROLL:  On the other guarantee I believe.

6           THE COURT:  Right.

7           MR. ROLL:  Right.

8           THE COURT:  Okay.  And --

9           MR. ROLL:  That was a lawsuit against LBSF.

10          THE COURT:  Right.  And now we're talking about an

11   LBHI guarantee, right?

12          MR. ROLL:  The LBF obligation.  So it's -- I was

13   little confused by the --

14          THE COURT:  What's the nexus between the LBSF suit

15   and the claim that you're seeking to have be deemed timely

16   allowed?

17          MR. ROLL:  No legal nexus, it's just he's setting

18   -- Mr. Torkin is setting forth the background by which we

19   were asked to get involved in this.  We got involved before

20   the Chapter 11 filings in fact.  And we sued on the LBSF

21   claim in October -- early October before LBSF filed its

22   Chapter 11 petition.

23          So he's -- I believe what he's trying to there is

24   simply indicate this is how we got involved, this is what we

25   were asked to do, these are the things we did do, the

Page 47

1    Chapter 11 filings occurred, the insolvency proceeding in

2    Switzerland ensued, the Chapter 15, and here the bar dates

3    came and we filed what we filed.  Then later we learned, you

4    know, we should have filed another claim based on this

5    guarantee.

6             So, you know, admittedly it's not the clearest

7    record just because time has passed, just because we have --

8    we have clouded memories, we have different people on the

9    scene, we have the things that happened when you have five

10   years past.  This -- and we did determine -- we did try to

11   determine whether there was something better, something

12   fully we could put in in terms of proof than what we had

13   here, but in conscience we couldn't.  I mean this is based

14   on peoples' recollections at the time.  Peoples'

15   recollections today are necessarily not as good.

16            THE COURT:  Okay.  Well I mean for the sake of

17   argument we'll -- let's say those are the facts, okay?  And

18   the estate will argue it doesn't matter.

19            MR. ROLL:  Right.

20            THE COURT:  Doesn't matter, still doesn't

21   constitute excusable neglect.

22            MR. ROLL:  Right.  They will.  And what they would

23   be doing, if they did that, is they would be running afoul

24   of the Supreme Court in Pioneer.  And I would point

25   specifically to Justice White's majority opinion.  In

Page 48

1    footnote 14, referring to the decent, he says:

2         "The decent -- not the deal that prevailed -- the

3         decent would permit judges to take account of full

4         range of equitable considerations only if they had

5         first made a threshold determination that the movant is

6         sufficiently blameless."

7         That's exactly the standard they're advocating

8    here, and it was rejected by the majority in Pioneer.

9         And the Second Circuit, let's talk about the hard

10   line --

11        THE COURT:  What do I do about the same facts,

12   lawyers on the scene looking at documents missing something?

13   In every one of those cases I would have to say that's no

14   problem --

15        MR. ROLL:  No.

16        THE COURT:  -- you get to file.

17        MR. ROLL:  Respectfully, Your Honor, you wouldn't

18   in every one of those cases, because what you would have to

19   do --

20        THE COURT:  I would have to go back and reconsider

21   an order that I entered regarding a hospital in -- somewhere

22   in the middle of the country.

23        If I were to grant you the relief that you seek

24   today it would be entirely inconsistent with my not having

25   allowed a claim based on the fact that the attorneys say

Page 49

1    they misread, they didn't understand the bar date to require

2    them to file a certain type of claim because they thought

3    they had an executory contract.  It's the same thing.

4            MR. ROLL:  Well, Your Honor, I wasn't involved in

5    those other things.

6            THE COURT:  No, and I don't mean to ambush you,

7    I'm just sharing with you the equitable problem of treating

8    similar in the same way.

9            MR. ROLL:  I understand.  But this is a huge case,

10   we all know that, we hear it said a thousand times.  There

11   are a lot of different situations, and the only reason that

12   Your Honor would actually have to go back and relook at

13   those situations is if Your Honor felt that the Court hadn't

14   taken into account all of the equitable factors that Pioneer

15   and the Second Circuit cases say you should look at.

16           THE COURT:  And how do I square the relief that

17   you want with Judge Peck's decision in the 2010 case?

18           MR. ROLL:  Very simply.  I think an important

19   element of Judge Peck's decision and an important element of

20   the Enron decision by the Second Circuit, which they rely on

21   a lot, is the notion of -- Judge Peck talks about confusion,

22   and I think it was some confusion here because of the multi-

23   jurisdictional nature of this -- but there's also an

24   undercurrent of was there actually an effort made to comply

25   with the bar date or was there just indifference?  Those are

1       two different things.

2               Here we don't have indifference, we don't have a

3       cavalier attitude.  Here we have let's get these filed,

4       let's file everything we know about.

5               THE COURT:  That's the same thing that happened in

6       the other case.  There was not indifference at all, there

7       was let's read this bar date notice, we're reading it this

8       way, we're doing this, we're not doing that, and then uh-oh,

9       later -- you know, I mean the fact that they are -- that

10      it's multi-jurisdictional, the fact that it can be multi-

11      debtor, right?

12              MR. ROLL:  Uh-huh.

13              THE COURT:  I mean bar dates can say -- bar

14      notices can say by the way, okay, if you file it in the

15      wrong debtor case it's okay, or bar notices can say it's not

16      okay, you better find out which debtor among, you know, the

17      258 Adelphia debtors, just to pick a random example, you got

18      to do your diligence, you got to figure it out.  That's why

19      bar date notices -- I'm not telling you something you don't

20      know of course -- the period is not five days, the period is

21      a long time.

22              MR. ROLL:  I understand that, Your Honor, and I

23      cannot in conscience stand up here and say --

24              THE COURT:  I know.

25              MR. ROLL:  -- it was anything other than a

Page 51

1       mistake.  It was a mistake.

2               But I do think that there's sufficient flexibility

3       in the case law, in the rule, in the situation here, and in

4       terms of consistency with the Court's prior rulings on these

5       things, and it's because it's an equitable determination in

6       each case.

7               And one last point and perhaps I've used up too

8       much of the Court's valuable time.

9               THE COURT:  No, that's fine.  That's fine.

10              MR. ROLL:  The plan administrator makes a point of

11      saying the Second Circuit has taken a hard line on these

12      things, and you know, I read that, it's a nice sound bite,

13      but that actually comes from a case that didn't deal with

14      creditors missing bar dates.  That hard line complication of

15      the Pioneer factors comes from the Civilvanch (ph) case I

16      think it is in 2003, which was a case of a deadline to file

17      an appeal and a tort action was missed, you know, and the

18      court there of course it took a hard line because it was a

19      clear violation of a clear and well-known and utterly

20      unambiguous court rule -- a statute.  And the mistake there

21      was the lawyer who missed the deadline relying on an offhand

22      remark by another lawyer.

23              THE COURT:  Right.  But -- right.  But --

24              MR. ROLL:  And so that's -- but that's the kind of

25      balancing the courts do.

Page 52

```
 1              THE COURT:  I understand that, but here the bar
 2    date is very clear.  It says probably in multiple places in
 3    bolded language with blinking lights, this is really
 4    important, file a claim or you will be forever barred.
 5              MR. ROLL:  And we read it.
 6              THE COURT:  Right?
 7              MR. ROLL:  And we told the client.
 8              THE COURT:  Right.  And therefore it was -- and
 9    therefore when the lawyers speak to the clients they say,
10    this is really important because you got to send me all your
11    stuff and it was missed.  I get it, people are human beings,
12    I get it.  Let me hear from the estate again.
13              MR. ROLL:  Certainly.  Thank you, Your Honor.
14              MR. HOROWITZ:  So I just want to --
15              THE COURT:  Are you ready to fall on your sword,
16    are you ready to give up?
17              MR. HOROWITZ:  I -- actually I want to clarify
18    something --
19              THE COURT:  Sure.
20              MR. HOROWITZ:  -- in our reply, because there was
21    a lot of colloquy that could have short circuited.
22              When we say that the -- that the claimant
23    possessed a copy of the LBHI guarantee we mean the claimant,
24    we don't mean Sherman & Sterling or the attorney who was
25    preparing those --
```

Page 53

1              THE COURT:  The claimant.  Right.

2              MR. HOROWITZ:  The claimant.

3              THE COURT:  Right.

4              MR. HOROWITZ:  Because the declaration says the

5     LBHI guarantee was sent to me in connection with preparing

6     the LBSF guarantee.

7              THE COURT:  Right.

8              MR. HOROWITZ:  So that was what we mean.  And then

9     the point is that it is the obligation of the claimants to

10    diligence --

11             THE COURT:  Well that's the point I just was

12    making with Mr. Roll --

13             MR. HOROWITZ:  Right.  So --

14             THE COURT:  -- is that --

15             MR. HOROWITZ:  Right.  So it's -- we're not

16    casting any kind of, you know, aspersions on the firm, but

17    it is the claimant's obligation.

18             The -- Your Honor mentioned all the other

19    claimants whose claims have been expunged.  Conway Hospital

20    is the --

21             THE COURT:  Conway Hospital is the one that -- and

22    again, I don't -- it's not -- it's unfair to Mr. Roll to

23    talk about a case he's unfamiliar with, but it is Conway

24    Hospital, and I believe it was -- that my denial of that

25    application was recently affirmed on appeal.

Page 54

1           MR. HOROWITZ:  Correct, it was affirmed by the

2    District Court.

3           Other claimants have raised the same excuse of

4    having multiple proceedings.  We've had claimants who said

5    that they had a guarantee claim and a claim against the

6    Dutch proceeding, one with CF Midas' claim, its claim was

7    expunged by this Court after a hearing.  Dow Corning claimed

8    it was confused between the LBI proceeding and the LBHI

9    proceeding.  That claim was expunged by this Court.

10          So that is another excuse or a reason for

11   (indiscernible) is consistently rejected by this Court.

12          The Second Circuit's hard line sound bite actually

13   comes from an Enron case from 2005 with very similar facts

14   to this.  The claimant in that case was citing a case from

15   this other case from the Second Circuit, but it was applying

16   it to a bar date in the Enron case, and that claimant was

17   trying to file a guarantee claim against the parent.  It had

18   filed a direct claim against the subsidiary debtor and it

19   realized later that it had a guarantee claim.  It wanted to

20   both file a late claim and amend its already timely filed

21   claim.  And the Bankruptcy Court, District Court, and Second

22   Circuit denied that request.

23          So again, Your Honor, we're just trying to run a

24   fair process, we're trying to treat everybody the same, and

25   so for that reason we request this claim expunged.

Page 55

```
 1              We can answer any -- I can answer any questions --

 2              THE COURT:  All right.

 3              MR. HOROWITZ:  -- the Court has.

 4              THE COURT:  Thank you.  All right.

 5              Could you come up for a moment?  Mr. Roll, could

 6    you come up for a moment?

 7              MR. ROLL:  Yes.

 8         (At side bar off the record)

 9              THE COURT:  We're going to take a ten-minute break

10    and then we'll resume with the next item on the agenda.  If

11    I could confer with the parties for a few moments I would

12    appreciate it.  The parties in this matter.  We'll come back

13    on the record in about 10 to 15 minutes.

14         (Recessed at 10:56 a.m.; reconvened at 11:07 a.m.)

15              THE COURT:  All right.  That brings us to the

16    trustee's supplemental objection to the amendment and

17    supplemental pleading to proofs of claim subject to the two

18    hundred and seventh omnibus objection.

19              MR. MITCHELL:  Yes, Your Honor.

20              THE COURT:  Good morning.

21              MR. MITCHELL:  Good morning.  Stuart Mitchell of

22    Hughes Hubbard & Reed, for the LBI trustee.

23              As Your Honor noted, yes, that is the matter that

24    we are now to.  And as Your Honor will remember at the

25    sufficiency hearing on January 22nd with respect to the
```

Page 56

1   trustee's two hundred and seventh omnibus objection the

2   Court heard arguments in connection with the claimants'

3   fraud claims which are at issue today.

4           The claims were based on the ownership of certain

5   high risk, highly restricted securities known as cash

6   settled call warrants.

7           The claimants' pleadings, prior to the

8   January 22nd hearing, consisted of in large part documents

9   incorporated by reference which dealt with other securities

10  and other matters unrelated to the claimants' purchase of

11  their warrants.

12          The Court granted the claimants one last

13  opportunity to plead an appropriate securities fraud

14  complaint.

15          The claimants did file an amended complaint in

16  which they transferred several passages from documents

17  previously incorporated earlier by reference; however, the

18  claimants did not remedy the fundamental flaw in their

19  pleadings.  They still have not pled any facts sufficient to

20  give rise to a claim against LBI.

21          The claimants frame their claim as securities

22  fraud claims under Rule 10(b)(5) and under New York law, and

23  to establish such claims they must plead facts in accordance

24  with Federal Rule of Civil Procedure 9 and in accordance

25  with the Twombly standard, which requires that their

Page 57

1    pleading establish plausible claims.

2            The facts must plead a material misrepresentation

3    from someone at LBI to the claimants in connection with the

4    securities they purchased.

5            They must -- with respect to that material

6    statement it must be made with scienter, with knowledge of

7    the statement's falsity, and with the intent to defraud.

8            And then the claimants must allege or pled that

9    they relied on that statement or misstatement to their

10   detriment.

11           The claimants have not pled any of these elements

12   with the requisite particularity, instead the claimants in

13   part make general and unsupported claims of alleged LBI

14   guarantees of LBHI's liquidity.  These claims fail for two

15   reasons.

16           First, the claims do not cite to any specific

17   statements made by LBI representatives to the claimants

18   which could be construed in any way as a guarantee of LBHI's

19   liquidity upon warrant maturity dates.

20           And second, the warrant PPMs, which each of the

21   claimants acknowledge they relied on, clearly put the

22   claimants on notice that they could have lost their entire

23   investment in the warrants in the event of, among other

24   things, LBHI's illiquidity on the warrant maturity dates.

25           Moreover, Your Honor, the claimants fail to plead

Page 58

1    facts sufficient to establish that anyone at LBI believed,

2    let along knew, that the time the claimants purchased the

3    warrants LBHI would not be able to honor its obligations.

4            The claimants' general obligations with respect to

5    this alleged LBI guarantee of LBHI liquidity fail to

6    establish any plausible claim of fraud.

7            Further, as the claimants did in their previous

8    proceedings, they continue to seek to attribute statements

9    on actions of LBHI to LBI.  The claimants have not

10   established an illegal or factual framework for justice this

11   unprecedented step.

12           Specifically in their most recent pleading the

13   claimants seek to attribute statements in LBHI SEC filings

14   to LBI by the application of the necessary or inevitable

15   framework applied by the Supreme Court in the case of Janus

16   Capital Group, Inc. v. First Derivative Traders.  However,

17   Janus does not morph the LBHI SEC filings into alleged

18   misstatements by LBI.

19           Applying the Janus frameworks to this facts in

20   this case shows that the statements complained of by the

21   claimants are first and last attributable to LBHI.  LBHI

22   filed the SEC statements referenced by the claimants.  The

23   SEC statements are clearly attributed to LBHI in the PPMs.

24           As the author and filer of the statements it is

25   the actions of LBHI that make any alleged misstatements in

Page 59

1    the SEC filings necessary or inevitable.

2            Neither do the claimants plead adequate reliance

3    on the LBHI SEC filings.  In a similar case before Judge

4    Kaplan plaintiffs had purchased cash settled call warrants,

5    very similar to the warrants held by the claimants, pressed

6    claims against former officers and directors of LBHI in

7    connection with certain LBHI SEC filings incorporated into

8    the offering documents of their warrants.  In that case

9    Judge Kaplan noted that the statements in the SEC filings

10   were clearly the statements of LBHI, but found that the

11   plaintiffs did not establish fraud because they did not

12   plead -- that they either specifically read or specifically

13   relied on the SEC filings when making their decision to

14   purchase the warrants.  The claimants' pleadings in the case

15   suffer from the same efficiency.

16           Finally, as noted in the trustee's papers as the

17   Court is aware and the claimants have acknowledged, they

18   filed claims for the same identical securities in a separate

19   Chapter 11 proceeding.

20           The claimants' allegations of fraud are undercut

21   by the allowance of their claims in that proceeding.  The

22   Chapter 11 debtors did not allow their claims on the premise

23   that the warrants were fraudulent securities.  To the

24   contrary, the LBHI claims were allowed in accordance with

25   the Chapter 11 debtor's two hundred and eighty-first omnibus

1   objection, which was premised on -- which premised the

2   allowance of the warrant claims on the legitimate

3   obligations of LBHI.

4          The Chapter 11 debtors filed their two hundred and

5   eighty-first omnibus objection to have the claims allowed at

6   their fair market value in accordance with the terms of the

7   warrants.

8          The trustee agrees with the Chapter 11 debtor's

9   with respect to their statement that the holders of the

10  warrant claims should not be allowed to recover more than

11  the value of their claims.

12         It would be inconsistent now to allow these claims

13  to go forward based on an alleged fraud in connection with

14  the warrants for LBHI, the issuer and counterparty of the

15  warrants has acknowledged the legitimacy of the exact same

16  securities held by the same claimants.

17         For these reason, Your Honor, and for the reasons

18  articulated in the trustee's filings, the claimants have

19  failed to plead an appropriate securities fraud complaint

20  and cannot do so.

21         Therefore, unless this Court has further questions

22  the trustee respectfully requests that the relief sought in

23  the two hundred and seventh omnibus objection and the

24  trustee's supplemental objection be granted to the claims,

25  including the amended and repleaded claims be disallowed and

Page 61

1    expunged in their entirety.

2            THE COURT:  Thank you.

3            All right.  Good morning.

4            MS. ALPERSTEIN:  Good morning, Your Honor.  My

5    name is Robin Alperstein, and I'm with Becker, Glynn on

6    behalf of the claimants.

7            THE COURT:  Okay.

8            MS. ALPERSTEIN:  I'm going to address specifically

9    the sufficiency of our legal claim with respect to counsel's

10   last argument.  My colleagues, either Chester Salomon or

11   Alec Ostrow, will address that specific point about the

12   prior LBHI case, the recovery with respect to the claims --

13           THE COURT:  Okay.

14           MS. ALPERSTEIN:  -- brought against LBHI.

15           THE COURT:  Okay.

16           MS. ALPERSTEIN:  I'm just going to talk about the

17   legal sufficiency of our 10(b)(5) claim.

18           THE COURT:  Okay.

19           MS. ALPERSTEIN:  Thank you.

20           First, I'd like to talk very briefly about the

21   framework of our claims before I address his specific legal

22   objections that he has made, because I think there's a bit

23   of a disconnect between what we've actually alleged and how

24   he has attempted to frame it for Your Honor.

25           In particular, this is a fraudulent omission case

Page 62

1    against LBI, not against LBHI, and in particular it is a

2    case that is premised on omissions that were made by LBI in

3    it's PPM and through its agents, its brokers, in connection

4    with the placement of the warrants.

5            Specifically the PPM contained false statements

6    and omissions concerning the truth about LBHI's actual

7    financial condition.  The truth about that financial

8    condition was not disclosed in the PPMs, it was not appended

9    to the risk factor that he cited, which I will get to.

10           THE COURT:  Yeah, but this is the attribution

11   issue.

12           MS. ALPERSTEIN:  That's a separate issue.  I'm

13   talking now about the omissions.

14           The attribution issue is that LBI -- LBI

15   promulgated and placed that PPM and sent its brokers out to

16   call up our clients and solicit them without ever mentioning

17   that the true state of LBHI's financial condition was not

18   what had been represented and what was being represented in

19   that PPM.

20           THE COURT:  So if that's what you're focusing on

21   then what were the statements that were made?  What were the

22   -- there are no allegations of any specific statements that

23   were made to specific people.

24           MS. ALPERSTEIN:  The allegation is that the

25   brokers omitted to state the true financial condition,

Page 63

1   omitted to state the existence of accounting for at the

2   highest levels of LBHI, and therefore falsely represented --

3        THE COURT:  And that they -- so the allegation is

4   that -- so there's a PPM, it's issued by LBHI.

5        MS. ALPERSTEIN:  Well it's placed -- the issuance

6   is true.

7        THE COURT:  Who -- the issuance is true.

8        MS. ALPERSTEIN:  But it's placed and promulgated

9   by LBI.

10       THE COURT:  Okay.  You -- okay.  I don't know what

11   significance you're attaching to the promulgated, but the

12   PPM is issued by LBHI, those are the statements of LBHI.

13       Next you say that someone, unnamed, at LBI got on

14   the phone knowing with scienter, calling your clients and

15   saying I've got this security for you.

16       MS. ALPERSTEIN:  With respect, Your Honor, that is

17   not what we're saying, and there are specific names in the

18   complaint.

19       With respect LBI, the entity, had corporate

20   scienter for the falsity of the PPM, and --

21       THE COURT:  Say that again.  LBI --

22       MS. ALPERSTEIN:  LBI the entity had scienter for

23   the falsity of the PPM and the falsity of the statements in

24   the PPM.

25       THE COURT:  Had scienter for.  I don't know what

Page 64

1    that means.

2            MS. ALPERSTEIN:  It means that LBI as a corporate

3    entity knew that the PPM contained false and misleading

4    statements about LBHI.

5            THE COURT:  Well, okay.  Okay.  And what fact do

6    you -- what do you allege beyond that conclusory statement?

7    You are -- your allegation is that LBI should be held

8    responsible for an allegedly false statement by LBHI.

9            MS. ALPERSTEIN:  My -- our argument is that LBI

10   should be held responsible for its own false statements and

11   omissions that it made through its brokers and by its

12   adoption of the PPM.

13           I think you're assuming that the PPM -- that the

14   maker of the statements in the PPM was LBHI.  LBI's name is

15   on that PPM.  LBI put forward that PPM.

16           THE COURT:  LBI is referenced on the cover page.

17   LBHI is not the issuer of the PPM.  Anybody reading it knows

18   that these are securities that are being issued by LBHI.

19   They're LBHI securities.

20           MS. ALPERSTEIN:  The warrants are LBHI securities,

21   that is true.

22           THE COURT:  Right.

23           MS. ALPERSTEIN:  But the PPM was put forward by

24   Lehman in connection and together with LBHI.

25           THE COURT:  You say together with LBHI, but you

Page 65

1    don't allege any basis on which to attribute these

2    statements and the knowledge of LBHI to LBI.

3              MS. ALPERSTEIN:  LBI's officers and directors were

4    the ones who created the accounting scheme, perpetrated it,

5    engaged it.

6              THE COURT:  What accounting scheme?

7              MS. ALPERSTEIN:  The accounting scheme that we

8    detail in our -- to the -- that we detail for 150 paragraphs

9    in our claim that's also mentioned by Judge Kaplan and that

10   the examiner found to failure to disclose the truth about

11   its financial condition with respect to the liquidity risk,

12   the risk concentration, the mortgage valuation transactions,

13   the risk management practices, the credit risk

14   concentration, and the Repo 105 transaction.

15             THE COURT:  And -- okay.  So all of that, we take

16   that as all being true with respect to LBHI, you say, right?

17             MS. ALPERSTEIN:  Yes.

18             THE COURT:  And what's the basis on which LBI can

19   be guilty of securities fraud for that conduct?

20             MS. ALPERSTEIN:  We are not seeking to hold LBI

21   accountable for that specific securities fraud.

22             What we are saying is that the LBI officers and

23   directors who perpetrated that fraud on behalf of LBHI knew

24   about that fraud.  So they knew that the statements that

25   were made in the PPM were false.  They knew those statements

Page 66

1    about LBHI were false, and then they sent their brokers out

2    to target customers and represent that this was a good

3    investment knowing that the likelihood that LBHI could ever

4    potentially pay out was far less than had been represented

5    in that PPM.

6              THE COURT:  Well what allegation is there that's

7    more than conclusory and that's plausible under the standard

8    of Iqbal and Twombly that anyone at LBI knew what you are

9    saying is the case?

10             MS. ALPERSTEIN:  The very same people perpetrated

11   the scheme.  Let me give you specifics.  Paragraphs 10

12   through 16 identify the officers, Fuld and O'Meara and

13   Lowitt and Gregory, et cetera, they have the same rules.

14   The CEO and chairman of the board --

15             THE COURT:  They were on the -- so Dick Fuld was

16   on the phone to your clients peddling these securities.  Is

17   that what you're saying?

18             MS. ALPERSTEIN:  No, Your Honor, Dick Fuld was the

19   chairman of LBI.  What he knew what he did in his capacity

20   at LBHI he also knew as the chairman --

21             THE COURT:  Okay.

22             MS. ALPERSTEIN:  -- and CEO of LBI.  He had the

23   same knowledge.

24             THE COURT:  Okay.

25             MS. ALPERSTEIN:  It's imputable to LBI.  And so

Page 67

1   did the CFO, so did O'Meara.  They knew that what they had

2   said and done on behalf of LBHI was not true.  And then for

3   LBHI they went out and targeted customers without telling

4   them that truth.  That's specifically alleged with

5   particularity.  Their role in the scheme, their knowledge,

6   and it's imputable.

7            THE COURT:  But so --

8            MS. ALPERSTEIN:  Pardon me.

9            THE COURT:  -- who made the phone calls?

10           MS. ALPERSTEIN:  The brokers made the phone calls.

11           THE COURT:  Okay.  So did the brokers know about

12   the scheme?

13           MS. ALPERSTEIN:  No, and they don't need to know

14   because the company has the scienter.

15           THE COURT:  Okay.  I'm going to ask you to just

16   bring it down --

17           MS. ALPERSTEIN:  I apologize.

18           THE COURT:  -- a couple of notches.  I feel --

19           MS. ALPERSTEIN:  I'm sorry, Judge.

20           THE COURT:  All right?  I'm simply trying to

21   understand, and it's clear to me that you see this very

22   clearly, and I'm simply trying to understand what you see so

23   clearly.

24           MS. ALPERSTEIN:  Thank you, Judge.

25           THE COURT:  Because I don't.

Page 68

```
 1              MS. ALPERSTEIN:  Okay.

 2              THE COURT:  All right?  So --

 3              MS. ALPERSTEIN:  Yes.

 4              THE COURT:  -- the purpose here is to give you the

 5     benefit of the doubt.

 6              MS. ALPERSTEIN:  Thank you, Judge, and I do

 7     apologize.

 8              THE COURT:  Is to give you the benefit of the

 9     doubt under the legal standard to see if this claim gets out

10     of the starting gate.

11              So far I'm not with you, so I'm trying.  All

12     right?  I'm trying.

13              So why don't you point me to where in the pleading

14     you think that this is all set forth.  And I have it, it's

15     filed at docket 11723, the amended and supplemental pleading

16     for the proofs of claim, right?

17              MS. ALPERSTEIN:  That's correct.

18              THE COURT:  Okay.  So why don't you point me

19     specifically --

20              MS. ALPERSTEIN:  Okay.

21              THE COURT:  -- to the allegations that you've been

22     describing.

23              MS. ALPERSTEIN:  Okay.  Let's start with

24     paragraph 2, which is more of a summary.

25              THE COURT:  Okay.
```

Page 69

1                 MS. ALPERSTEIN:  On page 2 --

2                 THE COURT:  Uh-huh.

3                 MS. ALPERSTEIN:  -- the first full sentence on

4      page 2 in paragraph 2.

5                 "The claimants' LBI brokers led them to believe

6           that if a reference fund hit its target there would be

7           no question that LBHI would pay them the specified

8           amount."

9                 Okay.  That's one.

10                THE COURT:  Okay.  And --

11                MS. ALPERSTEIN:  Then --

12                THE COURT:  And I'll let you keep going, but

13     here's one issue is that there is law that says that if a --

14     and I'm summarizing and simplifying -- but that if a broker

15     gives you a sales pitch, right, and then hands you a

16     document that says something completely different and

17     opposite that the document trumps the sales pitch.

18                So here the PPM says:

19                "An investment in the warrants involve substantial

20           risks, including the risk that investors may lose the

21           entire value of their investment in certain

22           circumstances."

23                MS. ALPERSTEIN:  Correct.

24                THE COURT:  So even if a broker said, don't worry

25     about that, all caps, all bold statement, everything is

Page 70

1    great, buy these, right?  Under exiting law as I understand

2    it the plaintiff would lose.

3            So we've got these PPMs, these are warrants,

4    right?  They're not, you know, fixed return instruments, and

5    the premise of your claim is that the LBI brokers led them

6    to believe, fill in the blank, right?

7            So right off the bat we've got this kind of

8    disconnect between what you're saying occurred and what the

9    actual documents in the PPM issued by LBHI said.

10           MS. ALPERSTEIN:  I think what I'm hearing now is a

11   disconnect between what I understand our claims to be and

12   the Court's understanding and our adversary's understanding.

13           In particular let me go with that risk factor.

14   The risk factor absolutely said you can lose your shirt if

15   LBHI cannot meet its obligations in the future.

16           THE COURT:  Right.  And what you're saying is the

17   broker said in that conversation look, the PPM says you

18   could lose your shirt, but I'm telling you right now you

19   have no worries, LBHI is as sound as, pick something that's

20   sound, not -- right?  That LBHI is absolutely good,

21   wonderful, fully secure, you have nothing to worry about,

22   right?

23           MS. ALPERSTEIN:  But here's the -- yes.  But

24   here's the issue, Judge.  We thought in this representation

25   contained in the PPM and in the public filings about the

Page 71

1    company that misrepresents the ability of the company to be

2    able to meet its obligations --

3              THE COURT:  Yes, but that's the attribution

4    problem.

5              MS. ALPERSTEIN:  But it's --

6              THE COURT:  That's different -- there's two sets

7    of statements.  There's what the PPM says.

8              MS. ALPERSTEIN:  Yes.

9              THE COURT:  Then the issue is, is if there's a

10   misrepresentation in the PPM can that be attributed to LBI?

11   That's one issue.

12             Then there's the phone call issue, right?  That

13   notwithstanding what it said in the PPM the LBI broker on

14   the phone, whether it was Dick Fuld or somebody, you know,

15   sitting in some cubicle somewhere, said to your clients,

16   I've got this product for you, the PPM makes it sound risky,

17   don't you worry, LBHI is completely solid, go ahead and

18   invest.

