WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
Christopher J. Cox

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
**In re**                                                   :   **Chapter 11 Case No.**
                                                            :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.***,**            :   **08-13555 (SCC)**
                                                            :
         **Debtors.**                                       :   **(Jointly Administered)**
                                                            :
------------------------------------------------------------x

**DECLARATION OF LAWRENCE BRANDMAN IN**
**SUPPORT OF MOTION PURSUANT TO RULE 9019 OF**
**THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND**
**SECTION 105(a) OF THE BANKRUPTCY CODE FOR APPROVAL**
**OF SETTLEMENT AGREEMENT RELATING TO AIRLIE LCDO I (AVIV**
**LCDO 2006-3) CREDIT DEFAULT SWAP AGREEMENT AND INDENTURE**

Pursuant to 28 U.S.C. § 1746, I, Lawrence Brandman, declare:

1.  I am over the age of 18 years and make these statements of my own personal knowledge based on my personal experience, my review of business records of Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), Lehman Brothers Special Financing Inc. ("LBSF"), and/or certain of their affiliates (collectively, the "Chapter 11

Estates"), and/or my consultation with other employees of and advisors to the Chapter 11 Estates. If called to testify, I could testify to the truth of the matters set forth herein.

2. I submit this Declaration in support of the *Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy Code for Approval of Settlement Agreement Relating to Airlie LCDO I (Aviv LCDO 2006-3) Credit Default Swap Agreement and Indenture*, dated May 20, 2015 [ECF No. 49703] (the "Motion").[1]

3. I am Managing Director, Derivatives Legal, Head of Bankruptcy Strategic Advisory with LBHI. One of my primary areas of responsibility is managing the Chapter 11 Estates' mediations relating to derivatives transactions. I also supervise the management of a portfolio of the Chapter 11 Estates' derivatives transactions, including with counterparties that are special purpose entities. In those roles I have independently reviewed, have become familiar with, and have personal knowledge regarding many derivatives transactions that the Chapter 11 Estates entered into before their bankruptcies, including the transaction that is the subject of the Motion. I have been the primary representative for the Chapter 11 Estates in connection with the matters set forth in the Motion, including for the ADR process and the negotiations that resulted in the entry into the settlement agreement among LBSF, LBHI and U.S. Bank National Association (the "Trustee"), solely in its capacity as trustee under the Indenture,[2] dated as of May 20, 2015 (the "Settlement Agreement").

4. I am thus fully familiar with the facts underlying the Motion, which I approved prior to its filing. I adopt the representations contained in the Motion, as if set forth in full and at length in this Declaration.

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Motion.

[2] A copy of the Indenture (without exhibits) is attached to the Motion as Exhibit A.

2

**The Credit Default Swap Agreement and The Indenture**

5.   It is my understanding that LBSF and Airlie LCDO I (Aviv LCDO 2006-3), Ltd., as Issuer (the "Issuer"), entered into the Transaction pursuant to a 1992 form ISDA Master Agreement, dated as of November 1, 2006 (the "ISDA Master Agreement"), as amended and supplemented by a certain Schedule to ISDA Master Agreement (the "Schedule"), and a Confirmation, dated November 1, 2006 (the "Confirmation").[3] LBHI guaranteed LBSF's obligations under the ISDA Master Agreement, Schedule and Confirmation (the "Guarantee" and, together with the ISDA Master Agreement, Schedule, and Confirmation, the "Credit Default Swap Agreement").

6.   It is also my understanding that under the Credit Default Swap Agreement, LBSF agreed to make periodic payments to the Issuer in exchange for the Issuer's promise to make payments to LBSF in respect of losses incurred in respect of certain specified reference obligations. In effect, LBSF, as the "Swap Counterparty," purchased protection from the Issuer, which sold protection on the creditworthiness of the obligations referenced in the Credit Default Swap Agreement.

7.   It is my further understanding that the Issuer issued various classes of notes (the "Notes") under the Indenture and preference shares (the "Preference Shares" and, together with the Notes, the "Securities") under a shares paying agency agreement (the "Shares Paying Agency Agreement"). The Notes were secured by a pool of collateral (the "Collateral") that also secured the Credit Default Swap Agreement. Through a series of note purchases, until the postpetition effectuation and implementation of the Termination Agreement (defined below), LBSF was both a holder of certain of the Notes and the Swap Counterparty under the Credit

---

[3] Copies of the ISDA Master Agreement, the Schedule and the Confirmation are attached to the Motion as Exhibit B.

