WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., *et al.*,** | : | **08-13555 (SCC)** |
| **Debtors.** | : | **(Jointly Administered)** |

**DECLARATION OF LAWRENCE BRANDMAN IN SUPPORT OF MOTION PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY CODE FOR APPROVAL OF SETTLEMENT AGREEMENT AMONG PUTNAM STRUCTURED PRODUCT CDO 2002-1 LTD., PUTNAM STRUCTURED PRODUCT CDO 2002-1 LLC, U.S. BANK NATIONAL ASSOCIATION, AS SUCCESSOR TRUSTEE, LEHMAN BROTHERS SPECIAL FINANCING INC., AND LEHMAN BROTHERS HOLDINGS INC.**

Pursuant to 28 U.S.C. § 1746, I, Lawrence Brandman, declare:

1. I am over the age of 18 years and make these statements of my personal knowledge based on my personal experience, my review of business records of Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), Lehman Brothers Special Financing Inc. ("LBSF"), and/or certain of their affiliates (collectively, the "Chapter 11 Estates"), and/or my consultation with other employees of and advisors to the Chapter 11 Estates. If called to testify, I could testify to the truth of the matters set forth herein.

2. I submit this Declaration in support of the *Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy Code for Approval of Settlement Agreement Among Putnam Structured Product CDO 2002-1 Ltd., Putnam Structured Product CDO 2002-1 LLC, U.S. Bank National Association, as Successor Trustee, Lehman Brothers Special Financing Inc., and Lehman Brothers Holdings Inc.*, dated July 6, 2015 [ECF No. 50217] (the "Motion").[1]

3. I am Managing Director, Derivatives Legal, and Head of Bankruptcy Strategic Advisory with LBHI. One of my primary areas of responsibility is managing the Chapter 11 Estates' mediations relating to derivatives transactions. I also supervise the management of a portfolio of the Chapter 11 Estates' derivatives transactions, including with counterparties that are special purpose entities. In those roles I have independently reviewed, have become familiar with, and have personal knowledge regarding many derivatives transactions that the Chapter 11 Estates entered into before their bankruptcies, including the transactions that are the subject of the Motion. I have been the primary representative for the Chapter 11 Estates in connection with the matters set forth in the Motion, including for the ADR process and the negotiations that resulted in the settlement agreement, dated as of July 2, 2015 (the "Settlement Agreement"), among LBSF, LBHI, Putnam Structured Product CDO 2002-1 Ltd., as Issuer (the "Putnam Issuer"), Putnam Structured Product CDO 2002-1 LLC, as Co-Issuer (the "Putnam Co-Issuer" and together with the Putnam Issuer, "Putnam"), and U.S. Bank National Association ("U.S. Bank" or the "Putnam Trustee"), solely in its capacity as successor trustee under the Amended and Restated Trust Deed, by and between Putnam and LaSalle Bank

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Motion.

National Association, as original trustee and securities administrator, dated as of May 29, 2003 (the "Putnam Trust Deed").

4. The Settlement Agreement provides for the resolution of all disputes between the parties thereto relating to: (a) the interest of the Putnam Issuer and the Putnam Co-Issuer in certain notes issued for (x) the account of the Series 2007-1 Segregated Portfolio by ALTA CDO SPC (the "Alta 2007-1 Issuer") and ALTA CDO LLC (the "Alta 2007-1 Co-Issuer"), and (y) the account of the Series 2007-2 Segregated Portfolio by ALTA CDO SPC (the "Alta 2007-2 Issuer" and together with the Alta 2007-1 Issuer, the "Alta Issuers") and ALTA CDO LLC (the "Alta 2007-2 Co-Issuer" and together with the Alta 2007-2 Co-Issuer, the "Alta Co-Issuers"), and (b) LBSF's claims against Putnam for amounts allegedly owed to LBSF in connection with the early termination of certain credit derivative swap transactions (the "Swaps") entered into among the Alta Issuers and the Alta Co-Issuers (together "Alta"), LBSF, and LBHI.

5. I am thus fully familiar with the facts underlying the Motion, which I approved prior to its filing. I adopt the representations contained in the Motion, as if set forth in full and at length in this Declaration.

