WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------------ x

## REPLY MEMORANDUM OF LAW OF
## LEHMAN BROTHERS HOLDINGS INC. IN FURTHER SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO
## RULE 7056 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
## <u>REGARDING CLAIM 67707 FILED BY SPANISH BROADCASTING SYSTEM, INC.</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

ANALYSIS...................................................................................................................3

I.    The Payoff Letter Did Not Render Spanish Broadcasting's Waiver of
Consequential Damages Ineffective or Unenforceable As a Matter of Law ......................3

      A.    Spanish Broadcasting Expressly Waived Any Right to Consequential
Damages.........................................................................................................3

      B.    The Damages Waiver is Effective and Enforceable .........................................5

II.    The Asserted Damages Are Consequential Damages As a Matter of Law ......................17

      A.    Whether the Asserted Damages Are Consequential or Direct Damages
May Be Decided As a Matter of Law ............................................................18

      B.    The Purported Expert Reports Confirm that the Asserted Damages Are
Consequential Damages.................................................................................19

      C.    Losses from Collateral Business Arrangements Are Consequential
Damages As A Matter of Law .......................................................................25

CONCLUSION...............................................................................................................29

WEIL:\95417575\13\58399.0011

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1523 Real Estate, Inc. v. E. Atl. Props., LLC*,
  24 Misc. 3d 1228(A), 901 N.Y.S.2d 901 (Sup. Ct. 2009) ......................................................11

*Abate v. Bushwick Sav. Bank*,
  138 N.Y.S.2d 140 (City Ct. 1955) ...............................................................................19, 20

*Am. List Corp. v. U.S. News & World Report, Inc.*,
  549 N.E.2d 1161 (N.Y. 1989)..............................................................................................20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 248 (1986).....................................................................................................20

*Avalon Constr. Corp. v. Kirch Holding Co., Inc.*,
  175 N.E. 651 (N.Y. 1931).............................................................................................20, 22

*Bond St. Knitters v. Peninsula Nat'l Bank*,
  42 N.Y.S.2d 744, 744 (1st Dep't 1943) (*per curiam*)..........................................................20

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
  262 F. Supp. 2d 204 (S.D.N.Y. 2003)..................................................................................11

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
  372 F.3d 471 (2d Cir. 2004)...................................................................................................6

*Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*,
  36 F. Supp. 3d 336 (S.D.N.Y. 2014)....................................................................................17

*Cent. Coordinates, Inc. v. Morgan Guar. Trust Co.*,
  494 N.Y.S.2d 602, 604 (Sup. Ct. 1985) ..............................................................................20

*Chock Full O'Nuts Corp. v. Tetley, Inc.*,
  152 F.3d 202 (2d Cir. 1998).................................................................................................16

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
  650 F. Supp. 2d 314 (S.D.N.Y. 2009)..................................................................................25

*Congregation Darech Amuno v. Blasof*,
  640 N.Y.S.2d 564, 565 (1st Dep't 1996) .............................................................................14

*Cummins, Inc. v. Atl. Mut. Ins. Co.*,
  56 A.D.3d 288, 867 N.Y.S.2d 81 (2008) .............................................................................17

*Cusano v. Horipro Entm't Grp.*,
   301 F. Supp. 2d 272 (S.D.N.Y. 2004) *aff'd*, 126 F. App'x 521 (2d Cir. 2005) ........................12

*D'Amato v. Five Star Reporting, Inc.*,
   No. 12-cv-3395 (ADS) (AKT), 2015 WL 248612 (E.D.N.Y. Jan. 17, 2015) .........................17

*DLJ Mortg. Capital Corp. v. Fairmont Funding, Ltd.*,
   920 N.Y.S.2d 1, 2 (1st Dep't 2011) ....................................................................................3

*Dorsey v. Artus*,
   No. 9:09-cv-1011, 2013 WL 5463720 (N.D.N.Y. Sept. 30, 2013).........................................28

*Emps.' Ret. Sys. of Ala. v. IBJ Shroder Bank & Trust Co.*,
   840 F. Supp. 972 (SDNY 1993).........................................................................................25

*Esquire Trade & Fin., Inc. v. CBQ, Inc.*,
   No. 03 CIV. 9650 (SC), 2009 WL 3756470 (S.D.N.Y. Nov. 5, 2009).............................16, 17

*FDIC v. Parkway Exec. Office Ctr.*,
   Nos. CIV.A. 96-121, CIV.A.96-122, 1998 WL 18204 (E.D. Pa. Jan. 9, 1998) .....................25

*First Montauk Sec. Corp. v. Menter*,
   26 F. Supp. 2d 688 (S.D.N.Y. 1998).................................................................................12

*Generale Bank, N.Y. Branch v. Wassel*,
   No. 91 Civ. 1768 (LAP), 1995 WL 312466 (S.D.N.Y. May 19, 1995)....................................5

*Genon Mid-Atl., LLC v. Stone & Webster, Inc.*,
   No. 11 CV 1299 (HB), 2012 WL 1372150 (S.D.N.Y. Apr. 18, 2012) ....................................19

*Gilbert Frank Corp. v. Fed. Ins. Co.*,
   520 N.E.2d 512 (N.Y. 1988)................................................................................................6

*Golden Archer Invs., LLC v. Skynet Fin. Sys.*,
   908 F. Supp. 2d 526 (S.D.N.Y. 2012)..................................................................................14

*Gould v. Bantam Books, Inc.*,
   No. 83 Civ. 5121 (LBS), 1984 WL 684 (S.D.N.Y. July 31, 1984) .........................................5

*Hudson Specialty Ins. Co. v. N.J. Transit Corp.*,
   No. 15-cv-89 (ER), 2015 WL 3542548 (S.D.N.Y. June 5, 2015) ..........................................17

*In re 18th Ave. Realty, Inc.*,
   No. 03-14480 (RDD), 2010 WL 1849403 (Bankr. S.D.N.Y. May 7, 2010) ....................16, 27

*In re Caldor, Inc.*,
   217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998) ...........................................................................5

WEIL:\95417575\13\58399.0011

*In re CCT Commc'ns, Inc.*,
    No. 07-10210 (SMB), 2008 WL 2705471 (Bankr. S.D.N.Y. July 2, 2008) ...........................13

*In re Miraj & Sons*,
    192 B.R. 297 (D. Ma 1996) .........................................................................................25

*Klos v. Polskie Linie Lotnicze*,
    133 F.3d 164, 168 (2d Cir. 1997)...............................................................................12

*Latham-Land I, LLC v. TGI Friday's, Inc.*,
    96 A.D.3d 1327 (N.Y. App. Div. 2012) .......................................................................25, 26

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010).....................................................................................16, 17

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
    639 F.3d 63 (2d Cir. 2011).........................................................................................13

*Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*,
    784 F.3d 78 (2d Cir. 2015).........................................................................................15

*Madeira v. Affordable Hous. Found., Inc.*,
    323 F. App'x 89 (2d Cir. 2009)...................................................................................16

*Morefun Co., Ltd. v. Mario Badescu Skin Care Inc.*,
    588 F. App'x 54 (2d Cir. 2014)...................................................................................13

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.*,
    436 N.E.2d 1265, 1270 (N.Y. 1982) ...........................................................................11

*NetTech Solutions, L.L.C. v. ZipPark.com*,
    No. 01 CIV. 2683 (SAS), 2001 WL 1111966 (S.D.N.Y. Sept. 20, 2001).................................5

*Ottinger v. Gen. Motors Corp.*,
    27 F. Supp. 508 (S.D.N.Y. 1939) .............................................................................5, 11

*PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*,
    73 F. Supp. 3d 358 (S.D.N.Y. 2014).......................................................................14, 18, 19

*Pollack v. Crocker*,
    660 F. Supp. 1284 (S.D.N.Y. 1987)..............................................................................14

*Primex Int'l Corp. v. Wal-Mart Stores, Inc.*,
    679 N.E.2d 624, 627 (N.Y. 1997)..............................................................................14, 15

*Rabin v. Parchem Trading, Inc. Profit Sharing Plan*,
    No. 13 CV 9201(VB), 2015 WL 861746 (S.D.N.Y. Jan. 30, 2015).......................................11

iv

*Reyes v. Metromedia Software, Inc.*
  840 F.Supp.2d 752 (S.D.N.Y. 2012)............................................................15

*R/S Assocs. v. N.Y. Job Dev. Auth .,*
  771 N.E.2d 240, 242 (N.Y.2002)..............................................................13

*Schonfeld v. Hilliard,*
  218 F.3d 164, 175 (2d Cir. 2000)..............................................................20

*Scientific Components Corp. v. Raytheon Co.,*
  No. M 82 (HB), 2005 U.S. Dist. LEXIS 13087 (S.D.N.Y. June 29, 2005)...........................10

*Semetex Corp. v. UBAF Arab Am. Bank,*
  51 F.3d 13 (2d Cir. 1995)......................................................................5

