William J.F. Roll, III
Solomon J. Noh
Randall Martin
Stacey L. Corr-Irvine
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (646) 848-7174

*Attorneys for the Maverick Entities*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
                                                                  :
In re:                                                            :   Chapter 11
                                                                  :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                          :   Case No. 08 – 13555 (SCC)
                                                                  :
                                    Debtors.                      :   (Jointly Administered)
                                                                  :
                                                                  :
------------------------------------------------------------------x

**OBJECTION OF MAVERICK ENTITIES TO THE MOTION PURSUANT
TO SECTIONS 8.4, 9.3, AND 14.1 OF THE MODIFIED THIRD
AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS
HOLDINGS INC. AND ITS AFFILIATED DEBTORS TO ESTIMATE
<u>CLAIMS FOR RESERVE AND DISTRIBUTION PURPOSES</u>**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

    Maverick Long Enhanced Fund, Ltd., Maverick Neutral Levered Fund, Ltd.,

Maverick Neutral Fund, Ltd., Maverick Fund USA, Ltd., Maverick Fund II, Ltd. and Maverick

Fund, L.D.C. (collectively, the "**Maverick Entities**" or "**Maverick**") hereby submit this

objection to the Motion Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended

Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors to Estimate

Claims for Reserve and Distribution Purposes [Docket No. 49954] (the "**Estimation Motion**"), submitted by Lehman Brothers Holdings Inc. ("**LBHI**") on June 10, 2015. In support thereof, the Maverick Entities submit the Declaration of Keith Hennington (the "**Hennington Declaration**"), attached hereto as <u>Exhibit A</u>, and respectfully represent as follows:

### Preliminary Statement

1. Due to a prime brokerage structure Lehman put in place and commonly used up until its bankruptcy filing in September of 2008, investment managers can be left with substantial unpaid claims against LBHI that far exceed the amount of their claims against Lehman Brothers International (Europe) ("**LBIE**"), Lehman's UK brokerage unit.[1] This is exactly the situation in which the Maverick Entities find themselves. The Maverick Entities entered into prime brokerage agreements with Lehman Brothers Inc. ("**LBI**"), the U.S. broker-dealer, which signed the agreements on behalf of not just itself but all of its affiliates, including LBHI. The prime brokerage agreements required the Lehman parties, including LBHI, to maintain custody of cash and securities held for the beneficial account of the Maverick Entities. In addition, LBHI signed an absolute and unconditional New York-law governed guarantee backstopping Lehman's obligations to the Maverick Entities under these prime brokerage agreements. As of LBHI's September 15, 2008 petition date, the value of the Maverick Entities' cash and securities positions amounted to approximately $118.1 million. As a matter of New York state and U.S. bankruptcy law, this is the amount of the Maverick Entities' claim against

---

[1] As noted in the Estimation Motion, LBIE is a foreign affiliate of LBHI that entered English administration proceedings on September 15, 2008.

2

LBHI and the Maverick Entities are entitled to pursue the full amount of this claim until they have made a full recovery.[2]

2. The Maverick Entities also entered into an arrangement with Lehman to facilitate short selling, in which the investor borrows securities from the broker-dealer with a promise to return those securities on a future date (with the hope or expectation that the securities will be worth more at the time of borrowing than at the time of redelivery). The parties also contracted for the provision of margin loans from time to time. These arrangements were governed by separate agreements with LBIE (*i.e.*, Global Master Securities Lending Agreements and Margin Lending Agreements, respectively). Importantly, LBHI was not a party to these separate contracts, and the Maverick Entities' obligations thereunder were owed solely to LBIE. As a result, as a matter of New York law, LBHI has no right to reduce the amounts it owes under the prime brokerage agreements and the guarantee by setting off amounts the Maverick Entities owed LBIE.

