

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4   In re:

5

6   LEHMAN BROTHERS HOLDINGS

7   INC.,

8                               Case No. 08-13555(SCC)

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  LEHMAN BROTHERS HOLDINGS

12  INC., IN ITS CAPACITY

13  AS PLAN ADMINISTRATOR,

14                Plaintiff,

15          v.                  Adv. Case No. 15-01110(SCC)

16  BANK FEDERAL HOME LOAN

17  BANK OF NEW YORK,

18

19                Defendant.

20  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21

22

23

24

25

Page 2

1    LEHMAN BROTHERS HOLDINGS

2    INC.,

3                    Plaintiff,

4          v.                    Adv. Case No. 14-02393(SCC)

5    LHM,

6

7                    Defendant.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - x

9    LEHMAN BROTHERS HOLDINGS

10   INC., IN ITS CAPACITY

11   AS PLAN ADMINISTRATOR

12                  Plaintiff,

13         v.                    Adv. Case No. 15-01287(SCC)

14   COMMONWEALTH OF

15   MASSACHUSETTS,

16

17                  Defendant.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - x

19                  U.S. Bankruptcy Court

20                  One Bowling Green

21                  New York, New York

22

23                  September 9, 2015

24                  10:08 AM

25

1    B E F O R E :

2    HON SHELLEY C. CHAPMAN

3    U.S. BANKRUPTCY JUDGE

4

5

6    Hearing re:  08-13555 - Doc #42105 Four Hundred Fifty-Fifth

7    Omnibus Objection to Claims (No Liability Claims)

8

9    Hearing re:  Adv. 15-01110 - Doc #10 Motion to Dismiss

10    Adversary Proceedings

11

12    Hearing re:  Adv. 15-01110 - Pre-trial Conference

13

14    Hearing re:  adv. 14-02393 - Doc #37 Motion to Strike

15    Defendants Jury Demand

16

17    Hearing re:  Adv. 15-01287 - Pre-trial Conference

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

Page 4

1   A P P E A R A N C E S :

2   WEIL, GOTSHAL & MANGES LLP

3        Attorneys for Lehman Brothers Holdings Inc., as Plan

4        Administrator

5        767 Fifth Avenue

6        New York, NY 10153-0119

7

8   BY:  JACQUELINE MARCUS, ESQ.

9        RALPH I. MILLER, ESQ.

10

11  WOLLMUTH MAHER & DEUTSCH LLP

12        Attorney for the Plaintiff

13        500 Fifth Avenue

14        New York, NY 10110

15

16  BY:  ADAM M. BIALEK, ESQ.

17

18  JONES DAY

19        Attorneys for the Plaintiff

20        222 East 41st Street

21        New York, NY 10017-6702

22

23  BY:  JAYANT W. TAMBE, ESQ.

24        RYAN J. ANDREOLI, ESQ.

25

Page 5

```
 1   FOX ROTHSCHILD LLP
 2        Attorney for Federal Home Loan Bank of New York
 3        100 Park Avenue
 4        Suite 1500
 5        New York, NY 10017
 6
 7   BY:  MITCHELL BERNS, ESQ.
 8        KATHLEEN AIELLO, ESQ.
 9        OKSANA G. WRIGHT, ESQ.
10
11   MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND OIOEI PC
12        Attorney for the Commonwealth
13        666 3rd Avenue
14        New York, NY 10017
15
16   BY:  KAITLIN R. WALSH, ESQ.
17
18   MARIN ADVOCIATES FOR CHILDREN
19        30 North San Pedro road
20        #275
21        San Rafael, CA 94903
22
23   BY:  TRACY L. HENDERSON, ESQ.
24
25
```

Page 6

1                    P R O C E E D I N G S

2            THE COURT:  Good morning.  Please have a seat.

3    How is everyone?

4            Good morning, Ms. Marcus.

5            MS. MARCUS:  Good morning, Your Honor.  Jacqueline

6    Marcus of Weil, Gotshal & Manges LLP on behalf of Lehman

7    Brothers Holdings Inc., as plan administrator.

8            Your Honor, we're here for the eighty-ninth

9    omnibus hearing.  Originally it looked like the calendar

10   would be a very full calendar this morning, and we're

11   actually down to only one matter on the calendar, and that

12   matter is now uncontested.  So this should be -- this part

13   of the hearing should be very quick.

14           THE COURT:  Okay.

15           MS. MARCUS:  The first item on the agenda is the

16   four hundred and fifty-fifth omnibus objection to claims,

17   it's ECF number 42105.

18           THE COURT:  Right.

19           MS. MARCUS:  It was listed as a contested matter

20   because in February of this year the claimants filed their

21   response to the objection, but late yesterday the claimants

22   withdrew their response, and that's at ECF number 50901.

23           In case the Court hasn't seen that withdrawal I

24   can hand a copy up.

25           THE COURT:  We have.  We have.

Page 7

1            MS. MARCUS:  Okay.  So all of a sudden the claims

2    objection is now uncontested.  If the Court would, like I

3    could go into the details, but I don't think that's

4    necessary.

5            THE COURT:  I reviewed it in preparation for it

6    being contested, so I don't think -- the effect of the

7    withdrawal of the objection is that I'm simply going to

8    grant the trustee's motion -- sustain the trustee's

9    objection.

10           MS. MARCUS:  Thank you, Your Honor.  And our

11   apologizes for the fact we had to prepare for the hearing,

12   we were just getting no responses.

13           THE COURT:  No problem.

14           MS. MARCUS:  Switching to the adversary proceeding

15   docket, the next matter is Lehman Brothers Holdings Inc.

16   versus Federal Home Loan Bank of New York.

17           THE COURT:  Right.

18           MS. MARCUS:  My partner, Ralph Miller, will be

19   handling this on behalf of the plan administrator, and

20   Mitchell Berns of Fox Rothschild, is here on behalf of HLB.

21           THE COURT:  Okay.

22           MS. MARCUS:  I believe we're going to start with

23   the motion to dismiss, so I'll turn the podium over to

24   Mr. Berns.

25           THE COURT:  Okay.  Thank you very much.

Page 8

1           Good morning.  How are you?

2           MR. BERNS:  Good morning, Your Honor.  Mitchell

3    Berns of Fox Rothschild for the Federal Home Loan Bank of

4    New York.

5           I understand you'd like to handle the motion first

6    and then we do the conference on the schedule.

