PAUL HASTINGS LLP
75 E. 55th Street
New York, New York 10022
Telephone: (212) 318-6000
Facsimile: (212) 752-2859
Kurt W. Hansson
Joshua M. Bennett
James T. Grogan

*Attorneys for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case<br><br>Case No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.<br><br>Plaintiff,<br><br>-against-<br><br>LONGWOOD AT OAKMONT, INC.,<br><br>Defendant. | Adv. Proc. No. 15-_____<br><br>**ADVERSARY PROCEEDING**<br>**COMPLAINT** |

Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, "Plaintiff") under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan"), on behalf of Lehman Brothers Special Financing Inc. ("LBSF"), by and through its attorneys, Paul Hastings LLP, for its complaint against Longwood at Oakmont, Inc. ("Longwood" or "Defendant"), alleges as follows:

**PRELIMINARY STATEMENT**[1]

1. Longwood was a party to a swap agreement with LBSF (the "Swap Agreement," attached as Exhibit A), under which the parties entered into an interest rate swap transaction in which Longwood was required to make monthly fixed-rate interest payments to LBSF and LBSF was required to make monthly floating-rate interest payments to Longwood (the "Transaction").

2. The bankruptcy filings of LBHI and LBSF in the fall of 2008 constituted Events of Default under the Swap Agreement, which entitled Longwood to terminate the Transaction early.

3. When Longwood did so, as of December 1, 2008, the present value of the fixed-rate interest payments that Longwood would have owed to LBSF over the remaining life of the Transaction (had it not been terminated early) was more than $6 million greater than the present value of the expected floating-rate interest payments that LBSF would have owed to Longwood. In other words, LBSF was squarely "in the money" on the Transaction.

4. Accordingly, by terminating the Transaction early and avoiding its future payment obligations to LBSF, Longwood realized a substantial multi-million dollar gain.

5. Under the terms of the agreement, Longwood was obligated to determine the amount of this gain, reasonably and in good faith, and pay this amount to LBSF as part of its Early Termination Payment.

6. Instead, Longwood followed a multi-step plan that was sent to it by its

---

[1] Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them below.

outside investment advisor, KSR Capital Advisors, Inc. ("KSR"). The plan was devised at a mini-summit of investment advisors, including KSR, who were looking for a way to create a purportedly defensible position for their clients to avoid their payment obligations when they terminated their swap agreements with LBSF.

7. In accordance with that plan, Longwood unreasonably and in bad faith determined that it gained $0 by terminating the Transaction early.

8. Longwood then failed to pay any Early Termination Payment to LBSF, and instead claimed that LBSF owed it over $400,000. Longwood made this determination by calculating certain unpaid amounts that were owed to LBSF, less certain out-of-pocket expenses and an alleged loss incurred in connection with an unrelated agreement, plus Longwood's gain from terminating the Transaction early—determined, as stated above, unreasonably and in bad faith by Longwood to be $0.

9. Accordingly, Longwood breached the Swap Agreement.

10. Plaintiff brings this action to recover the Early Termination Payment that Longwood owes to Plaintiff of approximately $6 million, plus interest.

**PARTIES**

11. LBHI is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. On September 15, 2008, LBHI commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On December 6, 2011, the Court approved and entered an order confirming the Plan. The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI,

as Plan Administrator, is authorized to prosecute litigation claims on behalf of the estate of LBSF.

12.     LBSF is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020.  It is a subsidiary of LBHI.  LBSF filed its chapter 11 petition with the Court on October 3, 2008.

13.     Longwood is a domestic not-for-profit corporation organized and existing under the laws of Pennsylvania with its principal place of business at 500 Route 909, Verona, Pennsylvania 15139.  Longwood owns and operates residential facilities for the elderly in Allegheny County, Pennsylvania.  In 2014, Longwood reported over $22 million in annual revenue (for fiscal year 2013) and over $106 million in assets.

**JURISDICTION AND VENUE**

14.     This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105, 502 and 541 of the Bankruptcy Code.

15.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.

16.     Pursuant to Article XIV of the Plan, and Paragraph 77 of the order confirming the Plan, the Bankruptcy Court has exclusive jurisdiction of all matters in connection with, arising out of, or related to these chapter 11 cases and the Plan pursuant to, and for the purposes of sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, to hear and determine any actions brought to recover all assets of the Debtor and property of the

-4-

estate, wherever located or to determine or declare entitlement to such assets and property.

