WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
William A. Maher
James N. Lawlor
Adam M. Bialek
Fletcher W. Strong

*Attorneys for Plaintiff Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ──────────────────────── x | | |
| In re: | : | |
| | | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | |
| | | Case No. 08-13555 (SCC) |
| Debtors. | : | |
| ──────────────────────── x | | |
| LEHMAN BROTHERS SPECIAL FINANCING INC., | : | |
| Plaintiff, | : | |
| − against − | : | Adversary Proceeding |
| | | No. _____ (SCC) |
| CORPORATE-BACKED TRUST CERTIFICATES, | : | |
| GOLDMAN SACHS CAPITAL I SECURITIES- | | |
| BACKED SERIES 2004-6 TRUST, | : | |
| Trust Defendant, | : | **COMPLAINT** |
| − and − | : | |
| U.S. BANK TRUST NATIONAL ASSOCIATION, | : | |
| Trustee Defendant. | : | |
| ──────────────────────── x | | |

TO THE HONORABLE SHELLY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF" or "Plaintiff"),[1] through

Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors

(the "Plan"), by and through its undersigned counsel, brings this Complaint against Corporate-

Backed Trust Certificates, Goldman Sachs Capital I Securities-Backed Series 2004-6 Trust (the

"Trust") and U.S. Bank Trust National Association ("U.S. Bank" or the "Trustee") (the Trust and

Trustee are collectively referred to as the "Defendants"), and respectfully states:

## PRELIMINARY STATEMENT

1.      This action arises out of the Defendants' failure to perform their

contractual obligations with respect to millions of dollars of fixed-rate interest payments due to

LBSF under an interest rate swap and related trust agreement (which created the Trust) since

September 2008 when the Trustee improperly and ineffectively declared the swap terminated.

Even if the Trustee's improper termination was somehow effective, LBSF remains contractually

entitled to a multi-million dollar swap termination payment that the Trust never calculated, let

alone paid LBSF.

2.      In March 2004, LBSF and the Trust entered into an interest rate swap,

whereby (i) the Trust agreed to pay LBSF interest received on underlying securities (fixed-rate

bonds with a 6.345% coupon) held by the Trust, and (ii) in exchange, LBSF agreed to make

quarterly payments to the Trust based on three-month LIBOR plus a 0.75% margin with respect

---

[1] LBSF is a debtor in the above-captioned jointly administered chapter 11 case of LBHI and its affiliated debtors. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Master Agreement (defined below).

to the outstanding notional amount of the swap. The notional amount of both the swap and

principal amount of the underlying securities comprising the Trust collateral was $25 million.

       3.      On September 15, 2008, LBHI, LBSF's credit support provider and

guarantor under the swap, filed a voluntary Chapter 11 bankruptcy petition, which constituted an

event of default under the swap. On or around September 22, 2008, the Trustee sent a notice to

the holders of certificates issued by the Trust stating that the swap had purportedly terminated as

a result of LBHI's bankruptcy filing, while declaring that the trust agreement remained active.

However, in order for a termination of the swap to be effective, the "Depositor" as defined by the

trust agreement, in this case Lehman ABS Corporation ("LABS"), was required to (i) issue a

termination notice, and (ii) declare an early termination date. LABS neither issued a termination

notice, nor declared an early termination date. Consequently, the Trustee's non-confirming

termination notice was ineffective, and the swap was (and remains) live. Nevertheless, from

September 2008, when the Trustee issued its purported notice, to the present, the Trust has failed

to make the required fixed-rate interest payments to LBSF on account of the underlying

securities held by the Trust. Accordingly, the Defendants have breached the swap agreement,

and LBSF is entitled to damages from Defendants amounting to the unpaid interest payments due

LBSF (less LBSF's mandated floating-rate interest payments tied to LIBOR), plus interest.

       4.      Alternatively, at the time of the swap's purported termination by the

Trustee, LBSF was (and continues to be) heavily "in the money" on the swap. To the extent that

the Court rules that the swap was effectively terminated, LBSF is entitled to recover a multi-

million dollar termination payment from the Trust. Notwithstanding LBSF's contractual

entitlement to a termination payment, which was to be calculated by the Trust, the Defendants

neither calculated, much less paid, any termination payment to LBSF. Instead, the Defendants

apparently seek to enforce contractual provisions in the parties' agreements that purportedly nullified LBSF's right to *any* termination payment based on LBHI's bankruptcy filing which constitute unenforceable *ipso facto* clauses.  The Defendants apparently enforced a "walkaway clause" in the swap agreement that purportedly extinguished LBSF's right to any termination payment if termination were premised upon LBHI's bankruptcy petition filing.  Although the Defendants may assert that even if there was a termination payment due LBSF, such a payment need not be made by reliance on the "priority modification provision" in Section 5(b) of the trust agreement which purportedly modified LBSF's right to senior payment priority.   The walkaway provision and priority modification provision being triggered upon LBHI's bankruptcy filing and resulting in a forfeiture of LBSF's otherwise contractually mandated multi-million dollar termination payment constitute unenforceable *ipso facto* clauses.  Further, the Defendants breached the swap agreement and trust agreement by failing to calculate a termination payment and pay the contractually mandated termination payment to LBSF as the "in the money" party.

