# EXHIBIT 1

Page 1

1  UNITED STATES BANKRUPTCY COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  Case No. 08-13555-scc
4  - - - - - - - - - - - - - - - - - - - -x
5  In the Matter of:
6
7  LEHMAN BROTHERS HOLDINGS INC.
8
9           Debtors.
10
11 - - - - - - - - - - - - - - - - - - - -x
12
13                United States Bankruptcy Court
14                One Bowling Green
15                New York, New York   10004-1408
16
17                September 17, 2015
18                10:04 A.M.
19
20 B E F O R E:
21 HON. SHELLEY C. CHAPMAN
22 U.S. BANKRUPTCY JUDGE
23
24
25 ECRO:  MATTHEW

Page 2

1  **HEARING re #47569:   Status Conference regarding the RMBS**
2  **Protocol**
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  **Transcribed by:  Theresa Pullan**

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   CHAPMAN AND CUTLER LLP

 4         Attorneys for US National Bank, As Trustee

 5         111 West Monroe Street

 6         Chicago, Illinois  60603-4080

 7         Houston, TX 77002-2755

 8   BY:   FRANKLIN H. TOP, III, ESQ.

 9

10   WILLKIE FARR & GALLAGHER LLP

11         Attorneys for Debtor

12         787 Seventh Avenue

13         New York, NY  10019

14   BY:   TODD G. COSENZA, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

1  has completed its initial review of the RMBS trustee's claims

2  on the first 50,000 loan files.  I think I have four general

3  observations and then we'll get into more detail.

4           As we discussed at the hearing in December, it's

5  clear to us from looking at the files that each claim file

6  presented is unique, it has unique challenges, unique factual

7  issues.  Each file has to be reviewed in context based on the

8  underwriter, the lender and the borrower.  Basically each,

9  every loan has an individualized story and that has made our

10  review process somewhat time consuming by the protocols working

11  in that regard, and that is something that we expected remember

12  when we had the hearing back in December.

13          Two, the second general observation, the RMBS

14  trustees have taken a very broad view of what documentation is

15  sufficient to establish a claim.  In many instances this broad

16  view encompasses --

17          THE COURT:  Broad view meaning fewer documents.

18          MR. COSENZA:  Yeah, anything that could facially seem

19  to be a claim, just throw it over to us for us to sort of rebut

20  and have to, you know, make an assessment and rebut the claim.

21  This is --

22          THE COURT:  Could you describe that in a little more

23  detail?

24          MR. COSENZA:  Sure.

25          THE COURT:  When you say a broad view, I'm reading

1  that to mean skinny documentation.

2          MR. COSENZA:  Yes.

3          THE COURT:  But then the next thing that you said

4  didn't seem consistent with that.  So give me an example.

5          MR. COSENZA:  Yeah, it's almost, I can give you

6  several examples.  I mean one example is there certain claims

7  that have been put forward to us as obvious breaches of reps

8  and warranties by borrower.  When we provide over to the

9  trustees the underwriting guidelines that the loan was written

10 under, the loan actually comports with the underwriting

11 guidelines, so we have to go through this process of them

12 sending it over to us, us looking at it, saying well it

13 actually comports with the underwriting guidelines, and then

14 sort of putting that to the side.  So step three is actually

15 going to have more files than we had initially anticipated.

16         THE COURT:  Does the protocol contemplate that in

17 response to your hitting it back, so to speak, that they are

18 then obligated to say you're right or does that go off into

19 another bucket?

20         MR. COSENZA:  So we now move on to step three, and

21 this is, we're going to have sort of a rubber is going to meet

22 the road in some sense.  We're going to have a meet and confer

23 business to business discussion.  They have what their claim

24 was, we have our basis for our rebuttal.  And I think a number

25 of these claims that they put forward are going to fall to the

1  side during that process. We hope, that's sort of our
2  expectation based on what we've seen and sort of what we're
3  putting back to them.
4        If that does not work, there's then step four of the
5  protocol which is the claims facilitation process where both
6  sides will have, you know, in essence a mediation process
7  before a claims facilitator where it decides if it's really a
8  viable claim, but there are some issues with that, there's
9  going to be a discussion as to whether or not that moves on to
10 step five and to Your Honor.
11       THE COURT: Right.
12       MR. COSENZA: But in terms of the documentation, just
13 some other issues that we've seen, just so I can highlight some
14 of them for you.
15       Another example is, there have been claims put
16 forward based on misrepresentations of income.
17       THE COURT: Right.
18       MR. COSENZA: And then to support that claim, the
19 trustees will put forward a W-2 or tax return for a year or two
20 after the loan was originated and that doesn't, that's an
21 example of something where they haven't put forward you know
22 sufficient evidence for us to show the breach occurred at the
23 time of origination.
24       There are a number of other examples where there are
25 typographical errors in the appraisal reports, they have put

