

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In re:

5

6    LEHMAN BROTHERS HOLDINGS

7    INC.,

8                              Case No. 08-13555(SCC)

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   LEHMAN BROTHERS INC.        Adv. Case No. 08-01420(SCC)

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   WONG, ET AL.,

14                   Plaintiffs,

15        v.                     Adv. Case No. 09-01120(SCC)

16   HSBC USA, INC., ET AL.,

17

18                   Defendants.

19   - - - - - - - - - - - - - - - - - - - - - - - - - - x

20

21

22

23

24

25

Page 2

1    LEHMAN BROTHERS HOLDINGS

2    INC. IN ITS CAPACITY AS

3    PLAN ADMINISTRATOR ON

4    BEHALF OF LEHMAN BROTHERS

5    SPECIAL FINANCING INC.,

6                    Plaintiff,

7            v.              Adv. Case No. 13-01689(SCC)

8    LCOR ALEXANDRIA L.L.C.,

9    ET AL.,

10

11                   Defendants.

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14

15                   U.S. Bankruptcy Court

16                   One Bowling Green

17                   New York, New York

18

19                   August 4, 2015

20                   10:03 AM

21

22

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 3

1     Hearing re:  08-13555 - Doc# 50217 Motion for Approval of

2     Settlement Agreement Among Putnam Structured Product CDO

3     2002-1 LTD., Putnam Structured Product CDO 2002-1 LLC, U.S.

4     Bank National Association, as Successor Trustee, Lehman

5     Brothers Special Financing Inc., and Lehman Brothers

6     Holdings Inc.

7

8     Hearing re:  08-13555 - Doc# 50296 Motion for Entry of an

9     Order Authorizing Lehman Brothers Special Financing Inc. to

10    Invest Disputed Claim Reserves for Claim Numbers 67733

11    Pursuant to Section 8.4 of the Modified Third Amended Joint

12    Chapter Plan of Lehman Brothers Holdings Inc. and its

13    Affiliated Debtors

14

15    Hearing re:  08-13555 - Doc# 50054 Motion for Objection to

16    Claim(s): The Plan Administrators Supplemental Objection to

17    the Four Hundred Thirty-First Omnibus Objection to Claims

18    (Reduce and Allow Claims)

19

20    Hearing re:  Adv. 08-01420 - Doc# 12478 Trustees Motion for

21    an Order to (I) Establish a Third Interim Distribution Fund

22    for General Unsecured Creditor Claims, (II) Release Reserves

23    from the Secured and Priority Claim Reserve, the First

24    Interim Distribution Fund, and the Second Interim

25    Distribution Fund, and (III) Make a Third Interim

Page 4

1    Distribution to Holders of Allowed General Unsecured

2    Creditor Claims with a Record Date of July 10, 2015

3

4    Hearing re:  Adv. 09-01120 - Status Conference

5

6    Hearing re:  Adv. 13-01689 - Motion to Amend Complaint

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South and Sheila G. Orms

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES

3          Attorneys for the Debtor

4          767 Fifth Avenue

5          New York, NY 10153-0119

6

7    BY:  JACQUELINE MARCUS, ESQ.

8          CANDACE M. ARTHUR, ESQ.

9

10   KEESAL, YOUNG & LOGAN

11         Attorney for the Debtor

12         450 Pacific Avenue

13         San Francisco, CA 94133

14

15   BY:  NATHAN JASKOWIAK, ESQ.

16

17   HUGHES HUBBARD & REED LLP

18         Attorneys for the SIPA Trustee

19         One Battery Park Plaza

20         New York, NY 10004-1482

21

22   BY:  MEAGHAN C. GRAGG, ESQ.

23         JEFFREY S. MARGOLIN, ESQ.

24

25

Page 6

1   CHAPMAN AND CUTLER LLP

2       Attorney for U.S. Bank National Association, as

3       Trustee

4       111 West Monroe Street

5       Chicago, IL 60603-4080

6

7   BY:  FRANKLIN H. TOPP III, ESQ.

8

9   QUINN EMANUEL URQUHART & SULLIVAN, LLP

10      Attorneys for the Creditors Committee

11      51 Madison Avenue

12      22nd Floor

13      New York, NY 10010

14

15  BY:  SUSHEEL KIRPALANI, ESQ.

16       SCOTT C. SHELLEY, ESQ.

17

18  MILBANK, TWEED, HADLEY & MCCLOY LLP

19      Attorneys for the Official Committee

20      28 Liberty Street

21      New York, NY 10005-1413

22

23  BY:  DENNIS C. O'DONNELL, ESQ.

24       GERALD UZZI, ESQ.

25

Page 7

1   GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

2        Attorney for the Plaintiffs

3        1999 Harrison Street

4        Suite 1600

5        P.O. Box 2079

6        Oakland, CA 94604-2079

7

8   BY:  J. GARY GWILLIAM, ESQ.

9

10  REED SMITH LLP

11        Attorney for Bank of New York Mellon

12        599 Lexington Avenue

13        New York, NY 10022

14

15  BY:  DAVID M. SCHLECKER, ESQ.

16

17  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

18        Attorneys for Citibank

19        1285 Avenue of the Americas

20        New York, NY 10019-6064

21

22  BY:  STEPHEN J. SHIMSHAK, ESQ.

23        KYLE KIMPLER, ESQ.

24

25

Page 8

```
 1   ROBBINS GELLER RUDMAN & DOWD LLP
 2        Attorney for Plaintiff Wong
 3        Post-Montgomery Center
 4        One Montgomery Street
 5        Suite 1800
 6        San Francisco, CA 94104
 7
 8   BY:  JASON C. DAVIS, ESQ.
 9
10   DPA PIPER
11        1251 Avenue of the Americas
12        New York, NY 10020-1104
13
14   BY:  THOMAS R. CALIFANO, ESQ.
15        SPENCER STIEFEL, ESQ.
16
17   QUINN EMANUEL URQUHART & SULLIVAN, LLP
18        Attorneys for Lehman
19        51 Madison Avenue
20        22nd Floor
21        New York, NY 10010
22
23   BY:  CALLI RAY, ESQ.
24        ANDREW J. ROSSMAN, ESQ.
25        LINDSAY M. WEBER, ESQ.
```

Page 9

1                    P R O C E E D I N G S

2              THE COURT:  Good morning, please have a seat.

3        Okay.  Good morning, everyone.  How are you?

4              MS. ARTHUR:  Good morning, Your Honor.  For the

5        record, Candace Arthur of Weil, Gotshal & Manges, on behalf

6        of Lehman Brothers Holdings Inc. as the plan administrator.

7              Your Honor, we filed an amended agenda letter

8        yesterday evening, and if it please the Court, I'll go in

9        the order of the items listed.

10             THE COURT:  Absolutely.

11             MS. ARTHUR:  The first item on the agenda before

12       the Court is the plan administrator's uncontested motion

13       pursuant to Bankruptcy Rule 9019 and Section 105(a) of the

14       Bankruptcy Code, seeking approval of a settlement agreement

15       amongst Lehman Brothers Special Financing Inc., Lehman

16       Brothers Holdings Inc., Putnam Structured Product CDO 2002-1

17       LLC, Putnam Structured Product CDO 2002-1 LTD., and U.S.

18       Bank National Association, in its capacity as successor

19       trustee.

20             Your Honor, we filed a motion on July 6th, it's

21       reflected on the docket as entry number 50217, and we filed

22       a declaration of Mr. Lawrence Branman (ph) in support of the

23       motion yesterday, and that's reflected on the docket as

24       50519.

25             In addition, Your Honor, the trustee has filed a

Page 10

1    declaration in connection with the motion as well, and

2    that's on if docket as 50487.

3             Your Honor, both Mr. Branman and counsel for the

4    trustee are in the court today.

5             Your Honor, the settlement agreement is another

6    one of the resolutions we have been able to arrive at in

7    connection with the STB flip clause disputes.

8             Specifically with respect to this matter it

9    resolves the estate's claims against Alta (ph) CDO SPC and

10   the distributions that it made.

11            I would like to state on the record that the

12   amounts reflected in the motion in connection with the

13   distributions were incorrect, and the correct amounts are

14   set forth in Mr. Branman's declaration.

15            As Mr. Branman's declaration provides, the Alta

16   CDO SPC trustees distributed approximately $410 million of

17   which the Putnam trust received approximately 42.5 million,

18   and it's the plan administrator's position that LBSF was due

19   and owing approximately 15.8 million.  So the settlement

20   agreement does resolve the issues that we have with respect

21   to that transaction.

22            The plan administrator submits that the settlement

23   agreement was entered into after arms length negotiations

24   and is in the best interest of LBSF's estates and its

25   creditors.

Page 11

```
 1              There were no objections to the motion or the

 2    settlement agreement, and subject to any questions that the

 3    Court may have, the plan administrator respectfully requests

 4    entry of an order approving the motion and approving the

 5    settlement agreement as well.

 6              THE COURT:  All right.  Thank you very much.

 7              Does anyone wish to be heard with respect to the

 8    plan administrator's motion for approval of a settlement

 9    between LBSF and Putnam.

10              Good morning, how are you?

11              MR. TOP:  Good morning, Your Honor, Frank Topp

12    from Chapman and Cutler on behalf of U.S. Bank National

13    Association.

14              And I just wanted to confirm for the Court's

15    record that not only were no objections filed in the

16    bankruptcy docket itself, but we have received no objections

17    from any noteholders or anything like that in connection

18    with this.

19              THE COURT:  Excellent.  Excellent.

20              MR. TOP:  Thank you.

21              THE COURT:  Thank you very much.  All right, the

22    motion will be approved.  Thank you.

23              MS. ARTHUR:  Thank you, Your Honor.

24              The second matter on the agenda will be handled by

25    Mr. Susheel Kirpalani.
```

Page 12

1          THE COURT:  Okay.  Good morning, Mr. Kirpalani.

2          MR. KIRPALANI:  Good morning, Your Honor.  For the

3    record Susheel Kirpalani from Quinn Emanuel on behalf of the

4    official committee of unsecured creditors of Lehman Brothers

5    and LBHI as plan administrator.

6          Judge, we're here this morning on the motion of

7    LBSF to invest a portion of the disputed claims reserve

8    pursuant to Section 8.4 of the plan.  The notice and the

9    motion are docket 50295 and 50296, and they were filed on

10   July 14th, 2015.  The objection deadline was July 28th,

11   2015.  And we filed a notice of transaction documents along

12   with some exhibits on July 30th.

13         The exhibits are namely a filed form of the

14   intercompany note and security agreement that LBSF would

15   enter into with LBHI, as well as a deposit control agreement

16   in order to better secure LBSF in its security interests at

17   LBHI, and a revised form of order, which happily to report,

18   Your Honor, we reached after agreement and substantial

19   discussions with Citibank, who had expressed some concerns

20   to us prior to filing, and we wanted to try to work all of

21   those out, which we did.

22         All of the motion papers were served via ECF on

23   the dates that we filed them.  And as noted in the letter to

24   Your Honor on July 31 there were no objections filed.

25         We filed a certificate of no objection yesterday

1    on August 3rd, and that's docket 50513.

2           Just to give the Court some context.  Your Honor

3    may recall that the plan administrator filed a similar

4    motion corresponding with JPMorgan's derivatives claim

5    against LBSF, that was docket 40673 last summer,

6    August 22nd, 2014, and this Court entered an order on

7    September 10th of last year at docket 46276 granting that

8    relief.  And so I just wanted to reorient the Court to why

9    are we doing these things, what does it actually accomplish?

10          It accomplishes two things.

11          First in situations that are unique like the

12   Citibank litigation they developed some trapped cash, it has

13   nothing to do with the merits of litigation, it's just a

14   matter of logic even more than amount, it's -- there's some

15   trapped cash, and the reason for that is LBSF, pursuant to

16   the plan, has to reserve the full amount of the maximum

17   potential claim and the distributions that would be payable

18   there.

19          So take Citibank's claims and LBSF are at most

20   $1.599 billion.  At LBSF's current distributions at 34 cents

21   on the dollar that's about $543 million of cash that's just

22   sitting at LBSF earning next to nothing, and it can't go

23   anywhere.  At the same time because of Citibank's unique

24   position with LBHI, as the Court knows it's hotly contested,

25   they have a deposit account at Citibank that LBHI claims

Page 14

1    should be returned to LBHI, and Citibank claims it has a

2    setoff right with respect to that.  So there's $2.069

3    billion of cash at LBHI, it's actually at Citibank, but --

4    that belongs to LBHI, and there's the 543 million of LBSF

5    claims.

6              So this mechanism, which was born last year, which

7    we figured out a way to use here as well with Citibank's

8    consent, is to take the cash or at least the conservative

9    amount of cash that under all circumstances is going to be

10   sitting there somewhere, cash collateralized or however, and

11   move it out of the system, get it into creditors' pockets.

12   And it's going to move out from LBSF to LBHI for further

13   distribution to LBHI's creditors.  So that's good for LBHI

14   creditors, because they get money, it's good for LBSF,

15   because the amount that LBSF is going to earn --

16             THE COURT:  Right.

17             MR. KIRPALANI:  -- on the amount invested in this

18   cash collateralized note will be 50 basis points higher than

19   what LBSF would otherwise be earning.  So it's kind of a

20   win/win situation.

21             In last year's motion the amount invested was

22   $560 million.  This motion is requesting a similar

23   investment, but the amount is actually going to be

24   $300 million initially, and it could go up by up to another

25   $150 million, and that was a negotiated number with Citibank

1    going through a variety of mathematical scenarios and

2    doomsday scenarios, what could happen, and that was reached

3    conservatively comfortable.  So the most it would be would

4    be 450 at some point.

5          Section 8.4 of the plan requires the establishment

6    of the reserves at each debtor, and as I mentioned, LBSF is

7    reserving about 34 cents on the dollar for disputed claims

8    in the maximum amount.

9          So this motion is again seeking to unlock a

10   portion using the most conservative and favorable

11   assumptions to the disputed claimants.  And we talked to

12   Citibank before we filed the motion, after we filed the

13   motion, and ultimately reached resolution.

14          And just to be clear, this note is secured by two

15   things.  It's secured by LBHI's deposit, so it's an amount

16   that LBHI owes to LBSF, $300 million.  What does it have to

17   back that up with?  It's got the amounts that LBHI is owed

18   from Citibank on the deposit, and if Citibank is successful

19   in getting paid from LBHI through the deposit then LBHI will

20   subrogate and have a good claim against LBSF.  So it's

21   basically round tripping in the money.  So those are the two

22   sources of recovery.

23          William Montuoro is a senior vice president of

24   Lehman Brothers Holdings Inc., submitted a declaration.  He

25   is here in court, Your Honor, the first row there, in case

Page 16

1     anyone has questions.

2               THE COURT:  All right.

3               MR. KIRPALANI:  I would just like to proffer one

4     change to his testimony that's in his declaration.

5               THE COURT:  Okay.

6               MR. KIRPALANI:  In his declaration he talks about

7     the minimum amount mathematically and logically that LBHI

8     would be able to repay would be $295 million, based on the

9     most conservative assumptions.  That number has been moved

10    down to $266 million.  And the reason for that is in

11    discussions with Citibank the assumption under the initial

12    concept was let's say it takes five years to resolve the

13    litigation with Citi --

14              THE COURT:  Let's not.

15         (Laughter)

16              MR. TOP:  Very happy to hear that.  Although

17    Citibank said just tacked on two more years to be safe.  So

18    we tacked on two more years to make it seven years.

19              THE COURT:  We're not getting a smile out of

20    Mr. Shimshak.

21              MR. TOP:  So we tacked on two more years, again,

22    just in the interest of conservatism, and so now because

23    it's seven years potentially, including potentially post-

24    petition interest at LBHI, and because LBSF is just an

25    unsecured claim, and we'd never earn and never be paid post-

Page 17

1   petition interest, so there's a negative arbitrage as the

2   Court is well aware.  And so the most that -- the most

3   conservative place to be under the new chart that

4   Mr. Montuoro submitted -- or that we submitted with the

5   notice but that he would attest to, if asked to do so, is

6   266 million should be the new amount of the note, plus

7   34 million for the amount of legal fees that Citibank would

8   include in its proof of claim against LBSF.

9            As the Court knows Supreme Court Second Circuit

10  says just because you're an unsecured creditor doesn't mean

11  you have a -- don't have an unsecured claim for fees if your

12  contract permits it.  So we tacked that on as well.  Because

13  if LBHI is paying it you could subrogate to the valid

14  unsecured amounts.  And so the new number is 300 million,

15  easy, round, and that's really all we have.

16           We do have copies of the new redlined order if you

17  want to walk through it or if you have it already, whatever

18  you'd prefer.

19           THE COURT:  That's fine.  That's fine.  Why don't

20  I ask if anyone else wishes to be heard.  Thank you very

21  much.

