Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5

6    LEHMAN BROTHERS HOLDINGS, INC.,    Case No. 08-13555 (SCC)

7

8            Debtor.

9

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  U.S. Bankruptcy Court

13                  One Bowling Green

14                  New York, New York

15

16

17                  September 21, 2015

18                  10:12 AM

19

20   B E F O R E :

21   HON SHELLEY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25

1    Hearing re:  Doc #50032 Motion for Summary Judgment

2    Regarding Claim 67707

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Jamie Gallagher

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES, LLP

3         Attorneys for the Debtor

4         767 Fifth Avenue

5         New York, NY 10153

6

7    BY:  JACQUELINE MARCUS, ESQ.

8         DENISE ALVAREZ, ESQ.

9         MELISSA SIEGEL, ESQ.

10        RALPH I. MILLER, ESQ.

11

12   KAYE SCHOLER, LLP

13        Attorney for Spanish Broadcasting

14        250 West 55th Street

15        New York, NY 10019

16

17   BY:  MADLYN GLEICH PRIMOFF, ESQ.

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  How is everyone today?  All right,

3     Mr. Miller, I'm ready when you are.

4              MR. MILLER:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. MILLER:  I'm Ralph Miller from the Weil,

7     Gotshal & Manges firm here on behalf of the plan

8     administrator, Lehman Brothers Holdings, Inc., which is

9     called LBHI and Lehman Commercial Paper, Inc., called LCPI.

10    And the first agenda item, and the only agenda item is a

11    motion for summary judgment on claim number 67707 brought by

12    Spanish Broadcasting Systems.

13              The record before the Court establishes that LBHI

14    and LCPI are entitled to summary judgment on two critical

15    damage issues.  First, a valid waiver of consequential and

16    special damages applies to the claim in this proceeding.

17    Second, at least 99 percent of the $41.9 million in damages

18    asserted in that claim are consequential or special damages.

19              Your Honor, may I approach with some excerpts from

20    the record that will facilitate our discussions?

21              THE COURT:  Sure.  And the percentage that you

22    referred to, the small percentage not included is the fee?

23    Damages?

24              MR. MILLER:  Yes, Your Honor.

25              THE COURT:  Okay.

Page 5

1            MR. MILLER:  The -- it's the refund due for the

2    portion of the fee that had to do with holding the $10

3    million.  The distinction here is there were also fees for

4    LCPI's agent for the group of banks.

5            THE COURT:  Right.  Right.

6            MR. MILLER:  And those fees we believe are not

7    returnable because LCPI completed its service.

8            THE COURT:  Right.

9            MR. MILLER:  So it's just separating that.

10            THE COURT:  But Spanish Broadcasting, as part of

11    its proof of claim, is seeking a refund of those fees?

12            MR. MILLER:  That's correct.

13            THE COURT:  Okay.

14            MR. MILLER:  And, Your Honor, we've agreed to that

15    refund.  We believe it's about $14,000 and they think it's

16    somewhere over 400 -- around $400,000 -- $373,000.  So

17    that's the 1 percent is the 373 --

18            THE COURT:  But in any event, I think you both

19    agree that's not part of this motion

20            MR. MILLER:  That's correct.

21            THE COURT:  Okay.

22            MR. MILLER:  Let me explain how I'd like to

23    organize my comments, subject of course to any questions

24    from the Court.

25            THE COURT:  Okay.

Page 6

1              MR. MILLER:  First, I'd like to deal briefly with

2      the irrevocable and unconditional waiver of any right of

3      Spanish Broadcasting's claim for "special exemplary,

4      punitive, or consequential damages" and show how it applies

5      to this proceeding and then I'll deal with the discovery

6      produced by Spanish Broadcasting that shows that the two

7      major components of the claim are special or consequential.

8      And --

9              THE COURT:  And in that regard, also, Spanish

10     Broadcasting makes the argument that, in essence, aha, there

11     was all of this discovery and then you announced that this

12     was ripe for summary judgment and then you didn't make any

13     reference to any of that discovery.  And from that, they

14     urge an inference that the discovery was in their favor and

15     that's why you didn't cite to it?

16             MR. MILLER:  No.

17             THE COURT:  So, do you know the part of their

18     brief that I'm --

19             MR. MILLER:  Yes, Your Honor.

20             THE COURT:  -- referring to?

21             MR. MILLER:  Yes, Your Honor.  They're talking, I

22     think --

23             THE COURT:  You don't have to make the detour --

24             MR. MILLER:  I'll be happy to --

25             THE COURT:  -- just along the road -- just --

Page 7

1          MR. MILLER:  I'll be happy to deal with that as I

2     go by, Your Honor.

3          THE COURT:  Sure.

4          MR. MILLER:  For example, the discovery having to

5     do with the negotiation of --

6          THE COURT:  Between the Weil firm and the Kaye

7     Scholer firm?

8          MR. MILLER:  -- of the payoff letter demonstrates

9     that the provisions in issue that we think are material were

10    not discussed.  So in that sense, the discovery -- like the

11    dog that did not bark in the night -- is important because

12    it does not create any parol evidence that would be relevant

13    on the language that's in issue.

14          Now, Ms. Primoff is going to talk about the word

15    expressly, and I'll mention that as I go by.  But we believe

16    that's immaterial.  So I think we do refer to it in a sense

17    that we say that there's nothing in the discovery that

18    changes the plain language of the documents that are before

19    the Court and that confirms our view that discovery is

20    sufficient for the Court to move forward with summary

21    judgment.

22          Your Honor, if you could turn first to tab 1, it

23    has the -- a flag by the operative waiver language.  And I

24    wanted to emphasize the word hereby and the structure of

25    this a little bit because I'm not sure our briefs did this.

Page 8

1    I always like to try to talk about something that's not in

2    the briefs if I can, Your Honor.

3            Section 10.12, submission to waiver -- I'm sorry

4    submission to jurisdiction; waivers says, "The borrower

5    hereby irrevocably and unconditionally" and then it has five

6    things that are done.  One of which is submitting to

7    jurisdiction in any legal action or proceeding relating to

8    this agreement.  That defines proceeding.  Then we get down

9    to (e), what the borrower hereby irrevocably and

10   unconditionally does as of June 10th, 2005, is waives to the

11   maximum extent not prohibited by law any right it may have

12   to claim or recover in any legal action or proceeding

13   referred to in this section, any special, exemplary,

14   punitive or consequential damages.

15           The plain language of this, Your Honor, is that

16   this is a waiver.  It is an event and as the Court knows,

17   waiver is defined under New York law as the voluntary

18   relinquishment of a known right.  It is an act.  It is not a

19   future promise.  And that's going to become important when

20   we get to the payoff letter, Your Honor.

21           Another thing that is important is you can take

22   judicial notice of the economic reality that the waiver

23   provision was necessarily priced into the deal, that when a

24   loan is made, the terms impact the interest rate and the

25   fees in that loan because if a lender is going to be exposed

Page 9

1    to the panoply of arrange of future damages then it's got to

2    build some additional risk into the interest rate.  So all

3    of the things about the waiver were set in time when the

4    loan was priced at that point.

5              And there's no dispute about the fact, I think,

6    among the parties that this kind of waiver can be valid and

7    is enforceable under New York law.  But as the Court

8    noticed, Spanish Broadcasting argues that a document signed

9    about six years later in 2012 called a payoff letter revoked

10   the waiver and that the waiver that was hereby given was set

11   aside.  Now there are three important undisputed events

12   before we get to the payoff letter.

13             Tab 2 is a notice of borrowing sent to an employee

14   of LCPI on October 3rd, 2008.  Obviously this was after LBHI

15   had filed for Chapter 11 protection.  And LCPI in that

16   notice of borrowing asked for the draw to be made on

17   October 6th.  The day before that, October 5th, LCPI filed

18   for Chapter 11 protection and Tab 3 is the response of LCPI

19   as agent, which said that LCPI, as agent, would remit 15

20   million of the 25 million.  That came from the other banks.

21   But that LCPI's share of the 10 million would not be

22   remitted.

23             Now at that point, Your Honor, the breach of

24   contract, which we admit occurred, was complete.  There was

25   an anticipatory repudiation.  They said we're not going to

1    do it.  They didn't do it.  Damages came into existence at

2    that point in time.  The waiver was in effect.  Tab 4 is an

3    excerpt from the amended claim for damages that's allegedly

4    caused by the failure to file -- to fund the 10 million.  It

5    has a report attached, which has this -- the Capstone (ph)

6    report which has not been superseded by other reports, but

7    it makes this reduction in invested capital argument.

