WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
William A. Maher
James N. Lawlor
Fletcher W. Strong

*Counsel for Plaintiff Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Case No: 08-13555 (SCC)<br><br>Chapter 11<br><br>Jointly Administered |
| LEHMAN BROTHERS HOLDINGS INC. and LEHMAN BROTHERS SPECIAL FINANCING INC.,<br><br>Plaintiffs,<br><br>– against –<br><br>SEQUA CORPORATION,<br><br>Defendant. | Adv. Pro. No. 15-_____ (SCC)<br><br>**COMPLAINT** |

Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator of Lehman Brothers Special Financing Inc. ("LBSF" or "Plaintiff"),[1] by and through its undersigned counsel, brings this Complaint against Sequa Corporation ("Sequa" or the "Defendant"), and respectfully states:

---

[1] LBSF is a debtor in the above-captioned jointly administered chapter 11 case of LBHI and its affiliated debtors.

**PRELIMINARY STATEMENT**

1. Sequa owed LBSF a multi-million dollar termination payment in connection with three related derivative transactions: an interest rate swap and two interest rate collars. Sequa, however, failed to calculate the termination payment in accordance with the governing agreement. As a result, Sequa paid LBSF just $1,784,311.67 of the termination payment, which resulted in a windfall for Sequa while depriving LBSF from receiving the full termination payment it was (and is still) owed.

2. Each of the transactions was governed by the same Master Agreement (defined below).[2] Following the bankruptcy filings of LBHI and LBSF, Sequa exercised its contractual right to terminate the transactions. On the date of the termination, the transactions were undisputedly "in-the-money" to LBSF. Sequa, as the non-defaulting party under the contract, was required to calculate the termination payment due to LBSF. Sequa was required to calculate this amount in *good faith* and in a *commercially reasonable manner*. Instead, with the help of its financial advisor, Chatham Financial Corporation ("Chatham"), Sequa calculated a termination payment that did not remotely reflect the value of the transactions. It did so by relying on a *single low-ball bid* that Chatham obtained from HSBC Bank plc ("HSBC"), while at the same time negotiating the terms of a replacement transaction with HSBC that was effectuated on more favorable terms.

3. In accordance with the parties' agreement, LBSF is entitled to recover from Sequa the full amount of the gain Sequa realized in terminating the transactions on the Early Termination Date, as well as all amounts improperly deducted from Sequa's termination payment on account of purported legal fees and expenses, plus interest.

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Master Agreement.

2

**PARTIES**

4. Plaintiff LBHI is a Delaware corporation with its principal place of business located at 1271 Avenue of the Americas, New York, New York 10020. On December 6, 2011, the Court approved and entered an order (the "Confirmation Order") confirming the Modified Third Amended Plan of Reorganization of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"). The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of LBSF.

5. Plaintiff LBSF is a Delaware corporation with its principal place of business located at 1271 Avenue of the Americas, New York, New York 10020.

6. Defendant Sequa is a Delaware corporation with its principal place of business located at 200 Park Avenue, New York, New York 10017.

**JURISDICTION AND VENUE**

7. This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8. The Court has subject-matter jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334. In addition, the parties have submitted to the exclusive jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York under the applicable agreements.

9. Further, this matter has a close nexus with the Plan. The Court has retained post-confirmation jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraph 77 of the Confirmation Order.

10. The Court has personal jurisdiction over the Defendants.

11. This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

12. Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11 cases are pending in this district.

13. Pursuant to Bankruptcy Rule 7008, this adversary proceeding relates to the Chapter 11 case *In re Lehman Brothers Holdings Inc.*, pending in this Court as Case No. 08-13555 (SCC).

14. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff consents to the entry of final judgment by this Court if it is determined that, absent consent of the parties, this Court cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## BACKGROUND

**A.    The Relevant Agreements and Transactions**

15. Upon information and belief, in December 2007, Sequa was acquired by a private equity partnership managed by The Carlyle Group. Upon information and belief, in order to finance that acquisition, Sequa issued hundreds of millions of dollars of debt, which accrued interest at floating rates.

16. Upon information and belief, in order to partially hedge the interest rate risk from the debt, Sequa entered into three separate transactions with LBSF in January 2008, consisting of an interest rate swap and two interest rate collars (collectively, the "Transactions").

17. Subsequently, the parties entered into a 2002 ISDA Master Agreement, dated June 25, 2008, between LBSF and Sequa (the "Master Agreement"), including the Schedule thereto, dated June 25, 2008, between LBSF and Sequa (the "Schedule"). On July 9, 2008, the confirmations relating to the Transactions were amended and restated to make them subject to the Master Agreement.

4

### i.  The Interest Rate Swap

18.     In a plain vanilla interest rate swap, one party pays a fixed rate while the other party pays a floating rate, each based on a specified notional amount and on scheduled payment dates.  Payments are typically netted, meaning that the fixed rate payer will make a net payment whenever the floating rate is less than the fixed rate and the floating rate payer will make a net payment whenever the floating rate is greater than the fixed rate.

