**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
|  | : Case No. 08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC. et al. | : |
|  | : (Jointly Administered) |
| Debtors. | : |
|  | : |
|  | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF RONALD H. HOPKINS IN SUPPORT OF OPPOSITION OF
ARCH INSURANCE COMPANY TO MOTION FOR ORDER COMPELLING
ARBITRATION OF DISPUTES UNDER SETTLEMENT
AGREEMENT BETWEEN DEBTORS AND ARCH INSURANCE COMPANY**

I, Ronald W. Hopkins, declare

1.     I am an attorney at law licensed to practice in the State of California and in the

Central District of California, and counsel for respondent Arch Insurance Company ("ARCH")

in proceedings pending in the state court in California relating to this matter. This declaration is

offered in support of Arch's opposition (the "Opposition") to the motion (the "Lehman Motion")

to compel arbitration at JAMS brought by the Lehman Parties.[1] The following statements are of

my own personal knowledge. If called upon to testify in this action, I could and would state the

following:

2.     Arch was a performance bond surety for one of California's largest subdivision

developers, the Suncal Companies ("Suncal"), in the years prior to the real estate recession of

2008. Typically, a surety such as Arch issues performance bonds on behalf of a subdivision

developer, such as Suncal, which guarantee to a public entity that public infrastructure

improvements in and around a residential subdivision will be completed. The basic statutory

---

[1] Unless otherwise defined, capitalized terms shall have the meaning ascribed to them in the Opposition.

purpose behind these bonds is to prevent a developer from selling the residences within a subdivision, and then abandoning the subdivision without completing the appurtenant public improvements (water, sewer, roads, etc.). The subdivision performance bonds are provided by the developer as principal and by the surety to the public entity obligee as pursuant to the Subdivision Map Act, California Government Code sections 64999 et seq.

3.      I am informed and believe that one or more of the Lehman Parties, the petitioners in the Lehman Motion, were the primary investors in and the source of funds for many of the subdivisions being constructed by Suncal. Each subdivision was organized as a stand-alone LLC under the control of the parent Suncal.

4.      The Suncal stand-alone entity at issue in this petition was Palmdale Hills Property, LLC, and the common name for the subdivision was Ritter Ranch. Ritter Ranch was proposed to be a 7000 unit two-phase subdivision located a few hundred yards off a rural road (Elizabeth Lake Road) several miles west of I-14 within the city limits of Palmdale, California.

5.      Beginning in April of 2005, Arch issued subdivision performance bonds to the City of Palmdale for Phase 1 Infrastructure (approximately $5,000,000 in total penal sums—the "Phase 1 Bonds")) and for Phase 1 of expansion of Elizabeth Lake Road (approximately $7,000,000 in total penal sums—the "ELR Bonds".). The previously existing one lane per direction rural road was to be widened to accommodate traffic from the anticipated 7000 new residences.

6.      Suncal then proceeded to install portions of the Phase 1 infrastructure (water, sewers, rough-out of roads, etc.) and also began the process of widening Elizabeth Lake Road.

7.      I am informed and believe that certain of the Lehman Parties filed voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States

Bankruptcy Court for the Southern District of New York in September of 2008. Shortly
thereafter in November of 2008, many of the Suncal entities including Palmdale Hills Property
LLC, filed  Chapter 11 voluntary petitions or were the subject of involuntary petitions in the
Central District of California, Santa Ana Division.

8.     As a result of the Palmdale Hills Property bankruptcy and cessation of
construction activities at Ritter Ranch, the City filed two lawsuits against Arch to enforce the
bonds. The first suit was dismissed without prejudice. The second suit—Los Angeles County
Superior Court Case No.BC425071 (the "Superior Court Lawsuit"), was filed on or about
October 29, 2009. The Superior Court Lawsuit sought only to enforce the ELR Bonds. My law
firm represented Arch as a defendant in this lawsuit. Arch's primary substantive defense to the
City's lawsuit was that it would constitute economic waste to build out the $7 million of ELR-
related road improvements—given that the improvements were designed to support an
anticipated 7000 unit subdivision, no homes had ever been constructed, and in light of the
housing recession it did not appear that any homes would be built for the foreseeable future.

9.     Beginning in the spring of 2010, Arch engaged in numerous meetings and
discussions with the City in an attempt to settle and resolve the Superior Court Lawsuit.
Separately, between 2008 and 2010, Palmdale Hills Property as Chapter 11 debtor-in-possession
had been able to obtain allocation of funds approved by the Bankruptcy Court as public health
and safety allocations, to complete much of the basic widening of ELR.

10.     Between the spring of 2010 and though early February 2011—numerous
representatives of the City (including three outside counsel) and Arch engaged in discussions,
telephone conferences, and meetings at City Hall to try to resolve the Superior Court Lawsuit.
The gist of these extensive meetings and discussions was that the City would accept performance

of a limited amount of the bonded improvements by Arch in satisfaction of the bonded obligations, and upon completion of those improvements would release Arch from the remaining bonded obligations. There would be no trial and attendant expense, and Arch would forego its economic waste defense.

11.    The final result of the lengthy negotiations between Arch and the City was for Arch to perform two items of work in exchange for the release of the ELR Bonds. The two items were: (1) completion of a punch-list of about twenty small miscellaneous items of work to complete the widening of ELR ("the Miscellaneous Road Work"); and (2) installation of street lights along Phase 1 of the ELR per a certain Street Light Bond ("Street Light Installation'). By the time the negotiations had ended, specific bids had been obtained for the Miscellaneous Road Work and the highest bid was approximately $300,000. Bids were not obtained for the Street Light Installation (bond penal sum $404,800) because it was understood that the plans would be re-designed to eliminate a traffic signal, which was not needed since no one lives at Ritter Ranch. There was, however, specific discussion at the settlement meetings that the street lights could no longer be installed in 2011 for the original penal sum of $404,800 established in 2005. The rough estimate of the cost of the street lights discussed at the meetings was approximately $700,000 to $725,000. The City asked Arch to pay for this cost above the penal sum of the Street Light Bonds—as well as the approximate $300,000 for the miscellaneous road work—as a quid pro quo in exchange for release of the remaining work under the $7,000,000 of ELR bonds.

12.    The Lehman Parties took no role whatsoever in the negotiations between Arch and the City to resolve the Superior Court Lawsuit in 2010 and 2011—and the Lehman Parties as a creditor of Suncal had not taken title to the subdivision property at that time.

13.     Arch and the City then reached a written settlement agreement of the Superior
Court Lawsuit on or about February 10, 2011. A true and correct copy of the Settlement
Agreement ("the Arch/City Agreement") has been submitted by the Lehman Parties to the Court
in connection with the Lehman Motion. It is attached as Exhibit D to the September 25, 2011
Settlement Agreement between Arch and the Lehman Parties. The September 25, 2011
Settlement Agreement is part of Exhibit 1 to the Lehman Motion.

14.     Separately, all of the parties to the Suncal bankruptcy proceeding were engaging
in a mega-mediation at JAMS before Ret. Judge Daniel Weinstein in late January 2011.  The
primary dispute in the Suncal bankruptcies involved rival competing plans for reorganization of
the Suncal stand-alones—with one plan supported by the Lehman Parties as the primary secured
creditors, and a second plan supported by Suncal itself which involved a new source of project
funding other than the Lehman Parties.  Under the plan supported by the Lehman Parties - title to
the Suncal subdivision projects would be transferred to new stand-alone entities owned by and
under the control of the Lehman Parties who were the major secured creditor.

15.     As part of the JAMS negotiations in late January of 2011 and following—the
Lehman Parties obtained Arch's agreement in principle to support their proposed bankruptcy
reorganization plans, in exchange for an agreement by the Lehman Parties to reimburse Arch for
expenses that Arch had incurred and was to incur in constructing improvements on certain
Suncal subdivisions.

16.     The agreements in principle reached by Arch and the Lehman Parties at the
JAMS mediation in January and February were not reduced to a final written agreement until
approximately September 25, 2011. *See* Exhibit A to the Lehman Motion.

17.     During the negotiations of the agreement, the Lehman Parties indicated that they would reimburse Arch for the construction expenses that Arch was required to undertake to the City under the Arch/City Agreement in the Superior Court Lawsuit.   However the Lehman Parties through their counsel indicated that they would not provide Arch with a "blank check" for reimbursement—but wished to place a "cap" or "ceiling" on the amount to be reimbursed. The cap was agreed upon at $1,100,000. The $1,100,000 was arrived at by adding the $300,000 bid for the Miscellaneous Street Work to the rough estimate of $700,000 for the Street Light Installation discussed in the settlement meetings with the City - and adding 10% as contingency.

18.     By the time of the closing of the Arch/Lehman Agreement in October of 2011--- Arch had already arranged for completion of the Miscellaneous Road Work by a contractor, and the Lehman Parties reimbursed Arch the sum of $197,310 expended by Arch prior to that time on the date of closing.

19.     The time frame to complete the Street Light Installation as called for by the Arch/City Agreement (four months after design completion) did not occur as planned because it was impossible. The Arch/City agreement assumed on its face that Arch could arrange for the re-design of the street lights as commonly occurs when sureties arrange completion of projects.  In fact—the particular branch of public utility SoCal Edison ("Edison") for this region insists that it control all aspects of street light re-design. Neither Arch nor the City understood this as is reflected in the Arch/City Agreement. Edison performs the design in a tiered three-step process. All in all, it took approximately three years until November of 2014 for Edison to complete the re-design—which went through several iterations as flaws were discovered in the first versions of the re-design prepared under the supervision of Edison.

20.     The Lehman Parties later assumed control of the project through their stand-alone entity after their Chapter 11 plan for the Suncal companies was confirmed, and took title to the project as LV Ritter Ranch.   LV Ritter Ranch engaged construction consultants (Rockne Construction) by 2012 to assist LV Ritter Ranch in connection with any construction that the City might require of LV Ritter Ranch as new owner of the subdivision project, as a condition for maintaining the entitlements. Arch in turn cooperated with LV Ritter Ranch's consultants— just as it had on another Suncal project—during the years of meetings with Edison, the City, LV Ritter Ranch and Arch-- as Edison worked through the design process.

21.     Arch was not privy to the details of the discussions between LV Ritter Ranch and the City regarding any infrastructure construction that the City would require of LV Ritter Ranch to maintain the development entitlements for the project.   Arch was aware that the City was requiring LV Ritter Ranch, among other obligations, to construct a secondary fire access road between Ritter Ranch and an adjacent subdivision.

22.     While Edison completed the design for the street lights, there was much informal discussion between the City, LV Ritter Ranch, Arch and Edison—that it would make sense for the same contractor who would perform improvements required by the City of LV Ritter Ranch—to also perform the Arch non-Edison obligations as to Street Light Installation. Edison requires that a portion of the street light work be performed by Edison itself—with the work between the street lights to be performed by outside contractors.

23.     Arch was informed by LV Ritter Ranch's construction consultants as Edison neared completion of the re-design process that they would obtain bids for the performance of the non-Edison portion of the Arch work, together with other work that the City was requiring.

Arch and the Lehman Parties then met to discuss the costs and engagement of contractors at Arch's offices in Los Angeles in November of 2014.

24.    In November of 2014, LV Ritter Ranch's construction consultants (Rockne) informed Arch that the street light plans were now buildable. LV Ritter Ranch's construction consultants prepared a chart summarizing costs of construction based on bids they had obtained. Pursuant to the chart provided by Rockne at the meeting—the estimated cost for a contractor to complete the non-Edison portion of the Street light work was $490,238.80. Edison itself had prepared an estimate/invoice for its own anticipated cost of the Street Light Installation in the amount of $452,431.73. The net result was that the estimated $700,000 to $725,000 cost of the Street Light Installation under the Arch/City Agreement had now ballooned up to $942,670.53. Further, the cost would exceed the "cap" amounts that the Lehman Parties had agreed to reimburse Arch under the Arch/Lehman Agreement. Arch indicated to the Lehman Parties at the meeting that it would accept this estimated net loss of $39,981.03. Arch waited for LV Ritter Ranch to prepare draft contracts to engage the contractors from whom the Lehman Parties had obtained the bids.

