1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS, INC.,

8

9              Debtor.

10

11  - - - - - - - - - - - - - - - - - - - - - - -x

12

13              United States Bankruptcy Court

14              One Bowling Green

15              New York, New York

16

17              November 13, 2015

18              12:11 PM

19

20  B E F O R E:

21  HON. SHELLEY C. CHAPMAN

22  U.S. BANKRUPTCY JUDGE

23

24

25  ECRO:  MICHELLE BROWN

1   HEARING RE Doc #51311 Motion to Renew Motion to Allow

2   Disclosure of Derivatives Questionnaires

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Nicole Yawn

Page 3

1   A P P E A R A N C E S :

2   QUINN EMANUEL

3        Attorneys for Lehman Brothers Holdings, Inc.

4        51 Madison Avenue

5        22nd Floor

6        New York, NY 10010

7

8   BY:   DIANE CAFFERATA HUTNYAN, ESQ.

9        LINDSAY M. WEBER, ESQ.

10       SCOTT C. SHELLEY, ESQ.

11

12  DECHERT LLP

13       Attorney for Russell

14       1095 Avenue of the Americas

15       New York, NY  10036

16

17  BY:   SHMUEL VASER, ESQ.

18

19  PROSKAUER ROSE LLP

20       Attorney for Royal Bank of Scotland

21       Eleven Times Square

22       New York, NY  10036

23

24  BY:  IRENA M. GOLDSTEIN, ESQ.

25

Page 4

1   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP

2       Attorney for Citibank

3       1285 Avenue of the Americas

4       New York, NY 10010-6064

5

6   BY:  LIZA VELAZQUEZ, ESQ.

7

8   SCHLAM STONE & DOLAN, LLP

9       Attorney for Citadel Energy Investment

10      26 Broadway

11      New York, NY 10004

12

13   BY:  BENNETTE DEACY KRAMER

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Okay.  Let's take Lehman now, please.
 3        (Pause)
 4            THE COURT:  Who am I hearing from?
 5            Good afternoon.
 6            MS. HUTNYAN:  Thank you, Your Honor.  Diane
 7    Hutnyan, on behalf of Lehman Brothers.
 8            THE COURT:  Yes.
 9            MS. HUTNYAN:  your Honor, in March, we brought a
10    motion, as you may recall, to allow the use of the
11    derivatives questionnaires on discovery.
12            THE COURT:  Right.
13            MS. HUTNYAN:  And the Court had granted relief as
14    to about 4,000 counterparties that had not had an objection
15    to that motion.
16            THE COURT:  Right.
17            MS. HUTNYAN:  Since then, we've been continuing
18    negotiations to try and reach a global solution that would
19    balance the interests of the remaining parties and
20    confidentiality with our need to use the information.  At
21    the Court's suggestion, we advanced an anonymization
22    proposal that would allow the limited redaction of
23    identifying information from the derivatives questionnaires.
24    Many were interested in the proposal, but we could not get
25    global consent.
```

Page 6

1             THE COURT:  Okay.

2             MS. HUTNYAN:  We couldn't get critical mass.  And

3     since we've been nearing the close of discovery in a couple

4     of the adversary proceedings, we decided to move forward and

5     renew the motion as to the remaining objectors.  That was

6     the motion that we brought on October 30th.

7             THE COURT:  Right.

8             MS. HUTNYAN:  After we set this for hearing, a

9     number of the counterparties came back to us and said we

10    like the anonymization proposal.  Can we continue

11    negotiating around it?  And so, based on their comments, we

12    revised the proposal, and we continued discussions over the

13    -- whatever it is -- 13 days that have elapsed pretty much

14    non-stop.

15            In addition, we came up with a proposal for the

16    banks who had rejected the anonymization proposal because, I

17    think, in large part because of the volume of the materials

18    that would need to be redacted.

19            THE COURT:  Right.  Okay.

20            MS. HUTNYAN:  And we've been negotiating with

21    everyone since then.  And we have a number of people that

22    have at least opted into the anonymization proposal.  Last

23    night, however, some of the parties asked about the bank

24    proposal and were interested in having that as an option.

25    And so, we extended, just last night, the bank proposal to

Page 7

1    the entire pool of objectors.

2              THE COURT:  Okay.

3              MS. HUTNYAN:  And so, what we would like to do now

4    is prepare proposed orders that we can circulate to them.

5    We plan to do that before Monday.  And that way, people can

6    review and comment on the orders.  One would be an order on

7    the bank proposal, for those that want to choose that.  The

8    other one would be about the anonymization proposal, for

9    those that choose to do that.

10             And then, at a hearing to be set as soon as Your

11   Honor can hear us again after November 20th -- we've asked

