**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------- X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | : | |
| | : | |
| Debtors. | : | |

----------------------------------------------------------------------- X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS SPECIAL FINANCING INC., and LEHMAN BROTHERS COMMERCIAL CORP. | : | |
| | : | |
| | : | |
| Plaintiffs | : | Adversary Proceeding |
| | : | |
| | : | No.: |
| -against- | : | |
| | : | |
| | : | |
| HSBC BANK PLC; HSBC BANK USA NATIONAL ASSOCIATION; HSBC FRANCE; and THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED | : | |
| | : | |
| | : | |
| Defendants. | : | |

----------------------------------------------------------------------- X

### COMPLAINT AND OBJECTION TO CLAIM NOS. 10933, 10935, 18864, 18867, 18868, 18869, 43789, 43790, 45092 and 45094

Plaintiffs Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Commercial Corporation ("LBCC"), and Lehman Brothers Holdings Inc. ("LBHI," and together with LBSF and LBCC, "Lehman") as debtors and debtors in possession, by their undersigned attorneys, allege the following against defendants HSBC Bank plc ("PLC"); HSBC Bank USA, National Association ("USA"); HSBC France ("France"); and The Hongkong and Shanghai Banking Corporation Limited ("HKSB" and, together with PLC, USA, and France, "HSBC"):

## PRELIMINARY STATEMENT

1.      This case concerns a portfolio of over 10,000, mostly plain vanilla derivatives trades between HSBC and Lehman, which HSBC terminated or were terminated automatically as a result of LBHI's bankruptcy filing on September 15, 2008.  HSBC used Lehman's bankruptcy to minimize its payments under Agreements that were substantially "in the money" to Lehman, to maximize its claims against Lehman under those Agreements that were not, and to manage the associated collateral to obtain an unfair advantage with respect to other creditors.  It exercised this opportunism in two major ways.

2.      *First*, upon reviewing its records and realizing that certain HSBC entities were likely to owe Lehman while other HSBC entities would be filing claims, HSBC engaged in a shell game, shuttling its Lehman claims and collateral among HSBC's subsidiaries.  This was done in order to minimize the amounts owed to the Lehman estate.  This assignment of claims for return of collateral was a brazen attempt to fabricate setoff advantages relative to other creditors and keep certain HSBC subsidiaries from paying 100 cent dollars to Lehman while other subsidiaries filed claims that at the time looked to be worth pennies on the dollar.  These assignments and set-offs were expressly prohibited by the parties' ISDA Master Agreements as well as the Bankruptcy Code's automatic stay.

3.      *Second*, HSBC manipulated its close-out calculations under the parties' ISDA Master Agreements, inflating the amounts it was due and understating the amounts it owed in violation of the plain terms of those Agreements.  HSBC engineered these calculations by: valuing the Lehman trades based on off-market, intra-company trades that falsely increased the value to HSBC relative to the true market value; choosing different days to value similar trades so it could maximize the benefit to HSBC depending on which side of the trades HSBC was on;

adding inflated, hypothetical, and commercially unreasonable add-on charges; and engaging in other manipulations of its claimed Close-out Amounts.

4.      As a result, the claims that HSBC submitted and the amounts HSBC paid to Lehman bore little relationship to the market values of the trades as of the respective Early Termination Dates or the gains and losses realized by HSBC as a result of the terminations.

5.      This two-fold opportunism is in direct contravention of the parties' ISDA Master Agreements and of the Bankruptcy Code.  HSBC's claims should be reduced or expunged, as described below, and it should be ordered to pay over to Lehman the reasonable amounts owed under the plain terms of its ISDA Master Agreements plus interest.

## **THE PARTIES**

6.      LBHI is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

7.      LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

8.      LBCC is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

9.      USA is a national banking association chartered under the laws of the United States, with its principal place of business in New York, New York.

10.     PLC is an English corporation with its principal place of business in London, England.

11.    France is a French corporation with its principal place of business in Paris, France.

12.    HKSB is a foreign banking corporation with its principal place of business in Hong Kong.

## JURISDICTION AND VENUE

13.    The statutory predicates for the relief requested herein are sections 105, 502, and 553 of the Bankruptcy Code, and rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

14.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

15.    This Court can enter a final order resolving all claims and objections asserted herein within the meaning of 28 U.S.C. § 157(b)(1), and appeals, if any, shall be made pursuant to 28 U.S.C. § 158(a)(1).

## BACKGROUND

**A.    The Course of Dealing Between HSBC and Lehman.**

16.    Derivatives trades between Lehman and HSBC were governed by a number of ISDA Master Agreements, each between an HSBC entity and a Lehman entity. Plaintiffs object to HSBC's claims under the following six master agreements, each of which was a form 1992 ISDA Master Agreement (Multicurrency-Cross Border) (with their related schedules, confirmations and credit support annexes, the "Agreements"):

| Date of Master | Lehman Entity | HSBC Entity | Agreement | Early Termination Date |
|---|---|---|---|---|
| Nov. 20, 1989; amended Jan. 18, 1996 | LBSF | USA | "LBSF-USA Agreement" | September 15, 2008 |

| Date of Master | Lehman Entity | HSBC Entity | Agreement | Early Termination Date |
|---|---|---|---|---|
| Feb. 11, 1998; amended Nov. 1, 2001 and June 5, 2003 | LBSF | PLC | "LBSF-PLC Agreement" | September 16, 2008 |
| Dec. 9, 1997 | LBSF | France | "LBSF-France Agreement" | September 16, 2008 |
| Jan. 24, 1997 | LBSF | HKSB | "LBSF-HKSB Agreement" | September 15, 2008 |
| Sept. 17, 2003 | LBCC | USA | "LBCC-USA Agreement" | September 15, 2008 |
| Jan. 13, 2000; amended Dec. 9, 2002 | LBCC | PLC | "LBCC-PLC Agreement" | September 15, 2008 |

LBHI is a guarantor of LBSF and LBCC's obligations under the Agreements and, therefore, is a "Credit Support Provider" under the Agreements.

17.    Under these Agreements, Lehman and HSBC were counterparties to over 10,000 derivatives transactions, falling primarily into three categories:

**Credit Default Swaps.**  Lehman and HSBC were counterparties to over 7,000 credit default swaps ("CDS"), whose values are derived from  credit events in certain underlying debt securities (*i.e.*, reference obligations).  CDS are effectively insurance against defaults (or credit events) of the underlying reference obligations.  The reference obligations can be the bonds of a single corporate or sovereign issuer, a basket or index made up of the bonds of many issuers, or a certain loss layer or tranche of a basket or index.

**Interest Rate Derivatives.**  Lehman and HSBC were also counterparties to approximately 2,500 interest rate derivatives transactions, whose value is derived from movements in a referenced interest rate.  These interest rate derivatives included swaps, swaptions, callable swaps, caps and floors, and other products, many of which are generic

and easily traded.  In fact, the vast majority of interest rate derivatives were the simplest form of plain vanilla interest rate swaps.

**FX Forwards and Options.**  Lehman and HSBC were also counterparties to approximately 1,000 currency trades, mostly plain vanilla foreign exchange forwards and options.

18.     In the normal course of business prior to the LBHI bankruptcy filing, at the end of each trading day, HSBC and Lehman marked to market the value of their derivatives portfolios, agreed on those values the following morning, and exchanged cash collateral (as required under the Credit Support Annex ("CSA")) to secure whichever party was "in-the-money" on a net basis under each Agreement.

