**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | Case No.   08-13555 (SCC) |
| LEHMAN BROTHERS | |
| HOLDINGS INC., *et al.*, | Chapter 11 |
| Debtors. | (Jointly Administered) |

## NOTICE OF FILING OF AMENDED OMNIBUS APPLICATION OF CERTAIN INDIVIDUAL COMMITTEE MEMBERS FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES

PLEASE TAKE NOTICE that certain individual members of the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. and each of its affiliated debtors have filed their Amended Omnibus Application of Certain Individual Committee Members for Payments of Fees and Reimbursement of Expenses ("**Amended Application**").  Additional notice will be provided when the date and time for a hearing to consider the Amended Application has been scheduled and a deadline for objections to the Amended Application has been set.

Dated:    New York, New York
          November 18, 2015

Respectfully submitted,

COVINGTON & BURLING LLP

By:    s/ Dianne F. Coffino
          Dianne F. Coffino
The New York Times Building
620 Eighth Avenue
Telephone: (212) 841-1000
Fax: (212) 841-1010
New York, NY 10018-1405
Counsel for Wilmington Trust Company, as
Co-Chair of the Committee and Indenture
Trustee

**Covington & Burling LLP**
The New York Times Building
620 Eighth Avenue
New York, NY  10018-1405
(212) 841-1000
Counsel for Wilmington Trust Company,
As Co-Chair of the Committee and Indenture
Trustee

**Strook & Strook & Lavan LLP**
180 Maiden Lane
New York, NY  10038-4982
(212) 806-5400
Counsel for Mizuho Bank Ltd., formerly
known as Mizuho Corporate Bank, Ltd.,
As Co-Chair of the Committee

**Loeb & Loeb LLP**
345 Park Avenue
New York, NY  10154
(212) 407-4000
Counsel for Wilmington Trust Company,
As Co-Chair of the Committee and Indenture
Trustee

**Sullivan & Worcester LLP**
One Post Office Square
Boston, MA  02109
(617) 338-2800
Counsel for U.S. Bank National Association,
As Member of the Committee and Indenture
Trustee

**Sheppard Mullin Richter & Hampton LLP**
30 Rockefeller Place
New York, NY  10112
(212) 653-8700
Counsel for The Bank of New York Mellon,
As Member of the Committee and Indenture
Trustee

**Kleinberg, Kaplan, Wolff & Cohen, P.C.**
551 Fifth Avenue, 18th Floor
(212) 986-6000
New York, NY  10176
Counsel for Elliott Management Corp.,
As Member of the Committee

**Arent Fox LLP**
1675 Broadway
New York, NY  10019
(212) 484-3957
Counsel for The Vanguard Group Inc.,
As Member of the Committee

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | Case No.   08-13555 (SCC) |
| LEHMAN BROTHERS | |
| HOLDINGS INC., *et al.*, | Chapter 11 |
| Debtors. | (Jointly Administered) |

## AMENDED OMNIBUS APPLICATION OF CERTAIN INDIVIDUAL COMMITTEE MEMBERS FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES

TO THE HONORABLE JUDGE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

The Bank of New York Mellon, as indenture trustee ("**BNY Mellon**"), Elliott

Management Corp. ("**Elliott**"), Mizuho Bank, Ltd., formerly known as Mizuho Corporate Bank, Ltd. ("**Mizuho**"), U.S. Bank National Association, as indenture trustee ("**U.S. Bank**"), The Vanguard Group Inc. ("**Vanguard**"), and Wilmington Trust Company, as indenture trustee ("**Wilmington**"),[1] each of whom is a current or former member ("**Committee Member**") of the Official Committee of Unsecured Creditors ("**Committee**") of Lehman Brothers Holdings Inc. ("**LBHI**") and the other above-captioned debtors ("**Debtors**" and with the Debtors' nondebtor and foreign affiliates, "**Lehman**") hereby submit this Amended Omnibus Application ("**Amended Application**"), pursuant to sections 503(b)(3)(D), 503(b)(4)[2] and 503(b)(5) of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, "**Bankruptcy Code**"), for approval of the payment by the Debtors of certain fees and expenses incurred in connection with the above-captioned Chapter 11 cases ("**Chapter 11 Cases**").[3]   In support of the Amended Application, Applicants respectfully state as follows:

---

[1]    BNY Mellon, Elliott, Mizuho, U.S. Bank, Vanguard and Wilmington are collectively referred to herein as "**Applicants**."

[2]    Certain of the Applicants—BNY Mellon, Mizuho, U.S. Bank and Wilmington—have filed supplemental applications under Bankruptcy Code §§ 502, 503(b)(3)(D), 503(b)(4) and/or 503(b)(5) contemporaneously herewith.

[3]    Two other Committee Members that were included in the original Omnibus Application ("**Original Application**") filed on January 30, 2012 [Dkt. # 24762]—Metropolitan Life Insurance Co. ("**Metropolitan Life**") and Shinsei Bank, Limited ("**Shinsei**")—are not participating in these remand proceedings.  Metropolitan Life withdrew its participation in the Original Application in its entirety during the December 19, 2012 hearing before this Court.  *See* Transcript of December 19, 2012 Hearing ("**Dec. 19 Hearing Tr.**") at 108:17-20.  Shinsei has withdrawn its request that its fees and expenses be paid as a substantial contribution award.  Applicants and Shinsei continue to reserve their rights to appeal the District Court Decision (defined below) to the Court of Appeals for the Second Circuit after these remand proceedings are concluded.

## PRELIMINARY STATEMENT

1.      If ever there was a unique Chapter 11 case that required extraordinary efforts above and beyond those normally required of members of a creditors' committee, it was Lehman.  Following the Debtors' sudden collapse and the mass departure of its employees, Applicants were tasked with far more than the usual committee duties of oversight and consultation.  Indeed, Applicants had to become involved to an uncommon extent in the formulation and execution of a strategy for the operation and liquidation of the Debtors.

2.      To meet this challenge, the Committee, early in the case, established subcommittees devoted to particular asset classes.  Applicants, through the subcommittees, had to immerse themselves in the minutiae of the Debtors' complex and varied business lines, including (among others) intricate derivatives transactions, multifaceted private equity interests, regulated bank affiliates, a substantial portfolio of loans that included funded and unfunded commitments in every tranche of debt and at every level of the capital structure, and voluminous real estate holdings.  Each subcommittee performed the initial analysis of each issue or transaction presented and made decisions regarding transactions or issues that had a value below a certain financial threshold.  In other cases, the subcommittees reported back to the full Committee to address the particular issue and make critical decisions related to the management and liquidation of the Debtors' assets.  Through this process, Applicants' efforts materially contributed to the stabilization, operation, and liquidation of the Debtors' assets.

3.      Similarly, Applicants did not just participate in the formulation of a plan of reorganization, as a committee would normally be expected to do.  Rather, in the face of three competing plans, Applicants were a moving force behind the creation of a compromise plan that garnered broad support from creditors and ultimately resulted in an uncontested confirmation—a

3

resoundingly successful resolution to what the Court described as "the biggest, the most incredibly complex, the most impossibly challenging international bankruptcy case that ever was."[4]

4.    Applicants required the advice and assistance of their own counsel in making their substantial contribution to these cases.    Applicants relied on their counsel to help them understand and address the wide range of complex and often novel issues that arose in connection with management of the Debtors' assets, the development of strategies for the liquidation of the Debtors' assets to maximize estate recoveries, and the formulation of the terms of a complex, multi-debtor consensual plan.

5.    Applicants also needed their own counsel to defend them when they became discovery targets of parties litigating with the estate.    In particular, representation by individual counsel was necessary to preserve the estate's claims by guarding against improper discovery requests and disclosure, including inadvertent waiver of privilege.    Absent their role as Committee Members, and their participation in the investigation and initiation of claims on behalf of and for the benefit of the estate, no such discovery would have occurred.

6.    This Amended Application is submitted in support of Applicants' request under Sections 503(b)(3)(D), 503(b)(4) and 503(b)(5) of the Bankruptcy Code for reimbursement of their reasonable fees and expenses[5] incurred in connection with the substantial contributions they

---

[4]    *See* Transcript of December 6, 2012 Hearing ("**Dec. 6 Hearing Tr.**"), at 68:24-25.

[5]    The amount of fees and expenses for which reimbursement is sought by each Applicant is set forth on **Exhibit "A"** hereto.

made to the Chapter 11 Cases as Committee members.[6]  With respect to certain of such fees and expenses, Applicants seek reimbursement under other provisions of Section 503.

7.      As described in more detail below, and as will be further demonstrated at trial, Applicants' intensive efforts over a 39-month period contributed measurably to the achievement of what the Court called "the most overwhelming outpouring of creditor consensus in the history of insolvency law,"[7] eliminated the costs associated with multiple committees and avoided years of expensive and protracted litigation.  Applicants made a substantial contribution to these cases and are therefore entitled to reimbursement of the actual, necessary and non-duplicative fees and expenses incurred in connection with their efforts.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over these cases and the Amended Application under 28 U.S.C. §§ 157 and 1334 and pursuant to Section 14.1(b), (g) and (o) of Article XIV of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors ("**Plan**").  Venue of these proceedings and this Amended Application is proper in this district under 28 U.S.C. §§ 1408 and 1409.

9.      The statutory predicates for the relief sought herein are Sections 503(b)(1)(A), 503(b)(3)(D), 503(b)(4), and 503(b)(5) of the Bankruptcy Code.

## PROCEDURAL BACKGROUND

10.     On December 6, 2011 ("**Confirmation Date**"), this Court confirmed the Plan, which incorporated a series of interrelated settlements between and among the different debtor

---

[6]      Applicants have submitted supplemental declarations ("**Declarations**") in support of the Amended Application, which are attached hereto as Exhibits B-1 to B-9.

[7]      *See* Dec. 6 Hearing Tr., at 69:4-6.

estates and foreign affiliates and their respective creditor constituencies.[8]   Overwhelming majorities of the Debtors' voting creditors supported the Plan, which resolved many of the contested issues that arose in the Chapter 11 Cases.[9]   As of the confirmation hearing, only one creditor pursued an objection to the Plan, and that objection was withdrawn during the hearing.[10] The Plan went effective on March 6, 2012 ("**Effective Date**") [Dkt. # 26039].

## A.    Bankruptcy Court Decision

11.    The Plan contained a provision (Section 6.7) that authorized the payment of the fees and expenses ("**Fees**") incurred by Committee Members during the Chapter 11 Cases.  The United States Trustee objected to this provision, but the parties agreed to adjourn the dispute pending the submission of an application for payment of the Fees by Committee Members.[11]   On January 30, 2012, the Committee Members filed the Original Application [Dkt. # 24762], which sought payment under Section 6.7 of the Plan, as authorized by Bankruptcy Code §§ 1123(b)(6) and 1129(a)(4) or, alternatively, as substantial contribution awards under Bankruptcy Code §§ 503(b)(3)(D) and 503(b)(4).[12]   The Debtors supported the relief sought by the Committee Members, submitting the Declaration of John K. Suckow, Lehman's President and Chief

---

[8]     *See* Order Confirming Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors ("**Confirmation Order**"), dated December 6, 2011 [Dkt. # 23023].

[9]     *See* Confirmation Order, at 19.

[10]    *See* Dec. 6 Hearing Tr., at 66:10-67:2.

[11]    *See In re Lehman Bros. Holdings Inc.*, 487 B.R. 181, 187 (Bankr. S.D.N.Y. 2013) ("***Lehman I***"); *see also* Confirmation Order, at 74.

[12]    The Original Application was modified to correct computational errors by Notice dated February 1, 2012  [Dkt. # 24881].

6

Executive Officer, in support of the Original Application.[13]  The United States Trustee filed the only substantive objection to the Original Application.[14]  No creditors opposed it.

12.     Oral argument was held on December 19, 2012.  On February 15, 2013, the Court issued a decision, overruling the United States Trustee's objection and granting the Original Application.   The Court concluded that the Debtors' voluntary reimbursement of the Fees pursuant to the Plan was not inconsistent with Bankruptcy Code § 503(b) and, in any case, was governed by Bankruptcy Code §§ 1123(b)(6) and 1129(a)(4).  *See Lehman I*, 487 B.R. at 190-93. Given its decision, the Court did not reach the alternative argument made by Applicants in the Original Application—that the Fees were also payable as a substantial contribution under Bankruptcy Code § 503(b).[15]   The Court did state, however, that a creditor serving as a committee member is entitled to seek payment of its legal fees and expenses from the estate under Section 503(b) for having made a substantial contribution.  *Lehman I*, 487 B.R. at 190 n. 8 ("[A] creditor, even one serving on an official creditors' committee, can seek to have his, her or its attorney/accountant fees reimbursed for having made a 'substantial contribution' under Section 503(b)(3)(D)").

---

[13]     *See* Declaration of John K. Suckow, as President and Chief Executive Officer of Lehman Brothers Holdings Inc., in Support of the Omnibus Application of Individual Members of Official Committee of Unsecured Creditors and Indenture Trustees for Payment of Fees and Expenses, dated November 15, 2012 [Dkt. # 32129].

