Hearing Date and Time: TBD
Objection Deadline: TBD

**STROOCK & STROOCK & LAVAN LLP**
180 Maiden Lane
New York, NY 10038-4982
(212) 806-5400
*Counsel for Mizuho Bank Ltd., formerly known as Mizuho Corporate Bank, Ltd., as Co-Chair of the Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
                                                              :
**In re:**                                                    :  Case No. 08-13555 (SCC)
                                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                  :  Chapter 11
                                                              :
**Debtors.**                                                  :  Jointly Administered
                                                              :
------------------------------------------------------------- x

# SUPPLEMENTAL APPLICATION OF MIZUHO BANK, LTD. FOR PAYMENT OF FEES AND EXPENSES OF ITS COUNSEL AS A SUBSTANTIAL CONTRIBUTION AWARD BASED ON MIZUHO'S CONTRIBUTION AS (A) A CREDITORS' COMMITTEE MEMBER, (B) CO-CHAIR OF THE CREDITORS' COMMITTEE AND (C) INDIVIDUAL CREDITOR

To The Honorable Judge Shelley C. Chapman, United States Bankruptcy Judge:

Mizuho Bank, Ltd., formerly known as Mizuho Corporate Bank, Ltd. ("Mizuho" or "Applicant") by its undersigned counsel Stroock & Stroock & Lavan LLP ("Stroock"), hereby submits this Supplemental Application for Payment of Fees and Expenses of its Counsel as a Substantial Contribution Award Based on Mizuho's Contribution as (a) a Creditors' Committee Member, (b) Co-Chair of the Creditors' Committee and (c) Individual Creditor (the "Supplemental Application"). Mizuho submits this Supplemental Application pursuant to Sections 503(b)(3)(D) and 503(b)(4) of Chapter 11 of Title 11, United States Code, 11 U.S.C. Section 101 et seq. (as amended, "Bankruptcy Code"), for approval of fees and expenses

NY 75979208

incurred in connection with the above-captioned Chapter 11 cases ("Chapter 11 Cases"). In support of the Supplemental Application, Mizuho respectfully states as follows:

## **PRELIMINARY STATEMENT**

1. Mizuho was member (a "Member") and co-chair (the "Co-Chair") of the Official Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings, Inc. ("LBHI") and its related debtors (together the "Debtors" or "Lehman"). Mizuho served in these capacities for the entirety of the Chapter 11 Cases. Mizuho and certain other Members of the Committee have simultaneously herewith filed an Amended Omnibus Application for certain Individual Members Seeking Approval of the payments by the Debtors of certain fees and expenses (the "Amended Omnibus Application") which amends an earlier application for such relief filed on January 20, 2012 (the "Original Application").

2. Stroock has served as Mizuho's outside counsel for the duration of Mizuho's Committee service. As set forth in the Amended Omnibus Application, Stroock's fees and expenses total $3,026,197.78 through March 6, 2012,[1] the effective date of the Debtors' confirmed plan (the "Plan"), and Mizuho seeks approval of the payment of such amount by the Debtors in full (the "Award").

3. The Amended Omnibus Application details the extraordinary work performed by the Members which greatly benefitted the estates. Mizuho joins in all of the arguments set forth in the Amended Omnibus Application, and believes that on the basis of its Committee membership alone it made a substantial contribution within the meaning of Section 503(b) of the Bankruptcy Code entitling it to payment of the Award in full.

---

[1] The Original Application included fees and expenses incurred through December 31, 2011 which for Mizuho totaled $2,880,938.29.

2

4.     But, as set forth below, as well as in the Declarations of Noel Purcell and John Suckow, dated December 17, 2015 and December 18, 2015, respectively, accompanying Mizuho's Supplemental Application, Mizuho did so much more. From the frenetic and tumultuous initial days of the Committee to the ultimate confirmation of the Plan, Mizuho worked tirelessly as a Co-Chair and beyond that, as an individual creditor, to maximize value for these estates and was able to do so only with the real time and continued advice of its own counsel, Stroock. Accordingly, Mizuho submits this Supplemental Application for a substantial contribution award based upon its contribution not only as Committee member but also in its capacity as Co-Chair and individual creditor.

