# <u>EXHIBIT  A</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                          :
In re:                                    :        Chapter 11 Case No.
                                          :
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :        08-13555 (SCC)
                                          :
                                          :
                  Debtors.                :        (Jointly Administered)
                                          :
                                          :
------------------------------------------------------------x
```

**DECLARATION OF NOEL P. PURCELL (I) IN FURTHER SUPPORT OF THE
AMENDED OMNIBUS APPLICATION OF CERTAIN INDIVIDUAL CREDITORS'
COMMITTEE MEMBERS FOR PAYMENT OF FEES AND EXPENSES AND (II) IN
SUPPORT OF MIZUHO BANK, LTD.'S SUPPLEMENTAL APPLICATION FOR
PAYMENT OF FEES AND EXPENSES OF STROOCK & STROOCK & LAVAN LLP**

Noel P. Purcell makes this declaration pursuant to 28 U.S.C. Section 1746 and states:

1.      I am a Senior Vice President of Mizuho Bank, USA, and a Managing Director and

Group Head of Real Estate and Specialized Finance at Mizuho Securities USA Inc.  In that

capacity, I am an authorized signatory of Mizuho Bank, Ltd. f/k/a/ Mizuho Corporate Bank, Ltd.

("Mizuho"), the parent of such entities, which served as a member and co-chair of the Official

Creditors' Committee (the "Committee") of Lehman Brothers Holdings, Inc. ("LBHI"), et al.

(collectively the "Debtors").

2.      I submit this Declaration (the "Declaration") in (i) Further Support of the

Amended Omnibus Application of Certain Individual Creditors' Committee Members for

Payment of Fees and Expenses and (ii) in Support of Mizuho Bank, Ltd.'s Supplemental

Application for Payment of Fees and Expenses of its Counsel as a Substantial Contribution

Award for its Contribution as (a) Creditors' Committee Member, (b) Co-Chair of the Creditors'

Committee and (c) Individual Creditor, based upon the substantial contribution Mizuho made

both in its capacity as member and co-chair of the Committee, and as an individual creditor of

the estates.  Unless otherwise stated herein, the facts set forth in this Declaration are based upon

my personal knowledge.  If I were called upon to testify, I would and could testify competently

as to the facts set forth herein.

3.      I have previously submitted a Declaration, dated January 26, 2012 (the "Original

Declaration"), in support of Mizuho's application for payment of fees and reimbursement of

expenses of its counsel, which is Exhibit B-4 to the Omnibus Application, dated January 30,

2012, of (i) the Individual Members of the Official Committee of Unsecured Creditors and (ii)

Indentures Trustees, pursuant to Section 1129(a)(4) or alternatively, Section 503(b)(3)(D) and

503(b)(4) of the Code for Payment of Fees and Expenses (the "Committee Members'

Application").  I have also submitted a Supplemental Declaration, dated November 12, 2012 (the

"Supplemental Declaration") in further support of the Committee Members' Application, which

is Exhibit A to the Reply of (i) the Individual Members of the Official Committee of Unsecured

Creditors and (ii) Indenture Trustees in further support of Omnibus Application pursuant to

Section 1129(a)(4) or, alternatively, Sections 503(b)(3)(D) and 503(b)(4) of the Code for

Payment of Fees and Reimbursement of Expenses.  Both the Original and Supplemental

Declarations contain detailed information concerning the role of the Committee and Mizuho's

efforts as member and co-chair of the Committee and are incorporated herein by reference.

4.      I am advised that the Court is presently reviewing the contributions made under a

"substantial contribution" standard and I submit this Declaration in that context.

**My Background and Business Experience**

5.      I have worked in the banking and financial services industries for over 25 years. During this extensive period, I have held various roles both at Mizuho and other prominent financial institutions, including the Bank of New York and Key Bank.  In my various positions at these institutions, I have developed wide expertise in a variety of corporate and real estate related credits.  Moreover, I have developed an in-depth knowledge of credit matters affecting a numbers of industries including, but not limited to, residential and commercial real estate development and management, revolving lines of credit and term loans to manufacturers, retail distribution facilities, auto dealer floor plan lines, letter of credit facilities to import/export companies as well as inventory lines of credit to commercial aircraft parts remanufactures. Additionally, I have developed a strong expertise in private equity transactions.  Furthermore, during my years at Key Bank, I participated integrally in that bank's "Swat team: which reviewed failed banks and savings and loans taken over by the FDIC to determine if they were assets Key Bank would consider purchasing.  My work on these matters included interacting with the bank regulators such as the OCC and FDIC and on-site reviews of banks throughout the United States.

