PAUL HASTINGS LLP
75 E. 55th Street
New York, New York 10022
Telephone: (212) 318-6000
Facsimile: (212) 752-2859
Kurt W. Hansson
Joshua M. Bennett

*Attorneys for Plaintiff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case<br><br>Case No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.<br><br>Plaintiff,<br><br>-against-<br><br>ACTS RETIREMENT-LIFE COMMUNITIES, INC.,<br><br>Defendant. | Adv. Proc. No. 15-_____<br><br>**ADVERSARY PROCEEDING COMPLAINT** |

Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, "Plaintiff") under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan"), on behalf of Lehman Brothers Special Financing Inc. ("LBSF"), by and through its attorneys, Paul Hastings LLP, for its complaint against ACTS Retirement-Life Communities, Inc. ("ACTS" or "Defendant"), alleges as follows:

**PRELIMINARY STATEMENT**[1]

1. ACTS was a party to a swap agreement with LBSF (the "Swap Agreement," attached as Exhibit A), under which the parties entered into an interest rate swap transaction (the "Transaction").

2. Under the Transaction, the parties were obligated to make monthly floating-rate interest payments based on a notional amount. The floating-rate applicable to ACTS's payments was equal to the PSA Municipal Bond Swap Index (a/k/a, and hereinafter, the "BMA Index"). The floating-rate applicable to LBSF's payments was equal to 77.25% of USD-LIBOR-BBA (1-month). The party whose monthly payment was greater than the other's was obligated to pay the difference to the other party.

3. The bankruptcy filings of LBHI and LBSF in the fall of 2008 constituted Events of Default under the Swap Agreement, which entitled ACTS to terminate the Transaction early, subject to various early termination procedures and payments.

4. At that time, the present value of the expected floating-rate payments that ACTS owed over the remaining life of the Transaction was substantially more than the present value of the expected floating-rate interest payments that LBSF owed. In other words, LBSF was squarely "in the money" on the Transaction.

5. Accordingly, if ACTS had terminated the Transaction at that time, it would have realized a substantial gain by avoiding its future payment obligations to LBSF.

6. Under the terms of the Swap Agreement, ACTS would have been

---

[1] Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them below.

obligated to determine the amount of this gain, reasonably and in good faith, and then pay this amount to LBSF, as part of its Early Termination Payment.

7. ACTS, however, opted not to terminate the Transaction at that time.

8. Instead, ACTS decided simply to stop making its monthly payments to LBSF on account of the bankruptcy filings.

9. ACTS failed to make such payments beginning in October 2008 and failed to do so for the next nine months thereafter—in breach of its contract with LBSF and in violation of the Bankruptcy Code.

10. As this Court has previously held in a matter involving a different LBSF swap counterparty, "riding the market out" and failing to make payments under a swap transaction on account of a bankruptcy filing—as ACTS did—is "simply unacceptable." *In re Lehman Brothers Holding Inc.*, Case No. 08-13555 (JMP) (Bankr. SDNY Sept. 15, 2009) (transcript of record at 101-113) (the "Metavante Decision").

11. The monthly payment obligations that ACTS failed to make over the course of nine months total more than $200,000 (the "Unpaid Amounts"). ACTS subsequently acknowledged that it owes LBSF this amount, although it still has not paid it.

12. On July 2, 2009, ACTS finally decided to terminate the Transaction, thereby triggering its obligation to determine the amount of its gain as a result of doing so.

13. As of July 2009, the present value of the expected floating-rate payments that ACTS would have owed over the remaining life of the Transaction (had it not been

terminated) was more than $5 million greater than the present value of the expected floating-rate interest payments that LBSF would have owed. Accordingly, by terminating the Transaction in July 2009, ACTS realized a multi-million dollar gain.

14. ACTS—which was advised by KSR Capital Advisors, Inc. ("KSR"), and just like several other LBSF swap counterparties that were advised by KSR—unreasonably and in bad faith determined that it gained $0 by terminating the Transaction, and then failed to pay any Early Termination Payment to LBSF, in breach of the Swap Agreement.

