WEIL, GOTSHAL & MANGES LLP
Jacqueline Marcus
767 Fifth Avenue
New York, NY  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

WEIL, GOTSHAL & MANGES LLP
Ralph I. Miller
1300 Eye Street, NW, Suite 900
Washington, DC  20005
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940

*Attorneys for Lehman Brothers Holdings Inc.,
in its capacity as Plan Administrator on behalf
of Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                                   Debtors. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.,<br><br>                                   Plaintiff,<br><br>         v.<br><br>Daiwa Securities Capital Markets Co. Ltd.,<br><br>                                   Defendant. | Adv. Proc. No. _____<br><br>**ADVERSARY PROCEEDING COMPLAINT** |

1. Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan") (in this capacity, the "Plan Administrator" or "Plaintiff"), on behalf of Lehman Brothers Special Financing Inc. ("LBSF"), brings this adversary proceeding against Defendant Daiwa Securities Capital Markets Co. Ltd. f/k/a Daiwa Securities SMBC Co. Ltd. f/k/a Daiwa Securities SB Capital Markets Co. Ltd. ("Daiwa") to recover millions of dollars, plus interest, that remains due and owing as a result of the termination by Daiwa of a portfolio of 955 derivatives transactions (the "Transactions") and alleges the following on knowledge, as to LBSF's and LBHI's own acts, and upon information and belief, as to all other matters:

**PRELIMINARY STATEMENT**

2. Shortly after LBHI filed its Chapter 11 petition on September 15, 2008 (the "LBHI Petition Date"), Daiwa elected to terminate the Transactions it had with LBSF. Once it terminated the Transactions, Daiwa was obligated to value those Transactions in good faith and in a commercially reasonable manner and pay LBSF an early termination payment consisting of any gain that Daiwa realized on the terminated Transactions.

3. As of the Early Termination Date[1] of September 26, 2008, the Transactions were heavily "in the money" to LBSF, as demonstrated by their mid-market, mark-to-market value of approximately $75 million. But instead of calculating its Loss reasonably and in good faith, Daiwa resorted to commercially unreasonable and bad faith valuation techniques, including deducting tens of millions of dollars of "unwind costs" that it did not incur from its valuations of

---

[1] Capitalized terms used but not defined herein shall have the meanings given them in the 1992 standard form (Multicurrency-Cross Border) ISDA Master Agreement, dated as of August 29, 2000 and amended as of December 4, 2001 (together with all schedules, annexes, exhibits, and amendments thereto, the "Master Agreement").

1

the Transactions. The fictitious "costs" that Daiwa concocted massively overstated any costs that Daiwa incurred, or would have incurred, in replacing or rehedging the Transactions.

4.  By manufacturing fictitious charges, Daiwa sought to turn a multi-million dollar payable it owed LBSF into a multi-million dollar receivable that it was not entitled to receive. By failing to calculate its gain reasonably and in good faith and turn that gain over to LBSF, Daiwa failed to comply with the clear terms of the Master Agreement.

5.  Daiwa then compounded its breach by filing proof of claim number 19340 against LBSF for $22,778,067.21 plus fees, expenses, and interest and proof of claim number 19339 against LBHI for $22,778,067.21 plus fees, expenses, and interest (collectively, the "Claims") based on the improper and commercially unreasonable valuation techniques.

6.  Daiwa's Loss calculation, which disregarded the Master Agreement's clear provisions, did not follow a commercially reasonable process in calculating its Loss, did not produce a commercially reasonable result, and was not determined in good faith. It should be disregarded. Daiwa owes LBSF an amount to be determined at trial, including contractual interest which continues to accrue until payment in full. LBHI and LBSF seek to compel payment of the amount that has been due since 2008 plus interest on that amount, and to disallow and expunge Daiwa's Claims.

## JURISDICTION AND VENUE

7.  On September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, commenced in this Court voluntary cases under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). A little over two weeks after the LBHI Petition Date, LBSF filed its own Chapter 11 petition on October 3, 2008.

8. This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 501 and 502 of the Bankruptcy Code.

9. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

10. The Court has personal jurisdiction over Daiwa. Daiwa has consented to this Court's jurisdiction by filing the Claims arising from the Transactions against LBHI and LBSF.

11. This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

12. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff states that it consents to the entry of a final judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

13. Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11 Cases are pending in this district.

