1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   CASE NO. 08-13555-scc

4   - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8              Debtor.

9

10   - - - - - - - - - - - - - - - - - x

11

12

13                    U.S. Bankruptcy Court

14                    One Bowling Green

15                    New York, New York

16

17                    December 17, 2015

18                    10:02 AM

19

20   B E F O R E:

21   HON. SHELLEY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO - F. FERGUSON

Page 2

1    HEARING Re:   Doc #51263 Motion for Order Compelling

2    Arbitration of Disputes Under Settlement Agreement Between

3    Debtors and Arch Insurance Company

4

5    HEARING Re:   Doc #20102 Debtors' Two Hundred Thirteenth

6    Omnibus Objection to Disallow and Expunge Certain Filed

7    Proofs of Claim

8

9    HEARING Re:   Doc #20103 Debtors' Two Hundred Fourteenth

10   Omnibus Objection to Disallow and Expunge Certain filed

11   Proofs of Claim

12

13   HEARING Re:   Doc #20104 Debtors' Two Hundred Fifteenth

14   Omnibus Objection to Disallow and Expunge Certain Filed

15   Proofs of Claim

16

17   HEARING Re:   Doc #20105 Debtors' Two Hundred Sixteenth

18   Omnibus Objection to Disallow and Expunge Certain Filed

19   Proofs of Claim

20

21   HEARING Re:   Doc #32652 Three Hundred Seventy-Ninth Omnibus

22   Objection to Claims (Subordinated Guarantee Claims)

23

24

25   Transcribed by:  Sheila Orms

```
 1   A P P E A R A N C E S :

 2

 3   HUGHES HUBBARD

 4        Attorneys for LBI Trustee

 5        One Battery Park Plaza

 6        New York, NY  10004

 7

 8   BY:  JEFFREY S. MARGOLIN, ESQ.

 9

10   WEIL GOTSHAL & MANGES

11        Attorneys for Lehman Brothers Holdings Inc.

12        767 Fifth Avenue

13        New York, NY  10153

14

15   BY:  GARRETT A. FAIL, ESQ.

16

17   PACHULSKI STANG ZIEHL & JONES

18        Attorneys for Lehman Partners

19        780 Third Avenue

20        36th Floor

21        New York, NY  10017

22

23   BY:  DEAN A. ZIEHL, ESQ.

24

25
```

1    VENTURINI & ASSOCIATES

2         Attorneys for Claimant Lamita Jabbour

3         230 Park Avenue

4         Suite 545

5         New York, NY  10169

6

7    BY:  AUGUST C. VENTURINI, ESQ.

8

9    COLE SCHOTZ

10        Attorneys for Daryani Family

11        1325 Avenue of the Americas

12        19th Floor

13        New York, NY  10019

14

15   BY:  DAVID R. HURST, ESQ.

16

17   CHIESA SHAHINIAN & GIANTOMASI PC

18        Attorneys for Arch Insurance Company

19        One Boland Drive

20        West Orange, NJ  07052

21

22   BY:  ARMEN SHAHINIAN, ESQ.

23

24

25

```
                                                              Page 5

 1   LAW OFFICES OF TALLY MY WIENER, ESQ.

 2        Attorneys for Alex Wong and Lionel Dardo Occhione

 3        119 West 72nd Street

 4        PMB 350

 5        New York, NY  10023

 6

 7   BY:  TALLY M. WIENER, ESQ.

 8

 9   GASCOU HOPKINS LLP

10        Attorneys for Arch Insurance Company

11        9696 Culver Blvd.

12        Suite 302

13        Culver City, CA  90232

14

15   BY:  RONALD W. HOPKINS, ESQ.

16

17   TELEPHONIC APPEARANCES:

18   BARRY P. GRUHER, GENOVESE JOBLOVE & BATTISTA, P.A.

19   RAJ V. IYER, CANYON PARTNERS

20   MICHAEL G. LINN, FARALLON CAPITAL MANAGEMENT

21   THOMAS W. HENDERSON, BURG, SIMPSON ELDREDGE HERSH & JARDINE

22   JASON B. SANJANA, REORG RESEARCH, INC.

23   RICHARD HODYL, HINKHOUSE WILLIAMS WALSH LLP

24   DAVID M. MILLER, BERENBAUM WEINSHIENK & EASON, P.C.

25
```

Page 6

```
 1                      P R O C E E D I N G S

 2              THE COURT:  All right.  How is everyone today?

 3              MR. MARGOLIN:  Good morning, Your Honor, Jeffrey

 4      Margolin, Hughes Hubbard & Reed for Mr. Giddens, the SIPA

 5      Trustee.

 6              Your Honor, originally we had one contested matter

 7      on the calendar --

 8              THE COURT:  Right.

 9              MR. MARGOLIN: -- which a notice of presentment in

10      connection with the Trustee's 263rd omnibus objection.  Late

11      yesterday we resolved that with the Chicago Board --

12              THE COURT:  Okay.

13              MR. MARGOLIN:  -- as reflected in the amended

14      agenda filed late last night, it was removed from the

15      calendar and the notice of presentment is withdrawn.  We

16      just wanted to put on the record for you today.

17              THE COURT:  Right.

18              MR. MARGOLIN:  We have no other matters on the

19      calendar.  I wish you a Happy New Year --

20              THE COURT:  Same to you.

21              MR. MARGOLIN:  -- and we'll see you in 2016.

22              THE COURT:  See you in 2016.  Very good.

23              MR. MARGOLIN:  If I may be excused?

24              THE COURT:  Yes, please, thank you.

25              MR. MARGOLIN:  Thank you.
```

Page 7

1              THE COURT:  All right.  Mr. Fail.

2              MR. FAIL:  I believe there's one matter on first.

3              THE COURT:  Mr. Ziehl, how are you?

4              MR. ZIEHL:  Fine.  Yes, good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. ZIEHL:  Dean Ziehl appearing for Lehman

7    Brothers Holdings Inc., LCPI, Lehman (indiscernible) Inc.

8    and LV Ritter Ranch (ph) on matter number 1.

9              THE COURT:  Good morning.

10             MR. SHAHINIAN:  Good morning, Armen Shahinian from

11   Chiesa Shahinian & Giantomasi appearing for Arch Insurance

12   Company and with me is Ron Hopkins of the Gascou Hopkins

13   firm in California.

14             THE COURT:  Okay.  Very good.  Welcome.

15             All right.  Mr. Ziehl, do you want to start off?

16             MR. ZIEHL:  Good morning, Your Honor.

17             THE COURT:  Needless to say I've read everything

18   that you submitted.

19             MR. ZIEHL:  I assumed so.  I can give you just a

20   little bit of background.

21             THE COURT:  Sure.

22             MR. ZIEHL:  The underlying dispute has to do with

23   the performance, interpretation, enforcement of an agreement

24   between Arch Insurance Company and the Lehman entities,

25   which has been referred to as the Arch Lehman settlements,

Page 8

1   specifically the enforcement of the arbitration clause in

2   that agreement.

3              That agreement was actually reached in September

4   of 2011, at JAM's (ph) office in New York with Judge

5   Weinstein.  It started -- the mediation started in

6   California but was actually, the agreement was concluded

7   here in New York.

8              This Court, predecessor court approved the order

9   of October of 2011 pursuant to 363 and 9019.  Under -- the

10  settlement was broader than this particular project.  It was

11  a global settlement, involved a number of disputes and

12  litigation between Arch, involving Arch, which was the

13  surety bond and performance bond company --

14             THE COURT:  Right.

15             MR. ZIEHL:  -- on a number of these large

16  subdivision projects in California.

17             The pending motion deals just with the Ritter

18  Ranch property --

19             THE COURT:  Right.

20             MR. ZIEHL:  -- which is in excess of 10,000 acres,

21  it's in Palmdale, California.  The -- in its most basic, the

22  agreement required Arch to perform various work under its

23  bond on the Ritter Ranch project, including specifically on

24  Elizabeth Lake Road, and that's why the agreement with the

25  city is called the ELR agreement, and it had to do with

Page 9

1    electrical work on that road.

2            And the work that they were obligated to perform

3    was described in an agreement it had with the settlement

4    agreement with the City which was attached as an exhibit to

5    the agreement, as to what its obligations were to Lehman,

6    and that was an attachment that was part of the package that

7    was approved by the Court.

8            Lehman was under -- had negotiated a cap on how

9    much it was going to be required to reimburse Arch for at

10   $1.1 million under that agreement, and then it had to secure

11   payment with two forms of collateral, an escrow account, and

12   also a deed of trust on the project.

13           To no surprise subsequently with this type of

14   development, there were delays and cost overruns.  Lehman

15   paid Arch the full cap amount, and Arch didn't finish all

16   the work that was required under the underlying agreement.

17   Arch refuses to release the Lehman collateral, even though

18   under the terms of the agreement, we believe that they're

19   required to do so.

20           So Lehman sent the arbitration notice, which was

21   to be, as you can see from the provision, an expedited way

22   to quickly resolve these types of disputes within a very

23   short period of time to Judge Weinstein, who had been the

24   mediator and agreed to be the arbitrator, so he had

25   familiarity, and to be administered by JAMS.

Page 10

1              And the two issues were presented, whether Arch

2      was obligated to release the collateral, and then whether

3      Arch's denial of financial responsibility to complete that

4      work in excess of the camp, could be essentially foisted off

5      on Lehman Brothers who will be stuck with it, in order to

6      get the subdivision approval process.

7              Arch --

8              THE COURT:  A moment, Mr. Ziehl.

9              MR. ZIEHL:  Yes.

10             THE COURT:  Could I ask whoever is on the phone on

11     a live line, please put your line on mute.  Thank you.  Yes?

12     Ma'am?  You're -- operator, ma'am, you need to put your line

13     on mute or you will be disconnected.

14             MS. ROOY:  The (indiscernible) so I'm trying to

15     (indiscernible).  Do you hear me?

16             THE COURT:  Yes, ma'am.

17             MS. ROOY:  Hello?

18             THE COURT:  You've been connected in connection

19     with a matter in the Lehman case, correct?

20             MS. ROOY:  Yes, that's correct.

21             THE COURT:  All right.  Is this Ms. Rooy?

22             MS. ROOY:  Yes, I'm (indiscernible).

23             THE COURT:  Okay.  Very well.  Your matter is not

24     being heard right now.  I'm hearing another matter.  This is

25     the Judge speaking --

Page 11

1              MS. ROOY:  Yes, thank you very much, this is

2     (indiscernible).

3              THE COURT:  I'm going to ask you to put your line

4     on mute, so that no noise comes into the courtroom now, and

5     when this first matter is concluded, we will call the matter

6     in which you are interested, and you will have an

7     opportunity to speak, all right?

8              Thank you.  I apologize, Mr. Ziehl.

9              MR. ZIEHL:  No problem, Your Honor.  So the issue

10    presented, Arch's response to those, the issues which is

11    whether or not Arch is required to release the collateral

12    and complete this work and not put it on.  Their response

13    was, they will agree to arbitrate the first issue --

14             THE COURT:  Their collateral orders?

15             MR. ZIEHL:  Their collateral, but they refused to

16    deal with the second issue.  And I said, well, let's let the

17    arbitrator decide arbitratorability, and they refused to let

18    the arbitrator decide the arbitratorability of it.  So I'm

19    not asking to waive their argument, but that decision should

20    be made by the arbitrator.

21             THE COURT:  Right.

22             MR. ZIEHL:  And then they refused to sign the

23    stipulation to allow the arbitration to commence, which is

24    why we're here today, Your Honor.

25             The obligation to arbitrate couldn't be clearer.

1    The large Lehman agreement has the broadest possible terms.

2          THE COURT:  That's paragraph 13.

3          MR. ZIEHL:  Yes, Your Honor, I won't read it, I

4    know that you have.  And that those disputes is to be done -

5    - administered by JAMS with Judge Weinstein as the

6    arbitrator.

7          The Court has clear authority to order this matter

8    to arbitration.  The October 19th, 2011 approval order

9    expressly retained jurisdiction also in paragraph 4 in the

10    broadest terms, I won't read that to you, I know the Court

11    has.

12          The district court has jurisdiction under 28

13    U.S.C. 1334.  This is a rising in jurisdiction, it is core

14    matter, it was when it was approved.

15          THE COURT:  But the -- but Arch points out in the

16    nicest possible way --

17          MR. ZIEHL:  Yes.

18          THE COURT:  -- that I'm a bankruptcy court, not a

19    district court.

20          MR. ZIEHL:  That's correct.  We have an automatic

21    reference --

22          THE COURT:  Yes, we do, don't we.

23          MR. ZIEHL:  -- in this district, and there's a

24    standing order of reference, which gives the bankruptcy

25    court subject matter jurisdiction and to enforce its own

Page 13

1    orders.  And I really would just refer you to the In Re

2    Motors Liquidation case where the district upheld Judge

3    Gerber doing exactly the type of thing that we're requiring

4    here.

5            Your Honor, there are really no valid arguments

6    against this.  What they do is they set up a strawman

7    argument.  They argue that what Lehman is doing is enforcing

8    an agreement that it's not a party to, that doesn't have an

9    arbitration clause, that has an indispensable party, which

10   is the city, which is the ELR agreement that was attached to

11   as an exhibit.

12           This wouldn't be the first case where to decide a

13   contract you would have to interpret some other agreement

14   that the parties who were in this case, Lehman was not a

15   party to.  That does not invalidate the obligation to

16   arbitrate the dispute under our agreement with them, which

17   is really a financial dispute at this point.

