Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                   U.S. Bankruptcy Court

14                   One Bowling Green

15                   New York, NY   10004

16

17                   January 21, 2016

18                   10:07 AM - 11:05 AM

19

20

21

22

23   B E F O R E :

24   HON SHELLY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    Hearing re:  Doc#51601 Motion to Reconsider FRCP 60 or FRBP

2    3008 of Aadit Seshasayee of the Disallowance of his Claim

3    Hearing re: Adversary proceeding: 10-03547-scc Lehman

4    Brothers Special Financing INc. v. Bank of America Natnoial

5    Association et al

6    Doc #1208 Motion by Amici Curiae SIFMA and ISDA for Leave to

7    File a Memorandum of Law in Support of the Noteholder

8    Defendants Omnibus Motion to Dismiss

9

10   Hearing re:  Adversary proceeding: 10-03547 Lehman Brothers

11   Special Financing Inc. v. Bank of American National

12   Association et al

13   Doc #1210 The Structured Finance Industry Group's Motion for

14   Leave to file Amicus Curiae Brief in Support Defendant's

15   Motion to Dismiss

16

17   Hearing re:  Adversary proceeding: 10-03547 Lehman Brothers

18   Special Financing Inc. v. Bank of American National

19   Association et al

20   Doc #1211 Motion of Proposed Amicus Curiae Structured

21   Finance Industry Group for an Order Authorizing Filing of

22   Documents Under Seal

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 3

1    A P P E A R A N C E S :

2

3    WACHTELL, LIPTON, ROSEN & KATZ

4         Attorney for Lehman Brothers Holdings

5         51 West 52nd Street

6         New York, NY 10019

7

8    BY:  GARRETT ORDOWER

9

10   PORZIO BROMBERG & NEWMAN, P.C.

11        100 Southgate Parkway

12        P.O. Box 1997

13        Morristown, NJ 07962

14

15   BY:  RACHEL A. PARISI

16        ROBERT M. SCHECHTER

17

18   WOLLMUTH MAHEN

19        Attorney for the Debtor

20        500 5th Avenue

21        New York, NY 10110

22

23   BY:  PAUL R. DEFILIPPO

24

25

Page 4

```
 1   FRESHFIELDS BRUCKHAUS DERINGER US LLP

 2        Attorneys for Structured Finance Industry group

 3        601 Lexington Avenue

 4        31st Floor

 5        New York, NY 10022

 6

 7   BY:  SHANNON M. LEITNER

 8        DAVID Y. LIVSHIZ

 9        TIMOTHY P. HARKNESS

10

11   WEIL, GOTSHAL & MANGES LLP

12        Attorneys for Debtors

13

14   BY:  GARRETT FAIL

15

16   ALSO PRESENT TELEPHONICALLY:

17   GABRIEL I. GLAZER

18   JASON B. SANJANA

19   MICHAEL G. LINN

20   BRYAN KRAKAUER

21   KATHARINE L. MAYER

22

23

24

25
```

Page 5

```
 1                    P R O C E E D I N G S

 2            MR. FAIL:  Good, Your Honor.  Happy new year.

 3            THE COURT:  Happy New Year.  I think it's the

 4     first time in the new year?

 5            MR. FAIL:  It is.  Good morning. For the record,

 6     Garrett Fail, Weil, Gotshal & Manges for Lehman Brothers

 7     Holdings, Inc.  This morning, Your Honor, there are three

 8     items ton the agenda, one contested matter and then two

 9     under the adversary proceedings.  Unless Your Honor prefers

10     otherwise, we would take the--the matters in the order that

11     they appear on the agenda.

12            THE COURT:  That's fine.

13            MR. FAIL:  The first item, then, is a motion to

14     reconsider and I would turn that over to the Claimant and

15     movant.

16            THE COURT:  Okay.  Very good.

17            MR. FAIL:  Thank you, Your Honor.

18            MR. SCHECHTER:  Thank you, Your Honor.

19            THE COURT:  How are you?

20            MR. SCHECHTER:  Good.  Robert Schechter and Rachel

21     Parisi --

22            THE COURT:  Hello.

23            MR. SCHECHTER:  -- on behalf of Aadit Seshasayee.

24     So, thank you for hearing from us this morning, Your Honor.

25            THE COURT:  Sure.
```

Page 6

```
 1              MR. SCHECHTER:  This may be a small claim in the
 2    eyes of Lehman Brothers Holding, Inc., but it is a life-
 3    altering event for Mr. Seshasayee and his family.  Mr.
 4    Seshasayee worked for Lehman Brothers Holding, Inc. for
 5    approximately fourteen years, and under 11 USC 502(j),
 6    Bankruptcy Rule 9024 and Federal Civil Procedure 60(b)6,
 7    there is certainly a basis to provide the relief requested
 8    in Mr. Seshasayee's motion in the sound discretion of this
 9    Court, and we believe that cause, the equities of this case
10    and due process dictate a ruling in favor of the requested
11    relief.
12              Mr. Seshasayee's motion doesn't open any
13    floodgates, it's a unique situation.  He was served or not
14    served at all.  If he was served, it looks as though the
15    claims noticing agent, if that's who handled this, put an
16    incorrect address on the location where they sent any
17    mailings, and also on the order on the motion, it was
18    granted that previous expunctious claim, the incorrect
19    address was there as well, and we could not find an
20    affidavit service of that order. Mr. Seshasayee has no
21    recollection of ever receiving a motion to expunge his claim
22    --
23              THE COURT:  Did he reside at the -- well, it -- it
24    all comes down to handwriting.  I looked at the proof of
25    claim --
```

Page 7

1          MR. SCHECHTER:  Yes.

2          THE COURT:  -- and it comes down to whether you

3     read it as Tec Gunter, T-E-C Gunter or Tre Gunter --

4          MR. SCHECHTER:  That's correct, Your Honor.

5          THE COURT:  -- and it's pretty much of a toss up,

6     but -- it's pretty much of a toss up, you know, but be that

7     as it may, did he reside at that address?

8          MR. SCHECHTER:  So, he resided many places

9     temporarily at that time.  This was a -- the home of a good

10    friend of his who he has shared with me he trusts and would

11    certainly apprise him of anything that was received on his

12    behalf, but as he shared in his certification, he was

13    constantly on the move, looking for employment at that time.

14    It was a very turbulent time for his entire family, and so

15    he was dependent on -- on his friend, who, again, he

16    certainly trusts.  And I'll add it, as far as the proof of

17    claim goes, Your Honor, it is the Debtor at this point that

18    does hold the original proof of claim.  I know we are all

19    looking at copies of it, but certainly the original of that

20    proof of claim would sit with the Debtor and its Claimants

21    and noticing agent.

22          THE COURT:  Okay, I -- I don't know if I

23    understand the significance of that with respect to --

24          MR. SCHECHTER:  To the extent that there may be

25    any further clarity in the original proof of claim that was

1    submitted.

2              THE COURT:  I think the -- the copy that I've

3    looked at is -- is not a bad copy and I think that you could

4    ask a room full of people, is it T-E-C or is it T-R-E and

5    you know, it would be all over the lot.  But there was no --

6              MR. SCHECHTER:  I agree, Your Honor.

7              THE COURT:  -- there -- there was no indication

8    that it was returned for non-delivery, in other words, going

9    to the -- or in fact there's another address that looks like

10   that, so.

