# **EXHIBIT 25**

FEB 25, 2016


HON JUDGE CHAPMAN USBC SDNY

Re: Lehman/JPMorgan Settlement  Case 08—13555 ch 11 (scc)


Your Honor:

Well, I guess I will have to go to the thrift shop and look for a newer jacket.

My old thread bare tweed was beyond hope and even my Greek tailor could

not save it. It sat in the back of my Volvo most of the winter and a couple of weeks

ago, I took a pretty bad spill on the ice and that gave me an 'epiphany'[1] so to speak

and I burned it in my friends wood stove way up[2] in New York along with some

other over-used stuff. I didn't think I would ever need it again. A fitting end in the

best Viking[3] tradition for a old and useful prop.

This current uproar started as a simple request. That the Court consider the

appointment of a Successor Examiner. After that, what at best might have been

called a tempest in a teapot became in short order a self proclaimed Super

'Emergency' by the Creditors Committee. I feel like I am faced with the

3rd String of the Junior Varsity. I have seen more stumbles and fumbles in

3 weeks than I saw with Weil Gotshal in 30 years.

---

[1] Ἐπιφάνεια
[2] Exit 31 on the Adirondack Northway, Essex County
[3] notably from the account of Ahmad ibn Fadlan-A 10th-century Arab Muslim writer named  produced a description of a
funeral.. https://en.wikipedia.org/wiki/Norse_funeral#Ibn_Fadlan_account

1

For example, there was a Document[4] filed with the Court under penalty of Perjury

stating that I had emailed the Court. As that is not my 'style'[5] it never happened.

 my Letter, docketed[6] on Epiq has had the filing date corrected by the Clerk

which Epiq has not yet updated. I cannot explain why the numbers are out of order.

## The Feb 8, 2016 hearing date.

So when I learned of this defective 'affirmation' I felt pretty much excused from

attending Court. I don't believe in telephone appearances, you lose 90% of the

value and fun of being in person in court.[7]

I also recall Mr. Kenneth Feinberg and Mr. Miller play acting out before court was

in session like medieval knights bowing and doffing hats and capes.

A funny sight for sure. Further, to get to New York City from upstate would

require me to leave @ midnight on Greyhound and travel all night, with a

layover in Albany which is a bit on the unsavory side, arrive @ the NYC Bus

Terminal, transfer to the subway and make the return, in all a pretty brutal, risky

and exhausting effort. In opposition to that, I assume the so called "professionals"

bill[8] 'portal to portal' and ride in private cars Mr. Miller, who prided himself on

appearances of thrift often seen taking the subway right in front of the Court.

---

[4] Docket 51963
[5] As the Court may note, I was never a party to the Case Management Order nor acceded to the Local Rule on email Service and despite pointing this out several times to the Committee they continue to think and act otherwise.
[6] Docket 51973
[7] I remember some years ago, when appearing before Judge Peck, and was sitting in the rear left corner. Several lawyers and paralegals sat down next to me. They were working fast and furious, texting and so forth to Mr. Miller's front bench next to the podium. When I got up for whatever and returned they were in a state of total shock as pretty much everything they were 'coaching' was in plain view to me, well before that...as I recall I had to correct Mr. Miller on at least 2 points which I sure led to a lot of yelling and screaming back @ the GM Building up by Central Park. I told them later, that they should pay more attention to who they sit next to, if they are going to play *the wizard of oz game* so to speak.
[8] As I recall most of the professional fee's in Lehman are kept in a so called "black box" unseen by outsiders

2

## Change of Plans

I had planned to leave last Saturday for the Bahamas. Ex 1.  In order to

Preserve my options, while I searched for the NY State Comptroller's

Documents, I made a request to enlarge the time to file an appeal.

In opposition, papers[9] were filed by the Committee. In a footnote, it was

stated that US District Judge McKelvie had sanctioned[10] me. That never

Happened. While it was true that he wanted to and opened the door

So to speak, when the Professional's pocketed the $750,000 they were

never heard from again in that case as I recall. That is reflected on the

Docket which is available to the Committee on Pacer. Further, it's pretty

obvious that Judge McKelvie was more concerned with the "Professionals"

than the Note/Bond holders being swindled for $700,000,000.

I don't like being lied to and further don't care to be lied about in legal papers.

## The Notice of Appeal

I don't recall off hand, just what is the fate of a Notice of Appeal filed

after the 10 days, without an extension, but as your Honor denied the

request based upon a growing pile of misrepresentations < to say the least >

including incredibly bad judgment[11]

---

[9] Docket 52027
[10] Kuntz v. Saul, Ewing, Remick & Saul, 200 B.R. 101 (D. Del. 1996) (Kuntz sanctioned for pursuing a frivolous appeal, notwithstanding his pro se status, because of Kuntz's extensive appellate experience -- listing failed federal and state appeals).

[11] Docket 52113

in how to develop opposition to my simple request, I proceeded to file the Notice
by US Mail from Chazy, NY.


## THE SANCTIONS MOTION

The following day, the Committee filed it's motion for Sanctions. The position
is based 110% upon the expungement Order of Judge Peck. However, as
no research was conducted and the Committee scoffed at the submission
that there was something else 'out there' that would give Standing
they more or less flew into a violent rage.

A letter was fired off to the Court complaining that they had been
unable to contact me by phone etc etc.

As I understand it, I am under no obligation under the Federal Rules
to have a phone. Nor even it I had a phone, I cannot see any reason
why I would provide it to them, in order to have written threats converted into
verbal threats and no doubt have the calls secretly recorded. They don't say
what numbers they tried or outline the nature of the 'research' trying to get
a number. I assume it was some kind of sit at your desk and pay to look.

There is a seasonal landline number I sometimes have access to @ a small
Motel on Cape Cod. That number services 86 rooms. I also believe that
there is a ongoing listing for me in Verizon Superpages in Upstate NY which is a
legacy from almost a decade ago.[12]

---

[12] http://wp.superpages.com/people/William-Kuntz/NY

In any event, even a Junior Sherlock Holmes would have been able to deduce

that as the several faxes I had sent came from either the Elizabethtown or

Chazy Library and the mailings were coming from Chazy, NY as reflected in

the proof of services, it seems that a phone call leaving a message might have

been a good start. Of course playing 'ain't it awful'[13] is much more dramatic.

Nor do I recall the Creditor's Committee giving me a phone for Christmas.

I think you can buy a track phone for $5 @ the Dollar Store. I do have

a phone in the 242(Bahamas) area code in the works, but you need to go in person

for obvious reasons[14].

Also the implied plea for sympathy that the Creditors would be damaged by

Tens of Millions of dollars. That's a fantastic overstatement. In the first, at

the current federal funds[15] rate, the interest on the entire sum comes in at just

over $5 USD million for an entire year. In the second, it is really not the concern

of the Court about the status of the Creditor's internal finances considering most

are now deep pocket corporate type investors. For example in docket # 52210

DeutcheBank appears to have transacted a claims trade for $463,779,394.00.

Crying for such people evokes no sympathy from me in light of the

circumstances of Lehman's collapse or scuttling.

---

[13] **Ain't it Awful** is a Party Game as defined by Eric Berne in Games People Play. There are 4 types, with
the most common as "**Look what they've done to us now**."
often humorous phrases such as "**See What You Made Me Do**,"

[14] Check your BTC bills (and Cable Bahamas)

[15] a ballpark figure suggested by one of the officers across the Street @ HSBC. For the court's information
HSBC is the successor indenture trustee to Marine Midland of some of the Grand Union Capital Corp Notes
and I stop in every time I am in New York to try to prod them into action. 26 Broadway, New York, NY 10004

What creditors do with a distribution, where they go with it, including Las Vegas

or tucking it under a mattress is misguided. It seems to me that the Committee

would be better served to collect Estate Funds still sitting in Albany with the State

Comptroller's Office instead of scoffing or for that matter also learning of the

unclaimed funds[16] dispute in Lehman from some years ago.

| | | |
|---|---|---|
| LEHMAN BROTHERS | 1301 6TH AVE 6TH FLOOR NEW YORK NY 10019 | GENWORTH LIFE INSURANCE CO |
| LEHMAN BROTHERS | 399 PARK AVE 6TH FLOOR NEW YORK NY 10022 | MASSACHUSETTS MUTUAL L INSURANCE CO |
| LEHMAN BROTHERS | 745 SEVENTH AVE NEW YORK NY 10019 | NATIXIS SECURITIES AMERIC |
| LEHMAN BROTHERS | 745 7TH AVENUE 13TH FL NEW YORK NY 10019 | CITICORP N A INC |
| LEHMAN BROTHERS | 745 7TH AVENUE 3ND FL N MINDY NEW YORK NY 10019 | CITICORP N A INC |
| LEHMAN BROTHERS | 50 COWLES AVE RYE NY 10580 | AMERIPRISE FINANCIAL INC |
| LEHMAN BROTHERS ASSE | C/O ATTN LISA BERDUCCI 3 WORLD FINANCIAL CTR NEW YORK NY 10285 | FIRST CLEARING LLC |
| LEHMAN BROTHERS ASSET MGMT INC | 399 PARK AVE 11 TH FL NEW YORK NY 10022 | GOLDMAN SACHS & CO |

---

[16]

3344    04/13/2009    Notice of Hearing on Motion of Unclaimed Property Recovery Service, INC

| | | |
|---|---|---|
| LEHMAN BROTHERS F/A/O AIG-DKR | SOUNDSHORE 745 7TH AVE 3RD FLR NEW YORK NY 10019 | BEAR STEARNS SECURITIES |
| LEHMAN BROTHERS FUND | 745 SEVENTH AVENUE 2ND FL NEW YORK NY 10019 | J P MORGAN |
| LEHMAN BROTHERS HOLDING INC | 38TH FLOOR ATTN: STUART FINKELSTEIN NEW YORK NY 10020 | MASSACHUSETTS MUTUAL L INSURANCE CO |
| LEHMAN BROTHERS HOLDINGS INC | 38TH FLOOR ATTN STUART FINKELSTEIN NEW YORK NY 10020 | MASSACHUSETTS MUTUAL L INSURANCE CO |
| LEHMAN BROTHERS HOLDINGS PLC. | ATTN JERRY TURZOLINO 399 PARK AVENUE NEW YORK NY 10022 | TRANSWITCH CORP |
| LEHMAN BROTHERS INC | 745 7TH AVENUE NEW YORK NY 10019 | PERSHING LLC |
| LEHMAN BROTHERS INTE | C/O CHRISTY SEARL ESQ LEHMAN B 1301 AVEN UE OF THE AMERICAS NEW YORK NY 10019 | PORTLAND GENERAL ELECT |
| LEHMAN BROTHERS INTE | 745 SEVENTH AVENUE NEW YORK NY 10019 | GOLDMAN SACHS EXECUTIC CLEARING |
| LEHMAN BROTHERS SPECIAL FINANCING INC | 745 7TH AVE 30TH FLOOR ATTN DIANNA NOTTI NGHAM NEW YORK NY 10019 | PERSHING LLC |
| LEHMAN BROTHERSCOMMISSIN MGMT | 747 7TH AVE 16TH FLOOR NEW YORK NY 10019 | NYSE AMEX LLC |

## THE FIRE ALARM

As of last weekend it seems pretty clear that I must abandon my plan to

attend to some long awaited tasks in the Bahamas including clearing 3 of my

Volvo's thru Customs. Track down missing household items and followup

on my 'business interest' in the King Solomon Diamond Mines operations,etc

and plan further toward bringing HSBC into a Common Law Court for it's

obvious egregious breach of Corporate Fiduciary Duty to me as a Noteholder

in Grand Union. It's quite clear to me that the standard of liability against

HSBC in the Bahamas would be 10 fold what one might expect here in NY.

