Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-01420 (SCC)

4   Case No. 08-13555 (SCC) (SIPA)

5   Case No. 09-14884 (SCC)

6   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

7   In the Matter of:

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9           Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  In the Matter of:

12  LEHMAN BROTHERS INC.,

13              Debtors.

14  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15

16                  U.S. Bankruptcy Court

17                  1 Bowling Green

18                  New York, New York

19

20                  Wednesday, March 11, 2015

21                  10:08 AM & 10:21 AM

22

23  B E F O R E :

24  THE HONORABLE SHELLEY C. CHAPMAN

25  U.S. BANKRUPTCY JUDGE

Page 2

1   Hearing re: UNCONTESTED -- Motion Pursuant to Federal Rule

2   of Bankruptcy Procedure 9019 for Entry of an Order Approving

3   Settlement Agreement Between the LBI Trustee and Lehman Re

4   Ltd. [LBI ECF No. 11331]

5

6   Hearing re: UNCONTESTED -- Trustee's Motion for an Order

7   Authorizing the Abandonment of Certain Securities [LBI ECF

8   No. 11314]

9

10   Hearing re: CONTESTED -- Motion of the Plan Administrator in

11   Aid of Execution of the Plan to Establish a Bar Date for

12   Demands for Postpetition Interest Against Lehman Brothers

13   OTC Derivatives Inc. and Lehman Brothers Commercial

14   Corporation [ECF No. 48487]

15

16   Hearing re: CONTESTED -- Trustee's Two Hundred Thirty-Third

17   Omnibus Objection to General Creditor Claims (No Liability

18   Claims) [LBI ECF No. 8858]

19

20   Hearing re: CONTESTED -- Trustee's Two Hundred Sixty-Fourth

21   Omnibus Objection to No Liability Claims [LBI ECF No. 9736]

22

23   Hearing re: Doc 162 Motion of the Joint Provisional Liquidators

24   of Lehman Re LTD for Authorization and approval of the

25   Settlement between Lehman re Ltd and Lehman Brothers Inc.

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for Lehman Brothers Holdings Inc. and Certain

