Joshua Dorchak
Matthew C. Ziegler
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York  10178
212.309.6000

*Attorneys for Trinity Investments Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | Jointly Administered |

CERTIFICATE OF SERVICE

I, Matthew C. Ziegler, hereby certify that on March 22, 2016, I have caused service of

the attached *Notice of Motion of Trinity Investments Limited to Compel Outstanding*

*Distributions on Allowed, Unsatisfied Guarantee Claims* [Docket No. 52309], as well as the

annexed *Declaration of Pierre Bour* [Docket No. 52309-1], upon the parties on the attached list

in the manner set forth therein.

       /s/  Matthew C. Ziegler
       MATTHEW C. ZIEGLER

TO:

Chambers of the Honorable Shelley C. Chapman
United States Bankruptcy Court
of the Southern District of New York                    By hand delivery
One Bowling Green
New York, New York 10004


The Office of the United States Trustee
for the Southern District of New York,
201 Varick Street, Suite 1006,
New York, New York 10014                                By mail
Attn: William K. Harrington, Esq., Susan Golden, Esq.,
and Andrea B. Schwartz, Esq.


Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153                                      By mail
Attn: Jacqueline Marcus, Esq. and Garrett A. Fail, Esq.


Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005                                      By mail
Attn: Dennis F. Dunne, Esq., Evan Fleck, Esq., and
Dennis O'Donnell, Esq.


                                                        By email if available; by mail
                                                        for entities and individuals
Rule 2002 Service List                                  who have not provided an
                                                        email address

Joshua Dorchak
Matthew C. Ziegler
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
212.309.6000

Objection Deadline: April 4, 2016 at 4:00 p.m.
Reply Deadline: April 12, 2016 at 12:00 p.m.
Hearing Date: April 14, 2016 at 10:00 a.m.

*Attorneys for Trinity Investments Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | Jointly Administered |

**NOTICE OF MOTION OF TRINITY INVESTMENTS LIMITED**
**TO COMPEL OUTSTANDING DISTRIBUTIONS**
**ON ALLOWED, UNSATISFIED GUARANTEE CLAIMS**

**PLEASE TAKE NOTICE THAT**, upon the accompanying Motion, and all pleadings

and proceedings heretofore had before this Court, Trinity Investments Limited ("Trinity"), by its

undersigned counsel, will move before the Honorable Shelley C. Chapman of the United States

Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 623,

New York, New York 10004, on **April 14, 2016 at 10:00 a.m.** (Prevailing Eastern Time) (the

"Hearing"), or such other time as the Court may determine, for entry of an order to compel

outstanding distributions on allowed, unsatisfied guarantee claims.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion must be

in writing, must conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

must set forth the name of the objecting party, the basis for the objection and the specific

grounds therefore, and must be filed with the Bankruptcy Court, electronically in accordance

with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case

Filing System may be found at www.nysb.uscourts.gov, the official website for the Bankruptcy

Court) by registered users of the Bankruptcy Court's case filing system, and by all other parties

in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or

any other Windows-based word processing format (with a hard copy hand-delivered directly to

the Chambers of the Honorable Shelley C. Chapman at the United States Bankruptcy Court,

Southern District of New York, One Bowling Green, Courtroom 623, New York, New York

10004), in accordance with General Order M-242, and any objection must further be served upon

(i) The Office of the United States Trustee for the Southern District of New York, 201 Varick

Street, Suite 1006, New York, New York 10014, Attn: William K. Harrington, Esq., Susan

Golden, Esq., and Andrea B. Schwartz, Esq.; (ii) Weil Gotshal & Manges LLP, 767 Fifth

Avenue, New York, NY 10153, Attn: Jacqueline Marcus, Esq., and Garrett A. Fail, Esq.,

attorneys for the Debtors; (iii) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, NY 10005, Attn: Dennis F. Dunne, Esq., Evan Fleck, Esq., Dennis O'Donnell,

Esq., attorneys for the Official Committee of Unsecured Creditors; and (iv) Morgan, Lewis &

Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Joshua Dorchak, Esq., and

Matthew C. Ziegler, Esq., attorneys for Trinity Investments Limited; so as to be filed and

received by no later than **April 4, 2016 at 4:00 p.m.** (Prevailing Eastern Time) (the "Objection

Deadline").

       **PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing on any date after the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated:   March 22, 2016
         New York, New York

                            **MORGAN, LEWIS & BOCKIUS LLP**

                            By: /s/ Joshua Dorchak
                                Joshua Dorchak
                                Matthew C. Ziegler
                                101 Park Avenue
                                New York, New York 10178
                                Telephone:  212.309.6000
                                Email:  joshua.dorchak@morganlewis.com
                                        matthew.ziegler@morganlews.com

                                *Attorneys for Trinity Investments Limited*

Joshua Dorchak
Matthew C. Ziegler
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
212.309.6000

Objection Deadline: April 4, 2016 at 4:00 p.m.
Reply Deadline: April 12, 2016 at 12:00 p.m.
Hearing Date: April 14, 2016 at 10:00 a.m.

*Attorneys for Trinity Investments Limited*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | Jointly Administered |

## MOTION OF TRINITY INVESTMENTS LIMITED TO COMPEL OUTSTANDING DISTRIBUTIONS ON ALLOWED, UNSATISFIED GUARANTEE CLAIMS

Trinity Investments Limited ("Trinity"), through its undersigned attorneys, hereby moves

this Court (the "Motion"), pursuant to Section 105(a) of the Bankruptcy Code and Rule 3021 of

the Federal Rules of Bankruptcy Procedure, to enforce this Court's December 6, 2011 Order

[Docket No. 23023] (the "Confirmation Order") confirming the Modified Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan"), by

entering an order compelling Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator

and Debtor, to pay Trinity the amounts that should have been paid, but were not paid, to Trinity

in the most recent distribution to creditors on October 3, 2015 as the holder of numerous claims

that were and remain settled, fixed, allowed, and not yet satisfied in full under the Plan.

## PRELIMINARY STATEMENT

1.      LBHI willfully and wrongfully excluded twenty-four Allowed Guarantee Claims

held by Trinity from the eighth distribution to creditors in this case on October 1, 2015.  There

should be no question that these claims had not been (and have not been) satisfied in full, and thus were (and are) entitled to further distributions from LBHI, under the Plan. As described in detail in the accompanying Declaration of Pierre Bour in support of the Motion (the "Trinity Declaration"), these claims remain unsatisfied in full because Trinity, in its business judgment, declined to accept certain prejudicial conditions to further distributions on the related direct claims that were improperly imposed by the primary obligor, Lehman Brothers Bankhaus AG ("LBB"). Apparently, LBHI believes that it has the right to disavow its own obligations to Trinity under the Plan to the extent of distributions that LBHI would have preferred for Trinity to receive from LBB but that Trinity, with good reason, did not receive. Nothing in the Plan gives LBHI any such right to make business decisions for its creditors, to force its guarantee creditors to accept payments from primary obligors, or to credit itself for would-be third-party distributions not actually made. Accordingly, the Motion should be granted.

## **BACKGROUND**

2.      On and after September 15, 2008, LBHI and several of its direct and indirect subsidiaries filed the above-captioned jointly administered chapter 11 cases in the Court (the "LBHI Proceeding"). On December 6, 2011, the Court entered the Confirmation Order. On March 6, 2012, the Plan became effective. On April 17, 2012, LBHI made its initial distribution to holders of allowed general unsecured claims, and since that date LBHI has made further such distributions at six month intervals, pursuant to Section 8.3 of the Plan.

3.      On November 12, 2008, the German banking regulator filed insolvency proceedings against LBHI's wholly owned subsidiary LBB, and on November 13, 2008, the local court (*Amtsgericht*) of Frankfurt am Main (the "LBB Court") opened insolvency proceeding, file no. 810 IN 1120/08 L (the "LBB Proceeding"), and appointed an insolvency

administrator (the "LBB Administrator"), in respect of LBB.  In October 2010, LBB made its initial distribution to holders of allowed general unsecured claims, and since that date LBB has made further such distributions at irregular intervals.

4.      As of November 24, 2014, Trinity, as assignee or subparticipant, held beneficial interests in twenty-five duly filed claims against LBB based on bonds or other contractual obligations of LBB (the "Direct Claims").  Trinity Decl. ¶ 9, Ex. A, Sched. A.  At that time, all of the Direct Claims had been fixed and allowed by LBB and had received interim distributions (net of tax withholdings) in the LBB Proceedings.  *Id.*

5.      As of November 24, 2014, Trinity, as assignee or subparticipant, held beneficial interests in twenty-five duly filed LBB-related guarantee claims against LBHI (the "Guarantee Claims") based on LBHI's specific, written guarantees of LBB's bond (Class 5) or other contractual (Class 9A) obligations subject to the Direct Claims.  *Id.*  ¶ 10, Ex. A, Scheds. B & C, Exs. E & F (representative LBHI guarantees for LBB bond and contract obligations, respectively).  At that time, four of the Guarantee Claims had been fixed and allowed by LBHI and had received interim distributions in the LBHI Proceedings.  *Id.*, Ex. A, Sched. B (top half of page).

6.      In November 2014, LBB and LBHI, and LBHI and several creditors of both LBB and LBHI, including Trinity, entered into separate but interrelated agreements that conditionally resolved numerous legal and procedural disputes in the LBB Proceeding as well as numerous LBB-related guarantee claim valuation disputes in the LBHI Proceeding, as summarized below.  *Id*. ¶¶ 12-15; *see* Plan Administrator's Quarterly Financial Report as of October 1, 2015 [Docket No. 51709] ("10/1/2015 QFR") at 24 (under heading "*Bankhaus Creditors' Settlement*").

7.      On November 19, 2014, LBHI (as Plan Administrator under the Plan) and LBB

(through the LBB Administrator) entered into an agreement (the "LBHI-LBB Agreement")

which provided, among other things, for:

- a series of agreements known collectively as the "Harmonizing Resolution," including certain "Creditors Assembly Resolutions" resolving legal disputes as to the German Insolvency Code, and certain confirmations regarding the status of the LBB Proceeding and costs and fees incurred in the LBB Proceeding; and

- separate settlement agreements between LBHI and LBB creditors (collectively known as the "Bilateral Agreements") to implement the Harmonizing Resolution.

Trinity Decl. ¶ 12, Ex. A, ¶¶ H-I; *see* 10/1/2015 QFR at 24.

8.      On November 24, 2014, Trinity and LBHI entered into one such Bilateral

Agreement (the "Trinity-LBHI Agreement"), which provided, among other things, that:

- Trinity will support the Creditors Assembly Resolutions and the Harmonizing Resolution, and will not object to their implementation to the LBB Court or this Court, "subject to the correct implementation of the Harmonizing Resolution by the LBB Administrator, the Insolvency Court and LBHI" (¶ 4);

- Trinity consents to the LBB Administrator's management of the LBB Proceeding to date and his fees up to €500,000,000.00, including €312,180,375.00 to date (¶ 5);

- if a statutory majority of LBB's creditors, including Trinity and the other settling LBB creditors, voted in favor of the Creditors Assembly Resolutions, then Trinity's Guarantee Claims "shall be Allowed Claims in the [LBHI Proceeding] in the amounts and classes set forth … and *shall be entitled to receive distributions under the [Plan]* (in addition to distributions from LBB in respect of the [LBB] Claims) *without any deductions or withholdings whatsoever* (except for any tax withholding expressly required pursuant to the Plan) …." (¶ 7) (emphasis added);

- Trinity agrees to disgorge to LBHI any consideration received on account of any Allowed [ ] Guarantee Claim to the extent such consideration "*combined with distributions or other consideration made or paid by, or on behalf of, LBB in the LBB Proceeding* to [Trinity] or any previous holder on account of any portion of the related [Allowed Direct Claim] (converted to USD in accordance with section 8.13 (d) of the Plan), in the aggregate exceed[s] the allowed amount of such Allowed [ ] Guarantee Claim" (¶ 9) (emphasis added); and

- if the Guarantee Claims are Allowed and Trinity receives distributions from LBB on the Direct Claims and from LBHI on the Guarantee Claims that in the aggregate reach a certain amount determined by a formula (the "Quota Cap"), Trinity assigns the Guarantee Claims to LBHI, along with any distributions in excess of their maximum recovery under the Plan and any ancillary claims (¶ 10).

Trinity Decl. ¶ 13, Ex. A, ¶¶ 4-10 (emphasis added); *see* 10/1/2015 QFR at 24.

9.      At about the same time, several other creditors of LBB and LBHI entered into substantively identical or similar Bilateral Agreements with LBHI.  *See* Trinity Decl. ¶ 15, Ex. A, ¶ E; 10/1/2015 QFR at 24.

10.      On November 25, 2014 (the "Effective Date"), the LBB Administrator held a Creditors Assembly Meeting, the main purpose of which was for creditors to vote on the Creditors Assembly Resolutions, which, if approved, would affirm the Harmonizing Resolution and permit substantially all of LBB's remaining assets to be distributed to creditors with allowed claims. Trinity Decl. ¶ 16; 10/1/2015 QFR at 24.  At that Creditors Assembly Meeting, 99.5% of LBB's voting creditors, including Trinity and the other parties to Bilateral Agreements, approved the Creditors Assembly Resolutions.  This approval triggered the effectiveness of the LBHI-LBB Agreement, the Trinity-LBHI Agreement, and the other Bilateral Agreements.  *Id.*  Accordingly, as of the Effective Date, the Direct Claims were fixed and allowed in the LBB Proceeding (as such, the "Allowed Direct Claims"), and twenty-four of the Guarantee Claims were fixed and allowed in the LBHI Proceeding (as such, the "Allowed Guarantee Claims").  Trinity Decl. ¶ 16, Ex. A ¶ 7; *see* 10/1/2015 QFR at 24.[1]

11.      As of the Effective Date, Trinity or its predecessors in interest had received the first through fourth distributions from LBB (net of tax withholdings) on nearly all of the Direct Claims (one Allowed Direct Claim (the "Unpaid Claim") has received no distributions to date),

---

[1]      The Trinity-LBHI Agreement also provided for the allowance of three direct claims against LBHI independently of any allowed claims against LBB, *see* Trinity Decl. ¶ 14, Ex. A, Sched. C, as well as the expungement of one claim as against LBB, none of which claims are relevant to the Motion.

and Trinity or its predecessors in interest had received the first through sixth distributions from

LBHI only on those Guarantee Claims that were previously allowed.  *Id.* ¶ 17.

12.    As of December 10, 2014, Trinity had become the record holder of all of the

Allowed Guarantee Claims.  *Id.* ¶ 18.

13.    In January-February 2015, LBB made its fifth distribution to creditors ("LBB

D5").  Trinity received interim distributions in LBB D5 that resulted in an aggregate recovery

(including tax withholdings) from LBB of 80% of the Allowed Direct Claims.  *Id.* ¶ 19.

Applying the EUR-USD foreign exchange rate dictated by section 8.13(d) of the Plan, this

amount equated to 75.55% toward full satisfaction of the Allowed Guarantee Claims.  *Id.*[2]

14.    On or about April 2, 2015, LBHI made its seventh distribution to creditors

("LBHI D7").  *See* Notice Regarding Seventh Distribution Pursuant to the [Plan] [Docket No.

49001] ("LBHI D7 Notice").  Because the Allowed Guarantee Claims were not deemed satisfied

in full under the Plan, Trinity received direct and, as applicable, catch-up distributions in LBHI

D7 that resulted in an aggregate recovery from LBHI of 21.73% (Class 5) or 20.46% (Class 9A)

of the Allowed Guarantee Claims.  Trinity Decl. ¶ 20; *see* LBHI D7 Notice at 4.

15.    Thus, through LBHI D7, Trinity or its predecessors in interest had received an

aggregate 97.28% (Class 5) or 96.01% (Class 9A) toward full satisfaction of the Allowed

Guarantee Claims pursuant to section 8.13 of the Plan.  *Id.* ¶ 21.

16.    On August 10, 2015, LBB (through counsel) contacted Trinity concerning an

anticipated sixth distribution from LBB ("LBB D6"), by which LBB proposed that Trinity would

receive a final distribution of €5,093,728.95 (the "Proposed Final LBB Distribution"), which

would bring Trinity's aggregate recovery (including tax withholdings) on the Allowed Direct

---

[2]    Trinity believes that it is undisputed that the EUR-USD exchange rate dictated by section 8.13(d) of the Plan is
1.3402.  Trinity Decl. ¶ 19.

Claims and the Allowed Guarantee Claims to the Quota Cap set forth in the Trinity-LBHI Agreement. *Id.* ¶ 22, Ex. B (8/10/2015 14:18 email). LBB further asserted that, as preconditions to receiving the Proposed Final LBB Distribution, Trinity must sign (a) a confirmation that, upon receipt of the Proposed Final LBB Distribution, Trinity would have received the entire amount due on the Allowed Direct Claims, and (b) other unspecified "form sheets." *Id.*, Ex. B.

