UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-30-16

In re LEHMAN BROTHERS HOLDINGS INC.

OPINION AND ORDER

MARVIN C. SCHWARTZ, *et al.*,

    Claimants-Appellants,

-v-

LEHMAN BROTHERS HOLDINGS INC.,

    Debtor-Appellee.

No. 15-cv-1302 (RJS)

JENNIFER ADLER, *et al.*,

    Claimants-Appellants,

-v-

LEHMAN BROTHERS HOLDINGS INC.,

    Debtor-Appellee.

No. 15-cv-1326 (RJS)

MADELYN ANTONCIC, *et al.*,

    Claimants-Appellants,

-v-

LEHMAN BROTHERS HOLDINGS INC.,

    Debtor-Appellee.

No. 15-cv-1368 (RJS)

| | |
|---|---|
| DONALD BOUGHRUM, *et al.*, <br><br>                         Claimants-Appellants, <br><br>   -v- <br><br> LEHMAN BROTHERS HOLDINGS INC., <br><br>                         Debtor-Appellee. | No. 15-cv-1376 (RJS) |
| ROCCO F. ANDRIOLA, *et al.*, <br><br>                         Claimants-Appellants, <br><br>   -v- <br><br> LEHMAN BROTHERS HOLDINGS INC., <br><br>                         Debtor-Appellee. | No. 15-cv-1407 (RJS) |
| VIRGILIO CASUPLE, *et al.*, <br><br>                         Claimants-Appellants, <br><br>   -v- <br><br> LEHMAN BROTHERS HOLDINGS INC., <br><br>                         Debtor-Appellee. | No. 15-cv-1431 (RJS) |
| FABIO LIOTTI, *et al.*, <br><br>                         Claimants-Appellants, <br><br>   -v- <br><br> LEHMAN BROTHERS HOLDINGS INC., <br><br>                         Debtor-Appellee. | No. 15-cv-1700 (RJS) |

RICHARD J. SULLIVAN, District Judge:

Now before the Court are seven related appeals from a November 7, 2014 Order of the United States Bankruptcy Court (the "November 7 Order") sustaining the omnibus objections of the Debtor-Appellee, Lehman Brothers Holdings Inc. ("Lehman" or the "Firm"), to the claims filed by certain of its former employees ("Appellants") and reclassifying those claims as "equity interests" for distribution purposes. For the reasons set forth below, the Court affirms the Bankruptcy Court's thorough and well-reasoned decision.

## I. BACKGROUND

Appellants are former senior employees of Lehman whose seven-figure compensation packages consisted of both cash and equity pursuant to the terms of Lehman's longstanding equity award program (the "Compensation Plan").[1] (*See* November 3 Order at 154, 159; *see also* Stipulation of Facts Regarding Restricted Stock Units ("Stipulation" or "Stip.") at JA 4–150.) The equity component of this Compensation Plan included "restricted stock units" in Lehman for U.S. employees and "contingent stock awards" in Lehman for non-U.S. employees (collectively, "RSUs"). (*See* November 3 Order at JA 154; *see also* Stip. at JA 6–7.)[2] A Lehman employee holding RSUs had a contingent right to own common stock in Lehman that would automatically vest five years after the

---

[1] The procedural history of this case is set forth in great detail in the Bankruptcy Court's November 3 Memorandum and Decision (the "November 3 Order") underlying the Bankruptcy Court's November 7 Order. Therefore, the Court recounts only those facts necessary for purposes of resolving these related appeals (collectively, the "appeal"). The facts set forth herein are drawn from the documents contained in the parties' Joint Appendix ("JA"), a copy of which was filed in each appeal. (*E.g.*, 15-cv-1302, Doc. No. 12.) In deciding this appeal, the Court has also considered (1) Appellants' briefs (15-cv-1302, Doc. No. 6; 15-cv-1326, Doc. No. 6; 15-cv-1368, Doc. No. 5; 15-cv-1376, Doc. No. 5; 15-cv-1407, Doc. No. 6; 15-cv-1431, Doc. No. 7; and 15-cv-1700, Doc. No. 5); (2) Lehman's omnibus brief in opposition to Appellants' appeals (15-cv-1302, Doc. No. 10 ("Lehman Br.")); and (3) Appellants' replies (15-cv-1302, Doc. No. 11; 15-cv-1326, Doc. No. 10; 15-cv-1368, Doc. No. 10; 15-cv-1376, Doc. No. 11; 15-cv-1407, Doc. No. 11; 15-cv-1431, Doc. No. 13; 15-cv-1700, Doc. No. 9). To the extent there are relevant factual disputes or evidentiary challenges asserted by the parties, they are expressly noted in this Order.

