Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - x

4   In the Matter of:

5   LEHMAN BROTHERS HOLDINGS INC.,     CASE NO. 08-13555-scc

6           Debtor.

7   - - - - - - - - - - - - - - - - - x

8   LEHMAN BROTHERS HOLDINGS INC.     ADVERSARY PROCEEDING

9   v.                               CASE NO. 15-01430-scc

10  ACTS RETIREMENT-LIFE COMMUNITIES, INC.

11  - - - - - - - - - - - - - - - - - x

12  LEHMAN BROTHERS HOLDING INC.,

13  in its capacity as               ADVERSARY PROCEEDING

14  v.                               CASE NO. 15-01431-scc

15  DAIWA SECURITIES CAPITAL

16  MARKETS CO. LTD.

17  - - - - - - - - - - - - - - - - - x

18  LEHMAN BROTHERS HOLDINGS INC.     ADVERSARY PROCEEDING

19  v                                CASE NO. 16-01002-scc

20  STANDARD PACIFIC MORTGAGE, INC.

21  - - - - - - - - - - - - - - - - - x

22                      U.S. Bankruptcy Court

23                      One Bowling Green

24                      New York, New York

25

Page 2

1                           March 29, 2016

2                           10:00 AM

3

4    B E F O R E :

5    HON. SHELLEY C. CHAPMAN

6    U.S. BANKRUPTCY JUDGE

7

8    ECRO - K. HARRIS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    HEARING Re:  Doc #47589 Status Conference Relating to the

2    Motion of Dr. Thomas Marsoner to Deem Proofs of Claim to be

3    Timely

4

5    HEARING Re:  Doc #52342 Notice of Status Report of the RMBS

6    Trustees with Respect to Compliance with the Protocol and

7    Motion to Extend the Overall Claim File Cut-Off Date for

8    Certain Loans Under the Protocol Order

9

10   HEARING Re:  Adversary proceeding: 15-01430-scc Lehman

11   Brothers Holdings Inc. v ACTS Retirement-Life Communities,

12   Inc., Pre-trial Conference

13

14   HEARING Re:  Adversary proceeding 15-01431-scc Lehman

15   Brothers Holdings Inc., in its capacity as V. Daiwa

16   Securities Capital Markets Co. Ltd.; Pre-Trial Conference

17

18   HEARING Re:  Adversary proceeding, 16-01002-scc Lehman

19   Brothers Holdings Inc. v. Standard Pacific Mortgage, Inc.;

20   Doc #19 Motion to Dismiss Adversary Proceeding filed by

21   Philip Rogers Stein on behalf of Standard Pacific Mortgage,

22   Inc.

23

24   HEARING Re:  Adversary proceeding: 16-01002-scc Lehman

25   Brothers Holdings Inc. v Standard Pacific Mortgage, Inc.;



Page 4

1    Pre-Trial Conference

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:    Sheila Orms and Lisa Beck

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES, L.L.P.

