# Exhibit A

# LEHMAN BROTHERS BANK FSB

## BROKER AGREEMENT

This Agreement made this __9th__ day of __JULY__, 20__04__ by and between LEHMAN BROTHERS BANK, FSB, a federal savings bank (hereinafter referred to as "LBB"), and __NEW FREEDOM MORTGAGE CORPORATION__ having its principal office at __2363 S. FOOTHILL DRIVE SALT LAKE CITY, UT 84109__ (hereinafter referred to as "Broker").

### RECITALS

WHEREAS, Broker is engaged in the business of originating mortgage loans secured by first and/or second mortgage liens on residential real property,

WHEREAS, the parties wish to establish a non-exclusive relationship whereby Broker submits loan packages to LBB for possible closing, and funding.

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises contained herein, the parties agree as follows:

### AGREEMENT

1. **GENERAL**
   From time to time pursuant to this Agreement and subject to the warranties, representations, covenants and agreements herein, Broker may offer to assign, transfer, convey and/or deliver to, and may compensate Broker for, all of its right, title, interest in and to certain eligible mortgage loans. As used herein, "loan" shall refer to a mortgage loan, "borrower" shall include all borrowers, and "mortgage" shall include a mortgage, deed of trust or other security instrument, as applicable.

2. **COMPENSATION**
   Compensation shall be paid from LBB to Broker for any of the following, among other purposes:
   (a) The release of servicing rights created or in the process of creation by Broker, (b) the good actually furnished in the form of a mortgage loan or related mortgage file, (c) the savings in production costs realized by LBB as a result of the use of the Broker's staff and facilities in lieu of LBB's own branch offices, and (d) other services actually performed by Broker for the benefit of LBB in the origination and sale of a loan, as permitted by applicable law, the value and scope of which may vary for each transaction under this Agreement.
   a. Upon acceptance by LBB of any loan application submitted by Broker, and further upon the execution of any documents required by LBB, LBB agrees to pay Broker, or cause to be disbursed at closing, if applicable, all compensation due Broker. No consideration shall be paid to Broker on any proposed loan, which is not closed, and funded by LBB.
   b. Each loan accepted by LBB shall be closed, and funded at the confirmed lock-in price, based on LBB's rate sheet in effect at the time of the lock-in, subject to any adjustments defined in LBB's written guidelines, as more particularly described in Section 7 below. Any consideration payable to Broker with respect to any loan shall be paid only after LBB deducts from the proceeds all funds or fees due LBB, which fees LBB shall establish in its written guidelines.
      i. LBB reserves the right to change the fee structure for a particular program upon written notice to Broker.
      ii. Broker authorizes LBB to deduct any monies due LBB by Broker under the terms of this Agreement, in connection with the particular loan being closed, funded and/or purchased or any other transaction, from any compensation due Broker from a closing, and funding
   c. For table-funded or brokered loans, total compensation shall not exceed the reasonable value of the services, goods and facilities provided by Broker to LBB in an individual transaction, as determined by local market conditions and as may be limited or restricted by applicable law. Any compensation paid to Broker by the borrowers, sellers or LBB shall be reflected properly by

Lehman Brothers Bank, FSB                    Revised 3/2004                            Page 1

CONFIDENTIAL                                                                LEH-FREEDOM_0000112

        Broker on the Good Faith Estimate and on the HUD-1 Settlement Statement. Broker shall further provide each applicant with the MBA Model Disclosure, which shall be executed by Broker and each applicant.
   d.  Should any loan funding result in a shortage at closing due to Broker quoting an applicant less than LBB's required discount and fees, Broker agrees to pay the shortage from its own good funds at or before the time of loan closing.

3. **DELIVERY / CANCELLATION**
   a. Broker agrees that delivery to LBB is mandatory for all locked loans that close. LBB may, in its sole discretion, restrict the volume of loans that may be locked with LBB by Broker or terminate this Agreement if it determines that Broker cancels lock-in commitments with LBB in order to obtain better pricing elsewhere or if it determines that the fallout ratio for Broker is excessive.
   b. Broker agrees to notify LBB, in writing and within 24 hours, when a loan application that has been locked with LBB is cancelled by the borrower or is denied by Broker.

