Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    Adv. Case No. 10-03547-scc

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In re

7    LEHMAN BROTHERS HOLDINGS, INC.,

8             Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   LEHMAN BROTHERS HOLDINGS INC., ET AL

11                Plaintiff,

12            v.

13   BANK OF AMERICA NATIONAL ASSOCIATION, ET AL

14                Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16

17                U.S. Bankruptcy Court

18                One Bowling Green

19                New York, NY  10004

20                April 29, 2016

21                2:06 PM - 3:27 PM

22

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

1   HEARING re:   Conference re Proof of Claim Nos. 21217, 21140,

2   20421, 21146

3

4   HEARING re:   Conference (Adversary Proceeding 10-03547)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    JONES DAY

 4         Attorneys for Lehman Brothers Holdings, Inc.

 5         222 East 41st Street

 6         New York, NY 10017

 7

 8    BY:  RYAN J. ANDREOLI

 9         LAURI W. SAWYER

10

11    HOGAN LOVELLS

12         875 Third Avenue

13         New York, NY 10022

14

15    BY:  DENNIS H. TRACEY, III

16         BEN LEWIS

17         JOHN D. BECK

18

19    ALSO PRESENT TELEPHONICALLY:

20    IAN BURKE

21    JOHN DZIADZIO

22    MARTHA SOLINGER

23

24

25
```

Page 4

1                    P R O C E E D I N G S

2             THE COURT:  How's everyone's day, other than being

3       entirely unhappy at being back down here?

4             MAN:  (indiscernible) that.

5             THE COURT:  I am at a loss to figure out what's

6       happening.  The letters read like two people who have

7       watched a different movie.  So what can we do to bring this

8       to a conclusion?

9             MS. SAWYER:  I mean, I think that we're, you know,

10      concerned about what little progress we made from the last

11      conference and how to kind of get us moving forward.

12            THE COURT:  See, that's the problem, though, Ms.

13      Sawyer, because I read your letter and I think, "Oh my

14      goodness," but then I read Mr. Tracey's letter, and based on

15      his view, there's virtually nothing to talk about.  So we're

16      going to have to again just go through the items one by one.

17      And the problem that I have that I'm going to have to rely

18      on you for.

19            And part of the reason I'm going to do this on the

20      record today is that it's virtually impossible for me to

21      keep detailed track of what the agreements are.  I can't

22      kind of be the enforcer in that regard.  So I'm just trying

23      to referee fairly, right?  But we really do need to be done.

24      So why don't we just start and just go through each item?

25      You have your teams here, and let's just try to get through

Page 5

1   it.

2           MS. SAWYER:  Before we do that, though, I think --

3           THE COURT:  Sure.

4           MS. SAWYER:  -- just you know, setting the stage a

5   little bit is we fundamentally feel like unless we are on

6   the eve of a court hearing, we're not making progress.  And

7   so, you know, we spent time during the three weeks following

8   up and sending letters.  And then, you know, at noon,

9   yesterday, we got a letter that was very different than the

10  letter that was sent to Your Honor at nine o'clock.

11          And so, it's a frustrating situation for us to be

12  in, where you know, on the B quotes issue, when we talked

13  about that, I mean, they told us, "Just talk about -- just

14  look at the search terms and give us comments."

15          I mean, that's very different than Mr. Tracey's

16  letter he sent nine hours later to the Court.  And so, we

17  feel like unless we're on the verge of coming to Court and

18  we had a meet and confer this morning, trying to talk about

19  things, that we're not moving forward.

20          And so, you know, I appreciate Your Honor's time,

21  and I think it's frankly very important for us to have it,

22  because otherwise, we're not moving forward, is our view.

23  And so, then you know, there's a flurry of activity in the

24  24 hours before we come here.  Lots of promises are made.

25  And we feel were going to go away.  And time will lag again.

1    So that's just setting the stage.

2              THE COURT:  Okay.

3              MS. SAWYER:  We can go through the specific

4    issues.

5              THE COURT:  All right.  So what we'll do is, I'll

6    let you respond, Mr. Tracey.  We'll go through -- after Mr.

7    Tracey kind of gives his opening statement, we'll go through

8    the documents.

9              I do -- I know we spent three hours last time, I

10   hope we don't have to do that again.  At three o'clock, I

11   have a conference call in another Lehman matter that

12   involves a cast of hundreds, so I'm going to have to take a

13   break at three o'clock no matter what.  If we can conclude

14   by then, great.  If not, I'll have to go do that for about

15   15 minutes and then we'll have to come back.  All right?  Go

16   ahead.

17             MR. TRACEY:  I certainly hope that we can conclude

18   by then, because if we can't, that means I'm all wrong about

19   the way I do things.  So just the basic point is that we've

20   been working since the last time we saw you, but it's only

21   two weeks, and we're talking about 250 gigabytes of

22   information.

23             It takes a huge amount of time to gather the

24   information, to upload it into machines.  The machines go

25   all night, and then you're basically saying, "You can't do

Page 7

1   anything until the machine stops working."  It's taken close

2   to a week to ingest all that information.

3          So we aren't working.  And we believe that we are

4   going to be basically done with every single one of the

5   deliverables, with one or two exceptions, by Monday or

6   Tuesday of next week.  And I don't think we have any

7   disagreements, except on B quotes, where I think we lack a

8   common understanding of what's in the database, and that's

9   really what's dividing us.  But we don't disagree --

10          THE COURT:  Okay.

11          MR. TRACEY:  -- on what the agreements were or

12   what we have to do.

13          THE COURT:  Okay.

14          MR. TRACEY:  So --

15          THE COURT:  All right, so then let's roll through

16   the items and I think the best way to do it is to start with

17   Ms. Sawyer's -- well, I'll ask you.  Because there's a

18   difference between your April 28th letter to me and your

19   April 26th letter to Mr. Tracey.

20          MS. SAWYER:  I think the -- my suggestion would be

21   to discuss the April 28th letter to the Court.

22          THE COURT:  Okay.

23          MS. SAWYER:  But again, I don't think we need to

24   go through all the issues on my April 26th letter to Mr.

25   Tracey.  I think that there's a few issues I'd want to talk

Page 8

1    about.

2            THE COURT:  Okay.

3            MS. SAWYER:  But we don't need to go through them

4    all, so I think that might be the most efficient way

5    forward.

6            THE COURT:  Okay.  All right.  So the first one is

7    the B quotes.

8            MS. SAWYER:  So at the last conference, our

9    understanding was, is that QVT was either going to provide

10   us with all the quotes in the B quotes database for

11   September 1st to September 19th, 2008, or, if they were

12   unable to technically figure out how to do that, they were

13   just going to turn over the database to us because it didn't

14   -- doesn't contain any confidential information.

15           They advised us, last week, that it was a sequel

16   database, SQL, which means that the information isn't just

17   an email that can be searched with a -- with search terms.

18   It's actually a database that contain -- it gets the emails

19   and then it extracts information, so extracts the ticker and

20   it extracts the time, it extracts the date, it extracts the

21   quote.

22           And it creates a database of that information.

23   And then, it may attach the actual email that it extracted

24   the information from.  And so, it's a database.  And so, we

25   said, "Once you told us it's a sequel database," your

Page 9

```
 1    suggestion to run search terms through it isn't going to get

 2    us what we need, it's going to get us, you know, the

 3    tickers, but it's not going to get the rest of the stuff

 4    related to the tickers in the database.

 5            It's a -- it's SQL means Specific Queried

 6    Language.  It needs to be queried.  It's a database.  So

 7    they proposed search terms.  We wrote to them and said,

 8    "Search terms aren't going to work.  You need to just give

 9    us the database.  We need to query it.  And so, we spoke

10    about it this morning.

11            THE COURT:  I don't understand.

12            MS. SAWYER:  Okay.

13            THE COURT:  Why can't you search?  Give me an

14    example of what would happen if you search the database.

15            MS. SAWYER:  If you ran the -- a ticker through

16    the database.

17            THE COURT:  A ticker, right.

18            MS. SAWYER:  And all you would get was that

19    ticker, you wouldn't get the quotes related to that ticker.

20    It's not going to connect up.  It's not like you're going to

21    get an email that has all the information in it.  You're

22    just going to get the ticker.  You're just going to get the

23    -- what you searched for.

