**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
: 
In re                                    :    **Chapter 11 Case No.**
                                         :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, :    **08-13555 (JMP)**
                                         :
            Debtors.                     :    **(Jointly Administered)**
                                         :
------------------------------------------------------------x

### OMNIBUS REPLY TO IRONBRIDGE ENTITIES' RESPONSE TO PLAN ADMINISTRATOR'S FIVE HUNDRED NINTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc., as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan"), files this omnibus reply to the responses [ECF Nos. 52321, 52322 and 52324] (the "Responses") filed by Ironbridge Mountain Cottages, LLC ("Ironbridge Mountain"), Ironbridge Aspen Collection, LLC ("Ironbridge Aspen"), and Ironbridge Homes, LLC ("Ironbridge Homes" and, collectively with Ironbridge Mountain and Ironbridge Aspen, the "Ironbridge Entities") to the Plan Administrator's Five Hundred Ninth Omnibus Objection to Claim (No Liability Claims) [ECF No. 51006] (the "Objection"), and respectfully represents as follows:

**Preliminary Statement**

1.  Prior to the commencement of its chapter 11 case, LB Rose Ranch LLC ("Rose Ranch") took title to lots to be developed (the "Property") located in Garfield County, Colorado. The Property consisted of residential building lots (the "Residential Lots"), undeveloped unrestricted lots (the "Open Lots"), riverfront lots (the "Riverfront Lots"), and, pursuant to a requirement by the Garfield County planning board, deed-restricted affordable housing units (the "Affordable Homes"). Rose Ranch entered into that certain Purchase Agreement (as hereinafter defined) with the Ironbridge Entities (direct and indirect assignees of Hansen Construction, Inc. ("Hansen")) so that the Ironbridge Entities could develop the homes on the Property. Pursuant to the Purchase Agreement, the Ironbridge Entities were to, among other things, (i) arrange for the purchase and development of the majority of the Residential Lots and Open Lots, and share in the profits of such developed home sales with Rose Ranch, (ii) pay Rose Ranch $690,000 in connection with the Riverfront Lots, and (iii) construct the Affordable Homes in accordance with an agreed upon budget.

2.  In material breach of obligations under the Purchase Agreement, the Ironbridge Entities (x) improperly withheld profits due to Rose Ranch in excess of $1.7 million, (y) failed to pay any amounts due on account of the Riverfront Lots and accordingly owe Rose Ranch $690,000 (plus interest accruing at 15% per year as of March 2010), and (z) failed to develop the Affordable Homes within the budget agreed upon by Rose Ranch in the Affordable Homes Letter Agreement (as hereinafter defined). On November 16, 2009, Rose Ranch moved to reject the Purchase Agreement and the Affordable Homes Letter Agreement (the "Rejection"). This Court entered an order granting such relief on December 7, 2009 [ECF No. 6064].

2

3. The proofs of claim asserted by the Ironbridge Entities against Rose Ranch (proofs of claim numbers 30848, 30849, and 66154, collectively, the "Ironbridge Claims") should be disallowed and expunged for several reasons:

- First, each of the Ironbridge Entities is jointly and severally liable for all obligations under the Purchase Agreement, including more than $2.4 million owed to Rose Ranch thereunder. Thus, any amounts purportedly payable to any Ironbridge Entity must be offset by damages or other amounts payable to Rose Ranch.

- Second, Ironbridge Aspen brazenly asserts that it is owed (i) completion fees for Residential Lots it failed to ever complete and for which LBRR was forced to hire a third party developer to complete, and (ii) amounts for which Rose Ranch has already paid.

- Third, both Ironbridge Aspen and Ironbridge Mountain assert amounts due on account of mechanic lien rights under Colorado law, which they are expressly prohibited from asserting under the Purchase Agreement.

- Fourth, despite material breaches of the Ironbridge Agreements by the Ironbridge Entities, and the considerable amounts owed to Rose Ranch thereunder, Ironbridge Homes asserts a damage claim as a result of the Rejection (the "Rejection Damage Claim"). The Rejection Damage Claim is inflated, unsubstantiated, and, moreover, the Ironbridge Entities actually benefited from the Rejection given that the Rejection relieved them of further obligations under the Purchase Agreement.

