**HEARING DATE AND TIME**: July 12, 2016 at 10:00 a.m. (Eastern Time)
**RESPONSE DEADLINE**: June 28, 2016 at 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| Debtors. | : | (Jointly Administered) |

-----------------------------------------------------------------x

**NOTICE OF HEARING ON THE PLAN ADMINISTRATOR'S**
**OBJECTION TO PROOF OF CLAIM NUMBER 16838**

     **PLEASE TAKE NOTICE** that on May 10, 2016 Lehman Brothers Holdings Inc.

("LBHI"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc. and Its Affiliated Debtors for the entities in the above-referenced

chapter 11 cases, filed the objection to proof of claim number 16838 (the "Objection"), and that a

hearing (the "Hearing") to consider the Objection will be held before the Honorable Shelley C.

Chapman, United States Bankruptcy Judge, in Courtroom 623 of the United States Bankruptcy

Court for the Southern District of New York, One Bowling Green, New York, New York 10004,

on **July 12, 2016 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.

     **PLEASE TAKE FURTHER NOTICE** that any responses to the Objection must

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court, shall be filed with the Bankruptcy Court (a) electronically in

accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by

1

registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and shall be served in accordance with General Order M-399 upon (i) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 623; (ii) attorneys for LBHI, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Garrett A. Fail, Esq., and Kate Doorley, Esq.) and (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: William K. Harrington, Esq., Susan Golden, Esq., and Andrea B. Schwartz, Esq.); so as to be so filed and received by no later than **June 28, 2016 at 4:00 p.m. (Eastern Time)** (the "Response Deadline").

PLEASE TAKE FURTHER NOTICE that if no responses are timely filed and served with respect to the Objection, the Plan Administrator may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Objection, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated: May 10, 2016
      New York, New York

                                          /s/ Garrett A. Fail
                                          Garrett A. Fail

                                          WEIL, GOTSHAL & MANGES LLP
                                          767 Fifth Avenue
                                          New York, New York 10153
                                          Telephone: (212) 310-8000
                                          Facsimile: (212) 310-8007

                                          Attorneys for Lehman Brothers Holdings Inc.
                                          and Certain of Its Affiliates

WEIL:\95707923\3\58399.0011

**HEARING DATE AND TIME**: July 12, 2016 at 10:00 a.m. (Eastern Time)
**RESPONSE DEADLINE**: June 28, 2016 at 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
|  |  |  |
| --- | --- | --- |
| In re | : | **Chapter 11 Case No.** |
|  | : |  |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
|  | : |  |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------x

## PLAN ADMINISTRATOR'S OBJECTION TO PROOF OF CLAIM NUMBER 16838

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan"), files this objection to proof of claim number 16838 (the "Disputed Claim") asserted by Highland CDO Opportunity Master Fund, L.P. ("Highland"), and respectfully represents:[1]

### RELIEF REQUESTED

1.      LBHI hereby seeks entry an order disallowing and expunging the Disputed Claim pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  A copy of the proposed order is attached hereto as Exhibit A.

---

[1] Capitalized terms used by not otherwise defined herein shall have the meaning ascribed in the Plan.

## JURISDICTION

2.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

3.        Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

4.        On December 6, 2011 the Court approved and entered an order confirming the Plan [ECF No. 23023]. The Plan became effective on March 6, 2012.

5.        Pursuant to the Plan, the Plan Administrator is authorized to interpose and prosecute objections to claims filed against the Chapter 11 Estates.

## THE DISPUTED CLAIM

6.        Highland asserts a Guarantee Claim that is not based on any specific guarantee of a transaction or agreement by LBHI and that is based solely on a corporate resolution passed by the board of LBHI (the "Resolution").  *See* Disputed Claim.

7.        Highland asserts LBHI is liable for a purported primary obligation of Lehman Brothers International (Europe) ("LBIE").  *See id.*  Highland currently asserts LBHI is liable for an amount above and beyond the amount of the primary claim that LBIE allowed and satisfied.  *See* ECF No. 50244 (disclosing allowance by LBIE of a claim for only 50% of the amount asserted against LBIE (and LBHI) ($5,014,985.90 v. $10,026,061)).

8.        In January 2013, LBHI issued a subpoena for the production of documents to Highland pursuant to Bankruptcy Rule 2004.  *See id.*; ECF No. 41089.  The subpoena contained two simple requests: one for documents that show how and when and the

circumstances under which Highland learned of or obtained the Resolution; and one for documents that support or relate to any claim that Highland relied upon the Resolution in connection with its transactions with LBIE.  In February 2013, Highland responded, stating that "it does not possess or control any non-privileged documents responsive" to the requests.  *See* Ex. B attached hereto.

9.    In March 2013, LBHI issued a subpoena for the examination of witnesses to Highland pursuant to Bankruptcy Rule 2004.  *See* ECF No. 41089 at ¶10.  As disclosed by Highland, "[b]efore the August deposition, Highland attempted to obviate the need for and cost of a deposition by offering LBHI an Affidavit attesting to the facts sought by way of the Rule 2004 subpoena."  ECF No. 41089 at fn 2.  A copy of the affidavit is attached hereto as Exhibit C. It states: Highland entered into a Global Master Repurchase Agreement ("GMRA") with LBIE in May 2007, Aff. ¶3; "Prior to entering into the GMRA, [Highland] had not seen or otherwise had no direct knowledge of the [Resolution]," *id.* ¶4; and "On or about September 10, 2009, [Highland] became aware that other creditors of LBIE were filing claims in the LBHI bankruptcy case based upon the [Resolution] and, thereby, became aware of the [Resolution]," *id.* ¶7.

10.    At a subsequent deposition in August 2013, Highland testified in a consistent manner.[2]  Highland testified repeatedly that Highland had not seen or learned of the Resolution in 2007 or 2008 (i.e., prepetition) and that the Resolution "was provided in connection with the filing [of the Disputed Claim] by counsel."  Tr. at 23:18-19; *see also id.* at 24: 6-13 ("The date of this filing, September 15, 2009 and it was provided by counsel prior to the filing, so that was the first time we became aware of it."); *id.* at 35:17-21 ("[W]e only became aware of the guarantee at the time of the claim…. we only became aware whenever the claim

---

[2] A copy of the deposition transcript is attached hereto as Exhibit D.

was submitted per our advice of counsel."); *id.* at 36:2-4 ("[W]e were just notified of the global guarantee when we submitted the claim."); *id.* at 69:10-12 ("LBHI, you know, filed for bankruptcy in the September '08 time frame, so [Highland] wouldn't have had [the Resolution] at the time."); *id.* at 70:3-5 ("[W]e were made aware of the guarantee at the time that the claim was submitted in September of '09."); *id.* at 71:4-7 ("[P]rior to the submission of the claim in September of '09 was when we were made aware of the guarantee via external counsel. That was the first time."); *id.* at 72:4-11 ("Q. … when the Highland fund entered the GMRA it was not relying on any guarantee by LBHI of LBIE's obligations? … A. Based off of the timing when external counsel provided us the guarantee prior to September of '09, yes.); *id.* at 72:18-24 ("External counsel who helped us prepare this claim was the only source of the knowledge … [o]f the guarantee…").

## THE DISPUTED CLAIM SHOULD BE DISALLOWED AND EXPUNGED

11.     If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim. *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729, 2007 Bankr. LEXIS 660, at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000). Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).

12.     A guaranty is a contractual undertaking by one party, the guarantor, to satisfy the obligations of another party, the primary obligor, to a third party, the creditor, in the event of a default by the primary obligor. *See Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.*, No. 06 Civ. 52(JGK), 2006 WL 2337186, at *13 (S.D.N.Y. Aug. 11, 2006);

4

RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 1 cmts. f, g (1996); BLACK'S LAW

DICTIONARY (9th ed. 2009); 38 AM. JUR. 2D *Guaranty* § 1 (2014).

13.    Like all contracts, acceptance is a crucial element in forming a valid

guaranty contract.  The United States Supreme Court in *Davis Sewing-Mach. Co. v. Richards*,

115 U.S. 524 (1885), explained:

> A contract of guaranty, like every other contract, can only be made by mutual
> assent of the parties. . . . [I]f the guaranty is signed by the guarantor without any
> previous request of the other party, and in his absence, for no consideration
> moving between them except future advances to be made to the principal debtor,
> the guaranty is in legal effect an offer or proposal on the part of the guarantor,
> *needing an acceptance by the other party to complete the contract*.

*Id.* at 525 (emphasis added) [3]

14.    Specific guaranties identify the benefiting creditor or, "with precision,"

the underlying agreements being guaranteed.  *See, e.g.*, *Cavendish Traders, Ltd. v. Nice Skate

Shoes, Ltd.*, 117 F. Supp. 2d 394, 400 (S.D.N.Y. 2000) (stating that a valid guaranty must

describe "with precision the obligation to which the person is bound").  The Disputed Claim does

not identify any specific guarantee of LBIE's obligations under the GMRA.

15.    General guaranties are offers that can be accepted by anyone to whom

they are presented and do not necessarily specify the particular transactions that will be

guaranteed.  *See Evansville Nat'l Bank v. Kaufman*, 93 N.Y. 273, 276 (1883); 38 AM. JUR. 2D

*Guaranty* § 14; *see also Philip Carey Co. v. Duffy*, 10 N.Y.S.2d 876, 876 (N.Y. App. Div. 1939).

To benefit from a general guaranty, a creditor must show that it knew of the existence of the

guaranty and acted in reliance upon its terms when entering into the transaction with the primary

---

[3] Furthermore, under the New York Statute of Frauds, a guaranty contract must be in writing and signed by the
guarantor.  *See* N.Y. GEN. OBLIG. LAW § 5-701(a)(2) (McKinney 2002); *see also DeRosis v. Kaufman*, 641
N.Y.S.2d 831, 832–34 (N.Y. App. Div. 1996).  The Plan Administrator does not concede, and reserves all of its
rights to argue that the Resolution is not a guaranty contract of any kind and that the Resolution would not satisfy
the Statute of Frauds.

WEIL:\95707923\3\58399.0011

obligor.   Acceptance of a general guaranty may be indicated by a party extending credit in reliance on the guaranty—and the extension of credit also qualifies as consideration for the guaranty.  *See Evansville Nat'l Bank*, 93 N.Y. at 279; 63 N.Y. JUR. 2D *Guaranty and Suretyship* § 78 (2014); *see also Union Carbide Corp. v. Katz*, 489 F.2d 1374, 1376 (7th Cir. 1973); *Farmers' State Bank of York v. Brock*, 234 N.W. 92, 94 (Neb. 1931).  As the court in *Federal Deposit Insurance Corp. v. Schumacher*, 660 F. Supp. 6 (E.D.N.Y. 1984), explained:

> It is, of course, elementary that a creditor's right to enforce a contract of guaranty must be based upon knowledge of the existence of the guaranty and that the credit must be extended in reliance thereof[.]

*Id.* at 8 (citations omitted).  Indeed, it is well-settled that:

> A "general" guaranty is addressed to persons generally and may be enforced by anyone to whom it is presented although it has been recognized that the person so acting must have had definite knowledge of the existence of the guaranty and acted in reliance on it.

38 AM. JUR. 2D *Guaranty* § 14.

16.    Therefore, courts consistently require knowledge and reliance in enforcing claims based on general guarantees.  *See, e.g., Philip Carey Co. v. Duffy*, 10 N.Y.S.2d 876 (N.Y. App. Div. 1939); *see also Joe Balestrieri & Co.* v. *Comm'r of Internal Revenue*, 177 F.2d 867, 873 (9th Cir. 1949) (recognizing the validity of guaranty claim where guaranty was made at the request of the prospective creditor and was delivered by the primary obligor); *J. C. Wattenbarger & Sons v. Sanders*, 30 Cal. Rptr. 910, 915 (Cal. Ct. App. 1963) (rejecting guaranty claim where there was "no proof that credit was extended with knowledge of it and reliance upon it"); *Calcot Ass'n v. Coast Cotton Mills*, 295 P.2d 1, 4 (Cal. Dist. Ct. App. 1956) (recognizing guaranty claim where court recognized that product was delivered to the primary obligor "only because the guaranties had been made").

WEIL:\95707923\3\58399.0011

17.     To the extent that the Resolution is found to be a guarantee, it could be, at best, a general guarantee.  It does not identify any particular counterparty or transaction to which it might apply, and certainly does not identify any "with precision."  *See Cavendish Traders, Ltd.*, 117 F. Supp. 2d at 400.  Accordingly, a Guarantee Claim based on the Resolution alone could be enforceable only by a creditor that establishes – as a required, *prima facie* element in its claim – that it knew of and relied upon the Resolution when transacting business with the relevant primary obligor.

18.     Highland has stated that it did not know or rely upon the Resolution prepetition.  As such, Highland fails to meet the basic threshold of proof necessary to establish a claim.  Consequently, the Disputed Claim must be disallowed and expunged to prevent recovery by a party who do not hold a valid claim against LBHI.

19.     Highland's lack of knowledge of and reliance on the Resolution is consistent with the Debtors' estimation of the inability of creditors' to assert valid claims based on purported general guarantees by LBHI.  *See* ECF No. 19629 (Disclosure Statement Exhibit 6 ("Debtors' Estimates of Claims and Claims Data") (stating in section (b)(v) ("Guarantee Resolution") that approximately $6 billion of claims were estimated by the Debtors at zero value)).  It is also consistent with other creditors' estimation of such claims.  *Compare* ECF No. 29193 (motion requesting authority to settle claims) *with* ECF No. 29505 (order limiting Plan Administrator's authority to allow claims based on Corporate Resolution); *see also* Tr. Hr'g July 18, 2012 (evidencing that restrictions imposed on the Debtors' ability to settle corporate resolution claims was due to creditors who did not believe in the validity of such claims or in the ability of a creditor to establish knowledge and reliance on a corporate resolution).

7

## RESERVATION OF RIGHTS

20.      This Objection may be determined at a Sufficiency Hearing.  The Plan

Administrator reserves all rights to object on any other bases to the Disputed Claim as to which

the Court does not grant the relief requested herein.  The Plan Administrator reserves the right to

conduct discovery as to the Disputed Claim and any matters raised by Highland and to

supplement this and other filings as a result thereof.

Dated:    May10, 2016
          New York, New York

                              /s/ Garrett A. Fail
                              Garrett A. Fail

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              *Attorneys for Lehman Brothers Holdings Inc.*
                              *and Certain of Its Affiliates*

