Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   Adv. Case No. 15-01426-scc

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7   LEHMAN BROTHERS HOLDINGS INC.,

8           Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10  LEHMAN BROTHERS HOLDINGS INC.,

11              Plaintiff,

12          v.

13  iFREEDOM DIRECT CORPORATION (f/k/a NEW FREEDOM MORTGAGE,

14              Defendants.

15  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16

17              U.S. Bankruptcy Court

18              One Bowling Green

19              New York, NY  10004

20              May 5, 2016

21              2:03 PM

22

23  B E F O R E :

24  HON SHELLEY C. CHAPMAN

25  U.S. BANKRUPTCY JUDGE

Page 2

1    Hearing re:  Doc #52076 Motion to Enforce the Automatic

2    Stay, the Plan, and the Confirmation order against iFreedom

3    Direct Corporation and Security National Mortgage

4    Corporation filed by William A Maher on behalf of Lehman

5    Brothers Holdings Inc.

6

7    Hearing re:  Adversary proceeding: 15-01426-scc Lehman

8    Brothers Holdings Inc. v. iFreedom Direct Corporation (f/k/a

9    New Freedom Mortgage Pre-trial Conference

10

11   Hearing re:  Adversary proceeding: 15-01426-scc Lehman

12   Brothers Holdings Inc. v. iFreedom Direct Corporation (f/k/a

13   New Freedom Mortgage Doc #I3 Motion of iFreedom Direct

14   Corporation to Dismiss the Complaint, or in the Alternative,

15   to Stay or Transfer This Action, or for the Court to Abstain

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    WOLLMUTH MAHER & DEUTSCH LLP

 4         Attorney for Lehman Brothers Special Financing Inc

 5         500 Fifth Avenue

 6         New York, NY 10110

 7

 8    BY:  PAUL R. DEFILIPPO

 9         WILLIAM F. DAHILL

10         ADAM M. BIALEK

11

12    FENSTERSTOCK & PARTNERS LLP

13         Attorney for Security National

14         100 Broadway

15         New York, NY 10005

16

17    BY:  BLAIR C. FENSTERSTOCK

18

19    MACKEY PRICE MECHAM

20         Attorney for Security National

21         350 American Plaza II

22         57 West 200 South

23         Salt Lake City, UT 84101

24

25    BY:  GIFFORD W. PRICE
```

1    MILLER TOONE

2         Attorney for Security National

3         165 Regent Street

4         Salt Lake City, UT 95202

5

6    BY:  BLAKE D. MILLER

7

8    COHNE KINGHORN

9         Attorney for iFreedom

10        111 East Broadway, 11th Floor

11        Salt Lake City, UT 84111

12

13   BY:  GEORG HOFMANN

14

15   K&L GATES

16        Attorney for iFreedom

17        599 Lexington Avenue

18        New York, NY 10022

19

20   BY:  LANI A. ADLER

21

22

23

24

25

Page 5

1    OKIN HOLLANDER LLC

2         Attorney for The Lindy Funding Trust, Intervenor

3         500 Frank W. Burr Blvd., Suite 40

4         Glenpointe Centre West, 2nd Floor

5         Teaneck, NJ 07666

6

7    BY:  PAUL S. HOLLANDER

8

9    STADTMAUER & ASSOCIATES

10        Attorney for Creditor

11        370 Lexington Avenue, Suite 1703

12        New York, NY 10017

13

14   BY:  MARC A. STADTMAUER

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  So we have on the calendar this

3    afternoon two separate matters.  One is the motion of Lehman

4    Brothers to enforce the automatic stay, the plan, and the

5    confirmation order against both iFreedom Direct Corporation

6    and Security National Mortgage Company.  On that, I have the

7    motion, I have an objection, and a memorandum from Security

8    National and iFreedom and I have Lehman's reply.

9    Separately, I have iFreedom's motion to dismiss the

10   Complaint pending here or, in the alternative, to stay or

11   transfer the proceedings or to abstain.  So did you have an

12   idea as to how we should proceed?

13           MR. MAHER:  Your Honor, Bill Maher on behalf of

14   the plan administrator, LBHI.  I thought we would start with

15   the motions to enforce the automatic stay.

16           THE COURT:  Yes, I agree.

17           MR. MAHER:  And then address the other issue,

18   which is somewhat related.

19           THE COURT:  Right, right.  That sounds good.  So

20   why don't you tell me who you folks are and who's going to

21   be speaking.

22           MR. FENSTERSTOCK:  Your Honor, on behalf of

23   Security National, which is this table, Blair Fensterstock

24   from Fensterstock & Partner, Gifford Price from Mackey

25   Price, Blake Miller from Miller Toone, and Blake will be

Page 7

1    handling most of the argument, and then we have our General

2    Counsel, Jeff Stevens.

3              THE COURT:  Okay.  Let me get that again, you are

4    all Security National.

5              MR. FENSTERSTOCK:  Yes.

6              THE COURT:  Okay.  And what about iFreedom folks.

7              MR. HOFFMAN:  Good afternoon, George Hoffman.  I

8    represent iFreedom.  Also here is Lani Adler.

9              THE COURT:  All right, thank you.  I've read the

10   papers obviously.

11             MR. MAHER:  Good afternoon, Your Honor.  I'd like

12   to set the stage, if I could, just a little in terms of

13   what's at issue on these motions.

14             THE COURT:  Sure.  Also, I think it'll be helpful

15   just to make sure everybody has the same predicate facts.

16   I've probably lost count at this point, but this is at least

17   the third or fourth round, if you will, of engaging with

18   counterparties against whom Lehman is asserting

19   indemnification claims arising from or in connection with

20   the Fannie and Freddie settlements.  There are, of course,

21   differences from one to the next, but in material respects,

22   that's what we're talking about -- that class of

23   counterparties.

24             MR. MAHER:  Yes, Your Honor.

25             THE COURT:  Okay.

Page 8

1        MR. MAHER:  With respect to the parties who are

2   here before you today, Security National sold us 136

3   defective loans in an amount totaling approximately $24

4   million; iFreedom sold us six defective loans.  And, again,

5   I'm focusing here on the loans that were settled as part of

6   the Fannie Mae/Freddie Mac global settlement in January and

7   February, 2014.

8        THE COURT:  Right.

9        MR. MAHER:  iFreedom sold us six loans:  two ones

10  that deal with the correspondent lender agreement, the LPA,

11  the loan purchase agreement, and the incorporated seller's

12  guide; and four dealing with broker agreements, which is

13  separate, but similar, in the sense that there's a broad

14  indemnification clause kick in with that based upon breaches

15  of representations and warranties.

16        THE COURT:  Okay.

17        MR. MAHER:  Security Nationals are all loans under

18  the LPA and the seller's guide, as you've been addressed

19  before previously, Your Honor.

20        THE COURT:  So give me again the amount of the

21  Security National.  You said it was --

22        MR. MAHER:  I'm sorry, I didn't get to that, Your

23  Honor.  It was approximately a little more than $1 million.

24        THE COURT:  That's iFreedom.

25        MR. MAHER:  iFreedom.

Page 9

```
 1              THE COURT:  And Security National was?

 2              MR. MAHER:  About $24 million.

 3              THE COURT:  Okay.

 4              MR. MAHER:  Your Honor, that's an important point.

 5   iFreedom has six loans at issue for about a million dollars.

 6   They filed five separate lawsuits in Utah, opposed a motion

 7   to consolidate that we filed in Utah.  They filed a motion

 8   to withdraw the reference from this Court.  They filed a

 9   motion to dismiss on jurisdictional and on procedural

10   grounds, and they're opposing our motion for enforcement of

11   violation stay.

12              Any lawyer would know that it is economically

13   irrational to spend hundreds of thousands of dollars.

14              THE COURT:  So what do you think -- so what's --

15   so assuming those facts to be true, which I can hear your

16   adversary tell me whether or not it's true, what's your

17   point?  What do you think is going on?

