Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In re

6    LEHMAN BROTHERS HOLDINGS INC., et al.,

7             Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9    Case No. 08-01420-scc (SIPA)

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   In re

12   LEHMAN BROTHERS INC.,

13                Debtor.

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15

16                U.S. Bankruptcy Court

17                One Bowling Green

18                New York, NY  10004

19                May 10, 2016

20                10:02 AM

21

22   B E F O R E :

23   HON SHELLEY C. CHAPMAN

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1    Hearing re:  Doc #13494 Trustees Motion for Authorization to

2    Sell Certain Debt Instruments Pursuant to SIPA Section

3    78fff-1(b) and Sections 105 and 363 of the Bankruptcy Code

4

5    Hearing re:  Doc #13493 Trustees Motion for an Order

6    Authorizing the Abandonment of Certain Lehman Brothers Inc.

7    Data

8

9    Hearing re:  Doc #12194 Trustee's Motion for an Order

10   Regarding Certain Repurchase Agreement Claims

11

12   Hearing re: Doc #51685 Amended Omnibus Application of

13   certain members of the Official Committee of Unsecured

14   Creditors for payment of fees and reimbursement of expenses

15

16   Hearing re: Doc #52574 Second Motion in Aid of Alternative

17   Dispute Resolution Procedures Order for Indemnification

18   Claims of the Debtors Against Mortgage Loan Sellers

19

20   Hearing re: Doc #51006 Plan Administrators Five Hundred

21   Ninth Omnibus Objection to Claims (No Liability Claims)

22

23   Hearing re: Doc# 13592 Statement / Notice of Revised

24   Proposed Order Authorizing the Abandonment of Certain Lehman

25   Brothers Inc. Data (related document(s)13493)

1    Hearing re: Doc# 13595 Notice of Hearing / Notice of Agenda

2    of Matters Scheduled for the Ninety-Seventh Omnibus and

3    Claims Hearing on May 10, 2016 at 10:00 a.m.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    WEIL GOTSHAL & MANGES

4         Attorneys for Lehman Brothers Holdings, Inc. and its

5         affiliated Debtors

6         787 Fifth Avenue

7         New York, NY 10153

8

9    BY:  JACQUELINE MARCUS

10        CANDACE M. ARTHUR

11

12   SHAPIRO BIEGING BARBER OTTESON

13        Counsel for Ironbridge Homes LLC, Ironbridge Mountain

14        Cottages, Ironbridge Aspen Collection, LLC

15        4582 S. Ulster Street Pkwy, Suite 1650

16        Denver, Colorado 80237

17

18   BY:  DUNCAN E. BARBER

19        TRACY KLESTADT

20

21

22

23

24

25

Page 5

```
 1   COVINGTON & BURLING LLP

 2        Attorney for Wilmington as Indenture Trustee

 3        620 Eighth Avenue

 4        New York, NY 10018

 5

 6   BY:  DIANNE COFFINO

 7

 8   SHEPPARD MULLIN RICHTER & HAMPTON LLP

 9        Attorney for Bank of New York Mellon

10        Four Embarcadero Center, 17th Floor

11        San Francisco, CA 94111

12

13   BY:  MICHAEL AHRENS

14

15   HUGHES HUBBARD & REED

16        Attorney for Mr. Giddens, the LBI Trustee

17        One Battery Park Plaza

18        New York, NY 10004

19

20   BY:  JEFFREY MARGOLIN

21        MARLENA C. FRANTIZIDES

22        MICHAEL E. SALZMAN

23

24

25
```

```
                                                            Page 6

 1    WOLLMUTH MAHER & DEUTSCH LLP

 2         Attorney for the Debtors

 3         500 5th Avenue, #12

 4         New York, NY 10110

 5

 6    BY:  FLETCHER W. STRONG

 7         JIM LAWLER

 8

 9    DAVID J. HOFFMAN

10

11    MILBANK, TWEED, HADLEY & MCCLOY LLP

12         Attorney for Official Committee of Unsecured Creditors

13         28 Liberty Street

14         New York, NY 10005

15

16    BY:  DENNIS C. O'DONNELL

17         DAVID COHEN (TELEPHONICALLY)

18

19    KLEINBERG KAPLAN

20         Attorney for Elliott Management Corp.

21         551 Fifth Avenue

22         New York, NY 10176

23

24    BY:  MATTHEW J. GOLD

25
```

Page 7

1

2  STROOCK & STROOCK & LAVAN LLP

3       Counsel for Mizuno Bank LTC

4       180 Maiden Lane

5       New York, NY 10038

6

7  BY:  CLAUDE SZYFER

8       SHERRY MILLMAN

9

10  STADTMAUER & ASSOCIATES

11       Attorney for Creditor

12       370 Lexington Avenue, Suite 1703

13       New York, NY 10017

14

15  BY:  MARC A. STADTMAUER

16

17  UNITED STATES DEPARTMENT OF JUSTICE

18       Attorney for U.S. Trustee

19

20  BY:  ANDREA SCHWARTZ

21       SUSAN D. GOLDEN

22

23  ALSO APPEARING TELEPHONICALLY:

24  JEANNE DARCEY

25  ERIC J. KILEY

1   MICHAEL G. LINN

2   PATRICK MOHAN

3   ROBERT PADWAY

4   AMJAD M. KHAN

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

1                P R O C E E D I N G S

2            THE COURT:   Please have a seat. How is everyone

3      today?  All right, I'm ready when you are.

4            MR. MARGOLIN:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MR. MARGOLIN:  Jeffrey Margolin, Hughes Hubbard &

7      Reed for Mr. Giddens, the LBI Trustee.  We have three

8      matters on the LBI portion of the agenda this morning.

9            THE COURT:  Yes.

10           MR. MARGOLIN:  Two are uncontested and one is

11     contested.  If it's okay with you, we'll proceed with the

12     order set forth in the agenda.

13           THE COURT:  Certainly.

14           MR. MARGOLIN:  Your Honor, the first matter on the

15     agenda is the Trustee's uncontested motion for authority to

16     abandon and destroy certain data and documents maintained by

17     the LBI estate.

18           With many phases of liquidation complete, this

19     motion is the second in a series of abandonment motions that

20     the Trustee anticipates filing with the Court as its

21     professionals determine that certain documents and data are

22     no longer necessary to effectuate the remaining work streams

23     and thereby are ripe for abandonment and destruction,

24     furtherance of the Trustee's goals of reducing

25     administrative expenditures and facilitating an orderly

Page 10

1   closure of the estate.

2          Your Honor approved a prior abandonment motion

3   back in February 2015 and that has been effectuated.  Today,

4   Your Honor, on the current motion, we seek authority to

5   abandon and destroy certain electronic databases legacy

6   database archives, backup tapes, certain paper documents and

7   other wind-down materials as further described in the

8   motion.

9          The abandonment of this data and documents will

10  provide substantial cost savings to the LBI estate.  We

11  received a number of inquiries, Your Honor, regarding the

12  motion.  Two enquiries from Barclays, and Claimants subject

13  to the Trustee's 260th omnibus objection to general Creditor

14  claims, what we call the A Katz Claimants, which is fully

15  submitted before Your Honor, focused on certain of the

16  electronic databases.

17         After discussions with these parties, we

18  identified and determined that certain folders, what we call

19  the Libby discovery database, this was the database that was

20  created for attorney work product in connection with the

21  Libby litigation, which was resolved in 2013, contained

22  certain documents and data received from or produced to

23  third parties in which the Trustee may not have access to

24  original source materials that would allow him to replicate

25  this particular data and documents.

Page 11

1           This is a very small amount of data and documents,

2    less than one million of the approximately 23 million data

3    and documents contained in this database.

4           As a result, Your Honor, although there is no use

5    to the Trustee of these data and documents but it costs the

6    estate approximately $50,000 to maintain these folders in

7    the database per year, we've agreed to carve this out from

8    the abandonment motion.

9           This carve-out is reflected in the revised

10   proposed order filed with the Court yesterday.  Again, Your

11   Honor, no responses were received to the motion.  SIPC

12   supports this motion, and Mr. Caputo is in the courtroom

13   today.

14          Unless the Court has any questions, the Trustee

15   respectfully requests entry of the revised proposed order as

16   yet another step toward winding down and closing the estate.

17          THE COURT:  All right, very well.  Let me ask if

18   anyone in the courtroom wishes to be heard with respect to

19   the Trustee's motion for an order authorizing the

20   abandonment of certain Lehman Brothers, Inc. data.  All

21   right, very well, we'll enter the order.  Thank you.

22          MR. MARGOLIN:  Thank you, Your Honor.  We'll

23   submit an order.  The next matter will be handled by my

24   colleague, Marlena Frantzides.

25          THE COURT:  Thank you.

Page 12

1          MR. MARGOLIN:  Thank you.

2          THE COURT:  Good morning.

3          MS. FRANTZIDES:  Good morning, Your Honor.

4    Marlena Frantzides of Hughes Hubbard & Reed on behalf of the

5    SIPA Trustee.  The second matter on the LBI hearing agenda

6    today is the Trustee's motion for authorization to sell

7    certain debt instruments supported by the declaration of

8    Christopher K. Kiplok, who is in the Courtroom today.  The

9    motion is uncontested.

10          By this motion, the Trustee is seeking

11   authorization to sell three cross-collateralized,

12   subordinated bonds relating to the Harvest Grove, Schering

13   Park and Tarrant County Housing projects, which I will refer

14   to as the debt instruments.

15          These debt instruments were issued during the

16   course of the liquidation when certain prior subordinated

17   bonds were cancelled in connection with the sale of the

18   underlying housing projects.

19          Each one of the debt instruments is highly

20   subordinated, so the Trustee determined, in conjunction with

21   his financial advisors, that it was unlikely they were to

22   have any real economic value to any party outside of the

23   capital structure.

24          So, after negotiating in negotiations and

25   discussions with other debt holders, which includes LBHI,

Page 13

1    who holds subordinated bonds related to Sunset Ridge, which

2    is another housing project within the capital structure,

3    Merrill Lynch, the sole senior bondholder made an offer to

4    purchase the debt instruments for $1 million dollars.

5            As of April 19th, when this motion was filed,

6    Merrill Lynch was the highest bidder and only party that had

7    made a firm offer to purchase the debt instruments, however

8    the motion made clear that to the extent there was any other

9    interested party, the Trustee would consider higher or

10   better offers up to and until Thursday, May 5th, 2016.

11           On Thursday, May 5th, LBHI made an overbid of $1.1

12   million dollars for the debt instruments, so on Friday, May

13   6th, a competitive auction was conducted by the Trustee's

14   professionals, representatives from LBHI and Merrill Lynch

15   attended the auction and bidding proceeded with each party

16   bidding in increments of at least $100,000.

17           Merrill Lynch was the winner of the auction, so

18   bidding the highest bid for $4.7 million dollars and I'm

19   happy to report, Your Honor, that we're prepared to go

20   forward with the sale of the debt instruments for the

21   purchase price of $4.7 million to Merrill Lynch today.

22           Additionally, during the course of the discussion,

23   LBHI approached the Trustee's professionals requesting that

24   it be made clear that the sale of the LBI debt instruments

25   did not affect LBHI's rights with respect to these Sunset

Page 14

1    Ridge subordinated bonds.

2            The Trustee, Merrill Lynch and LBHI were able to

3    reach an agreement regarding appropriate language and that

4    is reflected in the revised order and amended assignment

5    agreement filed into the Court on Friday, May 6th.

6            The Trustee has determined, in consultation with

7    his professionals, that the sale of the debt instruments to

8    Merrill Lynch for -- excuse me, $4.7 million, represents the

9    best means of maximizing the value of the debt instruments

10   for the benefit of the LBI estate and Creditors and no

11   responses were received to the motion.

