Page 1

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No.  08-13555-scc

 4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 5   In the Matter of:

 6

 7   LEHMAN BROTHERS HOLDINGS INC.,

 8

 9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11                   U.S.  Bankruptcy Court

12                   One Bowling Green

13                   New York, NY 10004

14

15                   June 9, 2016

16                   2:01 PM

17

18

19

20

21

22

23   B E F O R E :

24   HON SHELLY C. CHAPMAN

25   U.S.  BANKRUPTCY JUDGE
```

Page 2

1    Hearing re:  Doc #52640 Debtors Motion to (A) Disallow and

2    Expunge Certain RMBS Claims, and (B) Release Certain Related

3    Claims Reserves/

4

5    Hearing re:  Discovery Conference (Claim of JPMorgan)/

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
1    A P P E A R A N C E S :

2

3    SEWARD & KISSELL LLP

4         Attorney for

5         One Battery Park Plaza

6         New York, NY 10004

7

8    BY:  DANIEL GUZMAN

9

10   ROLLIN BRASWELL FISHER LLC

11        Attorney for

12        8350 E Crescent Parkway, Suite 100

13        Greenwood Village, CO 80111

14

15   BY:   MICHAEL ROLLIN

16

17   CHAPMAN & CUTLER LLP

18        Attorney for U.S. Bank National Association, as Trustee

19        111 west Monroe Street

20        Chicago, IL 60603

21

22   BY:  FRANKLIN H. TOP III

23

24

25
```

1   ALSTON & BIRD LLP

2        Attorney for

3        One Atlantic Center

4        1201 West Peachtree Street

5        Atlanta, GA 30309

6

7   BY:  SAGE M. SIGLER

8

9   WILLKIE FARR & GALLAGHER LLP

10        Attorney for

11        787 Seventh Avenue

12        New York, NY 10019

13

14   BY:  PAUL V. SHALHOUB

15        TODD COSENZA

16        THOMAS H. FRENCH

17

18   ALSO PRESENT TELEPHONICALLY:

19

20   PATRICK MOHAN

21   CELINE BUEHL

22   CINDY DELANO

23

24

25

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  How's everyone?

3              MR. COSENZA:  Good afternoon, Your Honor.

4              THE COURT:  I'm just looking at the list.  Got a

5    couple folks on the phone, listen-only mode.

6              MR. COSENZA:  Sure.  Good afternoon, Your Honor,

7    Todd Cosenza from Willkie, Farr & Gallagher, for Lehman

8    Brothers Holdings, Inc., the plan administrator.  Your

9    Honor, we made a motion a little over six weeks ago to

10   expunge a number of claims, and we thought the motion was

11   basically a motion to seek administrative relief to clean up

12   the claims registry, in light of prior orders that have been

13   answered by the Court.  So we ask for a simple order

14   directing the expungement of the proofs of claims that were

15   attached to Exhibit B to our motion, basically to clean up

16   the claims registry.

17             The claims on Exhibit B previously were expunged

18   by a fact of the protocol order, and the protocol extension

19   order.  The trustees have not submitted any loans due

20   protocol for those claims.  I don't think that's disputed in

21   the motions.  So after 16 months of operating under the

22   protocol, the trustees now argue that the protocol -- and

23   this, I'm trying to understand their argument -- that the

24   protocol only applies to cover loans, not to all the RMBS

25   trust, and the trustees basically seek to revise, in some

Page 6

1   way revoke the prior orders from the Court on the protocol

2   order, as well as the protocol extension order.

3           And Your Honor, I want to note, before I get into

4   the details of the argument, there have been many direct

5   representations made to Lehman, as well as to the Court, as

6   to the protocol and how it was intended to be a full

7   comprehensive process, and cover all the trust, and

8   seemingly, the trustees have done a 180, they're taking a

9   very different position in their motion, in particular for

10  the transfer of trust, saying that they are now part of the

11  covered loans, and in theory, aren't covered by the

12  protocol.  And that, I think, is very different form the

13  past, and how they've been operating under the protocol, and

14  various statements that have been made to us, as well as to

15  the Court.  So Your Honor, for background, I don't know if

16  can approach, and I have some slides, to go through the

17  various definitions.

18          THE COURT:  I have read everything, and as you

19  know, I was there, so to speak, at the beginning when the

20  estimation motion was heard, and the cross-motion, and then

21  the protocol evolved.  So, but that being said, I think it

22  is useful for you to go ahead and take us through the

23  definitions and the structure.

24          MR. COSENZA:  Sure.  So Your Honor, as you know,

25  because in 2014, the trustees moved to increase the reserve,

Page 7

1    and thus started a series of motions that led to a hearing

2    that took place in the middle of December 2014.  The

3    trustees moved to increase the reserve.  They also moved

4    theoretically to allow and estimate claims.  Lehman cross-

5    moved for imposition under protocol.  Any one of the primary

6    reasons why we cross-moved for protocol was to try to get

7    full and comprehensive, I would say belief would be too

8    strong a word, but basically a full and comprehensive review

9    of all the loans that could potentially be at issue.

10          So we included in our cross-motion various

11   definitions of the RMBS claims, and in the slides that I

12   handed to you, I just quoted a couple of the paragraphs from

13   our complaint.  Paragraph 1 talks about the claims that were

14   brought, and how they totaled approximately $37 billion

15   against LBHI and SASCO for damages allegedly inured by their

16   trust that issued Presidential mortgage-backed securities.

