1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555(SCC)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8

9         Debtor.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13               U.S. Bankruptcy Court

14               One Bowling Green

15               New York, New York

16

17               November 4, 2014

18               8:41 AM

19

20   B E F O R E :

21   HON SHELLEY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25

1  Hearing re:  Evidentiary Hearing re: Doc #19888 Debtors' One

2  Hundred Ninety-First Omnibus Objection to Claims (Valued

3  Derivative Claims) filed by Robert J. Lemons on behalf of

4  Lehman Brothers Holdings Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sheila G. Orms, Dawn South, and Nicole Yawn

1    A P P E A R A N C E S :

2    JONES DAY

3        Attorneys for the Debtor

4        222 East 41st Street

5        New York, NY 10017-6702

6

7    BY:  JAYANT W. TAMBE, ESQ.

8        LAURI W. SWAYER, ESQ.

9        JENNIFER L. DEL MEDICO, ESQ.

10

11    PACIFICA LAW GROUP

12        Attorneys for TSA

13        1191 2nd Avenue

14        Suite 2100

15        Seattle, WA 98101-2945

16

17    BY:  KYMBERLY K. EVANSON, ESQ.

18        PAUL J. LAWRENCE, ESQ.

19        TAKI V. FLEVARIS, ESQ.

20

21

22

23

24

25

P R O C E E D I N G S

1
2     THE COURT:  How is everyone?

3     UNIDENTIFIED SPEAKER:  Very good, Your Honor.

4     UNIDENTIFIED SPEAKER:  Fine, Your Honor.

5     THE COURT:  There's a big crowd.  I'm ready when

6  you are.  Good morning, Mr. Lawrence.

7     MR. LAWRENCE:  Good morning.  Everyone get seated.

8     THE COURT:  Is there a way to turn this light off

9  until we need it, or are we going to need to eminently?

10    MR. LAWRENCE:  I think we can turn it off for now.

11    THE COURT:  It's slightly distracting.  We need

12 somebody young to turn it off, right?

13    MR. LAWRENCE:  So your screen, though, is going to

14 see what's on the --

15    THE COURT:  Yeah, but I can just push that.

16    MR. LAWRENCE:  I do have a PowerPoint, so.

17    THE COURT:  I can just push that little button

18 till --

19    MR. LAWRENCE:  Right.

20    THE COURT:  -- you're ready to tell me something.

21 Okay.

22    MR. LAWRENCE:  So I am ready to --

23    THE COURT:  Okay, Mr. Lawrence.

24    MR. LAWRENCE:  May it please the Court, good

25 morning, Your Honor, Paul Lawrence for the Washington TSA.

1  I'm here with Kymberly Evanson, Taki Flevaris and Eric

2  Moser, along with Kim Herman, who is Executive Director of

3  the TSA, Bob Cook, the Finance Director, and Mike Roberts

4  who's on the Board of the Finance Commission.

5       THE COURT:  Welcome.

6       MR. LAWRENCE:  We're here because the Debtor

7  Lehman defaulted and breached on agreement that was very

8  valuable to the people of the State of Washington, provided

9  a significant benefit in over $2 million a year in cash flow

10  to the people of State of Washington who helped them to pay

11  off bonds, and ultimately to return more money to be

12  available for health initiatives within the state.

13       The Washington TSA is a state agency.  They were

14  tasked with one task, that is securitizing the state

15  revenues from the tobacco masters settlement agreements.

16  And they were -- said that they could do up to 30 percent of

17  the revenues to secure bonds and they issued about $518

18  million of bonds in 2002.

19       Now, these bonds were subject to an indenture.

20  And the indenture is found at Joint Exhibit 3.  The

21  indenture had a couple of key points in it that are

22  important.  One, on page 26 of the indenture there was a

23  restriction set on how the TSA could invest all the monies

24  it received from the master settlement agreement, so this

25  included any payments at all that went to the TSA, whether

1    they're being paid to the bondholders or being paid in to

2    what we'll talk about in a second, the reserve fund.  And

3    there was a definition on page 4 of the indenture of what

4    eligible investments were.  And these were all investments

5    that were short term, highly liquid, low risk investments,

6    because this is public money, it had to be available.

7         Another part about the indenture, the indenture

8    had a default provision, and this is on page 28 of the

9    indenture.  And the default provision said that if there is

10   no other specific direction about how this money is going to

11   be invested, it should be put in the money market fund

12   eligible security.  So one of the eligible securities was

13   money market funds; the indenture said, absent any other

14   direction, put it in a money market fund.  And that's, in

15   fact, with the exception of the RFA money which we'll get to

16   in a second, all the money that came in from the tobacco

17   settlements, that came to the TSA that were being held until

18   bond payments were due, all of that money except for the RFA

19   money was put into money market funds.

20        THE COURT:  But here, it says if the issuer shall

21   have failed to give investment direction.  So the issuer can

22   give investment directions otherwise consistent with the

23   requirements of the indenture.

24        MR. LAWRENCE:  Absolutely.  The point is only that

25   it's the default --

1          THE COURT:  Right, okay.

2          MR. LAWRENCE:  -- and, in fact, this was what the

3    money went into other than the RFA money.  All the money

4    that came in semi-annually from the tobacco settlement

5    agreement always went into money market funds.

6          Now, part of the indenture set up this reserve

7    fund, which is called in the indenture, the liquidity

8    reserve account, and this was a $45.53 million account that

9    had the purpose to secure the annual bondholder payments.

10   So there two payments a year, and a $45 million had to

11   always be held by the TSA, regardless of the flow of money

12   from the master settlement agreement in this liquidity

13   reserve account.

14         These funds -- sorry.  Went too far.  These funds

15   were, as I said, had to be highly liquid, safe, and they

16   were subject to being drawn upon, that is, they had to be

17   available to make the payments to the bondholders in case

18   there was insufficient cash flow from the master settlement

19   agreements.

20         So back in 19 -- sorry, in 2002 when the bonds

21   were first issued, there was an instrument that many other

22   like entities to the Washington TSA were entering into, and

23   that is returned to here as a reserve fund agreement.

24         The reserve fund agreement is really a variation

25   of a forward purchase agreement.  And the way that it's

1    structured generally is that TSA was going to receive a

2    guaranteed rate of return from some dealer in exchange for

3    delivering on a semi-annual basis the amount of the reserve

4    fund, $45.53 million which the dealer then could invest in

5    any of the eligible securities under the indenture.  But at

6    the end of six months, the dealer had to deliver it back to

7    the TSA, so they had the $45 million in cash readily

8    available to make a payment to the bondholders if necessary,

9    and then the process repeated itself every six months.

10              THE COURT:  I want you to say that again.

11              MR. LAWRENCE:  So the way the system worked is the

12   TSA has the $45 million in the reserve fund --

13              THE COURT:  Uh-huh.

14              MR. LAWRENCE:  -- they deliver that to the dealer.

15   The dealer then has the option to invest that in an eligible

16   security, but the eligible security has to be such, it's

17   safe, but it also has to be such that it is redeemed within

18   six months, so it turns back to cash.  And it's done through

19   a -- there's a third party trustee that we don't need to

20   worry about.

21              THE COURT:  Okay.

22              MR. LAWRENCE:  And so at the end of the six

23   months, the TSA gets back $45.53 million in cash.

24              THE COURT:  Okay.  So let me ask you a question.

25              MR. LAWRENCE:  Sure.

1          THE COURT:  So it would not have been permissible,

2     and we're talking about Lehman, but you said the dealer, so

3     let's just keep it generic for the moment, right.

4          MR. LAWRENCE:  Yeah.

5          THE COURT:  So $45 million you have a dealer, you

6     say, here's the $45 million, and not only was the dealer

7     promising to give back to the $45 million, but it was also

8     promising that it was going to purchase securities that

9     would otherwise comply with the restrictions in the

10    indenture as if the TSA itself were buying those securities.

11         In other words --

12         MR. LAWRENCE:  Yes.

13         THE COURT:  -- it couldn't be just take my word

14    for it, I've got a $100 million in cash sitting in my

15    account, now I'm dealer talking, right.

16         MR. LAWRENCE:  Right.

17         THE COURT:  I'm going to take your $45 million and

18    invest in Triple B bonds --

19         MR. LAWRENCE:  Right.

20         THE COURT:  -- but don't worry, because I've got

21    this other $100 million here, and no matter what, I'm

22    promising to give you back the 45.  So what you're saying is

23    that here's the 45, and then during that six month period,

24    the recipient, the dealer recipient could still only use

25    that 45 to invest in securities that were indenture

1    compliant, right?

2            MR. LAWRENCE:  Right.  And that --

3            THE COURT:  And then there was a spread, and

4    that's how the dealer was going to make money in the deal,

5    correct?  Any or all of that, that's wrong?

6            MR. LAWRENCE:  So two things.  First of all, the

7    RFA specified three particular eligible investments,

8    commercial paper of a very high grade --

9            THE COURT:  Agency.

10           MR. LAWRENCE:  -- agencies and government --

11           THE COURT:  Treasures.

12           MR. LAWRENCE:  -- treasuries.

13           THE COURT:  Right.

14           MR. LAWRENCE:  And that there also were a couple

15   of other like money market for the option --

16           THE COURT:  Okay.

17           MR. LAWRENCE:  -- for the TSA.

18           The second thing is that obviously they have to

19   return the guaranteed rate of interest.  In addition to the

20   $45 million, they have to return the guaranteed rate of

21   interest on top of that.  So that's a guaranteed rate that

22   the dealer has to pay regardless of how they do --

23           THE COURT:  Right, regardless of how that's the --

24   right.

25           MR. LAWRENCE:  Right.  And it's all done through a

1  trustee, but that's basically the structure of the

2  agreement.

3        THE COURT:  Okay.

4        MR. LAWRENCE:  So the TSA went out and worked with

5  an entity to do request for bids.  That is, they went out to

6  a number of dealers and said, we want to bid -- have you bid

7  on what is the best guaranteed rate you're going to give us

8  under this structure.

9        And one of the provisions of the bid was the

10  definition of the termination amount, and that's what's on

11  the screen now.  This is from the RF bid, the request for

12  bids.  And it basically said the termination amount should

13  be determined by the burdened party.  So that's important

14  because we'll get into a little bit of argument about what

15  the termination amount is.

16        So we get back bid results, and you'll see that

17  seven dealers came back with bid results, and they ranged

18  from two dealers said, no, we're not going to bid on this

19  because of credit concerns.  And you'll hear testimony that

20  tobacco investments like these were considered very risky in

21  the market, because these are not bonds, for example, that

22  are secured by the general obligation of the state.  They're

23  not bonds secured by tax revenue.  The only security for

24  these tobacco bonds is payments from the master settlement

25  agreement.  And no one knew for sure how those payments were

1    going to come in.

2         So tobacco investments had a particular risk

3    involved with them.  And again, you'll hear a little bit

4    more about that and you'll certainly hear testimony about

5    that.

6         THE COURT:  Okay.  But I don't understand what

7    that has to do with anything, because we're bidding on

8    here's my $45 million, give me a guaranteed rate on it.

9    What does that -- what is the credit risk involved in

10   delivering that guaranteed return have to do with the

11   riskiness of tobacco bonds?

12        MR. LAWRENCE:  So the relationship is this.  So

13   say for example there were insufficient payments under the

14   master settlement agreement to pay off the bondholders on a

15   bond date.

16        THE COURT:  And you had to tap into the 45.

17        MR. LAWRENCE:  I had to take -- let's say I had

18   take -- tap the $45 million and I had to pay that to the

19   bondholders.

20        THE COURT:  Right.

21        MR. LAWRENCE:  So the structure of the deal with

22   the dealers is they then don't get that $45 million to

23   invest until I can replenish my reserve fund.  So they're

24   stuck basically with having no money to invest for a period

25   of time.  They have committed and hedged their deal in such

1    a way that they have hedges outstanding, and so they are at

2    risk.

3            The other side of the risk is that if there were a

4    problem with these bonds, the bonds went belly up, and this

5    is a risk that's really important to the dealer, and so the

6    TSA couldn't deliver $45 million and basically defaulted, if

7    interest rates had zoomed up --

8            THE COURT:  Right.

9            MR. LAWRENCE:  -- so that this was a really

10   favorable deal to the dealer --

11           THE COURT:  Right.

12           MR. LAWRENCE:  -- and the TSA was going to owe

13   money to Lehman, you know, and they did -- ran exposure up

14   to the $30 million it might be owed to Lehman, if the TSA

15   went belly up because of the tobacco settlement appeals,

16   Lehman would be at risk for not getting paid the $38 million

17   that they otherwise would be due.

18           And you'll see Lehman that actually capped their

19   total tobacco risk, because they were concerned about

20   tobacco.  They said, we are only going to take a certain

21   amount of tobacco risk on our books in general.

22           So the bids came back and as you'll see, there's a

23   range of bids.  Lehman was at the top of the range, which is

24   why they were chosen.  They came back with no conditions in

25   addition to what was in the request for bids, but I think

1   one thing that's important here to just keep in mind, is

2   that there's a significant range of bids of almost a

3   percent, almost a hundred basis points between the top and

4   the bottom.

5         And one of the things that you're going to hear

6   from their expert is that this is all standard valuation

7   stuff, and that he would expect the market to have a really

8   small band of differences, because everybody's doing this

9   the same way.  But, in fact, there's a very significant

10  difference between the high and the low bid, that's much

11  higher than what their expert have predicted based on their

12  standard valuation.

13        So how did Lehman respond to this bid?  We know

14  that they did a calculation using their own internal

15  software program as to how much money they thought they

16  could earn by investing commercial paper every six months

17  over the term of the agreement, and they determined that

18  they were going to be able to earn $37.2 million to Lehman.

19        Well, Lehman doesn't just say, okay, well, we'll

20  then bid to pay that $37 million to TSA, they take certain

21  charges against that $37 million.  And what they did because

22  of the credit issues, they set up a credit mitigation of

23  just over 4 and a half million.  They then also took profit

24  and they took costs, for example, their cost of hedging,

25  their cost of a broker, their attorney's costs out of the

1   deal, and then figured out a rate of 4.484 percept that

2   would, in their calculation, return to the TSA $30 million.

3        So they're not just saying what does the forward

4   curve say we can deliver commercial paper, they're taking

5   out of that credit, profit, and other costs to say what

6   we'll deliver to the TSA.

7        So in terms of the negotiation of the RFA, what

8   you'll see is that the first Lehman draft of the reserve

9   fund agreement had Lehman determining the termination

10  amount.  That's how they drafted it.  TSA objected saying,

11  hey, the request for bids specifies as we saw, that the

12  burdened party is supposed to do the termination amount.

13  Lehman says, yes, you're right, and they change the

14  definition of the termination amount, so that the burdened

15  party determines the termination amount.

16       In the course of performance of the RFA, Lehman

17  always delivered commercial paper, even though theoretically

18  they had the options to deliver agencies, deliver T-bills,

19  they always delivered commercial paper.  They priced it

20  based on commercial paper and that's how they performed.

21       The Lehman bankruptcy costs in event of default,

22  Lehman ultimately after December failed to deliver

23  securities, and so we're here.

24       So the issue at hand is to try to figure out what

25  the claim amount is that arises from Lehman's default.  Now,

1　there are some points of agreement here. I think we all

2　agree that TSA is the burdened party because Lehman was the

3　defaulting party. We all agree that Lehman agreed to return

4　a rate of 4.484 percent on the $45.3 million reserve fund.

5　　　　And we all agree because their expert testified

6　that the market for new reserve funds in March of 2009 was

7　inactive, and that's important going forward.

8　　　　So the RFA tells us what to do in this situation.

9　The RFA has a definition of the termination amount, which is

10　on page 3 of the RFA. And the RFA starts with a preference

11　for using the market to try to figure it out. It says, go

12　out into the market, find three quotations for a dealer to

13　enter into an agreement, not some indication, what they

14　would actually do to enter into an agreement that preserves

15　for the burdened party the economic equivalence of its

16　rights.

17　　　　So we don't -- we're not going to mess around with

18　hypotheticals or whatever, guessing, we can go to the

19　market, let's see if we can three bids, and then we have the

20　information we need.

21　　　　Now, the testimony of swap is that they reached

22　out to dealers, and swap was Peter Shapiro, he'll testify,

23　he was hired by TSA that he reached out to dealers for

24　quotes, and nobody was willing to do so. And that's

25　entirely consistent with the fact that this was, we all

1   agree, an inactive market for reserve funding agreements.

2   Nobody was willing to enter into a reserve fund agreement of

3   any kind in March of 2009.

4          THE COURT:  Could you flip back to the prior side?

5          MR. LAWRENCE:  Yes.

6          THE COURT:  Is there a time period within which

7   the calculation needs to occur?

8          MR. LAWRENCE:  Within which the calculation --

9          THE COURT:  Calculation of the termination amount

10   needs to occur.

11          MR. LAWRENCE:  I don't believe that this sets a

12   time limit of when the burdened party has to do its

13   calculation.  It has to do it under Bankruptcy Code as of

14   the date of rejection, once that's established.

15          THE COURT:  Well, that's right.  That's the as of

16   date.

17          MR. LAWRENCE:  Right.

18          THE COURT:  That's the date that you key it to,

19   and then the last time, and then you have to, as a book end,

20   well, not a book end, but another point is the bar date.

21          MR. LAWRENCE:  Right.

22          THE COURT:  So by the bar date, right, you have to

23   figure out what your claim is.

24          MR. LAWRENCE:  Yes.

25          THE COURT:  But I guess I'm asking indirectly what

1    the period of time would be during which the, I would say

2    obligation to request quotations was extant.

3         MR. LAWRENCE:  There -- the only relevant

4    provision is there is a provision in the RFA that if Lehman

5    wanted to go out and get quotes, they had to do it within

6    three days of the -- essentially the rejection date of March

7    24th.  But there's no other restriction on when the burdened

8    party is supposed to calculate the termination amount.  I

9    think the testimony will be that around the rejection date

10   is when both Lehman and TSA went out to try to find market

11   quotations.

12        THE COURT:  Okay.

13        MR. LAWRENCE:  So the market quotation process

14   failed, though, because there were no market -- there was no

15   market for doing this.  And so what's next?  So again, the

16   RFA tells us what to do.  It says, okay, if the burdened

17   party is unable to obtain three such quotes, the termination

18   amount shall be the amount as reasonably determined in good

19   faith by the burdened party to be the burdened party's total

20   losses and cost including any loss of bargain.  That's the

21   operative definition before this Court.

22        And again, the burdened party is the TSA, so we're

23   trying to figure out what are the TSA's total losses and

24   costs, including any loss of bargain from the default by

25   Lehman.  The RFA tells us what to do.

1           The RFA continues that in addition to that amount,

2      we're entitled to any unpaid amounts from the date of

3      termination including amounts due under Section 7.7, and

4      you'll see, although there's a little bit of an argument

5      about that, there's an additional 500 and some odd thousand

6      dollars under Section 7.7 losses.  And that we're also

7      allowed to include costs and expenses, including cost of

8      collection and attorney's fees.

9           And this section concludes with the following,

10     "Any determination of the termination amount by the burdened

11     party shall be conclusive and binding on the parties," and

12     I'm sorry about the typo, "hereto, absent manifest error."

13          So the RFA tells us, TSA is the burdened party, go

14     out, do this in good faith, figure out TSA's total losses

15     and cost, and that determination is conclusive and binding

16     absent manifest error.

17          So now we get to the experts.  We have two sets of

18     experts, and contrary to Lehman's position, we do not

19     believe that there are inherent inconsistencies between the

20     two, because what both of them are trying to do is look at

21     what was the benefit that the RFA was to give to the TSA,

22     how much money was to be delivered under the RFA at the

23     guaranteed rate, and to compare that to another number.

24          Curry & Hastrack (ph) compared that to what they

25     thought TSA's actual investment would be, and so their

1    actual losses is simply the cumulative value of what

2    would've been delivered on the RFA and what they were

3    actually able to be earned over time until the end of the

4    agreement in 2032.  Peter Shapiro will talk about in more

5    detail.

6            THE COURT:  Yeah, but that's -- but the second

7    part of that, I mean, the fixed ARM is easy --

8            MR. LAWRENCE:  Right.

9            THE COURT:  -- because the RFA tells us what it

10   is.  But it's the second party of it that everybody's --

11           MR. LAWRENCE:  Exactly.

12           THE COURT:  -- focusing on.

13           MR. LAWRENCE:  Exactly.

14           THE COURT:  Because Lehman's position is that it

15   should be a different number.

16           MR. LAWRENCE:  Exactly, that's correct.

17           THE COURT:  Okay.

18           MR. LAWRENCE:  So we are focusing on, and Curry &

19   Hastrack and Shapiro do use a different for that second ARM.

20           THE COURT:  Methodology.

21           MR. LAWRENCE:  Well, they use a different guide

22   for that second ARM, I don't know if the methodology -- the

23   methodology is looking at the values --

24           THE COURT:  Right.

25           MR. LAWRENCE:  -- and subtracting the values at

1    the end of the day.

2         So Curry & Hastrack are trying to figure out what

3    are the TSA's losses resulting from the Lehman default.  And

4    what they want to do is, okay, let's figure out what TSA

5    actually can earn, what they predict TSA will earn based on

6    the investment options that they had, and they comparing

7    then the return on investment options that the TSA had with

8    the return that would've been provided by the fixed legs.

9         And what they did, is they came up with a matrix,

10   and there are a couple of aspects to this matrix.  You'll

11   see there are a number of replacement investments that they

12   considered, and these are the replacement investments that

13   were available to them, certificates -- sorry, commercial

14   paper, certificates of deposit, agency discount notes, the

15   actual reinvestments, money market, and then they actually

16   looked at a callable swap type transaction which doesn't

17   exactly mirror the RFA, but in their view, was maybe close

18   enough.

19        And they looked at the period from the time of the

20   failed delivery, December of '08 to the date of rejection,

21   March '09, and looked at what were the replacement yields

22   available for each of these various investments, and you can

23   see, there was a range to --

24        THE COURT:  Why did they choose that period of

25   time?

1          MR. LAWRENCE:  Because the Bankruptcy Code says

2    you have to use March of 2009 as a date of valuation.

3          THE COURT:  Okay.

4          MR. LAWRENCE:  So they looked at what did the

5    yield from the period when the first failed delivery to

6    March of 2009, and you'll see there's a range of yields for

7    commercial paper, CD, discount notes, the actual is money

8    markets, and then the callable swaps.

9          And they said, okay, look, these ranges, they're

10   not very significant, differences.  We know what the TSA

11   actually did, that is, they used money market.  We know that

12   they have been using money market for money that's coming in

13   from the tobacco settlement master agreements.  So if we're

14   going to stay with the reality fact based evaluation, we

15   should predict that that's how they will continue to invest

16   their money is in money market accounts during the term of

17   the contract.

18         So what they did simply was to take the yield that

19   they were actually earning, and ran that out to the end of

20   the contract, and compared the money market yield on the

21   reserve fund amount to the yield on the RFA amount, and the

22   difference is 37 and a half million.  And that's discounted

23   down to present value.

24         It's a simple fact based method to determine TSA's

25   actual losses.  It doesn't require guessing as to what

1    actually happened.  It's based on what actually happened,

2    everybody has to do some prediction about the future, but

3    it's a fact-based determination.

4            THE COURT:  Okay.  So everyone has to do some

5    prediction about the future.

6            MR. LAWRENCE:  Right.

7            THE COURT:  So what Curry & Hastrack are doing is

8    making a prediction incorporating a prediction about the

9    future.

10            MR. LAWRENCE:  They -- everyone has to make a

11    prediction about the future, and they are predicting that

12    TSA will do the same thing that they have done historically.

13            THE COURT:  And they are predicting that these

14    rates historically low will be what the rates are through

15    2032?

16            MR. LAWRENCE:  Right, that is true.

17            THE COURT:  That's what they're doing.

18            MR. LAWRENCE:  That's what they're doing.  And, in

19    fact, as you'll see what they did, is they looked at what

20    happened afterwards to September 13th, to make sure that

21    they were not -- to get a reality check on what they were

22    doing.

23            And the reality was that the rates actually --

24            THE COURT:  That's the second --

25            MR. LAWRENCE:  Yes, the second line.

1          THE COURT:  -- line.  Okay.

2          MR. LAWRENCE:  But the rates continued to fall.

3    They didn't go up, they continued to fall.  So actually TSA

4    was earning substantially less than their money markets,

5    same way that they would've earned less on the yields of

6    commercial paper, certificates of deposits.  So that's their

7    reality check.

8          Was that 65 a reasonable number?  Well, if rates

9    had skyrocketed up, then they would say, you know, maybe

10    that's not a reasonable number, but rates actually went

11    down.  And so we know that make (sic) them feel comfortable

12    that .65 is a reasonable number.

13          And again, the standard in the RFA, it's got to be

14    reasonable and in good faith, it doesn't have to be perfect.

15    It's not a matter of two people saying, well, you do this or

16    that, if it's reasonable good faith, it's enough.

17          And you'll see there are a range of losses, some

18    of which were substantially higher than 37 and a half

19    million, some are lower, but again, staying in reality of

20    what they did, they felt it was 37 and a half million.  And

21    on top of that is the $500,000 of Section 7.7 losses.

22          So Peter Shapiro is the other expert.  He did a

23    slightly different determination to try to figure out what

24    the alternative was for TSA.  He recognized that there was a

25    preferred valuation method based on market quotations for

1    replacement investments, but those weren't available.

2           So what Peter Shapiro did, tried to do, is say,

3    okay, we know how dealers price these reserve fund

4    agreements, we saw it from Lehman, and we're going to see

5    what it would price at if we went out on the market.  So

6    we'll take a hypothetical dealer, we'll look at the amount

7    of earnings that might have been available, had they

8    invested in CP using a forward curve.  Then they estimated

9    credit charges, profit charges, et cetera, that the dealer

10   would have made, the hypothetical, a real dealer would have

11   made if they had priced this, and determined that a

12   calculation based of loss based on that.

13          And it's a little chart that he created that shows

14   the date that he's looked at it, which is the rejection

15   date, and looks at the CP spread, that is the spread to live

16   or that he feels the CP would've earned.  And you'll see in

17   his testimony, he feels that that was very generous to

18   Lehman actually, and that that overstates the CP spread.

19          The credit spread is based on his view of the

20   difference, and this is again, this is the database number.

21   It's the difference between what the TSA's bonds were

22   actually trading at on March 25th, 2009, and what a

23   comparable municipal bond was trading at that time.  So the

24   difference was 4.29 percent, that is if you wanted to buy a

25   TSA bond, you could get a lot more in the market -- you

1   could earn a lot higher yield in the market than a regular

2   municipal bond because they're risky.  That's where you get

3   your increased yield because you're taking on increased

4   risk.

5         Then he calculated profit, and he says, look these

6   numbers are not perfect number, they're a totality, you'll

7   see from Lehman that they have similar spread numbers.  It's

8   somewhat in the discretion of the trader, but he feels that

9   when you look at the three numbers together, that gives you

10  a way to discount and figure out what the hypothetical

11  contract that would've been available would be, would be.

12        And all he did is compared the total dollars that

13  would come out of the RFA with the total dollars that would

14  come out of a hypothetical contract, and determine that the

15  difference between the two, which is the same way

16  calculating losses is $38 million.

17        Now, Lehman likes to make a big deal, well, wow,

18  look at these two numbers, they're the same.  These guys

19  didn't talk to each other, they didn't confer with each

20  other.  Curry & Hastrack did have benefit of Peter Shapiro's

21  calculation because it was submitted back in nineteen --

22  2009, but they didn't coordinate, Shapiro didn't talk to

23  them, they didn't talk to Shapiro about their things.

24        I don't think that -- there's nothing wrong with

25  coincidence when it relates to something like this.  And I

1    -- it's not an exact analogy but new math and old math, I

2    don't understand new math.  New math is taken -- you take

3    the hundreds and they do this, that's what they teach in

4    fifth grade.  I understand old math, ten times six is

5    whatever, but you come up with the same number.  It's not a

6    matter of coincidence, it's a matter of there's some

7    validity to what you're doing.

8           So the fact that there's coincidence, the fact

9    that these are the same numbers is not a matter of

10   coincidence, I think it adds to the validity of the numbers.

11          So let's look at Lehman's experts.  They have two

12   experts.  They have an academic, Dr. Babble (ph) --

13          THE COURT:  You say that not in a pejorative way,

14   of course.

15          MR. LAWRENCE:  I'm sure I would enjoy taking a

16   class from Dr. Babble, actually I think, as I understand it,

17   we're all going to take a class from Dr. Babble --

18          THE COURT:  Excellent.

19          MR. LAWRENCE:  -- for about two hours, but I'm not

20   sure that he has anything to do with this case.  He doesn't

21   analyze loss under the RFA, he doesn't analyze the value of

22   the RFA, he doesn't analyze the termination amount, he

23   doesn't come out with any number that has any relevance to

24   the Court.

25          All he's here to do is to explain to us, in his

1    finance 101, what the forward curve is, and how it's used in

2    the market.  We don't deny that the forward curve is used in

3    the market, but I think there are a couple of important

4    aspects of the forward curve that he'll admit.  One, is that

5    it's not an accurate predictor of future rates.  It doesn't

6    tell you what future rates are actually going to be.

7          THE COURT:  So he's going to talk about market

8    expectations, right?

9          MR. LAWRENCE:  As of a particular day.

10         THE COURT:  Correct.

11         MR. LAWRENCE:  And to get benefit from that market

12   prediction -- sorry, market --

13         THE COURT:  Market --

14         MR. LAWRENCE:  -- expectation as of a particular

15   date, you have to be able to transact on that particular

16   day.

17          So it works for Lehman to say, okay, we can offer

18   you a 4.484 percent rate of return on this commercial paper

19   forward curve because on that same day, I'm going to go out

20   and I'm going to buy hedges that lock in that interest rate.

21   Well, the TSA doesn't have the ability to buy hedges,

22   certainly not long term hedges.  They don't have the ability

23   to buy investments out more than six months, so they can't

24   go in and buy a long term investment, that would reflect the

25   market expectation of long term rates on date of rejection.

1          So the forward curve really, in our view, has

2     little application to TSA's ability to transact.  But Dr.

3     Babble will tell us what the forward curve is and how it's

4     used for whatever that is worth.

5          Their main expert is Sam Gruer (ph).  Now, Mr.

6     Gruer uses what he's described as the standard industry

7     valuation method, which is a misnomer, and we can explain

8     why.

9          First of all, he uses a mid-market value.  What

10    that means is, if you remember the way that Lehman priced

11    this, they did a CP curve, and they took off charges for

12    profits, whatever.  He stops at the CP curve, he uses

13    agencies, instead of CP, but he just takes the first curve,

14    he doesn't take off any charges, he doesn't take off for

15    credit, he doesn't take off for profits, even though he

16    admits that if a dealer were pricing a new RFA, and that

17    they would, in fact, take off credit charges, they would, in

18    fact, take off profit charges and other costs.

19          So by using a mid-market value, he's significant

20    overstating the value of the investment, because he doesn't

21    take into account the charges.  And these charges are

22    essentially were charged to TSA back in 2002.  Because

23    remember, the investment was going to generate $37 million.

24    Lehman basically kept and charged TSA $7 million that they

25    get to keep to deliver TSA their anticipated $30 million.

1   So those are very real numbers that affect how RFAs are

2   produced, but Mr. Gruer ignores them in his calculations.

3        Secondly, he uses this quote, industry standard

4   valuation, it's not in the RFA.  The RFA could've said,

5   okay, if we can't get market quotations, which is a market

6   based system, then we will use some sort of industry

7   standard valuation, we'll use a mid-market valuation.  They

8   could've said that in the RFA, they didn't.

