WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                                    :
**In re**                                                           :       **Chapter 11 Case No.**
                                                                    :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,                        :       **08-13555 (SCC)**
                                                                    :
                                          **Debtors.**              :       **(Jointly Administered)**
                                                                    :
-------------------------------------------------------------------x

## NOTICE OF HEARING ON
## THE PLAN ADMINISTRATOR'S OBJECTION TO CLAIM NUMBER 29606

          **PLEASE TAKE NOTICE** that, on May 20, 2016, Lehman Brothers Holdings

Inc. ("LBHI"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for the entities in the above-

referenced chapter 11 cases, served the Plan Administrator's Objection to Claim Number 29606

(the "Objection"), and that a hearing (the "Hearing") to consider the Objection will be held

before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom 623

of the United States Bankruptcy Court for the Southern District of New York, One Bowling

Green, New York, New York 10004, on **July 28, 2016, at 10:00 a.m. (Eastern Time)**, or as

soon thereafter as counsel may be heard.

1

PLEASE TAKE FURTHER NOTICE that any responses to the Objection must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and shall be served in accordance with General Order M-399 upon (i) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 623; (ii) attorneys for LBHI, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Richard L. Levine, Esq. and Garrett A. Fail, Esq.) and (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: William K. Harrington, Esq., Susan Golden, Esq., and Andrea B. Schwartz, Esq.); so as to be so filed and received by no later than **June 20, 2016, at 4:00 p.m. (Eastern Time)** (the "Response Deadline").

PLEASE TAKE FURTHER NOTICE that if no responses are timely filed and served with respect to the Objection, the Plan Administrator may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed

WEIL:\95666327\12\58399.0011

order annexed to the Objection, which order may be entered with no further notice or opportunity

to be heard offered to any party.

Dated: May 20, 2016
        New York, New York

/s/ Richard L. Levine
Richard L. Levine
Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

WEIL:\95666327\12\58399.0011

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

---------------------------------------------------------------x

## PLAN ADMINISTRATOR'S OBJECTION TO CLAIM NUMBER 29606

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors (the "Plan") for the entities in the above-referenced chapter 11 cases,

respectfully represents as follows:

### RELIEF REQUESTED

1.       SRM Global Master Fund Limited Partnership ("SRM") filed proof of

claim number 29606 asserting several claims (each a "Claim" and together, the "Claims")

against LBHI for guaranty liability based on alleged obligations of Lehman Brothers

International (Europe) ("LBIE") owed in connection with LBIE's role as SRM's broker dealer.

███████████████████████████████████████████████████

███████████.  SRM, however, has failed to be forthcoming in Rule 2004 discovery.

SRM, in any event, has failed to establish the existence of a valid and binding guaranty. Accordingly, the Claims must be disallowed in their entirety.  Further, as fully established below, even assuming the existence of a guaranty by LBHI, each of the Claims must be dismissed for failure to state a claim upon which relief may be granted and disallowed.

2.     SRM's claims against LBIE mostly arise under the International Prime Brokerage Agreement (the "PBA") between SRM and LBIE, which SRM terminated on November 6, 2008 (the "PBA Termination Date").  As a result, under the PBA, SRM was entitled to receive only the net amount owing to it (if any) as of the PBA Termination Date, including the value of any securities held by LBIE for SRM.  █████████████████

███████████████████████████████     ████████████████

████████████████████████████████████

████████████

3.     To the contrary, SRM alleges (in significant part) that it is owed hundreds of millions of additional damages from LBHI based on the post-PBA Termination Date increase in the value securities that LBIE held for SRM.  Specifically, among other things, SRM seeks to recover the appreciation in value occurring after SRM terminated its prime brokerage relationship with LBIE and, in some instances, ████████████████████████

████.  There is, however, no basis for SRM's claim to such amounts under the title 11 of the United States Code (the "Bankruptcy Code") or under its contractual arrangements with LBIE.

4.     Section 502 of the Bankruptcy Code requires claims to be valued as of the petition date.  In the alternative, section 562 of the Bankruptcy Code requires claims arising from the termination of a "securities contract" to be measured as of the contract termination date.  In

2

either case, SRM cannot recover based on stock price appreciation long after the dates mandated by the Bankruptcy Code.

5.      Moreover, the PBA entered into between SRM and LBIE itself contains a broad exculpatory provision that limits LBIE's liability for damages (beyond any termination date netting out of obligations) to situations where LBIE has been grossly negligent, fraudulent, or in willful default or breach of its obligations.  SRM has not alleged that LBIE (or, for that matter, LBHI) was grossly negligent, fraudulent or in willful default or breach of its duties through its administrators or otherwise.

6.      But even if SRM could allege gross negligence, fraud, or willful misconduct (which it cannot), the express terms of the PBA limit SRM's resulting damages to the market value of the applicable securities <u>as of the date of discovery of loss</u>.  Such date occurred, by SRM's own admission, shortly after LBIE entered administration on September 15, 2008, ████████████████████████████████.  Accordingly, there is for this reason as well basis for SRM's claim for the significant postpetition appreciation in the value of securities—or, for that matter, its other Claims as more fully addressed below.

7.      The Plan Administrator therefore seeks an order, pursuant to section 502(b) of the Bankruptcy Code and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), disallowing and expunging the Claims (as further described below) in their entirety.

## **<u>JURISDICTION</u>**

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

### A.    General Background

9.      Commencing on September 15, 2008 (the "Petition Date"), and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

10.      On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023] (the "Confirmation Order"). The Plan became effective on March 6, 2012. Pursuant to the Plan, the Plan Administrator is authorized to interpose and prosecute objections to claims filed against LBHI.

11.      As set forth in an Order of the Court, dated April 19, 2010 [ECF No. 8474], all hearings to address the legal sufficiency of a particular contested claim and whether the contested claim states a claim against the asserted debtor under Bankruptcy Rule 7012 are considered "sufficiency hearings." The standard of review for a "sufficiency hearing" is equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim. *See* ECF No. 8474.

### B.    LBIE's English-law Administration

12.      LBIE is a subsidiary of LBHI that is not a debtor in the Chapter 11 Cases. On September 15, 2008, LBIE entered English administration proceedings pursuant to the United Kingdom Insolvency Act 1986 (the "LBIE Administration"). LBIE's estate is currently being wound-up by certain joint administrators (the "Joint Administrators") who are not controlled by the Plan Administrator.

4

C.    **Relevant Procedural History**

13.    On June 10, 2015, the Plan Administrator filed a motion [ECF No. 49954] (the "Estimation Motion") to estimate at zero dollars 1,150 claims filed against LBHI that assert guaranty liability against LBHI based on a primary obligation of LBIE.   The basis for the Estimation Motion was that such claims had been, or were expected to be, satisfied in full as a result of distributions from LBIE alone.   As a result of the Estimation Motion, over 900 claims asserting an aggregate amount of more than $3 billion were estimated at zero dollars for reserve and distribution purposes.

14.    SRM's Claims were subject to the Estimation Motion.   After SRM filed an objection ████████████████████████████████████████████████████████ [ECF No. 50319] (the "Estimation Objection"), the Plan Administrator withdrew the Estimation Motion as to SRM's Claims and sought discovery of SRM pursuant to Bankruptcy Rule 2004 to assess the Claims' validity.   Despite multiple requests, SRM has refused to provide the Plan Administrator with much of the discovery sought, including relevant communications between SRM and LBIE ██████████████████████████████████████████.[1]

15.    English law governs the underlying transaction documents between SRM and LBIE.   To assist the Court with the evaluation of such documents, and in accordance with Rule 44.1 of the Federal Rules of Civil Procedure, the Plan Administrator submits the accompanying Declaration of Sir John Chadwick, an expert on English law as set forth therein, which has been served and filed contemporaneously herewith (the "Chadwick Declaration").

---

[1] ████████████████████████████████████████████████████████████████
██████████████████████████ Counsel for LBHI wrote a letter to counsel for SRM on April 12, 2016, raising a host of open discovery issues and disputing that English law of privilege applied in this bankruptcy case. See Exhibit A hereto.  Counsel to SRM responded by letter on May 20, 2016.  See Exhibit B hereto.

WEIL:\95666327\12\58399.0011

## THE CLAIMS

16.    SRM asserts three disputed Claims against LBHI: (a) the "Segregated Assets Claim", (b) the "Forced Sales Claim", and (c) the "Lost Opportunities Claim" (each as defined below).[2]  As the basis for LBHI's alleged guarantor liability for each Claim, SRM relies exclusively upon a resolution from the Board of Directors of LBHI, dated June 9, 2005, a copy of which is attached hereto as Exhibit C (the "Corporate Resolution").[3]

17.    The "Segregated Assets Claim."  The Segregated Assets Claim is based on LBIE's alleged breach of the PBA, an International Prime Brokerage Agreement between SRM and LBIE, dated May 2008.[4]  Specifically, SRM alleges that, post-entry into administration, LBIE failed to return to SRM as required under the PBA certain securities that allegedly should have been held by LBIE in a segregated account (such securities, the "Segregated Assets").  Claim 29606 ¶ 12.

18.    ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Estimation Obj. ¶ 17.  And, in its proof of claim, SRM valued the Segregated Assets Claim at $65.4 million, which was the value of the Segregated Assets as of the date the proof of claim was filed.  Claim 29606 ¶ 12.  But in its Estimation Objection, SRM valued the Segregated Assets Claim at over $264 million, which was the asserted value of the Segregated Assets ████████████████████████████████████ ████████████████████████████████████████████████████████.  Estimation Obj. ¶ 17.

---

[2] A fourth component of SRM's proof of claim is based on an International Swaps and Derivatives Association Inc. Master Agreement between LBIE and SRM, dated as of May 12, 2008.  Such component (the "ISDA Claim") is not the subject of this Objection and is hereinafter excluded from the defined term "Claim."

[3] This copy was originally filed with the Court as Exhibit B to the Declaration of Richard A. Graham, ECF No. 50321.

[4] The PBA, as submitted by SRM to the Guarantee Questionnaire and Derivatives Questionnaire website, is attached hereto as Exhibit D.

19.    SRM continues to pursue its Segregated Assets Claim against LBHI in the amount of over $264 million, arguing that, ███████████████████████████████ ████████████████████████████████████████████, it "did not recover the full value on its claim against LBIE for the return of the Segregated Assets." [5] *Id.* As noted above, however, the PBA caps the value SRM is entitled to recover to the value of such assets at or before the PBA Termination Date in November 2008.

20.    The "Forced Sales Claim." SRM separately asserts it is owed $48.3 million by LBHI on account of certain stock sales it allegedly was "forced" to effectuate postpetition at disadvantageous prices to meet margin calls by other broker-dealers following LBIE's failure to timely return the Segregated Assets. Claim 29606 ¶ 16. Specifically, SRM alleges that it was forced to liquidate certain positions (the "Liquidated Securities") to meet margin calls because it could not use the Segregated Assets to meet such calls. *Id.* The Forced Sales Claim allegedly arises under the PBA – which, as noted, limits SRM's recovery to the value of the Segregated Assets at or before the PBA Termination Date. ███████████████ ████████████████████.

21.    The "Lost Opportunities Claim." The Lost Opportunities Claim alleges SRM suffered a purported round $100 million in damages (an amount we suspect plucked out-of-thin-air) as a result of a "loss of investment opportunities," allegedly resulting from LBIE's alleged post-Administration breaches of its contractual obligations. Claim 29606 ¶¶ 17-18. Specifically, SRM alleges that it lost investment opportunities because "SRM's management was

---

[5] In discovery, the Plan Administrator sought confirmation from SRM that the Segregated Assets Claim related only to shares of Virgin Media, which previously traded on NASDAQ. *See* Exhibit A. SRM responded by asserting that the Segregated Assets include "701,033 Charter Communications shares ███████████████," in addition to the shares of Virgin Media. Based on closing market prices, the publicly-traded shares of Virgin Media held by LBIE for SRM were worth approximately $52 million on September 15, 2008, and approximately $30 million on November 6, 2008, ████████████████████████████████████.

compelled to devote significant time and effort to dealing with the consequences of [LBIE's post-Administration] breaches." *Id.* ¶ 17.  SRM rather amazingly alleges that, "[i]f very large amounts of management time had not had to be devoted to issues resulting from the failure to segregate assets and other breaches by LBIE, SRM could have devoted substantially more time to finding even more mispriced investments and the fund returns would have been better." *Id.* The alleged "other breaches" referred to the Joint Administrators' alleged failure to deliver compliant margin notices under a Cross Margin and Netting Agreement (the "CMNA") between SRM and LBIE.[6] *Id.*  Under Clause 2.2 of the PBA, the CMNA is a document "identified as being related to a Transaction contemplated by" the PBA, and is thus governed by the PBA. *See* Chadwick Declaration ¶¶ 7, 30; PBA ¶ 2.2.

## OBJECTION

22.     A claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

23.     To be entitled to *prima facie* validity under Bankruptcy Rule 3001(f), a proof of claim must allege "facts sufficient to support a legal liability to the claimant."  *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991).  An objection refuting – on either a factual or a legal basis – one of a claim's essential allegations shifts to the claimant the burden of proof of demonstrating the validity of its claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729, 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

---

[6] The CMNA, as submitted by SRM to the Guarantee Questionnaire and Derivatives Questionnaire website, is attached hereto as Exhibit D.

24.    As set forth below, none of the Claims withstands scrutiny. Accordingly, the Court should disallow and expunge the Claims in their entirety.

## I.    LBHI Has No Guaranty Liability for Any Of The Three Claims

25.    Clause 2.2 of the PBA has a merger clause that states explicitly:

> Except to the extent that any other document or notice is expressly referred to in this Agreement (including, without limitation, the Customer Agreements) the terms of this Agreement constitute the entire agreement between the parties as to its subject matter and, to the extent of any such other document or notice, the terms of this Agreement will prevail.

There is no reference whatsoever to any guaranty by LBHI in the PBA (or the CMNA).

26.    SRM also represented in the PBA that it had "not relied on any representation, warranty or other statement of another party in entering into this Agreement other than those expressly set out in this Clause 16." PBA ¶ 16.3(a). SRM further represented that it "has not relied on any oral or written representation made by the Prime Broker or any person on behalf of the Prime Broker…." *Id.* ¶ 16.3(b)(i).

27.    A guaranty, of course, is a contractual undertaking by one party, the guarantor, to satisfy the obligations of another party, the primary obligor, to a third party, the creditor, in the event of a default by the primary obligor. *See Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.*, No. 06 Civ. 52(JGK), 2006 WL 2337186, at *13 (S.D.N.Y. Aug. 11, 2006); RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 1 cmts. f, g (1996); BLACK'S LAW DICTIONARY (9th ed. 2009); 38 AM. JUR. 2D *Guaranty* § 1 (2014).

28.    Like all contracts, acceptance is a crucial element in forming a valid guaranty contract, as the United States Supreme Court explained in *Davis Sewing-Mach. Co. v. Richards*, 115 U.S. 524 (1885):

> A contract of guaranty, like every other contract, can only be made by mutual assent of the parties. . . . [I]f the guaranty is signed by the guarantor without any

9

previous request of the other party, and in his absence, for no consideration moving between them except future advances to be made to the principal debtor, the guaranty is in legal effect an offer or proposal on the part of the guarantor, *needing an acceptance by the other party to complete the contract*.

*Id.* at 525 (emphasis added).[7]

29.    "Specific" guaranties identify the benefiting creditor or, "with precision," the underlying agreements being guaranteed. *See, e.g.*, *Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd.*, 117 F. Supp. 2d 394, 400 (S.D.N.Y. 2000) (stating that a valid guaranty must describe "with precision the obligation to which the person is bound"). The Claim does not identify any specific guaranty of LBIE's obligations under the PBA or CMNA. (The Claim alleges that SRM obtained a specific guaranty for its ISDA Claim but acknowledges that this specific guaranty does not govern the (disputed) Claims.) Claim 29606 ¶¶ 5-7

30.    "General" guaranties are offers that can be accepted by anyone to whom they are presented and do not necessarily specify the particular transactions that will be guaranteed. *See Evansville Nat'l Bank v. Kaufman*, 93 N.Y. 273, 276 (1883); 38 AM. JUR. 2D *Guaranty* § 14; *see also Philip Carey Co. v. Duffy*, 10 N.Y.S.2d 876, 876 (N.Y. App. Div. 4th Dep't 1939). To benefit from a general guaranty, a creditor must show that it knew of the existence of the guaranty and acted in reliance upon its terms when entering into the transaction with the primary obligor; acceptance of a general guaranty may be indicated by a party extending credit in reliance on the guaranty—and the extension of credit also qualifies as consideration for the guaranty. *See Evansville Nat'l Bank*, 93 N.Y. at 279; 63 N.Y. JUR. 2D *Guaranty and Suretyship* § 78 (2014); *see also Union Carbide Corp. v. Katz*, 489 F.2d 1374, 1376 (7th Cir.

---

[7] Furthermore, under the New York Statute of Frauds, a guaranty contract must be in writing and signed by the guarantor. *See* N.Y. GEN. OBLIG. LAW § 5-701(a)(2) (McKinney 2002); *see also DeRosis v. Kaufman*, 641 N.Y.S.2d 831, 832–34 (N.Y. App. Div. 1st Dep't 1996). The Plan Administrator does not concede, and reserves all of its rights to argue, that the Corporate Resolution is not a guaranty contract of any kind and that the Resolution would not satisfy the Statute of Frauds.

1973); *Farmers' State Bank of York v. Brock*, 234 N.W. 92, 94 (Neb. 1931). As the court in

*Federal Deposit Insurance Corp. v. Schumacher*, 660 F. Supp. 6 (E.D.N.Y. 1984), explained:

> It is, of course, elementary that a creditor's right to enforce a contract of guaranty must be based upon knowledge of the existence of the guaranty and that the credit must be extended in reliance thereof[.]

*Id.* at 8 (citations omitted). Indeed, it is well-settled that:

> A "general" guaranty is addressed to persons generally and may be enforced by anyone to whom it is presented although it has been recognized that the person so acting must have had definite knowledge of the existence of the guaranty and acted in reliance on it.

38 AM. JUR. 2D *Guaranty* § 14.

      31.     Therefore, courts consistently require knowledge and reliance on the part

of the claimant before enforcing general guaranties. *See, e.g., Philip Carey Co. v. Duffy*, 10

N.Y.S.2d 876 (N.Y. App. Div. 4th Dep't 1939); *see also Joe Balestrieri & Co.* v. *Comm'r of*

*Internal Revenue*, 177 F.2d 867, 873 (9th Cir. 1949) (recognizing the validity of a guaranty claim

where guaranty was made at the request of the prospective creditor and was delivered by the

primary obligor); *J. C. Wattenbarger & Sons v. Sanders*, 30 Cal. Rptr. 910, 915 (Cal. Ct. App.

1963) (rejecting guaranty claim where there was "no proof that credit was extended with

knowledge of it and reliance upon it"); *Calcot Ass'n v. Coast Cotton Mills*, 295 P.2d 1, 4 (Cal.

Dist. Ct. App. 1956) (recognizing guaranty claim where court recognized that product was

delivered to the primary obligor "only because the guaranties had been made").

      32.     To the extent that the Corporate Resolution is found to be a guaranty, it is,

at best, a general guaranty, because it does not identify any particular counterparty or transaction

to which it might apply and certainly does not identify any "with precision." *See Cavendish*

*Traders, Ltd.*, 117 F. Supp. 2d at 400. Accordingly, a guaranty claim based on the Corporate

Resolution alone is enforceable only by a creditor that establishes – as a required, *prima facie* element of its claim – that it knew of and relied upon the Corporate Resolution when transacting business with the relevant primary obligor.

33.    SRM has not alleged that it knew of and relied upon the Corporate Resolution at the time it entered into the PBA and CMNA with LBIE.  Even if SRM were now to assert that, as a matter of fact, it did rely on the Corporate Resolution, as set forth above, SRM expressly disclaimed reliance on any other document or representation outside of the four corners of the PBA when entering into the PBA, so it is precluded from now asserting reliance on the Corporate Resolution.  In contrast, SRM did obtain a specific guaranty of its ISDA Claim at the same time that it entered into the PBA.  Based on the forgoing, LBHI can have no guarantee liability for the Claims.

## II.    Clause 14 Of The PBA Precludes Recovery On All Three Claims

### A.    SRM Failed to Allege Gross Negligence, Fraud, or Willful Default

34.    SRM does not and cannot allege that it did not recover the value of the Segregated Assets as of the Petition Date or as of the PBA Termination Date.  In any event, any claim by SRM for damages beyond the value of the Segregated Assets at the time against LBIE was precluded by the very terms of the PBA, which contains a broad exculpatory provision that limits LBIE's (and LBHI's) liability to damages arising only in the event of gross negligence, fraud, or willful default or breach.  Specifically, Clause 14.4 of the PBA provides:

> Where the Prime Broker has been found to be liable, the Prime Broker shall only be liable to the Counterparty to the extent that the Prime Broker has been grossly negligent, fraudulent or is in willful default or breach of its duties as set out in this Agreement . . . .

12

PBA ¶ 14.4.  Clause 14.9 of the PBA further provides that "References in this Clause 14 to the Prime Broker shall include any Affiliate of the Prime Broker," which includes LBHI.  *See* PBA Schedule 3.

35.    SRM has not alleged LBIE (or LBHI) was grossly negligent, fraudulent, or in willful default or breach of its duties in failing to return securities postpetition to SRM. SRM has not otherwise alleged facts that would bring any of its Claims outside of the limitations of Clause 14 of the PBA.

36.    SRM cannot file a late claim or attempt to amend its Claim.  Confirmation Order ¶ 86.  Moreover, even if it could amend its Claims to assert a new, tort-based claim for gross negligence, willful misconduct, or fraud related to LBIE's failure to return securities, no facts could ever support such a claim given the terms of the PBA.  Under Clause 7.2(a) of the PBA, following an "Event of Default," or upon a "Potential Event of Default," LBIE expressly was <u>permitted</u> to decide not to return the Segregated Assets or securities "equivalent" to the Segregated Assets ("<u>Equivalent Securities</u>") notwithstanding a client request:

> The Prime Broker acting in good faith and in its commercially reasonable discretion shall not be required to make a payment or delivery under Clause 7.1 if - (a) an Event of Default or Potential Event of Default has occurred and is continuing[]

One "Event of Default" under the PBA, with notice from the non-defaulting party, is an "Act of Insolvency."  *See* PBA ¶ 12.1(d).  An Act of Insolvency occurs upon "the presentation or filing in any jurisdiction in respect of it in any Court . . . seeking . . . administration."  PBA Schedule 3(d).)  On September 15, 2008, LBIE was the subject of an order for administration made by the High Court of England and Wales, and the seeking of such an order constituted an Act of Insolvency under Schedule 3 of the PBA.  *See* Chadwick Declaration ¶¶ 23, 36, 50.

37.     Thus, any decision by the Joint Administrators not to return the Segregated Assets or "Equivalent Securities" in the period shortly after their appointment and in light of the circumstances of the global dissolution of Lehman Brothers was expressly permitted given there was a Potential Event of Default.  Further, any such decision would have been made in good faith and in the Joint Administrator's commercially reasonable discretion in their efforts to treat all creditors fairly in accordance with the priority scheme of the LBIE Administration and was far from the willful default, gross negligence, or fraud required to trigger liability under Clause 14.4 of the PBA.  *See* Chadwick Declaration ¶¶ 50, 64, 67.

**B.     Clause 14.3 Prohibits Recovery From LBHI Even if Gross Negligence, Willful Default, or Fraud Were Established**

38.     Under the PBA, even in the case where losses by SRM arise as a direct result of LBIE's (or LBHI's) gross negligence, willful default, or fraud, LBIE (and LBHI) "accepts no liability for and shall not be liable to [SRM] for any Losses whatsoever . . . as a result directly or indirectly from," among other things:

    a.  the general risks of investing, or

    b.  investing or holding assets in a particular country (including but not limited to, Losses arising from nationalization, expropriation or other governmental actions; regulations of the banking or securities industries; currency restrictions, devaluation or fluctuations; and <u>market conditions affecting the orderly execution of securities transaction or affecting the value of assets</u>) . . . .

PBA ¶ 14.3 (emphasis supplied).  The PBA is explicit that "such exclusion of liability shall extend, without limitation, to obligations in tort, any indirect, punitive Special or Consequential loss or damage. . . ." *Id.*

39.     The Claims seek the postpetition appreciation in value of certain assets based on LBIE's failure to return them, damages for forced sales of other securities at an

inopportune time due to the failure to return such assets, and recovery for lost investment opportunities due to LBIE's failure to promptly return the Segregated Assets and other breaches of the PBA in the midst of historical market turmoil.  Claim 29606 ¶¶ 12-18.  Such alleged damages fall squarely within the exculpation contained in Clause 14.3 of the PBA, arising directly or indirectly from the "general risks of investing" or "market conditions affecting . . . the value of assets," including indirect, Special, and Consequential damages.  *See* Chadwick Declaration ¶¶ 24, 70.

### C. Clause 14.4 Also Limits Any Damages Available to SRM To Amounts SRM Already Has Recovered

40.    Even if SRM could establish that LBIE (or LBHI) had acted fraudulently, grossly negligently, or in willful default of its obligations (which it cannot), Clause 14.4 of the PBA still would limit the amount of SRM's damages to the value of the securities as of the discovery of the breach.  Specifically, Clause 14.4 provides:

> The parties agree that, as a genuine pre-estimation of loss, [LBIE's] liability to [SRM] shall be determined based only upon the Market Value of the relevant cash or securities as at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities.

Thus, Clause 14.4 provides that SRM's damages must be "determined based only upon the Market Value of the relevant . . . securities as at the date of the discovery of loss and without reference to any special circumstances . . . or subsequent variations to the Market Values of the relevant . . . securities."  PBA ¶ 14.4.

41.    The "date of the discovery of the loss" was on or about the Petition Date.  "[I]t was admitted (indeed, alleged) by SRM that it discovered the loss – in the sense of appreciating that LBIE was not about to deliver Equivalent Securities – on or about September 19, 2008 . . . ."  Chadwick Decl. ¶ 69.  Accordingly, under the express terms of the PBA, SRM's

15

damages, if it otherwise was able to circumvent the limitations of Clauses 14.3 and 14.4 set forth above, would be the value of the relevant securities on September 19, 2008, precluding any claim for a subsequent appreciation in value or the other categories of claimed losses, including the Forced Sales Claim and the Lost Opportunities Claim.[8]

### III.    SRM Failed To Allege Cognizable Damages With Respect To The Segregated Assets Claim Based On A Proper Valuation Date

#### A.    SRM's Valuation Dates Have No Basis in Law and Conflict with the Bankruptcy Code

42.    SRM asserted its Segregated Assets Claim at $65.4 million based on the alleged value of the Segregated Assets as of the date the proof of claim was filed (Claim 29606 ¶ 12) and most recently asserted the same claim was at over $264 million based on the purported value of the Segregated Assets ██████████████████████████████████, nearly five years after LBHI's Petition Date.  Estimation Obj. ¶ 17.

43.    Neither SRM's choice of its claim filing date nor its selection of ███████ ███████████ as the valuation date for the Segregated Assets Claim has any basis in law.

44.    Under the Bankruptcy Code, claims are valued as of "the date of the filing of the petition."  11 U.S.C. § 502(b).  The only exception to this rule is found in section 562(a), which provides an alternative date (the "562 Date") for valuing certain claims that arise from the rejection, liquidation, termination, or acceleration of certain specified contracts, including "securities contract[s]."  Specifically, section 562(a) provides, in pertinent part, as follows:

---

[8] The limitation on damages set forth in Clause 14.4 is consistent with other acknowledgments and agreements by SRM in the PBA.  *See, e.g.*, PBA ¶ 14.6 (SRM acknowledges that LBIE "will not be monitoring the suitability of any Transaction or any of the Cash Accounts or Securities Accounts for the purposes of evaluating their composition or their or [SRM's] performance . . . [or] overall financial position."); 14.7 ("The holding of assets in, and investing in, foreign jurisdictions may involve risks of loss or other special features and the Counterparty accepts that the consequences of so investing and holding assets in such foreign jurisdictions shall be entirely at the risk of [SRM].").

16

> [I]f a financial institution . . . financial participant, [or] master netting agreement participant . . . liquidates, terminates, or accelerates [a securities contract], damages shall be measured as of the earlier of –
>
> (2) the date or dates of such liquidation, termination, or acceleration.

11 U.S.C. § 562(a).  There can be no question that the PBA is a "securities contract" for purposes of section 562.  *See SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 476 B.R. 715, 720 (S.D.N.Y. 2012).

45.    Assuming, *arguendo*, that section 562(a) applies, the 562 Date is November 6, 2008.  In discovery, SRM produced the Termination Notice attached hereto as Exhibit F, which terminated the PBA as of November 6, 2008, the PBA Termination Date – a date some ten months *before* SRM filed its guaranty claim against LBHI ███████████████ ████████████████████.  Despite this, SRM is attempting to collect from LBHI the post-termination increase in value of the Segregated Assets.  *See* Estimation Obj. n. 2 ("LBIE failed to return the Segregated Assets to SRM, and the value of the Segregated Assets increased over time . . . .").

46.    SRM's attempt to "ride the market" must be rejected.  To the extent section 562 does not apply, the Bankruptcy Code is clear that the Segregated Assets Claim must be valued as of the Petition Date.  11 U.S.C § 502(b).  Valuing all claims asserted against LBHI as of the Petition Date is consistent with the fundamental principle of bankruptcy that there should be an equality of distribution among similarly situated creditors.  To the extent section 562 applies, then valuing the Segregated Assets Claim as of the PBA Termination Date is both required under the Bankruptcy Code and consistent with the intent of the safe harbor provisions: such provisions protect financial markets from the volatility associated with delaying the final

17

and prompt resolution of securities and derivatives contracts.  *See, e.g.*, H.R. Rep. No. 101-484, at 2 (1990), U.S. Code Cong. & Admin. News 1990 pp. 223-24.

47.     Whether SRM's Claim against LBIE was valued in the LBIE Administration on a date other than either the Petition Date or the 562 Date is irrelevant.  As the case law uniformly holds, when the Bankruptcy Code specifically addresses an issue, the Bankruptcy Code controls.  *See, e.g.*, *In re Enron*, 354 B.R. 652, 659 (S.D.N.Y. 2006) ("[S]tate law is only controlling where the Bankruptcy Code itself does not establish the rule to be applied.") (citations omitted).

48.     Multiple circuit courts have held that claims in bankruptcy should be valued in accordance with the express terms of the Bankruptcy Code, notwithstanding any applicable non-bankruptcy law to the contrary.  For example, in *In re American Home Patient, Inc.*, 414 F.3d 614, 620 (6th Cir. 2005), the Sixth Circuit declined to apply New York law to determine the damages resulting from the rejection of an executory contract, stating

> Resort to state law is appropriate and/or necessary when a gap exists in federal bankruptcy law,' but when [the Code's] specific provisions leave no 'gap' . . . [the specific Code provision] control[s] any conflicting provisions of state law.

In *American Home Patient*, the non-defaulting party argued that New York law provided that damages should be measured as of the date the non-defaulting party learned of the breach.  The court found New York law inapplicable because the Bankruptcy Code specifically provided that damages for rejection of executory contracts are measured as of the date of the filing of the petition.  *Id.*

49.     The Fifth Circuit reached the same conclusion in *In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338 (5th Cir. 1984).  In *Brints Cotton Marketing*, creditors argued that damages resulting from the debtor's rejection of their executory contracts should have been

WEIL:\95666327\12\58399.0011

measured in accordance with applicable state contract law. *Id.* at 1341. The Fifth Circuit

rejected the creditors' argument, stating

> Whatever the merits under state law . . . absent bankruptcy, the
> creditors' contention overlooks that, while state law ordinarily
> determines what claims of creditors are valid and subsisting
> obligations, a bankruptcy court is entitled (if authorized by the
> federal bankruptcy statute) to determine how and what claims are
> allowable for bankruptcy purposes.

*Id.* The Court affirmed the bankruptcy court's determination that the date of the filing of the

petition was the proper date to measure damages, regardless of whether state law would lead to a

different damage valuation date. *Id.* at 1342.

50. The reason SRM has failed to allege a proper valuation date under the

Bankruptcy Code seems clear. If one applies a valuation date of September 15, 2008, or

November 6, 2008, as required by the Bankruptcy Code, ████████████████████████

████████████████████████████████████.

51. For these reasons, as well, the Segregated Assets Claim must be dismissed

as a matter of law.

## B. SRM's Selected Valuation Dates  Also Conflict With The Express Terms of the PBA

52. Even assuming, *arguendo*, that the valuation of the Segregated Assets

Claim is not governed by section 502 or 562 of the Bankruptcy Code and is instead governed by

the terms of the PBA, there is no basis to value the Segregated Assets Claim as SRM has

claimed.

