**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                      :      Chapter 11 Case No.
                                           :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :      08-13555 (SCC)
                                           :
                  Debtors.                 :      (Jointly Administered)
-------------------------------------------------------------------x

_____

**DECLARATION OF SIR JOHN CHADWICK**
**IN RESPECT OF ENGLISH LAW ISSUES**
**ARISING IN RELATION TO THE RECOVERY OF DAMAGES**
**CLAIMED BY SRM GLOBAL MASTER FUND LIMITED PARTNERSHIP**
_____

**I, Sir John Chadwick, of One Essex Court, Temple, London EC4Y 9AR, make this declaration under 28 U.S.C. § 1746:**

**Retainer and Instructions**

1.  I have been retained on behalf of Lehman Brothers Holdings Inc. ("LBHI") to report my opinion on certain English law issues arising in relation to the recoverability of damages claimed by SRM Global Master Fund Limited Partnership ("SRM") in its Proof of Claim filed in proceedings in the United States Bankruptcy Court for the Southern District of New York (the "Court").

2.  I understand that LBHI was the ultimate parent company of the Lehman Brothers group; of which the main operating subsidiary in Europe – and the group's European broker-dealer - was Lehman Brothers International (Europe) ("LBIE"). LBIE was the subject of an order for administration made on 15 September 2008 by the High Court of England and Wales. On the same date (15 September 2008) LBHI filed for relief under chapter 11 of title 11 of the United States Bankruptcy Code. The claim asserted by SRM in these chapter 11 proceedings is based on LBHI's alleged liability as guarantor of certain obligations said to have been owed by LBIE to SRM.

3.  I have been provided with copies of the following (amongst other) documents:

    (i)   an agreement made between SRM and LBIE, dated May 2008 and described as an International Prime Brokerage Agreement (the "PBA");

(ii)  an agreement made between SRM and LBIE, also dated May 2008, described as a Master Institutional Futures Customer Agreement (the "MIFCA"); and

(iii) an agreement made between SRM and LBIE, dated 9 May 2008 and described as a Cross Margining and Netting Agreement (the "CMNA").

Each of the PBA, the MIFCA and the CMNA are expressed to be governed by English law. I have been provided, also, with copies of:

(iv)  a document dated 9 June 2005 and described as the Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (the "Corp Res Guarantee");

(v)  a document dated 12 May 2008 and described as the Guarantee of Lehman Brothers Holdings Inc. (London Branch) ("the ISDA Guarantee"); and

(vi) an agreement made between LBIE and SRM, dated as of 12 May 2008 and described as an International Swaps and Derivatives Association Inc. Master Agreement (the "ISDA Master" and, together with an appurtenant schedule and credit support annex, the "ISDA Documentation");

The ISDA Master is also expressed to be governed by English law**.**  I have not been asked to consider or report my opinion on the effect of the Corp Res Guarantee and the ISDA Guarantee (the "Guarantees"); and I do not do so.

4.    I have been provided with a copy of the Proof of Claim filed on behalf of SRM in these proceedings on 22 September 2009. The claim is advanced under the five heads set out at paragraph 18 of the Attachment to Proof of Claim: (i) a claim in respect of the ISDA Documentation in an amount of US$49,389,923 (subject to reduction to US$26,462,531 pursuant to a right of set-off claimed by SRM) and additional interest, fees, costs and expenses; (ii) a claim in respect of the value of the Segregated Assets and Cash that (it is said) LBIE failed properly to segregate and/or to return in an amount of approximately US$106,600,000; (iii) a claim in respect of damages resulting from the alleged failure to return the Segregated Assets in an amount of approximately US$48,300,000; (iv) a claim in respect of lost opportunity costs in an amount of approximately US$100,000,000 and (v) a claim in respect of fees incurred to the date of the Proof of Claim in an amount of US$750,000. The aggregate amount claimed in the Proof of Claim was US$305,039,923. LBIH's liability in respect of those claims is alleged to arise under the Guarantees.



5.

6.

7.  The English law issues in relation to which I have been asked to report my opinion are confined to three of the five heads advanced in the Proof of Claim: that is to say (adopting the enumeration in paragraph 18 of the Attachment to Proof of Claim) the claims under heads (ii), (iii) and (iv). Those claims are described in my instructions as, respectively, the "Segregated Assets Claim", the "Forced Sales Claim" and the "Lost Opportunities Claim".

8.  The issues which I have been asked to address are these:

A. Based on a review of the relevant agreements between the parties**,** did SRM have a contractual or a proprietary right to the return of the Segregated Assets?

B. Assuming that from and after a date not later than 6 November 2008 SRM's only right in respect of the return of the Segregated Assets was a contractual right, (i) do the terms of the PBA preclude a recovery from LBIE of any appreciation in the value of such shares occurring after the "date of the discovery of loss" and, if so, (ii) what would the "date of the discovery of loss" be?

C. Does the PBA preclude a recovery from LBIE on account of the Forced Sales Claim, particularly in light of the contractual restriction on damages set forth in section 14.4 of the PBA?

D. Do the applicable agreements preclude a recovery from LBIE on account of the Lost Opportunities Claim?

E. Even assuming, *arguendo*, that the applicable agreements did not preclude such a recovery as a matter of contract, would other principles of English law preclude a recovery from LBIE on account of the Lost Opportunities Claim?

9. I have been asked to address those issues in order to assist the Court in determining – in the context of a formal objection to the Claim on the merits, seeking disallowance of the Claim as a matter of law and on the basis that no evidentiary hearing or trial is required - the likely outcome if SRM had sued LBIE in England for the losses in respect of which it has advanced the Segregated Assets Claim, the Forced Sales Claim and the Lost Opportunities Claim. It has been agreed by LBIH that I will be compensated at my normal hourly rates; and that my entitlement to compensation will not be dependent on the conclusions I reach, the content of this declaration or the outcome of the proceedings in the Bankruptcy Court. I understand that, in preparing this declaration, my obligations are to the Bankruptcy Court.

10. This declaration has been prepared solely for the purposes for which I have been retained and should not be relied on for any other purpose.

**Qualifications and Experience**

11. I was called to the Bar of England and Wales in 1966. While in private practice I specialized in financial, corporate and insolvency work. I was standing counsel to the Department of Trade and Industry from 1974 until 1980, when I was appointed Queen's Counsel. During the 1980s I appeared in the High Court, the Court of

Appeal and the House of Lords in many of the leading financial, corporate and insolvency cases. In 1991 I was appointed a judge of the High Court of England and Wales and assigned to the Chancery Division, in which such cases are commonly brought. Between 1986 and 1993 I was a part-time judge of the Courts of Appeal of Jersey and Guernsey. In 1997 I was appointed to the Court of Appeal of England and Wales. Financial, corporate and insolvency cases frequently came before me as a judge of that Court; and it was usual for me to give the lead judgment in such cases. I retired from the Court of Appeal in November 2007.

12. Following retirement from the Court of Appeal of England and Wales, I was appointed President of the Court of Appeal of the Cayman Islands, a Justice (and, subsequently Deputy Chief Justice) of the Dubai International Financial Centre Courts and a Lieutenant Bailiff (judge) of the Royal Court in Guernsey. Together, those appointments have occupied about six months of my time in each year. In those jurisdictions I heard and determined cases involving financial, corporate, and insolvency issues. I retired as President of the Court of Appeal of the Cayman Islands and as Deputy Chief Justice of the Dubai International Financial Centre Court on 20 January 2016 (on attaining the age of 75 years). Until I attained that age I continued to sit in the Court of Appeal of England and Wales, as required; and I sat in the Judicial Committee of the United Kingdom Privy Council from time to time. I have sat as an arbitrator in international commercial arbitrations; and I have given expert evidence in litigation outside England and Wales.

**Summary of Conclusions**

13. I understand that it may be of assistance to the Court if I summarise the conclusions which I have reached on the issues in respect of which I have been asked to report my opinion, before setting out in detail the reasons which have led me to those conclusions. In doing so, I should emphasise that this summary should be read in conjunction with those reasons. With that caveat, the conclusions which I have reached are these:

*Issue A: Based on a review of the relevant agreements between the parties, did SRM have a contractual or a proprietary right to the return of the Segregated Assets?*
As a matter of English law, any proprietary right that SRM had to a return of the Segregated Assets determined not later than 6 November 2008, when, as a result of

5

SRM's termination of the PBA, the close-out provisions in Clause 13 of the PBA took effect, and SRM's proprietary right (if any) to the delivery of securities was replaced by the right to payment of the balance (if any) in its favour on the taking of the account for which Clause 13.2 provided.

Further, it is likely that, prior to 6 November 2008, any proprietary right of SRM to a return of the Segregated Assets had already determined, or had ceased to be exercisable. If the Segregated Assets (i) were "Charged Assets" for purposes of Clause 11.1 of the PBA, and thus available to LBIE for use for its own purposes[1], and (ii) had, in fact, been lent or otherwise disposed of, or charged or hypothecated, by LBIE in the course of such use, then SRM's proprietary right would have been extinguished on such loan or disposal, or would have become subject to the security interest created by such charge or hypothecation, with the result that SRM's only right in respect of the return of the Segregated Assets was a contractual right to the delivery of Equivalent Securities.

*Issue B: Assuming that from and after a date not later than 6 November 2008, SRM's only right in respect of the return of the Segregated Assets was a contractual right, (i) do the terms of the PBA preclude a recovery from LBIE of any appreciation in the value of such shares occurring after the "date of the discovery of loss" and, if so, (ii) what would the "date of the discovery of loss" be?*

Whether or not SRM had a proprietary right to a return of the Segregated Assets prior to 6 November 2008, the effect of the close-out provisions in Clause 13 of the PBA was that there could be no claim by SRM to any subsequent appreciation in the value of such shares after that date.

