
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Jayant W. Tambe
Laura Washington Sawyer
Jennifer L. Del Medico
Joseph J. Boylan

*Attorneys for Lehman Brothers
Holding Inc., on behalf of itself and
in its capacity as Plan Administrator,
and Lehman Brothers Special
Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
:
In re: : Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*, : Case No. 08-13555 (SCC)
:
               Debtors. : (Jointly Administered)
:
---------------------------------------------------------------X
:
LEHMAN BROTHERS HOLDING INC., on :
behalf of its itself and in its capacity as Plan :
Administrator, and LEHMAN BROTHERS :
SPECIAL FINANCING INC., : Adv. Proc. No. 16-_____ (SCC)
:
               Plaintiffs, :
:
v. :
:
BUCKEYE TOBACCO SETTLEMENT :
FINANCING AUTHORITY, :
:
               Defendant. :
---------------------------------------------------------------X

**ADVERSARY COMPLAINT**

Lehman Brothers Holdings Inc. ("LBHI") (on behalf of itself and in its capacity as Plan Administrator) and Lehman Brothers Special Financing Inc. ("LBSF," collectively with LBHI, "Plaintiffs" or "Lehman") by and through their attorneys, Jones Day, for their Complaint hereby allege as follows:

**INTRODUCTION**

1. This action arises out of the termination of a reserve fund agreement between LBSF and the Buckeye Tobacco Settlement Financing Authority ("Buckeye" or "Defendant"). The Reserve Fund Agreement ("RFA") was a long-term investment contract under which Lehman delivered securities to Buckeye that provided for a guaranteed rate of return on approximately $389 million held in a reserve fund established by Buckeye to secure payments of bonds issued by it, in consideration for Buckeye's agreement to use the funds in the reserve fund to periodically purchase securities from Lehman at a fixed price.

2. After LBHI filed for bankruptcy protection on September 15, 2008, Buckeye proceeded to terminate the RFA on September 19, 2008. Buckeye further purported to determine the "Termination Amount" described in the RFA and claimed that Lehman owed Buckeye $29,442,000, plus interest and fees. On September 21, 2009, Buckeye filed Proofs of Claim Nos. 22666 and 22667 (each a "Claim," and together the "Claims"), against LBSF and LBHI (as guarantor of the RFA), respectively, each claiming Buckeye was owed "not less than $29,442,000" plus interest and fees in connection with the termination of the RFA.

3. However, Buckeye is not entitled to a single cent from either LBSF or LBHI in connection with the termination of the RFA. Buckeye failed to determine the Termination Amount in accordance with RFA, which expressly requires that any such calculation be reasonable and made in good faith. Instead, Buckeye appears to have based its Termination

Amount determination on indicative and facially unreasonable "quotations," turning a blind eye to the true value of the RFA as of September 19, 2008.

4. Indeed, when the RFA is properly valued as of September 19, 2008, using the standard industry methodology for valuing reserve fund agreements like the RFA, it is clear that Buckeye owes LBSF a Termination Amount in excess of $20 million—a $50 million difference from the amount claimed by Buckeye.

5. Buckeye's determination of the Termination Amount, which disregarded the RFA's express requirement that it be done reasonably and in good faith, must be rejected. Buckeye owes LBSF an amount to be determined at trial, including contractual interest which continues to accrue until payment in full has been made. Lehman seeks to compel payment of the amount that Buckeye owes and to disallow and expunge Buckeye's Claims.

## PARTIES

6. Plaintiff LBHI is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. On September 15, 2008, LBHI commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code. On December 6, 2011, the Court approved and entered an order confirming the Plan. The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute litigation claims on behalf of the estates and interpose and prosecute objections to claims against the estates.

7. Plaintiff LBSF is a Delaware corporation, with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. On October 3, 2008, LBSF commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code. LBSF's chapter 11 case

has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) (the "Chapter 11 Cases").

8. Defendant Buckeye is an independent public instrumentality of the State of Ohio that was established through the Ohio legislature's enactment of Sections 183.51 and 183.52 of the Ohio Revised Code. Buckeye's principal place of business is at 30 East Broad Street, 34th Floor, Columbus, Ohio 43215.

