WHITE & CASE LLP
David G. Hille, Esq.
Gregory M. Starner, Esq.
1155 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113

*Counsel for SRM Global Master Fund Limited Partnership*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

| | |
|---|---|
| **In re** | : |
| | : Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : 08-13555 (SCC) (Jointly |
| | : Administered) |
| Debtors. | : |
| | : |

------------------------------------------------------------------- x

### SRM GLOBAL MASTER FUND LIMITED PARTNERSHIP'S RESPONSE TO THE PLAN ADMINISTRATOR'S OBJECTION TO CLAIM NUMBER 29606

SRM Global Master Fund Limited Partnership ("SRM"), through its undersigned counsel, hereby responds to the *Plan Administrator's Objection to Claim Number 29606* [Dkt. No. 53215] (the "Objection") filed by Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator.[1]  In support of its response, and in reference to the Expert Opinion of Lord Collins of Mapesbury (the "Collins Declaration"), the Declaration of Philip Ian Price (the "Price Declaration"), and the Declaration of Jonathan Wood (the "Wood Declaration"); SRM respectfully represents as follows:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

# PRELIMINARY STATEMENT

1.      Through the Objection, LBHI seeks to wholly disallow the claims asserted by SRM pursuant to the broad guarantee issued by LBHI that fully guaranteed "the payment of all liabilities, obligations, and commitments" of LBIE.  LBHI fails to carry its substantial burden of establishing that, as a matter of law, SRM has not adequately pleaded claims for relief.

2.      First, SRM has sufficiently pled its claim to enforce the Global Guarantee (defined below) issued by LBHI.  SRM has sufficiently put LBHI on notice of its guaranty claim, which is all that is required at this stage, and also alleged facts from which it can be reasonably inferred that SRM knew of and relied on the Global Guarantee.  Nor is SRM precluded from enforcing the Global Guarantee against LBHI by the Prime Brokerage Agreement dated May 9, 2008 (the "PBA") pursuant to which LBIE acted as a prime broker to SRM.  In any case, under English law, LBHI is not a third party beneficiary of the PBA and cannot enforce or rely on the PBA to avoid its obligations under the Global Guarantee. Furthermore, the question of SRM's reliance is ultimately a question of fact, and the evidence will demonstrate that SRM relied on the Global Guarantee when it entered into the prime broker relationship with LBIE.

3.      Second, LBHI contends, as a matter of law, that SRM's claims are precluded by the exculpatory provisions in the PBA.  This argument fails because SRM has sufficiently alleged breaches of the PBA and the CMNA (defined below) and breaches of trust by LBIE that are not barred by the PBA.  As alleged in SRM's proof of claim [Claim No. 29606] (the "Proof of Claim"), LBIE breached its agreement with SRM as well as its duties as trustee of SRM's assets by failing to keep segregated, and not rehypothecate, the assets posted by SRM under the PBA, and also by refusing to return SRM's assets that LBIE held on trust, and further by failing to provide margin notices as required under the CMNA.  The exculpatory provisions in the PBA do not preclude these claims as a matter of law, and whether they even apply (which they do not)

is ultimately a question of fact.  In any case, LBIE's breaches of the PBA fall outside the scope of the exculpatory provision, and the CMNA does not limit or bar SRM's recovery of damages in any way.

4.     <u>Third</u>, LBHI's arguments regarding SRM's damages are similarly flawed.  SRM has sufficiently alleged cognizable damages, and LBHI's arguments regarding how SRM's damages should ultimately be calculated are premature at this stage.  In any event, neither the Bankruptcy Code nor the relevant agreements limit SRM's damages in the ways asserted by LBHI, and SRM is entitled to pursue all of its damages theories.

5.     LBHI fails to carry its substantial burden of establishing, as a matter of law, that SRM cannot pursue any recovery on its claims.  At this early stage of the litigation, all that matters is that SRM has given LBHI fair notice of its claims, and LBHI has not established as a matter of law that SRM failed to state plausible claims for relief after all of SRM's factual allegations are accepted as true and all reasonable inferences are drawn in SRM's favor.  Accordingly, this Court should deny the Objection.  At a minimum, the Court should schedule an evidentiary hearing and allow SRM to take discovery and present evidence in support of its claims.

## JURISDICTION

6.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334.

## FACTUAL ALLEGATIONS AND BACKGROUND[2]

### I.    SRM ENTERS INTO A PRIME BROKERAGE ARRANGEMENT WITH LBIE

7.    SRM is an exempted limited partnership established under the laws of the Cayman Islands formed in 2006.  See Wood Decl. ¶ 1.  As part of its business, SRM entered into prime brokerage relationships with several well-known institutions.  In or around March 2008, SRM began discussing entering into a broker arrangement with LBIE, a subsidiary of LBHI that is not a debtor in these Chapter 11 Cases.  Id. ¶ 4.

8.    Although LBIE's franchise was relatively new and less established than that of several other brokerages in London, SRM began to explore a potential prime brokerage arrangement with LBIE in the early spring of 2008 to diversify and supplement its existing prime brokerage relationships. Id. ¶ 4.  SRM was impressed by LBIE's stated intention of treating SRM as an important client.  See id. ¶ 4; see also Price Decl. ¶ 9.

9.    In the course of negotiating a prime brokerage relationship, SRM raised concerns about counterparty risk and sought assurances regarding LBIE's creditworthiness and credit support.  Id. ¶ 6.  LBIE assured SRM that, among other things, LBIE's obligations under brokerage agreements were guaranteed by LBHI pursuant to that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated June 9, 2005 (the "Global Guarantee").  Id. ¶ 7.[3]  The Global Guarantee provided that

---

[2] For purposes of the Objection, all factual allegations in the Proof of Claim must be accepted as true. SRM has also included in this response additional facts supported by the declarations of Messrs. Wood and Price to supplement SRM's Proof of Claim and assist the Court.  This Court has previously considered declarations and other materials submitted by parties in connection with a Sufficiency Hearing.  See, e.g., Mem. Decision Overruling Debtors' Obj. to CMBS Claims [Dkt. No. 45411] at 3, n.4 (July 28, 2014); Mem. Decision Sustaining Debtors' Obj. to Proofs of Claim Filed by 213847 Ontario Ltd. and 6785778 Canada Inc. [Dkt. No. 45858] at 5 (Aug. 19, 2014) (considering declarations and exhibits filed by the parties). If the Court would prefer or deems it necessary, SRM can more formally amend or supplement its Proof of Claim.

[3] The Global Guarantee is attached to the Objection as Exhibit C.

LBHI "fully guarantee[d] the payment of all liabilities, obligations, and commitments of [certain specified subsidiaries, including LBIE]. . . ." Global Guarantee at 2.[4]

10.     LBHI also issued the Guarantee of Lehman Brothers Holdings Inc. dated January 4, 2008 (the "LBHI 2008 Guarantee") which further confirmed that LBHI "absolutely and unconditionally guarantee[s] the payment by Lehman Brothers International (Europe) ('Affiliate') of all Affiliate's liabilities, obligations and commitments to any counterparty. . . ."[5]

11.     It was only after receiving assurances about the guarantee of LBIE's obligations by LBHI, and in reliance on such assurances, that SRM was willing to enter into a prime brokerage arrangement with LBIE.  See Price Decl. ¶ 7.

12.     To memorialize their relationship, LBIE and SRM executed a series of agreements including a Prime Brokerage Agreement dated May 9, 2008 (the "PBA"),[6] a Master Institutional Futures Customer Agreement dated on or about May 9, 2008 (the "MIFCA"), and a Cross Margining and Netting Agreement dated May 9, 2008 (the "CMNA")[7] (collectively with the ISDA Agreement, the "Brokerage Agreements").

13.     Pursuant to the PBA, LBIE acted as a prime broker to SRM.  The CMNA required LBIE to calculate SRM's margin requirements on a net basis across the other Brokerage Agreements and provide SRM with daily margin notices.  The MIFCA governed the purchase and sale of certain securities and other exchange-traded futures and option contracts.

---

[4] In addition to the representations made by LBIE to SRM, LBHI repeatedly represented to the marketplace and investing public that LBHI "guarantee[s] all of the obligations of certain subsidiaries…." See, e.g., LBHI's 2006 Form 10-K at F-7 (Feb. 13, 2007) and 2007 Form 10-K at 134 (Jan. 29, 2008); excerpts attached hereto as Exhibit 1. Credit agencies and other market analysts relied on the fact that LBIE was a guaranteed, indirect, wholly-owned subsidiary of LBHI in assessing the value of LBIE. See, e.g., Fitch Ratings, Press Release: Fitch Rates Lehman Brothers International (Europe) 'A+/F1+' (Nov. 13, 2006), attached hereto as Exhibit 2 ("The ratings assigned to LBIE mirror the ratings of its ultimate parent and guarantor, LBHI").

[5] The LBHI 2008 Guarantee is attached hereto to as Exhibit 3.

[6] See Objection Exhibit D.

[7] See Objection Exhibit E.

## II.    LBIE AGREES TO SEGREGATE AND NOT REHYPOTHECATE SRM'S ASSETS

14.    During the negotiations of the PBA, between March and April 2008, LBIE agreed to provide SRM with a tailored pricing scheme for LBIE's prime brokerage services:  LBIE would charge SRM its lower rate, provided that SRM did not pre-emptively designate all of its securities as ineligible for rehypothecation.  See Price Decl. ¶¶ 8-9.  LBIE also agreed to provide SRM with notice if LBIE intended to rehypothecate or dispose of SRM's posted securities and give SRM an opportunity to exclude any of SRM's posted securities from any proposed rehypothecation or disposal.  Id. ¶ 9.

