# Exhibit 7

**460**

A

## Dolphin Maritime & Aviation Services Ltd v Sveriges Angfartygs Assurans Forening (The Swedish Club).

[2009] EWHC 716 (Comm)

Queen's Bench Division (Commercial Court).

B

Christopher Clarke J.

Judgment delivered 2 April 2009.

C

*Jurisdiction - Inducing breach of contract - Place where harmful event occurred - Contract - Rights of third parties - Collision at sea followed by unsuccessful salvage attempt and wreck removal order - Turkish cargo insurers instructed recovery agent to seek to recover compensation in respect of cargo - Insurers settled directly with vessel's P & I club - Insurers declined to pay agent's commission - Claim against club for inducing breach of contract, conspiracy and breach of club letter of undertaking - Arguable that insurers bound to procure that sums recovered from club payable in first instance to agent in London - London place where harmful event or event giving rise to damage occurred when settlement money not paid there - English court had jurisdiction to hear tort claims against club - Club entitled to summary judgment on claim under letter of undertaking - Letter did not purport to confer benefit on agent and parties did not intend it to be enforceable by agent - Council Regulation 44/2001, art. 5(3) - Contracts (Rights of Third Parties) Act 1999, s. 1.*

D

E

This was an application by the defendants (i) to strike out the claim against them for procuring a breach of contract and unlawful means conspiracy on the ground that the court had no jurisdiction to hear it; and (ii) for summary judgment in a claim in contract on the grounds that it had no realistic prospect of success.

F

The claimant, Dolphin, was an English company which carried on business as a cargo recovery agent and claims correspondent. The defendant was a Swedish P & I club.

G

A vessel which was entered with the club collided with another vessel off Gibraltar, became semi-submerged and grounded on a reef in Gibraltar waters. There was an unsuccessful attempt to salve her under a Lloyd's Open Form. Eventually the Government of Gibraltar issued a wreck removal order requiring the removal of the vessel and her cargo. The cargo was bound for Turkey and the receivers and insurers were Turkish. At some stage the Turkish underwriters paid the cargo owners and became subrogated to their rights. An action was instituted in New York by the owners of the cargo against the owners of both vessels. The underwriters instructed Dolphin to seek to recover compensation in respect of the cargo on their behalf and that of the owners of the cargo.

H

© DSP Publishing Ltd

QB                          Dolphin Maritime v Swedish Club                    **461**

A        **Dolphin's case was that it was engaged on its standard terms which provided for any recoveries to be paid to it from which it would deduct its commission. Dolphin, acting on the underwriters' behalf, negotiated a letter of undertaking (LOU) with the club, which provided for sums recoverable from the owners of the ship to be paid to Dolphin on underwriters' behalf or to any solicitors appointed by them. The underwriters then settled directly with the club for $8.5 million.**
B    **Dolphin rendered an invoice to underwriters in respect of its commission, which underwriters declined to pay. Dolphin complained that the club had failed to comply with the terms of the LOU.**

    **Dolphin issued proceedings claiming that the club was liable for procuring or inducing a breach by underwriters of the agreement between Dolphin and**
C    **underwriters and that it was party to a conspiracy to use unlawful means. The club said that under Regulation 44/2001 it had to be sued in Sweden where it was domiciled. Dolphin relied on art. 5(3) on the basis that England was the place where the damage occurred.**

D        *Held*, **ruling accordingly:**

    **1. There was a well arguable case that, under the terms and conditions, the underwriters were bound to procure that the sums recovered directly from the club were paid in the first instance to Dolphin. Dolphin's essential complaint**
E    **was that it suffered harm because it did not receive the $8.5 million into its bank account which it should have done because, despite knowledge that that would involve a breach of the underwriters' contract with Dolphin, the club paid it to their accounts in Turkey. The contract, which was governed by English law, required recoveries and sums which would otherwise be recoveries to be received direct by Dolphin and the complaint in tort was that the club wrongfully brought**
F    **about a breach of that obligation. The place where the damage occurred or where the event giving rise to the damage caused injury was England where Dolphin did not receive the money which, if the contract had been performed, it should have received. (Dumez France SA v Hessische Landesbank (Case C-220/88) [1990] ECR I-49 and Reunion Europeenne SA v Spliethoff's Bevrachtingskantoor BV**
G    **(Case C-51/97) [1999] CLC 282; [1998] ECR I-6511 applied.)**

    **2. That conclusion did not conflate the place where the damage occurred with the place where the loss was suffered. There was a difference between a case in which the claimant complained that he had lost his money or goods and a case in which the claimant complained that he had not received a sum which he should**
H    **have received. In the former case the harm could be regarded as occurring in the place where the goods were lost or the place from or to which the moneys were paid, although the loss could be said to have been suffered in the claimant's domicile. In the latter case the harm lay in the non-receipt of the money at the place where it ought to have been received, and the damage was likely to have occurred there. That place might well be the place of his domicile and, therefore,**

**462**　　　　　　**Dolphin Maritime v Swedish Club**　　　　**[2009] 1 CLC**

also the place where he had suffered loss. **(Domicrest Ltd v Swiss Bank Corp
[1998] CLC 1451; [1999] QB 548 and Sunderland Marine Mutual Insurance Co
Ltd v Wiseman (The Seaward Quest) [2007] 1 CLC 989 considered.)**

　　**3. In the circumstances the place where the benefit should have been received
provided a sufficiently close connecting factor with the courts of a member state
other than that in which the defendant was domiciled which satisfied the need for
certainty and justified the attribution of jurisdiction to those courts for reasons
relating to the sound administration of justice. Accordingly, Dolphin's tortious
claims fell within art. 5(3) of the Regulation. (Kalfelis v Bankhaus Schroder
Munchmeyer Hengst & Co (Case 189/87) [1988] ECR 5565 applied.)**

　　**4. The provision in the LOU that payment should be made to Dolphin or
underwriters' solicitors was an agreement as to the means by which the club's
obligation to underwriters was to be discharged. It was not an indication
that the agent payee was an intended beneficiary of the promise. It did not
purport to confer a benefit on Dolphin in the sense meant by s. 1(1)(b) of the
Contracts (Rights of Third Parties) Act 1999. The intended beneficiaries were
the underwriters on whose behalf the payment was to be received. Further on a
proper construction of the contract it appeared that the parties did not intend
the term to be enforceable by Dolphin.**

　　**5. Accordingly, the court declined to strike out the claims in tort but gave
summary judgment in favour of the club on the claim in contract.**

The following cases were referred to in the judgment:

*Alfred Dunhill Ltd v Diffusion Internationale de Maroquinerie de Prestige SARL*
[2001] CLC 949.
*Custom Made Commercial Ltd v Stawa Metallbau GmbH* (Case C-288/92) [1994]
ECR I-2913.
*Domicrest Ltd v Swiss Bank Corp* [1998] CLC 1451; [1999] QB 548.
*Dumez France SA v Hessische Landesbank* (Case C-220/88) [1990] ECR I-49.
*Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* (Case 21/76) [1976]
ECR 1735; [1978] 1 QB 708.
*Kalfelis v Bankhaus Schroder Munchmeyer Hengst & Co* (Case 189/87) [1988]
ECR 5565.
*Kronhofer v Maier* (Case C-168/02) [2004] ECR I-6009.
*Laemthong International Lines Co Ltd v Artis (The Laemthong Glory)* [2005] 1
CLC 739.
*Marinari v Lloyds Bank plc* (Case C-364/93) [1995] ECR I-2719; [1996] QB 217.
*Prudential Assurance Co Ltd v Ayres* [2007] EWHC 775 (Ch).
*Reunion Europeenne SA v Spliethoff's Bevrachtingskantoor BV* (Case C-51/97)
[1999] CLC 282; [1998] ECR I-6511.

A
B
C
D
E
F
G
H

QB                     **Dolphin Maritime v Swedish Club**                     **463**
                              (*Christopher Clarke* J)

A    *Sunderland Marine Mutual Insurance Co Ltd v Wiseman (The Seaward Quest)*
     [2007] 1 CLC 989.

     Robert Bright QC (instructed by Reed Smith LLP) for the claimant.

B    Robert Thomas (instructed by Hill Dickinson LLP) for the defendant.


                                    JUDGMENT

     **Christopher Clarke J:**

C
     1. This is an application by the defendants (i) to strike out the claim against them
     for procuring a breach of contract and unlawful means conspiracy on the ground that
     the Court has no jurisdiction to hear it; and (ii) for summary judgment in a claim in
     contract on the grounds that it has no realistic prospect of success.

