# Exhibit 8

**706**

### Quest 4 Finance Ltd v Maxfield & Ors.

[2007] EWHC 2313 (QB)

Queen's Bench Division.

Teare J.

Judgment delivered 12 October 2007.

> *Guarantee – Warranty – Misrepresentation – Reliance – Claimant finance company providing short term finance – Brochure indicating that no personal guarantees were required from company directors – Borrowing company warranted that it would not go into winding up, administration or receivership – Directors warranted that they would indemnify claimant if borrower in breach of warranty – Company went into administration and claimant sued on directors' warranty – Brochure contained misrepresentation on which directors relied – Claimant could not rely on directors' declaration of non-reliance because claimant could not have believed declaration true and could not have relied on it – Warranty set aside on grounds of misrepresentation.*

   **This was an action in which the claimant finance company, Quest, claimed an indemnity from the first and second defendant directors pursuant to the terms of a 'warranty' document.**

   **The defendants' engineering company (Hilmax) required additional finance. Quest was in the business of providing short term finance for sums equivalent to twice the borrower's monthly wage bill. The brochure for that product, known as Wageroller, indicated that no personal guarantees were required from company directors and that instead a warranty was put in place to cover the event of any fraudulent acts being knowingly committed.**

   **Quest offered Hilmax finance of £110,000 and the parties entered into an agreement under which Hilmax warranted that there were no winding-up proceedings against it nor had any step been taken with a view to winding the company up voluntarily or putting it into administration or receivership. Under the accompanying warranty signed by the directors they warranted that Hilmax would continue to comply with its warranties and agreed to indemnify Quest against any loss suffered by reason of any breach by Hilmax of the warranties. The warranty document also contained a declaration that the directors in deciding to sign the document had placed no reliance on any advice or opinion of any person representing Quest.**

   **Hilmax went into administration and failed to repay the sums due to Quest under the terms of the loan agreement. Quest claimed that that was a breach of warranty and that the defendants were accordingly in breach of their warranty and liable to indemnify Quest in respect of the sums due from Hilmax.**

© DSP Publishing Ltd

A

    **The defendants argued that their warranty should be set aside because they were induced by a misrepresentation that personal guarantees were not required and that the warranty was put in place to cover the event of any fraudulent acts being knowingly committed. Quest argued that the defendants were estopped from relying upon the statements in the claimant's brochure by reason of the declaration made at the end of the warranty.**

B

    *Held*, **dismissing the claim and setting the warranty aside on the ground of a material misrepresentation:**

C

    **1. The brochure contained a misrepresentation. The person signing the warranty promised that the client company would comply with the warranties it had given. The nature of that promise was a guarantee. It was in substance an obligation to see to it that the client complied with the warranties it had given. Once the client failed to comply with its warranty the director was in breach of his obligation and was liable in damages. The fact that the directors did not warrant or promise that the client would pay its debts, under clause 2 of the loan agreement, did not prevent the true nature of the warranty given by the directors being properly analysed as a personal guarantee of the client company's warranty, under clause 4 of the agreement. The representation in the claimant's brochure that personal guarantees were not required was, therefore, incorrect. The statement in the brochure that the warranty was put in place to cover the event of any fraudulent acts being knowingly committed was also a misrepresentation.**

D

E

    **2. The claimant intended that the directors of potential clients who read the brochure would rely upon the clear statements in the brochure and the defendants believed those statements to be true and relied upon them.**

F

    **3. The claimant could not rely on the declaration of non-reliance. The statements in the brochure were 'advice' given on behalf of the claimant to which the declaration applied. However, in the circumstances the claimant failed to show that it believed the declaration of non-reliance to be true and relied upon it. Accordingly the defendants were not estopped from alleging that they relied upon the misrepresentations in the claimant's brochure and were induced by them to sign the warranty.**

G

H

The following cases were referred to in the judgment:

*Grimstead & Son Ltd v McGarrigan* [1998/99] Info TLR 384.
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1997] CLC 1243; [1998] 1 WLR 896.
*Moschi v Lep Air Services Ltd* [1973] AC 331.

