# Exhibit 9

Neutral Citation Number: [2009] EWHC 2545 (Ch)

Case No: 7942 of 2008

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 21/10/2009

**Before** :

**MR JUSTICE BRIGGS**

**Between:**

**IN THE MATTER OF LEHMAN BROTHERS**
**INTERNATIONAL (EUROPE)**
**(in administration)**
**(1)  ANTHONY VICTOR LOMAS**
**(2)  STEVEN ANTHONY PEARSON**
**(3)  DAN YORAM SCHWARZMANN**
**(4)  MICHAEL JOHN ANDREW JERVIS**
**(the Administrators of Lehman Brothers**
**International (Europe) (in administration))**                    **Applicants**
**- and -**
**RAB MARKET CYCLES (MASTER) FUND LIMITED**
**(1)  HONG LEONG BANK BERHAD**                                    **Respondents**

**Mr William Trower QC & Mr Daniel Bayfield** (instructed by **Linklaters LLP, One Silk Street, London EC2Y 8HQ**) for the Administrators
**Mr Jules Sher QC & Mr Sharif Shivji** (instructed by **Simmons & Simmons, CityPoint, One Ropemaker Street, London EC2Y 9SS**) for the First Respondent
**Mr Nicholas Peacock QC & Miss Catherine Addy** (instructed by **Baker & McKenzie LLP, 100 New Bridge Street, London EC4V 6JA**) for the Second Respondent

Hearing dates: 6th – 8th October 2009

Judgment

**Mr Justice Briggs :**

## INTRODUCTION

1.     This is an application by the Administrators of Lehman Brothers International (Europe) ("LBIE") for directions pursuant to paragraph 63 of Schedule B1 to the Insolvency Act 1986.  By it, the Administrators seek the court's guidance on one of the many difficult and complex issues arising in the Administration of LBIE.  There are pending a number of similar applications but, since the Administrators have taken the view that the subject matter of this application is both important, in terms of its effect on their ability to make early distribution, and self-contained, in the sense that its determination does not depend upon the determination of other issues, the Administrators have brought it forward for separate and early determination.

2.     The Administrators invite the court to determine how they should treat certain cash received by LBIE after having entered administration in consequence of corporate events or actions which affect securities held by LBIE as custodian under its standard form International Prime Brokerage Agreement (Charge Version) ("the Charge IPBA").  Where convenient, I shall refer to it as "Relevant Cash", and to securities held by LBIE as custodian as "Relevant Securities".  In outline, the issue is whether such cash should either be treated as trust money, and therefore segregated and paid to the beneficial owner of the security from which it derives, or added to the assets of LBIE available, subject to prior claims, for distribution to its unsecured creditors, including for that purpose the beneficial owners of the Relevant Securities.  An intermediate solution canvassed by the Administrators is that a sum equivalent to the Relevant Cash received should be paid to the beneficial owners of the Relevant Securities as an administration expense.

3.     In order that the court should hear full adversarial argument on these issues, the Administrators joined as a party to the Application RAB Market Cycles (Master) Fund Limited ("MCF"), which is LBIE's counterparty under a Charge IPBA, which had valuable securities held by LBIE as custodian when it went into administration, and which is therefore interested in contending for a direction that it should receive payment in full of cash derived from its securities, either as trust money, or as an administration expense.  The Administrators also joined Hong Leong Bank Berhard ("HLBB"), to represent all unsecured creditors of LBIE, with an interest in obtaining a direction that Relevant Cash is payable as an accretion to the assets available for distribution to them.

4.     Whereas a representation order is to be made to the effect that HLBB should represent all unsecured creditors, no such order is sought in relation to MCF.  Nonetheless, the Administrators (reasonably in my judgment) contend that the interests of all those who would benefit from a conclusion that Relevant Cash is held on trust, rather than as an accretion to LBIE's assets, or who would benefit from the intermediate solution canvassed by the Administrators, have been sufficiently and rigorously advanced by the submissions made on behalf of MCF, such that my decision on this application will be of value to the Administrators, even if not, strictly, binding on every such person.

5.     The outcome of this application turns mainly upon the interpretation and application to particular facts of the Charge IPBA.  The Administrators do not invite the court to

determine any issues of fact, but rather to address the questions asked by reference to assumed facts. At my invitation an agreed statement of those assumed facts was prepared during the course of the hearing. By 'agreed' I mean only that the parties agreed to treat the facts in the statement as the basis for their respective submissions, rather than to concede that the particular circumstances of, for example, MCF, are for all purposes indistinguishable from those assumed facts. As will appear, there are significant respects in which the facts relevant to MCF's individual claim differ from the assumed facts. For example, the Charge IPBA entered into between MCF and LBIE differs significantly from the standard form of Charge IPBA which I have been asked to interpret and apply. Furthermore, although LBIE held as custodian (but indirectly through a sub-custodian) two valuable securities of MCF when it went into administration, it has not in fact yet received any cash proceeds of those securities since then, all cash proceeds having been remitted to Lehman Brothers Inc. ("LBI") as sub-custodian, which is in an insolvency process in the USA.

6.      Mr Sher QC for MCF has very helpfully addressed his submissions mainly to the assumed facts, including the terms of the standard form Charge IPBA which forms part of them. Nonetheless he has not shrunk from reference to the particular facts about his client's predicament, both for the purpose of providing a concrete example against which to test the rival arguments about interpretation, and for the purpose of bringing home to the court what he described as the thoroughly unfair, unintended and uncommercial consequences of the interpretation put forward by HLBB on behalf of the unsecured creditors. The facts about MCF's predicament are verified by a witness statement, but neither assumed or admitted by the other parties. They are, in reality, unlikely to be contentious, but there is no benchmark against which I can, or need to, form any view about the extent to which they are typical.

## BACKGROUND

7.      An important part of LBIE's business consisted of the provision of prime brokerage services to institutional clients, for example to hedge funds, which typically lack the infrastructure with which to perform those tasks directly. Those services included trade execution, financing, clearing, processing and custodial services. By the time it went into administration in September 2008, LBIE had in the region of 900 prime brokerage clients.

8.      LBIE offered its prime brokerage services pursuant to a range of alternative standard form agreements, which were periodically amended and updated in particular in accordance with changes in the underlying regulatory regime. Of those alternatives, the two most important (as least for present purposes) were the Title Transfer IPBA and the Charge IPBA. The essential difference between the two was that, pursuant to the former, LBIE was to have all right, title and interest in and to securities delivered by or on behalf of the client, whereas under the latter LBIE was to hold securities as custodian, upon the basis that, subject to important exceptions, they were described as continuing to belong to the client, subject to a charge in favour of LBIE to secure all and any actual or contingent indebtedness of the client to it.

9.      Although both types of IPBA provided security to LBIE for the obligations of its prime brokerage clients (referred to in the IPBA, and in the rest of this judgment, as "Counterparties"), that was by no means their only or even primary function. As I shall have to describe in more detail in due course, the IPBA was designed to define

the scope and terms of the whole of the broker client relationship between LBIE and its Counterparty, a relationship which included the taking of instructions from the Counterparty for dealings with securities, the holding of securities and cash required for, or arising in the context of, those dealings, the making of loans to the Counterparty to fund dealings, and the settlement of accounts on termination of the relationship.  The IPBA also contained the main contractual provision requiring a Counterparty to maintain margin with LBIE in relation to open positions.

10.    The holding of securities by LBIE as custodian for a Counterparty under a Charge IPBA, together with its dealing with those securities as broker for the Counterparty, routinely gave rise to receipts of cash by LBIE (or by custodians on its behalf) since, generally, securities held or traded for a Counterparty would be registered in LBIE's (or its sub-custodian's) name.  The Administrators identified in their evidence four types of incoming cash received by LBIE in connection with securities held for Counterparties, namely:

i)    Cash received as a result of securities being redeemed (by the issuer) or having matured.

ii)    Cash received as a result of securities having been tendered under a tender offer.

iii)    Cash received as a result of a rights issue (for example in lieu of a fraction of a share).

iv)    Cash received as income, for example by way of dividends or coupons.

All those types of cash receipts continued after LBIE went into administration.  Prior to administration, cash would also be received by LBIE, for example, upon the sale of a security held for a Counterparty, on that Counterparty's instructions.

11.    It is immediately apparent that, although some receipts of cash referable to securities held by LBIE as custodian occur as a result of a voluntary act of the Counterparty, many, including all those which have continued after LBIE went into administration, do not.  This is true both of cash in the nature of income, and cash representing a capital receipt.  Furthermore, securities of a type which consists in substance of a promise by the issuer to pay cash at a future date (such as a US Treasury Bill) by their very nature turn themselves into cash over time.

12.    The relevance of all this is that the Charge IPBA appears on its face to draw a sharp distinction between the basis upon which, as broker, LBIE held securities and cash for its Counterparties.  Its custodianship of securities (the terms of which are set out in detail in Schedule 2 to the Charge IPBA) expressly recognised that the securities continued to belong beneficially to the Counterparty and not to LBIE.  By contrast, clause 5.2 of the Charge IPBA (which lies at the heart of the issues raised by this application) provides in relation to cash as follows:

"The parties acknowledge and agree that any cash held by us for you is received by us as collateral with full ownership under a collateral arrangement and is subject to the security interest contained in the Agreement.  Accordingly, such cash will not

be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash held by the Prime Broker will not be segregated from the money of the Prime Broker or any other counterparty of the Prime Broker and will be held free and clear of all trusts. The parties further agree that the Prime Broker will use such cash in the course of its business and the Counterparty will, therefore, rank as a general creditor of the Prime Broker in respect of such cash."

13.    The consequence of this dichotomy between the Counterparty's apparent beneficial interest in securities, and its status as a mere unsecured creditor in relation to cash is that, unless actively managed to produce a different consequence, a Counterparty's portfolio of beneficially owned securities held by LBIE as custodian is liable over time to leak away into cash, so as to be replaced by a merely unsecured receivable. This is of course in sharp contrast with the position of a beneficiary in an ordinary trust, where cash attributable to investments, whether of a capital or income nature is, in general, held by the trustee as an accretion to the trust fund. I refer to the Counterparty's beneficial interest in securities as being apparent because, despite the use of the phrase "belonging to the Counterparty" in relation to securities, it is HLBB's case that the Charge IPBA does not in fact confer any such proprietary interest.

