# Exhibit 11

180

**Reg. v. Miller (H.L.(E.) )**                                    **[1983]**

LORD BRIGHTMAN. My Lords, I would dismiss this appeal for the
reasons given by my noble and learned friend, Lord Diplock.                A

*Appeal dismissed.*

Solicitors: *Lee, Bolton & Lee for Michael T. Purcell & Co., Birmingham;
Sharpe, Pritchard & Co. for Ian S. Manson, Birmingham.*

B

J. A. G.

---

[HOUSE OF LORDS]

C

CHEALL . . . . . . . . . RESPONDENT

AND

ASSOCIATION OF PROFESSIONAL EXECUTIVE
       CLERICAL AND COMPUTER STAFF . . . APPELLANTS

1983  Feb. 21, 22;                    Lord Diplock, Lord Edmund-Davies,        D
      March 24              Lord Fraser of Tullybelton, Lord Brandon
                                        of Oakbrook and Lord Templeman

*Trade Union — Membership — Wrongful termination — Member
resigning from union and joining another union — Former
union complaining to T.U.C. disputes committee — Finding
that union accepting member in breach of Bridlington agree-
ment — Union giving notice under its rules terminating mem-
bership — Whether membership validly terminated*

E

The plaintiff, a security officer for a motor manufacturing
company, was secretary of the local branch of the union,
A.C.T.S.S., a subsidiary of the T.G.W.U. Disenchantment led
the plaintiff to resign from the A.C.T.S.S. and to join the
defendant union, A.P.E.X. Although the plaintiff had not, on
his application form, stated that he had been a former member
of the A.C.T.S.S. the local officials of A.P.E.X. were aware       F
of that fact. In breach of the T.U.C. Disputes Principles and
Procedures known as the Bridlington principles, in particular,
principle 2 which governed the recruitment of former members
of any affiliated union, A.P.E.X. had failed to inquire whether
the plaintiff's former union objected to the transfer prior to
accepting the plaintiff into its membership. The T.G.W.U.
having complained to the T.U.C., the T.U.C. disputes com-          G
mittee found that A.P.E.X. had contravened principle 2 and
directed A.P.E.X. to exclude the plaintiff and to advise him to
rejoin his former union. Accordingly, the A.P.E.X. executive
council, relying on rule 14 of its membership rules (which
permitted the expulsion of an individual member in order to
comply with a decision of the T.U.C. disputes committee)
purported to terminate the plaintiff's membership. The plain-
tiff, who had not at any stage of the dispute been accorded       H
a hearing, brought an action for a declaration that the
notice terminating his membership of A.P.E.X. was invalid.
Bingham J. dismissed the plaintiff's action. On appeal by the

**2 A.C.**                    **Cheall v. A.P.E.X. (H.L.(E.))**

A
plaintiff, the Court of Appeal (by a majority) allowed the appeal.

On appeal by A.P.E.X.: —

*Held,* allowing the appeal, (1) that the only way that A.P.E.X. could comply with the decision of the disputes committee of the T.U.C. was by terminating the plaintiff's membership of the union pursuant to rule 14 and that there was no principle of law which prevented the union from relying on that rule (post, pp. 188B–F, 189D–F, 191G—192A).

B
*New Zealand Shipping Co. Ltd.* v. *Société des Ateliers et Chantiers de France* [1919] A.C. 1, H.L.(E.) distinguished.

(2) That there was no principle of natural justice that the plaintiff was entitled to be heard before the disputes committee of the T.U.C. for the only parties in dispute before it were the trade unions concerned who alone were entitled to make representations written or oral to the committee (post, pp. 189G—190B, 191G—192A).

C
(3) That although A.P.E.X. was permitted to give notice to an individual member and the opportunity to be heard before deciding whether or not to exercise its discretion to expel a member under rule 14, the union had been under no obligation to give the plaintiff any such notice in circumstances where there was an unassailable factual finding of the T.U.C. disputes committee and a willingness on the part of his former union to readmit him to membership (post, pp. 190C–P, 191G—192A).

D
(4) That the Bridlington principles did not contravene any provision of the European Convention of Human Rights nor was there any existing rule of public policy that would prevent trade unions from entering into arrangements with one another which they considered to be in the interests of their members in promoting order in industrial relations and enhancing their members' bargaining power with their employers, albeit those

E
arrangements might restrict the right of an individual to join and to remain a member of a trade union of his choice, and accordingly the notice terminating the plaintiff's membership of the union was valid (post, pp. 190F–G, 191B–D, F, G—192A).

*Per curiam.* (1) Any limitation of the application of the Bridlington principles on the ground of public policy as had been suggested is a matter for Parliament and not for the courts (post, pp. 191D–E, G—192A).

