# Exhibit 12

08-13555-mg    Doc 53250-12    Filed 07/05/16    Entered 07/05/16 23:47:48    Exhibit 12
Pg 2 of 10

The Weekly Law Reports 20 May 1988

587

1 W.L.R.

A                              [HOUSE OF LORDS]


*ALGHUSSEIN ESTABLISHMENT    .    .    .    APPELLANTS
                          AND
B
ETON COLLEGE .    .    .    .    .    .    .    .    RESPONDENTS


1988  March 7, 8, 9;          Lord Bridge of Harwich, Lord Elwyn-Jones,
      May 5                      Lord Ackner, Lord Goff of Chieveley
                                      and Lord Jauncey of Tullichettle
C

*Contract—Construction—Presumption against taking advantage of own
  wrong—Building agreement—Lease for 99 years—Express words
  providing for grant of lease on wilful default—Whether party
  entitled to take advantage of own wrong*

D
    By an agreement in writing dated 30 June 1978, the
defendants, as landlords, agreed with S. Ltd., the predecessors
in title of the plaintiffs, to grant a lease for 99 years at a ground
rent, of land in London on terms which provided, inter alia:
    "3b . . . the tenant shall . . . as soon as is reasonably
    practicable following all necessary licences . . . use its best
    endeavours to commence and proceed diligently with the
    development" of a block of flats.
E
Clause 4 provided:
    that if for any reason due to the wilful default of the tenant
    the development shall remain uncompleted by 29 September
    1983 the lease shall forthwith be completed . . . " in the
    terms provided by the agreement.
On 12 March 1983 the agreement with the consent of the
defendants was assigned to the plaintiffs. By 1984 the
F development had not begun and in October 1984 the defendants
purported to treat the agreement as repudiated because of the
failure to commence and complete the development. The
plaintiffs brought an action claiming specific performance of the
obligation to grant a lease, and the defendants counterclaimed
possession of the site. Sir Nicolas Browne-Wilkinson V.-C. on
a preliminary issue held that the plaintiffs were not entitled to
G rely on the proviso to clause 4 of the agreement. On appeal by
the plaintiffs, the Court of Appeal affirmed that decision.
    On appeal by the plaintiffs:—
    *Held*, dismissing the appeal, that the well known rule of
construction, that there was a presumption that a party to a
contract could not be permitted to take advantage of his own
wrong as against the other party, applied, in the absence of an
H express provision to contradict the presumption, as much to a
party who sought to obtain a benefit under a continuing contract
on account of his breach, as it did to a party who relied on his
breach to avoid a contract and thereby escape his obligations;
that the terms of the proviso to clause 4 were not apt to
displace that rule of construction and that, therefore, the
plaintiffs were not entitled to invoke the proviso to obtain the
grant of the lease (post, pp. 589A–D, 591D, 594B–D, 595C–D, F).

New Zealand Shipping Co. v. Société des Ateliers et Chantiers de France [1917] 2 K.B. 717; [1919] A.C. 1, C.A. and H.L.(E.) applied.    A

Decision of the Court of Appeal affirmed.

The following cases are referred to in the opinion of Lord Jauncey of Tullichettle:

Cheall v. Association of Professional Executive Clerical and Computer Staff [1983] 2 A.C. 180; [1983] 2 W.L.R. 679; [1983] I.C.R. 398; [1983] 1 All E.R. 1130, H.L.(E.)    B

Doe d. Bryan v. Bancks (1821) 4 B. & Ald. 401

Malins v. Freeman (1838) 4 Bing. N.C. 395

New Zealand Shipping Co. v. Société des Ateliers et Chantiers de France [1917] 2 K.B. 717; [1919] A.C. 1, C.A. and H.L.(E.)

Quesnel Forks Gold Mining Co. Ltd. v. Ward [1920] A.C. 222, P.C.    C

Rede v. Farr (1817) 6 M. & S. 121

The following additional cases were cited in argument:

Canada Steamship Lines Ltd. v. The King [1952] A.C. 192; [1952] 1 All E.R. 305, P.C.

Grey v. Pearson (1857) 6 H.L.Cas. 61, H.L.(E.)    D

Hongkong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd. [1962] 2 Q.B. 26; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 474, C.A.

