# Exhibit 13

Court of Appeal                                                              A

# Aerospace Publishing Ltd and another *v* Thames Water Utilities Ltd

## [2007] EWCA Civ 3

2006  Oct 24, 25, 26, 27;                        Pill, Longmore and Wilson LJJ   B
2007  Jan 11

*Damages    Measure of damages    Picture archive, damage to    Claimants'*
*picture archive damaged by flood for which defendants liable    Archive used*
*extensively in claimants' publishing business    Whether damages to be assessed*
*by reference to cost of reinstating archive or diminution in value of archive*
*Whether time spent by claimants' staff in salvaging and reorganising damaged*   C
*archive recoverable head of damages*

    The claimant companies carried on business as publishers of specialist
publications relating to aviation and military history.  In the premises which they
shared the claimants kept a large archive of photographs, transparencies, artwork
and other reference material which they used extensively in their publications.  The
premises were flooded after a mains water pipe burst, causing considerable damage   D
to the archive.  The defendants, who were the water undertakers responsible for the
pipe for the purposes of the Water Industry Act 1991, admitted liability.  At the trial
on quantum, the judge accepted the claimants' contention that damages should be
measured by reference to the cost of reinstating the lost or damaged items rather than
by reference to the difference in the sale value of the archive before and after the loss,
and awarded damages accordingly.  He also awarded damages for the cost of work
done by some of the claimants' staff in salvaging and reorganising the archive after   E
the flood.
    On the defendants' appeal
    *Held*, (1) dismissing the appeal as to the correct measure of damages, that
although the archive had an economic value, in the sense of a commercial utility, its
value to the claimants was greater than such sum as could be obtained by selling it;
that, moreover, the fact that not every item in the archive could be precisely replaced
did not mean that the cost of reinstatement was not, in general, the measure of   F
damages to be preferred; and that, since there was a prospect of the claimants
publishing future publications for which the archive would have a use, and since they
would not have been able to continue to make the same sort of income without
reference to the archive, the appropriate measure of damages was the cost of
reinstatement ( post, paras 51  53, 69, 72, 105).
    *Southampton Container Terminals Ltd v Schiffahrtsgesellschaft Hansa Australia*
*mbH & Co (The Maersk Colombo)* [2001] 2 Lloyd's Rep 275, CA applied.          G
    (2) Substantially dismissing the appeal as to staff costs, that once a claimant had
established the fact and the extent of the diversion of staff time and that the diversion
had caused significant disruption to its business, it would be reasonable for the court
to infer from the disruption, unless the defendant could establish the contrary, that,
had their time not been thus diverted, staff would have applied it to activities which
would have generated revenue for the claimant in an amount at least equal to the
costs of employing them during that time; that since the diversion of the time of a   H
significant number of the claimants' employees had been adequately established, and
since there could be no sensible challenge to the conclusion that the claimants'
business was thereby disrupted, the judge had been entitled to draw the inference that
the employees had been diverted from revenue generating activities; and that,
accordingly, there had been no error in his decision to award damages for the costs of
the employees referable to the diversion, although he had erred in awarding damages

A   for work done by two freelance workers which had in fact been referable to the preparation of the claim against the defendants ( *post*, paras 71, 75, 86 87, 106).

*Standard Chartered Bank v Pakistan National Shipping Corpn* [2001] 1 All ER (Comm) 822, CA considered.

Decision of Holland J [2005] EWHC 2987 (QB) affirmed in part.

The following cases are referred to in the judgments:

B   *Admiral Management Services Ltd v Para Protect Europe Ltd* [2002] EWHC 233 (Ch); [2002] 1 WLR 2722; [2003] 2 All ER 1017; [2002] FSR 914

*BP Exploration Co (Libya) Ltd v Hunt (No 2)* [1979] 1 WLR 783; [1982] 1 All ER 925

*Darbishire v Warran* [1963] 1 WLR 1067; [1963] 3 All ER 310; [1963] 2 Lloyd's Rep 187, CA

C   *Horace Holman Group Ltd v Sherwood International Group Ltd* (unreported) 7 November 2001, Judge Peter Bowsher QC

*Jaura v Ahmed* [2002] EWCA Civ 210; The Times, 18 March 2002, CA

*Kaines (UK) Ltd v Osterreichische Warrenhandelsgesellschaft (formerly CGL Handelsgesellschaft mbH)* [1993] 2 Lloyd's Rep 1, CA

*R + V Versicherung AG v Risk Insurance and Reinsurance Solutions SA* [2006] EWHC 42 (Comm)

D   *Southampton Container Terminals Ltd v Schiffahrtsgesellschaft Hansa Australia mbH & Co (The Maersk Colombo)* [2001] EWCA Civ 717; [2001] 2 Lloyd's Rep 275, CA

*Standard Chartered Bank v Pakistan National Shipping Corpn (No 3)* [1999] 1 All ER (Comm) 417; [1999] 1 Lloyd's Rep 747; [2001] EWCA Civ 55; [2001] 1 All ER (Comm) 822, CA

*Tate & Lyle Food and Distribution Ltd v Greater London Council* [1982] 1 WLR 149; [1981] 3 All ER 716

E   The following additional cases were cited in argument:

*Allied Maples Group Ltd v Simmons & Simmons* [1995] 1 WLR 1602; [1995] 4 All ER 907, CA

*Asiansky Television plc v Bayer Rosin* [2001] EWCA Civ 1792; [2002] 2 CPLR 111, CA

*Assicurazioni Generali SpA v Arab Insurance Group (Practice Note)* [2002] EWCA Civ 1642; [2003] 1 WLR 577; [2003] 1 All ER (Comm) 140; [2003] Lloyd's Rep IR 131, CA

F   *Audergon v La Baguette Ltd* [2002] EWCA Civ 10; [2002] 2 CPLR 192, CA

*Banco de Portugal v Waterlow & Sons Ltd* [1937] AC 452, HL(E)

*Bryant v Macklin* [2005] EWCA Civ 762, CA

*Cattle v Stockton Waterworks Co* (1875) LR 10 QB 453, DC

*English v Emery Reimbold & Strick Ltd (Practice Note)* [2002] EWCA Civ 605; [2002] 1 WLR 2409; [2002] 3 All ER 385, CA

G   *Robinson v Bird* [2003] EWCA Civ 1820; [2004] WTLR 257, CA

*Ruxley Electronics and Construction Ltd v Forsyth* [1996] AC 344; [1995] 3 WLR 118; [1995] 3 All ER 268, HL(E)

*Scutt v Lomax* (2000) 79 P & CR D31, CA

*Spartan Steel and Alloys Ltd v Martin & Co (Contractors) Ltd* [1973] QB 27; [1972] 3 WLR 502; [1972] 3 All ER 557, CA

H   **APPEAL** and **CROSS-APPEAL** from Holland J

By a notice of appeal dated 23 January 2006 and pursuant to permission granted by the Court of Appeal (Brooke and Rix LJJ) on 1 February 2006, the defendants, Thames Water Utilities Ltd, appealed against the decision of Holland J [2005] EWHC 2987 (QB) handed down on 13 January 2006 to

award the claimants, Aerospace Publishing Ltd and Midsummer Books Ltd,    *A*
damages of £2,693,413 plus interest of £24,947 for loss and damage caused
to the claimants' picture archive held at 3A Brackenbury Road, London W6
by a flood for which the defendants had admitted liability under section 209
of the Water Industry Act 1991. The grounds of appeal were, inter alia:
(1) that the judge had erred in awarding damages by reference to the cost of
reinstating the archive rather than by reference to the difference in the sale    *B*
value of the archive before and after the loss; and (2) that the judge had erred
in awarding damages of £31,250 in respect of costs occasioned by the need
to divert employees from their normal duties to countering and mitigating
the impact of the flood.

By a respondent's notice the claimants cross-appealed against the amount
of interest awarded on the grounds: (1) that the judge erred in declining to
award interest on the whole sum of £2,328,144 which was awarded for    *C*
reinstatement of the archive, awarding interest only on £135,303 of that
sum; (2) that the judge erred in calculating all interest from the mid-point
between the date of the flood, 3 July 2001, and the date of the judgment,
rather than from the precise dates when the respective losses were incurred;
and (3) that the judge erred in calculating interest at 1% p a above base rate,
rather than at 2·5% p a above base rate.

The facts are stated in the judgment of Longmore LJ.    *D*

*Simon Rainey QC* and *Peter McMaster* for the defendants.
*Timothy Young QC* and *Henry Byam-Cook* for the claimants.

*Cur adv vult*

11 January 2007. The following judgments were handed down.    *E*

**LONGMORE LJ**

*Introduction*

1   This is an appeal on quantum. The question is how should one value a
private archive which has been damaged or destroyed. The archive was
partly lost and partly damaged. Although it is common ground that it is    *F*
the diminution in value of the archive that constitutes the amount of the
claimants' loss, should that diminution, on the facts of this case, be
measured by reference to the difference in the sale value of the archive before
and after the loss or by reference to the cost of reinstatement?

2   In the middle of the afternoon of Tuesday, 3 July 2001 a mains water
pipe, situated at the junction of Goldhawk Road and Brackenbury Road in    *G*
Hammersmith, London W6, burst. That caused a rapid and uncontrollable
ingress of water into the lower floor of premises at 3A Brackenbury Road
then occupied by Aerospace Publishing Ltd ("Aerospace") and Midsummer
Books Ltd ("Midsummer") ("the companies" or sometimes "the claimants").
Aerospace published, at regular intervals, high quality, lavishly illustrated,
formidably researched works on all aspects of aviation and its history.    *H*
Midsummer brought similar qualities to publications relating to military
history and a variety of other topics.

3   The lower floor of the premises contained the companies' library and
archive; this archive consisting of photographs, transparencies, artwork and
other reference material was largely contained in a number of four-drawer

A  filing cabinets and some chests.  The flood water entered the lower three
drawers of each of the cabinets causing considerable loss of or damage to
the contents.  It is not disputed that the Aerospace archive was a truly
comprehensive and historical collection, probably unique in the world in
private hands.

4    The defendants ("Thames Water") are and were the water undertakers
B  for the purposes of the Water Industry Act 1991 who owned and operated
the burst pipe.  By virtue of section 209 of the 1991 Act, they were liable for
any loss and damage occasioned by the resultant escape of water, whether
they were at fault or not.

5    Accordingly there was no dispute about liability at trial.  It was only
quantum which had to be resolved.  The companies contended that they
should be entitled to recover the cost of replacing the archive in so far as it
C  could be reinstated (e g by searching out, identifying and paying for copies of
photographs and transparencies which had been lost or damaged).  They
claimed about £3m on this basis.  Thames Water contended that the
companies had no intention of replacing the archive and that it would
anyway be unreasonable to do so.  It followed that the companies could only
recover the difference between the undamaged value of the archive and its
D  value in a damaged state in the sum of about £300,000.  This issue was tried
by Holland J between 24 October and 3 November 2005.  He determined in
a draft judgment made available on 11 November 2005 that the companies
did intend to reinstate if they had the money to do it and that it was
reasonable for them so to do.  He was in principle, therefore, prepared to
award the cost of reinstatement.

6    Thames Water's reaction was to ask the judge to respond to a number
E  of specific points made in their closing submissions.  The judge replied that
he was unwilling to add "paragraphs, each setting out a closing submission
and my comment" when the existing judgment had indicated his approach
with reasonable clarity.

