UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                           :    Chapter 11 Case No.
                                                :    08-13555 (SCC)
LEHMAN BROTHERS HOLDINGS INC., et al.,           :    (Jointly Administered)
                        Debtors.                :
                                                :
---------------------------------------------------------------x

## DECLARATION OF PHILIP IAN PRICE

I, **PHILIP IAN PRICE**, declare under penalty of perjury, as follows:

1. Between 2006 and 2009 I was the Chief Operating Officer and General Legal Counsel of SRM Advisors (Monaco) SAM, which is in effect an adviser to SRM Global Master Fund Limited Partnership ("**SRM**").

2. I make this declaration in support of the ongoing proceedings between SRM and Lehman Brothers Holding Inc. ("**LBHI**"). I make this declaration based upon my personal knowledge.

3. This declaration is accompanied by a number of exhibits (referred to in the footnotes as "Ex-PP[●]").

**INTRODUCTION**

4. SRM is an investment fund launched in 2006 and based in the Cayman Islands.

5. At the start of 2008, SRM had three prime brokers: Goldman Sachs, UBS and Merrill Lynch. After the collapse of Bear Stearns in February 2008, Merrill Lynch made a series of margin calls. These were met, but it became clear to SRM that Merrill Lynch was not the right broker to provide prime brokerage services to SRM. Accordingly, in or about March and

April 2008, SRM sought a new prime brokerage provider. Fraser McIntyre (SRM's Chief Financial Officer) and I entered into negotiations with representatives of Lehman Brothers International (Europe) ("**LBIE**") for such services.

6. In the aftermath of the Bear Stearns crash, counterparty risk was at the forefront of SRM's considerations and it was important to SRM that it was comfortable that LBIE had adequate insurances and guarantees in place. Prior to entering the Prime Brokerage Agreement ("**PBA**"), SRM asked LBIE representatives about parent company guarantees, insurances and any other assurances in place to protect SRM's assets in the event of LBIE's insolvency.[1]

7. LBIE provided SRM with assurances regarding its credit and protections for SRM in the event of a default by LBIE, which included a CAPCO surety bond and guarantees from its parent, LBHI, to get SRM comfortable with its counterparty risk. SRM was told that LBIE's obligations and liabilities were guaranteed by its parent, Lehman Brothers Holding Inc. and SRM would have recourse to LBHI if LBIE did not meet its liabilities and obligations in full. LBIE followed up after these discussions with copies of the relevant documents, including the CAPCO surety bond and the LBHI guarantee. SRM would not have used LBIE as a Prime Broker if it were not satisfied that adequate safeguards were in place in the event that LBIE defaulted or breached its obligations with respect to the prime brokerage arrangement.

8. In terms of pricing for prime brokerage services, LBIE had two price tariffs. Under one tariff, LBIE would be entitled to rehypothecate freely securities held for SRM. Under the other tariff it would be required to keep segregated SRM's securities at all times. The unsegregated tariff was uncompetitive and SRM would not consent to rehypothecation – this was for two principal reasons: (1) SRM's approach to its investments is proactive: it uses its voting rights where appropriate to safeguard and steer the management of companies in which it invests. Accordingly, it was important to SRM that it was able to use those voting rights. If SRM's securities were rehypothecated, it would have been unable to do so. (2) As explained above, counterparty risk was a real concern and SRM was not prepared to become an unsecured creditor in the event of LBIE's insolvency.

9. LBIE therefore tailored a third option for SRM. LBIE did not have a strong franchise in the prime brokerage market and was keen to have SRM as a high profile client. During a series of telephone negotiations around April and May 2008, Dominic Rieb-Smith (Director, Prime Brokerage Origination) and Ian Maynard (Head of Prime Brokerage Risk) of LBIE's prime

---

[1] Ex-PP1, email from LBIE to White & Case and SRM, RE: SRM Global Fund - equity prime brokerage account opening.

brokerage team agreed that LBIE would charge SRM the lower tariff, provided SRM did not pre-emptively designate its posted securities as excluded from rehypothecation (i.e., Ineligible Positions under the terms of the PBA). If LBIE wanted to rehypothecate SRM's posted securities, it agreed to give SRM notice of the same so that SRM could either elect to permit the rehypothecation or refuse the rehypothecation and designate the securities Ineligible Positions (and accordingly pay a higher tariff for those securities). Brian Bisesi (Lehman's then Head of European Prime Brokerage Sales) was also aware of this agreement.

10. After the PBA was executed, SRM were in near day-to-day contact with LBIE. Representatives of LBIE (including Dominic Rieb-Smith) repeatedly assured SRM that LBIE had not rehypothecated any of SRM's assets and would not rehypothecate any of SRM's securities without providing notice to SRM to allow SRM an opportunity to exclude such assets from rehypothecation. In other words, SRM were consistently assured that LBIE was honouring the parties' agreement for LBIE not to rehypothecate or otherwise dispose of SRM's posted assets without first providing notice to SRM and giving SRM an opportunity to prevent any rehypothecation and designate the securities Ineligible Positions pursuant to the PBA.

11. On 12 September, in light of market rumours that Lehman was on the brink of insolvency, SRM met with Dominic Rieb-Smith and Ian Maynard. LBIE confirmed at that meeting that the agreement was being honoured and none of SRM's stocks had been, or would be, rehypothecated.

12. On 15 September 2008, Lehman went into administration. Concerned that LBIE may have sought to rehypothecate SRM's assets to prop up LBIE's own liquidity position in the days before its administration, or that there was risk of LBIE or the Administrators comingling SRM's assets with those of other creditors, SRM wrote to LBIE on 15 September 2008 to reiterate that all of SRM's assets should be segregated and not rehypothecated or otherwise disposed of by LBIE.[2]

13. That same day, SRM were advised by Dominic Rieb-Smith and James Scully of LBIE that, at the very least, SRM's Virgin Media shares were still being held by LBIE for SRM. This was confirmed on 16 September 2008 by Gunner Burkhart (Head of European Prime Brokerage at LBIE) in a telephone call with Jon Wood, Ian Barclay and me and also separately by Dominic Rieb-Smith who informed SRM that though its 5,094,060 Virgin Media shares remained

---

[2] Ex-PP2, letter from SRM to LBIE dated 15 September 2008.

segregated and custodied with Lehman Brothers Inc., some of SRM's other stocks had been rehypothecated.

I declare under the penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Signed: *[signature]*

**PHILIP IAN PRICE**

4 July 2016