UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | 08-13555 (SCC) |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

───────────────────────────────x

## DECLARATION OF JONATHAN WOOD

I, **JONATHAN WOOD**, declare under penalty of perjury, as follows:

1. I am an investor with over 30 years' experience in equity trading, risk arbitrage, and derivatives. I began my career at Wedd Durlacher, later moving to Kleinwort Benson, and then UBS, where I ran a global proprietary investing desk for approximately 16 years. In 2006, I formed SRM Global Master Fund Limited Partnership ("**SRM**"), raising $3 billion of initial funds. Since its formation in 2006, I have served as the Chief Investment Officer of SRM. SRM is an investment fund incorporated and based in the Cayman Islands. SRM's fund was managed by SRM Fund Management (Cayman) Limited and the manager was advised by SRM Advisers (Monaco) SAM.

2. I make this declaration in support of the ongoing proceedings between SRM and Lehman Brothers Holding Inc. ("**LBHI**"). I make this declaration based upon my personal knowledge.

3. This declaration is accompanied by a number of exhibits (referred to in the footnotes as "Ex-JW[●]").

**A. INTRODUCTION**

4. In March 2008, SRM decided to explore the possibility of opening a prime brokerage relationship with Lehman Brothers International (Europe) ("**LBIE**"). SRM already held prime brokerage accounts with UBS, Goldman Sachs, and Merrill Lynch but was dissatisfied with Merrill Lynch and was looking for a replacement prime broker. We were persuaded by LBIE's assurances that, because LBIE was a relative newcomer to the prime brokerage market, SRM would be one of its most important clients.

5. A period of negotiation between SRM and LBIE followed, between March 2008 and early May 2008. These negotiations were principally handled by Philip Price for SRM (then General Counsel and Chief Operating Officer) who was assisted by Fraser McIntyre (SRM's Chief Financial Officer). Whilst these negotiations were ongoing, I participated in a number of high level discussions with Gunnar Burkhart (Head of European Prime Brokerage at LBIE) and Mark Rutherford (Head of European Sales at LBIE). During these discussions, SRM made clear that because its investment strategy often involved being an activist shareholder, our assets were not available for re-hypothecation – this was a 'redline' issue for SRM and was accepted by Mr Burkhart and Mr Rutherford.

6. Once the negotiations had been concluded, Mr Price informed me that he had conducted the necessary due diligence on LBIE, was satisfied with the assurances received from the LBIE team (particularly in respect of counterparty and operational risk), and that it was safe to proceed with engaging LBIE. On 9 May 2008, SRM signed a number of agreements with LBIE to establish the prime brokerage relationship. These included an International Prime Brokerage Agreement ("**PBA**"), a Cross Margining and Netting Agreement ("**CMNA**"), a Master International Futures Customer Agreement ("**MIFCA**") and an ISDA Master Agreement (the "**ISDA Agreement**").

7. Put simply, the PBA set out the terms upon which LBIE was appointed as SRM's prime broker and, in particular, how SRM's assets placed in the prime brokerage account were to be dealt with. Since the PBA and other agreements involved SRM and LBIE having exposure to each other, LBIE required SRM to provide net margin cover across all of the agreements. This net margin cover was calculated by LBIE under the CMNA and notified to SRM on a daily basis by way of a "margin notice". As I explain below, these margin notices were very important. Though SRM was able to monitor its positions on a daily basis and estimate the net margin cover which LBIE would require, LBIE's margin requirement calculations involved exercising discretion as to the marginability of the stocks. Given that element of discretion, SRM could not predict with certainty what net margin cover would be required by LBIE. The requirement to provide margin cover is industry standard for prime brokerage relationships and, as I discuss further below, during the relevant period SRM also had to meet margin requirements from its other prime brokers (UBS and Goldman Sachs).

8. After signing these agreements, SRM began trading equities and securities through LBIE. Although the volume frequently changed, as at August 2008, 30.7% of SRM's absolute positions and 61% of its net exposure was held via LBIE.

