UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : | **08-1355 (SCC)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

## EXPERT OPINION OF LORD COLLINS OF MAPESBURY

**I, Lawrence Antony Collins, Lord Collins of Mapesbury, of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG, affirm as follows:**

1.    I have been asked by White & Case to give a legal opinion on English law in relation to these proceedings.

2.    I propose to set out (1) my instructions, including the documents which I have been asked to consider; (2) my qualifications; (3) conflict of laws issues and my role as an expert; and (4) my views on the questions of (A) contractual interpretation and (B) damages which I have been asked to consider.

3.    In the course of this opinion I shall refer to decisions of the English courts, which are included in the Appendix to this opinion (as "LC/1" etc). Some of these decisions are very lengthy and only extracts have been included in the Appendix. In such cases I have satisfied myself that there is nothing in that part of the decision which has been omitted which affects the material which has been reproduced in the Appendix.

**I    Instructions**

4.    I have been asked to give an opinion on (A) the principles of contractual interpretation in English law and (B) the recoverability in English law of damages for loss of profits caused by disruption of management time.

5.    I have been provided with: (1) the proof of claim by SRM Global Master Fund LP dated September 18, 2009; (2) The Plan Administrator's Objection to Claim No 29606 dated May 20, 2016, and proposed order; (3) the declaration of Sir John Chadwick made in these proceedings on May 18, 2016, together with the documents to which he refers.

## II    Qualifications and disclosure

*Qualifications*

6.    I received my legal education at Cambridge University (BA (Law), 1963, First Class with Distinction; LLB (International Law), 1964, First Class); and Columbia University Law School (LLM 1965).

7.    I qualified as a solicitor in 1968, and practised in the field of international litigation until 2000, when I was appointed to be a judge of the Chancery Division (as Mr Justice Lawrence Collins), and subsequently of the Commercial Court. In 2007 I was appointed to be a member of the Court of Appeal (as Lord Justice Lawrence Collins).

8.    In April 2009 I was appointed a Lord of Appeal in Ordinary (as Lord Collins of Mapesbury), i.e. a member of the appellate committee of the House of Lords, then the highest court in the United Kingdom, the functions of which were taken over by the Supreme Court of the United Kingdom on its inauguration in October 2009, and of which I became a member until I reached the compulsory age of retirement in 2011. I continued to sit on an occasional basis in the UK Supreme Court and in the Privy Council (which hears appeals from, at the risk of over-simplification, British territories and certain independent Commonwealth states) until I reached the age of 75 earlier this year.

9.    Since my retirement as a judge, my principal activity has been as an international arbitrator. In addition, I have since 2011 been a Professor of Law at University College London. I am Chairman of the Takeover Appeal Board, having been previously its Vice-Chairman. I serve as a non-permanent judge of the Hong Kong Court of Final Appeal. I have been a visiting professor at Columbia University Law School (2012, 2013) and am now a visiting professor at New York University Law School.

10.    Since 1987 I have been the general editor of Dicey and Morris (now Dicey, Morris and Collins) on the Conflict of Laws, the leading work in that field in the British Commonwealth, the most recent edition (the 15th edition) of which was published in 2012. I am also the author of numerous published works, mainly on the conflict of laws and public international law.

11.   In 1994 I was awarded the degree of Doctor of Laws by Cambridge University for distinction by original contribution to the science or study of law. I am an elected Fellow of the British Academy, and an elected member of the Institut de droit international. I am also a member of the American Law Institute. I am an honorary and emeritus Fellow of Wolfson College, Cambridge and an honorary Fellow of Downing College, Cambridge.

*Lehman Brothers cases*

12.   I should mention that I have been a member of the panels of the UK Supreme Court which decided two Lehman Brothers cases (in the first of which I wrote the main judgment, and in the second of which I wrote a short judgment concurring with the majority) which have, so far as I am aware, no connection with the issues with which my instructions are concerned. *Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd* [2011] UKSC 38, [2012] 1 AC 383 involved the effect of the Lehman bankruptcy of agreements which altered priority over collateral in the special purpose vehicle, Lehman Bros Special Financing Inc. *Lehman Brothers International (Europe) v CRC Credit Fund Ltd* [2012] UKSC 6, [2012] Bus LR 667 was concerned with the effect on client monies held by LBIE  of the Client Assets Sourcebook ("CASS 7") issued by the Financial Services Authority under the Financial Services and Markets Act 2000.

**III  Conflict of laws issues and the role of an expert**

13.   There are two conflict of laws issues which arise in connection with this opinion.

14.   The first issue arises from the fact that it is accepted that all relevant agreements are governed by English law. It follows from my own understanding of conflict of laws rules in the United States that questions of interpretation are governed by English law. But it does not follow that the expert on the law governing the contract gives evidence on the meaning of the contract.