19             MS. ALPERSTEIN:  But I think that's the

20   disconnect, Judge, because we're not saying that the brokers

21   contradicted the PPM.  What we're saying is that the PPM was

22   false and misleading, including with respect to that risk

23   factor.

24             If I could just give you --

25             THE COURT:  Okay.  But then -- I'm trying to stay

Page 72

1    with you here.  But then it's a attribution thing.  Then

2    you're seeking to hold LBI responsible for what you are

3    saying were the fraudulent misrepresentations of LBHI, which

4    is the issuer of the PPM, not LBI.

5            MS. ALPERSTEIN:  I think that's not actually

6    correct, because LBI -- LBI is a broker/dealer with a

7    fiduciary obligation to its customers.  It called up and

8    targeted its long-standing customers and said, here's a

9    great investment, it's a great opportunity, LBHI is

10   involved, and here's the PPM.  It says that.  LBI says that

11   knowing, its top brass knows, its CEO, its chair, its CFO,

12   its COO, its heads of global risk management, its senior

13   VPs, they're all involved, they all know that the financial

14   statements that have been incorporated into the PPM contain

15   materially false and misleading statements, and that as a

16   result the overarching financial picture of LBHI and its

17   potential ability to meet its future obligations when due is

18   less than what is set forth in the PPM.  So the entity, LBI,

19   is aware of the falsity of LBHI's statements.

20           I'm not saying that it made them, it's aware of

21   them, and then it takes its army of brokers, the company,

22   sends them out as agents knowing full well that LBHI's

23   financial situation is other than has been represented and

24   says sell these.

25           And they go out, the dutiful army of brokers, they

Page 73

1    don't know that Dick Fuld knows, O'Meara knows, Kalan (ph)

2    knows, Gregory knows, they all know.  That's imputable to

3    LBI because LBI's highest level officers and directors know

4    and created the scheme.

5              So for them to then do this and then argue that

6    oh, gee, the brokers didn't happen to know because we didn't

7    tell them so therefore we can't be liable for sending these

8    people out and pretending that this is a good investment

9    when we've hidden the truth in the PPM.  That's the problem.

10   That's fraud.  The fraud is in connection with that

11   culpability and that knowledge of the falsity of the PPM

12   pursuant so which these securities were marketed and sold.

13             THE COURT:  Okay.  So --

14             MS. ALPERSTEIN:  Does that make sense?

15             THE COURT:  Well, I hear you.  So let's talk about

16   Joe Broker.

17             MS. ALPERSTEIN:  Okay.

18             THE COURT:  Okay?  Let's talk about Joe Broker.

19   Joe Broker makes a phone call to your clients and says, I've

20   got a great product for you, here it is.  Okay?  And your

21   client buys it.  Okay?  Joe Broker says, you know, read it

22   because there's risk.  Okay?  And it says it right here

23   there's risk.

24             MS. ALPERSTEIN:  Uh-huh.

25             THE COURT:  And the client buys it.  Okay?  And

Page 74

1    the facts are -- this is the hypothetical -- that Joe Broker

2    never had a conversation with Dick Fuld, Joe Broker sits in

3    a cubicle, okay, he is completely unaware of anything that's

4    going on in the big picture, he's a broker.  He's got

5    products --

6              MS. ALPERSTEIN:  Uh-huh.

7              THE COURT:  -- he picks up a phone, he calls them,

8    like any other broker he says, I've got something great for

9    you, buy it.  Okay?  You win?

10             MS. ALPERSTEIN:  I think so, yes.

11             THE COURT:  You win because -- simply because he

12   works -- it was in the -- this is your theory.  He was

13   working as a Lehman broker, an LBI broker, Dick Fuld knew

14   and was the architect of the scheme, and therefore because

15   the LBI broker was acting in the course of his employment,

16   utterly without knowledge of anything, that therefore that

17   was a fraudulent transaction.

18             MS. ALPERSTEIN:  Yes, and the reason for that,

19   Judge, is simply -- and as I think we put this in our papers

20   -- is if you were to rule otherwise you could have a

21   situation which would be the situation here where at the

22   highest, you know, echelons of the company.

23             THE COURT:  Right.

24             MS. ALPERSTEIN:  The company is orchestrating a

25   scheme.  It deliberately withholds that scheme from --

Page 75

```
 1                 THE COURT:  Right.

 2                 MS. ALPERSTEIN:  -- from its flunkies and they go

 3      out and then --

 4                 THE COURT:  Well let's not call them flunkies.

 5                 MS. ALPERSTEIN:  Fair enough.

 6                 THE COURT:  Okay?

 7                 MS. ALPERSTEIN:  And I don't mean to do a

 8      disservice or be disrespectful to the brokers.  To the

 9      people who are employed to do their jobs and place these

10      products.  They don't know the truth.  So they can go out

11      and say, gee, I didn't know.  And there's a reason we didn't

12      sue -- we didn't seek to hold those individual brokers

13      accountable.  They're simply agents.

14                 The company knew what was going on and it had a

15      duty to either not place those fraudulent securities or to

16      tell the brokers, you know what, you've got to qualify what

17      you're saying.  They also --

18                 THE COURT:  So how do you satisfy the scienter

19      requirement?  Isn't there a scienter requirement?

20                 MS. ALPERSTEIN:  Of course there is, yes, Your

21      Honor.

22                 THE COURT:  Okay.  So how do I satisfy the

23      scienter requirement?  Because we have Joe Broker --

24                 MS. ALPERSTEIN:  Yes.

25                 THE COURT:  -- okay?  He doesn't know.  Okay?
```

Page 76

1    There's no -- there is no scienter -- if he doesn't know

2    there's no scienter.

3                MS. ALPERSTEIN:  He's simply the agent, he's a

4    mouthpiece for LBI, and LBI knows because of the acts of its

5    officers and directors that are imputable to LBI.

6                THE COURT:  So Dick Fuld's scienter gets

7    attributed to the broker.

8                MS. ALPERSTEIN:  That is not completely correct,

9    and that would no be accurate.

10               The scienter that is attributed to LBI is the

11   scienter that comes from the combination of all of those

12   high level corporate officers and directors who knew.  That

13   put LBI on notice.  Therefore you've got the corporate

14   scienter at the time that the company then directs its

15   brokers to hawk this product to unsuspecting customers.

16               The scienter comes at the higher levels, from the

17   people who undertook the underlying fraudulent conduct and

18   knew about it.

19               THE COURT:  Well so -- okay.  But let's go back to

20   what you actually allege.  You say that the LBI brokers made

21   fraudulent sales pitches.  So that's a fraudulent

22   misrepresentation.  But you haven't said anything about

23   specifically what statements were made which could be

24   interpreted by your client as a guarantee of LBHI's

25   liquidity when the warrant matures against something that

Page 77

1  says in the PPM you may never see anything.

2          MS. ALPERSTEIN:  We are not alleging that the

3  brokers guaranteed that there would be an absolute ability

4  to pay.  What we've alleged, and I think this is a critical

5  issue, Your Honor, is that the truth about the financial

6  condition and the ability to potentially pay was misstated.

7  There was no qualifier, there was nothing said to qualify,

8  for example, that what -- the representations in the PPM

9  about LBHI's financial strength were true or not true.

10          So, for example, it's obviously material to any

11  investor -- I don't know if that's me -- it's material --

12  the financial condition of a counterparty or of the person

13  issuing the warrant is going to be material to the investor.

14  We don't have -- we were not given a true picture of that

15  financial condition.

16          We're not saying that they were promised that no

17  matter what under any circumstance in the history of the

18  earth there is no possibility that LBHI could not pay its

19  debt, and I think -- when they came due -- and I think

20  that's an effort on the part of the trustee to reframe our

21  case.

22          THE COURT:  So go back to your pleading if you

23  would and show me the allegation that LBI or their brokers

24  knew or believed that LBHI would not be able to pay on the

25  warrants.

1              MS. ALPERSTEIN:  That's not what we're alleging so

2    I can't show you that because we don't allege that they said

3    they would absolutely be able to pay.

4              THE COURT:  Okay.  Well what do you allege?

5              MS. ALPERSTEIN:  We allege the financial condition

6    of LBHI was misrepresented through omissions about the truth

7    of that condition, that its financial ability --

8              THE COURT:  To pay.

9              MS. ALPERSTEIN:  But we do not allege that there's

10   no ability to pay, just the elements that go into the

11   evaluation of the credit worthiness of that entity were

12   misstated.

13             THE COURT:  Okay.  Can you show me those

14   allegations?

15             MS. ALPERSTEIN:  The specific allegations with

16   respect to the Repo 105 piece of it are at paragraphs 41

17   through 83.  So they're pretty complicated.

18             The specific allegations with respect to the

19   omissions and misstatements regarding its liquidity levels

20   are at paragraphs 92 to 102.

21             The specific allegations regarding -- excuse me --

22   its risk management practices, which were misstated, are at

23   paragraphs 84 through 98.

24             The specific allegations concerning LBHI's

25   commercial real estate practices --

1                THE COURT:  So this is the allegation, Dick Fuld

2    knew this, Dick Fuld knew it wearing an LBHI hat, he knew

3    about it wearing an LBI hat, notwithstanding any lack of

4    knowledge of all of this by the brokers who were selling the

5    securities --

6                MS. ALPERSTEIN:  Correct.

7                THE COURT:  -- you win.

8                MS. ALPERSTEIN:  Yes, because the corporate

9    scienter of LBI when it sent its brokers out into the

10   workforce was already there from Fuld and O'Meara and --

11               THE COURT:  Okay.  And what's your authority for

12   that?  What's your authority for that legal principal?

13               MS. ALPERSTEIN:  First the general statement --

14   principal of agency, which we cite in our papers.  That's

15   one.

16               The Janus case mentions that there's nothing --

17   there's nothing in it -- (indiscernible) I take that back --

18   but there's nothing in Janus, for example, that upends in

19   any way the traditional principals of agency pursuant to

20   which the --

21               THE COURT:  But Janus says that a statement is not

22   attributable to a defendant, so here LBI, where the alleged

23   statement was not attributed to the defendant, here LBHI

24   issued the PPM, that's an undisputed fact, and two, the

25   defendant did not engage in any actions that made the

1          statement either necessary or inevitable.

2                    So Janus involved the situation where the

3          statements made in an SEC filing by one Janus fund were not

4          attributable to another Janus fund.

5                    MS. ALPERSTEIN:  The difference there, however is

6          that our case what we have is the same exact people, the

7          same overlapping people, and so that knowledge -- we can't

8          say gee, Dick Fuld, gee, O'Meara, gee, Kalan, gee, Gregory,

9          let's take your hat off, you don't really know in your

10         capacity as the chairman of LBI what the truth is about

11         LBHI.

12                   THE COURT:  Well but were there -- right, but is

13         there any difference?  I mean we could go back and look at

14         Janus.  There were undoubtedly overlapping personnel in

15         Janus as well.  That's the whole -- if the rule were simply

16         one person, two hats, whatever he says with respect to in

17         wearing one hat is attributable to the other hat life would

18         be a lot simpler, but that's not what the law is.

19                   MS. ALPERSTEIN:  But the issue in Janus was who's

20         the maker.  The issue in Janus was not the scienter of the

21         defendant there.  The question there was who's the maker?

22         Is the subsidiary -- was the funds advisory slash subsidiary

23         legitimately considered the maker of those statements?

24                   What we're talking about here is LBI's knowledge

25         of the falsity of those statements that it then sent its

Page 81

1    workers out into the world to then hawk.  That's the

2    difference here.  So you thought the corporate knowledge --

3              THE COURT:  But they're hawking -- again, another

4    word I don't like -- they're selling these securities --

5              MS. ALPERSTEIN:  Correct.

6              THE COURT:  -- that say in no uncertain terms, you

7    could lose every penny you put into this.  You could lose

8    every penny you put into this.  That's what people wrote

9    checks to buy.  They wrote checks to buy a security that

10   they were told in bold clear language in the prospectus, you

11   could lose every penny of your investment.

12             MS. ALPERSTEIN:  And there's no asterisk

13   suggesting, and by the way, that is a very real risk because

14   we have lied --

15             THE COURT:  But it says --

16             MS. ALPERSTEIN:  -- and our parent has lied about

17   the truth.

18             THE COURT:  -- it doesn't -- but it says an

19   investment in the warrants involves substantial risk,

20   including the risk that investors may lose the entire value

21   of their investments in certain circumstances.  And the

22   cases are lesion that say that when there's a sales pitch,

23   as there was here undoubtedly, and there's clear language

24   that informs the investor of the risk, the clear language

25   trumps the sale pitch.

1          MS. ALPERSTEIN:  No, I would argue and I do argue

2     that that risk factor is itself materially false and

3     misleading.  If I could use a hypothetical to explain this,

4     Judge.

5          Let's hypothesize that at the time of this risk

6     factor in fact Mr. Fuld and Mr. O'Meara knew that the

7     company was in the zone of insolvency.  I don't think that

8     any court would conclude that this risk factor would absolve

9     them, because they have knowingly -- they would have

10    knowingly hidden the fact that the company was technically

11    bankruptcy.  Well say gee, too bad we warned you -- we

12    warned you that me might not be able to play.

13          THE COURT:  Okay.  So let's talk about scienter,

14    okay?  Because we bring Dick Fuld in here --

15          MS. ALPERSTEIN:  Uh-huh.

16          THE COURT:  -- and put him in the box, okay?  And

17    you say to him, it's Friday, September 12th, okay?  He would

18    say we're going get bailed out.  He would say the company

19    actually isn't insolvent.  He wouldn't agree with you.

20          We now have the benefit of hindsight because

21    everybody remembers where they were that weekend, and

22    everybody was shocked that the company didn't get bailed

23    out.

24          There is a fairly good argument that in fact LBHI

25    wasn't insolvent but it became insolvent because it had to

Page 83

1   as in when it filed.

2          So if we -- if this were to go to trial, okay,

3   there would be an issue on the point of scienter, because

4   folks would come in and say, absolutely not, LBHI wasn't

5   insolvent.  Were we having problems?  Yes.  Was our

6   commercial paper not rolling?  Yes.  But we believed we were

7   going to get acquired.  We believed X, Y, and Z.

8          So it can't be taken as a given now, because now

9   we now what we know, that's a hindsight kind of approach --

10          MS. ALPERSTEIN:  And that's --

11          THE COURT:  -- and that's not the way it works.

12          MS. ALPERSTEIN:  And I understand that, Judge, and

13   I offer that as a hypothetical to attempt to illustrate that

14   the risk factor can't be an all absolving safe harbor to

15   simply -- for -- and I'm not saying this is what they said,

16   but for a company to say -- knowing -- and I'm not saying

17   that they knew this -- but for a company to say knowing that

18   they are functionally bankruptcy, by the way, a risk factor

19   is that we might at some point not be able to pay your debts

20   when due, that would be a false and misleading risk factor

21   because it -- and the reason it would be false and

22   misleading would be because the company knew facts that it

23   wasn't some theoretical generic risk that let's face it,

24   every company in the world faces the risk that they might at

25   some point not be able to meet their debts when due.  And so

1    when a company knows facts that make that risk not just

2    theoretical or generic and applicable to everyone, but

3    actually a real risk that there is some sort of risk, then

4    that's not going to be a fair risk factor, it's not

5    accurately presented, it's misleading and presented.

6            And what our argument here is, and I think it's

7    important to clarify this, our argument isn't that they

8    should have disclosed that they were functionally

9    bankruptcy.  We don't think that they thought that and we're

10   not saying that.  What we're saying is that that risk factor

11   and the disclosures are all misleading because they don't

12   allow the investor --

13           THE COURT:  But that's the claim against LBHI.

14   LBHI made the statements, not LBI.

15           MS. ALPERSTEIN:  If I could finish the point and

16   then I will address that one, Judge.

17           The point that we're making is that the investor

18   is looking to make a decision about whether or not to

19   invest.  One of the material items that the investor

20   considers is the ability of the counterparty to pay, and in

21   order to assess that they need to have accurate and not

22   misleading information about the financial condition of the

23   company.  When the company withholds that materially --

24   misstates it through accounting fraud and false filings,

25   that's a problem.

Page 85

1        I understand that LBHI is the entity that made

2   those false statements in the context of its SEC filings.

3   Those were incorporated by reference into the PPM.  The PPM

4   -- LBI however was the placement agent for the PPM.  LBI's

5   highest level of officers and directors, we've gone through

6   them, knew about those false and misleading statements,

7   because they're the ones who made them.  They're the one who

8   made them.  They're the ones who perpetrated the scheme

9   that's been detailed by the examiner and in other

10  litigations.  Dick Fuld knew, O'Meara knew, they all knew,

11  and that's imputable to LBI.

12       THE COURT:  Okay.  So, I'm going to ask you to

13  take a -- I'm going to ask you to pause for a moment and

14  take a seat, all right?

15       So let's talk about -- I'm going to go back to the

16  trustee.  Let's talk about this issue that seems to be at

17  the crux of this matter, which is the, you know, Repo 105,

18  it was a fraud at LBHI, Dick Fuld knew, Dick Fuld has an LBI

19  hat right next to his LBHI hat, and that every single broker

20  in every single cubicle can be deemed or should be deemed

21  under the law to be -- have acted with the same -- with a

22  level of knowledge and a scienter as if it were Dick Fuld

23  himself selling the securities.  Because that seems to me to

24  be the crux of this entire argument, that it doesn't matter

25  that the broker -- Joe Broker in the cubicle had no

Page 86

1      knowledge of that, he in good faith was selling this product

2      that had been, you know, in his daily box, here's products

3      you should sale, and he in good faith went out and sold it.

4               And what the plaintiff -- what the claimants are

5      saying is that doesn't matter, he could be as pure as the

6      driven snow, he worked for Dick Fuld, Dick Fuld knew, he

7      wore an LBI hat, he knew this in the LBHI side of his brain,

8      it's attributable, it doesn't matter that the risk factor

9      says there's a lot of risk because at the moment that the

10     phone call was made by Joe Broker Dick Fuld knew that the

11     whole thing was a fraud.  I think that's the claim.

12               So tell me why that's not a winner?

13               MR. MITCHELL:  Okay, Your Honor, thank you.

14               So as Your Honor has I think correctly pointed out

15     and the trustee would agree, you keep using the word

16     hindsight.  I think that's part of the issue here that

17     should be looked at.

18               Because also before I launch into the specific

19     answer, the nature of the security itself is important to

20     think about.  These are high risk securities sold at a

21     specific date valued by LBHI to be held to maturity.  So the

22     idea is these things are going to be valued in accordance

23     with the promise of an underlying fund.

24               THE COURT:  Right.

25               MR. MITCHELL:  There's a date over here where

1       something is going to happen.  We're going to calculate.  If

2       it goes one way you win, you get paid.  If it goes the other

3       way you don't.  Oh, by the way here's a PPM, there's a whole

4       bunch of other ways in which you can lose all your money,

5       and not only does it say in those bold letters that they --

6       you know, just written large, you could lose everything,

7       there's very specific places in the PPM that says if LBHI

8       should be in bankruptcy proceedings at maturity you could

9       lose everything.  There's not -- at best --

10              THE COURT:  Right.  But counsel would say that's

11      fine --

12              MR. MITCHELL:  That's fine.

13              THE COURT:  -- that's a standard risk factor, but

14      Dick Fuld knew that the house of cards was about to

15      collapse, and notwithstanding that the brokers were out

16      selling these securities.

17              So the risk factor looks good --

18              MR. MITCHELL:  Uh-huh.

19              THE COURT:  -- but in fact the risk factor should

20      have said oh, by the way, we're engaging in a massive fraud

21      and you should buy these securities any way.  That's what it

22      -- in counsel's view that's what an accurate risk factor

23      would have said.

24              MR. MITCHELL:  If it were a fraud, and I mean

25      that's the point.  If these -- and the claimants keep using

Page 88

```
 1    the word scheme with reference to these securities.  Yet

 2    they haven't pled anything to show that the securities

 3    themselves were in some way fraudulent, and that's how it

 4    must -- it has to be narrowed.

 5             Now the Court is correct --

 6             THE COURT:  No, I don't think she's -- she's not

 7    saying that the securities were fraudulent, she's saying

 8    that the fraud was LBI takes a PPM from LBHI.

 9             MR. MITCHELL:  Uh-huh.

10             THE COURT:  LBHI at that moment in time knows it's

11    engaging in fraud.  LBI knows because you attribute the

12    knowledge of the officers across the great divide from LBHI

13    to LBI, then you attribute that knowledge down to the

14    brokers.  So the fraud is selling securities knowing that

15    LBHI was not in good shape.

16             MR. MITCHELL:  Well that's the difference, and

17    that's the fundamental difference in the way this argument

18    works.  It's not enough for a claimant to come and say, well

19    you knew that things weren't as -- you know, they were going

20    to say as losey (sic).

21             THE COURT:  Right.

22             MR. MITCHELL:  A matter is you knew these were

23    fraudulent, that's why we have to tie it back to the

24    securities.  You knew LBHI couldn't pay.  That would be a

25    basis for fraud.
```

1                   THE COURT:  That's what they're alleging.

2                   MR. MITCHELL:  There's a couple --

3                   THE COURT:  They're saying -- that's what they're

4      saying.  They're saying that you knew --

5                   MR. MITCHELL:  That LBHI knew that --

6                   THE COURT:  Yes.

7                   MR. MITCHELL:  -- and by extension.

8                   THE COURT:  But that's what they're saying.

9      They're saying Dick Fuld knew that --

10                  MR. MITCHELL:  And the only way that -- I'm sorry.

11     I'm sorry, Your Honor, go ahead.

12                  THE COURT:  Go ahead.  That Dick Fuld knew that

13     LBHI would not be able to pay.

14                  MR. MITCHELL:  And the only -- and the basis upon

15     which they hang that is the fact of the LBHI bankruptcy.  As

16     the Court said, fraud by hindsight does not work.  That's a

17     Second Circuit standard, it's been codified in the PSLRA.

18     You can't look and say, well because you went bankrupt, you

19     knew you were going to go bankrupt, therefore you should

20     have told us.  And that's also something that's in the case

21     of Romback v. Chang (ph) which the trustee cites, almost a

22     very similar complaint by individuals that held securities

23     and they alleged that the entity that sold them securities,

24     well, you know, you told us that you were optimistic, and

25     you told us that things were going to go a lot better, turns

Page 90

1    out things didn't go well and the entity went bankrupt, and

2    they came back and said, well look, you lied to us, you

3    didn't tell us the truth about the circumstance.  And the

4    court said:

5         "People in charge of an enterprise are not

6         required to take a gloomy, fearful, or defeatist view

7         of the future, they can be expected to be confident

8         about their stewardship and prospects of the business

9         that they manage."

10        And that's I believe what the Court was getting at

11   with bringing Dick Fuld in, but the Lehman Brothers

12   bankruptcy was not a foregone conclusion at the moment the

13   warrants were sold to the claimants.  That's really what it

14   turns on.  And so that's why the PPMs become an issue,

15   that's why the risk factors become an issue, that's why the

16   nature of the securities and sales become an issue.

17        Not only that, but under the Telabs' (ph)

18   framework, this is the fraud by hindsight protection, if

19   there's going to be an inference of fraud from certain facts

20   pled, and the trustee would argue there have not been facts

21   pled to show that Dick Fuld knew or that anyone at LBI knew

22   or believed or thought that at the time the warrants were

23   sold several months prior to the bankruptcy that LBHI

24   wouldn't be around.

25        But given the facts as they are pled, taking into

Page 91

1    account the PPMs, taking into account the fact that LBHI

2    stepped up and said, yeah, we sold these things, they were

3    legitimate, there was no lie about the underlying

4    calculations, there was no lie about the existence at the

5    hedge fund against which these things would be valued.

6    Taking all those facts according to Telabs, if there's going

7    to be an inference of fraud it must be at least as

8    compelling as any counter-inference.  Well the counter-

9    inference that speaks large here, and I think as the Court

10   is speaking to is, this was business as usual.  LBHI is in

11   the business of selling securities, they're in the business

12   of selling risky securities.

13            THE COURT:  LBI is.

14            MR. MITCHELL:  I'm sorry, yeah, LBI.  Well LBHI is

15   in the business of structuring these things.

16            THE COURT:  Right.

17            MR. MITCHELL:  And putting these things together.

18   This was business as usual.  No one was walking around in

19   the months before the bankruptcy saying, gee, we're not

20   going to be around, what can we cobble together, what

21   scheme, to use the word of the claimants, can we put

22   together to fleece as many people as possible?  There's no

23   facts that they've pled to show that.  The facts --

24            THE COURT:  Well they plead everything from the

25   examiner's report.

1           MR. MITCHELL:  The -- yeah, the Repo 105.

2           THE COURT:  The Repo 105.

3           MR. MITCHELL:  And the use of that.

4           THE COURT:  Right.

5           MR. MITCHELL:  But does that speak to the idea

6    that at a certain point in time -- as the Court noted did

7    anybody at LBHI think we're not going to be around to pay on

8    these securities?

9           Now with respect to the use of the examiner's

10   report and the third amended complaint and things like that

11   those had relevance, and Judge Kaplan looked at those in

12   connection with very different securities under a very

13   different framework.  Those were not like the securities

14   here.  Again, bought to be held, not traded on an open

15   market, not purchased on an open market, the price of which

16   was not affected by movement of an open market.  Specific

17   price set by LBHI.  You want in, you hold these things to

18   maturity.  If you want to try to sell these things you have

19   to do it in accordance with very specific rules.  If you

20   don't follow those rules we won't recognize that sale.  I

21   mean these things were very highly restricted.

22          For the claimants to come in and say, well, the

23   PPMs don't really matter, even though the risk factor

24   they're complaining of actually materialized and they were

25   put on notice of it, would seem to get the entire point of

Page 93

1    having, as you say, the voluminous case law that says if

2    somebody tells you one thing and then hands you a PPM that

3    says the other thing that would be -- that would fly in the

4    face of all that case law.

5            The claimants look to and in their own statement

6    it was the ability to potentially pay that was the issue,

7    and there was no qualifier.

8            The trustee says first of all potentially paid is

9    not the question.  That doesn't raise to the level of fraud.

10   And the qualifier is absolutely there in the form of the

11   PPMs.  The claimants were put on absolute notice.

12           And, you know, with respect to --

13           THE COURT:  What about the scienter point?  What

14   about the brokers work for Dick Fuld, Dick Fuld knew all

15   about this, therefore you attribute under ordinary agency

16   principals Dick Fuld's scienter to satisfy the scienter

17   requirement of the innocent broker who was just selling

18   whatever was in his inbox that day?

19           MR. MITCHELL:  Right.  Your Honor, that doesn't

20   follow -- I mean if that's the claim the claim would be

21   against Dick Fuld.  Dick Fuld is the one that apparently has

22   that knowledge.

23           THE COURT:  No, but the plaintiff is saying that

24   the brokers worked for Dick Fuld --

25           MR. MITCHELL:  Uh-huh.

Page 94

1           THE COURT:  -- it would create another scheme, it

2     would enable defendants to escape liability by having the

3     guys at the top come up with a scheme, think it's a really

4     good scheme, it's super fraudulent, and then they just don't

5     tell the folks in the trenches who are then designed to

6     perpetrate the scheme.  So it's a perfect defense, because

7     all you have to do is not tell anyone about all this fraud

8     and have them innocently go out and sell the securities and

9     then this is the greatest thing ever.  So that's what

10    counsel is saying why that doesn't work.

11          So ordinary agency principals, the brokers were

12    working in the ordinary course of their employment, and

13    therefore it doesn't matter what they subjectively did or

14    did not --

15          MR. MITCHELL:  Uh-huh.

16          THE COURT:  -- do, you attribute Dick Fuld's

17    scienter, assuming it exited, to Joe Broker.

18          MR. MITCHELL:  So the reason -- thank you, Your

19    Honor.

20          The reason why that does not work is including

21    what you said, the attribution problem.  You've got

22    attribution from somebody at LBHI, LBHI -- actually this is

23    where the Janus comes into play too as well.  It's exactly

24    that.  The focus of the Janus case was two -- or maybe I'll

25    just say one policy issue overriding, which is the private

Page 95

1   right of action provided by securities laws must be narrowed

2   specifically to what we have in front of us.  And the way in

3   which the court got to that was this necessary or inevitable

4   framework, which was the entity.  And what they looked at

5   was which was the entity that did something that made these

6   alleged misstatements necessary or inevitable?

7          Now as the Court noted in that circumstance you

8   have a parent that created a mutual fund that issued

9   securities and filed statements with the SEC wherein the

10  statements were complained of, plaintiffs coming in and

11  saying, wait, this other entity is the one that needs to be

12  held accountable.  And the court said, no, no, no, very

13  clearly this entity, they issued, they filed with the SEC,

14  nothing is attributed to any of these folks over here, we

15  have to narrow this.

16         The same circumstance is at play here.  The

17  statements that are being complained of are the LBHI SEC

18  filings in connection with the securities issued by LBHI.

19  The actions -- to imply the necessary or inevitable

20  framework from Janus is to say who engaged in any practice

21  here that made these alleged misstatements necessary or

22  inevitable?  It was LBHI.

23         If that's the way it's going to follow, if it's

24  all the practices that are being complained of in the

25  complaint those are LBHI practices.  It's first and last a

Page 96

1  question of LBHI.  The Janus framework again does not

2  magically transform those into the actions of LBI.

3         The narrowing framework is very specific and very

4  clear, nope, if it's not attributed that way, if it's not

5  that person that did something that made these statements

6  necessary and inevitable you cannot attribute that statement

7  or by extension that scienter or anything the that entity,

8  it's this entity.

9         THE COURT:  But here I think they're saying --

10  because in Janus it was the same people, right?

11         MR. MITCHELL:  Uh-huh.

12         THE COURT:  But here what they're saying that it's

13  the same people and they actually knew.  They actually were

14  the architects of the scheme that caused the brokers to sell

15  these securities.  So that it's not really about

16  attribution, it's about actual knowledge and actual

17  scienter, and the attribution is not between LBHI and LBI,

18  you get over that fact by the fact that -- or they get past

19  that by the fact that Dick Fuld wore the two hats, and then

20  you have to attribute down to the brokers, which they say is

21  not a securities law thing, it's an ordinary agency thing

22  that the employee is carrying out the business of the

23  employer, and therefore LBI is liable and the subjective

24  intentions or statements of the broker don't matter.  That's

25  what I think that they're saying.