Default Swap Agreement (in such latter capacity, the "Swap Counterparty"). The Issuer pledged the Collateral to the Trustee for the benefit and security of the holders of the Notes (the "Noteholders"), which also included LBSF, and to LBSF, in its capacity as Swap Counterparty. The Trustee redeemed or liquidated the Collateral pursuant to a letter of direction from its majority Noteholder in October 2012 and continues to hold certain proceeds of the Collateral for the benefit of the remaining holders of the Notes, other than LBSF, and LBSF as Swap Counterparty.

8. I understand that under the Granting Clause of the Indenture, the Issuer granted to the Trustee, for the benefit and security of the secured parties, all of its right, title and interest, whether now owned or hereafter acquired, in, to and under, *inter alia*, the Issuer's rights under the Credit Default Swap Agreement, the Collateral, and substantially all other assets of the Issuer.

9. It is my understanding that under the terms of the Indenture the Trustee applies payment proceeds received generally in accordance with a "waterfall" provision. *See* Indenture § 11.1. Section 11.1(B)(i) clause "third" of the Indenture provides that a termination payment owed to LBSF as Swap Counterparty will be paid in advance of any distributions to Noteholders unless, *inter alia*, LBSF is the defaulting party under the Transaction. *See id.* § 11.1(B)(i). Under clause "second" of Section 11.1(B)(xiv), if, *inter alia*, LBSF is the defaulting party under the Transaction, the termination payment owed to LBSF is paid after the Noteholders and before the holders of Preference Shares (the "Preference Shareholders"). *See id.* § 11.1(B)(xiii). As a result, Section 11.1(B)(i) clause "third" and Section 11.1(B)(xiv) clause "second" of the Indenture (the "Waterfall Provisions") purport to provide that LBSF will receive termination payments before any distributions are made to Noteholders unless, *inter alia*, LBSF is the defaulting party under the Transaction.

4

**The Dispute**

10. On November 25, 2008, the Trustee received a letter from LBSF's counsel advising, *inter alia*, that (a) any action taken to exercise remedies with respect to the Notes would violate the automatic stay and, therefore, any actions to make distributions to Noteholders would violate the stay, and (b) any provision subordinating any termination payment due LBSF would be unenforceable. On November 28, 2008, the Issuer sent to LBSF a "Notice of Early Termination" which terminated the Transaction as of November 28, 2008.

11. On April 20, 2010, LBSF commenced Derivatives ADR No. 157 by serving an ADR Notice upon the Trustee and the Issuer pursuant to the ADR Procedures Order. On June 4, 2010, the Trustee served an ADR Response upon LBSF as required by the ADR Procedures Order.

12. On September 14, 2010, LBSF filed a complaint against, among others, the Trustee and the Issuer. *See* Adversary Proceeding No. 10-03542-SCC (the "Litigation"). At issue in Derivatives ADR No. 157 and in the Litigation is the dispute regarding, among other things, the enforceability of the Waterfall Provisions (the "Payment Dispute"), and questions as to the proper interpretation of the Credit Default Swap Agreement and the Indenture. The Litigation relates to the instant Payment Dispute among LBHI, LBSF, the Issuer, the Co-Issuer, and U.S. Bank (collectively, the "Parties"), as well as other similar disputes involving other issuers and trustees.

13. In the Litigation, LBSF seeks a declaratory judgment that provisions purporting to modify LBSF's economic rights to a termination payment premised on the bankruptcy filing of either LBHI or LBSF constitute unenforceable *ipso facto* clauses that inappropriately modify a debtor's interest in property, in violation of sections 365(e)(1) and 541(c)(1) of the Bankruptcy Code. LBSF also seeks a declaratory judgment that effectuation of

5

the Waterfall Provisions violates the automatic stay under section 362(a)(3) of the Bankruptcy Code because it involves an improper exercise of control over property of LBSF's estate. In the alternative, LBSF seeks a declaratory judgment that, if the Waterfall Provisions ultimately are found to be enforceable in whole or in part, they constitute either (i) a preferential transfer of an interest of LBSF in property that may be avoided under section 547 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; (ii) a constructive fraudulent transfer of an interest of LBSF in property that may be avoided under section 548(a)(1)(B) of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; or (iii) an unauthorized postpetition transfer of property of LBSF's estate that may be avoided under section 549 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code. The positions advanced by LBSF in the Litigation are not those of the Trustee.