**The Swap Agreements and the Alta Indentures**

6. It is my understanding that LBSF, LBHI, and the Alta 2007-1 Issuer, a special purpose vehicle and collateralized debt obligation or "CDO", entered into a 1992 form (Multicurrency-Cross Border) ISDA Master Agreement dated as of April 3, 2007 (the "Alta 2007-1 Master Agreement," and along with the annexed "Schedule," the relevant swap "Confirmations," and related documents, the "Alta 2007-1 Swap Agreement"). Also on April 3, 2007, the Alta 2007-1 Issuer and the Alta 2007-1 Co-Issuer, along with their trustee, U.S. Bank

National Association (in this capacity, the "Alta 2007-1 Trustee"), entered into a series indenture subject to certain standard terms (together, the "Alta Series 2007-1 Indenture").

7. It is also my understanding that, on October 9, 2007, LBSF, LBHI, and the Alta 2007-2 Issuer, a special purpose vehicle and CDO entered into a 1992 form (Multicurrency-Cross Border) ISDA Master Agreement (the "Alta 2007-2 Master Agreement," and along with the annexed "Schedule," the relevant swap "Confirmations," and related documents, the "Alta 2007-2 Swap Agreement" and, together with the Alta 2007-1 Swap Agreement, the "Swap Agreements"). Also on October 9, 2007, the Alta 2007-2 Issuer and the Alta 2007-2 Co-Issuer, along with their trustee, U.S. Bank National Association (in this capacity, the "Alta 2007-2 Trustee" and together with the Alta 2007-1 Trustee, the "Alta Trustees"), entered into a series indenture subject to certain standard terms (together, the "Alta Series 2007-2 Indenture" and, together with the Alta 2007-1 Indenture, the "Alta Indentures").

8. I understand that under the Swaps issued pursuant to the Swap Agreements, the Alta Issuers sold "credit protection" to LBSF on portfolios of diverse entities (collectively, the "Reference Entities") in exchange for periodic premium payments by LBSF to the respective Alta Issuer. I also understand that the Alta Indentures, among other things, govern the Alta Issuers' and the Alta Co-Issuers' respective payment obligations on certain notes (the "Alta Notes") they issued and sold to investors (the "Alta Noteholders"), such as Putnam.[2]

9. It is my further understanding that Alta used the money it received through the sale of the Alta Notes to acquire specific assets (the "Permitted Investments") that served as

[2] I understand that, pursuant to the Putnam Trust Deed, the Putnam Issuer and the Putnam Co-Issuer issued themselves certain notes (the "Putnam Notes") and a trust was created for administering the Putnam Notes. I further understand that the trust subsequently acquired $20,000,000 in principal amount of Alta Notes series A-0212454AA3 and $22,500,000 in principal amount of Alta Notes series A-1-81753CAA0 (collectively, the "Putnam Owned Notes").

collateral for, first, Alta's obligations to LBSF under the Swap Agreements and, thereafter, for Alta's obligations under the Alta Notes. LBSF was a "secured party" under and "an express third-party beneficiary" of each of the Alta Indentures.

10. I understand that the Alta Indentures provide that the Alta Noteholders will receive interest payments on the Alta Notes from, *inter alia*, LBSF's premium payments under the Swaps, and that they will be repaid principal from the available proceeds of the Permitted Investments but only *after* payment of any amounts due to LBSF as a result of credit events with respect to the Reference Entities. Indeed, the principal amount of the Alta Notes automatically is reduced by any such amounts paid to LBSF. Therefore, if Alta did not need to pay out on the Swaps (either in the ordinary course or at termination) because the Reference Entities remained healthy, then the Putnam Issuer (through the trust), like all Alta Noteholders, would benefit. *But*, if credit events occurred with respect to the Reference Entities, then the Putnam Issuer (through the trust), was at risk of losing some or all of its investment in the Putnam Owned Notes, given LBSF's senior payment priority position under the Alta Indentures.

11. Specifically, I understand that under the "Priority of Payments" — or payment "waterfall"— in section 5(iii) of each Alta Indenture, if LBSF has a claim against the applicable Alta Issuer under the applicable Swap Agreement, LBSF's right to payment has priority over any claims of Alta Noteholders. Thus, if Alta owed LBSF money under either Swap Agreement and Alta lacked sufficient funds to meet its remaining obligations after paying LBSF, the Alta Noteholders risked a partial or complete loss on their investment. I further understand that this payment arrangement was subject to modification under the terms of the Alta Indentures. Upon a default by LBSF, such as a bankruptcy filing by LBSF or LBHI, the Alta Indentures provide that LBSF must transfer its right to senior payment priority to the Alta

Noteholders (the so-called the "Priority Flip"). In that circumstance, the Priority Flip changes LBSF's position to junior payment priority for any early termination payment due under the Swaps.