*SPCP Grp., LLC v. Eagle Rock Field Servs., LP,*
  No. 12 Civ. 3610(PAC), 2013 WL 359650 (S.D.N.Y. Jan. 30, 2013) ............................13, 14

*T.-Co Metals, LLC v. Dempsey Pipe & Supply, Inc.,*
  592 F.3d 329 (2d Cir. 2010)................................................................25, 26

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.,*
  487 F.3d 89 (2d Cir. 2007)................................................................25, 26

*Twitchell v. Town of Pittsford,*
  106.A.D.2d 903, 904-05 (N.Y. App. Div. 4th Dep't 1984)......................................9

*Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.,*
  472 N.E.2d 315 (N.Y. 1984) .................................................................16

*U.S. v. Am. Soc'y of Composers, Authors & Publishers,*
  No. Civ. 13-95 (WCC), 1989 U.S. Dist. LEXIS 16907 (S.D.N.Y. Dec. 21, 1989).......9, 10, 15

*Vivaro Corp. v. Raza Commc'n, Inc. (In re Vivaro Corp.),*
  No. 12-01928 (MG), 2014 WL 486288 (Bankr. S.D.N.Y. Feb. 6, 2014)...................19, 20, 25

*Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi,*
  215 F.3d 247 (2d Cir. 2000).................................................................28

*Zelazny v. Pilgrim Funding Corp.,*
  244 N.Y.S.2d 810 (Dist. Ct. 1963) .........................................................22

## Other Authorities

Black's Law Dictionary ........................................................................7, 8

Merriam-Webster Dictionary.....................................................................7, 8

25 Williston on Contracts .......................................................................20

WEIL:\95417575\13\58399.0011

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (ECF No. 22737) (the "Plan"), on behalf of Lehman Commercial Paper Inc. ("LCPI"), files this reply memorandum of law in further support of its motion for summary judgment on the Three Hundred Twenty-Eighth Omnibus Objection to Claims (No Liability Claims), dated July 10, 2012 (ECF No. 29323, the "Objection"), to, among other claims, Claim No. 67707 (the "Claim") filed by Spanish Broadcasting System, Inc. ("Spanish Broadcasting").  In further support of the motion, the Plan Administrator respectfully represents as follows:

## PRELIMINARY STATEMENT

The evidence relied upon by both the Plan Administrator and Spanish Broadcasting conclusively establishes that Spanish Broadcasting "irrevocably and unconditionally" waived any right to recover the EBITDA Damages and the Swap Damages it seeks from LCPI.[1]  Based on Spanish Broadcasting's latest and ever-changing calculations and descriptions of its damages, the EBITDA Damages and the Swap Damages encompass $41.5 million out of the $41.8 million sought by Spanish Broadcasting, and constitute consequential damages expressly barred by the Damages Waiver.  Specifically, section 10.12(e) of the Credit Agreement states:  "Borrower [*i.e.*, Spanish Broadcasting] hereby irrevocably and unconditionally . . . waives . . . any right it may have to claim or recover in any legal action or

---

[1] Capitalized terms not defined herein shall have the same meanings ascribed to them in the *Memorandum of Law of Lehman Brothers Holdings Inc. in Support of Motion for Summary Judgment Pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure Regarding Claim 67707 Filed by Spanish Broadcasting System, Inc.*, filed on June 18, 2015 (ECF No. 50033) (the "Moving Memorandum" or "Mov. Mem.").

proceeding . . . any special, exemplary, punitive or consequential damages." 7056-1 Statement ¶ 9, §10.12(e).

Spanish Broadcasting attempts to avoid this inevitable conclusion by trying to manufacture an issue of fact regarding the enforceability of the waiver. Without any applicable evidence, Spanish Broadcasting argues that the parties intended the Payoff Letter to render the irrevocable Damages Waiver ineffective or unenforceable. However, glaringly absent from the Payoff Letter is any language revoking, terminating or nullifying the Damages Waiver, which was admittedly in full force and effect when LCPI failed to fund the 2008 Draw Request. Rather, the plain language in the Payoff Letter states that Spanish Broadcasting's "obligations" shall be terminated. Spanish Broadcasting therefore attempts to shoehorn the waiver into the definition of "obligations," relying on emails exchanged by the parties while negotiating the Payoff Letter. But, as demonstrated below, the parties never discussed the Damages Waiver during the course of the negotiations, and there is no evidence that LCPI shared Spanish Broadcasting's purported belief that the Damages Waiver would be rendered retroactively ineffective by the Payoff Letter. Thus, Spanish Broadcasting's insistence that LCPI agreed to terminate the Damages Waiver without any discussion or clear contractual language is unfounded. There also is no evidence supporting Spanish Broadcasting's outlandish contention that the Payoff Letter somehow terminated the Damages Waiver as a past right or obligation, but did not terminate LCPI's past obligation to fund the Draw Request. Spanish Broadcasting's baseless arguments do not create a material issue of fact.[2]

---

[2] Attached as Appendix 1 is a list of key dates and events, further demonstrating the outlandish nature of Spanish Broadcasting's argument that the Payoff Letter executed in 2012 rendered the Damages Waiver executed in 2005 ineffective with respect to the Claim that arose from a failure to fund in 2008.

Spanish Broadcasting also has presented no evidence that creates a factual issue regarding the characterization of damages. As demonstrated in the Moving Memorandum, the EDITDA Damages and the Swap Damages are consequential damages arising from collateral business arrangements, not direct damages arising from LCPI's failure to fund the Draw Request. Conclusory allegations stating otherwise do not alter this result. Furthermore, as demonstrated in the Moving Memorandum and further below, the statements submitted by Spanish Broadcasting's own purported experts—Capstone Advisory Group, James Trautman and Christopher J. Kearns—as well as the Garcia Declaration (defined below) all confirm that the damages asserted are not the direct result of LCPI's failure to loan Spanish Broadcasting $10 million. Rather, the asserted damages were allegedly caused by events that are several steps removed from the failure to make a loan advance, and/or arise from separate business arrangements. As such, they constitute consequential damages barred by the Damages Waiver, entitling the Plan Administrator to judgment as a matter of law.

## ANALYSIS

I. **The Payoff Letter Did Not Render Spanish Broadcasting's Waiver of Consequential Damages Ineffective or Unenforceable As a Matter of Law**

A. **Spanish Broadcasting Expressly Waived Any Right to Consequential Damages**

There is no genuine dispute that Spanish Broadcasting "irrevocably and unconditionally" waived any right to recover consequential damages when it executed the Credit Agreement on or about June 10, 2005. That waiver was part of the bargained-for exchange memorialized in the Credit Agreement. *See* 7056-1 Statement, Ex. C. As demonstrated in the Moving Memorandum, a waiver is a "clear manifestation" of intent "to relinquish [a] known right." Mov. Mem. at 19-20 (citing *DLJ Mortg. Capital Corp. v. Fairmont Funding, Ltd.*, 920 N.Y.S.2d 1, 2 (1st Dep't 2011)). Spanish Broadcasting clearly manifested its intent to relinquish

3

its right to consequential damages when it agreed to include section 10.12 in the Credit

Agreement.  Section 10.12 expressly states:

> *[Spanish Broadcasting]* hereby **irrevocably and unconditionally**
> *. . . waives*, to the maximum extent not prohibited by law, any right
> it may have to claim or recover in any legal action or proceeding
> referred to in this Section[3] **any special, exemplary, punitive or
> consequential damages.**

7056-1¶ 9, § 10.12(e) (emphasis added).   The express language of section 10.12(e) demonstrates

that Spanish Broadcasting "irrevocably and unconditionally" waived any right to recover

consequential damages, meaning that such waiver cannot be revoked and is not subject to any

conditions.  Despite this undisputed waiver, Spanish Broadcasting argues in the Opposition

Memorandum[4] that "[the] existence of a waiver is a question of fact" that is "generally ill-suited

for summary adjudication."  Opp. Mem. at 20.  Not once, however, does Spanish Broadcasting

contend that the Damages Waiver was invalid or unenforceable at the time the Credit Agreement

was executed or at the time of LCPI's failure to fund.  *See generally* Opp. Mem.; *see also* Mov.

Mem. at n.12.  Rather, Spanish Broadcasting attempts to set aside the Damages Waiver by

arguing, without any credible evidence, that the Payoff Letter executed by the parties *seven years

later* rendered the waiver ineffective or unenforceable.

   The cases relied upon by Spanish Broadcasting to argue the existence of an issue

of fact, all concern implied waivers that could only be determined by examining and interpreting

the conduct of the parties, not express waivers such as the Damages Waiver in the Credit

---

[3] Section 10.12 of the Credit Agreement refers to "any legal action or proceeding relating to this Agreement and the other Loan Documents to which [Spanish Broadcasting] is a party."  7056-1 Stmt. Ex. C § 10.12(a).  Given that Claim 67707 arises under the Credit Agreement, this contested matter qualifies as "a legal action or proceeding referred to in [Section 10.12]."