3. The Maverick Entities have yet to make a full recovery of all amounts owed to them by LBHI (nor will such a full recovery be forthcoming from LBIE). As described below, the Maverick Entities effectively recovered approximately $101.9 million of the $118.1 million owed to them by way of a setoff effectuated in connection with a global settlement with LBIE. But with $16.2 million as yet unrecovered, the Maverick Entities are entitled to pursue their full claim against LBHI until that unrecovered amount has been recouped. Under these

---

[2] As explained below, the calculation of the Maverick Entities' claims against LBHI under applicable New York and federal bankruptcy laws generates a claim larger than any claim that was or would have been satisfied in connection with LBIE's administration.

3

circumstances, estimation of the Maverick Entities' claims at $0 – which is effectively a request for disallowance – must be denied.[3]

**Background**

4.  Prior to the commencement of these chapter 11 cases, each of the Maverick Entities entered into a separate prime brokerage agreement (the "**Prime Brokerage Agreements**") with LBI, which signed not just on behalf of itself but also on behalf of all of its affiliates, including LBIE and LBHI.[4] Copies of the Prime Brokerage Agreements are attached as Exhibit B hereto. Among other things, pursuant to the Prime Brokerage Agreements, the Lehman entities agreed to maintain custody of certain cash and securities assets of the Maverick Entities.

5.  The Lehman entities' obligations under the Prime Brokerage Agreements were unconditionally and irrevocably guaranteed by LBHI pursuant to each of the following: (i) that certain Guarantee of Lehman Brothers Holdings Inc., dated April 20, 2006, issued in favor of the Maverick Entities (the "**LBHI Guarantee**"); (ii) the Unanimous Written Consent of the Executive Committee of the Board of Directors of LBHI dated June 9, 2005; and (iii) that certain Guaranty of Lehman Brothers Holdings, Inc., dated January 4, 2008 and addressed to Standard & Poor's Rating Services (collectively, the "**Guarantees**"). A copy of the LBHI Guarantee is attached as Exhibit C hereto.

6.  The LBHI Guarantee is governed by New York law and expressly

---

[3]  In addition to the $16.2 million recoverable by Maverick, the Maverick Entities proofs of claim also reserved the right to seek interest and legal fees and also generally asserted and preserved the right to pursue "all amounts payable" in connection with the Prime Brokerage Agreements and the Guarantees. Although Maverick believes the $16.2 million still owed to it provides ample justification to deny the Estimation Motion with respect to the Maverick Entities, Maverick expects that it may in the future continue to pursue any rights it may have to collect interest, legal fees, or other damages, including damages for lost investment opportunities or other items.

4

provides, *inter alia*, that:

   i. "The Guarantee is absolute and unconditional without limitation as to monetary amount or duration";

   ii. "This Guarantee is a guarantee of payment, and not of collection, and Maverick may exercise its rights hereunder against the Guarantor without first having to take any action against [LBIE], or any other guarantor"; and

   iii. "The Guarantor [*i.e.*, LBHI] hereby waives diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee."

7. The Maverick Entities were also party to several separate contracts with LBIE related to the facilitation of "short" trades and margin loans. Specifically, each of the Maverick Entities was party to: (i) a Global Master Securities Lending Agreement; and (ii) a Margin Lending Agreement. The Global Master Securities Lending Agreements were entered into with LBIE only, and provided for the facilitation of certain "short" trades whereby Maverick would effectively borrow and promptly sell securities, with an obligation to re-acquire and return equivalent securities at a future date. The Margin Lending Agreements were entered into with LBIE (and LBI, as agent) and addressed the terms under which LBIE might make margin loans to the Maverick Entities from time to time.

8. On September 15, 2008 (the "**LBHI Petition Date**"), LBHI commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). On the same date, LBIE entered English administration proceedings pursuant to the English Insolvency Act of 1986.

9. At the time of the insolvency filings, the Maverick Entities' cash and securities had been custodied with LBIE. As set forth in Exhibit D hereto, as of the LBHI

---

[4] LBHI acknowledged that it was a direct party to the Prime Brokerage Agreements in the LBHI Guaranty.