7           THE COURT:  Yes, I think so.

8           MR. BERNS:  Yes.  Yes, Your Honor.

9           Your Honor, I'll be brief.  I think the positions

10   are pretty well laid out in the papers.

11          THE COURT:  They are.

12          MR. BERNS:  Yeah.

13          THE COURT:  But let me start with one aspect of it

14   that -- and I really want to try to avoid too much getting

15   into the merits and characterizing the merits, because we're

16   obviously only at the beginning, but with respect to the

17   equitable subordination count you basically say two things.

18   Look, this doesn't amount to more than a hill of beans and

19   you go through some math, but in the same breath you say

20   this really can't be determined on a motion to dismiss.

21          So, I think first choice is I would find that this

22   is going to be de minimis no matter what and I should kick

23   it out, but you do admit that it's not something that would

24   typically be resolved on a motion to dismiss.

25          MR. BERNS:  I'd say both statements you made are

Page 9

1    right and consistent.  It is a hill of beans that can only

2    benefit lawyers and not creditors.

3              THE COURT:  Well but I -- see, I don't even think

4    -- I don't know that that's true, because I don't think that

5    when I look forward in the sense of looking ahead as opposed

6    to happily anticipating something, when I look forward to

7    this case being tried I don't know that the proof is going

8    to be any different or that anything is going to be any

9    different if the equitable subordination claim remains just

10   sitting out there.

11             MR. BERNS:  To the -- yes, in this sense.  The

12   contract provision at issue here contains an expressed good

13   faith requirement.

14             THE COURT:  That's the -- that's next.  That's the

15   point that I'm going to give Mr. Miller a hard time about.

16             MR. BERNS:  It does play though into the equitable

17   subordination issue.

18             Absolutely correct, Your Honor cannot make a

19   judgment about whether our conduct was equitable or not at

20   this stage, ridiculous, you can't do it.

21             What you can say is that leaving that claim in

22   there can just cause cost and mischief.  Anything that

23   Mr. Miller wants to test regarding the good faith of the

24   bank in calculating the termination value of these swaps is

25   going to --

Page 10

```
 1                THE COURT:  Look, but don't you think --

 2                MR. BERNS:  -- stay in the case any way.

 3                THE COURT:  But don't you think I would, you know,

 4      appropriately reign him in?  I mean I -- look --

 5                MR. BERNS:  We have faith that you will do so.

 6                THE COURT:  Okay.  The issue that I have, again,

 7      without getting into the merits and without characterizing,

 8      because it's so preliminary, I'm interested in what occurred

 9      here.

10                MR. BERNS:  Uh-huh.

11                THE COURT:  Okay?  I'm interested in the fact that

12      there appears to be a, you know, these 44 replacements that

13      were reported as one thing and then later turned out to be

14      another thing.  Okay?  Subject to your rights to put on

15      whatever case you will put on that's a fact that concerns

16      me.

17                So --

18                MR. BERNS:  Uh-huh.

19                THE COURT:  -- my view is the pleading -- the

20      equitable subordination count, and I'm not at the good faith

21      and fair dealing yet, it stays out there because I want to

22      see what happens.  I want to see what happens.  It seems to

23      me that if Lehman proves what they've alleged frankly there

24      ought to be a consequence.

25                MR. BERNS:  Uh-huh.
```

```
 1              THE COURT:  And I know the law very well about
 2      equitable subordination.
 3              MR. BERNS:  Yes, right.
 4              THE COURT:  And I know the law is that it's only
 5      to the extent of harm, but it's a biggie for me that people
 6      deal honestly when they're dealing in the bankruptcy court
 7      and in connection with a Chapter 11 case, so, I think it
 8      stays out there.
 9              MR. BERNS:  Yeah, I think the discovery will be
10      the same in any event, Your Honor.
11              THE COURT:  Good.  Okay.  That's what I think.
12              MR. BERNS:  Okay.
13              THE COURT:  So is there anything that you want to
14      say about the breach of the implied covenant of good faith
15      and fair dealing?
16              MR. BERNS:  Yeah.  Very briefly again, Your Honor.
17              The difference between this case and the cases
18      you've written on and talked about, the Wellmont and
19      LightSquared case, is that Mr. Miller's claim depends here
20      on a contract with an expressed good faith requirement.
21      It's already in the contract claim.  There's nothing to be
22      added by implying another covenant.
23              I understand --
24              THE COURT:  But the calculation --
25              MR. BERNS:  Yes.
```

Page 12

1          THE COURT:  -- I mean there's a number of

2     provisions of the ISDA that come into play here.  Where the

3     good faith words certainly live are the calculation of loss

4     must be done reasonably and in good faith.

5          MR. BERNS:  Yes.  Yes.

6          THE COURT:  Okay?  So there does seem to be a

7     scenario in which the calculation could have been done

8     reasonably and in good faith, but other things were not.

9          MR. BERNS:  Every --

10          THE COURT:  Okay.

11          MR. BERNS:  I'm sorry, Your Honor.

12          THE COURT:  Go ahead.

13          MR. BERNS:  Everything that has been alleged in

14     this complaint concerns the calculation of the damages.

15     It's all wrapped up in that loss definition with that broad

16     discretionary clause saying, you must calculate your gain on

17     termination.  Here we had a gain, so --

18          THE COURT:  Right.

19          MR. BERNS:  -- (indiscernible).  It all depends on

20     whether or not we calculated our gain on termination in good

21     faith.

22          THE COURT:  Including when you calculated it?

23          MR. BERNS:  Yes.  Yes, Your Honor.  That's all

24     part of that clause.  We calculated that claim.  I don't see

25     anything in the complaint that is contesting the date of our

Page 13

1    calculation.  We calculated in November of 2008.  This was

2    not a greatly delayed exercise.  We terminated the swaps on

3    the 18th of September.

4                THE COURT:  Right.

5                MR. BERNS:  We replaced most of the value within

6    two trading days.  And we finished up our calculation and

7    gave them a calculation statement at the end of November.

8                So this was not -- you know, this was not a drawn

9    out process.

10               THE COURT:  But that calculation statement

11   included the incorrect information about the existence of

12   the replacement swaps.