17. This Court has personal jurisdiction over Longwood pursuant to Rule 7004(f) of the Bankruptcy Rules, and because Longwood consented to such jurisdiction in the Swap Agreement and because Longwood has minimum contacts with the forum state in connection with the Transaction.

18. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

19. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff states that it consents to the entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## BACKGROUND

### A.  The Swap Agreement

20. On or about October 16, 2001, Longwood and LBSF entered into the Transaction.

21. Longwood entered into the Transaction because, *inter alia*, a financial covenant in a loan agreement between it and the Allegheny County Industrial Development Authority (Commonwealth of Pennsylvania) (the "Authority") obligated Longwood to maintain an interest rate hedge.

22. The Transaction was governed by the Swap Agreement, which was comprised of (i) a 1992 local currency-single jurisdiction ISDA master agreement (the "Master Agreement"); (ii) a schedule to the Master Agreement (the "Schedule"); (iii) a credit support

annex to the Schedule (the "Credit Support Annex"); and (iv) a trade confirmation (the "Confirmation").

23. Pursuant to the Confirmation, Longwood was required to make monthly payments to LBSF based on a fixed-rate of interest of 3.94% per annum in exchange for LBSF's obligation to make monthly payments to Longwood based on a floating-rate of interest of 67% of one-month USD-LIBOR-BBA.

24. Both sets of payments were based on a notional amount that started at $42,460,000—which was to be reduced in specified amounts set forth in an annex to the Confirmation, and ultimately down to $0 upon the maturity date.

25. The maturity date of the Transaction was July 1, 2027.

26. LBHI served as Credit Support Provider[2] to LBSF under the Swap Agreement. In this capacity, LBHI guaranteed LBSF's payment obligations to Longwood.

27. Section 11 of the Master Agreement states that "each party irrevocably … submits to … the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York."

28. Part 3(f) of the Schedule states that the Swap Agreement "will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

---

[2] Capitalized terms not expressly defined herein shall have the meaning ascribed to them in the Swap Agreement.

**B.      The Events of Default**

29. On September 15, 2008, LBHI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. LBSF did the same on October 3, 2008.

30. Pursuant to Section 5(a) of the Master Agreement, the bankruptcy filings constituted Events of Default.

31. As a result of these Events of Default, Longwood was permitted to designate an Early Termination Date—terminating the Transaction early—pursuant to Section 6(a) of the Master Agreement.

32. Section 6(c)(ii) of the Master Agreement states that "[u]pon the occurrence or effective designation of an Early Termination Date … [t]he amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e) [of the Master Agreement]."

33. Section 6(d)(i) of the Master Agreement states that "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date," the Non-Defaulting Party (here, Longwood) shall make calculations according to Section 6(e) of the Master Agreement and provide to the other party (LBSF) a statement "showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e))."

34. Section 6(e) of the Master Agreement includes a list of various methodologies for calculating any termination payments to be made upon the occurrence of an Early Termination Date (the "Early Termination Payment").

35. In Part 1(f) of the Schedule, the parties elected and agreed upon Second Method and Market Quotation as the methodology to be used for calculating the Early Termination Payment.

36. Section 6(e)(i)(3) of the Master Agreement states:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-Defaulting Party) in respect of the Terminated Transaction and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

37. In other words, if upon Early Termination the Defaulting Party (here, LBSF) is "in the money," the Non-defaulting Party (here, Longwood) is obligated to pay the Defaulting Party an Early Termination Payment, which is comprised of the Unpaid Amounts and the Settlement Amount.

38. Unpaid Amounts is defined in Section 12 of the Master Agreement as the amounts owing to any party that "became payable …on or prior to [the] Early Termination Date and which remain unpaid as at [the] Early Termination Date."

39. Settlement Amount is defined in Section 12 of the Master Agreement as an amount equal to the Market Quotation for each Terminated Transaction "for which a Market Quotation is determined."

40. Market Quotation is defined in Section 12 of the Master Agreement as the amount "determined on the basis of quotation from Reference Market-makers," which is defined,

in turn, as "four leading dealers in the relevant market selected" by the Non-defaulting Party "in good faith" to enter into a Replacement Transaction for the Terminated Transaction.

41. In other words, the Market Quotation process required the Non-defaulting Party to solicit bids from four leading swap dealers for what they would pay or charge to step into the shoes of LBSF in the Transaction.