5.     To the extent that the Court determines that the swap agreement was effectively terminated, the Trustee's application of the *ipso facto* clauses to deny LBSF its termination payment also constituted a transfer of property of the estate, consisting of LBSF's rights under the transaction documents, from LBSF to the Trust.  Such transfer, which occurred after the bankruptcy petition filing, violated the automatic stay under Section 362 of the Bankruptcy Code.  The Trust also received a substantial, unwarranted windfall as a result of the Trustee's improper transfer of LBSF's interest in the termination payment to the Trust, and the Trust has not paid anything in return.  Accordingly, equity and good conscience require that the Trust pay LBSF its multi-million dollar termination payment, plus interest.

## PARTIES

6.      Plaintiff LBSF is a Delaware corporation with its principal business address at 1271 Sixth Avenue, New York, New York 10020.

7.      Defendant Trust is a special purpose entity and trust formed under the laws of the State of New York pursuant to the Trust Agreement that was created for the purpose of entering into the Swap Agreement and issuing the Certificates to the Certificate Holders. Defendant Trustee is the trustee of the Trust, as well as the signatory to the Trust Agreement and Swap Agreement on behalf of the Trust.

8.      Defendant Trustee is a national banking association organized under the laws of the United States that does business throughout the United States, with its principal business address in New York located at 100 Wall Street, New York, New York 10005.

## JURISDICTION AND VENUE

9.      This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

10.     The Court has subject-matter jurisdiction over this proceeding under 28 U.S.C. §§ 157, 1334, and 2201.  In addition, the parties have submitted to the exclusive jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York under the applicable agreement.

11.     Further, this matter has a close nexus with the Plan, which became effective on March 6, 2012.  The Court has retained post-confirmation jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraph 77 of the Order dated December 6, 2011 confirming the Plan.

12.     The Court has personal jurisdiction over the Defendants.

13.     Venue is proper under 28 U.S.C. §§ 157(a), 1408, and 1409.

4

14.    Pursuant to Bankruptcy Rule 7008, this adversary proceeding relates to the chapter 11 case *In re Lehman Brothers Holdings Inc.*, pending in this Court as Case No. 08-13555 (SCC).

15.    Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff consents to the entry of final orders or judgment by this Court if it is determined that, absent consent of the parties, this Court cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## BACKGROUND

A.    **The Relevant Agreements and Transactions**

16.    As described more fully below, the Trust is a special purpose entity that in March 2004 (i) was formed by LABS and U.S. Bank for the purpose of receiving a deposit of $25 million worth of fixed-rate securities into the Trust and issuing certificates to the general public, and (ii) entered into an interest rate swap with LBSF in which LBSF would receive the fixed rate on the Trust's underlying securities while paying the Trust a floating interest rate tied to LIBOR which would then be passed on to the certificate holders.

i.    **The Trust Agreement**

17.    On March 19, 2004, LABS, as Depositor, and U.S. Bank, as Trustee, created the Trust by executing and delivering a Series Supplement (the "Series Supplement"), incorporating the Standard Terms for Trust Agreements, dated as of January 16, 2001 (the "Standard Terms" and, together with the Series Supplement, as amended and supplemented, the "Trust Agreement").  The Trust Agreement required LABS to deposit into the Trust the

5

underlying Trust collateral (the "Underlying Securities") consisting of: $25,000,000 principal

amount of 6.345% capital securities due February 15, 2034 issued by Goldman Sachs Capital I.[2]

18.    In turn, the Trust issued $25,000,000 face amount of Corporate-Backed

Trust Certificates, Goldman Sachs Capital I Securities-Backed Series 2004-6 (the "Certificates")

that were sold to the general public (the "Certificate Holders"). The Certificate Holders received

from the Trust quarterly interest payments of three-month LIBOR plus 0.75% on a $25,000,000

notional amount, which payments flowed from LBSF to the Trust in accordance with the interest

rate swap described below.

### ii.    The Interest Rate Swap

19.    Contemporaneously with the creation of the Trust Agreement, LBSF and

the Trust entered into an interest rate swap agreement on a $25,000,000 notional amount (the

"Swap Agreement" and together with the Trust Agreement, the "Transaction Agreements"). On

March 19, 2004, LBSF and the Trust entered into the Swap Agreement consisting of (a) a 1992

multicurrency cross-border ISDA standard form master agreement (the "Master Agreement"),

(b) a schedule to the Master Agreement (the "Schedule"), and (c) a swap confirmation to the

Master Agreement (the "Confirmation").