Page 8

1  those forward to us, they're really not material errors in the
2  appraisal's report.  And we expect and we have a meeting,
3  process with them, some of those claims are going to fall by
4  the side.
5          Another example is a number of claims were, they have
6  claims of misrepresentation from the borrower, that this is a
7  primary residence when in fact it was a second home.  And it's
8  clear when you actually look at the entire underwriting file
9  for some of those that it was disclosed to the originator that
10 these were in fact second homes so there's really no breach of
11 misrepresentation by the borrower.
12         But I guess the overall point, Your Honor is there is
13 a lot of stuff being thrown to us on this first step that we
14 thought we could whittle down by the trustees, we had to go
15 through a more painstaking process and go through a lot more,
16 you know, some more files than we expected.  But --
17         THE COURT:  Can you characterize, I'd be surprised if
18 you can but I'll ask anyway, can you characterize a percentage
19 of you know what you've described?  You know, like this
20 reflects what we see with respect to 50 percent, 10 percent?
21 Do you have a ballpark sense of how many?
22         MR. COSENZA:  I'll confer with my co-counsel but I
23 would say here --
24         THE COURT:  It's more than anecdotal.
25         MR. COSENZA:  Yeah.

1              THE COURT:  But it's not pervasive.

2              MR. COSENZA:  It may be somewhat pervasive, it could

3    be over 30 percent of the claims being put to us, if not

4    higher.  So it's an issue, and we're hoping in step three that

5    there's obviously going to be a much more reasonable approach

6    put forward by the trustees when they hear our rebuttals and

7    understand the claims that really are, really don't have any

8    merits and we don't have to waste time on step four or step

9    five.  That's why I mentioned before step three is really an

10   important part of this process.

11             But there is a downside to this and that it is

12   there's a lot more expense that we're incurring on step two to

13   go through.

14             THE COURT:  You know, I need to hear from the

15   trustees first, but my observation would be that taking what

16   you say as accurate then it ought to be the case that on a go

17   forward basis the process is adjusted so that those same things

18   do not continue to happen either because the protocol that's

19   been set up internally, I'm looking at the trustee's counsel,

20   either because the protocol that's been set up internally for

21   the review before the claims come over to you needs to be

22   tweaked or because individual reviewers or groups of reviewers

23   are not correctly implementing the protocols that are in place.

24   I'd rather believe that the instructions are correct and this

25   is kind of human error than systematically folks are being

1  help obviate more of the same happening.  And again, these
2  folks might stand up and tell me that you're completely wrong,
3  or marginally wrong.
4        MR. COSENZA:  One other part of this.  There are
5  weekly meet and confers between not the lawyers but basically
6  between Duff & Phelps and the Lehman team sort of go through
7  sort of big picture issues, so there are efforts that I think
8  are going to be much more detailed over the next month or two
9  to try to whittle these down.
10       THE COURT:  So that's good.  Okay.
11       MR. COSENZA:  Third point, Your Honor, general point
12  and observation, the trustees are presenting claims on
13  virtually all nonperforming loans with a value of at least
14  $1,000, so we have a very low monetary threshold for the claims
15  that are being put forward to us.  Again, this is not
16  surprising, but we were hoping to sort of get to the more
17  substantive claims, you know, getting a lot more volume that's
18  causing the trust to go through, or the estate to go through a
19  lot more in terms of expenses.
20       And fourth, Your Honor, I think is the point, you
21  know, the biggest point, due to the types of claims that are
22  being put forward to us, we believe we have received a
23  voluminous number of unwarranted claims.  And the plan
24  administrator can't justifiably accept those claims, and those
25  claims are going to have to go through step three, step four

1    take place at the time of loan.  Again, that number of

2    typographical errors that they have thrown up to us in the

3    appraisal documents doesn't impact the substance of the

4    appraisal, some technical issues with the appraisal, they put

5    those forward and we don't think those are bad appraisals

6    because the substantive data in the underlying appraisal is

7    accurate.

8            Again, the issue I raised before about whether or not

9    there's a misrepresentation as to whether or not this is a

10   primary residence or a secondary residence.  We have a number

11   of files that we've seen where we actually do a comprehensive

12   review of what the underwriters looked at and it's clear that

13   this was for a second home, not for a primary residence.

14   Again, we expect, we are hoping and we expect in step three all

15   those files will just fall right to the side.

16           THE COURT:  And you also mentioned files that are

17   only in the thousand dollar range.

18           MR. COSENZA:  Yes.

19           THE COURT:  Can you characterize how many?

20           MR. COSENZA:  I can ask Mr. Roe if you can just give

21   me one minute.  Yeah, we don't know the number, Your Honor.  So

22   I can speed things along, Your Honor, I don't have that number,

23   I can get it to you.

24           THE COURT:  That's fine.  I'm just trying to, you

25   know, gauge and --

```
 1                    CERTIFICATION

 2          I, Theresa Pullan, certify that the foregoing is a

 3   correct transcript from the official electronic sound recording

 4   of the proceedings in the above-entitled matter.

 5

 6   AAERT Certified Electronic Transcriber CET**00650

 7   Theresa Pullan

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22   Veritext

23   330 Old Country Road

24   Suite 300

25   Mineola, NY   11501
```