22           MR. KIRPALANI:  Okay.  Thank you, Your Honor.

23           THE COURT:  Thank you.

24           MR. SHIMSHAK:  Just very briefly, Your Honor.

25  Steve Shimshak, Paul, Weiss for Citi.

Page 18

```
 1              As Mr. Kirpalani's presentation indicated the

 2    documents were heavily negotiated.

 3              THE COURT:  Okay.

 4              MR. SHIMSHAK:  There were significant enhancements

 5    in contrast to what was originally offered to make us

 6    comfortable with the arrangement, and the result is an

 7    agreed order.  So we're pleased to go forward.

 8              THE COURT:  All right.

 9              MR. SHIMSHAK:  Thank you.

10              THE COURT:  Very good.  Well notwithstanding the

11    fact that this is indeed an ongoing and hotly contested

12    litigation it's excellent that the parties were able to work

13    out this arrangement, which inures to the benefit of all

14    concerned.  I'll approve the motion.

15              MR. KIRPALANI:  Thank you very much.

16              THE COURT:  Thank you very much.  All right.

17    Thank you.

18              MR. KIRPALANI:  Your Honor, may I be excused?

19              THE COURT:  Yes.

20              MR. KIRPALANI:  Okay.  Thank you.

21              THE COURT:  Thank you very much.

22              MR. SHIMSHAK:  Thank you, Your Honor.

23              THE COURT:  Thank you.

24              MS. ARTHUR:  Your Honor, the next matter on the

25    agenda with actually be Lehman Brothers Inc.
```

1            THE COURT:  Okay.  Thank you.  Good morning.

2            MS. GRAGG:  Good morning, Your Honor, Meaghan

3    Gragg with Hughes Hubbard & Reed, counsel for James W.

4    Gidden, the SIPA Trustee.

5            I'm here to address the trustee's motion for

6    authority to establish a third interim distribution fund of

7    approximately $1.887 billion for purposes of making a third

8    interim distribution to allow unsecured general creditors

9    and release reserves from the secured and priority reserve

10   in the first and second interim distribution funds reserving

11   for remaining unresolved claims, and to authorize the

12   trustee to make the third interim distribution from the LBI

13   estate to allow general unsecured creditors with a record

14   date of July 10th, 2015, which would achieve a cumulative

15   35 percent interim distribution to LBI's unsecured general

16   creditors.

17           John Dunn, the declarant, in support of the motion

18   is here in the courtroom today.

19           Your Honor, I'm personally gratified and the

20   trustee is delighted that we're here before the Court today

21   seeking authority to make a third substantial distribution

22   to allowed unsecured creditors.  This is a testament to the

23   effectiveness of the process laid out in SIPA and the

24   Bankruptcy Code as overseen by the Court and SIPC and the

25   collective efforts of the judges, court personnel,

Page 20

1    regulators, and professionals who participated in that

2    process, including those working on behalf of creditors.

3            Over the past year largely as a result of

4    resolving remaining disputed claims the trustee has been

5    able to reduce reserves by $805 million.  As a result we are

6    now in a position with a sufficient pool of available cash

7    to significantly increase the distribution to general

8    creditors.

9            Should the order be entered the trustee

10   anticipates proceeding with the third interim distribution

11   in early September, increasing the total amount distributed

12   to LBI's general unsecured creditors to approximately

13   7.5 billion.

14           We continue to work towards the wind down of the

15   estate as soon as possible, but it is not likely that will

16   occur this year as we still have a number of significant

17   pending litigations before this Court and appellate courts.

18           Should the Court authorize the third distribution

19   significantly all estate assets will be dedicated to

20   litigation reserves or distribution funds, and any further

21   distribution from the LBI estate beyond the proposed third

22   interim distribution will be contingent on the reduction of

23   existing reserves as a result of successful litigation of

24   the disputed claims, which may not be until the conclusion

25   of the liquidation.

Page 21

```
 1              The relief the trustee now seeks, which is

 2     detailed in the motion, is consistent with the relief

 3     already granted by the Court in the severe and priority

 4     reserve order and the first and second distribution orders.

 5              All outstanding general creditor claimants were

 6     served with the motion and schedules and had the opportunity

 7     to be heard.

 8              We have discussed the motion with certain

 9     claimants who had questions about how the relief requested

10     in the motion might affect their claims and the reserves

11     established by the trustee's previous distribution motions.

12              The trustee did not receive any opposition to the

13     motion, only reservations of rights, which we believe are

14     unnecessary and inappropriate filed by three fully reserved

15     (indiscernible) claimants whose claims for bonuses are

16     subject to litigation pending before this Court.

17              The trustee contacted the claimants' attorneys to

18     see if they would withdraw, I don't believe they're in the

19     courtroom today.

20              THE COURT:  So are any of the counsel for the

21     three claimants who filed reservations of rights present

22     here today?  They did not communicate to you that they were

23     withdrawing their reservations of rights?

24              MS. GRAGG:  No, they did not.

25              THE COURT:  My understanding is that consistent
```

Page 22

```
 1    with what you've represented that their claim amounts are

 2    indeed fully reserved at the full amounts that they're

 3    asserting.

 4              MS. GRAGG:  Yes, Your Honor.

 5              THE COURT:  So therefore the reservation of rights

 6    is what it is and their rights are fully reserved.  All

 7    right.

 8              MS. GRAGG:  Entering this order will benefit

 9    creditors, it's supported by SIPC, it's supported by major

10    creditors of the estate, and if you're has any questions I'm

11    here to answer them.

12              THE COURT:  All right.  Thank you very much.

13              Does anyone else wish to be heard with respect to

14    the trustee's motion for authority to make an additional

15    interim distribution?

16              I think it's important, as I have done in the

17    past, to pause and reflect on this accomplishment.  I think

18    I said it the last time you were before me seeking to make

19    the last interim distribution, but I very strongly believe

20    that it cannot be said enough.

21              To go back to September of 2008 folks believed

22    that customer claims would not be fully paid.  So not only

23    have customer claims been fully paid, but we are now at 35

24    cents on the dollar, which those of us who work in the

25    bankruptcy arena know may not sound great to somebody who
```

Page 23

1   would like to have 100 cents, but it's an extraordinary

2   accomplishment in most any case, and it's an incredibly

3   extraordinary accomplishment in this case.

4           The other side of that coin is the tremendous

5   amount of work that it takes to get there, and often one

6   reads criticism at the level of professional fees that are

7   expended in order to wind down, liquidate, fulfill the

8   mission of the trustee and this estate.

9           In reviewing the fee applications and in seeing

10  you folks come in here week in and week out and seeing the

11  level of effort that it takes to resolve even what appears

12  to be the most simple claim in terms of the forensic

13  accounting that's involved, the sophisticated financial

14  securities issues, all the way down to what we would think

15  of as ordinary contract disputes, which each have a very

16  real human element that has to be dealt with, because after

17  all there are people on the other end of a lot of these

18  claims, I think that all concerned deserve a tremendous

19  amount of congratulations.

20          Certainly from the Court's perspective as we

21  continue to operate in a time of budgetary constraints we

22  try our best to keep up with you, because every day that we

23  might have to delay, which I don't believe we do delay very

24  often, means another day that distributions don't get into

25  the hands of creditors who have been waiting all these

Page 24

1    years.

2             So, I'm very happy to approve the motion.  My

3    congratulations to everyone who's working.  Keep at it, and

4    I'm hoping that the number will go even higher before we're

5    done.  Thank you very much.

6             MS. GRAGG:  Thank you, Your Honor.

7             UNIDENTIFIED SPEAKER:  Can we be excused, Your

8    Honor?

9             THE COURT:  Yes.  Thank you.

10            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

11            THE COURT:  Thank you.

12            UNIDENTIFIED SPEAKER:  May I approach with the

13   order?

14            THE COURT:  Yes.  Good morning, Ms. Marcus.

15            MS. MARCUS:  Good morning, Your Honor.  Jacqueline

16   Marcus, Weil, Gotshal & Manges on behalf of Lehman Brothers

17   Holdings Inc. as plan administrator on behalf of BNC

18   Mortgage LLC.

19            Item number 4 on the agenda, Your Honor, is the

20   plan administrator's supplemental objection to the four

21   hundred thirty-first omnibus objection to claims, ECF number

22   50054.

23            This claim objection relates to the proofs of

24   claim filed by six former employees of debtor BNC.

25            The last time we were before you with respect to

Page 25

1    these claims was in October 2014 in response to the

2    claimants' motion for relief from the automatic stay to

3    continue their litigation against BNC in the California

4    state court.  The Court denied that motion.

5              Before engaging in further litigation regarding

6    the claims the parties tried for the third time to resolve

7    these claims through mediation.  The third mediation took

8    place in April of this year.  Representatives of the plan

9    administrator, BNC's insurance company, and the claimants

10   attended, and again the parties failed to reach a

11   resolution.

12             The plan --

13             THE COURT:  So can I ask you to pause --

14             MS. MARCUS:  Sure.

15             THE COURT:  -- and I'd like to know a little bit

16   more about the role of insurance here and also the claims

17   pools at BNC and what the projected distributions are.

18             Excuse me, sir, yes?

19             MR. GWILLIAM:  Your Honor --

20             THE COURT:  No, Ms. Marcus is at the podium, I'd

21   like to speak to her for right now.  Thank you very much.

22             MS. MARCUS:  Okay.  So let's start with the role

23   of the insurance company.  Excuse me.

24             As we determined at the state hearing in October

25   there is a retention, a $5 million retention which has not

1   nearly been approached yet.  At that time I think the number

2   that we used was $795,000 in all Lehman legal fees.  And

3   while we have incurred expenses since then, obviously we're

4   not anywhere near $5 million yet.

5           So the insurance company has taken the position so

6   far that it's not required to -- I don't know if they've

7   officially said they're not required to defend -- but we

8   haven't exceeded the retention yet.

9           Nevertheless we did persuade them to attend the

10   mediation, and we believe that if we had been able to come

11   up with a reasonable number that they might have contributed

12   to the settlement at that time, notwithstanding the fact --

13           THE COURT:  Okay.

14           MS. MARCUS:  -- we haven't exceeded the insured

15   retention.

16           With respect to the level of claims at BNC there

17   are perhaps a handful of claims with one big exception other

18   than the claims of these six plaintiffs, and depending on

19   what happens with the RNBS trustee claim, that's the big

20   exception, the RNBS trustee claim as you know is being

21   resolved through the claims protocol that the Court

22   approved, that claim was filed against BNC as well as many

23   of the other debtors.  So that claim is the one that

24   threatens to really --

25           THE COURT:  Swamp the pool.

1          MS. MARCUS:  Swamp is a good word.  Swamp all the

2     creditors.

3          BNC has on hand approximately $16 million.  If the

4     claims of these six claimants were allowed at 35 million

5     they wouldn't be able to pay all creditors in full.

6     Depending on what happens to the RNBS claim there might or

7     might not be sufficient funds to make a substantial

8     distribution to BNC's creditors.

9          THE COURT:  Okay.  All right.  I interrupted you,

10    I'm sorry.

11         MS. MARCUS:  Okay.  No problem.

12         The plan administrator filed a supplemental

13    objection, and as reflected in the agenda, the claimants

14    have filed a supplemental response and the plan

15    administrator has filed a reply.

16         There are a few salient facts that I believe are

17    undisputed that I'd like to just remind the Court of before

18    we delve into the merits.

19         Claimants collectively have filed proofs of claims

20    in the aggregate amount of $35 million, which claims do

21    include punitive damages.

22         Seven years prior to the commencement of BNC's

23    Chapter 11 case, in November of 2005, the claimants resigned

24    from BNC and commenced an action in state court in

25    Sacramento asserting a variety of claims.

1          BNC ceased its operations in October 2007, more

2     than a year before the commencement of its Chapter 11 case.

3          BNC's estate has approximately $15 million of

4     cash, and we've already talked about the insured retention.

5          As the Court is aware under the ADR claims

6     procedure the first hearing with respect to any claim

7     objection is called a sufficiency hearing.  I believe the

8     parties are also in agreement that the standard to be

9     applied in this hearing is the same standard applied for a

10    Rule 10(b)(6) motion.

11          THE COURT:  12(b)(6).

12          MS. MARCUS:  I'm sorry, 12(b)(6).

13          THE COURT:  You've got your 10(b)(5) and your

14    12(b)(6) mixed up.

15          MS. MARCUS:  Yep, yep.  Thank you, Your Honor.

16          The plan administrator takes issues with many of

17    the six claims -- many facts asserted in the six claims, but

18    many of those issues are factual disputes that would not be

19    appropriate for resolution here today.

20          The supplemental objection was filed really in

21    order to set forth a method -- excuse me -- matters that the

22    Court can determine as a matter of law.  The plan

23    administrator had two goals in mind.

24          First, by limiting the issues we believe that we

25    would narrow the issues for discovery and save both the

Page 29

1    estate's and the claimants' money as we proceed with the

2    claims litigation.

3            And second, we were hoping that the preliminary

4    holding -- the preliminary rulings would alter the

5    expectation of the claimants thereby making settlement

6    through a mediation or otherwise more likely.

7            With this in mind the plan administrator concluded

8    that there are three threshold areas that the Court can rule

9    on as a matter of law.  Two of them are issues of California

10   law, and with the Court's permission will be handled by

11   Nathan Jaskowiak from Keesal, Young & Logan, BNC's

12   California counsel.  Mr. Jaskowiak's pro hac vice motion has

13   already been granted by the Court.

14           He will speak to whether the proofs of claim have

15   established a claim for defamation under California law, and

16   whether under California law claimants can assert a claim

17   for loss of income after October 2007 when BNC closed its

18   doors.

19           The third issue is a matter of bankruptcy law, and

20   that is the extent to which the Court should allow any claim

21   for punitive damages against BNC.

22           Unless the Court prefers otherwise I'll address

23   those issues after Mr. Jaskowiak has said his piece.

24           THE COURT:  Okay.  That will be fine.  Thank you

25   very much.

Page 30

```
 1              MS. MARCUS:  Thank you.

 2              MR. JASKOWIAK:  Good morning, Your Honor.

 3              THE COURT:  Good morning.

 4              MR. JASKOWIAK:  Nathan Jaskowiak, Keesal, Young &

 5    Logan on behalf of Lehman Brothers Holdings Inc. as plan

 6    administrator on behalf of debtor BNC Mortgage LLC.

 7              So, I wanted to address two of the three issues

 8    that Ms. Marcus has put --

 9              THE COURT:  Right.  So let's talk about

10    defamation.

11              MR. JASKOWIAK:  Okay.

12              THE COURT:  All right?  So the claimants respond

13    to the plan administrator's objection by saying -- I'm at

14    page 6 of the response.  It says, "Instead debtor only

15    quotes a portion of the allegations.  Debtor has left out

16    the defamatory statement this is what was actually pled."

17    And then there's a reference to paragraph 147 of the

18    complaint, which says that -- and the bold is -- the

19    emphasis is added by the claimants, "Published false

20    information to others, disparaging plaintiffs," et cetera,

21    et cetera, and one claimant's work performance and

22    abilities.

23              So your position is that that's wholly conclusory.

24    And my question for you is, under California law is what is

25    required literally an allegation of the statement?
```

1          MR. JASKOWIAK:  I don't -- I think California law

2     you don't have to say it verbatim, but you have to

3     specifically identify it.  So something like this is far too

4     general just saying work performance and abilities, which is

5     really just a subject area, you would have to identify --

6          THE COURT:  The person says you're a terrible

7     worker, you're lazy.

8          MR. JASKOWIAK:  Right.  Exactly.

9          THE COURT:  Something like that.

10          MR. JASKOWIAK:  The statement.  And then if

11     there's multiple statements identify each of them.  I don't

12     think you have to say -- you know, put them in quotes or

13     anything, but you do have to identify each statement.  And

14     it's our position that this is just far too general under

15     California law.  We're probably the law of almost any other

16     state.

17          THE COURT:  Okay.

18          MR. JASKOWIAK:  And then with respect to -- they

19     requested leave to amend, and with respect to that there's

20     two points that we make in our reply brief, and one of them

21     is that California law has a qualified privilege through

22     employers to make statements concerning the work performance

23     of its employees, and then also that such statements would

24     be statements of opinion and not statements of fact, and

25     only a statement of fact can form the basis of a defamation

Page 32

1    claim.

2              So it's our position that leave to amend wouldn't

3    be able to cure either of those issues, and in any event,

4    they haven't given an offer of what they would even amend to

5    state.

6              So it's our position that these statements are far

7    too general and that leave to amend should be denied in any

8    event because there's -- it would be futile.

9              THE COURT:  Okay.  All right.  So that takes care

10   of defamation.

11             With respect to the loss of income, and we can

12   talk to counsel for the claimants about this as well, it's

13   undisputed that BNC closed in 2007, and it seems undisputed

14   also that lost wages, vis-à-vis, BNC stops when BNC stops.