8           So at this point, these things have all happened.

9    Now let's turn briefly to the payoff letter that's in Tab 5.

10   It's the key document for this first major issue, of course.

11   And two parts are flagged here.  First, there is the phrase

12   in yellow that the credit agreement and all obligations of

13   the borrower and other loan parties thereunder and under

14   other loan documents shall be terminated, parenthesis --

15          THE COURT:  Can I stop and ask you a question?

16   What was the occasion for the entry into this payoff letter?

17          MR. MILLER:  Yes, that's a very good question,

18   Your Honor.  This is a standard document.  At this point,

19   Spanish Broadcasting had a bunch of loans --

20          THE COURT:  Right.

21          MR. MILLER:  -- and Spanish Broadcasting wanted to

22   pay them all off.  And so an arrangement was made to pay off

23   this collection of loans for the collection of banks, one

24   subpart of which was the LCPI portion.  So LCPI's agent was

25   entering into this standard foreign document on behalf of

Page 11

1    the bank group and Spanish Broadcasting is making the

2    payment.

3            THE COURT:  Uh-huh, it's here and in the recital

4    it's Lehman, as administrative agent.

5            MR. MILLER:  Yes, Your Honor, so this is not a

6    deal between these two parties alone.  It's a deal both

7    between the larger bank group and between -- and Spanish

8    Broadcasting.  And frankly, one of the reasons that we think

9    the discovery is relevant is this is form language, except

10   for the word expressly, which they did add in in this

11   parenthesis, that contingent obligations which expressly

12   survive.

13           Well, Your Honor, in our view of the plain waiver

14   language and the plain language here is a waiver is not an

15   obligation.  The waiver had nothing left to be done.  Now

16   this does not rescind the termination.  I'm sorry, this does

17   not rescind the credit agreement.  It terminates the credit

18   agreement.  The credit agreement had future provisions that

19   were in effect.  Those future provisions were cut off.

20   Nobody owed anything and the credit agreement was what it

21   was.  But it did not terminate whatever obligations had

22   arisen in the past under the credit agreement.  And that's

23   what, by the way, a number of these cases hold that they

24   cite that they don't distinguish.

25           And the only reference to the claim is the carve-

1    out in this last sentence of the release.  There was a

2    release -- there's a standard release included in these

3    things -- and the standard release is broad.  And there's a

4    carve-out that says the forgoing release shall not apply to

5    the proof of claim, claim number 67707, the one we're here

6    for today, filed against Lehman on November 3rd, 2011, as

7    such claim may be amended in accordance with the applicable

8    law.  It's just a carve-out.  It doesn't increase the claim.

9    It doesn't change the claim.  It doesn't say the claim is --

10   is not only released, but the consequential damage waiver is

11   set aside.  It just doesn't deal with any of that.  This is

12   not part of a negotiation over the claim.  It's not a part

13   of the resolution over the claim.

14          And it makes no economic sense at all that LCPI,

15   as agent, would take a claim that was already sitting out

16   there for 40 to $50 million, depending upon how you read it,

17   and just in order to get the money in the door that was

18   already owed.  We're not talking about profit here.  We're

19   talking about paying off the loan.  To get the money in the

20   door, they would give up their defense to 99 percent of the

21   claim.  That just makes no economic sense and it could not

22   have been intended.

23          Now I assume that Spanish Broadcasting is to say,

24   well, it's their intention to build in what I would

25   characterize and say trap by adding the word expressly, and

Page 13

1    it was their intention to try to cut off the waiver defense.

2    I'll accept that as true.  Maybe that was their intention,

3    Your Honor.  That's an immaterial fact because it was not

4    expressed.  It's not in the document.  Nobody knew about it.

5    So if they had that intent, fine, that can be taken as a

6    true fact.  It doesn't change anything.

7            So we believe, Your Honor, that this issue is

8    simply a question of application of the plain language rule.

9    You take the waiver.  It's a waiver, it's over, it's done

10   with.  It applied at the time of all the material events.

11   The claim existed.  They claim was frozen.  The claim could

12   be amended.  The claim was carved out of the release.

13   Everybody went on down the road.  And at that point, we have

14   the same thing we would have before the Court if there had

15   been no entry into this at all.

16           So, Your Honor, I think that's the simple

17   approach.  I'm happy to answer some questions.  But we think

18   you put these two documents together and they're essentially

19   ships passing in the night.  They're dealing with different

20   points of time.  The credit agreement governed the business

21   between the parties.  All the business between the parties

22   was done up to the point when the loan was paid.  And when

23   the loan was paid, it was paid off.  It didn't change the

24   claim that arose.

25           It would be very much, by the way, like --

1            THE COURT:  So let me ask you a law school

2    hypothetical type of question.  The credit agreement says

3    borrower hereby --

4            MR. MILLER:  Yes.

5            THE COURT:  -- irrevocably and unconditionally

6    waives.

7            MR. MILLER:  Yes.

8            THE COURT:  So it's interesting, right, because it

9    says irrevocably.

10            MR. MILLER:  It says that, Your Honor.

11            THE COURT:  So in the payoff letter,

12    hypothetically, completely contrary to what you've just

13    argued, it could have said with reference to that certain

14    Section 10.12 of that certain credit agreement, LCPI,

15    notwithstanding the fact that it previously said

16    irrevocably, hereby waives.  It could have said something

17    totally clear and crisp that purported to undo the waiver,

18    but it did not.  But I guess I'm just focused on the fact

19    that -- what happens when somebody in a document, clear and

20    unambiguous on its face, says it's doing something

21    irrevocably.

22            MR. MILLER:  Well, Your Honor, I think you point

23    to a very clear issue which we talked about.  There are some

24    cases that say it's possible to waive a waiver.

25            THE COURT:  Right, but --

Page 15

1            MR. MILLER:  But that has to be clear.

2            THE COURT:  -- clear, right.

3            MR. MILLER:  Now a lot of the cases, and in fact

4    some of the cases cited by Spanish Broadcasting's briefing

5    are implied waiver cases, where it's not really --

6            THE COURT:  Sure.

7            MR. MILLER:  -- clear whether a waiver happened or

8    not.  The Capital Records case is a good example.  It's a --

9    was there a waiver of copyright or not, because they didn't

10   enforce the copyright over a period of time?  And then they

11   started enforcing -- trying to enforce the copyright and was

12   it too late.  And, you know, you get estoppel doctrines that

13   say well, once parties have relied upon the waiver, it's too

14   late to take it back.  As long as the waiver -- if the

15   waiver is a unilateral act, it's not a contract.  We're

16   doing the law school discussion, Your Honor.

17           THE COURT:  Right.

18           MR. MILLER:  Unfortunately, I've had a little more

19   exposure to waiver than I'd like in my law career, but, you

20   know, once it's done, it's done, but it has no consideration

21   for it, unless it's part of a contract.  And this had

22   consideration.  And part of the consideration was, you get

23   the interest rate and the fees you get because you make this

24   irrevocable removal of issues.

25           And this relates to what I'm going to talk about

Page 16

1    in a minute.  One of the reasons, Your Honor, which you can

2    take judicial notice of and we all recognize, that

3    commercial parties decide they don't want to hear about this

4    list of damages that is here, special, exemplary, punitive,

5    or consequential.  It's because any litigation that has to

6    sort out the categories of damages is a very difficult,

7    complicated litigation.  Each of these components has

8    different elements from the other components.  And we can

9    talk about what all is required for consequential.

10          So you're going to have to classify it, by the

11   way, whether it's special, or consequential, or the terms

12   that are usually used -- they're synonymous terms in the

13   case, just so you know, that are inconvenient.  Special and

14   consequential mean the same thing.  And we have a footnote

15   18 that talks about that.

16          The cases talk about direct, general, or sometimes

17   they call it legal damages.  I think the legal came from the

18   old days when equitable was the alternative.

19          THE COURT:  Right.

20          MR. MILLER:  So the answer is, Your Honor, that

21   these kinds of waivers make the deal much less expensive if

22   there's a dispute.

23          THE COURT:  But you -- I don't -- I mean, I think

24   that is something that we could say we "know", but that at

25   least my view is for the purposes of granting summary

Page 17

1    judgment to you, I ought not get into that because --

2                    MR. MILLER:  I don't think you have to get into

3    it, Your Honor, but --

4                    THE COURT:  -- because -- and I don't think I have

5    to get into it because the document says what it says and

6    whether or not on this occasion it affected the pricing or

7    not, this was the deal.

8                    MR. MILLER:  That's correct, Your Honor.

9                    THE COURT:  In the credit agreement, this was the

10   deal, no consequential.  No special, exemplary, punitive, or

11   consequential.  This was the deal.

12                   MR. MILLER:  That's correct, Your Honor.  This was

13   the deal.  And that -- a deal is a deal is essentially all

14   the argument we're making here.  And it was a commercial

15   deal between sophisticated parties and what happened later,

16   we think in the payoff letter did not join with it in any

17   way that could modify that language.  It should -- if they

18   wanted to modify it, they could have expressly done it.