19.     Pursuant to the interest rate swap that Sequa and LBSF entered into on January 29, 2008 (the "Swap"), Sequa would make fixed quarterly payments at a rate of 2.932% per annum, while LBSF would make floating quarterly payments based on three-month LIBOR, each based on a notional amount of $150,000,000.  The Swap became effective on March 31, 2008 and was scheduled to terminate on March 31, 2010.

### ii.  The Interest Rate Collars

20.     In an interest rate collar, one party purchases an interest rate ceiling or "cap," while simultaneously selling an interest rate "floor."  This strategy functions like an interest rate swap by requiring one party to make payments if the floating rate increases and the other party to make payments if the floating rate decreases; however, it also provides that no payments are made if the floating rate falls within a certain range.  Under a Collar, the seller of the floor (*i.e.* the fixed rate payer) makes payments when the floating rate is less than the floor rate and the seller of the cap (*i.e.* the floating rate payer) makes payments when the floating rate is greater than the cap rate.  No payments are made when the floating rate is between the cap rate and floor rate.

21.     Pursuant to the interest rate collars between Sequa and LBSF, Sequa sold floors to LBSF and LBSF sold caps to Sequa.  Under the interest rate collar entered into on January 29,

5

2008 (the "First Collar"), Sequa would make quarterly payments to LBSF if the three-month LIBOR rate fell below the 2.875% per annum "floor rate," while LBSF would make quarterly payments to Sequa if the three-month LIBOR rate rose above the 4.50% per annum "cap rate." Under the interest rate collar entered into on January 31, 2008 (the "Second Collar" and, together with the First Collar, the "Collars"), Sequa would make quarterly payments to LBSF if the three-month LIBOR rate fell below the 3.01% per annum "floor rate," while LBSF would make quarterly payments to Sequa if the three-month LIBOR rate rose above the 4.50% per annum "cap rate." Each Collar had a notional amount of $150,000,000, was scheduled to become effective on March 31, 2010 and was scheduled to terminate on March 31, 2011.

**B.    Early Termination of the Transactions**

22.    The Master Agreement provided that following an Event of Default, the Non-defaulting Party may, by notice to the Defaulting Party, "designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions." Master Agreement § 6(a). Consequently, an Early Termination Date could not occur prior to the date that the recipient of a termination notice actually receives effective notice.

23.    The Master Agreement provided that a termination notice to LBSF could be delivered (i) in person or by courier, (ii) by facsimile or (iii) by certified or registered mail. *See* Master Agreement § 12; Schedule Part 4(a). The Master Agreement further provided that a notice delivered by courier would be deemed effective "on the date it is delivered" and that a notice by facsimile is effective only upon "the date it is received by a responsible employee of the recipient." *Id.* § 12(a).

24.    On September 15, 2008, LBHI, LBSF's Credit Support Provider under the Master Agreement, filed a voluntary Chapter 11 bankruptcy petition. On October 3, 2008, LBSF filed a

6

voluntary Chapter 11 bankruptcy petition.  These bankruptcy filings constituted "Events of Default" under the Master Agreement.  Citing the bankruptcy filings of LBHI and LBSF, Sequa exercised its right to terminate the Transactions.

25.     On December 12, 2008, Sequa purported to terminate the Transactions by allegedly faxing and delivering via courier to LBSF a "Notice of Early Termination" (the "Termination Notice").[3]  The Termination Notice designated December 15, 2008 as the early termination date (the "Early Termination Date").

**C.     Sequa's Improper Calculation of the Termination Payment**

26.     At the same time it was attempting to terminate the Transactions, Sequa, through Chatham, was negotiating a new transaction with HSBC (the "Replacement Swap").  Although the terms of the Replacement Swap were different from those of the Transactions, the Replacement Swap would effectively replace the Transactions as a hedge for the interest rate exposure arising from Sequa's floating rate debt.

27.     Even though HSBC was actively negotiating the Replacement Swap with Sequa and knew that Sequa had no interest in entering into exact replacements for the Transactions, Chatham asked HSBC to provide a quotation for the Transactions so that Sequa could use that quotation to calculate its termination payment to LBSF.  On December 15, 2008, HSBC accommodated its new client by providing Sequa with a low-ball, non-competitive bid that included millions of dollars of hypothetical transaction costs.

28.     On December 18, 2008, Sequa and HSBC executed the Replacement Swap.  The transaction costs HSBC actually charged Sequa were a mere fraction of the costs imbedded in

---

[3] Sequa has the "burden of proving [LBSF's] receipt" of the faxed Termination Notice and such burden "will not be met by a transmission report generated by the sender's facsimile machine." Master Agreement § 12(a)(iii).  To the extent that the Termination Notice was not properly delivered to LBSF in accordance with the parties' agreements, the December 12, 2008 Termination Notice and early termination date stated therein would be rendered invalid.  *Id*. §§ 6(a), 12(a).

7

the indicative quotation it had provided three days earlier for the Transactions, even though the Replacement Swap was a riskier trade, as it had a larger notional amount and a later maturity date.

29. On that very same day, Sequa sent LBSF its calculation statement pursuant to Section 6(d)(i) of the Master Agreement, which set forth an amount payable to LBSF based entirely on the indicative quote HSBC provided on December 15, 2008, less certain fees it claimed to have incurred.