25.    Thereafter in early 2015, Eric Hoffman of the Lehman Parties informed Susan Neff of Arch that it was the Lehman Parties' view that Arch's obligations to the City under the 2011 agreement—which the Lehman Parties took no part in negotiating—should include approximately another $2MM for undergrounding of the electrical system at the project. The entire electrical system for the project has been above ground on telephone poles since Suncal began work on the project approximately in 2006. An electrical substation on a hill within the project transmits the electricity above-ground throughout the subdivision site as well as along ELR. The Lehman Parties took the position for the first time—despite having taken part in years

of meetings after they took title to the project-- that Arch should be required to pay the cost of switching out the electrical system to underground. The Lehman Parties alternatively suggested that since it was not "clear" who should bear this cost— Arch and the Lehman Parties should split the cost at roughly $1MM apiece.  This was the first time that such a suggestion has been made by anyone since formation of the agreement in 2011.

26.     Arch declined the Lehman Parties' request to fund the extra $2,000,000 of work, or to "split the cost."  The Lehman Parties then apparently went to the City in the spring of 2015 and informed the City that construction was not progressing because Arch refused to pay its share of the construction costs.

27.     In response to the information from the Lehman Parties —the City's outside counsel—who had not contacted Arch since 2012—sent Arch a default notice regarding Arch's duties *to the City* under the Arch/City Agreement. A true and correct copy of the letter of the City's outside counsel B. Tilden Kim is attached hereto as Exhibit "1."  On May 15, 2015, I replied to Mr. Kim's correspondence on behalf of Arch, and set forth the history of the design delays, Arch's direct dealings with the City and the Lehman Parties pertaining to sharing of contractors, and the Lehman Parties' demand that Arch share more of the cost than Arch had bargained for with the City. A true and correct copy of my letter of May 15, 2015 is attached hereto as Exhibit "2."

28.     Arch subsequently met with City twice in the summer of 2015 to discuss these issues. The resolution of the issues appeared to be at an impasse.

29.     On or about July 28, 2015, Jonas Stiklorius of the Lehman Parties, requested that Arch consent to a submission of two issues for binding arbitration at JAMS pursuant to the Arch/Lehman Agreement. The first issue was a determination of whether the Lehman Parties are

entitled to release of $1.5MM in collateral placed into escrow at the time of the Arch/Lehman Agreement, in order to secure the Lehman Parties' obligations to Arch under that agreement. The second issue seeks binding arbitration by JAMS of the scope of the construction work that Arch agreed to perform under the Arch/City Agreement to which the Lehman Parties are not contractual signatories. A copy of Jonas Stiklorius' July 28, 2015 letter is attached to Exhibit 1 to the Lehman Motion.

30.   On or about July 31, 2015, I directed a reply to the Lehman Parties' letter on behalf of Arch. I indicated generally that the proposed submission was not stated in a neutral fashion. I indicated that Arch would agree to the submission of issue #1 (the collateral return issue) as within the arbitration clause of the Arch/Lehman Agreement. However, Arch disagreed that the binding arbitration clause in the Arch/Lehman Agreement permitted jurisdiction of JAMS to interpret the scope of the Arch/City Agreement, to which the Lehman Parties are not signatories. Further, Arch contends that the City is an indispensable party to the determination of issues regarding the scope of the Arch/City Agreement, as the rights at issue are held by the City, and not by the Lehman Parties. A true and correct copy of my letter of July 31, 2015 to Jonas Stiklorius is attached hereto as Exhibit "3."

31.   The Lehman Parties responded by going ahead and presenting the submission of both issues to JAMS—together with an obviously one-sided and biased narrative of the factual history—through Mr. Ziehl's letter to arbitrator Daniel Weinstein of August 20, 2015 (Exhibit 1 to the Lehman Motion. Mr Ziehl also requested a hearing by the Arbitrator to determine the arbitrability of issue #2 regarding the scope of the construction work to be performed under the Arch/City Agreement.

32.    On or about August 24, 2015, I responded to the submission of the Lehman

Parties in a letter to Judge Weinstein, reiterating that Arch does not consent to the jurisdiction of

JAMS in the first instance with respect to the Lehman Parties' request to arbitrate the scope of

Arch's contract with a third party. A true and correct copy of my letter of August 24, 2015 to

Judge Weinstien is attached hereto as Exhibit "4."

33.    Subsequently, JAMS forwarded a stipulation to both Arch and the Lehman

Parties, requesting that the parties waive any conflict of interest or objection to the same

arbitrator who conducted the mediation being appointed as arbitrator of the issues submitted by

the Lehman Parties, due to the potential for his having received confidential information in the

course of the mediation. I responded on behalf of Arch that Arch would sign the stipulation and

waive the conflict to permit Judge Weinstein to arbitrate issue #1, but would not consent to any

jurisdiction of JAMS to conduct a binding arbitration of issue #2. A true and correct copy of my

correspondence to JAMS of September 24, 2015, transmitting the signed and modified

stipulation is attached hereto as Exhibit "5." JAMS subsequently replied that JAMS would not

appoint the arbitrator until both parties signed the exact same conflict waiver stipulation.

34.    Further, in order to resolve the impasse regarding construction of the project and

the scope of Arch's duties to the City, on September 23, 2015, Arch filed an action for

declaratory relief in this Central District of California, Case. No.2:15-cv-07435-FMO-PJW (the

"Declaratory Relief Action"). The Declaratory Relief Action seeks a judicial clarification of the

scope of Arch's construction obligations to the City under the Arch/City Agreement. A true and

correct copy of the complaint in this action is attached hereto as Exhibit "6."

35.    When I advised Tilden Kim, counsel for the City, of the filing of the Declaratory

Relief Action— counsel for the City was not aware that the Lehman Parties were purporting to

seeking a binding arbitration decision at JAMS on the scope of the City's rights under the Arch/City Agreement. Mr. Kim has agreed to accept service of the lawsuit on behalf of the City, and is presently in receipt of the summons and complaint.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Culver City, California on November 18, 2015.

*/s/ Ronald W. Hopkins*
Ronald W. Hopkins

5617480.2

# EXHIBIT 1



**RICHARDS | WATSON | GERSHON**
ATTORNEYS AT LAW – A PROFESSIONAL CORPORATION

355 South Grand Avenue, 40th Floor, Los Angeles, California 90071-3101
Telephone 213.626.8484   Facsimile 213.626.0078

RICHARD RICHARDS
(1916–1988)

GLENN R. WATSON
(1917–2010)

HARRY L. GERSHON
(1922–2007)

STEVEN L. DORSEY
WILLIAM L. STRAUSZ
MITCHELL E. ABBOTT
GREGORY W. STEPANICICH
QUINN M. BARROW
CAROL W. LYNCH
GREGORY M. KUNERT
THOMAS M. JIMBO
ROBERT C. CECCON
STEVEN H. KAUFMANN
KEVIN G. ENNIS
ROBIN D. HARRIS
MICHAEL ESTRADA
LAURENCE S. WIENER
B. TILDEN KIM
SASKIA T. ASAMURA
KAYSER O. SUME
PETER M. THORSON
JAMES L. MARKMAN
CRAIG A. STEELE
T. PETER PIERCE
TERENCE R. BOGA
LISA BOND
JANET E. COLESON
ROXANNE M. DIAZ
JIM G. GRAYSON
ROY A. CLARKE
MICHAEL F. YOSHIBA
REGINA N. DANNER
PAULA GUTIERREZ BAEZA
BRUCE W. GALLOWAY
DIANA K. CHUANG
PATRICK K. BOBKO
NORMAN A. DUPONT
DAVID M. SNOW
LOLLY A. ENRIQUEZ
KIRSTEN R. BOWMAN
GINETTA L. GIOVINCO
TRISHA ORTIZ
CANDICE K. LEE
JENNIFER PETRUSIS
STEVEN L. FLOWER
TOUSSAINT S. BAILEY
AMY GREYSON
DEBORAH R. HAKMAN
D. CRAIG FOX
MARICELA E. MARROQUIN
SERITA R. YOUNG
SHIRI KLIMA
SEAN B. GIBBONS
AARON C. O'DELL
AMANDA L. CHARNE
STEPHANIE CAO
PATRICK D. SKAHAN
STEPHEN D. LEE
YOUSTINA N. AZIZ
BRENDAN KEARNS
KYLE H. BROCHARD
NICHOLAS R. GHIRELLI
ISRA SHAH
CHRISTINA L. BROWNING
ISAAC M. ROSEN

OF COUNSEL
ROCHELLE BROWNE
TERESA HO-URANO
GENA M. STINNETT

SAN FRANCISCO OFFICE
TELEPHONE 415.421.8484

ORANGE COUNTY OFFICE
TELEPHONE 714.990.0901

TEMECULA OFFICE
TELEPHONE 951.695.2373

May 12, 2015

**VIA ELECTRONIC MAIL & U. S. MAIL**

Ronald W. Hopkins, Esq.
GASCOU HOPKINS LLP
9696 Culver Blvd., Suite 302
Culver City, CA 90232

Re:    *City of Palmdale v. Arch Insurance Co.; ELR Phase I Street Light
Construction -- DEMAND FOR ELR PHASE 1 STREET LIGHT
CONSTRUCTION*

Dear Mr. Hopkins:

This law firm represents the City of Palmdale, and this letter is being sent to you as
the designated person to be notified on Arch Insurance Company's behalf under the
City of Palmdale/Arch Insurance Company settlement agreement involving Elizabeth
Lake Road Phase I (the "Agreement").

Under the terms of that Agreement, "Arch shall cause the Improvements listed in
Appendix B to this Agreement to be completed within 4 months of the date the
Completion Contractor are engaged to perform those Improvements. The date for
completion . . . may be extended if circumstances beyond Arch's control render it
impossible to complete the Improvements . . . including but not limited to refusal of a
public entity to grant necessary approval or permit . . . ."

In November, 2014, all circumstances beyond Arch's control preventing its
completion of the Improvements no longer existed. In other words, SCE had
approved the street light plans, and your Completion Contractor (Rockne
Construction) had already been retained to construct the Improvements. More than 4
months have now passed, and none of the Improvements under Appendix B have
been completed, or even started.

Based upon the foregoing, Arch is in breach of the Agreement, and this letter
constitutes the City's notice of default on Arch, and demand to immediately complete
the Appendix B Improvements. The City is informed that Arch's refusal to complete
the Improvements is the approximately $2.2 million estimate to underground both
SCE's and AT&T's utility lines (necessary to perform the street light Improvements),
and that the undergrounding of AT&T's lines was never contemplated under the
Agreement. The City disagrees.

RICHARDS | WATSON | GERSHON
ATTORNEYS AT LAW — A PROFESSIONAL CORPORATION

Ronald W. Hopkins, Esq.
May 12, 2015
Page 2

First, if any above-ground utilities lines are to be under-grounded, the only reasonable expectation is for all of those utilities to be under-grounded. Second, the incremental cost to underground both utility lines is relatively small compared to undergrounding just one utility line. Third, Arch was fully aware of the existence of both SCE and AT&T above-ground lines along Elizabeth Lake Road when it signed the Agreement.

We, therefore, demand that Arch immediately direct its Completion Contractor (Rockne), to perform the Appendix B Improvements. Absent a positive response within two weeks of the date of this letter, we will have no choice but to seek authorization from the Palmdale City Council to file suit. The Agreement contains a prevailing party attorney's fees provision. The City fully intends to recover those fees and costs in the event of litigation.

We look forward to your immediate positive response to this demand. In the meantime, please do not hesitate to call me.

Very truly yours,

B. Tilden Kim

cc:    Mike Mischel

P6399-1244\1834122v1.doc

# EXHIBIT 2

# GASCOU HOPKINS LLP

ATTORNEYS AND COUNSELORS AT LAW    9696 Culver Blvd Suite 302
Culver City CA 90232
Telephone: (310) 785-9116
Facsimile: (310) 785-9149
www.gascouhopkins.com

*Via email and U.S. Mail*

May 15, 2015

B. Tilden Kim
Richards Watson Gershon
355 South Grand Avenue 40th Floor
Los Angeles, CA 90071-3101

Re: Demand for ELR Phase 1 Street Light Construction

Dear Mr. Kim:

I write in response to your May 12, 2015 correspondence—the first communication that we have had from your law firm on this matter in some years. In the interim—ARCH has engaged in countless meetings and communications with public utility Southern California Edison, representatives of the City, and representatives of the new project owner—Lehman Brothers—in order to fulfill ARCH's obligations under the February 10, 2011 Settlement Agreement between the City and ARCH.