12   everybody to respond to us by November 20th and let us know

13   which one they prefer.

14             THE COURT:  Okay.

15             MS. HUTNYAN:  To set a hearing so that, if there

16   are any remaining objectors, we can hear those issues and we

17   can enter the two proposed orders.  We think we should be

18   able to resolve most of the objections through the two

19   proposals.

20             THE COURT:  Okay.  Well, let me ask a few

21   questions.  Based on the pleadings that you had then

22   submitted, we created a chart for ourselves of who's in what

23   camp.  And we divided the universe, more or less, into three

24   parts.  One is those parties who had objected but were

25   seeking to redact or some form of anonymization or something

Page 8

1    of that sort.  And there seemed to be quite a few of those

2    who filed objections along those lines.

3           Then there were the joiners, folks who seemed to

4    join the objection of parties who were willing to redact.

5    So that's kind of the pool of people, which I think

6    comprises the majority of the objectors who seem willing to

7    work with Lehman on some sort of a proposal.

8           But there is a group, what we call the unqualified

9    objectors, who just say no.  So my question for you is do

10   you believe that you have gotten some indication of interest

11   from any or all of the unqualified objectors, the objectors

12   who say simply no.

13          MS. HUTNYAN:  Yes.

14          THE COURT:  Or are those folks talking to you?

15          MS. HUTNYAN:  Yes.  And, in fact, one of the

16   reasons why we realized that the bank proposal might be

17   helpful to some of the folks in the anonymization pool is

18   because, in talking with them, they were explaining why

19   anonymization just couldn't work for them.  And so, they

20   asked about this proposal.  And so, I'm thinking that, at

21   this point, those folks who have just received the bank

22   proposal may find that attractive.

23          It's basically a notice kind of proposal where, if

24   something is actually going to be filed in court, the

25   parties that need to file it will give that party notice.

1    And then, if they want to move to protect that piece of

2    information, they can.

3            THE COURT:  So that would not be against

4    production?  It would be only if it were going to be filed?

5            MS. HUTNYAN:  Well, it would --

6            THE COURT:  In other words, it's going to be

7    hypothetically in -- if it's going to be produced to

8    Citibank in one of the adversary proceedings, it would be

9    produced not anonymized?

10           MS. HUTNYAN:  Right.

11           THE COURT:  Or native form?

12           MS. HUTNYAN:  Non-anonymized, correct, in its

13   original form for use in that proceeding.

14           THE COURT:  For use in that proceeding?  Okay.

15           So why don't I ask is there anyone -- and I could

16   list them based on our kind of counting of the heads.  But I

17   could just ask.  Is there anyone here who isn't interested

18   in any discussions of any kind?

19           Delightful.  So --

20           MS. HUTNYAN:  If I could just note something in

21   fairness?

22           THE COURT:  Sure.

23           MS. HUTNYAN:  I told counterparties -- after I

24   sent this out, I likely would have time.

25           THE COURT:  Okay, yeah.

1          MS. HUTNYAN:  And I told them there wouldn't be

2     anything on the merits.

3          THE COURT:  Sure.

4          MS. HUTNYAN:  So that people were flying in, they

5     wouldn't.

6          THE COURT:  Right.

7          MS. HUTNYAN:  So they may not be here because of

8     that.

9          THE COURT:  I see.  Okay.  All right.

10          All right.  That sounds like an excellent plan and

11     excellent progress towards, frankly, a common sense solution

12     to this issue.  As long as everyone is here, I'll just ask

13     if anyone else wishes to say anything with respect to this

14     ongoing motion.

15          Come on up.

16          MS. VELAZQUEZ:  Good afternoon, Your Honor.

17          THE COURT:  Good afternoon.

18          MS. VELAZQUEZ:  Liza Velazquez, from Paul, Weiss,

19     on behalf of Citi.

20          THE COURT:  Yes.

21          MS. VELAZQUEZ:  Lehman filed reply papers two days

22     ago that misstate Citi's position and the record of our

23     discussions with Lehman on this issue.  So we respectfully

24     ask the Court to permit us to respond.  I'll be very brief.

25          Citi is not the one insisting that all of the DQs

Page 11

```
 1    are relevant.  It is Lehman who wants to be able to use this

 2    data in our litigation.  Three years ago, we asked Lehman to

 3    agree that both sides would limit themselves to an

 4    objectively-defined subset of 40 DQs.  But Lehman refused.