19.     On September 12, 2008, the final business day before Lehman filed for bankruptcy, the agreed mid-market values of the derivative trades between Lehman and HSBC as of the close of business on September 11, 2008 were as follows:

| **Agreement** | **MTM Value (USD millions)** |
|---|---|
| LBSF-USA | 491.6 |
| LBSF-PLC | 105.9 |
| LBSF-France | 15.8 |
| LBSF-HKSB | 29.4 |
| LBCC-USA | 14.0 |
| LBCC-PLC | (15.7) |
| **Total** | **641.1** |

Note: Values are shown from Lehman's perspective.  Positive values are amounts due to Lehman.

20.     Notwithstanding this agreed market value of $641.1 million in Lehman's favor just days prior to the Early Termination Dates of the Agreements,  HSBC claimed a market value for these same trades of only $357.6 million in Lehman's favor, almost half of the prior value, as of HSBC's Early Termination Dates.

**B.      The Chapter 11 Case and Claims Procedures.**

21.      Beginning on September 15, 2008 (the "Commencement Date") and periodically thereafter, Lehman filed with this Court voluntary cases under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").  Lehman's confirmed chapter 11 plans went effective in March 2012.

22.      On July 2, 2009, this Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases (the "Bar Date Order") [Docket No. 4271].  A copy of the Bar Date Order was made publicly available at http://www.lehman-docket.com.

23.      All claimants received notice of the Bar Date Order by mail.  *See* Notice of Deadlines for Filing Proofs of Claim (the "Bar Date Notice").  The Bar Date Notice also was posted on the docket, and the Bar Date Order was published in The New York Times (International Edition), The Wall Street Journal (International Edition), and The Financial Times. A list of the debtors in these chapter 11 cases and their respective case numbers was included as part of the Bar Date Notice as well as on the instructions to the proof of claim form.   In accordance with the Bar Date Order's requirement that claims be filed against the proper debtor, the Bar Date notice stated, in bold-face type and in capital letters, that "YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS."

## FACTUAL ALLEGATIONS

**A.      Lehman's Bankruptcy Leads to Termination of Portfolio of Derivatives Between Lehman and HSBC.**

24.      Because LBHI as guarantor was the designated Credit Support Provider to both LBSF and LBCC under the Agreements, its bankruptcy filing in the early morning of September 15, 2008 triggered an Event of Default under the Agreements.

-7-

25.    The parties' Agreements laid out specifically what would occur upon an Event of Default, and specifically assigned certain rights and responsibilities to HSBC as the non-defaulting party.

26.    In particular, upon an Event of Default, the non-defaulting party may select an Early Termination Date.   Agreement § 6(a).   Or, if Automatic Early Termination applies, then the Early Termination Date is the date of the Event of Default—September 15, 2008 in this case.   An Early Termination Date terminates all the outstanding trades under an Agreement and triggers an obligation on the part of the non-defaulting party to calculate the net amount owed to either party.   Agreement § 6(c).

27.    LBHI's bankruptcy filing triggered the Automatic Early Termination provision in the LBSF-HKSB and LBCC-PLC Agreements.   HKSB and PLC both provided notice of such Automatic Early Termination to Lehman by letters dated September 15, 2008.

28.    Then, by letters dated and received on September 15, 2008, HSBC notified Lehman that the LBHI filing likewise constituted an Event of Default under the LBSF-USA, LBCC-USA, and LBSF-PLC Agreements, designating September 15 as the Early Termination Date  as to LBSF-USA and LBCC-USA and September 16 as the Early Termination Date as to LBSF-PLC.

29.    Finally, by letter dated September 15, 2008 and received on September 16, 2008, HSBC notified Lehman that the LBHI filing constituted an Event of Default under the LBSF-France Agreement and designated September 16 as the Early Termination Date under that Agreement.

30.    Set out below is a summary of this early termination information.

-8-

| Agreement | Automatic Early Termination? | Early Termination Date |
|---|---|---|
| LBSF-USA | N | September 15, 2008 |
| LBSF-PLC | N | September 16, 2008 |
| LBSF-HKSB | Y | September 15, 2008[1] |
| LBSF-France | N | September 16, 2008 |
| LBCC-USA | N | September 15, 2008 |
| LBCC-PLC | Y | September 15, 2008 |

31.    The Agreements also set out how HSBC was to calculate the amount it owed or was owed on the terminated trades under each Agreement.

32.    Five of the Agreements were modified by the 2008 Close-out Amount Multilateral Agreement,[2] which adopted the Close-out Amount provision from the 2002 ISDA Master Agreement in place of the Market Quotation or Loss provisions from the 1992 ISDA Master Agreement.  Under those Agreements, upon an Event of Default, "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date," the non-defaulting party is required to calculate the Early Termination Amount, which must be "determined *as of* the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable."  Agreement §§ 6(d), 14 (emphasis added).

33.    The Early Termination Amount consists of any Unpaid Amounts owing between the counterparties and a "Close-out Amount or Close-out Amounts . . . for each Terminated Transaction or group of Terminated Transactions . . . ."  Agreement § 6(e)(i).

> "Close-out Amount" means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then

---

[1]   September 15, 2008 was a public holiday in Hong Kong and Tokyo, HKSB's primary locations; the next business day was September 16, 2008.

[2]   The LBSF-PLC, LBSF-USA, LBSF-HKSB, LBCC-PLC, and LBCC-USA Agreements.

> prevailing circumstances . . . or gains of the Determining Party that are or would
> be realised under then prevailing circumstances . . . in replacing, or in providing
> for the Determining Party the economic equivalent of . . . the material terms of
> that Terminated Transaction or group of Terminated Transactions . . . .

Agreement § 14.

34.    Additionally, the Close-out Amount provision requires that in calculating a Close-out Amount the non-defaulting party must "act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result." *Id.* This requirement is not merely aspirational; the User's Guide for the 2002 ISDA Master Agreement makes clear that this directive constitutes "*an overarching principle that applies to all Determining Party actions* in its determination of a Close-out Amount." INT'L SWAPS & DERIVATIVES ASS'N, USER'S GUIDE TO THE ISDA 2002 MASTER AGREEMENT 25 (2003 ed.) ("2002 ISDA User's Guide") (emphasis added).

35.    The LBSF-France Agreement was the only Agreement not covered by the 2008 Close-out Amount Multilateral Agreement. Rather, it was based on the 1992 ISDA Master Agreement and provided that upon an Event of Default, the non-defaulting party was required to calculate the amount payable or receivable using the Market Quotation methodology, unless such Market Quotation "would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result," in which case the non-defaulting party reverts to the Loss methodology (which France in fact did here). 1992 ISDA Master Agreement §§ 6(e), 14. The amount due under the Loss methodology is defined as "an amount that [the determining] party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) . . . ." 1992 ISDA Master Agreement § 14. Loss must be determined "as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable." *Id.*.

36.    The Agreements required HSBC to calculate the Early Termination Amount as of the Early Termination Date, in good faith and in a reasonable manner.  Instead, HSBC abandoned those principles and undertook a close-out process designed to maximize its own recovery at the expense of other Lehman creditors, as set out in the next sections.