[14]     *See* Omnibus Objection of the United States Trustee to Creditors' Applications for Reimbursement of Professional Fees and Expenses, dated February 15, 2012 [Dkt. # 25394].  The Fee Committee appointed by the Court (*see, infra,* Section III) also filed a limited objection to the Original Application.  The Fee Committee's primary objection was that it had insufficient time to review the Fees for reasonableness and it sought adjournment of the hearing for that purpose, dated February 15, 2012 [Dkt. 25384], at ¶ 11.  The objection was not pursued because the Debtors had already performed "an exhaustive review of the applications" and the United States Trustee at that time had asserted a reasonableness objection.  *See* Dec. 19 Hearing Tr., at 109:19-112:7.

[15]     *See* Original Application at 15-17.

13.    The Court also directed the parties to meet and confer to determine whether any disputes as to the reasonableness of the Fees could be resolved and stated that any unresolved question should be submitted to the Court for a determination of reasonableness in accordance with Section 1129(a)(4).[16]    The United States Trustee subsequently withdrew any remaining objections to the reasonableness of the Fees,[17] eliminating the need for a further hearing on that issue.  Thereafter, the Court approved the Fees pursuant to an Order dated May 31, 2013 (the text of which was negotiated with the United States Trustee),[18] and the Debtors paid the Fees to the Committee Members.

## B.    District Court Decision

14.    The United States Trustee appealed the Bankruptcy Court decision to the District Court by Notice of Appeal dated March 1, 2013 [Dkt. # 35662].  Following a hearing on the merits of the appeal, the District Court reversed the Bankruptcy Court decision insofar as the Fees awarded would be permissible consensual Plan payments under Bankruptcy Code §§ 1123(b)(6) and 1129(a)(4) ("**Section 1129(a)(4) Ruling**"), but it held that payment of the Fees was permissible under Bankruptcy Code § 503(b) to the extent that the Committee Members could demonstrate that they had made a substantial contribution to the Chapter 11 Cases.[19]

---

[16]    *Lehman I*, 487 B.R. at 193.

[17]    *See* Notice Regarding Final Resolution of Matters Related to United States Trustee's Objection to Fees, dated March 1, 2013 [Dkt. # 35661], annexed as **Exhibit "C"** hereto, at ¶¶ 2-3.

[18]    *See* Order Granting Omnibus Application of (I) Individual Members of Official Committee of Unsecured Creditors and (II) Indenture Trustees Pursuant to Section 1129(a)(4), or, Alternatively, Sections 503(b)(3)(D) and 503(b)(4) of Bankruptcy Code for Payment of Fees and Reimbursement of Expenses ("**Fee Order**"), dated May 31, 2013 [Dkt. ## 37674, 37674-1], annexed as **Exhibit "D"** hereto.

[19]    *See Davis v. Elliott Mgt. Corp. (In re Lehman Brothers Holdings Inc.)*, 508 B.R. 283, 295-96 (S.D.N.Y. 2014) ("***Lehman II***" or "**District Court Decision**").

15.     In so ruling, the District Court rejected the United States Trustee's argument that committee members, acting in their role as committee members, are ineligible for substantial contribution awards.  *See Lehman II*, 508 B.R. at 294 ("To the extent official committee members perform extraordinary work to benefit the estate, above and beyond normal committee duties, they may, as will be explained below, seek to be reimbursed under § 503(b)(3)(D) and 503(b)(4), which provide for payment of the professional fees incurred by entities that have made a 'substantial contribution in a case.'").  The District Court remanded the dispute to this Court for a factual determination of whether the Committee Members made a substantial contribution to the Chapter 11 Cases such that the Fees could be paid under Bankruptcy Code § 503(b).  *Id*. at 296.

## C.      Certification Denial

16.     The Committee Members filed a motion to certify the Section 1129(a)(4) Ruling for immediate appeal to the Court of Appeals for the Second Circuit ("**Certification Motion**") [District Court Dkt. # 20].  The United States Trustee opposed the Certification Motion [District Court Dkt. #25].  By order dated June 26, 2014 ("**Certification Order**"), the District Court denied the Certification Motion [District Court Dkt. # 30], and the dispute was remanded to this Court for an evidentiary hearing on the substantial contribution issue.

## D.      Remand

17.     Applicants have reviewed the Original Application (and related time records) and submit this Amended Application and the Supplemental Declarations in response to the Court's

comments during conferences held following remand.[20]

## FACTUAL BACKGROUND

## I.    <u>The Lehman Chapter 11 Cases</u>

18.    Prior to the commencement of these Chapter 11 Cases, Lehman was the fourth largest investment bank in the United States.[21]   Lehman provided a full array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management, and private equity to corporations, governments and municipalities, institutional clients, and high-net-worth individuals.   Lehman's businesses were organized into three segments: Capital Markets, Investment Banking, and Investment Management.   Its worldwide headquarters were located in New York, and it had regional headquarters in London and Tokyo.   Lehman operated a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.[22]   Lehman employed approximately 28,600 people worldwide as of November 30, 2007.[23]

19.    On September 15, 2008, and on various dates thereafter, LBHI and certain of its direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of the

---

[20]    It has taken the Applicants a considerable amount of time to prepare this Amended Application, in part because each Applicant  conducted a substantial review of years of time records, and in part because the Applicants endeavored to produce a single joint application to avoid redundancy and to facilitate review by the United States Trustee and the Court.

[21]    *See* Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, dated September 15, 2008 [Dkt. # 2].

[22]    *See* Debtors' Disclosure Statement for Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code ("**Discl. St**."), Ex. 19, at 19-1, September 1, 2011 [Dkt. # 19629].

[23]    Lehman Brothers Holdings Inc., Annual Report on Form 10-K Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended November 30, 2007, at 14.

Bankruptcy Code in this Court.[24]   In addition, Lehman Brothers, Inc. ("**LBI**"), another LBHI subsidiary and licensed broker-dealer, was the subject of a SIPA proceeding in this Court.[25] Almost 80 of LBHI's foreign affiliates also were the subject of insolvency proceedings before courts, governmental, regulatory or administrative bodies in 16 different foreign jurisdictions.[26]

20.     On September 17, 2008, the United States Trustee appointed the Committee, pursuant to section 1102(a)(1) of the Bankruptcy Code [Dkt. # 62].   The Committee Members originally included:   (a) Wilmington, (b) BNY Mellon, (c) Mizuho, (d) Metropolitan Life, (e) Shinsei, (f) The Royal Bank of Scotland, PLC ("**RBS**") and (g) RR Donnelly & Sons ("**RR Donnelly**").[27]   Mizuho and Wilmington served as Co-Chairs of the Committee throughout the entire case.[28]   RBS and RR Donnelly were later replaced by Vanguard and Aegon USA Investment Management ("**Aegon**").[29]   After Aegon and Shinsei resigned, on February 9, 2010, U.S. Bank and Elliott were appointed to the Committee.[30]

21.     Notwithstanding requests for the appointment of additional committees, the Committee was the only official committee appointed by the United States Trustee to represent

---

[24]     *See* Discl. St., § IV, at 19.

[25]     *See* Discl. St., § III.B. at 19.

[26]     *See* Discl. St., § IV.F.4, at 28.

[27]     *See* Discl. St., § IV.B, at 20.

[28]     *See* Declaration of Noel P. Purcell in Support of Mizuho's Application Pursuant to Section 1129(a)(4) or, Alternatively, Section 503(b)(D)(3) and 503(b)(4) of the Bankruptcy Code, for Payment of Fees and Reimbursement of Expenses of their Respective Counsel, dated January 26, 2012 [Dkt. # 24762], at ¶ 6;  Declaration of Julie J. Becker in Support of Wilmington Trust's Application Pursuant to Section 1129(a)(4), or, Alternatively, Sections 503(b)(3)(D) and 503(b)(4) of Bankruptcy Code for Payment of Fees and Reimbursement of Expenses ("Becker Declaration"), dated January 27, 2012 [Dkt. # 24762], at ¶ 18.

[29]     *See* Discl. St., § IV.B, at 21.

[30]     *See* Discl. St., § IV.B, at 20.

11

the interests of the unsecured creditors of the debtor-estates.[31]    Applicants held diverse claims against different Debtors:

(a)    Mizuho held a bank claim against LBHI and also had a significant derivatives claim against Lehman Brothers Special Financing Inc. ("**LBSF**") and a related guarantee claim against LBHI;

(b)    Wilmington was, and continues to serve as, the indenture trustee for holders of over $48 billion in notional amount of various senior notes issued by LBHI;

(c)    U.S. Bank was, and continues to serve as, the indenture trustee with respect to certain subordinated notes of LBHI in the principal amount of $1.475 billion and serves as trustee with respect to structured finance transactions involving one or more Debtors and nondebtor affiliates, often supported by guarantees by LBHI;

(d)    BNY Mellon was, and continues to serve as, the indenture trustee for holders of over $10 billion of subordinated notes issued by LBHI, as well as the indenture trustee with respect to certain debt issuances of LBI and a Lehman foreign affiliate, Lehman Brothers Treasury Co. B.V. ("**LBT**"), the holders of which in turn held guaranty claims against LBHI;

(e)    Elliott served as investment adviser on behalf of certain client accounts that beneficially owned securities of, or held other claims against LBHI, and many other Lehman entities, including claims against U.S. and foreign debtors (many of which were themselves creditors of LBHI) that were guaranteed by LBHI; and

(f)    Vanguard held debt claims (*e.g.* subordinated debt securities, senior medium-term notes, preferred securities, municipal bonds) against LBHI, municipal bond debt of Lehman Brothers Commodities Services, Inc., and claims arising from derivatives contracts against LBSF that were guaranteed by LBHI.

---

[31]    *See, e.g.,* Amended Motion for Appointment of Equity Committee, dated September 22, 2008 [Dkt. # 293].

II.    **Applicants' Role in Managing and Winding Down the Debtors' Assets**

22.    It was clear from the start that the Chapter 11 Cases would result in a complete liquidation of the Debtors.  But before a liquidating plan could be formulated, the Debtors' businesses had to be stabilized, their assets identified and inventoried, and plans and protocols developed for the management and wind-down of the assets.  Applicants played a critical role in this process.

A.    **The Committee Served As a Parallel Management Team
and Gatekeeper in the Liquidation Process.**

23.    The Debtors entered bankruptcy in a freefall.    None of the pre-bankruptcy

diligence and planning that would typically accompany a large Chapter 11 filing had been done.

At the beginning of the Chapter 11 Cases, reliable and timely information regarding the Debtors'

assets and businesses was not readily available.    To further complicate matters, all but a handful

of the Debtors' employees, including top-level management, had been terminated or transferred

within days of the filing in connection with the sale of LBI's broker-dealer business to Barclays

Capital, Inc. ("**Barclays**").[32]    Many of the Debtors' internal accounting and information systems

had been sold to Barclays.[33]    By force of circumstances, the task of identifying, evaluating and

preserving the Lehman assets and running the remaining Lehman businesses fell to the Debtors'

few remaining employees, the Debtors' restructuring professionals, the Committee's

restructuring professionals, and Applicants and their individual counsel.    Applicants were thus

required to take a much more active role in the strategic and day-to-day management of

Lehman's diverse and complex asset classes than would typically be required of a creditors'

committee member.

24.    Because of the diverse nature of the Debtors' assets and the large quantity of

assets and transactions involved, the Committee, early in the case, established the following

subcommittees devoted to particular asset classes: Derivatives Subcommittee; Real Estate

Subcommittee; Private Equity/Principal Investments Subcommittee; Loan Book Subcommittee;

---

[32]    *See* Discl. St., § IV.E, at 23.

[33]    *See* Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C)
Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and
Assignment of Contracts Relating to the Purchased Assets, Exh. 2, at 6-8, dated September 17, 2008 [Dkt.
# 60].

14

and Domestic Banks Subcommittee (collectively, "**Subcommittees**").[34]  The Committee also
establish a working group to analyze the valuation of the structured securities issued by certain
of the Debtors (as discussed in Section III below) (the "**Structured Securities Working
Group**").  Each Subcommittee included at least three members of the Committee.[35]

25.    As discussed in further detail below, the analysis and other work performed by
Applicants allowed the Subcommittees to address on their own or make recommendations to the
full Committee regarding particular issues, assets, and transactions.  The work performed by
members of these Subcommittees carried over into regular Committee meetings where the
proposed transactions or issues were thoroughly discussed and analyzed by the full Committee
and decisions were made.  This work was critical to assisting the full Committee in its analysis of
the issues related to the management and liquidation of the Debtors' assets.