5.     Mizuho does not seek any amounts greater than the Award; rather the services performed in these additional capacities serves as further and/or independent support for approval of the Award.[2]

## STATEMENT OF FACTS

**Mizuho's Role During the Lehman Chapter 11 Proceeding**

6.     Mizuho's representative, Noel Purcell, served both as Member and Co-Chair of the Committee from its inception on September 17, 2008 through the entirety of the cases and his declaration is annexed hereto as Exhibit A (the "Purcell Declaration" or "Purcell Dec."). As set forth in the Purcell Declaration, and supported by the declaration of John Suckow, former Chief Executive Officer of LBHI, annexed hereto as Exhibit B (the "Suckow Declaration" or "Suckow Dec."), Mizuho played a vital and prominent role in the successful reorganization of these cases, above and beyond normal creditor committee function.

---

[2] For avoidance of doubt, the Award does not include Stroock's fees and expenses included while representing Mizuho and its affiliates in connection with their specific respective claims and positions against the Debtors, and at no time has Mizuho sought such payment from the estates as part of its application herein.

3

NY 75979208

7. The Purcell Declaration demonstrates that:

- Mizuho played a prominent leadership role on the Committee, actively serving (i) as one of the two Co-Chairs, who were the Committee's co-chief executives, prioritizing issues, structuring debate, vetting concerns by individual members and communicating directly with the Debtors' representatives and professionals on a daily basis (Purcell Dec., at ¶ 9) and (ii) on eight of the subcommittees which acted as parallel management with respect to the Debtors' business activities (*Id*. at ¶ 19).

- The issues raised in Lehman were so urgent and critical in nature and magnitude that Mr. Purcell's involvement amounted to practically a second full-time job and required the guidance throughout of Mizuho's own counsel. (Purcell Dec., at ¶ 18). Indeed, Mizuho made it clear to Mr. Purcell that he could not serve as Co-Chair without Stroock serving as Mizuho's counsel. (*Id.*).

- The Co-Chair role propelled Mizuho into the center of the Plan negotiation process and lead to Mizuho playing a critical role for important business decisions affecting the Plan, as well as interfacing with the Debtors' management, the rest of the Committee and other parties-in-interest regarding plan issues. (Purcell Dec., at ¶¶ 22-29). The Committee's resolution of these fundamental issues among themselves proved absolutely critical to the success of the Plan process, as the Committee formulated a construct which served as the blueprint for the Plan ultimately proposed and confirmed by the Bankruptcy Court. (*Id.*, at ¶ 24).

- As will be more fully set forth here and in his Declaration, Mr. Purcell's input on matters ranging from the plan structure to non-debtor bank affiliate dispositions to real estate transactions (as well as, <u>inter alia</u>, Stroock's identification and efforts to have Debtors

4

properly allocate $2.9 billion in the structured securities valuation process), resulted in direct and tangible benefits to these estates and their creditors.

- Mizuho's extraordinary level of commitment and input as an individual creditor, based upon Mr. Purcell's expertise in various critical business sectors such as banking and real estate, stand apart from and in addition to its Co-Chair and Committee Member functions. (Purcell Dec. at ¶¶ 30-32).

- Mizuho's unique contribution in its capacity as individual creditor is further demonstrated by Debtors' request that Mizuho, together with Stroock (known for its extensive expertise in derivatives transactions), (i) be a part of the group developing the model for derivative settlements, and (ii) that Mizuho participate in discussions that resulted in the "Big Bank Framework," notwithstanding the fact Mizuho did not hold one of the thirteen largest derivative claims. (Purcell Dec., at ¶ 30 (p. 19)).

8. Importantly, this Court need not rely solely on Mizuho's assertions regarding its role. Mr. Suckow, LBHI's former Chief Executive Officer, corroborates the significant benefit provided by Mizuho "in terms of (i) its participation in formulating a consensual plan in one of the most difficult and complex set of cases ever filed, and (ii) its contribution in maximizing the value of the unique and diverse assets held by the estates" and labels those services "extraordinary in amount and quality." (Suckow Dec. at ¶ 5). In particular, Mr. Suckow acknowledges that Noel Purcell specifically "made himself available for countless calls, meetings and discussions during and after business hours, on weekends and on holidays" and that Mr. Purcell was often a "daily" visitor to Lehman's offices. (*Id.*, at ¶ 6).