6.      As my current position at Mizuho reflects, I have tremendous experience in the real estate industry which, as will be discussed, proved quite vital to the estates' multi-billion dollar real estate portfolio.  I have been involved in all aspects of both commercial and residential development lending, including, but not limited to, providing mortgage loans, real estate private equity transactions and mergers, CMBS transactions, term loans for manufacturing companies secured by real property, and all aspects of REIT financings and conversions. Moreover, I have participated in scores of real estate restructurings, which have involved

restructuring:  New York City commercial office tower mortgage loans, residential development

loans, distribution, office and retail facility loans restructurings, to just name a few.

7.      Simultaneous with my work within the Mizuho Real Estate team, because of my

strong workout experience, I lead Mizuho's distressed and restructuring efforts in the areas of

real estate and corporate finance.  Since 1997, I have been actively involved in some of the

highest profile corporate restructurings (in and out of bankruptcy) in the world including, but not

limited to, America West Airlines (Lead Agent), Bear Stearns, Enron, Worldcom, Global

Crossings, American Airlines, Delta Airlines, Energy Future Holdings, Genuity, Calpine

Corporation, Pacific Gas and Electric, Adelphia Communications Corporation, Charter

Communications, Williams Companies, CIT Group, AIG (ILFC), Continental Airlines,

Bethlehem Steel, Delphi Automotive, NRG, Federal-Mogul, Kodak, Sea Launch, United

Airlines, Warnaco, Southern California Edison, ATA Airlines, Northwest Airlines, MGM, Long

Term Capital Management and Dynegy.

8.      I personally served as Mizuho's representative on the Committee for the entirety

of these cases.  As such, I brought to the process a wealth of knowledge and experience from my

years in the real estate, banking and finance industries and from my overall business interactions

and relationships.

**Mizuho's Appointment to the Committee and Co-Chair**

9.      As set forth in the Original Declaration, on September 17, 2008, Mizuho was

appointed to the Committee, elected co-chair, and then served continuously in that capacity for

the entirety of the Lehman bankruptcy.  Thus, not only did Mizuho serve on the Committee since

its inception, it was also a co-chair since Day 1.

10.     Among other reasons, the Committee appointed Mizuho co-chair based upon its status as agent for lenders pursuant to a credit agreement under which LBHI was the borrower.  It should also be noted that at that time, Mizuho held a significant derivatives claim against Lehman Brothers Special Financing, Inc. with a related guaranty claim against LBHI.  In addition, several of its affiliates held substantial derivatives and structured securities claims against various Lehman debtors.

11.     During the entire duration on the Committee and as Co-Chair, Mizuho has been represented by Stroock & Stroock & Lavan LLP ("Stroock"), as outside counsel.  Stroock also represented Mizuho in connection with its various claims against the Debtors.  Mizuho seeks payment of Stroock's fees and expenses, which total $3,026,197.78, as a substantial contribution award for the enormous benefit Mizuho's efforts conferred upon the Debtors and these estates from 1) its service on the Committee, 2) its service as co-chair, and 3) in its capacity as an individual creditor.  For the avoidance of doubt, these amounts <u>do not</u> include Stroock's fees and expenses incurred while representing Mizuho and its affiliates in connection with their specific respective claims and positions against the Debtors, and at no time has Mizuho sought such payment from the estates as part of its application herein.

12.     As noted in paragraph 7, the Lehman cases were not Mizuho's or my first foray into the bankruptcy arena.  From that experience, I am well aware of the roles of and expectations for various parties in a bankruptcy case.

13.     Let me also be very clear that Mizuho understands that official creditors' committee members are not reimbursed for their counsel fees as a matter of course.  Mizuho has served on another creditors' committee in this district—the Genuity case—where it was also

represented by Stroock.  Mizuho did not seek payment from the Genuity estate of its counsel fees as a substantial contribution award or otherwise.  In Genuity, Mizuho recognized that it performed normal committee member duties and should bear the cost of its own counsel.