15. In fact, ACTS claimed that LBSF owed it over $50,000 that was allegedly incurred by ACTS in connection with alleged termination-related fees and expenses, and over $200,000 in connection with a Reserve Fund Agreement between ACTS and LBSF, dated December 18, 2002 (the "RFA"), that ACTS claims LBSF breached.[2]

16. Additionally, on or about September 18, 2009, ACTS filed proofs of claim in LBHI's and LBSF's respective chapter 11 proceedings, relating to certain amounts that ACTS alleged were owed in connection with the Transaction (Claim Numbers 16217 and 16218, hereinafter, the "Proofs of Claim"). Plaintiff objected to the Proofs of Claim in *Debtors' Two Hundred Twenty-Eighth Omnibus Objection to Claims (No Liability Derivative Claims)*, filed October 17, 2011 [Dkt. No. 20866] (the "Omnibus Objection," attached as Exhibit B). Plaintiff incorporates the Omnibus Objection by reference herein, and seeks declaratory judgment that the Proofs of Claim be disallowed and expunged for the reasons set forth in the Omnibus Objection and as further set forth herein.

---

[2] Plaintiff's evaluation of ACTS's claim with respect to the RFA is ongoing and accordingly Plaintiff takes no position with respect to such claim at this time.

## PARTIES

17. LBHI is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. On September 15, 2008, LBHI commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On December 6, 2011, the Court approved and entered an order confirming the Plan. The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute litigation claims on behalf of the estate of LBSF.

18. LBSF is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. It is a subsidiary of LBHI. LBSF filed its chapter 11 petition with the Court on October 3, 2008.

19. ACTS is a domestic not-for-profit corporation organized and existing under the laws of Pennsylvania with its principal place of business at 375 Morris Road, PO Box 90, West Point, Pennsylvania, 19486. ACTS operates various residential facilities for the elderly in Pennsylvania, North Carolina and Florida. In 2014, ACTS reported over $294 million in annual revenue (for fiscal year 2013) and over $941 million in assets.

## JURISDICTION AND VENUE

20. This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105, 502 and 541 of the Bankruptcy Code.

21. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.

22. Pursuant to Article XIV of the Plan, and Paragraph 77 of the order confirming the Plan, the Bankruptcy Court has exclusive jurisdiction of all matters in connection with, arising out of, or related to these chapter 11 cases and the Plan pursuant to, and for the purposes of sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, to hear and determine any actions brought to recover all assets of the Debtor and property of the estate, wherever located or to determine or declare entitlement to such assets and property.

23. This Court has personal jurisdiction over ACTS pursuant to Rule 7004(f) of the Bankruptcy Rules, and because ACTS filed the Proofs of Claim in LBHI's and LBSF's respective chapter 11 proceedings, because ACTS consented to such jurisdiction in the Swap Agreement, and because ACTS has minimum contacts with the forum state in connection with the Transaction.

24. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

25. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff states that it consents to the entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## BACKGROUND

**A.     The Swap Agreement**

26. On or about November 27, 2001, ACTS and LBSF entered into the Transaction.

27. The Transaction was governed by the Swap Agreement, which was

comprised of (i) a 1992 local currency-single jurisdiction ISDA master agreement (the "<u>Master Agreement</u>"); (ii) a schedule to the Master Agreement (the "<u>Schedule</u>"); (iii) a credit support annex to the Schedule (the "<u>Credit Support Annex</u>"); and (iv) a trade confirmation (the "<u>Confirmation</u>"). The Swap Agreement is attached as Exhibit A.

28. Under the Transaction, the parties were obligated to make monthly floating-rate interest payments based on the notional amount, which started at $100,000,000 and was to be reduced in specified amounts set forth in an annex to the Confirmation, and ultimately down to $0 upon the maturity date of November 15, 2029.

29. LBHI served as Credit Support Provider[3] to LBSF under the Swap Agreement. In this capacity, LBHI guaranteed LBSF's payment obligations.

30. Section 11 of the Master Agreement states that "each party irrevocably … submits to … the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York."

31. Part 3(f) of the Schedule states that the Swap Agreement "will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."