## THE PARTIES

14. LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020. On December 6, 2011, the Court approved and entered an order confirming the Plan. The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

15. LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

3

16. Daiwa is a corporation located in Japan that provides OTC derivatives transactions, sales and brokerage services, and investment banking services.

## BACKGROUND

**I.  The Master Agreement And The Transactions.**

17. The Master Agreement provides the basic terms for the parties' contractual relationship. As of September 15, 2008, pursuant to the Master Agreement, LBSF and Daiwa had 955 outstanding Transactions, comprised of 133 credit default swaps, 41 foreign exchange forwards and options, and 781 interest rate swaps and options, including 11 cross-currency swaps.

18. On September 23, 2008, shortly after the LBHI Petition Date, Daiwa served LBSF with a termination notice (the "Early Termination Notice"), terminating all outstanding Transactions between the parties and designating September 26, 2008 as the Early Termination Date under the Master Agreement.

19. The Schedule to the Master Agreement provides that the payment owed upon early termination will be calculated using "Loss and the Second Method." Master Agreement at Schedule at Part 1(f). The Master Agreement defines "Loss" as "an amount that [the Non-defaulting Party] reasonably determines in good faith to be *its* total losses and costs (or gain, in which case expressed as a negative number) in connection with this [Master] Agreement or . . . group of Terminated Transactions." Master Agreement § 14 (emphasis added).

20. The "Second Method" requires the party that is "out of the money" on the Terminated Transactions to make a termination payment to the party that is "in the money" on the Terminated Transactions, regardless of whether such party is the Defaulting Party or the Non-Defaulting Party. In doing so, the termination payment provisions selected in the Master

4

Agreement are designed to preserve the benefits of the bargain for each Party and not to punish the Defaulting Party or deprive it of such benefits.

21.     Here, it is undisputed that LBSF was "in the money" under the Transactions and Daiwa was "out of the money" as of the Early Termination Date – meaning that the present value of Daiwa's expected future payments to LBSF was greater than the present value of LBSF's expected future payments to Daiwa. The net value by which Daiwa was out of the money, together with the value of certain payments that Daiwa failed to make prior to the Early Termination Date, substantially exceeded the value of the collateral Daiwa had posted to LBSF.

22.     As such, the portfolio of Transactions represented a significant liability for Daiwa as of the Early Termination Date, even after setting off the collateral, and Daiwa realized a gain by terminating that liability.

23.     Because Daiwa realized this gain in terminating the Transactions, Daiwa was required to turn this gain over to LBSF in the form of a multi-million dollar early termination payment.

II.     **Daiwa Violates The Master Agreement And Harms LBSF Through Its Flawed Valuation.**

24.     On October 2, 2008, Daiwa sent LBSF a statement (the "Calculation Statement"), purportedly in accordance with section 6(d) of the Master Agreement, which asserts that **LBSF owes Daiwa** an early termination payment of $22,650,522, plus interest.

25.     While the mid-market, mark-to-market value of the terminated Transactions as of the Early Termination Date was approximately $74.8 million in LBSF's favor, Daiwa's Calculation Statement under-valued the terminated Transactions as being worth only $32.4 million in LBSF's favor. Daiwa attempted to write down the amount it owed to LBSF by

5

deducting tens of millions of dollars of hypothetical "unwind costs" from its valuations of the Transactions.

26.     After making these improper adjustments, Daiwa deducted another $55.1 million to account for collateral held by LBSF and missed payments. The end result was a statement claiming that LBSF owed Daiwa millions of dollars, when in fact the exact opposite was true.

### A.    Daiwa's Calculation Of The Early Termination Payment Was Not Reasonably Determined In Good Faith.

27.     Daiwa's Calculation Statement claims very substantial transaction costs that Daiwa alleges it would have paid had it entered into replacement transactions.

28.     While the definition of Loss permits the Non-defaulting Party to include any "loss or cost incurred as a result of . . . obtaining or reestablishing any hedge or related trading position," Daiwa did not take into account its actual replacement or rehedging transactions in putting together its Loss calculation. *See* Master Agreement § 14 (definition of "Loss").

29.     Discovery will be required to show how much of the portfolio Daiwa actually replaced or rehedged on or around the September 26, 2008 Early Termination Date and what costs (if any) it is entitled to deduct from the value of the terminated Transactions. Nevertheless, it is clear that the costs Daiwa seeks to impose on LBSF do not reflect amounts that Daiwa would have incurred had it replaced or rehedged the terminated Transactions. As a major swap participant, Daiwa would have been able to replace or rehedge the Transactions for a small fraction of these costs. The "costs" that Daiwa claimed are far beyond the realm of reasonableness.