18           There's ample Supreme Court authority.  I don't

19   want to go through everything, because I think we briefed it

20   very well, but we ask that the Court compel arbitration,

21   Your Honor.  The arbitration clause didn't say where the

22   arbitration had to be, as I -- we're perfectly fine having

23   it ordered in the -- in New York, since that's an argument

24   they raised under the Arbitration Act, that's just fine.

25   That's where the agreement was concluded anyway.  And this

Page 14

```
 1    has really no California connection.  Unless the Court has

 2    other questions I'm done.

 3              THE COURT:  You're done.  Thank you very much, Mr.

 4    Ziehl.  Good morning.

 5              MR. SHAHINIAN:  Good morning, Your Honor.  Armen

 6    Shahinian from Chiesa, Shahinian & Giantomasi for Arch.

 7              Fundamentally the problem here is what is it they

 8    are seeking to compel arbitration of.

 9              THE COURT:  I think Mr. Ziehl stated it pretty

10    clearly, they want their collateral released, and they want

11    at a minimum, the arbitrator to determine -- well, they

12    would like their first question answered, but at a minimum,

13    they would like to have the arbitrator decide the issue of

14    the arbitrability of the question.

15              MR. SHAHINIAN:  Right.  So back up a moment

16    because the issue of what the arbitrator is going to

17    determine has to be predicated upon what the agreement is,

18    that is the subject of the dispute.

19              THE COURT:  Well, let me ask you a question.  If

20    you had wanted to make it clear that if a dispute arose as

21    to Arch's obligation to continue to perform under the ELR

22    settlement agreement, you could have expressly said

23    provided, however, that there shall not be arbitration to

24    the extent that an issue arises over that issue.

25              MR. SHAHINIAN:  Right.
```

Page 15

```
 1              THE COURT:  But you didn't do that.  So your

 2    construction -- your construction rather renders meaningless

 3    the importation, if you will, of the ELR settlement into the

 4    big settlement.

 5              MR. SHAHINIAN:  So I think that the source of

 6    confusion here because the issue that they are -- let's look

 7    at the issue they're seeking to arbitrate.

 8              THE COURT:  Sure.

 9              MR. SHAHINIAN:  So --

10              THE COURT:  And you're referring to the January

11    28th -- July 28th, 2015 request for arbitration?

12              MR. SHAHINIAN:  I believe so, Your Honor.

13              THE COURT:  Okay.

14              MR. SHAHINIAN:  It states two issues.

15              THE COURT:  Right.

16              MR. SHAHINIAN:  And the issue that is the subject

17    of dispute here is whether Arch is obligated under the ELR

18    settlement agreement, and by reference therein, under the

19    settlement agreement, to complete the undergrounding work at

20    its sole expense, and if so, whether Arch is entitled to any

21    reimbursement therefore of the settlement agreement beyond

22    the ELR payment cap amount of 1.1 million.

23              THE COURT:  Uh-huh.

24              MR. SHAHINIAN:  So what is the obligation in the

25    agreement that it's asking to arbitrate.  The obligation is
```

Page 16

1    a reimbursement obligation for a payment made.  It is not an

2    issue of exoneration with respect to potential future

3    liability.  The cause of action that Arch will have at some

4    point in time is a cause of action only for reimbursement.

5    That cause of action has not yet accrued.

6           What they're trying to do is seek an advisory

7    opinion from an arbitrator regarding an obligation that

8    exists in a separate agreement that is not incorporated by

9    reference.  It is referenced, but it's referenced because

10   they need to reference what it is that the payment is going

11   to be that they're going to ultimately have liability to

12   reimburse for.  A cause of action for reimbursement doesn't

13   arise until payment is made.

14           THE COURT:  Well, but here's the problem.  The

15   problem is that, and I understand the way you formulated it,

16   it does sound like an advisory opinion.  But from the

17   perspective of Lehman, when it entered into the settlement

18   agreement, its goal and the goal that it thought it had

19   accomplished was to be done, 1.1 and done, collateral comes

20   out, the rest of you are on your own.

21           MR. SHAHINIAN:  Right.

22           THE COURT:  Okay.  Now, what you're saying is

23   that, well, we don't know what's going to happen, and at

24   some point we might turn to Lehman and say, pay us more.

25   And Lehman needs clarity on that point because to the extent

Page 17

1      that you're right and they're wrong, that effects -- once

2      conduct is affected by whether or not one believes they're

3      going to reimbursed from someone else, so that's kind of an

4      important gating issue going forward.

5              But in any event, what Mr. Ziehl is saying is,

6      that's great, you can make that argument to Judge Weinstein.

7      He can decide whether or not you're right or he's right.

8              MR. SHAHINIAN:  Okay.  So let's talk then about

9      what the arbitration agreement is.

10             So we agree --

11             THE COURT:  Meaning the agreement to arbitrate

12     that's in the --

13             MR. SHAHINIAN:  Correct.

14             THE COURT:  -- Lehman agreement.

15             MR. SHAHINIAN:  In the Lehman agreement.

16             THE COURT:  Right.

17             MR. SHAHINIAN:  So contrary to what has been

18     represented about the broadest possible terms with respect

19     to this arbitration agreement, unlike many of the other

20     cases that he cites, he talks about any and all claims, but

21     it stops there.  It's not just any and all claims that are

22     subject to arbitration, it's any and all claims with respect

23     to the enforcement of this agreement or -- excuse me, it's

24     not any and all claims.

25             THE COURT:  Performance, interpretation or

1   enforcement.

2          MR. SHAHINIAN:  Okay.  So cannot -- if the parties

3   cannot resolve any dispute which may arise between them

4   concerning the performance interpretation or enforcement of

5   this agreement or with respect to any claims, that's where

6   the any claims comes in, right.  So with respect to any

7   claims, they don't say any claims before that.  With respect

8   to any claims arising under this agreement, the parties

9   agree that any such dispute shall be submitted to binding

10  arbitration.

11         They don't say this agreement or any other

12  agreement, they don't say any and all claims, no matter what

13  they might be.  The context here is this, Judge, because I

14  think it's very important to understand the context of these

15  agreements.

16         The context is that Arch funded Sun Cal in this

17  job out in California.

18         THE COURT:  Right.

19         MR. SHAHINIAN:  Lehman comes to Arch and says,

20  Arch, support my plan as the lender on this job, not the Sun

21  Cal plan, you're the bonding company for Sun Cal, I'm going

22  to take possession, I want to take title, I want to develop

23  this property.

24         Well, Arch is the bonding company for Sun Cal,

25  they're not the bonding company for Lehman.  Now, if Lehman

Page 19

1    were going to come in and undertake now to become the

2    owner/developer, if the work is going to be done on this

3    project, it's now going to be done by Lehman for its

4    benefit.

5              Now, if it can get its own bonds, and it would be

6    required to get its own bonds to develop this property, to

7    get the permits necessary to do work, but instead of getting

8    its own bonds, it wants to rely on the original Sun Cal

9    bonds.  And we're okay with that, provided they pay the

10   cost.

11             Now, what is the cost going to be?  We don't know

12   exactly what the cost is going to be, but there's a

13   delineated scope of work that we understand to be the work,

14   we give pricing on it, it's a million dollars of work, and

15   we say, okay, give us a guarantee that you're cost to pay

16   our cost is, and they say okay.  And they say, okay, come

17   back and I want to cap it, because I want to be quantify

18   this, what's this really going to cost me because I've got

19   to go approve, you know, this deal, and what it's about

20   going to cost.  And I say, well, we can't be sure it's going

21   to cost a million dollars, it's not been -- you know, we

22   haven't paid it yet, we haven't gotten a firm quote yet, we

23   don't have all the approvals for the work yet, but it's

24   estimated at a million.  Okay.  We'll throw $100,000 on

25   there for contingencies and that should cover the work.

Page 20

```
 1              Now, what happened in the interim is that the
 2    local utility started intervening and changing the scope of
 3    the work to be done.  That has given rise to a dispute
 4    because we didn't bond a revised scope of work, we bonded
 5    the original scope of work for Sun Cal.
 6              So now we're talking, we have an agreement
 7    ultimately that's entered in the Sun Cal bankruptcy between
 8    -- excuse me, agreement entered between the City and Arch --
 9              THE COURT:  Right.
10              MR. SHAHINIAN:  -- with respect to the performance
11    of this work.  And we agreed we're going to perform the work
12    as we originally bonded it.
13              Lehman comes in and says, and you won't have to
14    pay because if you support my plan, instead of you having a
15    lien on the property of Sun Cal, you're now going to have a
16    lien on the property that I'm going to give you because I'm
17    going to own it.
18              THE COURT:  What you're suggesting now though is I
19    think something categorically different from what you were
20    talking about in your papers.  Because it's beginning to
21    sound as if you're suggesting that somehow someone was
22    misled.
23              MR. SHAHINIAN:  No, I --
24              THE COURT:  I mean, from my perspective, I'm
25    looking at plain words on a page.
```

Page 21

1            MR. SHAHINIAN:  Right.

2            THE COURT:  Right.  Plain words on a page, and the

3    pages are the settlement agreement, the Lehman settlement

4    agreement.

5            MR. SHAHINIAN:  Right.

6            THE COURT:  Right.  And the Court's order

7    approving the settlement agreement.

8            So you're now in kind of deep background,

9    suggesting that --

10           MR. SHAHINIAN:  Let me give you a context, because

11   I mean when you come back to the language what --

12           THE COURT:  Okay.

13           MR. SHAHINIAN:  -- was agreed upon.

14           THE COURT:  All right.

15           MR. SHAHINIAN:  So what the promise is by Lehman

16   is to reimburse us for the payment.  If we knew how much the

17   payment was, it would've just been liquidated, it would have

18   been put in the agreement at that time, but we didn't know

19   precisely what the payment would be.

20           The payment and the amount of the payment is

21   ultimately going to be determined, based upon the Arch

22   Palmdale agreements.  If there are any disputes under the

23   Arch Palmdale agreement, that's going to be decided in

24   California by a California court under California choice of

25   law, and that's going to end up deciding and determining how

Page 22

1    much we have to pay.

2          Now, a cause of action against Lehman doesn't

3    accrue until payment is made, a demand for payment from them

4    is paid and they refuse to pay.  And we agreed we would

5    arbitrate.  What we're going to arbitrate is disputes under

6    this agreement, that is the agreement between us and Lehman.

7    We're not going to arbitrate disputes as between us and the

8    City of Palmdale because we can't.  That agreement requires

9    that it be litigated in California before a California

10   court, and that will end up deciding how much we have to

11   pay.  We will then pay it, and then we will make a demand.

12         What they're trying to do with all due respect, is

13   put the cart before the horse.  What they'd like to do is

14   have some arbitrator decide, well, this is about your

15   liability to Palmdale, it's not about what our liability is

16   at all.  It's about reimbursement for a payment because the

17   arbitration clause is enforcing this agreement.  And this

18   agreement says they have an obligation to reimburse us for a

19   payment.

20         A dispute could arise, we don't dispute that a

21   dispute could arise, we understand we agreed to arbitrate

22   that dispute in -- before this judge in an expedited

23   arbitration, which was to take place within 48 hours in

24   California because unlike what has been suggested here, this

25   agreement came out of a mediation before Judge Weinstein and

Page 23

1    JAM's in California.

2              THE COURT:  Okay.  I'm not that interested in the

3    New York versus California.

4              MR. SHAHINIAN:  Okay.

5              THE COURT:  So.

6              MR. SHAHINIAN:  So let's get back to what it is

7    that we agreed to arbitrate, disputes under this agreement.

8    If we -- for a cause of action accrues because we've made a

9    payment, and they don't pay and we have a dispute, it's

10   subject to arbitration.  But that never arises, you don't

11   have a dispute until a cause of action accrues.

12             And this agreement doesn't say we no longer

13   arbitrate any disputes arising with respect to our possible

14   liability or perspective liability that may arise out of the

15   liability you had to the City of Palmdale, it is not an

16   exoneration obligation.  It is not even an indemnity

17   obligation per se.  You could say reimbursement obligation.

18             And right of reimbursement does not accrue until a

19   payment is made, and we all knew going in, that that payment

20   was going to be predicated upon the City of Palmdale

21   agreement that doesn't have an arbitration clause, that is

22   not subsumed within this arbitration clause.

23             THE COURT:  Okay.  I'm looking at the Lehman

24   settlement agreement that was approved by Judge Peck.  Okay.

25   I'm looking at paragraph 3(d).

Page 24

```
 1              MR. SHAHINIAN:  3(d).

 2              THE COURT:  3(d), are you with me?

 3              MR. SHAHINIAN:  I think so, that's "provided

 4    that."

 5              THE COURT:  "Provided that."

 6              MR. SHAHINIAN:  Yep.

 7              THE COURT:  So the way I was reading that was it's

 8    a cap.

 9              MR. SHAHINIAN:  Right.

10              THE COURT:  But you just got done explaining why

11    it's not a cap.

12              MR. SHAHINIAN:  But it is a cap.  We are not

13    contending they owe us more than 1.1 million.  Mr. Ziehl

14    misspoke about the payment of 1.1 million, that has not been

15    paid.  There's nothing in the record that says that's been

16    paid, it has not been paid.  That's what we're fighting

17    about, which we will fight about once we know if it's going

18    to be 1.1 million or if it's going to be a million or if

19    it's going to be 3 million.

20              If it's 3 million, it's 1.1 million, I don't have

21    a problem with that, Judge.  We're not saying the cap

22    doesn't apply.  They haven't paid us.  We don't know how

23    much it's going to cost.  How much it's going to cost is

24    going to depend on the resolution of the dispute with

25    Palmdale that's subject to being litigated in California.
```

Page 25

1   And until we pay, based upon whatever the resolution of that

2   dispute is, we don't know how much the money is.