11             MR. SCHECHTER:  Well, on -- on that point, Your

12   Honor, I was --

13             THE COURT:  Yes.

14             MR. SCHECHTER:  -- honestly a little bit

15   surprised.  There's no certification or any explanation of

16   what the procedures are for the noticing and claims agent if

17   they were to come across an address that they deemed

18   questionable or, you know, what they did here.  I know there

19   was attorney's argument that there was nothing returned.

20   You know, I don't know anything more than that.  I didn't

21   see anything asserted by, I presume, a third party that's

22   handling the mailing in a case of this size.

23             And you know, aside from that, Your Honor, as son

24   as Mr. Seshasayee -- he recognized what had happened here,

25   he did take quick action to notify Lehman Brothers Holding,

Page 9

```
 1    Inc., as Mr. Fail knows, we've been in touch for a while to

 2    see if we can work through the issues.  You know, I --

 3              THE COURT:  What's the -- the claim that Mr. Shesa

 4    -- sheh --

 5              MR. SCHECHTER: Seshasayee.

 6              THE COURT:  Yes.

 7              (Laughter)

 8              THE COURT:  Filed is in the amount of $199,000 or

 9    so?

10              MR. SCHECHTER:  That's the original claim, Your

11    Honor --

12              THE COURT:  Yes.

13              MR. SCHECHTER:  -- and if I can explain there as

14    well --

15              THE COURT:  Okay.

16              MR. SCHECHTER:  -- and I'm not going to profess to

17    be a tax expert, but Mr. Seshasayee worked under an

18    expatriate agreement with Lehman Brothers Holding, Inc.,

19    which they recognized in their own schedule of assets and

20    liabilities at the beginning of this case.  Pursuant to that

21    agreement, the understanding that I have of that

22    relationship is that Lehman Brothers Holding Inc. agrees to

23    pay Mr. Seshasayee the net amount that he would earn, had he

24    stayed here in the United States.  In exchange for them a,

25    taking care of his worldwide tax liabilities from the
```

Page 10

1    relationship and b, assisting with the preparation of the

2    tax filings necessary from this more complex relationship.

3            So, he was obviously very dependent on them and to

4    your point, Your Honor, about the amount of the claim, some

5    of the internal notes that would show up even on, say, his

6    paycheck and the things that were submitted, they -- they

7    really are more Lehman Brothers Holding Inc. internal

8    notations at that point because again, my understanding is

9    what typically happens is, there's no immediate taking of

10   money out of a paycheck and paying it over to the government

11   because there is this expatriate relationship.  There's sort

12   of a temporary waiver of that in exchange for paying the net

13   immediately to Mr. Seshasayee, but then satisfying all the

14   tax obligations.

15           So, the -- if you look closely at his proof of

16   claim, there's notations that refer to what looks like 2007,

17   which I think he may have even confused for notations that

18   then relate to 2008.

19           THE COURT:  My question is, though, the amount of

20   the claim is $199,000.

21           MR. SCHECHTER:  As originally filed.  We would

22   request, Your Honor, being --

23           THE COURT:  Well, this is where I'm going, I mean,

24   because it -- it's generally a good idea to ask for

25   everything that you want all at once, so what you're now --

Page 11

 1    what you're now going to tell me, I think, is that not only

 2    do you want reconsideration on the $199-, but you want leave

 3    to amend.

 4            MR. SCHECHTER:  That is correct, Your Honor, and

 5    the basis for that would be that really, the information is

 6    held by Lehman Brothers Holdings, Inc. as to what really all

 7    these notations mean in a paycheck.  I mean, one thing I'll

 8    just mention and I thought about in coming here today, at

 9    the beginning of a big case, you often see motions filed by

10    a Debtor that do certain things for employees of the Debtor,

11    and while those employees may be at the same priority level

12    that some other Creditors, there's a recognition there of

13    the relationship and maybe the uneven bargaining power and

14    you know, this Court being a Court of equity, which

15    certainly assists Debtors, will certainly assist other --

16    other parties.  And this is that type of relationship where

17    all of a sudden, after 14 years, a back is turned on someone

18    who he himself and his family has been dependent on an

19    institution that has made him feel that he has their full

20    faith and credit behind what they say they're going to do

21    for him.  And so that would be the basis for the amendment,

22    Your Honor.

23            THE COURT:  Well, I hear you and I don't disagree,

24    but of course, I've had, unfortunately, hundreds if not

25    thousands of employees who maybe not were exactly similarly

Page 12

1    situated but lost, you know, tremendous amounts of their

2    life savings and retirement as a result of what happened, so

3    that's --

4            MR. SCHECHTER:  Sure.

5            THE COURT:  -- that's highly unfortunate.  I think

6    what -- what the basis for granting relief would be, would

7    be my being convinced that in fact, there was no notice and

8    that we ought to be able to dig into this.  If I were to

9    grant reconsideration, it would put you back to the

10   beginning, so to speak --

11           MR. SCHECHTER:  Right.

12           THE COURT:  -- and it would not include, at this

13   moment, leave to amend.

14           MR. SCHECHTER:  Okay.

15           THE COURT:  I mean, there is a separate standard

16   for that and the facts are not before me, if it has to do

17   with different years, it's -- it would be an open question.

18           MR. SCHECHTER:  The amendment that we're

19   discussing all relates to that same 2008 --

20           THE COURT:  Well, again, that's not before me and

21   that's not part of your request so --

22           MR. SCHECHTER:  Sure.

23           THE COURT:  -- I just want to -- would want to be

24   clear that I suspected that that's where you might be going

25   with this, and that's why I asked the question.

Page 13

1          MR. SCHECHTER:  Thank you.

2          THE COURT:  Why don't you let me hear from Mr.

3    Fail?

4          MR. SCHECHTER:  Excellent.

5          THE COURT:  All right, thank you.

6          MR. FAIL:  Thank you, Your Honor.  Garrett Fail,

7    Weil, Gotshal for Lehman Brothers Holdings, Inc.

8          Your Honor touched on almost all of the points in

9    -- and I'll try to keep it brief, Your Honor. The 60(b)

10   motion is the Claimant's motion and the Claimant bears the

11   burden on that.  It's an extremely high standard, as Your

12   Honor mentioned and it's, you know, it's very obvious from

13   the case law, it is to be employed sparingly in the interest

14   of finality and consummation and conservation of scarce

15   judicial resources, as the District Court has noted in

16   Parish v. Solicito, amongst other Courts and cases.

17          So, the -- the question is, is there an injustice

18   here?  And so, what the Claimant would have to show, amongst

19   other things, is that if there was an error, it was not due

20   to his fault and if there was an error, that there were

21   consequences, and I'd like to address both very briefly.

22          THE COURT:  Okay.

23          MR. FAIL:  With respect to whether or not there --

24   if there was an error, it was the Claimants' fault or the

25   plan administrators or the claims agents, Your Honor has

Page 14

1    noted the -- the handwriting and you know, if you look at,

2    for example, the E's on the proof of claim that was supposed

3    to be -- what we thought was an E and is now being alleged

4    to be an R it doesn't look like it to the plan

5    administrator, Your Honor noted it can go either way.  When

6    you compare it to the other R's that were written in

7    handwriting, you know, there's a stem on the other R's,

8    there's no stem on the E.  But -- but that's only one piece

9    of the equation whether the handwriting -- certainly the

10   handwriting wasn't the plan administrator's fault.