I understand that Freeport had a Grand Union store at the time Marine Midland

was the Indenture Trustee. The fact that the respective Sucessor Indenture

Trustee's ie HSBC and US Bank have assets that run into the Trillions

and have yet to answer for being AWOL was one of the reasons I was never

overly concerned when Judge Peck expunged my 3 claims.

I have never appeared before your honor, and as is my custom, I usually

go and observe in court the overall demeanor of any Judge I might appear before.

So last Sunday night I took the so called Chinese Bus ' the Lucky Dragon'

from South Station in Boston to NYC @ 2 AM. Then after recalling just how

to navigate the #6 train from Canal St to 1 Bowling Green I sat in most of

the morning for _Sabine._ It was pretty interesting to me. I always marvel

when the Lawyers step back and remind everybody that 'they' have some

kind of superior knowledge as if a greek god had come down from Olympus

and given them a magic wreath of laurels.

8

The following day, when Lehman was to start, I was prepared to offer if

Recognized a Stipulation, which if accepted would have placed these funds into

the Court Registry and dispensed with all of these episodes of *the Lawyers Full*

*Employment Act Nonsense*.

I inquired with the Clerk's Office and was advised that they were unaware of any

limit on the amount of funds that can be placed into the Registry.

The real problem here is not anything I have done but the reluctance of Chase

to waive the provisions and proceed, subject to a repayment agreement or

further stipulation. I suspect that Chase will not, because a> they know that

the balance sheet of the Debtor is grossly inflated and they could never recover the

money after it is distributed thus facing a kind of triple whammy. Further that the

'settlement' is really put forward in bad faith. Further, it appears that on or about

The 2nd of Oct, 2008 Attorney Susheel of the quin firm noticed a Discovery of

Chase but nothing seems to have come of it. Now the Committee complains

that it was the Examiner's report that prompted this litigation and yields

a settlement. So what or what now was discovered back in 2008?

Or was that just posturing?

| 10/2/2008 | Application for FRBP 2004 Examination Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdi for Leave to Conduct Discovery of JPMorgan Chase Bank, N.A. Pursuant to 11 U.S.C. Sections 105(a) and 1103(c) anc Federal Rule of Bankruptcy Procedure 2004 filed by Susheel Kirpalani on behalf of Official Committee of Unsecured Cr with hearing to be held on 10/16/2008 at 10:00 AM at Courtroom 601 (JMP) Responses due by 10/13/2008, (Attachn # (1) Exhibit 1# (2) Exhibit 2# (3) Exhibit 3) (Kirpalani, Susheel) |
|---|---|
|  | Debtor: Lehman Brothers Holdings Inc. |

In any event, just about 10 AM the Fire Alarm went off. When I in New York

I try to maintain what might be called Situational Awareness. I had been to the

Top of the World Trade Center with my older son and was supposed to go on

the 10th of Sept with my younger son had we not canceled and gone one day later ?

So Just as your honor came to the Door without your robe, I was the 2nd out the

door and first down the fire escape stairwell. When you get down about 3 floors

there is a security door and it self locks after you pass thought it. About that

point in time, the alarm was cancelled but a Voice Override but I was down into

the other part of the Building and had to exit thru the main entrance.

When I returned to the Bankruptcy Court Entrance, I was not allowed to re-enter

by some very concerned US Marshall's and then the NYFD trucks started arriving

By the Park so it was clear that I was not going to be able to return.

As indicated, I went over to HSBC and then over to Foley Sq to the New

Courthouse. As I had learned the Committee was then trying to seek some

more 'emergency help' but there was nothing on the Computer Terminal on the

Ground Floor so I went upstairs to the adjunct Clerk's Office and once of the

Staff looked for anything also but found nothing.

At that point, about 1 pm I walked up to Chinatown to the Restaurant I always go

To and had Lo Min Pork with Noodles and hot tea. Later as it seemed that nothing

more might be accomplished, I checked out and took the last bus back to Boston.

I arrived back in Boston about 1 am and drove thru the heavy rain to Cape Cod

to catch the first Hyline Ferry to Nantucket.

When I checked my mail, as  evidenced Ex 2 by the US Post Office Round Stamp on a

letter from the District <state> Court there, there was nothing from the Committee

except **1 slim envelope**.

No letters, no enormous pleadings.

When I used to work in New York  as the Law Clerk for former Assistant

Manhatten District Attorney Robert Kiernan, Esq.

(see Rule 520.4 RULES OF THE NY STATE COURT OF APPEALS)

we called that **gutter service**. Now the Committee further wants me, apparently to

do more sommersaults and have added additional staff including members of the

Los Angles, Calif to produce a cornucopia of impressive documents.

They might have learned that from the GM case before Judge Gerber

in that crafting a document in NY but having it printed in the West adds some 3 to

4 hours and what the heck, it all goes on the bill. As I recall, under the NYCPLR

service by overnight is allowed if in fact the item is deposited before the

'published' time in the tariff/manual. despite thatm the fact is that often packages

can be delivered to the Base Station @ LAX even later.

On the other hand it is a little know fact that Nantucket being an island out into the

Atlantic Ocean sometimes has both Weather Issues which ground planes and

Cancel Ferry Operations. As I recall, before Judge Gerber, the papers arrived

on Nantucket just 5 minutes before the Hearing Commenced in NYC. Clearly

something I could never reply to but that's pretty much what goes on these days.

At last I knew, the Committee was seeking some kind of 'expedited' relief in

US District Court allowing me only 24 hours to respond which is kind of Novel but

typical in that the District Judge would be effectively presented papers ex-parte.

## DUBIOUS RELIANCE ON JUDGE PECK'S EXPUNGEMENT DECISION

So it seems that the Committee is more or less 'betting the ranch' on that

single slice of Jurisprudence. I have already provided the Committee with

a copy of USDJ NDNJ with Judge Martini's letter in Grand Union which

clearly points out that Weil, Gotshal was Co-Counsel to Grand Union in

the Case there before Judge Winfield. USBC NDNJ.Ex 3

I have already illustrated that at the time, Weil Gotshal was apparently working

for Lehman. I don't recall Judge Peck addressing the Obvious that allowing

Weil, Gotshall to prosecute an objection in Lehman might be considered

*Professional Mischief* at best. By adopting and embracing that Decision

not only has the Committee professional furthered that Mischief, they may

well have passed into the realm of what might be of interest to **Preet Bharara.**

I hear time and time again that Lehman had nothing to do with Grand Union.

Attached as Exhibit 4 are certain press items and as the court may note

I had these docketed[17] back in 2008. I also believe but have not yet located

Documents that reflect the various loans Lehman made to Grand Union.

---

[17] Docket 1261 10/24/2008

## THE STATE COMPTROLLER DOCUMENTS

I have also located the documents which I mentioned at first in my letter to the

Court early this month. They clears indicate that something was deposited in

Albany. For quite a long time, I believed that what ever it was had been reduced

to cash and while of interest gave no rise to any colorable standing. However

recently, the State Comptroller's Office has been insisting that I take 'delivery' and

execute a 'total' release of them.  That files has now been purged from the

State Comptroller's Internet Page. Ex 5.


As the Court may recall, I made neither an objection nor offered support to

the proposed settlement. I thought that suggesting a further review was

a constructive submission. In light of the high profile Political Retoric[18]

on all the major channels about Wall Street and the recent speech[19] by the new

-------------------------------

[18] Bernie Sanders says he can break up the banks in a year

http://qz.com/586884/bernie-sanders-says-he-can-break-up-the-banks-in-a-year-is-that-even-possible/

[19] Break up big banks, suggests the Fed's Neel Kashkari, who ran 2008 bailout fund
http://www.latimes.com/business/la-fi-kashkari-banks-federal-reserve-20160216-story.html

13

President of the Minneapolis Federal Reserve Bank < and apparently insider to

succeed the Present Board Chairwomen Janet Yellen >

As the actions by Chase are to almost all concerned the single most clearly

obvious to have breached the Faith Trust and Repose that Lehman placed

in Chase it seemed clear to me that this settlement needs to be

squeaky clean and the only way I know short of a Congressional Hearing

would be to appoint a Successor Examiner.

Instead the Committee want to rely upon what I might call

Faith Trust and a little Pixie Dust.

## STANDING

I for one, would have never advanced on the standing issue, it's a loser.

The Committee does not even address the greater standing problem that

has been 'out there for quite a while'

### On Considering the Public Interest in Bankruptcy: Who Decides What Best Serves the Public Interest? Noneconomic Interests in Bankruptcy: Standing  Ex 6

I would have zero'ed in on the Court's Power to appoint a Successor

Examiner.  That entire hearing would have taken perhaps 10 minutes.

I know how difficult it is to be a Bankruptcy Judge in New York.

From the time of Judge Galgay ordering Mr. Miller's Firm to produce

Certain Video Tapes taken in WT Grant of the meetings between the

Banks and Grant[20] using what was then new technolody and having

---

[20] the tapes most likely would have established that Grant was insolvent at the time of the Security Interst was filed thus perhaps handing them maybe a $540 million loss in 1970 dollars. The existence of the tapes was in the

14

Made that order, the following morning have the SEC arrive with

a Subpoena and wisking away the tapes never to been seen. That would

have been very frustrating. And the workload etc. I say how hard it was

for Judge Peck who was always polite but firm with me.

I submit this entire episode is nothing more than a monument to the colossal ego

of the Committee Professional and a tribute to the dangers of in-artfull drafting.

A single sentence or two would have carved out any problems about any delay

in the approval, for example providing for who would retain the interest pending

any delay. Just further evidence of Bad Faith and the too cozy relationship

between the professionals.

I request that the Court Censure the Committee and the Professionals and deny

the Motion in all respects.

Respectfully,

William Kuntz, III

India St PO Box 1801

Nantucket Ma 02554-1801

Feb 25, 2016

Hopkinton, Ma

---

Rule 2003 ? transcripts of which there were some 17,000 pages. While often referred to as the bedrock for
How the case was proceeding, I was told by the Clerk's Office in the old Foley Sq building that I was the first
person to ever request them for reading. Needless to say Mr. Miller was not pleased.