 5         of Its Affiliates

 6         767 Fifth Avenue

 7         New York, New York 10153

 8    BY:  GARRETT A. FAIL

 9         RALPH MILLER

10

11    HUGHES HUBBARD & REED LLP

12         Attorneys for James W. Giddens, Trustee for the SIPA

13         Liquidation of Lehman Brothers Inc.

14         One Battery Park Plaza

15         New York, New York 10004

16    BY:  MEAGHAN C. GRAGG

17         MICHAEL E. SALZMAN

18         RAMSEY CHAMIE

19         JEFFREY S. MARGOLIN

20         JAMES C. FITZPATRICK

21

22    CLEARY GOTTLIEB STEEN & HAMILTON LLP

23         Attorneys for Goldman, Sachs & Co., Silver Point

24         One Liberty Plaza

25         New York, New York 10006-1470
```

Page 4

```
 1    BY:  SEAN A. O'NEAL

 2         CARMINE D. BOCCUZZI, JR.

 3

 4    WILMER CUDER PICKERING HALE AND DORR LLP

 5         Attorneys for Värde Investment Partners LLP

 6         7 World Trade Center,

 7         250 Greenwich Street

 8         New York, New York 10007

 9    BY:  PHILIP ANKER

10

11    MORGAN, LEWIS & BOCKIUS LLP

12         Attorneys for Deutsche Bank

13         399 Park Avenue

14         New York, New York 10022-4689

15    BY:  JOSHUA DORCHAK

16

17    CADWALADER, WICKERSHAM & TAFT LLP

18         Attorney for Lehman Re Ltd.

19         One World Financial Center

20         New York, NY  10281

21    BY:  DAVID E. KRONENBERG

22         INGRID BAGBY

23

24    ALSO PRESENT TELEPHONICALLY:

25    RYAN DATTILO
```

Page 5

1    GABRIEL GLAZER

2    SCOTT HARTMAN

3    RAJ V. IYER

4    JASON B. SANJANA

5    MITCHELL SOCKETT

6    MICHAEIL ZEKYRGIAS

7    BENJAMIN WOLF

8    MICHAEL G. LINN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2              JUDGE CHAPMAN:  How is everyone today?

3              MAN: Very well, thank you.

4              JUDGE CHAPMAN: Okay, I'm ready when you are.

5              MS. GRAGG: Good morning, Your Honor.

6              JUDGE CHAPMAN: Good morning.

7              MS. GRAGG: Meaghan Gragg of Hughes Hubbard & Reed

8       for the SIPA Trustee. I just wanted to give a brief update

9       on distributions before we got started today.

10             JUDGE CHAPMAN: Sure.

11             MS. GRAGG: I'm happy to report that, as of

12      yesterday, we distributed 95 percent, $2 billion of the $2.2

13      billion fund is now in the hand of Creditors, and we'll

14      continue to distribute as Creditors submit their tax related

15      paperwork. We're also continuing our efforts towards the

16      unwind of the--the wind-down of the estate. Since the last

17      hearing before Your Honor, we found our realization report,

18      which is of great interest to our regulators and Creditors.

19      Unless Your Honor has any questions I'll turn it over to

20      Michael Salzman--

21             JUDGE CHAPMAN: No, I would just--I would just

22      share with you that last week, I had the privilege of guest-

23      teaching at Judge Peck's class, which he teaches at the NYU

24      Stern School, an interesting experience for the students to

25      have, the first and the second Lehman Judge in the same

Page 7

1    room, and I shared with Judge Peck the recent news regarding

2    distributions, and the general progress of these cases and,

3    suffice to say, it was very gratifying to him.

4              MS. GRAGG: Thank you, Your Honor. That's wonderful

5    news to hear. So--

6              JUDGE CHAPMAN: I'm ready.

7              MS. GRAGG: Okay, so we have four matters on the

8    LBI calendar today. The first two are the Lehman

9    resettlement, and the securities abandonment motion--

10             JUDGE CHAPMAN: Sure.

11             MS. GRAGG: --and then an LBHI matter will be

12   heard, and then we have two claims matters following that.

13             JUDGE CHAPMAN: All right, very good. Good morning.

14             MR. SALZMAN: Good morning, Your Honor. I'm Michael

15   Salzman and I, too, represent the SIPA Trustee in the LBI

16   Bankruptcy, and I'm here to present for the Trustee on the

17   motion to approve the Trustee's settlement with the

18   liquidators of Lehman Re Ltd.

19             JUDGE CHAPMAN: Okay.

20             MR. SALZMAN: This is the last substantial Lehman

21   affiliate claim in this liquidation, and so, to that extent,

22   it's a milestone in the case. I'm pleased to report that.

23   Lehman Re has its own motion pending today that's scheduled

24   for hearing to approve the same exact settlement in its

25   Chapter 15 case, and my understanding is that they will

Page 8

1    present after I'm complete--

2              JUDGE CHAPMAN: Okay.

3              MR. SALZMAN: --so that the two companion motions

4    come one after the other. This present settlement has

5    already received approval in the Supreme Court of Bermuda on

6    the Lehman Re side, where Lehman Re has its main proceeding.

7    As noted, Lehman Re, if, likely, Lehman Brothers, Inc. who

8    is an affiliate and a member of the Lehman Group, and

9    there's no opposition to this motion--

10             JUDGE CHAPMAN: Okay.

11             MR. SALZMAN: I offered due notice. The motion

12   provides--the settlement provides that Lehman Re will

13   receive a non-priority general unsecured claim for $125,

14   231,023. First, let me say that I can report that our

15   negotiations with Lehman Re, in my view at least, represent

16   a model of international cooperation in bankruptcy. There

17   was cooperation and civility throughout Lehman Re and its

18   professionals, which included Pricewaterhouse Coopers

19   Bermuda, the Ken (indiscernible) law firm, they used Black

20   Rock as a valuation expert on their side, we, in additional

21   to Hughes Hubbard employed Miller Buckfire and Deloitte to

22   help us. There was cooperation, there was arm's length

23   bargaining, but at the end of the day, the negotiation

24   really became a fact-based analysis and so we were able to

25   arrive at a number that was fair and equitable to both

Page 9

1    sides.

2           Lehman Re's claim had two components. One was an

3    inter-company balance and the other involved a repurchase

4    agreement with respect to 25 securities. The inter-company

5    balance was never hotly contested as to what the amount was.

6    The books and records agreed, and that's the $5 million and

7    odd change portion of the settlement.

8           JUDGE CHAPMAN: Right.

9           MR. SALZMAN: The repo claim, arose because LBI was

10   due to return 25 securities with a repurchase price of more

11   than $273 million dollars. LBI defaulted by virtue of its

12   going into liquidation, and these securities were structured

13   debt mortgage-backed securities. Lehman Re originally made a

14   claim for almost $190 million dollars with a respected

15   difference between the repurchased price that they were

16   supposed to receive and what they asserted the value was.

17   The challenge in our negotiation was to value them. It was

18   an unsettled market. They relevant date would have been

19   September 19, 2008, when LBI went into bankruptcy. That was

20   the default date, and so, there was a challenge to figure

21   out how to value the securities at that point.

22          There was, as I said before, arm's length

23   bargaining, each side used its own professionals, there was

24   some argument and analysis using transaction data for

25   comparable transactions, extrapolations from transactions

1    involving later dates, and back and forth with presentations

2    from experts as to how these valuations could be done, and

3    at the end of the day, we arrived at a compromise, such that

4    the original a hundred and approximately eighty-five million

5    dollars attributed to the claim by Lehman Re was reduced to

6    $120 million dollars, and that's the basis for the

7    settlement.

8            The iridium factors call for approval of this

9    motion I submit. There's no reason to believe that a better

10   outcome could be achieved by litigation. We've already had,

11   in effect, a battle of the experts and got the benefit of

12   the opinions and analysis from all of them. Delay is not in

13   the interest of anyone here, and so--

14           JUDGE CHAPMAN: Did you mention--I might have

15   missed it, the Center Bridge claim and how that's connected?

16           MR. SALZMAN: Sure. I have not, and--

17           JUDGE CHAPMAN: Okay.

18           MR. SALZMAN: --I'm happy to do that. Center Bridge

19   is a Creditor of Lehman Re and its estate--

20           JUDGE CHAPMAN: Right.

21           MR. SALZMAN: --a principal one, and so--and it had

22   made a claim directly in our estate as well, involving some

23   of these securities and claims of--that potentially, someone

24   who had worked for Lehman Brothers Inc., or several people

25   might have been responsible for acting negligently or

1  improperly and in, with respect to some of these same

2  securities, and Center Bridge had purchased that claim. One

3  of the considerations in settling this is that Center

4  Bridge--it's a condition of this settlement that Center

5  Bridge will also release that claim, and we expect that to

6  happen shortly.

7          I should say that, while that's part of this, the

8  real analysis came down to what were these securities worth,

9  and--

10         JUDGE CHAPMAN: Okay.

11         MR. SALZMAN: --and that's the primary basis for

12  the settlement.

13         JUDGE CHAPMAN: All right. All right. Why don't I

14  ask if anyone else wishes to be heard with respect to the

15  motion pursuant to rule 9019 for entry of an order approving

16  the settlement agreement between the LBI Trustee and Lehman

17  Re Ltd.? All right, that being said, I'm convinced that each

18  of the iridium factors weighs in favor of approval of the

19  settlement agreement, which is very obviously the product of

20  extensive, thoughtful negotiations. The settlement is fair,

21  equitable and in the best interests of the estates of each

22  of the LBI and Lehman Re and I will enter an order of

23  agreement.

24         MR. SALZMAN: Thank you, Your Honor.

25         JUDGE CHAPMAN: All right? Thank you. All right, so

Page 12

1    we'll move next to the abandonment motion.

2             MR. SALZMAN: I'm sorry, Your Honor, just for

3    clarification--

4             JUDGE CHAPMAN: Yes.

5             MR. SALZMAN: --the lawyers for Lehman Re are here

6    and want to make the motion in their case--

7             JUDGE CHAPMAN: Very good.

8             MR. SALZMAN: --so they can be heard next.

9             JUDGE CHAPMAN: Sure.

10            MR. SALZMAN: Okay.

11            JUDGE CHAPMAN: I was trying to be too efficient.

12            MR. KRONENBERG: Good morning, Your Honor.

13            THE COURT: Good morning.

14            MR. KRONENBERG: David Kronenberg of Calwalader,

15   Wickersham & Taft on behalf of the Joint Provisional

16   Liquidators of Lehman Re Limited. As noted by Mr. Salzman

17   Lehman Re is filed a parallel motion in its Chapter 15

18   proceeding for this Court's approval of the settlement. We

19   would note that Lehman Re has not received any objections to

20   its motion. Also as noted by Mr. Salzman the settlement has

21   already been approved by the Supreme Court of Bermuda in

22   which Lehman Re's (indiscernible) is pending. And the

23   Bermuda approval order is Exhibit 2 of the declaration of

24   Allison Tume in support of the motion. Miss Tume who is in

25   the courtroom today--she's sitting over there--is a director

Page 13

1    of PriceWaterhouseCoopers and is one of the principle PWC

2    employees responsible for Lehman Re's liquidation. She has

3    been involved in Lehman Re's liquidation since 2011 and led

4    the negotiation's with LBI that culminated in the settlement

5    agreement. The settlement comprehensively resolves all

6    disputes between the parties, and as Mr. Salzman mentioned

7    it resolves two main issues. The intercompany claim and the

8    repo claim.

9           The intercompany claim was based on the Lehman

10   global close which we viewed as authoritative, and the bulk

11   of the negotiations was around the repo claim. And as Mr.

12   Salzman mentioned determining the value of these securities

13   was difficult because they included collateralized data

14   obligations, commercial mortgage bank securities and various

15   other types of asset-backed securities that are often not

16   traded in a liquid market. And often included slices of

17   dozens or even hundreds of other types of securities of

18   varying complexity. The parties began discussions in August

19   of 2013 and over a six month period from July 2014 to

20   January 2015 the parties engaged in extensive negotiations.

21   And as Mr. Salzman mentioned we retain Black Rock Financial

22   Management. It's just us and they retained (indiscernible).

23   And over time as more information was exchanged and

24   evaluation work by these firms was analyzed, the parties'

25   positions narrowed and it became clear that litigation on

Page 14

1      the remaining issues would really be expensive, protracted

2      and uncertain. So the parties decided to compromise and the

3      claim together is worth $125,231,023. And as you mentioned

4      before as part of this compromise center bridge, as part of

5      a global solution, agreed to withdraw its claim. They have

6      agreed to do that after they get court approval here and at

7      that point the agreement will become effective.

8              The compromise here really exemplified the best of

9      the bankruptcy process. Through opening regular

10     communication the parties representatives analyzed all

11     factions of legal issues and reached a resolution that's

12     fair to everybody. And Ms. Tume updated Lehman Re

13     (indiscernible) liquidators throughout the settlement

14     process and their decisions ultimately enter into the

15     settlement was fully informed, represents an appropriate

16     exercise of their duties under Bermuda law, a sound exercise

17     of the business judgment and is the best interests of Lehman

18     Re's creditors. The settlement if approved will also enable

19     Lehman Re to conclude its liquidation in a timely manner. So

20     (indiscernible) respectfully request for the motion to be

21     approved.

22             THE COURT: All right, so Miss Tume's declaration

23     is part of the record. Let me ask if anybody wishes to cross

24     examine Miss Tume? All right. Does anyone wish to be heard

25     with respect to the settlement of the approval of the

1    settlement agreement between the LBI Trustee and Lehman Re

2    in the Lehman Re case? All right then for the sake of the

3    record let me repeat what I said about seven minutes ago

4    which is that I believe that each of the iridium factors has

5    been satisfied and weighs in favor of approval of the

6    settlement which is obviously the product of extensive and

7    thoughtful negotiations. The settlement is fair and

8    equitable and in the best interests of the estate of Lehman

9    Re as well as LBI and I will approve it.

10           MR. KRONENBERG: Thank you Your Honor.

11           THE COURT: All right? Thank you very much.

12    MR. CHAMIE: Good morning, Your Honor. Ramsey Chamie of

13    Hughes Hubbard & Reed on behalf of the SIPA Trustee here to

14    present the Trustee's motion for an order authorizing the

15    abandonment of certain securities. This is another step in

16    our efforts to wind up and close the estate. We recognize

17    that abandoning securities is extraordinary relief and in

18    that regard extraordinary steps have been taken to that all

19    the securities maximize value for the estate's creditors.

20           The declarants are here today. The motion is

21    unopposed, (indiscernible) in the estate's largest creditor,

22    LBHI support the motion. Additionally, the Ad hoc group of

23    LBI creditors has filed a statement in support of the

24    motion. And professionals for both LBHI and the Ad hoc group

25    have also met at the securities and have been kept informed

Page 16

1    throughout this process. Your Honor, this liquidation began

2    with more than 100,000 unique securities help for LBI and

3    its customers. We are now down to the last several hundred.

4    Over the course of the liquidation as the Court is aware the

5    Trustee has distributed $106 billion dollars of value to

6    customers and more than $5.9 billion dollars in case to

7    creditors. To generate the necessary cash for distributions

8    with the supervision of (indiscernible) the Trustee

9    implemented a strategy to liquidate all securities that were

10   not set aside for customers. In 2003 the Trustee retained

11   Black Rock Financial Management, Inc. which raise over $7

12   billion dollars for the estate through security sales. Soon

13   thereafter, the Trustee retained the investment bank Miller

14   Buckfire to sell approximately 3,200 remaining liquid

15   securities through transparent and public auctions as well

16   as at market sales.

17          In total, Miller Buckfire liquidated more than

18   2,800 securities, raising $437 million dollars for the LBI

19   estate. The 314 securities at issue, consist of non-

20   transferrable securities, which are registered to LBI, but

21   cannot be traded due to transfer restrictions. In many

22   cases, the issuing company no longer exists, and there is no

23   transfer agent. The same goes for the customer name

24   securities, which are physical certificates registered in

25   customer name as defined by SIPA. No one has requested these

Page 17

1    certificates, nor can the Trustee sell them.

2          Abandoning these valueless securities will reduce-

3    -

4          JUDGE CHAPMAN: So, let me ask you to stop there

5    and, and--

6          MR. CHAMIE: Sure.

7          JUDGE CHAPMAN: --and tell me again how those folks

8    have been noticed and what efforts have been done to attempt

9    to get them to come in and claim their securities.

10         MR. CHAMIE: Well, at the outset of the

11   liquidation, pursuant to SIPA, when we had customer name

12   securities and anyone requested them, we would return them.

13   That's separate from the claim process. In addition, the

14   Trustee sent out over 900,000 claim packets to customers and

15   former customers who could file claims to request

16   securities. We've gone through that process. In addition, if

17   we had any customer name security where there was an address

18   listed on the security--

19         JUDGE CHAPMAN: Right, right.

20         MR. CHAMIE: --we would mail to that address. In

21   some cases, the securities came back to us. Many of the

22   customer name securities, I would say the vast majority,

23   are--were issued by companies that are now no longer in

24   existence, and the securities have been de-listed. My

25   understanding is that, in my cases, these are decades old

1   securities that customers may have actually abandoned with

2   Lehman Brothers, back in the 60s and 70s, and they've just

3   been staying in Lehman's vault since then.

4           JUDGE CHAPMAN: So, has there been some kind of

5   publication notice that--along the lines of, you know,

6   unclaimed distributions, abandoned property. Not trying to

7   make it more difficult--

8           MR. CHAMIE: Mm hmm.

9           JUDGE CHAPMAN: --but I've seen in this case, folks