17.    On August 13, 2015, LBB (through counsel) provided Trinity with copies of: (a) the confirmation previewed three days earlier (the "Confirmation"); (b) a bank information "form sheet," which required that Trinity certify its wiring instructions; and (c) a withholding tax "form sheet," which required that Trinity certify its withholding tax status under German law. LBB requested that Trinity execute and return these documents within three business days. *Id.* ¶ 23, Exs. C (8/13/2015 10:50 email, with original attachments) & D (Confirmation, with English translation).

18.    Trinity had no objection to the demand for the wiring instructions and tax status forms. *Id.* ¶ 24. Trinity did object to the Confirmation, however, because Trinity could not certify that its receipt of the Proposed Final LBB Distribution would constitute full payment of the Allowed Direct Claims, as explained below. *Id.*

19.    The LBB Administrator has taken the position throughout the LBB Proceeding that the portion of any distribution that is in respect of the interest component of an allowed claim is subject, absent an exemption, to withholding tax at the rate of 25%, plus an additional solidarity surcharge of 5.5% applied to such withholding tax, under German law. *Id.* ¶ 25. As a result, the LBB Administrator had withheld a total of €1,158,058.20 (the "Prior Withholdings") from the amounts directly or indirectly distributed to Trinity based on the €7,897,604.53 aggregate interest component of the Allowed Direct Claims. *Id.*, Ex. D. The Proposed Final

LBB Distribution would have increased the tax withholdings from Trinity on the Allowed Direct Claims to €1,498,178.20 (the "Total Withholdings"). *Id.*

20.    In August 2015, and still today, Trinity has been unable to confirm that the Prior Withholdings will be, or that the Total Withholdings would be, properly refunded or credited to Trinity.  Trinity has not received responses from the German tax authorities to its submissions seeking refunds of the Prior Withholdings.  Unless and until this refund process is successfully completed and both distributions and withholdings on the Unpaid Claim are resolved, Trinity will not have received full payment from LBB.  Trinity was unwilling to give LBB the Confirmation because doing so arguably would deprive Trinity of any recourse to LBB in the event that LBB's action or inaction deprived Trinity of (a) refunds for the Prior Withholdings or, if applicable, the Total Withholdings, or (b) distributions on the Unpaid Claim. *Id.* ¶ 26.

21.    Trinity explained to LBB why Trinity objected to providing the Confirmation, and Trinity further reminded LBB that LBB had no right to demand the Confirmation as a precondition to receipt of the Proposed Final LBB Distribution, because no such document was required by the Creditors Assembly Resolutions, the Harmonizing Resolution, or the LBHI-LBB Agreement. *Id.* ¶ 27.  LBB disagreed, and refused to distribute any amount to Trinity in LBB D6 without first receiving the Confirmation. *Id.*

22.    At around the same time, LBHI contacted Trinity and argued that Trinity had an obligation to accept the Proposed Final LBB Distribution in LBB D6, which would result in the Allowed Guarantee Claims being satisfied in full under the Plan, and to provide LBB with any documents that it demanded in advance. *Id.* ¶ 28.  Trinity disagreed that it had any such obligation under the Trinity-LBHI Agreement, the Plan, or otherwise, and Trinity explained to LBHI why Trinity could not provide the Confirmation to LBB. *Id.*

23.     Trinity and LBB did not resolve their dispute over the Confirmation. *Id.* ¶ 29. Toward the end of August 2015, LBB issued LBB D6, but distributed nothing to Trinity on the Allowed Direct Claims. *Id.* As a result, Trinity's aggregate recovery remained unchanged since LBHI D7: that is, 2.72% (Class 5) or 3.99% (Class 9A) remained outstanding toward full satisfaction of the Allowed Guarantee Claims under the Plan. *Id.* Trinity looked to the upcoming LBHI distribution in September/October 2015 ("LBHI D8") to reduce this deficiency. *Id.*; *see* Notice Regarding Eighth Distribution Pursuant to the [Plan] [Docket No. 50984] ("LBHI D8 Notice").

24.     In advance of LBHI D8, Trinity had told LBHI that Trinity would not provide the Confirmation and that without the Confirmation LBB refused to include Trinity in LBB D6. Thus, LBHI should have known that the Allowed Guarantee Claims would *not* be satisfied in full and *would* be entitled to distributions in LBHI D8 pursuant to sections 8.3 and 8.13 of the Plan. *See* Trinity Decl. ¶ 30. Nonetheless, when LBHI issued LBHI D8 on October 3, 2015, including 1.54% to Class 5 and 1.46% to Class 9A, LBHI distributed nothing to Trinity on the Allowed Guarantee Claims. *Id.*; *see* LBHI D8 Notice, Ex. A.

25.     In two subsequent discussions with LBHI, although Trinity again explained why Trinity did not receive any payment in LBB D6, LBHI essentially asserted that Trinity, in LBHI's opinion, *should have* accepted the Proposed Final LBB Distribution in LBB D6, which *would have* resulted in the Allowed Guarantee Claims being deemed satisfied in full under the Plan, which in turn *would have* made any distribution on the Allowed Guarantee Claims in LBHI D8 (or afterward) an excess recovery. *Id.* ¶ 31.

26.     Trinity considered the Confirmation not only improper but sufficiently prejudicial that Trinity preferred to forego the immediate recovery of the Proposed Final LBB Distribution

in LBB D6 in favor of a distribution in LBHI D8 that not only was less in amount but deferred the satisfaction in full of the Allowed Guarantee Claims under the Plan for at least six months. *Id.* ¶ 32. Because LBHI has refused to include Trinity in LBHI D8 or (presumably) any further distributions, Trinity may never receive the outstanding 2.72% (Class 5) or 3.99% (Class 9A) due from LBHI on the Allowed Guarantee Claims without the assistance of this Court. *Id.*

27. For the avoidance of any doubt, Trinity is not seeking a recovery on the Allowed Guarantee Claims that is greater than what the Plan or the Trinity-LBHI Agreement provides. *Id.* ¶ 33. Trinity is not seeking to have LBHI cover the Prior Withholdings. *Id.* Because Trinity's disputes with LBB and LBHI remain unresolved, Trinity respectfully requests that this Court compel LBHI (a) immediately to pay Trinity the amounts that should have been distributed to Trinity in LBHI D8, and (b) to make further distributions to Trinity, not to exceed the maximum recovery provided for in the Plan, on the Allowed Guarantee Claims. *Id.*

## RELIEF REQUESTED

28. Trinity respectfully requests that this Court promptly enter an order compelling LBHI promptly to pay Trinity the amount that should have been paid to Trinity in LBHI D8, and to pay Trinity the appropriate amount in subsequent distributions, not to exceed the maximum recovery provided for in the Plan, in respect of the Allowed Guarantee Claims.

## ARGUMENT

29. Although the background is lengthy, the question before this Court is simple: Does LBHI have the right under the Plan or the Trinity-LBHI Agreement to force Trinity, against its will and business judgment, to accept distributions on the Allowed Direct Claims, in order to relieve LBHI of its obligation to make distributions on the Allowed Guarantee Claims? The answer is No, and accordingly, this Court should compel LBHI to comply with its

obligations under the Plan to make the outstanding distribution and future distributions to Trinity

on its Allowed Guarantee Claims.

30.     This Court has authority under Section 105(a) to "issue any order, process or

judgment that is necessary or appropriate to carry out the provisions of [title 11,]" and has the

inherent authority to enforce its own orders -- including, of course, the Confirmation Order -- at

any and all times.  This Court also has authority under Bankruptcy Rule 3021 to resolve disputes

concerning distributions on allowed claims under a confirmed chapter 11 plan.  Pursuant to

paragraph 77 of the Confirmation Order and section 14.1(j) of the Plan, this Court has authority

"[t]o hear and determine any actions brought against the Plan Administrator in connection with

the Plan, including, without limitation, any action relating to Distributions under the Plan."

31.     Section 8.3 of the Plan requires the Debtors to make semiannual Distributions to

holders of Allowed Claims.  Section 8.13(a) of the Plan provides that an Allowed Guarantee

Claim "shall … be deemed satisfied in full" if it "receives Distributions (excluding Distributions

contributed to the Plan Adjustment on account of such Allowed Guarantee Claim) that combined

with Distributions or other consideration provided on the corresponding Primary Claim … equal

the Allowed amount of such Guarantee Claim (or such amount as may be agreed to by a holder

and the Debtors)."   Section 8.13(d) of the Plan provides that, "[f]or purposes of determining

whether an Allowed Claim has been satisfied in full in accordance with Section 8.13(a) of the

Plan, all Distributions or other consideration provided by a Primary Obligor in a currency other

than the U.S. Dollar shall be converted to the U.S. Dollar applying the exchange rate derived

from Reuters existing at approximately 3:00 p.m. GMT on the Confirmation Date."

32.     Thus, the Plan requires that the satisfaction of Allowed Guarantee Claims be

determined based on Distributions that a creditor actually "receives" from the Debtor on its

Allowed Guarantee Claim and Distributions or other consideration actually "provided" on the corresponding Primary Claim. The Trinity-LBHI Agreement mirrors this language, requiring that Trinity's maximum recovery is based on consideration actually "received" on account of an Allowed Guarantee Claim and distributions or other consideration actually "made or paid" by LBB on the Allowed Direct Claim. Trinity Decl. ¶ 13, Ex. A, ¶ 9. Neither the Plan nor the Trinity-LBHI Agreement mentions, much less purports to credit LBHI for, distributions on Primary Claims that are rejected, disputed, subject to unsatisfied conditions, or the like. *See id.*

33.    As of the Record Date for LBHI D8 (August 22, 2015) and the date of LBHI D8 (October 1, 2015), it is undisputed that Trinity had *received* Distributions on the Allowed Guarantee Claims from LBHI and had been *provided* distributions and *paid* on the Allowed Direct Claims from LBB in an aggregate amount equal only to 97.28% (Class 5) or 96.01% (Class 9A) of full satisfaction of the Allowed Guaranteed Claims pursuant to Article VIII of the Plan. Trinity Decl. ¶¶ 21, 29. Thus, there should be no dispute that the Allowed Guarantee Claims were not as of LBHI D8, and are not today, "deemed satisfied in full" under the Plan. *See id.*; Plan §§ 8.13(a), 8.13(d).

34.    Nothing in the Plan or the Trinity-LBHI Agreement gives LBHI the right to compel Trinity to accept a distribution on the Allowed Direct Claims on terms that Trinity considers prejudicial (or to dictate to Trinity what constitutes prejudice). *See* Plan § 8.13; Trinity Decl. ¶¶ 24-28, 32. In this regard, the Plan and the Trinity-LBHI Agreement reflect the nature of the guarantees that LBHI originally gave, which are guarantees of payment and not of collection. *See* Trinity Decl. ¶¶ 7-8, Ex. E § 2.2 ("This Guarantee is one of payment and not collection."), Ex. F § 5 ("The Guarantor acknowledges and agrees that this Guarantee is one of payment and not of collection."). Accordingly, Trinity has no obligation to accept distributions on the

Allowed Direct Claims from LBB at all, in order to be entitled to Distributions from LBHI on the

Allowed Guarantee Claims. And certainly LBHI has no right to overrule Trinity's business

judgment -- i.e., its decision not to submit the Certification improperly demanded by LBB based

on a genuine concern of economic prejudice -- in order to reduce LBHI's own liability on the

Allowed Guarantee Claims. *See* Plan § 8.13; Trinity Decl. ¶¶ 24-26, 32.[3]

35.     To avoid any doubt on the subject, Trinity declined to comply with LBB's

unilateral, last-minute, unjustified demand for the Confirmation because it was materially

prejudicial, in that it created a risk that Trinity would lose recourse to LBB in the event that

Trinity did not eventually receive proper refunds for the Total Withholdings or distributions on

the Unpaid Claim. Trinity Decl. ¶¶ 24-26, 32-33.

36.     Finally, although LBHI's compliance with its own Plan cannot be prejudicial to

LBHI, it is important to note that, when the Allowed Guarantee Claims are satisfied in full under

the Plan, LBHI will subrogate to Trinity's claims against LBB and will automatically take

assignment of the Direct Claims pursuant to the LBHI Agreement. Plan § 8.14; Trinity Decl. ¶

13, Ex. A, ¶ 10. Thus, LBHI should have a corresponding recovery from LBB for amounts

distributed to Trinity and its predecessors in interest on the Allowed Guarantee Claims. *See id.*

---

[3]     The Plan gives LBHI the right to demand a certification, and potentially, security, from a holder of an Allowed
Guarantee Claim, to protect against excess recoveries, but LBHI did not demand any such certification or security
from Trinity and, in any event, LBHI was aware that Trinity would not accept the Proposed Final Distribution from
LBB as matters stood. Plan § 8.13(e); Trinity Decl. ¶¶ 26-28.

## CONCLUSION

For the reasons set forth above, Trinity respectfully requests that this Court enter an order that compels LBHI (a) promptly to pay Trinity the amounts that should have been paid to Trinity in LBHI D8 on the Allowed Guarantee Claims, and (b) to include the Allowed Guarantee Claims in any subsequent distributions, not to exceed the maximum recovery thereon provided for in the Plan, with such other and further relief as this Court deems just and proper.

Dated:    March 22, 2016
          New York, New York

MORGAN, LEWIS & BOCKIUS LLP

By: _____
    Joshua Dorchak
    Matthew C. Ziegler
    101 Park Avenue
    New York, New York 10178
    Telephone:  212.309.6000
    Email:  joshua.dorchak@morganlewis.com
            matthew.ziegler@morganlews.com

*Attorneys for Trinity Investments Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | Jointly Administered |

### DECLARATION OF PIERRE BOUR IN SUPPORT OF MOTION OF TRINITY INVESTMENTS LIMITED TO COMPEL OUTSTANDING DISTRIBUTIONS ON ALLOWED, UNSATISFIED GUARANTEE CLAIMS

I, Pierre Bour, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a Managing Member of Attestor Capital LLP ("Attestor"), which serves as investment manager for Trinity Investments Limited ("Trinity"). Attestor maintains its principal place of business at 20 Balderton Street, London, United Kingdom. Trinity maintains its registered office at 3 George's Dock, IFSC, Dublin 1, Ireland.

2.      I submit this Declaration based on my first-hand knowledge and my review of the relevant records in Attestor's and Trinity's files, except where otherwise noted, in support of Trinity's Motion to Compel Outstanding Distributions on Allowed, Unsatisfied Guarantee Claims (the "Motion") in the above-captioned proceeding (the "LBHI Proceeding").

3.      Annexed hereto as Exhibit A is a true and correct copy, in relevant part, of a Settlement Agreement entered into as of November 24, 2014 by and between Lehman Brothers Holdings Inc. ("LBHI") as Plan Administrator and Trinity (the "Trinity-LBHI Agreement"). Schedule A of the Trinity-LBHI Agreement lists the Allowed Direct Claims (as defined below) held by Trinity against Lehman Brothers Bankhaus AG ("LBB"). Schedule B of the Trinity-LBHI Agreement lists the Allowed Guarantee Claims (as defined below) held by Trinity against

LBHI. Schedule C of the Trinity-LBHI Agreement lists certain allowed claims against LBHI that do not relate to allowed claims against LBB. Schedule D of the Trinity-LBHI Agreement lists allowed claims against LBB held by Trinity and other Settling Creditors (as defined in the Trinity-LBHI Agreement), whose names are redacted here and in the body of the agreement, as being immaterial, and to avoid raising any confidentiality concerns. Copies of Schedules E and F, which concern the Creditors Assembly Resolutions (as defined below) and a notice and explanation of the same from LBB's Insolvency Administrator (the "LBB Administrator"), respectively, have not been attached, as they are in German and are not directly relevant to the motion.[1]

4.   Attached hereto as Exhibit B is a true and correct copy of an email dated August 10, 2015 from the LBB Administrator's counsel to Attestor concerning the Allowed Direct Claims (as defined below).[2]

5.   Attached hereto together as Exhibit C is a true and correct copy of an email dated August 13, 2015 from the LBB Administrator's counsel to Attestor concerning the Allowed Direct Claims (as defined below), with attachments. The first attachment (in German) is the Confirmation (as defined below). The second attachment (in German) is a request for wire transfer instructions. The third attachment (in German) is a request for tax withholding status information.

6.   Attached hereto as Exhibit D is a certified German-to-English translation of the Confirmation.[3]

---

[1]   Trinity will promptly provide copies and, if applicable, translations of any documents not provided herewith if the Court should request them.

[2]   The schedules attached to this email, which reflect unpaid balances remaining before Trinity would achieve its "Quota Cap," are not attached because the documents are not in dispute and their details are not directly relevant to the Motion. Trinity will promptly provide copies of such attachments if the Court should request them.

7.      Attached hereto together as Exhibit E is a true and correct copy of LBHI's guarantee of LBB's bond obligations, on which certain of the Allowed Guarantee Claims are based.

8.      Attached hereto together as Exhibit F is a true and correct copy of LBHI's guarantee of LBB's contractual obligations, on which certain of the Allowed Guarantee Claims are based.

9.      As of November 24, 2014, Trinity, as assignee or subparticipant, held beneficial interests in twenty-five duly filed claims against LBB based on bonds or other contractual obligations of LBB (the "Direct Claims"). *See* Ex. A, Sched. A. At that time, all of the Direct Claims had been fixed and allowed by LBB and had received distributions (net of tax withholdings) in the LBB Proceedings.