[2] "[T]he Stipulation identifies facts that are uncontested by the parties," and which "the parties . . . agreed" the Bankruptcy Court could "consider," along with "all documents attached to this Stipulation," "as evidence . . . in connection with [Lehman's] Omnibus Objections" to Appellants' and other former employees' claims. (Stip. at JA 6.) However, "the Stipulation does not constitute an admission that these facts or documents are material or relevant to the resolution of the Omnibus Objections," and the parties "do not waive, and expressly reserve, any objection to the relevance or weight of the facts cited" therein. (*Id.*)

issuance of the RSUs, so long as certain employment-related conditions were otherwise met. (*See* November 3 Order at JA 159 ("RSUs [were understood to be] . . . 'shares of Lehman . . . common stock that the [F]irm holds on [an employee's] behalf for five years, which [the employee] will be entitled to receive at that time, provided [he or she] meet[s] certain terms and conditions.'" (quoting Stip., Ex. 3 (2003 Senior Vice-President Equity Award Program)))).)[3]

A primary purpose of the Compensation Plan was to "provide[] employees of Lehman . . . with a direct ownership interest in the Firm," thereby giving these employees "an incentive to think and act like an owner every day, and allow[ing] [them] to share in the Firm's financial success over time." (Decl. of Andrew Wideman, dated Mar. 4, 2014, Ex. A ("July 2004 Compensation Plan Brochure") at JA 820; *see also* November 15, 2007 Prospectus Regarding Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan 95,000,000 Shares of Common Stock ("November 2007 Prospectus") at JA 2556 ("The purpose of the Plan is to strengthen [Lehman] by providing an incentive to [Plan] Participants to encourage them to devote their abilities to increase stockholder value and to sustain excellence.").) Like common stock, the RSUs did not have a fixed value. Rather, during the five-year holding period, the value of an RSU varied with the market value of common stock in Lehman, with the ultimate value of an RSU "depend[ing] on [Lehman's] stock price" at the time of delivery of a share of Lehman common stock to an RSU holder following the close of the five-year holding period. (November 3 Order at JA 161 (citing Apr. 1, 2014 Hrg. Tr. at 250–51); *see also* November 2007 Prospectus at JA 2556 ("The Plan is a long-term incentive plan which provides for the granting of stock options . . . , stock appreciation rights . . . , and other awards of Common Stock and awards that are valued in whole or in part by reference to, or otherwise based on the fair market value of

---

[3] Exhibit 3 to the Stipulation – the "2003 Senior Vice-President Equity Award Program" – is a brochure that describes Lehman's Compensation Plan for 2003, "including the issuance of and the tax treatment of RSUs and Stock Options." (15-cv-1326, Doc. No. 6 at 7 n.10 (citation omitted).) "The parties stipulated that the terms [of Lehman's Compensation Plan] were not materially changed during the years 2003 through 2008," which are the relevant years for purposes of this appeal. (*Id.*) This document is in the Joint Appendix submitted by the parties in this appeal. (*See* JA 33–48.)

2

Common Stock, including . . . RSUs . . . (collectively, the 'Awards').").) Moreover, when Lehman declared dividends on its common stock, employees holding RSUs received "dividend equivalents" in the form of additional RSUs, which, like their underlying RSUs, would also automatically convert into shares of common stock at the close of the five-year holding period. (July 2004 Compensation Plan Brochure at JA 825.) In addition, RSU holders had certain limited voting rights. (*See, e.g.*, *id.*)

After Lehman filed for bankruptcy on September 15, 2008, Appellants and other former Lehman employees (collectively, the "RSU claimants") submitted claims to the Bankruptcy Court for cash in an amount equivalent to the value of the unconverted RSUs they each held as of the date of the bankruptcy filing. From December 7, 2010 to August 24, 2012, Lehman filed omnibus objections to the RSU claims, arguing that these claims should be reclassified as equity and subordinated to the claims of general unsecured creditors. (*See* November 3 Order at JA 154 n.3.) For a majority of the RSU claims – that is, for 3,500 or 93% of them – Lehman's objections were unopposed, and therefore, in 2011 and 2012, the Bankruptcy Court issued a series of orders reclassifying these claims as equity. (*See* Fourth Amended Discovery Order at JA 3182.) Appellants, however, filed responses to Lehman's objections, prompting Lehman to file omnibus replies to Appellants' claims on March 28, 2011 and December 15, 2011. (*See* November 3 Order at JA 155.)