3         Attorneys for Lehman Brothers Holdings Inc.

4         767 Fifth Avenue

5         New York, NY   10153

6

7    BY:  DENISE ALVAREZ, ESQ.

8         JACQUELINE MARCUS, ESQ.

9

10   PAUL HASTINGS LLP

11        Attorneys for Lehman Brothers Holdings Inc.

12

13   BY:  JOSHUA M. BENNETT, ESQ.

14

15   JONES DAY

16        Attorneys for LBHI (On Daiwa Matter)

17        222 East 41st Street

18        New York, NY   10017

19

20   BY:  LAURI W. SAWYER, ESQ.

21        JAYANT W. TAMBE, ESQ.

22

23

24

25

1    HOGAN LOVELLS

2         Attorneys for Dr. Thomas Marsoner

3         875 Third Avenue

4         New York, NY  10022

5

6    BY:  M. SHANE JOHNSON, ESQ.

7         PIETER VAN TOL, ESQ.

8

9    ROLLIN BRASWELL FISHER LLP

10        Attorneys for LBHI

11        8350 E. Crescent Parkway

12        Suite 100

13        Greenwood Village, CO  80111

14

15   BY:  MICHAEL ROLLIN, ESQ.

16        MARITZA DOMINGUEZ BRASWELL, ESQ.

17

18   CHAPMAN AND CUTLER LLP

19        Attorneys for U.S. Bank National Association, as

20        Trustee

21        111 West Monroe Street

22        Chicago, IL  60603

23

24   BY:  FRANKLIN H. TOP, III, ESQ.

25

1    TELEPHONIC APPEARANCES:

2    GABRIEL I. GLAZER, PACHULSKI STANG ZIEHL & JONES

3    BRANDY GROOME, KING STREET CAPITAL MANAGEMENT, LLC

4    MICHAEL G. LINN, FARALLON CAPITAL MANAGEMENT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   P R O C E E D I N G S
 2             THE COURT:  Good morning, please have a seat.
 3             How is everyone.
 4             UNIDENTIFIED:  Good morning, Your Honor.
 5             THE COURT:  Good morning, Ms. Marcus, how are you?
 6             MS. MARCUS:  Well, thank you.  Jacqueline Marcus,
 7       Weil, Gotshal & Manges on behalf of Lehman Holdings Inc. and
 8       the debtors.  Your Honor, we're here for the ninety-fourth
 9       omnibus hearing which is really hard to believe --
10             THE COURT:  Do we do something special for the
11       100th?
12             MS. MARCUS:  I think we should.
13             THE COURT:  I think we should.
14             MS. MARCUS:  That'll be about I guess around
15       September or something.
16             THE COURT:  Okay.
17             MS. MARCUS:  There's actually one matter on --
18             THE COURT:  Maybe we can invite Judge Peck back.
19             MS. MARCUS:  There's actually one matter on the
20       omnibus calendar for today and there are various conferences
21       with respect --
22             THE COURT:  Yes.
23             MS. MARCUS:  -- to the adversary proceedings, and
24       I'd like to introduce my colleague, Denise Alvarez who will
25       be handling the motion of Dr. Thomas Marsoner to deemed
```

Page 9

1    proofs of claim to be timely.

2         THE COURT:  Thank you.  Good morning.

3         MS. ALVAREZ:  Good morning, Your Honor.  My name

4    is Denise Alvarez on behalf of Lehman Brothers.

5         On February 19th, 2015, the Court directed that

6    the parties engage in discovery on the threshold issue, and

7    Your Honor it, I'll just quote, "whether or not I can deem

8    this to be a timely filed proof of claim and that turns on,

9    I think both sides agree, as to whether or not Dr. Marsoner

10   was a known creditor."

11        And since that time, Your Honor, the parties have

12   engaged in substantial discovery.  I believe that the

13   parties are in agreement that discovery is complete, so we

14   would respectfully request that we move forward and schedule

15   an evidentiary hearing on the threshold issue.

16        THE COURT:  Okay.  So I assume that it goes

17   without saying that there's not agreement on the issue.

18        MR. VAN TOL:  Well --

19        THE COURT:  Based on discovery.

20        MR. VAN TOL:  Based on discovery.  Good morning,

21   Your Honor, Peter Van Tol for Dr. Thomas Marsoner from Hogan

22   Lovells and I'm joined by Shane Johnson.

23        But the parties still do debate whether or not Dr.

24   Marsoner is a known creditor, and we would like to schedule

25   an evidentiary hearing.

1              THE COURT:  Okay.

2              MR. VAN TOL:  I had a chance to confer with

3    counsel in advance, and I think we're in accord that a

4    hearing any time after the second half of May or in June --

5              THE COURT:  Okay.

6              MR. VAN TOL:  -- would suit the parties.

7              THE COURT:  And how much time do you think you'll

8    need?

9              MR. VAN TOL:  For the evidentiary hearing, Your

10   Honor?

11             THE COURT:  Yes.

12             MR. VAN TOL:  I think it would be -- I mean, if we

13   start at 9 in the morning, I'd be surprised we're not

14   finished by mid-day, by 1 o'clock.

15             THE COURT:  Okay.

16             MS. ALVAREZ:  We're likely to have one live

17   witness, some video testimony --

18             THE COURT:  Okay.

19             MS. ALVAREZ:  -- deposition testimony.

20             We thought between both sides, it could take a day

21   and a half.

22             MR. VAN TOL:  Well, Your Honor, that's -- I don't

23   necessarily disagree.  I had assumed that any deposition

24   testimony Your Honor would consider in chambers rather than

25   court.  We also have one witness, so if we have two live

1    witnesses --

2              THE COURT:  Okay.  All right.

3              MR. VAN TOL:  -- I think maybe a day at most.

4              THE COURT:  So we'll allocate you a day.  Let's

5    see, since I have you both here, let's see what we can come

6    up with.  I don't have my June calendar.  Let me ask you

7    this rather than hold everybody up, we'll confer in chambers

8    and come up with a couple of proposed dates, and we'll e-

9    mail all of you.  And then I would appreciate if you would

10   agree between yourselves on a standard pretrial order, so

11   that we know in advance who the witnesses are, and also

12   include the filing of any pretrial submissions with respect

13   to evidentiary matters or anything else.

14             MR. VAN TOL:  Yes, Your Honor.

15             THE COURT:  And to the extent that you can agree,

16   which I think it's highly likely that you will agree, you'll

17   contact us.

18             MR. VAN TOL:  Yes, Your Honor.

19             THE COURT:  All right?

20             MR. VAN TOL:  On the pretrial submissions, we had

21   anticipated just as in trial, simultaneous ones, not back

22   and forth.

23             THE COURT:  Yes, simultaneous ones, witness list

24   and we would need copies of any exhibits you plan to

25   introduce, the outer limits of anything you plan to

Page 12

1   introduce, subject to what you actually decide to put in at

2   the evidentiary hearing.

3           MR. VAN TOL:  And would the Court like that 30

4   days advance, would that be too --

5           THE COURT:  Oh, no, no, no.  Three or four days in

6   advance is fine.

7           MR. VAN TOL:  This is what happens appear in

8   bankruptcy court, Your Honor.

9           THE COURT:  Well, I see the look of alarm

10  sometimes, but we move on a quick pace, quick time frame.

11          MR. VAN TOL:  Understood.  And I think otherwise

12  that is it.  We are finished with any new discovery.  We

13  have one overhanging issue from an older request, but I

14  don't want to take up the Court's time --

15          THE COURT:  Okay.  All right.

16          MR. VAN TOL:  -- but I think we can work it out --

17          THE COURT:  Okay.  If you can't, let us know and

18  we can arrange a telephone call.  The only other thing

19  somewhat off topic that I would add, it's likely to be June

20  and not May, given what I know I have on the calendar in

21  May, and it strikes me that that is summer associate season,

22  and that this would be a very nice opportunity for you to

23  have your summer associates participate but not bill your

24  clients for the matter.

25          MR. VAN TOL:  We'll consider that a court order,

Page 13

1    Your Honor.

2              THE COURT:  All right.  Thank you very much.

3              All right.  Next.

4              MS. MARCUS:  Thank you, Your Honor.  The next

5    matter is the adversary proceeding, Lehman Brothers Holdings

6    et al versus ACTS Retirement-Life Communities.

7              THE COURT:  Yes.

8              MS. MARCUS:  It's going to be handled by Paul

9    Hastings.

10             THE COURT:  Okay.

11             MS. MARCUS:  Your Honor, since Weil isn't

12   representing Lehman on any of the matters, may we be

13   excused?

14             THE COURT:  Yes, of course, thank you.

15             MR. VAN TOL:  And may we be excused, Your Honor?

16             THE COURT:  Yes, thank you, have a good day.

17             Good morning.

18             MR. BENNETT:  Good morning, Your Honor.

19             THE COURT:  Good morning.