4. **RESPONSIBILITIES OF BROKER**
   a. Broker, at its sole expense, shall be responsible for some or all of the following services in the origination of a loan funded by LBB, as approved by LBB and/or as required by applicable law, local market custom, loan product, or individual loan parameters:
      i. Counsel and advise the borrower about the financing process and loan products available;
      ii. Pre-qualify the borrower;
      iii. Take a complete application, furnish applicable disclosures, and obtain required signatures;
      iv. Determine whether the loan application conforms with LBB and agency or investor guidelines pertaining to the type of loan originated;
      v. Lock in the loan with LBB per the rate sheet in effect at the time;
      vi. Obtain all required supporting documentation, as applicable: credit report, appraisal, tax returns, bank statements, verifications of deposit/employment, letters of explanation, etc.;
      vii. Analyze all required documentation and reconcile inconsistencies;
      viii. Maintain regular contact with all parties involved in the transaction to apprise them of the status of the loan and to gather additional information, as needed;
      ix. Submit the loan through Fannie Mae's Desktop Originator, Freddie Mac's Loan Prospector, or any other automated underwriting system approved by LBB for a particular loan product,
      x. Prepare and submit the original underwriting file;
      xi. Furnish any additional information to assist LBB in meeting investor/agency guidelines;
      xii. Perform such other services as LBB shall require to close the loan;
      xiii. Obtain any additional post-closing documentation requested by LBB to facilitate the sale of the loan in the secondary market;
      xiv. Obtain, and submit within LBB's deadlines, any required final documents.
   b. Broker/ acknowledges its reasonability to satisfy any and all conditions of loan approval and further acknowledges that this reasonability may not be delegated to any other party, such as the closing agent, title company, agent or applicant.
   c. Broker further agrees to cooperate with LBB in curing any defect in a loan, including resubmitting any missing or lost documentation.

5. **NO AGENCY**
Broker acknowledges and agrees that nothing in this Agreement, nor in the relationship between Broker and LBB, including the acceptance by LBB of any loan submitted by Broker, authorizes Broker to act in any way as a partner, agent, representative or employee of LBB. Broker is an independent entity and shall not make any statements which have the effect of leading a third party to reasonably believe that it is an agent of LBB and shall not use LBB's name in any advertising. Broker shall have no authority to bind, obligate or commit LBB by any promise or representation in a particular transaction unless specifically authorized by LBB in writing. Broker shall determine the method, details and means of performing all services described in this Agreement. LBB's closing, and funding of any loan shall not be an indication that LBB has authorized or ratified any actions of Broker.

6. **NON-EXCLUSIVITY**

Lehman Brothers Bank, FSB        Revised 3/2004        Page 2

CONFIDENTIAL                                                          LEH-FREEDOM_0000113

No exclusive relationship between Broker and LBB shall be inferred from this Agreement. It is expressly understood that, notwithstanding the execution of this Agreement, the referral of any loan by Broker to LBB hereunder, or any covenants and agreements contained herein: (a) LBB may make loans with or without the assistance of Broker and may fund/purchase loans from other brokers or correspondents, and (b) Broker may submit loans to other lenders

7. **LBB GUIDELINES**
LBB shall provide program descriptions and supply rate/price quotes on loan programs that are eligible for closing, and funding by LBB. LBB reserves the right to amend or revise from time to time, in its discretion, its documentation requirements, underwriting criteria, and other requirements with respect to any loan program. Broker agrees to comply with LBB's current lending policies, as described in LBB's guidelines or procedures, and agrees not to convey to applicants/borrowers any information which is inconsistent with those policies.

8. **UNDERWRITING**
With regard to loans that are closed and funded by LBB, Broker agrees to submit the underwriting package to LBB for approval/acceptance prior to closing. It is expressly agreed that loan approval shall be within LBB's sole discretion and that Broker shall not represent that LBB has approved or will approve any loan until Broker is so informed in writing by LBB. All loan packages submitted to LBB shall immediately become the property of LBB and all data/information contained therein may be subject to LBB's independent verification.

9. **AUTOMATED UNDERWRITING SYSTEMS**
   a. LBB shall accept loans which have been submitted by Broker through automated underwriting systems approved by LBB for a particular loan program or product (such as Fannie Mae's Desktop Originator or Freddie Mac's Loan Prospector) provided.
      i. The loan is submitted to LBB for underwriting review prior to closing;
      ii. Broker is registered with the provider of the automated underwriting system as a third-party originator for LBB;
      iii. The loan receives a disposition that is acceptable to LBB;
      iv. The loan meets LBB's guidelines in addition to an acceptable disposition from the automated underwriting system; and
      v. The loan data entered in the automated underwriting system by Broker is validated by LBB in the underwriting process or after LBB makes any corrections to the entry made by Broker/Seller in the automated underwriting system, the loan still receives a disposition acceptable to LBB.
   b. It is expressly agreed that acceptance by LBB of a loan application package containing an approval from an automated underwriting package shall not be construed as a commitment to lend. It is also agreed that in the event of a discrepancy between the data validated by LBB's review of the file and the data entered in the automated underwriting system by Broker, the findings of the automated underwriting system shall be considered null and void and LBB shall have no obligation to close, fund or purchase the loan. Broker acknowledges that LBB may impose approval conditions that are not specified in the findings of the automated underwriting system.

10. **ADVERSE ACTION NOTICE**
In accordance with the Federal Equal Credit Opportunity Act and Federal Reserve Regulation B202.9 (g), Broker agrees that in the event LBB declines a loan application and the application is not approved and closed by the Broker or any other funding source, Broker shall provide an adverse action notice and, if applicable, identify each creditor on whose behalf the notice is given.