24            THE COURT:  So it's not going to -- so if I think

25    of it in my simple way as a huge digital Excel spreadsheet -
```

Page 10

1    -

2            MS. SAWYER:  Absolutely.

3            THE COURT:  It's going to give you a field --

4            MS. SAWYER:  It's going to give you a field.

5            THE COURT:  -- and not a line?

6            MS. SAWYER:  Exactly.  It's not going to connect.

7    It's a relational database, so you have to connect it.  So

8    you have to ask it a question.  And you can say, "Give me

9    all the quotes related to this ticker."  And it can --

10   depending on how it's setup, you know, it can't say exactly

11   what the question is.  But you pose a question to it, it

12   gives you the information.  So we know how to use an SQL

13   database --

14           THE COURT:  Okay.

15           MS. SAWYER:  -- to ask the information.  And so,

16   we --

17           THE COURT:  Okay.

18           MS. SAWYER:  -- ask for it to be produced.  So we

19   spoke about it this morning with Mr. Tracey, and he said,

20   you know, "I just don't know enough technically about the

21   database.  I need to look into it.  And maybe you need to

22   talk to our tech people and try to figure it out."

23           That's all fine, but that's -- I mean, three weeks

24   have happened, and we haven't had that conversation.  You

25   know, we're still kind of -- until this morning, until the

Page 11

1    eve of coming to see the Court, we literally --

2              THE COURT:  So, when Mr. Tracey says in his

3    letter, which is at the top of Page Two, "Because Lehman is

4    refusing to comment on our proposed search terms, we plan to

5    ask our bender to run the relevant ticker symbols, and will

6    produce all non-responsive records.  This will collect all

7    quotes for all relevant positions in the requested period,"

8    you say, "That's incorrect."

9              MS. SAWYER:  Well, what -- agreed.

10             THE COURT:  As a matter of the way it will work?

11             MS. SAWYER:  Agreed.  What their vendor has

12   proposed is they take this massive Excel spreadsheet and --

13             THE COURT:  Right.

14             MS. SAWYER:  -- they'll convert it into some sort

15   of text format, and they'll try to connect everything up.

16   And then, they'll run searches through that, which we've had

17   problems with QVT's vendor before.  I honestly don't have

18   any confidence that that process is going to work because

19   that's not the way the database is designed.  You're trying

20   to like, force it into a search term process, when it's

21   setup to be handled differently.

22             THE COURT:  Okay.  So this is not a philosophical

23   difference, this is a technical problem?

24             MR. TRACEY:  Right.  If the way it works is the

25   way Ms. Washington -- Ms. Sawyer, sorry --

Page 12

1              MS. SAWYER:  Ms. Sawyer.

2              MR. TRACEY: -- works -- I'd be perfectly happy to

3     provide a database, and actually, it would be much easier

4     for us if it's easier for them.

5              THE COURT:  Yes.

6              MR. TRACEY:  So I agree.  But the problem is, when

7     we started this process --

8              THE COURT:  Yeah.

9              MR. TRACEY:  -- the idea was to run search terms

10    on it, so that's the path we went down.

11             THE COURT:  Right.

12             MR. TRACEY:  And we've spent the last two weeks

13    designing search terms and trying to get them to respond and

14    they haven't responded.  So we did waste some time on that

15    process.

16             THE COURT:  Okay.  But I think -- but --

17             MR. TRACEY:  Let me just finish.

18             THE COURT:  Okay.

19             MR. TRACEY:  The reason that we continued to

20    (indiscernible) that is a path to follow is as follows.  And

21    again, this is not a philosophical difference, it's a fact

22    question.  What -- and I just confirmed this with my IT

23    person today at QVT.

24             What he says is that the database has essentially

25    two elements.  It has the big Excel spreadsheet that Ms.

Page 13

1    Sawyer mentioned, and it has all of the underlying Bloomberg

2    messages.

3                    THE COURT:  Right, right.

4                    MR. TRACEY:  You know, in that database.

5                    THE COURT:  Okay, okay.

6                    MR. TRACEY:  So it -- so that's every email, every

7    Bloomberg message just --

8                    THE COURT:  Okay.

9                    MR. TRACEY:  -- that any one of our people who

10   were using this system sent overseeing for --

11                   THE COURT:  Okay.

12                   MR. TRACEY:  -- a 72 day period.  It's 125,000

13   emails, so -- for Bloomberg.  So those -- and those are

14   going to delay in very small part, to these tickers, and in

15   very large part, to the rest of their business.  So --

16                   THE COURT:  So can you search the -- can you

17   search the --

18                   MR. TRACEY:  (indiscernible).  No, let me --

19                   THE COURT:  No, no, no, hold on.  But what Mr.

20   Tracey is saying, they're Bloomberg messages, right?

21                   MR. TRACEY:  Yes, right.

22                   THE COURT:  So they are quotes.

23                   MR. TRACEY:  There are quotes in the Bloomberg

24   messages --

25                   THE COURT:  Right.

1          MR. TRACEY:  -- and there's also a lots of other

2     things in Bloomberg.

3          THE COURT:  Sure.

4          MR. TRACEY:  And so, what our -- so what -- we

5     can't just turn it over to them because then we're giving

6     them 125,000 Bloomberg messages, which most of which don't

7     relate to this case.  And I would have to review or have a

8     team review every single one of them, so what I'd like --

9          THE COURT:  But why can't you search -- so it --

10         MR. TRACEY:  I can.  I -- what I can do, and my

11    vendors told me that they can do this, and of course, we

12    don't know until they finish, but what they say is that you

13    can take all of those quotes, push a button -- they've

14    already done it, they said.  Push a button and they turn

15    (indiscernible) to text.  And then you search them through

16    the ticker.

17         THE COURT:  So there's two -- so what you just

18    said, Ms. Sawyer, was there's the database and then there's

19    the body of Bloomberg messages that were the data from which

20    was extracted to create the database.  So forget the

21    database.  You can't search that.

22         What Mr. Tracey is saying, "Okay, we're going to

23    go back into the documents that created the database, the

24    Bloomberg messages, and we're going to search those for the

25    tickers, and that will spit out the messages that contain

Page 15

1      the quotes, corresponding to those tickers," which sounds

2      like it's exactly what you want.

3              MR. TRACEY:  The only -- and let me just finish.

4      The only limitation, and it's probably -- and it's one that

5      they mentioned this morning is, whenever you convert

6      something, of course, it's not always perfect.  So I don't -

7      - like, when you convert a PDF --

8              THE COURT:  To a Word document.

9              MR. TRACEY:  -- to a Word, it's never perfect.

10             THE COURT:  Right.

11             MR. TRACEY:  So I think they're concerned about

12     the conversion process.  I can't tell you how reliable or

13     unreliable it is.  Our vendor says it's reliable.  But

14     that's an unknown and that's a downside of this process.

15     But I can't think of any other way to do this.

16             THE COURT:  But let me play devil's advocate.

17     Since Ms. Sawyer has offered last time, and again, seems to

18     be offering this time, "Just give us the database, we'll

19     take it from there," and there, and there's a protective

20     order in place, so that -- and we're looking at historical

21     data, right?

22             I mean, by definition, we're -- you're looking at

23     very, very historical data.  Then, why not, you know, say

24     King's X, give her the database and say, "Have a good time"?

25             MR. TRACEY:  That, I mean, why don't we just give

Page 16

1    them all of the emails for every one of our employees?  That

2    would be much easier.  We're not going to do that, because

3    90 percent of them are irrelevant and they're not entitled

4    to see them.  They relate to other business.  And our

5    clients would not be comfortable --

6            THE COURT:  I hear you.  I understand.  I was

7    merely focusing on the burden aspect of it.

8            MR. TRACEY:  The burden is a problem.

9            MS. SAWYER:  I mean, I think Mr. Tracey, though,

10   said his IT person told him it was two separate things.  It

11   was a database with all of the information extracted, and it

12   was a set of messages.  So I don't know why we can't get the

13   database because the information we need to get out of the

14   database is how many quotes QVT got for certain names on

15   certain days to discuss things like whether it was --

16   whether their market quotations process reasonably should've

17   failed.  And also, to assess some of their loss

18   calculations, which they claim to be based upon broker runs

19   and things like that, to know what other information QVT had

20   in its possession.

21           And so, having him -- having them go through, when

22   we've had lots of problems in this case, and review a bunch

23   of messages and produce what's responsive versus a database

24   that can be queried and ask that question and say, QVT had

25   17 quotes for this name, they were received at this time.

Page 17

1    It would be a very, I think --

2            MR. TRACEY:  If I can do that, I will do it.  I --

3    my vendor tells me, "You can't do that," but I would like to

4    put their -- them in touch with my vendor --

5            THE COURT:  Yes.

6            MR. TRACEY:  And they can ask all the questions

7    they want.  And if that can be done, that would be ideal.

8    Because then I don't have to do anything.

9            THE COURT:  Right.

10           MR. TRACEY:  And they get everything

11   (indiscernible).

12           THE COURT:  Then you don't have to convert and

13   search and review and --

14           MR. TRACEY:  That'd be great.

15           THE COURT:  -- if you can ask the database that

16   question --

17           MR. TRACEY:  That'd be great.

18           THE COURT:  Perfect, okay.

19           MR. TRACEY:  So we'll just put them in touch with

20   our IT people and they can ask all the questions they want.

21           MS. SAWYER:  (indiscernible) QVT IT person, then -

22   -

23           MR. TRACEY:  Then (indiscernible).

24           THE COURT:  Okay, that's perfect, great.

25           MS. SAWYER:  Thank you.

1          THE COURT:  So I think the next issue is Duff &

2     Phelps issue, which Mr. Andreoli was going to talk about.

3          MR. ANDREOLI:  Good afternoon, Your Honor.  So

4     this is just another issue that we just think we haven't

5     made enough progress on in the last three weeks.  So the

6     last time we were here, QVT agreed to target its searches to

7     find documents, communications relating to the work that

8     Duff & Phelps did to independently value the Lehman claims

9     in QVT's portfolio.

10         So 11 days after we appear, QVT proposed search

11    terms.  We gave them some feedback.  We exchanged letters