4. The Responses provide no basis to deny the Objection, and the Plan Administrator asserts that Rose Ranch is not liable for amounts due under the Ironbridge Claims. For the foregoing reasons and as set forth more fully below, the Plan Administrator respectfully requests that the Court (i) disallow and expunge the Ironbridge Claims, and (ii) enter an order releasing to Rose Ranch funds currently held in escrow pending resolution of the Ironbridge Claims.

WEIL:\95688396\8\58399.0011

5.      On May 4, 2016, more than seven months after Rose Ranch filed the Objection, and six weeks after they filed their Responses, the Ironbridge Entities filed their Supplemental Objections [ECF numbers 52682, 52683, and 52684] (collectively, the "Supplemental Objection"). In the Supplemental Objection, the Ironbridge Entities claim that the prosecution of the Objection is barred by a tolling agreement entered into by Rose Ranch with the Ironbridge Entities, dated March 27, 2012 (the "Tolling Agreement").

6.      Rose Ranch acknowledges that the Tolling Agreement purports to preclude the prosecution of the Objection, because it has not been terminated. Based upon their conduct over the past six months, however, the Ironbridge Entities are estopped from hiding behind the protection of the Tolling Agreement at this juncture. Specifically, the Ironbridge Entities did not raise the Tolling Agreement at any time after the Objection was filed. Indeed, there were multiple telephone conferences regarding the schedule for the hearing on the Objection, and numerous adjournments that were in response to the requests of the Ironbridge Entities. Moreover, without getting into the specifics of any settlement discussions, Rose Ranch and the Ironbridge Entities spent months negotiating a settlement of the Ironbridge Claims and the Objection and, the Plan Administrator believes, had an agreement in principle until the Ironbridge Entities reconsidered their position. It was due to the ongoing and seemingly fruitful settlement discussions that the Ironbridge Entities' response deadline was extended from the original October 28, 2015 date to March 23, 2016.

7.      Based on the conduct of the Ironbridge Entities, the Court should determine that they are estopped from relying on the Tolling Agreement.[1]

---

[1] "Equitable estoppel is triggered by conduct of one person that is inconsistent with the position later adopted by him and is prejudicial to the rights of others who relied on such conduct to their detriment." *In re DeArakie*, 199 B.R. 821, 827 (Bankr. S.D.N.Y. 1996) (citations omitted). Equitable estoppel is necessary "to prevent injustice to a party

4

**The Purchase Agreement and the Affordable Homes Letter Agreement**

8.  The rights and obligations as between Rose Ranch and the Ironbridge Entities were governed by (i) that certain Purchase and Sale Agreement, entered into on or about June 2004 (as amended, the "Purchase Agreement"), between Rose Ranch and Hansen, and subsequently assigned by Hansen to Ironbridge Homes and thereafter partially assigned to the other Ironbridge Entities, and (ii) that certain letter agreement, between Rose Ranch and Ironbridge Homes, dated November 12, 2007 (the "Affordable Homes Agreement").

*Summary of Purchase Agreement*:

9.  The Purchase Agreement sets forth the terms upon which the Ironbridge Entities (referred to therein as the "Developers") were to arrange the purchase and development of, among other things, the majority of the Open Lots. While the Purchase Agreement contemplates several different procedures by which the Open Lots could be developed, the most commonly utilized procedure was the so called "Freedom Program." Pursuant to the Freedom Program, the Ironbridge Entities would solicit offers to purchase Open Lots from third party purchasers (the "Home Buyers"). When the Ironbridge Entities received a qualifying offer, they would arrange for the relevant Home Buyer to obtain financing from a local bank (the "Construction Loans"). At the closing of an Open Lot, a portion of the proceeds of the Construction Loan (the "Initial Consideration") would be transferred from the Home Buyer to the Ironbridge Entities and then to Rose Ranch in exchange for title to the Open Lot which was transferred from Rose Ranch to the Ironbridge Entities and finally to the Home Buyer.

---

who has justifiably relied on another parties prior words or conduct." *OSRecovery, Inc. v. One Groupe Intern., Inc.*, 462 F.3d 87, 94 n.3 (2d Cir. 2006). "Equitable estoppel is a "flexible doctrine" which should be applied when the equities of the situation necessitate its implementation". *In re DeArakie*, 199 B.R. 827.

5

Ironbridge purchased one hundred thirty-one Open Lots pursuant to this "Freedom Program" procedure.