WEIL:\95707923\3\58399.0011

**<u>Exhibit A</u>**

WEIL:\95707923\3\58399.0011

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------ x
In re                                                   :          Chapter 11 Case No.
                                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,                  :          08-13555 (SCC)
                                                        :
                    Debtors.                            :          (Jointly Administered)
                                                        :
------------------------------------------------------------------ x
```

## ORDER GRANTING THE PLAN ADMINISTRATOR'S
## OBJECTION TO CLAIM NUMBER 16838

Upon the objection, dated May 10, 2016 (the "Objection"),[4] of Lehman Brothers

Holdings Inc., as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for certain entities in the above-

referenced chapter 11 cases (collectively, the "Chapter 11 Estates"), pursuant to section 502(b)

of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of

Bankruptcy Procedure, seeking to expunge proof of claim number 16838, all as more fully

described in the Objection; and due and proper notice of the Objection having been provided;

and it appearing that no other or further notice need be provided; and the Court having found and

determined that the relief sought in the Objection is in the best interests of the Chapter 11

Estates, their creditors, and all parties in interest and that the legal and factual bases set forth in

the Objection establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

---

[4] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to
such terms in the Objection.

1

ORDERED that the relief requested in the Objection is granted; and it is further

ORDERED that, claim number 16838 is disallowed and expunged in its entirety in accordance with the Plan; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: _____, 2016
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

2

**<u>Exhibit B</u>**

WEIL:\95707923\3\58399.0011

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | CASE NO. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., et. al., | JOINTLY ADMINISTERED |
| Debtor. | CHAPTER 11 |
|  | OBJECTIONS AND RESPONSES OF HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P. TO DEBTORS' SUBPOENA |

PROPOUNDING PARTY:        Debtors, Lehman Brothers Holdings Inc., et al.

RESPONDING PARTY:         Non-Party, Highland CDO Opportunity Master Fund, L.P.

Non-Party Highland CDO Opportunity Master Fund, L.P. ("Highland") provides these objections (the "Objections") and responses to the subpoena issued by Debtors, Lehman Brothers Holdings Inc., and its affiliated debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") dated January 7, 2012, to Highland (the "Subpoena") pursuant to Federal Rule of Civil Procedure 45, which is made applicable to Bankruptcy cases through Federal Rule of Bankruptcy Procedure 9016.  Highland expressly reserves the right to amend, expand, delete, or withdraw any part of the Objections stated herein.  Highland further reserves the right to seek appropriate compensation for any expenses incurred by Highland in connection with the Subpoena.

## HIGHLAND'S GENERAL OBJECTIONS

Each of the following General Objections is incorporated into each and every specific response below as if fully set forth therein. All General Objections are intended to be and are incorporated by reference into each response to the Subpoena.

1.    Highland objects to the Subpoena as vague, ambiguous, overly broad, unduly burdensome, harassing, duplicative, and calling for the production of documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

2.    Highland objects to the Subpoena to the extent it purports to impose any requirement or discovery obligation beyond those specifically set forth in the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and/or any applicable Local Rules.

3.    Highland objects to the definitions and instructions to the extent they purport to impose obligations on Highland beyond those required under the Federal Rules of Civil Procedure.

4.    Highland objects to the Subpoena to the extent it calls for the production of materials covered by the attorney-client privilege, work-product doctrine, common interest and/or joint defense privilege, right to privacy, protections for confidential and/or proprietary documents, or any other applicable legal privilege or privileges available by statute, rule, contract, or any other authority. Highland does not intend to waive any claim of privilege or protection by producing material or information pursuant to the Subpoena. In the event Highland inadvertently discloses any privileged or protected material or information, it is not intended and shall not be deemed to be a waiver by Highland of any applicable privilege or protection. A representation that Highland will produce non-privileged, responsive documents is

2

not to be construed as an admission that any non-privileged, responsive documents exist or as a waiver of any objections that may have been or may be asserted.

5.      Highland objects to the Subpoena to the extent it seeks to impose upon Highland the burden of producing electronically stored information from sources that are not reasonably accessible, including, without limitation, electronically stored information on Highland's electronic archival system, information that must be restored from backup tapes, or information not within Highland's possession, custody, and/or control.

6.      Highland objects to the Subpoena and each and every request therein to the extent it purports to impose any obligation on Highland to produce documents as maintained in the normal course of business or in the same order in which they existed prior to production. Highland will produce electronically stored information in a reasonably usable form.

7.      Highland objects to the extent that the Subpoena seeks proprietary information, trade secrets, or other confidential research, and/or development or commercial information. Highland also objects to the extent that the Subpoena seeks proprietary information regarding Highland's strategies, methodology, evaluation, and analysis of investment opportunities, clients and client information, and dissemination of information to clients and investors.

8.      Highland objects to the Subpoena on the grounds that it fails to allow reasonable time for compliance.

9.      Highland objects to the Subpoena to the extent it purports to impose any obligation on Highland to prepare a privilege log, if any, in excess of the requirements of the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure.

76332/0035-9251669v2

10.    Highland objects to the Subpoena to the extent it sets forth a time period for which it seeks responsive information that is overly broad and beyond the time period for which Highland maintains records.

11.    Highland objects to the Subpoena to the extent it calls for any legal conclusions, not properly the subject of fact discovery.

12.    Highland's responses contain the best information currently available.  Highland reserves the right to correct, clarify, supplement, amend, or supply additional or different information contained in these responses, if and when it has other or more accurate information and/or based upon the parties meet-and-confer conferences regarding the Subpoena.

13.    Highland reserves all objections to the relevancy, competency, materiality, privilege, and admissibility of the Subpoena and responses, including all objections as to their use as evidence for any purpose in this or any other proceeding.

14.    To the extent Highland responds to the Subpoena as covered by these Objections, Highland's response is without waiver and without prejudice concerning these Objections, which are hereby explicitly preserved.

15.    Highland objects to the Subpoena to the extent it calls for discovery from Highland that should be sought after the filing of and in the context of an Adversary Proceeding or an objection to claim.

76332/0035-9251669v2

## HIGHLAND'S SPECIFIC RESPONSES TO REQUESTS

Request No. 1:    All documents that show how and when and the circumstances under which You or a Prior Holder learned of or obtained, received or otherwise gained possession of the Guaranty Document.

**Objection/Response:**    **In addition to the grounds set forth in its General Objections, Highland objects to this Request to the extent it seeks documents protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection. Highland further objects to the Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiver of Highland's general and specific objections, Highland states that it does not possess or control any non-privileged documents responsive to this request.**

Request No. 2:    All documents that would support or relate to any claim that You or a Prior Holder relied upon an alleged Guaranty in connection with any transaction with the Primary Obligor.

**Objection/Response:**    **In addition to the grounds set forth in its General Objections, Highland objects to this Request to the extent it seeks documents protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection. Highland further objects to the Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiver of Highland's general and specific objections, Highland states that it does not possess or control any non-privileged documents responsive to this Request.**

76332/0035-9251669v2

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Highland CDO Opportunity
Master Fund, L.P.


By:    */s/ Adam J. Sklar*
　　　　Adam J. Sklar

DATED:  February 12, 2013

6

**Exhibit C**

WEIL:\95707923\3\58399.0011

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | |
| Debtors. | |

Chapter 11

Case No. 08-13555 (JMP)

(Jointly Administered)

**AFFIDAVIT IN LIEU OF RULE 2004 EXAM**

STATE OF TEXAS      )
                    ) ss:
COUNTY OF DALLAS   )

JASON POST, being duly sworn, deposes and says:

1.      I am Operations Director of Highland CDO Opportunity Master Fund, L.P. ("Highland CDO"), a claimant in the above-captioned case. I make this Affidavit based on my personal knowledge and based on the public filings and other publically-available information in connection with the above-captioned Lehman Brother Holdings, Inc. ("LBHI") bankruptcy case and the Lehman Brothers International (Europe) ("LBIE") administration in the United Kingdom.

2.      On June 9, 2005, by Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., LBHI "fully guarantee[d] the payment of all liabilities, obligations and commitments of" certain of its subsidiaries, including, but not limited to, LBIE (the "Guarantee Resolution"). A true copy of the Guarantee Resolution is attached hereto as Exhibit A and incorporated by reference herein.

3.      On May 31, 2007, Highland CDO and LBIE entered into a Global Master Repurchase Agreement (2000 version), as amended and supplemented from time to time (the

"GMRA"), pursuant to which LBIE sold certain securities to Highland CDO, and simultaneously agreed to repurchase those securities at a later date at an agreed price.

4.      Prior to entering into the GMRA, Highland CDO had not seen and otherwise had no direct knowledge of the Guarantee Resolution.

5.      On September 15, 2008, LBIE was placed into administration in the United Kingdom, thereby defaulting under the GMRA.

6.      On or about December 11, 2008, I submitted a claim on behalf of Highland CDO in the LBIE administration in the amount of $10,026,061, plus interest and expenses.  A true copy of Highland CDO's Submission Confirmation in the LBIE Administration is attached hereto as Exhibit B.

7.      On or about September 10, 2009, Highland CDO became aware that other creditors of LBIE were filing claims in the LBHI bankruptcy case based upon the Guarantee Resolution and, thereby, became aware of the Guarantee Resolution.

8.      On September 18, 2009, Highland CDO filed its Proof of Claim, Number 16838, in the LBIE bankruptcy case based upon the Guarantee Resolution.   A true copy of Highland CDO's Proof of Claim filed in this case, which sets forth the amount of its claim and attaches the documents underlying and supporting its claim, is attached hereto as Exhibit C and incorporated herein by reference.

9.      As of this date, no amount has been paid on account of LBIE's debt under the GMRA.

DATED:        Dallas, Texas
              August ___, 2013


                              _____
                                   Jason Post


2

**Exhibit D**

WEIL:\95707923\3\58399.0011

Page 1

1                          POST

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5      ------------------------------

6      In Re:

7                              Chapter 11

8                              Case No.

9      LEHMAN BROTHERS HOLDINGS INC., 08-13555(JMP)

10     et al.,                 (Jointly

11                             Administered)

12

13              Debtors.

14     ------------------------------

15

16

17          DEPOSITION OF JASON POST

18              DALLAS, TEXAS

19              AUGUST 20, 2013

20

21

22

23

24     Reported by:  Susan S. Klinger, RMR-CRR, CSR

25     Job No.:  64107

Page 2

```
 1                 POST
 2
 3
 4           August 20, 2013
 5             9:30 a.m.
 6
 7
 8
 9        Deposition of JASON POST, held at the
10   offices of Weil Gotshal & Manges, 200 Crescent
11   Court, Dallas, Texas, before Susan S. Klinger, a
12   Registered Merit Reporter and Certified
13   Realtime Reporter of the States of Texas and
14   California.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 POST
 2   A P P E A R A N C E S:
 3
 4   Attorneys for Debtor Trustee:
 5       Ms. Jennifer Larson
 6       WEIL GOTSHAL & MANGES
 7       767 Fifth Avenue
 8       New York, New York  10153
 9
10
11   Attorneys for Highland Capital:
12       Mr. Jason Goldsmith
13       HIGHLAND CAPITAL MANAGEMENT
14       300 Crescent Court
15       Dallas, Texas  75201
16
17
18
19   Also Present:
20       Mr. Jeff Goldblatt, videographer
21
22
23
24
25
```

Page 4

```
 1                 POST
 2       VIDEOGRAPHER:  Good morning.  This
 3   is the start of tape labeled 1 of the
 4   videotaped deposition of Jason Post in the
 5   matter In Re:  Lehman Brothers Holdings,
 6   Inc., et al in the United States Bankruptcy
 7   Court, Southern District of New York,
 8   number 08-13555.  This deposition is being
 9   held at 200 Crescent Court, Suite 300 in
10   Dallas, Texas on August 20th, 2013.  The
11   time is 9:29 a.m.
12       My name is Jeff Goldblatt.  I'm a
13   legal video specialist from TSG Reporting
14   headquartered at 747 Third Avenue, New
15   York, New York.  The court reporter is
16   Susan Klinger in association with TSG
17   Reporting.  Will counsel please introduce
18   yourself for the record.
19       MS. LARSON:  Jennifer Larson from
20   Weil Gotshal representing Lehman Brothers.
21       MR. GOLDSMITH:  Jason Goldsmith,
22   Highland Capital Management.
23       VIDEOGRAPHER:  Will the court
24   reporter please swear in the witness.
25       JASON POST,
```

Page 5

```
 1                 POST
 2   having been first duly sworn testified as
 3   follows:
 4             EXAMINATION
 5   BY MS. LARSON:
 6       Q.   Good morning, Jason.
 7       A.   Good morning.
 8       Q.   Have you ever been deposed before?
 9       A.   Yes.
10       Q.   When was that?
11       A.   I think this is probably my fourth
12   deposition all in connection with my employer,
13   Highland Capital Management, for the past three
14   years.
15       Q.   And you say in connection with
16   Highland Management.  What -- what was the
17   general subject of those depositions?
18       A.   The prior depositions related to
19   financing and settlement of claims.
20       Q.   Okay.  So you're familiar with the
21   ground rules of the depositions then I'm sure,
22   let me just go over a couple of things.
23       A.   Okay.
24       Q.   I will do my best to ask clear
25   questions.  Unless you tell me that you don't
```

2 (Pages 2 to 5)

Page 6

POST

1
2  understand it, I will assume that you do.
3      A.   Okay.
4      Q.   Let's try not to talk over each
5  other for the benefit of the court reporter.
6  So I will try to wait for you to finish your
7  answer and you will try to wait for me to
8  finish my question before responding.
9      Ask for a break anytime you need it,
10  but not while a question is pending. And you
11  may not consult with your counsel unless you're
12  concerned about privilege?
13     A.   Okay.
14     Q.   Okay. And is there any reason you
15  can't give your full attention to this
16  proceeding today?
17     A.   There is not.
18     Q.   You are not under the influence of
19  any medications that might affect your
20  concentration?
21     A.   No.
22     Q.   And if I say "Highland," will you
23  understand that to mean your employer?
24     A.   Highland Capital Management, L.P.
25     Q.   Uh-huh.

Page 7

POST

1
2      A.   Yes.
3      Q.   And then if I say Highland CDO
4  Opportunity Fund, you will understand that to
5  be the fund that is the subject of the claim
6  that we're mostly going to be talking about
7  today?
8      A.   Yes, Highland CDO Opportunity Master
9  Fund, L.P.
10     Q.   Yes, correct.
11     A.   Yes.
12     Q.   What is your title at Highland?
13     A.   My current title is director in our
14  compliance department.
15     Q.   And how long have you worked at
16  Highland?
17     A.   Since July of '08.
18     Q.   And has your role always been the
19  same?
20     A.   No.
21     Q.   What did you start as?
22     A.   My initial title was senior
23  portfolio operations analyst, and then in April
24  of '09 I became a treasury manager. And then
25  probably in June '09 around there director of

Page 8

POST

1
2  operations for the institutional funds. And my
3  title changed to director of compliance in
4  October of 2011.
5      Q.   Okay. In your role as senior
6  portfolio operations analyst, what did you do?
7      A.   When I came into the initial role, I
8  was primarily working on documenting and
9  identifying key terms in the various financing
10  relationships that Highland and its advised
11  accounts had entered into.
12     Q.   And when you say "key terms," what
13  types of things are you talking about?
14     A.   You know, who the authorized
15  signatories are. What, you know, the funds
16  that were involved. You know, if they're
17  keyman events, termination events. Basically a
18  lot of the documents prior to my employment
19  were kept in hard form. And I was tasked with
20  working with another colleague to summarize and
21  archive in an electronic form the financing
22  agreements for the institutional funds.
23     Q.   Who did you work for before
24  Highland?
25     A.   K Capital Partners in Boston,

Page 9

POST

1
2  Massachusetts.
3      Q.   And how long were you there?
4      A.   May of '05 through June of '08.
5      Q.   And who did you work for before
6  that?
7      A.   HBK Investments in Dallas, Texas.
8      Q.   Are you originally from Dallas or
9  Texas?
10     A.   I moved to Texas when I was in 6th
11  grade, so it's somewhat home. And I started
12  there right out of college, so August '01.
13     Q.   Okay. And what did you study in
14  college?
15     A.   Finance and international business
16  at Baylor University in Waco.
17     Q.   Do you have an advanced degree?
18     A.   I do not.
19     Q.   So you're not a lawyer?
20     A.   I am not.
21     Q.   I'm sorry, so you're not a lawyer?
22     A.   I am not.
23     Q.   Do you have an accounting degree?
24     A.   I do not.
25     Q.   In preparing for the deposition

3 (Pages 6 to 9)

Page 10

POST

1
2  today, did you look at the subpoenas that had
3  been issued to Highland?
4       A.    I looked at a subpoena provided by
5  Jason.
6       Q.    Let me show you a document.
7       A.    Okay.
8            (Exhibit 1 marked.)
9       Q.    I'm going to mark as Post Exhibit 1
10 a subpoena issued by Lehman Brothers to
11 Highland CDO Opportunity Master Fund, L.P.
12 dated March 1st, 2013.  Is this the document
13 that you were shown?
14      A.    Yes.
15      Q.    What did you do to prepare for
16 today?
17      A.    I discussed with Jason probably
18 on --
19           MR. GOLDSMITH:  Let's just keep it
20      limited to the fact that we had a
21      discussion and not -- not go into any of
22      the discussions themselves.
23      A.    There was a discussion on, I
24 believe, Thursday of last week and a brief
25 discussion on -- this morning.

Page 11

POST

1
2       Q.    Did you read any other documents
3  besides the subpoena?
4       A.    There was some support that Jason
5  also provided to me in connection with the
6  claim that I reviewed.
7       Q.    Did you meet with anybody besides
8  counsel?
9       A.    I did not.
10      Q.    Did you take any notes in
11 preparation for today?
12      A.    Just on the -- on the support that
13 was given to me.
14      Q.    I would like to see those notes.
15           Have you -- have you had any
16 conversations with any other Highland employees
17 former or current about this matter?
18      A.    I have not.
19      Q.    Let's start with a little
20 background.  Why don't you explain to me a
21 little bit about what Highland does?
22      A.    It is an investment advisor that
23 oversees -- that has an institutional arm and a
24 retail arm.  The retail arm basically advises,
25 designated advisor, mutual funds, open-ended

Page 12

POST

1
2  funds, closed-end funds and then it also has an
3  institutional silo that advises various CLOs,
4  hedge funds, private equity vehicles.
5       Q.    Does it also do its own investing?
6       A.    For -- for its personal account, I
7  believe there are -- I believe it does invest
8  on its behalf.  I don't have the details of
9  that though.
10      Q.    So what is the relationship between
11 Highland and Highland CDO Opportunity Master
12 Fund?
13      A.    Highland Capital Management, L.P. is
14 the investment advisor for Highland CDO
15 Opportunity Master Fund, L.P.
16      Q.    Does that mean it makes the
17 investment decisions for it?
18      A.    Yes.
19      Q.    And who at Capital Management,
20 Highland Capital Management oversees those
21 investment decisions for the Highland CDO
22 Opportunity Master Fund?
23      A.    It varies over time.
24      Q.    Do you know who was responsible in
25 the 2007-2008 time frame?

Page 13

POST

1
2       A.    I don't -- I think it may have been
3  Gibran Mahmud, but I don't recall specifically.
4       Q.    Is there a team or is it generally
5  one individual that does the investment
6  management?
7       A.    He had a team that worked with him.
8       Q.    Do you know how big that team would
9  have been?
10      A.    Probably 3 to 4 individuals, I would
11 imagine.
12      Q.    What types of investments did the
13 Highland CDO Opportunity Fund make?
14      A.    I know it invested in this CLO paper
15 that is in question as part of this
16 arrangement.  I don't have the PPM.  I would
17 have to refresh with the PPM to see what other
18 asset classes it can invest in.
19      Q.    By PPM you mean --
20      A.    The offering doc that governs the
21 investment objective of the fund.
22      Q.    Do you know what I mean when I refer
23 to repurchase or repo agreement?
24      A.    If you want to define it for me,
25 that is fine, I mean in your terms.

4  (Pages 10 to 13)

POST

1
2      Q.   No, let me rephrase.  Have you heard
3  of a repo agreement?
4      A.   Yes.
5      Q.   And are you familiar with the
6  agreement that is underlying the claim today?
7      A.   Yes.
8      Q.   And would you refer to that as a
9  repo agreement?
10     A.   Yes, I think it is called a global
11 master repurchase agreement.
12     Q.   And how often do you know if -- how
13 often did Highland CDO Opportunity Fund enter
14 repo agreements?
15     A.   I'm not sure.  I don't have the
16 exact number.
17     Q.   Do you have an approximate?
18     A.   Probably I would say at least half a
19 dozen maybe.
20     Q.   Do you know who the counterparties
21 were?
22     A.   I don't recall at this time.
23     Q.   Do you know any counterparties?
24     A.   Aside from the counterparty in
25 question, I don't -- I don't recall

POST

1
2  specifically.
3      Q.   Do you recall generally, were they
4  other investment banks?
5      A.   Yes.
6      Q.   And you mentioned Gibran Mahmud?
7      A.   Correct.
8      Q.   Is he the one who made decisions
9  about whether the fund would enter these repo
10 agreements?
11     A.   I think he would -- probably would
12 have been one of the people involved in that
13 decision.
14     Q.   And who did he report to?
15     A.   I believe at that time he may have
16 reported to Todd Travers who was a partner.
17     Q.   Who negotiated these agreements?
18     A.   I'm not sure.
19     Q.   What was the purpose for entering
20 these agreements?
21     A.   My understanding was that they
22 entered into them as a means of financing for
23 certain assets.
24     Q.   Repo agreements are generally
25 broadly speaking an exchange of securities for

POST

1
2  a certain amount of cash, is that your
3  understanding?
4      A.   Yes.
5      Q.   In the repo agreements that Highland
6  entered, was it receiving cash or the
7  securities?
8          MR. GOLDSMITH:  Objection, vague.
9      A.   Highland or the fund?
10     Q.   The fund, I'm sorry.  Let me
11 rephrase the question.
12     A.   Sure.
13     Q.   In the repo agreements that the
14 Highland fund entered, was it generally
15 receiving cash or securities?
16         MR. GOLDSMITH:  Objection, vague.
17     A.   I don't -- I don't have that
18 analysis in front of me.  I don't really know
19 without reviewing historical details.
20     Q.   You mentioned that the purpose was
21 financing assets?
22     A.   Yes.
23     Q.   Did that imply to you that it
24 received cash?
25     A.   It could.

POST

1
2      Q.   The fund entered other kinds of
3  agreements with Lehman entities didn't it, did
4  it not?
5      A.   I'm not sure.
6      Q.   Do you know whether it entered ISDA
7  agreements with Lehman?
8      A.   Yes.  I believe there was an ISDA
9  agreement for Highland CDO Opportunity Master
10 Fund with, I think it was Lehman Brothers
11 special financing, I believe.
12     Q.   And who negotiated those agreements?
13     A.   I'm not sure.
14     Q.   Would it have been the same person?
15     A.   I would assume -- my guess is there
16 would have probably been internal and external
17 counsel.
18     Q.   And who would have made the decision
19 to enter such agreements?
20     A.   I'm not sure.
21     Q.   You don't think it would have been
22 Gibran Mahmud?
23     A.   Again, he probably would have been
24 one of the individuals involved.
25     Q.   When the fund entered a repurchase

5 (Pages 14 to 17)

Page 18

POST

1
2  agreement, did it evaluate the credit
3  worthiness of its counterparty?
4      A.   I would assume that would have been
5  one of the analysis that one of the investment
6  team would have looked at prior to entering
7  into the agreement.
8      Q.   What would it have looked at to do
9  that evaluation?
10     A.   I'm not sure what metrics they would
11  have used.
12     Q.   Do you know whether the fund
13  reevaluated its collateral levels under the
14  agreement?
15     A.   I'm not sure.  I wasn't involved
16  with that aspect.
17     Q.   You didn't ask in preparation for
18  today?
19     A.   No.
20     Q.   Do you know who decided whether
21  Highland would roll a repurchase?
22     A.   Again, I would have to -- I would
23  assume it is probably going to be -- I don't
24  know specifically.  My guess, though, is that
25  Gibran may have been involved in that process.

Page 19

POST

1
2      Q.   Do you know who decided to terminate
3  the repo?
4      A.   Again, I don't know specifically,
5  but probably would have been Gibran involved in
6  that process.
7      Q.   You were talking about the agreement
8  that is the basis for the claim today.  It is
9  the global master repurchase agreement.  Do you
10  recall that is dated in May 2007?
11     A.   I don't recall the specific date,
12  but I know it is sometime in '07.
13     Q.   Do you know who decided to enter
14  that repo?
15     A.   I don't recall specifically.  It
16  would probably be whoever executed the
17  agreement would have been involved in that
18  process.
19     Q.   Do you know why Highland decided to
20  enter that agreement?
21     A.   Again, my -- my understanding would
22  be for financing of assets.
23     Q.   Do you understand that the -- let me
24  start over.
25         Do you understand, then, that under

Page 20

POST

1
2  this particular agreement the fund received
3  cash?
4      A.   I think in these transactions
5  involved it did.
6      Q.   Do you know who decided to roll this
7  particular repo?
8      A.   I don't -- I don't know specifically
9  who.  Again, my understanding is it would
10  probably be Gibran or somebody on his team that
11  would have made that decision which I wasn't
12  involved in.
13     Q.   Do you know how they made that
14  decision?
15     A.   I do not.
16     Q.   Does the fund have a process for
17  deciding to roll repos?
18     A.   I don't know.  Again, I wasn't
19  involved in that process.
20     Q.   I'm going to mark as Exhibit 2 the
21  proof of claim that Highland CDO Opportunity
22  Fund Master -- I'm sorry, Highland CDO
23  Opportunity Master Fund, L.P. filed against
24  Lehman Brothers Holdings, Inc. date stamped
25  September 18th, 2009.

Page 21

POST

1
2         (Exhibit 2 marked.)
3      Q.   Take a minute to look at that.
4      A.   Okay.
5      Q.   Have you seen this document before
6  today?
7      A.   Yes.
8      Q.   And do you recognize that the fund
9  filed this in LBHI's, Lehman Brothers Holdings,
10  Inc. bankruptcy proceeding?
11     A.   That is the counterparty that is
12  listed above, yes.
13     Q.   And do you see that on the first
14  page Highland CDO Opportunity Master Fund is
15  identified as the creditor?
16     A.   Yes.
17     Q.   If you look at paragraph 2 of the
18  proof of claim, I just want to walk-through a
19  couple of things on this document.
20     A.   Okay.
21     Q.   Do you see where it says that
22  L-B-I-E, if I call that LBIE, you will
23  understand what I am referring to?
24     A.   Sorry, LBIE.
25     Q.   LBIE.

6 (Pages 18 to 21)

Page 22