18              MR. MAHER:  I think they're just sparing no cost

19   on litigation to try to avoid being in this Court, where

20   this Court has already ruled and has been upheld by Judge

21   Pauley, that the claims are not time barred.  That is their

22   principal defense.  There are other defenses that they've

23   asserted, as we'll get into, but they're spending untold

24   amounts of money on procedural motions to avoid being in

25   this Court.  Anyway, I'll get to that when I get to the
```

Page 10

1    argument, Your Honor.

2            As you'll recall, there are representations and

3    warranties in the loan purchase agreement, and particularly

4    in the seller's guide that's incorporated into the loan

5    purchase agreement.  Section 711 of the seller's guide has a

6    very broad indemnification clause that Your Honor is

7    familiar with.

8            There were already disputes with Security National

9    -- again, that's the $24 million in loans, Your Honor -- in

10   2007.  And that's actually alleged in their Complaint in

11   Delaware in Paragraph 17.  There were disputes over prior

12   loans.  And, again, if you remember when I was here before,

13   Your Honor, I explained to you that most of what we're doing

14   here relates to the Fannie and Freddie settlements in 2014 -

15   - January and February of 2014, which were approved by this

16   Court.

17           However, prior to that time, even prior to the

18   bankruptcy filings, there were loans that were purchased in

19   the ones and twos and threes and they were then sold to

20   Fannie Mae and Freddie Mac, they'd find defects, they'd say

21   take them back.  We then turn around to the counterparties

22   and there would be various lawsuits in different parts of

23   the country or disputes about whether or not the loan was

24   defective and whether or not they were.

25           THE COURT:  Right, but at that moment in time -- I

Page 11

1    went through this in Hometrust, the two companion cases that

2    I call Home Trust.  At that moment in time, the only party

3    that had the right to do anything was Fannie and Freddie.

4              MR. MAHER:  Correct.

5              THE COURT:  They were the only -- at that moment,

6    they were the only party who could make a repurchase demand

7    and seek to pursue remedies under 710 or otherwise.

8              MR. MAHER:  You're right, Your Honor.  You've been

9    right all along.  They were trying to confuse the record --

10   they're trying to confuse the record in terms of what was

11   said in Hometrust LHM and how things happened.  Where the

12   loans were sources by Lehman Brothers Bank from Security

13   National or somewhere else, they were transferred and signed

14   by LBHI.  LBHI then sold the loans to Fannie Mae or Freddie

15   Mac, gave their own separate co-extensive representations

16   and warranties that were co-extensive with the ones, of

17   course, they relate to the value of the property, the

18   borrowers, a lot of things that you would have to be for --

19   but they were co-extensive.  They were not assigned the

20   rights under the LPA or the seller's guide.

21             So you were right, Your Honor.  During the time

22   when Fannie and Freddie had those loans, they were the party

23   in possession of the loans that had the right to assert

24   violations, whether it was against us or, arguably,

25   depending upon whether the third-party beneficiaries,

Page 12

1    against Security National or somebody else.

2            It was only in 2014 -- January and February of

3    2014 -- when the contingent obligation that they had under

4    these prepetition contracts actually became crystallized in

5    an indemnification claim.  Under New York law, we were able

6    to turn around under these prepetition contracts and sue

7    them.

8            So you were right, once they left our hands, we

9    had no ability to sue them on those loans because they were

10   in Fannie Mae or Freddie Mac's hands.  You've been right all

11   along.  They're trying to confuse the record and say

12   somehow, we had these rights, we transferred them to Fannie

13   and Freddie, which we didn't.  We sold the loan; we didn't

14   transfer or assign the rights.  And then somehow we got

15   those things back from Fannie and Freddie in 2014, and we're

16   now sitting on those.

17           THE COURT:  But for today's purposes, frankly, all

18   this is beside the point.

19           MR. MAHER:  Yes, absolutely, Your Honor.

20           THE COURT:  All beside the point.

21           MR. MAHER:  I agree with you, but they brought it

22   up in their papers and I'm trying to clarify the confusion

23   that they've created -- attempted to create.

24           THE COURT:  Well, I have a memory.  But it's all

25   beside the point for the purposes of today, although it

Page 13

1   does, I think, animate the reality of, I think as you

2   described it, of what's happening here.  There is this 10th

3   Circuit case that came down; there's already been someone

4   who's come in -- I'm not going to be able to recall the name

5   of the parties -- that was with the Hometrust, it was about

6   a month ago, who came in and said --

7          MR. MAHER:  Standard Pacific.

8          THE COURT:  Standard Pacific, thank you.  Standard

9   Pacific, 10th Circuit case, they're right, you're wrong, you

10  know, and nothing's changed.

11         MR. MAHER:  Exactly.

12         THE COURT:  And if you read, again, beside the

13  point, but if you read Hometrust, you know, I left no stone

14  unturned.  I went through every single case that's pending

15  out there and parsed the provision.  So be that as it may,

16  it's not for today.  What's for today is whether or not they

17  are permitted to have commenced these actions in Utah and

18  Delaware, and whether that's in violation of the automatic

19  stay, the plan, the confirmation order.

20         MR. MAHER:  Very well, Your Honor.  Now, when

21  Lehman filed bankruptcy in September of 2008, clearly, these

22  contingent indemnification rights that we had under the LPA

23  and the seller's guide were property of the estate.  There's

24  no doubt that under a broad definition of the Bankruptcy

25  Code of what is property of the estate, contingent,

Page 14

1   unmatured rights are part of what is the property of the

2   estate.

3           Fannie and Freddie filed proofs of claim in the

4   Bankruptcy Court about loans that had been sourced from LBHI

5   to Fannie and Freddie.  That was settled in January and

6   February of 2014 and was approved by this Court.

7           Now, that crystallized our right to sue, Your

8   Honor, which is relevant to the issue today.  However, we

9   made an application to Your Honor that it wasn't efficient,

10  it wasn't productive, it wasn't the best use of the Debtor's

11  resources to litigate against everyone immediately

12  simultaneously.  We, therefore, applied for an ADR order

13  from you where we would be allowed to mediate and try to

14  resolve these claims during the ADR process.  You approved

15  that order in June of 2014.

16          If you remember at the hearing, Your Honor, some

17  of the people would say, well, how do I know that the claims

18  -- what claims are asserted against me, what loans, what

19  claims.  People came and objected to that and said, I need

20  clarification.  And we said to you, Your Honor, we are going

21  to specify very clearly in the ADR package that we're going

22  to give people which loans, what amounts, what's defective

23  about those loans, and what we're seeking, and our legal

24  theories.  In other words, we're going to give them the

25  whole litigation conundra, so that they'd know exactly what

1    the claims are.  And if we don't resolve the claims in

2    mediation, we're going to sue you.  That was what was last.

3           So we go through this ADR process.  In order to

4    try to do it more efficiently, more cheaply, to save money

5    for the estate, we didn't immediately go into the ADR

6    process.  We had authority, we engaged in a B2B process, a

7    business-to-business person, which we tried to resolve the

8    issues.

9           If you'll recall, Your Honor, what happened then

10   is people would say the statute of limitations bars these

11   claims.  I don't have to pay you anything.  There's nothing

12   to talk about.

13          THE COURT:  Well, it was also worse than that.  It

14   was the statute of limitation bars these claims, and it was

15   being said out there -- and I learned this in filed papers -

16   - that sellers or counterparties were being advised, you

17   don't even have to talk to Lehman because your claims are

18   barred by the statute of limitations.  So we had

19   counterparties who were simply not complying with the ADR

20   order because they had been advised that they didn't have

21   to.  So we had to clarify that, that that was not permitted.

22          MR. MAHER:  Right.  And so when we got to that

23   roadblock, Your Honor, what we did is we filed two

24   litigations here in this Court as test cases -- the

25   Hometrust and the LHM case -- for it to tee up the issue

Page 16

1    before Your Honor of the applicability of the statute of

2    limitations and whether, in fact, these claims were timely

3    or time barred.

4           There was litigation in this Court.  It was

5    clearly intended by Lehman and shown to the world that we

6    were willing to litigate these claims in this Court to the

7    extent that they were not going to be able to be resolved.

8    Your Honor ruled upon that in February of 2015.  You issued

9    the order about a year ago -- it's almost a year ago today -

10   - May 7th of 2015.  In the meantime, LHM and Hometrust, if

11   you remember, moved to withdraw the reference from you,

12   saying you didn't have jurisdiction over these claims.

13          THE COURT:  Right.

14          MR. MAHER:  That was denied by Judge Engelmayer

15   and Judge Wood, two separate -- one for Hometrust, one for

16   LHM.  If you remember, Judge Engelmayer ruled just before --

17          THE COURT:  I think every single judge in the

18   Southern District of New York has gotten a motion to

19   withdraw the reference from it.

20          MR. MAHER:  Yes, Your Honor.  But I'm saying with

21   respect to these particular claims, they said you don't have

22   jurisdiction.

23          THE COURT:  Right.  They came back, but then it

24   went up to Judge Pauley.

25          MR. MAHER:  Yes.  But what they said on the motion

Page 17

1     to withdraw the reference, Judge, is if you remember Judge

2     Engelmayer wrote a nine-page opinion.

3               THE COURT:  I don't.

4               MR. MAHER:  He wrote a very flattering nine-page

5     opinion saying that you were in the best position to manage,

6     organize, and control this flood of potential litigation

7     that was going to happen in the Courthouse.  It said many

8     other nice things, but that was the focus of what he was

9     saying.

10              THE COURT:  I'll tell you, I mean, once something

11    leaves, I've got enough to do.  I probably didn't even read

12    it. I mean, I may not even know about it.

13              MR. MAHER:  The point is, the District Court

14    looked at this and said you were the person, this was the

15    Court that these claims should be handled and managed in in

16    negotiation and potential litigation.  Judge Wood separately

17    wrote a three-page opinion saying he agreed with Judge

18    Engelmayer.

19              Then we had, by the way, iFreedom, as I mentioned,

20    has made a third motion to withdraw the reference on these

21    very same claims in the Southern District.  It's now before

22    Judge Caproni.  Judge Caproni has not resolved the issue,

23    has not contacted the parties instantly briefed.

24              You ruled that the claims weren't time barred on

25    May 7th of last year, Your Honor.  That was, as you

Page 18

1    mentioned, appealed -- or permission to appeal.

2             THE COURT:  For permission to appeal.

3             MR. MAHER:  Judge Pauley wrote a lengthy decision

4    in which he was, again, very flattering of the work that you

5    had done with respect to reading all of these cases, and

6    basically said there is no basis to doubt that Judge Chapman

7    was right in her ruling that these claims are timely and

8    that they're appropriately brought.  That's the end of the

9    ruling in terms of this Court and the District Court, Your

10   Honor, as of September 25 of last year.

11            All right, so what happened with respect to these

12   counterparties.  What we had is in April 28th, after you had

13   ruled that the statute of limitations wasn't a bar, we

14   started engaging the ADR process in earnest.  We sent an ADR

15   package to iFreedom, we sent an ADR package to Security

16   National on August 27th.

17            Again, Judge, those packages are very specific.

18   They say these are the five loans, the six loans.  There's

19   no randomness about why there are six loans in this

20   declaratory judgment actions.  We told them which loans they

21   were.  We told them what was the defect with the loans.  We