12           Accordingly, the Trustee respectfully requests

13   that Your Honor grant the motion and approve the sale of the

14   debt instruments to Merrill Lynch.

15           THE COURT:  All right.  For purposes of good

16   order, shall we enter Mr. Kiplok's declaration into the

17   record?

18           MS. FRANTZIDES:  Yes.

19           THE COURT:  All right.  And ask, is there anybody

20   here who would like to cross-examine Mr. Kiplok?  Does

21   anyone else have anything they wish to say with respect to

22   the Trustee's motion for authorization to sell the debt

23   instruments that have been described?  All right, I

24   congratulate the Trustee for constructing a process that

25   generated so much value for the estate for the benefit of

Page 15

1    the unsecured Creditors, since, as I think everyone knows,

2    the customer claims have been paid in full, so I will

3    happily approve the motion.  Thank you.

4            MS. FRANTZIDES:  Thank you, Your Honor.  All

5    right, so that brings us to the motion regarding the repo

6    claims?

7            MR. HOFFMAN:  Correct.

8            THE COURT:  All right.  And I take it you are Mr.

9    Hoffman?

10           MR. HOFFMAN:  Yes, I am, Your Honor.

11           THE COURT:  All right, very well.  I've read the

12   papers, which I found -- I find the situation very dismaying

13   and I'm struggling to understand what it is, Mr. Hoffman,

14   that you think happened and what you think ought to happen.

15   We have a legal issue that has been up to the Supreme Court,

16   cert denied.  It's as final as it gets.

17           Moreover, the path to that point is -- includes

18   stipulation that your clients signed while they were

19   represented by the Clearly Gottlieb firm that made crystal

20   clear that once there was a final order on the status of

21   these repurchase claims, your clients would be bound by

22   that, and there were certain conditions that were imposed,

23   which were not satisfied by the rulings that were issued

24   through the Second Circuit.

25           But now we're here and you seem to be taking the

Page 16

1    position that none of that happened, that you ought to get

2    discovery and I'm just at a loss, really, to understand.

3           And also I think that your reaction to the

4    Trustee's suggestion that proceeding would be a violation of

5    the stipulation, which you characterize as -- I think you

6    use the word "hectoring," to me, is an appropriate, heads up

7    if you will, that the Trustee can't figure out why or how

8    you have an avenue to pursue your current claims.  So I

9    think, unless you have something additional you'd like to

10   add, that it might be most expeditious to hear from Mr.

11   Hoffman first.

12          MR. SALZMAN:  That works for me, thank you, Your

13   Honor.

14          THE COURT:  Okay, thank you.

15          MR. HOFFMAN:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MR. HOFFMAN:  I believe our position starts with

18   the word of the stipulation itself that was signed, that

19   says in Paragraph 1, that the non-participating Claimants,

20   of which my clients are among that group, will not serve nor

21   be subject to discovery with respect to any of the non-

22   participating objections unless and until the representative

23   objections have been litigated to a final order, or have

24   been settled.

25          THE COURT:  Okay.

Page 17

1              MR. HOFFMAN:  To me, that does not exclude the

2      possibility of discovery that indicates that there can be

3      discovery after the representative cases --

4              THE COURT:  Well, but that's putting the cart

5      before the house because that --

6              MR. HOFFMAN:  Okay, well that's Paragraph 1.

7              THE COURT:  -- that provision, to me, that

8      provision was crafted -- I don't know this, but it's common

9      sense, that that provision was crafted to deal with the

10     situation in which someone said that there was a factual

11     issue with respect to the paper that constitutes a repo

12     claim, which has not occurred here.

13             MR. HOFFMAN:  I can get to the substance if you --

14     if I will but I'll just go through the -- the next paragraph

15     of the stipulation says --

16             THE COURT:  Which paragraph are you on?

17             MR. HOFFMAN:  Paragraph 2.

18             THE COURT:  Okay.

19             MR. HOFFMAN:  And it says: "Any legal rulings made

20     by the Bankruptcy Court," and all the other courts --

21             THE COURT:  Right.

22             MR. HOFFMAN:  "shall apply in any litigation with

23     respect to the non-participating objections.  That does not

24     say -- that does not say that their result is your result.

25     It says that the rulings from the other cases will apply in

                                                        Page 18

1    our litigation.  It simply does not say what the Trustee

2    says it says.

3               THE COURT:  Okay, well, what do you -- okay, so I

4    hear the words, but what -- so the Second Circuit has ruled

5    --

6               MR. HOFFMAN:  Okay, I can explain how our cases is

7    different, if you'd like me to.

8               THE COURT:  Well, let's just stick with this for a

9    moment, okay?

10              MR. HOFFMAN:  Okay.

11              THE COURT:  The Second Circuit has ruled that the

12   repo claims, which it examined --

13              MR. HOFFMAN:  No, they've only examined one, Your

14   Honor, correct?

15              THE COURT:  Yes.  Issued pursuant to the same

16   master agreement as yours.

17              MR. HOFFMAN:  I don't know if it was precisely the

18   same, but similar.

19              THE COURT:  I think it's the same.

20              MR. HOFFMAN:  Okay.

21              THE COURT:  Okay?  They said that those claims are

22   not customer claims.

23              MR. HOFFMAN:  Correct.

24              THE COURT:  Okay?  And so what you're -- I think

25   where you're going with this is that there are other facts

1   and circumstances incident to your client's relationship

2   with LBI that somehow would enable you to distinguish your

3   claims from those claims.

4              MR. HOFFMAN:  Well, first of all, there was only

5   one claim and the Court itself, the Second Circuit

6   explicitly held -- if there's one thing the Second Circuit

7   clearly held is that if you can show entrustment, then you

8   are a SIPA customer Claimant, SIPA -- you're a SIPA

9   customer, okay?  The Court said that.  The Court didn't say

10  anything about repos in general or anything like that.  It

11  did say Doral did not have a customer claim.  It didn't say

12  you could never be a customer -- a repo agreement somehow

13  negates customer status based on anything else.  It doesn't

14  say that in there.  It says Doral doesn't have one and I'll

15  explain while Doral is a reverse repo --

16             THE COURT:  I'm pretty sure that the Second

17  Circuit thought that they were saying the opposite of what

18  you're saying.  I'm pretty sure that the Second Circuit

19  thought that they were saying that a claim of the type that

20  was before them --

21             MR. HOFFMAN:  Okay.

22             THE COURT:  -- right, was not a customer claim,

23  and in so doing, what the analysis that they were applying

24  was looking at whether or not there was entrustment and they

25  found in that connection that in connection with a repo

Page 20

1    claim, there was not.  Their ruling was not this is a repo

2    claim but the world at large, if you can demonstrate or

3    allege entrustment, you don't fall within the ambit of the

4    ruling.

5            That's not a fair reading of what the Second

6    Circuit did and this isn't the only case where time after

7    time, folks seek to distinguish themselves from certain

8    rulings regarding customer status.  There was a series of

9    appeals related to First Bank Puerto Rico matter in which

10   there were rulings related to customer status and a

11   subsequent Claimant came in and said, but that doesn't apply

12   to me because X, Y and Z.

13           Here, the extraordinary thing about this is that a

14   fair reading of the Second Circuit's ruling precludes the

15   allowance of your client's claims as customer claims by

16   itself, but in addition, your clients signed a stipulation

17   in which they agreed to certain rules of the road, and now

18   you're coming back and saying that the words on that page,

19   which they signed, don't mean what they say.  And that's --

20   that's pretty extraordinary.

21           MR. HOFFMAN:  Well, if I may, I mean, would the

22   Court like me to explain why I think this claim was

23   different than the one that was before the Second Circuit?

24           THE COURT:  Well, you first have to navigate your

25   way through the stipulation, which --

Page 21

1           MR. HOFFMAN:  Okay.

2           THE COURT:  -- which --

3           MR. HOFFMAN:  Sorry.

4           THE COURT:  You didn't read the last phrase in

5    Paragraph 2, which is that it applies unless the Court

6    expressly provides in a ruling that such legal rulings shall

7    not apply to the non-participating objections, then it gets

8    even more specific because there is the prohibition in

9    Paragraph 3 that you can't seek to distinguish your own

10   claim.  So, we have belt and we have suspenders.

11          MR. HOFFMAN:  Okay, can I take those one at a

12   time?

13          THE COURT:  Sure.  Mm hmm.

14          MR. HOFFMAN:  Okay.  First of all, now, what does

15   that mean, expressly provides in any ruling shall not apply

16   to the non-participating objection?  So does the mean that

17   the Second Circuit was going to say, we're deciding Doral's

18   case but these other people are before the Bankruptcy Court

19   who are not before us, that doesn't apply to them?  I don't

20   think you can agree to a thing like this.  I don't think you

21   can agree and say, well, if the Court goes off, you know --

22   I think that what happened is the Court did see -- the Court

23   --

24          THE COURT:  But you -- wait -- just to review,

25   your clients represented by Cleary Gottlieb, signed the

Page 22

1     stipulation.  It's a contract and it's a court order.

2                MR. HOFFMAN:  Okay.

3                THE COURT:  Okay?  But now you're saying, boy,

4     that was crazy.  Why did they agree to that?

5                MR. HOFFMAN:  The Court did expressly say that

6     there is a group of people who would not be covered by this

7     ruling and those are people who can have and show

8     entrustment.  They didn't call us out by name.  it doesn't

9     say Diego Katz, it doesn't say Marcello Katz.  It doesn't

10    say the parties to the stipulation of June, whatever, 2011.

11    It says --

12               THE COURT:  Do you have a view as to why all the

13    other non-participating claimants who signed this

14    stipulation are not standing here with you today and who

15    accepted their status as unsecured Claimants rather than

16    customer Claimants?

17               MR. HOFFMAN:  First of all, I think it's -- all of

18    them appear to be some sorts of institutions.  I think as

19    Mr. Salzman was indicating, I think one of the other Cleary

20    Gottlieb clients was Goldman Sachs something or other.  This

21    is an entirely different case.  This is retail customers who

22    were having retail accounts in a regular brokered account --

23               THE COURT:  Wait, I'm not following the

24    distinction.  So, a financial institution that has

25    shareholders and other stakeholders wouldn't pursue a valid

Page 23

1    claim?

2           MR. HOFFMAN:  I have no idea what their claims

3    there, and I think to cast aspersions like the Trustee is

4    here, to say that like, we can't defend ourselves without

5    revealing the attorney/client privilege to suggest that oh,

6    well, Cleary Gottlieb -- Cleary Gottlieb's other clients

7    didn't pursue this, so why are you doing that?  How are we

8    supposed to defend that?  The suggestion there is that Clary

9    Gottlieb told my client he lost, right?

10          THE COURT:  Well, respectfully, by the operation

11   of the stipulation, that is what happened.  And now, you

12   have come up -- you are backing away from language that your

13   clients agreed to, represented by predecessor counsel, and

14   we haven't even gotten to three, which says: "The Trustee

15   and the non-participating Claimants each agree not to

16   distinguish the repo claims of the non-participating

17   Claimants from the repo claims of the representative

18   Claimants for purposes of any legal rulings made by the

19   Bankruptcy Court or an Appellate Court in connection with

20   with the litigation of any of the representative objections.

21   Notwithstanding the foregoing, if and only if the Bankruptcy

22   Court or an Appellate Court makes any legal rulings that

23   distinguish among the repo claims of the representative

24   Claimants that the upper Court had to have made a ruling

25   that distinguishes among the repo claims of the

Page 24

1    representative Claimants," okay?

2             That's different -- slightly different provision

3    than the last provision of Paragraph 2. Then: "each non-

4    participating claimant shall not be restricted."  So, under

5    the clear words of Paragraph 3, your clients are not

6    entitled to seek to distinguish its claim from the repo

7    claims of the representative Claimants that were disposed of

8    by the Second Circuit.