17   This in intended to cover -- not just to cover loans, but

18   all the loans.  And indeed Your Honor, to go to Paragraph

19   21, the RMBS protocol, among other things, includes a

20   requirement that the RMBS trustees deliver to the plan

21   administrator any and all loan files that the RMBS trustee

22   believe may be put back to Lehman under the governing

23   agreements.

24          So that was part of our motion that was before the

25   Court back in December of 2014.  We had our hearing.  One of

Page 8

1    the issues that was discussed was what the RMBS claims were

2    intended to cover.  We concluded that it should be a

3    comprehensive program, and we are very fortunate that Your

4    Honor, you agreed with our view, that we should go forward

5    with the protocol, that would be a comprehensive way of

6    resolving all of these claims.  And in fact, Your Honor, if

7    you look at the protocol itself, at Page 2, Note 1, the

8    capitalized terms not defined herein shall have the same

9    meaning ascribed to them as in the cross-motion, which was

10   Lehman's cross-motion.

11          So the protocol order itself adopts the

12   definitions that Lehman had put forward in its cross-motion

13   for the imposition of the protocol.  So the definition of

14   the RMBS claims in the protocol correlates to what Lehman

15   believes was at issue as part of our cross-motion to

16   protocol, not the initial motion to estimate that the -- and

17   the motion to increase the reserves that the trustees had

18   put forward.  So that's the background.  One other thing,

19   and the protocol -- an issue that came up in the briefing --

20   at Page 4 of the Protocol, Section 3(e)(1), there's a

21   statement that each RMBS trustee may submit to the plan

22   administrator claims for alleged breaches of representations

23   of warranties and document deficiencies.  That was for all

24   the RMBS claims.

25          And then there's a statement there, as described

Page 9

1    below, and the trustees have argued that the definition of

2    RMBS claims is what was described below, and how the things

3    were going to be put to Lehman.  This is clearly intended to

4    cover the RMBS claims definition that had been built earlier

5    and referenced in the protocol order, and in the cross-

6    motion.  As described below was basically just a process of

7    how the claim files were supposed to be put to us, not to

8    say that the RMBS claims were defined as by what's set forth

9    below.  If you look at the actual protocol, was next set

10   forth below was how the process was supposed to work in

11   terms of the claim files.

12            So Your Honor, that's all helpful background.

13   There's now been, over time, a process for 16 months, where

14   the RMBS trustees were going back, collecting files, putting

15   them through the protocol.  There are various stages through

16   this process, where we try to meet various deadlines.  One

17   issue that came up a couple times was whether the RMBS

18   trustees were meeting their deadlines, and whether or not

19   they were intending to pursue loans under "transfer of

20   trust."  And there was representations made to both Lehman

21   and to the Court that the RMBS trustees were not pursuing

22   those claims.

23            And we moved along to the March 31st deadline,

24   which was the deadline set forth in the protocol, and the

25   RMBS trustees reached out to us a few weeks before the March

Page 10

1    31st deadline, noting that there were several delineated

2    loan files that they had trouble collecting, and asked for a

3    two-month extension to get those loan files and put them

4    through the protocol.  Lehman had discussions with the RMBS

5    trustees, and we brought this--they had made a motion to the

6    Court seeking a two-month extension.  We agreed to that

7    extension, and if you look at the extension motion that was

8    put forward -- and this is something that was filed by the

9    RMBS trustees -- they requested an extension of the March

10   31st overall claim file cutoff date to May 31st, solely in

11   respect to the remaining covered loans, which was as defined

12   in their motion, the 3800 additional loans that they needed

13   an extension for to put through the protocol, and they

14   attached those loans to Exhibit A of their motion.

15              Following that, Your Honor, they also mentioned in

16   their motion that they will not submit any additional RMBS

17   claims for covered loans or otherwise.  That's to be clear,

18   that was supposed to cover covered loans, and whatever else

19   they believed to have been covered.  Any other loans

20   potentially could have been through the protocol.  Under the

21   protocol, other than the RMBS claims that they basically got

22   an extension for --

23              THE COURT:  But isn't is circular?  Because if

24   you're taking the position that the transferor claims were

25   not covered by the protocol, then I'm imagining that they're

Page 11

```
 1   going to argue that there would be no need to reference

 2   them, because they're not covered by the protocol.  So it's

 3   a little circular.

 4           MR. COSENZA:  But Your Honor, the point that was

 5   in this motion, I think as part of an additional component

 6   of the protocol, the addition of adding "or otherwise" was

 7   to ensure that it was not only just loans that they could

 8   have put under covered loans, but also any other loans that

 9   they theoretically could have put in?

10           THE COURT:  Well, the term covered loans has its

11   genesis in the estimation motion, correct?

12           MR. COSENZA:  Yes.  That is correct.  And our

13   definition of the RMBS claims has its origin --

14           THE COURT:  In the cross-motion.

15           MR. COSENZA:  In the cross-motion.  And then Your

16   Honor, also part of the extension motion, and the order that

17   Your Honor entered --

18           THE COURT:  But covered -- just in terms of your

19   numbers, just give me a minute to find it again.  I think

20   there there's a big difference between all loans, and the

21   covered loans.

22           MR. COSENZA:  Oh yeah, there is, Your Honor.

23           THE COURT:  I saw the number, but now I can't find

24   it.  It's in a footnote somewhere.  Well, in any event, it

25   doesn't matter -- if somebody knows the answer -- it's in
```

Page 12

1    one of the early papers.