9        They said, we'll use the burdened parties' actual

10  losses and cost, and as Mr. Gruer admits, he does not -- he

11  did not try to calculate the actual losses and costs of TSA.

12  All he did was look at a mid-market valuation of eligible

13  securities.

14        We know it's not right because that value

15  inherently is lower than anything that could've been gotten

16  under the market quotation process.  Because remember, the

17  preference is market quotations.  The dealer is going to

18  give a market quotation, they're going to do a forward curve

19  analysis.  But they're going to take off for credit charge,

20  they're going to take off for profit, they're going to take

21  off for hedging costs, but -- and then you'd end up with a

22  lower deliverable to the TSA, but Gruer's number just

23  ignores those because he doesn't use the mid-market value.

24  So his number inherently would be substantially higher than

25  a market quotation process.  And it doesn't make any sense

1    to have the alternative be a lower value than the market

2    quotation.

3           It's based on inaccurate agency curve assumptions,

4    sometimes you have to test reality.  His agency curve

5    presumes that agencies are going to earn over a hundred

6    basis points higher than live or over the course of 2009 to

7    2032.

8           There's a reality about agencies.  Short-term

9    agencies, not long term agencies, and remember here, we are

10   only talking about delivery of short-term agencies.  Never,

11   in the history of the market, have short-term agencies

12   delivered in excess of live or.  They have historically

13   always delivered lower than live or.

14          So for Mr. Gruer to say that this should be based

15   on live or plus 114 basis points may reflect some long term

16   investment options, but it has nothing to do with delivering

17   short term agency securities under the agreement.  The

18   market history of short-term agencies is always below live

19   or.

20          We know that it's inaccurate because, as I said,

21   it has nothing to do with how Lehman priced this.  Lehman

22   priced this in 2002 with these credit charges at a live or

23   again minus spread.  And again, he's saying this should be

24   priced now or valued at a live or plus spread.  So there a

25   lot of indications that Mr. Gruer is just way off base.

1       So I want to talk in closing about a few of what I

2   think are Lehman's red herrings.  I believe they are try to

3   assert implicitly some sort of conspiracy theory by the TSA

4   and Peter Shapiro to take it to Lehman.

5       There's nothing to support that theory.  It's sort

6   of based on the timing of we're going to try to find a right

7   timing to bring our claim.  The timing is very straight

8   forward.  TSA sent a letter in November before

9   (indiscernible) said, hey, we're concerned that you're in

10  bankruptcy, and you're not going to deliver securities.

11      December they came around, they didn't deliver

12  securities, they went back to Lehman and said, you are in

13  default for delivering the securities.  There was then a

14  discussion with Lehman can we resolve this without going to

15  the Court for a rejection date, Lehman said, sure, we'll

16  resolve it if you waive your claims.  They didn't say, sure,

17  we'll just set a date, they said we'll set a date

18  voluntarily if you waive your claims.  Well, why should TSA

19  have to waive its claims, which they view,

20  rightfully/wrongfully because Your Honor will figure that

21  out as valuable?  That's not a reasonable request.

22      So TSA said no, and then in January, promptly

23  moved the Court for setting to reject the contract.  There

24  was then further discussions with Lehman, and everybody

25  agreed to set a rejection date of March 25th, 2009.  There's

1    no conspiracy in there.

2           Second red herring, market quotations were

3    available.  We have to have the evidence based on personal

4    knowledge, we had a little bit of this discussion yesterday.

5    Peter Shapiro will testify what Swap did to get market

6    quotations.

7           Their expert agrees with our expert, there was no

8    active market for RFAs -- for reserve fund agreements at

9    that time.  That is what the evidence is.  Speculation about

10   what may be other people may have done, and we don't know

11   what they said, we don't know what they offered, we don't

12   know whether they're real quotes or indicative quotes, it's

13   all not relevant to this case.

14          What's relevant is what Peter Shapiro did or did

15   not do, and what's relevant is that the expert agreed there

16   was no active market for RFAs and that there were no RFAs,

17   in fact, entered into any time around March of 2009 or

18   actually any time thereafter.

19          They're going to talk about PFM, and indicative

20   values that PFM came up with.  PFM was the financial advisor

21   to TSA.  PFM gave in that role some indicative values about

22   what the termination amount might be.  PFM, though, when

23   asked said well, these are indicative values, these are not

24   the actual values that we believe the termination amount

25   would have been.  And they never calculated that, because

1    they were never hired to do that.

2         When asked how they would've done that, they said

3    they would've -- they're not validating Peter Shapiro's

4    numbers, but they would've taken the same approach as Peter

5    Shapiro, that is, they would've tried to figure out the

6    eligible security, they would've taken a profit charge, they

7    would've taken credit charges, they would've taken costs

8    into account.

9         So PFM actually agrees with the methodology of

10   Peter Shapiro, they don't validate one way or the other his

11   numbers, but the idea that their indicative valuations,

12   which they admit themselves are nothing more than indicative

13   and not actual valuations, and they admit themselves, they

14   wouldn't have used, that has nothing, no relevance to this

15   case.

16        And finally, the as if it were Lehman dodge, the

17   termination amount is defined in the agreement.  That is the

18   operative language of the agreement, as if it were Lehman a)

19   is not something that any of the expert (sic) relied upon to

20   come to their termination of value, because it's not in the

21   termination amount.

22        So none of the experts believe that as if it were

23   Lehman is something that changes the valuation that should

24   be presented to this Court.  So on that basis alone it seems

25   irrelevant.

1        But if you read the contract, you'll see that the

2    as if it were Lehman is really doesn't tell you how to do

3    the termination amount.  It doesn't change the definition of

4    the termination amount.  The termination amount is defined

5    specifically, it gives you a process, it gives you a

6    detailed process, it simply has nothing to do with how you

7    calculate the termination amount.

8        And finally as we described, we think that the as

9    if it were Lehman language, to the extent Lehman is arguing

10   it has some validity in terms of the termination

11   calculation, that's contrary to what the request for bids

12   were, and it's contrary to what the discussions of the

13   parties were to change the termination amount to a

14   determination by the burden party, and again, it's really

15   just contrary to the more specific language of the

16   agreement, as to the definition of termination now.

17       When we get to the end of the evidence and argue

18   some months down the road, and you've had an opportunity to

19   read the depositions and consider the evidence, I think

20   you'll find that this was a very valuable contract to the

21   people to the State of Washington.  It is impossible, it was

22   actually impossible to get anywhere near 4.84 percent return

23   on a guaranteed rated in March of 2009.

24       That was generating $2 million plus a year to the

25   TSA, to the people of the State of Washington, which is now

1   lost.  And they are entitled to the difference between that

2   money and the money that they actually, looking in March

3   2009, could have gotten.  And that loss, whether it's 37 and

4   a half million dollars, as Curry & Hastrack said, or $38

5   million, that's the range that we believe Your Honor should

6   find.

7           THE COURT:  Okay.  Thank you very much.

8           MR. LAWRENCE:  Thank you.

9           THE COURT:  So that was 45 minutes.  So therefore,

10  out of the box, we've already reached our prearranged

11  agreements about timing, so Lehman, if you wish, Mr. Tambe,

12  you have 45 minutes.

13          MR. TAMBE:  Thank you.

14          MR. LAWRENCE:  Just let me unplug this so he

15  can --

16          THE COURT:  Going forward, if you have a hard copy

17  of your slides --

18          MR. LAWRENCE:  We're happy to provide it.

19          THE COURT:  -- it would help since it's hard for

20  the both of us to see the screen.

21          MR. LAWRENCE:  Okay.  I will e-mail that to

22  everybody.

23          THE COURT:  Okay.  Ready?

24          MR. TAMBE:  May I approach, Your Honor?

25          THE COURT:  Sure.  Thank you.

1          MR. TAMBE:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. TAMBE:  May it please the Court.  Jay Tambe,

4    Lauri Sawyer, Jennifer Del Medico from Jones Day on behalf

5    of the debtors.

6          MR. LAWRENCE:  Your Honor, could I --

7          THE COURT:  Yes, Mr. Lawrence?

8          MR. LAWRENCE:  -- just make an observation,

9    because I don't want to interrupt while he's going, but just

10   we haven't seen this before.  I do note that --

11         THE COURT:  Had he seen your slides before?

12         MR. LAWRENCE:  No, no, and I'm not objecting on

13   that basis.  I'm just saying that I notice one thing, and

14   that is, he is using I believe he's using documents that are

15   objected to, and you know, I don't want to really make a big

16   deal about it, but I want you to understand that there are

17   documents that are in here, that are objected to by TSA.

18   And with that caveat, that's fine.

19         THE COURT:  Okay.  So this is a demonstrative for

20   the purposes of opening argument --

21         MR. LAWRENCE:  Exactly.

22         THE COURT:  -- and nothing's being admitted into

23   evidence.

24         MR. LAWRENCE:  I just wanted to make that clear.

25         THE COURT:  Okay.

1          MR. LAWRENCE:  Thank you.

2          MR. TAMBE:  That's all I thought it was, Judge.

3          THE COURT:  Okay.

4          MR. TAMBE:  Here's where we are, Your Honor,

5     that's the background, that's covered ground, that's the

6     spread between the parties, 38 million versus 1.1 million.

7     It's our position that the claim should be reduced to zero.

8          Here's what the Washington TSA has to do.  They

9     have the burden of proof, no question about it, they have to

10    follow the contract, they have to abide by 562.  And they

11    have to demonstrate, and these were words, I believe, Mr.

12    Lawrence did not dwell on, they have to determine the

13    termination amount reasonably and in good faith.

14         They do get some benefits at the end, if at all,

15    if they do all of those things, that determination is

16    conclusive and binding, but then again, only if it is -- if

17    there is no manifest error.

18         And what's manifest error?  Plain error, it's

19    plainly wrong.  And I think we will be able to demonstrate

20    both with respect to Mr. Shapiro, and with respect to Curry

21    & Hastrack, is those valuations are just plainly wrong, even

22    if you don't talk about reasonableness, good faith, they're

23    just plainly wrong.

24         There was a lot of discussion about losses and

25    gains, and we should talk about losses and gains, because

1   the contract talks about losses and gains.  And that's

2   always a difficult concept to get your head around, because

3   if you look at it from the TSA's perspective, they've got a

4   contract that gives them $2 million a year --

5          THE COURT:  Right.

6          MR. TAMBE:  -- it goes away, how could that

7   possibly be a gain, all right.  And maybe it's the 4.484

8   that makes that a little difficult to understand, so let's

9   use an example.  If I've agreed for 30 years to lock-up my

10  $45 million and earn only 2 percent, that may be a good

11  contract, that may not be a good contract.

12         THE COURT:  It depends.

13         MR. TAMBE:  And it's going to depend.  And what

14  it's going to depend on is what are -- what is the interest

15  rate environment at the time you are making -- asking that

16  question.  At the outset, 2 percent for 30 years for $45

17  million may seem like a good deal, because the markets have

18  forecast, the markets have expected that interest rates

19  would be 1 percent for the next 30 years.  And you say,

20  that's a pretty good deal and then things change.  Interest

21  rates move, they always move.

22         The suggestion is made that because forward rates

23  don't predict the future, they're somehow unreliable or not

24  useful.  Just up the street, probably less than a mile away,

25  tens, hundreds of billions of dollars, if not trillions of

1    dollars are committed by very smart men and women by

2    governments, by municipalities every single day on the basis

3    of those forward curves.

4          The fact that they could actually go out and sell

5    30 year bonds is because there's a forward curve.  You

6    couldn't raise capital on a 30-year basis if there wasn't a

7    forward curve.  That's the curve they want to turn their

8    back on.

9          They also want to turn their back on the contract.

10   This is a provision that wasn't discussed in the opening,

11   7.6.  It is, in fact, the operative provision.  You don't

12   get to the definitional section until you talk about 7.6.

13   And 7.6 comes into play, and they invoke it, they just don't

14   talk about it very much, when there has been a Lehman

15   default, and when there's a Lehman default, there's a

16   process for how you go about calculating what's owed, what's

17   the termination amount.

18         But the operative provision of the contract is not

19   the definitional provision, it's the contract provision that

20   says, here's what you do when X happens, let's start there,

21   not backwards.

22         And what that provision says is, in the first

23   instance, it's Lehman that decides, even if Lehman is the

24   defaulting party, clear language, it's Lehman that's going

25   to decide.  It's only when Lehman has failed to make that

1    calculation that they get to it, and it says clearly in

2    there, when they do that, they have to do it as if it were

3    Lehman.  And we'll talk in a few minutes about what that

4    means.

5          You saw this language but it had different

6    highlights when you saw it a few minutes ago.  Right off the

7    bat, in two different places, termination amount, the

8    definition talks about reasonably and in good faith.

9          And what are you seeking these quotations are,

10   what you're trying to preserve is the economic equivalent of

11   its rights under this agreement, not to improve your

12   position, but really preserve what would have happened, had

13   the contract continued as if it had not been terminated.

14   That's what the market quotation process is trying to get

15   at.

16         We'll have evidence about whether a market

17   quotation process was wrong or not.  Other than Mr.

18   Shapiro's say so, there's not a strap evidence that supports

19   it.  We don't think it happened because we know what Mr.

20   Shapiro does when he actually runs a market quotation

21   process.  There's actually a trail left behind.  You can't

22   request quotes on a two inch thick set of documents, with

23   there being no paper to back it up.

24         And if you did it orally, you didn't actually seek

25   market quotations, you did something completely different

1    that they now want to say was a quotation process.  They

2    didn't do it.

3         The other part of the definition that they haven't

4    focused on, just like they didn't focus very much on

5    reasonably and good faith, is gains.  And it shows up in the

6    contract in a couple of places.  It shows up right there in

7    the definition, but it shows it very explicitly on Section

8    5.5.

9         And what 5.5 is there for, it is to specifically

10   give disclosure to the municipality when there is a

11   termination, you might owe money to Lehman, remember this

12   contract which on its face seems to read just one way, they

13   get benefits, 4.484.  They're being put on notice that you

14   might owe a lot of money to Lehman, when there's an early

15   termination.

16        And how is that possible?  It's possible because

17   the way you value this contract, the way you figure out what

18   the termination amount is, by comparing 4.484 to prevailing

19   interest rates, that's why this happens, and they were

20   warned about it.  That was a feature of the contract they

21   signed.  There's no claim from the other side that that's a

22   mistake.

23        And what happened when Lehman went back?  This is

24   a memo from September 25, 2008.  The first thing that TSA

25   did, following the bankruptcy of LBHI, was go to its trusted

1    long time counsel and advisor, so K&L Gates as counsel, PFM

2    as bond advisor, and said, what's the value of this

3    transaction, this very valuable contract we have, hey, PFM,

4    you ran the process, you were there at the outset, you sent

5    out the bid list, you evaluated the returns, you know this

6    contract inside and out, how do you value it.

7          And we know exactly how they valued it, that's

8    from Debtor's Exhibit 18.  We had been told by PFM that a

9    termination amount calculated as of the date of the call

10   would obligate the authority to pay Lehman approximately 1.2

11   million, not indicative --

12         THE COURT:  Mr. Lawrence said that's not a real

13   number.

14         MR. TAMBE:  Well, let's read the next line, and

15   this is documentation that's been poured over, not just by

16   PFM, but by counsel, studied at the board, it's part of the

17   board minutes, it's part of public record actually that's

18   how we have it.

19         The very next line, "This amount reflects what

20   Lehman would need to receive to preserve the economic

21   equivalent of the agreement for its terms."  We've seen that

22   language before.  It's right there in the definition of

23   termination amount, "preserving the economic equivalence."

24         That's what they equated that $1.2 million number

25   with.  That's how it was understood, that's how it was

1    received.

2           What did they do with that information?  They

3    decided not to pay Lehman.  They had a choice, and they

4    exercised that choice.  It was the consensus of those on the

5    phone call that based on current market conditions and legal

6    assessments, the authority should not terminate the

7    agreement, and trigger the payment of the termination

8    amount.

9           THE COURT:  So as of that moment in time, though,

10   TSA had nothing wrong.  They had a right to do that under

11   the agreement.

12          MR. TAMBE:  They had the right to do that, Your

13   Honor, and they were conscious of that right, and there was

14   a deliberate process that starts in September of 2008,

15   culminates in March, and we would say persists beyond March,

16   where the TSA is evaluating the number, looking at the

17   options, and you'll see in a few slides where we believe

18   they embark on a path that's quite different than setting a

19   fair value for the contract into a process that's designed

20   to get a boat load of money.  Not my words, Mr. Shapiro's

21   partner's words.

22          A month or two later, this is November of 2008,

23   they go back to PFM again, and PFM now says the markets have

24   moved, now you're a little bit in the money, so Lehman owes

25   you a little something.

1          Here's what they do with that information, there's

2    no expectation that we could collect the money from Lehman,

3    and unless the value to us of the termination payment was

4    large, it would not even have a significant discounted value

5    on the secondary market for such obligations.

6          In our view, Your Honor, those are the

7    fingerprints, that's the beginning of the process where they

8    decide, it's not just the termination amount they want, it's

9    not just an amount owed for Lehman to the TSA, it has to be

10   a large termination payment.  Why?  Because they want to

11   monetize it on the secondary market and get a discounted

12   value.

13         They're fully aware for whatever termination

14   amount they come up with, if they want to sell it,

15   crystallize it, and get cash, it's going to have to be a

16   large amount.  What's their real position on this?  That's

17   their real position on this, that's Kim Herman and you're

18   going to hear from Mr. Herman today.  It'll be a cold day in

19   hell that we pay Lehman anything.

20         I just want you to contrast that with the contract

21   they had signed.  The contract, Section 5.5 said very

22   clearly, look at the interest rates, look at the market

23   environment, you may owe a lot of money to Lehman.  What's

24   the view now, post-Lehman bankruptcy, well, Lehman's done a

25   bad, bad thing, they've gone bankrupt and they should be

1  punished.  It'll be a cold day in hell before we pay Lehman

2  anything.

3          And here's the objective, December 10th, 2008.

4  Mr. Shapiro and Swap Financial Group had earliest days of

5  their engagement, they're still thinking about how they're

6  going to get engaged on this, what they're going to do.

7  That's Mr. Napsinger (ph) one of Mr. Shapiro's colleagues at

8  Swap Financial Group talking to Mr. Shapiro and James Regaro

9  (ph), the person who actually ran the modeling and came up

10  with the valuation.

11          "Any way you go about it, Lehman will owe the

12  issuer a boat load of money.  We submit the claim, work on

13  our replacement, and wait to hear back from Lehman."

14  They've already decided in December, in the earliest days of

15  the engagement, before a rejection, before anything, any way

16  you look at it, Lehman will owe the issuer a boat load of

17  money.

18          What's also interesting about that e-mail, it's

19  three or four sentences up, "We could try to get MQs --" do

20  you see that, Your Honor?  "We could try to get MQs, but we

21  may be better off finding out the level to the last real

22  executions for these agreements."

23          Again, fingerprints, Your Honor, they're never

24  going to fess up to it.  They've already decided which way

25  they're going to tell a story.  We could try and get MQs,

1  they didn't try and get MQs, because they didn't want to be

2  bothered with the inconvenient truth of what market

3  indications or levels might be.  They wanted maximum

4  latitude to come up with the large number, so that they

5  could get to the conclusion, have Lehman owe the issuer a

6  boat load of money.

7        That's the engagement contract, to maximize the

8  authority's potential financial benefit.  And considering

9  whatever steps may be available to increase the odds of

10  collection and decrease delays.

11        All right.  So let's go to the valuation.  How did

12  they do it?  No dispute about this, it's the 4.48 guaranteed

13  rate.  And the whole question is, is that a good deal or a

14  bad deal given where interest rates were on March 25th,

15  2009.

16        Now, we heard a few minutes ago that I think the

17  words were, I didn't write them down, the commercial paper

18  curve has never ever in the history of live or ever been

19  below the live or curve.  So the CP curve has never ever

20  been below the live or curve.  Agencies have never ever

21  below -- been below the live or curve.

22        This was their starting point.  The CP curve that

23  Mr. Shapiro's model implies is that CP curve.  And it took

24  some stitching to get there, because Mr. Shapiro never gave

25  us a single spreadsheet, he never gave us a single diagram,

1    he didn't give us any data sets.  It took an order of this

2    Court to even get the screen shots for the models that he

3    had run.  But that curve is the U.S. Dollar three month live

4    or resets.  We get that from Mr. Curry and Mr. Hastrack.

5    They collected the data but ignored it.  They have that

6    data.

7            And then we did what Mr. Shapiro said we should

8    do, take the three month live or resets and add 66.6, that's

9    the spread to live or in his little calculation, that's

10   where he begins.

11           Mr. Lawrence said that was generous to Lehman, I

12   was generous to Lehman I think is what he said.  I asked Mr.

13   Shapiro almost exactly that question, I don't know if we

14   have the transcript.  Do we?

15           Page 141 of his December 2013 deposition, line 5

16   -- on down.

17               "All right.  Mr. Shapiro, before we broke for

18               lunch, we had been discussing Lehman Exhibit 15,

19               the April 2009 valuation, and we were discussing

20               commercial paper spreads.

21               "Correct.

22               "I believe at one point you testified that

23               adding the 66.6 basis points to live or curve

24               would work in Lehman's favor, correct?

25               "Yes.

1      "Now, you didn't use that calculation

2      because you were trying to do a favor for

3      Lehman, correct?

4      "No, we were trying, you know, a firm we

5      have a real discipline to try to do things

6      accurately, fairly, correctly, defensively,

7      that's our goal."

8      No generosity there.  He did it because it was the

9   right thing to do, that's what he believed.  That's what he

10  testified under oath.

11      Go back a slide down.

12      The fact of the matter is, on March 25th, 2009,

13  the market had a similar shape to a lot of other forward

14  obligations.  If you look at the Treasury forward rates,

15  deep liquid market.  I think Dr. Babble will say, the U.S.

16  Treasury market is something like a $10 trillion market,

17  billions of dollars of securities exchange hands, even in

18  March of 2009, that was a deep liquid market, good price

19  discovery.  People were making long term decisions.  There

20  were lots of folks trading in the market.  That gives you an

21  indication of where that market was then, and what the

22  expectation of the market is where the market would be.

23  That's reliable, credible market information.

24      They duck the market --

25      THE COURT:  Can I just ask a question though?

1          MR. TAMBE:  Sure, yeah.

2          THE COURT:  We're talking about these curves for

3     securities that have maturities that comply with the

4     indenture restrictions in the Washington indenture.

5          MR. TAMBE:  So if you'll look at slide 17 --

6          THE COURT:  Right?  Yes.

7          MR. TAMBE:  -- we are.  Because what 17 is talking

8     about are forward rates for -- Treasury forward rates are

9     for six month intervals.

10         THE COURT:  That's my question, right, because you

11    have --

12         MR. TAMBE:  One of those data points --

13         THE COURT:  Right.

14         MR. TAMBE:  -- if you go out ten years, that's not

15    what a ten year Treasury is trading at today --

16         THE COURT:  Right.

17         MR. TAMBE:  -- that's the forward rate --

18         THE COURT:  For a six month.

19         MR. TAMBE:  -- for a six month ten years from now,

20    right.

21         THE COURT:  That's what -- right.  Okay.

22         MR. TAMBE:  And we'll see the difference and the

23    relationship, and the strict mathematical relationship

24    between spot rates and forward rates.  Those aren't

25    inferred, they're not assumed, it's a question of math.

1          I showed that diagram to my 12-year old kid, and I

2     explained it to him, and he said, that's just the math, Dad,

3     isn't it?  Yeah, it's just the math.

4          THE COURT:  Well, you have a smart kid not

5     surprisingly.

6          MR. TAMBE:  All right.  So Washington ducks the

7     market, right.  If that's what the market is telling you,

8     they don't like that.  Because what they're trying to do is

9     create as much space as possible between floating leg, the

10    curves, and the flat line, the 4.48.

11         And we'll talk I think at length about the fact

12    that we don't believe (indiscernible) stock quotations, that

13    indicative -- indications and levels were available.

14    There's a way to find out what dealers would value this at.

15    PFM had no trouble valuing it, others had no trouble valuing

16    it.  PFM admitted that every tobacco RFA claimant that they

17    represent against the estate relies on market quotations.

18         So here's what Swap Financial did.  They took that

19    live or plus 66 curve, that's their commercial paper curve,

20    and they shoved it down.  That's the math.  We've had at

21    least four different explanations for what this means from

22    Mr. Shapiro, any way you look at it, Judge, their model

23    generates a floating curve that's going to have negative

24    interest rates for most of its duration.  That's how absurd

25    it is.  Negative interest rates.  You'd be better off

1   putting your money in a mattress.

2          If you look at the near term where the forward

3   rate -- the implied forward rates in Shapiro's model are

4   minus 2 and a half percent, that's like the TSA giving

5   someone the $45 million to invest, and saying, no, no, we'll

6   pay you interest to keep that money for us, that's the

7   absurdity of that model.  The boat doesn't float, Judge,

8   taking on water.

9          The reason it's taking on water, is Mr. Shapiro

10   himself really has no experience with tobacco RFAs.  He

11   relies on James Regaro.  Ironically Mr. Regaro used to work

12   for Lehman Brothers years ago.  And he sat at a desk with

13   two other guys.  He bid on RFAs fewer than five times when

14   the other two folks were senior to him were on vacation.

15          And the driver of this big push, the credit

16   charge, that's something Mr. Regaro had never done.  He was

17   asked at his deposition, hey, how would you go about

18   figuring out credit charges and profit charges, I'd ask the

19   other guys.  No experience with it.

20          How do they try and cover it?  They say, well,

21   it's a hypothetical replacement transaction, that

22   hypothetically in a market that they claim is inactive if a

23   dealer were to do it, the dealer would do it this way.

24          The interesting thing about the way they've

25   described the charges is, let's just see what their charges

1  are, right.  They charge us 85 percent of the claim, 85

2  percent of this claim is this massive credit charge.

3  Something that a dealer would have charged them to enter

4  into a transaction is something they want to recover from

5  the estate.

6         If this hypothetical transaction were ever done,

7  this isn't money that would be going to the TSA, it's money

8  that would be charged and earned by some dealer out there.

9  They want to get this, they want to keep it, and let's not

10 forget, they want all of this, the $38 million, and they

11 still have the 45.5.  They've always had it.  They've always

12 had it, and they can invest in December in agencies, and

13 June they can invest in U.S. Treasuries, and in December,

14 they can invest in commercial paper and so on and so forth,

15 for the next 23 years.

16        They can make those investment decisions every six

17 months with the money they have.  And when they go to a

18 dealer and say, I've got $45 million, can you buy some

19 agencies for me, they won't be charged a credit charge, they

20 won't be charged a profit charge --

21        THE COURT:  But I think the answer to that or it

22 goes back to the contract which requires that the

23 calculation be as of the termination.

24        MR. TAMBE:  That's right.

25        THE COURT:  Right?  So we're not in a scenario,

1  you're talking about reality, right?  You're talking about

2  reality.

3       MR. TAMBE:  I'm talking about reality on March

4  25th, right, there's a reality that --

5       THE COURT:  There's got to be reality as of that

6  date, right?

7       MR. TAMBE:  So the reality on March 25th is not

8  only are there spot rates for what you can do on that date,

9  there are markets, the deep developed markets, where 15

10  year, 20 year, 30 year obligations are actually traded.

11       What obligations; Treasuries, agencies, commercial

12  paper.  There's a real value, there's a reality on March

13  25th, 2009 that captures not just what's happening on March

14  25, 2009, but the market's view, the market's reality at

15  that point in time about what the future is.  Not because

16  they're predicting the future, because that's how long dated

17  transactions are actually done.

18       And to suggest that you can't do that, that you

19  should turn your back on it, is actually to turn your back

20  entirely on the entire long term market.  This product

21  wouldn't exist, the bonds wouldn't exist, U.S. Treasuries of

22  10, 15, 20, 30 years wouldn't exist if you didn't believe

23  that what happens on March 25th, 2009 is, in fact, the

24  market's value, the price of money on that day.  And the

25  market's expectation of what each of those six month

1   intervals are going to be in the future.

2          Now, Dr. Babble is not for being an academic.  The

3   fact of the matter is, a lot of people have spent probably a

4   hundred plus years looking at these relationships between

5   interest rates, long term interest rates, short-term

6   interest rates.  Dr. Babble doesn't just come up with a

7   theory and say, hey, how about this.  When he comes up with

8   a theory, it's subject to peer review.  He's got a Ph.D.

9   His thesis is subject to challenge from other academics.

10         He's published over a hundred papers.  He knows

11  intimately not just about long-dated instruments, how do you

12  value instruments that are infrequently traded.  That's the

13  perspective he's going to offer the Court.  Why it's not

14  just market practice, why it's not just theory, but why that

15  is, in fact, the way our markets are designed, and that's

16  how they operate.

17         Let's just talk for a couple of minutes about

18  credit charges.  I think you asked a question on this point,

19  the fact of the matter is, the $45 million is not a loan

20  made by Lehman, it's -- sorry, it's against the 30 or the

21  45?

22         MS. EVANSON:  The 30.

23         MR. TAMBE:  Okay.  Lehman didn't lend money to the

24  TSA where the TSA could sort of go bankrupt and Lehman

25  wouldn't get its principal back.  In fact, what happened

1  every six months is, the $45 million would come over to

2  Lehman, it would actually go to the U.S. Bank as trustee --

3       THE COURT:  Uh-huh.

4       MR. TAMBE:  -- and Lehman would deliver

5  collateral, it would remain invested in that collateral at

6  the trustee for six months.  It would mature, and the very

7  day, the very next day, it would be rolled over into the

8  next investment that Lehman had identified.

9       Lehman wasn't exposed to the TSA's credit risk in

10  that exchange.  How was Lehman exposed, if at all, to the

11  credit risk.

12       THE COURT:  Well, Lehman was going to make money

13  or not, depending upon the price of which it could buy the

14  -- and the return it would get on the eligible securities.

15  That's where the action is, right?

16       MR. TAMBE:  That's right.  And that's where the

17  action is in all of these transactions with the following

18  exception.  It's not like there's zero credit risk, and

19  we're not saying there's zero credit risk.  If you are going

20  to create a hypothetical replacement transaction and price

21  it on a -- where a hypothetical dealer might do, what a

22  dealer would do is look at the exposure; what are the

23  situations in which this deal is in the money to me, where

24  I'm actually owed money by the TSA.  And that really only

25  happens here in the termination scenario.

1              In the ordinary course, money isn't owed to

2      Lehman.  The only time you have money owed to Lehman, is

3      when there's a termination, a crystallization of what the

4      value of the transaction is.

5              At that particular point in time, if money is

6      owed --

7              THE COURT:  Let's go back, if you wouldn't mind,

8      go back to what Mr. Lawrence was saying about in the event

9      that there were a shortfall and TSA had to tap into the $45

10     million --

11             MR. TAMBE:  Yeah.

12             THE COURT:  -- to make a bond payment.  How would

13     that scenario have affected Lehman?

14             MR. TAMBE:  So say that's the day right before the

15     next roll.

16             THE COURT:  Yes.

17             MR. TAMBE:  Okay.  At that point in time, Lehman

18     is not owed anything, there's securities deposit with the

19     U.S. Bank --

20             THE COURT:  Right.

21             MR. TAMBE:  -- which are going to come due the

22     next day.  When they come due the next day, cash is

23     generated, 45 something million dollars, that goes to the

24     TSA.  The TSA says, well, we need some of this money because

25     there's been a shortfall, we can only put 35 million back.

1    Well, 35 million comes back, and it's used to purchase $35

2    million worth of securities.  Again, we don't have exposure

3    to their credit risk.  They don't owe us anything.