### i. *Assuming SRM Had a Proprietary Claim for the Segregated Assets as of the Petition Date, the Value of SRM's Segregated Assets Claim Damages Would Be Measured on or About the Termination Date, at the Latest.*

53. Under Clause 12 of the PBA, LBIE's administration constituted an Act of

Insolvency, which, with notice from SRM, became an Event of Default. Upon an Event of

19

Default, SRM was entitled to terminate the PBA.  On November 6, 2008, SRM sent LBIE the PBA Termination Notice terminating the PBA.

54.     If SRM had a proprietary (or customer) claim to the Segregated Assets, such proprietary claim would have been determined or ceased to be exercisable, at the latest, on the PBA Termination Date.  *See* Chadwick Decl. ¶¶ 13 (Issue A); 62-63.  Then, once SRM terminated the PBA, SRM was left with only a contractual claim to the return of the Segregated Assets governed by the close-out provisions of Clauses 13.1(d) and 13.2 of the PBA.  *Id.* Pursuant to Clause 13, SRM was entitled to receive only the net amounts due to it (if any) on or about the Termination Date.  *See* Chadwick Decl. at ¶ 46.  Thus, Clauses 12 and 13 of the PBA are consistent with Clause 14.4's limitation on recoveries against LBIE even in the case of gross negligence, fraud, or willful default.

55.     SRM seeks to recover from LBHI more than the balance of any amounts due between the parties upon termination (SRM's only available remedy under the express terms of the PBA).  As set forth above, under English law and the terms of the PBA, there is no basis for such claim.

      *ii.*     *Assuming SRM Had a Contractual Claim for the Segregated Assets as of the Petition Date, the Value of SRM's Segregated Assets Claim Damages Would Be Measured as of September 19, 2008.*

56.     As previously discussed, the crux of SRM's Segregated Assets Claim is that LBIE failed to properly segregate and return the Segregated Assets and, as a result, SRM failed to obtain the benefit of an increase in the value of such assets over time.  Assuming SRM had a contractual breach claim (as opposed to a proprietary or customer claim) for the return of such securities, such claim would have to be based upon a breach of Clause 7 or Clause 11.3 of

20

the PBA, each of which required LBIE to deliver certain securities to SRM under certain circumstances.[9]  *See* Chadwick Decl. ¶ 51.

57.     Assuming a breach of Clause 7 or Clause 11.3 of the PBA, or of any other provision of the PBA for that matter, damages would be subject to the limitations on liability set forth in Clause 14.4 of the PBA, which is discussed more fully above.  As noted, SRM's losses would be measured under this clause as of September 19, 2008, which is the "date of the discovery of loss."  *See supra* ¶¶ 40-41.

58.     Accordingly, under English law and the terms of the PBA, there is no basis for SRM's calculation of its claim for the Segregated Assets even as a contract claim.

## IV.    The Lost Opportunities Claim Should Be Dismissed

### A.     The Lost Opportunities Claim Should Be Dismissed Because The Damages Sought Are Speculative And Remote

59.     SRM alleges that it suffered $100 million in damages from "loss of investment opportunities" that resulted from the "substantial diversion of vast amounts of management time and energy."  Claim 29606 ¶ 17-18.

60.     The Lost Opportunities Claim is a quintessential claim for indirect or consequential losses, and such claims are not recoverable under the PBA.  *See supra* ¶¶ 38-39; PBA ¶ 14.4 ("[Losses shall be] determined based only upon the Market Value of the relevant . . . securities as at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses").

61.     Moreover, as the Chadwick Declaration makes clear, the speculative nature of the claim would be rejected by an English court:

---

[9] In the Claims, SRM does not specify the provisions of the PBA that are alleged to have been breached by LBIE.

> An English court would be likely to take the view that the allegations advanced in support of the Lost Opportunities Claim are so lacking in particularity that the claim should be dismissed because it is impossible for LBHI or the Court to address it.
>
> An English court would be likely to reach that conclusion because, under the general law, there are limitations on the extent to which damages can be recovered following a contractual breach. In particular, it is necessary for the claimant to allege and establish a sufficient causal link between the breach on which it relies and the loss in respect of which it claims. An English court would regard the absence of particularised allegations linking breach to loss as unacceptable. SRM asserts that its losses arise (at least in part) from wasteful diversion of management time resulting not only from continued and repeated breach of LBIE's obligations to serve compliant Margin Notices under the CMNA, but also from issues resulting from the failure to segregate assets under the PBA. It would be essential, as a matter of English law, to identify which losses are said to arise from the alleged failure to serve compliant Margin Notices and which losses are said to result from the alleged failure to segregate assets under the PBA.

Chadwick Declaration ¶ 13 (Issue E); ¶ 78 ("I feel able to say with confidence that an English Court (if seized of the issue) would be likely to take the view that the allegations advanced in support of the Lost Opportunities Claim are so lacking in particularity that, without more, the claim should be dismissed as embarrassing: in the sense that it is impossible for LBIH or the court to address it").[10]

62.     This is consistent with New York law. Under New York law, the alleged damages would not be recoverable because such damages are entirely speculative and not directly traced to the purported breach. As the New York Court of Appeals held in the seminal case of *Kenford Co. v. Erie Cty.*, 67 N.Y.2d 257, 261 (1986) (citations omitted),

> Loss of future profits as damages for breach of contract have been permitted in New York [only] under long-established and precise

---

[10] SRM has not articulated why, under the circumstances, the alleged failure of LBIE to deliver daily Margin Notices was of any real concern to the management of SRM or resulted in lost investment opportunities. *See* Chadwick Decl. ¶ 77. Further, SRM did not allege that it was unable to calculate its margin on its own.

WEIL:\95666327\12\58399.0011

rules of law. First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes. In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

63.    As noted above, SRM fails to allege any direct relationship between the purported breaches and the damages sought. For instance, SRM fails to allege how the purported failure to deliver compliant Margin Notices or return Segregated Assets resulted in management's time being diverted and how any diversion prevented management from otherwise fulfilling its investment obligations and other duties. Further, SRM does not allege – because it cannot – precisely what other investments it would have made had management's time not been "diverted" and show that these theoretical investments would have generated the $100 million in claimed losses. Even if SRM were now to allege, with the benefit of 20/20 hindsight, the particular transactions it would have executed to generate $100 million, such allegations will never be sufficient because SRM will never be able to prove how they actually would have invested the next dollar because it would necessarily be based on hypotheticals and assumptions. *See A.I.A. Holdings, S.A. v. Lehman Bros.*, 2002 WL 1334809, at *3 (S.D.N.Y. June 17, 2002) ("plaintiffs cannot recover for lost profits, as a matter of law, because the damages are speculative and solely dependent on hypotheticals and assumptions").

## RESERVATION OF RIGHTS

64.    The Plan Administrator reserves all rights to object on any other bases to the Claims as to which the Court does not grant the relief requested herein. The Plan Administrator reserves the right to conduct further discovery as to the Claims and any matters raised by SRM and to supplement this and other filings as a result thereof.

23

## NOTICE

65.    No trustee has been appointed in these chapter 11 cases.  Notice of this objection has been provided to (i) the United States Trustee for Region 2; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) SRM; and (vi) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [ECF No. 9635].  The Plan Administrator submits that no other or further notice need be provided.

66.    No previous request for the relief sought herein has been made by the Plan Administrator or the Chapter 11 Estates to this or any other Court.

WHEREFORE the Plan Administrator respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just.

Dated:  May 20, 2016
        New York, New York

/s/ Richard L. Levine
Richard L. Levine
Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

# EXHIBIT A

# Weil, Gotshal & Manges LLP

VIA E-MAIL

Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
+1 212 310 8000 tel
+1 212 310 8007 fax

Richard L. Levine
+1 (212) 310-8286
richard.levine@weil.com

April 12, 2016

Andrew W. Hammond
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036

Re: *In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (SCC), SRM Global Master Fund Limited
Partnership's Responses and Objections to Discovery Requests Served Pursuant to Rule 2004
of the Federal Rules of Bankruptcy Procedure

Dear Andrew:

We write on behalf of our client Lehman Brothers Holdings Inc. ("**LBHI**"). Thank you for
making SRM's productions on January 1, 2016, February 26, 2016, and April 1, 2016, available to us.
We and LBHI are continuing to review those productions.

We also are in receipt of your letter, dated March 7, 2016 (the "**SRM Letter**"), which was sent
in response to LBHI's letter, dated February 5, 2016 (the "**First LBHI Letter**").[1] We continue to stand
by the First LBHI Letter and all positions set forth therein. Nevertheless, LBHI sees no purpose in
continuing to debate matters where SRM has represented that it has not withheld documents on the basis
of an objection which LBHI has taken issue with.[2] Indeed, this letter is aimed at narrowing the
discovery-related issues in an effort to advance this matter towards quick resolution.

The overall goal of LBHI in serving the Subpoena and delivering both this letter and the First
LBHI Letter is to ensure that LBHI understands and fairly evaluates SRM's claims. We believe SRM
shares this goal. Accordingly, to facilitate progress on this matter, LBHI requests the production of the
limited additional information listed below, which information falls within the scope of the Subpoena:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First LBHI
Letter or the SRM Letter, as applicable.

[2] LBHI's failure dispute any assertions made by SRM in the SRM Letter or any responses or objections in the Responses
shall not be construed as a waiver of any rights, including the right to object to a response or objection on a stated ground or
any additional ground at a later time.

Andrew W. Hammond, Esq.                                    **Weil, Gotshal & Manges LLP**
April 12, 2016
Page 2

1.   SRM's LBIE Positions.  In connection with the submission of its guaranty questionnaire,
     SRM provided LBHI the attached document ("**SRM's LBIE Portfolio**").  Please confirm
     that the positions listed in SRM's LBIE Portfolio constitute an accurate representation of
     all of the positions SRM had with LBIE as of September 15, 2008.  If the positions listed
     in SRM's LBIE Portfolio do not constitute an accurate or complete representation, please
     explain any inaccuracies and identify any missing positions.

2.   The Post-Petition Appreciation Claim.  SRM contends that it asserted a claim (the "**Post-
     Petition Appreciation Claim**") against Lehman Brothers International (Europe)
     ("**LBIE**") for the return of certain assets and
     ██████████████████████████.  The information received by LBHI to date
     concerning this claim appears to be inconsistent.  In the Interrogatory Responses, SRM
     defines the assets in question to include shares of Virgin Media, Charter
     Communications, Hudbay Minerals, Assured Guaranty, and Cheniere Energy.  *See*
     Interrogatory Responses at n. 2.  In contrast, the SRM Estimation Objection[3], ████████
     ████████████████ ████████, suggests that the assets in question include
     shares of only Virgin Media and Charter Communications.  *See* SRM Estimation
     Objection ¶¶ 10, 15; ████████████.

     To avoid confusion over this claim, please identify the particular securities that form the
     basis for (i) the Post-Petition Appreciation Claim against LBIE and (ii) the claim being
     asserted against LBHI on account of the Post-Petition Appreciation Claim (the "**Post-
     Petition Appreciation Guaranty Claim**").  Stated otherwise, and for example, is each of
     these claims based solely on SRM's Virgin Media and Charter Communications
     positions, or are there other positions included in either of these claims, such as any of the
     other positions listed in SRM's LBIE Portfolio.  If the latter, please identify what
     additional securities are included in the Post-Petition Appreciation Claim and the Post-
     Petition Appreciation LBHI Claim.

     In addition, please specify the dollar amount of the Post-Petition Appreciation Guaranty
     Claim.  For example, is it $44,268,340.60 or a different amount?  If a different amount,
     please specify the amount and the method and details of SRM's calculation.

3.   The Forced Sales Claim.  We understand that SRM is asserting an additional claim
     against LBHI (the "**Forced Sales Claim**") based on LBIE's alleged failure to return
     "Segregated Assets," which allegedly caused SRM to sell certain securities in its UBS

---

[3] *See* SRM Global Master Fund Limited Partnership's Limited Objection to Plan Administrator's Motion to Estimate Claims
for Reserve and Distribution Purposes, dated July 10, 2015 ("the <u>SRM Estimation Objection</u>").

[4] ████████████████████████████████████████████████████████
██████████████████████████████

Andrew W. Hammond, Esq.
April 12, 2016
Page 3

**Weil, Gotshal & Manges LLP**

and Goldman Sachs Prime Brokerage Accounts (such securities, the "**Non-LBIE Securities**") to meet certain margin calls.

Please identify the particular securities SRM includes as "Segregated Assets" in the context of the Forced Sales Claim. In addition, please specify each of the SRM positions, trades, or transactions to which the margin calls relate (*i.e.*, what underlying positions, trades, or transactions triggered the margin call).

To further assist LBHI's understanding and evaluation of the Forced Sales Claim, please also provide: (a) each of the applicable margin calls that SRM received that is relevant to this claim, and (b) for each sale of a position executed in response to such a margin call, (i) the name of the applicable security, (ii) the quantity sold, (iii) the sale price, (iv) the cost basis, (v) the date of the sale, and (vi) SRM's calculation of its loss in connection with such sale. In addition, please specify the (aggregate) claim amount currently being asserted against LBHI on account of the Forced Sales Claim and please describe the valuation methodology used to calculate such amount.

Finally, please explain (i) why SRM assets other than the Non-LBIE Securities (*e.g.*, cash) were not available to satisfy the margin calls, and (ii) why SRM had to sell the Non-LBIE Securities, as opposed to other securities, to meet the margin calls.

4.  <u>SRM's Short Positions</u>. Based on LBHI's review of SRM's LBIE Portfolio, we understand that SRM had short equity positions in Goupe Danone, Casino Guichard Perrshr, and Volkswagen AG. Please confirm this understanding. If SRM had other short positions with LBIE at LBIE's date of entry into administration, please identify those positions.

For each of SRM's short positions, please identify (i) the date such position was closed, (ii) the value ascribed to the position by LBIE as of closing, (iii) the value ascribed to the position by SRM as of closing, and (iv) the value of the position utilized by the parties for purposes of setoff of SRM's obligations to LBIE.

With respect to your request that LBHI explain the basis for any contention that SRM's short positions must be accounted for in SRM's damage calculation, there are potentially multiple ways in which SRM's short positions may be relevant. For example, to the extent SRM was a net debtor of LBIE under the transaction documents as of the applicable valuation date, whether by reason of SRM's short positions or otherwise, LBHI would have no liability to SRM as an alleged guarantor of LBIE's obligations under those transaction documents.

5.  <u>SRM's Futures / Currency Positions</u>. Please specify the nature or purpose of the negative currency positions listed in SRM's LBIE Portfolio (*i.e.*, do the positions represent margin

Andrew W. Hammond, Esq.                          **Weil, Gotshal & Manges LLP**
April 12, 2016
Page 4

loans, currency hedges, or something else). If SRM had additional negative currency positions with LBIE that were not listed in SRM's LBIE Portfolio, please identify those positions.

For each of SRM's negative currency positions, please identify (i) the date such position was closed, (ii) the value ascribed to the position by LBIE as of closing, (iii) the value ascribed to the position by SRM as of closing, and (iv) the value of the position utilized by the parties for purposes of setoff of SRM's obligations to LBIE.

6.  

7.  Privilege Log. The Order requires SRM to submit a privilege log to LBHI. Order at 3. Please provide such log promptly, which should include the basis for any redactions included in SRM's productions. Absent a privilege log, LBHI cannot assess SRM's claim of privilege. (If SRM proposes to provide a categorical log, that may or may not be sufficient; we are prepared to discuss.)

Finally, please note that LBHI disagrees with SRM's contention that LBHI somehow waived any right to challenge SRM's Responses. The Order is clear that within 10 days of filing the Responses, *SRM* was required either (i) to produce responsive documents or (ii) file the Responses with the Court and promptly schedule a hearing. Order at 2-3. When and whether LBHI responded to the Responses is of no moment. SRM cannot shift to LBHI the obligations placed upon SRM by the Order.

This letter is written without prejudice or waiver of any rights, claims, and defenses of LBHI.

Very truly yours,

Richard L. Levine

cc:    Garrett Fail, Esq. (Weil)
       Adam Lavine, Esq. (Weil)
       Brijesh David, Esq. (Lehman)



# EXHIBIT B

WHITE & CASE

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036-2787
T +1 212 819 8200

whitecase.com

May 20, 2016

Re:    ***In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (SCC), SRM Global Master
Fund Limited Partnership's Responses and Objections to Discovery Requests
Served Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure**

Dear Richard:

We write in response to your letter of April 12, 2016 (the "April 12 Letter"). This letter
is written without prejudice or waiver of any rights, claims, or defenses of SRM.

As an initial matter, SRM shares LBHI's stated overall goal to advance this matter
towards quick resolution and will provide additional clarification as appropriate to ensure that
LBHI understands and fairly evaluates SRM's claims. The answers to many of the questions
posed in your April 12 Letter can be found in SRM's document production. Nevertheless, SRM
will respond to each section of your letter in turn:

1.    SRM's LBIE Positions. The spreadsheet attached to the April 12 Letter (the "November
6 Detail Report"), listing descriptions for SRM's PB and ISDA accounts as of November 6,
2008, accurately reflects the positions (securities and quantities thereof) SRM held with LBIE as
of September 15, 2008.

2.    The "Post-Petition Appreciation Claim". As an initial matter, it is unclear what you are
referring to as a "post-petition appreciation" claim. As explained in SRM's proof of claim, LBIE
failed to return certain of SRM's assets maintained by LBIE that LBIE undertook it would not
rehypothecate. SRM sought the return of those assets, however LBIE has asserted that they are
no longer available. Accordingly, SRM is asserting claims for the value of the assets which
LBIE is now unable to return. These include the 5,094,060 shares of Virgin Media, Inc.
reflected in the November 6 Detail Report and the 701,033 Charter Communications shares
████████████████████. As explained in SRM's Interrogatory Response No. (2)(g)
and SRM's Estimation Objection paragraph 17, SRM brings a claim for $264,269,340.60, which
represents the total value of the Virgin Media, Inc. shares ███████████████

WHITE & CASE

May 20, 2016

███████████████████████████.  If, contrary to our understanding, LBHI is in a position to return shares to SRM, please let us know.

To the extent that LBHI seeks additional detailed explanations from SRM regarding the substance of SRM's claims, SRM's position has already been made clear.  Itis not prepared to expand on its interrogatory responses and document productions in this manner.  SRM has already gone above and beyond its obligations to provide information to assist LBHI in assessing SRM's claims.  SRM has substantively responded to LBHI's Interrogatories, but, as we have previously advised, Local Bankruptcy Rule 7033-1 does not entitle LBHI to such responses.  Local Rule 7033-1 provides that "at the commencement of discovery, interrogatories will be restricted to those questions seeking names of witnesses with knowledge or information relevant to the subject matter of the action, the computation of each category of damage alleged, and the existence, custodian, location, and general description of relevant documents."  LBHI has not identified any authority for its contention that Local Rule 7033-1 should not apply in the present circumstances. Accordingly, if LBHI desires additional information to better understand SRM's claim to expedite the claims resolution process as it contends, SRM is prepared to provide LBHI with such information provided that LBHI agrees to use such information for settlement purposes only.

3.  The "Forced Sales Claim".  SRM has previously identified the Segregated Assets in paragraph (c) of its response to Interrogatory No. 2 and has produced relevant documents on this issue.  As set forth above, SRM notes that it is under no obligation to further explain its "Forced Sales Claim" in response to the Rule 2004 Subpoena.  However, to the extent that LBIE seeks additional clarification of SRM's position on this matter, SRM is willing to provide additional clarification provided that LBHI agrees to use such information for settlement purposes only.

4.  SRM's Short Positions.  As an initial matter, the specific questions posed regarding SRM's short positions are outside the scope of the Rule 2004 Subpoena.  We fail to understand the relevance of LBHI's questions regarding the short positions.  Your explanation that SRM's short positions are relevant to SRM's damages calculation to the extent SRM was a net debtor of LBIE under the transaction documents as of the applicable valuation date is based on a false premise.  LBIE acknowledged ██████████████████████████that SRM was not a net debtor of LBIE.  See SRM000699.  Nevertheless, in the spirit of cooperation, SRM confirms that SRM had short equity positions in Groupe Danone, Casino Guichard Perrshr, and Volkswagen AG as shown on the November 6 Detail Report.  We further confirm that SRM did not have other short positions with LBIE at the date of entry into administration.  We note that SRM has already provided documents, including correspondence between SRM and LBIE regarding the valuation of the short positions.  See e.g., SRM002654 - SRM002658.  To the extent that LBHI seeks information concerning (i) the date each position was closed, (ii) the value ascribed by LBIE as of closing, (iii) the value ascribed to the position by SRM as of closing, and (iv) the value of the position utilized by the parties for purposes of setoff of SRM's obligations to LBIE, SRM is willing to provide such information provided that LBHI agrees to use it for settlement purposes only.

WHITE & CASE

May 20, 2016

    5. <u>SRM's Futures / Currency Positions</u>.  The specific questions posed regarding SRM's futures and currency positions are outside the scope of the Rule 2004 Subpoena.  Nevertheless, SRM confirms that the currency positions listed in the November 6 Detail Report represent FX spots.  SRM confirms that it did not have additional negative currency positions with LBIE.   To the extent that LBHI seeks information concerning (i) the date such positions were closed, (ii) the value ascribed to the positions by LBIE as of closing, (iii) the value ascribed to the positions by SRM as of closing, and (iv) the value of the position utilized by the parties for purposes of setoff of SRM's obligations to LBIE, SRM is willing to provide such information provided that LBHI agrees to use it for settlement purposes only.



    Privilege questions in Rule 2004 discovery are governed by Rule 501 of the Federal Rules of Evidence.  *See In re Blier Cedar Co., Inc.*, 10 B.R. 993, 997-98 (Bankr. D. Me. 1981) (analyzing former analogous Rule 205(a)).  It follows that the federal common law of privilege applies. *Id.* It is further well-established in the Second Circuit that federal common law applies to choice-of-law questions under Rule 501.  *See, e.g., Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 519 (S.D.N.Y. 1992).  In making this choice of law determination, courts in the Second Circuit "consider the country with which the communications 'touch base.'" *Veleron Holding, B.V. v. BNP Paribas SA*, No. 12-CV-5966, 2014 WL 4184806, at *4 (S.D.N.Y. Aug. 22, 2014). This analysis inarguably applies even in Rule 2004 discovery. *See, e.g., In re China Med. Techs., Inc.*, 539 B.R. 643, 652 (S.D.N.Y. 2015) (applying the "touch base" test to determine applicable privilege law in Rule 2004 context).  As applied to the communications at hand regarding an English insolvency, based in England, the "touch base" test plainly dictates that English, and not American, privilege law applies. *See Kiobel v. Royal Dutch Petroleum Co.*, No. 02CIV7618, 2005 WL 1925656, at *2 (S.D.N.Y. Aug. 11, 2005) (applying English law to assess claims of privilege regarding communications between members of the English bar relating to prospective legal action in England).



WHITE & CASE

May 20, 2016

    7.  <u>Privilege Log</u>.  SRM will provide LBHI with a privilege log shortly. SRM believes that a categorical log would be appropriate in this instance and we look forward to discussing this in greater detail moving forward.

    Finally, while SRM agrees that the focus of both LBHI and SRM is appropriately on narrowing the discovery-related issues to advance this matter towards resolution, SRM disagrees with LBHI's statement that the Order somehow placed a burden upon SRM to file its Responses and Objections with the Court and promptly schedule a hearing to resolve such objections.  As explained in our March 7, 2016 letter, any obligation on the witness to "either (i) produce responsive documents in accordance with this Order or (ii) file the objection with the Court and promptly schedule a hearing," is contingent on there being discussions between the Debtor and witness such that "the Debtor and an objecting witness cannot resolve the objection."  Order at 2-3.  Accordingly, we see no reason to alter our position on the issue.

    We look forward to speaking with LBHI soon, including potentially setting up a time for the parties to meet, in order to move this process forward.

Regards,

*/s/ Andrew Hammond*
Andrew Hammond

# EXHIBIT C

**EXHIBIT B**

# UNANIMOUS WRITTEN CONSENT OF THE

## EXECUTIVE COMMITTEE OF THE

## BOARD OF DIRECTORS OF

## LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

**WHEREAS**, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

**WHEREAS**, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

**WHEREAS**, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

**WHEREAS**, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

**WHEREAS**, Management wishes to establish additional Guaranteed Subsidiaries,

**WHEREAS**, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

**WHEREAS**, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

**NOW THEREFORE BE IT**,

06-09-05  11:31  JDM INVESTMENTS                    ID=2023380294              P.02

06.06.2005   29:11   LEHM. → 91200030294                        NO.290   004
06/06/2005   16:41   LEHMN → 916467820653                        NO.524   002

RESOLVED, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

RESOLVED, that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, provided that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

RESOLVED, that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

RESOLVED, that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

FURTHER RESOLVED, that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 9, 2005

_____          _____
Richard S. Fuld, Jr.             John D. Macomber

2

06/08/2005     16:41     LEHMAN → 916467582859                                    NO.504     P03

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

3

# EXHIBIT D



This **INTERNATIONAL PRIME BROKERAGE AGREEMENT** (this "*Agreement*") is made on                     May 2008

**BETWEEN**

(1)    **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** of 25 Bank Street, Canary Wharf, London, E14 5LE, United Kingdom, a company incorporated under the laws of England and Wales (the "*Prime Broker*") for itself and as agent and trustee for and on behalf of the Lehman Companies (as defined in Schedule 3); and

(2)    **SRM Global Master Fund Limited Partnership**, an exempted limited partnership established under the laws of the Cayman Islands *(the "Fund")* acting through its general partner, **SRM Global Fund General Partner Limited**, an exempted limited company incorporated under the laws of the Cayman Islands (in its capacity as the general partner of and on behalf of the Fund, the "*Counterparty*"); and

(3)    **SRM Advisors (Monaco) SAM**, a limited company incorporated under the laws of Monaco with its principal office at 6th floor, Monte Carlo Palace, 7 boulevard des Moulins, MC 98000(the "*Agent*"),

**WHEREAS**

(A)    The Counterparty wishes to appoint the Prime Broker as its prime broker on the terms of this Agreement.

(B)    The Counterparty wishes to appoint the Agent, who acts as the investment manager for the Fund, as its agent for the purposes of this Agreement as set out in Clause 18 hereof.

(C)    Pursuant to the accounting conventions of the Prime Broker:

(a)    the receipt of securities delivered to the Prime Broker shall be recorded as a "debit" to the Counterparty's Securities Account and a transfer or advance of securities made to the Counterparty by the Prime Broker shall be recorded as a "credit" to the Counterparty's Securities Account;

(b)    the payment, transfer or advance of cash to the Counterparty or to its order shall be recorded as a "debit" to the Counterparty's Cash Account and the receipt of cash by the Prime Broker shall be recorded as a "credit" to the Counterparty's Cash Account.

**IT IS AGREED AS FOLLOWS:**

**1.    DEFINITIONS AND CONSTRUCTION**

1.1    In this Agreement, capitalised terms not otherwise specifically defined shall have the meanings given to them in Schedule 3.

1.2    In this Agreement, unless the context otherwise requires -

(a)    References to the singular shall include the plural and vice versa;

(b)    A reference to a "Clause" is to the relevant clause in the main body of this Agreement and, unless otherwise stated, a reference to a "Paragraph" is to the paragraph of that number in the Schedule to this Agreement in which the reference appears.

**2.    SCOPE OF AGREEMENT**

2.1    This Agreement applies to all acquisitions and disposals of securities, and the provision of any advances of cash and securities in respect thereof, in the form of a Principal Transaction, a Third Party Transaction in respect of which a Third Party Transaction Request has been issued to the Prime Broker in accordance with Paragraph 1.1 of Schedule 1, a Collateral Contract or a Novated Third Party Contract (each, a "*Transaction*" and together the "*Transactions*").

2.2    All Transactions and ancillary arrangements contemplated by this Agreement are entered into by the parties to this Agreement ("*Parties*", which term shall include the Lehman Companies) in reliance on the fact that this Agreement and all settlement requests, acknowledgements, Instructions, term sheets, confirmations and all other documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties. Except to the extent that any other document or notice is expressly referred to in this Agreement (including, without limitation, the Customer Agreements) the terms of this Agreement constitute the entire agreement between the parties as to its subject matter and, to the extent of any inconsistency between the terms of this Agreement and any such other document or notice, the terms of this Agreement will prevail.

2.3    The Parties' rights under this Agreement are cumulative and are in addition to its rights under general law. Any failure to exercise or any delay in exercising any such rights will not operate as a waiver or variation of those rights and any defective or partial exercise of any such rights will not preclude any further exercise of those rights.

2.4    The Prime Broker is authorised and regulated by the FSA and is subject to its Rules. Affiliates of the Prime Broker may not be authorised by the FSA and certain services provided overseas pursuant to this Agreement may not be regulated by the Rules.

2.5    The performance by the Parties of their obligations under this Agreement shall be subject to applicable laws and regulations, including applicable rules of any regulator or exchange and including (in the case of the Prime Broker) the Rules. The Prime Broker may take or refrain from taking such course of action as it may deem necessary in order to ensure compliance with such laws, regulations or rules as are applicable to it, notwithstanding any term of this Agreement and no such action shall constitute a breach of this Agreement. However, notwithstanding that, as between the Prime Broker or its Affiliates and its regulators, the Prime Broker and its Affiliates may be regulated by the Rules or equivalent regulations in the relevant jurisdiction, such Rules or regulations shall not be incorporated into this Agreement.

2.6    The Parties confirm their acceptance of and agreement to be bound by the provisions of the Schedules to this Agreement.



**3.    TRANSACTIONS, PAYMENTS AND DELIVERIES**

3.1    Wherever the Counterparty wishes the Prime Broker to enter into a Transaction, or the Counterparty requests the Prime Broker to settle a Transaction on the Counterparty's behalf, or to make or receive any other delivery or payments to, from or on behalf of the Counterparty, it shall issue a Principal Transaction Request or a Third Party Transaction Request, as applicable, to the Prime Broker, in the manner specified in Schedule 1.

3.2    The Counterparty agrees and accepts that the Prime Broker or its Affiliates may act as agent for the Counterparty in settling Transactions or delivering securities and making payments and such parties are authorised to do so.

3.3    Each party shall be responsible for complying with all exchange notification requirements that are applicable to it which, for the avoidance of doubt in the case of the Counterparty shall include all exchange notification requirements in relation to securities held as beneficial owner pursuant to this Agreement.

3.4    The Prime Broker shall not be obliged to make any payments and or deliveries to a third party, except as contemplated by this Agreement.

**4.    PROVISION OF FINANCE**

4.1    The Prime Broker may in its absolute discretion -

(a)    lend money to the Counterparty;

(b)    as a result of the Counterparty's sales or purchases of securities pursuant to Transactions, advance securities to the Counterparty;

(c)    discharge any obligation of the Counterparty to pay money or deliver securities under or in connection with a Transaction or pursuant to this Agreement and the Counterparty irrevocably authorises it to do so.  Except to the extent that cash of the relevant currency is for the time being credited to the Counterparty's Cash Accounts or, as the case may be, securities of the description and amount in question are for the time being debited to the Counterparty's Securities Accounts and in either case available for the purpose, any such discharge shall be treated as a Loan or, as the case may be, an advance by the Prime Broker to the Counterparty of the cash or securities so paid or delivered on behalf of the Counterparty.

4.2    Where the Prime Broker agrees to advance to the Counterparty securities which are Hong Kong securities, the Prime Broker will advance such securities by lending the securities to the Counterparty under the Stock Lending Agreement.  The Counterparty shall not be required to issue a Borrowing Request (as defined in the Stock Lending Agreement) in respect of such loan.

4.3    Where the Prime Broker agrees to loan to the Counterparty securities which are South African listed securities (as defined in Section 1 of the Stock Exchange Control Act, 1985 (Act No. 1 of 1985) the Counterparty warrants that:

(a)    the entering into of such Transactions under this Agreement is and will not be for the purposes of avoiding any tax liability under South African law, nor for the purposes of keeping a position open for more than 12 months;

(b)    on-delivery of the South African listed securities will be effected within 10 Business Days of the date of the transfer of the South African listed securities by the Prime Broker to the Counterparty;

(c)    Equivalent Securities will be returned to the Prime Broker within a period of 12 months as from the delivery of the South African listed securities by the Prime Broker to the Counterparty in respect of each Transaction; and

(d)    The Prime Broker will be compensated for any distributions in respect of the South African listed securities to which the Prime Broker would have been entitled to receive had such Transactions under this Agreement not been entered into.

4.4    The Counterparty will indemnify and hold the Prime Broker harmless in respect of any uncertificated securities tax which may become payable by the Prime Broker pursuant to the provisions of the Uncertificated Securities Tax, 1998 of South Africa in relation to any Transaction.