Further, if (as is likely) any proprietary right of SRM to a return of the Segregated Assets had already determined, or had ceased to be exercisable prior to 6 November 2008, Clause 14.4 of the PBA is clear that, after the date on which SRM's only right in respect of the return of the Segregated Assets was a contractual right, any liability of LBIE for failure to deliver the Segregated Assets or "Equivalent Securities" is limited to the market value of the relevant securities "as at the date of the discovery of loss." On the basis of the allegations made in the Attachment to Proof of Claim, an

---

[1] The allegations made in the Attachment to Proof of Claim suggest that the Segregated Assets were, in fact, subject to such a charge; given that SRM has alleged, *inter alia*, that the Segregated Assets were posted as "collateral" to LBIE and that LBIE had hypothecated the Segregated Assets.

English Court would take the view that SRM had admitted that "the date of the discovery of loss" was on or about 19 September 2008.  It would follow that SRM would not have been able recover from LBIE any loss attributable to the appreciation in the value of the Segregated Assets after that date[2] .

*Issue C*: *Does the PBA preclude a recovery from LBIE on account of the Forced Sales Claim, particularly in light of the contractual restriction on damages set forth in section 14.4 of the PBA?*

Clause 14.3 of the PBA provides that "the Prime Broker [LBIE] accepts no liability and shall not be liable to the Counterparty [SRM] . . . for any Losses whatsoever which [it] may incur (in connection with this Agreement and any Transaction) as a result directly or indirectly from – . . . (b) market conditions . . . affecting the value of assets. . .". Given the basis upon which SRM has advanced the Forced Sales Claim – the need to effect disadvantageous sales of assets (on a firesale basis) in order to meet margin calls which, themselves, were made by other prime brokers in consequence of the fall in the value of existing collateral – an English Court would conclude that the losses claimed by SRM under this head did result, "directly or indirectly from market conditions affecting the value of assets".  The effect, as a matter of English law, would be that Forced Sales Claim Sale was excluded.

The limitation of liability contained in Clause 14.4 of the PBA will also apply to the Forced Sales Claim.  The Forced Sales Claim, like the Segregated Assets Claim, is founded upon LBIE's failure to deliver securities to SRM: the situation addressed by Clause 14.4.  Given that SRM already is entitled to the market value of its securities "as at the date of the discovery of loss" under the Segregated Assets claim, SRM cannot obtain a double-recovery of such amount through the assertion of the Forced Sales Claim.

The requirement in Clause 14.4 that any loss be determined "without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities" emphasises that LBIE's

---

[2] Indeed, Clause 14.4 of the PBA provided that LBIE should only be liable to SRM for failure to deliver Equivalent Securities in breach of Clauses 7.1 or 11.3 to the extent that it had been grossly negligent, fraudulent or in willful default. No allegation of gross negligence, fraud or willful default in the context of failure to deliver Equivalent Securities following the events of 15 September 2008, has been made in the Attachment to Proof of Claim.

maximum liability cannot exceed the market value of the applicable securities as of the date of discovery of the loss.  If and to the extent that an English Court viewed this phrase as adding anything (other than emphasis) to the requirement that a determination of loss should be limited to the market value of the relevant securities, it would construe this phrase in light of the definition of "Consequential loss or damage" contained in Schedule 3 of the PBA.  Consequential loss includes loss of a kind or extent which was not reasonably foreseeable at the time that the PBA was entered into as a serious possibility in the event of the breach of obligation in question.  An English Court (if seized of the issue) would be likely to take the view that the market turbulence in the immediate aftermath of the events on 15 September 2008 and the consequent "forced sales" that underlie this claim were so exceptional that they were not reasonably foreseeable in May 2008.  In particular, an English Court would be likely to take the view that it was unforeseeable that as a consequence of a breach of the obligation to deliver securities that when SRM received margin calls from its other broker dealers, it would have to sell securities at a time when only firesale prices were obtainable.

*Issue D:  Do the applicable agreements preclude a recovery from LBIE on account of the Lost Opportunities Claim?*

Clause 14.4 of the PBA would apply to the Lost Opportunities Claim in the same manner as those provisions apply to the Forced Sales Claim both in relation to losses said to result from breaches by LBIE of its obligations to serve Margin Notices under the CMNA and to losses said to result from breaches by LBIE of its obligations under the PBA to deliver Equivalent Securities.

*Issue E: Even assuming, arguendo, that the applicable agreements did not preclude such a recovery as a matter of contract, would other principles of English law preclude a recovery from LBIE on account of the Lost Opportunities Claim?*

An English court would be likely to take the view that the allegations advanced in support of the Lost Opportunities Claim are so lacking in particularity that the claim should be dismissed because it is impossible for LBHI or the Court to address it.

An English court would be likely to reach that conclusion because, under the general law, there are limitations on the extent to which damages can be recovered following a contractual breach.  In particular, it is necessary for the claimant to allege and establish a sufficient causal link between the breach on which it relies and the loss in respect of which it claims. An English court would regard the absence of

particularised allegations linking breach to loss as unacceptable. SRM asserts that its losses arise (at least in part) from wasteful diversion of management time resulting not only from continued and repeated breach of LBIE's obligations to serve compliant Margin Notices under the CMNA, but also from issues resulting from the failure to segregate assets under the PBA. It would be essential, as a matter of English law, to identify which losses are said to arise from the alleged failure to serve compliant Margin Notices and which losses are said to result from the alleged failure to segregate assets under the PBA.

14. In order to address the issues on which I have been asked to report my opinion, I have found it necessary, first, to review the material provisions in the agreements made between LBIE and SRM in May 2008 to which I have referred; and, second, to analyse the effect of certain notices which were served under those agreements by or on behalf of SRM in the period following the administration order made on 15 September 2008. It is convenient, also, to set out the demands made by SRM or on its behalf for the return of what are described in the Attachment to Proof of Claim as "Segregated Assets" and to consider the legal effect of those demands, as a matter of English law. And it is necessary to set out the claims advanced by SRM in the Attachment to Proof of Claim.

**The International Prime Brokerage Agreement, the Master International Futures Customer Agreement, the Cross Margining and Netting Agreement and the ISDA Master Agreement.**

15. The PBA, the MIFCA and the CMNA (together with the Corp Res Guarantee) are described in my instructions as "Relevant Agreements". Each of the PBA, the MIFCA and the CMNA was made between LBIE and SRM (acting though its general partner, SRM Global Fund General Partner Limited). Each was made on or about 9 May 2008; that is to say, at the same time as the ISDA Master. It is unnecessary to refer to the provisions of the MIFCA in any detail. It is, I think, sufficient to say that I have not identified any provisions in the MIFCA, or in the attached extracts from the FSA Rules relating to the exchange traded or other contracts to which it relates, which are of material relevance in the context of the issues with respect to which I am asked to report my opinion.

*The PBA*

16. The primary purpose of the PBA, as appears from the recitals, was to set out the terms upon which SRM (referred to in that agreement as the "Counterparty") was to appoint LBIE (referred to as the "Prime Broker") as its prime broker. Clause 18 of the PBA provided that it should be governed by and construed in accordance with the laws of England.

17. The PBA was intended to apply to all acquisitions and disposals of securities and to the provision of any advances of cash and securities in respect of such acquisitions and disposals: Clause 2.1.   Acquisitions and disposals of securities – and the provision of advances of cash and securities in respect of acquisitions and disposals – were defined as "Transactions". Clause 2.2 was in these terms (so far as material in the present context):

> "2.2  All Transactions and ancillary arrangements contemplated by this Agreement a entered into by the parties to this Agreement . . . in reliance on the fact that this Agreement and all settlement requests, acknowledgments, Instructions, term sheets, confirmations and all other documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties. . . ."

18. Clause 4.1 of the PBA provided that the Prime Broker might, in its absolute discretion, (a) lend money to the Counterparty, (b) as a result of the Counterparty's sales or purchases of securities pursuant to Transactions, advance securities to the Counterparty and (c) discharge any obligation of the Counterparty to pay money or deliver securities under or in connection with a Transaction or pursuant to the agreement. Money lent, securities advanced or obligations discharged under Clause 4.1 were "Loans" for the purposes of the agreement: Schedule 3.

19. Clause 5 of the PBA was in these terms (so far as material):

> "5.    SECURITIES AND CASH ACCOUNTS
>
> 5.1  The Prime Broker shall open and maintain one or more Cash Accounts and  Securities Accounts  to which -
>    (a) in the case of Cash Accounts there shall be -
>       (i)  debited the amount of any Loan and all cash paid or deemed or treated as paid by the Prime Broker to or on behalf of the Counterparty;  and
>       (ii) credited  all cash paid or deemed or treated as paid to the Prime Broker, by or on behalf of the Counterparty (including sums received by the Prime Broker in settlement of Third Party Transactions); . . . , and
>    (b)  in the case of Securities Accounts there shall be –

(i)  debited all securities delivered to the Prime Broker by or on behalf of the Counterparty (including securities received by the Prime Broker in settlement of Third Party Transactions) or delivered or deemed or treated as delivered by or on behalf of the Counterparty to the Prime Broker; and

(ii)  credited all securities advanced by the Prime Broker to the Counterparty . . . or delivered or deemed or treated as advanced, by the Prime Broker to or on behalf of the Counterparty,

and the Prime Broker may combine such accounts where it considers appropriate.

Clause 5.1 gave effect to the accounting conventions of the Prime Broker described in recital (C) to the agreement.

20.  Clause 7 ("Payment and Delivery") contained the following amongst other provisions:

"7.1  Subject to Clause 7.2
(a)  upon reasonable request, the Prime Broker shall repay the Counterparty any cash standing for the time being to the credit of a Cash Account;
(b)  upon reasonable request, the Prime Broker shall deliver to the Counterparty securities equivalent to any securities standing for the time being to the debit of a Securities Account.