## JURISDICTION AND VENUE

9. This is an adversary proceeding brought pursuant to Sections 501, 502 and 541 of the Bankruptcy Code, Sections 2201 and 2202 of title 28 of the United States Code, and Rule 7001 and 7003 of the Federal Rules of Bankruptcy Procedure to recover amounts due to LBSF by Buckeye.

10. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.

11. This Court has personal jurisdiction over Buckeye. Buckeye consented to this Court's jurisdiction by filing the Claims against LBHI and LBSF.

12. This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Plaintiffs consent to the entry of final orders and judgment by the Bankruptcy Court.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) because the Chapter 11 Cases are pending in this district.

## BACKGROUND

### I. Tobacco Settlement Bonds and the Reserve Fund

14. On November 23, 1998, a number of states and tobacco manufacturers settled claims that the states had brought relating to the use of, or exposure to, tobacco products. As part of this settlement, the tobacco manufacturers agreed to pay the states an estimated $206 billion through 2025. Ohio was entitled to approximately 5.04% of the initial and annual payments, and approximately 2.8% of the payments made to states for their contributions to the tobacco litigations.

15. In order to monetize the future payments from the tobacco manufacturers, in 2007, Ohio established Buckeye pursuant to Sections 183.51 and 183.52 of the Ohio Revised Code (the "Act"). The Act authorized Buckeye to purchase tobacco settlement revenues from Ohio and issue bonds secured by and payable from such purchased tobacco settlement revenues.

16. In October 2007, Buckeye issued $5,531,594,541 of Tobacco Settlement Asset-Backed Bonds, Series 2007 (the "Bonds"), pursuant to an Indenture dated October 1, 2007, between Buckeye and U.S. Bank, National Association, as Trustee (the "Trustee"). A portion of the proceeds realized from the sale of the Bonds was deposited into a reserve fund to provide additional credit support to cover scheduled bond payments in the event of a temporary revenue shortfall (the "Reserve Fund").

### II. The Reserve Fund Agreement

17. In order to lock in a fixed rate of return on the funds held in the Reserve Fund, on October 29, 2007, Buckeye and the Trustee entered into the RFA with LBSF. The RFA provides the terms for the parties' contractual relationship. LBHI guaranteed LBSF's obligations pursuant to the RFA.

18. Under the RFA, LBSF would periodically provide Buckeye with Qualified Securities that yielded an annualized rate of return of 4.682% (the "Guaranteed Rate"), and which matured on or before the date that semi-annual debt service payments were due to be paid to bondholders (each, a "Bond Payment Date"). *See* RFA § 1.

19. The RFA provided that Buckeye would deliver an amount specified in the RFA to LBSF—$389,231,603.13 (subject to adjustment upon the occurrence of certain events)—on each Bond Payment Date (the "Scheduled Reserve Amount"). RFA Ex. G.

20. In exchange for the delivery of the Scheduled Reserve Amount, LBSF was required to deliver short-term "Eligible Securities" that would mature on or before the next Bond Payment Date. The RFA defined Eligible Securities to be:

> Securities in Book-Entry form satisfying each of the following three (3) criteria: (1) (a) obligations, the timely payment of the principal and interest on which are unconditionally guaranteed by the United States Government; (b) notes, bonds, debentures, mortgages and other evidences of indebtedness, issued or guaranteed at the time of the investment by the United States Postal Service, Federal National Mortgage Association, Federal Home Loan Bank, Federal Home Loan Mortgage Corporation, the Student Loan Marketing Association, the Federal Farm Credit System, the Tennessee Valley Authority, or any other United States government sponsored agency; (c) cash; and (d) commercial or finance company paper (including both non-interest bearing discount obligations and interest bearing obligations payable on demand or on a specific date not more than 270 days after the date of issuance thereof) that is rated at least "A-1" by S&P, "P-1" by Moody's and "F1" by Fitch, if rated by Fitch, provided that the issuer thereof is subject to U.S. law; (2) non-callable; (3) that, as of each respective Delivery Date, mature on or before the next succeeding Bond Payment Date.