15.    Pursuant to paragraph 11.6 of the PBA, LBIE and SRM also agreed that SRM could affirmatively designate certain collateral, including securities posted by SRM and held by LBIE, for segregation (meaning such assets could not be pooled or commingled with other customers' assets under any circumstances).  LBIE agreed to not hypothecate, dispose of or otherwise use any such collateral for its own purposes, and to keep such collateral in a separate account on trust for SRM (such segregated collateral referred to as "Ineligible Positions" in the PBA).  See PBA at ¶ 11.6.

16.    From the time of the execution of the PBA in May 2008 until LBIE was placed in administration, LBIE never indicated or provided any notice to SRM of any intent to rehypothecate or dispose of any of SRM's posted securities.  Wood Decl. ¶ 9.  To the contrary, although SRM and LBIE personnel were in near daily contact, LBIE never requested to rehypothecate SRM's assets and consistently assured SRM that its assets had not been, and would not be, rehypothecated.  Price Decl. ¶ 10.

17.    During an unprecedented week of instability in the markets, on or about September 12, 2008, SRM met with representatives of LBIE to address SRM's concerns about

counterparty risk.  Id. ¶ 11.  During this meeting, the representatives of LBIE assured SRM that

LBIE had not rehypothecated or otherwise disposed of any of the securities that SRM had posted

as collateral and LBIE reconfirmed it would not do so without prior notice to SRM.  Id. ¶ 11; see

also Wood Decl. ¶ 10.

### III.    LBHI FILES FOR BANKRUPTCY AND LBIE ENTERS ADMINISTRATION

18.    On September 15, 2008 (the "Petition Date"), LBHI filed a voluntary petition for

relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code").    On the same date, LBIE was placed into English administration

proceedings pursuant to the English Insolvency Act 1986.

19.    SRM immediately sought to confirm that LBIE had not rehypothecated or

otherwise disposed of SRM's posted securities and to ensure that LBIE would keep SRM's

assets segregated as LBIE promised just a few days prior.  To this end, SRM wrote to LBIE to

designate all of SRM's positions, including securities, cash, and other properties held as custody

assets or by way of margin or collateral, as Ineligible Positions.  See Wood Decl. ¶ 12; Wood

Decl., Ex-JW1.

20.    On or around September 16, 2008, LBIE disclosed to SRM for the first time that

while certain of SRM's posted securities were held by LBIE in a segregated account (including

5,094,060 shares of Virgin Media, Inc. common stock, the "Virgin Media Shares"), LBIE had

failed to segregate certain of SRM's other posted securities.  See id. ¶ 12.

21.    With the markets continuing to deteriorate, SRM took immediate steps to close

out its open positions and ensure that its rights and interests were protected from LBIE's sudden

collapse.  To this end, on September 18, 2008, SRM gave notice of termination of the ISDA

Agreement.  See Wood Decl. ¶ 13.  On September 26, 2008, SRM notified LBIE that SRM had

exercised its rights of set-off and, accordingly, set-off a portion of the amount owed to SRM

under the ISDA Documentation against amounts SRM owed to LBIE under the PBA.  <u>See</u> <u>id.</u> ¶ 15; Wood Decl., Ex-JW3.  SRM also requested the return of those SRM assets that LBIE had agreed to and was required to segregate (the "<u>Segregated Assets</u>"), including the Virgin Media Shares, as well as the margin cash provided by SRM pursuant to the MIFCA (the "<u>Margin Cash</u>").  Wood Decl. ¶ 16.  LBIE failed to return the Segregated Assets or the Margin Cash in response to that or any other contemporaneous request from SRM.  <u>Id.</u> ¶ 17.

22.    Separately, LBIE abruptly stopped providing SRM with daily margin notices in breach of LBIE's obligations under the CMNA.  From the execution of the CMNA (May 9, 2008) through September 12, 2008, LBIE provided SRM with a margin notice on a daily basis as required by the CMNA.  At that time of such market distress, the provision of the daily margin notice became even more critical for SRM to manage its risk and exposure as SRM's margin requirements with LBIE and other brokers increased daily.  <u>Id.</u> ¶ 25.  During this period of market instability, SRM was forced to sell off many positions it would have otherwise held in order to cover margin calls from its brokers, and SRM's management was forced to devote an inordinate amount of time to managing the fallout from LBIE's collapse.  <u>Id.</u> ¶¶ 26-31, 35-40.

23.    LBIE abruptly sent SRM a margin notice on October 30, 2008 (the "<u>October 30 Margin Notice</u>").  <u>Id.</u> ¶ 19; Wood Decl., Ex-JW4.  This caught SRM, who had by then closed out its positions, by surprise: in addition to being late (and following 34 days after SRM's set-off, and without any reference to SRM's set-off), the October 30 Margin Notice was also wrong—it stated that SRM was a net debtor to LBIE in the amount of $101,800,000, contrary to SRM's previous correspondence and the set-off SRM had effectuated as of September 26, 2008.  <u>Id.</u> ¶¶ 20-21.  While SRM believed the October 30 Margin Notice was erroneous and that its prior set-off was valid and effective (and thus there were no positions that remained open), the markets

continued to deteriorate dramatically and the position adopted by LBIE exposed SRM to potentially catastrophic margin requirements that would have presented a serious financial risk to the fund.   Wood Decl. ¶ 27.   SRM could not risk inaction in respect of the positions LBIE alleged remained open.   LBIE calling an event of default under the PBA would potentially have had disastrous consequences for the continuing operation of the fund.   Accordingly, SRM had no choice but to terminate the PBA.   Id. ¶¶ 22-23.

## IV.   **SRM PURSUES CLAIMS AGAINST LBIE**

24.   Given LBIE's failure to return SRM's assets and the substantial damage LBIE's actions caused to SRM's business, SRM pursued a series of claims against LBIE.   SRM's claims were for (a) certain sums under the ISDA Agreement; (b) cash margin provided pursuant to the MIFCA; (c) damages for LBIE's failure to return its Segregated Assets; (d) damages for forced sales of other assets occasioned by LBIE's failure to return the Segregated Assets; and (e) damages flowing from the unprecedented disruption to SRM's ability to carry out its business.

25.

Americas 91352871



## V.    SRM FILES ITS PROOF OF CLAIM AGAINST LBHI

26.    In compliance with the bar date in these Chapter 11 Cases, on September 21, 2009, ▮▮▮▮▮▮▮▮▮▮▮ SRM filed its Proof of Claim against LBHI [Claim No. 29606].  The Proof of Claim asserted claims against LBHI in the aggregate amount of $305,039,923, consisting of:  (a) $49,389,923 owing on account of its ISDA Transactions (the "ISDA Claim"); (b) $8,894,605 for the return of cash margin (including applicable interest) as of September 25, 2008; (c) $48,300,000 owing on account of damages resulting from LBIE's failure to return certain collateral that forced SRM to sell certain of its positions to cover margin calls; (d) approximately $106,600,000 on account of the then-current value of certain of the Segregated Assets, which consisted of the Virgin Media Shares held by LBIE,[10] and certain margin cash; (e) approximately $100 million on account of lost investment opportunities suffered due to the diversion of SRM's management resources; and (f) $750,000 in



legal fees and expenses then incurred.  <u>See</u> Proof of Claim at ¶ 18.[11]  SRM also filed a Guarantee

Questionnaire as part of its Proof of Claim.[12]

      27.     On June 10, 2015, nearly six years after the filing of the Proof of Claim, LBHI

filed a motion [Dkt. No. 49954] (the "<u>Estimation Motion</u>") seeking to estimate SRM's claims at

zero dollars.  SRM filed an objection [Dkt. No. 50319] and LBHI withdrew the Estimation

Motion as to SRM's claims.  LBHI then sought and received broad, one-sided discovery from

SRM pursuant to Bankruptcy Rule 2004.[13]  SRM has not had the opportunity to obtain any

discovery in connection with its Proof of Claim.  On May 20, 2016, without any prior notice,

LBHI filed the Objection.

## VI.    <u>LBHI FILES THE OBJECTION</u>

      28.     The Objection disputes three of SRM's claims against LBHI under the Global

Guarantee:[14]

- <u>The Segregated Assets Claim</u>.  Pursuant to this claim, LBIE breached its agreement with SRM and its duties as trustee of SRM's assets by (i) failing to segregate certain securities posted by SRM; and (ii) refusing to return SRM's Segregated Assets it had not rehypothecated.[15]  SRM seeks to be put in the position it would rightfully have been in had LBIE not breached its obligations as Prime Broker and trustee.

- <u>The Forced Sales Claim</u>.  Under this claim, LBIE's failure to return SRM's Segregated Assets forced SRM to prematurely liquidate positions at highly

---

[11] SRM reserved its right to amend or supplement its Proof of Claim, including for purposes of fixing, increasing or amending the amounts referred to within it and for adding or amending documents and other information and further describing the claims.  Proof of Claim at ¶ 20.

[12] <u>See</u> Confirmation of Submission of SRM's Guarantee Questionnaire, attached hereto as Exhibit 6.

[13] SRM produced over 10,224 pages of documents to LBHI and made itself available to assist in evaluating SRM's claims.

[14] The ISDA Claim is not the subject of the Objection.  <u>See</u> Objection at 6, n.2. LBHI also guaranteed LBIE's obligations under the ISDA agreement separately, pursuant to that certain Guarantee of Lehman Brothers Holdings Inc. (London Branch) dated May 12, 2008.  SRM's ISDA Claim remains outstanding.  <u>See</u> Proof of Claim ¶ 18.