D
     2. The claimant, Dolphin Maritime and Aviation Services Limited ('Dolphin'),
     is an English company based in Stanmore, Middlesex. It carries on business as a
     cargo recovery agent and claims correspondent. The defendant, Sveriges Angfartygs
     Assurans Forening ('the Club'), is a Swedish corporation and a well established P &
     I Club.

E
     3. In order to understand the nature of the dispute it is necessary to set out some
     of the history.

     **Facts**

F
     4. At some time after 31 July 2006 the Panamanian flagged vessel 'New Flame',
     which was entered with the Club, left New York carrying a cargo of scrap steel of
     about 42,000 mts bound for Iskenderun, Turkey. The purchasers of the cargo – Nursan
     Metalurji Edustri AS – had insured it with two Turkish insurers: Anadolu Sigorta
     ('Anadolu') and Garanti Sigorta ('Garanti'). Garanti now operates under the name
     Eureko Sigorta ('Eureko'). I refer to them hereafter as 'the underwriters'.

G
     5. On 12 August 2007 the 'New Flame' collided with the m.v. 'Torm Gertrud'
     off Gibraltar. The 'New Flame' became semi-submerged and grounded on a reef in
     Gibraltar waters. There was an unsuccessful attempt to salve her under a Lloyd's
     Open Form. Eventually the Government of Gibraltar issued a wreck removal order
H    requiring the removal of 'New Flame' and her cargo. At some stage the underwriters
     paid the cargo owners and became subrogated to their rights. An action was instituted
     in New York by the owners of the cargo against the owners of both vessels. The
     underwriters instructed Dolphin to seek to recover compensation in respect of the
     cargo on their behalf and that of the owners of the cargo.

**464**                     **Dolphin Maritime v Swedish Club**              **[2009] 1 CLC**
                              (Christopher Clarke J)

6. Recovery agents such as Dolphin are often paid by way of commission on the       A
recoveries which they take by way of deduction from the monies recovered. They
then pass on the balance to the principal on whose behalf they have acted. Dolphin's
case is that it accepted instructions from cargo underwriters subject to its standard
terms and conditions which make provision for their commission to be paid in that
way.                                                                                B

**Dolphin's terms**

7. Dolphins standard terms provide, inter alia, as follows:

'1.1. ...                                                                           C

(c) "The Services" means the provision of or doing or taking of one some or all
of (1) representation of the Client by the Company, including claims handling
and settling; (2) actions by the Company on behalf of the Client to achieve a
Recovery for the Client; (3) the giving of advice and opinions and consulting
services to the Client; (4) the conduct of investigations for the benefit of and on    D
behalf of the Client, whether in pursuit of a Recovery or not; (5) negotiation with
and reaching agreement with others on behalf of the Client; (6) the appointment
of others on behalf of the Client; and (7) preparation (as agents) for litigation or
Alternative Dispute Resolution process involving the Client.
                                                                                    E
(d) "Recovery" means any type of claim concerning another person either
pursued or resisted, and or subsequently agreed or settled, by the Company on
behalf of the Client, in order to obtain payment of monies due to the Client from
such other person or reduce the amount of any payment of monies to be made by
the Client to such other person and includes where appropriate the amounts of
money so obtained or reduced.                                                       F

…

6.1. The Client shall notify the Company forthwith in writing of any payments,
offers of payments or any other correspondence arising in relation to any          G
appointment of the Company, which are received directly by the client.
…

6.5. The Client undertakes not to discuss or negotiate any matter in relation to
which the Company has been appointed with any other person whether directly
or indirectly.                                                                      H
…

6.7. The Client undertakes promptly to pay the Company's fees, expenses and
disbursements in accordance with the terms and conditions contained herein.

QB         **Dolphin Maritime v Swedish Club**          **465**
(*Christopher Clarke* J)

A     6.8. The Client undertakes and agrees that any Recovery on its behalf by the Company will be received direct by the Company into the Company's bank account and not be directed to be paid or withheld by any other person.

…

B     7.1. In the event that the Company considers it appropriate to instruct, engage or retain any Service Support Provider, whether as an agent or as an independent contractor, for any purpose connected with the Services the Company has agreed to provide to the Client herein, the Client fully authorises the Company to do the same and agrees that all such persons shall be engaged instructed or retained by the Company acting only in its capacity as agent for the Client and that the Client remains directly liable to all such persons in relation to any services provided by them.

C

…

D     9.7. In those cases where the Company's fee is commission based the Company's usual practice is to deduct its fees from any Recovery received by it and thereafter to present a statement to the Client of the net Recovery payable to the Client, taking account of such deduction. Following presentation of the statement the net sum will be paid to the Client and no invoice will usually be issued.

E

**11 TERMINATION**

11.1. This agreement and any appointment of the Company by the Client in accordance with this agreement will continue until all the Services under this agreement or the subject of such appointment have been provided, unless this agreement is terminated earlier in accordance with the following terms.

F

11.2. Save in Recovery Cases as appears below, either party may terminate this agreement or any instruction pursuant to it at any time by giving 14 days written notice (by letter or fax, specifically excluding e-mail) of termination, which in the case of termination by the Client must be received at the Company's registered address. Upon any such termination the Client's liability for the Company's fees (based on the scale(s) applicable) will be as set out below. In addition, following any termination, the Client must settle any Service Support Provider's or any third parties claims for payment, fees and expenses within 7 days of receipt of any relevant invoice from that person.

G

H

Non-Recovery Cases

11.3. The Client shall pay the fees incurred up to termination as per the fee scale of the Company current and applicable at the time of termination.

**466**                    Dolphin Maritime v Swedish Club                    [2009] 1 CLC
                               (Christopher Clarke J)

Recovery Cases                                                                      A

11.4. In all cases in which this agreement relates in whole or in part to a
Recovery, the appointment of the Company by the Client in accordance with this
agreement to provide the Services in relation to that Recovery and as its agent is
irrevocable by the Client but may be terminated by the Company in accordance        B
with Clause 11.2 above.

11.5. If this agreement and or the Company's appointment or instruction is,
for whatever cause, terminated before the Company has concluded or received
a Recovery, the Client will, save as provided herein, be obliged to pay the
Company's fees immediately, based on the amount the Company reasonably            C
expected to recover alternatively on a quantum meruit basis, whichever results
in the higher figure.

11.6. If, prior to termination, the Company or any Service Support Provider
instructed by it on behalf of the Client, has negotiated a settlement proposal of
the Client's claims or liabilities at a level the Company has recommended that    D
the Client accepts, but the Client does not, the Client will be at liberty to pursue
the Recovery independently but will be obliged to pay the Company's fees based
on the recommended figure alternatively on a quantum meruit basis, whichever
results in the higher figure.
                                                                                    E
11.7. In the event that the reason for termination is the Client's impecuniosity or
insolvency a right exercisable against all persons to pursue the Recovery which
is the subject of this agreement shall automatically vest in the Company and
any monies recovered as a result will, subject to any applicable provisions of
insolvency law which may prevent the same, be the property of the Company           F
once recovered but in such cases any of the Client's liabilities, actual or potential,
associated with the Recovery shall, to the fullest extent permitted by any
applicable law, remain those of the Client.

11.8. In any of the above cases, any sums recovered directly by the Client from
any persons which would otherwise comprise a Recovery, and whether before          G
or after termination, must be paid in the first instance into the Company's
bank account. After deduction of the Company's fees and any other expenses
in accordance with the provisions of this agreement, the balance will then be
remitted to the Client.'
                                                                                    H
   8. After they were instructed Dolphin began to act on the underwriters' behalf.
Mr Sharma of Dolphin negotiated two important agreements on behalf of the
underwriters with the owners of the 'New Flame'. Owners' interests were represented
by the Club, on whose behalf Hill Dickinson's Piraeus office was instructed. One
of those agreements was an Escrow Agreement entered into on 30 November 2007
which provided for any recovery from the owners of the 'Torm Gertrud' to be paid

A   into a Hill Dickinson client account, of which Hill Dickinson was to be the escrow agent to stand as security for any settlement in favour of the Owners of the 'New Flame' against cargo interests arising out of the both-to-blame collision clause. That agreement was expressed to be in consideration of the owners of the 'New Flame' agreeing to provide security to Cargo Interests in the form of a Letter of Undertaking from the Club.

B

### The Letter of Undertaking

9. The second agreement was a Letter of Undertaking executed by the Club on 19 December 2007. It was addressed as follows:

C

'To: The Owners and/or Underwriters of the cargo detailed below ("the Cargo Interests")
C/o Dolphin Maritime & Aviation Services Ltd
(its address was then given)'

D

10. In consideration of the Cargo Interests consenting to the release from arrest and/or refraining from arresting the 'New Flame' for the purposes of obtaining security in respect of claims against the vessel or her owners in respect of the cargo now in question the Club undertook:

E

'to pay to [Dolphin] on your behalf or to any solicitors you may appoint such sums as may be due pursuant to a final and unappealable judgement issued by a US Court or as may be agreed to be recoverable from the owners of the … ship'

F

in respect of claims in respect of the cargo up to a total of $17.5 million.