**708**                                    **Quest 4 Finance v Maxfield**                    [2007] 2 CLC
                                                   (*Teare* J)

*Egan v Static Control Components (Europe) Ltd* [2004] EWCA Civ 392.                    A
*Watford Electronics Ltd v Sanderson CFL Ltd* [2002] FSR 19.

Simon Mills (instructed by Key2 Law LLP) for the claimant.

Timothy Frith (instructed by Devonshires) for the first and second defendants.        B

JUDGMENT

**Teare J:**

1. This is an action in which the claimant, Quest 4 Finance Ltd, a finance company,    C
claims an indemnity from the first and second defendants pursuant to the terms of a
document entitled 'Warranty' which each defendant signed on 18 July 2006. The sum
claimed is £118,211.93 (inclusive of interest). The third defendant has been adjudged
bankrupt and so these proceedings have not been continued against him. Oral evidence
was given by Mr Martin Andrews, an accountant who works as a consultant for the       D
claimant, and by John Maxfield and John Carter, the first and second defendants.

**The facts**

2. In 2006 Hilmax Engineering Ltd ('Hilmax') required additional finance. The          E
claimant was in the business of providing short term finance for sums equivalent to
twice the borrower's monthly wage bill. It is known as *Wageroller* and is a relatively
new financial product. Mr Andrews gave evidence that it had been on the market for
about three years.

3. The claimant and Hilmax were introduced in July 2006. The first defendant,          F
Mr Maxfield, was the chairman and managing director of Hilmax. He gave evidence
that he met Mr Dean, a broker, probably in the first week of July, at the suggestion
of Hilmax's accountant. He said that the meeting lasted about 30 minutes and that
Mr Dean brought to the meeting a brochure explaining the service offered by the
claimant. A copy of the brochure was in evidence. Mr Andrews accepted that it was
the claimant's brochure. It describes the service offered by the claimant. Mr Maxfield  G
said that he explained Hilmax's cash-flow problem and that neither he nor his co-
directors were willing to give personal guarantees in relation to any funds provided by
the claimant. He said that Mr Dean expressly stated that no personal guarantees would
be required. The claimant's brochure, which Mr Maxfield read, stated as follows:

                                                                                        H
> 'Importantly, no personal guarantees are required from company directors, and
> no charges are taken over the company …

> We understand the pressure placed on directors of businesses to give personal
> guarantees. *Wageroller* has been designed to alleviate this burden with no
> personal guarantee necessary …

© DSP Publishing Ltd

QB                              Quest 4 Finance v Maxfield                        **709**
                                     (*Teare* J)

A

   Will I have to give a personal guarantee?

   No. *Wageroller* does not require Personal Guarantees from your Directors. All
   that is required is a Warranty, which is put in place to cover the event of any
   fraudulent acts being knowingly committed.'

B

   4. Mr Maxfield was not cross-examined about this meeting. Thus at the close of
evidence there was no reason to suppose that any aspect of Mr Maxfield's account of
the meeting was challenged. However, in the course of final submissions counsel for
the claimant submitted that Mr Maxfield's evidence that he had read the claimant's
C brochure should not be accepted. This submission was founded on certain answers
given by the second defendant, Mr Carter, when he was cross-examined. I will refer
to this evidence later in the judgment but I state at this juncture that I did not regard
Mr Carter's evidence as a satisfactory basis upon which to challenge Mr Maxfield's
evidence that he had read the claimant's brochure. There was no application to recall
D Mr Maxfield after Mr Carter had given evidence.

   5. Having seen and heard Mr Maxfield give evidence, which he did in a straight
forward manner, I accept his evidence as to his meeting with Mr Dean, the production
of the claimant's brochure and the reading of the brochure by Mr Maxfield. One
would expect Mr Maxfield to read the brochure because it was the only document
E concerning *Wageroller* presented to him at that meeting (there was no evidence that
any document other than the brochure was produced at the meeting). I have no doubt
that the lack of a requirement for a personal guarantee was, as Mr Maxfield, said
an important matter for him. He and his directors had given personal guarantees to
other lenders and he was anxious not to be overstretched. The parts of the brochure
dealing with the need for a guarantee, in particular, the Question 'Will I have to give
F a personal guarantee?' and the answer given (which I have quoted earlier in this
Judgment) are likely to have been of very particular interest to him. Indeed the author
of the brochure must have intended that they would be so regarded by the directors of
any potential client who read the brochure.