14.    In practice, for as long as LBIE continued to perform its obligations as Prime Broker, its Counterparties could manage their portfolios of securities and cash held by LBIE in such a way as to avoid that leakage. In summary, although I shall have to describe this in more detail in due course, a Counterparty could instruct LBIE to roll securities (so that the proceeds of redemption of one were immediately applied towards the purchase of a replacement), to repay surplus cash (beyond that necessary to maintain equity in the portfolio in excess of the Counterparty's margin requirement), or to deliver securities to the Counterparty or some other broker or nominee (to the extent not required for imminent dealings or to maintain the necessary equity). If all else failed, the Counterparty had a right to redeem its securities from LBIE's charge, after closing all open positions and paying or crediting LBIE with the amount necessary to discharge all the Counterparty's liabilities. While it is true that the detailed provisions of the Charge IPBA placed a number of theoretical difficulties in the way of Counterparties managing their portfolios with LBIE so as to minimise their credit risk arising from being unsecured creditors of LBIE in relation to cash, it is not suggested that these caused any practical impediments, for as long as LBIE continued in business as a prime broker. For example, although LBIE was expressed to have an "absolute discretion" to decline to comply with transactional instructions given by a Counterparty, there is no evidence to suggest that this discretionary power was in practice exercised so as to prevent Counterparties actively managing the degree of their exposure to LBIE's credit risk, by avoiding the accrual of excessive credit balances on their Charge IPBA cash accounts.

15.    All this changed when LBIE went into administration, shortly before 8 a.m. on 15th September 2008. From that moment on, LBIE routinely refused or simply failed to comply with transactional instructions from its Counterparties. Demands by numerous Counterparties for the transfer of their securities portfolios to replacement

prime brokers, or for their delivery up (whether or not by way or redemption) were routinely declined and, although at least MCF took initial steps in that direction, no Counterparty obtained the permission of the court to bring proceedings to enforce a delivery up of securities.    Needless to say, LBIE's collapse into insolvent administration meant that no Counterparty could reduce its cash balances by giving instructions to LBIE to use them in the acquisition of further securities.

16.    The inevitable consequence of LBIE's going into administration and ceasing to continue to perform its prime brokerage services was therefore that the natural propensity of a typical securities portfolio, if left alone, to generate or, worse still, turn itself into cash over time could no longer be restrained by Counterparties, and the substantial cash mountain that has subsequently accrued, and which is the direct subject matter of this application, is therefore the direct result of LBIE's failure.    I was told that some US$1.8 billion has been received by LBIE since going into administration as cash attributable to client securities (both those in custody accounts and those in charge accounts) held as custodian for Counterparties under Charge IPBAs, of which no less than US$1.4 billion represents the proceeds of the maturity or redemption (by the issuer) of those securities.    In anticipation of the likelihood that Counterparties would advance proprietary claims in relation to that cash, notwithstanding the terms of clause 5.2 of the Charge IPBA, the Administrators have very properly arranged for that cash to be held separately from LBIE's general funds by a new custodian,  like the securities from which the cash has been derived.

17.    The US$1.8 billion to which I have referred is not by any means the whole of the cash attributable to securities held by LBIE pursuant to Charge IPBAs at the time of its administration.    The Charge IPBA permitted LBIE to hold Counterparties' securities through sub-custodians.    Some of those were Lehman affiliates, such as LBI, which are now themselves in formal insolvency processes.    In such cases cash attributable to securities held by Lehman affiliates as sub-custodian has accumulated otherwise than under LBIE's Administrators' control and has, for example in the case of LBI, been in substance frozen due to the affiliate's own insolvency abroad.

18.    The directions sought on this Application are strictly limited to cash under the Administrators' control.    Nonetheless, the issues of interpretation and application of the Charge IPBA which I have been asked to decide are likely to be of relevance (to put it no higher) to the Administrators' treatment of any cash attributable to securities held by sub-custodians under Charge IPBAs, if and when received by way of payment or dividend in those insolvency processes.    As it happens, the bulk of MCF's portfolio as at the date of LBIE's administration was held by LBI as sub-custodian, with the result that no cash attributable to those securities has in fact been received by LBIE or otherwise come into the Administrators' control.    Nonetheless, it has not been suggested that this aggravating feature of MCF's predicament disables it from advancing submissions designed to serve the interests of those potentially more fortunate Counterparties whose cash is now segregated under the Administrators' control.

19.    The gravity of the predicament facing Counterparties as the result of LBIE's failure, if clause 5.2 were to be held to govern the ownership of cash derived from securities and received by LBIE or sub-custodians on or after 15th September 2008, is graphically illustrated by the particular facts relating to MCF.    On that date, in excess of 90% of MCF's assets were represented by two US Treasury Bills ("T-Bills") held by LBI as

sub-custodian for LBIE pursuant to a Charge IPBA dated 10th March 2008. The first was due to mature three days later, on 18th September 2008, in the sum of US$45 million, and the second on 11th December 2008, in the sum of US$5 million. Those bills had been acquired on MCF's instructions by way of roll-over, using the proceeds of the maturity of earlier bills. Between 15th and 18th September 2008 MCF made repeated attempts to persuade LBIE to transfer those T-Bills (together with cash and open positions) to Credit Suisse as a replacement prime broker, or to deliver them to MCF itself, but to no avail. Both T-Bills thereafter matured in the amounts and on the dates stated, with the consequence that the bulk of MCF's securities portfolio held by LBIE under its Charge IPBA was, by the end of 2008, represented by cash caught up in the USA insolvency processes affecting LBI, in respect of which, if clause 5.2 applies to such cash, MCF is now only an unsecured creditor of LBIE. I should add that the evidence suggests, albeit that the Administrators are not in a position finally to admit it, that on 15th September 2008 MCF's cash account with LBIE was sufficiently in credit to cover all its liabilities to LBIE, including future or contingent liabilities on open positions. On that factual assumption, LBIE did not need to have recourse to its charge over MCF's securities, there being no net liability on the cash account. I am invited to assume, albeit no doubt in different proportions and to different degrees, that a similar predicament to that faced by MCF afflicted most of LBIE's Counterparties.

## THE ISSUES

20.     This dismal picture of MCF's descent from being the beneficial owner of a securities portfolio worth US$50 million to being the holder of an unsecured debt for the same nominal amount against the (probably) deeply insolvent LBIE assumes, first, that MCF was indeed the beneficial owner of the securities before their conversion into cash, and secondly, that MCF retained no beneficial interest in the cash, because of the operation of clause 5.2.    In the competing submissions advanced on this application, both those propositions have been vigorously challenged. For HLBB and all other unsecured creditors of LBIE Mr Peacock QC submitted that, notwithstanding the use of the phrase "belong to the Counterparty" in relation to securities, the Charge IPBA did not on its true construction impose any trust upon LBIE sufficient to give a Counterparty a proprietary interest even in securities held by LBIE as custodian. For MCF and all other Counterparties, Mr Sher QC submitted that clause 5.2 had no effect in relation to cash received by LBIE on and after 15th September 2008, on the alternative grounds that:

i)      clause 5.2 had no application at any time to cash derived from securities held as custodian;

ii)     clause 5.2 upon its true construction ceased to apply in relation to cash received by LBIE after it ceased to carry on its business in the ordinary course, ceased to perform its obligations as prime broker, and went into administration.

Alternatively, Mr Sher submitted that LBIE could claim no proprietary interest in Relevant Cash, regardless of the true construction of clause 5.2, on the basis of a number of equitable principles, namely:

iii)     that equity treats as done that which ought to have been done, so that the T-Bills ought to be treated as having been delivered by LBIE to MCF before they matured;

iv)     the benefit and burden principle, so that LBIE could not take the benefit of clause 5.2 without discharging the burden of providing its brokerage services;

v)      constructive trust, on the basis that it was unconscionable for LBIE not to deliver up the securities before maturity as requested;

vi)     the rule against obtaining an advantage from its own wrong, the wrong being its refusal to deliver up the T-Bills before maturity.

Yet further Mr Sher submitted that the court should relieve MCF and similarly disadvantaged Counterparties:

vii)    by reference to the principle in ex parte James (1874) LR 9 Ch App 609, on the basis that reliance on clause 5.2 by the Administrators would be unfair or inequitable; and,

viii)   on the basis that, even if Relevant Cash belonged beneficially to LBIE, the court should nonetheless order payment of an equivalent amount to Counterparties as an administration expense.

21.     The Administrators maintained an appropriate neutrality in relation to all the issues which I have summarised, save for the last.  In that respect, Mr Trower QC for the Administrators told me that they were of the view that payments to Counterparties equivalent to Relevant Cash were administration expenses, but nonetheless sought the court's confirmation that their view was correct.  Mr Trower acknowledged that the question whether such payments were administration expenses arose only if Counterparties were unable to claim any beneficial interest in Relevant Cash, but invited me nonetheless to determine the administration expenses issue in any event, in case a higher court should reach a different conclusion on any of the logically anterior issues.

22.     As will appear, I consider that the answers to the questions posed by this application turn primarily upon the interpretation of the Charge IPBA.  I shall therefore address those issues first.

## THE CHARGE IPBA

23.     It is necessary to begin with a general description of the Charge IPBA, in the form in current use at the time of LBIE's administration.  That form contained significant amendments to an earlier standard form, resulting from the coming into force of the Markets in Financial Instruments Directive (Directive 2004/39 EC) ("the MiFID") and consequential amendments made to the Client Assets Sourcebook issued by the Financial Services Authority ("CASS").

24.     The standard form Charge IPBA makes provision by way of parties for LBIE as Prime Broker, for the relevant client as Counterparty, and (optionally) for the client's investment manager as Agent.  Nothing turns on the presence or absence of an Agent

as a party. It is sufficient for present purposes to treat the Charge IPBA as an agreement between LBIE and a Counterparty.

25.    Recital A records the Counterparty's wish to appoint the Prime Broker as its prime broker on the terms of the Charge IPBA, described as "the Agreement". Recital C records what is at first sight a curious convention whereby, although cash received by LBIE for or from the Counterparty is described as credited to the Counterparty's cash account, securities received from or for the Counterparty are described as debited to the Counterparty's securities account. That convention of treating what is in reality a credit as a debit in relation to securities is adopted throughout the Agreement and, for the avoidance of confusion, in the rest of this judgment.

26.    Under clause 2, headed "SCOPE OF AGREEMENT", clause 2.1 provides that the Agreement applies to all acquisitions and disposals of securities, and the provision of any advances of cash and securities in respect thereof. It includes at clause 2.2 a modified form of entire agreement clause. Clauses 2.4 and 2.5 record that the Prime Broker is authorised and regulated by the FSA and subject to its rules, and that its performance of obligations under the Agreement is subject to all applicable regulatory and other laws and rules, but that the regulatory regime is not incorporated into the Agreement.