F
(2) Different considerations might apply if the effect of the plaintiff's expulsion from the union were to have put his job at risk, either because of the existence of a closed shop or for some other reason (post, pp. 191E, G—192A).

Decision of the Court of Appeal [1983] Q.B. 126; [1982] 3 W.L.R. 685; [1982] I.C.R. 543; [1982] 3 All E.R. 855 reversed.

G
The following cases are referred to in the opinion of Lord Diplock:

*Edwards* v. *Society of Graphical and Allied Trades* [1971] Ch. 354; [1970] 3 W.L.R. 713; [1970] 3 All E.R. 689, C.A.

*New Zealand Shipping Co. Ltd.* v. *Société des Ateliers et Chantiers de France* [1919] A.C. 1, H.L.(E.).

The following additional cases were cited in argument:

H
*Cinnamond* v. *British Airports Authority* [1980] 1 W.L.R. 582; [1980] 2 All E.R. 368, C.A.

*Durayappah* v. *Fernando* [1967] 2 A.C. 337; [1967] 3 W.L.R. 289; [1967] 2 All E.R. 152, P.C.

182

*Jackson and Haden's Contract, In re* [1906] 1 Ch. 412, C.A.
*John v. Rees* [1970] Ch. 345; [1969] 2 W.L.R. 1294; [1969] 2 All E.R.    A
    274.
*Kish v. Taylor* [1911] 1 K.B. 625, C.A.
*Malloch v. Aberdeen Corporation* [1971] 1 W.L.R. 1578; [1971] 2 All
    E.R. 1278, H.L.(Sc.).
*Meyrick's Settlement, In re* [1921] 1 Ch. 311.
*National Union of Railwaymen v. Sullivan* [1947] I.R. 77.
*Wiseman v. Borneman* [1971] A.C. 297; [1969] 3 W.L.R. 706; [1969]    B
    3 All E.R. 275, H.L.(E.).
*Young v. United Kingdom* [1981] I.R.L.R. 408.

APPEAL from the Court of Appeal.

This was an appeal by the appellants, the Association of Professional
Executive Clerical and Computer Staff (A.P.E.X.), from the judgment
dated June 18, 1982, of the Court of Appeal (Lord Denning M.R. and    C
Slade L.J., Donaldson L.J. dissenting) allowing the appeal of the respon-
dent, Ernest Dennis Cheall, from a judgment dated November 24, 1981,
of Bingham J., dismissing an action brought by the respondent for a
declaration that a notice of termination of his membership of the appel-
lant trade union by letter dated June 30, 1978, was unlawful.

The facts are set out in the opinion of Lord Diplock.    D

*Mark Saville Q.C., Frederic Reynold Q.C.* and *Cherie Booth* for the
appellants. There are four issues: (1) Whether rule 14 of the rules of
A.P.E.X. taken in conjunction with the Bridlington principles is void as
offending public policy in that it constitutes a restriction on an individual's
right to belong to a trade union of his choice. (2) Whether the proceedings
before the disputes committee of the T.U.C. were contrary to natural justice.    E
(3) Whether the proceedings before the executive committee of A.P.E.X.
were likewise void as contrary to natural justice. (4) Whether there is some
rule of law that prevents A.P.E.X. from relying on rule 14 as against the
respondent.

(1) Rule 14 as a matter of construction plainly applies to the respondent
in the circumstances. It was necessary for A.P.E.X. to comply with the    F
decision of the disputes committee of the T.U.C. and this could only be
done by terminating the respondent's membership of A.P.E.X. Accordingly
he was given six weeks' notice in writing of such termination. (2) The
contention that the proceedings before the disputes committee of the T.U.C.
were contrary to natural justice is unsustainable. (3) It is not disputed that
proceedings before the executive committee must comply with the principles
of natural justice. But there is no authority to support the proposition that    G
in relation to the respondent natural justice could only be complied with
by granting him a hearing before the executive committee. The true prin-
ciple is that natural justice obliges a tribunal to act fairly. If the respondent
had appeared before the executive committee there was nothing that he
could have contributed in relation to the matters before it. In those circum-
stances it cannot be said that the proceedings before it were invalidated:    H
see *Malloch v. Aberdeen Corporation* [1971] 1 W.L.R. 1578, 1582H, *per*
Lord Reid, 1595D, *per* Lord Wilberforce. See also *Cinnamond v. British
Airports Authority* [1980] 1 W.L.R. 582, 593D-F. The present issue can

A   be crystallised as follows: what was unfair in the way that the executive committee reached its decision? The answer is nothing. It is to be observed that the respondent did not ask for a hearing or to make representations before the committee came to its decision. Reliance is placed on the judgment of Bingham J. [1982] I.C.R. 231, 249F—250H and Donaldson L.J. [1983] Q.B. 126, 143D—144D.