Hughes v. Palmer (1865) 19 C.B.N.S. 393

Liverpool City Council v. Irwin [1977] A.C. 239; [1976] 2 W.L.R. 562; [1976] 2 All E.R. 39, H.L.(E.)

Magdalen Hospital v. Knotts (1879) 4 App.Cas. 324, H.L.(E.)

Photo Production Ltd. v. Securicor Transport Ltd. [1980] A.C. 827; [1980] 2 W.L.R. 283; [1980] 1 All E.R. 556, H.L.(E.)    E

Printing and Numerical Registering Co. v. Sampson (1875) L.R. 19 Eq. 462, C.A.

Roberts v. Davey (1833) 4 B. & Ad. 664

Shepherd (F.C.) & Co. Ltd. v. Jerrom [1987] Q.B. 301; [1986] 3 W.L.R. 801; [1986] I.C.R. 802; [1986] 3 All E.R. 589, C.A.

F

APPEAL from the Court of Appeal.

This was an appeal by leave dated 7 May 1987 of the House of Lords (Lord Bridge of Harwich, Lord Mackay of Clashfern and Lord Goff of Chieveley) by the plaintiffs, Alghussein Establishment, from the judgment dated 9 February 1987 of the Court of Appeal (Fox, Dillon and Woolf L.JJ.) dismissing an appeal by the plaintiffs from the judgment and order dated 9 July 1986 of Sir Nicolas Browne-Wilkinson V.-C., declaring    G that upon the true construction of an agreement dated 30 June 1978 made between the defendants, Eton College, and Suregrand Ltd., and in particular clause 4 thereof, and upon the assumption that the plaintiffs (the assignees of Suregrand Ltd.) were on 29 September 1983 and at all material times thereafter in wilful default of their obligations under the agreement and for that reason the development thereby contemplated    H remained uncompleted, the plaintiffs as opposed to the defendants were not entitled to insist on the grant of a lease of the land the subject of the agreement.

The facts are set out in the opinion of Lord Jauncey of Tullichettle.

Donald Keating Q.C. and Kirk Reynolds for the plaintiffs.
John Mowbray Q.C. and William Poulton for the defendants.

The Weekly Law Reports 20 May 1988

589

**1 W.L.R.**         Alghussein Establishment v. Eton College (H.L.(E.))

A     Their Lordships took time for consideration.

  5 May. LORD BRIDGE OF HARWICH. My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Jauncey of Tullichettle. I agree with it and for the reasons he gives I would dismiss the appeal.

B

  LORD ELWYN-JONES. My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Jauncey of Tullichettle. I agree with it and for the reasons he gives I would dismiss the appeal.

C

  LORD ACKNER. My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Jauncey of Tullichettle. I agree with it and for the reasons he gives I would dismiss the appeal.

D   LORD GOFF OF CHIEVELEY. My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Jauncey of Tullichettle. I agree with it and for the reasons he gives I would dismiss the appeal.

  LORD JAUNCEY OF TULLICHETTLE. My Lords, this appeal relates to the construction of a clause in an agreement relating to development of
E  land between the respondents and a company Suregrand Ltd. who later assigned their rights and obligations to the appellants. It may be said at the outset that the relevant part of the clause is of a most unusual nature the like of which will seldom be encountered in practice.
  The respondents own a valuable site in Elsworthy Road in the London Borough of Camden. On 30 June 1978 they entered into an
F  agreement with Suregrand whereby in consideration of payment to them of the sum of £150,000 they undertook to grant to Suregrand (1) a lease of the site and the development to be erected thereon, and (2) a licence to enter upon the site for the purpose of undertaking the development. In the agreement the respondents are described as the landlord and Suregrand as the tenant. Clause 3(a) provides that the tenant shall use
G  its best endeavours to obtain all necessary licences, permissions, approvals and consents in respect of the development and clause 3(b) provides, inter alia, that the tenant undertakes:

> "as soon as is reasonably practicable following all necessary licences permissions consents and approvals having been obtained as aforesaid to use its best endeavours to commence and proceed
H  diligently with the development in accordance with such licences permissions consents and approvals and complete the development to the reasonable satisfaction of the surveyors . . . ."