7    Thames Water then sought permission to appeal on the basis that the
judge had given insufficient reasons for coming to his conclusions.  In a
skeleton argument of 177 paragraphs and over 50 pages they instanced in
F  particular the following matters.  (1) There was a considerable body of
evidence about the recent history of the claimants' business, in the light of
which the judge ought to have concluded that the aviation side of the
business was being run down so that it was clear that Aerospace would not
reinstate the aviation archive, and even if reinstatement did occur,
Aerospace would not themselves be able to use it.  The judge scarcely
G  referred to this evidence and gave no or no adequate reason for refusing to
accept it.  (2) There had also at trial been comprehensive expert evidence
about changes in the market for publications relating to aircraft which
should have led the judge to conclude that the claimants' plans for further
publications (especially a proposal called "WAIF 2") were so misguided that
reinstatement of the archive would be unreasonable.  Again the judge had
given no or no adequate reason for rejecting this expert evidence; nor had the
H  judge critically evaluated the claimants' loss of profit claim.  (3) The judge
had failed to address an argument that, since publication had been able to
continue after the flood, reinstatement of the archive was unnecessary.

8    In the light of these contentions, this court decided on 1 February
2006 that the judge's conclusions were "arguably inadequately supported by

his reasons so as to make it possible to say that Thames Water had a realistic
prospect of success".  In his short reasons in support of the grant of
permission to appeal Rix LJ said [2006] EWCA Civ 717, paras 8–10:

> "8. In essence, Thames Water had run a case that Mr Morse
> [Aerospace's managing director] had wanted to sell the Aerospace
> company and its archive because he was more interested in pressing
> ahead with other parts of his business and could not do both, that the
> market had changed and that there was not the room, at any rate in the
> business and in the profitable sense, for a further publication such as
> WAIF 2, and they also relied upon other changes in the market and,
> indeed, in Aerospace's own modus operandi: for instance, in planning
> to move the site of the archive from its then current position
> immediately under the hands of the publishers to a different site in
> Islington, where there was an aim to reposition it as a library, not so
> much for use by Aerospace as publishers themselves but for the use of
> third parties upon payment.
> "9. I can, for instance, illustrate the judge's technique by reference
> to para 71 where he refers, as a point supporting Aerospace's case, to
> the efforts by Mr Morse in the months preceding the flood to sell the
> Aerospace business or its archive.  The value put upon the archive was
> some US$3m or nearly £2m.  The judge referred to this, at para 71, as
> a plus point and perhaps, on one view of the matter, it was.  Thames
> Water's approach to that episode was, however, to point to the fact
> that Mr Morse was willing to sell his company and its archive and
> was yet unable to obtain any bids, for either the company or the
> archive, at all.
> "10. There is no discussion of that counterpoint in that context . . ."

9    That then led to an application by the claimants (no doubt horrified
by the expense of a full appeal and by the possible prospect of a retrial) to
this court, accepting that the judge's reasons were not as fully expressed as
they might have been and themselves asking that the judge be asked to give
further reasons for his conclusions.  This the court refused to do because, as
Rix LJ put it, "the likely result is either a nil return or a danger of ex post
facto rationalisation".  He recorded that the claimants accepted that, in the
light of their position about the judge's reasons, the appeal would have to be
conducted on the basis that it was a full rehearing.

10    So it is that the appeal before us has been conducted on the basis of
being a full rehearing on the papers and the transcripts of the evidence which
was given to Holland J.  Understandably, neither party has asked for a retrial
and we have to do the best we can to assess the rival arguments on the
material we have.  In these circumstances it seems to us inevitable that we
have to accept the judge's conclusions about the integrity and bona fides of
the claimants' chief witness Mr Stanley Morse.  Mr Rainey for Thames
Water accepted that it would be virtually impossible for us to find that
Mr Morse had been intentionally trying to deceive the court but he
submitted that the extraneous circumstances set out in the evidence showed
that it was wholly unreasonable to seek to reinstate the archive and,
whatever Mr Morse's intention as to that was, damages should be assessed
not on the basis of reinstatement but on the basis of diminution in the sale
value of the archive.

731

[2007] Bus LR          Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)
                                                                    Longmore LJ

A    11   I should now proceed to set out the facts of the matter in more detail.
I can use the judge's narrative very largely but I shall supplement it by the
further facts relied on by Thames Water.

*Facts in detail*

12   Both the companies were incorporated in 1977, to further the
B    publishing ambitions of Mr Stanley Morse who has an 80% shareholding in
each company, and they have traded pursuant to his control as managing
director. Albeit closely associated, sharing the same premises and subject
to the same overall control, these companies have maintained separate
corporate identities, covering differing areas of commercial activity and
accounting separately. Thus, at all material times up to the date of the flood
Aerospace furthered Mr Morse's personal interest in, and enthusiasm for,
C    aeronautical matters. Midsummer brought similar qualities to publications
relating to military history and to a variety of other topics. They were both
profitable companies.

*Aerospace archive*

13   From its incorporation Aerospace, under Mr Morse's direction, had
D    built up an archive. The material came from various sources. All the
products of editorial research as demanded by a publishing venture went
into the archive, which included material from military archives in this
country, in France, in Germany and, more particularly, in the USA.
Systematic attendance at major international air shows led to the acquisition
of photographs and vital reference material. In 1986 a photograph library
E    was purchased for £25,000. In 1993 a large and exceptional photograph
and artwork collection, the Pilot Press Collection (put together by a
legendary figure in the compilation of aviation history, Mr William Green)
was similarly purchased, this time for £105,000. At about the same time
another collection, the John W R Taylor Collection, was purchased for
£75,000. The accounts reveal that investment in this archive had been
ongoing; financial statements identified continuing expenditure on this asset
F    in the sums of £24,970 in 1998, £17,396 in 1999 and £14,203 in 2000.
Some of this ongoing expenditure is explained by the commissioning of
artwork, that is, the commissioning from a few specialist artists of pictures
of aircraft in flight in order to illustrate a given topic—pictures notable for
their technical precision, essentially bringing the draughtsman's drawing to
life. The judge recorded that the book value of the archive as at the end of
G    2000 was £562,298.

14   The overall expenditure on and for the archive was not limited to
acquisitions. From 1995 a semi-retired aviation expert, Mr Douglas Stroud,
was engaged on a freelance basis to "integrate" the archive by arranging and
cataloguing it. Confronted with the then newly acquired separate
collections, his task was to fashion one "collection" out of the available
material, that is, to form what then became the Aerospace archive. The task
H    was monumental given the amount of the material and the steady accretion
of more material, but by May 2001 he had accomplished part of his task: the
photographs were then integrated and indexed by subject on an A to Z basis.
Other cataloguing work continued and in the event Mr Stroud was on the
premises when the flood occurred.

732
Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)          [2007] Bus LR
Longmore LJ

A

15   While Mr Stroud's efforts were directed towards integration into one collection for the benefit of Aerospace, the provenance of the contributing collections served to raise the external prestige of the whole.  Thus, by way of example, the fact that Mr Green's Pilot Press Collection accounted for a significant part of the content of the archive undoubtedly contributed to the reputation and thus the value of the whole.

B

16   The physical dimensions of the archive at 3 July 2001 can be described as follows.  (a) The great bulk of the archive was stored in 57 filing cabinets.  Large sized artworks were predominately stored in four plan chests.  (b) Within the filing cabinets the bulk of the archive was distributed amongst files.  There were at least 3,220 such files: the files were in alphabetical order with each file referable to a specific topic, typically an aircraft type.  The distribution of topics, on a broad-brush basis, could be apportioned as follows: (i) World War One and earlier, 4·5%; (ii) between the wars, 20%; (iii) World War Two, 11%; (iv) post-World War Two, 60%; (v) unclassifiable, 4·5%.  (c) Within the files were 218,262 photographic images, a figure which includes a number of transparencies.  These covered the full spectrum between the historically valuable rarity and the relatively commonplace.  There was also a spectrum as to quality.  The judge found that the scope for illustration of aviation and its history by way of photographs made the archive exceptional and arguably unique.  Yet further, a significant number of the images were valuable in their own right, either because of the historic value of their content or because they were the work of photographers famed in the field.  (d) Further, within the archive, was a mass of reference material available for editorial research: press cuttings; manufacturers' publicity material; letters; publications and plans.  (e) An additional and important component was artwork.  In the course of its trading Aerospace commissioned or otherwise acquired artwork images, viz, drawings and paintings of aircraft executed by specialists with an exactitude in terms of detail to satisfy the purist.  By July 2001 there were in the archive over 5,000 items of such artwork, such covering a great range of aviation subjects.

C

D

E

F

### Midsummer archive

17   This separate archive featured less in evidence: although substantial, it was less in size than that of Aerospace: it could not aspire to the same prestige and, significantly for present purposes, it suffered far less from the flood.  It too had been steadily built up, similarly inspired by Mr Morse's overall direction, and its content was impressive: (a) car section: 60,000 images and 500 artwork items; (b) motor cycle section: 40,000 images and 250 artwork items; (c) military and naval section: 35,000 images and 3,500 artwork items.  Additionally there was material relating to British and European wildlife.

G

### Partworks and journals

18   A key component of the companies' respective trading activities was the creation of partworks, so called because an ultimate "work" can be compiled by the consumer through the regular acquisition (whether by subscription or purchase from the newsagent) of magazine style parts.  Each such publication can be dismantled into sections—the appropriate filing of

H

A  each section serves to add to the envisaged final reference work.  To provide material to complete the partwork, publication would run for a predetermined prolonged period, typically for 200 or more issues. A claimant company engaged in this activity would formulate an idea for a new partwork and then cause it to be subjected to market research.  Thus far the work would be "in house" and at the expense of the company. Thereafter the enterprise would proceed in partnership with a publisher.

B  The company would prepare the editorial and illustrative content of each issue (retaining copyright); the publisher would then publish and market it, typically setting the whole in motion with a television marketing campaign. The contractual agreement with the publisher would provide for payment by the publisher of a creation fee and a royalty (say, 4%) on cover price sales. This joint venture would be aimed at a worldwide market.

C  19  Aerospace produced partworks as follows: "Illustrated Encyclopaedia of Aircraft" (1980); "Warplane" (1984); "Take Off" (1987, relaunched in 1992); "Airplane" (1989); "World Aircraft Information Files" ("WAIF") (1997/98).  Midsummer had produced similar partworks on military and other topics, such as wildlife and the Star Trek saga.

20  For the purposes of the trial much attention was focussed upon WAIF.  Starting in 1997/8 this partwork issue was still in progress as at the

D  flood: Issue 180 had been published; Issue 181 was in the course of editorial preparation; and as at that time it was contemplated that the full work would be complete as at the publication of Issue 200 or some such number. As was normal, Aerospace employees, who for administrative convenience were on the Midsummer payroll, were preparing each issue for the printers, that is, they were compiling the editorial content and deciding upon the numerous illustrations.  Publishing had been contracted to Bright Star

E  Publishing plc, a company then jointly owned by Mr Morse and a company independent of him, Eaglemoss Publications Ltd, in equal shares.  The Aerospace editorial team then consisted of Paul Eden (Editor), John Heathcott (Deputy Editor) and two designers.  The team brought to the enterprise a dedication to, and a real expertise in aviation matters—as perusal of the sample issues put before us graphically demonstrated.  The

F  income to Aerospace pre-flood was substantial.