9. Between execution of the PBA on 9 May 2008 and LBIE's entry into administration (on 15 September 2008), at no time did LBIE provide notice of any intention to re-hypothecate or otherwise dispose of any of SRM's assets. Indeed, during this period it was SRM's continued understanding that LBIE was holding SRM's assets, including posted securities, in a segregated account and would not seek to re-hypothecate or dispose of any such assets without first providing notice to SRM and giving SRM an opportunity to prevent any re-hypothecation or disposal by LBIE of SRM's assets. This understanding was based, in part, upon discussions between Mr Price and Mr McIntyre and Dominic Rieb-Smith (Director, Prime Brokerage Origination at LBIE) both before and after execution of the PBA (as reported to me). I understand that during the course of these discussions Mr Rieb-Smith assured Mr McIntyre on multiple occasions that LBIE had not, and would not, re-hypothecate SRM's assets without prior notice or approval from SRM. It was also based upon a discussion that I had with Mr Burkhart in early September, during which he confirmed SRM's assets had not been re-hypothecated.

B. **LBIE'S ADMINISTRATION**

10. On 12 September 2008, Mr McIntyre met with Mr Rieb-Smith and Ian Maynard (Head of Prime Brokerage Risk at LBIE) to discuss counterparty risk in light of the rumours that Lehman Brothers would file for bankruptcy protection in the United States. SRM wanted to confirm that if there was an insolvency event, its assets would be protected. During that meeting, LBIE told SRM that SRM's assets remained segregated and had not been re-hypothecated. LBIE also reassured SRM that the rumours about Lehman Brothers were unfounded. Notwithstanding these assurances, those rumours proved to be true and, on 15 September 2008, LBHI filed a Chapter 11 petition in the United States. That same day, LBIE entered administration.

11. At the time of LBIE's administration, SRM had various open long and short positions with LBIE pursuant to the PBA, as well as cash accounts (both in credit and debit positions) under the ISDA Agreement. Although SRM understood that these positions were segregated and had not been re-hypothecated, SRM was very concerned to ensure that these positions were properly protected from LBIE's administration and re-delivered to SRM as soon as possible. For this reason, as set out more fully below, SRM served a number of notices under the various agreements and sought to raise these issues directly with our contacts at LBIE.

C. **SRM TAKES STEPS TO PROTECT ITS POSITIONS UNDER THE AGREEMENTS**

3

12. On the day of LBIE's administration, SRM wrote to LBIE requiring it to segregate, to the extent it had not already done so, all of SRM's assets.[1] That same day, SRM was advised by Mr Rieb-Smith and James Scully of LBIE that, at a minimum, SRM's 5,094,060 Virgin Media shares were still being held by LBIE for SRM. Mr Burkhart confirmed this to be the case in a telephone call with myself, Ian Barclay, and Mr Price on 16 September 2008. Separately, Mr Rieb-Smith also informed SRM that whilst its Virgin Media shares remained segregated and custodied with Lehman Brothers Inc., some of SRM's other stocks had been re-hypothecated.

13. Following these conversations, and given the deteriorating market conditions, the management of SRM, including myself, decided that it was necessary to take further steps to protect the fund's position both under the PBA and SRM's other agreements with LBIE. Therefore, on 18 September 2008, SRM gave notice of termination of the ISDA Agreement and, the following day, provided a valuation of the amounts outstanding under that contract, with $48,398,612 owed by LBIE to SRM. This valuation was subsequently revised by SRM to $49,389,923.

14. Then, on 19 September 2008, SRM requested that LBIE return the segregated assets to its prime brokerage account at UBS (the "**Delivery Notice**").[2] Although SRM received a letter from Linklaters (acting on behalf of the Joint Administrators of LBIE) addressing the Delivery Notice some weeks later, in the meantime we were left completely in the dark as to the status of SRM's substantial positions held through LBIE.

15. Of course, during this time, I and the SRM management team were acutely aware that SRM had continuing exposure to LBIE in relation to open positions under the PBA. This continuing exposure was onerous – the market at that time was in a state of flux and prone to violent swings; the risk of incurring losses many times the value of the fund was real and one which we had to be alive to. On 22 September 2008 we calculated our exposure under the PBA (based on the then prevailing Bloomberg prices) to be $22,943,476.[3] In order to prevent incurring further exposure towards LBIE under the PBA (or CMNA), SRM decided to exercise its right to set-off this PBA exposure against the amounts owed to it under the ISDA Agreement (the "**Set-off Notice**").[4]

16. As far as we were aware, the effect of the Set-off Notice was to offset the $22,943,476 due to LBIE under the PBA against the $49,406,007.23[5] owed to SRM under the ISDA Agreement, resulting in SRM being a net creditor in the amount of $26,462,531.23. Having effected the set-

---

[1] Ex-JW1, letter from SRM to LBIE dated 15 September 2008. In requesting that LBIE segregate all of SRM's assets, SRM was reiterating and seeking to confirm its understanding, based on prior representations made by LBIE to SRM, that all of SRM's assets were segregated and had not been re-hypothecated by LBIE.