15.   The role of an expert on foreign law is to give evidence on the content of that law, and not to apply that law to the facts of the case, which is exclusively a matter for the judge (or, where appropriate, as sometimes in the United States, the jury).

16.   My understanding is that English law and United States law are the same on this point.

17.  That is the position in English law: "… the expert merely proves the foreign rules of construction, and the court itself, in the light of these rules, determines the meaning of the documents … the proper role of the expert is to prove the rules of construction of foreign law but not to assume the court's function in applying those rules" (Dicey, Morris and Collins, *Conflict of Laws*, 15th ed 2012, para 9-019 and n. 100).[1]

18.  This was confirmed in a decision earlier this year of the Privy Council in an appeal from the Court of Appeal of Gibraltar arising from the Madoff affair, in which I was the author of the opinion, and in which I also referred to the United States law on the point. In that case, *Vizcaya Partners Ltd v Picard* [2016] UKPC 5, [2016] Bus LR 413,[2] the Privy Council said (at para [60]):

> "Where the applicable law of the contract is foreign law, questions of interpretation are governed by the applicable law. In such a case the role of the expert is not to give evidence as to what the contract means. The role is 'to prove the rules of construction of the foreign law, and it is then for the court to interpret the contract in accordance with those rules': *King v Brandywine Reinsurance Co* [2005] 2 All ER (Comm) 1, para 68; *Dicey*, paras 9–019 and 32–144 ('the expert proves the foreign rules of construction, and the court, in the light of these rules, determines the meaning of the contract').[5]
>
> 5. The law is the same in the United States: see *Wright, Miller etc, Federal Practice and Procedure* , section 2444 ('The purpose of an expert witness in foreign law is to aid the court in determining the content of the applicable foreign law, not to apply the law to the facts of the case')."

19.  For those reasons I have, rightly, not been asked to give my views on the opinion of Sir John Chadwick on the meaning of the contractual documents. It should not, therefore, be assumed that I agree with them.

20.  The second point on the conflict of laws arises from the fact there is an issue between the parties in these proceedings on the sufficiency of the pleading of the claim to damages in the proof of claim. I understand that it is accepted in these proceedings that the question of recoverability of damage depends on English law.

21.  But it is a general principle of the conflict of laws both in England and the United States that questions of procedure are governed by the law of the forum: see Dicey,

---

[1] LC/33
[2] LC/1

Morris and Collins, *Conflict of Laws*, 15th ed 2012, para 7R-001;[3] American Law Institute, *Restatement Second, Conflict of Laws*, sections 122 (general principle), 127 (pleading), 135 (sufficiency of evidence).[4] I will revert to this point in Part B of Section IV below.

## IV   English law

## A   Interpretation of contracts

*Introduction*

22.   Although the basic principles have been settled since the 19th century, the modern approach to the interpretation of contracts has been the subject of development and elucidation in recent years in several important decisions of the House of Lords Appellate Committee, and its successor, the Supreme Court of the United Kingdom, which replaced the House of Lords in October 2009 as the highest appellate court.

23.   By way of preface, the obvious should perhaps be emphasised, namely that the vast majority of contracts are clear on their face and need no elaborate process of interpretation, and that the case law has grown up in relation to situations in which, for a variety of reasons, a contract is unclear or has otherwise not effectuated the intentions of the parties.

*Basic principle*

24.   The over-riding object of contractual interpretation is to give effect to the intention of the parties objectively established.

25.   The principles have most recently been re-stated by Lord Neuberger in *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619, at paras [15]-[22],[5] where he emphasised the following points:

(1)   When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean"

---

[3] LC/33
[4] LC/34
[5] LC/2

(*Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] AC 1101, at para [14],[6] per Lord Hoffmann).

(2) Reliance on commercial common sense and surrounding circumstances should not be invoked to undervalue the importance of the language of the provision which is to be construed.

(3) The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, except perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision.

(4) Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.

(5) When it comes to considering the centrally relevant words to be interpreted, the less clear they are, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. But that does not justify the court embarking on an exercise of searching for, or constructing, drafting infelicities in order to facilitate a departure from the natural meaning.

(6) The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language. Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made.

(7) A court should be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight.

(8) The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed. When interpreting a contract a

---

[6] LC/3

judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

(9) When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Because a contract is a bilateral arrangement involving both parties, it is not right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.