Page 97

1            So doesn't that go beyond Janus, what Janus said?

2            MR. MITCHELL:  I still think we're back in the

3    attribution wheelhouse to a certain extent, and I do think

4    there's two issues at play as the Court noted, right?

5    You've got the statements in the PPMs, you've gotten all

6    this -- I guess in connection with that the way in which

7    this scheme -- so-called scheme is concocted and they're

8    selling it, and then you've got the actions of LBHI.  At

9    some point there's some bleed over into that.

10            If its securities originated sold by and the basis

11    of the complaint is the actions of LBHI, again, that's all

12    LBHI (indiscernible), that's the attribution problem.

13            If it's this other matter again we come back to

14    the nature of these securities.  What was known?  We don't

15    see any pleading in here.  We understand what the claimants

16    are saying, but the claimants' claim all tends and seems to

17    be rooted in that notion of fraud by hindsight.  Well LBHI

18    went bankrupt.  You should have known many months ago that

19    that was the case.  You should have told us.  Well Romback

20    v. Chang says something very different.  It says, you don't

21    have to.

22            And the actions of the individual brokers, if the

23    individual brokers are, you know, they're getting their --

24    like you say their marching orders for the day, we have

25    these new securities, oh, fantastic, let's go sell these

1      things, and if there's no facts to show that the people up

2      top are concocting a scheme but they are constructing

3      securities as they normally do in the normal course of

4      business we say, hey, here we think this security is a good

5      thing, it's going to allow our investors to benefit from the

6      performance of another fund that they may not be able to

7      invest in, let's put these together and offer these two and

8      be sure we give them all of the necessary warnings because

9      they're real.  That's the facts.

10             And that gets back to the Telabs' factor.  We keep

11     coming back to the same thing.  The counter-inference from

12     all the facts as they have been pled.

13             The fact of the bankruptcy cannot be relied upon

14     as a basis for determining knowledge and intent, scienter,

15     back when the securities were filed.  It has to be measured

16     from that point.

17             And as the Court noted, then it's -- you know, to

18     bring Dick Fuld in and he's going to argue that right up

19     until the last second, no, we thought we were going to be

20     fine.  And --

21             THE COURT:  So if I -- so let's focus on that

22     though, because if I expunge the claims, which is tantamount

23     to a 12(b)(6) dismissal, right, then isn't that kind of

24     facty -- F-A-C-T-Y -- facty on my part?  In other words

25     could I be accused of having made on a motion to dismiss a

Page 99

1    factual determination?  Because what you have and are

2    talking about now is a characterization of what the

3    situation was like prior to September 15th, 2008.  We've had

4    this exchange, both of us about, you know, my view --

5              MR. MITCHELL:  Uh-huh.

6              THE COURT:  -- that the world was more complicated

7    than what the plaintiffs have alleged.  But aren't they

8    entitled to take a shot at establishing that in fact the

9    facts are as they say they were and that Dick Fuld -- and

10   obviously we're using the gentleman as a shorthand for, you

11   know, LBI management, et cetera.

12             So, I'm just beginning to be concerned that I not

13   be resolving factual issues just because we quote/unquote

14   know them, right?  I mean I think -- so that's a little bit

15   of a problem that I'm having.

16             The other problem that I'm having, which is more

17   directed at counsel for claimants, is that there is

18   absolutely overwhelming body of case law that you just

19   eluded to that says when you get a prospectus that very

20   clearly says, you know, the sun sets in the east and the

21   broker tells you no, no, no, the sun sets in the west -- I

22   probably have those reversed to make it meaningful -- when

23   the broker's statements directly contradict what's in the

24   prospectus the prospectus wins, and that doesn't turn on

25   whether or not there was a fraud.

Page 100

1           MR. MITCHELL:  Uh-huh.

2           THE COURT:  So that's kind of the other side of

3      the coin for me.

4           MR. MITCHELL:  Understood, Your Honor, and if I

5      may just to that point.

6           THE COURT:  To -- yeah.

7           MR. MITCHELL:  It's really -- from a legal

8      standpoint it's the question of plausibility.

9           THE COURT:  Plausibility.

10           MR. MITCHELL:  Plausibility versus possibility.

11           THE COURT:  Right.

12           MR. MITCHELL:  It's not enough to justify

13      discovery, and that's why the securities fraud standard is

14      so high, and that's why there's no claim of fraud by

15      hindsight, that's why we have Telabs to say insure that

16      there is not a counter-influence here that is more plausible

17      than fraud.

18           Because to go into this type of discovery is

19      expensive, it's costly, and unless there's a legitimate

20      reason, a plausible reason to think that if you go into

21      discovery you're going find that statement, that email, that

22      fact that says, hey, you know what, we're lying about all

23      those securities starting this date forward --

24           THE COURT:  Well if the government had bailed out

25      Lehman the warrants would be in the money, right?

Page 101

1              MR. MITCHELL:  They would have been in the money.

2      They would have had it, and so that's the thing.  It has to

3      be dated -- that scienter has to be dated --

4              THE COURT:  Right.

5              MR. MITCHELL:  -- from the date the warrants were

6      sold.

7              In connection with that, so that's why I say it's

8      plausible.  The facts as pled at this point in order to be

9      dismissed have to push it over the line.  Given all the

10     facts as being pled it's just not plausible.  More plausible

11     is the counter-inference which again this is business as

12     usual, these are securities, they're risky, they're sold to

13     people to be held to maturity, everybody thinks it should be

14     fine, but here's risk factors, be on notice.

15             If I may too, Your Honor, I think Your Honor got

16     to this if I could just --

17             THE COURT:  LBHI stock was also trading at 20 odd

18     cents even after the filing, just as a random fact.  We're

19     talking about solvency.

20             Okay.  Keep going.

21             MR. MITCHELL:  All right.  Thank you, Your Honor.

22             The other issue here -- the other issue which the

23     Court eluded to in January 22nd hearing, if I may.  The

24     Court posed a question to the claimants, and the trustee

25     agrees with your underlying concern here.  The Court said:

Page 102

 1              "So my question to you is if your construct in
 2          fact works then everybody -- everybody who had LBI as
 3          their broker and who bought LBHI securities during a
 4          certain time frame ..." --undefined, and that's my
 5      editorialization there.
 6              THE COURT:  Right.
 7              MR. MITCHELL:  When as you put it, "The
 8      shenanigans."  Here they're referred to as the excuse me.
 9      We're going on, "Then they've got in your view a valid
10      creditor claim against LBI for securities fraud."
11              The trustee would -- agrees with the underlying
12      concern and would even say, well, is it conceivable that it
13      doesn't necessarily even stop with securities fraud?  If
14      it's going to be pegged back in time at a certain point how
15      do we peg that, what is the fact to say here's the time?
16      And then doesn't any agreement then have a right to a fraud
17      claim under the -- a right to a fraud claim gets created,
18      particularly in this circumstance, where as the Court has
19      noted, clear warning has been given.  There's just been no
20      facts to push the claim over the plausibility line.  To do
21      so would undo the -- would indicate there is the potential
22      for attribution.
23              There's many, many things here at play that
24      there's just not been enough pled, and there's frankly just
25      not enough given the existence of the PPMs, given the way

Page 103

1    these claims have gone forward, there's just not enough to

2    push it over the line of plausibility.

3            THE COURT:  Okay.

4            MR. MITCHELL:  And that's the legal framework in

5    which this Court would be fully justified in --

6            THE COURT:  Okay.

7            MR. MITCHELL:  -- expunging these claims.

8            THE COURT:  All right.  Thank you.

9            MR. MITCHELL:  All right.  Thank you.

10           THE COURT:  All right.  What else from you folks?

11           MS. ALPERSTEIN:  Could I respond, Your Honor?

12           THE COURT:  Sure.

13           MS. ALPERSTEIN:  Thank you.

14           First I'd like to address this notion that we are

15   attempting to plead fraud hindsight, because it's just not

16   true.  Our allegation is not, it's simply not that at the

17   time of the PPM and at the time that the brokers solicited

18   the claimants that Fuld and others knew for a certainty that

19   the company would go bankrupt and would not be able to meet

20   its obligations when due.

21           The crux of our claims is that the financial

22   condition was not accurately represented.  The financial

23   condition --

24           THE COURT:  But it wouldn't -- if the government

25   had bailed out Lehman these securities would have paid.

Page 104

1            So the issue was whether -- so even if there was a

2    fraud the -- so there -- assume there's a fraud and Dick

3    Fuld knows there's a Fuld, but he's going to convince the

4    government to bail out Lehman, there's nothing fraudulent

5    about these statements, because if in fact the government

6    bailed out Lehman insolvency wouldn't have occurred, it's

7    the bankruptcy that caused the warrants not to be paid, you

8    wouldn't be standing here.  So --

9            MS. ALPERSTEIN:  I think there would still be a

10   fraud.  The question of damages would be obviated.

11           THE COURT:  Well there would --

12           MS. ALPERSTEIN:  But the fraudulent statements

13   would still have been fraudulent.

14           THE COURT:  But your claim here is because the

15   warrants didn't -- you didn't get paid.  The warrants didn't

16   deliver.  That's the claim.  The warrants didn't deliver.

17   And what you're saying is that the securities were sold

18   against the backdrop of knowing that there was financial

19   trouble.  Right.

20           MS. ALPERSTEIN:  Trouble, not necessarily

21   bankruptcy, but --

22           THE COURT:  Right.  But --

23           MS. ALPERSTEIN:  -- a false financial picture was

24   painted.

25           THE COURT:  Right.  But the problem -- the problem

1    that you have and it wears two different hats, it's a

2    plausibility problem and it's also an attribution problem.

3          The plausibility problem is that it's easy to look

4    at an examiner's report and say, look, look at the

5    examiner's report.  Right?  Obviously there was this, that,

6    and the other thing going on, but that very much is a

7    hindsight view.

8          Secondly, there is the issue that many, many

9    people didn't think Lehman was going file, they thought

10   Lehman was going to survive, in which case these warrants

11   would have been good.

12         So if you bring Fuld in here and you put him on

13   the witness stand he and a parade of other people will say,

14   we thought we had a deal over that weekend.

15         I mean the -- you know, it sounds like a factual

16   determination, but I think that there's ample basis for the

17   observation that many people would say that.

18         Then you have a Janus problem.  In Janus they were

19   the exact same people.  They were the exact same officers

20   and directors, and the Supreme Court said, no attribution.

21         MS. ALPERSTEIN:  But the Supreme Court said you're

22   not the maker of those statements.  What they didn't have in

23   Janus, there was not a question of whether the -- whether

24   the company, the subsidiary had scienter, that is not what

25   Janus turned on, it turned on who was responsible for making

Page 106

1        those false statements?

2                In our situation the attribution question is

3        whether or not corporate scienter can be imputed to the

4        company.

5                THE COURT:  Right.  And at the time -- so again,

6        so in your framework Dick Fuld and Joe Broker are

7        indistinguishable, so the scienter of Dick Fuld is I'm

8        selling securities that I know are not going to pay.  That

9        wasn't his mindset at the time.  His mindset at the time he

10       sold the securities, which is what your asking me to

11       envision, is that everything is going to be fine because

12       we're going get bailed out, there's going to be a

13       transaction.

14               His scienter, the scienter involved with selling

15       securities that you know not to be good securities, that

16       doesn't exist.  Did he know?  You say he knew that he was

17       engaging in accounting hocus pocus.  Maybe he did, maybe he

18       didn't, but his scienter in selling the securities was at

19       that moment in time everything is going to be fine.  It's

20       the opposite of -- it's the opposite.  He thought everything

21       was going to be fine.

22               MS. ALPERSTEIN:  Well, I think that we've pled it

23       pretty clearly that Fuld and the others knew that their

24       public filings that were describing the financial condition

25       of LBHI were false.  They had a whole host of schemes that

Page 107

1    they engaged in, misstatements and omissions regarding the

2    liquidity, regarding the risk management practices, you

3    know, artificially inflating their level of assets and

4    deflating their actual liabilities, creating a false picture

5    of the risk profile of the company and its eventual ability

6    to pay.  It's that false picture.  No guarantee of what's

7    going to happen in the future, but what the claimants and

8    others in the market were entitled to was an accurate

9    financial picture.  That picture was known by Fuld and

10   everyone else at the highest levels of LBI to be false.

11           The reason it was known, and the issue isn't

12   really attribution, Judge, it's the knowledge of the falsity

13   of that PPM.  And they had that knowledge.  We've pled that

14   with extreme particularity.  We've pled their roles in the

15   accounting fraud.  We've pled what they knew.  We've pled

16   statements that they made to the press, that they made to

17   the SEC, that were incorporated into the PPM and showed that

18   at the time those statements about the Repo 105, about the

19   concentration levels, about the liquidity risk were just not

20   true, and therefore the assets were inflated, the

21   liabilities were understated, and the financial picture of

22   LBHI was falsely presented.

23           I'm not saying and I can't in consciousness state

24   that he believed 100 percent that the company was going to

25   go down, and that's not what we've pled.  But what our --

Page 108

1   what the claimants had a right to know and didn't get was a

2   true picture of the real financial health of the company so

3   that they could make a reasonable investment or a

4   determination of whether to invest, and that was taken from

5   them.  We don't need to show that bankruptcy was known.

6           THE COURT:  So where -- so go back to the question

7   that I posed before, which is that therefore everyone after

8   a certain date who from LBI bought an LBHI security gets to

9   be in your shoes, right?

10          MS. ALPERSTEIN:  Well they've got a statute of

11  limitations issue among other things --

12          THE COURT:  Well forget about that.  But what

13  other claims are out there like yours?

14          MS. ALPERSTEIN:  I have no idea, Judge.  Perhaps

15  one of my colleagues knows.

16          THE COURT:  What other claims are out there like

17  yours?  If you -- what other claims have legs like this

18  claim?

19          MR. SALOMON:  Good morning, Judge.  Chester

20  Salomon.  If I may answer?

21          THE COURT:  Yes.  It's very disconcerting to have

22  to have a conversation with two people, and I would ask you

23  in the future that you have one person speak for you.  But

24  go ahead.

25          MS. ALPERSTEIN:  I apologize.

Page 109

```
1              THE COURT:  I know you said that at the outset,

2    but it's very difficult.  Go ahead.

3              MR. SALOMON:  I'm sorry, Judge.

4              THE COURT:  Go ahead.

5              MR. SALOMON:  I wanted to try to answer your

6    question.  The question -- I've raised that question with

7    counsel over the years since we filed --

8              THE COURT:  This counsel?

9              MR. SALOMON:  That's correct.

10             THE COURT:  LBI counsel?

11             MR. SALOMON:  About how many other people are in

12   the same position as our clients who had unresolved claims,

13   claims that have not already been disposed of by this Court.

14   And the impression I have is that there are few, if any,

15   that remain.  But counsel perhaps --

16             THE COURT:  No, but I'm -- but that takes me in

17   the other direction.  In other words there are so many

18   people who could have -- who might have been in the zone

19   where they bought LBHI products and could say that LBI sold

20   me this bad product, and yet I don't have something

21   elsewhere you can say that this claim was made and it

22   survived a motion to dismiss.  I -- so that cuts the other

23   way.

24             In other words not to diminish, you know, the

25   abilities of you folks to craft a good complaint, but there
```

Page 110

1    aren't a host of class actions out there by people who are

2    similarly situated to your people.  I'm just -- I'm

3    struggling to find the framework for this.  And so that

4    doesn't really advance the ball.

5              MS. ALPERSTEIN:  Judge, if I may, I guess I'm not

6    entirely sure why the existence of other potential claimants

7    would affect the sufficiency of our complaint.

8              THE COURT:  It doesn't affect the sufficiency of

9    your complaint, but I'm very big on context and very big on

10   following the lead of others who have, you know,

11   thoughtfully considered things before.  So if there were a

12   claim out there that had survived a motion to dismiss and

13   was -- and had legs that just would be something that I'm

14   interested in.  It doesn't -- it's not dispositive one way

15   or the other.

16             MS. ALPERSTEIN:  Well, thank you.

17             If I could just address a couple other issues --

18             THE COURT:  Okay.

19             MS. ALPERSTEIN:  -- that counsel raised.

20             He mentioned that we're -- he seems to think we're

21   taking the position that the PPMs don't matter, and that's

22   not our position.  Our position is that the PPMs do matter,

23   because what was said in them -- what was stated in them was

24   false.

25             THE COURT:  What was said in them was you could

Page 111

1    lose your entire investment.  There's no greater statement

2    and clearer statement of risk.  You're about to write a

3    check for a security and you could lose your entire

4    investment.

5              MS. ALPERSTEIN:  That doesn't give -- the generic

6    risk factor that you could lose --

7              THE COURT:  It's not --

8              MS. ALPERSTEIN:  -- doesn't give the right to just

9    lie about what the actual risk profile is, and that's what

10   happened.  They don't just get to say, by the way, if it

11   turns out that we can't pay our bills then you're going to

12   lose everything, and that's a given.  But they don't get to

13   do that and say, by the way, our ability to pay in the

14   future is compromised because we haven't given you a

15   positive actual factual presentation of what or likelihood

16   is of the ability to pay in the future.

17             It's like a -- it gets to -- so if they commit

18   fraud it's too bad because they were warned and they might

19   lose their shirt?  That's not how securities laws work.

20   They didn't -- it's not like a get out of jail free card

21   that they get to lie with imputity (sic) because they warned

22   that they might be able to -- they might not be able to pay

23   in the future.

24             And the risk factor itself is false and misleading

25   because it's omits the truth, it doesn't have an asterisk

Page 112

 1    saying, and by the way, this is a real potential risk

 2    because we are massively understated our ability to pay in

 3    the future, we haven't indicated to you what our real

 4    financial strengths are.

 5              THE COURT:  But that's all something that you

 6    allege, because now, with the benefit of hindsight, there's

 7    an examiner's report.

 8              MS. ALPERSTEIN:  But the fact that the examiner's

 9    report is out there detailing the elements of the fraud

10    doesn't make it fraud by hindsight, Judge.  What the

11    examiner's report goes through is the details of that

12    scheme, the accounting fraud that they engaged in.  It's --

13              THE COURT:  You understand that the examiner's

14    report is just an examiner's report, it's not --

15              MS. ALPERSTEIN:  I understand it's not proof.  I

16    understand --

17              THE COURT:  It's not proof of anything.

18              MS. ALPERSTEIN:  I understand that, but we have

19    alleged with specificity, the same specificity as in that

20    report to support our allegations that what's set forth in

21    that PPM is not correct.

22              THE COURT:  Well what about the fact that you've

23    alleged nothing about what any particular broker said to any

24    particular person?  Hi, client, this is Joe Broker, just as

25    I always do I'm calling you today to tell you what today's

Page 113

1   new Lehman securities are.  Here's one, it's for warrants,

2   I'll send you the PPM.  Have a nice day.  Okay?

3           MS. ALPERSTEIN:  Uh-huh.

4           THE COURT:  Doesn't puff it, doesn't say anything,

5   just says, here it is.  You win?

6           MS. ALPERSTEIN:  Well that's not what we allege.

7   We do allege that it was puffed.  We do allege the specific

8   conversations.

9           THE COURT:  Okay.  But that -- so okay.  So you

10  haven't alleged what any -- you haven't alleged specifically

11  Joe Broker said this, that, or the other to this client.

12  You haven't alleged any of that.

13          MS. ALPERSTEIN:  We've alleged that they said that

14  it was a good investment opportunity or an excellent

15  opportunity --

16          THE COURT:  Do you have the names of the brokers?

17          MS. ALPERSTEIN:  Yes, we do.  We do, Judge.

18          THE COURT:  Where's that?

19          MS. ALPERSTEIN:  That is at paragraphs -- I

20  believe it starts at paragraph 31.  Let me check.

21          UNIDENTIFIED SPEAKER:  Page 11.

22          THE COURT:  Paragraph 31?

23          MS. ALPERSTEIN:  Oh, yes.  Paragraph 31 identifies

24  the registered representative brokers as Robert Holland and

25  Sofia Frankle (ph), and then paragraph 33 discusses what

Page 114

1    they were told as is paragraph 34.  So paragraph 33 says

2    that the plaintiffs were told by their brokers that through

3    the special access of LBI that they're able to invest with

4    the other --

5              THE COURT:  So that's not -- okay.  So, okay.  So

6    that's -- let's say that that's true.  Okay?  Each of the

7    claimants was told that LBHI itself was investing in the

8    reference funds.  That might have been true.

9              MS. ALPERSTEIN:  Right.  Paragraph 36 we allege

10   that the LBI brokers said to the claimants that they had an

11   excellent or really great opportunity to invest indirectly.

12             THE COURT:  Okay.  Suppose -- so let's take that

13   as true.  Let's take that as true.  That's a classic

14   subjective sales pitch.  Really great opportunity, here,

15   invest.

16             MS. ALPERSTEIN:  The problem is that given that

17   the company knew at the time that the PPM contained false

18   and misleading allegations, as we have -- excuse me -- false

19   and misleading information, as we have alleged about LBHI,

20   there was a duty to disclose the truth, because they were

21   long-standing customers, there's a fiduciary role there,

22   they're actively targeting them, they're seeking them out,

23   they're calling them up and saying great opportunity.

24   There's no qualifier, there's no expect, you know, LBHI is

25   not in great condition, but it's still a great opportunity

Page 115

1      for you.  There's nothing.

2              THE COURT:  What's your authority for the -- so

3      your authority for getting past the possibility that these

4      brokers had no knowledge of Repo 105.  Which let's be real,

5      they didn't have any knowledge.

6              MS. ALPERSTEIN:  And we don't allege that they do.

7      I know they didn't, Judge.

8              THE COURT:  Okay.  Okay.  So what's the authority

9      for the fact that assuming that Dick Fuld knew about

10     everything that's in if examiner's report, what specifically

11     -- what's the authority for attributing that knowledge and

12     scienter to these brokers who it looks like were just doing

13     what they had always done?

14             MS. ALPERSTEIN:  It's two-fold.  There's -- the

15     first piece of it is the corporate scienter of LBI itself,

16     which is established by the knowledge of its officers and

17     directors about the falsity of the PPM.

18             THE COURT:  Okay.  That's not scienter.  That's

19     not scienter.  That is the attribution of the knowledge of

20     LBHI and the knowledge of LBI.  You say it's the -- Dick

21     Fuld knows.

22             MS. ALPERSTEIN:  But with respect, Judge, the

23     knowledge of LBI as a corporate entity about the truth or

24     falsity of what happened at LBHI --

25             THE COURT:  But what's the -- what's the authority

Page 116

```
 1    for the scienter of these individuals that with intent they

 2    are making fraudulent statements that they intend the client

 3    to rely on?  What's the --

 4            MS. ALPERSTEIN:  The authority is that their

 5    specific intent is not what's at issue.  The specific intent

 6    is the intent of LBHI who sent them out.  So they acted --

 7            THE COURT:  LBI you meant.

 8            MS. ALPERSTEIN:  LBI.

 9            THE COURT:  You meant LBI.

10            MS. ALPERSTEIN:  I'm sorry.  LBI sent them out.

11    So LBI knows that what it's having its brokers say is not

12    true.

13            THE COURT:  But what's the authority --

14            MS. ALPERSTEIN:  It's the --

15            THE COURT:  What's the -- give me a case.

16            MS. ALPERSTEIN:  I will give you the --

17            THE COURT:  Give me a case that says that even in

18    a situation in which there is no proof whatsoever that the

19    brokers had no subjective intent, right?

20            Let's talk about -- talk about the Climan (ph)

21    case, okay, in the Second Circuit where they said that the

22    broker's subjective intent on the quality of the investments

23    were not false, they honestly didn't believe they were

24    saying anything false at the time, and therefore it's not

25    actionable.
```

1           MS. ALPERSTEIN:  The difference there though,

2     Judge, is that in those cases you don't have the pre-

3     existing knowledge on behalf of the company.

4           So what you -- if this were a case, for example,

5     where we didn't have the Dick Fulds and the O'Mearas and the

6     Kalans, all we have is the brokers, you would need that

7     individualized intent of the brokers because there'd be

8     nothing to show that the company's agent -- that the

9     company, via its agents, knew what the agents were saying

10    was false.  But that's the ordinary situation.

11          Here we have the unusual situation that the

12    company itself, its knowledge can be gleamed by the

13    knowledge of its corporate officers.  So that's already

14    extant and out there at the time that the brokers are sent

15    out.  The brokers are acting solely as agents, they are

16    functionally mouthpieces for the entity.  So we have not

17    sued them.  We are not going after them for false and

18    misleading statements that they made in our own capacities

19    that are then attributable to the company.

20          The point is that what they say at the behest of

21    the company is actionable, because the company itself knew

22    that what they were saying didn't have merit and that they

23    should have disclosed the truth about the financial

24    condition of LBHI.

25          THE COURT:  But -- okay.  But the disconnect, and

Page 118

1    I appreciate we've been going at it for a long time, we're

2    going conclude soon -- but the disconnect is that when you

3    look at the statements they strongly encourage the purchase

4    of the warrants, there was no mention of the true financial

5    condition.  Okay.  They X an opportunity to invest.  So if

6    at that time -- we're talking about Dick Fuld's knowledge,

7    right?  Dick Fuld knows number one there's been some

8    accounting stuff that went on here, eventually there's going

9    to be an examiner's report that talks about Repo 105, but

10   I've just gotten off the phone with the White House and

11   looks like we're going to be bailed out.  Right?  So they're

12   selling these securities at that moment where Dick Fuld

13   believes Lehman is going to survive, notwithstanding the

14   existence of financial issues.  That's -- so that's the

15   framework, right?

16           So the broker is on the phone, he's Dick Fuld, he

17   knows, uh-oh, I've engaged in some bad things on an

18   accounting basis, some of the stuff is kind of shady, but

19   I'm going to be bailed out because I'm too big to fail.  So

20   therefore you're good to buy this security because Lehman is

21   going to survive.

22           It doesn't -- I mean I know it's not palatable and

23   it's not attractive, but if you try to get to the end of the

24   day, as I'm trying to do here, and I try to imagine your

25   prevailing, which is what I'm really trying to do, I'm

Page 119

1    trying to imagine how you prevail, because what I -- that's

2    part of what I'm doing.  I don't want to resolve any facts,

3    but I'm having a hard time -- it goes to plausibility -- I'm

4    having a hard time imagining plausibly how these claims

5    could prevail.

6            MS. ALPERSTEIN:  Well, Judge, our argument is that

7    the claimants wouldn't have purchased these securities in

8    the first place if they had known the truth about LBHI's

9    financial condition.

10           I cannot tell you whether if they had known the

11   truth, but they were guaranteed up and down that the

12   government was going to bail them out and therefore the

13   financial condition -- I think the upshot of your argument

14   is that the financial condition of LBHI was functionally

15   immaterial, because regardless of that condition it wouldn't

16   matter to an investor because they were going to get bailed

17   out --

18           THE COURT:  Well it was not so much --

19           MS. ALPERSTEIN:  -- no matter what and made whole.

20           THE COURT:  Right.  It was not so much the

21   financial condition as the -- you know --

22           MS. ALPERSTEIN:  The ability to be bailed out.

23           THE COURT:  The survival of -- the likelihood of

24   the survival of LBHI.

25           MS. ALPERSTEIN:  But I think that at the time that

Page 120

1    these were sold the question was really is this an

2    investment that the claimants would have made based on the

3    financial condition?  That condition was not accurately

4    portrayed and that's the basis of the claim.  And

5    particularly given the knowledge of LBI that the PPM that it

6    was disseminating and having its brokers go out and

7    disseminate was not accurate.

8              THE COURT:  So let me slightly shift though.

9              MS. ALPERSTEIN:  Okay.

10             THE COURT:  How is this different than a case in

11   which a different type security, let's -- a SWAP or

12   something.

13             MS. ALPERSTEIN:  Okay.

14             THE COURT:  Okay?  And the broker -- the

15   prospectus says this is really risky, you could lose

16   everything, right?

17             MS. ALPERSTEIN:  Uh-huh.

18             THE COURT:  And then the allegation is that the

19   broker said, don't worry what it says in the prospectus,

20   okay, this is going to be fine, this is just like investing

21   in fixed government securities fully backed by FDIC.  Okay?

22   In that case the claimant loses.  The claimant loses.

23             MS. ALPERSTEIN:  The claimant --

24             THE COURT:  The document wins.  The broker

25   knowingly has said -- has puffed, has made misleading

Page 121

1   statements.  The law in that scenario is that the prospectus

2   that you're given is what you should have believed and what

3   you reasonably relied on.  It wasn't reasonable for you to

4   rely on the sales pitch of the broker.  How do I get out of

5   that one?

6           MS. ALPERSTEIN:  I think in two ways.  Your

7   hypothetical ignores two critical points.

8           One is that in your hypothetical there's no false

9   and misleading statement that's made in the underlying

10  prospectus or PPM, which is what we have here.  You have

11  solely a PPM that has a risk factor in your hypothetical

12  that says you can lose your shirt but not a series of false

13  and misleading representations about the ability of the

14  counter party in the SWAP to pay.  So that's one

15  distinction, so I think that makes your hypothetical

16  inapplicable.

17          And the second is that in our case because of the

18  nature of the fiduciary relationship between LBI and its

19  customers there was a duty to disclose the truth when that

20  truth was known to the company.

21          In effect, and we do allege this, LBI shouldn't

22  have been acting as placement agent using a false and

23  misleading PPM.  But it armed its brokers with that PPM

24  knowing it was false and misleading and had them sell the

25  product, and it shouldn't have done that.  It should have

Page 122

1    abstained in effect.  Or if it was going to have them sell

2    the product it should have had them sell the product with

3    some kind of caveat if they weren't going have that caveat

4    in the PPM itself.

5            So it was a combination of factors, neither of

6    which was in the hypothetical that you posed, Judge.  So, I

7    don't think that that's an issue.