14.    On October 20, 2010, the Court entered the *Order Staying Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1)* [ECF No. 12199], thereby staying, among other things, certain adversary proceedings, including the Litigation, to allow parties to the Litigation and other similar actions time to explore the possibility of resolving their disputes without the need for litigation (the "Stay"). I have also been informed that the Stay has been subsequently extended by numerous orders of the Court. On September 11, 2014, the Court entered a scheduling order governing certain adversary proceedings, including the Litigation. *See* Adv. Proc. No. 10-03542 (SCC) [ECF No. 70] (the "Scheduling Order"). The Scheduling Order sets forth a schedule for

litigation of various issues in the Litigation. The Issuer and the Trustee have not answered or otherwise moved for any relief in the Litigation.

15. On April 1, 2011, LBSF submitted an SPV Derivatives ADR Election pursuant to which LBSF recommenced the ADR process under the SPV ADR Procedures Order. The Trustee served an amended ADR Response on June 13, 2011, and LBSF served its ADR Reply on July 5, 2011. LBSF and the Trustee participated in mediation pursuant to the ADR process on December 7, 2012. At various junctures following the commencement of the Litigation and through and including the mediation, LBSF and the Trustee have engaged in settlement discussions.

16. On October 11, 2012, the Parties entered into a termination agreement (the "Termination Agreement"), pursuant to which (i) the Parties terminated the Transaction as of November 28, 2008, (ii) the Issuer and the Trustee took action to cause certain assets held in respect of the Collateral to be redeemed or otherwise liquidated, and to cause the net proceeds thereof to be deposited with the Trustee, (iii) LBSF, in its capacity as the majority Noteholder, surrendered its Notes for cancellation in exchange for a final payment on such Notes as provided for in the Termination Agreement, (iv) the Indenture was deemed discharged subject to the satisfaction of certain conditions, and (v) the Parties exchanged mutual release of claims against one another. Pursuant to the Termination Agreement, all of the Notes other than the Class D Notes have been cancelled. The Trustee currently holds $841,179.60 in escrow for the benefit of the holders of the remaining Class D Notes (the "Remaining Notes").

17. I understand that throughout the course of its settlement negotiations with LBSF, including entry into and implementation of the Termination Agreement, and its participation in the Litigation, the Trustee has made numerous attempts to contact Noteholders and the Preference Shareholders for direction regarding the Payment Dispute and the application

7

of proceeds from the sale of the Collateral. Certain of the Noteholders and Preference Shareholders have not responded to the Trustee's communications. The Trustee has entered into the Settlement Agreement regarding the amounts currently held by the Trustee for the Remaining Notes, subject to the Court's approval of the terms of the Settlement Agreement pursuant to the terms of Bankruptcy Rule 9019. Entry of an order by this Court, in the form annexed to the Motion, is a condition precedent to the effectiveness of the Settlement Agreement.

## The Settlement Agreement[4]

18.     The Settlement Agreement compromises the legal disputes between the parties. Pursuant to the Settlement Agreement, within five business days after the Settlement Agreement's effective date the Trustee shall distribute and apply the amounts it holds in a reserve account created pursuant to the Termination Agreement (the "Escrow Amount"), in accordance with the order, priority and procedures set forth in the Settlement Agreement. Specifically, the Trustee is authorized under the Settlement Agreement to: (a) pay the outstanding fees and expenses of the Trustee in the amount specified in the Settlement Agreement and establish a reserve in the amount of $250,000 (the "Indemnity Reserve Amount"), (b) provided the Noteholder Settlement Amount Condition is met, pay an amount equal to the Noteholder Settlement Amount in satisfaction of the claims of holders of the Remaining Notes that do not object to the Settlement Agreement or the Motion; (c) if the Settlement Offer Condition is satisfied, and subject to certain conditions set forth in the Settlement Agreement, pay to LBSF an amount equal to the proportional amount being held in the Escrow Amount for the Remaining Notes other than the Remaining Notes held by an