**Alta's Early Termination of the Swaps and Distribution of Funds to Putnam**

12. It is my understanding that LBHI's chapter 11 filing constituted an "Event of Default" under the Swap Agreements. The Alta Trustees designated September 18, 2008, as the "Early Termination Date" "in respect of all outstanding Transactions" under the Credit Default Swap Agreement. LBSF asserts that it was owed a very significant early termination payment by Alta as a result of that early termination, given LBSF's "in the money" position in the Swaps at the time. Nevertheless, purportedly in reliance on the Priority Flip, on October 21, 2008, well after LBSF's chapter 11 filing, the Alta Trustees made distributions of interest and principal in excess of $410 million to the Alta Noteholders, including over $42.5 million to the Putnam Issuers or the Putnam Trustees, and none to LBSF. If the Priority Flip had not been effected, LBSF believes that Putnam would not have received approximately $15.8 million of the amount it actually received from the ALTA Trustees. LBHI and LBSF believe that LBSF is entitled to that approximately $15.8 million; the Alta Trustees, the Putnam Trustee, and Putnam dispute LBSF's and LBHI's contention that LBSF can recover the funds that the Alta Trustee paid to the Alta Noteholders, including Putnam, instead of to LBSF (the "Payment Dispute").

13. On September 14, 2010, LBSF commenced Adversary Proceeding No. 10-03547, captioned *Lehman Bros. Special Fin. Inc. v. Bank of Am. National Ass'n, et al.* (*In re Lehman Bros. Holdings Inc.*, *et al.*), Case No. 08-13547 (SCC) (the "Adversary Proceeding"), challenging, among other things, (a) the enforceability of certain provisions in the contracts governing Alta and the Alta Notes purporting to modify LBSF's right to receive payment upon

early termination of the Swaps solely as a result of LBSF's or LBHI's bankruptcy filings – *i.e.*, the Priority Flip, and (b) Alta's distribution of funds to Putnam and others related to their interest in the Alta Notes. LBSF named Alta as an "SPV Issuer Defendant" and the Putnam Issuer as a "Noteholder Defendant" in the Adversary Proceeding.

14. On October 20, 2010, the Court entered the *Order Staying Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1)* [ECF No. 12199], thereby staying, among other things, certain litigation, including the Adversary Proceeding, to allow parties to the Adversary Proceeding and other similar actions time to explore the possibility of resolving their disputes without the need for litigation (the "Stay"). I have also been informed that the Stay has been subsequently extended by orders of the Court. Most recently, on July 14, 2014, the Court entered a scheduling order governing the Distributed Actions, including the Adversary Proceeding. *See* Adv. Proc. No. 10-03547 (SCC) [ECF No. 794] (the "Scheduling Order"). The Scheduling Order sets forth a schedule for litigation of various issues in the Adversary Proceeding. Accordingly, as a result of the Stay and the Scheduling Order, Putnam, Alta, the Putnam Trustee, and the Alta Trustees have not answered or otherwise moved for any relief in the Adversary Proceeding.

15. On May 13, 2013, while the Adversary Proceeding was stayed, LBSF initiated an ADR proceeding relating to the Payment Dispute pursuant to the SPV ADR Procedures Order by serving SPV Derivatives ADR Notice No. 847 (the "SPV ADR Notice") on the Putnam Issuer. On July 29, 2013, the Putnam Trustee responded to the SPV ADR Notice on behalf of the Putnam Issuer. The Putnam Trustee subsequently has participated in the Court-mandated ADR process on behalf of Putnam. On February 12, 2015, the Plan Administrator on behalf of LBSF and LBHI, the Putnam Trustee, The Putnam Advisory Company, LLC, the

collateral manager for Putnam (the "Putnam Collateral Manager"), and certain holders of Putnam Notes engaged in mediation pursuant to the SPV ADR Procedures Order, ultimately resulting in entry into the Settlement Agreement described immediately below.

16. I understand that throughout the course of its settlement negotiations with LBSF and its participation in the Adversary Proceeding, the Putnam Trustee has made numerous attempts to contact the Putnam Noteholders for direction regarding the Payment Dispute.