[4] "Opposition Memorandum" and "Opp Mem." shall mean the *Memorandum of Law of Spanish Broadcasting System, Inc. in Opposition to Motion by Lehman Brothers Holdings Inc. for Summary Judgment Pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure Regarding Claim 67707 Filed by Spanish Broadcasting System, Inc.*, dated July 23, 2015 (ECF No. 50415).

WEIL:\95417575\13\58399.0011

Agreement.  *See* Opp. Mem. at  20 (citing *NetTech Solutions, L.L.C. v. ZipPark.com,* No. 01

CIV. 2683 (SAS), 2001 WL 1111966, at *6 (S.D.N.Y. Sept. 20, 2001); *In re Caldor, Inc.*, 217

B.R. 121, 133 (Bankr. S.D.N.Y. 1998)).  No such analysis is required here where Spanish

Broadcasting clearly and expressly waived its right to consequential damages.  *See Semetex*

*Corp. v. UBAF Arab Am. Bank*, 51 F.3d 13, 14 (2d Cir. 1995) ("'The intention to relinquish a

right may be established either as a matter of law or [as a matter of] fact.' . . . Such an intention

was shown here as a matter of law") (internal citation omitted); *see e.g.*, *Generale Bank, N.Y.*

*Branch v. Wassel,* No. 91 Civ. 1768 (LAP), 1995 WL 312466, at *4 (S.D.N.Y. May 19, 1995)

(granting summary judgment on the binding nature of an express waiver in written agreements);

*Gould v. Bantam Books, Inc.*, No. 83 Civ. 5121 (LBS), 1984 WL 684, at *5 (S.D.N.Y. July 31,

1984) (determining the question of a waiver on summary judgment); *Ottinger v. Gen. Motors*

*Corp.,* 27 F. Supp. 508, 511 (S.D.N.Y. 1939) (a waiver "proved by the express declaration of the

party or by his undisputed acts or language" may be "established as a matter of law.").  Thus,

there is no genuine dispute that Spanish Broadcasting intended to—and in fact did—waive any

right to consequential damages in 2005, and the Court should find the existence of such waiver

as a matter of law.

      **B.**     **The Damages Waiver is Effective and Enforceable**

              i.     The Payoff Letter Clearly and Unambiguously Terminated
                    Prospective Obligations Only

      The plain language of the Payoff Letter demonstrates that the Payoff Letter did

not revoke Spanish Broadcasting's waiver of consequential damages.  As demonstrated in the

Moving Memorandum, the Payoff Letter terminated "obligations" under the Credit Agreement

on a prospective basis only, leaving intact the parties' existing rights and obligations, including

5

Spanish Broadcasting's prior waiver of consequential damages. Mov. Mem. at 16-18.[5] Spanish Broadcasting's argument that the term "shall be" cannot apply prospectively because section 1(b) of the Payoff Letter applies to previously-granted liens is silly. *See* Opp. Mem. at 24-25. The language clearly was not intended to apply to future liens. It was intended to reflect that there were liens in existence at the time the Payoff Letter was executed that had to be terminated as of that date. Consistent with section 1(b), the "shall be" in section (1)(a) refers to the termination of obligations, which as demonstrated below, require a future duty to act, and thus, applies prospectively.

Further, the Plan Administrator does not argue, as Spanish Broadcasting suggests, that the Damages Waiver could never be terminated. *See* Opp. Mem. at 23. Rather, any waiver of LCPI's rights under the Damages Waiver in the Payoff Letter could be done only by clear and explicit language. Indeed, "a claim of waiver requires proof of an ***intentional relinquishment*** of a known right with both knowledge of its existence and an intention to relinquish it." *Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 482 (2d Cir. 2004) (internal citation omitted) (emphasis added). Thus, a waiver of LCPI's rights under the Damages Waiver must be clear and will "not be lightly presumed." *Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988).

Spanish Broadcasting nevertheless makes the extraordinary claim that the Damages Waiver was rendered ineffective following the execution of the Payoff Letter, despite the absence of any such statement in the Payoff Letter, relying primarily on emails exchanged between Kaye Scholer LLP ("Kaye Scholer") and Weil, Gotshal & Manges LLP ("Weil"), which

---

[5] Spanish Broadcasting's offhanded attempt to distinguish the cases relied upon by LBHI for this proposition fails. *See* Opp. Mem. at 25, n.4. Whether these cases involve a damages waiver is irrelevant. Each of them stands for the proposition that termination of a contract affects prospective rights and obligations only. *See* Mov. Mem. at 17-18.

6

represented Spanish Broadcasting and LCPI, respectively, in the negotiations.  *See* Opp. Mem. at

10-16.  By doing so, Spanish Broadcasting disregards the plain express language of the Payoff

Letter.  Section 1(a) of the Payoff Letter states:

> all outstanding Loans and all other amounts owing by [Spanish
> Broadcasting] under the Credit Agreement (including all principal,
> accrued interest and fees) shall be paid in full and the Credit
> Agreement ***and all obligations of [Spanish Broadcasting] and the
> other Loan Parties thereunder and under the other Loan
> Documents shall be terminated*** (other than contingent obligations
> which expressly survive by the terms of the Credit Agreement or
> such other Loan Documents, including without limitation, Section
> 10.5 of the Credit Agreement) . . . .

Miller Decl. Ex. 4 § 1(a) (emphasis added); *see also id.* § 5 (clarifying that "there shall be no

***further*** obligations under or in respect of the Loan Documents to any Loan Party under the

Credit Agreement.") (emphasis added).  By its own words, section 1(a) terminates all of Spanish

Broadcasting's future "obligations" under the Credit Agreement, except for certain contingent

obligations which expressly survive under the Credit Agreement or other "Loan Documents."

Section 1(a) does not revoke or undo waivers that occurred in the past.

        Spanish Broadcasting attempts to avoid this obvious conclusion by arguing that

the term "obligations" in section 1(a) includes waivers, relying on the definition of Merriam-

Webster's dictionary definition of "obligation."  Spanish Broadcasting argues that because the

dictionary definition of "obligation" is "the action of obligating oneself to a course of action (by

a promise or vow)," the Damages Waiver constitutes an obligation of Spanish Broadcasting

given that "it required Spanish Broadcasting to waive its right to claim or recover consequential

damages."  *See* Opp. Mem. at 12.  In doing so, Spanish Broadcasting ignores (1) the plain

language of the Damages Waiver; (2) the Merriam-Webster Dictionary definition of "waiver";

(3) the Black's Law Dictionary definition of "waiver" and "obligation"; and (4) well-settled case

law setting forth the legal meaning and ramifications of "waiver."

WEIL:\95417575\13\58399.0011

The Damages Waiver states that Spanish Broadcasting "irrevocably and unconditionally waives" any right to consequential damages. The Damages Waiver does not state that Spanish Broadcasting **will waive** that right sometime in the future, but rather, waives the right **at that time**. By its express terms, the Damages Waiver was "irrevocable," and thus, could not be revoked. It also was not contingent upon any future event or fulfillment of contingent obligations. It was "unconditional" and complete once performed, and thus, was not an "obligation" by the plain meaning of the term. Indeed, the Merriam-Webster Dictionary defines "waiver" as "**the act** of choosing not to use or require something that you are allowed to have or that is usually required." *Waiver*, Merriam-Webster, http://www.merriam-webster.com/dictionary/waiver (last visited Jul. 29, 2015) (emphasis added). That "act" occurred in 2005 when Spanish Broadcasting executed the Credit Agreement. There was nothing with respect to the Damages Waiver that was left to be performed. There is no dispute that the waiver was in full force and effect in 2008 when LCPI failed to fund the Draw Request. Black's Law Dictionary further clarifies this point by defining "waiver" as "[t]he voluntary relinquishment or abandonment—express or implied—of a legal right or advantage" and "[t]he instrument by which a person relinquishes or abandons a legal right or advantage." *Waiver*, Black's Law Dictionary (10th ed. 2014). In contrast, Black's Law Dictionary defines "obligation" as "[a] legal or moral duty **to do or not do** something." *Obligation*, Black's Law Dictionary (10th ed. 2014) (emphasis added). Thus, an obligation constitutes a duty to act in the future, while a waiver is an abandonment of rights that occurs at the time the waiver is executed. Indeed, as recognized by Black's Law Dictionary, a waiver is often completed pursuant to an "instrument by which a person relinquishes a legal right or advantage," such as the Damages Waiver in the Credit Agreement.

8

The cases cited by Spanish Broadcasting for the proposition that a survival provision was required to preserve the Damages Waiver are inapposite. *See* Opp. Mem. at 23-24. For example, in *Twitchell v. Town of Pittsford,* 106.A.D.2d 903, 904-05 (N.Y. App. Div. 4th Dep't 1984), the court held that the expiration of a contract regarding the maintenance of a skating rink terminated a provision requiring the procurement of liability insurance covering damages arising out of the use of the rink. *Id.* Unlike the Damages Waiver in the Credit Agreement, the relevant provision in *Twitchell* required an ongoing and/or future obligation.