5

Petition Date, LBIE had custody of approximately $118.1 million of property of the Maverick Entities, consisting of $59.4 million of cash and approximately $58.7 million of securities.

10. In accordance with the Court's Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, dated July 2, 2009 [Docket No. 4271], on September 22, 2009, the Maverick Entities timely filed Claim Nos. 27701, 27702, 27703, 27704, 27695, and 27696 (the "**Maverick Claims**") against LBHI for amounts owing under the Prime Brokerage Agreements.

11. On December 6, 2011 (the "**Confirmation Date**"), the Court entered an order [Docket No. 23023] confirming the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "**Plan**"). The Maverick Claims fall under Class 9A of the Plan, a class that has thus far received distributions reflecting approximately 20% of their allowed claims. *See* Notice Regarding Seventh Distribution Pursuant to the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holding Inc. and Its Affiliated Debtors [Docket No. 49001], dated March 26, 2015.

12. On March 30, 2012 (the "**LBIE Settlement Date**"), the Maverick Entities and LBIE entered into that certain Deed of Settlement by and among LBIE and certain of the Maverick Entities (the "**LBIE Settlement Agreement**"). A copy of the LBIE Settlement Agreement is attached hereto as Exhibit E.

13. In addition to addressing LBIE's obligations with respect to the cash and securities custodied in connection with the Prime Brokerage Agreements, the LBIE Settlement Agreement also resolved certain amounts that were owed to LBIE under the Margin Lending and the Global Master Securities Lending Agreements. LBIE Settlement Agreement, ¶2.3 and

6

Schedule 2. Specifically, the Maverick Entities made an aggregate cash payment to LBIE of $30 million and also effectively waived their right under English law to require LBIE to return the securities that had been custodied with LBIE.[5] LBIE Settlement Agreement, ¶¶ 2.1(i) and 2.1(b). On the date that the Maverick Entities agreed to waive any right to receive an in-kind distribution of their custodied securities, those securities were worth approximately $101.9 million (as compared to the total $118.1 million that LBIE owed the Maverick Entities under the terms of the Prime Brokerage Agreements).

14. Notably, by the time this setoff was effectuated, the value of the cash and securities custodied with LBIE had declined by approximately $16.2 million as compared to the value of such assets as of the LBHI Petition Date. Under the LBIE Settlement Agreement, the Maverick Entities preserved their right to pursue LBHI for the remainder of the amounts owed to it under the Prime Brokerage Agreements (*i.e.*, $16.2 million). LBIE Settlement Agreement, ¶ 2.4 ("this Deed is without prejudice to any right or claim of the Maverick Entities against any Lehman Brothers Entity other than LBIE").

15. On June 10, 2015, LBHI filed the Estimation Motion, seeking to estimate the Maverick Claims at $0 (including for purposes of allowance of such claims).

## Argument

**A. The Amounts Owed to the Maverick Entities By LBHI Must Be Determined Under United States Law and As of LBHI's Petition Date.**

16. Under the terms of the Prime Brokerage Agreements, the Lehman entities

---

[5] The total amount paid to LBIE was a function not only of the depreciated value of the Maverick Entities' custodied property, but also due to adverse price movements with respect to their short positions during LBIE's administration (a period during which the Maverick Entities lacked the legal ability, under English law, to unwind the short positions with LBIE). Indeed, as of the LBHI Petition Date, all of the Maverick Entities other than Maverick Fund II, Ltd. were owed money by LBIE on a net basis after accounting for all margin loan and short position obligations. Such entities were owed approximately $4.3 million from LBIE as of the LBHI Petition Date.