13               MR. BERNS:  I wouldn't characterize it's

14   incorrect, Your Honor, the bank made a decision to treat all

15   swaps, not replace as of the end of its calendar quarter,

16   which was September 30, as on replaced swaps.  It made a --

17   it was an accounting-based decision to do that.

18               THE COURT:  So -- okay.

19               MR. BERNS:  And that will be contested.

20               THE COURT:  Right.

21               MR. BERNS:  Yes.

22               THE COURT:  So if the ISDA --

23               MR. BERNS:  Uh-huh.

24               THE COURT:  -- permitted that --

25               MR. BERNS:  Yes.

Page 14

1              THE COURT:  -- right, then I think what Mr. Miller

2     is trying to say is that even if the ISDA permitted that

3     that's where the breach of the implied covenant of good

4     faith and fair dealing comes in, because you're now in

5     LightSquared world technical compliance but oh, come on, it

6     can't possibly be okay that the next day -- I'm exaggerating

7     -- you then go out and replace the positions and you don't

8     tell anyone for four, five, six years.

9              MR. BERNS:  I think that is Mr. Miller's position,

10    and our position -- if he's correct that we were playing a

11    game with that calculation, that we were hiding, that there

12    was these 44 swaps that we decided later to replace, if he's

13    correct about that our position is simple, it wouldn't pass

14    muster under the ISDA as written, it wouldn't be in good

15    faith -- it wouldn't be a good faith calculation.  If we are

16    gaming, cherry picking, if we did -- if he establishes that

17    we did that --

18             THE COURT:  Uh-huh.

19             MR. BERNS:  -- our position is there's one good

20    faith concept, it's already in this contract, you don't need

21    to imply another one.

22             We can't be gaming that calculation and satisfy

23    the requirement -- basic requirement of the loss provision

24    that our calculation of our gain be done in good faith and

25    reasonably.  So it's already there.  That's why this is an

Page 15

1    easy case.

2              THE COURT:  All right.

3              MR. BERNS:  Thank you, Your Honor.

4              THE COURT:  Let me talk to Mr. Miller, please.

5              How are you, Mr. Miller?

6              MR. MILLER:  Good morning.  I'm fine, Your Honor.

7    I hope you're well.

8              THE COURT:  So the question -- I think the most

9    succinct way to state the question is whether or not there's

10   a complete overlap between the good faith requirement in

11   loss, quote/unquote, as used in the ISDA, or elsewhere in

12   the ISDA and the implied covenant of good faith and fair

13   dealing.  Because if there's nothing -- you know, if it's a

14   been diagram and they're total a coincident then Mr. Berns I

15   think is right.

16             MR. MILLER:  Your Honor, may I approach?

17             THE COURT:  Sure.

18             MR. MILLER:  I have two --

19             THE COURT:  Thank you.

20             MR. MILLER:  Your Honor, I have two pages from the

21   pleading that I think deal precisely with that issue, which

22   I anticipated you were going to ask me.

23             The first chart that I passed out just from the

24   complaint illustrates the facts that are necessary for Count

25   I, the breach of contract count and also Count III, which is

Page 16

1    a violation of Section 562.  Those have to do with when and

2    what the value of the swaps are, the negotiable instrument

3    that is essentially the swap.  Actually it's 356 swaps, but

4    they're all very similar.  They are interest rate swaps and

5    they're one product essentially, and they're all terminated

6    on the date marked here, September the 18th, and the bank's

7    theory, as the Court has correctly noted, is that

8    replacement value on any date controls, that they can

9    stretch out a series of replacements at their discretion and

10   essentially pick valuation dates on subparts of the swaps

11   and then those would come retroactively applicable.

12            What they filed looked to be consistent with their

13   calculation statement, which had a table at the back, it's

14   described in the complaint so you take it as true, it said

15   unreplaced swaps, that this was all the replacements there

16   were.  In fact the replacements out here are off this chart

17   that were concealed by the calculation statement, and after

18   those replacements were made the calculation statement was

19   sent, and after those replacements were made two claims for

20   about $65 million were filed because these numbers are --

21   some of these numbers are below the 500 million roughly

22   collateral level.  So if in fact the value had been down

23   here some of the collateral would have come back to them.

24   If the value is up here there's $150 million before interest

25   of additional collateral that should have been posted and

Page 17

1    should be posted when they exercise their absolute

2    discretion.  In the Shield case you've noted they had

3    absolute discretion.

4              That's essentially the factual situation for

5    Count I.

6              The unreplaced swaps are invisible from the

7    standpoint of what they produce, half a decade passes,

8    Mr. Berns takes over as new counsel, and I want to

9    compliment him, he say, wait a minute, we need to rethink

10    this, because they've got a claim sitting out there that

11    says they're unreplaced swaps when they were in fact

12    replaced.

13              And it's very important to understand that the way

14    that they were replaced and the way they were handled

15    undermines their basic legal theory on valuation, and here's

16    the reason it does.

17              First in fact you can just continue to scatter

18    replacements all out this doctrine makes no sense, it's

19    unworkable, these negotiable instruments.  So the fact that

20    they did them, they hid them because they really couldn't

21    extend it that far, they just sort of thought they could

22    stretch it it appears to the end of September.

23              So concealing that fact, which is not something

24    that the ISDA says you do not do, you do not conceal facts

25    about your own conduct, because normally the ISDA does not

Page 18

1    have anything to do with the conduct of the non-defaulting

2    party.  Normally the ISDA is an objective replacement based

3    on what was the market on that date.  That's the only way

4    the other party can check it and figure out what to do with

5    it.

6              They have injected the novel theory our conduct

7    changes this calculation, and then they --

8              THE COURT:  But right there is where I say, right,

9    and that conduct as described by you is not in good faith.

10             MR. MILLER:  That's correct, Your Honor, that's my

11   point.

12             THE COURT:  So therefore they violate the ISDA in

13   that their calculation is not in good faith and made

14   reasonably and in good faith.

15             MR. MILLER:  Your Honor, let me suggest if you go

16   back with the chart that we have --

17             THE COURT:  Right.

18             MR. MILLER:  -- makes it clear that these things

19   had several consequences.