42. The Master Agreement, however, expressly contemplates in Section 12 the possibility that in certain circumstances a Market Quotation "cannot be determined." For example, the Master Agreement states in Section 12 that "[i]f fewer than three quotations are provided" from among the four Reference Market-makers selected, "it will be deemed that the Market Quotation in respect of such terminated Transaction … cannot be determined."

43. The Master Agreement also expressly contemplates in Section 12 the possibility that in certain circumstances the Market Quotation process might not "produce a commercially reasonable result."

44. In circumstances where either the Market Quotation cannot be determined or where the Market Quotation process produces a commercially unreasonable result, Section 12 of the Master Agreement states that the Settlement Amount is equal to the Non-Defaulting Party's Loss as a result of the Early Termination, regardless of whether that amount is "positive or negative."

45. In other words, Loss means either the Non-defaulting party's loss or its gain, as a result of terminating the Transaction.

46. The Non-defaulting party is expressly obligated to determine the amount

of this loss or gain reasonably and in good faith.

47. Indeed, Loss is defined in Section 12 of the Master Agreement as the "amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number)" in connection with the Terminated Transaction.

C. **Longwood is Advised By its Financial Advisor How to Avoid Paying its Gain to LBSF**

48. On October 24, 2008, a few weeks after LBHI and LBSF filed for bankruptcy, Joseph A. Wenger, Longwood's Senior Vice President of Finance and Chief Financial Officer, received an email from Longwood's financial advisor, Michael Kane, a Senior Managing Director at KSR.

49. Mr. Kane emailed Mr. Wenger to address the implications of the LBHI and LBSF bankruptcy filings on the Transaction, and to set forth a course of action for Longwood to follow.

50. The plan Mr. Kane set forth was designed to enable Longwood to do several things.

51. First, it was designed to enable Longwood to realize a substantial multi-million dollar gain when it terminated the Transaction with LBSF.

52. Second, it was designed to enable Longwood to enter into a Replacement Transaction with another swap dealer shortly after terminating the Transaction, which Longwood needed to do to maintain compliance with the financial covenant in its loan agreement with the Authority.

-10-

53.     Finally, and most importantly, it was designed to provide Longwood with a purportedly "defensible position" (as Mr. Kane described it), that the Settlement Amount owed to LBSF from terminating the Transaction was $0, and that this determination had been made by Longwood reasonably and in good faith—even though it clearly was not.

54.     As Mr. Wenger explained, the plan he proposed had been devised earlier that month at a "mini summit" among "swap advisors and their counsels," whose clients were in similar positions to Longwood.

55.     As Mr. Wenger further explained, the "mini summit" was convened in response to the LBHI bankruptcy, and for the express purpose of figuring out how to "get all their clients out of the[ir respective] swaps" with LBSF without paying any Settlement Amount to LBSF.

56.     Mr. Kane explained the plan as follows:  First, the borrower (here, Longwood) should identify the "Early Termination Date," and it should "move to terminate the [LBSF] swap as quickly as possible."  Next, the borrower "will need to calculate the Settlement Amount" using the Market Quotation methodology, which requires the borrower to "request bids from 4 leading dealers in the market on what they would pay to assume [LBSF's] position in the swap."  "However," Mr. Kane stated, the "bids should go to as many potential counterparties as possible (don't limit it to 4)."  This is because the "swap advisors" predicted at the "mini summit" that "the borrower will not get 3 bids" no matter how many bids it solicits.  "If there are less than 3 bids, the borrower will [then] use the Loss method and take whatever bid they receive" as the Settlement Amount.  As Mr. Kane explained, "any bids that do come back will most likely have $0 as the upfront payment" and "therefore, $0 will be the Settlement Amount"

to be paid to LBSF. If, however, "there are no" bids, then the borrower should declare "that there is no market for such a swap and the Settlement Amount would still be $0."

57. Mr. Kane then cautioned, "The borrowers do need to be careful here and not enter into another swap for a reasonable time. If they did, [LBSF] could have an argument that the determination of the Settlement Amount was not handled properly."

58. Mr. Kane further stated that most swap advisors at the "mini summit" agreed that "2-3 weeks" seemed a "reasonable" time to wait.

59. Mr. Kane then stated in closing, "It is important that borrower follow all the correct steps listed above – this will establish that the letter of the Agreement was followed and a defensible position that it did everything possible to establish the Settlement Amount."