20.    Pursuant to the Swap Agreement, the Trust agreed to pay LBSF any

interest payments received by the Trust on the Underlying Securities, which paid interest semi-

annually at a 6.345% per annum interest rate. In return, LBSF agreed to make quarterly

payments to the Trust based on three-month LIBOR plus a 0.75% margin with respect to the

outstanding notional amount of the Swap Agreement. LBSF's floating-rate payments were also

---

[2] Goldman Sachs Capital I is a Delaware statutory trust with a $2.75 billion capital structure that was created for the purpose of issuing capital securities to investors, including the $25 million Underlying Securities which were issued to the Trust. Payment on account of securities issued by Goldman Sachs Capital I, including the Underlying Securities, was guaranteed by The Goldman Sachs Group, Inc.

subject to an internal collar, such that any payment could not be less than 3.50% or greater than 7.50%. Confirmation § 3 at 2. LBSF's obligation to make a floating-rate payment to the Trust was contingent upon the Trust first making the related fixed-rate interest payments to LBSF. *Id.* § 3 at 3.

21.    The Scheduled Termination Date of the Swap Agreement was February 15, 2034, which was also the maturity date of the Underlying Securities.

**B.    Early Termination Provisions Required LABS to Provide Notice of Event of Default and Designate Early Termination Date**

22.    The Swap Agreement provided that the occurrence of certain "Events of Default," including the bankruptcy filing of LBHI, which was LBSF's Credit Support Provider and Swap Guarantor, may cause the termination of the Swap Agreement.

23.    However, upon the occurrence of an Event of Default by LBSF, including LBHI's bankruptcy filing, to effectively terminate the swap, LABS, as Depositor, was required to (i) give notice of the Event of Default to the Trust, and (ii) designate an "Early Termination Date":

> **Early Termination.**  Notwithstanding any other provision of this Agreement, in the event of the occurrence of an Event of Default with respect to [LBSF], ***the Depositor shall make the determination to designate an Early Termination Date*** in connection with the termination of this Agreement on behalf of [the Trust].  In addition, the Early Termination Date so designated shall be at least five Business Days following the date on which [the Trust] *receives such direction from the Depositor*.

Schedule Part 5(b) (emphasis added).

24.    Upon the proper notice and designation of an Early Termination Date of the Swap Agreement, then a termination payment "shall be due" to the "in the money party" under the swap.  Confirmation § 3 at 5.

25.     In the event of an Event of Default or Termination Event in which LBSF was the "Defaulting Party," then the Trust was obligated to calculate the termination payment using the Market Quotation method.  Confirmation § 3 at 6.

26.     The Trust Agreement also contemplated the termination of the Trust Agreement and the payment of an early termination payment to the applicable party pursuant to the Swap Agreement upon the occurrence of a Swap Agreement Termination Event.  Trust Agreement §§ 5(b), 14(i).

27.     A "Trust Swap Payment Default" is defined as the "occurrence of a Swap Agreement Termination Event related to the failure of the Trust to make any payment under the Swap Agreement."  Trust Agreement § 2.

**C.     Purported Early Termination of the Swap Agreement by the Trustee**

28.     On September 15, 2008, LBHI filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

29.     Upon information and belief, the Trustee delivered a "Notice of Swap Termination Event" to the Certificate Holders, dated September 22, 2008 (the "Purported Termination Notice"), declaring that the bankruptcy petition filing by LBHI constituted a "Swap Agreement Termination Event" and "Event of Default" under Section 5(a)(vii) of the Swap Agreement,[3] but not a "Trust Termination Event" under the Trust Agreement.  In the notice, the Trustee declared that no further obligations were due to or from either party under the Swap Agreement, and that going forward, all interest payments received from the Trust on account of the Underlying Securities would be forwarded to the Certificate Holders (instead of the Certificate Holders' previous receipt of three-month LIBOR plus 0.75%).

---

[3] As set forth below in Section D, the "Walkaway Provision" in the Swap Agreement provided that "[n]o termination payment shall be payable" upon the occurrence of an "Event of Default as described in Section 5(a)(vii) with [LBSF] as the Defaulting Party."  Confirmation § 3 at 5.

30.     However, LABS never gave notice of an Event of Default or designated an Early Termination Date, as required for the effective termination of the swap where LBSF was the Defaulting Party.  The Trustee was not authorized to send an early termination notice. LABS was the only entity authorized to send such notice.  Even assuming the Trustee was permitted to provide the requisite notice, the Trustee's Purported Termination Notice was ineffective because it failed to designate the appropriate Early Termination Date as required by the Swap Agreement.   Accordingly, the Swap Agreement was never properly or effectively terminated.