15   But what seems to be -- and I searched the complaint, which

16   is attached to the proof of claim, to try to get some

17   clarity around this -- because there seems to be some notion

18   that what's really being claimed is -- well the spin, if you

19   will, is a reduced earnings capacity, but then when I go

20   back into the complaint I have a hard time finding that.  So

21   is that --

22             MR. JASKOWIAK:  I think that's right.

23             THE COURT:  Do you disagree that there would be a

24   claim for reduced earnings capacity?

25             MR. JASKOWIAK:  I think that that's something that

Page 33

1    they would have needed to allege, and here they're really

2    seeking damages for back pay, front pay, and those are the

3    economic damages that they're seeking.  They don't make a

4    claim that they've been unable to work or that they --

5                THE COURT:  Right.  So the front pay stops in 2007

6    when the doors closed in terms of BNC, right?

7                MR. JASKOWIAK:  Right.  And I guess it would all

8    be back pay since we're not at a point where we have a

9    judgment.

10               THE COURT:  Right.

11               MR. JASKOWIAK:  But yes, either of them would stop

12   when the doors close, I think that's undisputed.

13               THE COURT:  Okay.  All right.

14               MR. JASKOWIAK:  But I mean, I think, Your Honor,

15   you're exactly right, they don't make an allegation.  I

16   think it's a purely manufactured claim to try to deal with

17   the fact that BNC is closed and that their economic damages

18   would be cut off, and it's our position that this lost

19   earnings capacity is not a claim that's recognized in

20   California.

21               They cited the California jury instruction, and it

22   instructs jurors to calculate how long would they have

23   worked at the employer, and to take into account how long

24   they expected the employer would have continued operations.

25   Well we know that, we know how long it continued operations,

1    and that's the cut off for lost wages.

2              One additional point is that they all found jobs,

3    so I don't think Mr. Gwilliam is going to dispute that, but

4    they did all find jobs.

5              So it's really our position that this is just a

6    way to inflate their economic damages claim.

7              THE COURT:  Okay.  All right.

8              MR. JASKOWIAK:  Oh, Your Honor, I'm sorry, I had

9    one additional issue.

10             I'm not sure if you need me to address it or not,

11   but they had made a claim that we had already filed our

12   answer in the state court, a case about eight years ago, and

13   that we couldn't bring a motion to -- or --

14             THE COURT:  That's --

15             MR. JASKOWIAK:  Okay.

16             THE COURT:  Right.  That's -- we're in a different

17   process now.

18             MR. JASKOWIAK:  Okay.

19             THE COURT:  And we'll get to that a little bit

20   more later.  Sir?

21             MR. GWILLIAM:  Thank you, Your Honor.  Again, Your

22   Honor, I'm Gary Gwilliam, attorney for all of the plaintiffs

23   in this matter, and it's nice to appear before you.

24             THE COURT:  Okay.

25             MR. GWILLIAM:  And I came out from California.

1              THE COURT:  Welcome.

2              MR. GWILLIAM:  Thank you.

3              So I'd like to at this point, Your Honor, just to

4    address the two issues that are before us and then we can

5    talk a little more generally about some of the issues that

6    Ms. Marcus brought up.

7              I would point out, Your Honor, that this is an

8    interesting objection.  It is a 12(b)(6) objection based

9    upon the pleadings only of a complaint that was filed in

10   2005.  So we're dealing, as I understand it, with the

11   sufficiency of a complaint under California law.  I think we

12   all agree to that.  And that's --

13             THE COURT:  Okay.  Well not so fast.

14             MR. GWILLIAM:  Okay.

15             THE COURT:  Not so fast.  You filed the complaint

16   in California.

17             MR. GWILLIAM:  Correct.

18             THE COURT:  But most significantly you filed

19   proofs of claim in this bankruptcy case.

20             MR. GWILLIAM:  We did.

21             THE COURT:  So once you filed a proof of claim in

22   this bankruptcy case, to which you attach to complaint in

23   California, that's the basis of your claim.

24             MR. GWILLIAM:  Well that's part of it.

25             THE COURT:  Well when -- the way the claims

Page 36

1    process works is you have to -- you file a proof of claim,

2    and I'm holding a claim here of Ms. Seymour (ph), and it

3    says basis for claim damages for wrongful termination, et

4    cetera, per attached complaint.

5              MR. GWILLIAM:  Right.

6              THE COURT:  So that --

7              MR. GWILLIAM:  But I believe she attached a

8    declaration also, but I don't -- I haven't looked at that

9    recently.  But that's true, we're looking at the sufficiency

10   of the claim.

11             THE COURT:  Well we're looking at the sufficiency

12   of the claim.  So there's a claims process here and the

13   basis of your claim is the complaint.

14             The procedures that are in place now and that have

15   been in place for years in this case are in order to

16   facilitate the review of these claims there is a -- what we

17   -- what's come to be called a sufficiency hearing, which

18   everybody agrees is just like a 12(b)(6), whether or not

19   there's enough alleged that gets you out of the starting

20   gate.

21             MR. GWILLIAM:  Right.

22             THE COURT:  So, I just want to somewhat correct

23   your perspective that the way that you're looking at it I'm

24   somehow redoing something that was done in California.

25             This is a claims process that unfolds here now

Page 37

1   until something else happens, which we can talk about later.

2           MR. GWILLIAM:  Well, I totally understand that,

3   Your Honor.

4           THE COURT:  Okay.

5           MR. GWILLIAM:  But I believe under 12(b)(6), as

6   under California law, we're looking at the sufficiency --

7           THE COURT:  Yes.

8           MR. GWILLIAM:  -- of the pleading.  And under

9   sufficiency of pleading laws if we have not pled something

10  appropriately on a complaint that was filed ten years ago we

11  have leave to amend, and oftentimes leave to engage in

12  discovery, if need be, in order to allow us to amend the --

13          THE COURT:  Alter as a general matter.

14          MR. GWILLIAM:  Right.

15          THE COURT:  Okay.

16          MR. GWILLIAM:  So given that context, so example,

17  on the defamation claim we filed what I believe is

18  sufficient pleading to put them on notice of what our plan

19  was.  If there is more detail that needs to be gone into I

20  would remind the Court that there was almost no discovery,

21  certainly no discovery of any of the defendants.

22          THE COURT:  Here's the issue that I have, is that

23  the particular portion that we're focuses on --

24          MR. GWILLIAM:  Right.

25          THE COURT:  -- is your allegation of what was said

Page 38

1    to the claimants --

2              MR. GWILLIAM:  Correct.

3              THE COURT:  -- right?  There's no discovery

4    required with respect to that.  They heard -- they --

5    presumably behind your complaint is knowledge of what was

6    said.

7              MR. GWILLIAM:  No.

8              THE COURT:  No.

9              MR. GWILLIAM:  No, because there could be other

10   people that it was published to that the plaintiffs did not

11   hear about.  So defamation does not require that the

12   plaintiffs themselves hear all the claims of defamation.  If

13   they are making other claims to other people out there that

14   are defamatory, that are causing them loss of reputation and

15   injury, that may be defamation even though the plaintiff

16   didn't directly hear it.  So --

17             THE COURT:  Well let me try to understand your

18   position --

19             MR. GWILLIAM:  Right.

20             THE COURT:  -- because this is different from what

21   you stated in your pleadings.  In your pleadings you stated

22   that under California law the defamatory statement is that

23   there were statements that were made about work performance

24   and abilities and that there was false information

25   disparaging the plaintiffs.

Page 39

```
 1              MR. GWILLIAM:  Right.  But that doesn't require

 2   that each plaintiff hear that.

 3              THE COURT:  Okay.

 4              MR. GWILLIAM:  So that's why discovery or further

 5   information is oftentimes --

 6              THE COURT:  But how did you know enough to file

 7   this complaint?

 8              MR. GWILLIAM:  Well, I'm sure that they heard it

 9   maybe secondhand and some comments were made to them.

10              THE COURT:  Okay.  And what I'm saying to you is

11   that at a minimum I would expect to see, if not verbatim in

12   more detail, what it is that they heard, otherwise it's

13   impossible to say someone has defamed me.  Presumably what

14   you're telling me is they heard, others told them that one

15   of the individual defendants said X, Y, or Z about them.  We

16   don't have anything like that here.

17              MR. GWILLIAM:  Well we have the allegation that

18   the Court just referred to in our complaint that they did

19   not mention in theirs, that named specifically the

20   defendants, Linda Harris, Nick Murphy recklessly published

21   false information disparaging the plaintiffs Colombo, et

22   cetera --

23              THE COURT:  My point is --

24              MR. GWILLIAM:  -- on information and belief.

25              THE COURT:  Okay.  My point is that if someone
```

Page 40

1    said -- if they heard something you have not even put in

2    what they heard.

3              MR. GWILLIAM:  Well typically under a California

4    pleading we don't have to do that, it's a liberal pleading,

5    and that's the whole --

6              THE COURT:  So is your idea that then you would

7    get to trial and then only at that point would there be a

8    revelation of what was said?

9              MR. GWILLIAM:  No.  I believe that under

10   California law, under 12(b)(6), and under the Demurrer

11   motion to strike if in fact they believe that this is not

12   sufficient they can file a Demurrer for uncertainty and then

13   we can have a second hearing.

14             THE COURT:  We're not in California law anymore.

15             MR. GWILLIAM:  Right.

16             THE COURT:  This is a federal court, I'm in the

17   federal rules of civil procedure, and the case management

18   order of this case.  So, I'm not -- I hear you.

19             MR. GWILLIAM:  Okay.

20             THE COURT:  It's the same concept, but you're --

21   you are unable to tell me what it is that was said or was

22   heard, and I am having a hard time understanding how

23   consistent with Rule 11 you would be able to file a pleading

24   without having knowledge of what you believe was said, the

25   very words.  I'm struggling with that.

1          MR. GWILLIAM:  Well if in fact you needed more

2     information that's the whole purpose of being allowed to

3     amend the complaint in order to give you more.  I'd have to

4     sit down and talk about what was said many years ago and go

5     through it.

6          THE COURT:  But --

7          MR. GWILLIAM:  But this pleading --

8          THE COURT:  -- let's just -- I'm going to keep

9     with -- keep with me in the moment.  We're back in 2005 and

10    these individuals leave BNC --

11         MR. GWILLIAM:  Right.

12         THE COURT:  -- because you say something happened.

13    Well what happened was, you say, people said bad things

14    about them.  What?  They -- when they came to you -- and I'm

15    not asking you to violate attorney/client privilege -- they

16    had to be a factual predicate for embarking on this lawsuit,

17    and it's common sense purely to believe that that involved

18    being told what was said.

19         MR. GWILLIAM:  Well we allege that Joe Penick (ph)

20    and Nick Murphy and Linda Harris made disparaging comments

21    about their work performance in the billings.  That is

22    indeed a general allegation as is typically done.  If more

23    information is needed then the complaint can be amended.

24    But we operated under this complaint for two years, plus --

25    and never got into it.

Page 42

1          So if you wanted me to say I want to know exactly

2     what was said then that's the whole purpose of having a

3     motion to amend.

4          THE COURT:  But if you're telling me right now

5     that your clients, if the question is put to them squarely,

6     what was said about you they would say that -- they would

7     simply say disparaging things.  They would not be able to

8     say specifically I was called a name, I was characterized as

9     this, that, or the other thing.

10         MR. GWILLIAM:  No, I think -- you know, I'd have

11     to go back and talk to them about what was said about that.

12     The interest -- no, I think that there was much more

13     specific said.  But again --

14         THE COURT:  But then why haven't you pled that?

15         MR. GWILLIAM:  Because it doesn't require -- the

16     pleadings do not require in California or under the

17     pleadings law to do anything more than this is a sufficient

18     pleading.  If it's insufficient we have a right to amend and

19     then we can bring those things in.

20         Secondly, all the information, particularly in the

21     defamation case, doesn't come strictly from the plaintiff,

22     and that's why oftentimes the court will allow us to move

23     forward towards (indiscernible).  Now --

24         THE COURT:  I totally hear you, but you still --

25     there's no good answer to the issue that in the first

Page 43

1    instance you have -- you're representing folks who say that

2    this occurred and yet they cannot give any quotes or

3    approximate quotes or anything more specific.  Under the law

4    general statements that --

5              MR. GWILLIAM:  Your Honor, with all due respect I

6    entirely disagree with that.  You're saying they quote

7    cannot do that.  They did not because they were not required

8    to under the California law pleadings that they filed in

9    November of 2005.  They filed an adequate complaint that was

10   worked on there.  If there's more detail that is needed then

11   that's the whole purpose of their right to amend.

12             Now oftentimes in cases like this the final motion

13   is on motion for summary judgment.  That's where these

14   issues are fleshed out, not at the pleading level, because

15   at the pleading level, particularly on defamation, they

16   oftentimes don't know everything that was defamed about

17   them.

18             So the whole point of allowing us to have general

19   pleadings and then at some stage later the Court will hear

20   this.

21             Now when we were here on October 7th, and I read

22   the entire transcript again, you talked about how at some

23   stage you would have to hear dispositive motions.  I do not

24   see this as a dispositive motion.

25             THE COURT:  If that's what the transcript says

Page 44

1    then it was an error.  I think the context there was your

2    belief that you were ultimately going to try this case back

3    in California, and I was trying to clarify for you the fact

4    that you're part of a claims process here and until I rule

5    otherwise the claims get resolved here.

6               MR. GWILLIAM:  Right.

7               THE COURT:  And I might have eluded to the fact

8    that if nothing else, no matter where it all shakes out, I'm

9    not going to identify issues before the parties do, that

10   oftentimes there could be dispositive motions here.

11              I quite agree with you this doesn't feel like a

12   dispositives motions case.  What this feels like is a case

13   that ought to be settled.

14              MR. GWILLIAM:  I couldn't agree with you more.

15              So let's just step back for a minute if you don't

16   mind --

17              THE COURT:  Sure.

18              MR. GWILLIAM:  -- and let me address some of the

19   issues that Ms. Marcus addressed --

20              THE COURT:  Okay.

21              MR. GWILLIAM:  -- because first of all with all

22   due respect I want this case settled, we've tried to have

23   this --

24              THE COURT:  You don't have to say with all due

25   respect, okay?  I will assume that you are affording me due

Page 45

1    respect.

2            MR. GWILLIAM:  I'm an old fashion lawyer and I

3    speak that way.

4            THE COURT:  Okay.

5            MR. GWILLIAM:  I don't mean any disrespect.

6    That's a term that I -

7            THE COURT:  Very good.  It's a habit.

8            MR. GWILLIAM:  Maybe a bad habit.

9            THE COURT:  Okay.

10           MR. GWILLIAM:  But, all right.

11           Your Honor, we fully want this case settled.  I do

12   not honestly believe that the issues on these objections, on

13   all three of these issues are the variances to the

14   settlement.  I've been involved in every aspect of this.

15   The variance to the settlement are back on what we call

16   these other claims, and that's been the issue that we've had

17   to deal with.

18           Now these RNBS claims something important has

19   happened since we were here on October 7th, 2014.  This

20   Court has now entered a detailed chronicle order for all of

21   those mortgages, claims against Lehman, BNC, and others, to

22   be very carefully gone through, litigated, claimed, and as I

23   understand it you had a hearing here not too long ago where

24   they talked about like it would be 50 percent of them going

25   out.  So, I think that that's been --

Page 46

1          THE COURT:  That's a little bit of a

2   mischaracterization.  Of the ones that had already been

3   submitted that had already been reviewed 50 percent didn't

4   make it through, but --

5          MR. GWILLIAM:  It just strikes me that when we

6   look at these RNBS claims with the protocol that the Court

7   set that's a tough barrier to find mortgages that are eight

8   or ten years old that you could prove fraud, cause, damage

9   all this time later, and it'll be interesting to see how all

10  of that flows out.

11          THE COURT:  I'll be very interested to see.

12          MR. GWILLIAM:  Well, I will too, because it

13  affects us to a certain extent.

14          But -- so I -- but what we come back to, Your

15  Honor, that concerns me, and this is a point I really wanted

16  to hit to have you be aware of.  There is $16 million

17  sitting in this BNC trust fund available for distribution.

18  My understanding is that there are no other significant

19  claims other than the possibility of the RNBS claims against

20  BNC other than ours.  But in our claim it was in the face

21  value of $35 million, could be settled within the

22  $16 million amount.

23          But what concerns me, Your Honor, is that

24  originally they put $5 million towards equity, now in

25  addition to the $16 million --

1          THE COURT:  Wait, what's the $5 million towards

2     equity?

3          MR. GWILLIAM:  That was towards equity to the

4     shareholders of BNC.  Now it's up to $10 million.

5          THE COURT:  I don't know what you're referring to,

6     sir.

7          MR. GWILLIAM:  There is a bank -- there's a profit

8     and loss statement of BNC that indicates $16 million is

9     available.  In addition to the $16 million they've allocated

10    $10 million towards equity to the shareholders.  That

11    concerns me that money would go to the shareholder equity

12    before the claims are paid.  So --

13         THE COURT:  We'll have to ask Ms. Marcus if she

14    can address what you're talking about, because I don't know.