19   Everybody would have said -- and I think we can almost

20   certainly represent to the Court that LCPI would have said,

21   what, you're crazy.  Of course we're not going to do away

22   with the waiver.  But, you know, you don't have to know that

23   information.

24                   The point is, that was not the exchange.  The

25   discovery has shown there's nothing left to be discovered.

Page 18

1    The facts are complete.  That conversation didn't happen.

2    Now if somebody had sent an e-mail and said, you know, we do

3    need to be getting rid of the waiver and somebody -- while

4    -- and said yes, well, of course, we know that.  That might

5    create a fact issue, Your Honor.

6              THE COURT:  Right.  Right.

7              MR. MILLER:  I recognize that.  That didn't

8    happen.  We didn't think it happened, but that's why we

9    wanted some discovery, Your Honor.

10             I would like to turn now, if I might, because I

11   think it's important to this issue as well to the question

12   of what their damages are that they are claiming and why we

13   believe that as a matter of law those are special or

14   consequential.  And for that purpose, I do want to note, by

15   the way, the timeline again on Tab -- in Tab 9, which shows

16   all the things that had happened and come into play before

17   the payoff letter and the fact that the events giving rise

18   to what we're going to talk about now were all over and done

19   with before the payoff letter.

20             THE COURT:  Tab 9?

21             MR. MILLER:  Tab 9.  I'm sorry.  I misspoke, Your

22   Honor.  I'm reading the backside of it.  And it's upside

23   down on the backside.  It's Tab 6.

24             THE COURT:  Okay.  Yes, okay.

25             MR. MILLER:  The -- Your Honor, if we turn now and

Page 19

1    skip over to Tab 10, and actually before I go there, I'd

2    like to say that there is a convenient summary of the

3    damages in the response to the motion on page 10 where

4    Spanish Broadcasting says, "As set forth in the Garcia

5    declaration, the Currents (ph) report, and the Trautman (ph)

6    report, the failure of Lehman to fund the draw caused

7    Spanish Broadcasting to suffer damages in the aggregate

8    amount of 41.9 million, which is comprised of: A) damages in

9    the amount of 24,500,000 (the "impacted EBITDA -- that's E-

10   B-I-T-D-A damages" resulting from Spanish Broadcasting's

11   lack of $4 million in funds needed for marketing expenses);

12   B) damages in the amount of $17,054,558, the "swap damages",

13   resulting from Spanish Broadcasting's lack of capital to

14   terminate and close out the swap in October of 2008.

15           THE COURT:  So -- I mean, so there's a lot in

16   there too.  I mean, the --

17           MR. MILLER:  Yes.

18           THE COURT:  -- the so-called inability to close

19   out the swap --

20           MR. MILLER:  Yes.

21           THE COURT:  -- is kind of problematic on a number

22   of levels.

23           MR. MILLER:  Yes, it is, Your Honor.

24           THE COURT:  Okay.

25           MR. MILLER:  And as I'm going to explain in a few

1    moments, these are essentially sort of Rube Goldberg

2    cartoons.  This happened.  That happened.  Something else

3    happened, and over here there's a result.  There's a lot of

4    distance between not having $10 million in 2008 that had to

5    be paid back and getting to, in this case, $4 million has a

6    $6 million multiplier and becomes $24 million in damages.

7    So I'll get to that in just a moment.

8           First, I think it might be helpful to talk about

9    one case that I think is really a controlling and important

10   case on this and that's Avalon Construction Company versus

11   Kirsch Holding.  It's an old case, but it's the New York

12   Court of Appeals and we believe it's still perfectly good

13   law.  It's a little bit dense, but it's well-reasoned.

14          The Court starts out and explains what the rule is

15   when a loan is repaid late.  The Court says, and this is

16   looking at, you know, what are the damages if the lender

17   doesn't perform.  The Court says, "When money is loaned or

18   goods sold on credit and the debt is not paid when due,

19   obviously the delay occasions the creditor nothing more than

20   the temporary loss of its use of its money.  For this loss,

21   the law compensates the creditor with an award of no greater

22   or other sum than legal interest."

23          Then the Court of Appeals cites to two

24   commentators who support that and it goes on and it says,

25   "Logically, a prospective borrower, whose contract for a

Page 21

1    loan has been breached, should stand in no better case.  His

2    money loss is likewise nothing else than the loss of its use

3    for a limited period.  However, the interest charged, which

4    would measure that loss, merely cancels the interest charge,

5    which would measure the loss of the lender had the loan been

6    made so that if a balance be struck, no loss is found.

7    Consequently, reason compels and all authority supports the

8    conclusion that a breach of contract to make a loan,

9    standing by itself, involves no legal damage."  And here,

10   it's using the term legal damage to mean the same thing as

11   direct or general.

12            Then it has about a dozen citations -- excuse me,

13   Your Honor -- and then it cites Sedgwick on damages as

14   saying, "Upon breach of a contract to loan money if no

15   special damage is shown, the recovery is only nominal.  For

16   though by the contract, the plaintiff would receive the

17   amount of the loan, it would be saddled with an obligation

18   of exactly the same amount so that the profit of the

19   contract would be nothing."  And Williston is then quoted by

20   the New York Court of Appeals to say, "Breach of a contract

21   to lend money for whatever period at the current rate of

22   interest or whatever rate of interest for no definite term,

23   involves no legal damage."  Again, legal meaning direct or

24   general.  "Unless consequential damages are recovered."

25            So the New York Court of Appeals has said in their

Page 22

1    other cases in New York that we cite that make this point

2    that when a loan is not made, what happens is a party has a

3    temporary loss of use of money.  Now if the party goes out

4    and borrows that money at their alternate rate, that clearly

5    is a damage.

6              THE COURT:  The delta between the contracted for

7    rate and what the market, if the market has moved up then

8    the additional cost of capital isn't recoverable damage?

9              MR. MILLER:  That's correct, Your Honor.  It's

10   very much like the concept of cover under the Universal

11   Commercial Code.  If a party doesn't get their widgets and

12   they go out and they buy other widgets, and they have to pay

13   more for it because of the timing change, they get the

14   difference in price.  So it's a concept of cover, that's

15   true.

16             And we also believe, by the way, that if there

17   were fees paid to hold this money and those fees were -- did

18   not produce a benefit, they would be refunded.  So we think

19   that's a direct damage.

20             THE COURT:  But for example, if the funding on day

21   one was -- were necessary to close a transaction scheduled

22   to occur later on day one, that if it did not occur and the

23   purchase price, if you will, on the transaction went up --

24   so it's the morning of day one --

25             MR. MILLER:  Yes, Your Honor.

1        THE COURT:  -- there's a loan.  It doesn't close.

2   In the afternoon of day one, the borrower was to have used

3   the funds to purchase widgets and there's a time of the

4   essence clause, I'm making this up, with respect to that

5   contract, and then the -- and it's a $10,000 a day penalty

6   to still buy the widgets.  If there's a waiver of

7   consequential damages, that incremental cost of buying the

8   widget, assuming that there can be a cover in funding the

9   next day, is for the borrower/purchaser's account.  It's

10  not --

11       MR. MILLER:  That's absolutely correct, Your

12  Honor --

13       THE COURT:  -- not recoverable against a lender

14  who failed to close on the morning of day one.

15       MR. MILLER:  That's correct.

16       THE COURT:  Right?

17       MR. MILLER:  And conveniently, one of the things

18  about a waiver is you don't have to deal with the

19  foreseeability element of consequential damages.  In the

20  example that you gave, if the lender knew that this was for

21  a transaction in the afternoon, at least the foreseeability

22  and understanding -- the term is actually foreseeable and

23  within the contemplation of both parties.  That was the term

24  of the Tractebel case in the Second Circuit.  If that

25  element is met, and if there is no waiver, that might be a

Page 24

1    consequential damage.

2            THE COURT:  Right.

3            MR. MILLER:  There's no doubt, Your Honor.

4            THE COURT:  But if there is --

5            MR. MILLER:  If it's a waiver, it's a

6    consequential damage.  It's -- because we don't know -- it's

7    certainly possible that they might be able to turn around

8    and borrow that money between the morning and the afternoon,

9    they're just going to have to pay a higher interest rate, in

10   which case, it's -- that would be a direct damage.  If they

11   had to turn around, to take your hypothetical, at noon, they

12   drew -- maybe they owe a line of credit, that was more like

13   credit card rights, and they had to draw on it for a couple

14   of days.  And they drew on it, did the deal, got permanent

15   financing so their -- you know, had a higher interest rate

16   for a few days, all that stuff could be and would be direct

17   or general or legal damages.