30. Sequa's calculation violated the terms of the Master Agreement as it was commercially unreasonable, not performed in good faith, and did not remotely reflect the actual value of the Transactions.

31. The Master Agreement required Sequa to calculate the termination payment "*in good faith* and [to] use *commercially reasonable procedures* in order to produce a *commercially reasonable result*." Master Agreement § 14 (defining "Close-out Amount") (emphasis added). Nevertheless, Sequa calculated the termination payment by soliciting one solitary bid through Sequa's financial agent, Chatham. The sole bid that Chatham purportedly received was from HSBC, which calculated its bid while simultaneously collaborating with Sequa on the terms of the Replacement Swap. Failing to act in a commercially reasonable manner, Sequa did not obtain any competitive bids or calculate the intrinsic value of the Transactions based on an industry standard mark-to-market analysis.

32. Accordingly, Sequa's calculation of the termination payment should be disregarded in favor of a commercially reasonable valuation.

33. In addition, Sequa improperly deducted approximately $100,000 in expenses for consulting fees it purportedly paid Chatham, as well as more than $17,000 in legal fees. This

8

amount far exceeds the "reasonable out-of-pocket expenses" which Sequa would be entitled to deduct for Chatham's role in soliciting a single set of quotations. Master Agreement § 11.

34. Contrary to the terms of the Master Agreement and applicable law, Sequa failed to calculate the termination payment in good faith or in a commercially reasonable manner. As such, Sequa owes LBSF the remainder of the properly calculated termination payment, as well as interest thereon.

**D.    Subsequent Communications Between the Parties**

35. On December 19, 2008, Sequa remitted $1,753,625 to LBSF based on the calculation set forth in its calculation statement. On July 15, 2009, Sequa remitted another $30,686.67 to LBSF in partial satisfaction of a periodic Swap payment in the amount of $50,358.50 that it had failed to make on September 30, 2008.

36. After unsuccessful informal negotiations, LBSF served Sequa with a Derivatives ADR Notice on October 13, 2011. The parties participated in a mediation session on May 9, 2012, which also concluded without a resolution.

37. On July 9, 2014, LBSF and Sequa executed a Tolling and Forbearance Agreement which tolled, among other things, any "statute or period of limitations, statutes of repose, or other time-based limitations or defenses" for any claims "arising out of or related to the Transactions or the Master Agreement" for a period of one year.

## COUNT I
### (Breach of the Master Agreement)

38. LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

9

39. On the Early Termination Date, LBSF was the party "in-the-money" and thus entitled to receive a substantial termination payment from Sequa in accordance with the Master Agreement.

40. The Master Agreement is a valid and enforceable agreement that is binding upon Sequa.

41. LBSF has substantially performed all of its obligations under the Master Agreement.

42. Sequa failed to use commercially reasonable procedures in order to produce a commercially reasonable result when it relied on a low-ball, indicative bid to value the Transactions at the same time it was replacing them with the same dealer that provided the bid, HSBC, on more favorable terms.

43. As a result, LBSF has been damaged in an amount to be proven at trial, constituting the unpaid portion of the termination payment owed by Sequa to LBSF as of the Early Termination Date and all unpaid periodic Swap payments, plus interest until final payment is made.

## COUNT II
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

44. LBSF repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

45. On the Early Termination Date, LBSF was the party "in-the-money" and thus entitled to receive a substantial termination payment from Sequa in accordance with the Master Agreement.

46. Sequa manipulated its calculation of the termination payment to achieve a windfall by running a dual process in which it sought an indicative, non-competitive quotation from HSBC at the same time it was entering into an actual transaction with HSBC.

47. By relying on that bid, ignoring its actual trading gains and refusing to pay LBSF a properly calculated, commercially reasonable termination payment in accordance with the proper procedures set forth in the Master Agreement, Sequa's conduct precluded LBSF from receiving the fruits of the Master Agreement, subverted LBSF's rights in the Master Agreement and constituted an end-run around the Master Agreement, in violation of the covenant of good faith and fair dealing implicit in all contracts governed by New York law.

48. As a result, LBSF has been damaged in an amount to be proven at trial, constituting the unpaid portion of the termination payment owed by Sequa to LBSF as of the Early Termination Date and all unpaid periodic Swap payments, plus interest until final payment is made.

## CONDITIONS PRECEDENT

All conditions precedent have occurred, been performed, or been waived or excused.

**PRAYER FOR RELIEF**

WHEREFORE, LBSF respectfully requests that the Court enter judgment in its favor, and against Sequa, as follows:

A. An award of damages in an amount to be determined at trial, plus interest and attorneys' fees, including the legal fees and expenses that Sequa improperly deducted from Sequa's termination payment to LBSF; and

B. Such other and further relief as the Court deems just and proper.

Dated:   New York, New York
    November 13, 2015

Respectfully submitted,

WOLLMUTH MAHER & DEUTSCH LLP

By:   /s/ James N. Lawlor
      William A. Maher
      James N. Lawlor
      Fletcher W. Strong

500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050

*Counsel for Plaintiff Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc.*