The Settlement Agreement, as you know, was negotiated in late 2010 and early 2011 while ARCH's bonded principal and subdivision developer—Palmdale Hills Property(Suncal), was in bankruptcy. At the time—the deal that was struck was that ARCH would construct two improvements along Elizabeth Lake Road: (1) about 20 items of miscellaneous street work remaining under the street improvement bond( as listed in Exhibit A to the agreement); and (2) installation of the street lights under the street light bond(as listed in Exhibit B to the agreement.)

Numerous persons were present at the meetings in which these items were negotiated—including members of your firm. There was never any discussion that installation of the street lights—as described in the street light bond—would also include a complete re-routing of the electrical system at the project—transforming the system from electrical poles to underground electricity. On the other hand—we did specifically discuss in our meetings at City Hall that due to inflation it was unlikely that we could arrange for installation of the Exhibit B street light items within the $404,800 penal sum of the Street Light bond. The ballpark estimate at the time *specifically discussed at the City Hall meeting with Veronica Gunderson of your firm* was that street light costs might be around $725,000 with inflation. Ms. Veronica Gunderson of your firm specifically asked that ARCH agree to incur this approximately $725,000 cost above the original penal sum of $404,800 —in exchange for the City's release of all the ELR bonds upon completion of the Exhibit A and Exhibit B work. Similarly, the rough cost estimate for the

Exhibit A Street Improvement miscellaneous work that we were asked to perform(about 20 individual items) was $300,000. At no point during this discussion was ARCH asked to pay for the complete re-working of the electrical system—which apparently may cost something on the order of an additional $1,000,000-$2,000,000.

Re-working of the electrical system is a line item in the Street Work bond at $602,000—but it was *not* included in the approximately 20 individual detailed items of street work that ARCH was required to perform under Exhibit A—nor discussed as part of the negotiations. Further—we are informed that Lehman as new project owner arranged for a release/exoneration of the Street Improvement Bond which was issued by Mr. Mischel in December. We understand that the bond was replaced by some sort of lien provided to the City by Lehman under the Subdivision Map Act—but do not have the details.

After the settlement agreement was finalized, ARCH engaged a construction supervisor(Bob Barjam—formerly Suncal's project manager) and a contractor( South Pac) who promptly performed the miscellaneous street light work—which was accepted by the City in September of 2011. This work was slightly delayed due to the need to obtain certain lapsed permits. The cost of this work turned out to be approximately $200,000 and it was paid for by ARCH—and later reimbursed to ARCH by Lehman at the bankruptcy closing.

As to street lights—it had been understood at the settlement meetings that a re-design of the plans was necessary. The particular reason which was articulated at the time was that the street light at the intersection of Ranch Road and Elizabeth Lake Road was to be eliminated—because of course no homes have ever been constructed at the Ritter Ranch subdivision and there was no point to stopping traffic at the light. While everyone knew there was to be a re-design—quite frankly no one realized or anticipated that Edison requires that the re-design be conducted in-house in a three-step process—and that it would ultimately take Edison years to complete the re-design.

In the interim—the title to the property passed by agreement in the Suncal bankruptcy to Suncal's primary creditor—Lehman Brothers in 2011. Lehman Brothers agreed at the time to reimburse ARCH up to a ceiling of $1,100,000 in costs fronted for the Exhibit A and Exhibit B work required of ARCH under the ARCH/City agreement—in exchange for ARCH's support of the Lehman plan for reorganization of the Debtor. This amount was based upon a rough estimate of the cost of the Exhibit A and Exhibit B work($300,000 plus $700,000) as discussed in ARCH's settlement meetings with the City—plus a small contingency. Lehman Brothers then took the subdivision property as part of the Chapter 11 reorganization in the name of a new stand-alone entity, LV Ritter Ranch. At the time of plan approval—the City reserved all of its rights against LV Ritter Ranch as to any and all requirements that the City might make from the new Lehman Brothers entity in exchange for maintaining the subdivision's development entitlements.

During this process—we spoke several times with the City's bankruptcy attorney Debra Riley—primarily to apprise Ms. Riley of completion of the street improvements, and of the So Cal Edison *delays* in finalizing street light plans. Ms. Riley was also aware of the ARCH/Lehman

agreement for Lehman to reimburse ARCH for the ELR completion costs—as the agreement required court approval.

The issue that no one anticipated at the time of the February 2011 ARCH/City settlement agreement was the length of time and bureaucratic requirements that it would take for So Cal Edison to complete the re-design. We have participated in numerous meetings with Edison on the re-design process over the years. These meetings were also generally attended by Mr. Heffernan of the City—as well as by representatives of the new owner Lehman Brothers—most notably Chris Bley and by Lehman's construction consultant, Mark Burkes of Rockne Construction. Mr. Mischel also attended at least one such meeting. We have worked closely with Lehman's consultant Mr. Burkes who is a technically very competent consultant and whom we understand is coordinating with the City on other Ritter Ranch issues with which we are not involved now that Lehman owns the project.

The issue of the re-design was complicated at first because Edison would not initiate the process without a "customer agreement" and ARCH as a surety would not qualify. Ultimately, the issue was resolved when Lehman agreed to be the "customer."

Edison would then proceed to prepare a re-design. Typically, Mr. Burkes would note technical issues with the re-design—and Edison would set about the process of preparing an additional re-design. On other occasions—Edison would itself note flaws or omissions from its own design. The process would then begin again. Each re-design involved a multi-step process in which Edison's branch office first prepares the design, and then sends the re-design to its regional office, who in turn run the design by Edison's outside consultants(Spectrum) before approval. We have been through this process several times—in which designs that Edison proclaimed would be final had to be re-done—due to some mistakes or omissions. Edison's project "team" at the regional office also changed twice during the re-design process. The important thing to note here is that City representatives were present with ARCH at *all* of the meetings with Edison—and copied with the Edison correspondence. The City is well aware that ARCH didn't create these delays in the design process and that they were completely beyond ARCH's control.

As the re-design process went along—ARCH was also informed by Lehman's representatives that it believed the cost of undergrounding would be borne by So Cal Edison.

That brings us to the most recent set of designs—which are apparently now acceptable. After being informed by Lehman in November that the design could now be built—we met with Rockne Construction and Lehman's new project manager Mike Masterson(who replaced Chris Bley.) It came to our attention at the time that the City was asking Lehman to perform additional improvements beyond those called for in the ARCH/City agreement. Lehman suggested that it made sense for all of the improvements to be performed at the same time under the supervision of Lehman's construction consultants Rockne Construction—rather than piecemeal. We agreed—and it was our belief that Lehman was in communication with the City on these issues—and the City also agreed that all of the improvements should be done at once and by one contractor.

Edison also presented various invoices to Lehman Brothers at the time of completion of the re-design—as it is Edison's requirement that certain portions of the actual work must be done by Edison and not by an outside completion contractor. The cost for actual street light installation by Edison(which Edison does not permit to be done by outside contractors) was estimated to be \$452,309. Lehman estimated the cost of non-Edison work to install the street lights as \$490,362.

Edison also submitted separate invoices to Lehman for improvements which were not part of the ARCH/City agreement.

At the time that we met with Lehman in November—it was our understanding that the cost of construction of the improvements that ARCH had agreed to complete has—with the passage of years and further inflation—now exceeded the \$1.1MM that Lehman agreed to reimburse ARCH in the ARCH/Lehman bankruptcy settlement incurred as part of the reorganization in 2011. ARCH was in agreement to pay the shortfall(after Lehman's satisfaction of remaining reimbursement obligations under the bankruptcy agreement) which Lehman estimated to ARCH in November of 2014 to be approximately \$42,670.

We awaited further word from Lehman on a joint contract for Rockne to supervise both the ARCH Exhibit B work—and additional items that the City and/or Edison was requesting from Lehman now that Lehman has title to the project. We were aware that Lehman Brothers through Rockne Construction was building out the access road extension and was in constant contact with the City. Of course—all present construction is ultimately to Lehman's benefit as project owner and holder of title to the property. We also became aware that Lehman had negotiated a release-exoneration of all ARCH bonds on the project which was formally issued by the City in December of 2014.

Most recently—we were quite surprised when Lehman contacted us on May 4, 2015 to indicate there might be a dispute as to what was included in the ARCH/City agreement—to which Lehman was not a party—nor was Lehman involved in any of the settlement negotiations leading to that agreement. Specifically, Lehman alleges that the complete re-working of the electrical from telephone poles to underground might be included in the ARCH/City agreement at a cost of approximately \$2.2MM. Lehman has suggested for the first time last week that ARCH and Lehman might "split the cost" on this additional work. Before we formulated a response to Lehman's proposal that we "split the difference"—we received your demand letter and default notice.

We assume some communication to you from Lehman is the background for the following assertion in your letter: "The city is informed that Arch's refusal to complete the Improvements is<sic> the approximately \$2.2 million estimate to underground both SCE's and AT & T's utility lines(necessary to perform the street light Improvements) and that the undergrounding of AT & T's lines was never contemplated under the Agreement. The City disagrees."

ARCH is also not in default because the agreement recognizes that delays may be excused when regulatory approvals are required or matters beyond ARCH's control prevent construction. Edison as a public utility has specific contracts that it requires for its portion of the work and our general understanding is that Edison will want Lehman to be the party to those contracts as its

"customer"—even if some of the funds are first paid by ARCH—later to be reimbursed by Lehman. Edison prepared a separate invoice/contract for the ARCH portion of the work. No one envisioned this level of complication in the ARCH/City agreement—which presumed that ARCH could simply engage a completion contractor to perform the work. I respectfully suggest that the City go back and review these provisions in the agreement. The agreement did not contemplate that Edison would assume control over the design process and that Edison would require that Edison control and contract for a significant portion of the actual construction work.

Quite frankly, we are concerned that the City may be being used as a pawn by Lehman Brothers in this dispute. ARCH has not had *any* discussions with the City in which it has refused to perform obligations under the agreement. The only source for your information must be Lehman Brothers—who first suggested that ARCH pay the significant additional costs not covered by the ARCH/City agreement last week! ARCH was not copied on any such communications even though the communications pertain to an ARCH/City agreement.

It is in this unfortunate context that you threaten to sue ARCH for breach of the agreement—despite the ongoing knowledge of the City's representatives as to ARCH's continuing efforts over the years to comply with its obligations under the settlement agreement. It is quite frankly disconcerting that you did not even bother to contact us to request a meeting—let alone to hear our side of this long story— before declaring ARCH in default and threatening a lawsuit.

Your law firm is well aware that the approximate ballpark cost of the street light improvements requested of ARCH during settlement negotiations at City Hall just prior to signing the settlement agreement was $725,000—and was based on the cost enumerated in the street light bond. Ms. Gunderson specifically insisted that we agree to pay these costs(above the $404,800 penal sum of the Street Light bond)—as a condition for the release of the remaining ELR bonds. Lehman also shared cost estimates with us in November of 2014 which indicated that ARCH's cost for the work under the ARCH/City agreement(combined for Edison work and independent contractor work) would now be approximately $942,670 prior to Edison's reimbursements to ARCH.

ARCH has always stood ready to satisfy its obligations under the ARCH/City agreement—but apparently the City is now adopting a position by Lehman Brothers *just asserted for the first time last week* which might cause ARCH to assume about $1MM-$2MM more in cost than the costs called out by the agreement.

We request a meeting of all concerned to address these issues as soon as possible. Should you resort to litigation in a circumstance where ARCH has striven for years at considerable expense to attempt to satisfy its obligations—but all concerned have encountered unanticipated circumstances— we remind you that the attorney's fee provision in the settlement agreement is a two-way street. We also reserve all rights arising from the City's decision to release and exonerate all of ARCH's bonds on the project—and to replace the ARCH/Suncal bonds with some sort of agreement with Lehman Brothers—which apparently occurred in December of 2014.

Page 5 of 6

We look forward to hearing from you at your earliest convenience to schedule the requested meeting.