 5              Instead, Lehman insists that its experts should

 6    have the right to cherry pick from the entire universe.  So

 7    it's because of Lehman's litigation position that Citi needs

 8    this discovery.  And respectfully, we do need it without

 9    further delay.

10              As Ms. Hutnyan noted, that discovery in our

11    adversary proceeding is about to close.  And expert

12    discovery is about to begin.  We have received a subset of

13    some of the DQs, but Lehman and its experts have had access

14    to the full universe --

15              THE COURT:  Okay.  We're not going to go --

16              MS. VELAZQUEZ:  Understood, understood.

17              THE COURT:  -- totally far afield into the

18    Citibank adversary.

19              MS. VELAZQUEZ:  Understood.  So we support the

20    motion.

21              THE COURT:  I understand --

22              MS. VELAZQUEZ:  I just wanted to clarify.  Thank

23    you.

24              THE COURT:  All right.  Thank you.

25              Good afternoon.
```

1             MR. VASSER:  Good afternoon, Your Honor.  Good

2     afternoon.  Shmuel Vasser, Dechert, LLP, for Russell.  And

3     I'm not sure where we fall in your chart about not willing

4     to talk --

5             THE COURT:  I think you fall in the you totally

6     object pile.

7             MR. VASSER:  Okay.  That's why I'm standing.  We

8     totally object based on the pleading.  And the only point I

9     wanted to mention -- and I'm not going to go into the

10    details of it.  I'll do it if I have to.

11            The problem I have with talking is that nobody's

12    talking back.  And --

13            THE COURT:  What do you mean by that?

14            MR. VASSER:  What I mean by that is whenever we

15    respond to a proposal, the response to us is you either take

16    what was proposed or we don't.  We can't negotiate with you

17    separately.  So I'm not sure how is that a negotiation.

18    We've obviously always and have been willing to talk.  But

19    we have concerns.  And when these concerns are not

20    addressed, I'm not sure if it's a negotiation or not.

21            I just want you to know that that's our position.

22    We're happy to talk.  We are willing to resolve it.  But

23    there can't be a meaningful solution when parties -- and I

24    don't know if any other parties in our --

25            THE COURT:  But here's the thing.  There are --

Page 13

1    first of all, the backdrop is that there are 4,000

2    counterparties who didn't react at all.  Okay?  So that's

3    number one.

4              Number two, you now have a massive group of

5    counterparties who are represented by all kinds of great law

6    firms.  And they seem to be showing a willingness to sign on

7    to the so-called bank proposal or the anonymization

8    proposal.  So what's different about your client that you

9    can't engage in the same fashion as some or all these

10   parties?

11             MR. VASSER:  Because it's a status conference, I'm

12   not going to -- our client has concerns.  They want

13   something --

14             THE COURT:  That's not good enough.

15             MR. VASSER:  Then you may reject our whole

16   objection.  I understand that.  All I'm saying is that we're

17   talking to --

18             THE COURT:  I'm asking you to explain to me what

19   distinguishes your situation from that of thousands of other

20   counterparties who have been willing to engage and respond

21   to proposals made by Lehman.  What's the difference?  Why --

22             MR. VASSER:  We are waiting.  We are making those

23   -- we responded.  But when a response comes back is that we

24   can't address your concern, not because we agree or disagree

25   with them, not because they're good or bad.  It's because

Page 14

1   you either have to accept it or reject it.  That's what I'm

2   saying.

3            THE COURT:  I hear the words, but I don't

4   understand it.  So have you reviewed the two proposals that

5   counsel outlined?

6            MR. VASSER:  I reviewed the initial proposal that

7   was made before the renewed motion was filed.  And I

8   reviewed the response that was made Thursday night before

9   the objection deadline.  And we provided comments on that.

10  And they will reject them.  And the one that came out last

11  night, the bank proposal, I reviewed and my clients

12  reviewed.  And we'll talk about it.  It may be acceptable

13  (indiscernible).

14           My only point is very simple -- is that the way

15  it's presented to us is accept or reject.  That's not a

16  negotiation.  That's my only point.

17           THE COURT:  Have a seat, please.

18           MR. VASSER:  Thank you.