**B.    HSBC Improperly Minimized Its Payments and Maximized Its Claims to Lehman.**

1.    *HSBC's Invalid Assignments of Collateral.*

37.    Even before HSBC had completed its close-out calculations, it began a scheme to manage its own claims against Lehman.  HSBC manufactured a series of inter-company assignments designed to ensure that it could offset its claims against its liabilities.  HSBC knew that it would be required to pay Lehman 100 cents on the dollar on HSBC's amounts due to Lehman, while the Lehman estate would likely pay only a fraction of that on HSBC's unsecured claims against Lehman.  Unfortunately for HSBC, this scheme was expressly barred by the parties' Agreements and by the Bankruptcy Code.

(a)    HSBC Engineers Belated Purported Assignments.

38.    At the time of LBHI's filing on September 15, 2008, LBSF held collateral posted by HSBC under CSAs with LBSF in the amount of $552 million—$416 million of which was held by LBSF against trades with USA, $99 million of which was held by LBSF against trades with PLC, $29 million of which was held by LBSF against trades with France, and $8 million of which was held by LBSF against trades with HKSB.

39.    Like every major dealer, HSBC marked its trades to market at the end of every business day.  As a result, on September 15, 2008, HSBC would have had a clear understanding of which HSBC entities were likely to owe money to Lehman and which might have claims against Lehman.  Recognizing that (1) USA and France had likely posted excess collateral with LBSF, (2) PLC and HKSB would owe amounts that would likely exceed the

collateral they had pledged to LBSF, and (3) claims filed in this Court against LBSF and LBHI could be expected to pay only a fraction of 100 cents on the dollar, HSBC set about engineering a setoff advantage for PLC and HKSB.

40.     Thus, after LBHI filed for bankruptcy, HSBC attempted to transfer claims for the return of collateral from USA and France to PLC and HKSB.  In this way, HSBC tried to ensure that each subsidiary would have sufficient claims to collateral to set off, to the fullest extent possible, any amounts owed by the respective subsidiaries to Lehman.

41.     Similarly, HSBC purported to transfer a receivable from LBCC under the LBCC-PLC Agreement from PLC to USA, hoping to create a triangular setoff and thereby limiting the amount USA would be required to pay LBCC.

42.     HSBC purported to execute inter-affiliate assignments by contract as follows:

| Transferor | Transferee | Amount | Property Transferred | Contract Date | Assignment |
|---|---|---|---|---|---|
| USA | PLC | $20 million | LBSF cash collateral | Sept. 20, 2008, amended Sept. 23, 2008 | "USA-PLC Assignment" |
| France | PLC | $28.6 million | LBSF cash collateral | Sept. 22, 2008, amended Sept. 23, 2008 | "France-PLC Assignment" |
| USA | HKSB | $10 million | LBSF cash collateral | Sept. 20, 2008 | "USA-HKSB Assignment" |
| PLC | USA | $2,327,326 | payable by LBCC | Oct. 4, 2008, amended August 18, 2009 | "LBCC Assignment" |

43.     All of these assignments were executed after LBHI's bankruptcy on September 15, 2008, and within 90 days of the bankruptcies of LBSF, on October 3, 2008, and LBCC, on October 5, 2008.  The LBCC close-out claim assignment between PLC and USA was dated "as of" October 4, 2008, a Saturday, just one day prior to LBCC's bankruptcy filing.

      (b)    <u>Assignments of Collateral Are Prohibited by the Agreements</u>.

44.    The purported assignments by HSBC of collateral held by LBSF are prohibited by Section 7 of the Agreements, which expressly provides that neither the Agreement itself "nor any interest or obligation in or under this Agreement may be transferred . . . by either party without the prior written consent of the other party."[3]  Section 7 further states that "[a]ny purported transfer that is not in compliance with this Section will be void."

45.    Although Section 7(b) entitles a party to transfer "all or any part of its interest in any *amount payable* to it from a Defaulting Party *under Section 6(e)*" (emphasis added), the collateral amounts that USA and France purported to assign to PLC and that USA purported to assign to HKSB were not amounts payable under Section 6(e) of the Agreements. USA's and France's claims to amounts held by LBSF as Credit Support Balances instead arise under Paragraph 8(b) of each Agreement's CSA.  The purported assignments were therefore expressly barred by, and are void under, Section 7.

      (c)    <u>All the Collateral Assignments Are Prohibited under the Bankruptcy Code</u>.

46.    HSBC's collateral assignments also violated the automatic stay imposed on property of bankrupt entities under Section 362(a) of the Bankruptcy Code.  *See, e.g.*, 11 U.S.C. § 362(a)(3) (providing that a bankruptcy petition operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate"); *id*. § 362(a)(4) (staying "any act to create, perfect, or enforce any lien

---

[3]  Although the Credit Support Balances that USA and France purported to assign were the subject of the applicable CSA, rather than the Agreements themselves, each CSA expressly provides that it "supplements, forms part of, and is subject to" the corresponding Agreement; accordingly, Section 7's prohibition on the transfer of any "interest or obligation in or under this Agreement" bars the transfer of interests or obligations under each corresponding CSA.

against property of the estate"); *id.* § 362(a)(6) (staying "any act to collect, assess, or recover a

claim against the debtor that arose before the commencement of the case under this title"); *see*

*also id.* § 362(a)(7) (prohibiting "the setoff of any debt owing to the debtor that arose before the

commencement of the case under this title against any claim against the debtor").

47.     By assigning LBSF's collateral between its subsidiaries, HSBC

impermissibly exercised control over the property of the Estate—the right of LBSF to be paid in

100 cent dollars by PLC and HKSB.   By assigning its right to reimbursements of excess

collateral to those entities *after* LBHI filed a bankruptcy petition, HSBC violated the Bankruptcy

Code's automatic stay.   *In re Lehman Bros. Holdings Inc.*, 422 B.R. 407, 420-21 (Bankr.

S.D.N.Y. 2010) ("*BNY*") (LBHI and LBSF constituted parts of an "integrated enterprise" such

that the LBHI bankruptcy filing on September 15, 2008 triggered certain Bankruptcy Code

protections on behalf of LBSF).

48.     Moreover, these assignments are not saved by the Bankruptcy Code's safe

harbor provision, which provides in relevant part:

> The exercise of any contractual right of any swap participant or financial
> participant to cause the liquidation, termination, or acceleration of one or more
> swap agreements because of a condition of the kind specified in section 365(e)(1)
> of this title or to offset or net out any termination values or payment amounts
> arising under or in connection with the termination, liquidation, or acceleration of
> one or more swap agreements shall not be stayed, avoided, or otherwise limited
> by operation of any provision of this title or by order of a court or administrative
> agency in any proceeding under this title.

11 U.S.C. § 560.

49.     By its plain language, the safe harbor provision applies only to protect the

"exercise of any contractual right"—but, as described above, the transfers of collateral are

actually <u>prohibited</u> under the Agreements.

-14-

50.     HSBC's scheme violated both the Agreements and the Bankruptcy Code, and was therefore invalid and unenforceable.

(d)     <u>HSBC Cannot Use the Assignments to Create Cross-Affiliate Setoffs</u>.

51.     HSBC is barred by the Bankruptcy Code from using its purported assignments of collateral held by LBSF and its purported assignment of a payable from LBCC to incorporate improper cross-affiliate setoffs into its claims.

52.     Here, HSBC would seek to set off LBSF obligations to return to USA and France amounts of excess collateral under Paragraph 8 of the respective CSAs against the obligations of PLC and HKSB to pay LBSF amounts owed under Section 6(e) of the respective Agreements.  Thus, HSBC has attempted to manufacture mutuality through USA's and France's assignment to PLC and HKSB of their rights to repayment of collateral by LBSF. However, it cannot rely on the assignments to create the mutuality required for setoff, because the assignments are transfers of claims within ninety days prior to the commencement of the bankruptcy case of LBSF, such that setoff is prohibited under the Bankruptcy Code.