26.    Following analysis by applicable Subcommittees and discussions by the full
Committee, the Committee Members quickly concluded that immediate sales of most of the
Debtors' assets were not in the best interest of the estates.  Because of the deepening financial
crisis, it was likely that immediate liquidation of the assets would realize only very depressed
values.  Thus, the Committee, together with the Debtors, developed an approach that allowed
assets to be held and managed until global economic conditions improved and monetization
became more attractive.  This was not a situation in which the Committee played solely an
oversight role.  Rather, the "hold and manage" strategy, combined with the limited executive
staff remaining at the Debtors, required Applicants, with the assistance and advice of their

---

[34]    Other subcommittees, which crossed asset classes, were formed as well, including Tax and
Litigation Subcommittees.

[35]    The composition of each Subcommittee and the Structured Securities Working Group is set forth
in **Exhibit "E"** hereto.

counsel, to act as a parallel management team, in conjunction with the Debtors' and Committee's professionals.  In this role, Applicants and their individual counsel devoted enormous time and resources to understanding and evaluating the Debtors' assets and businesses and developing strategies to maximize liquidation values.

27.     The scale and nature of Lehman's assets and businesses further distinguish the extraordinary work undertaken by Applicants in connection with the management of the Debtors' assets and businesses from normal committee work.  No other debtor has entered bankruptcy with a mix of financial assets and business lines as varied and extensive as Lehman's.  Given Lehman's role as a major player in the financial markets, the Lehman assets were complex, esoteric, and sophisticated.  They included equity and debt investments in real estate; private equity investments of all types in diverse industries; derivative transactions of all kinds, including highly individualized bespoke transactions; commercial loans at every level of the capital structure and interests in collateralized loan obligations; and regulated banking assets.[36]

28.     Applicants were required to make decisions on how to best manage existing business segments during the Chapter 11 Cases and how management, oversight and liquidation would continue to be implemented after confirmation of a plan.  They considered whether Lehman employees should remain in place, at what price and for how long, what retention or incentive mechanics were appropriate for the particular purpose, or whether third-party managers would be more appropriate and cost-effective.  Applicants also reviewed best practices, and where possible, identified alternative disposition methods for each asset class within each business segment.

---

[36]     *See, e.g.,* Discl. St., Ex. 19, at 19-1-19-6.

29.     Applicants were instrumental in developing court-approved and informal protocols that streamlined the liquidation process and eliminated the need for court hearings on a substantial number of matters.[37]  Through the use of these protocols, Applicants functioned as a gatekeeper for the Court during the liquidation process, saving the estates considerable time and expense.  For example, as discussed below, Applicants collaborated with the Debtors in the development of protocols for the settlement of derivative and real estate transactions.  As a result of these formal and informal protocols, Applicants vetted, negotiated, and eventually approved hundreds of transactions that did not require Court approval.  For those transactions that did require Court approval (because, for example, the amount in issue exceeded the threshold under the applicable protocol), Applicants streamlined the approval process by reviewing the proposed transaction and providing the Court with recommendations.  As a result, these transactions were approved without extensive costs and time-consuming delays.

**B.      Applicants' Additional Time Spent Serving on Subcommittees was Critical to the Committee's Role as a Parallel Management Team and Gatekeeper in the Liquidation Process.**

30.     Much of the underlying work that Applicants performed in executing the "hold and manage" strategy and the eventual liquidation of assets occurred through the Subcommittees and working groups.  The Subcommittees held regular—often weekly or twice a week—telephonic meetings throughout the Chapter 11 Cases.  To participate meaningfully in the Subcommittee meetings and make fully informed recommendations to the Committee, Applicants and their counsel reviewed and analyzed information provided by the Debtors' and

---

[37]     *See, e.g.,* Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6004(h) and 9019(a) for the Establishment of Procedures to Dispose of Real Estate Assets and Modification of the Order Establishing Procedures to (I) Restructure, (II) Make New or Additional Debt or Equity Investments in, and/or (III) Enter into Settlements and Compromises in Connection with Existing Real Estate Investments, dated June 17, 2010 [Dkt. # 9633].

17

the Committee's professionals before each Subcommittee meeting.  The Subcommittees also communicated regularly with the Debtors, were involved at the earliest stages of potential transactions, and provided input on the nature, pricing and structure of transactions.  A discussion of the work performed by Applicants with respect to the most important asset classes follows.

31.    **Derivatives.**  As of September 2008, the Debtors were parties to approximately 1.2 million derivatives transactions, involving approximately 6,500 counterparties.[38]  These were highly complex, sophisticated and often bespoke transactions arising in a very specialized industry.    The  Derivatives  Subcommittee  analyzed  and  made  decisions  or  made recommendations to the full Committee with respect to this portfolio on a regular basis after analyzing transactions or classes of transactions, including proposals regarding either termination and  settlement  or  assumption  and  assignment  of  transactions,  hedging  strategies,  and  the purchase of notes from certain special purpose entities to prevent erosion of value.  In certain cases, certain members of the Derivatives Subcommittee would participate in direct negotiations with the counterparties in an effort to assess or arrive at settlements that would benefit the estates and the creditors.  The work of the Derivatives Subcommittee required an advanced level of understanding of derivatives and the related law that the members could not have achieved without the guidance of their respective counsel.

32.    From late 2008 through the Effective Date, the Derivatives Subcommittee held at least 160 separate meetings and also spent many hours in meetings with the full Committee to discuss issues related to the Debtors' derivatives portfolio.  The complexity of the issues presented required members of the Derivatives Subcommittee to thoroughly prepare for each

---

[38]        *See* Discl. St., § IV.H.1, at 33.

meeting.  During the Subcommittee meetings, the members reviewed and analyzed proposed treatment of derivatives contracts.  The Subcommittee members, with guidance from their respective counsel, also developed strategies for monetization of the portfolio.

33.     The Derivatives Subcommittee negotiated with the Debtors to establish alternative dispute resolution ("**ADR**") procedures for claims arising under derivatives contracts.[39]  Many of the derivatives contracts raised similar issues regarding setoff, termination, valuation, and notice, and were thus amenable to standardized procedures.[40]  Collectively, the ADR process enabled the recovery of over $1 billion for the benefit of unsecured creditors and saved untold dollars and hours by avoiding the need for multiple adversary proceedings.[41]

34.     Further, the Derivatives Subcommittee was instrumental in negotiating ADR procedures for derivatives transactions involving special purpose vehicles, where beneficial and economic interest holders were not easily identifiable.  In particular, counsel for the indenture trustee Applicants, having significant experience with SPV structures and beneficial holder directions, were integral in formulating the so-called "ADR-SPV" procedures, which brought beneficial and economic interest holders having settlement authority to mediation proceedings to resolve the outstanding disputes without protracted litigation.

35.     The Derivatives Subcommittee also played an integral role in the formulation of a settlement framework applicable to Lehman's largest derivatives counterparties (the "**Big Bank**

---

[39]     *See* Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative Contracts, dated July 20, 2009 [Dkt. # 4453].

[40]     *See Id.* at 5.

[41]     *See* Supplemental Declaration of Julie J. Becker in Support of Omnibus Application of Individual Members of Official Committee of Unsecured Creditors and Indenture Trustees Pursuant to Section 1129(a)(4) or, Alternatively, Sections 503(b)(D)(3) and 503(b)(4) of the Bankruptcy Code, for Payment of Fees and Reimbursement of Expenses, dated November 12, 2012 [Dkt. # 32129] ("**Supplemental Becker Declaration**"), at ¶ 34.

**Framework**").[42]  In particular, Applicants thoroughly vetted multiple, complex calculations of settlement amounts for the allowance of claims pursuant to the Big Bank Framework.  The parameters for the resolution of claims that the Subcommittee helped to devise under the Big Bank Framework ultimately led to acceptance by the big-bank counterparties of significant reductions in the amounts of their filed derivatives claims.[43]  Acceptance of the Big Bank Framework by the big-bank counterparties was a predicate to obtaining plan support agreements by these creditors, which ultimately led to broader acceptance of the Plan.  Because of the complex and novel legal issues regarding allowance of derivatives claims raised by the Big Bank Framework, Applicants required the advice of their individual counsel to understand and effectively vet the propriety of the settlement framework and the calculation of specific settlement amounts.

36.    The law governing derivatives disputes is still not well-developed, and in 2008 was even less so, as these transactions were relatively new, diverse in structure, and had evolved rapidly over time.  Many of the issues arising from the Debtors' derivatives contracts raised novel questions of law that required detailed analysis and consideration by Applicants for which they required the expertise of their individual professional advisors.  For example, the Derivatives Subcommittee participated in complex cross-border litigation between the Debtors and the trustee for holders of notes issued by certain securitization vehicles regarding the triggering of payment priority provisions under the governing documents.[44]  The Derivatives Subcommittee advocated that the Committee intervene in this litigation, which resulted in a

---

[42]     *See* Disc. St. § V.E.1, at 50-51.

[43]     *See* Supplemental Becker Declaration, at 35.

[44]     *See Lehman Bros. Special Fin., Inc. v. BNY Corp. Trustee Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407, 411 (Bankr. S.D.N.Y. 2010).

ruling by the Court that created substantial leverage for the estates in negotiations with derivatives counterparties.[45]   The Derivatives Subcommittee also had to analyze settlements involving multiple counterparties from multiple jurisdictions.

37.    The Derivatives Subcommittee worked with the Debtors to reconcile and value 99% of the derivatives contracts.  Of the total, 58.5% of the derivatives contracts were settled and terminated.[46]  As of the Confirmation Date, derivatives settlements had brought more than $12.2 billion into the Debtors' estates, with a projected total recovery from the derivatives portfolio of more than $17 billion.[47]

38.    **Real Estate**.  The Debtors' real estate assets included commercial and residential mortgage loans, commercial and residential real estate properties, joint venture equity interests in real estate properties and other real estate-related investments, spanning the globe.[48]   The Committee and its Real Estate Subcommittee actively participated with the Debtors in the decision making with respect to this extensive and diverse portfolio.  As a result of the successful strategies employed, as of December 2011, the Debtors were projecting a total net recovery of more than $10 billion from the liquidation of the real estate portfolio.[49]

39.    The role of the Real Estate Subcommittee was not just to review the disposition of properties as might be expected in a liquidating Chapter 11.  Lehman had positions in complex

---

[45]    *Id.* at 422-23.

[46]    *See* Discl. St., § IV.H.1, at 33-34.

[47]    *See Id.*

[48]    *See* Discl. St., § IV.H.2, at 34.

[49]    *See* Supplemental Declaration of Noel P. Purcell in Support of Omnibus Application of Individual Members of Official Committee of Unsecured Creditors and Indenture Trustees Pursuant to Section 1129(a)(4) or, Alternatively, Section 503(b)(D)(3) and 503(b)(4) of the Bankruptcy Code, for Payment of Fees and Reimbursement of Expenses, dated November 15, 2012 (the "**Purcell Declaration**") [Dkt. # 32129], at ¶ 52.

transactions that could not be readily unwound because of the nature of the structures as well as the difficult economic climate.  As noted above, the effects of the Great Recession, which unfolded during (and was partially caused by) the Lehman filing, meant that prompt liquidation of many of the real estate properties could be achieved only at the cost of significant erosion of value.  Accordingly, the Committee tasked the Real Estate Subcommittee with implementing a strategy under which many of the real estate positions were held for far longer than is usual in a liquidation scenario.  This strategy often required decisions to be made regarding the infusion of cash to maintain and preserve assets (including investments in yet-to-be completed projects) pending liquidation.

40.    Many of the real estate assets dealt with by the Real Estate Subcommittee raised issues that were complex and unprecedented.  The Committee (through the Real Estate Subcommittee) worked with the Debtors to devise novel solutions to address these issues and maximize the value of the real estate assets in a variety of complex transactions.  The Canyon Ranch transaction, in which the Debtors held a significant investment interest, is an example of those efforts.  Work on this spa/condominium property in South Florida had stalled in large part because condominium buyers were having difficulty obtaining mortgages.  The Debtors stood to lose the bulk of their investment if the project failed or was further delayed.  The Committee analyzed the issues from a business and legal perspective and ultimately determined with the Debtors that the Debtors should provide mortgages to the prospective condominium owners, and then securitize those mortgages.  Positioning Lehman as lender was an attractive proposition; securitizing the mortgages limited the associated risk.  The result of this unique approach was that the project was able to proceed to completion and the Debtors were able to sell the project in

November 2014 for $21.6 million in excess of the approximately $17 million in debt outstanding with respect to the property.[50]

41.     The wildly successful outcome of the complex Archstone transaction was another example of the collaborative and creative efforts of the Debtors and the Committee, through the Real Estate Subcommittee.  Certain of the Debtors and their affiliates had acquired a substantial interest in this real estate investment trust through loans and investments made by them and other lenders in the aggregate amount of $22 billion prior to the commencement of the Chapter 11 Cases.[51]  After the bankruptcy filings, a decision had to be made as to whether the Debtors should commit additional funding of hundreds of millions of dollars to provide Archstone with necessary liquidity. This required extensive analysis and consideration by the Real Estate Subcommittee.  The Debtors, with input from the Committee, made the decision to fund, first, in 2009, and then again in 2010, in the hope that the value of the project would be preserved thereby.[52]

42.     A condition of the funding was that if any of the Debtors, their affiliates or their cosponsors thereafter sought to transfer their interest in Archstone, the other cosponsors would have a right of first offer.[53]  Subsequently, the other cosponsors sought to transfer their interests and, following extensive deliberations by the Real Estate Subcommittee, the Committee determined, with the Debtors, that it would be advantageous to exercise the right of first offer,

---

[50]     Joseph Checkler, "Judge Approves Sale of Canyon Ranch Hotel to Z Capital Partners," WALL STREET J., Dec. 3, 2014.