9. Further Mr. Suckow points to the "unique and significant" perspective Mizuho brought to the process "based upon its experience in the real estate and banking communities and

5

its creditor standing," (Suckow Dec. at ¶ 9), as well as the value to Lehman's management of Mr. Purcell's input "on many matters of critical importance throughout the course of those cases." (*Id,*. at ¶ 6).  Mr. Suckow, himself, concludes that "there can be little dispute that Mr. Purcell's involvement was above and beyond a normal creditor committee member's participation." (*Id.*, at ¶ 9).

## ARGUMENT

### MIZUHO IS ENTITLED TO A SUBSTANTIAL CONTRIBUTION AWARD BASED UPON ITS SERVICE AS COMMITTEE CO-CHAIR AND INDIVIDUAL CREDITOR AS WELL AS COMMITTEE MEMBER.

10. Section 503(b) of the Bankruptcy Code provides that where a creditor makes a substantial contribution to a chapter 11 case, such creditor shall receive an administrative expense claim equal to its actual and necessary expenses, including the reasonable fees and expenses of its attorneys. *See* 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4).  Generally, Courts find that a creditor has provided a substantial contribution when "extraordinary creditor actions … lead directly to tangible benefits to the creditors." *In re Bayou Group, LLC*, 431 B.R. 549, 560-61 (Bankr. S.D.N.Y. 2010).  Thus, Courts have held that a creditor provided a substantial contribution when "a creditor . . . actively facilitated the negotiation and successful confirmation of the chapter 11 plan" or where the "creditor's efforts led to a concrete, measurable monetary benefit for the estate." *See, id.* at 562; *see also*, *In re Granite Partners*, 213 B.R. 440, 446-47 (Bankr. S.D.N.Y. 1997).

11. In these Chapter 11 cases, Judge Sullivan ruled that an individual member of an Official Creditors' Committee is entitled to seek a substantial contribution award, *see Davis v. Elliot Mgt. Corp. (In re Lehman Brothers Holdings Inc.)*, 508 B.R. 283, 294 (S.D.N.Y. 2014) ("*Lehman II*"), and the Amended Omnibus Application reflects in detail the extraordinary work

6

NY 75979208

performed by the individual Members and the enormous benefit yielded which entitle the Members to a substantial contribution award. There can be no doubt that Mizuho was at the forefront of the Committee functioning, having served since the inception of the cases, participated on all subcommittees except one, and shaped the governance of the post-confirmation Lehman.

12. For Mizuho, however, additional facts—set forth in great detail in the Purcell and Suckow Declarations—overwhelmingly weigh in favor of granting Mizuho a substantial contribution award in full both in its capacity as Co-Chair and individual creditor.

13. Here, Mizuho's extraordinary efforts "lead directly to tangible benefits to" Lehman creditors –and not just Mizuho alone. The Purcell Declaration demonstrates unequivocally Mizuho's critical role in connection with major real estate transactions involving the estates' assets; significant involvement and contribution to various successful banking and financial transactions which helped net the estates millions of dollars and avoid the incurring of billions in liabilities. Mizuho's substantial contribution included, but was not limited to:

**Mizuho's Substantial Contribution to the Plan Process and Other Critical Issues**

14. Courts have not hesitated to find that a creditor provided a substantial contribution when it took an active and significant leadership role in the negotiation and confirmation of a consensual plan. *In re Granite Partners, L.P.,* 213 B.R. at 446 (Court ordered substantial contribution award where creditor "took an active role in facilitating the negotiation and successful confirmation of the plan."); *see also Spreights & Runyon v. Celotex Corp. (In re Celotex Corp.*, 227 F.3d 1336, 1340 (11th Cir. 2000) (finding substantial contribution where, among other things, party "worked tirelessly for several years ... to help the Debtors and other parties avoid an expensive, time consuming confirmation battle and develop a nearly consensual,

7

confirmable plan of reorganization."); *In re Bayou Group, LLP,* (Substantial contribution pursuant to Sections 503(b)3)(D) and/or 503b(4) can be granted where "a creditor who actively facilitated the negotiation and successful confirmation of the chapter 11 plan or, in opposing a plan, brought about the confirmation of a more favorable plan); *In re Lehal Realty Assocs.,* 112 B.R. 588, 590 (Bankr. S.D.N.Y. 1990) (same).