## Mizuho's Contribution as Committee Member and Co-Chair

14.     By contrast, everything about the Lehman cases and the efforts required of the Committee members, from the perspective of the time commitment, the complexity and diversity of the issues, Mizuho's (and the Committee's) contributions, and the results achieved, was extraordinary.  When Mizuho was asked to serve on the Committee, we never anticipated what we were getting ourselves into.  From the outset of the case—when we were in triage mode—to the high-stakes plan negotiations and other vital financial transactions which affected scores of creditors, I was called upon, often around the clock, to participate in urgent and complex decision making.

15.     Indeed, when LBHI and certain of its affiliates filed their Chapter 11 petitions in September 2008, it was a free fall bankruptcy.  Judge Peck, himself, documented the maelstrom of events created by the Lehman chapter 11 filing:

> *Lehman Week certainly was no ordinary week.  Each day brought with it a new systemic shock.*  Merrill Lynch had just been sold to Bank of America in a hastily-arranged transaction.  Lehman filed for bankruptcy relief in the early morning hours on September 15th (the "Filing Date") after running out of options, and AIG was bailed out by the Federal Reserve the very next day.  Seasoned observers too young to recall the Great Depression had never seen anything to match these disastrous events.  By the end of the week, Goldman Sachs and Morgan Stanley had sought refuge under the Bank Holding Company Act to achieve greater operational stability and security.  By virtue of astonishingly fast-moving market forces, venerable Wall Street institutions were toppling, being rescued or restructured on a daily basis.  Financial

> counterparties had reason to distrust the soundness of blue chip
> firms with once seemingly unimpeachable credentials.

In re Lehman Bros. Holdings Inc., 445 B.R. 143, 155 (Bankr. S.D.N.Y. Feb. 22, 2011) (emphasis

added).  The U.S. (and World) economies were racked by severe financial instability, and many

believed that the U.S. economy was on the precipice of entering into another Great Depression.

16.      While liquidation of Lehman was the ultimate goal, in order to maximize value

for all creditors, and minimize incurring additional liabilities, the bulk of Lehman's businesses

needed to continue to operate.  Substantially all of Lehman's employees, however, either moved

to Barclays or were terminated taking with them critical institutional knowledge and creating a

huge management vacuum within one week of the filing.  Accordingly, the task of running these

varied and complex businesses and shaping their ultimate liquidation fell to Lehman's newly

retained restructuring professionals and the Committee, the Committee's members and their

respective advisors.  Given Mizuho's position as co-chair of the Committee, and its knowledge

of many of these businesses, it took a prominent position in this process.  Moreover, given the

unprecedented events racking the economy, combined with the management vacuum at Lehman,

the first few weeks and months these cases were harrowing for the Debtors and Committee

members, often requiring around the clock availability as we sought to bring order to the chaos.

17.      In the Lehman cases—the largest bankruptcy in history—committee service

meant far more than attending periodic meetings and reviewing predictable case administration

issues.  Rather, the Committee functioned more as a parallel management team to the Debtors'

professionals, helping to develop strategies and tactics regarding a constant stream of significant

and complicated business decisions and doing so under enormous time constraints.  Some of the

key matters included, but were not limited to, rehabilitating non-debtor bank affiliates through

significant cash infusions for the ultimate benefit of these estates, determining the business

objectives of LAMCO, formulating strategies with respect to multi-billion dollar real estate

transactions and analyzing complex derivative transactions.

18.     For me, on behalf of Mizuho, it became a second full-time job—one that I could

not have properly performed without legal guidance and advice from Stroock on a real-time

basis.  Indeed, Mizuho management made it abundantly clear to me that I could not act as co-

chair without Stroock serving as my counsel.

19.     To ensure each of the Debtors' business activities received appropriate attention,

the Committee formed a number of subcommittees for specific business sectors.  While one

might assume this would have lightened the workload by dividing it among committee members,

that was not the case for Mizuho—I served on almost all of the subcommittees.  Indeed, Mizuho,

advised by Stroock, actively participated in the following eight subcommittees:  Loan Book

Subcommittee, Tax Subcommittee, Real Estate Subcommittee, Derivatives Subcommittee, the

Domestic Banks Subcommittee, Fee Subcommittee, Litigation Subcommittee, and, for its limited

existence, the Plan Discovery Subcommittee.  In addition, Mizuho participated in the structured

securities working group of the Committee and, as the Committee's representative, was

appointed to the Director Selection Committee, which was charged with selecting the new

Boards of Directors of the Lehman entities to lead their emergence from chapter 11.