**B.    <u>The Events of Default</u>**

32. On September 15, 2008, LBHI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. LBSF did the same on October 3, 2008.

---

[3] Capitalized terms not expressly defined herein shall have the meaning ascribed to them in the Swap Agreement.

33. Pursuant to Section 5(a) of the Master Agreement, the bankruptcy filings constituted Events of Default.

34. As a result of these Events of Default, ACTS was permitted to designate an Early Termination Date—terminating the Transaction early—pursuant to Section 6(a) of the Master Agreement.

35. Section 6(c)(ii) of the Master Agreement states that "[u]pon the occurrence or effective designation of an Early Termination Date … [t]he amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e) [of the Master Agreement]."

36. Section 6(d)(i) of the Master Agreement states that "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date," the Non-Defaulting Party (here, ACTS) shall make calculations according to Section 6(e) of the Master Agreement and provide to the other party (LBSF) a statement "showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e))."

37. Section 6(e) of the Master Agreement includes a list of various methodologies for calculating any termination payments to be made upon the occurrence of an Early Termination Date (the "<u>Early Termination Payment</u>").

38. In Part 1(f) of the Schedule, the parties elected and agreed upon Second Method and Market Quotation as the methodology to be used for calculating the Early Termination Payment.

39. Section 6(e)(i)(3) of the Master Agreement states:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-Defaulting Party) in respect of the Terminated Transaction and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

40. In other words, if upon early termination the Defaulting Party (here, LBSF) is "in the money," the Non-defaulting Party (here, ACTS) is obligated to pay the Defaulting Party an Early Termination Payment, which is comprised of the Unpaid Amounts and the Settlement Amount.

41. Unpaid Amounts is defined in Section 12 of the Master Agreement as the amounts owing to any party that "became payable …on or prior to [the] Early Termination Date and which remain unpaid as at [the] Early Termination Date."

42. Settlement Amount is defined in Section 12 of the Master Agreement as an amount equal to the Market Quotation for each Terminated Transaction "for which a Market Quotation is determined."

43. Market Quotation is defined in Section 12 of the Master Agreement as the amount "determined on the basis of quotations from Reference Market-makers," which is defined, in turn, as "four leading dealers in the relevant market selected" by the Non-defaulting Party "in good faith" to enter into a Replacement Transaction for the Terminated Transaction.

44. In other words, the Market Quotation process required the Non-defaulting

Party to solicit bids from four leading swap dealers for what they would pay or charge to step into the shoes of LBSF in the Transaction.

45. The Master Agreement, however, expressly contemplates in Section 12 the possibility that in certain circumstances a Market Quotation "cannot be determined." For example, the Master Agreement states in Section 12 that "[i]f fewer than three quotations are provided" from among the four Reference Market-makers selected, "it will be deemed that the Market Quotation in respect of such terminated Transaction … cannot be determined."

46. The Master Agreement also expressly contemplates in Section 12 the possibility that in certain circumstances the Market Quotation process might not "produce a commercially reasonable result."

47. In circumstances where either the Market Quotation cannot be determined or the Market Quotation process would not produce a commercially reasonable result, Section 12 of the Master Agreement states that the Settlement Amount is equal to the Non-Defaulting Party's Loss as a result of the early termination, regardless of whether that amount is "positive or negative."

48. In other words, Loss means either the Non-defaulting party's loss or its gain, as a result of terminating the Transaction.

49. The Non-defaulting party is expressly obligated to determine the amount of this loss or gain reasonably and in good faith.

50. Indeed, Loss is defined in Section 12 of the Master Agreement as the "amount that party reasonably determines in good faith to be its total losses and costs (or gain, in

-10-

which case expressed as a negative number)" in connection with the Terminated Transaction.

**C.    ACTS Keeps the Transaction Open, But Improperly Stops Making its Monthly Payments**

51.    Notwithstanding the bankruptcy filings by LBHI and LBSF in the fall of 2008, ACTS opted not to terminate the Transaction at that time.

52.    Instead, as of October 1, 2008, ACTS simply stopped making the monthly payments to LBSF that it owed under the Transaction.