30.     The Master Agreement does not permit Daiwa to enrich itself at the expense of LBSF's unsecured creditors by charging LBSF with hypothetical and inflated costs that are plainly not within "*its* total losses and costs (or gain . . .)," as defined by the Loss measure in the

6

Master Agreement. *See* Master Agreement § 14 (emphasis added). By trying to impose these enormous hypothetical costs, Daiwa acted in a commercially unreasonable manner in a bad faith attempt to avoid paying LBSF the amounts it was owed.

31. As such, Daiwa is not entitled to the amounts stated in its Calculation Statement, and it has owed a multi-million dollar early termination payment to LBSF since 2008.

### III. Daiwa Owes Contractual Default Interest On The Early Termination Payment.

32. When Daiwa delivered its Calculation Statement, it was also required to turn over its entire gain, including the missed payments and net of collateral, to LBSF in the form of an early termination payment. Master Agreement §§ 6(e)(i)(4), 14. Daiwa failed to pay LBSF the amount it was owed at that time and still has not paid any portion of that amount seven years later.

33. As a result, Daiwa owes interest to LBSF as provided in the Master Agreement. *See* Master Agreement § 6(d)(ii) (providing that "[a]n amount calculated as being due in respect of any Early Termination Date under section 6(e) will be payable on the day that notice of the amount payable is effective . . . . Such amount will be paid together with . . . interest thereon (before as well as after judgment) . . . from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate."). "Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed." *Id.* Section 14 of the Master Agreement provides that the "Applicable Rate" is the "Termination Rate" for the period of time between the Early Termination Date and provision of the Calculation Statement. *Id.* § 14. Thereafter, the "Applicable Rate" is the "Default Rate" for the period of time from the date of receipt of the Calculation Statement until the date when payment is made. *Id.* § 14.

7

34. Here, Default Rate interest began accruing on October 2, 2008 and continues to accrue until Daiwa pays LBSF in full.

## IV. **Daiwa Files Grossly Inflated Bankruptcy Claims In This Court Based On Its Improper Valuation.**

35. On September 18, 2009, Daiwa filed its Claims to recover the amounts Daiwa asserts it is owed in connection with the Transactions.

36. Daiwa's Claims are based upon the same faulty valuation procedures evident in the Calculation Statement.

37. There is no basis for any Daiwa claim against LBSF or LBHI. Daiwa is not entitled to a claim in *any* amount because it was Daiwa, not LBSF, which owed an early termination payment as of the Early Termination Date. Consequently, Daiwa's Claims should be disallowed and expunged.

38. Daiwa's filing and maintaining of these fictitious Claims has prejudiced LBSF, LBHI, and their respective unsecured creditors, as LBSF and LBHI have been forced to maintain millions of dollars of excessive reserves in connection with these Claims that would otherwise have been distributed to LBSF's legitimate unsecured creditors.

## V. **The Parties Attempt Settlement.**

39. Since 2009, LBSF has been engaged in settlement discussions with Daiwa without success. LBSF and Daiwa participated in a mediation session on February 21, 2012 under the Court's Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2009) [ECF No. 5207] and in a subsequent mediation session on April 22, 2015. During this period, the parties agreed to toll the running of the statute of limitations with respect their

8

possible claims. The mediations were unsuccessful. On December 21, 2015, LBHI gave written notice of termination under the terms of the tolling agreement.

## COUNT I

### Breach of the Master Agreement

40. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-39 of this Complaint as though fully set forth in this cause of action.

41. On the Early Termination Date, LBSF was the party "in the money" under the Transactions. Even after setting off the collateral Daiwa had posted under the Master Agreement, LBSF was still entitled to receive a multi-million dollar early termination payment from Daiwa.

42. The Master Agreement provides that the Non-defaulting Party's "Loss" is equal to the "amount that [the Non-defaulting Party] reasonably determines in good faith to be *its* total losses and costs (or gain, in which case expressed as a negative number) in connection with this [Master] Agreement or that . . . group of Terminated Transactions." *See* Master Agreement § 14 (definition of "Loss") (emphasis added). Moreover, the "Second Method," as selected by the parties, requires the "out of the money" party to pay the net value of the contract to the "in the money" party under the Transactions, regardless of who defaulted. *Id.* at § 6(e)(i).