3          There's no uncertainty here.  It's not going to be

4   more than $1.1 million.  It's clearly subject to the cap,

5   and we don't contend it's not subject to the cap.  The

6   question is, how much is it going to be.

7          Now, what the real motivation here, Your Honor, is

8   what they're trying to have this arbitrator do is

9   effectively give an advisory opinion about whether

10  undergrounding work is required in the Palmdale Arch

11  agreement.  That is not an issue that is ripe for

12  determination here, because their only role is to pay us if

13  we make a payment, and whether the undergrounding work is

14  required or not, will be litigated in California, because

15  that's what the agreement requires.

16         If they want to intervene in that litigation

17  because they think they've got some interest to protect,

18  they're welcome to intervene in the litigation.  But that is

19  not, in fact, what this agreement provides to be arbitrated.

20         THE COURT:  So let me understand though.  Arch

21  does not object to the submission to the arbitrator of the

22  second question, whether Arch is required under the

23  settlement agreement to release the collateral?

24         MR. SHAHINIAN:  Yes, Your Honor.

25         THE COURT:  But doesn't that necessarily involve

Page 26

1    the termination of the first question?

2            MR. SHAHINIAN:  Well, you know, I personally

3    believe that, because I don't think it's ripe until you know

4    how much you have to pay, whether the collateral is still

5    needed or not.  But frankly --

6            THE COURT:  So then maybe we can simplify this by

7    simply saying that you're going to go to Judge Weinstein

8    with the second question.

9            MR. SHAHINIAN:  I'm okay with that, Your Honor.  I

10   think -- I do agree that we could argue before Judge

11   Weinstein whether that question is ripe or not, but that's a

12   collateral issue in this agreement that we agreed to

13   arbitrate, and therefore, I'll make more substantive

14   arguments to Judge Weinstein about that subject, which I do

15   believe to be premature there.  But that is a collateral

16   issue that's unique to this agreement that arises under this

17   agreement that we agreed to arbitrate and okay with having

18   Judge Weinstein hear those arguments and decide those

19   arguments, decide the prematurity issue there, because we

20   agreed to that.

21           THE COURT:  Give me one second.  I wanted to look

22   at something else in 3(d).

23       (Pause)

24           THE COURT:  Okay.  Go ahead.

25           MR. SHAHINIAN:  So what ultimately this is about

Page 27

1    is Lehman's attempt to have us improve their property at our

2    expense.  That's what this is really about.  They want to

3    broaden the scope of our obligations to the City of Palmdale

4    beyond those which we undertook with the City of Palmdale

5    because now they own the property.  And if we can improve

6    their property at our cost, for their benefit, because they

7    negotiated this cap that would be great, but that's not what

8    this deal was all about.

9              This deal was about once we know what the

10   liability is, and once we pay the liability, they will

11   reimburse us.  And if there is a dispute, we will arbitrate

12   the dispute.  The cause of action simply hasn't accrued.

13             And these requests for an advisory opinion which

14   cannot bind, which cannot bind the City of Palmdale would

15   only subject us to a risk of premature results on an

16   advisory opinion on a cause of action that has not yet

17   accrued that we never agreed to submit to arbitration.

18             This arbitration clause doesn't say this agreement

19   and any and all other agreements.  It only says about this

20   agreement.  And this agreement which references the other

21   agreement, references it with respect to a reimbursement

22   obligation, and that cause of action has not yet arisen.

23             THE COURT:  All right.  Let me hear from Mr. Ziehl

24   again.

25             MR. SHAHINIAN:  Your Honor, okay, I'm sorry.

Page 28

```
 1              THE COURT:  If you have -- let me hear from Mr.

 2     Ziehl on this aspect of it, and then you can resume.

 3              MR. SHAHINIAN:  Thank you.

 4              MR. ZIEHL:  Your Honor, just very briefly.

 5              THE COURT:  So I have this feeling of -- that

 6     we're in alternate universes here.

 7              MR. ZIEHL:  I think you put your finger on it

 8     though.  And the first comment is, if you read the first

 9     clause of the arbitration agreement it says that, "any

10     dispute which may arise between them concerning the

11     performance, interpretation or enforcement of this agreement

12     or in the disjunctive with respect to any claim."  The very

13     first sentence of --

14              THE COURT:  Are you --

15              MR. ZIEHL:  -- paragraph 13 of the settlement, the

16     Lehman settlement.

17              THE COURT:  Paragraph 13 of the Lehman settlement?

18              MR. ZIEHL:  Yes, page 14.

19              THE COURT:  All right.  Let me get there.

20              MR. ZIEHL:  Or.

21              THE COURT:  Or with --

22              MR. ZIEHL:  Yeah, and he was trying to make it not

23     in the disjunctive.  But I think the Court put your hand on

24     it.  Every argument that he just made, is an argument that

25     he should be making to Judge Weinstein as to what is
```

Page 29

1   arbitral.

2            THE COURT:  So then not to be, you know, too

3   clever but we could say, all right, go to Judge Weinstein

4   with B, whether Arch is required under the settlement to

5   release the Arch collateral, and in my view embedded in that

6   is the first question.

7            MR. ZIEHL:  Correct.

8            THE COURT:  So on we go.

9            MR. ZIEHL:  Correct.  And they can make --

10           THE COURT:  You could submit a --

11           MR. ZIEHL:  -- your argument for that, no, you

12   can't decide that part of it or that part of it, but it's

13   for Judge Weinstein to decide this.

14           THE COURT:  But then you could submit a --

15   hypothetically, if your request for arbitration had only

16   said, a dispute has arisen between Arch and the Lehman

17   parties as to whether Arch is required under the settlement

18   agreement to release the Arch collateral irrespective, blah,

19   blah, blah --

20           MR. ZIEHL:  Yes.

21           THE COURT:  -- you would be arbitrating, because

22   they don't disagree with that.

23           MR. ZIEHL:  No.  But we started there, Your Honor,

24   I went back and said, here's what we claim the issues are.

25   It's without prejudice to you arguing that they're not.

```
 1                THE COURT:  Sure.

 2                MR. ZIEHL:  And --

 3                THE COURT:  What I'm saying is that in order -- if

 4     you take that question to Judge Weinstein --

 5                MR. ZIEHL:  Yes.

 6                THE COURT:  -- the first question is going to come

 7     up.

 8                MR. ZIEHL:  It will.

 9                THE COURT:  And you'll be there.  And he'll

10     decide.

11                MR. ZIEHL:  But they were specifically -- they put

12     language -- they marked up the stipulation for arbitration

13     excluding that question from the arbitration, they refused

14     to sign a stipulation if that issue was dealt with at all.

15     And that's the problem we have.

16                So they were not willing to let that issue either

17     be decided by or decided to be not arbitral by Judge

18     Weinstein.

19                THE COURT:  Could you address the suggestion that

20     Lehman's trying to get free work done?

21                MR. ZIEHL:  Yeah.  The paragraph D, the agreement

22     provides the work that Arch has committed to be done, which

23     is the attached ELR agreement in D, talks about the -- the

24     ELR work committed to be performed by Arch under the

25     settlement agreement.
```

Page 31

```
 1              Here's the reality, the other reality, the one
 2    that he didn't describe.  Arch will refuse to do it.  Arch
 3    will slow litigate with the city.  Lehman has liens on its
 4    property and cannot get the subdivision approval to sell the
 5    property from the city unless the work is done.
 6              So until -- unless the work is done, and that
 7    means either Lehman will be stuck with having to do it if
 8    Arch doesn't, that's the problem here.  And we put in the
 9    papers, it's clear Lehman is trying to sell this property
10    right now.  And this is a cloud on title, and that's why we
11    need this resolved quickly.
12              THE COURT:  All right.
13              MR. SHAHINIAN:  May I respond?
14              THE COURT:  Yes, Mr. Shaninian, and I interrupted
15    you, so you can keep going.
16              MR. SHAHINIAN:  That's okay.  The issue of cloud
17    on the title, I have no problem with this being submitted to
18    arbitration on the issue of, are they entitled to release of
19    the collateral.  We can argue about what the merits are
20    before the arbitrator on issues relating to release of
21    collateral, what the collateral is for, what that collateral
22    -- what the trigger points are in the agreements for the
23    release of collateral, that's fine, that's our agreement
24    with them.
25              Now, we may have different views on what the
```

Page 32

1    predicate facts are that will trigger release of collateral,

2    and we'll argue --

3              THE COURT:  But embedded in that is the issue of

4    the scope of the work.

5              MR. SHAHINIAN:  Your Honor, embedded in that is

6    the issue --

7              THE COURT:  Otherwise, you're going to go to Judge

8    Weinstein and if you tell him, we're here to arbitrate, but

9    you have nothing to say about the scope of the work.  It

10   doesn't make sense.

11             MR. SHAHINIAN:  Because on the merits, we're

12   entitled to win, Your Honor, but when we make that argument

13   to Judge Weinstein relative to collateral.  What they're

14   trying to do is say, your obligation -- their obligation is

15   something other than reimbursement for payment, but that's

16   what the agreement says it's for.  The agreement says it's

17   for reimbursement for payment because everybody knew how

18   that was going to get resolved, and it was going to get

19   resolved under the Palmdale agreement, which requires

20   litigation, which requires a choice of law in California,

21   and they're the ones driving the bus as to the dispute as to

22   what we have to do or don't have to do.

23             And that agreement, you know, they talk about

24   interpretation of this agreement, I have no problem with the

25   mediator interpreting this agreement, and we'll make those

```
1     arguments about collateral.  But one thing that's pretty

2     clear and it's not really subject to interpretation is, the

3     obligation of reimbursement for a payment made, and when a

4     cause of action for reimbursement of a payment made accrues.

5             THE COURT:  But it just continues to sound to me

6     that that's all for Judge Weinstein to decide.  So the

7     bankruptcy court, and for this purpose, you know, Judge Peck

8     and I are the same person, right.  The bankruptcy court

9     okays a settlement, the settlement agreement has, you know,

10    a pretty hefty arbitration clause that to me suggests that

11    matters of arbitrability and scope of arbitrability go to

12    the arbitrator.

13            MR. SHAHINIAN:  With respect to this agreement.

14    This agreement.

15            THE COURT:  Right.

16            MR. SHAHINIAN:  The Lehman agreement.

17            THE COURT:  And the arbitrator can say, wait a

18    minute, this is not about this agreement, which I mean, my

19    two cents is that it is about this agreement, because to the

20    extent that you have a settlement agreement that embodies,

21    encompasses, makes reference to another agreement, it then

22    becomes part of that agreement.

23            MR. SHAHINIAN:  It becomes part of that agreement

24    to determine how much we paid.  It's to determine how much

25    we paid.
```

Page 34

```
 1              THE COURT:  I love lawyers.

 2              MR. SHAHINIAN:  Well, no, Your Honor, under the

 3    language of this agreement --

 4              THE COURT:  Sure.

 5              MR. SHAHINIAN:  -- and what the reality of this

 6    agreement is and why it says that, the reality is, we didn't

 7    know how much we would have to pay.  And they can't tell us,

 8    an arbitrator can't tell us, he can give an advisory

 9    opinion, well, my opinion you should have to pay this.  But

10    that's not going to bind anybody.

11              What's going to bind us is what a judge in

12    California says, this is how much you have to pay.  At that

13    point in time, we'll have to pay it.  At that point in time,

14    we'll make a demand upon them.  At that point in time, they

15    will either pay it or they will dispute it.  If they dispute

16    it, it goes to a mediator.  But it never gets to the

17    mediator until the Court that has the power to decide the

18    issue of how much we have to pay renders a decision as to

19    that.  And advisory opinion from this mediator about how

20    much we're going to have to pay is meaningless.

21              THE COURT:  It's not a mediator, it's an

22    arbitrator.

23              MR. SHAHINIAN:  Excuse me, I'm sorry.

24              THE COURT:  In an --

25              MR. SHAHINIAN:  It was a mediator who became an
```

Page 35

1    arbitrator.

2              THE COURT:  Right.  Pursuant to an agreement that

3    you made to arbitrate the dispute.

4              MR. SHAHINIAN:  Yes, but not as to the

5    reimbursement obligation.

6              THE COURT:  But do you think that Lehman -- then

7    Lehman's agreement here they got a pig and a poke, I mean,

8    then if your construction is correct, then the arbitration

9    clause is pretty meaningless.

10             MR. SHAHINIAN:  No, not at all, Your Honor,

11   because the arbitration clause covers an entire agreement,

12   covers many things --

13             THE COURT:  But the release of the collateral is a

14   big thing.

15             MR. SHAHINIAN:  That's right.  And we're saying

16   they can mediate that, that's fine.  But if you look at what

17   their issue is and how they state the issue is whether we

18   are obligated under the ELR settlement agreement, and by

19   reference therein, under the settlement agreement with

20   Lehman to complete the undergrounding work at the sole

21   expense, completion of the undergrounding work at the sole

22   expenses of the driver, it's the payment --

23             THE COURT:  But the question --

24             MR. SHAHINIAN:  -- that's the driver.

25             THE COURT:  -- for the arbitrator is, those magic

1    words and by reference therein --

2            MR. SHAHINIAN:  Right.

3            THE COURT:  -- to bring it within the scope of the

4    paragraph 13 dispute resolution paragraph.  That's for the

5    arbitrator to decide.