11           But the other -- the other thing that Mr. -- or

12   that the Claimant could have done is check the claims

13   register.  So, he filed a claim in 2009, months after the

14   petition, and then, you know, almost automatically, that was

15   available for checking on EPIC's website and it's free and

16   it's publicly available 24 hours a day, and anyone could

17   have gone on by searching their last name to check to make

18   sure that the address was correct when entered or at any

19   time after.  The claim was filed in July of '09, the claims

20   objection was filed in February of 2012, there was ample

21   time to check and -- and possibly even update the address

22   unless the Claimant was continuously transient.

23           But I don't believe that there's any -- first of

24   all, there's no evidence whatsoever.  There's a declaration

25   from a witness who has not been made available for cross-

Page 15

1   examination, so all we have is -- there is no evidence in

2   the record on behalf of the Claimant.  But if you were to

3   accept that in if it were testimony, which it's not, there's

4   no -- there's no evidence that he's transient through 2012

5   and couldn't have updated an address to a permanent address.

6          So -- so that goes to the Debtor -- and the plan

7   administrator's argument that it was not the Debtor's fault

8   and indeed, any error was in fact at the hands of the

9   Claimant, as unfortunate as it is.

10         The second point is the consequence of an error.

11  If this was sent to Tecunter instead of Tregunter, throwing

12  that address into Google, it automatically says, "Do you

13  mean Tregunter?" and every other portion of the address was

14  correct including the person, the street name, the

15  neighborhood, the zip code.  So, it was -- it was suggested

16  in a reply that the Debtors didn't -- the plan administrator

17  didn't provide any case law.  But looking at the case law,

18  including in re (indiscernible) Enterprises, Inc., it's

19  clear that there is still a presumption, the mailbox rule is

20  still in place, even with an incorrect address where there

21  is only a slight mistake.  Consider, Your Honor, if Your

22  Honor were to receive mail to the Honorable Shirley Chapman

23  at Balling Green.  The presumption would still be there and

24  then the burden is on the Claimant to prove that it didn't

25  arrive, or that you would have to prove, Your Honor, in that

Page 16

1   instance that you didn't receive it.  And the case law is

2   very clear that a mere denial of receipt is insufficient.

3   So, if the declaration were evidence, which it is not, the

4   mere denial is -- is insufficient.  It's also hearsay --

5              THE COURT:  Well, this a -- this is a very

6   squirrelly thing here because I -- I think that, on the

7   misdelivery, misreading point, I'm inclined to agree with

8   you, but we don't have an individual who was residing at

9   that address, so we have another link in the chain and we --

10  we have no --

11             MR. FAIL:  We don't know if they were friends, we

12  don't know how long they were friends, we don't know if he

13  was an expat that moved since --

14             THE COURT:  We have literally no way -- we have no

15  way of knowing.  We have no way of knowing.

16             MR. FAIL:  And -- and under those circumstances,

17  Your Honor, the case law is very clear that the -- that the

18  Claimant hasn't met the burden and accordingly, the motion

19  should be denied.

20             With respect to other allegations that were made -

21  -

22             THE COURT:  When did -- when did -- so the claim

23  was filed in 2009 --

24             MR. FAIL:  Yes, Your Honor.

25             THE COURT:  -- and in 2012, Judge Peck granted the

1    objection, and then what happened?  It's 2016 now.

2            MR. FAIL:  So Your Honor, we could only as --

3    well, we could only speculate, but one could easily

4    speculate that the Creditor who's saying that he was only

5    recently contacted by the IRS is only now concerned with

6    respect to the claim, but having been aware in 2008 that he

7    believes he has a claim, having filed a claim in 2009 but

8    not having paid the taxes to the IRS because he's also

9    disputing that he owes anything to the IRS, you could assume

10   that -- easily assume that he received the objection and

11   said, "Well, I didn't have to pay anything to the IRS in

12   2012, it was 2008 taxes, throw this piece of paper away, I

13   have a claim against another estate, and I don't need to

14   care," until he was later contacted by 2014, 2015 by the IRS

15   who says, "You owe money."

16           THE COURT:  Well, I guess I -- I guess and -- and

17   maybe this is a question more for Mr. Schechter, but Mr.

18   Schechter's narrative was, this was a tumultuous time, it

19   was very difficult for the Claimant and his family, all of

20   which I, of course, can accept, but what I'm struggling

21   with, Mr. Schechter, is that you file a claim in 2009, you

22   would follow-up.  You -- you started by telling me that it's

23   a small amount of money for Lehman Brothers but it's a big

24   amount of money for the Claimant, you would follow-up.  So,

25   maybe you wouldn't follow-up in 2009, '10, '11, '12, you'd

Page 18

1    begin to want to follow-up and part of me would like to know

2    -- I mean, part of this number now that -- and -- and I

3    don't know that the IRS is asserting, must include interest

4    and penalties.  So the --

5                MR. FAIL:  According -- according to the

6    declaration, Your Honor, that's all they're -- they're

7    seeking to add.  It's -- it's late fees and penalties --

8                THE COURT:  Right, so --

9                MR. FAIL:  -- which the Claimant is disputing.

10               THE COURT:  Right.

11               MR. FAIL:  And then they're not even permissible

12   to be claims.

13               THE COURT:  Which -- which -- which -- so then you

14   get into the equities shifting because if it was Lehman's

15   bad with respect to service, right, at that point, Lehman

16   had no way of knowing that -- that service had failed, they

17   thought they were done, and yet, there's a claim sitting out

18   there, that from the IRS's perspective, is continuing to

19   accrue interest.  There was literally nothing that Lehman

20   could do in order to stop that clock.  It had gotten an

21   order expunging the claim.  So --

22               MR. FAIL:  Even if it had paid, Your Honor, it

23   would have been cents on the dollar and that wouldn't

24   entitled any unsecured creditors post-petition interest and

25   penalties.

```
 1              THE COURT:  That's -- that's -- that's another

 2     point, right?  So -- so even -- so what this is coming down

 3     to is at most, the reinstatement of the original claim, an

 4     inquiry into, you know, what happened, if you will, during

 5     all of those years, and then at most, what are the

 6     recoveries at LBHI now up to, 27 cents?

 7              MR. FAIL:  Your Honor, yes, approximately.

 8              THE COURT:  Right.  So, 27 cents on -- on some

 9     amount and I find it hard to see my way to how the interest

10     and penalties would be on Lehman you know, as of a certain

11     point in time when it was certainly not Lehman's fault that

12     this wasn't addressed.  So, this is not --

13              MR. FAIL:  Your Honor, just a couple of other

14     points just --

15              THE COURT:  Yeah.

16              MR. FAIL:  -- just to correct the record.  Mr.

17     Schechter mentioned throughout his -- his colloquy that

18     Lehman Brothers Holding Inc. was responsible, Lehman

19     Brothers Holdings, Inc., but when you look at the proof of

20     claim, either the -- the paycheck is the only thing attached

21     to the proof of claim, it says Lehman Brothers Global

22     Services Limited, which is a non-Debtor and not Lehman

23     Brothers Holdings Inc.  That is the entity that issued the

24     check, that his the entity whose name is on the check and on

25     the stub, that was the only Lehman entity reference with
```

Page 20

1    respect to the withholdings.  There's no link whatsoever in

2    the proof of claim or otherwise -- just, you know, that's

3    not for today, Your Honor.  The claim is expunged, there's

4    no claim to discuss, but just for the record, that -- I

5    needed to point that out.  With respect to the schedules of

6    assets and liabilities, this Court has already acknowledged

7    the schedules and SOFFAs had notes which included wide

8    disclaimers.  There was no admission whatsoever for -- for

9    virtually any claim in the schedules and the SOFFAs.