15

**Departing Flight: Sat Feb 20, 2016** (Arrive - Sun Feb 21, 2016)

Flight arrives on the next day.



| | | | | 🕐 1h 52m |
|---|---|---|---|---|
| Departs | 8:50pm | Feb 20 | Boston, MA | BOS |
| Arrives | 10:42pm | Feb 20 | Toronto, ON | YYZ |

Operated by Air Canada Express / Sky Regional - Flight 7669, Embraer 175 · Jet · Economy Class

👁 Overnight Connection at    Layover: 8h 3m
Lester B Pearson Intl Airport (YYZ).



| | | | | 🕐 3h 15m |
|---|---|---|---|---|
| Departs | 6:45am | Feb 21 | Toronto, ON | YYZ |
| Arrives | 10:00am | Feb 21 | Nassau, Bahamas | NAS |

Operated by Air Canada Rouge - Flight 1816, Airbus A319 · Jet · Economy Class

💼 Baggage Fees



Air Canada
Part operated by Air Canada Express / Sky Regional and Air Canada Rouge

BO
6:5 ⊙ Flight arrives on the
Bost            next day.
MA

🕐 **15h 10m**

**$270**
Total Per Person

[ Select › ]

≡  Hide Flight Details



## Baggage Fee Information

Listed below is the baggage fee policy for the carrier(s) in your selected itinerary. Baggage fees are not included in your trip cost and are the traveler's responsibility to pay to the airline directly. Actual fees may differ under certain guidelines, including whether you pay fees at the airport or online, your frequent flyer status and your cabin class. Please review carefully.

### Air Canada Baggage Policy

Please note that, unless otherwise noted, baggage fees below are quoted in CAD and are based on a maximum weight of 50 lbs (23 kg) and an overall size of 62 inches (157 cm) when you total length + width + height.

| Economy/Coach Class Travelers | | |
|---|---|---|
| Travel Between (To or From) | | Baggage Allowance and Fees |
| Canada | Canada | 1st Bag: 25 CAD<br>2nd Bag: 25 CAD |
| | United States (Including Hawaii) | 1st Bag: $25<br>2nd Bag: $35 |
| | Mexico, The Caribbean, and Bermuda | 1st Bag: 25 CAD<br>2nd Bag: 25 CAD |
| | Belize, Costa Rica, El Salvador, Guatemala, Honduras and Nicaragua | 1st Bag: Free<br>2nd Bag: 25 CAD |
| All Travel To and From Japan and Brazil | | Up to Two Bags Free |
| All Travel To and From Venezuela | | 1st Bag: Free<br>2nd Bag: $70 |
| All Travel To and From Africa (Excluding Egypt, Malawi, Morocco, and Zambia ) | | Up to Two Bags Free |
| All Other Regions/Countries | | 1st Bag: Free<br>2nd Bag: $100 |

| International Business Class and North American and Caribbean Business Class Travelers |
|---|
| 2 free bags weighing no more than 50 lbs (23 kg) each. |

| Carry-on Bags |
|---|
| 1 bag and 1 personal item at no extra charge. |

Carry-on bags and personal items must fit into the overhead bin or under the seat in front of you and in most cases may not exceed 45 linear inches (114 cm) in combined length, width and height, including any handles and wheels. Depending upon size of the aircraft , carry-on bags that fit the allowed size restrictions may be gate checked, during the boarding process and returned upon deplaning.

Allowance and fee amounts listed are not guaranteed and are subject to change by the airline. Fees displayed are based on the unrestricted coach, business and/or first class airfares and may apply each time you check-in baggage. Actual fees may differ in certain circumstances, including but not limited to fare type paid, whether you pay the fee at the airport or on your airline's website, your frequent flyer status and cabin class. Be sure to verify the actual fees with your airline(s) before you travel.

To confirm baggage fees for your reservation or for information on additional, overweight, or oversized bags, fare-type based baggage fees or if your confirmed class or itinerary is not shown, click here to visit the airline's website.

Optional Services such as pre-reserved or priority seating, in-flight entertainment, Wi-Fi, pets, dining, etc. vary by airline and flight. Information on which optional services are available on your flight, and fees for such services, can be reviewed by visiting your airline website; click here to visit the airline's website.

Close Window



NANTUCKET DISTRICT COURT
16 BROAD STREET
P.O. BOX 1800
NANTUCKET, MA 02554

NAME & ADDRESS OF DEFENDANT

William Kuntz
P. O. Box 1801
Nantucket, MA 02554



# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY



MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
59 WALNUT STREET, P.O. BOX 419
NEWARK, NJ 07101-0419
(973) 645-6340

WILLIAM J. MARTINI
JUDGE

June 10, 2005

**LETTER OPINION**

<u>**VIA REGULAR MAIL**</u>

Ravin, Greenberg & Marks, P.A.
Sheryll S. Tahiri, Esq.
101 Eisenhower Pkwy.
Roseland, NJ 07068

*(Attorneys for The Grand Union Company)*

Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman, P.C.
Thomas G. Aljian, Jr., Esq.
The Legal Center
One Riverfront Plaza
Newark, NJ 07102

*(Attorney for Americe, Inc.)*

**3**

Re:    **The Grand Union Co. v. Americe, Inc.**
          **Docket No.: 04-5669 (WJM)**

Dear Counsel:

This matter comes before the Court on The Grand Union Company's ("Grand Union
motion pursuant to Federal Rules of Civil Procedure 59 and 60 and Local Civil Rule 7.1(g)
reconsideration of the Court's April 18, 2005 Order dismissing Grand Union's bankruptcy a
for want of prosecution. For the reasons set forth below, the motion is **DENIED**.

## BACKGROUND

Bankruptcy Judge Novalyn L. Winfield entered an Order on August 6, 2004 that, am
other things, denied bankruptcy debtor Grand Union's motion for summary judgment and gr
Americe, Inc. ("America") leave to file an administrative claim request. Six days later, on
August 12, 2004, Grand Union, through counsel Ravin Greenberg P.C. ("Ravin Greenberg")
Weil, Gotshal & Manges LLP ("Weil Gotshal"), filed a notice of appeal and shortly thereafte

required by rule to submit appellate briefs to this Court within fifteen days of its appeal h;
been docketed, Fed. R. Bankr. P. 8009(a)(1), the notation of this transmission on the dock
indicates that Grand Union was given until December 27, 2004. Despite this generous br
schedule, Grand Union never filed any appellate brief. This Court exercised its discretion
dismissed Grand Union's appeal by Order dated April 18, 2005 for want of prosecution.

Counsel for Grand Union—specifically, Ravin Greenberg, not Weil Gotshal—now
the Court to reconsider this dismissal on the ground that Grand Union's failure to submit ;
appellate brief was attributable to counsel's "mistake and excusable neglect." (*See* Memo
of Law in Support of Motion for Reconsideration [*hereinafter* "App. Br."].) Specifically,
counsel for Grand Union points out that the attorney who was primarily in charge of handl
Grand Union's appeal, Allan Harris ("Mr. Harris") of Ravin Greenberg, left the firm Dece
31, 2004 and that "[i]t was only after [Mr. Harris] left, much past the deadline set forth in
8009, that [Howard S. Greenberg ("Mr. Greenberg"), also of Ravin Greenberg] became av
that a brief had not been filed." (*See* Cert. of Howard S. Greenberg ¶10.) Because the Dec
27, 2004 deadline ran several days before Mr. Harris left Ravin Greenberg, counsel for Gr
Union also notes that "[d]uring the time of filing of the appeal, several complications mad
difficult for [Ravin Greenberg] to file a brief on Appellant's behalf, and to proceed with th
appeal." (*Id.* ¶ 8.)

## ANALYSIS

Although dismissal of bankruptcy appeals for want of prosecution is discretionary,
must at least consider less severe sanctions for a litigant's failure to prosecute its case. *See*
*Jewelcor, Inc. v. Asia Commercial Co., Ltd.*, 11 F.3d 394, 397 (3d Cir. 1993). Counsel for
Union argues, therefore, that this Court, rather than dismissing Grand Union's appeal for w
prosecution, should have resorted to the less severe sanction of either issuing an Order to Sl
Cause setting forth an expedited briefing schedule or, instead, simply issuing another briefi
schedule. (*See* App. Br. at 4.) The Court fails to see how giving appellant additional time t
submit an appellate brief *which at the time of dismissal was already almost four months lat*
effective "sanction." Indeed, that would be no sanction at all.

The Court can discern no other effective sanction for failure to submit an appellate b
As this Court has already explained, the bankruptcy rules require appellant to file a brief wit
Court within fifteen days of an appeal having been docketed. Fed. R. Bankr. P. 8009(a)(1).
purpose of the briefing schedule in Bankruptcy Rule 8009 is to provide for the expeditious
resolution of bankruptcy proceedings. *See Jewelcor*, 11 F.3d at 397. It is clear that the purp
of the rule would be completely thwarted were the Court to allow Grand Union to delay
indefinitely the filing of its appellate brief, without which the Court cannot even begin to rev
the merits of its appeal.

Grand Union's failure to prosecute its appeal is the result of its own neglect. Indeed,
Ravin Greenberg acknowledges as much. (*See* App. Br. at 4.) Unable to dispute that it had
notice of the December 27, 2004 deadline, Ravin Greenberg offers only the vague excuse tha

behalf." This neglect is all the more inexplicable considering that Grand Union appears to been represented in bankruptcy proceedings not by one but in fact by two different law fir other—Weil Gotshal—being known for the strength of its bankruptcy practice. (*See* Notic Appeal dated Aug. 12, 2004).

Finally, there is evidence suggesting that Grand Union's failure to prosecute its app simply reflects its history of proceeding in a dilatory manner. That is, during the bankrupto court's October 4, 2004 telephone conference with counsel for Americe and with Ravin Greenberg regarding, among other things, the instant appeal, Judge Winfield stated: "I actu find this issue of appeal a little bit frustrating. [Grand Union] has had an astonishing disinclination to try this case. It's been difficult to get this to final conclusions. . . . I'm tir fooling around. . . . . [I] implore both parties to act with all due speed to get [Grand Union' appeal] before the district court and adjudicated . . . . This is an old adversary and it should hang around." (Transcript of October 4, 2004 Telephone Status Conference before Honora Novalyn L. Winfield at 8:6–11, 10:22–24, 11:4–5.) In response to Judge Winfield's reques Grand Union diligently prosecute its appeal, Mr. Greenberg, who now asks the Court to exc Grand Union's failure to file any appellate brief because the Ravin Greenberg attorney prim handling Grand Union's bankruptcy case left the firm four days *after* the December 27, 200 stated: "We're trying to, Your Honor." (*Id.* at 11:3.) Grand Union nevertheless failed to prosecute its appeal despite Mr. Greenberg's representation to Judge Winfield that it would with all due speed.

## CONCLUSION

For the foregoing reasons, Grand Union's motion for reconsideration of the Court's 18, 2005 Order dismissing Grand Union's bankruptcy appeal for want of prosecution is **DENIED**.