10  show up very, very late in the game and then say, you know,

11  they didn't know and had they known, so I just want to be

12  satisfied that--I'm not suggesting that you haven't, but

13  that every effort has been made to put these folks on notice

14  that you have these pieces of paper that have their name on

15  them.

16          MR. CHAMIE: Right. That's one of the primary

17  purposes of this motion. We feel through the claim process,

18  as well as just efforts to return customer name securities,

19  we've made every reasonable effort to return to them. At

20  this point, we're confident that there's such little value

21  in these securities that any further effort would outweigh

22  the cost that that effort would entail, would exceed,

23  actually, the value of the securities.

24          JUDGE CHAPMAN: So, with respect to the ones that,

25  as you said, are pieces of paper in the Lehman vault, what's

Page 19

1   going to happen to them?

2         MR. CHAMIE: We'll go through our custodian, which

3   is Bank of New York. They have procedures in place for

4   taking them, essentially, off the Trustee's books, which

5   will allow us to take them off our books and simplify our

6   remaining estate to reduce it to cash.

7         JUDGE CHAPMAN: Okay, and then if somebody turns

8   up, then what happens?

9         MR. CHAMIE: If someone did show up, the SEC, I

10  understand, has a process for lost and stolen securities

11  that they could avail themselves to, if that were the case.

12        JUDGE CHAPMAN: So they would have recourse and be

13  able to go through that process and obtain whatever value or

14  interest may be--may have been represented by those

15  securities?

16        MR. CHAMIE: Correct.

17        JUDGE CHAPMAN: Okay.

18        MR. CHAMIE: Um--

19        JUDGE CHAPMAN: I interrupted you, I'm sorry.

20        MR. CHAMIE: Oh. [LAUGHS] Well, abandoning the

21  securities for the reasons we just said would reduce the

22  administrative costs and we believe is an important step in

23  bringing the estate to a close, and for that reason, we seek

24  the Court's permission to abandon them--

25        JUDGE CHAPMAN: Okay.

Page 20

1          MR. CHAMIE: --as set forth in the proposed order.

2          JUDGE CHAPMAN: All right. Does anyone else wish to

3     be heard with respect to the Trustee's motion for an order

4     authorizing the abandonment of the securities described? All

5     right, thank you very much for answering my questions. Go on

6     to the order.

7          MR. CHAMIE: Thank you, Your Honor.

8          JUDGE CHAPMAN: Thank you.

9          MR. CHAMIE: I believe we'll turn the proceeding

10    over to LBHI at this time.

11         JUDGE CHAPMAN: Yes, please do.

12         MR. CHAMIE: Thank you.

13         JUDGE CHAPMAN: Thank you. Good morning, Mr.

14    Miller.

15         MR. MILLER: Good morning, Your Honor. I'm Ralph

16    Miller from Weil, Gotshal & Manges here for the plan

17    administrator, Lehman Brothers Holdings, Inc., also called

18    LBHI. May it please the Court, this agenda item is the plan

19    administrator's motion in aid of execution of a plan to

20    establish a bar date for demands for post-petition interest

21    against Lehman Brothers OTC Derivatives, Inc., which I will

22    call LOTC or L-O-T-C, and Lehman Brothers Commercial

23    Corporation, which I will call LBCC. As the Court knows, the

24    estates of LOTC an LBCC are solvent, and the payment of

25    post-petition interest has already generated some litigation

Page 21

1    in the form of an adversary proceeding, which was the

2    subject of a pre-trial conference. What'd I'd like--

3              JUDGE CHAPMAN: That's referring to Bania Brothers?

4              MR. MILLER: Yes, Your Honor, and sometimes called

5    Baupost because it's really the Baupost Group.

6              JUDGE CHAPMAN: Right.

7              MR. MILLER: What I'd like to do briefly, Your

8    Honor, is first, to outline the status of the pending

9    motion, second to explain why the plan administrator

10   believes the information required to be submitted by this

11   motion is appropriate and consistent with past practice, and

12   would contribute to orderly administration of the plan as a

13   whole, and finally, deal briefly with the so-called limited

14   objections to the motion, then the objectors will argue, and

15   I may have a response.

16             With regard to current status, I want to note for

17   the record that the original Plaintiffs in the adversary

18   proceeding I just mentioned were Bania Brothers, LLC,

19   Baupost Group Securities, LLC, and Wooderson and Partners,

20   LLC, which were collectively called the Baupost Group. The

21   Court will recall the plan administrator to file a motion to

22   dismiss, with regard to that adversary proceeding, and while

23   it was pending, the three Plaintiffs in the Baupost Group

24   filed an objection to this bar date motion, which has come

25   to be called the Baupost objection.

Page 22

1          However, it was joined then by Bank of America

2     Credit Products and two affiliated Merrill Lynch entities.

3     It was also joined by Värde Investment Partners, LP and

4     Deutsche Bank Securities. As the Court knows, a resolution

5     was later reached between the Baupost Group, the plan

6     administrator and that included dismissal of the adversary

7     proceeding and withdrawal of the original objection filed by

8     the Baupost Group, but the Baupost objection lives on

9     because of the joinders, Your Honor. So, when I talk about

10    the Baupost objection, I'm really talking about the

11    objection that is now being presented by Bank of America

12    Credit Products and its affiliates, Värde Investment

13    Partners and Deutsche Bank Securities.

14          A little confusing, but I think we need to be

15    clear on the record about that.

16          JUDGE CHAPMAN: Sure.

17          MR. MILLER: The second objection was filed by SPCP

18    Group, LLC, as agent for two funds that start with the name

19    Silver Point. The SPCP Group identifies itself in the

20    objection as Silver Point, and so for convenience, I'd like

21    to call that the Silver Point objection.

22          JUDGE CHAPMAN: Okay.

23          MR. MILLER: A key point, Your Honor, is that there

24    are a total of four groups that are objecting, Bank of

25    America, including Merrill Lynch, Bar day, Deutsche Bank and

Page 23

1   Silver Point, on behalf of seven separate entities, but the

2   plan administrator estimates that there are 270 other

3   entities with potential claim for post-petition interest

4   against LOTC or LBCC, who did not object and did not join

5   either of these objections. So it's important to understand

6   that more than 97 percent of the parties who would be

7   subject to this bar date motion, and the disclosures in it,

8   have not asserted any objection to the motion before the

9   Court, and have not requested any changes in the order.

10          Now, let me talk briefly about the relief that is

11   being requested. There is no objection, by the way, to the

12   establishment of a bar date.

13          JUDGE CHAPMAN: Right.

14          MR. MILLER: The only two objections are to

15   information to be submitted with the claim for a post-

16   petition interest, and there's also actually kind of an

17   interesting add-on for affirmative relief that I'll talk

18   about separately. As I will explain--

19          JUDGE CHAPMAN: Are you talking about the timeline?

20          MR. MILLER: No, actually, Your Honor, that motion

21   is not, I think, before the Court. I'm talking about these

22   requests for special access to information from the plan

23   administrator about inter-company, inter-Debtor claims,

24   which is--

25          JUDGE CHAPMAN: Okay.

Page 24

1           MR. MILLER: --which I would consider bolt-on and

2      we believe is not appropriate for the Court--

3           JUDGE CHAPMAN: Okay.

4           MR. MILLER: --to hear today. But turning to the

5      basic bar date issue, the plan administrator is seeking

6      something that's really a subset of the initial disclosure

7      that Federal Rule 26 requires any civil litigant seeking

8      damage in a routine case in Federal Court to provide. As set

9      out in the paragraph in the proposed order on the bottom of

10     the second page, the plan administrator seeks four things,

11     two of which are really administrative. First, it seeks the

12     amount of interest being sought in US dollars, just a

13     number. Second, it seeks, quote, "The calculation of such

14     amount and the source or any rates used in the calculation,"

15     closed quote. And third, an upload of any documentation in

16     support. The first thing is just logistical contact

17     information.

18           Now, if you compare that with the initial

19     disclosure provision in Rule 26A(3), which is required for

20     every civil litigant, it's very similar. It's, quote, "A

21     computation of each category of damages claimed by the

22     disclosing party, who must also make available for

23     inspection and copying, as under Rule 34, the documents or

24     other evidentiary matter, unless privileged or protected

25     from disclosure, on which each computation is based,

1    including materials bearing on the nature and extent of

2    injuries suffered," close quote.

3            The proposal for submission of this information,

4    we believe, is not burdensome and it's not unusual. We're

5    just asking them to provide--

6            JUDGE CHAPMAN: But you could ask for it, without

7    the citation to the Federal Rules, couldn't you?

8            MR. MILLER: Of course, Your Honor. I'm just saying

9    that they're now going to argue to you, Your Honor, that

10   this is drastic and burdensome, and that they should not be

11   required to provide it, and all I'm saying, Your Honor, is,

12   this is what basically every civil litigant has to provide,

13   and I'm going to explain why.

14           JUDGE CHAPMAN: And what I'm saying is that, even

15   without citation to that--

16           MR. MILLER: Of course. Of course.

17           JUDGE CHAPMAN: --just within the context of this

18   case and what's gone before, and what is necessary for the

19   plan administrator to do its job--

20           MR. MILLER: Absolutely, Your Honor, Sections

21   105(a) and 142 of the Bankruptcy Code, and Section 14.13 of

22   the Plan, authorize this Court to do this, and this is a

23   simplified variant of requirements that Judge Peck

24   established with regard to derivatives claims, the so-called

25   derivatives questionnaires, and Paragraph 15 of the motion

1    contains citations to a number of bankruptcy cases with a

2    similar requirements have been--

3             JUDGE CHAPMAN: Just so I understand, with respect

4    to the original--the big bar date, proofs of claim were

5    required to be filed on the--filed with the claims agent,

6    right?

7             MR. MILLER: Yes, Your Honor.

8             JUDGE CHAPMAN: But not--but the derivatives

9    questionnaires were not?

10            MR. MILLER: That's correct, Your Honor.

11            JUDGE CHAPMAN: Okay.

12            MR. MILLER: The derivatives--and these--the

13   additional information here is really analogous to the

14   derivatives questionnaires, just--but it's--they're actually

15   much more limited.

16            JUDGE CHAPMAN: But it's much, much more limited,

17   correct?

18            MR. MILLER: Much more limited than the derivatives

19   questionnaires.

20            JUDGE CHAPMAN: Mr. Fail wants to say something.

21            MR. FAIL: Your Honor, can I just clarify for the

22   record, they were filed on a website that was hosted, I

23   believe, by the claims agent and the same mechanism and the

24   same website would be used for the proposed bar date here.

25            JUDGE CHAPMAN: For the Proofs of Claim, but not

Page 27

1     the derivatives questionnaires.

2              MR. FAIL: The derivatives questionnaires were

3     uploaded electronically, but they were not accessible on the

4     public website where they claims docket is available.

5              JUDGE CHAPMAN: Okay. Thank you.

6              MR. MILLER: And the same would be true here of

7     this--this upload information, Your Honor.

8              JUDGE CHAPMAN: Okay. Okay.

9              MR. MILLER: Now, I want to turn for a minute to

10    the objections. There's a central theme for both objections,

11    and that is, that a routine derivatives transaction would

12    not normally require this information for demand for default

13    interest, but of course, the routine claim for default

14    interest in a derivatives contract is not in the context of

15    implementing bankruptcy plan, and it doesn't deal, as almost

16    all of these claims do, with assignments that occurred after

17    the Payor was in Chapter 11. So, for example, the standard

18    ISDA agreement does not contemplate it to the possibility of

19    the automatic stay, has an impact on an assignment, which is

20    an issue that the plan administrator has to deal with, nor

21    consider the possibility that there may be a release, which

22    impacts the outcome, and that's one of the things that has

23    to be considered.

24              And, these are all factors that the plan

25    administrator must consider as it deals with competing

Page 28

1    Creditor interest in multiple liquidating estates. The plan

2    administrator must focus not only on a contractual

3    interpretation of Creditor rights, but also on outcomes

4    where Creditor recoveries reflect a fair approximation of

5    losses. And we believe that, for those reasons, the

6    citations to the Finance One case, which are going to be a

7    central part of the objection, we believe, are really not

8    applicable. Finance One was not a bankruptcy case.

9    Ironically, it involved another Lehman Debtor, Lehman

10   Brothers Special Financing. Outside the bankruptcy context,

11   the District Judge in that case listed, quote, "Bad faith,

12   broad, gross negligence, or contravention of public policy,"

13   close quote, as factors that might be used to attack a

14   certification of cost of funds.

15           I would suggest, for example, violating the

16   automatic stay might be an issue of public policy, Your

17   Honor. An English Court that recently considered the same

18   language, Sal Oppenheim case, which is cited, has also held

19   that a certification under and ISDA agreement maybe

20   attacked, quote, "if there is no evidence to support it,"

21   close quote. I should note that in the Finance One case, the

22   party who was seeking to rely on its certificate also

23   supported it with evidence. It produced a number of actual

24   loan agreements. So, I can provide a series of other

25   distinctions, if necessary, Your Honor, but I think that the

Page 29

1   point here is that Finance One is not dealing with a

2   bankruptcy context.

3           I would also point out that, on this central

4   objection that's based on the ISDA agreement, the objectors

5   are trying to cut off an information flow from 270 other

6   parties, because they say they don't want to provide this

7   information themselves. That's not an appropriate

8   (indiscernible).

9           JUDGE CHAPMAN: Well, let me--let me try to--I

10  mean, there are very--a lot of aspects of this that are very

11  interesting, but can I understand--can you describe the pool

12  of funds from which these claims are going to be paid? It's

13  not limitless, right?

14          MR. MILLER: No, it's not limitless, Your Honor,

15  and you put your finger on a key point. There may or may not

16  be enough money in these two estates to pay all post-

17  petition interest claims. There are also either--

18          JUDGE CHAPMAN: Which, just for clarity's sake,

19  because one of the Objectors did raise this point, the

20  filing of the claim, or the institution of the bar date, is

21  not--is or is not intended by the plan administrator to cut

22  off the accrual of post-petition interest?

23          MR. MILLER: I don't think that issue has been

24  addressed at all in the bar date motion, Your Honor. I don't

25  think there's anything that says it's going to deal with

1   accrual of interest at all. So, I--

2           JUDGE CHAPMAN: Well, my--one of the Objectors

3   makes the point that they are entitled to post-petition

4   interest until they're paid their post-petition interest.

5           MR. MILLER: They argued that, yes, Your Honor.

6           JUDGE CHAPMAN: Pardon me?

7           MR. MILLER: They do argue that, yes, Your Honor.

8           JUDGE CHAPMAN: Okay.

9           MR. MILLER: I don't--I don't think that issue is

10  before the Court today one way or anoth--

11          JUDGE CHAPMAN: One way or--

12          MR. MILLER: One way or the other.

13          JUDGE CHAPMAN: One way or the other.

14          MR. MILLER: I mean--

15          JUDGE CHAPMAN: One way or the other, so the entry,

16  assuming every--assuming I get past all the other

17  objections, the entry of the bar date order in and of itself

18  is not going to cut off anyone's argument that they have a

19  right, until the moment before you actually give them the

20  money, that the interest clock is still ticking and that

21  they're entitled to that last penny. Right?

22          MR. MILLER: Right, Your Honor. I mean, I think

23  it's--it seems to clear to me at least, personally, and--and

24  I think I speak for the plan administrator on this that

25  nothing--nothing in this bar date order is going to change

1    the sufficiency hearing process, for example--

2              JUDGE CHAPMAN: Right.

3              MR. MILLER: --or the need for a specific

4    objection. If the parties submit their information, one of

5    the things that this will allow the plan administrator to do

6    is to group like issues together in omnibus objections, just

7    as we've done with others. So if there are a series of

8    claims that have a common objection, one of the things

9    that's possible is to bring the Court an objection with that

10   legal issue, and have a sufficiency hearing and you can

11   decide whether it's a legal issue, it's a factual issue or

12   what to do about it.

13             JUDGE CHAPMAN: Sure. Right.

14             MR. MILLER: And this is just--this is just the--

15             JUDGE CHAPMAN: It sounds like the old claims--it's

16   like a claims process.

17             MR. MILLER: It is a claims process.

18             JUDGE CHAPMAN: But it's also the case that, to the

19   extent that the relief that the Objectors seek were to be

20   granted, you wouldn't have visibility into what the 97 other

21   percent of the Claimants are putting before you, and

22   therefore, their claims could be exaggerated tenfold and

23   that would reduce the pro rata allocation that would be

24   available to everybody, including the Objectors.

25             MR. MILLER: Absolutely, Your Honor. I mean, with

Page 32

1    the--the plan administrator has successfully settled 65,000

2    other claims using a process that was essentially the one

3    that Judge Peck established, that it's moved very smoothly.

4    It has settled two large, very sophisticated parties with