10.     As of November 24, 2014, Trinity, as assignee or subparticipant, held beneficial interests in twenty-five duly filed LBB-related guarantee claims against LBHI (the "Guarantee Claims") based on LBHI's specific, written guarantees of LBB's bond (Class 5) or other contractual (Class 9A) obligations subject to the Direct Claims. Ex. A, Sched. B (Guarantee Claims); Exs. E-F (representative LBHI guarantees for LBB bond and contract obligations, respectively). At that time, four of the Guarantee Claims had been fixed and allowed by LBHI and had received distributions in the LBHI Proceedings. Ex. A, Sched. B (top half of page).

11.     [*omitted*]

12.     On information and belief, on November 19, 2014, LBHI (as Plan Administrator under the Plan) and LBB (through the LBB Administrator) entered into an agreement (the "LBHI-LBB Agreement") which provided, among other things, for:

---

3       German-to-English translations of the other attachments to Exhibit B are not attached because those documents are not in dispute and their details are not directly relevant to the Motion. Trinity will promptly provide such translations if the Court should request them.

- a series of agreements known collectively as the "<u>Harmonizing Resolution</u>," including certain "<u>Creditors Assembly Resolutions</u>" resolving legal disputes as to the German Insolvency Code, and certain confirmations regarding the status of the LBB Proceeding and costs and fees incurred in the LBB Proceeding; and

- separate settlement agreements between LBHI and LBB creditors (collectively known as the "<u>Bilateral Agreements</u>") to implement the Harmonizing Resolution.

*See* Ex. A, ¶¶ H-I.

13. On November 24, 2014, Trinity and LBHI entered into one such Bilateral Agreement (the "<u>Trinity-LBHI Agreement</u>"), which provided, among other things, that:

- Trinity will support the Creditors Assembly Resolutions and the Harmonizing Resolution, and will not object to their implementation to the LBB Court or this Court, "subject to the correct implementation of the Harmonizing Resolution by the LBB Administrator, the Insolvency Court and LBHI" (¶ 4);

- Trinity consents to the LBB Administrator's management of the LBB Proceeding to date and his fees up to €500,000,000.00, including €312,180,375.00 to date (¶ 5);

- if a statutory majority of LBB's creditors, including Trinity and the other settling LBB creditors, voted in favor of the Creditors Assembly Resolutions, then Trinity's Guarantee Claims "shall be Allowed Claims in the [LBHI Proceeding] in the amounts and classes set forth ... and *shall be entitled to receive distributions under the [Plan]* (in addition to distributions from LBB in respect of the [LBB] Claims) *without any deductions or withholdings whatsoever* (except for any tax withholding expressly required pursuant to the Plan) ...." (¶ 7) (emphasis added);

- Trinity agrees to disgorge to LBHI any consideration received on account of any Allowed [ ] Guarantee Claim to the extent such consideration "*combined with distributions or other consideration made or paid by, or on behalf of, LBB in the LBB Proceeding* to [Trinity] or any previous holder on account of any portion of the related [Allowed Direct Claim] (converted to USD in accordance with section 8.13 (d) of the Plan), in the aggregate exceed[s] the allowed amount of such Allowed [ ] Guarantee Claim" (¶ 9) (emphasis added); and

- if the Guarantee Claims are Allowed and Trinity receives distributions from LBB on the Direct Claims and from LBHI on the Guarantee Claims that in the aggregate reach a certain amount determined by a formula (the "<u>Quota Cap</u>"), Trinity assigns the Guarantee Claims to LBHI, along with any distributions in excess of their maximum recovery under the Plan and any ancillary claims (¶ 10).

Ex. A, ¶¶ 4-10.

14.     The Trinity-LBHI Agreement also provided for the allowance of three direct claims against LBHI independently of any allowed claims against LBB, *see* Ex. A, Sched. C, as well as the expungement of one further claim as against both LBB and LBHI, none of which claims are relevant to the Motion.

15.     At about the same time, on information and belief, several other creditors of LBB and LBHI entered into substantively identical or similar Bilateral Agreements with LBHI. *See* Ex. A, ¶ E.

16.     On information and belief, on November 25, 2014 (the "Effective Date"), the LBB Administrator held a Creditors Assembly Meeting, the main purpose of which was for creditors to vote on the Creditors Assembly Resolutions, which, if approved, would affirm the Harmonizing Resolution and permit substantially all of LBB's remaining assets to be distributed to creditors with allowed claims.    On information and belief, at that Creditors Assembly Meeting, 99.5% of LBB's voting creditors, including Trinity and the other parties to Bilateral Agreements, approved the Creditors Assembly Resolutions.    That approval triggered the effectiveness of the LBHI-LBB Agreement, the Trinity-LBHI Agreement, and the other Bilateral Agreements.    Accordingly, as of the Effective Date, the Direct Claims were all fixed and allowed in the LBB Proceeding (as such, the "Allowed Direct Claims"), and twenty-four of the Guarantee Claims were all fixed and allowed in the LBHI Proceeding (as such, the "Allowed Guarantee Claims").

17.     As of the Effective Date, Trinity or its predecessors in interest had received the first through fourth distributions from LBB (net of tax withholdings) on nearly all of the Direct Claims (one Allowed Direct Claim (the "Unpaid Claim") has received no distributions to date),

and Trinity or its predecessors in interest had received the first through sixth distributions from LBHI only on those Guarantee Claims that were previously allowed.

18.   As of December 10, 2014, Trinity had become the record holder of all of the Allowed Guarantee Claims.

19.   On information and belief, in January - February 2015, LBB made its fifth distribution to creditors ("LBB D5").   Trinity received direct and, as applicable, catch-up distributions in LBB D5 that resulted in an aggregate recovery (including tax withholdings) from LBB of 80% of the Allowed Direct Claims.  Applying the EUR-USD foreign exchange rate set forth in section 8.13(d) of the Plan -- which Trinity believes is undisputedly 1.3402 -- this amount equated to 75.55% toward full satisfaction of the Allowed Guarantee Claims.

20.   On information and belief, on or about April 2, 2015, LBHI made its seventh distribution to creditors ("LBHI D7").  Because the Allowed Guarantee Claims were not deemed satisfied in full under the Plan, Trinity received direct and, as applicable, catch-up distributions in LBHI D7 that resulted in an aggregate recovery from LBHI of 21.73% (Class 5) or 20.46% (Class 9A) of the Allowed Guarantee Claims.

21.   Thus, through LBHI D7, Trinity or its predecessors in interest had received an aggregate 97.28% (Class 5) or 96.01% (Class 9A) toward full satisfaction of the Allowed Guarantee Claims pursuant to section 8.13 of the Plan.

22.   On August 10, 2015, LBB (through counsel) contacted Trinity concerning an anticipated sixth distribution from LBB ("LBB D6"), by which LBB proposed that Trinity would receive a final distribution of €5,093,728.95 (the "Proposed Final LBB Distribution"), which would bring Trinity's aggregate recovery (including tax withholdings) on the Allowed Direct Claims and the Allowed Guarantee Claims to the Quota Cap set forth in the Trinity-LBHI

Agreement. LBB further asserted that, as preconditions to receiving the Proposed Final LBB

Distribution, Trinity was required to sign (a) a confirmation that, upon receipt of the Proposed

Final LBB Distribution, Trinity would have received the entire amount due on the Allowed

Direct Claims, and (b) other unspecified "form sheets." Ex. B (8/10/2015 14:18 email).

23.     On August 13, 2015, LBB (through counsel) provided Trinity with copies of: (a)

the confirmation previewed three days earlier (the "Confirmation"); (b) a bank information

"form sheet," which required that Trinity certify its wiring instructions; and (c) a withholding tax

"form sheet," which required that Trinity certify its withholding tax status under German law.

LBB requested that Trinity execute and return these documents within three business days. Exs.

C (8/13/2015 10:50 email) & D (Confirmation, with English translation).

24.     Trinity had no objection to the demand for the wiring instructions and tax status

forms. Trinity did object to the Confirmation, however, because Trinity could not certify that its

receipt of the Proposed Final LBB Distribution would constitute full payment of the Allowed

Direct Claims, as explained below.

25.     On information and belief, the LBB Administrator has taken the position

throughout the LBB Proceeding that the portion of any distribution that is in respect of the

interest component of an allowed claim is subject, absent an exemption, to withholding tax at the

rate of 25%, plus an additional solidarity surcharge of 5.5% applied to such withholding tax,

under German law. As a result, the LBB Administrator had withheld a total of €1,158,058.20

(the "Prior Withholdings") from the amounts directly or indirectly distributed to Trinity based on

the €7,897,604.53 aggregate interest component of the Allowed Direct Claims. *See* Ex. D. The

Proposed Final LBB Distribution would have increased the tax withholdings from Trinity on the

Allowed Direct Claims to €1,498,178.20 (the "Total Withholdings"). *See id.*

26.     In August 2015, and still today, Trinity has been unable to confirm that the Prior

Withholdings will be, or that the Total Withholdings would be, properly refunded or credited to

Trinity.  Trinity has not received responses from the German tax authorities to its submissions

seeking refunds of the Prior Withholdings.  Unless and until this refund process is successfully

completed and both distributions and withholdings on the Unpaid Claim are resolved, Trinity

will not have received full payment from LBB.  Trinity was unwilling to give LBB the

Confirmation because doing so arguably would deprive Trinity of any recourse to LBB in the

event that LBB's action or inaction deprived Trinity of (a) refunds for the Prior Withholdings or,

if applicable, the Total Withholdings, or (b) distributions on the Unpaid Claim.

27.     Trinity explained to LBB why Trinity objected to providing the Confirmation, and

Trinity further reminded LBB that LBB had no right to demand the Confirmation as a

precondition to receipt of the Proposed Final LBB Distribution, because no such document was

required by the Creditors Assembly Resolutions, the Harmonizing Resolution, or the LBHI-LBB

Agreement.  LBB disagreed, and refused to distribute any amount to Trinity in LBB D6 without

first receiving the Confirmation.

28.     At around the same time, LBHI contacted Trinity and argued that Trinity had an

obligation to accept the Proposed Final LBB Distribution in LBB D6, which would result in the

Allowed Guarantee Claims being satisfied in full under the Plan, and to provide LBB with any

documents that it demanded in advance.  Trinity disagreed that it had any such obligation under

the Trinity-LBHI Agreement, the Plan, or otherwise, and Trinity explained to LBHI why Trinity

could not provide the Confirmation to LBB.  LBHI did not then or thereafter request from

Trinity a certification or other materials under section 8.13(e) of the Plan.

29.     Trinity and LBB did not resolve their dispute over the Confirmation. Toward the end of August 2015, LBB issued LBB D6, but distributed nothing to Trinity on the Allowed Direct Claims. As a result, Trinity's aggregate recovery remained unchanged since LBHI D7: that is, 2.72% (Class 5) or 3.99% (Class 9A) remained outstanding toward full satisfaction of the Allowed Guarantee Claims under the Plan. Trinity looked to the upcoming LBHI distribution in September - October 2015 ("LBHI D8") to reduce this deficiency.

30.     In advance of LBHI D8, Trinity had told LBHI that Trinity would not provide the Confirmation and that without the Confirmation LBB refused to include Trinity in LBB D6. Thus, LBHI should have known that the Allowed Guarantee Claims would *not* be satisfied in full and *would* be entitled to distributions in LBHI D8 pursuant to sections 8.3 and 8.13 of the Plan. Nonetheless, when, on information and belief, LBHI issued LBHI D8 on October 3, 2015, including 1.54% to Class 5 and 1.46% to Class 9A, LBHI distributed nothing to Trinity on the Allowed Guarantee Claims.

31.     In two subsequent discussions with LBHI, although Trinity again explained why Trinity did not receive any payment in LBB D6, LBHI essentially asserted that Trinity, in LBHI's opinion, *should have* accepted the Proposed Final LBB Distribution in LBB D6, which *would have* resulted in the Allowed Guarantee Claims being deemed satisfied in full under the Plan, which in turn *would have* made any distribution on the Allowed Guarantee Claims in LBHI D8 (or afterward) an excess recovery.

32.     Trinity considered the Confirmation not only improper but sufficiently prejudicial that Trinity preferred to forego the immediate recovery of the Proposed Final LBB Distribution in LBB D6 in favor of a distribution in LBHI D8 that not only was less in amount but deferred the satisfaction in full of the Allowed Guarantee Claims under the Plan for at least six months.

Because LBHI has refused to include Trinity in LBHI D8 or (presumably) any further distributions, Trinity may never receive the outstanding 2.72% (Class 5) or 3.99% (Class 9A) due from LBHI on the Allowed Guarantee Claims without the assistance of this Court.

33.    For the avoidance of any doubt, Trinity is not seeking a recovery on the Allowed Guarantee Claims that is greater than what the Plan or the Trinity-LBHI Agreement provides. Trinity is not seeking to have LBHI cover the Prior Withholdings, which Trinity continues to pursue with the German tax authorities. Because Trinity's disputes with LBB and LBHI remain unresolved, Trinity respectfully requests that this Court compel LBHI (a) immediately to pay Trinity the amounts that should have been distributed to Trinity in LBHI D8, and (b) to make further distributions to Trinity, not to exceed the maximum recovery provided for in the Plan, on the Allowed Guarantee Claims.

I hereby declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: **17** March 2016
London, England

Pierre Bour

## EXHIBIT A

Execution Version

## SETTLEMENT AGREEMENT

This settlement agreement (the "Settlement Agreement") is entered into as of 24 November 2014 (the "Execution Date") by and between Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator (the "Plan Administrator") pursuant to the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), for and on behalf of the jointly-administered debtors in the chapter 11 cases described in the recitals below (the "Chapter 11 Estates"), on the one hand, and Trinity Investments Limited (the "Creditor"), on the other hand (each of the Plan Administrator and the Creditor, a "Party" and together, the "Parties").

## RECITALS:

A.      On September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the Southern District of New York (the "U.S. Court"). The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") under Case No. 08-13555 (SCC).

B.      On November 12, 2008 (the "LBB Commencement Date"), the German banking regulator filed insolvency proceedings against LBHI's wholly owned subsidiary Lehman Brothers Bankhaus AG ("LBB") and on November 13, 2008, the local court (*Amtsgericht*) of Frankfurt am Main (the "Insolvency Court") opened insolvency proceedings, file no. 810 IN 1120/08 L (the "LBB Proceeding") and appointed an insolvency administrator (the "Insolvency Administrator" or the "Insolvency Administration").

C.      The Creditor has filed the claims against LBB that are set forth on Schedule A hereto. Such claims have been allowed by LBB, and appear on LBB's insolvency table, in the amounts and with the claim numbers set forth on Schedule A under the headings "Allowed Amount" and "Claim Number" (the "Insolvency Claims"). In addition to the Insolvency Claims, the Creditor holds a disputed claim registered under serial number § 38 - 83 of LBB's Insolvency table which claim is preliminarily denied (*bestritten*) (the "Signal Iduna Claim").

D.      By order, dated July 2, 2009 [ECF No. 4271], the U.S. Court established September 22, 2009 as the deadline to file proofs of claim (each a "Proof of Claim") in the Chapter 11 Cases.

E.      The Creditor duly filed the Proofs of Claim against LBHI that are set forth on Schedule B hereto, asserting unsecured claims in the amounts set forth on Schedule B under the heading "Asserted Amount," on account of LBHI's guarantee of LBB's obligations (the "Creditor Guarantee Claims" and, together with the Insolvency Claims, the "Claims"). The Creditor Guarantee Claims were assigned claim numbers by the U.S. Court-approved claims and noticing agent (the "Claims Agent") as set forth on Schedule B under the heading "Claim

Number." In addition, this Settlement Agreement shall settle the allowance of certain other claims against LBHI (the "Direct Claims") as set forth on Schedule C.

The Insolvency Claims and the Creditor Guarantee Clams are claims that have been transferred and (sub-) participated after the opening of the LBB Proceeding to various investors. The Creditor is one of several investment funds that have sought the enforcement of these claims in the LBB Proceedings and against LBHI (the "Settling Creditors"). The Settling Creditors are

REDACTED

The Insolvency Claims asserted by the Settling Creditors are listed in Schedule D (the "Settling Creditors Insolvency Claims").

F.      On December 6, 2011, the U.S. Court entered an order confirming the Plan [ECF No. 23023] (the "Confirmation Order"). The Confirmation Order provides that the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) [ECF No. 7936] (the "First Settlement Procedures Order") shall continue to apply and be binding on all parties following the effective date of the Plan through the date upon which all of the Chapter 11 Cases have been closed in accordance with Section 6.6 of the Plan. On March 6, 2012, the Plan became effective.

G.      On July 18, 2012, the U.S. Court entered the Order Modifying Certain Existing Claims Orders, approving claims settlement procedures [ECF No. 29505] (the "Second Settlement Procedures Order"). The Second Settlement Procedures Order superseded the First Settlement Procedures Order. As of the date hereof, the Second Settlement Procedures Order has not been appealed, stayed or vacated, in whole or in part.