On December 21, 2011, the Bankruptcy Court held a conference on Lehman's objections to Appellants' claims and asked Appellants to explain why their claims were distinguishable from those at issue in *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006) ("*Enron*"), in which the bankruptcy court found that similar claims filed by former Enron employees were subject to mandatory subordination under Section 510(b) of the Bankruptcy Code. (*See* Dec. 21, 2011 Hrg. Tr. at 58–59.) In response, Appellants argued that their claims were distinguishable because, unlike the claimants in *Enron*, Appellants "had no choice but to accept the Lehman pay structure," and therefore, "they never willingly exchanged their labors for [that] structure." (*E.g.*, *id.* at 69–70; *id.* at 70 (arguing

3

that Appellants "clearly fall outside of . . . *Enron*" because they were "never . . . willing purchasers" of RSUs, but rather were effectively forced to accept the terms of Lehman's Compensation Plan).) In addition, Appellants also argued that *Enron* was distinguishable on the grounds that it "deal[t] with stock options," not RSUs (*id.* at 116), and that Appellants' claims implicated New York's wage and labor laws, which were issues, Appellants asserted, that the court in *Enron* "was not asked to consider" (*id.* at 159–60).

Following the hearing, the Bankruptcy Court directed the parties to submit supplemental briefing and to engage in additional limited discovery regarding the RSU claims. (*See* November 3 Order at JA 156–57; *see also* Fourth Amended Discovery Order at JA 3181–97 (establishing the protocol for this additional discovery).) After the close of this discovery, which spanned more than a year, the parties entered into the Stipulation referenced above. (JA 4–150.) Subsequently, from April 1 to 3, 2014, the Bankruptcy Court held a three-day evidentiary hearing regarding Lehman's Compensation Plan and the nature of the RSUs. (*See* November 3 Order at JA 157; Apr. 1–3, 2014 Hrg. Tr. at JA 1046–814.) This hearing involved testimony from certain Appellants, oral argument from the parties, and the submission of fifty-one exhibits, including the "operative contract" and other documents governing Lehman's Compensation Plan. (Lehman Br. at 12–13; *see also* November 3 Order at JA 157.) Following the hearing, the parties submitted additional briefing on the issue. (*See* November 3 Order at JA 157.)

On November 3, 2014, Judge Chapman issued a thirty-one-page decision sustaining Lehman's objections to Appellants' claims and reclassifying the claims as "equity" under Lehman's Chapter 11 Plan. (November 3 Order.) Judge Chapman found that, like the claims in *Enron*, Appellants' claims were for damages arising from the purchase of securities of Lehman, and therefore were subject to mandatory subordination pursuant to Section 510(b) of the Bankruptcy Code. (*Id.* at JA 178–79.) Alternatively, Judge Chapman concluded that the RSUs were "equity securities" pursuant to Section

4

101(16) of the Bankruptcy Code, and that, as a result, Appellants' claims were really based on interests in equity securities and therefore had to be dismissed because such interests are not "claims" under the Code. (*Id.* at JA 179.) On November 7, 2014, Judge Chapman issued a final order implementing the November 3 decision. (November 7 Order.)

In late November 2014, Appellants served Lehman with notices of their plan to appeal the November 7 Order. In February and March 2015, Appellants filed their appeals. On March 31, 2015, Appellants submitted their opening briefs, making substantially the same arguments that they had previously presented to the Bankruptcy Court. On April 29, 2015, Lehman filed its omnibus brief in opposition to Appellants' seven related appeals. The appeals were fully briefed as of May 13, 2015, when Appellants filed their reply briefs.

## II. STANDARD OF REVIEW

A district court has appellate jurisdiction over bankruptcy court rulings, *see* 28 U.S.C. § 158(a), and reviews a bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error, *In re Kalikow*, 602 F.3d 82, 91 (2d Cir. 2010). A finding of fact is clearly erroneous when the reviewing court is "left with the definite and firm conviction that a mistake has been made." *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009). "In reviewing a decision of a bankruptcy court, the district court may affirm on any ground that finds support in the record." *In re Campbell*, 539 B.R. 66, 72 (S.D.N.Y. 2015) (citation omitted).