20             MR. BENNETT:  Good morning, Your Honor, Joshua

21   Bennett from Paul Hastings on behalf of Lehman Brothers

22   Holdings Inc.  This is adversary proceeding 15-1430 against

23   ACTS --

24             THE COURT:  Right.

25             MR. BENNETT:  -- Retirement-Life Communities.

Page 14

1           THE COURT:  All right.

2           MR. BENNETT:  This is another matter that's

3    related to one of Lehman's former counterparties in interest

4    rate swap transaction.  Lehman's claim is in excess of $5

5    million in this one.

6               In this particular case, the counterparty opted

7    not to terminate the interest rate swap upon the bankruptcy

8    filings.  Its position was it neither needs to terminate or

9    need to comply with its obligations, doesn't need to pay

10   that amount for about 90 months.

11          THE COURT:  Okay.

12          MR. BENNETT:  Judge Peck previously in 2009 we

13   believe firmly ruled that was inappropriate in the case

14   against a counterparty called Metavante --

15          THE COURT:  Yes, Metavante.

16          MR. BENNETT:  M-e-t-a-v-a-n-t-e.  ACTS eventually

17   decided to terminate in July of 2009.  Under the terms of

18   the contract it was obligated to do a market quotation

19   process, it's position is that that process failed under the

20   terms of the contract, it was then supposed to determine its

21   lost or gain in good faith and reasonably, it was

22   represented by a financial advisor who was the financial

23   advisor in several of these matters that are before Your

24   Honor.

25              That financial advisor instructed ACTS to take the

Page 15

1    position that by the sheer fact of the failure of the market

2    quotation process, the swap was worthless, and therefore it

3    neither -- it didn't lose anything.

4                THE COURT:  Which financial advisor is that?

5                MR. BENNETT:  This is KSR Capital Advisors, based

6    in Chicago.

7                THE COURT:  Okay.

8                MR. BENNETT:  So the same issue is in a matter

9    versus Longwood and versus Presbyterian Senior Care which

10   were before Your Honor.

11               THE COURT:  Okay.

12               MR. BENNETT:  Lehman took the position that, no,

13   the expected future payments under the swap clearly

14   indisputably put Lehman in the money by about $5 million

15   based on net present value of what Lehman would pay versus

16   net present value of what ACTS Retirement would pay.

17               ACTS has refused to pay anything.  ACTS has

18   refused to pay the nine months of missed payments, from the

19   bankruptcy to the termination.  Its position appears to be

20   that there's some small amount unrelated to the interest

21   rate swap that Lehman allegedly owes on a separate agreement

22   that's separate from it, is a reserve fund agreement, S

23   position that Lehman owes approximately 300,000.  Lehman's

24   claim is that it's owed in excess of 5 million.

25               The case is pretty straight forward.  I've several

Page 16

1    had conversations with defense counsel.  We have a proposed

2    schedule that's worked out, assuming the dates are okay with

3    you, we would file it when I get back to the office this

4    afternoon.

5                    THE COURT:  Okay.  Give me some sense of what your

6    dates is.

7                    MR. BENNETT:  Fact discovery would end November

8    17, that's seven plus months from now, expert discovery in

9    January of 2017 and we would have dispositive motions before

10   Your Honor February 2nd.

11                   THE COURT:  Why does it have to take so long?  I -

12   - perhaps it's more a question for ACTS counsel.

13                   MR. BENNETT:  Well, it wasn't scheduled on -- I

14   had proposed -- I had based it on some others --

15                   THE COURT:  Okay.

16                   MR. BENNETT:  -- that you so ordered in similar

17   matters, there were some holidays coming up.

18                   THE COURT:  Across the board I'm trying to

19   accelerate the pace of these disputes.  So to the extent

20   that I go along, I'll consider them firm dates.  And there's

21   no automatic move to dispositive motions.

22                   MR. BENNETT:  Okay.

23                   THE COURT:  All right.  So we're going to have to

24   do a stop, look and listen after you complete fact and

25   expert discovery, and I'll give you my view as to whether or

1   not I think it'd be useful for there to be dispositive --

2            MR. BENNETT:  Absolutely.

3            THE COURT:  -- motions and if not, then I don't

4   suppose I can preclude you from filing them, but I would

5   prefer to move right to a trial.

6            MR. BENNETT:  That would be fine.  Because we

7   think some of the issues are fairly straight forward --

8            THE COURT:  Okay.

9            MR. BENNETT:  -- and probably not --

10            THE COURT:  What about ADR, has there been any

11   attempt to mediate?

12            MR. BENNETT:  There was.  It went through the

13   process, that obviously failed, which brings us here.

14            THE COURT:  All right.  Thank you.  Good morning.

15            UNIDENTIFIED:  Good morning, Your Honor.  Rich

16   Omishio (ph), Drinkel Bill and Reed (ph) on behalf of ACTS.

17   I just wanted to say we obviously dispute the allegations of

18   Lehman in connection with the adversary proceeding.  We have

19   --

20            THE COURT:  Do you dispute the fact that you,

21   prior to the termination of the agreement, that you made no

22   payments?

23            UNIDENTIFIED:  We --

24            THE COURT:  Is that an undisputed fact?

25            UNIDENTIFIED:  That we made no payments after the

Page 18

1    termination?

2           THE COURT:  No, prior to the termination.

3           UNIDENTIFIED:  Prior to the termination?

4           THE COURT:  Yeah.

5           UNIDENTIFIED:  I believe that is undisputed, I'd

6    have to double-check.  And, Your Honor, with regard to the

7    schedule, we had understood that the schedule is the same as

8    in terms of time periods as in the other cases are based on

9    similar --

10          THE COURT:  What's the total amount of payments

11   that weren't paid prior to the termination, do you know?

12          MR. BENNETT:  It's in excess of 200,000.

13          THE COURT:  Do you want to go back to mediation?

14          UNIDENTIFIED:  I'd have to raise it with my

15   client, Your Honor, but the mediation was unsuccessful.

16          THE COURT:  Well, I take it that ACTS is a non-

17   profit.

18          UNIDENTIFIED:  It is, Your Honor.

19          MR. BENNETT:  Your Honor, we tried mediation,

20   there were briefs, there was a mediator's recommendation, we

21   reached out to the counterparty prior to --

22          THE COURT:  Have you shared any of the documents

23   that evidence the market -- the failure of market quotation

24   process?

25          UNIDENTIFIED:  We did not represent ACTS in

Page 19

1    connection with the mediation, we've been brought in for the

2    litigation, Your Honor.  But it's my understanding some

3    documents were shared in mediation.

4              MR. BENNETT:  That's correct.

5              THE COURT:  All right.  Well, I would suggest you

6    get started on fact discovery and see what is revealed in

7    the documents, particularly with respect to the failure of

8    market quotation and take a good look at how the market

9    moved during the relevant period of time, and to the extent

10   that it looks like further mediation would be a good idea

11   based on more information, you can let me know.

12             UNIDENTIFIED:  Thank you, Your Honor.

13             THE COURT:  All right?

14             MR. BENNETT:  Thank you, Your Honor.

15             THE COURT:  Okay.  Thank you.

16             All right.  The next matter on my agenda is Daiwa

17   Securities.

18             How are you, Mr. Tambe?

19             MR. TAMBE:  Fine, thank you, Your Honor.  You?

20             THE COURT:  I see Mr. Maloney (ph).

21             MR. MALONEY:  Good morning, Your Honor.

22             THE COURT:  Getting into position.  Smiling today.

23             MR. MALONEY:  We resolved the other matter.

24             THE COURT:  What's that?

25             MR. MALONEY:  We resolved the other matter.

Page 20

1          MR. TAMBE:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. TAMBE:  Jayant Tambe and Lauri Sawyer and

4    Jeremy Merdolin (ph) from Jones Day for Lehman.  This is our

5    first appearance on the Daiwa matter.  It's an adversary

6    complaint.

7          Just briefly, it's a single 1992 ISDA master

8    agreement, 955 transactions, trades of various types,

9    interest rates, CDS, foreign exchange.  The early