11. **GENERAL REPRESENTATIONS AND WARRANTIES BY BROKER**
Broker represents, warrants and agrees to the following:
   a. Broker is duly organized and represents, warrants and covenants that it is in compliance and will remain in compliance with all licensing requirements applicable to the origination of loans to be closed, funded and/or purchased by LBB under this Agreement.
   b. The execution, delivery and performance of the obligations under this Agreement by Broker:
      i. Have been duly authorized by all necessary corporate and/or partnership actions, and

Lehman Brothers Bank, FSB                Revised 3/2004                              Page 3

CONFIDENTIAL                                                         LEH-FREEDOM_0000114

    ii. Do not violate any provision of law, rule, regulation, order, writ, judgment, injunction, decree, determination, award or agreement presently in effect, or, to the knowledge of Broker, pending.

c. There are no actions, suits, or proceedings pending or, to the knowledge of Broker, threatened against or affecting Broker or its properties before any court, government entity, commission, board, bureau, agency or instrumentality, which if determined adversely to Broker, would have a material adverse effect on the financial condition, properties or operation of Broker. Any obligation of LBB under this Agreement shall cease automatically if:

    i. A petition for redress or order of a court or agency supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities, bankruptcy or similar proceedings, or for the winding up or liquidation of its affairs, shall have been entered against Broker; or

    ii. Broker shall admit verbally or in writing its inability to pay its debts as they come due or voluntarily suspend payment of its obligations.

d. This Agreement constitutes, when duly executed and delivered by Broker, a legally valid and binding obligation of Broker enforceable against Broker to its terms.

e. Broker is in compliance with the eligibility standards established, and revised from time to time, by LBB.

f. Broker shall maintain any FHA or VA approvals required for the origination and processing of loans under this Agreement during the term of this Agreement, as applicable.

g. Broker does not and will not in the future employ any entity or individual on Freddie Mac's Exclusionary List or HUD's Limited Denial Participants list.

h. Broker employs or will employ a sufficient number of knowledgeable and capable individuals to perform the services required by this Agreement.

12. **REPRESENTATIONS AND WARRANTIES REGARDING FHA SPONSORSHIP OR VA AGENCY**
In the event that LBB agrees to close, and fund loans from Broker under an FHA sponsorship or VA agency, Broker represents, warrants and agrees to the following, as applicable:

a. Broker is in compliance and shall remain in compliance with all eligibility requirements of HUD or VA for originating loans under a sponsorship or agency relationship, including, but not limited to, minimum net worth requirements. Should eligibility be impaired, Broker agrees to immediately notify LBB.

b. Broker shall operate in compliance with all of HUD's or VA's guidelines regarding the origination, processing and closing of FHA or VA loans.

c. Broker shall retain any required HUD or VA manuals in its branch/office.

d. Regarding FHA originations, Broker shall maintain an acceptable quality control plan, as required by HUD 4060.1 chapter 6.

e. Broker shall pay any annual renewal fees required by HUD or VA.

f. Broker shall not sign a lock-in agreement with the borrower until the loan has been locked in with LBB and LBB has accepted the lock-in terms.

g. Regarding FHA originations, Broker shall comply with HUD mortgagee letters 94-43 and 94-16 as well as any other HUD mortgagee letters as they relate to fees, overages and tiered pricing. Broker agrees to comply with all regional HUD office guidelines regarding maximum allowable fees, such as origination fees, inspection fees, attorney fees, overnight delivery fees, etc. In the event that it is discovered that Broker has charged fees in excess of those allowed by HUD, Broker shall promptly refund any excess to the borrower. Underwriting approval by LBB shall not negate the responsibility of Broker in this regard.

h. Broker acknowledges that LBB will submit said FHA or VA loans for insurance or guaranty. Broker agrees to correct any deficiencies in documentation so the loans may be insured or guaranteed.

13. **WARRANTIES, REPRESENTATIONS AND AGREEMENTS PERTAINING TO EACH LOAN**
Broker warrants, represents and agrees to the following as to each loan submitted to LBB:

a. Broker has originated and processed the loan in its own name and on its own behalf and no third-party origination or processing service has been used, without the prior consent of LBB.

b. The property securing the loan is located within a jurisdiction where Broker is licensed to originate mortgage loans.