12    this week.  But basically, the documents that were collected

13    have not -- the process of processing them and searching

14    them has not been completed.

15         So we still don't have our -- a hit report.  We

16    still don't know the volume of documents that are going to

17    need to be reviewed.  We still don't have agreement on

18    whether QVT's going to actually review all those documents

19    or whether we're going to have to negotiate further on

20    search terms.

21         So it's just another issue, where you know, it's

22    been three weeks, we'd really like to move the process

23    forward.  And when Mr. Tracey says that, you know, they've

24    completed all these order roles and everything's going to be

25    done this week, this is one where we can't envision a

Page 19

1    scenario where this isn't going to be -- where this is going

2    to be completed in the next two to three weeks.

3              THE COURT:  So Mr. Tracey, you say that you

4    thought last night you thought the hit report would be ready

5    this morning.

6              MR. TRACEY:  Yes.

7              THE COURT:  And it is?

8              MR. TRACEY:  We did get one, yes.

9              THE COURT:  Okay.  So has that been shared with

10   these --

11             MR. TRACEY:  We just got it by email, actually,

12   after our call, (indiscernible).

13             THE COURT:  Okay.

14             MR. TRACEY:  So we haven't been able to do that.

15   I think -- can you just mention quickly what they said?

16             MR. ANDREOLI:  Yes.

17             THE COURT:  Sure.

18             MR. TRACEY:  Your Honor, if that's...

19             THE COURT:  Great.

20             MR. TRACEY:  We think it's manageable.  We

21   (indiscernible), but we can agree to the search terms that

22   they propose, and we can review the documents.  And it's

23   around -- it's going to be under 40,000 documents, we think.

24   And it may be less if we can (indiscernible) against

25   previously produced and reviewed documents.  So it should be

Page 20

1    manageable, we don't think that's disputed.

2           THE COURT:  Okay.  So is the protocol to share the

3    hit report or just to tell them the number?  How have you

4    typically been doing it?

5           MR. ANDREOLI:  I mean, in the past, we have not

6    shared hit reports.  We didn't share hit reports back in

7    September, just due to the volume.

8           THE COURT:  Okay, all right.

9           MR. ANDREOLI:  However, it's (indiscernible) --

10          THE COURT:  So it's just a kind of a qualitative -

11   -

12          MR. ANDREOLI:  Well, I think at this stage, just

13   given the problems that we've had, we'd like to see the hit

14   report.

15          MR. TRACEY:  I'm happy to --

16          THE COURT:  Okay.  All right.

17          MR. LEWIS:  Your Honor, one thing that we didn't

18   discuss previously --

19          THE COURT:  So you think you're going to -- when

20   you de-dupe, it's going to be substantially lower than the

21   40,000?

22          MR. LEWIS:  We hope so, yeah.  I certainly hope

23   so.  We're going to bring in an additional piece of data

24   we're going to (indiscernible) you.  And then, we just have

25   to tweak the date range of the hit report that Mr. Andreoli

Page 21

1    and I discussed earlier today.  So --

2              THE COURT:  Okay.

3              MR. LEWIS:  -- you won't get the hit report today,

4    but as soon as the final thing is ready, I'll give it to you

5    and we'll start preparing those documents.

6              MR. TRACEY:  We'll look at it as soon as we get

7    it.

8              THE COURT:  Okay.  Okay.  Sounds good.  All right.

9    The next one on the letter is investor community --

10             MS. SAWYER:  Side pocket.

11             THE COURT:  Side pocket investor communications

12   issues.

13             MS. SAWYER:  So we learned for the first time in

14   the letter to Your Honor that they had collected these

15   documents.  They had these documents ready to review, and

16   that the volume of the documents was about 8,000 documents.

17   So that's fine, and we're glad that that's moving forward

18   and we're glad we have that information.

19             Our concern with this is about their provision

20   about redacting investor names.  And we've discussed the

21   redactions of investor names.  We don't fundamentally have

22   an objection to that.  What we have a concern about is that

23   QVT has historically been very aggressive in its redactions

24   that they have taken.

25             And so, we're concerned about what the means, that

Page 22

1    they're going to be redacting investor names.  I mean, the

2    last conference, we talked about the organizational chart

3    that was redacted extensively.  Since then, we've gotten

4    transfer documents regarding these transfers of interest

5    that are literally or completely redacted for pages upon

6    pages.

7              And then, there'll be just one entry that makes no

8    sense because everything else has been redacted.  And so, it

9    seems to me they're going well beyond just the redaction of

10   investor names.  Mr. Tracey assured me this morning on our

11   meet and confer that they would be much more limited in

12   their redactions, that they would focus on investor names.

13             He also represented to me that they were going to

14   be reproducing the transfer documents they recently produced

15   that were almost entirely redacted to limit down those

16   redactions.  So I think we've resolved this issue and have a

17   plan going forward, but I just wanted to make sure that the

18   Court understood that we had this concern and we had this

19   discussion and we have this agreement.

20             THE COURT:  Okay.

21             MR. TRACEY:  That's all accurate.

22             THE COURT:  Okay.  All right.

23             MS. SAWYER:  The next topic on our letter is audit

24   at QVT.com.  And the corresponding concern we have about

25   some missing documents from QVT's files.  So they had

Page 23

1    represented prior to the last conference with the Court that

2    audit at QVT.com.  So we didn't even talk about that at the

3    last conference, because we thought that those were in the

4    works of being produced.

5            So this one is one we've waited on even longer

6    than the ones from the conference, but we're glad that we're

7    going to be getting the documents.  And hopefully, those

8    documents will be produced in the next several weeks, based

9    upon what QVT told me this morning.

10           THE COURT:  Okay.

11           MS. SAWYER:  In connection with the deleted

12   documents, as indicated in Mr. Tracey's letter, he believes

13   that some documents may have been deleted in the ordinary

14   course in 2009.  I mean, I think it's hard to say the

15   documents related to Lehman in 2009 should be deleted in the

16   ordinary course, particularly in the fact that QVT's been

17   asserting work product over its communications going back to

18   mid-2008.

19           So it seems like there's an inconsistency to

20   suggest that it's appropriate for documents to be deleted in

21   2009, related to Lehman, yet are -- is asserting work

22   product over those.  We discussed that.  Mr. Tracey and I

23   discussed that this morning.

24           We've asked for information related to their

25   litigation (indiscernible) and the process about the timing

Page 24

1   of which when that litigation (indiscernible) was put into

2   place.  But we have concerns about this, as we talked about

3   at the April 8th conference.

4           There are lots of documents that we see in other

5   matters, that we would expect to see here, that we don't

6   have.  And they haven't been able to find.  And so we have,

7   you know, it's not just the fact there are four documents

8   that they can't find from Mr. Collins, we think that there's

9   potentially a larger issue here, because we're just not

10  seeing the documents that you would normally expect to see a

11  counterparty have, talking about a claim and the preparation

12  of a claim.

13          And so, you know, he's agreed to give us that

14  information.  I think we'll take it from there.  But again,

15  I wanted to update the Court on our discussions and where we

16  were.

17          THE COURT:  So this is the issue of it's a small

18  shop, there are a few people.

19          MR. TRACEY:  Right.

20          THE COURT:  And it's -- it sounds (indiscernible)

21  that there weren't a lot of documents, but that's just the

22  way that it was.

23          MR. TRACEY:  Well, but they (indiscernible)

24  calculation, as you'll hear when we have our trial, they

25  came into the office on a -- two Saturdays into Sundays in

Page 25

1    September and October.  And they did basically all of the

2    work on those two weekend days, sitting together on a

3    trading floor.

4         So there just wasn't any opportunity to send a lot

5    of emails back and forth because they were talking.  Nobody

6    sent a confirm email when you're talking to your partner on

7    the trading floor.  So I don't think it's very surprising

8    that there aren't a lot of documents around it.  And I

9    really don't want to get into the situation where we're

10   making claims of deletion of documents, where there's

11   absolutely no evidence of it.

12        Now there is evidence that Mr. Collins, a year

13   later, or six months later, in early 2009, when he was doing

14   his audit work with his auditor, deleted some of his emails,

15   each one of those was actually, we believe, copied to a

16   specific email or audit email folder, (indiscernible) that

17   QVT.com.

18        And we've found most of them in there.  We're

19   looking for the rest because that's one the -- one of these

20   sets of documents that is not (indiscernible) yet.  But we

21   don't believe that we've lost any documents in that context.

22   But in the context of this overall case, which goes over a

23   nine-year period, when there have been third party subpoenas

24   of all the people that QVT talked to, as third parties, that

25   there's only two or three documents that they can identify

Page 26

1    as different from the third parties to ours, I think is

2    remarkable.

3           So the -- I don't think we have a document

4    deletion issue here, and I don't want to get in a situation

5    where we're making speculative statements about that, and

6    trying to make that come true.

7           MS. SAWYER:  I mean, in fairness, though, the

8    third party productions have been very small, are still

9    coming in.  And so, I don't think we can draw any

10   conclusions that we are missing just these four documents.

11   I mean, we have many third party subpoena (indiscernible)

12   standing, but we don't have documents produced.

13          THE COURT:  Well, look, I mean, if everything --

14   if something comes in and you know, you're missing 1,000

15   documents, then we'll have something (indiscernible).  But I

16   think that right now, we're in the realm of, you know, it is

17   where it is, and there's no other indication that something

18   untoward happened.  And I won't go beyond that and

19   characterize what I think this case is really going to be

20   about, but --

21          MS. SAWYER:  And then, for example, we -- they

22   have been unable to find any market quotation solicitations

23   for one category of trades, just unable to find them.

24          MR. TRACEY:  Well, probably didn't send it.

25          MS. SAWYER:  Okay.

Page 27