10. The Initial Consideration was allocated between a price fixed in the Purchase Agreement, and the lot premium, which was to be agreed upon by Rose Ranch and the Ironbridge Entities and was related to aesthetic variables such as the view or location relative to country club amenities. The other component of the consideration due to Rose Ranch from the Ironbridge Entities pursuant to the Freedom Program was a percentage (generally speaking, fifty percent) of the Ironbridge Entities' profits from the sale of each Open Lot (the "Shared Profits"). In order to evaluate the Ironbridge Entities' representations with respect to their profits, Section 4 of the Purchase Agreement required the Ironbridge Entities to provide financial statements to Rose Ranch on a monthly basis (the "Reporting Requirements").

11. Pursuant to the Purchase Agreement, the Ironbridge Entities expressly agreed that they:

> shall not place or allow to be placed any lien on any portion of the Property prior to closing on such portion, whether in its endeavor to comply with the applicable conditions of this Agreement, or otherwise. [The Ironbridge Entities] shall never place or allow to be placed any lien on any portion of the Property not owned in fee simple by the [Ironbridge Entities].

Purchase Agreement at § 22(a).

12. The Purchase Agreement also includes an indemnification provision, pursuant to which Rose Ranch and the Ironbridge Entities agreed to "defend and hold one another harmless from and against any and all costs, expenses, liabilities, claims and damages (including reasonable attorneys' fees and expenses of litigation) of every nature and kind, resulting from claims made by consumers or buyers with respect to the sale of Property not the result of the indemnified party's actions or omission. . . ." Purchase Agreement at § 8(d).

6

13. Additionally, pursuant to the Second Amendment to the Purchase Agreement, dated November 15, 2006, Ironbridge Homes purchased the Riverfront Lots from Rose Ranch for $340,000 and $350,000, respectively. The purchase price was payable under promissory notes due on or prior to May 7, 2010. It is the Plan Administrator's understanding that, on or around May 14, 2010, the Ironbridge Entities filed Statements of Dissolution with the Colorado Secretary of State. Rose Ranch never received any payments from the Ironbridge Entities for the amounts that were payable under the promissory notes.

*Summary of Affordable Homes Agreement*:

14. Pursuant to the Affordable Homes Agreement, the Ironbridge Entities agreed to construct the Affordable Homes for a contract price of between $215,000 and $228,000 (the "Contract Price") per unit. For each Affordable Home, Rose Ranch would reimburse Ironbridge for 100% of its direct costs and pay 70% of the difference between the direct costs and the Contract Price. Rose Ranch would then retain the remaining 30% of the difference between the Contract Price and Ironbridge's direct costs. If Ironbridge's direct cost was at or above the Contract Price, Rose Ranch's liability was capped at the Contract Price.

15. The Affordable Homes Agreement included an overall budget of costs and expenses and also provided for a budget to be developed and agreed upon for each Affordable Home. The individual budget for each Affordable Home could not be modified except by written consent from Rose Ranch (to be provided in its sole discretion). In October 2008, despite the national real estate market downturn, Ironbridge proposed substantial and unjustifiable revisions to the budget. Rose Ranch withheld approval of the proposed revisions, thus resulting in the budgets it approved in 2006 remaining in effect.

7

**Escrow Amounts**

16. On March 17, 2009, Ironbridge Mountain filed a notice pursuant to section 546(b) of the Bankruptcy Code to enforce a mechanic's lien for alleged labor performed and materials furnished and used in connection with certain of the Affordable Homes, in the amount of $63,670. *See* [ECF No. 3139]. Ironbridge Aspen filed a similar notice also on March 17, 2009, seeking to enforce its mechanic's lien for alleged labor performed and materials furnished and used in connection with certain of the Affordable Homes, in the amount of $446,147.[2] *See* [ECF No. 3138].

17. On June 17, 2009, this Court entered an order authorizing the establishment of procedures for the Debtors to sell or abandon *de minimis* assets (ECF No. 4029), and, in pertinent part, directing Rose Ranch to use funds from the net sale proceeds of the Affordable Homes to fund an escrow account to be used to satisfy the various liens asserted by, among others, the Ironbridge Entities. In furtherance of such order, Rose Ranch entered into an agreement with Land Title Guarantee Company (the "Escrow Holder"), dated December 30, 2009 (the "Escrow Agreement") and deposited $509,817 (including any accrued interest, the "Escrow Amount") into an interest bearing account with the Escrow Holder (the "Escrow Account"). Pursuant to the Escrow Agreement, the Escrow Amount will be held until the Escrow Holder receives (1) the written consent of Rose Ranch and the Ironbridge Entities that have asserted liens (the "Lien Claimants") that the liens have been satisfied, settled or otherwise deemed satisfied, or (2) an order of the Bankruptcy Court stating that all Lien Claimants have been paid in full, settled or otherwise deemed satisfied.