```
 1              POST
 2      A.   Yes.
 3      Q.   Do you see where it says that, "LBIE
 4  and Highland CDO Opportunity Master Fund, L.P.
 5  entered into that certain Global Master
 6  Repurchase Agreement (2000 version) dated as of
 7  May 31st, 2007."
 8      A.   Yes, that is what is listed here.
 9      Q.   And this is the agreement we were
10  just discussing; correct?
11      A.   Correct.
12      Q.   And you said you had reviewed this
13  agreement?
14      A.   I reviewed the Global Master
15  Repurchase Agreement.
16      Q.   Yes.
17      A.   I didn't review it in detail, but it
18  was part of the support that was given to me.
19      Q.   On page 1 again do you see in
20  paragraph 3 it says, "LBIE's obligations under
21  the agreement are guaranteed by LBHI pursuant
22  to that certain Unanimous Written Consent of
23  the executive committee of the board of
24  directors of Lehman Brothers Holdings Inc.
25  dated as of June 9th, 2005."
```

Page 23

```
 1              POST
 2      A.   Yes, that is what is listed here.
 3      Q.   And had you seen that document
 4  before?
 5      A.   Prior to today?
 6      Q.   Uh-huh.
 7      A.   Yes.
 8      Q.   When?
 9      A.   It was provided to me by external
10  counsel.
11      Q.   Had you seen it in 2009?
12      A.   At the time of the filing?
13      Q.   Yes.
14      A.   Yes, it is Exhibit B that is listed
15  on here.
16      Q.   Had you seen it in 2007 or 2008,
17  sorry, when you started Highland?
18      A.   I had not.  It was provided in
19  connection with the filing by counsel.
20      Q.   So you say it was provided to you in
21  connection with the filing.  Then in 2007 when
22  the fund entered the repo agreement, it was not
23  aware of this document, was it, of the
24  Unanimous Written Consent?
25          MR. GOLDSMITH:  Just to be clear, he
```

Page 24

```
 1              POST
 2  wasn't -- I think he said he was not
 3  employed in 2007, but you can speak to, you
 4  know, your understanding of what occurred
 5  before you started.
 6      A.   Again, if it pertains to this
 7  guarantee that was referenced on here, it was
 8  provided to me in connection with the filing in
 9  what was it September or April of '09.  I'm
10  sorry, I guess the date is on here.  The date
11  of this filing, September 15th of 2009 and it
12  was provided by counsel prior to the filing, so
13  that was the first time we became aware of it.
14      Q.   By "we" you mean --
15      A.   The fund.
16      Q.   In paragraph 4 of the proof of
17  claim, do you see that it references a default
18  notice?
19      A.   I do.
20      Q.   Is that the notice by which Highland
21  terminated the repo?
22      A.   Yes.  They're declaring an event of
23  default pursuant to, it says, to paragraph
24  10(a) here.
25      Q.   In paragraph 5 do you see that it
```

Page 25