22   told them what our legal theories were of why you were

23   liable for that, not just on statute of limitations, but on

24   a whole host of other issues.  If you do not think that that

25   is a roadmap to we are going to sue you, here is the

Page 19

1    litigation coming if you don't resolve it.  There's no case

2    out there that says you have to be more precise than that.

3              Anyway, we had a mediation with iFreedom in

4    September of 2015.  We had a mediation with Security

5    National of January 7th of this year.

6              THE COURT:  But why does what you said matter?

7    Why can't they say, so what, right?  So what, we've engaged

8    in the ADR process, and if they want to sue first.

9              MR. MAHER:  Right.  That gets to the meat of why

10   we're here today, Your Honor.

11             THE COURT:  Yeah.

12             MR. MAHER:  I raise this as background because,

13   frankly, iFreedom's motion to dismiss, they raise a lot of

14   these issues about who filed first.

15             THE COURT:  Yes, that's true.

16             MR. MAHER:  Whether you were told in advance of

17   what the claim -- litigation insipient or not, all of this

18   is relative to those issues, Your Honor.

19             THE COURT:  I understand.

20             MR. MAHER:  So iFreedom sued in December five

21   separate declaratory judgment actions on six loans.  Within

22   days -- literally within days -- we filed our own action

23   here against iFreedom.  That's important when we get to the

24   other motion, Your Honor.

25             Security National, they filed a lawsuit in

Page 20

1    Delaware on January 26th, and we filed again our omnibus

2    action, including then roughly 150 counterparties, within

3    days of that filing.  Again, that matters in terms of who's

4    first and whether or not there's any first to file rule

5    principle that applies when people are filing within days of

6    each other.

7            Their filings, Your Honor, were clearly efforts to

8    anticipate that we were going to sue them and get the first

9    drop on us in the jurisdiction that they thought was

10   favorable to them, away from your ruling and Judge Pauley's

11   ruling on the statute of limitations.  They're forum

12   shopping, in our view, and it's an end run, frankly, around

13   this Court's jurisdiction.

14           We're coming now to what is really the legal issue

15   for you today in terms of the automatic stay.  We've made

16   applications under two separate provisions to enforce the

17   automatic stay: 362(a)(1) and 362(a)(3).

18           Turning first to 362(a)(1), Your Honor, it

19   requires the commencement of a proceeding against a Debtor

20   that was or could have been commenced before the

21   commencement of the case under this title.  Now the mortgage

22   sellers can see the declaratory judgment action would, in

23   fact, violate -- could violate -- that provision of the

24   automatic stay.  That's iFreedom's brief at Page 13.

25           THE COURT:  Well, but see, this is where it gets

Page 21

1    really interesting because of the inconsistencies in the

2    thinking by what the cause of action accrue, because in

3    their view of the world, the reason that the claims were

4    barred by the statute of limitations is that the cause of

5    action accrued way earlier.  Right?

6              MR. MAHER:  Yes.

7              THE COURT:  But that's not right.  The cause of

8    action didn't accrue then.  The cause of action that you're

9    asserting against them for indemnification did not accrue

10   until the Fannie and Freddie settlement was effective.

11             MR. MAHER:  Correct.  But under their theory, Your

12   Honor, they could have sued prepetition for a declaration

13   that these claims were untimely or that there were no

14   breaches of representations and warranties or the assignment

15   wasn't proper or all the other things that they were --

16             THE COURT:  But they couldn't have sued -- they

17   could have sued the party in whose hands the piece of paper

18   was at that time, not -- and that wouldn't have been the

19   reorganized LBHI.  Somebody has a little timeline in there.

20             MR. MAHER:  Yeah, I saw the timeline, Your Honor.

21   It's inaccurate.  It is accurate with respect to repurchase

22   claims.

23             THE COURT:  Yes, that's the point.  It's accurate

24   with respect to repurchase claims.  It's the repurchase

25   claims that could have been brought prepetition.  The claim

Page 22

1    that you are asserting against them now is not a repurchase

2    claim.

3              MR. MAHER:  I understand that.

4              THE COURT:  It's an indemnification claims.

5              MR. MAHER:  I understand that.

6              THE COURT:  So, therefore, because it's not a

7    repurchase claim, your first -- the 362(a)(1) argument, I

8    don't think works.

9              MR. MAHER:  Let me respond to that.  I understand

10   your point exactly, Your Honor.  It depends upon the yin and

11   the yang, which glass or prism you view it through --

12             THE COURT:  You are really rolling out the

13   metaphors there -- yins and yangs and glasses and prisms.

14             MR. MAHER:  -- under their theory, Your Honor.

15   Our point is I agree with you.  We think that the claims did

16   not accrue until January or February of 2014.  And, of

17   course, it's, like, well, how could they have brought those

18   claims prepetition if they didn't accrue until January 20 of

19   2014, on our view of the world.

20             On their view of the world, the claims started to

21   accrue on the indemnification claims when they sold the

22   loan.  That's their view of the world.  That is what they

23   are propagating in all these courthouses around the country.

24   Your indemnification claim accrues at the same time you sold

25   the loan.

Page 23

1              THE COURT:  Well, I have this colloquy in

2       Hometrust.  And counsel, at that hearing, acknowledged that,

3       had you shows up at that point and attempted to sue, it

4       would have been dismissed for not being ripe.  So it sets up

5       this conundrum of you're either too early or you're too

6       late.

7              MR. MAHER:  Correct.

8              THE COURT:  Which can't be the way that it works.

9              MR. MAHER:  I agree with you, Your Honor.  And

10      that's the right way the world should work.  I agree with

11      you.  What I'm saying is, their view of the world -- that

12      the indemnification claim runs from the date of the purchase

13      of the loan -- means that they could have brought these

14      claims prepetition depending upon the timing of the loan, or

15      they could have brought a declaratory judgment saying

16      there's going to, or on their assignment claim or on their

17      breach of the written warranty claim.

18              I'm saying if you look at it from their

19      perspective on their view, they could have brought a claim

20      prepetition that is barred under 362(a)(1).  That's my

21      point.  I agree with the way the world should work and the

22      way the world you see it, Your Honor.

23              THE COURT:  Right.  But I have to rule based on

24      the correct view of the world.  I don't agree with that view

25      of the world, right?

Page 24

1          MR. MAHER:  Yes.  No, but, Your Honor, what

2    they're saying is these claims could not have been brought

3    prepetition.  Under their view of the world, they could have

4    been.

5          THE COURT:  Right, I got it.

6          MR. MAHER:  Anyway, I'll move on.  They cite Excel

7    Specialty, Your Honor.  That has nothing to do with this

8    situation.  But if we're moving on past 362(a)(1), I'll pass

9    that case.

10          THE COURT:  Yeah, because I think that the real

11    crux of it is set forth starting at Page 8 of your reply,

12    where you walk through how 362(a)(3) and the plan and the

13    confirmation order, how that all works together.

14          MR. MAHER:  Right.  Your Honor, under 362(a)(3),

15    any act to obtain possession of property of the estate or

16    property from the estate or to exercise control over

17    property of the estate is subject to the automatic stay.

18          Now I've already established and we discussed

19    earlier, Your Honor, that there's no question that as of the

20    petition date, these contingent indemnification claims were

21    property of the estate, contrary to their factual confusion.

22    There's no question that the definition of property of the

23    estate is extremely broad.  These contingent unmatured

24    indemnification claims weren't property of the estate as of

25    the date of the filing.

1              THE COURT:  But they say to that, they say, ah-ha,

2       then they quote me.  They quote me for the proposition that

3       the claims didn't accrue until the Fannie and Freddie

4       settlement; so, therefore, how could they have been property

5       of the estate at the time of the confirmation.

6              MR. MAHER:  Right.  And the answer is that they

7       were contingent unmatured indemnification claims, which

8       clearly fall within the broad definition of property of the

9       estate as of the petition date.

10             Now what they also say separately -- and I think

11      that responds to that argument.  What they also say

12      separately is even if it was property of the estate, it

13      ceased to become property of the estate after the plan was

14      confirmed and became effective.  That's one of their

15      arguments, Your Honor.  I'll get to that in a second.

16             The contingent indemnification claims are

17      prepetition contracts that were property of the estate.  The

18      Lehman plan provided for liquidation of the indemnification

19      claims for the benefit of the creditors of the estate.  And

20      as part of the plan, Your Honor, there was a broad

21      injunction provision, which continued the automatic stay.

22      Under 1307 of the plan at 54 of the order, all injunctions

23      or stays arising out under or entered during the Chapter 11

24      cases, under Section 105 or 362 of the Bankruptcy Code or

25      otherwise, and in existence on the confirmation date shall

Page 26

1   remain in full force and effect until the closing of all

2   these cases.

3          That, Your Honor, and you also retained

4   jurisdiction under the plan in order to enforce those

5   things.  The reason we are all here, Your Honor, the reason

6   that you approved these indemnification settlements, and the

7   reason you approved the ADR order is there is jurisdiction

8   under the plan to protect what was the property of the

9   estate.

10         Now it has revested.  They are correct, it

11  revested, but it revested subject to the other provisions of

12  the plan.  The other provisions of the plan maintain the

13  prior injunctions that were in place, Your Honor, as of the

14  time that this was property of the estate.  And there's a

15  reason for that -- LBHI did not get a discharge under the

16  plan, Your Honor, and the continued stay is the only thing

17  that prevents the dismembering, frankly, of the assets of

18  the Debtors from people filing all over the country with

19  respect to claims that Lehman has.

20         THE COURT:  I'm struggling to find it now.

21  There's a provision in the ADR order -- what I'm looking for

22  is in one of the pleadings, there's a quote from the ADR

23  order.  I'm sorry, I had a long day ahead.  Here it is, it's

24  on Page 14 of Security National's memorandum, and it quotes

25  Paragraph 25 of the ADR order.  And it says, if a seller --

Page 27

1    that would be them -- has commenced any action or proceeding

2    in any other Court or forum or commences any other action or

3    proceeding in any other Court or forum following service

4    upon it of an indemnification ADR package, LBHI reserves the

5    right to remove to this Court any such lawsuit, proceeding,

6    or claim, and the defendant take action in any such Court or

7    other pleading to protect LBHI's creditors.

8            Security National, in its pleadings says, it

9    responded that it did not agree that LBHI would have any

10   valid removal rights, and it preserved all of its defenses

11   related to removal.

12           So my question is, if you weren't contemplating

13   that, in fact, there could be litigation elsewhere that

14   wasn't violative of the plan and the confirmation order, why

15   is that in the ADR order?

16           MR. MAHER:  I think we responded to that in our

17   reply brief, Your Honor.  We basically said it's just a belt

18   and suspenders thing.

19           THE COURT:  In case someone did it?

20           MR. MAHER:  In case somebody did it.  That didn't

21   say we didn't think it wouldn't be in violation of the

22   automatic stay; it just says we also have this right, we're

23   reserving that right as well.  We always have the right,

24   which is specifically reserved in the plan and the

25   confirmation order, that the stays that were in place remain

Page 28