9             MR. HOFFMAN:  Okay, so can I get to the issue of

10   distinguishing?

11            THE COURT:  Sure.

12            MR. HOFFMAN:  Okay.  That is clearly a reference

13   to the stipulation of facts that the Trustee and the

14   representative Claimants never produced.  So how are we

15   supposed to know --

16            THE COURT:  Where does it say that?  It doesn't --

17   I just read the words.  It does not reference a stipulation

18   of facts.

19            MR. HOFFMAN:   Okay, so how -- how is my client

20   supposed to know what the facts of those claims are?  The

21   entire matter, largely, was filed under seal in this Court.

22   I've never seen any of the deposition transcripts from the

23   Trustee.  There's never been any discovery given to my

24   client.  How is he supposed to know that his facts are not

25   the same as the facts of --

Page 25

1           THE COURT:  Okay, you know what we have, Mr.

2    Hoffman?  Here's what we have.  What you're saying is that

3    you believe -- you're arguing for a basis to be relieved of

4    the agreement that your clients signed, because that's in

5    essence what you're saying, because you're not denying now

6    that the words mean what they say, but you're saying it

7    really can't -- it can't have meant that because that

8    wouldn't be fair or it can't have meant that because of a

9    number of reasons.  So I mean, it's basically like coming in

10   after the fact and alleging something like fraud in the

11   inducement or some basis on which to collaterally attack

12   this document.  But there isn't anything.  There isn't

13   anything.  There was a ruling by the Second Circuit that

14   said that repo claims, that by its terms, include the types

15   of claims that your client holds, are not customer claims.

16           MR. HOFFMAN:  I think --

17           THE COURT:  And I -- and I -- look, I understand

18   the distinction between an institutional investor and these

19   are individuals.  I understand that, and they lost money.

20   But it -- things can't turn on that distinction, right?

21           MR. HOFFMAN:  I perfectly understand what you're

22   saying, Your Honor, but let me --

23           THE COURT:  Go ahead.

24           MR. HOFFMAN:  -- let me get to the part where I

25   think there is the actual distinction in the facts and I'll

Page 26

1    -- I'll just be a second --

2              THE COURT:  But how do I get past --

3              MR. HOFFMAN:  Okay --

4              THE COURT:   -- how do I allow you distinguish the

5    claims of your clients when this binding stipulation says

6    that you agree not to?

7              MR. HOFFMAN:  Well, I would say, first of all,

8    that the previous paragraph that says -- where the Second

9    Circuit expressly makes the distinction --

10             THE COURT:  No, but forget about that paragraph.

11             MR. HOFFMAN:  Okay, well --

12             THE COURT:  Pretend that paragraph doesn't exist.

13             MR. HOFFMAN:  Okay, pretend that, all right.

14             THE COURT:  Just Paragraph 3.

15             MR. HOFFMAN:  All right, I would say this.  Look,

16   the other stipulation that's between the so-called

17   representative Claimants and the Trustee was attached as an

18   Exhibit to this order, to this stipulation order, and it was

19   itself so ordered.  In that order, the Trustee and the

20   representative Claimants to produce this stipulation of

21   facts, an agreed set of facts that they were going to

22   litigate on, okay?  And they never did that.

23             THE COURT:  Okay, so if you were -- so then you

24   would have expected Paragraph 3 to say, subject to the

25   execution of that stipulation --

Page 27

1          MR. HOFFMAN:  It's not perfect.

2          THE COURT:  -- we agree.

3          MR. HOFFMAN:  I would have expected it to say a

4    lot of other things if it says what the Trustee says it

5    says, but it's not perfect, okay?  But where is it going to

6    come from?  Where does that set of facts that we're going to

7    distinguish ourselves from going to come from?  And it's got

8    to come from that stipulation, okay?  That's the only source

9    of it.  The whole thing was filed under seal.  They didn't

10   allow us any discovery.  How are we supposed to know what

11   claims were really litigated and what weren't?  How do I I

12   know that there aren't facts in there somewhere --

13          THE COURT:  Well, your clients chose to sign

14   those.  It was not predicated on the execution of a

15   stipulation of undisputed facts.

16          MR. HOFFMAN:  It was predicated on the stipulation

17   that was an actual exhibit to this other second order.  It

18   was part of it as an exhibit.  And they want to shut us down

19   and they didn't dot all the Is and cross all the Ts, okay?

20   I mean, maybe this was -- would be the most efficient way to

21   have done it, maybe in retrospect the Trustee, you know,

22   they didn't do what they were supposed to do, and if they're

23   going to shut us down, take away everything and say you

24   don't even have a right to be heard, I think they have to be

25   taking care of every single detail.

Page 28

```
 1              And one of those details, and it's not a small

 2   one, because I did include -- I showed you that Mr. -- one

 3   of the other counsel did, on behalf of the group, I was

 4   participating in the group on behalf of another Claimant at

 5   the time, sent that email to Ms. Hansa about -- that that

 6   was a major concern, the contents of this stipulation.  Now,

 7   that the people from Cleary Gottlieb or wherever, I don't

 8   know what Cleary Gottlieb is so important -- you know, but

 9   did they screw up and not put the right language in there?

10   I don't know if they did or not, but that thing was

11   obviously the place where the thing to be distinguished from

12   was going to come from.

13              THE COURT:  I have a stipulation that's clear on

14   its face that was voluntarily signed by parties that were

15   represented by sophisticated counsel, and now there's been

16   an adverse ruling of the Second Circuit and what you're

17   telling me is that it should have been drafted differently,

18   it should have been drafted better, you're not bound, you

19   want to just keep going, and that's just simply not the way

20   it works.

21              MR. HOFFMAN:  I'm not saying that I'm not bound to

22   the stipulation, or my clients aren't bound to the

23   stipulation.

24              THE COURT:  You're absolutely saying that your

25   clients aren't bound by the stipulation.
```

Page 29

1           MR. HOFFMAN:  Okay --

2           THE COURT:  That --

3           MR. HOFFMAN:  -- in my view, I'm coming back to

4    what I said, that Judge Peck himself said in the TBA case,

5    is what a test case means, meaning we decide the case and

6    you know, that's the rule of the case for the -- that's the

7    law of the case for the other people but if you can

8    distinguish yourself, that's it, and I think that that's

9    where all this boils down to and gets us back so --

10          THE COURT:  That's exactly right --

11          MR. HOFFMAN:  Yeah.

12          THE COURT:  -- except that in this case, you

13   agreed that you weren't going to try to distinguish

14   yourself.  You absolutely correctly described the procedure

15   of a test case, but here, your clients agreed to not seek to

16   distinguish themselves.  That's what they agreed to.

17          MR. HOFFMAN:  Well, I'm just -- my point on that

18   is that if there is any distinction to be made, a, I think

19   that would be overruled by the Second Circuit thing.  I

20   understand the Court's point on this other point.  However,

21   that the distinguishing has to come from that stipulation of

22   facts that the Trustee and the other guys, the

23   representative people, never produced.  They never did it.

24          THE COURT:  And I will say --

25          MR. HOFFMAN:  It was Court ordered, they have to

Page 30

1    do it.

2              THE COURT:  And I will say again that Paragraph 3

3    doesn't say that, subject to the submission or the agreement

4    on a stipulation of undisputed facts, comma, everyone agrees

5    to this.  That -- it doesn't say that.  So, your view now is

6    it should have said that, but it didn't say that and --

7              MR. HOFFMAN:  Okay, not to -- and -- this will be

8    the last time I'm going to say anything on this --

9              THE COURT:  Okay.

10             MR. HOFFMAN:  -- particular topic, but I do have

11   some more things I'd like to say.  But the other thing was

12   part -- what I'm trying to convey is that the original

13   stipulation that set up the representative Claimants was

14   part of this stipulation.  It's in this stipulation.  It was

15   an exhibit to it, and it itself is so ordered, and then this

16   was so ordered with an exhibit to it, so it's in there.

17   It's not some other separate document.  It's part of this

18   document.

19             THE COURT:  Okay.

20             MR. HOFFMAN:  Okay?  That's the last thing I'm

21   going to say about that.

22             THE COURT:  Okay.

23             MR. HOFFMAN:  Okay?

24             THE COURT:  Yup.

25             MR. HOFFMAN:  And I would just like -- okay, I

Page 31

```
1    will very quickly tell you why I think this case is -- might

2    be a factual difference from the other cases.

3              THE COURT:  Okay, sure.

4              MR. HOFFMAN:  Okay?  All the other cases were

5    reverse repos in which -- and they were termed repos, so

6    Doral or whoever, just to make it simple, has a bunch of

7    securities, they go to -- they went to Lehman Brothers, they

8    say, okay, I'll give you X amount today or $100 million

9    dollars in securities today, you give me $90 million dollars

10   or whatever the deal was and they say, okay, five years from

11   now, we'll come back and we'll switch and you'll give me $95

12   million, I'll give you the securities back, whatever.

13             THE COURT:  Right.

14             MR. HOFFMAN:  That's more or less the case, right?

15   And then --

16             THE COURT:  Yup.

17             MR. HOFFMAN:  -- then the Second Circuit said,

18   look, in that five-year period of time, Lehman Brothers has

19   no obligation to hold those securities for you, to do

20   anything, whatever, it's a contract.  Years later you come

21   back and you know, if they fail to do whatever on that

22   contract then that's just a -- you're just out of luck,

23   right?  They have some obligation to make you payments that

24   are equal to the interest or the coupons on the bonds and so

25   forth, but they're not really actually -- they don't even
```

Page 32

```
 1    have to hold the buckets, right?  That's -- can we agree

 2    that that's more or less what the case -- what the case

 3    said?  And it said, look, that doesn't make you a repo.

 4    That doesn't make you a customer because they have no

 5    obligation to hold those securities for you, right?  That's

 6    the case.

 7              THE COURT:  I -- you --

 8              MR. HOFFMAN:  Okay.

 9              THE COURT:  I get to ask the questions, not you,

10    so.

11              MR. HOFFMAN:  Okay.  I just want to make sure I'm

12    not going too far away from the Court's --

13              THE COURT:  I say okay in the sense that I hear

14    you and I'm listening to you.

15              MR. HOFFMAN:  Okay, you hear, me, all right.

16              THE COURT:  Okay?

17              MR. HOFFMAN:  In this case, the securities were

18    not, okay, and I'm 95 -- that's why I need a little

19    discovery so I'm asking for it, I know you're probably not -

20    - I'm not -- probably not going to get it, but I want to

21    tell you why I need it.  Because what they were doing, they

22    were doing some options trading on the bonds and then at

23    certain times, they would be owning bonds to cover the

24    options, okay?  Now, what the repo was, the way the bonds

25    were held in their account were as the proceeds of a -- they
```

Page 33

1    were the buyers.  They were in the situation of Lehman

2    Brothers in the other case, in the cases that went to the

3    Second Circuit, okay?  They were the buyers, that's what the

4    confirmations say.  Now, they bought them with a lot of

5    margin, so Lehman Brothers isn't going to let you go, it's a

6    million dollars. It was $900,000 or so on margin that each

7    was purchased with, it says they're margin accounts, so

8    that, unlike Lehman Brothers in the Second Circuit case,

9    they could walk away and settle all the bonds and stuff, my

10   clients couldn't do that.  Even though they owned them, they

11   owned them subject to their margin lead, okay?