2              MR. COSENZA:  Yes, it's in our, I think, I

3    believe, I know it's definitely in our initial cross-motion

4    to the protocol.

5              THE COURT:  That's what I'm thinking as well.

6              MR. COSENZA:  But there is a big difference, Your

7    Honor.  There were hundreds of thousands of loans that were

8    also part of the--that would be in addition to the 200-some-

9    odd thousand that are the covered loans.  But Your Honor,

10   one other things that I wanted to note was that the protocol

11   itself contemplated that if loans are not put through by

12   March 31st, they would be expunged.  And the protocol

13   extension order gave the same effect to what was initially

14   in the protocol basically saying, "except for the ones that

15   we provided an extension for, any such RMBS claims shall be

16   deemed waived and released by the RMBS trustees, and

17   disallowed and expunged upon entry of the order granting

18   motion.  And that order was submitted by the RMBS trustees,

19   and it was entered by the Court a little over six weeks ago.

20   So I think, Your Honor --

21             THE COURT:  So this issue didn't bubble up, so to

22   speak, until there was a, I think it was the March 31st

23   letter that said -- from the trustees saying, just to be

24   clear, the transferor files are not covered?

25             MR. COSENZA:  The issue had come up, Your Honor, I

Page 13

1    think at the status conference prior to that motion being

2    made, so that I have to go back--I think it was somewhere in

3    January, there was a discussion about whether or not these

4    loans should be put through the protocol.  And there was a

5    statement made by, I believe two of the counsel for the

6    trustees that they would make a decision not to put the

7    transfer loans through the protocol, and the theory --

8            THE COURT:  Purely cost-benefit, right.

9            MR. COSENZA:  Particular if it wasn't worth doing

10   that, because there was low probability of having any

11   liability against Lehman.  Which, from our perspective,

12   makes total sense that they made that decision.  So Your

13   Honor, that's the background for how we got here today.

14   There are a number of -- two other issues that have been

15   raised by the motion.  One is, there have been no claims

16   that have been put against SASCO, and as part of the initial

17   allocation process for the $5 billion reserve, $250 million

18   have been set aside for SASCO.  We believe that since no

19   claims have been put against SASCO --

20           THE COURT:  Physically, where were the SASCO --

21   are all the transferor files SASCO files?

22           MR. COSENZA:  No.

23           THE COURT:  The majority of them?  And so when the

24   protocol commenced, where were the SASCO files?  Do we know?

25   Someone has their hand raised in the back.  Mr. Witnauer, do

1    you remember?

2              MR. TOP:  I'm Mr. Top.

3              THE COURT:  I'm sorry, I do that to you every

4    time.

5              MR. TOP:  It's okay.  I suspect that the loan

6    files are applicable transferor loans are probably in the

7    possession of various servicers for each of the various

8    trusts.  So it's not like Lehman has a bucket of SASCO

9    loans.

10             THE COURT:  Yep, okay.  That's helpful.  Is that

11   consistent with what Mr. French is saying?

12             MR. FRENCH:  I apologize, I couldn't hear is

13   answer because (indiscernible).

14             THE COURT:  It's okay.  The answer was that

15   they're with various servicers.

16             MR. FRENCH:  They're definitely with various

17   servicers, but SASCO--

18             THE COURT:  Mr. French, tell the court reporter

19   what your name is.

20             MR. FRENCH:  Tom French, Willke, Farr & Gallagher.

21   SASCO served as the depositor for substantially, all of the

22   securitization process, and is completely independent of who

23   was servicing a given trust, and is also completely

24   independent of whether we're talking about transferor loans

25   or covered loans.

Page 15

1          THE COURT:  Okay, I'm following you.

2          MR. FRENCH:  All of the loans, whether sold by

3    transferors, or sold by LBHI, went through SASCO into the

4    trust.  There were, in some instances, duplicated reps, but

5    it was simply part of the structure of the SPD depositor

6    (indiscernible) with the SEC.

7          THE COURT:  What I'm going at with this question,

8    and I should have made it clear, was that one of the

9    arguments is that if you look at Paragraph Roman 1 of the

10   protocol, and it talks about receipt of claims form

11   servicers, I believe the trustees are arguing that that

12   demonstrates, in their view, that it's limited to covered

13   loans.  And I'm trying to make that foot, because I'm not

14   reading that language the same way, to tie that -- first of

15   all, this is simply the receipt of files for services.  But

16   just on that point, I'm trying to understand where the

17   transferor files lived, and how, if at all, that's at odds

18   or not included in the Roman 1 process.  I'm not taking

19   evidence here.  I don't want anyone to take the position

20   that I'm taking evidence.  So if we get to the point where

21   there's a disagreement about something, you'll let me know.

22   So, but it's helpful.

23         MR. FRENCH:  Okay.  It's my understanding that all

24   of the loans when filed, decided to (indiscernible)

25   servicers.

Page 16

1           THE COURT:  With one servicer or another.

2           MR. FRENCH:  Or another, correct.  And since

3     SASCO, to my understanding, did pull loan files physically,

4     it wasn't a servicer, it was simply a conduit through which

5     loans went on their way to securitization (indiscernible).