4            THE COURT:  But I think the point was that Lehman

5    priced the deal, based on the assumption that it would have

6    the $45 million every go around, so that because there was a

7    risk, however you want to calculate it, that at the 6-month

8    intervals, the RFA would not be as valuable to the dealer,

9    because there was a risk that the money that comes back, and

10   that you are then making profit off is a lower amount than

11   the 45.  That's what I understood Mr. Lawrence to be saying.

12           MR. TAMBE:  Right.  And I believe Mr. Lawrence

13   also said, and if he didn't say it, his witnesses will say

14   it, if Lehman had hedged that exposure by entering into a

15   hedging transaction.  So if there was a shortfall, Lehman

16   would have some more commercial paper, it wouldn't have a

17   hole.  They'd have some more commercial paper, they'd sell

18   that commercial paper on the market, they'd be done with it.

19           And the risk there isn't the TSA's risk.  The risk

20   that Lehman is then taking on is commercial paper risk.

21           THE COURT:  Right, right.

22           MR. TAMBE:  But let's get back to -- but I don't

23   want to leave you with the impression that there's zero

24   exposure to the TSA, because there is and it is under this

25   termination scenario when there's a termination.  And to

1   figure out what that exposure is, you have to again use a

2   forward curve.  What's the expectation at any point in time

3   that over the remaining life of this deal, what we have to

4   pay versus what we can receive on the eligible securities is

5   going to be in the TSA's favor.

6        When is that going to happen, and what's the

7   likelihood there will be a default.  That's their curving

8   in, right, that's their live or plus 66 curve.  And sure,

9   it's got the floating leg below the fixed leg initially, but

10  then they're roughly in parity for the remainder of the

11  deal.

12       What that suggests is a very low exposure.  What

13  that suggests is there will be no period in time where

14  floating rates are so much above the fixed rate, that the

15  dealer is going to be owed a lot of money where the dealer

16  can say, I'm concerned, I'm going to be owed a lot of money

17  on a termination, and maybe the TSA can't pay me.

18       So if you're thinking about credit risk, you have

19  to look not just at the credit worthiness of the TSA, but

20  under what circumstances is money going to be owed.

21       THE COURT:  So if we were suddenly in a time

22  machine and went back to the 1970s and '80s where the

23  interest rates were, you know, sky high --

24       MR. TAMBE:  Uh-huh.

25       THE COURT:  -- and Lehman disappeared.

1          MR. TAMBE:  Right.

2          THE COURT:  That would be a termination amount, a

3   huge termination amount owing to Lehman because --

4          MR. TAMBE:  Yeah.

5          THE COURT:  -- the rates were so high.

6          MR. TAMBE:  What was ironic about it is, right,

7   that's where the credit charge would be implied, but if

8   that's the environment in which we're operating the

9   termination amount, zero.

10         THE COURT:  Right.

11         MR. TAMBE:  The claim amount is zero.

12         THE COURT:  Understood, right.

13         MR. TAMBE:  So it's an internally inconsistent way

14  of looking at it, and that's the fundamental problem we have

15  with the credit charge.

16         All right.  So they think there's no conflict, I

17  think there's an irreconcilable conflict.  Curry & Hastrack

18  who spent 45 years, by the way, making their living off of

19  the forward curve, show up in this courtroom and say it's a

20  flat line, that's the only reasonable way of looking at it;

21  65 basis points from now to eternity.  That's a flat line,

22  we call it the flat line conjecture, that's dead on arrival.

23         It rejects -- the only basis they offer for their

24  expertise is the time they spent at Morgan Stanley and other

25  banks doing exactly what Sam Gruer has done, valuing forward

1    purchase agreements, using the forward curve, and not just

2    using it for the sake of fun, right, for valuing positions

3    of federally regulated financial institution, mocking those

4    positions, trading, recognizing gains and losses, the SEC's

5    watching them, the auditors are watching them, everyone's

6    watching them, and what do they use?  They use forward

7    curves.

8            Billions of dollars of capital is put at risk by

9    Morgan Stanley and other banks on the basis of what Curry &

10   Hastrack used to do before they became expert witnesses.

11   Using the forward curve to commit the resources of the

12   financial institution in long dated ventures, 15 year, 20

13   year, 30 year transactions, they've thrown that all out the

14   window.  And they've also thrown out of the window a hundred

15   plus years of market practice, peer tested financial theory.

16           Entirely ignores commercially reasonable

17   determinance of value.  This is not a difficult exercise,

18   Your Honor, the other day, you're asked to compare the fixed

19   rate versus eligible securities.  There were deep liquid

20   markets for each of the eligible securities.  They just

21   simply ignored them.

22           The flat line theory in contract, untested,

23   unreliable, inadmissible.  You asked, why did they look at

24   that particular interval.  Why indeed.  No explanation

25   given.  There's no learned treatise, no theory, no

1      justification for why it should be three months.

2            For the data points they had, they had longer data

3      points, they just chose not to use them.  Why, for example,

4      didn't they look back 23 years, if they're looking forward

5      23 years.  We would say as a matter of market practice and

6      finance theory, any look back is not reliable, because

7      that's not how the market operates.  The market looks at

8      forward commitments, it looks at what people are actually

9      paying for 5 years, 10 years, 30 years.

10           THE COURT:  Is somebody, one of the experts, yours

11     or theirs, going to talk about -- I mean, one of the

12     conceptual things that I'm struggling with and hopefully

13     will become clarified is the relationship between kind of

14     snapshot reality and market expectations versus future

15     predictions?

16           And the one thing that we know --

17           MR. TAMBE:  Uh-huh.

18           THE COURT:  -- and I don't know how much we knew

19     it at the time, but we now know, the period of time which

20     this was happening was a period of time in which everybody

21     woke up every day and felt that the world was going to end

22     financially.

23           MR. TAMBE:  Uh-huh.

24           THE COURT:  So that the interest rates undoubtedly

25     reflected that anxiety, right.  So one thing that I'm going

1  to be very interested in hearing is, you know, during this

2  period of time from September 2008 through whenever you

3  folks tell me is appropriate, you know, looking at what

4  happened, and I imagine if you look at a whole bunch of

5  forward curves or other data points, certainly stock market,

6  you're really low.  Those are really low during those

7  periods of time.  And it seems as if what Washington TSA is

8  saying, that it's completely legitimate and appropriate to

9  do a snapshot, a screenshot, freeze frame on that period of

10  time, flat lining it across the future, and you say,

11  absolutely not.

12        MR. TAMBE:  Absolutely not.  And again, I mean, I

13  don't think we've been (indiscernible) for suggesting that

14  Dr. Babble could be up here for two hours, but that's really

15  what he's getting at.  I mean, these are fundamental

16  questions.  These are the same questions we had when we

17  approach these kinds of issues in the Lehman bankruptcy, is

18  how do you value these things.  What -- you know, how

19  reliable is the market data, how do we use the market data.

20        We're told by 562, you've got to do it as of March

21  25th, 2009.

22        THE COURT:  Right.

23        MR. TAMBE:  What does that mean?

24        THE COURT:  What does that mean, right.

25        MR. TAMBE:  That's a legal exercise, it's an

1    academic exercise, and it's also a market practice exercise.

2    So, you know, we may not think very highly of academics, I'm

3    not sure why we would suggest that --

4              THE COURT:  My husband's an academic, so you know,

5    just --

6              MR. TAMBE:  So I think it'll be helpful.

7              THE COURT:  -- keep that in mind.

8              MR. TAMBE:  I think it'll be helpful, right, it'll

9    be helpful to hear from someone's who's really spent his

10   lifetime thinking about these issues, as to why it's right,

11   both as a matter of theory, but also as a matter of

12   practice.

13             THE COURT:  Okay.

14             MR. TAMBE:  I'm going to -- where am I against the

15   board light.

16             THE COURT:  You're a half an hour in, right?

17             MR. TAMBE:  I'll be done very soon then.

18             And what's the rationale they offer for departing

19   from everything they know and have worked with for 45 plus

20   collective years.  We -- the last two sentences, "We

21   discarded this method, however, as we believe that using a

22   value based on a replacement investment strategy --" by the

23   way, the same thing that Mr. Shapiro did, "is unfair to the

24   TSA, and dramatically understates its loss."

25             So using market signals is unfair, let's come up

1   with a $37 million because that's more fair, I suppose 50

2   million would be fairer still, and maybe $100 would be the

3   fairest outcome of all from the TSA's perspective, but

4   that's not how we value and consider financial instruments

5   like this.

6           You can't have an idiosyncratic view and say,

7   well, in my eyes, and only in my eyes, it's going to be X.

8   There is a market for the eligible securities.  The interest

9   rates that are embedded in this contract, the 4.484 are

10  based on traded instruments.  We have a lot of information

11  about those traded instruments.  People make firm decisions

12  about those instruments, so do Curry & Hasrack.

13          So when you talk about fair, well, is it fair to

14  Lehman's creditors for one idiosyncratic creditor say, well,

15  I'm going to turn my back on the market, the market data

16  that governs everyone else's claims, but I'm going to come

17  up with a completely new untested theory, and that's going

18  to be mine reasonable answer.

19          Lots of problems on that from a finance theory,

20  and a market practice perspective, but I also think it's

21  fundamentally flawed under Daubert.  The suggestion was

22  made, well, you've got to two guys, you've got two fairly

23  experienced people on the one hand, on the other hand, why

24  can it be that.  That's what, in part, Daubert is designed

25  to deal with and address.

1          You don't get through the gate if you don't have a

2     reliable theory.  If you have all this experience, but

3     you're not actually using that experience, you're turning

4     your back on that experience to come up with something else,

5     why is your opinion admissible?  It's not on the basis of

6     your experience, and you're not an academic, you're not peer

7     tested, you're not peer reviewed.

8          THE COURT:  So you're going to ask them all those

9     questions, right?

10         MR. TAMBE:  I sure am, Judge.

11         THE COURT:  Okay.

12         MR. TAMBE:  What the -- what Mr. Gruer did on

13    slide 25 is he just took as a given a lot of Mr. Shapiro's

14    assumptions, and said, if I just make an adjustment for a

15    proper credit charge, what would Mr. Shapiro's calculation

16    look like.  Right.  So you've got -- if this thing works,

17    right, so you've got the same CP curve number, the big

18    difference is the credit number.  He simply accepts 7.7(b)

19    and -- for purposes of this exercise, right, and if you

20    simply use Mr. Shapiro's curve, a proper exposure based

21    credit charge, you'd have a $7 million claim, not a $38

22    million claim.

23         Now, obviously Mr. Brewer would say that's the

24    wrong curve to use, the cheapest to deliver securities for

25    agencies, not CP, but you'll see what a dramatic difference

1    it makes if you simply apply the credit charge properly even

2    to Mr. Shapiro's curve.

3        We believe the determination should be made as of

4    March 25th, 2009.  So they're going to talk about post March

5    25, 2009 issues, as a way of saying, well, it buttresses

6    that theory.  Well, if we're going to consider what happened

7    after March 25, 2009, we should consider the TSA's own

8    conduct.

9        They had choices, they had the $45.5 million, they

10   can invest it any number of different ways, and they're free

11   to do that.  What they can't do is try and charge the Lehman

12   estate for their revised risk expectations.  They were

13   perfectly happy under the RFE, receiving commercial paper,

14   receiving agencies, receiving treasuries.

15       Now, they want to put their money in the

16   equivalent of a mattress in money market funds with

17   overnight liquidity, fine, you can do that, but don't charge

18   us for the difference.  That's not the deal you had with us,

19   that's not the bargain you lost or gained.  Now, you're

20   valuing something completely different.

21       Here's what BFM, their long time advisors said to

22   them in November 2008, hey, why don't you invest in

23   agencies, this is November 2008.  They'll yield 2.68 percent

24   to 3.38 percent, multiples of what they were earning in

25   money market funds.  They went out and got proposals in

1    March 2011, lots of different proposals with higher --

2            THE COURT:  But those -- these have maturities

3    that are too long.

4            MR. TAMBE:  Sure they do, sure they do.

5            THE COURT:  Right?

6            MR. TAMBE:  Sure they do, but these are the kinds

7    of options that were available to them, and they're going to

8    sit back and say, well, we can't do this.  Well --

9            THE COURT:  I'm confused.  Because I thought we

10   all agreed that they could only invest in things that had

11   maturities that were six months or shorter.  So why should I

12   be looking at maturities that are 5 and 12 years?

13           MR. TAMBE:  It's a fair question to ask them,

14   Judge, because they asked for proposals, they had dialogue

15   with third parties, and they had third parties approaching

16   them, and saying, you don't have to be stuck in these short

17   term investments, indentures can be amended, RFAs can be

18   amended, there's lots of things that can be done.

19           In fact, they paid off, they refinanced the bonds

20   in this time, and they earned a massive gain.  They have all

21   sorts of options available to them and they're sitting on

22   the $45 and a half million.  So if we're going to talk about

23   post March 25, 2009 conduct, let's talk about this conduct

24   as well.  What were the options truly available to them, are

25   they really buried and stuck in 65 basis points?  No,

1  they're not.  No, they're not.

2        Barclays November 2011, they've been offered a

3  guaranteed investment contract, and this is in 2011, right,

4  when rates have fallen even further according to Mr.

5  Lawrence, they're being offered other options.  These are

6  options.  But they turned their back on all of them and

7  said, no, no, we want the Lehman estate to pay us $38

8  million.  That's from Swap Financial Group, they came up

9  with a tranched investment structure with a yield of 2.6

10  percent using a variety of different products.

11        Again, lower rates in 2011 than existed in 2009,

12  and that's their theory they come up with.  The fact of the

13  matter is, there is, as Mr. Shapiro said a broadly accepted

14  methodology.  You value this transaction the way you'd value

15  a fixed or floating swap.  You look at the fixed leg, you

16  look at the floating leg.

17        How do you determine what the floating leg is, you

18  look at the cheapest to deliver securities.  There's market

19  data, reliable market data about what that is.  You compare

20  those two streams, that tells you what the value of the

21  contract was on the rejection date.

22        And if you apply those principles, which I think

23  even Mr. Shapiro would say, are the principles that underlie

24  his analysis, what you get at is a number that's a

25  reasonable good faith number and that number is actually a

1  payable to Lehman, based on all the market data that was

2  available on March 25th, 2009, commercial reasonable,

3  reliable market data.

4          They don't get a look back.  No creditor gets a

5  look back.  Thank you, Your Honor.

6          THE COURT:  Okay.  Thank you.  Would you like to

7  take a five minute break before we begin the witnesses?

8          Okay.  Five minutes always turns into ten minutes,

9  so let's just call ten minutes, all right?  Thank you.

10     (Recessed at 10:30 a.m.; reconvened at 10:41 a.m.)

11         THE COURT:  All right.  Please have a seat.  Did

12  we lose Mr. Lawrence already?

13         MS. EVANSON:  He will be back momentarily.

14         THE COURT:  Okay, excellent.

15     (Pause)

16         THE COURT:  Can you give me the forward curve on

17  what we're doing in terms of timing, Mr. Lawrence, when you

18  -- how long witnesses are going to take, lunch breaks, and

19  the like, knowing that we are aiming towards a 3:20 hard

20  stop I have today.

21         MR. LAWRENCE:  The witness order is Kim Herman,

22  the Executive Director of the TSA is the first witness.  If

23  I recall correctly, the parties estimated between direct and

24  cross, it'll take about an hour and a half or so.  So maybe

25  proceed with Mr. Herman and then take a lunch break --

1          THE COURT:  Sure.

2          MR. LAWRENCE:  -- and then come back with the next

3     witness.

4          THE COURT:  Okay.  Are there any witnesses who

5     need to be excluded, have been excluded?

6          MR. LAWRENCE:  Mr. Shapiro is the only one and he

7     left.

8          THE COURT:  All right.  Let's go.

9          MS. EVANSON:  Good morning, Your Honor.  I'm

10    Kymberly Evanson on behalf of the Washington State Tobacco

11    Settlement Authority.  May I approach?

12         THE COURT:  Yes.

13         MS. EVANSON:  For the Court's convenience we have

14    a binder of the exhibits --

15         THE COURT:  Excellent.

16         MS. EVANSON:  -- we expect to be examining on.

17    I've shown this to opposing counsel.

18         THE COURT:  Thank you.  Would you by any chance

19    have another copy for Ms. Lecus (ph)?  No.

20         MS. EVANSON:  I don't --

21         THE COURT:  Okay.

22         MS. EVANSON:  -- at the moment.  All the exhibits

23    will be shown on the screen as well.

24         THE COURT:  Okay.  Then I'm going to do this.

25    Okay.

1      (Pause)

2          THE COURT:  You're in there.  It's a little cozy.

3          MR. HERMAN:  Okay.

4          THE COURT:  Would you raise your right hand,

5    please, sir.

6      (Witness Sworn)

7          THE COURT:  Please have a seat.  At any time you'd

8    like to have a break or a drink of water please let us know.

9    DIRECT EXAMINATION

10   BY MS. EVANSON:

11   Q    Mr. Herman, please introduce yourself for the record,

12   starting with your full name.

13   A    My name is Kim Herman, I'm the executive director of

14   the Washington Tobacco Settlement Authority.

15   Q    I'd like to talk a little bit first about your

16   background.  Can you tell me, please, where did you go to

17   college.

18   A    I went to Washington State University.  I have a B.A.

19   in political science.

20   Q    And when did you graduate?

21   A    1967.

22   Q    And what did you do following your graduation from

23   Washington State?

24   A    Following by graduation I went in Peace Corps for two

25   years, I served in the Dominican Republic doing rural

1   community development.

2           When I left the Peace Corps I went to work in

3   Fauquier County, Virginia, Warrenton, Virginia about 60

4   miles west of Washington, D.C. doing rural housing

5   development.

6           After I left Virginia I went down to Indianola,

7   Mississippi and worked for about four and a half years

8   running a delta housing development organization, which was

9   helping farm workers build homes.

10          And then after that I went back to Washington,

11  D.C. and worked for a group called Rural Housing Alliance,

12  which had a contract with the Department of Labor to help

13  develop farm worker housing around the nation in 28 states.

14          And when I left Washington, D.C. I returned to

15  where I grew up in Spokane, Washington to work for the

16  Carter administration on a rural assistance initiative to

17  try and make HUD programs work better in rural areas.

18          From there I went down to Yakima, Washington where

19  I was executive director of the Yakima Housing Authority.

20          From the Yakima Housing Authority I went to Oregon

21  and worked with the Portland Development Commission running

22  their home rehabilitation program.

23          And from there I went to the current job, the

24  executive director of the Washington State Housing Finance

25  Commission and the TSA.

1   Q    And what year was it that you joined the Washington

2   State Housing Finance Commission?

3   A    1984.

4   Q    And what is your role at the Washington State Housing

5   Finance Commission?

6   A    I am the executive director of the Washington State

7   Housing Finance Commission.

8   Q    Have you been in that role since 1984?

9   A    I have been in that role since 1984.

10   Q    Can you explain briefly what's the purpose of the

11   Housing Finance Commission?

12   A    The Housing Finance Commission was created to take

13   advantage of tax exempt bonds that could be issued for the

14   development of affordable housing, and the commission was

15   created to operate without the good faith and credit of the

16   State of Washington to issue tax exempt bonds and use other

17   programs to cooperate with federal, state, and local

18   affordable housing programs to provide affordable housing

19   for low and moderate income people.

20   Q    I want to shift gears a little bit and talk about the

21   Tobacco Settlement Authority --

22   A    Uh-huh.

23   Q    -- or the TSA.  What is the TSA?

24   A    The TSA was in created in 2002 to allow the State of

25   Washington to do what a number of states were doing, which

1   was issue tax exempt bonds against tobacco settlement

2   revenues from the settlement between the major tobacco

3   companies and the states and to issue those bonds in order

4   to bring forward money from those revenues so that we could

5   fill a gap in the 2002 budget -- state budget, the revenue

6   gap and use a portion of the tobacco settlement revenues

7   from the future to pay off those bonds.

8   Q     And what year was that?

9   A     That was in 2002.

10  Q     And what's your role at the TSA?

11  A     When the legislature created the TSA they directed in

12  that legislation that the Washington State Housing Finance

13  Commission should provide the staff to the TSA because of

14  our bonding experience.

15  Q     So you're the executive director then?

16  A     Yes.

17  Q     Can you explain for us your responsibilities as the

18  executive director of the TSA?

19  A     My responsibilities as director of the TSA are to carry

20  out the policies and programs of the TSA that are developed

21  by the board -- by the board of directors of the TSA, and

22  primarily to beginning with that was to issue bonds against

23  future revenues to fill a $450 million hole in the 2002

24  state budget.

25  Q     You mentioned the TSA board.  What is the role of the

1    TSA board, vis-à-vis, the TSA staff?

2    A     The TSA board is the board.  They're a regulatory body

3    under state law, which means they can make -- promulgate

4    rules, make regulations.  They are the TSA themselves.  They

5    set policy, make the decisions, and make all the responsible

6    decisions which the staff carries out.

7    Q     Would you consider the board a high level entity in

8    terms of the day-to-day operations of the TSA?

9    A     Well they are -- as I said, they're a regulatory body

10   under state law, so they are an individual body under state

11   law that has the right to make rules and regulations and

12   carry out business.

13   Q     Is it fair to say that the TSA staff is the

14   administrative and technical part of the TSA?

15   A     Yes, that's fair to say.

16   Q     How much -- who do you report to and how often?

17   A     Well, I report to the board, and in between board

18   meetings I report to the chair of the TSA.

19   Q     And how do you make those reports?

20   A     I talk with her -- him or her either by telephone, in

21   person, or my email usually if I'm communicating it depends

22   on what the issue is what the timing is.

23   Q     And if a TSA board member wants more information on a

24   particular topic would they come to you and ask for it?

25   A     Normally they would probably either email me or pick up

1    the telephone and contact me.  They're also free to contact

2    another member of the staff that works on TSA issues.  When

3    they do that then the staff let me know that they've had

4    that conversation with the board member.

5    Q    So there's a policy in place that the staff would

6    report to you if a board member had contacted them?

7    A    Yes.

8    Q    In your role as the executive director since 2002 has a

9    TSA board member ever complained to you that they were not

10   receiving adequate information from you about a certain

11   topic?

12   A    No.

13   Q    Has any member of the board ever complained that you or

14   TSA staff had taken any action without sufficient authority?

15   A    No.

16   Q    Let's go back in time to 2002 and talk a little bit

17   about the bonds that you mentioned.

18        Can you explain what those bonds had to do with

19   the tobacco settlement with the states?

20   A    Well, as I mentioned a minute ago, the Tobacco

21   Settlement Authority was created specifically to issue bonds

22   to bring forward a pot of money to replace -- to plug a hole

23   in the 2002 budget of the state.

24        So we were authorized to purchase from the state a

25   percentage of the future revenues of -- from the tobacco

1    settlement, which would be used to pay off those bonds.

2          So in 2002 we did issue 517 million plus of tax

3    exempt bonds and we paid the state $450 million for 29.2

4    percent of the future revenues of the state for as long as

5    the bonds were outstanding.

6    Q    What does the State of Washington do with the other is

7    it 81.8 percent of the tobacco settlement revenues its

8    receiving?

9    A    The intent of what they wanted to do with the tobacco

10   revenues was to do research on tobacco to help pay for the

11   cost of people who were injured by smoking that the state

12   had to make payments to for healthcare and other issues, and

13   they wanted to run programs -- educational programs and

14   other programs to keep youth and other people from ever

15   taking up smoking.  That was the intent of what they wanted

16   to do with those settlement funds.

17   Q    So the 29.2 percent that comes into TSA is that passed

18   on to pay off bondholders?

19   A    Yes.  Yeah, the 29.2 percent that we purchased is used

20   to retire the bonds as long as the bonds are outstanding.

21   Q    And how does TSA actually get that 29.2 percent?  Does

22   it come in annually?

23   A    Every April the settlement payments are released by the

24   group that collects the funds on behalf of the states.  So

25   every April we get a set of emails letting us know what they

1    think the payments will be to Washington State, and then at

2    a later time the actual payments come in maybe a week or

3    week and a half after that.

4    Q    Are those payments always the exact same amount?

5    A    No.

6    Q    And what impacts the variability?

7    A    Well the payments are -- the payments are dependent

8    first of all on domestic consumption of cigarettes in the

9    United States and other tobacco products, and the

10   consumption has been going down since the settlement, and

11   therefore the amount of the payment, the 29.2 percent that

12   we receive, varies -- has varied from year to year and has

13   had a downward trend.

14        In addition there was an arbitration process to be

15   established where the major tobacco companies could dispute

16   whether or not a state was enforcing the tobacco settlement

17   agreement on non-participating manufacturers in that state,

18   and if the major tobacco companies didn't feel that a state

19   was enforcing the tobacco settlement agreement in a strong

20   enough manner they could deposit funds in a dispute account

21   which would not go to the states until there was an

22   arbitration held.

23        What happened was the first dispute funds were set

24   aside in 2003 but it took the states that participated and

25   the appointed judges -- former judges that were going to do

1   the arbitrations about eight years to figure out how they

2   were going to do the arbitration.  So there were no payments

3   released.  Actually the first payments were released in

4   2013, so -- for the 2003 year.

5          So all of the time that there were payments

6   withheld that was additional money that was not coming to

7   the State of Washington.

8   Q    So just to make sure I understand what you're saying.

9   There was an arbitration that had the end result of

10  decreasing the amount of money that the states were

11  receiving under the settlement account?

12  A    Yes.  If they identified you as a state that they did

13  not feel was enforcing the tobacco settlement on non-

14  participating manufacturers then they would withhold that,

15  and we didn't get any money under that, and the arbitration

16  was to be done year by year because the number -- the

17  different states might be named in different years.

18         So as I said, the first arbitration wasn't

19  completed until 2013 for Washington State, which was for the

20  year 2003.  So during that whole period we didn't receive

21  funds that were put into the dispute account.

22  Q    And Washington won that arbitration?

23  A    We did win that arbitration, yes.

24  Q    I'm showing you what's been marked as Joint Exhibit 3.

25  Do you recognize this document and can you generally

1  describe what it is?

2  A    Yes.  This is the indenture, which is the legal

3  contract between the Washington Tobacco Settlement

4  Authority, the bondholders, and the trustee, U.S. Bank, and

5  it sets forth all of the terms and conditions for the bond

6  issue that we did.

7          MS. EVANSON:  Just one moment, please.

8  BY MS. EVANSON:

9  Q    And I've turned to page 7 of the indenture.  Could you

10  read for me what it says down there at the bottom?

11  A    It says, "Liquidity reserve account means the account

12  of that name established and owned by the indenture trustee

13  pursuant to Section 401."

14  Q    Sorry.

15  A    "Liquidity reserve requirement means an amount equal to

16  $45,534,106.25."

17  Q    And is that amount, is that the reserving fund that

18  we're referring to in this case?

19  A    Yes.

20          (Pause)

21  Q    I've turned to page 20 of the indenture, and if you can

22  see I can make this bigger for you.  But can you read what

23  Section 401(d) says?

24  A    401(d) says, "The liquidity reserve account."

25  Q    And I'm sorry, can you read that part -- up at the top,

1    Section 401?

2    A    Oh, excuse me.  Section 401:

3        "Establishment of accounts.  The indenture trustee

4    shall establish and maintain the following segregated trust

5    accounts in the indenture trustee's name."

6    Q    And what's the significance of that?

7    A    Well that -- that shows that the trustee did establish

8    a liquidity reserve account to hold the reserve funds that

9    we established.

10   Q    Now, I'm looking at page 26 of the indenture,

11   Section 405.  And can you just read the first two and a half

12   lines there?

13   A    Section 405, investments.

14       "(A), pending its use under this indenture money

15   in the accounts may be invested by the indenture trustee in

16   eligible investments and shall be so invested pursuant to

17   written direction of the issuer."

18   Q    And generally speaking what were the eligible

19   investments under the indenture?

20   A    Eligible investments under the indenture had to meet

21   certain ratings, guidelines, had to be invested in certain

22   limited types of investments that the trustee could invest

23   in, but they were -- they were specified.

24   Q    Were there ratings requirements?

25   A    Yes.

1  Q     If you look at page 26 of the indenture I'm showing you

2  now sub part (E), can you read that portion for me, please.

3  A     It says:

4        "(E), if the issuer shall have failed to give

5  investment directions to the indenture trustee then the

6  indenture trustee shall invest the funds in the accounts and

7  investment specified in Subsection 8 of the definition of

8  eligible investments."

9  Q     And what's your understanding of the definition of

10  eligible investments at Subsection 8?

11  A     I believe that the Subsection 8 of the definition of

12  eligible investments talks about the default investment

13  being money market funds.

14  Q     And here, I found it for you, here is Subsection 8, so

15  if you could just read the first line and a half there.

16  A     "Units of taxable or tax exempt money market funds,

17  which funds are regulated in investment companies and seek

18  to maintain a constant net asset value per share and have

19  been rated by each rating agency rating such funds in one of

20  the three highest rating categories."

21  Q     And that's fine, you don't need to keep going.

22        So is it fair to say that the indenture imposed

23  reinstructions on the TSA in terms of what they could

24  invest?

25  A     Yes.

1    Q    And that absent other direction from the issuer the

2    default position was money market accounts?

3    A    Yes.

4    Q    I'd like to talk about the reserve fund agreement now

5    that's at issue in this case.

6         You testified that the indenture -- and we looked

7    at that component -- required the creation of a reserve fund

8    account.  Can you tell me a little bit about how TSA went

9    about fulfilling that requirement?

10   A    Well first of all when we issued the bonds, as I

11   mentioned a minute ago, while we paid the state $450 million

12   for the funds -- or for the percentage of the tobacco

13   settlement revenues we also -- we issued a total amount of

14   $517 million, which was to cover the cost and establish the

15   $45 million reserve account.

16        While we structured the bond issues we -- the

17   finance team and our attorneys and investment bankers talked

18   about the different kinds of investments.  They decided on

19   seeking out a reserve fund agreement and they put together a

20   request for bids for such a reserve fund agreement, which

21   was put out into the market to get bids on that type of a

22   reserve fund agreement.

23   Q    I'm going to show you what's been marked as Joint

24   Exhibit 4.  Is this the request for bids that you just

25   referred to?

1    A    Yes, it is.

2    Q    Who put this package together on behalf of TSA?

3    A    This package would have been put together by PFM with

4    the assistance of CSG, another advisor, our attorneys, and

5    the senior manager on the account.

6    Q    Who is PFM?

7    A    PFM was our selected financial advisor for the bond

8    issue.

9    Q    Is PFM still your financial advisor?

10   A    PFM still is our financial advisor.

11   Q    So, I'm turning to page 2 of the request for bids.  Can

12   you generally describe what is on this page?

13   A    This is the description of what the terms and

14   conditions that were in the RFP that we would -- that we

15   wanted in the reserve fund agreement.  It specifies when we

16   would take bids, different terms and conditions for the

17   responders to work with and comply with.

18   Q    If you look at point 2, and I'll make it larger so it's

19   easier to see here, where it says, "Type of investment."

20   What was important to TSA about the type of investment?

21   A    It was a guaranteed deal for a purchase and sale

22   agreement with downgrade provisions providing a semiannual

23   tender.

24       Basically we were looking for a very safe

25   investment, we wanted to have the money available every six

1    months in case we had to use the reserves to make payments

2    on the bonds.  We were looking obviously for a return on

3    investment that we could get.  We wanted it to be with a

4    highly-rated third party.  Those were most of the concerns

5    that we were -- that we really wanted to get through this

6    type of investment.

7    Q    And I'm flipping to page 4.22 where it says,

8    "Termination amount."  What's your understanding of this

9    provision of the FRB?

10   A    This provision of the RFP makes the point that the

11   termination amount could be determined by a burdened party

12   if there was a default of one party or the other, the

13   burdened party would get to make the determination of the

14   termination amount or a third party acceptable to both

15   parties so that it would be -- that's the importance of

16   that, is that it was the burdens party -- the burdened party

17   that would make the determination of the termination amount.