4.5    The Counterparty shall on demand by the Prime Broker –

(a)    repay any Loan of monies (together with fees and interest thereon pursuant to the terms of this Agreement);

(b)    within not more than the standard settlement time for the relevant securities on the relevant exchange or in the clearing and settlement organisation through which the relevant Advanced Securities were originally advanced by the Prime Broker, deliver securities ,equivalent to any Advanced Securities (together with fees and interest on the value thereof pursuant to the terms of this Agreement) and shall make such payments as are provided by Clause 8 with respect to income on such securities.  Where the Advanced Securities are Hong Kong securities, the Counterparty shall deliver Equivalent Securities to the Prime Broker in accordance with the Stock Lending Agreement and such delivery shall discharge the Counterparty's obligation under this Clause.

4.6    The Counterparty may not use the proceeds of any Loan in any way, directly or indirectly, for any purpose which is unlawful under any applicable law nor for the making, instigation or conducting of a takeover of, or tender offer for, any person or any other action which, when complete, will have the effect of acquiring control of any such person.  The Prime Broker shall be entitled to assume (without any enquiry on its part) that the purpose of any Loan falls within the investment guidelines and requirements of the Fund and will be used only in connection with the prime brokerage business contemplated by this Agreement.

4.7    The Prime Broker shall not be obliged to advance any securities to the Counterparty or discharge any obligation of the Counterparty to deliver securities in accordance with Clause 4.1 where such request will result in the aggregate Market Value

Equivalent of Advanced Securities in respect of which Equivalent Securities have not been delivered by the Counterparty to the Prime Broker exceeding any limits notified by the Prime Broker to the Counterparty from time to time.

## 5. SECURITIES AND CASH ACCOUNTS

5.1    The Prime Broker shall open and maintain one or more Cash Accounts and Securities Accounts to which -

(a)    in the case of Cash Accounts there shall be -

(i)    debited the amount of any Loan and all cash paid or deemed or treated as paid by the Prime Broker to or on behalf of the Counterparty; and

(ii)    credited all cash paid or deemed or treated as paid to the Prime Broker, by or on behalf of the Counterparty (including sums received by the Prime Broker in settlement of Third Party Transactions); and

(b)    in the case of Securities Accounts there shall be -

(i)    debited all securities delivered to the Prime Broker by or on behalf of the Counterparty (including securities received by the Prime Broker in settlement of Third Party Transactions) or delivered or deemed or treated as delivered by or on behalf of the Counterparty to the Prime Broker; and

(ii)    credited all securities advanced by the Prime Broker to the Counterparty (including Hong Kong securities advanced under the Stock Lending Agreement) or delivered or deemed or treated as advanced, by the Prime Broker to or on behalf of the Counterparty,

and the Prime Broker may combine such accounts where it considers appropriate.

5.2    The parties acknowledge and agree that any cash held by us for you is received by us as collateral with full ownership under a collateral arrangement and is subject to the security interest contained in the Agreement. Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash held by the Prime Broker will not be segregated from the money of the Prime Broker or any other counterparty of the Prime Broker and will be held free and clear of all trusts. The parties further agree that the Prime Broker will use such cash in the course of its business and the Counterparty will, therefore, rank as a general creditor of the Prime Broker in respect of such cash.

## 6. MARGIN REQUIREMENT

6.1    For the purpose of this Agreement, "*Net Equity*" means the aggregate of -

(a)    the sum of -

(i)    the absolute value of all credit balances on the Cash Accounts; and

(ii)    the Market Value Equivalent of all securities comprised in all debit balances on the Securities Accounts;

(b)    less the sum of -

(i)    the absolute value of all debit balances on the Cash Accounts; and

(ii)    the Market Value Equivalent of all securities comprised in all credit balances on the Securities Accounts; and

(iii)    the absolute value of all sums due to the Prime Broker pursuant to this Agreement (to the extent not debited from the Cash Accounts).

6.2    INTENTIONALLY LEFT BLANK

6.3    If, for the purposes of determining the credit or debit balances on the Cash Accounts or the Securities Accounts (including for the purposes of calculating the Net Equity), the relevant cash or securities are denominated in a currency other than the Base Currency, then the Prime Broker may convert such currencies as are necessary for the purposes of such determination into the Base Currency at the Spot Rate prevailing at such time.

6.4    If at any time there is a Margin Deficit l, the Counterparty shall pay or deliver (whether or not pursuant to a Margin Call) to the Prime Broker such cash or securities acceptable to the Prime Broker as will ensure that, following such payment or delivery, such Margin Deficit will be eliminated.

6.5    When calculating the value of any balance on any account for the purposes of Clause 6.1, the Prime Broker may in its commercially reasonable discretion and acting in good faith, take into account any variation or potential variation in the value of cash or securities due to the availability, liquidity, solvency or market volatility of such asset or other market variable applicable to that asset.

6.6    In the event of a Margin Call, the Counterparty shall make such payment or delivery not later than close of business on the Business Day following that on which the Margin Call is made.

6.7    Any cash paid and any securities delivered by or on behalf of the Counterparty to the Prime Broker pursuant to a Margin Call or otherwise under Clause 6.4 shall (in the case of cash) be credited to the Cash Accounts and (in the case of securities) be debited to the Securities Accounts.

6.8    The Prime Broker may from time to time specify general principles, criteria and margin rates which it intends to adopt in connection with its calculation of the Margin Requirement applicable to any Transactions and positions. Such specified information may be notified by the Prime Broker to the Counterparty in such manner as the Prime Broker considers appropriate including, without limitation, by means of any Terms.

6.9    If at any time the Counterparty is required to provide margin or collateral to the Prime Broker under a Customer Agreement which may be a title transfer agreement, to the extent that there is a Margin Excess, the Counterparty authorises and requests the Prime Broker to transfer from the appropriate Cash Account or Securities Account cash or securities with a Market Value Equivalent sufficient to fulfil that requirement or otherwise to designate in its books and records an amount sufficient to fulfil that requirement.

## 7.    PAYMENT AND DELIVERY

7.1    –Subject to Clause 7.2

(a)    upon reasonable request, the Prime Broker shall repay the Counterparty any cash standing for the time being to the credit of a Cash Account;

(b)    upon reasonable request, the Prime Broker shall deliver to the Counterparty securities equivalent to any securities standing for the time being to the debit of a Securities Account.

7.2    The Prime Broker acting in good faith and in its commercially reasonable discretion shall not be required to make a payment or delivery under Clause 7.1 if –

(a)    an Event of Default or Potential Event of Default has occurred and is continuing; or

(b)    the Prime Broker is entitled to apply the amount of cash so payable or securities so deliverable in respect of a debt or obligation owed to it by or on behalf of the Counterparty or (in the case of cash) to reduce or eliminate a debit balance on the Cash Accounts or (in the case of securities) to increase or create a debit balance to the Securities Accounts.

7.3    Without prejudice to clause 13.2, the Counterparty undertakes to pay any amount payable under this Agreement on the due date without deduction or the exercise of any right of equity, set-off or counterclaim that the Counterparty may have or allege against the Prime Broker.

7.4    The Prime Broker may, acting in good faith and in its commercially reasonable discretion, refuse to accept (or accept on such terms as it may, acting in good faith and in its commercially reasonable discretion, determine) any delivery of securities or Equivalent Securities by or on behalf of the Counterparty.

7.5    The Prime Broker may refuse to effect any request to make any payment or delivery under this Agreement or any Customer Agreement where this would result in the creation of, or an increase in, a Margin Deficit.

7.6    Without prejudice to Paragraph 2 of Schedule 2, Securities or Equivalent Securities delivered to the Prime Broker are only accepted by the Prime Broker when transferred into the sole name of the Prime Broker or its nominee.

7.7    The Counterparty shall pay any Taxes arising in respect of a Transaction and acknowledges and agrees that the filing of returns related to such Taxes, payment of all relevant tax liabilities, and all other actions related to its tax affairs shall be the responsibility of the Counterparty.

7.8    Subject to Clause 8, all cash payable by one party to the other shall be paid free and clear of, and without withholding or deduction for, any Taxes of whatsoever nature imposed, levied, collected, withheld or assessed by any authority having power to tax, unless the withholding or deduction is required by law. In that event, the paying party shall pay such additional amounts as will result in the net amounts receivable by the other

party (after taking account of such withholding or deduction) being equal to such amounts as would have been received by it had no such Taxes been required to be withheld or deducted; provided that -

(a)    to the extent any amount is recovered in respect of such withholding or deduction by any party receiving such additional amounts, an amount equal to that recovered shall be paid promptly following receipt to the paying party or (where any such payment recovered is to be made to the Counterparty) credited to any Cash Accounts;

(b)    no such additional amounts shall be payable by the non-defaulting party to the other party in respect of any payment under Clause 13.2; and

(c)    no such additional amounts shall be payable by the Prime Broker in respect of any payment made by the Prime Broker under Clause 8 or Clause 10.6(d).

7.9    If the Counterparty is, at any time, required to make any payment of cash or any delivery of securities to the Prime Broker under any provision of this Agreement, including, without limitation, in respect of Margin under Clause 6, fees or interest under Clause 9 and cash or Equivalent Securities under Clause 11, the Counterparty hereby authorises the Prime Broker to debit or credit the relevant Cash Account or Securities Account in order to effect such payment or delivery.

## 8.    INCOME, CORPORATE EVENTS AND VOTING

**Income**

8.1    Unless otherwise agreed between the parties or specified on a relevant confirmation, if income is paid or distributed by the issuer of any securities comprised in the balances on the Securities Accounts -

(a)    in respect of securities standing to the credit of a Securities Account, the Counterparty will (subject to Clause 8.2) pay to the Prime Broker an amount equal to, and in the same currency as, the amount paid by the issuer or, in the case of income in the form of securities, deliver to the Prime Broker securities equivalent to such securities;

(b)    in respect of securities standing to the debit of a Securities Account, the Prime Broker will (subject to Clause 8.3) pay to the Counterparty an amount equal to, and in the same currency as, the amount paid by the issuer or, in the case of income in the form of securities, deliver to the Counterparty securities equivalent to such securities. The Prime Broker will credit the relevant Cash Account in respect of the amount so payable or, as the case may be, debit the relevant Securities Account in respect of the securities so deliverable.

8.2    Unless otherwise agreed between the parties or specified on a relevant confirmation, the amount debited or credited under Clause 8.1(a) shall include but not be restricted to –

(a)     any amount which is deducted or withheld in respect of tax by or on behalf of the issuer of the relevant securities   and

(b)     any additional tax credits to which a holder of such securities as specified ny the Prime Broker would be entitled in respect of such income.

8.3    Unless otherwise agreed between the parties or specified on a relevant confirmation, any amount credited or debited pursuant to Clause 8.1(b) shall not -

(a)     include any amount in respect of cash or securities which is -

(i)     deducted or withheld in respect of tax by or on behalf of the issuer of the relevant securities;

(ii)    required to be accounted for to the United Kingdom Inland Revenue in respect of the income in question; or

(iii)   might be recovered by the Prime Broker or any other holder of the securities from any relevant taxation authority outside the United Kingdom in respect of the income in question; and

(b)     exceed the amount of cash (or the amount of securities comprising income) which the Counterparty would have received from the issuer in respect of the income, had the Counterparty been the holder of such securities on the relevant date, net of any amount which is or, as the case may be, would have been, held or deducted or withheld in respect of tax by or on behalf of the issuer of the relevant securities.

In this Clause, "*relevant date*" means, in relation to any income, the date by reference to which the identity is determined of those holders to whom that income is paid.

8.4    The Prime Broker will use reasonable efforts to claim dividends and interest payments on the Counterparty's securities but will not have any duty to take steps to recover any amounts due in respect of which the issuer or its registrar, paying agent or other agent defaults, although it will use reasonable endeavours to provide the Counterparty with such information as reasonably requested by the Counterparty and such other assistance as the Prime Broker and its Affiliates determine is appropriate in their discretion, subject to their internal policies and being indemnified to its and their reasonable satisfaction.

**Corporate Events**

8.5    The Prime Broker shall inform the Counterparty if it becomes aware of the occurrence or prospective occurrence of any conversion, subscription, sub-division, consolidation, redemption, rights issue, takeover or other offer, capital reorganisation, call, capitalisation issue or distribution of, or a granting of, an entitlement to receive securities or any other corporate event (each a "*Corporate Event*") with respect to any securities comprised in any debit balance on the Securities Accounts.

8.6    Where a Corporate Event giving rise to a right or option occurs, the Counterparty (in respect of securities debited to the Securities Accounts) or the Prime Broker (in respect of securities credited to the Securities Accounts) may within a reasonable time before the latest time for the exercise of the right or option give notice to the other party that it wishes to receive Equivalent Securities or other assets in such form as will arise if the right is exercised in such manner as is stated in the notice.

8.7    The Prime Broker may, upon service of such notice, credit or debit the relevant Cash Account or the relevant Securities Account (or both) with such amounts of cash or, as the case may be, securities as would reflect the performance of the instructions in such notice by the Prime Broker.  If the Counterparty does not serve notice under Clause 8.6, the Prime Broker shall credit or debit the relevant Cash Account or the relevant Securities Account (or both) to reflect the taking of such action as the Prime Broker in good faith and acting in its commercially reasonable discretion deems appropriate.  The Counterparty acknowledges that Equivalent Securities, or other assets required to be delivered under Clause 8.6, may be the subject of a loan made by the Prime Broker to third parties and that reasonable notice must be given to the Prime Broker to provide for the return of such Equivalent Securities or other assets.

8.8    A notice served by the Counterparty under Clause 8.6 shall not be effective -

(a)     where it refers to an event which involves the payment of money by the holder of securities, unless the Counterparty pays to the Prime Broker, for value not later than the due date of the relevant payment, an amount equal to that which is required to be paid by such a holder of securities; or

(b)     if the exercise of the right or option stated in the notice would create or increase a Margin Deficit.

8.9    If a call becomes payable in respect of partly-paid securities, the Prime Broker may debit the Cash Accounts with a sum equal to the amount so payable, but shall have no liability whatsoever for the consequences of a failure to satisfy any calls made.

8.10   Where the Prime Broker or any third party holding securities on behalf of the Prime Broker is legally liable to meet any payment due or to become due in respect of such securities, the Counterparty will provide the Prime Broker or such other person (as the case may be) with funds to meet such payment, for value not later than the day on which the call is payable.

**Voting**

8.11   If a right to vote (other than a right contemplated by Clause 8.5) arises in respect of any securities comprised in a debit balance on the Securities Accounts, the Prime Broker may in its absolute discretion –

(a)     deliver such securities to the Counterparty or to its order within a reasonable time before the latest time for the exercise of such vote; or

(b)     request instructions from the Counterparty in respect of such voting rights and use its reasonable endeavours to arrange for such voting rights to be

exercised in accordance with such instructions provided those instructions are received within such period as the Prime Broker reasonably requires.

In the absence of such instructions, the Prime Broker may exercise the right to vote as it in its absolute discretion deems appropriate.

8.12    The provisions of this Clause 8 shall apply to Advance Securities which are Hong Kong securities.

## 9.    FEES AND INTEREST

9.1    The Counterparty shall pay fees and remuneration to the Prime Broker in respect of Transactions, at such rates, at such times and calculated in such manner as may from time to time be notified by the Prime Broker to the Counterparty, whether generally (including by means of the Terms) or in respect of a particular Transaction, such notification to have immediate effect unless otherwise specified in the notification or other written agreement between the Counterparty and the Prime Broker.  Such fees and remuneration at the commencement of this Agreement are set out in the last Terms provided by the Prime Broker to the Counterparty.

9.2    The Prime Broker shall pay interest to the Counterparty on any credit balance on a Cash Account.  The Counterparty shall pay interest to the Prime Broker on any debit balances on a Cash Account.  Such interest shall be at such rates as may be notified by the Prime Broker to the Counterparty from time to time (including by means of the Terms).

9.3    Any amount payable by one party to the other under this Agreement which is not paid when due shall bear interest (compounded on a daily basis) from the date on which such payment became due until the date of actual payment at a rate equal to LIBOR plus two per cent..

## 10.    SECURITY

10.1    As continuing security for the payment and discharge of all the Liabilities (as defined below), the Counterparty hereby, with full title guarantee and free from any encumbrances whatsoever, charges in favour of the Prime Broker for itself and as trustee for the other Lehman Companies by way of first fixed charge -

(a)    all right, title and interest in and to securities and any other assets not falling within sub-paragraphs (b) to (f) constituted for the time being by debits to any Securities Account;

(b)    all securities and other assets which, or the certificates or documents of title to which, are for the time being deposited with or held by a Lehman Company;

(c)    all other securities and all rights, cash (including without limitation dividends) and property whatsoever which may from time to time accrue on, be derived from or be offered in respect of any assets referred to in sub-paragraphs (a) and (b) above, whether by way of Corporate Event or otherwise;

(d)    all cash for the time being credited to any Cash Account;

(e)    all rights of the Counterparty arising in respect of any securities, assets or cash referred to in sub-paragraphs (a) to (d) above, including, without limitation, any rights against any custodian, banker or other person;

(f)    all rights of the Counterparty under this Agreement including, without limitation, all rights of the Counterparty to delivery of Equivalent Securities;

(g)    all rights of the Counterparty to receive payment of the Net Default Amount payable under any Customer Agreement,

but in each case so that the covenants implied by the Law of Property (Miscellaneous Provisions) Act 1994 in the charges contained in or created pursuant to this Agreement are construed with the omission of -

(i)    the words "other than any charges, encumbrances or rights which that person does not and could not reasonably be expected to know about" in section 3(1) of that Act; and

(ii)    section 6(2) of that Act.

10.2    "*Liabilities*" at any time, means the aggregate (as determined by the Prime Broker acting in good faith and its commercially reasonable discretion, including without limitation in accordance with Clause 13) of all monies, debts, liabilities and obligations, whether present or future, actual or contingent, owing or incurred by the Counterparty to the Prime Broker or any Lehman Company under or in connection with this Agreement, any Transaction, the Customer Agreements, any other contract or otherwise (in each case, whether alone or jointly (or jointly and severally) with any other person, whether actually or contingently and whether as principal, surety or otherwise), plus any costs and expenses (including, without limitation, legal fees) which the Prime Broker may incur in enforcing, perfecting or maintaining any of its rights, whether pursuant to the terms of this Agreement or any Transaction, contract or otherwise, including without limitation:

(a)    the amounts of principal, interest, fees, remuneration, Margin Requirement and other monies due and payable; and

(b)    any loss of bargain, the cost of funding or currency exchange and, to the extent not already covered, any loss incurred by the Prime Broker in liquidating, obtaining or re-establishing any hedge or related position.

10.3    The security provided under this Clause 10 is continuing security and will extend to the ultimate balance of the Liabilities, regardless of any intermediate payment or discharge in whole or in part by or on behalf of the Counterparty.

10.4    Subject to Clause 10.14, if the Prime Broker is satisfied (acting in its commercially reasonable discretion  and in good faith) that all the Liabilities have been irrevocably paid in full and that all facilities which might give rise to Liabilities have terminated, the Prime Broker shall, at the request and cost of the Counterparty, release, reassign or discharge (as appropriate) the Charged Assets from the security created pursuant to this Clause 10.

10.5    Upon or at any time after the occurrence of an Event of Default in relation to the Counterparty, all sums provided to be paid and securities provided to be delivered by the Counterparty pursuant to the terms of this Agreement shall become immediately due and payable or deliverable (as applicable) and the Prime Broker shall not be obliged to accept any further Instructions from the Counterparty in respect of the Charged Assets, including without limitation, the exercise of any rights in respect of the events described in Clause 8. Without prior notice or demand, the Prime Broker (for itself and as agent, or as the case may be, trustee for the Lehman Companies) may enforce the Security and exercise all powers and rights of a mortgagee conferred by statute or otherwise.

10.6    Without limiting Clause 10.5, the Counterparty hereby irrevocably authorises the Prime Broker acting in good faith, at any time after an Event of Default in relation to the Counterparty and without notice to the Counterparty, to  sell or otherwise realise the Charged Assets in such manner as it may deem appropriate and apply the proceeds of sale as follows –

(a)    first, in or towards payment of all costs and expenses incurred by the Prime Broker in connection with such disposal;

(b)    secondly, in or towards payment and satisfaction of any sum due to the Prime Broker pursuant to Clause 13 in such order and manner as the Prime Broker may determine;

(c)    thirdly, in or towards payment and satisfaction of any other sum and liability comprising the Liabilities due from the Counterparty to the Prime Broker and the Lehman Companies in such order and manner as the Prime Broker may determine; and

(d)    fourthly, in payment of any surplus to the Counterparty.

10.7    For all purposes, including any legal proceedings, a certificate by any officer of the Prime Broker acting in good faith and in its commercially reasonable discretion as to the sums or Liabilities for the time being due to or incurred by the Prime Broker or any Lehman Company shall be prime facie evidence in the absence of manifest error.

10.8    Sections 93 (restriction of right of consolidation) and 103 (regulation of exercise of power of sale) of the Law of Property Act 1925 will not apply to this Agreement.

10.9    The Counterparty shall not create or permit to subsist any mortgage, charge, pledge, lien or other security interest securing any obligation of any person (or any other agreement or arrangement having a similar effect), over the Charged Assets except for (i) a Permitted Encumbrance or (ii) the security created or expressed to be created by or pursuant to this Agreement in favour of the Prime Broker, nor shall it seek or agree to dispose of such Charged Assets, save in accordance with this Agreement.

10.10   The Prime Broker may, at the request of the Counterparty, in its absolute discretion permit the Counterparty to deal with or otherwise dispose of any of the Charged Assets, subject to the other provisions of this Agreement.  If at any time the Prime Broker consents to such a dealing or disposition, that consent shall in no way constitute a waiver of the Prime Broker's right to refuse to give its consent to any other request.  If the Prime Broker permits such a dealing or disposition of any of the Charged Assets, then on such

dealing or disposition the relevant Charged Assets shall be automatically released from the Security.

10.11   For the purpose of perfecting or enforcing the Security, if the Prime Broker so requests at any time or times, the Counterparty will promptly execute and sign all such transfers, assignments, powers of attorney, further assurances or other documents and do all such other acts and things as may reasonably be required to vest or to realise the Security or any of it in the Prime Broker or any Lehman Company or to its order or to a purchaser or transferee to perfect or preserve the rights and interests of the Prime Broker and the Lehman Companies in respect of the Security (including, without limitation, the institution and conduct of legal proceedings) or for the exercise by the Prime Broker of all or any of the powers, authorities and discretions conferred on the Prime Broker by this Agreement.

10.12   The Counterparty by way of security hereby irrevocably appoints the Prime Broker as its attorney on the Counterparty's behalf and in the Counterparty's name or otherwise to execute any transfers, assignments, further assurances or other documents as may reasonably be required to vest or to realise the Security or any of it in the Prime Broker or to its order or any Lehman Company or to its order or to a purchaser or transferee to perfect or preserve the rights and interests in respect of the Security of the Prime Broker and the Lehman Companies (including, without limitation, the institution and conduct of legal proceedings) or for the exercise by any Lehman Company of all or any of the powers, authorities and discretions conferred on them by this Agreement.   The Counterparty hereby ratifies and confirms and agrees to ratify and confirm whatever the Prime Broker shall do in the exercise of the above power of attorney.

10.13   The powers conferred on the Prime Broker pursuant to this Agreement in relation to the Charged Assets or any part thereof shall be in addition to and not in substitution for the powers conferred on mortgagees under the Law of Property Act 1925 and where there is any ambiguity or conflict between the powers contained in such Act and those conferred by this Agreement, this Agreement shall prevail.

10.14   If the Prime Broker reasonably determines that any payment received or recovered by the Prime Broker or any Lehman Company may be avoided or invalidated after the Liabilities have been discharged in full, and after any facility which might give rise to such Liabilities has been terminated, this Agreement (and the Security created thereby) will remain in full force and effect and neither the Prime Broker nor any Lehman Company will be obliged to release any Charged Assets until the expiry of such period as the Prime Broker or that Lehman Company as the case may be shall reasonably determine.

10.15   No payment which may be avoided or adjusted under any law, including any enactment relating to bankruptcy or insolvency, and no release, settlement or discharge given or made by the Prime Broker or any Lehman Company on the faith of any such assurance, security or payment, shall prejudice or affect the right of the Prime Broker or any Lehman Company to recover the Liabilities from the Counterparty or to enforce the Security to the full extent of the Liabilities.

10.16   At any time following (i) the Prime Broker or any Lehman Company receiving notice (either actual or otherwise) of any subsequent security interest affecting any assets subject to the Security or (ii) the occurrence of any Act of Insolvency in respect of the

Counterparty, the Prime Broker may open a new Cash Account or Securities Account (or both) in the Counterparty's name (whether or not the Prime Broker permits any existing account to continue). If the Prime Broker does not open such a new account, the Prime Broker will nevertheless be treated as if the Prime Broker had done so at the time, as the case may be, when the notice was received or deemed to have been received of the subsequent security interest or at the time of the Act of Insolvency. No cash or assets thereafter paid or delivered into any Cash Account or Securities Account, whether new or continuing, shall discharge or reduce the amount receivable pursuant to this Agreement.

10.17  No person dealing with the Prime Broker shall be concerned to enquire whether any event has happened upon which any of the powers, authorities and discretions conferred by or pursuant to this Agreement, and conditions in relation to the Charged Assets or any part thereof, are or may be exercisable by the Prime Broker, or otherwise as to the propriety or regularity of acts purporting or intended to be in exercise of any such powers, authorities and discretions, and all the protections to purchasers contained in Sections 104 and 107 of the Law of Property Act 1925 shall apply to any person purchasing from or dealing with the Prime Broker in like manner as if the statutory powers of sale in relation to the Charged Assets hereby charged had not been varied or extended by this Agreement.

10.18  The receipt of the Prime Broker shall be an absolute and a conclusive discharge to a purchaser and shall relieve the purchaser of any obligation to see to the application of any moneys paid to or by the direction of the Prime Broker or any Lehman Company, as the case may be.

10.19  The Prime Broker may credit any amounts received or recovered by it in exercise of its rights under this Agreement to, and require the same to be paid to it for crediting to, an interest bearing suspense account for so long and in such manner as it may determine.

## 11.    RIGHT OF USE

11.1    Subject to clause **Error! Reference source not found.**, the Counterparty hereby authorises the Prime Broker at any time or times to borrow, lend, charge, hypothecate, dispose of or otherwise use for its own purposes any securities which are included in the Charged Assets by transferring such securities to itself or to another person without giving notice of such transfer to the Counterparty.  The Counterparty agrees that the Prime Broker may retain for its own account all fees, profits and other benefits received in connection with any such borrowing, loan, charge, hypothecation, disposal or use. ("**Collateral Use**")

11.2    Upon –

    (a)    a borrowing, lending, disposal or other use, such securities will become the absolute property of the Prime Broker (or that of the transferee) free from the Security and from any equity, right, title or interest of the Counterparty;

    (b)    a charge or hypothecation of any of the Counterparty's securities, all of those securities, including the Counterparty's interest in those securities, will be subject to the charge or other security interest created by such charge or rehypothecation.

11.3    Upon any such borrowing, lending, charge, hypothecation, disposal or use, the Counterparty will have a right against the Prime Broker for the delivery of securities equivalent to those securities.  Where, in respect of any securities, the Counterparty has instructed the Prime Broker to exercise any rights under Clause 8, the Prime Broker shall deliver securities equivalent to those securities in such form as has resulted from the exercise of such rights.

11.4    If on the due date for delivery thereof the Prime Broker shall for any reason be unable to deliver any Equivalent Securities to the Counterparty, the Prime Broker may, pending such delivery, credit the Cash Accounts in an amount equal to the Market Value Equivalent of those Equivalent Securities.  Upon delivery of those Equivalent Securities to the Counterparty, the Prime Broker will debit the relevant Cash Account in the amount of the cash so credited.

11.5    Upon delivery or payment to the Counterparty of Equivalent Securities or Collateral, such Equivalent Securities or Collateral will become subject to the Security and constitute Charged Assets and shall be subject to all the provisions of this Agreement including, without limitation, those of Clause 10 and this Clause 11.

11.6    In connection with any Collateral Use pursuant to clause 11.1, the Counterparty may from time to time request in writing the Prime Broker to exclude certain positions from such Collateral Use (each such position, an "**Ineligible Position**"). Any Ineligible Positions shall be held in account number 05606852 and notwithstanding clause 9 or other written agreement in relation to fees and interest, Counterparty shall pay fees and interest in relation to Ineligible Positions as determined in the Prime Broker's discretion and notified to the Counterparty at the time of the Prime Broker agreeing to exclude such Ineligible Positions.

## 12.    EVENTS OF DEFAULT

12.1    Each of the following events is an "*Event of Default*" in relation to the relevant party (the "*Defaulting Party*", the other party being the "*Non-Defaulting Party*"):

    (a)    the Counterparty fails to eliminate a Margin Deficit on the due date in accordance with Clause 6 and the Prime Broker serves a Default Notice on the Counterparty; or

    (b)    the Counterparty fails to make any other payment of cash or delivery of securities by the due date (unless, in relation to securities, caused by the failure of the Prime Broker to redeliver Equivalent Securities in accordance with Clause 11.4), or fails to comply with or perform any other agreement or obligation and such failure is not remedied by close of business in London on the Business Day following the Business Day on which written notice of such failure given to the Counterparty by the Prime Broker , and the Prime Broker serves a Default Notice on the Counterparty; or

    (c)    an Act of Insolvency occurs in relation to the Counterparty (including any general partner, managing member or analogous representative entity) or, where applicable, the Fund or the Agent; or

(d)    an Act of Insolvency occurs in relation to the Prime Broker and the Counterparty serves a Default Notice on the Prime Broker; or

(e)    any representations made or deemed to have been made or repeated by the Counterparty or Agent are incorrect or untrue in any material respect, and the Prime Broker serves a Default Notice on the Counterparty or Agent; or

(f)    the Counterparty admits to the Prime Broker that it is unable to, or intends not to, perform any of its obligations under this Agreement, and the Prime Broker serves a Default Notice on the Counterparty; or

(g)    the Counterparty or, where applicable, the Fund or the Agent is suspended or expelled from any securities exchange or association, or is suspended from dealing in securities by any government agency, or any of the assets of the Counterparty or the assets of an investor held by, or to the order of, the Counterparty are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation, and the Prime Broker serves a Default Notice on the Counterparty; or

(h)    an event of default or equivalent event occurs under a Customer Agreement, or under any other agreement between the Counterparty or the Agent or its affiliates and the Prime Broker or any of its Affiliates and the Prime Broker serves a Default Notice on the Counterparty; or

(i)    a financial obligation of the Counterparty in an amount greater than 2% of the latest published Net Asset Value (or its equivalent in another currency) is not paid in accordance with its terms and the Prime Broker serves a Default Notice on the Counterparty; or

(j)    the most recent prospectus of the Counterparty (or any feeder fund of the Counterparty, as the case may be) is amended or modified in relation to either (i) the legal structure of the Counterparty or (ii) the rights of investors to redeem their interests in a manner which in the reasonable opinion of the Prime Broker will have a material adverse effect on the Counterparty's or Agent's ability to perform its obligations under this Agreement or an Transaction hereunder or an Customer Agreement and the Prime Broker serves a Default Notice on the Counterparty.

(k)    the General Partner of the Counterparty resigns or there is a change in the management or control of the Counterparty or the Agent which, in the sole and absolute discretion of the Prime Broker, may be prejudicial to the interests of the Prime Broker or to its ability to continue to offer its services under this Agreement; or

(l)    the Fund has failed to maintain a Net Asset Value in an amount equal to the greater of USD 500,000,000 as reflected in the Fund's audited financial statements at any time after the execution date of this Agreement, or (B) has experienced a decline in its Net Asset Value during any one-month period preceding such date, of 20 percent or more, or (C) has experienced a decline in its Net Asset Value during any three-month period preceding such date, of 30 percent or more, or (D) has experienced a decline in its Net Asset Value

during any twelve-month period preceding such date, of 40 percent or more.

12.2    Each party shall immediately notify the other if an Event of Default occurs in relation to it.

## 13.    CLOSE-OUT

13.1    Upon the occurrence of an Event of Default, the Non-Defaulting Party may, by written notice to the Defaulting Party, terminate this Agreement with effect from the time of the Event of Default (the date of such occurrence being the "***Termination Date***"). On the Termination Date, the following shall immediately occur -

(a)    any obligation of the Prime Broker to settle any Transaction, on behalf of the Counterparty shall cease;

(b)    the Loan shall be immediately repayable;

(c)    all other outstanding obligations of each party to deliver securities or Equivalent Securities or to pay cash to the other under this Agreement shall become due for performance immediately (and shall be effected only in accordance with the following provisions of this Clause 13);

(d)    the Prime Broker, or in the event that an Event of Default has occurred under the 12.1(d), the Counterparty (the "**Default Calculation Agent**") shall establish, as at the date of the Event of Default, the Default Market Values of all cash and securities to be delivered or paid by each party under paragraph (c) above and the Net Default Amount payable under any Customer Agreement that has been terminated.