7.2  The Prime Broker acting in good faith and in its commercially reasonable discretion shall not be required to make a payment or delivery under Clause 7.1 if –
(a)  an Event of Default or Potential Event of Default has occurred and is continuing; or
(b)  the Prime Broker is entitled to apply the amount of cash so payable or securities so deliverable in respect of a debt or obligation owed to it by or on behalf of the Counterparty or (in the case of cash) to reduce or eliminate a debit balance on the Cash Accounts or (in the case of securities) to increase or create a debit balance to the Securities Accounts."

For the purposes of Clause 7.2(a), "Potential Event of Default" meant "an event which with the service of notice or passage of time, or both, would be or in the opinion of the Prime Broker be likely to be an Event of Default".

21.  By Clause 10.1 of the PBA, the Counterparty charged in favour of the Prime Broker (with full title guarantee and free from all encumbrances), "as continuing security for the payment and discharge of all the Liabilities" assets which included: "(a) all right, title and interest in and to securities . . . constituted for the time being by debits to any Securities Account; (b) all securities and other assets which, or the certificates or

11

documents of title to which, are for the time being deposited with or held by a Lehman Company; (c) all other securities and all rights, cash (including without limitation, dividends) and property whatsoever which may from time to time accrue on, be derived from or be offered in respect of any assets referred to in sub-paragraphs (a) and (b) above, whether by way of Corporate Event or otherwise; and (d) all cash for the time being credited to any Cash Account". "Liabilities", in that context, had the meaning given to that term by Clause 10.2: it included "all monies, debts, liabilities and obligations, whether present or future, actual or contingent, owing or incurred by the Counterparty to the Prime Broker or any other Lehman Company under or in connection with this Agreement, any Transaction, the Customer Agreements any other contract or otherwise . . ." In that context "Customer Agreement" included the ISDA Master and the MIFCA: Schedule 3.

22. Securities and other assets charged to the Prime Broker under Clause 10.1 were "Charged Assets" for the purposes of the PBA: Schedule 3.  Clause 11 set out the rights of use enjoyed by the Prime Broker in respect of the Charged Assets. So far as material, it contained the following provisions:

> "11.1 Subject to clause [11.6], the  Counterparty  hereby authorises the Prime Broker at any time or times to borrow, lend, charge, hypothecate, dispose of or otherwise use for its own purposes any securities which are included in the Charged Assets by transferring such securities to itself or to another person without giving notice of such transfer to the Counterparty.  The Counterparty agrees that the Prime Broker may retain for its own account all fees, profits and other benefits received in connection with any such borrowing, loan, charge, hypothecation, disposal or use. ('Collateral Use')
>
> 11.2 Upon –
> > (a) a borrowing, lending, disposal or other use, such securities will become the absolute property of the Prime Broker  (or  that  of  the transferee) free from the Security and from any equity, right, title or interest of the Counterparty;
> > (b) a charge or hypothecation of any of the Counterparty's securities, all of those securities, including the Counterparty's interest in those securities, will be subject to the charge or other security interest created by such charge or rehypothecation.
>
> 11.3  Upon any such borrowing, lending, charge, hypothecation, disposal or use, the Counterparty will have a right against the Prime Broker for the delivery of securities equivalent to those securities. . . .
>
> 11.4  If on the due date for delivery thereof the Prime Broker shall for any reason be unable to deliver any Equivalent Securities to the Counterparty, the Prime Broker may, pending such delivery, credit the Cash Accounts in an amount equal to the Market Value Equivalent of those Equivalent

> Securities. . . .
>
> 11.5 . . .
>
> 11.6 In connection with any Collateral Use pursuant to clause 11.1, the Counterparty may from time to time request in writing the Prime Broker to exclude certain positions from such Collateral Use (each such position, an 'Ineligible Position'). Any Ineligible Positions shall be held in account number 05606852 and notwithstanding clause 9 or other written agreement in relation to fees and interest, Counterparty shall pay fees and interest in relation to Ineligible Positions as determined in the Prime Broker's discretion and notified to the Counterparty at the time of the Prime Broker agreeing to exclude such Ineligible Positions."

In that context "Equivalent Securities" meant (so far as material):

> ". . . with respect to any security, securities of the same issuer, issue and of an identical type, nominal value and description as such security and shall include the certificates and other documents of or evidencing title and transfer in respect of the foregoing (as appropriate) . . .": Schedule 3.

Special provisions applied if and to the extent that the relevant securities were partly paid or had been converted, subdivided, consolidated, redeemed or made the subject of a takeover or other similar event. "Market Value Equivalent" meant an amount equal to the Market Value of such securities as of any time on any day as determined by the Prime Broker and "Market Value" meant, with respect to securities, the price for such securities obtained from a source selected by the Prime Broker: Schedule 3.

23. Clause 12.1 of the PBA provided that there was an "Event of Default" where "(d) An Act of Insolvency occurs in relation to the Prime Broker and the Counterparty serves a Default Notice on the Prime Broker". An "Act of Insolvency", in relation to any party, included "(d) the presentation or filing in any jurisdiction of a petition in respect of it in any Court . . . seeking . . . administration": Schedule 3. Clause 13.1 provided that, upon the occurrence of an Event of Default, the Non-Defaulting Party might, by written notice served on the Defaulting Party, terminate the agreement with effect from the time of the Event of Default (the date of such occurrence being the "Termination Date"). The clause went on:

> "13.1 . . . On the Termination Date, the following shall immediately occur –
> (a) any obligation of the Prime Broker to settle any Transaction, on behalf of the Counterparty shall cease;
> (b) the Loan shall be immediately repayable;
> (c) all other outstanding obligations of each party to deliver securities or Equivalent Securities or to pay cash to the other under this Agreement shall become due for performance immediately (and

> shall be effected only in accordance with the following provisions of this Clause 13);
>
> (d)  the Prime Broker, or in the event that an Event of Default has occurred under Clause 12.1(d), the Counterparty (the 'Default Calculation Agent') shall establish, as at the date of the Event of Default, the Default Market Values of all cash and securities to be delivered or paid by each party under paragraph (c) above . . ."

Clause 13.2 was in these terms (so far as material):

> "13.2 On the basis of the sums so established, an account shall be taken (as at the Termination Date) of what is due from each party to the other under this Agreement (on the basis that each party's claim against the other in respect of the transfer to it of securities or Equivalent Securities equals the Default Market Value therefor) and the sums due from one party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the party having the claims valued at the lower amount) and such balance shall be due and payable on the next following Business Day. . . ."

"Default Market Value" meant, in the case of securities to be delivered by the Defaulting Party:

> ". . . the amount it would cost to buy such securities at the Default Valuation Time at the best available offer price therefore on the most appropriate market, adjusted for the market impact of such default by the Default Calculation Agent acting in good faith and in its commercially reasonable discretion . . ."

and, if the relevant Event of Default occurred during normal business hours on a dealing day in the most appropriate market, "Default Valuation Time" meant either the close of business in that market on the following dealing day; or in other cases, no later than the close of business on the second dealing day in that market after the day on which the relevant Event of Default occurred: Schedule 3.

24.  Clause 14 ("Indemnity and Liability") contained provisions which were intended to limit or exclude the liability of the Prime Broker for losses suffered by the Counterparty. In particular, Clauses 14.3 and 14.4 were in these terms (so far as material):

> "14.3 Save in the case of sub-clause 14.3(g) where any Losses or liability is caused as a direct result of gross negligence, wilful default, fraud on the part of the Prime Broker, its Affiliates or nominees with whom securities are held which are directly controlled by the Prime Broker or its Affiliates, the Prime Broker accepts no liability and shall not be liable to the Counterparty . . . for any Losses whatsoever which [it] may incur (in connection with this Agreement and any Transaction) as a result directly or indirectly from –
>
> (a)  the general risks of investing; or

14

     (b) investing or holding assets in a particular country (including, but not limited to, Losses arising from nationalisation, expropriation or other governmental actions; regulations of the banking or securities industries; currency restrictions, devaluations or fluctuations; and market conditions affecting the orderly execution of securities transactions or affecting the value of assets); or

     (c) acting on Instructions or in relation to notices, requests, waivers, consents, receipts, corporate actions or other documents which the Prime Broker in good faith believes to be genuine and to have been given or signed by Authorised Persons, and the Counterparty will be bound by the same; or

     (d) the collection, deposit or credit of invalid, fraudulent or forged securities or cash transfers; or

     (e) effecting delivery or payment against an expectation of receipt save where such delivery or payment was contrary to local market practice; or

     (f) an Instruction to deliver securities to a broker, even if the Prime Broker might have information tending to show that this course of action, or the choice of a particular broker for a transaction, was unwise; or

     (g) the Prime Broker's inability to deliver securities on the same day that such securities are received for the Counterparty's Securities Accounts;

and such exclusion of liability shall extend, without limitation, to obligations in tort, any indirect, punitive Special or Consequential loss or damage, even if the Prime Broker was previously informed of the possibility of such loss or damage, provided that this does not apply to any loss or damage caused by fraud on the part of the Prime Broker or to death or personal injury arising from any failure on the part of the Prime Broker to take reasonable care or exercise reasonable skill.

14.4 Where the Prime Broker has been found to be liable, the Prime Broker shall only be liable to the Counterparty to the extent that the Prime Broker has been grossly negligent, fraudulent or is in wilful default or breach of its duties as set out in this Agreement, save that nothing in this Agreement shall restrict any liability owed by the Prime Broker to the Counterparty under the Financial Services and Markets Act 2000 or the Rules or disclaim any liability to an extent not permitted by such Act or the Rules. The parties agree that, as a genuine pre-estimate of loss, the Prime Broker's liability to the Counterparty shall be determined based only upon the Market Value of the relevant cash or securities as at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities."