RFA § 1, Ex. A. In other words, LBSF was allowed to choose among several specific types of securities instruments, such as treasury securities, agency securities, and commercial paper.

21. While LBSF had the right to select which Eligible Securities to deliver on each delivery date, those Eligible Securities had to be "Qualified Securities" under the terms of the

RFA.  The RFA required that those securities "(i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Scheduled Reserve Amount."  RFA § 1.

22. By its terms, the RFA was scheduled to terminate on June 1, 2047.  However, the RFA could also be terminated upon the occurrence of certain defined events of default, including, *inter alia*, LBSF's failure to deliver Qualified Securities on the deposit date and the insolvency of LBSF or LBHI.  RFA § 7.3.

23. Upon the occurrence of any event of default that resulted in the termination of the RFA, the Burdened Party was required to determine a "Termination Amount" pursuant to procedures specified in the RFA.  RFA, §§ 1, 7.6(b), 7.6(c).

24. Under the RFA, "Termination Amount" was defined to be an amount:

> [A]s determined by [the Burdened Party] reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers . . .  of the amount, if any, that each such Dealer would require [the Burdened Party] to pay the Dealer . . . or would pay to the Burdened Party . . . in consideration of such Dealer entering into an agreement with [the Burdened Party]. . . which would have the effect of preserving for [the Burdened Party] the economic equivalent of its rights under [the RFA] . . . provided, however that . . . (ii) if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations. . . . (iii) if [the Burdened Party] is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by [the Burdened Party] to be [the Burdened Party's] total losses and costs . . . or gains . . . in connection with the termination of this Agreement . . .

RFA, § 1.

25. Buckeye, as the "Burdened Party," was entitled to determine the Termination Amount, but any such determination had to be done "reasonably and in good faith."  Further, to the extent that Buckeye was unable to obtain three quotations for the amounts that dealers would

- 7 -

require in order to enter into economically equivalent transactions, Buckeye should then base any Termination Amount upon its total losses or gains.

26. The RFA explicitly highlighted certain risks Buckeye assumed by entering into the RFA with LBSF, including that Buckeye was foregoing "the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future." RFA § 5.4.

27. Buckeye also expressly confirmed in the RFA that it understood the bi-directional nature of the RFA. The RFA provided that a Termination Amount could be payable to LBSF upon the termination of the RFA and that, under certain circumstances, "the amount of any Termination Amount owed to Lehman by [Buckeye] could be substantial." RFA § 5.5.

### III. Buckeye's Termination of the RFA

28. On September 15, 2008, LBHI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. On October 3, 2008, LBSF also filed a voluntary petition for relief under chapter 11 in this Court. Both voluntary filings constituted events of default under the RFA. RFA § 7.3.

29. On September 19, 2008, Buckeye faxed and emailed a Notice of Termination of the RFA to LBSF pursuant to sections 7.3(d) and 7.6(c) of the RFA.

30. On that same day, Buckeye sent a Notice of Termination Amount pursuant to section 7.6(c) of the RFA, claiming that LBSF owed it a Termination Amount of $29,442,000 based upon "quotations solicited from three Dealers."

### IV. Buckeye's Determination of the Termination Amount Was Not Reasonably Determined in Good Faith

31. Buckeye purports to base its determination of the Termination Amount upon "quotations" it received from three dealers: Morgan Stanley, Citibank and Depfa Bank plc.

- 8 -

However, the amounts provided by the dealers vary dramatically, with over a $115 million difference between the highest and lowest amounts, as shown below:

| Dealer | Amount |
| --- | --- |
| Morgan Stanley | $3,966,000 |
| Depfa Bank plc | $29,442,000 |
| Citibank | $120,500,000 |

32.    The wide disparity of the values provided by the dealers calls into serious question the propriety of relying upon such values to determine the Termination Amount. Given the extremely large range of the values, there are no indicia of reliability of the responses. The values provided by the dealers do not seem to have any relation to the economic terms of the RFA and presumably reflect the influence of other factors. Given the issues with these values, Buckeye's use of the "middle quotation" was arbitrary and certainly not reasonable or done in good faith. The responses should have been disregarded by Buckeye as meaningless.