[15] <u>See</u> Proof of Claim at ¶¶ 13-16.

disadvantageous prices to cover margin requirements at its other brokerages as a result of the unavailability of its wholly unencumbered Segregated Assets.[16]

- <u>The Lost Opportunities Claim</u>.  SRM seeks to recover the damages arising from the unprecedented and inordinate diversion of SRM's senior management's time occasioned by LBIE's breaches of its obligations to SRM, including, <u>inter alia</u>, LBIE's failures under the CMNA and the PBA. [17]

## RESPONSE TO OBJECTION

### I.    PLEADING STANDARDS

29.    LBHI's Objection has triggered a Sufficiency Hearing.[18]    As LBHI acknowledges, the standard of review at this preliminary stage is "equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim."  Procedures Order at ¶ 4(a)(i).  The Rule 12(b)(6) motion to dismiss standard is made applicable in these proceedings by Bankruptcy Rule 7012(b).

30.    Under the applicable standard, the Court must accept SRM's factual allegations as true and draw all reasonable inferences in SRM's favor.  <u>See</u> <u>In re Lehman Brothers Holdings Inc.</u>, 515 B.R. 171, 174 (S.D.N.Y. 2014) (citing <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atlantic Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 555-56 (2007); <u>E.E.O.C.</u> v. <u>Staten Island Sav. Bank</u>, 207 F.3d 144, 148 (2d Cir. 2000)).  The appropriate inquiry for this Court in reviewing SRM's claims "is not whether a plaintiff is likely to prevail, but whether [SRM] is entitled to offer evidence to support [its] claims."  <u>In re Lehman Brothers Holdings Inc.</u>, 515 B.R. at 175 (citing <u>Chance</u> v. <u>Armstrong</u>, 143 F.3d 698, 701 (2d Cir. 1998)).  SRM need only provide LBHI "fair notice of the basis for [SRM's] claims" in order for its proof of claim to survive at this early

---

[16] <u>See</u> Proof of Claim at ¶¶ 13-16.

[17] <u>See</u> Proof of Claim at ¶ 17.

[18] As defined in the *Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors* [Dkt. No. 8474] (Apr. 19, 2010) (the "<u>Procedures Order</u>").

stage. See In re Awal Bank, BSC, 455 B.R. 73, 85 (Bankr. S.D.N.Y. 2011) ("Detailed factual allegations are unnecessary and a Complaint that states a plausible claim for relief will survive a motion to dismiss."). Additionally, to the extent a disputed contractual provision is subject to alternative, reasonable interpretations, dismissal of SRM's claims is not warranted. See Payday Advance Plus, Inc. v. Findwhat.com, 478 F. Supp. 2d 496, 502-03 (S.D.N.Y. 2007) (denying motion to dismiss "where the language is subject to more than one reasonable meaning and where extrinsic evidence of the parties' intent exists, the question of the proper interpretation should be submitted to the trier of fact"); Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993) (same).

31.    As set forth below, LBHI has failed to establish that SRM has not stated a plausible claim for relief, and the Objection should be denied.

## II.    FOREIGN LAW STANDARD

32.    English law governs the Brokerage Agreements between SRM and LBIE. LBHI has submitted a declaration of Sir John Chadwick (the "Chadwick Declaration") under the guise of a Rule 44.1 foreign law opinion. However, the Chadwick Declaration offers almost no opinions on the applicable principles of English law and instead purports to offer conclusions regarding the ultimate issues and questions of contract interpretation.

33.    It is well established that "[t]he purpose of an expert witness in foreign law is to aid the court in determining the content of the applicable foreign law, not to apply the law to the facts of the case." 9A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2444 (3d ed. 2016); see also Bigio v. Coca-Cola Co., No. 97 Civ. 2858, 2010 WL 3377503, at *5 (S.D.N.Y. Aug. 23, 2010), aff'd, 675 F.3d 163 (2d Cir. N.Y. 2010) (discounting plaintiff's expert "partisan statement" in favor of defendant's expert's "succinct statement of [foreign] law");

HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc., 264 F.R.D. 146, 148 (D.N.J. 2009) (same).

34.     Here, the Chadwick Declaration goes far beyond the proper scope of a Rule 44.1 submission and offers nothing more than Chadwick's own interpretation of the contracts at issue. Indeed, Chadwick admits that he has been asked to determine "the likely outcome if SRM had sued LBIE in England for the losses in respect of which it has advanced [its claims.]" Chadwick Decl. ¶ 9. There is absolutely no reference to any English legal authorities, treatises or judicial decisions, and Chadwick does not articulate the legal principles and relevant legal standards that apply to the questions of contract interpretation or to any of SRM's claims. This type of submission does nothing to aid the Court in determining the content of the applicable foreign law. See, e.g., In re: Lyondell Chem. Co., 543 B.R. 428, 448 (Bankr. S.D.N.Y. 2016).

35.     This Court should disregard the Chadwick Declaration because it seeks to usurp the Court's exclusive authority to apply law to facts and to make ultimate determinations in the case. See, e.g., Hexamedics v. Guidant Corp., No. CIV 00-2532(PAM/JGL), 2002 WL 246678, at *7 (D. Minn. Feb. 8, 2002) (declining to rely on the testimony of a purported Rule 44.1 expert because the testimony went to the ultimate issue and usurped the province of the court.); Labuda v. Schmidt, No. 04 C 1281, 2005 WL 2290247, at *7 (N.D.Ill. Sept. 19, 2005) (recognizing that an affidavit from a Rule 44.1 expert that purports to address or resolve factual questions goes beyond the permissible ambit of Rule 44.1); ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc., 198 F. Supp. 2d 598, 623 (E.D.Pa. 2002) (disallowing testimony from a foreign law expert "to the extent that it seeks to guide the court in determining the facts of this case"); HTC Corp. v. IPCOM GmbH, No. 08-1897, 2009 WL 5908010, at *1 (D.D.C. Dec. 18, 2009) (accepting

witness testimony to the extent it merely stated what foreign law is while not considering expert's "discuss[ion] of the outcomes of the case" and any "opinions [that] appear partial").

36.     In contrast to LBHI's approach, SRM has filed with this submission the Declaration of Lord Lawrence Collins of Mapesbury (the "Collins Declaration"), a former member of the Supreme Court of the United Kingdom (the highest court in the United Kingdom) and Lord of Appeal in Ordinary of the House of Lords (formerly the highest court in the United Kingdom). The Collins Declaration provides this Court with a clear articulation of the applicable principles of English law, complete with citations to relevant authorities. Lord Collins does not opine on the meaning of the Brokerage Agreements or apply the facts of the case to those agreements, as that is clearly the province of this Court. See, e.g., Bodum USA, Inc. v. La Cafetiere, Inc., 621 F.3d 624, 629 (7th Cir. 2010) (recognizing that "objective, English-language" primary sources are more valuable to the Court than a "slant[ed]. . . warring declaration[].").

37.     This Court has previously recognized the value of succinct and researched expert testimony, crediting such submissions over conclusory and unsupported contrary assertions such as those proffered by LBHI here. In re Bozel S.A., 434 B.R. 108, 112-13 (Bankr. S.D.N.Y. 2010) (crediting well-supported expert testimony over competing expert who "failed to provide a reasonable basis for her legal conclusions," and identified no instances in which the issue was considered or decided by a Luxembourg court); see also Bigio, 2010 WL 3377503, at *5 (relying on "succinct statement of Egyptian law" over competing "conclusory, partisan statement"); Ancile Inv. Co. v. Archer Daniels Midland Co., No. 08 CV 9492 KMW, 2012 WL 6098729, at *5-6 (S.D.N.Y. Nov. 30, 2012), aff'd, 538 F. App'x 19 (2d Cir. 2013) (finding expert declaration

relying on expert's opinion—and not providing judicial precedents—should not be relied on by the court).  Accordingly, SRM requests that the Chadwick Declaration be disregarded in full.

## III.    LBHI'S GUARANTEE OF LBIE IS ENFORCEABLE BY SRM

38.    SRM seeks to enforce the Global Guarantee issued by LBHI that fully guarantees "the payment of all liabilities, obligations, and commitments" of LBIE.  LBHI does not (seriously) dispute the validity of the Global Guarantee,[19] or that the Global Guarantee was intended to and does guarantee all of LBIE's obligations.[20]  Rather, LBHI argues that SRM has not sufficiently alleged that it relied on the Global Guarantee and that SRM is in any event precluded by the PBA from recovering under the Global Guarantee. Objection ¶ 33.  Both of LBHI's arguments are without merit.

### A.    SRM Has Sufficiently Pled Guarantee Liability

39.    SRM has sufficiently put LBHI on notice of its guaranty claim, which is all that is required at this stage.  SRM's Proof of Claim clearly alleges that "LBIE's obligations under the PBA, MIFCA, and the CMNA are guaranteed by LBHI pursuant to that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers

---

[19] LBHI does not dispute the guarantee's validity but purports to "reserve all of its rights to argue, that the Corporate Resolution [that approved the Global Guarantee] is not a guaranty contract of any kind and that the Resolution would not satisfy the Statute of Frauds." Objection at 10, n.7.  This is a remarkable suggestion.  LBHI repeatedly represented to the marketplace and investing public that LBHI "guarantee[s] all of the obligations of certain subsidiaries…" See, e.g., LBHI's 2006 Form 10-K at F-7 (Feb. 13, 2007) and 2007 Form 10-K at 134 (Jan. 29, 2008), excerpts attached hereto as Exhibit 1.  As LBHI has already acknowledged in these cases, the Global Guarantee was enacted to enable the Guaranteed Subsidiaries to transact business with third parties.  See Disclosure Statement at 12 [Dkt. No. 13505] (Dec. 15, 2010) ("Investment banks . . . such as Lehman Brothers [] guaranteed the obligations of their respective trading subsidiaries as a matter of course. . . . [and] LBHI guaranteed its subsidiaries' obligations in almost every trade to assure the counterparty that its trades would execute and settle as contemplated by the governing ISDAs.").  LBHI's covert suggestion that the Global Guarantee is unenforceable and "not a guaranty" is tantamount to an admission of securities fraud, among other things.  Furthermore, the Examiner in these cases has already recognized the validity of the Global Guarantee, concluding that it "may be viewed as a unilateral contract for a general guaranty that may be enforced by 'anyone to whom it is presented who acts upon it.'"  See Report of Anton R. Valukas, Examiner, Vol. 5 of 9, at 1775 [Dkt. No. 8307] (Mar. 14, 2010).