### The lead up to a settlement agreement between the underwriters and the owners of the vessel

G

11. On 4 December 2007 Cavus & Coskunsu ('Cavus'), a Turkish Law firm, e-mailed the Club saying that they were writing on behalf of Anadolu to explore possibilities as to whether the underwriters would get involved in removing cargo from the vessel and bringing it to the destination port. On 8 January 2008 a meeting took places between Mr Sharma and the Club at the Club's offices in Piraeus to discuss delivery of the cargo. On 21 January 2008 Hill Dickinson e-mailed Cavus, with a copy to Dolphin, to ask whether instructions had been received from cargo insurers as to whether they would take delivery of the cargo which was planned to be raised and salved from no 5 hold.

H

12. At the end of January another party (unspecified in the Club's evidence) appeared claiming to represent Anadolu and asking to discuss proposals concerning the cargo onboard. The Club passed this message on to their representative in Turkey

**468**          Dolphin Maritime v Swedish Club          [2009] 1 CLC
                        (Christopher Clarke J)

– Mr Ferruh Serbest – and asked him to speak to Anadolu about their intentions in
relation to the cargo and to ask who was authorised to act on their behalf. The Club
also asked Mr Serbest to ascertain the intentions of Garanti. On 2 February Mr Serbest
met representatives of both underwriters at Anadolu's offices. They expressed interest
in meeting Mr James Greene of the Club to discuss the disposal of the cargo.

13. As a result on 12 and 13 February 2008 a meeting took place at the offices of
Anadolu in Istanbul between Mr Greene and representatives of the cargo underwriters.
This meeting is said to have taken place without Dolphin's knowledge. Discussions
turned at this meeting to the settlement of the cargo claim. It appears to have been
agreed, subject to the approval of the Club's Head Office, that the Club would pay US
$8.5 million directly to the underwriters.

14. Negotiations followed between Mr Greene and the underwriters. According to
Dolphin it was notified by Anadolu on 18 February (a) that it had been negotiating
directly with the Club and (b) what were the terms of the proposed agreement. On
19 March Dolphin rendered an invoice to Anadolu in respect of its commission. On
25 March Anadolu declined to pay the commission and offered to pay a substantially
lesser amount. Neither the invoice of 19 March nor the letter of 25 March is in
evidence.

15. On 1 April Mr Sharma of Dolphin e-mailed to Mr Greene as follows:

'With reference to the above we understand that you approached our clients
directly on this matter some time ago. Leaving aside the questionable conduct
of your actions, we understand an agreement was reached w/p and subject to
contract to settle all the claims in respect of this matter at $8.5m.

Whilst we reserve our position in respect of your tortious interferences in our
contractual relations with our clients (see *Lumley v Gye*), nevertheless you will
no doubt recall that the LOU issued by the Swedish Club, copy attached for your
ease of reference, requires payment to be made by us.

Please note that Dolphin are instructed by cargo owners and cargo underwriters
and these instructions are not revocable in circumstances such as this.

You will appreciate that we hold you responsible in respect of any failure to
comply with the terms of LOU.

…

For your reference, our bank details for payment to be made are as follows–

Dolphin Maritime & Aviation Services Limited
National Westminster Bank Plc

QB                     **Dolphin Maritime v Swedish Club**                     **469**
                        *(Christopher Clarke J)*

A       P O Box 4 UQ
        30 North Audley Street
        London, W1A 4UQ

        Sort Code: 50-41-06
        Swift Code: NWBKGB2LXXX
B
        For US$ only:
        Account no: 01717359
        IBAN No: GB18NWBK60730101717359

C       For GBP and *ALL* other currencies:
        Account no: 12444367
        IBAN No: GB85nwbk50410612444367'

D       16. On 3 April 2008 Mr Greene replied saying that he did not believe that any
        wrong had been occasioned by the settlement discussion that had been ongoing with
        the underwriters on a without prejudice basis with a view to settlement of cargo
        interests' claims.

        17. On 29 April 2008 the Managing Director of Dolphin wrote a letter of complaint
        to the Managing Director of the Club. Her letter, which attached a copy of the e-mails
E       exchanged on 1 and 3 April 2008, included the following paragraphs:

        'For your information, our terms and conditions entitle us to charge a recovery
        fee based upon approx 10% of the settlement, as well as time and trouble fees
        for the casualty assistance. Mr Greene has also been advised that the instructions
F       from our clients were irrevocable.

        Regrettably, given the substantial fees at stake and the commercial damage
        this has caused to us with our clients, we have had no alternative other than to
        place the Club on notice that our rights are reserved in respect of any tortious
        interference by the Club on our contract with our clients.
G
        As you may be aware, the LOU provided by the Swedish Club provides for
        payment of any settlement funds to be made via Dolphin, as do the terms and
        conditions on which we are instructed. However it seems that the draft settlement
        agreement provides for funds to be paid directly from the Swedish Club to the
H       cargo underwriters, bypassing Dolphin.

        Accordingly, to protect the interests of our company we have been obliged to
        seek legal advice and unless this matter is resolved, we intend to bring an action
        for damages against your Association, not only in respect of the outstanding fees
        but also for the loss of business caused by this interference'.

### The Settlement Agreement                                                          A

18. On 14 May 2008 a settlement agreement was concluded between Gladiator
Navigation SA, the owners of the 'New Flame,' and the underwriters. The agreement,
which was subject to English law and jurisdiction, contained a warranty in the recitals
that the underwriters had paid out the full total loss claim to the cargo interests. Under       B
that agreement the owners agreed to settle the claims of the underwriters for a total
sum of $8,500.000, of which $4,029,000 was to go to Anadolu and $4,471,000 to
Eureko. Payment was to be made by way of telegraphic transfer to two separate bank
accounts of the underwriters in Turkey.

19. The agreement went on to provide that a meeting should take place within seven       C
days at which the owners would agree to remit the respective sums by telegraphic
transfer. Upon presentation by the owners of clear confirmation that the funds had
been irrevocably sent the underwriters were to hand over various original documents.
The underwriters undertook that no claim would be made under the LOU.

20. On 15 May 2008 Reed Smith on behalf of Dolphin wrote to the Club. Their            D
letter asserted that Dolphin had been instructed on a 'no cure, no pay' basis in respect
of the loss of the cargo and on the basis of their standard terms. (The letter said that
they were attached but they appear not to have been.) The letter summarised those
terms as providing that Dolphin was to be remunerated on commission; that its
instructions were irrevocable; that it was to have the exclusive conduct and handling      E
of the recovery claim and that underwriters were precluded from negotiating directly
with third parties representing potential defendants. The letter then set out the history
and contended that if and insofar as the Club entered into a settlement agreement
with underwriters or made payment to them pursuant to it it had committed the tort
of inducing a breach and conspiracy and further, that it would be in a breach of the
obligation to pay Dolphin under the LOU which was enforceable by Dolphin. The        F
letter sought an undertaking from the Club not to make payment, if that had not
already occurred, other than via Dolphin or, if it had been made, damages amounting
to £521,934.

21. At some date which is likely to be on or around 21 May, i.e. seven days after       G
the settlement agreement, the Club made payment to the underwriters pursuant to the
agreement. On 23 May the Club wrote a long letter to Reed Smith denying liability.
It contended that the Club was entirely unaware of the particular arrangements that
Dolphin had with its principals, was never told of Dolphin's standard terms, and had
never in fact received a copy of them because they were not attached to Reed Smith's
letter of 15 May. The allegations were rejected as entirely without merit.                 H

### The claims advanced in the claim form

22. The first two claims made in the claim form are that the Club is liable for
procuring or inducing a breach by underwriters of the agreement between Dolphin

A    and underwriters and that it was party to a conspiracy to use unlawful means. Although this is not spelt out in the claim form the conspiracy is, I presume, intended to be a conspiracy between the club and the underwriters and the unlawful means to be the breach of contract induced by the Club.

B    23. In order to succeed in a claim for inducing breach of contract it will be necessary for Dolphin to prove that the Club knew that the agreement that it was entering into with the underwriters, and which it performed, involved a breach of the underwriters' obligations towards Dolphin; and that in entering into the agreement the Club intended to bring about a breach of that agreement. There is an issue between the parties as to whether or not the Club had the necessary knowledge of the two critical

C    aspects of the contract between underwriters and Dolphin namely (i) the contractual provision that the underwriters should not discuss or negotiate any matter in relation to which Dolphin had been appointed with any other person directly or indirectly and (ii) the undertaking that any settlement monies would be received direct by Dolphin into its bank account.