G   6. Mr Maxfield said that he was asked for Hilmax's last audited accounts and the
last quarterly management accounts. He said that about two days later he was told
by telephone that all was in order. By letter dated 11 July 2006 the claimant offered
finance of £110,000 on terms set out in the letter and in a contract entitled an Account
Opening Form. The relevant documents were sent to the broker by e-mail on 13 July
2006.
H

   7. On 18 July 2006 Hilmax entered into an agreement with the claimant on the
terms of the Account Opening Form ('the Agreement'). The Agreement was signed
on behalf of Hilmax by Mr Maxfield and the third defendant, a director and secretary
of Hilmax.

**710**          **Quest 4 Finance v Maxfield**          **[2007] 2 CLC**
                    (*Teare* J)

8. Hilmax gave certain warranties. Clause 4 provided as follows:                    A

'4.1 The Client hereby warrants and throughout the currency of this Agreement will continue to warrant that:

…                                                                                    B

4.1.6 there are no winding up proceedings instituted against the Client and the Client has not entered into any voluntary or other arrangement with the Client's creditors or been the subject of a moratorium relating to any such arrangement nor has any step been taken with a view to winding the Client up voluntarily or putting the Client into administration or receivership; …'            C

9. Clause 5 dealt with commencement and termination and provided, amongst other things, as follows:

'5.3 The Financier shall be at liberty to terminate this Agreement forthwith by notice upon the occurrence of any of the following events or at any time thereafter:                                                                           D

5.3.1 the Client fails to pay when due any amount due from the Client to the Financier; or

…                                                                                    E

5.3.3 a petition is presented or a meeting is called to consider a resolution to wind up the Client or any step is taken with a view to putting the Client into administration; or

…                                                                                    F

5.3.9 the Client shall commit any breach of this Agreement.

5.4 Upon termination under clause 5.1 or upon the Financier becoming entitled   G
to terminate this Agreement under clause 5.3:

5.4.1 the Total Funds in Use due from the Client to the Financier will immediately become repayable together with interest thereon at 4% over the base rate from time to time of Barclays Bank plc from the date on which the Funds in Use      H
becomes immediately repayable until repayment occurs (whether before or after judgment or demand); …'

10. Also on 18 July 2006 Mr Maxfield signed a document entitled Warranty which provided as follows:

**© DSP Publishing Ltd**

QB                          Quest 4 Finance v Maxfield                          **711**
                                    (*Teare* J)

A          'RECITALS

           …

           (B) The Warrantor agrees to indemnify the Financier and hold it harmless against
B          all and any losses reasonable costs (including legal costs), damages, interest and
           expenses it may suffer or incur by reason of any breach or breaches by the Client
           of the Warranties set out in the Agreement.

           OPERATIVE PROVISIONS

C          The Warrantor hereby warrants to the Financier that in consideration of the
           Financier entering into or continuing the Agreement at the Warrantor's request
           that the Client has complied with each and every warranty set out in clause 4
           of the Agreement and will continue so to comply during the currency of the
           Agreement.

D          …

           DECLARATION ON BEHALF OF INDIVIDUAL ACCEPTING LIABILITY
           UNDER THIS DOCUMENT

E          Before I sign this document I have had every opportunity to study it and I fully
           understand its nature, meaning and effect, including the obligations to be placed
           upon me following my signature.

           In deciding to sign this document, I have placed no reliance upon any advice or
F          opinion of

           (i) any person having an interest in the Client; or

           (ii) the Client; or

G          (iii) any person representing the interests of Quest 4 Finance Ltd.'