27.    Clause 3, headed "TRANSACTIONS, PAYMENTS AND DELIVERIES", provides for the Counterparty to give requisite instructions to the Prime Broker to enter into or settle transactions, in the manner specified in Schedule 1, and confers on the Prime Broker authority to act as the Counterparty's agent. Schedule 1 sets out the requisite procedures. In relation to what are defined as "Third Party Transactions" (i.e. transactions between a Counterparty and anyone other than LBIE), paragraph 1.2 provides that the Prime Broker may at any time before settlement and in its absolute discretion reject the relevant instruction by giving oral or written notice to that effect to the Counterparty. In relation to what are defined as "Principal Transactions" (i.e. transactions between the Counterparty and the Prime Broker, such as the purchase of a security by one from the other) paragraph 2.2 provides that any relevant instruction from the Counterparty constitutes an offer, which the Prime Broker is at liberty to accept or reject.

28.    Clause 4, headed "PROVISION OF FINANCE", provides that the Prime Broker may in its absolute discretion lend money or advance securities to the Counterparty, and discharge any obligation of the Counterparty to pay money or deliver securities under or in connection with any Transaction.

29.    Clause 5, headed "SECURITIES AND CASH ACCOUNTS", provides, at clause 5.1, for the Prime Broker to open and maintain one or more Cash Accounts and Securities Accounts. In relation to the Cash Accounts all "cash paid or deemed or treated as paid by the Prime Broker to or on behalf of the Counterparty" is debited and "all cash paid or deemed or treated as paid to the Prime Broker, by or on behalf of the Counterparty (including sums received by the Prime Broker in settlement of Third Party Transactions)" is credited. In relation to Securities Accounts it is provided that "all securities delivered to the Prime Broker by or on behalf of the Counterparty or delivered or deemed or treated as delivered by or on behalf of the Counterparty to the Prime Broker" are debited, and that "all securities advanced by the Prime Broker to

the Counterparty or delivered or deemed or treated as advanced by the Prime Broker to or on behalf of the Counterparty" are credited.

30.    There follows clause 5.2, which I have already set out in full.  Its first sentence:

> "The parties acknowledge and agree that any cash held by us for you is received by us as collateral with full ownership under a collateral arrangement and is subject to the security interest contained in the Agreement."

is a linguistic descendant of paragraph 7.2.3 of CASS (in the edition in force at the time of LBIE's administration), which provides that:

> "Where a client transfers full ownership of money to a firm for the purpose of securing or otherwise covering present or future, actual or contingent or prospective obligations, such money should no longer be regarded as client money."

It is common ground that clause 5.2 of the Agreement was intended to take advantage of the exception afforded by that paragraph to the rigour of the client money rules in CASS.  The extent to which it succeeded in doing so is a matter which I have to determine.

31.    Clause 6, headed "MARGIN REQUIREMENT", contains a formula for the definition of "Net Equity" pursuant to which the absolute value of credit balances on all Cash Accounts together with the "Market Value Equivalent" of all securities comprised in debit balances on the Security Accounts are set against all equivalent cash debits and securities credits, together with other amounts due to the Prime Broker.  The net surplus (if any) is the Net Equity, and by clause 6.2 the Counterparty is required to ensure that at all times the Net Equity is not less than the Margin Requirement. Clause 6.4 requires any margin deficit to be made good by the payment or delivery to the Prime Broker of additional cash or securities of the requisite value.

32.    Clause 7, headed "PAYMENT AND DELIVERY", contains the following provisions of central relevance to the issues:

> "7.1.  Subject to Clause 7.2
>
> (a) upon reasonable request, the Prime Broker shall repay the Counterparty any cash standing for the time being to the credit of a Cash Account;
>
> (b) upon reasonable request, the Prime Broker shall deliver to the Counterparty securities equivalent to any securities standing for the time being to the debit of a Securities Account.
>
> 7.2.    The Prime Broker shall not be required to make a payment or delivery under Clause 7.1 if

> (a)   an Event of Default or Potential Event of Default has
> occurred and is continuing; or
>
> (b)   …"

Clause 7.5 entitles the Prime Broker to refuse to make any such payment or delivery where this would result in the creation of, or an increase in, a Margin Deficit.

33.   Events of Default are exhaustively listed in clause 12.1, to which I shall come in due course.  A Potential Event of Default is defined in Schedule 3 as follows:

> "Potential Event of Default" means an event which with the
> service of notice or passage of time, or both, would be or would
> in the opinion of the Prime Broker be likely to be an Event of
> Default;"

34.   Under clause 8, headed "INCOME, CORPORATE EVENTS AND VOTING" clause 8.1 under the sub-heading "Income" provides as follows:

> "If income is paid or distributed by the issuer of any securities
> comprised in the balances on the Securities Accounts
>
> (a)      …
>
> (b)      in respect of securities standing to the debit of a
> Securities Account, the Prime Broker will (subject to clause
> 8.3) pay to the Counterparty an amount equal to, and in the
> same currency as, the amount paid by the issuer or, in the case
> of income in the form of securities, deliver to the Counterparty
> securities equivalent to such securities.  The Prime Broker will
> credit the relevant Cash Account in respect of the amount so
> payable or, as the case may be, debit the relevant Securities
> Account in respect of the securities so deliverable."

Clause 8.3 entitles the Prime Broker to make appropriate deductions in relation to tax.

35.   Under the sub-heading "Corporate Events" clause 8.5 requires the Prime Broker to inform the Counterparty if it becomes aware of the occurrence or prospective occurrence of a Corporate Event.  This is defined as:

> "Any conversion, subscription, sub-division, consolidation,
> redemption, rights issue, takeover or other offer, capital
> reorganisation, call, capitalisation issue or distribution of, or a
> granting of, an entitlement to receive securities or any other
> corporate event with respect to any securities comprised in any
> debit balance on the Securities Accounts."

Clauses 8.6 to 8.7 make provision for securities and cash accruing for the benefit of a Counterparty as the result of a Corporate Event to be debited or credited as the case may be to the Counterparty's Securities and Cash Accounts.

36.    Clause 9, headed "FEES AND INTEREST", makes provision in general terms for the Counterparty to pay fees and remuneration to the Prime Broker. Clause 9.2 provides that the Prime Broker may pay interest to the Counterparty on any credit balance on a Cash Account, and that the Counterparty shall pay interest to the Prime Broker on any debit balance.

37.    Clause 10, headed "SECURITY", is the main charging clause under the Agreement. Clause 10.1 provides (so far as is relevant) as follows:

> "As continuing security for the payment and discharge of all the Liabilities (as defined below), the Counterparty hereby, with full title guarantee and free from any encumbrances whatsoever, charges in favour of the Prime Broker for itself and as trustee for the other Lehman Companies by way of first fixed charge
>
> (a)    all right, title and interest in and to securities and any other assets not falling within sub-paragraphs (b) to (f) constituted for the time being by debits to any Securities Account;
>
> (b)    all securities and assets which, or the certificates of documents of title to which, are for the time being deposited with or held by a Lehman Company;
>
> (c)    all other securities and all rights, cash (including without limitation dividends) and property whatsoever which may from time to time accrue on, be derived from or be offered in respect of any assets referred to in sub-paragraphs (a) and (b) above, whether by way of Corporate Event or otherwise;
>
> (d)    all cash for the time being credited to any Cash Account;
>
> (e)    all rights of the Counterparty arising in respect of any securities, assets or cash referred to in sub-paragraphs (a) to (d) above, including, without limitation, any rights against any custodian, banker or other person;
>
> (f)    all rights of the Counterparty under this Agreement including, without limitation, all rights of Counterparty to delivery of Equivalent Securities;
>
> (g)    …"

Liabilities are very broadly defined in clause 10.2, so as to include all future and contingent liabilities of the Counterparty to the Prime Broker. Clause 10.3 provides that the security conferred by clause 10 is to be continuing security. Clause 10.4 provides as follows:

"Subject to clause 10.14, if the Prime Broker is satisfied that all the Liabilities have been irrevocably paid in full and that all facilities which might give rise to Liabilities have terminated, the Prime Broker shall, at the request and cost of the Counterparty, release, reassign or discharge (as appropriate) the Charged Assets from the security created pursuant to this clause 10."

Clause 10.14 provides a limited exclusion from the right of redemption in clause 10.4, where the Prime Broker:

"… reasonably determines that any payment received or recovered by the Prime Broker or any Lehman Company may be avoided or invalidated after the Liabilities have been discharged in full…"

38.    Clause 11, headed "RIGHT OF USE", provides as follows:

11.1    The Counterparty hereby authorises the Prime Broker at any time or times to borrow, lend, charge, hypothecate, dispose of or otherwise use for its own purposes any securities which are included in the Charged Assets by transferring such securities to itself or to another person without giving notice of such transfer to the Counterparty.  The Counterparty agrees that the Prime Broker may retain for its own account all fees, profits and other benefits received in connection with any such borrowing, loan, charge, hypothecation, disposal or use.

11.2    Upon

(a)    a borrowing, lending, disposal or other use, such securities will become the absolute property of the Prime Broker (or that of the transferee) free from the Security and from any equity, right, title or interest of the Counterparty;

(b)    a charge or hypothecation of any of the Counterparty's securities, all of those securities, including the Counterparty's interest in those securities, will be subject to the charge or other security interest created by such charge or rehypothecation.

11.3    Upon any such borrowing, lending, charge, hypothecation, disposal or use, the Counterparty will have a right against the Prime Broker for the delivery of securities equivalent to those securities.  Where, in respect of any securities, the Counterparty has instructed the Prime Broker to exercise any rights under Clause 8, the Prime Broker shall deliver securities equivalent to those securities in such form as has resulted from the exercise of such rights.

> 11.4    If on the due date for delivery thereof the Prime Broker
> shall for any reason be unable to deliver any Equivalent
> Securities to the Counterparty, the Prime Broker may, pending
> such delivery, credit the Cash Accounts in an amount equal to
> the Market Value Equivalent of those Equivalent Securities.
> Upon delivery of those Equivalent Securities to the
> Counterparty, the Prime Broker will debit the relevant Cash
> Account in the amount of the cash so credited.
>
> 11.5    Upon delivery or payment to the Counterparty of
> Equivalent Securities or Collateral, such Equivalent Securities
> or Collateral will become subject to the Security and constitute
> Charged Assets and shall be subject to all the provisions of this
> Agreement including, without limitation, those of Clause 10
> and this Clause 11."