B   (4) The respondent contends that in respect to a clause such as rule 14 there is a well-settled principle of law that no party can take advantage of the existence of a state of things which his own default or wrong-doing has produced: *New Zealand Shipping Co. Ltd.* v. *Société des Ateliers et Chantiers de France* [1919] A.C. 1. That a breach of the Bridlington principles can be either deliberate or innocent and rule 14 cannot by its terms be said to exclude the above principle of law. Further, that on the construction of a clause such as rule 14 it is to be construed strictly against

C   the party seeking to rely upon it. It is that fact that there has been here a deliberate breach of the Bridlington principles that the respondent bases his contention. It is not said that a mere breach suffices for if that were so then the appellants could never rely on rule 14. This raises the question of the principle of the *New Zealand* case and whether the respondent's proposition falls within it. But the *New Zealand* case does not contain any over-

D   riding principle of law. It concerned the construction of the terms of a contract and is simply an example of construing the words the parties have used in the light of the surrounding circumstances in which the contract was made. As such it demonstrates that one party to a contract cannot trigger a termination clause by breaking the contract, in the absence of express words permitting him to do so. The case is plainly distinguishable, since no breach of the contract with the respondent led to the termination in the

E   present case. Further, Russell J. in *In re Meyrick's Settlement* [1921] 1 Ch. 311, 316, observed that the statement of Lord Shaw of Dunfermline [1919] A.C. 1, 11, cannot be taken literally.

   As to rule 14, it is a clause comparable to that in *In re Meyrick's Settlement* [1921] 1 Ch. 311. Since the respondent concedes that rule 14 can only operate if the appellants have broken the Bridlington principles,

F   he is forced to seek a distinction between innocent and deliberate breaches, but there is no rule or canon of construction comparable to that in the *New Zealand* case [1919] A.C. 1, or elsewhere. The judgment of Bingham J. is adopted.

   *George Newman Q.C.* and *Stephen Auld* for the respondent. It is first necessary to consider the restrictions inherent in the Bridlington principles and their impact on the contract and the respondent and A.P.E.X. Prin-

G   ciples 2 to 5 create restrictions upon the freedom of the person to join a union, to leave a union and to be free to join another union. By reason of principle 2 an individual who has been a member of a union can be prevented from joining another union even if he has given notice so to do. Further, an individual who is a member of a union can be expelled from that union. These consequences are said to flow justifiably in terms of con-

H   tractual principles from the inclusion of the model rule in the rule book (rule 14). These are principles which affect the contract between the respondent and A.P.E.X. and which are unknown to one of the contracting parties. Accordingly, a person who might give reasonable notice to exercise

184

**Cheall v. A.P.E.X. (H.L.(E.))**                    **[1983]**

A

his statutory right to leave the union can find himself blacked from joining another union. These restraints are not such as justifiably flow from the inclusion of the model rule in the rule book: see the judgment of Slade L.J. [1983] Q.B. 126, 158F–H.

It is unreasonable to construe rule 14 in the contractual circumstances of this case as providing for a necessity other than one which has not been created by the deliberate conduct of the union.

B

The respondent's case on the contractual position has always been taken on alternative grounds: (i) on the fact that the respondent did not agree to be excluded from membership of A.P.E.X. in these circumstances because rule 14 is insufficiently precise to bind him. One basis for the requirement for precision is the rule of construction illustrated by the *New Zealand Shipping* case [1919] A.C. 1. See the judgment of Slade L.J. [1983] Q.B. 126, 159H—160A. (ii) There is no such rule of construction which saves the respondent from the consequences of the contract he had entered into and that accordingly, on the general principles of contract he must be taken to have agreed to the consequences that occurred. If (ii) be the correct view of the law then the respondent invokes public policy on the classic grounds that protection of the liberty of the individual is too important to be bargained away. What the respondent has bargained away is: (a) his freedom to associate with a particular trade union and the union which wishes him to remain in membership; his right at common law to exercise his trade in the manner he thinks best in his own interests. The respondent also relies on the way the argument was put before Bingham J. [1982] I.C.R. 231, 247E—248A.