  Clause 4, with which this appeal is primarily concerned, is in the following terms:

> "Upon the proper issue of the certificate of practical completion referred to in clause 3(a) hereof the landlords will forthwith grant

A

and the tenant shall forthwith accept and execute a counterpart of the lease *provided that* if for any reason due to the wilful default of the tenant the development shall remain uncompleted on the 29th day of September 1983 the lease shall forthwith be granted and completed as aforesaid but without prejudice to the provisions of clause 3 hereof."

B

The lease referred to in the agreement and of which a draft is appended thereto is for 99 years and contains no covenant to build. Indeed its provisions assume that the site will have been developed before the commencement of the 99 year term.

On 12 March 1979 Suregrand, with the consent of the respondents, assigned to the appellants their rights under the agreement for the sum of £310,000. The respondents aver that during the summer and autumn of 1979, in 1980 and in 1982 they, through their solicitors, pressed the appellants to commence work on the site but to no avail. They further aver that on 8 August 1984 they wrote to the appellants stating that unless active steps were commenced immediately to pursue the development they would seek to rescind the agreement. The appellants' solicitors replied to that letter stating inter alia that the "target was a start of works in the very near future." No such start was made and by letter of 23 October 1984 the respondents' solicitors informed the appellants that the Agreement was terminated because of the appellants' repudiation thereof which they accepted.

C

D

On 6 November 1984 the appellants commenced the present action claiming *first* that they had never repudiated the agreement, *second* that because of economic factors it had not been reasonably practicable to start the development and alternatively that if they were in wilful default the respondents were bound to grant to them a lease in the terms of clause 4. When the case came for trial before Sir Nicolas Browne-Wilkinson V.-C. it became apparent that the evidence was likely to range over a wide field and that its ambit might be restricted if certain questions of law could be answered in advance. The Vice-Chancellor identified two such questions namely (first) whether it was open to the appellants to say that it was not reasonably practicable to commence and proceed with the development simply on the grounds that such development, if entered into, would not have been profitable to them or could only have been carried out at a loss to them, and (second) whether, if it were to be established that the development remained uncompleted on 29 September 1983 due to the wilful default of the appellants, they, as opposed to the respondents, were entitled to insist on a grant of a lease under the proviso to clause 4 of the agreement. The Vice-Chancellor answered both these questions in the negative and the Court of Appeal unanimously reached the same conclusion. The appeal to this House is concerned solely with the second question.

E

F

G

Before considering the judgments in the courts below it is important to emphasise that the preliminary question now before this House is not capable, whichever way your Lordships decide it, of finally disposing of this litigation. The crucial issue will remain to be resolved as to whether or not there was a repudiation of the agreement by the appellants. Neither that issue nor any of the subsidiary issues which may arise in consequence of the resolution of that issue are before your Lordships. I well understand the Vice-Chancellor's concern to narrow the ambit of

H

The Weekly Law Reports 20 May 1988

591

1 W.L.R.          Alghussein Establishment v. Eton College (H.L.(E.))     Lord Jauncey
of Tullichettle

A the trial and the first question he decided certainly has done so, but in relation to the second question with hindsight one can see that, as sometimes happens with preliminary questions which the parties bring up to your Lordships' House, the intended shortcut may prove in the end only to have prolonged the proceedings.

In answering the second question the Vice-Chancellor expressed a strong suspicion that the word "Not" in the proviso to clause 4 had been
B omitted so that it should have read "provided that if for any reason *not* due to wilful default of the appellant . . . ." Nevertheless, reluctantly and in the absence of any claim for rectification, he concluded that his suspicion did not go far enough to entitle him as a matter of construction to insert the word in the proviso. However relying upon *New Zealand Shipping Co. v. Société des Ateliers et Chantiers de France* [1919] A.C. 1
C he concluded that the appellants, if in wilful default, could not rely on their own wrong to found a legal right. That, said the Vice-Chancellor, appeared to be a principle which could not be tolerated whatever the clear words of the contract might say. In the Court of Appeal, Dillon L.J., with whom Woolf and Fox L.JJ. agreed, concluded, in the light of the authority cited, that as a matter of construction the proviso to clause
D 4 had to be read subject to the implied condition that the party seeking to found on the proviso was not himself in default.