21  Additional to its output of partworks Aerospace had published two lavishly illustrated "glossy" journals on aviation topics: "World Air Power" and "Wings of Fame".  These offered an in-depth approach to their respective topics, with content prepared by knowledgeable enthusiasts for other knowledgeable enthusiasts.  "World Air Power" focused on current military aircraft and was published quarterly.  In the event there were

G  43 issues.  "Wings of Fame" focused on historic aircraft and there were 20 issues.  These journals were thus published less frequently than the partworks and were more detailed.  Counsel drew a (no doubt very inexact) parallel with the distinction between Counsel magazine and the more scholarly Cambridge Law Journal or Law Quarterly Review.

H  *Use of the Aerospace archive*

22  It is beyond dispute that prior to the flood, use of the Aerospace archive had been crucial to the preparation of Aerospace publications. Perusal of the partwork issues and of the journals readily serves to highlight the imperative need for ready access during preparation to in-depth

reference material and to a wide-ranging sophisticated photographic library.
It is not just the perusal of one issue or one journal—it is perusal in the
context of ongoing commitments to repeat these publications at specified
intervals, each covering different but (in the case of partworks) integrated
topics, each demanding the same standards in editorial input.  Absent a
readily available comprehensive archive no such enterprise could have been
contemplated, let alone achieved.

23  Despite several of the titles being highly detailed, in-depth
publications for which no expense would be spared in presenting a
comprehensive illustrative selection, on many occasions the Aerospace
archive provided all the photographs necessary to complete the article.
Where this was not the case, the photographs that were acquired to complete
the article were often added to the collection.  Archive material could, of
course, be used without having to make any payment to outside bodies.  If
photographs or other material had to be outsourced, substantial payment
would have to be made.  In his written evidence Mr Morse put it this way:

"Because the Aerospace archive was beautifully organised, our editors
were able to research and compile pictorial 'packages' for articles
immediately and quickly.  The richness, quality and comprehensiveness of
each aircraft file provided nearly everything any article called for,
whether it was about an individual aircraft, an airline, a war operation or
a line of historic development.  With the Aerospace archive, compiling an
article was a single job conducted within a short while (from minutes to
within an hour or two).  By contrast, when photographs had to come
from outside the Aerospace archive, there would be dozens of telephone
calls to dozens of collectors spread over dozens of days.  Many
photographs were in overseas collections and owners would take days to
research, package and despatch consignments to us.  Many packages
would come by Fed Ex with attendant costs.  Others would come in by
various postal systems, with consequent delays and losses.  When asked
for a shortlist of, say, ten aircraft photographs, a photographer or
collection would often research and submit around 100.  Because we had
to take extreme care over submitted photographs and because there was
usually a loss fee of up to £500 per photograph, each picture had to be
individually and clerically logged in and out—a massive task that would
inevitably become delayed and cause further problems and costs.  There
were also penalising insurance costs involved in having agency
photographs in our offices.  Without the Aerospace archive, the numbers
of agency photographs required on site would have been a huge insurance
liability.  At least one full-time member of staff was deployed to 'traffic'
these outside photographs, but it very often became the work of many.
And this was when the Aerospace archive provided at least two thirds
of the pictorial material we published.  Had we relied on outside
photographs and artworks, we would have needed several staff members
permanently employed on administering and trafficking these items.  Had
Aerospace relied on outside sources for licensed photographs or artwork,
it would also have had to pay reproduction fees for each use.  For
instance, all photo agencies (such as the Flight Collection, TRH Picture,
Austin Brown etc) charge for each use of a photograph.  The larger the
picture used, the greater the fee.  There would be further fees to pay if the

735
[2007] Bus LR          Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)
Longmore LJ

A    picture was used in later-derived books or new partwork. A single agency
photograph used on a cover could end up costing thousands of pounds,
whereas repeated uses of our archive material were at effectively zero
cost. In addition licences from picture agencies were always for one-time
use. Subsequent publications such as derived books could never have
been published with these 'extra costs'. Finally only Aerospace archive
contained the high-quality technical artworks that were a hallmark of

B    Aerospace's products and there are only an inadequate number of other
sources of these illustrations in the world: no artwork agencies nor
private collectors. This is because, although it is possible to commission
artists to create such artworks from new, the costs are great and there is a
need for considerable editorial research support and only restricted
numbers due to the few artists available and the time it takes them to

C    create these artworks."

*The pre-flood history*

24   In the light of Thames Water's arguments it is necessary to trace
Mr Morse's business activities over the years preceding the flood.

D    *Offer to sell Aerospace*

25   In his evidence Mr Morse explained in detail how he came to the
decision that he would dispose of the Aerospace business, if a suitable buyer
at the right price could be found. As he put it:

"Aerospace continued to be a profitable and vibrant business, as it had
been since 1977 and as it would remain until the day of the flood. Looked

E    at in isolation as the Midsummer group's aviation publishing wing,
Aerospace was a success. However, given the decision to cut back on
growth and dispose of some of the group's assets, Aerospace was the
obvious choice. Therefore, we considered selling Aerospace as a separate
business, something that was always a built-in option since I started the
business in 1977. We considered the sale of Aerospace precisely because
it had valuable assets that would be clearly attractive to the right buyer—

F    the intellectual property asset of the Aerospace archive and the
intellectual property asset of the journals, together with the promise of
future growth."

26   Offers were then made first to Motorbooks, a US company, inviting
purchase of the Aerospace archive and the journals, "World Air Power" and

G    "Wings of Fame" and then to a UK company, Chrysalis Books, offering
"most of Aerospace and our archive including aviation, military, naval,
motorcar and motorbike archive and resources" for £5m. Mr Morse said:
"we have considerable presence in the partwork business and Aerospace no
longer fits." Mr Soph Moeng, his senior editor and rights manager, put
together a prospectus for Chrysalis which, inter alia, valued the Aerospace
archive at £1,932,500. On 15 September 2000, on Mr Morse's behalf,

H    Mr Moeng quoted values to Motorbooks in dollars: $3m for the journals
and $5m for the archive.

27   These proposals elicited no interest. A similar proposal was made in
January 2001 to Marshall Cavendish, the well-known publishers, to sell the
Aerospace archive for £1,932,500: again, nothing came of this. Finally in

early 2001 Mr Moeng again sought to solicit interest from Motorbooks for    A
the purchase of the archive but to no avail.

### Summertime

28    On 5 October 2000 Summertime Publishing Ltd ("Summertime")
was incorporated.  It had an authorised capital of £100 divided as to 1,000
shares at 10p each.   In the event 501 shares were issued at par to    B
Midsummer, that is, in effect, to Mr Morse.  On 8 December 2000 a number
of consequential agreements were made.   By the principal agreement
International Masters Publishers Ltd ("IMP") acquired for £736,000 the
remaining 499 shares and consequential provisions were made to secure the
future conduct of Summertime as a joint venture of Midsummer and IMP.
By clause 15 Midsummer    C

> "covenants with IMP that Midsummer . . . shall not (and will procure
> that none of the other members of its group shall) at any time . . . without
> the prior written consent of IMP . . . carry on . . . any business which is
> the same as or competitive . . ."

It is accepted that "its group" would include Aerospace.

29    Associated with the agreement of 8 December 2000 is a contract for    D
the provision by Midsummer and Mr Morse to Summertime of their
respective services as defined.   Particular attention is drawn by Thames
Water to the following clauses:

> "3.2 [Midsummer] shall provide its services in relation to the
> origination of ideas for continuity series or projects exclusively to
> [Summertime] and will convey to [Summertime] all ideas and concepts it    E
> originates for continuity series during the term of this agreement and shall
> not undertake any other business that competes with the business of
> [Summertime] during the life of this agreement . . .
> "4.1 [Midsummer] agrees not during the life of this agreement whether
> by its officers, employees or agents or otherwise howsoever and whether
> as a consultant, principal, partner, director, employee or otherwise    F
> directly or indirectly . . . to provide or procure the provision of any
> consultancy services or to carry out or procure the carrying out of any
> other business activity work or services for a third party if the services
> activity or work relate to or are concerned with the development . . . of
> any product which is either the same as or substantially similar to and, in
> any case, competitive with any of the products of [Summertime] which
> are the subject of the service."    G

30    Aerospace was not in terms party to any of the foregoing but on
8 January 2001 it was party to an agreement, the practical effect of which
was to assign to Summertime the rights hitherto assigned to Bright Star in the
copyright of WAIF and also to oblige Aerospace to use its best endeavours to
enable Summertime to be able to use the archive if, in the event, the archive
was sold.  Since Thames Water attach considerable significance to that letter,    H
I set out its terms:

> "In consideration of you today entering into the agreements listed in
> the schedule hereto, we hereby jointly and severally undertake to you that
> we will respectively use our best endeavours to procure that in [sic] any

A    sale of the rights to the Midsummer archive and/or the Aerospace archive or any part thereof will exclude the right to exploit the material contained in the Midsummer archive and the Aerospace archive as continuity series in any format (including, without limitation, partworks).  We further jointly and severally undertake to you that in the event that either: (a) we secure the exclusion of continuity series rights in any sale of the Midsummer archive and/or the Aerospace archive or any part thereof or

B    (b) a sale of the Midsummer archive and/or the Aerospace archive or any part thereof is not completed by us by 30 June 2001 we will negotiate with you in good faith with you the grant of a licence to you to exploit such rights in the Midsummer archive and/or the Aerospace archive."

*Art Tech*

C    31   In the autumn of 2000 Mr Stanislaw Gnych, a "book packager" trading as Amber Books Ltd heard that Mr Morse was seeking a buyer for the Aerospace archive.  He had had earlier business dealings with the companies in the course of which he had become knowledgeable about and very impressed with the companies' archives.  In his then opinion there was hitherto unexploited commercial potential in using these archives as picture libraries, with the result that the content would not just be exploited "in

D    house".  Accordingly he conceived the idea of establishing a picture library business based on these and other like archives and to that end he approached Mr Morse.  Discussions proved fruitful and by March 2001 there was an oral agreement to the effect that the archives would be moved in stages from the Hammersmith premises to those that were to be leased by Art Tech for this enterprise in Islington.  Once in place in the autumn of

E    2001, Art Tech would conduct a picture library with the pictures coming from these archives.  The contracts, yet to be drafted, were to maintain ownership of the material in the hands of the companies and their employees were to have continuing free access to the material.  A percentage of Art Tech's fee income amounting to 50% would be the consideration.

32   This enterprise was getting underway as at the flood—as recently as

F    1 July Mr Gnych had personally conducted a final viewing and assessment at the Hammersmith premises.

33   In evidence, Mr Morse explained his then attitude.  He had neither the skills nor the inclination to run a picture library ("a clerical business"); removal of the archives would serve to provide more space and the housing in Islington would be rent-free to him; further, he could envisage future editorial work utilising the archive being conducted in space available at

G    Islington without overmuch inconvenience.

*AIRtime*

34   By way of an agreement in writing of 24 April 2001 Aerospace sold to AIRtime Publishing Inc, a US company, its journals, "World Air Power" and "Wings of Fame", for $15,000.  The agreement gave to AIRtime access

H    to the Aerospace archive to sustain continuing publication of AIRtime's own publication, "International Air Power Review", subject to a royalty agreement.  In so far as archive material was published in this journal Aerospace were to receive 4% of the net sale price on sales up to a total of $85,000.