[2] Ex-JW2, letter from Clifford Chance to LBIE dated 19 September 2008.

[3] Ex-JW3, Appendix 1 to letter from SRM to LBIE dated 26 September 2008.

[4] Ex-JW3, letter from SRM to LBIE dated 26 September 2008.

[5] This figure comprised the amount owed ($49,389,923) plus interest of $16,084.23.

4

off, we reasonably believed that no positions would remain open under the PBA (and thus, that no further liability under either the PBA or the CMNA would accrue).[6] As I have said, this was important given the volatile market conditions – any open positions could have represented a material risk to the fund and its investors. In addition, in the Set-off Notice, we again requested that LBIE return SRM's segregated assets (including 5,094,060 Virgin Media Inc. shares not employed for the purposes of the set-off) and margin cover provided pursuant to the MIFCA.[7]

**D.    LBIE FAILS TO RETURN SRM'S ASSETS OR SERVE MARGIN NOTICES**

17. SRM continued to press for the return of its assets throughout October 2008 and explained the substantial impact that LBIE's failure to do so was having on SRM's business (which I describe further below). However, LBIE did not return SRM's assets, alleging it could not do so because it was faced with a number of practical difficulties and because a potential event of default under the PBA had occurred, which (in its view) meant its obligation to redeliver the assets was qualified.

18. Just as significantly, from the day of LBIE's entry into administration, LBIE failed to provide any of the daily margin notices it was supposed to provide under the CMNA. No explanation was provided by LBIE for the failure to provide these margin notices. As I explain further below, had valid margin notices been served, it would quickly have become apparent to SRM that the set-off was not accepted by LBIE and, therefore, any further deterioration of SRM's position (which SRM believed it had closed out) would have been prevented.

19. Then, on 30 October 2008, SRM received a phone call from Mr Burkhart, who forewarned us that SRM would be receiving something from LBIE's Joint Administrators. Shortly afterwards, LBIE sent SRM a margin notice (the "**Margin Notice**") showing a margin deficit of $364,300,000 and a margin requirement of $101,800,000.[8] This was the first margin notice received from LBIE since 12 September 2008.

20. We were shocked by the Margin Notice. As I have explained, so far as we were concerned, no positions remained open after the set-off on 22 September 2008. Whilst there was a dispute with LBIE as to (a) the amount outstanding and (b) what LBIE was obliged to deliver up to SRM, in the absence of any communication to the contrary, we assumed that the set-off had been validly effected. We could only infer from the Margin Notice that (despite never previously notifying us of the fact) LBIE regarded the set-off as invalid with the consequence that, as markets

---

[6]   This assumption was confirmed, to my mind, by the fact that LBIE did not subsequently deliver any Margin Notices (until the notice of 30 October 2008) – there would have been no need to deliver such notices where there were no open positions under the PBA.

[7]   Ex-JW3, letter from SRM to LBIE dated 26 September 2008. The Virgin Media shareholding is set out in Appendix 2 together with a dividend on those shares in the amount of $142,634.

[8]   Ex-JW4, email from Linklaters to SRM dated 30 October 2008.

5

deteriorated dramatically, so did SRM's positions. Under the terms of the Margin Notice, SRM went from being a net creditor of LBIE on 22 September 2008, in the amount of $35,356,181.23 (plus Virgin Media shares and dividends), to being a net debtor in the amount of $101,800,000.

21. For this reason, on receipt of the Margin Notice I immediately tried to contact Mr Burkhart at LBIE to clarify the effect of the notice. I could not reach him and we were only able to speak to him the following day. During that conversation I told him that SRM had effected a set-off on 22 September 2008. Mr Burkhart was not aware of this and said he had to check. Later that day, he called back and, in a conference call with the senior management of SRM (including myself), stated that he was not in charge of the situation and that he did not have access to all the details, but that he was not sure that the set-off had been accepted by LBIE. Mr Burkhart was apologetic and explained that he did not understand or agree with the position that LBIE was adopting.