26. In *Bank of Credit and Commerce International SA v Ali* [2001] UKHL, [2002] 1 AC 281, at para [8],[7] Lord Bingham stated the principle in these terms:

"In construing this provision, as any other contractual provision, the object of the court is to give effect to what the contracting parties intended. To ascertain the intention of the parties the court reads the terms of the contract as a whole, giving the words used their natural and ordinary meaning in the context of the agreement, the parties' relationship and all the relevant facts surrounding the transaction so far as known to the parties. To ascertain the parties' intentions the court does not of course inquire into the parties' subjective states of mind but makes an objective judgment based on the materials already identified."

*Natural meaning*

27. The starting point is, of course, the natural meaning of the language used by the parties. In *Prenn v Simmonds* [1971] 1 WLR 1381, at 1385,[8] Lord Wilberforce said:

"The words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get 'agreement' and in the hope that disputes will not arise. The only course then can be to try to ascertain the 'natural' meaning."

28. In the vast majority of cases the ending point will also be the natural and ordinary meaning of the words of the contract: "the enquiry will start, and usually finish, by asking what is the ordinary meaning of the words used": *Charter Reinsurance Co Ltd v Fagan* [1997] AC 313, 384[9] per Lord Mustill.

*Surrounding circumstances and commercial common sense*

---

[7] LC/4
[8] LC/5
[9] LC/6

29.  But that does not necessarily mean that a literal interpretation divorced from context or from the surrounding circumstances will be adopted. In *Prenn v Simmonds, ante,*[10] the House of Lords adopted the approach of Cardozo J in the New York Court of Appeals (who in turn had cited English textbook authority).

30.  Lord Wilberforce said (at 1383-1384):

> "... The time has long passed when agreements ... were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. There is no need to appeal here to any modern, anti-literal, tendencies, for Lord Blackburn's well-known judgment in *River Wear Commissioners v. Adamson* (1877) 2 App Cas 743, 763 provides ample warrant for a liberal approach. We must, as he said, inquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view.
>
> ...
>
> I may refer to one other case, to dispel the idea that English law is left behind in some island of literal interpretation. In *Utica City National Bank v. Gunn* (1918) 118 N.E. 607 the New York Court of Appeals followed precisely the English line. Cardozo J. in his judgment refers, at p. 608, to 'the genesis and aim of the transaction' citing *Stephen's Digest of the Law of Evidence* and *Wigmore on Evidence*. Surrounding circumstances may, he says, 'stamp upon a contract a popular or looser meaning' than the strict legal meaning, certainly when to follow the latter would make the transaction futile. 'It is easier to give a new shade of meaning to a word than to give no meaning to a whole transaction.' ..."

31.  Consequently in *Antaios Compania Naviera SA v Salen Rederierna AB* [1985] AC 191, at 201,[11] Lord Diplock took the opportunity of re-stating that: "if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common-sense, it must be made to yield to business common-sense." See also *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, at para 16;[12] *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900, at para 21.[13]

---

[10] LC/5
[11] LC/7
[12] LC/3
[13] LC/8

32. The same essential point has been put in different ways. Thus in *Arbuthnott v Fagan* [1995] CLC 1396, at 1400,[14] Sir Thomas Bingham MR said:

> "Courts will never construe words in a vacuum. To a greater or lesser extent, depending on the subject matter, they will wish to be informed of what may variously be described as the context, the background, the factual matrix or the mischief. To seek to construe any instrument in ignorance or disregard of the circumstances which gave rise to it or the situation in which it is expected to take effect is in my view pedantic, sterile and productive of error. But that is not to say that an initial judgment of what an instrument was or should reasonably have been intended to achieve should be permitted to override the clear language of the instrument, since what an author says is usually the surest guide to what he means. To my mind construction is a composite exercise, neither uncompromisingly literal nor unswervingly purposive: the instrument must speak for itself, but it must do so in situ and not be transported to the laboratory for microscopic analysis."

33. In *Sirius International Insurance Co v FAI General Insurance Ltd* [2004] UKHL 54, [2004] 1 WLR 3251[15] Lord Steyn said, at paras [19]-[20]:

> "There has been a shift from literal methods of interpretation towards a more commercial approach. ... In *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, 771, I explained the rationale of this approach as follows:

> 'In determining the meaning of the language of a commercial contract ... the law ... generally favours a commercially sensible construction. The reason for this approach is that a commercial construction is more likely to give effect to the intention of the parties. Words are therefore interpreted in the way in which a reasonable commercial person would construe them. And the standard of the reasonable commercial person is hostile to technical interpretations and undue emphasis on niceties of language.' "

34. More recently in the UK Supreme Court, in *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900, at paras [14] and [21],[16] Lord Clarke of Stone-cum-Ebony said:

> "... the ultimate aim of interpreting a provision in a contract, especially a commercial contract, is to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant.