8            THE COURT:  All right.  Before you lose your voice

9    let me ask the trustee to respond briefly, and then I think

10   we're going to have to conclude.  Thank you.

11           MR. MITCHELL:  Thank you, Your Honor.

12           We'll just briefly note that the issues still seem

13   to be the same.  There's questions of what is and what

14   should not be attributed to LBHI and we keep coming back to

15   the same point.  The statements and the actions that are

16   complained of are all LBHI centric.

17           There's this notion of this knowledge of the

18   financial condition and whether or not LBHI would be bailed

19   out.

20           Those are things again back in time when the

21   warrants were purchased they were purchased to be held to

22   maturity, which is over three and a half years in the

23   future.  The plausibility of prescience or clairvoyance, the

24   ability of anyone at that point to peg exactly, well three

25   and a half years in the future, and the claimants have even

Page 123

1    said that's not what they're saying.

2            THE COURT:  But don't they have to have an

3    opportunity to establish that what's in the examiner's

4    report was known to LBI?  If what's in the examiner's report

5    was known to LBI, right?

6            MR. MITCHELL:  Yeah.

7            THE COURT:  And they knowingly went out and sold

8    an LBHI product knowing what was in the examiner's report

9    then that would be bad.

10           MR. MITCHELL:  If that were proven it still does

11   not speak to securities fraud with respect to the purchase

12   of their warrants.  It just doesn't.

13           THE COURT:  Say that again?

14           MR. MITCHELL:  If that were to be proven it still

15   does not speak to the securities fraud claim with respect to

16   their purchase of the warrants, because of the

17   countervailing influence.  Just to cite a couple of cases.

18           THE COURT:  LBI -- what they're saying is LBI --

19           MR. MITCHELL:  Uh-huh.

20           THE COURT:  -- knowingly and intentionally sold

21   the warrants and they knew that LBHI had a poor financial

22   condition.  So that in addition to saying, hey, this is a

23   risky investment, you could lose everything.

24           MR. MITCHELL:  Uh-huh.

25           THE COURT:  What they needed to have said was

Page 124

1    specifically there's all this stuff on LBHI's balance sheet

2    that you ought to know about, this, that, the other thing.

3    If you still feel uncomfortable after that then you can buy,

4    and that LBI knew that.  That's where I get to the fact --

5    that's where I get to the hesitation with respect to

6    resolving issues of fact, because we're still at a

7    sufficiency hearing.

8              MR. MITCHELL:  Yes, Your Honor.

9              THE COURT:  We're still at a sufficiency hearing.

10             And so for them not to have the ability to take it

11   to the next level, which, you know, for all the reasons that

12   we've been talking at and talking around, you know, there

13   are huge hurdles, but I still feel that notwithstanding

14   Janus and Climan, and all of these other cases we've

15   identified, a fact issue that's inappropriate to resolve at

16   a sufficiency hearing.

17             I think it's a hugely heavy lift to get to the

18   finish line.  Hugely heavy lift to get to the finish line,

19   but I feel that we have accomplished something by the

20   dialogue by identifying something that feels like a fact

21   issue and that feels like something that ought not to be

22   resolved at a sufficiency hearing.

23             MR. MITCHELL:  Actually, Your Honor, if I could

24   address that --

25             THE COURT:  Sure.

Page 125

1          MR. MITCHELL:  -- briefly.

2          With respect to that and that heavy lift that you

3    refer to, that speaks directly to what we were talking about

4    before with --

5          THE COURT:  Plausibility.

6          MR. MITCHELL:  -- the plausibility.

7          THE COURT:  Right.

8          MR. MITCHELL:  The Telabs' factor.

9          When it was that heavy of a lift that weighs in

10   favor of saying you've alleged the possibility, you haven't

11   crossed the line to plausibility.  It's not that they have

12   to absolutely prove, that's not what Telabs stands for, but

13   if looking at all of the facts as pled, as the Court noted,

14   the claimants have not pled that the claimants have said

15   that their broker said anything specific about the absolute

16   fact that LBHI is going pay on their warrants, or they

17   haven't -- you know, there's lots of things that just

18   haven't been pled with particularly.  They haven't met the

19   standards yet at this point.

20         With respect to what is known and what is not

21   known and what -- you know, knowing these facts about Repo

22   105, knowing the facts about everything that's in the

23   examiner's report, would that resolve the problem?  The

24   problem is three and a half years -- over three and a half

25   years in the future when LBHI, when these things mature, and

Page 126

```
 1    then the calculations is done, and if the claimants are in

 2    the money is LBHI going to be around?  Well there's case law

 3    that speaks to those things.  There's case law -- Acida v.

 4    Imsera (ph) from the Second Circuit, "Defendant's lack of

 5    clairvoyance simply does not constitute securities fraud."

 6    That seems to be what we keep coming back to.  Padanny

 7    versus Robertson Stevens (ph).

 8              THE COURT:  But they're distinguishing that by

 9    saying -- let me try to give an example.  They're

10    distinguishing that by saying, you know, it's not about the

11    fact that no one could anticipate that the housing market

12    would collapse, et cetera, and that therefore there would be

13    a bankruptcy.  They're saying, no, no, no, it's not about

14    that.

15              MR. MITCHELL:  Uh-huh.

16              THE COURT:  Look, there was this massive stuff

17    that took place that occurred at the time.  Now the examiner

18    has identified it and it's got a name.

19              MR. MITCHELL:  Uh-huh.

20              THE COURT:  But Dick Fuld knew it at the time.

21    Factually he knew it at the time, and that therefore that

22    was something that should have been in a prospectus issued

23    by LBHI designed to get people to buy --

24              MR. MITCHELL:  Uh-huh.

25              THE COURT:  -- LBHI securities.  So -- and that
```

Page 127

1   those facts were not included LBI knew they weren't

2   included, LBI sent its brokers out to sell with that

3   knowledge, it didn't matter that they thought LBHI was going

4   to be bailed out.  That --

5              MR. MITCHELL:  Understood, Your Honor.  And that's

6   -- and then you get back to Romback v. Chang, we get back to

7   that framework wherein you've got the court saying in a

8   circumstance in which there were things on the horizon,

9   where the entity saw it.  Well, you know, we've got some

10  difficulties, we've got some problems.  But you know what,

11  we've also got some good things cooking, and we are

12  optimistic about our outlook.

13             And so the court said to plaintiffs who had a very

14  similar thing, you didn't tell us the absolute truth, you

15  didn't lay out all of the potential problems, you defrauded

16  us.  And the court said, no, no, no, that's not fraud.

17             And that's what it comes down to, this question.

18  It's not enough -- it just doesn't raise the bar enough even

19  if we were to take Repo 105 and all of that it doesn't raise

20  the bar, because we're still dealing with the facts

21  surrounding the particular warrants purchased by the

22  claimants with a maturity date over three and a half years

23  in the future, again courts have said, a lack of

24  clairvoyance knowing about what's going to happen then does

25  not constitute securities fraud.  You can't say well

Page 128

1    bankruptcy happened in the intervening period, you should

2    have known, you should have told us more.  Courts have said

3    you can't do that.  That's not the basis for a securities

4    fraud.

5             Romback v. Chang says, you know what, these people

6    who are running this corporation they're entitled to be

7    optimistic about the future.

8             Again, we come back to the same issue with under

9    the Telabs' framework.  The facts as pled do not give rise

10   to a compelling inference of fraud with respect to the

11   warrants, and that is -- that are the -- those are the

12   securities in question.

13            The claimants seek to have Judge Kaplan's thoughts

14   on the examiner's report and all those other things with

15   respect to publicly issued, publicly traded securities on an

16   impersonal market under a different framework.  That is not

17   applicable to these securities.  These securities are very

18   specific.

19            And the PPMs, as much as the claimants want to

20   stay well, you know, these were generic, those risk factors

21   don't mean anything.  As the Court noted and the trustee

22   agrees, how much stronger can a risk factor be in bold

23   letters, you could lose everything?

24            And in their -- by the way, if LBHI goes

25   bankruptcy I don't know how they want that qualified even

Page 129

1    more.  They're asking to have clairvoyance on the other

2    side.  They're saying, well, you know, they should have

3    known.  Again, fraud by hindsight, not a valid complaint.

4    So --

5                THE COURT:  Okay.

6                MR. MITCHELL:  -- the legal framework in this, we

7    understand the Court's concerned about facts, but even given

8    those in relation to the facts with respect to these claims

9    it does not rise to securities fraud.

10               THE COURT:  Okay.  Well you've given me a lot of

11   think about.  I think we need to conclude, especially since

12   I have a 2 o'clock hearing, and thank you very much for the

13   excellent and thoughtful presentations, and you'll hear from

14   us when you hear from us.

15               MS. ALPERSTEIN:  Thank you very much, Judge.

16               THE COURT:  All right?  Thank you very much.

17          (Recessed at 12:37 p.m.; reconvened at 2:02 p.m.)

18               THE COURT:  Hello, Ms. Marcus.  How are you?

19               MS. MARCUS:  Good morning, Your Honor -- oh, good

20   afternoon, excuse me.

21               THE COURT:  Good afternoon.

22               MS. MARCUS:  I'm not usually here in the

23   afternoon.  There's been a request, Your Honor, to go a

24   little out of order --

25               THE COURT:  Okay.

Page 130

1          MS. MARCUS:  -- on the agenda, if that's okay with

2    you.

3          THE COURT:  So what is it that folks would like to

4    do?

5          MS. MARCUS:  To start with the Moore Macro motions

6    to compel.

7          THE COURT:  I don't think that's a good idea.  I

8    think the Moore Macro motions, unless parties have

9    substantially advanced from the positions that are reflected

10   in the papers, I think that's going to take quite a long

11   period of time.  So is there a reason why we can't begin

12   with Utah --

13         MS. MARCUS:  Not at all.

14         THE COURT:  -- with the Utah matter?

15         MS. MARCUS:  Not at all, not as far as we're

16   concerned.

17         THE COURT:  All right.  So let's start with the

18   Utah matter and then we can reexamine the issue of whether

19   Moore Macro or the status conference in the U.S. Bank

20   adversary goes forward next.

21         MS. MARCUS:  That's fine --

22         THE COURT:  Is that all right?

23         MS. MARCUS:  -- Your Honor, yes.

24         THE COURT:  Okay, thank you.

25         MS. MARCUS:  And in connection with that matter,

Page 131

1    Weil is actually representing the debtors in that matter and

2    my partner Christopher Cox, Christopher J. Cox is here.

3                 THE COURT:  Okay.

4                 MS. MARCUS:  He was admitted pro hac vice by Judge

5    Peck, but he hasn't appeared before you before.

6                 THE COURT:  Okay.

7                 MS. MARCUS:  He's from our Silicon Valley office.

8                 THE COURT:  Okay, very good.  Welcome.

9                 MR. COX:  Good afternoon, Your Honor.

10                THE COURT:  Hello.

11                MR. SLAUGHTER:  Good afternoon, Your Honor.  May

12   it please the Court, William Slaughter of Ballard Spahr on

13   behalf of Utah Housing Corporation, formerly known as Utah

14   Housing Finance Agency.

15                This is a dispute, Your Honor, between Lehman and

16   Utah Housing concerning the valuation of --

17                THE COURT:  Right.

18                MR. SLAUGHTER:  -- interest rate swaps following

19   the bankruptcy.  There's no dispute as to the propriety of

20   the terminations.  There are three counts in the complaint,

21   two counts of breach of contract under state law and one

22   count of unjust enrichment under state law.

23                We've moved to dismiss on two grounds --

24                THE COURT:  Right.

25                MR. SLAUGHTER:  -- one is the forum-selection

Page 132

1    clause in the swap agreements and the other is the doctrine

2    of sovereign immunity, and I'll deal with them in that

3    order, if that's okay.

4              Each of the --

5              THE COURT:  So let me --

6              MR. SLAUGHTER:  Oh, you're going to jump right --

7              THE COURT:  -- so first of all --

8              (Laughter.)

9              THE COURT:  -- first of all --

10             MR. SLAUGHTER:  Somehow I thought I wouldn't get

11   that far.

12             THE COURT:  Yeah.

13             (Laughter.)

14             THE COURT:  You got farther than you thought?

15             MR. SLAUGHTER:  I got to introduce who I was.

16             THE COURT:  Right.  All right, so I've spent a lot

17   of time with the papers and a lot of time --

18             MR. SLAUGHTER:  Terrific.

19             THE COURT:  -- thinking about the issues that you

20   raise and I'm zeroing in on, subject to everybody continuing

21   to argue what they'd like, I'm zeroing in on the exact

22   language, because that's what I have to do, right?  So the

23   exact language that I'm zeroing in on is Part V of the

24   schedules that altered the ISDA -- right? -- say, "with

25   respect to any proceedings against Utah Housing, such

Page 133

1    proceedings shall be brought only in the courts or tribunals

2    in which such proceedings may be brought against Utah

3    Housing under the laws of the State of Utah and submits to

4    the jurisdiction of such courts."

5         More significantly, I believe, is the following,

6    "Although" -- and I'm saying Utah Housing, because that's

7    the party -- "Although Utah Housing is an independent agency

8    of the State of Utah is entitled to immunity on the grounds

9    of sovereignty in certain situations, immunity from suit is

10   statutorily waived by Utah Housing as to any of its

11   contractual obligations, including, but not limited to,

12   payment obligations under this agreement."

13        So that's the big hook on which your argument

14   rests, one of the big hooks, right?

15        MR. SLAUGHTER:  Well, there are two equally big

16   hooks.

17        THE COURT:  Okay, two equally big hooks.  That's

18   one of the big hooks on which your argument rests is that

19   the waiver is a statutory waiver, it's only waived to the

20   extent it's waived in the Utah statute, right?  And in the

21   Utah --

22        MR. SLAUGHTER:  Yes.

23        THE COURT:  I'm not trying to tricky you --

24        MR. SLAUGHTER:  No, no, I'm saying that's the --

25        THE COURT:  -- okay?  I'm not trying to trick you.

Page 134

```
 1              MR. SLAUGHTER:  -- I'm saying that's correct --

 2              THE COURT:  And the Utah statute --

 3              MR. SLAUGHTER:  -- that the Utah statute --

 4              THE COURT:  -- says --

 5              MR. SLAUGHTER:  -- says only in Utah.

 6              THE COURT:  Right.  So that's exactly where my

 7    interest is, because then the next sentence after the

 8    semicolon says, "and proceedings may be brought against Utah

 9    Housing in such courts and tribunals as are permitted under

10    the laws of the State of Utah."

11              MR. SLAUGHTER:  Correct.

12              THE COURT:  Right?  And what you've told me is --

13              MR. SLAUGHTER:  The laws of the State of Utah --

14              THE COURT:  The laws of the State of --

15              MR. SLAUGHTER:  -- provide --

16              THE COURT:  -- Utah provide you can only sue me in

17    Utah --

18              MR. SLAUGHTER:  And there is --

19              THE COURT:  -- right?

20              MR. SLAUGHTER:  -- case after case after case that

21    says that, the statute says that, and there's no authority

22    that's been presented to you to suggest otherwise.  You get

23    it.

24              THE COURT:  I get it.  However, if you were

25    drafting this, if you were drafting this, fewer words could
```

Page 135

1    have been used to more clearly convey the point that you can

2    only sue Utah Housing in Utah.  It doesn't say that.  It

3    says, "may be brought against such courts and tribunals as

4    are permitted in the laws of the State of Utah."  It's

5    oblique where it could have been direct.

6           MR. SLAUGHTER:  I'm not going to argue with you,

7    Judge Chapman that --

8           THE COURT:  And --

9           MR. SLAUGHTER:  -- I didn't write this --

10          THE COURT:  -- with all due respect to --

11          MR. SLAUGHTER:  -- and --

12          THE COURT:  -- the legislature of Utah --

13          MR. SLAUGHTER:  -- I can --

14          THE COURT:  -- I'm just making --

15          MR. SLAUGHTER:  -- I can --

16          THE COURT:  -- a simple observation.

17          MR. SLAUGHTER:  -- certainly tell you that this

18   not the only provision of the swap agreements that you've

19   had to address that could have been written more precisely

20   than it was written.  You could have just said Utah; they

21   didn't say that, they said the courts permitted by the law

22   of Utah.  There can be no dispute that the law of Utah

23   permits an action against Utah Housing to be brought only in

24   the courts of the State of Utah.

25          THE COURT:  But it would have been more

Page 136

1   straightforward to simply say that instead of --

2           MR. SLAUGHTER:  I don't think more straightforward

3   is the standard.  I think --

4           THE COURT:  More direct.

5           MR. SLAUGHTER:  -- the standard is whether this

6   provision -- what this provision is intended to mean, and it

7   is intended to mean that the action against Utah Housing

8   under the swap agreement may -- shall be brought only -- I

9   mean, there's an argument here that this is not a mandatory

10  provision --

11          THE COURT:  I understand.

12          MR. SLAUGHTER:  -- it's a mandatory provision --

13  shall be brought only in the courts that are permitted by

14  the laws of -- that -- only in the courts in which actions

15  against Utah Housing may be brought under the laws of the

16  State of Utah, and there are only Utah courts in which

17  actions against Utah Housing may be brought under the laws

18  of the State of Utah.

19          I don't see how you can go from the observation

20  that you might have drafted this more precisely --

21          THE COURT:  You're --

22          MR. SLAUGHTER:  -- to say that I don't --

23          THE COURT:  -- you're assuming that I'm going

24  somewhere that I haven't gone yet.  I'm merely asking the

25  question --

Page 137

1           MR. SLAUGHTER:  I can't tell you that I wouldn't

2      have drafted it with fewer words.

3           THE COURT:  Okay.  So my next question is, if we

4      could find the person at Lehman Brothers who was involved in

5      this negotiation and we could ask him, do you remember, you

6      did these 80 agreements with Utah?  And he'll say, oh, yes,

7      I remember.  And he were to testify that Utah Housing led

8      him to believe that under the laws of the State of Utah

9      meant other courts, would that make a difference?

10          MR. SLAUGHTER:  I only think that you can get to

11     those kind of extra-contractual evidence of intend if you

12     think the agreement is ambiguous.

13          THE COURT:  Well, but -- so --

14          MR. SLAUGHTER:  This agreement --

15          THE COURT:  -- you've joined me exact --

16          MR. SLAUGHTER:  -- this agreement --

17          THE COURT:  Can I --

18          MR. SLAUGHTER:  -- Your Honor --

19          THE COURT:  -- when I --

20          MR. SLAUGHTER:  -- is not ambiguous.

21          THE COURT:  -- when I talk, I get to talk, you get

22     to not.  Okay?  When you read this and you read the totality

23     of it, and you begin to think about why the extra words had

24     to be used, including in the forum-selection clause about

25     the submission to jurisdiction, you could make a plausible

Page 138

1    argument, if this were not legislation-based, you could make

2    a plausible argument that there's an ambiguity here, don't

3    you --

4             MR. SLAUGHTER:  I --

5             THE COURT:  -- you don't agree?

6             MR. SLAUGHTER:  With great respect, Your Honor, I

7    could not disagree more.

8             THE COURT:  Okay.

9             MR. SLAUGHTER:  This clause is clear, it says,

10   "shall be brought only in the courts in which they may be

11   brought under the laws of the State of Utah."  There is no

12   argument that has been made in these papers or otherwise

13   that suggests that an action against an agency of Utah under

14   Utah law may be brought in tribunals outside of the State of

15   Utah.  You cannot, with great respect, Your Honor --

16            THE COURT:  It's okay, you don't --

17            MR. SLAUGHTER:  -- squeeze --

18            THE COURT:  -- have to keep saying that.

19            MR. SLAUGHTER:  -- well, squeeze an ambiguity into

20   that.

21            THE COURT:  Well, the ambiguity I think arises by

22   the fact that it says they may be brought in such courts and

23   tribunals as are permitted under the laws of the State of

24   Utah, it appears to invoke a wider variety of laws.

25            MR. SLAUGHTER:  Unless someone can come up with a

Page 139

1    colorable argument as to how under the laws of the State of

2    Utah an action against an agency of the state may be brought

3    out of state, which with great respect to my friends --

4              THE COURT:  You don't have to keep --

5              MR. SLAUGHTER:  -- they have not come up with, you

6    cannot get to the kind of ambiguity or any ambiguity at all

7    that would permit consideration of the kind of extra-

8    contractual evidence that you're talking about.  I mean --

9              THE COURT:  Okay.

10             MR. SLAUGHTER:  All right?  And --

11             THE COURT:  So let me ask my next set of

12   questions.  Of course, I don't know whether what's alleged

13   is true, what's alleged --

14             MR. SLAUGHTER:  You mean, non --

15             THE COURT:  -- with respect to the --

16             MR. SLAUGHTER:  -- on the merits?

17             THE COURT:  -- underlying transactions --

18             MR. SLAUGHTER:  Yes.

19             THE COURT:  -- okay?  What's alleged is that, when

20   the music stops, the swaps were in the money to Lehman and

21   that $48 million was paid, a large amount of money --

22             MR. SLAUGHTER:  I think that's alleged and agreed,

23   so --

24             THE COURT:  Okay.  It's further alleged that

25   subsequently Utah Housing entered into replacement

Page 140

1    transactions -- it's alleged, I don't know -- that --

2              MR. SLAUGHTER:  No, we did.

3              THE COURT:  Okay, that netted it approximately $9

4    million.

5              MR. SLAUGHTER:  That we don't agree with --

6              THE COURT:  Okay.

7              MR. SLAUGHTER:  -- because the replacement

8    transactions were not on the same terms as the transactions

9    that were terminated.

10              THE COURT:  Okay.  So there's --

11              MR. SLAUGHTER:  But that's a dispute.

12              THE COURT:  -- there's grounds for disagreement.

13   So where issue is joined has to do with how much additional

14   money --

15              MR. SLAUGHTER:  If any.

16              THE COURT:  -- or not, if any, Lehman should be

17   paid by Utah.  And it -- right?

18              MR. SLAUGHTER:  Correct.

19              THE COURT:  Okay.  And it appears to be the case

20   that an entity called Swap Financial Group advised Utah in

21   connection with these transactions.

22              MR. SLAUGHTER:  In connection with the

23   terminations, yes.

24              THE COURT:  Yes.  So bottom line is, you say, if

25   LBHI wants to bring an action against Utah Housing for these

Page 141

1    amounts that are allegedly owed, it has to be done in the

2    state courts of Utah --

3             MR. SLAUGHTER:  As agreed in the contract.

4             THE COURT:  -- as agreed in the contract and as

5    reflected in the statute.

6             So I have two follow-up questions, completely

7    unrelated.  One, don't I have in rem jurisdiction because

8    the contract is property of the estate and also the amounts

9    that weren't paid are property of the estate?  That's

10   question number one.  And question number two is with

11   respect to the -- I don't know how to characterize it --

12   it's not a representation, but the assertion, the

13   observation that Lehman doesn't have to worry about the

14   statute of limitations because it has available to it a

15   savings clause under Utah law?

16            MR. SLAUGHTER:  I knew you would ask the second

17   question, so I'll do that --

18            THE COURT:  Okay.

19            MR. SLAUGHTER:  -- one first.

20            THE COURT:  Do you want to take that one first?

21            MR. SLAUGHTER:  Absolutely, that's a nonissue.

22   There is a savings clause, it gives them one year from the

23   date of dismissal.  Assuming this action was timely filed

24   when it was filed and you dismiss it, they have a year to

25   sue us in Utah.

Page 142

1          THE COURT:  Okay, I'm going to -- but that's not

2     quite as much as I'm looking for.

3          MR. SLAUGHTER:  What more do you need?

4          THE COURT:  I need a representation -- you're

5     asking me to as a factor --

6          MR. SLAUGHTER:  I give you that representation, go

7     ahead and tell --

8          THE COURT:  You give me the representation that

9     assuming this action was timely filed, if I were to dismiss

10    it and it were to be lodged in the state court of Utah

11    appropriately consistent with Utah's claim of sovereign

12    immunity and all of its statutory requirements, that Utah

13    Housing would not assert a time bar?

14         MR. SLAUGHTER:  That is correct.

15         THE COURT:  All right.  Now go to my first

16    question.

17         MR. SLAUGHTER:  I made very clear in the papers

18    that we do not --

19         THE COURT:  Well, you made very clear that you

20    believed that that was available, that there is a savings

21    clause, but it was short of representing that it would not

22    -- that there would not be an assertion that it didn't

23    apply.  So, thank you for the straight answer to my pointed

24    question.

25         MR. SLAUGHTER:  Okay.

Page 143

1          THE COURT:  Next is --

2          MR. SLAUGHTER:  So now the other question is --

3          THE COURT:  -- the in rem jurisdiction.

4          MR. SLAUGHTER:  -- the jurisdiction, I don't think

5   we've ever contended that this Court doesn't have

6   jurisdiction under 1334 over claims that the estate can

7   issue.

8          THE COURT:  Not the issue.

9          MR. SLAUGHTER:  It's -- the argument that we're

10  making is based upon a contractual forum selection.  It is

11  not a statutory or constitutional -- you know, for that

12  point it's not a statutory or constitutional argument as to

13  jurisdiction, it is simply a question of whether this

14  federal court, consistent with controlling Supreme Court

15  authority, will enforce the parties' agreement as to forum.

16  By definition, Your Honor, you don't get into forum

17  selection unless there are two courts that potentially have

18  jurisdiction.  So we don't contend that this Court wouldn't

19  otherwise have jurisdiction, we simply say that you must --

20  let me withdraw that -- you should enforce the parties'

21  agreement as to forum.  It's a venue issue, albeit a

22  mandatory venue issue, not a jurisdictional issue.

23          THE COURT:  So I'm just trying to follow you,

24  because I'm taking it in a slightly different order.

25          MR. SLAUGHTER:  I do -- okay, I'll --

Page 144

1                THE COURT:  In other words, you're saying that

2      even if in rem, my in rem jurisdiction trumps your sovereign

3      immunity claim, which I think DPH says --

4                MR. SLAUGHTER:  Your Honor, you're jumping to the

5      second ground.

6                THE COURT:  Okay.  Well you --

7                MR. SLAUGHTER:  And I'm happy to -- I'm happy to

8      address --

9                THE COURT:  -- switched them up.  So where I am --

10               MR. SLAUGHTER:  -- I'm happy to address --

11               THE COURT:  -- is -- where I am is --

12               MR. SLAUGHTER:  -- I'm happy to address the second

13     ground.  Ground number one is the parties agreed --

14               THE COURT:  Okay.

15               MR. SLAUGHTER:  -- that this action must be

16     brought, you must enforce that agreement, unless there is

17     some exceptional circumstances --

18               THE COURT:  Okay.

19               MR. SLAUGHTER:  -- which don't exist here.

20               THE COURT:  Got it.

21               MR. SLAUGHTER:  If this were a core action, you

22     would weigh the benefits of centralization in bankruptcy

23     over the policy favoring enforcement of the parties'

24     agreements, but this is not a core action, this is not a

25     core action, and the cases very clearly say that in a non-

Page 145

```
 1    core proceeding you have to go where the agreement tells you

 2    to go.

 3              THE COURT:  Okay, next.

 4              MR. SLAUGHTER:  Now, sovereign immunity --

 5              THE COURT:  Right.

 6              MR. SLAUGHTER:  -- which is separate and distinct

 7    and applies even if the parties hadn't --

 8              THE COURT:  I got it.

 9              MR. SLAUGHTER:  -- said anything in their

10    agreement --

11              THE COURT:  I got it.

12              MR. SLAUGHTER:  -- sovereign immunity says that,

13    as an agency of the State of Utah, Utah Housing may only be

14    sued where it's been consented to be sued.  Okay?

15              THE COURT:  Right.

16              MR. SLAUGHTER:  And that's an element of

17    sovereignty of our states and it extends to state agencies.

18    Utah Housing has consented in the immunity act to be sued on

19    contract obligations, but only in Utah.  That's what the

20    immunity act says --

21              THE COURT:  Right.

22              MR. SLAUGHTER:  -- and that's what the cases

23    interpreting the immunity act --

24              THE COURT:  Okay.

25              MR. SLAUGHTER:  -- universally provide.
```

Page 146

1             THE COURT:  Right.

2             MR. SLAUGHTER:  In the swap agreements --

3             THE COURT:  Right.

4             MR. SLAUGHTER:  -- the provision dealing with

5    contractual waiver, without making reference to Section 501

6    of the immunity act specifically, makes reference to it

7    implicitly by saying that Utah Housing is subject to

8    sovereign immunity, but has statutorily --

9             THE COURT:  Statutorily --

10            MR. SLAUGHTER:  -- waived --

11            THE COURT:  -- right.

12            MR. SLAUGHTER:  -- that immunity for contract

13   claims.  And of course the immunity act contains such a

14   statutory waiver of contract claims, but that waiver is

15   limited under the same statute to actions in Utah.

16            So very simply, our argument on sovereign immunity

17   is that Lehman nor any other person may sue Utah Housing,

18   may sue the State of Utah, except where and to the extent it

19   has consented to be sued.

20            THE COURT:  But now we're talking past each other,

21   because in DPH -- right?  So you're saying there was a

22   contractual waiver, there was a contractual statutory

23   waiver, right?

24            MR. SLAUGHTER:  Now I -- you mentioned DPH, I know

25   where your --

Page 147

1              THE COURT:  Okay.

2              MR. SLAUGHTER:  -- thinking is.

3              THE COURT:  So now in DPH there was no waiver and

4    the Second Circuit said in rem jurisdiction --

5              MR. SLAUGHTER:  But --

6              THE COURT:  -- trumps sovereign immunity.  So it

7    wouldn't --

8              MR. SLAUGHTER:  -- let me see if I can --

9              THE COURT:  -- matter -- it wouldn't matter that

10   you had waived it to some extent only, because my in rem

11   jurisdiction would still trump that --

12             MR. SLAUGHTER:  Okay.

13             THE COURT:  -- right?

14             MR. SLAUGHTER:  Can I --

15             THE COURT:  Yes.

16             MR. SLAUGHTER:  Yes, if this were core, if this

17   were a bankruptcy cause of action.  That's what the Katz

18   decision held, that by --

19             THE COURT:  So I agree with you --

20             MR. SLAUGHTER:  Okay.

21             THE COURT:  -- it was core, but why should core

22   versus non-core --

23             MR. SLAUGHTER:  Because --

24             THE COURT:  -- matter -- please let me finish --

25   why should core versus non-core -- thank you for your

Page 148

1    patience -- why should core versus non-core matter when

2    we're talking about jurisdiction?  Because the general rule

3    is that, if I have jurisdiction, I'm supposed to exercise

4    it.  So why does core versus non-core serve as kind of like

5    a yellow stop light to my going ahead and exercising in rem

6    jurisdiction without -- not about forum selection, just vis-

7    à-vis sovereign immunity?