---

[4] In keeping with the confidentiality provisions of the Parties' settlement, and due to LBHI's and LBSF's desire to keep the economic terms of the settlement confidential, the Settlement Agreement was not included as an exhibit to the Motion. The descriptions of documents set forth herein are being provided as summaries only. In the case of an inconsistency between the summary herein and the documents, the terms of the documents shall control.

8

Objecting Noteholder; and (d) if the Settlement Offer Condition is not satisfied, pay to LBSF an amount equal to the proportional amount being held in the Escrow Amount for the Remaining Notes other than those Remaining Notes (a) for which the Settlement Offer Condition has not been waived and (b) that are held by an Objecting Noteholder.  LBSF retains all rights as Noteholder or Swap Counterparty except as otherwise explicitly set forth in the Settlement Agreement, and, to the extent that LBSF subsequently purchases Remaining Notes from Objecting Noteholders, commensurate *pro rata* amounts will be deducted from the Escrow Amount and paid to LBSF.  Distribution of any remaining Escrow Amount and any remaining Indemnity Reserve Amount to LBSF will be subject to certain conditions set forth in the Settlement Agreement.

19.  LBSF and the Plan Administrator acknowledge and agree that they, and any agents and assigns thereof, as applicable, will only seek payment for damages and other relief, including interest thereon, with respect to or in connection with the Indenture, the Transaction (including, *inter alia*, any termination payment), the Notes, the Preference Shares, the Shares Paying Agency Agreement, the Settlement Agreement, the Termination Agreement, the letter of direction issued by the majority Noteholder in connection with the Termination Agreement, and/or the Credit Default Swap Agreement, in an aggregate amount not to exceed the then remaining Escrow Amount.

20.  It is my understanding that, pursuant to the Termination Agreement, any proofs of claim filed by the Trustee and the Issuer against any of the Chapter 11 Estates that were related to the Transaction and subject to the Termination Agreement have been withdrawn.

### The Settlement Is in LBSF's Best Interests and Should Be Approved

21.  The use of the Court's equitable authority to approve the Settlement Agreement is justified and appropriate.  First, the Settlement Agreement will result in a payment

9

to LBSF's estate that the Plan Administrator has determined, in the exercise of its business judgment, will adequately compensate LBSF's estate for the early termination value of the Transaction in light of the risks and costs of further litigation. Second, the Settlement Agreement protects the interests of the Remaining Noteholders because it does not permit any distribution from the Escrow Amount in respect of a Noteholder that objects to the Settlement Agreement or this Motion. Third, regardless of the outcome of the Payment Dispute, the payment rights of the Preference Shareholders will be subordinated to those of both the Remaining Noteholders and LBSF, as Swap Counterparty; as a result, the Preference Shareholders should be indifferent to the approval of the Settlement Agreement because they will not receive a payment under the waterfall under any scenario. Moreover, any interested parties that may object to the terms of the Settlement Agreement will have the opportunity to lodge an objection with and be heard by this Court.

22. The Settlement Agreement will benefit LBSF and its creditors by allowing LBSF to capture the remaining value of the Transaction for its estate. If there is an Objecting Noteholder, the Settlement Agreement will not resolve the Payment Dispute: LBSF retains the right to maintain its positions in respect of the Payment Dispute in the Litigation or elsewhere. If there is no Objecting Noteholder then the Payment Dispute will be fully resolved as to the Parties. Regardless, in the Plan Administrator's informed business judgment, the compromises set forth in the Settlement Agreement are "fair and equitable," are well within the "range of reasonableness," and are in the best interests of LBSF's estate and its creditors. I believe that the Settlement Agreement was entered into in good faith and negotiated at arm's length. Therefore, the Motion, which seeks approval of the Settlement Agreement, should be granted.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 15th day of June 2015.

/s/ Lawrence Brandman
Lawrence Brandman