**The Settlement Agreement**[3]

17. The Settlement Agreement compromises the Payment Dispute. Entry of an Order by this Court, in the form annexed to the Motion, approving the Settlement Agreement pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code, is a condition precedent to the effectiveness of the Settlement Agreement. Pursuant to the Settlement Agreement,[4] the Putnam Trustee has deposited the Principal Proceeds (as defined in the Putnam Trust Deed) on each Payment Date (as defined in the Putnam Trust Deed) into an escrow account (the "Settlement Escrow") until the Settlement Escrow holds the agreed upon Settlement Amount. As of the date hereof, the Settlement Escrow holds the full Settlement Amount. Within three business days of entry of an Order approving the Motion becoming final (the "Approval Date"), the Putnam Trustee shall pay all funds in the Settlement Escrow to LBSF by wire transfer.

18. Upon payment in full of the Settlement Amount, LBSF, LBHI, and the Plan Administrator shall promptly dismiss with prejudice any and all claims against Putnam

[3] In keeping with the confidentiality provisions of the Settlement Agreement, and due to LBHI's and LBSF's desire to keep the economic terms of the settlement confidential, the Settlement Agreement was not included as an exhibit to the Motion.

[4] The descriptions of documents set forth herein are being provided as summaries only. In the case of an inconsistency between the summary herein and the documents, the terms of the actual documents shall control.

Issuer, the Putnam Co-Issuer, the Putnam Collateral Manager, and U.S. Bank, individually and/or as the Putnam Trustee, from any and all claims arising under, related to, or in connection with the Putnam Owned Notes, including, any such claims made in the Adversary Proceeding.

19. Additionally, it is my understanding that, upon payment in full of the Settlement Amount to LBSF, LBSF, LBHI, and the Plan Administrator shall release U.S. Bank, individually and as Putnam Trustee, any and all prior trustees under the Putnam Trust Deed, the Putnam Issuer, the Putnam Co-Issuer, the Putnam Collateral Manager, and any and all former, current, or future holders of Notes issued pursuant to the Putman Trust Deed, from any and all claims arising from, related to, or in connection with the Putnam Owned Notes and the Putnam Trust Deed, and shall covenant never to commence a proceeding regarding the same.

20. It is also my understanding that, upon payment in full of the Settlement Amount to LBSF, LBSF, LBHI, and the Plan Administrator shall release U.S. Bank, individually and as the Alta Trustees, the Alta Issuers, the Alta Co-Issuers, and any and all former, current or future Alta Noteholders, from any and all claims, arising from (i) any amounts distributed by, or on behalf of, the Alta Trustees to, or for the benefit of, Putnam or the Putnam Trustee on account of the Putnam Owned Notes or (ii) any amounts, including, without limitation, prejudgment interest, claimed under or in connection with the SPV ADR Notice, and shall covenant never to commence a proceeding regarding the same.

**The Settlement Agreement Is in**
**<u>LBSF's Best Interests and Should Be Approved</u>**

21. The use of the Court's equitable authority to approve the Settlement Agreement is justified and appropriate. Here, the Settlement Agreement will benefit LBHI, LBSF and their creditors. First, the Settlement Agreement will result in a substantial payment to LBSF's estate that the Plan Administrator has determined, in the exercise of its business

judgment, will adequately compensate LBSF's estate for the early termination value of the Swaps in light of the risks and costs of further litigation. Second, entry into the Settlement Agreement will avoid future disputes and litigation concerning the Putnam Owned Notes. Third, all Noteholders that would have received a payment of Principal Proceeds under the Putnam Trust Deed but for the Settlement Agreement were made aware of the terms of the Settlement Agreement prior to the filing of the Motion and have not posed any objection.

22. For the reasons set forth above, I and my colleagues involved in the management of the Chapter 11 Estates, as well as counsel to the Chapter 11 Estates, have concluded, in our considered business judgment, that the compromises set forth in the Settlement Agreement are "fair and equitable," are well within the "range of reasonableness," and are in the best interests of LBSF's estate and its creditors. We believe the Settlement Agreement was entered into in good faith and negotiated at arm's length. Therefore, the Motion, which seeks approval of the Settlement Agreement, should be granted.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 3rd day of August 2015.

/s/ Lawrence Brandman
Lawrence Brandman