*U.S. v. Am. Soc'y of Composers, Authors & Publishers,* No. Civ. 13-95 (WCC), 1989 U.S. Dist. LEXIS 16907 (S.D.N.Y. Dec. 21, 1989) ("*ASCAP*"), also cited by Spanish Broadcasting, involved the termination of temporary licensing agreements, which had been entered into pending the negotiation of final licensing agreements. The court, after a detailed and careful analysis of the contractual language, denied summary judgment, holding that termination of the temporary agreements may have terminated a waiver of the right to challenge licensing rates contained in those agreements, in part, because concluding otherwise would (i) render certain provisions of the temporary agreements superfluous, which "runs afoul" of basic contract interpretation, *id.* at *37; and (ii) would defeat the purpose of the agreements, which was to act "as a temporary licensing mechanism that could be replaced with a regular license when that became feasible." *Id.* at *38. The *ASCAP* court's interpretation is consistent with the Plan Administrator's position that termination of the Credit Agreement merely affected prospective obligations, because the waiver in *ASCAP*, if effective, would have precluded post-termination proceedings to challenge royalty fees that accrued before termination of the interim agreements.[6] Likewise, in the instant case, there is no basis to infer that the Damages Waiver,

---

[6] As the court explained: "[I]t is not disputed that the waiver provision bars the station from instituting a separate proceeding with respect to the period covered by the extension." *ASCAP*, 1989 U.S. Dist. LEXIS 16907, at *41, n.9.

which operated before termination and was in effect when the failure-to-fund occurred, was intended to be terminated retroactively.  Indeed, Spanish Broadcasting continues to rely on pre-existing obligations in the Credit Agreement to support the Claim and LCPI must likewise be able to rely on any defenses contained within that agreement—including the Damages Waiver— effective at the time that the Claim arose.  *See, infra,* section II.B.iii.  Moreover, unlike the circumstances in *ASCAP,* concluding that the Damages Waiver survived termination would not render provisions in the Credit Agreement superfluous.

The one case cited by Spanish Broadcasting involving a consequential damages waiver, *Scientific Components Corp. v. Raytheon Co.*, No. M 82 (HB), 2005 U.S. Dist. LEXIS 13087 (S.D.N.Y. June 29, 2005), concerns the termination of an agreement that contained a provision specifically identifying which provisions would survive upon termination.  No such provision exists in the Credit Agreement.  Further, the *Raytheon* court had been asked to confirm an arbitration award which it did based on the fact that the defendant cited no case law supporting its argument that the arbitration panel "acted with manifest disregard of the law," not because the court necessarily agreed with the decision.  *Id.* at *9–10.  Indeed, the *Raytheon* court stated that the defendant's "underlying argument is that the Panel wrongly interpreted the Supply Agreement or perhaps more to their way of thinking, came out the wrong way," which was insufficient to overturn an arbitration award.  *Id.* at *10.  Finally, none of the cases cited by Spanish Broadcasting appear to involve a waiver that was "irrevocabl[e] and unconditional[]" when granted.  Spanish Broadcasting's contention that an express survival provision was necessary to ensure the survival of the Damages Waiver, which was already irrevocable, is misguided at best.

10

The conclusion that the Damages Waiver was not revoked is consistent with controlling case law providing that waivers constitute "the relinquishment of a known right" that once completed, "cannot be expunged or recalled." *See Rabin v. Parchem Trading, Inc. Profit Sharing Plan*, No. 13 CV 9201(VB), 2015 WL 861746, at *4 (S.D.N.Y. Jan. 30, 2015) ("[a] waiver, to the extent that it has been executed, cannot be expunged or recalled") (citations omitted); *Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204, 211 (S.D.N.Y. 2003) (same) (citing *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1270 (N.Y. 1982)), *aff'd in part, rev'd on other grounds in part by*, 372 F.3d 471 (2d Cir. 2004); *1523 Real Estate, Inc. v. E. Atl. Props., LLC*, 24 Misc. 3d 1228(A), 901 N.Y.S.2d 901 (Sup. Ct. 2009) (same); *see also Ottinger,* 27 F. Supp. at 511 ("A waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed. It is the voluntary act of the party, and does not require or depend upon a new contract, new consideration or an estoppel.  It cannot be recalled or expunged.") (citation omitted). Accordingly, the Payoff Letter unambiguously terminates prospective "obligations" only and not past "waivers" completed upon the execution of the Credit Agreement.  Spanish Broadcasting's attempt to shoehorn the Damages Waiver into the definition of "obligations" must fail.

    ii.   The Addition of the Word "Expressly" to Section 1(a) of the
          <u>Payoff Letter Does Not Alter this Analysis</u>

Because the plain language of the Payoff Letter does not, on its face, undo Spanish Broadcasting's waiver of consequential damages, Spanish Broadcasting relies primarily on the various email communications by which the parties negotiated the Payoff Letter to argue that the Damages Waiver is ineffective.  *See* Opp. Mem. at 10-16.  Spanish Broadcasting points to its request that LCPI add the word "expressly" to section 1(a) so that it would terminate all obligations "other than contingent obligations which ***expressly*** survive by the terms of the Credit

11

Agreement." *Id.* (emphasis added).  Spanish Broadcasting states that "[the] intent of this

comment was to make clear that all of the obligations under the Credit Agreement *(including*

*Spanish Broadcasting's obligation to waive its right to claim or recover consequential damages*

*under Section 10.12(e) of the Credit Agreement*) would terminate, except where the Credit

Agreement expressly provided for survival" and that LCPI accepted this edit to the draft Payoff

Letter.  Opp. Mem. at 13 (emphasis added).   But, there is no evidence that Spanish

Broadcasting's supposed intent was ever expressed to LCPI (because it was not) and the

unexpressed subjective intentions of Spanish Broadcasting are irrelevant to establishing LCPI's

reasons for accepting the edit.  *See Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir.

1997) ("When interpreting the meaning of a contract, it is the objective intent of the parties that

controls. . . . The secret or subjective intent of the parties is irrelevant.") (internal citations

omitted); *Cusano v. Horipro Entm't Grp.*, 301 F. Supp. 2d 272, 277 (S.D.N.Y. 2004) *aff'd*, 126 F.

App'x 521 (2d Cir. 2005) ("When the terms of a contract are clear, '[t]he secret or subjective

intent of the parties is irrelevant.'") (internal citation omitted), *First Montauk Sec. Corp. v.*

*Menter*, 26 F. Supp. 2d 688, 689 (S.D.N.Y. 1998) ("it is hornbook law that the uncommunicated

subjective intent of a party is irrelevant in interpreting a contract.").

      Glaringly absent from the Gittlitz Declaration describing the parties' negotiations

of the Payoff Letter is any evidence that Spanish Broadcasting discussed the Damages Waiver

with LCPI.[7]  Rather, Spanish Broadcasting implies that it would have expected LCPI to raise the

issue.  *See* Gittlitz Decl. ¶22.  What Spanish Broadcasting would have expected is of no moment;

all that matters are the intentions of the parties as expressed in the language of the Payoff Letter.

---

[7] "Gittlitz Declaration" refers to the *Declaration of Sheryl Gittlitz in Support of Spanish Broadcasting System, Inc.'s Opposition to Motion by Lehman Brothers Holdings Inc. for Summary Judgment Pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure Regarding Claim 67707 by Spanish Broadcasting System, Inc.*, dated July 23, 2015 (ECF No. 50419).

*See Lockheed Martin Corp. v. Retail Holdings, N.V.,* 639 F.3d 63, 69 (2d Cir. 2011) ("It is

axiomatic under New York law . . . that '[t]he fundamental objective of contract interpretation is

to give effect to the ***expressed*** intentions of the parties.'") (emphasis added) (internal citation

omitted); *In re CCT Commc'ns, Inc.,* No. 07-10210 (SMB), 2008 WL 2705471, at *6 (Bankr.