7

(including LBIE and LBHI) agreed to custody certain cash and securities for the Maverick Entities and was obligated, under such contracts and applicable state law, to execute trades and return custodied cash and securities when instructed to do so. *See*, *e.g.*, Prime Brokerage Agreements ¶ 3; NY CLS UCC §§ 8-503, 8-506, 8-508 (2015). These contractual commitments and statutory obligations were breached when LBIE entered U.K. administration proceedings and could no longer execute trades or return property to the Maverick Entities. LBIE's failure to comply with such obligations was compensable by an award of money damages, calculated as of the date of breach. *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971) (contract claimant is entitled to "the loss sustained or gain prevented at the time and place of breach" in context of failure to tender shares); *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006) ("It is settled Second Circuit law that in a breach of contract case, damages are calculated at the time of the breach."); *Kaminsky v. Herrick, Feinstein LLP*, 870 N.Y.S.2d 1, 11-12 (App. Div. 2008) (adopting the *Simon* court's reasoning and applying it to the calculation of damages for breach of contract for failure to deliver shares in an IPO at the initial offering price); *N.Y. News Publ'g. Co. v. Nat'l S.S. Co.*, 148 N.Y. 39, 41 (1895) ("The rule in this state seems to be that where a party…fails to deliver the property, his obligation is thereby converted into one for the payment of money.").

17.     Moreover, both LBIE and LBHI were directly and jointly liable under the terms of the Prime Brokerage Agreements. *Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*, 802 N.Y.S.2d 411, 414 (App. Div. 2005) ("Settled rules governing the interpretation of contracts provide that when two or more entities take on an obligation…they do so jointly, and that words of severance are necessary to overcome this primary presumption."); *Schneider v. Bytner*, 481 N.Y.S.2d 777, 779 (App. Div. 1984) ("A contractual obligation entered into by more

8

than one person is always presumed to be joint unless the contrary is stated."*); see also U.S. Printing & Lithograph Co. v. Powers*, 233 N.Y. 143, 152 (1922) ("It is a general rule, so well established as not to require extended discussion, that promises by two or more persons create a joint duty unless the contrary is stated. It is a general presumption of law that, when two or more persons undertake an obligation, they undertake jointly; words of severance being necessary to overcome this primary presumption."); *Alexander v. Wheeler*, 407 N.Y.S.2d 319, 320-21 (App. Div. 1978) (adopting the *U.S. Printing* rule).

18. Thus, under applicable state law, damages resulting from LBIE's failure to comply with the Prime Brokerage Agreements, and LBHI's resulting liability under the Prime Brokerage Agreements (as a co-party) and the LBHI Guarantee (as a guarantor), must be calculated based on the value of all cash and securities custodied with LBIE on the date of breach (*i.e.*, September 15, 2008). *In re O.P.M. Leasing Servs., Inc.*, 56 B.R. 678, 684 (Bankr. S.D.N.Y. 1986) ("[d]amages in a bankruptcy case must be measured in accordance with accepted contract law principles.").

19. The Bankruptcy Code also makes it clear that claims against a chapter 11 debtor such as LBHI are to be determined "as of the date of the filing of the petition." 11 U.S.C. §502(b); *In re Solutia Inc.*, 379 B.R. 473, 483 (Bankr. S.D.N.Y. 2007) ("§502(b) requires that a claim be determined as of the filing date" and claims allowance "is not a forward looking process" that can take into account future outcomes in an insolvency proceeding); *In re Chateaugay Corp.*, No. 94 CIV. 1257 (LMM), 1996 WL 346010, at *1 (S.D.N.Y. June 24, 1996) ("[T]he bankruptcy court…'shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition.'"); *In re O.P.M. Leasing Servs., Inc.*, 79 B.R. 161, 165 (S.D.N.Y. 1987) (The court acknowledges the "clear language of § 502(b)

9

requiring the bankruptcy court to 'determine the amount of such claim ... as of the date of the filing of the petition.'"). Thus, the allowed amount of any claim arising under the LBHI Guarantee must be calculated by reference to the total amounts owed under the Prime Brokerage Agreements as of the LBHI Petition Date.

20. The approximate amounts owed to each of the Maverick Entities under the Prime Brokerage Agreements as of the LBHI Petition Date are identified on <u>Exhibit D</u> hereto and total approximately $118.1 million. Such amounts reflect the value of cash and securities custodied with LBIE on September 15, 2008.