20             The 285 swaps they did replace, these are

21   basically the dots of the chart, and they said they

22   replaced, and that literally hasn't changed.  But then we

23   got to 71 swaps, and you've already noted 44 of them they

24   said were unreplaced and were replaced.  They filed a

25   bankruptcy claim.  The ISDA says nothing about filing

1   bankruptcy claims.  The ISDA says nothing about taking a

2   claim for $45 million and inflating it to about $65 million

3   and leaving it on the docket for 5 years.  That conduct

4   caused costs to the estate, that conduct caused disruption,

5   that conduct had implications for settlement discussions,

6   there were two mediations in this case, that conduct is not

7   covered by the commercially reasonable --

8           THE COURT:  By the ISDA.

9           MR. MILLER:  -- by the ISDA -- no, it doesn't say

10  anything about bankruptcy claims, it doesn't say anything

11  about misrepresenting.

12          This is exactly the kind of forging of

13  implementation of the ISDA contract that you talked about in

14  LightSquared and it came up in Wellmont.  They had

15  additional conduct, and our view is that this additional

16  conduct produces additional damages.

17          Let's assume, as we think is correct, that they

18  should valued on the 18th their whole theory is no good.

19  Okay.  All that produces is a correct value on interest.

20  But on top of that they misrepresented their own conduct and

21  they interposed two claims, one against LBHI and one against

22  LBSF, that were inflated by 44 percent.

23          What if all the claimants in this case inflated

24  their claims by 44 percent based on misrepresentation facts?

25  What does that do to the administration and estate?

Page 20

1          There ought to be additional damages, and as the

2     Court noted in LightSquared, some of the additional damages

3     might include additional administrative expenses, interest

4     in dividends lost by creditors during the delay,

5     professional fees and expenses incurred.  Those would be on

6     top of the 150 million plus interest that should be

7     recovered, and they never get to equitable subordination

8     because they have no claim.

9          That's what the good faith and fair dealing

10    complaint is for, is for the additional damage of sticking

11    two claims out there and not correcting the calculation

12    statement.  The calculation statement is actually only one

13    subpart.  So that's what we believe the additional conduct

14    is.

15         It is only a motion to dismiss, it should be

16    preserved, and we ask that the Court deny the partial motion

17    to dismiss, Your Honor.

18              THE COURT:  All right.  Thank you, Mr. Miller.

19              MR. BERNS:  Just very briefly?

20              THE COURT:  Yes.

21              MR. BERNS:  I'm not sure I understand Mr. Miller's

22    point about additional damages.  What he's -- I understood

23    him to be arguing about the implied covenant claim.  It's

24    either -- that's a breach of contract claim.  It's an

25    implied covenant, but either he's got contract damages or he

Page 21

1    doesn't.  Whatever contract damages he can recover for a

2    breach of the implied covenant he can also recover for

3    breach of good faith under the contract.  So, I don't --

4    it's still complete duplication.

5            THE COURT:  I don't think there is, because what

6    he's focusing on is the filing of the bankruptcy claim.  The

7    filing of the bankruptcy claim, which is not governed by the

8    ISDA, and the entire course of conduct related to the filing

9    of the bankruptcy claim is outside of the ISDA regime.

10           And I said it when you rose earlier, and subject

11   to your rights to be heard and to defend the allegations,

12   it's a troubling set of facts on its face.

13           Mr. Miller articulated exactly what I had been

14   thinking about, which is this wouldn't be a good thing if

15   people routinely did it.  Now it's not a -- it's not

16   breaking news that people submit over-inflated claims in a

17   bankruptcy case.  They do that, I've heard.  On the advice

18   of lawyers, on the advice of advisors, they know they're

19   only going to get paid cents on the dollar, it's a

20   litigation position, et cetera.

21           What has been alleged here, at least preliminarily

22   arguably, is in a different category.  I don't know.

23           But it strikes me again that at this very

24   preliminary stage, and because it's not going to change one

25   iota how the parties prepare for trial, I think it ought to

Page 22

```
1    stay in, because it strikes me that something happened, we

2    need to get to the bottom of it, and that if in fact it

3    happened the way Mr. Miller says it did and you don't

4    provide a explanation that makes it seem better there ought

5    to be a consequence.  And whether the consequence frankly

6    is, you know, a couple of $10,000 of administrative expense

7    or whatever, there ought to be a consequence --

8              MR. BERNS:  Uh-huh.

9              THE COURT:  -- that this is about adjudicating

10   this dispute, but this also implicates, at this stage, the

11   appropriate administration of the bankruptcy system in a

12   bankruptcy case of this magnitude.

13             So, I think the motion to dismiss is going to be

14   denied.

15             MR. BERNS:  Uh-huh.

16             THE COURT:  It is going to be denied, and I think

17   we ought to talk about the discovery schedule --

18             MR. BERNS:  Okay.

19             THE COURT:  -- going forward.  And on that if we

20   could, Mr. Miller, if we could segway into the discovery

21   schedule.  On that one --

22             MR. BERNS:  Would you like me here?

23             THE COURT:  You can go back to the table.

24             MR. BERNS:  Yeah.

25             THE COURT:  On that one -- you know, I love charts
```

Page 23

1    because charts are always delightfully cherry picked, okay,

2    they're just -- you know, you find two of the most difficult

3    cases and you say, look how much time they have, and then

4    you say, you know, there's not enough time here, but I'm

5    really -- this is a real head-scratcher to me, because

6    there's -- you're not that far apart.

7            So the only point, Mr. Miller, that you make is

8    look, discovery -- pretrial schedules only get longer, they

9    don't get shorter, but at the outset you're only apart by

10   two months.

11           MR. BERNS:  Five months, Your Honor.

12           THE COURT:  No -- well, I mean for the first

13   phase.

14           MR. BERNS:  For the first phase, yes.

15           THE COURT:  For document production.  So, you

16   know, I'm just not smart enough to know what difference the

17   two months makes.

18           MR. BERNS:  Your Honor, it's based on our estimate

19   of how long it's going to take.  The primarily gating issue

20   here is there's lots of transcripts, some of which aren't in

21   good shape.  I'm talking about all the transcripts that need

22   transcription and review and all that, it's a lot more --

23           THE COURT:  Do you have an agreement about there

24   being a rolling production or is this --

25           MR. BERNS:  Yes, we'll start producing whenever.

Page 24

1   Whenever we have stuff we'll start producing.  We just have

2   a good sense -- but the burden of production here, Your

3   Honor, is I would say a large measure of it's going to fall

4   on us, because the key issues in contention are just what we

5   did in replacing these swaps and how we acted.