### D. Longwood Terminates the Transaction

60. Longwood thereafter executed the plan set forth in Mr. Kane's email.

61. In particular, in a letter dated November 10, 2008 from Longwood to LBSF, Longwood provided notice to LBSF that "a Bankruptcy Event of Default ha[d] occurred … under Section 5(a)(vii) of the agreement," and Longwood designated December 1, 2008 as the Early Termination Date of the Transaction.

62. Next, on November 19, 2008, KSR, acting on behalf of Longwood, solicited bids from twelve swap dealers[3] to enter into a Replacement Transaction with Longwood—in purported compliance with the "letter of the Agreement."

63. By soliciting bids from twelve swap dealers, however, Longwood was not

---

[3] According to documents obtained from Longwood, the twelve swap dealers solicited in mid-November 2008 were: Allied Irish Bank, Bank of America, Barclays, Citizens Bank, Deutsche Bank, Goldman Sachs, JP Morgan, Key Bank, Loop Capital Markets, Merrill Lynch, Morgan Stanley, and Wachovia Bank.

-12-

acting in compliance with the "letter of the Agreement." Indeed, the Master Agreement obligated Longwood to solicit bids from "four leading dealers." By soliciting bids from twelve swap dealers, Longwood was thereby violating the agreement.

64. Moreover, Longwood solicited bids from these twelve dealers in bad faith. Indeed, Longwood somehow knew in advance that it was unlikely that any of the twelve swap dealers solicited would place a bid, and that, if they did, it would be for $0. Longwood then did exactly as KSR advised, in order to establish a purportedly "defensible position" that it gained $0 by terminating the transaction, so that it could claim the Settlement Amount should be $0.

65. As KSR predicted, none of the twelve swap dealers placed a bid.

66. On December 10, 2008, Longwood delivered to LBSF a calculation statement dated December 2, 2008 (the "Calculation Statement"), stating that Longwood "attempted to utilize the Second Method and Market Quotation to determine the Settlement Amount[, but] received fewer than three (3) quotations [and] therefore was required to use Loss to determine the Settlement Amount."

67. Longwood's purported "attempt" to utilize the Market Quotation process, however, was just window-dressing. Indeed, KSR advised Longwood in advance that the market quotation process run by KSR would fail—and that is precisely what happened.

68. Longwood further stated in the Calculation Statement—with no supporting documentation or explanation—that "[u]tilizing Loss, Longwood determines that the Settlement Amount is $-0-."

69. This "determination," of course, had been predetermined nearly a month

earlier by Longwood, as part of the plan KSR devised.

70. Longwood waited until December to advise LBSF of this "determination," because Longwood first needed to contrive evidence to make this determination purportedly "defensible," *i.e.*, the failed Market Quotation process that was designed to fail.

71. To this $0 figure, Longwood added $99,200.36 in Unpaid Amounts due to LBSF, and deducted (i) $11,425 in "reasonable out-of-pocket expenses, including legal fees, allegedly incurred by Longwood in connection with the early termination of the Agreement" and (ii) $511,701.52 in losses allegedly incurred by Longwood and owed by LBSF in connection with an unrelated agreement, for a net aggregate payment allegedly payable by LBSF to Longwood of $423,926.16.

72. Approximately one week later, Longwood completed the plan as devised by KSR by entering into a replacement transaction with another swap dealer at a far lower rate than the terminated Transaction with LBSF.

73. As a result of doing so, Longwood locked in its gain of approximately $6 million—shortly after providing its Calculation Statement to LBSF in which Longwood stated that it had realized no gain.

E. **Longwood's Determination that it Gained $0 By Terminating the Transaction with LBSF was Unreasonable and in Bad Faith**

74. The Master Agreement obligated Longwood to determine its "Loss" "reasonably" and "in good faith," as the amount of its "total losses … or gain" as a result of the Termination of the Transaction.

75. Longwood failed to do so.

76. Instead, Longwood determined that it gained $0 as a result of terminating the Transaction, based on the fact that none of the swap dealers it solicited in mid-November in connection with the Market Quotation process placed a bid.

77. But the fact that the Market Quotation process resulted in no bids does not mean that Longwood gained $0.

78. Rather, when a market price cannot be determined, "one must use a different method to discover the value." *See, e.g., In re American Home Mortgage Holdings, Inc.*, 411 B.R. 181, 193 (Bankr. D. Del. 2009), *aff'd*, 637 F.3d 246 (3d Cir. 2011).