31.     On October 3, 2008, LBSF filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

**D.     Failure to Make Termination Payment to LBSF**

32.     Upon the early termination of the Swap Agreement, the "in the money" party was entitled to a termination payment from the "out of the money" party.

33.     LBSF was "in the money" on the Swap Agreement at the time of the swap's purported termination in September 2008.  As a result, the Trustee's purported termination of the Swap Agreement would have entitled LBSF to a multi-million dollar termination payment from the Trust, to be calculated by the Trust with the delivery of a termination payment calculation statement to LBSF.  Confirmation § 3 at 6; Master Agreement § 6(d).

34.     However, upon information and belief, the Trust never calculated the termination payment owed to LBSF, nor delivered its termination payment calculation as required under the Swap Agreement.  The Trust also never paid the contractually mandated termination payment to LBSF.

9

35.     Upon information and belief, the Trust failed to undertake the necessary settlement calculation and make the requisite termination payment to LBSF because of the application of certain unenforceable provisions in the Swap Agreement providing that upon the termination of the Swap Agreement due to the bankruptcy filing of LBHI, then LBSF would not be entitled to any termination payment.  Specifically, the Swap Agreement contained a "Walkaway Provision" providing that if the Swap Agreement was terminated because of the bankruptcy petition filing of LBHI as described in Section 5(a)(vii) of the Swap Agreement, then "no termination payment shall be payable" to LBSF.  Confirmation § 3 at 5 ("No termination payment shall be payable by either [LBSF] or [the Trust] following . . . (iii) an Event of Default as described in Section 5(a)(vii) with [LBSF] as the Defaulting Party."); *see also* Schedule Part 1(e).  Indeed, the Purported Termination Notice referenced an Event of Default under Section 5(a)(vii) before unilaterally declaring that no further payments would be made to LBSF on account of the Swap Agreement.  If the Walkaway Provision was utilized by the Trustee, the Certificate Holders obtained a higher priority distribution than they had a right to but for the filing of a title 11 case by LBHI.

36.     In addition, if the Trust was effectively terminated based upon certain specified events, *not* including the bankruptcy filing of LBHI, then LBSF would be entitled to priority over the Certificate Holders to any "Early Termination Payment."  Trust Agreement § 5(b).  However, if termination was for any other reason, including the bankruptcy filing of LBHI, then the priorities would flip such that a liquidating distribution would be made first to the Certificate Holders, and LBSF's rights to any Early Termination Payment would be subordinated to the Certificate Holders' rights.  Trust Agreement § 5(c).[4]

---

[4] The priority modification provisions of Section 5(b), (c) of the Trust Agreement shall hereinafter be referred to as the "Priority Modification Provision."

37.    Without waiver of Plaintiff's claim that the Swap Agreement was not effectively terminated, if the Court determines that the Swap Agreement was effectively terminated, the Trustee had an obligation to terminate the Trust and make the necessary termination payment due LBSF under Section 9(ii) of the Trust Agreement.  The Trustee has failed and refused to perform its obligations under the Trust Agreement in the event the Court determines that the swap was properly terminated

38.    In addition, the Trust Agreement provided that upon a Trust Swap Payment Default, which was defined as "the occurrence of a Swap Agreement Termination Event related to the failure of the Trust to make any payment under the Swap Agreement," then LBSF's first-priority right to a termination payment under the Trust Agreement was not to be subordinated to the Certificate Holders' rights under the Priority Modification Provision.  Trust Agreement §§ 2 (defining "Trust Swap Payment Default"), 5(b).

39.    In any event, even if the underlying transactions were properly terminated, the provisions in both the Swap Agreement and Trust Agreement which modify LBSF's right to a termination payment if based upon LBHI's bankruptcy filing constitute unenforceable *ipso facto* provisions.

40.    After the Trustee issued the Purported Termination Notice, it no longer made any payments to LBSF on account of payments owed under the Swap Agreement.  Instead, the interest payments that the Trust continued to receive on account of the Underlying Securities were forwarded to the Certificate Holders in lieu of the floating rate payments tied to LIBOR previously made.

## COUNT I
### Against All Defendants
#### (*Declaratory Judgment – Walkaway Provision and Priority Modification Provision Are Unenforceable Ipso Facto Clauses*)

41.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

42.    At the time of the LBHI bankruptcy filing, the parties' respective obligations under the Transaction Agreements were continuing and the performance of material obligations under the Trust Agreement and Swap Agreement remained outstanding on both sides.