15    The only way that the equity, which would be big Lehman,

16    right, the only way that there would be a recovery there,

17    which has happened from time to time, is if all unsecured

18    creditors at BNC are paid in full.

19         MR. GWILLIAM:  Totally agree.

20         THE COURT:  That's the way it works.  So --

21         MR. GWILLIAM:  So, I think this becomes important,

22    because, for example, when we get to the punitive damages

23    one of the issues is are we going to possibly dilute other

24    claims by a claim of punitive damages, and if there's plenty

25    of money available to pay us off entirely, and if it doesn't

Page 48

1    look like there's going to be other claims that are there I

2    don't think that that's a major issue.  But maybe we cross

3    that bridge when we get there.  But I don't -- I honestly

4    don't feel that this objection hearing is taking us very far

5    forward.

6             When we were here on October 7th the Court may

7    remember that one of the issues that we talked about was if

8    we're going to get involved in discovery, and you wanted to

9    move this case along expeditiously, you made that very clear

10   and I know that's been your process in all these claims, the

11   expectation that I had is that we would move forward with

12   discovery.  You said specifically, and you asked Ms. Marcus

13   to agree, that we could start discovery in California, and

14   I'm pleased to see that we have a California lawyer here

15   from a very fine firm that can engage in discovery, but not

16   one bit of discovery has been done since we were here on

17   October 7th.

18            Now true we did have another mediation.  When I

19   asked that discovery get started and I said let's take the

20   depositions of the plaintiffs, ask them questions about the

21   defamation, ask them questions about their loss of earnings

22   and loss of earning capacity, let's do that.  Only one

23   plaintiffs' deposition was every taken years ago.  The

24   answer was --

25            THE COURT:  Well that gets to -- the lost earnings

Page 49

1   piece gets to the other thing that we need some

2   clarification around, because it is undisputed that BNC

3   closed in 2005.  It is undisputed you cannot make a claim

4   for lost wages payable by BNC after the time that BNC

5   closed.

6           MR. GWILLIAM:  And I don't think that's the law in

7   California and I think it is disputed that we can make a

8   claim for that because of the loss of earning capacity.

9           THE COURT:  Well, no, no, no, no.  No, let's be

10  very precise.  The loss of earning capacity is a different

11  beast entirely.  The loss of earnings at BNC stops if there

12  is an entitlement at the moment that BNC closed its doors.

13          I went back and I read the complaint, I do not see

14  an allegation of diminished earning capacity.  And then

15  based on what I've been advised by counsel in this hearing

16  there would appear to be the impediment to that claim.

17          Again, I don't know what the facts are, I only

18  know what I'm being told, but to the extent that the

19  claimants obtained employment then that is a factor that

20  would go into an allegation -- the merit of an allegation of

21  diminished earning capacity if an individual is terminated.

22          Putting to one side questions about emotional

23  distress, intentional infliction of motional distress, and

24  all of that, simply economic damages.  If the individual

25  were able a month later to obtain a job at a salary similar

1    to what she earned previously there is no economic damage.

2           MR. GWILLIAM:  No, what concerns me and what

3    concerns me about Mr. Jaskowiak's comment was that he's told

4    this Court that they had gotten jobs.  That's not true.

5    Some did and some didn't, but why are we talking about what

6    happened factually if we're still dealing with the pleading

7    issue?

8           THE COURT:  I think the reason that we're talking

9    about what happened factually -- and maybe the thing to do

10   is to pause after this exchange.

11          What Ms. Marcus explained, which is consistent

12   with what we do routinely with all of these claims, is to

13   find ways to make the process -- to right size the process.

14   And the plan administrator, you disagree, but the plan

15   administrator is explaining a view that this claim -- the

16   parameters of this claim are too large and that therefore if

17   the parameters of the claim were right sized that might

18   facilitate settlement, because there is funding there, the

19   exact distribution to dividend will be uncertain, what is

20   certain is that not a penny leaves until all unsecured

21   creditors are paid in full for their allowed amounts.

22          The existence of the punitive damages claim, and

23   I'm not -- I'm disinclined to offer an advisory -- issue an

24   advisory opinion, but I will tell you -- this proof of claim

25   is filed here, this is a submission to the equitable

Page 51

1    jurisdiction of the Court.  Okay?  It's highly unlikely that

2    punitive damages would be allowed as an allowed claim in

3    this court.  Not to say hypothetically before a jury you

4    wouldn't be able to get them, but in terms of allowing in

5    the bankruptcy sense a claim for punitive damages highly

6    unlikely.

7              MR. GWILLIAM:  Okay.

8              THE COURT:  Okay?  And I think that what we ought

9    to do is take a pause, because I have another matter that I

10   have to get to, and I would very much like, with your

11   permission, to have a conference in chambers for a while and

12   see if we can make a little more progress when we're sitting

13   a couple feet from each other rather than having you behind

14   the podium.

15             MR. GWILLIAM:  Very happy and pleased to do that,

16   Your Honor.

17             THE COURT:  Would you be willing to wait to do

18   that?

19             MR. GWILLIAM:  I will wait as long as -- I came

20   all the way out here from California today.

21             THE COURT:  Well we got some lovely weather for

22   you today, sir.

23             MR. GWILLIAM:  Yeah, and my daughter and grandson

24   live out here, so listen, there's some benefits that I'm

25   very happy to have here.

Page 52

```
 1              THE COURT:  Very excellent.

 2              All right.  Well if you wouldn't mind taking a

 3     seat I'm going to call the next matter and then we'll --

 4     Ms. Marcus, are you able to stay around?

 5              MS. MARCUS:  Yes, Your Honor.

 6              THE COURT:  Okay.

 7              MS. MARCUS:  That's a great idea.  Thank you.

 8              THE COURT:  Okay.  Thank you.

 9              All right.  What do we have next?

10              MS. ARTHUR:  Your Honor, the next matter looks

11     like it's a status conference actually, Your Honor, of Ka

12     Kin Wong --

13              THE COURT:  Yes.

14              MS. ARTHUR:  -- versus Lehman Brothers Special

15     Financing Inc.

16              THE COURT:  Okay.  So, I'm just kind of playing

17     around with the schedule here.  Should we move on to --

18              MS. ARTHUR:  The next one is the 2 p.m. hearing.

19              THE COURT:  You're right, the LCOR is at 2 p.m.,

20     so we're down to these two.  Okay.

21              MS. ARTHUR:  Yes, Your Honor.

22              THE COURT:  Thank you.  Thank you.  All right.  So

23     why don't you come on up.

24              All right.  So this is LBHI, this is Ka Kin Wong

25     versus HSBC.  Yes?
```

Page 53

1            MR. SLACK:  That's right.

2            THE COURT:  Okay.

3            MR. SLACK:  So this is a case, Your Honor, that

4    was filed back in 2005.  We haven't been before you on this

5    case ever, so this is the --

6            THE COURT:  It was up visiting with Judge Batz --

7            MR. SLACK:  And that's exactly right.

8            THE COURT:  -- among others.

9            MR. SLACK:  And what this case concerns, it may

10   help just to do a little background.

11           This is a complex derivative structure.  And the

12   way this worked, Your Honor, is that there was an entity

13   called Pacific Finance that issued notes, which sometimes

14   are referred to here as minibonds, and they were in

15   different series, and that's important because each series

16   had their own set of transaction documents.

17           The plaintiffs here are the noteholders or mini

18   bondholders at the Pacific Finance level.  And Pacific

19   Finance then entered into a derivative with LBSF.  What's

20   interesting is, is that at what we call the minibond level

21   that trust and the trustees do not have what Your Honor has

22   probably seen as a change in the waterfall provision.  So it

23   doesn't have that at all, it just says in fact in that -- at

24   that level that LBSF gets paid first whatever it's owned and

25   then money goes out to the mini bondholders.

Page 54

1            The collateral at that level, at the minibond

2    level was notes from another trust at the sapphire level.

3    So at the sapphire level again you had a more traditional

4    trust, you had notes issued, Pacific Finance bought those

5    notes, and that's the collateral at the minibond level.  At

6    that level there is a change in the waterfall.  And BNY is

7    the trustee at that level.

8            So, Your Honor, when the first complaint was filed

9    back in 2009 it had a direct claim against LBSF and others,

10   and Judge Peck heard a motion to dismiss in that case.

11           While the motion to dismiss was pending I would

12   note the plaintiffs made a motion to withdraw the reference

13   the first time that Judge Swain denied.  Judge Peck then

14   heard the motion to dismiss, granted the motion to dismiss,

15   and it went up to Judge Pauley.  Judge Pauley affirmed the

16   dismissal of the direct claims, allowed the plaintiffs to

17   amend to bring derivative claims on behalf of the trust, and

18   also sent back a claim for a constructive trust which Judge

19   Peck had dismissed for Judge Peck to clarify the reasons why

20   that also should be dismissed based on a standing issue.

21           So a new motion to dismiss was --

22           THE COURT:  Which he then did?

23           MR. SLACK:  He did not, he didn't address it

24   because that was in the new complaint where there was a new

25   motion to dismiss.

1          So the amended complaint was filed, the amended

2     complaint had the derivative claims and then reallege the

3     constructive trust claims.

4          A new motion to dismiss was filed in 2011, and

5     while that motion to dismiss was pending there were two

6     things that happened.  One was that the plaintiffs again

7     moved to withdraw the reference.  And the other thing was

8     that there was a settlement -- a fairly complex settlement

9     that was taking place in Hong Kong related to all of the

10    trusts at the sapphire level, at the minibond level, it

11    included the trustees in LBSF.  That settlement required a

12    number of different steps.  It took some time to implement.

13    It had a process by which each of the series of notes had to

14    vote individually, and the votes were essentially in the

15    high 90's.  And there's a list in the letter we sent,

16    there's a list of the voting percentages, and it's --

17    they're all -- each series voted again in the high 90's to

18    approve the settlement.

19         There were -- this settlement was effectuated

20    through the derivatives procedures order in front of Judge

21    Peck, and there was an objection to an amendment to the

22    derivatives procedures order.  Judge Peck held that again

23    the minibond plaintiffs here did not have standing to

24    challenge the change and amendment to the derivative

25    procedures order.  That was also appealed to Judge

Page 56

1    Sullivan.  Judge Sullivan affirmed Judge Peck saying that

2    the plaintiffs here were not parties in interest for

3    purposes of the bankruptcy in order to have standing to

4    challenge the change to the derivatives procedures order.

5              So another --

6              THE COURT:  Under a -- their creditor is a

7    creditor's theory?

8              MR. SLACK:  Exactly.  That's exactly right.

9              So that brings us to essentially where we are now,

10   which is that the new motion to withdraw the reference was

11   denied, and that motion had been pending for four years, and

12   a fully briefed motion to dismiss but briefed again more

13   than four years ago is now pending in front of Your Honor.

14             We've had some conversations with the plaintiffs.

15   It's certainly our view, we think correct, that the

16   settlement here completely resolves these matters, because

17   when you're suing derivatively on behalf of the trust and

18   the trust settles there's no longer any derivative claim to

19   bring.  And the analogy of course in the corporate world is

20   that if a corporation settles a claim that settlement is

21   final.  If there's a shareholder that objects to that

22   settlement its remedy is to sue the corporation and the

23   directors for some kind of breach.  But the actual

24   derivative claim is no longer available.  And of course

25   that's exactly the situation we have here where for the last

Page 57

1    four years ago there really has been no claim that can be

2    brought either directly or derivatively.

3              So we've had some discussions with the plaintiffs.

4    The -- you know, we personally think that the plaintiffs

5    here whose clients got all of the information relating to

6    the settlement, they -- I don't know whether their

7    particular clients voted for it or against it, again, they

8    were overwhelming voted for it, but would have received all

9    of the information with respect to the settlement four years

10   ago.

11             We included information with respect to the

12   settlement in a number of different pleadings.  Both in our

13   reply to the motion to dismiss, the amended complaint here,

14   and also in connection with both the motions for the appeal

15   of the change to the derivatives procedures order, and also

16   with the motion to withdraw the reference.  And so the

17   plaintiffs have certainly known about this settlement and

18   should have known about it for the last four years.

19             THE COURT:  Well maybe apropos of the prior matter

20   maybe it makes sense to have a brief conversation in

21   chambers to talk about this a couple feet apart across the

22   table, if that would be acceptable to you folks.  Is that

23   acceptable?

24             MR. DAVIS:  Your Honor, Jason Davis of Robbins

25   Geller Rudman & Dowd --

Page 58

```
 1                THE COURT:  Yes.

 2                MR. DAVIS:  -- for the plaintiffs.  Yes, we think

 3    that's an excellent suggestion.

 4                THE COURT:  Okay.

 5                MR. DAVIS:  And we support it.

 6                THE COURT:  All right.  So why don't we do that,

 7    Mr. Slack.  And then, Ms. Marcus, we'll take this one first,

 8    and then we'll come back and we'll go back to the California

 9    matter.

10                MS. MARCUS:  That's fine, Your Honor.

11                THE COURT:  All right?

12         (Recessed at 11:05 a.m.; reconvened at 12:05 p.m.)

13                THE COURT:  You don't have to take -- you can keep

14    your stuff there, it's okay.

15                UNIDENTIFIED SPEAKER:  (Indiscernible) papers for

16    Lehman.

17                THE COURT:  That's okay.  Oh, they're Lehman

18    papers.

19                UNIDENTIFIED SPEAKER:  Yeah.

20                THE COURT:  Okay.  I seem to have lost everyone.

21    Here they come.  Here they come.

22         (Pause)

23                THE COURT:  All right.  We're going to go back on

24    the record in LBHI with respect to the plan administrator's

25    supplemental objection to the four hundred and thirty-first
```

Page 59

```
 1    omnibus objection to claims, the various claims filed

 2    against BNC Bank.

 3              And having listened to the arguments of counsel

 4    we'll take the matter under advisement and allow the parties

 5    an additional period of time to continue discussions among

 6    themselves regarding further proceedings.

 7              I think it's best, especially since it's August,

 8    to let you do that on your own schedule, with the

 9    understanding that I do want to keep moving this along

10    because it's been pending for so long.  But, Ms. Marcus, if

11    I could impose on you to keep track of the time and contact

12    chambers perhaps, you know, at the very beginning of

13    September and let us know when you'd like to come back in

14    for further status.

15              MS. MARCUS:  Of course, Your Honor.  And we'll

16    coordinate it with Mr. Gwilliam --

17              THE COURT:  All right.

18              MS. MARCUS:  -- to make sure it's convenient.

19              THE COURT:  And, Mr. Gwilliam, notwithstanding

20    fact that you can enjoy being in New York, if at the next

21    time it would be better for you to appear telephonically by

22    all means we can arrange for that.

23              MR. GWILLIAM:  Thank you.

24              THE COURT:  All right?

25              MR. GWILLIAM:  I may take you up on that.
```

Page 60

1          THE COURT:  Okay.  All right.  Thank you for

2     making the trip.

3          MR. GWILLIAM:  I appreciate your time, Your Honor.

4     Thank you.

5          THE COURT:  Thank you very much.  Thank you.

6          MS. MARCUS:  Thank you, Your Honor.

7          THE COURT:  Thank you.  All right.  Ms. Marcus, I

8     don't think there's anything else in the LBHI --

9          MS. MARCUS:  No that was the calendar.

10          THE COURT:  -- calendar.  Okay.  Thank you very

11     much.

12          MS. MARCUS:  Thank you.

13          THE COURT:  If you folks would give me two minutes

14     to get my other file.

15        (Recessed at 12:07; reconvened at 2:05. p.m.)

16     THE COURT:  All right.  How is everyone?

17          UNIDENTIFIED SPEAKER:  Very good, Your Honor.

18          THE COURT:  Okay.  I'm ready when you are.  How

19     are you, Mr. Rossman?

20          MR. ROSSMAN:  Very good, Your Honor.  How are you?

21          THE COURT:  Okay.

22          MR. ROSSMAN:  If I may, Andrew Rossman, Quinn

23     Emanuel on behalf of Lehman Brothers Holdings, Inc.

24          If you'll indulge me, Your Honor, I think it would

25     be helpful is for me to first give you a brief overview of

Page 61

1     this case.  I think this is the first time that we've

2     appeared before you in this matter.

3               THE COURT:  It is and I'm happy to listen.  I have

4     read everything that's --

5               MR. ROSSMAN:  I have no doubt.

6               THE COURT:  -- been filed with some interest, so

7     I'm looking forward to hearing more.

8               MR. ROSSMAN:  Great.  So my essential game plan is

9     to give you a brief description of the dispute in general,

10    an overview of the motion, and then I'll take you through

11    what I think are the principle points.  It is, of course, a

12    motion to amend.

13              THE COURT:  Right.

14              MR. ROSSMAN:  And you have not only the motion,

15    but you have a clean copy and a redline copy of the proposed

16    second amended complaint.