18           But significantly, and the facts are, and this is

19   in the record, and it's admitted in the exchange about

20   undisputed facts.  Originally, Spanish Broadcasting put in a

21   claim for increased cost of alternate financing, but then it

22   has formally withdrawn that claim.  So that element -- the

23   direct damages have been taken out of this case by the facts

24   and it's not like they overlooked it.  They decided to take

25   it out.

1           So that particular element is gone and all that's

2    left of direct damages in our view is this fight about how

3    much of the fee went with something else.

4           Continuing, Your Honor, just a little bit more and

5    I'm making good progress on this, is let's talk a little bit

6    about the impacted EBITDA damages.  The Trautman report on

7    Tab 10, which has a flag, explains how they say this chain

8    would have occurred.  And the first thing that he does is he

9    takes an assumption.  He doesn't actually have any facts for

10   the second sentence.  In fact, this is --

11          THE COURT:  Well, before you even get there, I

12   mean, don't I get to decide what'd direct and what's

13   consequential damages?

14          MR. MILLER:  Absolutely you do, Your Honor.  You

15   have to.  You have to decide that --

16          THE COURT:  I mean in the --

17          MR. MILLER:  -- to charge a jury if you had a

18   jury.

19          THE COURT:  Right.  I mean, it's a legal

20   determination.

21          MR. MILLER:  It's a legal determination, Your

22   Honor.  It certainly is.

23          THE COURT:  And Ms. Primoff is shaking her head

24   behind you, but, I mean --

25          MR. MILLER:  Well, I mean, their contention is we

Page 26

1    ought to be able to let our expert tell you what's the

2    difference because they're going to -- I mean, I don't want

3    to anticipate her story too much, but I've heard it and read

4    it.  They're going to say if our expert gets up and says

5    it's a natural and probable consequence of not having $10

6    million in September of 2008 that over a period of time we

7    lose $25 million, boom, that makes it direct damages.

8         THE COURT:  Well, I'm willing to listen to an

9    expert on doing the math, but I'm not willing to listen to

10   an expert tell me how to make the legal determination of

11   which damages are which damages.  So --

12        MR. MILLER:  And you shouldn't, Your Honor,

13   because the case law is very clear that that's your

14   decision.  And again, if you think about this context in a

15   jury trial, and I realize we're going to have a jury trial,

16   the judge has to decide, before the Trier of Fact comes in,

17   what set of rules to give the jury and has to tell them if

18   you find this set of facts then you can award these kind of

19   damages, if you find that sets of facts then -- and, you

20   know, punitive damages, we know that all these damages

21   circles are used in reference to a VIN diagram recently.

22   The circles of damages do not overlap.  Some are contained

23   within others and so on, but there's different elements.  So

24   you're absolutely correct, Your Honor.

25        But anyway, he doesn't actually have anything

1    about why $4 million was not used.  He makes an assumption.

2    My understanding is that it was intended for working capital

3    purposes, which he recites, and SBS would have used 4

4    million of the 25 million for the purpose of marketing and

5    promoting its radio properties.  Okay.  He makes that

6    assumption.

7           THE COURT:  But also, they got 15.

8           MR. MILLER:  They got 15, Your Honor, and,

9    actually, the record shows, if you'll --

10          THE COURT:  And I think the record shows that they

11    actually, when all is said and done, for example, had enough

12    cash on hand --

13          MR. MILLER:  Yes.

14          THE COURT:  -- to have been able to pay off the

15    swap termination when it should have terminated.

16          MR. MILLER:  Yes, and they actually had enough for

17    this 4 million, too.  And also, Your Honor, I mean, let's --

18    again, they made a public statement, which is in the record,

19    that the failure to get the $10 million is not going to

20    affect their short-term liquidity.  This is actually at Tab,

21    I believe it's Tab 8.  Tab 8, Your Honor, has the fact that

22    they had $32 million in cash at the end of 2008 and Tab 9

23    has the quote that says "We are exploring options to replace

24    Lehman's commitment within the revolver, but we cannot

25    guarantee we'll be able to do it" is what it says basically.

1    And it says "However, we believe that we have sufficient

2    liquidity to conduct our normal operations and do not

3    believe that the potential reduction in available capacity

4    under this revolver would have a material impact on our

5    short-term liquidity."  So that's --

6              THE COURT:  But again, you know --

7              MR. MILLER:  -- an admission.  You don't have to

8    consider that.

9              THE COURT:  But once again, this is in the

10   category of, in your view, I don't even have to get here and

11   talk about all of this because it doesn't get past the

12   threshold legal determination in terms of its qualification

13   or lack thereof as a consequential damage.

14             MR. MILLER:  Absolutely, Your Honor.  And it also

15   though does show that -- it shows that the very performance

16   promised, which is another test for direct damages, does not

17   include anything that's talked about in the Troutman or the

18   Kerns report.  Nothing in the credit agreement says we are

19   funding a specific amount of marketing expenses or it says

20   we're loaning this money to you so you can pay off your swap

21   or it's not a special purpose.  Well, it's plenty sponge-

22   able and that's one of the things that happens, of course,

23   Your Honor.

24             If you go back to Tab 10, which is what I was

25   talking about, the next part of the explanation, the second

Page 29

1    flag here, I believe, is the discussion of how -- actually,

2    it's the next highlight.  It's on the bottom of the next

3    page.  This is his explanation of what I would call the "for

4    want of a nail the shoe was lost, for want of a shoe the

5    horse was lost, for want of a horse the battle was lost"

6    argument.

7           And he says "Whether for SBS or any other owner of

8    radio stations, limitations on the ability to adequately

9    market/promote would be expected" -- and, interestingly,

10   that's underlined -- "to eventually result" -- eventually

11   result -- "in declining ratings and brand awareness/identity

12   and would, in turn, be expected to result in poor

13   advertising sales performance in relation to competing

14   stations and it would have an increasing impact in time

15   because of the pre-existing audience affinity and awareness

16   diminishing and then it would stabilize at a new lower

17   normal."

18          This is the tale of where all this goes.  Now,

19   conveniently, a very similar case was decided by Judge

20   Rakoff when he applied the Tractebel Energy ruling which is

21   another significant guidepost that you have here, Your

22   Honor.  In Tractebel the Court explained that prototype

23   consequential damages arise from collateral losses in

24   collateral business arrangements.

25          In this case, by Judge Rakoff applying that rule,

Page 30

1    is compania intel, but they, I'm sorry, embotelladora, I'm

2    not doing it very well.  Embotelladora del Pacifico, it

3    means the bottling company of the pacific and it was the

4    PepsiCo Bottler and he called it by the initials CEPSA so

5    I'm going to call it CEPSA, if that's okay.

6         CEPSA claimed that PepsiCo had allowed other

7    bottlers to sell Pepsi products in its territory in

8    violation of an exclusive bottling agreement which was

9    called EBA.  And poaching on the exclusive sales territory

10   was claimed by CEPSA to have caused it to lose sales of

11   Pepsi from its bottling facilities.  Now, this damage theory

12   is actually less convoluted than the one we just read, but

13   it's still a chain that's similar to the impacted EBITDA

14   damages because in both cases the damages were claimed to be

15   the loss of sales to third parties.

16        In CEPSA, the third-party purchasers were drinkers

17   of Pepsi who bought from other bottlers and here the third-

18   party purchasers are advertisers who would purchase more air

19   time, he says, from Spanish Broadcasting if they had had

20   more promotion.  Now, Judge Rakoff had no difficulty in

21   finding that CEPSA was making a claim for consequential

22   damages under the Tractebel Energy ruling.  He wrote:

23        "Here CEPSA is plainly not seeking to recover

24   money that PepsiCo agreed to pay under the EBA" -- and he

25   cites Tractebel -- "instead CEPSA is seeking to recover lost

Page 31

1    profits from lost sales to third parties that are not

2    governed by the EBA.  Such damages are properly

3    characterized as consequential damages because as a result

4    of PepsiCo's alleged breach, CEPSA suffered lost profits on

5    collateral business arrangements, i.e. sales of PepsiCo

6    products to its customers throughout its exclusive

7    territory."

8            I believe his analysis was correct and I believe

9    it's right on point and it is the short answer to why the

10   impacted EBITDA damages are consequential or special as a

11   matter of law.  In addition to, by the way, the rule under

12   the Avalon case, another case, that says when you're dealing

13   with a special circumstance of loaning money, everything

14   except things about the interest rate and fees is

15   consequential.  So just the general analysis works.

16           Finally, Your Honor, Tab 11 is the Kerns report

17   and this has to do with the swap damages.  Now, the swap

18   damages are kind of another long story.  There was a swap.

19   It was a hedging swap.  I believe the record shows that they

20   could have gotten the hedging swap anywhere, but they got it

21   from LBSF.  That really doesn't matter why they had the

22   swap.