Very truly yours,

Ronald W. Hopkins

cc: Susan D. Neff, Esq.—ARCH Insurance Company

# EXHIBIT 3

# GASCOU HOPKINS LLP

ATTORNEYS AND COUNSELORS AT LAW    9696 Culver Blvd Suite 302
Culver City CA 90232
Telephone (310) 785-9116
Facsimile (310) 785-9149
www.gascouhopkins.com

July 31, 2015

Lehman Brothers Holdings, Inc.
Lehman ALI, Inc.
Lehman Brothers Commercial paper Inc.
LV Ritter Ranch LLC
c/o Lehman Brothers Holdings, Inc.
1271 Avenue of the Americas
New York, New York 10020
Attention: Jonas Stiklorius

Re: Request for Arbitration Under Settlement Agreement

Dear Mr. Stiklorius:

I am writing on behalf of my client Arch Insurance Company ("Arch") in response to your correspondence of July 28, 2015, received by Arch on July 29, 2015, in which you request that Arch execute a draft joint Request for Arbitration with the Hon. Daniel Weinstein at JAMS pertaining to certain disputes arising between Arch and Lehman Brothers Holdings, Inc. ("LBHI"), Lehman ALI, Inc. ("ALI"), Lehman Commercial Paper, Inc. ("LCPI") and LV Ritter Ranch LLC (LV Ritter)—collectively the "Lehman Parties"—arising from the September 27, 2011 Settlement Agreement and the April 27, 2012 Joinder to Settlement Agreement.

Please be advised that Arch is amenable to submitting what it understands to be the main dispute between Arch and the Lehman Parties to arbitration at JAMS pursuant to Section 13 of the Settlement Agreement. However, Arch cannot agree to execute the specific Request for Arbitration Document that you have sent us to us—which attaches and references both a Dispute Notice and Exhibit A to the Dispute Notice—for the following reasons:

(1) Exhibit A is a lengthy narrative which contains a biased, one-sided, selective and inaccurate description of certain background facts to the dispute. The list of issues to be arbitrated should be described in a succinct and neutral manner.

(2) Exhibit A appears to request adjudication of a dispute which involves the interpretation and scope of performance of work under Arch's separate settlement agreement with the City of Palmdale to which the Lehman Parties are not parties. Specifically, you ask the arbitrator to determine: "...whether Arch is obligated under the ELR Settlement Agreement...to complete the Undergrounding Work at its sole expense." The Lehman Parties had no involvement whatsoever in the negotiations and formation of the separate ELR settlement agreement between Arch and the City of Palmdale. The Arbitrator simply does not have jurisdiction under Section 13 of the Settlement Agreement to adjudicate the scope of contractual obligations between ARCH and the City of Palmdale regarding interpretation of the ELR settlement agreement. The City of Palmdale is not a party to the Settlement Agreement between Arch and the Lehman Parties.

Arch objects to the inclusion of any such issues in the Request for Arbitration and will not stipulate to the submission of such issues to binding arbitration.

Arch respectfully requests that the Lehman Parties re-draft Exhibit A to the Dispute Notice before Arch will consider signing the "Request for Arbitration with Hon. Daniel Weinstein (Ret.)

Arch suggests that the dispute between Arch and the Lehman Parties could be succinctly stated as follows in a revised Exhibit A:

"Are the Lehman Parties presently entitled under the Settlement Agreement to demand that Arch consent to release of the $1.5MM in escrowed cash collateral and to release of the Deed of Trust."

As discussed above, Arch stands ready to submit the collateral release issue to arbitration, but simply cannot execute the Request for Arbitration as currently drafted. Please advise if the Lehman Parties are willing to revise Exhibit A to the Dispute Notice.

Very truly yours,

Ronald W. Hopkins

Ronald W. Hopkins

cc: Joelle Halperin—Lehman Brothers Holdings, Inc.
Michael Bond, Esq.—Weil Gotshal & Manges LLP
Dean Ziehl, Esq.—Pachulski, Stang & Ziehl LLP(also via email)
Susan D. Neff, Esq.—Arch Insurance Company
T. Scott Leo, Esq.—Leo and Weber, P.C

# EXHIBIT 4

# GASCOU HOPKINS LLP

ATTORNEYS AND COUNSELORS AT LAW    9696 Culver Blvd Suite 302
Culver City, CA 90232
Telephone: (310) 785-9116
Facsimile: (310) 785-9149
www.gascouhopkins.com

**Via Email**

August 24, 2015

JAMS
1601 Cloverfield Boulevard
Suite 370-South
Santa Monica, California 90404
Attention: Hon. Daniel Weinstein(Ret.)

> Re: Lehman Request for Arbitration
>     JAMS Reference # 1100071706

Dear Judge Weinstein:

I am writing on behalf of my client ARCH Insurance Company in response to the letter to you dated August 20, 2015 from Anthony Barsanti of Lehman Brothers Holdings, Inc. which requests arbitration of two issues concerning the Ritter Ranch subdivision project.

Lehman previously wrote to us on July 28, 2015 to request our consent to submission of two issues to binding arbitration pursuant to the bankruptcy Settlement Agreement between ARCH and the Lehman Parties which resulted from the January 2011 mediation that you conducted at JAMS. We responded in correspondence of July 31, 2015, and basically set forth three positions:

(1) A joint arbitration submission should set forth the issues to be arbitrated in a succinct and neutral manner. Exhibit A to Lehman's proposed submission was a narrative which contains a biased, one-side, selective and inaccurate description of the facts. No reasonable party would sign off on such a proposed submission.

(2) We would agree to submission of the Lehman Parties' first proposed issue—provided it was described in a neutral manner. We even suggested a neutral description of the issue: "Are the Lehman Parties presently entitled under the Settlement Agreement to demand that Arch consent to release of the $1.5MM in escrowed cash collateral and to release of the Deed of Trust."

(3) We do not consent to Lehman's proposed submission to the extent Lehman asks you to determine the scope of Arch's obligations to the City of Palmdale under a separate Settlement Agreement with the City of Palmdale and ARCH to which Lehman is not a party. Even if we wanted your Honor to decide that dispute, JAMS simply has no jurisdiction over the City of Palmdale, an indispensable party to any determination regarding the scope of construction duties under its contractual agreement with Arch.

Because Lehman chose to send you its biased narrative Exhibit "A" to the proposed submission—we feel compelled to provide our own description to the factual background of these very complex disputes.

## The Ritter Ranch Project

ARCH issued approximately $12MM of subdivision performance and payment bonds in 2006 on behalf of Palmdale Hills Property, a Suncal stand-alone entity, as subdivision developer of Ritter Ranch. Approximately $5MM of these bonds pertained to construction of the main infrastructure of Phase 1 of the housing subdivision. Another $7MM of bonds pertained to improvements on and along a rural road near the subdivision, Elizabeth Lake Road(the "ELR bonds.") The road was to be widened to accommodate traffic to the proposed 7000 unit subdivision. Suncal completed a significant part of the Phase 1 infrastructure improvements prior to its bankruptcy in September of 2008, and had also begun the widening of ELR. Significant funds to complete the widening of ELR were also authorized by the bankruptcy court during the pendency of the Chapter 11 as a health and safety issue. The Phase 1 infrastructure(water mains, sewers, etc.) was never put into operation, and no houses have ever been built at the subdivision to this day.

## The City of Palmdale/ARCH Lawsuit

The City of Palmdale sued ARCH on the $7MM of ELR bonds in 2010 in Los Angeles County Superior Court. With the exception of widening of ELR, the remaining work under the ELR bonds was not complete. ARCH's primary defenses to the City's lawsuit were that it would constitute economic waste: (1) to build out riding trails and to install a mile of curbs for a completely uninhabited subdivision, and (2) to install street lights adjacent to an uninhabited desert subdivision, where the rural road does not have any lights for considerable distances on either side of the subdivision.

Beginning in the spring of 2010 and through the beginning of 2011—ARCH and the City conducted several lengthy settlement meetings at City Hall in Palmdale to attempt to resolve the City's disputes with ARCH under the ELR bonds. The Lehman Parties were at that point simply the lender to Palmdale Hills Property. The Lehman Parties did not own the subdivision at the time—and had no role whatsoever in the lengthy negotiations between the City and ARCH.

The negotiations ended in a compromise in early 2011 in which the City agreed to accept performance of a portion of the bonded improvements in exchange for an ultimate release and exoneration of the ELR bonds. Under the compromise, ARCH was to arrange for completion of two items of work: (1) miscellaneous items to complete widening of ELR itself under the Road Bond, and (2) installation of the Street lights under the Street Light Bond.

During the months of negotiations, ARCH was able to obtain bids for the road work because the roadwork involved approximately 20 discreet punch-list items. The bids were in amounts up to approximately $300,000.

However, during the negotiations the City's consultant representatives indicated that the Street Light Plans would have to be re-done, in particular to delete traffic signals. There was no point in

having traffic signals at the intersection to an unbuilt, uninhabited subdivision. It was not possible to obtain a bid from contractors where plans would be revised. There was significant discussion of the anticipated cost of the Street Light Installation. Specifically, all involved understood that the Street Lights could not be installed for the bond penal sum of $404,800, established in 2006. The rough estimate of the current cost to install the Street Lights discussed extensively in the 2010 negotiations meetings was approximately $700,000.

It was on this basis that ARCH and the City of Palmdale entered into their Settlement Agreement to resolve the City's lawsuit for ARCH's performance of a limited number of the bonded items. ARCH's estimated loss would be approximately $1,000,000. In exchange for this compromise, ARCH would forego litigating the "economic waste" defenses.

### The ARCH/Lehman Bankruptcy Settlement

Quite near to the time of execution of the ARCH/City settlement agreement, ARCH participated in the global mediation before your Honor at JAMS regarding the Suncal bankruptcies. The gist of the very complex mediation result was that the Lehman Parties made various financial concessions to ARCH regarding ARCH's performance of work at the Suncal projects, in exchange for ARCH's agreement to support and to vote for the Lehman-backed Chapter 11 reorganization plans for various Suncal stand-alone debtors. ARCH also assigned the rights against its Suncal indemnitors to Lehman, to sweeten the deal for Suncal's acquiescence to the Lehman plans. The reorganization plans of course provide for transfer of title to the projects to new Lehman stand-alone entities upon confirmation.

As part of the negotiations regarding ARCH's support of the Lehman plans, ARCH asked Lehman to reimburse ARCH for cost of construction paid out under settlements with public entities—including payments on the Marblehead project and the Ritter Ranch project.

Lehman agreed to reimburse ARCH for its payments under the ARCH/ City of Palmdale settlement agreement. Lehman, however, insisted on a cap to the payments. The amount of the cap ultimately incorporated into the ARCH/Lehman agreement was $1.1MM. This was calculated by adding the estimated $300,000 cost of the road improvements, the estimated $700,000 cost of the street light installation, and $100,000 for a 10% contingency. Lehman indicated that it would insist on a cap so that Arch would not have "carte blanche" on the expenses.

It took about eight months of negotiations with Weil Gotshal for the agreement in principle reached between Arch and Lehman at the January 2011 mediation to be reduced to a writing on September 27, 2011. The new Lehman stand-alone entity—LV Ritter Ranch—assumed ownership of the property in late 2011.

### Performance under the ARCH/City Settlement Agreement

After reaching settlement with the City of Palmdale in February 2011, ARCH set out immediately to contract for performance of the miscellaneous road work—and had the work completed by August 2011. The cost of the work came in under estimate at $197,310.95. When

the ARCH/Lehman Settlement closed on September 27, 2011, Lehman remitted reimbursement for the road work to ARCH. That left Lehman with a commitment to ARCH to fund $902,689.05 for the Street Light Installation.

## Problems and Delays with Street Light Design due to Edison

When ARCH and the City reached the February 2011 Settlement Agreement—both mistakenly assumed as reflected in the agreement that ARCH could take the laboring oar to arrange for re-design of the Street Lights. Both parties understood that the street light design would be subject to approval by the public utility, Edison. The time to complete the work was also extended if regulatory approvals were not granted.

Unfortunately, it turned out that the particular regional branch of Edison insists that all design of street lights be performed in-house in at least a three-step process. The Edison branch office does the first design, the regional office reviews the design, and then passes the design to outside consultants. This takes several months. Further, Edison would not start the process until it had a "Customer Agreement" in place—and ARCH would not qualify as the customer.

The initial re-design by Edison had flaws. The Edison project team, which changed twice over the years, had to commission the design process several times, and in the end it took three years until November 2014 before a buildable design was achieved.

During this time period, representatives of ARCH, Lehman's project management, Lehman's construction consultants (Rockne Construction) and the City regularly attended meetings with Edison on the progress of the design and related issues. Everyone appeared to be on the same page as the various iterations of the design were completed, found to have mistakes or missing elements, and re-done by Edison in-house.