19           MS. VELAZQUEZ:  I've invited Mr. Vasser to talk

20  with me.  I also sent him an extensive email pointing out

21  some of the issues around the things that he had raised.

22  And I'm happy to talk with him some more about it.

23           But the fact is is that I have spoken almost non-

24  stop for a week with multiple counterparties who have given

25  me feedback on these proposals, many of which have allowed

1   me to expand the proposal in areas where they were concerned

2   so as to get them into the fold.  And so, it absolutely has

3   been a two-way street.  And indeed, the reason why I

4   advanced the bank proposal to the others is due to feedback

5   that I had from counterparties.  So it's very much a

6   negotiation.

7              THE COURT:  Okay.  All right.  Well, I guess

8   you'll just continue it.  It sounds like a negotiation to

9   me.

10             So if you can't reach agreement, I think it's with

11  -- Mr. Vasser represents Russell Investments, perhaps among

12  others.  Hopefully, you'll be able to come to a meeting of

13  the minds.  If not, we'll take it up at the next turn.

14             All right?

15             Yes, ma'am?

16             MS. KRAMER:  Hi.  Bennette Kramer, from Schlam

17  Stone & Dolan.

18             THE COURT:  Yes.

19             MS. KRAMER:  I represent Citadel, whose objection

20  was quoted freely.  I just wanted to say that, yes, that

21  they are -- that the people from Lehmans from Quinn are

22  discussing with us.  But every time they come to a point, it

23  really is a take it or leave it situation.  It's not a --

24  you either take our proposal, which some of my clients have

25  had real issues with -- or we're going to just produce your

Page 16

1    derivative questionnaires without any redaction whatsoever.

2              THE COURT:  But that doesn't make any sense,

3    because as things stand right now, they can't produce them.

4              MS. KRAMER:  That's true, but --

5              THE COURT:  So unless what they're saying is that

6    agree to -- here are the proposals that Lehman is prepared

7    to support --

8              MS. KRAMER:  Yes.

9              THE COURT:  -- or we're going to ask the Court for

10   relief.  I mean, those are the two options that Lehman has

11   at this point.  They do not have the option of producing the

12   derivatives questionnaires for anyone who hasn't consented.

13   And by the derivative questionnaires' defined term, I mean

14   the actual questionnaire and the uploads.  Although I do --

15   and maybe continuing to talk about it a little bit helps.

16             And I understand it's just a status conference.

17   But in the absence of -- I don't understand, among many

18   things, about this why some of the underlying agreements

19   would not be freely reproducible.

20             In other words, if there are ISDAs (ph) between

21   certain counterparties and Lehman, in the absence of a

22   provision in the ISDA or any of the CSAs or schedules or

23   other documents that it includes, if Lehman has those in its

24   files, the fact that they also happen to have been uploaded

25   into the derivatives questionnaire is kind of beside the

Page 17

1    point.

2              So there's nothing, per se, about an ISDA that is

3    not producible.  So that's been the part of this that's a

4    little bit of a head-scratcher for me, on the one hand.  On

5    the other hand, the bar order and the surrounding matters --

6    they mean what they say.  And that's why Lehman's going

7    through this process.

8              You know, there's a hard way and an easy way to do

9    things.  And I think the failure to agree on a mechanism

10   will just force everyone to go to a harder way, a more

11   expensive and less efficient way to ultimately get to the

12   same place.  So again, I'll remain optimistic that you'll

13   get there.

14             I know you're -- you know, I've seen the folks

15   from your firm.  They're very thoughtful.  And Citadel was

16   among those parties that didn't simply say no, but that

17   offered some parameters that they would feel comfortable

18   with.  So hopefully, you can get on the same page.

19             MS. KRAMER:  Yeah.  I would note -- I'm not going

20   to go into details.  But the Citadel parameters are slightly

21   narrower than --

22             THE COURT:  I can see that.

23             MS. KRAMER:  -- the others.  And about the ISDAs,

24   let me just say real quickly.  I understand, from my

25   clients, some of the ISDAs have confidentiality agreements.

1              THE COURT:  Well, that's a different story.

2     Right.

3              MS. KRAMER:  Right.