53.     Additionally, the collateral assignments are also transfers of claims occurring after the commencement of the bankruptcy case of LBHI, because the contracts purporting to create the assignments post-dated the bankruptcy filing of LBHI.  Because the assignments purported to assign claims subject to LBHI's guarantee, arising from LBHI's bankruptcy filing and following the initiation of LBHI's bankruptcy proceeding, the assignments constitute impermissible claim transfers after the commencement of the LBHI bankruptcy case— thereby doubly barred by the Bankruptcy Code.

54.     For the same reason, USA is not entitled to reduce its payment obligations to LBCC under the LBCC-USA Agreement by setting off the amount owed by LBCC to PLC under their Agreement.  PLC's assignment to USA of its right to receive the payment owed by

LBCC under Section 6(e) of the LBCC-PLC Agreement does not create mutuality. USA's attempt to setoff PLC's entitlement to payment from LBCC against its own obligation to pay LBCC is therefore barred under the Bankruptcy Code.

2.    *HSBC Calculates Inflated Close-out Amounts.*

55.    Not content to simply engineer a situation whereby it minimized the possibility that 100 cent dollars would be due to LBSF, HSBC next set about maximizing the amount it could demand from Lehman. In so doing, HSBC flouted the Agreements' requirements of good faith and commercial reasonableness, purposely inflating its claim beyond the commercially reasonable value of the terminated trades.

56.    HSBC used a three pronged approach to inflating its claims, by cherry-picking (i) valuation dates, (ii) market data, and (iii) its own trading activity. It valued similar trades on dates that were days or sometimes months apart, depending on which date provided greater benefit to HSBC. It hand-picked broker screens and dealer runs to add enormously inflated bid/offer and liquidity charges, which bore no resemblance to amounts HSBC did or would have "incurred under then prevailing circumstances," to its claims. And it used a few select "replacement trades," including a manufactured intra-company trade, to price its Lehman positions, while at the very same time likely executing true arms-length trades in the market at levels drastically different than those submitted in its Lehman claims. In each of these cases, HSBC's tactics bore no relationship to HSBC's "losses or costs . . . that are or would be incurred under then prevailing circumstances," and resulted in close-out calculations that were not commercially reasonable and were not reached in good faith.

57.    These practices inflated HSBC's claim with respect to each category of trades between HSBC and Lehman, as follows.

-16-

     (a)     <u>HSBC Inflated Its Close-out Calculations with Respect to Its Lehman Credit Portfolio</u>.

58.     HSBC employed a number of commercially unreasonable procedures in an attempt to inflate the termination value of its Lehman credit portfolio of over 7,000 trades, including: (i) improperly and inconsistently choosing valuation dates, in some cases weeks after the relevant Early Termination Date; (ii) relying on non-arm's length intra-company trade values while likely simultaneously executing similar trades with third-parties at materially different values; (iii) ignoring the lack of reasonableness of the results of "dealer polls" to attempt to benefit from "low bids"; and (iv) applying inconsistent and hypothetical bid/offer charges.

59.     For example, PLC and LBSF were party to a total of 16 CDS trades referencing the obligations of three Icelandic banks. CDS on each of the banks traded at similarly high credit spreads and each generally traded frequently in the CDS market until each bank was nationalized by Iceland several weeks after the Early Termination Date. The nationalizations triggered credit events under the CDS (that is, for CDS trades that were still live, not the PLC-LBSF trades) and loss payments for live trades were determined via competitive auction in November 2008 per standard ISDA protocols.

60.     In September 2008, dealers were making markets in both senior and subordinated CDS of these Icelandic banks every day and reporting their prices to vendors such as MarkIt Partners[4], an independent, third-party service to which HSBC subscribed. And HSBC, as a major dealer, had ample access. Therefore, both reasonable and actual determinants of value existed on and around the Early Termination Date. However, HSBC valued only trades relating to one of the banks as of that date. For that bank, HSBC was a net seller of protection and

_____

[4] MarkIt Partners is a private company headquartered in London, whose data is widely used and relied on by CDS market participants to value CDS trades.

benefitted by valuing the trades as of the Early Termination Date. For trades related to the other two banks, HSBC valued them based on the November auction prices, two months after the Early Termination Date. HSBC chose such inconsistent dates because HSBC was a net buyer of protection for the other two banks and using the November date added over $27.3 million to its claims. To make matters worse, HSBC calculated its claim related to one of the banks to be larger than the notional amount of the trades, which is impossible. Simply stated, HSBC ignored the many reasonable and actual determinants of value available as of the Early Termination Date, chose to value similar trades on two very different dates, and then calculated an impossible loss amount. The only consistency to this approach is that each decision benefitted HSBC—the epitome of bad faith.

61.    Another striking example of HSBC's claim manipulation is its valuation of CDS trades on a credit index called CDX IG Series 10. Around the time of Lehman's bankruptcy, CDX IG Series 10 was the most liquidly traded credit index, trading tens of billions of dollars of notional every day. HSBC and Lehman were party to 10 CDS trades covering this reference obligation. As the CDX IG Series 10 was the most readily tradable credit index, market prices were abundant and trades could easily have been, and likely were, executed by HSBC on an arms-length basis on the Early Termination Date. HSBC valued its four smallest trades using market prices as of the Early Termination Date, consistent with end of day prices published by vendors like CMA[5] and Markit Partners. But for its six larger trades, rather than use the same methodology, HSBC valued these based on an internal replacement trade. This means HSBC traded with itself and then used that internal "replacement" as the basis to value the

---

[5]    CMA is a private company with offices in New York and London that provides real-time pricing services that are widely used and relied on by CDS market participants.

larger positions with Lehman.  But while the average arms-length price throughout the day on the Early Termination Date was 188 bps per annum,[6] HSBC was able to manufacture an internal trade at a price of 214 bps per annum, benefitting HSBC to the tune of $8.3 million.

62.    HSBC also inflated its claim on a CDS trade where the reference obligation was a tranched mortgage-backed security index called TABX.  In the period leading up to the Lehman bankruptcy, the mortgage securities underlying the index had been rapidly written down, and prices reflected the market's belief that there would soon be a full loss on these tranches (which is in fact what occurred within a year of Lehman's bankruptcy).  The securities underlying the index contained certain loss triggers, which, once they were hit, could not be reversed.  So the only uncertainty remaining was when, in the relatively near future, the 100% payment by HSBC would be due.  In fact, on September 12, 2008, a collateral statement agreed to by both HSBC and Lehman valued this trade at over 99%, in Lehman's favor (*i.e.*, a 99% loss to HSBC).  Yet HSBC submitted a claim valuing Lehman's terminated TABX position at only 87%, resulting in $23.7 million of claim inflation.

63.    As a final example, although its calculations are opaque, it appears that HSBC failed to net (*i.e.*, to group trades using methods that are customary among financial institutions) the trades in the portfolio of credit trades under the LBSF-HKSB Agreement.  This enabled HKSB to add unreasonable, hypothetical charges to its claim.

64.    In valuing its credit trades for close-out purposes, HSBC acted in bad faith, using commercially unreasonable procedures to achieve a commercially unreasonable result.  Moreover, some of these trades were valued using prices from dates well after the Early

---

[6] This figure reflects the average of over 5,800 bid and ask prices submitted to CMA by CDS dealers over the course of the Early Termination Date.