[51]     See Discl. St., Ex. 18, at 18-5.

[52]     See Discl. St., Ex. 18, at 18-5, 18-6.

[53]     See Order Granting the Debtors' Motion Pursuant to Sections 105(a), 363(b) and 365(a) of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 for Authorization to (I) Assume, as Modified, Certain Loan Agreements, and (II) Consummate Related Loans to Be Made by Lehman Commercial Paper Inc. and Other Lenders to Archstone, dated January 28, 2009 [Dkt. # 2677], at ¶ 5.

notwithstanding that it would require a material outlay of funds.  This approach again marked a significant departure from the traditional posture in a liquidating Chapter 11, but one that ultimately yielded a recovery of $6.45 billion (with the purchasers assuming more than $9.5 billion in Archstone debt) to the estates.[54]

43.    Given the complexity as well as the sheer volume of properties that had to be addressed, Applicants—with the encouragement of the Committee professionals—frequently consulted with their own counsel, as well as Committee counsel, in wrestling with issues and hashing out a strategy.  None of the participants in these discussions considered the contributions of Applicants' counsel to be duplicative of the services of Committee counsel.  Rather, they complemented the work of Committee counsel, amplified the analysis and produced resolutions that were well thought through.

44.    The Real Estate Subcommittee met weekly (or more often) during the cases, for a total of over 200 meetings.  The Subcommittee reviewed and approved or made recommendations to the full Committee with regard to numerous issues related to the Debtors' real estate holdings.  The Real Estate Subcommittee analyzed and vetted proposed structures for many hundreds of real estate transactions with a total value in excess of $12 billion.

45.    In furtherance of its gatekeeper function, the Real Estate Subcommittee developed and negotiated the following protocols, which were approved by the Court:

a.    the Global Real Estate Protocol and Real Estate Disposition Protocol, governing properties for which the estimated recovery

---

[54]    Michael J. De La Merced, "Lehman Sells Property Firm in a Deal Worth $6.5 Billion," N.Y. TIMES, Nov. 26, 2012, at B1.

amount was greater than $25 million but less than or equal to $100 million;[55]

    b.    the Foreclosure SPE Protocol, governing foreclosure sales of a residential portfolio or commercial property of greater than or equal to $10 million but less than $25 million;[56]

    c.    the Discounted Payoff Protocol, governing discounted payoffs of loan modifications where the mark-to-market carrying value of a commercial real estate loan was greater than or equal to $10 million but less than $25 million;[57] and

    d.    the De Minimis Asset Sale Protocol, governing sales of properties for which the book value or sale price was greater than $850,000 but less than $2 million.[58]

46.    These protocols allowed Lehman to consummate time-sensitive transactions expeditiously, often with only Committee approval or summary proceedings. The process implemented through these protocols improved the pace and efficiency of Lehman's restructuring efforts, reduced the burden on the Court, and spared the estates the considerable costs that would have been incurred if lengthy motion practice and full court hearings were required for every real estate transaction.

---

[55]    *See* Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6004(h) and 9019(a) for the Establishment of Procedures to Dispose of Real Estate Assets and Modification of the Order Establishing Procedures to (I) Restructure, (II) Make New or Additional Debt or Equity Investments in, and/or (III) Enter into Settlements and Compromises in Connection with Existing Real Estate Investments, dated June 17, 2010 [Dkt. # 9633].

[56]    *See* Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure Establishing Procedures for the Debtors to Transfer their Interests in Respect of Residential and Commercial Loans Subject to Foreclosure to Wholly-Owned Non-Debtor Subsidiaries, dated September 24, 2009 [Dkt. # 5272].

[57]    *See* Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(b) Authorizing the Establishment of Procedures for the Debtors to Compromise Claims of the Debtors in Respect of Real Estate Loans, dated September 16, 2009 [Dkt. # 5187].

[58]    *See* Amended Order Granting Debtors' Motion Pursuant to Sections 105, 363, and 554(a) of the Bankruptcy Code for Authority to Establish Procedures to Sell or AbandonDe Minimis Assets, dated March 31, 2010 [Dkt. # 7958].

47.    **Private Equity/Principal Investments.**    Lehman's    Private    Equity    and
Principal Investments business included (i) equity and fixed-income direct investments in
companies, (ii) general partner interests in asset managers, (iii) limited partner interests in third-
party investment funds; and (iv) general partner and limited partner or side-by-side interests in
Lehman-sponsored investment funds.  Lehman's private equity business operated in not just one
or two, but six major asset classes: merchant banking, real estate, venture capital, credit-related
investments, private-fund investments and infrastructure.  Lehman had raised privately-placed
funds in each of these asset classes, and acted as a general partner for them.  It also held general
partner, limited partner and side-by-side interests in the funds.[59]  In addition, Lehman's Principal
Investments business made other non-fund-related direct investments.[60]

48.    Many of the Private Equity and Principal Investments were uniquely structured.
Because these investments often were not liquid, Applicants and their advisors worked with the
Debtors and their advisors to determine whether and when to sell the Debtors' interests in such
investments and at what price and how to manage them in the interim to enhance recoveries.[61]
To evaluate and structure these transactions, Applicants were required to understand complex
investment transactions and the evolving marketplace that developed for them after 2008,
determine the effect of such transactions on the various corporate Debtors, and facilitate
acceptable resolutions with third parties.

49.    In evaluating the liquidation alternatives for certain of Lehman's investment
management division businesses, Applicants and their respective counsel worked extensively on

---

[59]    *See* Discl. St., Ex. 18, at 18-12.

[60]    *See* Discl. St., § IV.H.4, at 36.

[61]    *See* Discl. St., § IV.H.4, at 36.

strategies to maximize value that, at times, suggested hybrid, alternative sale structures rather than straight sale transactions.  One example is the sale of the Debtors' interest in investment manager Neuberger Berman.  The Debtors initially favored a third-party stalking horse bid for Neuberger Berman that included walk-away rights, significant termination fees and expense reimbursement, and terms that could have resulted in substantial reductions to the purchase price based upon market fluctuations.  The Committee, based on the investigation, analysis and recommendation of the Private Equity Subcommittee, working with their advisors, advocated against the third-party stalking horse sale in favor of a management-led buyout transaction that improved the economic and structural terms of the deal.  The management buy-out structure was later revised to include the retention by the estates of significant preferred and common equity positions in Neuberger Berman with a value of approximately $1.3 billion—almost twice what it would have received under the stalking horse bid.[62]

50.    The Neuberger Berman transaction required Applicants to understand and evaluate the strategic and structural alternatives, the legal, economic and strategic implications of the retention of equity, the appropriate split of preferred and common interests, liquidation preference values, the risks to monetization of the retained equity interests over time, and the manner in which to optimize value for those interests, all of which required the assistance of counsel.

51.    The Debtors' private equity portfolio had an adjusted value of approximately $8.2 billion at the outset of the cases.[63]  The value of the portfolio as of March 31, 2015, when taking

---

[62]    *See* Becker Declaration, at ¶ 32.

[63]    The adjusted initial value of the private equity portfolio takes into account periodic transfers and reclassifications as reflected in the Debtors' balance sheets.  *See* Monthly Operating Reports and Balance Sheets, filed for quarterly periods from December 31, 2008, through March 31, 2015 ("**Monthly** (continued…)

into account approximately $10.3 billion received through dispositions of the assets, is approximately $12.3 billion.[64] Applicants' work was integral to the successful preservation and monetization, the material enhancement in value and the monetization of these assets.

52.    **Loan Book.**    Lehman acted as a commercial lender prior to commencement of the Chapter 11 Cases.    Upon its bankruptcy filing, Lehman held funded and unfunded lending commitments to numerous borrowers.    Lehman also sold or participated portions of its commercial loans to various special purpose entities, which issued securities backed by the transferred loans.[65]    These lending and securitization activities were collectively referred to as the "loan book."    As of June 30, 2011, the loan book portfolio consisted of $3.1 billion in funded assets with an estimated market value of $2.3 billion.[66]

53.    The Loan Book Subcommittee assisted in the management of Lehman's loan book portfolio.    The Loan Book Subcommittee reviewed each month's loan activity throughout 2009, 2010 and 2011, pursuant to a Court-approved review and approval protocol that the Subcommittee negotiated with the Debtors.[67]

54.    The Loan Book Subcommittee reviewed and made decisions or made recommendations to the full Committee regarding many hundreds of transactions as well as numerous legal and business issues relevant to multiple transactions within the loan book. Because many of the borrowers under Lehman's unfunded commitments were in default, the

---

**Operating Reports**") [Dkt. # 4875, 6151, 8754, 10745, 14105, 16321, 18713, 21188, 23766, 27649, 29731, 31360, 33471, 36207, 38955, 40224, 42236, 43916, 45443, 46422, 48002, 49003, 50478].

[64]    *Id.*

[65]    *See* Discl. St., § IV.I.a, at 37.

[66]    *See* Purcell Declaration, at 15-16.

[67]    *See* Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(b) Authorizing the Establishment of Procedures to Terminate Unfunded Commitments and Restructure Corporate Loan Agreements, dated June 3, 2009 [Dkt. # 3753].

Subcommittee often functioned much like a steering committee of lenders in a workout scenario. Applicants were required to analyze difficult factual and legal issues to determine whether further funding under the loans should be made to protect the estate's investment in those transactions or whether other measures should be taken. Among the major transactions and issues analyzed and reviewed by the Loan Book Subcommittee were:

a.   whether the Debtors should assume or reject trade confirmations to purchase or sell interests in funded and unfunded loans totaling approximately $15.1 billion (funded) and $26.3 billion (unfunded) in the aggregate; [68]

b.   the restructuring of in loans from LCPI to Education Media Publishing Group Limited, a highly leveraged publishing company;

c.   the method for addressing the lender default provisions in credit agreements involving a Lehman debtor as a lender, including loans to the Glimcher Properties, Owens Illinois, TXU, SL Green, HD Supply, and Dupont;

d.   the financing and trades issues involving GE Corporate Financial Services, Inc. and the Fusion entities;

e.   the asset purchase agreement with Lehman Brothers Bankhaus, AG ("**Bankhaus**") regarding $3.45 billion in face amount of notes issued by SPVs under securitization structures; [69]

f.   a settlement between LCPI and Pentwater Capital Management, LP, regarding a dispute over obligations regarding a $3 million term loan to Visteon Corporation; [70]

g.   the restructuring of Lehman's $59.3 million position in the FairPoint Communications Term Loan A; [71]

---

[68]    Lehman Brothers Holdings Inc., "The State of the Estate" (January 14, 2009), at 9.

[69]    *See* Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 for Authorization and Approval of a Settlement Agreement with the Insolvency Administrator of Lehman Brothers Bankhaus AG (In Insolvenz), dated December 18, 2009 [Dkt. # 6303], at 3.

[70]    *See* Stipulation and Agreed Order Resolving Dispute Regarding Open Trade Confirmation with Pentwater Capital Management, LP, dated August 17, 2009 [Dkt. # 4858], at 2.

    h.      the organized wind-down of certain Lehman European subsidiaries, including ELQ Hypotheken B.V. and related companies;[72]

    i.      the recapitalization of Libro Securitizadora de Creditos Financeiros, a Brazilian nondebtor Lehman subsidiary owned by LBSF and LBI Group, Inc.;[73] and

    j.      the settlement regarding the termination of a loan commitment with First Data, one of LCPI's largest remaining loan commitments.

55.    Through the Chapter 11 Cases, Applicant continued to analyze alternative asset-management options for Lehman's loan book portfolio with the goal of allowing Lehman to more quickly monetize the portfolio. These efforts led to the execution of an asset management agreement with WCAS Fraser Sullivan Investment Management, LLC.[74]

56.    **Domestic Banks.**    LBHI owned two non-debtor domestic banks (the "**Banks**"): Woodlands Commercial Bank ("**Woodlands**") and Aurora Bank FSB ("**Aurora**").[75] Woodlands was subject to supervision by the Federal Deposit Insurance Corporation and the Department of Financial Institutions of the State of Utah, and Aurora was subject to the Office of

---

[71]    *See* Motion of Lehman Commercial Paper Inc. Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 for Authorization to Purchase FairPoint Participation, dated Sept. 13, 2010 [Dkt. # 5199], at 5; Order Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 Authorizing Lehman Commercial Paper Inc. to Purchase FairPoint Participation. [Dkt. # 5551].

[72]    *See* Debtors' Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Debt Repayment Agreement with ELQ Hypotheken N.V. [Dkt. # 4959], at 6; Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of a Debt Repayment Agreement with ELQ Hypotheken N.V. [Dkt. # 5186].