15. Here, Mizuho undertook a prominent leadership role in the process to develop and negotiate the Plan which led to a global consensual resolution that saved the estates millions of dollars that would have been incurred in protracted litigation. (Purcell Dec. at ¶¶ 22-29; Suckow Dec. at ¶ 5). The robust debate and extensive negotiation conducted by the Committee, which as Co-Chair, Mizuho helped to lead, proved critical in resolving some of the most significant issues in the case, including substantive consolidation, inter-company claims and inter-creditor claims. (*Id.*, at ¶ 23). Mizuho, advised at all relevant times by Stroock, continually assessed the probability of success on various legal issues, including substantive consolidation and the enforceability of guarantees, in considering the various recovery scenarios. (*Id.*). Ultimately, the Committee's resolution of these issues on behalf of all creditors—without any litigation—resulted in the formulation of a construct which served as the blueprint for the plan proposed and confirmed by the Bankruptcy Court. (*Id., at ¶ 24).* The Plan was approved by over 99% of the voting creditors and even Judge Peck recognized the unique accomplishment. (*Id.*).

16. As Co-Chair, Mizuho was also a leader among Committee members. As set forth in the Purcell Declaration, Mizuho advocated zealously on behalf of the unsecured creditor body as a whole during the plan process—without regard to whether the particular issue related to Mizuho's bank loan claim or its various other claims—and during the balance of the case. (Purcell Dec., at ¶ 26). For example, Stroock, Mizuho's counsel, identified and challenged the

inclusion of a significant CVA (adjustment for change in Lehman's credit quality) in the amount of $2.9 billion, which the Debtors had built into their structured securities valuation methodology, and constituted a detriment to noteholder claimants. (*Id.*). Even after the public filing of Lehman's 8K in October 2010 and the public dissemination of the $2.9 billion adjustment, Stroock and Mizuho continued to advocate for the elimination of the adjustment, which was ultimately agreed to by Debtors, thus providing a material economic benefit to the noteholder claimants. (*Id.*).

### **Mizuho's Services and Substantial Contribution as an Individual Creditor**

17. Mizuho's contributions as an individual creditor, advised at all times by Stroock, also went "above and beyond" that of a normal creditor in a chapter 11 proceeding and further support a finding that Mizuho provided a substantial contribution to these cases. Both as Co-Chair and individual creditor, Mizuho—through Mr. Purcell—worked tirelessly to improve overall liquidity of the estates and improve recoveries for all creditors. Without the assistance and advice of Stroock, Mr. Purcell would not have been able to provide this direct and tangible benefit to the estates. (Purcell Dec., at ¶ 30).

18. For example, Mizuho took a leading role in helping to develop a strategy together with Lehman's management and professionals to effectuate the Archstone transaction, among other real estate dispositions, which approach yielded the estates approximately $1.1 billion more for the creditors than alternative strategies proposed. (Purcell Dec., at ¶ 31 (p. 14)). Throughout the discussions relating to the Archstone transaction, Stroock's advice proved particularly important in helping to assess the various strategic options. Additionally, given Mr. Purcell's over 25 years of experience in the real estate and banking industries, the estate asked him to analyze and review many of Lehman's pre-bankruptcy real estate strategies and to advise on

their implementation and feasibility post-chapter 11 filing. (*Id.* (p. 15)). These projects included the air base redevelopment in California, the re-branding and sale of hotels in France, the allocation of new capital to redevelop a number of properties in New York City. Much of the work for these transactions was done not on "Committee Time" or with Committee resources, but on Mizuho's own time, and capitalized on Mr. Purcell's over 25 years of real estate experience and contacts.

19. Mizuho also participated in the development of a derivatives model and strategy to settle hundreds of thousands of derivatives contracts resulting in hundreds of millions of dollars in recovery to the creditors. (Purcell Dec., at ¶ 31 (p. 19)). Because of Stroock's extensive experience in derivatives transactions, Mr. Purcell and Stroock attorneys were asked to be part of the group of creditors that helped to develop the model for resolving one of the biggest issues facing the estates—derivatives settlements. (*Id.*). Notwithstanding the fact that Mizuho did not have one of the thirteen largest derivative claims, Mizuho (accompanied and advised throughout by Stroock) also participated in the development of the "Big Bank Framework." Stroock advised Mr. Purcell extensively with respect to these issues, as well as the inter-company claims treatment. (*Id.*). Participation in this process helped lead to the settlement of thousands of claims worth tens of billions of dollars with a minimal amount of litigation, and the settlement of so many derivative claims substantially reduced expenses to the estate. (*Id.*).