20.     As a result of its diligence, probing review of the Debtors' activities and own

proposals, the Committee and in particular, Mizuho, played an active role in, among other things,

the establishment of the Derivatives ADR process, the development of both a structured

securities and derivatives framework, and the functioning of the Debtors' various businesses, all
to the direct benefit of these estates.

21.    The Committee was also instrumental in the reduction in claims from $1.3 trillion
to $437.3 billion (as of May 15, 2012), a monumental accomplishment given the compressed
timeframe, volume of work and complexity of issues.

**Mizuho's Substantial Contribution to the Plan Process**

22.    In addition to the significant role played with respect to the Debtors' business
function, the Committee members made additional substantial contribution to these cases
through the plan formulation process.  Rather than establish multiple committees, the United
States Trustee determined to have only one official creditors' committee and populated the
Committee with claimants representing different interests in the various Debtor estates.  As
stated above, Mizuho, for its part, held a senior bank debt claim against LBHI; a derivatives
based claim against LBSF, with a guarantee claim against LBHI; and Mizuho's affiliates also
filed claims arising under the Lehman Brothers Treasury notes, as well as derivatives claims
against LBSF and LBHI.  Some on the Committee represented subordinated debt holders, and
still others held a variety of other claims.  Thus, each of the Committee members represented not
only the unsecured creditor body at large, but they were also representative of specific creditor
constituencies of different Debtors.

23.    As a result, through robust debates and extensive negotiation, the Committee
members resolved some of the most significant issues in the cases which were at the crux of the
plan process, i.e., substantive consolidation, inter-company claims and inter-creditor claims.
Mizuho, advised by Stroock, and the other Committee members, worked diligently in assessing

the probability of success on various legal issues, including substantive consolidation and

enforceability of guarantees, and in considering various recovery scenarios.

24.    The Committee's resolution of these fundamental issues among themselves

proved critical to the success of the plan process because the Committee then formulated a

construct which served as the blueprint for the plan proposed and confirmed by the Bankruptcy

Court.  The Debtors' initial plan construct proved to be not viable, like those proposed by

competing creditor groups.  However, after extensive input by the Committee members, an

agreement reallocating recoveries to settle substantive consolidation and other issues led to a

plan that bridged the gap among competing plan proponents.  Indeed, even Judge Peck

recognized the uniqueness of having over 99% of the voting creditors supporting the plan in a

case of this size, involving so many different creditor groups.

25.    Mizuho and the other Committee members each needed separate counsel for this

plan negotiation process because each member advanced different viewpoints which had

disparate impact upon the different Debtors' estates and their creditors.  The work done by

Stroock did not duplicate the Committee counsel's services; rather Stroock provided advice and

counselling responsive to Mizuho's individual analysis of the very complex plan issues.  The

ability of the Committee members to assess the different perspectives, with the guidance of

individual counsel and the oversight of Committee counsel, and to conduct vigorous debate in

the Committee room rather than the courtroom, saved these estates years of protracted litigation

and millions of dollars in needless expense.  Achieving consensus on the plan issues, with the aid

of individual counsel, within the confines of one committee saved the estates significant amounts

in fees that would have been incurred had there been multiple official creditors' committees with

multiple estate professionals.

26.      As co-chair, Mizuho was a leader among the Committee members.  Mizuho also advocated zealously on behalf of the  unsecured creditor body in the plan process, as well as every other aspect of the case, without regard to whether the particular issue at hand related to the bank loan claim which lead to its appointment to the Committee.  For example, Mizuho's leadership in connection with the structured securities valuation process created value for many different classes of noteholders.  Mizuho worked tirelessly as part of a working group comprised of creditor representatives and individuals employed by the Debtors to ensure that the process was fair.  As part of that work, Strook identified and challenged the inclusion of a significant CVA (adjustment for change in Lehman's credit quality) in the amount of $2.9 billion which the Debtors built into their structured securities valuation methodology, as set forth in their October 29, 2010 8K to the detriment of certain noteholder claimants.  Mizuho's counsel argued Debtors' $2.9 billion adjustment was not appropriate, and advocated for a change, even after the public filing.  Strook pressed until the adjustment was ultimately eliminated for all the notes under review so that there was an appropriate reallocation of value which in this circumstance resulted in a material benefit to holders of allowed note claims.