53.    On November 26, 2008, ACTS sent a letter to LBSF to provide a purported explanation as to why it was no longer making its payments under the Transaction (the "November 26, 2008 Letter").

54.    ACTS stated in the November 26, 2008 Letter that an Event of Default had occurred and was continuing to occur pursuant to Section 5(a) of the Master Agreement, as a result of LBHI's bankruptcy filing, and that while ACTS was reserving its right to terminate the Transaction early pursuant to Section 6(a) of the Master Agreement, it was not doing so "at this time."

55.    ACTS, further stated in the November 26, 2008 Letter that it was not obligated to make payments to LBSF while an Event of Default was occurring, and cited Section 2(a)(iii) of the Master Agreement as purported support for this position.

56.    Section 2(a)(iii) of the Master Agreement provides that each obligation of each party under the Agreement is subject to "the condition precedent that no Event of Default … with respect to the other party has occurred and is continuing."

57. ACTS's position, however, was legally invalid as the Bankruptcy Code renders unenforceable contractual provisions such as Section 2(a)(iii) that modify a debtor's rights solely based on the filing of a bankruptcy case. Such clauses are often referred to as *ipso facto* clauses. *See* 11 U.S.C. § 365(e)(1).

58. The Court addressed this issue in the *Metavante* Decision, *supra*, at 109-112, and held that a non-debtor may not ride out the market while avoiding its obligations under an "executory contract," such as a swap agreement, on account of bankruptcy filings, as such conduct is "contrary to the spirit … of the Bankruptcy Code" and contrary to "relevant case law."

D. **ACTS Finally Terminates the Transaction**

59. On June 25, 2009, LBHI and LBSF sent a letter to ACTS advising it of the legal invalidity of its position in connection with its refusal to perform its payment obligations under the Transaction.

60. One week later, on July 2, 2009, ACTS sent a letter to LBHI and LBSF, designating July 2, 2009 as the Early Termination Date pursuant to Section 6(a) of the Master Agreement (the "Early Termination Letter").

61. Upon doing so, ACTS became obligated under the Master Agreement to determine the amount of any Early Termination Payment that was owed.

62. On July 10, 2009, ACTS delivered to LBSF a letter pursuant to Section 6(d)(i) of the Master Agreement, containing ACTS's determination of the Early Termination Payment (the "Calculation Statement").

63. According to the Calculation Statement, ACTS conducted a Market Quotation process, in which it solicited bids from multiple Reference Market-makers in December 2008 and again in July 2009 to provide a replacement swap. More specifically, as ACTS stated in a later letter, ACT sought quotations from ten Reference Market-makers.

64. The Market Quotation Process, however, "yielded no bids in which a payment to or from a Referenced [sic] Market-maker was offered in exchange for entering into a Replacement Swap."

65. As ACTS explained, the Reference Market Makers that were solicited declined to bid because "the credit terms under the Replacement Swap that was offered," which were "identical to those contained in the [Swap Agreement]," were "unacceptable" to them.

66. ACTS further stated that because it was "[u]nable to secure any quotation of relevant rates or prices from one or more leading dealers in the market, Loss was determined to be $0."

67. On that basis, ACTS stated that no Early Termination Payment was owed to LBSF; and, in fact, that LBSF owed ACTS an Early Termination Payment of $352,036.32, an amount which allegedly represented:

> "all outstanding amounts due and owing under the Agreement ($34,265.92), plus reasonable out-of-pocket expenses, including legal fees, incurred by ACTS in connection with the early termination of the Agreement ($24,305.60) and plus [sic] ACTS [sic] loss as of this date arising from LBSF's failure to honor its obligations under the Reserve Fund Agreement between ACTS and LBSF dated December 18, 2002 ($293,464.80).

68. On September 18, 2009, ACTS filed the Proofs of Claim in LBHI's and

LBSF's respective chapter 11 proceedings for $58,571.52—which is the sum of the amount ACTS claimed LBSF owed under the Swap Agreement, plus ACTS's alleged reasonable out-of-pocket expenses in connection with the termination of the Transaction.[4]

69.    Six months later, on March 3, 2010, ACTS sent LBSF and LBHI a letter in which ACTS stated that it had determined that there was "an unpaid amount of $227,171.01 owing to Lehman" and that this amount "was inadvertently not accounted for in the … Calculation Statement" (the "March 3, 2010 Letter").