43. By valuing the Transactions using faulty valuation methodologies, including deducting tens of millions of dollars of hypothetical and wildly inflated replacement costs, Daiwa failed to reasonably determine its Loss in good faith. Further, Daiwa did not pay (and still has not paid) LBSF the early termination payment LBSF was owed or the interest that has accrued thereon.

44. As a result, Daiwa has breached the Master Agreement, damaging LBSF in an amount to be proven at trial, representing the value of Daiwa's gain as of the Early Termination

9

Date, inclusive of missed payments it failed to make to LBSF, minus the value of the collateral Daiwa had posted to LBSF, plus contractual interest, which continues to accrue until final payment is made to LBSF.

## COUNT II

### Breach of the Implied Covenant of Good Faith and Fair Dealing

45. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-44 of this Complaint as though fully set forth in this cause of action.

46. On the Early Termination Date, LBSF was entitled to receive a substantial early termination payment from Daiwa, but Daiwa manipulated its Loss calculation in order to retain a windfall. Daiwa knew that it had realized a gain upon terminating the Transactions, so Daiwa should have paid LBSF the early termination payment.

47. Not only has Daiwa paid LBSF nothing to date, but it has also filed and maintained Claims against LBSF and LBHI totaling $45,556,134.42. Daiwa's filing of those improper Claims, and its failure to withdraw those Claims during the six years since such filing, is a diversionary tactic designed to apply settlement pressure on LBSF and LBHI. Daiwa has thwarted the orderly and proper administration of the Chapter 11 estates of those debtors and prevented those debtors from distributing significant amounts of cash to their legitimate creditors.

48. Such actions have been conducted in bad faith, but they are not governed by the Master Agreement and are outside of the ISDA regime. Daiwa has violated the covenant of good faith and fair dealing.

49. As a result of this breach, LBSF has been damaged in an amount to be proven at trial.

10

**COUNT III**

**Disallowance of Daiwa's Claims and Objection to Claims**

50.  Plaintiff repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-49 of this Complaint as though fully set forth in this cause of action.

51.  A proof of claim will not be deemed allowed if a party in interest objects thereto. 11 U.S.C. § 502(a).

52.  Plaintiff objects to Daiwa's Claims and seeks entry of a judgment against Daiwa expunging and disallowing its Claims pursuant to section 502(b) of the Bankruptcy Code on the basis that LBSF and LBHI have no liability to Daiwa.

53.  Indeed, Daiwa's Claims rely entirely on Daiwa's flawed valuation of the early termination payment owed for the Transactions.  Given the Master Agreement's mandate that Daiwa determine its Loss reasonably and in good faith – and Daiwa's manifest failure to do so – Daiwa's calculation underlying its Claims is unsupportable.

54.  Valuing the Transactions in a reasonable and good faith manner, as required by the Master Agreement, yields a termination value of the Transactions greatly in LBSF's favor and results in Daiwa owing LBSF millions of dollars more than the value of the collateral Daiwa had posted to LBSF.  Accordingly, LBSF and LBHI do not owe any amounts to Daiwa, so Daiwa's Claims are not valid.

55.  Pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007, therefore, the Plan Administrator on behalf of LBSF requests that this Court disallow and expunge the Claims in their entirety.

56.  The Plan Administrator on behalf of LBSF hereby expressly reserves the right to further object to the Claims on any other basis.

11

## CONDITIONS PRECEDENT

All conditions precedent have occurred, been performed, or been waived or excused.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered:

A. As to Counts I and II awarding LBSF damages from Daiwa in an amount to be determined at trial, representing the value of the Transactions to LBSF on the Early Termination Date (after adjusting for posted collateral and missed payments under the Transactions), plus an amount to be determined at trial, representing the harm Daiwa has caused to (1) the orderly and proper administration of the Chapter 11 estates of the debtors and (2) the debtors' creditors, because the debtors have been prevented from distributing significant amounts, plus contractual interest, which will continue to accrue until LBSF receives payment in full;

B. As to Count III, entry of a judgment against Daiwa disallowing and expunging its Claims pursuant to section 502(b) of the Bankruptcy Code;

C. Pre-judgment and post-judgment interest; and

D. Such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

Dated: December 23, 2015
Washington, DC

By: /s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Ralph I. Miller
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

*Attorneys for Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.*