6            MR. SHAHINIAN:  It doesn't bring within the scope

7    the -- what they are asking.  They're asking whether we're

8    entitled to reimbursement.  That's what the issue is.  They

9    framed the issue as whether we are entitled to

10   reimbursement, that is, in fact, what the issue is.

11           And that issue simply cannot be determined by this

12   arbitrator, by any arbitrator, by anyone until the City of

13   Palmdale gets a judgment in California where everybody knew,

14   including Lehman going in, that's where this was going to be

15   resolved, that we would then get a judgment against us, and

16   we would have a payment that we would have to make, and then

17   we would reimburse them.

18           But they're trying to have this mediator opine as

19   to what the scope of the reimbursement obligation is when we

20   haven't even made payment yet, we haven't made a claim for

21   reimbursement.

22           So if there's issues, if they're concerned about

23   issues relative to collateral, which they say are clouding

24   the title, and understand, this is a very large subdivision,

25   and this amount of money isn't clouding title, and that can

Page 37

1    certainly be addressed and resolved.  It may be resolved

2    consensually before the arbitrator formerly mediator or not.

3    It's for him to decide the conditions under which they're

4    entitled to their release of collateral.  Because collateral

5    is not addressed in the Palmdale agreement with us.

6              THE COURT:  Right.

7              MR. SHAHINIAN:  That's not the subject of the

8    Palmdale dispute.  What's the subject of the Palmdale

9    dispute is how much we're going to have to pay.  And now

10   what they're trying to do is bring the reimbursement

11   obligation, that's what they're talking about, a

12   reimbursement obligation.  Well, payment hasn't been made,

13   we don't know how much we're going to have to pay.  And

14   until we know that, any opinion is advisory until the Court

15   has jurisdiction over that issue --

16             THE COURT:  But you will make that precise

17   argument to Judge Weinstein.

18             MR. SHAHINIAN:  But they will --

19             THE COURT:  Hold on.  You'll make that precise

20   argument to Judge Weinstein, and then he will say, if he

21   agrees with you, he can't release the collateral because he

22   doesn't know what the reimbursement amount is, right?

23             MR. SHAHINIAN:  We will make that as to the

24   reimbursement, as to the collateral issue.

25             THE COURT:  Right.

1              MR. SHAHINIAN:  But we won't be making the

2    argument and having the Court to decide -- what they are

3    asking the Court to decide here is what is the scope of the

4    obligation that gives rise to the reimbursement of the

5    payment that you haven't made yet, you haven't made a demand

6    yet, you haven't had a cause of action yet.

7              THE COURT:  You know, and I -- maybe I'm confused.

8    Are we arguing over $1.1 million?

9              MR. SHAHINIAN:  Effectively as to --

10             THE COURT:  From Lehman's perspective?

11             MR. ZIEHL:  No, Your Honor.

12             THE COURT:  You're going to have to help me out

13   because I -- then I don't understand --

14             MR. ZIEHL:  The ELR work they --

15             THE COURT:  Right.  The collateral release --

16             MR. ZIEHL:  Yes.

17             THE COURT:  -- that language says it's the lessor

18   of --

19             MR. ZIEHL:  Yes.

20             THE COURT:  -- 1.1 million or the amount.

21             MR. ZIEHL:  Correct.

22             THE COURT:  So I thought about probably about half

23   an hour ago, I did have agreement that at most we were

24   talking about $1.1 million from Lehman's standpoint.  That's

25   not correct?

Page 39

```
 1              MR. ZIEHL:  Yeah, unless Arch does not do the work
 2    that it was obligated to perform --
 3              THE COURT:  Right.
 4              MR. ZIEHL:  -- in which case, and if Lehman is
 5    stuck with that obligation, it's this other uncertain amount
 6    of money.  The thing that Lehman negotiated not to be
 7    exposed to by having a cap on --
 8              THE COURT:  See, that gets back -- so that gets
 9    back -- that gets exactly back to where I started, which was
10    the way I'm reading the settlement agreement approved by
11    Judge Peck was that from Lehman's perspective what Judge
12    Peck approved was a cap.  That's -- this settlement
13    agreement approved by this Court reflects a cap.
14              And there was an agreement to arbitrate disputes
15    about this settlement agreement.  So broadly speaking, the
16    issue is, is it a cap, or isn't it a cap, and related to
17    that now comes the release of the collateral.  And I hear
18    you but --
19              MR. SHAHINIAN:  Well, but --
20              THE COURT:  -- I still -- go ahead.
21              MR. SHAHINIAN:  So I think that -- I agree with
22    everything you just said.
23              THE COURT:  Okay.
24              MR. SHAHINIAN:  So there's no dispute about that.
25    Where the dispute arises is how they framed the issue.
```

Page 40

1            THE COURT:  So then go in my conference room and

2      frame the issue a different way.

3            MR. ZIEHL:  I'll do better than that, Your Honor.

4      We will stipulate that we can frame the issue the way we

5      want to, they can frame it the way they want to, and the

6      arbitrator will decide what the issue is.

7            MR. SHAHINIAN:  Okay.  The --

8            THE COURT:  Yes.

9            MR. ZIEHL:  He's asking for an advisory opinion

10     here --

11           THE COURT:  I'm not going to give you one.

12           MR. SHAHINIAN:  I'm not asking this Court to give

13     me an advisory opinion.  I'm saying that the --

14           THE COURT:  Well, you say I don't even have

15     jurisdiction, so you don't even want me to give any opinion.

16           MR. SHAHINIAN:  I don't see how this has a close

17     nexus to the plan of reorganization of Lehman, so I don't

18     think you do to be perfectly candid.  We haven't got to that

19     part of the argument.

20           I -- whether their cap is 1 million, 1.1 million,

21     900,000 --

22           THE COURT:  I always have jurisdiction to enforce

23     my own orders.

24           MR. SHAHINIAN:  But we're not saying that there's

25     anything in the arbitration agreement, we're not trying to

Page 41

1    escape liability for the arbitration --

2              THE COURT:  You're trying to escape arbitration.

3              MR. SHAHINIAN:  No.  We're trying to limit the

4    arbitration clause because unless there is certainly clear

5    and unequivocal language saying that the dispute with the

6    City of Palmdale over the scope of our work is subject to

7    arbitration, it is not subject to arbitration.

8              THE COURT:  I keep coming back to the issue of

9    whether, you know, the devil in the details here is with all

10   due respect to whoever phrased the request for arbitration

11   is the wording of the request.

12             For example, you could submit the issue to Judge

13   Weinstein as whether the undergrounding work is subject to

14   the cap reflected in paragraph 3(d) of the settlement

15   agreement.

16             MR. SHAHINIAN:  Your Honor, I frankly think that

17   it would be premature for the mediator, since we're talking

18   about -- this comes -- the relevance of this is the

19   reimbursement demand, because that's what they're saying

20   here, and therefore entitled to reimbursement.

21             THE COURT:  But from the perspective of the

22   settlement agreement, the threshold issue is was this a cap

23   or was it not a cap.  And your construction really renders

24   the arbitration clause meaningless.

25             MR. SHAHINIAN:  No, it doesn't, not at all, Your

1    Honor.  For example, whatever the -- there are many triggers

2    to release of collateral.  They're in our agreement, it is

3    what it is.  What they're trying to do is say, is they want

4    to know how much the reimbursement is going to be.  We don't

5    know that until we have to make payment and make a demand.

6         And then if they say, that demand is for too much

7    money, we'll have to arbitrate it.  But until we know how

8    much we have to pay it, and pay it, our cause of action for

9    reimbursement doesn't accrue in any other decision by any

10   tribunal in which the City of Palmdale is not bound would

11   simply subject us to the risk of inconsistent

12   determinations, and be an advisory opinion because our cause

13   of action hasn't even accrued yet.  And they're seeking to

14   have an arbitrator decide the reimbursement issue that

15   hasn't accrued yet.  And that's why we object to A.

16        We understand there are substantive arguments that

17   will be subsumed in B that will touch upon some of these

18   issues, and we'll have to deal with that.  But --

19        THE COURT:  Then go with B, and you each can

20   present your arguments to Judge Weinstein as to what -- how

21   you unpack B.

22        MR. SHAHINIAN:  I agree with that.

23        THE COURT:  Okay.  Then we're done.

24        MR. SHAHINIAN:  So if the issue is stated as issue

25   B, they can make whatever arguments they want to make

Page 43

1   relative to why they're entitled to collateral release, and

2   we'll oppose them, and the judge will decide.  The

3   arbitrator will decide.  And we don't disagree with that,

4   because we did agree to arbitrate the --

5            THE COURT:  But it doesn't preclude them, it

6   doesn't preclude them, nor do I think you can fully resolve

7   the issue reflected in B without touching on the ELR

8   settlement which, in fact, was incorporated by reference, if

9   you will, into the Lehman settlement agreement which

10  provides for arbitration of disputes under that agreement or

11  any claims arising under that agreement.  And he will decide

12  whether or not, you know, how that works.

13           MR. SHAHINIAN:  It was not incorporated by

14  referenced.  It was referenced.

15           THE COURT:  It was referenced.

16           MR. SHAHINIAN:  It was referenced.  And so we

17  already knew that those issues were going to be litigated at

18  Palmdale, that was never a surprise to anybody.

19           THE COURT:  Well, I think that it's a lawyer's

20  distinction to say incorporated by reference because this

21  whole settlement agreement revolves around it.

22           MR. SHAHINIAN:  That's right, no problem.  But the

23  settlement agreement is a reimbursement obligation --

24           THE COURT:  Sure.

25           MR. SHAHINIAN:  -- and we can't lose sight of that

Page 44

1    --

2            THE COURT:  Sure.

3            MR. SHAHINIAN:  -- because that drives everything.

4            THE COURT:  Sure.

5            MR. SHAHINIAN:  What they're trying to do is

6    convert a reimbursement obligation into a potential

7    exoneration obligation as to which they will then have --

8            THE COURT:  Right.

9            MR. SHAHINIAN:  -- an interest in --

10           THE COURT:  I understand.

11           MR. SHAHINIAN:  -- how much.

12           THE COURT:  But you know, you can take the

13   transcript of this morning, and you can give it to Judge

14   Weinstein and he can, you know, get a head start on what

15   you're going to talk about, and --

16           MR. SHAHINIAN:  That's fine, Your Honor, as long

17   as we're talking about B, and we're not talking about

18   reimbursement because --

19           THE COURT:  Well, we're talking about B and what I

20   said was, that subject to the party's rights to unpack B,

21   the way each of you thinks it ought to be unpacked.

22           MR. SHAHINIAN:  They can make their arguments to

23   Judge Weinstein about that.

24           THE COURT:  So the question is, if you wish to

25   preserve -- well, I don't want to be presumptuous or sound

Page 45

1    coercive, but --

2              MR. SHAHINIAN:  That usually comes right before

3    I'm about to be coerced.

4              THE COURT:  Right.  No, truly, I'm just -- I

5    always am very sensitive to preserving everyone's rights vis

6    a vis an appeal.  So -- and here I think I do have a

7    disagreement about jurisdiction.  I think that the

8    jurisdictional point is clear that first of all, district

9    court versus bankruptcy court, bankruptcy courts all the

10   time hear and decide motions to compel arbitration under the

11   FAA.

12             Secondly, this is an order of this Court approved

13   under 9019.  I always have jurisdiction to enforce my

14   orders, which is what I view this as.  If you like, I can

15   read a long version, I could bore you by reading a decision.

16   If you think that the two of you can actually distill where

17   we just got to into an order that you would be content to

18   proceed based upon, and not worrying about appeals, I'll do

19   it that way.

20             And again, I can read what I have, or you know, or

21   we can try to reflect --

22             MR. ZIEHL:  Your Honor --

23             THE COURT:  -- the wording in an order, or we

24   could let the transcript -- I could so order the transcript

25   and save the lawyers from another round of having to try to

Page 46

1    agree on something.

2            MR. SHAHINIAN:  Well, I'm not anxious to have

3    either Mr. Ziehl or Mr. Hopkins fly back from California,

4    Your Honor.  If substantively we are at the point that what

5    is going to be arbitrated is B and everyone preserves all

6    their rights with respect to what their arguments are with

7    respect to B.

8            THE COURT:  Well, everyone's preserving their

9    rights to argue to the arbitrator about the scope of what is

10   encompassed in B.

11           MR. SHAHINIAN:  That's fine.

12           THE COURT:  Mr. Ziehl?

13           MR. ZIEHL:  Yeah, Your Honor, I think that's the

14   only way to go.  The arbitrator has to decide scope, and all

15   the parties are free to argue what is and isn't arbitral.

16           MR. SHAHINIAN:  Scope of what's within B, yes, you

17   know.

18           MR. ZIEHL:  This is the problem that we had.  This

19   is why we will never go in a room to be able to agree on how

20   -- what the arbitration is about, because they will keep

21   trying to narrow it to what they want to have arbitrated.

22   They're not going to let the arbitrator make a decision

23   based on the arguments of the parties.

24           We have offered and offered months ago, that we

25   stated the issues, it's without prejudice to them saying

Page 47

1    that that's outside of the scope of the arbitration but they

2    wouldn't accept that, and they wouldn't agree to arbitration

3    on that basis.

4              THE COURT:  But what I'm -- but B, I cannot

5    understand, I'm not smart enough with respect to this matter

6    yet, I cannot understand how you could fully address B

7    without touching on A.