10            And with respect to the floodgate arguments, it

11   was said and it was mentioned and it was glossed over but I

12   -- I don't understand how they couldn't open the floodgates.

13   We've had 70,000 claims filed, we're down to the last, let's

14   say, you know, 1,100 outcome.  To open up this one, which

15   was a liquidated claim, bring it back and possibility turn

16   it into an unliquidated claim would clearly open the

17   floodgates for claims that were filed (indiscernible)

18            THE COURT:  Well, like I said, I'm not --

19            MR. FAIL:  I know, Your Honor.

20            THE COURT:  -- you know, I'm -- I'm not to --

21            MR. FAIL:  I'm just -- I just wanted sort of --

22   for the record.

23            THE COURT:  Yeah.

24            MR. FAIL:  So, unless Your Honor has any other

25   questions, we think that the Claimant -- the plan

Page 21

1    administrator respectfully suggests that the Claimant has

2    not met its burden under 60(b) to have its claims

3    reconsidered and the motion should be denied.

4            THE COURT:  Right, thank you.

5            MR. FAIL:  Thank you.

6            THE COURT:  Mr. Schechter, anything more?

7            MR. SCHECHTER:  Just very briefly.  And again,

8    just with respect to the digitized, blown up letter, which

9    looks very blocky, again, I stand here a little bit

10   surprised that have not heard from the party who actually

11   has handled the claims administrator receipt, reading,

12   uploading to the website, sending out mailing and we have

13   attorney argument on what may have happened, but really, we

14   don't have any facts from the Debtor's side as to how that

15   was handled, what their process is, if they do receive this

16   kind of volume.  I imagine there are questions that come up

17   from time to time.

18           THE COURT:  But -- but Mr. Fail's point was that

19   it doesn't matter because it was, you know, close enough

20   that you know, you have the facts of -- of it's close

21   enough, so it's likely to have been delivered and there was

22   no -- and it wasn't returned for a bad address.

23           MR. SCHECHTER:  And I guess "close enough" can be

24   a grey area, but written in English incorrectly and sent to

25   Hong Kong doesn't seem to fall into the close enough bucket,

Page 22

1   you know, from where, I think, my client stands.  And the

2   other thing I'll just mention is --

3              THE COURT:  What about the -- what about the --

4   the lack of diligence?  I mean, you -- you began by telling

5   me how important this is.

6              MR. SCHECHTER:  Sure.

7              THE COURT:  What about the lack of diligence on

8   the part of your client?

9              MR. SCHECHTER:  Sure, I mean, the client filed his

10  claim timely, he understands this is a big estate.  Was he -

11  - we all know how, you know, hefty the -- the docket is.

12             THE COURT:  Sure.

13             MR. SCHECHTER:  You know, independently, I have no

14  idea whether he was monitoring it or not --

15             THE COURT:  Well, he found you at a certain point,

16  right?

17             MR. SCHECHTER:  He did find me at a certain point.

18             THE COURT:  So he could have found someone at an

19  earlier point to say, "Hey, this is really complicated and

20  big, can you call the lawyers, I can't even figure out who

21  they are?"

22             MR. SCHECHTER:  This does come after a 14-year

23  relationship o f dependency upon Lehman Brothers Holding

24  Inc., though, and -- and I think something that really

25  relates to this issue and to the amendment issue, Your

Page 23

1    Honor, is the basis for the objection itself.  I haven't

2    heard any mention of why Lehman Brothers Holdings Inc. files

3    a schedule of assets and liabilities, says, "Yes, we know

4    Aadit Seshasayee, yes, we have an expatriate agreement with

5    him," which comes with obligations, and then Lehman Brothers

6    Holdings, Inc. later feels comfortable filing something that

7    says exactly the opposite.

8            THE COURT:  Well, you know, we could have a debate

9    about that too.

10           MR. SCHECHTER:  I'm sure there's reservations and

11   --

12           THE COURT:  There -- there -- there absolutely

13   are, but in ballpark figures, can you tell me how much the

14   Claimant earned a year for Lehman -- I'll say "Lehman

15   Brothers" in quotes.

16           MR. SCHECHTER:  Right.  I mean, but -- the best

17   information I have would be what was on -- what was filed in

18   his proof of claim --

19           THE COURT:  Mm hmm.

20           MR. SCHECHTER:  -- which -- and again, I mean, his

21   -- his checks are a little bit complicated because there's -

22   -

23           THE COURT:  Yeah, we --

24           MR. SCHECHTER:  -- Lehman Brothers Holdings Inc.

25   internal --

Page 24

1          THE COURT:  Right.

2          MR. SCHECHTER:  -- language here.

3          THE COURT:  Right.

4          MR. SCHECHTER:  But you know, this -- this would

5     indicate gross pay of $849,000.

6          THE COURT:  I gue -- yeah.  I guess the point is

7     that, and there's no need to really belabor this, you know,

8     you talk about a 14-year relationship of -- of dependence

9     but he wasn't a low level employee, he was a high-earning

10    employee with some sophistication, you know, working around

11    the globe, so I think that that rather cuts the other way in

12    terms of his ability to find his way to somebody who could

13    have helped him, you know, sort out the process.  Be that as

14    it may, I have serious reservations about the ability to

15    pursue anything beyond the amount of the filed claim but

16    that's not before me today.  And I think that that would

17    indeed open the floodgates argument, but again, that's not

18    before me today.  And because it's basically a

19    (indiscernible) I'm going to allow the claim to be

20    reinstated and put us back to the starting gate and allow

21    the Debtor to engage on the merits of the claim.  You ought

22    to bear in mind that a $200,000 claim at, at most, you know,

23    I'm always hopeful that the distribution sums of your

24    Creditors are going to increase, at most 30-some cents on

25    the dollar, maybe 40 if Mr. Fail works extra hard, he's

Page 25

1    shaking his head no --

2            (Laughter)

3            MR. FAIL:  Your Honor, this is a general unsecured

4    claim, this is not a senior claim, this is --

5            THE COURT:  Yeah.

6            MR. FAIL:  I don't think so.

7            THE COURT:  So -- so that's what we're going to

8    do, all right?

9            MR. SCHECHTER:  Thank you.

10           THE COURT:  All right, so I'll grant the motion to

11   the extent that it puts us back in the position that we

12   would have been in, and it remains subject to LBHI's

13   objection.  To the extent that you wish to amend the claim,

14   that's going to have to be the subject of a -- of a separate

15   proceeding.  The -- I -- I pause on the amount of the

16   recovery because you know, these many years later, you know,

17   I always like to remind people that at the beginning, there

18   wasn't thought to be anything for anybody and at LBI,

19   customer claims have been paid in full, unsecureds are

20   getting returns and here, unsecureds are getting returns as

21   well, so.

22           MR. SCHECHTER:  Sure.

23           THE COURT:  I'd just like to --

24           MR. SCHECHTER:  Definitely good news in a large

25   case.