An appropriate Order accompanies this Letter Opinion.

s/William J. Martini

**William J. Martini, U.S.D.J.**

cc:   The Honorable Ronald J. Hedges, U.S.M.J.

lehman - Yahoo! Mail



lehman                                                          Friday, October 17,

From: "william kuntz" <kuntzwm1@yahoo.com>
  To: kuntzwm1@yahoo.com

# Grand Union Arranges $300 Million CreditFac

Publication: Business Wire
Date: Monday, April 27 1998
WAYNE, N.J--(BUSINESS WIRE)--April 27, 1998--
Plans to Commence Solicitation of Consents Shortly
The Grand Union Company said today that it has signed a firm underwritten commitment letter from
Warburg Dillon Read and Lehman Brothers for a $300 million credit facility

---

Do You Yahoo!?
Tired of spam? Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

**4**

# YAHOO! MAIL
### Classic

BNET.COM

From:  "william kuntz" <kuntzwm1@yahoo.com>                    Friday, October 17,
To:  john.lucas@weil.com, ddunne@milbank.com, dodonnell@milbank.com,
    kuntzwm1@yahoo.com

Business Editors
WAYNE, NJ--(BUSINESS WIRE)--October, 3, 2000
The Grand Union Company (OTC.BB: GUCO) today announced that, in order to facilitate the plan
the Company and provide for additional funding during the sale process, it has filed a voluntary cha
petition in the U.S. Bankruptcy Court in Newark, New Jersey. The filing will enable the Company to
conduct business as usual, provide service to its customers and meet its commitments during the s
Related Results
Grand Union Co.
Grand Union Completes Capital Restructuring
Grand Union Completes Capital Restructuring
Late news (Briefs)
Week In Review ( Spartan Stores Inc. buys Farmer Jack stores )(Taubman...
Grand Union also announced that it has obtained a $60 million debtor-in-possession financing comr
from Lehman Commercial Paper Inc., one of its existing lenders.

---

Do You Yahoo!?
Tired of spam? Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

**5**



BANKRUPTCY DATA . COM

Friday, October 17, 2

From: "william kuntz" <kuntzwm1@yahoo.com>

To: john.lucas@weil.com, kuntzwm1@yahoo.com, ddunne@milbank.com,
dcdonnell@milbank.com

**Grand Union Company** Ch. 11: October 3, 2000
*(October 1, 2000)*
Grand Union Co. announced that it obtained a $60 million debtor-in-possession commitment from
Commercial Paper, Inc.

---

Do You Yahoo!?
Tired of spam? Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

**6**

THOMAS P. DiNAPOLI
STATE COMPTROLLER





110 ST
ALBANY, NE

STATE OF NEW YORK
OFFICE OF THE STATE COMPTROLLER
Office of Unclaimed Funds

October 3, 2008

REFERENCE NUMBER:

GRAND UNION CAPITAL CORP
ATTN WILLIAM KUNTZ III
INDIA STREET
PO BOX 1801
NANTUCKET ISLAND, MA  02554-1801

## RE: LEHMAN BROTHERS BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW Y
## UNCLAIMED FUNDS

DEAR ,

On behalf of the New York State Comptroller's Office, I am writing to thank you for your in
regarding unclaimed funds.

We currently hold over $9 billion in unclaimed funds, involving more than 23 million accou
Comptroller is committed to returning these funds to the rightful owners, and we anticipate
claim will be reviewed in about 90 days. At that time we will either approve the claim for pa
will notify you in writing if we need additional documentation to complete your claim. Pleas
claims involving large dollar amounts, estates and securities may take longer to process.

No further action is required on your part at this time. Please notify us in writing if your mai
changes while this claim is in process.  Include the "REFERENCE NUMBER" at the top of
with any correspondence regarding this claim.

You can visit our website at http://www.osc.state.ny.us/ouf/faq.htm for answers to frequ
questions. If you need additional assistance or would like a status update, you may call our
Communications Center at 1-800-221-9311.

In the meantime, we thank you for your patience.

Sincerely,

7

9

Claim Form

New York State
Office of the State Comptroller

## Office of Unclaimed Funds

Tho
Stat

**Part I. Account Information**

| Name: KUNTZ WILLIAM A | Address: BOX 461, LAKE PLACID, NY 12946 |
| Account #: 033073395/027130763 | Reported By: LEHMAN BROTHERS HOLDINGS INC |

**Part II. Claimant Information**(Please print or type the following information)

Your Full Name: Kuntz
_Last Name_          _First Name_ Claude

Current Address: 725 M pruct          Farm Rd Hopcan brr, MA
_Street Address (Include Apt #)_          _City_          _State_

E-Mail Address:

If you are **not** currently residing at the address shown in Part I. Account Information, but once lived at that addre
following information about that address:          Telephone

Check One: ☐ Owned Home    ☒ Rented    Occupancy Dates: PO Bx Rented

If your name is different from the name shown in Part I. Account Information, please explain why:

Check One: ☐ Marriage/Divorce    ☐ Owner is Deceased    ☐ Other    Please explain:

**NOTE:** If the property being claimed or any additional property identified by OUF in its claim review is a sec
at less than $5,000, OUF will pay the cash value unless the owner initials the box below:

    I prefer to receive actual securities if available, rather than cash value. I realize this will require addition
    claim and that a fee may be charged to me by a broker in the future, should I wish to sell my securities. I
    security transaction may have tax consequences.

I hereby make claim for the above referenced funds held by the NYS Office of Unclaimed Funds. I hold the NYS Com
from any loss due to the payment of this claim. I attest to the fact that I, or the deceased owner, used the address shown
Information. Under penalty of perjury, I certify that the information I provided on this form is correct.

X_____          Sworn to me this ____ day of _____ 20____
(Claimant's Signature)
                    (Claimant's SS#)          (Notary Public)

**To claim this account, you must:**
    ✓ Sign the form and have your signature notarized by a licensed notary public.
    ✓ Mail claim form to: Unclaimed Funds, Office of the State Comptroller, 110 State St, Albany, N

If you need additional assistance, please visit our web site at www.osc.state.ny.us or call our Communication Center at 800-221-93
address is Unclaimed Funds, Office of the State Comptroller, 110 State Street, Albany, NY 12236.

The New York State Comptroller's Office has access to Federal, State, and local databases to verify reported information. All claims
audit. Any person knowingly submitting a fraudulent claim will be subject to ALL LEGAL PENALTIES.

Personal Privacy Protection Law: In accordance with the Personal Privacy Protection Law, you are advised that the information re
necessary to determine entitlement to certain unclaimed funds held by the New York State Comptroller. Failure to provide this infor
in denial of the claim. This information will be retained by the Director of Services, Office of Unclaimed Funds, 110 State Street, Alb

8

# Attorney Conflicts Of Interest In Bankruptcy Proceedings

Recent Bankruptcy decisions reflect confusion in the standards to be applied in resolving conflicts of interest issues. The trend of these cases appears to be toward the development of standards distinct from those which have developed under the Model Code of Professional Responsibility [hereinafter Model Code] and the court decisions interpreting it outside of the bankruptcy context. It is too early to determine if these cases reflect a general revision of conflicts of interest standards or merely a development of special principles applicable only in bankruptcy. If the former is true, then an analysis of the issue in the limited context of bankruptcy will simplify understanding of the policies behind the changes. If the trend is confined to bankruptcy cases, a different problem is presented.

The Model Code was drafted with every element of the legal profession in mind. The very concept of a professional ethic precludes the varying of ethical principles when applied to different areas of the law.[1] "The Canons of this Association govern all its members, irrespective of the nature of their practice, and the application of the Canons is not affected by statutes or regulations governing certain activities of lawyers which may prescribe less stringent standards."[2] Clearly, there is no room under the Code for a separate standard for bankruptcy. Congress intended to avoid the formulation of a separate bankruptcy bar when it reformed the Bankruptcy Act.[3]

In any given bankruptcy case there is a plethora of potential conflicts. The attorneys present may include:

—the debtor's attorney

—an attorney trustee acting as his own counsel

—the trustee's attorney

---

1. "Nothing in the Code of Professional Responsibility or in the teaching of prior cases warrants such ethical relativity, for the Code, like its predecessor the Canons of Professional Ethics, 'set[s] up a high moral standard, akin to that applicable to a fiduciary. . . . Without firm judicial support, the Canons of Ethics would be only reverberating generalities'." Emle Indus., Inc. v. Patentex, 478 F.2d 562, 575 (2d Cir. 1973) (citation omitted).

2. ABA Comm. on Professional Ethics and Professional Responsibility, Op. 203 (1940). *Cf.* ABA Comm. on Professional Ethics and Grievances, Op. 152 (1936).

3. H.R. REP. No. 595, 95th Cong., 2nd Sess. 95-96 (1972). [hereinafter cited as "House Report"].

230              The Journal of the Legal Profession

—the trustee's attorney in an ancillary proceeding
—the creditors' attorneys.

This comment will explore the various standards applied to attorney conflict of interest cases in bankruptcy cases with emphasis on the substantive provisions of the Bankruptcy Code and will compare those standards to the standards applied outside of bankruptcy.[4] Discussion of conflicts of interest of the trustee as trustee and not as an attorney are beyond the scope of this article, although the issues are frequently litigated together.[5]

Ironically, the potential for attorney conflicts of interest and the extent to which such conflicts can affect the bankruptcy process were greatly increased by the efforts of the drafters of the Bankruptcy Reform Act[6] [hereinafter BRA] to reduce the appearance of conflict created by the bankruptcy judge's dual role as judicial and administrative officer.[7] The discontinuation of routine case administration by the

---

4.   A complete discussion of the general conflict of interest subject is quite impossible in a short article. For illustrative cases from the various circuits *see:*
*Second Circuit.* Armstrong v. McAlpin, 625 F.2d 433 (2d Cir. 1979) (en banc); Board of Educ. v. Nyquist, 590 F.2d 1241 (2d Cir. 1979); Emle Indus., Inc. v. Patentex, Inc. 478 F.2d 562 (2d Cir. 1973).
*Third Circuit.* Kramer v. Scientific Control Corp., 534 F.2d 1085 (3d Cir.), *cert. denied*, 429 U.S. 830 (1976).
*Fourth Circuit.* United States v. Eggleston, 495 F.2d 1370 (4th Cir. 1974).
*Fifth Circuit.* Brennan's, Inc. v. Brennan's Restaurants, Inc., 590 F.2d 168 (5th Cir. 1979); Woods v. Covington County Bank, 537 F.2d 804 (5th Cir. 1976).
*Sixth Circuit.* General Elec. Co. v. Valeron Corp., 608 F.2d 265 (6th Cir. 1979).
*Seventh Circuit.* Westinghouse Elec. Corp. v. Kerr-McGee Corp., 580 F.2d 1311 (7th Cir.) *cert. denied*, 439 U.S. 95 (1978); Westinghouse Elec. v. Gulf Oil Corp., 588 F.2d 221 (7th Cir. 1978).
*Eighth Circuit.* Arkansas v. Dean Foods Prods. Co., 605 F.2d 380 (8th Cir. 1979); Fred Weber, Inc. v. Shell Oil Co., 566 F.2d 602 (8th Cir. 1977), *cert. denied*, 436 U.S. 905 (1978).
*Ninth Circuit.* Gas-a-tron v. Union Oil Co., 534 F.2d 1322 (9th Cir.), *cert. denied*, 429 U.S. 861 (1976).
*Tenth Circuit.* Waters v. Western Co., 436 F.2d 1072 (10th Cir. 1971).
5.   *See* REA Holding Corp., 2 Bankr. 733 (Bankr. S.D.N.Y. 1980); W.T. Grant, 4 Bankr. 53 (Bankr. S.D.N.Y. 1980).
6.   Title I Section 101 of the Bankruptcy Reform Act of 1978, Pub. L. 95-598, 92 Stat. 2549, enacted and codified the substantive bankruptcy law as Title 11 of the United States Code.
7.   House Report, *supra* note 3, at 88-116.

bankruptcy judge shifted the responsibility for administration of the debtor's estate[8] to the creditors' committee in Chapter 11 reorganization cases and to the trustee in Chapter 7 liquidation cases. The increased importance of the role that attorneys representing these parties fulfill makes a coherent and comprehensive approach to conflicts of interest more important than ever.