5    post-petition interest claims already using the existing

6    process. What it's trying to do is to continue to be able to

7    settle claims, and I'm--when we have the Objectors, I'll

8    explain. I think after they argue, I think I can explain why

9    I think that the unusual disclosures they're seeking would

10   make settlement very difficult, but that's really a

11   different part of the discussion right now.

12          All that the bar date motion seeks is the parties

13   to basically state, what are they asking for? It may well be

14   that the parties are asking for a small amount enough that

15   this becomes a relatively easy equation to solve. It may

16   well be that they were collectively asking for a lot more.

17   We do know that this is a--

18          JUDGE CHAPMAN: But they could, hypothetically, be

19   collectively asking for a sum in which you don't--wouldn't

20   even get to the issue of the entitlement of affiliates, non-

21   Debtor affiliates, controlled affiliates, however they're

22   defined, as to what their entitlement might be.

23          MR. MILLER: Well, I suppose, Your Honor,

24   technically, what they're asking for is separate from what's

25   going to be allowed, but it's certainly possible that the

Page 33

1    ultimately allowed amounts for post-petition interest would

2    make that irrelevant, but it's also possible that it would

3    be relevant. And one of the things the plan administrator

4    has to consider, Your Honor, is that what we're dealing with

5    here is premium, over 100 percent payment. There are a lot--

6          JUDGE CHAPMAN: Oh, yeah. We're tal--we're--we have

7    a very class problem here.

8          MR. MILLER: Well, we do, Your Honor, and a lot of

9    other Debtors that the plan administrator is charged to--

10   it's charge under the plan is to maximize distributions on

11   allowed claims. That's the--that was what was voted on in

12   the plan.

13         JUDGE CHAPMAN: Right.

14         MR. MILLER: And that's the charge. There are a lot

15   of other Debtors where the Claimants are getting cents on

16   the dollar, but those are leaked through to this--these

17   claims and what the plan administrator has to deal with,

18   with inter-Debtor obligations--

19         JUDGE CHAPMAN: Sure.

20         MR. MILLER: --including derivatives transactions.

21   So there's a whole series of claims that interlock in a web

22   here. And the plan administrator has dealt with this before,

23   it's qualified to deal with it, and what these Claimants are

24   doing, Your Honor, which is not surprising, we don't blame

25   them, is they're trying to maximize their field position

Page 34

1    with regard to their own individual claims.

2            JUDGE CHAPMAN: Sure.

3            MR. MILLER: And that's fine, but that's not what

4    the plan administrator is doing.

5            JUDGE CHAPMAN: Right, but what you're--I think

6    what you're saying is that, to draw the parallel to the

7    large claims process, if we had done what they're seeking to

8    do here, it would have been an endless free-for-all--

9            MR. MILLER: Absolutely, Your Honor.

10           JUDGE CHAPMAN: --with respect to other Creditors

11   attacking their fellow Creditors' claims--

12           MR. MILLER: Absolutely.

13           JUDGE CHAPMAN: --because as you said, because it's

14   cents on the dollar, it's more acute because of the more the

15   allowed claim is of one's neighbor, the lower the

16   distribution will be for you. So it's the same but

17   different.

18           MR. MILLER: Yes, it is, Your Honor, and the

19   problem--it's not surprising in this very low interest rate

20   environment that these sophisticated traders from the street

21   are trying to maximize yield. We understand that, Your

22   Honor, and it would help them maximize yield if they knew

23   what everybody else was asking for and they had a group

24   negotiation. So they're asking for a negotiating advantage,

25   essentially, which nobody has ever had in this plan before,

Page 35

1   and which the plan doesn't call for, the law doesn't call

2   for, and which, we believe, is not in the public interest.

3              But that's essentially what's happening and again,

4   we don't blame them, but the plan administrator's job is not

5   to do that. Its job is to try to resolve these claims

6   fairly, and we believe that, if we try to resolve with 280

7   at one time, with everybody on the table and everybody

8   negotiating, it creates an endless circle problem, which

9   can't be solved. And we--so that's why this--the jumping

10  ahead to these proposals for disclosure that they have

11  added, what they really want is qualitatively different from

12  the bar date order. It really has very little to do with the

13  bar date order.

14             They're not saying the plan administrator needs to

15  upload to its own website the information about inter-

16  company claims. The plan administrator already knows that.

17  What they want is either, in the case of the Baupost

18  objection, public disclosure of all the rates that the plan

19  administrator is dealing with for the inter-company claims,

20  or interestingly, in the Silver Point objection, they want a

21  special access. If they sign a confidentiality agreement,

22  Silver Point wants to have access, so it'll have access that

23  people that don't sign the confidentiality agreement won't

24  have. That's never happened in this estate before. I'm not

25  sure it's happened in any estate, but it's a creative

1      proposal, but we think it's really quite unworkable.

2              And very interestingly, Your Honor, it was not

3      noticed to the parties--you can't really understand it

4      unless you really dissect the objections, so there are a lot

5      of other Debtors to this estate that are probably, the

6      collective estate, probably not aware of this request for

7      change. And we suggest simply, Your Honor, that this

8      disclosure mechanism that they're trying to graft onto an

9      objection, is not properly noticed. It would be a

10     fundamental change in plan administration, and the people

11     who voted on the plan didn't know about it.

12             JUDGE CHAPMAN: But to go back to something that

13     you said earlier, to focus on what is being asked for and

14     what is not being asked for, this is just a bar date motion.

15             MR. MILLER: Yes, Your Honor.

16             JUDGE CHAPMAN: It's just a bar date motion, so it

17     doesn't predict or preclude what might happen in the future,

18     as we've heard in many, many other cases in which, for

19     example, when we are trying to decide the appropriate

20     termination amount, where parties will argue, for want of a

21     better word, over, "Well, we want to see what Lehman did in

22     all of these other cases that we say are like that." That

23     might happen here, if you have a disagreement about a

24     demand, it may not, right?

25             MR. MILLER: Yes, Your Honor. Absolutely. I mean,

Page 37

1    this--this is not supplanting the normal plan process for

2    processing claims. All this does, Your Honor, is it--

3             JUDGE CHAPMAN: And what about--

4             MR. MILLER: --an administrative mechanism to

5    conveniently get these 280 claims into the system with

6    comparable, minimal information so they can be processed

7    together.

8             JUDGE CHAPMAN: And what about the suggestion, I

9    don't--I certainly didn't see an order, but there's a

10   suggestion that entry of this order will enable the plan

11   administrator to disallow a claim without further ado, based

12   on insufficient information provided.

13            MR. MILLER: Your Honor, this doesn't have anything

14   to do with the disallowance of a claim. As I understand it,

15   the plan administrator can--is going to have to go through

16   the normal procedures to process these claims. I mean, this

17   is--

18            JUDGE CHAPMAN: Like a sufficiency hearing--

19            MR. MILLER: A sufficiency hearing--

20            JUDGE CHAPMAN: --like saying, I see what you

21   submitted--

22            MR. MILLER: --it could do--

23            JUDGE CHAPMAN: --I have questions, please submit

24   something more.

25            MR. MILLER: It could do a reduce and allow, Your

Page 38

1    Honor, or the like, but the parties would have all the

2    rights they'd always have--

3              JUDGE CHAPMAN: Okay.

4              MR. MILLER: --under that mechanism and they'd have

5    the rights for a sufficiency hearing and it's--if the Court

6    decided in the sufficiency hearing that they were entitled

7    to go forward with discovery, they could go forward with

8    discovery. Whatever it is, it would be processed just like

9    any other claim, as I understand it. So--

10             JUDGE CHAPMAN: Is there a specific connector

11   between these claims and the pro--and the sufficiency

12   hearing process, or is that something that we would

13   specifically need to make clear in an order?

14             MR. MILLER: I don't think we need another

15   connector, Your Honor, do we? I mean--

16             JUDGE CHAPMAN: I just am not familiar enough with

17   the orders that are in existence that we file every day with

18   respect to sufficiency hearings and the like, so I would

19   just want to be able to make clear that the parties' rights

20   in that regard, so that there's no confusion. Mr. Fail?

21             MR. FAIL: Your Honor, the plan administrator

22   intends to prosecute and evaluate these claims consis--in--

23   with consistent orders, sufficiency hearing, prior to any

24   discovery, and any merits hearing. The ability to do

25   alternative dispute resolution to avoid burdening the Court

Page 39

1   and judicial administration and waste of resources if things

2   could be settled and resolved outside of the Court.

3           JUDGE CHAPMAN: Okay. All right. I'm sorry, Mr.

4   Miller, for interrupting you a lot.

5           MR. MILLER: Your Honor, I think I've basically

6   finished what we believe is sort of the opening here,

7   subject to responding to the objections. The mission of the

8   plan administrator is, quote, "To maximize distribution to

9   holders of allowed claims," close quote. That's in Section

10  6.1(b)3. That's what the plan administrator is trying to do

11  here, and it believes that this bar date and the minimal

12  information required, is the next logical step. We would ask

13  the Court to approve it and we would ask the Court to not

14  take up issues here that we believe are not properly before

15  the Court. I would note, by the way, Silver Point has filed

16  a motion for some affirmative relief, including a setting a

17  deadline and a timetable. They voluntarily took that motion

18  off the calendar today, it's not on the calendar. That

19  motion will still be there. We can come back to that at some

20  future date.

21          JUDGE CHAPMAN: Okay.

22          MR. MILLER: People could file other affirmative

23  motions if they want to, and notice them as affirmative

24  motions affecting plan administration, but we don't think

25  those issues were properly noticed or properly in the

Page 40

1     hearing today.

2               JUDGE CHAPMAN: All right. Thank you very much, Mr.

3     Miller.

4               MR. MILLER: Thank you, Your Honor.

5               JUDGE CHAPMAN: Good morning.

6               MR. O'NEAL: Good morning, Your Honor. Sean O' Neal

7     on behalf of Silver Point, Cleary Gottlieb.

8               JUDGE CHAPMAN: Okay.

9               MR. O'NEAL: Before I begin, I do want to say that

10    Silver Point supports the basic approach in the bar date

11    motion, and in fact, I think, as we noted in our papers, the

12    bar date motion was filed in large part in response to our

13    own motion seeking affirmative relief, and some of the

14    discussions we had been having.

15              JUDGE CHAPMAN: Well, I don't know that I'll agree

16    that it was in response to. It was filed after it, so--

17              MR. O'NEAL: Okay. And so, I think what I'd like to

18    focus on is--

19              JUDGE CHAPMAN: What's left of your objection--

20              MR. O'NEAL: Yeah, I think--

21              JUDGE CHAPMAN: --given what Mr. Miller has made

22    clear this morning?

23              MR. O'NEAL: I think the issues are substantially

24    more narrow than indicated even by Mr. Miller. We're not

25    going forward with the timetable request, that's--

Page 41

1              JUDGE CHAPMAN: Okay.

2              MR. O'NEAL: --a subject of a different motion. We

3    had sought a reservation of rights with respect to our

4    arguments that the only documents relevant to the post-

5    petition interest claims are the ISDA and the post-petition

6    interest certification, and also a reservation of rights

7    with respect to the accrual of post-petition interest after

8    the bar date. We were not seeking to adjudicate that--those

9    issues today. We were just saying that those issues are not

10   being resolved today through the bar date order.

11             JUDGE CHAPMAN: Right, so you're seeking to reserve

12   the substantive issue--

13             MR. O'NEAL: That's correct.

14             JUDGE CHAPMAN: --which is basically the cost of

15   funds issue. I mean, just to be very--

16             MR. O'NEAL: That's correct.

17             JUDGE CHAPMAN: --just to really distill it down to

18   what it is, that--right?

19             MR. O'NEAL: That's correct.

20             JUDGE CHAPMAN: And the issue that I discussed with

21   Mr. Miller, which is the--how long the accrual continues,

22   assuming an entitlement at a particular rate?

23             MR. O'NEAL: That is correct, Your Honor, and we

24   are not objecting to the actual requirements for the

25   questionnaire.

1              JUDGE CHAPMAN: Okay.

2              MR. O'NEAL: We're more than happy to supply that

3      information. In fact, we already have, so we're not

4      objecting to that. We simply sought a reservation of rights

5      on those issues.

6              JUDGE CHAPMAN: Okay. So, Mr. Miller, does that--

7      any of that give you a problem?

8              MR. MILLER: Your Honor, we don't believe any of

9      those substantive issues were being resolved by the

10     establishing of the bar date. It's not in the order. I mean,

11     it's--there--it's a little bit of seeing goblins behind

12     trees.

13             JUDGE CHAPMAN: I agree, and this is the

14     fascinating thing with the reservation of rights. You're

15     reserving things that really weren't at all implicated by

16     the order, so I'm not inclined to put that in an order. It's

17     on the record, nobody is disagreeing with it. You have those

18     rights and any order that's entered is not going to

19     contravene those rights, either with respect to the issue of

20     what, under the ISDA you need to show--

21             MR. O'NEAL: Right.

22             JUDGE CHAPMAN: --in whose hands the

23     assignor/assignee issue, or the continuing accrual of the

24     interest beyond the bar date.

25             MR. O'NEAL: Thank you, Your Honor. We are more

Page 43

1     than happy with that.

2              JUDGE CHAPMAN: All right?

3              MR. O'NEAL: So, that leaves us with the key issue

4     that we have, the one remaining issue, and I think it's--it

5     was not accurately described--

6              JUDGE CHAPMAN: Okay, this is the--

7              MR. O'NEAL: --so I--

8              JUDGE CHAPMAN: --this is the access via a

9     confidentiality--

10             MR. O'NEAL: Exactly, exactly, and so we--it's much

11    more narrow than as described on the record. What we have

12    asked is that Debtors and Debtor affiliates, just like other

13    Claimants, be required to file these questionnaires, and go

14    through the same process, and I'll tell you why. And in

15    addition, we have said, in our limited objection, that the

16    total aggregate amount of all post-petition interest claims,

17    should be disclosed publicly, just--not identifying, you

18    know, by claim or anything like that, but simply the total

19    aggregate amount, to give the Creditors some idea of the

20    total amount outstanding.

21             JUDGE CHAPMAN: Why?

22             MR. O'NEAL: Um--

23             JUDGE CHAPMAN: Why should this be different from

24    the way the claims process was conducted pre-petition? It's

25    the same relative math, if you will.

Page 44

1          MR. O'NEAL: Right, and I'll get into that, and a

2     lot of this has to do with, in this situation, the majority

3     of claims are Debtor and Debtor-controlled claims, and so we

4     do have a concern about--

5          JUDGE CHAPMAN: Okay, you--just to be clear, you're

6     saying that--but I don't know whether that's true or not--

7          MR. O'NEAL: That's--

8          JUDGE CHAPMAN: --nor do I know whether or not it

9     matters. In other words, tomorrow, or the day after the bar

10    date, after you file your documentation, Mr. Miller might

11    call you and say, "Good news. We agree with your number,

12    where do we send the check?" and then you're done, right?

13         MR. O'NEAL: I think--yes, Your Honor. The publicly

14    available information we have suggests that the aggregate

15    amount of allowed claims held by Debtors and Debtor-

16    affiliates is approximately $500 million. You know, it's a

17    little more or less, and then I think the Debtor's papers

18    have said the total amount of claims is approximately a

19    billion, against LOTC. So I think that's how we come to

20    that--the large--

21         JUDGE CHAPMAN: Okay.

22         MR. O'NEAL: --percentage of the claims against

23    LOTC are by Debtors and Debtor affiliates. And so our focus

24    here, particularly on the ability to review the Debtor and

25    Debtor-controlled affiliate claims is the fact that the plan

Page 45

1    administrator has an inherent divided loyalty here. It's not

2    a nefarious conspiracy by any measure, it's just that the

3    plan administrator has a fiduciary duty to maximize claims

4    of its own, and to maximize claims of the LBHI estate--

5            JUDGE CHAPMAN: But that's when the argument--this

6    is always fascinating to me because you say "of its own".

7    The plan administrator has an overarching duty to maximize

8    value for each and every and all Creditors. And--

9            MR. O'NEAL: That's good.

10           JUDGE CHAPMAN: --that's been happening for many,

11   many years and will continue to happen. There is nothing

12   different about this situation, other than the Claimants are

13   in the enviable position of getting monies, post-petition

14   interest, beyond the face amounts of their claim. So it's

15   the same thing, and in addition, as I discussed with Mr.

16   Miller, and I am listening to the numbers that you're giving

17   me--

18           MR. O'NEAL: Sure.

19           JUDGE CHAPMAN: --at this moment, there's no

20   record, there's nothing that suggests to me that the

21   consideration and allowance of your claim, Silver Point's

22   claims for post-petition interest, necessarily will be

23   impacted by the Debtor claims. This is a bar date motion, so

24   at some later point--

25           MR. O'NEAL: Right.