H.      On 19 November 2014 LBHI and LBB, acting through the Insolvency Administrator, entered into an agreement ("LBB Agreement") which provides inter alia for creditors assembly resolutions as set forth in the Insolvency Court's order dated 28 October 2014, attached hereto as Schedule E (as expressly set forth therein, without any substantive alteration, the "Creditors Assembly Resolutions") resolving conflicting insolvency law issues, in particular section 44a of the German Insolvency Code ("InsO"), for certain confirmations regarding the status of the LBB Proceeding and costs and fees occurred, etc. in the LBB Proceeding (as explained in further details in the document attached hereto as Schedule F sent to LBB's creditors by LBB's Insolvency Administrator), and for bilateral agreements (the "Bilateral Agreements") between LBHI and LBB creditors containing substantially similar terms to those in this Settlement Agreement to implement the resolution of these issues (such agreed issues collectively, the "Harmonizing Resolution").

I.       After good-faith, arms'-length negotiations, the Parties have agreed to resolve the conflicting insolvency law issues and other issues relevant for implementing the Harmonizing Resolution, including the allowance of the Creditor Guarantee Claims in the Chapter 11 Cases, pursuant to the terms and conditions set forth in this Settlement Agreement.

J. Pursuant to the Plan and Second Settlement Procedures Order, the Plan Administrator is authorized to enter into this Settlement Agreement without approval of the U.S. Court or any other party in interest. *See* Second Settlement Procedures Order, ¶1.

## AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing, it is hereby stipulated and agreed that:

1. The Recitals set forth above form an integral part of this Settlement Agreement and are incorporated fully herein.

2. This Settlement Agreement shall become effective upon the Execution Date (the "<u>Effective Date</u>").

3. The Parties agree that as part of the Harmonizing Resolution certain creditors that do not hold guarantee claims against LBHI as set out in Exhibit 1 hereto (the "<u>Non-Guaranteed Creditors</u>") will receive both the (flexible) quota from the LBB estate in accordance with sections 187, 196, 197 InsO, which includes all advance distributions (the "<u>LBB Quota</u>") and, before or at the time of the final distribution (*Schlussverteilung*) receive a payment equaling their outstanding insolvency claim in the rank of section 38 InsO from cash that will be provided by LBHI for the benefit of those creditors, by purchase of their remaining outstanding insolvency claims or otherwise.

4. By this Settlement Agreement the Creditor agrees to the Harmonizing Resolution, including all Creditor Assembly Resolutions. The Creditor agrees to vote in favor of all of the Creditors Assembly Resolutions and hereby waives its right to object to or, if duly approved, to appeal the Creditors Assembly Resolutions; provided, however, that in the event the power of attorney entered into by the Creditor for purposes of voting on the Creditors Assembly Resolutions is not recognized by the Insolvency Court, but the Creditor otherwise fulfills its obligations under this paragraph 4, then the Creditor shall be deemed to have complied with this paragraph 4 in all respects and not to be in breach hereof. Furthermore the Creditor expressly agrees that it will not object to the Harmonizing Resolution by (i) filing any appeal or relief (including but not limited to the application pursuant to Sec. 78 InsO) to a German court, in or outside the creditor assembly against the Creditors Assembly Resolutions or any subsequent assembly resolutions or court decisions implementing the Harmonizing Resolution as set forth in the Creditor Assembly Resolutions including its underlying documentation (in particular the "*Beschlussvorlagen*" and explanations) and this Settlement Agreement, and waives any of its rights to object or appeal accordingly, (ii) objecting against or filing any appeal or relief against any distributions schedule ("*Verteilungsverzeichnis*") in the LBB proceeding implementing the Harmonizing Resolution as set out in the aforementioned resolutions and documentation, including any advance distributions, and waives any of its rights to object or appeal accordingly, (iii) orally or in writing communicating an objection to or dissent with the Harmonizing Resolution or its implementation by the Insolvency Administrator (in particular but not limited to the implementation by the treatment of the claims and the distribution as provided for in the Harmonizing Resolution) to the Insolvency Administrator or the Insolvency Court, (iv)

3

addressing the creditors or the Insolvency Court in the creditors' assembly in such a fashion or (v) doing the same on the record in the Chapter 11 Cases, for the avoidance of doubt all of the foregoing subject to the correct implementation of the Harmonizing Resolution by the Insolvency Administrator, the Insolvency Court and LBHI.

5. By way of this Settlement Agreement, the Creditor agrees and consents to (1) the identification, safeguarding, assessment, management, administration, disposition and distribution of the insolvency estate of LBB AG and to the results achieved and decisions made in the LBB AG Insolvency Proceeding such as disposals, settlements, measures and acts (*Handlungen*), including allowance and treatment of filed claims of other LBB creditors, and all acts or actions in court proceedings as laid down in the reporting to the Creditors as per the Insolvency Administrators' reports up to, and including, the 16th report as of 22 September 2014 (the "Insolvency Administrators' Reports") and other documents available for inspection of LBB's creditors in the Insolvency Court files, (2) the fulfilment of administrative claims against LBB's insolvency estate pursuant to sections 53 – 55 InsO (*Masseverbindlichkeiten*) as specified in the Insolvency Administrators' Reports (including its exhibits) or admitted/determined in orders issued by the Insolvency Court, (3) the previous costs and fees of the Insolvency Administration amounting to EUR 312,180,375.00 (excluding statutory VAT) for administrative services rendered (*erbrachte Verwalterleistungen*) by December 31, 2012, as admitted (*bewilligt*) by order of the Insolvency Court on September 19, 2013, and, on that basis, the final remuneration (fees) of the Insolvency Administration in a range between EUR 400m and EUR 500m (plus statutory VAT) within the meaning of section 63 InsO, (4) the previous costs and fees of the LBB AG Creditors' Committee and its members amounting to EUR 2,947,945.52 (plus statutory VAT) for the services rendered by December 31, 2012 as admitted in the previous orders of the Court are appropriate (*angemessen*) and, on that basis, the future invoices (*Abrechnung*) in accordance with the methodology of section 73 para 1 InsO applied so far, (5) the proposal that no hearing will take place regarding the final accounting of the Insolvency Administrator (*Schlussrechnung*) and that no other auditing regarding the accounting of the Insolvency Administrator (*Rechnungsprüfung*) is necessary other than the auditing currently being undertaken by FRTG-Group as mandated by the Insolvency Court; and (6) the proposal not to raise or assert or enforce any liability claims against the (former) organs of LBB.

6. Also, the Creditor agrees not to (except to enforce the terms of the Creditors Assembly Resolutions) make any claims or rights of whatsoever nature against the Insolvency Administrator, his firm and its partners, the members of LBB's Creditors Committee and LBB, as a result of, or in connection with, this Settlement Agreement, the implementation of the Creditors Assembly Resolutions as approved by a statutory majority at the creditors' assembly and related distributions provided for therein and the Creditor shall be barred from asserting any and all claims to receive additional distributions in the LBB Proceeding from LBB's estate on account of the Insolvency Claims not provided for and consistent with the Harmonizing Resolution.

7. Conditioned upon

(a) LBB's creditors' assembly having voted with statutory majority in favor of the Creditors Assembly Resolutions, it being understood that solely the factual voting of

4

the creditors with statutory majority shall be relevant and decisive and that it shall not be relevant whether the Creditors Assembly Resolutions are legally binding or have legal effect or whether a different creditor outside the Settling Creditors objects to the Creditors Assembly Resolutions;

(b) all Settling Creditors Insolvency Claims having voted in favor of the Creditor Assembly Resolutions in the creditors' assembly on November 25, 2014 subject to the proviso in paragraph 4 sentence 2 above; and

(c) neither the Creditor nor any other member of the Settling Creditors having objected (as set out under 4. above) to (i) the Creditor Assembly Resolutions or (ii) the Harmonizing Resolution until the closure of the creditors' assembly voting upon the Creditor Assembly Resolutions on November 25, 2014.

The date on which these conditions are met is referred to herein as the "Allowance Effective Date", which is anticipated to be November 25, 2014. On the Allowance Effective Date, the Creditor Guarantee Claims and the Direct Claims shall be Allowed Claims in the Chapter 11 Cases in the amounts and classes set forth on Schedule B and Schedule C under the headings "Allowed Amount" and "LBHI Class" (in such Allowed Amounts, the "Allowed Creditor Guarantee Claims" and the Allowed Direct Claims) and shall be entitled to receive distributions under the plan (in addition to distributions from LBB in respect of the Insolvency Claims) without any deductions or withholdings whatsoever (except for any tax withholding expressly required pursuant to the Plan); *provided that* the Plan Administrator will not make distributions in respect of the Allowed Creditor Guarantee Claim, including amounts retained pursuant to section 8.4 of the Plan, until the first Distribution Date that is at least 21 days after the Effective Date.

For the avoidance of doubt, for those Insolvency Claims which are held as a sub participation and the registered creditor in the LBB proceeding is not a member of the Settling Creditors or where a different creditor outside the Settling Creditors will exercise the voting rights pursuant to the underlying investment agreements, condition (b) above will be fulfilled and such fulfillment can be evidenced by a respective written voting instruction to the voting creditor and condition (c) can be fulfilled by a respective instruction not to object against the Creditor Assembly Resolutions or the Harmonizing Resolution. If the registered creditor in the LBB proceeding has voted in favor of the Creditor Assembly Resolutions and has not objected to the Creditor Assembly Resolutions or the Harmonizing Resolution as provided for in sect. 4, then the conditions set out in (b) and (c) above are deemed to be fulfilled. The Creditor agrees that it will not change the voting rights after execution of this Settlement Agreement in order to avoid or circumvent the obligations as set out in 4. above until the end of the creditor assembly voting on the Creditor Resolutions.

Should the creditors' assembly on November 25, 2014 not vote upon the Creditor Assembly Resolutions, e.g. because the vote is postponed or the creditor assembly is rescheduled, then the following shall apply:

(i) If the LBB creditors' assembly shall have voted with statutory majority in favor of the Creditor Assembly Resolutions within the year 2014, this agreement shall stay in effect and the provisions of this agreement shall apply accordingly;

(ii) If the LBB creditors' assembly shall not have voted with statutory majority in favor of the Creditor Assembly Resolutions within the year 2014, then this Settlement Agreement shall become null and void and of no further force and effect with retroactive effect and the parties will negotiate in good faith the further procedure to implement the Harmonizing Resolution based on the principles set out herein.

8.      Promptly after the Allowance Effective Date, the Plan Administrator shall deliver a joint instruction letter in the form annexed hereto as Exhibit 3, attaching a copy of this Settlement Agreement, to the Claims Agent with instructions to update the claims registry to reflect the Allowed Creditor Guarantee Claims and the Allowed Direct Claims. The Creditor agrees that the content of this Settlement Agreement or a copy of it may be made available to all other LBB Creditors and the Insolvency Court in the LBB Proceeding.

9.      The Creditor agrees to be liable to LBHI for the disgorgement of any distributions or other consideration received by the Creditor on account of any Allowed Creditor Guarantee Claim (excluding distributions contributed to the Plan Adjustment on account of such Allowed Creditor Guarantee Claim) to the extent that such distributions or other consideration, combined with distributions or other consideration made or paid by, or on behalf of, LBB in the LBB Proceeding to the Creditor or any previous holder on account of any portion of the related Insolvency Claim (converted to USD in accordance with section 8.13(d) of the Plan), in the aggregate exceed the allowed amount of such Allowed Creditor Guarantee Claim.

10.     The Creditor hereby assigns, transfers, and conveys all of its right, title and interest in and to (a) each Insolvency Claim together with (1) any distributions received on such Insolvency Claim (converted to USD in accordance with section 8.13(d) of the Plan) in excess of the allowed amount of the related Allowed Creditor Guarantee Claim and (2) any ancillary claims (*Nebenforderungen*) and any claims pursuant to section 39 para 1 No. 1 and 2 InsO and the Signal Iduna Claim together with any distributions and ancillary claims, as applicable (the "Assigned Claims"), free and clear of any and all liens and encumbrances, to LBHI (the "Assignment"), *provided that* the Assignment of each Insolvency Claim shall not be effective until (i) each of the Creditor Guarantee Claims has become an Allowed Claim in the Chapter 11 Cases in the amounts and classes set forth on Schedule B under the headings "Allowed Amount" and (ii) the Creditor has received distributions from LBHI and LBB on the respective Insolvency Claim (not taking into account the Signal Iduna Claim) and the related Allowed Creditor Guarantee Claim, that in combination are equal to the greater of the following amounts (such greater amount, the "Creditor's Quota Cap"):

(a.)    the USD amount of the Allowed Creditor Guarantee Claim, *provided that* any EUR distributions received by the Creditor from LBB in respect of a related Insolvency Claim (as specified in Schedule A) shall for purposes of this subparagraph (a) be converted into USD applying a EUR/USD exchange rate of 1.3402, and

6

(b.)    a USD amount equal to the amount of the related Insolvency Claim (as specified in Schedule A) converted into USD at a USD/EUR exchange rate of 1.41904, *provided that* any EUR distributions received by the Creditor from LBB in respect of such Insolvency Claim shall for purposes of this subparagraph (b) be converted into USD applying a EUR/USD exchange rate of 1.3402.

The Creditor agrees that upon the effectiveness of the Assignment, (i) the Creditor shall not further participate in the LBB Proceeding, except to the extent necessary to enforce its rights in connection with this Settlement Agreement, and (ii) all rights arising from the Assigned Claims will be exercisable by LBHI and not by the Creditor.

11.    The Creditor agrees that any creditor in the LBB Proceeding that holds an allowed claim for distribution in the LBB Proceeding and asserts a related guarantee claim against LBHI shall be treated as follows, and the Creditor further agrees that this treatment is part of the Creditors Assembly Resolutions:

(a.)    Each such guaranteed creditor that has (i) executed a bilateral settlement agreement or comparable binding agreement with LBHI containing substantially similar terms to those in this Settlement Agreement, including assignments of claims to LBHI, and (ii) voted in favor of and not objected to, or moved against, any of the terms of the Creditors Assembly Resolutions (such creditor, a "Settled Guarantee Creditor") shall receive distributions from LBHI and LBB on a given allowed creditor guarantee claim and related insolvency claim in the rank of section 38 InsO, respectively, until such distributions collectively reach the greater of the following amounts (such greater amount, except as expressly provided in subclause (iii) below, the "Quota Cap"):

*(i)* the USD amount of the allowed creditor guarantee claim, *provided that* any EUR distributions received by the creditor from LBB in respect of the related insolvency claim in the rank of section 38 InsO shall for purposes of this subclause (i) be converted into USD applying a EUR/USD exchange rate of 1.3402, and

*(ii)* a USD amount equal to the amount of the related insolvency claim in the rank of section 38 InsO converted into USD at a USD/EUR exchange rate of 1.41904, *provided that* any EUR distributions received by the creditor from LBB in respect of the related insolvency claim in the rank of section 38 InsO shall for purposes of this subclause (ii) be converted into USD applying a EUR/USD exchange rate of 1.3402; *and further provided that*,

*(iii)* notwithstanding the foregoing, the Quota Cap for BdB is derived from its settlement agreement with LBHI dated 30 September 2011; the Quota Cap for Entschädigungseinrichtung deutscher Banken GmbH (EdB) is derived from its settlement agreement with LBHI dated 30 September 2011 ; the Quota Cap for Bundesbank is derived from its settlement agreement with LBHI dated 11 October 2011; and for each of LBIE and LB Asia a different Quota Cap applies, taking into account that their allowed guarantee claims are higher than their related insolvency claims in the rank of section 38 InsO.

7

(b.)     Each such guaranteed creditor that has (i) not executed a bilateral settlement agreement (or comparable binding agreement with LBHI, including assignment of claims to LBHI) and/or (ii) not voted in favor of or objected to, or moved against, any of the terms of the Creditors Assembly Resolutions (such creditor, a "<u>Non Settled Guarantee Creditor</u>") shall (A) receive distributions out of the LBB Proceeding equal to (x) 100% of the allowed claim amount in the rank of section 38 InsO, minus (y) projected recovery amounts from LBHI on account of the related guarantee claim, currently estimated at 29.7% for LBHI Class 5 and 27.98% for LBHI Class 9A (as defined in the Plan) (irrespective of exchange rates), as updated from time to time by the LBB Insolvency Administrator using information provided by LBHI and/or publicly available market quotations, and (B) have reserves retained in the amount equal to 100% of its claim plus post-petition interest and post-petition costs (if applicable) as determined by the LBB Insolvency Administrator based on statutory law, less distributions from LBB and LBHI (if applicable); it being understood that if the Non Settled Guarantee Creditor agrees to a bilateral settlement agreement (or comparable binding agreement with LBHI, including assignments of claims to LBHI), then distributions to the Non Settled Guarantee Creditor shall be governed by subparagraph 11 (a) above (and it shall be deemed thereafter to be a "Settled Guarantee Creditor").

(c.)     The insolvency claims in the LBB Proceeding shall only be regarded discharged (*erfüllt*) by distributions or other consideration out of the LBB Proceeding, without taking into account any distributions or other consideration received from LBHI in respect of guarantee claims.