## III. DISCUSSION

Appellants challenge the Bankruptcy Court's alternate holdings that their claims either (1) are subject to mandatory subordination pursuant to Section 510(b) of the Bankruptcy Code, or (2) are based on Appellants' interests in "equity securities" under Section 101(16) of the Code, and therefore must be dismissed entirely because, pursuant to Section 101(5), such interests are not "claims" under the Bankruptcy Code. The Court will address each issue in turn.

5

A. Section 510(b)

Section 510(b) subordinates "claims which are in essence claims corresponding to ownership of securities (debt or equity)," *In re Lehman Bros. Inc.*, 808 F.3d 942, 944 (2d Cir. 2015), including, as relevant, (1) claims "for damages arising from the purchase" of "a security of the debtor," and (2) claims "arising from rescission of a purchase . . . of a security of the debtor," 11 U.S.C. § 510(b). Congress enacted Section 510(b) "to prevent shareholders and other securityholders from bootstrapping their equity interests to a level on par with general creditors and thus sharing equally in the distribution of the bankrupt estate." *Enron*, 341 B.R. at 161 (citation omitted); *see also In re Med Diversified, Inc.*, 461 F.3d 251, 256 (2d Cir. 2006) ("Congress[,] . . . in enacting [S]ection 510(b), adopted [the following] policy rationales for mandatory subordination: 1) the dissimilar risk and return expectations of shareholders and creditors; and 2) the reliance of creditors on the equity cushion provided by shareholder investment." (citation omitted)). Section 510(b), therefore, was designed to address the concern that "'[w]hen a corporation becomes bankrupt, the temptation to lay aside the garb of a shareholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion.'" *In re Med Diversified, Inc.*, 461 F.3d at 258 (quoting *In re Stirling Homex Corp.*, 579 F.2d 206, 213 (2d Cir. 1978)).

In light of these policy concerns, Section 510(b) is broadly construed. *See In re Lehman Bros. Inc.*, 808 F.3d at 948 ("[Section] 510(b) case law – our own and that of other courts – endorses a 'broad' interpretation of the section (at least to the extent that such an interpretation is plausibly supported by the text)."); *Enron*, 341 B.R. at 163 ("[T]he broad applicability of [S]ection 510(b) is now quite settled."); *In re WorldCom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold shares of stock or other securities of the debtor, the claimant falls within the scope of Section 510(b), and it is not up to the courts to decide that certain types of damage

6

or harm were not contemplated by Congress or should otherwise not be included within the scope of the statute."). "The form in which the equity interest is held is ultimately irrelevant. So long as the claimant's interest enabled him to participate in the success of the enterprise and the distribution of profits, the claim will be subordinated pursuant to [S]ection 510(b)." *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2006 WL 3782712, at *6 (Bankr. S.D.N.Y. Dec. 21, 2006).

Significantly, the Second Circuit and lower courts in its jurisdiction have specifically held that Section 510(b) applies to claims filed by former employees of the debtor for cash payment in an amount equivalent to the employees' securities-based compensation. *See, e.g., In re Med Diversified, Inc.*, 461 F.3d at 254 (concluding that a former executive employee's "claim for damages based on the debtor's failure to issue shares of its common stock in exchange for the claimant's stock in another company, pursuant to a termination agreement, is 'a claim . . . for damages arising from the purchase or sale of . . . a security [of the debtor]' within the meaning of [S]ection 510(b)"); *In re MF Glob. Holdings, Ltd*, No. 11-15059 (MG), 2014 WL 3882363, at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2014) (finding that terminated employee's claim for cash payment of unpaid RSU bonus was subordinate to other claims pursuant to Section 510(b)); *Enron*, 341 B.R. at 150–51 (holding that former employees' claims for the cash value of their unexercised stock options in the debtor were subordinated under Section 510(b)); *In re WorldCom, Inc.*, 2006 WL 3782712, at *6 (finding that former employee's claim – which was based on "his unexercised stock options and . . . stock held in his retirement accounts" – was subordinated under Section 510(b)). As these cases demonstrate, "Section 510(b) mandates subordination when an individual receives . . . securities in exchange for labor even when there is 'no actual sale or purchase' of securities." *In re Motors Liquidation Co.*, No. 11-cv-7893 (DLC), 2012 WL 398640, at *4 (S.D.N.Y. Feb. 7, 2012) (citing *In re Med Diversified, Inc.*, 461 F.3d at 258).