10   termination date designated by Daiwa was 9/26 so not

11   immediately upon the bankruptcy filing of LBHI, a week or so

12   later.

13         If you look at the mid-market valuations, on the

14   mid-market valuations Lehman was in the money $75 million on

15   the early termination date which is 9/26.  The claim, the

16   proofs of claim that have been filed by Daiwa in the amount

17   of $22 million going the other way.

18         There is collateral involved as well, so it's not

19   --

20         THE COURT:  Uh-huh.

21         MR. TAMBE:  The spread isn't 75 million to 22.

22   The spread is about $40 million in valuation difference

23   between the mid-market values and the values that they have

24   arrived at.

25         The complaint that was filed in March of this year

Page 21

1    alleged breach of contracts, alleged a breach of the implied

2    covenant, bad faith and fair dealing, and also sought to

3    expunge the proofs of claim.

4            It was filed by Weil, we've been substituted in as

5    counsel very recently.  There's a motion to dismiss that has

6    just been filed by Daiwa.  We have talked about a schedule.

7    We may need to tweak the schedule a little bit, because the

8    way it works right now it's a little out of sync.

9            THE COURT:  Is that on the calendar for a May

10   date?

11           MS. SAWYER:  It is on the calendar for a May date,

12   but that -- we didn't what the June omnibus was, and that

13   didn't give us really the time that we had agreed on --

14           THE COURT:  Okay.

15           MS. SAWYER:  -- briefing schedules.  So we were

16   looking for a new date for argument essentially.

17           THE COURT:  Okay.  All right.  So why don't we add

18   that to the list of dates that we need to give you.  Why

19   don't you contact Mr. Beller in chambers with some proposed

20   dates that are mutually acceptable to the parties, and we'll

21   get you on the calendar.  It doesn't have to be an omnibus

22   day, all right.

23           MR. TAMBE:  We've also had a discussion, I think

24   it was a somewhat extended discussion yesterday between

25   counsel just to set up a schedule on some expectations.

Page 22

1   Fact discovery, we anticipate, will be completed by January

2   2017.

3           THE COURT:  Okay.

4           MR. TAMBE:  Expert discovery by mid-summer 2017.

5   So late summer 2017, I'm ready, I'm waiting for it, late

6   summer 2017 we anticipate would be an appropriate hearing

7   date or trial date in this matter.

8           MS. SAWYER:  Just to clarify, that's what we

9   proposed yesterday, they're considering it, so we don't yet

10  have an agreement.

11          THE COURT:  Right now 2017 is shaping up to be

12  back-to-back-to-back Lehman trials.  So the earlier we can

13  get you slotted in for something, the more likely it is to

14  actually go then.  So I would suggest to you though that

15  late summer, literally late summer, meaning September I

16  think is more palatable for folks than late August.  I don't

17  think anyone wants to be here in late August.

18          MR. TAMBE:  So we'll confirm, propose a schedule

19  probably in the next couple of days.

20          THE COURT:  Okay.  How long do you think you'll

21  take for this one, Mr. Tambe, how long for the trial?

22          MR. TAMBE:  Oh, I can't even begin to estimate

23  that.  I would say just given the number of trades and

24  values, five days or less.  So, you know, four to five days.

25          THE COURT:  All right.  Thank you.

Page 23

1          MR. ZUTSHI:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. ZUTSHI:  Rishi Zutshi for Daiwa.  We have been

4   in mediation with the debtors since 2011, July 2011.

5          THE COURT:  How's that going?

6          MR. ZUTSHI:  Well, for several years we were told

7   we couldn't even make any statements about what our position

8   was with respect to --

9          THE COURT:  I was -- that was a sardonic comment,

10   yes.

11          MR. ZUTSHI:  We have been -- we're happy to be

12   before Your Honor now and are hopeful that we can address,

13   you know, I think one of the main issues that has been a

14   hindrance to our negotiations has been the legal theory that

15   is the primary legal theory in the complaint which is

16   essentially that Daiwa -- the operative agreement here was

17   1992 ISDA master agreement in which the parties had selected

18   loss and second method.

19          THE COURT:  Okay.

20          MR. ZUTSHI:  And the legal theory that

21   (indiscernible) has taken thus far and it's evidenced in

22   their amended complaint for the breach of contract claim is

23   that Daiwa was not entitled to calculate loss based on

24   market quotations that it solicited and obtained on the

25   early termination date, unless it had actually entered into

Page 24

1    replacement transactions for those trades.

2            THE COURT:  Okay.

3            MR. ZUTSHI:  So that and -- and that is a nutshell

4    the -- and subject to the motion to dismiss, the

5    (indiscernible) last week.  And we do think the resolution

6    of that issue could be helpful both in, you know, narrowing

7    issues if there were to be any sort of further trial, but

8    also in terms of --

9            THE COURT:  So is that a motion to dismiss or is

10   that a motion for summary judgment?

11           MR. ZUTSHI:  It's a motion to dismiss.

12           THE COURT:  Okay.

13           MR. ZUTSHI:  Based on the way the pleadings are

14   currently framed.  As I -- and essentially, the issue is the

15   amended complaint the way it's currently standing on right

16   now, states that quotations that Daiwa solicited our

17   essentially hypothetical costs and so that difference of $40

18   million that Mr. Tambe just referred to is based on the bid

19   offer, you know, adjustments to those mid-market values,

20   which in Lehman's taking the position that Daiwa is not

21   entitled at all unless (indiscernible) replacement

22   transactions.

23           And so based purely on language of the loss

24   definition which Your Honor is very familiar with --

25           THE COURT:  I'm familiar with.

Page 25

1          MR. ZUTSHI:  -- and the last sentence of that

2     definition and we think that that claim cannot stand on its

3     face, that theory is legally invalid.  And then there's also

4     issues with their breach (indiscernible) claim and the

5     objection obviously, you know, built upon the same theory

6     that the other claims are.

7          THE COURT:  Okay.  Very good.  So we will -- we're

8     going to leave this one with your contacting Mr. Beller for

9     a date for the motion and then you'll get back to us about

10    target dates for the trial.  All right.  Thank you very

11    much.  Thank you for coming in.

12          All right.  Next on my list is -- well, let me

13    ask, is anyone here on the Divern (ph) adversary?

14          UNIDENTIFIED:  (indiscernible) we just found out

15    about this last night after hours.

16          THE COURT:  I'm sorry, come up, yeah, who do you

17    represent?

18          UNIDENTIFIED:  We're going to be representing

19    North Star and Wilmington Trust.  We have not filed any

20    documents yet.  We found out after hours last night.

21          THE COURT:  Hold on, hold on.  This is in the

22    Divern adversary?

23          UNIDENTIFIED:  Yes, number 16 on your --

24          THE COURT:  Yes.  Is Mr. Divern here?

25          UNIDENTIFIED:  I believe it's (indiscernible).

1          UNIDENTIFIED:  No, I'm Thomas Hemel (ph), I'm

2     counsel with Lehman Brothers Holdings.

3          THE COURT:  Yes.  I'm just trying to figure out

4     what's going on because we were unable -- my understanding

5     was that there was an attempt to adjourn this, but that no

6     one could get in touch with Mr. Divern.  Is that your

7     understanding?  So what shall we do today?

8          UNIDENTIFIED:  Your Honor, we haven't been served.

9     We became aware of this case because it flashed on one of

10    our outside counsel's screens, and they let us know about

11    it, and we thought that they would, absent any communication

12    from the plaintiffs, put it off and see if we actually did

13    get served.

14         UNIDENTIFIED:  I believe that's the same situation

15    with --

16         THE COURT:  Yeah, I see.

17         UNIDENTIFIED:  There's also a bankruptcy

18    proceeding by Ms. Divern in Maryland as well.

19         THE COURT:  It's a Ms. Divern, not a Mr. Divern?

20         UNIDENTIFIED:  I believe it's a Miss, but I don't

21    know.

22         UNIDENTIFIED:  We're guessing, Your Honor.

23         THE COURT:  I see.

24         UNIDENTIFIED:  Information that was relayed to me

25    it was a Miss.