CONFIDENTIAL    LEH-FREEDOM_0000115

c.  Broker has not, assigned, encumbered, brokered or locked in the loan package or any interest in and to the loan to or with any party other than LBB.

d.  Broker has provided to the borrower any and all required documents and disclosures and has complied with all applicable federal, state and local laws, rules and regulations including, but not limited to, the Real Estate Settlement Procedures Act (RESPA) and Regulation X, the Equal Credit Opportunity Act (ECOA) and Regulation B, the Fair Credit Reporting Act, the Federal Truth-in-Lending Act and Regulation Z, the Flood Disaster Protection Act, the Home Mortgage Disclosure Act (HMDA) and Regulation C, the Fair Debt Collection Practices Act, Gramm-Leach-Bliley Act, any licensing, usury or sale of servicing laws, and any other applicable federal, state or local laws and regulations. Broker agrees, at its sole expense and with counsel selected by LBB, to defend any action brought against LBB or any subsequent assignee in respect hereto and to indemnify and save them harmless against any loss or damage thereunder.

e.  If applicable, applicants have been provided with any disclosures required of loan brokers under both state and federal law.

f.  The loan conforms to the agreed-upon terms of the lock-in commitment with LBB with respect to program or product type, interest rate, term and principal amount.

g.  The loan conforms to LBB's general guidelines and requirements in effect at the time the loan was originated and to the guidelines for the specific loan program or product originated, including, as applicable, the requirements of Fannie Mae, Freddie Mac, FHA, VA or a third-party investor. The loan further qualifies for mortgage insurance or guaranty, as required.

h.  Broker has no knowledge of any circumstances or conditions with respect to the loan that reasonably could be expected to cause investors or agencies to regard the loan as an unacceptable investment, cause the loan to become delinquent, or adversely affect the value or marketability of the loan.

i.  Broker has made diligent inquiry into all facts and circumstances in the making of the loan, including all material representations of the borrower, and as far as Broker is aware, none of the statements, information or documentation in the loan package contain any false or erroneous statements or omit material facts necessary to make such statements, information or documentation accurate and understandable. Broker shall promptly notify LBB if it becomes aware of any errors or misstatements.

j.  To the best of Broker's knowledge after due investigation, there is no adverse information or documentation concerning the borrower or the mortgaged property acting as security for the loan, other than as disclosed to LBB in writing in the loan package.

k.  To the best of Broker's knowledge, each document delivered by Broker to LBB is complete and accurate, and the signatures and initials on each document are authorized and genuine.

l.  To the best of Broker's knowledge, no borrower has had in his or her direct or indirect possession or control any credit, income or deposit verification document submitted to LBB with respect to the loan.

m.  To the best of Broker's knowledge after due investigation, no bankruptcy action, foreclosure proceedings or other court action is pending against the borrower or the mortgaged property acting as security for the loan, other than as disclosed to LBB in writing in the loan package.

n.  To the best of Broker's knowledge after due investigation, except as disclosed to LBB in writing in the loan package: (i) there are no pending proceedings for a total or partial condemnation of the subject property; (ii) the subject property is free of substantial damage; (iii) improvements on the mortgaged premises comply with all rules and regulations of any applicable governmental authority or agency and lie within the boundaries and building restriction lines of the property; (iv) improvements on adjoining properties do not encroach upon the mortgaged property; and (v) there is no condition, including, without limitation, any environmental hazard, present upon the mortgaged premises which could adversely affect the value of the collateral.

o.  Broker is not aware of any pending or contemplated subordinate financing in connection with the subject property that has not been disclosed to LBB in writing.

p.  Except as otherwise disclosed in writing to LBB prior to the closing, and/or funding of the loan, Broker has no direct or indirect ownership interest in the property acting as security for the loan.

q.  The borrower has no claim or defense against Broker or any agent, assignee or successor of Broker by reason of any act or omission of Broker, its directors, officers, agents, or employees.

r.  Broker has not made, directly or indirectly, any payment on the loan closed, or funded by LBB nor on any other loan made by the borrower to any other person or entities.

s.  The loan is not classified as (i) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994 or (ii) a "high cost," "threshold," "covered", "abusive" or "predatory" loan

CONFIDENTIAL                                                LEH-FREEDOM_0000116

       under any other applicable state, federal or local law. At the time of its origination, the loan complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws.

t.   The borrower was not encouraged or required to select a loan product which is a higher cost product designed for less creditworthy borrowers, unless at the time of the loan's origination, such borrower did not qualify, taking into account credit history and debt to income ratios, for a lower cost credit product then offered by the Broker or any affiliate of the Broker. If, at the time of loan application, the borrower may have qualified for a lower cost credit product then offered by any mortgage lending affiliate of Broker, Broker referred the borrower's application to such affiliate for underwriting consideration

u.   Broker has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"). Broker has established an anti-money laundering compliance program to the extent required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable borrower and the origin of the assets used by the said borrower to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable borrower for purposes of the Anti-Money Laundering Laws.

v.   No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person including without limitation Broker, the borrower, any appraiser, any builder or developer, or any other party involved in the origination of the loan or, in the application of any insurance in relation to such loan. No predatory or deceptive lending practices or deceptive trade practices, including, without limitation, the extension of credit without regard to the ability of the borrower to repay, and the extension of credit which has no apparent benefit to the borrower, were employed in the origination of the loan

w.   With respect to any loan, which is a Texas Home Equity Loan, any and all requirements of Section 50, Article XVI of the Texas Constitution applicable to Texas Home Equity Loans, which were in effect at the time of the origination of the Mortgage Loan, have been complied with. Specifically, without limiting the generality of the foregoing, any fees paid in connection with such loan in order for the borrower to receive a reduced interest rate are not required to be included in the calculation of the aggregate fees pursuant to Section 50(a)(6)(E) of the Texas Constitution.