```
 1              THE COURT:  Okay.

 2              MS. SAWYER:  I mean, if -- again, we've been

 3    asking if that's the case, but they didn't send them or if

 4    they're still looking for them.

 5              THE COURT:  Okay.  But that -- those are the types

 6    of issues we're going to have at the trial about, so if in

 7    fact they didn't send them and you're going to tell me what

 8    the consequence of that is, and that's why we're going to

 9    have the trial.  So, right?

10              MR. TRACEY:  Right, (indiscernible).  It's a very

11    (indiscernible).

12              THE COURT:  Okay.

13              MS. SAWYER:  So that -- I think that completes my

14    --

15              THE COURT:  Right, but the concern that I have,

16    Ms. Sawyer, is that you closed by saying, "These are but a

17    few examples of the issues we continue to have with QVT."

18              MS. SAWYER:  Sure.

19              THE COURT:  So we're all here.

20              MS. SAWYER:  Yup.  I have additional issues.

21              THE COURT:  Okay.  So what are the additional

22    issues?

23              MS. SAWYER:  So I think now going to my April 26th

24    letter --

25              THE COURT:  Right.
```

1          MS. SAWYER:  -- might be the best way to work

2     through those issues.  So I think again, I said we weren't

3     going to cover all the issues.

4          THE COURT:  Right.

5          MS. SAWYER:  So I think the first issue arises

6     with number three in my April 26th letter, which relates to

7     four documents.  You might recall at the April 8th

8     conference, they had indicated that they had been

9     withholding draft board materials.

10          THE COURT:  Right.

11          MS. SAWYER:  And they agreed to produce those

12     draft board materials.  And we had -- and they said they

13     were going to make redactions in them.  And we said, "Okay,

14     we need to know what these address -- redactions are for.

15     Are they for privilege or are they for something else?"

16          The way the documents have been produced to us,

17     they said they'd stamp it to make it clear what the purpose

18     of the redaction was.  The way documents have been produced

19     to us, they say, "Redacted, privileged/non-responsive."

20     Well, that doesn't give me any more information than just

21     covering it up and saying, "Redacted."  I don't know if

22     they're -- I don't know why non-responsive information's

23     being redacted from the board materials.

24          But setting that aside, you know, we're having,

25     again, large sections of these being redacted.  We don't

1    know the basis of the redaction, whether it's a privileged

2    assertion or whether it's something else.  And so, it's --

3    that's where we are.

4         I would hope that they can be more specific, as to

5    why they're redacting.  I would hope maybe as part of the

6    process of looking back at the other redactions, which seem

7    to be aggressive, that maybe these are also in that vein of

8    aggressive redactions.  It's unclear to us exactly what's

9    going on.

10        THE COURT:  Okay, so let's find out.

11        MR. LEWIS:  (indiscernible) easy information

12   (indiscernible) three different types of redactions.

13   There's redacted privilege, which is it's responsive

14   information on these claims, but it's a privileged portion

15   of the document.

16        There's redacted nonresponsive, which is just

17   nothing to do with these claims.  But where you've got legal

18   advice on a non-responsive topic.  So they've got in their

19   four documents, "Well, external counsel said this," but

20   nothing to do with (indiscernible) claims, but something

21   completely different.  There we said, "Well, it's

22   nonresponsive, but it's also privileged."  So to avoid

23   producing privileged information, only that category gets a

24   redacted, non-responsive/privileged to indicate that it's

25   not relevant, but it is also privileged.

Page 30

1           THE COURT:  That's what I assumed.  So --

2           MS. SAWYER:  It seems to me that everything's in

3    that last category.  I mean, we can go back through and

4    look, but we're not seeing -- I mean, I guess to me, if it

5    was nonresponsive, why even say anything more than

6    nonresponsive?

7           THE COURT:  Well, because I think that's it's --

8    they're using belt and suspenders to make sure that there's

9    no privileged waiver with respect to the nonresponsive

10   material.  That is in fact subject to another privilege.  So

11   that doesn't --

12          MS. SAWYER:  So our review of them seems to be

13   that everything's in that third category.  And so, we'll

14   take Mr. Lewis' representation that that's what that means,

15   that it has nothing to do with Lehman at all, and that

16   they're privileged, so that no information, further

17   information needs to be given.

18          MR. LEWIS:  Your Honor, if the statement is that

19   every single redaction (indiscernible) electronically --

20          THE COURT:  Okay.

21          MR. LEWIS:  -- if the statement is that every

22   single redaction --

23          THE COURT:  She said the large -- that seems to be

24   the lion's share of them.

25          MR. LEWIS:  The (indiscernible) -- but I don't

Page 31

1    think that's correct, but if you want to give us Bates

2    numbers, we'll be happy to look into it, but that was the

3    basis for the redactions.

4            MS. SAWYER:  Okay.  I mean, we -- it's hard when -

5    - it's hard when they're all that way to know what Bates

6    number to pick.  But I mean, we can consider it, but I mean,

7    I think we'll have to take the representation that they were

8    careful and that's the majority fell into that area.

9            THE COURT:  I mean, look.  You know --

10           MS. SAWYER:  I don't know what else to do.

11           THE COURT:  I'm willing to accept the

12   representation, what I've done in other cases, when there

13   have been concerns about the integrity of the redactions, I

14   have agreed to review in camera, you know, a sampling.  And

15   I'm happy to do that.

16           MS. SAWYER:  Okay.

17           THE COURT:  I mean, if you want to pick a --

18   either a random sampling of redacted documents or ones that

19   particularly trouble you because of the timeframe --

20           MS. SAWYER:  Sure.

21           THE COURT:  -- or other circumstances, then

22   identify them to Mr. Tracey, send me a binder that has the

23   redacted and the non-redacted, and I'll look at them.

24           MS. SAWYER:  Okay.

25           THE COURT:  And if that makes you feel better, I'm

Page 32

1   happy to do it.

2           MS. SAWYER:  All right.

3           THE COURT:  That's what I've done in other

4   instances, and you know, I can't tell you that there's a

5   particular way it comes out.  Sometimes, they all don't get

6   produced, and sometimes some get produced and sometimes,

7   none additional get produced.

8           MS. SAWYER:  Right.

9           THE COURT:  So I'm happy to do that for you, if

10  you'd like.

11          MS. SAWYER:  We appreciate that.

12          THE COURT:  Okay?

13          MS. SAWYER:  We'll look at the documents more

14  closely and see if we want to do that.

15          THE COURT:  Mr. Tracey, is -- would that be all

16  right with you?

17          MR. TRACEY:  Sure, of course.

18          MS. SAWYER:  Okay.

19          THE COURT:  Okay.  Okay?

20          MS. SAWYER:  Then we have some additional issues

21  in category number four, which is side pocket, which is a

22  very broad category.  The first issue is, is that we have

23  been asking for a long time to get the NAV of each side

24  pocket transfer, and the NAV -- so the amount being

25  transferred.

1            THE COURT:  Right.

2            MS. SAWYER:  And the NAV of the side pocket at the

3    time that transfer occurred.

4            THE COURT:  Right.

5            MS. SAWYER:  And we have gotten a spreadsheet that

6    contains information related to that, but it doesn't contain

7    that information.  And so, we've asked for that, and we

8    still have not gotten that.  And I don't know if it's an

9    objection to it or where we are.

10           MR. TRACEY:  No, I have no objection to it.  It --