---

[2] The amount Ironbridge Aspen asserted in the *Notice Pursuant to* 11 U.S.C. § 546(b) *by Ironbridge Aspen Collection, LLC*, exceeds the amounts asserted in the Ironbridge Aspen Claim which was amended, in part, to account for payments received by Rose Ranch.

18. For the reasons set forth in the Objection and herein, the Debtors respectfully request entry of an order directing the Escrow Holder to release all Escrow Amounts to Rose Ranch on the basis that the liens asserted by the Lien Claimants, Ironbridge Mountain and Ironbridge Aspen, are deemed satisfied or are otherwise invalid.

### The Ironbridge Homes Claim Should be Disallowed

19. Ironbridge Homes has asserted an unsecured claim against Rose Ranch for $3,355,373 plus contingent unliquidated amounts. *See* Proof of Claim No. 66154 (the "Ironbridge Homes Claim"). The Ironbridge Homes Claim asserts damages in the amount of (i) $804,959[3] on account of alleged direct costs incurred in developing the Property, (ii) $2,750,414 on account of rejection of the Purchase Agreement for costs and expenses allegedly incurred and that were to be allocated to future lot and home sales in 2009, and (iii) $783,350 as an estimate of amounts allegedly due for 2010. Additionally, the Ironbridge Homes Claim asserts an unliquidated and contingent claim on account of warranty work that Ironbridge Homes allegedly performed and, and at the time, intended to perform. The Plan Administrator believes that Rose Ranch does not have any liability to Ironbridge Homes under the Ironbridge Homes Claim.

20. The Ironbridge Homes Claim is inflated by virtue of its inclusion of amounts owed to entities other than Ironbridge Homes. The amount asserted by Ironbridge Homes for direct costs incurred is inclusive of amounts also allegedly owed to the other Ironbridge Entities and Ironbridge Management LLC. *See* Ironbridge Homes Claim at "Contribution and Distribution Summary as of 12/31/2008" (stating that amounts owed is

---

[3] The Response filed by Ironbridge Homes asserts that $1,272,632 is due and owing on account of direct costs incurred in developing the Property and not the amount of $804,959 asserted in both the Ironbridge Homes Claim and the original proof of claim number 31354. The Plan Administrator reserves all rights to object to any attempt by Ironbridge Homes to amend its proof of claim.

9

applicable to four entities). Ironbridge Homes has not provided any evidence to dispute the Objection. Instead, it merely "denies the bald assertion that the Claim is inflated." *See* Ironbridge Homes Response at ¶ 16.

21. Ironbridge Homes is also seeking to recover amounts for unauthorized work that was outside of the agreed upon budget. The Purchase Agreement required Ironbridge Homes to develop, construct, and sell homes on specific Open Lots in accordance with an overall budget for the Property agreed to in the Purchase Agreement, as well as budgets on a lot-by-lot basis, agreed upon between Ironbridge and Rose Ranch. Rose Ranch approved an overall development budget and individual home budgets in October 2006 (collectively, the "2006 Budget"). No proposed revised budgets were submitted during 2007 or the first nine months of 2008. The next proposed budget was presented by the Ironbridge Entities in October 2008. The proposed 2008 budget included, among other things, $5,265,702 in proposed increases in "overhead" and "supervision" costs. Rose Ranch did not approve the proposed 2008 budget. Accordingly, the 2006 Budget remained in effect. Rose Ranch is not liable for amounts asserted by the Ironbridge Entities in excess of the 2006 Budget. Thus, any such amounts asserted in the Ironbridge Homes Claim should be disallowed.

22. Additionally, Rose Ranch did not receive any Shared Profit payments from Ironbridge Homes after April 19, 2007, despite the fact that Ironbridge Homes continued to sell homes well after such date. Rose Ranch also did not receive any amounts owed to it in connection with the Riverfront Lots. Ironbridge Homes' actions were in material breach of the Purchase Agreement. Rose Ranch's records reflect that approximately $1,744,654 (plus accrued interest) is owed to Rose Ranch on account of unpaid Shared Profits and $690,000 (plus accrued interest) is owed to Rose Ranch on account of the Riverfront Lots.