```
 1              POST
 2  references a default valuation notice?
 3      A.   I do.
 4      Q.   And is that the notice -- is that
 5  the notice telling Lehman how Highland
 6  calculated how much LBIE owed under the repo
 7  agreement?
 8      A.   It is.
 9      Q.   And according to that valuation in
10  the proof of claim paragraph 6 it states that
11  the amount of $10,026,061 is due and payable
12  from LBIE as described in that valuation
13  statement; is that correct?
14      A.   Correct.
15      Q.   The valuation statement, in fact,
16  was amended, was it not?
17      A.   Yes.
18      Q.   And as of today, how much if
19  anything has Highland received from LBIE under
20  the GMRA?
21      A.   My understanding is nothing at this
22  time.
23      Q.   How much, if anything, does Highland
24  expect to receive from LBIE under the GMRA?
25          MR. GOLDSMITH:  Objection, vague.
```

7 (Pages 22 to 25)

Page 26

                        POST
1
2        A.   I would imagine that the amount
3   identified in the claim plus interest.
4        Q.   Do you know when that payment is
5   expected?
6        A.   I do not.
7        Q.   Do you recall submitting a
8   questionnaire in connection with this claim?
9        A.   Vaguely.
10        Q.   Do you recall that you submitted
11   documents with that questionnaire?
12        A.   If support was requested, it would
13   have been provided at the time of the
14   submission.
15        Q.   And did you understand that it was
16   your responsibility -- it was Highland's
17   responsibility to provide all the supporting
18   documents necessary for the proof of claim?
19        A.   If that is what you requested, yes.
20        Q.   To the best of your knowledge, are
21   all the documents that were submitted with the
22   questionnaire and the proof of claim the only
23   documents that Highland has that support that
24   guarantee claim against Lehman Brothers
25   Holdings, Inc.?

Page 27

                        POST
1
2        A.   That is my understanding.
3        Q.   I'm going to mark as Exhibit 3 the
4   Global Master Repurchase Agreement dated May
5   31st, 2007.
6            (Exhibit 3 marked.)
7        Q.   If you want to take a minute to look
8   at that.
9        A.   The entire document?
10        Q.   You can briefly familiarize yourself
11   with it to see if it is the document that you
12   looked at before?
13        A.   Yes.
14        Q.   Do you recognize this as a contract
15   entered into between Lehman Brothers
16   International Europe or LBIE as Party A and
17   Highland CDO Opportunity Master Fund as Party
18   B?
19        A.   That is what is listed on the first
20   page, correct.
21        Q.   The document is titled Global Master
22   Repurchase Agreement?
23        A.   Correct.
24        Q.   Dated May 31st, 2007?
25        A.   Correct.

Page 28

                        POST
1
2        Q.   Is this the same contract that is
3   referred to in paragraph 2 of the proof of
4   claim?
5        A.   It is.
6        Q.   If I could turn your attention to
7   page 22.  This is a signature block.  Do you
8   know who signed on behalf of Highland CDO
9   Opportunity Master Fund?
10        A.   Unfortunately the name is not listed
11   below, but that looks like it might be Todd
12   Travers' signature.
13        Q.   And you said he's a partner?
14        A.   He was a partner.  He's no longer
15   with the firm.
16        Q.   And just to be clear, he's a partner
17   with Highland Capital Management?
18        A.   Correct, he was a partner with
19   Highland Capital Management, L.P.
20        Q.   Do you see in the signature block
21   for LBIE the date underneath is 12/06/2007?
22        A.   I do.
23        Q.   Do you understand that date to be,
24   in fact, June 12th, 2007?
25        A.   If it was signed in Europe, my

Page 29

                        POST
1
2   understanding is they invert those two numbers,
3   so that would make sense.
4        Q.   Okay.  And that is close in time to
5   the date on the agreement; right?
6        A.   May 31st, 2007, yes.
7        Q.   Did Todd Travers have investment
8   authority for the Highland fund?
9        A.   I would believe so.  He was a
10   partner with Gibran reporting to him.
11        Q.   Do you know whether he, in fact, was
12   the person responsible for negotiating this
13   agreement?
14        A.   I don't know.  I would only be
15   speculating, but he would, you know, again,
16   speculating, but he probably would have to have
17   some involvement if he signed it.
18        Q.   And is that typically how it works
19   at Highland, does a partner of Capital
20   Management have some oversight into the
21   investments?
22        A.   Varies on a case-by-case basis, but
23   generally, yes.
24        Q.   Do you know of anybody else besides
25   Todd Travers and Gibran Mahmud who might have

POST

1  been involved in entering this agreement?
2      A.    There may have been individuals on
3  Gibran's team that may have assisted with
4  entering into the agreement.  And again,
5  internal and external counsel, but I'm
6  speculating as I wasn't an employee at the
7  time.
8      Q.    Do you know who they spoke to at
9  Lehman?
10     A.    I do not.
11     Q.    Did you ask when you were preparing
12 for today's deposition?
13     A.    I did not.
14     Q.    Do you know when the contract was
15 first discussed with Lehman?
16     A.    I do not.
17     Q.    Do you know how it came about?
18     A.    Again, I would be speculating, but
19 they may have been looking for an avenue to
20 finance securities.  And you know, Lehman was
21 one of the banks on the street at the time that
22 was willing to do that.
23     Q.    I understand that you had no role
24 because you weren't yet employed at Highland in

POST

1  the negotiation of this agreement, of Exhibit
2  2.  Did you --
3      MR. GOLDSMITH:  I think you mean
4  Exhibit 3.
5      MS. LARSON:  I beg your pardon,
6  Exhibit 3.
7      Q.    Did you review this agreement when
8  you came on to Highland?
9      A.    I mentioned at the beginning that I
10 was involved in a document collection and
11 summarization process.  So I don't recall this
12 one specifically, but if it was a global
13 project, it would have been encompassed in that
14 project.
15     Q.    This document is known as a master
16 agreement and then various transactions are
17 entered into under the master agreement; is
18 that correct?
19     A.    That is my understanding.
20     Q.    Do you know whether Highland did, in
21 fact, enter transactions under this agreement?
22     A.    Yes, because that is the basis for
23 the claim.
24     Q.    And how frequently did Highland

POST

1  enter into transactions with LBIE under this
2  agreement?
3      A.    I'm not sure historically how many
4  transactions it entered under this agreement.
5      Q.    Do you know how frequently Highland
6  rolled the repo?
7      A.    I would only be speculating.  I
8  would imagine at least monthly, but again that
9  is speculation though.  I don't have the exact
10 detail.
11     Q.    How did Highland typically
12 communicate its intention to roll a repo?
13     A.    I wasn't part of that group.  My
14 guess is, if I had to speculate, it would be
15 either via email or a phone call.
16     Q.    What factors would Highland consider
17 in deciding whether to roll a repo?
18     A.    I don't know.
19     Q.    Is credit risk of the counterparty
20 one of them?
21     A.    It may be.  Again, I wasn't involved
22 in that process, so I would be speculating.
23     Q.    How would Highland seek to mitigate
24 or offset credit risk under the GMRA?

POST

1      A.    The fund Highland CDO Opportunity, I
2  don't know.  Again, I wasn't -- that wasn't one
3  of my responsibilities and I'm not aware of how
4  that analysis was performed.
5      Q.    And you didn't ask in preparation
6  for today?
7      A.    I did not.
8      Q.    And do you know how Highland Capital
9  Management would seek to offset credit risk of
10 counterparties?
11     A.    There is senior management at the
12 firm and I'm not part of those discussions.  I
13 would be speculating in terms of how they
14 perform their analysis.
15     Q.    Do you know whether Highland
16 Opportunity Fund sought to mitigate or offset
17 counterparty risk under this particular
18 agreement?
19     A.    I'm not sure.
20     Q.    Do you know whether the fund sought
21 any security under this agreement?
22     A.    What do you mean?  I don't
23 understand what you mean by security, what do
24 you mean by that?

9  (Pages 30 to 33)

Page 34

POST

1             POST
2    Q.  Did it seek an agreement regarding
3  collateral or some other form of security under
4  this agreement?
5    A.  In the -- I would imagine in the
6  event that, you know, if assets moved in value
7  and cash could be called back, they would have
8  requested that.
9    Q.  We will get to that.  We talked
10  about earlier about how under a repo agreement
11  one party gets securities and one party gets
12  cash?
13    A.  Uh-huh.
14    Q.  Is that seen as offsetting credit
15  risk, the fact that if you gave securities you
16  held the other party's cash or vice versa?
17    A.  It could be.
18    Q.  Is that your understanding of how
19  repos work?
20    A.  Yes.
21    Q.  Is it your understanding that repos
22  generally do not have a guarantee attached to
23  them?
24    A.  I think it varies by counterparty.
25  If we're saying generally, I don't know how

Page 35

POST

1             POST
2  other banks approach guarantees on -- on, you
3  know, when they do business with other clients.
4  I can only speak to this agreement.  And I
5  mentioned earlier in terms of how I came about
6  with the knowledge of the guarantee.
7    Q.  This agreement, in fact, doesn't
8  have a guarantee attached to it, does it?
9    A.  My understanding is there is a
10  global guarantee that is put in place that was
11  evidenced in there under Exhibit B per the --
12  per the claim.
13    Q.  But in May 2007 when the GMRA was
14  entered into, there isn't a specific guarantee
15  that is attached to that agreement, is there?
16    A.  Again, I wasn't involved at the
17  time.  You know, we only became aware of the
18  guarantee at the time of the claim.  So if
19  there is none specified in here, then again, we
20  only became aware whenever the claim was
21  submitted per our advice of counsel.
22    Q.  And you didn't see one when you
23  looked through the documents today or earlier?
24    A.  I didn't look specifically at the
25  document right now, but I can if you would like

Page 36

POST

1             POST
2  me to.  But I mean, again, we were just
3  notified of the global guarantee when we
4  submitted the claim.
5    Q.  When you were preparing for today,
6  counsel didn't tell you or point you to a
7  specific guarantee or anybody else at Highland
8  didn't point you to or tell you about a
9  specific guarantee attached to the GMRA?
10    A.  Correct.
11    Q.  You mentioned that if assets moved
12  in value that cash could be called back.  Do
13  you recall saying that?
14    A.  Yes.
15    Q.  And you testified that you thought
16  that Highland would have done that?
17    A.  Correct.
18    Q.  Do you know if Highland, in fact,
19  did analyze whether the value of assets had
20  moved under this agreement?
21    A.  I don't know specifically under this
22  agreement. I know generally for agreements
23  like this or financing agreements in general if
24  the assets appreciate in value and there is the
25  ability to have cash or collateral returned

Page 37

POST

1             POST
2  back to you that request can be made to the
3  counterparty.
4    Q.  And do you know whether that
5  happened here?
6    A.  I don't -- I don't know specifically
7  during the duration of the agreement if that
8  happened.  I mean I would have to look at the
9  historical cash movements involved with the
10  facility.
11    Q.  And you didn't do that in
12  preparation for today?
13    A.  No.
14    Q.  Do you know whether this was the
15  first repurchase agreement entered into between
16  a Highland fund and LBIE?
17    A.  I don't know.
18    Q.  Do you know whether it was the first
19  agreement that any fund supervised by Highland
20  Capital Management entered with LBIE?
21    A.  My understanding is there were
22  agreements in place with various Lehman
23  entities.  The exact dates on when those
24  agreements were entered into though I don't
25  have them memorized.  They could be before or

Page 38

POST

1    they could be slightly after the date of this
2    agreement.
3        Q.   And you don't recall from your time
4    when you were summarizing the agreements the
5    general time span of any with Lehman?
6        A.   Generally probably 2007, 2008, but
7    again I don't recall specific dates.
8        Q.   Would you say that LBIE was a major
9    counterparty for Highland?
10       A.   It was one of the counterparties.
11   I'm not sure where it would be -- I'm not sure
12   where it would rank on the, I guess, hierarchy
13   of counterparties.
14       Q.   Is it one that you would have
15   expected Highland to carefully monitor?
16       A.   Again, I wasn't involved in the
17   monitoring of the counterparties, but that
18   would be a question for the PM or his team.
19       Q.   You don't recall in your time at
20   Highland whether LBIE was, in fact, carefully
21   monitored?
22       A.   I wasn't involved in that process.
23   My guess is it may have been handled by, you
24   know, other, you know, either Gibran or a

Page 39

POST

1    member of his team.
2        Q.   So I just want to make sure that it
3    is clear for the record.  That you mentioned
4    that you learned about the board resolution
5    guarantees when you initially filed the proof
6    of claim; correct?
7        A.   Correct, external counsel in
8    preparation for the claim provided it as part
9    of the claim submission.
10       Q.   And you don't recall learning about
11   any guarantee attached to the GMRA when you
12   first saw the agreement?
13       A.   I don't recall specifically.  Again,
14   it was provided by external counsel.
15       Q.   And you don't recall hearing about
16   the guarantee at the time that Lehman filed for
17   bankruptcy in 2008?
18       A.   Again, I first learned of the
19   guarantee in September of '09 or prior -- on or
20   around or prior to September '09, so I would
21   say no in September of '08.
22       Q.   Do you recall what Highland did in
23   September 2008 when Lehman Brothers Holdings
24   Inc. declared bankruptcy?

Page 40

POST

1        A.   I don't recall specifically.
2        Q.   Do you recall that happening, do you
3    recall the event let me say?
4        A.   I do recall that it was a -- I do
5    recall the event and I do recall the weeks
6    afterwards.  It was a very volatile time in the
7    marketplace.
8        Q.   Do you recall anybody discussing
9    Highland's exposure to Lehman at that time?
10       A.   Again, Highland CDO Opportunity
11   Master Fund and other accounts advised by
12   Highland had exposure to Lehman.  And they took
13   the necessary steps to notify, you know, the
14   Lehman entities that an event, a default had
15   occurred and submitted the claims pursuant to
16   the event of default.
17            So if your question or your question
18   was, you know, I believe how they notified them
19   or the notification and monitoring that was
20   performed, there was a bankruptcy event and
21   then there was the notification of claims that
22   were submitted after that.
23       Q.   Actually what I asked was whether
24   you recall anybody at the time at Highland

Page 41

POST

1    discussing Highland's exposure to Lehman when
2    it went into bankruptcy?
3        A.   I apologize.  My involvement was
4    primarily post the event of bankruptcy
5    occurring and assisting with the filing of the
6    claims and the valuation statements.  I wasn't
7    involved in the discussions that you are
8    alluding to.  I guess my involvement was after
9    the fact.
10       Q.   And you don't recall anybody at that
11   time mentioning whether their agreements were
12   guaranteed?
13       A.   I don't recall the discussions that
14   occurred during that time.  Again, my -- my
15   role was somewhat more administrative in terms
16   of submitting that the default had occurred and
17   then the accompanying valuation statement
18   associated with it.
19       Q.   And you don't recall anybody at the
20   time discussing with you or at the water cooler
21   or anywhere else whether Highland's exposure to
22   any Lehman entity was guaranteed?
23       A.   I would have to look at -- I would
24   have to look at the claims that were submitted

11 (Pages 38 to 41)

Page 42

POST

1  and if a guarantee was listed at the time.  I
2  mean I believe, only recalling from memory, I
3  believe some of the LBSF claims had guarantees
4  associated with them, but I would have to look
5  at them specifically to see who was the
6  guarantee that was listed on those.