```
 1    in place under the plan and the order.  It's completely

 2    coextensive.  The plan already says that.  This is saying

 3    something in addition to that, Your Honor.  It's a belt and

 4    suspenders.  That's what we said in our reply papers.

 5              Again, just a couple of references to the cases

 6    that they cite, Your Honor, on the 362(a)(3).  Obviously, we

 7    believe the Utah action and the Delaware action are intended

 8    to undermine LBHI's ability to litigate the indemnification

 9    claims in this Court, which is overseeing this entire

10    process as the District Court has said is the appropriate

11    way for these matters to be handled.

12              They have cited -- we cited the Madoff decision

13    from 2011, Judge Lifland in which the defendant was held to

14    have violated the automatic stay under 362(a)(3) by filing a

15    dec action in the Cayman Islands -- it was Maxum in that

16    case -- saying that none of their rights declared under

17    these agreements upon which the Debtor wanted to pursue as

18    the natural claim if it's claims.  And Judge Lifland clearly

19    held in that case that that was a violation of 362(a)(3).

20    We cite that to you as precedent for what we're saying here

21    today.

22              Now they cite you two or three cases, Your Honor.

23    There's the ResCap case from 2015 by Judge Glenn.  That has

24    nothing to do with the circumstances here.  They use the

25    colorful sword and shield language.  But if you actually
```

Page 29

```
 1    read that case, what that case relates to is a post-
 2    confirmation dispute in which the Debtor decided to pursue
 3    litigation, instead of making the put back, that they were
 4    required to.  And as a result of that, the other side was
 5    entitled to attorneys' fees, and there was a counterclaim in
 6    that case.  That has nothing to do with this circumstances.
 7    That is totally -- basically, what Judge Glenn said is that-
 8    -
 9              THE COURT:  Sause for the goose.
10              MR. MAHER:  Yes, exactly.  Once you walked out of
11    here, if you are breaching your contract and there's a
12    provision saying that they can recover, they can recover.
13    That has nothing to do with the situation that we have here.
14    They cite the (indiscernible) case.  That case involved a
15    group of minority shareholders who sued a company that the
16    Debtor wanted to do business with, but had yet not done
17    business with, in which they needed Bankruptcy Court
18    approval in order to approve that relationship.  So it was
19    completely in (indiscernible), and they were saying it was a
20    violation of 362(a)(3).  And the Court was saying, you don't
21    even have a contract, you don't have an agreement, and it's
22    minority shareholders of the other company that the company
23    you want to do business with are suing for breach of
24    fiduciary duty.  That's not a 363(a)(3) problem.  That's the
25    case they cite to you; there's no relevance to this case,
```

Page 30

1    Your Honor, and similar with the other case they cite.

2             Now I can briefly, if you'd like, address --

3    literally in two minutes -- the opposition to the motion to

4    dismiss, stay, or transfer to iFreedom, or I can wait until

5    after this.

6             THE COURT:  Why don't we wait.  Can you give me

7    the page cite to the Judge Lifland decision?  I mean, in the

8    brief, which brief it's in.

9             MR. MAHER:  In my brief?

10            THE COURT:  Yes.  It's in your reply?

11            MR. MAHER:  Well, it's actually in our main brief

12   and in our reply, Your Honor.  It is called Securities

13   Investor Protection Corp., the one off Madoff.

14            THE COURT:  Just looking for the page.

15            MR. MAHER:  It's 460.

16            THE COURT:  Oh, there it is, I see.

17            MR. MAHER:  460 Bankrupt 106 (2011).

18            THE COURT:  Right, thank you.  Thank you very

19   much.

20            BLAKE MILLER:  Good afternoon.

21            THE COURT:  Good afternoon.

22            BLAKE MILLER:  I'm Blake Miller representing

23   Security National.  Your Honor, the issue here today simply

24   whether the Delaware Superior Court (indiscernible)

25   automatic stay, at least as to Security National.  That's

Page 31

1    our case.

2           There are two provisions of the automatic stay

3    that are sought to be invoked.  You got (a)(1) and (a)(3),

4    actions that could have been commended by the petition date

5    or actions to take control of the property of the estate.

6    Let me address the first.

7           The issue there is simple.  Could Security

8    National have commenced a declaratory judgment action by at

9    least September, 2008.  The law on what's required for

10   declaratory judgment actions are pretty clear across the

11   country, and Delaware follows it, black-letter law, four

12   requirements: first, there has to be a present dispute

13   relating interest; second, must be asserted against a party

14   who holds that interest; third, the conflicting interest

15   must be real and they must be adverse; and four, they must

16   be right and not contingent on any future possibilities.

17          So present disputes can be contingent, can be

18   unmatured, can't be potential.  Lehman doesn't dispute these

19   requirements; in fact, it'd be hard to legitimately do so.

20   And although we set forth the applicable law for declaratory

21   judgment actions, Lehman hasn't cited a single case in

22   contrary.  They do take action -- issue with our citing

23   Excel Specialty case, on the base that Excel Specialty,

24   Lehman claims, does not hold that declaratory judgment

25   actions are not immune from the automatic stay.  Well, I

Page 32

1    agree.  It didn't hold that.

2            THE COURT:  You know, we can short circuit this

3    because there's no way that this action could have been

4    brought prepetition because a claim did not arise until

5    2014.

6            BLAKE MILLER:  Agreed.  Basically, we didn't know.

7    To supplement that, Your Honor, and cut to the chase, we

8    sold loans to the bank.  After that, we don't know what

9    happened to them.

10           THE COURT:  Well, now you do.

11           BLAKE MILLER:  Now we do, but in 2008, we didn't.

12   And a number of these got sold all through secondary

13   investors all over the place.  We know now about 1 percent

14   ended up in Fannie and Freddie Mac of our loans.  I don't

15   know, I can't sit here and tell you -- stand here, sorry --

16   and tell you what happened to the other 99 percent.  I

17   couldn't sue them to date, I wouldn't know who to sue.  I

18   guess I had to do John Doe declaratory judgment actions all

19   across the country.

20           So if I were to bring a declaratory judgment

21   action in 2008, I'd have to file an action against someone I

22   don't know against a claim that hasn't arisen, not yet

23   asserted, and upon which I (indiscernible).

24           THE COURT:  You won this point.

25           BLAKE MILLER:  Should I go on?

1          THE COURT:  So it's a local rule -- when you win,

2      you can stop arguing the point.

3          BLAKE MILLER:  Sorry, I get excited.  Second part,

4      (a)(3), property of the estate.

5          The obvious question then, is as of the filing of

6      the Delaware action, is it property of the estate.  I'm not

7      going to argue whether or not it was in September, 2008.  I

8      mean, I think it's an interesting position that under their

9      theory, you could argue it either way, but it doesn't matter

10     for us.  As of 2016 when the Delaware action was filed, was

11     that property of the estate.

12         1141 of the Bankruptcy Code is clear: Upon

13     confirmation of the plan, unless the plan or confirmation

14     order otherwise specifies, the property of the estate ceases

15     and becomes vested back in the Debtor.

16         So we look at the plan -- that's what the law is

17     and generalized.  Let's look at whether the plan or the

18     confirmation order otherwise specifies, and 13.7 of the plan

19     is the application provision.  It provides that on the

20     effective date, property of the estate shall vest in the

21     respective Debtor in all respects as if there were no

22     pending bankruptcy cases under any chapter or provision of

23     the Bankruptcy Code -- pretty clear.  The confirmation order

24     in Paragraph 39 is essentially the identical language.  It

25     vests in the Debtor as if no bankruptcy case or provision

Page 34

1    applied.  It's the (indiscernible) very broad, revesting

2    provisions seen in cases all across the country.

3             Now Lehman points out, though, there's language at

4    the end of that -- each of those paragraphs that say -- that

5    follows as if there are no pending cases language, which

6    says, and I quote, "except as explicitly provided herein."

7             THE COURT:  Right.

8             BLAKE MILLER:  Explicitly means fully and clearly

9    expressed, meaning leaving nothing implied.  So the issue

10   is, is there anything in the plan that expressly explicitly

11   -- not impliedly -- continues property of the estate.  Now

12   we're conflating on this side continuation of the automatic

13   stay, which another provision plan does, with continuation

14   of the estate.  What we're looking in 13.7 is does the

15   estate continue irrespective of 13.7.  Is there explicit

16   provision of the plan continuing the estate?  Not the stay,

17   the estate, and there is none -- 13.7 couldn't be clearer,

18   in fact, and the same with the confirmation order.

19            What Lehman argues in the reply memo is though

20   even though these claims vested back to the Debtor from the

21   estate on the effected date, they quote, "retain the

22   characteristics of and continue to functionally be property

23   of the estate.  It's an implied -- attempt to imply the

24   continuation of the estate, something this plan says you

25   can't do -- invest, unless expressly explicitly provides a

1    continuation.

2            So any attempt to imply the continuation of the

3    estate is contrary to the terms of both the plan and the

4    confirmation order.

5            Another provision of the plan, they cite -- I'm

6    sorry.

7            THE COURT:  I'll let you keep going.

8            BLAKE MILLER:  Have I confused you?

9            THE COURT:  No, you have not confused me.  You've

10   not confused me at all.  You are -- I disagree with your

11   reading of how all this works.  It would lead to reading the

12   confirmation order as being a completely empty and a

13   document that has no protective power of the Debtor.

14           Well, what would be the point of it?  The point of

15   the provisions in 13.1 and 13.7 and Paragraph 54 of the

16   confirmation order are to exactly do -- to give the Debtor

17   the exact right that it has here, which is to continue to

18   liquidate and collect and solely control property of the

19   estate.  This action, this cause of action against your

20   clients, as of the time that that confirmation order was

21   entered was undeniably property of the estate.

22           BLAKE MILLER:  I believe under --

23           THE COURT:  Now you're conflating unmatured and

24   contingent with whether or not something was property of the

25   estate.

Page 36

1        BLAKE MILLER:  I'm not trying to.  What these

2   claims were, matured and co-present effect, I don't care.

3   The issue is whether or not --

4        THE COURT:  You need to care.

5        BLAKE MILLER:  I don't care for the purposes of

6   determining if the property estate in 2016.  The issue is

7   was there an estate that could hold those claims in 2016, or