12           THE COURT:  Mm hmm.

13           MR. HOFFMAN:  And they were sitting in their

14   account in some sort of custodial capacity.  That is

15   covered, by the way, by the master agreement about when you

16   have proceeds but you leave them in there.  I mean, they're

17   people, they don't have their own -- all these fancy DDP

18   acts and so forth, they leave them in there, and that's what

19   I'm talking about.  That's what I think the difference is

20   between us and them.  We're not saying that a repo created

21   the customer status.  We're saying that those bonds sitting

22   in the account that were purchased creates the -- those

23   should have been -- those are entrusted by the brokerage,

24   okay?  Not something that's actual -- not something that

25   we're giving, we're taking, you know, like the other guy.

Page 34

1       It's like, it's completely arm's length, they shake hands,

2       see you in five years.  No, they -- LBI was holding my

3       client's property, my client and several clients' property

4       in each of the accounts because they were the purchasers

5       under the repo agreements.  Okay?  And that's why I think

6       that is -- that's true.

7               And as far as all this goes, Mr. Salzman and the

8       Trustee have made a lot of threats, I think is fair to call

9       them, about this --

10              THE COURT:  No, I don't think it's fair to call

11      them threats.  I think that -- that what you have is a

12      situation where you have the largest, most complex case of

13      this kind and a Trustee who's trying to do his level best to

14      get rulings and affect an orderly liquidation to return

15      distributions to folks just like your clients.  So, in order

16      to do that, it's necessary to lay down certain rules of the

17      road, to set up economies of scale, et cetera.  Not at the

18      expense of anybody's due process rights, but in order to

19      avoid, seriatim, people coming back and saying -- and

20      seeking to distinguish themselves, and -- otherwise it would

21      go on forever.

22              As it is now, you can pick up the newspaper -- I

23      guess people don't pick up the newspaper anymore, but you

24      can look at articles that say, you know, why is Lehman

25      Brothers still going when it's seven, eight years after the

Page 35

1   fact?  And this is one of those situations where you're

2   saying the Trustee is threatening.  The Trustee I think, in

3   good faith, and you, in good faith, representing your

4   clients, are trying to do, you know, trying to get a result.

5   The problem that I have is that by the plain reading of the

6   stipulation, your clients are precluded from doing what

7   you're doing now.  That's essentially what it comes down to

8   and you know, I think what you're saying is that, you know,

9   Cleary Gottlieb should have done a better job, should have

10  done a different job, but the words on this page are very

11  clear and I think, you know, to the lawyers' credit, they

12  kept it simple, and applying the simple words, I think you

13  get to a result that your clients are bound.  But I'd like

14  to give Mr. Salzman an opportunity, just hypothetically, to

15  respond to your argument that factually distinguishes your

16  client's situation from those that were passed on by the

17  Second Circuit.

18          MR. HOFFMAN:  Thank you.

19          THE COURT:  All right?  Thank you.

20          MR. SALZMAN:  Thank you, Your Honor.

21          THE COURT:  Sure.

22          MR. SALZMAN:  I'm Michael Salzman from Hughes

23  Hubbard & Reed on behalf of the LBI Trustee.

24          I don't hold any brief for Cleary Gottlieb.  They

25  did fine by themselves, but I would say that in this case,

Page 36

1    they knew what they were doing.  This was not a mistake on

2    their part.  It is correct that these folks, the Katz

3    Claimants, were subject to master repurchase agreements in a

4    form that was the same as the ones that were litigated and

5    the same that the other people who were stipulated agreed

6    to.

7            It was clear from the briefing that the case

8    essentially arose -- rose or fell on whether the Second

9    Circuit would accept the ruling from the District of New

10   Jersey in the Bevill, Bresler case and had it done so, we

11   would have had a different outcome, but plainly, that didn't

12   happen, and the stipulation did cut both ways.

13           If the Second Circuit had ruled in the opposite

14   direction, we would not have been able to stand up here

15   today and say, but the Katz Claimants are different, that

16   was a reverse repo, these folks, the Katz people had

17   straight repos not reverse repos, that was for institutions,

18   these are individual -- we wouldn't have been able to do any

19   of that either.  We would have had to accept the ruling and

20   that was a calculation that the Katz's attorney was entitled

21   to make and did make.

22           So, next, I would just say briefly that there was

23   no secret record.  There was parts that were sealed, but

24   there was plenty of briefing.  All the briefing was public,

25   there were 40 pages of facts described, so this wasn't done

Page 37

1     in the dark.

2            Further, I would say that the scheduling

3     stipulation to which Mr. Hoffman referred only said, and it

4     was just a scheduling stipulation, that we would endeavor to

5     stipulate.  Nothing was conditioned on actually having a

6     stipulation of facts.  As in many cases, it proved a waste

7     of time, eventually, and the lawyers on both sides concluded

8     it was better just to proceed on the record.  Even if we had

9     had a stipulation, it might have just not been a full

10    stipulation anyway, and the Cleary people understood that.

11           On the merits, the fact is that these folks got

12    their property back from Lehman because all their accounts

13    were transferred to Barclays, and so whatever was in their

14    account, including securities, was transferred to Barclays.

15    These Katz Claimants circled the N box, the No box, no we

16    are not claiming for securities.

17           In Paragraph 6 of the limited objection to the

18    Trustee's determination the Cleary filed on behalf of these

19    three sets of Claimants, they said that their damages, that

20    their claim for customer status was about the valuation

21    damage caused by the failure of Lehman to complete the

22    second leg of the repo transaction.  The difference between

23    the purchase price Lehman would have had to pay, or was

24    obligated to pay, for the securities (indiscernible).

25           THE COURT:  So what you're describing is different

Page 38

1    from what Mr. Hoffman described to me moments ago.  He was

2    describing cash that was essentially captive in their

3    accounts.

4           MR. SALZMAN:  There was no cash captive in their

5    account.  The account transferred to Barclays.  Paragraph 6

6    -- I'm repeating -- Paragraph 6 of the limited objection

7    filed on behalf of each of these three sets of Katz

8    Claimants says that their claim is based upon the difference

9    in price between the contract price and the valuation of the

10   securities.

11          And that's why, even though their claim -- their

12   accounts had, I'll say more than $10 million dollars in

13   them, they're not claiming anything like that.  They're

14   claiming the difference in value between the two prices, the

15   closeout price and the contract price.

16          And so, on the merits, I think the Court can be

17   completely confident that these people have a contract claim

18   just like Judge Peck ruled at the beginning of the test

19   case, these are essentially contract claims, or they are

20   contract claims, and that was the rationale all the way up

21   to the Second Circuit.  They're contract claims.  They're

22   not customer claims.  Thank you, Your Honor.

23          THE COURT:  Okay.  All right, thank you.  Mr.

24   Hoffman, would you like a brief opportunity for rebuttal?

25          MR. HOFFMAN:  Just very briefly, Your Honor.  I

Page 39

```
 1    don't think -- I think you can look at the exhibits and see
 2    that -- I don't think Mr. Salzman is correct.  There were
 3    securities -- if you look on Exhibit 7 -- exhibit -- I think
 4    it's 5, 6, and 7, it says "Margin Account," it shows
 5    securities, it says my client bought the securities.  You
 6    can look at those --
 7              THE COURT:  But you're not asking for the return
 8    of any securities.
 9              MR. HOFFMAN:  Well, they have -- okay.  As far as
10    checking those boxes goes, if that is not the basis of the
11    Trustee's motion here, if they're trying to expunge us for
12    some other reason, that -- whether or not they checked this
13    box or that box when they filed their claims or -- I mean,
14    they did not do that through counsel and my understanding is
15    Cleary Gottlieb, who we've all seemed to defer to today,
16    didn't update that, so I don't know exactly what the
17    significance of that --
18              THE COURT:  I'm sorry, are you disagreeing with
19    the way that Mr. Salzman characterized and described the
20    nature of your client's claims?
21              MR. HOFFMAN:  The nature of my clients claims are
22    that they had securities that they had purchased, purchased
23    under repurchase agreements, but they had purchased and they
24    were their property, just like the Second Circuit said, that
25    they're the property of the guy buying them in the thing
```

Page 40

1    until it gets reversed.  Now, Lehman Brothers may have had

2    an obligation to buy those back at a certain price, and if

3    that's the -- you know, if the arithmetic comes out safe,

4    it's not for the -- you know -- we weren't going to be

5    getting these securities because they were all subject to

6    margin allowance and so forth.

7              THE COURT:  Okay.  All right.

8              MR. HOFFMAN:  But if I just may be heard but --

9    just for --

10             THE COURT:  Mm hmm.

11             MR. HOFFMAN:  -- ten seconds, thirty seconds, is

12   that look, we're answering a motion here, okay?  And I don't

13   know, you know, Mr. Salzman has made a -- in his papers,

14   suggesting -- I've never heard of anybody being sanctioned

15   for answering a motion.  It's their motion, you know, and

16   the stipulation order is subject to judicial review.  If the

17   Court is going to pass on it and make its ruling then

18   there's nothing that could immunize that from being, you

19   know, looked at by a Court.

20             THE COURT:  Of course now.

21             MR. HOFFMAN:  Okay.  Thank you very much.

22             THE COURT:  Of course not.  Okay, thank you.  We

23   will take it under submission.

24             MR. SALZMAN:  Thank you, Your Honor.

25             THE COURT:  All right, thank you.

Page 41

1           MR. MARGOLIN:  Your Honor.

2           THE COURT:  Yes.

3           MR. MARGOLIN:  That completes the LBI course in

4    the calendar.  Can the LBI team be excused?

5           THE COURT:  Yes, thank you very much.

6           MR. MARGOLIN:  Thank you.

7           THE COURT:  Hello, Ms. Marcus.

8           MS. MARCUS:  Good morning, Your Honor.  Jacqueline

9    Marcus, Weil Gotshal & Manges on behalf of Lehman Brothers

10   Holdings, Inc. as plan administrator -- or on behalf of LBHI

11   and its affiliated Debtors.  Your Honor, the first matter on

12   the docket today for LBHI is a status conference regarding

13   the amended omnibus application of certain individual

14   Committee members for payment of fees and reimbursement of

15   expenses.

16          As you may know, Your Honor, the plan

17   administrator has not taken a position regarding this

18   matter, so I defer to the Office of the U.S. Trustee, Ms.

19   Schwartz or anybody else who wants to be heard.

20          THE COURT:  All right, so, it's been a while since

21   we were all together, and it looks like, on December 18th,

22   there was filed something styled "Amended application of

23   certain individual Committee members for payment of fees and

24   reimbursement of expenses," a long pleading that had various

25   declarations attached to it.  So that's all I know.

1            MS. COFFINO:  So why don't I give you an update?

2            THE COURT:  Thank you, Ms. Coffino.

3            MS. COFFINO:  May I approach the mic?

4            THE COURT:  Yes.

5            MS. COFFINO:  When we were last before you, it was

6     a long time ago, I realize that, you recognized that it --

7     what you'd asked us to do, which is basically pull apart our

8     time records and take out fees and time that was not --

9            THE COURT:  Extraordinary.

10           MS. COFFINO:  -- strong enough to be a substantial

11    contribution, that was more normal.

12           THE COURT:  I mean just -- right, just a level

13    set, right?  We had -- the case went up to Judge Sullivan --

14           MS. COFFINO:  That's correct.

15           THE COURT:  -- he reversed, and said that he

16    rejected the United States Trustee's position, which was a

17    categorical bar on these seeking reimbursement from the

18    estate for these types of fees, correct?

19           MS. SCHWARTZ:  Your Honor, that's not correct.

20    So, when it's appropriate for me to clarify that, I will do

21    that.

22           THE COURT:  Okay.  Well, he -- let me -- maybe I

23    misspoke.  He said that under certain circumstances,

24    Committee members could make an application for

25    reimbursement of their individual counsel fees under a

Page 43

1    substantial contribution standard.