6           THE COURT:  Okay, thank you.

7           MR. COSENZA:  The other, (indiscernible) one issue

8     is SASCO.  One other issue I wanted to address was the idea

9     of sampling, for low-level loans.  I think the history

10    behind the protocol was the reservation of rights for

11    sampling after loans were basically put through the protocol

12    -- I think there was a description, maybe of a mop up for

13    certain loans.  I don't think the intention of the parties

14    as they were proceeding through the protocol, and

15    particularly the protocol language was to not put in a large

16    group of loans, and then argue that they reserve all rights,

17    then sample the losses.

18           It was up to the trustees to make that first step

19    of putting the loans -- to collect the loans and put them

20    through Step 1, for us to then sort of evaluate them and

21    then move on, not to take their word that there would be a

22    certain number of files to have (indiscernible) level

23    losses, then we'll engage in a sampling exercise for them.

24    That wasn't the intention of the parities, that wasn't the

25    intention of the calculations of how things were done.  It's

Page 17

1    simply, as I think it "reads", both sides reserve their

2    rights on sampling and whether or not that would ever become

3    useful down the road.  It wasn't a path for someone, one of

4    the parties not to do something, and then say, "Oh, we'll

5    just sample that claims that we're not going to respond to

6    at different stages of the protocol."  That was the

7    intention of the parties, and I think the intention of the

8    protocol from the beginning.  So we were a little bit, very

9    surprised by that letter from the trustees, as well as the

10   argument that they put forward in response to our motion.

11             THE COURT:  Okay, thank you.

12             MR. COSENZA:  With that Your Honor, any questions,

13   I'd be happy to answer for you.

14             MR. TOP:  Good afternoon, Your Honor.

15             THE COURT:  Good afternoon.

16             MR. TOP:  Frank Top, from Chapman & Cutler, for

17   U.S.  Bank National Association, as trustee for a number of

18   these trusts that are subject to the motion.  This motion

19   comes in the context of seeking to expunge various claims.

20   And so as we take a look at the relief that's being

21   requested, what they're asking to do is have this Court

22   preclude the trustees from offering any other, any evidence

23   whatsoever with respect to a couple of groups of loans.

24   That being the transferor loans, and also the group of

25   12,000 loans that we wrote a letter about, that basically we

Page 18

1   said we could not economically, viably do these on a loan-

2   by-loan basis, because it would be way too expensive to do

3   so.  Now we're saying the fact that each loan --

4           THE COURT:  But hold on, hold on, hold on.

5           MR. TOP:  Sure, sure, sure.

6           THE COURT:  The 12,000 that you said you couldn't

7   do on an economic basis --

8           MR. TOP:  Correct.

9           THE COURT:  Those were the subject of a letter?

10  I'm confused --

11          MR. TOP:  Yes, so on March 31st, we sent a letter

12  -- and I believe it was attached to their motion, Your

13  Honor.

14          THE COURT:  Hold on, let me get it.

15          MR. TOP:  Sure.

16          THE COURT:  I'm sorry, the March 31st letter is

17  the --

18          MR. TOP:  Is written by Mr. Witnauer.

19          THE COURT:  The real one, not you.

20          MR. TOP:  That's right, that's right.

21          THE COURT:  And it's the listed loans, right?

22  Now, are all of those loans transferor loans?

23          MR. TOP:  No, all of those are covered loans, and

24  they were covered loans, but the losses were such that it

25  costs us a certain amount of money to review each particular

1    loan file, and then to process the data that we get from

2    reviewing the loan file, and then submitting it to Lehman,

3    and then there's obviously going to be costs after that.

4    And there was --

5              THE COURT:  Okay, I need to clarify this, because

6    I'm not thinking about it in the right way.

7              MR. TOP:  Sure.

8              THE COURT:  So there's a term, covered loans.

9              MR. TOP:  Correct.

10             THE COURT:  It comes from the estimation motion.

11   That's where it was born.  It's not in the protocol anywhere

12   else.

13             MR. TOP:  It was included -- it's in the protocol.

14             THE COURT:  It's in the protocol.

15             MR. TOP:  We did include it in the estimation

16   motion.  It has its genesis even prior to the estimation

17   motion.  We previewed -- before filing the estimation

18   motion, we had discussions with Lehman about how the heck

19   are we going to try to resolve these claims?

20             THE COURT:  All right, so let's just take -- the

21   listed loans are all covered loans?

22             MR. TOP:  That's correct.

23             THE COURT:  Okay.  So the covered loans are

24   clearly subject to the protocol.

25             MR. TOP:  That is correct.

Page 20

1                THE COURT:  Okay.  So with respect to those, your

2      argument is very simply that you had the right to make a

3      determination to not submit certain covered loans, and seek

4      to do sampling on them.

5                MR. TOP:  Right, I guess I would say it a little

6      bit differently.  I would say it that because of the losses

7      on those particular loans, the cost of reviewing them on a

8      loan-by-loan basis and submitting them through the protocol

9      was probably cost-prohibitive, in our view, and such that

10     while we weren't going to submit them through the protocol,

11     we wanted to reserve our right to somehow quantify the

12     damages with respect to those particular loans using an

13     alternative method, whether that be sampling or something

14     else.

15               THE COURT:  But you see, that's different than

16     what I thought until moments ago, which is I thought what

17     you were saying was that the loans that you were objecting

18     to the expungement of were all transferor loans, and not

19     covered loans.

20               MR. TOP:  That is true, too.  So we have two

21     buckets of loans we're objecting to.