18   Q    I'm going to show you what's been marked now as Joint

19   Exhibit 5 on the next page.  Let's see if I can rotate this.

20   There we go.  Do you recognize this document?

21   A    Yes, it is.  This is the document showing what the bids

22   were that we received in response to the request for bids.

23   Q    And I'm going make this larger so we can see it, the

24   copy is not great.  Can you read the first line where it

25   says, "Lehman Brothers."

1    A    It says, "The provider is Lehman Brothers, they're A

2    plus by Moody -- by S&P, they're A2 by Moody's, they're

3    offering a 4.484 percent coupon." James Lister (ph) was the

4    bidder for Lehman. And they have no conditions or notes on

5    the terms or conditions that were in the RFB requested bid.

6    Q    And why is Lehman listed as number one in this -- in

7    this summary?

8    A    Because they gave the highest bid, they met the

9    eligible criteria for providing the reserve fund agreement,

10   and because they agreed to all of the conditions that were

11   in the request for bids.

12   Q    The last two dealers on this list indicated a past

13   credit. Do you understand what that means?

14   A    I believe that to mean that they were passing on making

15   a bid on this because they did not want to be involved with

16   tobacco credits since tobacco credits were seen as a higher

17   risk credit.

18   Q    Let's talk about after you reserved -- or after you

19   received these bid requirements what did TSA do to actually

20   negotiate an RFA?

21   A    Lehman submitted a contract -- a form of a contract for

22   the reserve fund agreement, there were negotiations between

23   PFM and other members of our finance team, particularly

24   counsel -- bond counsel, and they negotiated the reserve

25   fund agreement that we finally signed.

1    Q    Who negotiated on behalf of TSA?

2    A    The TSA was primarily George Majors from PMF and

3    Richard Van Dusen from our bond counsel.

4    Q    And what negotiated on behalf of Lehman?

5        MS. SAWYER:  Objection.  It calls for speculation.

6    If he knows.

7        THE COURT:  If you know.

8        THE WITNESS:  I know Courtney Jenkins (ph).

9        THE COURT:  I'm sorry, could you repeat that?

10        THE WITNESS:  Courtney Jenkins.

11    BY MS. EVANSON:

12    Q    And how involved were you, Mr. Herman, in the

13    negotiations?

14    A    I wasn't directly involved in the negotiations.  I saw

15    emails that my name was on, I looked at those.  I did look

16    at some drafts of the agreement that were passed back and

17    forth.  But I was not directly involved in every -- every

18    piece of it.

19    Q    Were you involved in putting the terms and conditions

20    that TSA wanted into the request for bids?

21    A    I -- we reviewed those with the finance team at the

22    time prior to putting the bid out and took the

23    recommendation of the finance team to do that.

24    Q    Now when you say the finance team, just so we're clear,

25    who's included in the finance team?

1    A    Finance team are the senior manager that will be the

2    book running manager on the bonds, some co-managers who will

3    help sell the bonds, our bond counsels, there were two firms

4    that were bond counsel, and we had financial advisors, PFM

5    and also CSG was also involved at that time.  So it was --

6    and the staff obviously from the TSA.

7    Q    So you were on the finance team?

8    A    Yes.

9    Q    What about Mr. Cook, was he on the finance team?

10   A    Yes.

11   Q    And Mr. Edwards?

12   A    Mr. Edwards was too, he's the deputy director.

13   Q    Okay.  In negotiating the RFA how did the parties

14   communicate?

15   A    There were some phone calls, mostly though it was by

16   email.

17   Q    Were drafts sent back and forth?

18   A    There were comments on the drafts and I think there

19   were some drafts exchanged at the very end.  Mostly there

20   were comments on the different provisions.

21   Q    And who sent the initial draft?

22   A    The initial draft was sent to us by Lehman Brothers.

23   Q    I'm showing you what's been marked as TSA Exhibit G,

24   and this is again not a great copy, but I'm going to blow it

25   up here.  Well, let's see, I'll do it one piece at a time so

1   you can see it better.

2          So can you describe generally who is this email

3   from?

4   A    Richard Van Dusen.

5          MS. SAWYER:  I'm just going to object to the

6   extent this -- it lacks foundation.  I mean this witness

7   isn't on --

8          THE COURT:  Okay.  Hold on, because --

9          MS. SAWYER:  -- this email.

10         THE COURT:  -- I'm lost.

11         MS. EVANSON:  The witness is on the email, Your

12   Honor.

13         THE COURT:  Hold on.  First I have to find

14   actually the text that you're looking at.  This is TSA

15   Exhibit G?

16         MS. EVANSON:  And it is page 2, which is at your

17   tab 4, and it should be --

18         THE COURT:  Right.

19         MS. EVANSON:  -- on the top of the page.

20         THE COURT:  Okay.  I'm there.  Okay.

21         MS. EVANSON:  You got it?

22         THE COURT:  So this is from Richard Van Dusen to

23   Courtney Jenkins.  And what was the objection?

24         MS. SAWYER:  I'm sorry, so you're on the second

25   page of the email?

1        MS. EVANSON:  The second page of the email.

2        MS. SAWYER:  Okay.  All right.

3        THE COURT:  Okay?  Okay.  Thank you.  Sorry about

4   that.

5        MS. EVANSON:  No, thank you.

6   BY MS. EVANSON:

7   Q    So can you just describe who is this email from?

8   A    Richard Van Dusen who is one of our bond counsel from

9   Hawkins Delafield & Wood.

10  Q    And who is it to?

11  A    It is to Courtney Jenkins.

12  Q    And are you cc'd on this email?

13  A    I am cc'd on this email, yes.  KHerman@WSHSC.org.

14  Q    And what's the subject of this email?

15  A    The subject of this email was changes in the contract

16  that Richard Van Dusen wanted so that the final contract

17  would match the terms and conditions of the RFB.

18  Q    So these were changes that Richard Van Dusen were

19  proposing on behalf of TSA?

20  A    Yes.  Yes.  They're comments on the forward agreement,

21  yes.

22  Q    They were comments on the draft from Lehman?

23  A    Yes.

24  Q    I'm sorry, I couldn't quite hear you.

25  A    Yes.  Yes, they were.

1   Q    I'm going to look down about two-thirds of the way down

2   on the page and I'm going to blow this up again here.  At

3   point 8 can you read what that says there, please.

4   A    Yes.  Part 8:

5        "Termination amount.  The party determining the

6   termination amount should be the burdened party or as stated

7   in the RFB a third party acceptable to both parties making

8   this determination."

9   Q    And what's your --

10       MS. SAWYER:  Object.

11       THE COURT:  Hold on just a moment.

12       MS. SAWYER:  I'm going to object to this line of

13  questioning.  I mean we're just reading from a hearsay

14  document that's not been admitted into evidence here and

15  there's no indication that it is something that -- I mean

16  this isn't a party admission or anything other than just

17  hearsay, this section of this email.

18       MS. EVANSON:  I'm just going to ask him what his

19  understanding is of this -- of this provision.  I'm not

20  submitting it for the truth of what it says.

21       MS. SAWYER:  The questions have been to read from

22  the documents, so if we're going to ask different questions

23  --

24       THE COURT:  Yeah, so far we are just reading from

25  the document, so.

1          MS. EVANSON:  I will ask him.

2     BY MS. EVANSON:

3     Q    What is your understanding of this email?

4     A    My understanding of this email is that Mr. Van Dusen

5     was indicating changes that would -- should be made in the

6     draft document that was sent by Lehman to us, and these are

7     Mr. Van Dusen's changes, the comments that have come from

8     our working group indicating that we need to have these

9     changes made in the draft document.

10    Q    I'm showing you now what's been marked as TSA

11    Exhibit H, and I will blow this up again for you here so you

12    can read it, the top of the page.  At the top of the page do

13    you see who this email is from?

14    A    This is from Courtney Jenkins.

15    Q    And is this again to the finance team?

16    A    Yes, it is.

17    Q    And if we look down can you generally describe what

18    this email is doing from Courtney Jenkins?

19    A    Courtney Jenkins is sending back his comments about

20    what changes will be made and his acceptance or modification

21    of the comments and changes that were suggested by Dick Van

22    Dusen.

23    Q    And so this is in response to the email we just looked

24    at; is that correct?

25    A    Right, yes.

1    Q    And can you look at point 8.  I'm sorry, I keep

2    highlighting.  Point 8 here.  Let me do that again.  And

3    what's your understanding of this statement here from

4    Courtney Jenkins on behalf of Lehman?

5    A    My understanding is that this statement indicates that

6    they will change -- that Lehman will change the language to

7    be under the termination amount to be that the burdened

8    party would be the party that would make the -- determine

9    the termination amount or a third party acceptable to both

10   parties.  So he's saying that Lehman will make the change

11   asked for in this case by Mr. Van Dusen.

12   Q    I'm showing you what's been marked as TSA Exhibit I.

13        MS. EVANSON:  And, Your Honor, this is at tab 6.

14   BY MS. EVANSON:

15   Q    And again, this is -- it appears to be an email from

16   Courtney Jenkins.  And if you just read to yourself the

17   first two lines there.

18        MS. SAWYER:  I'm just going object, I'm not seeing

19   Mr. Herman on this particular email.  Maybe I'm overlooking

20   it.

21        MS. EVANSON:  Yeah, but this email was sent to the

22   finance team on behalf of Lehman, so it's a statement of a

23   party.

24        MS. SAWYER:  Right, but to the extent this

25   witness --

1              THE COURT:  I'm sorry, but --

2              MS. SAWYER:  -- has any personal knowledge of it

3    I'm not seeing him on this email.

4              THE COURT:  -- he's not on this email.

5              MS. EVANSON:  That's correct, Your Honor, he's not

6    on this email.

7              THE COURT:  Okay.  Then --

8              MS. EVANSON:  However he is a member of the

9    finance team and most of the staff is on this email.

10             THE COURT:  Okay.  But what's the -- what's the

11   purpose of your question?  If he's not on the email at least

12   as a foundation matter I would think you should ask him if

13   he's ever seen this email before.

14             MS. EVANSON:  I will do that, Your Honor.

15             THE COURT:  Okay?

16   BY MS. EVANSON:

17   Q    Have you ever seen this email before, Mr. Herman?

18   A    I have seen this email before.

19             THE COURT:  Other than in preparation for -- in

20   connection with this case.

21             THE WITNESS:  I have seen this email other than in

22   preparation for this case.

23   BY MS. EVANSON:

24   Q    Mr. Herman, who is Pam Mead (ph)?

25   A    Pam Mead is the manager of the TSA, or was at the time

1    we did the bond issue.

2    Q    Was she in the function of your administrative

3    assistant, so to speak, at this time in 2002?

4    A    Well she was the manager of what we call our two

5    affiliates, the Tobacco Settlement Authority and the

6    Washington Higher Education Facilities Authority, and she

7    was -- she was responsible for the day-to-day management of

8    the TSA.

9    Q    Did she correspond on your behalf at times?

10    A    She did at times, yes.  She represented TSA.

11    Q    Can you tell me what your understanding is of this

12    email from Courtney Jenkins?

13    A    He is saying that we've made the changes as previously

14    stated in the response to Mr. Van Dusen that he's -- he's

15    made changes that he agreed to make in the reserve fund

16    agreement that he's sending back.

17    Q    Thank you.

18        I want to shift gears now to show you what's been

19    marked as Joint Exhibit 1, which is the reserve fund

20    agreement.  Can you -- do you recognize this document?

21    A    I do.

22    Q    And can you just generally tell us what it is?

23    A    It is the reserve fund agreement that was finally

24    signed with Lehman Brothers for the investment of the

25    reserve funds.

1   Q    Now, I'm going show you some language that we've seen

2   before this morning.  Can you read just the first line or

3   the first line and a half of this point on page 5 of the

4   reserve fund agreement?

5   A    "Termination amount means determined by the burdened

6   party reasonably and in good faith on the basis of the

7   arithmetic mean."

8   Q    You don't have to read the whole thing.

9   A    Okay.

10  Q    Is it TSA's understanding that this -- this definition

11  matches the one that was in the request for bids?

12  A    Yes, that's my understanding.

13  Q    So just give me one moment, I'm going to go to the very

14  end of this document at page A.3?

15       MS. EVANSON:  Or I'm sorry, Your Honor, it's not

16  at the very end.  It's Appendix A.3.

17       THE COURT:  So it's Exhibit A?

18       MS. EVANSON:  It's Exhibit A to the RFA.  You see

19  there's little numbers.

20       THE COURT:  SFG000678?

21       MS. EVANSON:  That's correct, Your Honor.

22       THE COURT:  Okay.

23  BY MS. EVANSON:

24  Q    I'm showing you page A.3 of the RFA, Mr. Herman.  If

25  you look down where it says, "Bond payment date."  Do you

1    see that date there?

2    A    Yes.

3    Q    And what's the significance of that date?  First of

4    all, what is that date?

5    A    Well the date 5/30/42 is the scheduled termination date

6    of the bond issue when the bonds would be paid off, the last

7    payment made.

8    Q    Now here does it say 5/30/32 or 5/30/42?

9    A    It says 5/30/42.

10   Q    Was that a mistake?

11   A    Yes, it was.

12   Q    And was this mistake ever corrected?

13   A    Yes, it was corrected in March of 2009.

14   Q    I'm showing you what's been marked as Joint Exhibit 2.

15   Now, I believe you just testified that the mistake about the

16   end date was corrected.  If you could look at the date

17   across the top line there, can you see what date that was?

18   A    Amendment agreement as of March 26th, 2003.

19   Q    And what was the affect of this amendment agreement?

20   A    We changed the scheduled final maturity from 2042 to

21   2032, which is what it should have been.

22   Q    And why should it have been 2032?

23   A    Because that was the date that the bonds that we closed

24   terminated, and when we discovered this error we corrected

25   it.

1   Q    And so --

2           THE COURT:  Can I -- can I just clarify, sir?

3           THE WITNESS:  Yes.

4           THE COURT:  Mr. Herman, I think you said you

5   corrected it in March 2009.  So you misspoke.  You meant

6   March 2003 just to make the record clear?

7           THE WITNESS:  No.  Yes.  Yes.  Excuse me, yes.

8           THE COURT:  Okay.  Well, Ms. Evanson asked you the

9   question --

10          THE WITNESS:  I'm sorry.

11          THE COURT:  -- the first time.

12          THE WITNESS:  Yeah.

13          THE COURT:  You said March 2009.

14          THE WITNESS:  Yes, March 2003.  Yes, thank you,

15  Your Honor.

16          THE COURT:  Okay.

17          MS. EVANSON:  That's why I showed him to date,

18  Your Honor.

19  BY MS. EVANSON:

20  Q    So this amendment agreement goes out to 2032 to match

21  the maturity of the bonds.  Is that when TSA expected that

22  the bonds would be paid off?

23  A    No, there were two -- this was the scheduled maturity,

24  which was a flat payment maturity schedule, which kept the

25  bonds outstanding 'til 2032.

1          We had structured the bonds as turbo bonds, and

2    the turbo bonds meant that we expected to receive more money

3    from the tobacco settlement than the flat payment amount,

4    and the expected maturity date on the bonds at the time we

5    issued them was 2019.  So at that time we did expect to pay

6    off the bonds in 2019.

7    Q    And what was -- what were the factors that were

8    resulting in -- well, let me start over.

9          Were the bonds going to be paid off in 2019?

10   A    According to the projection we had at the time we

11   issued the bonds, yes, the bonds would have been paid off in

12   2019.

13   Q    As of 2008 were you still on schedule to pay them off

14   in 2019?

15   A    No, we were not on schedule to pay them off.  As I

16   explained earlier, there were -- there was less money coming

17   in than we anticipated for the two reasons that I also

18   already talked about.

19          So as we went through the life of the bonds up to

20   2008 we were experiencing less turbo payments than we had

21   anticipated and therefore we weren't paying off the bonds as

22   fast as we anticipated.

23   Q    So TSA pays off the bonds with those tobacco settlement

24   revenues or TSRs.  Does it apply any other monies to the

25   payment of the bonds?

1    A    No, the -- you know -- well the interest off of the

2    reserve fund would have been applied to the payment of the

3    bonds also, yes.  Any -- all monies that came into the

4    account, with the exception of monies that might be taken

5    out for operation of the TSA, would have been used to make

6    turbo payments and regular scheduled payments on the bonds.

7    Q    And in the first six years of the TSA did the TSA take

8    any money for operation?

9    A    We took $500,000 -- excuse me.  We took $500,000 in the

10   initial draw down when the bonds were issued to operate the

11   TSA, and that was the only amount we took out during the --

12   Q    Until -- until what point?

13   A    Until probably 2010 I think.  2009 or 2010, I don't

14   remember the exact date.

15   Q    So the TSA paid all its operating expenses from that

16   initial draw --

17   A    Yeah.

18   Q    -- for the first eight years?

19   A    Yes.

20   Q    Let's shift gears a little bit and talk about Lehman's

21   performance under the reserve fund agreement.

22        So from 2002 to 2008 did Lehman perform as

23   expected under the RFA?

24   A    Yes, they did.

25   Q    So for the first 6 years of this 30-year agreement it

1   performed as expected?

2   A    Yes.

3   Q    And then what happened in September of 2008?

4   A    In September of 2008 Lehman Brothers Holdings Inc.

5   filed bankruptcy and we knew there would probably be

6   problems.

7   Q    So what did TSA do in those first few days after

8   learning of LBHI's bankruptcy?

9   A    We had conversations with the finance team and we went

10   back and looked at the reserve fund agreement to refresh our

11   memories about the terms and conditions of the reserve fund

12   agreement, and we asked PFM to give us a quick estimate of

13   where they thought we would be under the reserve fund

14   agreement with regard to the termination situation.

15   Q    So this morning there was some discussion that this was

16   a time of high anxiety.  Is that fair to say that TSA was

17   experiencing high anxiety?

18   A    Well we -- we weren't experiencing high anxiety, I

19   would say we were -- we were anxious, but Lehman Brothers

20   Special Financing had not yet gone into bankruptcy and at

21   this point we were just trying to figure out what the

22   potential impact would be on the -- on the board -- or on

23   the TSA.

24        We also knew that Lehman Brothers Special

25   Financing if -- at that point still had the opportunity to

1    make good on the deposit of collateral in December at the

2    next date.

3    Q    So you mentioned that in these early days after the

4    bankruptcy TSA talked to its attorneys and talked to its

5    financial advisor PFM.

6        MS. SAWYER:  Objection, misstates his testimony.

7        MS. EVANSON:  We can read it back.

8    BY MS. EVANSON:

9    Q    Did you talk to -- did you talk to PFM in those early

10   days after the bankruptcy?

11   A    Yes.

12   Q    Did you speak to your attorneys?

13   A    Yes.

14   Q    Did you assemble the finance team?

15   A    Yes.

16   Q    And when you had those conversations did you receive a

17   valuation from PFM of what the amount might be owed or --

18   A    Yes.

19   Q    -- gained under the RFA?

20   A    Yes, their first estimate was that the TSA owed Lehman

21   1.2 million.

22   Q    And what was TSA's strategy after it got this

23   information?

24   A    Well TSA's strategy was to wait and see if Lehman

25   performed on December 1st and place new collateral, that we

1    would watch the market to find out what was happening under

2    the formula for determining the termination amount, and that

3    we would try and take all the actions we could to protect

4    the position of the TSA.

5    Q    And what was the TSA concerned about?

6    A    Well we were concerned about that we would, you know,

7    end up given market conditions that we might end up owing

8    money to Lehman, we were concerned about losing the 4.48

9    four percent, which was providing a significant amount of

10   money towards the turbo payments to retire the bonds.  You

11   know, those were the -- and we were concerned about, you

12   know, what would happen if Lehman Brothers Special Financing

13   didn't perform.

14   Q    So after Lehman Brothers Special Financing declared

15   bankruptcy in October of 2008 what did TSA do?

16   A    Well we -- we got together, we called a board meeting,

17   we talked about, you know, that we still wanted to wait and

18   see whether Lee Brothers Special Financing unit performed in

19   December by posting collateral, although we were beginning

20   to believe that that was less likely than we thought it had

21   been in September, and so we basically decided to do much

22   the same thing, we wanted to watch the performance of

23   Lehman, we wanted to watch the market, we wanted to protect

24   all the rights of the TSA, and we wanted to wait and see

25   what happened.

1    Q    And did TFM give a second valuation at this point?

2    A    They did give a second valuation at that point, and I

3    believe the second valuation was that the market had

4    reversed itself and that at that point Lehman Brothers would

5    owe TSA 1.2 million.

6    Q    Was PFM ever formally engaged to calculate a

7    termination amount or a claim in this case?

8    A    No.

9    Q    What did the board decide to do with respect to

10   handling the Lehman situation going forward at that

11   November 12th meeting?

12   A    They did -- they passed a resolution authorizing and

13   delegating me to do all necessary things to protect the

14   interests of the TSA, to continue to monitor the market, to

15   continue to monitor the performance of Lehman Brothers, and

16   not to terminate the agreement at that time.

17   Q    So after that board meeting did TSA reach out to Lehman

18   to ask about maybe a stipulated termination?

19   A    Yes, we did.  We wrote a letter to Lehman asking if

20   they would stipulate to a termination amount.

21   Q    And how did Lehman respond?

22   A    Lehman responded saying that they would be happy to

23   agree -- to stipulate to a termination amount as long as the

24   TSA would drop all of our rights and claims under the

25   reserve fund agreement.

1    Q    And did TSA agree to do that?

2    A    No, TSA could not agree to do that.  We had lost a

3    significant amount of earnings and we could -- we're dealing

4    with public money, we're trying to use the money off of the

5    reserve fund and other sources to help pay off the bonds

6    early so that the tobacco revenues could go back to the

7    state for other purposes, and so it would not have been

8    acceptable for us to accept to drop all of our claims and

9    rights.

10   Q    So in December of 2008 did LBSF perform to deliver the

11   collateral?

12   A    They did not, no.

13   Q    Do you recall TSA informing LBSF of its default at that

14   point?

15   A    Yes, we wrote a letter indicating to Lehman that they

16   had defaulted on the agreement, yes.

17   Q    I'm showing you what's been marked as Joint Exhibit 6,

18   and you just take a look at that.  Is this the letter that

19   you just referred to?

20   A    Yes, it is.

21   Q    And why did TSA send this letter?

22   A    We wanted to make it clear that TSA felt that Lehman

23   had defaulted on their agreement and we wanted to try and

24   begin the process of agreeing on a termination date of when

25   the agreement actually terminated.

1    Q    Mr. Herman, I'm going to switch gears a little bit and

2    talk about -- so you notified Lehman of its default in

3    December of 2008.  In December of 2008 what other steps did

4    TSA take in the resolution of this case?

5    A    Well we -- we engaged Swap Financial to try and help us

6    make a determination of what -- what the termination amount

7    would be under the agreement.

8    Q    Is that -- why did you do that?

9    A    We did that because one, we wanted to get -- we had

10   been told numerous times that the reserve fund agreement

11   acted a lot like a swap, that in order to do the

12   calculations it was very similar to what had to be done with

13   a swap.  So we had worked with worked with Swap Financial in

14   the past through the Housing Finance Commission to enter

15   into two swaps on some bond issues, so we felt that they

16   would be a knowledgeable third party who could help us on --

17   in this case.

18          Secondly, we wanted to get an independent third-

19   party opinion, because PFM was involved in the initial bond

20   issue and we felt that as an interested party that we --

21   that it would be better if we had an outside third-party

22   consultant who was providing us with an indication of what

23   the termination amount, what the value would be.

24   Q    Was an RFP conducted to hire Swap Financial at this

25   point?

1    A    No, we did not conduct an RFP at that time, we did it

2    under the emergency allowance under state law that we could

3    hire somebody in an emergency.

4    Q    And what was the emergency?

5    A    The emergency was that we had lost a significant amount

6    of income from the earnings of the TSA that would go towards

7    paying off the bonds and we felt that justified hiring a

8    third party at that time.

9    Q    Did anyone on the board -- the TSA board ever complain

10   about the hiring of Swap Financial?

11   A    No.

12   Q    Or complain that you were somehow without authority to

13   have reached out to Peter?

14   A    No.

15   Q    Mr. Herman, let's move to January of 2009.  We were

16   just in December of 2008.  Let's go to January of 2009.

17        You testified that you had asked Lehman to

18   stipulate to a termination back in November but they had

19   refused without a mutual waiver of claims.  So in December

20   after notifying them of their default what happened next?

21   Did you -- what did you do?

22   A    Well we -- if I remember correctly we sent them a

23   letter and asked them if we could agree upon a termination

24   date for the agreement and asked if they would agree to a

25   termination date.

1    Q    Did you approach the Court at some point in January of

2    2009?

3    A    Yes, we did.

4    Q    And did you file a motion to ask the Court to reject

5    the -- ask the Court to allow Lehman to reject the contract?

6    A    Yes, we did.

7    Q    And why did TSA want to establish a termination date?

8    A    Well at this point TSA was worried about what the

9    termination amount would be, the termination amount depended

10   on the market, the market had normalized after the TSA -- or

11   the Lehman default, and the TSA was in the money at this

12   point and we didn't want to be at the vagaries of the market

13   where if the market changed, if there was another shock to

14   the market that we might be back out of the money again, and

15   we didn't want to be put in that position.

16   Q    Did Swap Financial submit a declaration in support of

17   that motion?

18   A    Yes, they did.

19   Q    And in support of that declaration did TSA ask Swap

20   Financial to calculate an estimated termination amount?

21   A    Yes, they did -- we did get it in at the time that we

22   asked for that.

23   Q    And in support of that did TSA ask Swap to try and get

24   market quotations?

25   A    Yes.  Yes, we did ask Swap to try and get market

1    quotations.

2    Q    And how do you know that Peter Shapiro solicited market

3    quotations?

4    A    We had telephone conversations with Peter Shapiro.

5              MS. SAWYER:  Objection.

6              THE COURT:  Hold on.

7              MS. SAWYER:  To the extent -- to the extent it's

8    going to go into hearsay conversations with Mr. Shapiro.

9              MS. EVANSON:  I'm just asking about his personal

10   knowledge.

11             MS. SAWYER:  But he's recounting what he's -- he's

12   about to recount what Mr. Shapiro told him.

13             THE COURT:  Well the question is does he know if

14   Mr. Shapiro solicited market quotations?  And the witness is

15   testifying -- is going to testify that Mr. Shapiro told him

16   that he did.  That's coming in for the fact that Mr. Shapiro

17   told him that he did, not for the truth of whether or not in

18   fact Mr. Shapiro did.

19             MS. SAWYER:  Fair enough.

20             THE COURT:  Clear?

21             MS. EVANSON:  Yes.

22             THE COURT:  Okay.

23             THE WITNESS:  Okay.  Mr. -- we did have telephone

24   conversations with Mr. Shapiro.  We had asked him to go out

25   and get quotations.  He indicated to us that he had gone out

1    and got -- and tried to get quotations, that he had surveyed

2    the market, he was not able to get quotations, there were no

3    actual quotations available, and nobody was willing to give

4    him a quotation that was effective that we could do -- get

5    any agreement on.

6    BY MS. EVANSON:

7    Q    And did the Court eventually establish a rejection date

8    of the RFA?

9    A    Yes, they did, in March.

10   Q    And was that date March 25th, 2009?

11   A    Yes, it was.

12   Q    After the Court established a termination date what was

13   the next step that TSA took in pursuing its claim against

14   Lehman?

15   A    We filed proof of claims with the Court.

16   Q    And I'm going to show you -- I think -- what's been

17   marked as Joint Exhibit 8.  Is this the proof of claim that

18   you just referred to?

19   A    Yes, it is.  It's against Lehman Brothers Holdings Inc.

20   Q    And if you look down one more line can you read the

21   name of the debtor there?

22   A    "Lehman Brothers Special Financing Inc."

23   Q    And I'm going show you right here the claim amount.

24   Can you read that?  The copy is not very good.

25   A    "$47,063,714.01."

1    Q     And where did that number come from?

2    A     That was an estimate by Peter Shapiro of Swap

3    Financial.

4    Q     Are you aware of any errors in that number?

5    A     Yes, that number was calculated on the basis of a

6    scheduled termination date of 2042.  When we gave

7    Mr. Shapiro the reserve fund agreement we failed to give him

8    a copy of the amendment that has been entered into in March

9    of 2003 which changed that date.  So this calculation was

10   based on a termination date of 2042, which was 10 years too

11   long.

12   Q     Has that error since been corrected?

13   A     Yes, we corrected that error and notified Lehman of

14   that error just before we entered mediation a couple years

15   later.  We told them that that error had been made and we

16   corrected the amount of the estimate.

17   Q     So Lehman argued this morning that TSA hired Swap in

18   order to inflate its claim.  Is that true?

19   A     No.

20   Q     So I'm going show you what has been marked as Debtor's

21   Exhibit 99, it was something that came up in Mr. Tambe's

22   presentation this morning.  Do you recognize this email?

23   A     Yes, I do.

24   Q     And who wrote this email?

25   A     I wrote this email.

1    Q    And can you tell me why you wrote this email?

2    A    We had just gotten off of a telephone call in which we

3    had called Lehman and had a conversation with Lehman about

4    trying to agree on a termination amount, and we had listened

5    for about 45 minutes to an extensive reason why -- that

6    Lehman owed us very, very little, and I was very frustrated

7    at that time about what I had heard on that.  And so Peter

8    Shapiro had been on that call and had been doing most of the

9    talking with the representative from Lehman, and so I wrote

10   this letter -- this email to Peter and I was very, very

11   frustrated about what I had heard in that conversation.

12   Q    And why were you frustrated?

13   A    I was frustrated because basically Lehman was the

14   defaulting party in this case, they had broken the contract,

15   and we were getting a lot of -- if I can use the term run

16   around -- about why they didn't owe us any money, and that

17   was very frustrating to me.

18   Q    Now, Mr. Herman, I can see from the date below that

19   this took place in 2010.  You mentioned that this was --

20   this phone call was a part of trying to agree on a

21   termination amount with Lehman?

22   A    Yes.

23   Q    Was that a component of the crystallization process?

24   A    Yes.  We had been receiving offers to buy our claim and

25   we had -- we had looked at those and there were two types of

1    offers that you could do.  One was a crystallized claim,

2    which means there was an agreement between the two parties

3    on the amount of the claim, the termination amount, and if

4    you had a crystallized claim you could be paid more money

5    for somebody that wanted to buy it.

6         If you had an uncrystallized claim those kinds of

7    claims with the right for the buyer of the claim to have

8    recourse back to the seller of the claim in the case that if

9    there was a court decision and the buyer of the claim did

10   not get as much money as they anticipated they could go back

11   and have recourse against the, in this case the TSA to pay

12   them the gap in the money.

13        On a crystallized claim we could sell it without

14   recourse even though we'll take a little bit more of a hit

15   on it.

16        But we explored those options and ultimately gave

17   up on those options after these conversations.

18   Q    And why did you explore those options?

19   A    Well because we were exploring those options because we

20   understood it was going to be several years until we

21   expected to get any money out of going to court if we ended

22   having to do that with Lehman, and our interest was if we

23   could get money earlier we could use it to make turbo

24   payments and try and retire the bonds earlier.

25   Q    So in the course of those discussions about

1    crystallization did I understand your testimony correctly

2    that you had to reach agreement with Lehman on a

3    crystallized amount?

4    A    Yes, we had to agree on what the claim was worth to

5    crystallize the claim amount before the purchasers who were

6    interested in buying it as a crystallized claim.  It just

7    got us a higher amount of money for selling the claim if

8    that was the case.

9    Q    Now you said higher amount of money.  What are we

10   talking about here?  The claim in this case is $38 million.