13.2    On the basis of the sums so established, an account shall be taken (as at the Termination Date) of what is due from each party to the other under this Agreement (on the basis that each party's claim against the other in respect of the transfer to it of securities or Equivalent Securities equals the Default Market Value therefor) and the sums due from one party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the party having the claims valued at the lower amount) and such balance shall be due and payable on the next following Business Day. For the purpose of this calculation, all sums not denominated in the Base Currency shall be converted by the Default Calculation Agent into the Base Currency at the Spot Rate prevailing at the relevant time.

## 14.    INDEMNITY AND LIABILITY

14.1    Save in each case for Losses incurred as a direct result of gross negligence, wilful default or fraud on the part of the Prime Broker, its Affiliates or nominees with whom securities are held which are directly controlled by the Prime Broker or its Affiliates, the Counterparty shall indemnify and hold the Prime Broker, and its agents and Affiliates, and their respective directors, officers, employees and agents (the "***Indemnitees***") harmless from and against all Losses which they may incur or have asserted against them and which arise directly in connection with the entry into, or acting in respect of, this Agreement or any Transaction, including, without limitation, those arising directly in connection with -

(a)    any breach of the obligations, warranties and representations of the Counterparty or the Agent under this Agreement; or

(b)    any Instructions, request, communication or purported instructions believed in good faith by the Prime Broker to have been given by the Agent or any other Authorised Person;

(c)    any liability for Taxes arising in respect of a Transaction; or

(d)    the settlement or attempted settlement of any Transaction or any failure to settle any such Transaction; or

(e)    the entry into and performance of any agreements with third parties pursuant to this Agreement; or

(f)    the reasonable costs of the Prime Broker in defending itself successfully against any claims of fraud, gross negligence or wilful default;

(g)    any action taken by a third party (which is not a signatory to this Agreement) to gain control of cash or securities governed by this Agreement; or

(h)    in relation to clause 15, charges, fees, expenses, damages, liabilities and losses and reasonable legal costs incurred or sustained by the Prime Broker or an Affiliate in accordance with or as a result of enforcing or protecting or attempting to enforce or protect any of the Prime Brokers' or Affiliate's rights under this Agreement or any Customer Agreement.

14.2    If, in the Prime Broker's (or as the case may be, the Default Calculation Agent's) commercially reasonable discretion, any sum owed under or in connection with this Agreement or any Transaction, or any order or judgment given or made in relation to this Agreement or any Transaction, has to be converted from the currency in which such sum is payable into another currency for the purposes of this Agreement, then the Counterparty (or as the case may be, the non-defaulting party) shall indemnify the Prime Broker from and against any loss suffered or incurred as a result of any discrepancy between (a) the rate of exchange used for such conversion and (b) the rate or rates of exchange available to the Prime Broker (or as the case may be, the Default Calculation Agent) at the time of such receipt of such sum owing .

14.3    Save in the case of sub-clause 14.3(g) where any Losses or liability is caused as a direct result of gross negligence, wilful default, fraud on the part of the Prime Broker, its Affiliates or nominees with whom securities are held which are directly controlled by the Prime Broker or its Affiliates, the Prime Broker accepts no liability and shall not be liable to the Counterparty or, where applicable, the Fund or the Agent for any Losses whatsoever which any such party may incur (in connection with this Agreement and any Transaction) as a result directly or indirectly from -

(a)    the general risks of investing; or

(b)    investing or holding assets in a particular country (including, but not limited to, Losses arising from nationalisation, expropriation or other governmental actions; regulations of the banking or securities industries; currency

restrictions, devaluations or fluctuations; and market conditions affecting the orderly execution of securities transactions or affecting the value of assets),or

(c)    acting on Instructions or in relation to notices, requests, waivers, consents, receipts, corporate actions or other documents which the Prime Broker in good faith believes to be genuine and to have been given or signed by Authorised Persons, and the Counterparty will be bound by the same; or

(d)    the collection, deposit or credit of invalid, fraudulent or forged securities or cash transfers; or

(e)    effecting delivery or payment against an expectation of receipt save where such delivery or payment was contrary to local market practice; or

(f)    an Instruction to deliver securities to a broker, even if the Prime Broker might have information tending to show that this course of action, or the choice of a particular broker for a transaction, was unwise; or

(g)    the Prime Broker's inability to deliver securities on the same day that such securities are received for the Counterparty's Securities Accounts;

and such exclusion of liability shall extend, without limitation, to obligations in tort, any indirect, punitive Special or Consequential loss or damage, even if the Prime Broker was previously informed of the possibility of such loss or damage, provided that this does not apply to any loss or damage caused by fraud on the part of the Prime Broker or to death or personal injury arising from any failure on the part of the Prime Broker to take reasonable care or exercise reasonable skill.

14.4    Where the Prime Broker has been found to be liable, the Prime Broker shall only be liable to the Counterparty to the extent that the Prime Broker has been grossly negligent, fraudulent or is in wilful default or breach of its duties as set out in this Agreement, save that nothing in this Agreement shall restrict any liability owed by the Prime Broker to the Counterparty under the Financial Services and Markets Act 2000 or the Rules or disclaim any liability to an extent not permitted by such Act or the Rules. The parties agree that, as a genuine pre-estimate of loss, the Prime Broker's liability to the Counterparty shall be determined based only upon the Market Value of the relevant cash or securities as at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities.

14.5    Subject to Paragraph 7.2 of Schedule 2, The Prime Broker shall not be responsible for any Losses resulting from an act or omission of any broker or any other third party (in each case, that is not an Affiliate of the Prime Broker), whether or not appointed by the Prime Broker, which is beyond the control of the Prime Broker and shall not be obliged to request such broker or any third party to comply with its obligations. Payments of income and settlement proceeds are at the risk of the Counterparty. If the Prime Broker, at the Counterparty's request, appoints a broker or agent (in each case, that is not an Affiliate of the Prime Broker) to effect any transaction on behalf of the Counterparty, the Prime Broker shall have no liability whatsoever in respect of such broker's duties, actions,



omissions or solvency and such broker or agent is not the agent of Prime Broker for any purpose.

14.6    The Counterparty acknowledges that the Prime Broker will not be monitoring the suitability of any Transaction or any of the Cash Accounts or Securities Accounts for the purposes of evaluating their composition or their or the Counterparty's performance and will not be aware of or monitoring the Counterparty's overall financial position, investment objectives or investment restrictions.

14.7    The holding of assets in, and investing in, foreign jurisdictions may involve risks of loss or other special features and the Counterparty accepts that the consequences of so investing and holding assets in such foreign jurisdictions shall be entirely at the risk of the Counterparty. The Prime Broker or any of its divisions or Affiliates may be in possession of information tending to show that the Instructions received may not be in the best interests of the Counterparty. The Prime Broker is not under any duty to disclose any such information.

14.8    The Prime Broker may, but is not obliged to, maintain any insurance cover for the benefit of the Counterparty. Upon written request of the Counterparty, the Prime Broker shall provide any relevant certificate evidencing any such insurance to the Counterparty.

14.9    References in this Clause 14 to the Prime Broker shall include any Affiliate of the Prime Broker.

14.10  The obligation of the Counterparty to make payments to the Prime Broker in the currency in which they are due shall be enforceable as a separate cause of action.

14.11  Without prejudice to Clause 13, all sums due to the Prime Broker shall be paid free and clear of any equity, set-off or counterclaim.

**15.    INTENTIONALLY LEFT BLANK**

**16.    REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS**

16.1    Each party represents and warrants to the other that -

    (a)    it is duly incorporated or organised under the laws of its country of incorporation or organisation;

    (b)    it is duly authorised to execute and deliver this Agreement, to enter into the Transactions contemplated under this Agreement and to perform its obligations thereunder and in the case of the Counterparty, it has all obtained all necessary authorisations and consents, and taken all necessary corporate actions to deposit and control the cash and securities in the Cash Accounts and Securities Accounts, as appropriate, to grant the Security, generally to appoint Sub-Custodians (and specifically to use the Prime Broker as a custodian) in accordance with the terms of this Agreement and to borrow money and enter into foreign exchange transactions;

    (c)    except in the case of the Agent and SRM Global Fund General Partner Limited, it enters into this Agreement as principal;

    (d)    the person signing this Agreement on its behalf is, and any person representing it in entering into a Transaction is and will be, duly authorised to do so on its behalf;

    (e)    in the case of the Counterparty and, where applicable, the Fund –

       (i)    any partnership deed or agreement has not been dissolved or terminated and no party has taken steps towards the same; and

      (ii)    no Act of Insolvency has occurred or is pending in respect of such party or in respect of any general partner, managing member or analogous representative entity signing this Agreement;

    (f)    it has obtained all authorisations of any governmental or regulatory body required in connection with this Agreement and the Transactions contemplated and such authorisations are in full force and effect;

    (g)    the execution, delivery and performance of its obligations under this Agreement and all Transactions will not violate any law, ordinance, charter, bye-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected and this Agreement is its legal, valid and binding obligation, enforceable in accordance with its terms;

    (h)    except where the Counterparty is the trustee of a trust or the general partner of an exempted limited partnership, the Counterparty beneficially owns all cash and securities held by the Prime Broker in the Cash Accounts and the Securities Accounts, free of all encumbrances and other adverse interests (other than arising under this Agreement);

    (i)    at any time the Counterparty delivers or procures the delivery of securities to the Prime Broker it will have the full and unqualified right to make such delivery and all securities will be delivered fully paid and free from any lien, prohibition, impediment or restriction (on transfer or otherwise) imposed by law, regulation, agreement or by any constitutional document;

    (j)    in connection with this Agreement and each Transaction it is not relying on any advice (whether written or oral) of the other party;

    (k)    the Counterparty understands the nature and risks of all Transactions and the subject matter of this Agreement and has obtained such independent advice (if any) as it consider appropriate;

    (l)    at the time it delivers, or is treated as delivering, to the other party any securities or Equivalent Securities it will have the full and unqualified right to make such delivery;

    (m)    the Counterparty will, at the Prime Broker's request, provide any necessary certificate of non-residence or other appropriate documentation necessary to minimise the incidence of UK taxation in respect of income arising in respect of securities that are the subject of any Transaction or standing to the credit or debit of the Securities Accounts; and

(n)    the Counterparty is not an ERISA Plan or a person acting on behalf of an ERISA Plan and the Counterparty's assets do not constitute assets of an ERISA Plan.

16.2    Where the Counterparty enters into this Agreement as the general partner of a limited partnership it represents and warrants to the Prime Broker that –

(a)    it has been properly appointed as general partner, is empowered under the partnership deeds or constitutional documents to enter into and deliver this Agreement and any other documentation relating to this Agreement, to enter into each Transaction or contract entered into pursuant thereto and to perform its obligations thereunder and is entitled to deal with all relevant trust assets and that it has complied with the internal management procedures of the trust and any other procedural requirements;

(b)    it is absolutely entitled to pass full legal and beneficial ownership of all assets provided by it under this Agreement and each Transaction free of all encumbrances and adverse interests (other than those arising under this Agreement);

(c)    it is not in breach of any partnership deeds or constitutional documents and has the right to be indemnified out of the assets of the partnership for all obligations under this Agreement and each Transaction;

(d)    it has not lost and will not do anything or omit to do anything which may jeopardise or cause it to lose or in any way compromise its right to be indemnified in full out of the partnership assets in respect of its obligations under this Agreement and each Transaction;

(e)    it has an express right of indemnity from the assets of the partnership in respect of Transactions entered into which are in breach of any aspect of the relevant terms of the partnership; and

(f)    it is not acting in breach of its fiduciary duties in entering into this Agreement or any Transaction.

16.3    Each party acknowledges and agrees that -

(a)    they have not relied on any representation, warranty or other statement of another party in entering into this Agreement other than those expressly set out in this Clause 16; and

(b)    in the case of the Counterparty, the Counterparty further represents and warrants to the Prime Broker that –

(i)    it has not relied on any oral or written representation made by the Prime Broker or any person on behalf of the Prime Broker, and acknowledges that this Agreement sets out to the fullest extent the duties of the Prime Broker;

(ii)    it understands the nature and risks of the subject matter of this Agreement and all Transactions and shall seek independent advice where necessary;

(iii)    the cash and securities are not subject to any encumbrance or security interest, save for the charge created pursuant to Clause 10; and

(iv)    it is neither a "United States person" nor a "foreign person controlled by a United States person" as such terms are defined in Regulation X of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 224 (Regulation X defines (1) "United States person" to include "a person which is organised or exists under the laws of any state of the United States of America or, in the case of a natural person, a citizen or resident of the United States; a domestic estate; or a trust in which one or more of the foregoing persons has a cumulative direct or indirect beneficial interest in excess of 50% of the value of the trust" and (2) "foreign person controlled by a United States person" to include "any non corporate entity in which United States persons directly or indirectly have more than a 50% beneficial interest, and any corporation in which one or more United States persons, directly or indirectly, own stock possessing more than 50% of the total combined voting power of all classes of stock entitled to vote, or more than 50% of the total value of shares of all classes of stock").

16.4    On the day on which any Transaction is entered into and on each day on which securities or Equivalent Securities are to be transferred or a payment is to be made under this Agreement, each party shall each be deemed to repeat all of the foregoing representations. For the avoidance of doubt, the Counterparty will be liable as a principal for its obligations under this Agreement.

16.5    A party shall notify the other immediately in writing if any of the representations or warranties in this Clause 16 ceases to be true and correct or, with the service of notice or passage of time, would cease to be true and correct.

16.6    The Counterparty undertakes that it will supply the Prime Broker with monthly net asset value calculations and audited annual financial statements (or more frequent calculations or statements if available) promptly after their production and, in any event, upon demand by the Prime Broker.

## 17.    CUSTODY

17.1    With the exception of any assets validly transferred to the Prime Broker pursuant to Clause 11, any securities debited to the Securities Accounts shall be held by the Prime Broker as custodian, and the Counterparty hereby appoints the Prime Broker, and the Prime Broker agrees to act, as its custodian, in accordance with the terms of Schedule 2.

## 18.    APPOINTMENT OF AGENT

18.1    The Counterparty hereby appoints the Agent, and the Agent hereby agrees, to act as its agent with regard to this Agreement as if the Agent were herein named instead of the Counterparty, and the Counterparty hereby authorises the Prime Broker to accept and act on –

(a)    all and any Instructions, requests, information or other information believed by the Prime Broker in good faith to have been made or given by the Agent without any duty on the Prime Broker to make further enquiries;

(b) any other Instructions of the Agent in any respect concerning the Cash Accounts and Securities Accounts (including, without limitation, delivering or otherwise transferring investments and paying cash to the Agent or otherwise as the Agent may order or direct).

18.2    The Counterparty hereby ratifies all and any actions taken by the Agent in its name under the Agreement.

18.3    The Counterparty may at any time terminate the agency of the Agent and shall notify the Prime Broker in writing of such termination.  On and after receipt of such written notification the Prime Broker shall cease to act in accordance with any new instructions given by the Agent, provided that the Prime Broker shall be entitled to act in accordance with any existing instructions and that such termination is without prejudice to any other liabilities which the retiring Agent may have incurred prior to the termination of its agency.

## 19.   CONFLICTS OF INTEREST

19.1    The Counterparty hereby authorises the Prime Broker to act hereunder notwithstanding that the Prime Broker, or any of its divisions or Affiliates may have a material interest in the transaction or that circumstances are such that the Prime Broker may have a potential conflict of duty or interest, including the fact that the Prime Broker or any of its Affiliates may -

(a) deal as principal or act as a market maker or broker fund adviser in the securities to which Instructions relate;

(b) provide broking services to other persons;

(c) act as financial adviser to the issuer of such securities;

(d) act in the same Transaction as agent for more than one person;

(e) have a material interest in the issue of the securities; or

(f) earn profits from any of the activities listed herein;

and none of the Prime Broker, its agents or Affiliates shall have any fiduciary duties to the Counterparty.

## 20.   TERMS

20.1    In relation to any Terms notified by the Prime Broker to the Counterparty from time to time -

(a) the Prime Broker may in its sole and absolute discretion amend such Terms (in whole or in part) with immediate effect by notification to the Counterparty of revised Terms (subject to the terms of any applicable notice periods); and

(b) where any fact, criterion or qualitative issue falls to be determined by the Prime Broker under any Terms, the Prime Broker will be entitled to exercise such determination in good faith in accordance with such Terms; and

(c) in the event of any inconsistency between the terms of this Agreement and any Terms, the terms of this Agreement will prevail.

## 21.   ADVICE

21.1    The Counterparty acknowledges that nothing in this Agreement nor any act, omission, communication or course of conduct of the Prime Broker or its agents pursuant to this Agreement shall constitute the giving of advice.

## 22.   CONFIDENTIALITY

22.1    Subject to Clause 22.2, each Party undertakes to the other Parties that it will keep confidential (and will ensure that its officers, employees, agents and professional and other advisers keep confidential) any information which relates to the contents of this Agreement (or any agreement or arrangement entered into pursuant to this Agreement) or the other Parties (including the identity and break-up of their assets, liabilities and/or investment strategy). Each Party shall not use for its own business purposes or disclose to any third party any such confidential information without the consent of the relevant other Party.

22.2    Clause 22.1 shall not apply to any information which the Counterparty or Agent discloses –

(a) in accordance with any legal or regulatory requirement by which it is bound; or

(b) which is already in the public domain, provided that this has not happened as a result of a breach of this Agreement or any other duty of confidentiality;

(c) which has been sourced by the Counterparty or the Agent from a person other than the Prime Broker or its Affiliates, provided the Counterparty was not or should not have been aware that such other party was subject to a duty of confidentiality; or

(d) with the Prime Broker's consent.

## 23.   NOTICES

23.1    Any notice to be given under this Agreement -

(a) shall be in English and, except where expressly otherwise provided in this Agreement, shall be given in writing or by facsimile or such other means of communication and subject to such security measures as may be agreed between the parties hereto;

(b) may be given and shall be effective -

(i)   if in writing and delivered in person or by courier, at the time when it is delivered;

(ii)   if sent by facsimile, at the time when the transmission is received by a responsible employee of the recipient in legible form;

(iii)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), at the time when the mail is delivered or its delivery attempted;

except that any notice or communication received, or delivery of which is attempted, after close of business, or on a day which is not a Business Day, shall be treated as given at the opening of business on the next Business Day. Notices and communications served on any Agent shall be effective as if served directly on the Counterparty.

23.2   The Prime Broker may make a Margin Call by e-mail or any other electronic messaging system and such a Margin Call shall be effective when received by the Counterparty.

### 24. INSTRUCTIONS

24.1   The Counterparty may make any request to make payments of cash or deliveries of securities to or on behalf of the Counterparty ("*Instructions*") orally, by e-mail or by such electronic means of communication as the parties may agree from time to time. The Prime Broker may require the Counterparty to confirm oral Instructions in writing (by letter, facsimile or electronically) at any time. Instructions shall be given in accordance with this Clause 24 and the Counterparty confirms that such persons as may be notified orally or in writing by the Counterparty from time to time ("**Authorised Persons**") has the authority to give Instructions to the Prime Broker.

24.2   The Counterparty further confirms that each of the persons listed in Schedule 4 and such other persons as may be notified in writing by the Counterparty from time to time has the authority give cash payment instructions or instructions for the free delivery of securities from the Securities Account to the Prime Broker ("**Payment Authorised Person**").

24.3   The Prime Broker shall be entitled without further inquiry to execute or otherwise act upon Instructions, requests, information or other communication believed in good faith by the Prime Broker to have been made or given by any Authorised Person or Payment Authorised Person, notwithstanding that any such Instruction, request, information or other communication may afterwards be found not to have been genuine or not to have been made or given by an Authorised Person or Payment Authorised Person. Such execution or action shall in the absence of gross negligence, wilful default or fraud by the Prime Broker constitute a good discharge by the Prime Broker of its obligations and it shall not be liable for any actions taken or omitted to be taken in good faith.

24.4   The Counterparty undertakes –

(a)   to ensure that no person other than an Authorised Person shall give Instructions to the Prime Broker;

(b)   to comply with any security procedures specified by the Prime Broker from time to time; and

(c)   to notify the Prime Broker immediately of any unauthorised access or if it has reasonable grounds to suspect any unauthorised use of any user name or password.

### 25. DETERMINATION

25.1   Save to the extent otherwise provided in this Agreement, the Prime Broker shall exercise any discretion granted to under this Agreement in good faith.

### 26. NON-ASSIGNABILITY; TERMINATION

26.1   Subject to Clause 26.2 below, the rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned or charged, provided however that this Agreement and all Transactions shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. The Prime Broker may, however, delegate to a third party the performance of its obligations under this Agreement or all or any part of a Transaction on such terms as it considers appropriate.

26.2   Notwithstanding the foregoing, the Prime Broker may, in its sole and absolute discretion, novate, assign or charge any rights, benefits and obligations under this Agreement to any of its Affiliates, provided that such Affiliate has, or its obligations are guaranteed by an entity which has, a credit rating at least equal to or higher than that of the Prime Broker at the time of such assignment or charge.

26.3   Notwithstanding the provisions of Clause 13.1, the Counterparty may terminate this Agreement by giving written notice to the other parties of not less than 10 Business Days and the Prime Broker may terminate this Agreement by giving written notice to the other parties of not less than 90 Business Days, provided that:

(a)   this Agreement shall remain applicable to all Transactions and Liabilities then outstanding, provided further that the parties shall use reasonable endeavours to close out all such Transactions and discharge such Liabilities as soon as practicable in accordance with their terms;

(b)   all remedies under this Agreement shall survive termination;

(c)   the Counterparty may not terminate this Agreement if, at the time of termination a Margin Deficit would be created or increased, save where (i) the Defaulting Party is the Prime Broker and (ii) no Event of Default has occurred or is continuing in respect of the Counterparty ; and

(d)   Clauses 9, 10, 13, 15, 22, 28 and 29 and this Clause 26 shall survive termination of this Agreement.

### 27. FORCE MAJEURE

27.1   The Prime Broker shall not be liable for taking or not taking and shall not be obliged to take or refrain from taking any action which is beyond its power to take or

refrain from taking wholly or partly as a result of a state of affairs (including any change of applicable regulations or any directive or policy) which it was beyond the Prime Broker's control to prevent and the effect of which is beyond its power to avoid.

27.2    The Prime Broker will not be liable to the other parties for any delay in performance, or for the non-performance of any of its obligations hereunder by reason of any cause beyond the Prime Broker's (or that of any Sub-Custodian) reasonable control or for any losses caused by the occurrence of any contingency beyond the Prime Broker's (or that of any Sub-Custodian) reasonable control. This includes without limitation any breakdown or failure of transmission, communication or computer facilities, postal or other strikes or similar industrial action, acts of war or terrorism, insurrection, revolution, nuclear fusion, fission or radiation, acts of God and the failure of any relevant exchange, clearing house and/or broker for any reason to perform its obligations.

27.3    Any delay in performance or non-performance of any of its obligations under this Agreement by the Prime Broker by reason of the application of this Clause 27 shall not constitute an event for the purposes of Clause 12 which would, upon the serving of a Default Notice or otherwise, be an Event of Default in respect of the Prime Broker.

27.4    References in this Clause 27 to the Prime Broker shall include any Affiliate of the Prime Broker.

27.5    Upon the occurrence of an operational or systems breakdown or failure beyond the control of the Counterparty (a "*Counterparty Force Majeure Event*"), the Counterparty will immediately notify the Prime Broker specifying the nature of the Force Majeure Event and will give the Prime Broker such information about the Counterparty Force Majeure Event as the Prime Broker may reasonably require.

27.6    If there has been a Counterparty Force Majeure Event which is continuing with respect to the Counterparty and the Counterparty could not, after using all reasonable efforts overcome such Force Majeure Event, then during the continuance of the Force Majeure Event any delay in performance or non-performance of the Counterparty's obligations under this Agreement arising directly from such Counterparty Force Majeure Event shall not constitute an event for the purposes of Clause 12 which would, upon the serving of a Default Notice or otherwise, be an Event of Default in respect of the Counterparty; provided the Counterparty has (i) used reasonable efforts to mitigate the effects of such event or circumstance, (ii) in the case of an obligation to pay or deliver securities, funds or securities were available to Counterparty to enable it to meet such obligation and (iii) such Counterparty Force Majeure Event continues for no more than two Business Days.

## 28.    GOVERNING LAW AND JURISDICTION

28.1    This Agreement shall be governed by and construed in accordance with the laws of England.

28.2    The parties agree that the courts of England are to have exclusive jurisdiction to settle any dispute (including claims for set-off and counterclaims) which may arise in connection with the creation, validity, effect, interpretation or performance of, or the legal relationships established by, this Agreement or otherwise arising in connection with this

Agreement and for such purposes irrevocably submit to the jurisdiction of the English courts.

28.3

28.4    Nothing in this clause 28 shall limit the right of either party to bring proceedings in the courts of any other country which may have jurisdiction including the courts of the jurisdiction in which the Counterparty is located The Counterparty hereby irrevocably appoints Clifford Chance Secretaries Limited at present having its offices at 10 Upper Bank Street, London E14 5JJ as its agent to receive on its behalf service of process in such courts, and service upon such agent shall constitute good service notwithstanding any failure by such agent to notify the Counterparty of such service. If such agent ceases to be its agent, the Counterparty shall promptly appoint, and notify the Prime Broker of the identity of, a new agent in England. Nothing in this Clause 28 shall however affect the right to serve process in any other manner permitted by law.

## 29.    WAIVER OF IMMUNITY

29.1    The Counterparty hereby waives, to the fullest extent permitted by applicable law, all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction, attachment (both before and after judgement) and execution to which it might otherwise be entitled in any country or jurisdiction, relating in any way to this Agreement or any Transaction, and agrees that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding.

## 30.    RECORDING

30.1    The parties agree that each may without further notice electronically record all telephone conversations between them and such recordings may be admitted in evidence in any proceedings relating to this Agreement.

## 31.    CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999

31.1    Other than Affiliates of the Prime Broker and the directors, officers, employees and agents of the Prime Broker or its Affiliates, a person who is not a party to this Agreement shall have no right under the Contract (Rights of Third Parties) Act 1999 to enforce any of its terms.

**Lehman Brothers International (Europe)**

By: _____    )
Title: _____    )
Date: _____    )

**EXECUTED AS A DEED** for and on behalf of **SRM Global Master Fund Limited Partnership** acting through its general partner, **SRM Global Fund General Partner Limited**

By: _____  )
Title: _____  )
Date: _____  )


By: _____  )
Title: _____  )
Date: _____  )


**For and on behalf of SRM Advisors (Monaco) SAM**


By: _____  )
Title: _____  )
Date: _____  )

**SCHEDULE 1**

**PROCEDURES**

1.  **THIRD PARTY TRANSACTIONS**

1.1   Whenever the Counterparty wishes the Prime Broker to settle a Third Party Transaction, it shall request the Prime Broker to do so by giving Instructions (a "***Third Party Transaction Request***") to the Prime Broker in writing or by facsimile or by such other means of communication as may be agreed to by the parties which may include, without limitation, LehmanLive, Bloomberg, or another form of electronic messaging system.

1.2   The Prime Broker may at any time before settlement of a Third Party Transaction and in its absolute discretion reject the relevant Third Party Transaction Request by promptly giving oral or written notice to that effect to the Counterparty. The Prime Broker will, on request, provide reasons in writing for any such rejection. Within one Business Day following receipt by the Prime Broker of a Third Party Transaction Request the Prime Broker will send a confirmation of the Third Party Transaction to the Counterparty by facsimile or email. The Prime Broker shall be deemed to have accepted the terms of a Third Party Transaction only on settling such Third Party Transaction.

1.3   Unless any particular settlement method is specified in the Third Party Transaction Request, the Prime Broker may effect settlement of the relevant Third Party Transaction, or attempt to do so, by any means it, acting reasonably and in good faith, considers appropriate; including without limitation, a means which does not provide for delivery-versus-payment.

1.4   Save where a Third Party Transaction is novated in accordance with Paragraph 1.5, the Prime Broker shall, as between the Prime Broker and the third party or its agent, act as the Counterparty's agent in settling any Third Party Transaction and the Prime Broker may inform the third party, or its agent, that the Prime Broker is acting as agent of the Counterparty.

1.5   The Prime Broker may, in its absolute discretion, agree to a Novated Third Party Contract. The Counterparty appoints the Prime Broker as its agent to agree any such novation with a third party on its behalf upon such terms as the Prime Broker, acting reasonably and in good faith, sees fit without consultation with the Counterparty. Upon novation of a Third Party Transaction there shall arise a Collateral Contract.

1.6   The Prime Broker shall not be liable for any Losses incurred in respect of any failure by the third party to settle its obligations under a Third Party Transaction (including any Novated Third Party Contract) on the Contractual Settlement Date or at all.

1.7   The Prime Broker shall give written notice to the Counterparty of the failure of any Third Party Transaction (including any Novated Third Party Contract) or any Collateral Contract to settle on the Contractual Settlement Date as soon as reasonably practicable after becoming aware of such failure.

1.8   The Prime Broker shall, on the Contractual Settlement Date of -

(a)    a Third Party Transaction, credit any cash received from, or debit any cash payable to, the relevant third party to or from the Cash Accounts or, as appropriate, debit any securities received from, or credit any securities deliverable to, the relevant third party from or to the Securities Accounts;

(b)    a Collateral Contract, debit any cash payable by, or credit any cash payable to the Counterparty from or to the Cash Accounts or, as appropriate, credit any securities deliverable by, or debit any securities deliverable to, the Counterparty to or from the Securities Accounts.

1.9    The Prime Broker may reverse any entries made under Paragraph 1.8 if the Transaction fails to settle within such period following the relevant Contractual Settlement Dates as the Prime Broker considers reasonable. Any costs associated with any such failure to settle or such a reversal shall be for the account of the Counterparty.

**2.    PRINCIPAL TRANSACTIONS**

2.1    Whenever the Counterparty wishes to enter into an agreement to purchase from, or sell to, the Prime Broker securities or a sum of specified currency, it shall submit a Principal Transaction Request to the Prime Broker in writing or by facsimile or by such other means of communication as may be agreed to by the parties which may include, without limitation, LehmanLive, Bloomberg, or another form of electronic messaging system.

2.2    Service of a Principal Transaction Request shall constitute an offer by the Counterparty to enter into the Principal Transaction specified in the Principal Transaction Request, and that offer may be amended or revoked only with the consent of the Prime Broker.

2.3    Within one Business Day following acceptance by the Prime Broker of a Principal Transaction Request the Prime Broker may send a confirmation to the Counterparty by facsimile or email. Such confirmation shall not be deemed to be a binding acceptance by the Prime Broker of the Principal Transaction Request and the Prime Broker may reject any Principal Transaction Request by giving written notice to that effect as soon as reasonably practical to the Counterparty at any time up to and including the Contractual Settlement Date. The Prime Broker shall be deemed to have accepted the terms of such a Principal Transaction only on settling such Principal Transaction.

2.4    Subject to the provisions of Clause 6 and unless the parties otherwise agree, securities or cash which would otherwise fall to be delivered or paid by one party to the other on the Contractual Settlement Date of a Principal Transaction shall not be delivered or paid but shall:

(a)    be credited to, (in the case of cash payable to the Counterparty), or be debited from, (in the case of cash payable to the Prime Broker), the relevant Cash Account; or

(b)    be debited to, (in the case of securities deliverable to the Counterparty), or be credited to, (in the case of securities deliverable to the Prime Broker), the relevant Securities Account.

2.5    Securities debited or cash credited to an account pursuant to Paragraph 2.4 shall, for the purposes of Clause 6, be treated for accounting purposes as having been delivered or paid by the Counterparty to the Prime Broker.

**3.    DELIVERIES AND PAYMENTS TO THE PRIME BROKER**

3.1    Subject to the provisions of Clause 5, whenever the Counterparty wishes to deliver securities or pay cash to the Prime Broker it shall notify the Prime Broker of its intention to do so. Upon receipt of such securities or cash the Prime Broker shall, if such securities are of a type acceptable to the Prime Broker or such cash is of a currency acceptable to the Prime Broker, debit such securities to the relevant Securities Account or credit such cash to the relevant Cash Account.

**4.    DELIVERIES AND PAYMENTS TO THE COUNTERPARTY**

4.1    Whenever the Counterparty wishes the Prime Broker to deliver securities or pay cash to it or to its order, the Counterparty shall request the Prime Broker to do so in the form notified to the Counterparty by the Prime Broker from time to time.