In that context "Consequential loss or damage" had the meaning given to that expression by Schedule 3 to the agreement: the phrase meant:

     ". . . loss or damage of a kind or extent which was (*sic*) or was not reasonably foreseeable at the time this Agreement was entered into as a serious possibility in the event of the breach of obligation in question, including

without limitation, any breach of agreements entered into between the Counterparty and third parties, loss of profits or loss of business resulting from the breach of obligation in question"

25. As I have said, Clause 5.1(b)(i) of the PBA required that all securities delivered to the Prime Broker by or on behalf of the Counterparty be debited to the Securities Accounts. Clause 17.1 provided that, with the exception of any assets validly transferred to the Prime Broker pursuant to Clause 11 ("Right of Use"), any securities debited to the Securities Accounts should be held by the Prime Broker as custodian. For that purpose, the Counterparty appointed the Prime Broker, and the Prime Broker agreed to act, as its custodian, in accordance with the terms of Schedule 2 to the Agreement. Paragraph 2 of Schedule 2 was in these terms (so far as material):

> "2. SEGREGATION OF ASSETS
>
> 2.1 The Prime Broker will identify in its books and records that the securities belong to the Counterparty.
>
> 2.2    The Prime Broker will require that any Sub-Custodian or nominee appointed by it, or any Securities Depositary which it uses to hold the securities pursuant to this Agreement, will identify in its books and records that the securities belong to the customers of the Prime Broker (to the extent permitted by applicable mandatory law, regulation, or market practice) so that it is readily apparent that such securities do not belong to the Prime Broker."

*The CMNA*

26. Recital (A) to the CMNA recorded that LBIE and SRM (referred to as the "Counterparty") had entered into two or more Base Contracts pursuant to which LBIE and the Counterparty might from time to time have exposures, contingent liabilities or debts to each other; and that LBIE would require the Counterparty to provide Margin in relation to such exposures, contingent liabilities or debts pursuant to the terms of the relevant Base Contract. The purpose of the agreement, as appeared from Recital (B), was to set out, at the request of the Counterparty, provisions which would reduce the operational expense in respect of the Base Contracts by calculating the Margin Requirement on a net basis across all the Base Contracts. In that context "Base Contracts" meant:

> ". . . any agreement or transaction between Counterparty and LBIE and identified in Schedule l, as the same may be supplemented or amended from time to time (and, in the case of any master agreements or umbrella

16

agreements so identified each Transaction thereunder or covered thereby), and any related credit support or security agreements (other than this Agreement), and any terms or conditions incorporated by reference into any of the foregoing.".

The Base Contracts identified in Schedule 1 to that agreement were the ISDA Master, the PBA and the MIFCA. Clause 8.1 provided that the agreement be governed by the laws of England.

27. Clause 2.1 of the CMNA provided that, notwithstanding the terms of the Base Contracts, LBIE should on each Business Day determine the Margin Requirement in accordance with the Margin Methodology. Clause 2.4 required that LBIE notify the Counterparty of the net Margin Requirement by the Margin Notification Deadline on each Business Day. By Clause 2.5 LBIE agreed to apply the Margin Methodology on a committed basis "subject to the terms and conditions of Schedule 3". In that context "Margin Methodology" meant "the proprietary margin methodology applied to particular Base Contracts or categories of Transactions, as specified in Schedule 2, as such Schedule may be amended from time to time in accordance with the terms of this Agreement".

28. Clause 4 provided for close-out and netting off of all Base Contracts if (i) a Default Termination occurred in relation to any Base Contract and "such Default Termination is a result of any default, omission, action or status of the Counterparty (for the avoidance of doubt including, but not limited to, where the Counterparty is the Defaulting Party under the PBA or the Defaulting Party or Affected Party under the ISDA)" and (ii) LBIE had by notice to the Counterparty declared "that a Default Termination shall immediately occur under all other Base Contracts". To the extent that any Base Contract did not include provisions to the same effect, the terms of each Base Contract were modified so as to incorporate those provisions. But there was no parallel or comparable provision where the Default Termination was the result of any default, omission, action or status of LBIE.

29. Schedule 3 set out the terms and conditions upon which LBIE agreed not to change the principles or formulas applied to the Margin Methodology specified in Schedule 2. Paragraph 2 of Schedule 3 was in these terms (so far as material):

"2. LBIE agrees to provide the terms in this Schedule subject to the following conditions precedent:

17

(a)   no event of default, default or termination event (howsoever described) has occurred under any Base Contract;

(b)   the PBA (if any) and ISDA including the CPD Annex are in full force and effect;

(c)   . . ."

Paragraph 5 of Schedule 3 provided that LBIE might terminate the Schedule by giving notice at any time on or after the occurrence of one or more of the circumstances there set out. Those circumstances included (so far as material):

"(d) The occurrence of an event of default or termination event (however described) under any Base Contract . . ."

So far as I am aware, LBIE did not give notice under Paragraph 5(d) of Schedule 3 terminating the Schedule to the CMNA; as it might have done following the occurrence under the ISDA Master, on 15 September 2008, of an Event of Default and, on 18 September 2008, of the designation of an Early Termination Event.

30.   As I have said, Clause 2.2 of the PBA provided that ". . . all other documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties. . . .". In my view, it is plain that, as a matter of English Law, the CMNA and the PBA must be construed together; and that, when Clause 2.2 of the PBA is construed with the provisions of the CMNA in mind, the CMNA is properly to be regarded as a document "identified as being related to a Transaction contemplated by this Agreement [the PBA]".  It follows that the PBA and the CMNA must be read as forming a single agreement between the parties; and that the provisions of Clause 14.4 of the PBA apply in relation to alleged breaches by LBIE of its obligations to deliver Margin Notices under the CMNA, as they do in relation to alleged breaches by LBIE of its obligations to deliver securities or Equivalent Securities under the PBA.

*The ISDA Master*

31.   It is alleged by SRM in the Attachment to Proof of Claim that SRM and LBIE entered into the PBA, the MICFA and the CMNA pursuant to the ISDA Master (said there, I think in error, to be dated as of 9 May 2008; in that, although signed on behalf of SRM on that date, it was not signed on behalf of LBIE until 12 May 2008) to which they were party, and the ISDA Documentation.   Given that SRM refers, in the Attachment to Proof of Claim, to notices which were served under the ISDA

Documentation, it is necessary, also, to refer to certain provisions in the ISDA Master.

32. The ISDA Master recorded that LBIE and SRM "have entered and/or anticipate entering into one or more transactions (each a 'Transaction') that are or will be governed by this Master Agreement, which includes the schedule (the 'Schedule'), and the documents and other confirming evidence (each a 'Confirmation') exchanged between the parties confirming those Transactions". It provided that all Transactions were entered into in reliance on the fact that the Master Agreement and all Confirmations formed a single agreement between the parties (collectively referred to as this "Agreement"), and that the parties would not otherwise enter into any Transactions. Section 19 of the ISDA Master provided that the agreement was to be governed by the laws of England and Wales.

33. Section 2 of the ISDA Master set out the obligations of the Parties. In particular, section 2(a)(i) provided that each party "will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement".

34. Section 5 of the ISDA Master defined "Events of Default". Those included, under head (vii) "Bankruptcy" at item (6), a case in which one of the parties "seeks or becomes subject to the appointment of an administrator . . .". Section 6 provided for the Non-Defaulting Party to have the right to terminate following the occurrence of an Event of Default. The Section was in these terms, so far as material:

> "6 (a) . . . If at any time an Event of Default with respect to a party (the 'Defaulting Party') has occurred and is then continuing, the other party (the 'Non-Defaulting Party') may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions . . . ."

One effect of designation under Section 6(a) was that no further payments or deliveries under Section 2(a)(i) in respect of the Terminated Transactions would be required to be made (subject to other provisions in the Agreement) and the amount (if any) payable in respect of an Early Termination Date was to be determined pursuant to Section 6(e): Section 6(c)(ii). In that context "Terminated Transactions" meant, with respect to any early Termination Date resulting from an Event of Default, "all Transactions . . . in effect immediately before the effectiveness of the notice

designating that Early Termination Date . . .": Section 14. Section 6(d)(i) required that, on or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party would make the calculations on its part, if any, contemplated by Section 6(e) and would provide to the other party a statement showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)).

35.  Section 6(f)(i) of the ISDA Master – added by Part 5(e) of the Schedule – was in these terms (so far as material):

> "6 . . . (f) Set off
> (i) In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default . . . and the designation of an early Termination Date pursuant to Section 6 of the Agreement with respect to a party ('X'), the other party ('Y') will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement and regardless of the currency, place of payment or booking office of the obligation)."

**Notices served under the ISDA Master and the PBA**

36.  As I have said, LBIE was the subject of an order for administration made on 15 September 2008 by the High Court of England and Wales. Seeking such an order was an Event of Default for the purposes of the ISDA Master (Section 5(a)(vii)(6)); and was an Act of Insolvency for the purposes of the PBA (Schedule 3). Upon service by SRM of a notice under Section 6(a) of the ISDA Master designating an Early Termination Date, the provisions in Sections 6(c), (d) and (e) would have effect: no further payments or deliveries under Section 2(a)(i) in respect of the Terminated Transactions would be required to be made and the amount to be paid by one party to the other would be determined under those provisions. Upon service by SRM of a Default Notice under Clause 12.1(d) of the PBA there would have been an Event of Default within the meaning of Clause 12.1 of that agreement. Upon the occurrence of an Event of Default, the Non-Defaulting Party (which, in the events which had happened, was SRM) could terminate the PBA by service of a notice under Clause

13.1. On termination of the PBA in those circumstances, the Close-Out provisions in Clause 13 would have immediate effect as from the time of the Event of Default.