33.    In addition, the purported "quotations" upon which Buckeye relied were not quotations at all, but only non-actionable indications. In fact, each of the three dealers made clear in its response that the quote it was providing was indicative and not actionable. Such indications do not satisfy the requirement of the RFA that quotations should reflect "the amount, if any, that each such Dealer would *require* [the Burdened Party] to pay the Dealer . . . or would pay to the Burdened Party . . . in consideration of such Dealer entering into an agreement with [the Burdened Party] . . . which would have the effect of preserving for [Buckeye] the economic equivalent of its rights under [the RFA]." RFA § 1 (emphasis added). Consequently, Buckeye's

reliance on such indications – which do not meet the requirements of the RFA – was not appropriate or reasonable.

34. Upon information and belief, the quotation solicitation process conducted by Buckeye was not reasonable and deviated from the industry standard. Consequently, any attempt by Buckeye to rely upon such a flawed process must be rejected.

35. Thus, Buckeye failed to act "reasonably and in good faith" in determining the Termination Amount based upon a flawed quotation solicitation process that yielded only non-actionable quotes that did not remotely reflect the value of the RFA and ranged more than $115 million from each other.

## V. LBSF Was "In The Money" Under the RFA as of September 19, 2008

36. Using the industry standard methodology for determining the mid-market value of the RFA, LBSF was "in the money" under the RFA as of September 19, 2008, by approximately $20 million. Consequently, any Termination Amount payable under the RFA should have been paid by Buckeye to LBSF.

37. The fact that Buckeye's determination of the Termination Amount departs from the value of the RFA by nearly $50 million calls Buckeye's good faith and reasonableness into question. Upon information and belief, Buckeye was using the services of a financial advisor who was able to calculate and knew the value of the RFA as of September 19, 2008.

38. Buckeye's reliance on the values provided by the dealers, knowing that such values departed so significantly from the value of the RFA, was not reasonable. Instead, Buckeye should have determined its losses or gains under the RFA. Since Buckeye realized a gain by terminating the RFA (where it was "out of the money"), Buckeye should have turned that gain over to LBSF in the form of a multi-million dollar Termination Amount payment.

### VI. Buckeye Owes Contractual Default Interest to LBSF on the Termination Amount

39. When Buckeye determined the Termination Amount, it should have determined that a substantial payment was due to LBSF. Buckeye failed to pay LBSF the amount it was owed in September 2008 and still has not paid any portion of that amount in nearly eight years.

40. As a result, Buckeye owes interest to LBSF as provided in the RFA. The RFA specified that Buckeye was obligated to pay interest to LBSF on the unpaid Termination Amount at the Default Rate. RFA § 7.6. "Default Rate" is defined in the RFA as " a per annum rate equal to the lesser of (a) Federal Funds Rate plus 1% per annum, or (b) the maximum rate permitted by law." RFA § 1.

41. LBSF is entitled to interest that has accrued since the termination of the RFA on September 19, 2008 through the final payment of the Termination Amount, using the Federal Funds Rate plus 1% per annum as the Default Rate. RFA § 7.6. This interest continues to accrue until Buckeye pays in full.

### VII. Buckeye Filed Grossly Inflated Bankruptcy Claims in The Court Based Upon Its Unreasonable Determination of the Termination Amount

42. On September 21, 2009, Buckeye filed its Claims against LBSF and LBHI, claiming Buckeye was owed "not less than $29,442,000" plus interest and fees in connection with the termination of the RFA. Buckeye's Claims are based upon the same unreasonable determination of the Termination Amount detailed above. Accordingly, Lehman filed an objection to Buckeye's claims on December 21, 2015. Plan Administrator's Five Hundred Fifteenth Omnibus Objection to Claims, 1:08-BR-13555-SCC, Docket No. 51692 (Bankr. S.D.N.Y. Dec. 21, 2015).