[20] SRM agrees with LBHI that the Global Guarantee—which by its express terms "fully guarantee[d] the payment of all liabilities, obligations, and commitments of [certain specified subsidiaries, including LBIE]"—is a general guaranty. See Objection ¶ 30.  A general guaranty "is addressed to persons generally and may be enforced by anyone to whom it is presented." See 38 AM. JUR. 2D Guaranty § 14.

Holdings Inc. dated June 9, 2005" and that "the Global Guarantee effected a guarantee by LBHI of all liabilities and obligations of LBIE." See Proof of Claim ¶ 7. Additionally, when SRM submitted its Guarantee Questionnaire, SRM attached the Global Guarantee as "the specific promise, representation and/or agreement (including any corporate resolutions) under which your claim arises against the Guarantor."[21]

40.     The primary purpose of a proof of claim is "to ensure that all those involved in the proceeding will be made aware of the claims against the debtor's estate and will have an opportunity to contest those claims." In re Chateaugay Corp., 94 F.3d 772, 777 (2d Cir. 1996) (quoting In re PCH Assocs., 949 F.2d 585, 605 (2d Cir. 1991)). This is a "relatively low threshold," and "as long as a proof of claim provides fair notice and the court can glean an actionable claim from the complaint, the court must entertain the party's case." In re F-Squared Inv. Mgmt., LLC, 546 B.R. 538, 544 (Bankr. D. Del. 2016). LBHI cannot credibly claim that SRM's Proof of Claim and Guarantee Questionnaire did not provide notice that SRM brought its claims in reliance on the Global Guarantee, nor has LBHI even asserted that it "was in fact surprised" by SRM's pleading in this regard. In re Chateaugay Corp., 94 F.3d at 777 (upholding proof of claim and noting that objector put forward no evidence that it was in fact surprised by creditor's assertion of right).

41.     LBHI nonetheless argues that SRM has failed to sufficiently plead that it knew of and relied on the Global Guarantee.[22] Objection at 12. This argument is without merit. As an

---

[21] See Exhibit 6 (Confirmation of Submission of SRM's Guarantee Questionnaire) at 2.

[22] Reliance is likely not even required to enforce the Global Guarantee. While SRM maintains that it did in fact rely on LBHI's guarantee of LBIE (infra ¶¶ 42-44), the Global Guarantee is also a duly authorized resolution of the Executive Committee of LBHI to indemnify LBIE's creditors with respect to the non-payment of LBIE's debts. As such the Global Guarantee is analogous to a company's certificate of incorporation or other enabling documents which typically indemnify third parties. Accordingly, the Global Guarantee reflects LBHI's agreement to indemnify LBIE's creditors such as SRM who are express and intended third-party beneficiaries of the Global Guarantee. A third party may enforce and recover on a promise made for his or her benefit without knowledge of that promise. See, e.g., 22 N.Y. Jur. 2d Contracts § 317 ("In order for a third party to recover on a contract made for his or her

initial matter, LBHI has already conceded that a completed Guarantee Questionnaire evinces reliance on the guarantees, noting that it is "the debtors' view that any submission in connection with a proof of claim submitted under penalty of perjury is done with the utmost veracity and folks would submit guaranties only to the extent that they relied upon them in the underlying transaction."[23]    Accordingly, SRM sufficiently demonstrated its reliance when it submitted copies of the guarantee upon which it relied through the Guarantee Questionnaire.[24]

42.    SRM has also alleged facts from which it can be reasonably inferred that SRM knew of and relied on the Global Guarantee at the time it entered into the Brokerage Agreements.  Gerrity v. R.J. Reynolds Tobacco Co., 399 F. Supp. 2d 87, 94 (D. Conn. 2005) (denying motion to dismiss improper marketing and promotion claim where reliance—an element of the claim—could be reasonably inferred from the allegations in the complaint); O'Neill v. New York Univ., 97 A. 3d 199, 211-12 (N.Y. 1st Dep't 2012) (reinstating cause of action for breach of contract where allegations were sufficient to infer reliance).  Magic words are not required.  See U.S. Bank Nat'l Ass'n v. PHL Variable Co., No. 12 Civ. 6811, 2013 U.S. Dist. LEXIS 38768, at *24-25 (S.D.N.Y. Mar. 5, 2013) ("The proper inquiry here is not whether the Complaint contains the phrase, 'reasonable reliance,' but whether the pleadings plausibly

---

benefit, it is not essential that he or she knew of the contract at the time it was made"); Septembertide Pub., B.V. v. Stein & Day, Inc., 884 F.2d 675, 679 (2d Cir. 1989).

[23] See Hr'g Tr. at 104:15-10 [Dkt. No. 4183] (June 24, 2009).  At the time LBHI was establishing the requirements for proofs of claim in these cases, it also contemplated including a certification in the Guarantee Questionnaire to allow a claimant to check a box to certify it relied on the guaranty. Id. at 103:22-104:5.  Such an option on the Guarantee Questionnaire would have allowed claimants such as SRM to easily indicate their reliance, but LBHI ultimately elected to omit the certification question.  LBHI's election to not include an easy way for creditors to certify reliance is all the more reason why SRM's allegations regarding the enforceability of Global Guarantee should be deemed sufficient.

[24] See Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, entered July 2, 2009 [Dkt. No. 4271] at Exhibit D. (Guarantee Questionnaire) (short instructions state "information stated on or uploaded on this website is being submitted as part of the Proof of Claim form.")

alleges facts from which it can be inferred that the plaintiff reasonably relied on the defendant's representations"); Morse/Diesel, Inc. v. Trinity Indus., 655 F. Supp. 346, 354 (S.D.N.Y. 1987) ("While Trinity does not use the word 'rely', it does plead facts which can be construed as indicating it relied on McNulty's misrepresentations.").

43.     Here, it is undisputed that at the time SRM entered into the Brokerage Agreements with LBIE, LBHI had issued the Global Guarantee which guaranteed "the payment of all liabilities, obligations, and commitments" of LBIE.   Indeed, LBHI publicly touted the Global Guarantee and it was well known in the market.[25]   It can therefore be reasonably inferred that SRM, a hedge fund that specialized in identifying and managing risk, including counterparty credit risk, would have known about and relied on the existence of LBHI's broad guarantee of all of LBIE's "liabilities, obligations, and commitments" when SRM agreed to enter into a prime brokerage arrangement with LBIE.[26]   At a minimum, SRM has provided the factual predicates to its guarantee claim, thereby putting LBHI on sufficient notice of its theory of recovery.  See, e.g., In re Chateaugay Corp., 94 F.3d at 777 (finding proof of claim generally stating that the claim was subject to offset amounts was sufficiently specific to provide notice of a set-off right); Svenska Taendsticks Fabrik Aktiebolaget v.  Irving Trust (In re Int'l Match Corp.), 69 F.2d 73, 74 (2d Cir. 1934) (finding proof of claim that asserted claim for conversion rather than unjust enrichment sufficient to assert a claim for unjust enrichment where facts alleged were sufficient to support such a claim).

---

[25] See supra, note 19.

[26] LBHI has admitted that because the parent guarantee was public in the market, "trading activities with Lehman unregulated subsidiaries were completed pursuant to parent company guarantees" and "unregulated entities were viewed by trading counterparties simply as an extension of the Lehman Group."  See Disclosure Statement at 13 [Dkt. No. 13505] (Dec. 15, 2010).

44.    Ultimately, the question of reliance is a factual issue, and the evidence will show that SRM knew about and relied on the Global Guarantee.  Significantly, LBHI does not allege anywhere that SRM did not in fact rely upon the Global Guarantee.  To the contrary, SRM initially had concerns about LBIE's credit risk and creditworthiness, and SRM only was willing to enter into the Brokerage Agreements after LBIE assured SRM that LBHI guaranteed LBIE. Price Decl. ¶ 7.  Reliance on the Global Guarantee was foundational to the negotiation of the Brokerage Agreements; "counterparty risk was at the forefront of SRM's considerations and it was important to SRM that it was comfortable that LBIE had adequate insurances and guarantees in place."  Id. ¶ 6.  The parties' discussion of the Global Guarantee is also apparent from LBIE's communications.  For example, in an April 7, 2008 email, one of the LBIE representatives negotiating the PBA specifically referenced LBHI's guarantee in responding to certain of SRM's credit risk concerns:[27]

> Thank you for your comments on the PBA for SRM.
>
> In relation to your general question around insurance, LBIE maintains a surety bond issued by CAPCO.  As SIPA coverage is not available to customers of LBIE, the CAPCO bond does not provide SIPA excess coverage but instead covers the unsatisfied portion of a customer's net equity claim *not otherwise provided by LBIE's assets **or the LBHI guarantee***.

See Price Decl., Ex-PP1 (emphasis added).