D    24. The Club does not submit that there is no sufficiently arguable case that it had the requisite knowledge. Its challenge to the court exercising jurisdiction over it rests upon the rules laid down in the Judgments Regulation.[1]

*The Judgments Regulation*

E    25. The fundamental principle of the Regulation is that civil actions are, subject to certain exceptions, to be brought against individuals or companies in the courts in which they are domiciled. Article 2 provides:

F    '1. Subject to this Regulation, persons domiciled in a Member State shall, whatever, their nationality, be sued in the courts of that Member State'.

    26. There is no dispute but that the Club is domiciled in Sweden. Unless, therefore, one of the exceptions contained in the Regulation is applicable, an action against the club must be brought in Sweden.

G    27. Dolphin relies on Article 5. 3 which provides:

    'A person domiciled in a Member State may, in another Member State, be sued:

H    3. in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur'.

    28. The decision of the ECJ in *Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* (Case 21/76) [1976] ECR 1735; [1978] 1 QB 708 established that the words of Article 5.3. are to be construed so as to enable the claimant to commence proceedings:

**472**                      **Dolphin Maritime v Swedish Club**                    **[2009] 1 CLC**
                                  *(Christopher Clarke J)*

A

'at the place where the damage occurred or the place of the event giving rise to it'

Dolphin relies on the former alternative. The question, therefore, is where, in this case, the damage occurred.

B

**'The place where the damage occurred'**

29. The jurisprudence of the ECJ and other authority establishes that when considering the meaning of those words the following considerations must be borne in mind:

C

(a) the general and fundamental principle is that laid down in Article 2;

(b) the words of Article 5(3) are to be given an autonomous meaning and are not to be interpreted by reference to the definition of a cause of action under the particular national law concerned: see *Alfred Dunhill Ltd v Diffusion Internationale* [2001] CLC 949 at 958; *The Seaward Quest* [2007] 1 CLC 989 at para. 25;

D

(c) in ascertaining that meaning it is important to remember that the 'special jurisdiction' (see *Dumez France SA v Hessische Landesbank* (Case 220/88) [1990] ECR I-49) found in Article 5(3) is a derogation from the fundamental principle set out in Article 2. As such it must be restrictively interpreted: see e.g. *Kalfelis v Bankhaus Schroder* (Case 189/87) [1988] ECR 5565 and *Kronhofer* (168/02) [2004] ECR I-6009;

E

(d) the special jurisdiction is justified only because of the existence of a particularly close connecting factor between a particular dispute and the courts of a Member State other than that in which the defendant is domiciled which satisfies the need for certainty and justifies the attribution of jurisdiction to those courts for reasons relating to the sound administration of justice: see *Kalfelis*, para. 11; *Dumez*, para. 17 and *Reunion Europeenne SA v Spliethoff's Bevrachtingskantoor BV* (Case C-51/97) [1999] CLC 282; [1998] ECR I-6511, paras. 35-6.

F

G

(e) the fundamental objective of the Regulation militates against an interpretation of the Regulation, otherwise than in the cases expressly provided for, which might lead to recognition of the jurisdiction of the courts of the claimants' domicile and which would enable the claimant to determine the competent court by his choice of domicile: see *Dumez*, paras. 16 and 19 and *Alfred Dunhill Ltd v Diffusion Internationale* [2001] CLC 949 at 956.

H

(f) nevertheless, if a proper application of Article 5(3) entitles the claimant to commence proceedings in the courts of his domicile, he is not to be precluded from

© DSP Publishing Ltd

QB                    **Dolphin Maritime v Swedish Club**                    **473**
                          (*Christopher Clarke* J)

A    doing so because the court in question is a court of that domicile: *Custom Made
     Commercial Ltd v Stawa Metallbau GmbH* (Case C-288/92) [1994] ECR I-2913.

     30. In some cases the place where *the damage occurred* may not be difficult to
     discern. If a claimant's person or property is injured that place is likely to be the place
     where his person or property was at the time of the injury. In the case of economic
B    loss, however, the issue is not so clear cut. In one sense a corporation's economic loss
     is suffered in the place where its accounts are prepared because it is in them and there
     that its monetary loss is calculated and felt.

     31. However, as the jurisprudence of the ECJ makes clear, the fact that a
     corporation's loss is felt where its books are made up does not mean that that is the
C    place where the damage occurred for the purpose of Article 5.3. If that were so a
     corporation would in most economic loss cases be able to sue in the courts of its own
     domicile.

     32. The present case introduces an added complication in that, whilst the claimant
     complains of things that were done, e.g. the fact that the underwriters negotiated
D    directly with the Club, it also complains, most particularly, about what was not done,
     namely to procure that the recovery was paid to Dolphin itself.

E    **ECJ authorities**

     33. The approach taken by the ECJ to the question where the damage occurs
     appears from a number of authorities. In *Dumez* [1990] ECR I-49 two French
     companies made a joint venture agreement with a German gentleman for the
     construction of buildings on a plot he owned in Germany. The scheme fell through.
F    The two French companies sued various banks which they blamed for financial loss
     in the Tribunal de Commerce in Paris. The French companies had transferred their
     rights and obligations under the joint venture agreement to two German subsidiaries.
     Their claim was, accordingly, for what was termed 'ricochet' i.e. indirect losses. The
     Tribunal de Commerce and the Cour d'Appel held that the damage was suffered in
G    Germany and that the plaintiff companies had subsequently suffered a financial loss
     only by an indirect process.

     34. In his opinion the Advocate General said:

H        '51. In addition, many of the problems which certain commentators believe they
         perceive in the Mines de Potasse d'Alsace judgment derive from those authors
         – in my opinion incorrect – view that the solution adopted in that judgment leads
         to the possibility of jurisdiction being attributed to the court in whose judicial
         district the victim has his domicile. Here again, that view – which appears to
         reveal confusion between the place where the damage occurs (the very words
         used in the judgment) and the place where the damage is suffered – would have

**474**            Dolphin Maritime v Swedish Club            [2009] 1 CLC
                    (Christopher Clarke J)

the disadvantage of conflicting with the line of authority usually followed on that point by the courts of the Member States.                    A

52. Accordingly, the foregoing considerations lead me to consider that *the place where the damage occurs is, for indirect victims, the place where the initial damage manifested itself, in other words, the place where the damage to the direct victim occurred*.'[2]                    B

35. The judgment of the Court sets out the considerations summarised in paras. 29(c)–(e) above and concludes:

'20. It follows from the foregoing considerations that although, by virtue of a previous judgment of the Court (in *Mines de Potasse d'Alsace*, cited above),the expression "place where the harmful event occurred" contained in article 5(3) of the Convention may refer to the place *where the damage occurred, the latter concept can be understood only as indicating the place where the event giving rise to the damage, and entailing tortious, delictual or quasi-delictual liability, directly produced its harmful effects upon the person who is the immediate victim of that event*.                    C

D

21. Moreover, whilst the place *where the initial damage manifested itself* is usually closely related to the other components of the liability, in most cases the domicile of the indirect victim is not so related.                    E

22. It must therefore be stated in reply to the question submitted by the national court that the rule on jurisdiction laid down in Article 5(3) of the Convention cannot be interpreted as permitting the plaintiff pleading damage which he claims to be the consequence of the harm suffered by other persons who were direct victims of the harmful act to bring proceedings against the perpetrator of that act in the courts of the place in which he himself ascertained the damage to his assets.'                    F

36. In *Marinari v Lloyds Bank* (Case C-364/93) [1995] ECR I-2719; [1996] QB 217 the plaintiff presented a dubious looking set of promissory notes with a face value of US $752,500,000 to a branch of Lloyd's in Manchester. The police were contacted; the notes were seized; and the plaintiff was arrested. After his release the plaintiff brought an action in Italy, where he was domiciled, for the value of the notes and damages for his arrest.                    G

H

37. In his opinion the Advocate General said:

'22. Let us be clear: the exclusion of the courts of the place where the damage is ascertained – that is to say, where the harm is suffered, not where it occurred – must apply both to the direct victim and to the indirect victim, otherwise the

QB                     **Dolphin Maritime v Swedish Club**                     **475**
                          (Christopher Clarke J)

A    jurisdiction of the courts for the place where the plaintiff lives, which article 3 of
     the Convention specifically takes care to remove, would be revived.

     …

B    26. That case [Bier] concerned a complex situation in which the causal event
     and the harmful consequences occurred, from the outset, in two different
     contracting states. Here, by contrast, as is rightly pointed out by the United
     Kingdom Government, both the causal event (namely the conduct imputed to
     the employees of Lloyds Bank) and the initial damage, (sequestration of the
     promissory notes and imprisonment) occurred in the United Kingdom. Only
C    the alleged consequential damage (financial losses) could have been suffered in
     Italy.