           11. Mr Maxfield was asked whether he appreciated that the last section of the
           Warranty, the Declaration, was of importance to the claimant. He replied that he
           probably did not read it because he was confident as to how the finance worked as
           result of what he had been told by Mr Dean and what he had read in the claimant's
H          brochure. He accepted that the Warranty document appeared simple and that the
           clause entitled Operative Provisions looked pretty straightforward. He however
           understood from what he had read in the claimant's brochure that the warranty would
           only be called upon in the event of fraud.

**712**            **Quest 4 Finance v Maxfield**              [2007] 2 CLC
                        (*Teare* J)

A

12. The veracity of this evidence was challenged in cross-examination. It was submitted that Hilmax was in such desperate need of money that Mr Maxfield would have signed anything to get it and that his evidence about relying upon the claimant's brochure was made up after the event. Further or alternatively, it was said that the meaning of the declaration was so clear that he could not possibly have relied upon statements in the claimant's brochure. In the further alternative, if he did rely upon the brochure, the only representation he relied upon was that no personal guarantee was required.

B

13. Mr Maxfield stated that, after receiving a letter from the claimant's solicitors dated 3 October 2006, he wrote back saying that he did not consider himself personally liable as a result of the very clear representations that had been made through the sales pamphlets and directly by Mr Dean. I have not found in the trial bundle a letter which makes reference to the brochure. Mr Maxfield's letter dated 9 October does not do so. However, this passage in his evidence was not challenged in cross-examination. The brochure was clearly relied upon in the points of defence dated 1 December 2006.

C

D

14. Mr Maxfield was not only an experienced businessman (having been involved with Hilmax from its incorporation in 1962 until it went into administration in September 2006); he was also a magistrate form 1975 until 2004 and was awarded the OBE for his services to justice in Bedfordshire. As I have already remarked, Mr Maxfield gave his evidence in a straight forward manner. It was supported by the clear wording of the claimant's brochure. Of course, a prudent business man would not rely upon what he had read in the claimant's brochure when signing a declaration that he did not rely upon any advice or opinion of a person representing the claimant. But I consider that Mr Maxfield was lulled into a false sense of security by what he read in the claimant's brochure and believed to be true. He did not appreciate the conflict between his reliance upon the brochure and the declaration. He ought to have done so but he did not. Imprudently, he did not consider the effect of what he was signing. It may be that the financial situation of his company was such that the need for further finance diverted his attention from a careful study of the terms of the Warranty but I consider that his attention was also diverted by the very clear statements which he read in the claimant's brochure.

E

F

G

15. I therefore accept his evidence that, although he signed the Warranty, he understood from what he had read in the brochure that the warranty would only be called upon in the event of fraud. He did not regard the Warranty as a personal guarantee because of what had been stated in the claimant's brochure and because it was called a Warranty. I accept his evidence that he did not appreciate that the warranty could be operative in the absence of fraud when Hilmax breached a warranty. The statement in the brochure that the purpose of the warranty was to protect against fraud was made in answer to the question 'Will I have to give a personal guarantee?' It is most unlikely that if he read the brochure (as I have found that he did) he did not see and rely upon the statement as to the purpose of the Warranty. It would have been of considerable significance to him in circumstances where he had already given personal guarantees

H

QB                          Quest 4 Finance v Maxfield                          **713**
                              (*Teare* J)

A    to secure other loans. In this regard the statement in the claimant's brochure was
     misleading, as was accepted by Mr Andrews, who gave evidence on behalf of the
     claimant. I will have to consider later in this judgment whether Mr Maxfield, having
     signed the declaration of non-reliance, can rely upon this misleading statement in his
     defence of the claim brought against him.