39.    I was informed that there is a lively dispute, which the Administrators may in due
course invite the court to determine, as to the precise extent to which, and point of
time at which, clause 11 has the effect of depriving the Counterparty of any beneficial
interest in securities included in the Charged Assets.    On the second day of the
hearing, I was invited by counsel for two interested parties to join them to this
application for the purpose of enabling those issues to be properly determined now,
after full argument, in the event that the directions sought on this application by the
Administrators necessitated their determination.    I adjourned that application for
joinder on the basis of my then provisional view that it was most unlikely that I would
conclude that those issues as to the precise ambit of the Right of Use clause would
need to be determined now, but with liberty to apply to be joined in the event that,
after due consideration, I reached (and notified to the parties) a contrary view.    As
will appear, I have concluded that the issues as to the precise ambit and extent of
clause 11 (both as a matter of interpretation and under the applicable general law) do
not have to be resolved for the purposes of this application, so that no joinder of
additional parties is necessary.

40.    Clause 12, headed "EVENTS OF DAFAULT", sets out fourteen specified Events of
Default, in clause 12.1(a) to (n).    It is unnecessary to set them out in full.    The
following is a sufficient summary.    First, all of them except one constitute defaults by
the Counterparty (or its Agent).    The only exception, in clause 12.1(e) occurs where:

> "An Act of Insolvency occurs in relation to the Prime Broker
> and the Counterparty serves a Default Notice on the Prime
> Broker;"

Secondly, all the specified events, save four, only become Events of Default when a
Default Notice is served by the non-defaulting party.    The exceptions are (d), where
an Act of Insolvency occurs in relation to the Counterparty or its agents, and (l), (m)
and (n), which relate to adverse changes in the constitution, management or net asset
value of the Counterparty.    Subject to those exceptions, and until the non-defaulting
party serves notice, the specified events constitute Potential Events of Default.    "Act
of Insolvency", as used in clause 12.1(d) and (e) is defined so as to include seeking,
consenting to or acquiescing in the appointment of an administrator.    A "Default
Notice" is defined as meaning a written notice served by the non-defaulting party on

the defaulting party stating that an event specified in clause 11 (an obvious mistake for clause 12) shall be treated as an Event of Default for the purposes of the Agreement.

41.    Clause 13, headed "CLOSE-OUT", needs to be quoted in full:

> "13.1    Upon the occurrence of an Event of Default, the Non-Defaulting Party may, by written notice to the Defaulting Party, terminate this Agreement with effect from the time of the Event of Default (the date of such occurrence being the "*Termination Date*"). On the Termination Date, the following shall immediately occur –
>
> > (a)    any obligation of the Prime Broker to settle any Transaction, on behalf of the Counterparty shall cease;
> >
> > (b)    the Loan shall be immediately repayable;
> >
> > (c)    all other outstanding obligations of each party to deliver securities or Equivalent Securities or to pay cash to the other under this Agreement shall become due for performance immediately (and shall be effected only in accordance with the following provisions of this Clause 13);
> >
> > (d)    the Prime Broker shall establish, as at the date of the Event of Default, the Default Market Values of all cash and securities to be delivered or paid by each party under paragraph (c) above and the Net Default Amount payable under any Customer Agreement that has been terminated.
>
> 13.2    On the basis of the sums so established, an account shall be taken (as at the Termination Date) of what is due from each party to the other under this Agreement (on the basis that each party's claim against the other in respect of the transfer to it of securities or Equivalent Securities equals the Default Market Value therefor) and the sums due from one party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the party having the claims valued at the lower amount) and such balance shall be due and payable on the next following Business Day. For the purpose of this calculation, all sums not denominated in the Base Currency shall be converted by the Prime Broker into the Base Currency at the Spot Rate prevailing at the relevant time."

42.    I was told that there is, again, a dispute about the precise meaning and effect of clause 13, in particular as to the question whether clause 13.2 automatically converts any proprietary interest in securities belonging to a Counterparty at the Termination Date into personal rights to payment of money, as unsecured creditors of LBIE. It is sufficient for present purposes to note that the obvious risk that clause 13.2 has

precisely that effect has to date been enough to deter MCF and most other Counterparties (wishing to advance proprietary claims in relation to securities) from serving termination notices or, for that matter, Default Notices on LBIE.    Mr Peacock's submissions were based on an assumption that clause 13.2 does indeed have that effect.  Mr Sher did not dissent from that assumption.  It is sufficient, as will appear, for me to proceed upon the basis of that assumption, without having to decide that it is correct.

43.    I need say nothing more about the Agreement by way of description or summary, save that it is expressed to be governed by English law, and save for the important clause 17 and its appendant Schedule 2.  Clause 17, headed "CUSTODY", provides that:

> "17.1  With the exception of any assets transferred to the Prime Broker pursuant to clause 11, any securities debited to the Securities Accounts shall be held by the Prime Broker as custodian, and the Counterparty hereby appoints the Prime Broker, and the Prime Broker agrees to act, as its custodian, in accordance with the terms of Schedule 2."

Schedule 2 sets out a fairly lengthy custody code, of which the following provisions are material to the submissions made to me.

44.    Paragraph 2, headed "SEGREGATION OF ASSETS", provides as follows:

> "2.1  The Prime Broker will identify in its books and records that the securities belong to the Counterparty.
>
> 2.2        The Prime Broker will require that any sub-custodian or nominee appointed by it, or any Securities Depositary which it uses to hold the securities pursuant to this Agreement, will identify in its books and records that the securities belong to the customers of the Prime Broker (to the extent permitted by applicable mandatory law, regulation or market practice) so that it is readily apparent that such securities do not belong to the Prime Broker."

Paragraph 9, headed "OMNIBUS ACCOUNTS" provides as follows:

> "9.1  The Counterparty authorises the Prime Broker to hold securities in fungible accounts holding securities of other customers of the Prime Broker (but not securities of the Prime Broker), such accounts being designated as customer accounts. The Counterparty authorises the Prime Broker to hold securities in accounts with Sub-Custodians appointed by the Prime Broker on the basis that such accounts are fungible accounts which hold securities of other customers of the relevant Sub-Custodian (but not securities of such Sub-Custodians).  The Counterparty will accept delivery of securities of the same class and denomination as those deposited with the Prime Broker or any other Sub-Custodian appointed by the Prime Broker."

45.    Finally, reliance was placed by Mr Peacock on the following extract from paragraph 10, headed "UNITED KINGDOM REGULATORY MATTERS":

> "10.1    The Rules require the Prime Broker to inform the Counterparty that:
>
> (a)        …
>
> (b)        …
>
> (c)        although securities will ordinarily be registered in the name of a nominee, the Prime Broker may from time to time (where, due to the nature of the law or market practice of an overseas jurisdiction, it is in the Counterparty's best interests or it is not feasible to do otherwise) register or record securities in the name of a Sub-Custodian, or the Prime Broker itself subject always to Paragraph 2.  Securities may also be registered in the name of the Counterparty.  Subject always to Paragraph 2, if securities are registered in the name of the Prime Broker, such securities may not be segregated from assets of the Prime Broker, and, in the event of insolvency of the Prime Broker, such securities may not be as well protected.  Arrangements with Sub-Custodians are such that securities held with them shall be in a separate account containing assets belonging only to customers of the Prime Broker and not the Prime Broker's proprietary assets.  In any event, the Prime Broker will notify the Counterparty of the registration name used in respect of securities which are registrable securities;"

46.    The Rules referred to in paragraph 10.1 of Schedule 2 are defined as the FSA Rules, and paragraph 10.1(c) performs a notification obligation imposed by CASS 6.2.3(4)(b).

## The Charge IPBA as between LBIE and MCF

47.    My attention was drawn to certain small differences in wording between the standard form Charge IPBA which I have now sufficiently described, (and to which I refer as "the Agreement") and the specific document signed by MCF.  It became common ground that none of those differences is of any material significance.  Of more importance is a Deed of Amendment made on the same date (10th March 2008) between LBIE and MCF, which contained at clause 1.2 additional wording to be added to the Right of Use clause 11.1:

> "In connection with any Collateral Use pursuant to clause this 11.1 (*sic*), the Prime Broker on its own behalf and on behalf of each of the Lehman Companies agrees: (a) to provide a daily report to Counterparty listing the positions that are the subject of any Collateral Use; and (b) to exclude certain positions, being negotiable debt obligations issued by the sovereign governments of France, Germany, Italy and the United States, as ineligible for Collateral Use (each such position, an

"Ineligible Position").  Any Ineligible Positions shall be held in
account number 05606660."

It is common ground that the effect of the Deed of Amendment was to exclude MCF's
T-Bills from the Right of Use conferred on LBIE by clause 11.  This judgment is not
concerned with post-administration cash derived from securities in respect of which
LBIE did in fact exercise any Right of Use, so that the prohibition of any such right in
connection with MCF's T-Bills does not place it in any special class, separate from
other Counterparties in respect of whose securities post-administration cash has been
derived.  Nonetheless, the presence or absence of a Right of Use in Charge IPBAs
governing the parties' rights in relation to securities held by LBIE as custodian has
been relied upon in submissions, both about the presence or absence of any
proprietary rights in relation to securities, and about the ambit of clause 5.2.

## THE INTERPRETATION OF THE CHARGE IPBA

48.    I have already identified the main issues of interpretation and application of the
       Agreement, which are:

   (A) Do Counterparties have any proprietary rights or interests under the Agreement,
       even in relation to securities?

   (B) Does clause 5.2 apply to cash received by LBIE post-administration, derived
       from securities held as custodian (whether directly or by a sub-custodian)?

   Since the sheet anchor of Mr Sher's case in relation to cash is that the securities from
   which it has been derived are themselves held on trust, issue (A) logically comes first.

(A) -Are the securities held by LBIE on trust?

49.    Mr Peacock's submission that the Charge IPBA imposes no trust obligations on LBIE
       in relation to securities may be summarised as follows:

   i)      The question whether contractual provisions impose a trust upon the recipient
           of property is one of substance, not mere words.  Thus the use of words such
           as 'custodian' and phrases such as 'belong to the Counterparty' are not
           conclusive.

   ii)     Taking the Agreement as a whole, LBIE's rights in relation to securities are
           inconsistent with it being under the duties of a trustee, and the Counterparty's
           rights fall short of those capable of recognition as the proprietary rights of a
           beneficiary.

   iii)    The fact that, under clause 10 of the Agreement, the Counterparty charges its
           rights both in relation to securities and cash, does not point to a conclusion that
           its rights are proprietary.  Any contrary view would merely be the adoption of
           what Mr Peacock called the Charge Card fallacy.