C

D

Where a trade union is excluding a member under a compelling direction pursuant to a decision of the T.U.C. disputes committee it is of little use for him to have a hearing before the executive committee of his own union but there should be a right to be heard by the disputes committee of the T.U.C. for its decision is the effective cause of his exclusion from the union. There is no authority which states that the principles of natural justice cannot be applied in circumstances such as exist in the present case. There are indications in *Wiseman* v. *Borneman* [1971] A.C. 297, 308E–F, 317, that the court looks at the matter broadly. The fact that in the present case there is a two-tiered system, namely, proceedings before the T.U.C. disputes committee and a hearing before the executive committee of A.P.E.X., does not mean that the question should be departmentalised. The observations of Lord Wilberforce in *Wiseman* v. *Borneman* [1971] A.C. 297, 317, show that there are no hard and fast rules as to the application of the principles of natural justice. But if as here, where there is a hearing before a body which can deprive a plaintiff of his rights and the plaintiff is excluded from the hearing then natural justice can be invoked to remedy that injustice. Donaldson L.J. [1983] Q.B. 126, 142, specifically held against the respondent on this issue. In answer it is submitted: (i) the lord justice concedes that if there were an allegation of misconduct against the respondent, this would give him a right to a hearing. The lord justice is there confusing an encroachment on the respondent's rights, taking the example of misconduct, and ignoring the respondent's right to natural justice in any event; (ii) the example of the sub-contractor is not helpful for the

E

F

G

H

A   effect on the sub-contractor is incidental but here the position of the respondent is affected fundamentally and directly.

The substantive entitlement to natural justice is not to be determined by detailed consideration of the probabilities and a judicial balancing of facts so as to detemine whether if it had been accorded it would have made any difference. The observations contained in *Malloch* v. *Aberdeen Corporation* [1971] 1 W.L.R. 1578 were made in a case where as a matter of legal

B   certainty it might have been possible to conclude that nothing could have been said to affect the outcome. *Durayappah* v. *Fernando* [1967] 2 A.C. 337, 349c–e is an example of when natural justice can be invoked. Applying the three criteria there set out to the facts of the present case: (i) the respondent's status as a member of A.P.E.X. is of the first importance; (ii) the circumstances of the encroachment by A.P.E.X. on the membership of another union and the consequences which flowed from that had nothing

C   to do with any contractual right which the Trade Union Congress had against the respondent; (iii) the decision of the T.U.C. disputes committee had sufficiently serious consequences for the respondent to qualify him for the protection of invoking the principle of natural justice.

To summarise the argument on this issue: (a) an individual's entitlement to the protection of natural justice and reasonable cause in the termination

D   of his contract of membership of a trade union does not depend upon his conduct being in issue. It is derived from the special, important and "proprietary" nature of the contract of membership. (b) The effective cause of termination in this, as in many other cases, was an award of the disputes committee of the T.U.C. The system was expressly devised to achieve that very object. (c) If, as Donaldson L.J. and Bingham J. apparently accepted, once an award is made it is invariably enforced so that a

E   member will be excluded, and nothing the union can say to the T.U.C., nor anything the member can say to the union, can alter that course, if natural justice is to mean anything it must be accorded at the disputes committee hearing. [Reference was also made to *John* v. *Rees* [1970] Ch. 345, 402c–e].

If the above argument does not accord with English public policy then

F   reliance is placed on the impact of the European Convention on Human Rights to the facts of the present case. The model rule taken together with the Bridlington principles (namely the principles and procedures established by the T.U.C. for dealing with disputes between unions over membership) constitute "a coherent, interlocking scheme" (Bingham J. [1982] I.C.R. 231, 239d) for regulating trade union conduct by: (a) restricting the freedom of an individual to join a trade union of his choice; (b) compelling the

G   exclusion of an individual from membership of a trade union. It is an essential attribute of the machinery that the disputes committee should determine to which trade union an individual should belong and to make its award accordingly. Where, as here, the award requires a member to be excluded from membership, that award is always made by the disputes committee without notice to the member and without the member being

H   given an opportunity to be heard. It is considered axiomatic that members obtained in breach of the Bridlington principles should be excluded. A union which fails to exclude a member in accordance with an award faces disaffiliation from the T.U.C. These restrictions are in broad terms contrary

186
**Cheall v. A.P.E.X. (H.L.(E.))**                                    **[1983]**

to article 11 (1) of the Convention and are not justified by article 11 (2).     A
See *National Union of Railwaymen* v. *Sullivan* [1947] I.R. 77, 100, 101,
102, and *Young* v. *United Kingdom* [1981] I.R.L.R. 408.  In order to
succeed in the present case the respondent does not have to prove that the
restrictions are contrary to article 11 of the Convention.  But the approach
of the common law towards membership of a trade union is strengthened
by the Convention.  As to the judgment of Bingham J. [1982] I.C.R. 231,
253G—255C, where as here, there is a plain inconsistency between a state of     B
affairs and the Convention, the silence of English law cannot countervail the
obligation to ensure that international obligations are complied with.
Accordingly, article 11 (1) of the Convention should apply.  Further,
A.P.E.X., knowing of an unusual circumstance which could imperil the
respondent's contract with them, namely, the failure to make prior inquiries
of A.C.T.S.S., which constituted a breach of the Bridlington principles, is
sufficiently blameworthy conduct on their part to come within the decision     C
in the *New Zealand Shipping* case [1919] A.C. 1: see *per* Slade L.J.
[1983] Q.B. 126, 158F.