My Lords it is well established by a long line of authority that a contracting party will not in normal circumstances be entitled to take advantage of his own breach as against the other party. In *Rede v. Farr* (1817) 6 M. & S. 121, Lord Ellenborough C.J. said, at pp. 124–125:

E   "In this case, as to this proviso, it would be contrary to an universal principle of law, that a party shall never take advantage of his own wrong, if we were to hold that a lease, which in terms is a lease for twelve years, should be a lease determinable at the will and pleasure of the lessee; and that a lessee by not paying his rent should be at liberty to say that the lease is void. On this principle, even if it were not borne out so strongly as it is by the current of authorities,
F   it would be sufficient to hold that the lease was only void as against the lessee, not against the lessor."

In *Doe d. Bryan v. Bancks* (1821) 4 B. & Ald. 401, 402 a lease of a coal mine contained the following proviso:

G   "Provided also, and it is mutually agreed between the parties hereto, that the aforesaid works should commence and begin within one year from the date thereof, and *if the same should stop or cease working at any time two years, this lease shall be* deemed void to all intents and purposes."

Bayley J. said, at pp. 406–407:

H   "I am of opinion, that the true construction of the proviso in this lease, 'that it shall be null and void to all intents and purposes upon a cesser of two years,' is, that it shall be voidable only at the option of the lessor, and that it does not lie in the mouth of the lessee, who has been guilty of a wrongful act, in omitting to work in pursuance of his covenant, to avail himself of that wrongful act, and to insist, that thereby the lease has become void to all intents and purposes."

Holroyd J. concluded that the tenant could not insist that his own act amounted to a forfeiture and Best J. said, at pp. 409–410:

> "Besides, I take it to be an universal principle of law and justice, that no man can take advantage of his own wrong. Now it would be most inconsistent with that principle, to permit the defendant to protect himself against the consequences of this action, by afterwards setting up his own wrongful act at a former period."

In the *New Zealand Shipping* case in the Court of Appeal [1917] 2 K.B. 717, Viscount Reading C.J. said, at pp. 723–724:

> "Unless the language of the contract constrains the Court to hold otherwise, the law of England never permits a party to take advantage of his own default or wrong. In *Malins v. Freeman* (1838) 4 Bing. N.C. 395, 399 Coltman J. said: 'It is so contrary to justice that a party should avoid his own contract by his own wrong, that unless constrained, we should not adopt a construction favourable to such a purpose.' That appears to me to be the true underlying principle of the cases in which the word 'void' has been construed as if it meant voidable. Unless there are clear words to the contrary, a clause making a contract void must be read subject to the condition that the party who is seeking to set up the invalidity is not himself in default."

And Scrutton L.J. said, at p. 724:

> ". . . I think that clause 12 and all other clauses are to be read subject to an overriding condition or proviso that the party shall not take advantage of his own wrong, and therefore is estopped from alleging invalidity of which his own breach of contract is the cause."

On appeal to this House, Lord Finlay L.C. said [1919] A.C. 1, 8:

> "Questions of this sort have often arisen in case of provisions that a lease should be void on non-payment of rent or non-performance of covenants by the lessee. It has always been held that the lessee could not take advantage of his own act or default to avoid the lease, and the expression generally employed has been that such proviso makes the lease voidable by the lessor, or void at the option of the lessor. The decisions on the point are uniform, and are really illustrations of the very old principle laid down by Lord Coke (Co. Litt. 206b) that a man shall not be allowed to take advantage of a condition which he himself brought about."

The speech of Lord Atkinson contained the following passage, at p. 9:

> "It is undoubtedly competent for the two parties to a contract to stipulate by a clause in it that the contract shall be void upon the happening of an event over which neither of the parties shall have any control, cannot bring about, prevent or retard. . . . But if the stipulation be that the contract shall be void on the happening of an event which one or either of them can by his own act or omission bring about, then the party, who by his own act or omission brings that event about, cannot be permitted either to insist upon the stipulation himself or to compel the other party, who is blameless,

The Weekly Law Reports 20 May 1988

A    to insist upon it, because to permit the blameable party to do either would be to permit him to take advantage of his own wrong, in the one case directly, and in the other case indirectly in a roundabout way, but in either way putting an end to the contract.