738
Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)          [2007] Bus LR
Longmore LJ

35   It is to be noted that this development led to AIRtime recruiting from
Aerospace two members of the expert editorial staff, David Donald and Dan
March.

*The flood and consequent damage*

*Aerospace archive*

36   Of the original 218,262 images, 65,174 (28·9%) were unaffected, in
the main because they had been in upper drawers.  It is estimated that 32·1%
can be restored.  The rest, effectively 50% of the archive, cannot be restored.
The reference material was wholly destroyed.  In terms of files, the
schedule of 3,220 files identifies 867 that are undamaged, this time 26·9%.
Fundamental to the incidence of damage is the arbitrary nature inevitably
arising from the chance impact of the flood water.

37   The damage to artwork was higher in incidence.  The state of the
flood-soaked material is such that some of the impact has to be estimated.
The claimants contend that there were originally 5,110 items and that only a
modest proportion have any residual value as being substantially intact or
susceptible to restoration.

*Midsummer archive*

38   In the event the damage was markedly less extensive—it was the
artwork that bore the brunt.  The schedule put before the judge identified
341 items: 176 damaged beyond restoration; 92 susceptible to restoration;
and 73 largely intact.

*Post-flood*

*WAIF*

39   Aerospace—in effect Mr Eden and his team—maintained
production of this partwork initially up to Issue 200.  The judge's finding
was that in the absence of the archive this was a difficult and expensive
exercise.  The picture painted by Mr Eden is of time-consuming and costly
efforts to produce the required weekly issues utilising such material as was
still available and relying upon their extensive knowledge of aviation sources
to acquire sufficient additional images to allow publication.  The judge
accepted that, despite all that was done, the post-flood issues were
sub-standard, judging them by the normal exacting requirements.  Having
stopped at Issue 200, Aerospace received protests from readers who found
the resultant "work" was as to part incomplete and the team produced
another 18 issues so as to respond to these complaints.  This activity apart,
Aerospace has since been in limbo save for activities directed at identifying
and quantifying loss.

*Art Tech*

40   By reason of the flood it was not until September 2002 that any effect
could be given to the oral agreement reached in March 2001.  Thereafter
what remained of the Midsummer and Aerospace archives was moved in
stages to Art Tech's Islington premises there to be assessed "marketable or
no".  In March 2003 Art Tech started active marketing of that which it now
has: the Midsummer archive less its artwork and the undamaged rump of the

739
[2007] Bus LR          Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)
                                                                  Longmore LJ

A   Aerospace archive.  Even on this limited basis the enterprise has proved
    worthwhile.

    41   By way of a belated written agreement of 2 March 2004 the claimant
    companies agreed terms for the housing continuing cataloguing and
    insurance of the transferred archives.  The continuing ownership remains
    vested in the companies and their employees retain full and unrestricted
    access during normal business hours.  The agreement concludes with an
B   intimation of an intention to make a further agreement, this time for the
    commercial exploitation of the archives.

    42   The judge quoted from the oral evidence of Mr Gnych:

        "Holland J. My impression, and it is no more than this, is that even
    with the much-reduced archive that you received, this whole enterprise
    has been, really, quite successful?
C
        "A. It has been successful because it is a novel idea.  There is not
    another archive of this sort anywhere in the world that I am aware of.  My
    hopes, aspirations, were that it would be far more successful than it has
    been.  I am not sure whether my Lord has seen the first year's figures; we
    had a profit, which is, for a start-up operation, pretty impressive.  But
    I expected that profit to be much, much higher, frankly.  I am reasonably
D   happy with where it is, but, I would have expected more than that.  The
    idea of setting up an archive, photographs and artwork, which is so novel,
    which is so unusual, which is such high quality, was bound to be a
    success.  I am just staggered that nobody had ever done it before, frankly.

        "Holland J. I take it the lack of the Aerospace archive, or most of it, is
    deep frustration?
E       "A. Very frustrating, given that this has been dragging on for four years
    now."

    *AIRtime*

    43   As early as 10 July 2001 AIRtime put itself firmly behind Aerospace
    in the pursuit of compensation by means of an open letter:

F       "AIRtime Publishing Inc has an ongoing agreement with Aerospace
    Publishing Ltd, whereby AIRtime has access to the Aerospace
    photograph and artwork archive.  Material from the archive is used in
    the recently launched 'International Air Power Review'.  This archive is
    an invaluable and irreplaceable source of images for AIRtime, which
    draws a large proportion of the material for its publications from the
    picture/artwork library.  By tying up the greater majority of the library
G   images for some considerable time during restoration, the flood damage
    to the archive has seriously affected our ability to produce the
    publications we are working on at present, and those in planning for the
    immediate future.  This will result in our publications being delivered
    later than scheduled which, in turn, has serious ramifications for the
    financial side of our business.  While the effect on our publishing
    programme in the near term is disastrous, any delay in restoring the
H   library will also have grave consequences on our programme in the longer
    term."

    By way of a letter of 18 December 2001 AIRtime spelled out the serious
    impact upon the continuing production of "International Air Power Review"

of the damage to the Aerospace archive and confirmed that which had been    A
orally agreed, namely that there should be a revision of the royalty terms so
as to reduce payments to Aerospace.  The ultimate financial significance of
that revision appeared from a subsequent letter of 22 July 2004.

*The parties' cases at trial and the judge's findings*

44    We have not been troubled by detailed figures and the parties' cases    B
can be summarised fairly briefly.  The claim was for £3,265,127 on a
reinstatement basis, including £1,842,077 for replacement of 87,523
unrepairable photographic images, £135,303 for restoration of repairable
photographic images and £898,335 for replacement and some restoration of
artwork.  Thames Water contend that, on a reinstatement basis, the claim
should be only £2,447,911.  If the claim were properly to be assessed on the
basis of diminution of value, the claimants would then claim £1,058,513    C
while Thames Water put forward a figure of £274,460.

45    The judge held that while the first two figures claimed by way of
reinstatement were correct, the figure for replacement of artwork could not
be justified by reference to reinstatement because it was impossible for
artwork to be sensibly reinstated.  He, therefore, reduced the third figure
claimed to £89,686.  He reached a final figure of £2,564,378 on a    D
reinstatement basis and a final figure of £721,686 if the correct figure was
diminution in value.  He then turned to consider consequential loss and held
that a claim could properly be made for loss of profit on future publications
which failed to be published of £1,612,134.  This figure should, therefore, be
added to any loss calculated by reference to diminution in value.  It could
not, however, be awarded in addition to the loss calculated by reference to
reinstatement because the only loss that would be suffered if reinstatement    E
were awarded would be the cost of delay in obtaining the profit which he
assessed at £129,035.  The final figures were, therefore, £2,693,413 for
reinstatement loss and £2,574,504 for diminution in value.

46    It was no doubt because these figures were comparatively similar
that the judge thought it would not be particularly productive to lengthen
what was already a lengthy judgment in order to consider in detail the    F
evidence relating to the intention to reinstate and the reasonableness or
otherwise of reinstatement.  What is now said, however, by Thames Water is
that, since no further partworks or journals were ever going to be produced
by Aerospace the whole claim for loss of profit must fall away.  If, therefore,
the claim should be correctly assessed by reference to diminution in value it
would stand at maximum at £1,061,570 which is very different from the
sum finally awarded by the judge on the basis of reinstatement, viz the sum    G
of £2,693,413.  Of course even the sum of £1,061,570 falls to be reduced yet
further according to Thames Water for reasons relating to further details of
the award on a diminution in value basis.  Thus the stage is set for the
detailed arguments on the appeal.

*Thames Water's arguments in this court*                                       H

47    I have already observed that Thames Water found it necessary to file
a skeleton argument of 177 paragraphs; they then served a supplementary
skeleton argument of 149 paragraphs.  Such lengthy documents invariably
make it difficult to distinguish the wood from the trees and we quite

741
[2007] Bus LR        Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)
Longmore LJ

A   understand why the judge did not feel it necessary or even sensible to do a
point by point rebuttal of all matters raised in Thames Water's concluding
written submissions which themselves constituted a lengthy document.
Fortunately Mr Rainey was able to distil four separate steps in the argument
in the course of his oral submissions.  (a) Aerospace and its aviation
publishing business were, before the flood, shelved in favour of non-aviation
publishing and Aerospace was effectively in run-off.  (b) Aerospace would
B   not have published a further partwork once the current WAIF publication
had come to its natural end, nor could they identify any other aviation
publication which would have been issued.  The expert evidence was that the
market for WAIF-style publications had come to an end; the claimants had
produced no credible evidence to set against that and could say no more than
that they would research the market in some nebulous way and arrange fresh
C   publications in the light of that research; that was not sufficient to enable to
claimants to show that there was a viable future in aviation publishing, even
if step (a) above were rejected.  (c) The evidence was that publication of
WAIF continued despite the flood; that showed that the archive was not
essential; with repair of such damaged photographs as could be repaired at a
cost of £135,000, the claimants would be fully compensated.  (d) There was
no evidence to show that any future publication (especially if it was a WAIF-
D   style publication) would have generated any profit; moreover in the light of
(a) above any such loss of profit would have been suffered not by Aerospace
(or Midsummer) but by Summertime.  Before dealing with those arguments,
I should say a little about the law and the correct approach to the distinction
between the cost of reinstatement on the one hand and diminution in sale
value on the other.

E   *The law*

48   The judge set out, at para 38 of his judgment, the principles as stated
in *Southampton Container Terminals Ltd v Schiffahrtsgesellschaft Hansa
Australia mbH & Co (The Maersk Colombo)* [2001] 2 Lloyd's Rep 275,
para 71:

F      "(1) On proof of the tortious destruction of a chattel, the owner is
prima facie entitled to damages reflecting the market value of the chattel
'as is'.  (2) He is so entitled whether or not he intends to obtain a
replacement.  (3) The market or resale value is to be assessed on the
evidence, there being no standard measure applicable to all
circumstances.  (4) If the claimant intends to replace the chattel, and if the
market or resale value as assessed is inadequate for that purpose, then the
G   higher replacement value may, in the event, be the appropriate measure of
damages.  (5) When and if replacement value is claimed, the claimant can
only succeed to the extent that the claim is reasonable; that is, that it
reflects reasonable mitigation of its loss.  (6) The claim will ordinarily be
reasonable if it is reasonable to replace the chattel and the cost of
replacement is reasonable."

H   49   Although the parties agreed that these principles, coincidentally
formulated by Holland J himself in *The Maersk Colombo*, were indeed the
applicable principles, the facts of the present case require some elaboration
in two respects.  First, there was some argument on the question whether, in
order to recover the cost of reinstatement, the claimant must intend actually

to reinstate.  The principles espoused by counsel (Peter Gross QC) and endorsed in *The Maersk Colombo*, paras 25–26, indicate that it may not always be necessary.  The Holland J principles, also espoused in that case, suggest that it is.  I would say only that it must be very rare when the cost of reinstatement will be awarded to someone who does not intend to reinstate in fact.