### E. TERMINATION OF THE PBA

22. The Margin Notice put SRM in a very difficult position – the claimed debt would have put SRM in a very serious financial position, and, in a deteriorating market, it was likely that the margin requirement would only have increased further (exposing SRM to increased liability) if SRM did not take active steps to close out the positions LBIE alleged remained open. Given our duties to the fund and its investors, the senior management of SRM held a number of Board meetings and took advice on this issue. Ultimately, we concluded that, while SRM's set-off of 22 September 2008 was valid (and, therefore, that the Margin Notice was completely wrong), the risk posed by the position adopted by LBIE was so great that SRM was obliged – as a result of LBIE's actions, not least the provision of the erroneous Margin Notice – to terminate the PBA in reliance upon LBIE's administration as an event of default.

23. Accordingly, on 6 November 2008, SRM sent LBIE a Notice of Default under the PBA[9] and a Notice of Termination of the PBA.[10]

### F. THE IMPACT OF LBIE'S ACTIONS ON SRM

24. LBIE's actions had a significant impact on SRM. Indeed, it nearly destroyed SRM's business. In particular, I set out below: (a) the impact of the failure to serve margin notices and the provision of the incorrect Margin Notice; and (b) the impact of the failure to segregate and to re-deliver SRM's assets.

*The impact of the failure to provide margin notices and the provision of the incorrect Margin Notice*

---

[9] Ex-JW5, first letter from SRM to LBIE dated 6 November 2008.
[10] Ex-JW6, second letter from SRM to LBIE dated 6 November 2008.

6

25. The provision of daily margin notices is fundamental to the functioning of a hedge fund such as SRM. A margin notice tells the fund either that it has provided to the prime broker insufficient collateral or that it has provided excess collateral. It therefore permits (or requires) the hedge fund to manage its portfolio (as well as enabling the prime broker to manage its own risk exposure). Without margin notices, the hedge fund's ability to manage its portfolio is severely restricted. This is particularly so in volatile market conditions, where open positions are at risk of rapidly deteriorating, resulting in massive exposure. Accordingly, LBIE's failure to provide margin notices from 15 September 2008 until 30 October 2008 had a significant adverse impact on SRM's business.

26. If a proper margin notice had been provided in late September 2008 it would have been immediately apparent to SRM that LBIE rejected the validity of the set-off of 22 September 2008. On discovering this fact, SRM's reaction would have been the same as it was in November 2008 – the risk exposure would have necessitated terminating the PBA. Crucially, SRM would indisputably have been a net creditor to LBIE had the PBA been terminated in late September 2008. At this time, while markets had deteriorated, prices were nothing like as bad as they had become by early November 2008. Therefore, any dispute between SRM and LBIE would have centred on the amount by which SRM was in credit.

27. However, LBIE's failure to serve timely margin notices resulted in (to LBIE's mind) massive margin liability having accrued by the time the Margin Notice was eventually provided. As I have explained above, the Margin Notice included a margin requirement of $101,800,000. This radically altered the nature of the dispute into one upon which the very future of the fund depended.

28. Of course, a dispute of this nature could also have been avoided had the Margin Notice itself been accurate. ███████████████████████████████████████████████████████████████████████████████████████████████████ An accurate Margin Notice would not, therefore, have shown a margin requirement of $101,800,000 and the subsequent dispute between SRM and LBIE would have been very different.

29. As it was, the failure to provide margin notices and the provision of the incorrect Margin Notice resulted in a dispute between SRM and LBIE (lasting for over three years) as to whether SRM was a creditor to the tune of hundreds of millions of dollars or whether it was a debtor for a similarly large amount. As I have already noted, this was a dispute upon which the future of the fund depended and its significance meant that very large amounts of management time were devoted to it.

7

30. When considering the loss arising from diverted management time it is important to remember that SRM's business consists of investigating companies whose securities are mispriced and taking positions in those companies. This requires, on average, 50 to 100 hours of management time to investigate properly before a position is initiated. It is also crucial to appreciate that whilst SRM is a large fund in monetary terms, it did (and does) operate with a small core of staff. In particular SRM had, at the time, just three investment professionals (including myself and Mr Barclay). Before the issues with LBIE, Mr Barclay and I spent all of our time concentrating on investment opportunities and raising money from investors. In the months immediately following LBIE's administration, we were forced to devote all of our time to dealing with the dispute with LBIE and the fallout (which included a significant number of concerned investors who wanted to redeem their investments). The fund was effectively paralysed at a time when it could (and should) have been focussing exclusively on trading in a market with unprecedented opportunities for investments in mispriced securities. Even after these several months of paralysis, we were still required to spend considerable amounts of time dealing with the LBIE dispute meaning that our ability to investigate and initiate new positions, as well as raise new money for investment, was substantially impaired.