---

[14] LC/9
[15] LC/10
[16] LC/8

...

> The language used by the parties will often have more than one potential meaning. ... [T]he exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other."

35. But, as indicated above, In *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619, at para [17][17] Lord Neuberger emphasised that reliance on commercial common sense and surrounding circumstances should not be invoked to undervalue the importance of the language of the provision which is to be construed.

36. It is in those cases where the language used has more than one meaning or where the literal meaning or the natural meaning leads to an uncommercial result that it is most likely that the matrix of facts or the background facts referred to by Lord Wilberforce in *Prenn v Simmonds* [1971] 1 WLR 1381, 1384-1385,[18] will be found to be most helpful. As he explained later in *Schuler AG v Wickman Machine Tool Sales Ltd* [1974] AC 235, 261:[19]

> "... evidence may be admitted of surrounding circumstances or in order to explain technical expressions or to identify the subject matter of an agreement: or (an overlapping exception), to resolve a latent ambiguity. But ambiguity in this context is not to be equated with difficulty of construction, even difficulty to a point where judicial opinion as to meaning has differed..."

37. It is now commonplace that resort may be had to background material in construing commercial contracts. In *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, at 779,[20] Lord Hoffmann said:

> "In the case of commercial contracts, the restriction on the use of background has been quietly dropped. There are certain special kinds of

---

[17] LC/2
[18] LC/5
[19] LC/11
[20] LC/12

evidence, such as previous negotiations and express declarations of intent, which for practical reasons which it is unnecessary to analyse, are inadmissible in aid of construction. They can be used only in an action for rectification. But apart from these exceptions, commercial contracts are construed in the light of all the background which could reasonably have been expected to have been available to the parties in order to ascertain what would objectively have been understood to be their intention: *Prenn v. Simmonds* [1971] 1 W.L.R. 1381, 1383. The fact that the words are capable of a literal application is no obstacle to evidence which demonstrates what a reasonable person with knowledge of the background would have understood the parties to mean, even if this compels one to say that they used the wrong words. In this area, we no longer confuse the meaning of words with the question of what meaning the use of the words was intended to convey."

38.   Lord Hoffmann said in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, at 912-913:[21]

"…I do not think that the fundamental change which has overtaken this branch of the law, particularly as a result of the speeches of Lord Wilberforce in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381, 1384–1386 and *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989, is always sufficiently appreciated. The result has been, subject to one important exception, to assimilate the way in which such documents are interpreted by judges to the common sense principles by which any serious utterance would be interpreted in ordinary life. Almost all the old intellectual baggage of "legal" interpretation has been discarded. The principles may be summarised as follows.

(1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as the "matrix of fact," but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

…

---

[21] LC/13

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax: see *Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] A.C. 749.

(5) The 'rule' that words should be given their 'natural and ordinary meaning' reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. …"

*Limits on the use of surrounding circumstances*

39.   Lord Hoffmann's judgment has been cited in many subsequent decisions at all levels, but his statements of principle have been qualified in more recent decisions.

40.   First, in *Re Sigma Finance Corp (In Administration)* [2009] UKSC 2, [2010] 1 All ER 571,[22] I said, in a passage at paras [35] and [37] (with which Lord Hope and Lord Mance agreed, and which was subsequently cited with apparent approval in the majority decision of the Supreme Court in *BNY Mellon Trustee Services v LBG Capital* [2016] UKSC 29, at paras [31], [37])[23]:

… In complex documents of the kind in issue there are bound to be ambiguities, infelicities and inconsistencies. An over-literal interpretation of one provision without regard to the whole may distort or frustrate the commercial purpose. This is one of those too frequent cases where a document has been subjected to the type of textual analysis more appropriate to the interpretation of tax legislation which has been the subject of detailed scrutiny at all committee stages than to an instrument securing commercial obligations: …

… this is not the type of case where the background or matrix of fact is or ought to be relevant, except in the most generalised way. I do not consider,

---

[22] LC/14
[23] LC/15

> therefore, that there is much assistance to be derived from the principles of interpretation re-stated by Lord Hoffmann in the familiar passage in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 W.L.R. 896, 912–913. Where a security document secures a number of creditors who have advanced funds over a long period it would be quite wrong to take account of circumstances which are not known to all of them. In this type of case it is the wording of the instrument which is paramount. The instrument must be interpreted as a whole in the light of the commercial intention which may be inferred from the face of the instrument and from the nature of the debtor's business. ..."