8              MR. SLAUGHTER:  I have --

9              THE COURT:  Got it?

10             MR. SLAUGHTER:  -- an answer, Your Honor.

11             THE COURT:  Okay, go ahead.

12             MR. SLAUGHTER:  So you need to take a look at the

13   Supreme Court decision in the Katz case, which dealt with

14   the question of waiver of sovereign immunity in the context

15   of bankruptcy.  And what the Katz court -- what the case

16   before the Supreme involved there was a preference claim and

17   what the Katz court reasoned was that, by ratifying the

18   Constitution which delegated to Congress the power to make

19   laws on the subject of bankruptcies, the states consented to

20   be sued under such laws.

21             The causes of action that Lehman is asserting

22   against Utah Housing in this case do not arise under any law

23   on the subject of bankruptcy.  It's not a preference claim,

24   it's not a fraudulent claim, it's not a claim of invalidity

25   due to ipso facto or any of the other types of causes of

Page 149

1    action that we think of when we think about laws on the

2    subject of bankruptcies.  And there have been a number of

3    cases since the Katz decision which have drawn precisely

4    this distinction, that if it is a bankruptcy cause of action

5    you don't need anything more, states have waived it.  But if

6    it's a cause of action that is simply a piece of property

7    that the debtor's estate under Section 541 it is not waived

8    by virtue of the adoption of the Constitution and,

9    furthermore, the statute itself, by which I mean the

10   Bankruptcy Code, has a provision dealing with abrogation of

11   state sovereign immunity and it excludes actions that are

12   simply property of the estate by virtue of 541.

13            So neither the adoption of the Constitution nor

14   Congress' intent in passing the -- in adopting the

15   Bankruptcy Code gives bankruptcy courts the power to preside

16   over actions that -- against estates that are not bankruptcy

17   actions, and that's the distinction.

18            In the DPH case, which I've mentioned multiple

19   times in the papers, is a non-precedential summary order,

20   you know, which you I'm sure saw and appreciated, but the

21   point about the DPH case is that that was a core -- it was

22   determined to be a core action, because it involved a

23   dispute over the ongoing administration of the debtor's

24   estate having to do with the workers' compensation claims,

25   as well as a claim asserted against the debtor's estate,

Page 150

1    which is one of, as you know, categories of core matters.

2         There is no claim against the debtor's estate that

3    could serve as a hook for that, nor is there any ongoing

4    administration matters that affect -- that could give you

5    like there was in DPH.  DPH found the dispute in there to be

6    a core dispute and on that basis it's distinguishable from

7    this even if it were otherwise precedential, which it isn't.

8    So, Your Honor, I think you've got the issues and you've got

9    our arguments.

10             THE COURT:  Okay.

11             MR. SLAUGHTER:  I would --

12             THE COURT:  Why don't I give Mr. Cox a chance to

13   explain to me why you're wrong.

14             MR. COX:  Thank you, Your Honor.  Christopher Cox,

15   Weil, Gotshal & Manges, appearing for the estate.

16             Your Honor, in listening to the colloquy, I'd like

17   to just focus in on the issues that seem to matter most to

18   you and --

19             THE COURT:  Or anything you like, that's fine.

20             MR. COX:  So the first thing I'd like to bring up,

21   Your Honor, is there is no dispute that venue is proper

22   here.  And if you read the Atlantic Marine case, which is

23   the central case that's cited by Utah Housing, it's

24   important to understand that in their venue analysis,

25   applying that here, venue is proper.  And so what we need to

Page 151

1    do is --

2                THE COURT:  Well, venue is proper in the sense

3    that the cause of action arose here.

4                MR. COX:  Yes, and it could be brought here.  And

5    so what Atlantic Marine says is you have to look at a forum-

6    selection clause in a contract, and then you need to either

7    apply the 1404 transfer rules or forum non conveniens.  And

8    what's really important here is to keep in mind that forum

9    non conveniens is always a discretionary order.  It's an

10   analysis by the court and the court exercises its discretion

11   as to whether or not it will keep the case or send it.  So

12   it always is based on discretion.  And here I'd like to just

13   discuss with you two reasons why the Court can and should

14   keep this case, both under the plain language and under a

15   forum non conveniens analysis applying Atlantic Marine.

16               So the first thing is plain language.  You focus

17   exactly on what the issue is here.  The forum-selection

18   clause doesn't say what Utah Housing says it says and that

19   would have been the easiest provision to ever write.  You

20   know, if there's only one court, which is the District Court

21   for the State of Utah in the County of Salt Lake, that is

22   the easiest venue provision you could possibly write.

23               THE COURT:  I agree, but just because you and I

24   and I think Mr. Slaughter all agree that we could have done

25   a better job drafting it or, if you had gotten this draft,

1    you would have crossed it out and said District Court of

2    Utah doesn't mean that when you track it all through, as

3    frankly I assume somebody did when they entered into these

4    80 swap agreements, that you track it through and you get to

5    the fact that what they really meant is Utah state courts,

6    that's what they really meant.

7              MR. COX:  Well, Your Honor, let's just apply, you

8    know, the first principles of contract analysis, right?

9    Which is let's look at the plain language and let's look at

10   it in context.

11             So the jurisdiction provision isn't limited to

12   simply this one little sentence that Utah Housing wants to

13   focus on, it's much broader than that, and what it breaks

14   down into is it provides for four possible venues for cases

15   arising under this contract.  The first one is in subsection

16   (i).  What it says is Lehman is submitted to the non-

17   exclusive jurisdiction of either the courts of the State of

18   New York, the United States District Court located in the

19   Borough of Manhattan, or the state or federal courts of

20   Utah, essentially, it's paraphrasing.

21             Now, that's how you write a mandatory provision,

22   right?  It's not that these people didn't know how to do it.

23   When we're talking about whether you're going to be in

24   federal court, it says the United States District Court

25   located in the Borough of Manhattan, it's very specific.

Page 153

1    And that's what mandatory clauses are, they're specific,

2    they say you shall go to this one place.

3            Now, let's focus on Utah Housing's provision.

4    Your Honor focused on the exact right language, right?  So

5    what it says is, "proceedings shall be brought only in the

6    courts or tribunals," plural, right?  They're telling you

7    now there's one court in one county, that's the only place

8    we could do it.  It says courts or tribunals.  And it

9    finishes off by saying that they submit to the jurisdiction

10   of such courts or tribunals.  If they were statutorily

11   obligated to be in one court --

12           THE COURT:  Right, why would they have to submit

13   to the jurisdiction.

14           MR. COX:  -- why would they submit to a

15   jurisdiction?  So when you read through the entirety of the

16   jurisdiction provision and with -- keeping in mind that's

17   the Court's obligation and duty to give meaning to all the

18   words of the claim and not to rewrite it or blue-pencil it,

19   but to give words to all the -- you know, meaning to all the

20   words, what it is is it's a permissive clause that discusses

21   bringing actions in four different jurisdictions and we're

22   in one of them right now, right?  So that's the first thing

23   to keep in mind.

24           The second thing to keep in mind is, regardless of

25   whether Your Honor finds this is mandatory or permissive,

Page 154

1    you still come out to the same place, because we're applying

2    Atlantic Marine.  And Utah Housing concedes whether

3    expressly or tacitly in its briefing that, whether you find

4    this permissive or mandatory, you can still hold onto this

5    case in applying Atlantic Marine.  And so I'd like to just

6    discuss a little bit about that.

7         So Atlantic Marine, the first thing we need to

8    look at are what are the facts, right?  So in Atlantic

9    Marine there was a contract and the contract had a provision

10   in it that said any disputes arising out of the contract

11   need to be filed in the state court of Virginia in Norfolk

12   or in the Eastern District of Virginia in Norfolk, very

13   specific.  So what did the plaintiff do?  The plaintiff went

14   to Texas and intentionally didn't follow the provisions of

15   the contract that required you to file in Norfolk.

16        And so in that case the court as a matter of

17   policy said in a forum non conveniens or a 1404 context,

18   we're not going to give deference to the parties' choice of

19   forum and we're not going to look at the private interest

20   factors such as availability of evidence, service of, you

21   know, process and all those other things, because the

22   plaintiff should have known better.  The plaintiff should

23   have filed in Norfolk, because when they negotiated this

24   contract they knew there was only place that there was going

25   to be a litigation and that litigation was in Norfolk.

Page 155

1          That's not the situation we have here.  What we have is

2     we have the Southern District of New York, federal court,

3     contemplated as a potential venue for this case.  So you

4     don't throw out the private interest factors and punish

5     Lehman for filing within a contemplated jurisdiction and say

6     we're not going to do the traditional forum non conveniens

7     analysis, because under the reading of this that I think is

8     the right one is this is a permissive clause.

9          And Utah Housing really doesn't fight on that at

10    all, right?  When you look at the private interest factors

11    discussed in the briefs, they give it a footnote to

12    basically say, yeah, there are witnesses in Utah.  But we

13    put in the Dean Melchior affidavit discussing where the

14    contract was signed, where the payments were made, where the

15    valuation was done.

16          And Your Honor has zeroed in on a very important

17    fact, right?  The actual valuation here was done by Schwab

18    Financial and we know Peter Shapiro is in New Jersey, right?

19    Schwab Financial is here.  And then when you're looking at

20    the different private interest factors, which is, one, the

21    plaintiff's choice of forum, the sources of proof, access to

22    evidence, and making the trial easy, expeditious and

23    inexpensive, they weigh heavily for this jurisdiction.  It's

24    within your Court's discretion to hold onto this case.

25          Now, even if you looked at the forum-selection

Page 156

1   clause and decided it was mandatory, Atlantic Marine says

2   you can still exercise your discretion, hold onto it, if the

3   case is unusual or there are extraordinary circumstances,

4   and that is passed over in Utah's briefing.  If you actually

5   read the briefing, they just said there's nothing

6   extraordinary to see here, move along.  But in reality, this

7   is the poster child for an extraordinary circumstance in

8   which the Court should hold onto a case and exercise its

9   discretion under a forum non conveniens analysis.

10          Now, there's no dispute --

11          THE COURT:  But that's just because you

12   characterize the experience of the Court with similar

13   actions, that's all that that is --

14          MR. COX:  Well, it --

15          THE COURT:  -- right?

16          MR. COX:  -- one, it is, but I think what we've

17   seen from the withdrawal of reference motions that have been

18   taken up at the District Court, they're really applying the

19   same factors that you would in the public interest factors

20   here.  And what they're saying is that this is

21   extraordinary, this is unusual.  And frankly, Your Honor,

22   what you're going to see in this case is you're going to see

23   this issue play out dozens of times, it's going to be the

24   same ISDA, it's going to be the same definition of loss,

25   it's going to be the same players.  You're going to see Swap

Page 157

1    Financial, you're going to see Cain Brothers, they all did

2    the same thing.

3            THE COURT:  Really?

4            MR. COX:  And if we peel off this one case and we

5    send it to Utah to a judge who is not steeped in these

6    issues --

7            THE COURT:  But who can become steeped in them.

8            MR. COX:  Absolutely.  But the point I'm trying to

9    make is that Lehman now is subject to inconsistent rulings.

10   What's going to happen is whatever happens in Utah is now

11   going to be argued to be collateral estoppel or res judicata

12   here --

13           THE COURT:  But that won't -- but that's not the

14   case.  You know better than that, that's not the case.  If

15   you file this suit in Utah and the Utah court finds that the

16   process was improper and that Lehman is owed an additional

17   amount, there is no collateral estoppel whatsoever as far as

18   the next case involving the next counterparty.

19           MR. COX:  That's right, Your Honor, but estoppel

20   is a one-way ratchet.  Utah Housing is a one-off player, if

21   they lose and we fund it, we don't get the benefit of

22   collateral estoppel or res judicata, it only works against

23   us.  So if the Utah court comes up with a different

24   interpretation of what loss requires --

25           THE COURT:  Right.

1          MR. COX:  -- then it can be used against us in an

2     estoppel --

3          THE COURT:  By whom?

4          MR. COX:  By anybody.

5          THE COURT:  But I don't understand that.  In the

6     next swap valuation/termination case, the fact that a judge

7     in Utah credits what Swap Financial did and finds that Utah

8     doesn't owe Lehman any more money has absolutely no weight

9     or bearing on what happens in the next case involving the

10    next swap counterparty where the circumstances surrounding

11    the termination and the replacements and all of the other

12    things that we do in those cases has no -- it has no bearing

13    on it.

14         MR. COX:  As a factual matter, that's absolutely

15    correct --

16         THE COURT:  Right.

17         MR. COX:  -- you're absolutely right.  From a

18    legal perspective on interpreting loss, what the parties'

19    obligations were under the contract at the time of

20    termination --

21         THE COURT:  I still wouldn't -- I mean, with all

22    due respect, it would not have -- be -- it would not carry

23    weight.  They're going to be my cases, I'm going to try

24    them, I'm going to say what the contract requires or not,

25    and that's just not going to have any weight.  The worst

Page 159

1    that can happen is that, you know, just as might happen

2    here, you don't know whether Lehman would prevail or not.

3    We don't know, because we don't know what the facts are.

4              MR. COX:  Well, it gets into, I think it was the

5    opinion in the Welmont (ph) case, right?  Which is it's very

6    important for the estate to have intra-case uniformity in

7    the decisions, who we're in front of --

8              THE COURT:  Sure.

9              MR. COX:  -- you know, what we're arguing, and

10   that is exactly a public interest factor that weighs heavily

11   on keeping that here.

12             And the point, Your Honor, which I'm just trying

13   to underscore is it's discretionary for you.

14             THE COURT:  Understood.

15             MR. COX:  But simply because this hasn't come up

16   yet -- that agreement was 2013, right?  I mean, every fact

17   pattern hasn't played out yet --

18             THE COURT:  Right.

19             MR. COX:  -- but I think it's clear and it's, you

20   know, acknowledged in Utah Housing's briefing that if you

21   find -- even if you found that this was mandatory, you're

22   still going to have the discretion to keep the case and

23   that's what we would urge you to do.

24             THE COURT:  Is there anything that you want to say

25   with respect to the sovereign immunity?

Page 160

1              MR. COX:  No, Your Honor.  You know, we cited the

2     DPH case.  I was frankly looking for the Katz opinion in my

3     papers while it was being discussed, so I could read it and

4     address the issues that were there.  But we think in this

5     situation, first, the DPH case does, you know, say that your

6     in rem jurisdiction would override any sovereign immunity

7     and we don't think it's necessary that it be

8     constitutionally waived in that situation, it's a different

9     situation.  And so I would just leave it at that.

10             THE COURT:  All right, thank you.

11             MR. COX:  Thank you, Your Honor.

12             THE COURT:  So, Mr. Slaughter, what about the

13    argument that there are multiple courts that are mentioned?

14             MR. SLAUGHTER:  Your Honor, I was hoping to have

15    the opportunity to answer that.

16             THE COURT:  Okay.

17             MR. SLAUGHTER:  The provision that they're talking

18    about is a provision that applies generally, the provision

19    that we're talking about is the provision that applies to

20    proceedings against Utah Housing.  The provision they're

21    talking about is that a general submission jurisdiction,

22    non-exclusive jurisdiction of the states of New York, the

23    United States of New York City, the federal courts, as well

24    as the state and federal courts of Utah.  That's the general

25    provision, which would apply, for example, if Utah Housing

Page 161

1    were the plaintiffs.  But proceedings against Utah Housing,

2    which after all is the sovereign entity in this contract,

3    may only be brought where Utah law permits them to be

4    brought.  And the generally submission to jurisdiction of

5    the state and federal courts here, there and in Utah is not

6    what applies to actions or proceedings against Party B.

7    There's a specific, separately negotiated clause that's in

8    the --

9            THE COURT:  Well, what about the conflict with the

10   provision, I think it's Section 63(g)(7) 5023, that says

11   that venue is proper in the county in which the claim arose?

12           MR. SLAUGHTER:  Your Honor, let me address that,

13   because --

14           THE COURT:  Sure.

15           MR. SLAUGHTER:  -- I don't think I -- in answering

16   your questions before, I didn't think I got to it.  So they

17   cite the general venue statute of Utah.  Number one, that's

18   not applicable to cases against state agencies.  There is a

19   specific statute that's applicable to cases against state

20   agencies and that statute says, as we've discussed, only in

21   the courts of Utah.  Even if you could bring an act -- even

22   if the Utah general venue statute could be interpreted to

23   say you can sue other defendants where the cause of action

24   arose even if it's out of state, which I don't think, by the

25   way, is the correct way to look at a state venue statute.

Page 162

1    The correct way to look at the state venue statute is, when

2    you're in the state courts, which county do you go to, not

3    do you go to New York or Timbuktu.

4           It has to do with -- not to suggest that New York

5    isn't a great place to be too, but it's -- the general venue

6    statute is talking about which counties in Utah you may

7    bring an action and one of those is of course where the

8    cause of action arose.  That's not -- even if that gave them

9    what they wanted, it's not applicable here.  The provision

10   that's applicable here is the one dealing with claims

11   against state agencies and that statute, as we have said,

12   provides that it can only be brought --

13          THE COURT:  Is -- by way of background, has this

14   claim -- I truly don't know the answer to the question --

15   has this claim gone through any sort of ADR?

16          MR. SLAUGHTER:  Yes.

17          THE COURT:  It has?

18          MR. SLAUGHTER:  We've had ADR proceedings,

19   submission of extensive submissions.  I'm sure that you know

20   what goes on.  We had a full day in -- of negotiations,

21   which I won't characterize as other than to say that they

22   did not result in an agreement.  And I don't think that the

23   mediation is technically closed, but there hasn't been --

24          THE COURT:  Do you believe that continuing the

25   conversation would help?

Page 163

1              MR. SLAUGHTER:  No.  I -- you asked a straight

2    question --

3              THE COURT:  I asked, you answered.

4              MR. SLAUGHTER:  -- I'm giving you a straight

5    answer.  Judging -- no -- who knows whether people's

6    positions would change, but judging from the positions that

7    have been articulated to us and judging from our evaluation

8    of the merits, I don't think --

9              THE COURT:  Are you familiar with a case involving

10   the Washington Tobacco Settlement Authority?

11             MR. SLAUGHTER:  I don't know.  I can't possibly --

12   I don't remember which one that is.

13             THE COURT:  Well, it was one in which I believe we

14   had nine days of trial and probably two days of testimony by

15   Mr. Shapiro sitting right there, and the case ultimately

16   settled.

17             MR. SLAUGHTER:  So Mr. Shapiro just -- you may

18   have formed a judgment about him, he is not the person who

19   advised Utah Housing.

20             THE COURT:  Swap Financial Group is the entity

21   that was involved, just by way of background.

22             MR. SLAUGHTER:  Your Honor --

23             THE COURT:  I just like everybody to have all

24   facts that might be relevant to their consideration of the

25   way to terminate a dispute.

Page 164

```
 1              Mr. Cox, do you believe that further discussions
 2     would be a good idea?
 3              MR. COX:  Of course, we always think that
 4     settlement is a better option than litigating.
 5              THE COURT:  So why don't you folks agree to go
 6     have one more session before I render a decision and then
 7     I'll render a decision.
 8              MR. SLAUGHTER:  Your Honor, if you order us to do
 9     it, we will do it.  I have no authority to agree voluntarily
10     to do it.
11              THE COURT:  Well, why don't you inquire --
12              MR. SLAUGHTER:  I will.
13              THE COURT:  -- of your clients and you can report
14     back --
15              MR. SLAUGHTER:  Of course.
16              THE COURT:  -- and we'll go from there.  And
17     depending upon what the answer is, I'll issue a decision
18     shortly after that.  But I very much appreciate the papers,
19     the thorough arguments and getting a chance to talk to you
20     about the issues today.
21              MR. SLAUGHTER:  Thank you, Your Honor.
22              THE COURT:  All right?  Thank you.
23              Okay.  Do the folks in the U.S. Bank case
24     adversary wish to proceed now or are we to turn to Moore
25     Macro next?
```

Page 165

1          MR. COSENZA:  Sure, Your Honor.

2          THE COURT:  Mr. Cosenza, are you ready?

3          MR. COSENZA:  Yeah, we're ready, we're ready.

4          THE COURT:  All right, why don't you come on up.

5          MS. MARCUS:  Your Honor, may we be excused?

6          THE COURT:  Yes.  Thank you, Ms. Marcus.

7          MS. MARCUS:  Thank you.

8          THE COURT:  Mr. Cosenza, I'm quite sorry that you

9    had to make two trips down here today.  Had I realized that,

10   I would have tried to save you the subway fare.

11         MR. COSENZA:  No, no worries, no worries at all,

12   Your Honor.  We actually had to accommodate I think Mr.

13   Burke's schedule --

14         THE COURT:  Okay.

15         MR. COSENZA:  -- because he had an appearance

16   before Judge -- I forget which judge, but he was down here

17   on another matter.

18         THE COURT:  Okay.

19         MR. COSENZA:  Good afternoon, Your Honor.

20         THE COURT:  Good afternoon.

21         MR. COSENZA:  Unlike our proceeding this morning,

22   which seemed to go relatively smoothly, unfortunately, I

23   have to report that since our last appearance before you

24   three weeks ago things have not gone smoothly in this

25   matter.  There's been a failure of the parties to agree to a

Page 166

1    briefing schedule on the issue that you raised during our

2    last argument, our ninth count, which is basically what I'll

3    describe in short as the standing issue.  We've also had an

4    inability to reach a schedule on the briefing for the

5    reserved motion.  (Indiscernible) counsel immediately

6    before, you know, this conference seemed amenable to the

7    briefing schedule we proposed in our letter, so hopefully

8    that will move things along.

9            But there are two, I think, big issues here, Your

10   Honor.  One is, we've received notice from Green Point -- or

11   actually we didn't receive notice, but we saw in a letter

12   that was submitted to the state court judge that Green Point

13   is going to ask Your Honor to abstain from deciding the

14   standing issue.  We didn't -- I know Your Honor, I don't

15   think is copied on this letter.

16           THE COURT:  Was Green Point here when we were all

17   together last time?

18           MR. BURKE:  Yes, Your Honor, we were.

19           THE COURT:  And you didn't think it would be a

20   good idea to mention that to me?

21            MR. BURKE:  This was a decision subsequent to

22   that hearing.

23             MR. COSENZA:  Your Honor, I have a copy --

24           MR. BURKE:  They had just been served with a

25   complaint at that time.

1          MR. COSENZA:  So, Your Honor, that's one issue

2    that needs to be addressed today.  The second issue which --

3    you know, obviously, we're moving to --

4          THE COURT:  We were all here.  And there was

5    absolutely no suggestion that the course of action that I

6    was suggesting which was designed primarily to address the

7    concerns of the parties in the state court action that I not

8    do anything to interfere with that action which Lehman's

9    proposed course of action will not do.  You didn't think

10   that it was, I don't know, the right thing to do to mention

11   that if we go down that path, you might be asking the state

12   court -- you might be asking me to abstain?  That's just not

13   the way I'm used to having folks operate.  That's pulling

14   punches.

15         MR. BURKE:  No, Your Honor.  It was not something

16   we had discussed or entertained prior to that conference.

17   So it was not something we could have raised with you at

18   that time.

19          THE COURT:  So out of that conference should

20   have come the conclusion that I just have to sit here and do

21   nothing because that's what you were saying was that I just

22   have to sit there and do nothing as I preside over this case

23   and with the greatest respect to the state court judge, how

24   ever long it takes, I don't what he or she has on their

25   plate, that I just have to do nothing instead being

1    practical and seeking to move along the administration of

2    the case.  I proposed that we do certain things.  Everyone

3    seemed to be in agreement or amenable to it.  And now I'm

4    being told that that was a fool's errand.  And that makes me

5    unhappy.

6              MR. BURKE:  I'm sorry, Your Honor.  That was not

7    our intention.  However, after reviewing all of the issues

8    and all of the facts, we have reached the conclusion that

9    we, number one, we'll move to dismiss this complaint as to

10   Greenpoint.  And the Court is perfectly free to address all

11   of the issues relating to U.S. Bank's claim and Syncora's

12   claim that don't involve us.  So we think you have all the

13   tools you need to deal with what Lehman really cares about.

14   You don't need us here for that.  But in considering whether

15   that process made the most sense, we reached a conclusion

16   that, no, the state court's been working on this for six

17   years.  This should be there not here.

18             THE COURT:  Because it's here doesn't mean it's

19   not still there.  I expressly declined to do anything to

20   interfere with the disposition of what's pending in the

21   state court.

22             MR. BURKE:  And that motion is still pending, Your

23   Honor.  Your Honor has not decided that motion.  The motion

24   to stay is still out there.

25             THE COURT:  Would it make a difference if I were

1    to deny the motion to stay?  I don't think so based on what

2    you just said because if that's the issue, you could have

3    just said it.

4              MR. BURKE:  I tried to at the end of the

5    conference, Your Honor.

6              THE COURT:  Okay.

7              MR. BURKE:  And Your Honor made the speech that

8    you made, that you needed to take it under advisement.

9              THE COURT:  Okay.  I'm all hearing this in real

10   time so I'm not going to try to overreact.  I'm simply

11   trying to react to these new facts and to the feeling that

12   parties weren't as forthright with me.  Your statement that

13   you didn't think of it at the time, I accept at face

14   value --

15             MR. BURKE:  Yes.

16             THE COURT:  -- and we can go from there.  But I

17   don't believe that anything that I've undertaken to do here

18   in any way should interfere or diminish what happens in the

19   state court.  Everyone agreed -- everyone agreed that

20   because Lehman's not a party there, it had to be able to do

21   what it needed to do that what happened there wouldn't

22   collaterally estop Lehman.  So simply by saying to Lehman do

23   what you need to do here was a way of addressing everybody's

24   concerns.  Now you --

25             MR. BURKE:  Vis-à-vis the other two parties and

1     the people who are here because they filed claims here, yes.

2               THE COURT:  Okay.  Well, Mr. Cosenza is knitting

3     his brow and I'm knitting my brow back and forth because I'm

4     not sure I really understand the nuances of what you're

5     saying.  So I don't --

6               MR. BURKE:  We're not -- we're not needed.  Your

7     Honor has all the tools you need to address Syncora and U.S.

8     Bank's claims, the estimation proceedings, all of the things

9     that --

10              THE COURT:  They want to bring an action regarding

11    the validity of the assignments.  That's what they want,

12    right?

13              MR. COSENZA:  That's correct, Your Honor.

14              THE COURT:  That's what they want to do.

15              MR. BURKE:  And that issue is what is directly

16    before the state court and was --

17              THE COURT:  Albeit not with Lehman as a party.

18              MR. BURKE:  Correct.

19              THE COURT:  Okay.  Well, why don't we leave it

20    there and we'll see what happens --

21              MR. BURKE:  In the interest of full --

22              THE COURT:  At the same time that you inform the

23    state court, you might have cc'd this Court.

24              MR. BURKE:  I'm sorry about that, Your Honor.  In

25    the interest of full disclosure, we will also be moving to

Page 171

1    withdraw the reference for this case as well for the same

2    reasons.

3                    THE COURT:  Okay.

4                    MR. COSENZA:  Your Honor, I don't want to continue

5    to dwell on this but just for your reference, may I

6    approach?  And this is the letter that we were able to pull

7    off the state court docket that was sent regarding --

8                    THE COURT:  Sure.

9                    MR. COSENZA:  -- the extensions to --

10                   THE COURT:  Thank you.

11                   MR. COSENZA:  So, Your Honor --

12                   THE COURT:  Could you give me a moment to read it?

13                   MR. COSENZA:  Sure.

14       (Pause)

15                   THE COURT:  Okay.  Go ahead.

16                   MR. COSENZA:  Your Honor, and in terms of its

17   development and also the -- we've had very significant

18   difficulty.  One, getting all the parties to agree to a

19   suitable confidentiality stipulation in order that will

20   allow us to provide access to --

21                   THE COURT:  That seems like it was just resolved

22   within the last couple of hours.

23                   MR. COSENZA:  Correct.  So I think that now has --

24                   THE COURT:  Okay.

25                   MR. COSENZA:  That issue now should be to the

Page 172

1    side.  It's critical because that actually is -- approving

2    that order now sort of sets a timetable to setting up a full

3    briefing schedule on the ninth cause of action that allows

4    us to provide access to --

5              THE COURT:  Right.

6              MR. COSENZA:  -- all the New York state court

7    proceeding materials and also provide Greenpoint with access

8    to the unredacted version of the --

9              THE COURT:  Let me ask a follow-up question now

10   that I've been told not only about the request to abstain

11   but the motion to withdraw the reference.  Is there also

12   going to be a request for a stay pending a decision on the

13   motion to withdraw the reference?

14             MR. BURKE:  Yes, Your Honor.  Yes, Your Honor.

15             MR. COSENZA:  Your Honor, we're also -- this is

16   also the first we're hearing of this as well.

17             THE COURT:  Okay.  I mean, I assumed since I

18   assume counsel understands that the filing of a motion to

19   withdraw the reference doesn't affect the stay that,

20   naturally, there would be a request to stay pending

21   consideration of the motion to withdraw the reference.  So

22   just kind of filling out the picture here.

23             MR. COSENZA:  So, Your Honor, so on that issue in

24   terms of the briefing schedule, we would like -- we've tried

25   to work through --

Page 173

1          THE COURT:  All right.

2          MR. COSENZA:  -- with the parties -- All right.

3    So let's work out a schedule today.  So first -- so there's

4    two separate schedules, right, Mr. Cosenza?