S.D.N.Y. July 2, 2008) ("The primary objective when interpreting a contract is to give effect to

the parties' intent as revealed in the language they used.").  Indeed, LCPI would have had no

reason to believe that Spanish Broadcasting added the word "expressly" to terminate the

Damages Waiver given that the waiver was irrevocable and not an "obligation" based on the

plain and ordinary meaning of the term.  Thus, Spanish Broadcasting's contention that LCPI

failed to preserve its defenses under the Damages Waiver is incorrect, because the plain language

of the Payoff Letter—with or without the added word—did not terminate prior irrevocable

waivers.  *See* Opp. Mem. at 25-26 (arguing that whether Lehman released or waived its defenses

under the Damages Waiver is a question of fact).[8]

Furthermore, and most importantly, Spanish Broadcasting has not argued that any

provision of the Payoff Letter is vague and ambiguous.  Where the meaning of an agreement is

clear on its face, such as the Payoff Letter is here, extrinsic evidence may not be considered to

determine the intentions of the contracting parties.  *See Morefun Co., Ltd. v. Mario Badescu Skin

Care Inc.,* 588 F. App'x 54, 55 (2d Cir. 2014) ("Parol evidence 'is not admissible to create an

ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'")

(quoting *R/S Assocs. v. N.Y. Job Dev. Auth* ., 771 N.E.2d 240, 242 (N.Y.2002)); *SPCP Grp., LLC*

---

[8] Indeed, given that the Payoff Letter constitutes an obvious accommodation by LCPI as agent bank of Spanish Broadcasting's refinancing of the Credit Agreement, and given that Spanish Broadcasting had already filed its Claim for consequential damages in LCPI's chapter 11 case at the time the Payoff Letter was executed, *see* Claim No. 67707 (dated January 26, 2012 and amending Claim No. 15941, filed on September 18, 2009), it would be nonsensical to believe that LCPI would willingly allow Spanish Broadcasting's waiver of such damages to be vitiated without any discussion or exchange of additional consideration.

*v. Eagle Rock Field Servs., LP*, No. 12 Civ. 3610 (PAC), 2013 WL 359650, at *6 (S.D.N.Y. Jan.

30, 2013), *app.withdrawn* (Apr. 16, 2013) (same); *Golden Archer Invs., LLC v. Skynet Fin. Sys.,*

908 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (same); *Pollack v. Crocker,* 660 F. Supp. 1284, 1288–

89 (S.D.N.Y. 1987) (granting summary judgment to plaintiff based on "clear and unambiguous"

language in the contract, holding that "[o]nly where the language of the contract is ambiguous is

parol evidence admissible for contract interpretation.").  Thus, all of the extrinsic evidence relied

upon by Spanish Broadcasting is irrelevant and inadmissible, and should be disregarded.  As

such, none of it establishes a material issue of disputed fact concerning the meaning of section

1(a) of the Payoff Letter, entitling the Plan Administrator to judgment as a matter of law.  *See*

*PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 367 (S.D.N.Y.

2014) ("Only disputes over "facts that might affect the outcome of the suit under the governing

law" will preclude a grant of summary judgment.") (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)).[9]

        iii.    Spanish Broadcasting's Argument that Section 1(a) Terminated
               Retroactive Obligations Has No Merit

        Spanish Broadcasting's argument that section 1(a) of the Payoff Letter terminated

both past and future obligations constitutes another desperate attempt to create an issue of fact.

*See* Opp. Mem. at 24-25.  Without citing any law or refuting the Plan Administrator's case law,

Spanish Broadcasting argues that the term "shall be" which modifies "terminated" cannot be

limited to solely future obligations.  *See* Opp. Mem. at 24-25; Mov. Mem. at 16 (citing

*Congregation Darech Amuno v. Blasof*, 640 N.Y.S.2d 564, 565 (1st Dep't 1996) and *Primex*

---

[9] For this reason, the Plan Administrator did not rely upon evidence regarding the parties' negotiations of the Payoff Letter in support of its motion for summary judgment. *See* Opp Mem. at 20 (arguing the Plan Administrator did not "put forth any countervailing evidence regarding the intention of the parties").  Because the Payoff Letter is clear on its face, such evidence is irrelevant and immaterial to the motion.  Moreover, even the evidence regarding the negotiations proffered by Spanish Broadcasting demonstrates that the Damages Waiver was never discussed.

*Int'l Corp. v. Wal-Mart Stores, Inc.*, 679 N.E.2d 624, 627 (N.Y. 1997)).  Spanish Broadcasting

cannot have it both ways.  On the one hand, Spanish Broadcasting claims that it is entitled to

recover alleged damages for LCPI's breach of its obligation to fund $10 million of the Revolving

Credit Facility.  On the other hand, Spanish Broadcasting argues that "The Payoff Letter Did Not

Terminate Only Future Obligations of Spanish Broadcasting."  If Spanish Broadcasting's

interpretation of section 1(a) were correct (which it is not), then the Payoff Letter would have

terminated not only Spanish Broadcasting's past waiver, but also LCPI's past obligations under

the Credit Agreement, rendering the Claim wholly without merit and entitling Spanish

Broadcasting to zero damages.[10]

        In addition, Spanish Broadcasting's interpretation also would render the Release

in section 4 of the Payoff Letter superfluous, and thus, must be rejected under basic canons of

contract interpretation.  As demonstrated in the Moving Memorandum, the Release provides that

Spanish Broadcasting "hereby unconditionally and irrevocably waives all claims, suits, debts,

liens, losses, causes of action, demands, rights, damages or costs, or expenses of any kind . . . to

the extent arising *out of or in connection with the Loan Documents . . .*" under the Credit

Agreement.  Miller Decl. Ex. 4 § 4 (emphasis added).  Had section 1(a) terminated all pre-

existing rights and obligations under the Credit Agreement, the Release would have been

unnecessary because there could be no claims arising under the Credit Agreement.  It is a

"cardinal rule [of construction] that a contract should not be read to render any provision

superfluous."  *Reyes v. Metromedia Software, Inc.* 840 F.Supp.2d 752, 756 (S.D.N.Y. 2012); *see*

*also Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 87

(2d Cir. 2015) ("In construing a contract, a court should  . . . avoid any interpretation that would

---

[10] That the Release in section 4 of the Payoff Letter preserved Spanish Broadcasting's right to assert the Claim is of
no moment.  Spanish Broadcasting's argument would render the Claim meritless.

15

render a contractual provision without force and effect") (citing *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315 (N.Y. 1984)); *Madeira v. Affordable Hous. Found., Inc.*, 323 F. App'x 89, 91 (2d Cir. 2009) ("New York law clearly 'disfavors interpretations that render contract provisions meaningless or superfluous.'") (citation omitted); *In re 18th Ave. Realty, Inc.*, No. 03-14480(RDD), 2010 WL 1849403, at *6 (Bankr. S.D.N.Y. May 7, 2010) ("no provision of a contract should be left without force and effect.") (internal citations omitted); *ASCAP,* No. Civ. 13-95 (WCC), 1989 U.S. Dist. LEXIS 16907, at *37 ("a contract should be read in a manner that will give independent meaning to each of its terms and not reduce them to mere surplussage.").  Thus, Spanish Broadcasting's nonsensical interpretation is neither supported by the express terms of the Payoff Letter nor the law.

Furthermore, the mere existence of conflicting contractual interpretations does not, as Spanish Broadcasting contends, create a material issue of fact sufficient to defeat summary judgment.  *See* Opp. Mem. at 25.  Rather, only ***reasonable*** conflicting interpretations may constitute a material issue of fact.  *See Chock Full O'Nuts Corp. v. Tetley, Inc.,* 152 F.3d 202, 204–05 (2d Cir. 1998) (finding that despite conflicting contractual interpretations, "summary judgment may be granted if under any of the *reasonable* interpretations the moving party would prevail" and requiring the non-moving party to put forth "some other *plausible* interpretation") (emphasis added); *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation . . . unless each is a 'reasonable' interpretation.") (internal citation and quotation marks omitted); *Esquire Trade & Fin., Inc. v. CBQ, Inc.*, No. 03 CIV. 9650 (SC), 2009 WL 3756470, at *3 (S.D.N.Y. Nov. 5, 2009) ("A contractual provision is not rendered ambiguous simply because two

16

interpretations are technically possible; both interpretations must also be reasonable.").  Here,

Spanish Broadcasting urges the Bankruptcy Court to accept an interpretation that not only strains

the plain language of the Payoff Letter, but would render (1) the Claim meritless; and (2) a

highly negotiated provision of the Payoff Letter – the Release – meaningless.  Spanish

Broadcasting's conflicting interpretation is unreasonable, and thus, does not create a material

issue of fact.  *See Law Debenture Trust Co.* of NY, 595 F.3d at 467("the court should not find

the contract ambiguous where the interpretation urged by one party would 'strain [ ] the contract

language beyond its reasonable and ordinary meaning.'") (internal citation omitted).