**B. The Maverick Entities Are Entitled To Pursue the Full Amount of Their Claims Against LBHI Until They Have Made a Complete Recovery.**

21. It is settled law that creditors such as the Maverick Entities can pursue the full amount owed to them by a co-obligor until they have recovered in full. *See Ivanhoe Building & Loan Ass'n of Newark, N.J. v. ORR*, 295 U.S. 243, 246-47 (1935) (holding that recoveries received from a non-debtor do not reduce the amount of the claim a creditor may assert against the debtor); *see also Nuveen Mun. Trust v. Withumsmith Brown, P.C.*, 692 F.3d 283, 295 (3d Cir. 2012) ("Ivanhoe thus provides that a creditor may file a proof of claim for the total amount it is owed by a debtor even if it has recovered or may recover all or a portion of that amount from a non-debtor."); *In re LightSquared Inc.*, Case No. 12-12080, 2014 Bankr. LEXIS 4577, at *15 (Bankr. S.D.N.Y. 2014) ("In *Ivanhoe*, the United States Supreme Court held that a creditor was permitted to assert the full value of its claim against a debtor co-obligor, unreduced by the stipulated value of the collateral, subject only to the "single-satisfaction rule" that the creditor could not retain value beyond payment in full").

10

### C. The Maverick Entities Have Not Received A Full Satisfaction on Account of the Claimed Amounts.

22. The *Ivanhoe* rule is applicable here because the Maverick Entities have made only a partial recovery of the amounts owed to them under the Prime Brokerage Agreements. This partial recovery effectively was achieved by way of certain setoffs in connection with the negotiation and consummation of the LBIE Settlement Agreement. But the Maverick Entities have recovered substantially less than the full amounts owed to them under the Prime Brokerage Agreements as of the LBHI Petition Date and are thus entitled to continue to pursue their claims against LBHI under the *Ivanhoe* rule.

23. As described in paragraph 13 above, under the LBIE Settlement Agreement, the Maverick Entities made an aggregate cash payment to LBIE of $30 million and also waived any right to receive an in-kind distribution of custodied cash and securities worth approximately $101.9 million on or around the date of the settlement. This consideration was provided in exchange for a global resolution of liabilities owed to LBIE under the Global Master Securities Lending Agreements and Margin Lending Agreements. In light of the cancellation of indebtedness that would otherwise have been owed to LBIE, Maverick concedes that it already has effectively received approximately $101.9 million of value from LBIE in connection with the LBIE Settlement Agreement (reflecting an offset of the approximate value of the securities and cash that LBIE may have been obligated to return to Maverick under English law).

24. But this $101.9 million recovery still leaves a shortfall of $16.2 million that has yet to be recovered. Notably, the value of the Maverick Entities' custodied securities had declined considerably between the LBHI Petition Date and the date on which the economic terms of the LBIE Settlement Agreement were agreed in principle. It is precisely this decline in value that resulted in the Maverick Entities receiving less than the full value that was owed to

11

them by LBIE in connection with the breach of the Prime Brokerage Agreements. By the same token, because LBHI was a co-party to the Prime Brokerage Agreements and also guaranteed payment in full of the amounts owed by LBIE thereunder, it is this same decline in the value of the custodied securities for which LBHI remains liable.

25.    Under applicable law, the Maverick Entities are thus entitled to pursue claims in the full amount of $118.1 million against LBHI, and can recover up to $16.2 million of additional value (reflecting the fact that the Maverick Entities already have effectively recovered approximately $101.9 million from LBIE by way of setoff). In light of the fact that recoveries for Class 9A claims such as those held by the Maverick Entities already have received distributions in excess of 20% of their allowed claims, the Maverick Entities' allowable claim of $118.1 million would in fact be sufficient to ensure that the Maverick Entities recover the full $16.2 million not yet paid to it by LBIE.