6           THE COURT:  Right.

7           MR. BERNS:  So we've made an estimate, but we do

8   have some issues just in terms of personnel transition, and

9   we think that we'd rather start with something reasonable

10  than have to come back for these incremental increases all

11  the time.

12          We are -- I should say that we've made this point

13  to Mr. Miller, our client here is also very concerned about

14  the time here.  Remember there's an interest claim here and

15  that affects us as well.  So we plan -- we're pursuing this

16  case pretty expeditiously.  We started discovery before

17  we've even closed the pleadings, and we see those as

18  unrelated in a sense.

19          So we're going pursue this expeditiously, but we

20  think what we propose is quite reasonable and we'd rather

21  just not have to come back for a bunch of extensions.

22          THE COURT:  The next issue is why -- is this --

23  the fact depositions --

24          MR. BERNS:  Correct.

25          THE COURT:  -- is that time to complete?

Page 25

1          MR. BERNS:  That -- yeah, that's the deposition

2     period potentially start earlier than the end of document

3     production, but we thought that especially given the way

4     this five months lays out, it just lays out over the

5     summertime, so if we are finishing our document production

6     in April then we'd be doing depositions through I think

7     early September, and it seemed that especially -- I think

8     there's going to be -- there are a number of people at the

9     bank what are involved in this and I suspect Mr.

10    (Indiscernible) would want to go talk to them --

11          THE COURT:  I would suspect so.

12          MR. BERNS:  -- and we thought that it -- actually

13    and I'm going to want to be involved in those depositions,

14    and it's going to take some time, and there's probably going

15    to be some third-party deps as well.  I have traders here, I

16    think Mr. Miller is going to be contesting some of our

17    replacement pricing, whether we acted reasonably, whether we

18    set the right bids, there are other trade -- God knows what

19    they're going to remember five years later, but my guess is

20    they're going to be deposed.  And so --

21          THE COURT:  So let me ask you, do either of you

22    think realistically that this is going to be amenable to

23    summary judgment?

24          MR. BERNS:  I think issues will be amenable to

25    summary judgment.  Mr. Miller, one of his main contentions

Page 26

1   is the applicability of Section 562 here and what it means

2   if it's applicable.  Does it change the ISDA?  I think that

3   issue, if the Court has informed views on it will be whether

4   or not it disposes of the whole case or not, it'll narrow

5   the issues for either trial or discussion.

6           So, I think summary judgment motions here will be

7   very useful one way or another.

8           THE COURT:  Mr. Miller?

9           MR. MILLER:  Yes, Your Honor.  First of all --

10          THE COURT:  I mean I hate to just start, you know,

11  to split things down the middle.

12          MR. MILLER:  Right.  Okay.  Well, Your Honor, let

13  me say first of all that our position is we offered to let

14  them sort of distribute the time any way they wanted to

15  throughout.  We just felt that they originally asked for

16  seven months longer than we thought it ought to be, we

17  agreed to give two months, or maybe it was more and they

18  moved back, but we're still five months apart.

19          And the real problem with this is that the way

20  it's set up now the summary judgments we propose should be

21  able to be submitted even the winter of 2016, which would

22  open the way to a trial in early 2017.

23          THE COURT:  So why can't we get back those two

24  months by having the summary judgment exercise occur earlier

25  or coterminous with, for example, expert reports and expert

Page 27

1   depositions?  Because it won't have anything to do with that

2   will it?

3                MR. MILLER:  Well, Your Honor, I agree that a

4   partial summary judgment on this critical issue of what is

5   the operative date does not depend on what the experts say.

6                THE COURT:  Right.  I mean that's an issue of law,

7   that's -- right?

8                MR. MILLER:  A complete summary judgment on what

9   is the damage on that date is going to have expert

10  differentials, and you know, that's -- I don't think the

11  whole case --

12               THE COURT:  Right, but that's not going to be

13  summary judgment --

14               MR. MILLER:  That's right.

15               THE COURT:  -- because you're going to have

16  different experts, so.

17               MR. MILLER:  That's right, Your Honor.  So --

18               MR. BERNS:  Yeah, I can't anticipate all the

19  experts -- all the expert testimony yet, but I think

20  stacking summary judgment motions into the expert discovery

21  period is going to turn out to be a result in us coming back

22  in to -- it's not going to really work, Your Honor.

23               THE COURT:  I don't really understand that,

24  because a summary judgment is going to be asking me to make

25  a legal -- you just said it's a legal determination on a

1   purely legal issue, it's got nothing to do with -- it is

2   conceivable that it has nothing whatsoever to do with

3   experts.  If you've got competing expert reports I don't

4   want to see a summary judgment motion.

5           MR. BERNS:  Right.

6           THE COURT:  That's not a summary judgment motion.

7   It's just not.  A summary judgment motion is a purely legal

8   issue, no undisputed facts.  You know, I'm not going to do

9   death by a thousand cuts.

10          So, I know you have your rights under the federal

11  rules to file summary judgments, but it just strikes me that

12  that's one area that you're going to both have teams working

13  on this, and I can understand how you're going to want to be

14  in multiple depositions, but other folks can be working on a

15  summary judgment motion way, way earlier.  I mean that's one

16  place to pick up a couple of months.

17          MR. BERNS:  Yeah, Your Honor.

18          MR. MILLER:  And it's helpful, Your Honor.

19          THE COURT:  So, I mean, you know, put that -- back

20  that up into, I don't really care, you know, somewhere in

21  expert territory.

22          MR. MILLER:  That would certainly be acceptable to

23  us, Your Honor.

24          Our goal is to try to get this so that it becomes

25  possible to have this tried in early 2017 instead of out to

Page 29

```
 1    the end of 2017.  If we could get a trial setting by the way

 2    that would be really helpful for all of us because we'd work

 3    toward it, if the Court has any amenability to giving --

 4            THE COURT:  I am absolutely amenable to giving you

 5    a trial date.

 6            MR. MILLER:  Okay.

 7            THE COURT:  Absolutely.  It's helpful to me in

 8    many regards as well.

 9            So if you move the summary judgment exercise back

10    up so that's coincident with some aspect of the expert

11    reports, and the beauty of that is that also affords me time

12    to actually consider it and rule on it prior to when you're

13    going to go to trial.  So then if we in a very highly

14    complex and scientific fashion split the baby on document

15    production and call it ten months you've just gotten back

16    another month, so you've gotten back three months, and that

17    three of the five probably is a good result.

18            MR. MILLER:  It is, Your Honor.  We do have a --

19    we have a draft --

20            THE COURT:  Ten -- where does the ten months -- I

21    see agita on your face.  Where does the ten months put you

22    in terms of life?  You know, the summer, or Christmas?  I

23    think to be sensitive to those issues.

24            MR. BERNS:  Your Honor, one of our in terms of

25    life --
```

1          THE COURT:  I mean as my husband likes to quote

2     from the Godfather, this is the business you chose, so.