79. Indeed, if the parties intended for a failed Market Quotation process to result in a $0-valuation, they would have said so in the Swap Agreement.

80. Instead, the Swap Agreement states that when a Market Quotation cannot be determined, the Non-Defaulting Party must revert to a reasonable and good faith determination of its gain to determine the proper Settlement Amount.

81. As such, Longwood's determination that it gained $0, based on the fact that the Market Quotation could not be determined, renders meaningless the provisions in the Swap Agreement requiring the Non-defaulting Party to revert to a "reasonable" and "good faith" determination of its gain when the Market Quotation cannot be determined.

82. Moreover, Longwood's determination was clearly unreasonable and made in bad faith.

83. Indeed, Longwood pre-determined that its gain was $0 even before beginning the Market Quotation process, based on the plan devised by KSR. Longwood then engaged in the Market Quotation process so that it could claim it gained $0.

84. In doing so, Longwood unreasonably, and in bad faith, ignored the plain and significant financial impact that resulted from its early termination of the Transaction, *i.e.*, the substantial multi-million dollar gain that it realized.

### F. The Valuation of Longwood's Actual Gain

85. The amount that Longwood actually gained by terminating the Transaction early is best determined using the terms of Swap Agreement itself.

86. After all, the value of the Transaction is built into the terms of the Swap Agreement, *i.e.*, Longwood's obligation to make monthly payments based on a fixed-rate of interest of 3.94% per annum in exchange for LBSF's obligation to make monthly payments based on a floating-rate of interest of 67% of one-month USD-LIBOR-BBA.

87. The present value of Longwood's obligations exceeded the present value of LBSF's obligations by approximately $6 million.

88. Approximately two weeks after terminating the Transaction, Longwood entered into a replacement transaction with another swap dealer in which it received monthly payments based on the same floating-rate of interest as in the Transaction with LBSF but its own payment obligations to its new counterparty were based on a far lower fixed-rate of interest of only 2.19% per annum.

89. The present value of Longwood's saving under the new swap, when

compared with the original Transaction, was approximately $6 million.

90. Longwood was required under the Swap Agreement to turn over its approximately $6 million gain to LBSF, yet it failed to do so.

### G. Longwood Owes LBSF Interest

91. Pursuant to section 6(d) of the Master Agreement, any amount payable under Section 6(e), such as an Early Termination Payment, shall be paid inclusive of interest at the "Applicable Rate," to be calculated on the basis of daily compounding.

92. Under the Master Agreement, the Applicable Rate is defined as the "Termination Rate" before receipt of the Calculation Statement, and the "Default Rate" following the date upon which sums become payable under Section 6(d)(ii) of the Master Agreement, which is the date the Calculation Statement is received.

93. Termination Rate is defined in the Master Agreement as "a rate per annum equal to the arithmetic mean of the cost (without proof of evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts."

94. Default Rate is defined in Part 3(h) of the Schedule as one-month LIBOR plus 1%.

95. Interest will continue to accrue at the Default Rate until the date of full payment.

### COUNT 1
### (Breach of Contract by Longwood)

96. Plaintiff incorporates by reference all prior paragraphs of this Complaint.

-17-

97. The Swap Agreement is a valid and enforceable contract between Longwood and LBSF.

98. LBSF performed all of its obligations in connection with the Swap Agreement.

99. Longwood breached the Swap Agreement by determining its gain unreasonably and in bad faith, and thereby failing to pay LBSF the Early Termination Payment it owed.

100. Longwood also breached the Swap Agreement by soliciting bids from twelve swap dealers instead of four.

101. As a result, LBSF has been damaged in an amount to be proven at trial, but at least approximately $6 million, representing Longwood's gain as a result of terminating the Transaction and entering into a replacement transaction at a much lower interest rate, plus the interest that has accrued since the Early Termination Date and that will continue to accrue at the Default Rate until final payment is made to LBSF.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant judgment in its favor and against Longwood as follows:

1. Finding Longwood in breach of the Swap Agreement, and awarding Plaintiff damages from Longwood in an amount to be determined at trial, but in all events, at least approximately $6 million, plus interest;

2. Awarding Plaintiff pre-judgment and post-judgment interest; and

3. Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 15, 2015

By:   /s/ James T. Grogan
Kurt W. Hansson
Joshua M. Bennett
James T. Grogan

PAUL HASTINGS LLP
75 E. 55th Street
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 752-2859

*Attorneys for Plaintiff*