43.    Accordingly, the Trust Agreement and the Swap Agreement were executory contracts and subject to the protections of Sections 365(e), 541(c)(1)(B) and 363(l) of the Bankruptcy Code.

44.    The Walkaway Provision of the Swap Agreement and the Priority Modification Provision of the Trust Agreement that purport to deprive LBSF of its right to a termination payment as a result of LBHI's bankruptcy filing constitute unenforceable *ipso facto* clauses that violate Sections 365(e)(1), 541(c)(1) and 363(l) of the Bankruptcy Code.

45.    The Bankruptcy Code protects debtors from suffering a forfeiture for filing a Chapter 11 case, notwithstanding any contractual provisions or applicable law that would have that effect.  Section 365(e)(1) of the Bankruptcy Code provides that:

> [n]otwithstanding a provision in an executory contract . . .  an executory contract . . . of the debtor may not be terminated *or modified*, and any right or obligation under such contract or lease may not be terminated *or modified*, at any time after the commencement of the case solely because of a provision in such contract . . . that is conditioned on . . . the commencement of a case under this title . . . .

12

11 U.S.C. § 365(e)(1) (emphasis added).

46.     Similarly, Section 541(c)(1) recognizes that a debtor's interest in property:

> becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . that is conditioned on . . . the commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1).

47.     The Walkaway Provision and Priority Modification Provision, by their terms, also violate the *ipso facto* prohibition of Section 363(l).  Section 363(l) provides, in relevant part, that the debtor:

> may use, sell, or lease property under section (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a  case under this title or a custodian, and that effects, or give an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

11 U.S.C. § 363(l).  As described above, Section 541(a)(1) broadly defines property of the estate to include property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced.

48.     Because the Walkaway Provision and Priority Modification Provision are provisions of executory contracts that (a) become operative after the commencement of LBHI's and/or LBSF's bankruptcy case, (b) modified rights under the Transaction Agreements solely because of "the commencement of a case" under the Bankruptcy Code, and (c) deprive LBSF of its contractual termination payment, the provisions are unenforceable *ipso facto* clauses.

13

49.     There is an actual controversy between the parties on this issue because the Walkaway Provision and Priority Modification Provision are unenforceable *ipso facto* clauses and Defendants have not agreed to waive or disregard such provisions.

50.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that the Court enter a declaratory judgment that (a) the Walkaway Provision and Priority Modification Provision are unenforceable *ipso facto* clauses pursuant to Sections 365(e)(1), 541(c)(1)(B) and 363(l) of the Bankruptcy Code, and (b) to the extent that the Court determines that the Swap Agreement was properly terminated, that LBSF is entitled to its termination payment pursuant to the methodology set forth in the Swap Agreement and Trust Agreement, plus interest.

### COUNT II
**Against All Defendants**
***(Declaratory Judgment – Enforcement of Walkaway Provision and Priority
Modification Provision Violate the Automatic Stay)***

51.     LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

52.     Section 362(a) of the Bankruptcy Code provides, in relevant part, that the filing of a petition under Title 11 of the Bankruptcy Code "operates as a stay, applicable to all entities, of -- . . . (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . ." 11 U.S.C. § 362(a)(3).

53.     At the time LBHI and LBSF commenced their voluntary bankruptcy cases, LBSF's rights under the Transaction Agreements to a termination payment under the Swap Agreement constituted property of the estate.   Any effort to control LBSF's rights under the Transaction Agreements, including its right to a termination payment, would be subject to,

14

and in violation of, the automatic stay provided under Section 362(a) of the Bankruptcy Code.
*See* 11 U.S.C. § 362(a)(3).

54.     The safe harbor of Section 362(b)(17) of the Bankruptcy Code is
inapplicable because the modification of LBSF's payment priority solely as a result of LBHI's
bankruptcy filing did not constitute a liquidation, termination, or acceleration of the Swap
Agreement or Trust Agreement, and was not an offset or net out of any termination value,
payment amount or other credit enhancement of the parties' positions under those agreements.

55.     Further, the Walkaway Provision and Priority Modification Provision
improperly seek to take property of LBSF because of the bankruptcy filing of LBHI.  Property of
a debtor becomes property of the estate, "notwithstanding any provision in an agreement . . . that
is conditioned . . . on the commencement of a case under this title . . . and that effects or gives an
option to effect a forfeiture, modification, or termination of the debtor's interest in property."  11
U.S.C. § 541(c)(1).

56.     There is an actual controversy between the parties on this issue because
the Walkaway Provision and Priority Modification Provision are unenforceable *ipso facto*
clauses and Defendants have not agreed to waive or disregard such provisions.

57.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001,
LBSF requests that this Court enter a declaratory judgment that all actions to enforce the
Walkaway Provision and Priority Modification Provision constitute willful violations of the
automatic stay under Section 362(a)(3) of the Bankruptcy Code and are void *ab initio*.