17              THE COURT:  Right.

18              MR. ROSSMAN:  Just so you follow the bouncing

19    ball.  We file an amended complaint in December of 2014, as

20    to which there was no objection.  Principal change there was

21    to add Barclays as a defendant.  And there's factual

22    allegations added to, and then this amendment was filed in

23    June, as a motion I should say, as a proposed amendment.

24              So what's at stake here, Your Honor, is one swap.

25    This is a fixed for floating, what --

Page 62

1          THE COURT:  Right.

2          MR. ROSSMAN:  -- we consider to be a plain vanilla

3    interest rate swap.

4          THE COURT:  Right.

5          MR. ROSSMAN:  The context of this is there was a

6    bond issuance that Lehman assisted the entity that owned

7    this building in Alexandria, Virginia which is a post office

8    that was used to finance the building.

9          THE COURT:  Right.

10         MR. ROSSMAN:  And bonds were floating rate bonds,

11   so the entity had a risk, it faced exposure, with respect to

12   interest rates.

13         THE COURT:  Right.

14         MR. ROSSMAN:  So to hedge that, entered into a

15   swap with LBSF, which is a Lehman subsidiary that

16   principally enters into these types of transactions, and it

17   was a fixed for floating rate swap.

18              So we understand the economics here, the

19   obligation of LCOR, I'll call it LCOR for short, but this is

20   the LCOR Alexandria entities --

21         THE COURT:  Right.

22         MR. ROSSMAN:  -- who are the defendants, had an

23   obligation to pay a fixed rate of approximately 6.8 percent

24   on that swap.  The duration of the swap, the swap matured in

25   2032 --

Page 63

1            THE COURT:  In 2032.

2            MR. ROSSMAN:  -- you're ahead of me already, Your

3    Honor, so for 24 years, Lehman's counterparty had an

4    obligation to pay 6.8 percent, 6.8005 percent I think is the

5    precise number, and received a floating rate, which was live

6    or plus I think it was 23 basis points.

7            THE COURT:  Uh-huh.

8            MR. ROSSMAN:  So slightly over three month live

9    or, which at the time was dramatically low.  In fact, the --

10   Your Honor's heard all about --

11           THE COURT:  Forward curve.

12           MR. ROSSMAN:  -- the forward rate, forward curve.

13   So the relevant question is, primary relevant question,

14   economically speaking is, what was the interest rate for

15   instruments of this duration at that time period, and it was

16   less than 3 percent.

17           So what you had was an instrument that was

18   massively in the money for Lehman.  If it stayed in place

19   for 24 years, Lehman would get the interest of the 6.8

20   percent, and would be paying back something that was worth

21   less than 3 percent.

22           Lehman calculated that in the money value to be

23   worth about $24 million at the time of termination.  So the

24   swap was terminated at LCOR's initiation using the LBHI

25   bankruptcy filing as the event of termination.  They didn't

1    terminate in September, they terminated in December, okay.

2            Instead of finding $42 million in Lehman's favor

3    as the valuation, they actually swung past zero, and LCOR

4    determined in its calculation statement that Lehman owed

5    LCOR $6 million.  And that was what was initially

6    challenged.  It was challenged as an incorrect or sham even

7    calculation because it seemed so obviously wrong, and at the

8    time the case was being handled by Weil Gotshal as debtor's

9    counsel.

10           THE COURT:  Was that -- so the -- they went from

11   market to loss that -- and that calculation was attached to

12   a complaint that was ultimately delivered?

13           MR. ROSSMAN:  Interestingly, Your Honor, they did

14   not file a proof of claim, and I think it's suspicious that

15   they didn't file a proof of claim, when they thought they

16   were owed $6 million.  I think one of the consideration, I'm

17   purely speculating, but perhaps they didn't want to sign

18   their name to a court pleading.

19           THE COURT:  So there is no filed proof of claim

20   for that amount?

21           MR. ROSSMAN:  There's no filed proof of claim.

22   This is Lehman's adversary proceeding against LCOR.

23           THE COURT:  Right.

24           MR. ROSSMAN:  Okay.  So what Lehman's learned in

25   the course of first 2004 and then formal discovery in the

1    adversary proceeding is that, in fact, what LCOR did and did

2    not disclose to Lehman is it entered into a replacement swap

3    where Barclays stepped into the shoes of Lehman on the swap.

4    Barclays took over the obligations to LCOR, inherited the

5    benefit of the receipt of that high level of interest.  And

6    for that, it paid LCOR over $15 million.

7            So LCOR received on a transaction or claimed that

8    it suffered a loss of $6 million, it actually entered into a

9    replacement swap and received over $15 million in cash for

10   that.

11           We also learned that the individuals at Barclays

12   who were involved in that swap were individuals who had

13   responsibility while they were still employees of Lehman for

14   creating and handling that transaction.  So they were

15   insiders to the transaction, they had the benefit of

16   information that they had while they were under fiduciary

17   obligation as employees to Lehman, they took it with them,

18   including confidential information to Barclays when they

19   went over with the sale of the broker dealer and took

20   advantage of that to step into this high valuable swap.

21           And that is frankly, Your Honor, why we got

22   involved in the case as conflicts counsel to handle the

23   Barclays issue, Quinn Emanuel became involved at the end of

24   2014, November 2014, trained our attention on that issue and

25   filed the amended complaint that included the addition of

Page 66

1      the Barclays defendants in 2014.

2              What we have also learned in the course of

3      discovery, is that there were other entities involved, and

4      it's worth taking a minute to make sure that Your Honor

5      understands what the different defendants and opposed new

6      defendants are and what their roles are.

7              So Barclays, it's pretty obvious they were the

8      replacement swap provider, okay.  LCOR and a related entity

9      called PTO Holdings, which as I understand it, is the --

10             THE COURT:  Patent and Trademark Office, PTO,

11     right?

12             MR. ROSSMAN:  Precisely, Alexandria PTO --

13             THE COURT:  Right.

14             MR. ROSSMAN:  -- is that.  The PTO Holdings entity

15     is the immediate parent, if you will, of LCOR, which was a

16     swap counterparty to Lehman, and that entity in turn, we

17     believe, is owed by something called Rosegreen Trust, and

18     ultimately that is owned by the related companies and/or

19     their principals and families.

20             As you go further up the corporate chain, our

21     visibility greatly diminishes, but that's our understanding

22     based on the discovery that we have so far.

23             Mr. O'Toole is a related executive and he has had

24     -- I understand he's in the courtroom today, and he had

25     involvement in the events and we'll have a chance to go

Page 67

1       through the specifics of that, okay.

2               So you've got Barclays sort of one category, then

3       you've got what I will call the LCOR parties, which are all

4       the entities that are related or affiliated with the related

5       companies, and ultimately the LCOR Alexandria entity that

6       was a swap counterparty, and then you've got two other

7       defendants who were involved in the transaction as advisors,

8       Mr. Gross and the entity that he owns and controls called

9       BWRA and they were brought in as one of two swap advisors,

10      if you will, who were involved in the transaction.  And

11      they're one that we view as a culpable participant, both

12      because of their involvement in the close-out and the

13      replacement swap and behavior that we think is frankly,

14      pretty shocking wrongdoing, and also because they were

15      direct or indirect recipients of proceeds of the swap.

16              So we view them as liable, both in terms of --

17      liable as transferees and liable as participants, and that's

18      also true of the other new defendants who were in the

19      related companies or LCOR chain.  So those are three

20      categories of defendants that we have, Barclays running the

21      case, LCOR and PTO Holding is already in the case.

22              The new defendants are Rosegreen Trust, the

23      related companies, Mr. Gross, BWRA and Mr. O'Toole.  And

24      I'll take a moment to walk through those.

25              What I would explain to Your Honor is what we

Page 68

1    learned in discovery is that, in fact, this was supposed to

2    be a market quote ISDA, so you understand how the market

3    quote works, you go out to market, get four quotes, you take

4    the middle of the average of the two, don't ask me why they

5    made it four, this is what they did.  In fact, what we

6    understand is that they deliberately failed the market quote

7    process, as part of a design, as part of a scheme to get to

8    loss.  And then come up with a calculation that suited them,

9    rather than suited the economic reality.

10        So, for example, we see from BWRA a memorandum,

11   this is one of the swap advisors, a memorandum a day prior

12   to the effort to solicit quotes saying that there were no

13   quotes, that's already failed the quote process.  So they

14   have, you know, foreordained, if you will, that they're

15   going to get the result of note quotes.

16        And when you send someone out to do that, who

17   knows how the market works, it's not very hard to achieve.

18   So this Chatham Financial who is one of their advisors

19   initially evaluated the value of the swap as I've described

20   it to you on an economic basis, and told LCOR, and this is

21   back in November, so interest rates were actually a little

22   bit higher then than they were in December, rates continued

23   to go down as things got more challenging in the economy,

24   and the Government tried to help.  The --

25        THE COURT:  Meaning that the value of the swap

Page 69

1    continued to move in LBSF's favor.

2            MR. ROSSMAN:  The value of the swap from November

3    to December moved in Lehman's favor.

4            THE COURT:  Lehman's favor.

5            MR. ROSSMAN:  Correct, exactly, Your Honor.

6            So in November, Chatham advises -- we have a memo

7    about this, which we also got in discovery, that swaps were

8    at $19 million to Lehman.  So promptly what the defendants

9    do is they take Chatham out of that part of the work, they

10   no longer ask Chatham to make a loss calculation, and they

11   just instruct Chatham to go forth and do the quote process,

12   because Chatham has relationships with the dealers in the

13   market.

14           The quote process results in no quotes because

15   that's how they designed it, and they tested the market

16   beforehand, knew who the dealers were who were not

17   interested in this, and dialed them up and told them to say

18   no, and they said no, is effectively what we have alleged in

19   the complaint and what we think we'll be able to show.

20           In fact, they knew that there was an actual quote,

21   it wasn't just a quote, it was an actual transaction with

22   Barclays before they went and failed the quote process, and

23   that takes no -- you know, is no where reflected in the

24   report showing it failed the quote process.

25           There was an indication of interest in Deutsche

1    Bank to ask for more documents, they didn't know how to

2    handle that, other than to say, don't give Deutsche Bank

3    more documents, and you know, we're going to treat that --

4    we'll just ignore that and look for no's elsewhere.

5            So and what was shocking to us, is they

6    deliberately failed.  They went and calculated a loss not

7    with reference to the Barclays swap that they actually did,

8    okay, which reflected, you know, at least one marker, but

9    with respect to their own calculation, and even made matters

10   worse by adding into it a theoretical interest rate cap

11   which the cost of the theoretical interest rate cap, which

12   of course, they would never have needed because they already

13   had a replacement swap with Barclays, which took care of all

14   their interest rate risks.

15           So there's quite a bit of manipulation here that

16   we learned about in the course of this.  And what we've been

17   trying to do since we've --

18           THE COURT:  So they -- so eventually they

19   terminate, right, and they send -- they do send the loss

20   calculation?

21           MR. ROSSMAN:  They do send a loss calculation,

22   that's right.  And that's the one that reflects $6 million

23   in their favor.

24           But they don't file a proof of claim, they don't

25   pursue it.  They simply keep the proceeds of the Barclays

1   swap.  And our beef with Barclays, to be clear, Your Honor,

2   is two-fold.  One is, we think that Barclays took advantage

3   of Lehman information, because the Lehman employees went

4   over to Barclays --

5             THE COURT:  Was there anything -- so the question

6   that might be outside the purview of what you're prepared to

7   talk about though --

8             MR. ROSSMAN:  Sure.

9             THE COURT:  -- was there anything in the APA that

10  dealt with this very situation?  Because obviously the APA

11  specifically contemplated that many, many of the Lehman

12  employees would transition over to Barclays.

13            So is the --

14            MR. ROSSMAN:  That's right.

15            THE COURT:  So is the use by these individuals of

16  this information in and of itself wrongful?

17            MR. ROSSMAN:  We think so, Your Honor.  And that's

18  one of the allegations that we make in the complaint.  That

19  the use of the information was wrongful.  Okay.  And we

20  don't think it's sanctioned by the APA.

21            THE COURT:  So the transaction stayed.  Barclays

22  didn't own the transaction, obviously LBSF owned the

23  transaction.

24            MR. ROSSMAN:  Correct.

25            THE COURT:  Okay.  All right.

Page 72

1              MR. ROSSMAN:  Okay.  So Barclays not only

2     benefitted by using the information, they benefitted

3     because, you know, economically they got a dramatically in

4     the money swap, and they got it at, you know, a below market

5     price, and we believe what -- you know, one of the things

6     that we'll be exploring, one of the things that we allege,

7     Your Honor, is that it was -- what LCOR was looking for was

8     a cooperative participant, not a true arm's length dealer

9     who had given the full price, but someone who was willing to

10    go along with their scheme to give them a replacement swap

11    which they needed to get rid of their interest rate risk.

12             THE COURT:  So 15 is a pretty good price for 42 of

13    value?

14             MR. ROSSMAN:  We think it's a sweetheart price,

15    that's right.  Okay.

16             But Barclays has objected to the amendment, that

17    amendment stands.  Barclays hasn't objected to this

18    amendment.  What we're here today -- why we're here today is

19    because the LCOR defendants or LCOR and PTO have made an

20    objection primarily to our addition of new parts, and the

21    new part is what we explained, that are affiliates to PTO or

22    LCOR or advisors to them, and that's what their objection

23    is.

24             Now, I say, Your Honor, we are very cognizant of

25    the limited resources of the Court that are stretched by

1    this case, and we are cognizant of our limited resources,

2    and we wouldn't be chasing things that we think don't have

3    value or that don't have supportable legal positions.

4         Here, we think it clearly has both.  Our concern,

5    very frankly, Your Honor, is that when we've spent time, and

6    I'll be very careful as Mr. Tizzaio (ph) was in his

7    affidavit not to reveal any settlement communications or

8    offers of settlement.

9         But what we are very concerned about is we were

10   being told by individuals representing LCOR and PTO that we

11   should have reason to fear that we're not ever going to be

12   able to collect the judgment against these entities.

13        They very much led us both in settlement

14   discussions and in the incompleteness of their production, I

15   think frankly very suspicious, incompleteness of their

16   production in discovery, they led us to believe there wasn't

17   money available to answer a judgment.  That the money had to

18   move, the money was gone, with respect to PTO Holdings that

19   have the proceeds of the Barclays swap, and that we would

20   end up, you know, chasing a -- you know, if not a bankrupt

21   entity, an entity that was unable to answer the judgment.

22        And that caused us to take a deeper look, frankly,

23   and to try to get an understanding of where the funds went,

24   and who were the individuals involved.  At the same time --

25   well, actually later, up through and including October of

Page 74

1    2014, we got some of the most interesting documents.  As

2    Your Honor knows from private practice, frequently is at the

3    end of the discovery rainbow and you actually get the most

4    relevant documents, they finally produce to us documents

5    that reveal the true role and the true culpability of Mr.

6    Gross, BWRA and others in this scheme.

7         So, you know, we were aware of the names of the

8    individuals, we were aware that they were involved, Mr.

9    O'Toole, Mr. Gross were involved in discussions seeing if we

10   could get a settlement of this case, okay, but what we

11   didn't realize until we saw some frankly pretty shocking

12   documents, that they were actually involved in concocting

13   the scheme.

14        And that as individuals, not only do they have

15   their, you know, fingers dirty with the wrongdoing, but they

16   actually were recipients of proceeds.  They received an

17   economic benefit including in the case of BWRA, Mr. Gross'

18   entity, he threatened suit against the LCOR PTO Rosegreen

19   entities when he didn't get adequately paid for the

20   transaction.

21        And he was asking for at one point as much as a

22   million and a half dollars because he described, he

23   delivered to them effectively a windfall of some close to

24   $16 million, and he wanted to get paid for that.  And he

25   threatened to expose this by bringing a lawsuit, and they

Page 75

1   ultimately settled with him, frankly buying his cooperation,

2   keeping him quiet for a payment of $200,000 plus a 5 percent

3   interest in the outcome of this case.

4         So whatever proceeds, you know, they think they

5   may keep at the end of this following, you know, litigation

6   or a settlement, he's entitled to 5 percent of that under

7   their settlement.

8         So it was seeing that document, and obviously

9   these things take time, Your Honor, we've got to actually

10   get the documents, upload the documents, review the

11   documents, find them and appreciate their significance.

12         And we realized, okay, you know, there are people

13   here who are involved in the wrongdoing, who should be held

14   to account for their conduct, and maybe recipients of

15   proceeds.

16         So, you know, I'll take you, Your Honor, if I may

17   to, you know, why we want to amend and what we did with this

18   amendment.

19         So we -- having the benefit of this discovery, we

20   made an effort to try to give a more detailed recitation of

21   the facts, okay, incorporating the documents that we

22   received at the end of 2014.

23         So sequence of events is received those documents,

24   we've trained our attention on the Barclays amendment and

25   submitted that amendment.  And we told all of the defendants

Page 76

1    at the time in January that we intended to amend the gap.

2    So we sort of put the case on hold while we sorted through

3    all those documents, and made our effort to try to come up

4    with a comprehensive pleading so everyone would know, you

5    know, exactly what's at stake in the case.