23           The swap was in the money to LBSF and out of the

24   money to Spanish Broadcasting in mid-October when LBHI's

25   filing created an event of default and gave SBS the right to

Page 32

1    terminate.  What Spanish Broadcasting decided to do,

2    however, was not to terminate.  So they picked a point in

3    time out here and if you look at this subparagraph little I

4    in Tab 11, at the time of the of the failure of the fund

5    which would have been October, they say the swap was out of

6    the money $6 million.  That amount may be in dispute but it

7    really doesn't matter too much.  It was clearly out of the

8    money.  They would --

9            THE COURT:  It continued to move against them.

10           MR. MILLER:  It continued to move against them and

11   they actually never terminated the swap until they entered

12   into a settlement agreement at mediation and agreed to pay

13   $15,395,737 which is over here on the next column.  And so

14   his theory is that they paid this extra $9 million plus they

15   had some extra fees for $10 million.

16           For some reason they say it's 17 million and I

17   don't know where the rest of the money comes from, but in

18   any event, the whole point of this, Your Honor, is a whole

19   lot of things contributed to this loss.  First, that this

20   swap happened to be out of the money.  Second, they decided

21   to ride the market.  Third, the market moved against them

22   and they didn't terminate anywhere along the way and

23   finally, somehow or another, they had enough to pay $15

24   million and they did terminate later.

25           So this is collateral business relationships.

1   LBSF is the third party.  This is not -- LCPI and LBSF are

2   separate businesses and this is their saying we ended up

3   paying more money to a third party because you didn't give

4   us this -- by the way, it's only the $6 million and the ten

5   and they don't say why they didn't use any of the other 15

6   or why they didn't use the 32 million.  Those would all be

7   fact issues going forward.  You don't need to deal with

8   them.

9              So we just don't believe that these swap

10  termination damages could possibly be the value of the very

11  performance promised or the very performance that was

12  promised by the credit agreement.  So it has to be

13  consequential, it has to be special and the way it replies

14  to it.

15             I just want to close with one important conceptual

16  point because the administration of a bankruptcy state and

17  that is that if commercial transaction has to produce

18  litigation over what is special and consequential damages

19  and the kind of litigation that we're talking about here,

20  that's detrimental to the creditors and a very extensive

21  process and it's a great burden on the Court.

22             And Spanish Broadcasting and LCPI were

23  sophisticated parties.  They bargained for a simple, clean,

24  commercial transaction that didn't have this expense and

25  this uncertainty and we believe that the contract she be

1    enforced as written because that will achieve really what

2    the parties intended when they went into the bargain and

3    that is a clean transaction that can be paid off, that can

4    be terminated.  And if there were damages, they should not

5    have been a great burden on either party.

6              THE COURT:  Mr. Miller, before you sit down, could

7    you, in the portion of the Kern's report that's attached

8    behind Tab 11, so it's got total swap damages as $17 million

9    and then it says costs related to swap termination.  So the

10   proof of claim now seeks to recover on account of the swap

11   failure to fund, if you will, this $10 million number?  See

12   on page -- it's in little 1.

13             MR. MILLER:  Yes, I see, Your Honor.

14             THE COURT:  You see?

15             MR. MILLER:  Actually, I think what he does, Your

16   Honor, is he calculates this $10 million and then he says

17   they would have saved on borrowing costs --

18             THE COURT:  It would have saved the money that --

19             MR. MILLER:  -- by $6 million --

20             THE COURT:  Right.

21             MR. MILLER:  -- more dollars.  So they put -- you

22   know, they say that they had additional interest expense of

23   some kind because, I guess --

24             THE COURT:  So the swap payment would have been 6

25   million.  They ultimately settled it --

1          MR. MILLER:  For 15.4 million.

2          THE COURT:  -- 15. So they paid that but then

3     they're backing out the six.

4          MR. MILLER:  They said if they had had the ten

5     they would have used it to pay the six.

6          THE COURT:  Right.  But then, on top of all this,

7     they're adding an investment banker fee of $425,000 and

8     $500,000 legal fees for -- is that what it is?

9          MR. MILLER:  Apparently.  I don't know, Your

10    Honor.  You're going to have to ask --

11         THE COURT:  Is that -- okay.

12         MR. MILLER:  But that seems to be what is says

13    and, of course, Your Honor, if they had had the $10 million

14    draw they would have also had interest on the $10 million

15    draw.  So they would have been borrowing the $10 million.

16    So I don't see an adjustment in here anywhere but maybe it's

17    built into --

18         THE COURT:  Okay.

19         MR. MILLER:  -- the calculation for the interest.

20    But the point is, again --

21         THE COURT:  In any event, in your view, it doesn't

22    matter, it's consequential.

23         MR. MILLER:  Your Honor, this actually parts back

24    to a very perceptive statement by Judge Peck in the

25    sufficiency hearing where he said "The claims being asserted

Page 36

1    here are bloated, excessive and probably not allowable, but

2    I'm not ruling on that."  That is obviously our belief about

3    these claims but that doesn't -- that's not the basis for

4    the summary judgment.  The basis for the summary judgment is

5    the waiver and then, as a matter of law, the discovery shows

6    they are consequential or special.

7            THE COURT:  All right.  Thank you.

8            MR. MILLER:  Thank you, Your Honor.

9            MS. PRIMOFF:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MS. PRIMOFF:  Madlyn Primoff of Kaye Scholer on

12   behalf of Spanish Broadcasting.  Let's spend a moment, if we

13   can for Your Honor, on the legal standard applicable to

14   Lehman's summary judgment motion.

15           THE COURT:  You don't have to.

16           MS. PRIMOFF:  Okay.

17           THE COURT:  I know what it is.

18           MS. PRIMOFF:  On the facts, it's very important

19   that as Mr. Garcia, the CFO, says in his affidavit, Spanish

20   Broadcasting didn't event this working capital facility on

21   their own.  Lehman was the one who told them that they

22   needed to work on capital facility and they --

23           THE COURT:  What does that have to do with

24   anything?

25           MS. PRIMOFF:  Because the working capital facility

Page 37

1    was intended to be for rainy day money and at the time they

2    drew down on the facility it wasn't just raining, it was

3    pouring.  Spanish Broadcasting had a desperate need for

4    these funds and Lehman didn't provide them and as a result

5    of that Spanish Broadcasting was left with dangerously low

6    cash reserves as set forth in Mr. Garcia's declaration.  It

7    didn't have either the 6 million that it needed to terminate

8    the swap.  It didn't have the 4 million --

9            THE COURT:  It didn't have the 6 million it needed

10   to terminate the swap.  Are you sure about that?  Not that I

11   think it's relevant, but are you sure about that?

12           MS. PRIMOFF:  They had the money in the bank, but

13   in the judgment of the CFO, they could not have used the

14   funds for that purpose.  The failure to fund the draw left

15   Spanish Broadcasting severely undercapitalized and this is

16   all in -- I'm not making this up.  This is all in Mr.

17   Garcia's declaration.

18           THE COURT:  I understand, but what you're doing is

19   telling me -- there's very, very crystal clear language in

20   the credit agreement and instead of starting there and

21   trying to explain to me why that crystal clear language

22   isn't the beginning and the middle and the end of the story,

23   you are drawing my attention to all this other stuff that's

24   happening over here that suggests that your client and the

25   claimant, you know, was in dire straits.

1              But there's a contract.  It's called a credit

2      agreement.  It was negotiated between two sophisticated

3      parties and it's got crystal clear language in it and under

4      first year law school principles of contract interpretation,

5      in the absence of any ambiguity of that language, I'm stuck

6      with it.  And that language here is a waiver that says in

7      the clearest possible terms that these damages are hereby

8      irrevocably and unconditionally waived.  Period.  That's

9      where you got to start.

10              MS. PRIMOFF:  Okay.

11              THE COURT:  Okay.

12              MS. PRIMOFF:  I will start there, Your Honor.

13              THE COURT:  I'm sorry.  I --

14              MS. PRIMOFF:  No, no worries.  No worries.

15              THE COURT:  No, I spent the weekend with this so I

16      do, not surprisingly, have a clear view of what I'm

17      interested in.

18              MS. PRIMOFF:  Okay.

19              THE COURT:  Okay.  So --

20              MS. PRIMOFF:  No, we appreciate Your Honor's time

21      and attention and --

22              THE COURT:  Okay.

23              MS. PRIMOFF:  -- I'm going to start where you'd

24      like us to start.

25              THE COURT:  So get me out of that because that

1   language is, you know, 10.12, it's kind of a showstopper.