The installation of the street lights was to be performed by a combination of Edison and a completion contractor. ARCH liaised with Lehman's construction consultants, just as it had done on the Marblehead project, to coordinate the ARCH work with other work that the City was requiring of Lehman—in order for Lehman to maintain its project entitlements.

## The Lehman Project Entitlements and the City

The proposed Lehman Chapter 11 reorganization plans called for the new Lehman stand-alone entities (in this case LV Ritter Ranch) to automatically assume all development entitlements from the City of Palmdale. These entitlements are necessary in order for Lehman to be able to sell the asset to another developer—as it has been trying to do for some time.

The City of Palmdale—unlike the other municipalities in the Suncal bankruptcy—recognized that the entitlements are "financial accommodations"—which cannot automatically be assumed by the NEWCO without their consent. The City permitted Lehman to have the plan approved—but with a specific reservation of its rights in regards to extending the entitlements.

ARCH is not privy to the specifics of the discussions between the City and Lehman as to what the City may require of Lehman at present in order to maintain the entitlements. ARCH has generally understood that the City is requiring Lehman to build a secondary fire access road to connect Ritter Ranch with the adjacent Anaverde subdivision.

ARCH also understood that the City might be requiring Lehman to perform work with regards to the relocation of the project electricity and telephone lines—which are above-ground. These lines run out from Elizabeth Lake Road perhaps one-half mile to an electrical generating station on a hill within the would-be project.

Because it would make economic sense for the contractor engaged by Lehman who is performing any work required by the City—to also perform the non-Edison part of the Street Light work(for which Lehman would ultimately reimburse ARCH)—ARCH has coordinated and liaised with Lehman's construction consultants for some years to price the work. Everyone involved(Edison, the City, Lehman, Lehman's contractors, and ARCH) has attended several meetings over the years to discuss these issues.

## The November Meeting with Lehman

Lehman changed its project management at some time before November of 2014 shortly after the re-design was finalized by Edison. ARCH then met with Lehman's new project manager and its construction consultants. ARCH went over the history of the project with Lehman's new project manager. Lehman's construction consultants then presented a rough cost estimate based upon Edison's quotes for its cost of the ARCH work, and Lehman's estimates for performance of the non-Edison work within the ARCH/City agreement.

Lehman's rough cost estimate and the Edison estimate for Street Light Installation cost are attached hereto as Exhibits A and B. Under the Lehman estimate—the cost of the non-Edison ARCH work between the light standards listed in the left-hand column was estimated at $490,238.80. The total cost of the Edison work per Edison's cost invoice was $452,431.73. After applying a credit for SunCal deposits with Edison(which would also work a credit to Lehman's reimbursement duties)—the net cost of this work was $14,876.30. The total cost of the ARCH work per Lehman's own estimate—was $505,238.30. After applying the Suncal credit(both to ARCH's initial payment and to Edison's reimbursement duties)—the total cost of the ARCH work would exceed Lehman's reimbursement duties by $39,981.03.

ARCH was willing to proceed with the work and to accept this $39,981.03 loss. ARCH waited for a response from Lehman's new management on finalizing completion contracts under which ARCH would pay for its part of the costs—to be reimbursed mostly by Lehman.

## Lehman's Attempt to Expand the ARCH Duties

Lehman went silent after the November meeting with ARCH. Lehman emerged in March of 2015 with a new position never before articulated. Lehman stated that it believed that the ARCH/City settlement agreement was intended to include approximately $2MM of work to

relocate the Edison electric lines and AT & T telephone lines at the project from above-ground to underground.

Lehman, however, acknowledged that the issue was not clear—so it offered to split the cost of the remaining work with ARCH "fifty-fifty" at approximately $1MM apiece. ARCH responded by indicating that it would abide by its original commitment to the City as negotiated in 2010 and discussed by everyone involved with the project—but not to the expanded commitment which was invented out of whole cloth by Lehman. The Lehman cost estimates for this work—and alleged ARCH duty to incur additional costs—have been "ballpark" estimates—and have been changing from meeting to meeting.

## Lehman's Interference with ARCH's Settlement Contract with the City

At some point in the spring of 2015, Lehman apparently reported to the City it was prepared to begin construction of the adjacent Lehman-required work and ARCH-required work—but ARCH was refusing to pay for its share of the work. Lehman then articulated its theory to the City that ARCH was required to pay for perhaps $2MM of additional work under the ARCH/City agreement. Lehman's affirmative actions to try to persuade the City to expand the scope of ARCH's work may be seen as a tortious interference with contract.

## ARCH's Negotiations with the CITY

ARCH has engaged in exchanges of correspondence and cordial negotiations with the City over the past three months concerning the scope of ARCH's obligations since Lehman incorrectly indicated to the City that ARCH was refusing to fund its part of construction obligations. ARCH and the City have not reached a resolution to those discussions. ARCH's latest meeting with the City ended on a positive note—the City's statement that it " is sure we can work something out."

## Lehman's Present Request for Submission to Arbitration

The $1.1MM cap imposed on Lehman's reimbursement obligations to ARCH was based upon cost estimates of $300,000 for the Road Work and $700,000 for the Street Light Work as discussed between ARCH and the City. Lehman understood the basis for the estimate when it executed the bankruptcy Settlement Agreement. The cap was intended as a shield to Lehman in the event ARCH incurred cost overruns in performing the work.

Lehman now intends to use the cap as a sword to contend that ARCH's agreement with the City may encompass another $2MM of work. Lehman shows incredible hubris in making this assertion, as it took no part in the 2010 negotiations between ARCH and the City, and is not a party to the ARCH/City settlement agreement.

The only reasonable presumption that ARCH can make about Lehman's conduct is that Lehman realizes that the Ritter Ranch project, which is in a rural location and which may not be built out for a decade or more, has minimal sales value. Lehman's having to perform the improvements requested by the City in order to maintain entitlements before it sells and liquidates the asset—

may reduce the Ritter Ranch to even lower value. Therefore—Lehman wants to try to use the cap in the agreement as a sword to transfer expense to ARCH that ARCH and the City never contemplated when they negotiated their separate settlement agreement in 2010-2011 before Lehman came to own the project.

## Conclusion

The narrative above is a very brief condensation of several years of events. The bottom line is that Lehman is attempting in a patently Machiavellian fashion to use this arbitration as a vehicle to obtain a definitive ruling on the scope of a contract to which it is not a party. Lehman in like manner took no part in the negotiations of the ARCH/City contract in 2010—but has first iterated its interpretation of the contract in March of 2015 to try to minimize its costs as a developer on a low value asset—and to transfer costs to ARCH that ARCH did not assume in the ARCH/City agreement. The City of Palmdale is an indispensable party to any determination of rights arising between it and ARCH under the ARCH/City agreement—and JAMS has no jurisdiction over the ARCH/City agreement.

ARCH agrees and is willing to submit the first issue to arbitration per the ARCH/Lehman Settlement Agreement. That dispute has its own set of issues not described here. However, respectfully, ARCH does not consent to submission of the second issue regarding interpretation of the ARCH/City Settlement Agreement to JAMS' jurisdiction.

Very truly yours,

Ronald W. Hopkins

Ronald W. Hopkins

RWH:ss
Enclosures

cc: Anthony Barsanti
    Nellie Camerik, Esq.
    Dean Ziehl, Esq.
    Susan Neff, Esq.
    T. Scott Leo, esq.

**EXHIBIT A**



| | Street Lights (ARCH) | Rule 20-B |
|---|---|---|
| Total Costs | $505,238.30 | $1,569,377.25 |





Cost Estimate

Rockne
Construction

# EXHIBIT B



SOUTHERN CALIFORNIA
EDISON
An EDISON INTERNATIONAL® Company
Southern California Edison Company

130  E DYER RD STE C
SANTA ANA CA 92707-3766

| Invoice # | 185213 |
| Invoice Terms | 90 Days |
| Customer Name | LV RITTER RANCH, LLC |
| Customer Email | |
| Invoice Date | 09/11/2014 |
| SCE Contact | Mark Allen  Vaal |
| Telephone | (661)-257-8223 |
| Email - Billing Options | SCE INSTALL |
| Project Address | 42060 10TH STREET WEST LANCASTER CA 93534 |

Service Request Number:   7491629     Project Description:   RSB REMB (POINT A/B  5-7107) WEST
Project Location:   31508 ELIZABETH LAKE RD LEUTTER RANCHEO TRUST ELIZABEH CA 93559
Design #:   412665     Design Description:   RSB OH REMOVAL & UG UNSTALL (POINT A/B 5-7107)
Product #:   749146 - SELF INSTALLATION

LABOR:  This amount represents the total SCE labor required to complete the work request. All applicable labor related overheads are  included in the total SCE labor amount.   $0.00

MATERIAL:  This amount represents the total SCE material required to complete the work request. All applicable material related overheads are also included in the total SCE material amount.   $0.00

OTHER:  This amount represents the total SCE other costs required to complete the work request. In most cases, this other amount will consist of all additional equipment needed for completing the work request. This other amount typically consists of items such as Advance Energy Charge, SCE contractor work, right-of-ways, and permits.   $344,289.56

CREDITS:  This amount represents the total of all credits applied to complete the work request.   $0.00

TAX:     1.    ITCC on Applicant Funded        Non Base (Grossed-up) Amount   $49,722.25
                                                                               Tax Rate   35.00%
                                                                               Tax Amount   $17,403.84
         2.    ITCC on Net Construction (Less Non-Taxable Amount)    Tax Base (Taxable Amount)   $281,899.08
                                                                               Tax Rate   35.00%
                                                                               Tax Amount   $98,614.68

DEPOSITS:     Refundable Design & Engineering Advance   $0.00
              Previous Payments   $(447,431.78)

COMMENTS:
* Enclosed are 2 copies of your invoice. Please return 1 copy of the invoice with your payment.
* All prices are applicable for a period of 90 days from the date and are subject to change thereafter.
* Please return all applicable documents promptly to avoid delays.
* If a street light work order is cancelled with the customer, contracts for that service will be invoiced.
* Call the Edison company at 1-800-655-4555 to have questions or clarification of this invoice.

Please detach and return payment stub with payment.

Payment
Stub
Invoice #:     185213                    Please pay total amount now due:   $14,976.30

                                         Thank you for paying promptly
                                         Make check payable to Southern California Edison

LV RITTER RANCH, LLC
130  E DYER RD STE C                     42060 10TH STREET WEST
SANTA ANA CA 92707-3766                  LANCASTER CA 93534



**SOUTHERN CALIFORNIA**
**EDISON**
An EDISON INTERNATIONAL® Company
Southern California Edison Company

1313 E DYER RD STE C
SANTA ANA, CA 92705-3766

| | |
|---|---|
| Invoice # | 183213 |
| Invoice Terms | 30 Days |
| Customer Name | LV RITTER RANCH, LLC |
| Customer Email | |
| Invoice Date | 09/03/2014 |
| SCE Contact | Mark Allen Vera |
| Telephone | (661) 257-3125 |
| Install - Billing Option | SCE INSTALL |
| District Address | 42060 10TH STREET WEST LANCASTER CA 93534 |

**COMMENTS CONTENDER:**
* An Edison Inspector must approve all underground systems. Please call your designated Inspector 48 hours prior to construction to schedule an inspection.
* Payments accepted by check or money order only

# EXHIBIT 5

# GASCOU HOPKINS LLP

ATTORNEYS AND COUNSELORS AT LAW    9696 Culver Blvd Suite 302
Culver City CA 90232
Telephone: (310) 785-9116
Facsimile: (310) 785-9149
www.gascouhopkins.com

September 24, 2015

*Via email and U.S. Mail*

Dean Ziehl, Esq.
Pacuhlski, Stang, Ziehl & Jones
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067

Re: Lehman Parties v. ARCH Insurance Company
JAMS reference No. 1100081939

Dear Mr. Ziehl:

On September 16, 2015, we received a copy of the Stipulation For Arbitration in Action Previously Mediated By Same Neutral which was executed by the Lehman Parties and submitted to JAMS. The previous day September 15, 2015, my client ARCH submitted a modified Stipulation to JAMS consistent with the positions asserted in my prior correspondence of July 31, 2015 and August 21, 2015, namely our contention that JAMS does not have jurisdiction to decide issue #2 pertaining to interpretation of the ARCH/City of Palmdale which the Lehman parties have sought to submit.