4              THE COURT:  If the ISDAs themselves have a

5     confidentiality provision, then that's a different story.

6     But just to, you know, kind of spell out a little more what

7     I mean, in the event that Lehman were precluded --

8     continuing to be precluded from producing them and a third

9     party litigant still wanted them, a subpoena could issue.

10    And then, we would be in a situation that we would be in,

11    even if there were no DQ, right?  Then you would be a third

12    party who has to respond to a subpoena and would seek a

13    protective order.

14             And then, we would be, you know, into the 107(b).

15    So that's what I meant by we would be taking the long way

16    around to ultimately get, you know, to the same place, but

17    with the burden being to show that -- I think the burden

18    would slightly shift.

19             I think this all ought to be resolved is my view.

20    And I think it's amenable to being resolved.  So I'm just

21    going to remain optimistic until --

22             MS. KRAMER:  Well, I appreciate that, particularly

23    since there are so many parties involved.

24             THE COURT:  Right, right.  Okay.  All right.

25             Anyone else?

1          Okay.  So how should we -- should I give you a

2     date to come back?

3          MS. HUTNYAN:  Please.

4       (Pause)

5          THE COURT:  What timeframe do you want the date to

6     be in?  Before Thanksgiving?  After Thanksgiving?

7          MS. HUTNYAN:  We have asked people to respond by

8     the 20th.

9          THE COURT:  Okay.

10         MS. HUTNYAN:  So as soon thereafter as is

11    convenient for the Court, I think.

12         THE COURT:  So I'm sorry.  What did you say?

13         MS. HUTNYAN:  As soon thereafter as the Court can,

14    I think.

15         THE COURT:  As soon thereafter.  Okay.

16         MS. HUTNYAN:  The 23rd, maybe?

17         THE COURT:  The 23rd's getting bad.

18         MS. HUTNYAN:  Too close?

19         THE COURT:  The 24th in the morning we just have

20    ANC, right?

21         THE CLERK:  (Indiscernible).

22       (Pause)

23         THE COURT:  Well, there's another Lehman matter

24    scheduled to be heard in the morning of the 24th.  So I'm

25    inclined to try to slot you in then.

Page 20

1              MS. HUTNYAN:  Well, --

2              THE COURT:  No?

3              MS. HUTNYAN:  -- we have a deposition scheduled on

4    that day, Your Honor.

5              THE COURT:  Okay.

6              THE CLERK:  23rd (indiscernible).

7              THE COURT:  The 23rd.

8              THE CLERK:  (Indiscernible).

9              THE COURT:  Okay.

10             All right.  How about the morning of the 23rd?

11             MS. HUTNYAN:  The morning of the 23rd?

12             Jim?

13             UNIDENTIFIED SPEAKER:  (Indiscernible).

14             MS. HUTNYAN:  That'd be great, Your Honor.

15             THE COURT:  The morning of the 23rd?

16             MS. HUTNYAN:  Yes.

17             THE COURT:  All right.  So we'll have a continued

18   hearing on the motion relating to the production of the

19   derivatives questionnaire on November 23rd at 10:00 a.m.

20             MS. HUTNYAN:  Thank you, Your Honor.

21             THE COURT:  All right.  And if you would -- if you

22   could give us a heads up, say by the end of the day on the

23   20th just in broad terms as to whether we're going ahead

24   with an argument or whether we're substantially resolved,

25   that would be useful in terms of preparation for us.

Page 21

1            MS. HUTNYAN:  Okay, great.  And do that by filing

2    something or email?

3            THE COURT:  You could file something.

4            MS. HUTNYAN:  Okay.

5            THE COURT:  Or otherwise, just let our chambers

6    know whether we're going to be proceeding on the merits at

7    the hearing on the 23rd.

8            MS. HUTNYAN:  Okay.  Okay.  Good.  Thank you, Your

9    Honor.

10           THE COURT:  All right?  Okay.

11           Thank you all very much.  Have a pleasant weekend.

12           All right?

13       (Proceedings concluded at 12:31 PM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 22

1                 C E R T I F I C A T I O N

2

3    I, Nicole Yawn, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8        Nicole        Digitally signed by Nicole Yawn
                        DN: cn=Nicole Yawn, o, ou,
9        Yawn           email=digital1@veritext.com,
                        c=US
                        Date: 2015.11.17 14:15:58
10   _____   -05'00'

11   Nicole Yawn

12

13

14

15   Date:  November 17, 2015

16

17

18

19

20

21   Veritext Legal Solutions

22   330 Old Country Road

23   Suite 300

24   Mineola, NY 11501

25