Termination Date, contrary to the Agreements' express terms.  Upon information and belief, discovery will reveal other ways in which HSBC inflated its claim with respect to its credit trades with Lehman.  The result is Close-out Amounts with respect to HSBC's credit trades that bear no relationship to HSBC's loss or gain.

   (b) <u>HSBC Inflated Its Close-out Calculations with Respect to Its Lehman Rates Portfolio</u>.

   65. HSBC further inflated its claims by adding commercially unreasonable bid/offer charges to the portfolio of approximately 2,500 interest rate trades governed by the LBSF Agreements.  The vast majority of interest rate trades between HSBC and LBSF were plain vanilla interest rate swaps, amongst the most common and most liquid derivatives products.  Given the nature of these interest rate derivatives, HSBC could easily have re-hedged, and likely did re-hedge, the risk associated with these trades on a portfolio basis using a relatively small number of trades, and could have done so at or very close to mid-market prices.  In fact, as a major international dealer, it is likely that HSBC would have been in a position to re-hedge some of this interest rate risk with clients and earn, rather than pay, a bid/offer spread.

   66. Notwithstanding this,  HSBC hand-picked bid/offer spreads shown on broker screens, bearing no relationship to the costs HSBC did or would have "incurred under then prevailing circumstances," and applied them to their claim calculations.  The spreads used by HSBC represent multiples of the levels HSBC would have, and likely did pay when they re-hedged their risk exposures related to these interest rates trades.  In some cases HSBC even doubled the spreads shown on those broker screens, claiming that markets were stressed and thus, somehow, the broker spreads did not reflect that stress. These hypothetical bid/offer costs added over $100 million to HSBC's claims.

67.     Additionally, HSBC once again applied inconsistent methods for valuing trades in a pattern that could only benefit HSBC.  For a handful of less liquid interest rate trades, HSBC valued the trades based on replacement trades it executed, some as of the Early Termination Date and some many days after.  But HSBC did not provide any similar re-hedging information or support for the vast majority of the most liquid interest rate risks in the portfolio.  And for some of the trades, which HSBC valued based on models rather than replacement trades, the market data used by HSBC to value the trades was from weeks *after* the relevant Early Termination Date—notwithstanding that market prices for these trades were available as of the Early Termination Date and that HSBC had to mark these trades on a daily basis in the normal course of its business.  Upon information and belief, discovery will reveal other ways in which HSBC inflated its claim with respect to its rates trades with Lehman.

68.     Once again, HSBC exercised bad faith and a commercially unreasonable process to arrive at an artificial, commercially unreasonable Close-out Amount (or, in the case of the LBSF-France Agreement, Loss calculation), divorced from actual market prices on the Early Termination Date, and HSBC's hedging and replacement activities on that date.

(c)     <u>HSBC Inflated Its Close-out Calculations with Respect to Its Lehman FX Portfolio</u>.

69.     HSBC also applied inconsistent methodologies in calculating its FX Close-out Amounts.  For example, in calculating the Close-out Amounts for a portfolio of USD/THB currency swaps under the LBSF-HKSB Agreement, HSBC used a spot exchange rate of 34.06, but in providing support for other components of that same trade, the support showed a spot exchange rate of 34.22.  As with the credit trades, HSBC cherry-picked data, here from different times of day for the same trade.  A 0.16 point difference in exchanges rates is quite significant in FX trading, and resulted in an inflation of HSBC's claim by $2.2 million.

70.    HSBC's Close-out Amount with respect to the LBCC-PLC Agreement (which exclusively involves FX trades) contains so many errors and inconsistencies that it is difficult to pinpoint any one issue.  PLC calculated a Close-out Amount against LBCC that was missing trades, missing certain failed payments, and included unexplainable market values.  In fact, LBCC's records show PLC owed a payment to LBCC, although PLC calculated a payment running in the opposite direction.  Upon information and belief, discovery will reveal other ways in which HSBC inflated its claim with respect to its FX trades with Lehman.

71.    In addition, USA underpaid LBCC by $2.99 million as a result of a payment made by LBCC for margin on FX trades that HSBC did not properly credit.   On September 16, 2008, USA made a margin call on LBCC for FX trades under the LBCC-USA Agreement.   On September 17, 2008 collateral of $2.99 million was paid by LBCC to USA. However, USA wrongly credited this collateral to Lehman Brothers Inc. instead of LBCC.  Thus, the amount paid by USA to LBCC was indisputably understated by $2.99 million and should be increased by that amount plus interest.

3.    *HSBC Files Inflated Claims for Its Close-out Amounts and Attempts to Setoff Its Invalid Assignments.*

72.    Having thus significantly inflated its Close-out Amount calculations and purported to engineer a situation in which—even assuming that it was unsuccessful in defending its inflated claims—PLC and HKSB would have a setoff advantage against Lehman's other creditors, HSBC submitted calculation statements[7] under the Agreements to Lehman as follows:

---

[7]   Where HSBC's calculations resulted in amounts payable to HSBC, the calculation statements also claimed default interest.

| Agreement | Early Termination Amount | Amount of Collateral Pledged | Purported Assignments | Remaining Claim or Payable | Letter Date[8] |
|---|---|---|---|---|---|
| LBSF-USA | $336,486,281 to LBSF | $416,720,784 to LBSF | - $30,000,000 | $50,016,956 claim | Sept. 24, 2009 |
| LBSF-PLC | £47,968,680 to LBSF | £56,168,795 to LBSF | + $48,600,000 | £35,656,072 claim | Oct. 21, 2009 |
| LBSF-France | $77,708,292 to France | $28,576,973 to LBSF | - $28,576,973 | $78,641,237 claim | Jul. 1, 2009 |
| LBSF-HKSB | $5,238,422 to LBSF | $8,311,000 to LBSF | + $10,000,000 | $13,379,762.57 claim | Jan. 22, 2009 |
| LBCC-PLC | $2,327,326 to PLC | $ 0 | - $2,327,326 | $ 0 | Aug. 18, 2009 |
| LBCC-USA | $10,206,579 to LBCC | $2,001,936 to LBCC | + $2,327,326 | $5,803,700 payable to LBCC[9] | Sept. 16, 2009 |

73.     In September and October of 2009, HSBC filed the following Proofs of Claim against LBHI and LBSF:

| Agreement | Claimed Amount | Claim Date |
|---|---|---|
| LBSF-USA (the "USA Claims") | ($50,420,868.24) | Sept. 9, 2009 |
| LBSF-PLC (the "PLC Claims") | ($64,337,830.50) | Oct. 23, 2009 |
| LBSF-France (the "France Claims") | ($79,998,295.50) | Oct. 22, 2009 |
| LBSF-HKSB (the "HKSB Claims") | ($13,517,156.08[10]) | Sept. 18, 2009 |

74.     No claims were filed in respect of the LBCC-PLC or LBCC-USA Agreements.

75.     As described in detail in the preceding sections, these claim amounts are not commercially reasonable under the Agreements, and HSBC's purported assignments are

---

[8]  Letter date refers to the date of the final amendment to each calculation statement submitted by HSBC to Lehman.

[9]   This claim amount erroneously includes the $2.99 million paid by LBCC described in paragraph 71.