[73]    *See* Order Pursuant Section 105(a) 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 Approving Waiver by Lehman Brothers Special Financing Inc. of Certain Interest Payments From Its Subsidiary Libro Companhia Securitizadora de Creditos Financeiros. [Dkt. # 6295].

[74]    *See* Discl. St., § IV.H.3, at 35.

[75]    *See* Discl. St., § IV.H.5, at 36-37.

Thrift Supervision.[76]  Unlike the typical bank holding company bankruptcy, in which regulators

seize the assets of the regulated bank subsidiary before a filing occurs, the Banks were

distressed, but had not been seized by regulators and continued to operate.[77]  Thus, decisions had

to be made regarding maintenance and funding of these nondebtor Banks to avoid liquidation

and wind-down of the entities, which would have resulted in the loss of significant assets and

potential priority claims by regulators that could have aggregated as much as $2.7 billion

according to the Debtors' estimates.[78]

57.    The Domestic Banks Subcommittee assisted the Debtors in formulating strategies

to maintain the viability of the Banks and to avoid regulatory takeover of these valuable assets.

Subcommittee members spent considerable time analyzing the potential value to the estates of

making capital infusions to improve the capital levels at the Banks to satisfy regulatory

requirements and avoid potential seizures and liquidations by the Regulators.  To meet these

challenges, Applicants required the assistance of counsel to understand complex bank regulatory

and capital requirements.

58.    These were unique circumstances:  Applicants had to weigh the potential

detriment to creditors of allocating estate funds to two nondebtors against the potential benefit of

(i) preserving the value of those entities for the ultimate benefit of creditors and (ii) eliminating

potentially large priority claims of the Regulators.  The Subcommittee was also required to

understand and authorize multiple transactions pursuant to which the Lehman estates provided

cash infusions to the Banks as well as asset sales that provided further cash for the Banks.

---

[76]    *Id.*

[77]    *See* Discl. St., Ex. 18, at 18-10-18-11.

[78]    *See* Discl. St., Ex. 18, at 18-11.

59.     Applicants also undertook considerable efforts to ensure that the Banks were being properly managed to maximize their value for the Debtors' estates and creditors.  For example, the Subcommittee met with the OTS to discuss the alternatives for Aurora and helped to develop a business plan that was submitted to the OTS.  The Subcommittee also worked closely with the Debtors to finalize various settlements with the Regulators that allowed the Banks to resume normal profit-generating banking and lending operations.  The settlements resolved substantially all issues with the Regulators, including the elimination of their asserted nearly $3 billion in priority claims against LBHI, and permitted Lehman to realize the value of its equity interests in the Banks by facilitating an orderly wind-down of Woodlands and the implementation of a business plan for Aurora that positioned it for sale as a going concern.[79]

60.     **Litigation Subcommittee/Discovery of Committee Members**.  In addition to the hundreds of litigations for which Applicants provided significant oversight (including avoidance actions, derivatives claims litigation, claims disputes and others), Applicants played a significant role with respect to the investigation and commencement of a number of litigations brought on behalf of the estate.  In some cases, and solely because of their service on the Committee, Applicants were targeted by certain defendants for third-party discovery regarding the decision-making process for bringing these actions and certain allegedly related internal business decisions of Applicants.  Third-party discovery was sought and obtained from Applicants in several actions.  The discovery sought in these actions was broad and extensive.

61.     Each of the Committee Members found itself in the unusual position of being a discovery target not because it was personally involved in the matters that were the subject of estate litigation, but solely because of its status as a Committee Member that was involved in the

---

[79]     *See* Purcell Declaration, at 32-35

decisions to bring the lawsuits. To protect and preserve these litigation claims for the benefit of the estates and creditors, it was essential that the Committee Members be represented by counsel in responding to the discovery requests. Committee counsel was unable to represent the Committee Members individually in connection with the discovery. Thus, each of the individual Committee Members was forced to utilize its own counsel to assist it in responding to the document requests and to represent it during depositions.

62.     Applicants seek reimbursement for the reasonable fees and necessary expenses they incurred in connection with responding to and defending against the discovery requests by third-party litigants under Bankruptcy Code 503(b)(1)(A) as an actual, necessary cost and expense of preserving the estate and, alternatively, as a substantial contribution under Bankruptcy Code §§ 503(b)(3)(D) and (4). Discovery was taken from Applicants in their capacity as Committee Members. To preserve and protect the estate's interest in the litigation claims, Applicants were compelled to expend a substantial amount of time and effort in responding to discovery requests to the exclusion of other matters and derived no benefit, independent of benefits afforded creditors as a whole. Moreover, Applicants had no choice but to retain individual counsel to represent them in connection with the discovery to preserve the litigation claims for the benefit of the estate by guarding against improper discovery requests and disclosures, including inadvertent waivers of privilege.

## III.     Plan Formulation and Negotiation

63.     The multi-national and multi-tiered businesses of the Lehman corporate enterprise and the economic upheaval that was triggered by the commencement of these Chapter 11 Cases created significant potential for multiple protracted, complex and expensive litigations between and among the U.S. and foreign bankruptcy estates, competing creditor bodies and regulators.

Numerous difficult and contested issues existed, including the treatment of claims arising under intercompany cross-border transactions, substantive consolidation, enforceability of guarantees against LBHI by affiliates or creditors, and structural subordination. These issues and the need to resolve over $1.162 trillion in claims asserted against the estates threatened the Debtors' ability to confirm a plan of reorganization without engaging in protracted and expensive litigation.[80] In the end, due in significant part to the efforts of Applicants with the assistance of their respective counsel, this Court confirmed the Plan, on a substantially consensual basis[81] only 39 months after the commencement of the Chapter 11 Cases.

64.    Applicants played a critical role in the formulation of a viable plan that addressed and resolved competing concerns of disparate creditor constituencies holding claims against one or more of the debtor estates. The Committee Members were uniquely positioned to take this global view because of the composition of the Committee. Rather than appoint multiple committees to represent each of the bankruptcy estates and their creditor bodies, the U.S. Trustee appointed a single creditors' committee composed of creditors holding diverse claims at each level of the capital structure and against different Debtors.

65.    Applicants thus brought vital and often considerably varied perspectives on the competing interests of creditors of the different estates and the critical issues that had to be addressed to reach a consensual resolution in these cases, including: (i) substantive consolidation, (ii) intercompany and creditor guarantees, (iii) the treatment of

---

[80]    *See* Plan Status Report, dated January 13, 2011, at 6.

[81]    As of the confirmation hearing, the sole remaining creditor objection was withdrawn, leaving the U.S. Trustee's objection to the payment of Applicants' fees and expenses under the Plan as the only unresolved objection. Thus, the Plan was supported by all economic stakeholders. *See* Dec. 6 Hr. Tr.**,** at 66:10-67:2. Judge Peck called "the most overwhelming outpouring of creditor consensus in the history of the insolvency law" a "monumental" and "awe-inspiring" achievement. *Id*., at 69:4-11.

intercompany/foreign affiliate claims, and (iv) subordination of claims held by and against different Debtors.

66.    By way of example, an LBHI-only creditor might prefer substantive consolidation, while an LBSF creditor with debt guaranteed by LBHI might want to preserve the value in LBSF and therefore favor non-consolidation. A structured securities noteholder, such as a holder of LBT notes, might seek to maximize recovery of intercompany claims against LBHI (such as those held by LBT), but as the holder of an LBHI guarantee claim, recognize the importance of LBHI receiving a fair distribution of the Debtors' assets.

67.    Competing interests could have splintered the Committee. But Applicants— determined to find a collaborative solution—instead drew upon these divergent perspectives to analyze the issues fully and derive fair and equitable solutions for all of the creditor constituencies. Each critical issue triggered intense and robust debate among the Applicants from both legal and business perspectives. Often these discussions occurred on multiple occasions, as issues were thoroughly analyzed. Committee counsel presented an overview of the issues and in-depth analyses as required, but Applicants relied upon their own individual counsel as they advanced and evaluated different positions at every stage of the process and tested the various theories. Furthermore, Committee counsel regularly solicited the views of the Members' individual counsel to supplement and provide perspective to Committee counsel's initial take on these issues and, in particular, the consequences of different potential resolutions on the divergent interests of the different creditor groups.

68.    Substantive consolidation provides one example of a critical issue for which Applicants took extraordinary steps with regard to the plan process that required the advice of independent counsel. In March 2010, the Debtors filed their first proposed plan of

reorganization, which provided for certain economic settlements based on the risk of substantive consolidation but recognized the legal separateness of the Debtors.[82]  Applicants recognized the seriousness and seeming intractability of this issue early in the process of plan formulation, and it was the subject of impassioned debates within the Committee.  To fully air the relevant issues and conflicting arguments, Applicants took the unique step of setting up an internal moot-court-like debate.  Individual counsel to certain Committee Members made presentations to the Committee regarding their analysis of substantive consolidation issues, including how the law of substantive consolidation and related state-law doctrines should impact the claims of foreign debtor affiliates, such as LBT and the guarantee claims asserted against LBHI by the holders of claims against those foreign debtor affiliates.  Applying this analysis, Applicants began to develop a plan premised on an economic model that provided for creditor recoveries that fell between the recoveries under the polar opposite positions—complete substantive consolidation or complete non-consolidation of the Lehman entities—asserted by the two sides to the debate.

69.    As the plan process progressed, issues relating to the proper treatment of claims of foreign affiliate debtors, such as LBT, and the holders of guarantee claims against LBHI arising from primary claims against the foreign affiliate debtors were extensively debated.  During this time and continuing through the proposal of the consensual Plan, new plan iterations were discussed, proposed and analyzed by Applicants.  As plan discussions continued, Applicants' plan model and the Committee's increased appreciation of and fluency with substantive consolidation and other intercreditor issues was applied to various issues raised across the capital structure.

---

[82]    *See* Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, dated March 15, 2010 [Dkt. # 7572].

70.     While Applicants debated various plan constructs, the Debtors' initial proposed

plan met with resistance.   An ad hoc group of LBHI creditors ("**Ad Hoc Group**") filed a

competing joint Chapter 11 plan for all of the U.S. Debtors on December 15, 2010 that provided

for substantive consolidation.[83]   On April 25, 2011, a second group of creditors filed a third

competing plan for all but a few of the Debtors, which in contrast to the Ad Hoc Group's plan,

did not propose to substantively consolidate the Debtors.[84]

71.     Throughout this process, certain of the Applicants conferred with the Debtors,

various ad hoc groups and representatives of non-U.S. affiliated debtors to fully understand and

evaluate the different positions of the parties, including novel concepts including substantive

consolidation with non-U.S. affiliated debtors.

72.     The Committee ultimately arrived at a unique plan recovery model that differed

greatly from the initial plan proposed by the Debtors.  The Committee recovery model called for

a reallocation of creditor recoveries among the various estates to fairly reflect the probability of

outcomes if the issues in controversy were litigated.  This was no easy feat given the divergent

interests of the multiple constituencies involved and the fact that achieving even small changes in

plan recoveries resulted in the movement of millions of dollars between estates.

73.     Tax issues also complicated the plan analysis and efforts to reach a middle

ground.  Tax issues that arose in connection with the formulation of the plan included, without

limitation, analysis of the tax implications of the disposition of major assets such as the Debtors'

_____

[83]     *See* Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and
Certain of Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset
LLC Proposed by the Ad Hoc Group of Lehman Brothers Creditors, dated December 15, 2010 [Dkt. #
13504].

[84]     *See* Joint Chapter 11 Plan for Lehman Brothers Holdings Inc. and Its Affiliated Debtors Other
Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed by Non-Consolidation
Plan Proponents, dated April 25, 2011 [Dkt. # 16229].

bank affiliates, the allocation of tax liabilities among the corporate group (including foreign tax credits) and tax issues created by the plan reallocation mechanism and the use of a liquidating trust structure. Applicants required the assistance of counsel to understand the tax implications of the plan structure and the impact on creditor recoveries for the different debtor estates.

74. The Committee was able to formulate a consensual economic resolution by hashing out the issues internally, but outside of the Committee room the plan process was and threatened to remain contentious. In addition to the substantive consolidation and intercompany and foreign affiliate claims issues outlined above, which divided creditors into groups with starkly different positions, creditor groups also raised issues regarding the breadth and effect of provisions in various intercreditor agreements that further complicated the analysis of recoveries under the plan.