20. Furthermore, Mizuho worked hand-in-hand with Lehman's management in its determination to fund several hundred million dollars in liquidity to two non-debtor bank affiliates, Aurora Bank and Woodland Bank, in the face of the vast creditor majority pushing to shut down the banks. (Purcell Dec., at ¶ 31 (p. 16)). The decision to fund the two banks to keep them solvent, rather than closed them, meant that Lehman could continue to operate the banks

NY 75979208

without incurring a $3 billion priority claim for the regulators, which would arise if the regulators took over the banks. (*Id.*). Lehman's management consulted with Mizuho regarding the strategy and Mr. Purcell personally advocated each Committee member to support the upfront capital injection, rather than incur the significant priority claim. (*Id.*). Moreover, Lehman's mortgage servicing business improved and the estate was able to use the two banks to help service Lehman's loan book. (*Id.*). The funding decision ultimately resulted in millions of dollars in additional profit on the sale of the assets as well as a savings of approximately $3 billion in priority claims by the regulators.

21. Similarly, Mizuho played an integral role in the evaluation of Lehman's loan book and provided strong recommendations regarding the holding and selling of loans. Specifically, given Mr. Purcell's extensive experience in credit, workouts and recovery of assets, he was able to provide the estate with significant assistance in analyzing the Lehman loan book. Such work included scores of hours outside of Mr. Purcell's normal business day. (Purcell Dec., at ¶ 31 (p. 17)). Because of his knowledge concerning the valuation of loans, and how and when to market a loan, Mr. Purcell provided great assistance to the estate in connection with the timing on the sale or holding of a loan. The ultimate result: millions of dollars in savings for all creditors. (*Id.*).

22. Finally, Mr. Purcell also provided the estate with significant analysis and advice, in connection with Lehman's private equity transactions (Purcell Dec., at ¶ 31 (p. 18)), the ultimate sale of Neuberger Berman (*id.,* at p. 17); tax negotiation issues (*id.*, at p. 19), and other Lehman committee work, including but not limited to the Fee Committee which helped to ensure that all creditors were protected from excessive or unnecessary professional fees, and staff compensation issues (*id.*, at p. 20-21). All of these actions resulted in creditors saving millions

11

of dollars—a direct economic benefit to the estates, and strongly support a finding that Mizuho provided the Lehman estates with a substantial contribution "above and beyond" that of the normal creditor.

23. In addition, Courts have held that "[c]orroborating testimony by a disinterested party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation to activities which otherwise might not constitute a substantial contribution." *In re Buckhead Am. Corp.*, 161 B.R. 11, 15 (Bankr. D. Del 1993); citing *In re U.S. Lines*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989). There can be no greater testimonial by a disinterested party than the statement of John Suckow, LBHI's former Chief Executive Officer, that:

> … Mizuho, supported by its own professionals, rendered services which were extraordinary in amount and quality and which provided direct and significant benefit to these estates…

(Suckow Dec at ¶ 5). Mr. Suckow specifically recognized Mizuho's significant contributions in relation to the complicated real estate and banking issues faced by the estate, and that Mizuho's "level of depth and perspective to the process . . . . was unique and significant." (*Id.* at ¶ 9). Mr. Suckow, the individual who oversaw Lehman's reorganization process, sets forth unequivocally that Mr. Purcell's involvement was above and beyond a normal creditor committee member's participation." (Id. at ¶ 9).

24. Further, Mizuho's efforts and achievements as Co-Chair of the Committee are a separate, significant and recognizable basis for granting such Award. Indeed courts have recognized that the work undertaken by co-chairs exceeds that required of ordinary committee members and have compensated co-chairs accordingly. *See In re Worldwide Direct Inc.*, 334 B.R. 112, 128 (Bankr. Del. 2005) (awarding an administrative claim because the applicant

"served as co-chair of the Committee, the court believes that more work was required of it and its attorneys . . . "). *See* also *White Motor Credit Corp.*, 50 B.R. 885 at 902-04 (Bankr. N.D. Ohio 1985) (recognizing the significant role of co-chairs of the creditors committee who "were involved in virtually every vital issue attributable to the success of the case" and awarding payment of their counsel fees).