27.      Mizuho's position as co-chair magnified its involvement.  If the Committee was parallel management, the co-chairs were its chief executives – prioritizing issues, structuring debate and vetting concerns by individual members.  On behalf of the full Committee, the co-chairs met with the foreign representatives or ad hoc committee representatives.  And it was the co-chairs who participated in a plan working group with the Debtors and its representatives beginning at a very early stage of the proceedings.  At these sessions, the parties considered a variety of plan constructs, some of which formed the basis of the confirmed plan.

28.    The co-chairs were also charged with the responsibility of communicating with the Debtors on behalf of the Committee.  As a result, I spoke to and met with Lehman management often on a daily basis and frequently without  Committee counsel (Milbank Tweed). The co-chairs were not just a liaison between Debtors and the Committee; rather we were a sounding board for Lehman management such that, with advice and guidance from Stroock, I was constantly weighing in on and also originating concepts for the plan and for a plethora of business issues.

29.    Many issues were vetted with me and my co-chair before they were presented to various creditor groups, the full Committee, and sometimes even the Board of Directors. Essentially, we served as management's right arm, a position which necessitated having my own legal counsel.

**Mizuho's Services as an Individual Creditor**

30.    Mizuho's extraordinary level of commitment and my expertise in critical business sectors led Lehman management to rely on and derive direct benefit from my institution's input. Both as a co-chair and creditor, I worked tirelessly to address critical issues in these proceedings, often on personal time, including nights, weekends and holidays.  Thus, Mizuho's effort in this vein stands apart from (and in addition to) its Committee member function, as the substantial contribution of an individual creditor.  Again, without the assistance of and consultation with Stroock, I would not have been able to provide this valuable benefit to the estates.

31.    Examples of such substantial contribution and benefit to the estate[1] include the
following:

**Major Real Estate Transactions**

- Archstone Sale/IPO Evaluation and Sale Transaction:  I was deeply involved with the
estate in the transactions involving Archstone .  In short, given my extensive experience and
market knowledge as a real estate banker as well as my contacts with the prospective buyers, I
provided the estate significant advice concerning market viability of a sale transaction and the
alternative of an IPO.  Indeed, because of my understanding of the assets and the market, I
worked closely with representatives from both Alvarez & Marsal and Houlihan Lokey to develop
a coordinated strategy that led to the estate committing $3 billion to exercise a right of first
refusal and buy out the estate's equity partners.  The resulting purchase and subsequent sale for
$6.5 billion yielded the estate approximately $1.1 billion more for the creditors than the
alternative exit strategies.  Throughout the discussions and analysis of potential options,
Stroock's advice proved particularly important in the discussion relating to strategic options.

- Real Estate Redevelopment Analysis, Sales and Overall Strategy:  Above and beyond
Mizuho's role on the Real Estate Subcommittee, I spent significant time analyzing and
structuring plans for numerous Lehman pre- and post-bankruptcy strategies related to the
development and redevelopment of major commercial and residential real estate projects.[2]  This
work involved properties all over the country, Canada, Europe and Asia.  Projects such as the air
base redevelopment in California, the re-branding and sale of hotels in France, the allocation of
new capital to redevelop a number of properties in New York City, all resulted in creditors

---

[1] For the discussion that follows "estate" means the Lehman debtor estates as a whole.
[2] I was asked by the estate to review many of Lehman's pre-bankruptcy real estate strategies and to advise on their
feasibility and to assist on implementation.

saving millions of dollars—for example, by not investing new money for residential developments because market analysis showed would have floundered for years after the bankruptcy filing—and making millions of dollars by approving real estate deals which proved to be excellent investments for the creditors' ultimate recoveries.  The analysis of these projects was not done on "Committee time" or with Committee resources but on Mizuho's own time, with me using my more than 25 years of real estate experience and contacts to make these determinations.

- Canyon Ranch:  The Canyon Ranch transaction constitutes another prime example of a complex and unprecedented approach which the Debtors, in consultation with me and other Committee representatives, devised to maximize value.  The Debtors made a significant investment in this uncompleted spa/condominium property in South Florida, where work stalled because many of the condominium buyers encountered difficulty obtaining mortgages.  We determined, along with the Debtors, that the Debtors could provide mortgages to the buyers and then securitize the mortgages to limit any associated risk.  This novel approach of having the Debtors serve as lenders enabled the project to proceed to completion to the enormous benefit of the estate.

- Evaluation of the sale of Lehman's headquarters:  Immediately following the appointment of the Committee, I used my more than 25 years of experience as a real estate banker and my industry contacts to evaluate the market viability of the sale transaction, providing information which allowed the newly formed estate to properly analyze the conditions of the sale of Lehman's headquarters.