70.    On information and belief, this amount represents ACTS's determination of the Unpaid Amounts that ACTS failed to make for nine months, from October 1, 2008 to July 2, 2009.

71.    ACTS, however, still has not paid this amount to LBSF, nor ever amended or withdrawn its Proofs of Claim to account for such amounts owed to LBSF.

E.    **ACTS's Determination that it Gained $0 By Terminating the Transaction was Unreasonable and in Bad Faith**

72.    Under the Master Agreement, ACTS was obligated to determine its gain from terminating the Transaction "reasonably" and "in good faith."

73.    ACTS failed to do so.

74.    Instead, ACTS determined that it gained $0 as a result of terminating the Transaction, based on the fact that none of the swap dealers it solicited placed a bid.

---

[4]    ACTS also filed a proof of claim on September 18, 2009 for the amount allegedly owed by LBSF under the RFA. As stated above in note 2, Plaintiff's evaluation of the RFA is ongoing. Accordingly, Plaintiff takes no position with respect to this proof of claim at this time.

75. But the fact that the Market Quotation process resulted in no bids does not mean that ACTS gained $0 by terminating the Transaction.

76. When a market price cannot be determined, "one must use a different method to discover the value." *See, e.g., In re American Home Mortgage Holdings, Inc.*, 411 B.R. 181, 193 (Bankr. D. Del. 2009), *aff'd*, 637 F.3d 246 (3d Cir. 2011).

77. Indeed, if the parties intended for a failed Market Quotation process to result in a $0-valuation, they would have said so in the Swap Agreement.

78. Instead, the Master Agreement states that when a Market Quotation cannot be determined, the Non-Defaulting Party must revert to a reasonable and good faith determination of its gain to determine the proper Settlement Amount.

79. As such, ACTS's determination that it gained $0, based on the fact that the Market Quotation could not be determined, renders meaningless the provisions in the Master Agreement requiring the Non-defaulting Party to revert to a "reasonable" and "good faith" determination of its gain when the Market Quotation cannot be determined.

80. Moreover, ACTS unreasonably, and in bad faith, ignored the plain and significant financial impact that resulted from its early termination of the Transaction, *i.e.*, the substantial multi-million dollar gain that it realized.

F.   **The Valuation of ACTS's Actual Gain**

81. The amount that ACTS actually gained by terminating the Transaction early is easily determined using the terms of the Swap Agreement itself.

82. After all, the value of the Transaction is built into the terms of the Swap

Agreement, *i.e.*, ACTS's obligation to make monthly payments based on a floating-rate of interest equal to the BMA Index in exchange for LBSF's obligation to make monthly payments based on a floating-rate of interest equal to 77.25% of USD-LIBOR-BBA.

83. The present value of ACTS's obligations exceeded the present value of LBSF's obligations by more than $5 million.

84. Accordingly, ACTS realized a gain of more than $5 million by terminating the Transaction.

**G.    ACTS's Improperly Included Out-of-Pocket Fees and Expenses in its Determination of the Early Termination Payment**

85. ACTS improperly included in its determination of the Early Termination Payment the alleged out-of-pocket fees and expenses that it allegedly incurred in connection with its termination of the Transaction, amounting to $58,571.52.

86. The inclusion of this amount is unsupported by the Swap Agreement.

87. While Section 9 of the Master Agreement states that the Defaulting Party will "indemnify and hold harmless the other party for and against all reasonable and out-of-pocket expenses, including legal fees," such indemnity is expressly limited to expenses incurred "by reason of the enforcement and protection of [the Non-defaulting Party's] rights" under the Swap Agreement.

88. On information and belief, the out-of-pocket fees and expenses claimed by ACTS, or at least a significant portion thereof, were not incurred by reason of the enforcement or protection of any rights under the Swap Agreement.