8              MR. SHAHINIAN:  Yes.  Our position will certainly

9    be B will be premature until we know how much we have to

10   pay, because until we know how much we have to pay we won't

11   know how much our right of reimbursement is.

12             THE COURT:  And Mr. Ziehl then gets to say, that's

13   not right.  So we do -- so we agree.  We agree on the

14   question.  You're going to go to Judge Weinstein with B,

15   subject to the party's rights to unpack it vis a vis A.

16             MR. SHAHINIAN:  When you say unpack it, what I

17   understand that to mean is that he can make his arguments

18   that he is entitled to the release of collateral and on

19   whatever basis he's entitled to the release of collateral,

20   he will argue he is entitled to release of collateral.

21             THE COURT:  Yes.  Well --

22             MR. SHAHINIAN:  We will argue that he is not

23   entitled to release of title.  What is not going to be

24   arbitrated is what is the amount of reimbursement to which

25   he's entitled, which is what he's seeking to have arbitrated

Page 48

1    before we've made a payment, and before the reimbursement --

2              THE COURT:  Well, if you strike the parenthetical,

3    part of resolving B has to be whether Arch is obligated to

4    complete the undergrounding work.

5              MR. SHAHINIAN:  Whether we are obligated to

6    perform the undergrounding work is going to be decided by a

7    judge in California in our dispute over the Palmdale

8    agreement which requires litigation in California.  They're

9    going to decide, and we're going to pay, and that's the

10   number.

11             THE COURT:  Well, now we're chasing our tails.

12             MR. SHAHINIAN:  Right.

13             THE COURT:  So we can do this one of two ways.  I

14   can read to you for about 20 minutes what I have which says

15   that the scope of arbitration, which reflects that I have

16   jurisdiction, and recites with a lot of words, that the

17   scope of arbitration is a question for the arbitrator or we

18   can let this record stand as a ruling that you're going to

19   go and arbitrate B, and the party's rights are preserved to

20   in essence argue to the arbitrator what's encompassed in B,

21   including matters pertaining to the ELR which was referenced

22   in the subject of the settlement agreement in which the

23   arbitration decision provision presides.

24             And I truly, I truly, I'm happy to read, happy to

25   have you take a break and I can read, let you talk to each

Page 49

1    other --

2              MR. SHAHINIAN:  I'm fine with letting the record

3    stand and I think that if we are -- we will have our

4    respective arguments before the arbitrator relative to what

5    drives the release of the collateral, and he'll decide.

6              MR. ZIEHL:  Your Honor, counsel's drawing

7    distinctions here that I'm not sure I follow.  I think it's

8    probably better to put on the record what the Court has,

9    rather than have a record that's gone back and forth and

10   argue about what's in the transcript.  I'd rather just get a

11   clear ruling and move forward.

12             THE COURT:  Well then perhaps what we ought to do

13   is allow me to take the other matter on the calendar.  You

14   can talk to your co-counsel, you can talk to Mr. Ziehl if

15   you like, and then I'll ask you to come back up and I'll

16   read to you for about 20 minutes or so.

17             MR. ZIEHL:  Thank you, Your Honor.

18             THE COURT:  All right.

19             MR. SHAHINIAN:  My oral argument had no impact.

20             THE COURT:  No.  You see this is something that we

21   debate all the time, the balance between being prepared

22   versus I wouldn't say that your argument didn't have an

23   impact but --

24             MR. SHAHINIAN:  Thank you, Your Honor.

25             THE COURT:  -- I place a high value on moving

Page 50

1    things along, otherwise with all the Lehman matters --

2              MR. SHAHINIAN:  I understand, Your Honor, thank

3    you.

4              THE COURT:  -- it wouldn't work.  So let me hear

5    from Mr. Fail and then we can continue.

6              MR. ZIEHL:  Thank you, Your Honor.

7         (Pause)

8              THE COURT:  Hello, Mr. Fail.

9              MR. FAIL:  Good morning, Your Honor.  Garrett

10   Fail, Weil Gotshal for the Lehman debtors.

11             Before you this morning for what I'm optimistic

12   may be the shorter of the two agenda items.  This morning,

13   we have a continuation of a sufficiency hearing for four

14   omnibus objections, the Debtors' 213th, 214th, 215th, and

15   216th, as well as the first sufficiency hearing for the

16   Debtors' 379th omnibus objection.

17             There's a long procedural history, if I might try

18   to summarize it succinctly for you --

19             THE COURT:  Sure.

20             MR. FAIL:  -- it might be helpful.

21             Your Honor, there's 111 outstanding claims that

22   we're talking about today.  The Court conducted a hearing

23   with respect to the 213th through the 216th omnibus

24   objection back in -- I believe back in 20 --

25             THE COURT:  April of 2012.

Page 51

1          MR. FAIL:  That was the second hearing --

2          THE COURT:  Okay.

3          MR. FAIL:  -- but there was an uncontested one

4    earlier, and there was a contested hearing.  In the interim,

5    the debtors filed a reply to each one of the 213th through

6    the 216th objections, and in the exhibits thereto in the

7    text of the objection, responded to each individual,

8    summarized, responded and replied to each of the feedings or

9    filings and mostly letters that were interposed.

10         The Court did conduct a hearing on April 26, 2012.

11   The original objection was a cause and we can talk about

12   what the claims were for.  The claims were filed, and most

13   just listed an ISIN number, a securities identification

14   number.

15         THE COURT:  Right.

16         MR. FAIL:  Which the Court is obviously familiar

17   with.  That security is a preferred equity security in a

18   non-debtor, called Lehman Brothers UK Funding, and then

19   either 4 or 5.

20         THE COURT:  Right.

21         MR. FAIL:  There was two --

22         THE COURT:  UK Capital Funding 4 or 5.

23         MR. FAIL:  UK Capital Funding 4 or 5.  And each of

24   those had with it a subordinated guarantee against and from

25   Lehman Brothers Holdings Inc.  So with respect to the claims

Page 52

1    on file, the prima facie claim is a subordinated guarantee

2    claim against Lehman Brothers Holdings Inc.

3              THE COURT:  Right.

4              MR. FAIL:  The guarantee itself which was filed, a

5    copy of which was filed with the original objection, a

6    signed executed copy of the final guarantee was filed with

7    the debtors reply, says subordinated on it, no fewer than 40

8    times.  Section 2.9 --

9              THE COURT:  But it's not only subordinated, but

10   it's subordinated to all other subordinated liabilities.

11             MR. FAIL:  Exactly, Your Honor, and that's because

12   of the nature of the investment.  The UK Capital Funding

13   vehicles held subordinated debt from Lehman Brothers

14   Holdings Inc.  Lehman Brothers Holdings Inc. guaranteed on a

15   limited basis only certain things, not the face value of the

16   investment.  It guaranteed that if it paid on the sub-debt

17   essentially and the vehicle did not pass along that payment

18   on the sub-debt, then LBHI would essentially --

19             THE COURT:  Right.

20             MR. FAIL:  -- pay the creditors directly.

21             It did provide them as junior to all other

22   subordinated liabilities, and senior only to common stock of

23   LBHI.  Consistent with that, in Section 2.10 for example,

24   there was a no set off provision, again evidencing that this

25   would not be a claim against LBHI that could be set off

1    against that, but be treated more as preferred equity.

2              Indeed 2.11 said that if payments were

3    accidentally made after the insolvency of LBHI, those

4    payments should be returned.  No payments were made

5    obviously as a result of the bankruptcy.

6              These securities were sold outside of the United

7    States, but there was a prospectus that was issued with it.

8    Indeed, the prospectus says the words subordinated

9    approximately 170 times in it.  The cover of the prospectus

10   says in bold on the top that it has the benefit of a

11   subordinated guarantee from Lehman Brothers Holdings Inc.

12             There's the typical warnings to investors, to

13   understand the risk factors associated with it in the

14   prospectus.  The prospectus further clarifies and repeats

15   language that the guarantees are subordinated, and it was

16   said indeed, says quote on page 9, "the preferred securities

17   together with the subordinated guarantee are intended to

18   provide the holders with respect to the issuer, with the

19   rights on liquidation of the issuer equivalent to the

20   cumulative preferred stock of LBHI, whether or not issued."

21   Again treating it as preferred stock.  And there are

22   additional references throughout, Your Honor.

23             Page 15, for example, that they're guaranteed on a

24   limited and subordinated basis by LBHI.  It discusses the

25   consequences of LBHI and the risk factors associated with

Page 54

1    LBHI's financials.  Page 16 provides that, "the obligation

2    of LBHI under the subordinated guarantee will rank junior as

3    to payments to all liabilities to creditors of LBHI

4    (including without limitation general creditors and

5    subordinated debt holders excluding the parity securities

6    and junior capital) and claim holders of senior ranking

7    securities."

8              THE COURT:  So let me ask you a point of

9    clarification, if the remaining objectors -- let me back up.

10             MR. FAIL:  Yes, Your Honor.

11             THE COURT:  If the relief that Lehman is seeking

12   is consistent with previous orders to the effect that these

13   claims will either be Class 11 or Class 12 and we'll only

14   figure that out if by some miracle there's payment in full

15   of all senior classes or if Lehman, this round, is seeking

16   to disallow these claims and have them expunged, based on,

17   for example, the language in the guarantee that says, you

18   know, no further force and effect upon the dissolution of

19   the issuer.

20             Because, you know, as you know, we've done a lot

21   of subordination of claims and punted the question, if you

22   will, of their allowability because it just doesn't matter.

23             MR. FAIL:  Your Honor, we attempted to take the

24   path of least resistance, and that's exactly what we did as

25   our reply stated, we tried that in 2012, and I just want to

Page 55

1    be clear that what we were requesting is what we've asked

2    for and what the Court granted.  We're not trying to use

3    those orders as preclusive, and indeed Judge Peck preserved

4    and said he wanted to hear -- the Court wanted to hear from

5    every similarly situated creditor, because a lot of these

6    are Mom's and Pop's and the debtors were cognizant of that,

7    sympathetic to the situation.

8            The debtors subsequently objected to every other

9    UK Capital Funding 4 and 5 claim.  And that's how the 379th

10   objection, which was granted, Your Honor, with respect to 17

11   claims on a contested basis for $10.7 million.  There was

12   one letter filed by a pro se individual.

13           The debtors then filed the 428th objection, and

14   that was granted for every one of the 12 claims, which were

15   largely Citibank and Credit Suisse, Your Honor, for 61

16   million additional dollars.

17           And finally, Your Honor, there was a certificate

18   of no objection filed at ECF 51636 just this week or late

19   last week, Your Honor, for another $3.6 million, six claims

20   that were largely JPMorgan's.

21           THE COURT:  Okay.

22           MR. FAIL:  So we've now captured the universe, and

23   given the opportunity for large and small holders

24   collectively to make the arguments.  The vast majority of

25   these 111 claims that are outstanding simply objected to the

Page 56

```
1    disallowance.  And while the debtors do believe there are

2    multiple arguments to --

3              THE COURT:  Sure.

4              MR. FAIL:  -- say that the face amount of the

5    claims aren't that, there's no reason to upset anybody,

6    there was no reason to bother the Court with it at this

7    time.

8              THE COURT:  So that deals with -- I think Hogan

9    Lovells filed something on behalf of Lloyd's, right?

10             MR. FAIL:  Correct, Your Honor.  I think --

11             THE COURT:  Is someone from Hogan Lovells here?

12             MR. FAIL:  My understanding is that there were a

13   few claims that they originally objected for, I'll let

14   anyone speak for him or herself that is here, but they

15   represented a number of clients that we resolved with

16   respect to all but one of them, and I don't believe they

17   were going to prosecute it further.

18             THE COURT:  Okay.  So with that clarification as

19   to the nature of the relief that's being sought, I do have a

20   number of parties on the phone, and I'm not sure, to be

21   frank, if they filed written responses, objections or to the

22   extent which you've had an opportunity to engage with them.

23   So I would propose to call on them one-by-one, and hear from

24   them.

25             MR. FAIL:  Your Honor, I think that makes sense.
```

Page 57

1           THE COURT:  All right.  So, operator, if you could

2    open up the line, please for everyone.  I have a Mr. Gruher

3    on behalf of Jaime Murcia.

4           MR. GRUHER:  Yes, Your Honor, good morning, Barry

5    Gruher, Genovese Joblove & Batista, and we're appearing on

6    behalf of creditor, Jaime Murcia.

7           And, Your Honor, to answer your question to the

8    written response, we have filed a written response, the

9    latest one would be amended response in opposition to the

10   objection to Claim No. 67453, and that would pertain to the

11   215th omnibus objection.  And that amended response or that

12   document at 22672.

13          THE COURT:  All right.  Thank you.  Now, having

14   heard my colloquy with Mr. Fail, do you have a continuing

15   objection to the subordination of the claims?

16          MR. GRUHER:  Your Honor, actually we don't -- it's

17   not necessarily an objection to the subordination; however,

18   we did note in our amended response to the extent that

19   there's going to be a subordination, any subordination of

20   this claim should be ahead of any of the common stock as it

21   was set forth in our response, would be ahead of the common

22   stock of LBHI.