Page 26

1           THE COURT:  -- I -- I just like to -- I just like

2     to remind folks --

3           MR. SCHECHTER:  I don't disagree with that, Your

4     Honor.

5           THE COURT:  Okay.  All right, thank you very much.

6           MR. SCHECHTER:  Thank you again.

7           MR. FAIL:  Thank you, Your Honor.

8           THE COURT:  All right, thank you, Mr. Fail.

9           MR. FAIL:  Your Honor, if we may be excused --

10          THE COURT:  Yes.

11          MR. FAIL:  -- I'll turn the -- the podium over --

12          THE COURT:  Please.

13          MR. FAIL:  -- to the next parties, thank you.

14          THE COURT:  Thank you.

15          (New counsel takes position.

16          THE COURT:  Good morning, how are you?

17          MR. LIVSHIZ:  Good morning, Your Honor.  Happy new

18    year.

19          THE COURT:  Happy new year.

20          MR. LEITNER:  Good morning.

21          THE COURT:  Good morning.

22          MAN: Good morning.

23          THE COURT:  You can have a seat.  All right, so

24    all we're talking about today is whether or not we're going

25    to have amicus briefs, yes?

Page 27

```
 1              MR. LIVSHIZ:  That's correct.

 2              THE COURT:  And Lehman says no.

 3              (Laughter)

 4              THE COURT:  And you folks say yes.  So, this is

 5    different from Intel.  Who's here for ISDA?

 6              MAN:  (indiscernible)

 7              THE COURT:  Hi.

 8              MAN:  Hi.

 9              THE COURT:  So this is different than Intel, don't

10    you think?

11              MR. LIVSHIZ:  In the respect that the posture of

12    the case is different?

13              THE COURT:  No, that's not what I mean.  In

14    respect to the nature of the amicus.  I mean, in -- in

15    Intel, the question that I had was how to interpret the ISDA

16    and the master -- the master agreement and the drafting

17    history et cetera, et cetera, and because ISDA is ISDA and

18    wrote the ISDA --

19              (Laughter)

20              THE COURT:  -- you know, it was, to me, a much

21    clearer case for hearing what ISDA had to say.  Here, it's a

22    question of law and all of you folks are simply saying --

23    urging that, to be -- not to mince words, Judge Peck was

24    wrong.  That -- that's the -- that's the collective position

25    of what you're saying.  So it's -- it's really different
```

Page 28

1    from what -- what we saw in Intel, where that brief, which

2    was also opposed on the basis that it was -- I mean the

3    interesting thing in Intel, and I assume you're familiar

4    with it, was that it was filed along with Intel's brief.  It

5    wasn't a situation where the amicus party waited for all the

6    briefs to come in and then weighed in.  So it was clearly a,

7    you know, a -- a partisan piece.  I mean, I -- I think, for

8    the most part, most amicuses are.  I think that that part of

9    the juris prudence on when they should be filed is a little

10   odd.  But be that as it may, what I'm most interested in is

11   -- a response to the argument that Lehman makes is, this is

12   just piling on of folks saying that on the law, I should do

13   one or the other thing.  So, you want to respond to that?

14            MR. LIVSHIZ:  Yes, Your Honor.  Should --

15            THE COURT:  Sure.

16            MR. LIVSHIZ:  So the inherent question Your Honor

17   is bringing up is what, if I may, what additional can the

18   amici provide?

19            THE COURT:  Well, it's supposed to be -- it's

20   supposed to be -- it's supposed to allow, if it's helpful to

21   the Court.

22            MR. LIVSHIZ:  Right.

23            THE COURT:  Right?

24            MR. LIVSHIZ:  In this particular case, especially

25   given -- and speaking for SIFMA and ISDA specifically, these

Page 29

1    are two of the largest trade associations in the world with

2    members heavily involved in diverse and various roles in

3    (indiscernible) transactions that can provide several unique

4    perspectives, not the least of which is a discussion about

5    policy of market impacts on the Court's decision on these

6    transactions, a decision that transcends the 47 underlying

7    CDM transactions and goes to the heart of how termination

8    and liquidation provisions are to be treated in swap

9    agreements not limited to CDMs, but including currency

10   swaps, interest rate swaps and credit default swaps.  So the

11   perspective of the amici of ISDA and SIFMA specifically is

12   to provide that layered, nuanced understanding of, this is

13   the -- these are the market expectations, these were -- this

14   is how the ISDA agreements, how these provisions are thought

15   of and how they are expected to -- to be effectuated, and

16   also, specifically with ISDA, who had a significant role to

17   play in the enactment of Section 560 and the related Safe

18   Harbors in 1990, had understanding of the Congressional

19   intent behind the publication of the Safe Harbors.

20           So, the new that the organization are providing is

21   that legal interpretation from the perspective of the

22   industry, the market expectations and the policy

23   implications behind the critical decisions that are before

24   this Court, which these org -- which these associations are

25   uniquely positioned to provide assistance on.

1        THE COURT:  So, your focus is, in particular, on

2    Bank of New York, right?  Judge Peck's decision on Bank of

3    New York, which was issued when?  2010, I think?

4        MR. LIVSHIZ:  2010, correct.

5        THE COURT:  Okay, so it's 2016.  Huge market

6    turmoil in the six years since 2010?

7        MR. LIVSHIZ:  In respect to whether the world has

8    ended kind of post-BNY, certainly, you know, the world has

9    continued but that doesn't say, and from the perspective of

10   our members, that there hasn't been great uncertainty in the

11   enforcement of the agreements to which they've executed. And

12   the agreements that are still being contemplated, on whether

13   they are going to be enforced as written and as executed by

14   the parties.

15       THE COURT:  Well, it's interesting that you say

16   "as written" because that gets to another interesting point,

17   which is that, that's my job is to interpret the documents

18   as written, and you're telling me off the top that what

19   you're here to tell me is market expectation and the

20   industry's view of Congressional intent.  So that's, you

21   know, a couple layers of hearsay and contrary to the tenets

22   of statutory construction, I would have to find an ambiguity

23   to consider any of that, right?  So, why can't -- I mean,

24   why doesn't it simply come down to Lehman basically

25   stipulating that a ruling in their favor would be contrary

Page 31

1    to various market expectations?

2            MR. LIVSHIZ:  Well, the mar -- excuse me, Your

3    Honor.  The market expectation and the industry perspective

4    is helping to influence -- is a tool to understand how these

5    agreements are -- are treated and certainly the

6    understanding of the parties when they entered them.  But it

7    is the perspective of SIFMA and ISDA that there is a very

8    clear and explicit legal interpretation to -- to these

9    underlying agreements.

10            THE COURT:  Okay, but all of the defendants in the

11    distributed action, dozens of them, dozens of them,

12    represented by the very best law firms and the very best

13    lawyers at those law firms, don't you think they can be

14    counted on to make all of these arguments on behalf of their

15    clients, many of whom are members of the amici

16    organizations?  Surely, that A-list of lawyers is going to

17    make all the arguments that you're going to make.  Don't you

18    think?

19            MR. LIVSHIZ:  I think to the extent that there is

20    overlap, the amici would serve a reinforcing function to --

21    to say that, especially given the involvement of ISDA in the

22    formulation of -- of the Safe Harbors, which are a central

23    role in this dispute, it would reinforce the correctness of

24    the interpretation by the noteholder defendants.

25            THE COURT:  What about the inequity of -- of

Page 32

1    Lehman having page limitation and the defendants,

2    essentially, not having the page limitation?

3              MR. LIVSHIZ:  So is Your Honor getting to the

4    question of whether or not -- that the amici are serving as

5    an extension of the defendants?