In a Chapter 11 case, the creditors' committee is appointed by the court.[9] Ordinarily, the creditors' committee will consist of those persons holding the seven largest claims against the debtor. If the creditors have formed a committee prior to the order for relief, the court may continue that committee.[10] The creditors' committee represents the creditors in the formulation and negotiations of a reorganization plan[11] and is empowered to engage an attorney to represent it in investigating the acts, conduct, assets, liabilities, and financial condition of the debtor.[12] Under certain circumstances, a trustee may also be appointed in a Chapter 11 case.[13] If a trustee is not appointed, the debtor in possession[14] will have most of the rights and duties of a trustee.[15]

The primary restriction upon the committee's selection of an attorney is 11 U.S.C. § 1103(b)[16] which prohibits the creditors' committee attorney from simultaneously representing any other entity in connection with the case.[17] This section was enacted for the explicit purpose of reducing the potential for conflicts of interest.[18] Critics of this revision argue that there is no conflict of interest in the representation of one or more creditors concurrently with the creditors' committee and that disqualification works a hardship upon creditors, par-

---

8. Defined at 11 U.S.C. § 541 (1982).
9. 11 U.S.C. § 1102 (1982).
10. 11 U.S.C. § 1102(b)(1) (1982).
11. 11 U.S.C. § 1103(c) (1982).
12. 11 U.S.C. § 1103 (1982).
13. 11 U.S.C. § 702(d) (1982).
14. 11 U.S.C. § 1101(1) (1982). This section defines debtor in possession as "debtor except when a person that has qualified . . . is serving as a trustee in the case." *Id.*
15. 11 U.S.C. § 1107 (1982); *see* House Report, *supra* note 3, at 404.
16. 11 U.S.C. § 1103(b) (1982): "A person employed to represent a committee . . . may not, while employed by such committee, represent any other entity in connection with the case."
17. 11 U.S.C. § 1103(a) (1982).
18. House Report, *supra* note 3, at 402.

ticularly in small communities, by reducing the availability of
experienced bankruptcy attorneys.[19]

Changes in the substantive provisions of the B.R.A. make great
protection against conflicts of interest necessary. The Bankruptcy Code
makes all payments to a creditor during the ninety days preceding the
petition subject to avoidance as a preference.[20] Even payments made
in the ordinary course of business are avoidable if they are made more
than forty-five days after the debt is incurred.[21] Prevailing commercial
practices find even the most solvent companies paying their trade debts
after forty-five days. Where an attorney represents a creditor who has
received a preference the conflict which exists between the creditor and
the committee is a clear violation of DR 5-105.[22]

Critics of the restriction also urge that the creditors share a common
interest in maximizing the dividend payable from the estate. While essen-
tially correct, this argument fails to take into account the potential
conflict among the creditors concerning how to achieve their common
goal. Creditors who expect to receive a greater return and perhaps future
business from a going concern, will much prefer reorganization. Other
creditors will be unwilling to speculate on a dividend payable over time
and will seek a liquidation dividend. An attorney concurrently repre-
senting an individual creditor and the creditors' committee could not
pursue both objectives with equal vigor.[23]

Section 1103 has also been interpreted to preclude a law firm from
representation of creditors' committees in other bankruptcy cases where
there is a possibility of outstanding obligations from the debtors in
one case to the other.[24] Representation of any individual committee
member will also disqualify the attorney selected by the creditors'

---

19. *See President Ungerman Represents League on H.R. 3949*, 86 COMM. L.
J. 367-369 (Oct. 1981).

20. *See* B.R.A. § 547. A preference is a transfer by an insolvent to a creditor
which will enable the creditor to receive a greater percentage of his debt than other
creditors of the same class. *Id.*

21. 11 U.S.C. § 547 (1982).

22. MODEL CODE OF PROFESSIONAL RESPONSIBILITY, DR 5-105 (1980) (An attorney
must refuse to accept or continue employment if the interests of another client may
impair the independent professional judgment of the lawyer).

23. "An attorney who has been closely related by professional, business and
personal ties to those whose conduct may now be suspect is evidently in no position
to make any objective appraisal of the nature and extent of their involvement." *In
re* Bohack Corporation, 607 F.2d 258, 264 (2d Cir. 1979). *But see* Matter of Allied
Artists Pictures Corp. 17 Bankr. 288 (Bankr. S.D.N.Y. 1982).

24. *In re* Proof of the Pudding, Inc., 3 Bankr. 645, 648, (Bankr. S.D.N.Y. 1980).

committee.[25] This line of cases reflects the prophylactic standard generally applied outside of bankruptcy. Judge Friendly admonished, "[t]he conduct of bankruptcy proceedings not only should be right but must seem right."[26] On the whole, conflict of interest issues at the creditors' committee level are governed by standards designed to prevent any potential manifestation of conflict.

The Bankruptcy Code reinforces the spirit of the Model Code[27] by denying compensation for services and reimbursement of expenses of a professional person employed under 1103(a) if at any time during such employment, the person is not disinterested or holds or represents an interest adverse to the estate's interest with respect to the matter for which the person is employed.[28] The object of the B.R.A. is to ensure that an attorney employed by the creditors' committee does not have any interest which might impair his professional judgment in the case. In *In re Combustion Equipment Associates*,[29] the court established that even the appearance of conflict was to be avoided; thus the provisions of 11 U.S.C. § 1103(b) cannot be waived by the parties in interest.[30] If the court determines that there has been representation of an adverse interest it will deny compensation and reimbursement pursuant to section 328(c). The fee penalty is a prophylactic measure to prevent not only actual conflicts but also the mere possibility of divided loyalty.[31] Although these provisions do not extend so widely as Canons 4, 5 and 9, courts have generally found them sufficient to indicate that a stringent standard should be applied to conflict of interest questions for creditors' committee attorneys.

The less restrictive text of Model Rules 1.6, 1.7 and 1.9 are more closely aligned with the B.R.A. provision but are unlikely to work any substantial change upon courts' construction of the Act.

---

25.  *In re* Cumbustion Equip. Assoc., Inc., 8 Bankr. 566, (Bankr. Ct. S.D.N.Y. 1981). *See also* S. Rep. 863, 97th Cong., 1st Sess. 94 (1981); S. Rep. No. 150, 97th Cong., 1st Sess. 18-19 (1981).

26.  *In re* Ira Haupt & Co., 361 F.2d 164, 168 (2d Cir. 1966). *See also* House Report, *supra* note 3, at 407.

27.  *In re* Paine, 14 Bankr. 272, 274 (Bankr. W.D. Mich. 1981) ("The cancellation of the [attorney] fees was nothing more than a penalty for violation of the Code of Professional Responsibility.")

28.  11 U.S.C. § 101(13) (1982), *see also* 11 U.S.C. § 324 (1982).

29.  *Supra* note 25.

30.  *In re* Combustion Equip. Assoc., Inc., 8 Bankr. at 568.

31.  *See, e.g., In re* Paine, 14 Bankr. 272 (Bankr. W.D. Mich. 1981) *citing* Weil v. Neary, 278 U.S. 160 (1929). *But cf. In re* Laurent Watch Co., 539 F.2d 1231 (9th Cir. 1976); Stolkin v. Nachman, 472 F.2d 222 (7th Cir. 1973).

234                The Journal of the Legal Profession

In a Chapter 7 case, section 702 requires the court to appoint a interim trustee after the order for relief. The interim trustee's services terminate when the creditors elect a trustee at a meeting of the creditors.[32] In addition to electing a trustee, the creditors may elect a creditors' committee (or continue a committee organized under Chapter 11 as discussed above).[33] The committee will have a generally advisory function.[34] The most difficult bankruptcy related conflict of interest cases arise when the trustee exercises his power to appoint professional persons by selecting the same attorney who represented the creditors' committee. The pertinent parts of 11 U.S.C. § 327(a) and (c) state:

> (a) . . . the trustee, with the court's approval, may employ one or more attorneys, . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

> (c) In a case under Chapter 7 or 11 of this title, a person . . . may not, while employed by the trustee, represent, in connection with the case, a creditor.

The statutory language governing the selection of an attorney to represent the trustee does not automatically bar the employment of an attorney who previously represented a creditor. Section 327(c) represents a compromise between H.R. 8200 as passed by the House and the Senate Amendment. The provision states that former representation of a creditor, whether secured or unsecured, will not *automatically* disqualify a person from being employed by the trustee; but if such person is employed by the trustee, the person may no longer represent the creditor in connection with the case.[35]

Under prevailing practice, when the trustee appoints an attorney previously employed by an individual creditor or by the creditors' committee the attorney resigns from representation of the creditor(s). The trustee selects such an attorney to take advantage of his pre-existing knowledge and preparation. The motivation for the attorney to resign in favor of employment by the trustee lies somewhere between the altruistic goal of playing a larger role in the reorganization or orderly liquidation of the estate and the desire for larger fees.

---

32.  *Compare* 11 U.S.C. § 701 (1982) *with* Bankruptcy Rule 201.
33.  11 U.S.C. § 705 (1982); *see also* Bankruptcy Rules 207, 208.
34.  *Compare* 11 U.S.C. § 705(b) (1982) *with* Bankruptcy Rule 214.
35.  124 CONG. REC. H. 11091 (Sept. 28, 1978).

Under the Model Code, a lawyer may withdraw if the client
"knowingly and freely assents."[36] Since the protected interest is the
client's confidentiality, clearly the client may consent and waive his
right to object to successive representation.[37] The attorney must disclose
completely any future potential conflicts of interest to insure an effec-
tive consent.[38] Under the Model Code, DR 5-105(c) places the burden
of proof on the attorney and resolves doubts in favor of the client.[39]
Model Rule 1.9 explicitly permits a former client to waive his right
to disqualify his attorney.[40]

Model Rules 1.7 and 1.9 clarify the necessary mechanisms of client
consent to successive representation that were somewhat vague in the
Model Code.[41] The Official Comments to both 1.7 and 1.9 stress a
case-by-case analysis and explain that mere possible conflict is insuffi-
cient to disqualify an attorney.[42]

Beyond the enabling effect of the statutory language, the courts
are very deferential in allowing the trustee to select his counsel. To
some extent, Bankruptcy courts have relied upon the freedom to select
one's own counsel[43] and expanded the concept as a counterbalance to
the general conflict of interest considerations.[44] This development
appears to represent a general trend to accord greater freedom to retain
counsel and lesser importance to the appearance of impropriety.

Bankruptcy courts are favorably disposed to permit the successive

36. MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 4-110(C); 2-110 (1980).

37. See, e.g., In re Yarn Processing Patent Validity Litig., 530 F.2d 83, 89
(5th Cir. 1976); City of Cleveland v. Cleveland Elec. Illuminating Co., 440 F. Supp.
193, 205 (N.D. Ohio), aff'd mem., 573 F.2d 1310 (6th Cir. 1977), cert. denied, 435
U.S. 966 (1978).