```
1              JUDGE CHAPMAN: --at some later point, if and when

2      that ever became an issue, we might have a conversation

3      about it. But there's--nothing is served right now by going

4      down the route that you're suggesting. In the first

5      instance, the plan administrator needs to understand what

6      all these claims are. Many of them have traded, some of them

7      have not, I don't know how many of the ones that aren't here

8      today have not traded, and then we will be able to figure

9      out whether this is something that's worth talking about.

10             MR. O'NEAL: And Your Honor, we do agree that the

11     first step is for the plan administrator to--

12             JUDGE CHAPMAN: Okay.

13             MR. O'NEAL: --understand all the claims--

14             JUDGE CHAPMAN: Right.

15             MR. O'NEAL: --and that's why we say that the

16     Debtors and the Debtor-controlled affiliates should also be

17     required to file the questionnaires, so that the plan

18     administrator has before it, the total quantum of post-

19     petition interest claims. So we're not--we're saying that,

20     exactly as you say, which is that the plan administrator

21     needs to have before him, the entire amount of the

22     outstanding claims, and that includes the Debtor and Debtor-

23     controlled claims, because in this situation particularly,

24     that it represents the majority or near-majority of the

25     outstanding--
```

Page 47

1            JUDGE CHAPMAN: You're putting the cart before the

2    horse, because after we go through this process, which

3    again, the timing of it, apropos of Silver Point's now

4    withdrawn--

5            MR. O'NEAL: Sure.

6            JUDGE CHAPMAN: --motion or adjourned motion, the

7    timing of it is not at issue today. We have to get started,

8    you have to walk before you can run. If, at a certain point,

9    there were to be a disposition, and the disposition includes

10   the words, "there's not enough money to go around because

11   the claims of the Debtor affiliates swamp, dwarf, et

12   cetera," then we can have a conversation around that. This

13   is, and always has been, always will be, a transparent

14   process. No doubt about it. But right now, it's a bar date

15   motion--

16           MR. O'NEAL: Right.

17           JUDGE CHAPMAN: --that's asking for third parties

18   to file the most basic, simple information so the plan

19   administrator can get started.

20           MR. O'NEAL: Yes.

21           JUDGE CHAPMAN: What happens next in step five,

22   six, seven, eight through ten, we'll get to when we get to

23   it.

24           MR. O'NEAL: Okay, and what we're saying is that

25   step one should include a requirement for the Debtors and

Page 48

1    Debtor-controlled affiliates to file a questionnaire.

2            JUDGE CHAPMAN: Okay, I hear you.

3            MR. O'NEAL: Yeah, and so--and really, what we're

4    think--what we believe here is that, you know, is like I

5    say, it's not nefarious. The plan administrator has

6    fiduciary duties to all the Creditors, and so we're trying

7    to add a little transparency to the process, and I think our

8    suggestion that the questionnaires be made available to LOTC

9    Creditors that sign confidentiality agreements, is only with

10   respect to the Debtor and Debtor-controlled affiliate

11   claims. We're not looking to seek--to see other claims,

12   claims of other third parties. The idea is we wanted to be

13   able to see the claims of the Debtors and the Debtor-

14   controlled parties as a measure of transparency, and as a

15   means to audit and kind of check the natural divided

16   loyalties that the plan administrator faces in this

17   situation.

18           JUDGE CHAPMAN: Okay, thank you.

19           MR. O'NEAL: Thank you.

20           JUDGE CHAPMAN: All right, Mr. Miller, if you're

21   keeping track of things, to respond to that would be one of

22   them, okay?

23           MR. MILLER: Thank you, Your Honor.

24           MR. ANKER: Good morning, Your Honor.

25           JUDGE CHAPMAN: Good morning, how are you?

Page 49

1                MR. ANKER: How are you? Philip Anker, for the

2      record--

3                JUDGE CHAPMAN: Good to see you, Mr. Anker.

4                MR. ANKER: --Wilmer Cutler Pickering Hale and

5      Dorr. I'm going to try to be very brief. I think--

6                JUDGE CHAPMAN: You always say that.

7                MR. ANKER: What?

8                JUDGE CHAPMAN: You always say that.

9                MR. ANKER: I always say that and I rarely, rarely

10     stick to my promise, but I will try today. Your Honor, our

11     issues are very concrete and they are narrow, and I think

12     the easiest way for me to walk you through them is, we have

13     a black line of the order, may I--and I actually have given

14     it already to the--

15               JUDGE CHAPMAN: Okay.

16               MR. ANKER: --Weil Gotshal but I'll be happy to

17     give it to them again.

18               JUDGE CHAPMAN: I don't have it yet, do I?

19               MR. ANKER: No, I'm going to hand it up to you

20     right now.

21               JUDGE CHAPMAN: Okay. (Indiscernible) May I

22     approach, Your Honor?

23               JUDGE CHAPMAN: Sure.

24               MR. ANKER: Your Honor, fundamentally, all we're

25     trying to do with our markup, with one exception, is to

Page 50

1   implement precisely what I understand the substantive

2   discussion to be today, so that there is no mischief. The

3   one substantive difference is, and it's reflected on page

4   two of the markup, yesterday--I'm sorry, it may have been

5   two days ago--the Debtors filed their reply and suggested a

6   new date for the bar date, which would be April 13, which is

7   literally a month from today. It seems to us, given the

8   delay, we want to get this done too, 60 days for a bar date

9   is actually pretty quick, and we would therefore propose

10  that the bar date be the middle of May rather than literally

11  30 days from now. That, I think, should not be a terribly

12  controversial proposition.

13          Unless Your Honor has questions, I'm going to move

14  on. We agree with you, we need to have a date and get claims

15  in, and then that is not the substance. That is the

16  beginning of a process, and what we were concerned about is

17  that the way the order was written, and on the black line,

18  Your Honor, this is on page 3, there was a decretal

19  paragraph that said, "Order that any non-Debtor, non-

20  controlled affiliate," we haven't changed that, "that does

21  not timely assert a demand for post-petition interest, as

22  set forth above, shall be deemed to have waived any right,"

23  and we have the following concrete concerns. Let us--

24          JUDGE CHAPMAN: So that's the--that's the question

25  I asked Mr. Miller.

Page 51

1              MR. ANKER: That's right, and--

2              JUDGE CHAPMAN: Right?

3              MR. ANKER: --and frankly, Your Honor, everything

4     we have thereafter simply implements that. It says--

5              JUDGE CHAPMAN: But you're skipping over the big

6     one, Mr. Anker.

7              MR. ANKER: The certification?

8              JUDGE CHAPMAN: Look--yes.

9              MR. ANKER: Your Honor, we're willing to provide a

10    calculation. I mean, let me tell you what--let me tell you

11    what we were--

12             JUDGE CHAPMAN: You're still skipping over the big

13    one. The source.

14             MR. ANKER: We're happy to provide the source, Your

15    Honor. Let me be clear on the concern. Let me try to be

16    very, very concrete, and I either would ask that we have an

17    order, which would be my preference, or representation on

18    the record. Take the issue of whose cost of funds matters. I

19    am representing a Transferee. Let us assume hypothetically

20    that I put in, or my client puts in, claims where it says it

21    is its cost of funds that matters. Mr. Miller says, "No,

22    it's not." Let's assume Your Honor adjudicates that no it's

23    not. It's the original Transferee.

24             JUDGE CHAPMAN: Sure.

25             MR. ANKER: What I want, then--

Page 52

1          JUDGE CHAPMAN: The original Transferor.

2          MR. ANKER: The original Transferor, my apology.

3          JUDGE CHAPMAN: Okay.

4          MR. ANKER: What I want, then, is the ability to

5     say, "Okay, now I'll submit the original Transferor's cost

6     of funds." I don't want the fact that, by May 13, if we go--

7     I'm sorry, May 15, that I haven't put in that information,

8     that's a gotcha, that there's some substantive effect of

9     this order that says, if the information initially is

10    inadequate, based on adjudication and a rule of law that

11    Your Honor hasn't heard, that it's game, point, set, match,

12    over. That's a gotcha, and it's wrong.

13         JUDGE CHAPMAN: Okay, but let me--but--okay. You

14    say that's a gotcha, but let me give you a, "Really? Am I

15    going to do this twice?" In other words, you want to take a

16    shot at the Transferee rate being the right rate, and then

17    you want to say, you'll come to me, I'll either say yes or

18    no, and then you want to say, "Okay, I want to start over

19    now," and that seems to me to be--I don't want to abridge

20    your rights. It's never--should be a game of gotcha, but on

21    the other hand, why should I have to do it twice? Why should

22    there be a litigation roll of the dice, and then you say,

23    you know, as parties have said to me lately, "Oh, having

24    heard the Court, we're now going to take the opposite

25    position."

1              MR. ANKER: Your Honor, we're not taking the

2      opposite position. We're providing information. The way the

3      claim allowance process works and the way our order would

4      work--let me focus you on the remaining provisions. If you

5      turn to the bottom of page 3, we would say, if the plan

6      administrator reasonably believes that additional

7      information is required, it lets us know and we have a

8      meeting and confer, and it can then, if you turn to page 4,

9      put in an object and go to Court, and if then, the Court

10     determines that additional information is required, we can

11     seek to provide it. I simply don't want a gotcha. I want to

12     go to where Your Honor started today. This is a bar date,

13     not a substantive determination of rights. The way--

14             JUDGE CHAPMAN: But then--so let's focus on that,

15     and I apologize for interrupting you so much, but this is

16     difficult so I'm trying to keep up with all of you. So, why

17     wouldn't it be the--similar to, you submit a Proof of Claim,

18     right, and then the rules are, you can amend the Proof of

19     Claim after the bar date if it relates back. In essence,

20     what you're saying is, "I'm going to put in a Proof of

21     Claim, and then if it turns out that that's not the right

22     Proof of Claim, I'm going to put in a different Proof of

23     Claim based on a different agreement." And I--

24             MR. ANKER: No, Your Honor, I'm not. I think the

25     amendment is a perfectly good example. It is going to be a

Page 54

1    claim. I think that your statement is absolutely both right

2    and acceptable. If we fail to put in a claim, if we say, for

3    example, "We are not entitled to post-petition interest

4    pursuant to ISDA Agreement No. 442," we can't later put in a

5    claim based on ISDA Agreement 442. But if Your Honor

6    adjudicates later that, at--we put in a timely claim as to

7    442, if Your Honor reaches an adjudication or Your Honor

8    says information is inadequate, I want an opportunity to

9    provide more information. It will absolutely have to relate

10   back--

11           JUDGE CHAPMAN: Meaning that if you wanted--if the

12   first go around, your certification or your source is cost

13   of funds of the Assignee, and that gets turned back, then

14   you want to come back and submit cost of funds of the

15   Assignor.

16           MR. ANKER: Right, Your Honor, because I don't know

17   what all of their costs of funds are for one thing. It's

18   going to be a timely, difficult process for me to find that

19   out now. There's been no adjudication on that question. I

20   simply don't want a gotcha, and let me be candid with Your

21   Honor. My hope, and the way we've drafted this order, is

22   that I'm never going to have this issue in front of you

23   because we will reach resolution with the Debtor. That's my

24   goal, and that goes to the last thing that we've done in

25   this order, which is different from the suggestion of Silver

Page 55

1    Point. If you look at the very last decretal paragraph,

2    which suggests that - and again, Your Honor, I will take

3    representation on the record but I think an order is better

4    - we simply want to reserve the right and not have this

5    order in any way, shape or form be quoted back to us saying

6    we can't seek it, but if we can't reach a resolution, and we

7    believe we're entitled in that context to get the Debtor's--

8    what they've asserted as their own cost--their own interest

9    rates, we can seek it in discovery and they can object. And

10   that's all this says.

11           JUDGE CHAPMAN: Say that again? That--

12           MR. ANKER: Your Honor, imagine--we are not asking,

13   unlike Silver Point, at this point in time that Your Honor

14   require that there be disclosure to us, of what the Debtor-

15   controlled affiliates are seeking by way of post-petition

16   interest. All we are seeking, because this order says,

17   "Debtor-controlled affiliates need not provide that

18   information," is language that be--is clear, that later, if

19   we do have to litigate, and we take position, how can you

20   tell us 8 percent or 20 percent or 15 percent or whatever

21   the number is, is inappropriate when you yourself are

22   seeking that same percentage, that we can serve a discovery

23   request on them in connection with a contested matter, over

24   the allowance of our claim, they can object, and Your Honor,

25   if we can't reach adjudi--agreement, we'll ultimately reach

Page 56

1    resolution.

2            I'm happy to take that on the record rather than

3    an order.

4            JUDGE CHAPMAN: Okay.

5            MR. ANKER: I'm trying to save you--

6            JUDGE CHAPMAN: But I'm not--but then we get into--

7    then we get into your coming back later and saying that I

8    said that you were entitled to that.

9            MR. ANKER: No, Your Honor, I'm not going to say

10   that. Look at the lang--I mean, Your Honor, if you--

11           JUDGE CHAPMAN: Well, the problem is that, I'm not

12   going to negotiate the language of a bar order that, if you

13   add the black line, if you look at the black line language,

14   it doubles the language in the order. So I'm not going to do

15   that. It's not fair, it's not appropriate, so I'm not going

16   to do that. So if you want to, as we continue to go through

17   this, if there are things or there is an opportunity where

18   you can talk to Mr. Miller and get some tweaks, tweaks to

19   the order that would satisfy some of your concerns, I'll

20   entertain that, but I'm not going to--

21           MR. ANKER: Okay.

22           JUDGE CHAPMAN: I'm not going to insert myself into

23   the drafting process of the bar order and again, I'm most

24   focused on B, and B seems to me to go to the heart of it,

25   which is to gut the primary piece of information that the

Page 57

```
 1    plan administrator wants. We've already covered the fact

 2    that this is not intended to be a device that knocks you out

 3    of the box because you haven't provided enough information.

 4    I'm troubled by the notion that we could have a complete do-

 5    over after going down the path of, and I'm using very, very

 6    shorthand here, Assignee cost of funds versus--and then have

 7    a do-over and it's Assignor.

 8              MR. ANKER: Your Honor, we don't--let me try, and

 9    I'm going to try to--I'm going to try to be pragmatic and

10    address your concerns.

11              JUDGE CHAPMAN: Okay.

12              MR. ANKER: First, I would ask that the bar date

13    provide for claims to be filed by May 15, not by April 13.

14    Second--

15              JUDGE CHAPMAN: I'm inclined--I'm inclined to agree

16    with you on that.

17              MR. ANKER: Yeah. Thank you, Your Honor. Second, I-

18    -

19              JUDGE CHAPMAN: Against the backdrop, of course,

20    that Silver Point wants things to go more quickly.

21              MR. ANKER: I understand. We're not--there isn't--

22              JUDGE CHAPMAN: Okay.

23              MR. ANKER: --(indiscernible) on every issue on

24    this side of the table.