12.     LBHI undertakes not to make use, not to enforce and not to accept benefits in respect of any Assigned Claims or other claims assigned to LBHI by any of LBB's creditors pursuant to comparable binding agreements with LBHI containing substantially similar terms to those of this Settlement Agreement, including assignments of claims to LBHI, until:

(a.)     administrative costs, including fees, and expenses (*Massekosten und Massekostenverbindlichkeiten*) pursuant to sections 53 to 55 InsO have been paid or reserved for in the LBB Proceeding (section 187 InsO);

(b.)     each Settled Guarantee Creditor has received its quota cap (not taking into account any non-guaranteed claims, if applicable and subject to the individual agreements with specific creditors having different agreements on their Quota Cap); and

(c.)     each Non Settled Guarantee Creditor has received the full amount of distributions or has had the full amount of reserves retained as provided for in subparagraph 12(b) above.

(d.)     all other disputed claims have been reserved for; and

(e.)     all non-guaranteed claims listed in Exhibit 1 have been satisfied in full, i.e., have received payments equaling 100% of their outstanding insolvency claim in the rank of Sec. 38 InsO (partly through distributions by LBHI upon acquisition) or have received an offer from LBHI to acquire their claim in order to increase their distributions to 100% of their

8

WEIL:\95165247\2\58399.0011

outstanding insolvency claim in the rank of section 38 InsO and LBHI has provided the funds to remit to the creditor upon acceptance of LBHI's offer.

(f.)    For the avoidance of doubt, distributions to LBHI shall not be held up by the mere fact that the claims listed in Exhibit 2 which shall include the BdB Cost Claim, LBIE Claims, and LB Asia Claims have not yet received the full LBB quota according to sections 187, 196 InsO.

(g.)    Notwithstanding the above, when making distributions, the LBB Insolvency Administrator will include in the claims denominator (amount of claims used to determine the distribution quota) all allowed LBB claims including the claims assigned to LBHI by guarantee creditors notwithstanding the fact that said claims have reached their respective Quota Caps. Until (i) each Settled Guarantee Creditor's claim has reached its Quota Cap, (ii) each Non-Guaranteed Creditor's claim (other than those creditors' claims listed in Exhibit 2) has been satisfied as set forth in subparagraph 12(e) above, and (iii) reserves have been established as provided for above (the foregoing subclauses (i), (ii) and (iii) collectively, the "Non Satisfied Claims"), distribution amounts allocated to any of the claims assigned to LBHI shall be distributed or used for reserves for the Non Satisfied Claims in accordance with statutory law. This means, at each distribution date (and provided that reserves for administrative costs, including fees, and expenses pursuant to sections 53 to 55 InsO were established beforehand), distributions and reserves for Non Satisfied Claims, as applicable, shall be made on a pro rata basis. For the avoidance of doubt, distribution amounts allocated to any of the claims assigned to LBHI are reserved for based on the same principles that apply to all other claims that are reserved for. Once the Non Satisfied Claims have been satisfied through distributions or reserves as provided in the subparagraphs of paragraph 10 mentioned above, LBHI on account of the claims assigned to LBHI shall receive its pro rata share of distributions; *provided, that* should not all conditions in subparagraphs 12(a) through 12(e) hereof be satisfied, the LBB Insolvency Administrator shall reserve for the claims assigned to LBHI.

(h.)    For the avoidance of doubt, those claims listed in Exhibit 2 shall receive the full amount of the LBB quota according to sections 187, 196 InsO which shall factor in reserves or distributions to LBHI on account of the claims assigned to LBHI as set forth in this section, ensuring that they receive the same level of distributions they would have received outside of the Harmonizing Resolution.

13.    As requested by LBHI, the Creditor hereby agrees that all Insolvency Claims that are assigned to LBHI in accordance with the Creditors Assembly Resolutions and in the implementation of the Harmonizing Resolution shall remain in their current rank (Sect. 38 InsO or Section 39 para 1 no. 1 and 2 InsO) and that distributions in respect of such claims be made by LBB to LBHI on these claims in that rank, taking into account, however, the limitations set forth in paragraph 12 above, and the Creditor consents that other LBB creditors may be requested to agree, and may agree, on settlements in substance comparable to this Settlement Agreement.

9

14.     Should the distributions in the LBB proceedings not occur in accordance with the provisions set out in paragraph 11. and 12. and LBHI as a consequence receive distributions from LBB before the creditors of the Settling Creditors have reached their Quota Caps, LBHI will turn over those distributions that the creditors of the Settling Creditors would have received in case of a distribution schedule in accordance with paragraphs 11. and 12. (instead of LBHI) to the respective creditors of the Settling Creditors.

15.     [omitted]

16.     Upon the Allowance Effective Date, other than the right to receive distributions under the Plan and in accordance with this Settlement Agreement on account of the Allowed Creditor Guarantee Claims and the Allowed Direct Claims, the Creditor and its affiliates, successors and assigns, and their past, present and future members, officers, directors, shareholders, partners, principals, agents, insurers, servants, employees, representatives, administrators, executors, trustees and attorneys (collectively, the "Releasing Parties"), shall have no further right to payment from LBHI, the Plan Administrator, the Chapter 11 Estates, the affiliates controlled by the Chapter 11 Estates, or their respective successors or assigns (collectively, the "Released Parties") in respect of the Creditor Guarantee Claims and the Direct Claims, and upon the Allowance Effective Date hereby irrevocably waives any and all claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, defenses, rights of setoff and recoupment, debt, liens, losses, demands, damages, costs and causes of action of whatever nature arising out of or relating to the Creditor Guarantee Claims and the Direct Claims (collectively, the "Released Claims") against any of the Released Parties, and shall be barred from asserting against any of the Released Parties any and all Released Claims whatsoever, whether known or unknown, whether accrued or unaccrued, matured or unmatured, liquidated or unliquidated, certain or contingent, asserted or not asserted, and whether found in fact or law or in equity, in existence as of the execution of this Settlement Agreement; provided, however, that the releases granted in this Clause 16 shall not apply to obligations, rights, remedies or actions arising or accruing pursuant to the LBB Agreement or this Settlement Agreement.

17.     Subject to the exception set out at the end of this Clause, Clause 12 shall only become effective when LBB's Creditors Assembly has voted with statutory majority in favor of the Creditors Assembly Resolutions, it being understood that solely the factual voting of the creditors with statutory majority shall be relevant and decisive and that it shall not be relevant whether the Creditors Assembly Resolutions are legally binding or have legal effect or whether a different creditor outside the Settling Creditors objects to the Creditors Assembly Resolutions.

Subject to the Settling Creditors having reached the Creditor's Quota Caps for each and all of their Settling Creditors Insolvency Claims, the restrictions set out in Clause 12 shall fall away if a legally binding court order has ruled that either (i) any of LBHI's claims assigned by the guarantee creditors do not remain in the rank they had before the assignment or (ii) the Harmonizing Resolution cannot be implemented, in case such ruling has been issued within 24 months of LBB having distributed a quota of 90% to allowed LBB creditors' claims in the rank of section 38 InsO provided that such quota is achievable, if not, a lower quota applies as agreed between the LBB Insolvency Administrator and LBHI (so that the limitations set out in Clause

10

12 will not fall away as long as the Settling Creditors has not reached their Quota Caps in their entirety).

18.    The Parties agree and acknowledge that any breach of this Settlement Agreement may result in irreparable damage for which the non-breaching Parties will not have an adequate remedy at law. Accordingly, in addition to any other remedies and damages available, the Parties acknowledge and agree that any non-breaching Party may immediately seek enforcement of this Settlement Agreement by means of specific performance or injunction, without any requirement to post a bond or other security.

19.    This Settlement Agreement contains the entire agreement between the Parties as to the subject matter hereof and supersedes all prior agreements and undertakings between the Parties relating thereto, including, but not limited to, any prior agreements between the Creditor and LBHI concerning the Creditor Guarantee Claims.

20.    This Settlement Agreement may not be modified other than by a writing signed by the Parties.

21.    Each person who executes this Settlement Agreement represents and warrants that he or she is duly authorized to do so on behalf of the respective Party and that each such Party has full knowledge of and has consented to this Settlement Agreement.

22.    The Creditor represents and warrants that on the Effective Date, it has been assigned all of the Claims, the Direct Claim and the Signal Iduna Claim by Attestor Capital Value Master Fund, L.P. ("Attestor"), and owns the Claims, the Direct Claim and the Signal Iduna Claim free and clear of any and all liens, claims, setoff rights, security interests, participations, or encumbrances, and has not transferred or assigned any of the Claims, the Direct Claims and the Signal Iduna Claim to any other person, in whole or in part. The Creditor shall procure that Attestor will not assert any claims against LBHI resulting from or in connection with, the Claims, the Direct Claims and the Signal Iduna Claim.

23.    Except for the assignment of claims to LBHI pursuant to paragraph 10 of this Settlement Agreement, the Creditor may not convey, transfer, assign, participate, or sub-participate the Claims, or any rights or interests arising thereunder, in whole or in part, to any party or parties (any such party, a "Transferee") after the Execution Date, unless such conveyance, transfer, assignment, participation or sub-participation is consummated pursuant to a written agreement that provides that the terms and provisions of this Settlement Agreement, including, but not limited to, the obligation to assign claims pursuant to paragraph 8hereof, shall be binding in all respects upon the Transferee and any successor transferees

24.    LBHI may not convey, transfer, assign, participate, or sub-participate the Assigned Claims, or any rights or interests arising thereunder in whole or in part to any Transferee after the Execution Date, unless such conveyance, transfer, assignment, participation or sub-participation is consummated pursuant to a written agreement that provides that the terms and provisions of this Settlement Agreement shall be binding upon the Transferee and any successor transferees in all respects.

11

25.     Each Party represents and warrants to the other Party that its own execution and delivery of, and performance of its obligations under, this Settlement Agreement are within its corporate powers, have been duly authorized by all necessary action, and will not contravene any constitutional document or other instrument or agreement binding on it, or any law, regulation, judgment, order or administrative action binding on it.

26.     The Plan Administrator represents and warrants that this Settlement Agreement is being entered into in accordance with and pursuant to the terms of the Second Settlement Procedures Order, that the Plan Administrator is authorized to enter into it, and that this Settlement Agreement is valid and binding in accordance with the terms of the Plan and without the approval of the U.S. Court or any other party in interest.

27.     This Settlement Agreement shall inure to the benefit of, and shall be binding upon, the Parties hereto and their respective successors and assigns. The Parties acknowledge that the stipulations regarding the content of Creditors Assembly Resolutions and the obligation of the Creditor related thereto, which means confirmation of the measures undertaken, including allowance and treatment of other LBB creditors, costs and fees in the LBB Proceeding, waiver of rights and objections related thereto and the exclusion of liability of the Insolvency Administrator, his firm and its partners, the members of the LBB Creditors' Committee and the LBB (former) organs are for the benefit of each of these parties, including LBB, in accordance with Section 328 BGB.

28.     This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Settlement Agreement to present any copy, copies, or facsimiles signed by the Parties hereto to be charged. Delivery of an executed counterpart of a signature page by facsimile or PDF transmission shall be as effective as delivery of a manually executed counterpart.

29.     This Settlement Agreement shall inure to the benefit of, and shall be binding upon, the Parties hereto and their respective successors and assigns.

30.     All rights under Section 1542 of the California Civil Code, or any analogous state or federal law, are hereby expressly WAIVED, if applicable, with respect to any of the claims, injuries, or damages described in the release in Paragraph 4. Section 1542 of the California Civil Code reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

31.     This Settlement Agreement shall be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to conflicts of law principles thereof.

WEIL:\95165247\2\58399.0011

32.    The U.S. Court shall have exclusive jurisdiction over any and all disputes arising out of or otherwise relating to this Settlement Agreement. Should the U.S. Court abstain from exercising its jurisdiction or be found not to have jurisdiction over a matter relating to this Settlement Agreement, such matter shall be adjudicated in either a federal district court in the State of New York or a state court in the State of New York.

33.    The fees and expenses incurred by each Party in connection with this Settlement Agreement will be paid by such Party.

34.    Each Party acknowledges that this Settlement Agreement effects a settlement of potential claims and counterclaims that are denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing or a waiver of any rights or claims except as expressly provided for herein.

35.    This Settlement Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Settlement Agreement.

**THE UNDERSIGNED WARRANT THAT THEY HAVE READ THE TERMS OF THIS SETTLEMENT AGREEMENT, HAVE HAD THE ADVICE OF COUNSEL OR THE OPPORTUNITY TO OBTAIN SUCH ADVICE IN CONNECTION WITH READING, UNDERSTANDING AND EXECUTING THE SETTLEMENT AGREEMENT, AND HAVE FULL KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS SETTLEMENT AGREEMENT.**

LEHMAN BROTHERS HOLDINGS INC.

By:

Print Name:

Title:

Trinity Investments Limited
acting by Attestor Capital LLP

By:

    Name:    PIERRE BOUR

    Title:    MANAGING MEMBER

**Schedule A - Trinity**

| Claim No. according to LBB's creditor list | Allowed Insolvency Claim amount in LBB's insolvency proceedings (Euro) |
|---|---|
| § 38 - 101 | € 4,000,000.00 |
| § 38 - 137 | € 1,522,379.79 |
| § 38 - 244 | € 5,128,531.94 |
| § 38 - 247 | € 15,202,838.00 |
| § 38 - 256 | € 4,933,459.00 |
| § 38 - 261 | € 10,000,000.00 |
| § 38 - 262 | € 4,970,534.25 |
| § 38 - 268 | € 38,514,231.23 |
| § 38 - 484 | € 10,275,753.42 |
| § 38 - 530 | € 52,519.75 |
| § 38 - 710 | € 962,596.31 |

Subparticipations

| | |
|---|---|
| § 38 - 196 | € 2,046,333.33 |
| § 38 - 277 | € 2,347,190.21 |
| § 38 - 301 | € 6,655,125.80 |
| § 38 - 064 | € 1,054,295.28 |
| § 38 - 065 | € 484,080.38 |
| § 38 - 067 | € 862,569.44 |
| § 38 - 072 | € 1,703,407.41 |
| § 38 - 079 | € 2,128,056.71 |
| § 38 - 136 | € 870,421.99 |
| § 38 - 225 | € 1,909,020.60 |
| § 38 - 267 | € 4,722,692.50 |
| § 38 - 450 | € 5,000,000.00 |
| § 38 - 498 | € 102,816.44 |
| § 38 - 548 | € 10,193,450.68 |

1

**Schedule B - Trinity**

| Holder of Record | | |
|---|---|---|
| **LBHI Proof of Claim No.** | **Allowed Guarantee Claim amount in LBHI Case (USD)** | **LBHI Class** |
| 50504 | $ 12,845,043.08 | 5 |
| 50505 | $ 6,547,766.12 | 5 |
| 66027 | $ 7,184,612.20 | 5 |

| Subparticipations* | | |
|---|---|---|
| **LBHI Proof of Claim No.** | **Allowed Guarantee Claim amount in LBHI Case (USD)** | **LBHI Class** |
| 59837 | $ 2,227,869.67 | 5 |

| Holder of Record | | | |
|---|---|---|---|
| **LBHI Proof of Claim No.** | **Asserted Guarantee Claim amount in LBHI Case (USD)** | **To Be Allowed Guarantee Claim amount in LBHI Case (USD)** | **LBHI Class** |
| 14416 | $ 5,697,200.01 | [$5,676,160.00] | 9A |
| 17741 | $ 7,284,655.11 | [$7,277,591.96] | 9A |
| 21444 | $ 14,546,325.67 | [$14,581,705.13] | 5 |
| 21954 | $ 23,297,177.06 | [$21,573,435.24] | 9A |
| 55570 | $ 53,947,966.29 | [$56,019,197.35] | 9A |
| 67114 | $ 2,157,973.35 | [$2,160,317.82] | 5 |
| TBD | N/A | [$1,925,505.35] | 5 |

| Subparticipations* | | | |
|---|---|---|---|
| **LBHI Proof of Claim No.** | **Asserted Guarantee Claim amount in LBHI Case (USD)** | **To Be Allowed Guarantee Claim amount in LBHI Case (USD)** | **LBHI Class** |
| 5276 | $ 1,218,038.71 | [$1,224,020.54] | 5 |
| 10117 | n/a | [$2,417,203.25] | 9A |
| 13477 | $ 2,989,819.09 | [$3,019,797.59] | 5 |
| 15535 | $ 680,424.41 | [$686,929.42] | 5 |
| 16022 | $ 984,105.65 | [$1,235,163.62] | 5 |
| 17617 | $ 7,332,315.70 | [$7,241,100.64] | 5 |
| 19963 | $ 4,694,538.39 | [$3,330,756.80] | 9A |
| 19967 | $ 4,694,538.39 | [$2,903,828.85] | 9A |
| 22049 | $ - | [$6,701,689.57] | 9A |
| 22217 | $ 11,663,057.27 | [$14,464,914.25] | 5 |
| 28185 | $ 1,195,076.93 | [$1,496,087.17] | 5 |
| 65918 | $ 3,129,379.29 | [$9,443,889.72] | 9A |
| TBD | N/A | [$481,106.92] | 5 |

* Includes portion where LBHI claimaint is listed in EPIQ under a different name

08-13555-scc    Doc 52305    Filed 03/22/16    Entered 03/22/16 13:06:44    Exhibit
Pg 48 of 84