7

Appellants' claims for the cash value of their unconverted RSUs are materially indistinguishable from the claims that were found to be subject to mandatory subordination under Section 510(b) in the aforementioned cases. And while this Court is not bound by *Enron* or the other bankruptcy court cases listed above, the Court nevertheless finds the court's reasoning in *Enron* to be persuasive and notes that "the Second Circuit has cited [*Enron*] approvingly in arriving at its own broad interpretation of [S]ection 510(b)." *In re Gen. Mar. Corp.*, No. 13-cv-5019 (ER), 2014 WL 5089406, at *3 n.9 (S.D.N.Y. Sept. 29, 2014), *appeal withdrawn* (July 24, 2015); *see In re Med Diversified, Inc.*, 461 F.3d at 257 ("Helpful too is the recent and extraordinarily thorough decision in *In re Enron*, in which the bankruptcy court considered whether to subordinate claims by employees for damages they allegedly suffered when, due to the debtor's fraud, they chose not to exercise stock options immediately when they vested but to hold onto the options with hopes for future higher returns."). Thus, applying the principles set forth in these prior cases, the Court finds that the RSUs at issue here clearly constitute "securities" for subordination purposes. *See, e.g., In re Club Ventures Inv. LLC*, No. 11-10891 (ALG), 2012 WL 6139082, at *5 (Bankr. S.D.N.Y. Dec. 11, 2012) (holding that unissued "membership units" that would have "given [claimant] certain rights to share in the Debtor's profits" "after certain conditions were met," and which would have meant that claimant "had the risk and reward expectations of an equity holder," were "securities" within the meaning of Section 510(b)). Moreover, while Appellants did not purchase their RSUs on the open market, they clearly received them in exchange for their labor, and "[s]uch an exchange of value is sufficient to satisfy the requisite 'purchase' under [Section] 510(b)." *In re Motors Liquidation Co.*, No. 11-cv-8444 (RJS), 2012 WL 1886755, at *6 n.5 (S.D.N.Y. May 21, 2012) (citing *Enron*, 341 B.R. at 150).

Appellants nevertheless attempt to distinguish the claims in the above-mentioned cases by arguing that their purchases of Lehman RSUs were not *voluntary*. In essence, Appellants contend that they were *forced* to accept the terms of Lehman's Compensation Plan, including the RSU

8

component, or risk getting fired from the Firm. Appellants thus seek to nullify the compensation terms of their employment agreements with Lehman on grounds of economic duress. This argument, however, does not distinguish Appellants' claims from those at issue in the other cases. In fact, the court in *Enron* addressed and rejected a very similar argument. There, the claimants – former Enron employees – argued that they "did not 'purchase' stock options" because they "never elected to receive stock options [as part of their compensation], but rather were *required* to take a minimum percentage of their [compensation] in stock option form," and therefore, "there was no voluntary exchange" of value sufficient to satisfy the "purchase" requirement under Section 510(b). *Enron*, 341 B.R. at 151 (emphasis added). In rejecting this argument, the *Enron* court concluded:

> While this argument might appear at first blush intuitively reasonable, the distinction is flawed. Although implicit, there is nonetheless a bargain and exchange of value. Here, the exchange is made not at the time of payment but prior to employment. If these Claimants were required to receive a portion of their compensation as options, that was a condition of [their] employment the[y] . . . willingly accepted in return for their labor. These Claimants, thus, "purchased" the stock options with their labor. Therefore, the Court's previous conclusion [that Claimants' claims alleging fraudulent inducement with respect to the stock option component of their compensation package are claims "arising from" the purchase of a security and thus must be subordinated under Section 510(b)] is equally applicable to this [situation].

*Id.*

For purposes of this case, the Court adopts the reasoning of the *Enron* court and rejects Appellants' argument that they accepted their compensation terms under economic duress. (*See, e.g.*, 15-cv-1302, Doc. No. 6 at 3, 16 ("I signed this agreement because I had no other choice.").) Specifically, to the extent that Appellants were "required" to receive a portion of their compensation as RSUs, "that was a condition of employment the[y] willingly accepted in return for their labor." *Enron*, 341 B.R. at 151. The Court thus agrees with the Bankruptcy Court's conclusion that

9

Appellants "voluntarily and continuously accepted as a condition of their employment that part of their total compensation was to be paid in RSUs." (November 3 Order at JA 163.)[4]

Accordingly, the Court finds that Appellants' claims for cash based on the value of Appellants' unconverted RSUs as of the date of Lehman's bankruptcy filing are claims for damages arising from the purchase or rescission of securities in Lehman, and therefore, fall within Section 510(b)'s broad scope and must be subordinated to the claims of Lehman's general unsecured creditors.