```
 1              THE COURT:  I see.  All right.  Well, the
 2    plaintiff is not here, so I can't do anything today.  So
 3    I'll take it off the calendar.  I'm going to adjourn it
 4    without date, and I'll just ask you folks to attempt to
 5    contact the plaintiff and let us know.
 6              UNIDENTIFIED:  Thank you, Your Honor.
 7              UNIDENTIFIED:  Thank you, Your Honor.
 8              THE COURT:  All right.  Thank you for coming in, I
 9    appreciate it.
10              All right.  So I think that takes us back to
11    Standard Pacific.
12              Good morning.
13              MR. STEIN:  Good morning, Your Honor, Philip Stein
14    on behalf of Standard Pacific Mortgage.
15              Your Honor, as the Court is aware, we do believe
16    that there are --
17              THE COURT:  Well, before you get started, let me
18    take an appearance.
19              MR. ROLLIN:  Thank you, Your Honor, Michael Rollin
20    and Maritz Braswell, Rollin Braswell Fisher --
21              THE COURT:  Okay.  So first of all we have a
22    threshold issue over the filing, the late filing of a reply
23    brief.  So we need to talk about that first.
24              MR. STEIN:  Okay.  With respect to the timing,
25    Your Honor, we apologize.  We harken back to what the
```

Page 28

1    gentleman said earlier today about litigators in bankruptcy

2    court.  Having only been involved in this in connection with

3    the ADR process, never having been involved in the larger

4    bankruptcy case, I can honestly say I didn't even think to

5    look at the, what now I understand is the 2010 second

6    amended case management order that makes clear that these

7    are to be filed by noon rather than 4:30 or 5:00 p.m. when

8    we filed it.  So my apologies on that, Your Honor.

9             I thought that we would be setting a case

10   management order specific to the adversary proceeding, and

11   that's what we would be bound by.

12            THE COURT:  Mr. Rollin.

13            MR. ROLLIN:  Your Honor, I -- you know, receiving

14   the reply brief on 5 o'clock on a holiday weekend put the

15   plan administrator to its task over the course of a weekend

16   to prepare to address those issues.

17            I believe and really the only thing that's new in

18   there is the collateral estoppel argument.  Your Honor may

19   want to hear about that separately, but --

20            THE COURT:  Well, you know, there's a -- I mean,

21   besides the late filing which also disadvantaged me because

22   I had my packet of materials to review for the weekend and

23   that wasn't included in them.  It's not standard reply brief

24   material, it's a wholly new argument.

25            So there's the timing issue, and then there's a

1    fact that you raised an entirely new argument.  So that's

2    not a matter of something that is different in bankruptcy

3    court versus non-bankruptcy court.  That's just not the

4    purpose of a reply brief.

5         So -- but the last thing I want to do is, you

6    know, in a procedural way create any infirmities if you will

7    in the record.  So what I'm inclined to do and I'll ask Mr.

8    Rollin if he's happy with this, because to the extent that

9    there's an aggrieved party on this narrow issue, I would say

10   it is he, I can deem the letter that you replied as a

11   surreply and it can become the record of this case.  Or, you

12   know, and obviously you can address as much as you like on

13   the record.  I don't think that the additional issue is that

14   complicated frankly.

15        MR. ROLLIN:  Your Honor, we agree. We'd like to

16   nip this collateral estoppel issue in the bud frankly.  We

17   would like -- you know, I'd like to frankly see how the

18   argument goes today, whether any new material comes in.  I

19   believe it would be reasonable for the plan administrator to

20   be able to put in a real surreply that addresses the

21   arguments more fully, but I might wait and see how that goes

22   today.

23        THE COURT:  Okay.  All right.  So that can be our

24   working plan because I think it's a secondary issue.

25        MR. ROLLIN:  Thank you, Your Honor.

Page 30

1              THE COURT:  So --

2              MR. STEIN:  Your Honor, if I may --

3              THE COURT:  Yeah.

4              MR. STEIN:  Certainly we would have no objection

5    to the plan administrator filing a --

6              THE COURT:  Okay.

7              MR. STEIN:  -- fuller surreply brief if it deems

8    it necessary.

9              THE COURT:  I mean, I think it's no secret that

10   I'm very familiar with this issue.  And I read the 10th

11   Circuit opinion several times, I've read your briefs several

12   times, and I've reread my decision several times.  And we --

13   there's still a ships passing in the night problem here, and

14   I simply -- I don't think that the 10th Circuit addressed

15   the issue, indeed the 10th Circuit opinion makes no mention

16   whatsoever of Section 710 or Section 711.

17              And I, in a very, I thought and Judge Polly agreed

18   with me, in a very, very, very detailed way methodically

19   went through every decision prior to the 10th Circuit that

20   dealt with this issue and gave my analysis of why some of

21   them were more persuasive than others.  Not an exercise that

22   I particularly enjoyed, because of course, I have tremendous

23   respect for every judge who had the delightful task of

24   reading through the sellers guide.

25              But I did note something interesting, and that is

Page 31

1    that when I looked at the caption of the 10th Circuit case,

2    it does not include an appeal of Judge Bremer's decision in

3    -- that I discussed at length in my opinion.

4              MR. STEIN:  That's correct, Your Honor.  Let me

5    update the Court on that if I may.

6              That is as Your Honor is aware, the one case that

7    as decided against any of my clients in the District of

8    Colorado on this issue.  Even Judge Bremer agreed with the

9    rest of his fellow jurists that there was an issue with

10   regard to the application of the borrowing statute, and

11   therefore, Delaware's three statute of limitations should

12   apply, but it then did proceed to treat indemnification the

13   way you ultimately did.

14             But where things stand with that, Your Honor,

15   right now, is that knowing that we were going to file a

16   motion for reconsideration in light of what the 10th Circuit

17   had done, with the 10th Circuit obviously being binding on

18   Judge Bremer, what Lehman has agreed with us to do, in lieu

19   of our filing a motion for reconsideration is to jointly

20   seek and we have filed this with Judge Bremer, a motion to

21   vacate his opinion as a prelude to Lehman dismissing with

22   prejudice that claim.

23             So Judge Bremer has not yet moved on that in the

24   week or ten days since that has been filed.  But, Your

25   Honor, that one opinion from Colorado, which was an outlier

Page 32

1    to begin with, with respect to what all the judges had done

2    with respect to these issues, is almost certainly going to

3    no longer have any effect, either because it's going to be

4    vacated or because of a motion for reconsideration.

5            But, Your Honor, one thing I would like to address

6    with you, leaving aside issues that, you know, we feel very

7    strongly about with respect to Section 711 being as the

8    contract says on these four occasions a remedy,

9    indemnification being remedy, and the fact that the

10   indemnification and repurchase are dealt with in tandem and

11   always --

12           THE COURT:  It's a misreading of the Seller's

13   Guide.

14           MR. STEIN:  Your Honor --

15           THE COURT:  It is a misreading of the Seller's

16   Guide.  And counsel in Hometrust admitted -- admitted in

17   response to my question that under the theory that you are

18   suggesting, there's no good time to bring a claim.

19           MR. STEIN:  Your Honor, we take the exactly

20   opposition position as we did in our papers.  And I wanted

21   to start there actually with regard to the substance of our

22   argument.

23           Leaving aside the issue of what we see as clearly

24   a remedial provision, and, in fact, at the Lehman and Aurora

25   identified as a --

Page 33

1           THE COURT:  Characterizing it as a remedial

2    provision doesn't advance the ball.  It's remedial in the

3    sense that it is intended to compensate for a loss.  But the

4    fact that it is listed in 710, that indemnification is

5    listed in 710 and in 711, has significance.

6           MR. STEIN:  Your Honor, repurchase is listed in

7    both 710 and 711.  Events of default are listed in Section

8    710.  The first times that indemnification is referred to in

9    Section 710, it's referred to with a specific citation to

10   Section 711.  Section 710 is not creating, in and of itself,

11   a right to indemnification that doesn't otherwise exist in

12   the contract.  Section 710 is referring the reader to

13   Section 711 which covers indemnification just as it's

14   referring the reader at Section 705 which covers events of

15   default in Section 701 which addresses the 48 different

16   representations and warranties that are made, because,

17   again, this is not an indemnification agreement in the

18   broadest possible sense with respect to us effectively being

19   guarantors or any loss.  The reason there are 48

20   representations and warranties is because the bridge must be

21   tied to some underlying -- I mean -- I'm sorry.  The right

22   to indemnification is tied to, hinges upon, an underlying

23   breach.

24           But here is what I wanted to make clear.  If you

25   take Section 711 exactly as the Court does as creating an

Page 34

1    independent cause of action, then necessarily, it has to be

2    dealt with and applied in accordance with its terms.  One of

3    the easiest things that Lehman could have done in

4    establishing its Seller's Guide and establishing therein the

5    right to indemnification would be to have said, in far fewer

6    than the 425 or so words that comprise this provision as the

7    (indiscernible) stands -- what they could have said but

8    didn't was that this is a right that comes into being when a

9    payment is made to a third party.  And then, and only then,

10   can this be pursued.  One of our arguments, as you've seen

11   in our briefs, is that if you take Section 11 (sic), again,

12   exactly as the Court does, as something that must be applied

13   according to its terms and it gives rise to an independent

14   cause of action, there could be no question but that they

15   didn't need to wait until they paid a third party to seek

16   indemnification under that provision.  Any loss, any damage,

17   any attorneys' fees that they incurred.  And by their own

18   argument, by their own repeated allegations in this

19   complaint and the omnibus complaint that they filed one week

20   after the Tenth Circuit issued its ruling, what they say is

21   that they were caused damages.  The only time we did

22   anything with regard to this case, which is when we sold the

23   loans and made representations and warranties as of the sale

24   date.

25            And so, it would stand all sorts of jurisprudence

1    on its head to say that they didn't have a right, that they

2    did not have a right, to seek compensation for not having

3    gotten the value that they expected if indeed there were

4    defects in these loans.  It would stand all sorts of

5    jurisprudence on its head to say that they --

6           THE COURT:  I don't appreciate arguments that, in

7    essence, tell me that I would be incredibly dense if I don't

8    agree with you.

9           MR. STEIN:  Your Honor, I'm certainly not taking

10    that position.

11           THE COURT:  You just told me that it would stand

12    jurisprudence on its head.

13           MR. STEIN:  No.  But I'm raising the point that I

14    don't believe was raised by other counsel in the Hometrust

15    case.  I'm asking the Court to consider that was not raised

16    previously, which is that this is a very broadly worded