14. **LOAN FRAUD**
Broker acknowledges and agrees the Broker shall be responsible under this Agreement for all actions and omissions of Broker or any of Broker's employees or agents. Broker is responsible and shall be required to repurchase a Loan in which any fraud occurs in the origination of the Loan or the submission of a Loan application containing false or misleading information or involving fraudulent activity or conduct. Examples of Loan fraud include, but are not limited to:

a.   Submission of false or misleading information or untrue, inaccurate or incomplete information as part of a Loan application including, without limitation, false statements in an application;

b.   Falsification of documents or information purporting to substantiate credit, employment, salary, income, deposit and asset information or personal information including, but not limited to, identity, citizenship, or ownership of real or personal property,

c.   Forgery of any Loan application or any Loan document;

d.   False or misleading representations about current occupancy, status or intent to maintain required occupancy as set forth in the Loan application, the mortgage or deed of trust, or any other Loan documents;

e.   Lack of due diligence or concern by Broker, including failure to obtain or divulge information required by the Loan application of LBB's guidelines and failure to request further information as dictated by the borrowers response to other questions; or

f.   Acceptance of information or documentation the Broker knows or suspects to be inaccurate or acceptance of information that Broker should know or suspect to be inaccurate, including, but not limited to, simultaneous processing of multiple owner-occupied loans from a single applicant where the information differs on each Loan application, permitting an applicant or interested party to assist with the processing of a Loan application, or failure of Broker to disclose any pertinent information.

CONFIDENTIAL                                                                LEH-FREEDOM_0000117

15. **REPURCHASE OBLIGATIONS**
    Broker shall repurchase any Loan funded or purchased by LBB under this Agreement within thirty (30) calendar days of receipt of written demand from LBB based upon any one or more of the following circumstances,
    a. Any breach by the Broker or other failure of Broker to observe or perform, in any material respect, any of the representations, warranties, covenants or agreements set forth in this Agreement with respect to a particular Loan;
    b. The occurrence of any Loan fraud as described is Section 14 in connection with the origination of the Loan
    The option to request or accept repurchase of any Loan is at the sole discretion of LBB and shall survive the termination of this Agreement.

16. **REPURCHASE PRICE**
    The repurchase price for any Loan that Broker becomes obligated to repurchase under this agreement shall be:
    a. The percentage of par paid for the Loan by LBB, adjusted for credits to (a) principal; (b) interest, (c) escrow advances, and (d) any and all documented expenses incurred by LBB; or
    b. The price at which LBB must repurchase the Loan from a third party, including any and all penalties the LBB may incur from third parties.

17. **FAIR LENDING**
    Broker hereby agrees that all applicants and /or prospective applicants seeking residential mortgage credit financing will be treated in a fair and non-discriminatory manner consistent with the provisions of the Fair Housing Act and the Equal Credit Opportunity Act, and the implementing regulations promulgated thereunder

    Broker further acknowledges an understanding that LBB is an equal opportunity lender and will not tolerate lending discrimination in any form including on the basis of race, color, religion, national origin, sex, marital status, familial status, disability, age (provided applicant has the capacity to contract), applicant's receipt of income derived from any public assistance program, and the applicant's exercise, in good faith, of any right under the Consumer Credit Protection Act

18. **PRIVACY OF CONSUMER INFORMATION**
    a    As used in this Agreement:
        i.   "Consumer Information" shall mean any and all information relating to a specific person that was obtained from applicants or other sources during the loan application process.
        ii.  "Applicable Law" shall mean any and all federal, state and local statutes, regulations and other legal authority respecting the privacy of Consumer Information, including but not limited to the privacy provisions of the Gramm-Leach-Bliley Act of 1999, the Fair Credit Reporting Act and any similar state laws.
    b    Broker agrees not to disclose any Consumer Information provided either by applicants or LBB to any affiliate or unaffiliated third party except in accordance with Applicable Law.
    c    Broker shall provide LBB with its current privacy policy, and will update such privacy policy by providing changes to LBB as necessary to ensure that such privacy policy is current and accurate.
    d    Broker shall have in place an information security program designed to:
        i.   Ensure the security, integrity and confidentiality of Consumer Information.
        ii.  Protect against unauthorized access to or use of Consumer Information.
        iii. Protect against hazards to the security, integrity and confidentiality of Consumer Information.
    Broker shall maintain a written description of its information security program, and will provide LBB a copy of the program upon request.