11   on these issues, we've been (indiscernible) passing

12   (indiscernible) a little bit, because we did provide and at

13   the October conference, we agreed to provide certain

14   specific data --

15           THE COURT:  Yeah.

16           MR. TRACEY:  -- relating to the transfers.

17           THE COURT:  Right.

18           MR. TRACEY:  And it was specifically identified.

19   And (indiscernible) things was the total amount of NAV that

20   was transferred.

21           THE COURT:  Yeah.

22           MR. TRACEY:  And the percentage that that bore to

23   the total.

24           THE COURT:  To the -- that's right.  I remember

25   that.

1            MR. TRACEY:  So all you have to do is multiply

2    that number by the percentage, and you (indiscernible).

3            THE COURT:  To get the net total.

4            MR. TRACEY:  So I thought they had all this, but

5    if they want it in a spreadsheet, where we actually multiply

6    it on behalf of them, I'm happy to do it.

7            MS. SAWYER:  I mean, I'm not going to characterize

8    it.  I don't think we have the information, so I think if

9    you could give us the information --

10           MR. TRACEY:  Sure.

11           MS. SAWYER:  -- about the NAV, the (indiscernible)

12   --

13           THE COURT:  Okay.

14           MS. SAWYER:  -- that would be great.

15           THE COURT:  Okay.  Okay.

16           MS. SAWYER:  Also related to kind of NAV issues,

17   is we had been also seeking the NAV of the main fund, prior

18   to the transactions being moved out into the side pocket.

19           THE COURT:  Right.

20           MS. SAWYER:  And then, the NAV of the main fund,

21   after that transaction occurred.

22           THE COURT:  Right.

23           MS. SAWYER:  Mr. Tracey and I discussed that issue

24   this morning.  We understood how we were two ships passing

25   in the night, and I think we have an agreement that Mr.

1    Tracey will be producing an estimated NAV, or whatever QVT

2    did, because the official NAV was only done at the end of

3    the month.  And so, seeking this daily NAV, I think was a

4    miscommunication issue.  So I think Mr. Tracey's committed

5    to produce that information to us.

6              THE COURT:  Okay.

7              MR. TRACEY:  And that's accurate.

8              THE COURT:  Okay.  Great.

9              MS. SAWYER:  We also had a call with Mr. Julian

10   Sale, which we discussed at the last conference, because we

11   were concerned we were missing certain side pocket

12   documents.  And they said the best thing to do is you talk

13   to him.  We had a very useful call with Mr. Sale, I think a

14   week ago, and he spent a lot of time going over things with

15   us.

16             But the upshot of that call is Mr. Sale confirmed

17   that we in fact did not have the documents showing the side

18   pocket of the NAV.  We had documents that we assumed showed

19   the side pocket of the NAV, but when he looked at the

20   document, he said, "Oh no, that's not the right document."

21             THE COURT:  The NAV of the side pocket.

22             MS. SAWYER:  The NAV of the side pocket.  He said,

23   "Oh no, that's not the right documents, it's a different

24   document that you would need to look at to show you the side

25   pocket of the NAV for every month."  And the --

Page 36

1              THE COURT:  The NAV of the side pocket?

2              MS. SAWYER:  The NAV of the side pocket, yes.

3              THE COURT:  You keep saying side pocket of the

4    NAV.  That's okay.  Just --

5              MS. SAWYER:  Okay, I apologize.  I don't even know

6    I'm doing it, so I, I'll have to like, really slow down.

7              THE COURT:  It shows that she's been working too

8    hard.

9              MS. SAWYER:  So he indicated that there was --

10             MR. TRACEY:  She loves her work though.

11             THE COURT:  I do, you just keep believing that.

12             MS. SAWYER:  So he indicated that we didn't have

13   the right document to show the NAV --

14             THE COURT:  But didn't the item that you agreed on

15   two items ago, doesn't that give you this, the NAV of the

16   side pocket?

17             MS. SAWYER:  The -- it's two different things.

18             THE COURT:  Okay.

19             MS. SAWYER:  So the item we were talking about a

20   few moments ago was the NAV of the transfer of the side

21   pocket interests that were transferred.

22             THE COURT:  Right.

23             MS. SAWYER:  And the NAV of the side pocket at the

24   time of those transfers.

25             THE COURT:  Right.

Page 37

1          MS. SAWYER:  This is looking for the month-end

2  official side pocket NAV from QVT's fund administrator.

3          THE COURT:  Okay.

4          MS. SAWYER:  So slightly different things, because

5  the transfer might not happen at the end of the month, when

6  the official side pocket NAV --

7          THE COURT:  Okay.

8          MS. SAWYER:  -- is created.  So we learned that we

9  didn't have these documents.  Mr. Sale is going to look into

10 what the right document is to be produced to us.  We also

11 walked through what we had deduced was the analysis of

12 getting to the side pocket NAV, you know, looking at the

13 steps along the way.

14          And we realized that we did not have all of those

15 documents, either.  And Mr. Sale was going to investigate to

16 try to identify the correct documents we should be looking

17 at to get from the Lehman claim amount to the side pocket

18 NAV amount every month.  And so, we've -- he's investigating

19 and we're on our way with that, but that is still an

20 outstanding issue.

21          MR. TRACEY:  Yeah, it was a good call because we

22 all learned something.  We produced, as the NAV, something

23 called a portfolio report, which is (indiscernible) to all

24 investors (indiscernible).

25          THE COURT:  Right.  I remember that.

Page 38

1          MR. TRACEY:  And it has the NAV (indiscernible).

2    Well, it turns out that there are two NAVs, all right?

3    There's the NAV that goes to the investors in that report,

4    and then there is a separate NAV that's calculated by CITCO,

5    the fund administrator, which starts with that number, but

6    deducts fees, expenses --

7          THE COURT:  The net NAV.

8          MR. TRACEY:  -- and (indiscernible).  The net NAV,

9    right.  So we -- none of us do that, anybody in this room.

10   So he has now gone back and he is going to get the net NAV

11   for each month.  The -- those documents, there's a NAV for

12   the S25 in a huge spreadsheet each month.  So what he's

13   going to do is take out that NAV for each month, put it in

14   the spreadsheet, and then he's going to, you know, he'll

15   give an affidavit or whatever (indiscernible).

16         THE COURT:  At the risk of creating trouble,

17   causing trouble, why is the net NAV more relevant than the

18   gross NAV?

19         MR. TRACEY:  He liked that number better.  Because

20   it's --

21         MS. SAWYER:  He definitely reacted to it on the

22   call.  Like he said, "Oh no, that's not the right one.  We -

23   - you should use this other one."

24         MR. TRACEY:  The net NAV is actually what's in --

25   it's the average of everything that's in everybody's account

Page 39

```
 1    at the end of the month.  The gross NAV is before you take

 2    out all those expenses.  So it's just the NAV of the

 3    investments.  So we --

 4                THE COURT:  But if you're trying to tie it back to

 5    --

 6                MR. TRACEY:  I think the first one.  I think the

 7    gross --

 8                THE COURT:  The gross NAV --

 9                MR. TRACEY:  -- NAV is not important to them, but

10    they'll have both.

11                MS. SAWYER:  We'll have both.

12                THE COURT:  Okay.  I mean, just based on what you

13    said, it seems to me that the gross NAV is more relevant to

14    the issue that's -- that we have teed up here, but I'll

15    leave it at that.  I'm sure you'll figure it out, once you

16    get it.  So --

17                MR. TRACEY:  Well, we'll give them a net NAV for

18    each month.

19                THE COURT:  Okay.

20                MR. TRACEY:  And he's going to put together a set

21    of documents for one month that shows how you get from the

22    net to the gross.