23. Further, with respect to damages asserted as a result of the Rejection, it is the Plan Administrator's position that such amounts are not allowable given, among other reasons, Ironbridge Homes' material breaches to the Purchase Agreement prior to the Rejection. The Ironbridge Homes Response alleges that Rose Ranch's "indecision and lack of performance … constituted material breaches of the Purchase Agreement" but offers no factual details regarding what the alleged indecision and lack of performance consisted of. *See* Ironbridge Homes Response at ¶ 21. The Ironbridge Entities' dissolution approximately six (6) months after the Rejection evidences the liquidity issues it was experiencing during this time. Rather than harming Ironbridge, the rejection of the Purchase Agreement conferred a direct benefit to Ironbridge by relieving it of its monetary obligations to purchase additional Residential Lots.

24. The Plan Administrator also seeks disallowance of the unliquidated and contingent amounts included in the Ironbridge Claims that relate to any judgment that may be entered against the Ironbridge entities in (i) the case pending in Ninth Judicial District Court of Garfield County, Glenwood Springs, Colorado under the caption *Jamin Cook et al. v. Ironbridge Homes, LLC et al.* (Case No. 2010CV142) (the "Homeowners Litigation"), or (ii) the arbitration proceeding in which Rose Ranch was not a participant and liability was found against the Ironbridge Entities, Hansen and others (the "Arbitration Proceeding"). Neither the Homeowners Litigation nor the Arbitration Proceeding relates to any Property that is the subject of any Ironbridge Claim. Indeed, the Ironbridge Claims only relate to Phases II and III of the development project while the referenced proceedings relate to the lots developed in Phase I. Inasmuch as none of the Ironbridge Claims were timely amended to specifically include claims related to the Homeowners Litigation or the Arbitration Proceeding, despite the Ironbridge Entities' involvement in both proceedings, the Ironbridge Entities should not be

permitted to belatedly amend their claims now through the Ironbridge Responses. Such conduct is an impermissible end-run around the Court-approved claims procedures. It is evident that the Ironbridge Entities are attempting to conflate proceedings and unrelated claims in an attempt to delay resolution of the Ironbridge Claims and wrongfully wrest jurisdiction from the Bankruptcy Court. Moreover, *even if* the Ironbridge Entities newfound assertion that the Ironbridge Homes Claim includes contingent claims in connection with the Homeowners Litigation and the Arbitration Proceeding, the Purchase Agreement expressly states that the Ironbridge Entities and Rose Ranch will hold one another harmless from and against "any and all costs, expenses, liabilities, claims and damages (including reasonable attorneys' fees and expenses of litigation) of every nature and kind, resulting from claims by consumers or buyers with respect to the sale of Property not the result of the indemnified party's actions or omissions." Purchase Agreement at § 8(d). Thus, Rose Ranch cannot be held liable for any judgments entered against the Ironbridge Entities for their wrongdoing in connection with the construction defects alleged by the homeowners. Accordingly, the portion of the Ironbridge Homes Claim that purportedly seeks contribution or indemnification for judgement awards entered in the Homeowners Litigation or the Arbitration Proceeding should be disallowed and expunged.

## The Ironbridge Aspen Claim Should be Disallowed

25. Ironbridge Aspen has asserted a claim based on amounts allegedly owed for work performed by Ironbridge Aspen on lots 297 through 316 (inclusive) in the amount of $184,001, secured by a mechanic's lien, and an unsecured portion in the amount of $204,830. *See* Proof of Claim No. 30849 (the "Ironbridge Aspen Claim").