7     Q.   Okay.  I just wanted to know what
8  your general recollection was of that time.
9     A.   Yes, generally I mean whenever
10 the -- the default notice was submitted it was
11 prepared in conjunction with counsel and you
12 know --
13     MR. GOLDSMITH:  You don't have to go
14   into anything.
15     A.   Disregard that, sorry.
16     MR. GOLDSMITH:  You don't have to go
17   into anything relating to discussions with
18   counsel.
19     A.   I guess that is privileged.
20     Q.   I'm not asking for your recollection
21 of discussion with counsel, just your general
22 recollection at the time of what discussions
23 were about Highland's exposure to Lehman?
24     A.   Again, I mean there was a claim that

Page 43

POST

1  was present.  It would have been part of the,
2  you know, notice and valuation that would have
3  been submitted.  So you would have had -- I
4  would have to peel back and look at each
5  individual claim that was submitted to see, you
6  know, kind of the support and the guarantee
7  behind it.
8     Q.   And not including counsel, who did
9  you work with to prepare the valuation notices?
10     A.   It would have been Gibran and Paul
11 Roos.
12     Q.   Paul Roos?
13     A.   Yes.
14     Q.   Can you spell that?
15     A.   R-O-O-S.
16     Q.   What is his role?
17     A.   He was one of the analysts that was
18 on Gibran's team.
19     Q.   Is he still employed at Highland?
20     A.   He is not.
21     Q.   Is Gibran still employed at
22 Highland?
23     A.   No.
24     MS. LARSON:  Let's go off the record

Page 44

POST

1  shortly for a brief break.
2     VIDEOGRAPHER:  We are off record at
3   10:19 a.m.
4     (Recess, 10:19 to 10:27 a.m.)
5     VIDEOGRAPHER:  We are back on record
6   at 10:27 a.m.
7     Q.   I am going to mark Exhibit 4.
8     (Exhibit 4 marked.)
9     Q.   A default notice dated September
10 17th, 2008.  Take a moment to look at that.  Do
11 you recognize this as a notice referred to in
12 the proof of claim in paragraph 4?
13     A.   Yes.
14     Q.   This is signed by Todd Travers;
15 correct?
16     A.   Correct.
17     Q.   And this is merely a notice of
18 termination; correct?  It does not state how
19 much is owed by either party?
20     A.   Correct.  The last sentence says,
21 "We will notify you of the balance due under
22 the agreement in accordance with paragraph
23 10(c) of the agreement."
24     Q.   I will mark now Exhibit 5.

Page 45

POST

1  
2     (Exhibit 5 marked.)
3     Q.   Default valuation notice under
4  Global Master Repurchase Agreement.  This is
5  dated September 26th, 2008 sent from Highland
6  CDO Opportunity Master Fund Limited to Lehman
7  Brothers International Europe.  Do you see
8  that?
9     A.   Yes.
10     Q.   And this is the default valuation
11 notice referred to in the proof of claim in
12 paragraph 5; is that correct?
13     A.   There was a -- the date listed on
14 there is September 26, 2008, which is what this
15 is dated.  But the amount listed on here, the
16 8,753,248.22 differs from the amount listed in
17 number 6 of 10,026,061.00 as there was a
18 subsequent amendment to the valuation.
19     Q.   Correct.  You are leading to the
20 next document I'm going to mark.
21     A.   Okay.
22     Q.   Exhibit 6.
23     (Exhibit 6 marked.)
24     Q.   This is titled Amendment, Default
25 Valuation Notice under Global Master Repurchase

Page 46

POST
1          POST
2    Agreement.  It is dated October 10th, 2008.  It
3    is sent from Highland CDO Opportunity Master
4    Fund to Lehman Brothers International Europe.
5    Do you see that?
6        A.   I do.
7        Q.   And do you see in the second
8    paragraph of this document it says, "Party B
9    hereby demands payment from Party A in a total
10   amount of 10,026,061.81."
11       A.   I do.
12       Q.   Does that amount approximately
13   correspond to the amount listed in the proof of
14   claim, paragraph 5?
15       A.   I'm sorry, paragraph 6.
16       Q.   Yes, paragraph 6?
17       A.   Yes, roughly.
18       Q.   In paragraph -- I mean, I'm sorry,
19   in Exhibit 5 if you turn to the second page, do
20   you see it was signed by Mark Okada?
21       A.   I do.
22       Q.   Do you know who he was?
23       A.   He's a partner of Highland Capital
24   Management, L.P.
25       Q.   Was he a partner at this time?

Page 47

POST
1          POST
2        A.   Yes.
3        Q.   Is he still with Highland?
4        A.   Yes.
5        Q.   Do you know what his role is with
6    respect to valuing the termination value of the
7    repurchase agreement?
8        A.   He's an authorized signatory.  I
9    don't know specifically what his role was aside
10   from his signature listed here, and I speculate
11   he probably reviewed the valuation statement as
12   well.
13       Q.   Do you recall working with him in
14   September of 2008?
15       A.   I don't recall specifically.
16       Q.   Do you recall generally working with
17   him?
18       A.   I don't -- I don't recall
19   specifically or generally.
20       Q.   Do you know how the amounts listed
21   in either default valuation notice were
22   calculated?
23       A.   There is support that is provided in
24   the calculation statement.  It is kind of on
25   page -- I'm looking at Exhibit 6, page 11.

Page 48

POST
1          POST
2        Q.   I will just note for the record that
3    the pages in Exhibit 6 are actually not
4    numbered sequentially.  You are looking at the
5    page that has very small print on it, I believe
6    that says Lightpoint CLOV at the very top; is
7    that correct?
8        A.   Correct.
9        Q.   Go ahead.
10       A.   This is a -- this is the support
11   that was generated via Intex, which is a
12   third-party software that -- that Gibran and
13   Paul would use to value securities.
14       Q.   Paul Roos?
15       A.   Paul Roos.  And the value of the
16   securities would be used in determining the
17   value of the claim.
18       Q.   If you turn a few more pages in do
19   you see there is an email actually has your
20   name at the top of it?
21       A.   Sorry, Exhibit 6?
22       Q.   Exhibit 6.  It is dated Wednesday,
23   October 1st, 2008 from Ryan Grateke.  Do you
24   see that?
25       A.   Yes.

Page 49

POST
1          POST
2        Q.   Let's just go through some of the
3    names on here and see if they refresh your
4    recollection a little bit about who you were
5    working with at the time --
6        A.   Okay.
7        Q.   -- in the fall of 2008.  If you go
8    to the bottom of the email chain you see there
9    is an email from -- on the following page,
10   there is an email from Ryan Grateke to Gianna
11   DelliCarpini?
12       A.   Okay.
13       Q.   Do you know who Gianna was?
14       A.   No, I don't know who he or she was
15   personally other than there is a Lehman address
16   associated with the individual in the next
17   response above.
18       Q.   Do you know who Ryan is?
19       A.   He is a former employee who at the
20   time was one of the accountants that oversaw
21   the fund, Highland CDO Opportunity Master Fund,
22   L.P.
23       Q.   You said he oversaw the fund, do you
24   mean that he --
25       A.   Generally speaking he was -- when I

13 (Pages 46 to 49)

POST

1  said oversaw, he was -- he worked with a, the
2  administrator on the fund in preparing and
3  reconciling the books and records. He was an
4  accountant, so whatever is involved in that on
5  a monthly basis.
6      Q. So you are not saying that he made
7  investment decisions?
8      A. Correct.
9      Q. And he wouldn't have made
10 termination decisions?
11     A. I don't believe so.
12     Q. Are you familiar with the contents
13 of this email chain?
14     A. I don't recall specifically. The
15 email is from October '08, aside from what I
16 see that is listed here.
17     Q. It was sent to you; correct?
18     A. Correct. It was forwarded to me
19 from Ryan on October 1st, 2008 at 3:08 p.m.
20     Q. He says, "Here is the one for the
21 85,000;" is that correct?
22     A. Correct.
23     Q. Do you know what he was referring
24 to?
25

POST

1      A. I believe it is one of the missing
2  coupon payments or it is part of one of the
3  missing coupon payments that is listed on page
4  6.
5      Q. Page 6 is the page that says -- it
6  is printed landscaped and it says, "Net value
7  of deliverable securities," at the top. Is
8  that the one you are looking at?
9      A. Correct. And I believe it is part
10 of the number the 103,052.05.
11     Q. That says "missing coupon payments"
12 next to it?
13     A. Correct.
14     Q. That has a double star and it says
15 -- the double star at the bottom is next to
16 "added item;" is that correct?
17     A. That is what it says, correct.
18     Q. So do you think this is one of the
19 items that came in in the amended valuation
20 that wasn't in the original valuation?
21     A. It may have been, yes. I mean I
22 would have to compare side-by-side, but the
23 note leads to that effect.
24     Q. And by missing, you mean that the
25

POST

1  coupon payment was never made?
2      A. Correct. It looks like it was never
3  delivered by Lehman to the fund.
4      Q. If you turn to the next page after
5  that email chain you see another email chain
6  that was sent to you from -- or at least it has
7  your name at the top. It was sent from Michael
8  Chiara on September 11th, 2008 at 9:19 a.m. Do
9  you see that?
10     A. Yes.
11     Q. And although your name is at the
12 top, I do not see you in any of the addressees.
13 It says to Ryan Grateke, Paul Roos, Scott
14 Crowell?
15     A. Correct.
16     Q. Do you see in the text it says,
17 "Good morning, 2 trades are to roll tomorrow.
18 Details are attached, same HC and spread as
19 last month. Please let us know if you would
20 like to roll 1 million." Do you see that?
21     A. Yes.
22     Q. So what was your understanding of
23 what this email meant?
24     A. It was support that was included as

POST

1  part of the claim probably to evidence, you
2  know, the repos that were being financed at the
3  time, some of the assets that were being
4  financed at the time via the security.
5      Q. Is it your understanding that this
6  repo was rolled, in fact?
7      A. I don't -- I can't tell from this
8  email.
9      Q. And you don't recall from when you
10 were helping to prepare the valuation notices?
11     A. No, I mean, five years ago, I don't
12 recall specifically.
13     Q. Do you recall that repos were rolled
14 very shortly before they had declared
15 bankruptcy?
16     A. This email would evidence that two
17 were rolled right or prior to bankruptcy, yes.
18     Q. Do you see the next email in this
19 document again from Michael Chiara this one is
20 dated September 8th, 2008 at 6:21 a.m. to Ryan
21 Grateke, Jenna Bridges, Paul Roos, Scott
22 Crowell copying Gianna DelliCarpini. Do you
23 see that?
24     A. Yes.

14  (Pages 50 to 53)

Page 54

POST

1
2    Q.    You see it says, "Two repos are set
3  to roll off today.  We can roll at the same
4  spread an HC as last month.  Lightpoint was
5  marked up, Whitehorse was marked down.  Please
6  let us know if you would like to roll as per
7  the attached."  Do you see that?
8    A.    Yes.
9    Q.    What was your understanding of this
10 email?
11    A.    Again, it was additional support
12 that was included in the claim.  I think we
13 referred to Lightpoint earlier in the testimony
14 so you know it was one of the assets that was
15 being financed at the time.  So this email was
16 probably provided to evidence the assets that
17 were in the facility.
18    Q.    Whitehorse being another asset?
19    A.    I -- I would assume so, but we would
20 need to look at the -- the support
21 specifically.  I assume this is also the Intex
22 support says Whitehorse 4, I don't even know
23 what page it is, but it is -- it is within the
24 packet.
25    Q.    I see.  The email says Lightpoint

Page 55

POST

1
2  was marked up, Whitehorse was marked down.
3  What is your understanding of what that meant?
4    A.    It looks like they were valuing --
5  they were marking up and down the collateral.
6    Q.    Who -- who was marking up and down
7  the collateral?
8    A.    It appears to be Michael Chiara,
9  either him or someone on Lehman's end.  I can't
10 tell specifically from this email though.
11    Q.    And do you know what, if anything,
12 Highland or the Highland fund did in response
13 to Lehman marking collateral up or down?
14    A.    I don't -- I don't know.
15    Q.    And you didn't ask in preparation
16 for today?
17    A.    No.
18    Q.    Do you know whether Highland
19 adjusted the amount that it was holding for
20 Lehman or that Lehman was holding for it in
21 relation to Lightpoint being marked up or
22 Whitehorse being marked down?
23    A.    I don't -- I don't know.
24    Q.    If you turn to the next email.
25 Again, from Michael Chiara at Lehman.  This one

Page 56

POST

1
2  is dated Tuesday, September 2nd, 2008 at 3:42
3  p.m. to Ryan Grateke, Jenna Bridges, Paul Roos,
4  Scott Crowell.  Do you see that?
5    A.    Yes.
6    Q.    And this one says, "We have 2 repo
7  trades that matured today.  Apologies for not
8  sending roll details earlier.  We can roll at
9  the same terms (HC and spread) as last month.
10 The marks are within 1 point of last month's
11 marks.  Please let us know if you would like to
12 roll per the attached."  Do you see that?
13    A.    I do.
14    Q.    Do you understand what he meant by
15 the marks are within one point of last month's
16 mark?
17    A.    It appears he's valuing the
18 securities reference in this email close to the
19 same as they were valued the prior month.
20    Q.    Does this imply to you that the
21 securities were valued approximately once a
22 month?
23    A.    Based off of this email, yes.
24    Q.    Is it your understanding that the
25 agreements were rolled once a month?

Page 57

POST

1
2    A.    I don't recall the specific terms,
3  but at least these two repo trades that are
4  referenced in here alludes to the point that
5  they're being rolled monthly.
6    Q.    Did Highland have the option to not
7  roll?
8    A.    I'm sure they had that option.
9    Q.    What would have happened if Highland
10 had decided not to roll these repos?
11    A.    They would have taken the asset back
12 and I guess determined at that time, you know,
13 what to do with financing the asset from there.
14 Again, I would be more speculating though.
15 That would be something like a PM would need to
16 decide what he wants to do.
17    Q.    If Highland terminated these repos,
18 would that end its exposure to Lehman?
19    A.    All of the repos?
20    Q.    Let's say the repos under this
21 agreement.  Let me rephrase that, that was an
22 awkward question.  If Highland terminated all
23 the repos that were being done under this
24 agreement, would that end its exposure to
25 Lehman under this agreement?

POST

1
2     A.    For --
3     Q.    This agreement being the GMRA?
4     A.    For this -- for Highland CDO
5  Opportunity Master Fund under the GMRA, yes,
6  and assuming you know, whatever accruals and
7  interest had been settled up as well, yes.
8     Q.    If you flip a few more pages there
9  are some screen shots it looks like on the next
10  following pages, and then there is another
11  email.  Again, this has your name at the top,
12  but you're not one of the original recipients
13  on it.  It is from Andrew Wybolt at Lehman.com
14  dated Tuesday, September 9th, 2008 8:36 a.m.
15  sent to Ryan Grateke,
16  Highland.OTC.collateral@hedgefundservices.com.
17  Do you see that?
18     A.    I do.
19     Q.    Do you see at the bottom of this
20  email it looks like a message without content?
21     A.    Sorry, the bottom of page 1?
22     Q.    Uh-huh.
23     A.    And you are referring to the one
24  that is time stamped 2:06 p.m. with the dashes?
25     Q.    Correct?

POST

1
2     A.    Yes.
3     Q.    And then the next email up from Ryan
4  Grateke dated September 9th, 2008 at 9:31 a.m.
5  says, "Can we pull back any of this margin,
6  thanks."  Do you see that?
7     A.    Yes.
8     Q.    Now, that says 9:31 a.m. and the
9  email at the top says 8:36 a.m., but is it your
10  understanding that that is due to the time
11  difference between Texas and New York?
12     A.    Yes.
13     Q.    What is your understanding of what
14  Ryan Grateke meant by, "Can we pull back any of
15  this margin"?
16     A.    It looked like there was probably
17  some excess cash sitting in the account, and he
18  was looking to claw it back.  And it appears
19  from this email that he submitted a request to
20  Andrew, yes, it looks like Andrew Wybolt to see
21  how much could be pulled back.  And Andrew
22  responded with the amount.
23     Q.    And just so that I can make sure
24  that I understand what you are saying, Lehman
25  was holding margin or excess cash for Highland

POST

1
2  CDO Opportunity Fund; is that correct?
3     A.    Correct, that is what this is
4  showing.
5     Q.    And Highland was taking the
6  opportunity to pull back some of that margin;
7  correct?
8     A.    That is what this email is