8   did they go back to the Debtor free and clear of the

9   Bankruptcy Code and Bankruptcy Rules as if there are no

10  pending case.  I think the confirmation order and the plan

11  do very effective things.  These are done all the time,

12  where they vest back in the Debtor.  And contrary to what

13  counsel says, there is a discharge of the plan.  It's in

14  Paragraph 13.4.

15       So the other thing you would have to read 13.7 to

16  do is basically change the operation of 362.  What it says -

17  - I'm sorry, not 13.7, that's the vesting provisions.  The

18  provision dealing with the continuation of the stays.  Any

19  stay in effect, whether under 105 or 362, shall continue.

20  It provides for a dis.  It doesn't change the operation of

21  the automatic stay -- only Congress can do that; it provides

22  that simply whatever stays are in existence at the time

23  shall continue until closing of the case.  It doesn't make

24  any broader, it doesn't change they operate, it doesn't

25  change 362's working at all.  And what we know of 362,

Page 37

1    there's a number of different actions that can violate the

2    automatic stay, one of which involves property of the estate

3    to stay free.

4            THE COURT:  What's the purpose of the extension of

5    the injunction under the plan and the confirmation order?

6    What do you think the purpose of that is?

7            BLAKE MILLER:  In cases that I've done, largely

8    because there's often these type of plans where discharge is

9    granted upon distribution.  A discharge is usually on the

10   automatic stay for all non-estate property continues until

11   closing the case or discharge.

12           And in this case, they're providing for all those,

13   all the other elements of an automatic stay for non-estate

14   property continues now 'til closing -- not discharge --

15   closing.  That's what this did.  It affected the timing of

16   non-estate property automatic stay.  Look at 362.  There are

17   a number of provisions that are applicable, or the actions

18   that violate the automatic stay.

19           THE COURT:  But the point of these plan provisions

20   was to continue to protect property of the estate --

21   Debtor's property of the estate as of confirmation in the

22   same way that it was protected prior to confirmation.

23   That's what this does.

24           BLAKE MILLER:  Then it changes Section 362.  Your

25   Honor, I don't think it can do that generally because 362 in

Page 38

1   two different ways makes very, very clear.  The stay cannot

2   protect property once it leaves the estate; 362(a)(3) says

3   it only protects property of the estate, and 362(c) says the

4   automatic stay terminated as to property of the estate when

5   it ceases to become property of the estate.

6          THE COURT:  It says except as explicitly provided

7   herein.

8          BLAKE MILLER:  And I don't know anything that's

9   explicitly provided to continue the estate.  If you

10  interpret it that way, Your Honor, then what we have -- I

11  mean, 362 now reads differently, but I don't think that was

12  what was intended.  It's a plan injunction then.  Let's make

13  it a plan injunction.

14         THE COURT:  I'm not going to allow you to put

15  words in my mouth.  You can make your argument.

16         BLAKE MILLER:  All right.  The other concept, and

17  it would appear to me, would be it didn't continue the

18  automatic stay.  It created a new stay under the plan that,

19  irrespective of the fact the 362 ends the stay when property

20  no longer is property of the estate, this shall continue a

21  stay.  And that's a plan stay, a plan injunction, and it

22  binds those who are bound by the plan.

23         Under the Code, 1123 -- 1141, I'm sorry -- it

24  binds the Debtor, equity security holders, those who receive

25  distributions under the plan, creditors.  It's not disputed

Page 39

1    we're none of those.  The confirmation order says the same

2    thing; it binds the creditors, the Debtor, equity security

3    holders, those receiving distributions under the plan.  The

4    plan also says the same thing.  We have shown where we are

5    none of those.  We're just a party that, years later, Lehman

6    has asserted a claim against.  We did not participate in the

7    case, their case.  We did not offer a proof of claim.  We're

8    not a creditor.  We're not a security holder.  We're

9    nothing.

10            So if it is an injunction that is not found within

11    362, but derives its power and effectiveness from the

12    confirmation order, it doesn't bind us.

13            THE COURT:  But the cause of action is property of

14    the Lehman estate, right?

15            BLAKE MILLER:  I would disagree, respectfully.

16            THE COURT:  So whose property is it?

17            BLAKE MILLER:  The Debtors.  When a bankruptcy

18    case is filed, the Debtor has a universe of properties.

19            THE COURT:  Okay.  You know, maybe I've had too

20    many long days, but I really feel like you're lecturing me.

21            BLAKE MILLER:  I don't mean to.

22            THE COURT:  And I actually know how to do this,

23    okay.  So I don't need a lecture on the Bankruptcy Code or

24    how Chapter 11 works.

25            BLAKE MILLER:  I'm trying to explain myself and

Page 40

1    I'm doing a poor job.  I'm sorry.  I believe --

2              THE COURT:  The way that you are characterizing

3    the confirmation order, you're putting a gloss and an

4    interpretation on it that is pretty new.  It's certainly

5    going to be news to Lehman, who's been operating under the

6    confirmation order for quite a few years.  So you can keep

7    going, but I really don't want a lecture on bankruptcy 101.

8    Okay?  Go ahead.

9              BLAKE MILLER:  I'm trying to explain where I

10   believe it is property of the Debtor, not property of the

11   estate.

12             THE COURT:  Okay, go ahead.

13             BLAKE MILLER:  I believe that when a plan gets

14   confirmed, property of the estate can go various ways, and

15   the plan can provide for it.  If the plan doesn't provide

16   for it, the property of the estate -- the estate ceases, and

17   it just vests in the Debtor (indiscernible).

18             THE COURT:  So what are these guys doing all these

19   years?  Who were they working for?  What are they going to

20   do with this money that they collect?

21             BLAKE MILLER:  They would --

22             THE COURT:  Where does that go?

23             BLAKE MILLER:  The plan should provide for the way

24   it goes.  I believe it probably goes to administrative

25   expenses, and then creditors.  The plan should provide.  The

Page 41

1  plan is like a contract; in fact, I think that's the term

2  they used (indiscernible).

3          THE COURT:  The plan is a contract, right.  But

4  I'm trying to understand why you think that the Lehman plan

5  administrator doesn't have the right to exercise exclusive

6  control over the claims and causes of action that he's

7  pursuing in order to continue to liquidate the estate and

8  pay the creditors.  That's the part I don't understand.

9          BLAKE MILLER:  I believe the plan vests those

10  claims in the plan administrator.  I'm not disagreeing with

11  what Your Honor just said.  I believe it does.  The issue is

12  whether or not it is still vested with the protection of

13  being property of the estate under Section 362.  Now if the

14  plan and the confirmation order grants some additional

15  protections that 362 does not grant, then that's a plan

16  issue.  And then I would argue or submit, respectfully, Your

17  Honor, we're not bound by that.  Under 1141, the express

18  terms of the confirmation order, but express terms of the

19  plan.

20          I believe 362(a)(3) only applies to property of

21  the estate.  I don't believe the plan continued the estate.

22  It did continue the automatic stay.  It did vest these

23  causes of action and the plan administrator to pursue and

24  collect on behalf of creditors.

25          THE COURT:  Okay.

1          BLAKE MILLER:  There is much said at the beginning

2     of counsel's statements, I don't believe that they are

3     relevant to the issue of the automatic stay.  It's been

4     clear in the issue of forum shopping, I'm just -- on the

5     merit comment, I suppose.  To that, Your Honor, would be

6     that whether or not it's forum shopping isn't a violation of

7     the automatic stay.  It's a separate issue, separate

8     matters, and maybe it's related to the other matters before

9     the Court involving other parties, but not Security

10    National.

11         We do believe there's been a lot said here.  I

12    know that the proposed order that was submitted to Your

13    Honor, it asks you to make certain findings based on the

14    motions.  My concern --

15         THE COURT:  You know, what -- I'm just trying to

16    distill down what you're saying.  And one of your key points

17    is you weren't here during the plan process, you can't

18    possibly be bound.  But that's an incorrect view of 1141.

19         BLAKE MILLER:  May I respond?  I wasn't sure.

20         THE COURT:  Sure, you can respond.

21         BLAKE MILLER:  1141(b) - I'm sorry.

22         THE COURT:  You know, here's the thing.  There's a

23    lot of discussion about, you know, Bankruptcy Court's post-

24    confirmation jurisdiction and lessons.  There's a lot of

25    clarity about it -- that's point number one.

1              Point number two is, I will agree with you that we

2    ought to pay attention to the scope of plan injunctions.

3    Okay?  Because you cannot -- a Bankruptcy Court cannot enter

4    a plan injunction that, for example, could be read to limit

5    ordinary commercial activity.  But a plan injunction and a

6    plan of reorganization have to have the ability to safeguard

7    to the Debtor that's emerging from bankruptcy the ability to

8    collect, pursue causes of action and control that property

9    for the benefit of the creditors of the estate.  It has to;

10   otherwise, it's a free-for-all.

11              BLAKE MILLER:  The causes of action are vested in

12   the plan administrator, and the plan administrator is

13   charged with that responsibility.  We are not contesting

14   that.

15              THE COURT:  You're interfering with that property.

16              BLAKE MILLER:  Post-confirmation, I mean, those

17   claims can be brought in State Court, it can be brought

18   other places.  It doesn't interfere with it, nor does it --

19              THE COURT:  Of course it interferes with it.  It's

20   not your call.  It's the plan administrator's call.  The

21   property belongs to him.  The only reason that you are here

22   complaining is because you want to bring your dec action

23   anywhere but here, because you know already that here, this

24   Court has a view of the statute of limitations that is

25   different from your view.  That's the only reason.  Let's

Page 44

1    just be very blunt -- that is the only reason.

2            So, therefore, nothing could be more clearly

3    interfering with the plan administrator's plan to bring

4    these causes of action here and, by the way, in one place.

5    He's a fiduciary who doesn't have the ability or the

6    resources to run around the country after 3000

7    counterparties and thousands and thousands of loans and

8    bring one-off suits.  That's the whole point.  That's the

9    point of the ADR.  That's the point of these provisions that

10   got included in the plan and in the confirmation order and

11   that, frankly, people have been obeying and relying on for

12   years.

13           BLAKE MILLER:  In response, Your Honor, the action

14   in Delaware was filed for a number of reasons.  I can get

15   into them or Mr. Price is more familiar with them.  But