2              MS. SCHWARTZ:  Your Honor, if you would just bear

3    with me --

4              THE COURT:  Yeah.

5              MS. SCHWARTZ:  -- what Judge Sullivan actually

6    said, which he perceived the other side, understanding our

7    position to be that a Creditor Committee member under no

8    circumstances --

9              THE COURT:  No circumstances.

10             MS. SCHWARTZ:  -- could ever --

11             THE COURT:  That's what I just said.

12             MS. SCHWARTZ:  No, no, but I -- you didn't let me

13   finish, because when they went further for the application

14   for direct certification to the Second Circuit, the United

15   States Trustee counsel clarified to Judge Sullivan that that

16   was not our position and that our position was that a --

17   just because a Creditor sits on a Creditors' Committee does

18   not bar them from making an application as a Creditor in

19   wearing its Creditor hat, not as a Creditor seeking

20   substantial contribution for the work that the Creditor does

21   as part of its duties as a Creditor Committee member.  What

22   Judge Sullivan said at that hearing, which I brought a copy

23   of the transcript and a copy of the decision for Your Honor,

24   he made it very clear.  He said that he perceived, based on

25   the Appellee's briefs, that they perceived he was setting a

Page 44

1    new standard for substantial contribution claims when in

2    fact he was not doing that at all.  And in fact, what he

3    said was, he was merely restating the standard, and why this

4    means something, Your Honor --

5              THE COURT:  I have to tell you, I don't -- I am

6    not following at all what you're saying.

7              MS. SCHWARTZ:  Okay, well let me try this --

8              THE COURT:  All I know is what I read in Judge

9    Sullivan's opinion.

10             MS. SCHWARTZ:  In that one opinion, not in the

11   subsequent opinion on the motion for the direct cert to the

12   circuit, which I have brought copies for you, Your Honor.

13             THE COURT:  Okay, keep going.

14             MS. SCHWARTZ:  But the point is -- but the point

15   is, he had perceived us, based on what the arguments were at

16   that particular hearing, as taking the position that under

17   no circumstances could a Creditor Committee member ever file

18   a motion for a substantial contribution and he rejected

19   that.

20             THE COURT:  But -- I'm sorry, in his original

21   opinion, which is the only thing that I've seen, I've -- my

22   recollection is that he explicitly states what the U.S.

23   Trustee's position was and he rejects it.  He rejects, in

24   the opinion, the U.S. Trustee's argument, or his --

25             MS. SCHWARTZ:  Perception.

1          THE COURT:  -- perception of the argument that

2     your office's position was that there was a categorical bar.

3          MS. SCHWARTZ:  Correct.  And at the hearing, on

4     the application that the Creditors took to go right to the

5     Circuit to appeal the 1129(a)(4) issue, we clarified that

6     for Judge Sullivan, stating clearly on the record that we

7     had never argued that in our papers.

8          THE COURT:  Okay.  So was -- is he --

9          MS. SCHWARTZ:  It was a misperception.

10          THE COURT:  Okay, so now, is the upshot of all of

11     that, which, just to be clear --

12          MS. SCHWARTZ:  Yes.

13          THE COURT:  -- this is the first I'm hearing of

14     it.

15          MS. SCHWARTZ:  I understand that, Your Honor.

16          THE COURT:  SO is the upshot of that, that as we

17     go forward to resolve this now, and hypothetically, I were

18     to grant a substantial contribution claim for -- I'm going

19     to make up a number that's not on -- a million dollars in

20     the aggregate, say a million dollars, that -- and then there

21     were an appeal -- well, question.  If the applicants chose

22     to appeal, they would choose to appeal.  But would your

23     office be pursuing an appeal based on the argument that

24     there's a categorical bar?

25          MS. SCHWARTZ:  Absolutely not.

Page 46

1          THE COURT:  Okay, so we are -- so we are engaged

2     now on the issue of fulfilling what Judge Sullivan actually

3     said in his original opinion, which was the entitlement to a

4     substantial contribution claim for extraordinary work, work

5     above and beyond what a normal Committee would do.

6          MS. SCHWARTZ:  Well --

7          MS. COFFINO:  May I -- I would just like to

8     address one thing.

9          THE COURT:  Ms. Coffino, I apologize.  I didn't

10    mean to deprive you of your chance to speak, but this is a

11    helpful clarification.

12         MS. COFFINO:  Yeah, no, I agree.  Just a

13    clarification.  Your Honor, he did not -- what he said was,

14    just because a Creditor sits on a Creditors' Committee does

15    not bar that Creditor from seeking a substantial

16    contribution under the existing case law and standard, not a

17    new standard that --

18         THE COURT:  I --

19         MS. COFFINO:  -- wait, it's important, though,

20    Your Honor, because at that hearing where they went to the -

21    - for the certification, Judge Sullivan stated on the

22    transcript, which, it's on the docket, he stated he believed

23    that based on the other side's papers, they perceived that

24    he had made a new standard, that there was a standard called

25    above and beyond extraordinary services.  But what he was

Page 47

1    really saying and citing to Dana, Bayou, all the existing

2    cases, is that in order for the Creditors in this case, who

3    have been paid to date in the aggregate, $30 billion

4    dollars, in order for them to sustain a substantial

5    contribution claim, they have to satisfy the existing

6    elements, which Your Honor is familiar with.  Actual and

7    necessary benefit, direct, demonstrable benefit not just for

8    them but for the --

9              THE COURT:  Okay, but the operative quote from his

10   opinion, okay, and you know, this creates a quirky --

11             MS. COFFINO:  Yes, it does, Your Honor.

12             THE COURT:  -- this creates a quirky situation for

13   me to deal with because I have his opinion and --

14             MS. COFFINO:  Right.

15             THE COURT:  -- that's what I need to try to comply

16   with.

17             MS. COFFINO:  You also have to look at his

18   subsequent opinion, though, where he speaks to that.

19             THE COURT:  Well, the -- the operative language

20   from his first opinion was, "To the extent official

21   Committee members performed extraordinary work to benefit

22   the estate, above and beyond normal Committee duties, they

23   may, as will be explained below, seek to be reimbursed under

24   503(b)(3)(d) and (b)(4).  So --

25             MS. SCHWARTZ:  Right.

1          THE COURT:  The way I'm reading that, and I don't

2     think it's changed by what you're saying, I have yet to read

3     -- let me finish --

4          MS. COFFINO:  Yeah.

5          THE COURT:  -- is to the Committee members, don't

6     ask for normal Committee fees.  Don't ask for that.  Right?

7     Above and beyond normal Committee --

8          MS. COFFINO:  Right.

9          THE COURT:  -- don't ask for that.  Then we get

10    to, well, what can you ask for?

11         MS. COFFINO:  Right.

12         THE COURT:  And what you're saying is that 503(b),

13    the normal showing applies.

14         MS. COFFINO:  Correct.

15         THE COURT:  Okay.

16         MS. SCHWARTZ:  And what I'm also saying, Your

17    Honor, so I'm very clear, because I don't want this -- you

18    know, I think we come to you in a very good positon.  We've

19    had discussions, Ms. Coffino will talk to you about our

20    discussions and agree to a discovery schedule, all this good

21    stuff that's coming to you.  But so that it's not a surprise

22    to you, when we file our response, our view is, Your Honor,

23    that all of those Creditors can file a substantial

24    contribution motion for services they provided as a Creditor

25    to the estate based on the existing standard wearing their

1    individual Creditor hat, but not the fact that, for example,

2    they participated in 160 meetings to go to a --

3              THE COURT:  Well, I want to go back to the

4    statement that you made that we're in a good place, because

5    --

6              MS. SCHWARTZ:  Right.

7              THE COURT:  -- from what you just said, it doesn't

8    sound like a place I want to be, okay?

9              MS. SCHWARTZ:  Okay, fair enough.

10             THE COURT:  So let me -- why don't you have a seat

11   --

12             MS. SCHWARTZ:  Yes.

13             THE COURT:  -- and let me -- let's have Ms.

14   Coffino resume.

15             MS. COFFINO:  Let me just address this issue first

16   because we've been wrestling with it since the beginning the

17   first time we were here before you when we said we had a

18   threshold legal issue.

19             THE COURT:  Speak up, if you would, Ms. Coffino.

20             MS. COFFINO:  I'm sorry.  You know, this -- every

21   Committee member is a Creditor.  Everyone that sits on a

22   Committee is a Creditor, so I think that --

23             THE COURT:  That's a good thing.

24             MS. COFFINO:  But the -- the -- I think what the

25   Trustee -- U.S. Trustee is distinguishing between is work

Page 50

1     done qua Committee member, while you're on the Committee,

2     actual Committee work, and work does as an individual

3     Creditor totally outside the Committee's role.  And we read

4     Judge Sullivan's decision, and we don't think is subsequent

5     conclusion that the standard is the same, the elements are

6     the same, changes that, that you can get a substantial

7     contribution as a Committee member for Committee work if you

8     perform extraordinary work over and above the normal duties

9     of the Committee.  We just spent 11 months pulling apart our

10    time records for that reason.

11            THE COURT:  You see, so I don't -- so you are --

12    you are very far apart on what your view of what the law

13    actually is now, because -- go ahead, Ms. Coffino.

14            MS. COFFINO:  But we -- I mean, that is a legal

15    issue.  I'm sure that the U.S. Trustee will brief that issue

16    at the appropriate time, but as far as proceedings going

17    ahead on a factual basis, I think we are very close.  We

18    have an issue, one issue that --

19            THE COURT:  Well, what does that mean?  You --

20    what -- first of all, what are the total fees that are now

21    being requested by the applicants?

22            MS. COFFINO:  I think we shaved $7 million dollars

23    off of it, so somewhere around $19 million dollars.  It was

24    $26-, it's now $19-.

25            THE COURT:  And are you, without revealing

Page 51

1    anything that would be in the nature of settlement

2    discussions, are you engaged with the office of the U.S.

3    Trustee on -- on arriving at a number that would result in a

4    consensual order or are we embarking on a litigation path?

5          MS. COFFINO:  No, we are embarking on a

6    litigation, Your Honor.  There hasn't been settlement

7    discussions.  I think this issue precludes a settlement

8    discussion.

9          THE COURT:  But see, that -- that's exactly where

10   I started with my question to determine what we're doing,

11   because we're -- we are now in a situation where, because

12   the difference in opinion about what the legal standard is,

13   okay, this isn't going to end anytime soon because if I make

14   a -- if I make a ruling after a litigation and I go about an

15   analysis of what qualifies for reimbursement as a

16   substantial contribution, unless I adopt the qua Creditor

17   view as opposed to the qua Committee member view.

18          Then we're going to -- we're going to keep going

19   because there's going to be a continuing appeal, and I find

20   it very problematic procedurally to take a decision and then

21   -- and this is -- I'm very aware that there will be a

22   transcript of this, this is not at all a criticism of Judge

23   Sullivan, whose opinion I thought was crystal clear and I

24   stood and stand ready, as I have to, on the remand to apply

25   it.  But now, I have what I would call a muddying of what I

                                                              Page 52

1    had thought were clear -- clearer waters.  So -- and I'll

2    make it very clear that I think it's a waste of everyone's

3    resources to have an extended litigation over this.  I find

4    it very problematic.

5              MS. SCHWARTZ:  Your Honor, can I just address that

6    because I think -- I think I would address your issue on

7    resources.  First of all, as far as an appeal is concerned,

8    in the Creditors' papers, Your Honor would have seen that

9    they intend to go, take an appeal, after you rule because

10   they're going to appeal that 1129(a)(4) issue no matter what

11   happens here, and they put that in their papers.  So as far

12   as an appeal is concerned, they've already advised the

13   Court, that's what they're doing.  So that's one component

14   part.  I want to just be clear about that.

15             With respect to why he's --

16             THE COURT:  So let me understand this.  If I,

17   after a trial or a lack of objection by the U.S. Trustee, if

18   I were to enter an order granting the relief you request,

19   pursuant to a revised application, you're going to appeal?