22               THE COURT:  Okay, but to the extent that the loans

23     you are objecting to are covered loans, your argument, then,

24     on the definitions and the protocol, your argument is not

25     that it's not covered, that they're not subject to the

Page 21

1   protocol, you're just saying that the reservation of rights

2   means that you didn't have to submit them, because you

3   determined that it's not economic, and that after the

4   protocol otherwise runs, and we are at the stage of looking

5   at those claims for allowance or disallowance, you would get

6   to renew your motion to do sampling.

7            MR. TOP:  Or some other alternative means of

8   resolution, but that's right.

9            THE COURT:  But that's just not what the protocol

10  says or how it was intended to operate.  The bid and ask

11  leading to the protocol, one of the issues that we were

12  dealing with was that not all the loans were covered.  So

13  specifically, what everyone negotiated around when I

14  indicated that I was not going to go down the sampling road

15  at that juncture, was that we were going to have this

16  comprehensive process in order to winnow down the number of

17  hits, if you will, and then at the end we would see where we

18  were, and if at that point, once we had a smaller and more

19  robust and more reliable sample, if it still made sense to

20  do sampling in that context, we would revisit it.

21           But it was never -- there was never an opt-out.  I

22  mean, there was never an opt-out, or to take you up on the

23  common sense point that it doesn't make economic sense to

24  put them through the protocol, there wasn't a provision that

25  said, upon the certification of the trustees hat it's non-

Page 22

```
 1    economic, et cetera, et cetera, they're going to do

 2    something else.  It's just inconsistent with the structure,

 3    and the clear words of the protocol -- I believe entirely,

 4    and without question, with respect to everything that you

 5    concede is a covered loan.  Because either under your

 6    formulation of what claims are subject to the protocol,

 7    these are claims that are subject to the protocol.

 8              MR. TOP:  That's correct.  And Your Honor has

 9    identified our argument with respect to that, right?  Our

10    argument is that with respect to that group of loans, we did

11    not put them through the protocol.  We admit that.  And our

12    argument is, because of the reservation of rights language,

13    we would like to have, and reserve the right to quantify

14    those using an alternative method of determination, be that

15    sampling or something else, at least reserve that right, and

16    that's our argument, and you put your finger on it, and

17    you're either going to agree with that argument or you're

18    not going to agree with that argument.

19              THE COURT:  Well, I think I don't agree with the

20    argument, but also belt and suspenders I don't agree with

21    the argument because of the extension order.  Because that

22    very clearly says there's going to be an extension on the

23    deadlines for which you're being extended, and everything

24    else gets expunged.  So I think if there any ambiguity

25    whatsoever -- and right now I just talking about the covered
```

Page 23

1   loans, right -- that it just doesn't stand up.  And I

2   appreciate that the trustees are -- that there's a cost

3   element here.  And I heard you loud and clear on that point

4   when we went through the process of coming up with the

5   protocol.

6          So I think with respect to the covered loans, my

7   ruling is that the protocol did not provide for this kind of

8   an opt-out, and had the reservation of rights kick in, so

9   that without having going through the protocol, there would

10  be an opportunity to seek to have those claims allowed by

11  sampling or otherwise.  And that, in combination with the

12  language in the extension order, means that those claims are

13  properly expunged.  So now I think we need to pivot, which

14  has become a very significant word, I guess, so lately.  We

15  need to turn to anything else -- loans that are not, in your

16  terminology, covered loans, right?

17          MR. TOP:  Right.

18          THE COURT:  Okay.  And there the argument's a

19  little bit different, right?

20          MR. TOP:  Little bit different.  So taking a look

21  at the protocol order itself --

22          THE COURT:  Right.

23          MR. TOP:  It of course has, it references RMBS

24  claims, and there is a notation in there that says

25  capitalized terms not defined herein have the meaning set

Page 24

1    forth in the cross-motion.  The problem is, there was a

2    defined term, RMBS claims in the protocol itself.  And

3    that's down in Section 3 of the protocol.  I'll give you the

4    exact citation here.  It's Section 3(e)(i) on Page 4.  And

5    so before we even -- and so this definition comes in the

6    context of this RMBS claim protocol, and so just jumping

7    back to the beginning of this claim protocol, we talk about

8    gathering the claim files, and the protocol provides that we

9    are to provide letters of direction to two master servicers

10   on certain of the covered loans, and so we went out and

11   gathered the loan files, with respect to all these covered

12   loans.  And secondly, Lehman was supposed to provide us some

13   information from Aurora, there was like, 51,000 covered

14   loans that were --

15            THE COURT:  That's in Roman 2, right.

16            MR. TOP:  That's in Roman 2, and the hard drive

17   was to contain all of the images, electronic images Aurora

18   had in its system for the covered loans.  This is on Page 2.

19            THE COURT:  Mm-hmm.  Where does it say covered

20   loans in Roman 2?