11   Are we in that ballpark at all with selling the claim?

12   A    No.  No.  The -- if I remember correctly the highest we

13   got in this case was Lehman said that they pay us

14   $4 million.

15   Q    And as far as trying to sell the crystallized claim is

16   that -- is that going to result in some kind of money making

17   endeavor?

18           MS. SAWYER:  Objection, calls for speculation.

19           THE COURT:  I don't understand the question.

20   BY MS. EVANSON:

21   Q    Were you --

22           MS. EVANSON:  I'm sorry, I'll rephrase, Your

23   Honor.

24   BY MS. EVANSON:

25   Q    Were you getting offers on the secondary market?

1    Mr. Tambe insinuated this morning that offers on the

2    secondary market would be a way that TSA could somehow

3    increase or maximize what it was owed over the life of this

4    agreement.  Is that true?

5    A    Well, as I just said, in terms of if we had wanted to

6    sell we would have sold -- tried to sell at a crystallized

7    basis and without recourse to the TSA.

8         In this case the maximum amount that Lehman was

9    talking about in terms of crystallization was $4 million.

10   Our guarantees would have gotten us 45 to 50 cents on the

11   dollar, so that would have taken amount down to $2 million

12   or less, and we were being offered between 10 and 20 percent

13   of what the value of the payment off the claim would be,

14   which means that we would have gotten 10 or 20 percent of

15   less than $2 million in this case and that was worth nothing

16   to us in terms of what we felt a reasonable termination

17   amount was.

18   Q    So claims on the secondary market that means a couple

19   hundred thousand dollars?

20   A    In this case it would have been somewhere between 10

21   and 20 percent of less than $2 million.

22   Q    If you could have reached agreement with Lehman on the

23   crystallization amount?

24   A    Yes.

25   Q    But you were not able do so?

1    A    No.

2    Q    Mr. Herman, let's switch gears a little bit and talk

3    about what has TSA done with the reserve fund since the RFA

4    was terminated in March of 2009?

5    A    We've -- we've kept the reserve fund in the money

6    market fund as provided in the -- in the indenture.

7    Q    In addition to being provided and being the default

8    investment choice under the indenture why else did TSA elect

9    to keep the money in a money market fund?

10   A    We were very concerned about safety and liquidity, and

11   that was the safest place that we could keep it and still

12   have access to it every six months to make payments on the

13   bonds.

14   Q    Did TSA consider any other alternative investments?

15   A    Yes, we did.  We received some offers from members of

16   the finance team, we requested some offers to see if there

17   was a way that we could earn a higher amount on the reserve

18   fund but still meet our safety and liquidity concerns, and

19   so we did look at other options for investment.

20   Q    And what factors did TSA consider in selecting or

21   rejecting alternative investments?

22   A    We considered what kind of a return we could get on an

23   investment which would be better than the money market fund.

24   We considered third-party risk, you know, who was on the

25   other end of the investment.  We considered credit risk for

1    the tobacco area and concerns.  We considered access to the

2    money every six months so we could use it if we needed to to

3    make payments of the bonds.  All of those things were take

4    into consideration when we looked at those offers.

5    Q    Mr. Herman, what's been the impact of Lehman's default

6    on the TSA?

7    A    Well the impact of Lehman's default is that we've -- we

8    haven't, you know, received the approximately $2 million a

9    year that we expected to receive on the investment of the

10   reserves and that means that our turbo payments have been

11   less, and in conjunction with the fact that domestic tobacco

12   consumption has been down, the continued non-payment of the

13   dispute account withholdings, and loss of the income off of

14   the reserve fund the expected payment date of the bonds

15   moved from 2019 out to -- into 2022, 2023 in that area.

16   Q    And what's the impact on this State of Washington?

17   A    Well they lose -- every year that the payment -- the

18   expected termination date moves backwards it's another year

19   that the state doesn't get the 29.2 percent of tobacco

20   settlement revenues that they would like to have for other

21   purposes.

22   Q    And what are those other purposes?

23   A    Well those other purposes continue to be trying to put

24   money into tobacco and other types of health, research,

25   education about keeping people from starting to smoking --

1  start smoking, and to support some of the state programs

2  that pay for health expenses for people that are suffering

3  from health problems caused by tobacco, among other things.

4       MS. EVANSON:  Your Honor, may I have just one

5  moment?

6       THE COURT:  Sure.

7     (Pause)

8  BY MS. EVANSON:

9  Q    Mr. Herman, I just have a few more questions for you.

10       This morning we heard some argument that it was

11  perhaps a benefit to TSA to be relieved of its obligations

12  under the reserve fund agreement.  Did TSA consider being

13  relieved of its obligations to earn no more than 4.484

14  percent on its reserve fund?  Was that a benefit to TSA?

15  A    No, definitely not.

16  Q    Did any time -- at any time did TSA want to get out of

17  the reserve funds or --

18  A    No, we had no -- we had never had an intention of

19  getting out of the reserve fund agreement.

20  Q    TSA wouldn't rather go play the market and invest in

21  some eligible securities?

22  A    No.

23       MS. SAWYER:  Objection, leading.

24       MS. EVANSON:  I'll rephrase it.

25  BY MS. EVANSON:

1    Q    Is TSA able to go out and invest in eligible securities

2    on its own?

3    A    We would -- the only thing we can do is direct the --

4    we can direct the trustee to make an investment that's

5    eligible under the indenture, and -- so that we could make

6    that direction as long as it met the requirements of an

7    investment under the indenture.

8         And the other primary concern obviously is we

9    would have to have the reserve fund available every six

10   months for potential use if we did not have sufficient money

11   to make the plan payment -- or the necessary payment on the

12   bonds.

13         THE COURT:  So, Mr. Herman, let me ask you one.

14         THE WITNESS:  Yes, ma'am.

15         THE COURT:  So is there no higher yielding

16   eligible security that's available to TSA to invest in right

17   now than in money market funds in which under the indenture

18   it's the default investment in the absence of a direction

19   from TSA?

20         THE WITNESS:  We -- we have looked at other

21   investments and we've always looked at them and considered

22   the number of different risks that I had mentioned a minute

23   ago, third-party risk obviously being one since we were

24   invested with Lehman who was a very good third party we

25   thought, but they defaulted.  Return on investment is going

1    to be lower than we were getting in the Lehman agreement,

2    but obviously we could invest at a higher rate than we were

3    receiving from the money market funds.  Safety.  You know,

4    it'd have to be a safe investment.  We would have to -- and

5    safety would be one not putting the principal of the reserve

6    fund at risk in addition to losing the possibility of

7    earnings.  And then liquidity is a big issue because --

8              THE COURT:  I'm afraid --

9              THE WITNESS:  Yeah.

10             THE COURT:  -- I'm going to -- I asked you a very

11   simple question.

12             THE WITNESS:  I'm sorry.

13             THE COURT:  And I'm focusing on the definitions,

14   because that's what your counsel is focusing on.

15             Under the bond indenture there are things called

16   eligible securities.

17             THE WITNESS:  Yes, there are eligible --

18             THE COURT:  And my question is simply --

19             THE WITNESS:  -- investments that we could make at

20   this time, yes.

21             THE COURT:  Thank you.

22   BY MS. EVANSON:

23   Q    And what are the reasons that TSA has decided to stay

24   in the money market fund?

25             MS. SAWYER:  Objection, cumulative.

1          THE COURT:  Objection what?

2          MS. SAWYER:  Cumulative.  We've gone over this

3    already.

4          THE COURT:  Well, I think I opened the door, so I

5    think she's entitled -- Counsel is entitled to ask a follow-

6    up question.

7          MS. EVANSON:  Thank you, Your Honor.  We'll keep

8    it short.

9          THE WITNESS:  Yeah, safety and liquidity concerns.

10   As I started to indicate a minute ago there are a number of

11   risks that we've always looked at as we look at eligible

12   investments, and to date we've always felt that there was

13   either a safety or a liquidity concern, which we did not

14   want to take -- that we did not want to take that risk to

15   get a slightly higher return on the money.

16         MS. EVANSON:  Just one moment.  I think that's all

17   I have.

18         THE COURT:  All right.  Thank you.

19         MS. SAWYER:  Your Honor, we have a binder --

20         THE COURT:  Do you want to take a brief --

21         MS. SAWYER:  -- we have witness binders for

22   yourself --

23         THE COURT:  Okay.

24         MS. SAWYER:  -- and for the witness.

25         THE COURT:  Did you want to take a short break

1    before cross-examination?

2        MS. SAWYER:  Sure.  We can distribute those now.

3        THE COURT:  I'm sorry?

4        MS. SAWYER:  I'm sorry, I have a cold.  We can --

5    if we take a short break we can distribute the witness

6    binders.

7        THE COURT:  Yes, why don't we do that, and we'll

8    enable too witness to take a short break.

9        MS. SAWYER:  Thank you.

10        THE COURT:  You remain under oath, you're not to

11    discuss your testimony with anyone or be in anyone's

12    presence while they're discussing your testimony or the

13    case.

14        THE WITNESS:  Okay.

15        THE COURT:  All right?

16        THE WITNESS:  Yeah.

17        THE COURT:  Thank you.

18      (Recessed at 11:52 a.m.; reconvened at 12:02 p.m.)

19        THE COURT:  Please have a seat.

20        MS. SAWYER:  Your Honor, Lauri Sawyer from Jones

21    Day on behalf of Lehman.

22        THE COURT:  Nothing like having a cold for when

23    you have to --

24        MS. SAWYER:  Absolutely.

25        THE COURT:  -- conduct a trial.

1          MS. SAWYER:  I've got my cough drops and my

2     water --

3          THE COURT:  All right.

4          MS. SAWYER:  -- and we'll do our best.

5     CROSS-EXAMINATION

6     BY MS. SAWYER:

7     Q    Mr. Herman, in connection with the issuance of the

8     tobacco settlement bonds in 2002 Washington TSA established

9     the reserve fund, correct?

10    A    Yes.

11    Q    And the reserve fund contained funds that were set

12    aside in case there weren't sufficient tobacco settlement

13    revenues in order to make the bond payments, right?

14    A    Yes.

15    Q    And in the event of a shortfall in these tobacco

16    settlement revenues the funds could be taken out of the

17    reserve fund in order to make the bond payments, right?

18    A    Yes.

19    Q    And Washington TSA entered into the reserve fund

20    agreement in order to maximize its return on that reserve

21    fund itself, right?

22    A    Yes.

23    Q    And the RFA allowed Washington TSA to have access to

24    its funds every six months?

25    A    It did.

1    Q    But you also understood that the reserve fund agreement

2    presented certain risks for Washington TSA didn't you?

3    A    Yes, we did.

4    Q    Such as the possibility that in the event of

5    termination Washington TSA could be required to make a

6    substantial termination payment to Lehman, right?

7    A    Yes, we understood that.

8    Q    And you understood there would be a time -- there could

9    be a time or a place when TSA could be out of the money

10   under the reserve fund agreement, right?

11   A    Yes.

12   Q    And you also knew that the securities that Lehman was

13   delivering to you, there was a possibility those securities

14   could default, right?

15          UNIDENTIFIED SPEAKER:   (Indiscernible - 02:38:48).

16   BY MS. SAWYER:

17   Q    The securities that were delivered to you, there's a

18   possibility those securities could default?

19   A    Yes.

20   Q    And in that case you'd actually lose part of your

21   reserve fund or all of your reserve fund wouldn't you?

22   A    Yes.

23   Q    Lehman wasn't going make you whole in that was it --

24   were they?

25   A    Not if the securities that we held as collateral if

1    there was a default there I don't believe that it would be

2    done, no.

3    Q    And after Lehman -- after you first heard Lehman filed

4    for bankruptcy the first thing you did was to confirm that

5    the reserve fund was secure, right?

6    A    Yes, what we did is we got the finance team together to

7    try and figure out how -- what position it put us in and

8    figure out what -- where we were under the reserve fund

9    agreement, yes.

10   Q    But you knew that the reserve fund itself was secure?

11   A    We held collateral against the principal amount of the

12   reserve fund, yes.

13   Q    And then you looked at other potential negative

14   ramifications of the Lehman bankruptcy, right?

15   A    Yes.

16   Q    Including the possibility that Washington TSA could owe

17   money to Lehman?

18   A    Yes.

19   Q    And in fact you learned from your financial advisor,

20   PFM, that in fact in September of 2008 they had determined

21   that Washington TSA did owe money to Lehman?

22   A    Yes.

23   Q    And that amount was approximately $1.2 million

24   according to PFM, right?

25   A    Yes.

1    Q     And you found that idea that Washington TSA could owe

2    money to Lehman when Lehman was the defaulting party

3    astounding didn't you?

4    A     Yes.

5    Q     Excuse me.  Now even though PFM had calculated a

6    termination amount being payable by Washington TSA to Lehman

7    you still felt confident that PFM knew how to calculate the

8    termination amount didn't you?

9    A     We -- yes, we wouldn't have asked them to do it if we

10   didn't feel confidence in what they told us.

11   Q     And in fact you believed that they had calculated the

12   termination amount in accordance with the definition of

13   termination amount in the reserve fund agreement didn't you?

14   A     I believe we did at that point, yes.

15   Q     That was your understanding, correct?

16   A     Yes.

17   Q     I'd like you to look -- I hope you have a binder in

18   front of you.

19   A     Yes, I do.

20   Q     Okay.

21   A     A big one.

22   Q     I'd like you to look behind tab 18 of that binder.

23   Have you seen this document before?

24   A     Yes, I have.

25   Q     And this is a summary of this first full conversation

1   you had with your advisors following Lehman's bankruptcy

2   about the consequences on the reserve fund agreement,

3   correct?

4   A    Yes, it is.

5   Q    It reflects the discussion we just talked about?

6   A    Yes.

7        MS. SAWYER:  Your Honor, I'd like to move Debtor's

8   Exhibit 18 into evidence.

9        THE COURT:  Okay.  I thought our convention was

10  that we were going to not be moving as we went along.

11       MS. SAWYER:  Okay, that's fine if that's --

12       UNIDENTIFIED SPEAKER:  That's what I understood.

13       THE COURT:  Right?  I think that was our

14  convention that we adopted yesterday.

15       MS. SAWYER:  Okay.

16  BY MS. SAWYER:

17  Q    If you could turn to the last page in --

18       THE COURT:  But while we're on that point, so part

19  of the convention was that you each are doing your own

20  housekeeping, and at the end we're going to -- we're going

21  to place on the record everything that's going into

22  evidence.  Okay.  Good.

23       MS. SAWYER:  Okay.

24  BY MS. SAWYER:

25  Q    If you could turn to page 3 of the memorandum.

1    A    Okay.

2    Q    In the middle -- approximately the middle of the

3    paragraph it starts by saying, "It was the consensus of

4    those on the phone call ..."  Do you see that?

5    A    Yes.

6    Q    "It was the consensus of those on the phone call that

7    based on current market conditions and legal assessments the

8    Authority should not terminate the agreement and trigger the

9    payment of a termination amount, rather the Authority should

10   wait and see."  Correct?

11   A    Yes.

12   Q    And that's consistent with your memory of what happened

13   on this conversation, correct?

14   A    Yes.

15   Q    You certainly weren't going to terminate the agreement

16   in September of 2008 and pay Lehman $1.2 million were you?

17   A    No.

18   Q    In fact you had no intention of paying any termination

19   payment to Lehman at any time did you?

20   A    Not at that point.

21   Q    And as we saw when we saw Debtor's Exhibit 99 during

22   your direct examination you said it'd be a cold day in hell

23   before you pay Lehman anything, correct?

24   A    I did write that, yes.

25   Q    But you understood the agreements provided that

1    Washington TSA could be out of the money, correct?

2    A    Yes.

3    Q    Meaning that Washington TSA could be required under the

4    contract to pay -- pay a termination amount to Lehman?

5    A    Yes.

6    Q    A substantial termination amount?

7    A    Yes.

8    Q    And going back to the September 19th, 2008 call that

9    you had with your advisors you also took notes of that

10   conference call didn't you?

11   A    Yes, I did.

12   Q    I'd like you to turn to Debtor's Exhibit 17.  If you go

13   to the next page.  And these are the notes you wrote during

14   that -- I'm sorry, are you there?

15   A    Yep.

16   Q    Okay.  These are the notes you wrote during the

17   September 19th, 2008 call?

18   A    Yes, they are.

19   Q    And you wrote -- you wrote on the second page, so the

20   side -- the side on the right, the third bullet down you

21   say, "PFM as rates go up we still owe money to Lehman."  Do

22   you see that?

23   A    Yes.

24   Q    And that meant if interest rates rose PFM still thought

25   that Washington TSA would be out of the money to Lehman,

1    correct?

2    A    Yes.

3    Q    And if you go to the next page at the end you write --

4    I think it says, and you can correct me if it's wrong --

5    "John Bono (ph) comfortable with conclusion given what he

6    heard."  Do you see that?

7    A    Yes, I do.

8    Q    And Mr. Bono was with PFM, Washington TSA's financial

9    advisor?

10   A    Yes.

11   Q    And PFM had been advising Washington TSA since the

12   bonds were issued in 2002?

13   A    Yes.

14   Q    And you asked during this conference call Mr. Bono

15   whether he was comfortable with the conclusion that had been

16   reached on the conference call weren't you?

17   A    Yes.

18   Q    And you asked him because you trusted his opinion

19   didn't you?

20   A    Yes.

21   Q    And as we heard during your direct examination in

22   November 2008 PFM did another valuation of the termination

23   amount, correct?

24   A    Yes, I believe so.

25   Q    And at that time PFM determined that Lehman owed

1    Washington approximately $1.2 million, correct?

2    A    Yes.

3    Q    And so according to PFM the market had moved so that

4    Washington TSA was -- no longer owed any money to Lehman,

5    but instead Lehman owed money to Washington, right?

6    A    Yes.

7    Q    I'd like you to turn to Debtor's Exhibit 25.  Are you

8    there?

9    A    Yes.

10   Q    Okay.  And this is an email forwarded to you from PFM

11   that attached their termination value of the RFA, do you see

12   that?

13   A    Yes, I do.

14   Q    And the email indicates that Lehman now owes

15   $1.2 million approximately to Washington TSA, correct?

16   A    Yes.

17   Q    And Washington TSA got this updated termination number

18   in connection with the November 2008 board meeting of the

19   Washington TSA board, right?

20   A    I believe so, yes.

21   Q    And that board meeting was held earlier than previously

22   scheduled in order to discuss the Lehman bankruptcy, right?

23   A    Yes, it was.

24   Q    And that was the first time you had discussed with the

25   Washington TSA board the ramifications of the Lehman

1   bankruptcy, correct?

2   A    Yes, it was.

3   Q    You don't recall any discussions before that time with

4   the board?

5   A    I don't recall having discussions with people about

6   that, and I know we didn't have a board meeting before that,

7   no.

8   Q    If you could look at Debtor's Exhibit 24 in your

9   binder?

10   A    Twenty-four?

11   Q    Yes.

12   A    Uh-huh.

13   Q    And these are the board minutes of that November 12th,

14   2008 board meeting that we just talked about, correct?

15   A    Yes.

16   Q    And at this board meeting, if you turn to page 3, you

17   gave a presentation to the Washington TSA board regarding

18   the staff recommendations for the TSA reserve fund

19   agreement, correct?

20   A    Yes.

21   Q    And if you turn to page 4 you advised the board that if

22   -- if -- you advised the board "that if the agreement had

23   been terminated about a month ago the Authority would have

24   had to pay a termination fee to Lehman of approximately

25   $1.2 million."  Correct?

1    A    Yes.

2    Q    And that's what you told the board, correct?

3    A    Yes.

4    Q    And according to PFM you continued, "The market has

5    reserved itself and at this point in time Lehman would owe

6    money to the Authority."  Do you see that?

7    A    Yes.

8    Q    And that's what you told the board, right?

9    A    Yes.

10   Q    And then you continued and said, "there's no exception

11   that we could collect the money from Lehman."  Do you see

12   that?

13   A    Yes.

14   Q    And that's what you told the board in November 2008?

15   A    Right.

16   Q    And then you continued and said, "Unless the value to

17   us of the termination payment was large it would not even

18   have a significant discounted value on the secondary market

19   for such obligations."  Do you see that?

20   A    Which paragraph is it in?

21   Q    The same paragraph, the first full paragraph.

22   A    Oh, up there.

23   Q    Third line from the bottom.

24   A    Yes.  Yes, I see it.

25   Q    And that's what you told the board that unless the

1    value of any termination payment was large there wasn't

2    going to be a significant value on the secondary market for

3    you was there?

4    A    No.

5    Q    And your recommendation to the TSA board at this

6    November 2008 meeting was to wait and see what happened.

7    Leave the agreement in place and see what happened, correct?

8    A    Yes.

9    Q    And ultimately the decision of whether or not to

10   terminate the RFA was going to be based upon the market

11   value of any termination payment at the time you decided to

12   terminate it, right?

13   A    That was one of the considerations, yes.

14   Q    And that's what you told the board the decision was

15   going to be based on, correct?

16   A    One of the conditions, yes.

17   Q    There's also discussion at this November board meeting

18   about how the reserve fund would be invested if Lehman did

19   not deliver additional securities in December 2008, correct?

20   A    Yes.

21   Q    And the securities that Lehman had previously delivered

22   were going to mature in December 2008, meaning that

23   Washington TSA would have the full amount of its reserve

24   fund back, correct?

25   A    Yes.

1    Q     And you advised the board at this November 2008 board

2    meeting that you had yet to cross that bridge, correct?

3    A     Yes.

4    Q     That you hadn't decided what you were going to do with

5    the reserve fund if Lehman didn't deliver additional

6    securities, right?

7    A     That's correct.

8    Q     But you offered to consult with any members of the

9    board about investment alternatives for the reserve fund,

10   correct?

11   A     I did, yes.

12   Q     But you in fact didn't have any discussions with any

13   board members about alternative investments for the reserve

14   fund did you?

15   A     No.

16   Q     I'd like you to turn to Debtor's Exhibit 27.  Are you

17   there?

18   A     Yes.

19   Q     Is this the letter that you were referring to in your

20   direct testimony where you indicated the letter was sent to

21   Lehman asking for them to agree to reject the RFA?

22   A     Yes.

23   Q     And if you look at the second paragraph in the middle

24   of that paragraph it says, "At any given point in time LBSF

25   may be either in or out of the money."  Do you see that?

1    A    Yes.

2    Q    And at the time of this letter you believed that LBSF

3    was out of the money, correct?

4    A    Yes.

5    Q    Meaning that Washington TSA was in the money?

6    A    Yes.

7    Q    And so at this point in time Washington TSA believed

8    that it was owed a termination payment of some amount from

9    Lehman, correct?

10   A    Yes.

11   Q    And I believe you testified on your direct examination

12   that Lehman's response to this was asking TSA to waive its

13   claims against Lehman?

14   A    Yes.

15   Q    But wasn't in fact the response from Lehman a mutual

16   waiver of claims?

17   A    I'd have to look at the document, I don't remember.  I

18   remember that they asked us to waive our claims and rights.

19   Q    But you don't remember whether or not it was going to

20   be a mutual waiver of claims?

21   A    No.

22   Q    If you could look at Debtor's Exhibit 28.  Does this

23   refresh your recollection that the response from Lehman was

24   a mutual waiver of claims?

25   A    Yes.

1    Q    And in fact it was an offer of a mutual waiver of

2    claims?

3    A    That's what it says here.

4    Q    And did you ever discuss this offer from Lehman of a

5    mutual waiver of claims with the Washington TSA board?

6    A    We did not discuss it with the board, we discussed it

7    with our -- with the finance team and our legal counsels.

8    Q    But not the board?

9    A    No.

10   Q    You've seen -- switching gears a little bit.  You've

11   seen Swap Financial's outline of services that it intended

12   to provide to Washington TSA in connection with the RFA

13   haven't you?

14   A    Yes.

15   Q    If you could turn to Debtor's Exhibit 34.  And this in

16   fact is a memorandum from Swap Financial that describes the

17   services that Swap Financial was going to perform for

18   Washington TSA in connection with the reserve fund agreement

19   isn't it?

20   A    Yes.

21   Q    And if you look at it you'll see that there's four

22   numbered paragraphs contained in Debtor's Exhibit 34.  Do

23   you see that?

24   A    Yes.

25   Q    And the first numbered paragraph is valuation?

1    A    Yes.

2    Q    And the last sentence of that paragraph talks about the

3    analysis that will be done to value the reserve fund

4    agreement, correct?

5    A    Yes.

6    Q    And then the second numbered paragraph is entitled

7    strategy, right?

8    A    Yes.

9    Q    And it's distinct from the valuation section found in

10   Section 1, right?

11   A    Yes.

12   Q    And the first line of the strategy section says:

13        "In consultation with counsel we will assist in

14   the development of a strategy for making whatever claim

15   against Lehman is warranted with a goal to maximizing

16   Authority's potential financial benefit."

17        Do you see that?

18   A    Yes.

19   Q    So part of Swap Financial's job was to do whatever it

20   could to maximize Washington TSA's claim against Lehman

21   wasn't it?

22   A    Whenever it was warranted.  The warranted being what we

23   were justified in claiming.

24   Q    But a distinct task from the valuation task, correct?

25   A    I would say that -- I wouldn't make that distinction,

1    no.

2    Q    You think they're the same?

3    A    Yeah, I don't think that we were ever trying to

4    maximize beyond what we felt we were warranted or reasonable

5    to receive.

6    Q    And when Swap Financial first determined a termination

7    amount under the reserve fund agreement it was substantially

8    more than any prior determination had been made by PFM

9    wasn't it?

10   A    I believe it probably was probably because the market

11   had changed.

12   Q    Okay.  If you could look at Debtor's Exhibit 40.  You

13   talked about during your direct examination about a motion

14   being made to the Court in connection with the rejection of

15   the reserve fund agreement, correct?

16   A    Yes.

17   Q    And this is a declaration of Peter Shapiro that was

18   submitted in support of that motion, right?

19   A    Yes, I believe so.

20   Q    And if you look at paragraph 7, which is on the last

21   page of Debtor's Exhibit 40, Mr. Shapiro -- are you there?

22   A    Yeah.

23   Q    Mr. Shapiro notes:

24        "As of January 12th, 2009 LBSF was out of the

25   money turned RFA, and if the RFA was terminated on

1    January 12th, 2009 the 'termination amount' owed to TSA

2    under the RFA would be roughly $27.5 million."

3          Do you see that?

4    A   Yes, I see it.

5    Q   Substantially more than any valuation that had been

6    calculated by PFM, correct?

7    A   Yes.

8    Q   And you wanted to get the RFA terminated while

9    Washington TSA was so substantially in the money?

10   A   We wanted to get the RFA terminated when we were in the

11   money, yes.

12   Q   You didn't want to be subject to market fluctuations?

13   A   That's correct.

14   Q   And you also wanted to get the RFA terminated because

15   you were being approached by people that wanted to buy

16   Washington TSA's claim against Lehman at this time weren't

17   you?

18   A   That was one of the options we were exploring, yes.

19   Q   And in order to sell your claim you needed to have a

20   firm termination date, right?

21   A   We had to have a crystallized termination amount.

22   Q   And to do that you had to have a firm termination date,

23   correct?

24   A   We had to have a crystallized termination amount agreed

25   to by Lehman Brothers.  The crystallized amount wouldn't

1  necessarily depend on -- it might depend on how the

2  calculations were done, but we didn't have a set date that

3  we needed to do that.  We wanted to have a crystallized

4  amount.

5  Q    But you had to have an agreed date with Lehman to

6  determine the value, correct?

7  A    That probably would have been part of the

8  conversations, yes.

9  Q    Okay.  And did you get specific approval from the

10  Washington TSA before you filed this motion to compel Lehman

11  to reject the contract?

12  A    I did not.

13  Q    And you believe -- I believe you testified on your

14  direct examination that you believe Peter Shapiro surveyed

15  the market in connection with determining the termination

16  amount, correct?

17  A    Yes.

18  Q    And you understand he did that process twice didn't he?

19  A    That's what I understand, yes.

20  Q    And that as part of that process that Mr. Shapiro did

21  twice he received a number of indicative quotes didn't he?

22  A    He did get indicative quotes, he did not get any

23  actionable quotes, which means that we could not have

24  reinvested or taken any action that would get us a return

25  equal to the indicative quote.

1    Q    But you don't even know the range of indicative quotes

2    that he received did you -- do you?

3    A    I don't remember if they were ever mentioned or not.  I

4    don't recall, no.

5    Q    And I think you believe -- I'm sorry.  I believe you

6    testified on direct that since December 2008 Washington TSA

7    has kept the reserve fund exclusively in money market

8    accounts, correct?

9    A    Yes.

10   Q    And under the indenture there's a variety of eligible

11   investments in which Washington TSA could have invested in,

12   right?

13   A    Yes, eligible investments.

14   Q    Including agencies, treasuries, or commercial paper?

15   A    I believe so, yes.

16   Q    But Washington TSA hasn't invested the reserve fund in

17   any agencies, treasuries, or commercial papers since

18   December 2008 has it?

19   A    No.

20   Q    And Washington TSA has received a number of alternative

21   investment proposals for the reserve fund hasn't it?

22   A    Yes, we have.

23   Q    But Washington TSA hasn't taken advantage of any of

24   those options has it?

25   A    No.

1    Q    And you didn't involve the Washington TSA board in the

2    evaluation of any of those alternative options did you?

3    A    No, we did not.

4    Q    TSA has since refunded the 2002 bonds that relate to

5    the reserve fund agreement hasn't it?

6    A    Yes.

7    Q    If you could turn to Debtor's Exhibit 34.

8    A    Okay.

9         MS. EVANSON:  Your Honor, I just want to object

10    for the record.  There is a motion in limine pending with

11    respect to talking about the refunding.

12        THE COURT:  Right, but -- and we discussed this

13    yesterday, but unless I'm misremembering from this morning

14    there was argument and there was testimony about things that

15    occurred after the termination date.

16        As we discussed yesterday once that door was

17    opened all parties were entitled to walk back and forth

18    through it.

19        MS. SAWYER:  And I believe Mr. Herman testified

20    about the impact of Lehman's bankruptcy and the turbo

21    feature and all of that that occurred well after the --

22        MS. EVANSON:  Fair enough, Your Honor.

23        THE COURT:  All right.

24        MS. EVANSON:  Thank you.

25        THE COURT:  Thank you.

1    BY MS. SAWYER:

2    Q    Are you looking at Debtor's Exhibit 134?

3    A    Oh, 134?  I thought you said 34.

4    Q    I apologize.

5    A    Yes, I am.

6    Q    And this is a press release from the Tobacco Settlement

7    Authority about the refunding of the 2002 bonds, correct?

8    A    Yes, it is.

9    Q    And the refunding of the 2002 bonds created a present

10   value savings -- interest savings for Washington TSA of

11   about $60 million didn't it?

12   A    Yes.

13   Q    And when the 2004 bonds were refunded there was no need

14   to maintain the reserve fund connected to the 2002 bond

15   issuance did it?

16   A    No, we were able to lower the reserve fund.

17   Q    Instead a new reserve fund was created for the new bond

18   issuance, right?

19   A    Yes.

20   Q    You looked at some documents during your direct

21   examination about the negotiation of the reserve fund

22   agreement.  Do you recall those documents?

23   A    Yes.

24   Q    And you weren't involved in any discussions with Lehman

25   as to the terms that should or should not be included in the

1  reserve fund agreement were you?

2  A    I was not directly involved, no.  I did see the -- most

3  of the emails that went back and forth.

4  Q    But you didn't have any discussions with anybody about

5  Lehman -- at Lehman about the terms of the reserve fund

6  agreement?

7  A    No, I did not, no.

8  Q    And you weren't participating in any calls or any other

9  discussions other than the emails you saw about the terms of

10  the reserve fund agreement, correct?