4.2    The Prime Broker may, at any time before delivery or payment and in its absolute discretion reject any delivery or payment request by giving written notice as soon as reasonably practicable to that effect to the Counterparty. The Prime Broker will, on request, provide reasons in writing for any such rejection. The Prime Broker shall be deemed to have accepted a delivery or payment request only on making the relevant delivery or payment. The Prime Broker shall not be obliged to accept or give effect to any delivery or payment request which would result in the creation of, or an increase in, a Margin Deficit.

4.3    Unless a delivery request is rejected, the Prime Broker shall deliver the requested securities or cash in accordance with the delivery request, except that the Prime Broker may deliver the securities or cash at the earliest time it is reasonably practicable for the Prime Broker to make the requested delivery or payment, having regard to customary market practice and the time and date on which the delivery request is received, if that date is later than the settlement date requested by the Counterparty.

4.4    Securities and cash delivered to the Counterparty pursuant to Paragraph 4.3 shall, except to the extent securities of the amount and description in question or, as appropriate, cash of the amount and currency in question, are for the time being debited to a Securities Account or, as the case may be, credited to a Cash Account and available for the purpose, be treated as having been advanced or loaned by the Prime Broker to the Counterparty. The Counterparty shall, subject to the terms of this Agreement (including, without limitation, Clause 4.5(b)), be obliged to deliver to the Prime Broker, on demand, Equivalent Securities in respect of any securities advanced to the Counterparty and to repay on demand cash loaned to the Counterparty.

**5.    MISCELLANEOUS**

5.1    The Counterparty warrants to and for the benefit of the Prime Broker that it will not make any payments of cash to the Prime Broker under this Schedule other than pursuant to or for the purpose of or in connection with Transactions made or to be made with or through the Prime Broker.

## SCHEDULE 2

## CUSTODY

### 1.    POWERS AND DUTIES OF THE PRIME BROKER

1.1    The Prime Broker shall receive, hold, release and deliver (or instruct any Sub-Custodian to receive, hold, release and deliver) securities to or from the Securities Accounts (as appropriate) only on receipt of Instructions. The Counterparty authorises the Prime Broker to (or to instruct any Sub-Custodian to) allocate and deliver securities to the Securities Accounts and to transfer securities from the Securities Accounts to the Counterparty, only in accordance with such Instructions. The Prime Broker shall have full authority to do whatever it reasonably deems necessary in order to effect such Instructions. In addition, the Counterparty hereby authorises the Prime Broker to do whatever the Prime Broker deems necessary in its absolute discretion to effect such transfers of securities to and from the Securities Accounts as are required pursuant to the terms of this Agreement.

1.2    The Prime Broker shall be under no duty to take or omit to take any action with respect to any of the securities except in accordance with this Agreement.

1.3    The Prime Broker does not make any warranties, representations or other statements whatsoever in respect of the validity or sufficiency of the securities, the enforceability of any rights or interests relating thereto or whether it is appropriate, necessary or desirable to take or omit to take any action in relation thereto, and these matters shall be the exclusive concern of the Counterparty.

1.4    The Prime Broker shall have no duty to advise or make recommendations to the Counterparty in connection with the securities and the Prime Broker shall not be responsible for advising the Counterparty as to the investment merits of such securities.

### 2.    SEGREGATION OF ASSETS

2.1    The Prime Broker will identify in its books and records that the securities belong  to the Counterparty.

2.2    The Prime Broker will require that any Sub-Custodian or nominee appointed by it, or any Securities Depositary which it uses to hold the securities pursuant to this Agreement, will identify in its books and records that the securities belong to the customers of the Prime Broker (to the extent permitted by applicable mandatory law, regulation, or market practice) so that it is readily apparent that such securities do not belong to the Prime Broker.

### 3.    SHORT POSITIONS

3.1    The Prime Broker is not obliged to process transactions which will result in a short position on the Cash Accounts or the Securities Accounts. The Counterparty agrees that delivery Instructions will not be issued and acknowledges that the Prime Broker is not obliged to deliver any securities unless the Prime Broker has received evidence satisfactory to it that the relevant securities will have been received by the Prime Broker in time for delivery in accordance with the Counterparty's Instructions.

### 4.    CONFIRMATION OF ORAL INSTRUCTIONS/SECURITY DEVICES

Any Instructions delivered to the Prime Broker by telephone shall promptly thereafter be confirmed in writing by an Authorised Person (which confirmation may bear the facsimile signature of such person). The Prime Broker is authorised to follow such Instructions notwithstanding the failure of an Authorised Person to send such confirmation in writing or the failure of such confirmation to conform to the telephone Instructions received and the Prime Broker shall be indemnified by the Counterparty accordingly. The Counterparty shall be responsible for safeguarding any testkeys, identification codes or other security devices which the Prime Broker shall make available to the Counterparty or any Authorised Person.

### 5.    ACTING ON INSTRUCTIONS/UNCLEAR INSTRUCTIONS

The Counterparty authorises the Prime Broker to accept and act upon any Instructions received by it without enquiry. The Prime Broker may (without prejudice to the foregoing) seek clarification or confirmation of an Instruction from an Authorised Person and may decline to act upon an Instruction if it does not receive clarification or confirmation satisfactory to it. The Prime Broker shall not be liable for any loss arising from any delay whilst it obtains such clarification or confirmation or from exercising its right to decline to act in the absence of such clarification or confirmation.

### 6.    INSTRUCTIONS CONTRARY TO LAW/MARKET PRACTICE

The Prime Broker need not act upon Instructions which it reasonably believes to be contrary to law, regulation or market practice but is under no duty to investigate whether any Instructions comply with any applicable law, regulation or market practice, which, for the avoidance of doubt, shall be the sole responsibility for the Counterparty. The Prime Broker shall be entitled (but not bound), if it deems possible to do so to amend an Instruction in such a manner to comply with what the Prime Broker reasonably believes to be applicable law, regulation or market practice.

### 7.    SUB-CUSTODIANS AND SECURITIES DEPOSITORIES

#### Appointment

7.1    The Prime Broker is authorised under this Agreement to act through and hold the securities with Sub-Custodians being such other entities as the Prime Broker may appoint as sub-custodian (each a "*Sub-Custodian*"). In addition, the Prime Broker and each Sub-Custodian appointed by it may deposit securities with, and hold securities in any Securities Depository on such terms as such systems customarily operate. References in this Agreement to other Sub-Custodians which the Prime Broker may appoint shall include Affiliates of the Prime Broker but not Securities Depositaries. The Prime Broker reserves the right to add, replace or remove other Sub-Custodians and the Prime Broker shall give notice to the Counterparty of any such act as soon as reasonably practicable thereafter.

7.2    The Prime Broker will use reasonable skill, care and diligence in the selection of any Sub-Custodian appointed by it pursuant to this Agreement and shall be responsible to the Counterparty for satisfying itself as to the ongoing suitability of such Sub-Custodian, for the maintenance of an appropriate level of supervision over such Sub-Custodian and

for making periodic enquiries to confirm that the obligations of such Sub-Custodian to the Prime Broker are discharged in a satisfactory manner.

7.3    The Customer acknowledges and agrees that Prime Broker may grant to any Sub-Custodian or Securities Depository a lien, right of retention or sale over any securities held by, or deposited with, that Sub-Custodian or Securities Depository in respect of amounts owing to that Sub-Custodian or Depository.

**Liability for Other Sub-Custodians**

7.4    The Prime Broker shall be liable for losses arising out of the insolvency, acts or omissions of any Sub-Custodian that is an Affiliate of the Prime Broker but not of any other Sub-Custodian or of any Securities Depository.

**8.    HOLDING OF REGISTERED AND BEARER SECURITIES**

8.1    The Prime Broker is authorised to hold:

(a)    in bearer form, such securities as are customarily held in bearer form; and

(b)    registered in the name of (at the Prime Broker's discretion) the Counterparty or the Prime Broker or another Sub-Custodian appointed by the Prime Broker or any nominee of the Prime Broker or another Sub-Custodian appointed by the Prime Broker, such securities as are customarily held in registered form.

8.2    The Prime Broker shall not be liable for any loss suffered howsoever caused as a result of an Instruction to hold securities with, or have them registered in the name of, any person not chosen by the Prime Broker.

**9.    OMNIBUS ACCOUNTS**

9.1    The Counterparty authorises the Prime Broker to hold securities in fungible accounts holding securities of other customers of the Prime Broker (but not securities of the Prime Broker), such accounts being designated as customer accounts. The Counterparty authorises the Prime Broker to hold securities in accounts with Sub-Custodians appointed by the Prime Broker on the basis that such accounts are fungible accounts which hold securities of other customers of the relevant Sub-Custodian (but not securities of such Sub-Custodians). The Counterparty will accept delivery of securities of the same class and denomination as those deposited with the Prime Broker or any other Sub-Custodian appointed by the Prime Broker.

**10.    UNITED KINGDOM REGULATORY MATTERS**

10.1    The Rules require the Prime Broker to inform the Counterparty that:

(a)    where securities are held overseas there may be different settlement, legal and regulatory requirements in those jurisdictions from those applying in the United Kingdom, together with different practices for the separate identification of securities;

(b)    in providing the services described in this Agreement, the Prime Broker may hold securities with other Sub-Custodians who are in the same group as the Prime Broker;

(c)    although securities will ordinarily be registered in the name of a nominee, the Prime Broker may from time to time (where, due to the nature of the law or market practice of an overseas jurisdiction, it is in the Counterparty's best interests or it is not feasible to do otherwise) register or record securities in the name of a Sub-Custodian, or the Prime Broker itself subject always to Paragraph 2. Securities may also be registered in the name of the Counterparty. Subject always to Paragraph 2, if securities are registered in the name of the Prime Broker, such securities may not be segregated from assets of the Prime Broker, and, in the event of insolvency of the Prime Broker, such securities may not be as well protected. Arrangements with Sub-Custodians are such that securities held with them shall be in a separate account containing assets belonging only to customers of the Prime Broker and not the Prime Broker's proprietary assets. In any event, the Prime Broker will notify the Counterparty of the registration name used in respect of securities which are registrable securities;

(d)    the Prime Broker accepts the same level of liability for any nominee company controlled by the Prime Broker or by an Affiliate as for itself;

(e)    the omnibus accounts referred to in Paragraph 8 are a form of pooling;

(f)    if the Counterparty instructs the Prime Broker to hold securities with or register or record securities in the name of a person not chosen by the Prime Broker, the consequences of doing so are at the Counterparty's own risk and the Prime Broker shall not be liable therefore.

**11.    FRACTIONS/REDEMPTIONS BY LOT**

The Counterparty shall not be entitled to any fraction or other entitlement arising as a result of the Prime Broker holding securities in omnibus accounts, which is not directly referable solely to the holding of the Counterparty and such fractions or entitlements shall be at the disposal of the Prime Broker. On partial redemptions, the Prime Broker shall use whatever method it deems fair to determine how shares will be redeemed.

**12.    STATEMENTS**

12.1    The Prime Broker shall issue statements to the Counterparty on the first Business Day of each calendar month or as soon as reasonably practical thereafter identifying the amounts of cash in the Cash Accounts and identifying the securities in the Securities Accounts, and otherwise on request. A certificate or statement by the Prime Broker as to any cash or any securities held in a Cash Account or a Securities Account shall be conclusive in the absence of manifest error. Prices and other information contained in any statement sent to the Prime Broker have been obtained from sources the Prime Broker believes in good faith to be reliable. The Prime Broker does not, however, make any representation as to the accuracy of such information, nor that the prices specified necessarily reflect the proceeds that would be received on a disposal of the relevant securities.

12.2    References in this Agreement to statements include any statements in electronic form.

12.3    Where the Counterparty is ordinarily resident outside the United Kingdom, the Prime Broker may, at the Counterparty's request, arrange for custody statements to be retained by the Prime Broker.

12.4    The Counterparty agrees that the information, statements and other communications provided to it pursuant to the terms of this Agreement shall be in satisfaction of any obligation of the Prime Broker to deliver a confirmation, contract note or statement.

13.    **DISCLOSURE OF INFORMATION**

The Prime Broker shall be entitled to disclose any information relating to the Counterparty or the securities and/or cash held for the Counterparty as is required by any law, court, legal process, professional adviser or banking or other regulatory or examining authorities (whether governmental or otherwise).

**SCHEDULE 3**

**DEFINITIONS**

"*Act of Insolvency*" occurs in respect of a party upon:

(a)    its making a general assignment for the benefit of, or entering into a reorganisation, arrangement, or composition with creditors; or

(b)    its admitting in writing that it is unable to pay its debts as they become due; or

(c)    its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, examiner, receiver or liquidator or analogous officer of it or any material part of its property; or

(d)    the presentation or filing in any jurisdiction of a petition in respect of it in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition (except in the case of a petition for winding-up or any analogous proceeding) not having been stayed or dismissed within 15 days of its filing in the case of the Counterparty or within 30 days of its filing in the case of the Prime Broker; or

(e)    except where such appointment is made in respect of the Prime Broker whilst the Prime Broker remains solvent, the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such party or over all or any material part of such party's property; or

(f)    the convening of any meeting of its creditors for the purposes of considering a voluntary arrangement as referred to in section 3 of the Insolvency Act 1986 (or any analogous proceeding); or

(g)    any act analogous to any of (a) - (f) above; or

(h)    the occurrence of any procedure equivalent or analogous to the foregoing (a) to (g) in any other jurisdiction.; or

(i)    in respect of the Counterparty which is a limited partnership or limited liability company, the occurrence of any event or procedure referred to in paragraphs (a) to (h) above in relation to the general partner or any limited partner or, as the case may be, managing member.

"*Advanced Securities*" means securities advanced or treated as advanced to the Counterparty by the Prime Broker under Clause 4.1 including, for the avoidance of doubt, Hong Kong securities advanced by the Prime Broker under the Stock Lending Agreement;

"*Affiliate*" of the Prime Broker means an entity that is a subsidiary or holding company, or a subsidiary of a holding company, of the Prime Broker and the terms "subsidiary" and



"holding company" have the meanings given them in Section 736 of the Companies Act 1985 (or any statutory modification or re-enactment thereof);

"*Authorised Persons*" has the meaning in Clause 24.1;

"*Base Currency*" means the currency agreed as the base currency or, in the absence of such agreement, US dollars;

"*Business Day*" means a day on which commercial banks are generally open for business in London and Monaco;

"*Cash Account*" means an account for the payment of cash made and received (or deemed to have been made and received) pursuant to this Agreement and all Transactions relating thereto and such other payments as the Prime Broker and the Counterparty may from time to time agree;

"*Charged Assets*" means securities and other assets which are charged to the Prime Broker under Clause 10.1;

"*Collateral*" means cash or securities in which the Counterparty is not prohibited from investing by its investment guidelines, as notified to the Prime Broker from time to time;

"*Collateral Contract*" means a contract between the Prime Broker and the Counterparty, on identical terms to the Novated Third Party Contract to which it relates, except that:

(a)     the rights and obligations of the Prime Broker and the Counterparty under the Collateral Contract shall be equivalent to the rights and obligations of the third party and the Prime Broker respectively under the related Novated Third Party Contract; and

(b)     the Prime Broker shall be obliged to perform its obligations under the Collateral Contract only if and to the extent that the third party performs its obligations under the related Novated Third Party Contract;

"*Consequential loss or damage*" means loss or damage of a kind or extent which was or was not reasonably foreseeable at the time this Agreement was entered into as a serious possibility in the event of the breach of obligation in question, including without limitation, any breach of agreements entered into between the Counterparty and third parties, loss of profits or loss of business resulting from the breach of obligation in question;

"*Contractual Settlement Date*" means the date specified as the settlement date in the relevant confirmation sent by the Prime Broker to the Counterparty;

"*Customer Agreement*" means any contract for differences agreement or ISDA Master Agreement, or Master Institutional Futures Customer Agreement entered into between the Counterparty and the Prime Broker or between the Counterparty and any Affiliate, the Stock Lending Agreement, such other agreements between the Counterparty and the Prime Broker or the Counterparty and any Affiliate as the Prime Broker and the Counterparty may from time to time agree and any schedules to, and confirmations issued pursuant to, any of the aforesaid agreements;

"*Default Market Value*" means -

(a)     with respect to any cash on any date, the Market Value of such cash at the Default Valuation Time, and

(b)     with respect to any securities on any date -

   (i)     in the case of securities to be delivered to the Defaulting Party, the Market Value of such securities at the Default Valuation Time, adjusted for the market impact of such default by the Default Calculation Agent acting in good faith and in its commercially reasonable discretion , less all properly incurred costs, fees and expenses that would be incurred in connection with a sale by the Default Calculation Agent of such securities as determined by Default Calculation Agent acting in good faith and in its commercially reasonable discretion; and

   (ii)    in the case of securities to be delivered by the Defaulting Party, the amount it would cost to buy such securities at the Default Valuation Time at the best available offer price therefore on the most appropriate market, adjusted for the market impact of such default by the Default Calculation Agent acting in good faith and in its commercially reasonable discretion, together with all properly incurred costs, fees and expenses that would be incurred in connection therewith in each case as determined by the Default Calculation Agent acting in good faith and in its commercially reasonable discretion;

"*Default Notice*" means a written notice served by the Non-Defaulting Party on the Defaulting Party stating that an event specified in Clause 11 shall be treated as an Event of Default for the purposes of this Agreement;

"*Default Valuation Time*" means, with respect to any cash or securities -

(a)     if the relevant Event of Default occurs during normal business hours on a dealing day in the most appropriate market for the relevant cash and securities recorded in the Cash Accounts and Securities Accounts (as determined by the Default Calculation Agent, acting in good faith and in its commercially reasonable discretion), the close of business in that market on the following dealing day; and

(b)     in any other case, at such time as determined by the Default Calculation Agent (acting in good faith and in its commercially reasonable discretion) but in any event no later than the close of business on the second dealing day in that market after the day on which the relevant Event of Default occurs;

"*Defaulting Party*" has the meaning in Clause 12.1;

"*ERISA*" means the U.S. Employment Retirement Income Security Act of 1974 as amended;

"*ERISA plan*" means an employee benefit plan as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the US Internal Revenue Code of 1986, as amended;

"*Equivalent Securities*" means with respect to any security, securities of the same issuer, issue and of an identical type, nominal value and description as such security and shall include the certificates and other documents of or evidencing title and transfer in respect of the foregoing (as appropriate). If and to the extent that the relevant securities are partly-paid or have been converted, subdivided, consolidated, redeemed, made the subject of a takeover, capitalisation issue or rights issue, or any event similar to the foregoing, Equivalent Securities shall have the following meaning -

(a)    in the case of conversion, sub-division or consolidation, securities equivalent to the securities into which the relevant securities has been converted, subdivided or consolidated;

(b)    in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

(c)    in the case of a takeover, a sum of money or securities equivalent to the money or securities which was or were the consideration or alternative consideration;

(d)    in the case of a call on partly paid securities, securities equivalent to the relevant securities after such call has been paid up provided that the Counterparty has paid to the Prime Broker an amount of money equal to the sum due in respect of the call;

(e)    in the case of a capitalisation issue, securities equivalent to the relevant securities together with securities equivalent to the securities allotted by way of a bonus on securities of that kind;

(f)    in the case of a rights issue, securities equivalent to the relevant securities, together with the securities equivalent to securities allotted thereon, provided that the Counterparty has paid to the Prime Broker all sums due in respect thereof;

(g)    if a payment of interest, dividends or other distributions is made in respect of the relevant securities in the form of securities or a certificate which may at a future date be exchanged for securities, securities equivalent to the relevant securities, together with securities or a certificate equivalent to those allotted;

(h)    in the case of any event similar to any of the foregoing, securities equivalent to the relevant securities, together with or replaced by a sum of money or securities equivalent to that received in respect of the relevant securities resulting from such event;

and "*equivalent to*" shall be construed accordingly.

"*Event of Default*" has the meaning in Clause 12.1;

"*Excess Cash*" means cash constituting all or part of the Margin Excess and such cash will, whilst held as client money, cease to be treated as cash collateral delivered to the Prime Broker for the purposes of the calculation of Net Equity.

"*FSA*" means the Financial Services Authority;

"*FSA Client Money Rules*" means the rules and guidance contained in Chapter 4 of the FSA's client assets sourcebook (as amended or supplemented from time to time) and any related Rules relevant to client money;

"*Fund*" means, where the Counterparty is the trustee of a fund, that fund, as specified on page 1 of this Agreement;

"*Indemnitees*" has the meaning in Clause 14.1;

"*Instructions*" has the meaning in Clause 24.1;

"*Liabilities*" has the meaning in Clause 10.2;

"*Lehman Company*" means any Affiliate which is party to a Customer Agreement;

"*Loan*" means any loan made or treated as made under Clause 4.1;

"*Losses*" means all Taxes, fees, expenses, claims, actions, liabilities, damages, costs, losses, proceedings or other analogous matters;

"*Margin Call*" means a notification by the Prime Broker to the Counterparty of its obligation to deliver margin in order to eliminate a Margin Deficit and the amount of such Margin Deficit;

"*Margin Deficit*" means the amount by which the Net Equity is less than the Margin Requirement as determined by the Prime Broker in its absolute discretion on a trade date or settlement date basis;

"*Margin Excess*" means the amount by which the Net Equity is greater than the Margin Requirement as determined by the Prime Broker in its absolute discretion on a trade date or settlement date basis;

"*Margin Requirement*" means the amount calculated by the Prime Broker in its sole and absolute discretion by reference to the Net Equity and notified by the Prime Broker to the Counterparty from time to time as the Margin Requirement including, without limitation, any initial and subsequent Margin Requirement notified to the Counterparty in such manner as Prime Broker considers appropriate including, without limitation, by means of any Terms;

"*Market Value*" means -

(a)    with respect to cash, the amount of such cash (converted, if necessary, into Base Currency at the Spot Rate prevailing at the time ); and

(b)    with respect to securities, the price for such securities obtained from a source selected by the Prime Broker (acting in good faith and in its commercially reasonable discretion); provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Prime Broker (acting in good faith and in its commercially reasonable discretion). Market Value is determined by the

Prime Broker solely for the purposes of determining Margin Requirements and should not be relied on by the Counterparty for any other purposes.

"*Market Value Equivalent*" means, in respect of cash or securities as of any time on any day as determined by the Prime Broker (acting in good faith and in its commercially reasonable discretion), an amount equal to the Market Value of such cash or securities;

"*Net Default Amount*" in respect of any Customer Agreement, means the amount if any payable by one party to the other following the operation of the close-out and netting provisions of that Customer Agreement, as determined in accordance with that agreement;

"*Net Equity*" has the meaning in Clause 6.1;

"*Novated Third Party Contract*" means a Third Party Transaction which the Prime Broker and the Counterparty have agreed to be novated on terms that the rights and obligations of the Counterparty in respect of the Third Party Transaction shall be assumed by the Prime Broker;

"*Payment Authorised Persons*" has the meaning in Clause 24.2;

"*Permitted Encumbrance*" means, in relation to an asset, a security interest in relation to the asset created under any Customer Agreement, or any lien, charge or other equivalent encumbrance arising by operation of law or under the applicable custody documentation in favour of any sub-custodian pursuant to this Agreement through which the asset is so held or in whose name the asset is so registered, or any lien routinely imposed on all assets in a clearing system in which the asset is so held;

"*Potential Event of Default*" means an event which with the service of notice or passage of time, or both, would be or would in the opinion of the Prime Broker be likely to be an Event of Default;

"*Principal Transaction*" means a Transaction specified in a Principal Transaction Request;

"*Principal Transaction Request*" means the form of request submitted by the Counterparty to the Prime Broker from time to time for the purpose of Paragraph 2.1 of Schedule 1;

"*Rules*" means the rules of the Financial Services Authority;

"*Securities Account*" means an account for the deliveries of securities made and received (or deemed to have been made and received) pursuant to this Agreement and all Transactions relating thereto;

"*Securities Depositary*" means any securities depositary, settlement system, dematerialised book entry system, clearance system or similar system;

"*Security*" means the security created by or pursuant to this Agreement;

"*Spot Rate*" means the spot rate of exchange for the sale of the relevant currency against the purchase of the Base Currency as determined by the Prime Broker or Default

Calculation Agent (as applicable) using such reliable source as it may reasonably select (which may include, without limitation, any rates quoted by Bloomberg);

"*Stock Lending Agreement*" means the stock lending agreement entered into between the Prime Broker and the Counterparty in the form of the Overseas Securities Lender's Agreement or the Global Master Securities Lending Agreement published by the International Securities Lenders Association;

"*Sub-Custodian*" means any person appointed by the Prime Broker as sub-custodian in accordance with Paragraph 7.1 of Schedule 2;

"*Taxes*" for this purpose means any present or future tax, applicable VAT, duty, stamp duty, stamp duty reserve tax, transfer tax, levy, impost or charge of a similar nature payable to or imposed by any supra-national or national government, federal state, provincial, local, municipal taxing authority, body or official, of any jurisdiction (together with any related penalties, damages, fines, interest, surcharges and similar charges) other than taxes payable by the Prime Broker, its directors, officers, employees and agents on income or gains related to its business activities;

"*Termination Date*" has the meaning in Clause 13.1;

"*Terms*" means any terms notified by the Prime Broker to the Counterparty setting out the fees, interest rates and Margin Requirement, which the Prime Broker in its absolute discretion intends to apply to the Transactions, as amended from time to time, and if more than one, the last terms provided by the Prime Broker to the Counterparty;

"*Third Party Transaction*" means a Transaction established between the Counterparty and a third party;

"*Third Party Transaction Request*" has the meaning in Paragraph 1.1 of Schedule 1;

"*Transaction*" has the meaning in Clause 2.1 and, for the purposes of Clause 14, includes a loan of Hong Kong securities made under the Stock Loan Agreement.

## SCHEDULE 4

### AUTHORISED PERSONS

Name: )
............................... )
Position: )
............................... )
Specimen signature: )
............................... )

Name: )
............................... )
Position: )
............................... )
Specimen signature: )
............................... )

Name: )
............................... )
Position: )
............................... )
Specimen signature: )
............................... )

Name: )
............................... )
Position: )
............................... )
Specimen signature: )
............................... )

Name: )
............................... )
Position: )
............................... )
Specimen signature: )
............................... )

## CONTENTS

| CLAUSE | | PAGE |
|---|---|---|
| 1. | DEFINITIONS AND CONSTRUCTION | 1 |
| 2. | SCOPE OF AGREEMENT | 2 |
| 3. | TRANSACTIONS, PAYMENTS AND DELIVERIES | 3 |
| 4. | PROVISION OF FINANCE | 3 |
| 5. | SECURITIES AND CASH ACCOUNTS | 5 |
| 6. | MARGIN REQUIREMENT | 5 |
| 7. | PAYMENT AND DELIVERY | 7 |
| 8. | INCOME, CORPORATE EVENTS AND VOTING | 8 |
| | Income | 8 |
| | Corporate Events | 9 |
| | Voting | 10 |
| 9. | FEES AND INTEREST | 11 |
| 10. | SECURITY | 11 |
| 11. | RIGHT OF USE | 15 |
| 12. | EVENTS OF DEFAULT | 16 |
| 13. | CLOSE-OUT | 18 |
| 14. | INDEMNITY AND LIABILITY | 18 |
| 15. | GUARANTEE AND INDEMNITY | 21 |
| 16. | REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS | 21 |
| 17. | CUSTODY | 24 |
| 18. | APPOINTMENT OF AGENT | 24 |
| 19. | CONFLICTS OF INTEREST | 25 |
| 20. | TERMS | 25 |
| 21. | ADVICE | 26 |
| 22. | CONFIDENTIALITY | 26 |
| 23. | NOTICES | 26 |
| 24. | INSTRUCTIONS | 27 |
| 25. | DETERMINATION | 28 |
| 26. | NON-ASSIGNABILITY; TERMINATION | 28 |
| 27. | FORCE MAJEURE | 28 |
| 28. | GOVERNING LAW AND JURISDICTION | 29 |
| 29. | WAIVER OF IMMUNITY | 30 |

| | | |
|---|---|---|
| 30. | RECORDING | 30 |
| 31. | CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999 | 30 |
| SCHEDULE 1 PROCEDURES | | 32 |
| 1. | Third Party Transactions | 32 |
| 2. | Principal Transactions | 33 |
| 3. | Deliveries and payments to the Prime Broker | 34 |
| 4. | Deliveries and payments to the Counterparty | 34 |
| 5. | Miscellaneous | 34 |
| SCHEDULE 2 CUSTODY | | 35 |
| 1. | Powers and Duties of the Prime Broker | 35 |
| 2. | Segregation of Assets | 35 |
| 3. | Short Positions | 35 |
| 4. | Confirmation of Oral Instructions/Security Devices | 36 |
| 5. | Acting on Instructions/Unclear Instructions | 36 |
| 6. | Instructions Contrary to Law/Market Practice | 36 |
| 7. | Sub-custodians and Securities Depositories | 36 |
| Appointment | | 36 |
| Liability for Other Sub-Custodians | | 37 |
| 8. | Holding of Registered and Bearer Securities | 37 |
| 9. | Omnibus Accounts | 37 |
| 10. | United Kingdom Regulatory Matters | 37 |
| 11. | Fractions/Redemptions by Lot | 38 |
| 12. | Statements | 38 |
| 13. | Disclosure of Information | 39 |
| SCHEDULE 3 DEFINITIONS | | 40 |
| SCHEDULE 4 AUTHORISED PERSONS | | 47 |

_____ MAY 2008

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

**SRM GLOBAL MASTER FUND LIMITED PARTNERSHIP,** ACTING THROUGH ITS GENERAL PARTNER,

**SRM GLOBAL FUND GENERAL PARTNER LIMITED**

**INTERNATIONAL PRIME BROKERAGE AGREEMENT**

**FRESHFIELDS BRUCKHAUS DERINGER**

# EXHIBIT E

9 May 2008

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

AND

SRM GLOBAL MASTER FUND LIMITED PARTNERSHIP, ACTING
THROUGH ITS GENERAL PARTNER,
SRM GLOBAL FUND GENERAL PARTNER LIMITED

———————

CROSS MARGINING AND NETTING
AGREEMENT

———————

1465381-1.8/BUSINESS

## CONTENTS

| CLAUSE | PAGE |
|---|---|
| 1. | DEFINITIONS AND CONSTRUCTION; BASE CONTRACTS ...................... 1 |
| 2. | MARGIN REQUIREMENT ................................................................. 3 |
| 3. | TRANSFER OF MARGIN ................................................................. 4 |
| 4. | CROSS-DEFAULT, CLOSE-OUT AND NETTING ................................. 5 |
| 5. | REPRESENTATIONS AND WARRANTIES ........................................... 6 |
| 6. | MISCELLANEOUS ......................................................................... 7 |
| 7. | CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999 ...................... 9 |
| 8. | GOVERNING LAW AND JURISDICTION .......................................... 9 |
| SCHEDULE 1 BASE CONTRACTS ............................................................. 11 |
| SCHEDULE 2 SCENARIO MARGINING METHODOLOGY .............................. 12 |
| SCHEDULE 3 COMMITTED MARGIN TERMS ............................................ 4 |
|     Interpretation ............................................................................. 4 |
|     Committed Margin ...................................................................... 5 |
|     Cessation Events ......................................................................... 6 |
|     Substitution ............................................................................... 7 |
|     Maximum Commitment ................................................................ 9 |

This CROSS MARGINING AND NETTING AGREEMENT is made on 9 May 2008

BETWEEN

(1)    LEHMAN BROTHERS INTERNATIONAL (EUROPE) of 25 Bank Street, Canary Wharf, London, E14 5LE, United Kingdom, a company incorporated under the laws of England and Wales ("*LBIE*"); and

(2)    SRM Global Master Fund Limited Partnership, an exempted limited partnership established under the laws of the Cayman Islands *(the "Fund")* acting through its general partner, SRM Global Fund General Partner Limited, an exempted limited company incorporated under the laws of the Cayman Islands (in its capacity as the general partner of and on behalf of the Fund (the "*Counterparty*").

WHEREAS

(A)    LBIE and the Counterparty have entered into two or more Base Contracts pursuant to which LBIE and the Counterparty may from time to time have exposures, contingent liabilities or debts to each other. LBIE will require the Counterparty to provide Margin in relation to such exposures, contingent liabilities or debts pursuant to the terms of the relevant Base Contract.

(B)    The Counterparty has requested LBIE to enter into this Agreement in order to reduce its operational expense in respect of the Base Contracts by calculating the Margin Requirement on a net basis across all the Base Contracts.

IT IS AGREED AS FOLLOWS:

1.    DEFINITIONS AND CONSTRUCTION; BASE CONTRACTS

1.1    In this Agreement, capitalised terms not otherwise specifically defined shall have the meanings given to them in this Agreement.