37.    It is alleged by SRM in the Attachment to Proof of Claim:

(i) that, on 18 September 2008, following the occurrence of an Event of Default, under the ISDA Master, SRM delivered a notice to LBIE designating 18 September 2008 as the Early Termination Date on which all outstanding transactions under the ISDA Documentation would be terminated; (ii) that, on 26 September 2008, SRM delivered a statement to LBIE (the "Calculation Statement"), amending an earlier statement delivered on 19 September 2008 and containing SRM's calculation of the termination amount due and payable between the Parties under the ISDA Documentation; and

(iii) that, also on 26 September 2008, SRM delivered to LBIE a statement of setoff (the "Setoff Statement") notifying LBIE that SRM had set off a portion of the amount owed to it under the ISDA Documentation against amounts owed to LBIE with respect to certain obligations governed by the PBA and requesting the return of (a) certain identified SRM collateral posted to LBIE (said to have a value as at the date of the Proof of Claim of approximately US$65,400,000) which, it was said, was required to be maintained as segregated assets (the "Segregated Assets") and (b) margin provided by SRM to LBIE pursuant to the MIFCA, including applicable interest, in the amount of US$8,893,650 as at 25 September 2008 (the "Cash").

38.    I have been provided with copies of the following letters:

(i)    a letter dated 15 September 2008 from SRM (stated to be acting through SRM Global Fund General Partner Limited) addressed to LBIE and headed "Re: Notices under clauses 11.6 and 11.2 of the International Prime Brokerage Agreement";

(ii)    letters dated 18 September 2008 and 19 September 2008 and two letters dated 26 September 2008 from SRM (again, stated to be acting through the General Partner) addressed to LBIE and headed "ISDA Master Agreement dated as of 12 May 2008 between Lehman Brothers International (Europe) ('Lehman Brothers') and SRM Global Master Fund Limited Partnership ('SRM')";

(iii) a letter dated 18 September 2008 from Clifford Chance (stated to be acting on behalf of SRM) addressed to LBIE (with a copy to the then newly appointed administrators) and a letter dated 19 September 2008 addressed to the administrators, each headed "Re: Segregated Assets of SRM Global Master Fund Limited Partnership";

(iv) a letter dated 3 October 2008 from Clifford Chance addressed to Linklaters (as solicitors for the administrators of LBIE) and headed "Re LBIE-SRM Global Master Fund Partnership ('SRM'): claim for return of segregated assets";

(v) two letters dated 6 November 2008 from SRM, each addressed to the administrators of LBIE and copied to Linklaters, and headed, respectively, "Default Notice under the International Prime Brokerage Agreement" and "Termination Notice under the International Prime Brokerage Agreement".

The letters from SRM dated 18 and 19 September 2008, the first of the two letters dated 26 September 2008 and (in part) the second letter of that date purport to be notices under the ISDA Master. The letter dated 15 September 2008 and the two letters dated 6 November 2008 from SRM purport to be notices under the PBA. The letters dated 19 September and 3 October 2008 from Clifford Chance and (in part) the second of the two letters dated 26 September 2008 from SRM are demands for the return of the Segregated Assets.

*Notices under the ISDA Master*

39.  The letter dated 18 September 2008 from SRM contained the following paragraphs:

> "We hereby give notice that, as a result, among other things, of the Chapter 11 bankruptcy petition filed by Lehman Brothers' parent company, Lehman Brothers Holdings Inc. with the United States Bankruptcy Court and Lehman Brothers being subject to the appointment of an administrator in the United Kingdom on 15 September 2008, a present and continuing Event of Default under Section 5(a)(vii) of the Agreement has occurred with respect to Lehman Brothers.
>
> We hereby give you notice that we are exercising our right under Section 6(a) of  the  Agreement to terminate following an Event of Default and designate 18 September 2008 as an Early Termination  Date in respect of all outstanding Transactions."

That letter was followed by the letter dated 19 September 2008 from SRM, in which it was stated that the amount payable pursuant to Section 6(e) of the Agreement was US$48,398,612; and that such amount was payable by LBIE to SRM by close of business on that day.   Details of the calculations made in

determining the amount said to be payable pursuant to Section 6(e) of the Agreement were set out in a "Valuation Notice" which was attached. The first of the two letters of 26 September 2008 from SRM purported to update the letter of 19 September 2008 by including an additional amount (US$991,311) in respect of certain dividend payments. Details of the updated calculations were set out on a revised Valuation Notice. The updated net amount said to be owing to SRM (US$49,389,923) was the difference between the aggregate amount said to be due from SRM to LBIE (US$183,376,949) and the aggregate amount said to be due from LBIE to SRM (US$232,766,872). Reference prices were said to be based on Bloomberg closing prices as of 18 September 2008.

40.  The second of the two letters dated 26 September 2008 from SRM notified LBIE that SRM had exercised its right of set off under Section 6(f) of the ISDA Master (added by Part 5(e) of the Schedule) on 22 September 2008.  The notification was in these terms:

> "We note that the following liabilities were outstanding between SRM and Lehman Brothers immediately prior to set-off:
>
> "(i) USD 49,406,007.23 owed by Lehman Brothers to SRM, being SRM's claim under the Agreement (as notified by SRM to Lehman Brothers by written notice dated 19 September 2008) in the amount of USD 49,389,923.00 plus interest accrued due on such amount of USD 16,084.23; and
>
> (ii) certain obligations of Lehman Brothers and SRM to each other in respect of positions governed by the terms of the International Prime Brokerage Agreement (the 'PB Agreement') between Lehman Brothers and SRM. The various positions under the PB Agreement are detailed in Appendix l to this letter. We valued the non-cash balances using opening prices on 22 September 2008 and set-off all of the positions set out in Appendix 1 to result in a net amount of USD 22,943,476.00 owed by SRM to Lehman Brothers."
>
> We included the obligations specified in sub-paragraphs (i) and (ii) above in our set-off to result in a net amount of USD 26,462.531.23, which is payable by Lehman Brothers . . ."

Details of the calculations made in determining the value of the mutual obligations of the parties in respect of positions governed by the terms of the PBA were set out in Appendix 1 to that letter. The net amount said to be owing to LBIE (US$22,943,476) was the difference between the aggregate amount said to be due from SRM to LBIE (US$372,642,638) and the aggregate amount said to be due from LBIE to SRM (US$349,699,163). Reference prices were said to be based on

Bloomberg closing prices as of 22 September 2008.

41. Given that an Event of Default under Section 5(a)(vii)(6) of the ISDA Master had occurred on 15 September 2008 when LBIE sought or became subject to the administration order made by the High Court of England and Wales, the effect of the letter dated 18 September 2008 from SRM (as a matter of English law) was to designate that date (18 September 2008) as an Early Determination Date for the purposes of Section 6(a) of that agreement. Thereafter, no further payments or deliveries of securities specified in Confirmations confirming Transactions governed by the ISDA Master were required to be made: Section 6(c) of that agreement. It was for each party to make the calculations required by Section 6(e); and the balance, after set-off, was payable by one to the other. Calculations were made by SRM, notified to LBIE by the letter dated 19 September 2008 and updated by the Valuation Notice sent with the first letter dated 26 September 2008. The paying party (which, in the present case, was LBIE) was under an obligation to make payment of the amount calculated within two Business Days: Section 6(d)(ii).  That is the basis of the claim advanced under head (i) in paragraph 18 of the Attachment to Proof of Claim. Section 6(f) of the ISDA Master – added by Part 5(e) of the Schedule – permitted (but did not require) SRM to set-off the payment obligation under Section 6(d)(ii) against any obligation which it owed to LBIE (whether or not arising under the ISDA Master). SRM exercised that right of set-off in respect of the positions set out in Appendix 1 to the second letter of 26 September 2008.

*Notices under the PBA*

42. The letter dated 15 September 2008 from SRM referred to the International Prime Brokerage Agreement and continued in these terms:

> "Further to clause 11.6 of the PB Agreement, we are writing to notify you that all of SRM's assets and property deposited or placed with Lehman pursuant to the PB Agreement or under any related or ancillary agreement (including any '*Charged Assets*' as defined in the PB Agreement and any securities, cash and other properties provided for custody or by way of margin or collateral) should be treated as '*Ineligible Positions*' and maintained in a segregated account as provided for in such clause 11.6, and may not be rehypothecated, borrowed. lent, charged or otherwise used for Lehman's own purposes or the purposes of its general creditors, administrator or liquidator.

43. SRM's letter of 15 September 2008 was followed by the letter dated 18 September 2008 from Clifford Chance. In that letter, Clifford Chance wrote (so far as material):

> ". . . Further to SRM's letter dated 15 September 2008 to Lehman regarding certain provisions of the PB Agreement . . . we wish to reiterate that any assets and property deposited or placed by SRM with Lehman pursuant to the PB Agreement or under any related or ancillary agreement (including any 'Charged Assets' as defined in the PB Agreement and any securities, cash and other property provided by SRM for custody or by way of margin or collateral) and required to be maintained in a segregated account (including, for the avoidance of doubt, any Ineligible Positions as provided for in clause 11.6 of the PB Agreement) as required under Part 2 of Schedule 2 of the PB Agreement (all such property and assets, 'Segregated Assets'), are the property of SRM and may not be rehypothecated, borrowed, lent, charged or otherwise used for Lehman's own purposes or the purposes of its general creditors, administrators or liquidator."

44. As a matter of English law, the letter dated 15 September 2008 did not have the effect that assets and property deposited or placed by SRM with Lehman pursuant to the PBA which, prior to that date, had become Charged Assets pursuant to Clause 10.1 and so available for Collateral Use by LBIE under Clause 11.1 were, from and after receipt of that letter, to be excluded from Collateral Use and treated as "Ineligible Positions". Properly understood, once property and assets had become Charged Assets – and so were Security in the hands of LBIE for the Liabilities of SRM –that property and those assets remained Security unless and until, following a request made in writing by SRM pursuant to Clause 11.6, LBIE had agreed that they should be excluded from Collateral Use and be treated as Ineligible Positions. I am aware of no such agreement by LBIE[3]. The reference in Clause 11.6 to the obligation to pay fees and interest in relation to Ineligible Positions "as determined in the Prime Broker's discretion and notified to the Counterparty at the time of the Prime Broker agreeing to exclude such Ineligible Positions" is inconsistent with the view that SRM had a unilateral right – exercisable without the consent of LBIE – to exclude securities or other assets deposited with LBIE from the Clause 10.1 charge or from Collateral Use under that charge.