43. There is no basis for any Buckeye Claim against LBSF or LBHI. Buckeye is not entitled to a claim in any amount because it was Buckeye, not LBSF, which owed a Termination Amount payment. Consequently, Buckeye's Claims should be disallowed and expunged.

44. Buckeye's filing and maintaining of these unfounded Claims has prejudiced LBSF, LBHI and their respective unsecured creditors, as LBSF and LBHI have been forced to maintain millions of dollars in excessive reserves in connection with these Claims that would otherwise have been distributed to LBSF's and LBHI's legitimate unsecured creditors.

## FIRST CAUSE OF ACTION
(**Breach of Contract**)

45. LBSF repeats and incorporates the allegations contained in the foregoing paragraphs as if set forth fully herein.

46. The RFA constituted a valid contract between LBSF and Buckeye.

47. LBSF has performed its duties under the RFA.

48. Buckeye breached the RFA by failing to determine the Termination Amount reasonably and in good faith.

49. Buckeye further breached the RFA by failing to pay to LBSF the Termination Amount.

50. As a direct and proximate result of Buckeye's breaches of the Agreement, LBSF has been damaged in an amount to be proved at trial, representing the value of Buckeye's gain as of September 19, 2008, plus interest, which continues to accrue until payment is made to LBSF.

**SECOND CAUSE OF ACTION**
**(Declaratory Judgment regarding the**
**Disallowance of Buckeye's Claims)**

51.   Plaintiffs repeat and incorporate the allegations contained in the preceding paragraphs as if set forth fully herein.

52.   Plaintiffs have objected to Buckeye's Claims and seek entry of a judgment against Buckeye expunging and disallowing its Claims pursuant to section 502(b) of the Bankruptcy Code on the basis that LBSF and LBHI have no liability to Buckeye.

53.   As set forth above, Buckeye has failed to determine the Termination Amount reasonably and in good faith as required by the RFA.  As a result, Buckeye's determination underlying its Claims is unsupportable.

54.   Valuing the RFA in a reasonable and good faith manner, as required by the RFA, yields a Termination Amount greatly in LBSF's favor and results in Buckeye owing millions of dollars to LBSF.  Accordingly, LBSF and LBHI do not owe any amounts to Buckeye, so Buckeye's Claims are not valid.

55.   There is an actual controversy between the parties regarding whether Buckeye calculated the Termination Amount reasonably and in good faith.  The controversy is now ripe for adjudication pursuant to 28 U.S.C. § 2201.

56.   Pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007, therefore, the Plan Administrator requests that the Court disallow and expunge Buckeye's Claims in their entirety.

57.   The Plan Administrator hereby expressly reserves the right to further object to the Claims on any other basis.

58.   Unless the Court makes a declaration of the rights and obligations of the parties under the RFA, Plaintiffs will continue to suffer substantial harm, including but not limited to

requiring LBSF to continue to maintain a cash reserve in connection with Buckeye's invalid Claims. In addition, LBSF will be deprived of the Termination Amount that it is owed from Buckeye.

59. Accordingly, Plaintiffs request that the Court enter a declaratory judgment that Buckeye's Termination Amount was not calculated reasonably and in good faith, and must be disregarded.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Buckeye as follows:

(1) Determining that Buckeye has breached the RFA and owes LBSF damages in an amount to be determined at trial;

(2) Disallowing and expunging the Claims in their entirety as set forth herein;

(3) Awarding declaratory judgments in favor of Plaintiffs;

(4) Pre-judgment and post-judgment interest; and

(5) Granting such further relief as the Court deems just and proper.

Dated: July 1, 2016
      New York, New York

JONES DAY

   /s/ *Laura W. Sawyer*
Jayant W. Tambe
Laura Washington Sawyer
Jennifer L. Del Medico
Joseph J. Boylan
250 Vesey Street
New York, New York  10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for Lehman Brothers Holding Inc., on behalf of itself and in its capacity as Plan Administrator, and Lehman Brothers Special Financing Inc.*