### B.    The PBA Does Not Preclude SRM's Enforcement Of The Global Guarantee

45.    LBHI also asserts that the terms of the PBA preclude SRM from seeking to enforce the Global Guarantee.  Objection at 12.  Specifically, LBHI argues that Clauses 2.2 and

---

[27] SRM has not had the opportunity to take any discovery regarding this issue and there is likely additional evidence in the possession of LBIE and/or LBHI that further demonstrates the Global Guarantee was discussed and relied on by SRM when it entered into the prime brokerage relationship with LBIE.

16.3 of the PBA preclude SRM from relying on or enforcing the Global Guarantee.  Clause 2.2

provides:

> Except to the extent that any other document or notice is expressly referred to in this Agreement (including, without limitation, the customer Agreements) the terms of this Agreement constitute the entire agreement between the parties as to its subject matter and, to the extent of any such other document or notice, the terms of this Agreement will prevail.

Clause 16.3 provides:

> (a) [the parties] have not relied on any representation, warranty or other statement of another party in entering into this Agreement other than those expressly set out in this Clause 16; and

> (b) in the case of the Counterparty, the Counterparty further represents and warrants to the Prime Broker that it has not relied on any oral or written representation made by the Prime Broker or any person on behalf of the Prime Broker, and acknowledges that this Agreement sets out to the fullest extent the duties of the Prime Broker.

46.     These provisions of the PBA do not preclude or forestall SRM from enforcing the

Global Guarantee.  The PBA is governed by English law, and it is a well-established principle of

English law that if a party wishes to exclude or limit liability, it must be done with clear words

and any ambiguity must be resolved against the party seeking to avoid liability.  Collins Decl. ¶

47.  Furthermore, the intention to give up or waive reliance has to be clear on the face of the

instrument.  Id. ¶ 48.

47.     Clause 2.2 of the PBA is a boilerplate merger clause.  It contains no clear words

evincing an intent to release LBHI.   The clause makes no specific reference to the Global

Guarantee or any other guaranty, much less provide in clear language that SRM specifically

agreed to waive or release its right to enforce the Global Guarantee against LBHI.   This cannot

operate to absolve LBHI of its obligations under the Global Guarantee as a matter of English

law.  See Collins Decl. ¶ 49 ("[I]f a term is to be construed as having [the] effect [of forfeiting

reliance], clear words are necessary[.]") (citing <u>Cassa di Risparmio della Repubblica di San Marino Spa</u> v <u>Barclays Bank</u> [2011] EWHC 484 (Comm), [2011] 1 CLC 701 at [505]).[28]   The PBA (and CMNA and MIFCA) is totally silent with respect to the Global Guarantee and makes no reference whatsoever to waiving, releasing or impairing in any way SRM's right to enforce the Global Guarantee.[29]

48.    The Global Guarantee is also outside the scope of the merger clause.  Clause 2.2 refers to "the entire agreement between the parties as to its subject matter."  LBHI's obligations as guarantor of LBIE is not the subject matter of the PBA, and LBHI acknowledges "there is no reference whatsoever to any guaranty by LBHI in the PBA (or the CMNA)."  Objection ¶ 25. The Global Guarantee represents a separate and distinct agreement on the part of LBHI to guarantee the obligations and liabilities of LBIE.  It is not specific to the PBA and does not modify in any way the "subject matter" of the PBA or the obligations as between LBIE and SRM under the PBA.

49.    The representations and warranties in Clause 16.3 cited by LBHI are similarly unavailing and do not preclude SRM's enforcement of the Global Guarantee.  As with Clause

---

[28] Similarly, New York courts will not enforce an agreement to release unless it contains "an explicit, unequivocal statement of a present promise to release [another] from liability." <u>Digizip.com, Inc.</u> v. <u>Verizon Servs. Corp.</u>, 139 F. Supp. 3d 670, 681 (S.D.N.Y. 2015) (declining to dismiss claims purportedly released where the agreement containing the supposed release "did not encompass all claims" between the parties and nowhere mentions any potential obligations owed by defendant to plaintiff); <u>see also</u> <u>Cameron</u> v. <u>LR Credit 22, LLC</u>, 998 F. Supp. 2d 293, 299 (S.D.N.Y. 2014) (holding that where the contractual language "does not clearly evince [Plaintiff's] intention to release," "the Court will not so construe it on a motion to dismiss.").

[29] Likewise under New York law, merger clauses—particularly boilerplate versions of the type at issue here—do not act to invalidate a separate agreement or waive rights to enforce a separate agreement such as the Global Guarantee. <u>See</u> <u>Gen. Motors Corp.</u> v. <u>Fiat S.p.A.</u>; No. 08 Civ. 4999 (DAB), 678 F.Supp. 2d 141, 149 (S.D.N.Y. July 22, 2009) (boilerplate provisions in a contract that use the "merge," "entire agreement" and "supersedes all prior agreements" terminology will not void a separate, prior agreement); <u>Bank Julius Baer & Co.</u> v. <u>Waxfield, Ltd.</u>, 424 F.3d 278, 283 (2d Cir. 2005) (finding earlier arbitration agreement was not voided by merger clause that the agreement at issue "supersedes all prior agreements" even if a "a literal reading of the Clause would lead to that result"); <u>Demmert Bldg. Co.</u> v. <u>AMP, Inc.</u>, No. 806-70942-478, 2008 Bankr. LEXIS 503, at *20-21 (E.D.N.Y. Feb. 25, 2008) (earlier agreement for construction and repairs prior to rental of commercial space was binding where fully integrated lease with merger clause did not mention the construction agreement).

2.2, there is no specific reference to the Global Guarantee, and there is no express disclaimer or waiver of SRM's reliance on the Global Guarantee or right to enforce such guarantee against LBHI as required under English law.  In addition, the reference to statements of "another party" in Clause 16.3(a) should be read to refer to the parties to the PBA, i.e., LBIE and SRM.  The clear and obvious purpose of Clause 16.3 is to protect a party to the agreement from seeking to modify the terms of the PBA based on a statement made during negotiations.  It cannot be read to nullify the effect of a separate corporate guaranty that LBHI and LBIE were using to give comfort to counterparties contemplating transactions with Lehman entities.  The hypocrisy of such a bait and switch cannot be countenanced by this Court.

50.    Clause 16.3(b)(i) refers to "any oral or written representation made by the Prime Broker [i.e., LBIE] or any person on behalf of the Prime Broker. . . ."  The Global Guarantee is not a statement by LBIE, nor was the Global Guarantee or the corporate resolutions that effectuated the guarantee a statement made on behalf of LBIE.  The Global Guarantee was made and agreed to by LBHI, on behalf of LBHI.

51.    In any event, the PBA is an agreement solely between LBIE and SRM.  LBHI is not a party to the PBA, nor is LBHI a third party beneficiary of the Agreement.  As a matter of English law and pursuant to Clause 31.1 of the PBA, LBHI cannot enforce or rely on any of the referenced provisions of the PBA because none of those provisions expressly provide for LBHI's enforcement or suggest they were specifically intended to benefit LBHI.  See Contracts (Rights of Third Parties) Act 1999; Dolphin Maritime & Aviation Services Ltd v Sveriges Angfartygs Assurans Forening [2009] 1 C.L.C. 460 at [74] (recognizing that a contract needs to evince by clear language an intent to benefit a third party). [30]

---

[30] Attached hereto as Exhibit 7.  All English case citations herein are formatted according to the UK citation style.

52.    Furthermore, as a matter of English law, because LBHI intended for SRM to rely on the Global Guarantee, the non-reliance clauses cannot act as a bar to SRM's claims unless LBHI can demonstrate that LBIE (i) actually believed that SRM did not, in fact, rely on the Global Guarantee and (ii) relied on such declaration of non-reliance.  See Quest 4 Finance v Maxfield [2007] 2 C.L.C. 706 (finding at [38]-[39] that "in the ordinary case one would expect a contracting party who has required the other contracting party to make a declaration of non-reliance to believe the declaration to be true and to rely upon it" and that where one party had made "clear and unequivocal statements" that were "calculated to be relied upon" by another party, there could be no presumption that such party believed a contractual declaration of non-reliance by the other party to be true, unless it could demonstrate (i) such belief and (ii) reliance on that belief).[31]  LBHI does not make any such allegation or assertion in the Objection.

## IV.    THE PBA DOES NOT PRECLUDE SRM'S CLAIMS

LBHI's contention that SRM's claims are somehow precluded by the PBA is also wrong.

### A.    Clause 14 of the PBA Does Not Preclude SRM's Claims

#### 1.    SRM Has Sufficiently Alleged Breach Of The PBA

53.    LBHI argues that Clause 14.4 of the PBA contains a broad exculpatory provision that limits LBIE's liability to only events of gross negligence, fraud or willful default or breach, which LBHI asserts SRM has not alleged here.  Objection ¶ 35.  This argument lacks merit.

54.    SRM has alleged a breach of the PBA.  The Proof of Claim alleges that LBIE agreed that "LBIE would not rehypothecate any of SRM's assets without first getting SRM's permission" and that "LBIE had not been complying with this commitment."  See Proof of Claim ¶¶ 13-14.  Additionally, SRM alleged that LBIE failed to segregate SRM's assets and also failed to return the Segregated Assets to SRM.  Id. ¶¶ 15-16.

---

[31] Attached hereto as Exhibit 8.

55.     The question as to whether LBIE's breaches constitute gross negligence, fraud or willful default or breach of LBIE's duties under the agreement is a question of fact that cannot be resolved at the pleading stage.   See, e.g., Cimini v. Jaspan Schlesinger Hoffman LLP, No. 05CV5952, 2007 WL 173893, at *5 (E.D.N.Y. Jan. 19, 2007) (denying motion to dismiss on the basis of an exculpatory clause since "[i]f [plaintiff] is able to prove that [trustee] engaged in fraud, willful misconduct, or bad faith in connection with the Trust Agreement, then [trustee] may be liable regardless of the broad exoneration provision contained in the Trust Agreement"); Ally Gargano/MCA Advert., Ltd. v. Cooke Prop., Inc., No. 87 Civ. 7311 (RWS), 1989 U.S. Dist. LEXIS 12245, at *27 (S.D.N.Y. Oct. 13, 1989) (holding questions of fact regarding enforceability of exculpatory clause preclude dismissal even at summary judgment stage).