     27. We are thus dealing with a particular situation in which the causal event and
     the *direct harmful consequences* are located in a single territory and that initial
D    damage adversely affected the victim's assets in another contracting state.

     28. Although the court has not been called on to settle such a question directly,
     the basis for an answer is undeniably to be found in its judgments cited above
     since we are merely faced once more with the distinction which is of essential
     importance for the purpose of determining jurisdiction between the place where
E    the damage arises and the place where it is suffered.

     29. The court regarded as relevant to the determination of the court of competent
     jurisdiction, in the first of its judgments on the issue, only the damage that had
     occurred. More clearly still, in *Dumez* [1990] ECR 1-49 it displayed its hostility,
     it seems to me, to the taking into consideration of later financial consequences,
F    by referring, at p. 80, para. 21, to "the place where the initial damage manifested
     itself," that is to say, the place where the damage occurred.

     30. Now, to confer jurisdiction on the court in the place where the financial losses
     were ascertained would be tantamount to disregarding the specificity of the place
G    of occurrence as the criterion for the conferment of jurisdiction by placing it on
     the same footing as the place where the damage is suffered.

     31. That broader approach would thus uphold the forum actoris, since a victim
     generally suffers harm at the place where he is domiciled. Such a result would
     be manifestly contrary to article 5 of the Convention, which, as the court held, is
H    intended to meet the requirements of the proper administration of justice.'

     38. In giving judgment the ECJ, having considered *Bier* and *Dumez* said:

     '14. Whilst it is thus recognised that the term "place where the harmful event
     occurred" within the meaning of article 5(3) of the Convention may cover both

A

the place where the damage occurred and the place of the event giving rise to
it, that term cannot, however, be construed so extensively as to encompass any
place where the adverse consequences of an event that has already caused actual
damage elsewhere can be felt.

B

15. Consequently, that term cannot be construed as including the place where,
as in the present case, the victim claims to have suffered financial damage
consequential on initial damage arising and suffered by him in another
contracting state.'

C

39. In *Reunion Europeenne SA v Spliethoff's Bevrachtingskantoor BV* (Case C-
51/97) [1999] CLC 282; [1998] ECR I-6511 pears were carried from Melbourne to
Rotterdam by sea in refrigerated containers and then by road to France. When the
consignment arrived at Rungis the fruit had prematurely ripened. Subrogated insurers
brought an action in France against the issuer of the bill of lading, the actual carrier
and the Master.

D

40. In his opinion the Advocate General said:

'48. In my opinion, the abovementioned case-law shows that, in order to
determine the "place where the damage occurred", it is essential to define the
relevant "damage". "Damage" means any harm to the property or person of the
plaintiff, where it relates to the event giving rise to the damage, that is to say
to the illegal behaviour attributed to the defendant by a direct and causal link,
to the exclusion of indirect, more remote damage or damage which is suffered
by an indirect victim. Consequently, "the place where the damage occurred" is
that where the event giving rise to the damage caused injury, within the above
meaning, to the plaintiff.

E

F

49. The above case-law provides sufficient elements to determine the "place
where the damage occurred" in the case where the damage occurs in the course
of international carriage of good, as in the present case.

50. First of all, it must be observed that the basic obligation imposed on every
carrier is to load the goods at a given point and to deliver them intact at another
point. As a result, carriers are, in principle, liable for any damage caused to the
goods between the departure and the arrival points of the voyage that is to say for
the entire duration of the voyage.'

G

H

41. In its judgment the Court said:

'33. As the Advocate General emphasises in points 54–56 of his Opinion, in an
international transport operation of the kind at issue in the main proceedings
the place where the event giving rise to the damage occurred may be difficult
or indeed impossible to determine. In such circumstances, it will be for the

QB                    **Dolphin Maritime v Swedish Club**                    **477**
(Christopher Clarke J)

A    consignee of the damaged goods to bring the actual maritime carrier before the
courts for the place where the damage occurred. It must be pointed out in that
regard that, in an international transport operation of the kind at issue in the main
proceedings, the place where the damage occurred cannot be either the place of
final delivery, which, as the Commission rightly pointed out, can be changed in
mid-voyage, or the place where the damage was ascertained.

B

34. To allow the consignee to bring the actual maritime carrier before the courts
for the place of final delivery or before those for the place where the damage
was ascertained would in most cases mean attributing jurisdiction to the courts
for the place of the plaintiff's domicile, whereas the authors of the Convention
C    demonstrated their opposition to such attribution of jurisdiction otherwise than in
the cases for which it expressly provides (see, to that effect, *Dumez France and
Tracoba*, cited above, paragraphs 16 and 19, and Case C-89/91 *Shearson Lehman
Hutton v TVB* (Case C-89/91) [1993] ECR I-139, paragraph 17). Furthermore,
such an interpretation of the Convention would make the determination of the
competent court depend on uncertain factors, which would be incompatible
D    with the objective of the Convention which is to provide for a clear and certain
attribution of jurisdiction: see, to that effect, *Marinari*, paragraph 19, and *Handte*
(Case C-26/91), paragraph 19, both cited above).

35. In those circumstances, the place where the damage arose in the case of an
international transport operation of the kind at issue in the main proceedings can
E    only be the place where the actual maritime carrier was to deliver the goods.

36. That place meets the requirements of foreseeability and certainty imposed
by the Convention and displays a particularly close connecting factor with the
dispute in the main proceedings, so that the attribution of jurisdiction to the
F    courts for that place is justified by reasons relating to the sound administration
of justice and the efficacious conduct of proceedings.'

42. In *Domicrest Ltd v Swiss Bank Corp* [1998] CLC 1451; [1999] QB 548 the
English plaintiff agreed, contrary to its usual practice, to release goods in Switzerland
G    and Italy on receipt of a copy payment order from the bank. It sued the bank in
England on the footing that the bank had misrepresented the effect of the payment
order and its client's credit. Rix J, as he then was, held that the damage suffered by
the plaintiff had occurred in Switzerland and Italy where the goods were released. He
observed:

H
'It is by reference to the loss of those goods that the damages are in my view
primarily pleaded … even if there is also an alternative plea … in terms of the
unpaid price (a plea which in any event may have been intended for the claim
in breach of contract). In truth, even though Domicrest would have suffered no
loss if Swiss Bank Corporation, or Interglobal had paid the price of those goods,
nevertheless it has to be remembered that the remedy in negligent mis-statement

**478**                    Dolphin Maritime v Swedish Club                    **[2009] 1 CLC**
                                    (Christopher Clarke J)

A

is not, as it is in contract, to be put in the same position as if the contract had been
performed but depends on the answer to the question: what would have happened
if the negligent mis-statement had not been made? In that case, the goods would
not have been released before payment and this lost to Domicrest. The essence
of the complaint is in any event that the goods were released prior to payment
on the strength of Swiss Bank Corporation's representations and contrary to
Domicrest's trading policy. It seems to me that this is consistent with the decision
in *Marinari v Lloyds Bank plc* [1995] ECR I-2719; [1996] QB 217.'

B

**Application**

C

43. Mr Robert Bright, QC, for Dolphin submits that the underwriters were in
breach of their agreement with Dolphin at least from the time when the discussions
at the meeting of 12-13 January turned toward settlement. Initially they were in
breach of clauses 6.1 (notification of offers of payment) and 6.5 (exclusive right of
Dolphin to discuss and negotiate). Those breaches continued throughout the period
of the negotiations. The conclusion of the settlement agreement constituted a further
breach of clause 6.5 and clause 6.1 and also constituted an anticipatory breach of
clause 6.8 (agreement that any Recovery should be received direct by Dolphin). The
underwriters' actual breach of clause 6.8 occurred on the date of the further meeting
contemplated by clause 3 of the settlement when payment to the underwriters' bank
accounts in Turkey occurred. This breach prevented Dolphin from exercising its right
to make deductions in accordance with its normal practice referred to in clause 9.7.
This analysis falls to be made under English law, since that is the law governing the
contract between Dolphin and the underwriters.

D

E

44. Dolphin's damage occurred, he submits when the $8.5 million was paid away
to the underwriters. The effect of the Club doing that was that Dolphin did not receive
that sum, as the contract required. Not having received it it lost its security for the
payment of its fees; and incurred the risk, which has materialised, that it would not
receive its fees. Whilst the underwriters were in breach of contract in the several
respects set out in the previous paragraph, Dolphin's position was only materially
prejudiced when it failed to receive, as it should have done the recovery in its bank
account. No doubt that money, when received would be held in a fiduciary capacity.
But it would provide security for the fees. The antecedent negotiations and settlement
did not fatally compromise Dolphin's position since, if payment of the $8 million had
been made to them thereafter, Dolphin would have nothing substantive to complain
about.