B
        16. The second and third defendants also signed the Warranty. Mr Maxfield
     gave evidence that they did so after he had told them that no directors' guarantees
     were required and that warranties were required to cover fraudulent acts that were
     knowingly committed. The second defendant, Mr Carter, also gave evidence that he
     recalled being told by Mr Maxfield that no personal guarantees would need to be given
C    and that he understood that the Warranty was simply required to cover the event of
     any fraud being committed by the company in opening the account with the claimant.
     In cross-examination he said that he had no recollection of fraud being mentioned to
     him and that he could not explain how it was that he mentioned his understanding of
     the relevance of fraud in his statement. He was not an impressive witness. He did not
     appear to have any real recollection of what he was told before signing the Warranty.
D    This is not perhaps surprising since he was the Technical Director and, as he said,
     he was not a 'financial person'. However, I have no reason to doubt Mr Maxfield's
     evidence that he communicated to the second and third defendants his understanding
     of how the Warranty worked, based upon what he had been told by Mr Dean and what
     he had read in the claimant's brochure, before they signed the Warranty. Mr Carter's
E    evidence that he did not read the Warranty to see what he was signing up to seemed
     to me likely to be true. He relied upon what he had been told by Mr Maxfield who
     had passed on to him the statements made by the claimant in its brochure. It is more
     probable than not that Mr Carter relied upon those statements and I so find.

F
        17. In due course the claimant advanced funds for the payment of wages in July and
     August 2006. But in September 2006 Hilmax went into administration. The company
     failed to repay the sums due to the claimant under the terms of the Agreement.

     **The claimant's case**

G       18. The claimant's case is simple. The event of Hilmax going into administration
     was a breach of the warranty given by Hilmax in clause 4.1.6 of the Agreement.
     The claimant thereupon became entitled to terminate the Agreement pursuant to
     clause 5.3, and pursuant to clause 5.4 the 'Total Funds in Use' together with interest
     became immediately repayable. The fact that Hilmax was in breach of its warranty
     meant that the defendants were also in breach of the warranty given by each of them.
H    The claimant claims the sums now repayable by the company from the defendants
     pursuant to the terms of the Warranty. There is indeed no dispute that those sums
     are payable by the first and second defendants pursuant to the terms of the Warranty
     subject to a defence based upon the representations in the claimant's brochure that
     the claimant did not require a personal guarantee and that the Warranty was to protect
     the claimant against fraud.

**714**                     **Quest 4 Finance v Maxfield**                    [2007] 2 CLC
                              (*Teare* J)

A

**The defence**

19. The defendants admit that the Company was bound by the terms of the Agreement and that they signed the Warranties. However, they say that the Warranties should be set aside because they were induced by a misrepresentation that personal guarantees were not required and that the Warranty was 'put in place to cover the event of any fraudulent acts being knowingly committed.' Further or alternatively, it is said that the claimant is estopped from claiming the sums in question from the defendants' because of the same misrepresentation. Fraud forms no part of the claimant's pleaded case against the defendants.

B

C

**The claimant's reply**

20. By a Reply served in draft on the eve of the trial the claimant said that the defendants were estopped from relying upon the statements in the claimant's brochure by reason of the declaration made at the end of the Warranty.

D

21. Permission to serve this Reply out of time was sought at the commencement of the hearing. I granted such permission but adjourned the trial until 2 pm on the opening day of the trial to give counsel for the defendants the time he requested to consider how to approach cross-examination of the claimant's witnesses in the light of the point taken in the Reply (there was no further evidence to be adduced on behalf of the claimants apart from that already served) and to consider whether there was a point to be taken under the Unfair Contract Terms Act.

E

**Did the brochure contain a misrepresentation?**

F

22. It was submitted that the statement in the claimant's brochure that the claimant did not require personal guarantees from the directors of a client company was not correct. The obligations contained in the Warranty were in effect, though not described as such, a personal guarantee. It was submitted on behalf of the claimant that the Warranty was not a guarantee and therefore, at least in this respect, there was no misrepresentation.

G

23. A guarantee is a promise 'to see to it' that a debtor performs his obligations to the creditor. It is to be distinguished from an obligation on the part of the guarantor to pay a sum of money to the creditor in the event that the debtor did not. Whether a contractual promise is to be classified as a guarantee depends upon the words in which the parties have expressed the promise; see *Moschi v Lep Air Services* [1973] AC 331 at pp. 347–349. The question whether an obligation is a guarantee or not is a question of substance rather than of form; see *Chitty on Contracts* (29th edn) vol. 2, para. 44-041. Thus the circumstance that the word guarantee is not used in the Warranty is not determinative of the question of construction.