50.    Mr Peacock's first submission is self-explanatory, as is the third, once due regard is
       had to the observations of Lord Hoffmann on Re Charge Card Services Limited
       [1987] Ch 150 at 175-6 in Re Bank of Credit & Commerce International SA (No 8)
       [1988] AC 214, at 225 to 228.  By contrast his second submission deserves being

described in more detail.  Mr Peacock pointed to the fact that the Prime Broker is entitled pursuant to paragraph 9.1 of Schedule 2 to the Agreement to hold securities in fungible accounts and mix them with securities of other customers, and even in certain circumstances to hold securities of Counterparties in such a way that they are not segregated from its own securities; see paragraph 10.1(c) of Schedule 2.  Further, he pointed to the primary obligation of the Prime Broker, as being to deliver up not the securities held as custodian, but only equivalent securities, pursuant to clause 7.1(b) of the Agreement, and to the Prime Broker's Rights of Use in the meantime, pursuant to clause 11, whereby the Prime Broker could do, in effect, what it liked with the Counterparty's securities without even an obligation to give prior notice.  Yet further, he pointed to the Prime Broker's absolute discretion to refuse to implement the Counterparty's instructions in relation to dealings with securities.  Finally, Mr Peacock pointed to the fact (or the obvious risk) that, on termination of the Agreement, the Counterparty's rights consisted of unsecured receivables pursuant to clause 13.2 of the Agreement, rather than to the return of securities *in specie*, or even to the delivery of equivalents.

51.     Under what sort of trust known to English law, asked Mr Peacock, could the trustee be free to use the trust property for its own purposes, free to ignore the beneficiary's instructions to sell or deliver them, and be freed from any proprietary obligations in relation to them upon termination of the contract?  He submitted that a literal construction of clause 5.2, such that all cash derived from securities was received by the Prime Broker free from any proprietary claims of the Counterparty, was in complete harmony with a conclusion that the Agreement was, read as a whole, irreconcilable with the existence of any trust at all, even in relation to the securities themselves.

52.     Those are cogent submissions, and amply sufficient to demonstrate that if any trust is created by the Charge IPBA, it is a most unusual type of trust.  Nonetheless, I have not been persuaded by Mr Peacock's conclusion that the effect of the Agreement in relation to securities is that it creates no trust known to English law.  My reasons follow.

53.     Where an entity ("A") transfers legal title to property to another ("B") pursuant to a detailed written agreement, the question whether A has retained some proprietary or beneficial interest in the property transferred depends upon the parties' deemed mutual intention, on the true interpretation of that agreement.  In such cases, the labels used may not be decisive (as Mr Peacock submitted), but the language used may be a compelling guide.  In the present case, the parties to the Charge IPBA have, by their use of the words 'custody' and 'custodian', and by the phrases, in Schedule 2 paragraph 2 "belong to the Counterparty" and "do not belong to the Prime Broker" used the clearest language to display their intention that securities held by the Prime Broker for the time being continue to belong beneficially to the Counterparty, subject of course to the charge in favour of the Prime Broker.

54.     Secondly, it is well established, in particular in commercial relationships, that the presence or absence of an obligation on B (the recipient) to keep the property separate from its own property is a powerful indicator of the presence or absence of a relationship of trustee and beneficiary between B and A.  By contrast, the existence of a right in B to mix the fungible property of one beneficiary with the fungible property of another beneficiary in a single fund has never been a powerful contra-indication

against the existence of a relationship of trustee and beneficiary between B and A. An obvious example of such a relationship is that between solicitor and client, in relation to client money held by the solicitor in a client bank account.

55.     The Charge IPBA contains the clearest provisions, in particular in paragraphs 2 and 9 of Schedule 2, prohibiting the mixing of Counterparty securities with those of the custodian or sub-custodians. Furthermore, the circumstances where such mixing may occur, referred to in paragraph 10.1(c) of Schedule 2 are, in particular if read in conformity with paragraph 6.2.3 of CASS, contemplated as being wholly exceptional, arising due to the particular law or market practice of an overseas jurisdiction. Paragraph 10.1(c) is made expressly subject to paragraph 2 which requires that, even if at any time mixed, Counterparty securities are so dealt with in the Prime Broker's books and records, and in those of any sub-custodian, as to be separately identifiable.

56.     There is in my judgment nothing incompatible with the recognition of a proprietary Counterparty interest in securities in the provisions whereby they may be held in omnibus fungible accounts with equivalent securities of other Counterparties. While it may be that the consequence is that the proprietary interest of any particular Counterparty is to a rateable share in the fungible account rather than in particular securities in that account, there is no reason in my judgment why that interest should not be recognised as proprietary, or that the obligations of the account holder (be it as custodian or sub-custodian) are those of a trustee. Contrary to Mr Peacock's submissions, and quite separately from the proprietary language used, I regard the operative effect of the provisions of paragraphs 2 and 9 of Schedule 2 as powerful indicators in favour of the recognition of the creation of a trustee/beneficiary relationship between the Prime Broker and Counterparty in relation to securities.

57.     Nor do I regard the primary obligation of the Prime Broker under clause 7.1(b) of the Agreement, to deliver, upon reasonable request, equivalent securities to the Counterparty as pointing away from the recognition of a proprietary interest of the Counterparty in securities. The concept of "securities equivalent to … securities" is the subject of a precise and detailed definition in Schedule 3 to the Agreement. Broadly speaking they must be of the same issuer, issue, type, nominal value and description. In my judgment all that is recognised by the Prime Broker's liberty to deliver equivalent securities to those held for the time being for that Counterparty as custodian is practical business common-sense. At any moment in time prior to going into administration, it may be supposed that LBIE was holding substantial blocks of equivalent securities (such as T-Bills) for hundreds of its Counterparty customers, together with substantial holdings of its own. Upon delivery of an equivalent security to a requesting Counterparty (whether from LBIE's stocks as custodian or from its house account) the Counterparty's commercial desire to obtain property rather than cash or a debt in respect of its proprietary interest would be fully satisfied, and its proprietary interest in the fund into which its security had originally been transferred thereby discharged.

58.     I asked Mr Peacock whether he could think of any reason why, if a client asked his solicitor for the return of money held on client account and was paid cash by the solicitor from his own resources, that would not be both a full discharge of the solicitor's duty as trustee to the client, and a discharge, *pro tanto*, of the client's proprietary interest in the client account fund. He could think of no reason why not, and nor can I. It is in my judgment nothing to the point that equivalent securities may

nonetheless be recognisably distinct, for example because they are shares held under differently numbered share certificates.

59. There is in my judgment plainly nothing inimical to the recognition of a trust that the trustee has a discretion not to accept dealing instructions in relation to securities held for the beneficiary Counterparty. The conferring of discretion on trustees as to dealings with trust property is a perfectly normal feature of trusts, albeit not of pure nomineeship.

60. The Prime Broker's Right of Use under clause 11 of the Agreement raises very different considerations. It is, *prima facie* at least, inconsistent with the recognition of the obligations of a trustee that it should be at liberty to take and use trust property for its own benefit without even giving the beneficiary notice of its intention to do so.

61. The invariable *quid pro quo* for any exercise by the Prime Broker of the Right of Use is an obligation to deliver equivalent securities to the Counterparty, on the basis that the equivalent securities are thereupon held upon the same terms, as between Prime Broker and Counterparty, as the original securities: see clause 11.5. True it is that, under clause 11.4, it is contemplated that the Prime Broker may be unable to comply with that obligation immediately, and may credit the Counterparty's cash account in an amount equivalent to the Market Value Equivalent (as defined) of the equivalent securities, pending delivery of them. But this appears not to be so much a right to delay delivery of equivalent securities, but a form of short-term protection for the Counterparty in the event of a failure by the Prime Broker to comply with his primary obligation to deliver equivalent securities. It is also true that in the event of any delay in the delivery of equivalent securities under clause 11.3, the Counterparty will be at the credit risk of the Prime Broker.

62. Nonetheless, those considerations do not in my judgment sufficiently detract from a purposive and commercial analysis of clause 11 as, in substance, a right in the Prime Broker to swap trust property for equivalent property of its own. By equivalent I mean, of course, not equivalent in value, but equivalent within the detailed meaning of that word in Schedule 3 to the Agreement.

63. While therefore the Right of Use conferred by clause 11 is at first sight a powerful contra-indication to the recognition of a trustee/beneficiary relationship between Prime Broker and Counterparty in relation to securities, it is not, viewed in essence as a right to swap, fatal to the recognition of any such relationship, either viewed separately or in conjunction with such other contra-indications as are relied upon by Mr Peacock.

64. In reaching that conclusion it has been unnecessary for me to decide the contentious issue whether the Counterparty's beneficial interest in the original security is always and inevitably lost upon any transfer of the security by the Prime Broker to itself, or only upon some other dealing as would, in accordance with the general law, be sufficient to overreach that beneficial interest. In my judgment the Right of Use in clause 11 fails to displace the otherwise clear indications of an intention to create the relationship of trustee and beneficiary between Prime Broker and Counterparty in relation to securities that are to be gathered from the Agreement, viewed as a whole, even if its effect is immediate, rather than dependant upon overreaching. It is for that reason that I have found it unnecessary to accede to the invitation to admit as

interveners, parties anxious to argue for the narrower approach, based on overreaching. However broadly interpreted, clause 11 does not displace a trust in relation to securities which are, at any moment in time, not the subject of the exercise of any Right of Use. For the same reason, it is unnecessary for me to consider, as between LBIE and MCF, the effect of the prohibition of that right in relation to T-Bills, contained in the Deed of Amendment.

65.     I turn finally to consider the combined effect of Mr Peacock's last two points, namely the suspension of the Counterparty's right of delivery upon reasonable request under clause 7.1(b) where, under clause 7.2(a), there is an Event of Default or Potential Event of Default, and the arguable extinction of all proprietary rights to securities on termination, pursuant to clause 13.2. For this purpose, and so as to finesse any issues as to the effect of clause 13.2, I shall assume but without deciding that it has the draconian consequence, contended for by Mr Peacock, of converting all proprietary interests in securities into unsecured receivables of an equivalent face value. I shall also assume, notwithstanding Mr Sher's submission to the contrary, that the combined effect of clauses 7.2(a) and 12.1(e) is that an Act of Insolvency of the Prime Broker does indeed constitute a Potential Event of Default which has the effect of suspending the counterparty's clause 7.1(b) right to delivery of equivalent securities.

66.     Again, it is *prima facie* surprising in the context of an alleged trust relationship both that the insolvency of the trustee should suspend the beneficiary's right to call for the return of the trust property and that the termination of the agreement pursuant to which it was entrusted to the trustee should lead to the automatic extinction of any continuing beneficial interest in it. If the Agreement had provided for the automatic extinction of the Counterparty's beneficial interest in its securities upon the Prime Broker's insolvency, then that would on the face of it be the end of the matter, at least in cases such as the present where an insolvency event has occurred. That would, for reasons already mentioned, be fatal to any claim to a proprietary interest in post-administration cash derived from such securities.