  In conclusion, to revert to the first issue, it is a principle of law in the
construction of clauses like rule 14 that a party cannot reserve an arbitrary
power to annul a contract, that it is incumbent upon a party wishing to rely
upon such a clause to demonstrate that he has acted reasonably: *In re*     D
*Jackson and Haden's Contract* [1906] 1 Ch. 412, 419, *per* Collins M.R. and
*Kish* v. *Taylor* [1911] 1 K.B. 625, 633.

  *Saville Q.C.* was not called upon to reply.

  Their Lordships took time for consideration.

  March 24.  LORD DIPLOCK.  My Lords, the facts of this case, which     E
has given rise to acute conflict of judicial opinion in the courts below, are
set out in considerable detail in the judgment of Bingham J. [1982] I.C.R.
231.  In the action the respondent, Cheall, sought a declaration that a letter,
dated June 30, 1978, addressed to him by the appellants, A.P.E.X., the
trade union of which he had been a member for the last four years, and
purporting to give him six weeks' notice terminating his membership, was     F
invalid and of no effect.  Bingham J. held the notice to be valid and
effective.  On appeal to the Court of Appeal [1982] I.C.R. 543, Donald-
son L.J. in a dissenting judgment agreed with Bingham J.; but the majority
(Lord Denning M.R. and Slade L.J.), although not both for the same
reasons, allowed the appeal and granted Cheall the declaration that he
sought.

  For the purpose of disposing of the propositions of law, some of them     G
far-reaching, that have been advanced on Cheall's behalf at all three stages
of this litigation, the essential facts can be stated in summary form as
follows, leaving the curious reader to expand the summary if he so wishes
by reference to the judgment of Bingham J.

  In the early 1970s Cheall was employed at the Vauxhall motor works
at Luton as a security officer.  He was a member of the Association of     H
Clerical, Technical and Supervisory Staffs (A.C.T.S.S.), a trade union which
is itself part of the conglomerate trade union, the Transport and General
Workers' Union (T.G.W.U.).  Cheall was the secretary of the local branch

187
2 A.C.                    Cheall v. A.P.E.X. (H.L.(E.))              Lord Diplock

A   of A.C.T.S.S. at the Vauxhall works. He became disenchanted with the support that the branch was receiving from A.C.T.S.S. and, on May 6, 1974, together with a number of others he resigned his membership of A.C.T.S.S. On May 29, 1974, he applied to A.P.E.X. to become a member of that trade union: A.P.E.X., who knew full well that Cheall had until very recently been a member of A.C.T.S.S., accepted his application and he became a member of A.P.E.X. By the express terms of his application
B   form he agreed to be bound by its rules.

    In accepting Cheall into membership without first inquiring of A.C.T.S.S. whether it objected, A.P.E.X. was acting in breach of a code of conduct governing relations between trade unions that are members of the T.U.C. which is known as the Bridlington principles and is accepted as morally binding upon constituent unions among which both A.C.T.S.S. and A.P.E.X. are included. Complaints by one trade union of breaches of Bridlington
C   principles which involve what is referred to as the " poaching " of its members by another union, if not settled by amicable agreement between the unions concerned, are referred to a disputes committee which is empowered to make an award. A.C.T.S.S. objected to A.P.E.X. having poached Cheall and some eleven other former members of A.C.T.S.S. employed at the Vauxhall works; and after some considerable delay, in
D   February 1976, the T.G.W.U. made a formal complaint to the T.U.C. The complaint came on for hearing before a disputes committee on May 17, 1977. Cheall attended that hearing solely for the purpose of assisting the representative of A.P.E.X. who was presenting A.P.E.X.'s case, and not for the purpose of making representations on his own behalf so far as his personal interests might differ from those of A.P.E.X. He was not invited, nor would he have been permitted by the disputes committee, to do so.
E   On June 20, 1977, the disputes committee issued its findings and award, of which the relevant part is:

    " that A.P.E.X. should have made inquiries of the T.G.W.U. and by not doing so A.P.E.X. therefore acted in breach of principle 2 of the T.U.C. disputes principles and procedures. The disputes committee award that A.P.E.X. should exclude the eleven named individuals
F     and advise them to rejoin the T.G.W.U."