"The application to contracts such as these of the principle that a man shall not be permitted to take advantage of his own wrong thus necessarily leaves to the blameless party an option whether he will

B    or will not insist on the stipulation that the contract shall be void on the happening of the named event. To deprive him of that option would be but to effectuate the purpose of the blameable party. When this option is left to the blameless party, it is said that the contract is voidable, but that is only another way of saying that the blameable party cannot himself have the contract made void, cannot

C    force the other party to do so, and cannot deprive the latter of his right to do so. Of course, the parties may expressly or impliedly stipulate that the contract shall be voidable at the option of either party to it. I am not dealing with such a case as that."

In the Privy Council case of *Quesnel Forks Gold Mining Co. Ltd. v. Ward* [1920] A.C. 222 the Board had to consider a provision in a mining

D    lease for forfeiture in the event of the lessee ceasing for two years to carry on mining operations. In giving the advice of the Board Lord Buckmaster said, at p. 227:

"If the covenant does not effect this, then, although the word used is 'void,' the meaning is 'void at the option of the lessor,' or in other words 'voidable.' Their Lordships have no hesitation in saying

E    that that is the true meaning of the covenant. Substantial obligations are imposed upon the lessee under the terms of the lease; and it would not be consistent with the ordinary rules of construction applicable to such a document to hold that these obligations could be completely avoided by the lessee omitting to perform any work. It is of course possible so to frame a lease that this must be the

F    effect, and it would result that the term was then a term which ended on the happening of a condition solely in the power of a lessee. This, however, is not the language used in the lease."

He later referred to the *New Zealand Shipping* case [1919] A.C. 1 as authority for well known rules of construction. Finally in *Cheall v. Association of Professional Executive Clerical and Computer Staff* [1983]

G    2 A.C. 180 Lord Diplock referring to the *New Zealand Shipping* case said, at pp. 188–189:

"In the course of the speeches, which are not entirely consistent with one another, reference was made by all their Lordships to the well known rule of construction that, except in the unlikely case

H    that the contract contains clear express provisions to the contrary, it is to be presumed that it was not the intention of the parties that either party should be entitled to rely upon his own breaches of his primary obligations as bringing the contract to an end, i.e. as terminating any further primary obligations on his part then remaining unperformed. This rule of construction, which is paralleled by the rule of law that a contracting party cannot rely upon an event brought about by his own breach of contract as

08-13555-mg    Doc 53250-12    Filed 07/05/16    Entered 07/05/16 23:47:48    Exhibit 12
Pg 9 of 10
The Weekly Law Reports 20 May 1988
594
Alghussein Establishment v. Eton College (H.L.(E.))    [1988]
Lord Jauncey of Tullichettle

A

having terminated a contract by frustration, is often expressed in broad language as: 'A man cannot be permitted to take advantage of his own wrong.'"

Mr. Keating for the appellants submitted that the *New Zealand Shipping* case [1919] A.C. 1 and all the other relevant authorities were concerned with questions involving avoidance of a contract and they had no application to a case such as this where the continuance of the contract was involved. There was, he said, a fundamental difference between a provision which allowed the party to rely on his own wrong to avoid a contract and a provision which entitled him to enjoy a contractual benefit because of his wrong. I do not consider that this argument is sound. Although the authorities to which I have already referred involve cases of avoidance the clear theme running through them all was that no man can take advantage of his own wrong. There was nothing in any of them to suggest that the foregoing proposition was limited to cases where the parties in breach were seeking to avoid the contract and I can see no reason for so limiting it. A party who seeks to obtain a benefit under a continuing contract on account of his breach is just as much taking advantage of his own wrong as is a party who relies on his breach to avoid a contract and thereby escape his obligations.

B

C

D

Mr. Mowbray for the respondents accepted that if the proviso to clause 4 fell to be construed literally he must fail. However, he maintained that if the literal meaning were modified as a matter of construction to take account of the inconsistency and absurdity which would arise in relation to the agreement as a whole if the literal meaning prevailed, he could succeed. He further maintained that the principle that no man can take advantage of his own wrong was either a rule of construction which was subject only to express contrary provisions in the contract or alternatively an absolute rule of law and morality which operated as an estoppel whatever parties had agreed. In this case I do not think that the two arguments on construction can properly be separated. Furthermore although an absolute rule of law and morality would render unnecessary any detailed consideration of the provisions of the agreement I prefer to start by considering the effect of the principle as embodied in a rule of construction.