50   Secondly, the present case is not a case of a readily marketable asset, nor yet of a unique chattel like a rare manuscript, a Picasso painting or a Stradivarius violin.  In the first sort of case little difficulty will arise; reinstatement will not usually be appropriate as it would not be reasonable to reinstate if an article can be bought in by the claimant at a lower cost.  In the case of a unique chattel it may be reasonable to reinstate but it will not be too difficult, by reference to past auction prices, to assess realistically a market value even though the chattel itself is unique.  It will then be easy to compare figures for reinstatement and market value.

51   Here, by contrast, while cost of reinstatement is calculable (and is in the event largely agreed), market value is problematic to assess.  Plutarch regarded the human memory as an archive ("Essay on Curiosity" (2.520): see Philemon Holland's 1603 translation as printed in *Plutarch's Moralia* (Everyman ed, 1911), p 145 and that of Professor Donald Russell in *Plutarch, Selected Essays and Dialogues* (Oxford World's Classics, 1993), p 201).  In a similar way the archive in the present case represents the companies' memory and, as such, is an asset whose value could in conventional parlance be described as "priceless" and whose actual value can only be calculated with considerable difficulty.  The relevant experts agreed that it would be impossible to acquire a similar archive within a reasonable time and that, even if one were to sell the archive, it would have to be done through a number of auctions over a number of years in order to achieve the best reasonable price.  In these circumstances it was submitted by Mr Young for the claimants that the court should lean towards reinstatement unless the cost is prohibitive especially when, as in this case, the only way in which a resale value (see (3) and (4) in para 48 above) could be realised would be by destroying the very characteristic (namely its unity and comprehensiveness) which gives the collection its true value in the first place.

52   In general terms, I would be minded to accept this submission, on the facts of this case, since it is difficult to regard what may be called the strictly economic value of the archive (what the authorities call the resale value) as being the sole value of the archive.  It was a labour both of love and dedication to build up and then catalogue the archive in the first place.  The fact that it has an economic value, in the sense of a commercial utility, should not blind one to the further fact that its value to the owner may be (and, in this case, is) greater than such sum as can be obtained by selling it at spaced-out auctions.  Moreover, the fact that not every item in the archive can be precisely replaced does not mean that the cost of reinstatement is not, in general, the measure of damages to be preferred.  If the archive of a famous and long-established art dealer such as the Fine Art Society Ltd or an auctioneer such as Christie's or Sotheby's were destroyed, it would be mealy-mouthed in the extreme to confine recovery to the resale value of individual items.

743
[2007] Bus LR          Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)
Longmore LJ

A    53   This having been said, Thames Water's arguments still have to be
confronted. If Aerospace were indeed about to go out of business or there
was no prospect of future publications for which the archive would have a
use or they would have been able to continue to make the same sort of
income without reference to the archive, it would, no doubt, not be right to
award the reinstatement cost.

B    *Run-down of Aerospace business*

54   The salient facts relating to this argument are set out in paras 22–33
above and need not be repeated.

55   Mr Rainey relied very heavily on the sale by Aerospace of the
journals ("World Air Power" and "Wings of Fame") to AIRtime and the
terms of the agreement with Summertime (as to any new publication) and
C    the letter of 8 January 2001 as showing that Aerospace was, as he put it,
effectively in run-off. It must, however, be remembered that: (1) the
Aerospace business was not actually sold, despite overtures being made to
Motorbooks and Chrysalis; (2) Aerospace was not actually a party to the
Summertime arrangement, although it is fair to say that the restrictive
covenant given by Midsummer covered any companies in its group, so that if
D    Aerospace did compete with Summertime by causing a new magazine to be
published, Midsummer would find itself in breach of that contract; (3) the
archive was never sold to Art Tech, the arrangement being that, as from the
time of its removal to Islington, it would be managed by Art Tech on a
commercial basis; thus not only would free access continue to be offered to
Aerospace as owners of the archive but other companies or individuals
would be offered access for a fee.

E    56   Mr Morse was, naturally enough, asked a number of questions
about the attempted disposal of the Aerospace business and the actual
disposal of that part of the business represented by the journals, as well as
the arrangements with Summertime. Although it is not easy to see exactly
where in a lengthy cross-examination of Mr Morse it was put to him fairly
and squarely that the Aerospace business was effectively closing down as a
F    whole, Mr Morse firmly rebutted suggestions relating to inferences to be
drawn from particular transactions. On the face of it, the arrangements with
Summertime did look as if it was to be Summertime who would be doing the
business from January 2001, but since Mr Morse had a 50·1% shareholding
as opposed to IMP's 49·9% in the company, Mr Morse was always in a
position (if necessary) to reap a substantial part of any profit that might be
G    made from Summertime ventures if Summertime were minded to use the
archive. More importantly, perhaps, Mr Morse made the point that it was
the entirety of the business which was to be handled by Summertime after
IMP's injection of capital. The majority of the business was what had been
the Midsummer enterprise and it was that which IMP had injected their
capital to exploit. He said more than once that Summertime had no interest
in aviation projects and the arrangement with IMP and Summertime was a
H    friendly one by which he meant that, if future aviation projects were to be
undertaken (as, without the flood, he had intended should occur)
Summertime would never have raised any difficulty about Aerospace
continuing to use their archive for projects in which they (Summertime) had
no interest.

57   In relation to this part of the case Holland J made two important
findings: first (implicitly but throughout his judgment) that Mr Morse was
a credible and reliable witness and secondly (para 23) in relation to
Summertime, that there was no evidence of any impact upon the conduct of
Aerospace before the flood arising out of the two contractual arrangements
with Summertime.  These were findings which were open to the judge and I,
for my part, have seen no evidence which could justifiably be said to
controvert them.  Nor, looking at the evidence as a whole, could I conclude
that Aerospace's business or Mr Morse's participation in it had come to any
full stop.  No buyer had been found either for the business as a whole nor for
the archive on its own.  If there were to be any future aviation publications,
I have no doubt that they would have been arranged by Mr Morse as part of
Aerospace business rather than Summertime business or, if it had been
decided that Summertime should itself do the business, Aerospace (and
Mr Morse) would have been amply compensated for the use of the archive.

58   This is not an unimportant conclusion because the second step (see
para 47 above) in Mr Rainey's argument was, to a large extent, predicated
upon his success on step (a).  If the Aerospace business had been truly in run-
off, it would no doubt be comparatively easy to decide that evidence for
further publications was lacking.  Conversely once it is established that the
business is not in run-off it is comparatively easy to establish that decisions
would probably be made to issue future aircraft publications.  Whether that
decision would be commercially sensible is a different (although allied)
question; but the two questions need to be kept distinct.

*Future publications*

59   Mr Rainey attempted, at trial, to tie Mr Morse down to a prediction
that Aerospace would publish a further partwork similar to WAIF 1 (to be
called WAIF 2 for the purposes of argument) and then to demonstrate that
there was no market for any such publication so that such publication (and
any decision to reinstate the archive for that purpose) was a commercially
unreasonable decision for which Thames Water could not be expected to
pay.  This attempt failed at trial and its renewal must likewise fail before this
court.  In the first place Mr Morse made it plain on several occasions in his
evidence that he did intend to reinstate the archive, that he did intend at the
date of the flood to continue with further publications once a decent interval
had elapsed from the natural end of WAIF 1 and that Aerospace could expect
to make a decent profit out of such further publications.  On the basis (which
I have already said cannot be controverted) that Mr Morse was a credible
and reliable witness, it is very difficult for Mr Rainey to satisfy the court that
this evidence is not to be accepted.  It is, moreover, wrong to categorise the
evidence as being confined to a "WAIF 2 publication".  Mr Morse made clear
that, although he primarily had another partwork in mind, it would be
premature to come to any definite conclusion before doing some research at
the appropriate time.  That then led Mr Rainey to submit that, since nothing
firm could be shown to be in Mr Morse's mind, he had failed to discharge the
burden of showing that on the balance of probabilities any future work
would be published at all.  That is mere casuistry on Mr Rainey's part.  Any
sensible businessman may intend to publish but be unsure what form the
publication will take until the market is tested.  That does not make it in the
least improbable that future publication will occur.

745
[2007] Bus LR          Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)
Longmore LJ

A    60    The judge (with some justification) treated the arguments that the
Aerospace business was in run-off and that there was no intention to issue
further aviation publications as covering much the same ground.  He said, at
para 71:

"Thus, I start by finding that as at say, 1 July 2001 WAIF was not the
last Aerospace publication of its time: as a matter of probability there
would in due course have been a successor.  I so find notwithstanding the
B    point made as to the immediately preceding history because of an
overwhelming impression of Aerospace as an ongoing aviation-oriented
organisation with a reputation and a pride.  Mr Morse was and is an
aviation enthusiast as is his effective number two, Mr Moeng.  The
editorial staff then in place and working on WAIF were similarly skilled
and dedicated.  There was intense and understandable pride in the
C    partworks and in the archive and it is not without significance that on the
very day of the flood Mr Stroud was working at cataloguing.  Even
the efforts to sell the archive during the preceding months do not gainsay
this impression once one takes into account the asking price, £1,932,500.
This may have been of no assistance in establishing market value; it was
of great assistance in signalling the significance to Aerospace of the
D    archive and it served to counter the proposition that the only perceived
future role of the archive was a generator of picture library fees.  The
notion that the flood was coincidental with a change of corporate heart so
that the damage to the archive was happily of less significance than
hitherto would have been the case, and so that WAIF was to be the last
Aerospace publication does not accord with my view of the reality of the
situation and I reject submissions that are to that effect."

E    It is true that these conclusions were made without detailed reference to the
evidence and, in particular, to the detail of Aerospace's recent history just
before the flood and that they could have engaged more closely with
Mr Rainey's arguments.  But once those arguments have been tested against
the documentary and oral evidence, I can only say that not only were they
conclusions demonstrably open to the judge but that I would, so far, have
F    been minded to come to the same conclusions as the judge has done.

61    That, however, is to disregard the second aspect of step (b), namely
the alleged unwisdom of trying to issue aviation publications in the future
and the extent to which that might have affected both Mr Morse's own state
of mind and the reasonableness of reinstatement.

62    So I turn to the expert evidence which it is said that the judge
G    disregarded without giving reasons.  Three preliminary observations are
relevant.  First, the expert evidence was by no means all one way (see the
joint conclusions after the first exchange of reports).  Secondly, the value
of expert evidence in a case such as the present is by no means obvious; it is all
too easy for an expert to be able to express an opinion at trial about market
movements and customer trends four years after the event which has given
rise to the liability in the first place.  It was Mr Morse (himself having
H    considerable expertise in the publishing and marketing of aviation and other
publications) who had to make decisions affecting his business at the time.
In the absence of any attack on his bona fides his own views must be
accorded some weight, taking due account of his position as an interested
party in the proceedings.  Thirdly, it is important to have in mind what is the

correct question which the expert should be addressing.  I have already given
reasons for saying that a question which confined itself to the likely
marketability of a partwork almost identical to WAIF 1 was too narrow.
Since Mr Morse said that the likelihood was that a further partwork of some
kind would be published, a question about the viability of future partworks
was relevant but Mr Morse never confined himself to partworks.  His
intention was to publish whatever seemed to him would be marketable at the
time, being confident that the market for aviation publications had not
exhausted itself.  There is the further consideration that the time in relation
to which the relevant question had to be asked must (at any rate primarily)
be the date of the flood.  Mr Rainey accepted that this would be so subject to
the obviously correct qualification that, since (a) it was never intended that
there be an immediate successor to WAIF 1 when that partwork series ended
but rather that a new publication would probably come out in 2003 and
(b) the trial did not take place until 2005, the relevant question would have
to relate to one or other or perhaps both of those dates.  It is, in fact, the
latter date which is more relevant.  The prospect in 2001 of commercial
viability of a 2003 publication (the judge, in para 72, preferred to find that
the more likely date for publication was 2005 in any event) would no doubt
be relevant to the question whether the Aerospace business was in existence
or in run-off as at 2001 but that question has already been answered.  For the
present purpose of determining whether Mr Morse intended to reinstate,
once the flood had occurred, and whether it was reasonable for him so to
intend, the relevant question must be asked as at 2001 in relation to the time
when compensation would be likely to be received, viz at date of trial in
2005.