31. In addition to this lost management time, after service of the Margin Notice (and during the subsequent dispute with LBIE), the fund was required to pursue a much more cautious investment strategy than it otherwise would have done.

***The impact of the failure to segregate and re-deliver SRM's assets***

The Virgin Media Inc. shares

32. As I have explained above, following the Set-off Notice and Delivery Notice, SRM was expecting LBIE to re-deliver its 5,094,060 Virgin Media shares. LBIE never returned these shares and this caused substantial loss to SRM. By the time ▮▮▮▮ the value of these shares had increased from approximately $65.4 million to $264,268,340.60.

33. That valuation arises from Liberty Global plc.'s acquisition of Virgin Media in June 2013. Under the terms of that acquisition, each share of Virgin Media was exchanged for $17.50 in cash, 0.2582 Class A shares of Liberty Global ("**LBTYA Shares**") and 0.1928 Class C shares of Liberty Global ("**LBTYK Shares**"). Accordingly, the 5,094,060 Virgin Media shares belonging to SRM were converted on or about 7 June 2013 into $89,146,050, 1,315,286.292 LBTYA Shares and 982,134.768 LBTYK Shares. If LBIE had returned these shares to SRM ▮▮▮, in addition to the $89,146,050 in cash (exclusive of interest), SRM would have received LBTYA Shares with a

8

then-current total value of $102,434,496.42 and LBTYK Shares with a then-current total value of $72,687,794.17.

34. I understand that SRM's (converted) Virgin Media shares were sold by LBIE on or around November 2013.

The forced sale of North American positions

35. Furthermore, LBIE's failure to either (i) re-deliver the Virgin Media shares (and other securities posted by SRM) or (ii) provide cash in place of delivery (so that SRM could procure replacement Virgin Media shares on the market) meant that SRM was unable to use those shares as collateral to reduce its margin requirements at its other prime brokers (UBS and Goldman Sachs). Instead, SRM was forced to sell assets to meet those requirements, assets which it would otherwise have retained and which have appreciated substantially in value.

36. From 15 September 2008 onwards, as the mark-to-market values of each of its portfolios deteriorated in light of the turmoil in the financial markets caused by, among other things, Lehman's bankruptcy, SRM faced numerous margin calls from UBS and Goldman. Ordinarily, SRM would have met the margin requirements from excess collateral held at other prime brokers or through stock sales.

37. On 15 September and daily thereafter, SRM reviewed its positions at all three of its prime brokers and determined which shares were likely to perform more strongly over the long term. SRM examined its positions on a stock-by-stock basis and found that, generally speaking, certain North American shares were expected to perform better than the European shares. For that reason, if we had been able to manage the fund's margin requirements as we would have liked, SRM would have sold its European positions and retained those North American positions.

38. In line with that strategy, between 18 and 22 September 2008, SRM sold most of its European positions held through UBS and Goldman Sachs. In particular, on 18 September 2008, SRM sold its stock in Atos Origin, Eurazeo, Friends Provident Group and Parmalat. By 22 September 2008, SRM's only remaining European stock held through UBS and Goldman Sachs was its VW positions.

39. However, SRM was still facing margin calls from UBS and Goldman Sachs. Had LBIE returned the Virgin Media shares (unencumbered after SRM's set-off), these shares could have been posted as collateral with UBS and Goldman Sachs. This would have resulted in the margin calls being substantially less severe – the Virgin Media shares were a valuable asset. Alternatively, if LBIE had opted to pay SRM cash instead of redelivering the Virgin Media shares, that cash

9

could have been used to go towards meeting margin calls (or procuring securities to post as collateral) at other prime brokerages.

40. The failure of LBIE to do this meant that (after exhausting its European positions) SRM was also required to sell some of its North American stocks in order to meet the margin calls. SRM decided to sell different volumes of North American shares across its portfolio as the need to meet daily margin calls arose (rather than selling all of its holdings in a particular stock at once). Between 19 September 2008 and 6 October 2008 SRM sold: 700,000 shares in Assured Guaranty, 3.469 million shares in Hudbay Minerals, and 7.925 million shares in Virgin Media Inc. These duress sales were effected at extremely disadvantageous prices and, but for LBIE's conduct, would not have been made at all.



---

[11] Ex-JW7, letter from LBIE to SRM dated 29 August 2009.

43. 

I declare under the penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Signed: ..................................

JONATHAN WOOD

Dated 5 July 2016