41. Secondly, in *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619, at para [17][24] Lord Neuberger emphasised that reliance on commercial common sense and surrounding circumstances should not be invoked to undervalue the importance of the language of the provision which is to be construed. Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made.

*Multiple agreements*

42. One important area which may require elaboration is a principle which is really one of common sense, namely that contemporaneous documents should not be considered in isolation. The basic principle was stated with authority by one of the great judges of the nineteenth century, Sir George Jessel MR, in *Smith v Chadwick* (1882) 20 Ch D 27, 62-63[25] (affd without reference to this point (1884) 9 App Cas 187):

> "...when documents are actually contemporaneous, that is, two deeds executed at the same moment, a very common case, or within so short an interval that having regard to the nature of the transaction the Court comes to the conclusion that the series of deeds represents a single transaction between the same parties, it is then that they are all treated as one deed; and, of course, one deed between the same parties may be read to show the meaning of a sentence, and be equally read, although not contained in one deed, but in several parchments, if all the parchments together in the view of the Court make up one document for this purpose."

43. This principle which underlies a number of recent decisions in the Court of Appeal (in two of which I was a member of the panel) and the Supreme Court, in which

---

[24] LC/2
[25] LC/16

13

documents forming part of a single transaction have been interpreted in order to achieve consistency.

44.    In *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487, [2008] 2 CLC 864[26] the Court of Appeal was concerned with the relationship between two agreements. I said (at para [58]) that the relationship between the agreements was to be "looked at in broad commercial terms and by reference to the language of the two agreements." In a case involving a complex agreement, *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585, [2009] 1 CLC 934,[27] I said (at para [83])

> "But the essential task is to construe the jurisdiction agreement in the light of the transaction as a whole. As I suggested in *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487; [2008] 2 CLC 864 at [93], whether a dispute falls within one or more related agreements depends on the intention of the parties as revealed by the agreements."

45.    These decisions of the Court of Appeal were applied in *Sebastian Holdings Inc v Deutsche Bank AG* [2010] EWCA Civ 998, [2010] 1 Lloyd's Rep 106[28], where Thomas LJ said (at para 40):

> "The Supreme Court emphasised in *Re Sigma Finance Corp* [2009] UKSC 2 the need, when looking at a complex series of agreements, to construe an agreement which was part of a series of agreements by taking into account the overall scheme of the agreements and reading sentences and phrases in the context of that overall scheme."

46.    So also in *Easyair Ltd v Opal Telecom Ltd* [2009] EWHC 339 (Ch)[29] Lewison J (now Lewison LJ and the author of the leading textbook on the interpretation of contracts) construed agreements together as "one overall package" even though they each contained an "entire agreement" clause (at para 32).

*Interpretation of exclusion/exculpatory clauses and non-reliance clauses*

47.    It is well established that any doubt or ambiguity in the construction of an exemption or exculpatory clause will be resolved against the party relying upon it. There are many authorities which establish this principle and it is only necessary to quote one of the

---

[26] LC/17
[27] LC/18
[28] LC/19
[29] LC/20

most eminent English judges.  In *Dairy Containers Ltd v Tasman Orient Line CV* [2004] UKPC 22, [2015] 1 WLR 215, at [12],[30] Lord Bingham said:

> "This clause must be construed in the context of the contract as a whole. The general rule should be applied that if a party, otherwise liable, is to exclude or limit his liability or to rely on an exemption, he must do so in clear words; unclear words do not suffice; any ambiguity or lack of clarity must be resolved against that party …"

48.    In relation to non-reliance clauses, it is equally clear that the intention to give up reliance has to be clear. Thus in *Peekay v Australia & New Zealand Banking Group* [2006] EWCA Civ 386, [2006] 2 Lloyd's Rep 511, at [57][31] Moore-Bick LJ (with whom Chadwick LJ and I agreed) said:

> "It is common to include in certain kinds of contracts an express acknowledgment by each of the parties that they have not been induced to enter the contract by any representations other than those contained in the contract itself. The effectiveness of a clause of that kind may be challenged on the grounds that the contract as a whole, including the clause in question, can be avoided if in fact one or other party was induced to enter into it by misrepresentation. However, I can see no reason in principle why it should not be possible for parties to an agreement to give up any right to assert that they were induced to enter into it by misrepresentation, provided that they make their intention clear, or why a clause of that kind, if properly drafted, should not give rise to a contractual estoppel …"