5          MR. COSENZA:  Correct.  Correct.

6          THE COURT:  Okay.  So why don't you -- let's take

7    one.  Which one should we do first?

8          MR. COSENZA:  The first one, I think, is

9    (indiscernible) top.  I think the first one should be the

10   "standing issue" and the timing for that.  That's the

11   Greenpoint --

12         THE COURT:  Okay.

13         MR. COSENZA:  -- motion.

14         THE COURT:  And what's the bid and the ask on

15   that?

16         MR. COSENZA:  So I think the bid and the ask is

17   within -- excuse me -- the confidentiality order gets

18   entered within three days of the filing of the briefs, that

19   the papers would be submitted to you in a form of summary

20   judgments.  I guess Lehman will file with you and deal with

21   the Court on our papers.  So we'll get them to you within

22   three days.  And then at that point, we'll start sort of the

23   briefing schedule.  So we would like to have the defendants

24   in this case put in whatever supplements they need to

25   whatever's been put into the briefs.  Obviously, they're

Page 174

```
1     very familiar with the record already.  Just something that

2     needs clarification or to give you an update on where things

3     are within seven days of the filing of the papers from the

4     New York state court action.  And then we're not sure, as I

5     said last time, since we haven't access to all the briefings

6     and the unredacted version of the documents whether Lehman

7     will submit anything.  But if we do, I think we'd want to

8     submit something quickly within seven and we'd propose --

9     within seven days of Defendants filing their papers.  So

10    we're proposing a very quick schedule, Your Honor.  We

11    really think this is an important issue to be teed up and

12    decided 'cause that will dictate the course of this

13    proceeding.

14              THE COURT:  All right.  So why don't I hear from

15    these folks --

16              MR. COSENZA:  And I'll come back on Syncora.

17              THE COURT:  Sure.  Yeah.  So it's a little

18    difficult given that you've now said you're going to file

19    papers that seek to have me do nothing.  Nonetheless, we

20    need a briefing schedule.

21              MR. BURKE:  Understood.

22              THE COURT:  Okay.

23              MR. BURKE:  And subject to reserving all of our

24    rights under the other motions we're going to make.

25    We're --
```

Page 175

1          THE COURT:  Okay.

2          MR. BURKE:  -- prepared to address that.

3          THE COURT:  Okay.  So what's your counteroffer to

4     the seven days and seven days?

5          MR. BURKE:  Greenpoint's position is they are

6     happy with the papers the way they are.  They don't need

7     time to put in a response to the papers.

8          THE COURT:  Okay.

9          MR. BURKE:  What we need is if Lehman determines

10    it's going to submit something on its own that we have an

11    adequate time to reply.  So that --

12         THE COURT:  Okay.

13         MR. BURKE:  That's all we need.

14         THE COURT:  All right.  So that's fine.  So how

15    long do you think that you would like?  You're going to tell

16    me it depends on what they say.

17         MR. BURKE:  Well, there is discovery in the

18    underlying case.  If they start citing documents that

19    weren't in the original papers, there may be some issues

20    about getting the counter documents or contacts documents

21    but it won't take

22    long --

23         THE COURT:  It won't take long.  Okay.

24         MR. BURKE:  -- to respond if they put theirs in,

25    their proposal is now two weeks from tomorrow, I guess, is

Page 176

1    what they propose.

2              THE COURT:  Right.  So two weeks from tomorrow

3    takes us into the first week of August.

4              MR. BURKE:  Two weeks from that point should be

5    plenty for us.

6              THE COURT:  So two weeks from that point no matter

7    what, right?

8              MR. BURKE:  Unless the case is stayed.

9              THE COURT:  No.  I've moved off of that.  No.  I

10   meant no matter what Lehman puts in as a supplement, right?

11             MR. BURKE:  Yes.

12             THE COURT:  Okay.  And then so two weeks from the

13   23rd, that takes you to August 6th, right?

14             MR. BURKE:  That would theirs.

15             THE COURT:  That would be theirs.

16             MR. BURKE:  Right.

17             THE COURT:  And then two weeks after that would be

18   yours, would be August 20th, right?  And then they're saying

19   seven days after that.  But I think to be fair, two weeks

20   after that would bring us still -- everyone would be done in

21   time for the Labor Day weekend subject to whatever else

22   happens on whatever else you're filing.

23             MR. BURKE:  Yes.  And I only speak to Greenpoint,

24   not to the others.

25             THE COURT:  Okay.  So, Mr. Cosenza, subject to

Page 177

```
 1    hearing from the others, does that two and two work -- two,

 2    two and two work for you?

 3              MR. COSENZA:  Yeah.  That's fine, Your Honor.

 4              THE COURT:  I think seven days is a little tight

 5    especially in the summertime.

 6              MR. COSENZA:  I guess we can take a few more --

 7    you know, a couple more days.  But I guess we should also

 8    just get out a calendar and sort of documents these and --

 9    so we don't have to go back.

10              THE COURT:  So if you're going to do what you're

11    going to do by August 6th --

12              MR. COSENZA:  Yes.

13              THE COURT:  -- right?  And they're going to do

14    what they're going to do by August 20th.  And then you would

15    have two weeks after that.

16              MR. COSENZA:  That's perfect.  That's perfect.

17              THE COURT:  All right.  And that gets you one --

18    that gets you to Thursday, September 3rd, which is the

19    Thursday before Labor Day.

20              MR. COSENZA:  And also my birthday.

21              THE COURT:  Happy birthday.  Then you can file on

22    the 2nd so that your birthday can be free.  Are the other

23    folks all right with that schedule?

24              MR. CRAIG:  We're fine with that --

25              THE COURT:  Okay.
```

Page 178

1            MR. CRAIG:  -- if the Court is fine with that.

2            THE COURT:  Okay.

3            MS. BOLAND:  And so as U.S. Bank --

4            THE COURT:  Okay.

5            MS. BOLAND:  -- is concerned, Your Honor.

6            THE COURT:  Thank you very much.  Is Lehman all

7    right with that schedule, Mr. Cosenza?

8            MR. COSENZA:  Yes, I am, Your Honor.

9            THE COURT:  Okay.

10           MR. COSENZA:  I just have one point of

11   clarification.

12           THE COURT:  Sure.

13           MR. COSENZA:  I'm sort of confused by the timing

14   of the motion that's being proposed by Greenpoint.

15           THE COURT:  The timing hasn't been specified for

16   either the motion for abstention or the motion to withdraw

17   the reference.  So --

18           MR. COSENZA:  And the sequencing is for --

19           THE COURT:  Hasn't been specified.

20           MR. COSENZA:  Okay.  So with that, I'm sort of --

21           THE COURT:  So there's nothing I can say about

22   motions that haven't been filed other than the observation

23   that I made which counsel seems to understand and agree that

24   the mere filing of a motion to withdraw the reference

25   doesn't work a stay of anything unless I order that it be

Page 179

1    stayed.

2              MR. COSENZA:  So, Your Honor --

3              THE COURT:  And similarly then a stay can be

4    sought in the district court.

5              MR. BURKE:  If denied by Your Honor.

6              THE COURT:  If denied by me.

7              MR. COSENZA:  So, Your Honor, I guess we would

8    request some sense to the timing because, you know,

9    obviously, if there's going to be intense breakdown on this

10   other issue, I'd like to get a sense as to what they're

11   planning on doing.

12             THE COURT:  Well, sure.  I mean, as a courtesy, I

13   think that that would be --

14             MR. BURKE:  Sure.

15             THE COURT:  -- a good thing to do.

16             MR. BURKE:  Our deadline to respond to the

17   complaint is August 4th.  The motion will be no later than

18   that.  We hope to get it on file next week.

19             THE COURT:  Both motions.

20             MR. BURKE:  Correct.

21             THE COURT:  All three motions.

22             MR. BURKE:  Correct.

23             MR. COSENZA:  Does that include the stay motion?

24             MR. BURKE:  Yes.

25             THE COURT:  Why don't you -- can we take a couple

Page 180

1    of minutes.  I think Mr. Kantor is trying to digest

2    everything that's happening.  Okay.  So why don't we just

3    take a moment and let them speak and then we can keep going?

4         (Pause)

5              MR. COSENZA: Your Honor, we're going through, and

6    this is all news to us.  But one thing that does pop out at

7    us is there was the stay motion that was pending several

8    weeks ago that the parties basically agreed what to decide

9    so we can move forward on sort of what we thought was a

10   reasonable approach not impacting the state action but have

11   Your Honor decide the ninth cause of action.

12             THE COURT:  Right.

13             MR. COSENZA:  And the person --

14             THE COURT:  And they obviously don't like what

15   happened --

16             MR. COSENZA:  Yes.

17             THE COURT:  -- right?

18             THE COURT:  They didn't want me to stay it.  I

19   said I wasn't going to stay it.  And then I said I'm not

20   going to stay it but I'm going to do what I'm going to do

21   here.  And they obviously went back and their clients said

22   don't let the bankruptcy court do anything.  So now they're

23   filing a slew of motions.  So you can tell that I'm not

24   exactly -- you can tell that I'm reacting with surprise to

25   that because I believe that it's inconsistent where things

Page 181

1     were left which was that the state court absolutely should

2     do whatever it needs to do on whatever schedule it wants to

3     do it on but that I was going to proceed.  I will consider

4     the motions that they filed on the merits.  I think the

5     track record here -- I'm not making it up.  You can go

6     search the docket.  The track record on motions to withdraw

7     the reference is that almost across the board, they are

8     denied with respect to anything that has to do with anything

9     like this.  Every once in a while, they aren't denied.

10    Whatever district court judge gets this motion to withdraw

11    the reference will decide it.

12            So there's nothing more that I can say.  I've

13    already reacted, perhaps too much to motions that haven't

14    been filed yet, but to me, this new game plan just strikes

15    me as being inconsistent with the spirit of what we did at

16    the last hearing which was largely, I thought, to give the

17    defendants exactly what they wanted and they expressed no

18    opposition to allowing Lehman to do what it needed to do.

19            So, you know, I said it six different ways --

20            MR. COSENZA:  Yes.

21            THE COURT:  -- now and I just have to -- there's

22    also a precedent in what we refer colloquially as to as the

23    distributed action in which something not dissimilar

24    occurred and Lehman filed a motion to compel me to withdraw

25    -- someone to withdraw a motion to withdraw the reference

Page 182

1   which I denied.  And then it went up to the district court.

2   So there's a limit to what I appropriately can do and I've

3   now reached that limit including reaching a limit of my

4   patience.

5           MR. COSENZA:  I understand, Your Honor, and we're

6   sort of surprised and disappointed as well because we

7   thought we had a reasonable game plan going forward on this.

8           Should I move to simpler --

9           THE COURT:  Yeah.  So why don't you move to the

10  reserve motion?

11          MR. COSENZA:  So, Your Honor, you know, I raised

12  this issue at the last hearing.  It seems as though now

13  there's some agreement on the schedule.  I do want to raise

14  to you one, I think, sort of overarching point here which is

15  there's no doubt in our view and in the plan administrator's

16  view that we are all reserved for this claim by a

17  significant amount of money.  I think we know that the

18  reserve right now is way too high.  We haven't gotten a firm

19  view as to what the actual losses here incurred by Syncora

20  are.  We're going to get that out during the briefing.

21  We're going to have some targeted document discovery to try

22  to understand what their precise losses are so we can

23  actually get a pinpoint estimate 'cause we really think

24  there's an obligation here on our part to get the money out

25  to the creditors.  And this money shouldn't just be tied up

Page 183

1    and sort of a nebulous claim that this doesn't have much

2    basis.

3              The second component of this is, Your Honor, U.S.

4    Bank is the trustee for this particular trust.  And one

5    other issue which we've raised in our adversary complaint

6    but maybe it's, in light of today's hearing and having to do

7    moving on the protocol, U.S. Bank -- we're thinking about

8    how the protocol should work.  Given the loans that are in

9    this trust, you know, U.S. Bank will basically have to work

10   their losses for -- of actual losses incurred by this trust.

11   Another way of actually getting to the right number would be

12   U.S. Bank actually going to the loan by loan process for the

13   loans that are in this particular trust and go through the

14   steps of the protocol to sort of actually come to a number

15   that is, you know, the right number and whatever the

16   additional reserve is for this particular claim to be dealt

17   with swiftly and the monies, whatever it is, to be paid out

18   to U.S. Bank as the trustee and the rest of the money to be

19   released out to the creditors.

20             So there's almost two issues here.  We have one --

21   and they're tied together.  You have one is an over reserve

22   for the Syncora claim and obviously part of the five billion

23   dollars, that's already reserved for the RMBS claims.  Part

24   of that is attributable to this trust and we do want to sort

25   of go through and figure out what money we owe on that.  And

Page 184

```
 1    that has been working so far with the protocol and maybe the

 2    time has come for U.S. Bank to take a move and try to put

 3    those loans through the protocol so we can get to the right

 4    number and pay off that claim to this particular trust --

 5             THE COURT:  So are you suggesting --

 6             MR. COSENZA:  -- and try to wrap this up.

 7             THE COURT:  So are you suggesting that, in effect,

 8    the modification to the protocol that causes U.S. Bank to

 9    kind of jump the line?  I'm not clear on how the two things

10    fit together.

11             MR. COSENZA:  Yeah.  No.  I think so -- I think

12    you raise a good point.  I think what we would -- if U.S.

13    Bank went through the protocol for these particular loans in

14    this one trust, Lehman Brothers would move quickly.  And we

15    can work out an accelerated time frame to try to go through

16    these particular claims 'cause we do think the five -- some

17    portion of the five billion plus the 600 million is way over

18    reserved for this particular trust unless it is associated -

19    -

20             THE COURT:  So now I'm trying to understand --

21    'cause this is now new as well to me and perhaps to these

22    folks.  So would that be in lieu of proceedings on reducing

23    the reserve?

24             MR. COSENZA:  No.  I think it's part of the same

25    motion.  You know, the first step is sort of understanding
```

Page 185

1    what Syncora's losses are would be to go through and figure

2    out for the reserve what that number should be.  And once

3    that we figure out what generally what that number should be

4    based on their losses and what they think their losses are,

5    we get to that number for the reserve.  And then the next

6    step would be to go through the protocol process to this

7    particular one trust and those loans to see what part of the

8    reserve is actually absorbed through the losses that are put

9    forward --

10             THE COURT:  Are these loans --

11             MR. COSENZA:  -- leading to that particular trust.

12             THE COURT:  -- otherwise in the protocol, though?

13             MR. COSENZA:  They --

14             THE COURT:  Is it one of the trusts that's subject

15   to the protocol?

16             MR. COSENZA:  Yes.  It's not --

17             THE COURT:  Okay.  That was the disconnect --

18             MR. COSENZA:  Yeah.  That's --

19             THE COURT:  -- that I was having.  It's not

20   otherwise -- it's not one of the group of trusts that's in

21   the protocol.

22             MR. COSENZA:  Correct.  As of now, yes, that's

23   correct.

24             So, Your Honor, I guess, just highlighting it so -

25   - in terms of a briefing schedule on the motion to lower the

Page 186

1    reserve, I think that's step 1 for handling this claim to

2    try to figure out what these incurred losses are.  Once you

3    get to that and you get some money out to the creditors,

4    step 2 would be, okay, what are the actual losses --

5                 THE COURT:  Right.

6                 MR. COSENZA:  -- incurred by this.  And that's

7    what we're proposing for this.

8                 THE COURT:  Okay.  So now I've got knitted brows

9    over here.  I'm not sure these folks understand what it

10   fully means to go through the protocol.  And it's now been

11   confirmed that they're not in the protocol already.

12                MR. COSENZA:  Sure.

13                THE COURT:  So let's try to get one thing done.

14   Is there an agreement on the briefing schedule to reduce the

15   reserve?

16                MR. COSENZA:  I believe there is.  John?

17                MR. CRAIG:  Yes, there is, Your Honor.

18                THE COURT:  There is.  Okay.  So why don't you

19   tell us what that is?

20                MR. COSENZA:  I think it's what's set forth in our

21   letter, right?

22                MR. CRAIG:  Sure.

23                THE COURT:  It's what's in the letter?

24                MR. COSENZA:  Yeah.  So I believe we have August

25   31 for our motion.

Page 187

1              THE COURT:  Okay.

2              MR. COSENZA:  Syncora's opposition, September 21.

3     And then Lehman's reply, September 28th.  I do want to flag

4     for Your Honor that we are going to, again, going to have

5     some targeted discovery.  The documents and potentially even

6     a deposition but we're not certain on that to sort of

7     understand where their losses are coming from.

8              THE COURT:  All right.  I don't think I'm in a

9     position to give you -- you haven't asked but I'm not in a

10    position to give you a hearing date right this --

11             MR. COSENZA:  Sure.

12             THE COURT:  -- moment.  Presumably, you'd be

13    looking for something in October.

14             MR. COSENZA:  That's correct, Your Honor.

15             THE COURT:  Okay.  Well, if you could give us some

16    time to regroup, we can give you a hearing date.

17             MR. COSENZA:  That would be great.

18             THE COURT:  And we can do that before you file it.

19             MR. COSENZA:  Thank you, Your Honor.

20             THE COURT:  All right.  So we're going to leave

21    the issue of implementation of the protocol for another day.

22    Perhaps what would make sense is for you to talk to these

23    folks about it, explain it to them.  Try to persuade them

24    that would be a fruitful exercise.  And then maybe the next

25    time you come back we could see where that stands.

Page 188

1                MR. COSENZA:  Sure.  That makes sense, Your Honor.

2                THE COURT:  Okay.  But it sounds like, again, in

3      the interest of having as few surprises as possible, are we

4      going to be going on a standard briefing schedule for the

5      motions that are about to be filed?  Because I will tell you

6      that it is August and I am planning on not being here for at

7      least a day.

8                MR. BURKE:  We have no concern about how that

9      plays out.  I'm sure they'll want time to put in their

10     response.

11               THE COURT:  Right.  All right.  Well, I'm going --

12               MR. BURKE:  The stay motion may be more urgent

13     than others.  But --

14               THE COURT:  Okay.  Well, first the motion to

15     withdraw the reference has to be filed before you can ask me

16     to stay doing anything while it's filed.  So I think I'm

17     just going to wait and see.  And to the extent that --

18               MR. BURKE:  We will notice it out then under the

19     regular -- the Court's protocol and Lehman's protocol

20     (indiscernible) motions in this case.

21               THE COURT:  Okay.  So you're not going to be

22     seeking short notice.

23               MR. BURKE:  Correct.

24               MR. COSENZA:  We may -- obviously, Your Honor,

25     we'll look at their papers.  If we need additional time,

Page 189

1    we'll --

2                THE COURT:  Sure.

3                MR. COSENZA:  -- see how it plays out.

4                THE COURT:  Right.  First choice is that you work

5    it out.

6                MR. COSENZA:  Yes.

7                THE COURT:  But then to the extent that you're not

8    even -- if I'm not physically here, I'm reachable.

9                All right.  Mr. Cosenza, do you want to take a

10   minute?  'Cause I still see Mr. Kantor talking and I'm not

11   yelling at him but I ordinarily would.

12               MR. SHALOUB:  I think I could ask the questions --

13   I'm sorry, Your Honor.  Paul Shaloub for Willkie Farr.  I

14   could ask at Mr. Kantor's request that we now take a break.

15   He's inquiring as to whether or not the motion for

16   abstention, if they're going to make that request in this

17   court or in the district court.

18               MR. BURKE:  The motion to withdraw the reference

19   will be made in this court and transferred to the district

20   court.

21               THE COURT:  Yes.  He's asking with respect to the

22   motion for abstention.  That's --

23               MR. BURKE:  Well, that will be part of the motion

24   to dismiss.  It will be wrapped into the motion to dismiss.

25               THE COURT:  That's filed here.

Page 190

1          MR. BURKE:  Yes.

2          THE COURT:  Right.

3          MR. COSENZA:  Thank you, Your Honor.

4          THE COURT:  Any other lessons today on motions

5    that can be filed?  All right.  Thank you all very much.

6       (A chorus of thank you)

7          THE COURT:  We'll enter the -- as a housekeeping

8    matter, Mr. Cosenza, we need to enter the sealing order,

9    right?

10          MR. COSENZA:  Correct.  Do you need a copy?

11          THE COURT:  Do we have that?

12          MR. COSENZA:  I have a copy.

13          THE COURT:  We need --

14       (Pause)

15          THE COURT:  Do we have a Word version -- you have

16    to send Kevin a Word version.

17          MR. COSENZA:  Okay.  I'll send him --

18          THE COURT:  Okay.  Okay.

19          All right.  I think that brings us to Moore Macro.

20          Two bottles of water, Mr. Tambe?  Really?  Does

21    one have scotch in it maybe or vodka.

22          MR. TAMBE:  I might wish it had scotch in it.

23          THE COURT:  Okay.  I want to make a preliminary

24    statement.  My preliminary statement is that this situation

25    is pretty out of control.  And the papers from time to time,

Page 191

1    this time, take on ad hominem type characteristics and I

2    don't like that at all.  I believe that there were things

3    that were said in various letters that shouldn't have been

4    said.  And I think that the papers reflect an escalation of

5    hostilities that I really want to stop and reverse.  And I

6    want to get this on a constructive path that has one goal

7    which is to resolve the claim.  That's it.  Okay?

8            The way that I see these claims is I think maybe

9    differently than -- well, the way I see it is as follows.

10    There is alleged a series of transactions, assignments,

11    setoffs.  It now seems to be the case that the position

12    being taken by Moore Macro is that there was an oral

13    assignment.  That seems to be where things have settled.

14            The threshold question that we've talked about for

15    many months now in connection with the previous motions to

16    dismiss is whether or not what Moore Macro did was permitted

17    by the documents.  We have to look at the timing of what was

18    done and we then have to compare it to what the document

19    allows.  In other words, there is the question of whether or

20    not the seeming conflict between the -- Moore has no

21    affiliates language and the lack of a prohibition on

22    assignments.  That's kind of the issues.

23            But then we've now gone into this whole set of

24    issues relating to replacement hedges and as soon as

25    reasonably practicable and Moore has taken the position that

Page 192

1    an entire universe of Lehman documents ought to be

2    discoverable to -- in service of Moore's position that what

3    it did was just fine.

4           And, first of all, I think I disagree with that in

5    large measure.  There is specific contractual language here.

6    And what Moore did or did not do is going to be determined

7    largely by reference to what Moore did or did not do and in

8    the time frame that it did it.  And the vast volume of

9    transactions that Lehman touched in the days and weeks and

10   months that followed the filing, I'm not at all sure are at

11   all relevant to what Moore did or did not do.

12          And as a threshold matter, it seems to me we need

13   to focus on the very fundamental credit attacks of what

14   happened.  We're zeroing in on that meeting.  I don't

15   understand at this point what's going on with respect to the

16   whole subject matter waiver idea.  The papers -- I'm very

17   confused after the last set of papers because before Moore

18   Macro's last papers came in, it seemed that the parties were

19   narrowing the scope in light of the representation that it

20   was an oral assignment.  There was a sentence that said an

21   assignment need not be written and indeed here it was oral.

22   So then it seems that that teed up the issue of -- you're

23   taking the position that it was an oral assignment and now

24   there was some discussion of the scope of the subject matter

25   waiver.  And then Moore came in and said hold on, not so

Page 193

1    fast.  That would be an advisory opinion.  You can't make us

2    do anything.  And at that point, I got completely confused.

3          So my view is we have to focus discovery right now

4    on what happened.  You have to find out what happened.  So

5    I'm just trying to reset everyone's expectation.

6          So I'm happy to hear you.  I want the conversation

7    to be civilized and civil and to try to work toward the goal

8    of moving this forward.

9          If what the parties expect is that I'm going to

10   write a 100-page decision on cross-motions to compel, that's

11   not happening anytime soon.  So I'm happy to preserve

12   everybody's rights and they are your rights under the

13   Federal Rules of Civil Procedure or otherwise.  But I also

14   would like to not stop this litigation in its tracks when I

15   think the issues actually are pretty narrow.  I think the

16   issues are pretty narrow.  We have to find out what

17   happened.

18          Who wants to speak first?  Mr. Tambe?

19          MR. TAMBE:  Your Honor, let me start with where

20   you ended up which was what happened and the October 3rd

21   meeting.  And I can understand your confusion about where

22   things are on subject matter waiver because we think they

23   squarely put the issue before the Court.  The footnote that

24   they -- and let's take a step back.

25          I mean, they make it sound like this was always

Page 194

1    known.  It's been some revelation in the course of discovery

2    that, in fact, there was no assignment agreement that was

3    effective and in place when LBS filed for bankruptcy.

4    That's a fairly important fact.

5              THE COURT:  Well, they might -- I don't want --

6    they're going to disagree with you.  I mean, they're going

7    to disagree with you.  They're -- "effective", the word

8    "effective".  Okay?  They're going to disagree with you.

9              MR. TAMBE:  And that's why I said signed and

10   effective because there was no writing.  What now seems to

11   be clear is that there was no writing.

12             THE COURT:  Right.  But that -- now we're getting

13   to the real meat of it.

14             MR. TAMBE:  Right.

15             THE COURT:  Right?  So if the position is there

16   was no writing by 5:56 on the day in question, right, then

17   the question becomes we get discovery on what happened at

18   the meeting.  And then what?

19             MR. TAMBE:  So --

20             THE COURT:  And then what?  And then the privilege

21   log reflects entries that seem to describe a lot of stuff

22   that happened afterwards.  So is it Moore Macro's position

23   that all Lehman gets to do is to ask people who were at the

24   meeting, hey, what happened at the meeting, and they all

25   say, oh, there was an oral assignment.  That might be.  But

Page 195

1    then Lehman doesn't get to inquire about anything that

2    occurred afterwards or, frankly, anything that occurred

3    before when -- because if that's -- if that's the result,

4    it's a short case because -- on the issue of assignment and

5    setoff.  Because I think what your -- your position is that

6    it happened at that meeting, it all happened at that

7    meeting, it was effective at that meeting, and no matter

8    what happened afterwards or before has any bearing on that.

9    And if I believe the witnesses, it's the end of the story.

10   And that just can't be right when there's a clear record

11   that there exist communications on that very -- on that

12   topic.  That's what's reflected in the privilege log.  So in

13   my view, it can be that it's that day, what they say is what

14   they say and that's the end of the conversation.

15           So I need to hear from you on how you think this

16   ought to go because I don't think that you can cabin that

17   day and then just say everything else is out of bounds

18   including a subsequent communication where somebody says,

19   hey, we didn't really come to a firm conclusion at that

20   meeting.  I think we ought to document this.  I'm making it

21   up.  I obviously have no idea.  I have no idea.  But that's

22   the starting point before we even get in the same county as

23   all the issues about, hey, let's look at everything that

24   Lehman's got.

25           And then just to really kind of share with you my

Page 196

1    view of it, and you can convince me otherwise, and then you

2    have everything that -- the construct that everything that

3    needed to happen happened on that day.  And at the same

4    time, in the next breath, as soon as reasonably practicable

5    means not for eight months.  So those are like the bookends.

6    Everything that needed to happen happened on that day before

7    -- it was not a violation of the automatic stay, was

8    consistent with the documents, et cetera, and valid under

9    applicable law.  And as soon as reasonably practicable to

10   deliver the valuation statements wasn't for eight months.

11   So those are the two things.  And that's kind of where the

12   action is.

13          Similarly, with respect to this issue -- I'm

14   similarly confused about the bid and the ask on the

15   replacement hedges.  There's a statement that only one

16   replacement hedge was entered into.  And then there was a

17   long, long argument in the latest pleading that says it

18   would be completely unfair to make us have to identify

19   replacement hedges because it was Lehman.  Who knows?  So

20   that seems to be kind of a backing away from saying that

21   there was only one replacement hedge.

22          So I've said a lot.  I'm perfectly happy to hear

23   everything that you have to say.  Mostly, I want you to say

24   things that help us come to a resolution if we can't -- I'll

25   decide it, obviously, but my first choice is to come to some

1    kind of a resolution.

2              So why don't you speak first to the subject matter

3    waiver issue as it's come to be called?

4              MR. GROOTHUIS:  Sure.  So with respect to subject

5    matter waiver, our position is and has always been that

6    there was an oral assignment effected prior to the

7    bankruptcy on October 3rd, 2008.  And we were prepared to

8    waive privilege as to the facts and circumstances

9    surrounding that assignment which does include later

10   conversations about everything that happened back then.  But

11   the position that Lehman has taken is that any subsequent

12   conversation about the assignments, whether or not related

13   to the events of that day, would be covered by the subject

14   matter waiver.  In other words, a conversation that I might

15   have today with the client that happens to mention --

16             THE COURT:  Let's not talk about today.

17             MR. GROOTHUIS:  -- the word "assignment".

18             THE COURT:  Let's talk about prior to the deliver

19   of the valuation statements.  Let's talk about that day.

20             MR. GROOTHUIS:  Okay.  So --

21             THE COURT:  Okay?  But you're choosing your words

22   very carefully, right?  You're talking about what happened

23   that day, right?  But I'm not going to limit it to just,

24   hey, that was a great meeting.  I mean, to the extent that

25   there were subsequent communications generally about the

Page 198

1    assignment and the setoff, why shouldn't those be

2    discoverable?  You say that everything that needed to happen

3    happened that day before 5:56.  Everything's good.  But

4    then, subsequently, there's all these communications that

5    occurred that may take a -- that may shed light on your

6    characterization of what occurred in that meeting whether or

7    not they refer to it.  Hypothetically, if there's a

8    communication that somebody says, you know -- I'm not going

9    to give you an example.

10           MR. GROOTHUIS:  And if the distinction is what

11   happened at that meeting versus what shed light at the

12   meeting, we're not going to quibble over issues like that.

13   I'll tell you what the entries on the --

14           THE COURT:  No.  But you're -- again, you're

15   choosing your words very carefully which I know you're paid

16   very well to do.  And I'm not criticizing you for it.  But

17   it's not about what happened at the meeting.  It's about the

18   assignment and the setoff which you say -- which you say

19   occurred orally at that meeting.  Right?  So it's not about

20   just documenting it.   It's about evidence, communications,

21   that bear on the assertion, not what happened at the

22   meeting, the assertion that there was an oral assignment.