Accordingly, the Court should find that Spanish Broadcasting waived its right to recover

consequential damages as a matter of law.[11]

## II.    The Asserted Damages Are Consequential Damages As a Matter of Law

The evidence demonstrates that Spanish Broadcasting's asserted damages are

consequential damages as a matter of law.  Despite Spanish Broadcasting's attempt to create a

material issue of fact regarding the proper characterization of its asserted damages, there are no

material ***factual*** disputes precluding summary judgment.  The Plan Administrator does not

dispute that LCPI breached the Credit Agreement by failing to fund $10 million of the Revolving

---

[11] Spanish Broadcasting further argues that any ambiguity in the Payoff Letter should be construed against LCPI, as the drafter.  *See* Opp. Mem. at 25.  First, as demonstrated above, the Payoff Letter is not ambiguous, and thus, the doctrine of *contra proferentem* does not apply.  *See Catlin Speciality Ins. Co. v. QA3 Fin. Corp.,* 36 F. Supp. 3d 336, 342 (S.D.N.Y. 2014) (holding that *contra proferentem* is not a rule of interpretation, but rather, a "rule of policy" that applies when extrinsic evidence does not resolve the ambiguity in a contract).  Second, the doctrine of *contra proferentem* also does not apply where a contract is negotiated by sophisticated parties of equal bargaining power, particularly when they were each represented by counsel, as Spanish Broadcasting and LCPI were here.  *See Hudson Specialty Ins. Co. v. N.J. Transit Corp.,* No. 15-cv-89 (ER), 2015 WL 3542548, at *6 (S.D.N.Y. June 5, 2015) ("'*contra proferentem* does not apply where contracts are negotiated by sophisticated parties of equal bargaining power.'") (quoting *Catlin Specialty Ins.,* 36 F. Supp. 3d at 342); *D'Amato v. Five Star Reporting, Inc.,* No. 12-cv-3395 (ADS) (AKT), 2015 WL 248612, at *14 (E.D.N.Y. Jan. 17, 2015) ("*contra proferentem* does not apply in situations where, as here, both parties are represented by counsel and have meaningful opportunities to negotiate contractual terms."); *Cummins, Inc. v. Atl. Mut. Ins. Co.,* 56 A.D.3d 288, 290, 867 N.Y.S.2d 81, 83 (2008) (finding that the doctrine of *contra proferentem* did not apply because despite one party preparing the drafts of the agreement, the other party was sophisticated and "instrumental in crafting various parts of the agreement . . . [and] had equal bargaining power").

17

Credit Facility.  The Plan Administrator does not dispute the Credit Agreement provides that the funds requested would be used for Spanish Broadcasting's "working capital purposes, capital needs and general corporate purposes," and that Spanish Broadcasting was unable to use the requested funds for those purposes.  And, for purposes of this motion only, the Plan Administrator does not dispute that Spanish Broadcasting suffered $41.9 million in alleged losses because LCPI failed to loan it $10 million.  *See* Opp. Mem. at 10.[12]  Nevertheless, an analysis of the Credit Agreement, the damages sought by Spanish Broadcasting, and the relevant case law all confirm that the alleged damages, as described by Spanish Broadcasting in its declarations and its team of experts, constitute consequential damages barred by the Damages Waiver as a matter of law.

### A.    Whether the Asserted Damages Are Consequential or Direct Damages May Be Decided As a Matter of Law

Despite the Bankruptcy Court's ruling that the Plan Administrator may file a summary judgment motion on the proper characterization of Spanish Broadcasting's alleged damages, Spanish Broadcasting continues to argue that the characterization of damages is an issue of fact that must be reserved for trial.  Opp. Mem. at 28-29; April 29 Letter (ECF No. 49336).  As the Plan Administrator previously demonstrated, Spanish Broadcasting is simply wrong.  *See* May 4 Letter (ECF No. 49393).  "Courts in this District have often determined, at the summary judgment stage, whether damages claims are general or consequential."  *PNC Bank,* 73 F. Supp. 3d at 372 (holding, on summary judgment, that refund payments to clients,

---

[12] As recognized by the Bankruptcy Court, it would be extraordinarily difficult for Spanish Broadcasting to establish causation and the Plan Administrator reserves all of its rights to challenge causation, as well as the amount of the asserted damages.  *See* Feb. 13, 2013 Hr'g Tr. at 134:17-18 ("The claims being asserted here are bloated, excessive, and probably not allowable."); Mov. Mem. n.15 (reserving right "to contest on alternative grounds the amount and recoverability of the EBITDA Damages and the Swap Damages, including, but not limited to, causation."). However, for purposes of determining whether the asserted damages are consequential damages in connection with this motion, the Plan Administrator does not now challenge the causes and amounts of Spanish Broadcasting's asserted losses.

legal and audit fees, stemming from defendant's failure to timely transmit consumer loan

disclosures, constituted consequential damages barred by waiver); *see also Vivaro Corp. v. Raza*

*Commc'n, Inc. (In re Vivaro Corp.)*, No. 12-01928 (MG), 2014 WL 486288, at * 3–4 (Bankr.

S.D.N.Y. Feb. 6, 2014) (holding, on summary judgment, that lost profits associated with alleged

breach of distribution agreement constituted consequential damages barred by waiver).  That the

cited cases involve sale and distribution agreements and not "contracts for revolving credit

facilities to fund the working capital needs of an operating business," Opp. Mem. at 28-29, is a

distinction without a difference.  Indeed, courts have determined the proper characterization of

damages on summary judgment in a variety of contexts.  *See, e.g., Genon Mid-Atl., LLC v. Stone*

*& Webster, Inc.*, No. 11 CV 1299 (HB), 2012 WL 1372150, at *10 (S.D.N.Y. Apr. 18, 2012)

(granting partial summary judgment, finding that damages for loss of bonuses are barred by the

consequential damages waiver in purchase orders for wastewater treatment equipment, ancillary

engineering, and start-up services); *Abate v. Bushwick Sav. Bank*, 138 N.Y.S.2d 140, 144 (City

Ct. 1955) (granting summary judgment for defendant-bank where plaintiff alleged bank failed to

turn over deposited funds because the asserted damages—for the down-payment made on certain

property and legal fees incurred in a real estate matter—constitute consequential damages as a

matter of law).

### B.    The Purported Expert Reports Confirm that the Asserted Damages Are Consequential Damages

The facts alleged in the purported expert reports of James Trautman and

Christopher J. Kearns (the "Purported Expert Reports") further demonstrate that the alleged

damages are consequential damages as a matter of law.  As demonstrated in the Moving

Memorandum, direct damages constitute the "value of the very performance promised" while

consequential damages "compensate a plaintiff for additional losses (other than the value of the

19

promised performance) that are incurred as a result of the defendant's breach."  Mov. Mem. at 22

(citing *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000); *Am. List Corp. v. U.S. News &*

*World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989); *Vivaro*, 2014 WL 486288, at *3; *CCT*

*Commc'ns*, 464 B.R. at 117)).  As such, direct damages are often described as damages that "are

the natural and probable consequence of the breach."  *See, e.g., Am. List Corp.,* 549 N.E.2d

at1164 (N.Y. 1989).  It is well-established that in cases of breach of an agreement to lend money,

the "value of the performance promised" is best represented by the incremental cost of

replacement financing.  *See* Mov. Mem. at 24 (citing *Avalon Constr. Corp. v. Kirch Holding Co.,*

*Inc.*, 175 N.E. 651, 652–53 (N.Y. 1931); *Bond St. Knitters v. Peninsula Nat'l Bank*, 42 N.Y.S.2d

744, 744 (1st Dep't 1943) (*per curiam*); 25 Williston on Contracts § 66:101; *Cent. Coordinates,*

*Inc. v. Morgan Guar. Trust Co.*, 494 N.Y.S.2d 602, 604 (Sup. Ct. 1985); *Abate v. Bushwick Sav.*

*Bank*, 138 N.Y.S.2d 140, 144 (City Ct. 1955)).

Spanish Broadcasting does nothing to refute this case law.  Rather, Spanish

Broadcasting argues that the reports of its purported experts "expressly state, based on an in-

depth analysis of Spanish Broadcasting's damages," that those damages "are the natural and

probable consequence of Lehman's failure to fund the Draw," and thus, constitute direct

damages.  Opp. Mem. at 30.  The conclusory statements of Spanish Broadcasting's purported

experts do not establish that the asserted damages are in fact direct damages.  Indeed, their

alleged opinions do not, and cannot, alter the fact that any losses other than the incremental cost

of replacement financing constitute consequential damages under applicable case law.  Nor do

the purported experts raise a material issue of fact regarding the proper characterization of such

damages.  Rather, the reports confirm that the damages claimed by Spanish Broadcasting are not the direct fruits of the Credit Agreement, and thus, are consequential damages.[13]

Mr. Trautman, Spanish Broadcasting's purported expert in media market trends, evaluated the "natural and probable consequences of reduced marketing and promotional expenditures in SBS' most competitive markets" and concluded that Spanish Broadcasting's failure to use $4 million on advertising and marketing expenses caused losses of $13 million in 2010 as a result of reduced audience ratings.  Trautman Report ¶¶ 5, 7.  Mr. Trautman based his analysis on (1) advice he received from Spanish Broadcasting's counsel that direct damages are "the natural and probable consequence" of a breach of contract; (2) his "understanding" that the Revolving Credit Facility "was intended for working capital purposes;" and (3) Spanish Broadcasting's representation that it would have used $4 million of the $10 million requested of LCPI for marketing and promotional expenses.  *Id.* ¶¶ 4, 5.  To say that Mr. Trautman has "begged the question" is an understatement.  Mr. Trautman did not evaluate, as Spanish Broadcasting suggests, "the natural and probable consequence" of failing to loan money.  *See* Opp. Mem. at 30.  Nothing in Mr. Trautman's report indicates that he was advised of the conflicting and controlling case law.  Tellingly, Mr. Trautman is not an expert on contract law or financing agreements.  Trautman Report ¶ 1.