**D.  The Estimation Motion Presents No Factual Or Legal Argument As to Why the Claims Asserted by the Maverick Entities Should be Disallowed or Estimated at $0.**

26.    No argument presented in the Estimation Motion explains why the Maverick Entities' legitimate guarantee claims against LBHI should be estimated at $0 and effectively disallowed. Indeed, given that the LBHI Guarantee is, by its express terms, "absolute and unconditional," it is unclear whether LBHI can, as a matter of law, assert any defenses. *HSH Nordbank AG New York Branch v. Brian*, 421 F. App'x. 70, 72 (2d. Cir. 2011) ("creditor need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee").

### i.  *The Maverick Entities Will Receive No Future Distributions From LBIE*

27.    The Estimation Motion suggests that all beneficiaries of guarantees from LBHI will have their claims satisfied in full through past and future distributions made by LBIE.

NYDOCS04/587223.9

Estimation Motion, ¶ 15. But with respect to the Maverick Entities, this simply is not true. As noted above, the LBIE Settlement Agreement cut off the Maverick Entities' rights to receive any additional distributions from LBIE, while also preserving their rights to pursue entities other than LBIE for amounts owed. LBIE Settlement Agreement, ¶¶ 2.3 and 2.4. Because the LBHI Guarantee was a guarantee of payment, rather than a mere guarantee of collection, the Maverick Entities were fully entitled to enter into such an arrangement with LBIE and to pursue the balance of its claims from LBHI. *McMurray v. Noyes*, 72 N.Y. 523, 525 (N.Y. 1878) (beneficiary of guarantee of payment may "proceed directly against the guarantor...and the omission or neglect to proceed against [principal debtor]" does not provide the guarantor a defense). In addition, as described above, LBHI was also a party to the Prime Brokerage Agreements, and therefore, remains primarily liable as a matter of New York law. Accordingly, the arguments in the Estimation Motion concerning future distributions to be received from LBIE have no bearing with respect to the Maverick Entities, and provide no basis to estimate the Maverick Entities' claims at $0.

   ii. *LBIE's Satisfaction of Its Obligations Under English Insolvency Laws Do Not Discharge LBHI's Guarantee Obligations Under U.S. Law.*

   28. The Estimation Motion is also predicated on the assumption that LBHI's guarantee obligations should be discharged if LBIE has complied with its obligations under English insolvency law. Indeed, LBHI's argument presumes that guarantee claims against LBHI will be "allowed in amounts that approximate the allowed amounts of the corresponding primary claims", and jumps from this inaccurate premise to the flawed conclusion that "[because] all Relevant Guarantee Claims are expected to be satisfied in full from LBIE, they will not be entitled to a net recovery from LBHI." But as described above, the proper quantification of the amounts owed by LBHI must be assessed under U.S. law, which provides for calculation of

13

damages and allowed claims as of the LBHI Petition Date, and thus protects Maverick from precisely the deterioration in the value of their custodied cash and securities that was suffered here. English law, by contrast, required (at most) that LBIE return custodied property to the Maverick Entities, and afforded no additional claim or other protection for the deterioration in the value of such property prior to its return. Moreover, it is settled law that a guarantor cannot escape liability merely because the unsatisfied obligations of a primary obligor were discharged or reduced in connection with an insolvency proceeding.[6]

### iii. *Payments Made to LBIE Under the LBIE Settlement Agreement Do Not Imply That LBHI's Obligations to the Maverick Entities Were Satisfied In Full.*

29. The fact that LBIE received payments from the Maverick Entities in connection with the LBIE Settlement Agreement has no bearing on whether LBHI's separate obligations have been satisfied.