3          MR. BERNS:  And this is the business we choose.

4     There is one business that we can't control the founder of,

5     and my document manager is sitting next to me, and he's

6     going to be out for several months, and so that is part of

7     our consideration.  We are making arrangements to cover, but

8     it is going to extent the documents to such a time.

9          I still think realistically that the calendar is

10    the calendar, and whatever you determine we're going to hit,

11    but we'll probably be coming back to you if we press the

12    document production schedule with, you know, bits and pieces

13    and things that have to be done.

14         THE COURT:  Well again, I -- you know, life does

15    what it does and I appreciate that, but one of the benefits

16    of having large, extremely capable firms is that you figure

17    those things out.

18         MR. MILLER:  Yes, Your Honor.

19         MR. BERNS:  Yes, Your Honor.

20         THE COURT:  So, I'm going to say ten months on the

21    document production.

22         MR. BERNS:  Uh-huh.

23         THE COURT:  I'm sensitive to your representation

24    about your own involvement in fact depositions.  I don't

25    think I'm going to change that at all.  That moves you back

1   up three months.

2            So, Mr. Miller, where does that put the end point

3   at in terms of a trial date?

4            MR. MILLER:  Well, You Honor, I guess the question

5   is how long do you want to have with the summary judgment

6   motions?  The -- if we can move the --

7            THE COURT:  So if the summary judgment motions are

8   -- the expert reports come in on your calendar in October of

9   2016.

10           MR. MILLER:  Yes.

11           THE COURT:  Right?

12           MR. MILLER:  Right.

13           THE COURT:  So there's an enormous amount of time

14   between the expert reports and the expert depositions.  So

15   on my theory of the lack of relationship between them to me

16   there's no reason why the summary judgment motions couldn't

17   come in, for example, on February 1st.

18           MR. MILLER:  Of 2017?

19           THE COURT:  Of 2017.

20           MR. MILLER:  Yes.  Well --

21           THE COURT:  Right.  And then I could give you a

22   trial date of --

23           MR. MILLER:  April 9th?

24           THE COURT:  -- of April 1st.  I was going say end

25   of March, but that tends to be a spring break time for some

Page 32

1    people.  So first week of April 2017, how's that?

2             MR. MILLER:  Your Honor, let me look back and find

3    -- I mean we obviously would like it sooner, but if we can

4    get it then we'd love to knock it down and move forward with

5    that, and we certainly -- we're not -- we don't think

6    there's necessarily going to be nearly as many depositions

7    as Mr. Berns has suggested.  For one thing they're very

8    expensive, and for another thing our central position here

9    is --

10            THE COURT:  See under --

11            MR. MILLER:  -- that the conduct of the bank is

12   not relevant.

13            THE COURT:  -- under the existing schedule the

14   summary judgment motion is not coming until May 1st --

15            MR. BERNS:  Uh-huh.

16            THE COURT:  -- then you're not going to have a

17   trial 'til the fall.

18            MR. BERNS:  Uh-huh.

19            MR. MILLER:  That was our central concern, Your

20   Honor, with this.

21            THE COURT:  And --

22            MR. MILLER:  And your adjustment makes it possible

23   for us to have this trial.  We very much wanted it before

24   the summer of 2017.

25            If this gets moved off another six months the

Page 33

1    estate has to maintain personnel to deal with this, the

2    estate is shrinking at this point.

3            THE COURT:  Well let me take it from -- Mr. Berns,

4    what about this is not workable for you?

5            MR. BERNS:  I guess what I'm troubled with --

6    troubled about, Your Honor, is that Lehman has asserted a

7    $150 million claim against us.

8            THE COURT:  Right.

9            MR. BERNS:  The spread between where we are and

10   where they are is $200 million.

11           THE COURT:  Okay.

12           MR. BERNS:  This case was mediated in 2011, and

13   then nothing happened for three years until we got a request

14   for a tolling agreement because they weren't ready to do

15   anything.  By that time the statute of limitations --

16           THE COURT:  Okay.  Now we're --

17           MR. BERNS:  And we said, fine --

18           THE COURT:  But you see, now --

19           MR. BERNS:  -- now we're rushing --

20           THE COURT:  But now --

21           MR. BERNS:  -- now we're rushing.  I don't

22   understand why we're rushing.

23           THE COURT:  I don't think that we're rushing it, I

24   think that we're proceeding expeditiously, and against the

25   backdrop of, you know, what seems to have occurred here,

Page 34

1   everybody ought to be excited about getting this done.  I

2   think the time frames are aggressive, but not unachievable.

3   And again, it's a $200 million case, and therefore it I'm

4   sure will be appropriately staffed, and for goodness sake

5   we're talking about April of 2017, that's a really long way

6   away.

7               MR. BERNS:  Two years from when the claim filed.

8   Two years.  A case like this would normally be three or

9   four, maybe --

10               THE COURT:  Not before me.  Not here.  Not here.

11               MR. BERNS:  But it's -- there is a lot of work to

12   be done here.  We're going to do whatever Your Honor feels

13   is --

14               THE COURT:  Love it.

15               THE COURT:  -- proper.

16               THE COURT:  I tried LightSquared four times in a

17   year and a half, so I know that you can do it.  If you hit a

18   bump in the road of course I'd be willing to hearing about

19   it, but I think this tweaking of the schedule is reasonable

20   and achievable.

21               MR. MILLER:  Thank you.

22               THE COURT:  All right?

23               MR. MILLER:  Do you want us to revise the order

24   and submit it to the Court?