## COUNT III
### Against All Defendants
#### (*Turnover under Section 542(a) of the Bankruptcy Code of Estate Property*)

58.     LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

59.     Section 542(a) of the Bankruptcy Code provides that "an entity, . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

60.     If the unenforceable Walkaway Provision and/or Priority Modification Provision had not been enforced in violation of the automatic stay, LBSF would have received its "in the money" termination payment in the ordinary course.   LBSF's interest in the termination payment prior to enforcement of the Walkaway Provision and/or Priority Modification Provision constitutes property of the estate.

61.     Therefore, to the extent the Court rules that the Swap Agreement was properly terminated, LBSF is entitled to turnover of the value of LBSF's termination payment because LBSF was deprived of the use of those funds by enforcement of the Walkaway Provision and/or Priority Modification Provision.

62.     Accordingly, pursuant to Section 542(a) of the Bankruptcy Code, LBSF requests an order compelling and directing Defendants to turn over the above-described property to LBSF as it constitutes property of the bankruptcy estate.

## COUNT IV
### Against All Defendants
### (*Turnover under Section 542(b) of the Bankruptcy Code of Estate Property*)

63.     LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

64.     Section 542(b) of the Bankruptcy Code expressly provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b).

65.     If the void and unenforceable Walkaway Provision and/or Priority Modification Provision had not been enforced in violation of the automatic stay, LBSF would have received its "in the money" termination payment in the ordinary course.

66.     The amount owed to LBSF prior to enforcement of the Walkaway Provision and/or Priority Modification Provision constitutes a debt that has matured and is property of the estate pursuant to Section 541(a) of the Bankruptcy Code.  As a result of the operation of the Walkaway Provision and/or Priority Modification Provision, the Trust is in the possession, custody or control of assets consisting of the Debtors' interest in property in the amount of millions of dollars, which is of substantial value or benefit to the Debtors' estate and is property belonging to the Debtors that may be used by them.

67.     Accordingly, to the extent the Court rules that the Swap Agreement was properly terminated, pursuant to Section 542(b) of the Bankruptcy Code, LBSF requests an order

compelling and directing Defendants to turn over the above-described property to LBSF as it

constitutes property of the bankruptcy estate under Section 541(a) of the Bankruptcy Code.

## COUNT V
### Against All Defendants
### (*Breach of Swap Agreement and Trust Agreement – Failure to Pay Termination Payment*)

68.     LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

69.     All live trades as of the Plan confirmation date were assumed.

70.     The Swap Agreement is a valid and enforceable contract that is binding

upon the parties, other than the unenforceable Walkaway Provision, which should be severed

from the agreement.

71.     LBSF has substantially performed all of its obligations under the Swap

Agreement.

72.     The Trust Agreement is a valid and enforceable contract that is binding

upon the parties, other than the unenforceable Priority Modification Provision, which should be

severed from the agreement.

73.     LBSF has substantially performed all of its obligations under the Trust

Agreement.

74.     The Walkaway Provision in the Swap Agreement and the Priority

Modification Provision in the Trust Agreement constitute unenforceable *ipso facto* provisions

that the Defendants erroneously enforced upon notice of LBHI's bankruptcy filing.

75.     Assuming that the Trustee's purported termination was permissible, the

Defendants breached the Swap Agreement and Trust Agreement by, among other things, (i)

failing to calculate any termination payment in accordance with the parties' agreements, (ii)

failing to deliver a calculation statement, and (iii) failing to pay the required termination payment

to LBSF as the "in the money" party upon termination of the parties' agreements.

76.     Moreover, the failure to pay the required termination payment upon the

termination of the Swap Agreement constituted a Trust Swap Payment Default and hence a Trust

Termination Event, which required the Trustee to sell the Underlying Securities and calculate

and distribute to LBSF its contractually mandated termination payment ahead of any payment to

Certificate Holders as required by the Trust Agreement.  The failure to calculate the payment and

make the distribution constitutes a breach by the Trust.

77.     As a result, LBSF has been damaged in an amount to be proven at trial,

constituting the unpaid termination payment owed to LBSF, plus interest.

### COUNT VI
### Against All Defendants
### (*Unjust Enrichment*)

78.     LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

79.     At the time LBHI filed its voluntary petition for bankruptcy protection,

LBSF was heavily "in the money" on the Swap Agreement.  The Trustee's determination to

enforce the Walkaway Provision and/or Priority Modification Provision, however, wiped away

LBSF's "in the money" position and funneled LBSF's interest in the termination payment to the

Trust.

80.     The Trust thereby received a staggering windfall without providing any

compensation to LBSF.  LBSF received nothing in return.