6          And, you know, we expect there may be motions

7    filed against this pleading, the test of litigating this

8    pleading, we wanted to make sure that it had all of the

9    relevant facts in it.  And we wanted to make sure that we

10   were for the benefit of creditors, that we were recovering

11   all of the potential parties who may have received transfers

12   because we didn't have complete knowledge or visibility into

13   where all the money went.

14         So that's what we did.  If you look at to -- if

15   you don't like reading redlines, which I find intolerable,

16   you can look on pages 6 through 10 of our opening brief, and

17   we explain entity-by-entity what it is that we did in the

18   amended complaint, starting with Mr. O'Toole.

19         Mr. O'Toole is a beneficiary of the Rosegreen

20   Trust, he's an executive related, he had control over these

21   entities, and frankly was one of the individuals who

22   masterminded this scheme.  In addition to his direct

23   involvement, he received a pay-out of $185,000 from the

24   Barclays swap proceeds.

25         Related and Rosegreen, talk about what those

1    entities are.  We think they're the true parties in

2    interest, or beneficial owners above LCOR and PTO Holdings,

3    and you see reference in the documents we got ultimately

4    from BWRA and Chatham, that they believed they were acting

5    on behalf of those entities.

6              So, for example, when Chatham was out talking to

7    the dealers in the marketplace, it represented itself as

8    working on behalf of the related companies, because it

9    wanted to tell the marketplace that it was acting a big

10   important real estate concern, hoping that, you know, the

11   dealers would play along.

12             Mr. Gross and BWRA as I mentioned were advisors.

13   Mr. Gross described himself as Mr. O'Toole's favored

14   financial engineer in correspondence, when he was seeking

15   his additional fee, and you know, he's the one who brought

16   the potential claim that resulted in settlement that I

17   describe below.

18             An additional allegations in the complaint include

19   exactly how they manipulated the market quotation process,

20   including, you know, at one point instructing Goldman-Sachs

21   to respond no to a request for a market quotation.

22             So primarily that's what we did, is added

23   additional defendants, and add substantial additional facts,

24   Your Honor.  We've also narrowed the theories of liability.

25   We've eliminated a couple of causes of action, mindful of

Page 78

1    your rulings in the Raymond James' case and other similar

2    cases, so there's the money had received and turnover claims

3    are eliminated.  We don't want to waste any time on that.

4           And, you know, as I mentioned, you know, trying to

5    make sure that we've got the complete set of potential

6    defendants, based on what we see is the flow of funds.

7           Now, I want to talk about, if I can, Your Honor,

8    some legal issues that relate to this.  As you know, as

9    anybody who remembers anything from civil procedure knows,

10   leave to amend is freely granted.  And, you know, here we

11   don't think there's a serious dispute that we met the Rule

12   15(a) standard for adding additional factual allegations.

13          So the allegations that we have against Barclays,

14   the allegations we have against existing defendants, clearly

15   those fit within that very generous standard, where you can

16   amend, years later you can amend, during trial to conform

17   evidence, essentially Rule 15 is trying to say the Court

18   should disputes on the merits.

19          THE COURT:  Sorry.  So the real interesting

20   question here is the new parties.

21          MR. ROSSMAN:  Correct.  So let's talk about that.

22          THE COURT:  Right.

23          MR. ROSSMAN:  So as opening matter, LCOR and PTO

24   don't have standing to oppose our claims against new

25   defendants.  What the new defendants could have done, and

Page 79

1      chose not to do, is they could have intervened for the

2      limited purpose of opposing the amendment, arguing futility

3      or the statute of limitations, they had a right to do that -

4      -

5              THE COURT:  Right.

6              MR. ROSSMAN:  -- people do that in cases.  They

7      didn't do that.  They lie in the weeds and they relied on,

8      you know, their close comrades in LCOR and PTO Holding, but

9      we think it's quite clear and we cite, among other cases,

10     the WSA, Inc. versus ACA case in the Southern District 1996,

11     they don't have standing to make that assertion.

12             So we think the lack of standing bars their

13     objection and ends the debate right there.

14             I will, you know, for sake of completeness, Your

15     Honor, talk about the other issues.  We talked about, you

16     know, the general standard under Rule 15.  I think what

17     we're really considering here is the question of whether

18     there is a futility problem, because the additional

19     defendants are protected by a statute of limitations, and

20     leave to amend should be denied because it would be a

21     futility.

22             A couple of things I want to walk you through,

23     Your Honor.  The -- first I want, because it relates to two

24     elements here, which is the element of undue delay and the

25     element of good faith.  I want to take a minute and walk you

Page 80

1    through the timeframe of our involvement in these

2    allegations, okay.

3          What they've got to show, and the cases make it

4    clear, is you've got to show that there was not just really

5    delay, but there was undue delay.  So we cite numerous

6    cases, including a Second Circuit called Richardson

7    Greenshields which collects a whole bunch of interesting

8    cases, that say you can have years and years of delay, you

9    can amend during the course of trial, you can file long

10   after you knew about the new facts, all of this is permitted

11   by Rule 15, it's not undue delay.

12         The good faith prong really you've got to show

13   something that is in the nature of bad faith, on the part of

14   Lehman.  And we would come to Your Honor and say, we have

15   nothing but good faith, but I will demonstrate to you all of

16   the diligence and all of the effort that we made to come to

17   the right answer here.

18         So as Your Honor well knows, there's an extensive

19   ADR process in this case, we try to settle before we even

20   file, we had a mediation process pursuant to Judge Peck's

21   order mandatory mediation back in March of 2012, that was

22   unsuccessful.  And that was unsuccessful, Lehman took it

23   onto itself to try to settle outside of the mediation before

24   it filed anything, so in May of 2013 there was another set

25   of settlement meetings.  Mr. Tizzaio is in the courtroom and

Page 81

1    submitted an affidavit.  Attended those, and had discussions

2    with both Mr. Gross --

3              THE COURT:  So during that time frame without

4    getting into the substance of the settlement discussions,

5    you were more or less dealing with this as simply a plain

6    vanilla swap termination.

7              MR. ROSSMAN:  That's -- well, I wasn't, because I

8    wasn't in the case yet, but that's correct.

9              THE COURT:  Right.  So it was being dealt with as

10   a plain vanilla swap termination, and the question of we

11   view this as very much in the money to Lehman, why doesn't

12   LCOR agree.

13             MR. ROSSMAN:  Correct.

14             THE COURT:  In other words, there wasn't the

15   visibility into -- behind the curtain of what had happened.

16             MR. ROSSMAN:  That's right, Your Honor.  And there

17   was -- Lehman had some information, it had some 2004

18   discovery, but you know, that's the way it was initially

19   viewed in the case.  Although as the discussions went on,

20   and you know, it was being told by Mr. O'Toole and Mr. Gross

21   that Lehman's never going to find the money, Lehman's never

22   going to get an effective judgment against these entities,

23   of course, you know, Lehman started to grow concerned that

24   there was more going on here.

25             But truthfully it wasn't until the discovery that

Page 82

1    came in towards the end of 2014, did we really have a full

2    understanding of exactly the level of manipulation here and

3    the basis for additional claims.

4            So just to continue to walk through the process.

5            THE COURT:  Uh-huh.

6            MR. ROSSMAN:  The initial claim was filed November

7    of 2013 by Weil, and you'll see it's a relatively

8    unremarkable complaint that's attacking the close-out, Your

9    Honor, as you've seen many variations of that.  And then

10   there's another settlement meeting because, you know, as you

11   well know, we try very hard to settle these rather than

12   litigate where we don't have to in June of 2014, where Mr.

13   Tizzaio was, you know, effectively being taunted by, you

14   know, the PTO and LCOR representatives there, which included

15   Mr. O'Toole that they're never going to get a judgment.

16           So, you know, we very much, at that point, started

17   getting concerned, and discovery was pressed, and in the

18   last production of documents in October of 2014, we got,

19   among other things, a bank statement that showed the PTO

20   Holdings account at I believe Bank of America had been

21   emptied out, and there were no funds in it.

22           And if you would, Your Honor, if you look at

23   Exhibit J to Mr. Califano's declaration --

24           THE COURT:  I actually did not bring that out with

25   me.

1              MR. ROSSMAN:  Ah, we've got one.

2              THE COURT:  Do you have an extra copy?

3         (Pause)

4              MR. ROSSMAN:  It's hiding in plain sight, Your

5     Honor.

6              May I approach, Your Honor?

7              THE COURT:  Sure.  If I bring out all the paper on

8     a Lehman day, there won't be room for me to sit, so thank

9     you.

10             MR. ROSSMAN:  I understand that.

11             THE COURT:  So does counsel know, do you know the

12    page that Mr. Rossman's referring to?

13             MR. CALIFANO:  Yes, I do, Your Honor.

14             THE COURT:  Okay.

15             MR. CALIFANO:  I have my declaration here.

16             THE COURT:  Okay.

17             MR. ROSSMAN:  So what it is, is a spreadsheet and

18    you'll see in the column labeled redemption, on August 2nd,

19    2012, a redemption in the amount of $14.915 million.  And

20    shows as of that date a zero balance in the account.  This

21    is all we got in discovery.

22             So we had reason to believe that the account was

23    emptied, and we have people telling Mr. Tizzaio, you're

24    never going to collect.  So, you know, Lehman had good

25    reason to be concerned about how it was going to get back

Page 84

1    the value that was taken from it, the swap transaction, who

2    were the recipients who were unjustly enriched, who got the

3    benefits of what was in this account on the Barclays swap.

4          So that's October 2014, we were retained in

5    November, and filed the Barclays complaint, is first amended

6    complaint in December.  And January 12th, 2015, we told LCOR

7    that we intended to file an amended complaint, to put

8    everything on hold.

9          We provided a draft, it took a long time to get

10   through the documents, and frankly we got human resources of

11   the estate to be able to review and give us clearance on

12   some of these things.  We had a draft of the complaint that

13   we provided April 17th.  LCOR, they would not consent to the

14   amendment.  We had some confidentiality issues that we had

15   to sort through, some additional as we prepared to file the

16   complaint, we found additional documents we wanted to

17   include, we had to go through the confidentiality drill

18   again.  June we filed.

19         THE COURT:  I think that in the interest of moving

20   along, I think that the issues -- you've done a good job of

21   presenting the timeline with respect to the issue of delay,

22   undue delay, timing regarding the amendments and otherwise.

23         I think that to the extent that you have more to

24   say about the futility argument, so to speak, maybe we could

25   move to that.

1          MR. ROSSMAN:  Let me turn to that, Your Honor.

2     The one thing I did -- the last thing I want to mention on

3     this, and I do feel that -- you know, a little bit attacked

4     on the subject so I've taken my time to go through it.

5          THE COURT:  Well, this is -- the replacement of

6     counsel has led to a dramatic and drastic reformation of

7     Lehman's theory of the case.  So, you know, a number of

8     things in all these pleadings stand out, and that statement

9     stands out.  So what you've said is that as this ripened

10    into a litigation, as opposed to a claims resolution, your

11    firm stepped in as conflicts counsel, not necessarily

12    smarter or better counsel, just different counsel.

13         MR. ROSSMAN:  That's right, Your Honor.  And as we

14    learn more shocking developments in the case, right.

15         So the last thing I just wanted to mention

16    quickly, Your Honor, when we were -- when we delivered the

17    information, the new post amended complaint to Mr. Califano

18    and his firm, they told us that we were wrong, that in fact,

19    the money was there, in the PTO Holdings account, and they

20    gave us information about that.

21         What it turns out is, the money had been moved out

22    of the account, there's no money in the Bank of America

23    account anymore.  Apparently money was moved into an account

24    at Signature Bank, okay, which we didn't know, and they will

25    provide us discovery of that, and maybe an issue we take up

Page 86

1   later why they didn't provide the discovery of that, clearly

2   it was called for.

3          And they showed us an account statement, and when

4   we got that, we amended our draft complaint, we revised our

5   draft complaint to take out that allegation, and to take

6   them at their word.

7          Now, we don't, you know --

8          THE COURT:  So is the money still in an account in

9   the name of PTO?

10          MR. ROSSMAN:  That's what Mr. Califano has said in

11   his filings.

12          THE COURT:  Uh-huh.

13          MR. ROSSMAN:  We don't know the reality, we

14   haven't completed discovery, and frankly seeing the money

15   bouncing around concerns.

16          THE COURT:  Okay.

17          MR. ROSSMAN:  But the point is, we listened.  We

18   did revise the complaint and we filed it.  So all of this is

19   to say, you know, the actions were taken in good faith.  So

20   now I turn to futility, okay.

21          As I already mentioned, to the extent that we add

22   new factual allegations as opposed to new defendants,

23   there's no question it's not futile.  I don't think there's

24   a serious debate about that.  So really what we're talking

25   about are claims against new defendants.

Page 87

1            Two different things to keep your eye on here,

2    Your Honor.  To the extent there were transfers that were

3    made within six years of the filing of this complaint, June

4    2015, there's zero debate that those are timely, okay.  We

5    don't have to contort ourselves with relation back and the

6    meaning of Rule 15(c) which we'll get into in a minute.

7            And there's -- we don't know, because we don't

8    have complete visibility into everything that was

9    transferred, but we're aware of one such transfer, we're

10   aware that in September 2010, there was a $200,000 payment

11   to BWRA as part of the settlement.  That is clearly timely.

12           Our claim is for unjust enrichment, as part of

13   the, you know, it was paid indirectly through related, but

14   it was paid out of the Barclays proceeds, and we think under

15   any view of the case, that's a timely claim.

16           So now we get to our fed court's lesson today,

17   which is relation back.

18           THE COURT:  Relation back, right.

19           MR. ROSSMAN:  So what you've got to meet for

20   relation back is three elements.  You've got to show that

21   the claims arise out of the same conduct transaction

22   occurrence.  It's actually -- that's a very lack standard,

23   and that's easily met here.  I think they make a make-way

24   argument on that, but I don't think I need to take up much

25   of the Court's time, it's the same swap, close-out and the

Page 88

1    replacement swap that we're talking about.

2           Second is the question of whether the new

3    defendants received notice of the lawsuit.  They clearly

4    received notice of the lawsuit, they were involved in

5    settlement discussions going back to 2013 there.  They're

6    quite aware of this case, and there's no prejudice to them

7    at all, which is a critical point to be made here, Your

8    Honor, and you know, prejudice is one of the principal

9    factors in considering a Rule 15 motion.  None is really

10   alleged on the part of the LCOR defendants.

11          So the last one, which is of the most academic

12   interest at least to Your Honor is the requirement that the

13   new defendants knew or should have known that the action

14   would have been brought against them but for a mistake

15   concerning the proper parties' identity.  And that's Rule 15

16   -- it's a tongue twister, but it's Rule 15(c)(1)(C)(II) is

17   the mistake prong of relation back under Rule 15(c).

18          And one of the reasons why I spent the time and

19   energy to walk you through the timeline is for you to

20   understand that what you have is an effort by Lehman in good

21   faith to sort out the bodies.  We're trying to understand in

22   this complex web of companies that we don't, you know, have,

23   these are not public companies, we don't have clear

24   visibility into these entities.  We're trying to sort out

25   who are the responsible parties.

Page 89

1           And that doesn't just involve understanding of

2    corporate ownership relationships and the names of the

3    people, and the names of the entities, it also involves

4    understanding what their role was.  It also involves

5    understanding what their culpability was for the underlying

6    wrongdoing that's alleged.

7           And the other piece of this puzzle is following

8    the money, which we tried to do, and we got incomplete

9    information on that as well.

10          So when we thought that we, you know, saw that

11   there was no money in the account, you know we pursued that

12   with more vigor.  For some of these individuals, we were

13   able to see transfers to them, and we've made allegations of

14   unjust enrichment based on those transfers.  We don't know

15   that we have a complete set of everything.  So those are the

16   two things that we set out to do.

17          Now, on 15(c)(1)(C)(II), basic argument that we're

18   met with here, is that you can't add new parties as to

19   opposed to substituting a mistaken party.  So they rely on a

20   case called Barrow, which was decided in the Second Circuit,

21   and their interpretation of Barrow is that mistake means

22   that you name party A when you intended to name party B, and

23   you've got to substitute B for A, okay.

24          Since Barrow, the Supreme Court stepped in, and

25   decided in the Krepsky (ph) case that that's not right.

Page 90

1    That's not the focus.  And, in fact, the focus is on the

2    knowledge or understanding of the potential defendants, not

3    what's in the plaintiff here Lehman's mind, right.

4         So the question is, did the defendants have reason

5    to know that they were but for a misunderstanding on the

6    part of the plaintiff that they were parties that would have

7    been sued.

8         And on that, we have two bases, Your Honor, to

9    reach that conclusion, which we think we're clearly entitled

10   to.

11        First, let's make sure we understand the law.  We

12   cite in our brief, three recent Southern District cases,

13   three different judges, okay, respected judges, where they

14   all come to the conclusion that you can name additional

15   parties.  They're of course clearly wrong about that legal

16   point.