2           MS. PRIMOFF:  But it's not because the law is that

3   -- and it's Judge Cardoza, "those who make the contract can

4   undo it" and Nassau Trust, which is the prodigy for all of

5   these cases that Lehman cites also says --

6           THE COURT:  Okay.  So then you are agreeing that

7   Section 10.12, by its terms, on its face, is in fact a

8   waiver of special exemplary, punitive and consequential

9   damages.

10          MS. PRIMOFF:  When it was made and what we're

11  suggesting to the Court is that subsequent events caused

12  that waiver to be unwound, terminated.

13          THE COURT:  Well, it's not that subsequent events

14  can cause it to be unwound, it would have required that the

15  beneficiary of the waiver, LCPI, in clear and unequivocal

16  and unambiguous language would have had to say never mind,

17  remember that waiver that I gave you, I hereby revoke the

18  waiver and you can sue me for consequential, et cetera, et

19  cetera damages and it never said that.  It never said that.

20          Indeed, it is -- I think there was the word silly

21  somewhere in here, but I would say as a rational economic

22  actor and indeed one who owed fiduciary duties to estates at

23  that point, why would a revocation of this waiver have been

24  given at that subsequent point in time?  There's no

25  plausible explanation for that.  What was in it for LCPI to

Page 40

1    say, never mind, you're right, I looked at this forty-odd

2    million dollar claim you filed.  You waived the ability to

3    seek consequential damages but, never mind, we'll agree to

4    let you recover those now?

5            MS. PRIMOFF:  Okay.  We're getting repaid several

6    hundred million dollars on the credit facility.  That was

7    the context in which the payoff letter arose so Spanish

8    Broadcasting was refinancing its big credit facility --

9            THE COURT:  Right.

10           MS. PRIMOFF:  -- through the capital markets and

11   in connection with that the parties negotiated a payoff

12   letter and they negotiated precisely which terms of the

13   credit agreement and in the payoff would survive that

14   termination.

15           THE COURT:  And so in the payoff letter there is

16   no reference to Section 10.12 of the credit agreement.

17           MS. PRIMOFF:  Right.  And the payoff letter is

18   drafted to say these are the only provisions that survived

19   and that's the normal law.  The ASCAP decision cited in our

20   case says that the -- it says "Ordinarily, contract

21   provisions do not continue to bind --"

22           THE COURT:  At that point Spanish Broadcasting

23   owed the money.  They owed the money.  There was -- your

24   hypothesis is that LCPI voluntarily and knowingly and

25   intentionally undertook to take exposure to a $40 million

Page 41

1    claim it did not have in order to provide the means or the

2    occasion or to facilitate the repayment by Spanish

3    Broadcasting of money that it owed.

4            MS. PRIMOFF:  I don't know why they did what they

5    did.  I know that it was our intent through the drafting of

6    the payoff letter provisions on survival --

7            THE COURT:  So where's the email that says, hey,

8    we're revoking the waiver?  Where is that email?

9            MS. PRIMOFF:  Well, there are provisions

10   throughout the payoff letter that say these provisions

11   survive, these provisions survive.  It doesn't say 10.12

12   survives.  It doesn't say it and that's the law.  The law is

13   it had to say it.

14           THE COURT:  That's not the law.

15           MS. PRIMOFF:  Okay.

16           THE COURT:  A waiver is not an obligation.  A

17   waiver is not an obligation.  A waiver is an act.  It occurs

18   at a point in time.  It's not continuing.  It occurred.

19   It's over.  It's not an ongoing obligation.  It's not an

20   executory obligation.  It occurred.  It's over.

21           MS. PRIMOFF:  Your Honor, this was the substantial

22   back and forth over Section 4 of the payoff letter and it

23   went on for nine days and it's described in detail in the

24   Getlitz (ph) declaration and my partner, Ms. Getlitz, was

25   the drafts person -- I mean, Lehman was the drafts person

Page 42

1    but --

2              THE COURT:  Well, Mr. Miller has already said that

3    I could assume that that's absolutely what she had in mind

4    and it doesn't make a wit of difference.

5              MS. PRIMOFF:  But it does because the party's

6    intent is at issue --

7              THE COURT:  No, it's not -- the parties can't

8    secretly have an intent and it only be known to one party

9    and it not be known to the other party.

10             MS. PRIMOFF:  We submit it was known to all

11   parties.

12             THE COURT:  If you're right then you win today

13   because then that individual is going to get on the witness

14   stand and she's going to testify consistent with her

15   affidavit and she's going to say exactly what she said in

16   the affidavit and there's going to be no ability to cross-

17   examine her and it's game over.

18             MS. PRIMOFF:  No, what we're suggesting is that

19   the -- it's a question of intent of the parties as to

20   whether the waiver survived or not.

21             THE COURT:  The other party doesn't have the

22   intent.  You're positing that SBS's intent, albeit not

23   reflected in a document anywhere, is what has to prevail and

24   I'm suggesting to you that all the time parties come in in

25   the face of a clear document and say, oh, well, that wasn't

Page 43

1    the intent.  Well, but it doesn't work that way.  One party

2    can't have a secret intent and then when there's a problem

3    have that prevail over what the words of the document say.

4              If that is in fact what was happening then these

5    highly sophisticated lawyers could have very easily written

6    a provision that says for the avoidance of doubt -- I could

7    give you six different versions.  For the avoidance of

8    doubt, the waiver that was irrevocably given pursuant to

9    Section 10.12 is hereby revoked not withstanding anything to

10   the contrary therein.  That didn't happen.

11             The notion that LCPI was going to give up a waiver

12   that it was being alleged had a dollar sign of $40 million

13   on it, that it was going to give that up and undo that as a

14   necessary element of getting Spanish Broadcasting to repay

15   money it already owed, it's implausible.  It makes no sense.

16             MS. PRIMOFF:  Your Honor, we suggested that's

17   precisely why the parties went back and forth for nine days

18   over this issue.  It was back and forth, back and forth,

19   back and forth.

20             THE COURT:  And all you got after the back and

21   forth was an agreement that the release, that you still had

22   the right to prosecute the claim.  There was nothing that

23   said that LCPI didn't have the right to continue to assert

24   its rights, as they then existed, which were that there was

25   a waiver of special exemplary punitive and consequential

Page 44

1   damages.

2           They wanted everything to go away.  They didn't

3   get that.  But you didn't get a concession on their part

4   that they didn't still hold whatever defenses to the proof

5   of claim they had going into that discussion.

6           MS. PRIMOFF:  Well, Ms. Getlitz's view is that it

7   was the intent of the parties that the waiver survived.  And

8   we're not saying we win today.

9           THE COURT:  Ms. Getlitz's view is that that was

10  maybe her intent, but --

11          MS. PRIMOFF:  Well, on behalf of Spanish

12  Broadcasting.

13          THE COURT:  Right.  But it's not the parties.

14          MS. PRIMOFF:  Well, we believe that there is a

15  fact question as to what the intent of the parties was and

16  we're not saying we win that today, but we are saying we're

17  entitled to a trial on that issue.  I'll turn to the

18  characterization of the damages as --

19          THE COURT:  Sure.

20          MS. PRIMOFF:  -- directed.  The damages arise from

21  the failure to fund the working capital facility.  It's set

22  forth in both the Garcia declaration as well as the Kerns

23  affidavit that the funds were going to be used to terminate

24  the swap and the 4 million for normal marketing and

25  promotional expenses.  It's also set forth in both of those,

Page 45

1    the Garcia declaration and the Kerns affidavit, that Spanish

2    Broadcasting could not find this $10 million anywhere in the

3    market.  It was not available.

4             They went to the other revolving credit facility

5    lenders and asked them to fund and they would not and the

6    credit facility loans were trading at 58 cents on September

7    30, '08 and 38 cents on December 31.  So nobody is going to

8    lend 100 cents to get something that has a market value of

9    38 cents.

10             THE COURT:  Why do you need an investment banker

11    to terminate a swap?  Why do you need a half million dollars

12    in legal fees to terminate a swap?

13             MS. PRIMOFF:  I can explain that.  The delta

14    between the 6 million and the 15 million they ultimately

15    paid --

16             THE COURT:  Right.

17             MS. PRIMOFF:  -- let's just call that ten --

18             THE COURT:  Right.

19             MS. PRIMOFF:  -- and because of that ten, when

20    they did the refinancing they had to borrow $10 million

21    more.  So what Mr. Kerns did was he took the present value

22    of the $10 million --

23             THE COURT:  No, no, no.  In Mr. Kerns' affidavit

24    there are line items called additional swap damages incurred

25    to terminate the swap, (indiscernible) management,

Page 46

1    investment banker fees $525,000 and estimated legal and

2    other costs at half million dollars.