The modified stipulation returned by ARCH to JAMS contains the following added language:

"ARCH executed this stipulation only with respect to issue #1 submitted to arbitration by Lehman Bros. ARCH does not execute this stipulation as to issue #2, as previously stated in greater detail in correspondence from ARCH's counsel. ARCH objects and does not consent to the jurisdiction of JAMS to conduct an arbitration on issue #2 submitted by Lehman Bros. Issue #2 concerns a contract between ARCH and the City of Palmdale. The City of Palmdale is an indispensable party to litigation concerning interpretation of the ARCH/City of Palmdale agreement. ARCH does not waive its objection to the jurisdiction of JAMS as to issue #2."

Previously, in my correspondence to Mr. Stiklorius of July 31, 2015, we offered to consent to submit issue #1 to JAMS, and requested that the Lehman Parties revise Exhibit A to the original submission letter to JAMS—to delete the requested submission of Issue #2. We subsequently received Mr. Ziehl's position letter to Judge Weinstein—but the Lehman Parties have not acceded to ARCH's request to modify the submission and delete issue #2, and ARCH in its correspondence has consented to the submission only of issue #1.

It was in this context that we received the "Stipulation for Arbitration in Action Previously Mediated by Same Neutral" from JAMS, and returned the modified stipulation which clarifies

that while we agree to execute the Stipulation as to arbitration of issue #1, we will not agree to execute the stipulation as to issue #2 for all of the reasons stated in my prior letters.

JAMS has since informed us that—before appointing Judge Weinstein—it will require that both ARCH and the Lehman Parties execute the same version of the "Stipulation for Arbitration in Action Previously Mediated by Same Neutral." JAMS would prefer that the parties liaise directly with each other to determine if we may reach agreement regarding the stipulation.

Accordingly, we enclose a modified version of the stipulation for your consideration which we have executed. Please let us know if the Lehman Parties will execute this Stipulation, or if you would propose an alternative version.

Very truly yours,

Ronald W. Hopkins

cc: Ms. Julie McCool-JAMS

Enclosure

Hon. Daniel Weinstein (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111
415-774-2612

## JAMS ARBITRATION

Lehman Parties

Plaintiff(s),

v.

Arch Insurance

Defendant(s).

REF. NO. 1100081939

STIPULATION FOR
ARBITRATION IN ACTION
PREVIOUSLY MEDIATED
BY SAME NEUTRAL

The parties to the above entitled action have requested JAMS, and specifically Hon. Daniel Weinstein (Ret.), to conduct an arbitration in an action previously mediated by Hon. Daniel Weinstein (Ret.).

During the mediation, the neutral met privately with each party and counsel and received information frequently not shared with, and often disputed by, the party not present.

In a normal arbitration in which the neutral decides the outcome based on evidence received in an open session, it would be both unethical and unlawful for an arbitrator to receive information from one party in the absence of the other.

Accordingly, this combined process may proceed only with the consent of the parties and counsel. Moreover, JAMS and Hon. Daniel Weinstein (Ret.) will conduct such a proceeding only with a knowing waiver of the parties' right to have an arbitrator's decision based solely on information received in the presence of each other.

By their signature below, the parties hereto waive any right to complain of ex-parte (private) contact between Hon. Daniel Weinstein (Ret.) and the opposition party or counsel in the previous mediation or mediations and waive their respective right to have an arbitration award based solely upon information communicated to the mediator in their presence.

The parties hereto acknowledge that information so communicated during the mediation may be received by the neutral in confidence and may not be communicated to the adverse party. It is further acknowledge that such information, which the absent and adverse party may believe to be false, may influence the decision of the neutral when the neutral acts as an arbitrator. Notwithstanding these factors, it is the desire of the parties to proceed with this combined process and they hereby waive any defect in the procedure and the right to oppose confirmation or to seek vacature of any award rendered by the neutral on account of the above-described conduct of the neutral. Further, the parties hereto specifically release JAMS and Hon. Daniel Weinstein (Ret.) from any liability which might otherwise exist due to the receipt of information through an ex-parte communication.

The parties also acknowledge that the fact that the neutral presided as a mediator shall not provide a basis to seek the disqualification of the neutral as an arbitrator, whether pursuant to California Code of Civil Procedure section 1281.9 or otherwise, and the parties waive the right to do so. They also waive the right to any disclosure that might otherwise be required by section 1281.9 or the California Rules of Court Ethics Standards for Neutral Arbitrators in Contractual Arbitration.

The parties also acknowledge that they have discussed these issues with their respective attorneys, believe themselves to be fully informed of the adverse characteristics of this process, and have determined that they wish to proceed.

The attorneys whose signatures appear below attest that they have fully informed their clients of the alternative dispute resolution process available to them and have discussed the particular characteristics of the "Med-Arb" process which is the subject of this document.

The parties mutually acknowledge the following: ARCH executes this stipulation only with respect to issue #1 submitted to arbitration by Lehman Bros. ARCH does not execute this stipulation or waive any rights as to submission of issue #2. As previously stated in greater detail in correspondence from ARCH's counsel to the Lehman Parties and to JAMS, ARCH objects and does not consent to the jurisdiction of JAMS to conduct an arbitration on issue #2 submitted by Lehman Bros. Issue #2 concerns interpretation of a contract between ARCH and the City of Palmdale, who is not a party to this arbitration proceeding or to the arbitration agreement giving rise to this proceeding. ARCH contends that the City of Palmdale is an indispensable party to any litigation concerning interpretation of the ARCH/City of Palmdale agreement. ARCH does not waive its objection to the jurisdiction of JAMS as to issue #2, and consents to execute this stipulation only as to issue #1.

Dated this _____ day of _____, 20___.

_____

Dean A. Ziehl Esq.
Pachulski Stang Ziehl & Jones LLP

_____
Lehman Brothers Holding Inc.

_____
Lehman ALI, Inc.

_____
Lehman Commercial Paper, Inc.

_____
LV Ritter Ranch LLC

_____
Nellie P. Camerik Esq.
Weil Gotshal & Manges LLP

_____
Lehman Brothers Holding Inc.

_____
Lehman ALI, Inc.

_____
Lehman Commercial Paper, Inc.

_____
LV Ritter Ranch LLC

_____
Ronald W. Hopkins Esq.
Gascou Hopkins, LLP

9/24/15
_____

9-24-15
_____
Susan D. Neff Esq.
Arch Insurance Company

Arch Insurance Company

# EXHIBIT 6

1  Ronald W. Hopkins, Esq. (Bar No. 100895)
   rhopkins@gascouhopkins.com
2  Christian J. Gascou, Esq. (Bar No. 209957)
   cgascou@gascouhopkins.com
3  GASCOU HOPKINS LLP
   9696 Culver Boulevard, Suite 302
4  Culver City, California 90232
   Telephone:  (310) 785-9116
5  Facsimile:   (310) 785-9149

6  Attorneys for Plaintiff,
   ARCH INSURANCE COMPANY
7

8

9            UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11  ARCH INSURANCE COMPANY, a )    CASE NO. 2:15-cv-7435
12  Missouri corporation,      )
                               )
13           Plaintiff,        )    COMPLAINT FOR: (1)
                               )    DECLARATORY RELIEF RE
14       v.                    )    SCOPE OF CONTRACTUAL
                               )    OBLIGATIONS AND
15  CITY OF PALMDALE, a California )  EXONERATION; (2)
    Municipality,              )    DECLARATORY RELIEF RE
16                             )    REFORMATION OF CONTRACT;
             Defendant.        )    (3)DECLARATORY RELIEF RE
17  _____)    EXONERATION; and
                                    (4)DECLARATORY RELIEF RE
18                                  SUBROGATION

19                  THE PARTIES

20       1.    Plaintiff Arch Insurance Co., ("ARCH") is a Missouri corporation

21  authorized to do business as a surety company in the state of California and has its

22  principal place of business at 300 Plaza Three, 3rd Floor, Jersey City, New Jersey.

23       2.    Defendant City of Palmdale("CITY") is a California municipality that has

24  its principal place of business at 33800 Sierra Highway, Palmdale, California, and

25  which transacts business in the State of California as a municipal corporation.

26

27               JURISDICTION AND VENUE

28       3.    Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1332 because

                         - 1 -
                      COMPLAINT

1  of the diversity of citizenship between plaintiff ARCH and Defendant CITY, and the

2  amount in controversy exceeds $75,000.00.

3       4.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(a) because a

4  substantial part of the events or omissions giving rise to the claims herein occurred in

5  this district.

6                    **ALLEGATIONS COMMON TO ALL COUNTS**

7       5.      Beginning on or about April 20, 2005, Plaintiff ARCH issued subdivision

8  performance bonds as surety on behalf of its principal, developer Palmdale Hills

9  Property, LLC, one of the Suncal companies (hereinafter "SUNCAL") to CITY as

10  bond obligee. The performance bonds were issued pursuant to the Subdivision Map

11  Act, California Government Code sections 66499 *et seq.*, and generally act as security

12  to CITY for principal/developer SUNCAL's construction of infrastructure

13  improvements in and around a subdivision within the CITY to be known as Ritter

14  Ranch. ARCH issued bonds on behalf of SUNCAL as principal in the approximate

15  amount of $5,400,000 for Phase 1 infrastructure within the proposed

16  subdivision("PHASE 1 BONDS'), and $8,400,000 for improvements along a rural

17  road, Elizabeth Lake Road, near Phase 1 of the subdivision("ELR BONDS.").

18      6.      SUNCAL began performance of significant work under the PHASE 1

19  BONDS and significant work under a Street Improvement Bond, one of the ELR

20  BONDS, to widen the rural road in approximately 2006. However, no homes were

21  ever constructed in any phase of the proposed 7000 housing unit subdivision.

22      7.      On or about November 7, 2008, and as a result of the housing recession

23  being experienced throughout California and in particular as to rural subdivisions,

24  SUNCAL filed for bankruptcy protection under Chapter 11 of the United States

25  Bankruptcy Code in the Central District of California. Shortly prior to this time,

26  various entities associated with Lehman Bros., SUNCAL's primary investor/lender,

27  filed their own petitions for bankruptcy protection under Chapter 11 in New York.

28      8.      During the pendency of the SUNCAL bankruptcy, the Court authorized

- 2 -
**COMPLAINT**

1   approximately $2,000,000 of expenditures to be made by debtor-in-possession

2   SUNCAL to complete the widening of Elizabeth Lake Road under the Street

3   Improvement Bond, one of the ELR bonds. The debtor-in-possession was able to

4   contract for completion of most of the road widening, leaving a punch-list of

5   approximately 20 minor items of work to be completed to achieve the road widening.

6       9.    On or about October 29, 2009, the CITY filed suit against ARCH seeking

7   to enforce the ELR BONDS in Los Angeles County Superior Court, Case No.

8   BC425071. ARCH answered and joined issue. ARCH's primary affirmative defense

9   was that it would constitute economic waste to finish or begin many of the ELR

10  BOND improvements, because the infrastructure was meant to support a 7000 unit

11  housing subdivision, and no homes were built or likely to be built for some time at

12  Ritter Ranch. (Indeed, six years later at the time of filing of this action, no homes have

13  been built or are likely to be built for the foreseeable future at the project.)

14      10.   Beginning in early 2010, ARCH and the CITY engaged in extensive

15  settlement negotiations and meetings at the City Hall in an attempt to resolve the

16  CITY's action against ARCH on the ELR BONDS. The end result of the lengthy

17  negotiations was that the CITY would accept performance of certain items within the

18  ELR BONDS at ARCH's expense, and would exonerate all of the ELR BONDS upon

19  completion of those items. ARCH, in turn, would forego litigation of its economic

20  waste defenses.

21      11.   During the detailed and extended negotiations, the CITY produced a very

22  detailed punch-list of items it wished to have completed at ARCH's expense under the

23  Street Improvement Bond within the ELR bonds. Bids from potential contractors

24  indicated a cost range of up to $300,000 to complete the road widening work. The

25  CITY also asked ARCH to pay for the installation of Street Lights under the Street

26  Light Bond within the ELR BONDS. The penal sum of the Street Light Bond was

27  $404,800. It was understood and discussed at length in ARCH's meetings with the

28  CITY that the $404,800 amount established in 2005 as the penal sum was inadequate

**COMPLAINT**

1    to pay for the Street Light installation in 2011. Although firm bids could not be

2    obtained because the plans were to be revised to delete an unnecessary traffic

3    signal(given that there were no inhabitants at the subdivision intersection)—the

4    estimated amount of the expense to install the street lights and underground backbone

5    between the street lights discussed during the negotiations at City Hall was

6    approximately $700,000. The CITY specifically asked for ARCH to incur this expense

7    above the Street Light Bond penal sum of $404,800 in exchange for the ultimate

8    release of the remainder of the ELR BONDS, including the deletion of unnecessary

9    items such as building out riding trails and curbs at the uninhabited subdivision.