[10]   HKSB filed two sets of two of Proofs of Claim (against LBHI and LBSF) under the LBSF-HKSB Agreement, totaling $13,517,156.08.   The first set claimed $3,421,677.57, while the second set claimed $10,095,478.51, representing $10 million in collateral purportedly assigned by USA to HKSB, together with interest and fees.

invalid.   Moreover, even if HSBC's claims were reduced to reasonable levels under the Agreements and the Bankruptcy Code, and even if the assignments were somehow deemed permissible, HSBC's amounts assigned could not be setoff against any amounts due from PLC and HKSB to Lehman.

76.     Subsequently, Lehman and HSBC entered into agreements (the "Tolling Agreements") to toll any applicable statutes of limitations or other time-related defenses with respect to any potential claims arising out of or related to the transactions under the Agreements, and not to commence any formal proceedings to prosecute such claims during a certain period as defined by the Tolling Agreements (the "Tolling Period"). By amendment, the Tolling Period under each of the Tolling Agreements terminated on October 30, 2015.

77.     The relevant parties entered into Tolling Agreements applicable to transactions under the LBCC-USA, LBSF-HKSB, and LBSF-USA Agreements on September 14, 2012. They amended the Tolling Agreements on July 30, 2014 and October 24, 2014 to extend the Tolling Period. The relevant parties entered into Tolling Agreements applicable to transactions under the LBCC-PLC and LBSF-PLC Agreements on July 30, 2014. They amended the Tolling Agreements on October 24, 2014 to extend the Tolling Period. Finally, LBSF and France entered into a Tolling Agreement applicable to transactions under the LBSF-France Agreement on August 5, 2014. They amended the Tolling Agreement on October 24, 2014 to extend the Tolling Period.

## C.    HSBC Overstated Its Claims under Each of the Agreements.

### 1.    *LBSF-USA Agreement.*

78.     By notice received on September 15, 2008, USA terminated the transactions under the LBSF-USA Agreement and designated September 15, 2008 as the Early

Termination Date.  By a contract dated September 20, 2008 and amended September 23, 2008,

USA entered into the USA-PLC Assignment, in which USA purported to assign to PLC the right

to the return of $20 million of cash collateral held by LBSF.  USA also entered into the USA-

HKSB assignment by a contract dated September 20, 2008, in which it purported to assign to

HKSB the right to the return of $10 million of cash collateral held by LBSF.  On September 24,

2009, USA submitted an amended calculation statement to LBSF pursuant to section 6(d) of the

LBSF-USA Agreement.

79.     On September 9, 2009, USA filed proof of claim number 10935 against

LBSF and proof of claim number 10933 against LBHI for amounts allegedly due to USA under

the LBSF-USA Agreement (the "LBSF-USA Claim").  According to USA, the amount of the

LBSF-USA Claim was $50,420,868.24.

80.     For the reasons set forth above, the LBSF-USA Claim is overstated and a

reasonable calculation of the Early Termination Amount due under the LBSF-USA Agreement

should result in an amount payable to LBSF. Moreover, the USA-PLC Assignment and USA-

HKSB Assignment are barred by the Agreements and the Bankruptcy Code.

2.     *LBSF-PLC Agreement.*

81.     By notice dated September 15, 2008, PLC terminated the transactions

under the LBSF-PLC Agreement, designating September 16, 2008 as the Early Termination

Date.  By a contract dated September 20, 2008 and amended September 23, 2008, PLC entered

into the USA-PLC Assignment, in which USA purported to assign to PLC the right to the return

of $20 million of USA cash collateral held by LBSF.  By a contract dated September 22, 2008

and amended September 23, 2008, PLC also entered into the France-PLC Assignment, in which

France purported to assign to PLC the right to the return of $28,576,972.70 of France cash

collateral held by LBSF.   On October 21, 2009, PLC submitted an amended calculation statement to LBSF pursuant to section 6(d) of the LBSF-PLC Agreement.

82.   On September 18, 2009, PLC filed proof of claim number 18102 against LBSF (as amended, proof of claim number 45094) and proof of claim number 18103 against LBHI (as amended, proof of claim number 45092) for amounts allegedly due to PLC under the LBSF-PLC Agreement (the "LBSF-PLC Claim").   According to PLC, the amount of the LBSF-PLC Claim was $64,337,830.50.

83.   For the reasons set forth above, the LBSF-PLC Claim is overstated and a reasonable calculation of the Early Termination Amount due under the LBSF-PLC Agreement should result in an amount payable to LBSF.   Moreover, the USA-PLC Assignment and France-PLC Assignment are barred by the Agreements and the Bankruptcy Code.

3.   *LBSF-France Agreement.*

84.   By notice received September 16, 2008, France terminated the transactions under the LBSF-France Agreement, and designated September 16, 2008 as the Early Termination Date.   By a contract dated September 22, 2008 and amended September 23, 2008, France entered into the France-PLC Assignment, in which France purported to assign to PLC the right to the return of $28,576,972.70 million of cash collateral held by LBSF.   On July 1, 2009, France submitted an amended calculation statement to LBSF pursuant to section 6(d) of the LBSF-France Agreement.

85.   On September 18, 2009, France filed proof of claim number 18863 against LBSF (as amended, proof of claim number 43790) and proof of claim number 18859 against LBHI (as amended, proof of claim number 43789) for amounts allegedly due to France under the LBSF-France Agreement (the "LBSF-PLC Claim").   According to France, the amount of the

LBSF-France Claim was $79,998,295.50.

86.     For the reasons set forth above, the LBSF-France Claim is overstated. Moreover, the France-PLC Assignment is barred by the Agreements and the Bankruptcy Code.

    4.     *LBSF-HKSB Agreement.*

87.     By operation of the Automatic Early Termination provision, the transactions under the LBSF-HKSB Agreement were terminated on September 15, 2008, the Early Termination Date.  By a contract dated September 20, 2008, HKSB entered into the USA-HKSB assignment, in which USA purported to assign to HKSB the right to the return of $10 million of cash collateral held by LBSF.  On January 22, 2009, HKSB submitted an amended calculation statement to LBSF pursuant to section 6(d) of the LBSF-HKSB Agreement.

88.     On September 18, 2009, HKSB filed proof of claim number 18867 against LBSF and proof of claim number 18864 against LBHI for amounts allegedly due to HKSB under the LBSF-HKSB Agreement.  That same date, HKSB also filed proof of claim number 18868 against LBSF and proof of claim number 18869 against LBHI for collateral purportedly assigned by USA to HKSB, plus interest and fees (together with proofs of claim number 18867 and 18864, the "LBSF-HKSB Claim").  According to HKSB, the amount of the LBSF-HKSB Claim was $13,517,156.08.

89.     For the reasons set forth above, the LBSF-HKSB Claim is overstated and a reasonable calculation of the Early Termination Amount due under the LBSF-HKSB Agreement should result in an amount payable to LBSF. Moreover, the USA-HKSB Assignment is barred by the Agreements and the Bankruptcy Code.

    5.     *LBCC-USA Agreement.*

90.     By notice received on September 15, 2008, USA terminated the

transactions under the LBCC-USA Agreement, designating September 15, 2008 as the Early
Termination Date.  On September 16, 2008, USA made a margin call on LBCC in the amount of
$2.99 million, which LBCC paid.  However, USA wrongly credited this collateral to Lehman
Brothers Inc. instead of LBCC.  By a contract dated as of October 4, 2008, and amended on
August 18, 2009, USA entered into the LBCC assignment, in which PLC purported to assign to
USA the right to receive $2,327,326 payable by LBCC to PLC under the LBCC-PLC
Agreement.