75. As of early 2011, the Debtors had filed an amended plan[85] and the two most active creditor groups were pressing forward with their own plans—one plan premised on complete substantive consolidation and the other on complete non-consolidation. Thus, there were three separate and irreconcilable plans filed with the Court that were proceeding toward confirmation on a collision course. The Debtors accordingly filed a motion seeking to establish detailed discovery procedures to govern a discovery exercise that all parties feared would be lengthy and massive given the existence of multiple proposed plans premised on different

---

[85]     *See* First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, January 25, 2011 [Dkt. # 14150].

resolutions of fact-intensive issues, such as substantive consolidation.[86]  Applicants participated

in the creation and negotiation of the Plan discovery protocol that was approved by this Court.[87]

76.    The Committee, armed with the blueprint for a viable plan recovery construct,

worked tirelessly to advocate its position.  As a result of Applicants' efforts, the Committee and

the Debtors were then able to advance a revised proposal that bridged the gap between the

competing plan proponents by addressing the concerns of the divergent creditor groups, thereby

eliminating the need for competing plans.  This revised proposal ultimately engendered a global

resolution composed of the interrelated settlements embodied in the Debtors' Second Amended

Joint Plan, which was filed on July 1, 2011 and formed the basis for the Plan that was eventually

confirmed.[88]  Confirmation of the consensual Plan spared the estates the cost and delay of

litigating issues related to substantive consolidation, intercompany claims, intercreditor claims

and the enforceability of guarantees against LBHI.  Instead, the Plan provided for a consensual

reallocation of creditor recoveries to reflect the likely outcomes had such issues been litigated.

77.    **Structured Securities**.  Applicants also played an instrumental role in resolving

disputes regarding the valuation of certain structured debt securities issued by LBHI and other

domestic and foreign Lehman entities ("**Structured Securities**").  Under these securities, the

amounts due at maturity or periodic interest payments were linked to the performance of an

underlying asset or group of assets, including global indices, single stocks, currencies, interest

---

[86]    *See* Debtors' Motion Pursuant to Section 105 of the Bankruptcy Code and Rule 7026 of the Federal Rules of Bankruptcy Procedure for Authorization to Establish and Implement Procedures in Connection with Discovery Related to Plan Confirmation, dated March 8, 2011 [Dkt. # 14867].

[87]    *See* Order Establishing Schedule and Procedures in Connection with Discovery Related to Plan Confirmation and Other Issues, dated April 14, 2011 [Dkt. # 16003].

[88]    *See* Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, dated June 30, 2011 [Dkt. # 18204].

rates, and various credit derivative instruments and baskets of instruments.[89]  More than 21,000

claims arising under the Structured Securities in the aggregate amount of approximately $55

billion were filed against the Debtors.[90]  Structured Securities issued by various Lehman entities

were purportedly guaranteed by LBHI.  Estimation of the amount of these claims for voting and

distribution purposes was an essential component of the plan settlement.

78.     Because of the lack of controlling authority regarding the valuation of these

complex and exotic instruments, the Structured Securities raised knotty problems that threatened

to derail the fragile coalition in favor of the proposed plan of reorganization.  There were many

competing and incompatible valuation methodologies proposed by Lehman and interested

creditors, and the time and expense associated with litigating the allowed amounts of the

Structured Securities claims would have been, as the Debtors noted, "extraordinarily burdensome

on the Debtors, the claimants and the Court."[91]

79.     The members of the Structured Securities Working Group and their individual

counsel brought a sophisticated perspective to the analysis of the novel issues raised by valuation

of the Structured Securities.  The Committee's professionals freely and frequently sought the

Working Group's input as they worked with the Debtors' professionals and other creditors to

fashion a valuation approach that would be fair to the claimants and the Lehman estates and

reasonably acceptable to all parties.  Applicants and their counsel spent considerable time

analyzing the Structured Securities and vetting the valuation methodology proposed by the

---

[89]     *See* Discl. St. § V.D., at 48.

[90]     *Id*. at 49.

[91]     *See* Motion Pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and Bankruptcy Rule
9019 for Approval of Procedures for Determining the Allowed Amount of Claims Filed Based on
Structured Securities Issued or Guaranteed by Lehman Brothers Holdings Inc., dated April 27, 2011 [Dkt.
# 16294], at 5.

Debtors.   They also met directly with the Debtors' professionals to negotiate changes to the initially proposed methodology.   As a result of the work of Applicants and their counsel, the Debtors proposed a modified valuation methodology that was accepted by the various constituencies without the need for costly and time-consuming litigation.[92]

## ARGUMENT

## I.    Applicants' Actions Merit Substantial Contribution Awards.

### A.    Legal Standard

80.    Section 503(b)(3)(D) of the Bankruptcy Code provides that a court shall allow, as an administrative expense, the actual and necessary expenses incurred by a creditor or indenture trustee that makes a substantial contribution in a Chapter 11 case.[93]   Section 503(b)(4) allows for reimbursement of reasonable compensation for services rendered, and for reimbursement of actual and necessary expenses incurred, by an attorney of any such entity.[94]   Section 503(b)(5)

---

[92]    *See* Discl. St., § V.D., at 48-49 (describing the Structured Securities and the valuation methodology), and Exhibit 11 (Structured Securities Valuation Methodologies).

[93]    Section 503(b)(3)(D) provides: "[T]here shall be allowed, administrative expenses . . . including—the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title[.]"

[94]    Section 503(b)(4) provides: "[T]here shall be allowed, administrative expenses . . . including—(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]"

41

allows for reimbursement of reasonable compensation in connection with services rendered by indenture trustee in making a substantial contribution in a Chapter 11 case.[95]

81.   Judge Sullivan ruled that an individual member of an official creditors' committee is entitled to seek a substantial contribution award under Section 503(b)(3)(D) and (4). *Lehman II*, 508 B.R. at 294 ("To the extent official committee members perform extraordinary work to benefit the estate, above and beyond normal committee duties, they may, as will be explained below, seek to be reimbursed under § 503(b)(3)(D) and 503(b)(4), which provide for payment of the professional fees incurred by entities that have made a 'substantial contribution in a case.'"); *see also Lehman I*, 487 B.R. at 190 n.8 ("[A] creditor, even one serving on an official creditors' committee, can seek to have his, her or its attorney/accountant fees reimbursed for having made a 'substantial contribution' under Section 503(b)(3)(D)."). The District Court further held that the substantial contribution standard applicable to committee members is no different than the standard applied to non-committee creditors.[96]

82.   The substantial contribution provisions of the Bankruptcy Code are intended to "promote meaningful creditor participation in the reorganization process" while keeping administrative expenses to a minimum. *In re U.S. Lines, Inc.*, 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989). When an applicant's efforts are of such a nature and extent that the estate as a whole benefits, the reasonable costs of those efforts may be shifted to the estate. *See In re S & Y Enters., LLC*, 480 B.R. 452, 461 (Bankr. E.D.N.Y. 2012).

---

[95]   Section 503(b)(5) provides: "[T]here shall be allowed, administrative expenses . . . including— (5) reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case under chapter 9 or 11 of this title, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title[.]"

[96]   *See* Certification Order, at 5 n. 1.

83.     The inquiry under Section 503(b)(3)(D), (4) and (5) is a factual one.  *See In re Bayou Grp., LLC*, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010).  Courts examine the totality of the relevant facts when determining whether a party's actions substantially contributed to the case.  *See In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. 246, 253 (Bankr. D. Colo. 1990) (applicant's efforts "viewed as a whole" made a substantial contribution to the case). Determining whether a substantial contribution standard has been made is left to the discretion of the court, on a case-by-case basis.  *9085 E. Mineral Office Bldg.*, 119 B.R. at 249 n.9; *see also In re S & Y Enters.*, 480 B.R. at 461 (the substantial contribution analysis is "case-specific and fact-intensive").

84.     The Bankruptcy Code does not define the term "substantial contribution."  Courts have held that an applicant has substantially contributed to a Chapter 11 case if it has provided "a substantial contribution to the estate as demonstrated by benefit to the estate, the creditors and, to the extent relevant, the stockholders."  *In re McLean Indus., Inc.*, 88 B.R. 36, 38 (Bankr. S.D.N.Y. 1988) (internal quotations and citation omitted); *In re U.S. Lines*, 103 B.R. at 429.  An applicant need not establish that its efforts alone and exclusively resulted in a substantial contribution to a debtor's estate; rather, an applicant need only show a credible causal connection between its efforts and the contribution.  *See In re Granite Partners, L.P.*, 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997).

85.     To determine whether an applicant has made a substantial contribution to a Chapter 11 case, courts in the Second Circuit have considered various factors in determining whether a creditor has conferred an actual demonstrable benefit, including: (i) whether the services benefited the creditor, the estate itself, or all of the parties in the bankruptcy case; (ii) whether the services resulted in a significant and demonstrably positive benefit to the estate;

43

and (iii) whether the services duplicated the efforts of others.  *See In re Best Prods. Co., Inc.*, 173

B.R. 862, 865 (Bankr. S.D.N.Y. 1994).  Each of these standards is satisfied here.

B.    **Reimbursement of Applicants' Reasonable Fees as a
Substantial Contribution is Appropriate and Justified.**

i.    *Applicants Performed Extraordinary Services, Over and Above That
Normally Required of Committee Members, on Behalf of All Creditors
of the Estate.*

86.    As set forth below, Applicants met the extraordinary challenges of these Chapter

11 Cases by providing extraordinary services, which inured to the benefit of all creditors.

87.    The Chapter 11 Cases were described by the Court as "the biggest, the most

incredibly complex, the most impossibly challenging international bankruptcy that ever was."[97]

Lehman was in liquidation from the start, but lacked the employees or systems necessary to

manage and liquidate its complex asset classes.  The complexity of the Chapter 11 Cases was

exacerbated by the number of Lehman foreign affiliates, the interrelated business lines and

affiliate transactions and the pendency of numerous parallel insolvency proceedings in foreign

jurisdictions all over the world.  As a result, Applicants were tasked with and performed

extraordinary work, vastly exceeding the usual "consult and review" role required of committee

members.

88.    Acting as a parallel management team, Applicants participated almost daily in the

management and liquidation of the complicated maze of businesses and asset classes that

comprised the Lehman Debtors and their affiliates.[98]  As described above, these assets included:

(a) sophisticated and esoteric derivatives products, (b) varied complex real estate investments,

(c) private equity investments of different types in diverse industries, (d) a loan book that

---

[97]    *See* Dec. 6 Hearing Tr., at 68:24-25.

[98]    *See* Disc. St., § IV.B., at 21 ("The Creditors' Committee and its professionals have participated
actively, together with the Debtors and their professionals, in, among other things, reviewing the Debtors'
business operations across all of the Debtors' business lines as well as to all matters relating to the
administration of the Chapter 11 Cases and the formulation of the Plan.  These meetings occur on an
almost daily basis.")

included debt in every tranche in every level of the capital structure, and (e) regulated

commercial banks.  Given the number of transactions to be evaluated and the diversity and

complexity of these transactions, an enormous amount of time commitment, creativity and

business and legal acumen was required of Applicants and their individual counsel.

89.    The Subcommittees met frequently (some twice or more a week), in addition to

regular committee meetings, to understand the nature and scope of each of the Debtors' business

lines, worked closely with the Debtors and their professionals to manage assets, certain of which

required funding or cash infusions to preserve value, and strategized about and proposed the best

options for liquidation of the Debtors' assets to maximize estate value.   This work carried over

to Committee meetings.  Among other things, Applicants:

> a.    communicated regularly with the Debtors and participated in the
> management of the Debtors' businesses pending their ultimate
> liquidation;
>
> b.    worked closely with the Debtors and their professionals regarding
> a global strategy for the timing and method for liquidation of the
> Debtors' various businesses and assets by analyzing, critiquing,
> supplementing and proposing liquidation options for the different
> asset classes;
>
> c.    acted as gatekeepers by creating, in collaboration with the Debtors,
> formal and informal protocols that facilitated the management and
> wind-down of each of the Debtors' asset classes, including the
> administration and settlement of derivative transactions, the
> management of a corporate loan portfolio and domestic banks,  and
> the administration and sale of assets in the Debtors' real estate and
> private equity portfolio;
>
> d.    eliminated the need for court approval of numerous transactions
> below a certain court-approved threshold and streamlined court
> proceedings for those transactions requiring court approval by
> vetting,  negotiating  and  proposing  changes  and  making
> recommendations to the court thus allowing these transactions to
> be approved without extensive and expensive litigation; and

e.    participated actively in the analysis, valuation and resolution of disputes involving the Debtors' complex structured securities.

90.    Participation in the management and liquidation of Lehman's assets was only the first step taken by Applicants towards the successful consummation of the Chapter 11 Cases. From the inception of these cases, Applicants worked to promote plan confirmation by analyzing, resolving and eliminating numerous obstacles to confirmation, including disputes over substantive consolidation, the treatment of intercompany claims and guarantees, foreign affiliate claims, subordination, structured securities valuation and, ultimately, three competing plans of reorganization. Applicants played a key role in the creation of a plan model that served as the basis for resolution of the disparate competing plans through the confirmed Plan. Applicants' efforts with respect to this economic model contributed in large part to bringing diametrically opposed creditor groups to a middle ground that compromised the disputed issues in accordance with appropriate risk assessments and served as the basis for the consensual Plan.