25.  In these Chapter 11 cases, the Co-Chair role, which Mizuho assumed for the entirety of the proceedings, was an all-consuming one in which Mizuho was leader among the Committee Members.  As Co-Chair, Mizuho, through Mr. Purcell, communicated with the Debtors usually on a daily basis and came to serve as management's right arm.  Mr. Purcell, with advice and guidance from Stroock, both advised on and originated concepts for the Plan and a plethora of other business issues.  He served as liaison between the Debtors and the Committee, and sounding board for each.  On behalf of the full Committee, the Co-Chairs discussed plan structures with the Debtors and negotiated with representatives of other major parties-in-interest on issues ranging from valuation of the structured securities to substantive consolidation. Mizuho's interactions with the various parties which contributed to global resolution – instead of massive protracted litigation – fall squarely within the definition of "lowering the 'temperature' of a case by preventing excessive litigation and encouraging cooperation" deemed a benefit to the estates worthy of a substantial contribution award. *In re American Plumbing & Mechanical, Inc.*, 327 B.R. 273, 282-83 (Bankr. W.D.Texas 2005).

26.  Moreover, as set forth above and in the Purcell Declaration, Mizuho's actions stand apart from and in addition to its Committee Member or Co-Chair function as the substantial contribution of an individual creditor.  And no one, not even the Office of the United

13

States Trustee, can take issue herein with the right of Mizuho to seek its Award in the capacity as an individual creditor, notwithstanding its Committee membership.

27. Indeed, Judge Sullivan made that point abundantly clear stating that:

> [T]hose whose fees are paid by someone else have no incentive to keep costs under control, or to bring the litigiousness to an end. Nevertheless, there is no reason to think that the Bankruptcy Code would punish an entity that has made a substantial contribution solely because it was also willing and able to serve on the official committee. According to the UST's logic, a creditor who has used a lawyer to help file a petition or to recover property for the estate's benefit – expenses that are normally reimbursed under § 503(b)(3)(A)-(B) and 503(b)(4) – would be prevented from getting reimbursed simply because the creditor also served as a member of an official committee. Nothing in the language of the statute requires or suggests such a perverse outcome.

*Lehman II*, 508 B.R. at 295.

28. Thus, Mizuho submits that it is entitled to its Award in recognition of its substantial contribution as a Committee Co-Chair and individual creditor, as well as Committee Member.

**Payment of the Award Should be Allowed in Full**

29. Based upon the foregoing, Mizuho seeks approval of the Debtors' payment of the Award in full as a substantial contribution award. As stated in the Purcell Declaration, the fees and expenses are reasonable and no amount was included from preparation of Mizuho's proof of claim or other services rendered on Mizuho's behalf in advancing its own claims. In assessing a substantial contribution application, a court "should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions." *Hall Fin. Grp. Inc. v. DP Partners, Ltd. P'ship (In re DP Partners Ltd. Partnership)*, 106 F.3d. 667, 673 (5th Cir. 1997); *see White Motor Credit Corp.*, 50 B.R. at 908 ("The magnitude of the awards diminishes in relation to the outstanding achievements produced and the benefits enjoyed

by creditors and the entire estate through the talented services rendered."). Here, the $3,026,197.78 amount in counsel fees and expenses incurred in connection with Mizuho's services during the entirety of these cases as an active Committee Member, member of eight subcommittees and full time co-chair, while not insignificant, pales in contrast to the direct and substantial contribution made as well as the size of the attorneys' fees incurred by others in these Chapter 11 cases.

30.    This Court has suggested that Judge Sullivan's decision in *Lehman II* requires that there be some discount applied to take into account ordinary committee functions. Applicant respectfully disagrees. In his June 26, 2014 order denying the Committee members' motion to certify a ruling for immediate appeal (the "Certification Order," District Court Docket No. 30) Judge Sullivan made clear he was not establishing a new substantial contribution standard, but rather was relying on the same straight forward standard established in this Circuit, which simply allows for an award on the rare occasion where the creditor's involvement has been extraordinary.