**Banking and Financial Transactions**

- **Aurora Bank and other non-Debtor Bank Affiliate Dispositions**: I also spent
significant time considering a plan of disposition of Aurora Bank and Woodland Bank as the
Lehman estate worked through regulatory and other issues.  Early in the case, we determined that
if the banks closed, the estate could incur $3 billion in priority claims of the regulators which
would arise if they wound up taking over the banks.  In order to keep the banks solvent, we
needed to inject significant sums.  I personally contacted all of the Committee members and
advocated for making an initial cash infusion which would allow the estate to save that
immediate $3 billion in regulatory claims.  Lehman's management had many discussions
internally and with the bank regulators regarding the future of these banks, which were often
vetted with me, and I, in turn, shared that thinking with the Committee.  The Committee pushed
for the banks to continue to operate resulting in an additional infusion of several hundred  million
dollars.  Over time, the mortgage servicing business improved and the estate utilized both banks
to provide servicing for Lehman's loan book.  Ultimately, not only did the estate save billions on
the priority claim payments, but the loan portfolios increased in value and Debtors sold Aurora
and Woodland banks—at a significantly better price than anticipated.  My institution was deeply
involved in the Debtors' determination to fund several hundred million dollars in liquidity in the
face of the vast creditor majority pushing to shut down the banks.  This decision ultimately
resulted in millions of dollars of additional profit on the sale of the assets as well as a savings of
approximately $3 billion in liabilities which would have come ahead of the general creditor body
and eliminated any creditor recovery from the banks.

- **Lehman Loan Book Evaluation and Recommendations**:  I again used my more than
25 years as a senior portfolio recovery officer as well as my current market knowledge of sale

and trading of corporate loans to analyze and advise on the Lehman loan book. My work
included scores of hours outside of my normal business day, evaluating mark to market pricing
for the book and strategizing with Lehman senior management as to the proper timing for asset
disposition. Indeed, I have significant expertise in the two key issues with respect to loan book
evaluation—how do you value the paper; and how and when to market the loans. My
involvement resulted in a number of decisions to sell assets before Lehman staff had originally
anticipated, and also provided comfort in holding certain other assets longer, allowing the market
prices for those assets to appreciate significantly. The result: millions of dollars in savings for
creditors at large.

- **MBO – Neuberger Berman:** Early in the case when the estate had anticipated over
$1 trillion in claims and held approximately $1.5 billion in identifiable cash, a major mission was
to improve the overall liquidity of the estate. At that time, the estate's most liquid asset, outside
of the headquarters building, was its ownership stake in Neuberger Berman. This investment
management company, however, faced serious danger of losing its high profile asset managers
and losing billions of dollars in client fund redemptions. The estate received a number of
unsolicited offers to purchase its stake in Neuberger Berman for much needed cash. However, a
senior group of professionals from the estate, including me, worked to analyze our options and
ultimately assisted in the negotiation of a management buyout—an unpopular decision for many
creditors at the time. However, the professional analysis demonstrated that, in the long run, the
creditors would be substantially better off if we could stabilize Neuberger Berman and sell the
estate's interests at a time of less desperation. Again, without the support and analysis of many
people, including me, the chances of an early, much less fruitful sale would have been
significantly higher resulting in millions of dollars less in distributions to the creditors.

- <u>Private Equity Transactions</u>:  I have also spent the last 17 years at Mizuho providing leverage to various private equity real estate sponsors and am recognized as an expert in this space.  Throughout the life of the Lehman cases, I provided substantial advice to the estate, as to the market liquidity of certain Lehman investments and strategy for disposition of many of those assets, including the handling of Lehman-related equity and debt commitments to various funds and the appropriate way to treat those assets in a distressed situation.  In fact, early in the proceedings, Lehman's obligations under highly specific lending structures come into question and because I was among the few who had knowledge of these specific structures, I worked with the Lehman management team to address these issues.  The result was the payment of millions of dollars in obligations, without litigation, and the collection of millions more in ownership interest in assets distributions.