89. Rather, on information and belief, these fees and expenses were incurred by ACTS in connection with its attempt to avoid its obligation under the Swap Agreement to pay the Unpaid Amounts to LBSF, and to avoid its obligation to pay its gain as a result of terminating the Transaction to LBSF.

90. Such fees and expenses are neither "reasonable" nor were they incurred in connection with the "enforcement and protection of [ACTS's] rights," and therefore were not properly included in the determination of the Early Termination Payment.

**H.    ACTS Owes LBSF Interest**

91. Pursuant to section 6(d) of the Master Agreement, any amount payable under Section 6(e), such as an Early Termination Payment, shall be paid inclusive of interest at the "Applicable Rate," to be calculated on the basis of daily compounding.

92. Under the Master Agreement, the Applicable Rate is defined as the "Termination Rate" before receipt of the Calculation Statement, and the "Default Rate" following the date upon which sums become payable under Section 6(d)(ii) of the Master Agreement, which is the date the Calculation Statement is received.

93. Termination Rate is defined in the Master Agreement as "a rate per annum equal to the arithmetic mean of the cost (without proof of evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts."

94. Default Rate is defined in Part 3(h) of the Schedule as one-month LIBOR plus 1%.

95. Interest will continue to accrue at the Default Rate until the date of full

payment.

## COUNT 1
**(Breach of Contract by ACTS)**

96. Plaintiff incorporates by reference all prior paragraphs of this Complaint.

97. The Swap Agreement is a valid and enforceable contract between ACTS and LBSF.

98. LBSF performed all of its obligations in connection with the Swap Agreement.

99. ACTS breached the Swap Agreement by failing to make its payment obligations for nine months, from October 2008 to June 2009, which amount to more than $200,000, *i.e.*, the Unpaid Amounts.

100. ACTS's purported basis for failing to make such payments—on account of Plaintiff's bankruptcy filings—is in violation of the Bankruptcy Code, as this Court held in the *Metavante* Decision.

101. ACTS also breached the Swap Agreement by failing to pay LBSF the Unpaid Amounts as part of its Early Termination Payment.

102. ACTS also breached the Swap Agreement by failing to determine its gain as a result of its early termination reasonably and in good faith, and by failing to pay such gain to LBSF as part of its Early Termination Payment.

103. ACTS also breached the Swap Agreement in connection with the Market Quotation process by soliciting bids from ten Reference Market-Makers instead of four.

104. As a result, LBSF has been damaged in an amount to be proven at trial, which includes the more than $200,000 of Unpaid Amounts ACTS failed to make prior to the Early Termination Date, the multi-million gain ACTS realized in terminating the Transaction, and interest on these amounts.

## COUNT 2
### (Declaratory Judgment)

105. Plaintiff incorporates by reference all prior paragraphs of this Complaint.

106. On or about September 18, 2009, ACTS filed the Proofs of Claim in LBHI's and LBSF's respective chapter 11 proceedings relating to certain amounts that it alleged were owed in connection with the Transaction (Claim Numbers 16217 and 16218).

107. Plaintiff objected to the Proofs of Claim on October 17, 2011 in the Omnibus Objection.

108. The Proofs of Claim should be disallowed and expunged for the reasons set forth in the Omnibus Objection and as further set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant judgment in its favor and against ACTS as follows:

1. As to Count 1, finding ACTS in breach of the Swap Agreement, and awarding Plaintiff damages from ACTS in an amount to be determined at trial, including all interest owed by contract and law.

2. As to Count 2, a declaratory judgment that the Proofs of Claim filed by ACTS relating to the Transaction (Claim Numbers 16217 and 16218) are disallowed and expunged.

3. Awarding Plaintiff such other and further relief as the Court deems just

and proper.

Dated: New York, New York
December 23, 2015

            By: /s/ Joshua M. Bennett
               Kurt W. Hansson
               Joshua M. Bennett

               PAUL HASTINGS LLP
               75 E. 55th Street
               New York, NY 10022
               Telephone: (212) 318-6000
               Facsimile: (212) 752-2859

               *Attorneys for Plaintiff*