23          And I know that Mr. Fail and I have actually

24   discussed and e-mailed on this matter several years ago, and

25   I do understand that there's a proposed order that had been

Page 58

```
 1    certified.

 2              For purposes of the hearing, Your Honor, not to

 3    complicate things, we'll stand on our objection.

 4              THE COURT:  All right.  Mr. Fail.

 5              MR. FAIL:  Your Honor, Class 12 provides for all

 6    equity to be in the same class, Class 12, and if there is a

 7    distribution to that class for it to be distributed in

 8    accordance with the priorities of the underlying agreements.

 9              We believe that these documents are clear that

10    they should be treated like preferred stock, which would

11    come ahead of common --

12              THE COURT:  Okay.

13              MR. FAIL:  -- in this case, the objection should

14    be moot and resolved.

15              THE COURT:  Okay.  Mr. Gruher, that sounds like

16    you're on the same page with Mr. Fail.

17              MR. GRUHER:  Yes, Your Honor.

18              THE COURT:  Okay.  Very good.

19              All right.  The next party I have, Mr. Iyer?

20    Perhaps he was not here on this matter.

21              Okay.  Next I have Ms. Saskia Van Rooy.

22              MS. ROOY:  Yes, hello (indiscernible) I would like

23    -- is it possible (indiscernible), he also (indiscernible)

24    speak up for her client, is it possible maybe to

25    (indiscernible) afterwards but I don't (indiscernible).
```

1          MR. FAIL:  Ms. Van Rooy, if I could repeat for the

2     Judge, I think I understood you to say that Ms. Tally Wiener

3     is here representing at least one other client, and you

4     would prefer --

5          MS. ROOY:  Uh-huh.

6          MR. FAIL:  -- that she speak.  She's here in the

7     courtroom as is Mr. Hurst representing a separate client and

8     Mr. Venturini representing a third client.  I understand

9     that you'd like to speak after or --

10          MS. ROOY:  Yes (indiscernible).

11          THE COURT:  Okay.  Very well.  Please come up.

12          MS. ROOY:  Thank you very much.

13          THE COURT:  Good morning.

14          MS. WIENER:  Good morning, Your Honor.  My name is

15     Tally Wendy Wiener, I'm here for Alex Wong whose claim is

16     subject to the 216th omnibus claim objection.

17          THE COURT:  Okay.

18          MS. WIENER:  And for Lionel Dardo Occhione, this

19     claim is subject to the 214th omnibus objection.

20          I'm flattered by Ms. Rooy's request that I speak,

21     and her claim is subject to the 213th claim objection.

22          THE COURT:  Okay.

23          MS. WIENER:  And I'll be very brief.  I'm happy to

24     answer any questions the Court may have.

25          I was listening Your Honor's guidance with the

Page 60

1    previous hearing, and indeed you've said it for me, all I'm

2    asking you to do is to be the same person as Judge Peck for

3    purposes of adjudicating this.  Judge Peck was going to take

4    this under advisement in April of 2012.  I would like to ask

5    that Your Honor consider all of the responses that were then

6    pending, because Judge Peck said something like each

7    claimant speaks for all claimants, and then give us a

8    considered ruling based on those responses that were filed,

9    as they existed on that date.

10            Now, I had hoped what Weil Gotshal would do and

11   what Lehman would do was identify those responses for the

12   Court, because the papers that had been filed, it would take

13   like two days for the Court to pick out the different

14   responses.  You also have some -- I'm sorry, the Court also

15   has some informal responses.

16            I think getting to the substance --

17            THE COURT:  Well, I guess I'm a little confused.

18   I mean, all the time things come to me that for one reason

19   or another, Judge Peck took under advisement in the spirit

20   of allowing parties more time to have a conversation with

21   the estate's lawyers.  But at a certain point, we have to

22   keep disposing of open issues.

23            We've had -- the subordination issues come in many

24   different contexts.  This one is one of the simpler ones,

25   frankly, and I guess I just don't understand why now or what

Page 61

1    would be the basis for not subordinating the claims of the

2    clients that you are here representing today, when it's

3    crystal clear that these are subordinated claims.

4         MS. WIENER:  Your Honor, it's not so clear to us.

5    I guess our question is subordinate to what, because the

6    provisions, while the subordination repeats the word, it's

7    really not clear, subordinate to what.

8         THE COURT:  Well, let me put it this way, it says

9    that there's -- it's junior to all subordinated liabilities

10   of LBHI.  So at the time, of course, that that was entered

11   into, you know, the Lehman world hadn't come to an end yet,

12   and that was a way of ordering the liabilities, you know,

13   without regard to a bankruptcy.

14        Then there was the bankruptcy, right, and there

15   was the plan of reorganization, and consistent with the

16   requirements of the Bankruptcy Code, the claims get sorted

17   according to the absolute priority rule.

18        So what this language means is that no matter how

19   many other subordinated liabilities there are of LBHI, these

20   liabilities rank below them, right.  So for example, there

21   are claims made with respect to other securities, there are

22   claims made on account of certain compensation elements.

23        The point is that unfortunately unsecured claims

24   are not going to be paid in full.  There's just not enough

25   value to go around.  So whether or not one can precisely

Page 62

1    tell the amount of claims to which these claims are

2    subordinated or not, it simply doesn't matter.  If we ever

3    got to that point it would be a miracle, and I would be

4    happy to come back and have that conversation.  But for

5    right now, and consistent with the discussion I had with Mr.

6    Gruher on the last claim, these claims are below all other

7    subordinated claims as classified in the plan, but above the

8    common equity.

9            And there's no ambiguity on that point, there's no

10   issue of fact that any of these objection raises that would

11   require a further hearing on the merits or a further

12   evidentiary hearing.  You know it is what it is and I

13   understand that's not a happy result for folks, but I'm

14   obligated to enforce the plan, provisions of the plan

15   consistent with the provisions of the Bankruptcy Code.

16           So I think that, you know, the later date has come

17   with respect to these claims.  I'd be happy to listen to --

18   and I'd like to let the record stand, I will so order the

19   record in this regard when we're done, but to the extent

20   that Ms. Van Rooy wishes to add anything, I'm happy to hear

21   from her.

22           MS. WIENER:  May I respond to Your Honor?

23           THE COURT:  Sure.

24           MS. WIENER:  I hear you, and I take Your Honor's

25   points.  The -- I don't know that Your Honor has an

Page 63

1     evidentiary record that -- on these particular claims to

2     support the relief requested --

3               THE COURT:  But why --

4               MS. WIENER:  -- because initially there were

5     unsigned guarantees that were presented.  That is not

6     competent in this case.  Subsequently --

7               THE COURT:  But if you're relying on an unsigned

8     guarantee, you're one step further removed from a claim than

9     relying on a signed guarantee.

10              MS. WIENER:  No, Your Honor, it's a matter of

11    presumptions and burdens.  So presumptively here, we have

12    presumptively valid claims.  The burden then goes on --

13              THE COURT:  You have presumptively valid

14    subordinated claim.

15              MS. WIENER:  We have a presumptively valid claim

16    of some nature, subject to subordination objection if --

17              THE COURT:  No, that's not correct.  That's not

18    correct.  Your claim is based on a subordinated guarantee.

19              MS. WIENER:  Your Honor, the subordinated

20    guarantee that you're referring to is an unsigned document

21    that was presented by Lehman, which has the burden.

22              THE COURT:  And what's the basis of your claim

23    that you're relying on an unsigned document?  What's the --

24              MS. WIENER:  They concede the liability, we just

25    disagree with respect to the nature of the liability.  They

Page 64

1     admit the liability, and Lehman has come forward and

2     attached to the papers they filed most recently guarantees

3     which that they're not sworn, they just have representations

4     of counsel that these are the guarantees.

5          MS. WIENER:  So as a matter of housekeeping, and I

6     do appreciate this is a really complicated case, and we've

7     got to keep it moving, I think that the signed guarantees

8     that control these claims are not properly before this

9     Court.

10          THE COURT:  What is the basis of your claim?  What

11    is the basis of the claim?

12          MS. WIENER:  The guarantees which Lehman concedes.

13          THE COURT:  Okay.  Then what -- but now you're

14    telling me that somehow because a guarantee is not signed,

15    that means you have an unsecured claim, a non-subordinated

16    unsecured claim.

17          MS. WIENER:  I understand the consternation of it,

18    that's not the basis for why we have -- I'm sorry, why the

19    claimants have general unsecured claims.  I'll let Ms. Van

20    Rooy speak for herself, but she's going to tell you

21    something that makes this less simple, which is perhaps

22    getting into the violation of the European directive in

23    connection with Lehman's sale of these securities.

24          MR. FAIL:  Your Honor, if I --

25          THE COURT:  Claims related to -- claims arising

Page 65

1    out of the sale of securities under the Bankruptcy Code are

2    subordinated claims.  So if I were to listen to that, which

3    I'm happy to do, and agree for the purposes of this hearing

4    that any or all of that occurred, the most that that would

5    give rise to is a subordinated claim.

6                Otherwise, that would enable somebody who has a

7    claim with respect to wrongdoing in connection with the sale

8    of securities to move up the capital structure and get an

9    unsecured claim, and in essence, avoid or enhance or avoid

10   the risk that they undertook by engaging in a securities

11   transaction.

12               So none of that frankly would matter.  For the

13   purposes of the record, I'm happy to listen to it, but I'm

14   skeptical.

15               MS. WIENER:  Your Honor, I completely agree with

16   your analysis, of course.  I think if Your Honor would read

17   Ms. Van Rooy's papers they really rise to the level of

18   indicating that Lehman's got extremely unclean hands here,

19   and this is still a court of equity.  I do believe that that

20   is the point that she is trying to make.

21               Now, I also add that they have been adjourning

22   these claims out for years now.  This was teed up in 2011

23   and they've been fighting a war of attrition really, because

24   it's really hard to keep up with this case.  There have been

25   over 30,000 docket entries since they first teed this up.

Page 66

1    And I really believe that there has been such a hardship on

2    the claimants.  All of them are foreign, because it wasn't

3    okay to sell this in the United States, and I think they

4    should lose for a host of reasons here.

5             THE COURT:  There's no they, let me make this

6    point.  There is no they.  There is no Lehman.  There are

7    only all the creditors.  And the creditors deserve to get

8    their fair share of the assets that are left.  And to the

9    extent that I allow a claim that has no basis in law, that

10   inappropriately dilutes the recovery of those creditors

11   holding valid claims.

12            So the notion that, and I'm very aware that we're

13   in 2015, and this all happened in 2008, the estate

14   prioritizes what it deals with, it prioritizes dealing with

15   the claims that are clearly in the money if you will, it

16   can't get to everything, but the delay in and of itself, the

17   fact that we're in 2015, that's not a basis for giving

18   someone an unsecured claim.

19            I have spent countless hours with former Lehman

20   employees who lost their entire retirements because it was

21   in Lehman stock.  And I've explained to them that if I were

22   going to rule based on the particular unfortunate

23   circumstances of each claimant, that simply wouldn't be

24   right.  No one would want a system in which, you know, I

25   viewed the claims allowance process as listening to various

Page 67

1    supplicants and their situations.  I'm sympathetic with

2    every single one of them, but I cannot make a ruling based

3    on that.

4         I'm looking at the submission that was filed at

5    Docket 22959 on November 28, 2011 by Ms. Van Rooy.  And it

6    seems that the relief that she's asking for is that the

7    classification maintain its relative priority vis a vis

8    LBHI's other equity interests.  And that's exactly right.

9    It is going to be subordinated to all other claims, but it

10   will come ahead of equity.

11        And in the event that somehow value appears that

12   would flow down beyond the general unsecured class, there

13   would have to be a revisiting of certain issues relating to

14   subordinated claims.  But based on my knowledge, based on

15   the state of the estate, presentations that I've gotten,

16   where we are in the claims allowance process, where we are

17   in the asset recovery process, it does not appear that it's

18   going to happen.

19        With respect to your point about evidentiary, I'm

20   -- my view is that I'm only obligated to have an evidentiary

21   hearing if there's something ambiguous about the papers that

22   are presented to me in connection with the claim, and I find

23   no such ambiguity with respect to the documents underlying

24   these claims.

25        MS. WIENER:  Your Honor, the -- talking about the

Page 68

1   documents, the qualitatively, whether or not they are

2   competent evidence, I believe that they were unsigned

3   documents guarantee --

4           THE COURT:  Unless you can give me a piece of

5   paper that even if the guarantees are unsigned entitles you

6   to an unsecured claim, then it simply doesn't matter.

7           MS. WIENER:  Then, Your Honor, I come back to the

8   law of the case, which is that Judge Peck in April of 2012

9   explained from the bench that this was complicated, and he

10  was not going to rule.  He was going to take this under

11  advisement.

12          The only reason that didn't happen is because

13  Lehman then started filing a series of adjournments, because

14  they don't want this taken under advisement.  I believe --

15          MR. FAIL:  Your Honor, may I --

16          THE COURT:  Why don't you have a seat and let Mr.

17  Fail address this.

18          MR. FAIL:  If I could just interject.

19          THE COURT:  Because I think it's a

20  misrepresentation of what Judge Peck was doing at the time.

21  There have been any -- there are dozens and dozens of

22  matters that at one point were heard before Judge Peck and

23  have come back to me for final resolution.

24          So one thing we're not going to do is going to,

25  you know, get Judge Peck off the bench and back on the bench

Page 69

1    so to speak.  The job is mine now, and this is the

2    disposition I think is appropriate.

3              Mr. Fail, do you want to address that point --

4              MR. FAIL:  Just briefly, just briefly --

5              THE COURT:  -- and also the unsigned guarantee

6    point?

7              MR. FAIL:  -- for the record.

8              Thank you, Your Honor, and just briefly for the

9    record because I think you've hit the substantive points.