6              THE COURT:  Yeah.  I mean, you -- you -- you're

7    not supposed to be making arguments that are duplicative,

8    right, so you just told me you're making arguments that

9    there -- if it's -- if it's merely duplicative, it's not

10   helpful to me, right, because that just means I have to read

11   more stuff that duplicates what somebody else wrote.  So if

12   it's in addition, then it's more pages, and Lehman has a

13   page limitation, so that doesn't seem fair either.

14             MR. LIVSHIZ:  The -- you know, SIFMA and ISDA

15   independently came to and drafted their opinions.  They are

16   not in any way an extension on the defendants.

17             THE COURT:  Of course they are.  You just -- you

18   just told me they're reinforcing the Defendant's arguments.

19             MR. LIVSHIZ:  We agree with the perspective of the

20   defendants, not because there's a bias or favor to the

21   defendants, because we believe in the underlying -- in that

22   outcome, in the fact that Lehman's claims, if they were

23   victorious, would be a misinterpretation of the

24   (indiscernible)

25             THE COURT:  There's not just a bias for the

Page 33

1    defendants, there's an absolute alignment with the

2    defendants.  I mean, let's -- let's just be very clear here,

3    which -- which I don't view as a disqualification --

4              MR. LIVSHIZ:  Mm hmm.

5              THE COURT:  -- for -- for being an amicus but --

6    but there's an absolute alignment here.  It's no -- there's

7    no grey, there's no -- there's no grey area.  Why don't I

8    hear from Lehman, okay?  Thank you.

9              MS. LEITNER:  Your Honor, if I may, can I speak on

10   behalf of the estate (indiscernible) or would you prefer --

11   I can go after Lehman if you --

12             THE COURT:  Well, do you have anything to say

13   that's different from what I just heard?

14             MS. LEITNER:  I do, Your Honor.

15             THE COURT:  Okay.

16             MS. LEITNER:  Good morning, Your Honor, Shannon

17   Leitner from Freshfields Bruckhaus Deringer US, LLP on

18   behalf of the Structured Finance Industry Group or SFIG.

19             Your Honor, on a couple of points that you seem

20   troubled by that I'd like to address, specifically, on

21   whether SFIG's brief is, you know, spending page limits and

22   just piling on.  As an initial point, we haven't completed

23   briefing on this motion to dismiss.  It's entirely possible

24   Lehman has amici or are about to move to file an amicus

25   brief in support of their opposition to the omnibus

Page 34

1   Defendant's motion to dismiss.

2           So, the fact that there are amici here who are

3   interested in this case and are interested in supporting the

4   Defendant's position is not simply piling on.  If that were

5   the case, that would be true of every single amicus brief,

6   and I think as Your Honor is well aware, it's very common in

7   this Circuit, in this District, in this Chapter 11 case, to

8   have amicus briefs on important issues.

9           Separately, in terms of whether the lawyers in the

10  defense group are able to adequately represent SFIG's

11  position, we would respectfully state that the lawyers in

12  the defense group are representing the noteholder

13  defendants.  By definition, they're only representing a

14  sliver of the market.  SFIG, by contrast, has members from

15  across the entire market, including issuers, Trustees,

16  servicers, and in fact, Weil, Gotshal, counsel to the Debtor

17  here, is a member of SFIG as well.  Therefore, presenting a

18  market perspective of policy arguments related to these

19  legal questions, it has more weight, Your Honor, because it

20  represents this broad, diverse view from the market.

21          And then finally, Your Honor asked questions about

22  concern in the market and the repercussions of the BNY

23  decision, and SFIG respectfully feels that it's -- it's too

24  soon to tell the full repercussions from Judge Peck's

25  decision in 2010, and yes, it has been six years, but it has

1    affected how parties view these transactions, and it has put

2    some uncertainty into the market.  And to simply wait for

3    Armageddon to come to allow the industry groups to speak up

4    and voice what they view the (indiscernible)

5              THE COURT:  What -- what Armageddon -- what

6    Armageddon would that be?

7              MS. LEITNER:  The Armageddon would be some sort of

8    dramatic, financial collapse that -- that comes.  I mean, I

9    -- I guess where I'm going with this Your Honor, is that --

10             THE COURT:  But then you -- then -- then in your

11   world, right, you have Peck said one thing and Chapman said

12   another thing, hypothetically, right?

13             MS. LEITNER:  Sure.

14             THE COURT:  So, that looks pretty uncertain too

15   because, I don't know, Peck's pretty smart, you know?

16             (Laughter)

17             MS. LEITNER:  Yes, yes, Judge Peck is quite smart.

18   But Your Honor, like, I guess the point is that now is the

19   time to like, hear these voices but that SFIG is

20   representing a broad array of the market and there's no

21   reason to deny them the opportunity to weigh in and to

22   present the perspective of the market, which again, is a

23   diverse view from all aspects of the market.  And you know,

24   with all due respect to Judge Peck and his decision to -- to

25   allow SFIG's views on the policy arguments, which is a legal

Page 36

```
 1    interpretation question, to be before Your Honor when you

 2    consider the current omnibus motion to dismiss.

 3              THE COURT:  Thank you very much.

 4              MS. LEITNER:  Thank you.

 5              THE COURT:  All right, Mr. DeFilippo?

 6              MR. DEFILIPPO:  Thank you, Your Honor.  I'll try

 7    to be brief because Your Honor has hit most of my points in

 8    questioning counsel for the movants.  We did -- we do agree

 9    with the partisan nature of the amicuses and I won't say

10    anything more than that.  That seems to be obvious.

11              Your Honor correctly focused in on the two issues

12    that guide your discretion, which are whether the amicus add

13    anything that's unique to what you have before you and

14    whether their submissions are duplicative, and what they

15    have proposed to add that is supposedly unique on a motion

16    to dismiss is not able to be considered by Your Honor.

17              THE COURT:  Meaning background information.

18              MR. DEFILIPPO:  All -- all of the -- let me go

19    through a brief list of the hearsay or otherwise

20    inadmissible or inappropriate to consider information that

21    pervades their briefs, which they want you to consider on a

22    motion to dismiss.

23              On the SIFMA/ISDA brief at Page 1, they cite to a

24    2009 ISDA derivatives usage survey.  How can you possibly

25    consider that on a motion to dismiss?  On Page 2, they cite
```

1    the requirements of the rating agencies.  On Page 6, they

2    cite the evidence regarding growth in the size of the swap

3    market.  On Page 10, they cite to the claim that we are

4    perpetuating uncertainty in the markets, which as Your Honor

5    correctly noted has not been the case since 2010.  On Page

6    11, they cite to statistics from Fitch Monitoring.  On Page

7    12, an article from the Financial Times.  On Page 13, a

8    Moody's circular, a Fitch's rating circular, an SNP circular

9    and a compendium of rating agency criteria.  And on Page 14,

10   the entire discussion of what the participants in the CDO

11   market did or expected.  None of that is properly before

12   Your Honor on a motion to dismiss and therefore, they offer

13   no unique perspective.

14          Similarly, the SFIG brief at Page 5 talks about

15   market's participant views based on a cite to a treatise,

16   what market's participants rely on and why ratings are

17   important on Page 6.  On Page 7, they note three

18   inappropriate things, a treatise by (indiscernible) what has

19   happened in SFIG's experience.   How could you possibly

20   consider that?  And various rating agency documents.  On

21   Page 8, they perpetuate it by arguing that failing to

22   include the flip clauses would have substantially impaired

23   the ability to sell the notes.  I -- I don't know if that's

24   true and Your Honor shouldn't even think about it on this

25   motion.