38. E.F. Hutton & Co. v. Brown, 305 F. Supp. 371, 400 (S.D. Tex. 1969).

39. Id. See also Note, Attorney's Conflict of Interests: Representation of Interest
to that of Former Client, 55 B. U. L. REV. 61, 82 (1975).

40. MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.9 (1983).

41. Id.

42. Id.

43. E.g., In re Mandell, 69 F.2d 830, 831 (2d Cir. 1934); Hull v. Celanese
Corp., 513 F.2d 751 (2d Cir. 1975); Emle Indus. v. Patentex, Inc., 478 F.2d 568,
572 (2d Cir. 1973).

44. See, e.g., W.T. Grant Co. 4 Bankr. 53, 82 (S.D.N.Y. 1980): "It is a car-
dinal principle of bankruptcy administration that a trustee in bankruptcy is entitled
to engage attorneys of his choice, subject only to the approval of the court." (citing
In re Magna Products Corp., 251 F.2d 423, 424 (2d Cir. 1957)); see also In re Columbia
Iron Works, 142 F. 234 (E.D. Mich. 1904); In re Christ's Church of the Golden Rule,
157 F.2d 910 (9th Cir. 1946). But see In re Philadelphia Athletic Club, Inc., 20 Bankr.
328, 335 (Bankr. E.D.PA. 1982).

236          The Journal of the Legal Profession

representation of the creditors' committee and the trustee for the purpose of efficiency—the same reason that the trustee selected the attorney. "There is . . . an overriding concern in the Act with keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors.''[45] Obviously, the creditors' committee attorney will already be armed with the facts and circumstances of the estate and will be prepared to proceed in less time, thereby reducing expenses. This economy, however, is a two-edged sword. An attorney for the creditors' committee would have a reduced incentive to implement a successful reorganization plan in a bankruptcy court where the trustee employs the same attorney. A lucrative income stream can be assured by a failed reorganization, particularly in a complex case. Such incentives are clearly in derogation of Canon 5 and EC 5-15.[46] Further, it is reasonable to assume that the creditors' committee will consult their attorney with respect to their claims and their strategy for attaining a favorable reorganization plan. These matters are within the scope of the attorney-client relationship and are confidential.[47]

In addition to minimizing conflicts and the appearance of conflicts, another goal of sections 327 and 1103 is to reduce the scramble by lawyers for positions in bankruptcy or reorganization cases.[48] In an early application of section 327,[49] the court, in *In re Market Response Group, Inc.*, examined the factors discussed above and refused to grant the trustee's application to employ the former counsel to a Chapter 11 creditors' committee.[50] On a motion for reconsideration the court granted the application but only with great reluctance. The court concluded that the legislative mandate required the appointment, but only where the court is persuaded that no conflict of interest exists or will exist.[51] The court emphasized that appointment of the creditors' committee attorney will "not be made in a perfunctory, *pro forma* manner without full consideration of whether such employment is in the best

---

45.  Otte v. United States, 419 U.S. 43, 53 (1974).

46.  *In re* Codesco, Inc., 18 Bankr. 997 (Bankr. S.D.N.Y. 1982).

47.  *In re* Proof of Pudding, Inc., 3 Bankr. at 647 ("The attorney for a creditors' committee does not act in a vacuum; he is hired to pursue the interests of said committee.'').

48.  House Report, *supra* note 3, at 92, 96-97, 102-105.

49.  *In re* Market Response Group, Inc., 20 Bankr. 151 (Bankr. E.D. Mich. 1982).

50.  *Id.* at 152.

51.  *Id.* at 153.

interest of the estate.''[52] The trustee argued that representation by the
former counsel to the creditors' committee would improve the effi-
ciency of the administration of the estate and that the attorney was
not an adversary to the creditors[53] and cited *In re W.T. Grant Co.*[54]
where the court stated: ''the role of counsel to an Official Creditors'
Committee is not adverse to a bankruptcy trustee if liquidation should
ensue.''[55] The *Market Response* Court refused to adopt the *Grant*
blanket categorization and concluded that it will approve such employ-
ment only after the ''utmost scrutiny,'' when it is clear and certain
that no conflict, or potential for conflict, exists.[56] The Court emphasized
that it would resolve all doubts in favor of attorney disqualification.[57]

Subsequent to the *Market Response* decision there has been some
deterioration of the ''utmost scrutiny'' standard. Courts have seized
upon the ''not per se in conflict'' language found in, but not relied
upon, by the *Market Response* Court.[58] Two cases are particularly
illustrative of this trend. In *In re Codesco*,[59] the court enumerates some
of the potential conflicts and endorses the conflict prevention prin-
ciples discussed above, but then allows the representation in the face
of a potential conflict of interest by stating that the mere possibility
of conflict is not sufficient reason to deny the trustee his desired
attorney. In *In re Whitney-Forbes*,[60] the court gives its interpretation
of the rule of *Market Response* to be that ''bankruptcy courts general-
ly have allowed former counsel to the creditors' committee to repre-
sent the trustee.''[61] This is an inaccurate statement of the holding. The
utmost scrutiny standard is completely ignored and the acceptance of
the creditors' committee has become exactly the type of pro forma
action that the *Market Response* court held inadequate to protect the
interests of the estate and the integrity of the bankruptcy bench and
bar. An actual injury standard now replaces the prophylactic standard
in *Whitney-Forbes* and the court refuses to disqualify an attorney until
it finds true adversity of representation.

---

52. *Id.* at 153 (emphasis in original).
53. *Id.*
54. *In re* W.T. Grant Co., 4 Bankr. 53 (Bankr. S.D.N.Y. 1980).
55. *Id.* at 83.
56. *Id.*
57. *In re* Market Response Group, 20 Bankr. at 153 (citations omitted).
58. *Id.* 151.
59. 18 Bankr. 997, 1000 (Bankr. S.D.N.Y. 1982).
60. *In re* Whitney-Forbes, Inc., 31 Bankr. 836 (Bankr. N.D. Ill. 1983).
61. *Id.* at 840.

238            The Journal of the Legal Profession

Section 327(d)[62] specifically permits the court to authorize the trustee to act as his own counsel with the qualification that self-representation be in the best interest of the estate. Such an appointment would be in the best interest of the estate where the trustee sought to reduce duplication of effort with a view towards reducing the costs of administration.[63]

The potential for abuse of this section has proved tempting to some trustee attorneys. These unscrupulous attorneys avoid the goals of section 327(d) by allocating to themselves, as attorney, functions that would normally be performed by the trustee in order to inflate their fees. Unless the services rendered by the trustee as trustee and those rendered by the trustee as his own counsel are distinguished, the limitations on trustee compensation established in 11 U.S.C. § 326 are completely circumvented.[64] The B.R.A. dealt with this problem by limiting the compensation of professional persons under 11 U.S.C. § 328(b). The purpose of section 328(b) was stated in the legislative history:

> Subsection (b) limits a trustee that has been authorized to serve as his own counsel to one fee for each service. The purpose of permitting the trustee to serve as his own counsel is to reduce costs. It is not included to provide the trustee with a bonus by permitting him to receive two fees for the same service or to avoid the maxima fixed in section 326.[65]

If a challenge to the allocation of fees and services develops, an inherent conflict arises between the trustee's duty to preserve the assets of the estate and the attorney's desire to be compensated. The complexity of the problem is graphically illustrated by the court in *In re First Colonial Corp. of America*:[66]

> [T]he rule does not resolve the problems that may arise when a trustee-attorney's personal interest in the amount of compensation

---

62. 11 U.S.C. § 327(d) (1982). This section is essentially a restatement of Bankruptcy Rule 215(e).

63. *See In re* Smith, 8 Bankr. 699 (Bankr. D.R.I. 1981) (emphasizing that the purpose of permitting a trustee to serve as his own counsel was to reduce costs).

64. *See In re* McAuley Textile Corp., 11 Bankr. 646 (Bankr. D. Me. 1981) (The court sets out respective duties of trustee and attorney); *In re* Ira Haupt, 361 F.2d 164 (2d Cir. 1966); *see also In re* SMS, Inc., 15 Bankr. 496 (Bankr. D. Kan. 1981).

65. House Report, *supra* note 2, at 329; *see also* S. REP. No. 989, 95th Cong., 2d Sess. 39 (1978).

66. 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 909 (1977).

he receives in exchange for his services as attorney leads him to
take a position adverse to that of the bankrupt and its shareholders
whose interests he is charged with protecting in his role as trustee.
Where the trustee serves as his own attorney there is no disinterested
trustee to ensure that the attorney is paid only for professional
services necessary to the administration of the estate. In this situa-
tion it is unseemly, to say the least, for a trustee-attorney to urge
on appeal, first, that the compensation he was awarded for
furnishing legal services to the bankrupt estate should be increased,
and second that the bankrupt and its shareholders have no standing
to object to the amount of compensation because the Bankruptcy
Act makes safeguarding their interests his responsibility.[67]

Weighed against these conflicts or appearance of conflicts is the explicit
legislative directive to utilize the trustee-attorney arrangement to save
costs where possible. The courts can minimize unseemly behavior by
wielding the power of section 328(c) to deny compensation if the pro-
fessional person is not disinterested or has a conflicting interest.[68]

If the trustee employs the debtor's attorney, 11 U.S.C. § 327(e)
governs. The trustee may employ the debtor's attorney for a specified
special purpose if the employment is in the best interest of the estate
and the attorney is not adverse to the estate or does not represent an
interest adverse to the estate with respect to the specific matter for
which he is employed. This subsection is most often employed when
the debtor is engaged in complex litigation at the time of the filing
of the petition and changing of attorneys would be detrimental to the
litigation.[69]

The Bankruptcy Appellate Panel of the Ninth Circuit held that
a creditor's attorney who was, himself, a defendant in a suit by the
debtor, could nevertheless be a special counsel to the trustee under
section 327(e).[70] Analysis of section 327(e) by the court indicates that
the section does not require that an attorney serving as the trustee's
special counsel cease representing the creditors in the case because special
counsel has a limited role and is therefore less adverse.[71]

---

67.  *Id.* at 1297.
68.  House Report, *supra* note 3, at 329 ("This subsection provides a penalty
for conflicts of interest.").
69.  House Report, *supra* note 3, at 328.
70.  *In re* Fondiller, 15 Bankr. 890, 892 (Bankr. 9 Cir. 1981).
71.  *Id.*

240            The Journal of the Legal Profession

*Conclusion*

This comment has attempted to illustrate the competition among various goals of the Bankruptcy Reform Act as related to conflicts of interest and, to a limited extent, their interrelationship with the Model Code and Model Rules. It is impossible to detail all the possible permutations of conflicts that may arise in bankruptcy. Attorneys must understand the underlying policy considerations of efficiency and freedom to choose an attorney and balance those against the interests of the parties and the appearance of impropriety. There is no clear answer or standard which may be applied. The bankruptcy lawyer must respond to two mandates: make the bankruptcy system more efficient, and maintain both the apparent and actual propriety of the legal profession. Careful analysis of the potential conflicts illustrated above will serve as a guide.