25              JUDGE CHAPMAN: Yes, Mr. Fail?
```

1          MR. FAIL: Your Honor, may I just request

2     clarification as for a bar date, who's the only one that's

3     requested it. I've--no other parties--unless any other

4     parties here, and wants and--the gentlemen raising their

5     hands, their clients--

6          JUDGE CHAPMAN: Let's keep going. I said I'm

7     inclined, okay? Because I want to hear from Mr. Miller again

8     when everyone's had--

9          MR. ANKER: Your Honor, on the third issue, which

10    is simply reserving our rights to seek discovery, I simply

11    want to take a representation on the record that nothing in

12    this order is intended to prejudice our ability to seek that

13    discovery and of course, the Debtor's ability to object to

14    it, but the substance of this order will not govern that

15    question.

16         JUDGE CHAPMAN: It's just a bar order. It's just a

17    bar order that sets a date--

18         MR. ANKER: Okay.

19         JUDGE CHAPMAN: --and says what you have to file.

20    That's all it is.

21         MR. ANKER: And then my--my tweak on the middle

22    point is, we will provide the source of funds, we simply ask

23    that language be added to make it clear that, if information

24    is deemed to be inadequate, there will be an opportunity to

25    amend, as in accordance with and no greater but no less than

Page 59

1    the normal amendment process under the Federal rules, and

2    with respect to claims generally. We simply don't want a

3    gotcha, and Your Honor has said, there shouldn't be a

4    gotcha.

5              JUDGE CHAPMAN: Okay. Okay.

6              MR. ANKER: Thank you, Your Honor.

7              JUDGE CHAPMAN: Thank you. Anyone else from the

8    Objectors?

9              MR. DORCHAK: Good morning, Your Honor.

10             JUDGE CHAPMAN: Good morning.

11             MR. DORCHAK: Just (indiscernible) Josh Dorchak--

12             JUDGE CHAPMAN: How are you, Mr. Dorchak?

13             MR. DORCHAK: Morgan Lewis. Good, thank you. On

14   behalf of Deutsche Bank Securities. Not to repeat, I--from

15   the assurances we got today, from Deutsche Bank's position,

16   we've got a lot of the comfort that we--

17             JUDGE CHAPMAN: Okay.

18             MR. DORCHAK: --were looking for. I think there was

19   some mischaracterization, but most of the issues that we may

20   end up fighting about, we can fight about later, and that

21   was really what we wanted to do, to defer those substantive

22   disputes and not get caught up in the gotchas.

23             JUDGE CHAPMAN: Okay, thank you.

24             MR. MILLER: Okay, Your Honor, let me see if I can

25   do this in some sort of coherent order, since there's a lot.

1            JUDGE CHAPMAN: All right, so the first point on my

2    list was the, "Why shouldn't this apply to the Debtor-

3    related entities?"

4            MR. MILLER: Yes, Your Honor. Well, I guess the

5    first answer to that is, the plan administrator already

6    knows the facts about the Debtor entities. What this order

7    does is to give the plan administrator information. Making

8    the plan administrator submit through the website is a

9    meaningless exercise and in fact, in the derivative's

10   questionnaires, for example, all the Debtor affiliates were

11   excluded. So that's not really what they're asking for. What

12   they're asking for is not that it apply to the plan

13   administrator, which it already does and since--the plan

14   administrator would have the information, they're asking for

15   a disclosure mechanism for the plan administrator's claims,

16   and that creates exactly the same problem that you mentioned

17   which is, you then get, essentially, a circular negotiation,

18   because if that disclosure goes to everybody, then it makes

19   it very difficult to deal with anything.

20            I want to make it clear, Your Honor. This whole

21   conflict of interest and divided interest thing, there are

22   no retained earnings in this estate. There is no shareholder

23   versus--

24            JUDGE CHAPMAN: Right. As I like to say, there is

25   no Lehman.

Page 61

1           MR. MILLER: That's right.

2           JUDGE CHAPMAN: There are only the stakeholders.

3           MR. MILLER: That's right, Your Honor. And the--

4     it's all about Creditors.

5           JUDGE CHAPMAN: Right.

6           MR. MILLER: It's not about these people keeping

7     something, and the governance of the estate, the

8     administration of plan, it's described in a footnote at the

9     end of our reply, is set up through a Board of Directors

10    that was selected in an approved process under the plan.

11    There are certain disclosures that were approved in the

12    plan. What they're really trying to do is to modify the plan

13    and those disclosures, and graft on something that has not

14    been approved and frankly, it's to the detriment of other

15    Creditors and other estates, for them to have this special

16    visibility into a process that has not been present for

17    65,000 other claims that have been settled, and two large

18    post-petition interest claims that have been settled.

19    Because basically, what they're trying to do is to say, "We

20    don't want to--we want to see all there is so we can make

21    sure we ask for everything we could possibly ever get,

22    instead of just what we're entitled to," and that's really

23    what this is getting down to.

24          And we believe that the point is, Your Honor, they

25    should ask for what they're entitled to, and it will be

1    processed like all the other claims have been processed.

2         JUDGE CHAPMAN: Well, and I--and again, if you get

3    to the extreme hypothetical of, we establish the bar date,

4    all the claims come in, or the claims come in that there

5    are, and then the response from the plan administrator is,

6    "Thank you for your claims. As it turns out, you're each

7    only entitled to 2 cents of interest, and that's because the

8    claims of the Debtor affiliates are so large," we might have

9    a conversation at some point around that point. But we are

10   many, many, many steps away from that possibility, correct?

11        MR. MILLER: We believe so, yes, Your Honor. We

12   think--frankly, in this very low interest trade environment,

13   that if we get numbers that we expect we should get, then

14   this is not going to be much of a problem. We don't know the

15   outcome for sure, but I would add that Silver Point, to take

16   an example, who is making this point, Your Honor, has asked

17   for twice the rate of the original Assignor, who filed its

18   rate earlier with Lehman and now wants twice that rate.

19   Well, you know, if everybody asks for twice the rate of the

20   Assignor, we've got a different situation. But we don't

21   think that's going to happen with everybody, but we don't

22   know. that's what we'll know later.

23        JUDGE CHAPMAN: Okay.

24        MR. MILLER: This is all premature, Your Honor--

25        JUDGE CHAPMAN: Okay.

Page 63

1          MR. MILLER: --and their effort to get

2    unprecedented disclosure of the plan administrator, which is

3    inconsistent with the disclosure provisions in the plan, and

4    was not noticed, it's just something that we think should

5    not be resolved today. If they want to do discovery at some

6    point, obviously, you know, discovery is one of those issues

7    that is already governed by mechanisms and procedures and

8    we'll deal with discovery when we deal with discovery.

9          JUDGE CHAPMAN: Okay.

10          MR. MILLER: This is not a discovery motion.

11          JUDGE CHAPMAN: All right.

12          MR. MILLER: The issue of the timing, Your Honor,

13    270 of the parties who have post-petition interest claims

14    did not have a problem with the original bar date. We have

15    proposed to extend it to April 13th. We'd really like to get

16    those claims and start processing them. If the--if there's

17    a request for these parties to have an extension of time, I

18    think we have authority to give them an extension of time,

19    and we'll do that.

20          JUDGE CHAPMAN: That was my next--that would have

21    been my next question.

22          MR. MILLER: Yes, Your Honor, but we don't think

23    that everybody needs an extension of time. We'd like to get

24    working on the other 270 in the meantime, because we do

25    agree, frankly, with the Silver Point goal of doing this as

Page 64

1    rapidly as possible. We're trying--you know, time is money

2    here.

3              JUDGE CHAPMAN: Okay.

4              MR. MILLER: The longer it takes to administer an

5    estate, the more it costs, so--

6              JUDGE CHAPMAN: All right, well that's a surgically

7    precise solution to that issue. Okay.

8              MR. MILLER: So we think that that takes care of

9    that. Now, with regard to this issue about what rates they

10   provide, Your Honor, frankly, everybody who submits a claim

11   has to decide whether they're submitting the claim based on

12   one calculation, alternative calculations or whatever, and

13   if they decide to submit something and want to amend it,

14   they know the rules and they can figure out whether they can

15   amend it. We think, frankly, what they should do, if they

16   know the Assignor's rate and the Assignee's rate, we'd like

17   for people to give us both, because--

18             JUDGE CHAPMAN: Well, that's where I was going with

19   that.

20             MR. MILLER: Of course, and--

21             JUDGE CHAPMAN: So--

22             MR. MILLER: --and that also allows us, Your Honor,

23   to deal with the stay issue. I mean, as we've said, there is

24   a very significant legal issue. We're not asking the Court

25   to rule on it now, but the plan administrator has flagged

Page 65

1  it, that if the Assignee rate is materially higher than the

2  Assignor rate--

3          JUDGE CHAPMAN: Right.

4          MR. MILLER: --then there's a problem if, whether

5  the assignment violated the automatic stay such that that's

6  not applicable. You don't know the Assignor rate, you don't

7  know it. If somebody gives us the Assignor rate and says,

8  "Well, Assignor rate is 2 percent, we however, as an

9  Assignee think our rate is 1.8 percent," we don't have to

10 worry about that. We'll go down and say, "Okay, it's 1.8

11 percent. That seems pretty close to LIBOR plus one, we're

12 pretty happy, let's move along." So these--

13         JUDGE CHAPMAN: So are you--is it your view that,

14 if they--keeping with your language and not Mr. Anker's

15 language, providing a calculation--providing the calculation

16 of such amount, and the source for any rates used in the

17 calculation, that's your language.

18         MR. MILLER: That's our language, Your Honor. They

19 give us the rate and they give us the source.

20         JUDGE CHAPMAN: So, if they give you the rate and

21 they give you the source and those both relate to the

22 Assignee's documents, right, and then, hypothetically, you

23 prevail and say, "That's not right," without knowing what

24 the Assignor is, is it your view that they are done?

25         MR. MILLER: Well, not necessarily, Your Honor. I

Page 66

1    mean, it--there'd be a lot that would happen in the interim.

2    The way these claims are processed is that there would be a

3    question about, "So, would you like to tell us what the

4    Assignor is," "Well, we won't tell you," or, "Yes, we will

5    tell you," or "We'll negotiate it and figure out what we can

6    tell--"

7                JUDGE CHAPMAN:  I don't want to do it twice.

8                MR. MILLER: But that's not you. You don't--we

9    don't want to do it twice either, Your Honor. I mean, it

10   seems to us like, by the time we present it to the Court,

11   our goal would be to have the Assignor rate and the Assignee

12   rate, because we really need to know both to see whether

13   one's higher than the other. We think it's the Assignor rate

14   that--that's obviously our belief.

15               JUDGE CHAPMAN: So, you know, overruling my prior

16   statement that I wasn't going to get involved in negotiating

17   the language of the order, wouldn't it be wise, then, to

18   have language in the order that specifically makes clear for

19   the avoidance of doubt, that if there has been an assignment

20   with respect to a particular ISDA, that both the Assignor

21   and the Assignee, as sources, and the rates connected

22   therewith, be part of the submission that's subject to the

23   bar order?

24               MR. MILLER: Yes, Your Honor. That would certainly,

25   I think, be helpful. It does beyond what we were asking

Page 67

1    people to do, but I think that's a good solution to the

2    problem, Your Honor.

3          MR. ANKER: Your Honor, my only--Philip Anker. I

4    only wanted to say that I suspect that my client's case, and

5    I suspect others, they don't know the Assignor's--

6          JUDGE CHAPMAN: Well, I'm going to give you two

7    months to find out.

8          MR. ANKER: Your Honor, we're not--they may provide

9    us information, they may not. We may take different views,

10   but we're happy to say--we're happy to have the order say,

11   to the extent that there is information available to the

12   claimant, with respect to--

13         JUDGE CHAPMAN: Then you're going to have to

14   provide a certification that you can't get it.

15         MR. ANKER: That's fine, Your Honor.

16         MR. MILLER: Your Honor, I think that--I think we

17   believe that that would be a helpful clarification of the

18   order. It responds to the issues that they find--

19         JUDGE CHAPMAN: Okay, so who's ever keeping score

20   on the--with respect to the second decretal paragraph, we're

21   going to identify those parties to whom the April 13th date

22   does not apply, and the date that applies to them. We're

23   going to add some kind of an avoidance of doubt, we're going

24   to add a language to the third decretal paragraph regarding

25   what's required to be submitted with respect to situations

1    involving Assignors and Assignees and the situation in which

2    the Assignor information is purportedly not available

3    requiring a certification from the submitting Assignee that

4    they can't get the information, or to the extent that

5    there's some confidentiality issue, that that's what's

6    preventing the Assignee from providing what's otherwise

7    required. All right?

8              MR. MILLER: Yeah.

9              JUDGE CHAPMAN: Yes.

10             MR. MILLER: I see people are standing--

11             JUDGE CHAPMAN: Okay, let Mr. Miller finish and

12    then I'll--

13             MR. MILLER: Yes, Your Honor.

14             JUDGE CHAPMAN: --be happy to hear from all of you

15    again.

16             MR. MILLER: Just very briefly, Your Honor, we

17    don't believe that any of the changes in the black line

18    should be made other than whatever the Court has just

19    dictated and directed. We don't think any further

20    clarification is necessary at this point. It is, as you say,

21    just a bar date order, and--

22             JUDGE CHAPMAN: It is just a bar date order. I'll

23    say it again. I think--I'm not a huge fan of reservations of

24    rights. Your rights are what they are. Nothing in this order

25    cuts off anybody's substantive rights with respect to any

Page 69

1    arguments they might make about rates applicable to the

2    Debtor, any litigation positions they might take. It is

3    clear that, to the extent that the plan administrator has

4    questions, there's not going to be the ability simply to,

5    without more, disallow the claims. This process is going to

6    then kick off what I call the sufficiency hearing process,

7    just like every other claim that I've seen in this case.

8              So, to the extent that there should be something

9    in the order that makes clear that that whole procedure is

10   connected to and contemplated by this, I would ask you, Mr.

11   Miller, to put that connecting language in the order.

12             MR. MILLER: All right, Your Honor. We'll certainly