**Schedule C – Trinity**

| LBHI Proof of Claim No. | [To-be-allowed] Direct Claim amount in LBHI Case | LBHI Class | Comments |
|---|---|---|---|
| TBD | [$8,486,580.47] | 5 | Macron disputed (LBB claims §38-707 & §38-725) |
| TBD | [$41,119,315.76] | 5 | Diamond disputed (LBB claim §38-267) |
| TBD | [$202,335,932.12] | 5 | Neovara disputed (LBB Rank 38 Claims 552-562, 564-570 &706) |

**Schedule D**

**Settling Creditors**

| Claim No. according to LBB's creditor list | Economic holder | Allowed Insolvency Claim amount in LBB's insolvency proceedings (Euro) |
|---|---|---|
| § 38 - 002 | REDACTED | € 15.526.612,50 |
| § 38 - 048 | | € 6.285.065,24 |
| § 38 - 065 | | € 4.453.539,55 |
| § 38 - 072 | | € 6.813.629,63 |
| § 38 - 079 | | € 19.578.121,72 |
| § 38 - 101 | | € 28.272.009,05 |
| § 38 - 261 | | € 29.667.962,01 |
| § 38 - 262 | | € 9.941.068,01 |
| § 38 - 484 | | € 6.709.424,66 |
| § 38 - 485 | | € 8.734.390,41 |
| § 38 - 526 | | € 5.066.427,40 |
| § 38 - 527 | | € 10.000.000,00 |
| § 38 - 530 | | € 105.039,50 |
| § 38 - 546 | | € 10.322.526,64 |
| **Total** | REDACTED | € **161.475.816,32** |

| § 38 - 064 | Trinity | € 1.054.295,28 |
|---|---|---|
| § 38 - 065 | Trinity | € 484.080,38 |
| § 38 - 067 | Trinity | € 862.569,44 |
| § 38 - 072 | Trinity | € 1.703.407,41 |
| § 38 - 079 | Trinity | € 2.128.056,71 |
| § 38 - 101 | Trinity | € 4.000.000,00 |
| § 38 - 136 | Trinity | € 870.421,99 |
| § 38 - 137 | Trinity | € 1.522.379,79 |
| § 38 - 196 | Trinity | € 2.046.333,33 |
| § 38 - 225 | Trinity | € 1.909.020,60 |
| § 38 - 244 | Trinity | € 5.128.531,94 |
| § 38 - 247 | Trinity | € 15.202.838,00 |
| § 38 - 256 | Trinity | € 4.933.459,00 |
| § 38 - 261 | Trinity | € 10.000.000,00 |
| § 38 - 262 | Trinity | € 4.970.534,25 |
| § 38 - 267 | Trinity | € 4.722.692,50 |
| § 38 - 268 | Trinity | € 38.514.231,23 |
| § 38 - 277 | Trinity | € 2.347.190,21 |
| § 38 - 301 | Trinity | € 6.655.125,80 |
| § 38 - 450 | Trinity | € 5.000.000,00 |
| § 38 - 484 | Trinity | € 10.275.753,42 |
| § 38 - 498 | Trinity | € 102.816,44 |
| § 38 - 530 | Trinity | € 52.519,75 |

**Settling Creditors**

| Claim No. according to LBB's creditor list | Economic holder | Allowed Insolvency Claim amount in LBB's insolvency proceedings (Euro) | |
|---|---|---|---|
| § 38 - 548 | Trinity | € | 10.193.450,68 |
| § 38 - 710 | Trinity | € | 962.596,31 |
| **Total Attestor** | | **€** | **135.642.304,46** |

| | | | |
|---|---|---|---|
| § 38 - 004 | REDACTED | € | 2.558.827,90 |
| § 38 - 034 | | € | 14.275.511,07 |
| § 38 - 072 | | € | 6.813.629,63 |
| § 38 - 073 | | € | 5.019.861,11 |
| § 38 - 074 | | € | 6.321.631,97 |
| § 38 - 080 | | € | 15.757.865,75 |
| § 38 - 101 | | € | 27.060.351,50 |
| § 38 - 191 | | € | 5.122.444,44 |
| § 38 - 257 | | € | 5.084.383,33 |
| § 38 - 258 | | € | 7.771.504,50 |
| § 38 - 259 | | € | 2.590.501,50 |
| § 38 - 451 | | € | 10.193.315,07 |
| § 38 - 512 | | € | 10.317.994,42 |
| **Total REDACTED** | | **€** | **118.887.822,19** |

| | | | |
|---|---|---|---|
| § 38 - 002 | REDACTED | € | 31.053.225,00 |
| § 38 - 004 | | € | 3.582.359,04 |
| § 38 - 009 | | € | 15.302.433,06 |
| § 38 - 037 | | € | 20.259.746,67 |
| § 38 - 131 | | € | 8.082.213,70 |
| § 38 - 244 | | € | 3.075.868,85 |
| § 38 - 503 | | € | 705.000,00 |
| § 38 - 504 | | € | 295.000,00 |
| § 38 - 541 | | € | 6.338.183,91 |
| **Total REDACTED** | | **€** | **88.694.030,23** |

| | | | |
|---|---|---|---|
| § 38 - 065 | REDACTED | € | 96.816,08 |
| § 38 - 079 | | € | 425.611,34 |
| § 38 - 093 | | € | 5.054.780,03 |
| § 38 - 196 | | € | 2.046.333,33 |
| § 38 - 223 | | € | 1.679.500,00 |
| § 38 - 247 | | € | 15.202.838,00 |
| § 38 - 268 | | € | 19.512.323,38 |
| § 38 - 269 | | € | 10.443.850,82 |
| § 38 - 277 | | € | 2.347.190,21 |
| § 38 - 484 | | € | 3.612.767,12 |

2

**Settling Creditors**

| Claim No. according to LBB's creditor list | Economic holder | Allowed Insolvency Claim amount in LBB's insolvency proceedings (Euro) |
|---|---|---|
| § 38 - 710 | REDACTED | €                    487.676,63 |
| **Total** REDACTED | | **€         60.909.686,94** |

**EXHIBIT B**

**From:** Charlotte.Schildt@cms-hs.com [mailto:Charlotte.Schildt@cms-hs.com]
**Sent:** 10 August 2015 14:18
**To:** Bour, Pierre; Dibsdale, Emma
**Cc:** Christian.Grahlmann@weil.com; CBaerenz@goerg.de; Oliver.Scheffen@lbbag.de; ronald.geraghty@lehmanholdings.com; karen.garza@lehmanholdings.com
**Subject:** Preparation of another distribution to LBB creditors - Schedules regarding the Quota Cap

Pierre, Emma,

in preparation of a further, sixth distribution on the Lehman Brothers Bankhaus AG insolvency proceeding ("Distribution VI"), please find attached schedules showing the amounts that Trinity should receive to reach its Quota Cap as per the contractual agreements.  Please could you check the schedules and confirm whether you are in agreement with the amounts or please name any changes from your perspective at your earliest convenience. Your confirmation on the schedules, i.e. the amounts to be distributed in order for Trinity to reach its Quota Cap, is required for actually making the distributions by LBB accordingly. Also, we are copying LBHI/Weil Gotshal as counsel for LBHI in this email for ease of reference in terms of reconciliation on amounts contained in these schedules.

Please note that the Distribution VI is still subject to formal requirements and exact timing for its actual conduct is not yet confirmed.

We are copying Christian Bärenz of GÖRG in this email, assuming that he is still authorized for receipt of letters.  Form sheets as a requirement for taking part in the distribution beyond aforesaid confirmation will follow by separate mail.

Best regards,
Charlotte



**Dr. Charlotte Schildt**
**Rechtsanwältin | Partner**

**T** +49 69 71701 300
**M** +49 172 7221896
**F** +49 69 71701 367
**E** charlotte.schildt@cms-hs.com



CMS Hasche Sigle Partnerschaft von Rechtsanwälten und Steuerberatern mbB
Barckhausstraße 12-16 | 60325 Frankfurt am Main | Deutschland
www.cms-hs.com

Sitz: Berlin (AG Charlottenburg, PR 316 B)
Liste der Partner: www.cms-hs.com/partner_list

Please consider the environment before printing.

Der Inhalt dieser E-Mail (einschliesslich etwaiger beigefuegter Dateien) ist vertraulich und nur fuer den Empfaenger bestimmt. Sollten Sie nicht der bestimmungsgemaesse Empfaenger sein, ist Ihnen jegliche Offenlegung, Vervielfaeltigung, Weitergabe oder Nutzung des Inhalts untersagt. Bitte informieren Sie in diesem Fall unverzueglich den Absender und loeschen Sie die E-Mail (einschliesslich etwaiger beigefuegter Dateien) von Ihrem System. Vielen Dank.

The contents of this e-mail (including any attachments) are confidential and may be legally privileged. If you are not the intended recipient of this e-mail, any disclosure, copying, distribution or use of its contents is strictly prohibited, and you should please notify the sender immediately and then delete it (including any attachments) from your system.
Thank you.

**EXHIBIT C**

| From: | Charlotte.Schildt@cms-hs.com |
|---|---|
| Sent: | Thursday, August 13, 2015 10:50 AM |
| To: | Dibsdale, Emma; Bour, Pierre |
| Cc: | CBaerenz@goerg.de; Oliver.Scheffen@lbbag.de; Bianca.Hollander@cms-hs.com |
| Subject: | RE: Preparation of another distribution to LBB creditors - Schedules regarding the Quota Cap |
| Attachments: | Anlage1 Trinity.pdf; FB I Trinity.docx; FB II Trinity.doc |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

Emma,

Attached are the documents for Trinity to execute

- Confirmation re distribution amount as stated in the schedule that you already confirmed and registered claims holding (in German language though)
- Form Sheet re bank data
- Form sheet re tax

Could you please execute and send back duly executed documents to us in advance via PDF by next Tuesday, if possible?

Many thanks and best regards,
Charlotte

---

**From:** Schildt, Charlotte Louise
**Sent:** Tuesday, August 11, 2015 6:51 PM
**To:** 'Dibsdale, Emma' <Emma.Dibsdale@attestorcapital.com>; Bour, Pierre <Pierre.Bour@attestorcapital.com>
**Cc:** Christian.Grahlmann@weil.com; CBaerenz@goerg.de; Oliver Scheffen <Oliver.Scheffen@lehman.com>; ronald.geraghty@lehmanholdings.com; karen.garza@lehmanholdings.com
**Subject:** RE: Preparation of another distribution to LBB creditors - Schedules regarding the Quota Cap

Dear Emma,

many thanks. Confirmed.

Best regards,
Charlotte

---

**From:** Dibsdale, Emma [mailto:Emma.Dibsdale@attestorcapital.com]
**Sent:** Tuesday, August 11, 2015 6:02 PM
**To:** Schildt, Charlotte Louise <Charlotte.Schildt@cms-hs.com>; Bour, Pierre <Pierre.Bour@attestorcapital.com>
**Cc:** Christian.Grahlmann@weil.com; CBaerenz@goerg.de; Oliver Scheffen <Oliver.Scheffen@lbbag.de>; ronald.geraghty@lehmanholdings.com; karen.garza@lehmanholdings.com
**Subject:** RE: Preparation of another distribution to LBB creditors - Schedules regarding the Quota Cap

08-13555-scc    Doc 52305-1    Filed 03/22/16    Entered 03/22/16 13:06:44    Exhibit
Declaration of Pierre Bour    Pg 39 of 65

Dear Charlotte,

Thank you for your email and schedules.

We have been through your spreadsheets and the majority tie in with our expectations. The exception to this is claim number 267 attached, this appears to confirm that we have already received the first 5 LBB distributions totalling 80% in receipts on the claim and the LBHI distribution. In fact, we have only received the LBHI distribution so we calculate that EUR 3,977,179.88 is due on this claim rather than the EUR 199,025.77 highlighted in cell F14. Could you please confirm that EUR 3,977,179.88 is the correct amount due on the claim and will be the amount received once all the formal requirements for the next distribution have been met?

Kind regards,
Emma

**Emma Dibsdale (née Turney)**
**Attestor Capital LLP**
Fourth Floor
20 Balderton Street
London W1K 6TL
Tel: +44 2070749629
Mob: +44 7827224063
Emma.Dibsdale@attestorcapital.com

*Please note that my email address is now Emma.Dibsdale@attestorcapital.com*

**From:** Charlotte.Schildt@cms-hs.com [mailto:Charlotte.Schildt@cms-hs.com]
**Sent:** 10 August 2015 14:18
**To:** Bour, Pierre; Dibsdale, Emma
**Cc:** Christian.Grahlmann@weil.com; CBaerenz@goerg.de; Oliver.Scheffen@lbbag.de; ronald.geraghty@lehmanholdings.com; karen.garza@lehmanholdings.com
**Subject:** Preparation of another distribution to LBB creditors - Schedules regarding the Quota Cap

Pierre, Emma,

in preparation of a further, sixth distribution on the Lehman Brothers Bankhaus AG insolvency proceeding ("Distribution VI"), please find attached schedules showing the amounts that Trinity should receive to reach its Quota Cap as per the contractual agreements.  Please could you check the schedules and confirm whether you are in agreement with the amounts or please name any changes from your perspective at your earliest convenience. Your confirmation on the schedules, i.e. the amounts to be distributed in order for Trinity to reach its Quota Cap, is required for actually making the distributions by LBB accordingly. Also, we are copying LBHI/Weil Gotshal as counsel for LBHI in this email for ease of reference in terms of reconciliation on amounts contained in these schedules.

Please note that the Distribution VI is still subject to formal requirements and exact timing for its actual conduct is not yet confirmed.

We are copying Christian Bärenz of GÖRG in this email, assuming that he is still authorized for receipt of letters.  Form sheets as a requirement for taking part in the distribution beyond aforesaid confirmation will follow by separate mail.

Best regards,
Charlotte

**Dr. Charlotte Schildt**
**Rechtsanwältin | Partner**

**T** +49 69 71701 300
**M** +49 172 7221896
**F** +49 69 71701 367
**E** charlotte.schildt@cms-hs.com



CMS Hasche Sigle Partnerschaft von Rechtsanwälten und Steuerberatern mbB
Barckhausstraße 12-16 | 60325 Frankfurt am Main | Deutschland
www.cms-hs.com

Sitz: Berlin (AG Charlottenburg, PR 316 B)
Liste der Partner: www.cms-hs.com/partner_list

Please consider the environment before printing.

Der Inhalt dieser E-Mail (einschliesslich etwaiger beigefuegter Dateien) ist vertraulich und nur fuer den Empfaenger
bestimmt. Sollten Sie nicht der bestimmungsgemaesse Empfaenger sein, ist Ihnen jegliche Offenlegung,
Vervielfaeltigung, Weitergabe oder Nutzung des Inhalts untersagt. Bitte informieren Sie in diesem Fall unverzueglich
den Absender und loeschen Sie die E-Mail (einschliesslich etwaiger beigefuegter Dateien) von Ihrem System.
Vielen Dank.

The contents of this e-mail (including any attachments) are confidential and may be legally privileged. If you are not
the intended recipient of this e-mail, any disclosure, copying, distribution or use of its contents is strictly prohibited,
and you should please notify the sender immediately and then delete it (including any attachments) from your
system.
Thank you.

**Bestätigung durch den Gläubiger**

## I. Registrierung der Forderung

In der Insolvenztabelle bzw. im Verteilungsverzeichnis wurden folgende Forderungen für Sie bzw. Ihre Mandantin/Ihren Mandanten registriert:

Laufende Nummer:64, 65, 67, 72, 79, 83, 101, 136, 137, 196, 225, 244, 247, 256, 261, 262, 267, 268, 277, 301, 450, 484, 498, 530, 548, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 564, 565 ,566, 567, 568, 569, 570, 706, 710

Festgestellte Forderung:

| | |
|---|---|
| Hauptforderung: | 127.744.700,06 EUR |
| Zinsen: | 7.897.604,53 EUR |
| Kosten: | 0,00 EUR |
| Bestrittene Forderung insgesamt: | 44.965.836,83 EUR |

Soweit Forderungen aufgeteilt und in Teilen an verschiedene Neugläubiger abgetreten wurden, ist dies in den Insolvenzverfahrensakten gesondert abgebildet.

## II. Auszahlungsbetrag bis zum Erreichen der Befriedigungshöchstgrenze

Zur Erreichung der Befriedigungshöchstgrenze gemäß der Vereinbarung zwischen dem Gläubiger und Lehman Brothers Holdings Inc. ("LBHI") in Übereinstimmung mit den Beschlüssen der Gläubigerversammlung in dem Termin am 25. November 2014 und der Gegenseitigen Bestätigungserklärung gegenüber der Lehman Brothers Bankhaus AG ("LBB AG") beträgt der Auszahlungsbetrag im LBB AG Insolvenzverfahren

5.093.728,95 EUR.

Als Anlage beigefügt erhalten Sie je Anmeldung eine Übersicht, die LBHI zur Verfügung gestellt hat.