B. Section 101(16)

Appellants also challenge the Bankruptcy Court's alternate finding that the claims constitute interests in "equity securities" pursuant to Section 101(16) of the Bankruptcy Code, which are not "claims" pursuant to Section 101(5) of the Code. Although this argument is effectively mooted by the Court's ruling on Section 510(b), the Court nevertheless agrees with the Bankruptcy Court that Section 101(16) provides an alternate basis for dismissing Appellants' claims.

Pursuant to Federal Rule of Bankruptcy Procedure 3007(d)(7), omnibus objections, such as those filed by Lehman in this case, may be brought against claims that are "interests" rather than "claims." Fed. R. Bankr. P. 3007(d)(7). Pursuant to Section 101(5) of the Code, a "claim" is a "right to payment" or "equitable remedy," 11 U.S.C. §§ 101(5)(A)–(B), whereas, pursuant to Section

---

[4] Even if Appellants could make out an economic duress argument for their RSUs, that would not take their claims outside the scope of Section 510(b), since the claims would then simply be considered claims "arising from *rescission* of a purchase . . . of a security of the debtor," and thus would still be subject to mandatory subordination under Section 510(b). 11 U.S.C. § 510(b) (emphasis added); *see, e.g., In re Stylesite Mktg., Inc.*, 253 B.R. 503, 510–11 (Bankr. S.D.N.Y. 2000) (to prevail on its claim, claimant "must unwind the transaction . . . in the Agreement to recover its stock and cash," and thus "its plea for restitution is merely the remedial flip side of its rescission claim," but "[i]n any event, whatever [claimant] chooses to call it, its rights depend on its purchase of the [debtor's] stock, and, therefore, arise from that purchase" such that claimant's "right to relief" is necessarily subordinated under Section 510(b)); *see also In re Coronet Capital Co.*, 94-cv-1187 (LAP), 1995 WL 429494, at *9 (S.D.N.Y. July 20, 1995) ("[Section] 510(b) mandates that the appellants' claims remain subordinated despite appellants' claims for rescission."). Moreover, the fact that Appellants are seeking "'damages [that] flow from changes in the debtor's share price'" is "obvious evidence" that their claims "represent[] the equity interest[s] of . . . securityholder[s] and should be subordinated." *In re WorldCom, Inc.*, 2006 WL 3782712, at *6 (quoting *In re Med Diversified, Inc.*, 461 F.3d at 257–58); *see also In re Med Diversified, Inc.*, 461 F.3d at 257–58 ("because [claimant's] claim for damages is not a fixed amount but rather connected to the value of debtor's stock, we are inclined to read [S]ection 510(b) broadly to include his claim for damages").

10

101(16), an "equity security" – a specific type of interest – is separately defined to mean either a "share in a corporation, whether or not transferable or denominated 'stock', or similar security," *id.* § 101(16)(A), or a "warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph," *id.* § 101(16)(C). "Those who have 'claims' against [a] debtor[] are called 'creditors,' while those who [own interests in] 'equity securities' are called 'equity security holders.'" *In re Motors Liquidation Co.*, 2012 WL 1886755, at *4 (citation omitted). The important difference between a claim and an equity security interest is that the latter "'is not a claim against the debtor for which [its] holder may assert a right to payment' by filing a proof of claim." *Id.* (quoting *In re Pine Lake Vill. Apartment Co.*, 21 B.R. 478, 480 (Bankr. S.D.N.Y. 1982) (explaining that an equity security holder may file only a "proof of interest")).