17    provision.  There's no question about it.

18           But having worded the provision as broadly as they

19    did in drafting this contract, Your Honor, I'm simply saying

20    that Lehman, having worded it that broadly, having created

21    all sorts of opportunities for itself to seek

22    indemnification under all sorts of different scenarios can't

23    be heard to say now, well, we couldn't possibly have

24    asserted an indemnification claim until there was an

25    approved settlement in 2014.

1              So I'm certainly not trying to task Your Honor.

2      I'm simply asking that Lehman's own clear inclination, its

3      own clear motivation, in drafting Section 711 the way it did

4      must be applied.  They can't be heard now to say, again,

5      having drafted this as broadly as they did at the outset of

6      the provision that there was no way they could seek

7      indemnification when they acquired the loan from us.  There

8      was no way they could seek indemnification when they later,

9      as servicer, had to deal with foreclosure issues as indeed

10     they did on these loans.  Or when they incurred any

11     attorneys' fees in connection with proofs of claim.  They

12     never could have sought indemnification -- that's what

13     they're telling Your Honor -- until 2014.  That's simply not

14     correct.  And, Your Honor --

15              THE COURT:  There's nothing in the Tenth Circuit

16     opinion that has anything to do with this.

17              MR. STEIN:  Nope.  Your Honor, I'm making an

18     argument that is not in the Tenth Circuit.  I'm saying that

19     to the extent Your Honor is --

20              THE COURT:  So this is purely telling me to

21     reverse my other opinion.  I just want to understand what

22     you're saying.

23              MR. STEIN:  I'm making -- we've made at least

24     three arguments.  One is that this is a remedial provision.

25     The Tenth Circuit, you know, correctly said not only that

1    they -- that Lehman has not pled indemnification as the

2    (indiscernible) claim, but they couldn't.  There are three

3    pages of the 37-page opinion devoted to talking about cases

4    like City of New York v. Lead Industries Association and the

5    People's Republic of Yemen case.  So it's not dicta, in our

6    view, by any stretch of the imagination.  They're doing what

7    Courts very often do.  It's just so you didn't plead this.

8    And even if you had, I would rule against you because you,

9    as the City of New York Lead Industries case says, you've

10   distorted the true nature of an indemnification claim.  So

11   one argument is that.

12            A second argument is that to the extent that the

13   Court wishes simply to apply 711 according to its terms, we

14   would invite that, encourage that, and say there's no

15   question but that you could have sought indemnification

16   prior to a third party (indiscernible), indeed, their

17   affiliate.  Lehman Brothers Bank now known as Aurora only

18   seeks repurchase and indemnification in the cases that it

19   brings -- and it's brought many of them -- when there's been

20   no third party involvement whatsoever.

21            THE COURT:  Yes, because that's a different type

22   of indemnification.  That's a different type of

23   indemnification.  That's indemnification in 710.  This is

24   all very clearly explained in my opinion.  You simply don't

25   agree with my opinion.  Judge Pauley agreed with my opinion.

Page 38

1          MR. STEIN:  No question about it.  And I certainly

2     recognize that his opinion counts far more than mine does in

3     this regard.  But my client does have a right to make the

4     arguments that we're making.

5          THE COURT:  Of course they do.

6          MR. STEIN:  And so that's why I'm here, Your

7     Honor, to assert that just as it prevailed on a motion to

8     dismiss in the District of Colorado and then again on

9     appeal, we believe that we should be entitled to prevail in

10    this instance as well for many of the same reasons and the

11    additional reason that I brought to Your Honor's attention.

12         I would also just emphasize in that latter regard,

13    in terms of just applying Section 711 according to its

14    terms, that at the start of the provision, it is, as I've

15    said, very broadly worded to encompass not just anyone as to

16    third parties but any sort of loss, any sort of damages, any

17    sort of cost or expense.  It then becomes much narrower with

18    respect to the set of circumstances in which losses and

19    damages and penalties and everything come into play.  That

20    is to say it filters down to the fact that there has to have

21    been some breach of a representation, warranty or covenant

22    or act or failure to act on the part of the seller of the

23    loans, in this instance, Standard Pacific Mortgage.

24         THE COURT:  That's right.  And then there's a

25    repurchased amount and it's complied with.  There's no

1    damage.

2           MR. STEIN:  But there has to have been some

3    underlying basis --

4           THE COURT:  That's correct.

5           MR. STEIN:  Right.  And that being the case, as

6    cases in Delaware, for example, the (indiscernible)

7    basically cited the Aircraft Services case that we cited,

8    have said in these instances, what has to be looked at when

9    it's not just indemnification for any type of loss but

10   indemnification tied specifically to some sort of breach,

11   you do have to look to when the alleged breach occurred.

12          And so, our argument simply is that clearly what

13   they're saying the breach is, is the only thing we did,

14   which is to sell the loans and they say sell loans that were

15   defective and thereby breached representations and

16   warranties and we did that in 2006 and 2007.  And so,

17   therefore, under those Delaware cases, applying contractual

18   indemnification provisions, not implied indemnification

19   provisions to the extent there's a significant difference

20   there, even there you have to look, for this type of

21   contractual indemnification provision, at the time of the

22   underlying breach.  And so, we say that it should be time-

23   barred in that respect as well.

24          MR. ROLLIN:  Thank you, Your Honor.

25          I will be brief.  I don't think there's any need

Page 40

1    to go into any great detail but I do want to emphasize what

2    the Court pointed out and that is that nothing has changed

3    in this case since Your Honor entered the rulings in LHM and

4    Hometrust and since Judge Pauley issued his opinion with

5    respect to those cases.

6              THE COURT:  What about the argument that -- and

7    what I'm referring to -- give me a moment.  Counsel

8    disagreed with my description of the position or the answer

9    given by Hometrust counsel in the prior case that had Lehman

10   asserted an indemnification claim before it paid out to a

11   third party or promptly after the mortgages were booked,

12   they would have been subject to dismissal as too early.  And

13   then the bookend of that, of course, is now the argument

14   that it's too late.  But counsel disagrees with that.

15   Counsel is saying that you could have come in -- Lehman

16   could have come in and asserted an indemm -- and I'm putting

17   "indemnification" in quotes because I think indemnification

18   and remedy are not useful terms given the way that they're

19   used in the Seller's Guide.  So what about that argument

20   that you had an indemnification claim earlier; you just

21   chose not to assert it?

22             MR. ROLLIN:  Your Honor, let's be very careful, as

23   Your Honor has been, about distinguishing between

24   "indemnification" in Section 710 and the indemnification --

25             THE COURT:  That's right.

Page 41

1              MR. ROLLIN:  -- in Section 711.

2              THE COURT:  Right.

3              MR. ROLLIN:  Section 710 refers to

4    indemnification.  It's a very specific type of

5    indemnification and it applies only in a very narrow

6    circumstance.  In Section 710, if there's a breach of a

7    representation, warranty or covenant, solely with respect to

8    those that are found in 702 and 703 of the Seller's Guide,

9    that materially and adversely affects the value of the loan

10   and the interest of the purchaser therein which are the

11   requirements for repurchase in 710.  But if the loan does

12   not exist for repurchase, then and only then does "710

13   indemnification" spring.  That is solely to deal with the

14   instance where you've satisfied the obligations of 710 and

15   there is no loan to repurchase.

16             Section 711, as we brief, is entirely different.

17   And it says, if the plan administrator, LBHI, is entitled to

18   indemnification for its liability, losses, claims, judgments

19   including from third parties which their theory reads out of

20   the contract, all of that out of the contract, for --

21   resulting from or relating to, in any way, any breach.  And

22   not only if representations, warranties and covenants but

23   any representation, warranty, covenant or obligation

24   anywhere in the Seller's Guide, anywhere in the loan

25   purchase agreement or any act or any failure to act.

1            So that's an entirely different provision.  It has

2    a much broader causation standard.  It has a different

3    damages calculation.  It has a different set of factual

4    predicates that applies to a different, a broader set of

5    representations, warranties and obligations and springs from

6    precisely those types of third party claims that are at

7    issue here.  You sell the loans upstream.  That's the

8    transactional reality because those were all assignable and

9    they were assigned; they were sold upstream.  A claim comes

10   back.  A judgment is entered.  A penalty is imposed.  A fine

11   is levied, whatever that is.  And a claim for contractual

12   indemnification under 711 then springs.

13            THE COURT:  Do you want to say anything about the

14   collateral estoppel argument?

15            MR. ROLLIN:  I --

16            THE COURT:  Because there is an undercurrent,

17   particularly in the reply, that there's gamesmanship going

18   on here in the sense that Colorado used to be the form of

19   choice and now all of a sudden this is the form of choice.

20            MR. ROLLIN:  Truthfully, Your Honor -- and --

21            THE COURT:  Truthful is good.

22            MR. ROLLIN:  I know.  We're on a motion to dismiss

23   so this is also the -- truthfully was this is sort of

24   outside of all that but here's the background.  The claims

25   in what were often called round 1, which were 710 claims,

Page 43

1    were generally filed in the state in which the counterparty

2    resided so as to avoid the cost and delay with motions

3    related to personal jurisdiction and venue.

4              There came a point in time when, because so much

5    of the work for Lehman is centralized in Colorado, that it

6    made sense also, frankly, from a cost-saving perspective to

7    have the litigation in Colorado.  When the what are called

8    now the round 2 claims, the claims with respect to the

9    Fannie Mae and Freddie Mac claims against the estate, that

10   was very centered in this court and those settlements were

11   approved in this court.  And it made sense for us to

12   centralize those matters before Your Honor.

13             So there's no gamesmanship.  We've actually tried

14   to be efficient is what cost conscious in the matter in

15   which LBHI has prosecuted its claims first in round 1 under

16   710 and now in round 2 under Section 711.  That's all.

17             I don't think you can talk about the collateral

18   estoppel without first talking about, first, the clear

19   distinction between 710 and 711 that we've been talking

20   about.  And the fact that the Tenth Circuit looked at claim

21   -- breach of contract claims under 710 and applied the

22   breach of contract statute of limitations --

23             THE COURT:  Right.  All good.

24             MR. ROLLIN:  Okay.  All fine.

25             THE COURT:  Right.

Page 44