19. **APPRAISALS**
    Broker warrants that a licensed appraiser approved by the Broker has performed each appraisal submitted to LBB. That approval process involves the acceptable review of a single family, a condominium, and a multifamily appraisal. It also involves review of FHLMC's Exclusionary List and

Lehman Brothers Bank, FSB                Revised 3/2004                          Page 7

CONFIDENTIAL                                                        LEH-FREEDOM_0000118

Rx Date/Time    JUL-07-2004(WED) 15:10
JUL-07-2004 WED 03:15 PM S1B MORTGAGE BOISE    FAX NO. 2086727268    P 013
P. 13

HUD's LDP list, as well as a review of the Errors and Omissions policy and state license. The Broker will retain evidence of current licensing and adequate insurance coverage and will obtain the foregoing on an annual basis. Broker, in addition, represents and warrants that all appraisals conducted in connection with each Loan, comply with applicable federal and state law, applicable Agency requirements, and any appraisal requirements imposed by or pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA).

20. **INDEMNIFICATION**
   a. Broker shall indemnify, defend, and hold harmless LBB, its shareholders, directors, officers, employees, successors and assigns from and against any and all claims, liens, liability, loss, costs, damage, deficiency, suit, action, penalty or expense, whether foreseen or unforeseen, including, without limitation, reasonable attorney's fees/expenses and court costs, incurred by LBB in resisting or defending any and all claims or defenses of borrowers, governmental agencies or others resulting from any:
      i. Breach or misrepresentation of any covenant, agreement, representation, warranty, term, or condition in this Agreement by Broker, its directors, officers, employees, agents or contractors, and/or
      ii. Misrepresentation by Broker, its officers, employees, agents or contractors relating to any documentation or loan package submitted to LBB.
   b. Without limiting the generality of the foregoing, Broker's obligation to indemnify LBB shall extend to all repurchase demands received by LBB from any third-party or secondary market investor due to a breach of this Agreement or misrepresentation of any kind by Broker. Broker's obligation to indemnify LBB shall arise upon LBB's receipt of a repurchase demand, which LBB determines, in its sole and absolute discretion, to be enforceable, even if LBB has not yet incurred any loss with respect to such demand.
   c. Broker hereby releases and indemnifies LBB from and against any and all losses sustained by Broker as a result of a liability to Broker or any of Broker's agents or employees on the basis of any arrangement or agreement made by or on behalf of Broker not provided for herein.
   d. Broker's obligation to LBB with regard to indemnification shall be ongoing and unending and shall remain in effect after and survive this Agreement and any ultimate disposition (by sale or otherwise) of a loan closed, funded and/or purchased by LBB.
   e. Broker's obligation to fully indemnify LBB under this Agreement shall not be affected by LBB's taking any of the following actions with or without notice to Broker: (a) liquidation, repayment, or sale or resale of any loan, (b) foreclosure of any loan, (c) sale or resale of the property securing any loan.
   f. LBB hereby indemnifies Broker from and against all liens, damages, deficiencies, liabilities and penalties resulting from any breach or misrepresentation of any covenant, agreement, representation, warranty, term, or condition by LBB in connection with this Agreement.

21. **SOLICITATION / EARLY PAYOFF**
   a. Broker agrees that it will not solicit for refinance a first mortgage FHA, VA, conforming conventional or jumbo conventional loan that was closed, and funded by LBB within the previous six (6) months. In the event that a third-party or secondary market investor imposes a penalty or requires that LBB refund any premium pricing differential or servicing released premium because of an early payoff, Broker agrees to promptly furnish documentation to LBB establishing compliance with the provisions of this paragraph. If LBB determines that Broker has breached the provisions of this paragraph, and upon demand by LBB, Broker shall promptly pay to LBB an amount equal to the damages or losses suffered by LBB as a result of said breach. The demand of the third party or secondary market investor shall be deemed conclusive in all regards.
   b. Broker shall not commit to assign, convey or submit a second mortgage, Alt A loan or sub-prime loan to LBB which it has reason to believe will be paid off within twelve (12) months of closing, funding and/or purchase by LBB nor will Broker solicit for refinance a second mortgage, Alt A loan or sub prime loan that was closed, and funded by LBB within the previous twelve (12) months. If Broker originates a second mortgage, Alt A loan, or sub prime loan that has no prepayment penalty to the borrower at a premium price (price above par) and it prepays within twelve (12) months of closing, funding and/or purchase by LBB, Broker shall, upon demand by LBB, refund to LBB a portion of the premium (amount over par) paid to Broker within 30 days of written notice. If prepayment in full occurs within:
      i. 1 to 30 days of purchase/funding, 100% of the premium shall be refunded;

CONFIDENTIAL    LEH-FREEDOM_0000119

    ii.    31 to 60 days of purchase/funding, 11/12ths of the premium shall be refunded;
    iii.    61 to 90 days of purchase/funding, 10/12ths of the premium shall be refunded;
    iv.    91 to 120 days of purchase/funding, 9/12ths of the premium shall be refunded;
    v.    121 to 150 days of purchase/funding, 8/12ths of the premium shall be refunded;
    vi.    151 to 180 days of purchase/funding, 7/12ths of the premium shall be refunded;
    vii.    181 to 210 days of purchase/funding, 6/12ths of the premium shall be refunded;
    viii.    211 to 240 days of purchase/funding, 5/12ths of the premium shall be refunded;
    ix.    241 to 270 days of purchase/funding, 4/12ths of the premium shall be refunded;
    x.    271 to 300 days of purchase/funding, 3/12ths of the premium shall be refunded;
    xi.    301 to 330 days of purchase/funding, 2/12ths of the premium shall be refunded;
    xii.    331 to 359 days of purchase/funding, 1/12th of the premium shall be refunded.