23                THE COURT:  Wonderful.  Okay.

24                MS. SAWYER:  And then, I think then, we talked

25    about we were going to go over those, or is that not true?
```

1            MR. TRACEY:  We were going to what?

2            MS. SAWYER:  We were going to have a further call

3     with Mr. Sale.

4            MR. TRACEY:  Yeah.

5            MS. SAWYER:  Yes.  Okay, just to make sure.

6            THE COURT:  That's great.  Okay.

7            MS. SAWYER:  I think the -- I think that we can

8     skip a number of these --

9            THE COURT:  Okay.

10            MS. SAWYER:  -- because we understand that they're

11     in progress.  We under -- we've talked about some of them

12     this morning.  And we are hopeful that we are going to be

13     moving forward expeditiously on those.  I think the next one

14     I wanted to talk about was the (indiscernible) database, and

15     which is number 10.

16            THE COURT:  Okay.

17            MS. SAWYER:  And the (indiscernible) database, we

18     -- you might recall is there -- where they keep their marks

19     in that we learned from Mr. (indiscernible) at the last

20     conference, that there is some commentary about those marks,

21     month-end.  And QVT has committed to produce that

22     commentary, but they have indicated that they're going to

23     produce responsive, non-privileged commentary.

24            And so, I'm unsure what responsiveness review is

25     happening and how it's happening.  I'm also concerned about

Page 41

1    what might be privileged.  Like I can't quite imagine what

2    would be privileged in this commentary in a marks database.

3    So those were the issues I had about the representation.

4              And you know, I know I sound a little bit hyper

5    technical, but we have had so much history here, that like,

6    I want to just make sure we're crystal clear on what's

7    happening before we get a production that doesn't make any

8    sense to us.

9              THE COURT:  Okay.

10             MR. BECK:  Your Honor, John Beck.  So that's just

11   sort of standard disclaimer language that when we commit to

12   do something, we would obviously not produced anything

13   that's privileged.

14             THE COURT:  Sure.

15             MR. BECK:  We have collected those documents.

16   There's about 8,500.  We have already run privileged

17   searches on them.  There is nothing that we suspect

18   privilege on and (indiscernible) significant.

19             MS. SAWYER:  How much was the volume?  I just

20             THE COURT:  8,500.

21             MR. BECK:  8,500.

22             MS. SAWYER:  Okay, all right.  Great.

23             THE COURT:  Great.  Okay.  You did the B quotes.

24             MS. SAWYER:  B quotes, we did.  Deletions, we

25   talked about.  So I think the next one is Lehman at QVT.com.

1   And here, at Lehman at QVT.com, you know, this -- we talked

2   about the April 8th conference.  This was an email box that

3   was created to collect information about the Lehman claims,

4   process, the close-out, the market quotation process, et

5   cetera.

6           We believe that because of the nature of this

7   email box, which is they represent a very small 92 documents

8   at the last conference, we believe all of the documents in

9   that email box should be produced or logged.  We don't see

10  any reason that there should be some sort of responsiveness

11  analysis done of these.

12          And so, we've asked all -- have all the documents

13  in Lehman at QVT.com either been produced or logged?  And

14  the response we got is, "We produced all the responsive

15  documents."  To be honest, I want to know how that breaks

16  down, because I can't imagine what would be in this mailbox

17  that relates to the calculation of the Lehman claim that

18  wouldn't be responsive and shouldn't be produced.

19          So we didn't want search terms applied to it.

20  It's a small number of documents, and we think that they all

21  should just be produced.

22          MR. LEWIS:  Your Honor, that's happened.  You

23  know, Lehman, at QVT.com, we went over.  We looked at every

24  single document we collected from that repository.  And

25  we've produced the (indiscernible).

1          THE COURT:  Well, but that's the question.  What

2     is -- if this repository is designed -- is defined

3     accurately as a repository for information related to QVT's

4     claims against Lehman, then what is in there that doesn't

5     fit that description?

6          MR. LEWIS:  Okay.

7          THE COURT:  Unless it's a repository for all

8     things Lehman, including, you know, commentary about, you

9     know, what a travesty the Lehman bankruptcy is, or something

10    like that.

11         MR. LEWIS:  Well, QVT and Lehman have a number of

12    different relationships.  Lehman was LBI's and

13    (indiscernible) one of QVT's primary brokers.

14         THE COURT:  Yeah.

15         MR. LEWIS:  And we had a relationship with

16    (indiscernible) as well.  So to the extent of their emails,

17    and we can go back and check, but to the extent their

18    email's in relation to QVT's (indiscernible) claims, LBI

19    claims, those wouldn't be responsive for this.

20         THE COURT:  Okay.  Then it's a ships passing in

21    the night problem, because the way this is described by Ms.

22    Sawyer is that it's a repository -- well, if it's a

23    repository only for information relating to the claims

24    calculation, then that's an inaccurate description of the

25    repository.

1          If it's a repository for anything relating to

2     Lehman, and there are (indiscernible) documents and LBI

3     documents in there, then those are nonresponsive.

4          MS. SAWYER:  Okay, but we --

5          THE COURT:  Okay?

6          MS. SAWYER:  We haven't been told that.  That's

7     what -- we're just trying to figure -- I'm trying to figure

8     out like --

9          THE COURT:  Okay.

10         MS. SAWYER:  I've been asking, haven't gotten all

11    of the documents.  What else I -- what is this, you know?

12    And none of that information is being communicated.

13         THE COURT:  Okay.  So --

14         MS. SAWYER:  I mean, I feel like Mr. Lewis said,

15    "I think it is," but again, we've been asking for months and

16    months, "What is it?  How many documents are in it?  How

17    many have you produced?  And why haven't you produced them

18    all, if you haven't produced them all?"

19         MR. LEWIS:  I think the question's been asked and

20    answered many times.  To the extent you want us to go back

21    and look (indiscernible) --

22         THE COURT:  Okay, so Ms. Sawyer says, "We have

23    found 126 documents" --

24         MS. SAWYER:  Well, that's a -- that was like, my

25    second issue is, they told us there were only 92 and we

Page 45

1    found 126 that are produced to us, so again, we feel like

2    we're -- we don't know what's going on.  We feel like we're

3    not getting accurate information.  And this is obviously a

4    very important source of information.

5              MR. LEWIS:  So I think that the -- to the extent

6    there is a disparity of numbers, when emails or documents

7    are brought into our review databanks from multiple sources.

8    So if the three of us were on an email together, if Dennis

9    was the lead custodian for de-duplication processes, it

10   would look like you didn't have that email from me for

11   (indiscernible).

12             So to the extent I think a lot of these emails

13   (indiscernible) QVT are gone, we've also had additional QVT

14   custodians on the same communication.  The de-duplication

15   would affect those numbers.  And I think that may be a cause

16   for concern.

17             THE COURT:  A discrepancy?

18             MS. SAWYER:  Well, and then I go back to my

19   fundamental question.  They can tell me, without de-duping,

20   how many documents are in Lehman and QVT.com.  And so, if

21   it's 92 documents after they've done some de-duping process,

22   that's not the question I've ever asked.

23             The question I want to know is how many documents

24   are in Lehman at QVT.com, how many of those documents have

25   been produced, and logged, and how many -- and what, what's

Page 46

1    the rest?

2            MR. LEWIS:  And the answer to that is, when we

3    collect them from Lehman and QVT.com, we collected 93

4    documents.  What I need to go and check is to the extent

5    there's an email with multiple attachments, that would be

6    collected as one file.  But when you split it out, it may

7    end up being five different documents.  So that may be why

8    you get from 93 up to 126.  But I checked again this week

9    with our client, and there were 93 documents and they were

10   collected by the (indiscernible).

11           MS. SAWYER:  Okay.  I mean, I'm not sure -- I

12   don't even know what to say because I feel like the de-

13   duplication issue would -- doesn't address the fact that we

14   think there are more.  And I feel like -- (indiscernible) --

15           THE COURT:  So let's go with --

16           MS. SAWYER:  -- I don't know what else to ask.

17           THE COURT:  Okay.  So let's go with you -- your

18   concern that there are more.  If QVT tells you that there

19   are 500 documents in Lehman@QVT.com, and then they tell you

20   that 404 of them are not responsive because they relate to

21   LBIE or LBI, would that satisfy your concerns?  I'm -- I --

22           MS. SAWYER:  And I think, to be honest, I don't

23   know why we just don't see -- I mean, we feel like this is a

24   very important custodian database information.  So I don't

25   understand why we just don't give us the LBIE documents to

Page 47

1    just -- I mean, we're -- it -- I know it has nothing -- no