*Ironbridge Aspen's Unsecured Claims*

26. As Ironbridge Aspen acknowledged in its Response, it did not complete construction of any of the Affordable Homes. *See* Ironbridge Aspen Response at ¶ 7. Indeed, Rose Ranch decided to have the construction on lots numbers 297 through 316 (the "Unfinished Homes") completed by another contractor. Despite not completing any of the Unfinished Homes, Ironbridge Aspen claims it is owed amounts for cost savings which are only due and calculated upon completion of each Affordable Home. Ironbridge Aspen is not entitled to Cost Savings payments for Unfinished Homes. Moreover, Rose Ranch incurred additional outlays to complete construction of the Unfinished Homes which resulted in the aggregate construction costs of the Unfinished Homes exceeding their initial budgets. Further, the primary reason Rose Ranch was compelled to contract with third-party developers to complete construction of the Unfinished Homes was because of a dispute between Rose Ranch and Ironbridge Aspen regarding Ironbridge Aspen's accounting and allocation of costs and expenses and Ironbridge Aspen's inability to develop Affordable Homes within the approved overall and individual budgets.

27. In light of the foregoing, no amounts are owed to Ironbridge Aspen for Cost Savings on the Unfinished Homes, and Ironbridge Aspen's unsecured claim of $204,830 should be disallowed in its entirety.

*Ironbridge Aspen's Secured Claim*

28. The secured portion of the Ironbridge Aspen Claim relates to an invoice dated April 21, 2009, a copy of which is attached to Ironbridge Aspen's claim (*see* Ironbridge Aspen Response at ¶ 20). Although Ironbridge Aspen asserts that its claim is not inflated (*see*

13

Ironbridge Aspen Response at ¶¶ 20, 22), Rose Ranch's records show that several of the amounts underlying the Secured Claim have already been satisfied.

29.     As set forth in the Ironbridge Aspen Claim, Ironbridge Aspen made a "draw request" for Rose Ranch to pay Direct Costs of $272,470 on October 30, 2008. On December 3, 2008, in express breach of the Purchase Agreement, Ironbridge filed a mechanic's lien to secure the $272,470 Direct Costs owing to it (the "Mechanic's Lien"). On December 31, 2008, Rose Ranch issued two checks to Ironbridge in the amounts of $243,998.82 (check no. 4458) and $28,471.18 (check no. 4459), respectively, extinguishing the outstanding obligations under the October 30, 2008 draw request. The Ironbridge Aspen Claim confirms receipt of the $243,998.82 payment but mistakenly asserts that $28,471.18 remains outstanding. Accordingly, Ironbridge Aspen's secured claim of $184,001 should be reduced by $28,471.18.

30.     Similarly, Ironbridge Aspen asserts that it issued a draw request on February 3, 2009 in the amount of $115,217 for which it was never paid. However, Rose Ranch's records reflect that an automatic payment for $115,217 (check no. 4476) was issued to Ironbridge on December 31, 2008 in satisfaction of an invoice dated December 30, 2008. Furthermore, Rose Ranch's records do not reflect any draw request made on February 3, 2009 in the same amount. Accordingly, Rose Ranch is of the knowledge and belief that the amounts under the alleged February 3, 2009 draw request have already been satisfied. Thus, Ironbridge Aspen's secured claim should be further reduced by an additional $115,217.

31.     The remaining asserted amount of $40,312.82 should be disallowed on the basis that such amounts were not incurred pursuant to an approved budget and, even if allowed, should be classified as unsecured due to the express terms of the Purchase Agreement prohibiting Ironbridge Aspen's actions. Section 22(a) of the Purchase Agreement prohibited Ironbridge

14

Aspen from asserting any liens against the Property, including, without limitation, lots 297 through lots 316 that are the subject of Ironbridge Aspen purported lien.  Further, under section 17(b) of the Purchase Agreement, Ironbridge Aspen and the other Ironbridge Entities expressly waived "any right under Colorado statute or at common law or otherwise to record or file a *lis pendens* or a notice of pendency of action or similar notice of any type of any lien against all or any portion of the Property …".  Ironbridge Aspen acted in direct contravention of the Purchase Agreement which not only prohibited the filing of the mechanic liens but provided that such liens would not have been able to be foreclosed on due to Ironbridge Aspen's waiver of its right to commence an action pursuant to C.R.S. §38-22-101 *et. seq.*  The Ironbridge Aspen Claim should not be elevated to the status of a secured claim.

32.  Inasmuch as Ironbridge Aspen has no valid secured claim, the Court should determine that it has no valid interest in the Escrow Account.