9  indicating.
10     Q.    And Highland could pull back some of
11  the margin because the value of the securities
12  had dropped; is that correct?
13     A.    I don't know the exact rationale.
14  The assets -- I would be speculating the assets
15  could have appreciated in our favor or there
16  could have been, you know, some termination of
17  other historical repos or there could have been
18  some interest that would have hit the account.
19  It could have been multiple factors that would
20  have resulted in this 288,000 being available
21  in the account.
22     Q.    Okay.  And that is a good point.
23  Highland could claw back margin for a variety
24  of reasons; correct?
25     A.    Correct.

POST

1
2     Q.    It had the right to do so under the
3  GMRA?
4     A.    Correct.
5     Q.    Do you know how often it did that?
6     A.    I wasn't involved with the process,
7  so I'm not -- I'm not sure of the frequency.  I
8  would be speculating.  It looks like Ryan's
9  initiating this, so I'm not sure how frequently
10  he did it, but he probably would have had some
11  sort of metric to monitor what he thought could
12  be clawed back.
13     Q.    Do you have a general recollection
14  of whether Highland regularly evaluated it's --
15  the amount that was being held on margin?
16     A.    Yes, there was a team that did that
17  or that was tasked with that function.
18     Q.    So it was done on a regular basis?
19     A.    Yes.
20     Q.    If you turn to the next email, this
21  one was sent from Ryan Grateke to you on
22  Wednesday, September 17th, 2008 at 8:58 a.m.
23  Do you see that?
24     A.    Yes.
25     Q.    And the subject line is "Lehman

16 (Pages 58 to 61)

Page 62

POST

1
2 support"?
3     A.    Yes.
4     Q.    And is this email broadly speaking
5 looking at what the Highland fund's current
6 exposure was to Lehman?
7     A.    Sorry, I'm just going to read this
8 real quick.
9     Q.    Yes, take your time.
10     A.    I'm sorry, what was the question
11 again, please.
12     Q.    Is this email broadly speaking
13 looking at what the Highland fund's exposure
14 was currently at that time to Lehman under the
15 GMRA?
16     A.    Well, this appears to be one of the
17 components that is factored into the valuation
18 statement.  There is a -- on the valuation
19 statement, there is a line for cash margin of
20 194,664.02 which appears to be close to this
21 collateral balance of 194,451 plus interest.
22     Q.    If you look back at the first page
23 of Exhibit 6 the amended default valuation
24 notice and actually flip that over and look at
25 the second page at the signature block?

Page 63

POST

1
2     A.    Okay.
3     Q.    You see this was signed by Patrick
4 Boyce?
5     A.    Yes.
6     Q.    Do you know who he was?
7     A.    At the time, he was the CFO for
8 Highland Capital Management, L.P. and obviously
9 an authorized signatory.
10     Q.    Do you know what his role was with
11 respect to the default valuation notice?
12     A.    He would have been involved, I mean
13 he signed it so he would have done some, I
14 imagine some review of it.  And he over my boss
15 reported into Patrick, so I can't recall
16 specifically but he would have been involved in
17 the review of the claim prior to submission I
18 would imagine.
19     Q.    Who was your boss?
20     A.    Britt Brown.
21     Q.    Is Britt still at Highland?
22     A.    He is not.
23     Q.    When did he leave?
24     A.    April of '09, March, April of '09.
25     Q.    And you said he reported into

Page 64

POST

1
2 Patrick Boyce?
3     A.    Correct.
4     Q.    Is Patrick still with Highland?
5     A.    He is.
6     Q.    What was your -- what was Britt
7 Brown's role with respect to the valuation
8 notice?
9     A.    Again, he was my supervisor at the
10 time.  So I can't recall specifically, but I
11 would imagine generally he would have been
12 involved in the review prior to the submission.
13     Q.    Did he direct what needed to be done
14 to determine the value?
15     A.    He would have been involved in the
16 process.  I can't recall specifically, though,
17 what he would have done.
18     Q.    You said Patrick Boyce is still at
19 Highland.  Did you talk to him in preparation
20 for today?
21     A.    I did not.
22     Q.    Do you know why an amendment to this
23 claim was necessary?  I'm sorry, do you know
24 why an amendment to the valuation notice was
25 necessary?

Page 65

POST

1
2     A.    I believe there was a -- the value
3 of the securities changed and we talked about
4 it before it looks like there was some
5 additional items that were added to the claim.
6     Q.    Do you recall needing to do this
7 amendment?
8     A.    I would have been involved in the
9 process in preparation of the -- of the
10 amendment.  Again, it looks like it was -- the
11 primary driver looks like it was the net value
12 of the deliverable securities that was
13 adjusted.
14     Q.    But you have no specific
15 recollection of being involved in this
16 amendment?
17     A.    I helped put it together.  I don't
18 recall the specific details behind it, though.
19 I mean that was five years ago.
20     Q.    Do you recall submitting a claim
21 against LBIE in relation to this GMRA?
22     A.    You mean a valuation statement?
23     Q.    A claim against LBIE, do you recall
24 submitting a claim against LBIE in its
25 bankruptcy proceeding?

17 (Pages 62 to 65)

Page 66

POST

1
2      A.   Sorry, yes, there is -- I think
3  there was an online portal for claim submission
4  I recall generally, but I don't recall the
5  specifics behind it.
6      Q.   Did you assist in preparing that
7  claim?
8      A.   Yes.
9      Q.   Do you know what the current status
10 of that claim is?
11     A.   I do not.
12     Q.   Have you asked anybody what the
13 current status of the claim is?
14     A.   Just general discussions with Jason,
15 but...
16     MR. GOLDSMITH:  So you don't have to
17 go into those discussions.
18     Q.   Do you recall that the claim you
19 submitted against LBIE was for the same amount
20 as the claim you filed against LBHI?
21     A.   I believe so.  I think the only
22 thing that was probably different was I believe
23 in LBIE you had to file it in Sterling, so I
24 guess the FX rate or the FX conversion.
25     Q.   Do you know whether that amount --

Page 67

POST

1
2  I'm sorry, let me restart that question.  Do
3  you know whether the amount of Highland's claim
4  again LBIE in relation to the GMRA was ever
5  adjusted?
6      A.   I don't recall specifically.  I
7  believe the claim was probably submitted a few
8  years ago, so I don't -- again, the numbers are
9  probably going to be generally in line with or
10 it should be in line with the LBHI amount.
11     Q.   Currency conversion issues aside,
12 was the process for determining that amount the
13 same as the process for determining the amount
14 of the claim against LBHI?
15     A.   Yes, it was.
16     Q.   Do you know whether Highland or
17 Highland Opportunity Master Fund has been in
18 touch with or been in contact with the LBIE
19 administrators?
20     A.   Only in my discussions with Jason.
21     MR. GOLDSMITH:  Again, you don't
22 have to go into those.
23     Q.   And you said earlier you don't know
24 whether Highland has received payment on the
25 claim against LBIE?

Page 68

POST

1
2      A.   I don't believe it has.
3      Q.   Do you know who would know that
4  information?
5      A.   Jason or --
6      Q.   Do you know who else at Highland
7  would know that information?
8      A.   Potentially someone in our back
9  office.  If there was an amount that, you know,
10 may have been received into the bank that would
11 have referenced the, you know, the partial
12 payment or distribution from the claim.
13     Q.   I'm going to mark as Exhibit 7 a
14 document that says at the top, "Unanimous
15 Written Consent of the executive committee of
16 the board of directors of Lehman Brothers
17 Holdings Inc."
18     (Exhibit 7 marked.)
19     Q.   Take a minute to look at that.  Are
20 you familiar with this document?
21     A.   I believe it is the document that is
22 referred to in number 3 on the proof of claim.
23     Q.   And to your knowledge, Highland did
24 not receive this document before LBHI filed for
25 bankruptcy; is that correct?

Page 69

POST

1
2      A.   Correct, it was given to us by
3  counsel in preparation for submission of the
4  claim.
5      Q.   To your knowledge, Highland did not
6  know about this document before LBHI filed for
7  bankruptcy; is that correct?
8      A.   Again, we received it, I believe, in
9  September of '09 prior to filing the claim.  So
10 LBHI you know, filed for bankruptcy in the
11 September '08 time frame, so wouldn't have had
12 it at the time.
13     Q.   To your knowledge, did anybody at
14 Lehman tell anybody at Highland about the
15 existence of this document prior to September
16 2008?
17     A.   I personally didn't have a
18 conversation to that effect.
19     Q.   Do you know whether Highland, in
20 fact, had any indication that LBHI was
21 ultimately responsible for the amounts that
22 LBIE would owe under the GMRA at the time that
23 it entered the agreement?
24     A.   In May of 2007?
25     Q.   Correct.

18 (Pages 66 to 69)

Page 70

POST

1    A.    Again, I get back to the fact that
2  we weren't -- we were made aware of the
3  guarantee at the time that the claim was
4  submitted in September of '09.  So it wasn't
5  brought to -- you know, it was brought to our
6  attention by counsel so we were notified around
7  that time frame of the guarantee.
8    Q.    And you are not aware of any other
9  way that Highland learned about the guarantee,
10 any guarantee by LBHI?
11        MR. GOLDSMITH:  I think he's
12       answered this question every possible way
13       you have asked.  You can answer this one.
14    A.    Outside of counsel, no.
15    Q.    When you were preparing the -- in
16 the fall of September -- in the fall of 2009,
17 or in the fall of 2008 when Lehman first
18 declared bankruptcy, do you recall anybody
19 discussing any reliance that Highland had on
20 LBHI for the amounts due by LBIE under the
21 GMRA?
22        MR. GOLDSMITH:  Objection, vague.
23    A.    Sorry, we have two time frames,
24 September '08 and September '09.

Page 71

POST

1    Q.    At any time you might have been
2  working on this claim?
3    A.    Again, prior to submission of the
4  claim in September of '09 was when we were made
5  aware of the guarantee via external counsel.
6  That was the first time.
7        MS. LARSON:  Let's go off the record
8       for a second.
9        VIDEOGRAPHER:  We are off record at
10      11:05 a.m.
11      (Recess, 11:05 to 11:08 a.m.)
12        VIDEOGRAPHER:  We are back on record
13      at 11:08 a.m.
14    Q.    Jason, I just want to ask you two or
15 three more questions just to recap and make
16 sure that we have everything clean for the
17 record and then I will be done.
18    A.    Okay.
19    Q.    To your knowledge sitting here
20 today, at the time that the Highland fund
21 entered the GMRA with Lehman, it did not know
22 about any guarantee by LBHI of LBIE's
23 responsibilities; is that correct?
24    A.    Correct.  As I mentioned the

Page 72

POST

1  guarantee came to our attention when we --
2  prior to filing the claim in September of '09.
3    Q.    Okay.  So the corollary to that is
4  to your knowledge in 2007 when the Highland
5  fund entered the GMRA it was not relying on any
6  guarantee by LBHI of LBIE's obligations?
7        MR. GOLDSMITH:  Objection, vague.
8    A.    Based off of the timing when
9  external counsel provided us the guarantee
10 prior to September of '09, yes.
11    Q.    And to your knowledge, sitting here
12 today, Highland had no other source of
13 knowledge of LBHI's guarantee or of any LBHI
14 guarantee of LBIE obligations prior to
15 receiving the board resolutions?
16        MR. GOLDSMITH:  Objection, vague.
17    A.    External counsel who helped us
18 prepare this claim was the only source of the
19 knowledge.
20    Q.    Only source of the knowledge of
21 what?
22    A.    Of the guarantee, the LBHI
23 guarantee.
24        MS. LARSON:  I have no further

Page 73

POST

1  questions.  Thank you for your time today.
2        VIDEOGRAPHER:  We're off record at
3      11:10 a.m.  This concludes the videotaped
4      deposition of Jason Post.
5      (Deposition adjourned at 11:10 a.m.)
6
7
8        _____
9            JASON POST
10 Subscribed and sworn to before me
11 this_____ day of_____2013,
12 _____
13
14
15
16
17
18
19
20
21
22
23
24
25

19 (Pages 70 to 73)

Page 74

1          POST
2     C E R T I F I C A T E
3
4      I, SUSAN S. KLINGER, a certified shorthand
5   reporter within and for the States of Texas and
6   California, do hereby certify:
7      That JASON POST, the witness whose
8   deposition is hereinbefore set forth, was duly
9   sworn by me and that such deposition is a true
10  record of the testimony given by such witness.
11     I further certify that I am not related to
12  any of the parties to this action by blood or
13  marriage; and that I am in no way interested in
14  the outcome of this matter.
15     IN WITNESS WHEREOF, I have hereunto set my
16  hand this 21st of August, 2013.
17
18  _____
19          Susan S. Klinger,
20          RMR-CRR, CSR
21          Texas CSR# 6531
22          California CSR # 13084
23
24
25

Page 75

1          POST
2     I N D E X
3
4   WITNESS                    PAGE
5
6   JASON POST
7
8   EXAMINATION BY MS. LARSON        4
9
10      E X H I B I T S
11
12  No.    Page     Description
13  Exhibit 1   10      Subpoena
14  Exhibit 2   21      Proof of Claim
15  Exhibit 3   27      Global Master Repurchase
16                      Agreement
17  Exhibit 4   44      Default Notice, 9/17/08
18  Exhibit 5   45      Default Valuation Notice,
19                      9/26/08
20  Exhibit 6   45      Amendment, 10/10/08
21  Exhibit 7   68      Unanimous Written
22                      Consent
23
24
25

Page 76

1          POST
2     ERRATA SHEET FOR THE TRANSCRIPT OF:
3   Case Name:  In Re: Lehman Brothers Holdings Inc.
4   Dep. Date:  August 20, 2013
5   Deponent:  Jason Post
6   Pg. Ln.  Now Reads  Should Read   Reason
7   ___ ___  _____ _____ _____
8   ___ ___  _____ _____ _____
9   ___ ___  _____ _____ _____
10  ___ ___  _____ _____ _____
11  ___ ___  _____ _____ _____
12  ___ ___  _____ _____ _____
13  ___ ___  _____ _____ _____
14  ___ ___  _____ _____ _____
15  ___ ___  _____ _____ _____
16  ___ ___  _____ _____ _____
17  ___ ___  _____ _____ _____
18
19       _____
20       Signature of Deponent
21  SUBSCRIBED AND SWORN BEFORE ME
22  THIS___DAY OF_____, 2013.
23
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

20 (Pages 74 to 76)

## A

**ability (1)**
36:25
**accompanying (1)**
41:18
**account (4)**
12:6 59:17 60:18,21
**accountant (1)**
50:5
**accountants (1)**
49:20
**accounting (1)**
9:23
**accounts (2)**
8:11 40:12
**accruals (1)**
58:6
**action (1)**
74:12
**added (2)**
51:17 65:5
**additional (2)**
54:11 65:5
**address (1)**
49:15
**addressees (1)**
52:13
**adjourned (1)**
73:6
**adjusted (3)**
55:19 65:13 67:5
**Administered (1)**
1:11
**administrative (1)**
41:16
**administrator (1)**
50:3
**administrators (1)**
67:19
**advanced (1)**
9:17
**advice (1)**
35:21
**advised (2)**
8:10 40:12
**advises (2)**
11:24 12:3
**advisor (3)**
11:22,25 12:14
**affect (1)**
6:19
**ago (3)**
53:12 65:19 67:8
**agreement (60)**
13:23 14:3,6,9,11
  17:9 18:2,7,14 19:7

19:9,17,20 20:2
22:6,9,13,15,21
23:22 25:7 27:4,22
29:5,13 30:2,5 31:2
31:8,17,18,22 32:3
32:5 33:19,22 34:2
34:4,10 35:4,7,15
36:20,22 37:7,15,19
38:3 39:13 44:23,24
45:4 46:2 47:7
57:21,24,25 58:3
69:23 75:16
**agreements (19)**
8:22 14:14 15:10,17
15:20,24 16:5,13
17:3,7,12,19 36:22
36:23 37:22,24 38:5
41:12 56:25
**ahead (1)**
48:9
**al (2)**
1:10 4:6
**alludes (1)**
57:4
**alluding (1)**
41:9
**amended (3)**
25:16 51:20 62:23
**amendment (8)**
45:18,24 64:22,24
65:7,10,16 75:20
**amount (18)**
16:2 25:11 26:2 45:15
45:16 46:10,12,13
55:19 59:22 61:15
66:19,25 67:3,10,12
67:13 68:9
**amounts (3)**
47:20 69:21 70:21
**analysis (4)**
16:18 18:5 33:5,15
**analyst (2)**
7:23 8:6
**analysts (1)**
43:18
**analyze (1)**
36:19
**Andrew (4)**
58:13 59:20,20,21
**answer (2)**
6:7 70:14
**answered (1)**
70:13
**anybody (11)**
11:7 29:24 36:7 40:9
40:25 41:11,20

66:12 69:13,14
70:19
**anytime (1)**
6:9
**Apologies (1)**
56:7
**apologize (1)**
41:4
**appears (5)**
55:8 56:17 59:18
62:16,20
**appreciate (1)**
36:24
**appreciated (1)**
60:15
**approach (1)**
35:2
**approximate (1)**
14:17
**approximately (2)**
46:12 56:21
**April (4)**
7:23 24:9 63:24,24
**archive (1)**
8:21
**arm (3)**
11:23,24,24
**arrangement (1)**
13:16
**aside (4)**
14:24 47:9 50:16
67:11
**asked (3)**
40:24 66:12 70:14
**asking (1)**
42:21
**aspect (1)**
18:16
**asset (4)**
13:18 54:18 57:11,13
**assets (12)**
15:23 16:21 19:22
34:6 36:11,19,24
53:4 54:14,16 60:14
60:14
**assist (1)**
66:6
**assisted (1)**
30:4
**assisting (1)**
41:6
**associated (3)**
41:19 42:5 49:16
**association (1)**
4:16
**assume (6)**

6:2 17:15 18:4,23
54:19,21
**assuming (1)**
58:6
**attached (8)**
34:22 35:8,15 36:9
39:12 52:19 54:7
56:12
**attention (4)**
6:15 28:6 70:7 72:2
**Attorneys (2)**
3:4,11
**August (6)**
1:19 2:4 4:10 9:12
74:16 76:4
**authority (1)**
29:8
**authorized (3)**
8:14 47:8 63:9
**available (1)**
60:20
**avenue (3)**
3:7 4:14 30:20
**aware (8)**
23:23 24:13 33:4
35:17,20 70:3,9
71:6
**awkward (1)**
57:22
**a.m (17)**
2:5 4:11 44:4,5,7 52:9
53:21 58:14 59:4,8
59:9 61:22 71:11,12
71:14 73:4,6

## B

**B (5)**
23:14 27:18 35:11
46:8 75:10
**back (18)**
34:7 36:12 37:2 43:5
44:6 57:11 59:5,14
59:18,21 60:6,10,23
61:12 62:22 68:8
70:2 71:13
**background (1)**
11:20
**balance (2)**
44:22 62:21
**bank (1)**
68:10
**bankruptcy (15)**
1:2 4:6 21:10 39:18
39:25 40:21 41:3,5
53:16,18 65:25
68:25 69:7,10 70:19

**banks (3)**
15:4 30:22 35:2
**Based (2)**
56:23 72:9
**basically (2)**
8:17 11:24
**basis (5)**
19:8 29:22 31:23 50:6
61:18
**Baylor (1)**
9:16
**beg (1)**
31:6
**beginning (1)**
31:10
**behalf (2)**
12:8 28:8
**believe (21)**
10:24 12:7,7 15:15
17:8,11 29:9 40:19
42:3,4 48:5 50:12
51:2,10 65:2 66:21
66:22 67:7 68:2,21
69:8
**benefit (1)**
6:5
**best (2)**
5:24 26:20
**big (1)**
13:8
**bit (2)**
11:21 49:4
**block (3)**
28:7,20 62:25
**blood (1)**
74:12
**board (4)**
22:23 39:5 68:16
72:16
**books (1)**
50:4
**boss (2)**
63:14,19
**Boston (1)**
8:25
**bottom (4)**
49:8 51:16 58:19,21
**Boyce (3)**
63:4 64:2,18
**break (2)**
6:9 44:2
**Bridges (2)**
53:22 56:3
**brief (2)**
10:24 44:2
**briefly (1)**

Page  2

27:10
**Britt (3)**
63:20,21 64:6
**broadly (3)**
15:25 62:4,12
**Brothers (15)**
1:9 4:5,20 10:10
17:10 20:24 21:9
22:24 26:24 27:15
39:24 45:7 46:4
68:16 76:3
**brought (2)**
70:6,6
**Brown (1)**
63:20
**Brown's (1)**
64:7
**business (2)**
9:15 35:3

---
**C**
**C (3)**
3:2 74:2,2
**calculated (2)**
25:6 47:22
**calculation (1)**
47:24
**California (3)**
2:14 74:6,22
**call (2)**
21:22 32:16
**called (3)**
14:10 34:7 36:12
**Capital (16)**
3:11,13 4:22 5:13
6:24 8:25 12:13,19
12:20 28:17,19
29:19 33:9 37:20
46:23 63:8
**carefully (2)**
38:16,21
**Case (2)**
1:8 76:3
**case-by-case (1)**
29:22
**cash (14)**
16:2,6,15,24 20:3
34:7,12,16 36:12,25
37:9 59:17,25 62:19
**CDO (22)**
7:3,8 10:11 12:11,14
12:21 13:13 14:13
17:9 20:21,22 21:14
22:4 27:17 28:8
33:2 40:11 45:6
46:3 49:21 58:4

60:2
**certain (4)**
15:23 16:2 22:5,22
**certified (2)**
2:12 74:4
**certify (2)**
74:6,11
**CFO (1)**
63:7
**chain (4)**
49:8 50:14 52:6,6
**changed (2)**
8:3 65:3
**Chapter (1)**
1:7
**Chiara (4)**
52:9 53:20 55:8,25
**claim (56)**
7:5 11:6 14:6 19:8
20:21 21:18 24:17
25:10 26:3,8,18,22
26:24 28:4 31:24
35:12,18,20 36:4
39:7,9,10 42:25
43:6 44:13 45:11
46:14 48:17 53:2
54:12 63:17 64:23
65:5,20,23,24 66:3
66:7,10,13,18,20
67:3,7,14,25 68:12
68:22 69:4,9 70:4
71:3,5 72:3,19
75:14
**claims (6)**
5:19 40:16,22 41:7,25
42:4
**classes (1)**
13:18
**claw (2)**
59:18 60:23
**clawed (1)**
61:12
**clean (1)**
71:17
**clear (4)**
5:24 23:25 28:16 39:4
**clients (1)**
35:3
**CLO (1)**
13:14
**CLOs (1)**
12:3
**close (3)**
29:4 56:18 62:20
**closed-end (1)**
12:2

**CLOV (1)**
48:6
**collateral (7)**
18:13 34:3 36:25 55:5
55:7,13 62:21
**colleague (1)**
8:20
**collection (1)**
31:11
**college (2)**
9:12,14
**COMMISSION (1)**
76:25
**committee (2)**
22:23 68:15
**communicate (1)**
32:13
**compare (1)**
51:23
**compliance (2)**
7:14 8:3
**components (1)**
62:17
**concentration (1)**
6:20
**concerned (1)**
6:12
**concludes (1)**
73:4
**conjunction (1)**
42:12
**connection (7)**
5:12,15 11:5 23:19,21
24:8 26:8
**Consent (4)**
22:22 23:24 68:15
75:22
**consider (1)**
32:17
**consult (1)**
6:11
**contact (1)**
67:18
**content (1)**
58:20
**contents (1)**
50:13
**contract (3)**
27:14 28:2 30:15
**conversation (1)**
69:18
**conversations (1)**
11:16
**conversion (2)**
66:24 67:11
**cooler (1)**

41:21
**copying (1)**
53:23
**corollary (1)**
72:4
**correct (49)**
7:10 15:7 22:10,11
25:13,14 27:20,23
27:25 28:18 31:19
36:10,17 39:7,8
44:16,17,19,21
45:12,19 48:7,8
50:9,18,19,22,23
51:10,14,17,18 52:3
52:16 58:25 60:2,3
60:7,12,24,25 61:4
64:3 68:25 69:2,7
69:25 71:24,25
**correspond (1)**
46:13
**counsel (22)**
4:17 6:11 11:8 17:17
23:10,19 24:12 30:6
35:21 36:6 39:8,15
42:12,19,22 43:9
69:3 70:7,15 71:6
72:10,18
**counterparties (6)**
14:20,23 33:11 38:11
38:14,18
**counterparty (8)**
14:24 18:3 21:11
32:20 33:18 34:24
37:3 38:10
**couple (2)**
5:22 21:19
**coupon (4)**
51:3,4,12 52:2
**court (8)**
1:2 2:11 3:14 4:7,9,15
4:23 6:5
**credit (5)**
18:2 32:20,25 33:10
34:14
**creditor (1)**
21:15
**Crescent (3)**
2:10 3:14 4:9
**Crowell (3)**
52:15 53:23 56:4
**CSR (4)**
1:24 74:20,21,22
**Currency (1)**
67:11
**current (5)**
7:13 11:17 62:5 66:9

66:13
**currently (1)**
62:14

---
**D**
**D (1)**
75:2
**Dallas (6)**
1:18 2:11 3:15 4:10
9:7,8
**dashes (1)**
58:24
**date (10)**
19:11 20:24 24:10,10
28:21,23 29:5 38:2
45:13 76:4
**dated (15)**
10:12 19:10 22:6,25
27:4,24 44:10 45:5
45:15 46:2 48:22
53:21 56:2 58:14
59:4
**dates (2)**
37:23 38:8
**day (2)**
73:10 76:22
**Debtor (1)**
3:4
**Debtors (1)**
1:13
**decide (1)**
57:16
**decided (6)**
18:20 19:2,13,19 20:6
57:10
**deciding (2)**
20:17 32:18
**decision (4)**
15:13 17:18 20:11,14
**decisions (5)**
12:17,21 15:8 50:8,11
**declared (3)**
39:25 53:15 70:19
**declaring (1)**
24:22
**default (16)**
24:17,23 25:2 40:15
40:17 41:17 42:11
44:10 45:3,10,24
47:21 62:23 63:11
75:17,18
**define (1)**
13:24
**degree (2)**
9:17,23
**deliverable (2)**

51:8 65:12
**delivered (1)**
52:4
**DelliCarpini (2)**
49:11 53:23
**demands (1)**
46:9
**Dep (1)**
76:4
**department (1)**
7:14
**Deponent (2)**
76:5,20
**deposed (1)**
5:8
**deposition (11)**
1:17 2:9 4:4,8 5:12
9:25 30:13 73:5,6
74:8,9
**depositions (3)**
5:17,18,21
**described (1)**
25:12
**Description (1)**
75:12
**designated (1)**
11:25
**detail (2)**
22:17 32:11
**details (5)**
12:8 16:19 52:19 56:8
65:18
**determine (1)**
64:14
**determined (1)**
57:12
**determining (3)**
48:16 67:12,13
**difference (1)**
59:11
**different (1)**
66:22
**differs (1)**
45:16
**direct (1)**
64:13
**director (3)**
7:13,25 8:3
**directors (2)**
22:24 68:16
**discussed (2)**
10:17 30:16
**discussing (5)**
22:10 40:9 41:2,21
70:20
**discussion (4)**

10:21,23,25 42:22
**discussions (9)**
10:22 33:13 41:8,14
42:18,23 66:14,17
67:20
**Disregard (1)**
42:16
**distribution (1)**
68:12
**District (2)**
1:3 4:7
**doc (1)**
13:20
**document (21)**
10:6,12 21:5,19 23:3
23:23 27:9,11,21
31:11,16 35:25
45:20 46:8 53:20
68:14,20,21,24 69:6
69:15
**documenting (1)**
8:8
**documents (7)**
8:18 11:2 26:11,18,21
26:23 35:23
**double (2)**
51:15,16
**dozen (1)**
14:19
**driver (1)**
65:11
**dropped (1)**
60:12
**due (4)**
25:11 44:22 59:10
70:21
**duly (2)**
5:2 74:8
**duration (1)**
37:7

─────────────
**E**
─────────────

**E (6)**
3:2,2 74:2,2 75:2,10
**earlier (1)**
34:10 35:5,23 54:13
56:8 67:23
**effect (2)**
51:24 69:18
**either (5)**
32:16 38:25 44:20
47:21 55:9
**electronic (1)**
8:21
**email (29)**
32:16 48:19 49:8,9,10

50:14,16 52:6,6,24
53:9,17,19 54:10,15
54:25 55:10,24
56:18,23 58:11,20
59:3,9,19 60:8
61:20 62:4,12
**employed (4)**
24:3 30:25 43:20,22
**employee (2)**
30:7 49:19
**employees (1)**
11:16
**employer (2)**
5:12 6:23
**employment (1)**
8:18
**encompassed (1)**
31:14
**enter (7)**
14:13 15:9 17:19
19:13,20 31:22 32:2
**entered (19)**
8:11 15:22 16:6,14
17:2,6,25 22:5
23:22 27:15 31:18
32:5 35:14 37:15,20
37:24 69:23 71:22
72:6
**entering (4)**
15:19 18:6 30:2,5
**entire (1)**
27:9
**entities (3)**
17:3 37:23 40:15
**entity (1)**
41:23
**equity (1)**
12:4
**ERRATA (1)**
76:2
**et (2)**
1:10 4:6
**Europe (4)**
27:16 28:25 45:7 46:4
**evaluate (1)**
18:2
**evaluated (1)**
61:14
**evaluation (1)**
18:9
**event (8)**
24:22 34:6 40:4,6,15
40:17,21 41:5
**events (2)**
8:17,17
**evidence (3)**

53:2,17 54:16
**evidenced (1)**
35:11
**exact (4)**
14:16 32:10 37:23
60:13
**EXAMINATION (2)**
5:4 75:8
**excess (2)**
59:17,25
**exchange (1)**
15:25
**executed (1)**
19:16
**executive (1)**
22:23 68:15
**Exhibit (32)**
10:8,9 20:20 21:2
23:14 27:3,6 31:2,5
31:7 35:11 44:8,9
44:25 45:2,22,23
46:19 47:25 48:3,21
48:22 62:23 68:13
68:18 75:13,14,15
75:17,18,20,21
**existence (1)**
69:15
**expect (1)**
25:24
**expected (2)**
26:5 38:16
**EXPIRES (1)**
76:25
**explain (1)**
11:20
**exposure (9)**
40:10,13 41:2,22
42:24 57:18,24 62:6
62:13
**external (8)**
17:16 23:9 30:6 39:8
39:15 71:6 72:10,18

─────────────
**F**
─────────────

**F (1)**
74:2
**facility (2)**
37:10 54:17
**fact (13)**
10:20 25:15 28:24
29:11 31:22 34:15
35:7 36:18 38:21
41:10 53:7 69:20
70:2
**factored (1)**
62:17

**factors (2)**
32:17 60:19
**fall (4)**
49:7 70:17,17,18
**familiar (4)**
5:20 14:5 50:13 68:20
**familiarize (1)**
27:10
**favor (1)**
60:15
**Fifth (1)**
3:7
**file (1)**
66:23
**filed (8)**
20:23 21:9 39:6,17
66:20 68:24 69:6,10
**filing (9)**
23:12,19,21 24:8,11
24:12 41:6 69:9
72:3
**finance (2)**
9:15 30:21
**financed (3)**
53:3,5 54:15
**financing (9)**
5:19 8:9,21 15:22
16:21 17:11 19:22
36:23 57:13
**fine (1)**
13:25
**finish (2)**
6:6,8
**firm (2)**
28:15 33:13
**first (12)**
5:2 21:13 24:13 27:19
30:16 37:15,18
39:13,19 62:22
70:18 71:7
**five (2)**
53:12 65:19
**flip (2)**
58:8 62:24
**following (2)**
49:9 58:10
**follows (1)**
5:3
**form (3)**
8:19,21 34:3
**former (2)**
11:17 49:19
**forth (1)**
74:8
**forwarded (1)**
50:19

**fourth (1)**
5:11
**frame (3)**
12:25 69:11 70:8
**frames (1)**
70:24
**frequency (1)**
61:7
**frequently (3)**
31:25 32:6 61:9
**front (1)**
16:18
**full (1)**
6:15
**function (1)**
61:17
**fund (49)**
7:4,5,9 10:11 12:12
12:15,22 13:13,21
14:13 15:9 16:9,10
16:14 17:2,10,25
18:12 20:2,16,22,23
21:8,14 22:4 23:22
24:15 27:17 28:9
29:8 33:2,17,21
37:16,19 40:12 45:6
46:4 49:21,21,23
50:3 52:4 55:12
58:5 60:2 67:17
71:21 72:6
**funds (7)**
8:2,15,22 11:25 12:2
12:2,4
**fund's (2)**
62:5,13
**further (2)**
72:25 74:11
**FX (2)**
66:24,24

**G**

**general (7)**
5:17 36:23 38:6 42:9
42:22 61:13 66:14
**generally (16)**
13:4 15:3,24 16:14
29:23 34:22,25
36:22 38:7 42:10
47:16,19 49:25
64:11 66:4 67:9
**generated (1)**
48:11
**Gianna (3)**
49:10,13 53:23
**Gibran (12)**
13:3 15:6 17:22 18:25

19:5 20:10 29:10,25
38:25 43:11,22
48:12
**Gibran's (2)**
30:4 43:19
**give (1)**
6:15
**given (4)**
11:13 22:18 69:2
74:10
**global (12)**
14:10 19:9 22:5,14
27:4,21 31:13 35:10
36:3 45:4,25 75:15
**GMRA (16)**
25:20,24 32:25 35:13
36:9 39:12 58:3,5
61:3 62:15 65:21
67:4 69:22 70:22
71:22 72:6
**go (11)**
5:22 10:21 42:14,17
43:25 48:9 49:2,7
66:17 67:22 71:8
**going (10)**
7:6 10:9 18:23 20:20
27:3 44:8 45:20
62:7 67:9 68:13
**Goldblatt (2)**
3:20 4:12
**Goldsmith (17)**
3:12 4:21,21 10:19
16:8,16 23:25 25:25
31:4 42:14,17 66:16
67:21 70:12,23 72:8
72:17
**good (5)**
4:2 5:6,7 52:18 60:22
**Gotshal (3)**
2:10 3:6 4:20
**governs (1)**
13:20
**grade (1)**
9:11
**Grateke (9)**
48:23 49:10 52:14
53:22 56:3 58:15
59:4,14 61:21
**ground (1)**
5:21
**group (1)**
32:14
**guarantee (30)**
24:7 26:24 34:22 35:6
35:8,10,14,18 36:3
36:7,9 39:12,17,20

42:2,7 43:7 70:4,8
70:10,11 71:6,23
72:2,7,10,14,15,23
72:24
**guaranteed (3)**
22:21 41:13,23
**guarantees (3)**
35:2 39:6 42:4
**guess (10)**
17:15 18:24 24:10
32:15 38:13,24 41:9
42:20 57:12 66:24

**H**

**H (1)**
75:10
**half (1)**
14:18
**hand (1)**
74:16
**handled (1)**
38:24
**happened (3)**
37:5,8 57:9
**happening (1)**
40:3
**hard (1)**
8:19
**HBK (1)**
9:7
**HC (3)**
52:19 54:4 56:9
**headquartered (1)**
4:14
**heard (1)**
14:2
**hearing (1)**
39:16
**hedge (1)**
12:4
**held (4)**
2:9 4:9 34:16 61:15
**helped (2)**
65:17 72:18
**helping (1)**
53:11
**hereinbefore (1)**
74:8
**hereunto (1)**
74:15
**hierarchy (1)**
38:13
**Highland (109)**
3:11,13 4:22 5:13,16
6:22,24 7:3,8,12,16
8:10,24 10:3,11

11:16,21 12:11,11
12:13,14,20,21
13:13 14:13 16:5,9
16:14 17:9 18:21
19:19 20:21,22
21:14 22:4 23:17
24:20 25:5,19,23
26:23 27:17 28:8,17
28:19 29:8,19 30:25
31:9,21,25 32:6,12
32:17,24 33:2,9,16
36:7,16,18 37:16,19
38:10,16,21 39:23
40:11,13,25 43:20
43:23 45:5 46:3,23
47:3 49:21 55:12,12
55:18 57:6,9,17,22
58:4 59:25 60:5,10
60:23 61:14 62:5,13
63:8,21 64:4,19
67:16,17,24 68:6,23
69:5,14,19 70:10,20
71:21 72:5,13
**Highland's (6)**
26:16 40:10 41:2,22
42:24 67:3
**Highland.OTC.coll...**
58:16
**historical (3)**
16:19 37:9 60:17
**historically (1)**
32:4
**hit (1)**
60:18
**holding (3)**
55:19,20 59:25
**Holdings (9)**
1:9 4:5 20:24 21:9
22:24 26:25 39:24
68:17 76:3
**home (1)**
9:11

**I**

**identified (2)**
21:15 26:3
**identifying (1)**
8:9
**imagine (7)**
13:11 26:2 32:9 34:5
63:14,18 64:11
**imply (2)**
16:23 56:20
**included (2)**
52:25 54:12
**including (1)**

43:9
**indicating (1)**
60:9
**indication (1)**
69:20
**individual (3)**
13:5 43:6 49:16
**individuals (3)**
13:10 17:24 30:3
**influence (1)**
6:18
**information (2)**
68:4,7
**initial (2)**
7:22 8:7
**initially (1)**
39:6
**initiating (1)**
61:9
**institutional (3)**
8:2,22 11:23 12:3
**intention (1)**
32:13
**interest (4)**
26:3 58:7 60:18 62:21
**interested (1)**
74:13
**internal (2)**
17:16 30:6
**international (4)**
9:15 27:16 45:7 46:4
**Intex (2)**
48:11 54:21
**introduce (1)**
4:17
**invert (1)**
29:2
**invest (2)**
12:7 13:18
**invested (1)**
13:14
**investing (1)**
12:5
**investment (10)**
11:22 12:14,17,21
13:5,21 15:4 18:5
29:7 50:8
**investments (3)**
9:7 13:12 29:21
**involved (26)**
8:16 15:12 17:24
18:15,25 19:5,17
20:5,12,19 30:2
31:11 32:22 35:16
37:9 38:17,23 41:8
50:5 61:6 63:12,16

64:12,15 65:8,15
**involvement (3)**
29:17 41:4,9
**ISDA (2)**
17:6,8
**issued (2)**
10:3,10
**issues (1)**
67:11
**item (1)**
51:17
**items (2)**
51:20 65:5

_____ **J** _____

**Jason (19)**
1:17 2:9 3:12 4:4,21
4:25 5:6 10:5,17
11:4 66:14 67:20
68:5 71:15 73:5,8
74:7 75:6 76:5
**Jeff (2)**
3:20 4:12
**Jenna (2)**
53:22 56:3
**Jennifer (2)**
3:5 4:19
**Job (1)**
1:25
**Jointly (1)**
1:10
**July (1)**
7:17
**June (4)**
7:25 9:4 22:25 28:24

_____ **K** _____

**K (1)**
8:25
**keep (1)**
10:19
**kept (1)**
8:19
**key (2)**
8:9,12
**keyman (1)**
8:17
**kind (2)**
43:7 47:24
**kinds (1)**
17:2
**Klinger (5)**
1:24 2:11 4:16 74:4
74:19
**know (105)**
8:14,15,16 12:24 13:8

13:14,22 14:12,20
14:23 16:18 17:6
18:12,20,24 19:2,4
19:12,13,19 20:6,8
20:13,18 24:4 26:4
28:8 29:11,14,15,24
30:9,15,18,21 31:21
32:6,19 33:3,9,16
33:21 34:6,25 35:3
35:17 36:18,21,22
37:4,6,14,17,18
38:25,25 40:14,19
42:8,13 43:3,7
46:22 47:5,9,20
49:13,14,18 50:24
52:20 53:3 54:6,14
54:22 55:11,14,18
55:23 56:11 57:12
58:6 60:13,16 61:5
63:6,10 64:22,23
66:9,25 67:3,16,23
68:3,3,6,7,9,11 69:6
69:10,19 70:6 71:22
**knowledge (11)**
26:20 35:6 68:23 69:5
69:13 71:20 72:5,12
72:14,20,21
**known (1)**
31:16

_____ **L** _____

**labeled (1)**
4:3
**landscaped (1)**
51:7
**Larson (9)**
3:5 4:19,19 5:5 31:6
43:25 71:8 72:25
75:8
**lawyer (2)**
9:19,21
**LBHI (14)**
22:21 66:20 67:10,14
68:24 69:6,10,20
70:11,21 71:23 72:7
72:14,23
**LBHI's (2)**
21:9 72:14
**LBIE (26)**
21:22,24,25 22:3 25:6
25:12,19,24 27:16
28:21 32:2 37:16,20
38:9,21 65:21,23,24
66:19,23 67:4,18,25
69:22 70:21 72:15
**LBIE's (3)**

22:20 71:23 72:7
**LBSF (1)**
42:4
**leading (1)**
45:19
**leads (1)**
51:24
**learned (3)**
39:5,19 70:10
**learning (1)**
39:11
**leave (1)**
63:23
**legal (1)**
4:13
**Lehman (45)**
1:9 4:5,20 10:10 17:3
17:7,10 20:24 21:9
22:24 25:5 26:24
27:15 30:10,16,21
37:22 38:6 39:17,24
40:10,13,15 41:2,23
42:24 45:6 46:4
49:15 52:4 55:13,20
55:20,25 57:18,25
59:24 61:25 62:6,14
68:16 69:14 70:18
71:22 76:3
**Lehman's (1)**
55:9
**Lehman.com (1)**
58:13
**Let's (7)**
6:4 10:19 11:19 43:25
49:2 57:20 71:8
**levels (1)**
18:13
**Lightpoint (5)**
48:6 54:4,13,25 55:21
**limited (2)**
10:20 45:6
**line (4)**
61:25 62:19 67:9,10
**listed (16)**
21:12 22:8 23:2,14
27:19 28:10 42:2,7
45:13,15,16 46:13
47:10,20 50:17 51:4
**little (3)**
11:19,21 49:4
**Ln (1)**
76:6
**long (2)**
7:15 9:3
**longer (1)**
28:14

**look (15)**
10:2 21:3,17 27:7
35:24 37:8 41:24,25
42:5 43:5 44:11
54:20 62:22,24
68:19
**looked (6)**
10:4 18:6,8 27:12
35:23 59:16
**looking (7)**
30:20 47:25 48:4 51:9
59:18 62:5,13
**looks (10)**
28:11 52:3 55:4 58:9
58:20 59:20 61:8
65:4,10,11
**lot (1)**
8:18
**L-B-I-E (1)**
21:22
**L.P (11)**
6:24 7:9 10:11 12:13
12:15 20:23 22:4
28:19 46:24 49:22
63:8

_____ **M** _____

**Mahmud (4)**
13:3 15:6 17:22 29:25
**major (1)**
38:9
**management (17)**
3:13 4:22 5:13,16
6:24 12:13,19,20
13:6 28:17,19 29:20
33:10,12 37:20
46:24 63:8
**manager (1)**
7:24
**Manges (2)**
2:10 3:6
**March (2)**
10:12 63:24
**margin (8)**
59:5,15,25 60:6,11,23
61:15 62:19
**mark (9)**
10:9 20:20 27:3 44:8
44:25 45:20 46:20
56:16 68:13
**marked (13)**
10:8 21:2 27:6 44:9
45:2,23 54:5,5 55:2
55:2,21,22 68:18
**marketplace (1)**
40:8

**marking (3)**
55:5,6,13
**marks (3)**
56:10,11,15
**marriage (1)**
74:13
**Massachusetts (1)**
9:2
**master (29)**
7:8 10:11 12:11,15,22
14:11 17:9 19:9
20:22,23 21:14 22:4
22:5,14 27:4,17,21
28:9 31:16,18 40:12
45:4,6,25 46:3
49:21 58:5 67:17
75:15
**matter (3)**
4:5 11:17 74:14
**matured (1)**
56:7
**mean (23)**
6:23 12:16 13:19,22
13:25 24:14 31:4
33:23,24,25 36:2
37:8 42:3,10,25
46:18 49:24 51:22
51:25 53:12 63:12
65:19,22
**means (1)**
15:22
**meant (4)**
52:24 55:3 56:14
59:14
**medications (1)**
6:19
**meet (1)**
11:7
**member (1)**
39:2
**memorized (1)**
37:25
**memory (1)**
42:3
**mentioned (7)**
15:6 16:20 31:10 35:5
36:11 39:4 71:25
**mentioning (1)**
41:12
**merely (1)**
44:18
**Merit (1)**
2:12
**message (1)**
58:20
**metric (1)**

61:11
**metrics (1)**
18:10
**Michael (4)**
52:8 53:20 55:8,25
**million (1)**
52:21
**minute (3)**
21:3 27:7 68:19
**missing (4)**
51:2,4,12,25
**mitigate (2)**
32:24 33:17
**moment (1)**
44:11
**monitor (2)**
38:16 61:11
**monitored (1)**
38:22
**monitoring (2)**
38:18 40:20
**month (6)**
52:20 54:4 56:9,19,22
56:25
**monthly (3)**
32:9 50:6 57:5
**month's (2)**
56:10,15
**morning (5)**
4:2 5:6,7 10:25 52:18
**moved (4)**
9:10 34:6 36:11,20
**movements (1)**
37:9
**multiple (1)**
60:19
**mutual (1)**
11:25

**N**

**N (2)**
3:2 75:2
**name (7)**
4:12 28:10 48:20 52:8
52:12 58:11 76:3
**names (1)**
49:3
**necessary (4)**
26:18 40:14 64:23,25
**need (3)**
6:9 54:20 57:15
**needed (1)**
64:13
**needing (1)**
65:6
**negotiated (2)**

15:17 17:12
**negotiating (1)**
29:12
**negotiation (1)**
31:2
**net (2)**
51:7 65:11
**never (2)**
52:2,3
**New (7)**
1:3 3:8,8 4:7,14,15
59:11
**Notary (1)**
76:25
**note (2)**
48:2 51:24
**notes (2)**
11:10,14
**notice (20)**
24:18,20 25:2,4,5
42:11 43:3 44:10,12
44:18 45:3,11,25
47:21 62:24 63:11
64:8,24 75:17,18
**notices (2)**
43:10 53:11
**notification (2)**
40:20,22
**notified (3)**
36:3 40:19 70:7
**notify (2)**
40:14 44:22
**number (5)**
4:8 14:16 45:17 51:11
68:22
**numbered (1)**
48:4
**numbers (2)**
29:2 67:8

**O**

**Objection (6)**
16:8,16 25:25 70:23
72:8,17
**objective (1)**
13:21
**obligations (3)**
22:20 72:7,15
**obviously (1)**
63:8
**occurred (4)**
24:4 40:16 41:15,17
**occurring (1)**
41:6
**October (5)**
8:4 46:2 48:23 50:16

50:20
**offering (1)**
13:20
**office (1)**
68:9
**offices (1)**
2:10
**offset (3)**
32:25 33:10,17
**offsetting (1)**
34:14
**Okada (1)**
46:20
**Okay (19)**
5:20,23 6:3,13,14 8:5
9:13 10:7 21:4,20
29:4 42:8 45:21
49:6,12 60:22 63:2
71:19 72:4
**once (2)**
56:21,25
**online (1)**
66:3
**open-ended (1)**
11:25
**operations (3)**
7:23 8:2,6
**opportunity (25)**
7:4,8 10:11 12:11,15
12:22 13:13 14:13
17:9 20:21,23 21:14
22:4 27:17 28:9
33:2,17 40:11 45:6
46:3 49:21 58:5
60:2,6 67:17
**option (2)**
57:6,8
**original (2)**
51:21 58:12
**originally (1)**
9:8
**outcome (1)**
74:14
**Outside (1)**
70:15
**oversaw (3)**
49:20,23 50:2
**oversees (2)**
11:23 12:20
**oversight (1)**
29:20
**owe (1)**
69:22
**owed (2)**
25:6 44:20

**P**

**P (2)**
3:2,2
**packet (1)**
54:24
**page (19)**
21:14 22:19 27:20
28:7 46:19 47:25,25
48:5 49:9 51:4,6,6
52:5 54:23 58:21
62:22,25 75:4,12
**pages (4)**
48:3,18 58:8,10
**paper (1)**
13:14
**paragraph (15)**
21:17 22:20 24:16,23
24:25 25:10 28:3
44:13,23 45:12 46:8
46:14,15,16,18
**pardon (1)**
31:6
**part (9)**
13:15 22:18 32:14
33:13 39:9 43:2
51:3,10 53:2
**partial (1)**
68:11
**particular (3)**
20:2,7 33:18
**parties (1)**
74:12
**partner (9)**
15:16 28:13,14,16,18
29:10,19 46:23,25
**Partners (1)**
8:25
**party (7)**
27:16,17 34:11,11
44:20 46:8,9
**party's (1)**
34:16
**Patrick (5)**
63:3,15 64:2,4,18
**Paul (8)**
43:11,13 48:13,14,15
52:14 53:22 56:3
**payable (1)**
25:11
**payment (5)**
26:4 46:9 52:2 67:24
68:12
**payments (3)**
51:3,4,12
**peel (1)**
43:5

**pending (1)**
6:10
**people (1)**
15:12
**perform (1)**
33:15
**performed (2)**
33:5 40:21
**person (2)**
17:14 29:12
**personal (1)**
12:6
**personally (2)**
49:15 69:17
**pertains (1)**
24:6
**Pg (1)**
76:6
**phone (1)**
32:16
**place (2)**
35:10 37:22
**please (6)**
4:17,24 52:20 54:5
56:11 62:11
**plus (2)**
26:3 62:21
**PM (2)**
38:19 57:15
**point (6)**
36:6,8 56:10,15 57:4
60:22
**portal (1)**
66:3
**portfolio (2)**
7:23 8:6
**possible (1)**
70:13
**post (87)**
1:1,17 2:1,9 3:1 4:1,4
4:25 5:1 6:1 7:1 8:1
9:1 10:1,9 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1,5 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1

68:1 69:1 70:1 71:1
72:1 73:1,5,8 74:1,7
75:1,6 76:1,5
**Potentially (1)**
68:8
**PPM (3)**
13:16,17,19
**preparation (9)**
11:11 18:17 33:6
37:12 39:9 55:15
64:19 65:9 69:3
**prepare (4)**
10:15 43:10 53:11
72:19
**prepared (1)**
42:12
**preparing (6)**
9:25 30:12 36:5 50:3
66:6 70:16
**present (2)**
3:19 43:2
**primarily (2)**
8:8 41:5
**primary (1)**
65:11
**print (1)**
48:5
**printed (1)**
51:7
**prior (17)**
5:18 8:18 18:6 23:5
24:12 39:20,21
53:18 56:19 63:17
64:12 69:9,15 71:4
72:3,11,15
**private (1)**
12:4
**privilege (1)**
6:12
**privileged (1)**
42:20
**probably (22)**
5:11 7:25 10:17 13:10
14:18 15:11 17:16
17:23 18:23 19:5,16
20:10 29:16 38:7
47:11 53:2 54:16
59:16 61:10 66:22
67:7,9
**proceeding (3)**
6:16 21:10 65:25
**process (13)**
18:25 19:6,18 20:16
20:19 31:12 32:23
38:23 61:6 64:16
65:9 67:12,13

**project (2)**
31:14,15
**proof (13)**
20:21 21:18 24:16
25:10 26:18,22 28:3
39:6 44:13 45:11
46:13 68:22 75:14
**provide (1)**
26:17
**provided (13)**
10:4 11:5 23:9,18,20
24:8,12 26:13 39:9
39:15 47:23 54:16
72:10
**Public (1)**
76:25
**pull (4)**
59:5,14 60:6,10
**pulled (1)**
59:21
**purpose (2)**
15:19 16:20
**pursuant (3)**
22:21 24:23 40:16
**put (2)**
35:10 65:17
**p.m (3)**
50:20 56:3 58:24

---
**Q**

**question (12)**
6:8,10 13:15 14:25
16:11 38:19 40:18
40:18 57:22 62:10
67:2 70:13
**questionnaire (3)**
26:8,11,22
**questions (3)**
5:25 71:16 73:2
**quick (1)**
62:8

---
**R**

**R (2)**
3:2 74:2
**rank (1)**
38:13
**rate (1)**
66:24
**rationale (1)**
60:13
**read (3)**
11:2 62:7 76:6
**Reads (1)**
76:6
**real (1)**

62:8
**really (1)**
16:18
**Realtime (1)**
2:13
**reason (2)**
6:14 76:6
**reasons (1)**
60:24
**recall (50)**
13:3 14:22,25 15:3
19:10,11,15 26:7,10
31:12 36:13 38:4,8
38:20 39:11,14,16
39:23 40:2,3,4,5,6,6
40:9,25 41:11,14,20
47:13,15,16,18
50:15 53:10,13,14
57:2 63:15 64:10,16
65:6,18,20,23 66:4
66:4,18 67:6 70:19
**recalling (1)**
42:3
**recap (1)**
71:16
**receive (2)**
25:24 68:24
**received (6)**
16:24 20:2 25:19
67:24 68:10 69:8
**receiving (3)**
16:6,15 72:16
**Recess (2)**
44:5 71:12
**recipients (1)**
58:12
**recognize (3)**
21:8 27:14 44:12
**recollection (6)**
42:9,21,23 49:4 61:13
65:15
**reconciling (1)**
50:4
**record (12)**
4:18 39:4 43:25 44:3
44:6 48:2 71:8,10
71:13,18 73:3 74:10
**records (1)**
50:4
**reevaluated (1)**
18:13
**refer (2)**
13:22 14:8
**reference (1)**
56:18
**referenced (3)**

24:7 57:4 68:11
**references (2)**
24:17 25:2
**referred (5)**
28:3 44:12 45:11
54:13 68:22
**referring (3)**
21:23 50:24 58:23
**refresh (2)**
13:17 49:3
**regarding (1)**
34:2
**Registered (1)**
2:12
**regular (1)**
61:18
**regularly (1)**
61:14
**related (2)**
5:18 74:11
**relating (1)**
42:18
**relation (3)**
55:21 65:21 67:4
**relationship (1)**
12:10
**relationships (1)**
8:10
**reliance (1)**
70:20
**relying (1)**
72:6
**rephrase (3)**
14:2 16:11 57:21
**repo (21)**
13:23 14:3,9,14 15:9
15:24 16:5,13 19:3
19:14 20:7 23:22
24:21 25:6 32:7,13
32:18 34:10 53:7
56:6 57:3
**report (1)**
15:14
**reported (4)**
1:24 15:16 63:15,25
**reporter (6)**
2:12,13 4:15,24 6:5
74:5
**reporting (3)**
4:13,17 29:10
**repos (12)**
20:17 34:19,21 53:3
53:14 54:2 57:10,17
57:19,20,23 60:17
**representing (1)**
4:20

**repurchase (14)**
13:23 14:11 17:25
18:21 19:9 22:6,15
27:4,22 37:15 45:4
45:25 47:7 75:15
**request (2)**
37:2 59:19
**requested (2)**
26:12,19 34:8
**resolution (1)**
39:5
**resolutions (1)**
72:16
**respect (3)**
47:6 63:11 64:7
**responded (1)**
59:22
**responding (1)**
6:8
**response (2)**
49:17 55:12
**responsibilities (2)**
33:4 71:24
**responsibility (2)**
26:16,17
**responsible (3)**
12:24 29:12 69:21
**restart (1)**
67:2
**resulted (1)**
60:20
**retail (2)**
11:24,24
**returned (1)**
36:25
**review (5)**
22:17 31:8 63:14,17
64:12
**reviewed (2)**
11:6 22:12,14 47:11
**reviewing (1)**
16:19
**right (5)**
9:12 29:5 35:25 53:18
61:2
**risk (5)**
32:20,25 33:10,18
34:15
**RMR-CRR (2)**
1:24 74:20
**role (10)**
7:18 8:5,7 30:24
41:16 43:17 47:5,9
63:10 64:7
**roll (15)**
18:21 20:6,17 32:13

32:18 52:18,21 54:3
54:3,6 56:8,8,12
57:7,10
**rolled (6)**
32:7 53:7,14,18 56:25
57:5
**Roos (7)**
43:12,13 48:14,15
52:14 53:22 56:3
**roughly (1)**
46:17
**rules (1)**
5:21
**Ryan (11)**
48:23 49:10,18 50:20
52:14 53:21 56:3
58:15 59:3,14 61:21
**Ryan's (1)**
61:8
**R-O-O-S (1)**
43:16

─────────────
**S**

**S (6)**
1:24 2:11 3:2 74:4,19
75:10
**saw (1)**
39:13
**saying (4)**
34:25 36:13 50:7
59:24
**says (23)**
21:21 22:3,20 24:23
44:21 46:8 48:6
50:21 51:6,7,12,15
51:18 52:14,17 54:2
54:22,25 56:6 59:5
59:8,9 68:14
**Scott (3)**
52:14 53:22 56:4
**screen (1)**
58:9
**second (4)**
46:7,19 62:25 71:9
**securities (14)**
15:25 16:7,15 30:21
34:11,15 48:13,16
51:8 56:18,21 60:11
65:3,12
**security (4)**
33:22,24 34:3 53:15
**see (40)**
11:14 13:17 21:13,21
22:3,19 24:17,25
27:11 28:20 35:22
42:6 43:6 45:7 46:5

46:7,20 48:19,24
49:3,8 50:17 52:6
52:10,13,17,21
53:19,24 54:2,7,25
56:4,12 58:17,19
59:6,20 61:23 63:3
**seek (3)**
32:24 33:10 34:2
**seen (5)**
21:5 23:3,11,16 34:14
**sending (1)**
56:8
**senior (3)**
7:22 8:5 33:12
**sense (1)**
29:3
**sent (7)**
45:5 46:3 50:18 52:7
52:8 58:15 61:21
**sentence (1)**
44:21
**September (27)**
20:25 24:9,11 39:20
39:21,22,24 44:10
45:5,14 47:14 52:9
53:21 56:2 58:14
59:4 61:22 69:9,11
69:15 70:5,17,25,25
71:5 72:3,11
**sequentially (1)**
48:4
**set (3)**
54:2 74:8,15
**settled (1)**
58:7
**settlement (1)**
5:19
**SHEET (1)**
76:2
**shorthand (1)**
74:4
**shortly (2)**
44:2 53:15
**shots (1)**
58:9
**show (1)**
10:6
**showing (1)**
60:4
**shown (1)**
10:13
**side-by-side (1)**
51:23
**signatories (1)**
8:15
**signatory (2)**

47:8 63:9
**signature (6)**
28:7,12,20 47:10
62:25 76:20
**signed (7)**
28:8,25 29:17 44:15
46:20 63:3,13
**silo (1)**
12:3
**sitting (3)**
59:17 71:20 72:12
**slightly (1)**
38:2
**small (1)**
48:5
**software (1)**
48:12
**somebody (1)**
20:10
**somewhat (2)**
9:11 41:16
**sorry (17)**
9:21 16:10 20:22
21:24 23:17 24:10
42:16 46:15,18
48:21 58:21 62:7,10
64:23 66:2 67:2
70:24
**sort (1)**
61:11
**sought (2)**
33:17,21
**source (3)**
72:13,19,21
**Southern (2)**
1:3 4:7
**span (1)**
38:6
**speak (2)**
24:3 35:4
**speaking (4)**
15:25 49:25 62:4,12
**special (1)**
17:11
**specialist (1)**
4:13
**specific (8)**
19:11 35:14 36:7,9
38:8 57:2 65:14,18
**specifically (24)**
13:3 15:2 18:24 19:4
19:15 20:8 31:13
35:24 36:21 37:6
39:14 40:2 42:6
47:9,15,19 50:15
53:13 54:21 55:10

63:16 64:10,16 67:6
**specifics (1)**
66:5
**specified (1)**
35:19
**speculate (2)**
32:15 47:10
**speculating (10)**
29:15,16 30:7,19 32:8
32:23 33:14 57:14
60:14 61:8
**speculation (1)**
32:10
**spell (1)**
43:15
**spoke (1)**
30:9
**spread (3)**
52:19 54:4 56:9
**stamped (2)**
20:24 58:24
**star (2)**
51:15,16
**start (2)**
4:3 7:21 11:19 19:24
**started (3)**
9:11 23:17 24:5
**state (1)**
44:19
**statement (8)**
25:13,15 41:18 47:11
47:24 62:18,19
65:22
**statements (1)**
41:7
**states (5)**
1:2 2:13 4:6 25:10
74:5
**status (2)**
66:9,13
**steps (1)**
40:14
**Sterling (1)**
66:23
**street (1)**
30:22
**study (1)**
9:13
**subject (3)**
5:17 7:5 61:25
**submission (7)**
26:14 39:10 63:17
64:12 66:3 69:3
71:4
**submitted (14)**
26:10,21 35:21 36:4

40:16,23 41:25
42:11 43:4,6 59:19
66:19 67:7 70:5
**submitting (4)**
26:7 41:17 65:20,24
**subpoena (4)**
10:4,10 11:3 75:13
**subpoenas (1)**
10:2
**Subscribed (2)**
73:9 76:21
**subsequent (1)**
45:18
**Suite (1)**
4:9
**summarization (1)**
31:12
**summarize (1)**
8:20
**summarizing (1)**
38:5
**supervised (1)**
37:19
**supervisor (1)**
64:9
**support (13)**
11:4,12 22:18 26:12
26:23 43:7 47:23
48:10 52:25 54:11
54:20,22 62:2
**supporting (1)**
26:17
**sure (19)**
5:21 14:15 15:18
16:12 17:5,13,20
18:10,15 32:4 33:20
38:12,12 39:3 57:8
59:23 61:7,9 71:17
**Susan (5)**
1:24 2:11 4:16 74:4
74:19
**swear (1)**
4:24
**sworn (4)**
5:2 73:9 74:9 76:21

─────────────
**T**

**T (3)**
74:2,2 75:10
**take (6)**
11:10 21:3 27:7 44:11
62:9 68:19
**taken (1)**
57:11
**talk (2)**
6:4 64:19

talked (2)
34:9 65:3
talking (3)
7:6 8:13 19:7
tape (1)
4:3
tasked (2)
8:19 61:17
team (10)
13:4,7,8 18:6 20:10
30:4 38:19 39:2
43:19 61:16
tell (6)
5:25 36:6,8 53:8
55:10 69:14
telling (1)
25:5
terminate (1)
19:2
terminated (3)
24:21 57:17,22
termination (5)
8:17 44:19 47:6 50:11
60:16
terms (8)
8:9,12 13:25 33:14
35:5 41:16 56:9
57:2
testified (2)
5:2 36:15
testimony (2)
54:13 74:10
Texas (11)
1:18 2:11,13 3:15
4:10 9:7,9,10 59:11
74:5,21
text (1)
52:17
Thank (1)
73:2
thanks (1)
59:6
thing (1)
66:22
things (3)
5:22 8:13 21:19
think (15)
5:11 13:2 14:10 15:11
17:10,21 20:4 24:2
31:4 34:24 51:19
54:12 66:2,21 70:12
Third (1)
4:14
third-party (1)
48:12
thought (2)

36:15 61:11
three (2)
5:13 71:16
Thursday (1)
10:24
time (50)
4:11 12:23,25 14:22
15:15 23:12 24:13
25:22 26:13 29:4
30:8,22 35:17,18
38:4,6,20 39:17
40:7,10,25 41:12,15
41:21 42:2,9,23
46:25 49:5,20 53:4
53:5 54:15 57:12
58:24 59:10 62:9,14
63:7 64:10 69:11,12
69:22 70:4,8,24
71:2,7,21 73:2
timing (1)
72:9
title (4)
7:12,13,22 8:3
titled (2)
27:21 45:24
today (22)
6:16 7:7 10:2,16
11:11 14:6 18:18
19:8 21:6 23:5
25:18 33:7 35:23
36:5 37:12 54:3
55:16 56:7 64:20
71:21 72:13 73:2
today's (1)
30:13
Todd (5)
15:16 28:11 29:7,25
44:15
tomorrow (1)
52:18
top (8)
48:6,20 51:8 52:8,13
58:11 59:9 68:14
total (1)
46:9
touch (1)
67:18
trades (3)
52:18 56:7 57:3
transactions (5)
20:4 31:17,22 32:2,5
TRANSCRIPT (1)
76:2
Travers (5)
15:16 28:12 29:7,25
44:15

treasury (1)
7:24
true (1)
74:9
Trustee (1)
3:4
try (3)
6:4,6,7
TSG (2)
4:13,16
Tuesday (2)
56:2 58:14
turn (6)
28:6 46:19 48:18 52:5
55:24 61:20
two (6)
29:2 53:17 54:2 57:3
70:24 71:15
types (2)
8:13 13:12
typically (2)
29:18 32:12

## U

Uh-huh (4)
6:25 23:6 34:13 58:22
ultimately (1)
69:21
Unanimous (4)
22:22 23:24 68:14
75:21
underlying (1)
14:6
underneath (1)
28:21
understand (12)
6:2,23 7:4 19:23,25
21:23 26:15 28:23
30:24 33:24 56:14
59:24
understanding (20)
15:21 16:3 19:21 20:9
24:4 25:21 27:2
29:2 31:20 34:18,21
35:9 37:21 52:23
53:6 54:9 55:3
56:24 59:10,13
Unfortunately (1)
28:10
United (2)
1:2 4:6
University (1)
9:16
use (1)
48:13

## V

vague (6)
16:8,16 25:25 70:23
72:8,17
Vaguely (1)
26:9
valuation (25)
25:2,9,12,15 41:7,18
43:3,10 45:3,10,18
45:25 47:11,21
51:20,21 53:11
62:17,18,23 63:11
64:7,24 65:22 75:18
value (13)
34:6 36:12,19,24 47:6
48:13,15,17 51:7
60:11 64:14 65:2,11
valued (2)
56:19,21
valuing (3)
47:6 55:4 56:17
varies (3)
12:23 29:22 34:24
variety (1)
60:23
various (4)
8:9 12:3 31:17 37:22
vehicles (1)
12:4
versa (1)
34:16
version (1)
22:6
vice (1)
34:16
video (1)
4:13
videographer (8)
3:20 4:2,23 44:3,6
71:10,13 73:3
videotaped (2)
4:4 73:4
volatile (1)
40:7

## W

Waco (1)
9:16
wait (2)
6:6,7
walk-through (1)
21:18
want (5)
13:24 21:18 27:7 39:3
71:15
wanted (1)

42:8
wants (1)
57:16
wasn't (16)
18:15 20:11,18 24:2
30:7 32:14,22 33:3
33:3 35:16 38:17,23
41:7 51:21 61:6
70:5
water (1)
41:21
way (3)
70:10,13 74:13
Wednesday (2)
48:22 61:22
week (1)
10:24
weeks (1)
40:6
Weil (1)
2:10 3:6 4:20
went (1)
41:3
weren't (2)
30:25 70:3
we're (3)
7:6 34:25 73:3
WHEREOF (1)
74:15
Whitehorse (5)
54:5,18,22 55:2,22
willing (1)
30:23
witness (5)
4:24 74:7,10,15 75:4
work (4)
8:23 9:5 34:19 43:10
worked (3)
7:15 13:7 50:2
working (6)
8:8,20 47:13,16 49:5
71:3
works (1)
29:18
worthiness (1)
18:3
wouldn't (2)
50:10 69:11
Written (4)
22:22 23:24 68:15
75:21
Wybolt (2)
58:13 59:20

## X

X (2)

75:2,10

**Y**

**years (4)**
5:14 53:12 65:19 67:8
**York (7)**
1:3 3:8,8 4:7,15,15
59:11

**$**

**$10,026,061 (1)**
25:11

**0**

**01 (1)**
9:12
**05 (1)**
9:4
**07 (1)**
19:12
**08 (6)**
7:17 9:4 39:22 50:16
69:11 70:25
**08-13555 (1)**
4:8
**08-13555(JMP) (1)**
1:9
**09 (13)**
7:24,25 24:9 39:20,21
63:24,24 69:9 70:5
70:25 71:5 72:3,11

**1**

**1 (8)**
4:3 10:8,9 22:19
52:21 56:10 58:21
75:13
**1st (3)**
10:12 48:23 50:20
**10 (1)**
75:13
**10th (1)**
46:2
**10(a) (1)**
24:24
**10(c) (1)**
44:24
**10,026,061.00 (1)**
45:17
**10,026,061.81 (1)**
46:10
**10/10/08 (1)**
75:20
**10:19 (2)**
44:4,5
**10:27 (2)**

**2**

44:5,7
**10153 (1)**
3:8
**103,052.05 (1)**
51:11
**11 (2)**
1:7 47:25
**11th (1)**
52:9
**11:05 (2)**
71:11,12
**11:08 (2)**
71:12,14
**11:10 (2)**
73:4,6
**12th (1)**
28:24
**12/06/2007 (1)**
28:21
**13084 (1)**
74:22
**15th (1)**
24:11
**17th (2)**
44:11 61:22
**18th (1)**
20:25
**194,451 (1)**
62:21
**194,664.02 (1)**
62:20

**2 (8)**
20:20 21:2,17 28:3
31:3 52:18 56:6
75:14
**2nd (1)**
56:2
**2:06 (1)**
58:24
**20 (3)**
1:19 2:4 76:4
**20th (1)**
4:10
**200 (2)**
2:10 4:9
**2000 (1)**
22:6
**2005 (1)**
22:25
**2007 (13)**
19:10 22:7 23:16,21
24:3 27:5,24 28:24
29:6 35:13 38:7
69:24 72:5

**3**

**2007-2008 (1)**
12:25
**2008 (20)**
23:16 38:7 39:18,24
44:11 45:5,14 46:2
47:14 48:23 49:7
50:20 52:9 53:21
56:2 58:14 59:4
61:22 69:16 70:18
**2009 (4)**
20:25 23:11 24:11
70:17
**2011 (1)**
8:4
**2013 (8)**
1:19 2:4 4:10 10:12
73:10 74:16 76:4,22
**21 (1)**
75:14
**21st (1)**
74:16
**22 (1)**
28:7
**26 (1)**
45:14
**26th (1)**
45:5
**27 (1)**
75:15
**288,000 (1)**
60:20

**3 (8)**
13:10 22:20 27:3,6
31:5,7 68:22 75:15
**3:08 (1)**
50:20
**3:42 (1)**
56:2
**300 (2)**
3:14 4:9
**31st (4)**
22:7 27:5,24 29:6

**4**

**4 (8)**
13:10 24:16 44:8,9,13
54:22 75:8,17
**44 (1)**
75:17
**45 (2)**
75:18,20

**5**

**5 (7)**

24:25 44:25 45:2,12
46:14,19 75:18

**6**

**6 (14)**
25:10 45:17,22,23
46:15,16 47:25 48:3
48:21,22 51:5,6
62:23 75:20
**6th (1)**
9:10
**6:21 (1)**
53:21
**64107 (1)**
1:25
**6531 (1)**
74:21
**68 (1)**
75:21

**7**

**7 (3)**
68:13,18 75:21
**747 (1)**
4:14
**75201 (1)**
3:15
**767 (1)**
3:7

**8**

**8th (1)**
53:21
**8,753,248.22 (1)**
45:16
**8:36 (2)**
58:14 59:9
**8:58 (1)**
61:22
**85,000 (1)**
50:22

**9**

**9th (3)**
22:25 58:14 59:4
**9/17/08 (1)**
75:17
**9/26/08 (1)**
75:19
**9:19 (1)**
52:9
**9:29 (1)**
4:11
**9:30 (1)**
2:5
**9:31 (2)**

59:4,8