16   whether or not these are vested with the Debtor with the

17   right to pursue them, I think is a separate issue.  And

18   whether or not there is an exclusive determination by the

19   plan administrator on how they're to be brought and how

20   they're to be resolved and the parties against whom they're

21   sought have no say.

22           I think 1141(a) of the Code identifies -- let me

23   grab the section, Your Honor -- the provisions of the

24   confirmed plan by the Debtor in any issues and securities

25   under the plan, in an entity to acquiring property under the

Page 45

1    plan, and any creditor, security holder, or general partner

2    of the Debtor.

3            We have cited two cases saying that non-Debtors or

4    non-parties can be bound.  I think if you don't participate

5    in the case and you fall within one of these classes, you're

6    going to be bound.  If we're a creditor and there's a

7    channeling injunction that the plan provides, I think we're

8    bound.  If we fall within these classes, I think we're

9    bound.

10           The confirmation order uses the same description,

11   Your Honor, and so does the plan.  We are not -- and it's

12   undisputed -- we are not any of these classes.  If we have a

13   claim against the Debtor and the plan provided for

14   channeling that we had to pursue, we're bound by that

15   whether or not we chose to come in New York and argue about

16   it.  That's part of the reorganization process.  But this is

17   a plan injunction, though, the simple fact is we don't

18   follow in its classifications of people or entities that

19   either the plan or the confirmation order can bind.

20           Counsel for Lehman argued this is a contract.  I

21   wouldn't disagree.  But a contract only binds the parties to

22   the contract.  It doesn't bind non-parties.  If it's a

23   consent decree -- not a consent decree, but a consent order

24   of the confirmation plan, it binds those that are party to

25   the case or could have been parties.

Page 46

1           THE COURT:  So what about 13 -- so about Section

2   13.7 of the plan?

3           BLAKE MILLER:  13.7 vested the property and said,

4   plan administrator, you have all these rights.  Go forth,

5   they're yours.  And free of the Bankruptcy Code, free of the

6   bankruptcy case, as if no bankruptcy case did, in fact,

7   (indiscernible), but you're bound by the plan.

8           THE COURT:  Are you talking about 13.1 or 13.7?

9           BLAKE MILLER:  I'm sorry.

10           THE COURT:  13.1 is the revesting.

11           BLAKE MILLER:  Okay, 13.7, the continuation says.

12           THE COURT:  Yeah.

13           BLAKE MILLER:  What is say is any stay, whether or

14   on the 105 or 362, that, in effect, on consummation date

15   shall continue to fall into the case.  It doesn't expand --

16   if a 105 stay had been entered, it didn't expand it or

17   change it or effect it any way, just continued it.  If there

18   is a stay on 362, which I'll (indiscernible), it continues

19   that until close of the case, but it didn't change the way

20   it operates.

21           I would submit that as to property of the estate,

22   it ceases under Federal law, 362(c), when it becomes

23   property of the estate.  If we're going to say something

24   different from that, then there's a plan injunction and

25   wouldn't bind us because we're not within the

Page 47

1    classification.  362(c), I think is -- so I don't misspeak,

2    let me check it -- except as provided in (d)(e) and (f) and

3    (h), the stay of an act that is property of the estate under

4    subsection (a) -- it's in (a)(3) -- or this section

5    continues until such property is no longer property of the

6    estate.  That's what 362 provides, and 362(a)(1) or (a)(3)

7    bars actions that affect property of the estate.  Now

8    there's other provisions that, of course, they obviously

9    applies to, but this would continue.

10           If Lehman would have wanted the plan to say the

11   estate continues, they could have done.  Those plans often

12   are done, where the stay is continued in a plan trust or

13   some similar type of device.  This was given to a plan

14   administrator to serve the plan free, as if no bankruptcy

15   case was in existence.  So I ask my point simply, Your

16   Honor, it is, I don't believe that section, as I read it,

17   changed 362.  If it did, it didn't minus.

18           Last, unless Your Honor has some questions, I do

19   object to any order that would make findings here because I

20   don't think there's enough in the record here.  I've heard a

21   lot about extensive documents, I've heard a lot of other

22   things.  None of that, to my knowledge, is in direct with

23   this case makes it because I've called him the bankruptcy

24   side and don't know any of the other.

25           THE COURT:  I'm sorry, what --

1          BLAKE MILLER:  But I don't recall of any

2    documents, I'm assuming, assigning the rights of Lehman Bank

3    to holdings, agreements between the bank and holdings,

4    agreements between holdings and Fannie Mae or Freddie Mac.

5          THE COURT:  But I'm not making any findings, but

6    we had to talk about the predicate facts in order to have

7    something to talk about.

8          BLAKE MILLER:  The reason I raise it in a proposed

9    order had you make a finding.  You're just finding set forth

10   in the motion.  I don't know if that means -- and I should

11   tell you I don't know, there's nothing in the record.

12         THE COURT:  This is not an evidentiary hearing.

13   There's no findings, there are not going to be any findings

14   one way or the other.

15         BLAKE MILLER:  Well, are there either questions or

16   --

17         THE COURT:  No, we're going to keep going for a

18   while.

19         BLAKE MILLER:  Thank you.

20         THE COURT:  Thank you.

21         MR. HOFFMAN:  Good afternoon, George Hoffman for

22   iFreedom, Your Honor.  I'll take the Court's invitation with

23   respect to the 362(a)(1) issue.  I won't waste any of your

24   time with that.  And normally, I'd rest the vesting of

25   property of the estate and the Debtor, my point is

Page 49

1    consistent with Security National, but I think it works for

2    that.

3         What I would like to talk about is whether these

4    claims are property of the estate or not.  And the position

5    that we took, based on various statements that Lehman has

6    made in pleadings that are highlighted in our papers, is we

7    laid out the chart that Your Honor referred to earlier.  And

8    based on Lehman's statement, it appears these claims clearly

9    were not possessed by Lehman at the time of plan

10   confirmation.

11        THE COURT:  See, that's where you're wrong.  They

12   were possessed.  You're conflating whether they were ripe,

13   whether they were mature, whether they were contingent or

14   not.  They were possessed, but they could not be brought

15   until Fannie and Freddie settlements were approved.  And

16   then, consistent with long-standing New York law, once the

17   payment is made to the third party, the third-party

18   indemnification right arises and then you can bring it.

19        So they had the claims, albeit in an unmatured,

20   unripe, contingent form.  And I think that that is, you

21   know, fundamentally where we're not going to see eye to eye.

22   And it's also inconsistent with the position, although I'm

23   not making any findings, gone through on all these cases

24   that the claims -- these are not indemnity claims related to

25   a breach of a repurchase obligation.  In the seller's guide

1    in 710 and 711, the word indemnification is used in

2    different places and in different ways.  And all due respect

3    to all the judges who have looked at this, you know, I've

4    given my view.

5           MR. HOFFMAN:  I'm not here to argue about that,

6    Your Honor.

7           THE COURT:  I understand that.  What it has to do

8    with is then the nature of the claim do with accrual of the

9    claim.

10          MR. HOFFMAN:  So I'm not going to address my view

11   of the world or Lehman's view of the world.  I think it's

12   your view of the world that kind of counts in this

13   Courtroom.

14          THE COURT:  One would hope so; otherwise --

15          MR. HOFFMAN:  I certainly hope so.

16          THE COURT:  -- we have chaos.

17          MR. HOFFMAN:  And your view of the world was made

18   quite clear in Hometrust.  I'm not here to argue contrary to

19   Hometrust.  I'm here to argue, I think, consistent with

20   Hometrust.

21          THE COURT:  Okay.

22          MR. HOFFMAN:  And the Court was quite specific, a

23   cause of action for indemnification, which, again, we don't

24   agree with this necessarily, but this is the law in this

25   Court.  A cause of action for indemnification occurs when a

Page 51

1    party possesses a legal right to demand payment.  Here, LBHI

2    possessed no such right until it paid Fannie Mae.  Prior to

3    that time, no right referring to indemnification -- at least

4    the way I read it -- belonged only to Fannie Mae.

5            THE COURT:  Right, but that's a maturity point.

6    That's a maturity point.  That's not a point about whether

7    or not the causes of action existed in the sense of

8    property.  That's a maturity point.  They couldn't have

9    brought it yet.

10            MR. HOFFMAN:  Let me phrase it this way, Your

11    Honor.  Why is it that my client --

12            THE COURT:  Let me give you another example, okay?

13            MR. HOFFMAN:  Sure.

14            THE COURT:  Lehman, as you know, has hundreds of

15    thousands of derivative contracts and swap transactions.

16    It's still figuring it all out because of the overwhelming

17    number of them.  That doesn't mean that on the confirmation

18    date, it didn't have that cause of action, because it hasn't

19    gotten through the stack of tens of thousands of calculation

20    statements and valuation statements, and finally had been

21    able to figure out why a particular counterparty has

22    shortchanged it.  That was always its property.  It just

23    didn't figure it out until it finally brought the claim or

24    the adversary proceeding or whatever it is.

25            So the reason that this is so vexing to the types

Page 52

1    of institutions that you represent is because it's so remote

2    in time from the inception of the transaction.  I totally

3    get that.  But, and we're a little bit off the point here,

4    but it's interesting.  I mean, that's something that can be

5    addressed in future documentation.  But I have to deal with

6    the documents as they exist at the time that everybody

7    transacted.  And even though you were are now a moat in the

8    chain, it's been on down the line and the reps were carried

9    on and, you know, here we are with Lehman having paid an

10   enormous amount of money to Fannie and Freddie, and then

11   only then having the right to assert the third-party

12   indemnification claim.

13          And the breach -- the breach that everyone talks

14   about -- is not the breach of the purchase agreement.  It's

15   not the breach of the rep at the time that the loan was

16   booked.  It's a breach that occurs much later.  So, you

17   know, I know you folks disagree, but that's -- for the

18   purposes of this -- that's the view of the world that I'm

19   going to take to describe the property of the estate issue.

20          MR. HOFFMAN:  I understand completely.  So here's

21   the difference, Your Honor.  Why do you suppose it is that

22   my client has been sued by Lehman Brothers Holdings Inc.,

23   rather than Lehman Brothers Bank, the party that it has a

24   contract with?

25          THE COURT:  Because Lehman Brothers Holdings Inc.

Page 53

```
1    has the claim now, it has the indemnification claim.  There

2    is no party -- that counterparty farther down the chain

3    doesn't hold anything anymore.

4           MR. HOFFMAN:  So that would be because -- and let

5    me read what Lehman said about this.  This is a quote from a

6    motion in the other matter that the Court will hear, or may

7    here.  This is their response to the motion to dismiss or

8    transfer.  This says, LBB then assigned its rights and

9    remedies under the agreements, including the indemnification

10   rights, to LBHI.

11          THE COURT:  Yes, but this is where the imprecision

12   hangs everybody up.  Yes, that's absolutely right, but this

13   indemnification -- the indemnification that generically is

14   talked about is included on both 710 and 711.  It's used in

15   the agreement interchangeably with asking for money damages.

16   It's not the indemnification that is being sought now.

17   We're way far afield.

18          MR. HOFFMAN:  Well, what I'm saying is their point

19   is LBB transferred all of its rights, including

20   indemnification rights, to LBHI.  That's why LBB is not a

21   plaintiff in this situation.

22          THE COURT:  All right, LBB is out of the picture.

23          MR. HOFFMAN:  Because they transferred all their

24   rights to LBHI.  In turn, LBHI transferred all of its rights

25   to Fannie and Freddie, and that's where those rights --
```

1          THE COURT:  That's not true.

2          MR. HOFFMAN:  How do we know that?  That's what

3     they say.  I'm not making this up, Your Honor.  We have

4     their statements that that is what they said.

5          THE COURT:  But we are talking -- we're talking

6     about different indemnification claims.  Fannie and Freddie

7     had the right, at that point, had the right to assert

8     repurchase claims.  Lehman doesn't have that right.

9          MR. HOFFMAN:  We're talking about multiple

10    Lehmans, which confuses me.

11         THE COURT:  Okay.  Why don't you make your

12    argument, I'm going to stop talking.

13         MR. HOFFMAN:  Sure.  So the claims, Your Honor.

14    The claims, if they exist -- of course, we dispute that

15    there are any claims -- LBB entered into a contract with my

16    client.  It wasn't LBHI; it was LBB.  According to them --

17    not me -- according to them, LBB transferred all of its

18    rights, including indemnification rights, to LBHI.

19         Now, what happened after that point in the chain.

20    LBHI transferred its rights, presumably including

21    indemnification rights, just like LBB had done before to

22    Fannie Mae and Freddie Mac.  That's where those rights sat,

23    those indemnification rights, contingent on the

24    indemnification rights belonging to Fannie Mae and Freddie

25    Mac at the time the plan was confirmed in 2012.

Page 55

1              THE COURT:  I disagree.

2              MR. HOFFMAN:  Okay.  What evidence do we have on

3     which?

4              THE COURT:  It's not an evidence point.  It's an

5     accrual of a cause of action point.  It's a matter of law.

6     An indemnification claim, a third-party indemnification

7     claim, does not arise until a payment is made to a third

8     party.  The indemnification claim arose when Lehman paid

9     Fannie and Freddie.

10             MR. HOFFMAN:  What if all those rights have already

11    been transferred, Your Honor, which they had in this case.

12    Again, this is not -- what we're arguing about, it's

13    interesting, is not the actual documents or the evidence.

14    What we're arguing about, or we're discussing the colloquy,

15    about various statements Lehman has made in its pleadings

16    that are not entirely consistent, Your Honor.  I think --

17             THE COURT:  What does this have to do with whether

18    or not you're entitled to bring an action for a declaratory

19    judgment somewhere else?

20             MR. HOFFMAN:  That's an excellent question.

21             THE COURT:  Thank you.

22             MR. HOFFMAN:  So the question is whether these

23    claims were property of the estate, okay?  Our point is the

24    claims were not property of the estate because Lehman did

25    not have them at the time of the plan confirmation.  It had

Page 56

1    sold those claims to Fannie Mae and Freddie Mac.  They

2    belonged to Fannie Mae and Freddie Mac as of that time.

3    It's only after the settlements with Fannie and Freddie are

4    approved where those rights are assigned back.

5            THE COURT:  Do you understand that at the time of

6    plan confirmation that Fannie and Freddie had asserted huge

7    claims against Lehman?

8            MR. HOFFMAN:  I've read that, yes.

9            THE COURT:  Right, right.  So it's the very nature

10   of, at that moment in time, Lehman knew -- if Fannie and

11   Freddie called up and said, I've got great news, we're not

12   filing any claims in your case.  Okay?  There would have

13   been joy and jubilation at team Lehman.  They didn't do

14   that.  They filed huge claims.  So, therefore, from that

15   moment on, there was always a contingent and unmatured

16   indemnification claim that Lehman eventually would be able

17   to assert.  That's when it started, the minute that Fannie

18   and Freddie filed the claim in this case.

19           MR. HOFFMAN:  Well, what we know from Fannie and

20   Freddie filing huge claims in this case is they assert that

21   Lehman owes them a lot of money.  What we don't know is if

22   Lehman had a correspondent right against my client based

23   upon that.  And the only way I think we could determine

24   that, Your Honor, is if we saw the underlying paper by which

25   Lehman Brothers Holdings Inc. purported to acquire these

1    plans from Lehman Brothers Bank and then the paper by which

2    it transferred those claims to Fannie Mae and Freddie Mac.

3    Otherwise, it's a difficult question to answer, Your Honor,

4    without seeing that paper and knowing where the claims sat.

5              THE COURT:  So is what you're saying now is that I

6    need to have an evidentiary hearing in order to resolve

7    Lehman's motion to stay?

8              MR. HOFFMAN:  I think you have to determine

9    whether or not these claims are property of the estate.  I

10   think that the Court can deny the motion as a matter of law,

11   but if the Court --

12             THE COURT:  Deny it?

13             MR. HOFFMAN:  Yes.

14             THE COURT:  Why couldn't I grant it as a matter of

15   law?

16             MR. HOFFMAN:  The reason you can't grant it as a

17   matter of law is because you need to determine, in order to

18   grant the motion, that these claims are property of the

19   estate.

20             THE COURT:  So remind me again why, for $1

21   million, you want to go through all this?

22             MR. HOFFMAN:  A million dollars is a lot of money,

23   Your Honor.

24             THE COURT:  It's a lot of litigation.

25             MR. HOFFMAN:  I agree.  My client doesn't seek out

Page 58

1    litigation, Your Honor.  We'd be happy to not litigate.

2              THE COURT:  It starts litigation.

3              MR. HOFFMAN:  We did start litigation, Your Honor,

4    there's no doubt about it.  So, again, your question that

5    brought us here.  Why does it matter?  It matters -- and

6    this is not contested by Lehman.  If the claims were

7    acquired by Lehman after the time of confirmation, they are

8    not property of the estate.  If they are not property of the

9    estate --

10             THE COURT:  You're parsing the words incorrectly.

11   The claim accrued, the cause of action accrued, it accrued

12   when the Fannie and Freddie payments were made.  They

13   existed as property of the estate all during the case, as

14   soon a Fannie and Freddie made those claims, if not before.

15   It doesn't require looking at the underlying documents.

16             MR. HOFFMAN:  You need to know how it is that

17   Lehman Brothers Holdings Inc. possesses rights against my

18   client.

19             THE COURT:  Lehman Brothers Holdings Inc.

20   possesses rights against your client because Fannie and

21   Freddie were the upstream acquirers of loans originated by

22   your client.

23             MR. HOFFMAN:  So would --

24             THE COURT:  And Lehman has paid money to Fannie

25   and Freddie to settle defective claims -- the claims arising

1    from defective loans.

2           MR. HOFFMAN:  We know that.  What we do not know

3    is why Lehman Brothers Holdings Inc. held claims against my

4    client based on those facts.  I don't disagree with anything

5    the Court has said.  Why does it hold claims, as opposed to

6    Lehman Brothers Bank or some other person, Your Honor?  We

7    don't know, other than we have Lehman's statements in

8    pleadings.  Which those statements suggest, if not

9    constitute admissions, that at the time of plan

10   confirmation, the claims existed in Fannie and Freddie only.

11   And that's what the Court --

12           THE COURT:  We're talking past each other.  I

13   mean, there's no dispute, there's not dispute as to the

14   transfer of the claims on down the line or up line.

15           MR. HOFFMAN:  Yes, it is, Your Honor.  I dispute

16   that.

17           THE COURT:  What do you mean?

18           MR. HOFFMAN:  I have no evidence.  I have seen no

19   paper -- isn't that we need to prove whether a fact is true

20   or not?

21           THE COURT:  So your position is that Lehman, for

22   no good reason, paid Fannie and Freddie millions and

23   millions of dollars.

24           MR. HOFFMAN:  Your Honor, I'm not here to second

25   guess Lehman.

Page 60

```
 1              THE COURT:  But your theory is -- you're

 2    suggesting to me that this entire process, including the

 3    approval of a 9019 settlement, is built on sand; is that

 4    Lehman paid all of this money, when it didn't have to,

 5    because somewhere there wasn't a valid transfer.  And I will

 6    tell you that the issue of the transfer actually has been

 7    ruled upon in the State Court in another context.  You're

 8    not a party to it, so you can't be bound by it, but this

 9    notion that there's some sort of a break in the chain of

10    ownership is pretty frivolous.

11              MR. HOFFMAN:  I didn't say there was a break in

12    the chain of ownership.  I think we've specifically laid out

13    as best as we can tell what the chain of ownership is, and

14    it's not inconsistent with anything the Court's saying.

15              THE COURT:  Okay.  So what you're trying to do is

16    to get me to say something that you will then characterize

17    as a finding of fact.

18              MR. HOFFMAN:  No, Your Honor.

19              THE COURT:  And I'm not going to do that because

20    it's a matter of law that, as I've held in Hometrust, that

21    the indemnification claim accrued when Fannie and Freddie

22    were paid.  You're trying to create a question of fact as to

23    whether or not LBHI had indemnification rights.

24              MR. HOFFMAN:  Your Honor, I think it's their

25    burden to prove it's property of the estate.  It's their
```

Page 61

1   motion; they're the ones seeking relief from the Court.  We

2   didn't bring this motion, and there's no evidence upon which

3   the Court could find these claims the property of the

4   estate.

5            I can tell the Court's not convinced with my

6   evidence, so I'll leave the podium, if that's all right.

7            THE COURT:  I think you should.  Do you have

8   anything else?

9            MR. HOFFMAN:  The only other thing I would say,

10  Your Honor, is litigating in a claim in a forum that's

11  disfavored by --

12           THE COURT:  Do you take the position that you're

13  not bound by the confirmation order?

14           MR. HOFFMAN:  No.

15           THE COURT:  You're (indiscernible).

16           MR. HOFFMAN:  On some completely unrelated loans

17  that have nothing to do with this, we file a claim or a

18  creditor, we're bound.

19           THE COURT:  I appreciate that.  Someone wants to

20  hand you a note.  You can hand it to him now.

21           MR. HOFFMAN:  So, Your Honor, the last point I

22  make is that litigating a claim in a forum that Lehman

23  doesn't appreciate is not exercising control of property of

24  the estate.

25           THE COURT:  It's interfering with it.

Page 62

1      MR. HOFFMAN:  In what way?  They want to litigate

2   it clearly; they've sued my client.  We want to prove they

3   have no claim.  It's a question of where that litigation

4   will take place.

5      THE COURT:  Right, and your view of where that

6   litigation should take place is anywhere but here because of

7   the statute of limitations point.

8      MR. HOFFMAN:  Well, I think there's a host of

9   reasons, Your Honor.  I mean, I'm not going to hide about

10  the statute of limitations.  That's clearly an issue, but

11  it's not the only issue.  My client's headquartered in Salt

12  Lake City; it's employees, the vast majority of them, are in

13  Salt Lake City; the witnesses, the documents are in Salt

14  Lake City.  I'll address that later on, but that's not the

15  only reason, the statute of limitations question.  There are

16  a variety of reasons.

17     THE COURT:  Could one of them be that you think a

18  Utah judge will look more kindly on your clients that I

19  will?  Because that's completely, if you want to talk about

20  something for which there's no evidence, there is no

21  evidence.

22     MR. HOFFMAN:  I don't think I argued that, Your

23  Honor.

24     THE COURT:  Lehman doesn't win all the time here.

25     MR. HOFFMAN:  Your Honor, I'm expecting a fair

Page 63

1    shake in this Court.

2           THE COURT:  I give everyone a fair shake.

3           MR. HOFFMAN:  So I'm not going to argue this Court

4    isn't fair.  That's not my argument.  My argument is this

5    litigation will occur somewhere; we disagree where it's

6    going to be, obviously; and litigating a claim in a forum

7    that Lehman today doesn't care for is not exercising control

8    of property of the estate.  And I think it bears emphasis

9    here, Lehman filed these cases all over the country.

10           THE COURT:  Lehman filed, that's the key

11    difference, Lehman filed -- their call -- Lehman filed.

12           MR. HOFFMAN:  Right.  Was defending a cause of

13    action, is that interfering with property of the estate?

14           THE COURT:  You have dictated how to bring -- have

15    litigation, where the litigation will unfold.  That's

16    interfering with Lehman's enjoyment of all the aspects of

17    its property, which is this cause of action.

18           MR. HOFFMAN:  By the same token, any defense of

19    the cause of action I think would amount to interference,

20    Your Honor.  It's just a place that they don't care for.

21           THE COURT:  But that's ResCap, that's clearly

22    silly.  I mean, they bring a cause of action, the rule is

23    not you can't defend; of course, you can defend.  But they

24    assert that the full enjoyment of their property right

25    includes the right to determine the forum in which the

Page 64

1    litigation is brought, particularly against a backdrop of

2    litigation being brought in a way that is unfavorable to

3    them -- and remember who they are.  There is no Lehman; it's

4    just creditors, it's creditors.  There's no, you know,

5    Lehman; it's just creditors.

6              MR. HOFFMAN:  I understand the Court's point.

7    It's a dispute between two parties.  It's a state law

8    dispute.  It can be heard any number of different places,

9    and I would fully expect Lehman to file a case in the place

10   that's most advantageous to it.  I think that's their

11   attorney's duty.  And on the flip side, I think other

12   parties should do what's in their client's best interest to

13   defend against those claims, Your Honor.  And I agree, that

14   ResCap, and the stay is usable as a shield to prevent

15   dismemberment.  It's not meant as a tool, as a litigation

16   tactic, to channel litigation to a forum of the Debtor's

17   choice.  That's not the purpose of it.

18             THE COURT:  Okay, thank you.  You want to take

19   your --

20             MS. ADLER:  Yeah, just give us one minute, please.

21             THE COURT:  Sure.

22             MR. HOFFMAN:  Just a couple of very brief points.

23             THE COURT:   Sure.

24             MR. HOFFMAN:  What I meant to make that I'd

25   forgotten in the course.  So the seller's guide is obviously

Page 65

```
1    highly material to a problem many of the claims the Court

2    will have before it.  To four of the six claims that are at

3    issue in our case, it has no application, and that's because

4    the broker agreement that we have that governs four of the

5    six claims is not appropriate to the seller's guide.

6                THE COURT:  Okay.

7                MR. HOFFMAN:  The next point is the

8    indemnification packets that Lehman provided to us indicated

9    it acquired the claims that's asserting in 2013.

10               THE COURT:  I don't know what -- I hear you.  I

11   won't disagree with you.  I don't know what exactly that

12   refers to.

13               MS. ADLER:  It refers, Your Honor, to an

14   assignment that is referenced in the ADR, Your Honor,

15   package that Lehman sent to iFreedom that says that they

16   acquired these rights to go after us through an assignment

17   they obtained from Lehman Brothers in 2013.  And that's --

18   we can get you that document.

19               THE COURT:  Okay.  I don't know what to say to

20   that.  I hear you, but I don't know what that is.

21               MR. MAHER:  Your Honor, they're starting to

22   discuss what was talked about in ADR, which we think is

23   improper.  I won't respond to the legal arguments, which

24   obviously you have well in hand.  The reality is that --

25               THE COURT:  Well, there's a couple of things that
```

Page 66

1    I would like you to respond to.  The first, I think the crux

2    of the argument is that your interpretation of the

3    confirmation order inappropriately or improperly extends the

4    automatic stay?  Is that a fair characterization?

5              MR. MILLER:  What I would say is it extends it; it

6    shouldn't change to which it applies and what it doesn't

7    apply.

8              THE COURT:  Okay, thank you.  So that's point

9    number one.  And then the second point that was made was

10   that under 1141, they're not bound because they don't fall

11   into the category.

12             MR. DeFILIPPO:  Can I address that, Your Honor?

13             THE COURT:  I will give you relief from the local

14   rule, the no whack-a-mole rule, which is that multiple

15   people can't pop up.  Go ahead, Mr. DeFilippo.

16             MR. DeFILIPPO:  The discharge doesn't take affect

17   under the plan and the order until all distributions are

18   made.  So, as you noted earlier, it's essential that the

19   stay continuing to affect with respect to all the property

20   that is vested in the Debtors under the plan; otherwise,

21   dismemberment would be a potential occurrence.

22             So we don't think we're viewing it excessively

23   broadly; we think we're viewing it in a practical way that

24   is necessary to give effect to all of the provisions of the

25   confirmation order and the plan.

Page 67

1          THE COURT:  So the distinction between the Debtor

2    and the estate is not -- it doesn't make any difference?

3          MR. DeFILIPPO:  It doesn't make a functional

4    difference for purposes of what this confirmation order and

5    plan were designed to do, which was to protect assets that

6    may have been technically revesting from the estate to the

7    Debtors, but still needed the protections of the stay in

8    order not to be subject to --

9          THE COURT:  But counsel's going to say that if I

10   give it that effect, then I'm rewriting 362.

11         MR. DeFILIPPO:  Well Your Honor is the only Court

12   that has the power to interpret the confirmation order.  And

13   we think a proper interpretation of that order,

14   notwithstanding 362, would be to treat the injunctions that

15   are contained in it as effective to the claims in this case.

16         Now I want to make a point about 362(a)(3) that

17   was overlooked.  362(a)(3) does not only apply to property

18   of the estate; it applies to the obtaining of property from

19   the estate.  In addition to that, it doesn't have to be

20   property of the estate in order to be protected by

21   362(a)(3), which I think is an important distinction.  There

22   is really no functional difference between the estate and

23   LBHI as plan administrator.  They are both in existence to

24   serve the beneficial purposes of their creditors.

25         LBHI continues in that while it is the

Page 68

1    representative of the Debtor under the plan, Your Honor,

2    6.1(b) of the plan, the creation of the plan administrator

3    effectively continues the Debtor; 6.1(b) says that the plan

4    administrator is the substitute for the Debtor in all

5    respects.  So I don't think it's much of a stretch at all to

6    find that the estate functionally continues in effect, even

7    if the property of the estate revests in a different entity

8    that is the successor to the Debtor.

9          THE COURT:  Thank you.  Anything more?  Sure.

10          MR. DeFILIPPO:  In regards to the order, the plan

11    administrator is representative of the Debtors, the

12    management of the Debtor, if you want to look at it that

13    way.  There's no difference to the Debtor directly or

14    someone before the Debtor.  It's the difference between the

15    Debtor and the estate that's important; not between the

16    Debtor and Debtor's management or plan administrator for the

17    Debtor.

18          To the second point is 362(a)(3) is governed, only

19    applies to estate property.  Any act to obtain possession of

20    property of the estate or property from the estate or to

21    exercise control over the property of the estate, the estate

22    is the central feature of 362(a)(3) and it can properly give

23    the estate (indiscernible).

24          Now the other provisions?  No, they're free of

25    that restriction. But (a)(3) alone is estate property based,

Page 69

1    which brings me to my last point -- hopefully, last.  We

2    have to decide what stay we're talking about here.

3              THE COURT:  Can I just stop and ask a question?

4    Suppose that on the day of confirmation, the Debtor has a

5    contract and there's a breach -- ordinary, garden variety.

6              MR. HOFFMAN:  That occurred on confirmation date?

7              THE COURT:  That has already occurred on the

8    confirmation date, okay, a breach.  And then the plan

9    confirms.  And now that they have the bankruptcy behind

10   them, they're going to sue the counterparty for the breach.

11   And the plan provides and the confirmation order provides

12   what this one does.  Okay?  In your view of the world, the

13   Debtor doesn't have the right to control that litigation,

14   that that's not property of the Debtor, the estate?

15             MR. HOFFMAN:  In my view, the plan administrator

16   is vested with the right on behalf of the Debtor to bring

17   those causes of action.  It's the adverse party.

18             THE COURT:  It is, okay.

19             MR. HOFFMAN:  But it doesn't control everything

20   relating to that -- state law, other laws now apply.  If you

21   look at 13.7, as if the Bankruptcy Code or the Rules -- or

22   the Bankruptcy Code or provisions are not in effect.

23             The other (indiscernible) if I were to use your

24   example, if we had a cause of action that existed on the

25   confirmation date, so the stay applied to it on the

Page 70

1    confirmation date wen to the Debtor.  The Debtor decided I'm

2    not going to litigate it, I'm going to sell it.  I'm going

3    to sell it to a hedge fund it Florida.  Based on this

4    interpretation, the estate follows it all the way down to

5    Florida.  Now you got a Florida -- that nothing to do with

6    this case because that stay applied.

7                My point is, once it leaves the estate --

8                THE COURT:  Selling it to a third party is

9    entirely different.  That's not an apt analogy.  You're

10   drawing some distinction here that, frankly, was never -- it

11   undermines the ability of the plan administrator to

12   administer the estate.

13               MR. HOFFMAN:  The plan administrator is charged

14   with the sole responsibility of administering, but that

15   doesn't mean it controls non-parties, controls Security

16   National, with respect to where this litigation is to be

17   done.  That's other law, that's first right (indiscernible)

18   conveniences, a whole bunch of other law that governs that.

19   It didn't exclude that.  It just said that they're

20   representative of a trustee of a trust.  They're the

21   representative discharged with liquidity this.

22               The distinction I am making is between the estate

23   and the Debtor.  I think that, in my view, an important and

24   crucial -- crucial -- distinction.  Once Lehman's leaves the

25   estate, it loses the protection of (a)(3), and that's the

Page 71

1 way 362 works, which brings me back to what's the Debtor

2 operating under.  362, as Congress ruled it, stops the

3 protection of the estate when it gets revested in the

4 Debtor, which this plan did.  The plan administrator is

5 simply the representative of the Debtor.

6    If this is a plan injunction, it goes beyond that.

7    THE COURT:  I understand the plan injunction

8 point.

9    MR. HOFFMAN:  All right.  If there are no

10 questions, I'm done.

11    THE COURT:  Okay, thank you.

12    MR. DeFILIPPO:  Your Honor, I never answered your

13 question as to why the confirmation order binds non-

14 creditors.  It's because it's an order of this Court that

15 once somebody -- somebody can violate an injunction without

16 being a creditor.  If there's an injunction issued and

17 people are ordered not to do things and they do them anyway,

18 which is what happened, then they don't have to be a

19 creditor to violate a Court order.  They simply violate it.

20 They are -- now you're asking it to be enforced them.  So

21 for purposes of enforcement, they are a party and interest.

22 But it can be effective as against them once we bring them

23 here and ask you to enforce it against them.

24    MR. HOFFMAN:  May I respond to that, Your Honor.

25    THE COURT:  Yes, you can, but hold on a minute.

Page 72

1          MR. DeFILIPPO:  It's no different than any

2     affirmative injunction from a Federal Court that can bind

3     non-parties.  We could provide law if there is any doubt

4     about this, but I didn't think there was.  But Federal

5     Courts have the power to enjoin non-parties to the actions

6     before them and to have those injunctions enforced by

7     subsequent proceedings.

8          THE COURT:  Go ahead.

9          MR. HOFFMAN:  I don't think I could disagree more.

10    I do not believe an injunction can bind non-parties.  An

11    injunction of Rule 65 of the Federal Rules would bind

12    parties and those in privity or control content, but they

13    need due process, they need to participate.  The cases that

14    I'm aware of and two cited by Lehman Brothers were creditor

15    cases, they would come within the universe of people that

16    would be bound by that plan.  And even then, the Court

17    indicated you don't have the right to come in and argue this

18    -- there's due process, but you're within that

19    classification, so we're going to extend it to you.

20          If what the plan administrator wants is Rule 65

21    injunction, then we need to go through that process.  It's a

22    separate issue, four standards that requires an adversary

23    proceeding, injunction, all that.  I though what we're

24    talking about is an existing injunction, whether it's 362 or

25    plan injunction, they think it applies to this.

Page 73

1           THE COURT:  That's what I thought as well.  Okay,

2      what I'd like to do is take a short break and then come back

3      and talk to you a bit.  All right?  Let's see, if you could

4      come back at 3:45.  Thank you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6      Sonya Ledanski          Digitally signed by Sonya Ledanski Hyde
                               DN: cn=Sonya Ledanski Hyde,
                               o=Veritext, ou,
       Hyde                    email=digital@veritext.com, c=US
7                              Date: 2016.05.09 16:03:36 -04'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  May 9, 2016