20             MS. COFFINO:  No --

21             THE COURT:  You're going to appeal from an order

22   granting --

23             MS. COFFINO:  -- we reserve our right to appeal

24   the 1129(a)(4) issue.  For our part, Your Honor, we tried to

25   avoid all this.

1              THE COURT:  Didn't that ship already sail?

2              MS. COFFINO:  No, we asked -- we asked if it was

3      an interlocutory order.  We asked for the Judge to certify

4      it to the Second Circuit so we could avoid this very

5      circumstance that we're in now, and he refused to do it, so

6      we're back here.  We had no choice.  We thought we should be

7      --

8              THE COURT:  So I'm going to go through,

9      potentially, a long, contested trial going through thousands

10     of pages of time records, applying, potentially, two

11     different standards, and then, no matter what I do, there's

12     going to be an appeal?

13             MS. COFFINO:  That's -- on the 1129(a)(4) issue, I

14     believe that's right.  Unless there's some form of

15     settlement, yes.

16             MS. SCHWARTZ:  That is --

17             MS. COFFINO:  We tried to avoid it.

18             MS. SCHWARTZ:  -- exactly what they say in their

19     papers, and the money that they say that they've taken --

20             THE COURT:  You can avoid it.  You can just not do

21     it.

22             MS. COFFINO:  Your Honor, with the -- anyone can

23     give up their rights.

24             MS. SCHWARTZ:  Your Honor, that $7 million that

25     they say they've shaved off, that's -- they're going to seek

Page 54

1      that for their appeal.  That's all reserved for their

2      appeal.  So -- but let's talk about positive things for a

3      moment, if we can, try to shift it back a little bit,

4      because there are some.

5                  THE COURT:  The sun's out today.

6                  (Laughter)

7                  MS. SCHWARTZ:  But there are some.

8                  THE COURT:  It's not raining.

9                  MS. SCHWARTZ:  But there really are some.  There

10     really are some.  Okay.  Your Honor, we -- since they've

11     filed their papers, we've had a bunch of discussions with

12     the Creditors.  There hasn't been radio silence or anything

13     like that.  We've exchanged discovery schedules, we've

14     resolved how to get by certain discovery issues that we had.

15     With respect to some of the issues, Your Honor, we're

16     willing, if the other side is willing, if they want to --

17     we're going to talk because we'll have a 26(f) conference

18     with them next week, but we're willing, if they're willing

19     to stipulate to certain things, that's going to narrow

20     discovery.  But let me just point out a few things because I

21     think this is very important --

22                 THE COURT:  But do you hear the words that you're

23     saying, Ms. Schwartz?  The words that you're saying are

24     discovery.  It's May of 2016, so we're talking about

25     discovery of what these folks and their counsel did seven,

Page 55

1    eight, six, five years ago.  It's absurd.

2              MS. SCHWARTZ:  Not really because, let me say

3    this, if you read the services that they assert that qualify

4    for the substantial contribution claim, for example, serving

5    as a parallel management team when Alvarez and Marsal was

6    the management team for the Debtors and was paid over $600

7    million dollars for that service, it's not absurd to be able

8    to take discovery because the law says that a substantial

9    contribution claim is to be narrowly construed to not

10   mushroom the administrative expenses.

11             THE COURT:  So that one, as an example, for that

12   one, it really wouldn't matter whether it's qua Committee or

13   qua Creditor because you would say --

14             MS. SCHWARTZ:  It's duplicated and it wouldn't

15   make the standard.

16             THE COURT:  -- you would say no way, no how, no

17   matter what.

18             MS. SCHWARTZ:  Correct, and that's what I'm trying

19   to say to you, Your Honor, that that qua -- the way you said

20   it very elegantly, qua Committee, qua individual --

21             THE COURT:  That was -- I stole it from Ms.

22   Coffino.

23             MS. SCHWARTZ:  Okay, Ms. Coffino.  But that's just

24   one issue.  Your Honor, they say that they worked really,

25   really hard.  Well, the case law says that just because you

1    had extensive participation, you don't necessarily get a

2    substantial contribution claim.

3              Importantly, Your Honor, what the case law says is

4    that when you have retained professionals, and in this case,

5    the Committee had no bank, (indiscernible) --

6              THE COURT:  Okay, Ms. Schwartz, I appreciate that

7    if I said to you right now give me a closing argument, you

8    could, okay, but I'm not going to do that today.

9              MS. SCHWARTZ:  But the point is this --

10             THE COURT:  I under -- I understand the point.

11   Let me ask a different question of Ms. Marcus.

12             MS. COFFINO:  Sure.  Thank you, Your Honor.

13             THE COURT:  So, you indicated that, as if this

14   point you're, you know, agnostic a bystander.  Is it the

15   plan administrator's intent to remain on the sidelines?

16             MS. MARCUS:  Well, Your Honor, yesterday, or I

17   guess late last week when I spoke to Ms. Schwartz was the

18   first that we've heard about the new discovery initiative

19   and frankly, it's very troubling to us because on the one

20   hand, we want to stay on the sidelines.  On the other hand,

21   any discovery will necessarily involve the Debtor's

22   participation, I believe.

23             THE COURT:  Well, let me ask about the sideline

24   concept, because if this were a normal case, and -- or a

25   regular big case, for example, a substantial contribution

Page 57

1    application would be made as part of the claims process, and

2    the Debtor in the first instance, the reorganized Debtor,

3    would respond to the application.  Right?

4            MS. MARCUS:  Yes.

5            THE COURT:  Okay.  So -- and that's because the

6    Debtor has a -- reorganized Debtor has a stake in not paying

7    out admin expense money, right?

8            MS. MARCUS:  Correct.

9            THE COURT:  Okay.  So, it is at least

10   theoretically possible that the plan administrator could

11   look at all this and, well, in a more routine 503(b)

12   application, you might say yeah, I think you played an

13   important role in the case.  It's not worth $10 million

14   dollars, it's worth a million dollars.  And it could be

15   settled on that basis.

16           MS. MARCUS:  Correct.

17           THE COURT:  Correct?

18           MS. MARCUS:  Yes, but my understanding is that

19   even if, and we haven't engaged in settlement discussions,

20   but even if we did engage in settlement discussions with the

21   Committee representatives, we would also have to get the

22   office of the U.S. Trustee on board because they've

23   obviously taken a much greater role in this dispute than we

24   have.  So it would be a three-way discussion.

25           THE COURT:  Sure.  It would be a three-way

Page 58

1    discussion, but if there were to be a consensual resolution,

2    like any consensual resolution, someone could object.

3            MS. SCHWARTZ:  I think it's also not the normal

4    situation, Your Honor, because the Debtor had agreed to that

5    permissive plan provision.  So you see, from the outset, the

6    Debtor was willing to pay them.  They were willing to pay

7    them as a plan provision.

8            THE COURT:  Okay, but the Debtor stands corrected

9    by Judge Sullivan and everyone --

10           MS. SCHWARTZ:  Well, I just don't see their

11   incentive to play a large role in now what the Creditors try

12   to make a substantial contribution claim when initially,

13   they were like -- it's only -- remember, Your Honor, this is

14   a big case, right?  So the Debtor --

15           THE COURT:  Yeah.

16           MS. SCHWARTZ:  -- when they were coming up with

17   the consensual resolution, although we don't know this but

18   we'll inquire and we'll find out, $26 million and Andrea

19   Schwartz as an individual doesn't believe this, but in the

20   context of this case, it's a drop in the bucket.

21           THE COURT:  I understand, but my point is that now

22   -- okay --

23           MS. COFFINO:  May I speak?

24           THE COURT:  All right --

25           MS. MARCUS:  Can I say one more thing, Your Honor?

Page 59

1  Where we are very concerned that the discovery that the

2  parties are talking about now is going to consume more than

3  -- not more than but consume quite a lot of estate assets.

4  We've wound down the estate, there are much fewer employees

5  at the estate, and the last thing we want is to spend all

6  the money on discovery.

7          THE COURT:  Okay.  All right.  Okay, so go ahead,

8  Ms. Coffino.

9          MS. COFFINO:  Just by way of background, the

10 original application had two legal theories, 1129(a)(4) in

11 the plan provision, 503(b).  The Debtor did submit -- the

12 CEO submitted a declaration in support of that and said we

13 had made a contribution in his view.  That said, for our

14 part, we're happy to sit down with anyone.  We have -- you

15 know, we're not looking forward to six months of intensive

16 discovery here.

17         We tried to avoid it by going directly to the

18 Second Circuit.  But we're happy to talk to the Debtor and

19 we're happy to talk to the U.S. Trustee about a settlement.

20 If they're willing to (indiscernible)

21         THE COURT:  But that's inconsistent with the

22 notion that even if I were to grant your application in the

23 full amount, you're going to appeal.

24         MS. COFFINO:  But we could avoid the 503(b), you

25 know, proceeding.  It's a legal -- it's just an appeal,

Page 60

1      legal documents.  It's not six months of discovery and

2      depositions.

3                THE COURT:  Okay, so what's your idea of what

4      should happen next?

5                MS. COFFINO:  Well, as Ms. Schwartz was telling

6      you, we have had very productive sections in working out a

7      scheduling order.  We had one stumbling block.  We wanted

8      the UST to file a response, and other parties, wanted to set

9      a deadline for responses so that we knew who -- what

10     positions people were taking before discovery started.  They

11     didn't want to do that.  This morning, they have offered to

12     file a response by July 17th, and we can live with that, and

13     there's some -- you know, the overall discovery schedule, we

14     -- the timing I think we're in agreement on.  There may be

15     some nuances for internal deadlines that we need to work

16     out.  I think we're so close that we'll get there.  I do

17     believe that the U.S. Trustee also feels that way and that

18     we'd be ready to submit a scheduling order to you.

19                MS. SCHWARTZ:   And like I said, Your Honor --

20                THE COURT:  But we're going to have to have a

21     trial.

22                MS. COFFINO:  Yes, I think so, unless --

23                MS. SCHWARTZ:  Unless the Creditors decide that

24     they're going to waive their substantial contribution claim

25     and just take their appeal in 1129(a)(4) because -- because

Page 61

1    Judge Sullivan said, hey, I can't certify it and besides,

2    it's got to go back to Bankruptcy Court, you know, if they

3    waive their substantial contribution claim and just take

4    their 1129(a)(4) to the Circuit, you avoid the discovery at

5    the bankruptcy level.

6             MS. COFFINO:  Well, waiving our rights, Your

7    Honor, we're happy to sit down with anyone and talk about an

8    amicable resolution.

9             THE COURT:  Okay.

10            MS. COFFINO:  And we --

11            MS. SCHWARTZ:  And I will say, Your Honor, we have

12   -- we really have tried and we, the parties, we're -- I

13   think we're in a pretty good state in terms of that.  I was

14   the one who called Ms. Marcus to come today, to this

15   hearing.  I also called Committee counsel, Mr. O'Donnell is

16   here, sitting in the back, because I thought that, to the

17   extent we're going to be entering a discovery schedule and

18   that this was on the docket, they should be aware of it.  I

19   thought as a matter of courtesy that they should be here.

20   And I will say that we're going to have a 26(f) conference.

21   I really, truly believe, Your Honor, that there's going to

22   be a narrowing of issues, based on my conferences that I've

23   had with the other side.  The other thing --

24            THE COURT:  We're -- hold on.  Hold on.  First of

25   all, you should be aware that, between the beginning of June

Page 62

1   and the end of 2017, I have nine Lehman trials already

2   scheduled.  Nine.  So the concept that there's calendar room

3   for this is questionable.  That's point number one.  Point

4   number two is, before we embark on this exercise, we're

5   going to have a conference, okay?  So you're all here now.

6   I'd like you to take a seat.  I want to hear the other

7   matter that's on the calendar, and then we're going to

8   continue to talk.

9          MS. SCHWARTZ:  Okay.

10          THE COURT:  All right?  Thank you.

11          MS. MARCUS:  Your Honor, the next matter on the

12   calendar, it's an uncontested matter, and it's going to be

13   handled by Wollmuth.

14          THE COURT:  This is --

15          MR. STRONG:  This is matter number 5 on the agenda

16   for today.

17          THE COURT:  This is the post-petition interest?

18          MR. STRONG:  The LBHI's second motion in aid of

19   the indemnification claim's ADR order.

20          THE COURT:  All right.

21          CLERK:  Do you have the (indiscernible)?

22          THE COURT:  I mustn't have the right agenda.

23          MR. STRONG:  I can pass up the agenda, Your Honor.

24          (Judge confers with Clerk)

25          THE COURT:  Okay, the reason for my confusion is

Page 63

```
 1    because this is different from the agenda that I have.  So,

 2    it is not me.

 3             MS. MARCUS:  Sorry about that, Your Honor.

 4             THE COURT:  This is -- what you just handed me is

 5    different from the one that I'm looking at.  So this is an

 6    uncontested matter than relates to ADR.

 7             MR. STRONG:  Yes, Your Honor.

 8             THE COURT:  Okay.  I'm sorry.  Just trying to be

 9    clear.

10             MR. STRONG:  That's fine, and I apologize for any

11    confusion with regards to the agenda.

12             This motion that we're here for today, first let

13    me note my appearance.  Fletcher Strong of Wollmuth Maher &

14    Deutsch here on behalf of the Debtors.  Also with me is my

15    colleague, Jim Lawler, the partner on the case.  The motion

16    on the Court's calendar for today is LBHI's second motion in

17    aid of the indemnification claim to the ADR order.  And as

18    background, the Court entered the indemnification claims ADR

19    order June 2014, which created a mandatory mediation process

20    to resolve thousands of contractual indemnification claims

21    that Lehman holds against originators and other sellers of

22    defective mortgage loans to Lehman.

23             THE COURT:  Right.  So this is going forward --

24    the objectors with -- the order as it applies to certain

25    objectors is being adjourned out to the June date.
```

1          MR. STRONG:  Yes, Your Honor.  That's correct.

2          THE COURT:  Okay.  All right.

3          MR. STRONG:  There were four objections filed, all

4    objectors and all informal objectors that have reached out

5    to Debtor's counsel have been notified of the adjournment to

6    the June hearing.

7          THE COURT:  Okay, got it.  So we're carving out

8    K&B Capital, Selco Community Credit, Skyline and

9    TargetRate.com.

10         MR. STRONG:  Correct, Your Honor.

11         THE COURT:  Okay.  All right, so you'd like me to

12   enter the order with respect to the non-objecting parties?

13         MR. STRONG:  Correct.  We anticipate filing of the

14   revised proposed order later today.

15         THE COURT:  Okay.  All right.  Now that I see what

16   you're talking about, I'm good, and we'll enter that order

17   when we get it.

18         MR. STRONG:  Okay, thank you, Your Honor.

19         THE COURT:  All right, thank you very much.  Sorry

20   for the confusion.  Let me hand this back to you.  Thanks.

21   Okay?

22         MS. MARCUS:  I apologize for the confusion, Your

23   Honor.

24         THE COURT:  No problem.

25         MS. MARCUS:  I think maybe what happened was we

Page 65

```
 1    had sent an advance version and then as always happens,

 2    things changed, so.

 3              THE COURT:  Yes, it gets updated.  Okay.

 4              MS. MARCUS:  Apologies for that.

 5              THE COURT:  No problem.

 6              MS. MARCUS:  So the last item on the agenda, it is

 7    the last for today, is number six, and it's the plan

 8    administrator's five hundredth ninth objection to claims,

 9    ECF No. 51006.

10              THE COURT:  Right.  Okay.  So on that one, I have

11    the original document and then I have three objections, one

12    with respect to each of the three claims, and then there's a

13    supplement with respect to claim 66154, and then looking out

14    there, I'm also aware that there's now a motion to abstain.

15              MS. MARCUS:  That's correct.  Your Honor,

16    actually, three supplements, one for each of the objections.

17              THE COURT:  One for each one, okay.  All right, so

18    --

19              MS. MARCUS:  And the Debtor's reply that was filed

20    on Friday.

21              THE COURT:  Okay.  So how shall we approach this?

22              MS. MARCUS:  Well, I think we have a gating issue,

23    that's the elephant in the room --

24              THE COURT:  Yes, right.

25              MS. MARCUS:  -- so why don't we talk about that
```

Page 66

1    first?

2           THE COURT:  The tolling agreement.  Is that the

3    one?  Is that the elephant?

4           MS. MARCUS:  That's it.

5           THE COURT:  Okay.

6           MS. MARCUS:  So, Your Honor, as you know, because

7    you obviously read the papers, the Iron Bridge entities have

8    attached to their pleading a copy of a tolling agreement,

9    which they contend precludes the plan administrator from

10   moving forward today.  As noted in our reply, the language

11   of the tolling agreement appears to preclude the prosecution

12   of the objection.  However, as we've noted, we believe that

13   the Iron Bridge entities are estopped from relying on the

14   tolling agreement at this late date.

15          THE COURT:  The thing that I don't understand is

16   looking at the tolling agreement, it can be terminated on 30

17   days' notice.

18          MS. MARCUS:  That's correct, Your Honor.  Why

19   didn't we do it?  Because we didn't realize that the tolling

20   agreement covered under the Garfield County action

21   (indiscernible) the claims.

22          THE COURT:  The claims?

23          MS. MARCUS:  Yes.

24          THE COURT:  Okay.  Well, I appreciate that because

25   you might have made the argument, actually, that while it

Page 67

```
 1    tolled the latter, the Garfield County action, that you

 2    never intended to give up the ability to prosecute the

 3    claims, so -- but then -- so, if I read the tolling

 4    agreement correctly, which is just on 30 days' notice you

 5    can terminate it, I mean, we can either get started today or

 6    you can give the notice today and we can come back in 30

 7    days.

 8              MS. MARCUS:  That's exactly what I was going to

 9    say, Your Honor, and we just think, having been through

10    everything we've been through, I mean, the objection was

11    filed in September, adjourned repeatedly for months and

12    months and months --

13              THE COURT:  Right, so, I mean, as I -- you know,

14    as you know, I like to be practical.  I don't really like to

15    waste everyone's time.  So.

16              MS. MARCUS:  That's what we'd like Your Honor to

17    do, but obviously --

18              THE COURT:  Okay.

19              MS. MARCUS:  -- Mr. Barber may have a different

20    view.

21              THE COURT:  Yes.

22              MR. BARBER:  I'm all for practicalities, Your

23    Honor.

24              THE COURT:  Okay.

25              MR. BARBER:  Duncan Barber on behalf of the Iron
```

Page 68

1   Bridge Creditors.

2          THE COURT:  Okay.

3          MR. BARBER:  Tracy Klestadt with me here at

4   counsel table.  Thank you for clearing up the snafu on my

5   fee for pro hoc vice this morning.

6          THE COURT:  I didn't do a thing, but you're

7   welcome.

8          MR. BARBER:  So maybe your staff did.

9          THE COURT:  Somebody on my staff, okay.

10          MR. BARBER:  Right.  We filed -- the claim

11   objection was originally filed in mid-September and long

12   relationship with Ms. Arthur and Ms. Marcus and we put our

13   heads together and said we can crack this nut.  We failed.

14   That did result in a claim objection that we filed on March

15   23rd of this year.

16          A week later, in the tolled litigation in Colorado

17   that includes the same claims that formed the basis of the

18   claim objection, the Debtor filed a status report that I

19   referenced in my papers, continuing to kick that ball down

20   the road as a result of the tolling agreement.

21          I looked at that, circled back, and said, gee, I

22   think this is encompassed within it too.  Of course, our

23   goal is, obviously, resolve all claims in one case with one

24   Judge with all parties.  That said, it does seem to me that

25   -- actually, it's no -- there's no question, the tolling

Page 69

1  agreement applies, number one.  Number two --

2          THE COURT:  Okay, but, so Ms. Marcus just said

3  that if you're going to take that position, then she's being

4  quite candid, they'll send you a letter notifying you that

5  it terminates.

6          MR. BARBER:  Right.  Then I would ask for two

7  things.  Number one, if they do that, I have an assumption

8  why they haven't, but that's an assumption on my part, but

9  if they were to do that, I would ask two things.  One, our

10  preliminary stay relief hearing that then will have to get

11  set be set contemporaneously with our motion to abstain, so

12  that we just hear those all at once.

13          THE COURT:  You -- you know, I read all the papers

14  but I'm very confused.  Is the Colorado action entirely

15  encompass exactly the same things as the claims and the

16  claim objection?

17          MR. BARBER:  They -- but in terms of the complaint

18  that's been filed since November of 2011, it duplicates the

19  core objection to claim that's asserted here to the three

20  proofs of claim and then adds some tort claims because I

21  think they think in terms --

22          THE COURT:  But I'm just, you know, I still don't

23  understand why all that's going on.

24          MR. BARBER:  I'm sorry, why what?

25          THE COURT:  I don't -- I just don't understand --

1    just don't understand procedurally why all this is going on.

2    There are claims that are filed here, right?

3              MR. BARBER:  Correct.  Correct.

4              THE COURT:  And then how did that -- and who's the

5    Plaintiff in that litigation?

6              MR. BARBER:  Okay, let me -- let me -- yeah, sure,

7    let me explain that.  We filed proofs of claim --

8              THE COURT:  Yes.

9              MR. BARBER:  -- here.

10             THE COURT:  Right.

11             MR. BARBER:  The Debtor sued on the same facts and

12   transaction debt issue in our proofs of claim in November of

13   2011.  The Debtor is the Plaintiff.

14             THE COURT:  Okay.

15             MR. BARBER:  Sued these three Claimants --

16             THE COURT:  Okay.

17             MR. BARBER:  -- and a host of other people that

18   they say are on our side of the equation, if you will.

19             THE COURT:  Okay, and then you entered into the

20   tolling agreement.

21             MR. BARBER:  Yes, and we filed a stay relief

22   motion.  If you're going to file the complaint, we need to

23   get stay relief so we can defend.

24             THE COURT:  Okay, all right.

25             MR. BARBER:  We did, they postponed it, they said

Page 71

1      let's wait --

2                THE COURT:  Okay, so pause, pause.

3                MR. BARBER:  Okay.

4                THE COURT:  Time out.  So we're only going to --

5      so this is only going to happen one place, right?  It's

6      either going to happen here or it's going to happen there.

7      So Ms. Marcus, what does the plan administrator want to do

8      here?

9                MS. MARCUS:  So, Your Honor, may I speak from

10     here?  Is that okay?

11               THE COURT:  Sure, yeah.

12               MS. MARCUS:  When we filed the Garfield County

13     action, we were believing that we could obtain affirmative

14     relief against the Iron Bridge entities as well as other

15     defendants.  We've come to learn that the Iron Bridge

16     entities really don't have very much in the way of funds.

17     In fact, I think one of them, at least one of them may have

18     been dissolved.  So our view is that the claims against

19     these three entities would be heard here, and if necessary,

20     we can dismiss the Garfield County action as to those three

21     entities, not as to the other defendants, however.

22               THE COURT:  Okay.

23               MR. BARBER:  The issues in Garfield County are

24     exactly just --

25               THE COURT:  Okay, but she just said, Ms. Marcus

Page 72

1      just said she's going to let you out of that action.

2              MR. BARBER:  You know, that hasn't happened.  The

3      way things are currently postured, that has not happened.

4      And there is --

5              THE COURT:  Look, we're now -- let's introduce the

6      other elephant in the room, okay?  You'd rather have your

7      claims resolved in Colorado than here.  Let's face it.

8              MR. BARBER:  Actually, we'd rather have all of it

9      resolved with all the defendants.

10             THE COURT:  She can't -- Ms. Marcus can't do that

11     because their other defendants are not subjects to this

12     Court's jurisdiction.

13             MR. BARBER:  Okay, let's --

14             THE COURT:  Mr. Barber?

15             MR. BARBER:  Yeah?  There's another important

16     point.

17             THE COURT:  The important point is the following:

18     that the practical solution is either you agree today that

19     the tolling agreement doesn't apply, or if you don't, Ms.

20     Marcus is going to be good to her word and I'll hold her to

21     it, she'll send a notice and we'll run out the 30 days.  In

22     the meantime -- in the meantime, unless you take the

23     position that her filing a motion or a notice of

24     discontinuance with respect to your clients in the Colorado

25     action is itself barred by the forbearance agreement, which

Page 73

1   you may, then she will also, within a period of time which

2   she will commit to, on the record, endeavor to do that.  You

3   will -- your clients will then be no longer involved in the

4   lawsuit in Colorado in which Lehman is the Plaintiff.  You

5   then no longer have an argument to do anything but have your

6   claim resolved here, like any other Creditor.

7           MR. BARBER:  I think the tolling agreement

8   applies.

9           THE COURT:  Okay, so you're not going to be

10  practical.  Ms. Marcus, you're going to have to send a

11  letter, which, to clarify, Mr. Barber, if you believe that

12  the prior -- that that means that prior to the 30 days, Ms.

13  Marcus can't take any steps to dismiss your client out of

14  the lawsuit that's pending in Colorado.  Does the tolling

15  agreement preclude her from doing that?

16          MR. BARBER:  I think technically it does, okay?

17  And my clients aren't here for me to talk to them, okay?

18          THE COURT:  But this is a -- this is a technical,

19  legal point, and I'm sure that they're going to take your

20  advice on it, so why don't we do this, Ms. Marcus?  Why

21  don't we leave it that you're going to have to issue your

22  notice, and then Mr. Barber, if you would get -- after

23  you've had an opportunity to confer with your clients, get

24  back to Ms. Marcus and let her know if your position is that

25  the tolling agreement precludes her from taking any

Page 74

1    necessary action, I have no idea what it is, in Colorado to

2    either move by notice or by motion, to dismiss your clients

3    from the Colorado action.  If your position is that she's

4    free to do that sooner than the running of the 30 days, Ms.

5    Marcus, you can proceed --

6                MS. MARCUS:  Yes, Your Honor.

7                THE COURT:  -- to do that.  If the position is

8    that the 30 days has to run, then you can do it on the 31st

9    day after the giving of your notice.

10               MR. BARBER:  Okay.  We're talking about elephants

11   in the room.  Can I identify one other?

12               THE COURT:  Sure.

13               MR. BARBER:  Okay.

14               THE COURT:  Other than Mr. Klestadt?

15               (Laughter)

16               MR. BARBER:  He's obvious.  A core issue between

17   the Debtors and Iron Bridge and the affiliate -- and the

18   people affiliated with Iron Bridge, okay, is the

19   construction defect litigation, which I've been told you're

20   aware of, okay?

21               THE COURT:  Yes.

22               MR. BARBER:  That construction defect litigation

23   had one tiny bit more to go that will queue it up in a

24   correct posture for the Debtor and the Iron Bridge side to

25   determine liability between them for what happened.  The

Page 75

1    arbitration award was entered, the jury verdicts were

2    entered.  The jury -- there's a bunch of motions surrounding

3    the jury verdicts.  They haven't been reduced to judgment.

4    The Judge yesterday sent a -- set a hearing for July 10th to

5    resolve those pending motions, which shortly thereafter, we

6    all anticipate that the jury verdicts will be committed to

7    judgment.  At that point, it will now be a time when claims

8    between the Debtor and the Iron Bridge side will have to be

9    determined as between them.

10             THE COURT:  Okay.

11             MR. BARBER:  Okay?

12             THE COURT:  Okay in the sense that I hear you,

13   okay.

14             MR. BARBER:  I hear you, right, and I'm just

15   trying to get that on the table because that's an important

16   part of what will be resolved in this claim.

17             THE COURT:  Okay.  All right.  All right, so Ms.

18   Marcus, do you disagree with Mr. Barber's characterization

19   of the impact of that particular aspect?

20             MS. MARCUS:  Well, Your Honor, first of all, I

21   certainly wasn't aware that the Judge had set a July 10th

22   hearing which --

23             MR. BARBER:  I found out yesterday.

24             MS. MARCUS:  -- I'll be glad to hear.  I don't

25   know if Ms. (indiscernible) knew either.  Our view is that

Page 76

1    that litigation is really separate and apart from these

2    claims, but if you give me a moment to consult with my

3    client --

4              THE COURT:  Okay, but I guess the point is that if

5    that's going to happen on July 10th, then we get to the same

6    place by giving you an adjourned hearing date subsequent to

7    that time, and -- I mean, I'm flying blind at this point,

8    because this is all news to me.

9              MR. BARBER:  From a practical standpoint,

10   (indiscernible) me, let's see what the Judge does do.

11             MS. MARCUS:  May I have a moment to consult, Your

12   Honor?

13             THE COURT:  Sure.  Sure.

14             (Counsel confers with client off the record.)

15             THE COURT:  Look, you know, Ms. Marcus, as you

16   know, Mr. Barber, I'll say it to you, Mr. Klestadt knows as

17   well, I'm not going to -- I don't want to ambush anybody, so

18   to the extent that we are all -- new facts are emerging as

19   we're all here and you need time to figure out how

20   everything fits together, that's completely fine.  I don't

21   want to prejudice anybody from being able to do a thoughtful

22   analysis of where things stand.  My bottom line message

23   remains the same, is that I'd like to be practical and you

24   did indicate that you were talking settlement and that you

25   got to an impasse.  If you believe that additional

Page 77

```
 1   settlement discussions would be fruitful, that would be

 2   great.  If you think that you might be assisted by one of my

 3   colleagues who don't have a lot of free time these days but

 4   tend to say yes when I ask them to do something, that would

 5   be another option.  It does sound -- to me, looking at the

 6   merits, this is crying out to be settled.

 7            MS. MARCUS:  Your Honor, you took the words right

 8   out of my mouth.  In fact, that's exactly what I was going

 9   to say, that these claims, they're significant, obviously,

10   for the Claimants, they're significant for the Rose Branch

11   estate, but in the scheme of Lehman as you heard Ms.

12   Schwartz say, they're not very significant claims.

13            THE COURT:  So, Mr. Barber, would your clients --

14   could you inquire as to whether, free of charge, your

15   clients would be interested in participating in a mediation

16   under the auspices of a sitting Judge in this building?

17            MR. BARBER:  I definitely will ask.

18            THE COURT:  Or in the Southern District of New

19   York.

20            MR. BARBER:  Yeah.  Okay, my personal practice

21   style, we've never met, is keep at settlement, if you can

22   get it, you get there.

23            THE COURT:  We did meet years ago, you just don't

24   remember.

25            (Laughter)
```

Page 78

1              MR. BARBER:  Now, that's a hamper.

2              THE COURT:  Now that's going to make your really

3      nervous because I remember and you don't.

4              MS. MARCUS:  Your Honor, if I might add, I think

5      that one of the issues that we've been struggling with in

6      terms of trying to get to a settlement is that the Claimants

7      here believe, and I believe that it's a sincere belief, that

8      their claims are very much wrapped up with the homeowners'

9      litigation and the arbitration proceeding in Colorado --

10             THE COURT:  And you don't?

11             MS. MARCUS:  -- and we don't.

12             THE COURT:  Right.

13             MS. MARCUS:  And that's been the stumbling block.

14             THE COURT:  But I think that -- I think that if we

15     -- if we teed up a mediation, and I have a couple of my

16     colleagues in mind who are particularly experienced in just

17     exactly this type of dispute, it might be an illuminating

18     exercise for everyone.  If there's a issue of -- I don't

19     know if there's a hardship issue in having one of your

20     clients come to New York?

21             MR. BARBER:  Your Honor, a settlement necessarily

22     includes the defect litigation.

23             THE COURT:  But the --

24             MR. BARBER:  Okay, but is there a hardship issue,

25     no, there's not a hardship issue.  Can I have a -- can I

Page 79

1    have a client representative or representatives here with me

2    in New York for a mediation?  Absolutely.

3             THE COURT:  Okay.  I mean, look, if you -- I mean,

4    everything would be on the table, and that would be one of

5    the issues on the table.  You know, if the parties agree,

6    then there wouldn't be a need for a mediation.  Obviously,

7    you don't agree and I imagine that -- you have to get more

8    information around exactly what's going to happen in this

9    July date because that seemed to be a new fact.  So why

10   don't you have conversations --

11            MR. BARBER:  I definitely will.

12            THE COURT:  -- all right, and you know, we'll say

13   that the 30-day -- you know, you're going to have to deal

14   with the procedural issues as well.  I would encourage you

15   to come to some kind of a global resolution, but in the

16   absence of that, Ms. Marcus, you'll file the piece of paper

17   you have to file, and then, you know, just let me know and I

18   will make a couple of phone calls and I think that -- I

19   think it would be a positive experience.

20            MR. BARBER:  Great.

21            MS. MARCUS:  Okay.

22            THE COURT:  The price is certainly right.

23            MR. BARBER:  Appreciate it.

24            MS. MARCUS:  Thank you, Your Honor.

25            THE COURT:  All right, so I'm going to adjourn

Page 80

1    this without date and I'll leave it to the two of you just

2    to get back to my Chambers with what you want to happen

3    next, and if we don't hear from you after a certain amount

4    of time, we will be calling.

5              MS. MARCUS:  You know how to find us, and Your

6    Honor, what do we do in the meantime about Mr. Klestadt's

7    extension motion?  That's on for June 2nd.  It'll be part of

8    that --

9              MR. BARBER:  (Indiscernible) contract

10   (indiscernible).

11             MS. MARCUS:  Okay.  Okay, perfect.  Thank you,

12   Your Honor.

13             MR. BARBER:  And a Shelley Chapman is scratching a

14   memory back there.

15             THE COURT:  Yup.  You'll figure it out.

16             MR. BARBER:  I'm going to.  Thank you, Your Honor.

17             MR. KLESTADT:  Thank you, Your Honor.

18             MS. MARCUS:  That concludes the hearing, Your

19   Honor.

20             THE COURT:  All right.  Ms. Marcus, do you want to

21   remain for the conference?

22             MS. MARCUS:  Yes.

23             THE COURT:  Okay, thank you.  So I think what

24   we'll do so that we can have a more productive discussion is

25   just go -- go into the conference room.

1            MS. SCHWARTZ:  Your Honor, is it possible to stay

2    on the record because of the possible appeal issues?

3            THE COURT:  I'd like to have a conference.

4            MS. SCHWARTZ:  Thank you, Your Honor.

5            THE COURT:  Thank you.

6

7            (Whereupon these proceedings were concluded at

8    11:38 AM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                           Page        Line

5     Hearing re:  Doc #13493 Trustees Motion    11          19

6     for an Order Authorizing the Abandonment

7     of Certain Lehman Brothers Inc. Data

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 83

1                     C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5      Sonya Ledanski          Digitally signed by Sonya Ledanski Hyde
                               DN: cn=Sonya Ledanski Hyde, o=Veritext,
6      Hyde                    ou, email=digital@veritext.com, c=US
                               Date: 2016.05.11 16:31:59 -04'00'
7

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  May 11, 2016