21            MR. TOP:  It says It's Roman Numeral II,

22   Subsection B, two little Is, 1, and 3.

23            THE COURT:  Okay.

24            MR. TOP:  Okay, and so there's two reference to

25   covered loans there, and they were to provide us with

Page 25

1    information with respect to covered loans.  Third, the next

2    reference to covered loans comes with respect to our

3    completeness review.  So when we get those loans back, we

4    are to confirm in writing to the plan administrator that

5    these loans files are sufficient for the RMBS trustees to

6    review and assert claims, if any, arising from or relating

7    to covered loans included within the Aurora loan files.  And

8    that is the totality -- and there's no reference in here,

9    there's no specific reference to transferor loan, or

10   anything like that, that's silent with respect to whether or

11   not this is designed to cover transferor loans.  So then

12   when you get the definition of RMBS --

13            THE COURT:  Right, but when you say when you get

14   to the dentition, right, and you say -- your argument is

15   that the definition includes the words as described below,

16   and that the subsequent paragraphs in Sub-Paragraph E,

17   helped to define RMBS claims.  And my problem is that that's

18   just not the way this works.  The paragraphs that follow set

19   forth the manner of claim submission.  So the way you want

20   this definition to read, and you would win if it said that,

21   is it said, "An RMBS claim is any claim submitted to the

22   plan administrator by the trustees."  But that's not what

23   this says.  This says that each RMBS trustee may submit to

24   the plan administrator RMBS claims.  So the process points

25   don't help on the fact that that this --

1        MR. TOP:  Well, I guess my point is that this

2    paragraph is coming in the context of all these paragraphs

3    proceeding it that just talk about covered loans.  Right, so

4    then when we say we're gathering these loans, we're going to

5    review them for completeness, and do all these other

6    activities relating to covered loans, then we're going to

7    submit a claim.  That submission of a claim comes in the

8    context of reviewing and considering the completeness of

9    loan files, and things like that, of covered loans.

10        THE COURT:  But the only time -- this paragraph,

11   then, where we're talking about claim submission, right?  It

12   doesn't say that each RMBS trustee may submit to the plan

13   administrator claims for alleged breaches of representation,

14   and warranties and document deficiencies with respect to the

15   covered loans.  It says breaches of representations and

16   warranties, each an RMBS claim, and that it harkens back to

17   the terminology in the cross-motion.  And just as a matter

18   of common sense, why would we have -- and I really do want

19   to find that number.

20        MR. TOP:  You mean, in terms of number of

21   transferor loans?

22        THE COURT:  YEah.

23        MR. TOP:  At the time that we put together the

24   protocol, I believe there were 209,000 covered loans.  There

25   are at least two or three times the number of transferor

Page 27

1    loans, so I think at the time, there might have been a half

2    a million, maybe a little bit more, maybe a little bit less?

3    But it was a significantly larger number of loans that were

4    in the pool of transferor loans.

5            THE COURT:  But I guess --

6            MR. TOP:  And so my other point on this is that --

7            THE COURT:  And so what you're saying I did was

8    approve a protocol that applied to fewer than half of the

9    loan files?

10           MR. TOP:  Well, that's one way of looking at it.

11   The other way of looking at it, this is probably the largest

12   piece of the claims the RMBS trustees are going to have that

13   relate to covered loans, as opposed to transferor loans,

14   because of the differences with the representations and

15   warranties with respect to them.

16           THE COURT:  Right.

17           MR. TOP:  Right?  So there's like 50 or 60 reps

18   and warranties with respect to covered loans that they're

19   responsible for, and maybe four or five that they continue

20   to be responsible for, transferor loans.  So again, the

21   focus was -- and my view was to try to sit down and resolve

22   these claims, and of course this is the obvious way to

23   start.  Let's take a look at the covered loans, let's

24   generate the claim, a large percentage of the claim.  And so

25   the milestones (indiscernible) really relate to the 209,000.

Page 28

```
 1    We have to do 50,000 by July 1, and thereafter we had to do

 2    17,000 per month.  And you total all those numbers up, and

 3    it comes up to something over 200,000.

 4              THE COURT:  I need to have an understanding of the

 5    number of loans that are covered loans that are seeking to

 6    be expunged, and the number of loans that are transferor

 7    loans.  This is still very unclear to me

 8              MR. TOP:  Okay, so we can do the covered loans

 9    backwards.  We've submitted so far a little over 92,000

10    claims under the protocol for covered loans.  We also

11    submitted the letter that includes about 12,000, so that

12    would bring the total of that up to about 104, if my math is

13    correct.  We ended up reviewing probably approximately

14    220,000 loans, because we found some other loans that looked

15    like they were covered loans, so we included them in the

16    process.  So we're probably talking about 130,000 covered

17    loans that would be expunged, and then at least -- I don't

18    have an exact number, I'm sorry, for transferor loans, but I

19    want to say half a million.

20              THE COURT:  Okay, but hold on, Mr. Cosenza, let me

21    finish my thought.  So if transferor loans weren't covered,

22    then why were transferor loans submitted?

23              MR. TOP:  Transferor loans were not submitted.  We

24    didn't submit any transferor loans.

25              THE COURT:  I'm sorry, I thought you just said --
```

Page 29

```
 1              MR. TOP:  No, I did.  I apologize.  We submitted

 2      92,000 covered loans, plus the letter, 12,000 covered loans,

 3      104,000 covered loans.  So the 2000 (indiscernible).

 4              THE COURT:  So how do you get the 210?

 5              MR. TOP:  220?

 6              THE COURT:  Yeah.

 7              MR. TOP:  That's the total number of covered

 8      loans.

 9              THE COURT:  Okay, and that's just where we are in

10      the protocol now?

11              MR. TOP:  That's correct.  So we're coming into

12      Step 3, and --

13              MR. COSENZA:  I don't mean to interrupt, Your

14      Honor, just the numbers, they're referenced in Footnote 6 of

15      the trustee's motion.  The transferor loans, according to

16      the trustee, means that the RMBS trust that are not covered

17      loans.  Transfer of trust, meaning 150 out of 405 RMBS

18      trusts that are not covered trusts.  There are approximately

19      600,000 transferor loans in the RMBS trust.  And this is in

20      their objection.

21              THE COURT:  Footnote 6?

22              MR. COSENZA:  This is Footnote 6, Page 3 of their

23      objection to our motion.

24              THE COURT:  Footnote 6, Page 3.

25              MR. COSENZA:  Of their objection, that was filed
```

Page 30

1    right before Memorial Day.  May 26th.

2          THE COURT:  Okay.  So how many -- so you're

3    seeking to avoid disallowance of all of the transferor

4    loans?  No transferor loans have been submitted to the

5    protocol?

6          MR. TOP:  That's right.

7          THE COURT:  And when it came time to do the

8    extension order, and the clear language said everything else

9    is expunged --

10          MR. TOP:  Covered loans, or otherwise, that are

11    subject to the protocol.  I mean, the purpose of bargaining

12    and extension is not to seek to change the protocol in any

13    way.  We just had a handful of loans (indiscernible) review.

14          THE COURT:  But how is -- you went to the Lehman

15    and said, "We're running out of time, give us an extension."

16    And they said, "Okay, tell us what you need an extension

17    for," and they did."  And they said, "Okay, we'll give you

18    the extension, and everything else gets expunged.  So that's

19    where the ships passed in the night, you're telling me.

20          MR. TOP:  Yes.

21          THE COURT:  But the language of the order says

22    covered loans or otherwise.  What was the point of saying

23    "or otherwise" -- if you say that the protocol only relates

24    to covered loans, and you were only seeking an extension

25    relating to loans covered by the protocol, then why would

Page 31

1    the extension order have to include the words "or

2    otherwise"?  Because if we're all only talking about covered

3    loans, you wouldn't have had to have the words "or

4    otherwise."

5              MR. TOP:  Well, which may be why -- again, we

6    weren't trying to change the protocol, or do anything like

7    that.  I think that's what I told Your Honor when I did this

8    in March.  Or otherwise doesn't mean anything to me, if

9    (indiscernible) looking in terms of covered loans.

10             THE COURT:  But lawyers are lawyers, right?  So if

11   there is no otherwise, and everything is covered loan,

12   there's no need to use the terminology "or otherwise".  I

13   need to ask Mr. Cosenza a question, okay?

14             MR. TOP:  Sure, sure.

15             THE COURT:  So I'm interested in the math of the

16   protocol.  If Mr. Top is incorrect, why do the number of

17   files only add up to the number of covered loans?

18             MR. TOP:  Your Honor, just to give you background

19   behind the protocol --

20             THE COURT:  Do you know what I mean?

21             MR. TOP:  You have to (indiscernible) how we got

22   there.  When they moved to increase the reserve to that

23   astronomical number we had the hearing on, they didn't

24   ascribe any value to the transferor loans.  That was not

25   even part of their inflated $12 billion to $13 billion

Page 32

1    number.  So they didn't even include that as part of it.  So

2    in terms of us calculating, and sitting down with the

3    trustees as to the loans that were sort of at issue, there

4    was an acknowledgement -- there have been several

5    acknowledgements during this whole process, of the protocol

6    that they were not pursing the transferor loans.  There were

7    acknowledges to us, there were acknowledgements to Your

8    Honor during this process.

9            And I do want to -- I want to go back and forth,

10   but I did want to touch one point on the extension order.

11   There was a debate I had with Ms. Bolan, who represents U.S.

12   Bank in the (indiscernible) litigation about the transferor

13   loan being covered, and U.S.  Bank's claim being covered

14   within the protocol.  And there was a long debate about

15   that, and Ms. Bolan took the position that the U.S.  Bank

16   trust, even though it's a transferor trust, should not be

17   covered by the protocol, should be different, and basically

18   we said, "No, we just were (indiscernible) notice that you

19   should put those loans through, and they never put those

20   loans through."

21           And it's telling that in the extension order,

22   because this was an issue on that one transferor trust, we

23   added a paragraph, based on the request of the trustees,

24   when we went back and forth, to the extension order.  And it

25   wasn't going to give anyone rights, but it basically said,

Page 33

1    this order is laid out on Page 2, this order is without

2    prejudice to the rights of the parties in the Green Point

3    adversary proceeding, including any right to seek or contest

4    the application of the protocol order, and/or protocol to

5    the loans which are subject to the Green Point adversary.

6    So that was a carve out, because that was a dispute with

7    that one particular trust, that was a transfer of trust, and

8    whether or not that should be put through the protocol.  But

9    we're just seeking today, if that really was the issue, and

10   they were intending to put -- transfer of trust weren't

11   covered by the protocol -- there would be no reason to have

12   this one sort of reservation of both side's arguments on the

13   Green Point Trust, because that's a transfer of trusts.  So

14   that's one point.

15          Your Honor, the other point about the Aurora

16   loans.  Aurora only has covered loans.  It doesn't have a

17   transfer of loans, and that is why there was that definition

18   of transfer of loans.  The loan files for the transfer of

19   trust are with the servicers, that they sought information

20   from the B of As, the (indiscernible).  All the transferor

21   loans are with those servicers.  They could very easily have

22   gained access through the protocol, or flagged that as an

23   issue during the process.  They realized, as they had done

24   when they filed their initial motion increase the reserve,

25   that the transferor loans weren't really worth pursuing,

Page 34

1    they're of little or no value.  That makes sense, from our

2    perspective.

3           To have 16 months go along, agree to the

4    expungement motion, not to come with us for an extension on

5    any issues, make various representations to us throughout

6    the entire process, to us, to the Court that they're not

7    pursuing them, and now to come forward with this objection

8    to our motion, which is simply an administrative motion, is

9    a little bit astounding, frankly, from our perspective.

10   This is something, that really, if there was some confusion,

11   it could have been corrected really early in the protocol,

12   and frankly, the representations that they made to us and to

13   the Court during this process, they are now being directly

14   contradicted by the counsel, for the trustees.

15          So this is -- I really don't know what to make of

16   why we're here today.  That order was simply an

17   administrative order to simply clean up the claims registry,

18   because we're told by our client that the claims registry is

19   massive in this case, and simply way or sort of cleaning it

20   up.  And now that we're at this position, in response to

21   that motion I would have thought we would have been here, if

22   this really was an issue, back in January, when we talked

23   about this with Your Honor with various counsel present,

24   where there was a representation made that they weren't

25   pursuing the transfer loans.  I thought maybe they'd

Page 35

1    reconsider that in March when they sought the extension,

2    they would have raised this issue with us.  Instead, we gave

3    them the extension, because frankly, for the number of loans

4    that were left, there were obviously always administrative

5    issues.  Given the extra two months, makes total sense.  But

6    not to raise this as an issue, but then to raise it after

7    they get the extension is really -- we're sort of shocked by

8    why we're here today.

9              Your Honor, just one last point, because there

10   seems to be all sorts of definitional -- it was clear that

11   the protocol motion, our cross-motion, was the motion that

12   was granted by the Court.  The definitions in there were

13   intended -- and we had the hearing, it was intended to cover

14   everything, that was everyone's intention.  We included a

15   footnote in the protocol order, to make sure there was

16   little confusion about this, that it was intended to cover

17   all the loans.  It incorporates our definition.  We agree

18   with Your Honor's views as described therein, was really

19   just described the claims process, not to modify prior

20   definitions, and not to somehow limit the universe of loans.

21   So we think for all those reasons, Your Honor, we think our

22   motion should be granted, and all these claims should be

23   expunged.  Thank you.

24              THE COURT:  All right, if you would give me about

25   five minutes or so, and then I'm going to come back and let

Page 36

1    you know what I'd like to do, all right?

2          (Recess)

3          THE COURT:  Okay.  Thank you very much.  I

4    appreciate your answering all the questions I had coming

5    into this.  I think, as I indicated to Mr. Top, once the

6    clarification was made, with respect to which loans we're

7    talking about, the two buckets being covered loans and

8    transferor loans.  I think what I said to Mr. Top, with

9    respect to the operation of the reservation of rights to use

10   sampling or alternate means, is in fact my ruling.  As it

11   emerged, there's no dispute that the loans that were the

12   subject of the letter as to which the trustee's asserted

13   their reservation of rights to seek to prove them up by

14   alternate means, that's not how the protocol operates, but

15   by its terms.  That in effect, would operate as an opt-out

16   provision, and that's just not the way the protocol words.

17   So as to that, that argument is rejected.

18          As to the transferor loans, the argument as to

19   that centered around the use of the term covered loans in

20   various portions of the protocol, but given the history and

21   the genesis of the protocol, which began with the estimation

22   motion, was responded to with the cross-motion, which fully

23   embraced all of the loans, to use the terminology that was

24   used initially, the covered loans and the transferor loans.

25   Notwithstanding the fact that the number of loan fields,

Page 37

1    when you add them up under the protocols, the protocols

2    contemplated the progression towards the finish line, it

3    adds up to roughly the number of covered loans.  My ruling

4    is that the protocol, in fact, covered everything, and that

5    to the extent that -- and the numbers are not inconsistent

6    with that, because as the way this has developed, it has

7    certainly been -- has certainly seemed clear that the

8    transferor loans were not viewed as having much, if any,

9    value, and therefore it's appropriate that the march toward

10   the finish line, and submitting all these loan files,

11   properly focused on loans that were not transferor loans.

12          Moreover, the facts and circumstances, and the

13   language of the extension order, created another occasion

14   and reinforce my view that these claims should be expunged.

15   The inclusion of the words, or otherwise, in addition, the

16   language that Mr. Cosenza pointed out with respect to that

17   subset of loans just add up to a picture in which it's clear

18   to me that this process was intended to, and did, and

19   everybody was operating under the impression that it related

20   to all the loans.  So for all those reasons, and including,

21   with respect to the reduction of the reserves, I'm going to

22   enter an order granting Lehman's motion.

23          All right?  All right, will you share an order

24   with each other and send it to us, once you have everyone's

25   sign-off?  Thank you very much, and let me also say that I

Page 38

1    know that there was a lot of back and forth on the

2    scheduling of this, and I very much appreciate your

3    flexibility.  I'm about to start three weeks of trial,

4    travel, trial, travel, and I just, I wanted to see you

5    sooner rather than later.  So I appreciate that some of your

6    colleagues aren't here today, and I appreciate that you were

7    still willing to come in.  All right?  Okay, thank you.

8    Thank you.

9             (Whereupon these proceedings were concluded at

10   3:04 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 39

1                           C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5      Sonya Ledanski                Digitally signed by Sonya Ledanski Hyde
                                     DN: cn=Sonya Ledanski Hyde, o=Veritext,
6      Hyde                          ou, email=digital@veritext.com, c=US
                                     Date: 2016.06.13 15:43:17 -04'00'
7

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  June 13, 2016