11  A    To be honest I don't remember if I had any

12  conversations with members of the finance team about

13  specific, you know, details of the fund, no.

14  Q    But you didn't have any discussions -- you weren't

15  participating in any discussions with Lehman?

16  A    No, I was not.

17  Q    Okay.  If you could look at Joint Exhibit 2.

18  A    Okay.

19  Q    This is the amendment agreement that you looked at on

20  your direct examination, correct?

21  A    Yes.

22  Q    And in March of 2003 the reserve fund agreement was

23  amended I believe you said to correct the mistake relating

24  to the end date of the reserve fund agreement, right?

25  A    Yes.

1    Q    Changing it from 2042 to 2032?

2    A    Right.

3    Q    No other mistakes were corrected at the time this

4    amendment agreement was entered into, right?

5    A    No.

6    Q    I'd like you to turn to Joint Exhibit 5.

7    A    Okay.

8    Q    Are you there?  And this is the second page of this.

9    And this was a document you looked at on your direct

10   examination?

11   A    Yes.

12   Q    And I believe you testified as to the sixth and seventh

13   lines on -- from Merrill Lynch and Wachovia?

14   A    Yes.

15   Q    You didn't have any discussions with anybody at Merrill

16   Lynch or Wachovia as to the reasons they passed on the

17   bidding process did you?

18   A    No, I did not personally.

19        MS. SAWYER:  Can I have one moment, Your Honor?

20        THE COURT:  Sure.

21     (Pause)

22        MS. SAWYER:  Your Honor, there was a document

23   that's not in the witness binder, so --

24        THE COURT:  Okay.

25        MS. SAWYER:  -- contingency plan A.

1        THE COURT:  That's why you have a contingency

2   planning.

3        MS. SAWYER:  Yes.  Yes.

4      (Pause)

5        MS. SAWYER:  May I approach the witness?

6        THE COURT:  Sure.  Thank you.

7        MS. SAWYER:  It's debtor's in both.

8        THE COURT:  Thank you.  Got her.  Thank you.

9   BY MS. SAWYER:

10   Q    Mr. Herman, I just have shown you Debtor's Exhibit 65.

11   Do you see that?

12   A    Yes.

13   Q    And this is a memorandum prepared by Swap Financial

14   Group on April 21st, 2009 regarding the calculation of loss

15   for TSA's reserve fund agreement?

16   A    Yes.

17   Q    And you've seen this document before haven't you?

18   A    Yes, I have.

19   Q    And if you turn to the last page of this document.

20   A    Yes.

21   Q    There's a section called calculation of loss.  Do you

22   see that?

23   A    Uh-huh.

24   Q    And he calculates -- Mr. Shapiro calculates the loss

25   under the reserve fund agreement as of two dates.  Do you

1    see that?  October 2nd, 2008 and March 25th, 2009?

2    A    Yes.

3    Q    And looking at the October 2nd, 2008 date Mr. Shapiro

4    calculates the loss under the reserve fund agreement as

5    $11,313,217.  Do you see that?

6    A    Yes, I do.

7    Q    And that's during the same time period that PFM was

8    calculating the loss either being one million to Lehman or

9    one million against Lehman, correct?

10   A    Yes.

11   Q    So it wasn't just a market movement that accounts for

12   the differences between PFM's valuation and Mr. Shapiro's

13   valuation is it?

14   A    I don't understand the question.  What do you mean it

15   was -- it wasn't just a market reason?

16   Q    It's not just the market that changes the valuation

17   from Swap Financial's approach to PFM's approach is it?

18   A    Well, I still don't understand the question, but the

19   evaluations are definitely different, yes.

20   Q    Mr. Shapiro considered a lot of other factors other

21   than PFM that PFM did not?

22   A    Yes, I think so.

23   Q    Okay.

24        MS. SAWYER:  I have no further questions.

25        THE COURT:  All right.  Thank you.

1          Redirect?

2          MS. EVANSON:  I just have a few follow-up

3    questions, Your Honor.

4          THE COURT:  Okay.  Are we staying with Lehman's

5    binder?

6          MS. EVANSON:  Yeah, that's fine with me --

7          THE COURT:  Okay.

8          MS. EVANSON:  -- if it's okay with you.  And I may

9    plug myself back in here.

10         THE COURT:  Okay.

11         MS. EVANSON:  Just one moment, please.

12       (Pause)

13   REDIRECT EXAMINATION

14   BY MS. EVANSON:

15   Q    Mr. Herman, if you could turn back to Debtor's

16   Exhibit 24, please, which we looked at.  They were the

17   minutes from that November 12th, 2008 board meeting.

18   A    Yes.

19   Q    And if you look at the bottom of page 4 -- I think I

20   have it pulled up here.  If I can put it on the screen.

21         THE COURT:  What number, Ms. Evanson?

22         MS. EVANSON:  We are on Debtor's Exhibit 24, Your

23   Honor.

24         THE COURT:  Okay.

25         MS. EVANSON:  I'm going to try and make this

1    visible to everyone here.

2           THE COURT:  That's the board of directors'

3    minutes?

4           MS. EVANSON:  It's the board minutes, right.

5    BY MS. EVANSON:

6    Q    And down on page 4 if you look at the bottom paragraph

7    there and you take a minute to read the second half of this,

8    on your cross-examination counsel asked you about the wait

9    and see strategy that TSA had put in place in November of

10   2008.  Can you please look at the last sentence there that

11   starts, "On December 1st ..."

12   A    Yes.

13   Q    Can you read that for me, please.

14   A    It says:

15          "On December 1st Lehman Brothers is obligated to

16   replace the security.  If they fail the replace it, which is

17   likely, we would realize the value and go forward to invest

18   the money."

19   Q    Does the fact that Lehman Brothers had not yet failed

20   to deliver securities, did that factor into the wait and see

21   strategy that TSA adopted at this meeting?

22   A    Yes, it did.

23          MS. SAWYER:  Objection, leading.

24   BY MS. EVANSON:

25   Q    Can you explain to me the factors that TSA considered

1   in waiting and seeing at this point in November of 2008?

2   A    We were concerned about whether or not and we didn't

3   know whether or not Lehman Brothers Special Financing would

4   be able to replace the collateral, they still had the option

5   to do that, which would leave the agreement in place.  That

6   was the major consideration.

7        We were also just waiting to see what else

8   developed with regard to the overall -- you know, Lehman's

9   overall bankruptcies.

10  Q    Mr. Herman, I'm going to jump ahead to a line of

11  questioning.  You talked about alternative investments and

12  whether alternative investments were in fact discussed with

13  the board.  I believe you testified that there weren't any

14  alternative investments that were discussed with the board.

15  Why was that?

16  A    Because we were delegated the -- I was delegated the

17  authority to do -- to take any and all actions necessary to

18  protect the interests of the Tobacco Settlement Authority to

19  monitor the progress of Lehman and the bankruptcies to

20  monitor the market and do whatever I felt was best to -- to

21  guard our interests.

22  Q    Did any board members ever complaint that you were not

23  acting within that delegation?

24  A    No.

25  Q    Did board members ever approach you to ask about

1   alternative investments?

2   A    Not that I remember, no.

3   Q    I want to go back to Debtor's Exhibit 84, which I think

4   I've got here, which is the minutes of the December 9th,

5   2009 meeting.

6   A    Uh-huh.

7        MS. SAWYER:  I'm just going to object.  These

8   weren't covered during the cross-examination.

9        THE COURT:  Is it otherwise within the scope?

10       MS. EVANSON:  It is otherwise within the scope,

11   Your Honor.

12       THE COURT:  How is that?

13       MS. EVANSON:  Well, I can ask him without the

14   exhibit, but --

15       THE COURT:  All right.

16       MS. EVANSON:  -- it is within the scope because it

17   falls within the discussion relating to the mutual waiver of

18   claims.

19       THE COURT:  Okay.  Go ahead.

20       MS. EVANSON:  Okay.

21       MS. EVANSON:  May I publish it?

22       THE COURT:  Go ahead.

23   BY MS. EVANSON:

24   Q    Now you testified on cross that TSA did not agree to

25   enter into a mutual waiver of claims.  And -- I'm sorry, go

1   ahead.

2   A    No, that's -- yes.

3   Q    What considerations does TSA have to take into account

4   when considering whether to enter into a mutual waiver of

5   claims?

6   A    Well we would have to take into account what impact

7   that would have on the future of our payments against the

8   bond issue, how fast the tobacco settlement revenues could

9   be returned to the state, what accountability that the TSA

10  might face with regard to -- you know, from the legislature

11  or other public bodies that would want to know how we acted

12  in this situation.

13  Q    And were those concerns discussed with the board?

14  A    Yes, we did discuss those with the boards.

15  Q    And I'm showing you what's been marked as Debtor's

16  Exhibit 84, which are the board meeting minutes from

17  December 9th, 2009.  If you look down at the bottom of this

18  paragraph I have highlighted it mentions two conditions

19  linked to settling an undisputed claim.  Are these

20  conditions --

21       MS. SAWYER:  I'm just going to object again.  I

22  don't think this has to do with the mutual release of claims

23  that took place in November 2008.

24       THE COURT:  This doesn't -- this doesn't have

25  anything to do with -- this doesn't have to do with the

1   mutual release.

2          MS. EVANSON:  Your Honor, we'll go to another

3   topic.

4   BY MS. EVANSON:

5   Q    Mr. Herman, are there any restrictions on TSA's ability

6   to waive claims?

7   A    You know, I think it would be in terms of waiving

8   claims where we felt we were owed money -- rightfully owed

9   money and under reasonable terms and conditions I think that

10   the board would be acting negligently to do that.

11          MS. EVANSON:  Thank you.  That's all I have.

12          THE COURT:  Okay.

13          MS. SAWYER:  I have nothing further.  Thank you.

14          THE COURT:  Anything more?

15          Mr. Herman, thank you very much.

16          THE WITNESS:  Thank you.

17          THE COURT:  You may step down.

18          So this is our lunch break.  And how long would

19   you like?  It seems to me we're roughly going along

20   schedule.  So we'll do whatever you want to do.

21          MR. TAMBE:  Forty-five minutes, Your Honor.

22          THE COURT:  Forty-five minutes.  So that puts us

23   back here at 1:20; is that right?

24          MR. TAMBE:  Yep.

25          THE COURT:  Did I get that right?

1           MR. LAWRENCE:  Yes.

2           THE COURT:  Okay, 1:20.

3           MS. EVANSON:  Thank you.

4           MR. TAMBE:  Thank you.

5           THE COURT:  Thank you.

6       (Recessed at 12:37 p.m.; reconvened at 1:25 p.m.)

7           THE COURT:  All right, please have a seat.  Ready

8   when you are.

9           MS. EVANSON:  Thank you, Your Honor.  Just one

10  moment.

11      (Pause)

12          MS. EVANSON:  Mr. Cook.

13          THE COURT:  Would you please raise your right

14  hand.

15      (Witness Sworn)

16          THE COURT:  Thank you.  Please have a seat.  If at

17  any time you'd like to have a break or a drink of water

18  please let us know.

19      (Pause)

20  DIRECT EXAMINATION

21  BY MS. EVANSON:

22  Q    All right.  Mr. Cook, could you please introduce

23  yourself for the record.

24  A    Yes.  I'm Robert D. Cook, I'm the senior director of

25  finance at the Washington State Housing Finance Commission

1   and the Tobacco Settlement Authority.

2   Q     Mr. Cook, can you tell me where you to college?

3   A     In 1978 I received a bachelor of science in business

4   administration in accountancy at the University of Missouri

5   at Columbia, and in 1990 I received an MBA from Northern

6   Illinois University.

7   Q     And after you got your bachelor's degree what did you

8   do for work?

9   A     I worked for a CPA firm for two years, I was a

10  controller in cooperative and non-profit organizations for

11  about 15 years, and I've been at the Housing Finance

12  Commission and the Tobacco Settlement Authority since 1996.

13  Q     And what are your roles and responsibilities at the

14  Tobacco Settlement Authority?

15  A     My role is really twofold.  On one hand I am in charge

16  of all of the financial reporting and accounting as in any

17  organization, and on the other side I'm responsible for

18  monitoring the bond issue and help in structuring bond

19  issues.

20  Q     And is your role and responsibility the same at both

21  agencies?

22  A     Yes, it is.

23  Q     And how long have you been in that role?

24  A     Eighteen and a half years.

25  Q     So the entire time you've been at TSA?

1    A    That's correct.

2    Q    Thank you.

3         Mr. Cook, Mr. Herman testified earlier about the

4    TSA board.  Do you interact with the TSA board?

5    A    I do generally at board meetings, which are usually

6    twice per year, I present financial statements and other

7    memos and things that are appropriate to the business of the

8    Authority at this time.

9    Q    I want to shift gears a little bit and go to 2002 at

10   the time of the bond issue.  Can you explain your role, if

11   any, in the 2002 issue?

12   A    As I mentioned earlier, when we structure bond issues I

13   am involved at a high level in reviewing documents' terms

14   and conditions, the ones that specifically were very

15   interested in making sure that are followed through, work

16   with bond counsel, financial advisors, and others of our

17   finance team to insure that we have a good transaction.

18   Q    I'm showing you what's been previously marked as Joint

19   Exhibit 4.  Do you recognize this document?

20   A    I do.

21   Q    And what is this?

22   A    This is a bid prepared in October of 2002 by Public

23   Financial Management, our financial advisor, to bid a

24   reserve fund agreement as part of the 2002 bond transaction.

25   Q    And were you involved in the preparation of this bid

1    document?

2    A    I reviewed various versions of this bid document.

3    Q    In conjunction with PFM?

4    A    That's correct.

5    Q    If we move to page 2 I would like to walk you through

6    some of these terms and conditions that we didn't get into

7    in detail before.

8         Looking at the first page can you tell me what

9    provisions were the most important to TSA in the bid

10   document?

11   A    There are a number that are very important.

12        First of all some of them would be summarized by

13   saying that it had to meet the terms of a qualified

14   investment on the terms of the indenture, it had to be

15   highly rated, the dates, amounts, and so on were very

16   important, and finally we did ask for the bid on two basis,

17   one of which would have had a par termination in the case of

18   early termination and one of which would have a market

19   termination.

20   Q    Can you explain a little more.  What's the difference

21   between a par termination or a par break and a market break?

22   A    Well in the event that the bonds were paid off early

23   and because this was structured as a turbo transaction we

24   anticipate that the bonds pay off early we had the option of

25   having a full call at par, that is neither party would have

1   a gain or a loss, or the other option would be that we would

2   do a market valuation at the time the agreement ended and a

3   market adjustment would be paid to the party to which it was

4   due.

5   Q    What was the significance -- what was the significance

6   of -- of getting a fixed rate?

7   A    We asked for a fixed rate because the rate of the bonds

8   was fixed and we wanted to match that so that we knew

9   exactly how the impact would affect the cash flows and the

10  bond so it would be more easily structured.

11  Q    I want to scroll to the next page.  Can you tell me

12  which provisions on this page were particularly important to

13  the TSA?

14  A    Again the rating is important and it's noted by who was

15  eligible to bid.  The fact that the securities would be

16  posted with the trustee as collateral and would be due every

17  six months when bond interest and principal payments were

18  due.  And then a delineation of the eligible securities is

19  there as well.

20  Q    And turning to the next page.  If you could look at

21  point 19 there.  Can you explain what's a mandatory clean up

22  call?

23  A    Briefly referenced earlier is the fact that we

24  anticipated and structured this transaction so that it would

25  be paid earlier than its scheduled maturity, and we were

1    using any and all proceeds that we received both from the

2    TSRs and interest and other -- any other interest or money

3    that we would receive to pay off bonds as quickly as

4    possible.  Therefore we had to have the ability to end the

5    transaction when we had enough money to pay everything off.

6    Q    And ending the transaction you mean paying off the

7    bonds?

8    A    That's correct, paying off the bonds.

9    Q    If you look at the next page of the bid document, which

10   is two more pages down, point number 26, what does that

11   mean, replenishment?

12   A    Replenishment would only occur in the case that the

13   Tobacco Settlement Authority had to call on the liquidity

14   reserve, and the provision that's there shows that we would

15   have 12 months to reinvest up to the amount of the agreement

16   without any penalty or termination of the agreement.

17   Q    So does that mean if for whatever reason TSA had to dip

18   into the reserve fund the agreement stayed in tact?

19   A    That's correct.

20   Q    Mr. Cook, what was the end date of the RFA?

21   A    The end date in the bid was set to match the end date

22   of the bonds, which was 2032.

23   Q    And you mentioned the turbo structure earlier.  Can you

24   explain if the TSA had an expectation that the bonds would

25   be paid off sooner?

1   A    Yes.  Cash flows at the time that we did the

2   transaction we anticipated that the bonds would be fully

3   repaid by 2019.

4   Q    And why did you anticipate that?

5   A    Because again we were receiving more revenue and had

6   budgeted to receive more revenue than was necessary to pay

7   the scheduled maturity, and by paying the bonds off as

8   quickly as possible with all resources we would minimize the

9   cost to the State of Washington.

10  Q    How did TSA determine the rate at which the bonds were

11  being paid off?

12  A    We had actual evidence as we got into the transaction

13  and we could see the amounts of money that we received from

14  the -- of the TSRs and how much we were able to pay, so we

15  had a known piece, and then after that we asked both our

16  financial advisor and our bond underwriter at various times

17  with new information to project what the repayment structure

18  was going to be.

19  Q    And how did those -- how did your financial advisor --

20  was that PFM?

21  A    Yes.

22  Q    And your bond underwriter was that --

23  A    Barclays.

24  Q    -- Barclays?  Barclays.  How did they provide you that

25  information?

1    A     Usually in a written memo.

2    Q     I want to show you what's been marked as TSA Exhibit S.

3    And this copy is not very good so I do have a demonstrative

4    I'll use on the screen that just makes it a little bit

5    brighter.  But is this one of those memos you were just

6    referring to?

7    A     Yes, this is one prepared by PFM, and it's dated

8    November 23rd, 2009.

9    Q     Who is Roen Blacker (ph)?

10    A     Brone (ph) Blacker is a principal at our local office

11    of Public Financial Management.

12    Q     And I see that you are on the cc line.  Do you recall

13    receiving this memo?

14    A     Yes, I do.

15    Q     And did you receive these periodically in the course of

16    your work as the finance director?

17    A     Yes.

18    Q     So, I'm going to show you what is a blow up of that

19    chart down at the bottom.  Oops and that's not it.  There it

20    is.  This is A chart that just added color to that poor copy

21    that you saw before.  Can you generally describe to me what

22    is this chart depicting?

23    A     This chart is depicting various expected payoff dates

24    under scenarios, the top line of which is the original

25    projected base case at the time of the bond issuance and

1    then others that were modified over time.

2    Q    And so that gray line on top, is that the original

3    projected case?

4    A    Yes, that's correct.

5    Q    The next line down, the green line, where it says

6    "Current modified projections."  What does that mean?

7    A    That means based upon information that was available at

8    the time that this memo was prepared and the deficiency in

9    receipts that we had had a new revised projection of how the

10   bonds would be paid off, and it shows that at the time of

11   this memo the expected payoff date was about 2023.

12   Q    I'm going to go back to the poor copy of this memo and

13   go -- oops, sorry -- and go to page 2.  And can you look at

14   the section I've highlighted here that says, "Reinvestment

15   assumption," and just read those two sentences for me?

16   A    "The reinvestment rate is assumed to be one percent for

17   all funds held under the trust indenture.  This relatively

18   conservative assumption reflects the low investment

19   opportunities currently available to the Authority."

20   Q    So what's your understanding of that statement?

21   A    Again, as of this date the financial markets and

22   reinvestment opportunities were diminished and rates were

23   much lower than they had been historically.

24   Q    Was TSA actually receiving one percent on its reserve

25   fund at this point in 2009?

1   A    No, we were receiving significantly less, about 20

2   percent of that amount, as I recall.

3   Q    I'm going to show you now what's been marked as TSA

4   Exhibit T.  Can you -- do you recognize this document?

5   A    I do.

6   Q    And do you -- can you generally explain what it is?

7   A    It's a similar memo to the one we saw before; however,

8   this one was provided by Barclays Capital, and it's dated

9   June 8th of 2011.

10   Q    And do you recall receiving this?

11   A    I do.

12   Q    I'm going to again do a blow up of this black and white

13   chart here to add color to it.  Can you describe this chart

14   to me?

15   A    As before the top line shows the original projection

16   with the estimated final pay off of 2019, a new projection

17   based upon ISH Global Insight's latest forecast in terms of

18   the smoking rates, that's the yellow line, and that shows a

19   pay off of about 2024, and some other alternatives with

20   additional declines in smoking rates.

21   Q    So going back to Exhibit T, I'm going to look at the

22   second page again, and can you read what that says right

23   there?

24   A    "The reinvestment rate is assumed to be .2 percent for

25   all funds held under the trust indenture.  This conservative

1    assumption reflects the low yielding investment

2    opportunities currently available to the Authority."

3    Q    And was this the opinion of Barclays at this time?

4    A    Yes, it was.

5    Q    And was TSA receiving .2 percent on its reserve point

6    at this point in 2011?

7    A    We were receiving less than that.

8    Q    So is it fair to say that the bond payoff date was

9    getting later as time went on?

10    A    Yes, that's correct.

11    Q    And what's your understanding of why that was the case?

12    A    A number of factors contributed to that.

13        First of all the rate of smoking was going down

14    more quickly than it was originally determined, there were

15    withholdings of TSRs by participating manufacturers, they

16    were posting some of their payment into escrow until

17    arbitration was settled on a point as to whether the states

18    were effectively enforcing its non-smoking agreements as per

19    part of the master settlement agreement, and we were

20    receiving interest earnings significantly less than the

21    $2 million a year that we had anticipated on the reserve

22    fund agreement.

23    Q    Mr. Cook, I want to change gears a little bit and talk

24    about Lehman's default.  So immediately after Lehman's

25    default what did TSA do?

1    A    The guarantor entity was the one that defaulted in

2    September of 2008, and soon thereafter, within a few days,

3    we gathered key members of our finance team, including the

4    financial advisor, Public Financial Management, and our

5    attorneys at K&L Gates to discuss what the impact of the

6    bankruptcy of that guarantor would be on the Tobacco

7    Settlement Authority.

8    Q    And do you recall those conversations?

9    A    I do.

10    Q    Was PFM involved in those meetings?

11    A    Yes.

12    Q    And did PFM, to your recollection, provide an initial

13    evaluation of the termination amount?

14    A    Yes, an initial indication was that it was possible

15    that the Tobacco Settlement Authority owed Lehman Brothers

16    about $1.2 million as of that time.

17    Q    Was that in September?

18    A    That is correct.

19    Q    Did you ever ask -- did you ever engage PFM to provide

20    a calculation -- a formal calculation of the termination

21    amount to be submitted in this matter?

22    A    No, we did not.

23    Q    And moving to December of 2008, did you reach out to

24    Peter Shapiro?

25    A    I did, by email.

1    Q    And why did you do that?

2    A    At that point in time we knew that first of all the

3    provider entity had gone bankrupt in October, collateral

4    that was held by the trustee on December 1st was not

5    reposted so that there was a failure of the party to perform

6    there.  We had had discussions in our internal staff

7    meetings about finding someone to value what our claim might

8    be since this valuation more closely resembled a valuation

9    on a swap.  And we were looking for somebody other than our

10   financial advisor, PFM, who had been involved in helping us

11   structure the transaction and bidding the transaction.

12   Q    Why did you want someone other than PFM?

13   A    Because they had been involved from the very beginning.

14   Q    Were you -- what was your concern about that?

15   A    We wanted an independent third party.

16   Q    Mr. Cook, what did you ask Peter Shapiro to do?

17   A    At that time we asked that he -- if he would be

18   interested in helping us evaluate the true cost and loss of

19   the Tobacco Settlement Authority in its claim.

20   Q    And what was your perception of the market during those

21   days?

22   A    Obviously the --

23        MS. SAWYER:  Objection, vague.

24        THE COURT:  You can answer.

25        THE WITNESS:  Obviously the market from September

1   the Lehman Brothers bankruptcy up and through that time had

2   been very turbulent, there were a number of issues going on

3   in the financial markets, credit was dramatically tightened,

4   banks and their solvency were questioned, and there were

5   concerns in the financial markets that reverberated

6   throughout the world.

7   BY MS. EVANSON:

8   Q    Mr. Cook, I want to change gears a little bit and ask

9   you about what has been done with the reserve fund since

10  Lehman's default.  How has the reserve fund been invested?

11  A    Since the default, it has been invested in a money

12  market fund.

13  Q    Has it always been in the same money market fund?

14  A    No, it has not.  It's been in two different funds.

15  Q    I want to show you what's been marked as Joint

16  Exhibit 7.  Let me blow it up a little bit and see if you

17  can read it.  Let's see.  Can you see that?

18  A    Yes.

19  Q    Okay.  Do you recognize this email?

20  A    Yes, it's an email that I sent to Kim Herman and other

21  staff at the Authority.

22  Q    And what was the purpose of this email?

23  A    It was to talk about some reinvestment options as of

24  June of 2009.  We had the trustee provide us with some

25  investment options.  We had been in the First American prime

1  obligations money market fund, which was offered by the

2  trustee, U.S. Bank.

3      We also had funds in the Housing Finance

4  Commission entity in the prime, Fidelity prime money market

5  fund, a AAA fund.  Was yielding considerably more at that

6  time.  There were some other fixed rate options that were

7  all pretty low, except a commercial paper and a foreign bank

8  that was in a similar rate as the current money market fund.

9  Q    If you look down toward the bottom, in the last

10  paragraph, you stated -- let's see.  There you go.  "With

11  rates so low, I'm hesitant to chase rates and money

12  markets."  What did you mean by that?

13  A    Administratively, we have a small staff, and we do this

14  -- or we monitor and provide staffing to this transaction at

15  the minimal cost that we can.  We don't have an active

16  management strategy or persons to do that on-hand.  So I

17  don't want to be looking at investments or having my people

18  take their time to look at various investments over time.

19  Q    Now, I believe you testified earlier that you are the

20  finance director for both the Washington State Housing

21  Finance Authority and TSA.  How much of your personal time

22  or how much of your FTE time is dedicated to the TSA?

23  A    As I recall, only about two percent of my time.

24  Q    Just before the last paragraph here, there's a note

25  that says, "Finally Roen Blacker and I chatted about this

1    issue, and he's going to pull their asset management group

2    to see if they have any ideas."  Do you recall did Roen

3    Blacker come up with any ideas?

4    A    I don't recall anything.

5    Q    Mr. Cook, other than money market accounts, did TSA

6    consider other alternative investments for the reserve fund?

7    A    We had received a number of proposals from various

8    groups over the years to do different kinds of investments

9    with our reserve fund.

10   Q    Can you generally describe what those were?

11   A    Many of them were uncollateralized kicks that we were

12   not able or going to enter into, especially given our

13   experience with the need to have collateral on-hand in the

14   case of an event.  And many of the others did not meet the

15   terms of the indenture.  Some were longer term than we could

16   have so that there might be market risk so that every six

17   months, we would not have the total amount of the reserve

18   fund liquid, which was a requirement of the indenture.

19   Q    Did you discuss any of the potential options you just

20   described with the board?

21   A    No, not with the board.  We had some brief internal

22   discussions after each one.

23   Q    Did you get recommendations from anybody else about

24   reinvestment?

25   A    Yeah, I don't recall.  I mean, as I said, we did

1    receive some proposals from time to time.

2    Q    Did Peter Shapiro give you a proposal about

3    reinvestment?

4    A    Yes, he did, actually, and it was a structured

5    investment that had three different parts, and one of those

6    was a swap component that would be variable, and we were

7    concerned about the mark-to-market risk on that.

8    Q    Is that why you didn't pursue the options that Peter

9    discussed?

10    A    That and also the term, the length of the term and so

11    on.

12    Q    Why didn't TSA just go into the market and buy

13    treasuries or agencies every six months?

14    A    During this time, treasuries actually were yielding in

15    many cases less than what the money markets were, because

16    they reacted more quickly to the market changes than the

17    money markets did.  And again, there was the complication

18    factor of not having staff on-hand to do these kinds of

19    transactions and trades.

20    Q    Mr. Cook, what's the current rate on TSA's money market

21    account?

22    A    .001 percent.

23    Q    Has TSA calculated the amount of lost interest caused

24    by the Lehman's breach?

25    A    We have.

1   Q    Is that something that you do in the regular course of

2   your work as finance director?

3   A    I do those kinds of calculations.  I usually don't have

4   a loss that I need to calculate.

5   Q    Did you put these calculations into a spreadsheet?

6   A    I did.

7   Q    I'm going to try to show you on this thing here what

8   has been marked as TSA Exhibit B.

9   A    Can you turn a quarter turn?

10  Q    Yeah, I'm sorry.  Is this the first page of the

11  spreadsheet I just told you about?

12  A    Yes, that is.

13  Q    And can you describe generally what that calculation is

14  you're making here?

15  A    From the date of the breach of the agreement, I started

16  taking the amount of money market interest that we earned

17  backing into what the actual rate of return was, compared

18  those earnings to the amount that we would have -- or these

19  are just the earnings, yes, that we received on that.

20  Q    I'm going to show you the other path of that same first

21  stage if the whole thing had been printed out.  Can you see

22  that?

23  A    Yes.

24  Q    And what do these amounts here represent?  What is this

25  calculation?

1    A    This represents as of the date of this, which is 9/30

2    of '13, the reserve fund agreement would have provided us

3    with $9,868,000 of earnings and that we had actually earned

4    during that time, $400,000.

5    Q    Mr. Cook, what's the impact of these losses on the TSA?

6    A    The major impact is the longer the bonds are going to

7    be at higher interest costs and a delay in getting the

8    reserve stream back to the state of Washington.  Again, that

9    $2 million a year was used to pay down bonds.  So there was

10   not only the lost interest, but there was the lost

11   opportunity costs of paying high-rate bonds off that were

12   yielding between six and seven percent.

13        MS. EVANSON:  Your Honor, may I have just a

14   moment?

15        THE COURT:  Sure.

16        MS. EVANSON:  That's all I have for this witness.

17        THE COURT:  Okay.  Thank you.

18        MS. SAWYER:  Your Honor, I have a witness

19   (indiscernible - 00:26:49).

20      (Pause)

21   CROSS-EXAMINATION

22   BY MS. SAWYER:

23   Q    November 2008, you asked PFM to determine what the

24   termination amount would be if the RFA were terminated in

25   November of 2008, correct?

1    A    We asked for an indication of what the amount might be.

2    Q    And you reached out to PFM for that?

3    A    Yes, we did.

4    Q    And they gave you a valuation at that time showing that

5    Lehman would now owe Washington TSA approximately $1.2?

6    A    That's correct.

7    Q    If you could turn to Exhibit 25 in your binder.  Is

8    this a copy of the valuation you received from PFM in

9    November 2008?

10   A    Yes, it is.

11   Q    And you contacted Mr. Shapiro in December 2008,

12   correct?

13   A    That's correct.

14   Q    And he prepared an outline of services that he intended

15   to provide to Washington TSA at that time?

16   A    That's correct.

17   Q    If you could turn to Exhibit 34 in your binder.  And

18   this is the outline of the services that he provided to you,

19   correct?

20   A    Yes.

21   Q    And, in fact, the memorandum's addressed to you,

22   correct?

23   A    It is.

24   Q    And, if you look at paragraph 2 of Debtor's Exhibit 34,

25   you see that one of the tasks Mr. Shapiro is going to

1    perform is to assist in the development of a strategy for

2    making whatever claim against Lehman is warranted with the

3    goal to maximizing the Authority's potential financial

4    benefit.  Do you see that?

5    A    I do.

6    Q    And that's consistent with the direction that you gave

7    to Swap Financial to make the Tobacco Settlement Authority

8    whole, isn't it?

9    A    It is, because we had to make sure that the state

10   citizens were not harmed by the lack of getting a full

11   settlement.

12   Q    And, in order to be made whole, you needed to maximize

13   the claim against Lehman, correct?

14   A    We needed to maximize the correct amount of the claim

15   in the guidelines of how it was to be calculated.

16   Q    And that's how you would be made whole, correct?

17   A    That is correct.

18   Q    And, in Debtor's Exhibit 34, that's not the first

19   proposal from Swap Financial regarding services that they

20   were going to provide to Washington TSA in connection with

21   the reserve fund agreement, was it?

22   A    I don't specifically recall.

23   Q    Do you recall that Mr. Shapiro had initially proposed

24   to help Washington TSA replace its reserve fund agreement in

25   December 2008?

1 A  That very well could have been, yes.

2 Q  Okay.  If you could turn to Debtor's Exhibit 35.  You

3 there?

4 A  Yes.

5 Q  This is an email exchange among you, Washington TSA

6 staff members, and Mr. Shapiro.  And, if you look at the

7 bottom of the first page, continuing on the second page,

8 there's an email from you to Mr. Shapiro.  Do you see that?

9 A  Yes.

10 Q  And, in the last paragraph of that email, you note,

11 "Any possible replacement process for the agreement is down

12 the road and will have to be undertaken once we have a

13 defendant of settlement."  Do you see that?

14 A  I do.

15 Q  And is that consistent with what you told Mr. Shapiro

16 at that time, that the replacement process would be down the

17 road?

18 A  It is.

19 Q  And it's your understanding that Mr. Shapiro polled the

20 marketplace in order to see if he could get market

21 quotations for the reserve fund agreement?

22 A  That is my understanding.

23 Q  And, when he polled the marketplace, he was able to get

24 some indicative rates?

25 A  As I understand, he did get an indicative rate.

1    Q    But you don't know what that rate was?

2    A    I do not.  It was not actionable.

3    Q    But you don't know what the rate was?

4    A    I do not.

5    Q    And you don't know when Mr. Shapiro conducted that

6    process, do you?

7    A    It was shortly before we had that discussion.  I don't

8    remember exactly what the dates were.

9    Q    You don't know even what year it was?

10   A    Without referring to these things, I would have to say

11   it was in the 2008.

12   Q    And, in December of 2008, the securities that Lehman

13   had previously delivered to Washington TSA matured, didn't

14   they?

15   A    They did.

16   Q    And, at that point, Washington TSA had the principal

17   intact of its reserve fund, right?

18   A    We had the principal intact in our reserve.

19   Q    And, since that time, as you testified on direct, the

20   reserve fund's been held in just money market accounts,

21   correct?

22   A    That's right.

23   Q    If you could turn to Debtor's Exhibit 108.  Do you see

24   it?

25   A    Yes.

1    Q    And this is an email exchange between you and Deborah

2    Kirkendall (ph) at U.S. Bank.  She's the trustee, correct?

3    A    That's right.

4    Q    And she's checking in with you to see if you wanted to

5    make any investments with the reserve fund in 2011, doesn't

6    she?

7    A    Yes.

8    Q    And you respond to her that, "Not right now.  Let's

9    just leave them in the money market.  We're trying to work

10   on a longer term strategy," don't you?

11   A    That's correct.

12   Q    And, since Lehman's bankruptcy, you haven't entered

13   into any other investment agreements relating to the reserve

14   fund, have you?

15   A    We have not.

16   Q    But you have received a number of alternative

17   investment proposals?

18   A    We have received proposals that did not meet the terms

19   of the indenture and were not acceptable to the staff to

20   recommend to the board.

21   Q    And it's your role, as the senior director of finance,

22   to evaluate these opportunities along with the staff, isn't

23   it?

24   A    That's correct.

25   Q    Okay.  And you also, aside from you said not meeting

1   the terms of the indenture, there were concerns about them

2   not providing enough return in connection with the risks you

3   might be taking on, correct?

4   A    The nominal amount of increase in earnings was not

5   significant compared to the money market rates at that time

6   for those that might have been eligible.

7   Q    So they weren't paying enough?

8   A    That's correct.

9   Q    And you were also concerned about the interest rate

10  environment at the time you were getting the proposals,

11  weren't you?

12  A    That's correct.  Some of proposals locked us in for a

13  longer term, and, at that point in time, many of us thought

14  interest rates would go up.

15  Q    And you, in fact, expected interest rates to rise.  So

16  you didn't want to lock Washington TSA into some

17  artificially low rate, did you?

18  A    That's correct.

19  Q    You wanted an investment that, over the life of it,

20  would actually exceed where interest rates were expected to

21  go, right?

22  A    We wanted to maximize the amount of interest that we

23  could earn.

24  Q    I'd like to look at some of these specific proposals

25  with you.  So if you could turn to Debtor's Exhibit 20.

1    A    Okay.

2    Q    And this is an email from Barclay's to Mr. Kim Herman

3    that Mr. Herman forwards on to you.  Do you see that?

4    A    I do.

5    Q    And it would have been in the regular course of your

6    business to have Mr. Herman forward a proposal like this for

7    your evaluation, wouldn't it?

8    A    Yes.

9    Q    And you did not pursue this GIC (ph) that's being

10   referred to in Kim Arnan's (ph) email, did you?

11   A    At that point in time, the reserve fund agreement was

12   still in effect.

13   Q    And so, you didn't investigate this GIC at that time?

14   A    So we did not, because we were also very concerned at

15   that point in time there was much disruption in the markets,

16   and going into anything else at that point in time was not

17   something we would have considered.

18   Q    Could you turn to Debtor's Exhibit 105?

19   A    105?

20   Q    Yes.

21   A    Okay.

22   Q    And this is an email exchange from John McCarthy, of

23   the Grant Street Group, to you, isn't it?

24   A    Yes.

25   Q    And you know John McCarthy, don't you?

1    A    I do.

2    Q    And you know the Grant Street Group, right?

3    A    I do.

4    Q    And they have a propriety of bid platform for placing

5    investment agreements?

6    A    That's correct.

7    Q    And you had talked to him about getting some rate

8    indications for investment alternatives for Washington TSA?

9    A    That's correct.

10   Q    And, in Debtor's Exhibit 105, Mr. McCarthy's providing

11   you with those rate indications, isn't he?

12   A    Yes.

13   Q    And if you turn to the second page of Debtor's Exhibit

14   105 -- are you there?

15   A    Yes.

16   Q    Okay.  There's a number of investment rate indications

17   being provided there, correct?

18   A    Yes.

19   Q    And all of these are significantly higher than what

20   Washington TSA was earning in its reserve fund money market

21   account at this time, right?

22   A    That's correct.

23   Q    But, nonetheless, you dismissed all these investment

24   opportunities?

25   A    None of these met the terms of the indenture.

1   Q   And did I hear you correctly on direct examination that

2   a GIC was not permitted under the indenture?

3   A   You did not.

4   Q   Okay.

5   A   A GIC is permitted but only if it met certain rating

6   requirements.

7   Q   Okay.  So a GIC, a guaranteed investment contract, is

8   permitted under the indenture if it meets certain

9   requirements?

10   A   If it meets the requirements of the eligible

11   investments in the indenture.

12   Q   Okay.  And you discussed these rate indications we see

13   in Debtor's Exhibit 105 with Mr. Herman, didn't you?

14   A   Yes.

15   Q   If you could turn to Debtor's 106.  And this is, in

16   fact, the email exchange you had with Mr. Herman regarding

17   Debtor's Exhibit 105, isn't it?

18   A   It is.

19   Q   And it would have been in your regular course of

20   business at Washington TSA to discuss this with Mr. Herman,

21   correct?

22   A   It would.

23   Q   And you point out to Mr. Herman that even the

24   collateralized GICs are significantly above the money market

25   and other current options, don't you?

1   A    That's right.

2   Q    But, nonetheless, you still don't explore any of those

3   options?

4   A    That's right, because the underlying were BBB.  We

5   weren't interested in taking that much credit risk.

6   Q    If you could turn to Debtor's Exhibit 109.  Are you

7   there?

8   A    Yes.

9   Q    This is a memorandum from Barclay's Capital to

10  Washington TSA dated November 2011 proposing an investment

11  alternative to Washington TSA, isn't it?

12  A    That's correct.

13  Q    And Washington TSA didn't enter into this proposed

14  investment opportunity, did it?

15  A    We did not.

16  Q    If you could turn to Debtor's Exhibit 22.

17  A    Okay.

18  Q    This is a memorandum from PFM dated November 11th,

19  2008.  Do you see this?

20  A    I do.

21  Q    In the regular course of your business at Washington

22  TSA, you would have reviewed this memorandum?

23  A    Yes.

24  Q    And this memorandum's discussing reinvestment strategy

25  for the reserve fund.  Do you see that?

1    A    Can you point me to that section?

2    Q    In the first paragraph, it says, "Our objective in

3    preparing this memorandum is to assist the Washington

4    Tobacco Settlement Authority with identifying an optimal

5    reinvestment strategy for the reserve fund."  Do you see

6    that?

7    A    Yes.

8    Q    And this is before Lehman did not deliver additional

9    securities in December 2008, correct?

10   A    That's right.

11   Q    But yet, at this point, you're also -- you're speaking

12   with PFM about potential reinvestment strategies for the

13   reserve fund, right?

14   A    We were evaluating all possible contingencies at that

15   time.

16   Q    And talking to PFM about it?

17   A    Yes.

18   Q    And, even Mr. Shapiro was concerned that Washington TSA

19   should be getting a better return on its reserve fund than

20   it was, wasn't he?

21   A    You'd have to ask Mr. Shapiro.

22   Q    In fact, Mr. Shapiro proposed some investment

23   alternatives to Washington TSA for its reserve fund?

24   A    He did.

25   Q    And if you could turn to Debtor's Exhibit 111.

1    A    Okay.

2    Q    And this is a memorandum from Swap Financial Group and

3    Mr. Shapiro relating to the reinvestment of TSA's reserve

4    fund, isn't it?

5    A    Yes.

6    Q    And you had asked Swap Financial to prepare this

7    analysis, didn't you?

8    A    Yes.

9    Q    And, in response to your request, you received Debtor's

10    Exhibit 11, right?

11    A    Yes.

12    Q    And it was directed to you?

13    A    Yes.

14    Q    And then, if you turn to the third page of Debtor's

15    Exhibit 111, Mr. Shapiro is proposing a three-tranche

16    investment strategy.  Do you see that?

17    A    I do.

18    Q    Which would give Washington TSA an average yield of

19    approximately 2.6 percent?

20    A    Yes.

21    Q    But Washington TSA didn't pursue the strategy outlined

22    by Mr. Shapiro, did it?

23    A    We did not, because it involved a variable rate or a

24    swap portion of a significant amount of this.  We were

25    concerned that a market valuation would make the reserve

1    fund less than whole at a date at which we might need to

2    call on it.

3    Q    You were also concerned about being locked into a long-

4    term strategy providing for only 2.6 percent return, weren't

5    you?

6    A    Again, we all felt that interest rates were going to be

7    rising, and we did not want to make a long-term commitment

8    to rates at that time.

9    Q    And Washington TSA considered selling its claim against

10   the Lehman estate to a secondary purchaser, didn't it?

11   A    If we had a crystallized claim, we had considered it.

12   Q    And you knew, in the connection with any such sale,

13   there'd be a discount, correct?

14   A    Yes.

15   Q    Would you turn to Debtor's Exhibit 81?

16   A    Okay.

17   Q    And this is a memorandum from you to the Authority

18   members.  Do you see that?

19   A    I do.

20   Q    And the Authority members is the TSA Board?

21   A    It is.  They are.

22   Q    And you prepared this memorandum?

23   A    Yes, I did.

24   Q    And, if you look at the second page of Debtor's Exhibit

25   81, it discusses -- it says, "In pursuing our claim, we have

1   two options." Do you see that?

2   A    Yes.

3   Q    And one option is to continue to do nothing and

4   continue with the bankruptcy process, and the other option

5   is to try to sell the claim. Do you see that?

6   A    Yes.

7   Q    And the recommendation on page 3 of your memorandum is

8   to pursue a crystallization process and putting the claim

9   out to bid on a non-recourse basis, correct?

10  A    Right.

11  Q    And, in fact, that's what the TSA Board agreed to do?

12  A    At that time, that's correct.

13  Q    And you went through the spreadsheet with Ms. Evanson

14  that you prepared?

15  A    Yes.

16  Q    And that spreadsheet purports to calculate your losses

17  that you've incurred through, I believe it's,

18  September 30th, 2013, correct?

19  A    That's correct.

20  Q    That spreadsheet doesn't tell us anything about what

21  the anticipated loss would be?

22  A    That's correct.

23          MS. SAWYER:  Can I have just a moment, Your Honor?

24          THE COURT:  Yes.

25      (Pause)

1          MS. SAWYER:  Just a couple more questions.

2          THE COURT:  Sure.

3     BY MS. SAWYER:

4     Q     Looking again at this -- or talking again about the

5     spreadsheet that you prepared, it also doesn't tell you

6     whether or not there might be potential gain to Washington

7     TSA in the future?

8     A     It did nothing about the -- beyond the date of

9     September 30th, 2011, when it was prepared.

10    Q     It didn't purport to analyze whether interest rates

11    would rise past that point or fall?

12    A     It did not.

13    Q     And, going back to all the investment opportunities

14    that we looked at, those are all from people that know

15    Washington TSA, correct?

16    A     They know us, yes.

17    Q     They're from PFM, your financial adviser, right?

18    A     Among others.

19    Q     Or Barclay's, your -- the bond underwriter?

20    A     Uh-huh.

21    Q     They all knew the terms of the indenture, correct?

22    A     Yes.

23    Q     And they were -- and it's your position they were

24    proposing alternatives that were inconsistent with what TSA

25    could do under the indenture?

1   A    We were not comfortable with the conditions of the

2   bids.

3   Q    So TSA wasn't comfortable with the conditions?

4   A    That's correct.

5   Q    Not that they were inconsistent with the indenture?

6   A    We were not comfortable with the terms.

7   Q    Not making analysis on whether or not it was

8   inconsistent with the indenture?

9   A    Not at that time.

10  Q    Okay.  Thank you.

11       THE COURT:  Before you sit down, --

12       MS. SAWYER:  Yes.

13       THE COURT:  -- I have a couple.

14       MS. SAWYER:  Sure.

15       THE COURT:  Okay.

16       Mr. Cook, I think about 45 minutes ago, you were

17  asked some questions in connection with Debtor's Exhibit 34,

18  which is the Swap Financial memorandum, the scope of

19  services.  Can you glance at that?  That's the one.

20       And I think you said something along the lines

21  when Ms. Sawyer was asking you about the strategy bullet

22  point about your goal of maximizing -- the language here

23  says you're maximizing the Authority's potential financial

24  benefit.  And you said something along the lines of you

25  wanted to make TSA to be made whole.  Am I remembering that

1      correctly?

2               THE WITNESS:  That was the term that I used, yes.

3      In terms of, again, the claim that's warranted, which is in

4      the second line there.

5               THE COURT:  Okay.  But what --

6               THE WITNESS:  To make sure that it is completely

7      everything that is warranted to us.

8               THE COURT:  Okay.  But you said earlier that you

9      wanted TSA to be made whole.

10              THE WITNESS:  That's what I said, yes.

11              THE COURT:  Okay.  So, at that point, did you have

12     an understanding of what the return might be to creditors in

13     the bankruptcy in December of 2008?

14              THE WITNESS:  No, and I did not consider that

15     factor as part of being made whole.  I understood that, in a

16     bankruptcy, that there would be a discount to the amount of

17     the claim.

18              THE COURT:  So, even if the number that came out

19     of Mr. Shapiro's analysis was a number that you believed was

20     the highest number that could be calculated pursuant to the

21     RFA, TSA was not necessarily going to be made whole?

22              THE WITNESS:  No, no.

23              THE COURT:  You were going to be treated the same

24     way as any other unsecured creditor, right?

25              THE WITNESS:  Absolutely.  What I should have said

1    is we wanted to make our claim that would have made us

2    whole, had we had that amount, realizing that, under the

3    terms of the bankruptcy, obviously, we are not going to get

4    100 percent return.

5            THE COURT:  And one more.  If you could go back to

6    Debtor's 109, which is the Barclay's memo to you dated

7    November 4th, 2011.

8            THE WITNESS:  Yes.

9            THE COURT:  Is the investment described on page 2

10   -- is that compliant with the definition of eligible

11   security under the RFA?  Do you know?

12           THE WITNESS:  We believe it is.

13           THE COURT:  Okay.  Thank you.

14           MS. SAWYER:  I have just a follow-up question.

15           THE COURT:  Okay.

16           MS. SAWYER:  Or two.

17   BY MS. SAWYER:

18   Q    So the judge asked you about your comment about being

19   made whole.  Do you remember that?  But your goal was to

20   make Washington TSA whole, wasn't it?

21   A    The goal was to make our claim whole.

22   Q    But you recall when we talked about this at my

23   deposition, you testified that you wanted Washington TSA to

24   be made whole by the default of Lehman Brothers, correct?

25   A    What I meant by that is that I wanted our claim to make

1   us whole, realizing that, in a bankruptcy, that a claim that

2   would be entered into would not be something that would be

3   paid 100 percent.

4   Q    But that's not what you said when I deposed you.

5   A    That was what the intention was.

6        MS. SAWYER:  I don't have anything further.

7        THE COURT:  Okay.  Thank you.

8        Ms. Evanson?

9        MS. EVANSON:  Just one moment, Your Honor.

10       THE COURT:  Okay.

11      (Pause)

12   REDIRECT EXAMINATION

13   BY MS. EVANSON:

14   Q    Mr. Cook, I just have a few questions for you.  Since

15   we're on Debtor's Exhibit 109, that second page that the

16   Court just asked you about, was this proposal for a

17   collateralized investment or an uncollateralized investment?

18   A    It was uncollateralized, and, at this point in time and

19   still to this day, we would not consider an uncollateralized

20   investment.

21   Q    Why is that?

22   A    Because of the financial turmoil that continues to go

23   on and the fact that we have experience with the bankruptcy

24   of a provider.

25   Q    And what was the term on this proposed investment from

1    Barclay's?

2    A    It was a 5-year return, 2.75 percent.

3    Q    And what was the term of the investment?

4    A    Five years.

5    Q    Five years?  Is that consistent with the requirements

6    under the indenture?

7    A    The term, since it would be a liquidity reserve GIC, as

8    long as it could be drawn upon during the five years, that

9    would have worked.

10   Q    But TSA ultimately determined -- tell me why TSA

11   ultimately determined not to enter into this

12   uncollateralized GIC.

13   A    First of all, it was uncollateralized.  Second of all,

14   again, we thought that interest rates might be rising such

15   that we would not want to lock into a longer term rate at

16   that time.

17   Q    Mr. Cook, can you turn to Debtor's Exhibit 108, please?

18   And Ms. Sawyer showed this to you, where you said you were

19   working on a longer term strategy.  Can you turn to the

20   second page?  And, up at the top of the email, can you just

21   tell us who this is from?

22   A    This is from Deborah Kirkendall, who is at U.S. Bank,

23   our trustee on the bond.

24   Q    And what's the date on this email?

25   A    June 7th, 2011.

1   Q    And so, this was part of what was forwarded to you as

2   far as investment strategies or reinvestment options?

3   A    That's correct.

4   Q    Can you look at what that says there?  If the customer

5   -- could you please read that?

6   A    If the customer would like to consider C.P., meaning

7   Commercial Paper, maturing 12/1, we may be able to place

8   part of or all of this out to that date.  Here's what I'm

9   seeing in current C.P. rates.

10  Q    And what are the rates listed there?

11  A    .44 and .15.

12  Q    And, if you look down a little bit further, the last

13  paragraph there, what's that last sentence?  And it starts

14  with, "Treasuries."

15  A    "The other eligible products would not yield higher

16  than the Fidelity Fund.  Treasuries to 12/1 are about .07

17  percent, and agencies are at .08 percent."

18  Q    And about what were you making on the Fidelity Fund at

19  this time?

20  A    Something similar to that.  I don't recall without

21  looking.

22  Q    That's fine.  I just wanted to let Your Honor know.

23       MS. SAWYER:  I have nothing further.

24    (Pause)

25       THE COURT:  You're getting a nice little bit of

1    sun there, Mr. Cook.

2            THE WITNESS:  A little breeze, too, thank God.

3            THE COURT:  Well, go ahead.  It's a hedge.

4            THE WITNESS:  Yes, oh, boy.  Fixed late (sic)

5    variable rate.

6            MS. EVANSON:  That's all we have.

7            THE COURT:  All right.

8    Thank you, Mr. Cook.  You can step down.

9            THE WITNESS:  Thanks.

10           THE COURT:  Thank you very much.

11           All right.  Mr. Lawrence, Ms. Evanson, what's

12   next?

13           MS. EVANSON:  Yeah, the TSA would like to call

14   Mike Roberts.

15           THE COURT:  Okay.  So we have an hour left of

16   available time for today.  You want to roll right into the

17   next witness, or would you like to take a three-minute

18   break?

19           MR. LAWRENCE:  If we could just take, yeah, three

20   to five minutes just to run around.

21           THE COURT:  Okay.

22           MS. EVANSON:  It should be short.

23           MR. LAWRENCE:  Short.

24           THE COURT:  Sure, okay.  Thank you.

25           (Recessed at 2:19 a.m.; reconvened at 2:30 p.m.)

1      THE COURT:  So, before we get rolling, I'd like to

2   clarify what time we're starting tomorrow morning.

3      MR. LAWRENCE:  The way that I am looking at how

4   things are going, --

5      THE COURT:  Yes.

6      MR. LAWRENCE:  WE made good progress today.  I

7   don't believe it's necessary to start earlier than 10:00.  I

8   know we haven't discussed this, but we have --

9      THE COURT:  I'm getting an, "Eeek," expression.

10  How about 9:30?

11     MR. LAWRENCE:  Fine.  We can -- that's great.

12     THE COURT:  So to have a crystallized starting

13  time.

14     UNIDENTIFIED SPEAKER:  9:30 would be a fine start

15  time.

16     UNIDENTIFIED SPEAKER:  As long as I can sell that.

17     THE COURT:  9:30?

18     UNIDENTIFIED SPEAKER:  Yes.

19     THE COURT:  Okay?

20     UNIDENTIFIED SPEAKER:  Thank you.

21     THE COURT:  How about that, everyone around here,

22  9:30?  Is that okay?  Okay.  9:30 it is.  Okay.

23     Ready.

24     MS. EVANSON:  The TSA would like to call Mr. Mike

25  Roberts.

1    THE COURT:  Good afternoon.

2    MR. ROBERTS:  Good afternoon.

3    THE COURT:  Would you raise your right hand,

4    please?

5    (Witness Sworn)

6    THE COURT:  Please have a seat.  Let us know if

7    you'd like to take a break or if you need any water.

8    THE WITNESS:  Thank you.

9    MS. EVANSON:  Thank you, Your Honor.

10   DIRECT EXAMINATION

11   BY MS. EVANSON:

12   Q    Mr. Roberts, can you please state your full name for

13   the record?

14   A    It's Michael Edward Roberts.

15   Q    And, Mr. Roberts, I want to talk briefly about your

16   background.  Where did you go to college?

17   A    University of Washington.

18   Q    And when did you graduate?

19   A    I graduated with a bachelor's of science in mechanical

20   engineering in 1972 and an MBA in 1975.

21   Q    And what did you do after you got your MBA for work?

22   A    I worked briefly for the Weyerhaeuser Corporation at a

23   large, integrated lumber mill in Coos Bay, Oregon.  And, a

24   year later, I was applying for work and began work at the

25   governor's budget office in Washington state.

1    Q    And what did you do after that?

2    A    Well, I spent basically 30 years in civil service.

3    About half that time was working in various jobs within the

4    governor's budget office, and about half that time was spent

5    working in the superintendent of public instructions office.

6    During that time, I was personal staff to two different

7    governors and two different state superintendents of public

8    instruction.

9    Q    And what were your titles in those -- when you were

10   working in those agencies?

11   A    I was the senior budget assistant to the governor for

12   transportation for two years and for capital budget for

13   seven years, six years.  For the superintendent of public

14   instruction, I started out as an operating budget analyst

15   and ended up being the acting assistant superintendent for

16   finance and governmental liaison, i.e., the lobbyist.

17   Q    And was there a time that you worked at the Office of

18   Financial Management for the state?

19   A    Pardon me?

20   Q    Was there a time that you worked at OFM, of the Office

21   of Financial Management?

22   A    Yeah, I'm sorry.  There were two different times.  I

23   began my state service there for about three years.  And

24   then, my last eight years, nine years was -- excuse me --

25   back at OFM at the senior budget assistant level.

1    Q    And did you retire from OFM?

2    A    I did.

3    Q    And when did you retire?

4    A    February of 2006.

5    Q    And what have you been doing since your retirement?

6    A    I've been doing some consulting.  I actually worked

7    with the U.S. State Department to create a training program

8    on capital budgeting and taught classes in the remnants of

9    Yugoslavia.  I actually worked for the Housing Finance

10   Commission on some legislation that they were trying to get

11   passed for student loans.

12          I have consulted with a school district to help

13   them secure funding for a high-tech science and technology

14   high school to be built.  All sorts of things.  But frankly,

15   it's kind of tapered off in the last couple of years.

16   Q    And are you currently a member of the TSA Board?

17   A    I am.

18   Q    And when did you join the TSA Board?

19   A    2010.

20   Q    And have you served on other boards?

21   A    Over the years, yes.  I was the governor's appointee to

22   the Transportation Improvement Board, which was a policy-

23   setting allocate state funds to local government sort of

24   board.  I served on a private non-profit as the treasurer

25   for some years.  And, over the years, I've been appointed by

1   my various bosses to either chair or participate in policy

2   advisory committees related to school construction, gas

3   taxation, that sort of thing.

4   Q    Do you have an officer position on the TSA Board?

5   A    Currently, I'm the secretary.

6   Q    Let's talk about the board.  How many board members are

7   there?

8   A    There is five.

9   Q    And what are the duties of a TSA Board member?

10  A    Well, it's fairly generic.  We're adjoined to attend

11  meetings, actively participate in the business of the board.

12  We're to ensure that the laws are followed by the agency and

13  the board that we're participating in, and ultimately, we're

14  supposed to be acting as reasonable, prudent people would

15  act.

16  Q    Okay.  How often does the board meet?

17  A    Twice a year and usually in June and December.

18  Q    What does the TSA staff do?

19  A    The TSA staff basically does, in my mind, my word, kind

20  of the ministerial part of the activities of the agency.

21  They're the ones who monitor cash flow.  They're the ones

22  who stay in touch with the trustee.

23        They're the ones who hire consultants.  They're

24  the ones who provide financial reports to us and others.

25  Actually, one that Mr. Cook missed was is that they very

1    regularly present the board with bills to pay for the staff

2    time that we use at the Housing Finance Commission.

3    Q    Does the board ever delegate any activities to staff?

4    A    Yes, we do, and that can cover quite a range of things,

5    too.  For instance, when this thing we're discussing now

6    have started up, the board did authorize Mr. Herman to take

7    whatever actions are necessary to protect our principal and

8    assets, if you will, while all of this turbulence was going

9    on.

10   Q    How --

11   A    Go ahead.

12   Q    I'm sorry.  How does the board monitor staff work, or

13   does the board monitor staff work?

14   A    We do.  I mean, we get regular reports.  The financial

15   reports we get from Bob.  Kim also provides us updates

16   during the meetings, and, frankly, we get emails if there's

17   emergent stuff that's of importance to us or things that we

18   need to be updated on.  They've been, I think, quite good at

19   keeping us current, if you will.

20   Q    Let's talk a little bit about the RFA with Lehman.

21   Even though you joined the board in 2010, are you familiar

22   with the RFA at issue in this case and TSA's claims against

23   Lehman?

24   A    I would say yes.  I didn't have a good appreciation,

25   like, at the first meeting, but the staff and the board have

1   done a good job of bringing me up to speed on the history,

2   and, needless to say, I'm here because I am involved in the

3   current activities.

4   Q    I want to go back in time a little bit, Mr. Roberts.

5   Can you briefly describe your role in the 2002 bond issue

6   from the OFM side?

7   A    Okay.  Well, I was at OFM.  That was a -- let's just

8   say that the whole securitization bond issue thing was a new

9   thing of the state of Washington.  It came about because the

10  legislature was kind of gridlocked and they needed around

11  $500 million to make the budget balance.  That was done very

12  late in the session, and I was the guy at OFM who dealt with

13  the treasurer on bonds.  So I guess that was the logic for

14  me getting tapped by the director of OFM to be the liaison.

15       He basically instructed me to get hold of this

16  guy, Kim Herman, and basically give him whatever help he

17  needed from us and basically be ready to provide people in

18  Olympia with a report on what's going on or how it's

19  progressing.  So --

20  Q    So, based on your prior work on the 2002 bond issue,

21  are you generally familiar with the 2002 bond issue and the

22  reserve fund agreement that's in place?

23  A    Yes.

24  Q    Why, from the perspective of the TSA Board, was it

25  important for the TSA to have a reserve fund agreement in

1    place?

2    A    Well, the first thing I think, without saying, is is

3    that it was part of the indentures of the bond issue.  This

4    was described to me as the OFM guy as when I'd ask why, it

5    was basically to provide another layer of assurance to the

6    bond buyers that there -- notwithstanding the potential

7    variability of the tobacco payments, that there would be a

8    reserve to ensure that there would be timely payments on the

9    bonds as specified.  So that was really the first part of

10   this.

11          What follows that is that, with the turbo

12   agreement and all this other stuff, there were expectations

13   of faster than advertised retirement, and, from the OFM

14   budget guy's standpoint, these are fungible monies.  This

15   was money that we're basically accelerating the acceptance

16   of to pay for a general obligation requirement today.

17          And the sooner we got back to getting all that

18   cash flowing back into the general fund, the sooner we could

19   continue to support health programs, which is what the

20   original intent of the payments were.  But, so long as we

21   were taking that money out, they wanted us to pay off the

22   bonds as soon as possible so we wouldn't have to be using

23   taxes to replace that money that's being foregone.

24   Q    When you just said they wanted us to pay off the bonds

25   as soon as possible, who were you talking about?

1    A    I am generally describing the legislature or those

2    folks in the legislature who have to make budgets balance.

3    And what we've done now is we've traded a one-time shot of

4    money to balance one budget for a stream of revenue that

5    we're now giving up to pay off those bonds that we issued.

6    Q    After you joined the board, what did you learn about

7    the Lehman matter?

8    A    That basically what appeared to be a reasonably good

9    deal did not -- you know, it did not survive and that

10   ultimately there was cash flow that was expected,

11   anticipated, and thought to be there that was no longer

12   arriving.

13   Q    In your role as a board member, how did the staff

14   communicate with you and the board about this case?

15   A    We received periodic updates.  Quite a bit of the

16   financial analysis as it was kind of reached certain summary

17   points, we would hear from Bob, either in memo form or

18   emails.  Same with Kim.

19        And then, obviously, we had pretty regularly a

20   sector of each of our regular meetings devoted to what's

21   going on, what's the latest on the Lehman Brothers

22   situation.  And frankly, if it was emergent enough, we'd get

23   a phone call.

24   Q    Since the time of Lehman's default, has the board

25   discussed reinvestment of the reserve fund?

1          MS. SAWYER:  Objection.

2          THE COURT:  Yes?

3          MS. SAWYER:  A lack of foundation.  He didn't join

4    the board 'til 2010.

5          THE COURT:  Okay.

6          Ask the question a little more surgically.

7          MS. EVANSON:  Sure.

8    BY MS. EVANSON:

9    Q    Mr. Roberts, since you joined the board in 2010, have

10   you been privy to any discussions of reinvestment of the

11   reserve fund?

12   A    There have been periodic conversations about that.

13   This is a topic that we've revisited more than once, and it

14   usually starts with have there been any opportunities that

15   have arrived.

16          And, at this point, we're depending upon the

17   staff.  If there was a viable one, we expected to see it.

18   And, at this point, we have not seen a viable one.

19   Q    So would evaluating potential reinvestment options --

20   would that be a staff function or a board function?

21   A    At this point, it's a staff function, and my

22   expectation as a board member is we would see something that

23   kind of fit the criteria and that could be presented to us

24   as a recommended adoption.

25   Q    Mr. Roberts, has anyone on the board ever complained to

1    you about the handling of the Lehman matter by TSA staff?

2    A    No.

3    Q    Have you ever heard any complaints from other board

4    members?

5    A    No.

6    Q    Does the board have any concerns about Kim Herman's

7    exercise of his delegation of authority?

8    A    No.

9    Q    Does the board have any concerns about the hiring of

10   Peter Shapiro or Swap Financial?

11   A    No.

12   Q    Is the board satisfied with the staff's actions in

13   handling this matter?

14   A    I would say yes.

15   Q    What does the TSA Board hope to get out of this

16   hearing?

17   A    Well, I'm going to avoid the use of made whole, but we

18   see the $38 million loss, and, frankly, we think we've, in

19   good faith, bargained.  You know, we had a contract, and our

20   expectation was that there would be performance of that

21   contract.  And, at this point, that represents money that

22   would accelerate the state's ability to do the other things

23   that the state is required to do as far as helping people

24   with their health problems.

25          MS. EVANSON:  Just one moment, please.  That's all

1    I have.

2            THE COURT:  Okay.

3            UNIDENTIFIED SPEAKER:  Can we just have a moment,

4    Your Honor?

5            THE COURT:  Sure.

6        (Pause)

7            THE COURT:  Maybe I missed something.  Could I

8    have one of each of you just to ask you a clarifying

9    question?

10       (Laughter)

11           THE COURT:  Are you going to dance?

12       (Pause)

13           THE COURT:  Thank you.

14   CROSS-EXAMINATION

15   BY MS. DEL MEDICO:

16   Q    Mr. Roberts, could I ask you to turn to Debtor's

17   Exhibit 109 in your binder?

18   A    Yeah.

19   Q    Are you there?

20   A    Yes.

21   Q    Mr. Roberts, Debtor's Exhibit 109 is a memo from

22   Barclay's Capital to the TSA dated November 4th, 2011.  Do

23   you see that?

24   A    Yes.

25   Q    Have you ever seen this document before?

1   A    I am trying to recall if this was shown to me during my

2   deposition, but, other than that, no.

3   Q    Prior to your deposition, you've never seen this

4   document before?

5   A    I don't believe so.

6   Q    Can you turn to the second page of the document,

7   please?

8   A    There.

9   Q    Do you see in the box where it says term, five years?

10  A    Yes.

11  Q    Balance, $45,530,000?

12  A    Yes.

13  Q    Variable rate, 1.5 percent and fixed rate, 2.75

14  percent?  Do you see that?

15  A    I see that.

16  Q    Did anyone ever tell you that this investment from

17  Barclay's was an eligible security under the indenture?

18  A    No.

19  Q    Wouldn't you have liked to earn 2.75 percent since 2011

20  'til now?

21  A    In isolation, that might sound reasonable, but I'm not

22  sure what all the other factors are.

23  Q    But no --

24  A    Risk, et cetera.

25  Q    But no one at TSA ever discussed this with you,

1   correct?

2   A     Correct.

3         MS. DEL MEDICO:  No further questions.

4         THE COURT:  Okay.

5         MS. EVANSON:  I have one follow-up question.

6         THE COURT:  Okay.

7   REDIRECT EXAMINATION

8   BY MS. EVANSON:

9   Q     Mr. Roberts, what direction was given to staff in terms

10  of evaluating reinvestment opportunities?

11        MS. DEL MEDICO:  Objection.  Beyond the scope.

12        MS. EVANSON:  It's not beyond the scope.  She just

13  asked him about a reinvestment opportunity.

14        THE COURT:  I'm going to allow.

15        Go ahead.

16  BY MS. EVANSON:

17  A     It would be difficult for me to answer that question

18  directly, because I think some of that sort of activity may

19  have happened before me, my being on the board.  But,

20  subsequent to that, I mean, my sense from dealing with the

21  board members is, if the staff sees what they feel is a

22  viable, acceptable proposal, then they were to bring it to

23  the board.

24  Q     Thank you.

25        THE COURT:  All right.

1          Thank you very much.

2          THE WITNESS:  Thank you.

3          THE COURT:  You're excused, Mr. Roberts.

4          MS. SAWYER:  We just need to go get the next

5    witness.

6          MR. LAWRENCE:  If only (sic) one of ours.

7          THE COURT:  Oh, okay.

8          MR. LAWRENCE:  Okay.

9      (Pause)

10         THE COURT:  Could you stand and raise your right

11   hand?  I'm sorry.

12     (Witness Sworn)

13         THE COURT:  Please have a seat.

14         UNIDENTIFIED SPEAKER:  Sorry, Your Honor.

15     (Pause)

16   DIRECT EXAMINATION

17   BY MR. LAWRENCE:

18   Q    Good afternoon, Mr. Konheim.  Could you state your name

19   for the record, please?

20   A    Seth Lawrence Konheim.

21   Q    Thank you.  And where are you currently employed?

22   A    I'm currently employed by Lehman Brothers Holding, Inc.

23   Q    Okay.  And how long have you been employed by Lehman

24   entities, let's put it that way?

25   A    Since 1995.  So approximately 18, 19 years.

1    Q    Okay.  And could you explain to us your responsibility

2    history at Lehman's, starting with in 1995?

3    A     In 1995, I started in a back office group, where I

4    handled cash differences.  I then joined -- in 1997, around

5    May or June, I joined middle office, which is an operations

6    function related to a group called Total Trend Swaps (ph).

7              And I then proceeded to work in some other areas

8    in municipal derivatives, including GICs, muni. derivatives.

9    And, later on, I handled -- I was a manager in various rates

10   products.

11   Q    Interest rate what?

12   A    Interest rate products.

13   Q    So what was your responsibility in around 2002?

14   A    I was a supervisor in the municipal derivatives middle

15   office.

16   Q    And could you explain what you did as a supervisor in

17   middle office with municipal derivatives?

18   A    As a supervisor in muni. deriv. middle office, we were

19   responsible for trade bookings.

20   Q    The middle office plays a role between traders and

21   other elements of Lehman, correct?

22   A    Based upon the trade bookings, yes.

23   Q    Okay.  And the trade bookings that you were involved

24   with were municipal derivative trades, correct?

25   A    They were transactions entered into by the municipal

1   derivative desk.

2   Q     And that would include tobacco RFAs, correct?

3   A     Tobacco RFAs are customers.  The trades themselves --

4   those customers would have executed with Lehman, would have

5   most likely been done by the municipal derivative desk.

6   Q     So, in part of your responsibilities in the middle desk

7   included involvement with tobacco RFA trades that Lehman

8   engaged in?  Is that fair?

9          MR. TAMBE:  Objection to form, Your Honor.

10          MR. LAWRENCE:  If we can just have some

11   specificity on involvement.

12          MR. TAMBE:  It's foundational, Your Honor.  It's a

13   little too vague as phrased.

14          THE COURT:  Okay.  I'm trying my best to follow

15   along.

16   BY MR. LAWREENCE:

17   Q     Could you explain what your particular responsibility

18   was with respect to tobacco RFA trades that Lehman engaged

19   in in the 2002 period?

20   A     We would have put into Lehman's risk management system

21   the transaction details or reserve fund agreements,

22   including tobacco trades that were reserve fund agreements.

23   Q     Do you generally have an understanding of the policies

24   with respect to tobacco -- Lehman engaging in tobacco

25   reserve fund agreement trades?

1    A    I'm not sure what you mean by policies.

2    Q    For example, with respect to credit issues of tobacco

3    RFA trades.

4    A    I --

5         MR. TAMBE:  Again, Your Honor, just to be clear.

6         THE COURT:  Yeah.

7         MR. TAMBE:  This is the witness that we had the

8    pretrial hearing about.

9         THE COURT:  Yes.

10        MR. LAWRENCE:  All I'm trying --

11        THE COURT:  Okay.

12        MR. LAWRENCE:  All I'm trying to do is assess what

13   he knows.

14        THE COURT:  Wait, wait, wait, calm down.

15        MR. TAMBE:  As long as it's clear that the

16   question is being asked of his personal knowledge I think

17   it'll help the witness --

18        THE COURT:  Yes.

19        MR. TAMBE:  -- and I think it'll help the record.

20        THE COURT:  So --

21        MR. LAWRENCE:  That was the question.  I asked him

22   what his knowledge was.

23        THE COURT:  Right.  So just to be clear,

24   Mr. Konheim, the rules of engagement, if you will, are that

25   counsel is limiting his examination to matters that he

1    believes are within your personal knowledge as opposed to

2    something that you learned in preparation for the 30(b)(6)

3    examination, and Counsel is proceeding in good faith along

4    those lines.  If he happens to stray from the path of the

5    straight and narrow you should feel free to tell him.

6              THE WITNESS:  Yes, Your Honor.

7    BY MR. LAWRENCE:

8    Q    I'm only trying to understand what you personally were

9    involved in.

10   A    With relation to what aspect of the trade?

11   Q    Let me step back.  Okay.  You -- in the middle desk

12   you're responsible for managing the trade desk portfolio,

13   correct?

14   A    The bookings of the trader's portfolio.

15   Q    And that may include risk reporting or generation,

16   correct?

17   A    Interest rate risk, production, and the effects of

18   booking the trade, which could -- the trade booking creates

19   various reports.

20   Q    And it includes profit and loss reporting, correct?

21   A    We did not report the trader's profit and loss.  We --

22   Q    Go ahead.

23   A    Profit and loss was reported by product control.

24   Q    Okay.

25   A    We would produce a file at the end of the day that

1    estimated the marks of the trades.

2    Q    Let's just go to your deposition.

3         MR. LAWRENCE:  Okay.  If we could have his

4    deposition.

5         MR. TAMBE:  Your Honor, I don't believe he can be

6    impeached by 30(b)(6) deposition.  He's testifying here in a

7    completely different capacity than he was at his 30(b)(6)

8    deposition.

9         MR. LAWRENCE:  The question --

10        MR. TAMBE:  This is the problem with proceeding

11   this way.

12        MR. LAWRENCE:  The question --

13        THE COURT:  Okay.  Hold on.  We're going to have

14   -- when there's an objection we're going to have the

15   objection fully stated and then I'm going hear the response,

16   okay?  Go ahead.

17        MR. TAMBE:  And the objection is improper

18   impeachment, because I believe he's going to be shown his

19   30(b)(6) deposition, which is the only deposition he gave.

20   He can't be impeached in his personal capacity as a personal

21   trial witness based on what he testified to as a 30(b)(6)

22   witness.

23        THE COURT:  Mr. Lawrence?

24        MR. LAWRENCE:  Okay.  What I would ask and am

25   trying to ask him what his personal responsibilities were,

1   and his -- he gave an answer as to what he did in 2002 in

2   his role.  So that's all I'm trying to establish.

3         THE COURT:  Okay.  So consistent -- so putting

4   aside the issue of the proper methodology of impeachment, on

5   the issue of matching up personal capacity and

6   representative capacity you're only going to use the

7   transcript with respect to testimony that he gave in his

8   personal capacity, not his 30(b)(6) capacity, right?

9         MR. LAWRENCE:  My intention is to only give --

10  sorry -- only use the deposition for matters which he

11  testified he knew about personally.

12        THE COURT:  Yes.  Right?  That -- I mean we have a

13  hats issue, right?

14        MR. TAMBE:  Yeah.

15        THE COURT:  The witness is wearing -- previously

16  has worn -- well, the witness --

17        MR. TAMBE:  The only hat he wore before, Your

18  Honor --

19        THE COURT:  Was a 30(b)(6).

20        MR. TAMBE:  -- was a 30(b)(6) hat.

21        THE COURT:  Right.

22        MR. TAMBE:  And I don't rule out the fact that

23  there may be specific Q and A that says do you personally

24  know this, do you personally know that.

25        THE COURT:  Right.

1          MR. TAMBE:  But I want to be careful that that's

2    all we're doing.

3          THE COURT:  Right.

4          MR. TAMBE:  And again, it's in fairness for the

5    witness who doesn't do this for a living.

6          THE COURT:  Right.  Okay.

7          MR. TAMBE:  The two hat situation is confusing to

8    all of us.

9          THE COURT:  Right.  But it's up to us --

10          MR. TAMBE:  Right.

11          THE COURT:  -- it's not up to the witness to worry

12    about it.

13          MR. LAWRENCE:  Yes.

14          THE COURT:  Mr. Konheim, this is all lawyer talk.

15          THE WITNESS:  Right.

16          THE COURT:  You don't have to -- just try to tune

17    it out, okay?  But if you would, sir, pull the microphone a

18    little closer to you so I can -- we can all hear you better.

19    Thank you.

20          THE WITNESS:  Can I do one thing?  I'm just going

21    to get me some water.

22       (Pause)

23    BY MR. LAWRENCE:

24    Q    Do you recall your deposition being taken in this case?

25    A    I do.

1   Q    Okay.  If I could focus your attention to page 7 of the

2   deposition.

3        MR. TAMBE:  I'm sorry, are you showing that to

4   him?

5        MR. LAWRENCE:  I'm -- I guess I (indiscernible -

6   01:23:41).

7        THE COURT:  Okay.

8        MR. LAWRENCE:  I apologize.

9   BY MR. LAWRENCE:

10  Q    Are you on page 7 of the deposition?

11  A    Yes.

12  Q    Okay.  And I asked you what -- what was your role on or

13  about 2002, correct?

14  A    Correct.

15  Q    Could you read your answer?

16  A    "I was the manager of municipal drew middle office,

17  actually the supervisor."

18  Q    Okay.  And I further -- if you could go back and -- to

19  page 6,on question 7, I asked you to tell me the

20  responsibilities of the middle office of where that fits in,

21  correct?  Line 7.

22  A    Line 7.

23  Q    Yes.

24  A    Tell me responsibilities.

25  Q    Okay.  And you -- that -- you were a supervisor so you

1    knew what the responsibilities of the middle office were,

2    correct?  Based on your personal involvement at Lehman,

3    correct?

4    A    Yes.

5    Q    Okay.  And could you read your answer?

6    A    I said:

7         "It may include risk reporting or generation, it

8    may include P&L reports, profit and loss reporting, it may

9    include all aspects of a trade as a go between the trading

10   desk and various groups that are in various control groups

11   that are accounting groups and there are settlement groups

12   in general."

13   Q    Okay.  Thank you.

14        MR. TAMBE:  And again in fairness, Your Honor,

15   just to complete the stop maybe the question should be asked

16   of the witness which of those things did he personally do.

17   Because he's being asked a question not about his personal

18   role but about the middle office.  That's the answer he

19   gives.

20        THE COURT:  Okay.  I think that the deposition

21   testimony and the testimony here today seems reasonably

22   clear that the witness is the person responsible for

23   managing -- or being a supervisor of the middle office.

24        MR. LAWRENCE:  Right.

25        THE COURT:  So I think that that necessarily

1   implies that he had personal knowledge.  So let's move on.

2              MR. LAWRENCE:  Okay.

3   BY MR. LAWRENCE:

4   Q    So with respect to that responsibility as supervisor of

5   the managing office do you have knowledge regarding the

6   treatment of tobacco risk by Lehman in 2002?

7   A    Which aspect of the risk are you referring to?

8   Q    The credit risks associated with entering into tobacco

9   RFA, in other words whether Lehman had a specific policy

10  that affected its tobacco RF trades -- RFA trades.  Sorry.

11  A    I'm aware that Lehman had policies related to credit

12  risk.  I do not know what the specific policies are.

13  Q    Are you aware that there was a specific policy with

14  respect to tobacco trade risks?

15  A    I'm not aware.  I was not aware that there was specific

16  policies related to their tobacco risk.

17  Q    Okay.  But you were involved in the Washington TSA

18  trade, correct?

19  A    I -- as part of the booking of the transaction we were

20  involved in the transaction, yes.

21  Q    Okay.  And so you are familiar in that position with

22  the Washington TSA trade, correct?

23  A    I'm familiar with the Washington Tobacco -- TSA

24  transaction.

25  Q    Okay.  Can I show you TSA Exhibit 3 -- C, sorry.

1   A   Yes.

2   Q   And this is a memorandum from Chris Armada (ph).  Do

3   you see that?

4   A   Yes.

5   Q   And you are on the cc list of the memorandum, correct?

6   A   Correct.

7   Q   Okay.  First of all who is Chris Armada?

8   A   Chris Armada was a staff member of the municipal

9   derivative middle office.

10  Q   And was he somebody who worked under your supervision?

11  A   Correct, he worked under my supervision.

12  Q   And this has to do with the Washington TSA trade,

13  correct?

14  A   Correct.

15  Q   Okay.  And if we could focus on what information is on

16  this -- we can see it but I'd appreciate that, okay?

17  A   That complete explanation for all fields?

18  Q   Well let's start with each field and we'll go one at a

19  time.  Okay.  The first field says, "Washington Tobacco

20  $37,208,000."  Do you see that?

21  A   Yes.

22  Q   Okay.  And does that represent the amount of money that

23  Lehman anticipated earning on the investment of commercial

24  paper that it could purchase with the reserve fund under the

25  RFA?

1   A    That represents -- that line represents Lehman

2   receiving -- using a model, the -- it is the unrealized

3   value of that transaction --

4   Q    Okay.  And when you say Lehman --

5   A    -- where you're receiving commercial --

6   Q    I'm sorry.

7   A    -- paper.

8   Q    When you say Lehman utilized the model they had a

9   proprietary model that they used to figure out for a

10  potential trade like this how much money they potentially

11  could earn, correct?

12         MR. TAMBE:  Object to the form of the question.  I

13  think he's leading him and he's misstating his prior

14  testimony.  Why don't you just ask him open-ended questions

15  as to what this is?

16         MR. LAWRENCE:  I think I can lead him, he's a

17  Lehman witness.

18         MR. TAMBE:  I don't think you've demonstrated he's

19  hostile yet.  I mean he's a middle office guy who enters

20  trade data.  Ask him about the trade data.

21         THE COURT:  Well is he -- has he been called as a

22  hostile witness or not?

23         MR. LAWRENCE:  We did not designate whether he's a

24  hostile witness or not.

25         THE COURT:  Okay.  So then let's --

1    MR. LAWRENCE:  I mean certainly Lehman has been

2    hostile in terms of their arguments, but that may not affect

3    the witness.

4         THE COURT:  Okay.  Well that's unnecessary.

5         MR. LAWRENCE:  Well, I just meant at first.

6         THE COURT:  Why don't we try to ask non-leading

7    questions until further notice.

8    BY MR. LAWRENCE:

9    Q    Could you -- could you explain the model that you just

10   described and how that -- how Lehman used the model to

11   arrive at the $37,208,000 number?

12   A    We input into our systems the notion of the trade along

13   with the schedule of the deposit dates and the maturity

14   dates.  The model projects, based upon a curve, a forward

15   rate and that value creates a cash flow.  That is then

16   discounted back to the current rate.

17   Q    Okay.

18   A    It then sums up the value of Lehman receiving the

19   commercial paper leg of the trade is line one, 413853L.

20   Q    Okay.

21   A    That 37,208 is the net value of that receivable.

22   Q    Okay.  So just so we understand, when you say the

23   notion of the trade you're talking about the 45 million plus

24   or minus?

25   A    On trade date I believe it was 46 million.

1    Q    Okay.  And in terms of the payment dates did that come

2    from the request for bid?

3    A    It comes from the request for bid.

4    Q    Okay.  And you indicated that this used a curve based

5    on commercial paper being the security that Lehman would

6    deliver, correct?

7    A    Based upon Lehman delivering commercial paper that was

8    what that projection was for.

9    Q    Okay.  And then the model sums up all of what Lehman

10   under the model is going to earn and discounts that to

11   present value to come up with the $37.2 million number?

12   A    Correct.

13   Q    Okay.  The second line is called guaranteed rate.  Do

14   you see that?

15   A    Yes.

16   Q    Okay.  Could you explain what is reflected in the

17   second line?

18   A    So -- and I didn't finish the first line.

19   Q    Oh, I'm sorry, please go on and finish the first line.

20   A    The last line is 26,842, that is the interest rate risk

21   on that leg of the trade.  So it represents if rates move

22   one basis point, .01 percent, that's how much the value of

23   the trade will change.

24   Q    Okay.  Now if you could --

25   A    The second line is --

1   Q     -- the second line.  Thank you.

2   A     -- similar to the first line except it's not a forward

3   rate, it's the guaranteed rate on the trade.  The same

4   schedule, discounted to a present -- present value.

5   Q     Okay.  So that essentially uses the same notion amount,

6   the $46 million I think you said, and then the guaranteed

7   rate that Lehman was willing to bid of 4.48 percent -- 4.484

8   percent, correct?

9   A     Correct.

10   Q     And then discounted to present value Lehman anticipated

11   that it would deliver to the Washington TSA $30.6 million?

12   A     Correct.

13   Q     Okay.  And then do you want to explain the 34,466?

14   A     It is the risk -- the amount that that trade will move

15   as interest rates move one basis point.

16   Q     Then could you explain the third line?

17   A     The third line is an option that is booked to an

18   account called (indiscernible - 01:33:13).  It is an option

19   to cancel the trade that the trader has booked to own

20   themselves to address the -- the optionality built into the

21   trade.

22   Q     Okay.  And is that a credit risk?

23   A     A -- it is a market risk to the terms of the trade,

24   which also by virtue mitigates credit on the trade.

25   Q     Okay.  And just so we're on the same page, we're

1    talking a distinct risk from an interest rate risk, correct?

2         MR. TAMBE:  Objection, qualifying.

3    BY MR. LAWRENCE:

4    Q    I mean there are interest rate risks associated with

5    this trade, correct?

6    A    There's interest rate risk on the trade, it also -- it

7    has interest rate risk itself.  It is a market risk with the

8    trade, which is interest rate risk.

9    Q    Okay.  Well let's stick with market risk, the credit

10   mitigation of $4.522 million, okay?  That reflects the risks

11   from the terms of the trade, correct?

12   A    Yes.

13   Q    And it also reflects the risks with respect to the

14   counterparty involved in the trade?

15   A    No, it represents -- it -- the actual basis of the

16   trade is an option to cancel that the desk owns against

17   itself.  Because it is negative it reduces the credit on the

18   trade and the value can never go positive on that option

19   because then it will be out of the money.  So it becomes

20   money by therefore it automatically creates its own

21   mitigation -- credit mitigation of the trade.

22   Q    And is that something that's determined -- the amount

23   determined by the credit department at Lehman?

24   A    The -- which amount is it determined by credit --

25   Q    The credit mitigation option, is that something that

1   the trader gets from the credit division?

2   A     Not that I know of.

3   Q     Okay.  Where does that number come from?  How is that

4   number arrived at, the 4.522 credit mitigation option, where

5   does that number come from?

6   A     From the terms of the trade, the booking of the trade.

7   Q     Okay.  Who determines that number?

8   A     The model determined -- you mean the 4.5?

9   Q     Yes.  Yes.

10   A    It's determined by the model.

11   Q    Okay.  And the 2,089,000, what does that represent?

12   A    That represents adding up various numbers from the

13   spreadsheet.

14   Q    Okay.  Does that -- does that number of 2,089,000 cover

15   Lehman's profits anticipated on the day the trade is made?

16   A    The 2 million 89 is the sum of trades that aren't in

17   here along with these three lines.  I don't know what the

18   other trades are.

19   Q    Is it correct that the two million includes profits

20   plus the costs of hedge trades that were entered into in

21   connection with this RFA?

22   A    It -- embedded in that number is these three trades

23   plus other transactions which are redacted.  If those are

24   the hedge transactions they would be included, there could

25   be other transactions embedded in that number.  I can't tell

1  you.

2  Q    Is profit embedded in that number as well?

3  A    Is -- I'm not sure what you mean by --

4  Q    Is there a profit -- does Lehman try to make a profit

5  on its trades?

6  A    Lehman tries to make -- always tries to make a profit

7  on the trades.

8  Q    And is profit included within the $2 million number?

9  A    I can't -- since -- it is -- at that moment in time it

10  is the net value of the transactions that were on that

11  sheet.  Since the sheet is new business the beginning value

12  was 0, the ending value is 2 million 89.  What makes up the

13  2,89- I can't tell you from here because some of them are

14  redacted.  But for that day those trades they had a possible

15  profit of 2 million 89.  It doesn't mean that that's the

16  complete profit, because I can't tell you if any -- there

17  were other charges or they made money elsewhere that would

18  get included.

19          THE COURT:  So, could I just interrupt?

20          MR. LAWRENCE:  Sure.

21          THE COURT:  With my seven minutes I have left.

22          MR. LAWRENCE:  Yes, Your Honor.

23          THE COURT:  I mean if somebody had a calculator

24  and you added 37208 minus 3641 minus 4522 what number do you

25  get?  I'm trying to follow what the witness is trying to

1   explain, and I'm not there, so I don't know what I'm looking

2   at if I've got something redacted, I don't know what's going

3   on.  So to the extent that either of you cares about that

4   I'm telling you.

5          MR. LAWRENCE:  No, we certainly --

6          MR. TAMBE:  I can only answer the question you

7   just asked, I just scribbled the numbers out.

8          THE COURT:  Okay.

9          MR. TAMBE:  Just the numbers that are shown come

10  out to 129, so it doesn't add up to the 2089, and that's my

11  quick math.

12         THE COURT:  Okay.

13         MR. TAMBE:  So I'm not testifying, but --

14         THE COURT:  Okay.  That's what my quick math

15  indicated too, so that's consistent with what the witness is

16  trying to say that there's something under the redacted

17  piece that's reflected in that 2 million 89 number.  So --

18  okay.  I just was trying to make sure I understood what was

19  being said.

20         MR. LAWRENCE:  Okay.

21  BY MR. LAWRENCE:

22  Q    It's the major component of the netting between 37.2,

23  30.6, and 4.5, the profit and loss with adjustments?

24  A    Sorry, can you -- what's -- I didn't understand the

25  question part.

1    Q    Is the --

2    A    The netting of the three --

3    Q    -- major component of the netting of the 37.2, 30.6,

4    and 4.5 number is that the profit and loss with adjustments?

5    A    The 37.2 and the 30.6 were booked to back up TSA --

6    Washington Tobacco TSA.  The 4.5 was booked to a separate

7    counterparty.

8         At one view of the trade, you know, they took each

9    piece and they did something with it.  Held it out as P&L,

10   it's new trade booking for the day.  The -- you know, how

11   they flashed the P&L, what they did with it I'm not sure

12   because that wasn't a role that I was responsible for.

13   Q    Can you turn to page 38 of your deposition?

14   A    Yes.

15   Q    And on line 19, tell me when you're there.

16   A    Yes.

17   Q    I asked you, "So the major component of the netting of

18   the 37.2, 30.6, and 4.5 number is the P&L?"  Do you see

19   that?

20   A    I said, "Yes, with adjustments, that is P&L".

21   Q    And then I said --

22   A    I'm not disagreeing with that.

23   Q    Okay.  That's really what I'm trying to establish.  And

24   the adjustments that you identified were adjustments for

25   hedging trade costs, correct?

1          MR. TAMBE:  Can I just be clear, Your Honor --

2          THE WITNESS:  Yes.

3          MR. TAMBE:  -- this is again the 30(b)(6)

4    deposition.

5          THE COURT:  Right.  Okay.

6          MR. TAMBE:  This is 30(b)(6) testimony that he's

7    being impeached with.

8          THE COURT:  Okay.

9          MR. LAWRENCE:  This is a document that he --

10          THE COURT:  Hold on.

11          MR. LAWRENCE:  I'm sorry, I thought I was supposed

12    to respond.

13          THE COURT:  Where -- show me again what portion of

14    the deposition were you reading from, Mr. Lawrence?

15          MR. LAWRENCE:  Page 38.

16          THE COURT:  Okay.

17          MR. LAWRENCE:  Line 19.  And I'm asking about a

18    document that went to him while he was supervisor of the

19    middle desk of municipal derivatives.

20          THE COURT:  Look, we're going to call a time out

21    for today --

22          MR. LAWRENCE:  Okay.

23          THE COURT:  -- because we have four minutes left.

24    Come back up here because I want to show you something, I

25    want you two to be able to work this out.  The good news is

1    you're done for the day.

2            THE WITNESS:  Yes.  The bad news?

3            THE COURT:  The bad new social security you have

4    to come back tomorrow.

5            THE WITNESS:  That's okay.

6            THE COURT:  So the rules are unfortunately that

7    you can't discuss your testimony with any of the attorneys,

8    you can't be around anyone who's discussing the tell me.

9            You should go home today, you shouting watch some,

10   you know, television show about judges that presumably are

11   funnier than I am.

12      (Laughter)

13           THE COURT:  Which I hear there are plenty of.  And

14   we're going to start tomorrow morning at 9:30.  And a lot of

15   what you saw here today, as I said, is just -- is just what

16   lawyers do.

17           THE WITNESS:  Right.

18           THE COURT:  It's just what lawyers do.  All right?

19           THE WITNESS:  Yes.

20           THE COURT:  So we're done for today.  I will see

21   you -- and I apologize for the early stop today.  It's a big

22   day for the Court.

23           MR. LAWRENCE:  It sounds like a good event.

24      (Whereupon these proceedings were concluded at 3:21 PM)

25

```
1                 I N D E X

2

3              T E S T I M O N Y

4    TSA'S

5    WITNESS          EXAM BY        PAGE    LINE

6    KIM HERMAN         MS. EVANSON      72      9

7                  MS. SAWYER    124     5

8                  MS. EVANSON   150     13

9

10   RICHARD D. COOK    MS. EVANSON    156     20

11                 MS. SAWYER    174     21

12                 MS. EVANSON   193     12

13

14   MICHAEL EDWARDS

15   ROBERTS          MS. EVANSON    198     10

16                 MS. JENNIFER DEL

17               MEDICO      208    14

18                 MS. EVANSON   210     7

19

20   SETH KONHEIM       MR. LAWRENCE   211     16

21

22

23

24

25
```

1            C E R T I F I C A T I O N

2

3    I, Sheila G. Orms, Dawn South, and Nicole Yawn, certify that

4    the foregoing transcript is a true and accurate record of

5    the proceedings.

6

7    Shelia G. Orms    Digitally signed by Shelia G. Orms
                       DN: cn=Shelia G. Orms, o=Veritext,
                       ou, email=digital@veritext.com, c=US
8    _____    Date: 2014.11.13 15:22:41 -05'00'

9    Sheila G. Orms

10

11   Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o=Veritext, ou,
                   email=digital@veritext.com, c=US
12   _____    Date: 2014.11.13 15:23:11 -05'00'

13   Dawn South

14   AAERT Certified Electronic Transcriber CET**D-408

15

16   Nicole Yawn    Digitally signed by Nicole Yawn
                    DN: cn=Nicole Yawn, o=Veritext, ou,
                    email=digital@veritext.com, c=US
17   _____    Date: 2014.11.13 15:23:44 -05'00'

18   Nicole Yawn

19   Veritext

20   330 Old Country Road

21   Suite 300

22   Mineola, NY 11501

23   Date: November 13, 2014

24

25