1.2    In this Agreement, unless the context otherwise requires:

(a)    references to the singular shall include the plural and vice versa;

(b)    references to time are to London time;

(c)    headings and sub-headings are for convenience of reference only and shall not affect the meaning or construction of any provision hereof; and

(d)    a reference to a "clause" is to the relevant clause in the main body of this Agreement.

1.3    In the event of any inconsistency between the terms of any Base Contract and this Agreement, the terms of this Agreement shall prevail.

1.4    Each Contract shall be a "Customer Agreement" and this Agreement shall constitute the "Terms" as defined in and for the purposes of the Prime Brokerage Agreement between the parties ("*PBA*"), if any, and the CFD Annex, as applicable.

"*Account*" means, in respect of any Base Contract, an account maintained by LBIE for the payment of cash or delivery of securities made and received (or deemed to have been made and received) pursuant to that Base Contract and all Transactions relating thereto and any other payments as LBIE and the Counterparty may from time to time agree.

"*Affiliate*" means, with respect to a party, any other entity controlled by, controlling or under common control with, that party. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Law*" means all applicable laws, rules, regulations, policy and interpretive statements of any governmental or quasi-governmental authorities and securities, commodities and options exchanges and self-regulatory organizations, including but not limited to all initial and maintenance margin requirements.

"*Base Contract*" means any agreement or transaction between Counterparty and LBIE and identified in Schedule 1, as the same may be supplemented or amended from time to time (and, in the case of any master agreements or umbrella agreements so identified each Transaction thereunder or covered thereby), and any related credit support or security agreements (other than this Agreement), and any terms or conditions incorporated by reference into any of the foregoing.

"*Base Currency*" means the currency agreed as the base currency or, in the absence of such agreement, US Dollars.

"*Business Day*" means each day on which commercial banks and foreign exchange markets are generally open to settle payments in London and Monaco.

"*Contract*" means each Base Contract and this Agreement.

"*Default Termination*" means, in respect of a Base Contract the acceleration and/or termination of one or more outstanding Transactions following the occurrence of an event of default, default or termination event (howsoever described) under that Base Contract.

"*Margin*" means initial, variation and top-up collateral, margin, credit support or security (howsoever described) in the form of cash or securities of a type and in a form acceptable to LBIE.

"*Margin Methodology*" means the proprietary margin methodology applied to particular Base Contracts or categories of Transactions, as specified in Schedule 2, as such Schedule may be amended from time to time in accordance with the terms of this Agreement.

"*Margin Notice*" has the meaning given in clause 2.4.

2

*"Margin Notification Deadline"* means 1:00 p.m. London time on any Business Day.

*"Margin Requirement"* means the amount of Margin payable or deliverable by the Counterparty to LBIE in respect of Transactions calculated in accordance with the relevant Margin Methodology applicable to such Transactions.

*"Margin Transfer"* means a transfer of Margin made under clause 3.1 or clause 3.2.

*"Market Value"* means, with respect to any Margin, the market value of such Margin as determined by LBIE by reference to such pricing sources as LBIE considers appropriate and taking into account, in its absolute discretion, acting in good faith, any variation in the value of cash or securities due to the availability, liquidity, solvency or market volatility of such asset or other market variable applicable to that asset.

*"MTM Calculation"* shall be, with respect to any Base Contract at any time, the amount determined by LBIE in accordance with the terms of the relevant Base Contract, which reflects the daily mark-to-market valuation of all positions and transactions governed by such agreement.

*"Net Default Amount"* means the net amount payable by one party to the other upon a Default Termination.

*"Regulatory Requirement"* means (a) with respect to LBIE or Counterparty, all requirements under Applicable Law, including without limitation all requirements as to the manner of LBIE's holding Margin, the manner of transfer to LBIE of Margin, and the amount of Margin held by LBIE in respect of any Base Contract, and (b) with respect to LBIE, (i) all requirements to hold Margin in respect of any Base Contract in order for LBIE to avoid any capital charges or other adverse capital consequences or any adverse tax consequences and (ii) all "house" margin requirements imposed by LBIE but only to the extent that their lack of imposition could in LBIE's sole and absolute discretion, acting in good faith, result in a breach of Applicable Law by LBIE.

*"Spot Rate"* means the spot rate of exchange quoted by Lehman Brothers Inc. for the sale by it of the relevant currency against the purchase of the Base Currency. *"Threshold Amount"* means US$ 100,000

*"Transaction"* means any individual transaction made subject to the terms of a Base Contract.

*"Transfer Deadline"* means 5:00 p.m., London time on any Business Day.

## 2. MARGIN REQUIREMENT

2.1  Notwithstanding the terms of the relevant Base Contracts, LBIE shall on each Business Day determine the Margin Requirement in accordance with the Margin Methodology.

2.2  Counterparty acknowledges that LBIE will calculate the Margin Requirement for each Base Contract. In particular, LBIE will, on each Business Day, calculate the Margin Requirement, being the sum of the following amounts:

    (a)    the Margin for Transactions as determined in accordance with Schedule 2;

    (b)    such additional amount, if any, as LBIE determines is necessary to ensure that it satisfies all applicable Regulatory Requirements; and

    (c)    except with respect to the PBA (as defined in Schedule 1) and any CFD Transaction (as defined in the ISDA listed in Schedule 1), the adjusted differential between the MTM Calculations in respect of each Base Contract on any particular day and the MTM Calculations in respect of each Base Contract on the previous date of determination. Any such determination by LBIE shall be adjusted by dis-applying any thresholds, minimum transfer amounts, independent amounts, or haircuts or discounts (howsoever described) otherwise applied in relation to the Credit Support associated with that Base Contract and without regard to any notice or dispute resolution procedures provided for by such Base Contract.

2.3  LBIE shall aggregate all positive amounts and all negative amounts so determined and net such two amounts, which net amount may be positive or negative.

2.4  By the Margin Notification Deadline on each Business Day LBIE shall notify the Counterparty (a *Margin Notice*), which notice may be through electronic communication or a web-based report (provided that the posting of such web-based report has been notified to the Counterparty by e-mail and for these purposes, the time such confirmatory e-mail is received by the Counterparty shall be deemed to be the time the Margin Notice was notified to the Counterparty), accessed by the Counterparty or an authorised agent for and on behalf of the Counterparty, of:

    (a)    the net Margin Requirement; and

    (b)    if the Market Value of Margin previously provided by the Counterparty is less than the Margin Requirement (a *Margin Deficit*), the amount of the Margin Deficit.

2.5  LBIE agrees to apply the Margin Methodology on a committed basis, subject to the terms and conditions of Schedule 3.

## 3. TRANSFER OF MARGIN

3.1  Notwithstanding the terms of any Base Contract, if at any time the Margin Requirement is a positive number, LBIE shall have the right to require the Counterparty to provide, return and/or release Margin under one or more of the Base Contracts in an aggregate amount or value (disapplying any thresholds, minimum transfer amounts, independent amounts, or haircuts or discounts (howsoever described)) at least equal to that Margin Requirement, provided that for the avoidance of doubt, LBIE shall have the

right to allocate and apportion Margin provided by the Counterparty from time to time to one or more Base Contracts including, without limitation, to satisfy any Regulatory Requirement. Accordingly, the Counterparty, by way of security, authorises LBIE to transfer any Margin from one or more Accounts for the limited purposes of this paragraph.

3.2    If there is a Margin Deficit in excess of the Threshold Amount, or insufficient assets standing to the credit of the Accounts to fully discharge any Margin Deficit in excess of the Threshold Amount, the Margin Notice shall be deemed to be a demand by LBIE for immediate payment or delivery to LBIE of Margin with a Market Value at least equal to that necessary to fully discharge any Margin Deficit.

3.3    A Margin Transfer shall be made under the Base Contract(s) specified by LBIE in the Margin Notice in its absolute discretion or, if not so specified, as may be allocated on receipt in accordance with Clause 3.1.

3.4    If LBIE requires the Counterparty to make a Margin Transfer under clause 3.2 then, notwithstanding the terms of the relevant Base Contract, the Counterparty shall make the Margin Transfer by the earlier of:

(a)    the Transfer Deadline on the Business Day following the day on which the Margin Notice is given (or, if the Margin Notice is given after the Margin Notification Deadline on any Business Day, by the Transfer Deadline on the second Business Day); and

(b)    the time at which Margin is required to be transferred pursuant to the terms of such Base Contract.

3.5    If the Counterparty fails to make a Margin Transfer in accordance with clause 3.2 and 3.4 LBIE may, notwithstanding the terms of the Base Contract under which the Margin Transfer is to be made, give notice to the Counterparty declaring that such failure is a credit support event of default under the relevant Base Contract whereupon a Default Termination shall immediately occur in accordance with the provisions of that Base Contract.

4.    CROSS-DEFAULT, CLOSE-OUT AND NETTING

4.1    If a Default Termination occurs in relation to any Base Contract and such Default Termination is a result of any default, omission, action or status of the Counterparty (for the avoidance of doubt including, but not limited to, where the Counterparty is the Defaulting Party under the PBA or the Defaulting Party or Affected Party under the ISDA), LBIE may at any time by notice to the Counterparty declare that a Default Termination shall immediately occur under all other Base Contracts and LBIE shall not be required to serve any separate notice under any Base Contract. To the extent that any Base Contract does not include provisions to the same effect as a Default Termination or this clause 4.1, the terms of each Base Contract are hereby modified so as to incorporate the provisions set out in this clause.

4.2    LBIE shall determine in accordance with the provisions of the relevant Base Contract the Net Default Amount payable by one party to the other under such Base Contract.

4.3    If following a Default Termination where such Default Termination is a result of any default, omission, action or status of the Counterparty (for the avoidance of doubt including, but not limited to, where the Counterparty is the Defaulting Party under the PBA or the Defaulting Party or Affected Party under the ISDA) reciprocal sums are owing between the parties in respect of the Net Default Amount payable under one or more Base Contracts, an account shall be taken of the amounts payable by each party to the other in respect of such sums and those sums shall be set off against each other; such calculations to be carried out by LBIE. Only the balance of the account shall be payable by the party owing the greater of those sums and such balance shall be due and payable on the Business Day following the day on which LBIE notifies the Counterparty of the amount due. If a party fails to pay this balance on such Business Day, that party shall pay interest (compounded on a daily basis) from the date on which such payment became due until the date of actual payment at a rate equal to the London inter-bank offered rate plus two per cent. For the purpose of this calculation, all sums not denominated in the Base Currency shall be converted by LBIE into the Base Currency at the Spot Rate prevailing at the relevant time.

4.4    If the exercise of any right pursuant to this Clause 4 shall be avoided or set aside by a court or shall be restrained, stayed or enjoined under Applicable Law, then the obligations in respect thereof shall be reinstated, or in the event of restraint, stay or injunction other than a permanent injunction that is non-appealable, preserved in the amounts as of the date of restraint, stay or injunction between LBIE, on the one hand, and Counterparty, on the other, until such time as such restraint or injunction shall no longer prohibit exercise of such right.

5.    REPRESENTATIONS AND WARRANTIES

5.1    Each party hereto represents and warrants, and shall be deemed to represent and warrant as of the date hereof and as of the time it enters into any Base Contract, to the other party hereto as follows:

(a)    it has full power and authority to execute and deliver this Agreement and any Base Contract and to perform and observe the provisions hereof and thereof and to enter into and perform any Transaction thereunder;

(b)    the execution, delivery and performance of this Agreement and any Base Contract either have been or will be, prior to entering into each Base Contract, duly authorised by all necessary corporate action and do not and will not contravene any requirement of law, its charter or by-laws or any transactional restriction or agreement binding on or affecting such party or its assets; and

5

(c)    this Agreement has been, and any Base Contract has been or will be at the time it is entered into, duly and properly executed and delivered by such party and constitutes and will constitute the legal, valid and binding obligation of such party enforceable in accordance with its terms, except as the enforcement of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditors' rights, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

5.2    In connection with the negotiation of and the entering into this Agreement and each Base Contract, the Counterparty acknowledges and agrees that:

(a)    LBIE is acting for its own account and is not acting as a fiduciary for, or a financial or investment advisor to the Counterparty (or in any similar capacity);

(b)    the Counterparty is not relying upon any communications (whether written or oral) from LBIE as investment advice or as a recommendation to enter into this Agreement or any Base Contract, it being understood that information and explanations related to the terms and conditions of this Agreement or any Base Contract shall not be considered investment advice or a recommendation to enter into this Agreement or any Base Contract;

(c)    the Counterparty has not received from LBIE any assurance or guarantee as to the expected results of this Agreement or any Base Contract; and

(d)    the Counterparty has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own independent investment, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary to consult and not upon any view expressed by LBIE.

6.    MISCELLANEOUS

6.1    *Entire Agreement.* This Agreement shall constitute the entire and exclusive understanding and agreement by the parties with respect to the matters addressed herein.

6.2    *No Assignment.* The Counterparty may not assign its rights or delegate its obligations under any Contract or Transaction without the prior written consent of LBIE, and any purported assignment or delegation absent such consent is null and void. Subject to the foregoing, all Contracts shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

6.3    *Termination.* Subject to Schedule 3, if applicable, LBIE may terminate this Agreement:

7

(a)    on five Business Days' prior written notice to the Counterparty; or

(b)    immediately if it is appropriate to do so to comply with any Regulatory Requirement

but, without prejudice to any rights or remedies of LBIE under the relevant Base Contract, no such termination shall affect any Base Contract or any of LBIE's rights under any Base Contract.

6.4    *Notices.* Unless otherwise specified, all notices and other communications to be given to a party hereunder shall or in writing and shall be given to the address, fax (confirmed if requested) or telephone number and to the individual or department specified below with respect to such party or such other address, fax or telephone number as such party may hereafter specify for the purpose of notice given in accordance with this clause. Unless otherwise specified, any notice, instruction or other communication, shall be effective upon receipt if given in accordance with this clause.

**Counterparty:**
SRM Advisers (Monaco) SAM[Please provide]
6th Floor
Monte Carlo Palace
7 Boulevard des Moulins
MC 9800
Monaco

Attention of: Philip Price and Andrew Mortimer
E-mail: Andrew.mortimer@srmglobalfund.com AND Philip.price@srmglobalfund.com

**LBIE:**
Lehman Brothers International (Europe)
Address: 25 Bank Street, London, E14 5LE
Phone: +44 (0) 20 7102 1000
Fax: +44 (0) 20 7067 8345
Attention of: Capital Markets Prime Services Legal

6.5    *Severability.* Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid or unenforceable under such Applicable Law, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability without otherwise affecting the validity or enforceability of such provision or the remaining provisions of this Agreement.

6.6    *Counterparts.* This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

8

6.7   *Amendments; Waivers.*   No amendment, modification, supplement or waiver in respect of this Agreement will be effective unless in writing and signed by all of the parties hereto. No failure or delay by any party hereto in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

7.   CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999

Other than Affiliates of LBIE, a person who is not a party to this Agreement shall have no right under the Contract (Rights of Third Parties) Act 1999 to enforce any of its terms. The parties to this Agreement do not require the consent of such Affiliates to amend or vary this Agreement at any time.

8.   GOVERNING LAW AND JURISDICTION

8.1   This Agreement is governed by and shall be construed in accordance with the laws of England.

8.2   The parties agree that the courts of England are to have exclusive jurisdiction to settle any dispute (including claims for set-off and counterclaims) which may arise in connection with the creation, validity, effect, interpretation or performance of, or the legal relationships established by, this Agreement or otherwise arising in connection with this Agreement and for such purposes irrevocably submit to the jurisdiction of the English courts.

8.3   Nothing in this clause 8.3 shall limit the right of either party to bring proceedings in the courts of any other country which may have jurisdiction including the courts of the jurisdiction in which the Counterparty is located.

8.4   The Counterparty hereby irrevocably appoints Clifford Chance Secretaries Limited at present having its offices at 10 Upper Bank Street, London E14 5JJ, England as its agent to receive on its behalf service of process in such courts, and service upon such agent shall constitute good service notwithstanding any failure by such agent to notify the Counterparty of such service. If such agent ceases to be its agent, the Counterparty shall promptly appoint, and notify LBIE of the identity of, a new agent in England. Nothing in this Clause 8 shall however affect the right to serve process in any other manner permitted by law.

9

IN WITNESS WHEREOF each of the Parties has caused this Agreement to be executed in its name and behalf by its duly authorised representative as of the date specified on page 1 of this Agreement

EXECUTED for and on behalf of Lehman Brothers International (Europe)

BRUCE RAILTON
Authorised Signatory

By: _____   )
Title: _____   )
Date: _____   )


EXECUTED for and on behalf of SRM Global Master Fund Limited Partnership acting through its general partner, SRM Global Fund General Partner Limited


By: _____   )
Title: _____   )
Date: _____   )


By: _____   )
Title: _____   )
Date: _____   )

10

12/05 2008 08:31 FAX

IN WITNESS WHEREOF each of the Parties has caused this Agreement to be executed in its name and behalf by its duly authorised representative as of the date specified on page 1 of this Agreement

EXECUTED for and on behalf of Lehman Brothers International (Europe)

By: _____                )
Title: _____ ____              )
Date: _____                )

EXECUTED for and on behalf of SRM Global Master Fund Limited Partnership acting through its general partner, SRM Global Fund General Partner Limited

By: PHILIP PRICE                )
Title: AUTHORISED SIGNATORY        )
Date: 9/5/08 ____                )

By: IAN BARCLAY                )
Title: AUTHORISED SIGNATORY        )
Date: 9/5/08.                )

---

## SCHEDULE 1

## BASE CONTRACTS

Base Contracts are the following agreements made between LBIE and the Counterparty:

1) ISDA Master Agreement dated on or about the date of this Agreement ("*ISDA*") including the additional terms for CFD Transactions ("*CFD Annex*").

2) International Prime Brokerage Agreement dated on or about the date of this Agreement ("*PBA*").

3) Master Institutional Futures Customer Agreement dated on or about the date of this Agreement ("*MIFCA*").

## SCHEDULE 2

### SCENARIO MARGINING METHODOLOGY

#### Scenario Eligible Transactions

As at the date of this Agreement, the Margin Methodology pursuant to this Schedule shall include only the following eligible transactions, countries and currencies, as amended from time to time by LBIE ("*Scenario Eligible Transactions*"):

Scenario Eligible Transactions must be denominated in Eligible Currencies and shall mean:

- Corporate Bonds - issued by entities who are organized under the laws of, and whose principal place of business is located in, one of the below listed Eligible Countries. For example, a U.S. dollar-denominated bond distributed in the United States whose ultimate credit risk is an operating company in China, would not be eligible.
- Government Bonds - issued by the sovereign governments of the below listed Eligible Countries.
- Interest Rate Swaps - denominated in one of the below listed Eligible Currencies.
- Money Market Futures - denominated in one of the below listed Eligible Currencies.
- Bond and Note Futures - Bond and Note Futures on eligible Government Debt.
- CDS (single name and index) - CDS on a reference entity that is the issuer of eligible Corporate or Government Bonds.
- Equities – (and CFD's and swaps on Equities) common stock issued by entities who are organized under the laws of, and whose principal place of business is located in, one of the below listed Eligible Countries.
- Convertible Bonds - issued by entities who are organized under the laws of, and whose principal place of business is located in, one of the below listed Eligible Countries.
- Listed Stock Options - Options whose underlying stock is issued by entities who are organized under the laws of, and whose principal place of business is located in, one of the below listed Eligible Countries.
- Listed Equity Index Options and Futures - Options or futures on a major equity index from one of the below listed Eligible Countries.
- FX Forwards in which both currencies in the currency pair are Eligible Currencies
- FX Futures in which both currencies in the currency pair are Eligible Currencies (except Finex Dollar Index Futures)
- Cash balances in Prime Brokerage accounts

Eligible Countries:

"G-10 Country" means Belgium, Canada, France, Germany, Italy, Japan, the Netherlands, Sweden, Switzerland, the United Kingdom and the United States.

"Euro-Zone Non G-10" means Austria, Finland, Greece (Government Bonds only), Ireland, Portugal (Government Bonds only), and Spain.

"Non Euro-Zone Non G-10" means Australia, Denmark, Iceland, New Zealand and Norway.

"G-22 Country" means the union of G-10 Country, Euro-Zone Non G-10 and Non Euro-Zone Non-G10.

Eligible currencies:

"G-10 Country Currency" means CAD, CHF, EUR, GBP, JPY, SEK, and USD.

"Euro-Zone Non G-10 Currency" means EUR.

"Non Euro-Zone Non G-10 Currency" includes AUD, DKK, NOK, ISK, and NZD.

For other countries, the eligibility of products is restricted as outlined.

Non G-22 Hard Currency[1] Sovereign Bonds: Argentina, Brazil, Chile, Colombia, Ecuador, Mexico, Panama, Peru, Uruguay, Venezuela, Bulgaria, Croatia, Czech Republic, Estonia, Hungary, Latvia, Lithuania, Poland, Romania, Russia, Slovakia, Slovenia, Turkey, Ukraine, China, Hong Kong, India, Indonesia, Malaysia, Philippines, Kazakhstan, Singapore, South Korea, Taiwan, Thailand, Egypt, Israel, South Africa, Qatar, UAE.

Non G-22 Hard Currency Corporate Bonds: Argentina, Brazil, Chile, Mexico, Venezuela, Puerto Rico, Czech Republic, Hungary, Poland, Russia, Turkey, China, Hong Kong, India, Indonesia, Malaysia, Philippines, Kazakhstan, Singapore, South Korea, Taiwan, Thailand, Israel, South Africa, Qatar, UAE.

Non G-22 Local Currency Sovereign Bonds: Brazil, Hungary, Mexico, Poland, Russia, South Africa, Turkey.

Non G-22 FX Products[2]: Argentina[2], Brazil, Chile[3], China[3], Czech Republic[3], Egypt[2], Hong Kong[3], Hungary, Indonesia[3], Israel[2], India[3], Mexico, Malaysia[3], Philippines[3],

---

[1] "Hard-currency" refers to USD, EUR, JPY, GBP, CHF, CAD

[2] All FX spot trades associated with currencies from these countries are eligible. For Product Types Fx Forwards and Fx Futures only crosses which involve one of these EMG currencies and one of either USD, EUR, JPY are eligible

[3] Only spot FX trades.

13

Poland, Russia, Saudi Arabia[5], Singapore[5], South Korea[5], South Africa, Thailand[5], Turkey, Taiwan[5].

<u>Non G-22 Equities:</u> Brazil, Mexico, Chile, Argentina, Taiwan, Hong Kong, Korea, Singapore, China, Thailand, Malaysia, Indonesia, India, Philippines, Russia, Hungary, Poland, Turkey, Czech Republic, Egypt, Israel, South Africa.

Non-Eligible Transactions:

All transactions not within the scope of this Schedule as set out above shall be considered "*Non-Eligible Transactions*" and will not qualify for any "Committed Margin" terms and Margin for such Non-Eligible Transactions shall be will be reviewed and approved on a case-by-case basis by LBIE and determined in accordance with the relevant Base Contract.

Scenario Margin Methodology:

LBIE shall determine the total margin charge for all Scenario Eligible Transactions each Business Day by running a series of stress tests outlined in Table 1, Table 2, Table 3, Table 4 and Table 5 (each a "Test") and calculating the loss with respect to each such Test . Additionally, a portfolio liquidation cost will be calculated as outlined in Table 7. On any given day, the absolute value of the calculated loss of the Test which results in the largest U.S. dollar amount with respect to the Scenario Eligible Transactions plus the liquidation cost shall be the margin requirement with respect to the Scenario Eligible Transactions.

For any portfolio the diversification index for credit (denoted $DI_{cr}$) is defined as the portfolio credit VaR divided by the sum of the credit VaR for each position in the portfolio[4]:

$$DI_{cr} = Max\left\{20\%, \frac{PortfolioCreditVaR}{\sum_i CVaR_i}\right\}.$$

The diversification index for equity (denoted $DI_{eq}$) will have *PortfolioCreditVaR* replaced by *PortfolioEquityVaR* and position level credit VaR, $CVaR_i$, replaced by $EqVaR_i$ or the equity VaR for the i[th] position of the portfolio[4]:

$$DI_{eq} = Max\left\{20\%, \frac{PortfolioEquityVaR}{\sum_i EqVaR_i}\right\}$$

The diversification index of the portfolio (denoted $DI_P$) will have *PortfolioCreditVaR* replaced by *TotalPortfolioVaR* and position level credit VaR, $CVaR_i$, replaced by $VaR_i$ or the total VaR for the i[th] position of the portfolio[5]:

$$DI_P = \frac{TotalPortfolioVaR}{\sum_i VaR_i}$$

Further definitions:

* Spread01 means the U.S. Dollar change in position value due to a 1 basis point tightening in the credit spread.
* IRPV01 means the U.S. Dollar change in position value due to a 1 basis point tightening in the yield.
* NetSpread01 means for a given collection of positions, the sum of position Spread01's.
* Delta (Δ) means the U.S. Dollar change in the position value with respect to a $1 increase in the equity value, multiplied by spot price of the underlying.
* Net Issuer Delta means for all positions from a given issuer, the sum of position Delta's.
* VAR shall mean the average of the worst percentile corresponding to the VAR Confidence Level of daily losses derived over the VAR Data Period appropriately scaled by the VAR Holding Period calculated using VAR Methodology.

---

[4] The DI floor of 20% may be reduced inasmuch as there are offsetting positions within the same issuer in the portfolio. Specifically, the credit DI floor of 20% is adjusted by the ratio of the sum of issuer-level credit VaR to the sum of position-level credit VaR. The equity DI floor of 20% is also adjusted by a similar ratio of equity VaRs.

14

---

[5] The total portolio VaR is based on a historically simulated p&l vector. This p&l vector consists of a portion due to equity risk, a portion due to credit risk, and a portion due to all other risks. A constant multiplier is applied to the portion due to equity risk and credit risk, respectively, equal to the ratio of the equity DI (respectively credit DI) to the unfloored equity DI (respectively unfloored credit DI). Thus the portfolio DI is adjusted only inasmuch as the equity and credit DI's are increased and in proportion to the risk in each of equity and credit relative to the total portfolio risk.

15

- VAR Confidence Level means 99%.
- VAR Data Period means the daily data period commencing on January 4, 1999 to the present date (growing time series).
- VAR Holding Period is five days.
- VAR Parameters means the VAR Confidence Level, the VAR Data Period, and the VAR Holding Period.
- VAR Methodology means the value-at-risk methodology used by LBIE or any of its Affiliates in their sole discretion to determine the VAR based on a number of factors, including but not limited to the VAR Parameters, historical risk factors over the VAR Data Period, such as prices, interest rates, volatility and spread, and current sensitivities and other factors each as determined by LBIE or any of its Affiliates in their sole discretion, for the given VAR Portfolio.
- Liquid default swap indices are the more recent CDX.HY, CDX.IG and iTraxx series as determined at Lehman Brothers sole discretion.
- A/B FX rate represents the current exchange rate in terms of number of units of B required to purchase 1 unit of A.
- $Notional_{USD}^{Aeg}$ is the notional of the leg of the FX transaction that has a currency equal to currency A (defined in Appendix D), converted to USD at the current spot A/USD FX rate.
- $\Delta_{USD}^{Aeg}$ means the discounted notional of the A currency leg of an FX Forward, converted to USD at the current spot A/USD FX rate.
- $\rho_{USD}^{Aeg}$ ($\rho_{USD}^{Beg}$) is the change in the FX forward's value in USD when the interest rate of the A (B) currency falls by 1%.
- $PV_{USD}$ represents the transaction's net present value, converted to USD.

**Table 1: Univariate Scenarios**

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| Adverse Credit Move | Credit improving – Short Positions [Parallel Spread Moves across debt maturities]:<br><br>A. G-22 Issuers:<br><br>i. Non-defaulted bonds and CDS on non-defaulted bonds -<br>• Current Spread 0-50bp: 35% spread shock.<br>• Current Spread 50-150bp: 28% spread shock.<br>• Current Spread 150-700bp: 35% spread shock.<br>• Current Spread > 700bp: 45% spread shock.<br><br>ii. Liquid default swap indices:<br>• Current Spread 0-95bp: 15% spread | **Position Loss**<br><br>Non-Defaulted Corporate Bonds:<br><br>$Loss_i = -DI_{ev} \times |Spread'01_i| \times \{CurrentSpread_i \times Shock_i\}$<br><br>Non-Defaulted Convertible Bonds (full re-pricing): |

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| | shock.<br>• Current Spread > 95bp: 21%<br><br>iii. Defaulted bonds, market value (MV) rises by 15% of their current level; CDS on defaulted bonds Mark-to-Market (MTM) changes by 15%*(Notional+MTM)<br><br>B. Non G-22 Issuers:<br><br>i. Bonds and CDS with a Current Spread less than 250 bp, 60% spread shock for sovereign issuers, 65% spread shock for corporate issuers.<br><br>ii. Bonds and CDS with a Current Spread greater than 450 bp:<br>• Current Spread 450-600, MV rises by 11% for sovereign bonds, 13% for corporate bonds; CDS MTM changes by 11%*(Notional+MTM) for CDS on sovereign bonds, 13%*(Notional+MTM) for CDS on corporate bonds.<br>• Current Spread 600-1000, MV rises by 14% for sovereign bonds, 18% for corporate bonds; CDS MTM changes by 14%*(Notional+MTM) for CDS on sovereign bonds, 18%*(Notional+MTM) for CDS on corporate bonds.<br>• Current Spread > 1000, MV rises by 22% for sovereign bonds, 29% for corporate bonds; CDS MTM changes by 22%*(Notional+MTM) for CDS on sovereign bonds, 29%*(Notional+MTM) for CDS on corporate bonds.<br>• Defaulted bonds, MV rises by 42% for sovereign and corporate bonds; CDS MTM changes by 42%*(Notional+MTM) for CDS on sovereign and corporate bonds.<br><br>iv. Bonds and CDS with a Current Spread between 250 and 450 bp receive a loss equal to a linearly interpolated spread | $Loss_i = -DI_{ev} \times$<br>$abs\left[\dfrac{Value(Spread'_i) - }{MT_i}\right]$<br><br>where $Value(x)$ is the value of the convertible position at a spread of $x$, and $Spread_i = CurrentSpread_i + X_i \times (CurrentSpread_i \times Shock_i)$<br><br>where $X_i = 1$ if long the convertible, -1 otherwise.<br><br><br>Defaulted Bonds (corporate and convertible):<br><br>$Loss_i = -DI_{ev} \times |MT_i| \times Shock_i$<br><br><br>CDS on defaulted bonds:<br><br>$Loss_i = -DI_{ev} \times$<br>$|Notional_i + MTM_i| \times Shock_i$<br><br><br>Linearly interpolated price and spread loss:<br><br>$Loss_i = \left(\dfrac{450 - CurrentSpread_i}{450 - 250}\right) Loss_{i,Spread}$<br>$+ \left(\dfrac{CurrentSpread_i - 250}{450 - 250}\right) Loss_{i,Px}$<br><br><br>**Total loss**<br><br>$Loss_{port} = \sum_i Loss_i$ |

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| | shock loss and price shock loss. | |
| | Credit Worsening – Long Positions [Parallel Spread Moves across debt maturities]:<br><br>A. G-22 Issuers<br><br>i.  Non-defaulted bonds and CDS on non-defaulted bonds -<ul><li>Current Spread 0-50bp: 65% spread shock.</li><li>Current Spread 50-150bp: 45% spread shock.</li><li>Current Spread 150-700bp: 50% spread shock.</li><li>Current Spread >700bp: 60% spread shock.</li></ul>ii.  Liquid Default Swap Indices:<ul><li>Current Spread 0-95bp: 25% spread shock.</li><li>Current Spread > 95bp: 35% spread shock.</li></ul>iii.  Defaulted bonds, MV falls by 15% of their current level; CDS on defaulted bonds Mark-to-Market (MTM) decreases by 15%*(Notional+MTM)<br><br>B. Non G-22 Issuers<br><br>i.  Bonds and CDS with a Current Spread less than 250 bp:<ul><li>Current Spread less than 50 bp, 75% spread shock for sovereign issuers, 80% spread shock for corporate issuers.</li><li>Current Spread 50-250, 65% spread shock for sovereign issuers, 70% spread shock for corporate issuers.</li></ul>ii.  Bonds and CDS with a Current Spread greater than 450 bp:<ul><li>Current Spread 450-600, MV decreases by 12% for sovereign bonds, 13% for corporate bonds; CDS MTM decreases by 12%*(Notional+MTM) for CDS on sovereign bonds, 13%*(Notional+MTM) for CDS on</li></ul> | |

18

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| | corporate bonds.<ul><li>Current Spread 600-1000, MV decreases by 16% for sovereign bonds, 19% for corporate bonds; CDS MTM decreases by 16%*(Notional+MTM) for CDS on sovereign bonds, 19%*(Notional+MTM) for CDS on corporate bonds.</li><li>Current Spread > 1000, MV decreases by 25% for sovereign bonds, 30% for corporate bonds; CDS MTM decreases by 25%*(Notional+MTM) for CDS on sovereign bonds, 30%*(Notional+MTM) for CDS on corporate bonds.</li><li>Defaulted bonds, MV decreases by 35% for sovereign and corporate bonds; CDS MTM decreases by 35%*(Notional+MTM) for CDS on sovereign and corporate bonds.</li></ul>v.  Bonds and CDS with a Current Spread between 250 and 450 bp receive a loss equal to a linearly interpolated spread shock loss and price shock loss. | |
| Credit Curve: 2yr - 10 yr<br><br>Bear Flattener | i.  0Y to 2Y spreads widen by 30% of their current spread level for G-22, 40% for non G-22;<br>ii.  spreads on 10Y and beyond remain unchanged; and<br>iii.  spreads between 2Y and 10Y are widened by levels implied by linear interpolation of the 2Y and 10Y spread shocks. | |
| Credit Curve: 2 yr - 10 yr<br><br>Bear Steepener | i.  10Y spreads and beyond widen by 25% of their current spread level for G-22, 35% for non G-22;<br>ii.  spreads on 0Y to 2Y remain unchanged; and<br>iii.  spreads between 2Y and 10Y are widened by levels implied by linear interpolation of the 2Y and 10Y spread shocks. | |

19

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| Credit Curve: 10yr - 30 yr<br><br>Bear Flattener | i. 10Y and below spreads widen by 15% of their current spread level for G-22, 20% for non G-22;<br>ii. spreads on 30Y and beyond remain unchanged; and<br>iii. spreads between 10Y and 30Y are widened by levels implied by linear interpolation of the 10Y and 30Y spread shocks. | **Position Loss**<br><br>$Loss_i = -Spread01_i \times Shock_i$ |
| Credit Curve:<br><br>10 yr - 30 yr<br><br>Bear Steepener | i. 30Y spreads widen by 15% and 90Y spreads widen by 7.5% of their current level for G-22, 20% and 10%, respectively, for non G-22;<br>ii. spreads on 0Y to 10Y remain unchanged; and<br>iii. spreads between 10Y and 30Y and spreads between 30Y and 90Y are widened by levels implied by linear interpolation of the 30Y and 90Y spread shocks. | **Total loss**<br><br>$Loss_{port} = \sum_i Loss_i$ |
| Basis Risk - CDS widening | Corporate Issuer's Bond spread curve is unchanged. the entire CDS curve is widened by 10% of current spread level | |
| Basis Risk - CDS tightening | Corporate Issuer's Bond spread curve is unchanged, the entire CDS curve is tightened by 10% of current spread level | **Position Loss**<br><br>$Loss_i = -Spread01_i \times Shock_i$ |
| Basis Risk - Bond widening | Corporate Issuer's Bond spread curve is widened by 10% of current spread level, the entire CDS curve is unchanged | **Total loss**<br><br>$Loss_{port} = \sum_i Loss_i$ |
| Basis Risk - Bond tightening | Corporate Issuer's Bond spread curve is tightened by 10% of current spread level, the entire CDS curve is unchanged | |
| Interest rate widening | IR Curve widening:<br><br>i. USD and CAD treasury curves widen by 45bp,<br>ii. EUR, JPY and CHF treasury curves | |

20

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| | widen by 35bp, and<br>iii. GBP, DKK, NOK and SEK treasury curves widen by 40bp.<br>iv. AUD and NZD treasury curves widen by 50bp.<br>v. MXN and PLN treasury curves widen by 100bp.<br>vi. HUF and ZAR treasury curves widen by 150bp.<br>vii. BRL, RUB and TRY treasury curves widen by 350bp, 500bp and 1200bp, respectively.<br>viii. When IR swaps, Money Market Futures, ED futures, or Fed Fund futures are present, the portfolio receives an additional basis margin charge of 5 bp on the NetSpread01 per currency of such positions. | |
| Interest rate tightening | IR Curve tightening:<br><br>i. USD, CAD, NOK and SEK treasury curves tighten by 40bp,<br>ii. EUR, JPY and CHF treasury curves tighten by 30bp, and<br>iii. GBP and DKK treasury curves tighten by 35bp<br>iv. AUD and NZD treasury curves tighten by 50bp<br>v. MXN and PLN treasury curves tighten by 100 bp<br>vi. HUF and ZAR treasury curves tighten by 150 bp<br>vii. BRL, RUB and TRY treasury curves tighten by 350bp, 500bp and 1200bp, respectively<br>viii. When IR swaps, Money Market Futures, ED futures, and Fed Fund futures are present, the portfolio receives an additional basis margin charge of 5 bp on the NetSpread01 per currency of such positions. | **Position loss:**<br><br>$Loss_i = -IRPV01_i \times Shock_i$<br><br>**Basis margin charge:**<br><br>$NetPV01_{CCY_i} = \sum_{Trades\_with\_Basis\_Risk, CCY_i} IRPV01_i$<br><br>$BasisMarginCharge = -\left| \sum_{Currency} NetPV01_{CCY_i} \times Shock \right|$ |

21

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| Rate Curve:<br><br>2yr - 10 yr<br><br>Bear Flattener | 0Y to 2Y rate curve widens by:<br><br>i. 25bp for USD and JPY,<br>ii. 30 bp for EUR, CHF and CAD,<br>iii. 35bp for GBP,<br>iv. 75% of their interest rate widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY,<br>v. rates on 10Y and beyond are unchanged; and<br>vi. rates between 2 and 10Y are widened by levels implied by linear interpolation of the 2 and 10Y rate shocks.<br>vii. No basis margin charge. | Portfolio loss:<br><br>$Loss_{port} = \sum_i Loss_i +$<br><br>$BasisMarginCharge$ |
| Rate Curve:<br><br>2 yr - 10 yr<br><br>Bear Steepener | 10Y and beyond rate curve widens by:<br><br>i. 30bp for USD, EUR and CHF,<br>ii. 35bp for GBP and CAD,<br>iii. 25bp for JPY,<br>iv. 75% of their interest rate widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY;<br>v. rate curve on 0Y to 2Y are unchanged; and<br>vi. rates between 2Y and 10Y are widened by levels implied by linear interpolation of the 2Y and 10Y rate shocks.<br>vii. No basis margin charge. | |
| Rate Curve:<br>10yr - 30 yr<br><br>Bear Flattener | 10Y and below rate curve widens by:<br><br>i. 20bp for USD, EUR, and GBP,<br>ii. 25bp for JPY and CHF,<br>iii. 30bp for CAD,<br>iv. 65% of their interest rate widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY;<br>v. rate curve on 30Y and beyond are unchanged; and<br>vi. rates between 10Y and 30Y are widened by levels implied by linear interpolation of the 10Y rate shock and 30Y rate.<br>vii. No basis margin charge. | |
| Rate Curve: | 30Y rate curve widens by: | |

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| 10 yr - 30 yr<br><br>Bear Steepener | i. 30Y: 20bp for USD, EUR, GBP, and CAD,<br>ii. 30Y: 25bp for JPY and CHF,<br>iii. 30Y: 65% of their interest rate widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY;<br>iv. 90Y: 10bp for USD, EUR, GBP, CAD and CHF;<br>v. 90Y: 12.5bp for JPY,<br>vi. 90Y: 32.5% of their interest rate widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY;<br>vii. rate curve on 0Y to 10Y are unchanged; and<br>viii. rates between 10Y and 30Y and rates between 30Y and 90Y are widened by levels implied by linear interpolation of the 30Y and 90Y rate shocks.<br>ix. No basis margin charge. | |
| Treasury/Swap Basis Widening | All LIBOR curves widen 20 bp + 10 bp x Min{1,2*Max{0,1-TimeToMaturity}} | Position loss:<br><br>$Loss_i = -JRPY01_i \times Shock_i$<br><br>for LIBOR-based positions, 0 otherwise. |
| Treasury/Swap Basis Tightening | All LIBOR curves tighten 20 bp + 10 bp x Min{1,2*Max{0,1-TimeToMaturity}} | Total loss<br><br>$Loss_{port} = \sum_i Loss_i$ |
| Treasury/Bond and Note Futures Basis Widening | Bond and note futures rates widen 15bp ("shock"), treasury curve unchanged. | Position loss:<br><br>$Loss_i = Value_i(futuresRate_i + Shock_i) - MTM_i$ |
| Treasury/Bond and Note Futures Basis Tightening | Bond and note futures rates tighten 15bp ("shock"), treasury curve unchanged. | for bond and note futures, 0 otherwise. $Value_i(x)$ is the value of a bond or note futures position $i$ at a yield |

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| | | of $x$.<br><br>Total loss<br><br>$Loss_{port} = \sum_i Loss_i$ |
| Adverse Equity Move | All trades with equity risk are re-priced at shocked equity levels. If the Counterparty is long equity risk, the shocks are negative, positive otherwise. The shocks are based on 90-day historical realized equity volatility. Shocks for G-22 issuers are given by linear interpolation of the following table:<br><br><table><tr><td>Historical 90 day equity volatility</td><td>Shock</td></tr><tr><td>Vol <= 15%</td><td>10%</td></tr><tr><td>25%</td><td>15%</td></tr><tr><td>40%</td><td>25%</td></tr><tr><td>70%</td><td>43%</td></tr><tr><td>85%</td><td>56%</td></tr><tr><td>>=100%</td><td>73%</td></tr></table><br>Notwithstanding the foregoing, Market shocks for single stocks are floored at 15%.<br><br>Shocks for Brazil, Mexico, Chile, Taiwan, Hong Kong, South Korea, Singapore, Poland, Turkey, Israel, and South Africa are given by linear interpolation of the following table: | Position loss:<br><br>$Loss_i = -DI_{eq} \times \left[ Value_i(Spo t_i^*) - MV_i \right]$<br><br>where $Value_i(x)$ is the value of position $i$ at an equity price of $x$, and<br><br>$Spo t_i^* = Spot_i \times [1 + Shock_i]$<br><br>Portfolio loss:<br><br>$Loss_{port} = \sum_i Loss_i$ |

24

| Test | Test Parameters (a "Shock") | Loss Calculation |
|------|------------------------------|------------------|

| Historical 90 day equity volatility | Shock |
|--------------------------------------|-------|
| Vol <= 25% | 17% |
| 40% | 28% |
| 70% | 47% |
| 85% | 62% |
| >=100% | 80% |

Shocks for the remaining non G-22 countries are given by linear interpolation of the following table:

| Historical 90 day equity volatility | Shock |
|--------------------------------------|-------|
| Vol <= 25% | 19% |
| 40% | 30% |
| 70% | 52% |
| 85% | 77% |
| >=100% | 88% |

## Combined Scenarios

LBIE shall calculate the loss for each position by running each such position through a series of sub-scenarios and choosing the Test that yields the greatest loss, by position. For each Test, the two applicable shock components' results are added to produce the Test's result.

25

Table 2: Combined Scenarios

| Risk Factors | Test | Credit Move | IR Move | Credit Spread Shock | IR Shock |
|--------------|------|-------------|---------|---------------------|----------|
| Credit Spreads and Interest Rates | 1 | Widen | Widen | If defaulted, then price shock shall be equal to that specified in Table 1. Otherwise, for G-22 Issuers it shall be equal to 70% of the shock specified in Table 1.<br><br>For non G-22 Issuers:<br><br>• Current Spread < 250bp it shall be 95% of the shock specified in Table 1.<br>• Current Spread >450bp it shall be 100% of the price shocks specified in Table1. | If defaulted, then there will be no IR shock. Otherwise, for G-22 issuers it will be70% of the IR shocks specified in Table 1.<br><br>For non G-22 Issuers:<br><br>• Current Spread < 250bp, it shall be 40% of the IR shocks specified in Table 1.<br>• Current Spread > 450bp, there is no IR shock. |
| | | | | Non G-22, Current Spread >250bp and <450bp the loss shall be linearly interpolated between the joint Credit Spread and IR loss and the Price loss. | |
| | 2 | Tighten | Tighten | If defaulted, then price shock shall be equal to that specified in Table 1.<br><br>Otherwise, for G-22 Issuers, it shall be equal to 70% of the | If defaulted, then there will be no IR shock. Otherwise, for G-22 issuers it will be 70% of the IR shocks specified in Table 1. |

26

| | | | spread shock specified in Table 1. For non G-22 Issuers: <br>• Current Spread < 250bp it shall be 95% of the shock specified in Table 1. <br>• Current Spread >450bp it shall be 100% of the price shocks specified in Table1. | For non G-22 Issuers: <br>• Current Spread < 250bp, it shall be 40% of the IR shocks specified in Table 1. <br>• Current Spread > 450bp, there is no IR shock. |
|---|---|---|---|---|
| | | | Non G-22, Current Spread >250bp and <450bp the loss shall be linearly interpolated between the joint Credit Spread and IR loss and the Price loss. | |
| 3 | Widen | Flat | Same as the shocks specified in Table 1, with the same linear interpolation for non G-22 with Current Spread between 250 and 450bp. | No shock |
| 4 | Tighten | Flat | Same as the Shocks specified in Table 1, with the same linear interpolation for non G-22 with Current Spread between 250 and 450bp. | No shock |
| 5 | Flat | Widen | No shock | IR Shock specified in Table 1 |

27

| | 6 | Flat | Tighten | No shock | IR Shock specified in Table 1 |
|---|---|---|---|---|---|

| Risk Factors | Test | Equity Move | Credit Move | Equity Price Shock | Credit Spread Shock |
|---|---|---|---|---|---|
| Equity Price and Credit Spreads | 7 | Decrease | Widen | 65% of the Equity Shock specified in Table 1. | 95% of the Credit Spread Shock specified in Table 1. |
| | 8 | Decrease | Widen | 98% of the Equity Shock specified in Table 1. | 65% of the Credit Spread Shock specified in Table 1. |
| | 9 | Increase | Tighten | 98% of the Equity Shock specified in Table1. | 85% of the Credit Spread Shock specified in Table 1. |
| | 10 | Adverse | Flat | Same as the Equity Shock specified in Table1. | No shock |
| | 11 | Flat | Widen | No shock | Same as the Credit Spread Shock specified in Table 1. |
| | 12 | Flat | Tighten | No shock | Same as the Credit Spread Shock specified in Table 1. |

| Risk Factors | Test | Equity Move | Volatility Move | 90-day Vol | Equity Price Shock[6] | Volatility Shock[7] | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 1mo | 3mo | 6mo | 1yr |
| Equity Price and Implied Volatility | 13 | Increase | Decrease | 15% | 10% | -1% | -3% | -5% | -9% |
| | | | | 25% | 15% | -6% | -5% | -5% | -10% |
| | | | | 40% | 24% | -12% | -9% | -8% | -12% |
| | | | | 65% | 34% | -23% | -19% | -16% | -28% |

6 The equity price shock is determined by linear interpolation.

7 The implied volatility shock is determined by bi-linear interpolation.

28

| Test | Volatility Move | Credit Spread Move | Credit Spread Shock | Volatility Shock | | | | |
|---|---|---|---|---|---|---|---|---|
| 14 | Decrease | Increase | 15% | -10% | 18% | 12% | 5% | 0% |
| | | | 25% | -15% | 13% | 10% | 5% | 0% |
| | | | 40% | -25% | 9% | 10% | 5% | 0% |
| | | | 65% | -38% | 4% | 6% | 3% | -11% |
| 15 | Increase | Increase | 15% | 10% | 59% | 45% | 45% | 52% |
| | | | 25% | 15% | 34% | 8% | 5% | 10% |
| | | | 40% | 25% | 13% | 6% | 5% | 6% |
| | | | 65% | 40% | 8% | 3% | 2% | 4% |
| 16 | Decrease | Increase | 15% | -10% | 80% | 55% | 65% | 76% |
| | | | 25% | -15% | 64% | 38% | 28% | 27% |
| | | | 40% | -25% | 64% | 38% | 28% | 27% |
| | | | 65% | -40% | 64% | 38% | 28% | 27% |
| 17 | Flat | Decrease | 34% | No change | -37% | -21% | -19% | -35% |
| | | | 50% | | -36% | -28% | -25% | -32% |
| | | | 66% | | -63% | -49% | -44% | -54% |
| 18 | Flat | Increase | 34% | No change | 55% | 40% | 34% | 70% |
| | | | 50% | | 61% | 45% | 37% | 45% |
| | | | 66% | | 71% | 52% | 44% | 54% |
| 19 | Adverse | Flat | Same as the Equity Shock specified in Table 1. | No shock | | | | |

| Risk Factors | Test | Volatility Move | Credit Spread Move | Credit Spread Shock | Volatility Shock |
|---|---|---|---|---|---|

| | Test | Volatility Move | Credit Spread Move | Credit Spread Shock | Volatility Shock |
|---|---|---|---|---|---|
| Implied Volatility and Credit Spreads | 20 | Decrease | Widen | 25% of the Credit Spread Shock specified in Table 1. | 90% of the Volatility Shock as outlined in Scenario 17 of joint equity and vol scenario. |
| | 21 | Increase | Tighten | 50% of the Credit Spread Shock specified in Table 1. | 85% of the Volatility Shock as outlined in Scenario 18 of joint equity and vol scenario. |
| | 22 | Decrease | Flat | No shock. | 100% of the Volatility Shock as outlined in Scenario 17 of joint equity and vol scenario. |
| | 23 | Increase | Flat | No shock. | 100% of the Volatility Shock as outlined in Scenario 18 of joint equity and vol scenario. |
| | 24 | Flat | Widen | 100% of Credit-Spread widening shock. | No shock |
| | 25 | Flat | Tighten | 100% of Credit Spread tightening shock. | No shock |

| Risk Factors | Test | F/X Rate Move | IR Difference Move | F/X Rate Shock | IR Difference Shock |
|---|---|---|---|---|---|
| | 26 | Decrease | Widen | FX Down Shocks specified in Table 16 of Appendix D | IR Difference Widening Shocks in Table 18 of Appendix D |
| | 27 | Increase | Tighten | FX Up Shocks specified in Table 16 of Appendix D | IR Difference Tightening Shocks in Table 18 of Appendix D |
| | 28 | Decrease | Flat | FX Down Shocks specified in Table 16 of Appendix D | No shock. |

| 29 | Increase | Flat | FX Up Shocks specified in Table 16 of <u>Appendix D</u> | No shock. |
|----|----------|------|--------------------------------------------------------|-----------|
| 30 | Flat | Widen | No shock. | IR Difference Widening Shocks in Table 18 of <u>Appendix D</u> |
| 31 | Flat | Tighten | No shock. | IR Difference Tightening Shocks in Table 18 of <u>Appendix D</u> |

$Loss_i^j$ shall denote the loss for position $i$ under the joint test $j$. The loss for each position under the combined scenarios is defined as:

$$Loss_i = Min(Loss_i^1,...,Loss_{31}^i).$$

The total loss under the four combined scenarios set forth in Table 2 above is defined as

$$Loss_{port} = DI_P \times \sum_i Loss_i$$

### *Event Risk Tests*

There are two Event Risks: Portfolio Event Risk and Single Issuer Event Risk.

### Portfolio Event Risk Test

The event risk for the portfolio is determined by an empirical model which captures portfolio quality and issuer concentration. For each issuer, LBIE shall calculate the Loss Given Event ("LGE") (the term Event is used instead of default since a short position may have significant event risk if prices increase or spreads tighten).

For investment grade issuers, the Loss Given Event is the worst of:

Bond Positions:

a. The loss from a three-notch credit rating downgrade (credit spreads widen, common stock prices unchanged).

31

Equity Positions (including Convertible Bonds):

a. The loss from a large decrease in the per share price of the issuer's common stock (spreads unchanged).

b. The loss from a large increase in the per share price of the issuer's common stock (spreads unchanged).

c. The loss from a combination of credit spread widening and decrease in per share price of issuer's common stock.

For non investment grade issuers, the LGE is the worst of:

1. The loss corresponding to default
2. The loss from a large equity price increase.

The determination of an issuer's rating is based on the applicable Moody's and S&P issuer ratings as determined by LBIE. If both agencies rate the issuer, the lower of the two is used. If only one agency has a published rating on the issuer, that rating shall be determinative. If neither is rated by the rating agencies, LBIE will use the ratings on the ultimate parent issuer if deemed appropriate to do so. Otherwise, the rating shall be spread-implied (if the portfolio includes a spread-based security of the issuer) or implied from the 90-day volatility and market capitalization of the issuer as described in <u>Appendix C</u>.

Table 3~~Table 3~~ describes the calculation of LGE for each issuer:

Table 3: Portfolio Event Risk

| Issuer Rating | Event Description | Credit Spread Shock (bp) | Equity Shock | 5-day Probability |
|---------------|-------------------|--------------------------|--------------|-------------------|
| BBB- or Higher | Three Notch Down-grade | +25 for AAA<br>+44 for AA<br>+73 for A<br>+169 for BBB | No shock | 0.15% for AAA<br>0.15% for AA<br>0.12% for A<br>0.12% for BBB |
| | Equity Price Decrease | No shock | Max{-100%, -1.5xVol_90day} | |
| | Joint Spread Widening and | 75% of Spread Widening | 75% of equity price decrease | |

32

| Issuer Rating | Event Description | Credit Spread Shock (bp) | Equity Shock | 5-day Probability |
|---|---|---|---|---|
| | Equity Price Decrease | | | |
| | Equity Price Increase | No shock | +1.5xVol_90day | 0.13% |
| Below BBB- or in Default | Default | LGD (as defined below) | -100% | 0.015% for BB+ 0.016% for BB 0.042% for BB- 0.065% for B+ 0.111% for B 0.204% for B- 0.591% for CCC-D |
| | Equity Price Increase | No shock | +1.5xVol_90day | 0.13% |

For investment grade issuers, the loss associated with a three notch credit rating downgrade is

$$-NetSpread01 \times DownGradeShock,$$

where the NetSpread01 is over all positions from the issuer.

For a corporate or convertible bond with issuer rating lower than BBB-, the loss given default ("LGD") is

$$Principal \times R - MV$$

where R is the recovery rate ("Recovery Rate"). The Recovery Rate shall be determined by LBIE in their discretion. Note that the LGD may be either negative (an actual loss) or positive (a gain in value upon default).

33

---

For a CDS referencing a bond with an issuer rating lower than BBB-, the LGD is defined as:

$$[-(1-R) \times Notional] - MTM$$

Note that for a CDS, the notional has a negative sign when the Counterparty has bought protection and the above equation would imply a gain in the event of default (as expected). The LGD for any issuer is then determined by computing the sum of the loss given default for all positions with that issuer.

The LGD for cash equity positions is $-MV$. Listed options are re-priced at a stock price of 0 with the LGD being $OptionValueAtZero - MTM$.

The portfolio loss associated with the event test is:

$$Loss_{EventTest} = EL_{Portfolio} \times \left(15 + 1.5\sqrt{herf_{Portfolio}}\right).$$

$EL_{Portfolio}$ is the expected loss for the portfolio ignoring issuers with positive LGEs:

$$EL_{Portfolio} = \sum_{issuers,i} \min\{LGE_i, 0\} \times P_i.$$

$herf_{Portfolio}$ is the Herfindahl Index for the portfolio as measured by issuer concentration,

$$herf_{Portfolio} = \sum_{issuers,i} (wt_i)^2,$$

where the $wt_i$'s are issuer weights equal to:

$$wt_i = 100 \times \frac{\min\{LGE_i, 0\}}{\sum_{issuers,i} \min\{LGE_i, 0\}}.$$

### Single Issuer Event Risk Test

The Single Issuer Event Loss is the single largest loss that results from separately taking each Issuer to default. Corporate bonds, converts, and CDS are taken to recovery, and other products with equity risk are re-priced at an equity price of 0. The single issuer loss is a fraction of these price declines as defined in Table 4.

34

**Table 4: Single Issuer Event Risk**

| Issuer Rating | | Event Description | Bond/CDS/Convertible Shock | Equity Shock | Single Issuer Event Loss |
|---|---|---|---|---|---|
| AAA to AA- | 10% | | | | |
| A+ to A- | 20% | | | | |
| BBB+ to BBB- | 25% | Default | Bonds/CDS/ Convertible equal the Recovery Rate | -100% | Single Issuer Largest Loss |
| BB+ to BB- | 30% | | | | |
| B+ to B- | 40% | | | | |
| CCC+ and below | 50% | | | | |

*Sector Test*

All positions in the portfolio are grouped into one of the 24 GICS Industry Groups. All trades from each of the 24 sectors are grouped together. Each group receives two shocks—equity up plus credit tightening, and equity down plus credit widening as described in Table 5.

**Table 5 Sector Scenarios**

| Scenario Number | Equity Move | Credit Move | Equity Shock | Credit Spread Shock / MTM Shock (defaulted bonds) | |
|---|---|---|---|---|---|
| 1 | Decrease | Widen | See Table 6, column Long. | Current Spread | Shock |
| | | | | <50 | +50% |
| | | | | 50-150 | +25% |
| | | | | >150 | +35% |
| | | | | If defaulted, -9% MTM Shock. | |
| 2 | Increase | Tighten | See Table 6, column Short. | Current Spread | Shock |
| | | | | <50 | -25% |
| | | | | 50-150 | -20% |
| | | | | >150 | -20% |
| | | | | If defaulted, +7% MTM Shock. | |

**Table 6 Equity Sector Shocks**

| GICS Industry Group | Equity Shock | |
|---|---|---|
| | Long | Short |
| Transportation | -34% | +14% |
| Household & Personal Products | -34% | +27% |
| Technology Hardware & Equipment | -34% | +27% |
| Food Beverage & Tobacco | -34% | +27% |
| Telecommunication Services | -34% | +27% |
| Commercial Services & Supplies | -23% | +14% |
| Software & Services | -23% | +27% |
| Semiconductors & Semiconductor Equipment | -23% | +27% |
| Pharmaceuticals, Biotechnology & Life Sciences | -23% | +27% |
| Health Care Equipment & Services | -23% | +14% |
| Retailing | -23% | +14% |
| Media | -23% | +14% |
| Automobiles & Components | -23% | +14% |

35

36

| Real Estate | -23% | +27% |
|---|---|---|
| Utilities | -15% | +14% |
| Materials | -15% | +14% |
| Consumer Durables & Apparel | -23% | +27% |
| Diversified Financials | -15% | +14% |
| Energy | -15% | +14% |
| Consumer Services | -15% | +14% |
| Banks | -15% | +14% |
| Insurance | -15% | +14% |
| Capital Goods | -15% | +27% |
| Food & Staples Retailing | -15% | +14% |
| NULL Long | -23% | n/a |
| NULL Short | n/a | +27% |

The loss for a sector in each of the 2 scenarios is simply the sum of the position losses. The portfolio loss for the sector scenario is the worst loss over all sectors.

## Liquidation Cost

The portfolio liquidation cost is the sum of position-level liquidation costs:

$$LiquidationCost_{pfo} = \sum \left[ LiqCost_i^{cr} + LiqCost_i^{eq} \right]$$

Table 7: Portfolio Liquidation Cost

| Risk Factor | Liquidity Shocks | Liquidity Cost Calculation |
|---|---|---|
| Credit Spread | All positions with credit spread risk receive:<br><br>i. Base liquidity shock as described in Appendix A.<br><br>ii. Size liquidity shock as described in Appendix A. | $LiqCost_i^{cr} = T1e10sh_i \times \|Spread01_i\| \times (base_i + size_i) \times spread_i \times (1 - IssuerOffset_i)$ |
| Equity | All Positions with equity risk receive:<br><br>i. Base and Stress liquidity shocks as described in Appendix B.<br><br>ii. Size liquidity shock as described in Appendix B.<br><br>iii. Positions that constitute a large percent of free float of small market cap names receive a shock based on percent of free float, as described in Appendix B. | $LiqCost_i^{eq} = \|\Delta_i\| \times (BaseLiq_i + FreeFloatLiq_i) - \frac{1}{2}\Gamma_i \times (BaseLiq_i + FreeFloatLiq_i)^2 + DI_{eq} \times \left[\|\Delta_i\| \times SizeLiq_i - \frac{1}{2}\Gamma_i \times SizeLiq_i^2\right]$ |

## Appendix A

The credit base shock is a function of product type and is floored as follows:

Table 8  Base credit liquidity shocks

| Product Type | Base Liquidity Shock | Minimum Absolute Base Shock Size |
|---|---|---|
| High Grade Bonds, Single Name CDS, LCDS, Hard Currency non G-22 Sovereign Bonds and CDS, Off-the-run Default Swap Indices | 3.5% | 5bp |

| High Yield Bonds, Hard Currency non G-22 Corporate Bonds, Local Currency non G-22 Sovereign Bonds, and Convertible bonds. | 7% | 10bp |
| On-the-run Default Swap Indices | 1% | 2bp |

The credit size liquidity shock depends on issue amount outstanding:

$$size_i = slope_i \times Max\left\{\left[\frac{|Notional_i|}{AmtOut_i} - threshold_i\right], 0\right\}$$

The slope parameter depends on product type and whether the position is long or short, and the threshold parameter depends on product type, as follows:

Table 9  Credit liquidity size parameters

| Product Type | Slope | | |
| | Long | Short | Threshold |
| --- | --- | --- | --- |
| High Grade and High Yield bonds, Hard Currency non G-22 Sovereign bonds, Hard Currency non G-22 Corporate bonds, Local Currency non G-22 Sovereign bonds, and Convertible bonds | 0.7 | 0.5 | 1% |
| Single Name CDS (corporate and sovereign), LCDS, On-the-run Default Swap Indices, Off-the-run Default Swap Indices | 0.35 | 0.25 | 1% |

The amount outstanding used for single name CDS and LCDS is the amount outstanding for the corresponding reference entity. For CDX IG and iTraxx positions, the amount outstanding used is $25Bn , and for CDX HY it is $12.5Bn.

The liquidity tier multiplier depends on the bond features, issue size, issue date and issuer country as described in Table 10:

Table 10  Credit liquidity grouping rules

| Group | Cash Grouping Rules | Derivative Grouping Rules | Tier Multiplier |
| --- | --- | --- | --- |
| Group I | Bonds issued within the last year with amount outstanding >$500mm for High Grade and | On-the-run Default Swap Index positions and Single Name CDS that are | 1.0 |
| | hard currency non G-22 Sovereign bonds, >$300mm for High Yield. Non G-22 corporate bonds, non G-22 local currency sovereign bonds. and bonds with IsRule144A="Y" are not eligible for Group I. Nor are any bonds with CalculationType=ACCRUED ONLY FLOAT, ARGENT BODEN FLT, BRADY-FLT RIG YLD, CCT FLOATERS, FIX-TO-FLOAT BONDS, FLOATER AI: ACT/ACT, FLOATING RATE NOTE, INDEX LINKED, INVERSE FLOATER, NO CALL-FLOATERS, PERPETUAL FLOATER, MULTI-COUPON, MULTI-COUPON: JAPN, MULTI-PERIOD BONDS, MULTI-PRD FLIRB, MULTI-STEP %SINKS, MULTI STEP BONDS. | constituents of on-the-run indices. | |
| Group III | All non G-22 corporate bonds, non G-22 local currency sovereign bonds, bonds with MaturityType = "PERP", IsStructuredNote="Y", IsinDefault="Y", IsPayInKind="Y", or any bond with BondType=CATASTROPHE, COLLATERAL TRUST, INFLATION LINKED, SAMURAI, URIDASHI, CREDIT LINKED, EQUIPMENT TRUST, HYBRID, LOAN PARTICIPATION NOTE, PIK, SUKUK AL MUDARABAH, SUKUK AS MUSHARAKAH, SUKUK/ISLAMIC, or | Single name CDS that are not members of any default swap index. | 2.0 |

| Group | Cash Grouping Rules | Derivative Grouping Rules | Tier Multiplier |
|-------|--------------------|--------------------------|-----------------|
|       | TOGGLE. |                          |                 |
| Group II | All other bonds | Off-the-run Default Swap Index positions and single name CDS that are constituents of off-the-run indices. | 1.5 |

The issuer offset is provided whenever the portfolio has both long and short credit positions from the same issuer. For each issuer, the long Spread01 and the short Spread01 is given by:

$$LongSP01_j = \sum_{\substack{positions\ i \\ from\ issuer\ j}} Max\left[0, SP01_i\right], \text{ and } ShortSP01_j = \sum_{\substack{positions\ i \\ from\ issuer\ j}} Min\left[0, SP01_i\right].$$

The issuer offset for position $i$ from issuer $j$ is:

$$IssuerOffset_i = \begin{cases} Min\left\{100\%, \dfrac{\left|ShortSP01_j\right|}{LongSP01_j}\right\} \times 50\% & \text{if Long} \\[3mm] Min\left\{100\%, \dfrac{LongSP01_j}{-\left|ShortSP01_j\right|}\right\} \times 50\% & \text{if Short} \end{cases}$$

41

---

### Appendix B

The size-based equity liquidity margin charge is:

Equation 1: Size Liquidity Shock for Equities

$$M \times NTD \times \sigma^2 / 252,$$

where $\sigma$ is the 90-day realized volatility for the underlying (annualized, e.g., 0.35), $NTD$[8] is the number of trading days in the portfolio for that issuer's common stock, and $M$ is 50 for G-22 currencies and 60 for non G-22 currencies. More specifically, the $NTD$ for the $j^{th}$ position from issuer $i$ is the absolute value of the net issuer delta divided by the price of the underlying (this gives an equivalent number of shares), divided by the 90-day average daily volume for the underlying.

The base liquidation cost is determined by applying an equity price shock which depends on market cap and is described by 5 parameters:

$$baseShock_i = Max\left\{min, Min\left[max, c_1 + c_2 \times \left(\ln(mktCap_i) \times c_3 + \frac{1}{\sqrt{mktCap_i}} \times (1 - c_3)\right)\right]\right\} \times 10^{-4}$$

The parameters are given in Table 11 Table 11.

Table 11 Equity Base Shock Parameters

| Currency | $c_1$ | $c_2$ | $c_3$ | Min | Max |
|----------|-------|-------|-------|-----|-----|
| USD, CAD, GBP | -3 | 1400000 | 0 | 20 | 2000 |
| AUD, NZD | 3250 | -160 | 1 | 70 | 2000 |
| JPY | 1606 | -74 | 1 | 50 | 2000 |
| EUR, CHF, NOK, SEK, DKK | 355 | -15 | 1 | 20 | 2000 |
| ISK | 30 | 840000 | 0 | 50 | 2000 |
| CNY, CZK | 30 | 1260000 | 0 | 75 | 6000 |
| HKD, TWD, ZAR | 30 | 765000 | 0 | 75 | 6000 |

---

[8] For positions greater than 5 trading days, Equation 1 is split into 2 parts—the amount corresponding to the first 5 days, and the remaining, or leftover. The leftover is added to the base liquidity shock, where it is not diversified away by way of the DI multiplication.

42

| Currency | $c_1$ | $c_2$ | $c_3$ | Min | Max |
|---|---|---|---|---|---|
| KRW, INR | 30 | 420000 | 0 | 75 | 6000 |
| TRY, ARS, EGP, PLN, SGD, HUF | 60 | 1250000 | 0 | 150 | 6000 |
| THB, MYR, ILS | 60 | 870000 | 0 | 150 | 6000 |
| BRL | 60 | 3510000 | 0 | 150 | 6000 |
| RUB | 60 | 9300000 | 0 | 150 | 6000 |
| MEP, CLP | 90 | 6000000 | 0 | 225 | 6000 |
| IDR, PHP | 90 | 1620000 | 0 | 225 | 6000 |

The percent of free float liquidity shock depends on market cap, currency, and the percent of free float that the position constitutes, and is described by 4 parameters:

$$pctFFShock_i = Max\left\{0, \frac{c_u - mktCap_i}{c_u - c_l}\right\} \times Max\left\{0, pctFlt_i - pctFlt_{free}\right\}$$

The parameters are given in Table 12.

Table 12 Percent of free-float liquidity parameters

| Parameter | All G-22 Currencies | All other currencies |
|---|---|---|
| $c_u$ | 1.25Bn | 1Bn |
| $c_l$ | 0.75Bn | 500Mn |
| $pctFlt_{free}$ | 5% | 5% |

### Appendix C

The spread implied credit rating is based on Table 13.

Table 13 Spread-implied ratings

| spread (bp) | Credit Rating |
|---|---|
| <40 | AAA |
| <70 | AA |
| <100 | A |
| <180 | BBB |
| <270 | BB |
| <400 | B |
| >=400 | CCC |

If the portfolio has multiple bonds from the same issuer, the lowest of the spread-implied rating is used.

If no spread-based products from the issuer are present in the portfolio, the issuer's 90-day equity volatility and market capitalization determine the issuer rating.

The Rating Score is defined as

$$RatingScore = 8.2 \times \sigma_{90-day} - 4.7 \times \frac{MktCap(\$\$mm)}{100,000}$$

If the rating score is less than or equal to 2.3 then the issuer is treated as investment grade. The appropriate downgrade shock in basis points together with the associated probability shall be calculated by linear interpolation of the probabilities defined in Table 14.

If the rating score is greater than 2.3 then the issuer is treated as non investment grade. The appropriate probability for default should be calculated by linear interpolation of the probabilities defined in Table 15.

If either the issuer's market capitalization or 90-day volatility cannot be determined by LBIE, the issuer shall be given a CCC rating.

Table 14 Rating score mapping (IG)

| Rating Score | Downgrade Shock (bp) | Associated Probability |
|---|---|---|
| -7.9 | 25 | 0.1534% |
| -2.9 | 44 | 0.1509% |
| 0.3 | 73 | 0.1152% |

43

44

| Rating Score | Downgrade Shock (bp) | Associated Probability |
|---|---|---|
| 2.3 | 169 | 0.1172% |

Table 15 Rating score mapping (HY)

| Rating Score | Associated Probability |
|---|---|
| 2.3 | 0.0159% |
| 4.1 | 0.1114% |
| 5 | 0.5914% |

45

## Appendix D – Joint FX / IR Difference Shock Sizes and Loss Calculations

### Table 16 FX Down / Up Shocks

| ccyA/ ccyB | USD | EUR | AUD | NZD | CAD | CHF | GBP | JPY | DKK | NOK | SEK |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USD | | | -4%/4% | -4%/4% | -3%/3% | -4%/4% | -3%/3% | -4%/4% | -4%/3% | -3%/3% | -3%/3% |
| EUR | -4%/4% | | -4%/4% | -4%/4% | -4%/5% | -4%/4% | -3%/3% | -5%/5% | -3%/3% | -3%/3% | -3%/3% |
| AUD | -5%/5% | | | -3%/3% | -4%/5% | -4%/4% | | -5%/5% | -5%/5% | -5%/5% | -5%/5% |
| NZD | -5%/5% | | -3%/3% | | -4%/4% | -5%/4% | | -5%/5% | -5%/5% | -5%/5% | -5%/5% |
| CAD | -4%/4% | | | | | -5%/4% | | -5%/4% | -5%/4% | -5%/4% | -5%/4% |
| CHF | -4%/4% | | | | | | -5%/4% | -4%/4% | -5%/4% | -5%/5% | -5%/4% |
| GBP | -3%/3% | | -4%/4% | -4%/4% | -3%/4% | -3%/3% | | -4%/3% | -5%/4% | -3%/3% | -3%/3% |
| JPY | -4%/4% | | | | | | | | | | |
| DKK | -4%/4% | | | | | | | | | | |
| NOK | -4%/4% | | | | | | | -5%/5% | | | -2%/2% |
| SEK | -4%/4% | | | | | | | -5%/5% | | -3%/3% | |

No shocks are specified for currency pairs which are greyed out.

46

Table 17 FX Down / Up Shocks - non-G22 Currencies

| Country | Ccy B / Ccy A | USD | | EUR | | JPY | |
|---|---|---|---|---|---|---|---|
| | | Down | Up | Down | Up | Down | Up |
| Argentina | ARS | -15% | 10% | - | - | - | - |
| Brazil | BRL | -11% | 9% | -9% | 12% | -9% | 12% |
| Chile | CLP | -4% | 4% | - | - | - | - |
| China | CNY | -7% | 7% | - | - | - | - |
| Czech Republic | CZK | -5% | 5% | - | - | - | - |
| Egypt | EGP | -6% | 6% | - | - | - | - |
| Hong Kong | HKD | -7% | 7% | - | - | - | - |
| Hungary | HUF | -5% | 5% | -4% | 4% | -6% | 6% |
| India | INR | -5% | 5% | - | - | - | - |
| Indonesia | IDR | -10% | 10% | - | - | - | - |
| Israel | ILS | -5% | 5% | - | - | - | - |
| Malaysia | MYR | -7% | 7% | - | - | - | - |
| Mexico | MXN | -4% | 4% | -5% | 6% | -6% | 6% |
| Philippines | PHP | -5% | 5% | - | - | - | - |
| Poland | PLN | -5% | 5% | -5% | 5% | -6% | 6% |

47

| Russia | RUB | -15% | 10% | -7% | 7% | -10% | 15% |
|---|---|---|---|---|---|---|---|
| Saudi Arabia | SAR | -7% | 7% | - | - | - | - |
| Singapore | SGD | -7% | 7% | - | - | - | - |
| South Africa | ZAR | -10% | 8% | -8% | 10% | -8% | 10% |
| South Korea | KRW | -5% | 5% | - | - | - | - |
| Taiwan | TWD | -5% | 5% | - | - | - | - |
| Thailand | THB | -6% | 6% | - | - | - | - |
| Turkey | TRY | -15% | 15% | -10% | 12% | -10% | 12% |

48

Table 18 IR Difference Tightening / Widening Shocks

| ccyA/ccyB | USD | EUR | AUD | NZD | CAD | CHF | GBP | JPY | DKK | NOK | SEK |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USD | | | | | -20/30 | -20/30 | | -40/40 | | | |
| EUR | -30/30 | | -30/30 | -30/30 | -30/30 | -20/20 | -20/20 | -30/30 | -30/40 | -30/40 | -30/40 |
| AUD | -30/30 | | | -30/30 | -30/30 | -10/30 | | -20/30 | -30/30 | -30/30 | -30/30 |
| NZD | -30/30 | | | | -30/30 | -30/30 | | -20/30 | -30/30 | -30/30 | -30/30 |
| CAD | -30/20 | | | | | -30/30 | | -40/40 | -40/40 | -40/50 | -40/50 |
| CHF | -30/20 | | | | | | | -20/20 | -30/40 | -30/40 | -30/40 |
| GBP | -30/30 | | -30/30 | -30/30 | -30/30 | -20/20 | | -30/40 | -20/30 | -20/30 | -20/30 |
| JPY | -40/40 | | | | | | | | | | |
| DKK | -50/40 | | | | | | | -30/40 | | -40/30 | -30/30 |
| NOK | -50/40 | | | | | | | -30/40 | | | -40/40 |
| SEK | -50/40 | | | | | | | -30/40 | | | |

(values in bp)

Table 19 IR Difference Tightening / Widening Shocks - non-G22 Currencies

| Country | Currency | Tighten | Widen |
|---|---|---|---|
| Brazil | BRL | -400 | 400 |

49

| Hungary | HUF | -130 | 130 |
|---|---|---|---|
| Mexico | MXN | -100 | 100 |
| Poland | PLN | -100 | 100 |
| Russia | RUB | -400 | 400 |
| South Africa | ZAR | -120 | 120 |
| Turkey | TRY | -1200 | 1200 |

## IR Difference Shock – Add-On

If remaining maturity < 1 year then add (IR Difference Widening) / subtract (IR Difference Tightening) 10 bp to each value in the table above.

If remaining maturity >= 1 year and <=2 years then add (IR Difference Widening) / subtract (IR Difference Tightening) an amount corresponding to the linear interpolation between 10 bp and 0 bp.

If remaining maturity >2 years then make no changes to shock sizes in tables 15 and 16 above.

50

Draft: Subject to Internal Review

## Loss Calculations for FX / IR Difference Combined Scenarios

### Definitions:

In the expressions that follow in this appendix we will rely on the following definitions of shock sizes (further to those given in the main definitions section):

- $FxShock_j^{A/B}$ is the percentage shock between currencies A and B, which is found by matching the row that corresponds to A with the column that corresponds to B in Table 16.
- $IRDiffShock_j^{A,B}$ is the interest rate difference shock (in bp) between currencies A and B. This shock is found by matching the row that corresponds to A with the column that corresponds to B in Table 18.
- $IRShock_B^{Up}$ and $IRShock_B^{Down}$ are the (basis point) interest rate Up and Down moves, respectively, for currency B which are specified in Table 1 (Interest Rate Widening / Tightening).

### Product Type = F/X CASH

Product Type ="FX Cash" will be sensitive only to F/X Shocks. F/X Shock Cash losses are given by:

$$Loss_j^i = FxShock_j^{A/USD} * Notional_{USD}^{Aleg}$$

where

- A is the non-USD currency (USD F/X Cash positions, naturally carry no risk).

### Product Type = F/X FUTURE

ProductType="F/X Future" will be sensitive to both F/X Shocks and IR Difference Shocks.

The FX / IR Difference Shock Futures losses are given by:

$$Loss_j^i = FxShock_j^{A/B} * Notional_{USD}^{Aleg} - \rho_{USD}^{Aleg} IRDiffShock_j^{A,B} /100$$

where

- A is the future contract's denomination currency
- B is the other currency involved in the F/X Future.

### Product Type = F/X FORWARD

MIR

For an F/X forward between currencies A and B, $Loss_j^i$ is calculated as:

$$Loss_j^i = \Delta_{USD}^{Aleg} FxShock_j^{A,B} - \rho_{USD}^{Aleg} IRDiffShock_j^{A,B} /100$$

Currencies A and B are chosen as follows. If USD is one of the two currencies of the Forward, A is the other currency of the transaction (and B is the USD). If both currencies are non-USD, A and B are chosen according to the usual market quotation order for the currency pair (eg. EUR vs JPY is usually quoted EUR/JPY, ie. number of JPY per 1 EUR. According to our convention this means A=EUR and B=JPY).

Add-ons (apply only to ProductType=F/X Forward):

If one of either A or B is USD add to $Loss_j^i$:

$$- \max\left\{ \left(\rho_{USD}^{Aleg} + \rho_{USD}^{Bleg}\right) IRShock_B^{Up} /100, \left(\rho_{USD}^{Aleg} + \rho_{USD}^{Bleg}\right) IRShock_B^{Down} /100 \right\}$$

Equation 2: Add-on for FX-Forwards when the USD is part of the currency pair

If both A and B are different from USD add to $Loss_j^i$ the value given by Equation 2 and the following:

$$- \max\left\{ (PV_{USD}) FxShock_{Up}^{B/USD}, (PV_{USD}) FxShock_{Down}^{B/USD} \right\}$$

### SCHEDULE 3

### COMMITTED MARGIN TERMS

1.    This Schedule sets out the terms and conditions upon which LBIE agrees not to change the principles or formulas applied to the Margin Methodology specified in Schedule 2 and certain pricing terms. In the event of a conflict or inconsistency between the provisions of this Schedule and those of any Base Contract, the relevant provision(s) of this Schedule shall prevail.

#### Interpretation

Headings herein are for ease of reference only and shall not affect the interpretation hereof. Terms used but not otherwise defined in this Schedule shall have the meanings ascribed to them in this Agreement, otherwise as defined in the PBA, if any, or the CFD Annex as applicable and for the purpose of this Schedule:

"*Act of Insolvency*" occurs in respect of the Counterparty upon:

(a)    its making a general assignment for the benefit of, or entering into a reorganisation, arrangement, or composition with creditors; or

(b)    its admitting in writing that it is unable to pay its debts as they become due; or

(c)    its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, examiner, receiver or liquidator or analogous officer of it or any material part of its property; or

(d)    the presentation or filing in any jurisdiction of a petition in respect of it in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition (except in the case of a petition for winding-up or any analogous proceeding) not having been stayed or dismissed within 30 days of its filing; or

(e)    the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such party or over all or any material part of such party's property; or

(f)    the convening of any meeting of its creditors for the purposes of considering a voluntary arrangement as referred to in section 3 of the Insolvency Act 1986 (or any analogous proceeding); or

(g)    the occurrence of any procedure equivalent or analogous to the foregoing (a) to (g) in any other jurisdiction;

"*Investment Advisor*" means SRM Advisers (Monaco) SAM

"*Loan Amount*" means the aggregate of:

(a)    all cash lent or advanced by LBIE pursuant to the PBA, if any; and

(b)    all Notional Amounts under all CFD Transactions in respect of which the Counterparty is the Equity Amount Receiver less the aggregate of any Credit Support Amount paid with respect to the Counterparty under paragraph 10 of the CFD Annex.

*"Look-Back Loan Value"* shall on any Business Day be equal to 110% of the average of the Loan Amount excluding any Non-Committed Portion during the immediately preceding twenty (20) Business Days.

*"Net Asset Value"* or *"NAV"* means. as of any date of determination, the net asset value of the Counterparty as calculated in accordance with the methodology set out in the latest version of the offering memorandum/articles of association of the Counterparty.

Subject only to the provisions of paragraph 4 & 5, nothing in this Schedule shall operate so as to prevent or limit either the right of LBIE to take or refrain from taking any action or to exercise or refrain from exercising any right or discretion which LBIE has or may have under any Base Contract or this Agreement including, without limitation, LBIE's right to refrain from clearing, settling or financing any individual transaction. Additionally, for the avoidance of doubt, nothing in this Schedule shall operate so as to prevent or limit the rights of either party to terminate any CFD Transaction under clause 11 (*Additional Disruption Events*) of the CFD Annex.

2.    LBIE agrees to provide the terms in this Schedule subject to the following conditions precedent:

(a)    no event of default, default or termination event (howsoever described) has occurred under any Base Contract;

(b)    the PBA (if any) and ISDA including the CFD Annex are in full force and effect;

(c)    the Counterparty is in compliance with the relevant capital and NAV requirements detailed in this Schedule and no Cessation Event has occurred.

**Committed Margin**

3.    Prior to the occurrence of a Cessation Event (as set out below in clause 5), LBIE will apply the Margin Methodology set out in Schedule 2 (the *"Committed Margin"*) and the other fees and rates set out in the Terms pursuant to the PBA, subject always to paragraph 10 (the *"Committed Pricing"*) for a rolling period of 90 calendar days (the *"Commitment Period"*) provided that the Counterparty has given prior written notice by email to the following addresses: Ian Maynard: imaynard@lehman.com; Rowland Wren: rowren@lehman.com; Richard Smither: rsmither@lehman.com, of each Transaction to which it requests that LBIE apply such Committed Pricing and Committed Margin and LBIE agrees to apply the Committed Pricing and Committed Margin. For the avoidance of doubt, any Margin applicable to Non-Eligible Transactions pursuant to Schedule 2 and any Transactions for which prior notice has not been received as set out above or Transactions in relation to which LBIE does not agree to provide the Committed Margin or Committed Pricing, will not form part of or be deemed to be included in the Committed Margin and Committed Pricing and, accordingly, margin rates and fees and rates may be

Page 5

changed (upwards or downwards) in accordance with the terms of the relevant Base Contract.

4.    The Commitment Period will commence on the date hereof and will terminate on the close of business in London 90 calendar days after LBIE gives the Counterparty notice of termination of this Schedule; provided that, if such 90th day is not a Business Day, then the Commitment Period will terminate on the next Business Day.

Subject to the provisions of paragraphs 5 & 7, all new Transactions entered into upon or after the provision of such notice but prior to the termination of the Commitment Period will be governed by this Schedule. Upon termination of the Commitment Period, LBIE may set the Margin Requirement with respect to positions previously subject to the Committed Margin terms on the basis of margin rates or methodology determined by it in its discretion acting in good faith and in accordance with the terms of the relevant Base Contract.

**Cessation Events**

5.    LBIE may terminate this Schedule by giving notice at any time on or after the occurrence of one or more of the following circumstances or events (and without regard to whether any such circumstance or event is continuing) (each a *"Cessation Event"*): t:

(a)    On any day during the Commitment Period, if LBIE determines that:

(i)    the most recent prospectus of the Counterparty (or any feeder fund of the Counterparty, as the case may be) is amended or modified in relation to either (i) the legal structure of the Counterparty or (ii) the rights of investors to redeem their interests in a manner which in the reasonable opinion of the Prime Broker will have a material adverse effect on the Counterparty's or Agent's ability to perform its obligations under this Agreement or an Transaction hereunder or an Customer Agreement and the Prime Broker serves a Default Notice on the Counterparty;

(ii)    (A) the Investment Advisor merges or consolidates with, or sells or otherwise transfers its advisory business or all or a material portion of its assets to, any individual or entity not being an Affiliate of the Investment Advisor, without the prior consent of LBIE (such consent not to be unreasonably withheld or delayed); (B) an Act of Insolvency occurs with respect to the Investment Advisor; or (C) the Investment Advisor has any of its registrations, authorisations. licenses or memberships with any relevant regulatory authority revoked, suspended or terminated;

(iii)   SRM Advisers (Monaco) SAM ceases to be the investment adviser to the Counterparty's investment manager and LBIE reasonably determines that such an event has had a material adverse effect on the ability of the Counterparty to perform its obligations under this Agreement;

(iv)   the Fund has failed to maintain a Net Asset Value in an amount equal to the greater of USD 500,000,000 as reflected in the Fund's audited financial statements at any time after the execution date of this Agreement, or (B) has experienced a decline in its Net Asset Value during any one-month

Page 6

period preceding such date. of 20 percent or more, or (C) has experienced a decline in its Net Asset Value during any three-month period preceding such date, or of 30 percent or more. or (D) has experienced a decline in its Net Asset Value during any twelve-month period preceding such date. of 40 percent or more.

(b)  LBIE is required to change the Margin Requirement as a result of Applicable Law (in which case LBIE shall be entitled to take such action. as it deems necessary acting reasonably and in good faith, to ensure compliance with such Applicable Law).

(c)  The Counterparty fails to deliver to LBIE accurate and current NAV data in relation to the Counterparty as follows:

(i)  With respect to monthly NAV statements, delivered by the Counterparty, no later than the 15th calendar day after each month end to the LBIE Corporate Credit Group (email: LehmanLondonCreditNAV@Lehman.com), such monthly NAV statements must include as a minimum: the NAV of the Counterparty, the NAV per unit of the Counterparty, number of units outstanding and percentile performance for the month, provided however, that LBIE shall notify the Counterparty of any failure to provide a monthly NAV statement and the Counterparty shall have until the second Business Day after such notice is given to provide such NAV statement provided that the NAV per unit and performance related data need not be provided in respect of Class D Units of the SRM Global Master Fund Limited Partnership; and

(ii)  With respect to audited annual NAV data, delivered no later than 180 calendar days after the Counterparty's fiscal year-end, provided however, that LBIE shall notify the Counterparty of any failure to provide the audited annual NAV data and the Counterparty shall have three Business Days from its receipt of such notice to provide the appropriate NAV statement.

(d)  The occurrence of an event of default or termination event (howsoever described) under any Base Contract other than pursuant to Section 5(b)(i) or (ii) of the ISDA, provided that notwithstanding Section 5(c) of the ISDA, if an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality (in each case as such terms are defined in the ISDA), it will be treated as an Event of Default and not an Illegality.

### Substitution

6.  In the event that LBIE provides the Counterparty with notice of the termination of the Commitment Period, then upon or after provision of such notice, Counterparty may only substitute securities with other securities in the same or a higher quality category as set forth below (i.e.. substitute a stock in the Russell 3000 with another component stock in an "E1" or "E2" category index). New securities positions must be delivered prior to LBIE releasing substituted positions. Moreover, any substitution shall be subject to the following: (i) the net total of such substitutions shall not cause the Loan Amount to exceed the Maximum Loan Amount; (ii) all portfolio and margin requirements must be satisfied;

and (iii) the new positions would be of similar or better quality as compared to the existing positions as set forth below.

*Equity Products Substitution Categories:*

| E1(Highest Quality) | E2 (Medium Quality) | E3 (Lower Quality) |
|---|---|---|
| U.S. Common | U.S Common | Europe Common |
| S&P 500 | S&P 400 Mid Cap | FTSE Small Cap Index |
| Europe Common | S&P 600 Small Cap | German DAX Mid Cap Index |
| Austrian Traded ATX Index (ATX) | Russell 1000 | Asia |
| BEL 20 Index (BEL20) | Russell 2000 | TOPIX 500 (Tokyo) |
| Swiss Market Index (SMI) | Russell 3000 | |
| Dax 30 (DAX) | The S&P / Toronto Stock Exchange (excluding securities under $5.00) | |
| KFX Copenhagen Share Index (KFX) | U.S. Other | |
| IBEX 35 Index (IBEX) | ADRs | |
| Hex 25 Index (HEX25) | ETFs | |
| CAC 40 (CAC) | Europe Common | |
| FTSE 100 Index (UKX) | SPI Swiss Performance Index (SPI) | |
| MIB 30 (MIB30) | HDAX | |
| Amsterdam Exchange Index (AEX) | DAX 100 Price Index | |
| OBX stock Index (OBX) | Spain MA Madrid Index (MADX) | |
| OMX Stockholm Index (OMX) | SBF120 (SBF 120) | |
| Asia Common | SBF 250 | |
| Nikkei 225 | The Portugal PSI 20 | |
| S&P ASX | FTSE 250 Index (MCX) | |
| The Australian All Ordinaries | MIB Telematico (MISTEL) | |
| | Amsterdam Midkap Index (AMX) | |
| | Asia | |
| | Nikei 300 | |
| | Hang Seng Index | |
| | The Australian 20 Leaders | |
| | Singapore All Equities Index | |
| | The Straits Times Index (Singapore) | |

*Fixed Income Products Substitution Categories:*

a) Investment Grade Bonds can be substituted with other Investment Grade Bonds of equal or better credit quality.

b) Non-Investment Grade Bonds can only be substituted with either Investment Grade Bonds or other Non-Investment Grade Bonds of equal or better credit quality.

## Maximum Commitment

7.    During the term of the Commitment Period, the maximum Loan Amount for the Counterparty to which the Committed Margin Rates and Committed Pricing will apply will be (i) until the expiry of four (4) weeks from the date of this Agreement, 120% of the Counterparty's average Loan Amount for such number of days as this Agreement has been in existence and thereafter, (ii) 120% of the Counterparty's previous four (4) weeks' average Loan Amount, in each case as calculated by LBIE (the "*Maximum Loan Amount*").

8.    Such average Loan Amount will be calculated on a daily basis during the duration of this Schedule. However, if at any time during the Commitment Period, LBIE provides Counterparty with a notice of termination of the Committed Margin, the Maximum Loan Amount on each day for the remainder of the Commitment Period shall be equal to the lowest of (i) the Look-Back Loan Value as of the date such notice of termination is given, (ii) the then prevailing Loan Amount as of the date such notice of termination is given, or (iii) the lowest Loan Amount on any day subsequent to the date such notice of termination was given.

9.    In relation to all Transactions as a result of which the Loan Amount exceeds the Maximum Loan Amount, LBIE may require additional Margin as determined in its sole discretion with respect to any Transaction or portion of a Transaction causing such excess Loan Amount. In such event, LBIE, in its sole discretion acting in good faith, shall have the right to determine which Transactions in excess of the Maximum Loan Amounts shall require such additional Margin.

10.    LBIE and the Counterparty shall agree applicable Prime Brokerage Rates, such rates to be evidenced in the Terms as defined in the PBA. LBIE may, in its discretion and without the Counterparty's prior consent, change at any time the relevant Prime Brokerage Rates applicable to existing open positions and to future positions reported in the Counterparty's prime brokerage account at LBIE either (a) on 90 calendar days' notice to the Counterparty of any such change; or (b) at any time on the occurrence of a Market Event, but only in relation to position(s) pertinent to such Market Event and only to the extent that LBIE in its discretion, acting in good faith, deems appropriate to cover any increase in cost of funding as applicable. For the avoidance of doubt, unpaid fees and interest shall constitute the Counterparty's indebtedness, and from part of the Counterparty's PB Liabilities, to LBIE or its affiliates, as applicable.

For the purposes of this clause:

"*Prime Brokerage Rates*" means (a) the spread on the interest rate applied to the Counterparty's aggregate debit balance for each currency recorded in the Counterparty's prime brokerage account at LBIE, (b) the spread on the interest rate applied to the aggregate credit balance for each currency recorded in the Counterparty's prime brokerage account at LBIE, (c) short sale cover fees (typically referred to as "securities lending fees"), (d) short sale cover "put-through" fees (e) fees referred to in clause 14 of the CFD Annex and (f) settlement fees for settling transactions cleared through the Counterparty's prime brokerage account at LBIE. Prime Brokerage Rates shall not include any other fees or charges such as execution or brokerage commissions, ticket fees, exchange fees, transfer fees, registration costs, taxes (including stamp duty and stamp duty reserve tax) or

other costs and expenses, howsoever described, whether charged by LBIE (or is affiliates) or charged by third parties and passed on to the Counterparty from time to time under the terms of the PBA.

"*Market Event*" means any of the following events or circumstances: (a) in respect of an open short position reported in the Counterparty's prime brokerage account at LBIE, LBIE has incurred or will incur an increase in the rate of borrowing the corresponding securities in circumstances where the securities are or subsequently become "hard-to-borrow" or go "on special". For this purposes "*hard-to-borrow*" means a particular security that is in high demand in relation to its availability in the market and is relatively expensive to borrow; and "*on special*" means securities that for various reasons are sought-after in the market by borrowers; or (b) any change in the cost of funding a position, including the cost of borrowing cash or change to the base interest rate applied to the interest paid or charged to the Counterparty. For the avoidance of doubt but without limiting this clause 10, the parties agree that the following events would constitute a Market Event: (i) Lehman Brothers Holdings Inc. ("*LBHI*") fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least A3 as determined by Moody's; or (ii) LBHI fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least A- as determined by S&P; or (iii) LBHI fails to maintain a short-term rating (or any successor rating) of at least P-1 as determined by Moody's; or (iv) LBHI fails to maintain a short-term issue credit rating (or any successor rating) of at least A-1 as determined by S&P; or (v) LBHI ceases to be rated by either Moody's or S&P or (vi) the five-year credit spread of Lehman Brothers CDS debt increases by more than 100 basis points over a 60 calendar day period.

# EXHIBIT F

SRM Global Master Fund Limited Partnership
PO Box 309GT
Ugland House
South Church Street
George Town, Grand Cayman
Cayman Islands

6 November 2008

**Second Letter**
**BY FAX AND BY HAND**

Lehman Brothers International (Europe) (in administration)
25 Bank Street
London
E14 5LE

| | |
|---|---|
| **For the attention of:** | **The Joint Administrators; and** |
| | **Gunner Burkhart** |

Fax No.                          0207 067 9390

cc:

**BY FAX AND BY EMAIL**

Linklaters LLP
One Silk Street
London EC2Y 8HQ

| | |
|---|---|
| **For the attention of:** | **Mark Middleton** |
| | **Nick Porter** |
| | **Rory Conway** |

Fax No.                          020 7456 2222

Email address:              mark.middleton@linklaters.com
                                    nick.porter@linklaters.com
                                    rory.conway@linklaters.com

Dear Sirs

UK/1898518/01                                                            467100/70-40394809

CONFIDENTIAL                                                            SRM002719

**Termination Notice under the International Prime Brokerage Agreement**

We write in connection with the International Prime Brokerage Agreement dated 9 May 2008 between Lehman Brothers International (Europe) (**"Lehman"**) and SRM Global Master Fund Limited Partnership (**"SRM"**) (the **"PB Agreement"**).

We refer to Clause 13.1 of the PB Agreement and our first letter and Default Notice of today and we hereby give notice to terminate the PB Agreement with effect from 6 November 2008 (being the time of the Event of Default referred to in that first letter and Default Notice).

This letter and Termination Notice is without prejudice to the validity of the exercise of our right to set off under Part 5(e) of the Schedule to the ISDA Master Agreement dated as of 12 May 2008 between Lehman and SRM as described in one of our letters to you of 26 September 2008 and without prejudice to our rights and obligations generally, which are hereby reserved in their entirety.

Yours faithfully

By: _____

Name: IAN BARCLAY    PHILIP PRICE

Title: AUTHORISED SIGNATORIES

Date: 6 November 2008

CONFIDENTIAL

SRM002720

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
In re                                                    :    **Chapter 11 Case No.**
                                                         :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :    **08-13555 (SCC)**
                                                         :
                          **Debtors.**         :    **(Jointly Administered)**
-----------------------------------------------------------------------x

### ORDER GRANTING PLAN ADMINISTRATOR'S OBJECTION TO CLAIM NUMBER 29606 FILED BY SRM GLOBAL MASTER FUND LIMITIED PARTNERSHIP

Upon the objection, dated May 20, 2016 (the "Objection"),[1] of Lehman Brothers

Holdings Inc., as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and its Affiliated Debtors, seeking to disallow and expunge

the Claim pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy

Code") and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure, all as more fully

described in the Objection; and due and proper notice of the Objection having been provided as

stated therein, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief sought in the Objection is in the best interests of

LBHI, its creditors, and all parties in interest, and that the legal and factual bases set forth in the

Objection establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Objection is granted; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the Claims

are disallowed and expunged in their entirety with prejudice; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

matters arising from or related to this Order.

Dated: _____, 2016
        New York, New York

        _____
        UNITED STATES BANKRUPTCY JUDGE

WEIL:\95723615\1\58399.0011