---

[3] The allegation in paragraph 13 of the Attachment to Proof of Claim that "LBIE . . . repeatedly agreed with SRM that LBIE would not rehypothecate any of SRM's assets without first getting SRM's permission or at a minimum giving SRM sufficient notice for SRM to exercise its contractual right under the PBA to prohibit rehypothecation" does not support (and, indeed, is inconsistent with) the view that there was agreement, following a request in writing by SRM under Clause 11.6, that property and assets deposited with LBIE should be excluded from Collateral Use and treated as Ineligible Positions.

45. The first of the two letters dated 6 November 2008 from SRM was in these terms, so far as material:

> "This letter constitutes a default Notice under the PB Agreement. By virtue of the appointment of administrators to Lehman on 15 September 2008, an Act of Insolvency (as specified in Clause 12.1(d) of the PB Agreement) has occurred and is continuing in relation to Lehman. We hereby notify you that we are treating that event as an Event of Default for the purposes of the PB Agreement."

The second letter of the same date was in these terms, so far as material:

> "We refer to Clause 13.1 of the PB Agreement and our first letter and Default Notice of today and we hereby give notice to terminate the PB Agreement with effect from 6 November 2008 (being the time of the Event of Default referred to in that first letter and Default Notice)."

46. The effect of those letters, as a matter of English law, was that the PBA terminated, pursuant to Clause 13.1, on 6 November 2008; that all outstanding obligations of each party to deliver securities or Equivalent Securities or to pay cash to the other under that agreement became due for performance on 6 November 2008 (Clause 13.1(c)); and that, on and from that date, performance of such obligations was to be in accordance with the provisions in Clause 13.1(d) and 13.2. Those provisions required that SRM, as the Default Calculation Agent, should establish, as at 6 November 2008, the Default Market Values of all cash and securities to be paid or delivered under Clause 13.1(c); that an account should be taken of what was due from LBIE to SRM (or from SRM to LBIE) on the basis that each party's claim against the other in respect of the transfer to it of securities or Equivalent Securities was equal to the Default Market Value of those securities or Equivalent Securities; that the sums due from one party should be set-off against the sums due from the other; that only the balance of the account should be payable; and that the balance should be paid on the next following Business Day. There was no provision of the PBA entitling either party to any recovery related to changes in value subsequent to the termination of the PBA.

**Demands for the return of Segregated Assets**

47.  On 19 September 2008, Clifford Chance wrote again, asserting that the Segregated Assets to which they had referred in their letter of 18 September 2008 were the property of SRM and requesting that they be returned immediately to a specified account. The letter went on to state that:

"SRM confirms that the delay to date in the return of the Segregated Assets has resulted in loss and irreparable harm to SRM.

As a result of the above, any failure or continued delay to return the Segregated Assets will mean that SRM will have no alternative other than to pursue all remedies available at law or in equity against Lehman and/or the Joint Administrators themselves, including, but not limited to, damages for direct, indirect and/or consequential loss."

48. That letter was followed by the second of the two letters dated 26 September 2008 from SRM. I have already referred to the notification of the exercise of the right of set-off which that letter contained. The letter went on:

"Following the set-off as described above, all liabilities of SRM to Lehman Brothers under the PB Agreement and the related agreements have been discharged in full and SRM reiterates its request for the return of its segregated assets (including but not limited to the shares of Virgin Media Inc. and dividends in respect of such shares, each as detailed in Appendix 2) as per the letter dated 19 September 2008 sent by our legal advisors, Clifford Chance LLP, to Lehman Brothers and the Joint Administrators.

We also demand immediate return of all margin provided by SRM to Lehman Brothers pursuant to the Master Institutional Futures Customer Agreement dated 12 May 2008 between Lehman Brothers and SRM, including applicable interest. As of close of business on 25 September 2008, this margin equals USD 8,893,650.00. This margin can be returned to SRM using the account details specified above."

Appendix 2 to the letter showed 5,094,060 Virgin Media Inc. Shares (with dividends in the sum of US$142,634) due to SRM.

49. In their letter dated 3 October 2008 to Linklaters, Clifford Chance referred to the earlier correspondence and to the failure of the administrators to release segregated assets in accordance with the requests that had been made. They went on to state:

". . . the continued and persistent failure by the Joint Administrators  to return any segregated assets to any of LBIE's clients, coupled with an unwillingness to communicate with regard to specific client enquiries, is an unacceptable manner in which to manage the administration.

It follows that our clients find themselves in a situation where the continued delay in restoring to them their segregated assets is causing their business significant harm.

Specifically:

(i) following the appointment of the Joint Administrators, third parties who had received rehypothecated assets from LBIE as collateral for various obligations disposed of such assets aggressively in the market. This resulted in substantial losses and a reduction in our clients' net asset value;  and

27

(ii)    the losses also caused UBS and Goldman Sachs to post significant margin calls in respect of the unrealised mark-to-market losses on our clients' positions relative to the leverage provided by each prime broker.

Typically, our clients meet their margin calls from excess collateral held at each prime broker (ie the extent to which the market value of the securities held by the prime broker exceeds the value of the leverage provided to the portfolio by the prime broker). If our clients did not maintain such an excess at a particular prime broker (eg because the value of our clients' securities held at the broker had fallen in comparison with the leverage provided) it would have been usual for our clients to meet their margin calls either by transferring excess collateral from another of their prime brokers or by liquidating certain of their positions to reduce leverage and create excess collateral. In the week of 15th September our clients were not able to maintain an excess because of falling mark-to-market values of their securities. Moreover the failure of the Joint Administrators to allow timely release of segregated cash and physical positions to our clients resulted in our client's business suffering liquidity stress. This meant that our clients had no alternative other than to sell their assets into what was a very distressed market and at fire-sale prices.  Our clients liquidated the bulk of their assets in this way in order to meet their margin calls and in doing so locked in further substantial losses.

In summary, the refusal of the Joint Administrators to release our clients' segregated assets, coupled with the uncontrolled unwinding by LBIE's counterparties of their exposures, has caused our clients - and the investors to whom they are answerable - significant losses. The failure of the Joint Administrators to return our client's segregated assets results in our clients' losses continuing as each day passes and places an intolerable strain upon our clients' financial resources. For this reason it is imperative for the health of our clients' business that the segregated assets are released back to our clients as a matter of utmost urgency."

50.    I have already explained that, as a matter of English law, property and assets deposited or placed by SRM with Lehman pursuant to the PBA which, prior to 15 September 2008, had become Charged Assets pursuant to Clause 10.1 and so available for Collateral Use by LBIE under Clause 11.1, did not, from and after receipt of SRM's letter of that date, cease to be Charged Assets: in particular, they were not, then, to be treated as "Ineligible Positions" and did not, then, become excluded from Collateral Use.  The obligations of LBIE under the PBA, in relation to those assets, were upon reasonable request to deliver to SRM securities (Equivalent Securities) equivalent to any securities standing to the debit of a Securities Account: Clause 7.1(b).  But that obligation was subject to the qualification in Clause 7.2(a): LBIE, acting in good faith and in its reasonable commercial discretion, was not

required to make a delivery under Clause 7.1 if an Event of Default or a Potential Event of Default had occurred and was continuing. Although no Event of Default under the PBA had occurred at the dates of the letters of 19 September 2008, 26 September 2008 or 3 October 2008, there was, at the dates of those letters, a continuing Potential Event of Default: the Act of Insolvency constituted by LBIE's application for an administration order had occurred on 15 September 2008 and that was an event which, with the service of a notice by SRM would be (or would in the opinion of LBIE be likely to be) an Event of Default; as, in the events which happened, proved to be the case.

51.   Further, if (notwithstanding the continuing Potential Event of Default) LBIE's obligation to deliver Equivalent Securities under Clause 7.1 did arise – or if (in circumstances where the securities belonging to SRM and standing to the debit of a Securities Account had been lent, charged, hypothecated or otherwise disposed of by LBIE by way of Collateral Use) a right to the delivery of Equivalent Securities arose under Clause 11.3 – the obligation to deliver was suspended under Clause 11.4 in circumstances where, for any reason, LBIE was unable to deliver Equivalent Securities to SRM on the due date for delivery. In such circumstances, LBIE was entitled, pending delivery, to credit the Cash Accounts in an amount equal to the Market Value Equivalent of the Equivalent Securities which it was obliged to deliver.

52.   As a matter of English law, the premise which appears to underlie the demands for immediate delivery of the Segregated Securities made in the letters of 19 and 26 September and 3 October 2008 – that there was an unfettered proprietary right to the return of assets in the possession of LBIE which belonged to SRM - is misconceived. And, as I have said, SRM's contractual rights as at the dates of those letters were limited to the recovery of the value of the securities as  at the date of discovery of loss, pursuant to Clause 14.4 of the PBA.

**The claims made by SRM in the Proof of Claim**

53.   As I have said, the claims made by SRM in the Proof of Claim are summarised at paragraph 18 of the Attachment to that Proof under five heads; of which three – the Segregated Assets Claim, the Forced Sales Claim and the Lost Opportunities Claim – give rise to the English law issues on which I am asked to report my opinion.

*The Segregated Assets Claim*

54. "Segregated Assets", for the purposes of the Proof of Claim is a defined term. It means "certain identified SRM collateral posted to LBIE . . . as more fully described in the letter dated September 19, 2008 from SRM to LBIE (the 'Segregated Assets')": paragraph 12 of the Attachment to Proof of Claim. But, as I have explained, the letter of 19 September 2008 from SRM does not identify "SRM collateral posted to LBIE": the assets listed in the Valuation Notice attached to that letter are derivatives (equity swap and CFD) in relation to which calculations had been made for the purpose of determining the amount payable under Section 6(d) of the ISDA Master. They are relevant in the context of quantifying the first head of claim: that is to say, the claim in respect of "(i) the ISDA Documentation in the amount of $49,389,923". They have nothing to do with the second head of claim: the claim in respect of "(ii) the value of the Segregated Assets and Cash that LBIE failed properly to segregate and/or to return". Properly understood, as it seems to me, the assets to which to the second and third heads of claim relate are the assets described in the letter dated 19 September 2008 from Clifford Chance to LBIE as "certain assets and property deposited and placed with Lehman pursuant to the PB Agreement or under any revised or ancillary agreement (including any 'Charged Assets' as defined in the PB Agreement and any securities, cash and other property provided by SRM for custody or by way of margin or collateral) . . . (all such property and assets 'Segregated Assets')".

55. That view is confirmed (i) by the reference in the second letter dated 26 September 2008 from SRM to LBIE to SRM's request "for the return of its segregated assets (including but not limited to the shares of Virgin Media Inc. and dividends in respect of such shares, each as detailed in Appendix 2) as per the letter dated 19 September 2008 sent by our legal advisers, Clifford Chance LLP, to Lehman Brothers and the Joint Administrators" and (ii) by the reference, also in paragraph 12 of the Attachment to Proof of Claim to the request for the return of the Segregated Assets being "set forth in the Set-off Statement": which must be a reference to the document (comprising Appendix 1 and Appendix 2) which was sent by SRM to LBIE with SRM's second letter dated 26 September 2008. As I have said, the assets identified in Appendix 1 are assets in relation to which SRM had sought to exercise a right of set-off under the ISDA Master.

56. It is alleged in the Attachment to Proof of Claim:

    (i) that, on 26 September 2008, SRM requested the return of certain identified SRM collateral posted to LBIE (having a value as at the date of the Proof of Claim of approximately US$65,400,000) which, it is said, was required to be maintained as segregated assets (the "Segregated Assets");

    (ii) that the Segregated Assets formed only part of a larger portfolio of assets held by LBIE on behalf of SRM under the PBA;

    (iii) that, in the summer of 2008 and again in September 2008, prior to the administration order, LBIE (through individual members of its prime brokerage team) agreed with SRM that it (LBIE) would not rehypothecate any of SRM's assets without first obtaining SRM's permission or giving SRM sufficient notice to exercise its contractual rights under the PBA to prohibit rehypothecation; and that, on the basis of (and in consideration for) such commitments and assurances, SRM deposited substantial collateral with LBIE and refrained from designating all stock as automatically non-rehypothecable, as was its right under the PBA;

    (iv) that, shortly following the appointment of administrators to LBIE on 15 September 2008, LBIE disclosed to SRM that LBIE had not been complying with the commitment not to rehypothecate; and that many of SRM's assets had, in fact, been rehypothecated by SRM; and

    (v) that, SRM had suffered damage in respect of the losses which it had suffered as a consequence of LBIE having failed to segregate its long positions contrary to its commitment not to rehypothecate and in breach of contract and/or trust; in that (it was said), if LBIE had properly segregated those long positions, SRM would have sold its European long positions and then applied the proceeds to discharge SRM's short positions under the PBA and the overdraft, leaving the North American long positions ((having a value as at the date of the Proof of Claim of US$97.7 million) wholly unencumbered and therefore free to be delivered up immediately to SRM.

57. As I have said, ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████   If my understanding of the position is correct, then, in part (at least), the dispute between SRM and LBHI in relation to the Segregated Assets Claim is as to the date upon which the Segregated Assets fell to be valued.

*The Forced Sales Claim*

58. It is alleged in the Attachment to Proof of Claim:

> (i) that, as a result of LBIE's failure to return the Segregated Assets to SRM on request, SRM was not able to deploy the Segregated Assets to meet margin calls for which it was obligated to other prime brokers; and, as a result, was compelled to effect disadvantageous sales of assets in order to meet such margin calls; and

> (ii) that the claim in respect of pecuniary damages and losses attributable to forced sales is in amount approximately US$48,300,000.

59. Further particulars of the basis on which this claim is advanced may be found in passages of the letter dated 3 October 2008 from Clifford Chance to Linklaters which I have set out. In short, SRM seeks to recover from LBHI losses alleged to have been suffered because -  being unable to use the Segregated Assets to meet margin calls by other prime brokers - it had no option but to liquidate certain positions on a forced sale basis in order to meet those calls.

*The Lost Opportunities Claim*

60. It is alleged in the Attachment to Proof of Claim:

> (i) that, following the appointment of administrators on 15 September 2008, LBIE was in continued and repeated breach of its obligations to serve compliant Margin Notices under the CMNA; in that LBIE failed to serve the daily Margin Notices required under clause 2 of that agreement and did serve a "grossly erroneous" Margin Notice dated 30 October 2008;

> (ii) that, as a consequence of those breaches, SRM was constrained to adopt a much more conservative investment strategy than it would otherwise have done in the then current market environment;

> (iii) that SRM's management were compelled to devote significant time and effort to dealing with the consequences of those breaches;

    (iv) that the breaches resulted in significant loss of investment opportunities for the SRM fund over the period after LBIE went into administration; and continue to do so;

    (v) that, if very large amounts of management time had not been devoted to issues resulting from the failure to segregate assets and other breaches by LBIE, SRM could have devoted substantially more time to finding mispriced investments and the fund returns would have been even better than they were (in that the fund performance would have improved by an estimated 50%); and

    (vi) that the claim in respect of losses arising from lost investment opportunities was estimated at approximately US$100 million.

In short, SRM seeks to recover from LBHI losses alleged to have been suffered as a consequence of opportunities lost by reason of LBIE's alleged failure (i) to serve Margin Notices under the CMNA and (ii) to segregate assets under the PBA; and, in particular, caused by a wasteful diversion of management time said to result from such failure.

61.    Having set out the material provisions of the relevant documents, the effect of the notices served under those documents and the terms of the demands made for the return of the Segregated Assets, considered the legal effect of those demands and explained the nature of the claims advanced in the Proof of Claim, I now turn to the issues on which I have been asked to report my opinion.

**Issue A: Based on a review of the relevant agreements between the parties, did SRM have a contractual or a proprietary right to the return of the Segregated Assets?**

62.    As a matter of English law, ownership of securities "deposited or placed with [LBIE] pursuant to the [PBA] or under any revised or ancillary agreement (including any "Charged Assets" as defined in the [PBA] and any securities, cash and other property provided by SRM for custody or by way of margin or collateral)" – to adopt the description of "Segregated Assets" in the letter dated 19 September 2008 from Clifford Chance – remained in SRM unless and until either (i) the securities, being Charged Assets for the purposes of clause 11.1, were used by LBIE for its own purposes by transferring such securities to itself or to another person by way of a borrowing, lending, disposal or other use (Clause 11.2(a)) or (ii), upon the occurrence

of an Event of Default,  the Non-Defaulting Party, by written notice to the Defaulting Party under Clause 13.1, terminated the Agreement, with the effect that the mutual rights and obligations of LBIE and SRM in respect of the securities were closed out in accordance with Clause 13.2 of the PBA. In the present case, SRM's ownership of securities comprised within the description "Segregated Assets" (in so far as it had not already determined under clause 11.2(a) of the PBA) would have determined, at the  latest, on 6 November 2008, the Termination Date for the purposes of Clause 13.1 of the PBA.

63.  As a matter of English law, SRM had a proprietary right to the return of securities for so long as (but only for so long as) those securities remained in its ownership, notwithstanding that they had been deposited or placed with LBIE pursuant to the PBA. But, where the securities had become and remained Charged Assets, the exercise of that proprietary right was subject to the limitations and restrictions imposed by the terms under which they had been charged. In particular, if while Charged Assets, (i) those securities had been lent or disposed of, SRM's interest as owner would have been extinguished (Clause 11.2(a) of the PBA) and (ii) those securities had been charged or hypothecated by LBIE for its own use, SRM's interest would have become subject to the charge or other security interest created by such charge or hypothecation (Clause 11.2(b)).

64.  In addition to the proprietary right to the return of securities which remained in its ownership – which arose under the general law and which (subject to the limitations and restrictions imposed by the charge) was preserved by Clause 2.3 of the PBA – but subject to but subject to the rule against double recovery, SRM had contractual rights to the delivery of Equivalent Securities upon reasonable request: Clause 7.1 and Clause 11.3. But the contractual right conferred by Clause 7.1 was subject to the qualification (in Clause 7.2(a)) that LBIE acting in good faith and in its commercially reasonable discretion was not required to deliver Equivalent Securities to SRM because a Potential Event of Default had occurred on 15 September 2008. And the contractual right conferred by Clause 11.3 was qualified by Clause 11.4; which entitled LBIE to credit the Cash Accounts in an amount equal to the Market Value Equivalent of the Equivalent Securities in circumstances where, for any reason, LBIE was unable to deliver Equivalent Securities to SRM on the due date for delivery.

Further, and in any event, the contractual rights to the delivery of Equivalent Securities were exercisable from and after 6 November 2008 only in accordance with the close-out provisions of Clause 13.1(d) and Clause 13.2: that is to say, by setting off what one party owed to the other as of the date of termination and making payment of the balance.

**Issue B: Assuming that from and after a date not later than 6 November 2008, SRM's only right in respect of the return of the Segregated Assets was a contractual right, (i) do the terms of the PBA preclude a recovery from LBIE of any appreciation in the value of such shares occurring after the "date of the discovery of loss" and, if so, (ii) what would the "date of the discovery of loss" be?**

65. Whether or not SRM had a proprietary right to a return of the Segregated Assets prior to 6 November 2008, as a matter of English law the effect of the close-out provisions in Clause 13 of the PBA was that there could be no claim by SRM to any subsequent appreciation in the value of such shares after that date.

66. Further, if (as is likely) any proprietary right of SRM to a return of the Segregated Assets had already determined, or had ceased to be exercisable, prior to 6 November 2008, SRM's only rights in respect of the return of the Segregated Assets after the date of such determination were contractual rights, under Clause 7.1 and Clause 11.3, to the delivery of Equivalent Securities. Those contractual rights were subject to the provisions in Clause 14, which, as I have said, were intended to limit or exclude the liability of the Prime Broker (LBIE) for losses suffered by the Counterparty (SRM). Clause 14.3 provided that "Save . . . where any Losses or liability was caused as a direct result of gross negligence, willful default, fraud on the part of the Prime Broker . . . the Prime Broker accepts no liability and shall not be liable to the counterparty . . . for any losses whatsoever which [it] may incur . . . as a result directly or indirectly from . . . (g)  the Prime Broker's inability to deliver securities on the same day  that  such securities are received  for the Counterparty's Securities   Accounts"; but that provision did not exclude liability for a more general failure to deliver Equivalent Securities pursuant to the Prime Broker's breach of its contractual obligations. Clause 14.4 applied in circumstances where, notwithstanding Clause 14.3, the Prime Broker had been found to be liable for breach of its contractual obligations. In such a case Clause 14.4 provided that the Prime Broker should only be liable to the Counterparty "to the extent that the Prime Broker has

been grossly negligent, fraudulent or is in wilful default or breach of its duties as set out in this Agreement".

67. No allegation of gross negligence, fraud or willful default in the context of failure to deliver Equivalent Securities following the events of 15 September 2008, has been made in the Attachment to Proof of Claim. It is relevant to have in mind that, if the failure to make a delivery of Equivalent Securities when called upon to do so was a breach of the obligations under Clause 7.1 or Clause 11.3, that breach occurred, as alleged, in the period immediately following the appointment of administrators to manage the affairs of LBIE. In my view, save in the most exceptional circumstances, which would need to be particularised with specificity, an English Court would summarily reject an allegation that administrators who had been in office for no more than a few weeks, and who were faced with a potential insolvency, were not acting in good faith and in their commercially reasonable discretion if they chose not to make a delivery of Equivalent Securities in a case where a Potential Act of Default had occurred which would lead to (or would in their opinion be likely to lead to) a Close-Out under Clause 13.1.  Nevertheless, given that (as I understand the position) LBHI is content to advance its formal objection on the merits on the basis that, in any event, SRM is not entitled to any losses beyond those accrued as of the date of discovery of the loss, it is unnecessary (in this Declaration) to examine this issue further.

68. Clause 14.4 of the PBA goes on to provide that (in cases where liability for loss is not excluded or restricted by the first sentence of that clause) and as a genuine pre-estimate of loss, the determination of LBIE's liability should be based only upon the market value of the relevant securities as at the date of the discovery of the loss and without reference to ". . . subsequent variations to the Market Value of the relevant . . . securities". Accordingly, Clause 14.4 does preclude recovery from LBIE in respect of loss, suffered by reason of a failure to deliver Equivalent Securities in breach of Clause 7.1 or Clause 11.3, which is referable to any appreciation in the value of the Segregated Assets after "the date of the discovery of the loss".

69. Although the date on which the loss arising from the alleged failure to deliver Equivalent Securities was discovered is a matter of fact,  the facts alleged in the Attachment to Proof of Claim and the letters to which I have referred, would be

36

sufficient, as a matter of English law, to satisfy an English Court (if seized of the issue) that it was admitted (indeed, alleged) by SRM that it discovered the loss – in the sense of appreciating that LBIE was not about to deliver Equivalent Securities - on or about 19 September 2008; and, in any event, not later than 3 October 2008 (the date of the letter in which Clifford Chance informed Linklaters that SRM had given instructions to make an application to the Court. It follows that Clause 14.4 of the PBA precluded SRM from recovering from LBIE any loss attributable to the appreciation in the value of the Segregated Assets after that date.

**Issue C: Does the PBA preclude a recovery from LBIE on account of the Forced Sales Claim, particularly in light of the contractual restriction on damages set forth in section 14.4 of the PBA?**

70. I have explained, earlier in this Declaration, that Clause 14.3 of the PBA provides that "the Prime Broker [LBIE] accepts no liability and shall not be liable to the Counterparty [SRM] . . . for any Losses whatsoever which [it] may incur (in connection with this Agreement and any Transaction) as a result directly or indirectly from – . . . (b) market conditions . . . affecting the value of assets. . .". Given the basis upon which SRM advances the Forced Sales Claim – the need to effect disadvantageous sales of assets (on a firesale basis) in order to meet margin calls (which, themselves, were made by other prime brokers in consequence of the fall in the value of existing collateral – I have no doubt that an English Court would conclude that the losses claimed by SRM under this head did result, "directly or indirectly from market conditions affecting the value of assets". There is nothing in the language of Clause 14.3(b) which requires that the assets of which the value is affected by market conditions should, themselves, be assets held by the Prime Broker. The effect, as a matter of English law, is that Forced Sales Claim is excluded.

71. Clause 14.4 of the PBA provided that any liability of LBIE's for failure to deliver Equivalent Securities on the due date should be determined (as a genuine pre-estimate of loss) based only upon the market value of the relevant securities as at the date of the discovery of the loss and without reference to "any special circumstances, indirect or consequential losses. . .". As a matter of English law, the exclusion of reference to "special circumstances, indirect or consequential losses" in the determination of loss resulting from failure to deliver Equivalent Securities on the

due date simply emphasises the requirement that determination of the loss is to be based "only upon the market value of the relevant securities as at the date of the discovery of the loss"; but, in so far as the exclusionary phrase "without reference to any special circumstances, indirect or consequential losses" were to be relied upon, that phrase would be construed in the light of the definition of "Consequential loss or damage" contained in Schedule 3 of the PBA. Consequential loss includes loss of a kind or extent which was not reasonably foreseeable at the time that the PBA was entered into as a serious possibility in the event of the breach of obligation in question.

72.  I feel able to say, with confidence that an English Court (if seized of the issue) would be likely to take the view that the market turbulence in the immediate aftermath of the events on 15 September 2008 and the consequent "forced sales" that underlie this claim were so exceptional that they were not reasonably foreseeable in May 2008. An English Court would likely take the view that it was unforeseeable that, as a consequence of a breach of the obligation to deliver securities that when SRM received margin calls from its other broker dealers, it would have to sell securities at a time when only firesale prices were obtainable.

**Issue D: Do the applicable agreements preclude a recovery from LBIE on account of the Lost Opportunities Claim?**

73.  Insofar as the Lost Opportunities Claim is based upon breaches by LBIE of its obligations under the PBA to deliver Equivalent Securities as a factor leading to lost opportunities or wasteful diversion of management time, the provisions of Clause 14.4 of the PBA would apply in the same manner as those provisions apply to the Forced Sales Claim, as already explained. And, in any event, any damages recoverable by SRM would be limited to the market value of Equivalent Securities at the time of discovery and double recovery would not be permitted.

74.  Further in so far as the Lost Opportunities Claim is based upon breaches of the obligations under the CMNA as a factor leading to lost opportunities or wasteful diversion of management time, the provisions of Clause 14.4 of the PBA would , for reasons which I have explained, apply to the losses said to result from breaches by LBIE of its obligations to serve Margin Notices under the CMNA. Such losses

would be regarded by an English Court as "indirect or consequential losses"; and so would be excluded under those provisions.

**Issue E: Even assuming, *arguendo*, that the applicable agreements did not preclude such a recovery as a matter of contract, would other principles of English law preclude a recovery from LBIE on account of the Lost Opportunities Claim?**

75.  Under English law, there are limitations on the extent to which damages under the general law can be recovered for loss following a contractual breach. In particular, it is necessary for the claimant to establish a sufficient causal link between the breach on which it relies and the loss in respect of which it claims.

76.  In the present case, that requirement presents obvious difficulties for SRM; not least in circumstances in which the losses alleged are said to have arisen (in part at least) from wasteful diversion of management time resulting not only from continued and repeated breach of its obligations to serve compliant Margin Notices under the CMNA, but also (in very large measure) from issues resulting from the failure to segregate assets and other breaches by LBIE. It would be essential as a matter of English law to distinguish between the losses which are said to have flowed from wasteful diversion of management time caused by LBIE's alleged failure to serve Margin Notices and the losses which are said to have flowed from wasteful diversion of management time caused by LBIE's alleged failure to segregate assets and other breaches of the PBA.

77.  It is important to keep in mind that SRM do not allege in the Attachment to Proof of Claim that the absence of daily Margin Notices caused direct loss: the claim is in respect of indirect loss flowing from the need to adopt a conservative approach and the diversion of management time. Given that the ISDA Master Agreement had been terminated by the designation of an Early Termination Date and closed-out – and that SRM was seeking to recover the securities which it had deposited with LBIE under the PBA on the basis that those securities had ceased to be Charged Assets - there is no reason to think that the failure of LBIE to deliver daily Margin Notices was of any real concern to the management of SRM. Further, there is no reason to think that, if it did need to have the information that would have been contained in daily Margin Notices, SRM could not have obtained that information from within its own resources.

78. I feel able to say with confidence that an English Court (if seized of the issue) would be likely to take the view that the allegations advanced in support of the Lost Opportunities Claim are so lacking in particularity that, without more, the claim should be dismissed as embarrassing: in the sense that it is impossible for LBIH or the court to address it.

**I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.**

J. M. Chadwick

Sir John Chadwick
18 May 2016

40