56.     In any event, while not necessary at this stage, the facts surrounding LBIE's conduct support a finding that LBIE was grossly negligent, fraudulent or in willful default or breach of its duties under the PBA.   Under English law, "willful default" generally entails intentional or reckless breach of duty and "gross negligence" arises from a serious disregard of or indifference to an obvious risk.  Collins Decl. ¶¶ 52, 54.

57.     Here, LBIE committed to segregating and not rehypothecating or otherwise disposing of the significant assets posted by SRM under the PBA.  See, e.g., Proof of Claim at ¶13; supra ¶¶ 14-16.  SRM relied on those commitments in posting substantial collateral with LBIE, and trusted it could rely on LBIE to fulfill its duties and obligations.  Those duties and obligations also arose pursuant to LBIE's regulatory obligations as a firm (then) regulated by the Financial Services Authority (FSA).[32]  However, just when the markets were experiencing the most extreme volatility in late 2008, LBIE entirely failed to perform even basic brokerage duties,

---

[32] LBIE's performance of its obligations under the PBA is subject to the FSA's Rules. See Clause 2.5 of the PBA.

holding on to SRM assets while keeping SRM entirely in the dark as to what its position was. By failing to segregate and return the posted collateral to SRM, LBIE left SRM without the ability to meet margin calls to other prime brokers and forced SRM to effect fire sales of its assets just to stay afloat and mitigate its damages.  Wood Decl. ¶¶ 35-40.  As it was, LBIE's conduct nearly destroyed SRM's business.  Id. ¶ 24.  LBIE's failure to segregate and return SRM assets also misappropriated the value of the specific securities posted by SRM and breached the FSA's Rules.[33]   In these circumstances, there is at least a plausible basis, particularly if one draws all reasonable inferences in SRM's favor as the Court must do at this stage, that LBIE was grossly negligent in complying with its obligations not to rehypothecate SRM's assets, or that LBIE intentionally disregarded the terms of its agreement with SRM, its obligations under the FSA Rules, and the significant impact that LBIE's conduct would and did have on SRM.  This is particularly the case where LBIE re-asserted its agreement not to re-hypothecate as late as September 12, 2008, but had evidently breached that agreement either by that date or within a short time thereafter.  Price Declaration ¶¶ 10-11.

58.    Furthermore, Clause 14.4 would not apply to a breach of trust claim by SRM. The facts alleged by SRM give rise to a breach of trust claim under English Law.  See, e.g., Proof of Claim at ¶ 15 (alleging a breach of trust).  Under Clause 17.1, securities posted by SRM were held by LBIE as custodian on trust for SRM.  See Re Lehman Brothers International Europe [2009] EWHC 2545 (Ch) at [72] (Briggs, J.) (noting that securities held by LBIE as custodian for Counterparties were, and remain, held upon trust, such that Counterparties retained

---

[33] See Financial Conduct Authority, FSA Handbook of Rules and Guidance, Client Assets Sourcebook, at Ch. 6.2, https://www.handbook.fca.org.uk/handbook/CASS/6/2 html?date=2008-09-05 (displaying rules in force as of May 9, 2008, the date SRM and LBIE entered into the PBA, through to January 1, 2009).

and continued to retain after the commencement of LBIE's administration, a beneficial interest in those securities, subject of course to LBIE's charge.)[34]

59.    As a matter of English law, an exemption clause such as Clause 14.4 cannot excuse a trustee such as LBIE who knows that its act or omission is contrary to the interests of the beneficiary (here, SRM) or is recklessly indifferent to the beneficiary's interests. <u>See</u> <u>Armitage</u> v <u>Nurse and others</u> [1997] EWCA Civ 1279.[35]

60.    LBHI seeks to rely on Clause 7.2(a) of the PBA to argue that any decision by LBIE to not return the Segregated Assets was permitted under the PBA.  Objection ¶ 36. However, the question of whether LBIE, per the terms of Clause 7.2(a), may have properly exercised in good faith any purported discretion it had under the PBA is a factual question which cannot be resolved at this stage.  <u>See</u>, <u>e.g.</u>, <u>Radakovich</u> v. <u>Energy Recovery, Inc.</u>, No. 11-13443, 2012 U.S. Dist. LEXIS 141733, at *10 (E.D. Mich. Sep. 30, 2012) (denying motion to dismiss breach of contract claim, holding that issue of reasonable discretion is not subject to dismissal under Rule 12(b)(6)).

61.    In any case, LBIE did not have a license to disregard its commitments to SRM by rehypothecating or disposing of the substantial collateral posted by SRM which LBIE held on trust for SRM.  LBHI contends that LBIE's delivery obligations under Clause 7.1 of the PBA were suspended based on LBIE's own insolvency.  Objection ¶ 36.[36]  That contention is doubtful as a matter of law.  <u>See</u> <u>Re Lehman Brothers International Europe</u> [2009] EWHC 2545 (Ch) at [66] (noting the incongruity of the insolvency of a trustee being used as a basis to suspend a beneficiary's right for the return of property held on trust). Even if such a provision were

---

[34] Attached hereto as Exhibit 9.

[35] Attached hereto as Exhibit 10.

[36] Whether LBHI's entrance into administration was an Event of Default or Potential Event of Default is a question of fact properly considered on an evidentiary record.

enforceable, there is no commercial rationale for the parties to have agreed that in the event of the trustee's insolvency the beneficiary's right for the return of its trust property would be suspended. This is particularly so given the fact that a beneficiary's ability to enforce its proprietary rights is most significant in circumstances where the trustee is insolvent. LBIE cannot use its own insolvency to excuse or justify its decision to withhold and/or dispose of the Segregated Assets which were the property of SRM.

### 2. SRM's CMNA-Related Claims Are Not Precluded By Clause 14.4 Of The PBA

62. LBHI also asserts that the Lost Opportunities Claim is barred under Clause 14.4 of the PBA. As set forth in the Proof of Claim, the Lost Opportunities Claim is based, among other things, on LBIE's breaches of the CMNA and the resulting damages from SRM having to adopt a more conservative investment approach and diverting SRM management's time away from making investments. See Proof of Claim at ¶ 17. Even if the Lost Opportunities Claim seeks to recover indirect or consequential damages as LBHI asserts (and which SRM does not concede), the CMNA does not limit or bar SRM's recovery of such damages.

63. LBHI does not dispute this, but nevertheless suggests—relying on Chadwick's conclusory opinion—that Clause 14.4 of the PBA should be read into the CMNA and would apply to any breach of the CMNA. In Chadwick's view, the CMNA and the PBA must be construed together pursuant to Clause 2.2 of the PBA because the CMNA is properly regarded as a document "identified as being related to a Transaction contemplated by" the PBA. From there, Chadwick concludes that Clause 14.4 of the PBA must apply in relation to any alleged breaches by LBIE of the CMNA. Chadwick Decl. ¶ 30.

64. Chadwick's conclusion is not supported by any legal authority and, in any event, is wrong. A proper reading of Clause 2.2 starts with the natural and ordinary meaning of the

language used by the parties in the agreement. Collins Decl. ¶ 24. Here, a plain reading of Clause 2.2 makes clear that the parties did not intend to read specific provisions of the PBA such as 14.4 into the CMNA. Clause 2.2 in relevant part refers to the PBA "and all settlement requests, acknowledgements, Instructions, term sheets, confirmations and all other documents identified as being related to a Transaction contemplated by" the PBA as forming "a single agreement between the parties." The term "Transaction" is defined in Clause 2.1 to include "all acquisitions and disposals of securities, and the provision of any advances of cash and securities in respect thereof" or a "Third Party Transaction", which is just a Transaction between SRM and any third party. There is no reference whatsoever in Clause 2.2 to the CMNA or any margin notices. Indeed, the CMNA is not referred to anywhere in the PBA. The documents contemplated by Clause 2.2 are documents generated in connection with Transactions carried out under the PBA. They have nothing to do with a separate contractual arrangement such as the CMNA which governs an independent and separate aspect of the overall commercial relationship between LBIE and SRM.

65. Furthermore, as discussed <u>supra</u> ¶ 46, under English law an intention to exclude or limit liability must be clearly set forth in the relevant agreement(s). Collins Decl. ¶ 47. There are no provisions or references reflecting such an intent in either the PBA or the CMNA. If the parties had intended LBIE's liabilities under the CMNA to be limited in the way Chadwick suggests, they were required to say so expressly. They did not, and, therefore, as a matter of English law, Clause 14.4 cannot be read into the CMNA.

66. At a minimum, it cannot be said that Chadwick's strained reading of the PBA is the only reasonable interpretation as a matter of law. To the extent the provisions can reasonably be read more than one way or if there is any ambiguity with respect to the proper interpretation

of Clause 2.2 of the PBA, dismissal (or a ruling as a matter of law) at this early stage is not appropriate.  See Payday Advance Plus, Inc. v. Findwhat.com, 478 F. Supp. 2d 496, 502-03 (S.D.N.Y. 2007) (denying motion to dismiss because there is a reasonable dispute as to the meaning of a contractual term); Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993) (same).

### 3.  SRM's Claims Are Not Precluded By Clause 14.3 Of The PBA

67.    LBHI also contends that SRM cannot recover on its Segregated Assets and Forced Sales claims because of the purported exculpation contained in Clause 14.3 of the PBA. Specifically, LBHI argues that SRM's losses associated with the Segregated Assets and Forced Sales claims arise directly or indirectly from "the general risks of investing" or "market conditions affecting. . .  the value of assets."  Objection ¶ 38.  LBHI's argument is premised on a flawed reading of the agreement.

68.    The plain meaning of the "general risks of investing" does not include the scenario here where LBIE failed to segregate and return SRM's assets.  It cannot reasonably be argued that LBIE's failure to comply with its commitments in this regard was a "general risk of investing."  LBHI does not explain how LBIE's misconduct would qualify as a "general risk of investing", and only cites to the Chadwick Declaration for support, which does not even address the issue.  Objection ¶ 39.

69.    The reference to "market conditions affecting. . . the value of assets" in Clause 14.3(b) also does not apply.  LBHI omits the critical portion of the provision, which limits the provision to losses that result from "investing or holding assets in a particular country" and then goes on to provide an illustrative list of the type of country-specific incidents contemplated that includes "nationalization, expropriation or other governmental actions; regulations. . . currency restrictions, devaluations or fluctuations; and market conditions affecting the orderly execution

of securities transactions or affecting the value of assets."  See Objection Exhibit D, Clause 14.3(b).

70.    LBHI does not, and cannot, contend that LBIE's failure to segregate and return SRM's assets was somehow caused by any circumstances unique to any particular country in which SRM's assets were invested or held.  LBHI again cites only to the Chadwick Declaration for support.  Objection ¶ 39.  However, the conclusion offered by Chadwick is flawed.  Similar to LBHI, Chadwick omits the controlling language at the beginning of Clause 14.3(b),[37] and does not suggest that any of the losses asserted by SRM are a result of "investing or holding assets in a particular country."  Chadwick Decl. ¶ 70.[38]

71.    Furthermore, as noted, under English law the intention to release or limit recovery of damages must be express and clear.  Collins Decl. ¶ 47.  References in Clause 14.3 to the "general risk of investing" and "market conditions affecting. . . the value of assets" are neither express nor clearly referring to the risk of LBIE breaching is obligations under the PBA and violating its other commitments to SRM.

## V.    SRM HAS ALLEGED COGNIZABLE DAMAGES

72.    As set forth in SRM's Objection to the Estimation Motion and its responses to LBHI's interrogatories, the value of SRM's Segregated Assets claim should be calculated as of

---

[37] Notwithstanding his omission of the controlling part of Clause 14.3(b), Chadwick does not hesitate to offer his conclusion regarding the ultimate issue as to how the provision should be interpreted and applied as a matter of English law.  Chadwick Decl. ¶ 70 (". . . I have no doubt that an English Court would conclude. . .").  Not only is his analysis and conclusion faulty given his failure to consider the controlling language of the clause, this is also another example of Chadwick going beyond the proper scope of a Rule 44.1 expert and offering his own assessment of questions of fact and determination of the ultimate issues.

[38] Chadwick also suggests that the reference to "market conditions affecting . . . the value of assets" is not limited to assets held by LBIE, and should be interpreted to apply to any of SRM's assets anywhere, including with other prime brokers.  Chadwick Decl. ¶ 70.  Chadwick offers no basis for his incredibly broad interpretation.  To the extent Clause 14.3(b) was intended to apply where market conditions affect *any* of SRM's assets wherever located or held, express language to that effect needed to be included (which it was not).

███████ LBHI disagrees and contends that the value of the Segregated Assets claim is more properly calculated as of the Petition Date or certain other dates pursuant to different provisions of the Code or the PBA.  See Objection at 16-20.

73.     The question of how SRM's damages should be calculated is premature at this stage.  See Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Research, No. 15-CV-2044 (AJN), 2016 WL 205445, at *7 (S.D.N.Y. Jan. 15, 2016) (denying motion to dismiss premised on plaintiff's alleged failure to plead non-speculative damages, concluding that a plaintiff "need not, at this stage, specify the measure of damages"); see also Xpeditor Creditor Tr. v. Credit Suisse First Boston (USA) Inc., 341 F. Supp. 2d 258 (S.D.N.Y. 2004) (denying motion to dismiss as to contract claim because plaintiff "need only put [defendant] on notice of its claims" and "need only allege that it was damaged; it is not required to specify the measure of damages nor to plead proof of causation").  The parties are entitled to submit evidence, developed through fair and reciprocal discovery, in support of their damages theories.  The proper computation of SRM's damages, including the appropriate valuation date under any particular theory of recovery, will be subject of a detailed evidentiary presentation that will likely include expert testimony.[39]

74.     In any event, LBIE's proposed approach to calculating SRM's damages—including the valuation dates—is not correct.

---

[39] LBHI also contends, without any support, that if SRM's damages are calculated as of the dates put forward by LBHI, ███████████████████████████████████████████████████████████████████████

A.    **SRM's Proposed Valuation Dates Are Not Inconsistent With The Bankruptcy Code**

1.    **Section 562 Does Not Apply To SRM's Guarantee Claims**

75.    LBHI contends that the PBA is a "securities contract" as contemplated by §§ 562 and 741(7)(A) and therefore any claims under the PBA should be calculated as of November 6, 2008, when SRM terminated the PBA.   Objection ¶¶ 44-45.   However, the claims asserted by SRM against LBHI are based on a guaranty.[40]   The Global Guarantee does not reference or specifically concern any securities transaction, and is not specifically a "securities contract" under the Code. See, e.g., In re Qimonda Richmond, LLC, 467 B.R. 318, 323 (Bankr. D. Del. 2012) (credit enhancement to bonds and indentures is not a § 741(7)(A) "securities contract" as the underlying instruments are not "securities contracts").

2.    **The Segregated Assets Claim** ██████████████████████

76.    Alternatively, LBHI asserts that SRM's Segregated Assets claim must be calculated as of the Petition Date under Section 502.   Objection ¶¶ 44-46.   This argument is also without merit.

77.    As of the Petition Date, the Segregated Assets claim against LBHI was a contingent, unliquidated claim.   A claim is "contingent" where "the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event," and "the occurrence or happening of [such] extrinsic event . . . will trigger . . . liability." See Mazzeo v. United States (In re Mazzeo), 131 F.3d 295, 303 (2d Cir. 1997); see also In re Chateaugay Corp., 944 F.2d 977, 1004 (2d Cir. 1991) (noting that "contingent" claims are usually considered obligations that will become due upon the happening of a future event).   Guarantees are

---

[40] LBHI's reference to SIPC v. Bernard L. Madoff Inv. Secs. LLC, 476 B.R. 715, 720 (S.D.N.Y. 2012) is accordingly irrelevant. Madoff simply confirms that, as defined in § 741(7), agreements providing for securities transactions are "securities contracts."   LBHI does not assert, and Madoff does not hold, that guaranties are securities contracts pursuant to §741(7).

contingent obligations.  In re S. Cinemas, Inc., 256 B.R. 520, 533 (Bankr. M.D. Fla. 2000) ("A guaranty is a classic example of a contingent obligation.").  Contingent claims are properly calculated when they cease to be contingent and become fixed and liquidated.  See, e.g., Stebbins v. Artificial Horizon, Ltd., No. 15-CV-1196 (JFB), 2016 U.S. Dist. LEXIS 34680, at *13-19 (E.D.N.Y. Mar. 17, 2016) (affirming bankruptcy court's finding that guarantee claim became non-contingent at the time of the principal obligor's default, and the claim determinable in the full amount of the outstanding indebtedness).

78.    Here, as of the Petition Date and when the Proof of Claim was filed, SRM's claims against LBHI were premised on enforcing a guarantee against LBHI if the primary obligor, LBIE, failed to satisfy fully SRM's claims.  SRM's claims only became fixed and ceased to be contingent once "all predicates to enforcement have occurred", ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮    See, e.g., In re F.B.F. Indus., Inc., 165 B.R. 544, 548-49 (Bankr. E.D.Pa. 1994); In re LightSquared Inc., No. 12-12080 (SCC), 2014 WL 5488413, at *3 (Bankr. S.D.N.Y. Oct. 30, 2014) (guarantor debtors' liability no longer contingent where, but for the bankruptcy, creditor could seek payment from guarantor without the occurrence of any future event).

### 3.  The Segregated Assets Claim ▮▮▮▮▮▮▮▮▮▮▮▮

79.    Alternatively, LBHI contends that the valuation dates put forward by SRM conflict with the express terms of the PBA.  Objection ¶¶ 52-58.  This argument is flawed as a matter of English law.

80.    As discussed, supra ¶¶ 58-61, a trust relationship existed in respect of the Segregated Assets (specifically, the Virgin Media Shares) as a consequence of which SRM held a proprietary beneficial interest in the Virgin Media Shares.  Contrary to LBHI's assertions, this proprietary beneficial interest was not extinguished by SRM's termination of the PBA, especially

in circumstances where the event of default giving rise to the right to terminate was the insolvency of the trustee, LBIE. As a matter of English law, it is unlikely that the termination of the PBA for any reason, let alone because of the trustee's default, could have the effect of extinguishing a beneficial interest in the trust assets. See Re Lehman Brothers International Europe [2009] EWHC 2545 (Ch) at [66] (considering the effect of termination of a prime brokerage agreement, noting the incongruity of the insolvency of a trustee being used as a basis to suspend a beneficiary's right for the return of property held on trust). Here, SRM's proprietary beneficial interest in the Virgin Media Shares ███████████████████████ █████████████████████████████████████████████████████████████████ ███████████████████ Accordingly, SRM's loss in respect of the Virgin Media shares is properly valued ███████████████████████████

81. In any event, SRM terminated the PBA as a result of LBIE's (admitted) wrongful refusal to recognize SRM's setoff. English law does not permit a party to benefit from its own wrong, and SRM's termination of the PBA under the circumstances should not limit SRM's ability to recover for its loses. See Cheall v A.P.E.X. [1983] 2 AC 180 at [189] (in which the House of Lords confirmed the existence of the principle "that a party to a contract is not permitted to take advantage of his own breach of duty" except "in the unlikely case that the contract contains clear express provisions to the contrary")[41]; Alghussein Establishment v Eton College [1988] 1 WLR 587 at [594] (in which the House of Lords reviewed the earlier authorities, including Cheall, and noted "the clear theme running through them all was that no man can take advantage of his own wrong.").[42]

---

[41] Attached hereto as Exhibit 11.

[42] Attached hereto as Exhibit 12.

### 4. SRM's Damages Are Not Limited To Petition Date Under Clause 14.4

82.    Similarly, Clause 14.4 does not limit the Segregated Assets claim to the value of the relevant securities on the Petition Date as LBHI contends.   Objection ¶ 41.   Clause 14.4 provides in relevant part:

> The parties agree that, as a genuine pre-estimate of loss, the Prime Broker's liability to the Counterparty shall be determined based only upon the Market Value of the relevant cash or securities as **at the date of the discovery of loss** and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities.

83.    LBHI contends that Clause 14.4 of the PBA would "limit the amount of SRM's damages to the value of the securities as of the discovery of the **breach**." (emphasis added) Objection ¶ 40.   However, clause 14.4 does not operate to limit LBHI's liability as at the date of the <u>breach</u>, but rather the "date of the discovery of the **loss**".   This is properly because on the date of breach a party's loss may be undiscoverable (<u>e.g.</u>, contingent or otherwise incapable of being determined).   Accordingly, though the breach may be known, it does not follow that the loss has been discovered.

84.    Despite acknowledging that on the basis of their own submission, the date the loss was discovered is a matter of fact, LBHI and Chadwick contend that the date of discovery of the loss with respect to the Segregated Assets claim was on or about the Petition Date when SRM allegedly discovered that LBIE would not deliver the Segregated Assets or Equivalent Securities. Objection ¶ 41; Chadwick Decl. ¶ 69.   That is incorrect, SRM's loss in respect of its Segregated Assets ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ the point at which it knew it would not receive its Segregated Assets.

### 5. SRM May Recover Lost Opportunities and Lost Profits Under English Law

85.     As set forth in the Proof of Claim, SRM's Lost Opportunities Claim is based on

LBIE's breach of the CMNA by failing to provide SRM with the requisite margin notices and

also serving SRM with the grossly erroneous October 30 Margin Notice.  See Proof of Claim at

¶ 17.  LBHI does not dispute that LBIE breached the CMNA, but seeks to dismiss the Lost

Opportunities Claim on the basis that it seeks damages that are "speculative and remote."

Objection at 21.  LBHI's argument is without merit.  SRM has sufficiently alleged a claim for

breach of the CMNA and is permitted to seek recovery based on diversion of SRM

management's time and lost investment opportunities.

86.     As a matter of English law, parties to a contract are permitted to seek recovery of

losses arising from a breach of contract based on lost investment opportunities and diversion of

employees' time.  Collins Decl. ¶ 72.  Thus, it will be a matter of SRM establishing, at the

appropriate time and upon an evidentiary record, that it is entitled to recover damages under this

theory.  In the meantime, it is reasonable at this stage for the Court to infer that, had SRM's

management's time not been diverted, their time would have been applied to activities which

would have generated revenue for SRM.  See Collins Decl. ¶¶ 72-73; Aerospace Publishing Ltd

v Thames Water Utilities Ltd [2007] EWCA Civ 3, [2007] Bus LR 726 at [86] (holding that "in

the ordinary case, and unless the defendant can establish the contrary, it is reasonable for the

court to infer from the disruption that, had their time not been thus diverted, staff would have

applied it to activities which would, directly or indirectly, have generated revenue for the

claimant. . .").[43]

---

[43] Attached hereto as Exhibit 13.

87.     LBHI's own purported expert does not argue otherwise.  Indeed, Chadwick does not suggest parties to a contract cannot recover damages based on the diversion of staff time, disruption of business or lost investment opportunities.  He simply asserts that SRM's Proof of Claim is not detailed enough to establish a sufficient causal link between the alleged breaches and the losses.  Chadwick Decl. ¶¶ 75, 76.  That, however, is not a basis to dismiss SRM's claims at the pleading stage.  This is the case under English law.  Collins Decl. ¶ 73. It is likewise the same under New York law.[44]

88.     It is premature for LBHI to raise evidentiary issues regarding SRM's damages theories.  SRM will present evidence demonstrating that the significant impact of LBIE failing to comply with its obligations under the CMNA.  Here, but for LBIE's failure to provide the margin notices, much of the time spent dealing with October 30 Margin Notice, related fallout ███ ████████████████████████████████████ could have been spent on the business of SRM, raising funds from investors, investigating investment opportunities and generating profits for the fund.  Wood Decl. ¶¶ 25-30.

---

[44] See Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc., 242 F. 3d 189, 197-98 (2d Cir. 2003) (dismissing motion to dismiss as to loss causation in securities fraud case where allegations in complaint give rise to an inference that  of a connection between the plaintiff's economic loss and defendants' action).  Neither of the cases cited by LBHI involved the dismissal of a damages theory at the pleading stage or on a motion to dismiss.  To the contrary, in both cases, the plaintiffs were allowed to present extensive evidence to support their damages theories.  In A.I.A. Holdings, the court expressly recognized that lost opportunities and lost profits are recoverable under New York law, and also acknowledged that the party seeking to recover such damages must be given an opportunity to present evidence establishing such damages.  2002 WL 1334809, at *3-4 (S.D.N.Y. June 17, 2002) (ruling on summary judgment that plaintiffs had not submitted sufficient evidence to support lost opportunity claims and certain lost profit claims, but concluding plaintiffs could recover certain lost profits based on the evidence submitted).  In Kenford Co. v. Erie Cty., the court similarly allowed evidence in support of the parties' damages theories and considered a "massive quantity" of plaintiff's statistical projections on lost profits.  67 N.Y. 2d 257, 262 (1986).  The court also expressly recognized that lost opportunities and lost profits damages are available, though it ultimately found the unique circumstances of that claim made an assessment of lost profits too speculative.  Id. Here, SRM has not yet had the opportunity to put forward its evidence in support of its damages theories, including its Lost Opportunities Claim.

## VI.    SRM SHOULD HAVE AN OPPORTUNITY TO SUPPLEMENT ITS PROOF OF CLAIM IF NECESSARY

89.    SRM believes and submits that it has adequately stated its claims in its Proof of Claim.  Nonetheless, SRM should be permitted an opportunity to supplement or amend its Proof of Claim to the extent the Court concludes additional detail is necessary or would be helpful. Bankruptcy courts have explained that where a court finds that a proof of claim is deficient because it does not contain sufficient factual support, the court "should give the claimant an opportunity to amend or prove its claim."  In re Stoecker, 143 B.R. 879, 883-84 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 5 F.3d 1022 (7th Cir. 1993) ("Amendments allow creditors to cure defects in claims as originally filed and allow creditors to describe their claims with greater particularity."); see also In re Int'l Horizons, Inc., 751 F.2d 1213, 1216 (11th Cir. 1985) ("[A]mendment to a claim is freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim."); Integrated Res., Inc. v. Ameritrust Co., N.A. (In re Integrated Res., Inc.), 157 B.R. 66, 70 (S.D.N.Y. 1993) (same).

90.    In this Circuit, bankruptcy courts apply a two-pronged analysis when considering whether to allow an amendment: first, was there a "timely assertion of a similar claim or demand evidencing an intention to hold the estate liable," and second, is it equitable to allow the amendment.  In re Residential Capital, LLC, 513 B.R. 856, 870 (Bankr. S.D.N.Y. 2014).  The first prong is satisfied if "the amendment (1) corrects a defect of form in the original claim; (2) describes the original claim with greater particularity; or (3) pleads a new theory of recovery on the facts set forth in the original claim."  Id. (quotations and citations omitted).  Here, subject to the Court's directions, SRM anticipates only adding additional details and supporting facts to describe "the original claim with greater particularity."

91.     The equitable factors also weigh in favor of providing SRM an opportunity to supplement its Proof of Claim.   SRM originally filed its Proof of Claim in September 2009. LBHI did nothing with respect to SRM's claims for almost six years, and then without any notice, LBHI filed the Estimation Motion seeking to estimate SRM's claims at zero.   When SRM rightly objected, LBHI promptly withdrew the Estimation Motion and sought broad discovery from SRM pursuant to Bankruptcy Rule 2004.   After obtaining one-sided discovery, LBHI filed the Objection, taking issue with many of the factual issues underlying SRM's claims.   Under the circumstances, allowing SRM leave to supplement its Proof of Claim, to the extent the Court believes additional detail is necessary, would not prejudice LBHI or harm the estate.   Rather, it would allow SRM to put forth more detailed allegations in support of its claims that will enable this Court and LBHI to more accurately assess the nature and merits of the claims and quantum of damages at issue.

## CONCLUSION

WHEREFORE, SRM respectfully requests that the Court enter an order denying the

Objection and granting such other and further relief as the Court deems just and proper.

Dated:  July 5, 2016
New York, New York

Respectfully submitted,

WHITE & CASE LLP

By: _/s/ Gregory M. Starner_
David G. Hille
Gregory M. Starner

1155 Avenue of the Americas
New York, New York  10036
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113

Counsel for SRM Global Master Fund
Limited Partnership