F

G

H

45. Mr Robert Thomas for the Club's first submission was that the attempt by
Dolphin to rely on Article 5(3) fails in limine because Dolphin has not established
that, if payment had been made to it, it would have been made in England. It could
just as well have been paid in New York or elsewhere in the USA. Further the invoice
sent to the underwriters has never been produced so that we do not know where
payment of that invoice had to be made.

© DSP Publishing Ltd

A

46. To this there are, as Mr Bright pointed out, several answers, of which the fifth and most cogent only surfaced towards the middle of the argument. Firstly, Dolphin is an English company, and the court is entitled to assume that any payment to it would be required to be paid in England. In the absence of any proof that Dolphin called for payment to be made elsewhere that is what the contract would require. Secondly,
B
it matters not what the invoice said (if it said anything) about payment. The relevant payment to be made is the payment of the settlement monies to Dolphin (i.e. the $8.5 million), not the fee, which is for a fraction of that. Thirdly, he submitted that para. 15 of Mr Brown' second witness statement ('The breaches causing loss which were induced, including, inter alia, the failure to ensure that the settlement monies were paid into the claimant's account, occurred within the jurisdiction') in effect attests
C
that the monies were to be paid in England. Fourthly, he informed me on instructions that Dolphin only had an English bank account, and offered Mr Sharma as a witness to confirm that. Fifthly, the e-mail of 1 April set out in para. 15 above specified that payment should be made to an English bank account. In those circumstances it is plain that Dolphin has a well arguable case that the $8.5 million should have been
D
paid to them in London.

47. Mr Thomas submits that Mr Bright's analysis is (a) inappropriately fashioned by reference to English municipal law; and (b) too refined, if not recherché. The reality and the substance, he submits is that the damage to Dolphin was done because, and
E
when, monies that should have been paid to Dolphin were paid to the underwriters' Turkish bank accounts. The place where the harm occurred was either the place from which the relevant payment was made; or the place – i.e. Turkey – where it was received. For present purposes it is not necessary to decide which is correct[3].
In *Domicrest* it was the release of the goods which caused loss and the place of their release was the place where the harm occurred. So here the release of monies that
F
should have gone to the claimant is the cause of the loss and either the place of release or the place to which the monies went is the place of the damage. Particular care must be taken in assessing any argument which relies on the effect on the claimant; since that is apt to produce the result that the claimant is entitled to sue in the court of its domicile because that is where a limited company feels most financial effects.

G

48. The argument at the hearing proceeded upon the basis that 'Recovery' embraced the money obtained by underwriters as a result of their settlement with the Club. It appeared to me, however, when I came to write this judgment, that that was by no means clear; and I invited the parties to make further submissions.

H

49. The definition of 'Recovery' embraces both a claim and any money obtained as a result of the claim being agreed or settled. The parties agreed that Dolphin should be the sole negotiator (clause 6.5), and that Dolphin would agree or settle a claim and then receive the Recovery i.e. the amount obtained under the settlement (clause 1.1(c)) direct into its bank account (clause 6.8). Assume, however, as happened in the present case, that the claim is initially pursued by Dolphin, but that the Client (i.e.

**480**          **Dolphin Maritime v Swedish Club**          **[2009] 1 CLC**
                      (Christopher Clarke J)

the underwriters) then settle and receive payment direct. The Client will have been in breach of clause 6.5. But, as it seems to me, it will not have been in breach of clause 6.8. That clause provides for the Client to procure that 'any Recovery on [the Client's] behalf by Dolphin' will be received direct by Dolphin. But, where the client has been in breach of clause 6.5. by negotiating direct, the breach will have ensured that 'the amount of any money … obtained' (which the definition of 'Recovery' includes) will not have been obtained on the Client's behalf by Dolphin but by the Client itself. If so clause 6.8 will not bite on the sum which the underwriters obtained by their own efforts.

50. Mr Bright submitted that 'Recovery' included a claim pursued by Dolphin whether or not the claim actually led to any money being received, and that, because of the wide definition of 'Recovery' clause 6.8. applied where monies were recovered pursuant to a settlement not in fact handled by Dolphin but in the context of a claim which had been pursed by Dolphin.

51. I do not accept this. The use by the draftsman of the phrase 'and or' (sic) in the expression 'either pursued or resisted, and or subsequently agreed or settled, by the Company on behalf of the Client' is inelegant. But it is tolerably clear that he intended 'Recovery' to embrace (i) a claim which Dolphin had pursued but not settled; (ii) a claim which Dolphin had pursued to settlement; and (iii) an amount of money obtained by way of settlement. But in each case the claim was to have been pursued, agreed or settled by Dolphin on behalf of the client and any monies caught within the definition were to be monies 'so obtained' i.e. obtained by the agreement or settlement made by Dolphin on the Client's behalf. Consistently with this clause 6.8. applies to any 'Recovery', on the Client's behalf by Dolphin. In context that means any amount of money obtained as a result of the claim having been agreed or settled by Dolphin on behalf of the Client.

52. That conclusion seems to me consistent with clause 11. That clause provides that, in cases other than 'Recovery' cases (i.e. cases not involving a money claim by the Client) either party may terminate on 14 days' notice. Under clause 11.3 the Client will then be liable for the fees incurred up to termination. But in 'Recovery' cases, (here meaning cases where there has been a claim pursued by Dolphin to obtain money) the position is as follows:

(a) the agreement is only terminable by Dolphin and if not so terminated it continues (clause 11.4);

(b) if it is terminated before Dolphin has concluded or received a 'Recovery', i.e. obtained an amount of money on the Client's behalf, the client is obliged to pay fees based on the amount that Dolphin expected to recover (clause 11.5);

(c) if prior to termination Dolphin has negotiated a settlement proposal which it recommends but the Client rejects, the Client can purse the 'Recovery' (here meaning

QB                     **Dolphin Maritime v Swedish Club**                **481**
                         (*Christopher Clarke* J)

A   the claim initially pursued by Dolphin but not agreed or settled by them) but is
    obliged to pay fees based on the recommended figure (or on a quantum meruit)
    (clause 11.6);

    (d) if Dolphin terminates because of the Client's impecuniosity it has the right to
B   pursue the 'Recovery' (here again the claim initially pursued by Dolphin but not yet
    settled by them) and any monies recovered by Dolphin will, subject to insolvency law
    provisions, belong to Dolphin (clause 11.7).

    53. Clause 11.8 applies 'in any of the above cases'. That expression seems to
    me wide enough to embrace the situation where an agreement irrevocable by the
C   Client continues pursuant to clause 11.4. I see no satisfactory reason to limit the
    expression to the cases set out in paras. 11.5–11.7 and not to all the 'Recovery Cases'
    including a case in which the agreement relates to a 'Recovery' and the appointment
    is irrevocable and continues. Accordingly, in any of the cases set out in para. 52
    above any sum recovered directly by the Client from anyone which 'would otherwise
    comprise a Recovery' i.e. which would be a 'Recovery' if obtained by Dolphin must
D   be paid in the first instance to Dolphin's bank account. That provision appears to
    me to confirm that monies obtained directly by the Client are not a 'Recovery' even
    though they would be if they had been obtained by Dolphin.

    54. Mr Bright submitted that, if, as I do, I rejected his submission that 'Recovery'
E   included settlement monies obtained otherwise than by Dolphin, I should hold that
    the terms should be construed so as to impose an implied obligation on the Client to
    arrange for such settlement monies to be paid to Dolphin. The officious bystander
    would, he submits, have been told that on the facts of the present case the underwriters
    should obviously be obliged to pay the settlement monies to Dolphin's bank account
F   so as to enable Dolphin to follow the usual procedure specified in clause 9.7.

    55. I do not regard it as necessary for the officious bystander to ask his question.
    The parties have, in my judgment, made the necessary provision in clause 11.8 for the
    circumstance where Dolphin pursues a claim which the client then settles directly.

G   56. Accordingly there is, as it seems to me, a well arguable case that, under the
    terms and conditions, the underwriters were bound to procure that the sums recovered
    directly from the Club were paid in the first instance to Dolphin. I do not regard
    Dolphin as precluded from relying on clause 11.8 by reason of the contents of the
    Claim Form. That pleads, in para. 4, that the underwriters were obliged to ensure that
    any payment in settlement of any cargo claim was paid direct to the Claimants.
H
    57. In those circumstances, the arguments on behalf of Dolphin are, in my judgment,
    to be preferred. Dolphin's essential complaint is that it suffered harm because it did
    not receive the $8.5 million into its bank account which it should have done because,
    despite knowledge that this would involve a breach of the underwriters' contract with
    Dolphin, the Club paid it to their accounts in Turkey. I recognise that the matter must

**482**            Dolphin Maritime v Swedish Club            [2009] 1 CLC
(Christopher Clarke J)

be looked at through European spectacles. But there is nothing insular in recognising that the contract (which is governed and must be interpreted by English law) calls in terms for 'Recoveries' and quasi-Recoveries (i.e. sums which would otherwise comprise 'Recoveries') to be received direct by Dolphin and that the complaint in tort is that the Club wrongfully brought about a breach of that obligation.

58. When, in those circumstances, I ask myself 'where the damage to the direct victim occurred' (Dumez: Advocate General para. 52) or 'where the event giving rise to the damage, and entailing tortious liability, directly produced its harmful effects upon the person who is the immediate victim of that event' (*Dumez* (ECJ) para. 20) or 'where the event giving rise to the damage caused injury' (*Reunion*), the answer appears to me that it is in this country, where Dolphin did not receive the money which, if the contract had been performed, it should have received.

59. Further, if I ask myself what would have been the position if the tort complained of had not taken place, the answer is that payment would have been made to Dolphin in England; and the essence of Dolphin's complaint is that that did not occur. Mr Thomas submitted that an inquiry as to what would have happened if the tort was not committed was no guide to the question – where did the damage occur? If there was no tort, there would have been no damage. In some cases, e.g. in cases of damage to goods or persons, the question may have no great utility. But in others where the claimant has failed to obtain some property or money which he would otherwise have received the answer to the question may be a guide to identifying where the harm in the particular case occurred.

60. I do not ignore the danger of conflating the place where the damage occurred with the place where the loss was suffered. There is, however, a difference between a case in which the claimant complains that he has lost his money or goods (as in *Domicrest* or *The Seaward Quest*) and a case in which the claimant complains that he has not received a sum which he should have received. In the former case the harm may be regarded as occurring in the place where the goods were lost (*Domicrest*) or the place from or to which the moneys were paid (*The Seaward Quest*), although the loss may be said to have been suffered in the claimant's domicile. In the latter case the harm lies in the non receipt of the money at the place where it ought to have been received, and the damage to him is likely to have occurred in the place where he should have received it. That place may well be the place of his domicile and, therefore, also the place where he has suffered loss. An analogy may be drawn with the non delivery of cargo at the destination port: see *Reunion Europeenne*.

61. There is, in my view, nothing inconsistent with the scheme of the Regulation in that result. In those circumstances the place where the benefit should have been received provides a sufficiently 'close connecting factor with the courts of a Member State other than that in which the defendant is domiciled which satisfies the need for certainty and justifies the attribution of jurisdiction to those courts for reasons relating to the sound administration of justice', particularly where, as here, the contract

QB                    **Dolphin Maritime v Swedish Club**                    **483**
                        (*Christopher Clarke* J)

A    between Dolphin and the Club was subject to English law and arbitration, and where
     Dolphin was a provider of services in England (as well as elsewhere).

     62. Accordingly, Dolphin's tortious claims fall, in my judgment, within Article
     5(3) of the Regulation. Whilst the argument centred round the claim for inducing
B    breach of contract, I did not understand it to be suggested that, if the inducement
     claim fell within that Article the claim in conspiracy might not.

     63. I would have reached a similar conclusion if I had held that there was no
     obligation under the terms to procure that the $8.5 million was paid to Dolphin in
     England. On that footing the relevant breaches would be the breaches of clause 6.5.
C    constituted by the underwriters negotiating and settling with the Club directly in the
     discussions that led to the agreement of 14 May and the further meeting on or around
     21 May at which the underwriters must have confirmed their instruction for payment
     direct to their own bank accounts and called on the Club to remit the settlement
     monies accordingly. In addition the underwriters will have been in breach of the
     notification provisions of clause 6.1. by reason of the underwriters' failure to inform
D    Dolphin about the progress of the settlement negotiations, although the extent of that
     breach is in issue.

     64. On this analysis the relevant breaches occurred, so far as clause 6.1. (failure
     to inform) is concerned, in England and, so far as clause 5 (direct negotiation) is
E    concerned, in Greece or Turkey. The harmful events therefore occurred in one or other
     of those countries. But the relevant question remains: where did Dolphin suffer the
     harmful consequences of those events? The harmful consequence to Dolphin of these
     breaches was not that the agreement was made but that under it Dolphin was not paid
     direct. The effect was to deprive Dolphin of the rights that would have accrued to it
     under clause 6.8. if Dolphin had made the Recovery. If the underwriters had complied
F    with their obligations the claim would have been settled with Dolphin's involvement
     and on terms that the monies would be paid into Dolphin's bank account. In the event
     Dolphin was deprived of the right to have payment made to it in England under what
     would probably have been an agreement which like the 14 May settlement agreement
     provided for English law and jurisdiction.

G
     **The Contracts (Rights of Third Parties) Act 1999**

     65. The Act provides:

H    '1 *Right of third party to enforce contractual term*

     (1) Subject to the provisions of this Act, a person who is not a party to a contract
     (a "third party") may in his own right enforce a term of the contract if–

     (a) the contract expressly provides that he may, or

**484**                     Dolphin Maritime v Swedish Club                 **[2009] 1 CLC**
                              (Christopher Clarke J)

(b) subject to subsection (2), the term purports to confer a benefit on him.                    A

(2) Subsection (1)(b) does not apply if on a proper construction of the contract
it appears that the parties did not intend the term to be enforceable by the third
party.

…                                                                                               B

2 *Variation and rescission of contract*

2(1) Subject to the provisions of this section, where a third party has a right under
section 1 to enforce a term of the contract, the parties to the contract may not, by          C
agreement, rescind the contract, or vary it in such a way as to extinguish or alter
his entitlement under that right, without his consent if–

(a) the third party has communicated his assent to the term to the promisor,

(b) the promisor is aware that the third party has relied on the term, or                       D

(c) the promisor can reasonably be expected to have foreseen that the third party
would rely on the term and the third party has in fact relied on it.

…                                                                                               E

(5) The court or arbitral tribunal may, on the application of the parties to a
contract, dispense with any consent that may be required under subsection (1)(c)
if satisfied that it cannot reasonably be ascertained whether or not the third party
has in fact relied on the term.                                                                 F

(6) If the court or arbitral tribunal dispenses with a third party's consent, it
may impose such conditions as it thinks fit, including a condition requiring the
payment of compensation to the third party.

(7) The jurisdiction conferred on the court by subsections (4) to (6) is exercisable          G
by both the High Court and a county court.'

**The submissions**

*Dolphin*
                                                                                                H
66. The LOU does not expressly provide that Dolphin may enforce it. Dolphin
submits that it has a good arguable case that the contract purports to confer a benefit
on it and that it does not, on its proper construction, appear that the parties did not
intend the term providing for payment to Dolphin not to be enforceable by it.

© DSP Publishing Ltd

A     67. As to the former, Dolphin stood to benefit from the receipt of money to itself because such a payment would give it security for its claim to commission. As to the latter, there is, it is submitted, nothing in the LOU to indicate that the parties did not intend it to be enforceable by Dolphin. The fact that the LOU is addressed to Dolphin is a strong indication that it was intended to be enforceable by Dolphin.

B     68. In developing his submissions in this respect Mr Bright postulated three different situations:

(i) A agrees with B to pay C $8,500,000;

C     (ii) A agrees with B to pay B by making a payment of that amount to a specified account of B at C's bank;

(iii) The present case.

D     69. In the first case the payment is plainly for the benefit of C and, all other things being equal, C is entitled to enforce the term against A. In the second case, as he submits, whilst in a sense the payment benefits C (since the bank may have a right of set-off in respect of monies paid into the bank account and will, in any event, benefit from having the funds deposited with it) most people would regard the agreement as providing simply for payment to B. It would not be in their immediate contemplation that the bank would benefit and the bank would not, generally, be entitled to recover.

E     Thus the prospect of a flood of potential claims by banks and other designated recipients (solicitors, agents, etc), which Mr Thomas relies on as sound reason for rejecting any claim to the applicability of the Act, can be disregarded.

F     70. In the present case the negotiations for the LOU took place, not between A (the underwriters) and B (the Club) but between C (Dolphin), on A's behalf, and B. Dolphin is the addressee of the LOU. The LOU calls for payment to Dolphin on the underwriters' behalf – not to the underwriters (B) at their bank. Further the LOU must like all contracts be construed in its factual matrix. There is evidence in Mr Brown's witness statement that provisions such as those found in the standard terms

G     are standard practice for recovery agents and are adopted so that they do not run the risk of not receiving their fees. If that is so, it lends support to Dolphin being entitled to enforce against the Club.

*The Club*

H     71. Mr Thomas submits that the LOU does not purport to confer a benefit on Dolphin and that, on its true construction, the parties did not intend its terms to be enforceable by Dolphin. A distinction is to be made between an intention to confer a benefit and the mere fact that a person may incidentally gain some benefit from the performance of a particular term in the contract between two others. The present case falls into the latter category.

**486**                    Dolphin Maritime v Swedish Club                    [2009] 1 CLC
                              (Christopher Clarke J)

*Discussion*                                                                          A

72. In *Prudential Assurance Co Ltd v Ayres* [2007] EWHC 775 (Ch), Lindsay
J held that section 1(1)(b) of the Act was satisfied if, on a true construction of the
term in question, its sense had the effect of conferring a benefit on the third party in
question, and that there was within section 1(1)(b) no requirement that the benefit            B
on the third party should be the predominant purpose or intent behind the term. In
that case the term in question was a provision in a deed between a landlord and the
assignee of a lease, which was a firm, that the liability of the assignee for future rent
should not extend to the personal assets of the partners and that any recovery by the
landlord against the assignee or 'any previous tenant' for default under the lease was           C
limited to the assets of the partnership. The previous tenant sought to enforce this
provision when sued by the landlord for arrears of rent (the assignee having failed
to pay). Lindsay J held that the previous tenant was entitled to enforce this provision
against the landlord (itself a lessee of a superior landlord).

73. The Court of Appeal reversed this decision holding that the relevant provision,          D
properly interpreted, did not purport to confer a benefit on the previous tenant but to
restrict the rights of the landlord and the previous tenant against the assignee. In those
circumstances no question of the application of the 1999 Act arose.

*Section 1(1)(b)*
                                                                                      E
74. A contract does not purport to confer a benefit on a third party simply because
the position of that third party will be improved if the contract is performed. The
reference in the section to the term purporting to 'confer' a benefit seems to me to
connote that the language used by the parties shows that one of the purposes of their
bargain (rather than one of its incidental effects if performed) was to benefit the third       F
party.

75. In my judgment the term in question does not purport to confer a benefit on
Dolphin in the sense meant by section 1(1)(b) of the 1999 Act. The provision in the
LOU that payment should be made to Dolphin or underwriters' solicitors was an
agreement as to the means by which the Club's obligation to underwriters was to be
discharged. It was not an indication that the agent payee was an intended beneficiary          G
of the promise. The intended beneficiaries were the underwriters on whose behalf the
payment was to be received.

76. A provision for payment of a sum to an agent on his principal's behalf is to be
contrasted with an agreement by A and B that A will pay C (C not being A's agent                H
or trustee)[4]. Further, the fact that payment is to be made either to one company
(Dolphin) or any firm or company in a specified category (underwriters' solicitors)
seems to me to indicate that it is not the purpose of the provision to benefit Dolphin
or the solicitors rather than to specify the appropriate mode of payment.

© DSP Publishing Ltd

QB                    **Dolphin Maritime v Swedish Club**                    **487**
                        (*Christopher Clarke* J)

A    77. Even if it be established that recovery agents usually deduct their commission
     from the recovery and agree with their clients that the recovery should be paid to
     them that would not in my judgment transform this agreement into one whose purpose
     was to confer a benefit on Dolphin. There are, no doubt, many agents who habitually
     deduct their fees or commission from the recovery that they make. That is not, in my
     judgment, sufficient to make an agreement to pay an agent on behalf of his principal
B    an agreement which purports, so far as the contracting parties are concerned, to confer
     a benefit on the agent for the purposes of section 1(1)(b) of the 1999 Act.

     *Section 1(2)*

C    78. If I am wrong on that, then the next question is whether, on a proper
     construction of the contract it appears that the parties did not intend the term to be
     enforceable by Dolphin. The practical efficacy of any right of enforcement would
     necessarily be dependent on the settlement monies not being paid to any solicitor
     appointed by the underwriters. Payment to such a solicitor would not be contrary to
     the LOU which expressly contemplates such a payment. The question also arises as to
D    whether the LOU prohibits the Club making payment to the underwriters' own bank
     account and whether, if payment is so made, it would operate as a discharge of the
     Club's obligations.

E    79. It seems to me unreasonable to suppose that the parties to the LOU intended
     the provision for payment to Dolphin or some solicitor of the underwriters to preclude
     payment to the underwriters direct. If, however, the contract must be construed as
     having that effect, the next question is whether the parties could vary that agreement
     by agreeing to make and receive payment direct. Dolphin must necessarily contend
     that section 2 of the Act prevents such a variation since, if the parties were entitled
     to vary the agreement, they must be taken to have done so by asking for and making
F    payment to the underwriters.

G    80. It appears to me unrealistic to suppose that, by agreeing that the Club would
     pay Dolphin or any solicitors appointed by the underwriters (an expression which
     Mr Bright suggested should be interpreted as extending to US attorneys in view of
     the action commenced in New York), the Club and the underwriters intended that
     Dolphin should, where no solicitors had been appointed by the underwriters, have an
     enforceable right to require payment of the settlement monies to it, with the result
     that, although the underwriters could, consistently with the LOU, appoint solicitors
     and ask the Club to pay them, they could not without breaching Dolphin's rights
     under the LOU legitimately agree with the Club that it should be paid direct.

H    81. If such a right was intended to exist it is unclear what the position would be
     if a solicitor or solicitors were in fact appointed by the underwriters. It would be
     surprising if, Dolphin, assuming it had a right beforehand, would now have no right
     at all. If, in those circumstances, it had any right it would, presumably, be a right
     held jointly with the solicitor(s) to have the settlement monies paid either to Dolphin

**488**                    **Dolphin Maritime v Swedish Club**                    **[2009] 1 CLC**
                            (Christopher Clarke J)

or an appointed solicitor. Whether or not that right would be of any value would
presumably depend on whether it could be established that, if Dolphin had not paid
the underwriters direct, it would be more likely to have paid Dolphin. It is unrealistic
to suppose that the parties contemplated this issue ever arising.

82. In short, I do not regard it as well arguable that the parties to the LOU intended
(or do not appear not to have intended) that the provision for payment to Dolphin
or the solicitors should be enforceable by Dolphin and/or any appointed solicitors.
On the contrary that provision appears in its commercial context to be a standard
provision as to the mode of discharge of an obligation undertaken for the benefit of
the underwriters. The parties were not concerned to give Dolphin or any appointed
solicitors some right of enforcement. They simply wished to provide for how the
benefit to be conferred on the underwriters under any judgment or agreement was to
be made.

83. The fact that the LOU was addressed to the cargo interests care of Dolphin does
not, in my view, indicate any intention that Dolphin should be a kind of quasi-party,
as Mr Bright put it. On the contrary it appears to distinguish between (i) those who
are parties and beneficiaries of the obligations contained in the LOU, namely the Club
and the Cargo Interests, and (ii) a company which acts on the underwriters' behalf for
the purposes of receipt of the monies due under the LOU.

84. In short, although Mr Bright seeks to put this case in his third category it is, as
it seems to me, in the same category as that of A who agrees to pay B at B's bankers,
C.

85. Accordingly, I decline to strike out the claims in tort and propose to give
summary judgment in favour of the Club on the claim in contract. I invite counsel to
draw up an order to give effect to that conclusion.

*(Order accordingly)*

NOTES

1. Council Regulation (EC) 44/2001 of 22 December 2000 on Jurisdiction and the
Recognition and Enforcement of Judgments in Civil and Commercial matters.
2. Emphasis added in this and the subsequent citations.
3. In *The Seaward Quest* [2007] 1 CLC 989, where underwriters sought to recover
the insurance monies paid out when a fishing vessel was scuttled from the master
and others on the grounds, inter alia, of deceit, Langley J held that the harm occurred
in Scotland where the monies were received and not in England from which he was
prepared to assume the payment had been made.
4. Or the agreement in *The Laemthong Glory* [2005] 1 CLC 739 that the receivers
would indemnify the charterer's servants or agents for delivery of the cargo without
production of the bills of lading which the owners of the vessel were entitled to

QB                          **Dolphin Maritime v Swedish Club**                          **489**
                              (*Christopher Clarke* J)

A    enforce since in delivering the cargo they were acting as the charterers' agents. It is
     also to be distinguished from any of the examples of the intended applicability of the
     provision set out in paras. 7.28–7.44 of The Law Commission's Report on 'Privity of
     Contract: Contracts for the benefit of third parties'.

                                    _____