H

QB                     Quest 4 Finance v Maxfield                 **715**
                          (*Teare* J)

A    24. It is plain that there is no guarantee of the Client's promise to pay to the
claimant the sums due to the claimant. However, it was contended that the obligation
contained in the Operative Provisions of the Warranty whereby the person signing the
Warranty 'warrants … that the Client has complied with each and every warranty set
out in clause 4 of the Agreement and will continue so to comply during the currency
B    of the Agreement' is a guarantee.

     25. The claimant's case is that this obligation was not a guarantee but a warranty.
It is true that it is described as a warranty and that the verb 'to warrant' is used.
However, the description of the document is not conclusive and the use of the verb to
warrant means no more than to promise. The question to be resolved is the nature of
C    that promise. In my judgment the nature of that promise is a guarantee. The person
signing the Warranty warrants, that is, promises that the Client has complied or will
comply with the warranties it has given. This is in substance an obligation to see to
it that the Client complies with the Warranties it has given. Once the Client fails to
comply with its warranty the director is in breach of his obligation and is liable in
D    damages.

     26. It was further submitted on behalf of the claimant that the liability of the
directors under the Warranty was not co-extensive with the liability of the client
company because the directors would not be liable in circumstances where the client
company would be liable for non-payment. It was suggested that this indicated that
E    the Warranty was not a guarantee. I agree that the principle of co-extensiveness is an
important feature of a guarantee. But the liability of the directors under the warranty
(or promise) that they give, that the client company has complied with the warranties
under clause 4 of the Agreement and will continue so to comply, is co-extensive
with the client company's liability under clause 4 of the Agreement. The fact that the
F    directors do not warrant (or promise) that the client company will pay its debts under
clause 2 of the Agreement does not in my judgment prevent the true nature of the
warranty given by the directors being properly analysed as a guarantee of the client
company's warranty under clause 4 of the Agreement.

     27. The representation in the claimant's brochure that personal guarantees were
G    not required was, therefore, incorrect. The obligations required to be assumed by
the defendants did not extend to guarantees of the debts owed by Hilmax pursuant
to clause 2 of the Agreement, but they did amount to guarantees of the obligations
assumed by Hilmax pursuant to clause 4 of the Agreement.

     28. Whether or not my conclusion as to the nature of the director's obligation
H    is correct there is no doubt that the statement in the claimant's brochure that the
Warranty is 'put in place to cover the event of any fraudulent acts being knowingly
committed' was not correct. Mr Andrews accepted that the statement was misleading
and counsel for the claimant accepted that it was a misrepresentation. The warranty
given by Hilmax under clause 4 of the Agreement is a continuing warranty. Hilmax
breached that warranty when it went into administration in September 2006. That

**716**                          **Quest 4 Finance v Maxfield**                    **[2007] 2 CLC**
                                        (*Teare* J)

breach in turn put the defendants in breach of their warranty or guarantee that Hilmax
has complied with the warranty it gave 'and will continue so to comply during the
currency of the Agreement.' No fraud need be alleged to found liability against the
defendants under the Warranty; and no fraud is alleged either against Hilmax or the
defendants.

29. The defendants pleaded that the misrepresentations in the claimant's brochure
were made fraudulently. No particulars were given of the basis upon which the
misrepresentations were said to have been made fraudulently. As a result it was
submitted in the supplemental skeleton argument of counsel for the claimant that the
defendants should not be permitted to put the allegation to Mr Andrews. No argument
was heard as to that matter but when Mr Andrews was cross-examined no allegation
of fraud was put to him.

30. In the closing submissions of counsel for the defendants it was submitted that
the misrepresentations were made fraudulently because they were made without any
belief in their truth or at least recklessly as to whether the content was true or not. In
circumstances where the allegation of fraud was not particularised, where no evidence
was adduced in support of the allegation and where the allegation was not put to the
witness called on behalf of the claimant I do not consider that this allegation can
properly or fairly be pursued.

31. However, an agreement may be set aside on the grounds that it was induced by
an innocent misrepresentation. Equally, an innocent misrepresentation can found an
estoppel. But in either case the court must be satisfied that the representor intended
that the representee would rely upon the misrepresentation and that the representee
believed it to be true and relied upon it. Subject to the effect of the Declaration at
the end of the Warranty I would hold that the claimant intended that the directors of
potential clients who read the brochure would rely upon the clear statements in the
brochure and that the defendants believed those statements to be true and relied upon
them.

**The declaration of non-reliance**

32. It is submitted that the Declaration contains a clear and unequivocal
representation that the defendants have not relied upon any advice of any person
representing the interests of the claimant, that the defendants intended the claimant to
act upon the Declaration and that the claimant believed the Declaration to be true and
had acted upon it (see *Grimstead & Son Ltd v McGarrigan* [1998/99] Info. TLR 384
at pp. 411–12). Thus it was said that the defendants were estopped from alleging that
they relied upon the statements in the brochure (ibid, at p. 411).

33. The first question is whether the Declaration clearly and unequivocally applied
to the statements in the claimant's brochure. It was submitted that it did not, firstly,

© DSP Publishing Ltd

A    because the misrepresentations are not properly described as advice and, secondly, because the misrepresentations were not made by a person representing the interests of the claimant.

B    34. The subject of 'advice' may be either guidance (as to how to act or as to the legal effect of a document) or information. In the present case the claimant's brochure stated two pieces of information, firstly, that the claimant did not require personal guarantees and, secondly, that the Warranty was put in place to cover the event of any fraudulent acts being knowingly committed. It was submitted that a statement of 'existing circumstances' was not 'advice'. I did not follow that submission and reject it. In my judgment the two pieces of information stated in the claimant's brochure

C    were the subject of 'advice' given by the claimant to the reader of the brochure.

35. The person who put the brochure into circulation to be read by potential clients and their directors is likely to have been an employee of the claimant. It was submitted that the advice in the brochure was not given by a person representing the interests of the claimant. It was said that such phrase was apt to describe an agent,

D    broker or other intermediary instructed to represent the interests of the claimant. It was not apt to describe an employee of the claimant. Reliance was placed upon the principle of construction (*contra proferentem*) by which, in the case of ambiguity, a contract should be construed more strongly against the party who put forward the wording; see *Chitty on Contracts* vol. 1, para. 12-083 (and 12-085 where the principle is applied to contracts of guarantee). However, before such principle comes into play

E    there must be a true ambiguity. If the meaning which the document would convey to a reasonable person having all the background knowledge which could reasonably have been available to the parties in the situation in which they were at the time of the contract (see *Investors Compensation Scheme v West Bromwich Building Society* [1997] CLC 1243 at p. 1257; [1998] 1 WLR 896 at p. 912) is clear then there is no ambiguity and there is no room for the contra proferentem to come into play (see

F    *Static Control Components v Egan* [2004] EWCA Civ 392 at para. 37).

36. The commercial purpose of the declaration of non-reliance, which is part of the relevant background, is to ensure, in the interests of certainty, that the rights

G    of the parties are governed by the terms of the written contract. Thus the make of the declaration is prevented from relying upon anything other than the true nature, meaning and effect of the document which he has signed; and the first part of the declaration confirms that he understands the nature, meaning and effect of the Warranty. With this purpose in mind I am satisfied that, properly construed, the phrase 'any person representing the interests of Quest 4 Finance Ltd.' includes any person

H    who represents the interests of the claimant whether he does so pursuant to a contract of employment or a contract of agency. To restrict such persons to agents, brokers or other intermediaries would restrict the ambit of the commercial purpose of the declaration for no discernible reason. Further, an employee represents the interests of his employer. It is through his employees that the employer acts.

**718**                    **Quest 4 Finance v Maxfield**                    [2007] 2 CLC
                              (*Teare* J)

A

37. By signing the declaration the defendants plainly intended (at any rate objectively) that the claimant would act upon it. The remaining hurdle for the claimant to surmount is to show, the burden of proof being on it, that it believed the declaration to be true and relied upon it. That burden may sometimes not be discharged. In *Watford Electronics Ltd v Sanderson CFL Ltd* [2002] FSR 19 at para. 40 Chadwick LJ said:

B

> '… it may be impossible for a party who has made representations which he intended should be relied upon to satisfy the court that he entered into the contract in the belief that a statement by the other party that he had not relied upon those representations was true.'

C

38. In the ordinary case one would expect a contracting party who has required the other contracting party to make a declaration of non-reliance to believe the declaration to be true and to rely upon it. That is because the purpose of such a declaration is to ensure, in the interests of certainty, that the rights of the parties are governed by the terms of the written contract.

D

39. However, this is not the ordinary case. In the present case the claimant has made clear and unequivocal statements in its brochure, calculated to be relied upon by the directors of companies seeking finance, that the claimant does not require a personal guarantee and that the warranty which the directors are required to sign is put in place to cover the event of any fraudulent acts being knowingly committed. The claimant would expect directors to find these statements most attractive (as Mr Andrews accepted), causing them to enter into a contract for *Wageroller* finance on behalf of their company and to sign the required warranty. In a case such as the present there can be no presumption that the claimant believed the declaration of non-reliance to be true and relied upon it.

E

F

40. The claimant asserts that it did believe the declaration of non-reliance to be true and relied upon it. The evidence on which the claimant relies to prove the truth of that assertion on the balance of probabilities is the statement of Mr Andrews that

G

> 'upon receipt of the paperwork we checked that the paperwork was in order and that the Warranties were signed by the three directors. The claimant will not make any payments until the documentation is fully completed as it relies on the terms of both the Agreement and the Warranties in advancing moneys to clients.'

41. Mr Andrews was cross-examined about reliance. It was suggested to him that the claimant relied, not upon the declaration of non-reliance, but upon an insurance policy underwritten by Atradius against credit risk. I am sure that reliance was placed on that policy but it does not follow that no reliance was placed upon the declaration of non-reliance. Whether the claimant has shown that it believed the declaration of non-reliance to be true and relied upon it depends upon the sufficiency of Mr Andrews's statement to discharge that burden of proof.

H

A

42. The striking aspect of Mr Andrews' statement, which was signed long after receipt of the defence, is that it makes no reference to the claimant's brochure or to the material statements contained in it. Thus Mr Andrews' statement does not attempt to explain how it came about that the claimant seeks to persuade directors to sign the Warranty by stating that it is put in place to cover the event of any fraudulent acts being knowingly committed and yet requires them to sign a Warranty which, in the absence of fraud, imposes a personal liability upon the directors when the client company breaches the warranties it gives. The court is left in doubt as to how these opposing stances are reconciled by the claimant. Mr Andrews' statement does not explain how it is that, although the claimant must have expected directors to believe and rely upon the clear and unequivocal statements in its brochure, it nevertheless believes and relies upon the directors' declaration of non-reliance on such statements. Indeed Mr Andrews' statement does not specifically mention the declaration of non-reliance in the Warranty. It does not specifically assert that the claimant believed and relied upon the declaration of non-reliance. On the contrary he states that the defence is a matter for legal submissions.

B

C

D

43. In these circumstances the crucial question is whether Mr Andrews' statement is sufficient to discharge the burden upon the claimant to show that it believed and relied upon the declaration of non-reliance made by the defendants. I do not consider it is. It does not specifically address the question of the declaration and whether the claimant believed it to be true. In a case such as the present, where the claimant made clear representations in its brochure designed to assure directors that they would only be liable in the event of fraud and so must have expected directors to believe such statements, the bald statement by Mr Andrews which I have quoted is not, in my judgment, enough. At best the court is left in doubt as to whether the claimant believed the declaration of non-reliance to be true.

E

F

44. For these reasons the defendants are not estopped from alleging that they relied upon the misrepresentations in the claimant's brochure and were induced by them to sign the Warranty. It follows that the defendants can successfully defend the claim brought against them on the grounds that the claimant is estopped from alleging that the defendants are liable upon the Warranty in the absence of fraud.

G

**Conclusion**

45. The claim is therefore dismissed. The defendants are also entitled to an order that the Warranty is set aside on the grounds of a material misrepresentation.

H

*(Claim dismissed*)
————————