67.     I consider that the Agreement falls critically short of providing for that consequence. It falls short primarily because, as most Counterparties have recognised, the potentially disastrous consequences of clause 13.2 of the Agreement are only triggered if, both, the Counterparty notifies an Event of Default and then serves notice under clause 13.1 terminating the Agreement. Counterparties are not obliged to serve either notice, and most of them have not done so. Plainly, the Prime Broker cannot do so either under clause 12.1(e) or clause 13.1, because it is not the Non-Defaulting Party.

68.     What therefore is the effect of the suspension of the right to demand the return of securities brought about by clause 7.2(a)? In my judgment, a mere suspension of a beneficiary's right to demand the return of trust property from an insolvent trustee does not of itself count against the continuing existence of a trust. The natural expectation in relation to a Prime Broker such as LBIE subject to English insolvency processes is that trust property will in due course, once identified, be returned by the competent office-holder to qualifying beneficiaries or, in the event of a shortfall, shared out among them. I can think of no reason why the suspension of the contractual right to demand return in the meantime should, any more than the statutory moratorium on bringing proceedings for a return of securities, prevent that outcome. On the contrary, it is likely to ensure that such an outcome is properly and

fairly managed, so that all those claiming a beneficial interest in property under the control of the insolvent Prime Broker receive their just entitlements.

69.    Of course, the Counterparty can have its proprietary interests in securities expropriated (in the sense of being converted into unsecured receivables under clause 13) in the event that it commits an Event of Default.  But there is nothing inherently inimical to the recognition of a trustee/beneficiary relationship in the inclusion of provisions whereby, upon default by the beneficiary, its beneficial interest may be converted into a personal claim of equivalent face value.  In the absence of the insolvency of the Prime Broker, (and therefore assuming its ability to pay its debts), clause 13.2 merely converts a proprietary interest into a personal right of truly equivalent value.

70.    Nothing in Mr Peacock's submissions addressed what I consider to be a telling indicator in favour of a proprietary interest of a Counterparty in securities, namely the express right of redemption conferred by clause 10.4 of the Agreement.  It is true that the right of redemption is hedged about by conditions, such that the Prime Broker should be satisfied that all the liabilities have been irrevocably paid in full, and that in practice it is unlikely to be exercisable for as long as there exist any open positions on the Counterparty's trading account.  Nonetheless, it is expressed as a right to redeem by the re-assignment of the charged assets (which include the securities), and it is not suspended upon the Prime Broker's insolvency.  It is therefore a right which is inconsistent with any portrayal of the Charge IPBA as a structure under which the Counterparty cannot enforce the return of its securities by redemption, and which therefore contemplates no continuing proprietary interest in those securities.

71.    Turning to Mr Peacock's third main submission, I accept that, contrary to the analysis of Millett J in Re Charge Card (*supra*) it is not a contradiction in terms for there to be a charge by A to B of a debt owed by B to A.  But I nonetheless regard the detailed charging provisions of clause 10 of the Agreement as another indication favourable to the conclusion that the Counterparty enjoyed a proprietary interest in securities held by the Prime Broker as custodian.  One of the essential differences between the Charge IPBA and the Title Transfer IPBA is that the former, but not the latter, contains provisions by way of charge.  Both forms of agreement operate by way of collateral security.  In my judgment, the primary reason for the inclusion of detailed charging provisions in the Charge IPBA was precisely because it was intended to preserve proprietary rights of the Counterparty in securities delivered to the Prime Broker, whereas the Title Transfer IPBA was not.

72.    I therefore reject Mr Peacock's submissions on this issue.  In my judgment, securities held by LBIE as custodian for Counterparties were, and remain, held upon trust, such that Counterparties retained and continued to retain after the commencement of LBIE's administration, a beneficial interest in those securities, subject of course to LBIE's charge.  No substantially different legal consequence ensues from securities, such as MCF's T-Bills, having been held by sub-custodians, although the practical consequences in the event of a foreign sub-custodian's insolvency may prove to be different.

B – Does clause 5.2 apply to cash received by LBIE post-administration, derived from securities held as custodian (whether directly or by a sub-custodian)?

73.    I consider this to be the critical issue, decisive of this application.  Read literally and without regard as to its purpose clause 5.2 contains no qualitative or temporal limitation.  It is expressed to apply to "any cash held by us for you", and is not in terms expressed to cease to have effect earlier than upon the termination of the Agreement.  For reasons already given, Counterparties have not, for the most part, chosen to terminate Charge IPBAs as a result of LBIE's administration.

74.    Nonetheless, Mr Sher advanced two alternative constructions of clause 5.2, each based on a different aspect of the purposes for which, so he submitted, it was included in the Agreement.  His first and more radical submission was that clause 5.2 had no application to cash held or received by the Prime Broker in respect of which the source was a security or other asset or right already subject to the Prime Broker's charge in clause 10 of the Agreement.  Viewed in positive rather than negative terms, clause 5.2 applied only to cash brought into charge for the first time by being transferred from free assets of the Counterparty or of some third party acting on its direction.  Thus, it would apply to cash paid to LBIE to fund dealing transactions, or cash paid in to meet a margin requirement, but not to cash derived from a security already held by LBIE as custodian (or by a sub-custodian) subject to the clause 10 charge.

75.    The justification for that interpretation was based, fairly and squarely, upon the uncontentious assertion that a main purpose of clause 5.2 was to take advantage of the exception to the client money regime constituted by paragraph 7.2.3 of CASS (in its then form).  Paragraph 7.2.3 is expressed to apply where, and only where:

> "A client transfers full ownership of money to a firm for the purpose of securing or otherwise covering present or future, actual or contingent or prospective obligations …"

Mr Sher submitted that CASS 7.2.3 would be satisfied in the event of any transfer of ownership of money which was, prior to the transfer, not subject to any security in favour of the recipient, because the provision of security would be a purpose of the transfer.  By contrast, he submitted, where the source of the cash was already subject to LBIE's charge (as it always would be in relation to cash derived from securities held as custodian) the transfer of full ownership of that cash under clause 5.2 would not be for the purpose of securing or otherwise covering present or future, actual or contingent or prospective obligations, because the cash would be security for those obligations even if full ownership of it were not transferred.  It would simply be client money subject to the clause 10 charge.  On the contrary, Mr Sher submitted, the true purpose of the transfer of ownership of cash derived from securities already charged was to enable that cash to be used by LBIE in the ordinary course of its business as its own money, a purpose expressly contemplated by the last sentence of clause 5.2.

76.    It followed, said Mr Sher, that any interpretation of clause 5.2 which applied to cash, the ownership of which was not transferred for the purpose of affording security, would fall foul of paragraph 7.2.3 of CASS, and therefore constitute a serious breach by LBIE of the regulatory regime to which, although not incorporated, the Agreement was declared to be subject, by clause 2.5.  Any available interpretation which was in

harmony with, rather than in breach of, CASS was therefore to be preferred, and therefore a construction which limited clause 5.2 strictly to cash, the ownership of which was transferred as fresh or added security, was therefore also to be preferred.

77. Mr Sher bolstered his submission by pointing out that nowhere in clause 5.2 is it expressly stated that the purpose of the transfer of ownership of cash was the provision of security. The first sentence reads:

> "The parties acknowledge and agree that any cash held by us for you is received by us as collateral with full ownership under a collateral agreement and is subject to the security interest contained in the Agreement."

That was all no doubt true, said Mr Sher, but that was not the language of purpose, by contrast with the last sentence of clause 5.2, in which its true purpose is revealed. The fact that the first sentence of clause 5.2 echoed the language of paragraph 7.2.3 of CASS, shorn of its reference to purpose, was neither here nor there.

78. This is an ingenious and sophisticated argument, with startling consequences if correct, not least because it does not appear that LBIE or any of its Counterparties, or for that matter the FSA, recognised it at any time during LBIE's conduct of its Prime Brokerage service before it went into administration.

79. In my judgment, a reading of clause 5.2 in the context of the Agreement as a whole makes it clear that it applies to all, rather than part of, the cash held by the Prime Broker for a Counterparty. If clause 5.2 had the narrower meaning contended for by Mr Sher, it would have been necessary both for the Agreement to contain provision for the holding of cash to which clause 5.2 did not apply, and therefore in a manner consistent with CASS, so that the Prime Broker would have needed to maintain, at one and the same time, a client cash account operated in accordance with CASS, and a non-client cash account to deal with cash held pursuant to clause 5.2. Such a split arrangement in relation to cash is not merely absent from the Agreement, but inconsistent with the provisions as to cash accounts in clauses 5 and 7, and in particular with the provisions as to treatment of income derived from securities in clause 8.1(b). It would seriously undermine the achievement of the main purpose of clause 5.2, namely to facilitate the on-going business of the Prime Broker. In summary, although the Agreement contemplates that more than one cash account may be held for a Counterparty, it speaks with one voice to the effect that, in relation to all cash, the relationship between the Prime Broker and the Counterparty is that of debtor/creditor rather than that of trustee and beneficiary. That is of course also the natural meaning of the language of clause 5.2 itself.

80. It is true that the language of paragraph 7.2.3 of CASS is more easily applied to money the ownership of which is transferred for the purpose of providing fresh security, than to money that derives from an asset which is already charged as security. Furthermore, Mr Peacock could not point to any typical situations in which the Prime Broker's security would be improved in any way by operation of clause 5.2 (other than one rather far-fetched example). Nonetheless I do not consider that the fact that money (or the asset from which it is derived) is already charged as security before full ownership of it is transferred, also by way of security, means that the transfer of full ownership contravenes CASS, in the sense of falling outside the

exception to the client money regime constituted by paragraph 7.2.3. It follows that this first argument in favour of a narrow interpretation of the scope of clause 5.2 of the Agreement fails.

81. Mr Sher's second purposive argument was that clause 5.2, properly interpreted, applies only for as long as the Prime Broker is carrying on its business as such, and discharging its prime brokerage obligations to the Counterparty. As a slight variation on that argument, he submitted that clause 5.2 would cease to apply if the Prime Broker went out of business, including for that purpose business other than its prime brokerage business.

82. This submission was placed upon two foundations. The first was the clear expression in the last sentence of clause 5.2 that its purpose was to enable the Prime Broker to use cash affected by clause 5.2 in the course of its business. In fact, the last sentence provides not merely that the Prime Broker may do this, but that it will do so. Clause 5.2 is therefore, so the argument goes, purposeless and therefore redundant in the event that the Prime Broker goes out of business, and ought not therefore to apply to cash received after that occurs. Mr Sher did not go so far as to submit that cash already held by the Prime Broker at the moment of its going out of business would thereafter be held as client money, but only that new cash received thereafter would not fall into the Prime Broker's general funds.

83. Mr Sher's second foundation was based upon what he described as the disastrous consequences for the Counterparty if clause 5.2 continued to apply during a period when the Prime Broker was no longer performing its obligations as such, and therefore failing or refusing to permit the Counterparty to manage its ever-increasing exposure to the Prime Broker's credit risk. Because of the inherent tendency of securities to yield or turn into cash, the Counterparty would be deprived of the value of its proprietary interest in securities held by the Prime Broker as custodian at precisely the time when it most needed it.

84. For the unsecured creditors, Mr Peacock submitted first, that there was nothing in the language of clause 5.2 to which a temporal limitation of the type contended for by Mr Sher could be attached. Secondly he submitted that clause 5.2 took effect from the date of the Agreement as an absolute equitable assignment by the Counterparty to the Prime Broker of all property falling within its scope, so that the conceptual analysis of the clause operating during a period of time, so as to be potentially terminable, was inherently flawed. In that context he submitted that the purpose of clause 5.2 (namely to permit the Prime Broker to use cash in the course of its business) was sufficiently satisfied as at the date of the Agreement when, as he submitted, the assignment took effect.

85. Finally, Mr Peacock submitted that the contractual remedy for a failure of the Prime Broker to continue to provide the prime brokerage service was for the Counterparty to terminate the Agreement, in which case clause 13 provided for the conversion of all the counterparty's proprietary interests in securities into unsecured debt in any event. Since that was the end game, he submitted, there was nothing surprising or uncommercial about clause 5.2 continuing to have that effect over time, even after the Prime Broker ceased to perform the services, or went out of business. Mr Peacock submitted that there was nothing surprising in a conclusion that clause 5.2 continued to operate in the event of the Prime Broker's insolvency. First, he said that the Prime

Broker's business included paying its creditors, and did not therefore cease on insolvency. Secondly, he submitted that, read as a whole, the Agreement clearly allocated to the Counterparty the risk of being an unsecured creditor on the Prime Broker's insolvency.

86.    In my judgment, clause 5.2 does have the temporal limitation for which Mr Sher contends, albeit that it is not spelt out in clear express terms. My reasons follow.

87.    Mr Sher put his argument in terms of construction rather than implied terms, but it is clear (if it was ever in doubt) that the latter is no more nor less than an aspect of the former: see <u>Attorney General of Belize v. Belize Telecom Limited</u> [2009] UKPC 10, at paragraphs 16 to 27 in the judgment of the Privy Council delivered by Lord Hoffmann. Furthermore, I consider that the following extract from that judgment is particularly apt to describe the court's task in relation to the construction of clause 5.2 of the Agreement:

> "16.    Before discussing in greater detail the reasoning of the Court of Appeal, the Board will make some general observations about the process of implication. The court has no power to improve upon the instrument which it is called upon to construe, whether it be a contract, a statute or articles of association. It cannot introduce terms to make it fairer or more reasonable. It is concerned only to discover what the instrument means. However, that meaning is not necessarily or always what the authors or parties to the document would have intended. It is the meaning which the instrument would convey to a reasonable person having all the background knowledge which would reasonably be available to the audience to whom the instrument is addressed: see *Investors Compensation Scheme Ltd v West Bromwich Building* Society [1998] 1 WLR 896, 912-913. It is this objective meaning which is conventionally called the intention of the parties, or the intention of Parliament, or the intention of whatever person or body was or is deemed to have been the author of the instrument.
>
> 17.    The question of implication arises when the instrument does not expressly provide for what is to happen when some event occurs. The most usual inference in such a case is that nothing is to happen. If the parties had intended something to happen, the instrument would have said so. Otherwise, the express provisions of the instrument are to continue to operate undisturbed. If the event has caused loss to one or other of the parties, the loss lies where it falls.
>
> 18.    In some cases, however, the reasonable addressee would understand the instrument to mean something else. He would consider that the only meaning consistent with the other provisions of the instrument, read against the relevant background, is that something is to happen. The event in question is to affect the rights of the parties. The instrument

may not have expressly said so, but this is what it must mean.
In such a case, it is said that the court implies a term as to what
will happen if the event in question occurs.  But the implication
of the term is not an addition to the instrument.  It only spells
out what the instrument means."

88.    Applied to the present case, the Agreement is silent as to what if anything should
       happen, in terms of the continued operation of clause 5.2,  in the event that the Prime
       Broker either goes out of business, ceases to perform the prime brokerage service,
       goes into an insolvency process, or does all three of those things simultaneously, as
       actually occurred in relation to LBIE.  Is the inference therefore that clause 5.2 was to
       continue to operate undisturbed, regardless of the happening of those events, or would
       the 'reasonable addressee' understand the Agreement to mean something else, namely
       that the only meaning consistent with the other provisions of the Agreement read
       against the relevant background, is that clause 5.2 should, in those circumstances,
       cease to operate?

89.    In approaching that question, I reject the submission that because LBIE continued,
       once in administration, to have an obligation to pay unsecured creditors, and
       continued to carry out certain administrative functions of a business nature, it did not
       therefore cease to carry on business in the ordinary commercial sense in which that
       phrase is understood.  The particular statutory objective of the administration of LBIE
       is to achieve the better realisation of its assets than would be achieved in a liquidation,
       not the rescuing of LBIE and its business as a going concern.

90.    Secondly, it does not seem to me that the question whether clause 5.2 should be
       regarded as operating by way of an original and complete absolute equitable
       assignment of future property is of any relevance or utility to the resolution of this
       question of interpretation.  Much time and ingenuity was devoted by counsel to the
       pros and cons of the assignment analysis, but it seems to me simply to miss the point.
       If it is to be concluded that clause 5.2 means (whether or not by way of implied term)
       that its operation ceases upon the Prime Broker's going out of business or ceasing to
       provide the prime brokerage service, that would, even on Mr Peacock's assignment
       analysis, simply qualify the extent of the assignment, so as to exclude from its ambit
       cash received by the Prime Broker after the happening of the relevant event.

91.    Thirdly, I am not persuaded that the risk of the Prime Broker's insolvency has by the
       Agreement been clearly allocated to the Counterparty.  Although such an insolvency
       is a Potential Event of Default, the Counterparty is not obliged either to turn it into an
       actual Event of Default, still less to serve a termination notice which triggers the
       provisions of clause 13.

92.    Fourthly, there is no allocation at all to the Counterparty of the risk inherent in the
       Prime Broker ceasing to perform its services as such which, as I have explained in
       detail, inevitably leads to a leakage away of the Counterparty's securities into cash,
       once it is unable to require or persuade the Prime Broker to manage its portfolio so as
       to avoid that result.  Neither a refusal by the Prime Broker to perform its services, nor
       its going out of business, are identified as Events of Default.  The Agreement is, in its
       express terms, silent about those events.

93.    Lord Hoffmann's 'reasonable addressee' is, both in the <u>Belize</u> case and in the <u>ICS</u> case which preceded it, described as "a reasonable person having all the background knowledge which would reasonably be available to the audience to whom the instrument is addressed" (<u>Belize</u> at paragraph 16).  In the present case, the audience consists of the sophisticated parties to the Agreement, who may be taken to have been familiar with the nature of the securities likely to be delivered to LBIE as custodian (or to sub-custodians), and familiar with their inherent tendency both to generate cash and to turn themselves into cash over time.  Although it may be supposed that the insolvency of LBIE (an affiliate of one of the world's largest investment banks, fully guaranteed by its parent) was regarded as a very unlikely contingency, it is by no means illegitimate to ask what the reasonable addressee would think was meant to happen to a Counterparty's securities held by LBIE as custodian in such an event. Was the inevitable conversion of those securities into cash over time to lead the Counterparty to becoming, eventually, a purely unsecured creditor, or was the Counterparty to retain the same proprietary interest in cash thereafter derived from those securities, as it did in the securities themselves?  When it is borne in mind that the main purpose of the transfer to LBIE of full ownership of such cash, identified in clause 5.2 (namely to enable LBIE to use it in the course of its business) had come to an end, I consider that this question admits of only one reasonable answer.  It is that the transfer of full ownership of cash arising from investments held as custodian, after LBIE goes out of business and ceases to perform its services, thereby also ceases. Furthermore, the transfer of ownership of that cash is entirely unnecessary for the preservation of LBIE's security for the liabilities of the Counterparty since, even if thereafter held as client money, it continues to be subject to the express charge in clause 10.

94.    In paragraph 25 of its judgment in <u>Belize</u>, the Privy Council said this:

> "The need for an implied term not infrequently arises when the draftsman of a complicated instrument has omitted to make express provision for some event because he has not fully thought through the contingencies which might arise, even though it is obvious after a careful consideration of the express terms and the background that only one answer would be consistent with the rest of the instrument."

In my judgment that description exactly fits the present case.  The insolvency of LBIE, although it did not pass entirely without mention in the Agreement, was no doubt regarded by the draftsman as a remote contingency.  The dire consequences for Counterparties of its going out of business and refusing to perform its Prime Brokerage services were, it seems to me, entirely overlooked.  But careful thought about those contingencies would quickly lead to the conclusion that, as in this case, they might all occur together, so that the involuntarily conversion of a Counterparty from a beneficiary with proprietary interests in securities into an unsecured creditor would be likely to take place at precisely the time when the preservation of its proprietary rights mattered most.  The existence and safeguarding of those rights was an important feature of the Agreement (by contrast in particular with the Title Transfer IPBA) and the destruction of those rights without any concomitant benefit to the Prime Broker, either in terms of the ability to use the money for a continuing

business, or the preservation of its rights as chargee, cannot therefore be consistent with the Agreement, read as a whole.

95.    It is not necessary in this case to consider whether, if LBIE had ceased to carry on its general business but continued to comply with instructions from Counterparties with regard to their securities, this would have triggered a termination of clause 5.2.  Nor need the converse be considered, namely a refusal to continue to provide the brokerage services, while LBIE continued otherwise in business.   Both events occurred, as might have been predicted, simultaneously.

96.    My conclusion as to the interpretation of clause 5.2 in its context is sufficient to determine this application, in favour of the outcome contended for by MCF.   In particular, it renders unnecessary any recourse to the various equitable maxims and principles relied upon by Mr Sher as alternatives.   For what it is worth, I doubt whether any of those alternatives would have availed him, if I had concluded as a matter of interpretation that clause 5.2 continued to apply to Relevant Cash.

97.    I was however pressed by Mr Trower QC for the Administrators to deal with the issue as to administration expenses, not merely if I concluded that MCF failed on the interpretation issues, but also if it succeeded, against the risk that a higher court might take a different view on the interpretation issues.   My conclusion that Relevant Cash is to be regarded as client money (subject always to LBIE's charge) makes it unnecessary for the Administrators to consider whether payments of equivalent amounts should be made as administration expenses.   The cash is client money, it has been segregated, and (subject to questions of rateable sharing in the event of a shortfall, and factual issues as to entitlement) it can simply be paid to Counterparties as such.   I therefore turn to address the administration expenses issue on the assumption, contrary to my conclusion, that clause 5.2 of the Agreement continues to apply to Relevant Cash.

## ADMINISTRATION EXPENSES

98.    The question of what constitutes an administration expense is now governed by rule 2.67(1) of the Insolvency Rules 1986 (as amended).   Both Mr Trower and Mr Sher submitted that the payments which the Administrators considered that they should make in the present circumstances fell within sub-rule (f), as being "any necessary disbursement by the administrator in the course of the administration …".   Mr Trower submitted that although for the purposes of liquidators' expenses, the decision of the House of Lords in Re Toshoku Finance UK plc [2002] 1 WLR 671 had removed what was previously thought by some to be a general discretion in the court to identify particular debts as expenses, the flexible approach to that question in the context of administration adopted by Sir Donald Nicholls V-C in Re Atlantic Computer Systems plc [1992] Ch 505, at pages 527-8, remains good law.

99.    At paragraph 38 of his opinion in Toshoku, Lord Hoffmann said this, in relation to Sir Donald Nicholls' analysis in Atlantic Computer Systems:

"The second point is the proposition that whether debts should count as expenses of the liquidation is a matter for discretion of the court.   In my opinion there is no such discretion.   Rule 4.218 determines what counts as expenses, subject only to the

limited discretion under section 156 of the 1986 Act to re-arrange the priorities of expenses inter-se.  The court will of course interpret rule 4.218 to include debts which, under the <u>Lundy Granite Co</u> principle, are deemed to be expenses of the liquidation.  Ordinarily this means that debts such as rents under a lease will be treated as coming within paragraph (a), but the principle may possibly enlarge the scope of other paragraphs as well.  But the application of that principle does not involve an exercise of discretion any more than the application of any other legal principle to the particular facts of the case."

100.    In my judgment that dictum is no less applicable to administration expenses than it is to liquidation expenses, subject to two caveats.  The first is that the court habitually deals flexibly with applications for permission by, for example, secured creditors of a company in administration to enforce their security, or by landlords to forfeit a lease of property to the company.  In such circumstances it is commonplace for the creditor to be restrained, for the better functioning of the administration, provided that the administrator discharges what would otherwise be unsecured liabilities, as they arise.  The imposition by the court of such a condition for the refusal of permission to the creditor to enforce his security or forfeiture could convert a debt which might otherwise not be an administration expense into one that was.

101.    Furthermore, under the <u>Lundy Granite</u> principle itself, the retention by administrators of property for the benefit of the administration may mean that liabilities incurred by reason of that retention, although unsecured, become administration expenses.  Mr Trower pointed me to the obiter dicta of Mr Warren QC in <u>Re Japan Leasing (Europe) plc</u> [1999] BPIR 911 as a further example of the application of the same principle, where administrators adopted an agency contract of the company by accepting a payment proffered to it as agent, with the consequence that obligations to pay money arising under that contract after its adoption fell to be paid as administration expenses.  <u>Japan Leasing</u> was of course decided prior to <u>Toshoku</u>, and before the substantial alignment of the administration expenses regime with that applicable to liquidation.

102.    Mr Trower's analysis of the facts of the present case, on the assumption that clause 5.2 of the Charge IPBA continued to apply to Relevant Cash, was as follows:

i)      Subject to the payment of any relevant debts due to LBIE, the Counterparty under a Charge IPBA had a right to obtain a re-assignment of its securities by way of redemption pursuant to clause 10.4 of the Agreement.

ii)     It was nonetheless for the benefit of the administration that LBIE should not be subjected to redemption actions by up to 900 Counterparties, many of whom demanded the return of their securities shortly after LBIE went into administration, but were refused.

iii)    Although the flow into LBIE of Relevant Cash derived from such securities may in one sense be regarded as the automatic consequence of clause 5.2 (at least in relation to Charge IPBAs which were not terminated) in practical terms that cash flow was caused by LBIE's refusal, at the Administrators' behest, to return the securities pursuant to the Counterparties' demands.

iv)   That incoming cash flow created a concomitant unsecured obligation on LBIE to pay equivalent cash to the Counterparties, which would not have arisen if the securities had been returned as demanded.

v)   Accordingly, save for the fact that the Administrators did not require every Counterparty to make a pointless application for permission to enforce its right to redeem, so as to obtain a court order requiring payment of sums equivalent to Relevant Cash as a condition for being refused, all the ingredients for treating the debts arising in favour of Counterparties by reason of that incoming cash flow as liquidation expenses were thereby satisfied.

vi)   It would therefore be a time consuming, expensive and pointless charade for Counterparties to have to make applications for permission to enforce their rights, in circumstances where the outcome was a foregone conclusion.  The court should therefore recognise and direct now that unsecured debts equivalent to the incoming relevant cash should be payable as administration expenses.

103.   To this practical and eminently commonsensical argument Mr Peacock responded as follows:

i)   For as long as the true ownership of securities held by LBIE as custodian remained to be investigated by the Administrators (a primary reason for their not being returned pursuant to Counterparties' demands) the Administrators could not identify with certainty what proportion of incoming cash ought to be reflected in a payment out to particular Counterparties.

ii)   LBIE continued to receive Relevant Cash because, pursuant to clause 5.2, that cash belonged to LBIE, both legally and beneficially.  It did not therefore have to adopt a contract (as occurred in <u>Japan Leasing</u>) to enable it to obtain the cash.

iii)   In any event, on the assumption that clause 5.2 was intended to have continuing operation for as long as the Agreement lasted, the risk of LBIE's insolvency was contractually allocated to the Counterparties, who could have no complaint that cash derived from their securities continued to accrue for LBIE's benefit.  To recognise an obligation to pay the concomitant debts as liquidation expenses would simply be to reallocate that risk, contrary to the parties' bargain.

iv)   In any event, the Administrators had succeeded in staving off the threat of a multiplicity of redemption actions without having to concede (in or out of court) an obligation to pay amounts equivalent to the incoming cash as liquidation expenses.  Payments of such debts were therefore not <u>necessary</u> disbursements within the meaning of IR2.67(1)(f).

v)   Since the purpose of this administration was to maximise realisations for creditors, it was not served by making preferential payments to a particular class.

104. After considerable initial misgivings, I have narrowly been persuaded by Mr Trower's submissions on this issue, essentially for the reasons he gave, which I have summarised above. Nonetheless out of respect for Mr Peacock's formidable submissions to the contrary, I would add the following observations in relation to them.

105. I do not understand the present application to amount to an invitation that I should direct the Administrators to pay any Relevant Cash otherwise than to Counterparties whom, after due inquiry, the Administrators have satisfied themselves are (or were) the beneficial owners of the relevant securities from which the incoming cash flow derived. Payments equivalent to Relevant Cash would only be made to Counterparties once those uncertainties have all been resolved. Even though an important purpose of the administration, served by not immediately responding to demands for the redemption of securities, was that it gave the Administrators time to deal with those uncertainties, that was by no means the only purpose served. The Administrators have since September 2008 had innumerable competing priorities for the application of their finite resources.

106. Secondly, although (on the assumption which I am required to make that clause 5.2 continued to operate post-administration) it is true that LBIE received the Relevant Cash as beneficial owner, that analysis by no means displaces the practical reality of the submission that the real reason for those receipts was indeed the administrators' refusal to permit LBIE to return securities to Counterparties by way of redemption. The receipts were a windfall to LBIE, caused by its administration. The correctness of Mr Trower's causation analysis on that point is the primary reason for my acceptance of his submissions as a whole.

107. Thirdly, even if clause 5.2 continued to apply to Relevant Cash, I do not accept Mr Peacock's submission that there was a comprehensive allocation to Counterparties of the risks arising from LBIE's insolvency, in the sense that there was any contractual recognition that redemption of securities pursuant to clause 10.4 would be refused merely because LBIE was insolvent. As a matter of contractual intention, the Counterparties' rights to redeem ought to have insulated them from the risks inherent in the outflow of cash from their securities after the date upon which redemption should have taken place.

108. Mr Peacock's fourth point, that payment of sums equivalent to the Relevant Cash was not a <u>necessary</u> disbursement, was perhaps his best one. But it has serious practical disadvantages in a large administration such as the present, where a whole class of potential applicants for permission to sue sensibly decide not to do so, without first reaching separate bargains pursuant to which the Administrators agree to make specific payments as a *quid pro quo*. To confine necessity to a situation in which the relevant payment has either been ordered by the Court or extracted from the Administrators as part of an out of court bargain seems to me to construe it too narrowly. If it is a payment which ought to be made in fairness and justice to a Counterparty which, because of administration, has been or will be prejudiced by LBIE's retention of its securities beyond the date when they should have been delivered by way of redemption, then it is in my judgment properly to be described as a necessary disbursement, even if a promise to make it did not have to be extracted from the Administrators by the exercise of legal or commercial pressure.

109.  Another route by which I have arrived at the same conclusion is that, although the Administrators have not adopted or retained the Relevant Securities so as to use them for a purpose of the administration (within the strict confines of the <u>Lundy Granite</u> principle), they have nonetheless thus far resisted their delivery to Counterparties on demand, because to have done so would have been contrary to the efficient conduct of the administration.  It has therefore been for the better conduct of the administration that the securities have thus far been retained. By contrast it is no part of the purpose of the administration that the unsecured creditors of LBIE should obtain a consequential windfall at the Counterparties' expense.  Payments of sums equivalent to the Relevant Cash are therefore necessary disbursements, because they are necessary in order to remedy the injustice which the retention of that windfall would otherwise bring about.

110.  Finally, it is inherent in any payment of an unsecured debt as an administration expense that it prefers that creditor to the other unsecured creditors of the company. But its identification as an administration expense means necessarily that the payment is not a wrongful preference.  It is simply a payment which the law recognises ought to be made, in particular circumstances.

111.  It follows therefore that, had I come to the conclusion that clause 5.2 of the Charge IPBA continued to apply to Relevant Cash, I would have directed the Administrators to make payments of equivalent amounts to such Counterparties whom the Administrators identified as the beneficial owners of the securities from which the incoming cash derived.

112.  I will hear submissions as to the appropriate form of an Order to give effect to the decisions which I have reached.