    Non-compliance with this award would have exposed A.P.E.X. to sanctions, including suspension from membership of the T.U.C. and the ultimate sanction of expulsion. These are risks which the executive council of A.P.E.X. might reasonably think it would be contrary to the interests of the general body of their members to run.
G   An award of a disputes committee upon a poaching complaint which is upheld, has for many years been in the standard terms adopted in the award in the instant case: the offending union is required to exclude the poached members from membership and to advise them to rejoin their former union. In order to enable it to comply with such an award A.P.E.X., like the great majority of trade unions that are members of the T.U.C., have
H   adopted a model rule recommended by that body in 1956 which forms rule 14 of the rules of A.P.E.X. by which Cheall had agreed to be bound. It reads as follows:

188
Lord Diplock                Cheall v. A.P.E.X. (H.L.(E.))                [1983]

> "14. Decisions of T.U.C. Disputes Committee
> "Notwithstanding anything in these rules the executive council may,
> by giving six weeks' notice in writing, terminate the membership of any
> member if necessary, in order to comply with a decision of the disputes
> committee of the Trades Union Congress."

It was under this rule that A.P.E.X. terminated Cheall's membership.

*The construction of the rule*

My Lords, with great respect to Slade L.J. who alone thought otherwise,
the meaning of this rule as a matter of construction and its applicability
to Cheall after the award of the disputes committee of June 20, 1977, appear
to me to be clear beyond argument. There had been a decision of the
disputes committee of the Trades Union Congress; the only way in which
A.P.E.X. could comply with it was by terminating Cheall's membership; it
was therefore necessary to do so in order to comply with that decision.
There is in my view no room for ambiguity about it.

Slade L.J. [1982] I.C.R. 543, 577, although he did refer to it "as a
matter of construction of the rule," relied upon a principle that he con-
sidered could be extracted from the speeches in this House in *New Zealand
Shipping Co. Ltd.* v. *Société des Ateliers et Chantiers de France* [1919]
A.C. 1, viz.:

> "A.P.E.X. cannot be heard to say that expulsion of the plaintiff is
> 'necessary in order to comply with a decision of the disputes com-
> mittee of the Trades Union Congress,' within the meaning of the rule,
> in a case such as the present where such necessity as there may be
> has arisen as a direct result of the conscious and deliberate breach
> by A.P.E.X. of the Bridlington principles in admitting him to member-
> ship."

But this, with respect, is not construction; "cannot be heard to say" is the
language of estoppel; what the learned Lord Justice is really saying is that
there is some rule of law that prevents A.P.E.X. from relying on rule 14 as
against Cheall. To the suggested rule of law I accordingly now turn.

*The supposed rule of law*

My Lords, the *New Zealand Shipping* case [1919] A.C. 1, from which,
it is contended, the supposed rule of law can be extracted, was an appeal
upon a case stated by an umpire in an arbitration of a phrase in a ship-
building contract: "thereupon this contract shall become void," where the
events to the occurrence of which "thereupon" referred were of different
kinds; some of them could only be brought about by some breach of the
contract by the shipbuilder, others could happen without any breach of
contract by either party. The umpire had found as a fact that the event
relied upon by the shipbuilders as bringing the clause into operation so as
to render the contract void happened without any breach of the ship-
building contract by either party, and the actual decision of this House
was that the shipbuilder was entitled to treat the contract as void. In the
course of the speeches, which are not entirely consistent with one another,
reference was made by all their Lordships to the well known rule of

**2 A.C.**                    Cheall v. A.P.E.X. (H.L.(E.))                    Lord Diplock

A construction that, except in the unlikely case that the contract contains clear
express provisions to the contrary, it is to be presumed that it was not the
intention of the parties that either party should be entitled to rely upon his
own breaches of his primary obligations as bringing the contract to an end,
i.e. as terminating any further primary obligations on his part then remain-
ing unperformed.  This rule of construction, which is paralleled by the rule
of law that a contracting party cannot rely upon an event brought about
B by his own breach of contract as having terminated a contract by frustra-
tion, is often expressed in broad language as: "A man cannot be permitted
to take advantage of his own wrong."  But this may be misleading if it is
adopted without defining the breach of duty to which the pejorative word
" wrong " is intended to refer and the person to whom the duty is owed.

The breach of duty which it is suggested disentitled A.P.E.X. in the
instant case to rely upon rule 14 as against Cheall was its duty under the
C Bridlington principles not to poach members from A.C.T.S.S.  This duty,
though moral only and not legally enforceable, it owed to A.C.T.S.S. and
T.G.W.U. and, may be, other trade unions that are members of the T.U.C.;
but plainly it cannot have owed such duty to individual members of trade
unions, since only trade unions were parties to the agreement embodied in
the Bridlington principles.

D Since rule 14 can only come into effect when there has been a breach
by A.P.E.X. of the duty owed by it to another trade union under the
Bridlington principles, it is hopeless to argue that A.P.E.X. is debarred
from relying on the rule to terminate the membership of a poached mem-
ber, merely because it acted in breach of the Bridlington principles in
poaching him.  So counsel for Cheall felt constrained to introduce the
concept of a distinction to be drawn between a " conscious and deliberate "
E breach of the Bridlington principles and a breach that was merely inadver-
tent.  The former it was argued disentitled A.P.E.X., as a matter of law,
ever to rely upon rule 14 to terminate the membership of the person in
respect of whom the conscious and deliberate breach was committed, while
an inadvertent breach did entitle it to do so.

My Lords, I know of no principle of law which justifies this distinction.
F The *New Zealand Shipping* case [1919] A.C. 1, the only authority relied
upon for it, contains no hint that any such distinction between deliberate
and inadvertent breaches of duty is to be drawn in applying the rule that
was the subject of discussion in that case.  To attract the principle, whether
it be one of construction or one of law, that a party to a contract is not
permitted to take advantage of his own breach of duty, the duty must be
one that is owed to the other party under that contract; breach of a duty
G whether contractual or non-contractual owed to a stranger to the contract
does not suffice.  I have no hesitation in rejecting the argument based upon
the supposed rule of law.

*Natural justice*

It was contended on Cheall's behalf that the termination of his member-
H ship was also void because the procedure which resulted in it constituted a
denial to him of natural justice.  He was entitled, it was suggested, not
merely to be present, as he was, at the hearing of the complaint against
A.P.E.X. by the disputes committee, but also to make representations,

190
Lord Diplock            Cheall v. A.P.E.X. (H.L.(E.))                [1983]

written or oral, to the disputes committee explaining his reasons for wishing    A
to switch his membership from A.C.T.S.S. to A.P.E.X. and the consequences
that an award adverse to A.P.E.X. would have upon him personally.

This contention did not find favour with any of the judges in the courts
below: the only parties to the dispute that was before the disputes com-
mittee were the trade unions concerned. They, and they only, were entitled
to make representations written or oral to the committee. Decisions that
resolve disputes between the parties to them, whether by litigation or some    B
other adversarial dispute-resolving process, often have consequences which
affect persons who are not parties to the dispute; but the legal concept of
natural justice has never been extended to give such persons as well as the
parties themselves rights to be heard by the decision-making tribunal before
the decision is reached. If natural justice required that Cheall should be
entitled to be heard, there could be no stopping there; any other member of
either union who thought he would be adversely affected by the decision, if    C
it went one way or the other, would have a similar right to be heard. To
claim that this is a requirement of "fair play in action" (to borrow
Sach L.J.'s description of natural justice in *Edwards* v. *Society of Graphical
and Allied Trades* [1971] Ch. 354, 382) would be little short of ludicrous.

Alternatively, though rather more mutedly, it was submitted that Cheall
was entitled to be heard by the executive council of A.P.E.X. before they    D
decided to comply with the award, which was already more than one year
old, by giving him notice of termination of his membership under rule 14.
In his judgment Bingham J. sets out what had in fact occurred before the
executive council reached its decision to act under rule 14 and Cheall's own
knowledge of it. That, in the learned judge's view, made it inevitable that
the only way in which A.P.E.X. could fulfil its duty to act in the best
interest of its members as a whole was by complying with the award of the    E
disputes committee. His conclusion was that, in the circumstances that he
recounts, there was no legal obligation on A.P.E.X. to give Cheall prior
notice of their decision or grant him an opportunity to be heard. "To have
done so," said the learned judge [1982] I.C.R. 231, 250, " where nothing
he said could affect the outcome would in my view have been cruel
deception." My Lords, I can content myself with saying: "I agree."    F

*Public policy*

Finally it was argued that if all the submissions with which I have
already dealt failed, as in my opinion they plainly do, the Bridlington
principles, which have been in operation since as long ago as 1939, are
contrary to public policy, since they restrict the right of the individual to    G
join and to remain a member of a trade union of his choice; and that any
attempt to give effect to any such restriction would, upon application by the
individual affected by it, be prevented by the courts.

This supposed rule of public policy has, it is claimed, always formed
part of the common law of England but it has now been reinforced by the
accession of the United Kingdom to the European Convention for the    H
Protection of Human Rights and Fundamental Freedoms (1953) (Cmd.
8969), of which article 11 reads as follows:

191

2 A.C.                    Cheall v. A.P.E.X. (H.L.(E.))              Lord Diplock

A
" 1. Everyone has the right to freedom of peaceful assembly and to freedom of association with others, including the right to form and to join trade unions for the protection of his interests.

" 2. No restrictions shall be placed on the exercise of these rights other than such as are prescribed by law and are necessary in a democratic society in the interests of national security or public safety, for the prevention of disorder or crime, for the protection of health or morals

B
or for the protection of the rights and freedoms of others. This article shall not prevent the imposition of lawful restrictions on the exercise of these rights by members of the armed forces, of the police or of the administration of the state."

C
My Lords, freedom of association can only be mutual; there can be no right of an individual to associate with other individuals who are not willing to associate with him. The body of the membership of A.P.E.X., represented by its executive council and whose best interests it was the duty of the executive council to promote, were not willing to continue to accept Cheall as a fellow-member. No doubt this was because if they continued to accept him, they ran the risk of attracting the sanction of suspension or expulsion of A.P.E.X. from the T.U.C. and all the attendant disadvantages to themselves as members of A.P.E.X. that such suspension or expulsion

D
would entail. But I know of no existing rule of public policy that would prevent trade unions from entering into arrangements with one another which they consider to be in the interests of their members in promoting order in industrial relations and enhancing their members' bargaining power with their employers; nor do I think it a permissible exercise of your Lordships' judicial power to create a new rule of public policy to that effect. If this is to be done at all it must be done by Parliament.

E
Different considerations might apply if the effect of Cheall's expulsion from A.P.E.X. were to have put his job in jeopardy, either because of the existence of a closed shop or for some other reason. But this is not the case. All that has happened is that he left a union, A.C.T.S.S., in order to join another union, A.P.E.X., which he preferred. After four years of membership he was compelled, against his will, to leave it and was given

F
the opportunity, which he rejected, of rejoining A.C.T.S.S. if he so wished.

My human sympathies are with Mr. Cheall, but I am not in a position to indulge them; for I am left in no doubt that upon all the points that have been so ingeniously argued, the law is against him and that accordingly this appeal must be allowed and the judgment of Bingham J. restored.

G
LORD EDMUND-DAVIES. My Lords, I am in entire agreement with the speech prepared by my noble and learned friend, Lord Diplock, in this case and would accordingly allow the appeal.

LORD FRASER OF TULLYBELTON. My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Diplock. I agree with it, and, for the reasons there stated, I would

H
allow this appeal.

LORD BRANDON OF OAKBROOK. My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend,

192
Lord Brandon
of Oakbrook                    Cheall v. A.P.E.X. (H.L.(E.) )                    [1983]

Lord Diplock.  I agree with it, and for the reasons which he gives I would       A
allow the appeal and restore the judgment of Bingham J.

LORD TEMPLEMAN.  My Lords, for the reasons given by my noble and
learned friend, Lord Diplock, I too would allow this appeal.

                                                    *Appeal allowed.*
                                                                                B
Solicitors: *John L. Williams; Boyle & Ormerod, Aylesbury.*

                                                            J. A. G.

                              ─────────
                                                                                C
                          [HOUSE OF LORDS]

ROBERTS PETROLEUM LTD.  .    .    .    . RESPONDENTS
                              AND
BERNARD KENNY LTD.  .    .    .    .    . APPELLANTS

1982  Dec. 15, 16, 20;           Lord Diplock, Lord Edmund-Davies,     D
1983  Feb. 10                     Lord Keith of Kinkel, Lord Roskill
                                        and Lord Brightman

    *Execution — Charging order nisi — Order absolute — Order nisi*
       *obtained by company's largest creditor—Statement of affairs*
       *showing company to be insolvent—Extraordinary resolutions*
       *passed that company be wound up — Charging order made*
       *absolute—Order discharged by judge on basis of company's*          E
       *apparent insolvency and probable liquidation—Whether proper*
       *exercise of discretion—Principles on which discretion to dis-*
       *charge order or make absolute to be exercised — Whether*
       *compulsory or voluntary winding up of company " sufficient*
       *cause " for not making order absolute — Administration of*
       *Justice Act 1956 (4 & 5 Eliz. 2, c. 46), s. 35 (1) (2) (as amended*
       *by County Courts Act 1959 (7 & 8 Eliz. 2, c. 22), s. 204, Sch.*     F
       *3)* [1]*—R.S.C., Ord. 50, r. 1* [2]
    *House of Lords—Citation of authorities—Unreported judgments*
       *of Court of Appeal (Civil Division)—Transcripts not to be*
       *cited without leave*

         The plaintiffs supplied petroleum products wholesale to the
    defendants, who owned two filling stations.  By October 1978
    the defendants owed large sums of money to their various           G
    wholesalers, including the plaintiffs.  On March 8, 1979, the
    plaintiffs issued a specially indorsed writ claiming from the
    defendants £74,001·02 for petrol sold and delivered between
    1977 and 1979.  The defendants did not enter an appearance.
    After a meeting of the defendants' directors on March 12,
    1979, instructions were given for a statement of affairs to
    be prepared, notice was given of an informal meeting of all
    creditors to be held on March 26, 1979, and creditors were         H

─────────
[1] Administration of Justice Act 1956, s. 35 (1) (2) (as amended): see post,
pp. 203G—204A.
[2] R.S.C., Ord. 50, r. 1: see post, p. 204B-D.