E

F

My Lords, the proviso to clause 4 appears not only to be at odds with the preceding part of the clause but inconsistent with the principal provisions of clause 3. When Dillon L.J. in the Court of Appeal described it as "a half-baked clause" I do not think that he was overstating the matter. Sub-clauses (a) and (b) of clause 3 provide that the tenant shall first of all obtain the necessary licences permissions etc. for the development and as soon as reasonably practicable thereafter shall commence, proceed with diligently and complete the development. No time limit for completion is provided in the agreement but in both sub-clauses (a) and (b) the tenant is taken bound to use his best endeavours to perform the obligations and the parties clearly intended that he would not waste time in proceeding to completion. Clause 4 provides for the immediate grant of a lease by the landlord upon the proper issue of the certificate of practical completion. The draft lease relates to the "piece of land with buildings standing thereon" and, as I have already remarked, the provisions clearly contemplate that the

G

H

The Weekly Law Reports 20 May 1988

595

1 W.L.R.        Alghussein Establishment v. Eton College (H.L.(E.))        Lord Jauncey of Tullichettle

A  development will have been completed by the commencement of the term. In that situation it is not surprising that it contains no covenant to build. So far the pattern of clauses 3 and 4 of the agreement is entirely coherent. The proviso to clause 4 however upsets this pattern. On a literal construction a tenant who has failed to complete or even to start the development due to his wilful default by 29 September 1983 is entitled to demand that a lease be granted to him, whereas a tenant who
B  has done his best to complete but has failed through no fault to do so would not on that date be entitled to a lease. This is, to say the least of it, a bizarre result. If the obligation to complete the development in clause 3(b) were not to be implied in any lease so granted but were to remain, as the literal reading of the words might suggest, an obligation under the agreement the matter would be even more bizarre because the
C  landlord would have no remedy under the lease for failure to develop during its currency and would be left with the limited remedy of damages under the agreement. Even if it were appropriate to imply the provision of clause 3(b) into any lease to be granted under the proviso to clause 4, and I make this assumption without deciding the matter one way or the other, there remains the question whether in the words of Lord Diplock in the *Cheall* case [1983] 2 A.C. 180, 189 the agreement
D  contains clear express provisions to contradict the presumption that it was not the intention of parties that either should be entitled to rely on his own breach in order to obtain a benefit. I find no such clear express provision. Although the proviso refers specifically to the wilful default of the tenant it does not state that the tenant should be entitled to take advantage thereof. It is one thing for wilful default of a party to be made the occasion upon which a provision comes into operation but it is
E  quite another thing for that party to be given the right to rely on that default. Furthermore it is not disputed that a lease granted under the proviso which contained no covenant to build would render the whole scheme unworkable. In that situation it is reasonable to assume that if the parties had intended in this extraordinary proviso to displace the presumption they would have expressly imported clause 3(b) into any such lease rather than leaving it to possible but uncertain implication.
F  All in all I have no doubt that the terms of the proviso were not apt to displace the rule of construction and I consider that the Vice-Chancellor and the Court of Appeal were correct in concluding that the appellants were not entitled to invoke the proviso to clause 4.

It only remains to refer to the respondents' argument that there is an absolute rule of law and morality which prevents a party taking advantage of his own wrong whatever the terms of the contract. My
G  Lords I do not find it necessary to deal with this. For my part I have no doubt that the weight of authority favours the view that in general the principle is embodied in a rule of construction rather than in an absolute rule of law. However, that is not to say that there cannot be situations such as self-induced frustration, to which Lord Diplock referred in the *Cheall* case, where an absolute rule exists. It is neither necessary nor would it be profitable to explore the matter further in this case.
H  For the reasons given I would therefore dismiss the appeal.

*Appeal dismissed with costs.*

Solicitors: *Argles & Court, Maidstone, Kent; Peake & Co.*

J. A. G.