63   The question, therefore, which any expert (if he could be found)
would have to address would be whether a reasonable businessman would
have thought in 2001 that there was a reasonable prospect of profitably
issuing one or more aviation publications in about 2005.  The question only
has to be stated for it to be seen how speculative it is; it is difficult to answer
without falling into the trap of relying on one's knowledge (acquired in
hindsight) of how business developed in 2002, 2003 and 2004.  Not only did
the experts fall into the trap but it is far from clear that they were invited to
address the right question at all.

64   One might be forgiven for thinking that the most relevant pieces of
hard evidence which might help to answer this highly speculative question
were answers given to questionnaires circulated with one of the
WAIF 1 publications.  These answers were analysed by a company called
Vivid Interface Ltd and, although the number of persons replying to a
questionnaire of this sort was inevitably limited (it was in fact 1,000 which is
a by no means negligible return) the replies received are not without interest.
More than 50% of responders expressed serious interest in world military
aircraft, aircraft weapons, air forces of the world, war in the air, aviation
technology, A to Z of aircraft and history of aviation.  91% and 93% thought
the text/picture balance and the technical content of WAIF 1 were about
right.  Large numbers rated various formats as excellent.  Much smaller
numbers read competing publications but 89% were sufficiently interested to
spend serious sums on aircraft books.  These are not signs of a market in
serious decline.

A    65   We were not referred to any part of the evidence of the experts
retained by either side where this document was accorded any weight or
where any explanation was given as to why it should not be accorded
weight.  Instead much was made of significantly later events.  The thrust of
the evidence of Mr Byrne (the expert called by Thames Water) was that the
market for photo-intensive partworks in the style of WAIF 1 had declined in
favour of modern mixed medium partworks which rather than being photo-
B    intensive would have fewer photographs but be accompanied by a DVD or
other video representation.  For this purpose he and Mr Rainey relied on
research done into something called a "Fighting Aircraft" project in 2003.
This research was commissioned by Summertime in collaboration with an
Italian company called De Agostini probably (according to Mr Morse) with
a view to distribution in Japan.  This research did indeed show that DVDs
C    were a popular accompaniment for partworks but it did not exclude
marketability of more traditional partworks nor did it, in any way, go to
show that Aerospace and Mr Morse would decline to adapt to a changing
market if there was one.  When one discovers further that this research was
based on a focus group discussion with only ten persons, one cannot help
feeling that it is a very slender foundation from which to address what I have
called the relevant question.
D    66   In the end Mr Rainey fell back on the onus of proof, saying that it
was for Aerospace to prove that they had it in mind to issue one or more
particular types of publication, and that they had alighted on a
WAIF 2 publication which would never have been feasible in the market
conditions as they had become.  I have already said that that is too narrow
an approach and a wise businessman who intends to use his archive for
E    future publication will wait to see what sort of publication can best be made.
That state of mind should not (and, in my judgment, does not) preclude
recovery of the cost of reinstatement unless it is manifest that such a decision
would be commercially unwise.  I have seen no persuasive evidence to
suggest that any publication which Mr Morse decided to publish would be
commercially disastrous.

F    *Continued publication of WAIF 1*

67   I can deal with this more briefly.  The judge's finding was in para 72:

"Next I find that a condition precedent to the preparation of any such
successor partwork would have been ready access to an archive
substantially 'as was'.  I so find because, as I see it, Aerospace could not
have lent itself to any work of less 'scholastic' depth compatible with
G    obtaining materials wholly or substantially from external sources and
because the extra costs involved would militate against the enterprise.
Yet further, I cannot regard an uncatalogued rump as any significant
substitute for the catalogued archive 'as was'."

There was ample evidence to justify this finding, since both Mr Morse and
Mr Eden had explained in evidence how difficult it was to continue WAIF 1,
H    how (against the odds) they had succeeded to the extent that few (if any)
customers complained about the fall in quality resulting from the flood and
how they had hoped to finish the run with Issue 200 in November 2001,
although they had not in fact been allowed by the public to do so.  In the
light of this evidence the conclusions of the judge are eminently justifiable.  It

is, indeed, inherently unattractive for Thames Water (who caused the flood    A
in the first place) to be arguing that the valiant continuation of WAIF 1
shows that in truth there was little need for the archive at all and that once
£135,000 had been spent in repairing damaged photographs, Aerospace
would be able to carry on just as before.

### Likelihood of profit

B

68    The substance of this particular branch of the subject has already
been covered.  No doubt if subsequent publications were to be just like
WAIF 1 the likely profit would be small.  But once it is accepted (a) that
Mr Morse intends to reinstate and (b) that he is not intending to confine
himself to a WAIF 1 style publication and (c) that he is an honest and not an
unreasonable businessman, he is not bound to go further and show that his    C
business plans are bound to make a profit.  Debate about profitability does
not detract from his intention to reinstate, if it is found that his intention is
genuine.  Many reasonable businessmen make decisions which do not turn
out as well as they had hoped; he does not have to prove that his plans are
bound to be sound before he can recover the cost of reinstatement.  As far as
the question of the consequential loss claim is concerned, it is only the cost of
the delay in earning the anticipated profit which can form a proper head of    D
recovery if reinstatement is otherwise allowable.  The argument that it is
only a Summertime loss and not an Aerospace loss has been already dealt
with above.

### Conclusion on reinstatement as against a diminution in value

69    I would, therefore, conclude that Aerospace are entitled to recover
damages on a reinstatement basis as the judge has found.  The fact that his    E
reasoning could have been fuller makes no difference to the ultimate
outcome.

### Reflection

70    In a complex factual case such as the present it will often be
comparatively easy for an appellant to allege that a judgment is imperfectly    F
or inadequately reasoned on one aspect or another and even to persuade this
court, on an unopposed permission application, that that is arguably so.
Appellants must, however, be aware that there is no obligation on a judge to
give a particular response to every submission made (judgments in this
country are quite long enough already) and that, unless it becomes apparent
in the course of the appeal that a serious injustice has been done, appeals on    G
the ground of inadequacy of reasons in complex factual disputes are likely to
fail.  One shudders to think what the costs of this appeal have been and it is
important to emphasise that the fact that one division of this court gave
permission to appeal is very far indeed from being any guarantee of success.

71    I have read and agree with Wilson LJ's analysis of staff costs and the
issues which arise on the cross-appeal.  The overall result is, therefore, that    H
the appeal of Thames Water is dismissed save in relation to the insignificant
sum of £6,047 allegedly incurred in respect of the two freelance
ex-employees.  The claimants' cross-appeal on interest is substantially
allowed, although it fails in relation to the lesser arguments set out in
paras 91(b) and (c) below.

A    **WILSON LJ**

72    I agree.  Pill and Longmore LJJ have invited me to deliver the main
judgment on two further, discrete areas of the case.

*Staff costs*

73    As part of their claim for special damage, the claimants included
B    what initially was a very large sum allegedly referable to payments made to
staff for work necessarily done by them in relation to, and consequent upon,
the flood.  In due course this head of claim was reduced to £31,520.  In the
event the judge upheld this part of the claim although in his judgment
the digits were so transposed as to read £31,250.  Recognising that, in the
absence of their appeal on matters of far greater financial consequence, it
would have been inappropriate for them to appeal against this small
C    proportion of the award, Thames Water nevertheless added objection to it to
their other grounds of appeal.

74    The claim for £31,520 was broken down as to £25,473 in respect of
the claimants' employees and as to £6,047 in respect of two ex-employees
who had returned to work for them on a freelance basis.  As figures, neither
of them was challenged.  But Thames Water articulated before the judge a
D    different type of objection to each of the two figures.  Although it was almost
de minimis, the fact is that the judge failed to address their objection
referable to the freelancers.  He did address their objection referable to the
employees but, so Thames Water complain, fell into error in overruling it.

75    As summarised in Thames Water's grounds of appeal, "the judge
should have held that the freelance costs were costs of the action to be
E    assessed".  What, then, was the evidence in relation to the work done by the
two freelancers?  According to Mr Moeng, most of their work related to the
inspection and assessment of damage in February and March 2003.  In that
the claim was issued on 27 May 2003, it seems to be a fair inference that the
assessment done by the freelancers some three months earlier was referable
to preparation of the claim.  The balance of the claim referable to freelance
work related to six small payments made to one freelancer between August
F    2003 and June 2005.  The third of the six was described by the claimants as
"Writing witness statement" and, before us, Mr Young was quick to concede
that such, at least, was an item of costs rather than of damages.  No doubt
the dividing line between work referable to the claim and work referable to
the attempted reconstitution of the claimants' business activity is narrow;
but, in light of the fact that two of the areas of work done by the freelancers
thus appear to relate to costs, the onus was in my view firmly on the
G    claimants to adduce clear evidence that the other items were not analogous.
This they failed to do.  So I consider that, had the judge descended to this
minor issue, he should have upheld Thames Water's contention.

76    The claim referable to employees related to work done by seven of
them in the weeks, months and years after the flood referable to the works
of salvage, which were delicate and complex, and other works of
reorganisation reactive to the flood.  The contention of the claimants was,
H    of course, not that, in the absence of the flood, they would not have had to
pay their employees but that in its absence their employees would have
concentrated upon their conventional activities, out of which the claimants
would have made money.  One of their then senior editors, Mr Bishop, gave
evidence that, had it not been for his work referable to the flood between

750
Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)          [2007] Bus LR
Wilson LJ

July and September 2001, he would have been working in his editorial-writing capacity in the creation of publications.  The evidence of Mr Moeng was similar.  That, however, was as far as the specific evidence went.  Mr Young seems to have contended before the judge that he could confidently infer that, in the absence of the work done by them referable to the flood, the employees would, by their conventional activities, have contributed to increased revenue for the claimants.  It was Mr Rainey's contention, by contrast, that any claim that the employees had been diverted from revenue-generating activities had not been spelt out, still less substantiated in evidence.

77   The judge explained his resolution of this issue in the following words:

"As to staff costs, this represents a calculation of the cost allegedly occasioned to Midsummer by the post-flood need to divert employees from their normal duties to countering and mitigating the impact of the flood.  The defendants object to this head of claim: flood or no flood, the claimants would have expended the same sum, given that the individuals concerned were in their full-time employment.  I reject this objection.  Had the claimants engaged temporary workers, there could have been no objection to the cost.  As I see it, there can be no objection in principle to essentially the same claim because they took the easier and possibly cheaper course of diverting their existing workforce from profit-earning activities to those arising from the flood."

78   It was the contention of Mr Rainey before us that any claim by a claimant that its employees have been diverted from revenue-generating activities in order to attend to the consequences of a tortious or otherwise wrongful act has to be strictly proved; that the claimants failed to prove such loss of revenue; and that it was not open to the judge in law simply to infer diversion from revenue-generating activities.

79   In this regard we were referred to five authorities.

80   First, *Tate & Lyle Food and Distribution Ltd v Greater London Council* [1982] 1 WLR 149.  The defendants were liable to the claimants for having failed to dredge silt which they had caused to be accumulated when constructing new piers for the Woolwich ferry and which had obstructed the claimants' use of their barge moorings.  The result had been that the claimants themselves had had to dredge the silt and, as part of their claim, they claimed managerial and supervisory expenses referable to that operation.  In rejecting this part of the claim Forbes J said, at p 152:

"I have no doubt that the expenditure of managerial time in remedying an actionable wrong done to a trading concern can properly form the subject matter of a head of special damage.  In a case such as this it would be wholly unrealistic to assume that no such additional managerial time was in fact expended.  I would also accept that it must be extremely difficult to quantify.  But modern office arrangements permit of the recording of the time spent by managerial staff on particular projects.  I do not believe that it would have been impossible for the plaintiffs in this case to have kept some record to show the extent to which their trading routine was disturbed by the necessity for continual dredging sessions."

A     It is thus important to note that the claim was rejected not because of a
failure specifically to establish that, had it not been diverted to the remedial
measures, the managerial time would have been productive of revenue for
the claimants but only because they had not properly demonstrated the
amount of time thus diverted and, more generally, the extent to which their
trading routine had been disturbed by it.

B     81   Second, *Standard Chartered Bank v Pakistan National Shipping
Corpn (No 3)* [2001] 1 All ER (Comm) 822.   As part of its attempt to
mitigate its loss caused by deceit perpetrated in relation to it by the
defendants, the claimant bank presided over the sale of a cargo of bitumen
in Vietnam.   In that regard it despatched Mr Griffiths, one of its officers,
to Vietnam; and the report of the decision at first instance [1999] 1 All
ER (Comm) 417 shows that he went to Vietnam on two occasions, each
C     for about two months.   As part of its damages, the bank claimed an
amount equal to his salary during those visits, namely US$30,000.   On the
defendants' appeal to this court, the trial judge's award to the bank of this
sum was set aside.   In giving the only substantive judgment, with which
Henry LJ and Wall J agreed, Potter LJ cited the passage in the judgment of
Forbes J set out above and continued [2001] 1 All ER (Comm) 822, para 49:

D         "It does not seem to me that either the passage quoted or the
circumstances relating to the claim in the *Tate & Lyle* case justify the
recovery of the proportion of Mr Griffiths's salary claimed in this case.
No doubt it was true, as the judge stated, that, in visiting Vietnam,
Mr Griffiths was engaged in an unusual task.   However it is not suggested
that his trip abroad, as an employee engaged in the business of [the bank]
and in respect of whose responsibilities his salary was in any event
E         payable, led to any significant disruption in [the bank's] business or any
loss of profit or increased expenditure on [the bank's] part . . .   In certain
situations, involving particular types of trading concern, such a claim
may be appropriate.   In particular, building contractors who, by reason of
delay, suffer increased costs attributable to a particular job which costs
are irrecoverable elsewhere, may claim for a proportion of their fixed
F         overheads (including head office salaries) as part of their claim for
consequential loss.   However, that is not this case.   There is no suggestion
that the business of [the bank], or the system of charging upon which its
profits depend, were in any way adversely affected by the diversion of
Mr Griffiths to Vietnam."

This, then, was a case of the diversion of one employee in a large
G     organisation away from his normal duties; and it had not even been
"suggested", let alone established, that his diversion had led to any
significant disruption of, or indeed any adverse effect at all upon, the bank's
business.   Although this court was there identifying a low threshold, the
bank had nevertheless failed to cross it.

82   Third, *Horace Holman Group Ltd v Sherwood International Group
Ltd* (unreported) 7 November 2001.   The defendants were liable to the
H     claimants for having failed to provide them with an adequate software
package.   As part of their damages, the claimants claimed time wasted by
their directors and staff in struggling with the inadequacies of the software
provided by the defendants.   In allowing this claim Judge Bowsher QC,
sitting in the Technology and Construction Court, noted what Forbes J had

said in the *Tate & Lyle* case [1982] 1 WLR 149 and observed that, by      A
contrast with that case, at least he had some evidence of the amount of time
spent by the directors and staff, albeit only in the form of a reconstruction
from memory.  He continued, at para 73: "I cannot and do not say, in the
absence of records there is to be no recovery."  Then, in paras 75–78, the
judge rejected the suggestion of the defendants that, in this regard, there
were relevant distinctions between an income-producing employee and what      B
was described as a "back office" employee or indeed between short periods
and long periods of diverted time.  "In all cases", he said, at para 78, "the
claimants were paying for time which was to be a benefit to them and they
lost the benefit of that time".  Earlier, at para 75, the judge had accepted the
observation of the claimants' forensic accountant that "every employer
values each employee at more than the employee is paid, otherwise there is
no point in employing him".  Although it does not seem that the decision of      C
this court in the *Standard Chartered Bank* case, decided nine months earlier,
was cited to him, I do not consider that its citation would have led the judge
to a different conclusion.  If the kernel of the decision in the *Standard
Chartered Bank* case was the requirement to demonstrate significant
disruption of business as well as the alleged diversion of time, both had been
well demonstrated before Judge Bowsher QC.

83    Fourth, *Admiral Management Services Ltd v Para-Protect Europe      D
Ltd* [2002] 1 WLR 2722.  The claimants became suspicious that the
defendants were wrongfully using their confidential information.  Their staff
made an initial investigation.  They obtained a search and seizure order; and
the material thus seized was examined by the staff.  In due course a Tomlin
order was made, under which an issue between the parties as to the
defendants' liability to the claimants for their staff costs referable to the
investigation and examination was referred to a judge.  Stanley Burnton J      E
first held that, in so far as any member of the claimants' staff could be
classified as an expert and could be found in that regard to have performed
expert work, the costs referable to that member fell within the costs of and
incidental to the claim, which the defendants had agreed to pay.  The judge
then proceeded to consider whether staff costs not thus recoverable as costs
of and incidental to the claim were recoverable by the claimants as damages.      F
Neither the decision of this court in the *Standard Chartered Bank* case nor,
for that matter, the then very recent decision of Judge Bowsher QC in the
*Horace Holman Group* case seems to have been cited to him.  He
determined that, in that it was for payments to staff which would have been
made in any event, the claim had to be formulated, if at all, as a claim for lost
revenue as a result of the diversion of the time of the staff.  The judge      G
continued, at para 87:

    "Of course, it may be difficult to quantify any loss of revenue or
    business consequential on the diversion of employee time to dealing with
    a tort or breach of contract suffered by an employer.  It may be that the
    cost of employee time may be taken as an approximation for the loss of
    revenue involved; but, if so, the claim remains a claim for loss of revenue      H
    rather than a claim for expenditure occasioned by the tort or breach of
    contract."

Then the judge concluded that, in so far as it existed at all, the necessary
evidence of loss of revenue was extremely vague and not confirmed by other

A   evidence which, had the loss existed, might have been expected to confirm it. He therefore concluded that, while in theory a claim for damages for loss of revenue might be available to the claimants in this regard, there was no evidence to justify it.

**84**  Fifth, *R + V Versicherung AG v Risk Insurance and Reinsurance Solutions SA* [2006] EWHC 42 (Comm). It had already been held that the

B   defendants, insurance intermediaries, were liable to the claimants, a German reinsurance company, because of a conspiracy to defraud the claimants on the part of one of the defendants' employees. By this, second, judgment Gloster J had to decide issues of principle in relation to quantum of damage and in particular to the recoverability by the claimants of the costs of paying their staff during time devoted to investigation and/or mitigation of the tort.

C   The defendants conceded only that the claimants could recover for what they could establish as a loss of profit sustained by the diversion of staff time. In a careful judgment Gloster J sought to analyse the effect of the four decisions referred to above, as well as others. She observed, at para 76, that she had some difficulty with the reasoning of Stanley Burnton J in the *Admiral Management Services* case. Then she said, at para 77:

D   "In my judgment, as a matter of principle, such head of loss (i e the cost of wasted staff time spent on the investigation and/or mitigation of the tort) is recoverable, notwithstanding that no additional expenditure 'loss', or loss of revenue or profit can be shown. However, this is subject to the proviso that it has to be demonstrated with sufficient certainty that the wasted time was indeed spent on investigating and/or mitigating the relevant tort; i e that the expenditure was directly attributable to the

E   tort . . . This is perhaps simply another way of putting what Potter LJ said in the *Standard Chartered Bank* case, namely that to be able to recover one has to show some significant disruption to the business; in other words that staff have been significantly diverted from their usual activities. Otherwise the alleged wasted expenditure on wages cannot be said to be 'directly attributable' to the tort."

F   **85**  In my view the divide between the decisions of Stanley Burnton J in the *Admiral Management Services* case [2002] 1 WLR 2722 and of Gloster J in the *R + V Versicherung AG* case [2006] EWHC 42 (Comm) is not as stark as may appear. But, to the extent that there is a difference, I consider that the approach of Gloster J is preferable as being, unsurprisingly, more consonant with the decision of this court in the *Standard Chartered Bank* case [2001]

G   1 All ER (Comm) 822, not cited to Stanley Burnton J.

**86**  I consider that the authorities establish the following propositions. (a) The fact and, if so, the extent of the diversion of staff time have to be properly established and, if in that regard evidence which it would have been reasonable for the claimant to adduce is not adduced, he is at risk of a finding that they have not been established.  (b) The claimant also has to establish that the diversion caused significant disruption to its business.

H   (c) Even though it may well be that strictly the claim should be cast in terms of a loss of revenue attributable to the diversion of staff time, nevertheless in the ordinary case, and unless the defendant can establish the contrary, it is reasonable for the court to infer from the disruption that, had their time not been thus diverted, staff would have applied it to activities which would,

directly or indirectly, have generated revenue for the claimant in an amount       A
at least equal to the costs of employing them during that time.

87   In that in the present case the diversion of the time of a significant
number of the claimants' employees, particularly their senior employees,
was set out in detail and adequately established, and in that there could be
no sensible challenge to a conclusion that their business was thereby
disrupted, indeed substantially so, I consider that the judge was entitled to       B
draw the inference that the employees had been diverted from revenue-
generating activities; and accordingly I see no error in his allowance within
the damages for the costs of the employees referable to the diversion.

*The cross-appeal*

88   The subsidiary part of the claimants' cross-appeal was compromised
in the dying moments of the oral argument before us.  It had related first to      C
two awards in relation to continuing losses calculated by the judge to the
date of his judgment, which the claimants contended should be so varied as
to include losses for the further year reflected by the pendency of this appeal.
But it had related in particular to the award of £129,035 reflective of loss of
profits consequent upon the delay in the publication of WAIF 2 from
September 2005 to January 2008 (rounded down by the judge to a period of       D
two years), which, again, the claimants contended should be so varied as to
include loss of profit for a further year of delay until January 2009
consequent upon the appeal.   The compromise is that Thames Water
concede the validity of the latter contention and will submit to a 50%
increase in the award of £129,035, ie to £193,553, and that the claimants
will abandon the other contentions.                                                E

89   The main part of the cross-appeal relates to the judge's award of
interest to the effective date of judgment (agreed to be 21 December 2005
rather than 13 January 2006) pursuant to section 35A of the Supreme Court
Act 1981.  The award was of £15,476.  The claimants contend that it was
gravely deficient.

90   The reasoning behind the judge's award of interest proceeded in the
following way. (a) The judge correctly noted Mr Young's concession that no      F
interest should accrue on the award of £129,035 referable to the delay in the
receipt of profits from September 2005 to January 2008.  Unfortunately,
however, the judge overlooked the concession when shortly thereafter he
turned to make his calculations.  This error, which of course favoured the
claimants rather than vice versa, should be corrected by counsel when they
kindly make the fresh calculations consequent upon our judgments.       G
(b) The judge ruled that, with one exception set out at (c) below, no part of
the award of £2,328,144 referable to restoration of the archive and to the
diminution in value of the artwork should bear interest.  In this regard he
purported to uphold the submissions of Mr Rainey.  But such was not an
entirely accurate representation of Mr Rainey's submissions for he had
conceded that the award of £89,686 referable to the diminution in value of
the artwork should bear interest. (c) The judge's exception to the ruling set      H
out at (b) above related to the component of £135,303 within the figure of
£2,328,144.  This component related to the cost of restoration of such of the
affected photographs as were susceptible of restoration.  The judge ruled
that

A

"But for post-flood impecuniosity this sum should have been part of the special damage and I agree with Mr Young that unless it is supplemented with interest it is likely to prove to be an unrealistic estimate given its age and provenance."

(d) Next, making a trivial arithmetical error, the judge calculated the total part of the award which in his opinion should bear interest. (e) In light of the

B

fact that the losses within the interest-bearing part of the award had accrued at different times between the dates of the flood and of the judgment, the judge decided to calculate interest on all of them from a mid-point between those two dates. (f) The judge also decided to award interest for that period at a rate of 5% p a, being 1% above the base rate which, by averaging, the parties had agreed at 4%. (g) Then, uncontroversially, the judge made

C

allowance for Thames Water's two interim payments to the claimants with effect from their respective dates.

91    The claimants allege that the reasoning of the judge set out above betrays appealable error in the following three areas: (a) in declining to award interest on the whole sum of £2,328,144 referred to at para 90(b) above; (b) in calculating all interest from the mid-point between the dates of the flood and of the judgment, rather than from more precise dates when the

D

respective losses were incurred; and (c) in calculating interest at 1% p a above base rate, rather than at 2·5% p a above base rate.

92    Upon what grounds did the judge decline to award interest on all save £135,303 of the award of £2,328,144?  Without having set out Mr Rainey's argument, the judge said only that he was "correct in principle".    Putting aside for this purpose Mr Rainey's overlooked

E

concession about the award referable to the artwork, one therefore has to turn to see what Mr Rainey had argued.  There is no transcript of the proceedings before the judge conducted by video link on 20 December 2005, at which issues relating to interest, costs and otherwise were canvassed.  But, in his skeleton argument dated 19 December 2005, Mr Rainey had succinctly set out his case as follows:

F

"In the case of archival restoration no loss has been incurred: the award gives to the claimants a fund which does not represent the chattel (as diminution in value would) for a specific future exercise.  No interest is therefore recoverable."

93    In my view there is a fallacy at the heart of Mr Rainey's argument.  It

G

jumps from the true proposition that no remedial costs have yet been incurred to the false proposition that no loss has yet been incurred.  The loss was incurred on 3 July 2001 and the fact that in the end the judge—correctly so we are holding—favoured a computation of most of the loss by reference to the cost of a restoration not yet conducted does not alter the date of the loss.  Informing therefore the judge's exercise of discretion to award interest under section 35A of the 1981 Act should have been "the basic principle . . .

H

that interest will be awarded from the date of loss".  So said Robert Goff J in a passage undisturbed on appeal in *BP Exploration Co (Libya) Ltd v Hunt (No 2)* [1979] 1 WLR 783, 847c; and he proceeded to add: "the mere fact that it is impossible for the defendant to quantify the sum due until judgment has been given will not generally preclude such an award."

94    The basic principle is, of course, not immutable.  Had the evidence enabled him to do so, Mr Rainey might have argued that the costs of restoration included in the award were calculated by reference to figures which obtained in 2005 and thus that an award of interest would duplicate an allowance already built into it.  But he never so argued.  On the contrary it was Mr Young who, as part of his application for an award of interest, argued—apparently without challenge—that such costs were calculated by reference to figures which obtained in 2001 and which had indeed been finally presented to Thames Water as early as 2003.  In the minor area of photographic restoration Mr Young's argument found favour with the judge; but Mr Rainey has not sought to explain to us why the costs of such restoration should have fallen for treatment different from that of the costs of other aspects of the archival restoration.

95    Both before the judge and before us Mr Rainey relied primarily on the decision of this court in *Kaines (UK) Ltd v Osterreichische Warrenhandelsgesellschaft (formerly CGL Handelsgesellschaft mbH)* [1993] 2 Lloyd's Rep 1.  In June 1987 the defendants repudiated a contract to sell the claimants oil for lifting in September 1987 and for payment in October 1987.  The claimants thereupon contracted to buy the oil at a higher price, again for lifting in September 1987 and for payment in October 1987; and in August 1987 they issued their claim against the defendants.  This court held that the trial judge had erred in awarding interest from as far back as the date of the issue of the claim in that it was only in October 1987, when they had paid the higher price, that the claimants had sustained the loss.  In my view this decision is of no value whatever to Mr Rainey; indeed it reinforces the need to focus carefully on the date of loss.  The fact is that, on analysis, Mr Rainey's successful submission to the judge was thoroughly unprincipled: its effect was to reward Thames Water—and conversely to prejudice the claimants—for the delay of over four years which Thames Water had achieved by their resistance to a claim which had a far greater value than they had ever conceded.

96    For the above reasons I conclude that there was an appealable flaw in the judge's discretionary refusal to award interest on the entire figure of £2,328,144; and I propose that the cross-appeal be allowed in that first regard.

97    Part of Mr Rainey's response to the second part of the cross-appeal as to interest is that, in the course of the hearing on 20 December 2005, Mr Young conceded that it would be permissible for the judge to calculate it in the manner to which he now objects, namely from the mid-point between the dates of the flood and of the judgment.  In this regard the lack of a transcript of the proceedings is unfortunate.  Mr Young vehemently and in my view convincingly denies that he conceded—or at the very least intended to concede—that, in relation to his substantially unsuccessful application for interest on the figure of £2,328,144, the calculation should run only from that mid-point.  For, as I have explained, that figure represented loss entirely incurred on the date of the flood.  Even had he made such a concession, however, the circumstances are that the judge made no substantial award of interest in that regard and so did not apply his mid-point to it, with the result that, if, as I propose, we substitute an award in that regard, we are in substance unconstrained from identifying the appropriate starting point, which is indubitably the date of the flood.  In relation, however, to the

757
[2007] Bus LR        Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)
Wilson LJ

A    balance of the interest-bearing components of the total award, it is clear:
(a) that in his written submissions to the judge for the hearing on
20 December 2005 Mr Young conceded that different components of the
loss had been sustained over different periods and that, for all such
components, mid-points within those different periods should be taken as
the starting points of individual calculations of interest; (b) that in the course
B    of the hearing the judge invited counsel's submissions on a broader
approach, namely to effect one composite calculation in relation to all such
components from the mid-point between the dates of the flood and of the
judgment; and (c) that, like Mr Rainey, Mr Young did—as he accepted
before us—concede that the broader approach was permissible. In such
circumstances, as in effect Mr Young now recognises, the claimants can
scarcely press this area of their cross-appeal. Even absent his concession,
C    I would on balance have categorised the judge's approach as permissibly
simple rather than impermissibly crude.

98    I would also dismiss the third part of the cross-appeal as to interest.
The argument in this regard is founded upon evidence placed before the
judge as late as 20 December 2005 itself that between 2001 and 2005 the
claimants had had to borrow at a rate of 2·5% p a above base rate (and
D    indeed subject to payment of an additional risk fee upon which Mr Young
concedes that he cannot rely). Although in the light in particular of the
decision of this court in *Jaura v Ahmed*, The Times, 18 March 2002 the
judge might permissibly have departed from the conventional use of a rate
equal only to 1% above base rate in order to reflect the higher rate at which,
unsurprisingly in the light of the size of their operation, the claimants had
had to borrow, I do not consider that his refusal to depart from it exceeded
E    the bounds of his discretion.

**PILL LJ**

99    I add a few words only on the issue of reinstatement versus market
value. Mr Morse underlined that he was a businessman and viewed the
Aerospace archive as a business asset for business use, and the issue should in
F    my view be approached on that basis. It was an unusual asset, assiduously
built up over many years by a man who combined a commercial motivation
with a deep and sustained enthusiasm for aviation literature.

100    The judge had, and was entitled to have, "an overwhelming
impression of Aerospace as an ongoing aviation oriented organisation with a
reputation and a pride" and Mr Morse, as an "aviation enthusiast", as was
his effective number two.

G    101    It is most unlikely that the archive could be reinstated exactly
because many of the archival items were probably very rare or even unique,
but sustained efforts would probably produce an aviation archive of equal
importance and interest. That is not in issue because the cost of
replacement, as distinct from whether damages should be calculated on a
reinstatement basis, has not been challenged.

H    102    The question is whether reinstatement would make sense
commercially. As Pearson LJ put it in *Darbishire v Warran* [1963] 1 WLR
1067, 1076, a case involving a damaged motor car:

"It is vital, for the purpose of assessing damages fairly between the
plaintiff and the defendant, to consider whether the plaintiff's course of

758
*Aerospace Publishing Ltd v Thames Water Utilities Ltd* (CA)        [2007] Bus LR
Pill LJ

A

action was economic or uneconomic, and if it was uneconomic it cannot
(at any rate in the absence of special circumstances, of which there is no
evidence in this case) form a proper basis for assessment of damages.  The
question has to be considered from the point of view of a businessman."

103   In this case, I would not be prepared, tempting though it would be,
to hold that the rarity and interest of the collection in itself gave it a value in
damages greater than its market value or in itself created a right to damages
on a reinstatement basis.  The measure of damage for a unique or "freak"
article, considered in *Darbishire's* case, does not require consideration in
this case.

104   However, in my judgment, the judge was entitled to conclude, at
para 76:

C

"I find on balance of probability that Mr Morse does have a present
intention to restore so much of the archive as is constituted by
photographic images and reference material, funds permitting.  I find that
any award reflecting diminution in value would be inadequate for that
purpose.  I find that the cost of the restoration as intended by Mr Morse is
reasonable in itself and that viewed objectively it is reasonable to expend
such on that restoration."

D

105   Longmore LJ has analysed in detail the evidence about the
commercial prospects for Aerospace.  I agree with his analysis and with his
conclusion that Aerospace is entitled to recover damages on a reinstatement
basis, as the judge found.  I also agree that the fact that the judge's reasoning
could have been fuller does not affect the ultimate outcome.

106   I agree with Wilson LJ on the issue of staff costs and the issues
which arise on the cross-appeal.

E

*Appeal allowed in part.*

*Solicitors: Lane & Partners LLP; Collyer Bristow.*

B P W

F

B

G

H