49.    More recently it has been confirmed by Hamblen J (now Hamblen LJ) that if a term is to be construed as having this effect (and thereby prevent from arising the ordinary consequences which would otherwise follow as a matter of law) clear words are necessary: *Cassa di Risparmio della Repubblica di San Marino Spa v Barclays Bank* [2011] EWHC 484 (Comm), [2011] 1 CLC 701 at [505].[32]

*Multiple agreements and "Single agreement" clauses*

50.    Although multiple agreements should be interpreted to achieve consistency, in my opinion, against the background of the *contra proferentem* approach to the interpretation of exemption or exculpatory clauses, a "single agreement" clause would

---

[30] LC/21
[31] LC/22
[32] LC/23

not, without a clearly expressed intention, have the effect that an exculpatory provision in relation to obligations under one of the agreements would be incorporated in another contract dealing with different contractual obligations.

*Gross negligence and wilful default*

51.   Words in an exemption or exculpatory clause must be construed in their context, but certain expressions have received judicial attention such that they have come to have, subject to contrary indication, an accepted meaning. Those expressions include "gross negligence" and "wilful default", not least because they arise in many legal contexts other than purely contractual ones, including trust instruments, company constitutions and criminal statutes.

52.   The modern approach to the concept of "gross negligence" in the contractual commercial context has been expressed by Mance J (now Lord Mance in the UK Supreme Court) in *Red Sea Tankers Ltd v Papachristidis (The Ardent)* [1997] 2 Lloyd's Rep 547, at 586, in this way:

> "Gross negligence is clearly intended to represent something more fundamental than failure to exercise proper skill and/or care constituting negligence… As a matter of ordinary language and general impression, the concept of gross negligence seems to me capable of embracing not only conduct undertaken with actual appreciation of the risks involved, but also serious disregard of or indifference to an obvious risk."

53.   This approach has been applied subsequently by other judges: *Camarata Property Inc v Credit Suisse Securities (Europe) Ltd* [2011] EWHC 479 (Comm), [2011] 1 CLC 627, at [161][33] (Andrew Smith J) and *Winnetka Trading Corporation v Julius Baer International Ltd* [2011] EWHC 2030 (Ch), [2012] 1 BCLC 588, at [16][34] (Roth J).

54.   The expression "wilful default" has also been considered in a number of different contexts. In *Armitage v Nurse* [1998] Ch 241 at 252,[35] Millett LJ said:

> "First, the expression "wilful default" is used in the cases in two senses. A trustee is said to be accountable on the footing of wilful default when he is accountable not only for money which he has in fact received but also for money which he could with reasonable diligence have received.

---

[33] LC/26
[34] LC/27
[35] LC/24

> It is sufficient that the trustee has been guilty of a want of ordinary
> prudence … In the context of a trustee exclusion clause, however,
> such as section 30 of the Trustee Act 1925, it means a deliberate breach
> of trust…"

55.   In the context of exemption from liability in trust instruments, wilful default has been
"equated with consciousness that the act or omission complained of is a breach of duty,
or recklessness as to whether that act or omission is a breach of duty" (Lewin on Trusts,
19th ed Tucker et al, 2015, para 39-143).[36]

56.   Wilful in the contractual context "involve[s] a knowingly wrongful action or failure to
act or some act or failure to act that was done with 'reckless carelessness', that is not
caring what the results of that carelessness might be": *Springwell Navigation Corp v JP
Morgan Chase Bank* [2010] EWCA Civ 1221, [2010] 2 CLC 705, at [193][37] (a case on
"wilful misconduct").

57.   The overall effect of the many authorities is, in my opinion, that (1) wilful default will
generally be interpreted to mean intentional or reckless breach of duty and (2) gross
negligence will generally be interpreted to mean serious disregard of or indifference to
an obvious risk.

*Where something has "gone wrong" with the language*

58.   The background and purpose of the transaction may show that something "has gone
wrong" with the language of the contract and that a literal interpretation may be
avoided to ensure that the intentions of the parties may be effectuated without it being
necessary to resort to rectification of the contract.

59.   *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101[38] was
such a case. The House of Lords held that, although a court would not easily accept that
linguistic mistakes had been made in formal documents, if the context and background
drove a court to conclude that something had gone wrong with the language of a
contract the law did not require it to attribute to the parties an intention which a
reasonable person would not have understood them to have had; that where it was clear
both that there was a mistake on the face of the document and what correction ought to

---

[36] LC/35
[37] LC/28
[38] LC/3

be made in order to cure it, in that it was clear what a reasonable person having all the background knowledge which would have been available to the parties would have understood the parties by using the language in the contract to have meant, the court was entitled to correct the mistake as a matter of construction.

60.   The facts of the case are complex and do not need to be spelled out here. Lord Hoffmann said (at paras [15]-[16]):

> "It clearly requires a strong case to persuade the court that something must have gone wrong with the language and the judge and the majority of the Court of Appeal did not think that such a case had been made out. On the other hand, Lawrence Collins LJ thought it had. It is, I am afraid, not unusual that an interpretation which does not strike one person as sufficiently irrational to justify a conclusion that there has been a linguistic mistake will seem commercially absurd to another: compare the *Kirin-Amgen* case [2005] All ER 667, 684–685. Such a division of opinion occurred in the *Investors Compensation Scheme* case itself [1998] 1 WLR 896. The subtleties of language are such that no judicial guidelines or statements of principle can prevent it from sometimes happening. It is fortunately rare because most draftsmen of formal documents think about what they are saying and use language with care. But this appears to be an exceptional case in which the drafting was careless and no one noticed.
>
> I agree with the dissenting opinion of Lawrence Collins LJ because I think that to interpret the definition of ARP in accordance with ordinary rules of syntax makes no commercial sense. …"

61.   Accordingly in *State Street Bank & Trust Co v Sompo Japan Insurance Inc* [2010] EWHC 1461,[39] Sir Andrew Morritt, C said at para [20]: "… although the mistake must be clear it may emerge from a consideration of all the relevant documents, not only on the face of one of them; nor is there a limit to the correction which may be made provided that it is clear to the reasonable person having regard to all the relevant documents what the parties meant."

62.   But this principle cannot be taken too far. As indicated above, in *Arnold v Britton*[40] Lord Neuberger emphasised that the court should not embark on an exercise of searching for, or constructing, drafting infelicities in order to facilitate a departure from the natural meaning, and the mere fact that a contractual arrangement, if interpreted

---

[39] LC/29
[40] LC/2

according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language.

*Excluded matters*

63.   There are three areas which are excluded from the scope of the exercise of contractual interpretation. The first is the subjective intention of the parties. The second is evidence of conduct subsequent to the contract. The third is evidence of the pre-contractual negotiations.

*Subjective intention*

64.   It is the intention of the parties, objectively ascertained, which is relevant, and not their subjective intentions. It is only necessary to refer to what Lord Wilberforce said in *Prenn v Simmonds* [1971] 1 WLR 1381, at 1385:[41]

> "Far more, and indeed totally, dangerous is it to admit evidence of one party's objective – even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want. So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised."

65.   In *Sirius International Insurance Co v FAI General Insurance Ltd* [2004] UKHL 54, [2004] 1 WLR 3251 Lord Steyn said, at para [18]:[42]

> "… The aim of the inquiry is not to probe the real intentions of the parties but to ascertain the contextual meaning of the relevant contractual language. The inquiry is objective: the question is what a reasonable person, circumstanced as the actual parties were, would have understood the parties to have meant by the use of specific language. The answer to that question is to be gathered from the text under consideration and its relevant contextual scene."

*Subsequent conduct*

66.   By contrast with some other systems of law, English law regards as irrelevant, and inadmissible, evidence of subsequent conduct by the parties as a guide to interpretation.

---

[41] LC/5
[42] LC/10

In *Schuler AG v Wickman Machine Tool Sales Ltd* [1974] AC 235, at 261,[43] Lord Wilberforce said:

> "The first qualification involves the legal question whether this agreement may be construed in the light of certain allegedly relevant subsequent actions by the parties. … In my opinion, subsequent actions ought not to have been taken into account. The general rule is that extrinsic evidence is not admissible for the construction of a written contract; the parties' intentions must be ascertained, on legal principles of construction, from the words they have used. It is one and the same principle which excludes evidence of statements, or actions, during negotiations, at the time of the contract, or subsequent to the contract, any of which to the lay mind might at first sight seem to be proper to receive..."

*Pre-contractual negotiations*

67.    Again by contrast with some other legal systems, it has been established since the 19th century that pre-contractual negotiations are not admissible evidence in the construction of contracts.

68.    The principle was re-affirmed in *Prenn v Simmonds* [1971] 1 WLR 1381, 1384-1385,[44] where Lord Wilberforce considered that the reason for not admitting evidence of negotiations was not a technical one or even mainly one of convenience. It was simply that such evidence was unhelpful. By the nature of things, where negotiations were difficult, the parties' positions, with each passing letter, were changing and until the final agreement, though converging, still divergent. It was only the final document which recorded a consensus.

69.    The principle was re-affirmed in *Schuler AG v Wickman Machine Tool Sales Ltd* [1974] AC 235, at 261,[45] and in *Investors Compensation Scheme Ltd. v West Bromwich Building Society* [1998] 1 WLR. 896, 912-913,[46] Lord Hoffmann said that the law excluded from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They were admissible only in an action for rectification; and the law made this distinction for reasons of practical policy and, in this respect only, legal interpretation differed from the way utterances were interpreted

---

[43] LC/11
[44] LC/5
[45] LC/11
[46] LC/13

in ordinary life. He acknowledged that the boundaries of this exception are in some respects unclear, but that case was not the occasion on which to explore them.

70.   The question did arise for decision in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101.[47] That was a case in which the documents passing between the parties in the course of negotiation made it absolutely clear what had been intended, and in my dissenting judgment in the Court of Appeal ([2008] EWCA Civ 183, [2008] 2 All ER (Comm) 387, para [108])[48] I said that the reasons for the exclusionary rule were by no means self-evident, and I referred to the American Law Institute, *Restatement Second: Contracts*, section 214, and to the division of authority in the state courts in the United States as whether evidence of prior negotiations can be used to show whether contract language lacks the required degree of clarity.

71.   But the House of Lords re-affirmed the rule. Lord Hoffmann pointed out that the rule of inadmissibility had been established for a very long time, and therefore to allow evidence of pre-contractual negotiations to be used in aid of construction would therefore require a departure from a long and consistent line of authority: para [30]. He concluded that there was no clearly established case for departing from the exclusionary rule. He accepted that the rule might well mean, that parties were sometimes held bound by a contract in terms which, upon a full investigation of the course of negotiations, a reasonable observer would not have taken them to have intended. But a system which sometimes allowed this to happen might be justified in the more general interest of economy and predictability in obtaining advice and adjudicating disputes: para [41]. But he emphasised that the rule excluded evidence of what was said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant. It did not exclude the use of such evidence for other purposes: for example, to establish that a fact which might be relevant as background was known to the parties, or to support a claim for rectification or estoppel. These were not exceptions to the rule, and operated outside it: para [42].

## B   Damages

*Losses flowing from disruption of management time*

---

[47] LC/3
[48] LC/30

72.   Losses caused by disruption of management time are in principle recoverable in English law as damages for breach of contract if they are caused by the breach and are reasonably foreseeable: Chitty on Contracts, 32nd ed Beale et al, 2015, vol 1, para 26-173,[49] quoting the decision of the Court of Appeal in *Aerospace Publishing Ltd v Thames Water Utilities Ltd* [2007] EWCA Civ 3, [2007] Bus LR 726,[50] in which Wilson LJ considered a number of the previous authorities and said at [86]:

> "I consider that the authorities establish the following propositions. (a) The fact and, if so, the extent of the diversion of staff time have to be properly established and, if in that regard evidence which it would have been reasonable for the claimant to adduce is not adduced, he is at risk of a finding that they have not been established. (b) The claimant also has to establish that the diversion caused significant disruption to its business. (c) Even though it may well be that strictly the claim should be cast in terms of a loss of revenue attributable to the diversion of staff time, nevertheless in the ordinary case, and unless the defendant can establish the contrary, it is reasonable for the court to infer from the disruption that, had their time not been thus diverted, staff would have applied it to activities which would, directly or indirectly, have generated revenue for the claimant in an amount at least equal to the costs of employing them during that time."

73.   That was a case involving a statutory tort, but the principles are correctly treated in Chitty, above, as equally applicable to claims for damages relating to disruption of management time as a result of breaches of contract: cf *Borealis AB v Geogas Trading SA* [2010] EWHC 2789 (Comm), [2011] 1 Lloyd's Rep 482, at [147][51] (where it was common ground that the principle applied to contract cases).

*Particulars of damage*

74.   The extent to which details of the losses must be pleaded is, in accordance with elementary principles, a matter of procedure governed by the law of the forum, i.e. New York law. English procedural law provides for a different approach to general damages (which do not have to be specifically pleaded to obtain recovery) and special damages (which do have to be pleaded and proved). But the general principle in English procedural law is that a defendant who is disadvantaged by insufficient particularity in the claimant's pleading may request further information and obtain an order from the

---

[49] LC/36
[50] LC/31
[51] LC/32

22

court. In practice, a claim or head of claim will not be struck out or dismissed without the claimant having the opportunity to remedy any defect, provided that there is reason to believe that the defect is capable of being remedied: see, e.g. McGregor on Damages, 19th ed 2014, para 49-019.[52]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**AFFIRMED** by the above-mentioned

**LAWRENCE ANTONY COLLINS,**
**LORD COLLINS OF MAPESBURY,**

on July 4, 2016  in London, England

---

[52] LC/37