23   So I think it's broader than what you're articulating.  I

24   don't agree with Lehman that it goes through 2014.  I don't

25   agree with that.  But it's -- but the basics are broader

Page 199

1    than what you say.

2             MR. GROOTHUIS:  And --

3             THE COURT:  So --

4             MR. GROOTHUIS:  Okay.

5             THE COURT:  -- I don't know if you're

6    intentionally choosing those words or not.

7             MR. GROOTHUIS:  What I'm draw the distinction

8    between is there are subsequent entries on our privilege log

9    that go through the date of the delivery of the last

10   valuation statement --

11            THE COURT:  Right.

12            MR. GROOTHUIS:  -- which I believe was in August

13   of 2009.

14            THE COURT:  Right.

15            MR. GROOTHUIS:  And under Lehman's argument with

16   respect to the waiver which is that every document that so

17   much as mentions the word assignments is -- the privilege is

18   waived.  So, for example, we had valuation statements that

19   were prepared in draft form.  And the draft of which there

20   are many that happen to mention the assignments 'cause

21   they're referenced in the valuation statements, those would

22   all be, under Lehman's theory, the privilege as to those

23   documents would be waived and they would be picked up in the

24   scope of this.  And that has nothing to do with

25            THE COURT:  Okay.  That's a good --

1          MR. GROOTHUIS:  -- what did or did not happen --

2          THE COURT:  Okay.

3          MR. GROOTHUIS:  -- at the October 3rd meeting.

4          THE COURT:  That's a fair point.

5          MR. GROOTHUIS:  Okay.

6          THE COURT:  Okay.

7          MR. GROOTHUIS:  So, I mean, that's the vast, vast

8      majority of the entries on the privilege log that refer to

9      assignments.

10          THE COURT:  Well, let's look at the privilege log.

11          MR. GROOTHUIS:  Sure.

12      (Pause)

13          THE COURT:  See, the problem is that if you just

14      start with, say, log number 19 -- actually, the logs are all

15      over the place, I guess because it goes by date.  If you

16      start with the October 3rd e-mails on page 5 of the log and

17      you continue.

18          MR. GROOTHUIS:  Sorry.  I'm just trying to get to

19      where you are.

20          THE COURT:  Sure.  I'll wait for you.

21          MR. GROOTHUIS:  It's page 5?

22          THE COURT:  I'll wait for you to get there.

23          MR. GROOTHUIS:  Yeah.  I'm on page 5 in --

24          THE COURT:  Yeah.  So if you just -- if you page

25      through the entries after that, and then we get to the ones

Page 201

1   where it says it lacks metadata, there's no indication for

2   these that these e-mails have to do with valuation

3   statements.

4           MR. GROOTHUIS:  And that's correct.  So the

5   immediate aftermath of the October 3rd meeting involves some

6   e-mails relating to the events of that meeting as to which

7   we would be waiving privilege, and other e-mails that relate

8   to legal advice about the validity of assignments whether

9   they take place pre-petition or post-petition.  And in our

10  view, that's a legal question.  And the legal advice that

11  Moore took is either right or it's wrong but the Court is

12  ultimately going to decide that question.

13          THE COURT:  Right.  But if -- so I'm going to give

14  you a hypothetical.  Again, I have no idea what occurred.

15          MR. GROOTHUIS:  Sure.

16          THE COURT:  Okay?  So Moore gets advice that in

17  order to fully realize the value of the setoff claim, you

18  have to do some assignments.  Okay?  And everyone gets

19  together on October 3rd and they agree around the table,

20  let's do assignments, and everyone says okay.  And then

21  subsequent to that, Moore is informed that doesn't really

22  work.  Right?  That doesn't really work.  And then begins to

23  prepare documents in order to document the assignments that

24  they've now been told don't really work.  What about that?

25          MR. GROOTHUIS:  So --

1              THE COURT:  Is that --

2              MR. GROOTHUIS:  If that advice is correct, then

3      the assignment either happened on the 3rd of October or it

4      didn't.  And any subsequent documentation that they would

5      have done made no difference.  And so that touches the point

6      I was trying to make earlier which is if the legal advice

7      whatever you did -- whatever happened on that day is going

8      to be determinative of whether the assignments were valid or

9      not.  Their contention is it's not valid.  But that's all

10     going to be based on what happened at that meeting.  And so,

11     whatever legal advice they took in 2009 or -- through today

12     about here are the things that needed to have been done to

13     make it effective, to our way of thinking, that's legal

14     advice and it doesn't relate to the fact of the assignment.

15     And if they want to make their arguments --

16             THE COURT:  But what do I do about the potential

17     credibility issue when I have somebody saying, oh yes, we

18     effected assignments that day and then there appears to have

19     been an enormous amount of communications and documentations

20     back and forth that, at a minimum, call into question the

21     credibility of -- I don't know any of these people, I have

22     no idea what the facts are.  I'm just trying come to a fair

23     resolution of understanding what occurred.  Obviously,

24     people continue to talk about assignment and setoff after

25     the meeting.  And it seems to me fair game for counsel to be

1   able to understand, well, what was all of that about.

2   Otherwise, how do I assess the credibility of the statement

3   that, yes, all the assignments took place in the meeting?

4   You got to help me on this.

5           MR. GROOTHUIS:   The only suggestion I have -- I

6   think Your Honor can make that determination based on the

7   credibility of the witnesses because the assignments, as I

8   mentioned earlier, either did or did not happen that day.

9   And I personally don't see what relevance later legal advice

10  might have based on the completion of an assignment on that

11  day.   But if Your Honor wants to take a look at these

12  documents in camera and decide which ones, in fairness,

13  ought to be included within the scope of the waiver in order

14  to make it not prejudicial to the other side, we're happy to

15  go with that move.   I mean, that's -- if you're looking for

16  a suggestion as to how to proceed, that would be my

17  recommendation.

18          MR. TAMBE:   Can I just speak to that --

19          THE COURT:   Mr. Tambe?   Sure.

20          MR. TAMBE:   Just on that one issue.   I think just

21  the phrase used by counsel is whether they were seeking

22  legal advice.   I think there's more to it than that.   So

23  again, hypotheticals, right?   They go out and ask outside

24  counsel to opine on something.   We do want to get the facts

25  that were provided to outside counsel which may be reflected

1    in outside counsel's letter back or communication back

2    saying you've told us the following.  Based on the

3    following, we give you the following conclusions.  There's

4    two parts of that legal opinion.  The first part of that

5    legal opinion we believe is squarely within subject matter

6    waiver because it goes to credibility.  That's how I cross-

7    examine their people.  What were you telling your lawyers

8    about what really happened at that meeting?  I should have -

9    - there should be no dispute as to subject matter waiver on

10   that point.

11           What the lawyers, the outside lawyers, then

12   concluded, they said, well, based on this set of facts, it

13   is our legal opinion x, y and z then goes to your point

14   which is based on that can say, well, you know what, you've

15   got to have that in writing.  And the process then gets

16   underway to document this agreement.  And those kinds of

17   communications, Your Honor, could have happened even after

18   2009.  2010, 2011, someone starts drilling in on these

19   assignments and says what really happened here.  And facts

20   are relayed by people who were participants in that October

21   3rd meeting.

22           THE COURT:  But ultimately, the agreements were

23   ultimately -- I mean, there start to be draft assignment

24   agreements, right?

25           MR. TAMBE:  But -- they start to be.  But I think

Page 205

1    where we are in this case now is how ever perfect those

2    assignment agreements are, we know one thing about those

3    written assignment agreements.  They are after October 3rd.

4              THE COURT:  Sure.  We know that.

5              MR. TAMBE:  Right.  So the only thing that they

6    can rest their case on now is that there's a fully formed

7    oral -

8              THE COURT:  That's right.

9              MR. TAMBE:  -- effective agreement.  Right?

10             THE COURT:  Right.

11             MR. TAMBE:  That's a high burden in any case where

12   it's going to be entirely based on oral testimony of --

13             THE COURT:  But -- okay.  But that's why I go back

14   to -- but that's why the whole story needs to be discerned

15   here because you're saying it was fully formed in that

16   meeting.  Everything was done.  But there's this -- all of

17   this other stuff that occurs afterwards that has to be

18   relevant to -- and ought to be discoverable notwithstanding

19   an assertion of privilege to find out what actually

20   happened.

21             MR. GROOTHUIS:  And we're prepared to give all

22   that.  I mean, to take Mr. Tambe's example, if there was a

23   communication to a lawyer after October 3rd saying here's

24   what we did that day, you tell us whether it was right or

25   not.  That relates to the facts and circumstances of that

Page 206

1    October 3rd meeting.  That would be within the scope of the

2    waiver.  And our position is whatever the lawyer came back

3    with, it was -- now that it wasn't valid, is legal opinion

4    and advice.  And it doesn't bear on the factual question of

5    whether the assignments were done that day.  There was an

6    oral assignment.  That's always been our position.  And

7    under the law, an oral assignment is every bit as good as a

8    written assignment.  So this Court can determine based on

9    the testimony of the witnesses and whatever documents refer

10   to what happened that day, whether those assignments were

11   complete, and that's how we do the scope.  But as I said

12   before, Your Honor --

13              THE COURT:  How does he cross-examine your

14   witnesses?

15              MR. GROOTHUIS:  He's going to be able to talk to

16   everybody who was in that room, including lawyers, and ask

17   who said what to whom.  And if there were later

18   communications that refer to what happened that day, he's

19   going to get all those as well.  That gives him all that he

20   needs to cross-examine the witnesses and make whatever

21   arguments he wants to as to the effect that these

22   assignments didn't happen that day.  But what he's asking

23   for -- and I think Your Honor has recognized it, it can't be

24   as broad as what they're suggesting which is it goes through

25   today.  And not just what happened with respect to these

Page 207

1    assignments but any documents that mentions.

2              THE COURT:  Is there an outside date -- have the

3    actual written assignments been produced?

4              MR. GROOTHUIS:  Yes.

5              MR. TAMBE:  Yes.

6              THE COURT:  Plan purchase agreement.  And what

7    dates are on them?

8              MR. TAMBE:  I don't think --

9              UNIDENTIFIED SPEAKER:  We have a signoff on the

10   agreement but not the drafts.

11             THE COURT:  What's the final date?

12             MR. TAMBE:  Well, the final date says on it -- and

13   it's a curious choice of words.  But it says on it -- let me

14   make sure I -- it starts off by saying "This Agreement is

15   entered into by the signatories hereto and is effective the

16   3rd day of October, 2008."  Can I hand this up?

17             THE COURT:  Sure.

18             MR. TAMBE:  Because -- so that's what the written

19   agreement says.

20             THE COURT:  But is there metadata that shows --

21             MR. TAMBE:  No, there's not.

22             THE COURT:  Why not?

23             MR. TAMBE:  And let me ask that.  And, by the way,

24   this is going back to what you talked about a couple of

25   matters ago, it's a curious choice of words.  When we talk

Page 208

1    about the agreements that are entered as of a particular

2    date, we say an agreement is entered as of.  And one of the

3    things the readers, it wasn't actually entered on that day;

4    it was entered as of that date.  This makes it -- makes one

5    reach the conclusion that, in fact, it was entered into on -

6    - executed on October 3rd when we now know it wasn't.  It

7    was done weeks, if not months, later.  And this is the only

8    document we had to go on until discovery began in this case

9    as to -- and the signature block is undated on the

10   agreement.

11            MR. GROOTHUIS:  To be clear, so there's an e-mail

12   in which includes the word "document" that was circulated on

13   October 3rd that is the Word version of this agreement that

14   was not signed.  There is subsequent written -- excuse me.

15   There's a subsequent signed version of the agreement.  And

16   we don't dispute that that written signed agreement was not

17   signed until after the 3rd of October.  So whether it was

18   done a day later, a month later or a year later, it's course

19   petition.  But that document is memorializing the

20   assignments that occurred at this meeting that we've been

21   discussing.  So it does appear --

22            THE COURT:  I'm sorry.  Can you say that again?

23            MR. GROOTHUIS:  Sure.  The written -- I can't tell

24   from this slide whether this is the Word document that was

25   attached to an e-mail which has a time on it that was

Page 209

1    circulated on October 3rd, 2008 or this is the signed

2    version of the agreement which had been produced in

3    discovery.  It was a hard copy that was scanned.

4              MR. TAMBE:  Right.  So we don't have the e-mail

5    from October 3rd because we've claimed privilege over it.

6    What we have is the signed scanned pdf document not the Word

7    document.

8              MR. GROOTHUIS:  Okay.  So then this is the scanned

9    version -- the signed version.

10             MR. TAMBE:  It's the signed version.

11             MR. GROOTHUIS:  Okay.  I thought I heard you say

12   it was.

13             THE COURT:  No.  It's a signed version.  The point

14   is that -- yes.  It's the signed version.

15             MR. GROOTHUIS:  Okay.

16             THE COURT:  But I go back to the privilege log and

17   days after that, there continues to be e-mail traffic back

18   and forth concerning assignments and setoffs.

19             MR. GROOTHUIS:  Right.

20             THE COURT:  Right?  So if the position is that

21   everything was said and done on the 3rd and there continues

22   to be e-mails -- I mean, when something's done, as you said,

23   it's done.  But here, people kept talking about it.  So then

24   in order to test the assertion that it was done and

25   effective on October 3rd, it seems appropriate that these e-

Page 210

1    mails subsequent that refer back not only to the meeting but

2    to the assignments ought to be produced so that there's a

3    full picture of what occurred.  If there were indisputably a

4    written agreement that was dated, just to make it easy, on

5    October 2nd, we wouldn't be here.  We wouldn't be here.  But

6    it's not because you're taking the position that it was an

7    oral assignment and a setoff -- and a setoff, right?  Right?

8    No?

9              MR. GROOTHUIS:  Well, the assignment is done at

10   the October 3rd meeting.

11             THE COURT:  Right?

12             MR. GROOTHUIS:  Right.

13             THE COURT:  Right.

14             MR. GROOTHUIS:  So with respect to the later e-

15   mails that refer to the assignments, our position is that if

16   those documents refer to whether the assignments happened or

17   not --

18             THE COURT:  Okay.

19             MR. GROOTHUIS:  -- then they're entitled to those

20   and they will get those.  This is part of the scope of the

21   waiver.  If they reflect legal advice about the timing as to

22   which an assignment would have been permissible versus not,

23   i.e.,

24   pre-petition versus post-petition, that is legal advice

25   disconnected from the facts of what happened and we don't

Page 211

1    think that's covered by the waiver.  But if Your Honor has

2    concerns about that --

3              THE COURT:  But what if the legal advice says --

4    again, just to give an extreme example, the legal advice

5    says I told you that an assignment was -- an oral assignment

6    was ineffective.  What if it said that?  Right?  Isn't that

7    something that everyone ought to know?

8              MR. GROOTHUIS:  I don't think so because if that's

9    accurate advice then that's a legal question that the

10   Court's going to rule on.  And so, if the assignment was

11   done orally and it turns out that an oral assignment is

12   invalid then whether the legal advice said that later or it

13   said the opposite later doesn't bear on whether the

14   assignment was orally conveyed.  The issue that they want to

15   challenge --

16             THE COURT:  But if the issue -- if it then becomes

17   that assignment wasn't effective and now there's an

18   automatic stay in place and things flow from that, it --

19   look, I respect the attorney/client privilege entirely.  But

20   this has been placed in issue because of the particular

21   position that Moore Macro is taking.  And in order to have a

22   determination on that matter, we need to know what happened.

23             So if you want to do this by -- half by agreement

24   and  half by in-camera review, I'll do it that way.  If we

25   want to agree to do it in stages, I'm not going to give Mr.

Page 212

1    Tambe discovery through 2014 right now.  If something

2    emerges in a first or second round of review that indicates

3    that the --  you know, the never-ending story that for

4    completeness sake would require that there be subsequent

5    deduction then we can go there.  But I think the only way to

6    get through this difficult situation is in little steps.  So

7    the first little step is whatever you agree to, we'll do.

8    Whatever I can then review in-camera, I'll do.  And then it

9    would be without prejudice to Mr. Tambe's ability to say

10   that's not enough and your ability to say it is enough.

11          MR. GROOTHUIS:  Okay.  So just -- so to be -- so

12   I'm following correctly --

13          THE COURT:  Yes.

14          MR. GROOTHUIS:  -- we will produce documents that

15   --

16          THE COURT:  Why don't you articulate -- I don't

17   want to be -- you suggested in your papers that if I were to

18   say anything about a subject matter waiver, I would be

19   rendering an advisory opinion.  I don't want to do that.

20   What I'm asking you is that to the extent that you ca

21   articulate, at least for a first stage, reserving all of

22   your rights, an agreed scope of a -- call it a subject

23   matter waiver or just call it documents you're willing to

24   produce, articulate that, and then describe the set of

25   documents that you are -- that you will submit to me for in-

Page 213

1    camera review and then we'll go from there.

2              MR. GROOTHUIS:  So the documents that we would

3    produce, we've articulated that population documents -- it's

4    in our papers.  It was the same subject of the stipulation

5    that we've been negotiating for a long time.  This got

6    started with Lehman asking us whether we were intending to

7    waive privilege.  And so, in order to avoid this very fight

8    that we're having right now where we say here's what we're

9    willing to waive and they say they want the sun, the moon

10   and the stars, we try

11   to -- I'm sorry.  I'm mindful of the Court's admonition at

12   the beginning and I'm going to take it to heart.

13             THE COURT:  So just --

14             MR. GROOTHUIS:  We tried to work this out.

15             THE COURT:  So let's just make it part of this

16   record.  If you can read from your papers or from Lehman's

17   papers or somewhere --

18             MR. GROOTHUIS:  Sure.

19             THE COURT:  -- so that we have it --

20             MR. GROOTHUIS:  I'll show you where it is.  It's

21   the same language in the stipulation that we've been

22   circulating.  And --

23             THE COURT:  It's in which document?  Do you

24   remember?

25             MR. GROOTHUIS:  It is --

Page 214

1          THE COURT:  It's the --

2          MR. GROOTHUIS:  Most recently, it was in --

3          THE COURT:  The memorandum of law in opposition to

4    the motion to compel?

5          MR. GROOTHUIS:  Yeah.  I think it would be there.

6    Let me just find that.

7          THE COURT:  16 and 17?

8          MR. GROOTHUIS:  Yes.  So on page 17, there's a

9    paragraph that starts with "Consistent with this authority"

10   -- and we submitted a proposed order.  So it's the same

11   language that's been in the stipulation that's on page 17 of

12   our opposition to the motion to compel and it's in the

13   proposed order.  So what I would propose then is we'll go

14   ahead and produce what we think we ought to produce.  We'll

15   make our witnesses available.  They will answer all the

16   questions that are subject to that waiver scope.  And if

17   Lehman wants to come back and suggest that there was

18   additional material that they weren't given access to that

19   they ought to have been given access to, hopefully that will

20   be a limited population of information.  And we'll come back

21   --

22         THE COURT:  Okay.  But let me focus on this.  I

23   have a number of questions.  One is, I'll ask Mr. Tambe, the

24   date starts with October 2nd.

25         MR. TAMBE:  Yeah.  But that's -- it only pretends

Page 215

1    to start on October 2nd.  If you look at the numbers, in

2    fact, the log entries that are dated October 2nd are not

3    included in that list.  So if you want to have their list

4    next to our appendix, we can go through the numbers.  So the

5    numbers --

6              THE COURT:  But is it -- So this wasn't the way --

7    this wasn't the way I was thinking about it.  I don't know

8    why -- as a preliminary matter, I don't know why it starts

9    on October 2nd.  Why doesn't it go back before October 2nd?

10             MR. GROOTHUIS:  You talking about the proposed

11   order?

12             THE COURT:  Well, I'm not thinking of it in terms

13   of a proposed order.  I'm trying to articulate a scope.  And

14   to me, this again, is too narrow because it's not just about

15   the facts, circumstances and events leading to or at the

16   October 3rd, 2008 meeting.  It's relating to the assignment.

17             MR. GROOTHUIS:  So I think it's because the

18   concept of the assignment was never raised prior to October

19   2nd.  And I'm looking at the log entries.  And the issue of

20   assignments did not come up until October 2nd.  And that's

21   why October 2nd

22   is --

23             THE COURT:  Okay.  Hold on.  Let me get back to

24   the log.

25             MR. GROOTHUIS:  Let me do it myself.

Page 216

```
 1              THE COURT:  Well, are you representing that the --
 2    a series of e-mails begins on the 22nd, 23rd relating to
 3    ISDAs and setoff.  So that -- those log entries mean what
 4    they say, that there was nothing in there that relates to
 5    assignment.
 6              MR. GROOTHUIS:  That's my understanding but I'm
 7    happy to go back --
 8              THE COURT:  If you could --
 9              MR. GROOTHUIS:  -- and confirm those log entries
10    to make sure that they don't.
11              THE COURT:  Right.  Because I noted that
12    difference.  Because then beginning on -- you're quite
13    right.  On October 2nd is the first time someone talks about
14    assignment.
15              MR. GROOTHUIS:  So we'll go back and take a look.
16              THE COURT:  Right.  I know exactly what you're
17    going to say, Mr. Tambe --
18              MR. TAMBE:  Yes.
19              THE COURT:  -- but you can say it anyway.  Go
20    ahead.
21              MR. TAMBE:  I might surprise you, Judge.  So
22    clearly, our argue is -- it goes back to the 22nd.  We noted
23    those.  But let's even talk about the entries that they seem
24    to be with us on, right?  The October 2nd entries, they say
25    -- well, they agree to the time period being October 2nd
```

1    onwards to 2009.

2              THE COURT:  And --

3              MR. TAMBE:  But then they're not giving us those

4    entries from October 2nd.  Page 4 of our appendix.  That's -

5    - looks like a series of e-mails that lead up to this

6    meeting on the 3rd.

7              THE COURT:  Right.  But so my view is that every

8    communication that deals with an assignment either ought to

9    be produced or given to me for in-camera review.  That's my

10   view.  So from -- you're going to confirm that the documents

11   prior to October 2nd, in fact, only relate to general issues

12   regarding ISDAs and setoff and don't deal with assignment in

13   any way.  And then from October 2nd, at least for the time

14   being through August 25th, 2009, you're either going to

15   produce everything that relates to assignments or you're

16   going to give it to me for in-camera review to the extent

17   that you believe it fits within your category of the after

18   the fact legal advice that wouldn't have any bearing.

19             MR. GROOTHUIS:  Okay.

20             THE COURT:  And so the way -- so the next sentence

21   in that paragraph on page 17 that says "Because documents

22   13", et cetera, et cetera meet these criteria, I'm not

23   following those criteria.  I just established the criteria.

24   Right?  And I'm also not limiting it to the drafting,

25   execution, recording, completion and perfection.  It's just

1   relating to the assignment.  Just relating to assignment or

2   -- I don't want to get caught by a definite article.  I

3   spent three hours yesterday hearing about the lack of a

4   definite article.  So assignments -- the assignments.

5   Right?

6           MR. GROOTHUIS:  Yes.  I understand.

7           THE COURT:  Okay.

8           MR. GROOTHUIS:  So --

9           THE COURT:  So we can turn then -- the Court

10  originally started by referring to the assignments that why

11  are we asking or why are we having a dispute about the

12  valuation documents.  And if the claims related only to the

13  assignment and setoff, I would agree with you.  There would

14  be no reason for us to be asking about valuation related

15  documents.  But they do have claims.  And frankly, the value

16  of those claims far outweighs the issue in terms of monetary

17  value of the assignments that what was paid was undervalued.

18  And therefore, they're challenging the valuations for these

19  terminated transactions.  And so, our position is if they're

20  going to put the valuations at issue, then the documents

21  that are in their files that relate to the valuations, be

22  they Lehman's internal valuations or valuations that they

23  received on other counterparties for these same transactions

24  --

25          THE COURT:  But wait.  You just -- you left the

1    station without telling me.  Okay?  I'm not doing that yet.

2    Okay?

3              MR. GROOTHUIS:  Okay.

4              THE COURT:  We're still on the documents to be

5    produced by Moore Macro --

6              MR. GROOTHUIS:  Okay.

7              THE COURT:  -- side of things.  Okay?  So right

8    now we have a first round game plan.  And I don't put words

9    in your mouth.  But if you're doing it not by agreement or

10   if you're doing it -- if I'm ordering it over your

11   objection, we ought to make that clear because you want to

12   preserve your rights.  So I just want to have clarity on the

13   basis on which we're proceeding.

14             MR. GROOTHUIS:  Okay.  So --

15             THE COURT:  Okay.  So solely with respect to the

16   assignment related documents that we've just described are

17   going to be produced.

18             MR. GROOTHUIS:  Right.

19             THE COURT:  Is that our agreement or is that what

20   I've ordered you to do?

21             MR. GROOTHUIS:  So what we can agree to is what we

22   put in our papers, the proposed order.  And if Your Honor is

23   proposing to proceed the way you suggested, we will -- we do

24   object to that because we think that anything beyond the

25   fact and circumstances of that meeting is irrelevant.  But

Page 220

1    we'll comply with the order and we will submit them for in-

2    camera review.

3                THE COURT:  Okay.  So -- and what I'm trying to do

4    is preserve your rights for any subsequent appeal.  We get

5    to the end of the day.  Mr. Tambe shows a witness a

6    document.  The whole case turns on that document.  You then

7    get to say on appeal that document shouldn't have been

8    produced.  That's all I'm trying to do is to preserve your

9    rights.

10               MR. GROOTHUIS:  Okay.

11               THE COURT:  -- and have you never say that I

12   didn't preserve your rights.  So are we clear?  Are we good

13   on that point?

14               MR. GROOTHUIS:  Yes.

15               THE COURT:  Okay.  Now let's talk about

16   replacement hedges.  Okay?  And I don't have clarity on what

17   your position is.  So first, your position seemed to be

18   there was only one replacement hedge.  Then the position

19   seemed to be it's asking the wrong question.  We could never

20   identify all of the replacement hedges.  And then that led

21   me to begin to wonder whether I really understood if you

22   both were talking about the same thing when you talk about

23   replacement hedges.  So to me, replacement hedges are

24   absolutely relevant.  They're absolutely relevant.  And

25   Lehman's entitled to know whether you entered into

Page 221

1    replacement hedges.  It's no more complicated than that.

2    But it seems to have become more complicated.  So why don't

3    you talk about that one?

4          MR. GROOTHUIS:  Sure.  So on replacement hedges,

5    we respectfully disagree.  We think that the definition of

6    loss provides that a party may calculate its losses by

7    reference to quotations that they've obtained from leading

8    dealers in the market.  And that's what Moore did.  And the

9    quotations that Moore obtained from leading dealers in the

10   market reflect the replacement value because you're getting

11   a quote from somebody who would step in on Lehman's side of

12   the trade.  And so what Lehman is saying is, the quotes that

13   you obtained from these leading market dealers are

14   unreasonable.  The only reasonable quotes you could have

15   used are these mid-market end-of-the-day prices at which --

16   and our position with respect to those is we could have

17   never transacted at those prices.

18          THE COURT:  Sure.

19          MR. GROOTHUIS:  And the price at the end of the

20   day --

21          THE COURT:  Right.

22          MR. GROOTHUIS:  -- on one of the most volatile

23   days in market history is going to look very different from

24   the price that you obtained at 1 p.m. that day.

25          THE COURT:  Okay.

 1                MR. GROOTHUIS:  Okay.

 2                THE COURT:  But that's what a trial is about,

 3     right?

 4                MR. GROOTHUIS:  Right.

 5                THE COURT:  Okay.  But right now it seems to me

 6     that you don't get to arbitrarily say what you just said and

 7     please ignore the fact that five minutes later -- I'm

 8     obviously exaggerating -- five minutes later despite the

 9     fact that we got those quotations, we entered into these

10     replacement hedges.  If you entered into the replacement

11     hedges, let's know what they are.  And you can still

12     maintain that the right way to calculate your loss is with

13     regard -- using the quotations that you got.  The way I read

14     your papers was you're telling me what's relevant and what's

15     not.  It's discoverable.  You then fully get to say at trial

16     or otherwise that -- you get to argue that it's not.  But

17     they get to know because the -- they get to know in fact

18     what replacement transactions -- to your point, quotes are

19     great; transactions are better --

20                MR. GROOTHUIS:  Okay.

21                THE COURT:  -- in some instances.  I don't know.

22     Right?  What you just said was, sure, there were those

23     quotes.  But we could have never transacted.  Okay?  But

24     what they're saying is, we're with you.  You then

25     transacted.  Show me the transactions.  So, Mr. Tambe, maybe

Page 223

```
1    you can say it differently but isn't that -- is that what

2    you want?

3              MR. TAMBE:  That is exactly what we want.  And

4    here's the point of confusion that we have from their

5    papers.  This is page 11 of their opposition.

6              THE COURT:  Yeah.

7              MR. TAMBE:  So -- and it's the paragraph that says

8    "Given that" --

9              THE COURT:  That --

10             MR. TAMBE:  "Given that" --

11             THE COURT:  That's the one that I didn't

12   understand.

13             MR. TAMBE:  Right.  Because but for that -- if all

14   they're saying is they had one replacement trade --

15             THE COURT:  Right.

16             MR. TAMBE:  -- and that's the only one, okay, it

17   addresses the discovery issue and we can move on.  But they

18   seem to want it both ways.  But they're saying, well,

19   there's only one replacement trade we're going to tell you

20   about but there may have been others.  That's the problem.

21             THE COURT:  Well, but then again, again to focus

22   on the choice of words which got me.  This is the very

23   paragraph that got me confused.  Because it says "may have

24   been entered into because of Lehman's collapse.

25             That strikes me as being broader than what we're
```

Page 224

1    talking about, isn't it?

2           MR. TAMBE:  It is.

3           THE COURT:  Okay.  In other words, lots of things

4    happened because of Lehman's collapse that were secondary

5    and tertiary to the trades that existed between these

6    parties.  I'm talking about actual replacement hedges for

7    what we're talking about.  Either you entered into them or

8    you didn't in this narrow period of time.  So.

9           MR. GROOTHUIS:  So like the issue that we have is

10   the way they defined the replacement hedges as capital R,

11   capital H.  It's a defined term that they created.  And what

12   they defined it as and I'm just pointing out that pension is

13   any trade that were an entry or were considered entered, the

14   considered entering into I believe the period was a stand of

15   three weeks.

16          And so our position is a transaction that happened

17   three weeks later at a different price and perhaps the

18   original terminated transaction may have been an oil crude

19   option that, you know, was going to settle in, let's say, in

20   December.  And the subsequent transaction was a March crude.

21          Who is to say whether that was a replacement or

22   not if it was with a different maturity date and with a

23   different price?  And so we're unable to determine based on

24   the definition of replacement trades what is and what isn't.

25   What we have said is in Ward's records there one trade is

Page 225

1    recorded as a one for one replacement.

2              But what they're saying is give me three weeks of

3    your trade to get up and they'll -- I guess they're planning

4    to decide what is and what isn't a replacement trade.  And

5    our position is that's irrelevant.

6              Indeed the example that Your Honor provided five

7    minutes later is a very different situation from three weeks

8    later and it's the three weeks later that they're asking

9    for.

10             THE COURT:  If you were able to enter into a

11   replacement trade two weeks later and then in which you were

12   -- that was beneficial to you, right?  Your position is that

13   the calculation of loss shouldn't take that into account?

14             MR. GROOTHUIS:  Our position is we have on --

15             THE COURT:  Bearing in mind that the valuation

16   statements weren't submitted until much later.

17             MR. GROOTHUIS:  They were submitted later, but

18   they're as of the early termination date which is -- or

19   which is either September 15th or 16th --

20             THE COURT:  Right.

21             MR. GROOTHUIS:  -- depending on the month.

22             THE COURT:  Right.

23             MR. GROOTHUIS:  So we can't tell seven years later

24   what was in the trader's mind whether they entered into a

25   particular transaction two weeks later as a form for

Page 226

1    replacement or a September 15th trade that was terminated.

2    There is no way for us to determine.

3            THE COURT:   So -- Okay.   So solve this problem

4    for me Mr. Tambe.

5            MR. TAMBE:   Yeah.   Can I speak to this, Your

6    Honor?   We've been down this path.   Not just with respect to

7    Lehman.   I've been doing this for ten years.

8            Traders just don't trade on whims.   Okay.   They --

9    people have a very good idea of what their risk positions

10   are.   And when Lehman happens that very good idea of how

11   we're going to manage that risk position.   They don't just

12   roll the dice and say, hey, you know, we may enter two

13   trades today.   Oh, I'm feeling lucky; I'll enter five

14   tomorrow.

15           When we talk about what -- that's why we phrased

16   it the way we did.   These are extremely smart folks, right?

17   They know how -- they know their risk positions right down

18   to the penny.   And they're managing that very carefully.   We

19   need to cast a net in a broad way because they are 100

20   places that are going to go high.

21           Well, we didn't record it as a Lehman replacement.

22   We didn't say this was because of Lehman.   When you imagine

23   the risk position, you terminate a Lehman that created a

24   certain new risk position.   You took steps either for one

25   replacement or a portfolio replacement, you did certain

Page 227

1      things to get back into your preferred risk position.

2              We want to call that replacement hedges, because

3      that's what you actually did to manage this risk, not the

4      bill you sent us nine months later.  That's what I'm trying

5      to get at.

6              THE COURT:  See that's the problem that -- that's

7      part of the problem that we have here is the gap between --

8      is the gap between when the terminations occurred and when

9      the valuation statements were sent.  So that's one of the

10     issues.

11             MR. GROOTHUIS:  I think that's a separate issue.

12     It doesn't --

13             THE COURT:  It is --

14             MR. GROOTHUIS:  -- relate to these replacements.

15             THE CLERK:  -- a separate issue, but it

16     underscores the point that it's not inconsistent with the

17     fact that the valuation statements came months afterwards.

18     That things were happening that affected the valuation.

19     You're now saying that we got quotes; we were done.  Okay.

20             If that's your -- if that's true, then that

21     creates another problem which is if that's true, why did it

22     take nine months to submit a valuation?  That's -- there's a

23     logical inconsistency here.  If what you're saying is it

24     went out without quotes that we were supposed to do -- done.

25     Then there's a problem because you didn't submit the

1    valuation statements.

2         Maybe, Mr. Tambe is going say yeah, you managed

3    the risk and through a series of trades in the coming weeks

4    you came out here and then you submitted a valuation

5    statement.

6         I have no idea.  But it can't just be that it's

7    limited to the one trade that someone recorded as a direct

8    one for one.  It has to be broader and again, it's not --

9    it's not forever.  It's just in this period of time.  And

10   it's -- you get to make all of your arguments.  You get to

11   argue that it has nothing to do with the loss calculation.

12   But replacement hedges are relevant and they need to be

13   produced.

14        MR. GROOTHUIS:  Okay.  So then I think the

15   questions is what period of time are you ordering us to

16   produce statement?

17        THE COURT:  Well, Mr. Tambe, why don't you explain

18   what date range you believe is the appropriate date range

19   and why.

20        MR. TAMBE:  I need to confer the evaluation books

21   from the statement we -- we thought about the time period we

22   set forth.

23        THE COURT:  Right.

24        MR. TAMBE:  We set forth three weeks given what

25   the underlying order, how frequently they traded, et cetera.

Page 229

```
1    So we are asking for three weeks.  We don't financially --

2    this is a volume issue or a burden issue --

3              THE COURT:    Right.  If --

4              MR.  TAMBE:  -- they can make a great out about

5    it.  They haven't.

6              THE COURT:  Well, talk -- I mean --

7              MR. GROOTHUIS:  We haven't.  We've said it's

8    irrelevant and burdensome to produce three weeks of data,

9    especially when --

10             THE COURT:  Okay.  But I don't -- we've talked

11   about relevance.  I mean relevance is my call.  Right now I

12   think it's discoverable.  Whether ultimately it is or is not

13   relevant remains to be seen.  So right now I think it's

14   discoverable because it is potentially relevant.  I don't

15   know.

16             But if we're talking about 100,000 trades, then,

17   you know, then it's a burden issue.  But I have no idea.  So

18   your position is that it is a relevance one and on that

19   basis, enter in the context of the discovery, I'm overruling

20   that and I'm saying that you need to produce them.  All

21   right.

22             So if the point is that it's a 100,000 trades and

23   it's burdensome and will crash your system, that's something

24   you and Mr. Tambe can discuss.

25             MR. GROOTHUIS:  Okay. Then I'll inquire as to the
```

1       issue around burdensome.  How many trades we're talking

2       about and what it would take to recreate them and we'll

3       discuss it.

4                   MR. TAMBE:  That's fine.  We can talk about that

5       too.

6                   THE COURT:  Okay.  I'm stumbling on the word

7       "recreate".  I don't -- I don't know what that means.  I

8       don't want to grab further defeat from the jaws of victory

9       here.  But when you say recreate, I assume that that data

10      exists somewhere that can be retrieved.

11                  MR. GROOTHUIS:  I think so too.  But I'll be --

12                  THE COURT:  Okay.  But recreate suggests something

13      else.

14                  MR. GROOTHUIS:  I didn't mean to suggest that we

15      were going to --

16                  THE COURT:  Okay.

17                  MR. GROOTHUIS:  -- create something new from old

18      thoughts.

19                  THE COURT:  All right.  So those were the two big

20      ticket items  so-to-speak in the Lehman motion to compel.

21      Is that anything, Mr. Tambe, that said his -- that's been

22      left by the side of the road?

23                  MR. TAMBE:  No.  Those are the two issues in our

24      motion, Your Honor.

25                  THE COURT:  All right.  So now let's go back the

Page 231

1   other way.  Okay.  And talk about what you folks want from

2   Lehman.  All right.  I will tell you that I believe that

3   that work product privileges is broader than you say.  And I

4   believe that there's a difference between a bankruptcy

5   estate and what it does and a financial institution and what

6   it does.

7          There have been other instances in which Lehman

8   has produced narrowly tailored documents that they've

9   convinced me directly relate and are relevant to a dispute.

10  There's no dispute quite like this one.  But a dispute like

11  this.

12         And I'm struggling here because as I said an hour

13  ago, at the threshold issues of the set off and the

14  assignment, and then I have the issue of the as soon as

15  practicable.  That's the key one here.  It's the as soon as

16  practicable.  It's not -- we don't even get to the quotes

17  and how the quotes were used and which quotes were used

18  issue yet.  We get to what they're saying is that you failed

19  to comply with the requirement that the valuation statements

20  be delivered as soon as reasonably practicable.

21         So any -- there's nothing that I can imagine from

22  Lehman that would bear on that issue.  That only has to do

23  with your reasons and the facts and circumstances

24  surrounding your nondelivery of the documents for the period

25  of time.  So that's the first problem that I have.

Page 232

1           So you if you want to speak to that?

2           MR. GROOTHUIS:  Yes.  Do you want me to speak --

3    do you want me to start there?

4           THE COURT:  Sure.

5           MR. GROOTHUIS:  Sure.  So on the timing of the

6    delivery of the valuation statements, I'm not disagreeing

7    that Moore's particular facts and circumstances are going to

8    be relevant.

9           Our position however is it may also be relevant

10   whether Moore was the first person to submit its valuation

11   statement, the 50th percentile or the very last person.  And

12   that has some bearing on whether Moore was acting reasonable

13   when it submitted its valuation.

14          THE COURT:  So in other words, if we looked at the

15   entire body of Lehman terminated trades, right.  If out of

16   the million of them, 800,000 were submitted in nine months,

17   then that is probative of the fact that your period of time.

18          MR. GROOTHUIS:   That's our -- that's our

19   position.

20          THE COURT:  Okay.  Mr. Tambe, what do you think of

21   that?

22          MR. TAMBE:  I think it sort of reads out the

23   relevant language from the operative provisions.  It makes

24   it sound like all that the provision required is reasonable

25   conduct.  And that's not quite how it reads.  So this is Tab

Page 233

1   5.

2              THE COURT:  Okay.

3              MR. TAMBE:  And we talked about this in a

4   different context in the last time we were here on Moore.

5   And this is 6D1 from these -- the Master Agreement.

6              THE COURT:  Right.

7              MR. TAMBE:  It starts with the notion that it's

8   going to be on the early termination date.  So it's on or as

9   soon as reasonably practicable following the occurrence of

10  an early termination date.  So the default positon really is

11  on.  And if I'm not on the early termination date, it's kind

12  of up to Moore to say why it was not reasonably practicable

13  for Moore not to deliver on the early termination date.

14             This is not a general search for what are

15  reasonable periods of time to deliver calculation

16  statements.  You're supposed to do it on the early

17  termination date.  And they control, by the way, what day is

18  the early termination date.  It's not automatically

19  determination.   They could have waited a couple of days,

20  gotten their ducks in a row if that's what they needed to

21  do, and terminated and given us a calculation statement.

22             That's not what they did.  So it goes back to the

23  relevance point.  What other parties did, how they were

24  situated, why it may have been reasonable practicable --

25             THE COURT:  You see, that gets to the heart of the

Page 234

1    issue, because -- and I don't -- I don't know if Lehman has

2    this data.  But let me try to explain my problem which is

3    that each party has its own set of facts.  And what's

4    reasonably practicable for one party may not be for another

5    party.  So that somebody who's not as sophisticated as

6    Moore, somebody like, I don't know, a hospital or a public

7    entity that doesn't really understand what's happening and

8    it might take them awhile to get their act together.  And

9    there might be a lot of them and Lehman might have a lot of

10   them.  But that doesn't mean that, that has a bearing on

11   what's -- what was reasonably practicable for Moore to have

12   done.  That's kind of the disconnect that I have.

13            MR. TAMBE:  My response to that is that's an

14   argument that Lehman would be free to make if it turns out

15   that there were 200,000 counterparties that submitted their

16   valuation statements after Moore did and they're all

17   different in some way, they can make that argument.

18            But the issue right now is, is it discoverable?

19   Is it at all relevant to party's making for a defense?  And

20   they'll be free to make all of those arguments.  But we

21   should be free to make our arguments too.  And one of the

22   pieces of discovery that we think we need in order to make

23   this argument is where did we fit in line in terms of all

24   the other counterparties.  It relates to our claim or

25   defense that we have and that's why we think it's discovery.

1            THE COURT:  Mr. Tambe, what kind of data does

2    Lehman have you think that --

3            MR. TAMBE:  I know we have some data and I can --

4    if I can (indiscernible) for just a minute or two, I can

5    tell you what would level to the field we have. I'm not sure

6    we're going to advance the ball.  I mean for example if we

7    come back and say off a 1,000 counterparties --

8            THE COURT:  Right.

9            MR. TAMBE:  -- 250 did it within three months, 250

10   took six months, 250 took nine months, then my next question

11   is going to be well, who are the 250 who did it in three

12   months?

13           THE COURT:  Right, I mean --

14           MR. TAMBE:  Who are the 250 that took nine months?

15   You they go a trial within a trial as to whether they are

16   not liar or an out and out liar.  We're not going to argue

17   it.  But if it advances the ball, Your Honor, we're not

18   going to argue that they were not reasonably practicable

19   because they were one of the latest parties.

20           We're just simply going to say they standing alone

21   took too long based on their own facts and circumstances,

22   not in comparison to the others, just by themselves.

23           THE COURT:  See the problem -- the problem becomes

24   one of once you attempt to put this in that larger context,

25   but there are so many problems with it because it ends up

Page 236

1    being -- having cherry picking problems, having problems

2    having to do with what else was going on with a particular

3    counterparty.  It will never end and I -- I don't believe

4    and I'm going to stick to my original inkling on this one.

5    That I don't believe that it's relevant at all no matter

6    what it said.

7             I don't think it's relevant to the question of

8    whether Moore delivered its calculation statements in a

9    period of time that was reasonably as soon as reasonably

10   practicable for Moore under its circumstances.  I do not

11   believe that what other parties did has a bearing on that.

12   So that's going to be my ruling on that one in terms of

13   preserving Moore rights.  All right.

14            So do you want to go the next, your next one?

15            MR. GROOTHUIS:  Sure.  Do you want me to talk

16   about the internal the internal Lehman valuations or the

17   other counterparty evaluations?

18            THE COURT:  What -- we have -- whatever you'd

19   like.

20            MR. GROOTHUIS:  Okay.

21            THE COURT:  Okay.

22            MR. GROOTHUIS:  So let's talk about Lehman's

23   internal valuations.  What we're asking for is Lehman's

24   unvarnished valuations prepared by the business people that

25   were working for the estate.  And we believe that these are

Page 237

1    valuations that would have been prepared in the ordinary

2    course of the estate's business unwinding the one million or

3    so transactions that refer to in their paper -- in their

4    papers.

5             And that those transactions would have had to have

6    been valued whether there was going to be litigation or not.

7    Lehman's position is that from the moment they filed for

8    bankruptcy, every valuation that was generated by anyone of

9    the estate was done in anticipation of and because of

10   litigation.  And in other words, what they're saying, if the

11   purpose of the bankruptcy estate is to litigate.  And there

12   isn't a case that supports that sweeping assertion and would

13   upends that (indiscernible) of law.  It is not the law that

14   every piece of paper generated by a bankruptcy estate is

15   prepared because of litigation.

16            It's their burden to establish the critics.  And

17   so they submitted declarations in support of their assertion

18   that the vast majority of the items on their privilege log

19   are spreadsheets that have some language that say

20   spreadsheets prepared in anticipation of litigation.  And

21   these are not just spreadsheets, but regularly prepared,

22   regularly sent to in some cases as many as 300 people.

23            It's their burden to produce evidence that these

24   spreadsheets were prepared in anticipation of litigation,

25   but we've looked at these declarations and what they're

Page 238

1    saying is that the estate had a six-step process for valuing

2    transactions.  And they talk about how they had to collect

3    the data, reconcile trades, and then go through the process

4    of valuing these transactions.

5            Not once in these declarations do they talk about

6    how they're being prepared for litigation which they would

7    be required to do, it's out position, if they were going to

8    assert an attorney work product objection.  And because none

9    of these declarations mention the concept of litigation, we

10   don't think they've met their burden that these ordinary

11   core spreadsheets were in fact prepared in anticipation or

12   because of litigation.

13           And the case upon which they are principally

14   relying, this DeAngeles (ph) vs. Poursine (ph) case, we

15   think doesn't support their position because there's a case

16   where counsel permissions and accounting firm -- and this is

17   counsel to a CIPA trustee in the N.F. Wilco (ph) case to

18   investigate the source of missing customer files.  It's a

19   sort of forensic examination.  That's the kind of thing that

20   is done in -- because of litigation.  And that case talks

21   about how litigation was virtually inevitable.

22           Here we're talking about preparing spreadsheets

23   that compare counterparty's valuation to Lehman's own

24   business people's valuations.  And so even if at some point

25   I think their claim is that because somewhere among those

Page 239

1    300 people there was a lawyer and a lawyer may have asked

2    for something, that doesn't imbue all of these documents

3    that are prepared in the ordinary course with the privilege

4    that's generated by an attorney work product requirement.

5            Even their papers talk about the possibility of

6    litigation but that's not enough.  It has to be under the

7    second circuit case of U.S. vs. Ottoman (ph).

8            THE COURT:  So when do thing work product attaches

9    for the purpose of this dispute?

10           MR. GROOTHUIS:  So I haven't obviously seen the

11   documents on their privilege laws.  We know that we received

12   -- we first received the subpoena from them in the middle of

13   2014.  So we knew they were contemplating litigation in the

14   middle of 2014.  Prior to that, I see no suggestion either

15   in the privilege laws or any of the declarations that they

16   presented on this motion that suggests that they were

17   contemplating litigation.

18           And to be clear, I mean they say, well, Lehman was

19   a big bankruptcy.  There was lots of counterparties, of

20   course there was going to be litigation.

21           But the standard is not some litigation against

22   some counterparty.  Obviously, any large bankruptcy there is

23   a possibility of some bankruptcy.  But what they're saying

24   is these documents were prepared in anticipation or because

25   of the litigation against Moore.

Page 240

1          THE COURT:  I've lost the thread of what -- what

2     it is that you want.  You want any agreements, valuations of

3     Moore's positions?

4          MR. GROOTHUIS:  Yes.  That's what we want.  And at

5     some point as far as we can tell, it's the middle of 2014

6     when they started actually preparing for litigation against

7     Moore and lawyers were getting involved in that process.  I

8     understand there would be an attorney work product privilege

9     at that point.  But prior to that point, I want their

10    internal valuations of these trades so that when they

11    challenge the reasonableness of Moore's valuations, I can

12    cross-examine their expert based on Lehman's internal

13    valuations.

14          THE COURT:  Bearing in mind that their claim is

15    that you didn't deliver the valuation statements as soon as

16    reasonably practicable.

17          MR. GROOTHUIS:  That's one of their claims.

18          THE COURT:  Right.

19          MR. GROOTHUIS:  But they are also claiming

20    valuation differences.  And as I mentioned earlier, the --

21    you know the valuation piece of this case has become the

22    tail wagging the dog.  It's a far bigger piece in terms of

23    dollars and cents point of view than the delivery of the

24    valuation statements for the assignment and set off piece.

25          It's, you know, in the order of tens of millions

Page 241

1    of dollars of claims against Moore specifically related to

2    valuation issues when factoring the interests.

3            And so because of that we believe that we are

4    entitled to Lehman's internal valuations.

5            THE COURT:  Right.  Mr. Tambe, why don't you

6    respond to that.  First of all, how burdensome -- let's hold

7    the date for a moment.  How burdensome would it be -- well,

8    doable would it be to identify and produce internal

9    valuations of the Moore trades or the Moore terminations?

10           MR. TAMBE:  There would be some burden involved.

11   There are -- there's a type of spreadsheet that would have

12   valuation information on it for Moore and other

13   counterparties.  Those spreadsheets can be identified, but

14   then they would need to be redacted for all of the other

15   parties so that only --

16           THE COURT:  Okay.

17           MR. TAMBE:  -- the line relating to Moore would

18   have to be raised.

19           THE COURT:  All right.  So let's do them.  Let's

20   just do them.

21           MR. TAMBE:  Yeah.  As long as it's not seen as the

22   broader waiver of work product/privilege, we're happy to

23   produce that.

24           THE COURT:  It's not a broader waiver.  I'm

25   ordering you to do it.  Okay.

Page 242

```
 1              MR. TAMBE:  Okay.

 2              THE COURT:  Okay?

 3              MR. GROOTHUIS:  Great.

 4              THE COURT:  Okay.  All right.  Are we almost done?

 5              MR. GROOTHUIS:  Almost done.  One more issue, Your

 6   Honor.

 7              THE COURT:  One more.  Okay.

 8              MR. GROOTHUIS:  And that relates to other

 9   counterparty valuations --

10              THE COURT:  Okay.

11              MR. GROOTHUIS:  -- that we haven't received.  As

12   to that, I think there are -- they've raised both burdensome

13   and relevance objections.

14              THE COURT:  This is where you polled the Citibank

15   card?

16              MR. GROOTHUIS:  Well, it's not just Citibank.  I

17   mean we've been looking at some of the transcripts from

18   other proceedings (indiscernible) used.  We know they

19   produced them in other cases.  We were told by Lehman's

20   counsel in this case that the reason they were making this

21   motion to disclose the derivatives questionnaires was so

22   that they could produce these things to us among others.

23              They made the motion.  The motion was granted.

24   We're still waiting for these counterparty valuations.

25   There's at least one letter in this record where they say
```

Page 243

1    they're going to give it to us in a couple of weeks and here

2    we are.  We still haven't gotten them.

3              THE COURT:   Okay.  So let's here from Mr. Tambe

4    about that -- about this one.  Where are we on this one?

5              MR. TAMBE:  One point, the motion to disclose the

6    questionnaires by the way was opposed by a number of

7    parties, including Moore.  So the very stuff they want --

8    basically no one else should have.  But let's not get hung

9    up on that.

10             We're happy to produce to them the questionnaire.

11   I think that the filter is any counterparty that had trades

12   similar to the trades that Moore has, that would be the

13   universe.  If that can be readily done, we'll do it that

14   way.  Otherwise, if they want several thousand

15   questionnaires, they're happy to have them and they can  go

16   through them.

17             MR. TAMBE:  Just to respond to the point about our

18   -- we objected on confidentiality grounds.  We weren't

19   saying that they shouldn't be turned over.  We're just

20   saying that they should be produced in a way that protects

21   the confidential information.

22             THE COURT:  Okay.  All right.  I'll let that one -

23   - I'll let that one pass.

24             MR. TAMBE:  I think he may have left that part

25   out.

Page 244

1          THE COURT:  I think you just got -- I think you

2     just got another group of documents though.

3          MR. GROOTHUIS:  I'm not sure I did because I've

4     heard this before and I know I'm trying to be respectful,

5     but we've heard this before, that we're going to get this

6     type of information and we're going to look into it.

7          THE COURT:  Okay.  But Mr. Tambe just told me, and

8     I know where he lives.  So he's going to produce those

9     documents to you and then if there's something more -- no

10    pun intended that you think is necessary, you know where I

11    live.

12         MR. GROOTHUIS:  Fine.

13         THE COURT:  All right.  So I think --

14         MR. TAMBE:  That will be done, Your Honor.

15         THE COURT:  -- that that is it.

16         MR. GROOTHUIS:  Okay.

17         THE COURT:  All right?

18         MR. TAMBE:  Except for the objecting party.  The

19    parties who object that we can't share that stuff.  But

20    everyone else's.  I think there are several thousand still

21    that we can produce.

22         THE COURT:  I can't get around that.  Right?

23         MR. GROOTHUIS:  I don't know if you can or you

24    can't, Your Honor.

25         THE COURT:  Not without doing something -- not

Page 245

1    without doing something else.  Why don't we agree that

2    you'll start with what is not problematic and then to the

3    extent that you feel that you need more, again, no pun

4    intended, we can -- it's without prejudice to your rights to

5    continue to press for those other documents subject to

6    whatever else it is that we have to do.

7            MR. GROOTHUIS:  Okay.  So then just a housekeeping

8    matter.

9            THE COURT:  Yes.

10           MR. GROOTHUIS:  If that discovery pile I believe

11   is the middle of October.  So we're trying to schedule

12   depositions now for September.  Can we get a sense for when

13   we're going to get these documents so we have enough time to

14   review them and then just make sure that we --

15           THE COURT:  Well, I have to -- when am I going to

16   get your in -- I'm going to get a set of in-cameras, right?

17           MR. TAMBE:  Yes.

18           THE COURT:  Okay.  So you'll get those to me next

19   -- today -- I don't even know what day it is.  Today is

20   Wednesday?

21           MR. GROOTHUIS:  Wednesday.

22           THE COURT:  You'll get them to me sometime next

23   week?

24           MR. TAMBE:  By next week, we can do that.  Next

25   -- and as soon as they transmit those to you, we'll be

Page 246

```
 1    delivering to them the questionnaires.

 2                 THE COURT:  Okay.

 3                 MR. TAMBE:  So let's set a date.  Monday -- Monday

 4    of next week, we can do it.

 5                 MR. GROOTHUIS:  You can do that?

 6                 THE COURT:  Monday, Tuesday, Wednesday.  Monday

 7    makes people work on the weekend.

 8                 MR. GROOTHUIS:  That's true.

 9                 THE COURT:  And it's the summertime.  Okay.  So

10    let's not do Monday.  All right.

11                 MR. GROOTHUIS:  Tuesday.

12                 THE COURT:  Tuesday?

13                 MR. GROOTHUIS:  Yep.

14                 THE COURT:  Tuesday?

15                 MR. TAMBE:  You got it.

16                 I've been told that we can't --

17                 THE COURT:  Ms. Sawyer is trying to tell you

18    something.

19                 MS. SAWYER:  We can't receive this, not in July.

20                 MR. TAMBE:  (indiscernible) can be and can't be

21    done be for questioning?

22                 THE COURT:  When in telling him what to do, you

23    know.  Not to let it -- have to let him listen.

24                 MR. TAMBE:  So, I'm being told --

25                 THE COURT:  By the people who have to do the work.
```

Page 247

1          MR. TAMBE:  Who to do the work and let me know

2     whatever date that is.  It's at least a week for the

3     questionnaires and the different counterparties gave us a

4     backup information with different formats.  I'll just state

5     -- Credit Speaks for example gave us a gigabyte of

6     information for one.  So that would be produced as soon as

7     we can produce them.  Okay.  And I can't tell you --

8          THE COURT:  And do you want -- look, if you need

9     relief from the deadline a little bit, we can do that.

10    Without -- you know, without knowing the volume and the

11    exact timing it seems unfair to say right now.  But let's

12    just roll it out in good faith to each other and then to the

13    extent that you need relief from the schedule if you can't

14    work it out which I encourage you to do, you'll let me know.

15    But a couple of weeks one way or the other doesn't really

16    make that much difference.

17         MR. GROOTHUIS:  And that's fine.  I just want to

18    be clear what we're getting.  It's -- if the parties

19    submitted both the derivative questionnaire and backup for

20    the actual quotes that they used --

21         THE COURT:  Yes.

22         MR. GROOTHUIS:  -- that's what we're getting.

23         THE COURT:  That's how the derivative

24    questionnaire is defined --

25         MR. GROOTHUIS:  Yes.

```
 1            THE COURT:  -- it includes the backup, it includes

 2    the stuff they submitted.

 3            MR. GROOTHUIS:  Okay.

 4            THE COURT:  Right?

 5            MR. GROOTHUIS:  And I guess we'll be back in touch

 6    if the volume is such that we feel like we have to extend

 7    the schedule.

 8            THE COURT:  All right, but, you know, you have to

 9    be careful what you ask for sometimes.

10            MR. GROOTHUIS:  I understand.

11            THE COURT:  All right?  All right, thank you very,

12    very much.

13        (A chorus of thank you)

14            THE COURT:  Have a lovely evening.

15        (Whereupon these proceedings were concluded at 4:29

16    p.m.)

17

18

19

20

21

22

23

24

25
```

Page 249

1                     I N D E X

2

3                      RULINGS

4                                                        PAGE

5    Adv. 08-01420 - Doc #12409 Eighteenth Application of

6    Hughes Hubbard & Reed LLP for Allowance of Interim

7    Compensation for Services Rendered and Reimbursement

8    of Actual and Necessary Expenses Incurred from

9    January 1, 2015 through April 30, 2015               12

10

11   Adv. 08-01420 - Doc #12408 Joint Notice of Presentment

12   of Eighth Amended Order Establishing Procedures

13   Governing Interim Monthly Compensation of Trustee and

14   Hughes Hubbard & Reed LLP                            13

15

16   Doc #52 Motion to Compel Document Discovery filed

17   by Bennette D. Kramer on behalf of JR Moore,

18   LP, et al.                                           240

19

20

21

22

23

24

25

Page 250

1                   C E R T I F I C A T I O N

2

3    We, Dawn South, Tracey Williams, Lisa Beck, and Leigh David,

4    certify that the foregoing transcript is a true and accurate

5    record of the proceedings.

6    Dawn South    Digitally signed by Dawn South
     DN: cn=Dawn South, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2015.07.24 10:57:44 -04'00'
     _____

7    Dawn South

8    AAERT Certified Electronic Transcriber CET**D-408

9    Tracey Williams    Digitally signed by Tracey Williams
     DN: cn=Tracey Williams, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2015.07.24 11:01:03 -04'00'
     _____

10   Tracey Williams

11   AAERT Certified Electronic Transcriber CET**00152

12   Lisa Beck    Digitally signed by Lisa Beck
     DN: cn=Lisa Beck, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2015.07.24 11:01:39 -04'00'
     _____

13   Lisa Beck

14   AAERT Certified Electronic Transcriber CET**D-486

15   Leigh David    Digitally signed by Leigh David
     DN: cn=Leigh David, o=Veritext, ou,
     email=digital@veritext.com, c=US
     Date: 2015.07.24 11:02:23 -04'00'
     _____

16   Leigh David

17   AAERT Certified Electronic Transcriber CET*D-694

18

19   Date:  July 23, 2015

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501