Mr. Kearns' report suffers from the same infirmities.  Mr. Kearns expands on Mr. Trautman's conclusions by further evaluating the losses suffered by Spanish Broadcasting as a

---

[13] The Purported Expert Reports are attached as Exhibits 1 and 2 to the *Declaration of Madlyn Gleich Primoff in Support of Spanish Broadcasting System, Inc.'s Opposition to Motion by Lehman Brothers Holdings Inc. for Summary Judgment Pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure Regarding Claim 67707 by Spanish Broadcasting System, Inc.*, dated July 23, 2015 (ECF No. 50421).  Exhibit 1 is referred to herein as the "Trautman Report" and Exhibit 2 is referred to herein as the "Kearns Report."  Although the Plan Administrator does not dispute the facts or opinions asserted in the Purported Expert Reports for purposes of the Plan Administrator's motion for summary judgment only, the Plan Administrator reserves its right to object to or otherwise challenge the designation and/or qualifications of Mr. Trautman and Mr. Kearns as expert witnesses, as well as the facts and opinions asserted in their reports.

result of LCPI failing to fund the $10 million Draw Request.  He concludes that Spanish

Broadcasting suffered $24.5 million in "Impacted EBITDA Damages" and $17 million in "Swap

Damages," and that such damages are "the natural and probable consequence" of LCPI's breach.

Kearns Report at 11, 12, 15.  As with Mr. Trautman's report, Mr. Kearns' report is devoid of any

indication that he was advised of the case law providing that direct damages for failure to loan

money are the incremental cost of replacement financing.  *See generally* Kearns Report.

Moreover, despite Mr. Kearns' conclusory assertion that Spanish Broadcasting could not have

obtained replacement financing, Spanish Broadcasting has not provided any evidence that ***it

actually sought*** replacement financing.[14]  Even if replacement financing were unavailable,

damages for losses other than the incremental cost of replacement financing constitute

consequential damages barred by the Damages Waiver.  *See Avalon,* ("[t]he utmost liability of a

person who breaches his contract to loan money, in the absence of notice of ***special***

circumstances, is for the increased interest the other person was obliged to pay.") (emphasis

added); *Zelazny v. Pilgrim Funding Corp.*, 244 N.Y.S.2d 810, 816 (Dist.  Ct. 1963) ("special

damages which an inability to obtain money under the peculiar circumstances of his case has

actually caused [the plaintiff]" are recoverable as consequential damages).  Accordingly, neither

report provides the Bankruptcy Court with any evidentiary basis on which to conclude that the

damages sought by Spanish Broadcasting are direct, and not, consequential damages.

---

[14] *See Declaration of Joseph A. Garcia in Support of Amended Proof of Claim of Spanish Broadcasting System, Inc. and in Response to Lehman's Reply*, dated January 29, 2013 (the "First Garcia Declaration"),¶11 (general statement that Spanish Broadcasting "was unable to obtain $10 million of replacement financing" without describing any attempts to do so); *Declaration of Joseph A. Garcia in Support of Spanish Broadcasting System, Inc.'s Opposition to Motion by Lehman Brothers Holdings Inc. for Summary Judgment Pursuant to  Rule 7056 of the Federal Rules of Bankruptcy Procedure Regarding Claim 67707 Filed by Spanish Broadcasting System, Inc.*, dated July 23, 2015 (ECF No. 50418) ("Second Garcia Declaration," together with the First Garcia Declaration, the "Garcia Declarations") ¶¶19-26 (allegedly explaining why Spanish Broadcasting could not obtain replacement financing, but not describing any attempts to do so).

To the contrary, the Purported Expert Reports provide the Court with ample evidence to conclude that the asserted damages are properly characterized as consequential damages.  Mr. Trautman opines that the "Impacted EBITDA Damages" were caused by "declines in audience ratings" allegedly suffered by Spanish Broadcasting due to "reduced marketing and promotional spending (i.e., compared to the position SBS would have been in had Lehman performed under the contract)."  Trautman Report ¶ 7.  But, any monetary damages suffered as a result of a reduction in promotional spending are several steps removed from LCPI's failure to loan $10 million.  This is demonstrated by Mr. Trautman's own report.  He explains that LCPI's failure to loan Spanish Broadcasting $10 million left Spanish Broadcasting with a shortfall of $4 million in promotional spending, which resulted in:

- "limitations on the ability to adequately market/promote"

- which "would be expected to eventually result in declining ratings and brand awareness/identity"; and

- declining ratings and brand awareness/identity "would in turn be expected to result in poor advertising sales performance in relation to competing stations."

*Id.* ¶ 8.  According to Mr. Trautman, such limitations in promotional spending "would be expected to have increasing impacts in the time following the lack of promotion, since pre-existing audience affinity and awareness would naturally diminish as the amount of time since the last extensive promotional activity grew."  *Id.*  Thus, according to Spanish Broadcasting, LCPI's failure to fund the Draw Request led to insufficient promotional spending which led to declining ratings and brand awareness, which led to poor advertising sales, which over time, impacted Spanish Broadcasting's bottom line.  This collective downward spiraling of events confirms that the alleged losses are so attenuated that they cannot be "the natural and probable consequence" of LCPI's failure to fund.

23

Mr. Kearns also confirms that any "Swap Damages" suffered by Spanish Broadcasting are consequential damages in that they allegedly resulted from (1) Spanish Broadcasting's alleged inability to terminate an ISDA Master Agreement with a LBSF, an affiliate of LCPI; (2) a settlement agreement entered into with LSBF with regard to the ISDA Master Agreement; plus (3) "investment banker fees" and "estimated legal and other costs" allegedly incurred in connection with the Swap. Spanish Broadcasting's assertion that it was "required" to enter into the Swap is both incorrect and immaterial. *See* Opp. Mem. at 33-34; Second Garcia Declaration ¶¶ 8, 30 ("In connection with the Credit Agreement, pursuant to an affirmative covenant imposed by Lehman, Spanish Broadcasting was required to enter into a swap agreement.").[15] LBSF is a separate legal entity, and the Swap Damages also were allegedly suffered as a result of decisions made by Spanish Broadcasting, which culminated in a separate settlement agreement, and also allegedly resulted from certain investment banking and legal fees that Spanish Broadcasting incurred with other entities and/or persons. Accordingly,

---

[15] Despite Spanish Broadcasting's representations to the contrary, the Credit Agreement did not require Spanish Broadcasting to enter into the Swap with LBSF. Section 6.12 of the Credit Agreement required Spanish Broadcasting to enter into hedge agreements, to the extent necessary, but did not require the hedge agreement to be with LBSF. Section 6.12 of the Credit Agreement states:

> Interest Rate Protection. Within 90 days after the Closing Date, Borrower shall enter into Hedge Agreements to the extent necessary to provide that at least 40% of the total amount of the Term Loans outstanding from time to time is subject to either fixed interest rate or interest rate protection for a period of not less than 2 years, which Hedge Agreements shall have terms and conditions satisfactory to the Administrative Agent.

7056-1 Stmt., Ex. C § 6.12. "Hedge Agreement" is defined in section 1.1 of the Credit Agreement as:

> "Hedge Agreements": all interest rate swaps, caps, collar agreements, foreign exchange agreements, commodity contracts, currency swaps or similar arrangements entered into by the Borrower or any of its Subsidiaries providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies, as each may be amended, supplemented, replaced or otherwise modified from time to time in accordance with this Agreement.

7056-1 Stmt., Ex. C § 1.1. Thus, nothing in the Credit Agreement required Spanish Broadcasting to enter into a Swap with LBSF.

WEIL:\95417575\13\58399.0011

each of the alleged losses, even if true, would have arisen from collateral business arrangements, not LCPI's failure to loan $10 million.

### C.    Losses from Collateral Business Arrangements Are Consequential Damages As A Matter of Law

As demonstrated in the Moving Memorandum, attenuated damages arising from collateral business arrangements—such as promotional arrangements and swap agreements—are consequential damages as a matter of law.  *See* Mov. Mem. at 22-23 (citing *Vivaro Corp.,* 2014 WL 486288, at * 3; *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,* 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F. 3d. 89, 108 (2d Cir. 2007)).  Spanish Broadcasting's attempt to avoid this conclusion by arguing that "diminution in value" damages are recoverable, fails.  The cases relied upon by Spanish Broadcasting are inapposite because they concern contracts where the financing was provided for a specific use.  *See Latham-Land I, LLC v. TGI Friday's, Inc.,* 96 A.D.3d 1327 (N.Y. App. Div. 2012) (lessor agreed to provide financing to a lessee that agreed to build and operate a restaurant that the lessor would own at the end of the lease); *FDIC v. Parkway Exec. Office Ctr.,* Nos. CIV.A. 96-121, CIV.A.96-122, 1998 WL 18204 (E.D. Pa. Jan. 9, 1998) (financing of a construction loan); *Emps.' Ret. Sys. of Ala. v. IBJ Shroder Bank & Trust Co.,* 840 F. Supp. 972 (SDNY 1993) (same); *In re Miraj & Sons,* 192 B.R. 297 (D. Ma 1996) (financing to purchase condominiums).

For example, in *Latham-Land,* the court held that the diminution in value of land on which the borrower agreed to construct a restaurant was "the very essence of the contract." *Latham-Land,* 96 A.D.3d at 1332.  In concluding that such damages were direct damages, the Court contrasted plaintiff's losses with "losses stemming from some anticipated profit linked to, but collateral to, the parties['] agreement," which according to the court, would constitute

consequential damages.  *Id.*  Unlike the agreement at issue in *Latham-Land,* the Credit

Agreement does not identify a specific use for the funds, but rather, generally states that the

funds would be used for the "working capital purposes, capital needs and general corporate

purposes" of Spanish Broadcasting.  7056-1 Stmt., Ex. C.  *T.-Co Metals, LLC v. Dempsey Pipe*

*& Supply, Inc.*, 592 F.3d 329 (2d Cir. 2010), also relied upon by Spanish Broadcasting, *see* Opp.

Mem. at 32, likewise is inapplicable because it addresses the determination of damages for the

delivery of defective goods under the Uniform Commercial Code, in that case, steel pipes.  *T.-Co*

*Metals,* 592 F.3d at 335.  Damages recoverable from an agreement to purchase a specific product

in workable condition are fundamentally different than the damages recoverable for failure to

make a loan, the end product of which is an extension of credit at a specified rate of interest.

Controlling case law confirms that the damages sought by Spanish Broadcasting

are consequential damages as a matter of law.  LCPI's failure to loan $10 million deprived

Spanish Broadcasting of only the right to borrow $10 million at an agreed-upon rate of interest.

Spanish Broadcasting's direct damages, therefore, are quantified by the increased rate of interest

it would have to pay to borrow the $10 million from a third party.  Any revenue that Spanish

Broadcasting could have or would have generated with the $10 million, or any losses it could

have avoided with the $10 million, constitute, at best, consequential damages.  Indeed, lost

profits are recoverable as direct damages only when they represent amounts a breaching party

agreed to pay under the contract.  *See Tractebel,* 487 F.3d at 108 n.19 (holding lost profits are

direct damages because contract expressly stated the non-defaulting party was entitled to

damages equal to "the present value of the economic loss (exclusive of [c]osts) resulting from

the termination of the [a]greement").  Spanish Broadcasting argues that the EBITDA Damages

and the Swap Damages are not consequential damages because section 4.16(b) of the Credit

Agreement provides that the proceeds from the Revolving Credit Facility would be used for

"working capital purposes, capital needs and general corporate purposes" of Spanish

Broadcasting.  Opp. Mem. at 31.  But, section 4.16(b) simply ensures that the funds will be used

for business purposes.  If Spanish Broadcasting were correct, then as long as the use of the funds

complied with the terms of the Credit Agreement, no losses could ever constitute consequential

damages.  Given that the parties included the Damages Waiver in the Credit Agreement, that is

not be a proper interpretation under the law.  *See In re 18th Ave. Realty,* 2010 WL 1849403, at

*6 (Bankr. ("no provision of a contract should be left without force and effect.") (internal

citations omitted).

Despite the governing case law, Spanish Broadcasting once again relies on an

article authored by Weil attorneys to argue that "Lehman's counsel has expressly conceded" that

diminution in value damages are direct or general damages.  Opp. Mem. at 33; *see also Response

of Spanish Broadcasting System, Inc. to Three Hundred Twenty-Eighth Omnibus Objection to

Claims (No Liability Claims)* at ¶ 20, In re Lehman Brothers Holdings Inc., No. 08-13555 (JMP)

(Bankr. S.D.N.Y. Sept. 13, 2012) (ECF No. 30907); April 29 Letter (ECF No. 49336).  LBHI's

counsel has done no such thing.  As the Plan Administrator previously stated, the article is "not

applicable to damages arising from the failure to extend credit" but merely "provides drafting

advice to corporate attorneys in the mergers and acquisitions context."  *Reply to Response of

Spanish Broadcasting and in Further Support of the Three Hundred Twenty-Eighth Omnibus

Objection to Claims (No Liability Claims)* at 11 n.3, In re Lehman Brothers Holdings Inc., No.

08-13555 (JMP) (Bankr. S.D.N.Y. Jan. 24, 2013) (ECF No. 34175).  Indeed, the article expressly

states that it is an attempt to define consequential damages "***in the merger and acquisition

context***" and "provide a legally coherent framework for answering . . . questions that are raised

by the inclusion of a consequential damage waiver provision *in a business acquisition* or related agreement." (emphasis added). The article does not discuss the characterization of damages for failure to make a loan, the incorporation of consequential damages waivers in credit agreements, the waivers' effect on borrowers, or the effect of a waiver on a claim following a failure to fund. Spanish Broadcasting's continued reliance on this article is unwarranted.

Indeed, all of the evidence relied upon by Spanish Broadcasting demonstrates that the EBITDA Damages and the Swap Damages are consequential damages that have been waived by Spanish Broadcasting. The plain language of both the Credit Agreement and the Payoff Letter establishes that the Damages Waiver occurred and was never revoked, terminated, waived, or otherwise undone. The reports of Mr. Trautman and Mr. Kearns, as well as the Capstone Report attached to the Claim, all demonstrate that the EBITDA Damages and the Swap Damages did not arise directly from LCPI's failure to fund the Draw Request, but rather represent a guesstimate of the business decisions Spanish Broadcasting would have made and the uses to which Spanish Broadcasting contends the $10 million would have been put. The corroborated factual evidence offered in both the Garcia Declarations does the same.[16] Such losses are the result of collateral business arrangements and constitute consequential damages as a matter of law. Accordingly, the Court should grant the Plan Administrator's motion for summary judgment.

---

[16] Uncorroborated statements made in the Garcia Declarations, such as Mr. Garcia's blanket statement that the "alleged damages were not 'collateral business arrangements'" are not sufficient to create a material issue of fact, and thus, should not be considered by the Bankruptcy Court. *See Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) ("The conclusory allegations in . . . [the] affidavit are not sufficient to create a material issue of fact."); *Dorsey v. Artus*, No. 9:09-cv-1011 (GLS/DEP), 2013 WL 5463720, at *8 (N.D.N.Y. Sept. 30, 2013) (finding that it is "true that conclusory, self-serving affidavits that are unsupported by any factual detail are insufficient to give rise to a dispute of material fact.").

WEIL:\95417575\13\58399.0011

## CONCLUSION

For the reasons set forth herein and in the Moving Memorandum, the Plan

Administrator respectfully requests that the Court (a) find that the Damages Waiver is a valid

and enforceable waiver of all consequential and special damages, (b) find that the EBITDA

Damages and the Swap Damages constitute consequential damages that have been waived, and

(c) grant such other and further relief as is just and appropriate.

Dated:    August 13, 2015
          New York, New York


                          */s/ Ralph I. Miller*
                          WEIL, GOTSHAL & MANGES LLP
                          Ralph I. Miller
                          Jacqueline Marcus
                          767 Fifth Avenue
                          New York, New York 10153
                          Telephone:  (212) 310-8000
                          Facsimile:  (212) 310-8007

                          *Attorneys for Lehman Brothers Holdings Inc.*
                          *and Certain of Its Affiliates*

WEIL:\95417575\13\58399.0011

**Appendix 1**

**Key Dates & Events**

| Event | Date |
|---|---|
| Execution of the Credit Agreement with the Damages Waiver | June 10, 2005 |
| Execution of the Swap | June 28, 2005 |
| Spanish Broadcasting's Draw Request | October 3, 2008 |
| LCPI Files a Petition for Relief under Chapter 11 of the Bankruptcy Code | October 5, 2008 |
| LCPI's Failure to Fund the Draw Request | October 6, 2008 |
| Filing of Spanish Broadcasting's Claim | September 18, 2009 |
| Swap Settlement Agreement Terminating the Swap | June 17, 2010 |
| Filing of Amendment to Spanish Broadcasting's Claim | November 3, 2011 |
| Execution of Payoff Letter | February 6, 2012 |
| Spanish Broadcasting's First Public Assertion that the Payoff Letter terminated the Damages Waiver | September 13, 2012 [ECF No. 30907] |

WEIL:\95417575\13\58399.0011