30. The net payment received by LBIE under the LBIE Settlement Agreement reflected a multi-contract setoff arrangement that is unavailable to LBHI. Notably, because LBHI is not a party to the margin lending and securities lending agreements that gave rise to the Maverick Entities' liabilities to LBIE, LBHI cannot avail itself of any such setoff rights. *Marcus Dairy, Inc. v. Jacene Realty Corp.*, 638 N.Y.S.2d 779, 780 (2d Dep't 1996) ("[Under]…New York law, a guarantee agreement is separate and distinct from the contract" with the primary

---

[6] *Bank of N. Am. v. Shapiro*, 298 N.Y.S.2d 399, 401 (1st Dep't 1969) (under New York law, guarantor is liable "even where the principal may escape liability"); *Instituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Prods.*, 323 F. Supp. 630, 637 (S.D.N.Y. 1971) (Obligations of a guarantor not discharged merely because foreign bankruptcy proceeding allowed discharge of obligations of primary obligor, noting that "If a creditor, by accepting a final partial distribution of the debtor's assets from the [Italian] Bankruptcy Court...forfeited his rights to collect the balance from the guarantor, the guarantee would become a meaningless instrument"); *Credit Suisse First Boston Mortg. Capital LLC v. Cohn*, 03 Civ. 6146 (DC), 2004 U.S. Dist. LEXIS 16577, at *24 (S.D.N.Y. 2004) ("A discharge of liability pursuant to the bankruptcy laws generally does not affect a guarantor's liability and leaves a creditor free to pursue collection from a guarantor."); *Johnson v. Beck*, 117 B.R. 461, 470 (Bankr. D. Minn. 1990) (claim against guarantor "enforceable in its full amount...notwithstanding any limitation on its allowability" arising from insolvency proceeding of a primary obligor).

14

obligor, and "thus a party who enters into an unconditional guarantee of payment may not assert setoffs or defenses which arise independently from the guarantee."). Furthermore, setoff is in any event a "defense" or "counterclaim", and LBHI expressly waived all such defenses and counterclaims by providing an "unconditional" guarantee. *See*, *e.g.*, *U.S. Bank N.A. v. Perlmutter (In re South Side House, LLC)*, 470 B.R. 659, 675 (Bankr. E.D.N.Y. 2012) (collecting cases and holding that "unconditional guaranties have been held to foreclose, as a matter of law, guarantors from asserting any defenses or counterclaims") (citation omitted).

31. Finally, even if such legal setoff rights were available to LBHI under New York law (and they are not), Maverick is unaware of LBHI ever having taken any affirmative act to effectuate such a setoff, as is required as a matter of law before a setoff is effective. *Clarkson Co. Ltd. v. Shaheen*, 533 F. Supp. 905, 925 (S.D.N.Y. 1982) ("[T]he act of setoff is ... complete ... (when) three steps have been taken: (1) the decision to exercise the right, (2) some action which accomplishes the setoff and (3) some record which evidences that the right of setoff has been exercised." (citing *Baker v. National City Bank of Cleveland*, 511 F.2d 1016, 1018 (6th Cir. 1975))); *see also Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 20 (1995). Moreover, all amounts owed to LBIE have already been fully satisfied by the Maverick Entities as a result of the cash payment and other consideration that was provided to LBIE under the LBIE Settlement Agreement. Thus, all potential setoff amounts have been fully exhausted under the LBIE Settlement Agreement and nothing remains available for LBHI to setoff in any event. Upon the consummation of the LBIE Settlement Agreement, LBIE had received full satisfaction of all amounts owed to it, but the Maverick Entities had not yet recovered the full amount to which they are entitled under the Prime Brokerage Agreements. LBHI remains obligated, under applicable law, to make up that shortfall.

15

**Conclusion**

WHEREFORE, the Maverick Entities respectfully request that the Court deny the Motion with respect to the Maverick Claims, allow the Maverick Claims against LBHI, and grant such other and further relief as is just and equitable.

Dated:  New York, New York
        August 21, 2015

                SHEARMAN & STERLING LLP

By:    */s/* Solomon J. Noh
       William J.F. Roll, III
       Solomon J. Noh
       Randall Martin
       Stacey L. Corr-Irvine
       599 Lexington Avenue
       New York, New York 10022
       Telephone:  (212) 848-4000
       Facsimile:  (646) 848-7174

*Attorneys for the Maverick Entities*