25               THE COURT:  I think that would be --

Page 35

```
 1              MR. BERNS:  We'll work on that.  We'll work that

 2      out.

 3              THE COURT:  That would be useful.

 4              MR. MILLER:  Right.  I did want to note, Your

 5      Honor, we very appreciate that and we agree with everything

 6      you've said, but with interest it's actually more like a

 7      $300 million case than a $200 million case, because the

 8      interest will --

 9              THE COURT:  Well now you're making more of his

10      point, so I don't know, Mr. Miller, perhaps you should stop

11      talking.

12              MR. MILLER:  Thank you, Your Honor, for your time.

13              THE COURT:  All right.  Thank you very much.

14              MR. BERNS:  Thank you, Your Honor.

15              THE COURT:  All right.

16              MS. MARCUS:  Your Honor, the next matter on the

17      agenda is also the adversary proceeding docket and it's the

18      LHM matter.  That's going to be handled by Mr. Bialek from

19      Wollmuth.

20              THE COURT:  Okay.

21              MS. MARCUS:  May we be excused, Your Honor?

22              THE COURT:  Yes.  Thank you, Ms. Marcus.

23              MS. MARCUS:  Thank you.

24          (Pause)

25              THE COURT:  I'd like to take a brief break and
```

Page 36

```
 1    confer with the parties on this matter in chambers.  All

 2    right?  If you would join me in that conference room back

 3    there I would appreciate it.  We'll come back on the record

 4    very shortly.

 5          (Recessed at 10:46 a.m.; reconvened at 11:04 a.m.)

 6          THE COURT:  We're going to go back on the record

 7    with respect to the -- Lehman's motion to strike defendant's

 8    jury demand.  I think, folks that you're positions are very

 9    well laid out in the papers, and I don't think I'm going ask

10    for any further oral argument this morning, so we're going

11    take this under submission and we'll get back to you in due

12    course.  All right?  But I appreciate your coming out for

13    the hearing.

14        (A chorus of thank you)

15          THE COURT:  All right.  Thank you.

16          All right.  Next.  Where's my agenda?  I got it.

17          MR. TAMBE:  Good morning, Your Honor.

18          THE COURT:  Good morning, Mr. Tambe.  How are you?

19          MR. TAMBE:  Fine.  Thank you.  This is Lehman

20    Brothers adversary proceeding against Commonwealth of

21    Massachusetts, it's a pretrial conference.  My colleague,

22    Ryan Andreoli, will be addressing this matter.

23          THE COURT:  Okay.  Very good.

24          MR. ANDREOLI:  Good morning, Your Honor.

25          THE COURT:  Good morning.
```

Page 37

1           MR. ANDREOLI:  Ryan Andreoli from Jones Day on

2     behalf of the plaintiffs, LBHI and LBSF.

3           So this is our first time before the Court on this

4     adversary proceeding, so we just wanted to give Your Honor

5     about a minute or so of background --

6           THE COURT:  That would be great.

7           MR. ANDREOLI:  -- and then discuss the scheduling

8     issue that we may seek the Court's guidance on --

9           THE COURT:  Okay.

10          MR. ANDREOLI:  -- in the next week or so.

11          So this is a fairly standard valuation dispute.

12    Two ISDA master agreements, six interest rate swaps in

13    total.  The Commonwealth terminated the transactions on two

14    different occasions.  The first was about five different

15    swaps in October of 2008, and then the last swap in November

16    of 2008.  They hired a financial advisor to assist them with

17    that process.  And ultimately entered into replacement swaps

18    for all of the six swaps at issue.  They received

19    approximately $9 million more in replacement swaps than they

20    have paid Lehman to date.  So that's sort of the basis of

21    our claims.

22          We have not yet agreed on a scheduling order.  As

23    you may have seen from the docket we filed our complaint at

24    the end of July, the Commonwealth filed their answer I guess

25    it was a week or two ago.  The -- we proposed a draft

Page 38

1    scheduling order at the beginning of last week.  We've been

2    informed that the Commonwealth's client is away on vacation

3    or perhaps just out of the office for the next two weeks.

4    So we have proposed to discuss the scheduling order to try

5    to reach an agreement next week when they return.

6              THE COURT:  Okay.

7              MR. ANDREOLI:  We've been informed that the

8    Commonwealth, at least counsel, thinks that they may need,

9    you know, a couple of weeks to negotiate the scheduling

10   order, which seems like a little unreasonable to us.

11             So we would propose that if we don't reach an

12   agreement next week we submit a letter to Your Honor to try

13   to resolve the dispute.

14             And just to sort of lay out our proposal.  We

15   think that this matter can be through discovery -- document

16   discovery by the middle of December, fact discovery

17   concluding by the end of January, expert discovery by the

18   end of March, and then dispositive motions, if any, by the

19   end of May.

20             The Commonwealth, while they don't have authority

21   to negotiate until their client returns, they've proposed

22   something substantially lengthier beginning with not even

23   serving initial document requests interrogatories until mid

24   November, which seems like an extraordinary length of time

25   to serve document requests.  Their proposal continues

Page 39

1    through the end of document production in February, fact

2    depositions end of June, expert reports in July, and

3    dispositive motions approximately 14 or 15 months from now

4    in November of 2016.

5            So we don't have a dispute yet, but just wanted to

6    let the Court know that we may be sending a letter to Your

7    Honor as early as next week.

8            THE COURT:  Okay.  Thank you.

9            MR. ANDREOLI:  Thanks very much.

10           THE COURT:  Good morning.

11           MS. WALSH:  Good morning, Your Honor.  Kaitlin

12   Walsh from Mintz Levin for the Commonwealth.

13           What Mr. Andreoli said was true, my client is out,

14   we got the draft discovery plan on September 1st, and

15   unfortunately she's out from the 3rd through the 14th.  Her

16   first day back is the 14th.

17           So what we were hoping was that we would have next

18   week to work with her in coming up with a consensual plan.

19   We're optimistic that we can do that.  I don't think

20   we're --

21           THE COURT:  But she's --

22           MS. WALSH:  So she's back --

23           THE COURT:  So she's back on Monday.

24           MS. WALSH:  -- on the 14th, yeah.

25           THE COURT:  Okay.

Page 40

1               MS. WALSH:  On Monday.

2               THE COURT:  Okay.

3               MS. WALSH:  And our concern was two days when

4    she's back from being out for ten days I guess for us to be

5    able to get her focused and get the -- her approval in two

6    days is a little tight.

7               So all we were asking was that we have until the

8    next week, the following week, to come up with the plan,

9    we're thinking like the end of that week, if possible, so

10   that we can --

11              THE COURT:  Do you mean 'til the 25th?

12              MS. WALSH:  Yeah.  Or some time --

13              THE COURT:  Let me just -- let's do a level set

14   here.

15              MS. WALSH:  Uh-huh.

16              THE COURT:  These times -- I mean I appreciate

17   that your client is going to have a lot to do, everybody has

18   a lot to do, this is a schedule, and if in fact what's being

19   contemplated is to not even get out of the starting blocks

20   until November then we need to have an attitude adjustment,

21   because that's not -- again, I respect people's life's

22   events and religious holidays --

23              MS. WALSH:  Right.

24              THE COURT:  -- and schedules, but we're not going

25   to wait until November to get started, nor frankly should it

Page 41

1    take, you know, ten days to agree on the discovery schedule.

2              MS. WALSH:  Right, understood.

3              THE COURT:  I mean the way I would -- you know,

4    you're counsel, you come up with a proposal, you're going to

5    have to go through it with her, it just doesn't take that

6    long.

7              MS. WALSH:  Uh-huh.

8              THE COURT:  She's not reviewing a substantive

9    draft, she's not -- it's not a settlement discussion, it's

10   just a schedule.

11             MS. WALSH:  Right.

12             THE COURT:  So we're going to have to move a

13   little more rapidly.  I mean I think, you know -- and again,

14   you said that she's -- this person is coming back on the

15   14th.

16             MS. WALSH:  Yes, she's back on the 14th.

17             THE COURT:  Okay.  The Jewish holidays commence on

18   the 14th, so I don't want to inadvertently --

19             MS. WALSH:  Uh-huh.

20             THE COURT:  -- be prejudicing anybody in that

21   regard.  But that being said, I don't see a reason why by

22   the close of business on the 18th you can't have either

23   agreed or agree to disagree and then you can submit, you

24   know, competing proposals or counsel for Lehman can submit

25   its proposal and indicate what your issue is with respect to

Page 42

1    any component of it.

2              MS. WALSH:  Okay.

3              THE COURT:  All right?  So that's, you know,

4    giving your client time to, you know --

5              MS. WALSH:  So the end -- that's the end of next

6    week.

7              THE COURT:  That's the end of next week.  So if

8    your client returns on the morning of the 14th that gives

9    you until the end of close of business on the 18th.

10             MS. WALSH:  I appreciate that, and that'll give us

11   time to hopefully work this out and not have to be back

12   before you.

13             THE COURT:  But again, waiting until November to

14   serve document --

15             MS. WALSH:  Right.

16             THE COURT:  -- requests is a non-starter.

17             MS. WALSH:  Right.  Well we had not gone over this

18   with the client, this was something, you know, based on

19   other discovery schedules in other cases, we looked at

20   those, and the schedule initially proposed by Lehman was

21   about half the time of other cases, and especially since,

22   you know, the Commonwealth has responded to subpoenas back

23   in 2010 and already produced --

24             THE COURT:  Sure.

25             MS. WALSH:  -- significant documents, you know,

Page 43

1    that -- we just want to be very sensitive to not -- we don't

2    want to be rushing discovery.  We would be at a severe

3    disadvantage since they've already gotten boxes of documents

4    from us if then we're moving very quickly and we don't have

5    the time to really, you know, go through everything and get

6    exactly what we need since we haven't had the benefit of

7    discovery.  So that's not --

8                 THE COURT:  I don't think I'm following that.  I

9    mean there's a certain lopsidedness in these cases.  I mean

10   the issue is largely focused on the conduct of the

11   Commonwealth.

12                MS. WALSH:  Uh-huh.

13                THE COURT:  Right?  So the fact that you have

14   already responded to a subpoena and presumably gathered and

15   produced documents --

16                MS. WALSH:  Right.

17                THE COURT:  -- that's a good thing in the sense of

18   that it's not work that needs to be duplicated --

19                MS. WALSH:  Redone.

20                THE COURT:  -- because you've already internally,

21   you know, done that.

22                MS. WALSH:  Uh-huh.  Uh-huh.

23                THE COURT:  And as these things go I think it's

24   very hard to make apples to apples comparisons, because

25   everyone is different, some involve more transactions, some

1   involve fewer transactions, people keep records better or

2   not.

3          MS. WALSH:  Right.

4          THE COURT:  I'm not going to prejudice you, but my

5   general attitude, if you will, as we head into the fall of

6   2015 and are staring down the seventh anniversary of the

7   Lehman filing is I want to -- I'm going to really start

8   moving these things long as quickly as I can, because there

9   are a lot of them --

10         MS. WALSH:  Uh-huh.

11         THE COURT:  -- and they don't get better with

12  time.

13         MS. WALSH:  Uh-huh.

14         THE COURT:  So you can tell your client that, you

15  know, we're going to be energetic about this.

16         MS. WALSH:  Okay.

17         THE COURT:  But will not act in a way that causes

18  any undue hardship.

19         MS. WALSH:  Thank you, Your Honor.

20         THE COURT:  Does that sound all right?

21         MS. WALSH:  Yes, the 18th is -- we'll work towards

22  that.

23         THE DEFENDANT:  Does that sound all right to you

24  folks?

25         All right.  So we'll wait to hear from you.  First

1    choice is an agreed schedule and second choice will be

2    something other than that.  All right?

3              MS. WALSH:   Thank you.

4              THE COURT:  Okay.  Thank you very much.  I think

5    that's it.  That's it, Matt.  Thank you.

6        (Whereupon these proceedings were concluded at 11:14

7    AM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2

3                         RULINGS

4                                                      PAGE

5   Doc #42105 Four Hundred Fifty-Fifth Omnibus Objection

6   to Claims (No Liability Claims)                     7

7

8   Adv. 15-01110 - Doc #10 Motion to Dismiss Adversary

9   Proceedings                                         22

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 47

1                C E R T I F I C A T I O N

2

3   I, Dawn South, certify that the foregoing transcript is a

4   true and accurate record of the proceedings.

5   Dawn South

> Digitally signed by Dawn South
> DN: cn=Dawn South, o, ou,
> email=digital1@veritext.com, c=US
> Date: 2015.09.10 14:17:39 -04'00'

6   _____

7   Dawn South

8   AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12   Date:   September 10, 2015

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501