19

81.     The Trust has been improperly and unjustly enriched, at LBSF's expense, as a result of such transfer.

82.     To the extent the Court rules that the Swap Agreement was properly terminated, equity and good conscience require that the Trust return the value of LBSF's termination payment, plus interest.

### COUNT VII
**Against All Defendants**
(*Constructive Trust*)

83.     LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

84.     The Trustee has a confidential and/or fiduciary relationship with LBSF with respect to LBSF's interest in the Trust collateral.  By entering into the Swap Agreement and making payments thereunder, LBSF relied on the Trustee's implicit promise not to improperly extinguish LBSF's interest in the termination payment.

85.     As a result of the improper cancellation of LBSF's interest in the termination payment, the Trust has been improperly and unjustly enriched at LBSF's expense.

86.     At the time that the Trustee noticed the cancellation of LBSF's termination payment, the Trust was on notice that LBHI filed for Chapter 11 bankruptcy protection and that transactions relating to the estate of LBHI and its affiliated debtors were subject to the Bankruptcy Code.  Accordingly, the Trust was not a *bona fide* purchaser of LBSF's termination payment rights.

20

87.     Because of the unjust enrichment of the Trust, to the extent the Court rules that the Swap Agreement was properly terminated, LBSF is entitled to the imposition of a constructive trust with respect to LBSF's termination payment.

## COUNT VIII
### Against All Defendants
#### (*Money Had and Received*)

88.     LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

89.     LBSF was substantially "in the money" on the swap at the time of the Swap Agreement's purported termination.  LBSF, therefore, had an interest in the termination payment it was contractually owed which was improperly retained by the Trust.

90.     As a result of the improper retention of the termination payment, the Trust received property that rightfully belonged to LBSF.

91.     Indeed, the retention resulted in an enormous windfall to the Trust.  LBSF received nothing in return.

92.     To the extent the Court rules that the Swap Agreement was properly terminated, equity and good conscience require that the Trust return the value of LBSF's termination payment, plus interest.

## COUNT IX
### Against All Defendants
#### (*Replevin*)

93.     LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

94.     Pursuant to the terms of Transaction Agreements, LBSF was granted an interest in the Trust collateral and the proceeds thereof.  LBSF held such interest at the time LBSF's interest in the termination payment to be satisfied from the Trust collateral was transferred to the Trust.

95.     At the time of LBHI's filing of its voluntary petition for bankruptcy protection and the purported termination of the swap, LBSF was heavily "in the money" on the Swap Agreement.

96.     The Trustee's determination to enforce the Walkaway Provision and/or Priority Modification Provision, however, and retain 100% of LBSF's termination payment, divested LBSF of substantial value arising from its "in the money" position.

97.     LBSF possesses and still retains an interest in the Trust collateral and the proceeds therefrom that is senior to any junior interest held by the Trust, and LBSF has the immediate right to possession of the Trust collateral.

98.     The Trust wrongfully retains possession of all of the Trust collateral and proceeds therefrom, subject to LBSF's valid and superior interest.

99.     As of the date of this Complaint, the Trust has failed to comply with LBSF's demand for immediate possession of the Trust collateral to satisfy LBSF's termination payment.

100.     Therefore, as the direct and proximate result of the foregoing, to the extent the Court rules that the Swap Agreement was properly terminated, LBSF is entitled to an order of replevin directing the Trust to immediately tender the value of LBSF's termination payment, plus interest.

## COUNT X
### Against All Defendants
*(Declaratory Judgment – Walkaway Provision and Priority
Modification Provision Are Unenforceable Penalties)*

101.     LBSF repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

102.     There is no rational relationship between the Trust's retention of LBSF's

interest in the termination payment, on the one hand, and any damages the Trust has suffered as a

result of LBHI's bankruptcy filings, on the other hand.  The contractual provisions which yield

this result – the Walkaway Provision and/or Priority Modification Provision – do not represent

even a pretextual attempt to approximate actual damages.

103.     These provisions were intended solely to coerce performance.  Rather than

fairly compensate for any resulting harm or loss, the Walkaway Provision and/or Priority

Modification Provision instead have produced what may fairly be described as a windfall for the

Trust, and a punitive blow to LBSF.

104.     Accordingly, the large transfer of value from LBSF to the Trust constitutes

an unenforceable penalty.

105.     There is an actual controversy between the parties on these issues because:

(i) the Transaction Documents contain the Walkaway Provision and Priority Modification

Provision; and (ii) Defendants have refused to acknowledge that these contractual provisions are

unenforceable and pay LBSF what it is rightfully owed.

106.     Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests

that the Court enter a declaratory judgment that the Walkaway Provision and Priority

Modification Provision operate as unenforceable penalties.

## COUNT XI
### Against All Defendants
*(In the Alternative, Breach of Swap Agreement – Interest
Payments on Underlying Securities)*

107.    LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

108.    In the alternative, if the Court determines that the Swap Agreement was not properly terminated as LBSF respectfully submits, then LBSF seeks damages for the Defendants' failure to make the required interest payments on account of the Underlying Securities.

109.    All live trades as of the Plan confirmation date were assumed.

110.    The Swap Agreement is a valid and enforceable contract that is binding upon the Defendants.

111.    LBSF has substantially performed all of its obligations under the Swap Agreement.

112.    In order to terminate the Swap Agreement with respect to an LBSF Event of Default, LABS was required to issue a notice of termination and designate an Early Termination Date. *See* Schedule Part 5(b). LABS never issued the required notice or designated an Early Termination Date.

113.    In addition, the Trust was obligated to deliver a termination payment calculation statement. *See* Confirmation § 3 at 6; Master Agreement § 6(d). The calculation statement was never prepared by the Trust or delivered to LBSF.

114.    The Purported Termination Notice issued by the Trustee did not effectively terminate the Swap Agreement. Accordingly, the Swap Agreement remains in force.

24

115.    Under the Swap Agreement, the Trustee was obligated to forward the fixed-rate interest payments on account of the Underlying Securities to LBSF upon receipt.

116.    The Trustee has breached the Swap Agreement by failing to make any of the required fixed-rate interest payments to LBSF since the Trustee issued its Purported Termination Notice on September 22, 2008 to present.

117.    As a result, LBSF has been damaged in an amount to be proven at trial, constituting the unpaid fixed-rate interest payments on account of the Underlying Securities from September 22, 2008 to present (less LBSF's contractually mandated floating-rate interest payments tied to LIBOR), plus interest.

## CONDITIONS PRECEDENT

All conditions precedent to suit have occurred, been performed, or been waived or excused.

## PRAYER FOR RELIEF

WHEREFORE, LBSF respectfully requests that the Court enter judgment in its favor, and against Defendants, as follows:

I.    Declaratory judgment that the Walkaway Provision and/or Priority Modification Provision that were triggered upon LBHI's bankruptcy filing constitute unenforceable *ipso facto* clauses that violate 11 U.S.C. §§ 365(e)(1), 541(c)(1) and 363(l), and LBSF is entitled to its termination payment;

II.    Declaratory judgment that all actions to enforce the Walkaway Provision and/or Priority Modification Provision constituted willful violations of the automatic stay under 11 U.S.C. § 362(a) and are void *ab initio*;

III.    Judgment that the Defendants account for and turn over the property of the estate now or formerly in their possession, custody or control or the value of such property under 11 U.S.C. § 542(a);

IV.    Judgment that the Defendants account for and turn over the property of the estate now or formerly in their possession, custody or control or the value of such property under 11 U.S.C. § 542(b);

25

V.      Judgment that the Defendants breached the Swap Agreement and Trust Agreement by applying the unenforceable Walkway Provision and/or Priority Modification Provision, failing to calculate a termination payment, and failing to pay LBSF its termination payment as the "in the money" party upon termination;

VI.     Judgment that the Trust was unjustly enriched for its failure to return the portion of the Trust collateral in the form of the value of the termination payment that was due to LBSF in accordance with equity and good conscience;

VII.    Judgment imposing a constructive trust on the Trust collateral and proceeds therefrom;

VIII.   Judgment that the retention of LBSF's interest in the termination payment to the Trust constituted a transfer of LBSF's interest in the property and that under principles of equity and good conscience, the Trust should not be permitted to retain the property;

IX.     Judgment of replevin against the Trust for its failure to return LBSF's interest in the termination payment that rightfully belongs to LBSF;

X.      Declaratory judgment against the Defendants on the unenforceable penalty claim and ordering them to pay LBSF the value of LBSF's "in the money" position in the Swap Agreement;

XI.     In the alternative, judgment that the Swap Agreement is still live and that LBSF is entitled to all unpaid interest payments made on account of the Underlying Securities;

XII.    An award of damages in an amount to be determined at trial, plus interest; and

XIII.   Such other and further relief as the Court deems just and proper, including costs and attorneys' fees.


**[SIGNATURE PAGE FOLLOWS]**


26

Dated:      New York, New York
            September 18, 2015

                              Respectfully submitted,

                              WOLLMUTH MAHER & DEUTSCH LLP

                              By:  /s/ James N. Lawlor
                                     William A. Maher
                                     James N. Lawlor
                                     Adam M. Bialek
                                     Fletcher W. Strong

                              500 Fifth Avenue
                              New York, New York 10110
                              Telephone: (212) 382-3300
                              Facsimile: (212) 382-0050

                              *Attorneys for Lehman Brothers Special
                              Financing Inc.*