17        Krepsky says that if you got a mistake, if you are

18   mistaken as to the role or the culpability of the other

19   defendants that you now want to name that that meets mistake

20   under Rule 15(c).  And as a --

21        THE COURT:  So that's SRAL Gallery and Rico

22   Navarro (ph) and Lon Disponk (ph) and the Abdel (ph) case,

23   right?

24        MR. ROSSMAN:  Exactly, Your Honor.  Exactly, Your

25   Honor.  And these frequently involve -- the SRAL case is one

1    that involves executives of a company, and the need to

2    develop an understanding of exactly what that role was, and

3    their culpable participation before they could name them as

4    defendants.

5         The Abdel case involved police officers, many of

6    these cases happened in Ninth Section 1983 context or a, you

7    know, claims against --

8         THE COURT:  Well, and then you also have Randall's

9    Island Family Golf (ph) which had --

10        MR. ROSSMAN:  Which is a transfer case.

11        THE COURT:  Which is a transfer case,

12   significantly which is a transfer case.

13        MR. ROSSMAN:  That's right, Your Honor.

14        THE COURT:  Yeah.

15        MR. ROSSMAN:  And we think the Randall's Island

16   case is a great example of facts similar to these, where you

17   don't know exactly where the money is going.

18        But the important point here is we had an

19   imperfect understanding of where the money went, we had an

20   imperfect understanding of what the roles were of the

21   various players.  And as that understanding evolved, we made

22   a good faith effort to name them.  And the individuals,

23   because they're so closely tied in to the entities that were

24   already defendants, they well knew, they well knew what

25   their role was, they well knew what their culpability was.

Page 92

1          They anticipated this litigation in the settlement

2     agreement between BWRA and LCOR specifically anticipates the

3     possibility of a Lehman dispute, and what happens in the

4     case of a Lehman dispute.

5          So we think there's no question there we meet the

6     Krepsky standard.  We don't think you have to resolve the

7     question of whether Barrow is good law or bad law, in order

8     to reach the conclusion that the judges did in those three

9     cases that the claim is good.

10          The last thing I'll mention on the statute of

11     limitations, Your Honor, is we've got an independent basis

12     under state law.  So Rule 15(c)(1)(A) says -- federal rules,

13     says that if you're timely under the law of the jurisdiction

14     whose claim it is, here it's New York, okay it's an unjust

15     enrichment claim in New York, then you're timely,

16     irrespective of whether you meet the federal standard.

17          And New York has under the CPLR, Section 1024, has

18     a specific codification of John Doe practice.  And here what

19     we named is John Doe's in the original complaint, and in the

20     amended complaint, were recipients, John Doe 1 through 10,

21     recipients of the Barclays swap proceeds.

22          And we did that because we knew we had imperfect

23     information, and we knew we'd have to sort out the bodies.

24     They knew that they, you know, were among those John Does.

25     And in addition to having a right to amend them in the

Page 93

1    federal standard, we have a right to amend under the state

2    standard under Section 1024.

3             And the last thing I'll remind Your Honor, and

4    then I will sit down, is that you've already answered the

5    question, the Raymond James' case about substantively

6    whether we stayed a claim for unjust enrichment, despite the

7    fact that there is a contract here.  It's conduct that's

8    outside of the contract like the Building (ph) case as you

9    said in your decision in Raymond James.  Thank you, Your

10   Honor.

11            THE COURT:  Thank you, Mr. Rossman.

12            MR. CALIFANO:  Good afternoon, Your Honor.

13            THE COURT:  Good afternoon.

14            MR. CALIFANO:  Mr. Rossman told a very interesting

15   story, but it really doesn't have anything to do with this

16   motion.  And I think the way to frame this is to look at the

17   pleading, look at the first amended complaint, and what that

18   would have given defendants notice on, and what they've

19   proposed second amended complaint.

20            Now, the story about the investigation they did

21   and the facts they found isn't reflected in the complaint.

22   Because if you look at paragraph 128 --

23            THE COURT:  Why would it be reflected in the

24   complaint?  The complaint is the product of the

25   investigation, if the allegations against the defendants.

1          MR. CALIFANO:  Yes, but it's not -- the complaint

2    that is supposedly the result of their investigation, and

3    the claim, the claim for relief, the unjust enrichment

4    claim, Your Honor, while there are facts, there are not

5    elements of the claim against these new defendants, because

6    it still relates to, as a result, of LCOR's action,

7    paragraph 129.

8          THE COURT:  Okay.  We need to reset.  This is a

9    motion for leave to amend the complaint.

10         MR. CALIFANO:  Yes.

11         THE COURT:  This is not a motion to dismiss the

12   causes of action.  So you're starting at a rather different

13   place than I expected you to go.

14         MR. CALIFANO:  Well, Your Honor, the case law does

15   say when you oppose a motion to amend, based on futility,

16   the 12(b)(6) standards.

17         THE COURT:  I understand that, but you are

18   deliberately choosing not to address head on virtually

19   everything that Mr. Rossman said.

20         MR. CALIFANO:  Your Honor, what Mr. Rossman said

21   about the background doesn't relate to the fact that they're

22   seeking to amend and add these new defendants, Your Honor.

23   Because the original complaint --

24         THE COURT:  Uh-huh.

25         MR. CALIFANO:  -- had the unjust enrichment claim

Page 95

1    and it was based on the claim of LCOR's actions --

2              THE COURT:  That's right.

3              MR. CALIFANO:  -- in the (indiscernible).  Okay?

4              THE COURT:  Right.

5              MR. CALIFANO:  The second amended complaint --

6              THE COURT:  Yes.

7              MR. CALIFANO:  -- as the unjust enrichment still

8    relating to LCOR's actions not the actions of these new

9    defendants.  The case hasn't changed, Your Honor.  After --

10             THE COURT:  Well -- I'm going to keep interrupting

11   you because first, there's the issue of standing.

12             MR. CALIFANO:  Yes, Your Honor.

13             THE COURT:  Okay.  Which is a real issue.

14             MR. CALIFANO:  Yes, Your Honor, but there is a

15   case AgriStone (ph), I just had it here a second ago, which

16   dealt with that issue.  And said -- while this is AgriStone

17   Meat & Poultry v Mariah Capital, Northern District Iowa,

18   Eastern Division, while the legal authority on this issue

19   appears to be limited, the cases support a view that a

20   current defendant may assert futility on behalf of a

21   prospective defendant.

22             This result would seem to have particular

23   application in this case, when the four prospective

24   defendants have a close legal relationship with the current

25   defendant, and it appears likely that all the defendants

Page 96

1    would be represented by the same attorneys.

2              THE COURT:  Are all the defendants going to be

3    represented by the same attorneys here?

4              MR. CALIFANO:  Your Honor, we're here today, you

5    know, representing the new defendants.

6              THE COURT:  You are?

7              MR. CALIFANO:  Well, we're here on their behalf,

8    objecting to the amendments.

9              THE COURT:  Those are two different things.

10   You're appearing as counsel for LCOR Alexandria LLC --

11             MR. CALIFANO:  Yes.

12             THE COURT:  -- and PTO Holdings.

13             MR. CALIFANO:  Right.

14             THE COURT:  So if you're telling me that you're

15   going to be representing all reputed defendants, that's a

16   fact that --

17             MR. CALIFANO:  I wholly represent the new

18   defendants, I haven't had that conversation with Mr.

19   O'Toole, but he does --

20             THE COURT:  And there might be -- I mean, not to

21   make the suggestion, but there might be diversions of

22   interests among the various parties at a certain point.  But

23   if you get there, I assume you'll deal with that.

24             MR. CALIFANO:  If we get there, we'll deal with

25   that, Your Honor.

1           THE COURT:  But the timeline that Mr. Rossman laid

2    out for 45 minutes was detailing Lehman's following the

3    trail --

4           MR. CALIFANO:  Yes, Your Honor.

5           THE COURT:  -- of this transaction.  And I don't -

6    - and what I had expected to hear from you as a refutation

7    of that.

8           MR. CALIFANO:  Well, Your Honor, I was going to,

9    but I --

10          THE COURT:  Okay.

11          MR. CALIFANO:  -- wanted to frame it in the

12   context of their amended complaint in their pleading,

13   because while they say -- first of all, they knew of the

14   Barclays swap back in 2009.  They knew at that time in the

15   2004 discovery, because there was discovery done before.

16          THE COURT:  Sure.

17          MR. CALIFANO:  So they knew about the Barclays

18   swap.

19          THE COURT:  Right.

20          MR. CALIFANO:  They knew about those transactions.

21          THE COURT:  But that's --

22          MR. CALIFANO:  But subsequent --

23          THE COURT:  Let's pause on that, okay.  Because of

24   all the derivative transactions that come through this room,

25   this is one of the simpler ones, this is one of the simpler

Page 98

1    ones.  So you have something that in the absence of

2    something that frankly I can't imagine sitting here now, you

3    have a swap, the transaction that is demonstrably in the

4    money to LBSF, I know that's a shocking concept to people,

5    because Lehman quote/unquote filed, but in your pleadings

6    you also seem to suggest or feel that there's something

7    untoward or inappropriate about the non-defaulting party

8    having to pay the --

9              MR. CALIFANO:  No, Your Honor, I --

10             THE COURT:  -- opposing party money.  So that --

11   it's a swap, it's a contract dispute, right.

12             MR. CALIFANO:  And we understand that.

13             THE COURT:  Right.  So you've got this, you know,

14   dramatic fixed floating swap, and we have something that is

15   not at all straight forward.  And there's -- I feel there's

16   this attempt being made to divert attention from the very

17   basics of the transaction.

18             For example, I asked Mr. Rossman pretty quickly,

19   is there a proof of claim, because I didn't see any mention

20   of a proof of claim.  He clarified there's no proof of

21   claim.  Why isn't there a proof of claim?

22             MR. CALIFANO:  I don't know, Your Honor, I was not

23   at that time --

24             THE COURT:  It's kind of an odd fact.  Most people

25   who are owed $6 million try to collect $6 million, right?

1    The recoveries against the Lehman Estates are running pretty

2    well.  So that's an odd fact.  Okay.  And when I read Title

3    18, makes me a little nervous because if what's being

4    alleged is true, whether there's a proof of claim or not,

5    it's not a good thing.  It's not a good thing.

6              MR. CALIFANO:  And can I explain that?

7              THE COURT:  Sure.  Do you know what Title 18 is?

8              MR. CALIFANO:  Yes, I do.

9              THE COURT:  If you read the language and conduct

10   in connection with the bankruptcy case, if the allegations

11   are, in fact, what Mr. Rossman says they are, I have a

12   concern.

13             MR. CALIFANO:  Well, which allegation would that

14   be, Your Honor?

15             THE COURT:  Well, the allegation that if you take

16   the allegation that there was a plain vanilla swap, we'll

17   characterize it as that.  There was an event of default that

18   gave rise to a termination right, no question about it.  And

19   then under the applicable ISDA there's a procedure that has

20   to be followed.

21             MR. CALIFANO:  Right.

22             THE COURT:  Okay.  If -- and again if, if, if,

23   because I don't know, Mr. Rossman could be wrong on

24   everything that he says, if the allegations are correct,

25   there was instead of a $42 million -- a process leading to a

Page 100

```
1    $42 million payment to Lehman, there was a $6 million loss.

2    That's not, you know, a couple of million dollars swing

3    where people were getting quotes at different times in the

4    day, or people were using different costs of capital or

5    other things that might come into play when you're figuring

6    out loss.

7            So you reacted particularly negatively to the use

8    of the word conspiracy, when in the plain English meaning of

9    the word is a group of people working together to do

10   something.  So if the allegations are largely correct, then

11   there was a concerted plan to take something that was in the

12   money to Lehman and have Barclays step into the shoes, and

13   on top of everything else, assert a loss.

14           It's a fact pattern of interest.  I obviously have

15   no idea what's true.

16           MR. CALIFANO:  Right.  But that was in the

17   original complaint --

18           THE COURT:  Yes.

19           MR. CALIFANO:  -- Your Honor.  That's what we've

20   been dealing with since that original complaint was filed.

21   We answered, we engaged in discovery.  That is -- the reason

22   why I started out by saying these stories are relevant,

23   that's already in the original complaint.  Okay.  So those

24   issues can be dealt with there.

25           THE COURT:  But the role, the specific -- the
```

Page 101

1   particular roles of the particular individuals and the

2   particular movement of the money and arrangements could not

3   have been known simply from the close-out, the plain vanilla

4   swap closing.

5          MR. CALIFANO:  If you're talking about the

6   movement of money, the transaction of Barclays in creating

7   the account of PTO, that was not --

8          THE COURT:  The role of the new defendants, this

9   is squarely within the three cases that Mr. Rossman pointed

10  us to, what was not known was the role of the putative new

11  defendants in the transactions that were --

12         MR. CALIFANO:  I disagree, Your Honor, and I will

13  tell you why, because these issues, the whole issue as to

14  whether the market quotations were properly received, that

15  was an issue that was dealt with in mediation, and that was

16  an issue through the beginning of this case when Weil

17  Gotshal were representing the plaintiffs.  Those issues were

18  there, all those issues.

19         Mr. Gross' role was all there, Mr. O'Toole's role,

20  that was all part of the discovery, and part of the

21  mediation statements, it's in the mediation statements the

22  process.

23         So if they disputed the process, that was done

24  then.  The individual's roles were done then, and it's only

25  factual because the individuals -- the corporations can only

Page 102

1    act for the individuals.

2           And, Your Honor, I think if it was something that

3    was truly discovered, the complaint here just adds

4    allegations about these new defendants, and tries to

5    shoehorn them into the unjust enrichment claim.

6           So there's not a fraud claim in here, there's not

7    a civil conspiracy claim in here, this is a contract case,

8    all right.  At the end of the contract, there was money owed

9    to one party in an amount to be determined, that's the

10   issue.  What happened subsequent to the termination didn't

11   increase Lehman's damages at all, didn't change the nature

12   of the damages at all.  This is a breach of contract case.

13          The best their allegations are, are that people

14   took an aggressive position, that's their allegation, and

15   that's all there is, Your Honor.  That is all there is.  I

16   mean, they've characterized it with a lot of adjectives, but

17   it still doesn't change the fact that this is a contract

18   case, Your Honor, and --

19          THE COURT:  See, this is where we're not going to

20   agree.  This is more than a contract case.  A contract case

21   is there's an ISDA that has a close-out provision, and the

22   parties have a reasonable disagreement about what the

23   correct termination payment is.

24          This is dramatically different from a contract

25   case.  This complaint alleges a series of concerted actions

Page 103

1    that were designed to achieve a windfall, that's the word

2    that's used, purely, purely at Lehman's expense.

3            It was made possible by virtue of conduct of

4    various parties working together.  In a normal economic

5    situation this wouldn't be the result.  The notion that the

6    -- I think that you and Mr. Rossman do not agree on the

7    visibility of Lehman into what went on or around this

8    transaction.  You're quite right.

9            There was a Barclays' transaction, they knew about

10   that.  What they are saying in support of the motion to

11   amend, consistent with cases in this district is that what

12   they didn't understand until they had subsequent discovery

13   was the particular role that each of the individuals played

14   in the process.

15           MR. CALIFANO:  And can I address something Your

16   Honor said?

17           THE COURT:  Sure.

18           MR. CALIFANO:  You said at Lehman's expense.  What

19   occurred and nothing occurred after the termination that

20   increased or changed in the nature of their damages.  There

21   was nothing done at Lehman's expense after termination, and

22   if the position is unreasonable that we've taken, then isn't

23   the -- isn't there a remedy for summary judgment, as opposed

24   to suing a number of individuals now on --

25           THE COURT:  There's an allegation made that the

Page 104

1    individuals involved were in the process of settling, making

2    it clear that Lehman was on a fool's errand because they

3    would never get the money.  Doesn't --

4         MR. CALIFANO:  And first of all, I don't see how

5    that could be the cause of an action, based on a cause of

6    action, and I do think also, Your Honor, those were

7    inappropriate, because they were in the context of

8    settlement negotiations.

9         But in settlement negotiations, isn't the

10   defendants' ability to pay always a question?  Especially

11   when you're looking and talking about situations like this.

12   Defendants' ability to pay.  So if somebody says in

13   settlement discussion, you can get a large judgment, but

14   you're not going to be able to enforce it.

15        THE COURT:  I understand that, but this is

16   somewhat different.  Because what you have here is -- and

17   it's -- you keep trying to focus me on what occurred after

18   the Barclays' transaction and --

19        MR. CALIFANO:  Well, Your Honor just referenced

20   the settlement negotiations.

21        THE COURT:  Well, I'm trying to focus on what

22   happened before.  Because what has been alleged in the

23   complaint is that there was a plan that was implemented, it

24   was culminated in the Barclays' transaction, all right.  And

25   the planning that went into that, as alleged, was a sham

Page 105

1    market quotation process.  And a realization that Barclays

2    would be able to step into the shoes of Lehman for a good

3    price, everyone was going to be a winner, except Lehman.

4            So the involvement of each of the newly named

5    defendants in the process that culminated in the Barclays'

6    transaction and then the funds being transferred after

7    Barclays made the payment, that's what this is about.

8            MR. CALIFANO:  I understand that, Your Honor, but

9    first of all, without conceding the facts, and we're not

10   addressing them today for purposes of this motion have taken

11   as true, but even if that was the case, even if that was the

12   case, Lehman doesn't have any damages, different or

13   additional to the termination payment they may be entitled

14   to.  Which is what this case is all about.

15           Now, there's no issue --

16           THE COURT:  They have unjust enrichment claims.

17           MR. CALIFANO:  They don't, Your Honor, but let's

18   just address the fact that there was a default.  That

19   default gave LCOR the right to terminate.  That's not in

20   dispute.

21           THE COURT:  Yes.

22           MR. CALIFANO:  Upon that termination, Lehman had

23   the rights that they had, okay, they were fixed at that

24   point, they were entitled or not entitled to obtain it on

25   that swap termination.

1          What happened before that and after that didn't

2     change the fact that their damages were fixed as of that

3     termination.  They can't get additional damages, and they

4     can't get different damages.

5          The unjust enrichment claim, Your Honor, is --

6     there's no basis for that.  The Barclays' monies were never

7     monies that Lehman was entitled to.  Okay.  And the fact

8     that they're relying on subsequent transfers, at the very

9     best, if Lehman did have a claim to that money, then that

10    claim, that unjust enrichment claim accrued when the monies

11    were transferred to PTO.  Because arguably, and there's no

12    legal basis for this.

13         If they argue that they had a claim to the

14    particular Barclays' proceeds, okay, and there's no

15    allegation in the complaint of any legal entitlement to the

16    monies, then subsequent transfers don't start the clock

17    running on unjust enrichment.  Once it was transferred, once

18    Lehman -- it was transferred from Lehman, which is what

19    they're saying, which we dispute, that's when the unjust

20    enrichment claim appeared.

21         The fact that they transferred money after that

22    wouldn't start the clock running again, wouldn't start a new

23    cause of action for unjust enrichment, because it wasn't

24    taken from that.  Because even taking their allegations at

25    best --

1          THE COURT:  So --

2          MR. CALIFANO:  -- the transfer there, the unjust

3     enrichment occurred when the money is put in PTO.

4          THE COURT:  Is the money still in PTO?

5          MR. CALIFANO:  The money is still in PTO and we

6     showed them that recently.  I mean, we haven't given them a

7     daily balance, but I mean, the statement that he doesn't

8     know, we gave them the statement, where it is right now.

9     And they have an unjust --

10          THE COURT:  But then let me try and take you down

11    a different path.  So if that's true, right, and in essence

12    what you're saying is, don't worry about all these other

13    guys, because the money's still in PTO, we're good for it.

14          MR. CALIFANO:  No, what I'm saying is, Your Honor,

15    their claim that --

16          THE COURT:  I'm not --

17          MR. CALIFANO:  That they went after all the other

18    defendants because they thought the PTO money was gone, well

19    --

20          THE COURT:  Well, I'm asking you a direct

21    question.  If you're telling me that the, what we'll call

22    the Barclays' money is still in PTO, right --

23          MR. CALIFANO:  Yes.

24          THE COURT:  -- then if this is, in fact, a plain

25    contract dispute, then why don't we just very quickly

Page 108

1    determine liability on the close-out of the swap?

2            MR. CALIFANO:  Sure, we could do that, Your Honor,

3    and then we don't need to bring in all these causes of

4    action.

5            THE COURT:  Well, put that to one side.  Lehman's

6    made an allegation that, you know, based on what you say,

7    arithmetic that the swap was $42 million in the money to

8    LBSF.  It's a simple swap.  It's a simple swap, right?  So -

9    - but where you're going with it is, you're going to, I

10   believe, attempt to establish that the market quotation

11   process was real, that there were no market quotes.

12           MR. CALIFANO:  Yes, yes, Your Honor.

13           THE COURT:  And you have had a loss?

14           MR. CALIFANO:  Yes.

15           THE COURT:  How could you have a loss if you made

16   $15 million?  How could you have a loss if you made $15

17   million?  I don't understand that.

18           MR. CALIFANO:  But it's not the issue for today.

19   It's not the issue for today.

20           THE COURT:  You have a very, very narrow view of

21   what the issue is for today, and I have a much broader view

22   of what this is for today.

23           MR. CALIFANO:  Well, I'm here on this motion to

24   amend, Your Honor.

25           THE COURT:  All right.  But your entire argument

Page 109

1    has not been on a motion to amend.  Your entire argument has

2    been on a motion to dismiss, I think.

3              MR. CALIFANO:  Yes, because we are responding to

4    their motion to amend with the argument of futility, which

5    is a 12(b)(6) standard as the cases say.

6              And I think the original complaint had this unjust

7    enrichment claim, it had an unjust enrichment claim against

8    PTO.  If they believe that there is a valid unjust

9    enrichment claim they're protected there.  If there were

10   transfers, if they were able to get a judgment and they were

11   transferred, they have all those remedies.  It's not the

12   basis --

13             THE COURT:  What do you mean they have all those

14   remedies?

15             MR. CALIFANO:  If they get a judgment, right, and

16   then they see transfers, if fraudulent conveyance, and they

17   can raise the fraudulent conveyance theory if they believe

18   the money was transferred, they don't have to sue

19   individuals at this point.  Suing individuals, in addition

20   to Mr. Gross and Mr. O'Toole where they do allege

21   (indiscernible) receipts, they sue a number of other

22   entities without even the basis -- without having the

23   various allegation that a payment was received by them.

24             THE COURT:  Well, the monies you just told me were

25   in the PTO account, so PTO is directly or indirectly held by

Page 110

1    two of the other defendants, right?

2            MR. CALIFANO:  So you can't -- you have to have --

3    you can't just sue the corporate parents without any

4    allegations, they have no passing allegations, they have no

5    allegations that the corporate parents were involved at all,

6    and related by the way, is not in the corporate chain at

7    all.  Not in the ownership chain at all.

8            But you can't just add them because they're in the

9    chain, you know, in the corporate ownership chain.  And

10   there's not a single allegation against those entities.

11           THE COURT:  When you say those entities, which two

12   entities?

13           MR. CALIFANO:  There's not a single allegation

14   against Rosegreen or related.  Other than the fact that they

15   may have received.  But they know, they know where all the

16   funds are.  They know where all the PTO funds are.  They can

17   do the math.  We've given them account statements, and they

18   referenced a $200,000 payment and a $185,000 payment.

19           THE COURT:  Okay.  Why don't you let me hear from

20   Mr. Rossman again.

21           MR. ROSSMAN:  Unless Your Honor has questions,

22   I'll be super brief.  I hope the money's there, okay, we

23   don't have a current account statement, I'd like to, I'd

24   like to get a confirm that it's there and will be there.

25   Here's among other things that we know --

Page 111

1           THE COURT:  So you want more than $15 million,

2    though, right?

3           MR. ROSSMAN:  Your Honor, we do, and we want to

4    have the -- we want to be able to collect, because we think

5    damages exceed that.  But we don't -- certainly the full

6    15.64 million that was received from Barclays, our

7    understanding is that's not at PTO Holdings anymore, because

8    there have been distributions.

9           Related received $275,000 on December 15th, 2008.

10   Mr. O'Toole received $185,000.

11          THE COURT:  Gross, is it Gross?

12          MR. ROSSMAN:  Mr. Gross, BWRA received 200,000 in

13   2010 in the settlement that I mentioned, he'd received

14   20,000 back in December 29 of 2008, and a million dollars

15   was distributed to investors, including $652,500 to an

16   entity called Related GSA LLC.  Which has --

17          THE COURT:  And what about the Rosegreen Trust?

18          MR. ROSSMAN:  I'm sorry, Your Honor?

19          THE COURT:  The Rosegreen Trust.

20          MR. ROSSMAN:  The Rosegreen Trust, we don't --

21   pardon me one second, Your Honor.

22          MR. CALIFANO:  Your Honor, if I may.

23          THE COURT:  Yeah.

24          MR. CALIFANO:  I just want to note that not one of

25   these allegations are in the complaint.  So I don't know if

Page 112

1    he's amending his complaint right now.

2              MR. ROSSMAN:  No.

3              MR. CALIFANO:  But these allegations aren't in the

4    complaint.

5              MR. ROSSMAN:  Your Honor, we don't know whether

6    there's been a specific transfer to Rosegreen or not.  What

7    we do understand from the documents that were produced in

8    October of 2014 is that Mr. Gross and BWRA believed that

9    they were working for Rosegreen, and I've got -- you know,

10   got documents to show it, Your Honor.

11             I'm looking at a letter that was sent from Mr.

12   Gross' counsel at Ropes and Gray who's bragging about, you

13   know, the value of the work that BWRA had done exceeding all

14   expectations for a favorable result for Rosegreen.

15             So, you know, Your Honor, we don't know precisely

16   where all this went.  We made a game effort in the

17   complaint, frankly a lot of elbow grease that went into it,

18   to identify it as best we could.  We were led astray in

19   terms of where the money is.  We don't have confirmation

20   where the money all went, and we do have claims and

21   potential damages that greatly exceed the $15 million.

22             So I think the idea, you know, I'm fond of Your

23   Honor's idea of running to a quick resolution of the value

24   of the underlying swap against the counterparty and that's

25   certainly we'd love to explore but we think we've got, you

Page 113

1    know, damages that gone beyond that and want --

2           THE COURT:  So --

3           MR. ROSSMAN:  And the time for that is after the

4    amendment when we sort it all out in discovery and --

5           THE COURT:  Well, I'm just trying to figure out

6    the best way to approach this.  Because to the extent that,

7    Mr. Califano, you're going to be representing everybody,

8    right, then the facts are what the facts are with respect to

9    the close-out.

10          MR. CALIFANO:  Yes.

11          THE COURT:  Right?  So we could, and I am going to

12   allow the amendment.  I think that the standing question is

13   interesting, but I don't think I even have to deal with it,

14   because I think that the claims all relate back.  And to the

15   extent that there is a sense that some of -- that there may

16   be some futility, I can take that up on motions to dismiss.

17   But I'm going to allow the amendment.

18          What I would like to do is focus more on how we

19   keep this from escalating into more of a drama than it

20   already is, because I'm not a huge fan of drama.

21          So I'd like to go back to the notion that it's a

22   simple contract dispute, and that will be what it will be,

23   and it really, you know, all of the allegations that Mr.

24   Rossman has pointed out to in the complaint may come into

25   play, particularly -- forget about, you know, payments and

Page 114

1    settlements around payments, just focusing on the close-out

2    process, market quotations, et cetera, we're going to have

3    to get to the bottom of that.

4            So, you know, thinking out loud here, we could

5    fast track to a liability determination on the close-out,

6    and everybody's rights could be reserved in terms of whether

7    they, you know, ultimately have a right to be dismissed out,

8    you know, on any and all other grounds.  But --

9            MR. CALIFANO:  The only issue is, Your Honor, that

10   we've not received discovery from Lehman.

11           THE COURT:  I'm sorry?

12           MR. CALIFANO:  We have not received discovery.  We

13   have outstanding discovery from Lehman.

14           THE COURT:  Okay.

15           MR. CALIFANO:  We have significant outstanding

16   discovery, so that needs to be factored into it.

17           THE COURT:  Sure.

18           MR. ROSSMAN:  I don't think we're (indiscernible)

19   discovery either, Your Honor, but we're happy to provide.

20           THE COURT:  Yeah, although I don't -- I just out

21   of curiosity, given that under the ISDA, it's the

22   counterparties obligation here, I'm just wondering what

23   exactly is the discovery that you expect to get from Lehman.

24           MR. CALIFANO:  Well, we've had outstanding

25   requests for a significant period of time, so.  And we

Page 115

1    haven't had a response to those requests.

2            THE COURT:  Do you know, Mr. Rossman, what they

3    are?

4            MR. ROSSMAN:  I don't know off hand, Your Honor.

5            THE COURT:  Okay.

6            MR. ROSSMAN:  We've not even had a meet and confer

7    on that.

8            THE COURT:  Okay.

9            MR. ROSSMAN:  We'll have to do that.

10           THE COURT:  Well, perhaps you should do that,

11   because in the usual situation where it's the -- you know,

12   here in particular, where you have the premise of the loss,

13   going to loss under the ISDA is the failure of the quotation

14   process, that would have virtually nothing to do with

15   Lehman, you know, around the termination of this particular

16   ISDA.  But, you know, you can have a meet and confer, and if

17   there's discovery that they're fairly entitled to, you ought

18   to give it to them, and we should, you know, we should go

19   from there.

20           But I'm with you in terms of keeping this to the,

21   you know, contract dispute that it is.  But I think that

22   it's appropriate to amend the complaint, bring everybody in

23   as defendants who there have been allegations against, I

24   think their roles were not fully understood.  And as time

25   goes on, their roles may be fully more understood, and there

Page 116

1    may be motion practice and all of your rights are fully

2    reserved in that regard.

3            MR. CALIFANO:  Yeah, I would anticipate, Your

4    Honor, that they -- well, we'll see what the second amended

5    complaint looks like, but I would anticipate that there's

6    significant legal deficiencies.

7            MR. ROSSMAN:  Well, you know, what the second

8    amended complaint, you know, everyone knows what that looks

9    like, we'll file it with Your Honor's permission.  We'll

10   meet and confer with them on discovery including our own --

11           THE COURT:  But I want to be --

12           MR. ROSSMAN:  -- need for discovery --

13           THE COURT:  I want to be clear.

14           MR. ROSSMAN:  -- and proceed as quickly as we can.

15           THE COURT:  You have whatever rights you have

16   under the federal rules to file whatever motions you believe

17   you can.  But in terms of my overall management of the case,

18   I'm not going to entertain dispositions on multiple motions

19   to dismiss and keep everything else in abeyance.

20           MR. ROSSMAN:  I understand.

21           THE COURT:  We're going to run down parallel

22   tracks.  All right?

23           MR. CALIFANO:  Thank you, Your Honor.

24           THE COURT:  Okay.  Thank you very much.

25           MR. ROSSMAN:  Thank you, Your Honor.

Page 117

1            THE COURT:  Will you send us an order please, and

2    would you send it by Mr. Califano first?

3            MR. ROSSMAN:  I will, Your Honor.

4            THE COURT:  Thank you.

5    (Proceedings concluded at 3:22 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 118

1                            I N D E X

2

3                            RULINGS

4                                                      PAGE

5       08-13555 - Doc# 50217 Motion for Approval of

6       Settlement Agreement Among Putnam Structured Product

7       CDO 2002-1 LTD., Putnam Structured Product CDO 2002-1

8       LLC, U.S. Bank National Association, as Successor

9       Trustee, Lehman Brothers Special Financing Inc., and

10      Lehman Brothers Holdings Inc.                     11

11

12      08-13555 - Doc# 50296 Motion for Entry of an Order

13      Authorizing Lehman Brothers Special Financing Inc.

14      to Invest Disputed Claim Reserves for Claim Numbers

15      67733 Pursuant to Section 8.4 of the Modified Third

16      Amended Joint Chapter Plan of Lehman Brothers

17      Holdings Inc. and its Affiliated Debtors          18

18

19      Adv. 08-01420 - Doc# 12478 Trustees Motion for an

20      Order to (I) Establish a Third Interim Distribution

21      Fund for General Unsecured Creditor Claims, (II)

22      Release Reserves from the Secured and Priority Claim

23      Reserve, the First Interim Distribution Fund, and the

24      Second Interim Distribution Fund, and (III) Make a

25      Third Interim Distribution to Holders of Allowed

Page 119

1      General Unsecured Creditor Claims with a Record Date

2      of July 10, 2015                                          24

3

4      Adv. 13-01689 - Motion to Amend Complaint                 113

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 120

1                    C E R T I F I C A T I O N

2

3       We, Dawn South and Sheila G. Orms, certify that the

4       foregoing transcript is a true and accurate record of the

5       proceedings. Dawn South      Digitally signed by Dawn South
                                      DN: cn=Dawn South, o, ou,
                                      email=digital1@veritext.com, c=US
                                      Date: 2015.08.06 14:51:19 -04'00'
6       _____

7       Dawn South

8       AAERT Certified Electronic Transcriber CET**D-408
        Sheila Orms        Digitally signed by Sheila Orms
                           DN: cn=Sheila Orms, o, ou,
                           email=digital1@veritext.com, c=US
9       _____
                           Date: 2015.08.06 14:51:56 -04'00'

10      Sheila G. Orms

11

12

13      Date:  August 6, 2015

14

15

16

17

18

19

20

21

22      Veritext Legal Solutions

23      330 Old Country Road

24      Suite 300

25      Mineola, NY 11501