3            MS. PRIMOFF:  The investment banking fees related

4    to bringing in the refinancing loan with the additional $10

5    million.  So we couldn't get the money.  Mr. Troutman is our

6    media expert and there's a lag.  What he's saying, as a

7    media expert, is that you don't have immediacy to the

8    failure of fund, the marketing and promotional expenses.  So

9    he looks at Spanish Broadcasting's five most significant

10   markets and he determines based on a ratings decline

11   compared to our competitors, that we suffered a ratings

12   decline and a time committing $13 million reduction of

13   EBITDA in 2010.

14           And then you turn to Mr. Kerns, and looking at

15   market comps, he applies the 6.75 multiple to that.  Let's

16   get this up.  I apologize.  He applies the EBITDA margin of

17   28.6 to the $13 million to arrive at 3.6.  He then applies

18   the multiple to that to yield the $24.5 million dollars of

19   damages.

20           The law is, Your Honor, and this is at page 28 of

21   our brief, that the question of whether damages are direct

22   or consequential is a question of fact and Lehman cites

23   cases to the contrary, but all of the cases that they cite

24   are lost profits cases and this is not a lost profits case.

25   This is a diminution in value case.  And the difference is

Page 47

1    by not funding the $4 million of marketing and promotional

2    expenses, they damaged our brand which led to a reduction --

3              THE COURT:  So where does it say all of this in

4    the credit agreement?  It's a credit agreement.  It's an

5    agreement to loan money.

6              MS. PRIMOFF:  Right.

7              THE COURT:  Right.

8              MS. PRIMOFF:  Or working capital that they told us

9    we should have.

10             THE COURT:  So let me go back to the swap

11   termination.  So you terminated the swap in 2010, right?

12   And the refi was in 2012, right?

13             MS. PRIMOFF:  Yes.

14             THE COURT:  So you get to claim as damages your

15   expenses in connection with the refi that you did in 2012

16   for a swap that you terminated in 2010?

17             MS. PRIMOFF:  Yes.

18             THE COURT:  Is Spanish Broadcasting still

19   incurring damages as a result of LCPI's failure to fund this

20   loan?

21             MS. PRIMOFF:  Well, we quantified at the 24.5

22   million dollars through the combination of Troutman's

23   analysis and Kern's analysis.  It's not --

24             THE COURT:  But if we go to trial next year then

25   there are going to be more damages.

1          MS. PRIMOFF:  No.  No, because the analysis, it

2    looks at terminal values and market multiples and --

3          THE COURT:  I see.

4          MS. PRIMOFF:  -- and that kind of stuff.  It takes

5    that into account.  Direct damages are the natural and

6    probable consequence of the breach.  That's what Lehman said

7    in its opening brief, that's the formulation thought the

8    experts took into account.

9          Again, these are not lost profits damages.  This

10   is diminution in value damages and the Second Circuit has

11   accepted that as a measure of damages in the TECO Metals

12   case.  The UCC also recognizes the distinction between

13   diminution in value damages and consequential damages.  And

14   (indiscernible) recognized the distinction in an article,

15   albeit in the M&A context, but the context spoke to

16   contractual damages.

17          And again, Your Honor, we don't have a summary

18   judgment motion so it's not as though we're here today

19   saying, you know, we should win and walk away with 24.5

20   million and 17 million.  What we're saying is that there are

21   material issues of disputed fact that go to the question of

22   whether these damages are consequential or direct and that

23   we're entitled to proceed to trial and demonstrate that they

24   are direct and that they're compensable.

25          I would just point Your Honor, if I may --

Page 49

1          THE COURT:  Sure.

2          MS. PRIMOFF:  -- to two cases cited in our papers.

3          THE COURT:  Okay.

4          MS. PRIMOFF:  The first I think I've mentioned

5     which is U.S. v. ASCAP cited at pages 23 and 24.

6          THE COURT:  All right.

7          MS. PRIMOFF:  And then the second is Scientific

8     Components v. Raytheon --

9          THE COURT:  Right.

10         MS. PRIMOFF:  -- which specifically dealt with a

11    waiver of consequential damages and it was not --

12         THE COURT:  Well, in the Raytheon case there was

13    actually a section that listed sections which would not

14    survive termination, right?  Right.

15         MS. PRIMOFF:  Yes, and we have the functional

16    equivalent here because we've got provisions that say this

17    will survive, this will survive and nowhere does --

18         THE COURT:  Show me the functional equivalent.

19         MS. PRIMOFF:  Show you?

20         THE COURT:  Yes, what are you talking about the

21    functional equivalent of a section of a survival section?

22         MS. PRIMOFF:  What it is is it's broken out in the

23    context of this agreement.  So it says 10.5, the contingent

24    obligations will survive.

25         THE COURT:  Where are you referring to, in the

Page 50

1    credit agreement?

2            MS. PRIMOFF:  Both in the credit agreement --

3            THE COURT:  Well, I'm just asking you to show me.

4    So in the credit agreement you say 10.5 is the survival

5    provision?

6            MS. PRIMOFF:  No, there's nothing -- I'm sorry.

7    There's nothing that's called a survival provision.

8            THE COURT:  Okay.

9            MS. PRIMOFF:  There are provisions throughout the

10   documents that say this will survive.  So just bear with me

11   a second, please.  Okay.  So the credit agreement 2.19(c),

12   it says the obligations of the borrower pursuant to this

13   section shall survive the termination of the agreement and

14   the payoff --

15           THE COURT:  Right.  So there's not a separate

16   section in the credit agreement with a heading, which would

17   have no meaning because headings have no meaning, which says

18   survival of provisions.  There's none of that.

19           MS. PRIMOFF:  Correct.

20           THE COURT:  So you're pointing me to one

21   particular provision that says that this will survive,

22   right?

23           MS. PRIMOFF:  Yes, and then Section 2 --

24           THE COURT:  But wait, not so fast.

25           MS. PRIMOFF:  Okay.

1          THE COURT:  But the one you just showed me has the

2     magic word "obligations".  A waiver is not an obligation.

3          MS. PRIMOFF:  Okay.  Let's look at 2.20(e).

4          THE COURT:  2.20(e).  Okay.  But again, I'm just

5     taking you at your word and you are point me to a case that

6     I think says that there's a section that deals with it that

7     in other words makes a list of the survival of obligations,

8     right?  So we don't have that here.

9          MS. PRIMOFF:  No, we don't have that but I think

10    that's a distinction without a difference, respectfully,

11    because there are various provisions of the credit agreement

12    and the payoff letter that say this will survive.  And they

13    --

14          THE COURT:  So okay.  So let's pause on this one.

15    So you say the parties signed this credit agreement and you

16    say that at that moment in time, if that agreement were to

17    have terminated the next day, forget the payoff letter.

18    That because you've got a provision 10.12 that says we

19    hereby irrevocably and unconditionally waive consequential

20    damages and you're saying that because it didn't also say

21    this provision survives termination of the agreement that

22    when the agreement terminates that provision doesn't

23    survive.

24          MS. PRIMOFF:  That is the law according to ASCAP.

25          THE COURT:  But that would be an absolutely

1    extraordinary thing --

2              MS. PRIMOFF:  Well, then why --

3              THE COURT:  -- for the clear words to say I hereby

4    unconditionally waive.  Not I shall waive, not I promise in

5    the future, right now I waive.  But if it terminates I no

6    longer waive.  So if, for example, the worst economic

7    meltdown since the Great Depression happens, the waiver goes

8    away and the sky is the limit on consequential damages and

9    all of that is what the parties intended.

10             MS. PRIMOFF:  All I'm saying, Your Honor, is that

11   in 2.19(c) they manage to say "shall survive" and in 2.20(e)

12   they said "shall survive" and if they intended for 10.12(e)

13   to say "shall survive", it should have said "shall survive".

14             THE COURT:  What's the point of it?  Under what

15   circumstances would it have any teeth?  It becomes a

16   nonsensical provision if you need to also have this magic

17   mantra of that it shall survive?  It is an act that occurs

18   in the past.  It is a waiver.  It happened.  There's --

19             MS. PRIMOFF:  But waivers can be undone and we

20   think that by virtue of the payoff letter, which also did

21   the same thing in terms of "shall survive", we think it

22   didn't.  I mean, the Getlitz declaration says that the word

23   expressly was put in there to say "expressly survive".  That

24   if it wasn't listed and it wasn't mentioned in the credit

25   agreement that it didn't survive and that's what the Getlitz

1    declaration says and "expressly" meant something.  We came

2    back and we said "expressly".

3           THE COURT:  So if Ms. Getlitz gets on the stand

4    and I were to ask her did you have direct discussions with

5    your counter-party about the need to undo the consequential

6    damage waiver, she would say yes?

7           MS. PRIMOFF:  No, she would say no.

8           THE COURT:  She would say no.  Because nobody

9    thought that's what they were doing on the LCPI side.

10          MS. PRIMOFF:  I can't speak to what they thought

11   on their side, but it's clear, based on the affidavit

12   submitted to Your Honor, as to what we thought they were

13   doing on our side.  Unless the Court has further questions,

14   I have nothing further, Your Honor.

15          THE COURT:  Thank you.

16          Mr. Miller, do you want to deal with the

17   "expressly" point?

18          MR. MILLER:  Yes, Your Honor.  I will deal with

19   that point.  The sequence here, if we look back at Tab 5 --

20          THE COURT:  And also, if you could deal with

21   Ms. Primoff's points about the numerous provisions in the

22   credit agreement that have a built-in survival clause.

23          MR. MILLER:  Yes, Your Honor.  I'll try to do

24   that.  Starting with the payoff letter in Tab 5, let's go

25   back to the language.  The credit agreement and all

1   obligations of the borrower and other loan parties therein

2   and under the other loan documents shall be terminated. It

3   does not say are hereby retroactively terminated.  It

4   doesn't say they're rescinded.  It says they shall be

5   terminated other than contingent obligations which expressly

6   survived by the terms of the credit agreement or such other

7   loan documents including without limitation Section 10.5 of

8   the credit agreement.

9        And if we look at Section 10.5 and the other

10   sections that do expressly survive, we find that they are

11   things that are fairly typical, long-term continuing duties

12   that people should have like (indiscernible) expenses was

13   10.5 that they agreed to reimburse for things that were

14   necessary after the termination to be done.

15        And there are provisions, I think, on

16   confidentiality.  There are some other things here like, I

17   think, 10.14 may be one of those that survives.  In any

18   event, all of these are the things that are going to be

19   ongoing future events.  The waiver, as the Court has

20   correctly analyzed it, was over and done with and it applied

21   in the past.  I think the Court has already deal with the

22   Raytheon case correctly with express exception, but I wanted

23   to explain why I think the ASCAP case actually also provides

24   a very helpful analysis of this for our position.

25        If you look at the ASCAP case, and the facts are a

Page 55

1    little bit complicated there, but it had to do with an

2    ongoing loyalty dispute and there were certain parties,

3    radio stations that were actually going to sit out the

4    royalty dispute, but they agreed to be -- they had temporary

5    licenses and they agreed to be bound by the outcome of that

6    proceeding and the dispute was how long did that agreement

7    continue?  And that agreement was terminated and they said,

8    well, we ought to be able to now have a new dispute.

9            Footnote 9 makes the very important point in the

10   ASCAP decision.  It is not disputed that the waiver

11   provision bars the stations from instituting a separate

12   proceeding with regard to the period covered by the

13   extension to the extent that ASCAP also hoped that the

14   waiver language would bar later proceedings for periods

15   after the extension event agreement had been terminated,

16   however, such a unilateral expectation cannot be enforced

17   absent explicit language in binding it.

18            In essence, it's a little bit flipped in

19   positions, but the Court rejected the very argument that she

20   is making here about an unexpressed expectation.  But the

21   Court says the waiver provision applied to all the things

22   that happened while it was in effect, which is the point

23   here, the waiver was in effect at the time of the failure t

24   fund.  It was in effect at the time the claim was filed and

25   the claim was merely carved out of the release.  There is

Page 56

1    nothing to do with the claim.

2            And I might add that, and I know we're going out

3    of the record a little bit, Ms. Primoff said that there was

4    hundreds of millions of dollars paid.  I understand that the

5    portion that LCPI received was more in the nature of 10

6    million of that money from things it had done before, but it

7    was certainly less than the value of the $40 million claim

8    and we would be able to show that if went forward.

9            The point is, you were absolutely right on the

10   economics here.  It made absolutely no economic sense for

11   LCPI to agree to give up its very strong defense that it

12   thought it had to the excessive and bloated claim, in its

13   view, in the words of Judge Peck, to give that up for

14   nothing.  And so, you know, Your Honor, we think that that -

15   - you know, we think your analysis is absolutely correct.

16           A couple of other points --

17           THE COURT:  So under that theory, just to keep

18   following it, LCPI, if you will, as administrative agent,

19   takes one for the team for the bank group?

20           MR. MILLER:  That would be the theory, yes, Your

21   Honor.  But in order for the bank group to get most of the

22   other people to get their money in the door, LCPI gives up

23   this claim but -- and that this is -- if this were the

24   agreement, it's just really hard to believe that Spanish

25   Broadcasting wouldn't say, you know, we really want a for

Page 57

1    avoidance of doubt clause on that.  That's really important

2    to us.

3            I mean, to some extent the important of it to them

4    is also a reason why you would expect that if they really

5    thought that was the deal they were making they would have

6    put it in here.  I mean, it's just hard to believe that it

7    was not.  And sticking to the word "expressly", and again,

8    unless this is sort of, you know, trick drafting, trying to

9    sneak one by, which I'm not suggesting is, the logic is that

10   if the parties really made that deal this would be front and

11   center and it was something that was there.  I might add

12   that it's not even clear that LCPI signed the payoff letter.

13           THE COURT:  Well, it signed the letter as an agent

14   bank, right?  As the agent, not as a party, right?

15           MR. MILLER:  Yes, it did sign it as an

16   administrative agent.  It actually did not sign it, but as

17   administrative agent, I think, Your Honor, arguably it

18   signed for all the bank group, but it certainly did not sign

19   as (indiscernible).

20           I might also point out, Your Honor, one of the

21   inconsistencies of their argument is that the obligation to

22   repay doesn't have survival language.  You know, I mean, if

23   the credit agreement is really terminated it doesn't even

24   have to pay at all and, you know, and by the way, if they

25   really terminated everything, it's not clear why they still

1    have a claim for the loss although the claim is preserved.

2    I mean, this whole idea that everything was terminated

3    except things that expressly survived and the fees that are

4    called out, it just -- again, plain language, we think,

5    answers the question.

6         THE COURT:  All right.

7         MR. MILLER:  With regard to the damages theory,

8    just very quickly, I do want to mention that at the April

9    27th hearing the Court asked Ms. Primoff, do you have a

10   universe of documents that you think demonstrate your

11   damages and she said yes.  And you had asked, have you

12   produced those and she said yes.  So the record is complete,

13   we think, on the damage issue.

14        And Your Honor, there's also -- I mean, there's a

15   lot of sort of almost nonsense in the way some of the

16   damages work.  One of the points, for example, is that under

17   the credit agreement, if they had gotten the $10 million

18   draw it would have reached maturity in 2010, two years

19   later.  And yet their investment banker calculates the cost

20   somehow of that $10 million for a future time after 2010.  I

21   mean, it's really -- the report is just not well put

22   together, but the point is it's got all kinds of stuff hung

23   on it which is clearly consequential damages.  It's all

24   consequential damages.

25        So for those reasons, Your Honor, I'd be happy to

Page 59

1    answer any other questions the Court may have, but we

2    believe the record is complete, the record is clear.  This

3    is a summary judgment case.  The plain language, as you

4    said, of the waiver was irrevocable, it was unconditional,

5    it was operative, it was in effect at the time of all the

6    events that gave rise to the claim at the time the claim

7    was, in fact, filed.

8              The payoff letter certainly does not have the

9    clarify necessary to set aside that sort of material

10    provision.  If it applies, as a matter of law, the first two

11    components of damages, the impacted EBITDA damages and the

12    swap damages are certainly consequential or special and

13    under those circumstances we could resolve 99 percent of the

14    case in summary judgment and ask you to do so, Your Honor.

15    Thank you.

16              THE COURT:  Thank you.

17              Anything further, Ms. Primoff?

18              MS. PRIMOFF:  No, Your Honor.

19              THE COURT:  Okay.  Thank you very much.  If you

20    have a few minutes, I'm wondering if you could join me for a

21    conference off the record, all right?  I'll let you decide

22    whomever you'd like to bring with you.

23        (Whereupon these proceedings were concluded at 11:34

24    AM)

25

Page 60

C E R T I F I C A T I O N

I, Jamie Gallagher, certify that the foregoing transcript is

a true and accurate record of the proceedings.

*Jamie Gallagher*

Digitally signed by Jamie Gallagher
DN: cn=Jamie Gallagher, o=Veritext,
ou, email=digital@veritext.com, c=US
Date: 2015.10.14 11:20:15 -04'00'

_____

Jamie Gallagher

I, Debra McCostlin, certify that the foregoing transcript is

a true and accurate record of the proceedings.

*Debra McCostlin*

Digitally signed by Debra McCostlin
DN: cn=Debra McCostlin, o=Veritext, ou,
email=digital1@veritext.com, c=US
Date: 2015.10.14 11:21:14 -04'00'

_____

Debra McCostlin

Date:  September 21, 2015

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Page 61

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25