10   Basically, ARCH agreed to arrange for performance of approximately $1,000,000 of

11   work in exchange for exoneration of the balance of work due under the $7MM of ELR

12   BONDS. A true and correct copy of the Settlement Agreement between ARCH and

13   the CITY dated February 10, 2011(the "SETTLEMENT AGREEMENT") is attached

14   hereto as exhibit "A".

15        12.    Shortly after execution of the SETTLEMENT AGREEMENT, ARCH

16   engaged a completion contractor to complete the approximately 20 items of

17   miscellaneous work under the Street Improvement Bond, listed in Appendix A to the

18   SETTLEMENT AGREEMENT. The work was completed and accepted by the CITY

19   by approximately September of 2011.

20        13.    The SETTLEMENT AGREEMENT envisioned that ARCH would

21   arrange for completion of the design of the Street Lights within one month and would

22   contract for completion of the Street Light work within four months of the design

23   completion, subject to delay arising from any regulatory approvals. The Street Light

24   Work was described generally in Appendix B to the SETTLEMENT AGREEMENT.

25   ARCH and the CITY understood that a portion of the Street Light work was required

26   at each light standard to be performed by EDISON per EDISON's requirements, and

27   that underground backbone work between the street lights was to be performed by a

28   private contractor engaged by ARCH. At the time that the SETTLEMENT

- 4 -
**COMPLAINT**

1   AGREEMENT was reached, neither ARCH nor the CITY understood that the public

2   utility, EDISON, insists on control of the entire process of design of street lights. The

3   time frame to provide the Street Light design (one month) and to perform the Street

4   Light Work(four months) in the SETTLEMENT AGREEMENT was in fact

5   impossible due to the design requirements imposed by public utility EDISON and

6   EDISON's actual scheduling practices.

7        14.   The design process employed by EDISON is a multi-step procedure in

8   which EDISON's branch office first prepares the design, then sends the design to the

9   Regional office, who then sends the design to outside engineering consultants for

10   review. This three-step process takes several months. Between 2011 and November of

11   2014, EDISON went through the three-step process several times—as defects were

12   discovered in the various iterations of the design prepared by EDISON. EDISON also

13   changed out the management team assigned to the project twice.

14        15.   While the EDISON design was going through its various iterations, the

15   SUNCAL reorganization plan was approved in Bankruptcy Court. Under the terms of

16   the Plan, title to the Ritter Ranch subdivision project passed to LV RITTER RANCH

17   ("hereinafter "LEHMAN"), a new stand-alone entity owned by entities  associated

18   with SUNCAL's lender and primary creditor Lehman Bros. The LEHMAN plan for

19   the SUNCAL bankruptcy reorganization had proposed that the original development

20   and entitlement agreements granted by the CITY to SUNCAL which permitted the

21   subdivision to be developed would automatically pass to LEHMAN when the

22   LEHMAN stand-alone would take title.   The CITY agreed in the bankruptcy

23   proceeding that the reorganization could proceed, but reserved its objections to the

24   attempt at automatic assignment of the development agreement rights. Subdivision

25   development agreements and improvement agreements with a municipality are

26   "financial accommodation" contracts and cannot be assumed without consent of the

27   party who granted the accommodations. As a practical matter—the CITY retained and

28   continues to retain the right under the Subdivision Map Act to impose conditions on

- 5 -
**COMPLAINT**

1   LEHMAN in order for LEHMAN to maintain the entitlements necessary to develop or

2   to sell the property as the new owner/developer.

3        16.   After LEHMAN took title to the Subdivision property in late 2011, there

4   were numerous meetings and communications concerning the development of the

5   EDISON design for the street lights.  The participants at these meetings included

6   representatives of EDISON, the CITY, LEHMAN's project management, LEHMAN's

7   construction consultants (Rockne Construction), and ARCH.  At all times during these

8   meetings and communications, ARCH reiterated its intent to perform the Street Light

9   installation obligations under the SETTLEMENT AGREEMENT, despite the

10   significant delays in completion of the design by EDISON and the takeover of the

11   project by LEHMAN. The general purpose of these meetings was to promote

12   cooperation between all parties now that LEHMAN had assumed title to the project—

13   while the performance of ARCH's obligations under the February 2011

14   SETTLEMENT AGREEMENT was delayed.

15        17.   ARCH also worked in close cooperation with LEHMAN's construction

16   consultants and THE CITY. Although ARCH did not know the precise nature of any

17   infrastructure work that the CITY would require of LEHMAN in order to maintain the

18   entitlements, ARCH was aware generally that certain work would be required of

19   LEHMAN by the CITY as a condition for maintaining the entitlements. ARCH, the

20   CITY, and LEHMAN had an informal understanding that it would make sense from

21   both a technical and economic perspective if the same contractors were engaged by

22   ARCH and LEHMAN through LEHMAN's construction consultants to perform their

23   respective duties to the CITY. Also, in most instances, LEHMAN's construction

24   consultants were involved in explaining to EDISON the defects in the various

25   iterations of the EDISON design.

26       18.   In November of 2014, LEHMAN's construction consultants and

27   management informed ARCH that the latest iteration of the EDISON design appeared

28   to be buildable. EDISON had also prepared a bill to ARCH for EDISON's part of the

- 6 -
**COMPLAINT**

1  Street Light Installation in the amount of $452,309 (net $14,876 after application of
2  SUNCAL's $437,431 deposit with EDISON.) LEHMAN's construction consultants
3  also provided ARCH a spread sheet with a cost estimate for the non-Edison portion of
4  the ARCH work for the underground backbone between the Street Lights in the
5  amount of $490,362.   ARCH was prepared to fund its share of the expenses, as
6  outlined by LEHMAN's construction consultants, in order to discharge its obligations
7  to CITY under the settlement agreement. ARCH understood that LEHMAN would be
8  contracting independently with contractors to perform other work not related to the
9  SETTLEMENT AGREEMENT. ARCH waited for LEHMAN to prepare the
10  construction contracts which would involve both ARCH-funded work and LEHMAN-
11  funded work following the November meeting.

12       19.   In February of 2015, rather than preparing the construction contracts,
13  LEHMAN's management informed ARCH that it believed the actual scope of
14  ARCH's duties to the CITY under the SETTLEMENT AGREEMENT were much
15  greater than the actual agreement provided—even though LEHMAN had no
16  involvement whatsoever in the 2010-2011 negotiations between ARCH and the CITY.
17  Specifically, the electricity lines and AT&T phone lines for the entire project are
18  above-ground and on telephone poles running from the electrical sub—station within
19  Phase 1 of the project down to Elizabeth Lake Road and along the road itself.
20  LEHMAN's ballpark rough estimate of the total cost of moving and undergrounding
21  of electric and phone lines was approximately $2,000,000—not including the
22  estimated $940,000 cost of the ARCH financial commitment to the CITY under the
23  SETTLEMENT AGREEMENT for the Street Lights. LEHMAN suggested that since
24  it was not "entirely clear" whose responsibility it was to pay for the relocation—that
25  ARCH and LEHMAN should split the cost—meaning ARCH would be asked to pay
26  another $1,000,000 above its original commitment to the CITY. ARCH again re-
27  affirmed its willingness to pay for its share of the costs in satisfaction of its
28  obligations under the SETTLEMENT AGREEMENT, but objected to LEHMAN's

1  attempt to expand ARCH's duties.

2      20.    At some point thereafter, LEHMAN's management apparently contacted

3  the CITY to indicate that there were no contracts for the various improvements that

4  CITY was requesting from LEHMAN and ARCH, and the improvements that ARCH

5  agreed to perform under the SETTLEMENT AGREEMENT, because ARCH would

6  not fund its share of the improvements. Based on this incorrect information from

7  LEHMAN, the CITY's outside counsel then sent ARCH a default letter regarding the

8  performance of the Street Light work. This was the first contact ARCH had received

9  in some years from the CITY's outside counsel—although ARCH had been

10  participating regularly in the numerous meetings with the CITY representatives over

11  the years concerning finalization of the EDISON design and the delays in finalizing

12  the design. ARCH replied to the CITY with correspondence which summarized the

13  EDISON design delays, the ongoing meetings between ARCH and the CITY for the

14  last three years, the informal agreement that the ARCH and LEHMAN work requested

15  by the CITY would be performed by the same contractor, and LEHMAN's improper

16  assertions with respect to the expanded scope of the ARCH work under the

17  SETTLEMENT AGREEMENT.

18      21.    ARCH has since participated in meetings with the CITY and LEHMAN.

19  ARCH has reiterated its willingness to fund its portion of the obligations under the

20  SETTLEMENT AGREEMENT with the CITY—but disagrees with LEHMAN's

21  assertion to the CITY that ARCH's scope and attendant costs should be significantly

22  greater. The parties appear to be presently at an impasse in negotiations, and

23  LEHMAN appears to be attempting to intimidate the CITY into taking its position on

24  an expanded scope of ARCH's duties, despite LEHMAN's total lack of involvement

25  in the negotiations of the deal between the CITY and ARCH.

26      22.    On a related note, LEHMAN as subdivision developer approached the

27  CITY in late 2014 and obtained full release and exoneration letters from the CITY on

28  *all* ARCH bonds on the subdivision—both the PHASE 1 BONDS and the ELR

**COMPLAINT**

1   BONDS. LEHMAN apparently obtained the CITY's permission to replace the bonds
2   with liens on the subdivision property granted by LEHMAN—a form of security
3   permitted by the Subdivision Map Act as an alternative to surety bonds. ARCH does
4   not know the amount of the liens—and if they were calculated to correspond to the
5   original penal sum of the PHASE 1 BONDS and the ELR BONDS given by ARCH as
6   the security for performance by SUNCAL. After LEHMAN obtained release of the
7   PHASE 1 BONDS and the ELR BONDS—LEHMAN requested that ARCH release
8   $1,500,000 in escrowed collateral pledged by LEHMAN to ARCH under a settlement
9   agreement in the SUNCAL bankruptcy. One purpose of the bankruptcy settlement
10  agreement between ARCH and LEHMAN, was to assure LEHMAN's duty to
11  reimburse ARCH up to $1,100,000 for the cost of the road work and installation of the
12  street lights. Under the ARCH/CITY SETTLEMENT AGREEMENT, the bonds were
13  not to be released and exonerated until *after* ARCH arranged for completion of the
14  Road Work and the Street Light Work. LEHMAN is presently initiating an arbitration
15  proceeding at JAMS in which it alleges that ARCH must consent to release of
16  $1,500,000 in escrowed collateral because the CITY has now issued release letters on
17  all ARCH PHASE 1 BONDS and ELR BONDS, even though ARCH's obligations
18  under the ELR BONDS under the SETTLEMENT AGREEMENT have not been
19  discharged.
20
21                              -**FIRST COUNT**
22  **(Declaratory Relief re Scope of Contractual Duties and Exoneration of Bonds**
23                              **(Against CITY)**
24       23.   Plaintiff incorporates its allegations in paragraph 1 through 22 of this
25  complaint, as if set forth in full herein.
26       24.   An actionable and justifiable controversy exists between ARCH and
27  CITY regarding their rights and obligations under the SETTLEMENT AGREEMENT
28  attached as Exhibit "A".   Plaintiff ARCH contends and seeks declaratory relief as

**COMPLAINT**

1 follows: (1) ARCH has at all times substantially complied with its obligations to CITY

2 under the SETTLEMENT AGREEMENT, despite mutual mistakes of material fact by

3 both ARCH and CITY in assumptions made regarding the control of the design

4 process for the Street Lights, which rendered performance under the time frames set

5 forth in the agreement impossible, and despite the course of conduct regarding

6 negotiations between the Parties as LEHMAN became the owner/developer during the

7 EDISON delays. ARCH contends that it should not be deemed in default of its

8 obligations. (2) The scope of the street light work negotiated by ARCH and CITY

9 has an approximate cost of $940,000(not including SUNCAL deposits with EDISON)

10 as indicated in the EDISON estimate for Street Light Installation and LEHMAN

11 November 2014 estimate for the underground backbone work between the Street

12 Lights, and ARCH does not have responsibility to undertake the much larger scope of

13 work to completely re-locate electrical and At & T lines as advocated to the CITY by

14 LEHMAN. (3) Alternatively, ARCH's performance of the Street Light work is

15 excused due to changed circumstances which rendered performance impossible under

16 the original terms of the SETTLEMENT AGREEMENT, and due to the CITY's

17 decision to accept substitute security from the new owner LEHMAN under the

18 Subdivision Map Act, and to issue a full release and exoneration of the ARCH ELR

19 BONDS.

20    25.    Defendant CITY contends that ARCH is in default of its obligations

21 under the SETTLEMENT AGREEMENT, and appears to adopt the position of the

22 new third party developer LEHMAN that the scope of Street Light work required of

23 ARCH under the SETTLEMENT AGREEMENT is much greater than the estimated

24 cost of $900,000(net of SUNCAL deposits) as indicated in the EDISON and

25 LEHMAN November 2014 estimates.  Plaintiff ARCH requests declaratory relief

26 regarding the scope of its obligations pursuant to Federal Declaratory Judgment Act,

27 28 U.S.C. §2201 *et seq.*, and/or California Code of Civil Procedure section 1060.

28    26.    Plaintiff ARCH seeks the following alternative forms of declaratory relief

- 10 -

**COMPLAINT**

1 | from this court:

2 |       a.  For a declaration that ARCH's remaining duties to the CITY under the
3 |           SETTLEMENT AGREEMENT are excused and discharged, because
4 |           CITY has released and exonerated all of the ARCH ELR BONDS in
5 |           consideration of LEHMAN's providing substitute security under the
6 |           Subdivision Map Act to CITY regarding the bonded obligations.

7 |       b.  Alternatively, for a declaration that ARCH's remaining duties to the
8 |           CITY are discharged due to supervening impracticability or impossibility
9 |           due to the non-occurrence of events which were a basic assumption of
10 |          the contract, namely that ARCH could arrange for the re-design within
11 |          one month and complete the work within four months. (Restatement 2d,
12 |          *Contracts,* section 261.)

13 |      c.  Alternatively, for a declaration that ARCH has substantially complied
14 |          with its obligations under the SETTLEMENT AGREEMENT to CITY
15 |          and that CITY's default letter should be deemed of no legal effect in
16 |          light of (i) the mutual mistake of CITY and ARCH regarding the
17 |          EDISON control of and delays in the Street Light design process; (ii) the
18 |          course of conduct in which CITY, EDISON and ARCH have worked
19 |          with new developer/owner LEHMAN to coordinate joint development at
20 |          the project for both LEHMAN work and ARCH work under the
21 |          SETTLEMENT AGREEMENT; and (3) ARCH's tenders of
22 |          performance with regards to the remainder of work under the
23 |          SETTLEMENT AGREEMENT.

24 |      d.  Alternatively, for a declaration that the scope of ARCH's remaining
25 |          duties to CITY under the agreement is in the approximate $940,000
26 |          amount of the EDISON and LEHMAN November 2014 cost
27 |          estimates(net of SUNCAL deposits with EDISON)---and not the much
28 |          greater scope advocated by LEHMAN in early 2015, and apparently

- 11 -
**COMPLAINT**

1    adopted by the CITY.

2        e. For other relief as the court shall deem proper in equity.

3                    **SECOND COUNT**

4    **(For Declaratory Relief re Reformation of Agreement Against CITY)**

5        27.    Plaintiff incorporates Paragraphs 1 through 25 of this complaint as if set

6    forth in full herein.

7        28.    The SETTLEMENT AGREEMENT between the CITY and ARCH was

8    based upon a mutual and material mistake—that ARCH could arrange for the design

9    of the Street Light Work within one month, and contract for the work to be completed

10    within four months. Neither ARCH nor the CITY anticipated that EDISON would

11    insist on complete control of the new design, that the process would take years to

12    complete, and that in the interim a new owner would begin performance of its own

13    duties to CITY. The delay in the completion of the design due to EDISON has also

14    resulted in an increase in the estimated costs of the Street Light Work beyond the

15    original rough estimate of $700,000. Further, to the extent that the CITY may adopt

16    LEHMAN's new position that the SETTLEMENT AGREEMENT requires roughly

17    $2,000,000 of additional work from ARCH, then the SETTLEMENT AGREEMENT

18    between ARCH and CITY was entered into based upon a mutual material mistake.

19        29.    Plaintiff ARCH suggests that in equity the SETTLEMENT

20    AGREEMENT should be reformed due to mutual mistake, and that the actions taken

21    by ARCH to date to perform its obligations, and the current offer to perform, should

22    be deemed to be in substantial compliance with ARCH's duties to the CITY under the

23    SETTLEMENT AGREEMENT, and performance of the approximately $940,000 of

24    work in the EDISON and LEHMAN November 2014 estimates(net of SUNCAL

25    deposits with EDISON) should be deemed compliance with ARCH's obligations

26    under the SETTLEMENT AGREEMENT. Any default notice by the CITY to ARCH

27    should be deemed of no legal effect.

28                    **THIRD COUNT**

- 12 -

**COMPLAINT**

1          **(For Declaratory Relief re Exoneration Against CITY)**

2          30.     Plaintiff incorporates paragraph 1 through 29 of this complaint, as if set

3     forth in full herein.

4          31.     Defendant CITY issued release letters exonerating all of the ARCH

5     PHASE ONE BONDS and the ELR BONDS in late December 2014 upon receiving

6     consideration and substitute security from new subdivision developer LEHMAN in

7     the form of liens, an acceptable form of security under the Subdivision Map Act to

8     guarantee performance of infrastructure improvements. Under the SETTLEMENT

9     AGREEMENT, the release of the ELR BONDS and the PHASE 1 BONDS was not to

10    occur until after ARCH had arranged for the performance of the street light work.

11         32.     LEHMAN as developer has now initiated an arbitration proceeding with

12    ARCH at the Judicial Arbitration and Mediation Service (JAMS Reference No.

13    1100081939)—in which LEHMAN alleges that ARCH must consent to release of

14    $1,500,000 in collateral pledged in escrow by LEHMAN to ARCH as part of the

15    bankruptcy reorganization, to hold ARCH harmless from bond losses on the project—

16    due precisely to the CITY's release of the bonds. While ARCH disputes LEHMAN's

17    contentions, should LEHMAN prevail, the CITY's action in accepting substitute

18    security from LEHMAN may have materially affected ARCH's rights as a surety to

19    be reimbursed for loss payments. An act by the obligee CITY to impair ARCH's

20    recourse to collateral as secondary obligor against the substitute principal obligor

21    LEHMAN is an impairment of suretyship and discharges ARCH as a secondary

22    obligor from the performance of any remaining obligations. Restatement of

23    Suretyship, 3d., Section 37.

24         33.     By accepting the liens from LEHMAN as substitute or successor

25    principal, the CITY has altered the original obligation to the detriment of ARCH.

26    Under California law, Civil Code Section 2819, a surety is exonerated, except so far as

27    he or she may be indemnified by the principal, if by any act of the creditor, without

28    the consent of the surety the original obligation of the principal is altered in any

- 13 -
**COMPLAINT**

1  respect or the remedies or rights of the creditor against the principal, in respect

2  thereto, are in any way impaired or suspended.

3         34.   ARCH further contends that in equity the release and exoneration

4  of the ELR BONDS by CITY should excuse any duty of ARCH to perform

5  obligations within the ELR BONDS referenced in the SETTLEMENT

6  AGREEMENT. The CITY has voluntarily and knowingly waived its rights under the

7  ELR BONDS by accepting the replacement security from LEHMAN, to whose

8  economic benefit any improvements would inure, and by issuing full releases of the

9  ELR BONDS in consideration for acceptance of the LEHMAN security. The CITY's

10  acceptance of the replacement liens from LEHMAN is a material modification of the

11  principal obligor's duties. By accepting or requiring the substitute liens from

12  LEHMAN as the substitute principal obligor, the CITY as obligee is bound in equity

13  to require performance from LEHMAN as principal obligor, and not from ARCH as

14  secondary obligor.

15                        **FOURTH COUNT**

16                  **(For Declaratory Relief Re Subrogation)**

17         35.   Plaintiff incorporates paragraphs 1 through 34 of this complaint as

18  though set forth in full.

19         36.   Under California law, Civil Code section 2854, a surety is entitled to the

20  benefit of every security for the performance of the principal obligation held by the

21  creditor, or by the co-surety at the time of entering into the contract of suretyship, or

22  acquired by him or her afterwards, whether the surety was aware of the security or not.

23         37.   The CITY did not inform ARCH that acting as creditor for the bonded

24  obligations, it accepted substitute security in the form of liens against the subdivision

25  property provided by LEHMAN. ARCH therefore seeks a declaration that to the

26  extent it performs or is found liable to perform any obligations which are co-extensive

27  with the substitute security provided by LEHMAN, ARCH should be deemed

28  subrogated to the rights of the CITY to the liens, and the liens should be deemed

**COMPLAINT**

1  assigned and transferred to ARCH by operation of law.

2                                    **PRAYER**

3      WHEREFORE, ARCH prays alternatively for relief as follows:

4  **On The First Count (Against CITY)**

5      1.    For a declaration that ARCH's SETTLEMENT AGREEMENT with the

6            CITY is rescinded due to mutual mistake of material fact;

7      2.    In the alternative, for a declaration that ARCH's further performance

8            under the SETTLEMENT AGREEMENT is excused due to the CITY's

9            full release and exoneration of the ELR bonds and acceptance of

10           substitute security for the bonded obligations from the new developer

11           LEHMAN.

12     3.    In the alternative, for a declaration that ARCH's further performance

13           excused and discharged due to supervening impracticability.

14     4.    In the alternative, for a declaration that ARCH has substantially complied

15           with its obligations to CITY under the SETTLEMENT AGREEMENT in

16           light of mutual mistakes of material fact and the subsequent course of

17           conduct of the parties; and

18     5.    In the alternative, for declaratory relief regarding the scope of the

19           obligations to the CITY regarding the Street Light portion of the work.

20 **On The Second Count (Against CITY)**

21     1.    For a judgment for reformation of the SETTLEMENT AGREEMENT

22           due to mutual mistake and circumstance beyond to the control of ARCH,

23           and findings that ARCH's conduct has been in substantial compliance

24           with the reformed terms of the agreement, and the City's notice of

25           default be deemed to have no legal effect.

26 **On The Third Count (Against CITY)**

27     1.    For a judgment that ARCH's obligations to the CITY under the

28           SETTLEMENT AGREEMENT to complete certain improvements under

- 15 -

**COMPLAINT**

1            the ELR BONDS are exonerated and excused, due to the CITY's

2            acceptance of substitute security from new owner LEHMAN, and the

3            CITY's issuance of full release and exoneration letters on the ELR

4            BONDS.

**On the Fourth Count(Against CITY)**

6    1.      For declaratory relief that to the extent ARCH arranges for completion of

7            any work required by the liens provided to CITY by LEHMAN, that

8            ARCH should be deemed subrogated to the CITY's rights to the liens,

9            and the liens should be deemed transferred and assigned by CITY to

10            ARCH as a matter of law.

**On All Counts**

13    1.      For costs of suit herein;

14    2.      For attorneys' fees pursuant to agreement; and

15    3.      For such other and further relief as the court shall in equity deem just

16            and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests trial by jury of this matter.

DATED: SEPTEMBER 22, 2015          GASCOU HOPKINS LLP

                                    */s/ Ronald W. Hopkins*
                                    RONALD W. HOPKINS
                                    rhopkins@gascouhopkins.com

                                    Attorneys for Plaintiff ARCH
                                    Insurance Company

**COMPLAINT**

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2015, the foregoing COMPLAINT was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

DATED: SEPTEMBER 23, 2015       GASCOU HOPKINS LLP

/s/ Christian J. Gascou
CHRISTIAN J. GASCOU
cgascou@gascouhopkins.com

/s/ Ronald W. Hopkins
RONALD W. HOPKINS
rhopkins@gascouhopkins.com

Attorneys for Plaintiff Arch Insurance Company

COMPLAINT