91.    On September 16, 2009, USA submitted an amended calculation statement
to LBCC pursuant to section 6(d) of the LBCC-USA Agreement.  USA did not file any claims
against LBCC or LBHI for amounts related to the LBCC-USA Agreement.

92.    For the reasons set forth above, a reasonable calculation of the Early
Termination Amount due under the LBCC-USA Agreement should result in an amount payable
to LBCC.  Moreover, the LBCC Assignment is barred by the Bankruptcy Code.

6.    *LBCC-PLC Agreement.*

93.    By operation of the Automatic Early Termination provision, the
transactions under the LBCC-PLC Agreement were terminated on September 15, 2008, the Early
Termination Date.  By a contract dated as of October 4, 2008, and amended on August 18, 2009,
PLC purported to enter into the LBCC Assignment, in which PLC purported to assign to USA
the right to receive $2,327,326 payable by LBCC to PLC under the LBCC-PLC Agreement.

94.    On August 18, 2009, PLC submitted an amended calculation statement to
LBCC pursuant to section 6(d) of the LBCC-PLC Agreement.  PLC did not file any claims
against LBCC or LBHI for amounts related to the LBCC-PLC Agreement.

95.    For the reasons set forth above, a reasonable calculation of the Early Termination Amount due under the LBCC-PLC Agreement should result in an amount payable to LBCC.  Moreover, the LBCC Assignment is barred by the Bankruptcy Code.

## FIRST CAUSE OF ACTION
### (Objection to Claim under LBSF-USA Agreement)

96.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

97.    The LBSF-USA Claim is not a valid claim against LBSF because the calculation of such claim did not use commercially reasonable procedures, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.

98.    The LBSF-USA Claim should be reduced and expunged.  Plaintiffs hereby expressly reserve the right to further object to the LBSF-USA Claim, or any other claims filed by USA, on any other basis.

## SECOND CAUSE OF ACTION
### (Breach of LBSF-USA Agreement)

99.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

100.    USA breached the LBSF-USA Agreement by calculating the Close-out Amount under the LBSF-USA Agreement in bad faith, and using commercially unreasonable procedures that produced a commercially unreasonable result that was wholly unrelated to its actual economic damages.

101.    Under the LBSF-USA Agreement, USA was required to pay LBSF for any gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBSF-USA Agreement would have resulted in a net payment to LBSF.

Instead, USA calculated a Close-out Amount under the LBSF-USA Agreement resulting in a claim for a net payment to USA in the amount of $50,420,868.24.

102.    As a direct and proximate result of USA's breach of the LBSF-USA Agreement, LBSF has been deprived of an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Objection to Claim under LBSF-PLC Agreement)

103.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

104.    The LBSF-PLC Claim is not a valid claim against LBSF because the calculation of such claim did not use commercially reasonable procedures, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.

105.    The LBSF-PLC Claim should be reduced and expunged.  Plaintiffs hereby expressly reserve the right to further object to the LBSF-PLC Claim, or any other claims filed by PLC, on any other basis.

### FOURTH CAUSE OF ACTION
### (Breach of LBSF-PLC Agreement)

106.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

107.    PLC breached the LBSF-PLC Agreement by calculating the Close-out Amount under the LBSF-PLC Agreement in bad faith, and using commercially unreasonable procedures that produced a commercially unreasonable result that was wholly unrelated to its actual economic damages.

108.    Under the LBSF-PLC Agreement, PLC was required to pay LBSF for any gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-

out Amount under the LBSF-PLC Agreement would have resulted in a net payment to LBSF. Instead, PLC calculated a Close-out Amount under the LBSF-PLC Agreement resulting in a claim for a net payment to PLC in the amount of $64,337,830.50.

109.    As a direct and proximate result of PLC's breach of the LBSF-PLC Agreement, LBSF has been deprived of an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Objection to Claim under LBSF-France Agreement)

110.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

111.    The LBSF-France Claim is not a valid claim against LBSF because the calculation of such claim did not use commercially reasonable procedures, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.

112.    The LBSF-France Claim should be reduced by an amount to be determined at trial.  Plaintiffs hereby expressly reserve the right to further object to the LBSF-France Claim, or any other claims filed by France, on any other basis.

## SIXTH CAUSE OF ACTION
### (Objection to Claim under LBSF-HKSB Agreement)

113.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

114.    The LBSF-HKSB Claim is not a valid claim against LBSF because the calculation of such claim did not use commercially reasonable procedures, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.

115.    The LBSF-HKSB Claim should be reduced and expunged.    Plaintiffs hereby expressly reserve the right to further object to the LBSF-HKSB Claim, or any other claims filed by HKSB, on any other basis.

### SEVENTH CAUSE OF ACTION
**(Breach of LBSF-HKSB Agreement)**

116.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

117.    HKSB breached the LBSF-HKSB Agreement by calculating the Close-out Amount under the LBSF-HKSB Agreement in bad faith, and using commercially unreasonable procedures that produced a commercially unreasonable result that was wholly unrelated to its actual economic damages.

118.    Under the LBSF-HKSB Agreement, HKSB was required to pay LBSF for any gains it enjoyed as a result of termination.    A commercially reasonable calculation of the Close-out Amount under the LBSF-HKSB Agreement would have resulted in a net payment to LBSF.    Instead, HKSB calculated a Close-out Amount under the LBSF-HKSB Agreement resulting in a claim for a net payment to HKSB in the amount of $13,517,156.08.

119.    As a direct and proximate result of HKSB breach of the LBSF-HKSB Agreement, LBSF has been deprived of an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
**(Breach of LBCC-USA Agreement)**

120.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

121.    USA breached the LBCC-USA Agreement by calculating the Close-out Amount under the LBCC-USA Agreement in bad faith, and using commercially unreasonable

procedures that produced a commercially unreasonable result that was wholly unrelated to its actual economic damages.

122.   Under the LBCC-USA Agreement, USA was required to pay LBCC for any gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBCC-USA Agreement would have resulted in a net payment to LBCC greater than USA's calculation of $5,803,700.

123.   As a direct and proximate result of USA's breach of the LBCC-USA Agreement, LBCC has been deprived of an amount to be determined at trial.

**NINTH CAUSE OF ACTION**
**(Breach of LBCC-PLC Agreement)**

124.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

125.   PLC breached the LBCC-PLC Agreement by calculating the Close-out Amount under the LBCC-PLC Agreement in bad faith, using commercially unreasonable procedures that produced a commercially unreasonable result that was wholly unrelated to its actual economic damages.

126.   Under the LBCC-PLC Agreement, PLC was required to pay LBCC for any gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBCC-PLC Agreement would have resulted in a net payment to LBCC.  Instead, PLC asserted that no amount was due to LBCC under the LBCC-PLC Agreement.

127.   As a direct and proximate result of PLC's breach of the LBCC-PLC Agreement, LBCC has been deprived of an amount to be determined at trial.

**TENTH CAUSE OF ACTION**

**(Declaratory Judgment that the USA-PLC Assignment Is Not Permitted under the Master Agreements and Sections 362(a) and 553 of the Bankruptcy Code)**

128.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

129.    The USA-PLC Assignment is prohibited by Section 7 of the LBSF-USA Agreement, which expressly provides that neither the Agreement itself "nor any interest or obligation in or under this Agreement may be transferred . . . by either party without the prior written consent of the other party."  Section 7 further states that "[a]ny purported transfer that is not in compliance with this Section will be void."

130.    USA and PLC's reliance on the USA-PLC Assignment in calculating their claims violated the automatic stay on property of entities that have filed for bankruptcy imposed by Section 362(a) of the Bankruptcy Code.  Moreover, because USA and PLC had no legal right to include the result of the USA-PLC Assignment in their proofs of claims, the USA-PLC Assignment is not safe-harbored under Section 560 of the Bankruptcy Code.

131.    In the event that PLC's claims are reduced to permissible levels under the LBSF-PLC Agreement and the Bankruptcy Code, the amount of the USA-PLC Assignment cannot be setoff against any amounts due from PLC, because such setoff would violate section 553 of the Bankruptcy Code.  Here, PLC would seek to set off LBSF obligations to return to USA amounts of excess collateral under Paragraph 8 of the LBSF-USA CSA against the obligation of PLC to pay LBSF amounts owed under Section 6(e) of the LBSF-PLC Agreement.

132.    The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

133.    This action is within the jurisdiction of this Court, and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

134.    An actual controversy exists between Plaintiffs, USA, and PLC which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

135.    Plaintiffs therefore request a judgment (a) declaring the USA-PLC Assignment is not permitted under the Master Agreements or the Bankruptcy Code and (b) reducing the LBSF-PLC Claim by the amount of the USA-PLC Assignment.

## ELEVENTH CAUSE OF ACTION
### (Declaratory Judgment that the France-PLC Assignment Is Not Permitted under the Master Agreements and Sections 362(a) and 553 of the Bankruptcy Code)

136.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

137.    The France-PLC Assignment is prohibited by Section 7 of the LBSF-France Agreement, which expressly provides that neither the Agreement itself "nor any interest or obligation in or under this Agreement may be transferred . . . by either party without the prior written consent of the other party."  Section 7 further states that "[a]ny purported transfer that is not in compliance with this Section will be void."

138.    France and PLC's reliance on the France-PLC Assignment in calculating their claims violated the automatic stay on property of entities that have filed for bankruptcy imposed by Section 362(a) of the Bankruptcy Code.  Moreover, because France and PLC had no legal right to include the result of the France-PLC Assignment in their proofs of claims, the France-PLC Assignment is not safe-harbored under Section 560 of the Bankruptcy Code.

139.    In the event that PLC's claims are reduced to permissible levels under the LBSF-PLC Agreement and the Bankruptcy Code, the amount of the France-PLC Assignment cannot be setoff against any amounts due from PLC, because such setoff would violate section 553 of the Bankruptcy Code.  Here, PLC would seek to set off LBSF obligations to return to

France amounts of excess collateral under Paragraph 8 of the LBSF-France CSA against the obligation of PLC to pay LBSF amounts owed under Section 6(e) of the LBSF-PLC Agreement.

140.    The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

141.    This action is within the jurisdiction of this Court, and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

142.    An actual controversy exists between Plaintiffs, France, and PLC which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

143.    Plaintiffs therefore request a judgment (a) declaring the France-PLC Assignment is not permitted under the Master Agreements or the Bankruptcy Code and (b) reducing the LBSF-PLC Claim by the amount of the France-PLC Assignment.

**TWELFTH CAUSE OF ACTION**
**(Declaratory Judgment that the USA-HKSB Assignment Is Not Permitted under the Master Agreements and Sections 362(a) and 553 of the Bankruptcy Code)**

144.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

145.    The USA-HKSB Assignment is prohibited by Section 7 of the LBSF-USA Agreement, which expressly provides that neither the Agreement itself "nor any interest or obligation in or under this Agreement may be transferred . . . by either party without the prior written consent of the other party."  Section 7 further states that "[a]ny purported transfer that is not in compliance with this Section will be void."

146.    USA and HKSB's reliance on the USA-HKSB Assignment in calculating their claims violated the automatic stay on property of entities that have filed for bankruptcy imposed by Section 362(a) of the Bankruptcy Code.  Moreover, because USA and HKSB had no

legal right to include the result of the USA-HKSB Assignment in their proofs of claims, the USA-HKSB Assignment is not safe-harbored under Section 560 of the Bankruptcy Code.

147.    In the event that HKSB's claims are reduced to permissible levels under the LBSF-PLC Agreement and the Bankruptcy Code, the amount of the USA-HKSB Assignment cannot be setoff against any amounts due from HKSB, because such setoff would violate section 553 of the Bankruptcy Code.  Here, HKSB would seek to set off LBSF obligations to return to USA amounts of excess collateral under Paragraph 8 of the LBSF-USA CSA against the obligation of HKSB to pay LBSF amounts owed under Section 6(e) of the LBSF-HKSB Agreement.

148.    The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

149.    This action is within the jurisdiction of this Court, and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

150.    An actual controversy exists between Plaintiffs, USA, and HKSB which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

151.    Plaintiffs therefore request a judgment (a) declaring the USA-HKSB Assignment is not permitted under the Master Agreements or the Bankruptcy Code and (b) reducing the LBSF-HKSB Claim by the amount of the USA-HKSB Assignment.

## THIRTEENTH CAUSE OF ACTION
### (Declaratory Judgment that the LBCC Assignment Is Not Permitted under the Master Agreements and Sections 362(a) and 553 of the Bankruptcy Code)

152.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

153.    The LBCC Assignment cannot be setoff against any amounts due from USA to LBCC, because such setoff would violate section 553 of the Bankruptcy Code.  Pursuant

to that section, a creditor is able to "offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a). Here, USA seeks to set off alleged LBCC obligations to PLC under the LBCC-PLC Agreement against the obligation of USA to pay LBCC amounts owed under LBCC-USA Agreement.

154.    The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

155.    This action is within the jurisdiction of this Court, and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

156.    An actual controversy exists between Plaintiffs, USA, and PLC which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

157.    Plaintiffs therefore request a judgment (a) declaring the LBCC Assignment is not permitted under the Master Agreements or the Bankruptcy Code and (b) awarding LBCC the amount of the LBCC Assignment from USA.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment against HSBC as follows:

A.    Sustaining the Plaintiffs' objections to the LBSF-USA Claim, LBSF-PLC Claim, LBSF-France Claim, and LBSF-HKSB Claim reducing or expunging such claims to amounts to be determined at trial;

B.    Determining that HSBC has breached the LBSF-USA Agreement, the LBSF-PLC Agreement, the LBSF-HKSB Agreement, the LBCC-USA Agreement, and the LBCC-PLC Agreement and owes Lehman damages in an amount to be determined at trial;

C.      Awarding declaratory judgments in favor of Plaintiffs as set forth herein, including declaration of the parties' rights and obligations under the Agreements;

D.      Awarding interest, as well as costs and disbursements of this action and attorneys' fees; and

E.      Awarding such other relief as this Court deems just and proper.


Dated: December 4, 2015                          Respectfully submitted,
New York, New York


                                                 **QUINN EMANUEL URQUHART &**
                                                 **SULLIVAN, LLP**
                                                 By: /s/ Daniel Cunningham
                                                 Daniel Cunningham
                                                 Andrew Rossman
                                                 Ellison Ward Merkel
                                                 51 Madison Avenue, 22nd Floor
                                                 New York, New York 10010-1601
                                                 (212) 849-7000

                                                 Benjamin Odell
                                                 865 South Figueroa Street, 10th Floor
                                                 Los Angeles, California 90017-2543
                                                 (213) 443-3000

                                                 *Counsel for Plaintiffs*