91.    There is no question that Applicants' efforts were intended to and did benefit the bankruptcy estates and their creditor constituencies as a whole. Any benefits derived by Applicants individually or the creditors they represented were no different than the benefits enjoyed by similarly-situated creditors. In any event, most activities of an interested party that result in a substantial contribution will benefit that party to some degree, but self-interestedness does not in and of itself preclude reimbursement for those efforts. *See Celullar 101, Inc. v. Channel Commc'ns, Inc. (In re Cellular 101, Inc.)*, 377 F.3d 1092, 1098 (9th Cir. 2004); *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994); *In re S & Y Enters., LLC*, 480 B.R. 452, 463 (Bankr. E.D.N.Y. 2012) (citing *In re AmFin Fin. Corp.*, 468 B.R. 827, 833 (Bankr. N.D. Ohio 2012)); *In re Ocean Blue Leasehold Prop. LLC*, 414 B.R. 798, 808 (Bankr. S.D. Fla. 2009) (substantial contribution analysis emphasizes the value of, and not the motivation behind, the

47

creditor's contribution to the resolution of the chapter 11 case);  *In re U.S. Lines*, 103 B.R. at 430

(services that confer a significant and demonstrable benefit and which have not been rendered

solely on behalf of a creditor's own interest should be compensated).[99]

> ### ii.   *Applicants' Services Conferred a Significant, Direct and Demonstrable Benefit on the Estate.*

92.   Applicants' efforts resulted in significant, direct benefits to the estates and their

creditor constituencies, both in terms of (a) enhanced recoveries on assets through the creation

and implementation of protocols for the settlement of disputes and asset sales and the day-to-day

management and strategies created and implemented for maximizing values, and (b) the

avoidance of multiple and massive litigation costs in connection with disputes arising during the

Chapter 11 Cases and, particularly, in connection with confirmation of the Plan.  These benefits

included:

i.   the realization of more than $12.2 billion from derivative settlements, as of December 31, 2010;[100]

ii.   the collection of approximately $10.3 billion from the liquidation of the private equity portfolio as of March 31, 2015;[101]

iii.   the recovery of more than $13.2 billion from the liquidation of the real estate portfolio, as of December 2011 projections;[102]

iv.   the preservation of a loan book portfolio that the Debtors estimated, as of August 24, 2011, would yield gross proceeds of approximately $4.8 billion;[103]

---

[99]   Thus, "a creditor's motive in taking actions that benefit the estate has little relevance in the determination whether the creditor has incurred actual and necessary expenses in making a substantial contribution to a case."  *Hall Fin. Grp., Inc. v. DP Partners, Ltd. P'ship (In re DP Partners Ltd. P'ship)*, 106 F.3d 667, 673 (5th Cir. 1997).

[100]   *See* Discl. St., § IV.H.1, at 34.  The total projected recovery from the derivatives portfolio is more than $17 billion.  *See* Supplemental Becker Declaration, at 15-16.

[101]   *See* Monthly Operating Reports.

[102]   *See* Discl. St., § IV.H.2, at 35.

      v.     the avoidance of significant legal expenses associated with multiple contested matters and adversary proceedings through the creation and implementation of ADR procedures and other protocols for out-of-court resolution of disputed matters and transaction approvals; and

      vi.    estate savings of hundreds of millions of dollars in estimated litigation costs associated with extended contested plan proceedings to resolve which of the three competing plans filed in the Chapter 11 Cases should be confirmed, if any.[104]

93.    Courts have long recognized that making significant contributions, as Applicants have, to a successful Chapter 11 plan provides a basis for substantial contribution awards.[105] *See In re Lehal Realty Assocs.*, 112 B.R. 588, 590 (Bankr. S.D.N.Y. 1990) (actions by creditor that led to consummation of chapter 11 liquidation plan compensable as substantial contribution); *In re Granite Partners, L.P.*, 213 B.R. at 446 (substantial contribution appropriate where applicant "took an active role in facilitating the negotiation and successful confirmation of the plan"); *Speights & Runyan v. Celotex Corp. (In re Celotex Corp.)*, 227 F.3d 1336, 1340-41 (11th Cir. 2000) (applicant worked tirelessly for several years toward consensual resolution of chapter 11 case); *In re Baldwin-United Corp.,*, 79 B.R. 321, 341-44 (Bankr. S.D. Ohio 1987) (substantial contribution made where applicant mediated disputes among parties in interest leading to development of consensual plan); *In re Encapsulation Int'l Inc.*, No. 96-31762 WHB, 1998 WL

---

[103]     *See* Discl. St., § IV.H.3, at 36.

[104]     Professional fees in the Lehman cases aggregated approximately $300 million annually. Confirmation of the consensual plan thus saved the estate a year of costly litigation over the competing plans and other fees that would have been incurred in connection with the administration of the Chapter 11 Cases (approximately $200 million to $400 million in total).

[105]     Substantial contribution is not limited, however, solely to efforts that lead to plan confirmation. *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 945 (3d Cir. 1994) (analyzing legislative history of Section 503(b)(D)).

801898, at *4-5 (Bankr. W.D. Tenn. Nov. 9, 1998) (reimbursing a creditor for fees and expenses incurred in connection with efforts that led to confirmation of a consensual plan of liquidation).

94.    In addition, the Committee's diverse makeup of creditors holding claims at different levels of the capital structure and against different debtor-estates allowed Applicants to bring unique perspectives to issues that arose throughout the Chapter 11 Cases and during the plan negotiation process.    By assuming the workload of multiple committees representing separate creditor constituencies in different debtor-estates, Applicants helped save significant administrative expenses that would have been incurred by multiple committees and were able to achieve settlements culminating in a consensual Plan, within a much more compressed time frame than would normally be expected.    Indeed, much of the legal analysis that would have driven the different positions of separate committees for different estates was provided by Applicants' individual counsel.    It is well-settled that activities that bridge differences between parties[106] or result in estate savings[107] also provide a basis for substantial contribution awards.

---

[106]    Courts recognize that the direct benefit element can be satisfied by other than a quantifiable monetary benefit.  *In re Energy Partners, Ltd.*, 422 B.R. 68, 83 (Bankr. S.D. Tex. 2009) ("[t]he question whether the estate has been benefitted cannot be so narrowly confined.") (quoting *Matter of TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1420 (5th Cir. 1992)); *Bodin Concrete, L.P. v. Concrete Opp'y Fund II, LLC*, No. 3:14-CV-1695-K, 2014 WL 5431588, at * 2 (N.D. Tex., Oct. 23, 2014) ("To assume that the benefit could always be quantified and, therefore, be a requirement of the substantial contribution analysis is wrong[.]")  The estate may receive "other less readily calculable benefits" such as "lowering the 'temperature' of a case by preventing excessive litigation and encouraging cooperation." *See In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 282-83 (Bankr. W.D. Tex. 2005) (citing *In re Baldwin-United Corp.*, 79 B.R. at343).

[107]    *See In re Mirant Corp.* 354 B.R. 113, 136 (Bankr. N.D. Tex. 2006) (applicant's actions eliminated issue that might have required attention at the confirmation hearing, saving the estate costs and time); *In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. at 255 (objection to fee application resulting in fee reduction provided substantial contribution); *In re FF Holdings Corp.*, 343 B.R. 84, at 87 (D. Del. 2006) (applicant's actions led to withdrawal of sole objection to confirmation, saving the estate the expense of a hearing and potential losses that could have resulted from a delay in the plan's confirmation).

95.    In earlier proceedings before this Court, Judge Peck recognized that Applicants' efforts in reconciling the competing interests of the different Lehman estates and their disparate groups of creditors was a significant benefit to the Lehman estates:

> The issues presented in this contested fee dispute are linked to the successful negotiations that culminated in the formulation and confirmation of the Plan. This process of negotiation and consensual dispute resolution was unprecedented in its complexity and involved exceptionally difficult questions that implicated distribution rights and creditor treatment. Issues in relation to substantive consolidation and re-characterization were overwhelmingly complicated and unpredictable. A contested confirmation would have been virtually impossible to litigate. Settlements were needed and emerged as the only practical alternative to avoid a monumental and unmanageable confirmation battle.
>
> These settlements are the foundation of the Plan, and the Applicants individually take some of the credit for having helped to bring the chapter 11 cases of Lehman Brothers Holdings Inc. and its affiliated debtors (the "Debtors") to a successful conclusion. Presumably in recognition of these efforts, the Debtors agreed to pay all of the reasonable fees and expenses, including attorneys' fees, incurred by the Applicants in connection with the chapter 11 cases.

*Lehman I*, 487 B.R. at 187.

96.    Applicants' central role in the formulation, negotiation and confirmation of the Plan and the contributions they made during this process were recognized by others.[108]    At the

---

[108]    Applicants do not claim to be the only parties responsible for bringing these Chapter 11 Cases to a successful conclusion. Rather, as Judge Peck recognized in granting other substantial contribution awards, the extraordinary accomplishments in these Chapter 11 Cases were the results of the efforts of disparate groups coming together to reach an accord on the terms of a plan of reorganization that would avoid the depletion of estate assets through time consuming and expensive litigation. *See* Transcript of September 19, 2012 Hearing, at 29:13-20 ("And to be clear, for reasons similar to the ones that were expressed during Mr. Shore's presentation, the dialectic of a consolidation plan, a non-consolidation plan and a plan in the middle prove to be a useful means to putting this case to a culmination of a consensus and no one party can take credit, but all parties can take credit."). An applicant seeking payment of fees and expenses under Section 503(b) is not required to establish that its efforts alone and exclusively resulted in a "substantial contribution" to a debtor's estate; rather, the applicant need only demonstrate a credible causal connection between its efforts and the contribution. *See In re Granite Partners, L.P.*, 213 B.R. at 447. As has been demonstrated, Applicants played a key role in managing the liquidation of the Debtors' diverse assets and in the formulation and consummation of a consensual Plan.

confirmation hearing, Harvey Miller, lead counsel to the Debtors, stated that "[t]his was not a settlement, Your Honor, that was derived or formulated exclusively by the Debtors. The unsecured creditors' committee was an active, active proponent in the development of these compromises and these settlements."[109]  The Debtors also supported the Original Application by submitting a declaration of their CEO in support (*see*, *supra*, n. 13).  No economic stakeholder opposed the payment of fees and expenses requested under the Original Application, which also weighs in favor of the grant of substantial contribution awards to Applicants.  *See Bodin Concrete, L.P. v. Concrete Opportunity Fund II, LLC*, 2014 WL 5431588,  at * 1 (affirming bankruptcy court award of substantial contribution reimbursement where bankruptcy court had noted general creditor support of application as part of overall factual record supporting its award).

### iii.    *Applicants' Services Were Necessary and Not Duplicative of Services Performed by Others.*

97.    Applicants' efforts were not duplicative of Committee counsel's efforts.  First, the sheer volume of complex issues and other almost daily challenges faced by Applicants required the assistance of independent counsel.  While Applicants' representatives on the Committee are all seasoned business persons in their own fields, neither these representatives individually nor the Committee as a whole was expert in the numerous complex business lines of the Lehman enterprise.  Counsel was needed to decipher and understand the legal issues affecting the assets under review and to understand the potential consequences of what were often multiple and divergent proposals for resolution of disputes and liquidation of assets.

---

[109]    *See* Dec. 6, 2011 Hearing. Tr., at 41:24-42:3.

98.     Second, although the Chapter 11 Cases involved many Debtors with disparate creditor groups, only one creditors' committee was formed.  The Committee was populated with diverse creditors who were tasked with protecting adverse creditor groups, analyzing and making decisions regarding complex transactions across debtor-estate lines (including with numerous foreign debtors subject to their own insolvency proceedings) and reconciling competing creditor interests in the formulation of a plan.  It was correctly assumed that the diverse committee composition would meet the adequate representation standards and that Applicants would do the work of multiple committees.  While this lowered the cost of administration of the Chapter 11 Cases as a whole, the extensive and complex work with which Applicants were tasked required them to seek the advice of their own counsel to properly analyze and reconcile the competing issues and positions.

99.     Uniformity of position and resolution of contested issues was rarely attainable at the start of any analysis and issues were intensely debated between and among Committee members.   While Committee counsel provided analyses of the legal issues implicated by a proposal, it was not always in a position to recommend a proposal that might favor one set of creditors over another.  At other times, an Applicant that disagreed with a proposal of Committee counsel or another Applicant required the advice of counsel to provide a counter-proposal or resolution.   When it came to debating these complex issues, challenging proposals and formulating a plan for distribution of the Debtors' assets, individual member counsel played an essential and necessary independent role in reviewing and advising Applicants on issues from different perspectives, often at the request of Committee counsel.

100.    Committee counsel described the separate roles played by Committee counsel and

Applicants' individual counsel with respect to the plan process during the December 19, 2012

hearing on the Original Application:

> [T]his is a sui generis case here in Lehman.  This is a case where the committee members themselves were called upon, to frankly, just do more work than I've ever seen a committee member have to do between the committee and the subcommittees that they were on.  And Your Honor knows that thousands of hours drilling deeply into some of the most complex financial instruments that humans have ever devised.  And they did that at a time when for years they were the only sounding board for the debtors in terms of a proxy or surrogate for the creditor groups at large who were not restricted [and] did not seek non-public information. . . .

> \*    \*    \*

> Lehman was truly exceptional in this regard and it goes without saying, it was exceptional given the size and complexity of it, but I want to put a finer point on it.  What I believe a lot of the roles were for the individual counsels was in connection with the plan, and the whole process of getting ready for the plan, at the end of the day when we were getting prepared to engage the debtors with what we thought would clear the various creditor groups, in terms of acceptable allocations of value among LBHI, LBSF, LCPI and the like, we, the committee's advisors, would present a proposal to the committee which the committee members would then debate it amongst themselves.

> And the assistance of counsel in that process was critical given what we were talking about here.  It was the nature of Lehman's business that was not particularly familiar to any one of the committee members.

> So there was time in the cases where it was actually important for us to use the committee members and the fact that the members held different position—they were—it was put together by the U.S. Trustee's office for exactly this purpose. There [were] people with claims at LBHI. There were people that held claims at LBSF.  And when we called balls and strikes as best we could, it was helpful to take a moment, step back, reflect on and hear what the individual members thought through the prism of where they were at the particular time.

> To kind of stress test whether we — you know, people are all kind of marginally all unhappy with this and think they could do better. That's probably the right place to land which I think was ultimately proved out when we rolled it out to the ad hocs. But that was something I frankly haven't encountered to the same degree, nearly the same degree in any

54

other case before, which I think explains a little bit of what Your Honor was asking as to why they needed individual counsel . . . where you have committee counsel.[110]

Dec. 19 Hearing Tr., at 64:23-65:3; 67:19-69:1-4.[111]

101.   As noted above, the sheer volume of complex issues and transactions facing Applicants on an almost daily basis required that they have advice and analysis of skilled independent attorneys, as this Court previously found.  *See Lehman I*, 487 B.R. at 185 n. 5 ("[T]he Applicants performed services within such an extraordinary setting of complexity that it would have been difficult if not impossible for them to have carried out their duties without being able to confer with their own counsel").

## II.   Alternatively, Applicants' Reasonable Fees and Necessary Expenses Incurred as a Result of Third-Party Discovery of Committee Members Should be Reimbursed Under Section 503(b)(1)(A) and Section 503(b) Generally.

102.   Alternatively, section 503(b)(1)(A) and section 503(b) generally also provide a basis to award administrative expense priority to the fees and expenses incurred in defending against and responding to discovery requests made of Committee Members.  Section 503(b)'s list of expenses eligible for administrative-expense status is not exhaustive.  *See Alabama Surface Mining Comm'n v. N.P. Mining Co*., Inc. *(In re N.P. Mining Co., Inc.)*, 963 F.2d 1449, (11th Cir. 1992) (" It is clear from the face of the statute, however, that expenses not explicitly listed in section 503(b) can receive administrative-expense status in one of two ways, either as a nonlisted 'actual, necessary' expense of preserving the estate under 503(b)(1)(A) or as a nonlisted

---

[110]   The fact that creditor counsel undertakes a task at the request or with the consent of an estate professional creates "a strong presumption that a substantial contribution has been made by such creditor[.]"  *See In re Ocean Blue Leasehold Prop., LLC*, 414 B.R. 798, 810 (Bankr. S.D. Fla. 2009).

[111]   In commenting on the arguments of Committee counsel regarding the role of Applicants as a "beta test of different constituencies in the case as a whole" and their resulting need for advice of individual counsel, the Court expressed its view that a case could be made for substantial contribution. *See* Dec. 19 Hearing Tr., at 98:8-24.

administrative expense under 503(b) in general."); *Younger v. U.S. (Matter of Younger)*, 165 B.R. 965, 968 (S.D. Ga. 1994) ("Although certain types of administrative expenses are listed in the statute, the designations contained in section 503(b) are not exhaustive since use of the word 'including' in the statute is not limiting."); *In re Integrity Supply, Inc.*, 417 B.R. 514, 517 (Bankr. S.D. Ohio 2009) ("It is well established [that] the subsections of 503(b) are examples of what may qualify as administrative expenses, but do not limit the Court in deciding what may be allowed as an administrative expense under § 503(b)."); *Pergament v Maghazeh Family Tr.* (*In re Maghazeh*, 315 B.R. 650, 654 (Bankr. E.D.N.Y. 2004) (same).

103.    Courts have recognized that creditors who participate in litigation with the goal of enhancing or otherwise benefitting the estate are entitled to be reimbursed for their expenses. *See, e.g., Maghazeh*, 315 B.R. at 653-55 (compensating United States for legal fees and expenses incurred in connection with its participation in a litigation in an effort to uncover assets was appropriate and warranted). So too here. In conjunction with the Debtors, Applicants assisted in the initiation and prosecution of litigation against third parties to recover assets for and reduce claims against the estate. As a result, Applicants became personal discovery targets of certain defendants and incurred legal fees and expenses in responding to and defending against this discovery, which would not have occurred but for their status as Committee members. Representation by counsel during the discovery proceedings was necessary to limit appropriately the scope and breadth of discovery topics and protect against inadvertent privilege waivers, thus preserving and protecting this important estate asset.

104.    One of the purposes of section 503(b) is to encourage meaningful creditor participation in Chapter 11 cases. *See In re U.S. Lines, Inc.*, 103 B.R. at 429, *aff'd* 1991 U.S. Distr. Lexis 5262 (S.D.N.Y. Apr. 19, 1991). If creditors are to be encouraged to volunteer to sit

on committees and, as committee members, investigate and pursue claims for the benefit of creditors generally, they should be protected when they become discovery targets as a result. Otherwise, there will be a chilling effect on committee participation by creditors. *See, e.g., In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. at 253 ("This Court speculates that if creditors such as Travelers are subject to too strict of a standard the result would be an unfortunate chilling effect upon the goal of 11 U.S.C. § 503(b)(3)(D) of encouraging the kind of meaningful creditor participation in reorganization proceedings and beneficial service to the interests of all unsecured creditors as is presently before this Court."). Reimbursement of the fees and costs incurred by Applicants in connection with the JPMorgan discovery is consistent with that goal.

### III.    **Applicants' Fees Were Reasonable and Their Expenses Were Necessary.**

105.    After finding that an applicant has made a substantial contribution, courts permit payment of the applicant's reasonable fees "based on the time, the nature, the extent, and the value of such services" and actual and necessary costs.[112] *See* Bankruptcy Code § 503(b)(4); *In re Bayou Grp., LLC*, 431, B.R. 549, 557 (Bankr. S.D.N.Y. 2010).

106.    To determine the reasonableness of attorneys' fees, courts in this jurisdiction, like many others, employ the two-step lodestar analysis. *See In re 1031 Tax Grp.*, LLC, No. 07-11448-MG, 2009 WL 4806199, at *1-2 (Bankr. S.D.N.Y. Dec. 9, 2009)). The lodestar amount is calculated by first multiplying the reasonable number of hours spent by the professional by a reasonable billing rate. *See In re McLean Indus., Inc.*, 88 B.R. at 39.

107.    Step two requires evaluation of the reasonableness of the fee award under the twelve so-called *Johnson* factors, first announced by the Fifth Circuit in *Johnson v. Georgia*

---

[112]    As noted earlier, the U.S. Trustee withdrew its reasonableness objections to the Omnibus Application on March 1, 2013. *See* Ex. C, at ¶¶ 2-3.

*Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). These factors are: (a) the time and labor required for the matter; (b) the novelty and difficulty of the questions presented; (c) the skill needed to perform the services appropriately; (d) the preclusion of the professional from taking other cases by working on the matter; (e) the customary fee involved in similar instances; (f) whether the fee is fixed or contingent; (g) any time limitations imposed by the client; (h) the sums involved and the results obtained; (i) whether the case is desirable or not; (j) experience and ability of the employed professional; (k) the length of the relationship between the professional and the client; and (l) whether awards were granted in similar cases. *In re 1031 Tax Grp., LLC*, 2009 WL 4806199, at *1. In bankruptcy cases, courts also consider the size of the estate and the burden it can safely bear and the cost of comparable services outside of bankruptcy. *In re Gen. Oil Distribs., Inc.*, 51 B.R. 794, 797 (Bankr. E.D.N.Y. 1985).

108.   As demonstrated above and evidenced by the Declarations submitted by Applicants in support of the Amended Application, Applicants' fees and expenses are reasonable in light of the work performed and the results obtained. *First*, the rate structures of Applicants' counsel are comparable to the rates charged to other clients in bankruptcy and non-bankruptcy matters and to counsels' peer law firms. *Second*, the aggregate fees and expenses sought are justified given the complexity, importance and nature of the issues that arose in the Chapter 11 Cases as well as the size of these cases.[113] Applicants and their counsel were required to work

---

[113]   Applicants were paid an aggregate of $26,604,165.34 in fees and expenses under the Fee Order with respect to the pre-Effective Date Period (excluding certain payments to BNY Mellon as described in Exhibit A). Applicants have reduced the total amount sought under Section 503(b) to an aggregate of $19,578,570.87, but reserve their right to seek the entirety of their fees through appeal of the Section 1129(a)(4) Decision to the Court of Appeals for the Second Circuit. In either case, retention of the amounts already paid to Applicants will have little to no impact on distributions to creditors. *See* Lehman I, 487 B.R. at 184 ("A total of approximately $26 million is at stake, but in the context of the Lehman cases, that is not much money.") Indeed, no economic stakeholder objected or complained about payment (continued...)

under significant time constraints to respond to and resolve a vast number of complex, even esoteric, issues and disputes arising across such diverse business sectors as derivatives, structured securities, loan portfolios, banking, private equity, and real estate.  The complexities of the issues presented by the management and liquidation of the Debtors' assets and the plan process were exacerbated by the diverse and competing interests of the different Lehman estates and their creditor constituencies (including the contrary views held by disparate creditor groups on issues such as substantive consolidation and recharacterization of claims held by LBHI), all of whom were represented by one Committee.  Finally, Applicants played an integral role in the accomplishment of a fully-consensual Plan by formulating a consensus-building middle ground that satisfied the needs and desires of competing creditor groups.  Applicants' efforts resulted in the avoidance of lengthy and expensive litigation over which of the three competing plans of reorganization proposed by the Debtors and two ad hoc creditor groups should be confirmed.

109.    Extraordinary results—including the avoidance of what is estimated to be hundreds of millions of dollars in litigation expense—were achieved in these remarkably complex Chapter 11 Cases and in a short time frame.  This was accomplished, in significant part, by Applicants' exceptional efforts.  The compensation sought herein is reasonable.

---

of the fees.  Id. at 184 n. 3 and 186 ("[P]ayment of these fees became an element of the grand bargain that all creditors voted on and accepted by a landslide.").

## CONCLUSION

For the reasons set forth herein, Applicants respectfully request that this Court enter an

order granting the Amended Application, and awarding Applicants the fees and expenses set

forth on **Exhibit "A"** attached hereto.

Dated: New York, New York
        December 18, 2015

<div style="margin-left:40%">

**COVINGTON & BURLING LLP**
By: /s/ Dianne F. Coffino
    Dianne F. Coffino
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
Fax: (212) 841-1010
Counsel for Wilmington Trust Company, as Co-
Chair of the Committee and Indenture Trustee

**LOEB & LOEB LLP**
By: /s/ Walter H. Curchack
    Walter H. Curchack
345 Park Avenue
New York, NY 10154
Telephone: (212) 407-4000
Fax: (212) 504-8058
Counsel for Wilmington Trust Company, As Co-
Chair of the Committee and Indenture Trustee

**STROOCK & STROOCK & LAVAN LLP**
By: /s/ Mark A. Speiser
    Mark A. Speiser
180 Maiden Lane
New York, NY 10038-4982
Telephone: (212) 806-5400
Fax: (212) 806-6006
Counsel for Mizuho Bank Ltd., formerly known as
Mizuho Corporate Bank, Ltd., as Co-Chair of the
Committee

</div>

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**

By: /s/ Michael H. Ahrens

    Michael H. Ahrens

Four Embarcadero Center

Seventeenth Floor

San Francisco, CA 94111

Telephone: (415) 774-3243

Fax: (415) 434-3947

Counsel for The Bank of New York Mellon, as
Member of the Committee and Indenture Trustee


**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By: /s/ Matthew J. Gold

    Matthew J. Gold

551 Fifth Avenue, 18th Floor

New York, New York 10176

Phone: (212) 986-6000

Fax: (212) 986-8866

Counsel for Elliott Management Corp., as Member
of the Committee


**SULLIVAN & WORCESTER LLP**

By: /s/ Richard Hiersteiner

    Richard Hiersteiner

One Post Office Square

Boston, MA 02109

Phone: (617) 338-2800

Fax: (617) 338-2880

Counsel for U.S. Bank National Association, as
Member of the Committee and Indenture Trustee


**ARENT FOX LLP**

By: /s/ David Dubrow

    David Dubrow

1675 Broadway

New York, NY 10019

Phone : (212) 484-3957

Fax: (212) 484-3990

Counsel for The Vanguard Group Inc., as Member
of the Committee