> Although Appellees imply that the Court created a new standard for substantial contributions under § 11 U.S.C. 503(b)(3)(D) (Doc. No. 21 at 5-6), the Court in fact recited the same standard that is commonly used by courts in this Circuit. *Compare In re Lehman Bros. Holdings Inc.*, 508 B.R. 283 (S.D.N.Y. 2014) ("To the extent official committee members perform extraordinary work to benefit the estate, above and beyond normal committee duties, they may … have made a 'substantial contribution in a case.'"), *with In re United Merchants & Mfrs., Inc.*, No. 97 Civ. 5437 (DC), 1999 WL 4929, at *2 (S.D.N.Y. Jan. 5, 1999) ("A substantial contribution award is made only for extraordinary creditor actions, on those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate." (internal quotation marks omitted)), aff'd, 198 F.3d 235 (2d Cir. 1999); *see also Bedford JV, LLC v. Sky Lofts, LLC*, No. 12 Civ. 5850 (DLI), 2013 WL 4735643, at *4 (E.D.N.Y. Sept. 3, 2013) (requiring "extraordinary creditor actions"); *In re S & Y Enterprises, LLC*, 480 B.R. 452, 459 (Bankr. E.D.N.Y. 2012) (same); *In re Bayou*

> *Grp., LLC*, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010) (same); *In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (same). Appellees offer no reason why applying that standard would prove particularly difficult in this case. Certification Order, N. 1.

31. Mizuho meets that standard. And where, as here, "the estate as a whole directly benefits from an entity's participation in a Chapter 11 case," "the reasonable cost of those efforts should be shifted from applicant to the estate" *S&Y Enterprise LLC*, 480 B.R. 452, 461 (Bank. E.D.N.Y. 2012).

32. Moreover, the idea of isolating ordinary fees for attorneys service should not apply in this circumstance because as set forth in the Purcell Declaration, Mizuho needed its own counsel throughout the proceedings and even the more mundane matters required legal oversight by Mizuho's counsel because they served as building blocks for the more critical issues driving the outcome of these Chapter 11 cases.

33. In any event, even if the Court were to hold that a discount should be applied with respect to substantial contribution applications of Committee Members, Mizuho does not believe that such holding should be applied to its application for the following reasons:

> (1) Mizuho was conservative in its fee request from the time of its initial submission, never seeking, <u>inter alia</u>, fees in connection with its own claims or for time spent in court, other than for major hearings, such that it does not have excesses in the application that warrant elimination;

> (2) Mizuho went above and beyond the Committee's extraordinary work by assuming the role of Co-Chair, serving on almost every subcommittee, and shaping the governance of the reorganized estate, even following plan resolution when most parties in interest had exited, in order to maximize recoveries to the creditors;

(3)     Mizuho's rendered a substantial contribution as an individual creditor in addition to its Committee status which is something the District Court, this Court and the Office of the United States Trustee have each recognized as compensable; and

(4)     Mizuho's application has a "built-in discount" because Mizuho has not sought (i) a fee, estimated at $125,000, for its service on the Fee Committee, notwithstanding a court order permitting it to do so; or (ii) reimbursement for fees and expenses amounting to $89,154.61 incurred by a separate law firm which represented Mizuho in certain discovery proceedings brought against it in the JPMorgan Chase litigation solely based upon its status as a Committee member.

34.     Mizuho is aware that certain other Members have proposed a 30 percent discount on work related to general full committee meetings and telephone conferences. While, as set forth above, Mizuho does not believe that its Award should be subject to any discount, if this Court is inclined to apply a discount to the Award, Mizuho submits that it should be (i) no greater than that formula which amounts to $107,278.80 in the case of Mizuho's application, and (ii) without prejudice to Mizuho's rights to seek the full amount requested, pursuant to Section 1129(a)(4) on appeal of such cases.

WHEREFORE, for the reasons set forth here, as well as in the Purcell and Suckow Declarations, Mizuho seeks entry of an order approving the payment by the Debtors of the Award as a substantial contribution award in full and granting such other and further relief as is just and proper.

Dated: December 18, 2015  
       New York, New York

**STROOCK & STROOCK & LAVAN LLP**

By: /s/ Mark A. Speiser  
    Mark A. Speiser  
    Claude G. Szyfer  
    Sherry Millman  
180 Maiden Lane  
New York, NY 10038-4982  
(212) 806-5400

*Counsel for Mizuho Bank Ltd., formerly known as Mizuho Corporate Bank, Ltd., As Committee Member, Co-Chair of the Committee, and Individual Creditor*

NY 75979208