- <u>Derivatives Model and Big Bank Framework and Strategy Analysis</u>:  Mizuho was deeply involved in developing the derivatives model and strategy used by the estate to settle hundreds of thousands of derivatives contracts resulting in hundreds of millions of dollars in recovery for the estate's creditors.  Because of Stroock's extensive experience in derivatives, I was asked, together with Stroock to be part of the group to develop the model and clear the way to settle one of the biggest issues facing the estate – derivatives settlements.  In particular, I, along with Stroock, participated in the discussions that resulted in the "Big Bank Framework"— despite the fact that Mizuho did not file one of the thirteen largest derivative claims.  Guided by Stroock, I spent many additional hours analyzing and working through issues such as inter-company claims treatment as an acceptable and appropriate standard for analyzing the claims of derivatives related claims issues.  This process helped lead to the settlement of thousands of

claims worth tens of billions of dollars with a minimal amount of litigation.  The reduction in the

number of litigations has resulted in substantially reduced expenses to the estate.

- Tax negotiation issues:  On behalf of Mizuho, I also worked closely with the Lehman

tax lawyers and accountants in seeking settlements with the IRS and various state tax

departments, with respect to amounts owed by the Lehman estates.  We analyzed positions with

Lehman personnel, which resulted in settlements totaling tens of millions of dollars below the

amounts sought by the various tax authorities.  This undertaking was above and beyond

Mizuho's services on the Committee's Tax Subcommittee.

## Additional Significant Lehman Committee Work

- Fee Committee:  I replaced another Committee member and served on the Lehman

Fee Committee for several years to ensure that creditors were protected on the expense side of

the estate—all in addition to my services on the Committee's own fee subcommittee.  I worked

alongside the Debtors, the U. S. Trustee and the independently appointed chairman to ensure that

the fees were appropriate and that the review process was fair.   My extensive knowledge of

advisor billing through my own real estate and restructuring lending practice helped inform the

Fee Committee, and its chairman, on appropriate market billing practices.  I was instrumental in

developing a protocol for the retained professionals' submission of monthly budgets and in

identifying issues with respect to specific fees and expenses.  I attended chambers conferences

and had numerous discussions with retained professionals regarding fee and expense issues.  My

role—above and beyond Mizuho's role on the Committee—helped save millions of dollars of

estate money because negotiated settlements arising from billing disagreements with all of the

major law firms and financial advisors.  In fact, my institution did not even charge a fee for this

extra work, notwithstanding a Bankruptcy Court order authorizing Mizuho to do so.  Stroock's

assistance with respect to my Fee Committee service proved particularly critical as I could not

seek legal direction from the Committee's counsel, Milbank Tweed, given that as an estate

professional, its own invoices were subject to scrutiny by the Fee Committee

- <u>Lehman Compensation analysis</u>:  I served with the group of advisors who analyzed

Lehman management's strategy for staff compensation.  We reviewed the business plan and the

staffing needs and made suggestions for adjustments to both.  These adjustments saved the

estate's creditors hundreds of thousands, if not millions, of dollars in unnecessary expenses by

reducing redundant or unnecessary staff.  Indeed, even prior to plan confirmation, we made

recommendations—which were implemented—to start reducing estate headcount in order to

save on expenses.  I used my market knowledge to advise and provide discipline on proper

compensation levels for Lehman employees during the bankruptcy proceedings process.  Our

group met regularly and agreed to staffing and compensation resets once per annum.

32.     I do not in any way suggest that I or my institution, standing alone, was

responsible for the results achieved in terms of asset recoveries, strategic planning and global

consensus on the plan.  No one party can take that credit.  Rather, these results reflect the

extraordinary combined effort of several devoted parties, and Mizuho—advised by Stroock

throughout—proved a prominent player in that process.

33.     And, unlike many other parties-in-interest, Mizuho's commitment to the Lehman

estate continued even after the resolution of the plan process.  On behalf of Mizuho, I

volunteered to participate in the selection of the individuals who would serve on the Board of

Directors of the Debtors, post effective date, to ensure that the administration continued to be

overseen by the most capable persons who could maximize recoveries for the estates.  Those

efforts proved fruitful as under the helm of the Board, recoveries to creditors have far surpassed the projections made at the time of plan confirmation.

34.    On behalf of Mizuho, I could not and would not have acted so readily and effectively for the benefit of the Lehman estates had I not had real-time and continuous legal advice from Stroock.  Stroock's legal advice from the inception of the Lehman case to the ultimate plan confirmation—where their knowledge and advice on inter-creditor issues, substantive consolidation and other critical bankruptcy issues proved invaluable.  But the same would hold true for the other areas in which Mizuho contributed in its individual creditor capacity, whether it was in connection with the employee compensation analysis, which was not within the realm of in-depth, ongoing Committee review, or the Big Bank Framework strategy sessions, where Mizuho was invited to participate unrelated to its Committee member status.

35.    I submit that Mizuho is entitled to a substantial contribution award of its full attorney fees and expenses.  Mizuho has unequivocally rendered direct and significant benefit to the Lehman estates which far outweighs the cost of paying associated fees and expenses of Mizuho's counsel.

36.    Through my review of the proceedings before Your Honor I am aware that you may feel constrained, as a matter of law, to award as a substantial contribution less than the full amount of the counsel fees and expenses incurred by Creditors' Committee members.  I would submit that any discount Your Honor would consider on that basis should not apply to Mizuho given that a substantial portion of its efforts were in fact rendered not as Committee member but in its capacity as a co-chair and as an individual creditor.

37.      Further it should be noted that while it might be facially appealing for a
supplemental application to be submitted in a reduced amount, Mizuho does not have that
leeway because its original application did not contain excesses that might now be removed.
Mizuho should not be penalized for having been reasonable in its request from the inception of
this process.  Indeed, throughout Stroock's representation of Mizuho during these proceedings,
we have continually discussed maintaining strict discipline on the number of attorneys working
on the matter, as well as being judicious with respect to Stroock's involvement in matters.
Moreover, Mizuho did not seek reimbursement for fees and expenses incurred by counsel
representing it in connection with its claims by and against the estate, nor did it seek to charge
the estate for its attorneys' attendance at any but the most significant of court hearings.  In fact,
Mizuho has been so conservative that it has not sought reimbursement for certain amounts
which are very likely compensable such as (i) its service on the Fee Committee or (ii) the fees
and expenses amounting to $89,154.61 of a law firm other than Stroock which represented
Mizuho in certain discovery proceedings brought against it in the JPM litigation solely based
upon its status as a Creditor Committee member.

38.      I have reviewed Stroock's invoices and the time records for which compensation
is sought and believe them to be reasonable and to warrant payment as a substantial contribution
award.  In reviewing the attorney services, it is clear to me that they cannot be dissected by
individual time entry because they were all the critical building blocks upon which Mizuho was
able to render a substantial contribution.  The major issues in this case were so complex that it
was important that I have Stroock's input even on the most basic matters underpinning them.

39.      Moreover, another critical fact which must be brought to the Court's attention
stems from the ethical wall implemented by Mizuho based on its status as a Committee member

and creditor.  In my position as co-chair, I received material non-public information regarding the estate, which I shared with Stroock, resulting in discussions or legal research relating to that information.  Because Stroock's fee statements were reviewed by me as well as Mizuho personnel on the other side of the ethical wall, as prophylactic measure, we agreed that Stroock's bills should avoid reference to such issues, and maintain certain generality in its descriptions.  Thus, it would be difficult, if not impossible, for Stroock to go back and review its time entries and attempt to cut what would likely be minimal amounts of time.  In any event, I believe such an exercise is superfluous given the substantial contribution Mizuho provided here.

40.     Mizuho's position here is unique.  It is one of the few Committee members that served from Day One and it is the member which served on the most subcommittees.  It undertook the additional leadership role of co-chair throughout the entirety of the proceedings.  Mizuho was conservative in its fee request from the time of its initial submission, never seeking fees in connection with its own claims, or for time spent in court (other than for major hearings) or for work on the JPM discovery matter.  And, most significantly, it also rendered a substantial contribution as an individual creditor, unrelated to its committee status, which is something that the United States Trustee has agreed is compensable.

41.     Mizuho recognizes that $3,026,197.78 in counsel fees and expenses incurred is not an insubstantial amount.  But those fees, incurred over the course of 3-1/2 years, through Mizuho's service throughout the entirety of the cases as an active committee member, member of eight subcommittees, and full time co-chair pales in contrast to the direct and substantial contribution made in the context of these cases and the attorney fees incurred by others.

42.      Notwithstanding all of the above, if the Court is inclined to discount the substantial contribution award to Mizuho, I would submit that such discount should be no greater than a 30% discount with respect to fees incurred in participating in general full Committee meetings and teleconferences, which amounts to a discount of $107,278.80 and that it should be without prejudice to Mizuho's rights to seek the full amount requested, pursuant to Section 1129(a)(4), on appeal of said issue.

I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Executed this 17th day of December, 2015.

/s/ Noel P. Purcell
_____
Noel P. Purcell