10             So why we're here today, there's no dispute and we

11   put it in our reply that Your Honor has read, Judge Peck

12   adjourned the hearing, because he wanted to allow every

13   similarly situated creditor to be heard.  He also made it

14   clear that Ms. Wiener at the time I think represented one

15   creditor, she's since -- although she hasn't filed anything

16   on the docket under the bankruptcy rules, has found two

17   other clients that she's now standing before, one other at

18   least that she's representing, but that's fine.

19             But the Judge said, she doesn't represent anybody

20   that's not represented, and he granted at a hearing other

21   people, so we're talking about the remaining bunch.  Ms.

22   Wiener knows specifically, and it's clear from the docket,

23   that including Docket 27541 which is our reply to the 214th

24   objection, one of hers, we listed every single objection

25   filed by ECF and claim number.  We summarized it and we gave

Page 70

1    our reply.

2          So there's -- the Court, Your Honor, has read and

3    reviewed and considered every person, whether they're here

4    today, whether they were here in April of 2012, every

5    creditor who has responded on every one of the objections

6    the Court has had the opportunity, and I'm sure has read all

7    of this, and the Court can consider all of that as the

8    record.  There's no dispute about that.

9          Moreover, the implication that the debtors delay

10   is an attempt to silence voices is totally uncalled for --

11          THE COURT:  It's the opposite.

12          MR. FAIL:  -- and unsubstantiated.

13          THE COURT:  It's the opposite.

14          MR. FAIL:  It's the opposite, Your Honor.  And

15   indeed, we filed objections over time to some of the largest

16   claim holders that dwarf every individual to allow them to

17   speak, and as I stated in my opening presentation, and as we

18   put forth in the reply with the ECF numbers for Ms. Wiener

19   to trace, there aren't that many of them, tens of millions

20   of dollars, hundreds of millions of dollars have ultimately

21   read our pleadings and agreed.

22          With respect to the burden point, Your Honor, Your

23   Honor stated they are prima facie evidence of subordinated

24   claims, guaranteed claims.  We have no other burden to

25   overcome it.  Nonetheless, the Judge directed us to -- Judge

Page 71

1    Peck asked us to provide informally copies of the signed

2    guarantee which we did a long time ago.  If Ms. Wiener had

3    asked in advance of this hearing for us to file a

4    declaration, I certainly would have done that.  But she

5    didn't and it's not required by the burdens, and it's not

6    required for any other purpose.

7            This is a sufficiency hearing and she hasn't met

8    her burden to demonstrate why their claims are entitled to

9    anything more than they're going to be given.

10           Furthermore, Ms. Wiener, herself and her client

11   are not prejudiced as she's attended every hearing and every

12   opportunity, and so has Ms. Van Rooy.  As she put in her

13   pleadings, she spoke with Ms. Lutkus (ph) before the last

14   hearing and she's on the phone today and we're happy to hear

15   her, and happy to address her situation.

16           I personally spoke with her last night for 45

17   minutes at 8 p.m. last night when she called my office for

18   the first time in advance of the hearing, and I'm happy to

19   hear from her this day.

20           THE COURT:  All right.  Ms. Van Rooy, would you

21   like to be heard?

22           MS. ROOY:  Yes, I would like to be heard.

23           THE COURT:  Go ahead.

24           MS. ROOY:  I'm going to read from my two papers.

25   I filed one paper (indiscernible) 2011 and the second one

1    filed June 2012 (indiscernible) read my papers?

2              THE COURT:  Yes, ma'am?

3              MS. ROOY:  Because my arguments are

4    (indiscernible) because I (indiscernible) prospective and

5    (indiscernible) and I also talked (indiscernible) that like

6    the (indiscernible) they want to (indiscernible) reference

7    because (indiscernible) subordination.  In those prospectus

8    they are not (indiscernible) requirements of the European

9    prospectus (indiscernible) and also not requirements of the

10   (indiscernible) and the information in the (indiscernible)

11   prospectus regarding the alleged subordination of my claim

12   is ultimate comply with requirements of the prospectus

13   directive and with the requirements of the Section 87(a),

14   the United Kingdom (indiscernible).

15             So the (indiscernible) regarding the relationship

16   (indiscernible) of my claim also in breach of the

17   contractual agreements to (indiscernible) securities.  And I

18   mentioned that in my paper in trying to explain to you,

19   because (indiscernible) if you (indiscernible) prospectus

20   (indiscernible) with all parts of (indiscernible) prospectus

21   (indiscernible) is inconsistent, inaccurate and

22   (indiscernible), and pursuant (indiscernible) directives

23   (indiscernible) minority (indiscernible) prospectus.

24             And because the summary (indiscernible) together

25   with all the parts of the relationship are inconsistent,

Page 73

1     inaccurate and (indiscernible).  And therefore, this

2     inconsistent, inaccurate (indiscernible) prospectus should

3     be (indiscernible) against (indiscernible) which was Lehman.

4            In addition, the (indiscernible) and information

5     by reference is (indiscernible) article (indiscernible).

6     And in addition, the directives needs to (indiscernible)

7     ensure the (indiscernible) investors.  In this case, there

8     are inconsistent (indiscernible) prospective, so

9     (indiscernible) against (indiscernible) like me of

10    (indiscernible).

11           And so you know all (indiscernible) the talking

12    about the simple mention that our claims would be

13    subordinated if you look closer to the European

14    (indiscernible) prospectus and all the documents that belong

15    to it (indiscernible) to the (indiscernible) security, they

16    are against -- they are (indiscernible).

17           So (indiscernible) how do you say (indiscernible)

18    is quite difficult, difficult to talk.  And I also

19    (indiscernible) that Lehman (indiscernible) of the general

20    partner and the (indiscernible).  So they (indiscernible) on

21    purpose and they also used (indiscernible) they also had to

22    inform the (indiscernible) of the securities, so it's a

23    direct violation of the terms of the guarantee.

24           THE COURT:  Thank you.

25           MS. ROOY:  (indiscernible)

Page 74

1           THE COURT:  Let me give Mr. Fail an opportunity

2    briefly to respond, thank you very much.

3           MR. FAIL:  Just very briefly, and thank you, Ms.

4    Van Rooy.  I believe there were two general points that she

5    was making.  One that Lehman caused the dissolution of the

6    GP and therefore --

7           MS. ROOY:  Yes.

8           MR. FAIL:  -- the entity and therefore should be

9    responsible and shouldn't be excused from liability.  Again

10   to clarify for Ms. Rooy, we're not seeking to disallow the

11   claim on the basis of the termination of the guarantee, but

12   if she's asserting a separate claim and let's give all the

13   benefit of the doubt to her, if she were asserting a

14   separate claim for either that or for some violation of a

15   law, I would reserve all rights to say that that law

16   applies, that there was any violation of course, nonetheless

17   assuming arguendo she's right in her assertions, any such

18   claim would be also subordinated under U.S. bankruptcy law,

19   unfortunately for Ms. Van Rooy, leading to the same

20   practical result.

21           I would also add as a practical matter, the --

22   there was no damage or harm as a result of the consequence

23   of the dissolution of the GP or of the funding entity,

24   because that entity held -- those two entities held

25   approximately $780 million of subordinated debt.

Page 75

1          The debt is subordinated, distributions are being

2     made to senior creditors on account of that.  It's being

3     accounted for.  They were scheduled on the debtors books but

4     recovery would not flow through the holders, so I

5     appreciate, and I think I understood her comments, I don't

6     think it leads to a different result today.

7          THE COURT:  All right.  I agree and I think the

8     most important point that Ms. Fail made and that I would

9     like to emphasize and that I also mentioned to Ms. Wiener

10    was that even assuming the allegations with respect to

11    various violations of law are correct, it's unquestionable

12    that Section 510(b) of the United States Bankruptcy Code

13    would require the subordination of any such claims.

14          And because we are in a situation in which it is

15    academic as to whether and how much those claims and what

16    the different levels of subordination would be, it's not

17    necessary to get to those issues.

18          For better or worse, eight -- going on eight years

19    out from the Lehman case, there's not a prospect of recovery

20    to anyone lower in priority than general unsecured

21    creditors.  So while, of course, I have sympathy for

22    claimants who are not receiving a recovery, and I have

23    sympathy for the view that perhaps our laws were

24    insufficient to appropriately punish those who might have

25    contributed to the dissolution of Lehman and the entire

Page 76

1    financial crisis in 2008, that's beyond the scope of my

2    powers, and I cannot within the scope of enforcing the

3    bankruptcy plan remedy that or offer any other comfort to

4    those who aren't receiving a recovery.

5              What I would say to you though that I've said to

6    other claimants is that the opportunity to be heard is --

7    doesn't have a dollar value, but it's a precious thing, and

8    I hope that you at least felt that you have been heard both

9    by this court and by Mr. Fail representing the estate.

10             But the objections will be sustained.  All right.

11   Thank you very much for taking the time to dial in.

12             MS. ROOY:  (indiscernible) that the European

13   (indiscernible) says that stipulations (indiscernible)

14   should be clear, should be (indiscernible) understand for

15   investors.  And that's the point because the prospectus was

16   not (indiscernible) and also wasn't (indiscernible).

17             So you could make (indiscernible) if you read the

18   prospectus and you got to the (indiscernible) legislation it

19   was not clear to (indiscernible) --

20             THE COURT:  I understand.

21             MS. ROOY:  -- normal (indiscernible).

22             THE COURT:  Ms. Rooy, I under --

23             MS. ROOY:  (indiscernible)

24             THE COURT:  Ms. Rooy --

25             MS. ROOY:  (indiscernible) omitted it was not

Page 77

1    clear.

2              THE COURT:  Ms. Rooy --

3              MS. ROOY:  Because if it was clear

4    (indiscernible).

5              THE COURT:  -- I understand.  Ms. Rooy?  Ms. Rooy,

6    I would ask you to please hold on.  I understand --

7              MS. ROOY:  Yes?

8              THE COURT:  -- what you're saying, I understand,

9    you made that argument before, Mr. Fail addressed it.  I'm

10   going to address it one more time and then we're going to

11   have to move on.

12             Giving you the benefit of the doubt that you're

13   stating a claim with respect to infirmities in the

14   prospectus, such a claim --

15             MS. ROOY:  Yes.

16             THE COURT:  -- would be covered under Section

17   510(b) of the Bankruptcy Code and notwithstanding that they,

18   in your view, arise from a perspective governed by non-U.S.

19   law or otherwise.

20             So I do understand your argument and that

21   notwithstanding, the objection to the claims is going to be

22   sustained.

23             MS. ROOY:  (indiscernible) then --

24             THE COURT:  Ma'am, ma'am.

25             MS. ROOY:  -- (indiscernible).

1            THE COURT:  Ma'am, we are -- we're going to move

2    on to the next part of the hearing.  You're welcome to --

3            MS. ROOY:  (indiscernible)

4            THE COURT:  -- stay on the line and continue to

5    listen.  Thank you so much.

6            MS. ROOY:  Yes, thank you very much.

7            MR. HURST:  Thank you, Your Honor.  This is David

8    Hurst from Cole Schotz PC representing the Daryani Family.

9    The Daryanis have three claims totaling about $2.1 million.

10            Your Honor, back in 2011, I guess 2011, 2012, the

11    Daryanis filed responses to the 214th and the 216th omnibus

12    objections.  Those are at Docket Nos. 22507 and 27178.

13            Your Honor, I recognize these are subordinated

14    claims, so my argument is just slightly different.  I'm a

15    little afraid to make it, but I'm just going to throw it out

16    there.

17            THE COURT:  I'm still smiling.  Not for much

18    longer but I'm still smiling.

19            MR. HURST:  I'll get my argument made quickly.

20            In any case, Your Honor, I think it's clear these

21    are subordinated, that while they're subordinated debt

22    they're above common stock.  My argument is, Your Honor,

23    that these actually fall above Class 11, above 12, above 11,

24    but below 10C.  They fall in a place where there is no

25    class.  And I don't -- you know, what the debtors are doing

Page 79

1    for purposes of convenience is to try to stick us in a class

2    where we don't belong.  We're clearly not 510(b) claimants,

3    right, this is an unsecured obligation as are the guarantees

4    themselves say.

5              THE COURT:  Subordinated.

6              MR. HURST:  Right, it's subordinated but unsecured

7    obligation.

8              THE COURT:  But it says subordinated to all other

9    subordinated obligations.

10             MR. HURST:  Sure, sure.

11             THE COURT:  Okay.  So --

12             MR. HURST:  So we're below 10C is what that means.

13             THE COURT:  Right.

14             MR. HURST:  Okay.  But we're not 510(b) claims.

15             THE COURT:  Okay.

16             MR. HURST:  Those are other obligations that are

17   subordinated to a level of equity.  And then there's Class

18   12, Your Honor, which is equity.

19             THE COURT:  Right.

20             MR. HURST:  And the debtors have acknowledged in

21   their response filed at Docket No. 27541 that these

22   subordinated guarantees did not give rise to an equity

23   interest in Lehman because they didn't.

24             THE COURT:  Right.

25             MR. HURST:  So we're not equity, we're not 12,

Page 80

1    we're not 11, but we're below 10C.  So effectively, we're

2    Class 10D, we're just a class -- and all my client wants to

3    do is to make sure in the very unlikely situation where

4    money actually flowed down below 10C, that it flows first to

5    them before it gets --

6              THE COURT:  I'll tell you what.  We're going to

7    agree that you're below 10C --

8              MR. HURST:  Got it, agreed, Your Honor.

9              THE COURT:  -- right, and in the event that 10C

10   claims or class are paid in full --

11             MR. HURST:  Yes, Your Honor.

12             THE COURT:  -- you can come back and we can talk

13   about this.

14             MR. HURST:  But for purposes of today -- what's

15   the order going to say?

16             MR. FAIL:  Your Honor, may I just briefly try to

17   help?

18             THE COURT:  Sure.

19             MR. FAIL:  10 -- Class 11 are still claims.

20             THE COURT:  Right.

21             MR. FAIL:  The documents are very clear.  These

22   claims that we're talking about today, these 111 are parried

23   with preferred equity which are in Class 12.  And I

24   understand people want to be above Class 11, but there are

25   claims in Class 11 that are entitled to be paid first, and

Page 81

1    they aren't equity necessarily.

2            510(b) claims that are claims off of debt

3    securities going to 510(b), like RSU type claims --

4            THE COURT:  Yes.

5            MR. FAIL:  -- while sub-subject to whatever, you

6    know, litigation that's going on --

7            THE COURT:  Right.

8            MR. FAIL:  -- are claims about the failure to buy

9    Lehman stock are in equity.

10           THE COURT:  Right.

11           MR. FAIL:  But there are 510(b) based on debts

12   which is a correction for the record.

13           THE COURT:  Right.

14           MR. FAIL:  Happy to preserve things between 11, we

15   weren't offering 11 in the beginning, Your Honor, that was

16   an accommodation to folks that wanted to be in 11.  But to

17   say that -- and that's fine, we reserve the right to

18   prioritize if it's an event, I don't think it's going to be

19   an event, and you don't either, Your Honor.  But to put them

20   ahead of 11 is like a substantive difference, I don't think

21   it really --

22           THE COURT:  I'm not suggesting that I put them

23   ahead of 11, I'm just suggesting that you're not ahead of

24   11, but this is -- it's entirely academic.  You are -- there

25   will be no distribution beyond 10C.

Page 82

1          MR. HURST:  Your Honor, I respect what you're

2     saying and I've heard that Mr. Fail and he's been great to

3     explain that to me, but unfortunately my level of

4     information is not perfect.  And so you try to protect your

5     client the best way you can.

6          So so long as the order says, that we're below 10C

7     and we're not necessarily grouped in with 11 or grouped in

8     with 12, I just want to preserve our right to come back in

9     the unlikely event that funds do flow down below 10C, we can

10    come back and argue, yes, we are, we're above 11.  Because I

11    --

12          THE COURT:  Mr. Fail?

13          MR. FAIL:  I mean, there is no above 11, so we

14    could say that rights of priority within 11 and within 12,

15    you know, just practically --

16          THE COURT:  Right.

17          MR. FAIL:  -- that what he's asking for doesn't

18    exist.  So if you want, we could say within 11 we can come

19    back, I don't think we'll ever be back, and so that would be

20    fine, Your Honor.

21          THE COURT:  I mean, there is no -- it's another

22    land, there's nothing between 10C and 11.

23          MR. FAIL:  I'm happy to come back and say within

24    11.

25          THE COURT:  You're below 10C.

Page 83

1          MR. HURST:  I agree.

2          THE COURT:  So at this late date, I think we're

3    not going to -- you know, modify the plan and we're talking

4    about something that it would be a tremendously happy day if

5    it had monetary value.  So I think that, Mr. Fail, you can

6    draft language that makes clear that these claims are below

7    10C and in the event that funds become available for

8    distribution to claimants in classes below 10C it's without

9    prejudice to your argument to say you're entitled to such a

10   distribution.  Okay.  How's that?

11         MR. HURST:  That sounds wonderful, Your Honor, I

12   appreciate that.

13         THE COURT:  Mr. Fail, does that work for you?

14         MR. FAIL:  Very well, Your Honor, absolutely,

15   we'll submit that.

16         THE COURT:  All right.

17         MR. HURST:  Thank you very much, Your Honor.

18         THE COURT:  Who else?

19         MR. VENTURINI:  Just very briefly, Your Honor.  My

20   name is August Venturini for Lamita Jabbour.  We filed a

21   reply under objection 215, it was Document No. 22020.

22         And I understand everything that Your Honor has

23   said, and that has been said today, and we'll just say me

24   too in terms of my claim, if we can reserve the right at

25   some point, if there is money that comes down to the level

Page 84

1    of Class 10, to then come back and discuss where we lie,

2    because we believe the guarantee is not clear as to exactly

3    where we fall.

4              THE COURT:  The words subordinated to all other

5    subordinated debt is not clear?  It's pretty clear.

6              MR. VENTURINI:  What's not clear is what follows.

7    It says we're within pari passu with parity securities and

8    parity securities are defined as (indiscernible) securities.

9    So we're pari passu with ourself.  So it doesn't really say

10   what level of subordinated that we fall under, so.

11             THE COURT:  We'll count the angels on the head of

12   that pen when Mr. Fail pays all the unsecured creditors in

13   full.  Did you hear that?

14             MR. VENTURINI:  Did you hear that?

15             MR. FAIL:  Working every day to do it, Your Honor.

16             MR. VENTURINI:  Thank you, Your Honor.

17             THE COURT:  Thank you.  Is there anyone else --

18             MR. FAIL:  Your Honor, I think that concludes --

19             THE COURT:  Well, I have other folks on the phone.

20   I doubt that Mr. (indiscernible) wants to be heard on this

21   point.  I have a Mr. Henderson.  Are you there, Mr.

22   Henderson?

23             THE OPERATOR:  This is the court call operator,

24   (indiscernible) for Mr. Henderson.

25             THE COURT:  All right.  Thank you.

Page 85

1               Mr. Hodyl from the Hinkhouse Firm?

2               THE OPERATOR:  (indiscernible)

3               THE COURT:  And Mr. Miller.

4               THE OPERATOR:  (indiscernible) from that attorney.

5               THE COURT:  All right.  Thank you, Operator.

6               All right.  Mr. Fail, it looks like that concludes

7       this portion of the hearing.

8               MR. FAIL:  Yes, Your Honor, we'll submit orders in

9       accordance with the Court's direction.

10              THE COURT:  All right.

11              MS. WIENER:  Your Honor, I'm sorry, just one

12      housekeeping matter.  I was representing both Alex Wong and

13      Lionel Occhione --

14              THE COURT:  Yes.

15              MS. WIENER:  -- at the same time when I was before

16      Judge Peck --

17              THE COURT:  Yes.

18              MS. WIENER:  -- in 2012.  The suggestion was made

19      that I picked up somehow a claimant subsequently to acting

20      for one claimant, and I think Mr. Fail is just confused.  I

21      wanted to clarify that.  I'm thrilled with the result today

22      on the record.  Thank you, Your Honor.

23              THE COURT:  Okay.  Thank you very much.

24              MR. FAIL:  Thank you very much.

25              MR. GRUHER:  Your Honor?

Page 86

1           THE COURT:  Yes.

2           MR. GRUHER:  Your Honor, on this side, and I do

3    apologize chiming in, this is Barry Gruher again.

4           Am I to understand that based on what has at least

5    been discussed today that (indiscernible) Mr. Fail's

6    preparation of the orders relative to the 215th omnibus

7    objection that that's going to be across the board to all

8    those claimants that have had their claims objected to on

9    that objection?

10          THE COURT:  Yes.

11          MR. GRUHER:  Okay.

12          THE COURT:  If you would like Mr. Fail will send

13   you a copy of the order before he submits it to me for

14   signature.

15          MR. GRUHER:  Sure.  Thank you, Your Honor, and I

16   appreciate you allowing me to attend by phone.

17          THE COURT:  All right.  Mr. Fail, are you going to

18   depart now or are you going to stay?

19          MR. FAIL:  With the Court's permission I'm happy

20   to stay, I'm happy to --

21          THE COURT:  No, you can leave.  If you were going

22   to depart, I just wanted to note that I think this is the

23   last time this merry band will be together in 2015, and the

24   calendar is already filling up with dates for 2016 and 2017.

25   So I just wanted to express my appreciation to all of the

Page 87

1  firms, your firm and all of the other firms that are

2  continuing to work on the case and appreciate for how you

3  help us stay organized and stay on top of things, and wish

4  everyone on behalf of us down here happy holidays and a

5  happy New Year.

6           MR. FAIL:  Thank you, Your Honor, on behalf of the

7  debtors and all of their professionals, the same to you and

8  your staff for the accommodation of the time and 24-hour a

9  day and making time for us here during the day.  Thank you

10 very much, happy holidays.

11          THE COURT:  All right.  Thank you.

12          MR. GRUHER:  Thank you, Your Honor.

13          THE COURT:  Okay.  All right.  Let me have the

14 folks on the Arch dispute back up.

15          So you're going to announce peace?

16          MR. ZIEHL:  We did spend a lot of time talking,

17 Your Honor, and we're committed to trying to see if we can

18 resolve the underlying dispute, but I guess we just don't

19 have the people available today.

20          THE COURT:  Okay.

21          MR. ZIEHL:  But we'll be doing that soon.  But

22 Arch is not accepting jurisdiction and so I think for that

23 reason and we appreciate your time in that, but I think it's

24 best that we put in the record --

25          THE COURT:  Well, would you -- I can give you

Page 88

1    another option if you'd like.  And that is that my view will

2    not change.  If you would like to have the time to talk, you

3    can do that, and then we can reconvene telephonically, no

4    one has to come and visit if you don't want to, and I would

5    simply read what I would read now into the record.

6              I am unfortunately pressed for time at this point

7    because there's a judge's meeting --

8              MR. ZIEHL:  Okay.

9              THE COURT:  -- about to start, but if that's not

10   acceptable, then I'll stay and read now.

11             MR. ZIEHL:  I guess I would just like to put a

12   time now because I don't want -- part of this is just --

13             THE COURT:  Time.

14             MR. ZIEHL:  -- time and --

15             THE COURT:  Right.

16             MR. ZIEHL:  -- so --

17             THE COURT:  Well, cognizant of the holidays, it is

18   -- give me a suggestion, Mr. Ziehl, as to what the -- you

19   know, what the date would be for you to say deal or no deal?

20             MR. ZIEHL:  Yeah, we're going to talk next week.

21   And I think we'll find out pretty quickly whether --

22             THE COURT:  You think your decision-makers are

23   available --

24             MR. ZIEHL:  Yeah.

25             THE COURT:  -- next week?

Page 89

1          MR. SHAHINIAN:  I don't know for sure, but I have

2     no reason to believe otherwise.

3          THE COURT:  Okay.

4          MR. SHAHINIAN:  Except for the holiday season.

5          THE COURT:  Okay.  Well, I can give you, for

6     example, on -- how about to give you the benefit of the

7     doubt with respect to the holidays, how about on Friday, the

8     8th at a time that would be convenient for West Coasters?

9     Or I'm around on the 28th and the 29th, I'd be happy to --

10          MR. ZIEHL:  I would prefer that.

11          THE COURT:  I'm getting a pained look from your

12     colleague here.

13          MR. SHAHINIAN:  I'm pleased to report that I will

14     be in Belize with my family.

15          MR. ZIEHL:  If it's just to hear the reading on

16     the record, I'll be happy to send him a transcript.  The

17     problem is if there's going to be an appeal, there's further

18     delay, and this is supposed to be an expedited arbitration.

19          THE COURT:  What about -- how about Monday,

20     January 4th?  How about that, that way you don't have to --

21     I don't have to have the visual of you being in Belize

22     listening to me being in New York reading on the phone.

23          MR. SHAHINIAN:  Nor will you have to

24     (indiscernible).

25          THE COURT:  So what do I --

```
 1              MR. ZIEHL:  And --

 2              THE COURT:  We're going to figure out a time.

 3              MR. ZIEHL:  Don't worry about a California time,

 4    Your Honor.  You don't need to worry about California time.

 5              THE COURT:  I thought I had to worry about -- Mr.

 6    Hopkins is from California.

 7              MR. SHAHINIAN:  Yes.

 8              THE COURT:  Well, how about 3 o'clock?

 9              MR. ZIEHL:  That's fine, Your Honor.

10              MR. SHAHINIAN:  That'd be fine, Your Honor.

11              THE COURT:  That would be good for California as

12    well.  Is that all right, Mr. Ziehl?

13              MR. ZIEHL:  That's fine, Your Honor.

14              THE COURT:  All right.  So 3 o'clock on January

15    4th, and I will hope that you perhaps will work it out in

16    the meantime.

17              MR. SHAHINIAN:  I hope I can tell you there's no

18    need for the reading of the decision.

19              THE COURT:  That would be great.  As soon as you

20    know -- if you know -- well, as soon as you know up or down

21    because --

22              MR. SHAHINIAN:  As soon as I know, I'll call

23    chambers.

24              THE COURT:  Call Mr. O'Neal and let us know.  All

25    right.  Thank you so much.
```

Page 91

1              MR. ZIEHL:   Thank you, Your Honor.

2              THE COURT:   Have a good holidays.

3              MR. SHAHINIAN:   Thank you.

4    (Proceedings concluded at 11:59 a.m.)

5                              *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 92

1                           CERTIFICATE

2    I, Sheila G. Orms, certify that the foregoing is a true and

3    accurate transcript from the official electronic sound

4    recording.

5    **Sheila Orms**   Digitally signed by Sheila Orms
                        DN: cn=Sheila Orms, o, ou,
                        email=digital1@veritext.com, c=US
6    _____
                        Date: 2015.12.18 16:03:28 -05'00'

7    SHEILA ORMS, APPROVED TRANSCRIPTIONIST

8

9    DATED:   December 18, 2015

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25