1          The so-called critical importance of the flip

2     clauses and SFIG's views of what noteholders want.  They say

3     nothing usable that the defendants have not already said,

4     and therefore, it's not an appropriate subject for an amicus

5     submission, Your Honor.  And in addition, as you pointed

6     out, we negotiated in the second scheduling order, page

7     limits and filing dates and response dates.  Nobody ever on

8     the other side said, let's fold in something for the amicus.

9          Now, I'd be surprised if they weren't thinking

10    there might be amicus showing up since they've shown up in

11    all these cases, and by the way, let me talk about the cases

12    they cite, because it's misleading for them to say that

13    their -- their precedent to support the admission of amicus

14    when one of the parties opposes them.  As the cases have

15    said, when a party opposes an amicus submission, it's rare

16    to permit.  Now, in the Intel adversary and the Chase

17    adversary, the filing of amicus submissions was actually

18    unopposed by Lehman.  If you look at Chase, there was a

19    stipulation permitting it that Lehman signed, and if you

20    look at Lehman's brief in Intel, Lehman said, "We do not

21    oppose the filing of the amicus submission.  We think it's

22    wrong for the filing (indiscernible)".

23          THE COURT:  That's right.  That's right, you're

24    right.

25          MR. DEFILIPPO:  There is no indication in any of

Page 39

```
1    the cases they cite that actually opposed the submissions by
2    the amicus.  If you look through (indiscernible), there's
3    nothing.  If you look through Enron, there's no opposition
4    noted to the amicus filings.  None of those cases address
5    the issue before you, which is whether you should permit an
6    amicus filing in a motion to dismiss when one of the parties
7    has opposed it.  We think the factors that inform your
8    discretion clearly say no.  Thank you, Your Honor.
9              THE COURT:  All right, thank you.  All right, I'm
10   interested in -- in hearing a response to the points that
11   were made about how many, many of the points in the briefs I
12   can't even consider on a motion to dismiss.
13             MR. PINCUS:  Your Honor, may I?
14             MR. DEFILIPPO:  Sure.  I mean, it -- it's not --
15   we're -- we're not at the merits, we're -- we're at a motion
16   to dismiss and it does say in SFIG's reply brief, for
17   example, SFIG is offering legal arguments and background
18   information.  I -- I don't look at background.  I look --
19   it's  12(b)6, right?  So all of the things that Mr.
20   DeFilippo read are not things that I can consider.
21             MR. PINCUS:  Your Honor, I -- I'm --
22   (indiscernible) I should have introduced myself in the
23   beginning, Daniel Pincus of Orrick, Herrington & Sutcliffe.
24   I apologize for that.
25             THE COURT:  It's all right.
```

Page 40

1        MR. PINCUS:  I believe -- I -- I can't speak to --

2   to SFIG's statement, I'll certainly leave that to -- to the

3   other counsels, but a couple points I will be discussing,

4   and I do want to emphasize one point that the SFIG counsels

5   made, which is the diversity of representation within these

6   organization, particularly SIFMA and ISDA.

7        THE COURT:  But it's a motion to dismiss --

8        MR. PINCUS:  Right.

9        THE COURT:  -- being brought by the defendants in

10  this action.  So, on a motion to dismiss, where all I do is

11  assume that the allegations are true and look at the law,

12  how could I possibly consider what other people who care

13  about it might think?  I'm just having a really hard time

14  with that.

15       MR. PINCUS:  One of the core -- I'm sorry.

16       THE COURT:  It's a motion to dismiss, right?

17       MR. PINCUS:  Right.

18       THE COURT:  I'm just having a really hard time

19  with that.

20       MR. PINCUS:  One of the core functions of an

21  amici, as recognized by the Southern District is to provide

22  the policy market assessment perspective, and the fact that

23  you have articles that you have protestations emphasizing

24  the same points, and certainly that (indiscernible) created

25  from the Dante decision --

1            THE COURT:  By Dante you mean Bank of New York?

2            MR. PINCUS:  By Bank of New York, correct, Your

3    Honor.  If anything attests to the significant market

4    impacts of the current dispute, these --

5            THE COURT:  But I go back to what I said before,

6    okay?  We can stipulate that it will -- that -- that a

7    ruling against the defendants -- the -- that the defendants

8    and the amici believe it will have a significant market

9    impact.  Okay, but I still have to decide a motion to

10   dismiss and it is reverse -- would be reversible error to

11   consider things that are not part of that very narrow

12   record.  So I'm -- I -- I have a heightened concern about

13   that very fact.  I mean, and -- and I -- and we're at the

14   motion to dismiss phase.  I mean, in Intel, right, and Mr.

15   DeFilippo can correct me if I'm wrong, those were cross

16   motions for summary judgment, yes?

17           MR. DEFILIPPO:  Yes, Your Honor.

18           THE COURT:  It's different.

19           MR. PINCUS:  Correct, Your Honor.  In JP Morgan,

20   that was a motion to dismiss and those were briefs and

21   briefs were allowed that spoke to the legal -- and the same

22   panoply of issues, the legal and policy impacts of -- of --

23   of the considerations (indiscernible) by the Court at the

24   time.  And on a motion to dismiss posture.  It's -- and the

25   Southern District has a long history of allowing amici

Page 42

1    discussing these sorts of issues, examples of which are in

2    our brief, at the motion to dismiss stage.  It is certainly

3    not an abhorrent thing that amici are presenting these

4    critical perspectives at this juncture in a case, especially

5    a case such as this, where there are such significant

6    downstream consequences by the Court's decision.

7              THE COURT:  All right, thank you.

8              MS. LEITNER:  Your Honor, if I may?

9              THE COURT:  Sure.

10             MS. LEITNER:  Certainly, Your Honor, I join in

11   everything Mr. Pincus just said and further, I would point

12   out that, in addition to all of the examples we've pointed

13   out of Courts considering an amicus brief on a motion to

14   dismiss, think of famous cases like (indiscernible) that was

15   a motion to dismiss.  That went all the way up to the

16   Supreme Court and there are numerous cases where amici are

17   welcome -- welcomed and are --

18             THE COURT:  How can I consider things that are not

19   part of the -- the record that are not alleged in the

20   complaint.  How can I do that?

21             MS. LEITNER:  Certainly, Your Honor.  Because what

22   -- what the -- what SFIG's brief is trying to do is to argue

23   legal arguments about why policy considerations, which are

24   appropriate in interpreting the -- the motion to dismiss

25   before you and to offer the industry's perspective on the

Page 43

1    effects of these, which are things that one can consider on

2    a motion to dismiss.

3            THE COURT:  What's your authority for that

4    statement?

5            MS. LEITNER:  Certainly, it's -- and Your Honor,

6    if you look to the cases that we cite in our -- in our reply

7    papers, and if you further look at our brief, if you -- Mr.

8    DeFilippo's examples stop halfway through our brief.  He

9    doesn't point out that in Pages 18 to 21, we talk about

10   legal arguments that --

11           THE COURT:  Okay, but I'm -- I'm -- that's -- I'm

12   not talking about that, but what about all the examples he

13   gave, which are things that are completely extraneous to the

14   complaints?  How could I consider any of those on a motion

15   to dismiss.

16           MS. LEITNER:  Your Honor, we respectfully submit

17   that -- that those authorities are meant to support the

18   policy arguments that we make in parts B and C of our brief

19   that discuss legal questions about the interpretation of

20   contracts, about the interpretation of the meaning of the

21   word "liquidation", and that those are legal arguments which

22   are supported by the authorities we cite in our brief.

23   There's nothing further, Your Honor.

24           THE COURT:  All right.

25           MS. LEITNER:  Thank you.

Page 44

1          THE COURT:  I mean, here's the problem.  The

2    problem is that in order to prepare for today, I had to read

3    these briefs.  That's the problem.  So I think that's a --

4    that -- you know, it's kind of a flaw in the process because

5    it's very hard to unread something that you've read.  I have

6    serious concerns about the usefulness of this and again, I,

7    you know, even Judge Peck himself acknowledged that his

8    decision would go against market expectations.  So I get

9    that point, but I still -- it's still my job to read the

10   words and to figure out how to -- how to interpret them.

11   And -- and I certainly don't want to commit reversible error

12   by considering things that are not properly before me, and I

13   -- I truly, at this juncture, don't see how I can consider

14   the elements that Mr. DeFilippo pointed out.

15          That being said, I have this problem of not being

16   able to unread what I read, but Lehman needs to have an

17   absolute, full opportunity to respond to everything that was

18   said without worrying about page limits.  But what I'm not

19   going to have, then, is the defendants then piling on and

20   addressing the arguments that Mr. DeFilippo makes.  So,

21   there has to be some rational limitation and non-duplication

22   to what is said.  And already, we have, I think, a lot of

23   duplication.  So, Mr. DeFilippo --

24          MR. DEFILIPPO:  Yes, Your Honor?

25          THE COURT:  -- what -- what would you propose to

Page 45

1   solve this dilemma, I mean, besides not letting them file

2   something?

3           MR. DEFILIPPO:  Well, it sounds like Your Honor

4   appreciates the inappropriateness of substantial portions of

5   the brief and the duplicative nature of the balance of the

6   briefs. Now, there are no new legal --

7           THE COURT:  Well, I -- I -- I don't -- I have

8   concerns.

9           MR. DEFILIPPO:  Yes.

10          THE COURT:  I have concerns and questions about

11  how I could consider some of the materials that you've

12  highlighted, and then when you segue into the legal

13  argument, I have concerns that it's merely duplicative,

14  because as I said when I started, it's beyond what I could

15  imagine that all of the sophisticated defendants represented

16  by top flight law firms would miss a legal argument.

17          MR. DEFILIPPO:  They're the same arguments.

18  Exactly the same arguments, and yet, they're made with

19  different words, so we would need -- if you permit them, we

20  would need to respond to them within the existing

21  constraints which, you know, we're already finding are, you

22  know -- (indiscernible)

23          THE COURT:  Well, I'm going to -- I'm -- I'm going

24  to -- because I can't unread what I read, I'm going to lift

25  the existing constraints, but -- but we're not going to have

Page 46

1    -- I mean, do you folks think that your -- that -- that you

2    would have the opportunity to file a further brief?  A reply

3    brief?

4            MS. LEITNER:  Sure, Your Honor.

5            MR. LIVSHIZ:  Sure.

6            THE COURT:  Good answer.

7            MR. DEFILIPPO:  Well, can -- can we agree that a

8    response to the factual material is unnecessary?

9            THE COURT:  Yes.

10           MR. DEFILIPPO:  Okay.  If that -- if that's the

11   case, then if you --

12           THE COURT:  Yes, a response to the factual

13   material is unnecessary beyond what you've already

14   articulated, and presumably would want to say in more

15   elaborate terms, which is that it's inappropriate to be

16   considered at this stage of the proceedings.  Look, at the

17   end of the day, any Court that takes amici considers them,

18   you know, how -- at the level they think is appropriate.

19           MR. DEFILIPPO:  I had actually --

20           THE COURT:  So --

21           MR. DEFILIPPO:  -- a request for clarification,

22   Your Honor.  Does -- if Your Honor is inclined to permit

23   some amicus filing, does that mean they're in the case for

24   the balance of its life?

25           THE COURT:  No.  No, it does not.

1           MR. DEFILIPPO:  Every time they want to submit

2      something, they need to make a motion?

3           THE COURT:  Absolutely.

4           MR. DEFILIPPO:  Okay.

5           THE COURT:  They -- they're -- absolutely.

6      They're -- this is a motion, they're seeking leave to file -

7      - to be amici on this motion.  They're -- they're not in the

8      case going forward, and as you'll recall from -- or maybe

9      you won't, I'm sorry, it was Mr. Tombay who was here for

10     Intel.  ISDA did not argue at the -- at the hearing.  ISDA

11     was here, enthusiastically nodding when I was saying things

12     that were right --

13           (Laughter)

14           THE COURT:  -- and looking concerned when I

15     wasn't, but they -- they did not argue.  So it is -- you

16     know, it is -- it is limited.

17           MR. DEFILIPPO:  Just a briefing, no argument?

18           THE COURT:  Yes.  Yes, and no -- and no reply.  So

19     you -- you get to respond to what they say and they don't

20     get to reply.

21           MR. DEFILIPPO:  Okay.  Well, I sense that Your

22     Honor would permit us, perhaps, an additional few pages and

23     --

24           THE COURT:  An additional whatever you like.

25           MR. DEFILIPPO:  Well, we need to consult with the

Page 48

1   defendants as a group, I suggest, to make that work for them

2   as well, but okay.

3           THE COURT:  Okay?

4           MR. DEFILIPPO:  Thank you, Your Honor.

5           THE COURT:  All right, so that's what we're going

6   to do if you folks will work together to prepare an

7   appropriate order and submit it to us, I would appreciate

8   it.  Mr. DeFilippo, before you leave, and maybe it's not

9   appropriate to have a -- a detailed conversation about this,

10  but in -- in light of today's events and generally speaking,

11  we ought to begin talking about a timeframe for actually

12  having a hearing.

13          MR. DEFILIPPO:  Yes, Your Honor, I agree.

14          THE COURT:  So, when you engage with the

15  defendants, could you begin to raise that topic?  I don't

16  think that you were expecting to come in in February, right?

17          MR. DEFILIPPO:  No, we -- we -- they have time to

18  submit a reply.

19          THE COURT:  Right.

20          MR. DEFILIPPO:  So it probably won't be until the

21  spring.

22          THE COURT:  So -- yeah, so that the -- the spring

23  would be looking good.  So -- but the -- the sooner the

24  better to really talk about a date because I think we're

25  going to need to set aside a lot of time and the calendar

Page 49

1    has a way of filling itself up, so.

2            MR. DEFILIPPO:  Yes, Your Honor, we'll do that.

3            THE COURT:  All right, okay.

4            MR. DEFILIPPO:  Thank you.

5            THE COURT:  Thank you all very much.

6            (Whereupon these proceedings were concluded at

7    11:05 AM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 50

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6         Sonya                    Digitally signed by Sonya Ledanski
                                   Hyde

7         Ledanski Hyde            DN: cn=Sonya Ledanski Hyde, o,
                                   ou, email=digital1@veritext.com,
                                   c=US
                                   Date: 2016.01.22 16:31:33 -05'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  January 22, 2016