*W.A. Stranko*

PENAP

# U.S. Bankruptcy Court
## Southern District of New York (Manhattan)
## Adversary Proceeding #: 12-01874-scc
### Internal Use Only

*Assigned to:* Judge Shelley C. Chapman          *Date Filed:* 09/14/12
*Lead BK Case:* 08-13555
*Lead BK Title:* Lehman Brothers Holdings Inc.
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:*   14 Recovery of money/property - other
                       11 Recovery of money/property - 542 turnover of property

### Plaintiff
-----------------------
**Official Committee Of Unsecured Creditors**        represented by **Joseph D. Pizzurro**
**Of Lehman Brothers Holdings Inc., et al**          Curtis, Mallet-Prevost, Colt & Mosle LLP
                                                     101 Park Avenue
                                                     New York, NY 10178
                                                     212-696-6000
                                                     *LEAD ATTORNEY*

                                                     **Andrew J. Rossman**
                                                     Quinn Emanuel Urquhart & Sullivan, LLP
                                                     51 Madison Avenue
                                                     22nd Floor
                                                     New York, NY 10010
                                                     (212) 849-7282
                                                     Fax : (212) 849-7100
                                                     Email: andrewrossman@quinnemanuel.com

                                                     **James Tecce**
                                                     Quinn Emanuel Urquhart & Sullivan, LLP
                                                     51 Madison Avenue
                                                     22nd Floor
                                                     New York, NY 10010
                                                     212-849-7199
                                                     Fax : 212-849-7100
                                                     Email: jamestecce@quinnemanuel.com

*Plaintiff*
-----------------------

**Lehman Brothers Holdings Inc.**                    represented by **Joseph D. Pizzurro**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*

                                                                    **James Tecce**
                                                                    (See above for address)


*Plaintiff*
-----------------------

**Lehman Brothers Special Financing Inc.**           represented by **Joseph D. Pizzurro**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*

                                                                    **James Tecce**
                                                                    (See above for address)


*Plaintiff*
-----------------------

**Lehman Brothers Commodity Services Inc.**          represented by **Joseph D. Pizzurro**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*

                                                                    **James Tecce**
                                                                    (See above for address)


*Plaintiff*
-----------------------

**Lehman Brothers Commercial Corporation**           represented by **Joseph D. Pizzurro**
745 Seventh Avenue                                                  (See above for address)
New York, NY 10019                                                  *LEAD ATTORNEY*
Tax ID / EIN: 13-2927667
                                                                    **James Tecce**
                                                                    (See above for address)


V.


*Defendant*
-----------------------

**JPMORGAN CHASE BANK, N.A.**                        represented by **Martin Krolewski**
                                                                    Kelley Drye & Warren, LLP

101 Park Avenue
New York, NY 10178
(212) 808-7800
Fax : (212) 808-7897
Email: mkrolewski@kelleydrye.com

**David J. Marck**
Kelley Drye & Warren LLP
One Jefferson Road
Parsippany, NJ 07054
973-503-5917
Email: dmarck@kelleydrye.com

**Harold S. Novikoff**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1000
Fax : (212) 403-2000
Email: hsnovikoff@wlrk.com

*Defendant*
----------------------
**J.P. Morgan Markets Limited**
*fka* **Bear Stearns International Limited**

represented by **Martin Krolewski**
(See above for address)

**David J. Marck**
(See above for address)

**Harold S. Novikoff**
(See above for address)

*Defendant*
----------------------
**J.P. Morgan Securities Ltd.**

represented by **Martin Krolewski**
(See above for address)

**David J. Marck**
(See above for address)

**Harold S. Novikoff**
(See above for address)

2/22/2016 12:11 PM

*Defendant*
------------------------

**J. P. MORGAN VENTURES ENERGY
CORPORATION**                          represented by **Martin Krolewski**
                                                      (See above for address)

                                                      **David J. Marck**
                                                      (See above for address)

                                                      **Harold S. Novikoff**
                                                      (See above for address)


*Defendant*
------------------------

**JP MORGAN CHASE AND CO**             represented by **Martin Krolewski**
                                                      (See above for address)

                                                      **David J. Marck**
                                                      (See above for address)

                                                      **Harold S. Novikoff**
                                                      (See above for address)


*Defendant*
------------------------

**JPMorgan Bank Dublin PLC**           represented by **Martin Krolewski**
*fka* **Bear Stearns Bank PLC**                       (See above for address)

                                                      **David J. Marck**
                                                      (See above for address)

                                                      **Harold S. Novikoff**
                                                      (See above for address)


*Defendant*
------------------------

**BEAR STEARNS CREDIT PRODUCTS
INC.**                                 represented by **Martin Krolewski**
                                                      (See above for address)

                                                      **David J. Marck**
                                                      (See above for address)

                                                      **Harold S. Novikoff**
                                                      (See above for address)

*Defendant*
------------------------

**BEAR STEARNS FOREX INC**                    represented by **Martin Krolewski**
                                                (See above for address)

                                            **David J. Marck**
                                            (See above for address)

                                            **Harold S. Novikoff**
                                            (See above for address)

| Filing Date | # | Docket Text |
|---|---|---|
| 09/14/2012 | ◉1 | Adversary case 12-01874. Complaint against JPMORGAN CHASE BANK, N.A., J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., J. P. MORGAN VENTURES ENERGY CORPORATION, JP MORGAN CHASE AND CO, JPMorgan Bank Dublin PLC, BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC */Complaint and Objection to Claims No. 66451, 66453, 66454, 66455, 66462, 66470, 66472, 66473, 66474, and 66476*. Nature(s) of Suit: (14 (Recovery of money/property - other)), (11 (Recovery of money/property - 542 turnover of property)) Filed by Joseph D. Pizzurro, James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al, Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Lehman Brothers Commodity Services Inc., Lehman Brothers Commercial Corporation. (Tecce, James) (Entered: 09/14/2012) |
| 09/14/2012 | | Receipt of Complaint(12-01874-jmp) [cmp,cmp] ( 293.00) Filing Fee. Receipt number 8853981. Fee amount 293.00. (U.S. Treasury) (Entered: 09/14/2012) |
| 09/19/2012 | ◉2 | Summons with Notice of Pre-Trial Conference issued by Clerk's Office with Pre-Trial Conference set for 11/14/2012 at 02:00 PM at Courtroom 601 (JMP), Answer due by 10/19/2012, (Campbell, Tiffany) (Entered: 09/19/2012) |
| 10/22/2012 | ◉3 | Affidavit of Service (related document(s)1, 2) filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Tecce, James) (Entered: 10/22/2012) |
| 11/16/2012 | ◉4 | **(The wrong PDF file was entered)** Amended Complaint against BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC, J. P. MORGAN VENTURES ENERGY |

| | | |
|---|---|---|
| | | CORPORATION, J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., JP MORGAN CHASE AND CO, JPMORGAN CHASE BANK, N.A., JPMorgan Bank Dublin PLC */First Amended Complaint and Objection to Claims Nos. 66451, 66453, 66454, 66455, 66462, 66470, 66472, 66473, 66474 and 66476 - REDACTED* Filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G) (Tecce, James) **Modified on 11/16/2012 (Bush, Brent)** (Entered: 11/16/2012) |
| 11/16/2012 | 🔗 5 | Motion to Authorize */Notice of Motion and Motion for Order Authorizing Filing of Unredacted First Amended Complaint and Objection to Claims* (related document(s)4) filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Attachments: # 1 Exhibit A - Proposed Order) (Tecce, James) (Entered: 11/16/2012) |
| 11/16/2012 | 🔗 6 | Amended Complaint against BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC, J. P. MORGAN VENTURES ENERGY CORPORATION, J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., JP MORGAN CHASE AND CO, JPMORGAN CHASE BANK, N.A., JPMorgan Bank Dublin PLC */First Amended Complaint and Objection to Claims Nos. 66451, 66453, 66454, 66455, 66462, 66470, 66472, 66473, 66474 and 66476 - REDACTED* Filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G) (Tecce, James) (Entered: 11/16/2012) |
| 11/19/2012 | 🔗 7 | Amended Complaint against BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC, J. P. MORGAN VENTURES ENERGY CORPORATION, J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., JP MORGAN CHASE AND CO, JPMORGAN CHASE BANK, N.A., JPMorgan Bank Dublin PLC **FILED UNDER SEAL** Filed by Joseph D. Pizzurro, James Tecce on behalf of Lehman Brothers Commercial Corporation, Lehman Brothers Commodity Services Inc., Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Bush, Brent) (Entered: 11/21/2012) |
| 12/13/2012 | 🔗 8 | Stipulation *and [Proposed] Order Regarding First Amended Complaint and Objection to Claim Nos. 66451, 66453, 66454, 66455, 66462, 66470, 66472, 66473, 66474, and 66476 and Motion to Unseal Same* (related document(s)5, 7, 6) filed by James Tecce on behalf of Official |

| | | |
|---|---|---|
| | | Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Tecce, James) (Entered: 12/13/2012) |
| 12/13/2012 | 🔘 9 | Amended Complaint against BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC, J. P. MORGAN VENTURES ENERGY CORPORATION, J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., JP MORGAN CHASE AND CO, JPMORGAN CHASE BANK, N.A., JPMorgan Bank Dublin PLC *and Objection to Claim Nos. 66451, 66453, 66454, 66455, 66462, 66470, 66472, 66473, 66474, and 66476* (related document(s)7, 8, 6) Filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit f# 7 Exhibit G) (Tecce, James) (Entered: 12/13/2012) |
| 12/20/2012 | 🔘 10 | So Ordered Stipulation and Order Signed on 12/20/2012 Regarding First Amended Complaint and Objection to Claim Nos. 66451, 66453, 66454, 66455, 66462, 66470, 66472, 66473, 66474, and 66476 and Motion to Unseal Same. (related document(s)8) (Nulty, Lynda) (Entered: 12/20/2012) |
| 12/21/2012 | 🔘 11 | Amended Complaint against BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC, J. P. MORGAN VENTURES ENERGY CORPORATION, J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., JP MORGAN CHASE AND CO, JPMORGAN CHASE BANK, N.A., JPMorgan Bank Dublin PLC *FILED UNDER SEAL First Amended Complaint and Objection to Claim Nos. 66451, 66453, 66454, 66455, 66462, 66470, 66472, 66473, 66474, and 66476,* (related document(s)10) Filed by James Tecce on behalf of Lehman Brothers Commercial Corporation, Lehman Brothers Commodity Services Inc., Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Lopez, Mary) (Entered: 01/11/2013) |
| 02/14/2013 | 🔘 12 | Answer to Amended Complaint (Related Doc # 6) filed by Harold S. Novikoff on behalf of BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC, J. P. MORGAN VENTURES ENERGY CORPORATION, J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., JP MORGAN CHASE AND CO, JPMORGAN CHASE BANK, N.A., JPMorgan Bank Dublin PLC. (Novikoff, Harold) (Entered: 02/14/2013) |
| 02/19/2013 | 🔘 13 | Affidavit of Service (related document(s)12) filed by Harold S. Novikoff on behalf of BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC, J. P. MORGAN VENTURES |

| | | |
|---|---|---|
| | | ENERGY CORPORATION, J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., JP MORGAN CHASE AND CO, JPMORGAN CHASE BANK, N.A., JPMorgan Bank Dublin PLC. (Novikoff, Harold) (Entered: 02/19/2013) |
| 09/27/2013 | 🌐 14 | Notice of Proposed Order *Notice of Presentation of [Proposed] Scheduling Order and Discovery Plan* filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. with presentment to be held on 10/23/2013 (check with court for location) Objections due by 10/22/2013, (Attachments: # 1 Proposed Scheduling Order and Discovery Plan)(Tecce, James) (Entered: 09/27/2013) |
| 09/27/2013 | 🌐 15 | Notice of Presentment *of Confidentiality Stipulation and [Proposed] Protective Order* filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. with presentment to be held on 10/23/2013 at 02:00 PM at Courtroom 601 (JMP) Objections due by 10/22/2013, (Attachments: # 1 Confidentiality Stipulation and [Proposed] Protective Order)(Tecce, James) (Entered: 09/27/2013) |
| 11/07/2013 | 🌐 16 | Scheduling Order and Discovery Plan Signed on 11/7/2013. (related document(s)14) (Nulty, Lynda) (Entered: 11/07/2013) |
| 11/07/2013 | 🌐 17 | Confidentiality Stipulation and Protective Order Signed on 11/7/2013. (related document(s)15) (Nulty, Lynda) (Entered: 11/07/2013) |
| 12/19/2013 | 🌐 18 | Notice of Presentment *Notice of Presentation of [Proposed] First Amended Scheduling Order and Discovery Plan* filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. with presentment to be held on 1/29/2014 at 02:00 PM at Courtroom 601 (JMP) Objections due by 1/28/2014, (Attachments: # 1 Proposed Order)(Tecce, James) (Entered: 12/19/2013) |
| 01/31/2014 | 🌐 19 | **(PLEASE DISREGARD.)** Notice of Case Reassignment From Judge James M. Peck to Judge Shelley C. Chapman. Judge Shelley C. Chapman added to the case. (Richards, Beverly). Modified on 1/31/2014 (Gomez, Jessica). (Entered: 01/31/2014) |
| 01/31/2014 | 🌐 | Please Disregard Previously Docketed Notice of Reassignment, Entered on 1/31/2014. Judge James M. Peck is assigned to the case. (Gomez, Jessica). (Entered: 01/31/2014) |
| 02/01/2014 | 🌐 20 | Notice of Case Reassignment From Judge James M. Peck to Judge Shelley C. Chapman. Judge Shelley C. Chapman added to the case. |

| | | |
|---|---|---|
| | | (Gomez, Jessica). (Entered: 02/01/2014) |
| 02/25/2014 | 21 | First Amended Scheduling Order and Discovery Plan signed on 2/25/2014. (related document(s)16, 18, 14) (Chien, Jason) (Entered: 02/25/2014) |
| 03/13/2014 | 22 | Notice of Presentment /Notice of Presentation of [Proposed] Second Amended Scheduling Order and Discovery Plan filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. with presentment to be held on 3/27/2014 at 02:00 PM at Courtroom 601 (JMP) Objections due by 3/26/2014, (Attachments: # 1 Proposed Order)(Tecce, James) (Entered: 03/13/2014) |
| 04/03/2014 | 23 | Second Amended Scheduling Order and Discovery Plan signed on 4/3/2014. (related document(s)22) (Chien, Jason) (Entered: 04/03/2014) |
| 06/27/2014 | 24 | Notice of Presentment /Notice of Presentation of [Proposed] Third Amended Scheduling Order and Discovery Plan filed by James Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. with presentment to be held on 7/16/2014 at 10:00 AM at Courtroom 623 (SCC) Objections due by 7/15/2014, (Attachments: # 1 Proposed Third Amended Scheduling Order and Discovery Plan)(Tecce, James) (Entered: 06/27/2014) |
| 07/16/2014 | 25 | So Ordered Third Amended Scheduling Order and Discovery Plan signed on 7/16/2014. (related document(s)24) (Chien, Jason) (Entered: 07/16/2014) |
| 11/18/2014 | 26 | Notice of Presentment Notice of Presentation of [Proposed] Fourth Amended Scheduling Order and Discovery Plan filed by James C Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. with presentment to be held on 12/10/2014 at 10:00 AM at Courtroom 623 (SCC) Objections due by 12/9/2014, (Attachments: # 1 Proposed Fourth Amended Scheduling Order and Discovery Plan)(Tecce, James) (Entered: 11/18/2014) |
| 12/12/2014 | 27 | Fourth Amended Scheduling Order and Discovery Plan signed on 12/11/2014 (White, Greg) (Entered: 12/12/2014) |
| 04/09/2015 | 28 | Notice of Presentment filed by James C Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Attachments: # 1 PROPOSED] FIFTH AMENDED SCHEDULING ORDER AND DISCOVERY PLAN)(Tecce, James) (Entered: 04/09/2015) |

| 05/05/2015 | 🔍 29 | Fifth Amended Scheduling Order and Discovery Plan signed on 5/5/2015 (White, Greg) (Entered: 05/05/2015) |
| --- | --- | --- |
| 07/20/2015 | 🔍 30 | Notice of Appearance in Adversary Proceeding *and Request for Notices and Service of Papers* filed by Martin Krolewski on behalf of BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC, J. P. MORGAN VENTURES ENERGY CORPORATION, J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., JP MORGAN CHASE AND CO, JPMORGAN CHASE BANK, N.A., JPMorgan Bank Dublin PLC. (Krolewski, Martin) (Entered: 07/20/2015) |
| 07/20/2015 | 🔍 31 | Notice of Appearance in Adversary Proceeding *and Request for Notices and Service of Papers* filed by David J. Marck on behalf of BEAR STEARNS CREDIT PRODUCTS INC., BEAR STEARNS FOREX INC, J. P. MORGAN VENTURES ENERGY CORPORATION, J.P. Morgan Markets Limited, J.P. Morgan Securities Ltd., JP MORGAN CHASE AND CO, JPMORGAN CHASE BANK, N.A., JPMorgan Bank Dublin PLC. (Marck, David) (Entered: 07/20/2015) |
| 08/27/2015 | 🔍 32 | Notice of Presentment */Notice of Presentation of [Proposed] Sixth Amended Scheduling Order and Discovery Plan* filed by James C Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. with presentment to be held on 9/9/2015 at 10:00 AM at Courtroom 623 (SCC) Objections due by 9/8/2015, (Attachments: # 1 Proposed Order)(Tecce, James) (Entered: 08/27/2015) |
| 09/15/2015 | 🔍 33 | Sixth Amended Scheduling Order and Discovery Plan signed on 9/15/2015 (White, Greg) (Entered: 09/15/2015) |
| 01/25/2016 | 🔍 34 | Notice of Settlement of an Order */Notice of Motion of Lehman Brothers Holdings Inc. and Official Committee of Unsecured Creditors, Pursuant to Fed. R. Bankr. P. 9019 And 11 U.S.C. § 105(a), for Entry of Order Approving Settlement Agreement with JPMorgan Chase Bank, N.A. and Certain of its Affiliates with Respect to Avoidance Action and Derivatives Claims Objections and Granting Related Relief* filed by Andrew J. Rossman on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. with hearing to be held on 2/8/2016 at 10:00 AM at Courtroom 623 (SCC) Objections due by 2/2/2016, (Attachments: # 1 Exhibit A)(Rossman, Andrew) (Entered: 01/25/2016) |
| 01/25/2016 | 🔍 38 | Motion to Approve Compromise *This Administrative Entry was Entered for Docketing Purposes re: Document No. 34* filed by Clerks Office of the U.S. Bankruptcy Court. (White, Greg) (Entered: 02/08/2016) |

| | | |
|---|---|---|
| 01/27/2016 | ◉ 35 | Certificate of Service (related document(s)34) filed by Andrew J. Rossman on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Rossman, Andrew) (Entered: 01/27/2016) |
| 02/04/2016 | ◉ 36 | Statement of No Objection /Certificate of No Objection Under 28 U.S.C. § 1746 Regarding Motion of Lehman Brothers Holdings Inc. and Official Committee of Unsecured Creditors, Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(a), for Entry of Order Approving Settlement Agreement With JPMorgan Chase Bank, N.A. and Certain of its Affiliates With Respect to Avoidance Action and Derivatives Claims Objections and Granting Related Relief (related document(s)34) filed by James C Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4) (Tecce, James) (Entered: 02/04/2016) |
| 02/05/2016 | ◉ 37 | Certificate of Service (related document(s)36) filed by James C Tecce on behalf of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. (Tecce, James) (Entered: 02/05/2016) |
| 02/08/2016 | ◉ 39 | Order Granting Motion of Lehman Brothers Holdings Inc. and Official Committee of Unsecured Creditors for Entry of Order Approving Settlement Agreement with JPMorgan Chase Bank, N.A. and Certain of its Affiliates with Respect to Avoidance Action and Derivatives Claims Objections and Granting Related Relief(Related Doc # 34) signed on 2/8/2016 (White, Greg) (Entered: 02/08/2016) |

**On Considering the Public Interest in Bankruptcy: Who Decides What Best Serves
the Public Interest? Noneconomic Interests in Bankruptcy: Standing**

http://www.repository.law.indiana.edu/cgi/viewcontent.cgi?article=1895&context=ilj

"International Comparisons: Creditor Rights and the Public Interest". 2003. "International
Comparisons: Creditor Rights and the Public Interest". In *Creditor Rights and the Public
Interest: Restructuring Insolvent Corporations*, 229–68. University of Toronto
Press. http://www.jstor.org/stable/10.3138/9781442673595.13.

In this Article, Professor Martin challenges traditional notions of bankrnttcy court
standing and concludes that the current majority view of such standing, which limits
participation in bankruptcy cases to persons with pecuniary interests or claims in the
debtor, is too narrow. Professor Martin reviews current case law, statutory law, and
bankrptcy policy, and asks whether the people who are regularly granted the right to be
heard in bankruptcy cases are the same people who are substantially affected by
bankritcy cases. Ultimately, she concludes that limiting standing to persons with
pecuniary rights fails to provide a voice to all people substantially affected by
bankruptcy cases. In so concluding, she identifies situations in which unique bankruptcy
entitlements permit debtors and creditors to shift financial losses to third parties, some
of whom are not even parties to the bankruptcy proceeding and who thus have no
opportunity to protect their rights in these cases. Professor Martin goes on to explore
the practical ramifications of expanding standing, recognizing that bankruptcy courts
may not be wellequipped to address "nonpecuniary" claims. She argues that caisidering
nonpecuniary interests is economically efficient because it preserves existing social,
economic, and familial structures. She argues that, because a truly accurate economic
analysis must measure notjust present dollars, but all things that we value as a society,
there really are no such things as "noneconomic" or "nonpecuniary" interests. She
further argues that typical Law and Economics models used in bankruptcy
underestimate the societal costs of business

https://kb.osu.edu/dspace/bitstream/handle/1811/64952/OSLJ_V59N2_0429.pdf