13   do that.

14             JUDGE CHAPMAN: All right.

15             MR. MILLER: I think, Your Honor, that's all I

16   have--

17             JUDGE CHAPMAN: Okay.

18             MR. MILLER: --unless you have some more questions

19   for me.

20             JUDGE CHAPMAN: All right, let's hear what these

21   folks have to say one more time.

22             MR. MILLER: Sure.

23             MR. O'NEAL: I will be brief. We're more than happy

24   to go with the April 13th date and we would like others, as

25   many Creditors as possible to be subject to that.

Page 70

1          JUDGE CHAPMAN: Okay.

2          MR. O'NEAL: I do want to say one thing, which is

3     that the--our request for disclosure of the aggregate amount

4     of claims is not unprecedented. For example, in the Lehman

5     situation, the original bar date, all of those Proofs of

6     Claims were publicly available. The thing that wasn't

7     publicly available was the questionnaires, and how the

8     Creditors got to their calculation and some of the more

9     specific questions. So, all we're asking for is that there

10    be some kind of disclosure of the aggregate amount of claims

11    that have been asserted.

12         JUDGE CHAPMAN: I'm sorry, maybe I'm confused.

13    Proofs of Claim were uploaded onto the claims agent database

14    and were publicly available, correct?

15         MR. O'NEAL: By third parties, not the hundreds of-

16    -

17         JUDGE CHAPMAN: By third parties.

18         MR. O'NEAL: --not the hundreds of controlled

19    affiliates.

20         JUDGE CHAPMAN: Right, so are the--with respect to

21    these demands, are you talking about the third party demands

22    being publicly available?

23         MR. O'NEAL: No, ma'am. I'm only asking--only

24    suggesting that, if we're going to apply the same rule that

25    we applied with the Lehman Proofs of Claims, the original

Page 71

1    Proofs of Claims, that the total amount should be available.

2    The total aggregate amount of claims, not the claims

3    themselves, not the actual questionnaires, but the total

4    amount of the claims should be available.

5              JUDGE CHAPMAN: Okay.

6              MR. O'NEAL: So the Creditors have an idea. This is

7    a fish bowl. You know, we are still in a bankruptcy process

8    and--

9              JUDGE CHAPMAN: Right. It is--it is a fish bowl and

10   there is transparency and my point with respect to that,

11   which I'm going to stand by is that, we are not there yet.

12   First we're doing this, we're having a bar date, for the

13   third party claims. As and when we ever get to the point

14   that anybody believes they are aggrieved because of the

15   existence or size of the claims of Debtor affiliates, we can

16   talk about that issue again.

17             MR. O'NEAL: Okay. Thank you, Your Honor.

18             JUDGE CHAPMAN: All right, so Mr. Fail, you've been

19   very diligent at writing everything down. Will you circulate

20   the new version to all of the Objectors? I do not want to

21   hear from you that you don't agree. I do not want competing

22   orders. I trust you're going to be able to agree, based on

23   everything we've talked about on the language, and I'll take

24   a look at it and get it entered quickly, because we have a

25   date that's attached.

Page 72

1      MR. FAIL: Thank you very much, Your Honor. We

2  will.

3      JUDGE CHAPMAN: All right, Mr. Miller? Anything

4  more from you?

5      MR. MILLER: No, Your Honor. Thank you for your

6  time.

7      JUDGE CHAPMAN: Okay, thank you very much, folks.

8      MR. O'NEAL: Thank you, Your Honor.

9      MR. ANKER: Thanks, Your Honor.

10      (Recess)

11      JUDGE CHAPMAN: Let's give everyone a minute to

12  move around. This was supposed to be my easy.

13      MR. MARGOLIN: I'll try to be brief, Your Honor.

14      JUDGE CHAPMAN: Okay.

15      MR. MARGOLIN: For the record, Jeffrey Margolin,

16  Hughes Hubbard & Reed for Mr. Giddens. As Your Honor

17  identified, we're here on the Trustee's 233rd omnibus

18  objections of claims. This is No Liability claims in

19  particular, the general Creditor claim of RBCCCs, that's

20  Royal Bank of Canada Corporate Employee and Executive

21  Services, totaling approximately $1.8 million. All other

22  claims subject to this omnibus objection have been

23  disallowed and expunged or otherwise resolved by Your Honor.

24      As to the RBC claim, RBC filed claims against both

25  LBHI and LBI for an apparent obligation of LBH, PLC, an

Page 73

1    affiliate in a separate UK administration. The LBHI Chapter

2    11 claim was disallowed and expunged by prior Court order.

3    It is clear from the LBI claim and RBC's correspondence to

4    my firm, which are both annexed to the Trustee's reply, that

5    there's no basis for LBI liability. Your Honor, this is a

6    sophisticated party, a subsidiary of Royal Bank of Canada.

7              JUDGE CHAPMAN: Right.

8              MR. MARGOLIN: They had significant time and

9    abundant opportunity to provide additional information to

10   support any claim against LBI. RBC instead has been

11   unresponsive to our inquiries over the past several months.

12   Thereby, Your Honor, for the reasons set forth in the

13   Trustee's papers, unless you have any questions, we

14   respectfully request entry of an order disallowing and

15   expunging this claim.

16             JUDGE CHAPMAN: All right. Is our RBCC here or is

17   anyone present on behalf of RBCC? All right, hearing no

18   response, it's 11:35, the Trustee's objection is granted for

19   the reasons set forth in the Trustee's papers.

20             MR. MARGOLIN: Thank you very much, Your Honor.

21             JUDGE CHAPMAN: Thank you.

22             MR. MARGOLIN: We'll submit an order and the end of

23   the hearing. The next matter is the Trustee's 264th omnibus

24   objection, which is being handled by my colleague, Jim

25   Fitzpatrick.

1          JUDGE CHAPMAN: Okay, thank you very much. Okay,

2     Mr. Fitzpatrick.

3          MR. FITZPATRICK: Good morning, Your Honor.

4          JUDGE CHAPMAN: Good morning.

5          MR. FITZPATRICK: Jim Fitzpatrick, Hughes Hubbard,

6     for the LBI Trustee. Your Honor, I'm sure Your Honor is

7     familiar with the papers, so I won't repeat all of our

8     arguments, but if I could, I would like to just to focus on

9     two specific things. The first is the language of the

10    covenant itself and the relates--that we rely on, which as

11    Your Honor knows, was--it was attached as an Exhibit to the

12    declaration. In 3(b) the covenant--the language of the

13    covenant in 3(b)--

14         JUDGE CHAPMAN: Right.

15         MR. FITZPATRICK: --is a promise to provide

16    irrevocable notice of withdrawal, quote, "of any and all

17    SIPA customer claims and general Creditor Proof of Claims,"

18    so the first point about that, Your Honor, is that it's

19    really just not a possible interpretation of that to mean

20    that some but not others of the claims would be withdrawn.

21    It's very clear that it's any and all, and that really can

22    only mean one thing: to withdraw all of the SIPA customer

23    claims and all of the general Creditor Proof of Claims.

24         The second point about that covenant, Your Honor,

25    is that it is not a broad-reaching, general release, which

Page 75

1    we readily agree is disfavored. Those are disfavored by New

2    York Courts, no question, those releases that are any

3    claims, past, future, known, unknown, et cetera. This is

4    nothing like that. This is a covenant to withdraw specific

5    claims. There were less than ten of them, it's not a broad

6    universe. They were obviously known, they were filed claims,

7    and so we'd submit that none of the cases which do show,

8    which is correct, that New York disfavors general releases,

9    have any applicability to this covenant, and so--

10            JUDGE CHAPMAN: But what about--but what about, and

11   this was pointed out in the response--

12            MR. FITZPATRICK: Yes, Your Honor.

13            JUDGE CHAPMAN: --on page two, paragraph two, the

14   language in the stipulation, which was attached to Mr. St.

15   Lawrence's declaration, that the parties' rights are

16   reserved with respect to any other claims each may have

17   against the other, other than any claims in respect of or in

18   connection with the transaction. How do I reconcile those

19   two?

20            MR. FITZPATRICK: Yes, yes, Your Honor. That would-

21   -and that was going to be my second point. So first of all,

22   the argument is made that that reservation of rights is a

23   nullity if the covenant is enforced, and as we explained in

24   our reply, it's not a nullity at all. First of all, it

25   obviously reserves any claims that the Trustee--because it's

Page 76

1    mutual. It certainly reserves any claims the Trustee has

2    against Goldman and any of their defenses. It's also--

3            JUDGE CHAPMAN: It doesn't say that. It says, "any

4    other claims each may have--it might have against the

5    other." Right?

6            MR. FITZPATRICK: No. Yes, and it--absolutely--

7            JUDGE CHAPMAN: Right.

8            MR. FITZPATRICK: --and it also--it also reserves

9    any claims, small c, that Goldman might have against the

10   Trustee, other than the universe, which as I said, was less

11   than ten of the SIPA customer claims and the general

12   Creditor claims. There could be future claims, there could

13   be claims that don't fall into the category of SIPA customer

14   claims or general Creditor claims. So it clearly has

15   meaning, and the reservation of rights, and it's a nullity

16   if the plain language of the covenant is enforced, and in

17   fact, we'd submit, it's not a strained interpretation. It's

18   any claims each might have against the other. If they follow

19   their covenant and withdraw these claims irrevocably, they

20   don't have those claims any more. So it's the cla--this

21   reserves all rights as to the claims, other than, as dealt

22   with in the release, which is a release of the claims of the

23   transactions and the promise to withdraw the filed SIPA

24   customer and general Creditor claims.

25           JUDGE CHAPMAN: So you're saying that, if there's a

Page 77

1    general release, therefore they'd have no claims, and

2    notwithstanding that, there's a reservation of rights for

3    them to assert other claims, but they don't have any of

4    those.

5         MR. FITZPATRICK: No, Your Honor, no. It's not a

6    general release. The release--the release part of the

7    release, there's no dispute. Only release the transactions.

8    Mutually. It's the covenant to withdraw their claims, any

9    filed customer claims or general Creditor claims. That, they

10   don't have any more, and this reservation of rights doesn't

11   affect. What this reservation of rights does make clear is

12   that, the extent Goldman has any other claims, other than

13   the filed customer and filed general Creditor claims, which

14   they could, they could have future claims, they could have

15   other categories of claims that one could submit in a

16   bankruptcy that aren't customer or general Creditor. Those

17   are all clearly reserved by this reservation of rights, but

18   this reservation of rights can't overcome the very specific,

19   clear covenant to withdraw the, I believe there were nine,

20   claims, that fell into the categories of SIPA customer and

21   general Creditor claims.

22        And of course, I'm happy to answer further

23   questions, Your Honor, but I do--the stipulation was the

24   next place I was going to turn because that, I believe

25   that's the o--that's the question here. Otherwise, the plain

Page 78

1    language of the covenant, we'd submit it clearly--

2              JUDGE CHAPMAN: Sure, okay.

3              MR. FITZPATRICK: --clearly does, Your Honor.

4              JUDGE CHAPMAN: Okay. All right, thank you.

5              MR. FITZPATRICK: Thank you, Your Honor.

6              MR. BOCCUZZI, JR.: Good morning, Your Honor.

7              JUDGE CHAPMAN: Good morning.

8              MR. BOCCUZZI, JR.: Carmine Boccuzzi, Clearly

9    Gottlieb for Goldman Sachs & Company. The argument that Your

10   Honor just heard is urging on the Court to accept a reading

11   of this contract that misstates the forest for the trees.

12   The tree, exactly, which is the 3(b) covenant that they say,

13   and they really based their entire argument on. New York law

14   is clear, though, Your Honor, that you have to read the

15   contract as a whole, and the contract here is the so-called

16   release agreement, and the stipulation order that came to

17   Your Honor, and you can't accept a reading that renders

18   words, surplusage, or provisions meaningless. And the

19   reading they just presented to you, Your Honor, does exactly

20   that. It both ignores the specific and repeated references

21   to the transactions, which were 13 pages, 670 or so

22   specifically identified, listed out, scheduled transactions

23   attached to this agreement and defined. It has you ignore

24   all that, and it has you ignore the reservation of rights

25   because, make no mistake, read as they're reading it, it

Page 79

1    becomes meaningless because it's the null set.

2            There's a bar date in this SIPA proceeding,

3    obviously, that's long passed, and so they're asking you to

4    accept their reading, which says, "We reserve all rights,

5    other than," and it's very specific, "in connection with

6    those defined transactions." They're asking you really to

7    ignore that, and that's just not possible under New York

8    law, and if you get to the negotiation history, which we've

9    put in, and which they don't dispute, nothing in the

10   negotiation history supports this odd reading that they're

11   urging on the Court, where you have the withdrawal

12   provision, that covenant, divorced from the specific release

13   in the rest of the agreement that talks about the

14   transactions.

15           Nothing supports that divorce that they're urging,

16   and in fact, everything in the negotiation history,

17   including their statement that this withdrawal covenant was

18   specifically so Goldman would have to withdraw the released

19   claims, that's what paragraph ten says in the same

20   (indiscernible) declaration, because it was a burden for

21   them, that's fine, as a housekeeping matter. So they said,

22   "You send them in and then you deal with it." That was a

23   housekeeping matter.

24           And here, the one other thing they've always

25   harped on in their papers, everybody's sophisticated,

Page 80

1    everybody's sophisticated. Well, the case law is clear, the

2    ConEd which we cite and the ArcTrade case, where the courts

3    say, it is beyond imagination, logic, reason, everything we

4    think of the law, to think that sophisticated counterparties

5    would give up here, $9 million dollars in unrelated claims,

6    claims unrelated to the transactions, no one disputes that,

7    without a word of it in the negotiation history, without a

8    mention of it in what the parties actually put in the papers

9    that they signed and they submitted to this Court.

10            And so, if you march through the plain language,

11   and I'd just like to do it briefly--

12            JUDGE CHAPMAN: Okay.

13            MR. BOCCUZZI, JR.: --and in that negotiation

14   history, I don't see how the Court can come out with any

15   other result here than to overrule this objection, which--

16            JUDGE CHAPMAN: But let me--so let me get to,

17   procedurally, what you folks think that I'm doing, because

18   what you're saying is, at a minimum, there's an ambiguity in

19   the documents, and that therefore--otherwise, you wouldn't

20   be telling me about the negotiation history, right? So,

21   first year law school, if the documents are clear, right?

22            MR. BOCCUZZI, JR.: But I think the documents get

23   to our result, and I get confused, as you say, "at a

24   minimum." I would say at worst, for me, there's an ambiguity

25   that requires reference to the parol evidence.

Page 81

```
 1                JUDGE CHAPMAN: Right.

 2                MR. BOCCUZZI, JR.: However--

 3                JUDGE CHAPMAN: But that requires a further

 4     proceeding.

 5                MR. BOCCUZZI, JR.: It could, if Your Honor wants

 6     to get to that. I also say, Your Honor, two things. One, I

 7     think you could rule for us and should rule for us based on

 8     the plain language, which--

 9                JUDGE CHAPMAN: Okay, the plain language the other

10     way.

11                MR. BOCCUZZI, JR.: My plain language.

12                JUDGE CHAPMAN: Your language. Right.

13                MR. BOCCUZZI, JR.: Yes, you can rule of me based

14     on the plain language of this agreement--

15                JUDGE CHAPMAN: Right.

16                MR. BOCCUZZI, JR.: --and the fact that their

17     reading produces an illogical result and New York law

18     rejects that--

19                JUDGE CHAPMAN: Right, but just to be clear--

20                MR. BOCCUZZI, JR.: Uh huh?

21                JUDGE CHAPMAN: --their view of the plain language

22     is that there is an opposite conclusion.

23                MR. BOCCUZZI, JR.: Yes, but I--and my view of that

24     is that it produces ambiguity, you therefore need to go to

25     parol evidence, which we've put in--
```

Page 82

1              JUDGE CHAPMAN: Right, but this is not--

2              MR. BOCCUZZI, JR.: --and which they don't

3     challenge--

4              JUDGE CHAPMAN: --an evidentiary hearing. That--I'm

5     just trying to be--

6              MR. BOCCUZZI, JR.: Correct.

7              JUDGE CHAPMAN: --correct, procedurally, so this

8     is--

9              MR. BOCCUZZI, JR.: Correct.

10              JUDGE CHAPMAN: --not an evidentiary hearing. So if

11    I can't agree with one or the other of you, solely as a

12    matter of unambiguous words, then we have to go to the next

13    thing.

14              MR. BOCCUZZI, JR.: No. I would say yes, with one

15    caveat, which is, if you look at the parol evidence we've

16    submitted, and I'm not sure if they're going to say today if

17    they dispute that, they've had months to put in their side

18    of it, obviously their side of it is with them, they haven't

19    done that. I think their position in these papers is, they

20    accept our parol evidence, and they just think it comes to

21    an opposite argument, and I would say that, if you read the

22    parol evidence, you could decide as a matter of law, as the

23    ConEd case said, that this parol evidence supports as a

24    matter of law, the interpretation we're urging on Your

25    Honor.

1              JUDGE CHAPMAN: Sure.

2              MR. BOCCUZZI, JR.: Just to be clear--

3              JUDGE CHAPMAN: Right, so--

4              MR. BOCCUZZI, JR.: --I think there's--

5              JUDGE CHAPMAN: --so what you're saying is, and I

6     don't usually do this, that this has become converted into a

7     motion for summary judgment.

8              MR. BOCCUZZI, JR.: Yes. Where they haven't put in

9     anything, I don't think they've said they had anything to

10    put in.

11             JUDGE CHAPMAN: Okay, well, I'll ask, but that's

12    not usually the way these things go. Usually, this is, in

13    essence, a sufficiency hearing--

14             MR. BOCCUZZI, JR.: Right.

15             JUDGE CHAPMAN: --and if I can't say, up or down,

16    based on what I have before me, we then go to a merits

17    hearing, and that's where, I suppose, if you wanted to rely

18    just on what you have, they'd have an opportunity to

19    respond, or I'd have to say whether or not I think we

20    actually need an evidentiary hearing.

21             MR. BOCCUZZI, JR.: Yes.

22             JUDGE CHAPMAN: So--

23             MR. BOCCUZZI, JR.: Right, if Your Honor thinks

24    there are facts for fact finding, we need a hearing, that

25    would be the next step.

1                 JUDGE CHAPMAN: All right.

2                 MR. BOCCUZZI, JR.: I understand.

3                 JUDGE CHAPMAN: Okay. All right. Thank you very

4       much.

5                 MR. BOCCUZZI, JR.: So--and in terms of the plain

6       language, it's Exhibit A to the St. Lawrence declaration.

7                 JUDGE CHAPMAN: Okay.

8                 MR. BOCCUZZI, JR.: That's the stipulation and

9       order with the release agreement--

10                JUDGE CHAPMAN: Let me take a look at that.

11                MR. BOCCUZZI, JR.: --under it.

12                JUDGE CHAPMAN: Sure. Okay?

13                MR. BOCCUZZI, JR.: And so, here we have, right off

14      from the title, the final close out of certain transactions

15      between Lehman Brothers and the Goldman, Sachs entities. So,

16      the parties are agreeing, and you'll see the agreement, in

17      terms of what this agreement was, plays out through as the

18      whereas clauses. They were agreeing that they were resolving

19      and settling the transactions, defined term, and that's

20      defined in the fourth whereas clause. We're talking about

21      the Goldman parties and LBI entered into certain specific

22      transactions, the transactions--these are transactions of a

23      type wholly unrelated to the underwriter indemnity claims

24      that are--they're saying that we need to withdraw. They're

25      agreeing to those, close out those, to take steps in

Page 85

1    connection and related thereto, and then to sort of--and

2    resolve the matter in that way.

3         And once we go through this, one illogical leap

4    that they're asking you to take, Your Honor, is that in the

5    course of this agreement in which Goldman, Sachs was paying

6    over $100 million dollars in connection with these

7    specifically scheduled transactions, that we somehow just

8    decided gratuitously, and for no consideration, to give up

9    the unrelated underwriter indemnity claims. And again,

10   nothing in this agreement, which is silent as to those

11   claims, other than to reserve everything unrelated to the

12   transactions, supports that. And nothing in the undisputed

13   parol evidence negotiation history supports that view.

14        So, just reading down the other whereas clauses,

15   there's a reference to the second-to-last on the first page,

16   amounts that were due or were accrued in favor of LBI with

17   respect to the transactions, and then the next one is

18   important, whereas the Trustee and Goldman parties desire to

19   close out the transactions and take certain other actions

20   related thereto, not to resolve unrelated claims. The next

21   whereas talks about the transactions and the closeout

22   amount, which is that total $103 million dollars, and then

23   the next whereas clause, and I'll just read it, talks about

24   that, "the parties have negotiated in good faith, and

25   reached an agreement dated April 30th, 2014, setting forth

Page 86

1     the transactions and the rights of the parties with respect

2     to the parties' interest in the transactions."

3            Again, this is what the parties are agreeing to,

4     resolving these transactions, not taking steps unrelated to-

5     -with regards to unrelated transactions or claims between

6     them. And this line of quotes, if you go to paragraph four,

7     which Your Honor pointed counsel out to, this is the

8     reservation of rights. And it's not a reservation of rights

9     that says, "except as provided herein, we reserve--all

10    rights are reserved." It says, specifically, tied back to

11    the transactions. "Each of the parties expressly reserves

12    all of his or its rights and defenses with respect to any

13    other claims each might have against the other, other than

14    any claims in respect of or in connection with the

15    transactions."

16           It doesn't talk about only reserving future claims

17    or non-existent claims or all the caveats they put on it.

18    It's quite a specific and clear reservation of rights

19    saying, "This agreement is about the transactions." And

20    that's what we're doing. It's not about the transaction? We

21    reserved our rights. And it talks about claims, that's what

22    we're talking about, a claim is a Proof of Claim, and they

23    have their defenses to it.

24           So, I think this is critical language. It's not

25    just the reservation of rights, it's all of the references

Page 87

1    to the transactions, and what it was we were doing, and

2    again, the Consolidated Edison case that Judge Cole decided,

3    the ArcTrade case, they talk about, you've got to read the

4    contract as a whole. What were the parties accomplishing?

5    What were they doing? And all this explains that, and if you

6    turn to the agreement itself, and it's called a Release

7    Agreement, and that should be right after?

8              JUDGE CHAPMAN: Yes.

9              MR. BOCCUZZI, JR.: And again, I just want to draw

10   your attention to the la--it's on page three, unfortunately,

11   the pages aren't numbered, but the top whereas clause, right

12   before the now therefore? This is crystal clear. "Whereas

13   the parties desire to resolve and settle, finally and

14   forever, any and all actual or potential disputes between

15   them, including any and all claims against a party's

16   parents, subsidiaries and affiliates, arising out of or

17   relating in any way to, or in connection with the

18   transactions, in order to avoid the uncertainty, cost and

19   delay of potential litigation." So again, that carries

20   through into this, the release, which is paragraph one,

21   repeats that arising out of a relation to the transactions

22   language.

23              So, now, the fight is about, that all these

24   concepts get ignored if you don't have--because you don't

25   have those few words also in the covenant. And I would

1     argue, Your Honor, that that just doesn't make any sense,

2     because it basically is saying, because the reservation of

3     rights language in paragraph four is not somewhere near the

4     3(b) covenant, that you can ignore it. But I think if they

5     had it--if you just move the language around, the language

6     is in here. The language that gets you to the conclusion

7     that the only Proofs of Claims we're talking about are

8     claims concerning the transaction, is in this document. And

9     the parties agree as part of these documents, that they're

10    all read together as one agreement.

11          So they really are asking, "Well, I guess because

12    it's not on the same page, or it's not in that particular

13    clause," to turn an eye to that reservation of rights, and

14    therefore require us to withdraw these Proofs of Claim that

15    are unrelated to these transactions. And so I think that's

16    why, as a matter of plain language, we should prevail today

17    and the objection should be overruled.

18          But, if you accept their reading, then I think

19    you've got an ambiguity, because you're--because then the

20    Court would be holding, "Okay, you have to withdraw those,

21    and the reservation of rights is the null set. There's

22    nothing there, even though it appears that the parties

23    thought there might be other things, it appears that they

24    were explicit about saying if it's not related to the

25    transactions, I don't have to withdraw it." You have to

1    withdraw it because of this other thing. So that's an

2    ambiguity, and you have to resort to the parol evidence.

3           The parol evidence, they didn't put in anything.

4    We put in the declaration of Paul St. Lawrence, who was the

5    Cleary attorney who was dealing with this and again,

6    starting with the sophisticated party point, it's really--

7    well, actually, let me take a step back. The starting point

8    of these discussions, was them sending to--Hughes Hubbard

9    sending to Cleary Gottlieb, a draft agreement that was

10   specific, specific relief, and s--

11          JUDGE CHAPMAN: So let's not--let's not go into

12   that, because that's having--

13          MR. BOCCUZZI, JR.: Okay.

14          JUDGE CHAPMAN: --(indiscernible) go into the

15   history of the negotiation, so--

16          MR. BOCCUZZI, JR.: Okay.

17          JUDGE CHAPMAN: --let me hear from LBI again,

18   because I think that--I can't reconcile the language. So

19   therefore, the objection to the claim is not going to be

20   granted, and I don't think that I can conflate the

21   sufficiency hearing with the merits hearing, and I think

22   we're going to have to do more on this, because I think some

23   excellent points have been raised. I understand what the--

24   there are words on a page, there are words on another page.

25   I believe that context--you can't read a contract or a

Page 90

1    provision of a contract out of context, and there's enough

2    here, certainly, to open it up to an inquiry as to the

3    course of dealing between the parties and the negotiation.

4         So, the Trustee's objection is going to be denied,

5    and we have to figure out what we're going to do next. So,

6    you can either put papers in, we could set a trial date, we

7    could agree, see if we can agree on some stipulated facts.

8    If you want to go down the cross motions for summary

9    judgment route, we can do it that way.

10        MR. BOCCUZZI, JR.: Yes, Your Honor.

11        JUDGE CHAPMAN: I don't have a--there's nothing--

12   there's not--there's more than one way that we could go at

13   this point, but we have to go another route.

14        MR. BOCCUZZI, JR.: Yes, Your Honor.

15        JUDGE CHAPMAN: And I don't believe that you--that

16   you're required at this point to put in an evidentiary case

17   in response to what Goldman put in. What Goldman put in has

18   some heft, and I think the Trustee needs to figure out how

19   to respond to it and what we want to do next.

20        MR. FITZPATRICK: Yes, Your Honor, and we're

21   certainly prepared to do that. Maybe the best course would

22   be for the two of us to speak and then we can hopefully

23   submit a procedure to Your Honor that would be agreed.

24        JUDGE CHAPMAN: Right, and if you can't agree, then

25   we can have a status conference and decide how we will

1    proceed. All right?

2              MR. FITZPATRICK: Yes. No, absolutely, Your Honor.

3              MR. BOCCUZZI, JR.: So, Your Honor, I'm sorry, as

4    you started to speak, I was sitting down--

5              JUDGE CHAPMAN: I'm sorry.

6              MR. BOCCUZZI, JR.: I rustled the papers, so I

7    didn't hear what you--the first part of what you said.

8              JUDGE CHAPMAN: I just said I'm--

9              MR. BOCCUZZI, JR.: I think you said the objection

10   is overruled?

11             JUDGE CHAPMAN: The objection is not granted, and

12   we need to have further proceedings.

13             MR. BOCCUZZI, JR.: And we should talk and work out

14   what (indiscernible).

15             JUDGE CHAPMAN: Right, so this is, again, this is a

16   sufficiency hearing. I can't knock the claim out based on

17   this, and we're going to have to go to something else.

18   Whether that's going to be a trial, whether it's going to be

19   cross motions for summary judgment, the two of you want to

20   talk about it, if any further discovery is required, I'm

21   happy to give you additional calendar time as soon as I can

22   see my way clear to that. So I think you should just, as

23   counsel suggests, talk to each other, try to come to an

24   agreement for further proceedings. If you can't, let us know

25   and we can sit down together.

Page 92

1              MR. BOCCUZZI, JR.: Okay, Your Honor. Thanks.

2              JUDGE CHAPMAN: Okay?

3              MR. FITZPATRICK: Yes, Your Honor, and given that,

4    I assume Your Honor doesn't want to hear a substantive reply

5    to the points that were made which I am happy to do.

6              JUDGE CHAPMAN: I do not.

7              MR. FITZPATRICK: Okay, thank you, Your Honor.

8              JUDGE CHAPMAN: All right? Okay.

9              MR. FITZPATRICK: Thanks, Your Honor.

10             JUDGE CHAPMAN: All right, thank you.

11             (Whereupon these proceedings were concluded at

12   11:55 AM.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 93

1                     C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5     Sonya Ledanski

6     Hyde                     Digitally signed by Sonya Ledanski Hyde
                               DN: cn=Sonya Ledanski Hyde, o=Veritext,
                               ou, email=digital@veritext.com, c=US
7                              Date: 2016.03.14 12:19:52 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  March 12, 2015