Bitte überprüfen Sie diese Angaben. Bitte **bestätigen** Sie die Richtigkeit und Vollständigkeit der vorstehenden Angaben durch Gegenzeichnung dieser Anlage und Rücksendung eines Doppels an den Insolvenzverwalter unter seiner Kanzleianschrift, z. Hdn. Frau Rechtsanwältin Dr. Charlotte Schildt, Herrn Rechtsanwalt Dr. Matthias Nicht, c/o CMS Hasche Sigle, Barckhausstraße 12-16, 60325 Frankfurt am Main, Deutschland, Fax: +49 69 71701367, E-Mail: charlotte.schildt@cms-hs.com, matthias.nicht@cms-hs.com.

Liegt diese Bestätigung nicht vor, kann keine Auszahlung erfolgen.

_____          _____

Datum/Unterschrift                 (Name in Blockschrift)

Trinity Investments Limited
Fourth Floor, 3 George´s Dock, IFSC
Dublin 1

**I. Forderung gemäß Insolvenztabelle**

**Laufende Nr.:** 64, 65, 67, 72, 79, 83, 101, 136, 137, 196, 225, 244, 247, 256, 261, 262, 267,
268, 277, 301, 450, 484, 498, 530, 548, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562,
564, 565, 566, 567, 568, 569, 570, 706, 710

| | | |
|---|---|---|
| Festgestellte Forderung: | Hauptforderung | 127.744.700,06 EUR |
| | Zinsen | 7.897.604,53 EUR |
| Bestrittene Forderung: | Gesamt | 44.965.836,83 EUR |

**II. Bankverbindung**

1. Kontoinhaber:  _____

2. Kreditinstitut:  _____

3. Bankleitzahl:  _____

4. Kontonummer:  _____

5. IBAN:  _____

6. BIC:  _____

7. Verwendungszweck:.  _____

_____         _____
Unterschrift                                              Unterschrift

Trinity Investments Limited
Fourth Floor, 3 George´s Dock, IFSC
Dublin 1

## **Erklärung für Zwecke der Kapitalertragsteuer**

Die Gläubigerin hat im Rahmen des Insolvenzverfahrens über das Vermögen von Lehman Brothers Bankhaus AG Zinsen als Forderung zur Insolvenztabelle angemeldet. Das Insolvenzgericht hat diese Forderung festgestellt. Die Gläubigerin nimmt insoweit an Abschlagsverteilungen teil.

Der Gläubigerin ist bekannt, dass Zahlungen des Insolvenzverwalters auf diese Zinsforderung grundsätzlich der deutschen Kapitalertragsteuer gemäß §§ 43 ff. Einkommensteuergesetz (EStG), §§ 1 ff. Solidaritätszuschlagsgesetz (SolzG) unterliegen.

Der Gläubigerin ist bewusst, dass der Insolvenzverwalter daher von einer Abschlagszahlung 25 % Kapitalertragsteuer sowie hierauf 5,5 % Solidaritätszuschlag einbehalten und an das zuständige Finanzamt abführen wird, soweit die Abschlagszahlung auf Zinsen entfällt.

☐     Die Gläubigerin beantragt hiermit unwiderruflich, vom Kapitalertragsteuerabzug aus folgenden Gründen Abstand zu nehmen:
*(Zutreffendes bitte ankreuzen)*

      ☐     Die Gläubigerin ist ein deutsches **Kreditinstitut** und ist daher aufgrund des Interbankenprivilegs gemäß § 43 Abs. 2 Satz 2 EStG vom Kapitalertragsteuerabzug befreit.

      ☐     Die Gläubigerin ist eine **körperschaftsteuerbefreite Körperschaft**. Die Zinsen gehören zu keinem wirtschaftlichen Geschäftsbetrieb. Zum Nachweis der Steuerbefreiung nach § 44a Abs. 4 EStG legt die Gläubigerin eine gültige NV-Bescheinigung des zuständigen Finanzamtes bei.

      ☐     Die Gläubigerin ist ein sogenannter „**Dauerüberzahler**". Zum Nachweis dieses Status nach § 44a Abs. 5 EStG legt sie eine entsprechende Bescheinigung des zuständigen Finanzamtes bei.

☐ Die Gläubigerin unterliegt als sogenannter **„Steuerausländer"** weder der deutschen Körperschaftsteuer noch der deutschen Einkommensteuer. Insbesondere hat die Gläubigerin in Deutschland keine steuerliche Betriebsstätte. Zum Nachweis dieser Eigenschaft als Steuerausländer legt die Gläubigerin eine

    ☐ Steuerliche Ansässigkeitsbescheinigung

    ☐ Sitzbescheinigung

ihres Ansässigkeitsstaates bei.

☐ Die Gläubigerin unterhält als **beschränkt Steuerpflichtige** in Deutschland eine steuerliche Betriebsstätte, hat jedoch ihren Sitz oder Wohnsitz im Ausland. Zum Nachweis ihrer Ansässigkeit legt die Gläubigerin eine

    ☐ Steuerliche Ansässigkeitsbescheinigung

    ☐ Sitzbescheinigung

ihres Ansässigkeitsstaates bei.

Die Gläubigerin erklärt ferner:

    ☐ Die als Forderung zur Insolvenztabelle angemeldeten Zinsen gehören nicht zum Betriebsvermögen der von der Gläubigerin unterhaltenen deutschen Betriebsstätte.

☐ Die Gläubigerin erklärt hiermit, dass sie die alleinige Berechtigte hinsichtlich der geltend gemachten Forderung ist und dass keine Unterbeteiligungen oder wirtschaftlich vergleichbaren Rechtsgestaltungen bestehen.

☐ Die Gläubigerin erklärt hiermit, dass hinsichtlich der geltend gemachten Forderung eine oder mehrere Unterbeteiligungen oder wirtschaftlich vergleichbaren Rechtsgestaltungen bestehen, und zwar zugunsten von
……………………………………………
……………………………………………………………………………………… .

Der Gläubigerin ist bewusst, dass der Insolvenzverwalter vom Kapitalertragsteuerabzug nur dann Abstand nehmen darf, wenn ihm die gültigen Nachweise im Zeitpunkt der Abschlagszahlung vorliegen.


_____                    _____
          Unterschrift                                                                    Unterschrift

**EXHIBIT D**



## KERN

**Global Language Services**

Translations · Interpreting
DTP · Localization

KERN Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169

Tel. (212) 953 2070
Fax (212) 953 2073
kern.ny@e-kern.com

**www.e-kern.com**

State of :   New York

County of:   New York

ss.:

### CERTIFICATE OF ACCURACY

*IT IS HEREBY CERTIFIED, that  KERN Corporation, a corporation organized and existing under the laws of the State of New York, is professionally engaged in the rendering of foreign language translation services; that it has translated the following document(s)*

### CONFIRMATION BY THE CREDITOR

*from the **GERMAN** language into the **ENGLISH** language
and that the said translation is a true and correct rendering of the said document to the best of our knowledge and belief.*

Signed by: _____

(Rosana Chinchilla)
for

Sworn to before me this  2

Day of _____, 2015.

_____
Notary Public

**JOY WILTERMUTH**
NOTARY PUBLIC, State of New York
**No. 01WI - 6093589**
Qualified in New York County
My Commission Expires June 02, 2019

---

San Francisco: KERN Corporation · The Russ Building · 235 Montgomery Street, Suite 946 · San Francisco, CA 94104
Tel. (415) 433 5376 · Fax (415) 433 5377 · kern.sf@e-kern.com

**London:** Tel. 011 44 (20) 78 31 56 00 · **Frankfurt:** Tel. 011 49 (69) 75 60 73-0 · **Berlin:** Tel. 011 49 (30) 24 72 12 50 · **Paris:** Tel. 011 33 (1) 53 93 85 20
**Zurich:** Tel. 011 41 (1) 2 61 11 60 · **Hong Kong:** Tel. 011 (852) 28 50 44 55 · **Amsterdam:** Tel. 011 31 (20) 6 39 01 19 · **Lyon:** Tel. 011 33 (4) 783 783 73

KERN 06/2008

# Confirmation by the creditor

### I.  Registration of claim

The following claims have been registered for you or your client in the insolvency table or in the distribution list:

Sequential numbers: 64, 65, 67, 72, 79, 83, 101, 136, 137, 196, 225, 244, 247, 256, 261, 262, 267, 268, 277, 301, 450, 484, 498, 530, 548, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 564, 565 ,566, 567, 568, 569, 570, 706, 710

Determined claim:

| | |
|---|---|
| Main claim: | EUR 127,744,700.06 |
| Interest: | EUR 7,897,604.53 |
| Cost: | EUR 0.00 |
| Total of contested claims: | EUR 44,965,836.83 |

If claims were divided and assigned in parts to various creditors, this is displayed separately in the insolvency proceedings files.

### II. Payout amount up to the maximum satisfaction limit

In order to achieve the satisfaction limit in accordance with the agreement between the creditors and Lehman Brothers Holdings Inc. ("LBHI") in accordance with the decisions of the creditors' meeting on November 25, 2014 and the mutual confirmation notice to the Lehman Brothers Bankhaus AG ("LBB AG"), the amount paid in the LBB AG insolvency proceedings amounts to

EUR 5,093,728.95.

In the annex you will find an overview per application, which LBHI has provided.

Please check this information. Please **confirm** the accuracy and completeness of the above information by countersignature of this annex and return a duplicate to the liquidator under his office address, attention Dr. Charlotte Schildt, Dr. Matthias Nicht c/o CMS Hasche Sigle, Barckhausstraße 12-16, 60325 Frankfurt am Main, Germany, Fax: +49 69 71701367, email: charlotte.schildt@cms-hs.com, matthias.nicht@cms-hs.com.

If you do not provide this confirmation, no payment can be made.

_____
(Date/Signature)

_____
(Name in block letters)

**Bestätigung durch den Gläubiger**

## I. Registrierung der Forderung

In der Insolvenztabelle bzw. im Verteilungsverzeichnis wurden folgende Forderungen für Sie bzw. Ihre Mandantin/Ihren Mandanten registriert:

Laufende Nummer:64, 65, 67, 72, 79, 83, 101, 136, 137, 196, 225, 244, 247, 256, 261, 262, 267, 268, 277, 301, 450, 484, 498, 530, 548, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 564, 565 ,566, 567, 568, 569, 570, 706, 710

Festgestellte Forderung:

| | |
|---|---|
| Hauptforderung: | 127.744.700,06 EUR |
| Zinsen: | 7.897.604,53 EUR |
| Kosten: | 0,00 EUR |
| Bestrittene Forderung insgesamt: | 44.965.836,83 EUR |

Soweit Forderungen aufgeteilt und in Teilen an verschiedene Neugläubiger abgetreten wurden, ist dies in den Insolvenzverfahrensakten gesondert abgebildet.

## II. Auszahlungsbetrag bis zum Erreichen der Befriedigungshöchstgrenze

Zur Erreichung der Befriedigungshöchstgrenze gemäß der Vereinbarung zwischen dem Gläubiger und Lehman Brothers Holdings Inc. ("LBHI") in Übereinstimmung mit den Beschlüssen der Gläubigerversammlung in dem Termin am 25. November 2014 und der Gegenseitigen Bestätigungserklärung gegenüber der Lehman Brothers Bankhaus AG ("LBB AG") beträgt der Auszahlungsbetrag im LBB AG Insolvenzverfahren

5.093.728,95 EUR.

Als Anlage beigefügt erhalten Sie je Anmeldung eine Übersicht, die LBHI zur Verfügung gestellt hat.

Bitte überprüfen Sie diese Angaben. Bitte **bestätigen** Sie die Richtigkeit und Vollständigkeit der vorstehenden Angaben durch Gegenzeichnung dieser Anlage und Rücksendung eines Doppels an den Insolvenzverwalter unter seiner Kanzleianschrift, z. Hdn. Frau Rechtsanwältin Dr. Charlotte Schildt, Herrn Rechtsanwalt Dr. Matthias Nicht, c/o CMS Hasche Sigle, Barckhausstraße 12-16, 60325 Frankfurt am Main, Deutschland, Fax: +49 69 71701367, E-Mail: charlotte.schildt@cms-hs.com, matthias.nicht@cms-hs.com.

Liegt diese Bestätigung nicht vor, kann keine Auszahlung erfolgen.

_____          _____
Datum/Unterschrift                      (Name in Blockschrift)

08-13555-scc    Doc 52305-1    Filed 03/22/16    Entered 03/22/16 13:06:44    Exhibit
Declaration of Pierre Bour    Pg 50 of 65

**EXHIBIT E**

**C L I F F O R D**

**C H A N C E**

CLIFFORD CHANCE LLP

**EXECUTION COPY**

**LEHMAN BROTHERS HOLDINGS INC.**
**LEHMAN BROTHERS TREASURY CO. B.V.**
**LEHMAN BROTHERS BANKHAUS AG**

**U.S.$100,000,000,000**
**EURO MEDIUM-TERM NOTE PROGRAM**

*Unconditionally and irrevocably guaranteed, as to Notes to be issued by*
*Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG, by*

**LEHMAN BROTHERS HOLDINGS INC.**

_____

**GUARANTEE AGREEMENT**

*in respect of*

**LEHMAN BROTHERS BANKHAUS AG**

_____

24 July 2008

# CONTENTS

| Clause | | Page |
|--------|---|------|
| 1. | Definitions | 2 |
| 2. | Guarantee | 2 |
| 3. | Status | 4 |
| 4. | Continuing Guarantee | 5 |
| 5. | Reinstatement | 5 |
| 6. | Immediate Recourse | 5 |
| 7. | Covenants | 5 |
| 8. | Deposit Of Guarantee | 5 |
| 9. | Stamp Duties | 5 |
| 10. | Partial Invalidity | 6 |
| 11. | Notices | 6 |
| 12. | Governing Law | 6 |

**THIS GUARANTEE AGREEMENT** is made as of 24 July 2008.

_____

**BY**

(1)     **LEHMAN BROTHERS HOLDINGS INC.** (the "**Guarantor**")

**IN FAVOUR OF**

(2)     **HOLDERS** (as defined below); and

(3)     **THE ACCOUNTHOLDERS** (as defined below);

**WHEREAS**

(A)     **LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS TREASURY CO. B.V.** and **LEHMAN BROTHERS BANKHAUS AG** (each an "**Issuer**" and together the "**Issuers**") have established a Program (the "**Program**") for the issuance of medium-term notes (the "**Notes**").  In connection with the Program the Issuers have entered into an Amended and Restated Fiscal Agency Agreement dated 24 July 2008 (as supplemented and amended from time to time, the "**Fiscal Agency Agreement**") with The Bank of New York Mellon, acting through its London Branch, as Fiscal Agent, The Bank of New York Mellon, acting through its New York Branch, as Registrar and the other parties referred to therein.  Notes in bearer form may be represented initially by (in the case of Issuers other than Lehman Brothers Holdings Inc.) a permanent global Note (the "**Permanent Global Note**") or by a  temporary global Note (the "**Temporary Global Note**") exchangeable in accordance with its terms for a Permanent Global Note or, as the case may be, definitive notes in bearer form ("**Definitive Notes**") and/or registered Notes ("**Registered Notes**") represented by definitive Notes in registered form ("**Definitive Registered Notes**"), global Notes in registered form ("**Global Registered Notes**") or Notes in registered uncertificated form.   Permanent Global Notes are, in accordance with their respective terms, exchangeable for Definitive Notes.  Registered Notes may be represented initially by Definitive Registered Notes and/or Global Registered Notes. Global Registered Notes are themselves exchangeable, in accordance with their terms, for Definitive Registered Notes.  References herein to "**Global Notes**" shall be to Permanent Global Notes, Temporary Global Notes and Global Registered Notes.  A Global Note will be delivered to a depositary or a common depositary or a common safekeeper or a custodian, as the case may be, for any one or more of the Clearing Systems (as defined below) for credit to such securities clearing (or any other) account or accounts with any Clearing System as may be determined by the terms and conditions and operating procedures or management regulations of the relevant Clearing System with its respective participants and/or accountholders.

(B)     The Guarantor has agreed to guarantee irrevocably the payment of principal and interest together with all other sums payable by Lehman Brothers Bankhaus AG under the Notes issued by Lehman Brothers Bankhaus AG (the "**Guaranteed Issuer**") and to guarantee irrevocably the performance by the Guaranteed Issuer of its obligations

under the Deed of Covenant, dated 24 July 2008, by the Guaranteed Issuer in favour of the parties identified therein (as supplemented, amended or replaced from time to time, the "**Deed of Covenant**").

**NOW THIS GUARANTEE WITNESSES** as follows:

1.  **DEFINITIONS**

1.1  In this Guarantee the following words and expressions shall have the following meanings:

"**Accountholder**" shall bear the meaning ascribed thereto in the Deed of Covenant in respect of Guaranteed Notes;

"**Clearing System**" means each of Euroclear, Clearstream, Luxembourg, DTC and any other clearing system specified in the relevant Final Terms;

"**Conditions**" means the terms and conditions of the relevant Notes, as the same may be modified or supplemented in accordance with the terms thereof, and any reference to a numbered "**Condition**" is to the correspondingly numbered provision thereof;

"**DTC**" means The Depositary Trust Company;

"**Guaranteed Note**" shall mean a Note issued by the Guaranteed Issuer and shall include any related Coupon, Talon or Receipt;

"**Holder**" shall bear the meaning ascribed thereto in the Conditions, in respect of any Guaranteed Note;

"**Relevant Date**" means either (i) the date on which payment of the relevant Note first becomes due or (ii) if the full amount of the moneys payable has not been received by the Fiscal Agent (or any other paying agent in respect of the relevant Note) on or prior to such due date, the date on which all moneys then due for payment shall have been so received and notice to that effect shall have been duly given to the Holders or Accountholders; and

"**this Guarantee**" shall mean this Guarantee Agreement as amended or supplemented from time to time.

1.2  Headings used in this Guarantee are for each of reference only and shall not affect its construction.

1.3  Unless otherwise defined herein, terms defined in the Conditions have the same respective meanings when used in this Guarantee.

2.  **GUARANTEE**

2.1  The Guarantor hereby irrevocably and unconditionally guarantees to the Holders and the Accountholders the performance by the Guaranteed Issuer of all its obligations pursuant to the Conditions of the Notes including without limitation:

(a)    the due and punctual payment of each amount payable in respect of any Guaranteed Note and the Deed of Covenant as and when the same become due and payable; and

(b)    any obligation to deliver or procure the delivery of any securities pursuant to such Conditions,

so that the Guarantor shall, if the Guaranteed Issuer shall fail punctually to perform any such obligation, forthwith perform or procure the performance of the obligation in accordance with the applicable Conditions upon written demand by such Holder or Accountholder including (without limitation) the due and punctual payment of any such amount in the manner and currency prescribed by such Guaranteed Note which the Guaranteed Issuer shall be liable to pay under and pursuant to such Guaranteed Note or the Deed of Covenant or the delivery of any securities pursuant to such Conditions and which the Guaranteed Issuer shall have failed to pay or deliver (as the case may be) at the time such demand is made.

2.2    This Guarantee is one of payment and not collection. The Guarantor acknowledges that its obligations hereunder are several and independent obligations of the Guaranteed Issuer and that the Guarantor shall be liable as sole principal debtor, with the consequence that such liability will not be discharged, impaired or otherwise affected by anything which would not so discharge, impair or otherwise affect its liability if it were a sole principal debtor, including without limitation:

(a)    any time, indulgence, waiver or consent at any time given to the Guaranteed Issuer or any other person;

(b)    any amendment to the Conditions in respect of the Guaranteed Notes or the Deed of Covenant or to any security or other guarantee or indemnity;

(c)    the making or absence of any demand on the Guaranteed Issuer or any other person;

(d)    the enforcement or absence of enforcement of any Guaranteed Notes or the Deed of Covenant or of any security or other guarantee or indemnity;

(e)    the release of any such security, guarantee or indemnity;

(f)    the dissolution, amalgamation, reconstruction or reorganisation of the Guaranteed Issuer or any other person;

(g)    the winding up of the Guaranteed Issuer or the bringing of any analogous proceeding in any jurisdiction or any change in its status, function, control or ownership; and

(h)    the illegality, invalidity, irregularity or unenforceability of, or any defect in, any provision of any Guaranteed Note or the Deed of Covenant or any of the Guaranteed Issuer's obligations in respect thereof.

2.3    As a separate and alternative stipulation, the Guarantor irrevocably agrees that any sum
expressed to be payable by the Guaranteed Issuer under any Guaranteed Note or the
Deed of Covenant which is for any reason (including, without limitation, by reason of
any provision of any Guaranteed Note or the Deed of Covenant being or becoming
void, unenforceable or otherwise invalid under any applicable law) (whether or not
now known or becoming known to the Guaranteed Issuer, the Guarantor, the
Holder(s), the Accountholder(s) or any other person) not recoverable from it on the
basis of a guarantee, will nevertheless be recoverable from it as if it were the sole
principal debtor and will be paid by it to the Holder(s) or the Accountholder(s) on
written demand.  This indemnity constitutes a separate and independent obligation from
the other obligations in this Guarantee, gives rise to a separate and independent cause
of action and will apply irrespective of any indulgence granted by the Holder(s), the
Accountholder(s) or any other person.

3.    **STATUS**

3.1    The claims of the Holders and Accountholders against the Guarantor in respect of
senior Guaranteed Notes will constitute direct, unconditional and (subject to the
provisions of Condition 11 (*Negative Pledge with respect to Senior Notes*) and the
provisions of the Fiscal Agency Agreement) unsecured obligations of the Guarantor
and rank *pari passu* in right of payment among the Guarantee, prior to the equity
securities of the Guarantor and equally with all other unsecured and unsubordinated
debt obligations of the Guarantor (subject, in the event of insolvency, to laws affecting
creditors' rights generally).

3.2    The claims of the Holders and the Accountholders against the Guarantor in respect of
subordinated Guaranteed Notes constitute direct, unsecured and subordinated
obligations of the Guarantor and rank *pari passu* among themselves and *pari passu*
with all other present and future unsecured, unconditional and subordinated
indebtedness of the Guarantor and will be subordinated, in the event of the winding-up
of the Guarantor, to the claims of its Senior Creditors.  Amounts payable under the
Guarantee shall be due and payable by the Guarantor in such winding-up only if and to
the extent that all claims against the Guarantor by its Senior Creditors have been paid
in full.

3.3    Subject to applicable law, no Holder or Accountholder may be granted any security by
the Guarantor or any third party or claim any right of set-off in respect of any amount
owed to it by the Guarantor under this Guarantee in connection with subordinated
Guaranteed Notes and each Holder or relevant Accountholder shall be deemed to have
waived all such rights.

3.4    Subsequent agreements which limit the subordination effected pursuant to Clause 3.2 or
which accelerate payments under this Guarantee in respect of subordinated Guaranteed
Notes are not permitted by law.    Should payments be effected in respect of
subordinated Guaranteed Notes by the Guarantor before the maturity date without legal
preconditions being fulfilled, the amount paid shall be refunded to the Guarantor
notwithstanding any agreement to the contrary.

4.   **CONTINUING GUARANTEE**

This Guarantee is a continuing guarantee and shall extend to the ultimate balance of all the obligations of the Guaranteed Issuer under any Guaranteed Note notwithstanding any settlement of account or other matter or thing whatsoever. It shall remain in full force and effect until all such obligations have been irrevocably paid and satisfied in full. Furthermore, such obligations are additional to, and not in substitution for, any security or other guarantee or indemnity at any time existing in favour of any person.

5.   **REINSTATEMENT**

If any payment received by a Holder or Accountholder shall, on the subsequent bankruptcy, insolvency, corporate reorganisation or other similar event of the Guaranteed Issuer, be avoided or set aside under any laws relating to such events, such payment shall not be considered as discharging or diminishing the liability of the Guarantor and this Guarantee shall continue to apply as if such payment had at all times remained owing by the Guaranteed Issuer, provided that the obligations of the Guaranteed Issuer and/or the Guarantor under this Clause 5 shall, as regards each payment made to the Holder or Accountholder which is avoided or set aside, be contingent upon such payment being reimbursed to the Guaranteed Issuer or other persons entitled through the Guaranteed Issuer.

6.   **IMMEDIATE RECOURSE**

The Guarantor waives any right it may have of first requiring a Holder or Accountholder to proceed against or enforce any other rights or security against the Guaranteed Issuer or any other person before claiming from the Guarantor hereunder.

7.   **COVENANTS**

7.1   The Guarantor covenants in favour of the Holders and the Accountholders that it will duly perform and comply with the obligations expressed to be undertaken by it in the Conditions.

8.   **DEPOSIT OF GUARANTEE**

This Guarantee shall be deposited with and held by the Fiscal Agent until all obligations of the Guaranteed Issuer and/or in respect of the Guaranteed Notes have been discharged in full. The Guarantor hereby acknowledges the right of every Holder and Accountholder to the production of this Guarantee.

9.   **STAMP DUTIES**

The Guarantor shall pay all stamp, registration and other taxes and duties (including any interest and penalties thereon or in connection therewith) which may be payable upon or in connection with the execution and delivery of this Guarantee, and shall indemnify each Holder and Accountholder against any claim, demand, action, liability, damages, cost, loss or expense (including, without limitation, reasonable legal fees and any applicable value added tax) which it incurs as a result of or arising out of or in relation to any failure of the Guarantor to pay or delay in paying any of the same.

10.    **PARTIAL INVALIDITY**

If at any time any provision hereof is or becomes illegal, invalid or unenforceable in any respect under the laws of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the laws of any other jurisdiction shall in any way be affected or impaired thereby.

11.    **NOTICES**

All notices, demands or other communications by any Holder or Accountholder upon the Guarantor shall be duly served upon the Guarantor if served on the Guarantor by letter at 745 Seventh Avenue, New York, New York 10019.

12.    **GOVERNING LAW**

This Guarantee shall be governed by, and construed in accordance with, the law of the State of New York.

**IN WITNESS** whereof the Guarantor has executed this Guarantee the day and year first above written.


| | |
|---|---|
| **EXECUTED** | ) |
| by **LEHMAN BROTHERS HOLDINGS INC.** | ) |
| acting by | ) |

**EXHIBIT F**

E- 2296 - 21102 - LC

## GUARANTEE

**THIS GUARANTEE** is dated as of November 21, 2002 and is by Lehman Brothers
Holdings Inc., a Delaware corporation (the "**Guarantor**") in favor of Lehman Brothers
Bankhaus A.G., a company incorporated under the laws of the Federal Republic of
Germany ("**LBB**" which expression shall include its successors and assigns) and any
Counterparty (as defined below).

The Guarantor desires to unconditionally guarantee LBB's obligations to Counterparties
(the "**Obligations**") as set forth in this Guarantee.

Accordingly, in consideration of the benefits accruing to the Guarantor from LBB's
becoming obligated to Counterparties, the mutual promises contained in this Guarantee
and other valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the Guarantor and LBB hereby agree as follows:

1. **Definitions**.

    The following terms shall have the following meanings:

    "**Counterparty**" means any Person that is entitled to payment by LBB.

    "**Person**" means any individual, partnership, limited liability company,
    corporation, trust, joint stock company, unincorporated organization, joint
    venture, association, company, business trust or other entity or any government or
    agency, instrumentality or political subdivision of a government.

2. **Representation and Warranties**.

    The Guarantor represents and warrants that this Guarantee has been duly
    authorized, executed and delivered by the Guarantor and that this Guarantee
    constitutes a valid and legally binding obligation of the Guarantor enforceable in
    accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency,
    reorganization and other laws of general applicability relating to or affecting
    creditors' rights affecting the Guarantor and to general equity principles.

3. **Payment Obligations**.

    If LBB fails to make any payment to a Counterparty, the Guarantor will following
    the request of the Counterparty promptly pay directly to the Counterparty the
    amount of funds that LBB was required to pay and did not pay the Counterparty
    under the Obligation. Any payment by the Guarantor to the Counterparty shall
    discharge and satisfy, by a like amount, any obligation of LBB to the
    Counterparty. Each of the Guarantor and LBB acknowledges and agrees that
    each Counterparty is an express third-party beneficiary of this Guarantee. No

other persons or entities, other than the parties hereto and Counterparties, shall
have any rights, directly or indirectly, under or pursuant to this Guarantee.

4.     **Waiver of Subrogation**.

The Guarantor waives any and all rights that the Guarantee may have with respect
to LBB as a result of making any payment under this Guarantee, including,
without limitation, any right of subrogation, set off or counterclaim. The
Guarantor understands and agrees that LBB shall have no obligations to it as a
result of any payment made under this Guarantee.

5.     **Nature of Obligations, Non Performance; Waivers**.

The obligations of the Guarantor under Section 3 of this Guarantee are continuing
and irrevocable and the Guarantor waives all other defenses to payment
hereunder. Without limiting the foregoing, the failure by LBB to perform its
obligations under any agreement or instrument under which it is a party or by
which it is bound or the bankruptcy of LBB shall not affect the Guarantor's
obligations under this Guarantee. The Guarantor waives any failure or delay on
the part of the Counterparty in asserting or enforcing any of its rights or making
any claims or demands under this Guarantee. The Guarantor acknowledges and
agrees that this Guarantee is one of payment and not of collection.

6.     **Rank of Obligations**.

The Guarantor warrants and agrees that the payment obligations of the Guarantor
that may arise under Sections 3 of this Guarantor constitute irrevocable,
unconditional, unsecured and unsubordinated obligations of the Guarantor and
rank <u>pari passu</u> with all other unsecured and unsubordinated obligations of the
Guarantor.

7.     **Reinstatement**.

If any payment by LBB that would be an Obligation of the Guarantor if not for
such payment by LBB is voided (an "Avoidance Event") under any bankruptcy or
other insolvency-related law of any jurisdiction to which LBB may be or become
subject, and, as a result of such Avoidance Event, the applicable Counterparty (or
any assignee(s) or successor(s) in interest thereof) is required to return such
voided payment, or any portion of such voided payment (an "Avoided Payment"),
the Guarantor will pay the amount of the Avoided Payment out of funds of the
Guarantor within three business days of receipt by the Guarantor of a certified
copy of a final non-appealable order of a court or other governmental body having
jurisdiction, or such other written evidence as shall be reasonably acceptable to
the Guarantor, with respect to such Avoided Payment (specifying the amount and
required manner of repayment thereof), either (i) directly to such court or other
governmental body having jurisdiction or (ii) upon presentation of evidence

reasonably satisfactory to the Guarantor that the applicable Counterparty (or, if applicable, any assignee(s) or successor(s) in interest thereof) has repaid such amount in satisfaction of the legal requirements relating thereto, to such Counterparty (or, if applicable, any assignee(s) or successor(s) in interest thereof). This Guarantee, and the obligations of the Guarantor hereunder, shall be deemed reinstated if and to the extent required to give effect to the obligation of the Guarantor to pay any Avoided Payment in accordance with the preceding sentence.

8. **Termination; Amendment.**

This Guarantee may be amended or terminated at any time by written amendment or agreement signed by all parties executing this Guarantee provided, however, that no such amendment may adversely affect the rights, whether absolute or contingent, of any Counterparty that shall have accrued or which may accrue under any agreement or instrument, other than any rights with respect to any Obligation agreed to after the date that Counterparty has received notice of such amendment; and provided further that no such termination shall be effective with respect to any agreement or instrument agreed to prior to Counterparty's receipt of notice of such termination until such time as all such Obligations theretofore agreed to or incurred by LBB shall either no longer be outstanding or be satisfied in full.

9. **Notices.**

All notices or demands on the Guarantor shall be deemed effective when received, shall be in writing and shall be delivered by hand or by registered mail, or by facsimile transmission promptly confirmed by registered mail, addressed to the Guarantor at:

If to the Guarantor:    Lehman Brothers Holdings Inc.
399 Park Avenue, 11th Floor
New York, NY 10022
Attention:    Corporate Counsel
Telephone:    (212) 526-0778
Facsimile:    (212) 520-0176

If to LBB:    Lehman Brothers Bankhaus A.G.
Rathenauplatz 1
D-60313, Frankfurt Am Main, Germany
Attention:    Legal Counsel
Telephone:    +49-69-15307-0
Facsimile:    +49-69-15307-6499

Any such notice or demand shall be deemed to have been received:

(a)    if sent by telefax, with a confirmed receipt of transmission from the receiving machine, on the day on which transmitted; and

(b)    in the case of a written notice given by hand or by courier, on the day of actual delivery.

**10.    <u>Assignment; Successors</u>.**

Neither this Guarantor nor any rights or obligations hereunder may be assigned, transferred or delegated to any other Person or entity, and any such assignment, transfer or delegation shall be null and void, provided however that any Counterparty may assign their rights and interest and obligations hereunder to an assignee or transferee to which they have transferred their interest and obligations under any agreement or instrument in which the Counterparty and Guarantor are parties pursuant to the provisions thereof. This Guarantee shall be binding upon the Guarantor and upon its successors.

**11.    <u>Withholding Taxes</u>.**

Any payments to a Counterparty under this Guarantee shall be free of all withholding, stamp and other taxes and other governmental charges of any nature whatsoever. If any withholding is required, the Guarantor will pay the same to the appropriate governmental body and pay such additional amount to the Counterparty which, after deduction of any withholding, stamp or other taxes or other governmental charge of any nature whatsoever imposed with respect to the payment of such additional amount, shall result in the Counterparty receiving an amount equal to the amount that otherwise would have been payable had there been no such withholding.

**12.    <u>Governing Law</u>.**

(a)    This Guarantee shall be governed and construed in accordance with the substantive law of the State of New York, without regard to conflicts of law principles.

(b)    The Guarantor irrevocably submits to the non-exclusive jurisdiction of the courts of New York City.

(c)    LBB irrevocably appoints LBHI in relation to proceedings in State of New York as its agent to receive service of any legal processes on its behalf in connection with this Guarantee without excluding any other means of service permitted by the law of the relevant jurisdiction.

IN WITNESS WHEREOF, this Guarantee has been duly executed as of the date
first above written.


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:


LEHMAN BROTHERS BANKHAUS A.G.

By: _____               _____
Name: Helmut Olivier                        Frank Oliver Zeitz
Title:   Member of the Managing Board       Prokurist