Here, the Bankruptcy Court alternatively held that the RSUs issued to Appellants were "equity securit[ies]" under either Section 101(16)(A) or Section 101(16)(C). (*See* November 3 Order at 29–31.) The Court agrees. Indeed, with respect to Section 101(16)(A), there is substantial evidence in the record demonstrating that the RSUs were issued and treated as ownership shares in Lehman – shares that, while inferior to Lehman common stock, nevertheless carried similar benefits and risks. (*See, e.g.*, July 2004 Compensation Plan Brochure at JA 821 ("You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf for five years."); 2007 Compensation Plan brochure at JA 2547 (same); *id.* at JA 2553 (setting forth RSU holders' rights to receive dividends); *see also* July 2004 Compensation Plan Brochure at JA 825 (describing RSU holders' limited voting rights "related to [their] RSU awards"); *id.* at JA 820 ("[The Compensation Plan] provides [Lehman] employees . . . with a direct ownership interest in the Firm.").) *See generally In re Wash. Mut., Inc.*, 464 B.R. 656, 666 (Bankr. D. Del. 2012) ("[f]actors which courts consider in determining whether an instrument is equity include whether the holder's right is guaranteed, the

name given to the instrument, the intent of the parties, . . . the presence or absence of voting rights"). Although Appellants insist that RSUs – by their very definition – are different from common shares, the Bankruptcy Code's definition of "equity security" does not turn on the formalities of nomenclature and extends to "share[s] in a corporation, whether or not . . . denominated 'stock,'" or "similar securit[ies]." 11 U.S.C. § 101(16)(A). Surely, the RSUs at issue here are very "similar" to shares of Lehman common stock, and since an RSU "walks, talks, and squawks," *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 744 (2002), like shares in the Firm, the Court has little difficulty concluding that these RSUs are "equity securities" under Section 101(16)(A).

But even if RSUs are not "shares" or "similar securities" under Section 101(16)(A), they would clearly meet the definition of "rights" under Section 101(16)(C), since, pursuant to the terms of the Compensation Plan, Appellants, through their RSUs, held non-assignable rights to common stock in Lehman at a specified future time. (*E.g.*, July 2004 Compensation Plan Brochure at JA 821 ("Each RSU represents the right to receive one share of Lehman Brothers common stock five years after the grant date.")); *see, e.g., In re Wash. Mut., Inc.*, 464 B.R. at 667 (finding that the instrument at issue was an "equity security" under Section 101(16)(C) because although its holders "had no voting rights," they were entitled to common stock at a later date, and "would have had such rights upon receiving their distribution of common stock"). Appellants argue that the RSUs do not fall under the definition of "rights" in Section 101(16)(C) because the RSUs *convert* into Lehman common stock and Section 101(16)(C) expressly excludes a "right to convert" from the definition of "equity security." (15-cv-1326, Doc. No. 6 at 23, 25 (quoting 11 U.S.C. § 101(16)).) However, this argument fails for the simple reason that the Compensation Plan did not grant Appellants a *right* to convert RSUs to common stock in Lehman. Rather, upon the close of the five-year holding period – assuming certain conditions were otherwise met – an RSU would *automatically* convert into a share of Lehman common stock, and its holder would immediately have all the same rights, risks, and

12

rewards as other common stockholders. In other words, the RSU holder would be awarded shares of common stock without taking any action at all. Therefore, the Court concludes that the right-to-convert exclusion in Section 101(16)(C) does not apply to Appellants' RSUs. *See, e.g., In re MF Glob. Holdings, Ltd*, 2014 WL 3882363, at *4–5 (holding that RSUs issued to employee-claimant were not subject to Section 101(16)(C)'s "right-to-convert" exclusion because the debtor-employer's "RSU Award Agreement" "d[id] not grant" claimant "the right to convert the units into . . . common stock"; rather, the claimant "would be awarded shares without taking any action at all," since "[v]esting would have occur[r]ed automatically, and the shares would have been delivered" pursuant to the terms of the Agreement).

Accordingly, the Court finds that the RSUs constitute "equity securit[ies]" under Section 101(16) as that term is defined in either Section 101(16)(A) or Section 101(16)(C), and that Appellants' claims therefore should be dismissed entirely because they really reflect Appellants' interests in "equity securit[ies]," and as such, are not "claims" under the Bankruptcy Code.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that the Bankruptcy Court was correct in sustaining Lehman's omnibus objections to Appellants' claims in subordinating and reclassifying these claims as equity interests for distribution purposes under Lehman's Chapter 11 Plan. Accordingly, the Court affirms the Bankruptcy Court's November 7 Order. The Clerk of the Court is respectfully directed to close the seven related appeals resolved by this Order.

SO ORDERED.

Dated:    March 30, 2016
          New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

13