```
 1              MR. ROLLIN:  That is not this case.  So that part
 2     of the opinion is simply off point.
 3              The other part of the opinion is this.
 4              THE COURT:  I think where there's a realm of
 5     disagreement is that in Mr. Stein's view, there's a moment
 6     of breach.  There's a moment of breach and that everything
 7     starts to run from that moment of breach no matter what you
 8     call it.  I mean, that's what this is all about.  And that
 9     third party indemnification rights -- I'm putting words in
10     Mr. Stein's mouth -- flow from that moment.  And that's not
11     what -- that's not the way I read 710 and 711 to work.  It's
12     not the way basic New York law works with respect to the
13     accrual of a cause of action for third party
14     indemnification.  But I think that's the basic disagreement,
15     if you will, that cuts across all these cases.  But that
16     when I queried Hometrust counsel about it -- and this is in
17     footnote 4 of the opinion and I'll just read it.  It says:
18     "At oral argument, Hometrust's counsel confirmed that, under
19     its interpretation of the Agreement, a party that
20     subsequently sold the Loans and assigned its rights under
21     the Agreement to a third-party (i) would be barred from
22     making a claim against Hometrust for indemnification before
23     the statute of limitations had run unless such party had
24     actually made a payment to the third party, and (ii) could
25     not assert a claim against Hometrust for indemnification if
```

Page 45

1    payment to the third party was made after the statute of

2    limitations had run."

3              So counsel for Hometrust confirmed a either too

4    early or too late scenario which I think Mr. Stein disagrees

5    with.  He disagrees with the notion that there could have

6    been -- that you couldn't have acted sooner.

7              MR. ROLLIN:  Certainly not with respect to a third

8    party claim that is specifically protected against by 711.

9    It is any loss or liability, et cetera, resulting from and

10   then a variety of things that only come into being when a

11   third party makes a claim:  judgments, penalties, fines,

12   losses, et cetera.

13             How on the date of origination -- and there's no

14   explanation for this -- how on the date of origination could

15   LBHI have become liable to a third party for a judgment or

16   anything else?  It's simply a misreading, an impossible

17   reading.  And it's not fleeting, as Your Honor said in your

18   opinion; it is illusory, as Your Honor said in your opinion,

19   to take the position that a breach, a right to payment,

20   accrues on the date of the sale when it is impossible that a

21   third party claim of the character protected against in 711

22   has even come into being.

23             THE COURT:  All right.  Is there anything more you

24   want to say on the collateral estoppel point?

25             MR. ROLLIN:  I do, Your Honor.  And I want to

Page 46

1   mention these implied indemnity cases because I think it

2   goes to this.

3           But since --

4           THE COURT:  But we're not -- I mean, on that one,

5   this case is not about implied indemnity.

6           MR. ROLLIN:  Right.  Right.

7           THE COURT:  So it's --

8           MR. ROLLIN:  That's all there is to it.  And so,

9   the argument that this is collateral -- collaterally estops

10  a claim under Section 711 --

11          THE COURT:  11, right.

12          MR. ROLLIN:  -- on an opinion that deals with

13  Section 710 and accrual law with respect to (a), et cetera,

14  right, or a body of implied indemnity cases that have

15  nothing to do with this case is crazy.  I don't know how

16  else to say it.  This issue --

17          THE COURT:  It's not persuasive.  How about that?

18          MR. ROLLIN:  Not -- thank you, Your Honor.  This

19  issue was not litigated in the Tenth Circuit or any of the

20  other cases that were cited.  In fact, Your Honor looked at

21  the underlying cases and found --

22          THE COURT:  It did.

23          MR. ROLLIN:  -- that they were not persuasive on

24  this.  They're certainly not dispositive on this and that

25  this issue had not been addressed.  And so, there is no

Page 47

1  collateral estoppel effect.  Nor was, particularly with

2  respect to the implied indemnity, necessarily adjudicated in

3  the terms of a collateral estoppel because the opinion

4  rested entirely on the fact that LBHI only pleaded a breach

5  of contract claim not an indemnification claim.  And once

6  the Tenth Circuit reached its conclusion with respect to

7  accrual for breach of contract claims, any further

8  discussion of implied indemnity, relevant or not, and we

9  think not, was not necessary to the decision for purposes of

10  collateral estoppel.

11         THE COURT:  All right.  Thank you.

12         MR. ROLLIN:  Thank you, Your Honor.

13         THE COURT:  Mr. Stein, you know, it's

14  interesting -- well, at least it's interesting to me.  I

15  read the Tenth Circuit opinion shortly after it came out

16  'cause it flashed across my screen and it seemed relevant.

17  And I looked at it before your motion came in and concluded

18  that it -- from my perspective, it didn't change my

19  conclusion.

20         I fully appreciate that we have a disagreement.

21  And I also fully appreciate that -- how can I say this?  I

22  try not to phrase things in terms of wrong or right because

23  judges are just people.  So it may be down the road that

24  another judge reverses my decision.  But at the moment, at

25  least, I seem to have, at some level, persuaded Judge Pauley

Page 48

1    who I think is pretty smart.  And I did approach this with

2    an open mind to see if I could persuade myself that based on

3    what was said in the Tenth Circuit's opinion or in your

4    papers, you know, I would take a different path.  I just

5    couldn't get there.  As I was reading your papers, I had an

6    answer, so to speak, for your arguments and it went back to

7    my reasoning.

8           So I just want you to understand that despite the

9    hard time that I'm obviously giving you, I did really engage

10   in an open-minded exercise to give your arguments the

11   attention that they deserved.

12          MR. STEIN:  I appreciate that, Your Honor, very

13   much.  And I want to make clear if it's not obvious already,

14   as I hope it would be, that, clearly, in taking the

15   positions that we're taking recognizing that there are, in

16   some instances, 180 degrees from the one you took

17   previously, we're certainly not trying to cast aspersions on

18   the intelligence of Your Honor which your reputation

19   certainly precedes you and Judge Pauley as well.

20          But it is a legitimate debate.  And no one should

21   come away from this --

22          THE COURT:  If there weren't legitimate debates, I

23   suppose we wouldn't need the Supreme Court, right?  There is

24   circus --

25          MR. STEIN:  True.  And --

Page 49

1          THE COURT:  -- splits in all kinds of things.

2          MR. STEIN:  And I guess, you know, the final point

3     I would make and what's obviously a futile cause to make is

4     that, you know, not only did the Tenth Circuit do what it

5     did, but to the extent there is some concern on counsel's

6     part that, well, that never happens when there are

7     contractual indemnification cases, contractual

8     indemnification provisions at issue, you know, the Tenth

9     Circuit cited to any number of cases that did involve

10    contractual indemnification.  And we at least are very much

11    persuaded by, among other things, the case we cited at page

12    15 of our motion to dismiss, the CertainTeed Corp. v.

13    Celotex Corp. from the Delaware Court of Chancery.  And we

14    believe Delaware law has to be factored in here for reasons

15    that Judge (indiscernible) with.  And in that case -- and it

16    really goes to a point Your Honor made today -- that

17    indemnification isn't really that helpful a term because, in

18    that instance, what the Court said was that there was a

19    Section 8 of that contract that was labeled

20    "Indemnification" just like Section 711 is here.  And what

21    the Court said in the Delaware Court of Chancery was that

22    here it's really a term of art.  It really -- it's

23    essentially just compensatory damages.  And those

24    compensatory damages have to be tied to an underlying

25    breach.  So that's where that Delaware court came out.  I

Page 50

1    mentioned the Aircraft Services and LaPointe cases as well.

2            There are a number of cases that we've cited

3    continuously that do involve contractual indemnification

4    provisions and it's simply, as I said earlier, it's just a

5    matter of a legitimate debate back and forth.  People have

6    different readings and different views as to how all this

7    should be applied.  And we -- again, I do appreciate Your

8    Honor taking the time to consider all this anew.

9            THE COURT:  Well, I think that I don't see any

10   material differences on which I might distinguish the issue

11   that you've brought in the motion to dismiss.  So for the

12   sake of facilitating the preservation of your appeal rights,

13   I'm going to deny the motion for the reasons set forth on

14   the record here and also in the memorandum decision that I

15   previously issued in the Hometrust case.  So to the extent

16   that your appellate rights need to be preserved as they

17   should be, then that would form the basis of an opinion.  I,

18   frankly, don't have the time to write another opinion on

19   this issue.

20           MR. STEIN:  Fair enough.  Thank you, Your Honor.

21   And I will just again note for the record for those purposes

22   that we weren't involved in the Hometrust case and we do

23   strongly disagree with some of the arguments and positions

24   taken by Hometrust counsel.

25           THE COURT:  Fair enough.  Fair enough.  All right.

1              MR. STEIN:  Thank you, Your Honor.

2              THE COURT:  All right.  Thank you so much.  Thank

3    you.

4              All right.  What's next?  Mr. Cosenza?

5         (Pause)

6              THE COURT:  Good morning.

7              MR. COSENZA:  Good morning, Your Honor.  Todd

8    Cosenza, Willkie, Farr & Gallagher, for Lehman Brothers

9    Holding.

10             Your Honor, I guess there's just our status report

11   on the protocol.

12             THE COURT:  Right.

13             MR. COSENZA:  And there also was a motion that was

14   filed last week that the plan administrator worked closely

15   with the trustees.  We do not oppose.

16             THE COURT:  Okay.

17             MR. COSENZA:  I just want to sort of outline that.

18   If there are any factual inaccuracies, I'm sure the --

19             THE COURT:  Okay.

20             MR. COSENZA:  -- trustees will correct me.

21             THE COURT:  All right.  I did have a chance to

22   read the status report so thank you for that.

23             MR. COSENZA:  Sure.  So just a high level, Your

24   Honor.  As you know, there was a bar date of March 31st for

25   all the loans to go through -- loan process to go through

Page 52

1    the last step (indiscernible) of the protocol.  The trustees

2    have indicated to us that they've been diligent and they're

3    asserting a number of loan files despite their diligence

4    that they have not been able to get through at the protocol

5    by March 31st.  We worked closely with them to swiftly

6    delineate those files, those loan files, and they're

7    attached as Exhibit A to the motion.  I think there are

8    somewhere approximately 10,500 loans that are roughly

9    attached and they fall into different buckets.  I will

10   (indiscernible) the Court with the buckets as to reasons why

11   they slipped.

12            So we've agreed to give a two-month extension for

13   those delineated loan files.  So hopefully, those will be

14   put through the protocol by May 31st.

15            What's important for the plan administrator is

16   that we now have for the loans that have not gotten this

17   extension, both sides have agreed that March 31st will act

18   as a bar date.  Any loans that had not been put through the

19   protocol by that date are, in essence, expunged or

20   disallowed.  And I think we've -- both sides have worked and

21   put in a proposed order to that effect granting the

22   extension as well as will name the claims that have not

23   been -- the loans that have not been put through.  So

24   basically, I think --

25            THE COURT:  But they're pretty close to the total

Page 53

1    number --

2              MR. COSENZA:  Yes.

3              THE COURT:  -- right?

4              MR. COSENZA:  Yes.  But I do think just as one

5    point of clarification the transfer of loans have, in

6    essence, as we've discussed several times -- those will fall

7    to the side and, just for administrative purposes, that will

8    help us going forward.  And then we'll have to go through

9    the remaining steps of the protocol as we discussed with

10   Your Honor.

11             So on those basis, Your Honor, based on what's in

12   the proposed language of the proposed order regarding these

13   claims and the two-month extension, Lehman does not oppose

14   the motion to extend out the protocol.

15             THE COURT:  Okay.

16             MR. COSENZA:  We look forward to moving forward.

17   I don't know if you have any questions, Your Honor.

18             THE COURT:  I just had a question.  In paragraph 5

19   of the report, it kind of outlines that -- what I would call

20   the hit rate.  Can you characterize what's the difference

21   between the rejected claim files and the files deemed to

22   have insufficient documentation?

23             MR. COSENZA:  The rejected claim files would be

24   files that we don't believe based on our past are not valid

25   claims.  There are some others that fall into this other

Page 54

1    bucket where we don't think there's been enough evidence

2    provided to us to make an evaluation as to whether or not

3    there's been a breach or a rep or warranty.  Obviously,

4    going through the remaining steps of the protocol does mean

5    -- a lot of work done to compromise on both sides to try to

6    get through this because there's been a number of files that

7    have gone over or crossed to us that we don't think are

8    really valid claims.  We'll have to sort of listen to one

9    another and see as to whether or not we can work through

10   this.

11          I think this is -- you know, we had our hearing in

12   December on this on the protocol.  We anticipated largely a

13   lot of this but we did not expect the volume of claims to go

14   past that bar and to be sent over to the plan administrator.

15   With that being said, you know, we have the remaining steps

16   of the protocol and we're going to try to work through them.

17          THE COURT:  Okay.  All right.  Thank you.

18          MR. COSENZA:  Thank you, Your Honor.

19          THE COURT:  Good morning.

20          MR. TOP:  Good morning, Your Honor.

21          THE COURT:  How are you?

22          MR. TOP:  Frank Top from Chapman & Cutler on

23   behalf of U.S. Bank.  And again, you know, you have our

24   status report.

25          THE COURT:  Yes.

1          MR. TOP:  And obviously, we've made a lot of

2     progress from when we were here last December 2014.

3          Again, the sole purpose of the motion to extend

4     was really with respect to two buckets of loans, one that

5     were -- we anticipate getting from -- that we originally

6     requested that we anticipate getting in very, very shortly

7     to put through the protocol.  And another is we believe may

8     be covered loans and so we have a different time ask with

9     those loans.  We just need to finish up with dealing with

10    those as well.  And that's really the sole purpose that --

11    besides, you know, extending the time, we're not seeking any

12    other changes to the protocol order or anything like that.

13          THE COURT:  Okay.  All right.

14          MR. TOP:  Thank you, Your Honor.

15          THE COURT:  Sounds good.  Thank you.

16          Anything else?  Okay.  Anyone here for any other

17    matter?  All right.  Thank you very much.

18    (Whereupon, these proceedings were concluded at 11:03 a.m.)

19                         * * * * *

20

21

22

23

24

25

Page 56

1                              I N D E X

2

3                          R U L I N G S

4    IDENTIFICATION                                        PAGE

5    Motion to dismiss adversary proceeding 16-1002      50

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 57

```
 1                        CERTIFICATES

 2   We, Sheila G. Orms and Lisa Beck, certify that the foregoing

 3   is a true and accurate transcript from the official

 4   electronic sound recording.

 5
     Sheila Orms    Digitally signed by Sheila Orms
                    DN: cn=Sheila Orms, o, ou,
                    email=digital1@veritext.com,
 6                  c=US
     _____  Date: 2016.03.30 12:37:22 -04'00'

 7   SHEILA ORMS, APPROVED TRANSCRIBER

     Lisa Beck      Digitally signed by Lisa Beck
 8                  DN: cn=Lisa Beck, o, ou,
                    email=digital1@veritext.com,
                    c=US
 9   _____  Date: 2016.03.30 12:38:04 -04'00'

10   LISA BECK (CET**D-486)

11   AAERT Certified Electronic Transcriber

12

13   DATED:  March 30, 2016

14

15

16

17

18

19

20

21

22

23

24

25
```