22. **DISCLOSURE OF MISSTATEMENT OR MISREPRESENTATION**
Broker acknowledges and agrees that LBB may report instances of Broker making material misstatements/misrepresentations in connection with a loan, or knowingly aiding a borrower to do the same, to appropriate industry watch groups, agencies, and state and federal authorities or law enforcement agencies.

23. **PROPRIETARY INFORMATION**
    a. Broker shall not at any time during the term of this Agreement or following termination hereof, unless required by law or with the express written consent of LBB, directly or indirectly disclose or furnish to any person or entity not entitled to receive the same any trade secrets or confidential information, including, but not limited to LBB's business operations, finances, production methods, procedures, sources of funding, or customers.
    b. The parties agree that the relationship between LBB and Broker is unique and that neither party shall discuss any terms or conditions of this Agreement with any third party.
    c. With regard to loans registered with or closed, and funded by LBB, Broker agrees not to divulge any information regarding the borrowers to any person or entity not entitled to receive the same.

24. **RIGHT TO AUDIT**
Broker agrees to permit LBB's audit staff to conduct on-site audits of loan files that have been registered with or submitted to LBB. LBB shall have the right to audit and verify by alternative source any credit documentation in files submitted to LBB, including, but not limited to, credit reports or appraisals in a pre- or post-closing review, and such right shall survive LBB's closing, funding and/or purchase of a loan and the termination of this Agreement.

25. **ELIGIBILITY REVIEW**
Broker agrees to provide to LBB, as requested, its financial statements (audited, if available), a copy of all current licenses for the states in which it conducts business, a current list of principals, senior management and key employees, and any other information or documentation which LBB deems necessary to evaluate Broker's business or business practices. Broker further agrees to immediately notify LBB of any change in its ownership, senior management, key employees or financial condition as such changes occur. Broker acknowledges that LBB may at any time review Broker's business, business practices, or performance in delivering loans to LBB and, in its sole discretion, may: (a) require that Broker submit additional information or documentation regarding its business or business practices for LBB's review, (b) set conditions for re-approval of Broker, (c) restrict the volume of business from Broker, (d) restrict the services that Broker is approved to perform, (e) suspend the lock-in privileges of Broker, and/or (f) terminate this Agreement according to the provisions contained herein.

26. **GENERAL PROVISIONS**
    a    *Non-Assignability.*  Broker agrees that it may not assign its rights or delegate its obligations under this Agreement without the express written consent of LBB.

    b.    *Parties in Interest.*  This Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, executors, administrators, successors, and permitted assigns.

Lehman Brothers Bank, FSB        Revised 3/2004        Page 9

CONFIDENTIAL                                                           LEH-FREEDOM_0000120

Rx Date/Time    JUL-07-2004(WED) 15:10                                         P 015
JUL-07-2004 WED 03:16 PM SIB MORTGAGE BOISE       FAX NO. 2086727268       P. 15

c.   Termination. LBB may immediately terminate this Agreement without notice and will then have no further obligations under this Agreement upon: (i) failure of Broker to perform or abide by any term or obligation contained in this Agreement, (ii) discovery of any representation or warranty made by Broker to be false or incorrect, (iii) commencement by or against Broker of any bankruptcy, insolvency or similar proceedings, (iv) failure of loan applications submitted by Broker to satisfy LBB's expectations regarding loan quality and performance, and/or (v) LBB's determination that the actions of Broker contravene the terms of this Agreement or adversely impact LBB's business activities or reputation. Either party may terminate this Agreement for any other reason upon ten (10)-calendar day's written notice to the other. In the event of termination, Broker shall fully cooperate with and assist LBB in obtaining documentation necessary to complete the processing and full resolution of all matters relating to any confirmed locked or closed loans.

d.   Attorney's Fees. If either party to this Agreement brings any action, whether in suit or otherwise, to enforce the terms of this Agreement, the prevailing party in such action shall be entitled to receive reasonable attorney's fees and court costs, including appeal and bankruptcy, from the unsuccessful party in such action, in addition to any other relief to which the prevailing party may be entitled.

e.   Default. Broker's repudiation, breach, or inability to perform any of its commitments shall be deemed a default of this Agreement.

f.   Right to Specific Performance. Broker acknowledges that in the event of its insolvency, repudiation of this Agreement, or failure to perform any of Broker's obligations hereunder, money damages may not adequately compensate LBB for its losses and LBB may be unable to effect or obtain coverage to satisfy its commitments with third parties. Accordingly, Broker agrees that in the event of its insolvency, repudiation of this Agreement, or failure to perform any of its obligations, LBB may proceed immediately to take possession of all documents belonging to Broker relating to loans which have been committed for sale to LBB, by its own act, order or seizure, or such other remedy as may be available at law or equity. LBB's right to effect specific performance hereunder shall be in addition to any other remedies which LBB may have in law or equity.

g.   Right of Offset. Amounts owed to LBB by Broker under this Agreement may, at LBB's option and in its sole discretion, be offset by LBB against any payments then or thereafter owed by LBB to Broker.

h.   Integration. This Agreement supercedes any and all other agreements, either oral or in writing, between the parties and, together with any addendums and LBB's written guidelines or procedures, contains all the covenants and agreements between the parties. Each party to this Agreement acknowledges that no representations, inducements, promises or agreements, orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement or promise not contained in this Agreement shall be valid or binding. Any modification of this Agreement shall be effective only if it is in writing and signed by all parties

i.   Survival of Warranties. The representations, warranties, covenants, agreements and every other obligation contained in this Agreement shall survive the transactions provided for herein and shall be fully applicable whether or not LBB relies thereon or has knowledge of any facts at variance therewith

j.   Section Headings. Section headings contained in this Agreement are for reference purposes only and shall not effect the interpretation or meaning of any provision of this Agreement.

k.   Waivers, Remedies. Failure to or delay in auditing any loan or exercising any right shall not act as a waiver of any other right, nor shall any single or partial exercise of any right preclude any other or further exercise thereof. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any

CONFIDENTIAL                                                        LEH-FREEDOM_0000121

waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver. All remedies shall be cumulative and nonexclusive.

l. **Severability.** If any provision, or part thereof, of this Agreement is invalid or unenforceable under any law, the remaining provisions, or parts thereof, shall nevertheless continue in full force without being impaired or invalidated in any way.

m. **Further Assurances.** Each party shall perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

n. **Negative Inference.** LBB and Broker each acknowledge that this Agreement is the result of negotiations between the parties, each of whom shall be deemed to have drawn this Agreement. Any rule of law or any legal decision that would require interpretation of any claim of ambiguities in this Agreement against the party that drafted it shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to affect the intent of the parties.

o. **Consumer Relations.** Broker shall promptly inform LBB of any consumer-related difficulties regarding any loans committed to or closed, funded and/or purchased by LBB, including forwarding to LBB copies of all letters of complaint written to Broker by consumer, and shall otherwise cooperate fully with LBB in all consumer-related matters.

p. **Time of the Essence.** Time is of the essence with respect to each and every provision of this Agreement and the conditions and commitments entered into pursuant thereto.

q. **Jurisdiction.** This Agreement shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of New Jersey, except to the extent that applicable law governing mortgage loans dictates that the state in which such loans is effectuated must govern such loan transactions. Nevertheless, Broker hereby agrees that any court action arising out of this Agreement may be brought in any court of competent jurisdiction within the State of New Jersey.

r. **Notices.** All notices required under this Agreement shall be in writing and shall be deemed effective if either given by personal delivery or sent by certified mail, postage prepaid and return receipt requested, addressed to the party at its address as set forth below:

Notices intended for LBB shall be addressed to:

Lehman Brothers Bank, FSB
3040 Route 28
Branchburg, NJ 08876

Notices intended for Broker shall be addressed to:

*NEW FREEDOM MORTGAGE CORPORATION*
*2363 S. FOOTHILL DRIVE*
*SALT LAKE CITY, UT 84109*
*ATTN: TERRY E. TURVILLE, EVP/CFO*

s. **Due Authority.** LBB and Broker acknowledge that the individuals executing this document, and any other persons designated by these individuals in writing, are fully authorized, as evidenced by a resolution of their respective boards of directors (if applicable), to enter into binding commitments for the delivery, sale and/or purchase of mortgage loans on behalf of each respective party

Lehman Brothers Bank, FSB                    Revised 3/2004                          Page 11

CONFIDENTIAL                                                              LEH-FREEDOM_0000122

Rx Date/Time    JUL-07-2004(WED) 15:10                                    P 017
JUL-07-2004 WED 03:16 PM SIB MORTGAGE BOISE      FAX NO. 2086727268       P. 17

IN WITNESS WHEREOF, the parties to this Agreement have executed this instrument by their duly authorized officers on the dates set forth below.

ATTESTED _____

LEHMAN BROTHERS BANK, FSB
By _____
Printed name _____
Its _____
Date _____

BROKER
NEW FREEDOM MORTGAGE CORPORATION
License # _____
Expiration Date _____
By _____
BRET J. WALL
Printed name
Its PRESIDENT
Date JULY 9, 2004

ATTESTED _____

Lehman Brothers Bank, FSB                Revised 3/2004                   Page 12

CONFIDENTIAL                                                     LEH-FREEDOM_0000123