2    relevance, but like, I don't understand why we're drawing

3    that line, given the fact that we believe this is where the

4    information went, and we don't have all of the information

5    about market quotes and things like that.  So I understand.

6              THE COURT:  But how many documents total are there

7    in Lehman at QVT.com?

8              MR. LEWIS:  We collected 93.

9              THE COURT:  So there are -- that -- but now I'm

10   lost.  Because if you collected 93, and some of them relate

11   to LBIE and LBI, then you produced -- you didn't produce

12   those or you produced those with a redaction?  I'm genuinely

13   confused.

14             MR. LEWIS:  Yeah, I mean, maybe it'd be helpful if

15   we go back and we just do the numbers, we said, "Here are

16   the total numbers of emails or messages in Lehman at

17   QVT.com," and we'll look at the original 93, and we'll also

18   run a search for Lehman at QVT.com across our databases.

19   And we say of, you know, it --

20             THE COURT:  What's the difference between those

21   two things?  That's the part I don't understand.  Aren't --

22             MR. LEWIS:  So it's just a --

23             THE COURT:  It would be --

24             MR. LEWIS:  -- a safeguard to see if, for some

25   reason, there are additional documents in the database, the

Page 48

 1    (indiscernible) email was sent to a QTV custodian and Lehman

 2    at QVT.com.  If you ran that search, (indiscernible) to make

 3    sure you get everything.

 4              THE COURT:  I see.

 5              MR. LEWIS:  But we could do the numbers on that.

 6    We could provide you with a (indiscernible).

 7              THE COURT:  Do you understand that point?

 8              MS. SAWYER:  No, to be honest.

 9              THE COURT:  I understood it to mean that if you

10    query QVT -- if you query Lehman at QVT.com, and you get 90

11    documents, but then, if you also do a broader query, and the

12    query is to Julian Sale, CC Lehman at QVT.com, and you get a

13    hit, you might get that document, when you didn't get it by

14    querying Lehman at QVT.com, for reasons that nobody could

15    know.  Do you know --

16              MS. SAWYER:  But I feel like, I kind of wish --

17              THE COURT:  I just made that up.

18              MS. SAWYER:  I under -- I think we should step

19    back.  Like, the mailbox still exists, Lehman at QVT.com.

20    We should, regardless of what's been collected or de-dupd or

21    whatever, we should look at that mailbox and see how many

22    emails are in that mailbox.  That would have the two emails

23    and the CC emails in that mailbox.

24              THE COURT:  But that's contrary to what was just

25    said.

1          MS. SAWYER:  Well, that's what I don't understand

2     why we don't (indiscernible) them.

3          THE COURT:  We're going to keep at it, until we

4     get -- I mean, this is not a refusal to cooperate.  This, I

5     think, is a communication problem.  So let's -- Mr. Tracey's

6     going to try it.

7          MR. TRACEY:  Let me try and -- Mr. Lewis can

8     correct me if I get it wrong.  When we load things into our

9     review database, to do our searches and to determine which

10    ones are relevant and which ones aren't to produce, it's a

11    smaller number than was in the original email box, if you

12    looked on a computer, because it gets de-dupd down.

13         THE COURT:  Okay.

14         MS. SAWYER:  But you can go back to the original.

15         MR. TRACEY:  So let me finish.

16         MS. SAWYER:  Sorry.

17         MR. TRACEY:  So I'm  --

18         THE COURT:  So there's way too many of you

19    standing.

20         MR. LEWIS:  (indiscernible).

21         MR. BECK:  I'm sorry.

22         MR. TRACEY:  So are we together so far?

23         MS. SAWYER:  Yes.

24         MR. TRACEY:  Because -- yeah, because it takes out

25    any that are multiples.

Page 50

1          MS. SAWYER:  Sure.

2          THE COURT:  Okay.

3          MR. TRACEY:  And so we don't have to review it

4     multiple times.

5          THE COURT:  Right.

6          MR. TRACEY:  And that's, you know, just standard

7     procedure.  So if there are 93 in our review database, we --

8     we're pretty sure that there were more than 93 emails in

9     that mailbox --

10         THE COURT:  Right.

11         MR. TRACEY:  -- because there -- it was de-dupd

12    out.

13         THE COURT:  De-dupd, right.

14         MR. TRACEY:  So what -- I think what Lauri is

15    suggesting is we should go back to the original computer,

16    forget about review database, and find out how many emails

17    are in that mailbox.

18         THE COURT:  Mailbox.

19         MR. TRACEY:  And then figure out how many got

20    pulled out because of de-duping, and how many got produced.

21    And I'm happy to do that.  I mean, this is really

22    (indiscernible) for I think nothing, but I'm happy to do it,

23    if that -- I mean, we can do that, right?

24         MR. LEWIS:  Yeah, yup.

25         MR. TRACEY:  Okay.  We can do that.

1              THE COURT:  Okay, but now, so we start with 126,

2       hypothetically, and we de-dup and then we have 93.  And

3       those 93 are produced.

4              MR. TRACEY:  They're either produced or they're

5       not responsive because they're LBI, which we're not

6       producing.  In anything, we've not produced it.

7              THE COURT:  No, I understand that.

8              MR. TRACEY:  Yeah.

9              THE COURT:  I'm just trying to make the math work.

10             MR. TRACEY:  Yeah.  So the match is 126 total in

11      the mailbox.

12             THE COURT:  Right.

13             MR. TRACEY:  And when you de-dup, you get 92, and

14      this is just hypothetical.  And then, of those 92, we did a

15      -- we read every single one of them and decided that X

16      number were relevant, say 50, and we produced it.  So there

17      are three relevant numbers.  The total number in the

18      mailbox, the de-dup number and the number of

19      (indiscernible).

20             MR. BECK:  I just want to add, there's also, in

21      addition to duplication, there's a question, so we all

22      (indiscernible) the top email in the chain, and there's all

23      the emails down the line.  And so, we only review the top

24      one, and it looks like one email.  And then, when we

25      produce, we produced the lower levels also, so the

Page 52

1     production that goes out is more than what we've reviewed.

2              THE COURT:  Mm hmm.  Okay.

3              MR. TRACEY:  So (indiscernible).

4              THE COURT:  All right, so they're telling -- the

5     bottom line is that they're telling you that you're getting

6     every single hit in Lehman at QVT.com that relates to market

7     quotation, and that you're not getting wholly unrelated hits

8     that relate to (indiscernible) or LBI, just as if they were

9     unrelated third parties.  So I don't know, again, what more

10    there is that we could do on that, other than my in camera

11    review of them.

12             MS. SAWYER:  Okay.

13             THE COURT:  And I -- you know, I mean, I think

14    everybody understands why you're so interested in this

15    particular custodian.  But I take them at their word.

16             MS. SAWYER:  Okay.  Well, I think if we get the

17    information, then we could maybe talk about maybe doing some

18    in camera review of some of the withheld documents that

19    aren't -- so we'd need to know how many were produced, how

20    many were logged, and then how many were withheld.  And

21    then, it's --

22             THE COURT:  But are you -- just as a practical

23    matter, are you producing, to use Mr. Tracey's number, the

24    92 documents, and then documents -- and then 10 of them

25    being -- there -- so there's a date, and a sender.  And

Page 53

1    then, does it say, "Redacted," or are you physically not

2    even producing that page?

3              MR. TRACEY:  (indiscernible).

4              THE COURT:  The (indiscernible)?

5              MR. TRACEY:  No, we don't redact full documents.

6    We just don't (indiscernible).

7              MS. SAWYER:  Right.  So we don't --

8              THE COURT:  Right.

9              MS. SAWYER:  -- have any sense of what's been not

10   produced to us.

11             THE COURT:  But just by number of (indiscernible),

12   they're going to tell you that.

13             MS. SAWYER:  Exactly, exactly.

14             THE COURT:  Okay.

15             MR. LEWIS:  Your Honor, I just want to --

16   actually, we'll give you the breakdown, and then we can take

17   it from there.  Just one thing that occurred to us.  I think

18   when we did the re-review of Lehman at QVT.com, there was a

19   date range on that, and it -- the original search terms,

20   which did include Lehman at QVT.com, had kind of tranched

21   date periods.

22             So, which may have been (indiscernible) part of a

23   number discrepancy, maybe because we're -- the re-review

24   period was, I think the three and a half months after Lehman

25   filed.  And so, the answer may be that there are documents

Page 54

1  from a different date range, but we'll give a full breakdown

2  of all of the documents, and we can take it from there.

3          MS. SAWYER:  Okay.

4          THE COURT:  Okay?

5          MS. SAWYER:  That sounds useful.  And then, the, I

6  think next issue is you, right?  Is Mr. Andreoli has talked

7  about number 14 on my letter.

8          THE COURT:  Okay. I'm going to have to --

9          MS. SAWYER:  Do you need to break?

10          THE COURT:  I'm going to have to ask you to pause.

11          MS. SAWYER:  Okay.

12          THE COURT:  So do we (indiscernible) a number?  So

13  what's going to happen is, apparently, the three o'clock

14  people are just going to be on the telephone magically.  And

15  I'm just going to talk to them.  So you can stay here and

16  listen or not listen, and then when we're done, we'll just

17  keep going.  It shouldn't take very long.  Or you can step

18  out, yes, absolutely.

19          MR. LEWIS:  (indiscernible).

20          (Break)

21          THE COURT:  Okay, Ms. Sawyer?

22          MS. SAWYER:  Yes.  So going back to my April 26th

23  letter, number 14, the last number in that letter, Mr.

24  Andreoli's going to speak (indiscernible).

25          THE COURT:  Okay.

Page 55

1              MR. ANDREOLI:  So last time we were here, Your

2     Honor, we talked about the 418,000 documents that QVT had

3     initially coded as non-responsive.  And we discussed that we

4     had asked questions in January concerning whether they had

5     in fact all been reviewed and tagged non-responsive.

6              We were told, leading up to the last conference,

7     that yes, they had been reviewed.  And then, QVT had also

8     run some additional search terms on those documents to sort

9     of cross check to make sure that responsive documents are

10    not being withheld, due to human error in the first

11    instance.

12             So we'd asked to see those additional search

13    terms, and they were provided to us this week, but we have

14    some concerns about what was represented to us at that time.

15    So those search terms were provided.  And at that time,

16    counsel said, "To the extent that a non-privileged document

17    was marked responsive during an additional review, it has

18    been produced in a supplemental production or will be

19    produced."

20             And that's confusing to us because we had heard

21    from QVT's counsel that that process had been completed

22    before the last conference in March.  So we're concerned --

23    is there additional review that's still ongoing with respect

24    to those additional terms?

25             Are they changing responsiveness coding now, based

Page 56

1   on additional things that are happening?  We're just unsure

2   of what is happening with respect to those documents.  Is

3   everything -- is that second level of review completed?  Or

4   are we still waiting for additional responsive documents

5   (indiscernible).

6           THE COURT:  Okay, go ahead.

7           MR. BECK:  So, Your Honor, I just want to first

8   sort of go over the process that we did for these documents.

9   We brought all the documents in the database and we did a

10  responsive review, so that means, we had first level

11  reviews.  We had other attorney, more senior attorneys do

12  second level reviews.

13          And we did the whole process just like we did with

14  all the other documents.  That resulted in a (indiscernible)

15  of approximately 418,000 (indiscernible).  In response to

16  their questions, right in January, we started running

17  additional searches and re-reviewing all those searches, and

18  we have done them.

19          This statement, perhaps in (indiscernible), was

20  just trying to reassure them that they are making additional

21  requests in -- that we've been talking about today, and that

22  is in (indiscernible) letter.  Any newly produced documents,

23  they have to come out at 418 nonresponsive document.  So

24  that was perhaps (indiscernible) again, was just a statement

25  to reassure them that we are producing any new responsive

Page 57

1   document that we find.  That's all it was.  It was not

2   intended to (indiscernible) misleading (indiscernible).

3            THE COURT:  So you're saying that there are

4   418,000 documents, and that based on one set of requests,

5   everything was produced?  But then, there were incremental

6   requests that were then applied to those documents --

7            MR. BECK:  Yes.

8            THE COURT:  And those are the ones that are still

9   in process?

10           MR. BECK:  Well, for instance, so the December

11  2009 portfolio, (indiscernible).  One of the supplemental

12  searches that we ran was for (indiscernible).  We did not

13  catch that.  They specifically requested December 2009

14  report.  We did not produce that.  That is a document that

15  came out (indiscernible) that (indiscernible).

16           THE COURT:  I see.

17           MR. BECK:  (indiscernible) produce.  That's all

18  the (indiscernible).

19           MR. ANDREOLI:  Okay.  So I think we're on the same

20  page --

21           THE COURT:  Okay.

22           MR. ANDREOLI:  -- but just to make sure they

23  provided a list of search terms -- search queries and date

24  ranges on April 26th.

25           THE COURT:  26th.

Page 58

1          MR. ANDREOLI:  And I just want to make sure that

2     all of those search queries done, responsiveness done,

3     documents produced, anything incremental that we asked for

4     or have to ask -- asked for separate from this may still be

5     produced, but these search queries are done.

6          MR. BECK:  (indiscernible).

7          THE COURT:  Okay.  All right.  Did you want to

8     talk about the remaining two items in your letter?

9          MS. SAWYER:  Yeah, we haven't had an opportunity

10    to meet and confer with QVT on those issues.

11         THE COURT:  Okay.

12         MS. SAWYER:  I'm hoping to do that very soon.  To

13    be honest, the focus of the activity in the last 48 hours

14    has been primarily on the issues --

15         THE COURT:  (indiscernible).

16         MS. SAWYER:  -- arising out of the last

17    conference.  But these are obviously additional issues that

18    we will be exploring with QVT, and hopefully, doing that

19    quite soon.

20         THE COURT:  Okay.  All right.

21         MS. SAWYER:  So you know, I think our perception

22    is, is that as unfortunate as it is, we really need to have

23    a -- some pressure or a court conference to keep us moving

24    forward.  And so, I would ask -- and you know, there's many

25    things that we did not discuss today that QVT has

Page 59

1    represented what we've done early next week.

2           And so, hopefully, that's true.  So lots of things

3    we discussed today, that are going to take them some time to

4    collect, review.  Their vendor apparently takes a long time

5    to process documents, that process.  So there's things I

6    think will not be done early next week and things that will

7    be done in several weeks.  And so, it seems to me it makes

8    sense to give us another placeholder, because I don't know

9    how else to move us forward.

10          THE COURT:  Well, Mr. Tracey's going to entirely

11   dispute your characterization --

12          MR. TRACEY:  No, no.

13          THE COURT:  -- (indiscernible) -- no?

14          MR. TRACEY:  No.  All I was going to say is, the

15   way she's speaking, it sounds like Lauri thinks that I want

16   to come down here, and I (indiscernible).

17          THE COURT:  No I was going to say you're going to

18   dispute the characterization that it requires the existence

19   of a court date in order --

20          MR. TRACEY:  I don't (indiscernible) --

21          THE COURT:  -- for you to do what you promised to

22   do.  And I think that you would say that, but I'm happy to

23   give you a date and I'm happy to see you again or not see

24   you again.  So what date do you have in mind, Ms. Sawyer?

25          MS. SAWYER:  I think maybe three weeks, although I

Page 60

1    think three weeks from today, we actually have a QVT

2    deposition scheduled, so maybe like, the 19th, which is just

3    shy of three weeks.  Is that right?

4              THE COURT:  The 19th is a Thursday.

5              MR. TRACEY:  I'm going to be --

6              THE COURT:  Away?

7              MR. TRACEY:  -- in Hong Kong that week, but --

8              THE COURT:  Okay.

9              MR. TRACEY:  -- I think it would be okay to

10   schedule it and my colleagues can take care of it.

11             THE COURT:  Okay.

12             MS. SAWYER:  Okay, that's fine, Your Honor.

13             THE COURT:  So let me just check, what does it

14   look like?

15             CLERK:  (indiscernible).

16             THE COURT:  On Thursday the 19th?

17             CLERK:  (indiscernible).

18             MR. TRACEY:  I wonder if we could schedule it

19   possibly in the morning, so that if I can (indiscernible),

20   and (indiscernible).

21             THE COURT:  Sure.

22             MS. SAWYER:  That's fine, Your Honor.

23             THE COURT:  Okay.

24             MS. SAWYER:  (indiscernible)?

25             THE COURT:  (indiscernible).  Would you be willing

Page 61

1    to come in at 9:30?

2              MS. SAWYER:  That's fine.

3              THE COURT:  And that would help you in terms of

4    the time difference.

5              MR. TRACEY:  That'd be good.

6              THE COURT:  Okay, so 9:30 on the 19th, if

7    necessary.

8              MS. SAWYER:  If necessary.

9              THE COURT:  Okay, great.  Okay, thank you, folks.

10             MS. SAWYER:  Thank you.

11             MR. TRACEY:  Thanks, Your Honor.

12             THE COURT:  Have a good weekend.

13             (Whereupon these proceedings were concluded at

14   3:27 PM)

15

16

17

18

19

20

21

22

23

24

25

Page 62

```
 1                    C E R T I F I C A T I O N

 2

 3      I, Sonya Ledanski Hyde, certified that the foregoing

 4      transcript is a true and accurate record of the proceedings.

 5

 6      Sonya Ledanski          Digitally signed by Sonya Ledanski Hyde
                                DN: cn=Sonya Ledanski Hyde, o=Veritext,
                                ou, email=digital@veritext.com, c=US
        Hyde                    Date: 2016.05.03 16:31:15 -04'00'
 7

 8      Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  May 3, 2016
```