### **The Ironbridge Mountain Claim Should be Disallowed**

33.  Ironbridge Mountain asserted a claim against Rose Ranch for alleged unpaid Direct Costs stemming from the building of certain Affordable Homes, allocating $63,580 in general unsecured claims and $90 in claims secured by a mechanic's lien. *See* Proof of Claim No. 30848 (the "Ironbridge Mountain Claim").  For all the reasons already set forth above, including that the amount that Ironbridge Mountain owes amounts to Rose Ranch is in excess of Ironbridge Mountain's claim and that the Ironbridge Entities are barred from asserting mechanic liens against Rose Ranch, the Ironbridge Mountain Claim should be expunged and disallowed in its entirety.

34.  Inasmuch as Ironbridge Mountain has no valid secured claim, the Court should determine that it has no valid interest in the Escrow Account.

**Amounts Asserted in the Ironbridge Claims Should Be Offset by**
**<u>Unpaid Deferred Land Payments and Unpaid Promissory Notes owed to Rose Ranch</u>**

35. The First Amendment to Purchase and Sale Agreement Between LB Rose Ranch LLC and Hansen Construction, Inc., dated September 5, 2006 (the "<u>First Amendment</u>") expressly states the following:

> <u>Purchaser Obligations</u>. It is acknowledged and agreed that Ironbridge Homes, Ironbridge Mountain Cottages and Ironbridge Aspen Collection are affiliated entities who will be exercising rights hereunder and taking title to different and separate Phase 2 Lots (defined below) and performing the obligations of Purchaser hereunder with respect to such Phase 2 Lots. Accordingly, **each of Ironbridge Homes, Ironbridge Mountain Cottages and Ironbridge Aspen Collection agree to be held jointly and severally liable for all obligations of Purchaser under the Agreement, as herein amended**.

First Amendment at ¶ 1 (emphasis added). Each Ironbridge Entity has a prepetition obligation owing to Rose Ranch under the Purchase Agreement, as amended, thus providing the necessary mutuality for all of the Ironbridge Claims to be offset against amounts due to Rose Ranch.

36. Courts have generally held that debtors have setoff rights that stem from state law and are preserved *via* sections 502(b)(1) and 558 of the Bankruptcy Code, which provide, respectively, that claims are not allowable to the extent they are "unenforceable" and that the "estate shall have the benefit of any defense available to the debtor." *See Scherling v. Hellman Elec. Corp.* (*In re Westchester Structures, Inc.*), 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995); *Second Pennsylvania Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.),* 127 B.R. 346, 349–50 (Bkrtcy. W.D.Pa. 1991); *Sylvester v. Martin (In re Sylvester),* 130 B.R. 930, 939 (Bkrtcy. N.D. Ill. 1991). Under New York law, setoff is available as an equitable right. *See Westchester Structures,* 181 B.R. at 740. New York courts require that the obligations be mutual; that is, they must be "due to and from the same persons in the same capacity." *Westchester Structures*, 181 B.R. at 739-40 (citing *Beecher v. Peter A. Vogt Mfg.*, 125 N.E. 831,

16

833 (N.Y. 1920)). Rose Ranch is entitled to assert setoff rights against the Ironbridge Claims as an affirmative defense within the claims resolution process. *See In re Circuit City Stores, Inc.*, No. 08-35653, 2009 WL 4755253, at *2 (Bankr. E.D. Va. Dec. 3, 2009) ("The Debtors are asserting a defense within the claim resolution process. They do not seek affirmative relief. Therefore … an adversary proceeding is not necessary at this time.").

37. Rose Ranch is owed in excess of $2.4 million plus interest and attorneys' fees from the Ironbridge Entities. The Plan Administrator respectfully requests that the Ironbridge Aspen Claim and the Ironbridge Mountain Claim be recharacterized as unsecured and the amounts asserted, after deduction of amounts already paid by Rose Ranch, be offset by amounts owed to Rose Ranch on account of the Riverfront Lots. The Plan Administrator also respectfully requests entry of an order releasing the Escrow Amounts to Rose Ranch. The Plan Administrator respectfully requests that all remaining amounts due and owing to Rose Ranch under the Purchase Agreement be applied to offset the Ironbridge Homes Claims, after deduction of amounts asserted by Ironbridge Homes that are outside of the 2006 Budget.

**Conclusion**

Ironbridge has not overcome the bases set forth in the Objection to its claims. Based on the Objection, this Reply and on all of the proceedings before this Court, the Ironbridge Claims should be expunged with prejudice and the Escrow Amounts should be released to Rose Ranch.

Dated:   May 6, 2016
         New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
Facsimile:   (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates*