**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------

| | |
|---|---|
| **In re** | : **Chapter 11 Case No** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : **08-1355 (SCC)** |
| Debtors. | : **(Jointly Administered)** |
| | : |

---------------------------------------------------------------------

## EXPERT OPINION OF LORD COLLINS OF MAPESBURY

### July 4, 2016

### APPENDIX

| Tab | Cases |
|---|---|
| 1 | *Vizcaya Partners Ltd v Picard* [2016] UKPC 5, [2016] Bus LR 413 (extract) |
| 2 | *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619 (extract) |
| 3 | *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] AC 1101 |
| 4 | *Bank of Credit and Commerce International SA v Ali* [2001] UKHL, [2002] 1 AC 281 |
| 5 | *Prenn v Simmonds* [1971] 1 WLR 1381 |
| 6 | *Charter Reinsurance Co Ltd v Fagan* [1997] AC 313 (extract) |
| 7 | *Antaios Compania Naviera SA v Salen Rederierna AB* [1985] AC 191 |
| 8 | *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900 |
| 9 | *Arbuthnott v Fagan* [1995] CLC 1396 |
| 10 | *Sirius International Insurance Co v FAI General Insurance Ltd* [2004] UKHL 54, [2004] 1 WLR 3251 |
| 11 | *Schuler AG v Wickman Machine Tool Sales Ltd* [1974] AC 235 (extract) |
| 12 | *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749 (extract) |
| 13 | *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 |
| 14 | *Re Sigma Finance Corp (In Administration)* [2009] UKSC 2, [2010] 1 All ER 571 (extract) |
| 15 | *BNY Mellon Trustee Services v LBG Capital* [2016] UKSC 29 (extract) |
| 16 | *Smith v Chadwick* (1882) 20 Ch D 27 (extract) |
| 17 | *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487, [2008] 2 CLC 864 (extract) |

| 18 | *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585, [2009] 1 CLC 934 (extract) |
|----|---|
| 19 | *Sebastian Holdings Inc v Deutsche Bank AG* [2010] EWCA Civ 998, [2010] 1 Lloyd's Rep 106 (extract) |
| 20 | *Easyair Ltd v Opal Telecom Ltd* [2009] EWHC 339 (Ch) (extract) |
| 21 | *Dairy Containers Ltd v Tasman Orient Line CV* [2004] UKPC 22, [2015] 1 WLR 215 |
| 22 | *Peekay v Australia & New Zealand Banking Group* [2006] EWCA Civ 386, [2006] 2 Lloyd's Rep 511 (extract) |
| 23 | *Cassa di Risparmio della Repubblica di San Marino Spa v Barclays Bank* [2011] EWHC 484 (Comm), [2011] 1 CLC 701 (extract) |
| 24 | *Armitage v Nurse* [1998] Ch 241 (extract) |
| 25 | *Red Sea Tankers Ltd v Papachristidis (The Ardent)* [1997] 2 Lloyd's Rep 547 (extract) |
| 26 | *Camarata Property Inc v Credit Suisse Securities (Europe) Ltd* [2011] EWHC 479 (Comm), [2011] 1 CLC 627 (extract) |
| 27 | *Winnetka Trading Corporation v Julius Baer International Ltd* [2011] EWHC 2030 (Ch), [2012] 1 BCLC 588 (extract) |
| 28 | *Springwell Navigation Corp v JP Morgan Chase Bank* [2010] EWCA Civ 1221, [2010] 2 CLC 705 (extract) |
| 29 | *State Street Bank & Trust Co v Sompo Japan Insurance Inc* [2010] EWHC 1461 (extract) |
| 30 | *Chartbrook Ltd v Persimmon Homes Ltd*   ([2008] EWCA Civ 183, [2008] 2 All ER (Comm) 387 (extract) |
| 31 | *Aerospace Publishing Ltd v Thames Water Utilities Ltd* [2007] EWCA Civ 3, [2007] Bus LR 726 |
| 32 | *Borealis AB v Geogas Trading SA* [2010] EWHC 2789 (Comm), [2011] 1 Lloyd's Rep 482 (extract) |

| Tab | Other materials |
|-----|---|
| 33 | Dicey, Morris and Collins, *Conflict of Laws*, 15th ed 2012, paras 7R-001, 9-019 |
| 34 | American Law Institute, *Restatement Second, Conflict of Laws*, sections 122 (general principle), 127 (pleading), 135 (sufficiency of evidence). |
| 35 | Lewin on Trusts, 19th ed Tucker et al, 2015, para 39-143 |
| 36 | Chitty on Cntracts, 32nd ed Beale et al, 2015, vol 1, para 26-173 |
| 37 | McGregor on Damages, 19th ed 2014, para 49-019 |

LC/1

413

A

Privy Council

## Vizcaya Partners Ltd *v* Picard and another

### [2016] UKPC 5

B

### [on appeal from the Court of Appeal for Gibraltar]

2015  Dec 14;                       Lord Neuberger of Abbotsbury PSC, Lord Mance,
2016  Feb 3                  Lord Clarke of Stone-cum-Ebony, Lord Sumption JJSC,
                                                       Lord Collins of Mapesbury

*Conflict of laws — Foreign judgment — Enforcement — Trustee in liquidation
seeking to enforce in Gibraltar default judgment obtained against company in
New York — Company applying for summary judgment on ground that it had
not submitted to jurisdiction of New York court — Whether requirement that
agreement to submit to jurisdiction be express — Circumstances in which
agreement to be implied — Whether judgment enforceable in Gibraltar*

C

V Ltd, a company registered in the British Virgin Islands, invested in a scheme
operated by B LLC, a company incorporated in New York. The customer agreement
between the companies included an express choice of New York law, but not an
express choice of New York jurisdiction. Following the exposure of a major fraud by
B LLC in the operation of the scheme, a trustee was appointed in the liquidation of
the scheme in the New York Bankruptcy Court. The trustee started proceedings
against investors, including V Ltd, who had been repaid by the scheme before the
fraud was discovered to recover those sums. The trustee obtained a default judgment
in New York against V Ltd and sought to enforce it in Gibraltar, where V Ltd had
substantial assets. V Ltd applied for summary judgment in Gibraltar on the ground
that the default judgment could not be recognised in Gibraltar. The Chief Justice of
Gibraltar refused the application on the ground, inter alia, that it was arguable that
the default judgment was enforceable on the basis that V Ltd had agreed to submit to
the jurisdiction of the New York court. The Court of Appeal of Gibraltar upheld that
decision.

On appeal by the fund—

*Held*, advising that the appeal be allowed, that the ultimate question was
whether the judgment debtor had consented in advance to the jurisdiction of the
foreign court; that that consent did not have to be contractual, nor did it have to be
expressly given but could be implied, either by fact or law; that since it had to be
actual, consent could not be inferred from matters such as the mere fact of being a
shareholder in a foreign company or a member of a foreign partnership or the fact
that the contract which was the subject of the foreign proceedings was made in a
foreign country; that the evidence presented by the trustee did not show that there
was a term implied as a matter of fact or law that V Ltd had consented to the
jurisdiction of the New York court; that even if there had been an agreement to
submit, it would prima facie not apply to the current insolvency related avoidance
proceedings; and that, accordingly, the judgment of the New York court could not be
enforced in Gibraltar (post, paras 56–58, 60, 72–73, 76).

H

*Copin v Adamson* (1875) 1 Ex D 17 applied.
*Blohn v Desser* [1962] 2 QB 116 considered.
*Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] AC 670, PC explained.
*Vogel v R and A Kohnstamm* [1973] QB 133 disapproved.
Decision of Court of Appeal for Gibraltar (unreported) 11 March 2014
reversed.

© 2016 The Incorporated Council of Law Reporting for England and Wales

A  intention of the parties to the contract. The authorities on this class of implied term have been reviewed comprehensively by Lord Neuberger of Abbotsbury PSC in *Marks & Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2015] 3 WLR 1843, paras 15–31, and it is not necessary to repeat what he said there. The policy of the common law is not to imply such terms lightly, and that is why the principles have been formulated in terms of necessity or business efficacy or "it goes without saying". The second class consists of terms implied by law, which are implied into classes of contractual relationship as a necessary incident of the relationship concerned. An example is the obligation of confidentiality in banking contracts or in arbitration agreements: *Emmott v Michael Wilson & Partners Ltd* [2008] Bus LR 1361 ("really a rule of substantive law masquerading as an implied term": at para 84). On the different types of

C  implied term see *Luxor (Eastbourne) Ltd v Cooper* [1941] AC 108, 137, per Lord Wright; and more recently *Geys v Société Générale* [2013] 1 AC 523, para 55, per Baroness Hale of Richmond.

58  Because there has to be an actual agreement, the agreement or contractual term cannot be implied or inferred from such matters as:

(1) the mere fact of being a shareholder in a foreign company or a member of a foreign partnership: *Copin v Adamson* 1 Ex D 17 (in the Court of

D  Exchequer); *Emanuel v Symon* [1908] 1 KB 302 (and *Blohn v Desser* [1962] 2 QB 116 must be regarded as wrongly decided on this point);

(2) the fact that the contract which was the subject of the foreign proceedings was made in the foreign country: *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] AC 670; *Emanuel v Symon* ; *Mattar and Saba v Public Trustee* [1952] 3 DLR 399; *Jamieson v Northern Electricity Supply Corp*

E  *(Private) Ltd* 1970 SLT 113 and *Vogel v R & A Kohnstamm Ltd* [1973] QB 133;

(3) the fact that the contract was governed by the law of the foreign country: *Sfeir & Co v National Insurance Co of New Zealand* [1964] 1 Lloyd's Rep 330; *Jamieson v Northern Electricity Supply Corp (Pte) Ltd*; *Vogel v R & A Kohnstamm Ltd* [1973] QB 133; c f *New Hampshire Insurance Co v Strabag Bau AG* [1992] 1 Lloyd's 361, 371–372 (a case on

F  jurisdiction of the English court);

(4) the fact that the contract was to be performed in the foreign country: *Sfeir & Co v National Insurance Co of New Zealand* ; *Mattar and Saba v Public Trustee* ; *Jamieson v Northern Electricity Supply Corp (Pte) Ltd* ; *Vogel v RA Kohnstamm Ltd* ; or

(5) the fact that the result of the contract being governed by the foreign

G  law gives the foreign court jurisdiction under its own law: *Dunbee Ltd v Gilman & Co (Australia) Pty Ltd.* [1968] 2 Lloyd's Rep 394

*Implied terms in the conflict of laws*

59  Finally it is necessary to consider the implications in the conflict of laws of the distinction between terms implied in fact or from the circumstances, on the one hand, and terms implied by law, on the other

H  hand. The starting point is that the characterisation of whether there has been a submission to the jurisdiction of the foreign court for the purposes of enforcement of foreign judgments depends on English law: *Rubin v Eurofinance SA* [2013] Bus LR 1 (a case on submission in the course of proceedings). But in the present context what that means is that there must

430
**Vizcaya Partners Ltd v Picard (PC)**                    **[2016] Bus LR**

have been an agreement to submit to the jurisdiction of the foreign court, *A*
and that agreement may arise through an implied term.

60   Terms implied as a matter of fact depend on construction of the
contract in the light of the circumstances.   Where the applicable law of
the contract is foreign law, questions of interpretation are governed by the
applicable law[3].  In such a case the role of the expert is not to give evidence
as to what the contract means.  The role is "to prove the rules of construction
of the foreign law, and it is then for the court to interpret the contract in *B*
accordance with those rules": *King v Brandywine Reinsurance Co* [2005]
2 All ER (Comm) 1, para 68; *Dicey*, paras 9–019 and 32–144 ("the expert
proves the foreign rules of construction, and the court, in the light of these
rules, determines the meaning of the contract")[4].

61   The position is different in the case of terms implied by law, where
the function of the expert would be to give an opinion on whether a *C*
particular term is implied by law.   That is because whether there are
statutory terms or other terms implied by law depends on the foreign law.
The common law rules, as indicated above, apply to the question whether
there has been a contractual submission, and at common law "The proper
law of the contract does indeed fix the interpretation and construction of its
express terms and supply the relevant background of statutory or implied
terms" (*Vita Food Products Inc v Unus Shipping Co Ltd* [1939] AC 277, *D*
291); and for other cases, the Rome Convention and the Rome I Regulation
refer to the applicable law of the contract or the putative law of the term[5].
As a matter of English law, the fact that a contract is governed by English
law or was made in England provides a basis for service out the jurisdiction
under what was previously RSC Ord 11, r 1 and is now CPR Practice
Direction 6B, does not mean that there is an implied contractual submission *E*
to the jurisdiction: c f *Dunbee Ltd v Gilman & Co (Australia) Pty Ltd* [1968]
2 Lloyd's Rep 394.

*Jurisdiction under New York law*

62   So far as concerns Vizcaya, the complaint in the New York
proceedings claimed that the New York Bankruptcy Court had jurisdiction *F*
over Vizcaya for these reasons: the account agreements were deemed to be
entered into in the state of New York and were to be performed in New York
through securities trading activities that would take place in New York; the
Vizcaya account was held in New York, and Vizcaya wired funds from its
Bank Safra account to the BLMIS account in New York for application to its
account with BLMIS and the conduct of trading activities in New York, and
invested in BLMIS; Vizcaya purposefully availed itself of the benefits of *G*
conducting transactions in New York, out of which the action arose.
Vizcaya had therefore submitted itself to the jurisdiction of the courts of
New York.

63   The motion for summary judgment pleaded that the trustee met the
necessary standard of showing that the court had prima facie jurisdiction
over the defendants.  The basis of jurisdiction which was asserted was that
the transfers arose out of a business transaction tied to Vizcaya's securities *H*
account in New York; and that under the New York long arm statute, Civil
Practice Law and Rules ("CPLR") 302(a)(1)[6], the maintenance of a
securities account in New York was a sufficient basis for finding personal
jurisdiction for claims arising out of "transaction of business".   It was

© 2016 The Incorporated Council of Law Reporting for England and Wales

A claimed that the defaulting defendants purposefully availed themselves of the benefits of the transactions arising out of the Vizcaya accounts by requesting or directing that funds be invested by BLMIS in New York and by receiving the US$180m in transfers.

64 The motion relied on another decision in the Madoff affair dealing with avoidance of fraudulent transfers arising out of BLMIS account transactions, in which the defendants had customer agreements deemed to
B be made in New York and subject to New York law, directed transfers to and from their BLMIS account, and where one of the defendants designated a United States agent to direct financial transactions to act on its behalf; as a result, the defendant's conduct established sufficient minimum contacts to support a finding of personal jurisdiction: *Picard v Cohmad Securities Corpn* (2009) 418 BR 75, 80–81.

C 65 The order entering the default judgment recited that "the trustee made a proper prima facie showing of personal jurisdiction".

66 Evidence on New York law submitted by the trustee in these proceedings was (1) a witness statement by Professor Kenneth Klee, who specialises in insolvency law, and who is a member of the law faculty of UCLA Law School and a practising lawyer and (2) a witness statement by Mr Gonzalo Zeballos, a partner in the firm of Baker & Hostetler LLP, who
D act for the trustee.

67 Professor Klee's evidence was directed to the trustee's rights under the Account Management Documents, and only Mr Zeballos' evidence was directly relevant to the issues in this appeal. Under the heading "Submission to New York Law" his evidence was as follows, at paras 18–25:

E "18. The Customer Agreement deems New York state law as the law governing the Agreement. It is the Trustee's position that the language of the Customer Agreement in and of itself supports the application of substantive New York law to all matters pertaining to the Account Management Documents.

"19. It is notable, however, that even if the New York choice of law test (the 'significant relationship' or 'grouping of contacts' approach
F [footnote omitted][7] ) is applied to determine the applicable/proper law of the Account Management Documents, that New York law would still be the applicable law relating to the Account Management Documents.

"20. As a matter of New York law (i e since it is the applicable law of the Account Management Documents), Vizcaya agreed to the jurisdiction (and venue) of the New York courts. This is apparent from, inter alia, the
G fact it executed and agreed to the Account Management Documents that explicitly establish a contractual agency relationship governed by New York substantive law and the fact that Vizcaya carried on business in New York . . ."

"22. It is well settled under New York law that by agreeing to a contract governed by New York law, involving the transaction of business in New York by an agent, a party submits to the 'specific jurisdiction' of
H New York courts for adjudicating matters arising from that contract. *Parke-Bernet Galleries Inc v Franklyn* 26 NY 2d 13, 16 (1970).

"23. Specific jurisdiction 'exists when "a state exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum".' *Chlose v Queen Bee of Beverly*

432
Vizcaya Partners Ltd v Picard (PC)                                    [2016] Bus LR

*Hills LLC* 616 F 3d 158, 164 (2d Cir 2010) (quoting *Helicopteros*   A
*Nacionales de Colombia SA v Hall*, 466 US 408, 414, n 8 (1984).

"24. Under New York law, specific jurisdiction is established over a
non-domiciliary who, in person or through an agent: (1) transacts any
business within the state . . . New York Civil Practice Law and Rule
para 302; *Malmsteen v Universal Music Group Inc*, (unreported) 14 June
2012, at [3].

"25. Because the Account Management Documents establish an on-   B
going principal-agent relationship with BLMIS, Vizcaya's execution and
agreement to the Account Management Documents constitutes the
transacting of business in New York.   The Account Management
Documents define the commercial structure that provides the foundation
for Vizcaya's sole commercial activity—to invest with BLMIS in New
York."

C

68   His evidence is therefore that under New York law: (1) the choice of
New York law to govern the contract is effective to apply New York
substantive law to all matters relating to the Account Management
Documents; (2) the contractual relationship would have been governed by
New York law even in the absence of an express choice; (3) Vizcaya agreed
to the jurisdiction (or specific jurisdiction) of the New York courts by   D
agreeing to the Account Management Documents which established an
agency relationship and by carrying on business in New York (or transacting
business in New York); (4) specific jurisdiction is established under the New
York CPLR over a non-domiciliary who transacts any business within New
York.

69   Even as a matter of New York law the evidence does not state that a
choice of law carries with it an agreement to the jurisdiction of the New   E
York court, since it only does so, according to the evidence, if there is also
transaction of business in New York[8]. All that is being said is that in the
factual circumstances of the case the New York court has jurisdiction under
the long arm statute.

70   Most relevant for present purposes, there is no suggestion that there
is a term implied as a matter of fact or as a matter of law that Vizcaya   F
consented to the jurisdiction of the New York court. For a term to be
implied as a matter of fact, the trustee would have to adduce evidence of
New York law, not on what the contract means, but that there is a rule of
interpretation or construction, on the basis of which the Gibraltar court
could conclude that clause 10 in the context of the choice of law and the
deemed place of contracting amounts to a choice of jurisdiction. For a term
to be implied as a matter of law, the expert would have to show what   G
relevant terms are implied under New York law. There is no relevant
evidence under either head. The statements that Vizcaya agreed to the
jurisdiction of the New York court by agreeing to New York as the
governing law and by transacting business in New York say no more than
that these factors justified the assumption of jurisdiction under New York
CPLR, section 302.

71   There is no basis on the wording of the contract or in the evidence for   H
the trustee's suggestion that it makes a difference that the contract deems it
to have been made in New York. In the English cases the fact that a contract
was made in the foreign country had no weight in determining whether a
party had agreed to submit. If there had been an implied term under New

© 2016 The Incorporated Council of Law Reporting for England and Wales

433
**[2016] Bus LR**                                 Vizcaya Partners Ltd v Picard (PC)

A  York law as a result of that provision, no doubt it would have been relied
upon in the motion in New York for the default judgment. The unsurprising
overall effect of the evidence is that, as in English law or Gibraltar law, these
are factors in the exercise of long arm jurisdiction.

72  There is therefore no basis in the evidence for the assertion that
there was a contractual term that Vizcaya submitted to the New York
jurisdiction.
B

*The scope of any jurisdiction agreement*

73  The trustee would in any event have other formidable difficulties.
The first is that, if a jurisdiction agreement is to be implied as a matter of
fact or law, prima facie it would not apply to these proceedings. In *AWB
(Geneva) SA v North America Steamships* [2007] 2 Lloyd's Rep 315 a
C  swap agreement provided that pursuant to the ISDA Master Agreement,
the agreement was governed by English law and subject to the exclusive
jurisdiction of the English courts.  The trustee of one of the parties
brought statutory avoidance proceedings in Canada. The Court of Appeal
refused to grant an anti-suit injunction, because the choice of law
and choice of jurisdiction agreement did not apply to the insolvency
D  proceedings.  The proceedings in Canada did not relate to a dispute under
the contract.  They were part of insolvency proceedings.  It was a matter
for the Canadian Court to decide on the relief that it is prepared to grant
within the scope of those proceedings as it is concerned with issues of
insolvency and not with issues which relate to the contractual obligations
under the agreement.

74  In this case, of course, the jurisdiction agreement would be governed
E  by New York law, and what disputes to which it is applicable would be a
question of interpretation governed by the applicable law. But there is no
evidence of any rules of interpretation under New York law which could
lead the Gibraltar court to the conclusion that any implied submission under
clause 10 would apply to avoidance proceedings.

F  *Arbitration agreement*

75  It is therefore unnecessary to go further and consider whether the
arbitration agreement in clause 13 applies to the insolvency proceedings,
and therefore whether the default judgment would be unenforceable in any
event because it was obtained in breach of an arbitration agreement: see
*Dicey*, para 14R-097.

G  *V Disposition*

76  The Board will therefore humbly advise Her Majesty that the appeal
should be allowed. Any consequential order will depend on the terms of the
settlement between the parties, who have liberty to apply.

*Notes*

H  1. Since then the Canadian common law on the enforcement of foreign judgments
has developed differently from English law: see *Beals v Saldanha* [2003] 3 SCR 416;
*Dicey*, para 14-091.
2. It should be noted, however, that (1) the formal requirements for the existence of
a jurisdiction agreement under the recast Brussels I Regulation ((EU) No 1215/2012 of
the European Parliament and of the Council of 12 December 2012 on jurisdiction and

© 2016 The Incorporated Council of Law Reporting for England and Wales

434
**Vizcaya Partners Ltd v Picard (PC)**                                  **[2016] Bus LR**

the recognition and enforcement of judgments in civil and commercial matters    *A*
(OJ 2012 L 351 p 1)), article 25 (and its predecessors) are strict, and (2) the Hague
Convention on Choice of Court Agreements (2005), provides (article 3(b)) that "an
exclusive choice of court agreement must be concluded or documented— (i) in
writing; or (ii) by any other means of communication which renders information
accessible so as to be usable for subsequent reference". The Hague Convention is not
in force as between the United Kingdom and the United States.

3. The Convention on the law applicable to contractual obligations ("Rome    *B*
Convention") and the Rome I Regulation (Regulation (EC) No 593/2008 of the
European Parliament and of the Council of 17 June 2008 on the law applicable to
contractual obligations (Rome I) (OJ 2008 L 1777 p 6)) on the law applicable to
contractual obligations apply in Gibraltar. Because the contract was made in 2005 it
is the Rome Convention which would be applicable to this case. But "agreements on
the choice of court" are excluded from the scope of each of them (article 2(2)(d)), and
the common law rules therefore apply in the present case.

4. The law is the same in the United States: see *Wright, Miller etc, Federal Practice*    *C*
*and Procedure*, section 2444 ("The purpose of an expert witness in foreign law is to
aid the court in determining the applicable foreign law, not to apply the
law to the facts of the case").

5. Rome Convention, articles 8(1), 10(1)(a) Rome I Regulation, articles 10(1),
12(1)(a).

6. New York CPLR, section 302, is headed "Personal jurisdiction by acts of    *D*
non-domiciliaries" and so far as material provides: "(a) Acts which are the basis of
jurisdiction. As to a cause of action arising from any of the acts enumerated in this
section, a court may exercise personal jurisdiction over any non-domiciliary . . . who
in person or through an agent: (1) transacts any business within the state . . ."

7. The omitted footnote concludes that the various contacts with New York
(performance in New York; subject matter of the contract; Vizcaya's only business
being in New York) meant that the significant relationship test for the law governing
the contract led inexorably to the conclusion that New York law applied.    *E*

8. Mr Zeballos does not refer to the New York General Obligations Law, section
5-1402, which provides, in summary, that any person may sue a foreign corporation
in New York, where the action relates to any contract in which a choice of New York
law has been made, and which (a) is a contract arising out of a transaction covering in
the aggregate not less than US$1m, and (b) which contains a provision whereby such
foreign corporation agrees to submit to the jurisdiction of the courts of New York.

SHIRANIKHA HERBERT, Barrister    *F*

*G*

*H*

© 2016 The Incorporated Council of Law Reporting for England and Wales

LC/2

1619
[2015] AC    Arnold v Britton (SC(E))

A

Supreme Court

## Arnold *v* Britton and others

### [2015] UKSC 36

2015  Jan 26;    Lord Neuberger of Abbotsbury PSC, Lord Sumption,
B    June 10    Lord Carnwath, Lord Hughes, Lord Hodge JJSC

*Landlord and tenant — Covenant — Service charge — Long leases for holiday*
*chalets — Clause in leases purporting to provide for payment of charge at fixed*
*sum to be increased at compound rate of 10% per year — Clause inserted at time*
*of high inflation — Inflation subsequently at consistently lower annual rates —*
*Landlord levying service charge in accordance with specified sum — Tenants*
C    *claiming commercial sense requiring clause to be construed as variable service*
*charge based on actual expenditure with fixed sum as cap only — Whether clause*
*providing for fixed sum payment — Whether open to court to depart from*
*natural meaning of clause to prevent commercially absurd result*

From 1974 the then owners of an area of land granted a number of 99-year leases
of plots on which holiday chalets were to be built, the preamble to each lease stating
that it would be granted "upon terms similar in all respects" to the other leases, the
D    introductory words of clause 3 providing that each lessee's covenants as to use and
repair of chalets were, inter alia, for the benefit of other lessees, and clause 4(8)
containing a covenant by the lessors that the covenants imposed on other lessees were
to like effect. Clause 3 of the first group of leases included, in clause 3(2), a lessee's
covenant "to pay . . . a proportionate part of the expenses and outgoings incurred by
the lessors in the repair, maintenance, renewal and the provision of services [as set
out in the lease] in the yearly sum of £90", increasing thereafter at a three-yearly
E    compound rate of 10%. Subsequently, leases in respect of further chalets were
granted in which clause 3(2) provided for an annual 10% compound increase. In
2011 the tenants of those chalets whose annual service charge had risen to over
£2,700, as opposed to £282 for the chalets subject to the earlier leases, and who
claimed that an interpretation of the clause which required a fixed sum payment
resulted in such an absurdly high annual service charge that it could not be right,
claimed that clause 3(2) should be read as requiring them to pay a variable sum, being
F    a fair proportion of the cost of providing the services, with the specified sum being no
more than a cap on the maximum sum payable. The landlord commenced CPR Pt 8
proceedings in the county court seeking a declaration that clause 3(2) required the
payment of the fixed sum and not any lesser variable amount. The judge accepted the
construction contended for by the tenants and so dismissed the claim. Allowing an
appeal by the landlord the High Court judge held that, on a natural reading of the
clause, the object of the verb "to pay" was the fixed sum of £90 as escalated, whereas
G    the construction contended for by the tenants would involve rewriting the bargain
which the parties had made, which, given the high levels of inflation in the United
Kingdom when those leases had been granted, could not be said at that time to have
lacked commercial purpose. Dismissing the tenants' appeal, the Court of Appeal
affirmed the High Court judge's reasoning and held, additionally, that the words
"a proportionate part" were not inconsistent with a fixed service charge in
circumstances where other lessees were contributing to the overall service charge,
H    which in consequence was to be apportioned between them.

On the tenants' further appeal—

*Held*, dismissing the appeal (Lord Carnwath JSC dissenting), (1) that the
interpretation of a contractual provision, including one as to service charges,
involved identifying what the parties had meant through the eyes of a reasonable
reader, and, save in a very unusual case, that meaning was most obviously to be

© 2015 The Incorporated Council of Law Reporting for England and Wales

gleaned from the language of the provision; that, although the less clear the relevant words were, the more the court could properly depart from their natural meaning, it was not to embark on an exercise of searching for drafting infelicities in order to facilitate a departure from the natural meaning; that commercial common sense was relevant only to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date on which the contract had been made; and that, moreover, since the purpose of contractual interpretation was to identify what the parties had agreed, not what the court thought that they should have agreed, it was not the function of a court to relieve a party from the consequences of imprudence or poor advice (post, paras 15–20, 23, 66, 76–77).

Dicta of Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101, para 14, HL(E) and of Lord Clarke of Stone-cum-Ebony JSC in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900, para 21, SC(E) applied.

(2) That, applying those principles, the natural meaning of the words used in clause 3(2) was clear, namely that the first half of the clause stipulated that the lessee was to pay an annual service charge and the second half identified how that charge was to be calculated, namely by way of a fixed increase in the annual sum, which was explicable on the basis that the parties had assumed that the cost of providing the services would increase in line with the level of inflation then current and so accorded with commercial common sense at the date of the agreement; that the fact that it was now apparent that the sum payable could substantially exceed the parties' expectations at the time of the grant of the lease was not a reason for giving the clause a different meaning; that it followed that clause 3(2) of each lease fell to be applied as charging a fixed amount increasing annually at the compound rate stipulated therein; that such conclusion was unaffected by any building or letting scheme to be implied from the preamble to each lease read together with the introductory words to clause 3 and with clause 4(8), in that, even on an assumption that such a scheme of reciprocity and mutual enforceability of covenants could extend to a positive covenant to pay a service charge, it could not extend to the implication of a term preventing the lessor from recovering more by way of service charge than could be recovered under each of the earlier leases; and that, accordingly, the landlord was entitled to the declaration sought (post, paras 24–26, 35, 48–49, 51, 55–58, 60, 62, 66, 75, 77).

Decision of the Court of Appeal [2013] EWCA Civ 902; [2013] L & TR 371 affirmed.

The following cases are referred to in the judgments:

*Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56; 2012 SC (UKSC) 240; 2012 SCLR 114, SC(Sc)
*Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios)* [1985] AC 191; [1984] 3 WLR 592; [1984] 3 All ER 229; [1984] 2 Lloyd's Rep 235, HL(E)
*Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10; [2009] 1 WLR 1988; [2009] Bus LR 1316; [2009] 2 All ER 1127; [2009] 2 All ER (Comm) 1, PC
*Bank of Credit and Commerce International SA v Ali* [2001] UKHL 8; [2002] 1 AC 251; [2001] 2 WLR 735; [2001] ICR 337; [2001] 1 All ER 961, HL(E)
*Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38; [2009] AC 1101; [2009] 3 WLR 267; [2009] Bus LR 1200; [2009] 4 All ER 677; [2010] 1 All ER (Comm) 365, HL(E)
*Co-operative Wholesale Society Ltd v National Westminster Bank plc* [1995] 1 EGLR 97, CA
*Dolphin's Conveyance, In re* [1970] Ch 654; [1970] 3 WLR 31; [1970] 2 All ER 664
*Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2003] UKHL 12; [2004] 1 AC 715; [2003] 2 WLR 711; [2003] 2 All ER 785; [2003] 1 All ER (Comm) 625; [2003] 1 Lloyd's Rep 571, HL(E)
*Hyams v Titan Properties Ltd* (1972) 24 P & CR 359, CA

© 2015 The Incorporated Council of Law Reporting for England and Wales

outgoings incurred by the landlord during any particular accounting period.    A
The expression in clause 3(2) requiring payment of "a proportionate part" of
the expenses and outgoings incurred by the lessors is not merely consistent
with a fixed service charge; it is paradigm wording pay a fixed service charge.
If the parties had intended that the lessees should pay a variable service charge
subject to a cap, they would undoubtedly have made express provision for the
quantification, ascertainment and collection of the yearly variable charge:        B
there is none. Nor is there any commercial purpose for a landlord agreeing to
a variable service charge provision subject to a cap. Far from it being clear
that the parties intended that the lessee should pay a variable service charge
subject to a cap, it is abundantly clear that they did not.

Once the meaning of clause 3(2) has been ascertained by the process of
construing the express terms, the iterative process is at an end and there is no    C
need to consider the question of implied terms. In any event, a term cannot
be implied which is inconsistent with the meaning derived from the express
terms. Any reliance on *H Waites Ltd v Hambledon Court Ltd* [2014]
1 EGLR 119 is misplaced. The parties did not assume that the landlord's
actual expenditure would rise by at least 10% per annum: that would take no
account of infrequently occurring major expenditure. In so far as the parties    D
made any assumptions, the only relevant one was that the lessees would pay
a fixed service charge, increasing at the rate of 10% per annum, regardless of
actual inflation. Such assumption can never be "falsified" by actual inflation
rates, no matter how far such rates might diverge from 10% per annum. The
fact that the parties may have acted on the basis that the average inflation
rate throughout the term would be 10% was not an assumption; it was a best    E
guess made in the knowledge that the chances of average inflation actually
turning out to be 10% throughout the term would be virtually nil. That best
guess would never be falsified no matter what the actual inflation rates were.

A term cannot be implied into a lease to supply a meaning which is
inconsistent with the express language of the contract. Nor can commercial
considerations supply a meaning which is inconsistent with the express
language of the contract. In any event, any such commerciality argument        F
would be in substance an argument based on 34 years' hindsight, namely
that actual inflation would be significantly below 10% per annum. The risk
which the parties took in selecting an inflation adjustment rate as a fixed
percentage was one which they were perfectly entitled to judge—and must
be inferred to have judged—for themselves. It is not for the court to judge
the wisdom of the parties' bargain or to second-guess their motives.

*Morshead QC* replied.                                                           G

The court took time for consideration.

10 June 2015. The following judgments were handed down.

**LORD NEUBERGER OF ABBOTSBURY PSC** (with whom **LORD**    H
**SUMPTION** and **LORD HUGHES JJSC** agreed)

1 This appeal concerns the interpretation of service charge contribution
provisions in the leases of a number of chalets in a caravan park in south
Wales.

© 2015 The Incorporated Council of Law Reporting for England and Wales

1625
**[2015] AC**                                          **Arnold v Britton (SC(E))**
**Lord Neuberger of Abbotsbury PSC**

A    *The facts*

2   The facts may be summarised as follows (although they are more fully set out by Lord Carnwath JSC at paras 81–103).

3   Oxwich Leisure Park is on the Gower peninsular, and contains 91 chalets, each of which is let on very similar terms. The five leases which we have seen were granted between 1978 and 1991, either for a premium (of

B   less than £20,000) or in return for the lessee constructing the chalet. Each of the 91 chalets was let on a lease which was for a term of 99 years from 25 December 1974 and reserved a rent of £10 per annum increasing by £5 for each subsequent period of 21 years. Paragraph (2) of the recital of each lease contains the statement that the chalets on the leisure park were intended to be subject to leases "upon terms similar in all respects to the

C   present demise".

4   Clause 3 of each lease contains various covenants by the lessee, and it is introduced by the words:

"The lessee hereby covenants with the lessor and with and for the benefit of the owners and lessees from time to time during the currency of the term hereby granted of the other plots on the estate so far as the

D   obligations hereafter mentioned are capable of benefitting them . . ."

The covenants that follow concern use, repair, alienation and the like. Crucially for present purposes, clause 3(2) is a covenant to pay an annual service charge. Each lease also contains covenants by the lessor. One such covenant is to provide services to the park, such as maintaining roads, paths, fences, a recreation ground and drains, mowing lawns, and removing refuse.

E   The lessor also covenants in clause 4(8) that leases of other chalets "shall contain covenants on the part of the lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit".

5   25 of the chalets are said by the respondent, the current owner of the leisure park and the landlord under the leases, to be subject to leases

F   containing a service charge provision in clause 3(2), which requires the lessee to pay for the first year of the term a fixed sum of £90 per annum, and for each ensuing year a fixed sum representing a 10% increase on the previous year—i e an initial annual service charge of £90, which increases at a compound rate of 10% in each succeeding year. The issue on this appeal is whether the respondent's interpretation of clause 3(2) in those 25 leases is correct.

G   6   Of the 25 leases in question, 21 were granted between 1977 and 1991. Prior to the grant of most of those 21 leases, the other 70 chalets had been the subject of leases granted from the early 1970s. In each of those 70 leases, clause 3(2) was a covenant by the lessee:

"To pay to the lessors without any deduction in addition to the said rent a proportionate part of the expenses and outgoings incurred by the

H   lessors in the repair maintenance renewal and the provision of services hereafter set out the yearly sum of £90 and VAT (if any) for the first three years of the term hereby granted increasing thereafter by ten pounds per hundred for every subsequent three year period or part thereof."

© 2015 The Incorporated Council of Law Reporting for England and Wales

The effect of this clause, at least on the face of it, is that the initial service   A
charge of £90 per annum was to be increased on a compound basis by 10%
every three years, which is roughly equivalent to a compound rate of 3% per
annum.

7   The 21 leases referred to in para 6 have two slightly different versions
of clause 3(2), but the clause can be set out in the following form (with the
words shown in italics included in 14 of the 21 leases, but not in the other   B
seven):

"To pay to the lessors without any deductions in addition to the said
rent *as* a proportionate part of the expenses and outgoings incurred by the
lessors in the repair maintenance renewal *and renewal of the facilities of
the estate* and the provision of services hereafter set out the yearly sum of
£90 and VAT (if any) for the first year of the term hereby granted   C
increasing thereafter by ten pounds per hundred for every subsequent
year *or part* thereof."

8   To complicate matters a little further, the service charge clause in four
of these 21 leases (being four of the seven which did not include the words in
italics in the preceding quotation), had the word "for" before "the yearly
sum of £90". These four leases also included a proviso to the effect that, so   D
long as "the term hereby created is vested in the [original lessees] or the
survivor of them", clause 3(2) would be treated as being in the form set out
in para 6 above. This proviso has ceased to have effect as these four leases
are no longer vested in the original lessees.

9   Finally, the service charge clause in four of the 70 leases referred to in
para 6 above were varied pursuant to deeds of variation executed between   E
October 1998 and August 2002 so as to be identical to that set out in para 7
above, including the words in italics.

*The issues between the parties*

10   As already explained, the respondent, the current landlord, contends
that the service charge provisions in clause 3(2) of the 25 leases referred to in   F
paras 6–9 above have the effect of providing for a fixed annual charge of £90
for the first year of the term, increasing each subsequent year by 10% on a
compound basis. The appellants, the current tenants under 24 of the 25
leases, primarily contend that the respondent's construction results in such
an increasingly absurdly high annual service charge in the later years of each
of the 25 leases that it cannot be right. They argue that, properly read, each   G
service charge clause in the 25 leases requires the lessee to pay a fair
proportion of the lessor's costs of providing the services, subject to a
maximum, which is £90 in the first year of the term, and increases every year
by 10% on a compound basis. In other words, the appellants argue that, in
effect, the words "up to" should be read into the clause set out in para 7
above, between the words "the provision of services hereafter set out" and
"the yearly sum of £90". The appellants also have an alternative contention,   H
based on the provisions of recital (2), the opening words of clause 3 and the
provisions of clause 4(8) of their leases, namely that the lessor cannot
recover more by way of service charge than could be recovered under each of
the first 70 leases.

© 2015 The Incorporated Council of Law Reporting for England and Wales

1627

A    *The evidence*

11    Apart from the documents themselves and the published Retail Price
Index ("RPI") for each of the years 1970–2010, there is no evidence as to the
surrounding circumstances in which the 21 leases were executed, other than
the fact that the four leases referred to in para 8 above were granted to
individuals connected with the lessor. Following a request from the court,
B    we were also told that three of the four deeds of variation referred to in
para 9 above were entered into with the lessor's daughter as lessee.

12    I do not find it surprising that we have not been provided with any
further evidence. So far as the wording of clause 3(2) is concerned, there
may have been letters or notes of discussions in connection with the original
drafting and granting (and, in the four cases referred to in para 9 above, the
amending) of the leases. But, even if such notes or letters had survived, I very
C    much doubt that they would have thrown any light on what was intended to
be the effect of the drafting of the various forms of clause 3(2). Even if they
had done, they would probably have been inadmissible as I strongly suspect
that they would merely have shown what one party thought, or was advised,
that the clause meant. If such documents had shown what both parties to
the lease in question intended, they would probably only have been
D    admissible if there had been a claim for rectification.

13    As to the possibility of other material, I am unconvinced that, even if
it existed, evidence of the original level of services, the original cost of the
services or any investigations made on behalf of a potential lessee in relation
to the original services and their cost would have assisted on the issue of
what clause 3(2) of any of the 25 leases meant. The provisions for increase
at the end of clause 3(2) of each lease were plainly included to allow for
E    inflation, and the only evidence which appears to me to be potentially
relevant would be contemporary assessments of the actual and anticipated
annual rate of inflation, and, as already mentioned, we have the RPI for each
of the years in question.

*Interpretation of contractual provisions*

F    14    Over the past 45 years, the House of Lords and Supreme Court have
discussed the correct approach to be adopted to the interpretation, or
construction, of contracts in a number of cases starting with *Prenn v
Simmonds* [1971] 1 WLR 1381 and culminating in *Rainy Sky SA v Kookmin
Bank* [2011] 1 WLR 2900.

15    When interpreting a written contract, the court is concerned to
G    identify the intention of the parties by reference to "what a reasonable
person having all the background knowledge which would have been
available to the parties would have understood them to be using the
language in the contract to mean", to quote Lord Hoffmann in *Chartbrook
Ltd v Persimmon Homes Ltd* [2009] AC 1101, para 14. And it does so by
focussing on the meaning of the relevant words, in this case clause 3(2) of
each of the 25 leases, in their documentary, factual and commercial context.
H    That meaning has to be assessed in the light of (i) the natural and ordinary
meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the
overall purpose of the clause and the lease, (iv) the facts and circumstances
known or assumed by the parties at the time that the document was
executed, and (v) commercial common sense, but (vi) disregarding

© 2015 The Incorporated Council of Law Reporting for England and Wales

1628
Arnold v Britton (SC(E))                                                    [2015] AC
Lord Neuberger of Abbotsbury PSC

subjective evidence of any party's intentions. In this connection, see *Prenn*      A
[1971] 1 WLR 1381, 1384–1386; *Reardon Smith Line Ltd v Yngvar
Hansen-Tangen (trading as HE Hansen-Tangen)* [1976] 1 WLR 989,
995–997, per Lord Wilberforce; *Bank of Credit and Commerce
International SA v Ali* [2002] 1 AC 251, para 8, per Lord Bingham of
Cornhill; and the survey of more recent authorities in *Rainy Sky* [2011]
1 WLR 2900, paras 21–30, per Lord Clarke of Stone-cum-Ebony JSC.
                                                                                    B
16   For present purposes, I think it is important to emphasise seven
factors.

17   First, the reliance placed in some cases on commercial common sense
and surrounding circumstances (e g in *Chartbrook* [2009] AC 1101,
paras 16–26) should not be invoked to undervalue the importance of the
language of the provision which is to be construed. The exercise of
interpreting a provision involves identifying what the parties meant through    C
the eyes of a reasonable reader, and, save perhaps in a very unusual case, that
meaning is most obviously to be gleaned from the language of the provision.
Unlike commercial common sense and the surrounding circumstances, the
parties have control over the language they use in a contract. And, again
save perhaps in a very unusual case, the parties must have been specifically
focussing on the issue covered by the provision when agreeing the wording
of that provision.                                                              D

18   Secondly, when it comes to considering the centrally relevant words
to be interpreted, I accept that the less clear they are, or, to put it another
way, the worse their drafting, the more ready the court can properly be to
depart from their natural meaning. That is simply the obverse of the sensible
proposition that the clearer the natural meaning the more difficult it is to
justify departing from it.   However, that does not justify the court          E
embarking on an exercise of searching for, let alone constructing, drafting
infelicities in order to facilitate a departure from the natural meaning. If
there is a specific error in the drafting, it may often have no relevance to the
issue of interpretation which the court has to resolve.

19   The third point I should mention is that commercial common sense
is not to be invoked retrospectively. The mere fact that a contractual
arrangement, if interpreted according to its natural language, has worked      F
out badly, or even disastrously, for one of the parties is not a reason for
departing from the natural language. Commercial common sense is only
relevant to the extent of how matters would or could have been perceived by
the parties, or by reasonable people in the position of the parties, as at the
date that the contract was made. Judicial observations such as those of Lord
Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235,          G
251 and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB
(The Antaios)* [1985] AC 191, 201, quoted by Lord Carnwath JSC at
para 110, have to be read and applied bearing that important point in mind.

20   Fourthly, while commercial common sense is a very important factor
to take into account when interpreting a contract, a court should be very
slow to reject the natural meaning of a provision as correct simply because it
appears to be a very imprudent term for one of the parties to have agreed,      H
even ignoring the benefit of wisdom of hindsight. The purpose of
interpretation is to identify what the parties have agreed, not what the court
thinks that they should have agreed. Experience shows that it is by no means
unknown for people to enter into arrangements which are ill-advised, even

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

21  The fifth point concerns the facts known to the parties. When interpreting a contractual provision, one can only take into account facts or

B  circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.

22  Sixthly, in some cases, an event subsequently occurs which was

C  plainly not intended or contemplated by the parties, judging from the language of their contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention. An example of such a case is *Aberdeen City Council v Stewart Milne Group Ltd* 2012 SC (UKSC) 240, where the court concluded that "any . . . approach" other than that which was adopted "would defeat the parties' clear objectives", but the conclusion was based on what the parties "had in mind when they entered

D  into" the contract: see paras 21 and 22.

23  Seventhly, reference was made in argument to service charge clauses being construed "restrictively". I am unconvinced by the notion that service charge clauses are to be subject to any special rule of interpretation. Even if (which it is unnecessary to decide) a landlord may have simpler remedies than a tenant to enforce service charge provisions, that is not relevant to the

E  issue of how one interprets the contractual machinery for assessing the tenant's contribution. The origin of the adverb was in a judgment of Rix LJ in *McHale v Earl Cadogan* [2010] HLR 412, para 17. What he was saying, quite correctly, was that the court should not "bring within the general words of a service charge clause anything which does not clearly belong there". However, that does not help resolve the sort of issue of interpretation raised in this case.

F

*Discussion: interpretation of clause 3(2)*

24  When one turns to clause 3(2) of each of the 91 leases of the chalets in Oxwich Park, the natural meaning of the words used, at least until one considers the commercial consequences, seems clear. The first half of the clause (up to and including the words "hereafter set out") stipulates that the

G  lessee is to pay an annual charge to reimburse the lessor for the costs of providing the services which he covenants to provide, and the second half of the clause identifies how that service charge is to be calculated.

25  The fact that the second half of the clause results in the service charge being a fixed sum, rather than a sum dependent on the costs to the lessor of providing the contractual services is readily explicable. As stated in *Wonnacott, The History of the Law of Landlord and Tenant in England and*

H  *Wales* (2012), p 106, clauses which provide for charges which vary with the costs of providing services have resulted, at least since around 1960, in "more trouble between landlord and tenant than anything else". Further, legislation which started to come into force in 1972 has rendered it progressively more difficult for an "amateur landlord" (to use Wonnacott's

© 2015 The Incorporated Council of Law Reporting for England and Wales

LC/3

1101

*A*

House of Lords

# Chartbrook Ltd and another *v* Persimmon Homes Ltd and another

## [2009] UKHL 38

*B*    2009 March 31;                    Lord Hope of Craighead, Lord Hoffmann,
April 1, 2;              Lord Rodger of Earlsferry, Lord Walker of Gestingthorpe,
July 1                            Baroness Hale of Richmond

*Contract — Construction — Pre-contract negotiations — Parties disputing amounts*
*due under component of price of contract — Disputed component defined in*
*contract — Whether ordinary rules of construction applying — Whether*
*C*    *evidence of parties' negotiations admissible as aid to construction where disputed*
*term defined in contract — Whether rectification to be granted*

The claimant company was the owner of development land and the defendants
were developers. They entered into a contract whereby the defendants agreed to
obtain planning permission for the claimant's land and then, pursuant to a licence
from the claimant, to enter into possession, construct a mixed residential and
*D*    commercial development, and sell the properties on long leases. The claimants
agreed to grant the leases at the direction of the defendants, who would receive the
proceeds for their own account and pay the claimant an agreed price for the land.
Planning permission was granted and the development was built. A dispute arose
between the parties regarding a term of the contract which provided for an
"additional residential payment", which was a term defined in the contract. The
dispute related to the calculation of the amount payable under that term.
*E*    The defendants calculated the sum due as £897,051 whereas the claimants claimed to
be entitled to £4,484,862. The claimants brought proceedings against the defendants
for the unpaid balance of the additional residential payment which they claimed to be
owed. In support of their construction of the term of the contract the defendants
sought to rely on documents which were part of the pre-contractual negotiations.
Alternatively the defendants counterclaimed for rectification of the contract to
accord with what they claimed to be the parties' common agreement. The judge held
*F*    that the claimants' construction was the correct one and that evidence of the
pre-contractual negotiations was not admissible, particularly when an express
definition was contained within the contract. Accordingly, he gave judgment for the
claimants and dismissed the counterclaim. The Court of Appeal, by a majority,
upheld the judge's decision.

On appeal by the defendants—

*Held*, allowing the appeal, (1) that, although a court would not easily accept
that linguistic mistakes had been made in formal documents, if the context and
*G*    background drove a court to conclude that something had gone wrong with the
language of a contract the law did not require it to attribute to the parties an intention
which a reasonable person would not have understood them to have had; that where
it was clear both that there was a mistake on the face of the document and what
correction ought to be made in order to cure it, in that it was clear what a reasonable
person having all the background knowledge which would have been available to the
parties would have understood the parties by using the language in the contract to
*H*    have meant, the court was entitled to correct the mistake as a matter of construction;
that both those requirements were satisfied in the present case; that the definition of
"additional residential payment" in the contract was ambiguous and obviously
defective as a piece of drafting; that there was always a commercial context
to a contract negotiated between businessmen, and to interpret the definition in
accordance with the ordinary rules of syntax made no commercial sense; and that,

1102
**Chartbrook Ltd v Persimmon Homes Ltd (HL(E))**                    [2009] 1 AC

accordingly, taking into consideration the background and context but not the pre- *A*
contractual negotiations and applying the established principles of construction, the
claimants' construction could not be upheld, and the construction put forward by the
defendants was more appropriate (post, paras 1, 14–25, 68, 84–88, 91, 95–98).

Dicta of Brightman LJ in *East v Pantiles (Plant Hire) Ltd* (1981) 263 EG 61, CA
and of Carnwath LJ in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR
1336, para 50, CA approved.

*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] *B*
1 WLR 896, HL(E) applied.

But (2) that, although it would not be inconsistent with the English objective
theory of contractual interpretation to admit evidence of previous communications
between parties as part of the background which might throw light on what they
meant by the language used and there were no conceptual limits to what could
properly be regarded as background, the rule which had been in existence for many
years was that pre-contractual negotiations should be excluded as inadmissible *C*
simply because they were usually irrelevant to the question which the court had to
decide, namely, what the parties would reasonably be taken to have meant by the
language which they had finally adopted to express their agreement; that, even in a
case where background might be relevant, a departure from that exclusionary rule
would create uncertainty of outcome in disputes over interpretation and add to the
cost of advice, litigation or arbitration; that unlike surrounding circumstances, which
were by definition objective and uncontroversial facts, statements in the course of *D*
pre-contractual negotiations were subjective and could, if oral, be disputed, and it
was not often easy to distinguish between statements which reflected the aspirations
of a party and those which embodied a provisional consensus which might help in the
interpretation of the contract eventually concluded; that it could not confidently be
said that the exclusionary rule was impeding the proper development of the law or
had led to results which were unjust or contrary to public policy, so as to entitle the
House of Lords to depart from the authorities establishing it; that the availability of *E*
the remedies of rectification and estoppel by convention were safeguards which
would in most cases prevent the rule from causing any injustice, but those two
remedies would have to be pleaded and clearly established; that, although the rule
excluded evidence of what had been said or done during the course of negotiating the
agreement for the purpose of drawing inferences about what the contract meant, it
did not exclude the use of such evidence for other purposes, such as to establish that a
fact which might be relevant as background was known to the parties, or to support a *F*
claim for rectification or estoppel, which were not exceptions to the rule but operated
outside it; and that, accordingly, there were no grounds for departing from the
exclusionary rule and the evidence of the pre-contractual negotiations was not
admissible in support of the construction of the contract (post, paras 1–4, 33–38,
41–47, 69, 70, 97, 101).

*A & J Inglis v John Buttery & Co* (1878) 3 App Cas 552, HL(Sc) and *Prenn v
Simmonds* [1971] 1 WLR 1381, HL(E) followed.

*Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd (The Karen* *G*
*Oltmann)* [1976] 2 Lloyd's Rep 708 disapproved.

*Per curiam.* Rectification is not confined to cases where there was a concluded
antecedent contract with which the final contract did not conform but is also
available when there was no binding antecedent agreement but the parties had a
common continuing intention in respect of a particular matter in the instrument
in respect of which rectification is sought. In both cases the question is what an
objective observer would have thought the intentions of the parties to be. In order to *H*
get rectification it has to be shown that the parties were in complete agreement on the
terms of their contract but by an error wrote them down wrongly. If, by looking at
what the parties said or wrote to each other in coming to their agreement and then
comparing it with the contract they signed, it can be predicated with certainty what
their contract was, and that it is by common mistake wrongly expressed in the

1103
**[2009] 1 AC**                    *Chartbrook Ltd v Persimmon Homes Ltd (HL(E))*

A   document, the document can be rectified, but nothing less will suffice. On the facts
both parties were mistaken in thinking that the definition of the construction of
"additional residential payment" reflected their prior consensus, and so, had it been
necessary, the defendants would have been entitled to rectification (*post*, paras 1, 59,
64–67, 71, 97, 100, 101).

Dicta of Denning LJ in *Frederick E Rose (London) Ltd v William H Pim Jnr & Co
Ltd* [1953] 2 QB 450, 461, CA and of Mustill J in *Etablissements Georges et Paul
B   Levy v Adderley Navigation Co Panama SA (The Olympic Pride)* [1980] 2 Lloyd's
Rep 67, 72 approved.

Decision of the Court of Appeal [2008] EWCA Civ 183; [2008] 2 All ER (Comm)
387 reversed.

The following cases are referred to in the opinions of the Committee:

C   *Alexiou v Campbell* [2007] UKPC 11, PC
*Amalgamated Investment & Property Co Ltd v Texas Commerce International Bank
Ltd* [1982] QB 84; [1981] 3 WLR 565; [1981] 3 All ER 577, CA
*Antaios Cia Naviera SA v Salen Rederierna AB* [1985] AC 191; [1984] 3 WLR 592;
[1984] 3 All ER 229, HL(E)
*Bank of Credit and Commerce International SA v Ali* [2001] UKHL 8; [2002] 1 AC
251; [2001] 2 WLR 735;[2001] ICR 1226; [2001] 1 All ER 961, HL(E)
*Bank of Scotland v Dunedin Property Investment Co Ltd* 1998 SC 657, Ct of Sess
D   *Birmingham City Council v Walker* [2007] UKHL 22; [2007] 2 AC 262; [2007]
2 WLR 1057; [2007] 3 All ER 445, HL(E)
*Bratton Seymour Service Co Ltd v Oxborough* [1992] BCLC 693, CA
*Britoil plc v Hunt Overseas Oil Inc* [1994] CLC 561, CA
*Butlin's Settlement Trusts, In re* [1976] Ch 251; [1976] 2 WLR 547; [1976] 2 All ER
483
E   *Cambridge Antibody Technology Ltd v Abbott Biotechnology Ltd* [2004] EWHC
2974 (Pat); [2005] FSR 590
*Carmichael v National Power plc* [1999] 1 WLR 2042; [1999] ICR 337; [1999] 4 All
ER 897, HL(E)
*Cohen (George) Sons & Co Ltd v Docks and Inland Waterways Executive* (1950)
84 Ll L Rep 97, CA
*East v Pantiles (Plant Hire) Ltd* (1981) 263 EG 61
*Etablissements Georges et Paul Levy v Adderley Navigation Co Panama SA
F   (The Olympic Pride)* [1980] 2 Lloyd's Rep 67
*Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2003] UKHL 12;
[2004] 1 AC 715; [2003] 2 WLR 711; [2003] 2 All ER 785, HL(E)
*Inglis (A & J) v John Buttery & Co* (1877) 5 R 58, Ct of Sess; (1878) 3 App Cas 552,
HL(Sc)
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998]
1 WLR 896; [1998] 1 All ER 98, HL(E)
G   *Joscelyne v Nissen* [1970] 2 QB 86; [1970] 2 WLR 509; [1970] 1 All ER 1213, CA
*Jumbo King Ltd v Faithful Properties Ltd* (1999) 2 HKCFAR 279
*KPMG LLP v Network Rail Infrastructure Ltd* [2007] EWCA Civ 363; [2007]
Bus LR 1336, CA
*Kirin-Amgen Inc v Hoechst Marion Roussel Ltd* [2004] UKHL 46; [2005] 1 All ER
667; , HL(E)
*Lovell & Christmas Ltd v Wall* (1911) 104 LT 85, CA
H   *Macdonald v Dextra Accessories Ltd* [2005] UKHL 47; [2005] 4 All ER 107; [2005]
STC 1111, HL(E)
*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749;
[1997] 2 WLR 945; [1997] 3 All ER 352, HL(E)
*Miliangos v George Frank (Textiles) Ltd* [1976] AC 443; [1975] 3 WLR 758; [1975]
3 All ER 801, HL(E)

1104
**Chartbrook Ltd v Persimmon Homes Ltd (HL(E))**                    **[2009] 1 AC**

*Miller v Miller* (1822) 1 Sh App 308                                                    A
*National Bank of Sharjah v Dellborg* (unreported) 9 July 1997; [1997] CA Transcript
   No 1320, CA
*Oxfordshire County Council v Oxford City Council* [2006] UKHL 25; [2006] 2 AC
   674; [2006] 2 WLR 1235; [2006] 4 All ER 817, HL(E)
*Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd (The Karen
   Oltmann)* [1976] 2 Lloyd's Rep 708
*Pepper v Hart* [1993] AC 593; [1992] 3 WLR 1032; [1993] 1 All ER 42, HL(E)       B
*Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234; [1966] 3 All ER 77,
   HL(E)
*Prenn v Simmonds* [1971] 1 WLR 1381; [1971] 3 All ER 237, HL(E)
*R v National Insurance Comrs, Ex p Hudson* [1972] AC 944; [1972] 2 WLR 210;
   [1972] 1 All ER 145, HL(E)
*River Wear Comrs v Adamson* (1877) 2 App Cas 743, HL(E)
*Rose (Frederick E) (London) Ltd v William H Pim Jnr & Co Ltd* [1953] 2 QB 450;
   [1953] 3 WLR 497; [1953] 2 All ER 739, CA                                        C
*Rutland's (Countess of) Case* (1604) 5 Co Rep 25b
*Shore v Wilson* (1842) 9 Cl & F 355, HL(E)
*Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd*
   [1997] AC 254; [1996] 3 WLR 1051; [1996] 4 All ER 769, HL(E)
*Swainland Builders Ltd v Freehold Properties Ltd* [2002] EWCA Civ 560; [2002]
   2 EGLR 71, CA
*United Railways of Havana and Regla Warehouses Ltd, In re* [1961] AC 1007;       D
   [1960] 2 WLR 969; [1960] 2 All ER 332, HL(E)
*Yoshimoto v Canterbury Golf International* [2001] 1 NZLR 523

The following additional cases were cited in argument:

*Bates (Thomas) & Son Ltd v Wyndham's (Lingerie) Ltd* [1981] 1 WLR 505; [1981]
   1 All ER 1077, CA                                                                E
*Commission for the New Towns v Cooper (Great Britain) Ltd* [1995] Ch 259; [1995]
   2 WLR 677; [1995] 2 All ER 929, CA
*Crane v Hegeman-Harris Co Inc (Note)* [1971] 1 WLR 1390; [1939] 1 All ER 662
*Jones v Bright Capital Ltd* [2006] EWHC 3151 (Ch); [2007] PLR 31
*Melanesian Mission Trust Board v Australian Mutual Provident Society* [1997]
   2 EGLR 128, PC
*Munt v Beasley* [2006] EWCA Civ 370, CA                                          F
*PT Berlian Laju Tanker TBK v Nuse Shipping Ltd (The Aktor)* [2008] EWHC 1330
   (Comm); [2008] 2 All ER (Comm) 784; [2008] 2 Lloyd's Rep 246
*Ryledar Pty Ltd (trading as Volume Plus) v Euphoric Pty Ltd* [2007] NSWCA 65;
   [2007] 69 NSWLR 603
*Seagate Shipping Ltd v Glencore International AG (The Silver Constellation)* [2008]
   EWHC 1904 (Comm); [2009] 1 All ER (Comm) 148; [2008] 2 Lloyd's Rep 440
*Shipley Urban District Council v Bradford Corpn* [1936] Ch 375, CA               G
*Wickman Machine Tool Sales Ltd v L Schuler AG* [1974] AC 235; [1973] 2 WLR
   683; [1973] 2 All ER 39, HL(E)

**APPEAL** from the Court of Appeal
   By leave of the House of Lords (Lord Scott of Foscote, Lord Walker of
Gestingthorpe and Lord Mance) granted on 30 July 2008, the defendants,
Persimmon Homes Ltd and Persimmon plc, appealed from a decision of the
Court of Appeal (Tuckey and Rimer LJJ, Lawrence Collins LJ dissenting)        H
[2008] EWCA Civ 183; [2008] 2 All ER (Comm) 387 on 12 March 2008
to dismiss the defendants' appeal from a decision of Briggs J [2007]
EWHC 409 (Ch); [2007] 1 All ER (Comm) 1083 who on 2 March 2007 had
given judgment for the claimants, Chartbrook Ltd and Stephen Vantreen, in

A   the sum of £4,189,051·50 plus interest, and dismissed the defendants'
counterclaim for rectification of a contract entered into between the
claimants and the defendants for the development of a site at Hardwick's
Way, Wandsworth, London.

The facts are stated in the opinions of the Committee.

B   *Christopher Nugee QC* and *Julian Greenhill* (instructed by *Mayer Brown
International LLP*) for the defendants.

The sole question in this appeal is how the "additional residential
payment" payable by the defendants to the claimants under the agreement of
16 October 2001 is to be calculated. This gives rise to three issues: (1) the
true scope of the exclusionary rule under which the negotiations of the
parties are in general inadmissible to construe a contract (this is the most
C   far-reaching issue); (2) the true construction of the contract (with or without
the excluded material); and (3) rectification.

As to (1) admissibility, the general rule is that evidence of negotiations
leading up to a contract and of the parties' subjective intentions is not
admissible for the purpose of construing the contract. The leading modern
case confirming the rule and explaining its rationale is *Prenn v Simmonds*
[1971] 1 WLR 1381. The rule is recognised by Lord Hoffmann in *Investors
D   Compensation Scheme Ltd v West Bromwich Building Society* [1998]
1 WLR 896 and reaffirmed by the Privy Council in *Alexiou v Campbell*
[2007] UKPC 11. It is axiomatic that the process of construction of a
contract is an objective one and evidence as to what one party intended or
wanted is not admissible because the whole question is how far the other
party was willing to go to meet his objective: see *Prenn v Simmonds*
E   at p 1385F.

But when it comes to "negotiations" the rationale is not so
straightforward. There has in recent times been a revolution in the material
the court can look at to aid it in the process of interpretation. Negotiations
between the parties are clearly in fact part of the background knowledge
reasonably available to the parties at the time the contract was made. If the
matter is approached as one of principle the question should simply be one
F   of relevance.

As to the boundaries of the principle, the logical dividing line is between
those cases where the evidence of pre-contractual negotiations serves to do
no more than establish what each party's divergent negotiating position was,
and those cases where the evidence establishes a consensus between the
parties on the point at issue. In the latter case the evidence is not adduced to
G   mount the impermissible argument: "you can see I wanted X so you should
construe the contract as providing for X." It is adduced to mount the
altogether different argument: "you can see we agreed on X, so you should
construe the contract as providing for X." To adopt that dividing line would
be to adopt a principled approach to the question of admissibility based on
the relevance and helpfulness of the material rather than a mechanical one
under which the classification of a particular background fact, however
H   helpful or relevant, as a "negotiation" precludes the court from deriving any
assistance from it to resolve questions of construction. That approach in
no way cuts across the principle that construction is always concerned with
the objective and not the subjective. Where the evidence establishes that,
objectively, the parties reached a consensus on a particular point, that is

*A*

helpful, and if interpreted objectively, in no way represents a departure from the objective approach. [Reference was made to *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336; *Seagate Shipping Ltd v Glencore International AG (The Silver Constellation)* [2009] 1 All ER (Comm) 148; *Jones v Bright Capital Ltd* [2007] PLR 31 and *Birmingham City Council v Walker* [2007] 2 AC 262.]

*B*

Where pre-contractual material furnishes a clear insight into the purpose of the disputed provision, admitting it is likely to promote certainty rather than the reverse and promote the interests of justice. Both Briggs J and the Court of Appeal erred in holding that the boundaries of the existing exclusionary rule prevented them from admitting, as relevant background evidence on the question of construction, the terms of the offers made by the defendants and accepted by the claimants.

*C*

The material the defendants seek to have admitted is the terms of the pre-contract offers made by the defendants and the fact of their acceptance by the claimants. If that material is admitted it is clear what the defendants were offering to pay for the land and there is no difficulty in construing the contract. The starting and finishing points are the language of the contract but the use of other material would assist the court to interpret that language by seeing what a reasonable person with all the background material would have in mind when entering into the contract. All language is contextual and is not to be construed in vacuum. There is no legal rule of construction that words are only to be given their ordinary meaning.

*D*

A reasonable observer looking at all the circumstances would see that something had gone wrong in the wording of this contract. The term as to what "additional residential payment" means is very badly drafted but it can be resolved by looking at other material. The court must then have regard to anything that is known about the background to the contract and the surrounding circumstances. If the pre-contract material is looked at, there is no doubt at all what the contract meant. If however that material is excluded, and the court is obliged to construe the contract without regard to it as a detached and literal exercise, the result might be to force on the defendants a contract which they never intended to make, in circumstances where they had made it clear in unambiguous correspondence the amount of money they were offering for the land, and thereby make the defendants pay considerably more for the land than they had ever intended to. That suggests that something has gone wrong with the law.

*E*

*F*

Applying *Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234 it is right to depart from the exclusionary rule to the extent of permitting the court to admit the pre-contract material as relevant background evidence.

*G*

As to (2) construction, if the excluded material is admitted, the construction is obvious. If the material is not admitted. the definition of "additional residential payment" should nevertheless be construed in the way the defendants contend because this is the only way to make commercial sense of the contract. This is for the reasons given in the dissenting judgment of Lawrence Collins LJ in the Court of Appeal [2008] 2 All ER (Comm) 387, which the defendants adopt.

*H*

As to (3), if the defendants' argument on the construction of the contract is rejected, the next issue is rectification. Rectification of a contract is available where the written contract by mistake does not reflect the parties' accord as objectively gathered from their communications with each other.

A    In such a case the parties' private uncommunicated subjective understanding
of their accord is irrelevant to the inquiry. [Reference was made to
*Shipley Urban District Council v Bradford Corpn* [1936] Ch 375; *Crane v
Hegeman-Harris Co Inc (Note)* [1971] 1 WLR 1390; *Frederick E Rose
(London) Ltd v William H Pim Jnr & Co Ltd* [1953] 2 QB 450; *Joscelyne v
Nissen* [1970] 2 QB 86; *Etablissements Georges et Paul Levy v Adderley
B    Navigation Co Panama SA (The Olympic Pride)* [1980] 2 Lloyd's Rep 67;
*Britoil plc v Hunt Overseas Oil Inc* [1994] CLC 561; *PT Berlian Laju
Tanker TBK v Nuse Shipping Ltd (The Aktor)* [2008] 2 Lloyd's Rep 246;
*Cambridge Antibody Technology Ltd v Abbott Biotechnology Ltd* [2005]
FSR 590 and *Munt v Beasley* [2006] EWCA Civ 370.]
The trend of the authorities is strongly in the defendants' favour. The
issue is whether a written contract correctly records the previous accord
C    of the parties. If the contract does not do that there is common mistake.
On the facts of this case and the evidence before Briggs J there should be
rectification.

*Robert Miles QC* and *Timothy Morshead* (instructed by *Carter Ruck*) for
the claimants.

When parties enter into a formal written contract they are saying that
D    that is the definitive record of their agreement. [Reference was made to
*A & J Inglis v John Buttery & Co* (1878) 3 App Cas 552 and *Melanesian
Mission Trust Board v Australian Mutual Provident Society* [1997]
2 EGLR 128.] The exclusionary rule accords with contractual certainty and
with the ability to obtain speedy advice on contracts. The abolition of the
rule would undermine the advice a lawyer could give and would also
lengthen court proceedings. The rule also protects the interests of third
E    parties. There is no good reason for the House of Lords to do away with
the rule.
The defendants' submission that the rule should not apply where there
is a consensus between the parties during the negotiations lacks any
principled basis and would in practice sweep away the rule itself. During
negotiations the consensus will change and what is consensus might be highly
F    controversial. It would be necessary in each case to determine whether
a consensus has been reached so that any lawyer advising on a contract
would have to traverse the history, as would a court of construction.
The evidence in this case does not support the defendants' submission
that the parties had agreed on the terms. The initial view of the reasonable
observer reading the disputed clause would be that it was carefully drafted
by skilled lawyers. The defendants are wrong in their submission that the
G    clause was badly drafted. The natural meaning of the words is important in
this clause. [Reference was made to *Wickman Machine Tools Sales Ltd v
L Schuler AG* [1974] AC 235.]
There is no need for the law to admit evidence of negotiations as an aid to
interpretation, whether in the present case or generally. The facts of this case
do not suggest that the rule in *Prenn v Simmonds* [1971] 1 WLR 1381 is
unsound. On the contrary it suggests the opposite. The contract itself
H    is unambiguous. It does not produce a commercially absurd result nor is it
otherwise offensive to business common sense.
Rectification is a new point taken by the defendants. It is assumed that
the House of Lords has jurisdiction to hear this new point, but it must also
have a discretion to exclude it. It is too late for the defendants to take a new

point on this appeal and they should not be allowed to pursue it. The trial    *A*
judge would have been asked to make further findings if the new point had
been pursued.

Rectification should not be granted on the facts of this case. [Reference
was made to *Commission for the New Towns v Cooper (Great Britain) Ltd*
[1995] Ch 259.] Equity looks beyond the contract because the parties have
made a mistake. Equity regards it as unconscionable if one party tries to    *B*
enforce that contract against the other. For rectification one must look
at both parties' intention/state of mind and show that there was common
accord. [Reference was made to *Thomas Bates & Son Ltd v Wyndham's
(Lingerie) Ltd* [1981] 1 WLR 505; *Crane v Hegeman-Harris Co Inc (Note)*
[1971] 1 WLR 1390; *Etablissements Georges et Paul Levy v Adderley
Navigation Co Panama SA (The Olympic Pride)* [1980] 2 Lloyd's Rep 67;
*Britoil plc v Hunt Overseas Oil Inc* [1994] CLC 561; *PT Berlian Laju*    *C*
*Tanker TBK v Nuse Shipping Ltd (The Aktor)* [2008] 2 Lloyd's Rep 246;
*Ryledar Pty Ltd (trading as Volume Plus) v Euphoric Pty Ltd* (2007)
69 NSWLR 603 and *Frederick E Rose (London)Ltd v William H Pim Jnr &
Co Ltd* [1953] 2 QB 450.] There is a difference between a state of mind
and objective intention: see the *Britoil* case. That case is against the defendants.

If the claimant is right on the law there must be common mistake and the
defendants must lose. If the claimant is wrong on the law the defendants    *D*
must lose on the facts since there was no common accord.

*Nugee QC* in reply.

When the court is interpreting a contract it is trying to get as close as
possible to what the parties meant. A contract does things as well as says
things: it binds parties to do things and if they do not do what they promised
to do they voluntarily expose themselves to the coercive power of the state.    *E*
The parties expect the court to enforce the bargain which they have made
and encapsulated in a written contract. The words are a means to an end
and not a end in themselves. Words have to be interpreted. The best chance
of getting justice is for the court to put itself in the shoes of the parties,
starting with the words of the contract. The question is not what the words
meant but what these parties meant. It is not right to exclude the very
evidence which could clarify that. Letting in the negotiations gives the court    *F*
the best chance of ascertaining what the parties meant. [Reference was
made to *Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd
(The Karen Oltmann)* [1976] 2 Lloyd's Rep 708.]

Contractual certainty and speedy advice are important, but a lawyer
is bound to ask questions about the pre-contractual negotiations and
discussions. Therefore it is not right to suggest that there is going to be a    *G*
dramatic change to contractual certainty and the speed of advice if those
negotiations are admitted.    It will not make commercial litigation
impossible. The interests of third parties might be affected but the interests
of the parties to the contract are more important than those of third parties.
Third parties are successors and cannot take what the parties have not got.
The nemo dat principle applies and that is a risk which third parties take
when they take an assignment of a contract. The primary interest is that of    *H*
the contracting parties and not of the third parties.

There is no unfairness in taking a new point on rectification at this stage
of the appeal. It is not a new point but a new legal analysis. The judge was
right to say that agreement was in principle reached by the parties. At the

A  heart of the question of rectification is mistake. A mistaken belief is relevant
but the contract is not about what is in people's heads. The mistaken
belief is that what is in the contract correctly records what was agreed.
The inquiry is as to whether the contract encapsulates the agreement and
whether there has been a mistake in the preparation of the document.
[Reference was made to *Thomas Bates & Son Ltd v Wyndham's (Lingerie)*

B  *Ltd* [1981] 1 WLR 505; *Crane v Hegeman-Harris Co Inc (Note)* [1971]
1 WLR 1390; *Etablissements Georges et Paul Levy v Adderley Navigation
Co Panama SA (The Olympic Pride)* [1980] 2 Lloyd's Rep 67 and
*PT Berlian Laju Tanker TBK v Nuse Shipping Ltd (The Aktor)* [2008]
2 Lloyd's Rep 246.]

The Committee took time for consideration.

C
1 July 2009. **LORD HOPE OF CRAIGHEAD**

1  My Lords, I have had the privilege of reading in draft the opinion of
my noble and learned friend, Lord Hoffmann. Like my noble and learned
friend, Lord Walker of Gestingthorpe, whose opinion I have also had the
privilege of reading, I agree with all his reasoning and I share Lord Walker's
admiration for the way it has been expressed. For the reasons they give

D  I would allow the appeal.

2  I agree that Persimmon's argument that the House should take
account of the pre-contractual negotiations raises an important issue. Every
so often the rule that prior negotiations are inadmissible comes under
scrutiny. That is as it should be. One of the strengths of the common law is
that it can take a fresh look at itself so that it can keep pace with changing

E  circumstances. But for the reasons that have been set out by Lord Hoffmann
I think that the arguments for retaining the rule have lost none of their force
since *Prenn v Simmonds* [1971] 1 WLR 1381 demonstrated, as Lord
Wilberforce put it at p 1384, the disadvantages and danger of departing
from established doctrine.

3  In the Court of Appeal Lawrence Collins LJ said that the policy
reasons for the rule have not been fully articulated: [2008] 2 All

F  ER (Comm) 387, para 106. I am not sure, with respect, that everyone
would agree with him. Lord Gifford did his best to explain what they are
in his dissenting opinion in *A & J Inglis v John Buttery & Co* (1877)
5 R 58, 69–70. When that case came before this House, Lord Blackburn
said that they set out exactly what he himself thought: (1878) 3 App Cas
552, 577. As Lord Gifford explained, the very purpose of a formal

G  contract is to put an end to the disputes which would inevitably arise if the
matter were left upon what the parties said or wrote to each other during
the period of their negotiations. It is the formal contract that records their
bargain, however different it may be from what they may have stipulated
for previously.

4  Lord Blackburn clearly saw no conflict between the exclusionary rule
and Lord Justice Clerk Moncreiff's proposition that the court was entitled to

H  be put in the position that the parties stood before they signed: 5 R 58, 64.
In *River Wear Comrs v Adamson* (1877) 2 App Cas 743, 763 he had already
acknowledged that the court should look beyond the language of the
contract and see what the circumstances were with reference to which
the words were used. As he put it, the meaning of words varies according to

1110
**Chartbrook Ltd v Persimmon Homes Ltd (HL(E))**                    [2009] 1 AC
**Lord Hope of Craighead**

the circumstances with respect to which they are used. It was the reasons    A
that Lord Gifford articulated in *Inglis v Buttery* 5 R 58, 69–70, that
persuaded him that to admit evidence of prior negotiations would be a step
too far. I think that what appealed to Lord Blackburn still holds true today.
If more is needed, Lord Hoffmann's analysis provides it. As he has
indicated, it would only be if your Lordships were confident that the rule
was impeding the proper development of the law or contrary to public policy    B
that it would be right for it to be departed from. That this is so has not,
as I see it, been demonstrated.

## LORD HOFFMANN

5 My Lords, on 16 October 2001 Chartbrook Ltd ("Chartbrook")
entered into an agreement with Persimmon Homes Ltd ("Persimmon"), a
well known house-builder, for the development of a site in Wandsworth    C
which Chartbrook had recently acquired. The structure of the agreement
was that Persimmon would obtain planning permission and then, pursuant
to a licence from Chartbrook, enter into possession, construct a mixed
residential and commercial development (commercial premises below,
flats above, parking in the basement) and sell the properties on long leases.
Chartbrook would grant the leases at the direction of Persimmon,
which would receive the proceeds for its own account and pay Chartbrook    D
an agreed price for the land. Planning permission was duly granted and
the development was built, but there is a dispute over the price which
became payable.

6 Schedule 6 contained the relevant provisions. The price was defined
as the aggregate of the total land value and the balancing payment. The
total land value was made up of three parts: total residential land value, total    E
commercial land value and total residential car parking land value.
Total residential land value was to be £76·34 per square foot multiplied by
the area for which planning permission for flats was granted. Total
commercial land value was £38·80 per square foot multiplied by the area for
which planning permission for shops and other commercial uses was
granted. And total residential car parking land value was £3,024 multiplied
by the number of spaces for which planning permission was granted.    F
The schedule set out the dates upon which the total land value was to be
paid. In principle, payment would fall due as each flat, shop or parking
space was sold. But there was also a backstop provision for payment of
specified percentages of the total land value (so far as not already paid) by
dates commencing about two and a half years after the grant of planning
permission and ending about two years later, by which time the whole sum    G
was due, whether the properties had been sold or not.

7 The provisions about total land value are all quite straightforward
and only require the insertion of the appropriate figures from the planning
permission (which are not in dispute) into the formulae provided. The other
element in the price is the balancing payment. For reasons concerned with
its drafting history which need not be explored, the schedule defines the
balancing payment as the additional residential payment ("ARP") and then    H
goes on to define the latter expression. So when I refer to the ARP, that
means the balancing payment.

8 The definition of the ARP, over which the whole dispute turns, is
outwardly uncomplicated: "23·4% of the price achieved for each residential

A   unit in excess of the minimum guaranteed residential unit value less the costs
and incentives."

9   This contains three more defined concepts. Residential unit means a
flat. The minimum guaranteed residential unit value ("MGRUV") means
the total residential land value divided by the number of flats. And costs
and incentives ("C & I") mean the additional expense which Persimmon
B   might have to incur to induce someone to buy a flat; for example, by
providing fittings better than specification or paying legal expenses.
Such payments are economically equivalent to a reduction in the price
achieved.

10   Chartbrook says that the meaning of the definition is perfectly
simple. You take the price achieved, deduct the MGRUV and the C & I and
calculate 23·4% of the result. That gives you a figure for an individual flat
C   which, together with the figures for similar calculations on all the other flats,
makes up the ARP or balancing payment. That and the total land value
is the price. On the agreed figures, that produces a total land value of
£4,683,565 and an ARP of £4,484,862, making £9,168,427 in all. The
judge (Briggs J) [2007] 1 All ER (Comm) 1083 and a majority of the Court of
Appeal (Tuckey LJ and Rimer LJ) [2008] 2 all ER (Comm) 387 agreed.

D   11   This construction is certainly in accordance with conventional
syntax, at any rate, up to the point at which one decides when C & I should
be deducted. As Briggs J said, at para 53:

"ARP means 23·4% of something. To the question '23·4% of what?'
the clear answer is the excess of the price achieved for each residential
unit over the MGRUV, less the costs and incentives."

E   12   I do not think that the syntax helps one to decide whether C & I
should be deducted before or after calculating the 23·4%, that is to say,
whether there is a notional pause for breath after "MGRUV", represented in
the passage I have quoted from the judgment by a comma which does not
appear in the contract. That is a grammatical ambiguity which must be
resolved by considering the business purpose of providing for a deduction of
C & I. But the judge was clearly right about the effect of the syntax
F   employed in the first part of the definition.

13   Persimmon, on the other hand, says that the purpose of dividing the
price into total land value and ARP was to give Chartbrook a minimum price
for its land, calculated on current market assumptions, and to allow for the
possibility of an increase if the market rose and the flats sold for more than
expected. It is agreed that, at the time of the agreement, the parties expected
G   that a 700 square foot flat would sell for about £200,000 or so, maybe
slightly more. The MGRUV at £76·34 a square foot for such a flat was
£53,438 or 26·7% of a price of £200,000. If the realised price was £228,000,
it would represent 23·4%. The purpose of the ARP was to provide that if the
flats sold for more than £228,000, Chartbrook would be entitled to the
amount by which 23·4% of the higher price exceeded the £53,438 MGRUV.
What the definition therefore means is that you deduct C & I from the
H   realised price to arrive at the net price received by Persimmon, then calculate
23·4% of that price, and the ARP is the excess of that figure over MGRUV.
On this calculation, ARP is £897,051, compared with Chartbrook's claim
for £4,484,862. In the Court of Appeal Lawrence Collins LJ, dissenting,
held that Persimmon's construction was correct.

1112
**Chartbrook Ltd v Persimmon Homes Ltd (HL(E))**                    **[2009] 1 AC**
**Lord Hoffmann**

14  There is no dispute that the principles on which a contract (or any    A
other instrument or utterance) should be interpreted are those summarised
by the House of Lords in *Investors Compensation Scheme Ltd v West
Bromwich Building Society* [1998] 1 WLR 896, 912–913. They are well
known and need not be repeated. It is agreed that the question is what a
reasonable person having all the background knowledge which would have
been available to the parties would have understood them to be using the    B
language in the contract to mean. The House emphasised that "we do
not easily accept that people have made linguistic mistakes, particularly in
formal documents" (similar statements will be found in *Bank of Credit and
Commerce International SA v Ali* [2002] 1 AC 251, 269; *Kirin-Amgen Inc v
Hoechst Marion Roussel Ltd* [2005] 1 All ER 667, 681–682 and *Jumbo King
Ltd v Faithful Properties Ltd* (1999) 2 HKCFAR 279, 296) but said that in
some cases the context and background drove a court to the conclusion that    C
"something must have gone wrong with the language". In such a case, the
law did not require a court to attribute to the parties an intention which a
reasonable person would not have understood them to have had.

15  It clearly requires a strong case to persuade the court that something
must have gone wrong with the language and the judge and the majority of
the Court of Appeal did not think that such a case had been made out.
On the other hand, Lawrence Collins LJ thought it had. It is, I am afraid,    D
not unusual that an interpretation which does not strike one person as
sufficiently irrational to justify a conclusion that there has been a linguistic
mistake will seem commercially absurd to another: compare the *Kirin-
Amgen* case [2005] All ER 667, 684–685. Such a division of opinion
occurred in the *Investors Compensation Scheme* case itself [1998]
1 WLR 896. The subtleties of language are such that no judicial guidelines    E
or statements of principle can prevent it from sometimes happening. It is
fortunately rare because most draftsmen of formal documents think about
what they are saying and use language with care. But this appears to be an
exceptional case in which the drafting was careless and no one noticed.

16  I agree with the dissenting opinion of Lawrence Collins LJ because
I think that to interpret the definition of ARP in accordance with ordinary
rules of syntax makes no commercial sense. The term "minimum    F
guaranteed residential unit value", defined by reference to total residential
land value, strongly suggests that this was to be a guaranteed minimum
payment for the land value in respect of an individual flat. A guaranteed
minimum payment connotes the possibility of a larger payment which,
depending upon some contingency, may or may not fall due. Hence the term
"additional residential payment". The element of contingency is reinforced    G
by para 3.3 of the sixth schedule, which speaks of the "date of payment
*if any* of the balancing payment" (my emphasis).

17  The judge declined to regard the terms total land value and
minimum guaranteed residential unit value as indicative of an intention that
MGRUV was to be the minimum Chartbrook would receive as the land
value of a flat because both terms were defined expressions. They might just
as well have been algebraic symbols. Indeed they might, and I strongly    H
suspect that if they had been, they would have made it clear that the parties
were intending to give effect to Persimmon's construction. But the contract
does not use algebraic symbols. It uses labels. The words used as labels are
seldom arbitrary. They are usually chosen as a distillation of the meaning or

1113

A  purpose of a concept intended to be more precisely stated in the definition. In such cases the language of the defined expression may help to elucidate ambiguities in the definition or other parts of the agreement: compare *Birmingham City Council v Walker* [2007] 2 AC 262, 268. I therefore consider that Lawrence Collins LJ was right to take into account the connotations of contingency to be derived from the defined terms.

B      18  On Chartbrook's construction, there is virtually no element of contingency at all. ARP is payable in every case in which the flat sells for more than £53,438. Chartbrook submits that is still a contingency. Who could tell whether or not the market for flats in Wandsworth might not collapse? In the Court of Appeal, Rimer LJ accepted that submission. He said [2008] 2 All ER (Comm) 387, para 186, that the "relevant language", i e, the language of contingency, was "strictly consistent also with
C  Chartbrook's construction".

      19  My Lords, I cannot believe that any rational parties who wished to make provision for such a catastrophic fall in the housing market (itself an unlikely assumption) would have adopted so precise a sum to represent their estimate of what might happen. Why £53,438? That was the agreed minimum figure for that part of the value of a flat attributable to the *land* which Chartbrook was selling. It was clearly based upon a careful and
D  precise estimate of current market prices and building costs. But how could this figure have been appropriate as a minimum expected *sale* price of the entire flat at some future date? If the parties were wanting to guess at some extraordinary fall in the market against which Chartbrook was to be protected, why £53,438? Why not £50,000 or £60,000, or £100,000? A figure chosen to represent someone's fears about a possible
E  collapse in the market could only have been based upon wild speculation, not the kind of calculation which produces a figure like £53,438. That figure cannot have been meant to play the part in the calculation which Chartbrook's construction assigns to it. It must have been intended to function as a minimum land value, not a minimum sale price. To compare it with the realised sale price would not be comparing like with like.

F      20  It is of course true that the fact that a contract may appear to be unduly favourable to one of the parties is not a sufficient reason for supposing that it does not mean what it says. The reasonable addressee of the instrument has not been privy to the negotiations and cannot tell whether a provision favourable to one side was not in exchange for some concession elsewhere or simply a bad bargain. But the striking feature of this case is not merely that the provisions as interpreted by the judge and the
G  Court of Appeal are favourable to Chartbrook. It is that they make the structure and language of the various provisions of schedule 6 appear arbitrary and irrational, when it is possible for the concepts employed by the parties (MGRUV, C & I etc) to be combined in a rational way.

      21  I therefore think that Lawrence Collins LJ was right in saying that ARP must mean the amount by which 23·4% of the achieved price exceeds the MGRUV. I do not think that it is necessary to undertake the exercise of
H  comparing this language with that of the definition in order to see how much use of red ink is involved. When the language used in an instrument gives rise to difficulties of construction, the process of interpretation does not require one to formulate some alternative form of words which approximates as closely as possible to that of the parties. It is to decide what

1114
**Chartbrook Ltd v Persimmon Homes Ltd (HL(E))**                    [2009] 1 AC
**Lord Hoffmann**

a reasonable person would have understood the parties to have meant by   *A*
using the language which they did.  The fact that the court might have to
express that meaning in language quite different from that used by the
parties ("12 January" instead of "13 January" in *Mannai Investment Co Ltd
v Eagle Star Life Assurance Co Ltd* [1997] AC 749; "any claim sounding in
rescission (whether for undue influence or otherwise)" instead of "any claim
(whether sounding in rescission for undue influence or otherwise)" in         *B*
*Investors Compensation Scheme Ltd v West Bromwich Building Society*
[1998] 1 WLR 896) is no reason for not giving effect to what they appear to
have meant.

22  In *East v Pantiles (Plant Hire) Ltd* (1981) 263 EG 61 Brightman LJ
stated the conditions for what he called "correction of mistakes by
construction":                                                                   *C*

"Two conditions must be satisfied: first, there must be a clear mistake
on the face of the instrument; secondly, it must be clear what correction
ought to be made in order to cure the mistake.  If those conditions are
satisfied, then the correction is made as a matter of construction."

23  Subject to two qualifications, both of which are explained by
Carnwath LJ in his admirable judgment in *KPMG LLP v Network Rail*          *D*
*Infrastructure Ltd* [2007] Bus LR 1336, I would accept this statement,
which is in my opinion no more than an expression of the common sense
view that we do not readily accept that people have made mistakes in formal
documents.  The first qualification is that "correction of mistakes by
construction" is not a separate branch of the law, a summary version of an
action for rectification.  As Carnwath LJ said, at p 1351, para 50:

"Both in the judgment, and in the arguments before us, there was a         *E*
tendency to deal separately with correction of mistakes and construing
the paragraph 'as it stands', as though they were distinct exercises.  In
my view, they are simply aspects of the single task of interpreting the
agreement in its context, in order to get as close as possible to the meaning
which the parties intended."

24  The second qualification concerns the words "on the face of the         *F*
instrument".  I agree with Carnwath LJ, paras 44–50, that in deciding
whether there is a clear mistake, the court is not confined to reading the
document without regard to its background or context.  As the exercise is
part of the single task of interpretation, the background and context must
always be taken into consideration.

25  What is clear from these cases is that there is not, so to speak, a limit  *G*
to the amount of red ink or verbal rearrangement or correction which the
court is allowed.  All that is required is that it should be clear that something
has gone wrong with the language and that it should be clear what a
reasonable person would have understood the parties to have meant.  In my
opinion, both of these requirements are satisfied.

26  That leaves the question of the deduction of C & I, which the judge
and the majority of the Court of Appeal regarded as an insuperable obstacle  *H*
to Persimmon's construction.  I cannot see why this should be so.  Everyone
agrees that the only sum from which C & I can rationally be deducted is the
headline price achieved on the sale, so as to arrive at the net amount received
by Persimmon.  That is accordingly what the parties must have meant.

**[2009] 1 AC**                          **Chartbrook Ltd v Persimmon Homes Ltd (HL(E))**
                                                                    **Lord Hoffmann**

A  You deduct the C & I from the nominal price achieved and the ARP is the
   excess, if any, of 23·4% of that net sum over the MGRUV. Giving this
   meaning to the provision about C & I does not in any way weaken or affect
   the argument for interpreting the rest of the definition in a way which gives
   ARP a rational meaning. To say, as Rimer LJ said [2008] 2 All ER (Comm)
   387, para 185, that it requires "rewriting", or that it "distorts the meaning
   and arithmetic of the definition" is only to say that it requires one to
B  conclude that something has gone wrong with the language—not, in this
   case, with the meanings of words, but with the syntactical arrangement of
   those words. If however the context drives one to the conclusion that this
   must have happened, it is no answer that the interpretation does not reflect
   what the words would conventionally have been understood to mean.

   27   If your Lordships agree with this conclusion about the construction
C  of the contract, the appeal must be allowed. There is no need to say anything
   more.    But Persimmon advanced two alternative arguments of very
   considerable general importance and I think it is appropriate that your
   Lordships should deal with them.    The first was that (contrary to the
   unanimous opinion of the judge and the Court of Appeal) the House should
   take into account the pre-contractual negotiations, which in the opinion of
   Lawrence Collins LJ, at para 132, were determinative confirmation of
D  Persimmon's argument on construction. The second was that the judge and
   the Court of Appeal had misunderstood the principles upon which
   rectification may be decreed and that if Persimmon had failed on
   construction, the agreement should have been rectified.

   28   The rule that pre-contractual negotiations are inadmissible was
   clearly reaffirmed by this House in *Prenn v Simmonds* [1971] 1 WLR 1381,
E  1384 where Lord Wilberforce said that earlier authorities "contain little to
   encourage, and much to discourage, evidence of negotiation or of the
   parties' subjective intentions". It is clear that the rule of inadmissibility has
   been established for a very long time. In *A & J Inglis v John Buttery & Co*
   (1878) 3 App Cas 552, 577 Lord Blackburn said that Lord Justice Clerk
   Moncreiff, at (1877) 5 R 58, 64, had laid down a principle which was nearly
   accurate but not quite when he said that in all mercantile contracts "whether
F  they be clear and distinct or the reverse, the court [is] entitled to be placed in
   the position in which the parties stood before they signed". The only
   qualification Lord Blackburn made was to reject Lord Moncreiff's view that
   the court was entitled to look at the pre-contractual negotiations because
   unless one did so, one could not be fully in the position in which the parties
   had been.

G  29   Instead, Lord Blackburn preferred, at p 577, the opinion of Lord
   Gifford (5 R 58, 69–70):

       "Now, I think it is quite fixed—and no more wholesome or salutary
   rule relative to written contracts can be devised—that where parties agree
   to embody, and do actually embody, their contract in a formal written
   deed, then in determining what the contract really was and really meant, a
   court must look to the formal deed and to that deed alone. This is only
H  carrying out the will of the parties. The only meaning of adjusting
   a formal contract is, that the formal contract shall supersede all
   loose and preliminary negotiations—that there shall be no room for
   misunderstandings which may often arise, and which do constantly arise,
   in the course of long, and it may be desultory conversations, or in the

course of correspondence or negotiations during which the parties are *A* often widely at issue as to what they will insist on and what they will concede. The very purpose of a formal contract is to put an end to the disputes which would inevitably arise if the matter were left upon verbal negotiations or upon mixed communings partly consisting of letters and partly of conversations. The written contract is that which is to be appealed to by both parties, however different it may be from their *B* previous demands or stipulations, whether contained in letters or in verbal conversation. There can be no doubt that this is the general rule, and I think the general rule, strictly and with peculiar appropriateness applies to the present case."

30 To allow evidence of pre-contractual negotiations to be used in aid of construction would therefore require the House to depart from a long and *C* consistent line of authority, the binding force of which has frequently been acknowledged: see *Bank of Scotland v Dunedin Property Investment Co Ltd* 1998 SC 657, 665 ("well established and salutary", per Lord President Rodger; *Alexiou v Campbell* [2007] UKPC 11 at [15] ("vouched by . . . compelling authorities", per Lord Bingham of Cornhill). The House is nevertheless invited to do so, on the ground that the rule is illogical and prevents a court from, as the Lord Justice Clerk in *A & J Inglis v John* *D* *Buttery & Co* 3 App Cas 552 said, putting itself in the position of the parties and ascertaining their true intent.

31 In *Prenn v Simmonds* [1971] 1 WLR 1381, 1384–1385 Lord Wilberforce said by way of justification of the rule:

"The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience, (though the attempt to *E* admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, though converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of *F* the contractual words? If the same expressions are used, nothing is gained by looking back: indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to. It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense this is true: the commercial, or business object, *G* of the transaction, objectively ascertained, may be a surrounding fact. Cardozo J thought so in the *Utica Bank* case [*Utica City National Bank v Gunn* (1918) 118 NE 607]. And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, *H* or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The words used may, and often do, represent a formula which means different things to

1117
[2009] 1 AC                          Chartbrook Ltd v Persimmon Homes Ltd (HL(E))
                                                                    Lord Hoffmann

A    each side, yet may be accepted because that is the only way to get
     'agreement' and in the hope that disputes will not arise. The only course
     then can be to try to ascertain the 'natural' meaning. Far more, and
     indeed totally, dangerous is it to admit evidence of one party's
     objective—even if this is known to the other party. However strongly
     pursued this may be, the other party may only be willing to give it partial
B    recognition, and in a world of give and take, men often have to be
     satisfied with less than they want. So, again, it would be a matter of
     speculation how far the common intention was that the particular
     objective should be realised."

     32    Critics of the rule, such as Thomas J in New Zealand (*Yoshimoto v
     Canterbury Golf International Ltd* [2001] 1 NZLR 523, 538–549) Professor
     David McLauchlan ("Contract Interpretation: What is it About?" (2009)
C    31:5 Sydney Law Review 5-51) and Lord Nicholls of Birkenhead ("My
     Kingdom for a Horse: The Meaning of Words" (2005) 121 LQR 577–591)
     point out that although all this may usually be true, in some cases it will not.
     Among the dirt of aspirations, proposals and counterproposals there may
     gleam the gold of a genuine consensus on some aspect of the transaction
     expressed in terms which would influence an objective observer in
D    construing the language used by the parties in their final agreement. Why
     should the court deny itself the assistance of this material in deciding what
     the parties must be taken to have meant? Mr Christopher Nugee QC, who
     appeared for Persimmon, went so far as to say that in saying that such
     evidence was unhelpful, Lord Wilberforce was not only providing
     a justification for the rule but delimiting its extent. It should apply only
     in cases in which the pre-contractual negotiations are actually irrelevant.
E    If they do assist a court in deciding what an objective observer would have
     construed the contract to mean, they should be admitted. I cannot accept
     this submission. It is clear from what Lord Wilberforce said and the
     authorities upon which he relied that the exclusionary rule is not qualified in
     this way. There is no need for a special rule to exclude irrelevant evidence.

     33    I do however accept that it would not be inconsistent with the
F    English objective theory of contractual interpretation to admit evidence of
     previous communications between the parties as part of the background
     which may throw light upon what they meant by the language they used.
     The general rule, as I said in *Bank of Credit and Commerce International
     SA v Ali* [2002] 1 AC 251, 269, is that there are no conceptual limits to
     what can properly be regarded as background. Prima facie, therefore, the
     negotiations are potentially relevant background. They may be inadmissible
G    simply because they are irrelevant to the question which the court has to
     decide, namely, what the parties would reasonably be taken to have meant
     by the language which they finally adopted to express their agreement. For
     the reasons given by Lord Wilberforce, that will usually be the case. But not
     always. In exceptional cases, as Lord Nicholls has forcibly argued, a rule
     that prior negotiations are always inadmissible will prevent the court from
     giving effect to what a reasonable man in the position of the parties
H    would have taken them to have meant. Of course judges may disagree over
     whether in a particular case such evidence is helpful or not. In *Yoshimoto v
     Canterbury Golf International Ltd* [2001] 1 NZLR 523 Thomas J thought
     he had found gold in the negotiations but the Privy Council said it was only
     dirt. As I have said, there is nothing unusual or surprising about such

differences of opinion. In principle, however, I would accept that previous
negotiations may be relevant.

34  It therefore follows that while it is true that, as Lord Wilberforce
said, inadmissibility is normally based in irrelevance, there will be cases in
which it can be justified only on pragmatic grounds. I must consider these
grounds, which have been explored in detail in the literature and on the
whole rejected by academic writers but supported by some practitioners.

35  The first is that the admission of pre-contractual negotiations would
create greater uncertainty of outcome in disputes over interpretation and
add to the cost of advice, litigation or arbitration. Everyone engaged in the
exercise would have to read the correspondence and statements would have
to be taken from those who took part in oral negotiations. Not only would
this be time-consuming and expensive but the scope for disagreement over
whether the material affected the construction of the agreement (as in the
*Yoshimoto* case) would be considerably increased. As against this, it is
said that when a dispute over construction is litigated, evidence of the
pre-contractual negotiations is almost invariably tendered in support of an
alternative claim for rectification (as in *Prenn v Simmonds* [1971] 1 WLR
1381 and in this case) or an argument based on estoppel by convention or
some alleged exception to the exclusionary rule. Even if such an alternative
claim does not succeed, the judge will have read and possibly been influenced
by the evidence. The rule therefore achieves little in saving costs and its
abolition would restore some intellectual honesty to the judicial approach to
interpretation.

36  There is certainly a view in the profession that the less one has to
resort to any form of background in aid of interpretation, the better. The
document should so far as possible speak for itself. As Popham CJ said
in the *Countess of Rutland's Case* (1604) 5 Co Rep 25b, 26a:

"it would be inconvenient, that matters in writing made by advice
and on consideration, and which finally import the certain truth of the
agreement of the parties should be controlled by averment of the parties
to be proved by the uncertain testimony of slippery memory."

37  I do not think that these opinions can be dismissed as merely based
upon the fallacy that words have inherent or "available" meanings, rather
than being used by people to express meanings, although some of the
arguments advanced in support might suggest this. It reflects what may be a
sound practical intuition that the law of contract is an institution designed to
enforce promises with a high degree of predictability and that the more one
allows conventional meanings or syntax to be displaced by inferences drawn
from background, the less predictable the outcome is likely to be. In this
respect, it is interesting to consider the reaction to the statement of principle
in *Investors Compensation Scheme Ltd v West Bromwich Building Society*
[1998] 1 WLR 896, 912–913, which was viewed with alarm by some
distinguished commercial lawyers as having greatly increased the quantity of
background material which courts or arbitrators would be invited to
consider: see Lord Bingham's recent paper ("A New Thing Under the Sun?
The Interpretation of Contract and the ICS Decision" (2008) 12 Edinburgh
LR 374–390) and Spigelman CJ, "From text to context: contemporary
contractual interpretation" (2007) 81 ALJ 322. As Lord Bingham pointed
out, there was little in that statement of principle which could not be found

A  in earlier authorities. The only points it decided that might have been thought in the least controversial were, first, that it was not necessary to find an "ambiguity" before one could have any regard to background and, secondly, that the meaning which the parties would reasonably be taken to have intended could be given effect despite the fact that it was not, according to conventional usage, an "available" meaning of the words or syntax which they had actually used.

B  38  Like Lord Bingham, I rather doubt whether the *ICS* case produced a dramatic increase in the amount of material produced by way of background for the purposes of contractual interpretation. But pre-contractual negotiations seem to me capable of raising practical questions different from those created by other forms of background. Whereas the surrounding circumstances are, by definition, objective facts, which will usually be

C  uncontroversial, statements in the course of pre-contractual negotiations will be drenched in subjectivity and may, if oral, be very much in dispute. It is often not easy to distinguish between those statements which (if they were made at all) merely reflect the aspirations of one or other of the parties and those which embody at least a provisional consensus which may throw light on the meaning of the contract which was eventually concluded. But the imprecision of the line between negotiation and provisional agreement is

D  the very reason why in every case of dispute over interpretation, one or other of the parties is likely to require a court or arbitrator to take the course of negotiations into account. Your Lordships' experience in the analogous case of resort to statements in Hansard under the rule in *Pepper v Hart* [1993] AC 593 suggests that such evidence will be produced in any case in which there is the remotest chance that it may be accepted and that even these cases

E  will be only the tip of a mountain of discarded but expensive investigation. *Pepper v Hart* has also encouraged ministers and others to make statements in the hope of influencing the construction which the courts will give to a statute and it is possible that negotiating parties will be encouraged to improve the bundle of correspondence with similar statements.

39  Supporters of the admissibility of pre-contractual negotiations draw attention to the fact that continental legal systems seem to have little

F  difficulty in taking them into account. Both the *Unidroit Principles of International Commercial Contracts* (1994 and 2004 revision) and the *Principles of European Contract Law* (1999) provide that in ascertaining the "common intention of the parties", regard shall be had to prior negotiations: articles 4(3) and 5(102) respectively. The same is true of the United Nations Convention on Contracts for the International Sale of Goods (1980).

G  But these instruments reflect the French philosophy of contractual interpretation, which is altogether different from that of English law. As Professor Catherine Valcke explains in an illuminating article ("On Comparing French and English Contract Law: Insights from Social Contract Theory" (16 January 2009) Social Science Research Network), French law regards the intentions of the parties as a pure question of subjective fact, their volonté psychologique, uninfluenced by any rules of law. It follows

H  that any evidence of what they said or did, whether to each other or to third parties, may be relevant to establishing what their intentions actually were. There is in French law a sharp distinction between the ascertainment of their intentions and the application of legal rules which may, in the interests of fairness to other parties or otherwise, limit the extent to which those

intentions are given effect. English law, on the other hand, mixes up the *A* ascertainment of intention with the rules of law by depersonalising the contracting parties and asking, not what their intentions actually were, but what a reasonable outside observer would have taken them to be. One cannot in my opinion simply transpose rules based on one philosophy of contractual interpretation to another, or assume that the practical effect of admitting such evidence under the English system of civil procedure will be the same as that under a continental system. *B*

40   In his judgment in the present case [2007] 1 All ER (Comm) 1083, Briggs J thought that the most powerful argument against admitting evidence of pre-contractual negotiations was that it would be unfair to a third party who took an assignment of the contract or advanced money on its security. Such a person would not have been privy to the negotiations and may have taken the terms of the contract at face value. There is clearly *C* strength in this argument, but it is fair to say that the same point can be made (and has been made, notably by Saville LJ in *National Bank of Sharjah v Dellborg* [1997] CA Transcript No 1320, which is unreported, but the relevant passage is cited in Lord Bingham's paper in the Edinburgh Law Review) in respect of the admissibility of any form of background. The law sometimes deals with the problem by restricting the admissible background *D* to that which would be available not merely to the contracting parties but also to others to whom the document is treated as having been addressed. Thus in *Bratton Seymour Service Co Ltd v Oxborough* [1992] BCLC 693, the Court of Appeal decided that in construing the articles of association of the management company of a building divided into flats, background facts which would have been known to all the signatories were inadmissible because the articles should be regarded as addressed to anyone *E* who read the register of companies, including persons who would have known nothing of the facts in question. In *Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2004] 1 AC 715 the House of Lords construed words which identified the carrier on the front of a bill of lading without reference to what it said on the back, on the ground that the bankers to whom the bill would be tendered could not be expected to read the small *F* print. Ordinarily, however, a contract is treated as addressed to the parties alone and an assignee must either inquire as to any relevant background or take his chance on how that might affect the meaning a court will give to the document. The law has sometimes to compromise between protecting the interests of the contracting parties and those of third parties. But an extension of the admissible background will, at any rate in theory, increase the risk that a third party will find that the contract does not mean what he *G* thought. How often this is likely to be a practical problem is hard to say. In the present case, the construction of the agreement does not involve reliance upon any background which would not have been equally available to any prospective assignee or lender.

41   The conclusion I would reach is that there is no clearly established case for departing from the exclusionary rule. The rule may well mean, *H* as Lord Nicholls has argued, that parties are sometimes held bound by a contract in terms which, upon a full investigation of the course of negotiations, a reasonable observer would not have taken them to have intended. But a system which sometimes allows this to happen may be justified in the more general interest of economy and predictability in

A obtaining advice and adjudicating disputes. It is, after all, usually possible to avoid surprises by carefully reading the documents before signing them and there are the safety nets of rectification and estoppel by convention. Your Lordships do not have the material on which to form a view. It is possible that empirical study (for example, by the Law Commission) may show that the alleged disadvantages of admissibility are not in practice very significant
B or that they are outweighed by the advantages of doing more precise justice in exceptional cases or falling into line with international conventions. But the determination of where the balance of advantage lies is not in my opinion suitable for judicial decision. Your Lordships are being asked to depart from a rule which has been in existence for many years and several times affirmed by the House. There is power to do so under the *Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234. But that power was
C intended, as Lord Reid said in *R v National Insurance Comrs, Ex p Hudson* [1972] AC 944, 966, to be applied only in a small number of cases in which previous decisions of the House were "thought to be impeding the proper development of the law or to have led to results which were unjust or contrary to public policy". I do not think that anyone can be confident that this is true of the exclusionary rule.

D     42   The rule excludes evidence of what was said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant. It does not exclude the use of such evidence for other purposes: for example, to establish that a fact which may be relevant as background was known to the parties, or to support a claim for rectification or estoppel. These are not exceptions to the rule. They operate outside it.

E     43   There is however a group of cases in which judges have found an exception to the exclusionary rule and your Lordships will have to decide whether such an exception can be justified. The leading case is the decision of Kerr J in *Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd (The Karen Oltmann)* [1976] 2 Lloyd's Rep 708. This concerned a time charter for two years (14 days more or less in charterers' option) which
F contained a break clause: "Charterers to have the option to redeliver the vessel after 12 months' trading subject to giving three months' notice."

     44   The issue was whether "after 12 months' trading" meant that the break clause could be operated only at the end of the first year or at any time during the second year. The judge said that he was entitled to look at telexes by which the fixture was negotiated in which the parties discussed various lengths of break clauses and were clearly using the word "after" to mean
G "on the expiry of" rather than "at any time after the expiry of". He justified the admissibility of this evidence on the following principle, at p 712:

     "If a contract contains words which, in their context, are fairly capable of bearing more than one meaning, and if it is alleged that the parties have in effect negotiated on an agreed basis that the words bore only one of the two possible meanings, then it is permissible for the court to examine the
H extrinsic evidence relied upon to see whether the parties have in fact used the words in question in one sense only, so that they have in effect given their own dictionary meaning to the words as the result of their common intention. Such cases would not support a claim for rectification of the contract, because the choice of words in the contract would not result

1122
**Chartbrook Ltd v Persimmon Homes Ltd (HL(E))**                    [2009] 1 AC
**Lord Hoffmann**

from any mistake. The words used in the contract would ex hypothesi    *A*
reflect the meaning which both parties intended."

45   In his judgment in this case [2008] 2 All ER (Comm) 387, para 121,
Lawrence Collins LJ said of this principle that he doubted whether
it differed in any material respect from admitting evidence of prior
negotiations in construing a contract. Indeed, the case is frequently cited as
an example of a exception which undermines the rule: see for example    *B*
Professor McLauchlan, "Contract Interpretation: What is It About?" (2009)
31:5 Sydney Law Review 5-51. It is true that evidence may always be
adduced that the parties habitually used words in an unconventional sense in
order to support an argument that words in a contract should bear a similar
unconventional meaning. This is the "private dictionary" principle, which is
akin to the principle by which a linguistic usage in a trade or among a
religious sect may be proved: compare *Shore v Wilson* (1842) 9 Cl & F 355.    *C*
For this purpose it does not matter whether the evidence of usage by the
parties was in the course of negotiations or on any other occasion. It is
simply evidence of the linguistic usage which they had in common. But the
telexes in *The Karen Oltmann* [1976] 2 Lloyd's Rep 708 did not evidence
any unconventional usage. There was no private dictionary. The case
involved a choice between two perfectly conventional meanings of the word    *D*
"after" in a particular context. In my opinion Lawrence Collins LJ was right
in saying that the admission of the evidence infringed the exclusionary rule.
It is perhaps significant that the evidence merely confirmed the meaning
which Kerr J, as an experienced commercial judge, would in any case have
given to the clause.

46   What would have been the position if Kerr J had thought that,    *E*
without the evidence of the telexes, he would have construed the clause in
the opposite sense? He said that rectification would not be available because
"The words used in the contract would ex hypothesi reflect the meaning
which both parties intended": p 712. I do not understand this, because, on
this hypothesis, the telexes would show that the words (as construed by the
judge) did *not* reflect the meaning which both parties intended. And it is
generally accepted that Brightman J was right in *In re Butlin's Settlement*    *F*
*Trusts* [1976] Ch 251 in holding that rectification is available not only when
the parties intended to use different words but also when they mistakenly
thought their words bore a different meaning.

47   On its facts, *The Karen Oltmann* was in my opinion an illegitimate
extension of the "private dictionary" principle which, taken to its logical
conclusion, would destroy the exclusionary rule and any practical    *G*
advantages which it may have. There are two legitimate safety devices
which will in most cases prevent the exclusionary rule from causing
injustice. But they have to be specifically pleaded and clearly established.
One is rectification. The other is estoppel by convention, which has been
developed since the decision in *The Karen Oltmann*: see *Amalgamated
Investment & Property Co Ltd v Texas Commerce International Bank Ltd*
[1982] QB 84. If the parties have negotiated an agreement upon some    *H*
common assumption, which may include an assumption that certain words
will bear a certain meaning, they may be estopped from contending that
the words should be given a different meaning. Both of these remedies lie
outside the exclusionary rule, since they start from the premise that, as a

1123
[2009] 1 AC                          Chartbrook Ltd v Persimmon Homes Ltd (HL(E))
                                                                     Lord Hoffmann

A  matter of construction, the agreement does not have the meaning for which
   the party seeking rectification or raising an estoppel contends.

   48  The last point is whether, if Chartbrook's interpretation of the
   agreement had been correct, it should have been rectified to accord with
   Persimmon's interpretation. The requirements for rectification were
   succinctly summarized by Peter Gibson LJ in *Swainland Builders Ltd v*
B  *Freehold Properties Ltd* [2002] 2 EGLR 71, 74, para 33:

       "The party seeking rectification must show that: (1) the parties had
     a common continuing intention, whether or not amounting to an
     agreement, in respect of a particular matter in the instrument to be
     rectified; (2) there was an outward expression of accord; (3) the intention
     continued at the time of the execution of the instrument sought to be
     rectified; (4) by mistake, the instrument did not reflect that common
C    intention."

   49  To explain how the claim for rectification arose, I must summarise
   the relevant pre-contractual exchanges between the parties. They began by
   discussing a proposal for an outright sale of the land by Chartbrook to
   Persimmon at a price calculated by reference to such planning permission as
   Chartbrook might obtain. In early 2001 this structure was abandoned and
D  Persimmon in a letter dated 1 February 2001 proposed the building licence
   arrangement eventually agreed. The letter included the following passages:

       "we would be prepared to pay you 29·8% of the net sales proceeds
     generated from the private sale residential element of the scheme and a
     further 45% of the net sales revenue generated from the disposal of the
     commercial element of the site. We would pay you this proportion of the
E    income regardless of the development costs incurred by my company and
     the quantum of accommodation that we ultimately obtain planning
     permission for . . . By tying your land value to a percentage of the income,
     you will also automatically share in any sales uplift that we experience."

   50  This offer of a straightforward sharing of the proceeds was modified
   in a letter dated 6 February 2001 by the addition of what were described as
F  "guaranteed backstop dates and minimum payments":

       "Upon receipt of the purchase monies, the revenue will be apportioned
     to Chartbrook on the basis of 29·8% of the net revenue achieved from the
     disposal of the private sale residential units and 45% of the net revenue
     from the disposal of the commercial units. In addition, we are prepared
     to provide you with guaranteed backstop dates and minimum payments
G    that will be made regardless of the actual performance of the project both
     in terms of timescales and costs. I set out on the attached schedule our
     proposals concerning this element of the deal. Based on the current
     scheme for 80 units, and 9,020 sq ft of commercial floor space, the
     minimum land value we are prepared to pay to Chartbrook on the
     disposal of each residential unit is £67,000, together with a further
     minimum payment of £400,000 on the disposal of the commercial unit.
H    If as a result of improvements in the market, Chartbrook are entitled
     to more than the minimum payments I suggest an equalisation
     calculation takes place following the disposal of the last unit . . . Within
     the contract, I . . . suggest that a formula is included whereby the land
     value is calculated using the following inputs: private sale residential

1124
**Chartbrook Ltd v Persimmon Homes Ltd (HL(E))**                    **[2009] 1 AC**
**Lord Hoffmann**

accommodation . . . 94·96/sq ft . . . Once the total land value has been    A
calculated, a simple formula can then be applied to divide the land values
by the number of units, in order for us to calculate the guaranteed
payments that you will receive on the sale of each plot . . ."

51    On 12 February there was a further modification to make separate
provision for the sales of car parking spaces, but the overall offer for land
value remained the same. The judge found [2007] 1 All ER (Comm) 1083,    B
para 110, that Chartbrook accepted this offer in principle and Persimmon's
solicitors were instructed to draft an agreement. Their draft was attached to
an e-mail dated 1 March 2001 and contained essentially the same formulae
for calculating the price as those in the final agreement. The definition of
"additional residential payment" was (save for the percentage figure) in
precisely the same words as those of the final agreement.

52    Between March and May Chartbrook acquired some additional    C
adjoining land and Persimmon revised its cost estimates. The result was a
change in the figures but not in the formulae. In a letter dated 24 May
2001 Persimmon offered a new total land value of £7,191,947. The letter
contained a table setting out:

"the minimum guaranteed land values that you will receive for the
respective elements of the scheme, together with the percentage of sales    D
revenue that you will also be entitled to if the project performs better than
is currently anticipated."

53    The figures in the table were 23·4% for "percentage of sales revenue"
and £53,333 for "minimum value per plot". The judge found that this offer
was also accepted in principle and the new figures were inserted into the final
contract. The words of the definition of ARP in the final draft remained    E
(subject to the change in the percentage figure) exactly the same as in the first
draft.

54    It is I think clear that a reasonable person who read the February and
May letters in the light of the background known to the parties would have
taken them to have been intending that Chartbrook should receive an
ARP if, but only if, "the project performs better than is currently    F
anticipated".

55    Persimmon's case on rectification at the trial was that the letter of
24 May 2001 was an outward expression of the common and continuing
intention of the parties and (if Chartbrook was right about its true
construction) the definition had been drafted in the mistaken belief that it
gave effect to that common intention. On the other hand, the evidence of the
two principals of Chartbrook, Mr Vantreen and Mr Reeve, was that they    G
had made no mistake. The definition accorded exactly with what they had
thought they were being offered in the letters of February and May 2001.
Indeed, they said they would not have done the deal for any less. It was put
to them in cross-examination that no rational person could have understood
the letters in the sense which they claimed and Mr Vantreen was caused
some little difficulty by the fact that, on his copy of the May 2001 letter, he
had calculated the amount which (on Persimmon's construction of the    H
definition) the sale price of a 700 sq ft flat would have to exceed before
any ARP became payable (£228,000). This calculation would have been
irrelevant on his own construction of the definition and he was unable to
explain why he had made it. Nevertheless the judge accepted the evidence of

1125

A   Mr Reeve and Mr Vantreen that they had honestly believed that the
definition (as they claimed to have understood it) was what had been agreed
and they were not been mistaken. The judge therefore held that the mistake
was not common to both parties and dismissed the claim for rectification.

56   The case was argued at trial on the assumption that rectification
required both parties to be mistaken about whether the written agreement
reflected what they believed their prior consensus to have been. In the Court

B   of Appeal, Persimmon challenged the finding of fact about what Mr Reeve and
Mr Vantreen had believed, but not the underlying proposition of law.
The Court of Appeal unanimously dismissed this part of the appeal on the
ground that it could not disturb the findings of fact. There are accordingly
concurrent findings of fact about the states of mind of Mr Reeve and
Mr Vantreen. Your Lordships indicated at the hearing that in accordance

C   with the usual practice, you would not re-examine them: see *Smith New
Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997]
AC 254, 274–275.

57   In the printed case, however, Persimmon (encouraged by articles in
the Law Quarterly Review by Marcus Smith ("Rectification of Contracts for
Common Mistake, *Joscelyne v Nissen* and Subjective States of Mind" (2007)
123 LQR 116–132) and Professor McLauchlan ("The 'Drastic' Remedy of

D   Rectification for Unilateral Mistake" (2008) 124 LQR 608–640)) asked for
leave to challenge, for first time, the proposition of law.  Mr Nugee
submitted that the judge and the Court of Appeal had been wrong in their
assumption about what a party had to be mistaken about. Rectification
required a mistake about whether the written instrument correctly reflected
the prior consensus, not whether it accorded with what the party in question

E   believed that consensus to have been.  In accordance with the general
approach of English law, the terms of the prior consensus were what a
reasonable observer would have understood them to be and not what one or
even both of the parties believed them to be. In the present case, submitted
Mr Nugee, the prior consensus was contained in the May letter, which made
it clear that the terms were to be as contended for by Persimmon.  If the

F   definition in the final agreement did not have that meaning, it was not in
accordance with the prior consensus and if Mr Reeve and Mr Vantreen
believed that it was, then they, like the representatives of Persimmon, were
mistaken.

58   Mr Robert Miles QC, for Chartbrook, objected to Persimmon being
given leave to advance this argument.  He said that if the point had been
taken at the trial, the evidence might have taken a different shape. I rather

G   doubt this, but as I understand that the Committee shares my view that
Persimmon is entitled to succeed without rectification, the question is
academic. Nevertheless, as it has been very well and fully argued, I propose
to express an opinion about it.

59   Until the decision of the Court of Appeal in *Joscelyne v Nissen*
[1970] 2 QB 86 there was a view, based upon dicta in 19th and early 20th
century cases, that rectification was available only if there had been a

H   concluded antecedent contract with which the instrument did not conform.
In *Lovell & Christmas Ltd v Wall* (1911) 104 LT 85, 88 Cozens-
Hardy MR said that rectification "may be regarded as a branch of the
doctrine of specific performance". It presupposed a prior contract and
required proof that, by a common mistake, the final completed agreement as

1126
Chartbrook Ltd v Persimmon Homes Ltd (HL(E))                    [2009] 1 AC
Lord Hoffmann

executed failed to give proper effect to the prior contract. In *Joscelyne's* case    A
the Court of Appeal declared itself puzzled by the reference to specific
performance, but I think it is clear enough that Cozens-Hardy MR had in
mind a contractual obligation to execute a lease, conveyance, settlement or
similar instrument, giving rise to a specifically enforceable obligation to
do so. A failure to execute a document giving effect to the terms of the
agreement would be a breach of that obligation and the court, in rectifying
the instrument, would be specifically performing the agreement. Since the    B
decision in *Joscelyne's* case extended the availability of rectification to cases
in which there had been no enforceable prior agreement, specific
performance is plainly an inadequate explanation of the doctrine. But for
present purposes the significance of cases like *Lovell & Christmas Ltd v Wall*
104 LT 85 is that the terms of the contract to which the subsequent
instrument must conform must be objectively determined in the same way as    C
any other contract. Thus the common mistake must necessarily be as to
whether the instrument conformed to those terms and not to what one or
other of the parties believed those terms to have been.

60  Now that it has been established that rectification is also available
when there was no binding antecedent agreement but the parties had a
common continuing intention in respect of a particular matter in the
instrument to be rectified, it would be anomalous if the "common continuing    D
intention" were to be an objective fact if it amounted to an enforceable
contract but a subjective belief if it did not. On the contrary, the
authorities suggest that in both cases the question is what an objective observer
would have thought the intentions of the parties to be. Perhaps the clearest
statement is by Denning LJ in *Frederick E Rose (London) Ltd v William
H Pim Jnr & Co Ltd* [1953] 2 QB 450, 461:    E

"Rectification is concerned with contracts and documents, not with
intentions. In order to get rectification it is necessary to show that the
parties were in complete agreement on the terms of their contract, but by
an error wrote them down wrongly; and in this regard, in order to
ascertain the terms of their contract, you do not look into the inner minds
of the parties—into their intentions—any more than you do in the    F
formation of any other contract. You look at their outward acts, that is,
at what they said or wrote to one another in coming to their agreement,
and then compare it with the document which they have signed. If you
can predicate with certainty what their contract was, and that it is, by a
common mistake, wrongly expressed in the document, then you rectify
the document; but nothing less will suffice."
    G

61  Likewise in *Etablissements Georges et Paul Levy v Adderley
Navigation Co Panama SA (The Olympic Pride)* [1980] 2 Lloyd's Rep 67, 72,
Mustill J said:

"The prior transaction may consist either of a concluded agreement or
of a continuing common intention. In the latter event, the intention must
have been objectively manifested. It is the words and acts of the parties    H
demonstrating their intention, not the inward thoughts of the parties,
which matter."

62  An example of the application of this objective ascertainment of the
terms of the prior transaction is *George Cohen Sons & Co Ltd v Docks and*

1127
[2009] 1 AC                        Chartbrook Ltd v Persimmon Homes Ltd (HL(E))
Lord Hoffmann

A  *Inland Waterways Executive* (1950) 84 Ll L Rep 97 in which a landlord
negotiating a new lease proposed to the tenant that "the terms and
conditions contained in the present lease to be embodied in the new lease
where applicable". The tenant accepted this offer, but the new lease as
executed made the tenant liable for repairs which under the old lease had
been the responsibility of the landlord. In answer to a claim for rectification,
B  the landlord said that the new lease was in accordance with what he had
understood to be the effect of his offer. The Court of Appeal said that this
was irrelevant. What mattered was the objective meaning of what the
landlord had written. Evershed MR said, at p 107:

"If the defendants . . . did misconstrue [the letter] that is unfortunate
for them, but at least they cannot be heard to say that their letter was
C  intended to mean anything other than that which the words convey to the
reader as a piece of ordinary English."

63  As against these authorities, there are two cases upon which
Mr Miles relied. The first is *Britoil plc v Hunt Overseas Oil Inc* [1994]
CLC 561, in which the Court of Appeal by a majority (Glidewell LJ and
Hobhouse LJ, Hoffmann LJ dissenting) refused to rectify an agreement
D  which was alleged not to be in accordance with what had previously been
agreed in summary heads of agreement. Hobhouse LJ, who gave the
majority judgment, affirmed the decision of Saville J, who said that the
defendants had failed to establish that there was a prior common agreement
or intention in terms that the court could ascertain or (which is probably
another way of saying the same thing) that the definitive agreement failed to
reflect that prior agreement. In other words, the language of the heads
E  of agreement was too uncertain to satisfy the requirement stated by
Denning LJ in *Rose's* case [1953] 2 QB 450, 461 that one should be able to
"predicate with certainty what their contract was". Hobhouse LJ noted,
at p 571, that Saville J "did not base himself upon any consideration of the
evidence as to the actual state of mind of the parties" and in my opinion
the case lends no support to the view that a party must be mistaken as to
F  whether the document reflects what he subjectively believes the agreement
to have been.

64  The other case is the decision of Laddie J in *Cambridge Antibody
Technology Ltd v Abbott Biotechnology Ltd* [2005] FSR 590, in which he
rejected a submission that evidence of the subjective state of mind of one of
the parties contained in statements which had not been communicated
to the other party ("crossed the line") was inadmissible. In my opinion,
G  Laddie J was quite right not to exclude such evidence, but that is not
inconsistent with an objective approach to what the terms of the prior
consensus were. Unless itself a binding contract, the prior consensus is, by
definition, not contained in a document which the parties have agreed is
to be the sole memorial of their agreement. It may be oral or in writing
and, even if the latter, subject to later variation. In such a case, if
H  I may quote what I said in *Carmichael v National Power plc* [1999]
1 WLR 2042, 2050–2051:

"The evidence of a party as to what terms he understood to have been
agreed is some evidence tending to show that those terms, in an objective
sense, were agreed. Of course the tribunal may reject such evidence and

conclude that the party misunderstood the effect of what was being said      *A*
and done."

65   In a case in which the prior consensus was based wholly or in part on
oral exchanges or conduct, such evidence may be significant. A party may
have had a clear understanding of what was agreed without necessarily
being able to remember the precise conversation or action which gave rise to
that belief. Evidence of subsequent conduct may also have some evidential      *B*
value. On the other hand, where the prior consensus is expressed entirely in
writing, (as in *George Cohen Sons & Co Ltd v Docks and Inland Waterways
Executive* 84 Ll L Rep 97) such evidence is likely to carry very little weight.
But I do not think that it is inadmissible.

66   In this case there was no suggestion that the prior consensus was
based on anything other than the May letter. It is agreed that the terms of
that letter were accepted by Chartbrook and no one gave evidence of any      *C*
subsequent discussions which might have suggested an intention to depart
from them. It follows that (on the assumption that the judge was right in his
construction of the ARP definition) both parties were mistaken in thinking
that it reflected their prior consensus and Persimmon was entitled to
rectification.

67   Since, however, I think that the judge and the majority of the Court      *D*
of Appeal were wrong on the question of construction, I would allow the
appeal on that ground.

**LORD RODGER OF EARLSFERRY**

68   My Lords, I have had the privilege of considering the speeches
of my noble and learned friends, Lord Hoffmann and Lord Walker of
Gestingthorpe, in draft. For the reasons which they give, I consider that the      *E*
construction favoured by Persimmon is appropriate. In particular, it seems
to me that once you grasp the general structure of schedule 6 of the
agreement, as described by Lord Walker in para 79 of his speech, the
appropriate interpretation becomes clear.

69   Like Lord Hoffmann, I would decline counsel's elegant but, in the
event, unnecessary invitation to revisit the rule in *Prenn v Simmonds* [1971]      *F*
1 WLR 1381. No one could possibly say that the rule is based on some error
of law or misconception. On the contrary, the main pros and cons of having
regard to prior negotiations when interpreting a formal contract have been
known and discussed for centuries. The present law represents a choice
which was already second nature to the Earl of Eldon LC as long ago as
*Miller v Miller* (1822) 1 Sh App 308. When interpreting a clause
in a marriage contract which had been preceded by "a vast deal of      *G*
correspondence", the Earl of Eldon LC assured the House that he did not
recollect a case to which he had given more earnest attention, but still gave
the correspondence short shrift, at p 317:

"My Lords, all the previous correspondence I lay entirely out of the
case, because I cannot conceive that any thing can be more dangerous
than the construing deeds by the effect of letters and correspondence      *H*
previous to the execution of them."

Subsequently, at p 319, he described the possibility of looking at the effect of
the correspondence as "a very singular thing". Some 60 years later, with
rather more deliberation, the House affirmed that approach in *A & J Inglis v*

1129

A  *John Buttery & Co* (1878) 3 App Cas 552 and, a century after that, reaffirmed it in *Prenn v Simmonds* [1971] 1 WLR 1381. The rule could scarcely be more firmly embedded in our law.

70  Of course, in *Miliangos v George Frank (Textiles) Ltd* [1976] AC 443 the House departed from a rule, of which Lord Denning had said some 15 years previously, "if there is one thing clear in our law, it is that the claim must be made in sterling and the judgment given in sterling": *In re United Railways of Havana and Regla Warehouses Ltd* [1961] AC 1007, 1068–1069. But not only was that rule essentially procedural: in addition, the House could point to a change of circumstances which seemed to cry out for intervention. Here, by contrast, the rule about prior negotiations forms part of the law of evidence and there are no particular pressing circumstances which call for a change. The House is simply being asked to

C  make a fresh policy decision and, in effect, to legislate to provide for a different rule. The wisdom of the proposed change is, however, debatable. So, if there is to be a change, it should be on the basis of a fully informed debate in a forum where the competing policies can be properly investigated and evaluated. Although counsel presented the rival arguments with conspicuous skill, your Lordships' House in its judicial capacity is not that forum.

D  71  Like Lord Walker, I see no reason to differ from what Lord Hoffmann has said on rectification.

#### LORD WALKER OF GESTINGTHORPE

72  My Lords, I shall first address, on a traditional approach, the issue of construction raised in this appeal. That approach requires the court to

E  consider the disputed definition of "additional residential payment" in the context of the agreement as a whole, and the parties' shared understanding of the general situation and the aim of the transaction they were entering into.

73  The owner (Chartbrook) had assembled a site off Wandsworth High Street, London SW18 (Numbers 1, 3, 5, 7 and 9, Hardwicks Way), with valuable potential for development. Under the agreement dated 16 October

F  2001 the developer (Persimmon Homes, a subsidiary of a well-known quoted company which guaranteed the developer's obligations) had the responsibility of applying for planning permission for a mixed commercial and residential development in a form approved by the owner. The agreement was conditional on the developer obtaining planning permission in a satisfactory form within 15 months (subject to extension in certain

G  circumstances). If planning permission in a satisfactory form was obtained the owner would continue as registered owner of the site, but would execute a charge of the property as security for its obligations to the developer. The developer would occupy the site as a licensee and carry out the development at its own expense, including responsibility for insurance. The developer's obligations in carrying out the residential development (by the construction of flats) were not prescribed in detail. Its obligations in carrying out the

H  commercial development were limited to what were described as "core and shell works".

74  As the flats were developed they were to be marketed by the developer, at its own expense, and sold (together with parking spaces) on 125-year leases at escalating ground rents. The commercial development,

1130
Chartbrook Ltd v Persimmon Homes Ltd (HL(E))                    [2009] 1 AC
Lord Walker of Gestingthorpe

when the core and shell works were completed, was to be sold to a nominee *A* of the owner on a 125-year lease at a peppercorn rent. There was to be a premium calculated at the rate of £110 per square foot of the net internal area of the commercial premises (plus VAT). The developer was also to negotiate the eventual sale of the freehold subject to all these leases. The owner was under an obligation to grant all the necessary leases and to make the eventual transfer of the freehold.

*B*
75   As I have mentioned, the agreement did not provide in detail for the specification or cost of the construction by the developer of the residential part of the development—that is, the flats. The owner had to approve the planning application, and the developer had to meet NHBC standards, but that was all. In particular, the developer did not commit itself to any particular level of expenditure, with two minor exceptions: the developer undertook to spend a sum of at least £250,000 on planning gain through an *C* agreement under section 106 of the Town and Country Planning Act 1990, and to pay at least £25,000 in compensation to adjoining owners for the loss of rights to light. There was also an unquantified contingency sum for dealing with possible pollution in the substructure. These three items were to be deducted in computing the total residential land value ("TRLV") for the purposes of schedule 6 (the price) but there was nothing at all in *D* the agreement providing for the developers' overall profit as such to be computed and brought into the bargain.

76   All this is background, but to my mind relevant background, to the problem at the heart of this appeal, that is the correct construction of the definition of the additional residential payment ("ARP") set out in para 1 of schedule 6. The ARP (also pointlessly re-labelled as the balancing *E* payment) is one of two components which had to be aggregated to make up the price—that is, the total consideration payable by the developer to the owner. The other component was the total land value ("TLV"), that is the aggregate of (i) the TRLV already mentioned; (ii) the total commercial land value ("TCLV") and (iii) the total residential car parking land value ("TRCPLV"). Under para 3 of schedule 6 the TLV was payable by instalments over 52 months, starting nine months after the grant of *F* planning permission, and the ARP was payable on completion of the last residential sale or six months after the completion of the development, whichever was the earlier.

77   Each of the three components of the TLV was defined by a formula. The TRLV was to be computed by reference to the net internal area of the residential units for which planning permission was obtained at the rate of £76·34 per square foot ("less the section 106 money and less the rights *G* of light money and less the substructure assumptions additional cost"). The TCLV was to be computed by reference to the net internal area of the commercial premises for which planning permission was obtained, at the rate of £38·80 per square foot. The TRCPLV was to be £3,024 multiplied by the number of residential parking places for which planning permission was obtained.

*H*
78   Both parties were experienced in the property world—the owner as a land dealer, the developer as a developer—and they shared the knowledge that the site (including units 1 and 3, Hardwicks Way which the owner acquired during the negotiations), with the benefit of planning permission on favourable terms, would have a market value in the general

1131
[2009] 1 AC                    Chartbrook Ltd v Persimmon Homes Ltd (HL(E))
                                          Lord Walker of Gestingthorpe

A   region of £5m. They hoped that planning permission for residential
development would be granted for up to 100 flats with an aggregate
internal area of 50,000 to 60,000 square feet. The background facts
known to the parties included the recent takeover by the developer's group
of Beazer Homes Ltd, as a result of which the developer decided that
it could not afford an outright purchase of the Wandsworth site. Instead
B   the purchase was to be funded out of the proceeds of the disposal of the
development, and the owner would expect to be compensated for the
deferment of its consideration.

79  The definitions that I have already mentioned, and others, such as
costs and incentives ("C & I"), that I have yet to come to, can be quite
confusing. It is important, I think, to discern and keep in mind the general
structure of schedule 6 of the agreement. The components of the price
C   referable to the commercial development (TCLV) and the residential parking
(TRCPLV) were to be calculated under the simple formulae already
mentioned (together they eventually amounted to about £1·727m).
By contrast, the price for the residential development was to consist of two
elements, the TRLV and the ARP. The TRLV is agreed to be approximately
£4·684m, reflecting the approved residential internal area of rather over
61,000 square feet at £76·34 per square foot. The question is how much this
D   sum has to be increased by the ARP to make up the owner's total
consideration for the residential development.

80  The ARP is defined as follows: "23·4% of the price achieved for
each residential unit in excess of the minimum guaranteed residential unit
value ['MGRUV'] less the [C & I]." The amount of the C & I is agreed to
have been relatively trivial—a little less than £250,000 for all 100 flats—
E   and I put it aside for the moment, while recognising that it plays an
important part in the technicalities of the argument on construction.
If this item is disregarded for the moment the disputed text can be set out
in a simplified form, using "RP" (for residential price) where the judge and
the Court of Appeal referred to unit price: "23·4% of the RP in excess of
the MGRUV."

81  The MGRUV was defined as meaning: "for each residential unit
F   [i e each flat] the [TRLV] divided by the number of residential units for which
planning permission is granted." Under the planning permission eventually
granted on 23 August 2002 there were to be exactly 100 flats, which
simplifies the arithmetic. Nevertheless it may be unfortunate that the
draftsman chose to define the ARP by a formula referring to the MGRUV
rather than by referring directly to the TRLV (to which the MGRUV is
G   directly linked, being, as events turned out, 1% of it). The use of the two
linked formulae rather than one, and the fact that the formulae are not set
out in mathematical notation, make it harder to keep clearly in mind the
structure of the arrangements contained in schedule 6.

82  Briggs J expressed the issue in his judgment [2007] 1 All ER (Comm)
1083, paras 20 and 21:

H   "20. Leaving aside for the moment the point at which the C & I are
deducted, the broad commercial effect of each of the parties' rival
submissions may be summarised as follows. Chartbrook's case was that
it was entitled to a 23·4% share of the net proceeds of sale of each
residential unit in excess of a minimum guaranteed amount (being the
unitised total residential land value of £76·34 per square foot of

1132
**Chartbrook Ltd v Persimmon Homes Ltd (HL(E))**                                   **[2009] 1 AC**
**Lord Walker of Gestingthorpe**

residential net internal area). Put another way, its stake in the residential        *A*
part of the development was to be the whole of the first £76·34 per square
foot of net sales value, and 23·4% of the surplus.

"21. By contrast, Persimmon's case was that Chartbrook was to
receive an additional payment only if 23·4% of the net sales price
amounted to more than the minimum guaranteed residential unit value.
Put more broadly, Chartbrook's stake in the residential part of the        *B*
development was whichever was the greater of: (i) 23·4% of the net
residential sales price; and, (ii) the guaranteed minimum of £76·34 per
square foot of residential net internal area."

83   That is, with great respect to the judge, a confusing way of putting it,
because it fails to distinguish between the two elements of the price for the
residential development and to make clear whether it is addressing both
elements, or only the ARP. The owner was to get the TRLV in any event, as        *C*
the most important component of the TLV (a point that may be reflected in
the expression "in excess of" in the definition of the ARP). Indeed paras 20
and 21 of the judgment are to my mind two ways of describing the same
result, unless the judge intended para 20 to state the owner's view of the
ARP alone, and para 21 to state the developer's view of the TRLV and the
ARP operating in conjunction.        *D*

84   In his brief judgment Rimer LJ quoted the definition of the ARP and
observed [2008] 2 All ER (Comm) 387, para 183: "There is nothing unclear,
uncertain or ambiguous about that. It is clear, certain and unambiguous and
its arithmetic is straightforward." Tuckey LJ agreed. With profound respect
to both of them, I totally disagree. The definition is obviously defective as a
piece of drafting. To start with defects that can be spotted and remedied
fairly easily, the draftsman could not decide whether he was dealing with the        *E*
flats ("each residential unit") collectively or individually. The MGRUV was
one-hundredth of the TRLV, but the C & I was plainly defined as a single
aggregate figure.

85   Much more significantly and problematically, the draftsman has
failed to notice the ambiguity of the formula "*x*% of the RP in excess of the
MGRUV less the C & I". The ambiguity could be resolved by the use of        *F*
mathematical notation, as the judge observed [2007] 1 All ER (Comm)
1083, paras 18 and 19 (though he did not mention that there was also a
choice to be made as to putting another set of brackets round MGRUV—
C & I, so producing four possibilities rather than two).

86   Treated acontextually, the formula "*x*% of A in excess of B" is
undoubtedly ambiguous. It can mean $(x/100 \times A) - B$ or $x/100(A - B)$. If
required to guess I would opt for the latter meaning, because the        *G*
expression "in excess of" has been used rather than "less", and to my mind
"in excess of" suggests a focus on B as an integer and distances it from the
percentage.   But I readily accept that this would be little more than
guesswork.

87   In a contract negotiated between businessmen there always is a
commercial context. If a contracting party agrees to pay the whole of some
budgeted cost (B, say £100,000) and also agrees to pay 25% of the eventual        *H*
actual cost (A, say £140,000) in excess of the budgeted costs, he would
expect to pay a total of £110,000. Both elements of the obligation are, as it
were, in the same currency, that is, cost, and the wording of the second
element naturally translates into the formula $\frac{1}{4}(A - B)$, as $(\frac{1}{4}A) - B$ would be

A   commercial nonsense. The owner can therefore give plausible examples in which $\frac{1}{4}(A - B)$ would obviously be the right answer. But the present appeal is not such a case.

88   In this case the very significant difference between the results produced by the competing formulae in the figures set out in para 14 of the judgment of Lawrence Collins LJ in the Court of Appeal
B   [2008] 2 All ER (Comm) 387. The difference between the two bottom lines (£5,580,616 and £9,168,427) is £3,587,811. That difference figure is 76·6% of the TRLV (£4,683,565). On the owner's case it gets one hundred times the MGRUV as the TRLV, but in effect has to give credit for only 23·4% of it in the calculation of the ARP. That seems to be a fairly surprising bargain for commercial men to make. It becomes not merely surprising but totally incredible if one takes account of the fact that although schedule 6 does not
C   in terms state that the ARP is to have no value unless the actual receipts from sales of flats exceed the TRLV, that is implicit in its structure. On the owner's construction any such limitation is contradicted, and the ARP has a substantial value even if the sales do not reach the "trigger point" of £20·015m (23·4% of which is £4·684m).

89   This can be illustrated by considering the effect of the competing
D   formulae (set out in the judge's judgment [2007] 1 All ER (Comm) 1083, paras 18–19, but continuing to exclude C & I for the present) for assumed residential sale price totals (RP) of £18m, £20m, £20·015m (the trigger point), £22m and £23·849m (the actual result):

| | Owner's construction | | Developer's construction | |
|---|---|---|---|---|
E | RP | 23·4% (RP − MG) = | ARP | (23·4%RP) − MG = | ARP |
| 18·000 | 23·4% (18·000 − 4·684) = | 3·116 | (23·4% × 18·000) − 4·684 = | Negative |
F | 20·000 | 23·4% (20·000 − 4·684) = | 3·584 | (23·4% × 20·000) − 4·684 = | Negative |
| 20·015 *Trigger point* | 23·4% (20·015 − 4·684) = | 3·587 | (23·4% × 20·015) − 4·684 = | Zero |
G | 22·000 | 23·4% (22·000 − 4·684) = | 4·052 | (23·4% − 22·000) − 4·684 = | 0·464 |
| 23·849 *Actual result* | 23·4% (23·849 − 4·684) = | 4·485 | (23·4% × 23·849) − 4·684 = | 0·897 |
H | RP = Total actual receipts from residential sales | | | | |
| MG = Total residential land value (100 × MGRUV) | | | | |
| All amounts in £m | | | | |

1134
Chartbrook Ltd v Persimmon Homes Ltd (HL(E))                        [2009] 1 AC
Lord Walker of Gestingthorpe

The figures are, on the owner's construction, commercial nonsense. They    A
would bring the owner a total of £7·8m for the residential development
(£4·684m + £3·116m) even if sales of flats were disastrously low at £18m.
The idea of the TRLV (linked as it is to the MGRUV) as a guaranteed
minimum would be totally subverted.

90  The judge accepted that there was some force in the developer's
reliance on the words "if any" which occur in para 3.3 of schedule 6 with    B
reference to the balancing payment (alias the ARP). He saw less force in
the submission that he should give weight to the natural meaning of the
expressions "minimum", "guaranteed" and "additional" in the definitions of
the MGRUV and the ARP, on the ground, at para 61, that by the use of a
special definition "[t]he word or phrase is stripped of its natural meaning".
In preferring the owner's submissions the judge attached particular weight
to the difficulty (for the developer) of explaining the words "less the C & I".    C
The judge observed, at paras 55–57:

"55. An equally serious problem with Persimmon's construction is
what to do with the subtraction of the C & I. It is common ground that
the costs and incentives have a linear relationship with the amount of the
price achieved for each residential unit. For example, Persimmon may
agree the sale of a flat for £250,000 after incurring C & I of say £50,000    D
or, with the same commercial consequence, sell the same flat for
£200,000 but incur no C & I. Typical incentives would include payment
of the purchaser's legal fees or stamp duty, or the installation of special
features such as wooden floors, over and above the standard fit-out
specification.

"56. One would expect Chartbrook's profit share to be unaffected, one    E
way or the other, by the decision of Persimmon to sell a particular flat by
one or other of those methods (high price plus incentives or low price
without incentives). Chartbrook's construction, under which the C & I
are deducted from the price achieved for each residential unit before the
application of the 23·4% share, fulfils precisely that expectation.

"57. By contrast, Persimmon's construction deducts the C & I from
the 23·4% of the price achieved for the residential unit before the net    F
amount is compared with the MGRUV, to ascertain whether there is any
excess. By comparison with Chartbrook's construction, that calculation
magnifies the negative effect of C & I by a factor of more than three in
comparison with the positive effect of the increase in the residential unit
price attributable to the C & I."

91  Lawrence Collins LJ took a different view, and I unhesitatingly    G
prefer his view. His reasons are set out clearly in paras 90–94 of his
judgment [2008] 2 All ER (Comm) 387, and I cannot usefully add much to
them. But I would make a few further comments.

92  The first is as to the perceived problem about C & I. It is true that
from the developer's point of view it made little or no difference (except
perhaps for timing and tax) whether or not, in relation to a particular flat,
it spent an extra £2,000 on parquet flooring or granite worktops and    H
managed to sell the flat for £2,000 more as a result. But it did make a
marginal difference to the owner, as its ARP was calculated (in some way or
other, on any view) by reference to the total achieved by residential sales:
that is, by reference to the developer's turnover and not by reference to the

A   developer's profit (the judge's reference to "Chartbrook's profit share" was
not therefore entirely apposite).  So (to adopt the expression used in the
courts below) C & I had a linear relationship for the developer, but not for
the owner.  It would therefore have made sense for the parties to have
agreed that C & I expenditure and allowances should be deducted from the
total obtained for residential sales for the purposes of these computations
(rather as the section 106 money and the rights of light money were to

B   be disregarded in computing the TRLV).  But it would not make sense
to deduct the whole of the C & I from 23·4% of the total obtained for
residential sales.

93   Rimer LJ gave an example, at para 185, to reinforce his view
about the C & I.  His example produces very odd results but that is partly
because the figures taken are unrealistic.  If one takes more realistic figures

C   (such as a normal average sale price of £200,000 with C & I of £2,500
and an MGRUV of £47,500) the result is much less surprising.   But
it is still anomalous and makes no commercial sense, as Lawrence
Collins LJ observed.  An ARP of (23·4% of [RP less C & I]) less MGRUV
does make commercial sense, and in my opinion it is well within the
principles in *Antaios Cia Naviera SA v Salen Rederierna AB* [1985]
AC 191, 201 and *Investors Compensation Scheme Ltd v West Bromwich

D   Building Society* [1998] 1 WLR 896, 912–913, to read the agreement in
that way.

94   I am sure that Lawrence Collins LJ was right to give a lot of weight
to the terms "minimum", "guaranteed" and "additional" in the relevant
definitions.  There is a good deal of authority, if authority is needed, to give
weight to the natural meaning of words in a definition.  In relation to

E   statutory definitions there are the observations of my noble and learned
friend, Lord Hoffmann, in *Macdonald v Dextra Accessories Ltd* [2005] 4 All
ER 107, para 18 and *Birmingham City Council v Walker* [2007] 2 AC 262,
para 11 and Lord Scott of Foscote in *Oxfordshire County Council v Oxford
City Council* [2006] 2 AC 674, paras 82–83.  I would apply the same
principle to a definition in a commercial contract.

F   95   That brings me back to what I said earlier about the need, in the
midst of a thicket of rather confusing definitions, to keep in mind the general
structure of the bargain.  As part of the TLV the owner was to receive
the TRLV, the total residential land value, representing the estimated
value attributable to land which would (on the agreement becoming
unconditional) have the benefit of a favourable planning permission for
residential development (but on which development had not yet taken

G   place).  The developer was to bear all the costs of the development.
The owner was also to have the prospect of an additional payment, the ARP.
As regards the residential development the bargain could have been
expressed between businessmen as "a guaranteed minimum of the first
£76·34 per square foot of residential internal area from the total proceeds of
the flats, and 23·4% of the excess" (indeed the judge, in para 20 of his
judgment, summarised the owner's case in very similar terms, except that

H   he used "surplus" rather than "excess").  If one approaches it in that way,
the developer's case as to the meaning of the definition is not merely
linguistically possible, but is linguistically (as well as commercially)
compelling.  The owner's case becomes plausible only if one concentrates on
the ARP, forgetting the TRLV (to which the MGRUV is directly linked).

1136
Chartbrook Ltd v Persimmon Homes Ltd (HL(E))                    [2009] 1 AC
Lord Walker of Gestingthorpe

Lawrence Collins LJ dealt with this point quite briefly, in paras 81 and 93 of    A
his judgment [2008] 2 All ER (Comm) 387. He must have thought it
unnecessary to spell it out more fully. But as he ended in the minority I have
dealt with the point more fully.

96  Since preparing this opinion I have had the privilege of reading
in draft the opinion of my noble and learned friend, Lord Hoffmann.    B
In paras 5–26 of his opinion Lord Hoffmann reaches precisely the same
conclusion as I have reached in regard to the correct construction, by
traditional methods, of the agreement. I agree with all his reasoning, which
is essentially the same as my own, but more trenchantly expressed. I have
however thought it worthwhile setting out my own more pedestrian route
to the conclusion that this House should, without having to depart from
established principles of construction, allow the appeal and dismiss    C
Chartbrook's claim.

97  I have also read with interest and admiration Lord Hoffmann's
observations, in the remaining part of his opinion, on the important
questions that we do not have to decide. I would not differ from any of these
views. In particular, I agree that *The Karen Oltmann* [1976] 2 Lloyd's Rep
708 is a questionable application of the "private dictionary" principle, since
the meaning of the English word "after" can hardly be equated to the use of a    D
technical or trade term.

**BARONESS HALE OF RICHMOND**

98  My Lords, I too have had the privilege of reading in draft the
opinions of my noble and learned friends, Lord Hoffmann and Lord Walker
of Gestingthorpe. For the reasons they give, together with those of Lawrence
Collins LJ in the Court of Appeal, I agree that Persimmon's construction of    E
this contract is correct and that this appeal should be allowed.

99  But I have to confess that I would not have found it quite so easy
to reach this conclusion had we not been made aware of the agreement
which the parties had reached on this aspect of their bargain during the
negotiations which led up to the formal contract. On any objective view,
that made the matter crystal clear. This, to me, increased the attractions of
accepting counsel's eloquent invitation to reconsider the rule in *Prenn v*    F
*Simmonds* [1971] 1 WLR 1381, the pot so gently but effectively stirred by
Lord Nicholls of Birkenhead in his Chancery Bar Association lecture of 2005
("My Kingdom for a Horse: The Meaning of Words" (2005) 121 LQR 577).
My experience at the Law Commission has shown me how difficult it is
to achieve flexible and nuanced reform to a rule of the common law
by way of legislation. In the end abolition may be the only workable    G
legislative solution, as eventually happened with the hearsay rule (the Law
Commission's Report on *The Hearsay Rule in Civil Proceedings* (1993)
(Law Com No 216) (Cm 2321)). Even that can prove difficult if, on analysis,
the view is taken that the rule has no real content, as with the parol evidence
rule (the Law Commission's Report on *The Parol Evidence Rule* (1986)
(Law Com No 154) (Cmnd 9700)). The courts, on the other hand, are able
to achieve step-by-step changes which can distinguish cases in which such    H
evidence is "helpful" from cases in which it is not.

100  However, the approach to rectification adopted by Lord
Hoffmann would go a long way towards providing a solution. If the test of
the parties' continuing common intentions is an objective one, then the

1137

A  court is looking to see whether there was such a prior consensus and if so
what it was. Negotiations where there was no such consensus are indeed
"unhelpful". But negotiations where consensus was reached are very
helpful indeed. If the language in the eventual contract does not reflect that
consensus, then unless there has been a later variation of it, the formal
contract should be rectified to reflect it. It makes little sense if the test
for construing their prior consensus is different from the objective test for
B  construing their eventual contract. This situation is, and should be, quite
different from the situation where one party is mistaken as to its meaning
and the other party knows this—the latter should not be permitted to take
advantage of the former.

101  For those reasons, I would respectfully associate myself, as does
Lord Walker, with the views of Lord Hoffmann on the issues which we do
C  not have to decide. In particular, I would like to express my admiration for
the skill and charm with which both issues were argued by counsel on each
side. It is perhaps surprising that questions of such practical and theoretical
importance in the law of contract should still be open to debate and
development. But that is also the great strength of the common law.

D                                    *Appeal allowed with costs in the High
                                     Court, the Court of Appeal and the
                                     House of Lords.*

                                                                    S H

E                                    ―――――――

F

G

H

LC/4

A

House of Lords

# Bank of Credit and Commerce International SA *v* Ali and others

## [2001] UKHL/8

B

2001  Jan 16, 17, 18;          Lord Bingham of Cornhill, Lord Browne-Wilkinson,
       March 1                         Lord Nicholls of Birkenhead, Lord Hoffmann
                                              and Lord Clyde

*Employment — Contract of employment — Implied term — Redundant employees entering into agreement settling all claims arising from employment — Employer subsequently found to have conducted business illegally and dishonestly —*
C *Employees claiming stigma damages for breach of implied term of trust and confidence and misrepresentation — Whether claims barred by agreement*

In 1990 the defendant employees were made compulsorily redundant by the plaintiff bank. In consideration of a payment by the bank, they signed an agreement by which they accepted the terms set out "in full and final settlement of all or any claims . . . of whatsoever nature that exist or may exist" against the bank. In 1991
D the bank went into insolvent liquidation, and wide publicity was given to the corrupt and dishonest manner in which its business had been conducted. In the course of the liquidation the liquidators sought to recover loans made to the employees, who counterclaimed damages for misrepresentation and breach of their employment contracts as a result of which, they alleged, they were at a disadvantage on the labour market. The bank contended that the agreements signed by the employees were binding compromise agreements precluding their claims. The judge so held, but the
E Court of Appeal allowed an appeal by the employees.
On appeal by the bank—
*Held*, dismissing the appeal (Lord Hoffmann dissenting), that there were no special rules of interpretation applicable to a general release, which was to be construed in the same way as any other contract, the question being the intention of the parties ascertained objectively in the context of the circumstances in which the release had been entered into; that when the employees' agreements had been entered
F into neither party could realistically have supposed that a claim for damages in respect of disadvantage on the labour market was a possibility; and that, accordingly, the parties could not be held to have intended the releases to apply to such claims ( *post*, paras 8–9, 10, 19, 21, 26, 29, 35, 78–79, 85, 86).
Dicta of Lord Hoffmann in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912–913, HL(E) applied.
Decision of the Court of Appeal [2000] ICR 1410 affirmed.

G

The following cases are referred to in their Lordships' opinions:

*Arrale v Costain Civil Engineering Ltd* [1976] 1 Lloyd's Rep 98, CA
*Bank of Credit and Commerce International SA v Ali (No 2)* [2000] ICR 1354
*Bell v Lever Bros Ltd* [1932] AC 161, HL(E)
*Cloutte v Storey* [1911] 1 Ch 18, CA
H *Cole v Gibson* (1750) 1 Ves Sen 503
*Ecclesiastical Comrs for England v North Eastern Railway Co* (1877) 4 Ch D 845
*Grant v John Grant & Sons Pty Ltd* (1954) 91 CLR 112
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896; [1998] 1 All ER 98, HL(E)
*Lindo v Lindo* (1839) 1 Beav 496

*London and South Western Railway Co (Directors of the) v Blackmore* (1870)    A
    LR 4 HL 610, HL(E)
*Lyall v Edwards* (1861) 6 H & N 337
*Mahmud v Bank of Credit and Commerce International SA* [1998] AC 20; [1997]
    3 WLR 95; [1997] ICR 606; [1997] 3 All ER 1, HL(E)
*Mitchell (George) (Chesterhall) Ltd v Finney Lock Seeds Ltd* [1983] QB 284; [1982]
    3 WLR 1036; [1983] 1 All ER 108, CA
*Photo Production Ltd v Securicor Transport Ltd* [1980] AC 827; [1980] 2 WLR 283;    B
    [1980] 1 All ER 556, HL(E)
*R v Cambridge Health Authority, Ex p B* [1995] 1 WLR 898; [1995] 2 All ER 129, CA
*Ramsden v Hylton* (1751) 2 Ves Sen 304
*Richmond v Savill* [1926] 2 KB 530, CA
*Rutland's (Countess of) Case* (1604) 5 Co Rep 25b
*Salkeld v Vernon* (1758) 1 Eden 64
*Torrens Aloha Pty Ltd v Citibank NA* (1997) 144 ALR 89    C
*Tudor Grange Holdings Ltd v Citibank NA* [1992] Ch 53; [1991] 3 WLR 750;
    [1991] 4 All ER 1
*Turner v Turner* (1880) 14 Ch D 829
*Yoshimoto v Canterbury Golf International Ltd* [2001] 1 NZLR 523, CA

The following additional cases were cited in argument:

*Athabasca Realty Co Ltd v Foster* (1982) 18 Alta LR (2d) 385    D
*Brikom Investments Ltd v Carr* [1979] QB 467; [1979] 2 WLR 737; [1979] 2 All
    ER 753, CA
*Commercial Bank of Australia Ltd v Amadio* (1983) 151 CLR 447
*First Energy (UK) Ltd v Hungarian International Bank Ltd* [1993] 2 Lloyd's Rep 194,
    CA
*Hart v O'Connor* [1985] AC 1000; [1985] 3 WLR 214; [1985] 2 All ER 880, PC
*Horcal Ltd v Gatland* [1984] IRLR 288, CA    E
*Kirchner v New Home Sewing Machine Co* (1892) 31 NE 1104
*Kitchen Design and Advice Ltd v Lee Valley Water Co* [1989] 2 Lloyd's Rep 221
*Mangini v McClurg* (1969) 24 NY 2d 556
*Moore v Weston* (1871) 25 LT 542
*Moxon v Payne* (1873) LR 8 Ch App 881
*National Westminster Bank plc v Morgan* [1985] AC 686; [1985] 2 WLR 588; [1985]
    1 All ER 821, HL(E)    F
*Phillips v Homfray* (1871) LR 6 Ch App 770
*Scally v Southern Health and Social Services Board* [1992] 1 AC 294; [1991] 3 WLR
    778; [1991] ICR 771; [1991] 4 All ER 563, HL(NI)
*Skluth v United Merchants and Manufacturers Inc* (1990) 559 NYS 2d 280
*Three Rivers Motors Co v Ford Motor Co* (1975) 522 F 2d 885
*Turner v Green* [1895] 2 Ch 205
*Village Cay Marina Ltd v Acland* [1998] 2 BCLC 327, PC    G

**APPEAL** from the Court of Appeal

    This was an appeal by the plaintiff, Bank of Credit and Commerce
International SA (in compulsory liquidation), by leave of the Court of
Appeal (Sir Richard Scott V-C, Chadwick and Buxton LJJ) from their
decision on 19 April 2000 allowing an appeal by the defendant employees,
Munawar Ali and others, from Lightman J. The judge had ruled that Acas    H
COT-3 agreements were valid and binding on the employees and precluded
their claims for damages for breach of their contracts of employment and
misrepresentation against the bank.

    The facts are stated in the opinion of Lord Bingham of Cornhill.

.3555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Append
Declaration of Lord Collins   Pg 61 of 428
[2002] 1 AC
257
BCCI v Ali (HL(E))
Lord Bingham of Cornhill

A   When the agreements were entered into the bank had yet to collapse, and it would have been impossible for any employee to have suffered damage by reason of misrepresentation at the time when he was discharged. That is relevant in considering unconscionability.

Matters such as holiday pay and season ticket loans were expressly dealt with. The employees cannot have thought that the agreements were directed
B   to them. It is not open to the employees at this stage to say that the meaning of the agreement depends on the factual context if that depends on factual matters that were not explored at trial because of the concession made: see per Lord Hoffmann post, para 48.

As to *Commercial Bank of Australia Ltd v Amadio* 151 CLR 447, had the mortgagors known the facts they would not have executed the mortgage. There was thus unfairness in the bank's procurement of its execution. There
C   is no such unfairness or unreasonableness here, no question of the bank having hoped that the employees did not know about the claim.

Their Lordships took time for consideration.

1 March.   **LORD BINGHAM OF CORNHILL**
1   My Lords, the liquidators of the Bank of Credit and Commerce
D   International SA appeal against a decision of the Court of Appeal [2000] ICR 1410 reversing a decision of Lightman J [1999] ICR 1068. These decisions were made on an issue ordered to be tried to determine the effect, validity and enforceability of an agreement made between the bank and certain of its employees about a year before application was made for the winding up of the bank. Two cases were selected for trial as test cases on this
E   issue, but one of the cases has been compromised. Mr Naeem is thus the sole respondent to this appeal.

2   The facts giving rise to this litigation have been agreed between the parties and are comprehensively summarised by Lightman J in paragraph 3 in his judgment at first instance, at pp 1072–1074, and Chadwick LJ in paragraphs 42–49 of his judgment in the Court of Appeal [2000] ICR 1410, 1424–1429. It is unnecessary to rehearse that detailed history again. The
F   salient facts are these. Mr Naeem was employed by the bank in the United Kingdom from June 1985. In the spring and early summer of 1990 the bank embarked on an extensive reorganisation of its worldwide business which made a number of its UK employees redundant. Mr Naeem was one of these. Following consultation with the Advisory, Conciliation and Arbitration Service ("Acas") and the employees' trade union a notice was sent to
G   Mr Naeem among other employees on 18 June 1990 terminating his employment on 30 June 1990. The notice said that he would receive his full notice entitlement, a statutory redundancy payment ( plus accrued holiday pay) and an ex gratia payment. A schedule was attached to the notice summarising the payment on offer. Reference was made to potential set-offs for credit card debts, season ticket loans and current account overdraft balances owed to the bank (in Mr Naeem's case no such debts existed) and
H   Mr Naeem was offered the option of receiving an additional month's gross salary in addition to the total payment set out in the schedule if he was willing to sign an Acas form acknowledging that the payment he would receive from the bank was in full and final settlement. In the notice Mr Naeem was offered a meeting with an officer of Acas and he accepted this offer.

3  The meeting took place on 4 July 1990, just after the termination of    *A*
Mr Naeem's employment. Following a short interview with an Acas official
Mr Naeem signed and a representative of the bank countersigned Acas Form
COT-3 which recorded:

> "The applicant [Mr Naeem] agrees to accept the terms set out in the
> documents attached in full and final settlement of all or any claims
> whether under statute, common law or in equity of whatsoever nature    *B*
> that exist or may exist and, in particular, all or any claims rights or
> applications of whatsoever nature that the applicant has or may have or
> has made or could make in or to the industrial tribunal, except the
> applicant's rights under [the bank's] pension scheme."

Under the agreement Mr Naeem received a total of £9,910·79, of which
£2,772·50 was paid in consideration of Mr Naeem signing the form of    *C*
release. If he had not signed the form of release, he would not have received
that part of the total.

4  On 5 July 1991 application was made that the bank be wound up by
the High Court. It quickly became clear and generally known that the bank
was and had for some years been seriously insolvent and that a significant
part of its business had been carried on in a corrupt and dishonest manner.
In the course of the liquidation a number of employees sought to claim (or    *D*
counterclaim) damages caused to the employees by their association with the
bank, the stigma of which association was said to handicap the employees in
obtaining other employment. Such damages were attributed to the bank's
breach of an implied duty owed to the employees not to carry on a dishonest
or corrupt business. It was also contended that the employees had been
induced to work for the bank by the false representation that it was an    *E*
honest and creditworthy financial institution.

5  The liquidators rejected the employees' claims for stigma damages
and damages for misrepresentation, and their rejection of the stigma claims
was upheld by the courts until, in *Mahmud v Bank of Credit and Commerce
International SA* [1998] AC 20, the House of Lords ruled that such claims
were sustainable in principle. A number of employees including Mr Naeem
wish to pursue such claims. The liquidators contend that Mr Naeem (the    *F*
claimant chosen for the purpose of resolving this issue) is debarred from
claiming such damages by the terms of the release which he signed on 4 July
1990.

6  In paragraph 56 of his judgment in the Court of Appeal [2000]
ICR 1410, 1431 Chadwick LJ helpfully summarised the issues and the
factual setting in which they must be resolved:    *G*

> "The first issue on this appeal is whether the court should construe the
> general words used so as to include the stigma claims. The second issue is
> whether, if that is the effect of those words as a matter of construction, the
> court should allow [the bank] to rely upon a construction which has that
> effect. Those issues arise in a factual context in which (i) [the bank] must
> be treated as having knowledge at the relevant time that it was engaged in
> a dishonest and corrupt business—that is accepted for the purposes of the    *H*
> Acas COT-3 issue; (ii) Mr Naeem must be treated as not having that
> knowledge at the relevant time—that, also is accepted for the purposes of
> the issue; (iii) it was a necessary incident of the way in which [the bank]
> was carrying on its business that the dishonest and corrupt nature of that

13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Append
[2002] 1 AC    Declaration of Lord Collins    Pg 63 of 428

259
BCCI v Ali (HL(E))
Lord Bingham of Cornhill

A  business should be concealed from the general body of employees, including Mr Naeem; (iv) [the bank] must be taken to have known that Mr Naeem did not have that knowledge at the relevant time—it was [the bank's] intention to conceal the dishonest and corrupt nature of its business from the general body of its employees and there is no reason to think that it had not achieved that objective; (v) without that knowledge Mr Naeem could not have appreciated that there had been a breach of the

B  implied term on which the stigma claim is founded; and (vi) the possibility that [the bank]—a bank authorised by the Bank of England under the Banking Act 1987 to carry on banking business in London—would be carrying on a dishonest and corrupt business was so remote that Mr Naeem could not have been expected to appreciate that it might exist, or that [the bank] might be in breach of its obligation not to abuse the

C  trust and confidence which he was entitled to place in it as his employer."

7  Lightman J [1999] ICR 1068 and a majority of the Court of Appeal (Chadwick and Buxton LJJ) [2000] ICR 1410 held that the general language of the release was sufficiently comprehensive to embrace the claims which Mr Naeem sought to pursue. Since all the claims known to the parties were identified and met in full, the broad language of the release must (they held)

D  be taken to refer to other claims, not at that stage known or identified. Sir Richard Scott V-C took a different view. He held in paragraph 34 of his judgment, at p 1422, that the appeal should be allowed:

> "on the ground that the COT-3 agreement, properly construed on the assumed facts and in the context of the parties' knowledge at the time it was signed, does not bar Mr Naeem's 'stigma' claim."

E  Mr Naeem's appeal against Lightman J's dismissal of his claim was allowed, since all members of the Court of Appeal held that it would in all the circumstances be unconscionable for the bank to rely on the release in order to bar Mr Naeem's claim.

8  I consider first the proper construction of this release. In construing this provision, as any other contractual provision, the object of the court is

F  to give effect to what the contracting parties intended. To ascertain the intention of the parties the court reads the terms of the contract as a whole, giving the words used their natural and ordinary meaning in the context of the agreement, the parties' relationship and all the relevant facts surrounding the transaction so far as known to the parties. To ascertain the parties' intentions the court does not of course inquire into the parties'

G  subjective states of mind but makes an objective judgment based on the materials already identified. The general principles summarised by Lord Hoffmann in *Investors Compensation Scheme v West Bromwich Building Society* [1998] 1 WLR 896, 912–913 apply in a case such as this.

9  A party may, at any rate in a compromise agreement supported by valuable consideration, agree to release claims or rights of which he is unaware and of which he could not be aware, even claims which could not

H  on the facts known to the parties have been imagined, if appropriate language is used to make plain that that is his intention. This proposition was asserted by Lord Keeper Henley in *Salkeld v Vernon* (1758) 1 Eden 64, in a passage quoted in paragraph 11 below. It was endorsed by the High Court of Australia in *Grant v John Grant & Sons Pty Ltd* (1954) 91 CLR

112 where Dixon CJ (speaking for himself and Fullagar, Kitto and Taylor JJ)   A
said, at p 129:

> "No doubt it is possible a priori that the release was framed in general
> terms in the hope of blotting out, so to speak, all conceivable grounds of
> further disputes or claims between all or any two or more parties to the
> deed, whether in respect of matters disclosed by a party against whom a
> claim might be made or undisclosed, of matters within the knowledge of a   B
> party by whom a claim might be made or outside it. If so the case would
> fall within the exception which, in the passage already cited, Lord
> Northington [Lord Keeper Henley] made from his proposition that a
> release ex vi termini imports a knowledge in the releasor of what he
> releases, namely the exception expressed by the words 'unless upon a
> particular and solemn composition for peace persons expressly agree to
> release uncertain demands': *Salkeld v Vernon*, 1 Eden 64, 67, 68."   C

The proposition was roundly asserted by Sir Richard Scott V-C in the
present case. He said [2000] ICR 1410, 1415:

> "The law cannot possibly decline to allow parties to contract that all
> and any claims, whether or not known, shall be released. The question in
> a case such as the present is to ascertain, objectively, whether that was the   D
> parties' intention or whether, in order to correspond with their intentions,
> a restriction, and if so what restriction, should be placed on the scope of
> the release."

Sir Richard Scott V-C made a similar point at pp 1417–1418, para 19. This
seems to me to be both good law and good sense: it is no part of the court's
function to frustrate the intentions of contracting parties once those have   E
been objectively ascertained.

    10 But a long and in my view salutary line of authority shows that, in
the absence of clear language, the court will be very slow to infer that a party
intended to surrender rights and claims of which he was unaware and could
not have been aware. In *Cole v Gibson* (1750) 1 Ves Sen 503, 507, Lord
Hardwicke LC said:

  F

> "I will not say, there may not be such a confirmation or release given,
> as may release the remedy of the party; for it is hard to say that in a court
> of equity, a man having a right of action or suit to be relieved in equity,
> and knowing the whole of the case, may not release that, on whatever
> consideration it arises, so far as regards himself: but it must be applied to
> that particular case, doing it with his eyes open, and knowing the
> circumstances."   G

Lord Hardwicke LC returned to the question in *Ramsden v Hylton* (1751)
2 Ves Sen 304, 310:

> "The strongest and most material objection is the release; but I am of
> opinion, it would not be construed as a release of this demand, either in
> point of law, or in a court of equity. First, it is certain, that if a release is
> given on a particular consideration recited, notwithstanding that the   H
> release concludes with general words, yet the law, in order to prevent
> surprise, will construe it to relate to the particular matter recited (*Cole v
> Gibson* 1 Ves Sen 503, 507), which was under the contemplation of the
> parties, and intended to be released . . . But there is no occasion to rely on

A   the law for this; for it is clear, that it would not in a court of equity, it being admitted on all hands, and it must be so taken, that this settlement was unknown to all the parties: nor did the daughters know of this contingent provision, beside which they had no other provision out of this estate; and all they could be intitled to must arise out of the personal estate of their father or other relations. It is impossible then to imply within the general release that which neither party could have under
B   consideration, and which it is admitted neither side knew of; and as this release cannot have its effect to bar this demand, so it cannot be set up against them in a court of equity."

11   Lord Keeper Henley, in *Salkeld v Vernon* 1 Eden 64, 67–68, held:

C   "Now a release ex vi termini imports a knowledge in the releasor of what he releases, unless upon a particular and solemn composition for peace persons expressly agree to release uncertain demands."

Lord Langdale MR spoke to similar effect in *Lindo v Lindo* (1839) 1 Beav 496, 505–506, declining to construe general words as having an effect not contemplated by any of the parties at the time.

D   12   In *Lyall v Edwards* (1861) 6 H & N 337, the issue was whether the terms of a general release should be construed to cover potential claims in conversion of which the parties (or at any rate the releasor) were unaware at the time of the agreement. Pollock CB held, at p 347:

"It is a principle long sanctioned in courts of equity, that a release cannot apply, or be intended to apply to circumstances of which a party had no knowledge at the time he executed it, and that if it is so general in
E   its terms as to include matters never contemplated, the party will be entitled to relief."

Martin B confined himself to considering the relief which a court of equity would give if a release executed for a limited purpose was expressed in terms more extensive than intended. Wilde B advanced a rule of construction, at p 348:

F   "The doctrine of a court of equity is, that a release shall not be construed as applying to something of which the party executing it was ignorant, and we have now to act on that doctrine in a court of law."

13   This approach was echoed by Lord Westbury in *Directors of the London and South Western Railway Co v Blackmore* (1870) LR 4 HL 610, 623–624:

G   "The general words in a release are limited always to that thing or those things which were specially in the contemplation of the parties at the time when the release was given. But a dispute that had not emerged, or a question which had not at all arisen, cannot be considered as bound and concluded by the anticipatory words of a general release."

H   14   *Ecclesiastical Comrs for England v North Eastern Railway Co* (1877) 4 Ch D 845 again raised the question whether general words of release were to be held as covering claims of which one party was unaware at the date of the agreement. Malins V-C did not consider this question at any length in his judgment, but appears to have concluded, at p 853, that the release would have been treated as covering the claims in question had the

plaintiffs known the true facts, which they did not. In *Turner v Turner*  A
(1880) 14 Ch D 829, 834 he held:

> "In a case of this kind it is the duty of the court to construe the
> instrument according to the knowledge of the parties at the time, and
> according to what they intended, and not to extend it to property which
> was not intended to be comprised within it . . . I quite agree with the  B
> assertion made by Mr Woods and other of the learned counsel that the
> words of release are in themselves abundantly sufficient, and if the deed is
> to be read literally and to be considered as including everything which
> they had known or might hereafter know, it is quite clear that this suit is
> barred by that release. But it has always been the rule of this court to
> construe releases and documents of that kind with regard to the intention
> of the parties, and to refer in such cases to the state of the property which  C
> was known at the time."

A similar expression of opinion is to be found in *Cloutte v Storey* [1911] 1 Ch
18, 34. In *Grant v John Grant & Sons Pty Ltd* 91 CLR 112, the High Court
of Australia referred with approval to a number of these authorities,
including, at pp 125–126, a statement by Sir Frederick Pollock in his
*Principles of Contract*, 13th ed (1929), p 412: "in equity 'a release shall not  D
be construed as applying to something of which the party executing it was
ignorant'." Then the High Court concluded, at pp 129–130:

> "From the authorities which have already been cited it will be seen that
> equity proceeded upon the principle that a releasee must not use the
> general words of a release as a means of escaping the fulfilment of
> obligations falling outside the true purpose of the transaction as  E
> ascertained from the nature of the instrument and the surrounding
> circumstances including the state of knowledge of the respective parties
> concerning the existence, character and extent of the liability in question
> and the actual intention of the releasor."

15    A search of the Australian case law shows that *Grant v John Grant
& Sons Pty Ltd* has been frequently cited and relied upon. In *Torrens Aloha*  F
*Pty Ltd v Citibank NA* (1997) 144 ALR 89 it was held that a waiver
executed in 1987 should not be construed to cover a claim which was not the
subject of consideration by the parties at the time and would have been
doomed to failure until the High Court in effect created a new cause of
action five years later.

16    Reflections of such an approach are found in the judgment of Lord  G
Denning MR (but not the other members of the court) in *Arrale v Costain
Civil Engineering Ltd* [1976] 1 Lloyd's Rep 98. The plaintiff had lost his left
arm in an industrial accident in Dubai and had accepted a paltry sum in local
currency, the full sum to which he was entitled under a local ordinance:

> "in full satisfaction and discharge of all claims in respect of personal
> injury whether now or hereafter to become manifest arising directly or  H
> indirectly from an accident which occurred on 3 July 1998."

The issue was whether the release applied to claims for common law
damages. Lord Denning MR, in agreement with Stephenson LJ (Geoffrey
Lane LJ dissenting), held that it did not. But he also held that if, contrary to

A his view, the release did cover common law claims there was no consideration for the plaintiff's promise. As he put it, at p 102:

"I would say that, if there was a true accord and satisfaction, that is to say, if Mr Dohale, with full knowledge of his rights, freely and voluntarily agreed to accept the one sum in discharge of all his claims, then he would not be permitted to pursue a claim at common law. But in this case there
B is no evidence of a true accord at all. No one explained to Mr Dohale that he might have a claim at common law. No one gave a thought to it. So there can have been no agreement to release it. There being no true accord, he is not barred from pursuing his claim at common law."

17  In his judgment in the present case [2000] ICR 1410, 1418, para 22 Sir Richard Scott V-C held: "In my judgment, there are no such things as
C rules of equitable construction of documents." Buxton LJ, at pp 1440–1441, para 88.4, agreed with Sir Richard Scott V-C's proposition. I also agree with it. More than a century and a quarter have passed since the fusion of law and equity and it would be both destructive of that great reform and altogether anomalous if it were not correct. But acceptance of that proposition should not lead one to regard the authority cited above as spent, or as a dead letter.
D Some of the cases, I think, contain statements more dogmatic and unqualified than would now be acceptable, and in some of them questions of construction and relief were treated almost indistinguishably. But I think these authorities justify the proposition advanced in paragraph 10 above and provide not a rule of law but a cautionary principle which should inform the approach of the court to the construction of an instrument such as this. I accept, as my noble and learned friend, Lord Hoffmann, forcefully points
E out, that authorities must be read in the context of their peculiar facts. But the judges I have quoted expressed themselves in terms more general than was necessary for decision of the instant case, and I share their reluctance to infer that a party intended to give up something which neither he, nor the other party, knew or could know that he had.

18  So I turn to consider the agreement made between the bank and Mr Naeem.  His employment was terminated on grounds of genuine
F redundancy.  The agreement provided for payment in full of salary in lieu of notice and redundancy pay.  It took account of matters such as holiday pay and season ticket loans.  It plainly covered the ordinary incidents of the employer-employee relationship.  But the liquidators contend that it cannot have been limited to such incidents or to claims which might be made to an industrial tribunal: otherwise the reference to "all or any claims whether
G under statute, common law or in equity of whatsoever nature that exist or may exist" would lack any field of potential reference.  This is a compelling submission which has, understandably, found favour with the courts below and with my noble and learned friend Lord Hoffmann.  But the liquidators accept that the language of the clause is subject to some implied limitations: where ex-employees have had deposits with the bank, the liquidators have
H not (very properly) sought to resist claims for repayment in reliance on the general release.  Such claims, they say, fall outside the clause because they do not relate to the employer-employee relationship.  That would be true, if employees were entirely free to make whatever banking arrangements they chose.  But acceptance of these claims involves acceptance that the clause does not mean all it might be thought to say.  What of a latent claim for

industrial disease or personal injury caused to the employee by the   *A*
negligence of the employer but unknown to both parties? Mr Jeans for the
liquidators, in the course of an admirable argument, recognised the difficulty
of submitting that such a claim would be precluded by the provision, even
though it would relate to the employer-employee relationship. I would not
myself infer that the parties intended to provide for the release of such a
claim. The same would in my view be true if, unknown to the employee, the   *B*
bank had libelled him as an employee. The clause cannot be read literally.

19   What, then, of the claim for stigma damages which lies at the heart
of this appeal? The bank, through its senior employees, is fixed with
knowledge of the bank's insolvency and nefarious practices, although it
seems unlikely that those negotiating with the employees were alert to these
facts, very carefully concealed from the world. Mr Naeem had no such
knowledge. Neither the bank, even when fixed with such knowledge, nor   *C*
Mr Naeem could realistically have supposed that such a claim lay within the
realm of practical possibility. On a fair construction of this document
I cannot conclude that the parties intended to provide for the release of rights
and the surrender of claims which they could never have had in
contemplation at all. If the parties had sought to achieve so extravagant a
result they should in my opinion have used language which left no room for   *D*
doubt and which might at least have alerted Mr Naeem to the true effect of
what (on that hypothesis) he was agreeing.

20   On this ground, essentially the first ground of Sir Richard Scott V-C's
conclusion [2000] ICR 1410, 1422, para 34, I would dismiss the appeal.
This makes it unnecessary to consider whether, on the liquidators'
construction, Mr Naeem would be entitled to relief against enforcement of
the agreement on grounds of unconscionability, and I prefer to express no   *E*
opinion on that matter. I would order the liquidators to pay the costs of
these proceedings here and below, subject to any costs-sharing order which
may be or become applicable.

### LORD BROWNE-WILKINSON

21   My Lords, I have had the advantage reading in draft the speech
prepared by my noble and learned friend, Lord Bingham of Cornhill. For the   *F*
reasons which he gives I too would dismiss the appeal.

### LORD NICHOLLS OF BIRKENHEAD

22   My Lords, this appeal raises a question of interpretation of a general
release. By a general release I mean an agreement containing widely drawn
general words releasing all claims one party may have against the other. The   *G*
release given by Mr Naeem was of this character. Mr Naeem accepted a
payment from BCCI "in full and final settlement of all or any claims . . . of
whatsoever nature that exist or may exist".

23   The circumstances in which this general release was given are
typical. General releases are often entered into when parties are settling a
dispute which has arisen between them, or when a relationship between
them, such as employment or partnership, has come to an end. They want to   *H*
wipe the slate clean. Likewise, the problem which has arisen in this case is
typical. The problem concerns a claim which subsequently came to light but
whose existence was not known or suspected by either party at the time the
release was given. The emergence of this unsuspected claim gives rise to a

A   question which has confronted the courts on many occasions. The question is whether the context in which the general release was given is apt to cut down the apparently all-embracing scope of the words of the release.

24   In times past the common law courts and the Court of Chancery differed in their approach to this question. In particular, the Court of Chancery was readier to admit extrinsic evidence as an aid to interpretation than were the common law courts. Sir Frederick Pollock summarised the
B   matter thus in the first edition of his work *Principles of Contract* (1876), p 414:

> "We have seen that courts of law as well as courts of equity have assumed a power to put a restricted construction on general words when it appears on the face of the instrument that it cannot have been the real intention of the parties that they should be taken in their apparent general
C   sense. But courts of equity will do the like if the same conviction can be arrived at by evidence external to the instrument . . . This jurisdiction is exercised chiefly in dealing with releases."

25   This difference in approach is now a matter of historic interest and no more. It is part of the history of the law of interpretation, described vividly in *Wigmore on Evidence* (1981), vol 9, para 2461, p 193 as "the
D   history of a progress from a stiff and superstitious formalism to a flexible rationalism". Today there is no question of a document having a legal interpretation as distinct from an equitable interpretation.

26   Further, there is no room today for the application of any special "rules" of interpretation in the case of general releases. There is no room for any special rules because there is now no occasion for them. A general
E   release is a term in a contract. The meaning to be given to the words used in a contract is the meaning which ought reasonably to be ascribed to those words having due regard to the purpose of the contract and the circumstances in which the contract was made. This general principle is as much applicable to a general release as to any other contractual term. Why ever should it not be?

27   That said, the typical problem, as I have described it, which arises
F   regarding general releases poses a particular difficulty of its own. Courts are accustomed to deciding how an agreement should be interpreted and applied when unforeseen circumstances arise, for which the agreement has made no provision. That is not the problem which typically arises regarding a general release. The wording of a general release and the context in which it was given commonly make plain that the parties intended that the release should
G   not be confined to known claims. On the contrary, part of the object was that the release should extend to any claims which might later come to light. The parties wanted to achieve finality. When, therefore, a claim whose existence was not appreciated does come to light, on the face of the general words of the release and consistently with the purpose for which the release was given the release is applicable. The mere fact that the parties were
H   unaware of the particular claim is not a reason for excluding it from the scope of the release. The risk that further claims might later emerge was a risk the person giving the release took upon himself. It was against this very risk that the release was intended to protect the person in whose favour the release was made. For instance, a mutual general release on a settlement of final partnership accounts might well preclude an erstwhile partner from

bringing a claim if it subsequently came to light that inadvertently his share    A
of profits had been understated in the agreed accounts.

28    This approach, however, should not be pressed too far. It does not
mean that, once the possibility of further claims has been foreseen, a newly
emergent claim will always be regarded as caught by a general release,
whatever the circumstances in which it arises and whatever its subject matter
may be. However widely drawn the language, the circumstances in which
the release was given may suggest, and frequently they do suggest, that the    B
parties intended, or, more precisely, the parties are reasonably to be taken to
have intended, that the release should apply only to claims, known or
unknown, relating to a particular subject matter. The court has to consider,
therefore, what was the type of claims at which the release was directed. For
instance, depending on the circumstances, a mutual general release on a
settlement of final partnership accounts might properly be interpreted as    C
confined to claims arising in connection with the partnership business. It
could not reasonably be taken to preclude a claim if it later came to light that
encroaching tree roots from one partner's property had undermined the
foundations of his neighbouring partner's house. Echoing judicial language
used in the past, that would be regarded as outside the "contemplation" of
the parties at the time the release was entered into, not because it was an    D
unknown claim, but because it related to a subject matter which was not
"under consideration".

29    This approach, which is an orthodox application of the ordinary
principles of interpretation, is now well established. Over the years different
judges have used different language when referring to what is now
commonly described as the context, or the matrix of facts, in which a
contract was made. But, although expressed in different words, the constant    E
theme is that the scope of general words of a release depends upon the
context furnished by the surrounding circumstances in which the release was
given. The generality of the wording has no greater reach than this context
indicates.

30    The cases are legion. A few well known examples will suffice. As
long ago as 1750 Lord Hardwicke LC said that it was common in equity to
restrain a general release to "what was under consideration at the time of    F
giving it": see *Cole v Gibson* 1 Ves Sen 503, 506–507. A century later, in
1839, Lord Langdale MR said that the general words of a release are to be
restrained by:

"the contract and intention of the parties, that contract and intention
appearing by the deed itself or from any other proper evidence that may
be adduced upon the occasion": see *Lindo v Lindo* 1 Beav 496, 506.    G

In 1870 Lord Westbury said that the "general words in a release are limited
always to that thing or those things which were specially in the
contemplation of the parties at the time when the release was given": see
*Directors of the London and South Western Railway Co v Blackmore*
LR 4 HL 610, 623. In 1926 Bankes LJ emphasised the "necessity of
ascertaining what the parties were contracting about before the court can    H
determine the true meaning" of a release: see *Richmond v Savill* [1926] 2 KB
530, 540. In 1954 Dixon CJ, Fullagar, Kitto and Taylor JJ, in a joint
judgment in the High Court of Australia, said that the general words of a
release are confined to "the true purpose of the transaction as ascertained

A from the nature of the instrument and the surrounding circumstances": see *Grant v John Grant & Sons Pty Ltd* 91 CLR 112, 129.

 31 This judgment in the High Court of Australia in *Grant's* case contained also the observation that the surrounding circumstances to be taken into account include the state of knowledge of the respective parties concerning the existence, character and extent of the liability in question and

B "the actual intention of the releasor". For many years the accepted wisdom has been that evidence of the actual intention of the parties is not admissible on the interpretation of a written agreement, although such evidence is admissible for other purposes, for example, on a claim for rectification. In *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 913, my noble and learned friend Lord Hoffmann

C pointed out that the exclusion from evidence of the previous negotiations of the parties and their declarations of subjective intent is for reasons of practical policy. He added that the boundaries of this exception are in some respects unclear. Whether these reasons of practical policy still hold good today in all circumstances has become increasingly the subject of debate in recent years. The debate is still continuing: see the recent observations of Thomas J in the Court of Appeal of New Zealand in paragraphs 59 to 95

D of his judgment in *Yoshimoto v Canterbury Golf International Ltd* [2001] 1 NZLR 523. This is not the moment to pursue this topic, important though it is, because the point does not arise on this appeal. I desire, however, to keep the point open for careful consideration on a future occasion.

*Sharp practice*

E

 32 Thus far I have been considering the case where both parties were unaware of a claim which subsequently came to light. Materially different is the case where the party to whom the release was given knew that the other party had or might have a claim and knew also that the other party was ignorant of this. In some circumstances seeking and taking a general release

F in such a case, without disclosing the existence of the claim or possible claim, could be unacceptable sharp practice. When this is so, the law would be defective if it did not provide a remedy.

 33 That is not the present case. Although the bank through its officers may be fixed with knowledge of the corrupt activities taking place within the bank, officers of the bank and, through them, the bank itself, were not aware that these activities might give bank employees a claim for damages for

G breach of their contracts of employment. In *Mahmud v Bank of Credit and Commerce International SA* [1998] AC 20 the House developed or, put more bluntly, changed the law. The House decided that, as a matter of law, corrupt and dishonest activities by an employer are capable of giving rise to a claim in damages. But that decision was in June 1997, seven years after Mr Naeem had signed his release form. In these circumstances there can be

H no question of the bank having indulged in anything approaching sharp practice in this case. This being so, I prefer to leave discussion of the route by which the law provides a remedy where there has been sharp practice to a case where that issue arises for decision. That there is a remedy in such cases I do not for one moment doubt.

*The present case*                                                        A

34   I turn to the interpretation of the release signed by Mr Naeem. Clearly, the bank and Mr Naeem are to be regarded as having intended not to confine the release signed by Mr Naeem to known claims. Specific payments were made in settlement in full of all known claims. Mr Naeem's redundancy package comprised four weeks' pay, an ex gratia payment equal to two weeks' pay, three weeks' pay in lieu of notice, and statutory   B redundancy pay. These items totalled £7,138. An additional amount, equal to a further one month's pay, £2,772, was paid in exchange for his signing the general release (Acas Form COT-3). Plainly, the general release was intended to "mop up" any other claims which Mr Naeem might have. The bank was making a specific additional payment in order to be rid of the possibility of having to face any further claims from Mr Naeem. Unfair   C dismissal is the most obvious example. The release specifically mentioned any application Mr Naeem could make to the industrial tribunal. But the release is not confined to a claim for unfair dismissal. It would include also matters such as a claim for wrongful dismissal.

35   Equally clearly the release is confined to claims arising out of the employment relationship. The release cannot reasonably be regarded as embracing any claim the employee might have as a depositor or borrower.   D I am inclined to think that the release is to be construed even more narrowly as restricted to claims arising out of the *ending* of the employment relationship. What if it later came to light that due to a clerical error Mr Naeem had been significantly underpaid while employed? It would be surprising if Mr Naeem could not pursue such a claim. Whether this is so or not, I consider these parties are to be taken to have contracted on the basis   E of the law as it then stood. To my mind there is something inherently unattractive in treating these parties as having intended to include within the release a claim which, *as a matter of law*, did not then exist and whose existence could not then have been foreseen. This employee signed an informal release when he lost his job, in return for an additional month's pay. The ambit of the release should be kept within reasonable bounds. Mr Naeem cannot reasonably be regarded as having taken upon himself the   F risk of a subsequent retrospective change in the law. A claim arising out of such a change cannot be regarded as having been within the contemplation of the parties. I too would dismiss this appeal.

**LORD HOFFMANN**

36   My Lords, I have had the advantage of reading in draft the speech of   G my noble and learned friend, Lord Bingham of Cornhill, and I gratefully adopt his statement of the facts. There are two issues in this case. First, does Mr Naeem's claim fall within the description of claims which he agreed to release? If it does, then the second point is whether in the circumstances the bank is entitled to rely upon the agreement.

37   I agree with my noble and learned friend that the first issue raises an ordinary question of construction. What would a reasonable person have   H understood the parties to mean by using the language of the document against all the background which would reasonably have been available to them at the time? But I regret that I cannot agree with his answer. It appears to me to give too little weight to the actual language and background and to

*A*  rely unduly upon the expressions of judges used in other cases dealing with different documents.

38   The language of the document is very wide.  The impression it conveys is that the draftsman meant business.  He has gone to some trouble to avoid leaving anything out.  He uses traditional style: pairs of words like "full and final settlement", "all or any claims", "that exist or may exist" and
*B*  phrases like "whether under statute, common law or in equity" and "of whatsoever nature".  Admittedly, he could have gone further.  *Tudor Grange Holdings Ltd v Citibank NA* [1992] Ch 53, 57 contains an even more elaborate release and I have seen American documents in which the release covers an entire page.  But most people in this country would regard this as overkill.  The modern English tradition, while still erring on the side of caution, is to avoid the grosser excesses of verbiage and trust to the judges to
*C*  use common sense to get the message.  I think that this tendency should be encouraged.  So I think that anyone who was simply reading the document without preconceptions would accept that the draftsman was not leaving deliberate gaps.  It does not however follow that the language was to be read completely literally.  There may be limitations in scope to be inferred from the background, limitations from context which the draftsman may have
*D*  thought too obvious to mention.  But that is a different matter from saying that he did not use enough words.

39   The background is however very important.  I should in passing say that when, in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 913, I said that the admissible background included "absolutely anything which would have affected the
*E*  way in which the language of the document would have been understood by a reasonable man", I did not think it necessary to emphasise that I meant anything which a reasonable man would have regarded as *relevant*.  I was merely saying that there is no conceptual limit to what can be regarded as background.  It is not, for example, confined to the factual background but can include the state of the law (as in cases in which one takes into account that the parties are unlikely to have intended to agree to something unlawful
*F*  or legally ineffective) or proved common assumptions which were in fact quite mistaken.  But the primary source for understanding what the parties meant is their language interpreted in accordance with conventional usage: "we do not easily accept that people have made linguistic mistakes, particularly in formal documents".  I was certainly not encouraging a trawl through "background" which could not have made a reasonable person
*G*  think that the parties must have departed from conventional usage.

40   What is the relevant background in this case?  To start with, there are three matters to which I attach considerable importance.  First, there was no dispute between the parties.  No doubt Mr Naeem and his union were opposed to the whole idea of making him redundant.  But, given that he was being made redundant, there was no dispute about the legal consequences.  Mr Naeem had a claim to salary in lieu of notice and redundancy pay which
*H*  the bank did not contest.  Secondly, there was no element of compromise.  All his claims known to the parties were paid in full; in fact, more than in full because there was an ex gratia increase over the statutory redundancy pay.  Thirdly, the release was not simply in consideration of a settlement or compromise.  It was not, as often happens, a mere ancillary tidying up.  The

bank paid a separate consideration of some £2,700 specifically for the
release.

41    The absence of a dispute is important because most of the authorities
on the construction of releases concern documents which were intended to
settle disputes. In such a case, the scope of the dispute provides a limiting
background context to the document. It is easy to infer that although the
parties used very wide language—"all claims" and so forth—they meant all
claims arising out of the matters in dispute. It would go without saying that
they were not intending to include claims of an altogether different
character. A good example is the decision of the House of Lords in *Directors
of the London and South Western Railway Co v Blackmore* LR 4 HL 610. In
1861 the railway company used its statutory powers to buy some of
Mr Blackmore's land for railway purposes. In 1864 they had a dispute over
their boundary. This was settled by an agreement that he should build a wall
to be maintained at their joint expense. The agreement included a release of
claims in general terms. In 1866 the railway company decided that it did not
need the land it had taken and proposed to sell it as surplus land.
Mr Blackmore claimed that, as the person from whom it had been taken, he
had a statutory right of pre-emption under the Land Clauses Consolidation
Act 1845 (8 & 9 Vict c 18). The railway company argued (rather faintly, it
would seem, by their second counsel) that it fell within the description of
claims which he surrendered when settling the boundary dispute. Lord
Hatherley LC, who gave the leading judgment, did not even bother to
address this point. Lord Westbury picked it up. He said, at p 623:

> "The general words in a release are limited always to that thing or
> those things which were specially in the contemplation of the parties at
> the time when the release was given."

42    This is rather a sweeping statement. It is almost always dangerous to
say "always". But, in cases of a release given in connection with the
settlement of a dispute, it is a fair generalisation.

43    There may also be cases in which there is no dispute but the parties
enter into a compromise of undisputed claims. This happens when an
insolvent debtor enters into a composition with his creditors. In such a case,
an ancillary release is also likely to be construed as releasing any further
claim on the debts which are being compromised but not as extending to
claims which did not fall within the terms of the composition. The best
example is *Lyall v Edwards* 6 H & N 337. Edwards and Matthie were East
India and colonial brokers who suspended payment and entered into a
compromise with their creditors, including the plaintiffs. The creditors
agreed by a deed of composition that the assets of the partnership should be
realised, a dividend paid to creditors and the defendants then given a release
in general terms. After executing the deed, the plaintiffs found that they had
a claim for the conversion of 22 chests of indigo of which they had not
known and for which they had not claimed in the composition. The Court of
Exchequer held that a replication in these terms was a good answer to the
plea of release. Martin B said, at p 347:

> "The replication is founded on the equitable doctrine that if a release is
> given for a particular purpose, and it is understood by the parties that its
> operation is to be limited to that purpose, but it turns out that the terms of
> the release are more extensive than was intended, a court of equity will

A interfere and confine it to that which was in the contemplation of the parties at the time it was executed."

 **44** I shall have to come back later to the question of why Martin B calls this an "equitable doctrine" rather than an illustration of the general proposition that language always takes meaning from context. It requires a certain amount of historical explanation. But nowadays, if the context

B satisfies the court that a release was "understood by the parties . . . to be limited" in some way, then that, as an ordinary matter of construction, is what the document means. The decision in *Lyall v Edwards* makes perfectly good sense as an example of contextual construction.

 **45** In the present case, however, there is no context of a particular dispute being settled or particular claims being compromised.  So the generalisations in *Directors of the London and South Western Railway Co v*

C *Blackmore* LR 4 HL 610 and *Lyall v Edwards* 6 H & N 337 are of little assistance.  We are dealing with similar forms of words, but in a radically different situation.  Nevertheless, although there was no dispute or compromise, that does not mean that there was no context whatever.  The parties were making an agreement for the termination of Mr Naeem's employment.  One would therefore expect that when the release referred to

D all his claims, it meant claims arising out of the employment relationship. He agreed that he would not make any claims in his capacity as a former employee.  I doubt, however, whether a reasonable person would have understood the parties to be dealing with claims he might coincidentally have in some other capacity—for example, as a depositor with the bank.

 **46** It may also be that a reasonable person would regard the release as applicable only to *financial* claims and not, for example, to claims for

E personal injury.  This is a rather more difficult question, on which there is something to be said on both sides, and I shall return to it later.  But what seems to me quite impossible is to exclude financial claims arising out of the employment relationship on the grounds that they were unknown, or not within the specific contemplation of the parties.  Not only is there no context of compromise or dispute which suggests this, but there is an extremely

F strong indication which points the other way.

 **47** The counter-indication, as it seems to me, is the fact that after payment of the known claims in full, the bank paid £2,772·50 specifically for the release in the COT-3 form.  This may be taken as representative of the sums paid to the 900 employees who were made redundant.  So the bank paid some £2·5m for the releases.  The reasonable man is bound to ask himself: what was it paying for?  If it was intended that the release should be

G confined to claims within the contemplation of the parties, it was getting no consideration whatever.  Why did it bother to insist on the forms being signed?  In my view, one of the first principles of construction is to try to give some business sense to the agreement.  To exclude unknown claims makes the release nonsensical.  Nor do I think it is realistic to attribute to the parties an intention to make fine distinctions between different kinds of unknown claims; for example, between those which were conceivable but not

H conceived of and those which ( perhaps because of what was then thought to be the law) were not even conceivable.  To regard such claims as nevertheless included in the class of those released does not seem to me extravagant. On the contrary, the more improbable the claim, the more likely it is that the reasonable employee would be willing to part with it for ready money.  And

the construction gives effect to the object of the bank, which must have been    A
to draw a final line under the employment relationship.

48   For these reasons, I think that Miss Booth, who appeared for
Mr Naeem before Lightman J [1999] ICR 1068, was realistic and right to
concede that as a matter of construction her client's claim fell within the
terms of the release. Lightman J proceeded on this assumption. A majority
of the Court of Appeal [2000] ICR 1410 also thought that she was right.    B
I think that even Sir Richard Scott V-C accepted that, as a matter of objective
construction, giving the document the meaning it would have conveyed to a
reasonable man aware of all the background available to the parties, the
claim was covered by the release. But he laid stress on matters which were
known to only *one* of the parties, namely the knowledge by the higher
management of the bank fraud and their knowledge that Mr Naeem and
other employees were unaware of it. He said, at p 1421, para 30:    C

"In a case such as the present, in which Mr Naeem was unaware of the
facts but [the bank] was aware of them and was aware of Mr Naeem's
ignorance, a conclusion on construction which attributed to the parties an
objectively ascertained intention that the COT-3 release should bar the
'stigma' claim would reward dishonesty at the expense of the innocent.
The only honest intention that [the bank] could have had in the    D
circumstances of this case would have been an intention that left the
stigma claim outside the scope of the COT-3 release."

49   I read this passage as meaning that on ordinary principles of
objective construction, Mr Naeem's claim was barred, but that the bank's
knowledge and conduct made it inequitable, wrong, unfair, for the bank to
rely on that construction. This is an argument with which I shall in due    E
course have to deal, but it does not go to the first question I identified at the
beginning of my speech—the question of what the document means. It goes
to the second question—whether the bank is entitled to rely upon the
document. It would be contrary to basic principles of construction for the
meaning of a document to be affected by facts which were known to one
party but not reasonably available to the other.

50   The main contrary argument which Mr Allen put before your    F
Lordships was an argument based on authority. He referred the House to a
number of cases, going back to the 18th century, from which he culled
general statements much along the lines of those which I have already cited
from *Directors of the London and South Western Railway Co v Blackmore*
LR 4 HL 610 and *Lyall v Edwards* 6 H & N 337. From these he invited your
Lordships to hold that there was a general presumption that, in the absence    G
of what were described as "clear words to the contrary", general words of
release would be confined to matters which were within the specific
contemplation of the parties. And he urged your Lordships to adopt this
construction even in a case in which there were obviously no claims within
the specific contemplation of the parties.

51   My Lords, I have a number of difficulties with this argument, the first    H
of which goes to the root of the process of interpretation. If interpretation is
the quest to discover what a reasonable man would have understood specific
parties to have meant by the use of specific language in a specific situation at
a specific time and place, how can that be affected by authority? How can
the question of what a reasonable man in 1990 would have thought the bank

A  and Mr Naeem meant by using the language of an Acas form be answered by examining what Lord Keeper Henley said in 1758 (*Salkeld v Vernon* 1 Eden 64)? I can understand that if parties in a legal context use words in what appears to have been a technical sense, it may be necessary to ascertain that technical meaning from authorities. But there is nothing of that kind here.

B  52  My second difficulty is that Mr Allen's citations of authority were almost entirely context-free. He read a number of general statements of the kind which I have already cited without inviting your Lordships to examine in any detail the facts of the cases in which they were made. But that does not seem to me a proper use of authority. The remarks of judges, however general, have to be read in context no less than the general words of contractual documents.  Let me add to the two cases I have already mentioned another containing remarks upon which Mr Allen particularly

C  relied.  In *Ramsden v Hylton* 2 Ves Sen 304 John Hylton married the daughter of Sir Richard Musgrave in 1693 and the Musgrave family provided £2,000 for a marriage settlement. The trusts after the deaths of the husband and wife were to any sons in tail male and in default of male issue to trustees to create a portions term to raise £8,000 for portions for any daughters. John Hylton died in 1707 leaving two sons and four daughters. Both sons died without issue, so the trusts to raise portions for the daughters

D  took effect. But no one had been aware of the terms of the settlement. It was found among some family papers after the death of the second son, also called John. Until then it had been assumed that the elder son and then John were absolutely entitled to the settled property. When the settlement was found, the daughters claimed their portions.  As against one of the daughters, John's estate pleaded a release in general terms contained in a

E  deed made between her and John in 1728. The background to the deed was that John had owed his sister £1,000 under a family testamentary disposition and had given a bond for £2,000 as security. By the deed, she agreed to give up the bond and accept a mortgage over the settled estate, which everyone assumed to belong to John. The release stated that she accepted the mortgage in satisfaction of all her claims against him. This was the context in which Lord Hardwicke LC said, at p 310:

F  "The strongest and most material objection is the release; but I am of opinion, it would not be construed as a release of this demand, either in point of law, or in a court of equity. First, it is certain, that if a release is given on a particular consideration recited, notwithstanding that the release concludes with general words, yet the law, in order to prevent surprise, will construe it to relate to the particular matter recited (*Cole v*

G  *Gibson* 1 Ves Sen 507), which was under the contemplation of the parties, and intended to be released. The particular point in consideration was not relative to this estate, but what they could have against him as representative to his mother, brother, or father's personal estate, to which the words are particularly confined. But there is no occasion to rely on the law for this; for it is clear, that it would not in a court of equity, it being admitted on all hands, and it must be so taken, that this settlement

H  was unknown to all the parties: nor did the daughters know of this contingent provision, beside which they had no other provision out of this estate; and all they could be intitled to must arise out of the personal estate of their father or other relations. It is impossible then to imply within the general release that which neither party could have under

consideration, and which it is admitted neither side knew of; and as this    A
release cannot have its effect to bar this demand, so it cannot be set up
against them in a court of equity."

53   So in this case there was a particular context, namely the
testamentary claim of the daughter, which limited the scope of the release.
Like all the other cases, *Ramsden v Hylton* makes good sense in terms of
ascertaining contextual meaning.    B

54   It would be wearisome to take your Lordships through all the other
cases upon which Mr Allen relied. But I think it is worth pausing at this
point to consider why it has been possible for Mr Allen to compile, from
cases decided in contexts far removed from the present, an anthology of
dicta which appear to lay down generally applicable rules of construction. It
is not easy to recover the intellectual background against which the 18th and    C
even 19th century judges decided questions of construction and this is not
the place for a detailed historical inquiry. What is, I think, beyond dispute is
that their approach was far more literal and less sensitive to context than
ours today. Courts were reluctant to admit what was called "extrinsic
evidence", that is to say, evidence of background which would put the
language into context. This reluctance has to do with a number of factors
which are now of purely historical interest, such as trial by jury, under which    D
the construction of documents was treated as a matter of law for the judge,
the incompetence of the parties and persons interested to give evidence, the
fact that most documents which came before the courts were deeds prepared
by lawyers and a general feeling that the less the court took account of
extrinsic evidence, the more predictable would be the construction which it
gave to the document. As Popham CJ said in the *Countess of Rutland's Case*    E
(1604) 5 Co Rep 25b, 26a:

"it would be inconvenient that matters in writing made by advice and
on consideration and which finally import the certain truth of the
agreement of the parties should be controlled by averment of the parties
to be proved by the uncertain testimony of slippery memory."

55   In this pursuit of certainty the courts, of both common law and    F
equity, evolved what were called "rules of construction", by which certain
words or expressions were treated, in the absence of contrary language, as
having certain meanings. These rules no doubt reflected what in most cases
the parties would have intended by using such language. And in the case of
documents drawn up by lawyers, the skilled draftsman would be aware of
the rules of construction and navigate their reefs and shoals to give effect to    G
the intention of the parties, settlor or testator. But the generality with which
they were expressed and their insensitivity to context, as opposed to the
particular words which had been used, made them rigid and often
productive of injustice. Books like *Jarman on Wills* are monuments to the
rules of construction and a melancholy record of the occasions on which
they have defeated the intentions of testators.

56   It was this way of thinking which led 18th and 19th century judges    H
to explain their decisions in cases like *Ramsden v Hylton* 2 Ves Sen 304 as
based upon rules of construction rather than simply an interpretation of
language in its context and why Martin B in *Lyall v Edwards* 6 H & N 337
thought it necessary to say, not merely that the parties did not intend the

A  release to apply to claims outside the composition, but that his interpretation was based upon an "equitable doctrine".

57  It was however unusual, even in the 19th century, for commercial documents to be interpreted according to rules of construction. The quest for certainty, which still dominated the construction of wills and deeds, was thought less important than the need to give effect to the actual commercial purpose of the document. There was however one remarkable example in
B  the 20th century of a rule of construction being evolved by the courts in a commercial context. This was the rule for construing exemption clauses. But the purpose was different from that of most of the rules applied to wills and deeds. It was not to promote certainty of construction but to remedy the unfairness which exemption clauses could create. As Mr Allen also contended for a rule of construction on grounds of fairness, I think that the
C  story of the rise and fall of the rule of construction for exemption clauses may be instructive.

58  A vivid account of what happened was given by Lord Denning MR in *George Mitchell (Chesterhall) Ltd v Finney Lock Seeds Ltd* [1983] QB 284, 296–297:

> "None of you nowadays will remember the trouble we had—when
D  I was called to the Bar—with exemption clauses. They were printed in small print on the back of tickets and order forms and invoices. They were contained in catalogues or timetables. They were held to be binding on any person who took them without objection. No one ever did object. He never read them or knew what was in them. No matter how unreasonable they were, he was bound. All this was done in the name of 'freedom of contract'. But the freedom was all on the side of the big
E  concern which had the use of the printing press. No freedom for the little man who took the ticket or order form or invoice. The big concern said, 'Take it or leave it.' The little man had no option but to take it. The big concern could and did exempt itself from liability in its own interest without regard to the little man. It got away with it time after time. When the courts said to the big concern, 'You must put it in clear words', the big concern had no hesitation in doing so. It knew well that the little
F  man would never read the exemption clauses or understand them . . .

> "Faced with this abuse of power—by the strong against the weak—by the use of the small print of the conditions—the judges did what they could to put a curb upon it. They still had before them the idol, 'freedom of contract'. They still knelt down and worshipped it, but they concealed under their cloaks a secret weapon. They used it to stab the idol in the
G  back. This weapon was called 'the true construction of the contract'. They used it with great skill and ingenuity. They used it so as to depart from the natural meaning of the words of the exemption clause and to put upon them a strained and unnatural construction. In case after case, they said that the words were not strong enough to give the big concern exemption from liability; or that in the circumstances the big concern was not entitled to rely on the exemption clause. If a ship deviated from the
H  contractual voyage, the owner could not rely on the exemption clause. If a warehouseman stored the goods in the wrong warehouse, he could not pray in aid the limitation clause. If the seller supplied goods different in kind from those contracted for, he could not rely on any exemption from liability. If a shipowner delivered goods to a person without production

of the bill of lading, he could not escape responsibility by reference to an   *A*
exemption clause. In short, whenever the wide words—in their natural
meaning—would give rise to an unreasonable result, the judges either
rejected them as repugnant to the main purpose of the contract, or else cut
them down to size in order to produce a reasonable result."

59 Lord Denning MR went on, at pp 298–299, to explain that
everything had now changed as a result of the passing of the Unfair Contract   *B*
Terms Act 1977, "We should no longer have to go through all kinds of
gymnastic contortions to get round them." A few years earlier, in *Photo
Production Ltd v Securicor Transport Ltd* [1980] AC 827, 843 Lord
Wilberforce had said much the same thing:

> "There was a large number of problems, productive of injustice, in
> which it was worse than unsatisfactory to leave exception clauses to   *C*
> operate. Lord Reid referred to these in *Suisse Atlantique Société
> d'Armement Maritime SA v NV Rotterdamsche Kolen Centrale* [1967]
> 1 AC 361, 406, pointing out at the same time that the doctrine of
> fundamental breach was a dubious specific. But since then Parliament has
> taken a hand: it has passed the Unfair Contract Terms Act 1977. This Act
> applies to consumer contracts and those based on standard terms and
> enables exception clauses to be applied with regard to what is just and   *D*
> reasonable. It is significant that Parliament refrained from legislating
> over the whole field of contract. After this Act, in commercial matters
> generally, when the parties are not of unequal bargaining power, and
> when risks are normally borne by insurance, not only is the case for
> judicial intervention undemonstrated, but there is everything to be said,
> and this seems to have been Parliament's intention, for leaving the parties   *E*
> free to apportion the risks as they think fit and for respecting their
> decisions."

60 My Lords, the lesson which I would draw from the development of
the rules for construing exemption clauses is that the judicial creativity,
bordering on judicial legislation, which the application of that doctrine
involved is a desperate remedy, to be invoked only if it is necessary to remedy   *F*
a widespread injustice. Otherwise there is much to be said for giving effect
to what on ordinary principles of construction the parties agreed.

61 Whether such a rule of construction is necessary in this case can best
be considered after I have dealt with the second point, namely whether the
bank is precluded on grounds of fairness and equity from relying upon the
ordinary meaning of the release. It will then be possible to say whether
the law is adequate to deal with cases of unfairness, so as to make it unneces-   *G*
sary to approach the matter by an artificial rule of construction. When
judges say that "in the absence of clear words" they would be unwilling to
construe a document to mean something, they generally mean (as they did in
the case of exemption clauses) that the effect of the document is unfair. It
will therefore be essential to examine whether this is true of the present case.

62 The disappearance of artificial rules for the construction of
exemption clauses seems to me in accordance with the general trend in   *H*
matters of construction, which has been to try to assimilate judicial
techniques of construction to those which would be used by a reasonable
speaker of the language in the interpretation of any serious utterance in
ordinary life. In *Investors Compensation Scheme Ltd v West Bromwich*

A   *Building Society* [1998] 1 WLR 896, 912, I said with the concurrence of three other members of the House: "Almost all the old intellectual baggage of 'legal' interpretation has been discarded." But if Mr Allen's submissions on the rules of construction are accepted, a substantial piece of baggage will have been retrieved. Lord Keeper Henley's ghost (*Salkeld v Vernon* 1 Eden 64) will have struck back. I think it would be an unfortunate retreat into formalism if the outcome of this case were to require employers using the

B   services of Acas to add verbiage to the form of release in order to attain the comprehensiveness which it is obviously intended to achieve.

63   Before leaving the question of construction, I must deal with some subsidiary arguments which Mr Allen made. The first was what I might call the all-or-nothing argument. If I have understood it correctly, it went as follows. The bank's construction depends upon a literal reading of the

C   release clause. It involves reading "any claim" to mean absolutely any claim whatever. But the bank concedes that context would almost certainly limit the clause to claims arising out of the employment relationship. In so doing, they have sold the pass and allowed Mr Naeem to put forward a different principle of limitation for which the context provides no support—indeed, which the separate consideration for the release actually contradicts—

D   namely that it does not apply to claims which were unknown to the parties, or at any rate those which were entirely unknown or unimaginable. A similar argument is advanced on the basis of the concession that it was arguable that the release did not apply to personal injury claims. I find it difficult to deal with this argument because it seems to me so entirely irrational.

64   The following conversation may be imagined. A motorist is stopped by a park warden driving down a road which is signposted "No cars

E   allowed". He says "But I am driving a green car." The warden points out that it is nevertheless a car. The motorist says "But the words cannot be read literally. Do you suggest that they forbid children's toy cars?" The warden concedes that the context suggests a prohibition for the protection of pedestrians frequenting the park and that it does not apply to toy cars. "And what about police cars going to an emergency? Surely there is an implied exception for emergency vehicles?" "Yes, perhaps there is." "Well then" says

F   the motorist "if it cannot be read literally, why should it apply to green cars?"

65   The fact is that the bank is not contending for a literal meaning. It is contending for a contextual meaning, but submitting that while the context excludes claims outside the employee relationship, it includes unknown claims. As for personal injuries, I agree with Mr Jeans who appeared for the bank that this is a debatable area.   Mr Allen, who has considerable

G   experience of the use of the COT-3 form, told us that in industries in which long-term industrial injury claims are common, it is customary to have a specific clause excluding personal injury claims from the release. This would suggest that the parties otherwise expect that they would or might be caught by the general words. I am not sure that Mr Naeem would have been entitled to bring a claim after leaving his employment on the ground that he was suffering from repetitive strain injury caused by his use of the the bank's

H   computer. The bank might be entitled to say that it paid the extra money in return for not having to hear from Mr Naeem in his capacity as employee again. If, however, a court decided that it did not come within the class of claims released, it would not be on the ground that it had not been known at the time to the parties. On the contrary, one would be much more likely to

conclude that the parties intended to exclude such a claim from the release if $\quad$ A
it was known to the parties. If both parties knew that Mr Naeem had a
personal injury claim which was potentially worth, say, £30,000, the court
would be reluctant to interpret the agreement as amounting to its release in
consideration of less than £3,000. But the principle of exclusion would have
to be that personal injury claims, as such, were outside the scope of the
agreement. It would not support the exclusion of claims for some entirely
different reason.                                                                                          B

66    Another suggestion was that the clause should not be construed to
release claims arising out of a wrongful act of the bank. This was put
forward by analogy with the construction of exemption clauses, on which
there is authority for saying that they should prima facie not be read to
exempt a contracting party from liability for negligence. I have already
referred to the change which has taken place in the court's approach to $\quad$ C
exemption clauses. But in any case, there seems to me no real analogy. The
reason for the traditional hostility of the courts to exemption clauses was
that they often amounted to taking with one hand what had been given with
the other. A contracting party undertook various obligations and then
provided that he was not to be liable if he failed to perform them. But the
release in this case is quite different. The bank is paying a sum of money $\quad$ D
specifically to buy its release from any possible future claim by the employee.
If there was such a claim, it was almost bound to be founded upon some
wrongful act of the bank—a breach of contract or statutory obligation, or
else a tort. It is hard to imagine what other kind of claim there could be. So
the release involved the employee taking a sum of money in return for giving
up the speculative possibility that he might have such a claim. This has
nothing in common with an exemption clause.                                    E

67    Finally it was submitted that although, for the reasons I have
advanced, the release applied to unknown claims, it should not be read as
applying to claims of which the employer actually knew, and in particular
claims which he knew were unknown to the employee. There are two forms
in which this argument can be put. One, as I have already said, was that
adopted by Sir Richard Scott V-C [2000] ICR 1410, 1421, para 30. It $\quad$ F
involved relying as background upon the actual fact that the bank knew of
its own misconduct and knew that it was unknown to the employee. But
these facts, whatever argument they may support to preclude the bank from
relying on the agreement, cannot affect its construction. They are not
admissible background. An alternative is to put the proposition in general
terms: no release of unknown claims should be construed to extend to claims
which were known to the party obtaining the benefit of the release but not to $\quad$ G
the other party. My difficulty with this proposition is, that it involves
another artificial rule of construction. In view of the principles upon which
the beneficiary of a release can be precluded from relying upon it because he
has been guilty of sharp practice, to which I shall in a moment refer, I think
that it is unnecessary to create such a rule of construction. There is again an
analogy with exemption clauses and the 1977 Act.

68    My Lords, I turn now to the question of whether the bank is entitled $\quad$ H
to rely upon the terms of the release. Mr Jeans said that the bank was under
no obligation to disclose to Mr Naeem that it had been guilty of breaches of
the implied term of trust and confidence in the contract of employment. The
House of Lords decided in *Bell v Lever Bros Ltd* [1932] AC 161 that the

A  employment relationship was not a contract uberrimae fidei and that an employee negotiating the terms upon which his employment would be terminated had no obligation to disclose to the employer that he had been guilty of conduct which would have justified his summary dismissal. The same must be true of an employer.

B  69  My Lords, I think that this argument presses the principle in *Bell v Lever Bros Ltd* too far. It was not a case which concerned a general release. A transaction in which one party agrees in general terms to release another from any claims upon him has special features. It is not difficult to imply an obligation upon the beneficiary of such a release to disclose the existence of claims of which he actually knows and which he also realises may not be known to the other party. There are different ways in which it can be put. One may say, for example, that inviting a person to enter into a release in

C  general terms implies a representation that one is not aware of any specific claims which the other party may not know about. That would preserve the purity of the principle that there is no positive duty of disclosure. Or one could say, as the old Chancery judges did, that reliance upon such a release is against conscience when the beneficiary has been guilty of a suppressio veri or suggestio falsi. On a principle of law like this, I think it is legitimate to go

D  back to authority, to Lord Keeper Henley in *Salkeld v Vernon* 1 Eden 64, 69, where he said: "no rule is better established than that every deed obtained on suggestio falsi, or suppressio veri, is an imposition in a court of conscience."

70  In principle, therefore, I agree with what I consider Sir Richard Scott V-C [2000] ICR 1410, 1421 to have meant in the passage in paragraph 30 of his judgment which I have quoted (ante, paragraph 11), and with Chadwick LJ, that a person cannot be allowed to rely upon a release

E  in general terms if he knew that the other party had a claim and knew that the other party was not aware that he had a claim. I do not propose any wider principle: there is obviously room in the dealings of the market for legitimately taking advantage of the known ignorance of the other party. But, both on principle and authority, I think that a release of rights is a situation in which the court should not allow a party to do so. On the other

F  hand, if the context shows that the parties intended a general release for good consideration of rights unknown to both of them, I can see nothing unfair in such a transaction.

71  It follows that in my opinion the principle that a party to a general release cannot take advantage of a suggestio falsi or suppressio veri, in other words, of what would ordinarily be regarded as sharp practice, is sufficient to deal with any unfairness which may be caused by such releases. There is

G  no need to try to fill a gap by giving them an artificial construction.

72  I am therefore in complete agreement with Chadwick LJ on both the construction of the document and the principles which determine whether or not the bank may rely upon it. Where I respectfully part company from him is on the application of the law to the facts. In my opinion, there are no grounds for holding that in July 1990 the bank knew that Mr Naeem had or might have a claim for stigma against the bank of which he himself was

H  unaware. The representative of the bank who negotiated the agreement was also unaware of the central fraud, but I shall for present purposes assume that the knowledge of the higher management should be attributed to the bank. The bank would therefore have known that it had been continuously in breach of its implied obligation of trust and confidence. But that breach

had not caused any damage to Mr Naeem in the past and there was nothing A
to suggest that, now that he was leaving the bank, it would give rise to a
claim in the future. The bank was going to go on trading from Abu Dhabi
and did not contemplate an imminent disclosure of the fraud which might
affect Mr Naeem's prospects of re-employment. And even if the bank knew
or ought to have known that such might be the case, any lawyer whom it
consulted in 1990 would have advised that such consequences were too
remote to form the subject matter of a claim. It was not until *Mahmud v* B
*Bank of Credit and Commerce International SA* [1998] AC 20 that it would
have occurred to anyone. So the concealment of the central fraud was
extremely reprehensible conduct in relation to the depositors and the public
at large, but there was no reason to think it in any way relevant to the bank's
dealings with Mr Naeem in 1990. Accordingly I do not think that a case of
suppressio veri has been made out.                                           C

73  It follows that in my opinion the stigma claim falls within the
description of claims which Mr Naeem agreed to release and there is no
reason why the bank should not rely upon the release. My Lords, I do not
think that there is any injustice in this result. Of course I sympathise with
Mr Naeem, who, after a long and unblemished career in banking in Pakistan
and then, from 1974, in this country, found himself made redundant at the
difficult age of 49. But this is regrettably a very common occurrence. The D
claim that his subsequent difficulties in finding another job are attributable
to his having worked for the bank is however extremely speculative. In
*Mahmud's* case, at p 53, Lord Steyn drew attention to the formidable
practical obstacles to such a claim presented by the limiting principles of
causation, remoteness and mitigation. So it has turned out. In 1999
Lightman J [2000] ICR 1354 tried five representative cases out of the 369 E
which had been commenced by former bank employees. None of them
succeeded in proving that his unemployment was attributable to stigma.
Four of the cases tried by Lightman J appear to have concerned employees
who were dismissed by the liquidators when the bank collapsed in 1991. By
contrast, Mr Naeem and the others made redundant in 1990 face the
additional hurdle of having to explain why their unemployment is
attributable to stigma when they were unable to find jobs for a year before F
any stigma attached to them. The present position is that this vastly
expensive litigation, which has been twice to the House of Lords and given
rise to two lengthy trials before Lightman J, has produced benefits for no one
except the lawyers involved and has been at the expense, not of the
fraudulent villains, but of the public and the unfortunate creditors of the
bank.                                                                        G

74  Mr Naeem says that despite all his difficulties, he should be entitled
to have his day in court. He should not be struck out merely because he
accepted £2,772·50 for a general release in 1990. In *Mahmud's* case [1998]
AC 20 Lord Nicholls of Birkenhead said, at pp 41–42, that he was:

"conscious that the outcome of the present appeals may be seen by
some as opening the door to speculative claims, to the detriment of
admitted creditors. Claims of handicap in the labour market, and the H
other ingredients of the cause of action now under consideration, may
give rise to lengthy and costly investigations and, ultimately, litigation.
If the claims eventually fail, liquidators may well be unable to recover
their costs from the former employees . . . I am aware of the dangers

A    here, but it could not be right to allow 'floodgates' arguments of this
nature to stand in the way of claims which, as a matter of ordinary legal
principle, are well founded."

75    In general, I would respectfully agree.    Justice is a matter of
individual right which cannot be subjected to an ordinary utilitarian
calculation.    But there are limits.    There are some people who assume that
B    life itself is literally priceless; that no expense for the purpose of saving a life
can possibly be too much.    But the fact is that resources even for these
purposes are not unlimited.    Choices have to be made: see the judgment of
Sir Thomas Bingham MR in *R v Cambridge Health Authority, Ex p B* [1995]
1 WLR 898.    Similarly there comes a point at which the object of achieving
perfect justice for everyone has to be tempered by some consideration of the
resources required to investigate every possible claim.    In the present case,
C    this point does not arise.    The House has decided that the stigma claims
should go forward and so they must.    But I see no reason in justice to add to
the expense by giving the language of the release a strained construction
which will require the bank to answer claims from which it paid to be free.

76    I would allow the appeal and restore the judgment of Lightman J.

D    **LORD CLYDE**
77    My Lords, this case seems to me primarily to involve a question of
construction.    On 4 July 1990 Mr Naeem signed a formal agreement with
the appellant bank.    The agreement was typed on a printed form, headed
"Advisory Conciliation and Arbitration Service".    It bears the reference
COT-3.    From the provision for a "Tribunal case number" and the
descriptive headings to the agreement the form appears to have been
E    intended for use in connection with applications made or about to be made
to the industrial tribunal.    After specifying the parties to the agreement the
printed text states "Settlement reached as a result of conciliation action".
But these parts of the form are not of immediate relevance.    The critical
words are:

"The applicant agrees to accept the terms set out in the documents
F    attached in full and final settlement of all or any claims whether under
statute, common law or in equity of whatsoever nature that exist or may
exist and, in particular, all or any claims rights or applications of
whatsoever nature that the applicant has or may have or has made or
could make in or to the industrial tribunal, except the applicant's rights
under the [bank's] pension scheme."

G    The documents attached appear to have been a statement of "redundancy
disbursements" and a statement of "redundancy package calculation".
78    In the construction of any agreement the problem for a court is to
determine:

"the meaning which the document would convey to a reasonable
person having all the background knowledge which would reasonably
H    have been available to the parties in the situation in which they were at
the time of the contract":

*Investors Compensation Scheme Ltd v West Bromwich Building Society*
[1998] 1 WLR 896, 912, per Lord Hoffmann.    The knowledge reasonably
available to them must include matters of law as well as matters of fact.    The

problem is not resolved by asking the parties what they thought they A
intended. It is the imputed intention of the parties that the court is
concerned to ascertain. The parties may well have never applied their minds
to the particular eventuality which has subsequently arisen, so that they may
never in fact have had any conscious intention in relation to that eventuality.
It is an objective approach which is required and a solution should be found
which is both reasonable and realistic. The meaning of the agreement is to
be discovered from the words which they have used read in the context of the B
circumstances in which they made the agreement. The exercise is not one
where there are strict rules, but one where the solution is to be found by
considering the language used by the parties against the background of the
surrounding circumstances.

79  I agree with the view expressed in the Court of Appeal [2000]
ICR 1410, 1418, para 22 that there are no "rules of equitable construction". C
Such guides to construction as have been identified in the past should not be
allowed to constrain an approach to construction which looks to
commercial reality or common sense. If they are elevated to anything
approaching the status of rules they would deservedly be regarded as
impedimenta in the task of construction. But they may be seen as reflections
upon the way in which people may ordinarily be expected to express
themselves. Generally people will say what they mean. Generally if they D
intend their agreement to cover the unknown or the unforeseeable, they will
make it clear that their intention is to extend the agreement to cover such
cases. If an agreement seeks to curtail the possible liabilities of one party, he,
if not both of them, will generally be concerned to secure that the writing
clearly covers that curtailment.

80  On the face of it, if one were to take a strict or literal approach, the E
words of the agreement seem to include every claim of any kind, whether
then identifiable or not, which Mr Naeem might have in any capacity against
the bank at any time, then or in the future. But such a comprehensive
disclaimer would in my view be a remarkable thing for him to be giving, and
indeed it is not suggested that its scope does extend to such a universality. It
is accepted that it does not relate to sums which Mr Naeem might have in
any account which he had with the bank. So this is not a case where the F
plain meaning of the words can be taken as conclusive. There is then a real
problem as to the precise scope of the disclaimer.

81  At one extreme the employees in their statement of claim argued that
the agreement properly construed was a compromise in respect of their
claims for statutory redundancy pay, wages in lieu of notice and unfair
dismissal only. But that contention was not persisted in before G
Lightman J and it is clearly too narrow a solution. It fails to recognise
the reference to claims at common law or in equity, and the width of the
reference to claims "of whatsoever nature". On the other hand the
immediate context of the form COT-3 suggests that at least at the forefront
of the parties' minds were the claims which Mr Naeem might present to an
industrial tribunal. Indeed Acas had been brought in to assist in the
arrangements being made for the considerable number of cases where the H
bank was terminating employments and endeavouring to reach settlements
of claims which would arise on such terminations. In the statement which
had been prepared by Acas to explain the terms of the proposed settlement it
was stated that Acas had been asked by the bank to "assist in reaching

A settlements of claims which might be made to an industrial tribunal arising out of the ending of your employment". The statement went on to explain that in return for the sum of money and other benefits which were specified in the bank's letter: "you would agree to waive certain rights which you may have relating to possible claims to an industrial tribunal, (including unfair dismissal), or any other court." The agreement was evidently intended to deal principally with claims which could be taken to the industrial tribunal.

B Hence the reference in the agreement "in particular" to claims of that kind. But the reference to claims at common law and in equity of whatsoever nature must bring in matters beyond the scope of the jurisdiction of the industrial tribunal.

82 Claims at common law or in equity could at least include matters relating to the calculation or payment of past wages or other benefits to

C which the employee was entitled in terms of his contract. A claim at common law for wrongful dismissal could also be included. It seems to me that the context of the agreement is the termination of the employment and the desire of the employer to finalise any contractual debts due to the employees whose employment was being terminated together with all statutory or common law obligations arising upon the termination of the contract.

D 83 Regard should also be given to the statements of redundancy disbursements and redundancy payment calculation. It appears from these documents that the basic package which the bank was offering sought to meet any claim for statutory redundancy pay and for sums due in lieu of notice. It also allowed for settlement of other obligations and debts current between the parties in respect of mortgage subsidy, outstanding season ticket loan balance, current account overdraft and certain outstanding credit card

E debts. These all seem to relate to a final accounting between the parties of any indebtedness by the employee towards the employer on the termination of their relationship. But the bank was evidently to remain liable to the former employee in respect of any credit balances in any account he had with the bank and in respect of the pension rights expressly mentioned in the agreement.

F 84 The package also included an additional payment upon signing the form COT-3. The sum appears to have been one twelfth of the gross annual salary. Given that what the parties principally had in mind was the possibility of resort to the industrial tribunal it seems to me that an additional sum might not unreasonably be offered in order to secure finality and to avoid such a possibility. The provisions of section 140(2)(d), (e) and (g) of the Employment Protection (Consolidation) Act 1978 are relevant

G in this connection. By virtue of those provisions the involvement of Acas in the settlement of certain claims or potential claims to an industrial tribunal may exclude the operation of section 140(1), a section which otherwise would avoid any agreement such as the one here in issue to preclude an employee from bringing proceedings before the tribunal. The benefit which the employer might well consider worth paying a month's salary for was the security of obviating any proceedings before the tribunal arising out of

H the termination of the employment.

85 The alternative is to suppose that the sum was meant to discharge all future claims whether they arose out of the termination of the employment or not. While I can accept that it was intended to exclude any claims which the employee could then have made relating to the settlement of accounts at

the termination of the employment, it seems to me improbable that the  *A*
parties, in the context in which they were making this agreement, were
intending to cut out all future claims of any kind not related to the
termination. It was not resolved in the course of the argument whether a
claim for personal injury based on the negligence of the bank was meant to
be covered by the agreement. I should have thought that if that had been
intended, and if the amount of the month's salary was intended to cover that
sort of future claim, some more specific indication of that would have been  *B*
given in the terms of the agreement.

86    But the claim which Mr Naeem now seeks to present for stigma
damages is a far more remote possibility than a claim for personal injuries on
the ground of negligence. The stigma claim is one which neither party could
have contemplated even as a possibility as the law stood at the time when the
agreement was made. At that time it would not be known whether or not  *C*
the employee would have any difficulty at all in finding alternative
employment. The bank's conduct had not yet achieved the notoriety which
could create the stigma. But even if those facts had been even suspected as a
possibility the prospect of any liability falling on the bank to a former
employee is something which must have been far beyond the reasonable
contemplation of the parties. Even without formulating any definition of the
precise scope of the agreement, it seems to me that if the parties had intended  *D*
to cut out a claim of whose existence they could have no knowledge they
would have expressed that intention in words more precise than the
generalities which they in fact used. In so far as Mr Naeem may also seek to
present a claim in tort for fraudulent misrepresentation inducing him to start
the employment in the first place or to continue in it thereafter, while the
legal basis for such a claim may not be particularly novel, the idea of such a  *E*
claim at the time when the parties made the agreement at the termination of
the employment seems to me correspondingly remote from what the parties
might reasonably be taken in the circumstances to have contemplated.

87    The point has been stressed that claims for stigma damages may be
extraordinarily difficult of proof and while the construction which I have
preferred opens the door to Mr Naeem to present the claim, the hurdles
which he may yet face may be very difficult to overcome. But that is of  *F*
course a consideration entirely irrelevant to the question of construction
raised in this case. Having reached the view which I have on the matter of
construction it is unnecessary to say anything about any equitable
considerations which might operate to prevent the bank relying upon the
agreement, were it wide enough to comprehend the stigma claim.

88    I would dismiss the appeal.  *G*

*Appeal dismissed with costs subject to*
*any costs-sharing order that might*
*be or become applicable.*

*Solicitors: Lovells; Beale & Co.*

M G  *H*

LC/5

1 W.L.R.        **In re Ward decd. (Ch.D.)**        Plowman J.

**A**      So, far from *In re Ivory* beng an authority against the view which I take in this matter, in my judgment it impliedly supports that view.

I was also referred to *Concha* v. *Concha* (1886) 11 App.Cas. 541 in the House of Lords which again, I think, affords support for the view which I take because it was decided there by the House of Lords that the statement of the deceased's domicile which is to be found in probates and letters of administration, as indeed it is in the present case, is not conclusive
**B** in rem.

For those reasons, in my judgment question 1 of the originating summons falls to be answered in the terms of paragraph (b) of that question, and I will so declare.

I will make an order under question 2 (b) that

**C**      " the plaintiffs may (without being under any liability by so doing) refrain from bringing such proceedings as aforesaid unless the defendants provide to the plaintiffs security,"

and so on.

                                    *Order accordingly.*

**D**      Solicitors: *Winston & Co.; Fairchild, Greig & Co.*

                                    T. C. C. B.

---

**E**

[HOUSE OF LORDS]

\* PRENN   .   .   .   .   .   .   .   .   .   APPELLANT

                                 AND

SIMMONDS .   .   .   .   .   .   .   .   . RESPONDENT

**F** 1971 June 8, 9, 10, 14, 15;      Lord Reid, Lord Donovan, Lord Wilberforce,
     July 20                            Lord Pearson and Lord Diplock

*Contract—Agreement in writing—Construction—Option to buy shares at named price if " profits" available for dividend of company over relevant period reached named sum—Whether " profits" referred to those of company alone or to " con-*
**G** *solidated profits" of company and its subsidiaries—Whether evidence of prior negotiations between parties receivable as an aid to construction of agreement*

The respondent brought an action against the appellant in which he claimed that under the terms of an agreement under seal dated July 6, 1960, he was entitled to acquire from the appellant for a consideration of £6,600 a four per cent. interest in the ordinary capital of R.T.T., a company controlled
**H** by the appellant. That interest was at the date of trial worth some £200,000. The appellant disputed the claim on the ground that a necessary condition prescribed by the agreement had not been satisfied because less than £300,000 profits available for dividend on the ordinary stock of the company over the relevant period had been earned. The dispute between the parties related to whether the " profits " in question meant (a) the separate profits of R.T.T. alone in which case the amount over the period fell short of the target figure by less

**Prenn v. Simmonds (H.L.(E.) )**                    **[1971]**

than £10,000, or (b) the consolidated profits of the group con-  **A**
sisting of R.T.T. and subsidiaries in which case the amount
was largely exceeded.

Pennycuick J. rejected the respondent's construction that
" profits " meant consolidated profits but ordered rectification
of the agreement. On appeal, the Court of Appeal dismissed
the appeal finding in favour of the respondent on the question
of construction.

The appellant appealed to the House of Lords. On the  **B**
hearing of the appeal it was contended, inter alia, on behalf
of the respondent that it was permissible to look at prior
negotiations between the parties as an aid in the construction
of a written document: —

*Held,* (1) that in construing a written agreement evidence
of negotiations or of the parties' intentions ought not to be
received by the court, and that evidence should be restricted
to evidence of the factual background known to the parties  **C**
at or before the date of the contract, including evidence of the
" genesis " and objectively the " aim " of the transaction.

*Hvalfangerselskapet Polaris Aktieselskap* v. *Unilever Ltd.*
(1933) 39 Com.Cas. 1, H.L.(E.) considered.

(2) That albeit the wider principle of construction con-
tended for failed, the word " profits " in the context of the
agreement meant " consolidated profits," and that, accordingly,  **D**
the appeal must be dismissed.

Decision of the Court of Appeal affirmed.

The following cases are referred to in Lord Wilberforce's opinion:

*Crane* v. *Hegeman-Harris Co. Inc.* [1939] 1 All E.R. 662; post, p. 1390.
*Hvalfangerselskapet Polaris Aktieselskap* v. *Unilever Ltd.* (1933) 39 Com.
Cas. 1, H.L.(E.).
*MacDonald* v. *Longbottom* (1859) 1 E. & E. 977.  **E**
*River Wear Commissioners* v. *Adamson* (1877) 2 App.Cas. 743, H.L.(E.).
*Utica City National Bank* v. *Gunn* (1918) 118 N.E. 607.

The following additional cases were cited in argument:

*Bank of New Zealand* v. *Simpson* [1900] A.C. 182, P.C.
*Birch* v. *Depeyster* (1816) 4 Camp. 385.
*Edwards* v. *Saunton Hotel Co. Ltd.* [1943] 1 All E.R. 176.  **F**
*Holdsworth (Harold) & Co. (Wakefield) Ltd.* v. *Caddies* [1955] 1 W.L.R.
352; [1955] 1 All E.R. 725, H.L.(Sc.).
*Shore* v. *Wilson* (1842) 9 Cl. & Fin. 355, H.L.(E.).
*Suisse Atlantique Société D'Armement Maritime S.A.* v. *N.V. Rotter-
damsche Kolen Centrale* [1967] 1 A.C. 361; [1966] 2 W.L.R. 944;
[1966] 2 All E.R. 61, H.L.(E.).

**G**

APPEAL from the Court of Appeal.

This was an appeal by leave of the House of Lords by the appellant,
Daniel Dan Prenn, who was the defendant in the action, from the order
of the Court of Appeal (Lord Denning M.R., Widgery and Cross L.JJ.)
dated January 28, 1970, dismissing an appeal by the appellant from an
order dated February 25, 1969, whereby Pennycuick J. in an action by the  **H**
respondent, John Charles Simmonds, as plaintiff (1) ordered rectification
of a deed dated July 6, 1960, executed by the appellant and the respondent
for the acquisition by the respondent of certain shares in Controls &
Communications Ltd. (formerly called Radio & Television Trust Ltd.);
(2) ordered specific performance of the deed as so rectified and (3) ordered
that the appellant should pay nine-tenths of the respondent's costs of such
action.

**1 W.L.R.**                    **Prenn v. Simmonds (H.L.(E.))**

A    The Court of Appeal granted the respondent specific performance of the deed without rectification.

The facts are set out in the opinion of Lord Wilberforce.

*R. J. Parker Q.C., J. R. B. Fox-Andrews Q.C.* and *R. A. K. Wright* for the appellant.

B    *L. J. Bromley Q.C.* and *J. F. Lever (R. I. Threlfall Q.C.* with them) for the respondent.

Their Lordships took time for consideration.

July 20, 1971. LORD REID. My Lords, I have read the speech of my noble and learned friend, Lord Wilberforce. I agree with it and would

C    therefore dismiss this appeal.

LORD DONOVAN. My Lords, I find myself in entire agreement with the opinion of my noble and learned friend, Lord Wilberforce, and like him would dismiss this appeal.

LORD WILBERFORCE. My Lords, Dr. Simmonds' claim in this action is

D    that, under the terms of an agreement under seal dated July 6, 1960, he is entitled to acquire from Mr. Prenn, for a consideration of £6,600, a 4 per cent. interest in the ordinary capital of a company controlled by Mr. Prenn called now Controls & Communications Ltd., but at the relevant date Radio & Television Trust Ltd. (" R.T.T."). This interest was worth at the date of the trial about £200,000. Mr. Prenn disputes the claim, on

E    the ground that a necessary condition set by the agreement has not been satisfied because less than £300,000 profits available for dividend on the ordinary stock of R.T.T. over the relevant period has been earned. Dr. Simmonds maintains that the condition has been fulfilled.

The dispute relates not to the figures, which are agreed, but to the definition of profits of R.T.T. available for dividend on its ordinary stock. If this means the separate profits of R.T.T alone, the amount over the period

F    fell just short of the target, by less than £10,000. If it means the consolidated profits of the group consisting of R.T.T. and subsidiaries, the amount was largely exceeded. The small margin of deficiency, though capable of arousing sympathy for Dr. Simmonds, is not an argument for one or other side. A similar situation might arise on either interpretation and is inherent in the nature of " target " agreements.

G    The question is thus simply one of construction of the agreement and it should be capable of resolution shortly and cheaply. But Dr. Simmonds has claimed in the alternative that, if the agreement did not bear the meaning he contended for, it should be rectified so as to do so. This let in a mass of evidence, oral and documentary as to the parties' intentions, which would not be admissible on construction, though (as I shall explain) counsel for Dr. Simmonds tried to bring some of it in on that issue. It also involved

H    some issues of law. This part of the case overshadowed the rest, so that by far the greater part of the time spent both at first instance and in the Court of Appeal was concerned with it. In this House argument was heard first exclusively on the question of construction and as your Lordships reached on it a conclusion in favour of Dr. Simmonds, no argument on rectification was heard. I now deal with this construction issue.

In order for the agreement of July 6, 1960, to be understood, it must be placed in its context. The time has long passed when agreements, even

**Lord Wilberforce**          **Prenn v. Simmonds (H.L.(E.) )**          **[1971]**

those under seal, were isolated from the matrix of facts in which they were  A
set and interpreted purely on internal linguistic considerations. There is no
need to appeal here to any modern, anti-literal, tendencies, for Lord Black-
burn's well-known judgment in *River Wear Commissioners* v. *Adamson*
(1877) 2 App.Cas. 743, 763 provides ample warrant for a liberal approach.
We must, as he said, inquire beyond the language and see what the circum-
stances were with reference to which the words were used, and the object,
appearing from those circumstances, which the person using them had in  B
view. Moreover, at any rate since 1859 (*Macdonald* v. *Longbottom*, 1 E. &
E. 977) it has been clear enough that evidence of mutually known facts may
be admitted to identify the meaning of a descriptive term.

But the respondent's counsel contended for even greater extension of the
court's interpretative power. They argued that later authorities have gone
further and allow prior negotiations to be looked at in aid of the con-  C
struction of a written document. In my opinion, they did not make good
their contention. A modern authority in this House, which the respondent
invoked, is *Hvalfangerselskapet Polaris Aktieselskap* v. *Unilever Ltd.* (1933)
39 Com.Cas. 1 where it was necessary to interpret the words "entire
production." There, as here, there was a claim for rectification in the alter-
native so that a great deal of evidence of matters prior to the contract
was called. But the speeches give no support for a contention that  D
negotiations leading up to the contract can be taken into account: at most
they support the admission of evidence to establish a trade or technical
meaning (not in question here) and, of course, they recognise the ad-
missibility of evidence of surrounding circumstances. But they contain
little to encourage, and much to discourage, evidence of negotiation or of
the parties' subjective intentions.

I may refer to one other case, to dispel the idea that English law is left  E
behind in some island of literal interpretation. In *Utica City National
Bank* v. *Gunn* (1918) 118 N.E. 607 the New York Court of Appeals followed
precisely the English line. Cardozo J. in his judgment refers, at p. 608, to
"the genesis and aim of the transaction" citing *Stephen's Digest of the Law
of Evidence* and *Wigmore on Evidence.* Surrounding circumstances may,
he says, "stamp upon a contract a popular or looser meaning" than the  F
strict legal meaning, certainly when to follow the latter would make the
transaction futile. "It is easier to give a new shade of meaning to a word
than to give no meaning to a whole transaction." The whole judgment, as
one may expect, combines classicism with intelligent realism.

So I think the respondent gains little support from authority. On
principle, the matter is worth pursuing a little, because the present case  G
illustrates very well the disadvantages and danger of departing from
established doctrine and the virtue of the latter. There were prolonged
negotiations between solicitors, with exchanges of draft clauses, ultimately
emerging in clause 2 of the agreement. The reason for not admitting
evidence of these exchanges is not a technical one or even mainly one of
convenience, (though the attempt to admit it did greatly prolong the case
and add to its expense). It is simply that such evidence is unhelpful. By  H
the nature of things, where negotiations are difficult, the parties' positions,
with each passing letter, are changing and until the final agreement, though
converging, still divergent. It is only the final document which records a
consensus. If the previous documents use different expressions, how does
construction of those expressions, itself a doubtful process, help on the
construction of the contractual words? If the same expressions are used,
nothing is gained by looking back; indeed, something may be lost since

**1 W.L.R.**          **Prenn v. Simmonds (H.L.(E.) )**          **Lord Wilberforce**

A  the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to. It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense this is true: the commercial, or business object, of the transaction, objectively ascertained, may be a surrounding fact. Cardozo J. thought so in the *Utica Bank* case. And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering

B  the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The

C  words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get "agreement" and in the hope that disputes will not arise. The only course then can be to try to ascertain the "natural" meaning. Far more, and indeed totally, dangerous is it to admit evidence of one party's objective —even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition,

D  and in a world of give and take, men often have to be satisfied with less than they want. So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised. In the present case, Lord Denning M.R. seems to have taken into account Dr. Simmonds' anxiety (as testified by a witness) to protect himself against unilateral decisions by Mr. Prenn: and an argument pressed on us was

E  that, if Mr. Prenn's interpretation (i.e. that only the holding company's profits were relevant) was correct, Dr. Simmonds would, in this matter on which he felt so anxious, in some respect at least, be completely in Mr. Prenn's hands, for Mr. Prenn could decide just how much, or how little, of the subsidiaries' profits were to be passed to the holding company. I cannot see how any of this can be admissible, because, I repeat, I cannot see how it is helpful. Given the fact of Dr. Simmonds' anxiety, the whole question

F  is how far does the agreement meet it: how can we know, except by interpreting the agreement, how far Mr. Prenn was willing to meet him or how far Dr. Simmonds decided to take what he could get? Even the argument that Mr. Prenn's interpretation would put Dr. Simmonds in his hands, though apparently attractive, I find to be dangerous: a man in Dr. Simmonds' position—a professional man—entering into relations with the source of finance and benefits to come, might decide, in his own interest,

G  that if he could not get all the protection he wanted, the risk of partial protection was one to accept; that Mr. Prenn had to be trusted to act fairly. To say that the clause had this result is not to say that it was futile or frustratory: it is to say that a better clause could, with hindsight, in Dr. Simmonds' interest have been drawn. But the court cannot construct such a clause out of the material given.

H     In my opinion, then, evidence of negotiations, or of the parties' intentions, and a fortiori of Dr. Simmonds' intentions, ought not to be received, and evidence should be restricted to evidence of the factual background known to the parties at or before the date of the contract, including evidence of the "genesis" and objectively the "aim" of the transaction.

     As to the circumstances, and the object of the parties, there is no controversy in the present case. The agreement itself, on its face, almost supplies enough, without the necessity to supplement it by outside evidence. But

Lord Wilberforce        **Prenn v. Simmonds (H.L.(E.))**                    **[1971]**

some expansion, from undisputed facts, makes for clearer understanding    A
and I include a reference to these in what follows.

In the year (1959) before the making of the contract, R.T.T. was
controlled by Crompton Parkinson Ltd. a large public electrical en-
gineering company.  R.T.T. itself did not trade, but had a wholly owned
trading subsidiary, Airmec Ltd., which employed Dr. Simmonds as
managing director and as its leading technician.  The structure of R.T.T.
was such that Crompton Parkinson held 94 per cent. of its ordinary capital,    B
and the whole of an issue of redeemable preference stock: the amount
required to redeem it being £294,716 (there were also some capital certi-
ficates but I need not refer to this complication).  Mr. Prenn desired to
secure the services of Dr. Simmonds in his group of companies and decided
to do so by purchasing, from Crompton Parkinson, R.T.T. together, of
course, with its subsidiary Airmec which in turn would bring with it Dr.    C
Simmonds' services.  So in July-August 1959 an agreement was reached
by which Mr. Prenn agreed to buy the 94 per cent. of the ordinary
capital and the preference stock.  For this he paid £160,000 in cash.
The balance, £294,716, was to be paid by four equal instalments on
August 19, 1960, 1961, 1962 and 1963.  The agreement provided that
any money applied by R.T.T. in redeeming preference stock was to go in
reduction of the balance of the purchase price; and it was no doubt in    D
Mr. Prenn's prima facie interest that the preference stock should be
redeemed out of profits of R.T.T. so as to avoid his having to find cash
from his own resources.

The critical sale agreement between Mr. Prenn and Dr. Simmonds was
dated July 6, 1960, after a period of negotiation.  Its connection with
the Crompton Parkinson agreement is manifest, both from the recital of    E
the letter in it, and from the coincidence of the critical date in clause 2
with the date—August 19, 1963,—stated in the Crompton Parkinson agree-
ment as the terminal date for payment.  A reading of the agreement shows
that it was intended to secure for Dr. Simmonds the provision of an interest
in the equity of R.T.T. and that this was to be conditional upon Dr.
Simmonds remaining with R.T.T. long enough to ensure that the
Crompton Parkinson debt was paid off out of profits of R.T.T. and upon    F
R.T.T. in fact earning enough to enable the debts to be paid.  Thus clause
3 of the agreement provided for the sale to go off if Dr. Simmonds left
R.T.T. before the terminal date either voluntarily or through dismissal
for gross misconduct.

In order to make good this description of the agreement, I must set out
a number of its provisions.  After stating the parties there are recitals and    G
definitions:

" *Whereas*:

" A. In this agreement the following words and expressions shall
have the meanings set opposite them.

" ' R.T.T.'            Radio and Television Trust Limited. . . .

" ' Ordinary stock    The ordinary stock units of 6d. each in the    H
units '              capital of R.T.T. . . .

" ' The contract '    The contract created by exchange of letters
                     dated July 21, 1959, from Mr. Prenn to
                     K. R. Cork as agent for C.P. and July 29,
                     1959, from C.P. to Mr. Prenn as varied by a
                     memorandum in writing dated August 19,
                     1959, being a contract for the purchase by

A          Mr. Prenn of the interest of C.P. in R.T.T.
and which included 356,944 preference stock
units remaining in the hands of C.P. Under
the terms of this contract as varied there is an
obligation on the part of Mr. Prenn to pay
the sum of £294,716, being the balance of the
purchase money by four equal instalments
B          on August 19, in 1960, 1961, 1962 and 1963
respectively."

" B. Under the contract any money received by C.P. from R.T.T.
for any of the said 356,944 preference stock units redeemed after
August 19, 1959, is to be applied by C.P. in or towards payment of
the balance of the said purchase money. . . ."

C
Then the operative part:

" 1. (a) [Provided for a payment by Mr. Prenn to Dr. Simmonds of
£6,600] (b) [Provided for the sale to Dr. Simmonds of shares in
R.T.T.] (c) [Provided for sale of further shares to Dr. Simmonds].
" 2. The provisions of clause 1 hereof shall not take effect unless
and until any one of the following conditions has been satisfied:
D          " (a) The said sum of £294,716 has been paid or satisfied in full
on or before the due dates for payment thereof under the contract out
of monies provided by R.T.T. redeeming its preference stock units
out of its profits which would otherwise be available for dividend or
" (b) The aggregate profits of R.T.T. earned during the four years
ending August 19, 1963 and available for dividend on the ordinary
E          stock units for the time being issued whether declared or not shall have
amounted to £300,000 after payment or provision for income tax and
and profits tax provided always that the conditions of this sub-
paragraph (b) shall only apply if the preference stock units or any of
them are redeemed otherwise than out of the profits of R.T.T. which
would otherwise be available for dividend or the terms of payment of
F          the said balance of the purchase price under the contract or any part
thereof shall be re-arranged or all or any part of the said sum of
£294,716 shall be satisfied from any other source.
" 3. The provisions of clause 1 shall not take effect if at any time
before August 20, 1963 Dr. Simmonds ceases to be employed by
R.T.T. either directly or through any of its subsidiaries by reason of
his own act or is dismissed for gross misconduct and at the time
G          of such termination neither of the conditions in clause 2 shall have
been fulfilled.
" 4 and 5 [other consequential provisions]."

What, then, with this background, is the meaning of clause 2? Its pur-
pose is plain.  Paragraph (2) provides that Dr. Simmonds is not to get his
shares unless the outstanding debt to Crompton Parkinson has been repaid
H  by means of redemption of preference stock out of profits of R.T.T.  But
this might not be fair to Dr. Simmonds, for Mr. Prenn, under his agree-
ment with Crompton Parkinson, was not obliged to redeem the preference
stock, or, if he did, might not use R.T.T.'s profits to do so.  So paragraph
(b) is evidently designed to protect Dr. Simmonds against these possibilities.
There are three alternative events which might bring it into operation,
stated under the proviso.  If any of these happened, Dr. Simmonds was to
get his shares if the aggregate profits of R.T.T. earned over the four years

ending August 19, 1963, and available for dividend on the ordinary stock    **A**
units whether declared or not should have amounted to £300,000 after
payment or provision for income tax and profits tax.

All of this was in the nature of an inducement to Dr. Simmonds, to
procure whose expert services was a main object of the Crompton Parkin-
son purchase, and who was the mainspring of the profit earning activities of
R.T.T. through Airmec, to ensure that enough profits were earned to
match the £294,716 which, on this hypothesis, was to be paid by Mr. Prenn,    **B**
otherwise than out of R.T.T.'s profits, to Crompton Parkinson.

What profits, then, are contemplated by this clause?  The profits of
the R.T.T. group, including Airmec, or only such separate profits as reach
R.T.T. as holding company?  This is the whole question in the case.

As a final preliminary matter, before answering this question, it is neces-
sary to state a few more matters of fact which must have been present to    **C**
the minds of both parties.  First, it must have been known to these
businessmen, at least in general terms, that under the Companies Act, 1948,
there had to be placed before the shareholders of R.T.T. in general meeting
a consolidated profit and loss account giving a true and fair view of the
profits of R.T.T. and its subsidiaries combined just as if it was an account
of a single company.  No doubt there would also be separate profit and
loss accounts of each individual company, including R.T.T. itself, but I    **D**
have no hesitation in asserting that both under the scheme of the Act
and in accepted business practice, the significant document is the con-
solidated account which alone would show whether the enterprise
represented by the group was making profit or not.

Secondly, as one would expect, accounts in this form had been prepared
by R.T.T.  There are among the documents consolidated profit and loss    **E**
accounts of R.T.T. and subsidiaries for the year ended March 31, 1958,
the 15 months ended June 30, 1959, the nine months ended March 31,
1960,—the three relevant periods immediately before the agreement. Each
of these shows the consolidated profit on trading (i.e., of the group), the
dividend paid (i.e., on the preference and ordinary capital of R.T.T.) and
the balance on profit and loss account (of R.T.T. and the subsidiaries).
Thirdly, there are minutes showing how the decisions as to dividends (on    **F**
R.T.T. capital) out of the profits (of the group) were made.  Minutes of
August 11, 1959, and June 10, 1960, show, as one would expect, that
these were made by the board of the holding company, which then in-
structed the subsidiaries to declare the appropriate amount by way of divi-
dend, in favour of the holding company.

In the light of this, the meaning of clause 2 of the agreement seems to    **G**
me clear.  The references to " profits " in paragraph (a) and in paragraph
(b) can only, in my opinion, be to the consolidated profits of the group con-
sisting of R.T.T. and its subsidiaries.  It is only these profits which could
provides an incentive to Dr. Simmonds to remain and work with the group
and which could be a measure of his success.  On the other hand, no
purpose can be discerned why the reference should be to the separate
profits of R.T.T., which in fact means such part of the group profits as the    **H**
board of that company, effectively Mr. Prenn, decided to pass up to the
parent company.

Linguistically, the arguments point decidedly the same way.  The
reference to profits " earned," and that to income and profits tax, point
strongly to consolidated profits.  The use of the words " R.T.T." even
coupled with the definition appears to me perfectly neutral, since other
usages of " R.T.T." in the agreement (definition of " the contract " and

A  clause 3) dispel any idea that the draftsman had in mind any segregation
of R.T.T. (quâ parent) from the rest of its group. The reference (in para-
graph (*b*)) to profits " available for dividend on the ordinary stock units,"
so far from pointing toward the limited construction, points, for me, the
other way. For both commercially and on the established accounting
practice, all profits of the group are available for these dividends. It is
true that a large part of the profits was ploughed back into the business of
B  the subsidiaries, and that both parties must have contemplated that this
would be done, but this is not to the point. To say so, is to confuse the
earning of profits with their appropriation: all profits earned are available
for dividend; what is done with them is a matter of choice which rests with
those who control the company. Even if they decided to " plough them
back " they still remain " available for dividend," so long as they remain
C  in the balance sheet as " balance on profit and loss account."

One other argument I must mention. It is based on paragraph (*a*). The
reference there to profits otherwise available for dividend must, it is said,
be to profits of the holding company, because it is only out of them that
preference stock can be redeemed. This is said to be borne out by section
58 of the Companies Act 1948, which requires that redeemable preference
D  shares can only be redeemed out of " profits available for dividend " (or
by a new issue). The use of these same words in paragraph (*a*) is argued
to show that only separate profits of R.T.T. can be meant. In my opinion,
this argument is fallacious. Paragraph (*a*) can just as well be referring to
group profits: in a real sense (since R.T.T. does not trade) its preference
stock can only be redeemed by profits earned by the group. Admittedly,
E  before redemption can occur, they have to be passed up to R.T.T. (holding)
by way of dividend on the subsidiaries: but they are still group profits.
The only difference between paragraph (*a*) and paragraph (*b*) is that in the
one case a " passing up " operation is presupposed, in the other not. But the
" profits " are the same—group profits. The use of the words " available
for dividend " in section 58 proves nothing, since that section is not con-
F  cerned with any particular type of company, or with any distinction
between parent and subsidiary. It is simply, in effect, saying that redeem-
able preference shares must be redeemed out of profits, not out of capital.
What those profits are, in the case of a group, must be decided on argu-
ments outside the section.

To sum up, the appellant's construction does not fit in any way the aim
G  of the agreement, or correspond with commercial good sense, nor is it,
even linguistically, acceptable. The converse of each of these propositions
applies to Dr. Simmonds' interpretation. I would accept it.

It follows, in consequence, that the alternative claim for rectification does
not arise. But I take this opportunity of stating, as it was drawn to the
attention of the House by counsel at the bar, that the report of the
H  judgment of Simonds J. in *Crane* v. *Hegeman-Harris Co. Inc.* which
is contained in the All England Reports [1939] 1 All E.R. 662—a judgment
which has been much quoted and relied upon—appears to be incomplete,
omitting several pages. A full transcript was made available to your Lord-
ships and should be consulted on future citations.*

I would dismiss the appeal.

* Post, p. 1390.

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
Declaration of Lord Collins    Pg 99 of 428
1390

Prenn v. Simmonds (H.L.(E.))    [1971]

LORD PEARSON. My Lords, I have had the advantage of reading the    A
opinion of my noble and learned friend, Lord Wilberforce, and I agree
with it. I would dismiss the appeal.

LORD DIPLOCK. My Lords, I agree with what my noble and learned
friend, Lord Wilberforce, has said as to the principles to be applied in
the interpretation of a written agreement, and as to the reasons which underlie
the rule that evidence is not admissible of the negotiations between the    B
parties or any purpose which either of them hoped to achieve by it does
not appear from the words used in the agreement and the surrounding
circumstances.

I am perhaps less confident that the application of those principles to the
written agreement which falls to be construed in the instant appeal indicates
that the meaning contended for on behalf of Dr. Simmonds is to be    C
preferred to the alternative meaning which commended itself to the Vice-
Chancellor. But such doubts as I have are not strong enough to justify
my differing from the remainder of your Lordships.

*Appeal dismissed.*

Solicitors: *Kenneth Brown, Baker, Baker; Allen & Overy.*    D

J. A. G.

---

[NOTE]    E

[CHANCERY DIVISION]

* CRANE v. HEGEMAN-HARRIS CO. INC.

1939 Feb. 9    Simonds J.

Contract—Mistake—Rectification—Written agreement—Arbitration    F
clause—Award made on arbitration—Claim for rectification of
agreement in proceedings to enforce award—Estoppel

The following cases are referred to in the judgment:

*Caird* v. *Moss* (1886) 33 Ch.D. 22, Kay J. and C.A.
*Shipley Urban District Council* v. *Bradford Corporation* [1936] Ch. 375.

G

*Charles Harman K.C.* and *Gerald Upjohn* for the plaintiff.
*H. U. Willink K.C.* and *John Megaw* for the defendants.

SIMONDS J. The plaintiff in this suit is one Charles Howard Crane, an
American citizen and an architect. The defendants are the Hegeman-Harris
Co. Inc., a corporation incorporated under the laws of the State of New York
and, as I understand, domiciled in the City, County and State of New York.    H
The action is brought to enforce an award made by Mr. Roland Oliver K.C.,
upon a submission to arbitration made by the parties on April 19, 1937.
An action upon an award is in substance an action to enforce an agreement,
the agreement being implied in the submission to arbitration that the parties
will pay or do that sum or thing which is awarded by the arbitrator. To
that claim the defendants put in this defence. They say that the submission
to arbitration was no real submission, because it was based upon a fundamental
mistake of fact, the mistake of fact being that the agreement which gave rise

LC/6

A.C.

A

[HOUSE OF LORDS]

CHARTER REINSURANCE CO. LTD. .    .    .    . RESPONDENTS

AND

FAGAN    .    .    .    .    .    .    .    .    . APPELLANT

B
1995  May 22, 23, 24, 25;                                        Mance J.
      June 23

      1995  Sept. 12, 13, 14;                    Nourse, Staughton and
            Oct. 25                                 Simon Brown L.JJ.

      1996  Feb. 21, 22, 26;           Lord Goff of Chieveley, Lord Griffiths,
C           May 22                       Lord Browne-Wilkinson, Lord Mustill
                                             and Lord Hoffmann

*Insurance—Reinsurance—Excess of loss—Reinsurers' liability for ultim-*
    *ate net loss in excess of specified amount—Ultimate net loss defined*
    *as sum "actually paid" by insurers—Insurers in provisional*
    *liquidation—Whether reinsurers liable in respect of claims agreed*
D   *but not paid—Whether liability of reinsurers dependent on insurers*
    *having transferred funds to insured*

Under two whole account excess of loss reinsurances, the
reinsurers undertook to indemnify the insurers against "all losses
howsoever and wheresoever arising" during the period of the
reinsurance on any interest under policies and contracts of
insurance or reinsurance underwritten by the reinsured in their
E   whole account. Under a third policy, an aviation risk policy, the
reinsurer agreed to cover the liability of the insurers in respect of
the reinsured's aviation excess of loss underwritings during a
specified period. All three contracts provided that the reinsurer
was to be liable for the losses of the insurers in excess of an
ultimate net loss of a specified amount. The term "net loss" (or
in the aviation risk policy "ultimate net loss") was defined as
meaning "the sum actually paid by the reinsured in settlement of
F   losses or liability after making deductions for all recoveries, all
salvages and all claims upon other reinsurances whether collected
or not and shall include all adjustment expenses arising from the
settlement of claims . . ." The insurers, who were in provisional
liquidation, applied, pursuant to R.S.C., Ord. 14A, for determina-
tion of the question whether in order for the reinsurers to become
liable under the three excess of loss reinsurance agreements, it
was necessary for the insurers first to have made payment of the
G   relevant claim by way of transfer of funds to its insured. Mance J.
held that it was not. On appeal by the reinsurers, the Court of
Appeal (by a majority) dismissed the appeal.
On appeal by the reinsurer:—
*Held,* dismissing the appeal, that the words "actually paid" in
the context of the ultimate net loss clause did not have the
purpose of introducing a temporal precondition to recovery by
H   way of disbursement or other satisfaction of the precise net
commitment between the insurer and reinsured but were there
merely for the purpose of measurement; and that, accordingly,
the question raised by the summons should be answered in the
negative (post, pp. 381A–B, 386E–G, 390G–H, 392C–D, 395A–B).

Charter Reinsurance Co. Ltd. v. Fagan (H.L.(E.))    [1997]

Dictum of Lord Reid in *Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.* [1974] A.C. 235, 251, H.L.(E.) considered.    A

Decision of the Court of Appeal, *post*, pp. 353F et seq.; [1996] 1 All E.R. 406 affirmed.

The following cases are referred to in their Lordships' opinions:

*Allemannia Fire Insurance Co. of Pittsburgh v. Firemen's Insurance Co. of Baltimore* (1908) 209 U.S. 326    B

*British Dominions General Insurance Co. Ltd. v. Duder* [1915] 2 K.B. 394, C.A.

*Chippendale v. Holt* (1895) 1 Com.Cas. 197

*Eddystone Marine Insurance Co., In re; Ex parte Western Insurance Co.* [1892] 2 Ch. 423

*Fidelity & Deposit Co. v. Pink* (1937) 302 U.S. 224

*Firma C-Trade S.A. v. Newcastle Protection and Indemnity Association (The Fanti)* [1987] 2 Lloyd's Rep. 299, Staughton J.; [1991] 2 A.C. 1; [1990] 3 W.L.R. 78; [1990] 2 All E.R. 705, H.L.(E.)    C

*Gurney v. Grimmer* (1932) 44 Ll.L.Rep. 189, C.A.

*Insurance Co. of Africa v. Scor (U.K.) Reinsurance Co. Ltd.* [1985] 1 Lloyd's Rep. 312, C.A.

*Stickel v. Excess Insurance Co. of America* (1939) 23 N.E.2d 839

*Uzielli & Co. v. Boston Marine Insurance Co.* (1884) 15 Q.B.D. 11, C.A.

*Western Assurance Co. of Toronto v. Poole* [1903] 1 K.B. 376

*Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.* [1974] A.C. 235; [1973] 2 W.L.R. 683; [1973] 2 All E.R. 39, H.L.(E.)    D

The following additional cases were cited in argument in the House of Lords:

*Antaios Compania Naviera S.A. v. Salen Rederierna A.B. (The Antaios)* [1985] A.C. 191; [1984] 3 W.L.R. 592; [1984] 3 All E.R. 229, H.L.(E.)

*Arbuthnott v. Fagan* (unreported), 30 July 1993; Court of Appeal (Civil Division) Transcript No. 1024 of 1993, C.A.    E

*Birmingham Corporation v. Barnes* [1935] A.C. 292, H.L.(E.)

*Black King Shipping Corporation v. Massie* [1985] 1 Lloyd's Rep. 437

*Glasgow Assurance Corporation v. Symondson* (1911) 16 Com.Cas. 109

*Hill v. Mercantile and General Reinsurance Co. Plc.* [1995] L.R.L.R. 160, C.A.

*Home and Overseas Insurance Co. Ltd. v. Mentor Insurance Co. (U.K.) Ltd.* [1990] 1 W.L.R. 153; [1989] 3 All E.R. 74; [1989] 1 Lloyd's Rep. 473, C.A.    F

*Kingsley v. Sterling Industrial Securities Ltd.* [1967] 2 Q.B. 747; [1966] 2 W.L.R. 1265; [1966] 1 All E.R. 37; [1966] 2 All E.R. 414, McNair J. and C.A.

*Law Guarantee Trust and Accident Society Ltd., In re; Liverpool Mortgage Insurance Co.'s Case* [1914] 2 Ch. 617, C.A.

*Leader v. Duffey* (1888) 13 App.Cas. 294, H.L.(I.)

*Palm Shipping Inc. v. Kuwait Petroleum Corporation* [1988] 1 Lloyd's Rep. 500    G

*Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd.* [1982] A.C. 724; [1981] 3 W.L.R. 292; [1981] 2 All E.R. 1030, H.L.(E.)

*Rex v. Inhabitants of St. Nicholas, Rochester* (1834) 3 L.J.M.C. 45

*Smith v. Cooke; Storey v. Cooke* [1891] A.C. 297, H.L.(E.)

*Thompson v. Reynolds* (1857) 26 L.J.Q.B. 93

The following cases, although not cited in argument, were referred to in the printed cases:    H

*Attica Sea Carriers Corporation v. Ferrostaal Poseidon Bulk Reederei G.m.b.H.* [1976] 1 Lloyd's Rep. 250, C.A.

*Burnand v. Rodocanachi Sons & Co.* (1882) 7 App.Cas. 333, H.L.(E.)

A    22 May. LORD GOFF OF CHIEVELEY. My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Mustill, and for the reasons he gives I, too, would dismiss this appeal.

B    LORD GRIFFITHS. My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Mustill, and for the reasons he gives I, too, would dismiss this appeal.

LORD BROWNE-WILKINSON. My Lords, for the reasons given in the speech by my noble and learned friend, Lord Mustill, I, too, would dismiss this appeal.

C    LORD MUSTILL. My Lords, this appeal turns on the meaning of the words "actually paid" in three contracts of reinsurance. The question is whether the words prescribe that no sum will be paid by reinsurer to reinsured in respect of a loss, or more accurately that no sum will be brought into the balance of account between the two parties, until the reinsured has paid out a sum of money to the person whose claim against him has brought the reinsurance into play. At first sight this seems the

D    shortest of questions, requiring a very short answer; and so in the end it proves to be. But the instinctive response must be verified by studying the other terms of the contract, placed in the context of the factual and commercial background of the transaction. I will therefore go straight to the nature of the business and to the terms of the contract in which it was embodied, concentrating for the moment on only one of the three policies,

E    namely policy no. X 20693/5386.

By this contract two syndicates, represented in these proceedings by Mr. P. F. Fagan ("the syndicates") reinsured for small percentages of a total line Charter Reinsurance Co. Ltd. ("Charter") in respect of Charter's whole account for losses occurring during the calendar year 1989. The contract formed part of a programme which also comprised "specific reinsurances" taken out with others on four of Charter's accounts viz.,

F    non-marine LMX; non-marine international; marine; and aviation. These accounts were reinsured in a series of tranches to limits of, respectively, £23m., £11m., £32·25m. and £31·5m. Above these reinsurances of separate accounts were the levels of whole account reinsurance with which two of the three contracts in suit were concerned. Above a retention of £100,000, there were successive layers of £2·9m., £2m., £2·5m. and £2·5m. Policy no.

G    5386 insured the second of these layers, for £2m. excess of £3m. and one of the other policies sued upon covered the fourth layer up to £7·5m. For the purposes of the present litigation it is assumed that a series of major casualties arising from perils insured under the policy have caused valid claims to be made against Charter under policies issued by it to other reinsured or insured companies or syndicates ("the inward policies").

H    These claims are so large as to exhaust all the reinsurances comprising the specific accounts of the programme, and to encroach upon the relevant layers of whole account reinsurance. The problem arises from the fact that Charter is in provisional liquidation, being unable to pay its debts as they fall due, and these debts include claims under the inward policies. For

their part, the syndicates do not for present purposes dispute that all the
requirements of a valid claim against them by Charter are present, save
only one: that Charter have not paid, and cannot pay, the inward claims
which they have reinsured. Thus, say the syndicates, Charter have no
cause of action under the reinsurance.

The practical importance of this defence, if sound, is obvious; and its
implications have been multiplied by the levels of financial frailty
experienced in the London insurance market in recent years. Across the
market as a whole very large sums depend upon it, and the litigation from
which this appeal stems has been brought in practice, if not in form, as a
test case. The proceedings take the shape of an action by Charter for a
summary declaration that payment by way of transfer of funds or other
means of satisfaction by Charter under the inward policies was not a
condition precedent to the liability of the syndicates. Within a very few
months it proved possible to obtain the opinion of the Commercial Court
in the shape of a meticulous and thoughtful judgment of Mance J.,
granting a declaration in those terms. Upon recourse to the Court of
Appeal this decision was upheld by a majority, Staughton L.J. dissenting.
The syndicates now appeal to this House.

This being, I believe, a sufficient summary of the dispute I turn to
policy no. X 20693/5386. It is important to quote its terms at some length.

For ease of reference I have added numbers and letters, and have
placed in italics the words around which the controversy revolves.

"1. Reinsuring clause
    "This Reinsurance is to pay all losses howsoever and wheresoever
arising during the period of this Reinsurance on any Interest
under Policies and/or Contracts of Insurance and/or Reinsurance
underwritten by the Reinsured in their Whole Account. Subject
however to the following terms and conditions.

"2.(a) Liability clause
    *"The Reinsurers shall only be liable if and when the Ultimate Net
Loss sustained by the Reinsured* in respect of interest coming within
the scope of the Reinsuring Clause exceeds £3,000,000 or U.S. or
Can.$6,000,000 each and every loss and/or Catastrophe and/or
Calamity and/or Occurrence and/or Series of Occurrences arising out
of one event *and the Reinsurers shall thereupon become liable* for the
amount in excess thereof in each and every loss, but their liability
hereunder is limited to £2,000,000 or U.S. or Can.$4,000,000 each
and every loss and/or Catastrophe and/or Calamity and/or Occurrence
and/or Series of Occurrences arising out of one event.

    "(b) Warranted Reinsurers hereon to have benefit of Specific
Reinsurances as per Schedule attached.

"Ultimate net loss clause
    "(c) *The term 'Net Loss' shall mean the sum actually paid by the
Reinsured in settlement of losses or liability* after making deductions
for all recoveries, all salvages and all claims upon other Reinsurances
whether collected or not and shall include all adjustment expenses
arising from the settlement of claims other than the salaries of
employees and the office expenses of the Reinsured.

A          "(d) All Salvages, Recoveries or Payments recovered or received
subsequent to a loss settlement under this Reinsurance shall be
applied as if recovered or received prior to the aforesaid settlement
and all necessary adjustments shall be made by the parties hereto.
Provided always that nothing in this clause shall be construed to
mean that losses under this Reinsurance are not recoverable until the
Reinsured's Ultimate Net Loss has been ascertained.

B          "(e) Notwithstanding anything contained herein to the contrary,
it is understood and agreed that recoveries under all Underlying
Excess Reinsurance Treaties and/or Contracts (as far as applicable)
are for the sole benefit of the Reinsured and shall not be taken into
account in computing the Ultimate Net Loss or Losses in excess of
which this Reinsurance attaches nor in any way prejudice the
C          Reinsured's right of recovery hereunder.

"3. Period of reinsurance clause
          "This Reinsurance covers Losses Occurring during the period
commencing with 1 January 1989 and ending with 31 December 1989
both days inclusive, Local Standard time at the place where the loss
occurs. . . .

D          "4. Premium clause
          "The Minimum and Deposit Premium for this Reinsurance shall
be U.S.$600,000: 10 per cent. Payable in Sterling, namely £37,500;
$89\frac{1}{2}$ per cent. Payable in U.S. Dollars, namely $537,000; $\frac{1}{2}$ per cent.
Payable in Can. Dollars, namely $3,000 . . .

"5. Currency clause
E          "Losses (if any) paid by the Reinsured in currencies other than
Sterling, shall be converted into Sterling at the rate of exchange ruling
at the date of the settlement of loss or losses by the Reinsured other
than losses paid in U.S. or Can. Dollars which will be paid in those
currencies.

"6. Reinstatement clause
F          "In the event of loss or losses occurring under this Reinsurance, it
is hereby mutually agreed to reinstate this Reinsurance to its full
amount of £2,000,000 or U.S. or Can.$4,000,000 from the time of the
occurrence of such loss or losses to expiry of this Reinsurance and
that an additional premium shall be paid by the Reinsured upon the
amount of such loss or losses when they are settled in the first
instance calculated at 100 per cent. of the Minimum and Deposit
G          Premium hereunder subject to a further payment hereunder (if any)
when the Final Earned Premium is known. Reinstatement premiums
to be paid in the currency of loss settlement hereunder for which
purpose U.S. or Can.$1·60 = £1. Nevertheless the Reinsurers shall
never be liable for more than £2,000,000 or U.S. or Can.$4,000,000
in respect of any one loss and/or series of losses arising out of one
H          event, nor for more than £6,000,000 or U.S. or Can.$12,000,000 in
all."

          The case for the appellants concentrates almost exclusively on the
words in italics. It is very simple. These words plainly create a condition

precedent to any liability of the syndicates. The condition is that Charter        A
shall have "actually paid" under the original policies. If this expression
has a natural and ordinary meaning, effect should be given to it. The
expression and the words which comprise it do have such a meaning. By
no stretch of language can it be extended to cover a situation in which
Charter has not made any disbursement, actual or even notional, and will
never do so.

My Lords, to a substantial degree I accept this argument. I believe        B
that most expressions do have a natural meaning, in the sense of their
primary meaning in ordinary speech. Certainly, there are occasions where
direct recourse to such a meaning is inappropriate. Thus, the word may
come from a specialist vocabulary and have no significance in ordinary
speech. Or it may have one meaning in common speech and another in a
specialist vocabulary; and the context may show that the author of the        C
document in which it appears intended it to be understood in the latter
sense. Subject to this, however, the inquiry will start, and usually finish,
by asking what is the ordinary meaning of the words used. I begin,
therefore with "actually." In my opinion this word is used by way of
qualification or precaution, in the sense of "really," "in truth," "not
notionally" or "not prospectively." On this, I feel no doubts. The word
"paid" is more slippery. Unquestionably, it is no longer confined to the        D
delivery of cash or its equivalent. In ordinary speech it now embraces
transactions which involve the crediting and debiting of accounts by
electronic means, not only transfers between bank accounts by payment
cards and direct debits, but also dealings with credit cards and similar
instruments. Conditional payment by cheque would also be covered, at
any rate outside a strictly legal context. Furthermore, I think it plain that        E
in a document created to govern a transaction in the London insurance
market payment would extend beyond remittances from debtor to creditor
and would include the settlements in account with brokers which are a
feature of that market. None the less, even giving "paid" an extended
meaning the word would at first sight, and even without the qualifier
"actually," fall well short of encompassing a situation in which the debtor
had suffered no immediate financial detriment through a transfer of funds        F
in the direction of the creditor, and would never do so.

My Lords, I have used the expression "at first sight" because I had
initially thought that the meaning of the words was quite clear, and that
the complexities and mysteries of this specialist market had hidden the
obvious solution, and had led the courts below to abjure the simple and
right answer and to force on the words a meaning which they could not        G
possibly bear. I was not deflected from this opinion by any of the cases
cited, which with few exceptions (to which I must return) seemed too
remote from the present to offer any useful guidance.

This is, however, an occasion when a first impression and a simple
answer no longer seem the best, for I recognise now that the focus of
the argument is too narrow. The words must be set in the landscape of
the instrument as a whole. Once this is done the shape of the policy,        H
and the purpose of the terms which I have grouped as clause 2 become
quite clear. As one would expect, four essential features of the insurance
are described: the perils insured against; the measure of indemnity; the

A   duration of the cover; and the premium. Clause 1, read together with various later clauses of enlargement and restriction, which I have not quoted, describes the nature and geographical scope of the perils insured against. In principle, all events happening within the period laid down by clause 3 (construed in association with special provisions relating to liability insurance) which constitute losses by perils insured under the original policies are to be losses insured under this policy. This is not the

B   place to discuss the question, perhaps not yet finally resolved, whether there can be cases where a contract of reinsurance is an insurance of the reinsurer's liability under the inward policy or whether it is always an insurance on the original subject matter, the liability of the reinsured serving merely to give him an insurable interest. This may be important in the context of regulation, but it makes no difference here, for it is quite plain that payment by reinsurer is not the insured event. There has still

C   been an insured loss, and even if the argument for the syndicates is right the consequence is only to reduce or eliminate the amount of Charter's recovery under clause 2 in respect of a loss which has undoubtedly occurred. Clause 1 therefore has no bearing on the present dispute. Nor of course is the premium provision in clause 4 of any relevance.

D   What does matter is the group of provisions which establish the measure of indemnity, once a loss by an insured peril has taken place. I would break these down as follows.

(i) Clause 2(a) fixes the level at which financial prejudice suffered by Charter under the inward policies in consequence of a loss by a peril insured under this policy causes a liability to attach. This happens when the ultimate net loss in relation to each and every loss and/or catastrophe

E   and/or calamity and/or occurrence (which I will call a set of linked losses) exceeds £3m. This sub-clause also fixes the upper limit of indemnity under the policy. An additional limit, this time fixed by reference not to each set of linked losses but to the cover for the entire policy year, is imposed by the last sentence of clause 6.

(ii) Clause 2(b) incorporates into the scheme of the policy the four sets

F   of layered "specific" insurances (i.e. the "accounts") identified in the schedule. When an event occurs which is a peril insured under one of those sets of insurances and also under this policy the limits of all the insurances comprising that account must be exceeded before any indemnity begins to fall due under this policy.

(iii) Clause 2(c) gives meaning to clause 2(a) by defining ultimate net loss. (In fact the sub-clause omits "ultimate." This must be a mistake, for

G   otherwise the entire group of provisions makes no sense. The word does appear in the clause as typed in the aviation policy). The purpose of clause 2(c) is to make clear that the syndicates are not to pay losses gross, but that there is to be a netting-down for recoveries, salvage and the like when ascertaining whether, and if so by how much, the relevant liabilities of Charter cross the boundary into the layer covered by this policy.

H   (iv) The first sentence of clause 2(d) elaborates clause 2(c) by making clear that the fixing of an ultimate net loss in respect of any set of linked losses is provisional, in the sense that the amount of it, and hence its impact if any on this layer of insurance, is to be open to recomputation if

and when items of the identified description subsequently accrue to the    A
· benefit of Charter.

(v) The proviso in the second sentence of clause 2(*d*) emphasises that even though the computation of an ultimate net loss is provisional, if it yields a figure broaching the bottom of the layer insured under this policy it will then be "recoverable" even if a subsequent recalculation when all the figures are in may lead to an upward or downward adjustment, or even to the elimination of any recovery at all.    B

(vi) Clause 2(*e*) is puzzling at first sight, because the use of initial capitals may suggest that, like "Specific Insurances" in clause 2(*b*), the expression "Underlying Excess Reinsurance Treaties and/or Contracts" has a meaning specifically ascribed for the purpose of this policy. Yet one finds it nowhere defined. In fact, however, a reading of the document as a whole shows that capitals are used indiscriminately throughout, and that    C they have no special significance in clause 2(*e*). In the light of the explanations given in argument, I accept that the purpose of the sub-clause is simply to ensure that the calculation of the ultimate net loss under sub-clause (*a*) does not involve a deduction of the liabilities on the underlying layers, so as to diminish the possibility of a recovery on the layer covered by this policy.

Analysed in this way, the policy makes complete sense, and works    D perfectly well in practice when understood as requiring the satisfaction of only two conditions before an indemnity falls due. First, that an insured event shall have occurred within the period of the policy, and second that the event shall have produced a loss to Charter of a degree sufficient, when ultimately worked out, to bring the particular layer of reinsurance into play. This reading accommodates without strain the words "if and    E when," in clause 2(*a*); for they are concerned only with the point, not of time but of arithmetic, at which the figures for the ultimate net loss reach the appropriate level. Equally, I am now satisfied that the purpose of "the sum actually paid" in clause 2(*c*) is not to impose an additional condition precedent in relation to the disbursement of funds, but to emphasise that it is the ultimate outcome of the net loss calculation which determines the final liability of the syndicates under the policy. In this context, "actually"    F means "in the event when finally ascertained," and "paid" means "exposed to liability as a result of the loss insured under clause 1." These are far from the ordinary meanings of the words, and they may be far from the meanings which they would have had in other policies, and particularly in first-tier policies of reinsurance. But we are called upon to interpret them in a very specialised form of reinsurance, and I am now satisfied that, as    G Mance J. expressed it in his judgment at first instance, the words in question did not have the purpose of introducing a temporal precondition to recovery in the form of disbursement or other satisfaction of the precise net commitment between Charter and its reinsured, but were there "for the purpose of measurement."

Whilst I have come to this conclusion simply from a study of the document I ought to comment on a number of other matters which are    H said to bear upon it. In the first place, there is an argument ad absurdum to the effect that the parties cannot have intended Charter to retain such liquidity as would enable it to answer claims under the incoming policies

A   without recourse to the reinsurance. At a time when the use of money was a vital element in the profitability of insurance business it is impossible to suppose (the argument runs) that Charter should have agreed to finance its own outlays, the more so since, if the syndicates' interpretation of clause 2 is right, Charter would have to find, not only the funds required to disburse the sum due under this particular layer, but also the total of the underlying reinsurances. This would be a wholly impracticable

B   arrangement, and would bear especially hard on Charter if it fell into financial trouble and lacked the means to make the payments necessary to unlock the reimbursements due under its contracts with the syndicates.

   This argument draws strength from the shape of the policy. As I have already suggested, under this form of words, although perhaps not under all forms, the policy covers not, as might be thought, the suffering of loss

C   by the reinsured in the shape of a claim against him under the inward policies, but the occurrence of a casualty suffered by the subject-matter insured through the operation of an insured peril. The inward policies and the reinsurance are wholly distinct. It follows that in principle the liability of the reinsurer is wholly unaffected by whether the reinsured has satisfied the claim under the inward insurance: see, amongst several authorities, *In re Eddystone Marine Insurance Co.; Ex parte Western Insurance Co.* [1892]

D   Ch. 423. This result can undoubtedly be changed by express provision, but clear words would be required; and it would to my mind be strange if a term changing so fundamentally the financial structure of the relationship were to be buried in a provision such as clause 2, concerned essentially with the measure of indemnity, rather than being given a prominent position on its own.

E   Further arguments, to my mind some way short of conclusive, were advanced on each side. The syndicates pointed out a possible disconformity between the postponement of the reinsurers' liability to pay with the statutory provisions governing margins of solvency. For Charter attention was drawn to long-established contractual provisions creating just such a condition precedent as is argued for here: for example, in the running down clause and in protection and indemnity club cover against third

F   party liabilities, the effect of which was discussed in *Firma C-Trade S.A. v. Newcastle Protection and Indemnity Association* [1991] 2 A.C. 1. Each side suggested reasons why such a provision would or would not make commercial sense; and proposed ways in which the hardship to the reinsured might be ameliorated by devices such as the making of a series of small "pump priming" payments, which would produce a sufficient

G   trickle of cash to satisfy ultimately the inward claim in full, hence unlocking a recovery under the reinsurance.

   These arguments are fully explored in the judgments delivered below. Intending no disrespect I do not enter into them here, for in my opinion they cannot be decisive. If, as I believe, a proper reading of the policy discloses no condition precedent, there is little profit in considering whether it would have been absurd to include one. If, per contra, the

H   words "actually paid" can only as a matter of language and context mean what the syndicates maintain, I would hesitate long before giving them any other meaning, just because the result would be extraordinary. The words of Lord Reid in *Wickman Machine Tool Sales Ltd. v. Schuler A.G.*

**Lord Mustill**        **Charter Reinsurance Co. Ltd. v. Fagan (H.L.(E.))**        **[1997]**

[1974] A.C. 235, 251 do, of course, reflect not only a method of
constructing contracts but also the common experience of how language
is understood:

> "The fact that a particular construction leads to a very
> unreasonable result must be a relevant consideration. The more
> unreasonable the result the more unlikely it is that the parties can
> have intended it, and if they do intend it the more necessary it is that
> they shall make that intention abundantly clear."

This practical rule of thumb (if I may so describe it without disrespect)
must however have its limits. There comes a point at which the court
should remind itself that the task is to discover what the parties meant
from what they have said, and that to force upon the words a meaning
which they cannot fairly bear is to substitute for the bargain actually
made one which the court believes could better have been made. This is
an illegitimate role for a court. Particularly in the field of commerce,
where the parties need to know what they must do and what they can
insist on not doing, it is essential for them to be confident that they can
rely on the court to enforce their contract according to its terms. Certainly,
if in the present case the result of finding a condition precedent would be
anomalous there would be good reason for the court to look twice, and
more than twice, at the words used to see whether they might bear some
other meaning. In the end, however, the parties must be held to their
bargain. Thus, if I had adhered to my first impression that the expression
"actually paid" could possess, even in the context of the policy, only the
meaning which it has in ordinary speech I would have wished to consider
very carefully whether the opinion expressed in the dissenting judgment of
Staughton L.J., austere as it might seem, ought to be preferred. In the
event however, for the reasons stated, this is not my present understanding
of the words, and since the broader question does not on this view arise
I prefer to say no more about it.

Next, I must notice three decisions from the United States. The first is
*Allemannia Insurance Co. of Pittsburgh v. Firemen's Insurance Co. of
Baltimore* (1908) 209 U.S. 326. A proportionate policy of reinsurance
stipulated (p. 328) that:

> "11. Each entry under this compact . . . shall be subject to the
> same conditions, stipulations, risks and valuations as may be assumed
> by the said reinsured company under its original contracts hereunder
> reinsured, and losses, if any, shall be payable pro rata with, in the
> same manner, and upon the same terms and conditions as paid by
> the said reinsured company under its contracts hereunder reinsured,
> and in no event shall this company be liable for an amount in excess
> of a ratable proportion of the sum actually paid to the assured or
> reinsured . . ."

After the great fire in Baltimore of 1904 the direct insurer became
insolvent and could not pay more than 55 cents in the dollar, and
therefore was unable to satisfy claims under its policies unless it could
first recover from the reinsurer. The Supreme Court of the United States
held that payment by the reinsured was not a condition of recovery under

A    the reinsurance. Delivering the opinion of the court Peckham J. stated, at
p. 336:

> "We agree with the court below, that the language of the eleventh
> subdivision, taken in connection with the fact that it is used in a
> contract designated by the parties as one of reinsurance, means that
> the reinsuring company shall not pay more than its ratable proportion
B    of the actual liability payable on the part of the reinsured, after
> deducting all liability of other reinsurers. To hold otherwise is to
> utterly subvert the original meaning of the term reinsurance and to
> deprive the contract of its chief value. The losses are to be payable
> pro rata with, in the same manner and upon the same terms and
> conditions as paid by the reinsured company under its contracts. This
> means that such losses, payable pro rata, are to be paid upon the
C    same condition as are the losses of the insurer under its contract. . . .
> [This] . . . does not mean there must be an actual payment of such
> liability by the insurer before it can have any benefit of the contract
> of reinsurance which is made with defendant."

     In the second case, *Fidelity & Deposit Co. v. Pink* (1937) 302 U.S. 224
the contract was in very different terms. It stipulated that the reinsurer's
D    proportionate share of the loss should be paid to the reinsured upon proof
of payment by the reinsured, and on tender of documents in support. It
was furthermore stipulated that the reinsured might give the reinsurer
prospective notice of its intention to pay on a certain date, and might
require the reinsurer to put its share of the loss in the hands of the
reinsured by that date. Distinguishing the *Allemannia* case, without
E    differing from the statement of general principle therein contained, the
Supreme Court held that on this occasion the contract was effective to
make prior payment a condition precedent to liability.

     Finally, in *Stickel v. Excess Insurance Co. of America* (1939) 23 N.E.2d
839, an ultimate net loss clause defined that term (p. 841) as "the sum
actually paid in cash in settlement of losses for which the company is
liable, after making proper deductions . . ." Founding on the language of
F    the particular policy in question, the Supreme Court of Ohio found the
case closer to *Pink* than to *Allemannia*, and held that once again actual
disbursement was a condition precedent to recovery.

     There was some suggestion in argument that there is an inconsistency
between these cases. On examination I can detect none. Even the brief
account given above is sufficient to make the individual decisions perfectly
G    understandable. Whether they were all right it is unnecessary and
inappropriate to consider; and it is of course true that the *Allemannia*
case, 209 U.S. 326 was concerned with proportionate insurance, whereas
the present is not. What it is permissible to say however is that the brief
statement of general principle in that case accords with the law as it has
been understood for many years, in common law jurisdictions and
elsewhere. I can see nothing in these cases to cast doubt on the opinion
H    which I have expressed as to the effect of the present policy.

     Finally, there are the inferences about the purpose of the words
"actually paid" which may be drawn from the history of the "follow
settlements" clause. The matter is fully developed in the speech of my

noble and learned friend, Lord Hoffmann. If I own to hesitation in    A
adopting this as a direct answer to the problem it is because the historical
materials presented in argument are incomplete, and subsequent reading
has not filled the gaps. It is however clear that in the long time-frame of
the insurance industry excess of loss reinsurance is comparatively modern,
probably dating from transactions arranged by C.E. Heath in the United
States in the last two decades of the 19th century. It was not until after
the Baltimore fire that the need for an excess of loss non-proportionate    B
cover written on a treaty basis became obvious. Such cover would of
course need to provide for a means of ascertaining the point at which the
reinsurance (or its first layer) attached; equally important however, was
that this determined the amount of the reinsured's retention, always a
matter of prime importance when writing reinsurance. I think it a
reasonable surmise that this retention was expressed in terms of net rather    C
than gross. It is likely therefore that there was from the start some form
of ultimate net loss clause in American excess of loss policies. Given that
the *Allemannia* proportional reinsurance, effected in 1903, already included
these words, I think it as likely that they were simply copied into excess
of loss policies, as that they were deliberately included to combat a
puzzling English decision some 20 years old, not referred to at all in the    D
report of the *Allemannia* case, and not yet the subject of acute controversy
even in England. This is however surmise but it is possible to say with
some confidence that there is nothing in the available history to suggest
that the words "actually paid" were and are included in order to create a
condition precedent.

There is one final point, directed to the wording of this particular
policy. It will be recalled that clause 2(*c*) defined net loss as "the sum    E
actually paid . . . after making deductions for all recoveries [etc] whether
collected or not." There is a discontinuity here, if the syndicates are right.
There is good reason why the provisional ascertainment of the effect
which the losses will have on the reinsured layer should be made in the
light of forecasts about the funds which will be transferred out, and the
funds which will be transferred in, on future occasions before the ultimate    F
net loss is finally ascertained, but I can see no reason why uncollected
funds should be used as a contra sum at a time when through the absence
of payment under the inward policies there is nothing against which to set
them. Here again, I do not regard the point as conclusive, but it does
reinforce the solution at which I have independently arrived.

For these reasons therefore I consider that the interpretation given by    G
Mance J., and Simon Brown L.J. to policy no. X 20693/5386 was correct.
This makes it unnecessary to consider the alternative line of reasoning
which led Nourse L.J. to conclude in favour of Charter. The position
under the second policy is acknowledged to be the same.

There remains the aviation policy. There are differences between this
and the first two policies which might for other purposes be important.
Mance J. has drawn attention to some of them. But in my opinion none    H
of them bear on the present dispute, and the reasoning which I have
proposed applies equally to all three contracts.

In these circumstances I would dismiss the appeal.

A    LORD HOFFMANN. My Lords, this appeal turns upon the construction of a standard clause known as the ultimate net loss ("U.N.L.") clause which is in common use in the London excess of loss reinsurance market. Although the action concerns three particular policies of reinsurance written on behalf of two Lloyd's syndicates, it raises an issue which affects the whole reinsurance market.

B    The relevant provisions are set out in the speech of my noble and learned friend, Lord Mustill, and I need not repeat them. The question is whether the words "actually paid" mean that the liability of the reinsurers is limited to the sum in respect of which Charter Reinsurance has discharged its liabilities in respect of the risks which it insured. Mr. Sumption says that this is the natural meaning of the words. There is nothing in the context which requires them to be given a different meaning and that is the end of the matter.

C    I think that in some cases the notion of words having a natural meaning is not a very helpful one. Because the meaning of words is so sensitive to syntax and context, the natural meaning of words in one sentence may be quite unnatural in another. Thus a statement that words have a particular natural meaning may mean no more than that in many contexts they will have that meaning. In other contexts their meaning will be different but no less natural.

D    Take, for example, the word "pay." In many contexts, it will mean that money has changed hands, usually in discharge of some liability. In other contexts, it will mean only that a liability was incurred, without necessarily having been discharged. A wife comes home with a new dress and her husband says "What did you pay for it?" She would not be understanding his question in its natural meaning if she answered "Nothing, because the shop gave me 30 days' credit." It is perfectly clear from the context that the husband wanted to know the amount of the liability which she incurred, whether or not that liability has been discharged.

E    What is true of ordinary speech is also true of reinsurance. *In re Eddystone Marine Insurance Co.; Ex parte Western Insurance Co.* [1892] 2 Ch. 423 the policy contained the form of reinsurance clause then in common use "and to pay as may be paid thereon." As in this case, the reinsured company was in insolvent winding up and could not pay its debts. Stirling J. said, at p. 427, that the policy did not mean that the liability should have been discharged. They meant only that "the payment to be made on the reinsurance policy is to be regulated by that to be made on the original policy of insurance." In other words, the clause is concerned with the amount of liability and is indifferent to whether or not it has been discharged.

F    But, said Mr. Sumption, there is the word "actually." Stirling J. might have been willing to accept that paid could in some artificial or figurative sense mean "liable to be paid." But the word "actually" was surely added to make it clear that money must have changed hands. "Actually paid" said Mr. Sumption, meant actually paid.

G    One speaks of something being "actually" the case to point a contrast; perhaps with what appears to be the case, or with what might be the case, or with what is deemed to be the case. The effect of the word therefore

depends upon the nature of the distinction which the speaker is wanting    A
to make. This can appear only from the context in which the phrase is
used. It is artificial to start with an acontextual preconception about the
meaning of the words and then see whether that meaning is somehow
displaced. The context might indicate that the word was used to reverse
the ruling in the *Eddystone* case and require the liability of the reinsured
to have been discharged. On the other hand, it might suggest that a
different contrast was intended.    B

To revert to my domestic example, if the wife had answered "Well, the
dress was marked £300, but they were having a sale," and the husband
then asked "So what did you actually pay?" she would again be giving the
question an unnatural meaning if she answered "I have not paid anything
yet." It is obvious that the contrast which the husband wishes to draw is
between the price as marked and the lower price which was charged. He    C
is still not concerned with whether the liability has been discharged. This
is not a loose use of language. In the context of the rest of the
conversation, it is the natural meaning.

What then is the context? Is the draftsman wanting to draw a contrast
with the meaning given to "paid" in the *Eddystone* case [1892] 2 Ch. 423
or does he have some other contrast in mind? My noble and learned    D
friend, Lord Mustill, has analysed the structure of the policies and for the
reasons which he gives, I agree that the context points to a wish to
emphasise the net character of the liability as opposed to what, under the
terms of the policies, the liability might have been.

I think that these conclusions are reinforced by the history of
reinsurance clauses. Contracts of reinsurance were unlawful until 1864.
Such a contract is not an insurance of the primary insurer's potential    E
liability or disbursement. It is an independent contract between reinsured
and reinsurer in which the subject matter of the insurance is the same as
that of the primary insurance, that is to say, the risk to the ship or goods
or whatever might be insured. The difference lies in the nature of the
insurable interest, which in the case of the primary insurer, arises from his
liability under the original policy: see Buckley L.J. in *British Dominions*    F
*General Insurance Co. Ltd. v. Duder* [1915] 2 K.B. 394, 400.

The difference in the nature of the insurable interest does however
mean that, insurance being a contract of indemnity, the amount
recoverable will not necessarily be the same as under the primary
insurance. For example, the liability of the primary insurer will not
necessarily be for the whole loss suffered by the original insured but may    G
be subject to exceptions and limitations. His net outlay can also be
reduced by recoveries under his right of subrogation. It therefore became
customary in the market to have a special clause or clauses which defined
the extent of the reinsurer's liability. It appears that the most commonly
used form in the early years of reinsurance was to add the words "Being
a reinsurance, subject to all clauses and conditions of the original policy
or policies, and to pay as may be paid thereon:" see *McArthur, The*    H
*Contract of Marine Insurance*, 2nd ed. (1890), p. 332 and the form of
policy in *Uzielli & Co. v. Boston Marine Insurance Co.* (1884) 15 Q.B.D.
11, 12.

**A**

As construed by the courts, however, the phrase "and to pay as may be paid thereon" disappointed the expectations of the market on both sides. The original insurers assumed that it meant that if they agreed in good faith to pay under the original policy, they would be able to recover without having to prove their own legal liability. Reinsurers assumed that whatever the loss of the original insured might be, their liability would not exceed the net outlay of the reinsured, after taking all recoveries into account. Both assumptions were to prove false.

**B**

The story of how the expectations of original insurers were disappointed by the decision of Mathew J. in *Chippendale v. Holt* (1895) 1 Com.Cas. 197 and the subsequent development of the "follow settlements" clause to restore what had been thought to be the effect of the old clause has been told more than once, including by Scrutton L.J., who was junior counsel in *Chippendale v. Holt,* in *Gurney v. Grimmer* (1932) 44 Ll.L.R. 189, 192–194. (For subsequent developments, see Robert Goff L.J. in *Insurance Co. of Africa v. Scor (U.K.) Reinsurance Co. Ltd.* [1985] 1 Lloyd's Rep. 312.)

**C**

The second assumption, on the part of reinsurers, had however been shaken by an even earlier decision. In *Uzielli & Co. v. Boston Marine Insurance Co.,* 15 Q.B.D. 11 the defendants were reinsurers of the reinsurers of the *Rose Middleton,* which had been insured in the sum of £1,000. The ship went aground and the owners gave notice of abandonment to the original underwriters. The underwriters disputed the validity of the notice but eventually settled the claim for 88 per cent. But they also spent more money in getting the ship off the rocks than they eventually realised in selling her. The result was that they incurred a total loss of 112 per cent. They recovered the additional sum from the plaintiffs, their reinsurers, under a "sue and labour" clause in the policy which entitled them to recover such expenditure reasonably incurred by the insurers or their "factors or servants or assigns." The plaintiffs in turn claimed £1,120 from the defendants. Matthew J. held that there had been a constructive total loss, that the reinsurers were entitled to add the expenditure of the underwriters on salvage under the "sue and labour" clause and gave judgment for £1,120. The reinsurers appealed and the Court of Appeal held that, as against the defendants, the "sue and labour" clause did not cover expenditure by the original underwriters because they were not the "factors or servants or assigns" of the first reinsurers. One might have thought that the result would be that the plaintiffs could recover only the 88 per cent. of the £1,000 for which the claim of the shipowner had been settled. That was what had been paid on the original insurance policy. Instead, however, the court substituted a judgment in favour of the underwriters for £1,000.

**D**

**E**

**F**

**G**

The *Uzielli* case caused a good deal of puzzlement in the market and among marine insurance lawyers. Mr. McArthur (*The Contract of Marine Insurance,* p. 335) said that "as the facts in the case were peculiar, no general principle can be deduced from the decision." In *Western Assurance Co. of Toronto v. Poole* [1903] 1 K.B. 376, 387–388, Mr. Hamilton K.C. and Mr. Scrutton K.C. offered Bigham J. different explanations of the case, neither of which he found satisfactory. In *British Dominions General Insurance Co. Ltd. v. Duder* [1915] 2 K.B. 394, Buckley L.J. said that he could not find any principle in the case: p. 402. Pickford L.J. likewise

**H**

said, at p. 405, that it was very hard to understand and Bankes L.J. was    A
similarly perplexed: see p. 413. Although the principle of indemnity is
fully reaffirmed in *Duder* it would not be surprising if the market felt
nervous that the House of Lords might one day see some light in *Uzielli*
which had eluded other judges since the time it was decided.

Although the commercial history of the matter is not as well
documented as that of the "follow settlements" clause, it is clear that the
formula "pay as may be paid thereon" disappeared from standard forms    B
of reinsurance. The objects which it had sought to achieve on behalf of
the original insurers were taken over by the follow settlements clause. It
does not seem unreasonable to infer that its function in delimiting the
liability of the reinsurers was taken over by the ultimate net loss clause.
The U.N.L. clause shows throughout a preoccupation with ensuring that
the reinsurer cannot be called upon to pay more than the reinsured has    C
been required to pay. In *Uzielli* the words "pay as may be paid" had
proved ineffective to achieve this result, even though they had been
thought apt to do so. In his argument in *Duder's* case [1915] 2 K.B. 394,
398 Mr. Roche K.C., arguing for a similar result to that in *Uzielli*, said
plaintively but truthfully, that the words "pay as may be paid thereon:"
"weakened the case of the plaintiffs, and yet this court held that they
could recover the full 100 per cent. and not merely the 88 per cent. for    D
which they had settled the claim against them." It would not therefore be
surprising if underwriters thought that if "paid" was not good enough to
satisfy the courts, "actually paid" might drive the point home.

The U.N.L. clause in the policies before the House has been traced
back in unaltered form to the early 1930s and I would not be surprised if
it went even further back than that. The words "actually paid" can be    E
found in the policy considered in *Allemannia Insurance Co. of Pittsburgh
v. Firemen's Insurance Co. of Baltimore,* 209 U.S. 326, where they were
given the construction which I suggest in this case.

I find further support for my view in the fact that the U.N.L. clause
has been thought suitable for use in the London excess of loss reinsurance
market. There are certainly forms of reinsurance in which it may be
commercially appropriate to make discharge of his liability by the    F
reinsured a condition of the liability of the reinsurer. It may be, as in
cases of mutual insurance, that the reinsurer has an interest in making
certain that the reinsured maintains sufficient liquid assets to meet his
liabilities. Or it may be a protection against fraudulent claims. But the
London excess of loss market operates on the assumption that a
reinsurance programme will relieve the insurer of the burden of having to    G
pay claims covered by the reinsured layers. The regulation of insurers in
this country uses a test of solvency which treats reinsurance cover as a
proper deduction from the insurer's liabilities. None of this would make
sense if the insurer had first to satisfy the claim out of his own resources
before he could call upon his reinsurers to pay.

Mr. Sumption suggested a stratagem which insurers might use to avoid
having to pay the whole claim themselves. They could pay a part, even a    H
very small part, of the reinsured liability and then, having to this extent
actually paid, they could call upon the reinsurer to reimburse them.
Having thus primed the pump, they could by successive strokes draw up

A   the full amount from the reinsurance well. I cannot imagine that the parties could ever have contemplated such a strange procedure and one is bound to ask what commercial purpose the reinsurer could have expected to achieve by being able to insist upon it.

Considerations of history, language and commercial background therefore lead me to the conclusion that the word "actually" in the U.N.L. clause is used to emphasise that the loss for which the reinsurer is to be liable is to be net and that the clause does not restrict liability to the amount by which the liability of the reinsured for the loss has been discharged. I think that this is the natural meaning of the clause.

In conclusion I would like to pay tribute to the judgment of Mance J. which deals comprehensively with the issues and all the relevant authorities and with which I am in full agreement. I would dismiss the appeal.

*Appeal dismissed.*
*No order as to costs.*

*Solicitors: Ince & Co; Davies Arnold Cooper.*

J. A. G.

———

E

[PRIVY COUNCIL]

FARRINGTON   .   .   .   .   .   .   .   .   PETITIONER

AND

THE QUEEN   .   .   .   .   .   .   .   .   RESPONDENT

[APPLICATION FOR SPECIAL LEAVE TO APPEAL FROM THE COURT OF APPEAL
OF THE BAHAMAS]

1996   May 22;                        Lord Keith of Kinkel, Lord Jauncey
     June 17                         of Tullichettle and Lord Steyn

*Bahamas, The—Constitution—Fundamental rights and freedoms—*
*Sentence of death for murder—Applicant claiming delay in carrying*
*out execution contravening constitutional rights—Application for*
*stay of execution pending hearing of constitutional motion—Judge*
*refusing stay on ground that motion bound to fail—Court of Appeal*
*upholding judge's decision without dismissing motion—Whether*
*"decision" by Court of Appeal on constitutional motion—Whether*
*leave to appeal to Privy Council as of right—Bahamas Independence*
*Order 1973 (S.I. 1973 No. 1080), Sch., art. 104*

The applicant was convicted of murder in the Bahamas in 1992 and sentenced to death. His appeal to the Court of Appeal of The Bahamas was dismissed and the Judicial Committee of the

LC/7

A    incidents of the tenure of land, and among these incidents is the right, in appropriate circumstances, to the grant of relief against forfeiture. The National Land Code is a complete and comprehensive code of law governing the tenure of land in Malaysia and the incidents of it, as well as other important matters affecting land there, and there is no room for the importation of any rules of English law in that field except in so far as the Code itself may expressly provide for this.

B    For these reasons their Lordships will advise His Majesty the Yang di-Pertuan Agong that the appeals should be dismissed with costs.

*Solicitors: Philip Conway Thomas & Co.; Turner Kenneth Brown; Stephenson Harwood.*

C                                                                                        S. S.

D                                              ————

E

[HOUSE OF LORDS]

ANTAIOS COMPANIA NAVIERA S.A.    .    .    .    APPELLANTS

AND

F    SALEN REDERIERNA A.B..    .    .    .    .    .    RESPONDENTS

1984 July 2; 26                              Lord Diplock, Lord Keith of Kinkel,
                                                           Lord Scarman, Lord Roskill and
                                                           Lord Brandon of Oakbrook

G    *Arbitration—Appeal—Award—Charterparty—Withdrawal of vessel— Whether owners only entitled to withdraw on a repudiatory breach—Whether reasonable time expired before withdrawal— Grounds for granting leave to appeal—Arbitration Act 1979 (c.42), s.1(3)(b) (6A) (as amended by Supreme Court Act 1981 (c.54), s.148(2))*
*Ships' Names—Antaios*

H        The charterers chartered a vessel from the shipowners on 3 November 1978 on a three-year time charter in the N.Y.P.E. form. The charterparty contained a London arbitration clause and disputes which had arisen between the parties were referred to arbitration. One of the main issues in the arbitration was

whether the owners were entitled to withdraw the vessel from
the service of the charterers on discovering that inaccurate bills
of lading had been issued. Clause 5 of the charterparty provided
"on any breach of this charterparty, the owners shall be at
liberty to withdraw the vessel . . ." On 7 May 1980 the owners
had learned of the inaccuracy of the bills of lading but the
vessel was not withdrawn until 20 May. The arbitrators found,
inter alia, that the breach by the charterers was non-repudiatory
and that clause 5, properly construed, gave a right of withdrawal
only where there was a repudiatory breach. They found further
that even if, contrary to that finding, the owners had a right of
withdrawal that right had to be exercised within "a reasonable
time," which, in the circumstances, was some two days, and
that therefore the right to withdraw had been lost before 20
May 1980. The owners applied pursuant to section 1(3)(b) of
the Arbitration Act 1979[1] for leave to appeal against the
arbitration award.

Staughton J. dismissed the application on the grounds that
although the true construction of clause 5 of the charterparty
was a matter of public interest on which there was some
measure of uncertainty concerning the true answer, the
determination of that issue was immaterial in that it was
incapable of affecting the rights of the parties substantially or at
all unless the arbitrators were wrong in finding that the owners
by their own inactivity lost any right of withdrawal and on that
issue the arbitrators were probably right. Subsequently, pursuant
to section 1(6A) of the Act, the judge granted the owners leave
to appeal to the Court of Appeal from his refusal to allow an
appeal to the High Court. On appeal by the owners the Court
of Appeal dismissed the appeal.

On appeal by the owners:—

*Held*, dismissing the appeal, that since the arbitrators were
plainly right in determining that clause 5 of the charterparty
only gave a right to withdrawal where there was a repudiatory
breach and the breach by the charterers did not fall into that
category and the fact that by their delay the owners had in any
event lost the right of withdrawal, the judge was right to refuse
leave to appeal to the High Court but should not have granted
leave to appeal to the Court of Appeal against the refusal of
such leave (post, pp. 205B–D, 207G–208B, 209E–F).

*Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd.* (*The Nema*)
[1982] A.C. 724, H.L.(E.); *Miramar Maritime Corporation v.
Holborn Oil Trading Ltd.* [1984] A.C. 676, H.L.(E.) and *B.V.S.*

[1] Arbitration Act 1979, s.1: "(2) Subject to subsection (3) below, an appeal shall lie to
the High Court on any question of law arising out of an award made on an arbitration
agreement; and on the determination of such an appeal the High Court may by order—
(a) confirm, vary or set aside the award; or (b) remit the award to the reconsideration of
the arbitrator or umpire together with the court's opinion on the question of law which
was the subject of the appeal; and where the award is remitted under paragraph (b) above
the arbitrator or umpire shall, unless the order otherwise directs, make his award within
three months after the date of the order. (3) An appeal under this section may be brought
by any of the parties to the reference—(a) with the consent of all the other parties to the
reference; or (b) subject to section 3 below, with the leave of the court. (4) The High
Court shall not grant leave under subsection (3)(b) above unless it considers that, having
regard to all the circumstances, the determination of the question of law concerned could
substantially affect the rights of one or more of the parties to the arbitration agreement;
. . . (6A) Unless the High Court gives leave, no appeal shall lie to the Court of Appeal
from a decision of the High Court—(a) to grant or refuse leave under subsection (3)(b) or
(5)(b) above; or (b) to make or not to make an order under subsection (5) above."

**1 A.C.**    **Antaios Compania S.A. v. Salen A.B. (H.L.(E.))**

A    *S.A. v. Kerman Shipping Co. S.A. (The Kerman)* [1982] 1
W.L.R. 166 considered.

*Per curiam* (i) Unless judges are prepared to be vigilant in
the exercise of the discretions conferred upon them by sections
1 and 2 of the Arbitration Act 1979, they will allow the
intention of Parliament to promote speedy finality in arbitral
awards to be frustrated (post, p. 199D–E). Accordingly (a) leave
to appeal to the High Court from an arbitrator's award under
B    section 1(3)(*b*) should only be given, even in a case turning on
the construction of a standard term, where the judge considers
that a strong prima facie case has been made out that the
arbitrator had been wrong in his construction, and that applied
even though there might be dicta in other reported cases
suggesting that there might be two schools of thought among
commercial judges upon the term's construction; if there were
C    conflicting decisions the judge should give leave (post, pp. 203G—
204A); (b) leave to appeal from a decision to grant or refuse
leave to appeal to the High Court from an arbitral award should
only be granted under section 1(6A) where the decision called
for some amplification, elucidation or adaptation to changing
practices of existing guidelines (post, p. 205D–E).

(ii) On the hearing of applications under section 1(3)(*b*) for
leave to appeal to the High Court against arbitral awards a
D    judge ought not normally to give reasons for a grant or refusal
of leave and should follow a practice similar to that adopted by
the House of Lords when dealing with petitions for leave to
appeal (post, pp. 205H—206A).

Decision of the Court of Appeal [1983] 1 W.L.R. 1362;
[1983] 3 All E.R. 777 affirmed on different grounds.

E    The following cases are referred to in their Lordships' opinions:

*Associated Provincial Picture Houses Ltd. v. Wednesbury Corporation* [1948]
1 K.B. 223; [1947] 2 All E.R. 680, C.A.
*B.V.S. S.A. v. Kerman Shipping Co. S.A. (The Kerman)* [1982] 1 W.L.R.
166; [1982] 1 All E.R. 616
*Edwards v. Bairstow* [1956] A.C. 14; [1955] 3 W.L.R. 410; [1955] 3 All
E.R. 48, H.L.(E.)
F    *Mardorf Peach & Co. Ltd. v. Attica Sea Carriers Corporation of Liberia
(The Laconia)* [1977] A.C. 850; [1977] 2 W.L.R. 286; [1977] 1 All E.R.
545, H.L.(E.)
*Miramar Maritime Corporation v. Holborn Oil Trading Ltd.* [1984] A.C.
676; [1984] 3 W.L.R. 1; [1984] 2 All E.R. 326, H.L.(E.)
*Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd. (The Nema)* [1980] 2 Lloyd's
Rep. 83; [1980] Q.B. 547; [1980] 3 W.L.R. 326; [1980] 3 All E.R. 117,
G    C.A.; [1982] A.C. 724; [1981] 3 W.L.R. 292; [1981] 2 All E.R. 1030,
H.L.(E.)

The following additional cases were cited in argument:

*Allen v. Robles* [1969] 1 W.L.R. 1193; [1969] 3 All E.R. 154, C.A.
*Astro Valiente Compania Naviera S.A. v. Government of Pakistan Ministry
of Food and Agriculture* [1982] 1 All E.R. 578
H    *Evans v. Bartlam* [1937] A.C. 473; [1937] 2 All E.R. 646, H.L.(E.)
*Halfdan Greig & Co. A/S v. Sterling Coal and Navigation Corporation (The
Lysland)* [1973] Q.B. 843; [1973] 2 W.L.R. 904; [1973] 2 All E.R.
1073, C.A.

*Italmare Shipping Co. v. Ocean Tanker Co. Inc. (The Rio Sun)* [1982] 1    A
    W.L.R. 158; [1982] 1 All E.R. 517, C.A.
*Moel Tryvan Ship Co. Ltd. v. Andrew Weir & Co.* [1910] 2 K.B. 844, C.A.
*Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana (The
    Scaptrade)* [1981] 2 Lloyd's Rep. 425

APPEAL from the Court of Appeal.
    This was an appeal, by leave of the House of Lords (Lord Diplock,    B
Lord Bridge of Harwich and Lord Brandon of Oakbrook) on 19 January
1984, by the appellants, Antaios Compania Naviera S.A., from the
judgment dated 8 July 1983 of the Court of Appeal (Sir John Donaldson
M.R. and Fox L.J., Ackner L.J. dissenting) dismissing an appeal from
the judgment dated 19 November 1982 of Staughton J. [1983] 2 Lloyd's
Rep. 473, 476 refusing the appellants' application for leave to appeal to
the High Court from the award of arbitrators pursuant to section 1 of    C
the Arbitration Act 1979.
    At all material times the *Antaios* owned by the appellants, was time
chartered to the respondents, Salen Rederierna A.B., on the New York
Product Exchange form charterparty. There were a number of sub-
charters on substantially the same terms. The charterparty contained a
London arbitration clause and disputes arising between the parties were    D
referred to arbitration before a tribunal of three arbitrators, Mr.
Anthony Diamond Q.C., Mr. Bruce Harris and Mr. John Potter.
    One of the main issues in the arbitration, and the issue which led to
the present appeal, was whether the appellants were entitled to withdraw
the vessel from the service of the respondents under the time charter
upon discovering that inaccurate bills of lading had been issued. Clause
5 of the charterparty provided "on any breach of this charterparty, the    E
owners shall be at liberty to withdraw the vessel . . ." On 7 May 1980
the appellants learned of the inaccuracy of the bills of lading but the
vessel was not withdrawn until 20 May. The arbitrators found, inter alia,
that the breach by the respondents was non-repudiatory and that clause
5, properly construed, gave a right of withdrawal only where there was a
repudiatory breach. They found further that even if, contrary to their
finding, the appellants had a right of withdrawal that right had to be    F
exercised within "a reasonable time," which was, in the circumstances,
some two days, and that therefore the right to withdraw had been lost
before 20 May 1980. The appellants applied pursuant to section 1(3)(*b*)
of the Arbitration Act 1979 for leave to appeal against the arbitration
award.
    The facts are set out in the opinion of Lord Diplock.        G

    *Gordon Pollock Q.C., Angus Glennie* and *Geraldine Andrews* for
the appellants, the ship owners. The first issue raised by this appeal is:
did the decision by the arbitrators to the effect that the appellants had
lost their right to withdraw the vessel by the mere effluxion of a period
of time of two days raise a question of law? In the present case
Staughton J. did not give leave to appeal to the High Court because he    H
held that there was no issue of law which could affect the rights of the
parties. In this he was wrong: there was an issue of law on the
withdrawal of the vessel. The arbitrators state that whether the owners

A    lost the right of withdrawal is a question of law and a difficult question
of law. The analysis of the arbitrator's position by Ackner L.J. [1983] 1
W.L.R. 1362, 1373A–D, is plainly right.

It is emphasised that the arbitrators' decision raises an important
question of law, namely, whether mere lapse of time can defeat a right
to exercise a contractual right to terminate even where that lapse of time
does not give rise to any inference of an affirmation of the contract or
B    some election not to exercise the right to terminate. This question was
clearly a question of law which affected their decision as to whether the
right to withdraw was lost, since they made it clear that if the relevant
principle was one of "election" (which is used in the present context to
include affirmation, election, waiver and estoppel), they would have
found in favour of the appellants on this point.

C    The arbitrators found the point difficult because it is a question on
which there are, or appear to be, two "schools of thought." On the one
hand there are dicta in such cases as *Mardorf Peach & Co. Ltd. v.
Attica Sea Carriers Corporation of Liberia (The Laconia)* [1977] A.C.
850, 872, *per* Lord Wilberforce, which, if read out of context, might be
taken to suggest that there is an implied term or rule of law that such a
right be exercised within a reasonable time otherwise it is lost, regardless
D    of whether any inference of election can be drawn from the passage of
such time. On the other hand, there are decisions—conveniently
summarised by Lloyd J. in *Scandinavian Trading Tanker Co. A.B. v.
Flota Petrolera Ecuatoriana (The Scaptrade)* [1981] 2 Lloyd's Rep. 425
which appear to make it clear that such a right will only be lost by
election, whether expressed or inferred from the circumstances. In the
E    appellants' submission the dicta which are relied upon as suggesting an
implied term or rule of law regardless of an election were made in cases
where this problem did not arise and do not support the proposition. In
*The Scaptrade* [1981] 2 Lloyd's Rep. 425, 429, Lloyd J. analyses Lord
Wilberforce's speech in *The Laconia* [1977] A.C. 850 as laying down
that it is a question of waiver or election not of an implied term. In this
connection attention is drawn to the argument of Mr. Hobhouse in *The
F    Laconia* [1977] A.C. 850, 853G, 854E, 856B for it would appear that Lord
Wilberforce adopted the proposition there put forward. Mr. Hobhouse
had relied upon *Allen v. Robles* [1969] 1 W.L.R. 1193.

While it has always been assumed that the passage of time could give
rise to an inference of election, it will not always do so. Until recently it
has not been suggested that a party was under a duty to exercise such a
G    right within a reasonable time regardless of any consideration of election.
The point is a novel one and has never arisen directly for consideration.
It is of great commerical importance not only in relation to questions of
withdrawal but affecting also all contractual rights to terminate and even
the common law right to terminate for repudiatory breach. The
arbitrators, having expressly found no inference of election could be
drawn, were wrong in holding that the right to withdraw the vessel
H    under the charterparty had been lost.

If the appellants fail on this issue no other issue arises in the appeal.
[LORD DIPLOCK. Their Lordships are of the opinion that this case does
not raise any point of law fit to go to the High Court. But the appeal

does raise questions of principle in relation to the guidelines that should   A
be laid down in relation to appeals from arbitrators. The first question
is: in what circumstances should a judge who is refusing leave to the
High Court give leave to appeal to the Court of Appeal from his
decision refusing such leave?]

It is plain that it was the intention of the amendment introduced in
section 1 of the Abritration Act 1979 by section 148(2) of the Supreme
Court Act 1981 to give the judge of first instance control whether there   B
should be an appeal from the grant or refusal of leave to the High
Court. But section 1(6A) does not limit the judge's discretion in relation
to whether or not there should be an appeal to the Court of Appeal.

It may be that in relation to a particular award one judge would
grant leave because he considers that the arbitrator was probably wrong,
whilst another judge would refuse leave because he was of the view that   C
another judge would refuse leave because he was of the view that the
arbitrator was probably right. In those circumstances it would be wrong
for a judge to feel that his discretion in relation to the grant or refusal
of leave to the Court of Appeal was fettered by the guidelines. Another
instance where leave to appeal might be given is not at the stage of
discretion but where the judge considers that a genuine issue of law
arises on the terms of the award. In those circumstances he should allow   D
the case to go to the Court of Appeal because in that case he is not
asking the Court of Appeal to review his discretion. In those
circumstances the judge has recognised that other judges would have
come to a different view. There may well be cases which are unforeseen
and fall outside the first class of cases referred to by Staughton J. in his
judgment of 19 November 1982 [1983] 2 Lloyd's Rep. 473, 476. It is   E
wrong to fetter a judge's discretion in advance: see *Evans v. Bartlam*
[1937] A.C. 473, 488, *per* Lord Wright. Certainly a judge should be
entitled to grant leave to appeal to the Court of Appeal where there is a
conflict of judicial opinion on some important point of principle: see the
judgment of Ackner L.J. [1983] 1 W.L.R. 1362, 1375D–E.

[LORD DIPLOCK. The second issue on which counsel's assistance is
required is on the desirability of the judge who is refusing or granting   F
leave to the Court of Appeal, giving reasons for his decision.]

If a judge is refusing leave from an arbitral decision to the High
Court but is giving leave to the Court of Appeal against such refusal he
must give reasons in order to assist the Court of Appeal. The only
reason for giving judgment when the judge refuses leave to the High
Court is to satisfy the curiosity of the disappointed party, or exceptionally   G
there may be cases in this category when the judge considers it necessary
to give a reasoned judgment where it relates to the guidelines.

As to the guidelines themselves see the exemplification of the
guidelines laid down in *Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd.
(The Nema)* [1982] A.C. 724 by Parker J. in *B.V.S. S.A. v. Kerman
Shipping Co. S.A. (The Kerman)* [1982] 1 W.L.R. 166 where the judge
held that the categories of cases considered in *The Nema* were not   H
exhaustive and that, in particular, leave to appeal should be granted
where a particular point of principle needed to be clarified. There is also
another category of case where the guidelines are not applicable: e.g.

3555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Append
1 A.C.       Declaration of Lord Collins, R.B. Pg. 125 of 428
Astro Valiente Compania Naviera S.A. v. Government of Pakistan (H.L.(E.))

A *Astro Valiente Compania Naviera S.A.* v. *Government of Pakistan Ministry of Food and Agriculture* [1982] 1 All E.R. 578,—cases where the arbitration is of such complexity and the cases cited so numerous that the judge at the preliminary stage cannot decide whether the arbitrator was right or wrong. In conclusion it is pertinent to remember the observation of Lord Denning M.R. in *Italmare Shipping Co. v.*

B *Ocean Tanker Co. Inc. (The Rio Sun)* [1982] 1 W.L.R. 158, 162G: "Useful as guidelines often are, nevertheless it must be remembered that they are only guidelines. They are not barriers."

*Mark Saville Q.C.* and *Timothy Young* for the respondents, the charterers.

[LORD DIPLOCK. Their Lordships would like assistance on the question of the guidelines]

C    In so far as leave to appeal to the Court of Appeal is concerned reliance is placed on the judgment of Sir John Donaldson M.R. [1983] 1 W.L.R. 1362, 1369D–E. The Act of 1979 as construed in *The Nema* [1982] A.C. 724 charged the court of first instance with a discretion whether to grant leave or not and stressed the need for finality in awards. It is for the judge to make up his mind and if the judge decides that the arbitrator was probably not wrong then the case should go no

D further. If this position is departed from one is going back to *Halfdan Greig & Co. A/S v. Sterling Coal & Navigation Corporation (The Lysland)* [1973] Q.B. 843. The approach adopted by Ackner L.J. [1983] 1 W.L.R. 1362, 1375C–E is wrong. The present case on its facts shows the dangers of departing from the guidelines as laid down in *The Nema* [1982] A.C. 724 since it does not lead to finality. Moreover, it goes even

E further than *The Lysland* [1973] Q.B. 843. The respondents are not contending that *The Nema* laid down some rigid statutory position. The word "normally" is used in Lord Diplock's judgment because in general the object of the Act of 1979 is to achieve finality. It is to be remembered in this field that the parties have chosen their tribunal, namely arbitrators, and their decision should be the end of the matter. The approach adopted by Sir John Donaldson M.R., Fox L.J. and

F Staughton J. is correct. What has caused some disquiet in the city in relation to arbitrations is not *The Nema* principle but the extensive hearings before a commercial judge whether there should be an appeal from the arbitrator at all.

As to *The Kerman* [1982] 1 W.L.R. 166, the only passage in the judgment of Parker J. which the respondents would query is that at page

G 173B because what should be in the forefront of the judge's mind is finality.

In so far as the giving of reasons, where the judge refuses leave to appeal from the arbitrator to the High Court the respondents strongly contend that no reason should be given. If the judge grants leave to the High Court he should not give reasons because he has had only a preliminary view. If he refuses leave to appeal to the Court of Appeal

H from his grant or refusal to give leave to the High Court he should not give reasons but if he grants leave to go to the Court of Appeal then it is agreed that he should give reasons in order to assist the Court of Appeal.

As to *Astro Valiente Compania Naviera S.A. v. Government of*
*Pakistan Ministry of Food and Agriculture* [1982] 1 All E.R. 578, the
difficulty that arose in that case could have been put right under the
judicial review procedure. The fact that both parties required reasons is
nihil ad rem. In that case the judge should not have been persuaded to
give reasons for his decision.

Their Lordships took time for consideration.

26 July. LORD DIPLOCK. My Lords, on 3 November 1978, the *Antaios*
was chartered by the appellants ("the shipowners") to the respondents
("the charterers") on a three-year time charter in the New York Produce
Exchange ("N.Y.P.E.") form which incorporated the standard withdrawal
clause. The words appearing in the clause that are relevant to the
dispute which is the subject matter of this appeal are:

"failing the punctual and regular payment of the hire or on any
breach of this charter party the owners shall be at liberty to
withdraw the vessel from the service of the charterers without
prejudice to any claim they (the owners) may otherwise have
against the charterers."

The *Antaios* was sub-chartered, and sub-sub-chartered, but nothing
turns on this since the charterers were vicariously liable for any breaches
of the head charter committed by the sub-charterers or sub-sub-
charterers.

By May 1980 market rates of hire had risen, so it was very much to
the interest of the shipowners to withdraw the vessel when the charter
was only half-way through its term. This they purported to do on 20
May 1980, the charter being reinstated two days afterwards upon the
usual "without prejudice" terms as to the rate of hire payable until the
date of its expiry some 18 months later.

There were several disputes between the shipowners and the
charterers which were submitted to arbitration under clause 17 of
N.Y.P.E. which provides for arbitration in London. The arbitral hearing
in the only dispute with which your Lordships are concerned took place
in February 1982. It was about the shipowners' right to withdraw the
vessel on 20 May 1980. The arbitrator's award was published on 9 July
1982. So far as is relevant to the instant appeal it awarded and declared
that the shipowners were not entitled to withdraw the vessel *Antaios*
from the service of the charterers on or about 20 May 1980. The award
was accompanied by reasons that ran to no less than 96 pages, of which
78 were devoted to this issue.

On 30 July 1982 the shipowners applied to the High Court, under
section 1(3)(*b*) of the Arbitration Act 1979, for leave to appeal on
questions of law arising out of the award. Reduced to a single sentence,
the only question of law relied upon as so arising was the true
construction of the words "on any breach of this charter party" in the
standard N.Y.P.E. withdrawal clause.

Leave to appeal to the High Court was refused by Staughton J. on 5
November 1982, when he gave, as I think unwisely, reasons for his

**1 A.C.**          Antaios Compania S.A. v. Salen A.B. (H.L.(E.))          **Lord Diplock**

A   decision, which take up four columns in [1983] 2 Lloyd's Rep. 473, 474.
A fortnight later, on 19 November 1982, the same learned judge gave
leave to appeal to the Court of Appeal [1983] 2 Lloyd's Rep. 473, 476
from his own refusal of leave to appeal to the High Court from the
arbitrators' award. Again, but as I think in this case less unwisely, he
gave his reasons for doing so. These will merit examination by your
Lordships later. Pursuant to such leave, the appeal from Staughton J.'s
B   decision was heard by the Court of Appeal who, on 8 July 1983
dismissed it by a majority (Sir John Donaldson M.R. and Fox L.J.;
Ackner L.J. dissenting) [1983] 1 W.L.R. 1362. They refused leave to
appeal to this House from their decision; so, in the result, at that stage
approximately one year after its date, the award, which was in any event
only an interim one, became final and conclusive on the issues which it
C   decided.

My Lords, the course followed in the proceedings in the Supreme
Court, illustrates the difficulty of preventing counsel instructed in
commercial arbitrations of the kinds to which section 4 of the Arbitration
Act 1979 applies, from indulging (no doubt in the supposed commercial
interests of their clients) in delaying tactics, so as to attain a similar
result to that which it had been possible to achieve before the passing of
D   the Act of 1979 by using the procedure of demanding that an award be
stated in the form of a special case whenever the contract sued upon
raised a question of construction that was arguable, however faint the
prospects of success.          .

Unless judges are prepared to be vigilant in the exercise of the
discretions conferred upon them by sections 1 and 2 of the Arbitration
E   Act 1979, including in section 1 the new subsection (6A) that was added
by section 148(2) of the Supreme Court Act 1981, they will allow to be
frustrated the intention of Parliament, as plainly manifested by changes
in procedure that these statutes introduced, to promote speedy finality in
arbitral awards rather than that insistence upon meticulous semantic and
syntactical analysis of the words in which business men happen to have
chosen to express the bargain made between them, the meaning of
F   which is technically, though hardly commonsensically, classified in
English jurisprudence as a pure question of law.

That such was Parliament's intention this House was at pains to
indicate in the analysis of the provisions of the Arbitration Act 1979
made in my own speech in *Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd.
(The Nema)* [1982] A.C. 724 in which the other members of the House
G   who were present at the hearing concurred. At that time the way in
which the parliamentary intention was being thwarted was by parties to
arbitrations applying for leave to appeal from any award that involved a
question that was even remotely arguable as to the construction of the
relevant contract, and by some, though not all, commercial judges
following a policy of granting leave in virtually all such cases, albeit
upon conditions as to provision of security for, or payment into court of,
H   the whole or a substantial part of the amount of the award. Accordingly,
although the Court of Appeal's judgment in the *The Nema* [1982] A.C.
724, reversing that of Robert Goff J. [1980] 2 Lloyd's Rep. 83 granting
leave to appeal from an arbitral award, appeared prima facie to an

**Lord Diplock**        Antaios Compania S.A. v. Salen A.B. (H.L.(E.))        **[1985]**

Appeal Committee of this House to be right, leave to appeal from that A
judgment was granted by this House in order to afford it an opportunity
of laying down guidelines as to the circumstances in which the statutory
discretion to grant leave to appeal from arbitral awards by section
1(3)(*b*) ought to be exercised.

From the general guidelines stated in the *The Nema* I see, as yet, no
reason for departing. Like all guidelines as to how judicial discretion
should be exercised they are not intended to be all-embracing or B
immutable, but subject to adaptation to match changes in practices when
these occur or to refinement to meet problems of kinds that were not
foreseen, and are not covered by, what was said by this House in the
*The Nema*. The instant case, too, in the view of an Appeal Committee
of this House, disclosed a need for some addition to the *The Nema*
guidelines particularly in relation to the practices to be followed upon C
the refusal by a commercial judge of leave to appeal to the High Court
from an arbitral award. It was for that purpose that, despite the
additional delay caused to the arbitrators' award in the instant case
becoming final, that leave to appeal was granted.

My Lords, the dispute that was submitted to arbitration was a typical
case of a shipowner seeking to find an excuse to bring a long-term time
charter to a premature end in a rising freight market. Stripped to its D
essentials the shipowners were seeking to rely upon the charterer's
breach of an innominate term in the charterparty relating to the
charterer's right (acting through their sub-sub-charterers) to issue bills of
lading on behalf of the master of the vessel, as constituting "any other
breach of this charter party" within the meaning of the N.Y.P.E.
withdrawal clause.                                                              E

The arbitrators decided this issue against the shipowners. The 78
pages in which they expressed their reasons for doing so contained an
interesting, learned and detailed dissertation on the law, so lengthy as to
be, in my view, inappropriate for inclusion in the reasons given by
arbitrators for an award. Their reasons can be adequately summarised as
being (1) that "any other breach of this charter party" in the withdrawal
clause means a repudiatory breach—that is to say: a fundamental breach F
of an innominate term or breach of a term expressly stated to be a
condition, such as would entitle the shipowners to elect to treat the
contract as wrongfully repudiated by the charterers, a category into
which in the arbitrators' opinion the breaches complained of did not fall,
and (2) that even if that were wrong, the word "on" immediately
preceding "any other breach" meant "within a reasonable time of" their
first knowledge of the breach; and the shipowners, in the arbitrators' G
opinion, had not given notice of withdrawal until after such reasonable
time had expired.

To the semantic analysis, buttressed by generous citation of judicial
authority, which led the arbitrators to the conclusions as to the
interpretation of the wording of the withdrawal clause that I have
summarised, the arbitrators' added an uncomplicated reason based H
simply upon business commonsense:

"We always return to the point that the owners' construction is
wholly unreasonable, totally uncommercial and in total contradiction

A        to the whole purpose of the N.Y.P.E. time charter form. The owners relied on what they said was 'the literal meaning of the words in the clause.' We would say that if necessary, in a situation such as this, a purposive construction should be given to the clause so as not to defeat the commercial purpose of the contract."

B        This passage in the award anticipates the approach to questions of construction of commercial documents that was voiced by this House in the very recent case, *Miramar Maritime Corporation v. Holborn Oil Trading Ltd.* [1984] A.C. 676, which dealt with a bill of lading issued under a charterparty in Exxonvoy 1969 form. There, after referring to various situations which might arise if the construction for which the shipowners in that case contended were correct, I added, at p. 682, in a speech concurred in by my fellow Law Lords:

C        "There must be ascribed to the words a meaning that would make good commercial sense if the Exxonvoy bill of lading were issued in *any* of these situations, and not some meaning that imposed upon a transferee to whom the bill of lading for goods afloat was negotiated, a financial liability of unknown extent that no business man in his senses would be willing to incur."

D        While deprecating the extension of the use of the expression "purposive construction" from the interpretation of statutes to the interpretation of private contracts, I agree with the passage I have cited from the arbitrators' award and I take this opportunity of re-stating that if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense,

E        it must be made to yield to business commonsense.

Leave to appeal to the High Court from the arbitrators' award was refused by Staughton J. In giving reasons for his refusal, as is apparently his habit, he regarded the award as raising two questions: that which I have numbered (1) which he regarded as a question of construction and thus of law; and that which I have numbered (2), viz., whether a reasonable time had expired before the notice of withdrawal was given,

F        which he regarded as one of fact for the arbitrators. The arbitrators' decision that a reasonable time had already expired before notice of withdrawal was given, even on the assumption that the breaches relied upon by the shipowners although not classifiable in law as being repudiatory, nevertheless had entitled the shipowners when they learnt of them to give notice of withdrawal provided it were prompt, had the

G        result that whichever way question (1) was decided it could not substantially affect the rights of any parties to the arbitration, and leave to appeal upon that point of law was therefore barred by section 1(4) of the Act of 1979.

Staughton J., however, indicated that but for the "reasonable time" point he would have been strongly minded to give leave to appeal on the construction of the N.Y.P.E. withdrawal clause since this was in a

H        standard form which is widely used and conflicting judicial dicta are to be found as to the meaning which the arbitrators had ascribed to the expression "any other breach of this charter party" appearing in the clause. Staughton J., however, noted in his reasons for refusing leave

that while there were alternative jurisprudential concepts from which the    A
requirement that notice of withdrawal should be given within a
reasonable time might be derived, i.e., "implied term" of the contract
and "waiver," both of which concepts had been referred to indifferently
by Lord Wilberforce in *Mardorf Peach & Co. Ltd. v. Attica Sea Carriers
Corporation of Liberia (The Laconia)* [1977] A.C. 850 (a case which
dealt only with withdrawal in default of punctual and regular payment of
the hire), whichever concept were applied to the facts of the instant case    B
it would lead to the same result; and although the arbitrators had
plumped for "implied term" and excluded "waiver," the grounds which
they said precluded the existence of waiver were in the view of
Staughton J. and of the majority of the Court of Appeal (which is also
shared by me) quite manifestly wrong.

In his judgment of 19 November 1982 [1983] 2 Lloyd's Rep. 473,    C
476, in which he gave to the shipowners leave under section 1(6A) of
the Act of 1979 to appeal to the Court of Appeal from his refusal on 5
November of leave to appeal to the High Court from the arbitrators'
award, Staughton J. ventured upon a classification of those kinds of
cases in which a High Court judge ought to give leave to appeal to the
Court of Appeal under that subsection and those kinds of cases in which
he ought not. The conclusion that he reached was that included in the    D
former class were cases where the decision whether or not to give leave
to appeal to the High Court, under section 1(3)(*b*) in the particular case
in the judge's view called for some amplification, elucidation or
adaptation to changing practices, of the guidelines that had previously
been laid down in appellate courts. The judgment of Parker J. in *B.V.S.
S.A. v. Kerman Shipping Co. S.A. (The Kerman)* [1982] 1 W.L.R. 166,    E
he cited as an example of a case that fell within this class. He expressed
his own view that if the judge took the view that upon a substantial and
arguable point of law arising in a "standard term" case that the
arbitrators so far from being probably wrong were on the contrary
probably right, he should refuse both leave to appeal to the High Court
under section 1(3)(*b*), and also leave to appeal to the Court of Appeal
from such refusal under section 1(6A). This, with respect, appears to me    F
to be in complete accord with *The Nema* guidelines [1982] A.C. 724; but
paradoxically, Staughton J. treated this statement as bringing his
judgment into *The Kerman* class [1982] 1 W.L.R. 166, and for that
reason he gave leave to appeal to the Court of Appeal under section
1(6A).

Since the judge had given leave under section 1(6A) and had given    G
the above-mentioned reason for doing so, the Court of Appeal was
faced with two distinct questions: the first, which I shall call "the (6A)
question" invited the court to lay down guidelines for judges to apply
when deciding whether or not to grant leave to appeal to the Court of
Appeal from their own decision to grant or refuse leave to appeal to the
High Court from an arbitral award; the second, which I shall call "the
(3)(*b*) question," required the Court of Appeal to determine whether or    H
not Staughton J.'s exercise of his discretion by refusing such leave in the
instant case could be shown to have been unreasonable in the
*Wednesbury* sense [*Associated Provincial Picture Houses Ltd.* v.

A   *Wednesbury Corporation* [1948] 1 K.B. 223] of that term or, since he had in his judgment of 5 November 1982, given reasons for his decision, it could be shown to be wrong on the principle stated by Lord Radcliffe in *Edwards v. Bairstow* [1956] A.C. 14, 36. On the (6A) questions *The Nema* [1982] A.C. 724 did not lay down any guidelines: on the (3)(*b*) question it did.

B   Because he had taken the view that the arbitrators were probably right on the question I have numbered (2) in their award, the "reasonable time" point, Staughton J. forebore to say whether or not he had himself formed any view as to whether the arbitrators had probably been right or had probably been wrong on the question I have numbered (1), the "repudiatory breach" point. Nevertheless, he said that he would have been strongly inclined to give leave had he not been debarred from

C   granting leave by section 1(4). In the Court of Appeal [1983] 1 W.L.R. 1362 it was common ground between counsel for all parties that: because there had been conflicting dicta in cases reported at first instance which indicated the existence of two schools of thought among commercial judges as to whether "any breach" in the withdrawal clause was confined to repudiatory breaches or embraced all breaches however trivial and whether known to the charterer or not, Staughton J. would have been

D   right to give leave to appeal to the High Court under section 1(3)(*b*), irrespective of whether he himself thought that the arbitrators were probably right in their acceptance of the repudiatory breach construction or thought that they were probably wrong. This common ground between counsel shaped the way in which the argument developed in the Court of Appeal. That it should have been accepted without

E   question illustrates not only the reluctance of the commercial Bar, to which I have earlier made reference, to abandon the practices and modify those attitudes of mind which had the effect of breeding litigation and delaying finality on arbitral awards to which the Bar had become accustomed before the Act of 1979. Its uncritical acceptance by the majority of the Court of Appeal illustrates also the need for judicial vigilance to ensure that the Bar does so.

F   Ackner L.J. in his dissenting judgment made effective play with this common ground, which he rightly characterised as being in conflict with *The Nema* guidelines. There were also conflicting dicta, he pointed out, that demonstrated the existence of two schools of thought on whether the jurisprudential basis of the rule that notice of withdrawal must be given in a reasonable time was that of implied term or waiver, and what

G   was a reasonable time in a particular case might depend upon which school was right.

  My Lords, I think that your Lordships should take this opportunity of affirming that the guideline given in *The Nema* [1982] A.C. 724, 743 that even in a case that turns on the construction of a standard term, "leave should not be given . . . unless the judge considered that a strong prima facie case had been made out that the arbitrator had been wrong

H   in his construction," applies even though there may be dicta in other reported cases at first instance which suggest that upon some question of the construction of that standard term there may among commercial judges be two schools of thought. I am confining myself to conflicting

dicta not decisions. If there are conflicting decisions, the judge should give leave to appeal to the High Court, and whatever judge hears the appeal should in accordance with the decision that he favours give leave to appeal from his decision to the Court of Appeal with the appropriate certificate under section 1(7) as to the general public importance of the question to which it relates; for only thus can be attained that desirable degree of certainty in English commercial law which section 1(4) of the Act of 1979 was designed to preserve.

Decisions are one thing; dicta are quite another. In the first place they are persuasive only, their persuasive strength depending upon the professional reputation of the judge who voiced them. In the second place, the fact that there can only be found dicta but no conflicting decisions on the meaning of particular words or phrases appearing in the language used in a standard term in a commercial contract, especially if, like the N.Y.P.E. withdrawal clause, it has been in common use for very many years, suggests either that a choice between the rival meanings of those particular words or phrases that are espoused by the conflicting dicta is not one which has been found in practice to have consequences of sufficient commercial importance to justify the cost of litigating the matter; or that business men who enter into contracts containing that standard term share a common understanding as to what those particular words and phrases were intended by them to mean.

It was strenuously urged upon your Lordships that wherever it could be shown by comparison of judicial dicta that there were two schools of thought among commercial judges on any question of construction of a standard term in a commercial contract, leave to appeal from an arbitral award which involved that question of construction would depend upon which school of thought was the one to which the judge who heard the application adhered. Maybe it would; but it is in the very nature of judicial discretion that within the bounds of "reasonableness" in the wide *Wednesbury* sense [1948] 1 K.B. 223 of that term, one judge may exercise the discretion one way whereas another judge might have exercised it in another; it is not peculiar to section 1(3)(*b*). It follows that I do not agree with Sir John Donaldson M.R. [1983] 1 W.L.R. 1362, 1369H–1370B where in the instant case he says that leave should be given under section 1(3)(*b*) to appeal to the High Court on a question of construction of a standard term upon which it can be shown that there are two schools of thought among puisne judges where the conflict of judicial opinion appears in dicta only. This would not normally provide a reason for departing from *The Nema* guideline [1982] A.C. 724 which I have repeated earlier in this speech.

Staughton J. was accordingly right in applying those guidelines to the "reasonable time" point despite the existence of judicial dicta which indicated that there were two schools of thought as to the juristic basis of the requirement that notice of withdrawal should be given within a reasonable time, the "implied term" school and the "waiver" school which, in some cases, might make a difference as to what amounted to "a reasonable time" but did not in the instant case, because the facts found by the arbitrators which they considered excluded "waiver" were not capable in law of doing so. If, on the contrary, he had formed the

A    view that a strong prima facie case had been made out that the arbitrators had been wrong on the "reasonable time" point, so that their decision one way or the other on the repudiatory breach point would substantially affect the rights of the parties to the arbitration agreement, it would have been necessary for Staughton J. to make up his own mind whether a strong prima facie case had been made out that the arbitrators had also been wrong on the "repudiatory breach" point. If such had

B    been his opinion it would have been a proper exercise of his discretion to grant leave to appeal from the arbitral award to the High Court under section 1(3)(*b*). In the event, however, since this was not a matter to which the reasons in his judgment of 5 November 1982 reveal that he ever gave his mind, your Lordships would not be trespassing on the field of a discretion that a judge upon whom it was conferred had in fact

C    exercised if you were to take this opportunity of stating, consistently with the recent decision of this House in *Miramar Maritime Corporation v. Holborn Oil Trading Ltd.* [1984] A.C. 676, as to semantic and syntactical analysis yielding to business commonsense in the construction of commercial documents, that the arbitrators in the passage in their award that I have cited earlier were not obviously wrong but were obviously right in their decision on the "repudiatory breach" question.

D    This brings me to the "(6A) question" canvassed in Staughton J.'s second judgment of 19 November 1982: when should a judge give leave to appeal to the Court of Appeal from his own grant or refusal of leave to appeal to the High Court from an arbitral award? I agree with him that leave to appeal to the Court of Appeal should be granted by the judge under section 1(6A) only in cases where a decision whether to

E    grant or to refuse leave to appeal to the High Court under section 1(3)(*b*) in the particular case in his view called for some amplification, elucidation or adaptation to changing practices of existing guidelines laid down by appellate courts; and that leave to appeal under section 1(6A) should *not* be granted in any other type of case. Judges should have the courage of their own convictions and decide for themselves whether, applying existing guidelines, leave to appeal to the High Court under

F    section 1(3)(*b*) ought to be granted or not.

In the sole type of case in which leave to appeal to the Court of Appeal under section 1(6A) may properly be given the judge ought to give reasons for his decision to grant such appeal so that the Court of Appeal may be informed of the lacuna, uncertainty or unsuitability in the light of changing practices that the judge has perceived in the

G    existing guidelines; moreover since the grant of leave entails also the necessity for the application of *Edwards v. Bairstow* [1956] A.C. 14 principles by the Court of Appeal in order to examine whether the judge had acted within the limits of his discretion, the judge should also give the reasons for the way in which he had exercised his discretion.

However, save in the exceptional case in which he does give leave to appeal to the Court of Appeal under section 1(6A) because it falls

H    within this limited category, a judge ought not normally to give reasons for a grant or refusal under section 1(3)(*b*) of leave to appeal to the High Court from an arbitral award. He should follow the practice that has been adopted in your Lordships' House ever since a would-be

appellant from a judgment of the Court of Appeal was required to    A
petition this House for leave to appeal to it when leave to do so had not
been granted by the Court of Appeal itself. It has been the practice of
this House at the close of the short oral argument on the petition, to say
no more than that the petition is allowed or refused as the case may be.

Save in very exceptional circumstances which I find myself unable at
present to foresee, I can see no good reason why a commercial judge in
disposing of an application under section 1(3)(*b*) should do more than    B
that, and several good reasons why he should not. In the first place, he
is not himself deciding at this stage the question of law arising out of the
award which usually involves a question of construction of a commercial
contract. He is simply deciding whether the case is of a kind that is
recognised, under the current guidelines laid down by appellate courts,
as suitable to be admitted to appeal. In the second place, it adds to the    C
already excessive volume of reported judicial semantic and syntactical
analysis of particular words and phrases appearing in commercial
contracts which judges are inveigled to indulge in by the detailed oral
arguments which it appears to be current practice to allow on applications
under section 1(3)(*b*); whereas all that the judge has to decide on the
application is: first, is this dispute, on the one hand, about a one-off
clause or event, or, on the other hand, about a standard term or an    D
event which is a common occurrence in the trade or commercial activity
concerned? If it is the former, he must then consider: whether the
arbitrator was in the judge's view so obviously wrong as to preclude the
possibility that he might be right; if it is the latter, he must then
consider whether a strong prima facie case has been made out that the
arbitrator was wrong? Unless the answer he would give to the question    E
appropriate to the type of case to which the application with which he is
concerned is: "Yes," he should refuse leave to appeal.

The proliferation of reported judicial statements made in applications
under section 1(3)(*b*), which are refused, that become available for
subsequent citation in argument in cases where the actual question of
law that arose in the arbitration does fall to be decided by the court
itself, may have been mitigated since the date of Parker J.'s judgment in    F
*The Kerman* [1982] 1 W.L.R. 166 by the change in practice in the
hearing of applications under section 1(3)(*b*), from hearings on motion
in open court to hearings in chambers; but your Lordships have been
informed that this has not prevented judges from allowing to have
inflicted on them on such applications protracted arguments by counsel
which frequently extend over two or three days.    G

My Lords, to permit such prolonged and therefore costly arguments
on applications for leave to appeal to the High Court under section
1(3)(*b*), assists in frustrating the policy of Parliament in enacting the Act
of 1979. As respects the extent to which detailed argument should be
tolerated on such applications, too, it is appropriate that the practice of
this House in dealing with petitions for leave to appeal from judgments
of the Court of Appeal in civil actions should be followed. In the first    H
instance, a three-member Appeal Committee of the House peruses the
judgments delivered in the courts below and the grounds set out in the
written petition for leave to appeal that are relied upon by the petitioner

A    as making the case one in which leave ought to be granted. Upon this material the members of the Appeal Committee, if they are all three of opinion that the petition could not possibly succeed, may dismiss it ex parte without requiring or permitting any oral argument; but this is exceptional; generally a brief oral hearing inter partes is permitted of which the average duration is ten to fifteen minutes; the parties are not allowed to use the hearing as an opportunity to argue the appeal that is

B    the subject of the petition. The only question to be determined is whether the case in which leave to appeal is sought is of such a nature that it ought to be re-argued in this House instead of leaving the judgment appealed from as the final judgment in the case. If argument of this length is found to be adequate by the House of Lords to enable it to decide a question whether leave to appeal ought to be given, it

C    should be good enough for commercial judges who have to make up their minds upon a similar question where the criteria as to whether to grant leave or not are, under *The Nema* guidelines [1983] A.C. 724, less complex than those applicable to the grant of leave to appeal to this House from judgments of the Court of Appeal.

In *The Kerman* [1982] 1 W.L.R. 166, Parker J. pointed out that the passage in *The Nema* guidelines dealing with cases concerned with the

D    construction of a "one-off" clause it appeared to be contemplated by this House that applications in such cases would normally be dealt with on the papers alone. It is correct that it was contemplated that a painstaking perusal of the award and the reason set out in the application as constituting the grounds why leave to appeal should be granted, would play the major part in the decision-making process of the commercial

E    judge; but not so as to preclude subsequent brief oral argument limited to the question whether the grant of leave would fall within *The Nema* guidelines to the exclusion of any anticipatory argument directed to the merits of the appeal if leave should be granted.

My Lords, it may be, as your Lordships have found in the course of exercising the analogous jurisdiction of an Appeal Committee of this House, that there are occasionally applications for leave to appeal under

F    section 1(3)(*b*) that are so hopeless that they can be properly disposed of by a refusal made ex parte on the papers alone without incurring the delay and expense of an oral hearing. The introduction of any such procedure to deal with obviously hopeless applications would be a matter for the Rules Committee rather than your Lordships so I limit myself to the suggestion that it may be worthy of consideration by that

G    committee.

I would dismiss the appeal.

LORD KEITH OF KINKEL. My Lords, I have had the benefit of reading in draft the speech of my noble and learned friend, Lord Diplock. I agree with it, and for the reasons he gives I too would dismiss the appeal. I also agree with the supplementary observations of my noble

H    and learned friend, Lord Roskill.

LORD SCARMAN. My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Diplock and

Lord Scarman        Antaios Compania S.A. v. Salen A.B. (H.L.(E.))        [1985]

Lord Roskill. I agree with them, and for the reasons they give, I also    A
would dismiss the appeal.

LORD ROSKILL. My Lords, I have had the advantage of reading in
draft the speech of my noble and learned friend, Lord Diplock. I agree
with it in all respects and I would dismiss this appeal for the reasons he
gives. I add some observations of my own only to reinforce what my    B
noble and learned friend has said regarding the stopping, as a matter of
urgency, of practices which your Lordships were told have recently
grown up in connection with the hearing of applications for leave to
appeal against arbitral awards and which if allowed to continue
unchecked can only have the effect of what my noble and learned friend
has called "frustrating the intention of Parliament" in enacting the
Arbitration Act 1979.                                                   C
My noble and learned friend has referred to and indeed quoted from
his speech in *The Nema* [1982] A.C. 724. I venture to repeat what I said
in my own speech in that case, at pp. 745–746, in expressing my
agreement with what he had already said:

> "I entirely agree with [that speech] and respectfully adopt the
> criticisms which he has made of the several judgments of Robert    D
> Goff J. on this question in the instant case and in two subsequent
> cases . . . in which that learned judge felt free not to follow the
> decision of the Court of Appeal in the instant case. I would only
> add with profound respect to Robert Goff J. that if that learned
> judge's view were allowed to prevail I find it difficult to see what
> useful purpose has been served by the passing of the Act of 1979    E
> which had as one of its primary targets the abolition of the special
> case since it seems to me that if leave to appeal from an arbitral
> tribunal to the High Court is to be given in accordance with the
> principles which the learned judge there enunciated, the notoriously
> unsatisfactory results to which special cases have given rise in recent
> years will be perpetuated albeit in a different form."

My Lords, I see no reason to depart from a single word of what I    F
then said. But unhappily the warnings uttered in that case do not appear
to have had the intended effect and must now, I fear, be repeated.
One purpose of arbitration, especially in commercial disputes, is the
avoidance of delays, traditionally if often unfairly associated with the
judicial process. The award of an arbitral tribunal can, it is supposed, be
obtained swiftly and simply and without elaboration. Unhappily, the    G
former virtually unrestricted right to demand a special case from arbitral
tribunals made these admirable objectives almost impossible of
attainment. The arbitral process became even more protracted than the
judicial, with one or sometimes, as in commodity trade arbitrations, two
extra tiers of tribunal added below the High Court, the Court of Appeal
and your Lordships' House. The resultant abuse was notorious. Hence
the demand for the abolition of the special case successfully accomplished    H
in 1979. But if the restricted appellate system substituted for the special
case and the equally outdated motion to set aside an award for error of
law on its face, is to be operated in such a way as to make appeals to

A    the High Court, and even beyond the High Court, readily available, not only are the worst features of the system now abolished restored but the additional, albeit not unrestricted autonomy, of arbitral tribunals which the Act of 1979 was designed to establish, seriously hampered. Moreover, with all respect to the three arbitrators in the present case, whose lengthy reasons for their award I have read with admiration for their legal learning, if reasons for which the Act of 1979 makes provision are

B    to be given with such elaboration, the very preparation of those reasons must itself defeat the possibility of obtaining speedy arbitral decisions, independently of any question of further delay brought about by a possible appeal or appeals. In general, businessmen are interested in the decision, not in its underlying legal philosophy, however much lawyers may have that wider interest.

C    It is for these reasons, in addition to those which my noble and learned friend, Lord Diplock, has given that I respectfully endorse every word that he has said as to the need for circumspection as well as brevity in the granting of leave to appeal and for applications for such leave, whether successful or unsuccessful, to be dealt with as simply and informally as possible. I also entirely agree with what he has said regarding leave to appeal from the High Court to the Court of Appeal.

D    Returning to the instant case, like my noble and learned friend, I entertain no doubt whatever that the arbitrators were "obviously right in their decision on the 'repudiatory breach' point." For that reason and because Staughton J. rightly thought that the findings of fact on "the reasonable time" point concluded the matter, I think that this application for leave to appeal should have been rejected by the learned judge out

E    of hand.

LORD BRANDON OF OAKBROOK. My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Diplock and Lord Roskill. I agree with both of them entirely, and for the reasons which they give, I would dismiss the

F    appeal.

*Appeal dismissed.*

*Solicitors: Vincent Stokes French & Browne; Richards Butler & Co.*

G    J. A. G.

H    ———

LC/8

2900

**Rainy Sky SA v Kookmin Bank (SC(E))**                    [2011] 1 WLR

Supreme Court                                    *A*

## *Rainy Sky SA v Kookmin Bank*

### [2011] UKSC 50

2011 July 27;        Lord Phillips of Worth Matravers PSC, Lord Mance,
Nov 2              Lord Kerr of Tonaghmore, Lord Clarke of        *B*
                   Stone-cum-Ebony, Lord Wilson JJSC

*Contract — Construction — Performance bond — Advance payment bonds issued in*
  *respect of shipbuilding contracts — Shipbuilder experiencing financial difficulty*
  *and subjected to debt work-out procedure — Claimant buyers demanding*
  *repayment of instalments already paid to shipbuilder under terms of contracts —*
  *Shipbuilder refusing to repay instalments — Buyers claiming repayment under*    *C*
  *bonds — Whether bonds covering sums to which buyers claiming entitlement to*
  *repayment — Whether considerations of commercial common sense relevant in*
  *construing contractual terms*

  A shipbuilder entered into six contracts to build and sell a vessel to each of the
first six claimants. The purchase price of each vessel was payable in five equal
instalments at specified times with the final instalment being paid on delivery. It was
a term of the contract that as a condition precedent to the payment of the first       *D*
instalment the shipbuilder would give the buyers refund guarantees relating to the
instalments. In accordance with that term the defendant bank issued each claimant
with advance payment bonds. After the six claimants had paid the first instalment
and the first claimant had paid the second instalment, the shipbuilder experienced
financial difficulties and became the subject of a debt work-out procedure. The
shipbuilder refused to refund the instalments paid. The first six claimants together
with the seventh claimant who was the assignee of the benefit of the bonds, brought   *E*
proceedings against the bank claiming repayment under paragraph 3 of the bonds of
the instalments paid to the shipbuilder, and issued an application for Part 24
summary judgment. The bank refused to pay on the grounds that paragraph 3 had to
be read with paragraph 2 and on its true construction paragraph 3 did not cover the
refunds which the six claimants sought, but covered pre-delivery instalments prior to
the termination of the contract or a total loss of the vessel. The defendant issued a
counter application for Part 24 summary judgment. The judge in the Commercial       *F*
Court held that the construction of paragraph 3 of the bonds contended for by the
bank would have an uncommercial result and gave summary judgment for the
claimants. The bank appealed but conceded that the two different interpretations
of paragraph 3 advanced by the bank and by the claimants were both arguable.
The Court of Appeal held, by a majority, that the construction contended for by the
bank would not produce an absurd or irrational result and that it was not sufficient to
say that no credible commercial reason had been advanced for the limited scope of    *G*
the bonds as that would put the court in danger of substituting its own judgment of
the commerciality of the transaction for that of the parties. Accordingly, the Court
of Appeal allowed the appeal and gave summary judgment for the bank.
  On appeal by the claimants—
  *Held*, allowing the appeal, that the ultimate aim of interpreting a provision in a
contract, especially a commercial contract, was to determine what the parties meant
by the language used, and that involved ascertaining what a reasonable person would   *H*
have understood the parties to have meant; that the relevant reasonable person for
that purpose was one who had all the background knowledge which would
reasonably have been available to the parties in the situation in which they were at
the time of the contract; that where the parties had used unambiguous language the
court had to apply it, but it was not necessary to conclude that unless the most

A    natural meaning of the words produced a result so extreme as to suggest that it was unintended, the court had to give effect to that meaning; that the court had to have regard to all the relevant surrounding circumstances and if there were two possible constructions the court was entitled to prefer the construction which was consistent with business common sense and to reject the other; that it was not necessary to conclude that a particular construction would have an absurd or irrational result before having regard to the commercial purpose of the agreement; that since the two

B    possible interpretations of paragraph 3 contended for by the claimants and by the bank were both arguable, it was appropriate for the court to have regard to considerations of commercial common sense in resolving the question as to what a reasonable person would have understood the parties to have meant; that an appellate court was also entitled to take account of the fact that an experienced judge of the Commercial Court had concluded that the bank's construction would have an uncommercial result; that of the two arguable constructions of paragraph 3 the

C    claimants' construction was to be preferred because it was consistent with the commercial purpose of the bonds in a way that the bank's construction was not; and that, accordingly, the judge's order would be restored ( post, paras 14, 20, 21, 23, 29, 30, 40–47).

     *Co-operative Wholesale Society Ltd v National Westminster Bank plc* [1995] EGLR 97, CA, *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] 2 All ER (Comm) 299, CA and *Barclays Bank plc v HHY Luxembourg SARL* [2011] 1 BCLC 336, CA considered.

D      Decision of the Court of Appeal [2010] EWCA Civ 582; [2011] 1 All ER (Comm) 18 reversed.

The following cases are referred to in the judgment of Lord Clarke of Stone-cum-Ebony JSC:

*Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios)* [1985] AC 191; [1984] 3 WLR 592; [1984] 3 All ER 229, HL(E)

E   *Barclays Bank plc v HHY Luxembourg SARL* [2010] EWCA Civ 1248; [2011] 1 BCLC 336, CA

*Chartbrook Ltd v Persimmon Homes Ltd (Chartbrook Ltd Part 20 defendants)* [2009] UKHL 38; [2009] AC 1101; [2009] 3 WLR 267; [2009] Bus LR 1200, HL(E)

*Co-operative Wholesale Society Ltd v National Westminster Bank plc* [1995] 1 EGLR 97, CA

F   *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] EWCA Civ 1047; [2001] 2 All ER (Comm) 299; [2001] CLC 1103, CA

*Golden Key Ltd, In re* [2009] EWCA Civ 636, CA

*Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2003] UKHL 12; [2004] 1 AC 715; [2003] 2 WLR 711; [2003] 2 All ER 785, HL(E)

*International Fina Services AG v Katrina Shipping Ltd (The Fina Samco)* [1995] 2 Lloyd's Rep 344, CA

G   *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896; [1998] 1 All ER 98, HL(E)

*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749; [1997] 2 WLR 945; [1997] 3 All ER 352, HL(E)

*Pink Floyd Music Ltd v EMI Records Ltd (Practice Note)* [2010] EWCA Civ 1429; [2011] 1 WLR 770, CA

*Prenn v Simmonds* [1971] 1 WLR 1381; [1971] 3 All ER 237, HL(E)

H   *Sigma Finance Corpn, In re* [2009] UKSC 2; [2010] 1 All ER 571, SC(E)

*Society of Lloyd's v Robinson* [1999] 1 WLR 756; [1999] 1 All ER (Comm) 545

*Wickman Machine Tool Sales Ltd v L Schuler AG* [1974] AC 235; [1973] 2 WLR 683; [1973] 2 All ER 39, HL(E)

No additional cases were cited in argument.

2902
**Rainy Sky SA v Kookmin Bank (SC(E))**                    [2011] 1 WLR
Lord Clarke of Stone-cum-Ebony JSC

**APPEAL** from the Court of Appeal                                                        A

On 8 August 2009 the claimants, Rainy Sky SA, Seiland Shipping and
Trading Co, Islay Navigation Inc, Seapride Navigation Corpn, Seabrize Ltd,
Recif Corpn and Metrobulk Holdings SA, issued a claim form commencing
an action against the defendant, Kookmin Bank, for US$46,620,000 paid to
Jinse Shipbuilding Co Ltd under a shipbuilding contract. On 2 September
2009 the claimants issued an application for CPR Pt 24 summary judgment.
On 30 September 2009 the defendant issued a counter application for            B
Part 24 summary judgment. On 29 October 2009, Simon J, sitting in the
Commercial Court of the High Court [2009] EWHC 2624 (Comm); [2010]
1 All ER (Comm) 823, gave summary judgment for the claimants in the sum
of US$46,620,000 plus interest. On 27 May 2010, the Court of Appeal
(Thorpe and Patten LJJ, Sir Simon Tuckey dissenting) [2011] 1 All
ER (Comm) 18 allowed the defendant's appeal and gave summary judgment          C
for the defendant. By permission granted by the Supreme Court (Lord
Phillips of Worth Matravers, Lord Mance and Lord Clarke of Stone-cum-
Ebony) on 26 July 2010 the claimants appealed to the Supreme Court.

The facts are stated in the judgment of Lord Clarke of Stone-cum-Ebony.

*Mark Howard QC* and *Michael Ashcroft QC* (instructed by *Ince & Co
LLP*) for the claimants.                                                        D

*Guy Philipps QC* and *James Cutress* (instructed by *Linklaters*) for the
bank.

The court took time for consideration.

2 November 2011. **LORD CLARKE OF STONE-CUM-EBONY JSC**                         E
(with whom **LORD PHILLIPS OF WORTH MATRAVERS PSC, LORD
MANCE, LORD KERR OF TONAGHMORE** and **LORD WILSON JJSC**
agreed) handed down the following judgment.

*Introduction and factual background*

1 This appeal raises a short question of construction of shipbuilder's
refund guarantees given pursuant to six shipbuilding contracts ("the
contracts"). The contracts, which were all dated 11 May 2007, were         F
between each of the first to sixth claimants ("the buyers") and Jinse
Shipbuilding Co Ltd ("the builder"). Under the contracts the builder agreed
to build and sell one vessel to each of the buyers. The price of each vessel
was US$33,300,000, payable in five equal instalments of US$6,660,000 due
at specified points of time, with the final instalment payable on delivery.
By article X.8 of the contracts it was a condition precedent to payment by    G
the buyers of the first instalment that the builder would deliver to the buyers
refund guarantees relating to the first and subsequent instalments in a form
acceptable to the buyers' financiers. As envisaged by article X.8, by letter
dated 22 August 2007 the respondent, Kookmin Bank ("the bank"), issued
six materially identical "advance payment bonds" ("the bonds"), one to each
of the buyers. The seventh claimant ("the assignee") is the assignee of the
benefit of the bonds.                                                          H

2 On 29 August 2007, the buyers each paid the first instalment of
US$6,660,000 due under the contracts. On 29 September 2007, the first
claimant paid the second instalment of US$6,660,000 under the contract to
which it is a party.

2903

A    3   In 2008 the builder experienced financial difficulties and in late
January 2009 it entered into and/or became subject to a debt work-out
procedure under the Korean Corporate Restructuring Promotion Law 2007.
On 25 February 2009 the buyers wrote to the builder notifying it that this
development triggered article XII.3 of the contracts and demanding an
immediate refund of all the instalments paid, together with interest at 7% per
B    annum.     The builder refused to make any refund on the ground that
article XII.3 of the contracts had not been triggered as alleged.  The dispute
between the buyers and the builder has been submitted to arbitration
pursuant to article XIV.3 of the contracts.

    4   On 23 April 2009, the buyers wrote to the bank demanding
repayment under the bonds of the instalments paid under the contracts.  The
bank refused to pay.  It did so initially on the ground that it was not obliged
C    to pay pending resolution of the dispute between the buyers and the builder.
That argument was subsequently rejected by Simon J ("the judge") [2009]
EWHC 2624 (Comm); [2010] 1 All ER (Comm) 823 and there was no
appeal to the Court of Appeal against that part of his order.  The bank
subsequently raised a separate, and logically prior, argument that, on their
true construction, the bonds did not cover refunds to which the buyers were
entitled pursuant to article XII.3 of the contracts.
D    5   That argument was also rejected by the judge, who gave summary
judgment for the assignee, but succeeded in the Court of Appeal, which gave
summary judgment for the bank against the buyers and the assignee.  In the
Court of Appeal Sir Simon Tuckey agreed with the judge but the majority,
comprising Thorpe and Patten LJJ, held the bank's argument to be correct:
[2011] 1 All ER (Comm) 18.  The orders of the judge and the Court of
E    Appeal were made on 29 October 2009 and 27 May 2010 respectively.
The Court of Appeal refused permission to appeal.

    6   The buyers appeal to this court pursuant to permission granted by the
court.  The issue is whether, on the true construction of paragraph 3 of the
bonds, the buyers are entitled to payment under the bonds in respect of
refunds to which they are entitled under article XII.3 of the contracts.
F    No one suggested that the successful parties should not have summary
judgment in their favour.

*The bonds*

    7   I begin with the bonds because it was common ground that all
depends upon the true construction of the bonds and that the terms and
meaning of the contracts are only relevant to the extent that they inform the
G    true construction of the bonds.  The paragraphs in the letter comprising the
bonds were not numbered but both the judge and the Court of Appeal
referred to them by number for convenience of reference and I will do the
same.  As so numbered the relevant parts of each bond were these:

    "1. We refer to the . . . contract entered into between . . . the builder
and yourselves for the construction and delivery of . . . the 'vessel' to be
H    delivered before [31 July 2009].  Other terms and expressions used in this
bond shall have the same meaning as in the contract, a copy of which has
been provided to us.

    "2. Pursuant to the terms of the contract, you are entitled, upon your
rejection of the vessel in accordance with the terms of the contract,

your termination, cancellation or rescission of the contract or upon a   *A*
total loss of the vessel, to repayment of the pre-delivery instalments of the
contract price paid by you prior to such termination or a total loss of the
vessel (as the case may be) and the value of the buyer's supplies delivered
to the shipyard (if any) together with interest thereon at the rate of . . .
(7%) per annum (or . . . (10%) per annum in the case of a total loss of the
vessel) from the respective dates of payment by you of such instalments to   *B*
the date of remittance by telegraphic transfer of such refund.

"3. In consideration of your agreement to make the pre-delivery
instalments under the contract and for other good and valuable
consideration (the receipt and adequacy of which is hereby
acknowledged), we hereby, as primary obligor, irrevocably and
unconditionally undertake to pay to you, your successors and assigns, on
your first written demand, all such sums due to you under the contract (or   *C*
such sums which would have been due to you but for any irregularity,
illegality, invalidity or unenforceability in whole or in part of the
contract) *provided that* the total amount recoverable by you under this
bond shall not exceed [US$26,640,000] . . . plus interest thereon at
the rate of . . . (7%) per annum (or . . . (10%) per annum in the case of a
total loss of the vessel) from the respective dates of payment by you of   *D*
such instalments to the date of remittance by telegraphic transfer of such
refund.

"4. Payment by us under this bond shall be made without any
deduction or withholding, and promptly on receipt by us of a written
demand (substantially in the form attached) signed by two of your
directors stating that the builder has failed to fulfil the terms and
conditions of the contract and as a result of such failure, the amount   *E*
claimed is due to you and specifying in what respects the builder has so
failed and the amount claimed. Such claim and statement shall be
accepted by us as evidence for the purposes of this bond alone that this
amount claimed is due to you under this bond.

"5. Our liability under this bond shall not be affected by . . . (v) any
insolvency, re-organisation or dissolution of the builder, or (vi) any other   *F*
matter or thing which may operate to discharge or reduce our liability
hereunder . . ."

8   The bonds further provided that they were assignable, that they were
governed by English law and that all disputes arising out of them were to be
determined by the Commercial Court.

9   The resolution of the issue between the parties depends upon the true   *G*
construction of paragraph 3. The bank promised to pay on demand "all
such sums due to you under the contract". The question is what was meant
by "such sums". Only two possibilities were suggested. The buyers said
(and the judge and Sir Simon Tuckey held) that the expression "such sums"
referred back to the "pre-delivery instalments" in the first line. They said
that the purpose of the bond was to guarantee the refund of pre-delivery
instalments and that the promise was therefore to refund pre-delivery   *H*
instalments. By contrast the bank said (and Thorpe and Patten LJJ held) that
the expression "such sums" was a reference back to the sums referred to in
paragraph 2, namely the repayment of the pre-delivery instalments paid
prior to a termination of the contract or a total loss of the vessel and the

2905

A   value of the buyer's supplies in the case of a total loss. On the buyers'
analysis the bond guaranteed pre-delivery instalments which were repayable
under article XII.3 in the case of any insolvency event, whereas on the bank's
analysis it did not.

*The contracts*

B   10   It is common ground that the terms of the contracts are relevant to
the true construction of the bonds. They are referred to in the bonds and
provide the immediate context in which the bonds were entered into. They
are thus plainly an important aid to the meaning of the bonds.

11   Article X of the contracts provided, so far as material, as follows:

"*Article X: Payment*

"Refund by the builder

C   "5 . . . The payments made by the buyer to the builder prior to delivery
of the vessel shall constitute advances to the builder. If the vessel is
rejected by the buyer in accordance with the terms of this contract, or if
the buyer terminates, cancels or rescinds this contract pursuant to any of
the provisions of this contract specifically permitting the buyer to do
so, the builder shall forthwith refund to the buyer in US dollars, the full
D   amount of total sums paid by the buyer to the builder in advance of
delivery together with interest thereon as herein provided within thirty
(30) banking days of acceptance of rejection . . . The interest rate of the
refund . . . shall be seven per cent (7%) per annum . . . If the builder is
required to refund to the buyer the instalments paid by the buyer to the
builder as provided in this paragraph, the builder shall return to the buyer
E   all of the buyer's supplies as stipulated in article XIII which were not
incorporated into the vessel and pay to the buyer an amount equal to the
cost to the buyer of those buyer's supplies incorporated into the vessel.

"Total loss

6. If there is a total loss or a constructive total loss of the vessel prior to
delivery thereof, the builder shall proceed according to the mutual
F   agreement of the parties hereto either: (a) to build another vessel in place
of the vessel so lost . . . provided that the parties hereto shall have agreed
in writing to a reasonable cost and time for the construction . . . or (b) to
refund to the buyer the full amount of the total sums paid by the buyer to
the builder under the provisions of paragraph 2 of this article and the
value of buyer's supplies delivered to the shipyard, if any, together with
G   interest thereon at the rate of ten percent (10%) per annum . . . If the
parties hereto fail to reach such agreement within two (2) months after
the vessel is determined to be a total loss or constructive total loss, the
provisions of (b) herein above shall be applied . . ."

"Refund guarantee

"8. The builder shall as a condition precedent to payment by the buyer
of the first instalment deliver to the buyer an assignable letter of guarantee
H   issued by a first class Korean bank . . . to buyer's financiers for the refund
of the first instalment, and at the same time, together with the letter of
guarantee relating to the first instalment, builder shall also deliver to the
buyer an assignable letter of guarantee issued by a first class Korean
bank . . . for the refund of the respective instalments following the way of

2906
**Rainy Sky SA v Kookmin Bank (SC(E))**                    [2011] 1 WLR
**Lord Clarke of Stone-cum-Ebony JSC**

the payment stipulated in this article. The refund guarantees by the    A
builder to the buyer shall be indicated pre-delivery instalments plus
interest as aforesaid to the buyer under or pursuant to paragraph 5 above
in the form annexed hereto as exhibit 'A' which is yet to be agreed . . .
In the event that the refund guarantees, for all instalments, have not been
provided to the buyer in a form acceptable to the buyer's financiers and
have not been issued by an entity acceptable to buyer's financiers, by the    B
31st of August 2007 then the buyer may cancel this contract without
penalty on either side."

It is common ground that no form of guarantee was in fact annexed to the
contracts.

12   Article XII provided, so far as relevant:

   "*Article XII: Builders default*                                         C

   "3. If the builder shall apply for or consent to the appointment of a
receiver, trustee or liquidator, shall be adjudicated insolvent, shall apply
to the courts for protection from its creditors, file a voluntary petition in
bankruptcy or take advantage of any insolvency law, or any action shall
be taken by the builder having an effect similar to any of the foregoing or
the equivalent thereof in any jurisdiction, the buyer may by notice in
writing to the builder require the builder to refund immediately to the    D
buyer the full amount of all sums paid by the buyer to the builder on
account of the vessel and interest thereon at seven per cent (7%) per
annum on the amount to be refunded to the buyer, computed from the
respective date such sums were paid by the buyer to the date of remittance
of the refundable amount to the buyer and immediately upon receipt of
such notice the builder shall refund such amount to the buyer. Following    E
such refund the builder may, but shall not be obliged to, by notice in
writing to the buyer given within ten (10) business days terminate this
contract. If the builder does not so terminate the contract the buyer's
obligation to pay further instalments prior to delivery of the vessel under
article X 2(a), (b), (c) and (d) shall be suspended and the full contract
price shall be paid to the builder upon delivery of the vessel in the manner    F
contemplated by article X paragraph 2(e)."

13   The contracts contained a number of provisions which entitled the
buyer to cancel the contract, namely articles III.1 and XII.1 (delay) and
article III.2(b), 3(c), 4(d) and 5(d) (insufficient speed, excessive fuel
consumption, deficient deadweight or cargo capacity). Some of those
provisions specifically entitled the buyer to a refund of all advance payments
following cancellation. Others did not, although in such cases article X.5    G
would apply and have the same effect. The contracts also contained in
article XIII further detailed provisions relating to buyer's supplies.

*The correct approach to construction*

14   For the most part, the correct approach to construction of the bonds,    H
as in the case of any contract, was not in dispute. The principles have
been discussed in many cases, notably of course, as Lord Neuberger of
Abbotsbury MR said in *Pink Floyd Music Ltd v EMI Records Ltd* [2010]
EWCA Civ 1429, para 17, by Lord Hoffmann in *Mannai Investment Co Ltd
v Eagle Star Life Assurance Co Ltd* [1997] AC 749, passim, in *Investors*

2907
[2011] 1 WLR                                      Rainy Sky SA v Kookmin Bank (SC(E))
                                                  Lord Clarke of Stone-cum-Ebony JSC

A   *Compensation Scheme Ltd v West Bromwich Building Society* [1998]
    1 WLR 896, 912F–913G and in *Chartbrook Ltd v Persimmon Homes Ltd
    (Chartbrook Ltd Part 20 defendants)* [2009] AC 1101, paras 21–26. I agree
    with Lord Neuberger (also at para 17) that those cases show that
    the ultimate aim of interpreting a provision in a contract, especially a
    commercial contract, is to determine what the parties meant by the language
B   used, which involves ascertaining what a reasonable person would have
    understood the parties to have meant. As Lord Hoffmann made clear in the
    first of the principles he summarised in the *Investors Compensation Scheme*
    case [1998] 1 WLR 896, 912H, the relevant reasonable person is one who
    has all the background knowledge which would reasonably have been
    available to the parties in the situation in which they were at the time of the
    contract.

C   15   The issue between the parties in this appeal is the role to be played by
    considerations of business common sense in determining what the parties
    meant. Sir Simon Tuckey said, at para 19 of his judgment, that there was no
    dispute about the principles of construction and the bank so submitted in its
    skeleton argument. However, I do not think that is quite correct.

    16   At para 18 Sir Simon identified the question of construction,
D   substantially as set out in para 9 above, and said, at para 19:

    "There is no dispute about the principles of construction to be applied
    in order to answer this question. The court must first look at the words
    which the parties have used in the bond itself. The shipbuilding contract
    is of course the context and cause for the bond but is nevertheless a
    separate contract between different parties. If the language of the bond
E   leads clearly to a conclusion that one or other of the constructions
    contended for is the correct one, the court must give effect to it, however
    surprising or unreasonable the result might be. But if there are two
    possible constructions, the court is entitled to reject the one which is
    unreasonable and, in a commercial context, the one which flouts business
    common sense. This follows from the House of Lords decisions in
F   *Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235, 251
    where Lord Reid said: 'The fact that a particular construction leads to a
    very unreasonable result must be a relevant consideration. The more
    unreasonable the result, the more unlikely it is that the parties can have
    intended it, and if they do intend it the more necessary it is that they shall
    make that intention abundantly clear' and *The Antaios* [1985] AC 191,
    201 where Lord Diplock said: 'If detailed and syntactical analysis of
G   words in a commercial contract is going to lead to a conclusion that flouts
    business common sense it must yield to business common sense.'"

    17   As I read his judgment, Patten LJ did not put the question in quite the
    same way. This can be seen from paras 35–44 of his judgment. At para 35
    he referred to Sir Simon Tuckey's approach at para 19 (as quoted above).
    He also referred to para 18(iii) of the judge's judgment, where the judge
    described the bank's construction of the bond as having the surprising and
H   uncommercial result of the guarantee not being available to meet the
    builder's repayment obligations in the event of insolvency. Patten LJ noted
    that the judge appeared to have taken that into account as a factor in favour
    of the buyers' construction of paragraph 3 of the bonds. Patten LJ added
    that the judge's approach was the same as that of Sir Simon Tuckey.

18 Patten LJ then referred to the cases mentioned above and expressed *A*
his conclusion in principle thus, at para 42:

"In this case (as in most others) the court is not privy to the
negotiations between the parties or to the commercial and other pressures
which may have dictated the balance of interests which the contract
strikes. Unless the most natural meaning of the words produces a result
which is so extreme as to suggest that it was unintended, the court has no *B*
alternative but to give effect it its terms. To do otherwise would be to risk
imposing obligations on one or other party which they were never willing
to assume and in circumstances which amount to no more than
guesswork on the part of the court."

19 Finally, at paras 43 and 44, Patten LJ quoted from the speeches of
Lord Wilberforce in *Prenn v Simmonds* [1971] 1 WLR 1381, 1384–1385 *C*
and of Lord Hoffmann in the *Chartbrook* case [2009] AC 1101, para 20,
where they discussed the reason for the rule excluding evidence of pre-
contractual negotiations. In particular they stressed the irrelevance of the
parties' subjective intentions and noted that the mere fact that a term in the
contract appears to be particularly unfavourable to one party or the other is
irrelevant. As Lord Hoffmann put it, the term may have been agreed in
exchange for some concession made elsewhere in the transaction or it may *D*
simply have been a bad bargain.

20 I entirely accept those caveats. However, it seems to me to be clear
that the principle stated by Patten LJ in para 42 is different from that stated
by the judge in his para 18(iii) and by Sir Simon Tuckey in para 19. It is not
in my judgment necessary to conclude that, unless the most natural meaning
of the words produces a result so extreme as to suggest that it was *E*
unintended, the court must give effect to that meaning.

21 The language used by the parties will often have more than one
potential meaning. I would accept the submission made on behalf of the
appellants that the exercise of construction is essentially one unitary exercise
in which the court must consider the language used and ascertain what a
reasonable person, that is a person who has all the background knowledge
which would reasonably have been available to the parties in the situation in *F*
which they were at the time of the contract, would have understood the
parties to have meant. In doing so, the court must have regard to all the
relevant surrounding circumstances. If there are two possible constructions,
the court is entitled to prefer the construction which is consistent with
business common sense and to reject the other.

22 This conclusion appears to me to be supported by Lord Reid's *G*
approach in *Wickman Machine Tool Sales Ltd v L Schuler AG* [1974]
AC 235 quoted by Sir Simon Tuckey and set out above. I am of course aware
that, in considering statements of general principle in a particular case, the
court must have regard to the fact that the precise formulation of the
proposition may be affected by the facts of the case. Nevertheless, there is a
consistent body of opinion, largely collated by the buyers in an appendix to
their case, which supports the approach of the judge and Sir Simon Tuckey. *H*

23 Where the parties have used unambiguous language, the court must
apply it. This can be seen from the decision of the Court of Appeal in
*Co-operative Wholesale Society Ltd v National Westminster Bank plc*
[1995] 1 EGLR 97. The court was considering the true construction of rent

A   review clauses in a number of different cases. The underlying result which
    the landlords sought in each case was the same. The court regarded it as a
    most improbable commercial result. Where the result, though improbable,
    flowed from the unambiguous language of the clause, the landlords
    succeeded, whereas where it did not, they failed. The court held that
    ordinary principles of construction applied to rent review clauses and
B   applied the principles in *Antaios Cia Naviera SA v Salen Rederierna AB (The
    Antaios)* [1985] AC 191. After quoting the passage from the speech of Lord
    Diplock cited above, Hoffmann LJ said, at p 99:

        "This robust declaration does not, however, mean that one can rewrite
    the language which the parties have used in order to make the contract
    conform to business common sense. But language is a very flexible
    instrument and, if it is capable of more than one construction, one
C   chooses that which seems most likely to give effect to the commercial
    purpose of the agreement."

        24   The court also comprised Leggatt and Simon Brown LJJ. Simon
    Brown LJ, at p 101, said that, having regard to the improbable result for
    which the landlords contended, only the most unambiguous of such clauses
    could properly be found to bear the landlords' construction and that in the
D   case of only one of the leases did the clause "unambiguously . . . achieve the
    improbable result for which the landlords contend". The case is of interest
    because Simon Brown LJ considered that, of the other three cases, one
    unambiguously failed to achieve the result sought by the landlords, whereas,
    of the other two, he said this, at p 102:

E       "For my part, I would accept that the more obvious reading of both
    favours the landlord's construction. I am persuaded, however, that they
    are capable of being, and therefore, for the reasons already given, should
    be, construed differently."

    That case is therefore an example of the adoption and application of the
    principle endorsed by the judge and by Sir Simon Tuckey. See also
F   *International Fina Services AG v Katrina Shipping Ltd (The Fina Samco)*
    [1995] 2 Lloyd's Rep 344, 350, where Neill LJ said it was necessary when
    construing a commercial document to strive to attribute to it a meaning
    which accords with business common sense.

        25   In 1997, writing extra-judicially in "Contract law: Fulfilling the
    reasonable expectations of honest men" 113 LQR 433, 441, Lord Steyn
    expressed the principle thus:

G       "Often there is no obvious or ordinary meaning of the language under
    consideration. There are competing interpretations to be considered. In
    choosing between alternatives a court should primarily be guided by the
    contextual scene in which the stipulation in question appears. And
    speaking generally commercially minded judges would regard the
    commercial purpose of the contract as more important than niceties of
H   language. And, in the event of doubt, the working assumption will be
    that a fair construction best matches the reasonable expectations of the
    parties."

    I agree. He said much the same judicially in *Society of Lloyd's v Robinson*
    [1999] WLR 756, 763:

"Loyalty to the text of a commercial contract, instrument, or *A*
document read in its contextual setting is the paramount principle of
interpretation. But in the process of interpreting the meaning of the
language of a commercial document the court ought generally to favour a
commercially sensible construction. The reason for this approach is that
a commercial construction is likely to give effect to the intention of the
parties. Words ought therefore to be interpreted in the way in which a *B*
reasonable commercial person would construe them. And the reasonable
commercial person can safely be assumed to be unimpressed with
technical interpretations and undue emphasis on niceties of language."

26   Similar assistance is at hand nearer at home. In *Gan Insurance Co
Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] 2 All ER (Comm) 299,
Mance LJ said: *C*

"13. Construction, as Sir Thomas Bingham MR said in *Arbuthnott v
Fagan* [1995] CLC 1396, 1400 is thus 'a composite exercise, neither
uncompromisingly literal nor unswervingly purposive'. To para 5, one
may add as a coda words of Lord Bridge of Harwich in *Mitsui
Construction Co Ltd v Attorney General of Hong Kong* (1986) 10 Con
LR 1, cited in my judgment in *Sinochem International Oil (London) Co
Ltd v Mobil Sales and Supply Corpn (Sinochem International Oil Co Ltd,
Third Party)* [2000] 1 All ER (Comm) 474, 482. Speaking of a poorly *D*
drafted and ambiguous contract, Lord Bridge said that poor drafting itself
provides: 'no reason to depart from the fundamental rule of construction
of contractual documents that the intention of the parties must be
ascertained from the language that they have used interpreted in the light
of the relevant factual situation in which the contract was made. But the *E*
poorer the quality of the drafting, the less willing the court should be to be
driven by semantic niceties to attribute to the parties an improbable and
unbusinesslike intention, if the language used, whatever it may lack in
precision, is reasonably capable of an interpretation which attributes to
the parties an intention to make provision for contingencies inherent in
the work contracted for on a sensible and businesslike basis.'" *F*

"16 . . . in my judgment the subclause has no very natural meaning and
is, at the least, open to two possible meanings or interpretations—one the
judge's, the other that it addresses two separate subject matters. In these
circumstances, it is especially important to undertake the exercise on
which the judge declined to embark, that is to consider the implications of
each interpretation. In my opinion, a court when construing any *G*
document should always have an eye to the consequences of a particular
construction, even if they often only serve as a check on an obvious
meaning or a restraint upon adoption of a conceivable but unbusinesslike
meaning. In intermediate situations, as Professor Guest wisely observes
in *Chitty on Contracts* (28th ed) (1999), vol 1, para 12-049, a 'balance
has to be struck' through the exercise of sound judicial discretion."

27   More generally, in *Homburg Houtimport BV v Agrosin Private Ltd
(The Starsin)* [2004] 1 AC 715, para 10, Lord Bingham referred to *H*

"the rule to which Lord Halsbury LC alluded in *Glynn v Margetson &
Co* [1893] AC 351, 359, 'that a business sense will be given to business

A    documents'. The business sense is that which businessmen, in the course of their ordinary dealings, would give the document."

28    Three other cases merit brief reference. The same approach was adopted by Arden LJ in *In re Golden Key Ltd* [2009] EWCA Civ 636 at [29] and [42] and by this court in *In re Sigma Finance Corpn* [2010] 1 All ER 571, para 12, where Lord Mance said that the resolution of an issue of
B    interpretation in a case like the present was an iterative process, involving checking each of the rival meanings against other provisions of the document and investigating its commercial consequences.

29    Finally, it is worth setting out two extracts from the judgment of Longmore LJ in *Barclays Bank plc v HHY Luxembourg SARL* [2011] 1 BCLC 336, paras 25 and 26:

C        "25. The matter does not of course rest there because when alternative constructions are available one has to consider which is the more commercially sensible. On this aspect of the matter Mr Zacaroli has all the cards . . .

        "26. The judge said that it did not flout common sense to say that the clause provided for a very limited level of release, but that, with respect, is
D        not quite the way to look at the matter. If a clause is capable of two meanings, as on any view this clause is, it is quite possible that neither meaning will flout common sense. In such circumstances, it is much more appropriate to adopt the more, rather than the less, commercial construction."

        30    In my opinion Longmore LJ has there neatly summarised the correct
E    approach to the problem. That approach is now supported by a significant body of authority. As stated in a little more detail in para 21 above, it is in essence that, where a term of a contract is open to more than one interpretation, it is generally appropriate to adopt the interpretation which is most consistent with business common sense. For these reasons I prefer the approach of the judge and Sir Simon Tuckey to that of Patten LJ, which is
F    to my mind significantly different on this point.

*Application to the facts*

        31    As indicated above, two possible interpretations of paragraph 3 of the bonds were advanced. It was conceded on behalf of the bank in the Court of Appeal that both constructions were arguable. I did not understand Mr Guy Philipps QC to resile from that position on behalf of the bank in this
G    court. In any event, in my judgment there are indeed two possible interpretations.

        32    The strength of the bank's interpretation is that it is not easy to see the point of paragraph 2 of the bonds if the buyers' interpretation of paragraph 3 is correct. On the other hand, the buyers' interpretation is straightforward. It is that, reduced to its essentials, the bank's promise in
H    paragraph 3 was that

        "in consideration of your [ie the buyers'] agreement to make the pre-delivery instalments . . . we hereby, as primary obligor, promise to pay to you, your successors and assigns, on your first written demand, all such sums due to you under the contract . . ."

2912
**Rainy Sky SA v Kookmin Bank (SC(E))**                    [2011] 1 WLR
**Lord Clarke of Stone-cum-Ebony JSC**

In the absence of paragraph 2 there could be no doubt that the reference to
"such sums" was a reference to the "pre-delivery instalments" at the
beginning of paragraph 3. That makes perfect sense because one would
naturally expect the parties to agree (and the buyers' financiers to insist) that,
in the event, for example, of the insolvency of the builders, the buyers
should have security for the repayment of the pre-delivery instalments which
they had paid.

33  The question is whether the presence of paragraph 2 leads to a
different conclusion. It was submitted with force by Mr Philipps on behalf
of the bank that it did. He correctly submitted that paragraph 3 must be
construed in its context and that part of the context was paragraph 2, which
was of course the immediately preceding paragraph. He submitted that the
only purpose there can have been for including paragraph 2 in the bonds was
to identify the scope of paragraph 3. He further submitted that no other
sensible explanation for the inclusion of paragraph 2 had been advanced on
behalf of the buyers.

34  I accept the submission that no very good reason was advanced on
behalf of the buyers for the inclusion of paragraph 2 in the bonds. The best
they could do was to say that it was a preamble to the operative provision in
paragraph 3, that it simply set out some of the buyers' rights under the
contracts and that it was not intended to identify the scope of the bank's
liability under the bonds. Patten LJ accepted [2011] 1 All ER (Comm) 18,
para 50 that the buyers' construction was arguable but said that, in his view,
it was not the meaning that the document would convey to a reasonable
person reading it with knowledge of the terms of the contracts. This must
I think mean that he took the view that, although it was arguable that it had
that effect, it did not in fact do so. Otherwise the buyers' construction could
not in any relevant sense have been said to be arguable and Patten LJ would
surely not have described it as such. Patten LJ made this clear in para 51
(quoted below), where he described the alternative constructions as not
being in any way evenly balanced. The position is thus that, although he
regarded both constructions as arguable in the sense that the bonds might
convey either construction to a reasonable person reading the bonds with
knowledge of the terms of the contracts, in his view the bank's construction
was plainly to be preferred. If Patten LJ went further later in para 51, where
he said that the fact that cover for the insolvency of the builder was desirable
did not justify a departure from what would otherwise be "the natural and
obvious construction of the bond", I respectfully disagree because I do not
regard the bank's construction as being the natural and ordinary meaning of
the bonds.

35  I have considered the competing arguments for myself and have
concluded that they are much more finely balanced than suggested by
Patten LJ and the bank. In para 48 Patten LJ expressed the view that
paragraph 2 of the bonds reproduced the terms of article X.5 and article X.6
of the contracts and therefore complied with article X.8. In para 49 he
concluded that the obvious purpose of paragraph 2 was to give the addressee
of the bonds a clear statement of the builder's obligations under the
contracts "which are to be covered by the guarantee and one which is
consistent with the terms of the builder's obligations to provide the bond
under article X.8 of the contract".

A    36    For my part, I would not entirely accept that analysis. Paragraph 2 of the bonds did reproduce the terms of article X.5 and article X.6 of the contracts but it does not seem to me that it complied with the requirements of article X.8. As I see it, article X.8 did not provide for the terms in which the bonds were to be issued. It provided that two letters of guarantee were to be provided, the first by a first class Korean bank or Guarantee Insurance Company for the refund of the first instalment and the second issued by

B    "a first class Korean bank or Guarantee Insurance Company acceptable to the buyer's financiers for the refund of the respective instalments following the way of the payment stipulated in this article". The first paragraph of article X.8 included this:

C    "The refund guarantees by the builder to the buyer shall be indicated pre-delivery instalments plus interest as aforesaid to the buyer under or pursuant to paragraph 5 above in the form annexed hereto as exhibit 'A' which is yet to be agreed."

37    In fact there was no form annexed to the contracts, so it is far from clear what was meant by the sentence of the first paragraph of article X.8 just quoted. As I see it, it was left that the parties would agree the final form of the bonds referable to the second and subsequent instalments. Moreover

D    both the identity of the issuer of the bonds and the form of the bonds were to be acceptable to the buyers' financiers. That was made clear by the second paragraph of article X.8 which is quoted in para 11 above. I would accept the submission made on behalf of the buyers that it is clear that neither article X.5 nor article X.8 was intended to set out all the circumstances in which the refund guarantees should operate. For example, there was no

E    cross-reference in article X.8 to the builder's obligation under article X.6 of the contracts to refund the instalments paid in the event of actual or constructive total loss, although it is common ground that the bonds did cover that obligation. In short, article X.8 did not purport to dictate the final scope of the bonds. In particular, it did not require that the guarantees should cover refund obligations only under article X.5 and article X.6 of the contracts.

F    38    There is a further curiosity in paragraph 2 of the bonds. In describing the buyers' rights under the contracts, it did not limit their rights to a refund of the pre-delivery instalments of the price. It extended them to the case where the buyers were entitled to "the value of the buyer's supplies delivered to the shipyard (if any)," although in so doing it failed accurately to reflect the contractual position in relation to termination as opposed to total

G    loss, since under article X.5 of the contracts the obligation on termination was to return the supplies, and only to (re)pay their value insofar as already incorporated into the vessel. It would seem to follow from the bank's submission that paragraph 2 defined the scope of the bank's obligations under paragraph 3 that the expression "all such sums due to you under the contract" included both the obligations to refund identified in paragraph 2 and the obligation to pay the value of the buyer's supplies" (whatever that

H    might cover). That was indeed the submission advanced in the bank's skeleton argument in the Court of Appeal. It is however a submission that is no longer advanced by either party. That is no doubt because the difficulty with it is that the bonds were described as "advance payment bonds" and the amount of each bond was US$26,640,000, which was the total amount of

2914
Rainy Sky SA v Kookmin Bank (SC(E))                    [2011] 1 WLR
Lord Clarke of Stone-cum-Ebony JSC

the second and subsequent instalments of the price, and because interest was
only payable under paragraph 3 of the bonds "from the respective dates of
payment by [the buyers] of such instalments", thus leaving no room for a
right to payment of the value of buyer's supplies under the bonds.

39   Sir Simon Tuckey took a different view of the construction of the
critical clauses of the bonds from that of Patten and Thorpe LJJ. He did so in
para 28, where he was considering whether in the particular circumstances
of the case the judge should have had regard to considerations of commercial
and business common sense. He said this:

"But should the judge's approach in this case have been more restricted
as Mr Philipps contends? I do not think so. The title to article X as a
whole is 'payment' but it contains an assortment of different terms.
Article X.8 is drafted on the basis that the form of guarantee which the
parties contemplated would be annexed to the agreement. That would be
the document to look at if one was trying to discover from the contract
what the buyer was looking for, not the reference back to article X.5.
This reference back is poorly drafted and quite capable of referring simply
to the opening sentence of paragraph 5. It is difficult to construe it in a
way which restricts the refund obligations which the bond was to cover,
not least because there is no reference to the article X.6 obligation to a
refund following total or constructive loss of the vessel which both parties
agree was to be covered by the bond. By the same token, no significance
should be attached to the omission of the article XII.3 refund obligation.
Nor do I think there is anything in Mr Philipps' further point. On the
happening of an article XII.3 event the buyer was entitled to a refund of
its advance payments 'immediately'. If that did not happen the contract
was in a state of limbo: neither party could terminate at that stage. If the
builder did not proceed with the construction of the vessel, as would be
extremely likely if it was insolvent, the buyer could terminate for delay
under article XII.l but, under the terms of this article, only after 90 days
plus 14 days notice. Only then could it call on the bond. I cannot see how
any buyer (or its financiers) could possibly be satisfied with this as a
remedy in the situation where the builder was insolvent or nearly so."

I agree with Sir Simon Tuckey and prefer his approach to that of the majority
in the Court of Appeal.

40   In all these circumstances, because of the difficulties in construing
paragraph 2 as setting out the sums due under the bond, if I were focusing
only on the language of the clause, I would be inclined to prefer the buyers'
construction to that of the bank. I note in passing in this regard that the
construction advanced by the bank was something of an afterthought.
However, I recognize that, on the buyers' construction, it is not easy to see
why paragraph 2 was included in the bond at all, and that the bank's
construction is arguable. This case is therefore a good example of the kind
of case referred to in the authorities to which I have referred. Since the
language of paragraph 3 is capable of two meanings it is appropriate for the
court to have regard to considerations of commercial common sense in
resolving the question what a reasonable person would have understood the
parties to have meant.

41   As noted at para 17 above, at his para 18(iii) the judge described the
bank's construction of the bonds as having what he called the surprising and

A  uncommercial result that the buyers would not be able to call on the bonds on the happening of the event, namely insolvency of the builder, which would be most likely to require the first class security. I agree with Sir Simon Tuckey that an appellate court is entitled to take account of the fact that an experienced judge of the Commercial Court reached that conclusion. In any event, Sir Simon Tuckey expressed essentially the same view in strong terms, at para 30:

B

"... On the bank's construction the bonds covered each of the situations in which the buyers were entitled to a return or refund of the advance payments which they had made under the contracts apart from the insolvency of the builder. No credible commercial reason has been advanced as to why the parties (or the buyers' financiers) should have agreed to this. On the contrary, it makes no commercial sense. As the judge said, insolvency of the builder was the situation for which the security of an advance payment bond was most likely to be needed. The importance attached in these contracts to the obligation to refund in the event of insolvency can be seen from the fact that they required the refund to be made immediately. It defies commercial common sense to think that this, among all other such obligations, was the only one which the parties intended should not be secured. Had the parties intended this surprising result I would have expected the contracts and the bonds to have spelt this out clearly but they do not do so."

C

D

I agree.

42  Patten LJ's view to the contrary is summarised at para 51:

E  "For the reasons which I have given, I do not regard the alternative constructions of paragraph 3 advanced on this appeal as being in any way evenly balanced. I also agree with Mr Philipps that it is impermissible to speculate on the reasons for omitting repayments in the event of insolvency from the bond. Although the judge is right to say that cover for such event was, objectively speaking, desirable, that is not sufficient in itself to justify a departure from what would otherwise be the natural and obvious construction of the bond. There may be any number of reasons why the builder was unable or unwilling to provide bank cover in the event of its insolvency and why the buyer was prepared to take the risk. This is not a case in which the construction contended for would produce an absurd or irrational result in the sense described in the cases I have referred to and merely to say that no credible commercial reason has been advanced for the limited scope of the bond does, in my view, put us in real danger of substituting our own judgment of the commerciality of the transaction for that of those who were actually party to it."

F

G

43  As Hoffmann LJ put it (in *Co-operative Wholesale Society Ltd v National Westminster Bank plc* [1995] 1 EGLR 97), after quoting from Lord Diplock's speech in *The Antaios* [1985] AC 191, if the language is capable of more than one construction, it is not necessary to conclude that a particular construction would produce an absurd or irrational result before having regard to the commercial purpose of the agreement. See, for example, per Hoffmann LJ, quoted at para 23 above, where he said: "But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial

H

2916
Rainy Sky SA v Kookmin Bank (SC(E))                              [2011] 1 WLR
Lord Clarke of Stone-cum-Ebony JSC

purpose of the agreement." See also the quotation from Longmore LJ at     A
para 29 above, where he said that, if a clause is capable of two meanings, it is
quite possible that neither meaning will flout common sense, but that, in
such a case, it is much more appropriate to adopt the more, rather than the
less, commercial construction: *Barclays Bank plc v HHY Luxembourg
SARL* [2011] 1 BCLC 336, para 26.

44   In para 51 Patten LJ appears to have accepted that no credible     B
commercial reasons were advanced for the limited scope of the bonds being
advanced by the bank. Mr Philipps submitted that it was not necessary for
the bank to address the question but I have no doubt that if he or the bank
had been able to think of a credible reason for excluding repayments in the
event of the builder's insolvency, such a reason would have been at the
forefront of the bank's case.

45   In these circumstances I would, if necessary, go so far as to say that     C
the omission of the obligation to make such re-payments from the bonds
would flout common sense but it is not necessary to go so far. I agree with
the judge and Sir Simon Tuckey that, of the two arguable constructions of
paragraph 3 of the bonds, the buyers' construction is to be preferred because
it is consistent with the commercial purpose of the bonds in a way in which
the bank's construction is not.

46   I note that Thorpe LJ was initially inclined to agree with the     D
conclusions of the judge but, in the event, agreed with Patten LJ without
giving any independent reasons of his own.

*Conclusion*

47   For these reasons I would allow the appeal and restore the order of
the judge.                                                              E

> *Appeal allowed.*
> *Order of Court of Appeal set aside and
>   order of Simon J restored.*
> *Defendant to pay claimants' costs in
>   Supreme Court and Court of Appeal,
>   to be assessed if not agreed.*                                     F

SHIRANIKHA HERBERT, Barrister

G

H

# LC/9

**1,396**

A

## Arbuthnott v Fagan.
## Deeny v Gooda Walker Ltd (in liquidation).

Court of Appeal (Civil Division).
Sir Thomas Bingham MR, Steyn and Hoffmann L JJ.
Judgment delivered 30 July 1993.

B

> *Lloyd's insurance market – Underwriting conducted on behalf of names by underwriting agents through syndicates – Names and underwriting agents parties to Lloyd's standard agency agreements – Construction of 'pay now, sue later' clause – Whether names precluded from bringing action for breach of contract or negligence in conduct of underwriting against managing and members' agents before paying cash calls in respect of underwriting.*

This was an appeal against a decision of Saville J on the construction of clauses in Lloyd's standard agency agreements. The issue was whether the names were precluded by the 'pay now, sue later' clauses from bringing actions for negligent underwriting against the members' and managing agents before paying the sums demanded.

C

As a result of severe losses the plaintiff Lloyd's names brought actions against their members' agents and managing agents for breach of contract and breach of duty in the conduct of underwriting for certain syndicates. The contracts in question were Lloyd's standard agency agreements. The form of agreement was changed with effect from 1990, but in respect of the clauses in issue there was no material difference. A preliminary issue as to the construction of the 'pay now, sue later' clauses was determined by the Commercial Court in favour of the names. Saville J held that the clauses precluded the names from making any legal challenge to the agents' assessment of the names' liabilities, expenses and outgoings of the underwriting business until they had paid the cash requirements made upon them, but their claims arising from negligent underwriting were not or need not be related to cash calls made against them. The underwriting agents appealed.

D

E

*Held,* dismissing the appeal:

1. The purpose of the 'pay now, sue later' clause was to ensure that the settlement of claims was not deferred by litigation between the names and the members' and managing agents. The subclause in issue was designed to preclude a name from challenging the cash demand in the courts before it had been paid. It was not intended to prevent a name from bringing proceedings for breach of contract or negligence in respect of the underwriting for the relevant year of account.

F

Per curiam (Sir Thomas Bingham MR) Courts will never construe words in a vacuum. They will wish to be informed of the context, the background, the factual matrix or the mischief. But an initial judgment of what an instrument was intended to achieve should not be permitted to override the clear language of the instrument since what an author says is usually the surest guide to what he means. Construction is a composite exercise, neither uncompromisingly literal nor unswervingly purposive: the instrument must speak for itself, but it must do so in situ and not be transported to the laboratory for microscopic analysis.

G

The following cases were referred to in the judgments:

*Attorney-General v Prince Ernest Augustus of Hanover* [1957] AC 436.
*Boobyer v Holman & Co Ltd* [1993] 1 Ll Rep 96.
*Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989.

H

Bernard Eder QC and David Foxton (instructed by Elborne Mitchell) for the appellant Fagan.

Bernard Eder QC and Simon Bryan (instructed by Elborne Mitchell) for the appellant Gooda Walker Ltd.

© 1995 CCH Editions Limited
bcom95 bcom   11 Mp   1396   —bcom11   125

A    Anthony Boswood QC and Stephen Moriarty (instructed by Richards Butler) for the
respondent Arbuthnott.

Jonathan Mance QC and David Lord (instructed by Wilde Sapte) for the respondent
Deeny.

### JUDGMENT

**Bingham MR:** This appeal, against a decision of Saville J given on 13 May 1993, raises
an issue of construction. All the plaintiffs are Lloyd's names. The relevant defendants are
these names' members' agents and also (in the Gooda Walker action) their managing
agents. The issue of construction arises from the agreements between the names and these
agents.

In the Feltrim action the names sued their members' agents claiming damages for
breach of contract in the conduct of underwriting for four syndicates. The claim related
to three underwriting years (1987–89 inclusive). During that period the names and the
members' agents were parties to a standard agency agreement in the form mandatorily
prescribed by Lloyd's Agency Agreements Byelaw No. 1 of 1985. For purposes of this
appeal the crucial provision of that agreement is cl. 9. After 1989 that form of agreement
was superseded.

In the Gooda Walker action the names sued their members' agents for damages for
breach of contract and tort in the conduct of underwriting for four (different) syndicates
during the years 1988 and 1989. The same form of agreement as in the Feltrim action
governed relations between the names and their members' agents during that period and
the construction of cl. 9 is accordingly in issue in this action also. But a further claim has
been made by these names relating to the 1990 underwriting year. It has been made
against the names' members' agents and also their managing agents. Against the former
it was made under the standard members' agents' agreement prescribed by Lloyd's
Agency Agreements Byelaw No. 8 of 1988 and against the latter under the standard
managing agents' agreement prescribed by the same byelaw. These forms of agreement
came into force for the year 1990 onwards. In this action an issue also therefore arises on
the construction of cl. 7.1 of the 1990 form of standard managing agents' agreement.

Although these factual distinctions exist between the Feltrim and Gooda Walker
actions, and although cl. 7.1 of the later agreement does not exactly reproduce the
language of cl. 9 of the earlier agreement, it is only very faintly suggested that the two
clauses are, for any purpose relevant to this appeal, to be differently construed and I do
not think there is any ground for doing so. It is therefore convenient to confine attention
to one of the clauses and I turn to cl. 9 as the clause under which most of the pleaded
claims have been made.

Clause 9 is headed 'Undertaking by the name to pay all liabilities and outgoings' and
its first three subclauses read as follows:

'(a) The name shall keep the agent at all times in funds available for the payment
of the liabilities, expenses and outgoings of the underwriting business. All such
funds and any other moneys for the time being held on the name's behalf may in
the absolute discretion of the agent be paid or applied in or towards the discharge
of such liabilities, expenses and outgoings provided that in the case of expenses
and outgoings incidental to the conduct of the underwriting business they are
proper and reasonable in incidence and amount. The agent shall have an unfettered
discretion in determining the funds from time to time required from the name for
the purpose of making any such payments as aforesaid, and the agent shall be the
sole judge both as to the existence and as to the amount (or the estimated amount)
of any such liability, expense or outgoing. The agent shall be under no liability to
make any such payments otherwise than out of assets for the time being held for

the account of the name; but should the agent nevertheless do so, the name shall    A
reimburse the agent in respect thereof.

(b) The name shall pay any funds required by the agent under subcl. (a) of this
clause free from and clear of any set-off, counterclaim or other deduction on any
account whatsoever and promptly within such period for payment as the agent
may in its discretion specify in its requirement; and in respect of such payment time
shall be of the essence. The name hereby agrees that no such setoff, counterclaim    B
or deduction shall be a defence to any proceedings instituted by the agent to enforce
a requirement, and the name waives stay of execution and consents to the
immediate enforcement of any judgment obtained in such proceedings.

(c) It shall be a condition precedent to the issue of proceedings or the making of
any reference to arbitration by the name in respect of any matter arising out of or
in any way connected with either the making of such requirement by the agent or
the subject matter thereof, or the preparation or audit of the accounts referred to    C
in cl. 6, that the name shall have duly complied with any such requirement made
or purported to be made by the agent, and no cause of action in respect of any
such matter shall arise or accrue in favour of the name until such requirement shall
have in all respects been duly complied with. At no time shall the name seek
injunctive or any other relief for the purpose (or which has the result) of preventing
the agent from making or enforcing any such requirement or of preventing the    D
agent or any sub-agent from applying any money or assets for the time being held
by them respectively on behalf of the name in or towards the discharge of the
liabilities, expenses and outgoings of the underwriting business.'

'The underwriting business' referred to in subcl. (a) is defined in cl. 2(a) of the agreement
to mean:

    'underwriting at Lloyd's for the account of the name such classes and descriptions    E
    of insurance business, other than those prohibited by the council, as may be
    transacted by the syndicate.'

'The syndicate', by virtue of cl. 1(a), means the syndicate or syndicates of which the name
is a member.

Subclauses (a) and (b) are not directly in issue in this appeal, but they provide the
essential prelude to subcl. (c), which is. Subclause (a) contains two important stipulations:    F
that the name must keep the agent in funds to enable the agent to meet the liabilities,
expenses and outgoings of the underwriting business as defined; and that it is for the
agent alone (subject no doubt to a duty of honesty: *Boobyer v Holman & Co Ltd* [1993]
1 Ll Rep 96) to decide what sum is needed for those purposes. Subclause (b) obliges the
name promptly to pay any sum required by the agent in full and without deduction of
any kind. Should the agent issue proceedings to enforce any requirement, the name
agrees to forego any right to plead any set-off, counterclaim or deduction or to claim a    G
stay of execution or to resist the enforcement of any judgment.

So one comes to subcl. (c). The agents draw attention to the names' claims in the
actions and suggest that the loss and damage claimed relate directly to and are founded
upon the cash requirements made upon the names for purposes of the underwriting
business. They accordingly submit:

(1)    that a name who has not met a requirement made for a particular syndicate for a    H
      particular year of account has no cause of action and cannot bring proceedings for
      breach of contract or negligence in respect of that syndicate and that year of
      account; and

(2)    that in any event a name has no cause of action and is precluded from bringing
      proceedings in respect of claims for breach of contract or duty when the damages

A

which he seeks to claim relate to a requirement made upon him for underwriting liabilities or expenses which he has not met. It appears that before the judge the agents put their case more broadly, but I have quoted the submission as put in the skeleton argument provided to this court.

The names contend that subcl. (c) has an altogether more limited purpose: to preclude the name from making any legal challenge to the making of a requirement or to its substance (i.e. the agent's assessment of the liabilities, expenses and outgoings of the underwriting business) until he has paid the sum called for. But while accepting that such a challenge is precluded the names deny that their claims arising from negligent underwriting are, or need be, related to cash calls made against them.

Saville J preferred the names' construction, basing himself both on the language of the subclause and on its wider commercial purpose.

As always on an issue of this kind, the parties have, very properly, analysed the precise language of cl. 9(c) in great detail in order to identify every possible pointer to the true construction of the subclause. I do not in any way disparage this exercise, but nor do I think it necessary to rehearse the detailed arguments advanced. For in my view the construction of the subclause is plain and is that for which the names contend.

Access to funds with which to settle valid claims by policyholders is the life-blood of any insurance business. Under the Lloyd's régime the members' or managing agent has a wide discretion to determine the sum necessary to fund the conduct of the underwriting business, including the payment of claims, which he may demand from the name and the name must pay at once. The settlement of claims is not to be deferred while names and members or managing agents squabble among themselves. So the name agrees, if sued, to forgo all defences and all procedural devices which may defeat or delay enforcement of the claim for the sum demanded. So far, as already stated, the draftsman's intention is clear and uncontroversial. But the draftsman was plainly alive, as any experienced lawyer would be, to another risk: that the name might himself initiate legal proceedings to challenge the demand, whether on procedural or substantial grounds, or attack the audit on which it was based, or might have recourse to the courts to seek to prevent such demand being made in the first place. These possible escape routes also the draftsman was, as I infer, plainly determined to block. Clause 9(c) was his way of doing so.

Mr Eder, for the members and managing agents, argued that the names' construction failed to give effect to the full terms of the subclause, part of which would on that basis be superfluous. He may have been right, but I do not find the point persuasive even if correct. In drafting a clause of this kind a draftsman's primary concern is not to avoid repetition (he may even think it desirable to make explicit what would anyway be implicit) but at all costs to avoid leaving loopholes which an unscrupulous party might exploit, even if this does lead to repetition.

Much more persuasive, to my mind, is the care taken by the draftsman to define the rights of suit which the name is precluded from making until he has paid. These are 'in respect of any matter arising out of or in any way connected with either the making of such requirement by the agent or the subject matter thereof', and 'the preparation or audit of the accounts', and 'in respect of any such matter' and 'preventing the making or enforcing any such requirement'. In other words, the name is precluded from exercising litigious rights relating to the agent's requirement (whether as to procedure or substance) and its accounting basis. Had the intention been to restrict the rights of the names in the sweeping manner contended for by the agents much broader and less specific language would have been appropriate and would, I feel sure, have been used.

As it is, the scheme of the clause seems to me to be clear and sensible. The duty of the name to pay sums required by the agent without prevarication or deduction or delay is stated clearly and unequivocally. That reflects the overriding need, acknowledged on all

**1,400**                    **Arbuthnott v Fagan**                    **[1995] CLC**
                            *(Steyn LJ)*

sides, to ensure that funds are available for the prompt settlement of the claims of those      A
who have insured or reinsured at Lloyd's. But that need does not require that names
should forego all rights to complain of negligent underwriting while there are still calls
outstanding and unpaid. There is no necessary connection between foregoing rights to
challenge requirements until payment has been made and foregoing rights to complain
of negligent underwriting not involving a challenge (on grounds of procedure or
substance) to the requirement, and far from seeking to link them the text of the subclause
is on my reading of it clear in its intention to treat them separately by directing its      B
prohibition to the former situation and not the latter. I am fortified in my preference for
the names' construction by the recognition that the agents would, as I think, deprive the
names of valuable rights without doing so clearly or for any obvious reason, would in
certain situations work severe hardship to the names without corresponding benefit to
the market and would give rise to offensive anomalies.

I would accordingly echo the observation of the judge:      C

'In my judgment, bearing in mind the purpose of the "pay now, sue later"
provisions and the words the parties have chosen to use, neither of the
constructions suggested by Mr Eder is correct.'

I agree, on the somewhat different formulation advanced to this court, both as to cl. 9(c)
and cl. 7.1(e). I would accordingly dismiss this appeal and affirm the judge's answers to      D
the questions put to him.

Courts will never construe words in a vacuum. To a greater or lesser extent, depending
on the subject matter, they will wish to be informed of what may variously be described
as the context, the background, the factual matrix or the mischief. To seek to construe
any instrument in ignorance or disregard of the circumstances which gave rise to it or the
situation in which it is expected to take effect is in my view pedantic, sterile and
productive of error. But that is not to say that an initial judgment of what an instrument      E
was or should reasonably have been intended to achieve should be permitted to override
the clear language of the instrument, since what an author says is usually the surest guide
to what he means. To my mind construction is a composite exercise, neither
uncompromisingly literal nor unswervingly purposive: the instrument must speak for
itself, but it must do so in situ and not be transported to the laboratory for microscopic
analysis.      F

**Steyn LJ:** I have had the advantage of reading the judgments of Bingham MR and
Hoffmann LJ and I agree with their reasons for concluding that the appeals before us
ought to be dismissed. In view, however, of the great importance of the matter for the
Lloyd's insurance market, and for those who are involved in it, I will briefly explain why
I entertain no doubt that the construction of the 'pay now, sue later' provision put
forward by the agents in the Feltrim and Gooda Walker actions is demonstrably wrong.      G

A study of the two sets of points of claim show, and the agents concede, that both
actions are based on the premise that the agents acted within their authority and validly
committed the names to insurance liabilities. And the fact that the carrying on of the
underwriting business resulted in expenses and outgoings is common ground. The validity
of the cash calls made under cl. 9 is not challenged directly or indirectly by the names.
The case pleaded in the points of claim are confined to assertions that in breach of      H
contract or in breach of the common law duty of care the agents negligently committed
the names to imprudent insurance liabilities, or, alternatively negligently failed to protect
the names by appropriate reinsurances when it would have been prudent to do so. In his
careful and incisive speech Mr Eder QC emphasised that the fact of cash calls, and the
payments made by names pursuant to the cash calls, must necessarily be part of the
evidential material which will be placed before the court in aid of the quantification of

© **1995 CCH Editions Limited**
bcom95 bcom  11 Mp  1400  —bcom11  125

CA                          **Arbuthnott v Fagan**                          **1,401**
                                 *(Steyn LJ)*

A    the names losses. That may be right. But the very deployment of such evidence by the
     names will presuppose the acceptance by the names of validity of the cash calls.

     Against this characterisation of the proceedings, I turn first to the question whether
     cl. 9 of the standard agency agreement which is scheduled to the Agency Agreements
     Byelaw No. 1 of 1985, 11 March 1985, is apt to preclude such proceedings until the
     names have paid the relevant cash calls. The critical provision is cl. 9(c). It adopts a
B    twofold technique: it stipulates for a condition precedent to certain proceedings, and
     provides that no cause of action 'in respect of any such matter shall arise', until the
     relevant cash call has been paid. It creates a contractual prohibition against the taking of
     certain proceedings by the name against the agent. The question is: what proceedings?
     As Bingham MR has pointed out the answer to that question is to be found in the
     meaning of the following words in cl. 9(c):

C           'in respect of any matter arising out of or in any way connected with either the
            making of such requirement by the agent or the subject matter thereof, or the
            preparation or audit of the accounts referred in cl. 6 . . .'

     The question is whether these words properly construed cover the proceedings as I have
     described them.

     There are two rival interpretations before the court. The interpretation advanced on
D    behalf of the plaintiff names, which was accepted by Seville J, treats cl. 9(c) as creating a
     prohibition against proceedings challenging the validity of a cash call until the cash call
     has been paid. The interpretation put forward on behalf of the agents treats cl. 9 (c) as
     prohibiting all proceedings relating a name's membership of a particular syndicate for a
     particular year of account until the name has paid all cash calls in respect of that syndicate
     for that year of account.

     Mr Eder emphasised the width of the words 'in respect of any matter arising out of or
E    in any way connected with'. I was unimpressed with this semantic analysis. These words
     are merely descriptive of the connection between the proceedings and 'the making of such
     requirement by the agent or the subject matter thereof', the latter being the words upon
     which Mr Eder relies. The 'making of such requirement' plainly refers to the issue and
     despatch of a cash call. It cannot assist the agents' argument. That leaves the words 'the
     subject matter thereof'. What does 'the subject matter of the requirement' mean? On one
     view it might mean the actual details of the cash call. The judge concluded that it means
F    the agents' assessment of liabilities, expenses and outgoings which led to the cash call. As
     a matter of first impression and common sense that is how I would also interpret cl. 9(c)
     read in the context of cl. 9 as a whole. And the detailed textual analysis undertaken by
     Mr Eder does not suggest to me that the agents' extensive interpretation is to be preferred.
     I am, however, confident that even if cl. 9(c) is capable as a matter of language of
     accommodating the agents' interpretation it must nevertheless be rejected. In my view
G    the context excludes it as a feasible interpretation.

     I regard the purpose of cl. 9(c) as a matter of prime importance. It was common
     ground at first instance, and again before us, that the only purpose of the provision is to
     protect policyholders. The objective is that valid claims of policyholders should be paid
     promptly. It is conceded on behalf of the agents that it was not even a subsidiary purpose
     of cl. 9(c) to confer a protection on agents for breaches committed by them in and about
     the underwriting of insurance business.

H    I readily accept Mr Eder's submission that the starting point of the process of
     interpretation must be the language of the contract. But Mr Eder went further and said
     that, if the meaning of the words is clear, as he submitted it is, the purpose of the
     contractual provisions cannot be allowed to influence the court's interpretation. That
     involves approaching the process of interpretation in the fashion of a black-letter man.
     The argument assumes that interpretation is a purely linguistic or semantic process until

**1,402**                            **Arbuthnott v Fagan**                        **[1995] CLC**
                                        *(Steyn LJ)*

an ambiguity is revealed. That is wrong. Dictionaries never solve concrete problems of   A
construction. The meaning of words cannot be ascertained divorced from their context.
And part of the contextual scene is the purpose of the provision. In the field of statutory
interpretation the speeches of the House of Lords in *Attorney-General v Prince Ernest
Augustus of Hanover* [1957] AC 436 showed that the purpose of a statute, or part of a
statute, is something to be taken into account in ascertaining the ordinary meaning of
words in the statute: see Viscount Simonds' speech, at p. 461, and Lord Somervill of
Harrow's speech, at p. 473. It is true that such a purpose may also be called in aid at a   B
later stage in the process of interpretation if the language of the statute is ambiguous but
it is important to bear in mind that the purpose of the statute is a permissible aid at all
stages in the process of interpretation. In this respect a similar approach is applicable to
the interpretation of a contractual text. That is why in *Reardon Smith Line Ltd v Yngvar
Hansen-Tangen* [1976] 1 WLR 989 Lord Wilberforce, speaking for the majority of their
Lordships, made plain that in construing a commercial contract it is always right that the   C
court should take into account the purpose of a contract and that presupposes an
appreciation of the contextual scene of the contract.

*Corbin on Contracts*, 1960, vol. 3, s. 545, explains the role that the ascertainment of the
purpose of a contract should play in the process of interpretation:

> 'In order to determine purposes we are obliged to interpret their words in the
> document of agreement and their relevant words and acts extrinsic to that   D
> document. It may seem foolish, therefore, to say that the words of a contract
> should be interpreted in the light of the purposes that the parties meant to achieve,
> when we can turn on that light only by process of interpretation. Nevertheless, it is
> believed that such an admonition serves a useful purpose. As the evidence comes
> in and as interpretation is in process, the court may soon form a tentative
> conviction as to the principal purpose or purposes of the parties. As long as that
> conviction holds (and the court must be ready at all times to be moved by new   E
> evidence), further interpretation of the words of contract should be such as to
> attain that purpose, if reasonably possible.'

In the same section of this seminal work the author added that if the court is convinced
that it knows the purpose of the contract, however vaguely expressed and poorly
analysed, it should be loath to adopt any interpretation of the language that would
produce a different result. In my judgment these observations accurately state the   F
approach to be adopted. And in the present case the purpose of cl. 9(c) is not in doubt.

Given the acknowledged purpose of cl. 9(c) I take the view that it only created a
prohibition on legal proceedings calling in question a cash call until that cash call was
paid. That is a meaningful interpretation since in the absence of a provision such as
cl. 9(c) a name could challenge a cash call on the ground that it was not made in good
faith or upon reasonable grounds. See *Boobyer v Holman & Co* [1993] 1 Ll Rep 96, at   G
p. 97. And the names' interpretation ensures that the underlying purpose of cl. 9(c) is
fully achieved. After all cl. 9(c) effectively precludes a challenge to a cash call until it is
paid. Cash calls directed to names to pay for liabilities, expenses and outgoings of the
underwriting business will therefore be readily collectible by summary judgment.

The implications of the agents' argument that cl. 9(c) precludes the names from suing
the agents for negligence so long as a cash call in respect of the syndicate and year of   H
account remains outstanding generates immediate scepticism. This is an invitation to
adopt an interpretation which is at variance with the purpose of cl. 9(c). This
interpretation achieves something that is commercially unnecessary and different from
the acknowledged purpose of cl. 9(c). It amounts to saying that cl. 9(c) has the
coincidental or collateral effect that the agent is protected against actions in negligence
while a cash call remains unpaid. Furthermore, as Mr Boswood QC said, the agent's

**CA**                          **Arbuthnott v Fagan**                          **1,403**
                              *(Hoffmann LJ)*

A    interpretation leads to the extraordinary result that if the agent ruins a name by negligent underwriting, so that the name cannot pay the cash call, the contract breaker or tortfeasor goes scot-free. And that result is inimical to the interests of policyholders and the Lloyd's market since the claim against the agent may be an asset available to meet the policyholders' claims. That is so uncommercial and unreasonable a result that words of the greatest precision would be required to achieve it. Clause 9(c) plainly comes nowhere near this.

I would therefore dismiss the appeal in the Feltrim action and in the Gooda Walker action so far as it involves the interpretation of cl. 9(c).

In the Gooda Walker action a similar issue arises in respect of the 1990 underwriting year under cl. 7.1(e) of the standard managing agent's agreement, which is in a form scheduled to the Agency Agreements Byelaw No. 8 of 1988, 7 December 1988. While there are differences between the wording of cl. 9(c), which I have considered, and cl. 7.1(e), the differences are plainly immaterial. For the reasons already given I would also dismiss the appeal in the Gooda Walker action in respect of the 1990 underwriting year.

**Hoffmann LJ:** It does not seem to me sensible, or indeed possible, to try to construe cl. 9(c) without regard to the purpose of the clause a whole. This is particularly true when one is trying to construe so vague an expression as 'connected with'. Connections may exist in an infinite variety of forms and degrees. Only the context can indicate which of these connections is meant. The need to examine the context is not obviated by the use of intensifiers like 'in any way'. I accept Mr Eder's submission that such words indicate an intention that the concept of connection should be broadly construed. But they cannot be read literally, or else they will include connections such as Fluellen found between Harry Monmouth and Alexander of Macedon:

> 'There is a river in Macedon, and there is also moreover a river at Monmouth . . . and there is salmons in both.'

It is therefore still necessary to limit the connections to those which are relevant for the purpose in hand.

The purpose of cl. 9 is clear and uncontroversial. It is designed to insulate the liability of the name to provide whatever funds are necessary for the underwriting business from the state of accounts between himself and the agent. Such insulation is necessary for the purposes of enabling the Lloyd's market to meet its liabilities. Otherwise the flow of funds needed to pay policyholders' claims may be clogged by disputes within Lloyd's between names and their agents, to the detriment of the market as a whole.

Clause 9 achieves this result by making a cash call an autonomous source of liability, insulated from the underlying relationship of principal and agent in much the same way as a documentary credit is insulated from the underlying commercial transaction. Clause 9(a) requires the name to pay whatever sum the agent in his discretion decides is needed to discharge the liabilities of the underwriting business. Clause 9(b) prevents the name from raising a set-off or counterclaim by way of defence. Clause 9(c) makes compliance with a cash call a condition precedent to the issue of proceedings 'in respect of any matter arising out of or in any way connected with the making of such requirement by the agent or the subject-matter thereof'. The 'making of such requirement' means the act of making the call. Its 'subject-matter' is the contents of the demand: the amount which the name is asked to pay and any further information which it contains. What kind of connection do the words 'in any way connected with' connote? This is where assistance must be found in the purpose of the clause as a whole. In my view the relevant connection is one which makes the proceedings a challenge to the validity or enforceability of the call. This construction enables the three subclauses to constitute a coherent and rational structure: subcl. (a) empowers the agent to create the autonomous obligations; subcl. (b) prevents

A

the name from using matters arising between him and agent as a defence and subcl. (c) prevents him from actively impugning the validity or enforceability of the obligations.

On this view, the proceedings brought by the names do not fall within (c). They are not calculated to challenge, invalidate or block the enforcement of the cash calls. The names acknowledge their liability in respect of those which remain unpaid. In some cases at least, the reason for non-payment is that they have no more money. But they wish to pursue claims for negligence by the agents in the conduct of the underwriting business. In my judgment these claims are not for the purpose of cl. 9 'connected with' the cash calls. The whole purpose of the clause in making the cash call an autonomous obligation is to ensure that there is no such connection.

B

It seems to me legitimate to test the plausibility of a given construction by examining what the consequences would be. The construction for which the agents contend means that if they are going to be negligent, they should rather ruin their names entirely than leave them with enough resources to pay their calls. In the latter case they will be exposed to an action for negligence whereas in the former case they will be immune. Mr Eder said that his startling consequence had to be accepted in the interests of maintaining discipline at Lloyd's and inducing the names to pay their calls. But his argument cannot apply to those who have no money. And in cases of contumacious refusal to pay, it is hard to see why denial of the right to sue for negligence will be more effective than the undisputed right of Lloyd's to obtain judgment for the unpaid calls.

C

D

I think that the construction adopted by the judge gives full effect to the policy of insulating the call liability from the other rights and duties of name and agent inter se. I accept that it may also mean, if one analyses the various phrases in detail, that parts of the clause overlap with the effect of other parts and are redundant. In a document like this, however, little weight should be given to an argument based on redundancy. It is a common consequence of a determination to make sure that one has obliterated the conceptual target. The draftsman wanted to leave no loophole for counter-attack by the recipient or intended recipient of a call. It is no justification for construing the language so as to apply to a situation which, on a fair reading of the general purpose of the clause was not within the target area.

E

I would therefore dismiss the appeal.

*(Appeal dismissed)*

F

G

H

© **1995 CCH Editions Limited**
bcom95 bcom   11 Mp   1404  —bcom11   125

LC/10

3251

**[2004] 1 WLR**                    Sirius Insurance Co v FAI General Insurance (HL(E))

*A*

House of Lords

# *Sirius International Insurance Co (Publ) *v* FAI General Insurance Ltd and others

## [2004] UKHL 54

*B*

2004  Nov 8, 9;                    Lord Bingham of Cornhill, Lord Nicholls of Birkenhead,
    Dec 2                             Lord Steyn, Lord Walker of Gestingthorpe
                                      and Lord Brown of Eaton-under-Heywood

*Banking — Letter of credit — Condition for draw-down — Letter of credit subject to express negative covenant not to draw down unless conditions satisfied — Whether entitlement to draw down — Whether conditions satisfied*

*C*

The defendant wished to reinsure the liabilities of a Lloyd's syndicate. Since the syndicate had concerns about the defendant's solvency the claimant agreed to reinsure the liabilities of the syndicate and retrocede it to the defendant. Under the agreement, in the event of any claim under the reinsurances, the claimant would be liable to the syndicate and the defendant would be correspondingly liable to the claimant. It was a term of the agreement that the defendant provide the claimant with a letter of credit for US$5m. The letter of credit was subject to an express negative covenant, contained in an agreed side letter, that the claimant would neither pay a claim by the syndicate nor draw down without the defendant's consent. When the syndicate made a claim the defendant disputed the coverage provided by the reinsurances and retrocessions and arbitration proceedings were commenced in the claimant's name on behalf of the syndicate. Those proceedings were compromised by a Tomlin order by which the defendant agreed it was indebted to the claimant in the sum of US$22·5m. It was also agreed that the letter of credit be drawn down and held in an escrow account and that the positions of the parties in respect of the proceeds of that account were unaffected by the settlement. On the claimant's application for the determination of preliminary issues the judge held that, while the principle of autonomy which applied to letters of credit was a of vital importance, there was no reason why the law should not give effect to an express agreement that a party would not draw down a letter of credit unless certain conditions were met, that by acknowledging its indebtedness to the claimant the defendant effectively agreed that the claimant should pay the syndicate's claims, that the conditions limiting the drawing down of the letter of credit were therefore satisfied and that the proceeds of the escrow account belonged to the claimant as it would have been entitled to draw down. The Court of Appeal held that the literal meaning of the words of the Tomlin order did not express an agreement by the defendant that the claimant should pay the syndicate's claim and that, consequently, the underlying agreement had not been fulfilled and the defendant was entitled to the proceeds of the escrow account.

*D*

*E*

*F*

*G*

On appeal by the claimant—

*Held*, allowing the appeal, that it was unnecessary for the House to resolve any issues regarding the so-called autonomy principle applicable to letters of credit issued by banks, and the appeal turned on the basis of the correct contextual interpretation of non-standard documents; that although leave to appeal would not ordinarily have been granted in such a case, the House was seized with the issue and it fell to be resolved; that the Tomlin order had to be construed objectively as a commercial instrument; that the question which had to be asked was what would a reasonable person, circumstanced as the actual parties were, have understood the parties to have meant by the use of specific language; that the answer to that question was to be gathered from the text under consideration and its relevant contextual scene; that there had been a shift from literal methods of interpretation towards a more commercial approach; that, generally speaking, literalism should be resisted; and that

*H*

3252
**Sirius Insurance Co v FAI General Insurance (HL(E))**                    **[2004] 1 WLR**

( per Lord Nicholls of Birkenhead, Lord Steyn and Lord Walker of Gestingthorpe) the    A
Court of Appeal's interpretation of the Tomlin order had been uncommercial and
literalistic, and the judge's interpretation had been correct ( post, paras 1–3, 18–19,
25, 27–28, 39–40).

*Antaios Compania Naviera SA v Salen Rederierna AB* [1985] AC 191, HL(E),
*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749,
HL(E) and *Investors Compensation Scheme Ltd v West Bromwich Building Society*
[1998] 1 WLR 896, HL(E) applied.                                             B

Decision of the Court of Appeal [2003] EWCA Civ 470; [2003] 1 WLR 2214;
[2004] 1 All ER 308 reversed.

The following cases are referred to in the opinions of their Lordships:
*Antaios Compania Naviera SA v Salen Rederierna AB* [1985] AC 191; [1984] 3 WLR
    592; [1984] 3 All ER 229, HL(E)
*Bank of Credit and Commerce International SA v Ali* [2001] UKHL 8; [2002] 1 AC    C
    251; [2001] 2 WLR 735; [2001] 1 All ER 961, HL(E)
*Bolivinter Oil SA v Chase Manhattan Bank NA (Practice Note)* [1984] 1 WLR 392;
    [1984] 1 All ER 351; [1984] 1 Lloyd's Rep 251, CA
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998]
    1 WLR 896; [1998] 1 All ER 98, HL(E)
*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749;
    [1997] 2 WLR 945; [1997] 3 All ER 352, HL(E)                            D
*On Demand Information plc v Michael Gerson (Finance) plc* [2002] UKHL 13;
    [2003] 1 AC 368; [2002] 2 WLR 919; [2002] 2 All ER 949, HL(E)

The following additional cases were cited in argument:
*Boral Formwork & Scaffolding Pty Ltd v Action Makers Ltd* [2003] NSWSC 713
*Czarnikow-Rionda Sugar Trading Inc v Standard Bank London Ltd* [1999] 2 Lloyd's
    Rep 187                                                                 E
*Deutsche Rückversicherung AG v Walbrook Insurance Co Ltd* [1995] 1 WLR 1017;
    [1994] 4 All ER 181; sub nom *Group Josi Re ( formerly Groupe Josi Réassurance
    SA) v Walbrook Insurance Co Ltd* [1996] 1 WLR 1152; [1996] 1 All ER 791, CA
*Fletcher Construction Australia Ltd v Varnsdorf Pty Ltd* [1998] 3 VR 812
*GKN Contractors Ltd v Lloyds Bank plc* (1985) 30 BLR 48, CA
*Harbottle (R D) (Mercantile) Ltd v National Westminster Bank Ltd* [1978] QB 146;
    [1977] 3 WLR 752; [1977] 2 All ER 862                                   F
*Liverpool City Council v Irwin* [1977] AC 239; [1976] 2 WLR 562; [1976] 2 All
    ER 39, HL(E)
*Owen (Edward) Engineering Ltd v Barclays Bank International Ltd* [1978] QB 159;
    [1977] 3 WLR 764; [1978] 1 All ER 976; [1978] 1 Lloyd's Rep 166, CA
*Shamsher Jute Mills Ltd v Sethia (London) Ltd* [1987] 1 Lloyd's Rep 388
*Standard Trust Co v The Bank of Nova Scotia* (2001) 201 Nfld & PEIR 8
*United City Merchants (Investments) Ltd v Royal Bank of Canada* [1983] 1 AC 168;    G
    [1982] 2 WLR 1039; [1982] 2 All ER 720; [1982] 2 Lloyd's Rep 1, HL(E)
*Urquhart Lindsay and Co v Eastern Bank Ltd* [1922] 1 KB 318

**APPEAL** from the Court of Appeal

This was an appeal by the claimant, Sirius International Insurance Co
(Publ), with leave of the House given on 8 July 2003, from a decision of the
Court of Appeal (May, Carnwath LJJ and Wall J) dated 4 April 2003, in    H
favour of the defendants, FAI General Insurance Ltd and its liquidators
(Anthony McMahon, Thomas Riddell and John Wardrop), which reversed a
decision of Jacob J dated 23 July 2002, in determining a preliminary issue, to
the effect that the proceeds of a letter of credit which had been paid into an

A   escrow account pursuant to a Tomlin order, dated 6 April 2001, belonged to the claimant.

The facts are stated in the opinion of Lord Steyn.

*Geoffrey Vos QC* and *Peter Arden* for the claimant.
*Gabriel Moss QC* and *Philip Marshall QC* for the defendant.

B   Their Lordships took time for consideration.

2 December. **LORD BINGHAM OF CORNHILL**

1   My Lords, left to myself, I should have accepted the interpretation put by the defendant on the Tomlin order agreed between the parties on 6 April 2001. But no issue of principle on the construction of contracts divides the parties. The Tomlin order is expressed in terms which are one-off. If the claimant's argument on construction is accepted no point of law of general public importance arises. I must acknowledge that the judge adopted the construction favoured by a majority of my noble and learned friends. My own reasons for favouring a different construction differ from those of the Court of Appeal. This being so, no purpose is served by expounding the interpretation which I myself would have put on the Tomlin order, and I am content to accept that favoured by the majority. I would accordingly agree that the appeal should be allowed.

**LORD NICHOLLS OF BIRKENHEAD**

2   My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Steyn and Lord Walker of Gestingthorpe. For the reasons they give, with which I agree, I would allow this appeal.

**LORD STEYN**

3   My Lords, when leave to appeal was granted by an Appeal Committee, it may have appeared that important issues regarding the so-called autonomy principle applicable to letters of credit issued by banks would have to be resolved. Certainly that was the main thrust of the petition. In the result it has turned out to be unnecessary to examine the arguments about the autonomy principle. Instead it has become clear that the appeal should be decided on the basis of the correct contextual interpretation of two related documents. Those two documents are a side letter to a letter of credit, agreed between the party setting up the letter of credit and the beneficiary, and a schedule to a Tomlin order settling a dispute that had arisen between the parties. These two documents are not in standard form. The interpretation of these documents is, like the construction of all texts, a matter of law but it does not involve a question of general public importance. The House would not ordinarily have given leave to appeal in such a one-off case. But the House is now seized with it, and the issue must be resolved.

*The commercial context*

4   Sirius International Insurance Co (Publ) is a company incorporated under the laws of Sweden. It carries on business as an insurer and reinsurer. FAI General Insurance Ltd is a company incorporated under the laws of

3254
**Sirius Insurance Co v FAI General Insurance (HL(E))**                    **[2004] 1 WLR**
**Lord Steyn**

New South Wales. It also carries on business as an insurer and reinsurer. It    *A*
is part of the insolvent HIH insurance group.    FAI is in provisional
liquidation in Australia and in England.    The second to fourth defendants
are FAI's English provisional liquidators, who were appointed as such by an
order made by Hart J on 23 March 2001.

5    In early 1997 a syndicate at Lloyd's, Agnew, wished to reinsure its
liabilities on its onshore energy account. FAI offered to act as reinsurer but
Agnew required an "A" rated reinsurer.    FAI was not "A" rated.    *B*
Accordingly, Agnew required the policy to be fronted by an acceptably rated
reinsurer. Sirius was an "A" rated reinsurer. By its letter dated 15 October
1997, Sirius agreed to "front" the reinsurance by writing the policy for
Agnew, and then retroceding it "back to back" to FAI. For fronting the
reinsurance Sirius received an annual fee of US$65,000.

6    Sirius duly wrote the reinsurance for Agnew for two periods:    *C*
1 December 1996 to 31 December 1997 and 31 December 1997 to
31 December 1998 and FAI duly wrote the retrocessions for Sirius for
the same periods. The premiums for the two years were respectively US$2m
and US$1.6m. These sums went to FAI. To summarise: Agnew was the
insurer; Sirius was the fronting reinsurer, and FAI was the retrocessionaire.

7    By undertaking to act as fronting reinsurer Sirius assumed the risk, in
the event of the insolvency or default of FAI, of having nevertheless to pay    *D*
Agnew. The fact that the FAI was not an "A" rated insurance company
underlined the fact of the risk.    Not surprisingly, Sirius required security.
Sirius insisted on a letter of credit from a bank.    A side letter, dated
3 September 1999, which was negotiated between Sirius and FAI, provided:

"We [Sirius] therefore undertake that we will not agree or pay any
claim presented to Sirius by [Agnew] without FAI's prior agreement in    *E*
writing, nor will we draw down under [the letter of credit], unless
(1) FAI has agreed that Sirius should pay a claim but has not put Sirius in
funds to do so, notwithstanding the simultaneous settlements clause in
our retrocession contract (see below) or (2) [Agnew] obtains a judgment
or binding arbitration award against Sirius which Sirius is obliged to pay."

Paragraph 3 of the side letter also recorded that    *F*

"FAI has already agreed to a simultaneous settlements clause which
provides that FAI shall pay their share of any loss under the retrocession
simultaneously with Sirius' payment to Agnew".

Thereafter, FAI (by now acting by its parent HIH) produced a draft letter of
credit. The terms of the letter of credit, which incorporated the ICC Uniform
Customs and Practice for Documentary Credits (1993 Revision), were    *G*
approved by Sirius. On 24 January 2000, Westpac Banking Corpn, an
Australian bank, produced an irrevocable standby letter of credit for US$5m
in the terms agreed by the parties. Westpac was not aware of the terms of the
side letter.

*The dispute*    *H*

8    By this time, Agnew had claimed against Sirius under the
reinsurances, and a dispute had developed as to whether the reinsurances
written by Sirius and, consequent upon that, the retrocessions written by
FAI, should respond to the claims. On 23 March 2000, Lambert Fenchurch

3255
**[2004] 1 WLR**          Sirius Insurance Co v FAI General Insurance (HL(E))
Lord Steyn

A  Ltd (Agnew's brokers), Agnew and Sirius entered into a funding agreement
whereby, inter alia, Lambert Fenchurch agreed to fund Agnew in respect of
its paid losses due under the reinsurances and Sirius agreed to permit
Lambert Fenchurch to commence proceedings on its behalf to enforce Sirius'
rights under the retrocessions. Prior to the funding agreement, Sirius had
suggested an ad hoc arbitration between Agnew and FAI. FAI refused to
engage in such an arbitration. In May 2000, Sirius started arbitration
B  proceedings against FAI claiming to be entitled to payment by FAI under the
retrocessions which issue necessarily involved the question whether Sirius
was liable to Agnew. On 15 March 2001, provisional liquidators were
appointed in Australia over FAI. On 23 March 2001, provisional
liquidators were appointed in England by Hart J. This had the effect, under
section 130(2) of the Insolvency Act 1986, of automatically staying the
C  arbitration proceedings.

*The Tomlin order*

9  Sirius applied to court for a lifting of the automatic stay on the
arbitration, which was by then about to come to a lengthy substantive
hearing. By that time the provisional liquidators were running FAI. The
D  application to lift the automatic stay on the arbitration were compromised
between Sirius and the provisional liquidators of FAI by a Tomlin order
dated 6 April 2001. The material terms of the Tomlin order were as follows:

"1 FAI General Insurance Co Ltd ('FAI') is indebted to the applicant
[Sirius] in the sum of US$22,500,000 and the applicant shall be entitled to
prove in the liquidation or scheme of arrangement of FAI in the said sum
E  of US$22,500,000. 2 [Sirius] shall draw down on Westpac Banking
Corporation's Irrevocable Standby Letter of Credit No 772 dated
3 February 2000 ('the LOC'). 3 [Sirius] shall pay the proceeds of the
LOC ('the proceeds') into an escrow account to be held together with
accrued interest thereon by Reynolds Porter Chamberlain pending the
resolution of the parties' claims (if any) in respect of the LOC. 4 For the
avoidance of doubt, the position and all arguments of the applicant and
F  the respondents in respect of the LOC are preserved in respect of the
proceeds notwithstanding the terms of this schedule. 5 Save for the
parties' rights with respect to the LOC and the agreements associated to
the LOC, the terms herein shall be in full and final settlement of all claims
raised by either party in the arbitration proceedings."

G  On about 12 June 2001, the letter of credit was drawn down in accordance
with its terms and the proceeds were placed in escrow pursuant to the
Tomlin order.

*The proceedings*

10  On 31 July 2001, Reynolds Porter Chamberlain, on behalf of Sirius,
demanded payment of the sums held in escrow. The demand was not
H  acceded to and these proceedings were commenced by Sirius by application
dated 19 September 2001. On 27 May 2002, Mr Registrar Baister directed
that certain questions be determined as preliminary issues: namely (a) what
were the conditions upon which Sirius could draw down the letter of credit
and (b) whether those conditions were satisfied.

3256
Sirius Insurance Co v FAI General Insurance (HL(E))          [2004] 1 WLR
Lord Steyn

11   On 23 July 2002, Jacob J [2003] 1 WLR 87 decided that the first      A
condition of the side letter had been satisfied by the terms of paragraph 1 of
the Tomlin order and gave directions for the future conduct of the
application and also gave FAI permission to appeal. In respect of the first
condition of the side letter Jacob J observed, at p 94, para 26:

"[Counsel for FAI] submitted that FAI had never agreed that Sirius
should pay a claim. [Counsel for Sirius] says that FAI in effect did so by   B
clause 1 of the Tomlin schedule. By that clause FAI acknowledged an
indebtedness of US$22·5m to Sirius. Everyone knew that there was a
back-to-back arrangement in place, that the US$22·5m would inure for
Agnew's benefit. So in substance, submitted [counsel for Sirius],
FAI agreed to payment by Sirius. They knew exactly who was really
getting the benefit of clause 1 of the settlement agreement. I think that is   C
right. No one ever thought that the right to the US$22·5m was really that
of Sirius. The commercial substance is that FAI had agreed that Sirius
should pay a claim."

12   On 4 April 2003, the Court of Appeal reversed the decision of the
judge. The Court of Appeal [2003] 1 WLR 2214 held that the first condition
of the side letter had not been satisfied and decided that FAI was entitled to
the proceeds of the letter of credit. On the point of interpretation May LJ   D
concluded, at pp 2222–2223, para 21:

"[Counsel for Sirius] accepted that the second condition of the
3 September 1999 agreement was not and is not fulfilled. He accepted
that the first condition was not fulfilled before the Tomlin order. He
accepted that the literal words of paragraph 1 do not express an         E
agreement by FAI that Sirius should pay Agnew's claim. Creative
construction or implication is required to interpret it as doing so. He
accepted, I think, that an award in contested arbitration proceedings
would not have fulfilled the first condition. But the Tomlin order, he said,
embodied an agreement not an award, and the agreement that Sirius
should be entitled to prove in FAI's liquidation or administration for
US$22·5m necessarily carried with it an agreement by FAI that Sirius     F
should pay Agnew's claim. I do not think so."

Carnwath LJ agreed, at p 2227, para 34, and Wall J came to the same
conclusion, at p 2228, para 39. The Court of Appeal held that FAI were
entitled to the proceeds of the letter of credit in the escrow account. The
effect was Sirius became an unsecured creditor in the insolvency of FAI.
13   Sirius now appeals to the House of Lords.                            G

*The issues*

14   The statement of issues agreed between the parties reads as follows:

"(1) Whether paragraph 1 of the Tomlin order, on its true
construction, constituted an agreement by FAI that [Sirius] should pay
Agnew and thereby satisfied the first of the conditions for draw down set   H
out in the agreement. (2) Whether, having regard to paragraphs 4 and 5 of
the Tomlin order, any of the provisions of that order can be construed as
taking away FAI's argument that it was entitled to the proceeds of the
letter of credit as a result of non-compliance with the conditions of draw

A    down in the agreement. (3) Whether, in the event that [Sirius] could not establish that the agreed conditions for draw down were satisfied, it follows that draw down in breach of the agreement gave rise to an entitlement on the part of FAI to the proceeds of the letter of credit, as opposed to a claim in damages. This question raises the following issues: (a) Whether the effect of the autonomy principle, which is applicable to letters of credit and all other documentary credits, is such as to give [Sirius] the right to the proceeds, leaving FAI with its claim in damages; or

B    (b) Whether, in the circumstances of this case, FAI is entitled to the proceeds."

*The point of construction*

C    15    The principal question is whether the first condition of the side letter was satisfied by the terms of paragraph 1 of the Tomlin order.

16    The judge ended his trenchant judgment by saying, at p 94, para 28:

"I reach this conclusion without regret. The truth is that FAI got the benefit of Sirius fronting the deal. The price of that was the provision of the letter of credit. The letter of credit was properly drawn down. It was there to meet just the eventualities that happened."

D

This was a reference to the merits of the underlying dispute. In the construction of commercial documents a hard-headed approach is necessary. The merits of the underlying dispute, predating the Tomlin order, were as such entirely irrelevant to the determination of the question of construction. But the matrix of the Tomlin order may cast light on its meaning.

E    17    Turning now to the two documents to be considered, the meaning of the first condition of the side letter is not in doubt. It stipulates as a pre-condition for draw down under the letter of credit that: "FAI has agreed that Sirius should pay [to Agnew] a claim but has not put Sirius in funds to do so, notwithstanding the simultaneous settlements clause . . ." (Words in square brackets inserted). No dispute about the meaning of this precondition

F    emerged during the oral hearing of the appeal. The critical question is whether the terms of paragraph 1 of the Tomlin order satisfied this condition.

18    The settlement contained in the Tomlin order must be construed as a commercial instrument. The aim of the inquiry is not to probe the real intentions of the parties but to ascertain the contextual meaning of the relevant contractual language. The inquiry is objective: the question is what

G    a reasonable person, circumstanced as the actual parties were, would have understood the parties to have meant by the use of specific language. The answer to that question is to be gathered from the text under consideration and its relevant contextual scene.

19    There has been a shift from literal methods of interpretation towards a more commercial approach. In *Antaios Compania Naviera SA v Salen*

H    *Rederierna AB* [1985] AC 191, 201, Lord Diplock, in an opinion concurred in by his fellow Law Lords, observed: "if detailed semantic and syntactical analysis of a word in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense." In *Mannai Investment Co Ltd v Eagle Star Life Assurance*

*Co Ltd* [1997] AC 749, 771, I explained the rationale of this approach as follows:     *A*

> "In determining the meaning of the language of a commercial contract . . . the law . . . generally favours a commercially sensible construction. The reason for this approach is that a commercial construction is more likely to give effect to the intention of the parties. Words are therefore interpreted in the way in which a reasonable     *B* commercial person would construe them. And the standard of the reasonable commercial person is hostile to technical interpretations and undue emphasis on niceties of language."

The tendency should therefore generally speaking be against literalism. What is literalism? It will depend on the context. But an example is given in *The Works of William Paley* (1838 ed), vol III, p 60. The moral philosophy     *C* of Paley influenced thinking on contract in the 19th century. The example is as follows: the tyrant Temures promised the garrison of Sebastia that no blood would be shed if they surrendered to him. They surrendered. He shed no blood. He buried them all alive. This is literalism. If possible it should be resisted in the interpretative process. This approach was affirmed by the decisions of the House in *Mannai Investment Co Ltd v Eagle Star Life*     *D* *Assurance Co Ltd* [1997] AC 749, 775E–G, per Lord Hoffmann and in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 913D–E, per Lord Hoffmann.

20    From the surrounding circumstances preceding the making of the Tomlin order, and the text of the Tomlin order, it can be inferred that the parties had two major immediate objectives. First, they desired to compromise an arbitration that would have been long and costly. This     *E* objective was achieved by paragraph 5 of the Tomlin order. Secondly, the letter of credit had been extended but was due to expire on 15 November 2001. Both parties wanted to obtain a draw down of the letter of credit on terms which left open the issue of the entitlement of the proceeds of the draw down. Paragraph 2 of the Tomlin order provided for the draw down.

21    That brings me directly to the effect of paragraph 1 of the Tomlin     *F* order read in context of the remainder of the paragraphs of the schedule to it. At first glance there are countervailing indications. Counsel for Sirius emphasised the unqualified acknowledgement of indebtedness in a specific sum in paragraph 1. While literally paragraph 1 recorded the indebtedness of FAI to Sirius, counsel for Sirius argued that by reason of the back-to-back fronting arrangement, and the simultaneous settlement clause referred to in the side letter itself, paragraph 1 necessarily meant that FAI acknowledged     *G* the indebtedness of Sirius to Agnew in the same sum. At the very least, he argued, it meant that FAI accepted that the insured events had occurred and that liability in the sum of $22·5m had been incurred under the matching reinsurances and retrocessions. As against this counsel for FAI relied heavily on the words in paragraph 4 that "*all* arguments of [Sirius] and [FAI] are preserved in respect of the proceeds notwithstanding the terms of this     *H* schedule". His primary argument was that paragraph 1 must be read as entirely subordinate to paragraph 4. He submitted that the very fact that it was agreed that the proceeds would be paid into an escrow account, rather than be paid over to Sirius, supported this argument.

A    22 If this argument of FAI is accepted, it follows inexorably that by virtue of the terms of the settlement in the Tomlin order Sirius abandoned the chance of ever fulfilling either condition of the side letter. That must be so since the arbitration proceedings were compromised. In his judgment the judge trenchantly commented on such an outcome, at p 93, paras 21–22:

B    "If one follows the logic of [the] argument through, its effect is that the letter of credit was agreed at the time to be unenforceable. It might as well have been torn up by the agreement . . . This is such a bizarre conclusion that it cannot be right."

On this point May LJ came to the same conclusion. He said, at p 2222, para 19:

C    "In my judgment, the judge was correct to reject FAI's extreme submissions based on paragraphs 4 and 5 of the schedule to the Tomlin order. The short point is that paragraphs 4 and 5 cannot, in my view, be read as leaving open for future contention that which paragraph 1 compromised. Paragraph 1 compromised the arbitration proceedings. It did not purport to determine questions arising out of the letter of credit. Available arguments as to the letter of credit were preserved, but the

D    indebtedness of FAI to Sirius under the retrocessions was determined."

Carnwath LJ agreed with the judgment of May LJ and in a separate judgment Wall J took the same view. In my view the outcome contemplated by the argument of counsel for FAI is so extraordinary as to be commercially implausible.

E    23 I would accept the argument of counsel for Sirius and reject the argument of counsel for FAI. It does not follow from this conclusion that the reservation of rights under paragraph 4, and the payment of the proceeds into the escrow account, is to be given no meaning. These features of the settlement were intended to enable the English provisional liquidators to decide whether, and if so, in what manner, they might wish to challenge Sirius' right to the proceeds of the letter of credit. One must bear in mind that the provisional liquidators took office only 13 days before the Tomlin

F    order and probably knew very little about the background. The reservation of rights would, for example, have entitled them to rely, for example, on dishonesty in the underlying transaction if that could be established. Only in such an attenuated sense were rights reserved. Given this reservation of rights, the arrangement to pay the proceeds into an escrow account was not surprising.

G    24 For all these reasons I would reject the primary argument of counsel for FAI.

25 That leaves the reasoning of the Court of Appeal to the effect "that the literal words of paragraph 1 do not express an agreement by FAI that Sirius should pay Agnew's claim": p 2223, para 21, per May LJ and p 2228, para 39, per Wall J. It is indeed true that literally paragraph 1 did not so

H    provide. But it is also clear that the words of paragraph 1 necessarily meant that FAI agreed that, under the back to back reinsurances, and the simultaneous settlements procedure, that Sirius should pay Agnew. If it were necessary I would reach this conclusion on the basis of a constructional implication. I do not, however, think that it is necessary to resort to an implication. In my view the judge was right to conclude that on a correct

interpretation of paragraph 1 of the Tomlin order the first condition of the   A
side letter was satisfied. With due respect to the members of the Court of
Appeal their interpretation was uncommercial and literalistic.

26   Given this conclusion it is common ground that all remaining issues
fall away.

27   For these reasons, as well as the reasons given by my noble and
learned friend, Lord Walker of Gestingthorpe, I would allow the appeal
against the order of the Court of Appeal and restore the order of Jacob J.   B

## LORD WALKER OF GESTINGTHORPE

28   My Lords, I have had the advantage of reading in draft the speech of
my noble and learned friend, Lord Steyn. I agree with it, and for the reasons
which he gives I would allow this appeal. But because of the differences of
opinion between your Lordships on the first issue, the issue of construction,   C
I wish to add a few observations in my own words.

29   The House has to construe two contractual documents which
interact on each other. One is a letter dated 3 September 1999 written by
Ms Monica Cramer Manhem, a senior vice-president of the principal
company in the group which includes the appellant, Sirius. The letter is part
of an exchange of correspondence between reinsurance executives, and none
of the correspondence appears to have been drafted by lawyers. The other   D
document is the schedule to a Tomlin order made on 6 April 2001. The
order was made on what had originally been an application to lift a stay of
arbitration proceedings between Sirius and the first respondent, FAI. It had
the effect of bringing the arbitration proceedings to an abrupt end. What
further effect it had is a matter of acute controversy, on which Jacob J and
the Court of Appeal reached different conclusions.   E

30   The Tomlin order was drafted by competent and experienced
lawyers (the House was not told its exact provenance, but both sides had
solicitors and counsel of high standing). But it seems to have been produced
under severe time constraints, and at a time when (because of the recent
appointment of provisional liquidators with solicitors and counsel who were
new to the matter) one side at least was by no means well informed about the
tangled history of these reinsurances. Sirius (and the brokers, Lambert   F
Fenchurch, who were in substance conducting the arbitration in the name of
Sirius) had much more opportunity to become acquainted with the
complexities of the position but for them too FAI's dramatic plunge into
insolvency was a new factor calling for specialised advice.

31   When a commercial dispute arises it is sometimes convenient to both
sides to reach a limited agreement involving some immediate action, but to   G
leave other issues unresolved, to be compromised or litigated at some future
time. In the present case it is reasonably clear—whatever other difficulties
there are about the construction and effect of the schedule to the Tomlin
order—that both sides wanted to achieve two immediate objectives. One
was to put an end to the arbitration proceedings, in which a long and
expensive hearing was due to start very soon. The other was to obtain draw-
down on the letter of credit (which had been extended but was to expire on   H
15 November 2001) while leaving open the issue of entitlement to the
proceeds of the draw-down.

32   When parties are under severe time pressure, and one or both of
them have inadequate information, such a limited agreement may be all that

A the parties can achieve. But in such difficult circumstances they may have to accept that the immediate action on which they do agree inevitably alters the context of the issues which remain unresolved. For instance, a consent order for sale of equipment subject to a finance lease may raise the question whether relief from forfeiture, which the lessee was seeking from the court, is still available (see the decision of this House in *On Demand Information plc v Michael Gerson (Finance) plc* [2003] 1 AC 368, especially in the speech

B of Lord Millett, at p 381, paras 36–39).

33   So in this case the two important points on which the parties did agree inevitably had an effect on the issues which were not resolved. Paragraphs 1 and 5 of the schedule had the effect of putting a final end to the arbitration. It was no longer possible for Sirius to obtain declaratory relief (sought, in addition to a money award, in the arbitration) to the effect that

C Sirius was bound to pay Agnew and FAI was bound to pay Sirius. Moreover, paragraphs 2 and 3 of the schedule had the effect that Westpac, the issuer of the letter of credit, dropped out of the picture. The escrow account was a sort of substitute for the letter of credit but it was of a different kind, as the element of "the great and fundamentally important separation" (the expression used by Sir John Donaldson MR in *Bolivinter Oil SA v Chase Manhattan Bank (Practice Note)* [1984] 1 Lloyd's Rep 251, 256) between

D banker and re-insurers was no longer there.   The deceptively simple language of para 4 of the schedule must in my view be approached with these points in mind.

34   The terms in the schedule, and paragraph 4 in particular, must also be viewed, like any other contractual document, in their commercial context.   In this House there was not much common ground between

E counsel as to how the commercial context of the Tomlin order should be characterised.   The courts below saw much more of the extensive documentary evidence than has been placed before your Lordships. But the limited evidence before the House discloses some uncontroversial facts which may be material. (a) The order of Mr Registrar Baister made on 27 May 2002 (that is, more than a year after the Tomlin order) shows that there was still no agreement as to what the basic contractual documents

F were. Between August 1999 and January 2000 there had been a lengthy exchange of correspondence (identified in the affidavit dated 18 September 2001 of Mr Timothy Brown of Reynolds Porter Chamberlain and the witness statement dated 2 November 2001 of Ms Kathryn Carr of Ince & Co) from which the effective contractual terms had to be identified and extracted. (b) In an affidavit made on 5 April 2001 (that is, the day before

G the Tomlin order) Mr Timothy Bull of Reynolds Porter Chamberlain deposed (in relation to the letter of 3 September 1999) to his belief that: "The agreement does not say so however the intention is that FAI's written agreement would not be unreasonably withheld." Whether or not this was admissible or cogent on the issue of construction of the letter, it appears to have been the only clear instance of an argument about the letter of credit put forward openly before the making of the Tomlin order. (c) There is

H mention (in a letter dated 31 July 2001 from Reynolds Porter Chamberlain to Freshfields Bruckhaus Deringer, and also in an affidavit of Mr Timothy Brown of Reynolds Porter Chamberlain sworn on 18 September 2001) of a suggestion put forward on behalf of the provisional liquidators that (in the words of the letter) "the security given by the LOC must be 'downgraded' as

a result of FAI's insolvency to security for any distribution in the estate of *A* FAI". This suggestion was evidently put forward after the appointment of the provisional liquidators but before the Tomlin order. (d) However, it does not seem to have been a considered view, since on 7 August 2001 Freshfields (for the provisional liquidators) stated that their clients had still not had an opportunity to acquaint themselves with the facts and take a view as to the merits of Sirius's claim. In order to do so they would need (among other things) to contact Ince & Co (who had acted for FAI at the time). *B* Freshfields' state of knowledge on 6 April 2001 must have been even more deficient. (e) In her witness statement of 2 November 2001 Ms Carr put forward further arguments (based on allegations of champerty and misrepresentation) on behalf of the provisional liquidators but there is no suggestion that these arguments were live at the date of the Tomlin order.

35   Against that background I turn to paragraph 4 of the schedule to the *C* Tomlin order:

"For the avoidance of doubt, the position and all arguments of [Sirius] and [FAI and the provisional liquidators] in respect of the LOC are preserved in respect of the proceeds notwithstanding the terms of this schedule."

*D*
Meticulous verbal analysis of this paragraph is not appropriate, at any rate not to the exclusion of common sense, or its commercial context. Nevertheless I make three short verbal points. First, the words "For the avoidance of doubt", although sometimes loosely used, suggest that the paragraph is going to spell out what is fairly obvious (or at any rate unsurprising) rather than subverting the other provisions of the schedule. Second, the reference to arguments being "preserved" cannot in the *E* circumstances sensibly restrict the parties to arguments which had already been articulated and advanced (compare the mirror-image issue of the release of unknown claims considered by this House in *Bank of Credit and Commerce International SA v Ali* [2002] 1 AC 251); at the time when the Tomlin order was made there seems to have been doubt even as to the identity of the relevant contractual documents. Any arguments, whether or not already canvassed, could be put forward (the parenthesis " (if any)" in *F* paragraph 3 is consistent with that). Third, the repetition of "in respect of" ("the arguments . . . in respect of the LOC are preserved in respect of the proceeds") is not careless drafting but serves to emphasise the intended parallel between the letter of credit before draw-down and the proceeds after draw-down.

36   Then there are the most controversial words in paragraph 4, *G* "notwithstanding the terms of this schedule". Plainly they are intended to have some sort of overriding effect: in particular, since the issues left unresolved centre on the letter of credit, to require entitlement to the letter of credit to be determined as if there had been no draw-down.   That hypothetical approach may give rise to more difficulties than the parties had fully thought through, but it is consistent with their commercial objectives.

37   Does the schedule intend the hypothesis to be stretched further, so as *H* to require the apparently unqualified acknowledgement in paragraph 1 of FAI's liability to be disregarded in determining entitlement to the proceeds of the letter of credit? The judge thought that that would be an extraordinary result. He said, at p 93, paras 21–22:

3263

**[2004] 1 WLR**                    Sirius Insurance Co v FAI General Insurance (HL(E))
                                    Lord Walker of Gestingthorpe

A    "If one follows the logic of [the] argument through, its effect is that the
     letter of credit was agreed at the time to be unenforceable.  It might as
     well have been torn up by the agreement . . .  This is such a bizarre
     conclusion that it cannot be right."

     38  In the Court of Appeal May LJ took the same view.  He said,
     at p 2222, para 19:

B        "In my judgement, the judge was correct to reject FAI's extreme
     submissions based on paragraphs 4 and 5 of the schedule to the Tomlin
     order.  The short point is that paragraphs 4 and 5 cannot, in my view, be
     read as leaving open for future contention that which paragraph
     1 compromised.  Paragraph 1 compromised the arbitration proceedings.
     It did not purport to determine questions arising out of the letter of credit.
C    Available arguments as to the letter of credit were preserved, but the
     indebtedness of FIA to Sirius under the retrocessions was determined."

     Carnwath LJ agreed with May LJ; and Wall J expressed similar views.
     39  The ground on which the Court of Appeal disagreed with the judge
     was not as to a far-reaching counterfactual hypothesis introduced by
     paragraph 4, but as to the proper meaning of paragraph 1, construed in its
D    commercial context.  On that point, for all the reasons given by Lord Steyn,
     I respectfully prefer the reasoning of the judge to that of the Court of Appeal.
     As the judge said, at p 94, para 26: "The commercial substance is that
     FAI had agreed that Sirius should pay a claim."  For these reasons I would
     allow the appeal.

     **LORD BROWN OF EATON-UNDER-HEYWOOD**
E    40  My Lords, I find myself in precisely the same position as my noble
     and learned friend, Lord Bingham of Cornhill.  I too was inclined to the
     construction of the Tomlin order contended for by the defendants.  For the
     reasons given by Lord Bingham, however, I too am content to agree that
     the appeal should be allowed.

F                                                    *Appeal allowed.*

     *Solicitors: Reynolds Porter Chamberlain; Ince & Co.*

                                                            B L S

G                              —————

H

LC/11

A    made.  He conceded that if the respondent had not been insured in respect
of his costs he could not have resisted the making of the order sought;
but that—he said—was because the respondent would have had in his
favour not simply the fact of success but also the fact of financial hardship.
I cannot accept this submission either.  As my noble and learned friend,
Lord Reid, said in *Gallie* v. *Lee* (*No. 2*) [1971] A.C. 1039, 1048, the
Act directs the court to consider all the circumstances and decide on
B    broad lines.  One circumstance—and a very important circumstance—is the
fact that the appeal has resulted in success for the unassisted litigant.  In
any given case there may be many other relevant circumstances—some
telling in favour of the unassisted party and some against him—which the
court has to take into account and weigh against each other; but I do not
think that one can deduce from the wording of the Act a hard and fast
rule such as was contended for by counsel that, even though there is nothing
C    to be said against the applicant, the fact of his success alone can never
entitle him to an order.  On the facts of this case where the legal aid
authorities have financed two wholly unsuccessful appeals, I am clearly of
opinion that it is " just and equitable " that the order asked for should
be made.  The costs of all the parties of the application should also, I
think, be paid out of the legal aid fund.

D
                                                        *Order accordingly.*

    Solicitors: *Sharpe, Pritchard & Co.; The Law Society; Peacock &
Goddard.*
                                                        J. A. G.

E

                                ————

                        [HOUSE OF LORDS]

F  L. SCHULER A.G.    .    .    .    .    .    .    APPELLANTS
                                AND
   WICKMAN MACHINE TOOL SALES LTD.    .    .    RESPONDENTS

   [On appeal from WICKMAN MACHINE TOOL SALES LTD. *v.* L. SCHULER A.G.]

G  1973  Jan. 30, 31;            Lord Reid, Lord Morris of Borth-y-Gest,
        Feb. 1, 5, 6, 7, 8;           Lord Wilberforce, Lord Simon of
        April 4                         Glaisdale and Lord Kilbrandon

        *Contract—Construction—" Condition "—Long-term agency con-
            tract for sale of panel presses—Single subclause providing that
            it should be " condition " of agreement for agents to visit
H           named motor manufacturers weekly to solicit orders—
            Meaning of " condition " in context—Whether ambiguous—
            Whether single breach entitling other party to repudiate
            contract—Whether subsequent conduct of parties relevant to
            interpretation*

**Wickman Tools v. Schuler A.G. (H.L.(E.))**                    **[1974]**

In May 1963 the appellants, German manufacturers, agreed
to give the respondents, an English company, the sole selling   **A**
rights for panel presses made by them for 4½ years. Clause 7
(*b*) of the contract provided that " It shall be [a] condition of
this agreement that (i) [the respondents] shall send its repre-
sentatives to visit " the six largest United Kingdom motor manu-
facturers " at least once in every week " to solicit orders for
panel presses. No other of the 20 clauses of the agreement was
described as a condition.

During the first eight months the respondents failed in   **B**
the visiting obligation on a scale which the arbitrator in the
consequential arbitration found to be a " material breach "
but the evidence showed that it was treated as remediable
under clause 11 (*a*) (i), which provided that either party could
terminate the agreement if the other committed a material
breach of its obligations and failed to remedy it within 60
days of being required to do so; and he found that those
breaches had been waived. In the next six months there   **C**
were immaterial breaches of the obligation, some for good
reasons; but in July 1964 the appellants claimed the right to
terminate the contract under clause 11 (*a*) (i) and terminated it
in October 1964.

The respondents claimed damages for wrongful repudiation.
Not until the hearing of the dispute before the arbitrator were
the appellants' points of defence amended to found the right
to repudiate on the respondents' breach of the " express con-   **D**
dition " in clause 7 (*b*). The arbitrator construed " condition "
in the subclause as referable to the provisions of clause 11 (*a*)
(i) and awarded in the respondents' favour; but Mocatta J. on
appeal on a case stated held that the introduction of the words
" It shall be [a] condition . . ." in one subclause gave the
appellants the right to repudiate the whole contract if the
respondents committed only one isolated breach of the visiting
obligation. The Court of Appeal (by a majority) reversed that   **E**
decision holding, inter alia, that in construing the contract
which was ambiguous in its terms it was relevant to consider
the subsequent conduct of the parties.

The appellants appealed : —

*Held,* (1) that in general an agreement could not be
construed in the light of the subsequent actions of the parties.

*Whitworth Street Estates (Manchester) Ltd.* v. *James Miller
& Partners Ltd.* [1970] A.C. 583, H.L.(E.) applied.   **F**

*Watcham* v. *Attorney-General of East Africa Protectorate*
[1919] A.C. 533, P.C. considered.

(2) Dismissing the appeal (Lord Wilberforce dissenting),
that the word condition had acquired more than one meaning
in contracts, and in the present agreement, in relation to the
continuing visiting obligation, its meaning was equivocal; that
in the light of the rest of the contract " condition " in clause
7 (*b*) meant a contractual term breach of which if unremedied   **G**
(i.e., unrectified for the future if capable of rectification) gave
the appellants the right to terminate the contract in accordance
with clause 11; and that it was not a condition in the primary
sense of being used as a term of art such that a single breach
of it, however trivial and however long past, would, in the
absence of any waiver, entitle the innocent party to terminate
the whole contract forthwith.

*Per* Lord Reid. The fact that a particular construction   **H**
leads to a very unreasonable result must be a relevant con-
sideration. The more unreasonable the result the more unlikely
it is that the parties can have intended it, and if they do intend

**Wickman Tools v. Schuler A.G. (H.L.(E.))** [1974]

of repudiation in the event of there being " material " breaches of contract.
If it had been the intention of the parties to provide by clause 7 (*b*) that    A
any breach of it (by any failure to visit) was to be so basic to the further
continuance of the contract as to entitle Schuler at once to treat the contract
as ended, then, such a breach would automatically and inevitably be a
" material " breach and one which Schuler need give Wickman no oppor-
tunity to remedy. The fact that the detailed provisions of clause 11 do not
preserve what (on Schuler's submissions) would have been Schuler's un-    B
doubted rights under clause 7 (*b*) is a pointer which confirms my view as to
the meaning of clause 7 (*b*).

For the reasons which I have given I would dismiss the appeal. I
would, however, not base or support my conclusion by having regard to the
way in which Schuler at certain times expressed themselves in reference to
the agreement. Nor is it of any moment that the issue in the litigation
which now survives was not at first pleaded. If the point taken on behalf    C
of Schuler is a valid one it cannot matter that for a period neither its
existence nor its strength was appreciated. It is said, however, that the
way in which the meaning of clause 7 (*b*) was interpreted by Schuler during
the currency of the agreement made it plain that they did not consider
themselves entitled to end the agreement if there were breaches of the
clause. It is said that as the result of a meeting in November, 1963,    D
Schuler proceeded on the basis that there had been failures by Wickman
to make weekly visits and that that put them " in breach of contract
which, under the terms of the agreement must be righted in 60 days from
notice thereof." It is said that in December 1963, Schuler were advised
that if Wickman had failed to fulfil their contractual obligations as to visits
to the six companies they (Wickman) were entitled under the contract to
have 60 days within which to remedy their breach. So it is said that it is    E
shown that (from November, 1963) the parties understood or interpreted
their contract in the sense that a breach by Wickman of clause 7 (*b*) would
not entitle Schuler to rescind as Schuler now contend that they were so
entitled. But assuming that the parties did so reveal their understanding of
the matter, there being no suggestion of a new agreement or of an estoppel,
I do not think that the task of the court in interpreting the contract is    F
assisted or is in any way altered. There may or may not be special
considerations in cases where there have been operations in regard to
land which have taken place pursuant to or subsequent to some document
of title or contract concerning the land. That need not now be considered.
But in a case such as the present I see no reason to doubt the applicability or
the authority of what was said in *Whitworth Street Estates (Manchester)*
*Ltd.* v. *James Miller & Partners Ltd.* [1970] A.C. 583. If on the true    G
construction of a contract a right is given to a party, that right is not
diminished because during some period either the existence of the right or
its full extent was not appreciated.

For the reasons which I have given I would dismiss the appeal.

LORD WILBERFORCE. My Lords, with two qualifications, this case is one    H
of interpretation of the written agency or distributorship agreement between
the appellants and the respondents dated May 1, 1963, in particular of
clause 7 (*b*) of that agreement.

A   The first qualification involves the legal question whether this agreement may be construed in the light of certain allegedly relevant subsequent actions by the parties. Consideration of such actions undoubtedly influenced the majority of the Court of Appeal to decide, as they did, in the respondent's favour: and it is suggested, with much force, that, but for this, Edmund Davies L.J. would have decided the case the other way. In my opinion, subsequent actions ought not to have been taken into account.

B   The general rule is that extrinsic evidence is not admissible for the construction of a written contract; the parties' intentions must be ascertained, on legal principles of construction, from the words they have used. It is one and the same principle which excludes evidence of statements, or actions, during negotiations, at the time of the contract, or subsequent to the contract, any of which to the lay mind might at first sight seem to be proper to receive. As to statements during negotiations this House has affirmed the rule of exclusion in *Prenn* v. *Simmonds* [1971] 1 W.L.R.

C   1381 as to subsequent actions (unless evidencing a new agreement or as the basis of an estoppel) in *Whitworth Street Estates (Manchester) Ltd.* v. *James Miller & Partners Ltd.* [1970] A.C. 583.

There are of course exceptions. I attempt no exhaustive list of them. In the case of ancient documents, contemporaneous or subsequent action

D   may be adduced in order to explain words whose contemporary meaning may have become obscure. And evidence may be admitted of surrounding circumstances or in order to explain technical expressions or to identify the subject matter of an agreement: or (an overlapping exception), to resolve a latent ambiguity. But ambiguity in this context is not to be equated with difficulty of construction, even difficulty to a point where judicial opinion as to meaning has differed. This is, I venture to think, elementary law. On

E   this test there is certainly no ambiguity here.

The arguments used in order to induce us to depart from these settled rules and to admit evidence of subsequent conduct generally in aid of construction, were fragile. They were based first on the Privy Council judgment in *Watcham* v. *Attorney-General of East African Protectorate* [1919] A.C. 533 not, it was pointed out, cited in *Whitworth's* case. But

F   there was no negligence by counsel or incuria by their Lordships in omitting to refer to a precedent which I had thought had long been recognised to be nothing but the refuge of the desperate. Whether, in its own field, namely, that of interpretation of deeds relating to real property by reference to acts of possession, it retains any credibility in the face of powerful judicial criticism is not before us. But in relation to the interpretation of contracts or written documents generally I must deprecate its future

G   citation in English courts as an authority. It should be unnecessary to add that the well-known words of Sir Edward Sugden (later Lord St. Leonards) (*Attorney-General* v. *Drummond* (1842) 1 Dr. & War. 353, 368) ". . . tell me what you have done under *such* a deed, and I will tell you what *that deed* means " relate to ancient instruments and it is an abuse of them to cite them in other applications. Secondly, there were other

H   authorities cited, *Hillas & Co. Ltd.* v. *Arcos Ltd.* (1932) 43 Ll.L.R. 359 and *Foley* v. *Classique Coaches Ltd.* [1934] 2 K.B. 1. But, with respect, these are not in any way relevant to the present discussion, and the judgment of Lawrence J. in *Radio Pictures Ltd.* v. *Inland Revenue Commissioners*

(1938) 22 T.C. 106, so far as it bears on this point was disapproved in the
Court of Appeal and in my opinion was not correct in law.

In my opinion, therefore, the subsequent actings relied upon should
have been left entirely out of account: in saying this I must not be taken to
agree that the particular actings relied on are of any assistance whatever
towards one or other construction of the contract. Indeed if one were
to pursue the matter, the facts of the present case would be found to
illustrate, rather vividly, the dangers inherent in entertaining this class of
evidence at all.

The second legal issue which arises I would state in this way: whether
it is open to the parties to a contract, not being a contract for the sale of
goods, to use the word " condition " to introduce a term, breach of which
ipso facto entitles the other party to treat the contract at an end.

The proposition that this may be done has not been uncriticised. It is
said that this is contrary to modern trends which focus interest rather upon
the nature of the breach, allowing the innocent party to rescind or repudiate
whenever the breach is fundamental, whether the clause breached is called
a condition or not: that the affixing of the label " condition " cannot
pre-empt the right of the court to estimate for itself the character of the
breach. Alternatively it is said that the result contended for can only be
achieved if the consequences of a breach of a " condition " (sc., that the
other party may rescind) are spelt out in the contract. In support of this
line of argument reliance is placed on the judgment of the Court of Appeal
in *Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962]
2 Q.B. 26.

My Lords, this approach has something to commend it: it has academic
support. The use as a promissory term of " condition " is artificial, as is
that of " warranty " in some contexts. But in my opinion this use is now
too deeply embedded in English law to be uprooted by anything less than a
complete revision. I shall not trace the development of the term through
19th-century cases, many of them decisions of Lord Blackburn, to the
present time: this has been well done by academic writers. I would only
add that the *Hongkong Fir* case, even if it could, did not reverse the
trend. What it did decide, and I do not think that this was anything new,
was that though a term (there a " seaworthiness " term) was not a " con-
dition " in the technical sense, it might still be a term, breach of which if
sufficiently serious could go to the root of the contract. Nothing in the
judgments as I read them cast any doubt upon the meaning or effect of
" condition " where that word is technically used.

The alternative argument, in my opinion, is equally precluded by
authority. It is not necessary for parties to a contract, when stipulating a
condition, to spell out the consequences of breach: these are inherent in
the (assumedly deliberate) use of the word: *Suisse Atlantique Société
d'Armement Maritime S.A.* v. *N.V. Rotterdamsche Kolen Centrale* [1967]
1 A.C. 361, 422, *per* Lord Upjohn.

It is upon this legal basis, as to which I venture to think that your
Lordships are agreed, that this contract must be construed. Does clause
7 (*b*) amount to a " condition " or a " term "? (to call it an important
or material term adds, with all respect, nothing but some intellectual
assuagement). My Lords, I am clear in my own mind that it is a condition,

A  but your Lordships take the contrary view. On a matter of construction of a particular document, to develop the reasons for a minority opinion serves no purpose. I am all the more happy to refrain from so doing because the judgments of Mocatta J., Stephenson L.J., and indeed of Edmund Davies L.J., on construction, give me complete satisfaction and I could in any case add little of value to their reasons. I would only add that, for my part, to call the clause arbitrary, capricious or fantastic, or to

B  introduce as a test of its validity the ubiquitous reasonable man (I do not know whether he is English or German) is to assume, contrary to the evidence, that both parties to this contract adopted a standard of easygoing tolerance rather than one of aggressive, insistent punctuality and efficiency. This is not an assumption I am prepared to make, nor do I think myself entitled to impose the former standard upon the parties if their words indicate, as they plainly do, the latter. I note finally, that the result of

C  treating the clause, so careful and specific in its requirements, as a term is, in effect, to deprive the appellants of any remedy in respect of admitted and by no means minimal breaches. The arbitrator's finding that these breaches were not " material " was not, in my opinion, justified in law in the face of the parties' own characterisation of them in their document : indeed the fact that he was able to do so, and so leave the appellants

D  without remedy, argues strongly that the legal basis of his finding—that clause 7 (b) was merely a term—is unsound.

    I would allow this appeal.

    LORD SIMON OF GLAISDALE. My Lords, the decision in this appeal depends on the answers to two questions : first, can " subsequent conduct " of the parties be relied on for the construction of the distributorship agree-

E  ment of May 1, 1963?; and, secondly, with or without assistance from "subsequent conduct" (dependent on the answer to the first question), was Wickmans' breach of clause 7 (b) of the agreement on its proper construction such as to entitle Schulers to rely on it so as to amount to a rescission of the agreement in November 1964?

    There is one general principle of law which is relevant to both questions.

F  This has been frequently stated, but it is most pungently expressed in *Norton on Deeds* (1906), p. 43, though it applies to all written instruments :

      " . . . the question to be answered always is, ' What is the meaning of what the parties have said? ' not, ' What did the parties mean to say? ' . . . it being a presumption juris et de jure . . . that the parties intended to say that which they have said."

G  It is, of course, always open to a party to claim rectification of an instrument which has failed to express the common intention of the parties; but, so long as the instrument remains unrectified, the rule of construction is as stated by *Norton*. It is, indeed, the only workable rule. In the instant case no question of rectification arises.

H    Although, logically, the first question should be answered first, in the circumstances of the present case it is more convenient to consider the second question first (i.e., whether the agreement can be construed adequately without reference to subsequent conduct), and then to consider

the first question (i.e., whether subsequent conduct is available either to control, or to supply inadequacies in, the primary tools of construction).

A

### Construction independently of subsequent conduct

On this part of the case I agree so completely with what has been said by my noble and learned friend, Lord Reid, that I do not attempt to cover any ground which he has traversed.

The case finally turns on the meaning to be attached to the word   B
" condition " in clause 7 (b) read in the light of all the rest of the contract. Various meanings of this word, both in popular usage and as a legal term of art, have been debated before your Lordships. The agreement was intended to have legal effect and was drawn up by lawyers. This raises a presumption that the words in the contract are used in a sense that they bear as legal terms of art, if they are reasonably capable of bearing such meaning in their context: see *Sydall* v. *Castings Ltd.* [1967] 1 Q.B. 302.   C
But this presumption is rebuttable; so that, even in a document drawn up by lawyers and intended to have legal effect, a word capable of bearing meaning as a legal term of art will be construed in a popular sense if the instrument shows that the parties intended to use it in that sense. Most words in English are capable of a number of meanings, either in popular usage or as legal terms of art or both. In either category, prima facie they   D
will be read in their most usual and natural (or primary) sense. But this again is a rebuttable presumption; so that a word will be construed in a less usual or natural (or secondary) sense if the instrument shows that it is intended in such sense. In the distributorship agreement there is nothing to suggest that the word " condition " was used in any of its popular senses or to displace the presumption that it was used as a legal term of art in one or other of its senses.   E

The primary legal sense of " condition " appears from the judgment of Fletcher Moulton L.J. (approved by your Lordships' House [1911] A.C. 394) in *Wallis, Son & Wells* v. *Pratt & Haynes* [1910] 2 K.B. 1003, 1012:

" There are some [obligations] which go so directly to the substance of the contract or, in other words, are so essential to its very nature that their non-performance may fairly be considered by the other party   F
as a substantial failure to perform the contract at all. On the other hand there are other obligations which, though they must be per-formed, are not so vital that a failure to perform them goes to the substance of the contract . . . later usage has consecrated the term ' condition ' to describe an obligation of the former class and ' warranty ' to describe an obligation of the latter class."   G

It was argued on behalf of the respondents that " condition " does not, since recent cases (e.g., *Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2 Q.B. 26), bear this primary meaning in the law of contract. But the fact that it has now been made explicit that there lies intermediate between conditions and warranties a large " innominate " class of contractual terms (*any* breach of which does not give rise to a right in the   H
other party to terminate the contract, but only a material breach, immaterial breaches merely giving rise, like breaches of warranty, to a right to claim damages) does not involve in any way that " condition " is no longer the

A    appropriate word to describe a contractual term any breach of which (by express stipulation or by its innate nature in its context) gives rise to a right in the other party to terminate the contract. The sense designated by Fletcher Moulton L.J. is still, in my view, the primary meaning of " condition " as a legal term of art. It is therefore, prima facie, in this sense that the word is used in clause 7 (b). This prima facie sense is reinforced by the fact that the stipulation in clause 7 (b) is the only one which starts " It shall
B    be [a] condition. . . ." This is a further indication that " condition " here means something more than " contractual term," which is unquestionably one of the senses which it can bear as a legal term of art.

On the other hand, to read " condition " in clause 7 (b) in what I regard as its primary sense as a term of art produces, as my noble and learned friend, Lord Reid, has shown, such absurd results that this cannot be the
C    meaning to be ascribed to it, provided that it is reasonably capable of some other meaning. A secondary meaning of " condition " as a term of art is " contractual term." But it must mean more than merely this in clause 7 (b), since this stipulation is singled out from all the other contractual terms to be dubbed a " condition." I agree with my noble and learned friend that, in the light of the rest of the contract, it means a contractual term breach of which if unremedied (i.e., unrectified for the
D    future, if capable of rectification) gives Schulers the right to terminate the contract in accordance with clause 11. It follows that I agree with the decision of the learned arbitrator and with the conclusion of the majority of the Court of Appeal and would therefore dismiss the appeal.

### Construction by subsequent conduct

E    The majority of the Court of Appeal came to their conclusion in favour of Wickmans by construing the agreement by reference to the subsequent conduct of the parties thereunder. They recognised that it had been stated by four of their Lordships who decided *Whitworth Street Estates (Manchester) Ltd.* v. *James Miller & Partners Ltd.* [1970] A.C. 583 that the conduct of the parties under a contract is not available as an aid to construction; but held that this rule only applied when the
F    instrument to be construed is unambiguous, and that *Watcham* v. *Attorney-General of East Africa Protectorate* [1919] A.C. 533 (which was not cited in the *Whitworth Street Estates* case) was authority entitling the court to have recourse to subsequent conduct of the parties under this contract to resolve the ambiguity that they descried therein. The distribution agreement is not drafted with entire felicity, and therefore presents difficulties in construction. But this is not the same as embody-
G    ing an ambiguity. Agreeing as I do with the interpretation of my noble and learned friend, Lord Reid, I cannot on final resolution find that there is any ambiguity in the agreement. Nevertheless, the question of the availability of subsequent conduct as an aid to interpretation is an important one which ought not if possible to be left in its present state of uncertainty; and, since it was fully and carefully argued before your
H    Lordships, I do not feel that I would be justified in remaining silent on it.

The *Whitworth Street Estates* case was concerned with a contract (containing an arbitration clause) between an English and a Scots company which was to be performed in Scotland, but was silent as to whether

the contract (and the arbitration thereunder) was to be governed by   **A**
English or by Scots law.  Disputes having arisen, an arbitration took
place in Scotland.  The issue before the Court of Appeal and your Lord-
ships' House was whether the arbiter could be required to state a case
for the opinion of the English High Court, which in turn depended on
what was the curial law of the arbitration.  If the contract was to be
governed by Scots law, that too would be the curial law of the arbitration;
but it was argued that even if the law of the contract were English the   **B**
curial law of the arbitration was Scottish.  In the Court of Appeal ([1969]
1 W.L.R. 377) Lord Denning M.R. held that the crucial question in
determining what was the law governing the contract was to ask: " what is
the *system of law* with which the transaction has the closest and most
real connection? " (p. 380 E).  He concluded that that was English law
(p. 381 C–D).  He went on, at p. 381 D:
                                                                           **C**
> " I am confirmed in this view by the subsequent conduct of the
> parties.  This is always available to aid the interpretation of a con-
> tract and to find out its closest connections.  On two occasions the
> parties seem to have assumed that the transaction was governed by
> English law."

Davies L.J. agreed (see especially p. 383 H).  Widgery L.J., who also   **D**
agreed that English was the proper law of the contract, said, at pp. 383–384:

> " To solve a problem such as arises in this case one looks first at
> the express terms of the contract to see whether that intention is there
> to be found.  If it is not, then in my judgment the next step is to
> consider the conduct of the parties to see whether that conduct shows
> that a decision in regard to the proper law of the contract can be   **E**
> inferred from it.  If the parties' conduct shows that they have
> adopted a particular view with regard to the proper law, then it may
> be inferred that they have agreed that that law shall govern the
> contract accordingly."

When the *Whitworth Street Estates* case [1970] A.C. 583 came to your
Lordships' House it was argued that the subsequent conduct of the parties   **F**
could not be looked at to determine what was the proper law of the con-
tract (p. 590 F; contra p. 594 C and F).  Four of the five members of the
Appellate Committee dealt expressly with this matter.  My noble and
learned friend, Lord Reid, said, at p. 603:

> " It has been assumed in the course of this case that it is proper, in
> determining what was the proper law, to have regard to actings of
> the parties after their contract had been made.  Of course the actings   **G**
> of the parties (including any words which they used) may be sufficient
> to show that they made a new contract.  If they made no agreement
> originally as to the proper law, such actings may show that they
> made an agreement about that at a later stage.  Or if they did make
> such an agreement originally such actings may show that they later
> agreed to alter it.  But with regard to actings of the parties between   **H**
> the date of the original contract and the date of Mr. Underwood's
> appointment I did not understand it to be argued that they were
> sufficient to establish any new contract, and I think they clearly were

.3555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Append
Declaration of Lord Collins    Pg 190 of 428    267
A.C.    Wickman Tools v. Schuler A.G. (H.L.(E.))    Lord Simon of
Glaisdale

A    not. As I understood him, counsel sought to use those actings to
show that there was an agreement when the original contract was made
that the proper law of that contract was to be the law of England.
I must say that I had thought that it is now well settled that it is not
legitimate to use as an aid in the construction of the contract anything
which the parties said or did after it was made. Otherwise one might
have the result that a contract meant one thing the day it was signed,
B    but by reason of subsequent events meant something different a month
or a year later."

My noble and learned friend, Lord Hodson, said, at p. 606 :

" I should add that I cannot assent to the view which seems to have
found favour in the eyes of the Master of the Rolls and Widgery L.J.
that as a matter of construction the contract can be construed not only
C    in its surrounding circumstances but also by reference to the subsequent
conduct of the parties."

My noble and learned friend, Viscount Dilhorne, said, at p. 611 :

" I do not consider that one can properly have regard to the parties'
conduct after the contract has been entered into when considering
whether an inference can be drawn as to their intention when they
D    entered into the contract, though subsequent conduct by one party
may give rise to an estoppel."

My noble and learned friend, Lord Wilberforce, said, at p. 614 :

". . . once it was seen that the parties had made no express choice
of law, the correct course was to ascertain from all relevant contem-
E    porary circumstances including, but not limited to, what the parties
said or did at the time, what intention ought to be imputed to them
on the formation of the contract. Unless it were to found an estoppel
or a subsequent agreement, I do not think that subsequent conduct
can be relevant to this question."

It will be noticed that, except perhaps for Widgery L.J.'s, all these
F    pronouncements (both in the Court of Appeal in favour of there being a
rule whereby subsequent conduct is available as an aid to interpretation
and contra in your Lordships' House) are perfectly general, none drawing
the distinction which was drawn by the majority of the Court of Appeal
in the instant case between ambiguous and unambiguous instruments. It
must therefore be determined, first, whether or not the *Whitworth Street
Estates* case was one where the instrument was ambiguous; secondly, if
G    not, whether the situation there was so closely analogous to an ambiguity
that it would be wrong to draw a distinction; thirdly, whether what was
said on the matter in the *Whitworth Street Estates* case was part of the
ratio decidendi or obiter; and, fourthly, if the latter, whether it should
nonetheless be regarded as settling the law. It is convenient to consider
together the first and second and the third and fourth points respectively.

H    The problem posed by the *Whitworth Street Estates* case was that the
contract made no express provision on a matter which turned out to be
crucial, namely, whether English or Scots law governed the contract and
the arbitration. The only way of distinguishing such a situation from an

ambiguity would be to say that in a situation such as *Whitworth* the diffi-   A
culty facing the court was that the contract was silent on a crucial point,
whereas in a case such as *Watcham* a patent ambiguity appeared on the
face of the instrument—i.e. to regard the former as a case where the court
was invited to take account of subsequent conduct to add an absent term, the
latter as one where the court was invited to take account of subsequent
conduct to determine which of two present but inconsistent terms was to be
preferred. But such a distinction would, in my view, merely be to complicate   B
the law and to introduce intolerable refinements.  There was, it is true, con-
siderable older authority which suggested that, although extrinsic evidence
could be adduced to resolve ambiguity (though never direct evidence of in-
tention in the case of a patent ambiguity), it could not be adduced to in-
fluence the interpretation of an unambiguous instrument (see *Norton*, p. 56
and ch. VI).  The justification for the adduction of extrinsic evidence to re-   C
solve an ambiguity must be that it might be the last resort to save an instru-
ment from being void for uncertainty.  This type of practical consideration is
characteristically potent in shaping our law; but in this field its practical
recommendation is, in my judgment, outweighed by the inconveniences and
anomalies involved.  In particular, the distinction between the admissibility
of direct and circumstantial evidence of intention seems to me to be quite
unjustifiable in these days.  And the distinctions between patent ambiguities,   D
latent ambiguities and equivocations as regards admissibility of extrinsic
evidence are based on outmoded and highly technical and artificial rules
and introduce absurd refinements.  What was said in *Whitworth* should
therefore, in my judgment, be taken to apply generally to documentary
construction, even when an ambiguity can be spelt out.

  This brings me to consider how far what was said about this matter
in *Whitworth* was part of its ratio decidendi.  Lord Reid held the con-   E
tract to be governed by Scots law; and he therefore did not find it neces-
sary to determine whether, if the proper law of contract were English,
the arbitration was nevertheless governed by Scots law.  In order to arrive
at the conclusion that the law of the contract was Scottish, Lord Reid
had, in my view, necessarily to determine whether to take into account
the subsequent conduct of the parties which had been relied on by the   F
Court of Appeal in holding the law of the contract to be English.  In other
words, what he said about the availability of subsequent conduct as an
aid to interpretation of contract was part of the ratio decidendi of his
judgment.  It is true that, on strict analysis, what was said by Lord Hodson,
Viscount Dilhorne and Lord Wilberforce cannot be regarded as a vital
step towards their conclusions; but, as I have already ventured to demon-
strate, the point was directly in issue between the parties in your Lordships'   G
House.  I am therefore firmly of opinion that what was said should be
regarded as settling the law on this point.  I am reinforced in this opinion
because, in my view, *Whitworth Street Estates* was a correct decision on
the point for reasons additional to those given in the speeches.  First,
subsequent conduct is of no greater probative value in the interpretation
of an instrument than prior negotiations or direct evidence of intention:   H
it might, indeed, be most misleading to let in subsequent conduct without
reference to these other matters.  But *Prenn v. Simmonds* [1971] 1 W.L.R.
1381 gives convincing reasons why negotiations are not available as an aid

A   to construction; and it does not, and could not consistently with its
reasoning, make any exception in the case of ambiguity. As for direct
evidence of intention, there is clear authority that this is not available in the
case of a patent ambiguity; and I have already ventured to submit to your
Lordships the undesirability of distinguishing between direct and circum-
stantial evidence and between latent and patent ambiguities in this regard.
Secondly, subsequent conduct is equally referable to what the parties meant
B   to say as to the meaning of what they said; and, as the citation from
*Norton* shows, it is only the latter which is relevant. Sir Edward Sugden's
frequently quoted and epigrammatic dictum in *Attorney-General v. Drum-
mond* (1842) 1 Dr. & War. 353, 368, ". . . tell me what you have done
under such a deed, and I will tell you what that deed means " really
contains a logical flaw : if you tell me what you have done under a deed,
I can at best tell you only what you think that deed means. Moreover,
C   Sir Edward Sugden was expressly dealing with " ancient instruments." I
would add, thirdly, that the practical difficulties involved in admitting
subsequent conduct as an aid to interpretation are only marginally, if at all,
less than are involved in admitting evidence of prior negotiations.

In their printed case the respondents invited your Lordships to depart
from the decision in *Whitworth Street Estates* if it could not be dis-
D   tinguished. But nothing was laid before your Lordships which would bring
this case within the Lord Chancellor's statement of July 26, 1966, which
sets the bounds for your Lordships to depart from a previous decision of
your Lordships' House. The fact that even a relevant authority is not
cited is no ground in itself for departure from precedent in your Lord-
ships' House.

*Watcham's* case was already considerably weakened as a persuasive
E   authority by what was said about it in *Gaisberg v. Storr* [1950] 1 K.B. 107,
114 and *Sussex Caravan Parks Ltd.* v. *Richardson* [1961] 1 W.L.R. 561,
568. In the light of the *Whitworth Street Estates* case it can no longer be
regarded as authority for the proposition for which it was cited in the Court
of Appeal in the instant case. It is possible that the actual decision can
be justified, as can certainly many of the authorities on which it purports
F   to found, by well recognised exceptions to the rule against adduction of
extrinsic evidence to interpret an instrument. These are authoritatively
stated by Parke B. in *Shore* v. *Wilson* (1842) 9 Cl. & F. 355, 555, 556:

" In the first place, there is no doubt that not only where the language
of the instrument is such as the court does not understand, it is
competent to receive evidence of the proper meaning of that language,
as when it is written in a foreign tongue; but it is also competent,
G   where technical words or peculiar terms, or indeed any expressions
are used, which at the time the instrument was written had acquired
an appropriate meaning, either generally or by local usage, or amongst
particular classes. . . . This description of evidence is admissible,
in order to enable the court to understand the meaning of the words
contained in the instrument itself, by themselves, and without refer-
H   ence to the extrinsic facts on which the instrument is intended to
operate. For the purpose of applying the instrument to the facts,
and determining what passes by it, and who take an interest under
it, a second description of evidence is admissible, viz. every material

fact that will enable the court to identify the person or thing men-
tioned in the instrument, and to place the court, whose province it    A
is to declare the meaning of the words of the instrument, as near as
may be in the situation of the parties to it."

I would add that Parke B. continued:

   " From the context of the instrument, and from these two descriptions
   of evidence, with such circumstances as by law the court, without    B
   evidence, may of itself notice, it is its duty to construe and apply
   the words of that instrument; and no extrinsic evidence of the inten-
   tion of the party to the deed, from his declarations, whether at the
   time of his executing the instrument, or before or after that time, is
   admissible; the duty of the court being to declare the meaning of
   what is written in the instrument, not of what was intended to have
   been written."    C

To which I would also add, once more from *Norton*, p. 138:

   " The subsequent admission as to the true meaning of a deed by, or
   subsequent conduct of, a party to , . . a deed, cannot be received to
   aid the construction of the deed "

though (p. 139): " This rule does not apply to ancient documents . . . "    D

   LORD KILBRANDON. My Lords, the appellants (Schuler) who are machine
tool manufacturers in Germany, entered into an agreement with the res-
pondents (Sales), who sell machine tools in Britain and elsewhere, provid-
ing inter alia that the respondents should sell as agents for the appellants,
on a commission basis to six named motor manufacturers, panel presses
made by them.    This is a commercial relationship of a commonplace    E
character, and it seems extraordinary that the contract embodying it should
have been drafted in terms which have given rise to such acute differences
of judicial opinion.    There was only one feature of the agreement which
called for what may be an unusual stipulation in contracts of this nature;
clause 7, after providing, in the ordinary way, that " (*a*) Subject to clause
17 Sales will use its best endeavours to promote and extend the sale of    F
Schuler products in the territory," goes on as follows:

   " (b) It shall be condition of this agreement that :—(i) Sales shall send
   its representatives to visit the six firms whose names are listed in the
   Schedule hereto at least once in every week for the purpose of soliciting
   orders for panel presses; (ii) that the same representative shall visit each
   firm on each occasion unless there are unavoidable reasons preventing    G
   the visit being made by that representative in which case the visit shall
   be made by an alternate representative and Sales will ensure that such a
   visit is always made by the same alternate representative.
      Sales agrees to inform Schuler of the names of the representatives
   and alternate representatives instructed to make the visits required by
   this clause."

   The question in this appeal is, whether when they used the word " con-    H
dition " in 7 (*b*) the parties meant to constitute a fundamental condition of
the contract, going " to the root of the contract so that it is clear that the

A  parties contemplated *any* breach of it entitles the other party at once to treat the contract as at an end ": *Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2 Q.B. 26, 63, *per* Upjohn L.J. It is undoubted that parties may, if they so desire, make any term whatever, unimportant as it might seem to be to an observer relying upon a priori reasoning of his own, a condition giving entitlement, on its breach, to rescission at the instance of the party aggrieved. The judgments in *Bettini*

B  v. *Gye* (1876) 1 Q.B.D. 183, are commonly cited as authority for a proposition which no one now challenges. Whether the words which the parties have used in setting out their agreement do indeed exhibit a particular intention, as regards any particular stipulation, is a question of law. But one would have hoped that by this time it would have been possible to select words, in the context of the agreement as a whole, which would have made clear what the parties intended mutually to agree upon. Such has

C  not, evidently, been achieved in the instant case.

If, as the appellants submit, the use of the word " condition " in 7 (*b*) marks the intention of parties to provide in the event of breach, a ground for rescission, one is immediately struck by the fact that special provision for a right to rescind, in certain other circumstances, has been made under the heading " Duration of Agreement " in clause 11. Those circumstances,

D  again, are of a very mixed character. While the effect of clause 11 is to give a right to rescind if a party " shall have committed a material breach of its obligations hereunder and shall have failed to remedy the same within 60 days of being required in writing so to do," many of the obligations referred to are, in the strict sense, irremediable. For example, once the respondents have communicated the appellants' trade secrets in breach of clause 14, or once the appellants have published advertising

E  matter not containing the respondents' name, in breach of clause 17, the damage is done, and nothing can be done within 60 days, or ever, by way of remedy. It is possible that " remedy " means " satisfy the other party that it won't happen again." It is also possible that, in the case of a truly irremediable material breach, which goes to the root of the contractual relationship, as would presumably a breach of clause 14, you simply write

F  the provision for remedying in 60 days out of the document as a term incapable of being fulfilled. And your Lordships have already noticed the difficulties, under this clause, to which an anticipatory breach will give rise.

On the whole, though without a great deal of confidence, I come to the conclusion that the use of the word " condition " in 7 (*b*) was not intended by the parties to isolate an individual fundamental term, and to provide

G  for rescission, on any breach, in addition to the other more general provisions for rescission set out in clause 11, without the opportunity being given to the party at fault by clause 11 to put things right for the future, where the nature of the breach made that possible. Thus, when the appellants first had reason to complain in January 1963 of material breaches of clause 7 (*b*), they could have called upon the respondents to make better arrange-

H  ments within 60 days, upon pain of rescission. It is only in this way that I can give any meaning to the remedial provision.

But when one comes to October 1964 and the situation as to visiting obtaining at the time the appellants claimed to rescind, considerable amend-

**Lord Kilbrandon    Wickman Tools v. Schuler A.G. (H.L.(E.))**                    **[1974]**

ment had been made; as the learned arbitrator finds, the irregularities did
not amount to a material breach, and the provisions of clause 11 were    A
therefore of no effect.  Unless, therefore, contrary to my view, there is an
independent right to rescind under clause 7, to be deduced from the fact
that the parties selected the word " condition " in order to express their
intention, the appellants cannot succeed.

I respectfully agree with the learned Master of the Rolls that one is
not constrained, by analogies from the Sale of Goods Act 1893, or by    B
authorities such as the insurance cases, *Thomson* v. *Weems* (1884) 9
App.Cas. 671 and *Dawsons Ltd.* v. *Bonnin* [1922] 2 A.C. 413, or by *Wallis,
Son & Wells* v. *Pratt & Haynes* [1911] A.C. 394, so to hold.  One must,
above all other considerations as I think in a case where the agreement is
in obscure terms, see whether an interpretation proposed is likely to lead
to unreasonable results, and if it is, be reluctant to accept it.  The grotesque
consequences of an insistence on a right to rescind on *any* breach of clause    C
7 (*b*) do not require emphasis.  It was suggested that one must concede
to the appellants the right to inflict severe terms, since they will have
known their own interests better than we can do.  Be that so, I am not
prepared to accept that if, instead of using the equivocal word " condition "
in clause 7, the appellants' draftsman had spelled out the consequences
he intended should follow upon the slightest breach, the respondents    D
would have been prepared to sign the agreement presented to them.
I understand the view of the learned arbitrator to be that they would not.

While I agree that this appeal should be dismissed, I would not be
prepared to do so upon a consideration of the actings of the parties, subse-
quent to the agreement, as permitting me to infer their contractual intentions
therefrom.  I think this would be contrary to the principle of *Whitworth Street
Estates (Manchester) Ltd.* v. *James Miller & Partners Ltd.* [1970]    E
A.C. 583.  The decision in *Watcham* v. *Attorney-General of East Africa
Protectorate* [1919] A.C. 533, which was referred to by the learned
Master of the Rolls, does not, I believe, command universal confidence,
though I would not question it so far as it merely lays down that, where
the extent of a grant of land is stated in an ambiguous manner in a
conveyance, it is legitimate to interpret the deed by the extent of the    F
possession which proceeded upon it.  And I am not sure that I see
any reason to confine such a rule to ancient deeds.  It is, however, a dubious
expedient to attempt to make out what parties meant by what they did; in
the ordinary way one is limited to deciding what they meant by what they
said in the agreement under construction.  Of the cases concerning com-
mercial contracts to which we were referred, I understand *Hillas and Co.
Ltd.* v. *Arcos Ltd.*, 43 Ll.L.R. 359, 366 to hold that in what I will call an ex-    G
tension to a contract of sale, in the absence of necessary stipulations literally
provided therein, the necessary stipulations contained in the original contract
may be therein implied, in order to prevent the sterile result of avoidance
for uncertainty.  In *Radio Pictures Ltd.* v. *Inland Revenue Commissioners*,
22 T.C. 106, the problem was whether a particular document could pro-
perly be included among the batch of documents which as a whole formed    H
the contract, so that the stipulations therein were themselves con-
tractual.  I can see that these cases are in some degree analogous to
*Watcham*, in as much as they concern the ambit or extent of the contract

A rather than the interpreting of particular mutual obligations. That distinction may not be easily expressed in words, but at any rate I would be reluctant to apply the *Watcham* doctrine to the construction of mercantile contracts. In the present case, such application is, in any event, in my view unnecessary. I would dismiss this appeal.

*Appeal dismissed.*

B Solicitors: *Allen & Overy; Joynson-Hicks & Co. for Rotherham & Co., Coventry.*

J. A. G.

C

[HOUSE OF LORDS]

ATTORNEY-GENERAL . . . . . . APPELLANT

D AND

TIMES NEWSPAPERS LTD. . . . . . . RESPONDENTS

1973 May 8, 9, 10, 14,       Lord Reid, Lord Morris of Borth-y-Gest,
   15, 16, 17, 21, 22, 23;      Lord Diplock, Lord Simon of Glaisdale
   July 18, 25                    and Lord Cross of Chelsea

E *Contempt of Court—Pending proceedings—Prejudicing settlement —Matter of public interest—Drug manufactured by company causing deformity in children in utero—Actions begun within three-year limitation period settled in 1968—Writs issued in 261 cases after leave obtained ex parte for extended time —Negotiations in progress for settlement—Long delay—News-paper seeking to publish article on company's development and marketing of drug—Whether publication contempt of court*

F *Contempt of Court—Pending proceedings—Attorney-General— Whether proper person to move in civil proceedings*

Between 1959 and 1961 a company made and marketed under licence a drug containing thalidomide. About 450 children were born with gross deformities to mothers who had taken that drug during pregnancy. In 1968, 62 actions against the company begun within 3 years of the births of the children were compromised by lump sum payments conditional on the allegations of negligence against the company being withdrawn. Thereafter leave to issue writs out of time was granted ex parte in 261 cases, but apart from a statement of claim in one case and a defence delivered in 1969 no further steps had been taken in those actions. A further 123 claims had been notified in correspondence. In 1971 negotiations began on the company's proposal to set up a £3¼ million charitable trust fund for those children outside the 1968 settlement conditional on all the parents accepting the proposal. Five parents refused. An application to replace

LC/12

3555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Append
Declaration of Lord Collins    Pg 198 of 428    749
A.C.              Reg. v. Governor of Brixton Prison, Ex p. Levin (H.L.(E.))    Lord Hoffmann

A   unless there had been what Lord Browne-Wilkinson in *Reg. v. Hull University Visitor, Ex parte Page* [1993] A.C. 682, 702D described as a "relevant error of law, i.e., an error in the actual making of the decision which affected the decision itself." In my view there was no such error and I would therefore dismiss the appeal.

B   Lord Hutton. My Lords, I have had the advantage of reading in draft the speech to be delivered by my noble and learned friend, Lord Hoffmann. I agree with it and for the reasons which he gives I would dismiss the appeal.

*Appeal dismissed.*

C   *Solicitors: Reynolds Dawson; Crown Prosecution Service, Headquarters.*

A. R.

D   ————

[HOUSE OF LORDS]

E   MANNAI INVESTMENT CO. LTD.   .   .   .   .   Appellant

AND

EAGLE STAR LIFE ASSURANCE CO. LTD.   .   .   Respondent

1997  Jan. 20;                    Lord Goff of Chieveley,
F       May 21       Lord Jauncey of Tullichettle, Lord Steyn,
                            Lord Hoffmann and Lord Clyde

*Landlord and Tenant—Lease for fixed term—Notice to determine— Lease for 10 years—Provision to determine—Notice wrongly stating date of termination—Whether effective*

G   By two leases dated 11 March 1992 office premises and a car park were demised by the landlord to the tenant for the term of 10 years from and including 13 January 1992. By a clause in each of the leases it was agreed that the tenant could determine the lease by serving not less than six months' notice in writing on the landlord or its solicitors to expire "on the third anniversary of the term commencement date." By letters dated 24 June 1994 the tenant gave notices to the landlord to determine both leases on 12 January 1995. The judge held that on the true construction of
H   the leases and the notices served by the tenant the terms granted by the leases were determined on the the last moment of 12 January 1995, being the first moment of 13 January 1995. The Court of Appeal allowed the landlord's appeal, holding that a notice stated to take effect on 12 January could not operate to

750

**Mannai Ltd. v. Eagle Star Ass. Co. Ltd. (H.L.(E.))**                    **[1997]**

determine the lease on 13 January and that the notices served by      A
the tenant were, therefore, ineffective.

On appeal by the tenant:—

*Held,* allowing the appeal (Lord Goff of Chieveley and Lord
Jauncey of Tullichettle dissenting), that the construction of the
notices had to be approached objectively, and the question was
how a reasonable recipient would have understood them, bearing
in mind their context; that the purpose of the notices was to
inform the landlord of the tenant's decision to determine the      B
leases in accordance with the break clauses; that a reasonable
recipient with knowledge of the terms of the leases and of the
third anniversary date would have been left in no doubt that the
tenant wished to determine the leases on 13 January 1995 but had
wrongly described it as 12 January; and that, accordingly, the
notices were effective to determine the leases (post, pp. 767c,
E–H, 768D–769A, 773B–D, 774G–775A, B–E, 776A–C, 780F–G,
781D–E, H–782E, F–783D).                                            C

*Carradine Properties Ltd. v. Aslam* [1976] 1 W.L.R. 442
applied.

*Cadby v. Martinez* (1840) 11 A. & E. 720 and *Hankey v.
Clavering* [1942] 2 K.B. 326, C.A. overruled.

Decision of the Court of Appeal [1995] 1 W.L.R. 1508; [1996]
1 All E.R. 55 reversed.

D

The following cases are referred to in the speeches of their Lordships:

*Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191;
[1984] 3 W.L.R. 592; [1984] 3 All E.R. 229, H.L.(E.)
*Cadby v. Martinez* (1840) 11 A. & E. 720
*Carradine Properties Ltd. v. Aslam* [1976] 1 W.L.R. 442; [1976] 1 All E.R. 573
*Delta Vale Properties Ltd. v. Mills* [1990] 1 W.L.R. 445; [1990] 2 All E.R. 176,
C.A.                                                               E
*Doe d. Cox v. Roe* (1803) 4 Esp. 185
*Doe d. Spicer v. Lea* (1809) 11 East 312
*Fish, In re; Ingham v. Rayner* [1894] 2 Ch. 83, C.A.
*Gardner v. Ingram* (1889) 61 L.T. 729
*Garston v. Scottish Widows' Fund and Life Assurance Society* [1996] 1 W.L.R.
834; [1996] 4 All E.R. 282
*Germax Securities Ltd. v. Spiegal* (1978) 37 P. & C.R. 204, C.A.           F
*Hankey v. Clavering* [1942] 2 K.B. 326; [1942] 2 All E.R. 311, C.A.
*Micrografix v. Woking 8 Ltd.* [1995] 2 E.G.L.R. 32
*National Society for the Prevention of Cruelty to Children v. Scottish National
Society for the Prevention of Cruelty to Children* [1915] A.C. 207,
H.L.(Sc.)
*Norwegian American Cruises AlS (formerly Norwegian American Lines AlS) v.
Paul Mundy Ltd.* [1988] 2 Lloyd's Rep. 343, C.A.                            G
*Peel, In the Goods of* (1870) L.R. 2 P. & D. 46
*Phipps (P.) and Co. (Northampton and Towcester Breweries) Ltd. v. Rogers*
[1925] 1 K.B. 14, C.A.
*Prenn v. Simmonds* [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237, H.L.(E.)
*Price v. Mann* [1942] 1 All E.R. 453, C.A.
*Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen (trading as H. E. Hansen-
Tangen)* [1976] 1 W.L.R. 989; [1976] 3 All E.R. 570, H.L.(E.)              H
*Sidebotham v. Holland* [1895] 1 Q.B. 378, C.A.
*Sudbrook Trading Estate Ltd. v. Eggleton* [1983] 1 A.C. 444; [1982] 3 W.L.R.
315; [1982] 3 All E.R. 1, H.L.(E.)
*Sunrose Ltd. v. Gould* [1962] 1 W.L.R. 20; [1961] 3 All E.R. 1142, C.A.

A   Mr. Patten warned that a departure from the old rule would cause great uncertainty in the daily construction of notices to quit in county courts throughout the land. I confess that this prospect has caused me some anxiety and I think that it must be given serious consideration.

The rule as applied to wills, which restricts the use of background in aid of construction, reflects a distrust of the use of oral evidence to prove the background facts. The people who could give evidence about the
B   background to a will would in most cases be members of the family interested in the outcome of the case and until 1843, persons with an interest in the litigation were not even competent witnesses. No doubt the exclusion of background makes, in a somewhat arbitrary way, for greater certainty in the sense that there is less room for dispute about what the background was and the effect which it has upon the intention to be
C   attributed to the testator. But, as the cases mournfully show, this certainty is bought at the price of interpretations which everyone knows to be contrary to the meaning which he intended.

There are documents in which the need for certainty is paramount and which admissible background is restricted to avoid the possibility that the same document may have different meanings for different people according to their knowledge of the background. Documents required by bankers'
D   commercial credits fall within this category. Article 13(*a*) of the Uniform Customs and Practice for Commercial Credits (1993 revision) says (echoing Lord Greene M.R.'s phrase in *Hankey v. Clavering*) that the documents must "upon their face" appear to be in accordance with the terms and conditions of the credit. But the reasons of policy which require the restriction of background in this case do not apply to notices given
E   pursuant to clauses in leases. In practice, the only relevant background will be, as in this case, the terms of the lease itself, which may show beyond any reasonable doubt what was the intention of the person who gave the notice. There will be no question of the parties not being privy to the same background—both of them will have the lease—and no room for dispute over what the relevant background is.

In the case of commercial contracts, the restriction on the use of
F   background has been quietly dropped. There are certain special kinds of evidence, such as previous negotiations and express declarations of intent, which for practical reasons which it is unnecessary to analyse, are inadmissible in aid of construction. They can be used only in an action for rectification. But apart from these exceptions, commercial contracts are construed in the light of all the background which could reasonably
G   have been expected to have been available to the parties in order to ascertain what would objectively have been understood to be their intention: *Prenn v. Simmonds* [1971] 1 W.L.R. 1381, 1383. The fact that the words are capable of a literal application is no obstacle to evidence which demonstrates what a reasonable person with knowledge of the background would have understood the parties to mean, even if this compels one to say that they used the wrong words. In this area, we no
H   longer confuse the meaning of words with the question of what meaning the use of the words was intended to convey. Why, therefore, should the rules for the construction of notices be different from those for the construction of contracts? There seems to me no answer to this question.

A   All that can be said is that the rules for the construction of notices, like those for the construction of wills, have not yet caught up with the move to common sense interpretation of contracts which is marked by the speeches of Lord Wilberforce in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381 and *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989. The question is therefore whether there is any reason not to bring the rules for notices up to date by overruling the old cases.

B   There can, I think, be no question of anyone having acted in reliance on the principle of construction used in *Hankey v. Clavering* [1942] 2 K.B. 326. The consequence of such a construction is only to allow one party to take an unmeritorious advantage of another's verbal error, an adventitious bonus upon which no one could have relied. In this respect, the case for rejecting the old authorities is at least as strong as it was in *Sudbrook Trading Estate Ltd. v. Eggleton* [1983] 1 A.C. 444, in which this House overruled cases going back to the early 19th century on the construction of contracts for sale at a valuation.

C   Nor do I think that a decision overruling the old cases will create uncertainty as to what the law is. In fact I think that the present law is uncertain and that only a decision of this House, either adopting or rejecting the *Hankey v. Clavering* rule of construction, will make it certain. So, for example, in *Carradine Properties Ltd. v. Aslam* [1976] 1 W.L.R. 442, 444, Goulding J. said that the test for the validity of a notice was: "Is the notice quite clear to a reasonable tenant reading it? Is it plain that he cannot be misled by it?" and he went on to say that the reasonable tenant must be taken to know the terms of the lease. This test was approved by the Court of Appeal in *Germax Securities Ltd. v. Spiegal* (1978) 37 P. & C.R. 204, 206 and, as will be apparent from what I have already said, I think that it was the right test to adopt. It is, however, absolutely impossible to reconcile the application of such a test with the decision in *Hankey v. Clavering*, in which no reasonable tenant who knew the terms of the lease could possibly have mistaken the landlord's meaning. It is therefore not surprising that in *Micrografix v. Woking 8 Ltd.* [1995] 2 E.G.L.R. 32 Jacob J. felt free to dismiss *Hankey v. Clavering* as "much distinguished" and to ignore it, or that Rattee J. in *Garston v. Scottish Widows' Fund and Life Assurance Society* [1996] 1 W.L.R. 834 should be puzzled as to why the Court of Appeal in this case considered, as I think rightly, that they were bound by *Hankey v. Clavering*.

G   In my view, therefore, the House should say unequivocally that the test stated by Goulding J. in *Carradine Properties Ltd. v. Aslam* [1976] 1 W.L.R. 442 was right and that *Hankey v. Clavering* and the earlier cases should no longer be followed. The notice should be construed against the background of the terms of the lease. Interpreted in this way, the notice in the present case was valid and I would therefore allow the appeal.

H   LORD CLYDE. My Lords, the question in this appeal is whether the two letters dated 24 June 1994 and sent by the appellant tenant to the respondent landlord qualify as effective notices to determine the leases to which each letter respectively referred. Their validity as notices has to be tested against the terms of the power under which they were served. It is accepted that the two cases are for present purposes indistinguishable

A    and that the relevant terms of the power were set out in clause 7(13) and were:

"The tenant may by serving not less than six months' notice in writing on the landlord or its solicitors such notice to expire on the third anniversary of the term commencement date determine this lease and upon expiry of such notice this lease shall cease and determine and have no further effect . . ."

B    The substance of the power is expressed by the words, "The tenant may . . . determine this lease." The method of its exercise is specified by the intervening words. The tenant must give six months' notice; the notice must be in writing; the notice must be served on the landlord or its solicitors. The sub-clause also states that the notice is to expire on the third anniversary of the term commencement date. The significance of that

C    statement is that the period of six months is to terminate on that date. This regulates the time for the giving of the notice. The third anniversary marks the end of the period prior to which a notice under clause 7(13) must be given. But it is not required that the notice should include mention of the date of the intended determination of the lease. That date is prescribed by clause 7(13) where it states that the lease shall determine

D    on expiry of the notice.

Where a notice of termination complies precisely and unambiguously with the provision which empowers the sending of the notice then its validity should be unquestioned. Where the terms of the notice do not altogether accord with the provisions of the contract that may or may not render the notice unenforceable. The problem then may come to be one of finding a fair and reasonable construction of the notice. But there can

E    be cases where the validity of the notice cannot be saved by any construction and will have to be regarded as bad.

In some cases it may be obvious from the notice by itself that an error has been made. In *Carradine Properties Ltd. v. Aslam* [1976] 1 W.L.R. 442 an expressed intention to determine the lease at a date in 1973 was obviously incorrect in a notice served in 1974. In other cases the

F    discrepancy can only be seen from a study of the terms of the lease. One would need to be aware of the provisions of the lease in such a case to appreciate that the permitted date was inaccurately stated. I see no reason in principle why in each of these kinds of case, provided of course that the wording is not absolutely clear and unambiguous, a notice should not be equally open to construction with a view to its possible validity.

In the present case the two letters in my view satisfy the formal and

G    technical requirements of clause 7(13). But they go further and call for a determination of each lease one day before the day which the sub-clause identified as the date for the determination of the notice and for the determination of the lease. As I have mentioned that was not a formal requisite of the notice. Each notice proclaims at the outset that it is given "pursuant to clause 7(13)." This was a precise reference to the particular

H    provision under which the notices were each being sent, as distinct from some general reference to the agreement between the parties. But it is evident from a consideration of that clause that there is a discrepancy between the date there indicated for the termination of the lease and the date stated in the notice. Whether that inaccuracy in the notice is fatal or

not depends on the proper construction of the notices. The formulation     A
propounded by Goulding J. in the *Carradine* case, at p. 444, was "Is the
notice quite clear to a reasonable tenant reading it? Is it plain that he
cannot be misled by it?" *Delta Vale Properties Ltd. v. Mills* [1990]
1 W.L.R. 445 concerned a vendor's notice to complete which was in
condition 23 of the conditions of sale, but I see no reason why any
different principle of construction should apply. Slade L.J. observed, at     B
p. 454:

> "In my judgment, notices to complete served under condition 23, if
> they are to be valid, must be sufficiently clear and unambiguous to
> leave a reasonable recipient in no reasonable doubt as to how and
> when they are intended to operate."

The standard of reference is that of the reasonable man exercising his     C
common sense in the context and in the circumstances of the particular
case. It is not an absolute clarity or an absolute absence of any possible
ambiguity which is desiderated. To demand a perfect precision in matters
which are not within the formal requirements of the relevant power would
in my view impose an unduly high standard in the framing of notices such
as those in issue here. While careless drafting is certainly to be discouraged
the evident intention of a notice should not in matters of this kind be     D
rejected in preference for a technical precision.

The test is an objective one. In circumstances where an estoppel might
arise the actual understanding of the recipient may be relevant, but in
general the actual understanding of the parties is beside the point. That
the test is an objective one was recognised in *Micrografix v. Woking 8 Ltd.*
[1995] 2 E.G.L.R. 32. It was held there that the landlords would not have     E
been misled by the references to a wrong date both in the notice to
terminate the lease and in the covering letter. Each document was
expressly written pursuant to the particular break clause in the lease. The
recipients would have observed the errors because they would be familiar
with the terms of the lease and would have known that the only date of
determination had to be 23 June 1995. They would know that there was
no requirement to specify any date in the notice. They would see that the     F
tenant wanted to leave. It was held that the notice was valid.

In my opinion a like view should be taken in the circumstances of the
present case. The notices were expressed to be "pursuant to clause 7(13)."
It is plain from that that the tenant intended to invoke that clause. It is
also plain that the tenant wished to determine the tenancy and that clause
is the only clause under which the tenant could achieve that result. The     G
landlord would be expected to know the terms of the lease and the date
on which the lease fell to be determined under that clause. He would also
be expected to know that there was no formal requirement for the tenant
to specify in the notice the date of termination of the lease. There was no
evident reason why the tenant should specify 12 January rather than
13 January. The close proximity of the 13th makes it the more evident
that it was erroneous and that the date intended was the date which the     H
parties had agreed for a determination of the tenancy under clause 7(13).
While there is a discrepancy evident in the notices between the reference
to the clause and the statement of the date it seems to me that the notices

A  were sufficiently clear and unambiguous. No reasonable landlord would in my view be misled by the statement of a date which in the context of a clear intention to invoke clause 7(13) was inaccurate. The landlord would in my view recognise that in each case the reference to 12 January was to be read as a reference to 13 January and I would so construe the notices.

In *Hankey v. Clavering* [1942] 2 K.B. 326 the court refused to disregard a slip even although the intention of the notice was sufficiently clear from
B  its terms and the recipient could not reasonably misunderstand it. In my view that was too strict and too technical an approach. Counsel for the tenant sought to restrict the decision in the *Hankey* case to circumstances where the insertion of the date of termination is an essential requirement of a notice. I am, however, not persuaded that the decision in the *Hankey* case rested on the understanding that the specification of the date was an
C  essential. I note that the corresponding provisions in the *Carradine* case and in the *Micrografix* case were not dissimilar and indeed in the latter case one element in the decision was the consideration that there was no requirement to specify a date. While to a considerable extent the cases in this field may turn upon their own circumstances I do not consider that the decision reached in the *Hankey* case was sound and in my opinion it should be overruled. In the circumstances of the present case I take the
D  view that the notices were valid and effective. I agree with your Lordships that the argument based on *Sidebotham v. Holland* [1895] 1 Q.B. 378 is without merit. But for the reasons which I have explained I would allow the appeal.

E                    *Appeal allowed.*
*Order of Court of Appeal set aside.*
*Order of Judge Rich Q.C. of*
*16 November 1994 restored save*
*for words "the last moment of*
*12 January 1996 being the first*
*moment of."*
F                    *Landlord to pay tenant's costs in Court*
*of Appeal and House of Lords.*

*Solicitors: Manches & Co.; Nabarro Nathanson.*

A. R.

G

H                    END OF VOLUME AND OF APPEAL CASES SERIES FOR 1997

LC/13

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
896                                         Declaration of Lord Collins    Pg 206 of 428

The Weekly Law Reports 22 May 1998

[1998]

[HOUSE OF LORDS]

A

*INVESTORS COMPENSATION SCHEME LTD. .    .    APPELLANTS

AND

WEST BROMWICH BUILDING SOCIETY  .    .    . RESPONDENTS

AND

B

SAME    .    .    .    .    .    .    .    .    . APPELLANTS

AND

HOPKIN & SONS (A FIRM) AND OTHERS  .    .    . RESPONDENTS

1997  April 21, 22, 23;        Lord Goff of Chieveley, Lord Lloyd of Berwick,
      June 19                      Lord Hoffmann, Lord Hope of Craighead    C
                                           and Lord Clyde

*Financial Services—Compensation—Statutory scheme—Investors' rights
assigned to scheme—Whether right of rescission chose in action—
Whether misuse of language or syntax to be taken into account in
construing assignment—Whether assignment valid*

D

On the advice of independent financial advisers, investors
entered into home income plans under which they took out
mortgages on their homes with certain building societies to secure
advances which were then invested in equity-linked bonds. They
suffered heavy losses as a result of a fall in equities and rise in
interest rates. The financial advisers having become insolvent, the
investors lodged claims for compensation with the Investors
Compensation Scheme Ltd., the body established pursuant to      E
section 54 of the Financial Services Act 1986[1] to provide a
compensation fund for persons with unsatisfied claims against
persons authorised to carry on investment business. The scheme's
claim form required the investor to assign to the scheme all rights
arising out of the transaction against the financial advisers and
anyone else, subject to a reservation of certain rights against the
building society which provided the mortgage. Section 3(b) of the
form excepted from the assignment the benefits of any claim      F
(whether sounding in rescission for undue influence or otherwise)
that the investor might have against the building society in which
he claimed an abatement of sums he would otherwise have to pay
the building society in respect of the mortgage loan or interest on
that loan. The scheme declined to compensate investors for
moneys which they had given away or spent on themselves, or
professional fees or damages for illness, anxiety and stress and the
decision not to do so was upheld by the House of Lords. The      G
scheme then brought proceedings against various building societies
and firms of solicitors for compensation for breach of statutory
duty under the Act of 1986 and damages for breach of duty at
common law, claiming to sue as assignee of the investors. The
question arose whether section 3(b) meant there had not been a
valid assignment of investors' rights against the building society.
The judge decided as a preliminary issue that section 3(b) had      H
only reserved to the investor the right to an adjustment of the
mortgage debt in the event of rescission as part of a mutual
restoration of benefits but that the purported assignment, being
an assignment of part of the remedy attaching to a chose in
action, was void. The Court of Appeal held that the words of
section 3(b) could not bear the judge's construction.

[1] Financial Services Act 1986, s. 54: see post, pp. 907G–908B.

1 W.L.R.                    I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))

A
On appeal by the scheme to the House of Lords:—
*Held,* allowing the appeal (Lord Lloyd of Berwick dissenting),
that in construing contractual documents the aim was to find the
meaning which the document would convey to a reasonable person
having all the background knowledge reasonably available to the
parties, including anything which would have affected the way a
reasonable man would have understood it, but excluding previous
negotiations and declarations of subjective intent; that the meaning
B
which a document would convey to a reasonable man was what
the parties using its words against the relevant background would
reasonably have been supposed to mean and included the
possibility of ambiguity and even misuse of words or syntax; that
the court was not obliged to ascribe to the parties an intention
which plainly they could not have had, and in choosing between
competing unnatural meanings was entitled to decide that the
parties must have made mistakes of meaning or syntax; that a
C
claim to rescission could be made only by the owner of the
mortgaged property and was not a separately assignable chose in
action but was simply part of the process of rescission; and that
in reserving to the investor any claim to abatement of the
mortgage debt consequent on rescission section 3(b) was not
cutting down the scope of the chose in action assigned to the
scheme but was merely intended to make clear that the investor
would not be accountable to the scheme for any abatement of the
D
debt as a result of an action for rescission of the mortgage; that
the claim form was effective to assign to the scheme the whole of
the investors' claim to compensation and damages, although they
retained the right to claim rescission of their mortgages on such
terms as the court might consider just; and that, accordingly, the
scheme could maintain the actions against the building societies
and the solicitors (post, pp. 898H, 912H–913E, 914E–F, 916D–917A,
E
918A–G).
Decision of the Court of Appeal reversed.

The following cases are referred to in their Lordship's opinions:
*Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191;
     [1984] 3 W.L.R. 592; [1984] 3 All E.R. 229, H.L.(E.)
*Barclays Bank Plc. v. O'Brien* [1994] 1 A.C. 180; [1993] 3 W.L.R. 786; [1993]
F
     4 All E.R. 417, H.L.(E.)
*Charter Reinsurance Co. Ltd. v. Fagan* [1997] A.C. 313; [1996] 2 W.L.R. 726;
     [1996] 3 All E.R. 46, H.L.(E.)
*Investors Compensation Scheme Ltd. v. Cheltenham and Gloucester Building
     Society* (unreported), 1 November 1995, Evans-Lombe J.
*Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] A.C.
     749; [1997] 2 W.L.R. 945; [1997] 3 All E.R. 352, H.L.(E.)
*Porter v. National Union of Journalists* [1980] I.R.L.R. 404, H.L.(E.)
G
*Prenn v. Simmonds* [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237, H.L.(E.)
*Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989; [1976]
     3 All E.R. 570, H.L.(E.)
*Reg. v. Investors Compensation Scheme Ltd., Ex parte Bowden* [1996] A.C. 261;
     [1995] 3 W.L.R. 289; [1995] 3 All E.R. 605, H.L.(E.)
*Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.* [1974] A.C. 235; [1973]
     2 W.L.R. 683; [1973] 2 All E.R. 39, H.L.(E.)
H
*Wilson v. United Counties Bank Ltd.* [1920] A.C. 102, H.L.(E.)

The following additional cases were cited in argument:
*Archer v. Brown* [1985] Q.B. 401; [1984] 3 W.L.R. 350; [1984] 2 All E.R. 267
*Barings Plc. v. Coopers & Lybrand,* The Times, 6 December 1996; Court of
     Appeal (Civil Division) Transcript No. 1557 of 1996, C.A.
*Bechervaise v. Lewis* (1872) L.R. 7 C.P. 372
*Bristol and West Building Society v. May May & Merrimans* [1998] 1 W.L.R.
     336; [1997] 3 All E.R. 206

I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))    [1998]

Cheese v. Thomas [1994] 1 W.L.R. 129; [1994] 1 All E.R. 35, C.A.    A
Christensen v. Scott [1996] 1 N.Z.L.R. 273
Derry v. Peek (1889) 14 App.Cas. 337, H.L.(E.)
Durham Brothers v. Robertson [1898] 1 Q.B. 765, C.A.
Erlanger v. New Sombrero Phosphate Co. (1878) 3 App.Cas. 1218, H.L.(E.)
F. & B. Entertainments Ltd. v. Leisure Enterprises Ltd. (1976) 240 E.G. 455
Federal Commerce & Navigation Co. Ltd. v. Molena Alpha Inc. [1978] Q.B. 927;
    [1978] 3 W.L.R. 309; [1978] 3 All E.R. 1066, Kerr J. and C.A.    B
Forster v. Baker [1910] 2 K.B. 636, Bray J. and C.A.
Hanak v. Green [1958] 2 Q.B. 9; [1958] 2 W.L.R. 755; [1958] 2 All E.R. 141,
    C.A.
Kleiss v. Captain Snooze Pty. Ltd. (unreported), 18 January 1996, Federal
    Court of Australia
Morris (B.O.) Ltd. v. Perrott and Bolton [1945] 1 All E.R. 576, C.A.
Newbigging v. Adam (1886) 34 Ch.D. 582, C.A.
O'Sullivan v. Management Agency and Music Ltd. [1985] Q.B. 428; [1984]    C
    3 W.L.R. 448; [1985] 3 All E.R. 351, C.A.
Redgrave v. Hurd (1881) 20 Ch.D. 1, C.A.
Steel Wing Co. Ltd., In re [1921] 1 Ch. 349
T.S.B. Bank Plc. v. Camfield [1995] 1 W.L.R. 430; [1995] 1 All E.R. 951, C.A.
Unsworth Trusts, In re (1865) 2 Dr. & Sm. 337
Whittington v. Seale-Hayne (1900) 82 L.T. 49
Wilson v. United Counties Bank Ltd. [1920] A.C. 102, H.L.(E.)    D

APPEAL from the Court of Appeal.

This was an appeal by the Investors Compensation Scheme Ltd.
("I.C.S.") with leave of the House of Lords (Lord Mustill, Lord Steyn and
Lord Hope of Craighead) given on 27 February 1997 from the decision of
the Court of Appeal (Leggatt, Swinton Thomas and Mummery L.JJ.)    E
delivered on 1 November 1996 dismissing the appeal of I.C.S. from a
decision of Evans-Lombe J. delivered on 3 October 1996 on a trial of
preliminary issues in actions against the defendant, the West Bromwich
Building Society ("W.B.B.S."), by Eric John Alford, Gladys Armitage and
others ("the investors") and the I.C.S., and against Hopkin & Sons and
other firms of solicitors, by the I.C.S., that the investors' claims had not
been validly assigned to I.C.S. Philip Haring, one of the investors,    F
intervened on their behalf.

The facts are stated in the opinion of Lord Hoffmann.

Geoffrey Vos Q.C., Denis Brock, solicitor, and Guy Morpuss for the
I.C.S.    .
David Oliver Q.C., Andrew Hochhauser Q.C. and Vernon Flynn for the    G
W.B.B.S.
Jonathan Sumption Q.C. and Mark Cannon for Hopkin & Sons.
Nicholas Strauss Q.C. and Neil Kitchener for Mr. Haring.

Their Lordships took time for consideration.

19 June. LORD GOFF OF CHIEVELEY. My Lords, I have had the    H
opportunity of reading in draft the speech of my noble and learned friend,
Lord Hoffmann. I agree with the conclusion which he has reached as to
the construction to be placed upon section 3(b) of the Investors
Compensation Scheme claim form and, for the reasons given by him,
I would answer the questions directed by Evans-Lombe J. to be tried as
preliminary issues in the manner proposed by my noble and learned friend.
I would therefore allow the appeal.

A    LORD LLOYD OF BERWICK.  My Lords.

*Background*

This is the second occasion on which the House has had to consider the scheme for compensating investors set up under section 54 of the Financial Services Act 1986. On the first occasion I described the Rules made by the Securities and Investment Board under section 54(6) of the Act as being needlessly confusing and obscure. On this occasion it is not the Rules that are primarily in issue, but a single clause in the claim form which investors are required to sign when making a claim for compensation; and the problem arises not from any obscurity of the language (the meaning is, I think, tolerably clear) but from slovenly drafting.

The general background to the home income plans, and the reasons why so many investors have come to grief, have already been described in the judgments in the earlier appeal, and need not be repeated here. The particular background to the present appeals are proceedings brought by two groups of investors against West Bromwich Building Society ("W.B.B.S.") for damages for negligence at common law and under section 2(1) of the Misrepresentation Act 1967. They also claim rescission of their mortgages on the ground of misrepresentation and undue influence, equitable compensation, damages in lieu of rescission under section 2(2) of the Act of 1967, and a variety of other remedies. Some of these remedies overlap.

The Investors Compensation Scheme Ltd. ("I.C.S.") have also commenced proceedings against W.B.B.S. in which they claim as assignees of the Investors' rights against W.B.B.S. They assert that all the investors' claims against W.B.B.S. have been validly assigned to I.C.S., with the exception of the investors' claim for rescission. It follows that there are competing claims against W.B.B.S. for the same damages, by the investors on the one hand and I.C.S. on the other. The resolution of the issue which thus arises indirectly between I.C.S. and the investors depends on the true construction of the claim form, and in particular on the scope of the provisions relating to the assignment of the investors' rights against third parties.

As between I.C.S. and W.B.B.S. there is a further issue. For W.B.B.S. allege in the alternative that if the question of construction is resolved in favour of I.C.S., and the investors have purported to assign their claims for damages against W.B.B.S., then the assignment is void or unenforceable on grounds of public policy.

In addition to their claim against W.B.B.S., I.C.S. have brought proceedings against numerous firms of solicitors, in which they claim damages for negligence in advising their clients in relation to the home income plans. These proceedings are also brought as assignees under the claim form. But there are two important differences. In the first place, there is no issue as to the meaning or scope of the assignment in the case of claims against the solicitors. Secondly (and no doubt for the same reason) none of the investors have brought their own proceedings against the solicitors. So there is no underlying conflict between I.C.S. and the investors in relation to the I.C.S. claim against the solicitors. The solicitors' defence is the same as the alternative argument advanced by W.B.B.S., namely, that the assignment is void or unenforceable on grounds of public policy.

Before turning to the question of construction, it is convenient to set out the main provisions of the claim form. The form is addressed to the

individual investor. In section 2 it sets out the amount of the compensation    A
to which the recipient is entitled under the scheme. Section 3(a) sets out
the claimants' declaration. It provides (in a typical case) as follows:

> "I/we hereby claim compensation for losses amounting to £20,345 as
> a result of the default of Fisher Prew-Smith ... I/we believe ... that
> I/we have a claim against the firm in respect of negligent acts and/or
> advice given by Fisher Prew-Smith on or after 28 August 1988 ...    B
> I/we confirm that I/we have received no compensation of any kind in
> respect of amounts owed to me/us at the date of default by Fisher
> Prew-Smith or any other person. I/we also confirm that I/we do not
> expect to receive any such compensation in the future ... I/we
> understand that subject to section 3(b) below: 1. I/we are not obliged
> to make a claim under this scheme. 2. Investors' Compensation
> Scheme Ltd. ... will take over my/our rights and claims against Fisher    C
> Prew-Smith and other third parties on the payment of any
> compensation as described in the transfer of rights at section 4 of this
> form."

The claimants' declaration is then signed by the investor.

Section 3(b), on which the present appeal turns, sets out a counter-
declaration by I.C.S. It provides:    D

> "I.C.S. agrees that the following claims shall not be treated as a 'third
> party claim' (as defined in section 4 of this form) for the purposes of
> this agreement and that the benefits of such claims shall enure to you
> absolutely: Any claim (whether sounding in rescission for undue
> influence or otherwise) that you have or may have against the West
> Bromwich Building Society in which you claim an abatement of sums    E
> which you would otherwise have to repay to that society in respect of
> sums borrowed by you from that society in connection with the
> transaction and dealings giving rise to the claim (including interest on
> any such sums)."

Section 4 is headed "Investor's agreement and acknowledgement (rights
against participant firm)." It provides as follows:    F

> "1. I/we agree that my/our rights against the participant firm in
> respect of the claim shall pass to Investors Compensation Scheme
> Ltd. ('I.C.S.') on payment of compensation pursuant to the Financial
> Services (Compensation of Investors) Rules 1990 ('the rules') ...
> 3. I/we acknowledge that under the rules on payment of the amount
> of £20,345·15 I/we will no longer have the right to make a claim    G
> against the participant firm in respect of the claim and that any such
> right will be vested in I.C.S. pursuant to the rules, and I/we further
> acknowledge that any sums which would otherwise be payable to me/
> us in respect of the claim by the participant firm, or by any trustee
> appointed under the Financial Services Act 1986, shall be paid instead
> to I.C.S. . . . 5. I/we agree that in the event of my/our receiving any
> moneys or assets in respect of the claim from the participant firm or    H
> from any trustee appointed under the Financial Services Act 1986
> I/we will forthwith pay or transfer them to I.C.S. 6. I/we hereby
> assign absolutely to I.C.S. each and every third party claim and the
> benefit thereof . . . 12. In this document, 'third party claim' means
> any right, claim or cause of action which the claimant has or may
> have against any person other than the participant firm or against any
> fund or property in the hands of any person other than the participant

08-13555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Appendix to
Declaration of Lord Collins   Pg 211 of 428
The Weekly Law Reports 22 May 1998

1 W.L.R.          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))   Lord Lloyd of Berwick

A   firm and arising out of the circumstances giving rise to the claim or
otherwise relating to the claim whether such claims shall arise in debt,
breach of contract, tort, breach of trust or in any other manner
whatsoever (and including all sums to which I/we may become entitled
under sections 6 and 61 of the Financial Services Act 1986).”

Section 4 is then signed by the investor. There follows an explanatory note.
B   Paragraphs 1, 2 and 3 are all concerned with the assignment of claims
against the participant firm, in this case Fisher Prew-Smith. Paragraph 4
is concerned with the assignment of third party claims. It provides:

“4. You also agree that I.C.S. should be able to use any rights
which you now have against anyone else in relation to the claim.
Examples might be directors of the firm or other persons also
C   responsible for causing the loss for which you are being com-
pensated. You give up all those rights and transfer them to I.C.S.
(paragraph 6).”

So much for the general shape of the claim form. I now return to
section 3(b). It provides for an exception in respect of third party claims
assigned under paragraph 6 of section 4. Mr. Vos on behalf of I.C.S.
D   submits that the exception is confined to claims against W.B.B.S. for
rescission. Mr. Oliver on behalf of W.B.B.S. and Mr. Strauss on behalf of
the investors submit that the exception covers all claims against W.B.B.S.
whether for rescission or not, in which the investor claims a reduction in
the amount due under the mortgage loan.

This is not the first time the court has had to consider the meaning of
section 3(b). The same question arose in proceedings brought by I.C.S.
E   against Cheltenham and Gloucester Plc., formerly known as Cheltenham
and Gloucester Building Society. In that case Evans-Lombe J., who has
had overall charge of the litigation, ordered, and subsequently tried, a
preliminary issue as to the construction of section 3(b). He held that the
more natural meaning of the words was that for which the investors
contend; in other words that the exception covers all possible claims
F   against Cheltenham and Gloucester, and is not limited to claims for
rescission. However, he went on to reject what he regarded as the more
natural meaning of the words on the ground that it produced a “ridiculous”
result, contrary to the “demonstrable purpose of the parties in entering
into the claim forms.” He thus upheld I.C.S.’s construction even though it
meant, in his view, doing violence to the language of the claim form.

When the present proceedings were before Evans-Lombe J., he repeated
G   his view that the investors’ construction was the more natural meaning of
the words, but held once again that such meaning was displaced by a
consideration of the surrounding circumstances, and in particular by the
need for an “efficient system” to enable I.C.S. to recover its outlay.
However, the learned judge went on to hold that the purported assignment
in favour of I.C.S. was invalid, on the grounds that the assignment of
H   some but not all the remedies available against W.B.B.S. in respect of a
single cause of action is ineffective in law. Since the assignment was invalid,
it followed that the investors were free to pursue their claims for damages
against W.B.B.S.

I.C.S. appealed to the Court of Appeal. The Court of Appeal agreed
with Evans-Lombe J. that the investors’ construction accords with the
natural meaning of the words. But unlike the judge they did not regard
the result as commercially ridiculous. Leggatt L.J. who gave the leading

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
Declaration of Lord Collins    Pg 212 of 428
The Weekly Law Reports 22 May 1998
902

judgment said: "There is simply no warrant for limiting the rights retained    A
to claims for or consequent upon rescission." I find myself in complete
agreement with the Court of Appeal.

*The question of construction*

A useful starting point for ascertaining the meaning of section 3(b) of
the claim form is to put oneself in the position of the ordinary investor to
whom the claim form is addressed. This was the approach adopted by the    B
House in *Porter v. National Union of Journalists* [1980] I.R.L.R. 404. They
question in that case concerned the proper construction of the rules of the
N.U.J. Lord Diplock said, at p. 407:

"I turn then to the interpretation of the relevant rules, bearing in
mind that their purpose is to inform the members of the N.U.J. of
what rights they acquire and obligations they assume vis-à-vis the    C
union and their fellow members, by becoming and remaining members
of it. The readership to which the rules are addressed consists of
ordinary working journalists, not judges or lawyers versed in the
semantic technicalities of statutory draftsmanship."

The purpose of the claim form was to inform the investor in relatively
non-technical language what his rights and liabilities were to be on receipt    D
of compensation under the scheme. No doubt the investor would start by
reading the explanatory note, as he is invited to do before signing
section 4. He would notice that the first three paragraphs of the
explanatory note are all dealing with his right to claim against the
defaulting firm, Fisher Prew-Smith. This would not surprise him. For it
was the firm of Fisher Prew-Smith which led him into his disastrous    E
investment. He would well understand that I.C.S. might wish to recover
some or all of its outlay from that firm: see paragraph 2 of the explanatory
note. He might then turn to section 4 itself. He would at once notice that
the heading of section 4 refers specifically to "rights against participant
firm." Next he would find that the first five paragraphs of section 4 are all
dealing with the claim against Fisher Prew-Smith. He would infer that the
claim against Fisher Prew-Smith was of primary importance to I.C.S.;    F
otherwise it would hardly have been given such prominence.

Next he would read paragraph 4 of the explanatory note. He would
note that he was to give up his rights against "anyone else" in relation to
the claim (i.e. the claim against Fisher Prew-Smith). The examples given
are any rights he might have against a director of Fisher Prew-Smith "or
any persons also responsible" for causing his loss. He might or might not
at that stage envisage a claim against W.B.B.S.; probably not. Certainly the    G
reference to "other persons" in the context of the directors of Fisher Prew-
Smith does not serve to highlight a possible claim against W.B.B.S. If he
were in doubt, he would turn to paragraph 6 of section 4, note the
definition of third party claim in paragraph 12, and so come to
section 3(b).

On a quick reading of section 3(b) our hypothetical reasonable investor    H
would notice that it excludes from the definition of third party claim any
claim which he might have against W.B.B.S. for an "abatement" of sums
due under his mortgage. The benefit of any such claim was to enure to
him absolutely. In other words it was *not* to pass to I.C.S. under any
circumstances. He would probably not pause over the words in brackets,
recognising that words in brackets do not ordinarily govern the meaning
of the rest of the sentence, especially if the parenthesis starts with the word

1 W.L.R.     I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))  Lord Lloyd of Berwick

A   "whether" and ends with the words "or otherwise." He might well, in passing, understand the words in brackets as being the equivalent of "whether or not sounding in rescission for undue influence." He would then come to "abatement." This would strike him as an unusual word in the context. So he would turn to his lawyer (who is assumed to be at his elbow) and ask him whether abatement has some special meaning in law. His lawyer would reply that abatement has a technical meaning in the law

B   of nuisance, and in connection with contracts for the sale of goods and the provision of services. But otherwise it simply means reduction. It has no technical meaning in relation to rescission. Counsel were unable to point to a single case in which the word had been used in that connection. So the investor would understand that if he still owed money on his mortgage, as would almost always be the case, he would retain the right to sue W.B.B.S. in order to reduce his outstanding debt. Again, this would

C   not surprise him. For in most cases he would not have recovered full compensation from I.C.S., and in some cases nothing like full compensation. Certainly he would wish to have all defences available should W.B.B.S. start proceedings against him for recovery of the loan.

So the position would be that he, the investor, would retain his right to sue W.B.B.S. for a reduction of the mortgage debt, but I.C.S. would obtain

D   the right to sue Fisher Prew-Smith and "third parties" other than W.B.B.S., on the understanding that I.C.S. would reassign those rights on request, should they not be needed: see paragraph 5 of the explanatory note. This would strike the investor as fair and reasonable. At this stage our hypothetical investor would feel that he understood his rights and obligations well enough and would sign section 4.

E   Is there, then, any reason why the courts should not give section 3(b), and the claim form as a whole, the same meaning as the investor? (I shall refer to this as "the plain meaning." ) The objections fall into two groups. The first group of objections relate to the language of section 3(b); the second group of objections relate to the legal and commercial consequences of adopting the plain meaning. I suspect that none of these objections would occur to anyone other than a lawyer.

F

*The meaning of the language*

The objection to the plain meaning is the inclusion of the words "for undue influence" after "rescission;" for any lawyer would know that there are other grounds on which the investor might claim rescission, for example, on the ground of misrepresentation. Why, therefore, should the draftsman have specifically included one of the grounds on which the

G   investor might claim rescission, but not others?

We do not know the answer to this question. It may be that if one had access to the preliminary drafts of the claim form, or to the mind of the draftsman himself, the answer would emerge clearly enough. It may be that a claim for rescission on the ground of undue influence was, for some reason, uppermost in the draftsman's mind; so he put the words in. But

H   we cannot go into the draftsman's mind. We having nothing to go on but the words he has used. The inclusion of undue influence is odd, but not so odd as to obscure the meaning. "Or otherwise" must relate back to "whether sounding in rescission." Any other construction would leave "whether" hanging in the air. So "or otherwise" covers claims in contract and tort. It is not limited to other grounds for claiming rescission. The drafting is slovenly. But I do not have any great difficulty with the meaning.

It is said that the plain meaning would make the words in brackets    A
otiose. So indeed it would. But words in brackets are often otiose,
especially brackets in the format "(whether ... or otherwise)." They show
that the general words which precede the parenthesis are not limited to
any particular kind of claim, but cover all claims so long as they are
claims for reduction of sums due.

What are the alternatives? Mr. Vos submits that section 3(b) means
"any claims sounding in rescission (whether for undue influence or    B
otherwise) in which you claim an abatement ..." I agree with Evans-
Lombe J. that such a construction does violence to the language. I know
of no principle of construction (whether by reference to what Lord
Wilberforce said in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381, 1384–1386 or
otherwise) which would enable the court to take words from within the
brackets, where they are clearly intended to underline the width of "any    C
claim," and place them outside the brackets where they have the exact
opposite effect. As Leggatt L.J. said in the Court of Appeal, such a
construction is simply not an available meaning of the words used; and it
is, after all, from the words used that one must ascertain what the parties
meant. Purposive interpretation of a contract is a useful tool where the
purpose can be identified with reasonable certainty. But creative
interpretation is another thing altogether. The one must not be allowed to    D
shade into the other.

So with great respect to those taking a different view, I do not regard
the present case as raising any question of ambiguity, or of choosing
between two possible interpretations. The construction advocated by the
investors, though it gives rise to the oddity which I have mentioned, is a
permissible construction of the words used. The I.C.S.'s construction is    E
not.

Nor does the I.C.S. construction avoid one of the main objections
which is raised against the investors' construction. If "whether sounding in
rescission for undue influence or otherwise" is otiose on the investors'
construction, so also is "whether for undue influence or otherwise" on the
I.C.S.'s construction. Indeed the objection is all the greater, since a claim
for rescission would necessarily result in an abatement, if by abatement is    F
meant the financial adjustment which takes place in any event on rescission
of a contract, and which would in this case be limited (if Mr. Vos's
argument is correct) to repayment of W.B.B.S.'s charges and an adjustment
in the rate of interest on the loan. On that view, section 3(b) would be an
elaborate way of saying very little indeed.

*The legal and commercial consequences*    G

If Evans-Lombe J. is right that the investors' construction is the more
natural meaning of section 3(b) and if, a fortiori, the Court of Appeal is
right that the I.C.S.'s construction is not even a possible meaning of the
language used, then it would take a very strong case indeed before
I would reject the former meaning in favour of the latter. As Lord Mustill
said in *Charter Reinsurance Co. Ltd. v. Fagan* [1997] A.C. 313, 387:    H

"If ... the words 'actually paid' can only as a matter of language and
context mean what the syndicates maintain, I would hesitate long
before giving them any other meaning, just because the result would
be extraordinary."

What then are the consequences of the investors' construction which
are said to be so extraordinary, or so "very unreasonable" (the expression

A   used by Lord Reid in *Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.*
[1974] A.C. 235, 251), and which Evans-Lombe J. described as producing
a ridiculous result? I start with the commercial consequences. It is said
that I.C.S. would have wanted to take over the investors' claim against
W.B.B.S., as well as their claim against Fisher Prew-Smith, since W.B.B.S.
would be worth suing, whereas Fisher Prew-Smith, being insolvent, would
not. Secondly it is said that the investors would have little incentive to sue
B   W.B.B.S., once they had received compensation from I.C.S. A third
objection was that the investors would not be entitled to claim on their
own behalf, once they had accepted compensation. This third objection is
now accepted as being wrong in law, and is no longer relied on.

   By way of answer to the second objection, Mr. Strauss pointed out
that since, in the generality of cases, investors had received only between
C   half and three-quarters of their losses by way of compensation, they would
have every incentive to look elsewhere for a remedy. Over 500 investors
have in fact done so, by bringing claims against Cheltenham and
Gloucester, W.B.B.S. and other building societies. So it does not look as if
the investors have been shy or backward in pursuing their rights.

   As to the first objection, the structure and language of the claim form,
and the express provisions of section 54(2)(*e*) of the Act, do not suggest
D   that claims against participant firms were expected to be valueless. (It is
common ground that "person" in section 54(2)(*e*) means, and means only,
the participant firm.) It is true that Fisher Prew-Smith are in liquidation.
But other participant firms are not. Moreover the building societies are
not the only third parties likely to be worth suing. It must not be forgotten
that I.C.S. has brought proceedings against 197 firms of solvent solicitors.
E   In any event it is not for the court to speculate on what the parties would
have wanted. I accept, of course, as Mr. Vos observed, that I.C.S. is not a
charity. But it is far from being an ordinary commercial organisation. Its
raison d'être is the compensation of investors.

   Even so, if I.C.S. had undertaken to compensate the investors in full
then one might perhaps have expected I.C.S. to insist on a transfer of all
third party rights. But that is not what has happened. It is common
F   ground that investors have retained rights of some kind against W.B.B.S.
That being so it would seem to me as likely as not, commercially, that the
agreement would provide for the investors to retain the whole of their
rights against W.B.B.S., including the right to claim damages in reduction
of their loans. Such a consequence cannot be regarded as "ridiculous" or
"extraordinary" or "very unreasonable."

G   Various other so-called anomalies are mentioned in Mr. Vos's written
submissions by way of reply. For example, a conscientious investor who
had used his compensation to pay off his mortgage would lose his rights
against W.B.B.S., since there would then be no sum to be abated, whereas
a less conscientious investor who had spent his compensation on a holiday
would retain his rights in full. I agree with Mr. Vos that there are
theoretical anomalies on the investors' construction, though how likely
H   they would be to arise in practice is another question. Where I disagree
with him is in his evaluation of these anomalies. In my judgment they fall
far short of the sort of absurdity which would justify the rejection of what
I have called the plain meaning of section 3(b). They do not prompt the
comment "whatever else the parties may have had in mind, they cannot
have meant *that.*"

   As for the legal consequences, the difficulties are all on the other side.
Both Evans-Lombe J. and the Court of Appeal were of the view that the

splitting of mutually inconsistent remedies in respect of a single cause of    A
action against W.B.B.S. meant that the purported assignment was void for
uncertainty, as well as being contrary to public policy. My noble and
learned friend, Lord Hoffmann has found a way round that difficulty. But
the difficulty does not arise at all on the investors' construction. If the
whole of the investors' rights against W.B.B.S. are retained, the question of
splitting remedies, and "dividing the indivisible" simply does not arise.

For the above reasons I would hold that on the true construction of    B
the claim form the investors' claims against W.B.B.S. have been retained
by the investors, and have not been assigned to I.C.S. It follows that the
question whether if there had been an assignment, it would have been
valid or invalid does not call for an answer. In the result, therefore,
I would uphold the reasoning of the Court of Appeal and dismiss the
main appeal.                                                            C

*The claim against the solicitors*

I can deal with the remaining point quite briefly, since I agree with
your Lordships that the investors' claims against their solicitors have been
validly assigned to I.C.S., and that this part of the appeal should therefore
be allowed. There can be no doubt that paragraph 6 of section 4 purports
to transfer to I.C.S. the investors' rights against the solicitors. There is no    D
issue as to the meaning of paragraph 6 in that connection. The only
question is whether the assignment is effective in law. Evans-Lombe J.
dealt with the point briefly at the end of his judgment. Having held that it
was not possible in law to assign some but not all remedies in respect of a
single cause of action, he went on to conclude that the same reasoning
must also apply, logically, to the claim against the solicitors, since the    E
solicitors might wish to bring in W.B.B.S. as third parties.

Mr. Sumption supports the judge's conclusion. He submitted that the
purported assignment is void, because it is legally impossible for the
investors to assign their right to claim against the solicitors while retaining
the right to claim against W.B.B.S. in respect of the same loss.
Mr. Sumption was not able to point to any authority in support of this
submission. He relies instead on the traditional antipathy of the courts to    F
the assignment of bare rights to litigate. Alternatively he submits that if
there can be an assignment at all in such circumstances, it will only be
effective in law if the parties have agreed as to their respective priority. In
the absence of agreement, the court has no means for deciding between
competing claimants in regard to the same loss.

Since the claims against W.B.B.S. and the solicitors give rise to separate    G
causes of action, the problem of splitting remedies in respect of the *same*
cause of action, which Evans-Lombe J. and the Court of Appeal regarded
as insoluble, does not arise in so acute a form. I believe it could be solved
satisfactorily by sensible case management. But I need not develop the
matter further. For Mr. Sumption concedes that if the main appeal is
allowed, as your Lordships propose, then the appeal in the solicitor's
action must also be allowed.                                           H

LORD HOFFMANN. My Lords, The Investors Compensation Scheme
was set up pursuant to section 54 of the Financial Services Act 1986 to
provide a compensation fund for people who have unsatisfied claims
against persons authorised under the Act to carry on investment business.
The rules under which the scheme is administered provide that, on paying
compensation, the company managing the scheme is to take over the

1 W.L.R.          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          Lord Hoffmann

A   applicant's rights against the authorised person and also, if the management company so determines, any rights he may have against other persons relating to the subject matter of his claim.

In 1992 the management company, called Investors Compensation Scheme Ltd. ("I.C.S."), began to receive a large number of claims from home owners, mainly elderly retired people, who had been advised by authorised persons, independent financial advisers belonging to the

B   Financial Intermediaries, Managers and Brokers Regulatory Association, to enter into schemes called "home income plans." These schemes had been marketed by the financial advisers in conjunction with certain building societies during the late 1980s and involved the owners mortgaging their homes to secure advances at enhanced rates of interest which they mainly invested in equity-linked bonds. The subsequent fall in equities and

C   house prices and the rise in interest rates had caused the owners severe losses. They had claims against the financial advisers for negligence and breach of their statutory duties under the Act of 1986 as well as possible claims against the building societies and the solicitors who had acted in connection with the mortgages.

I.C.S. drafted a claim form for the home owner claimants (whom I shall call "the investors") to sign. We shall have to examine it later in

D   some detail. For the moment it is enough to say that it contained an assignment to I.C.S. of all the investor's rights arising out of the transaction against the financial advisers and anyone else, subject to a reservation of certain rights against the building society. This reservation, in section 3(b) of the form, has given rise to this litigation. Evans-Lombe J., who had to determine its meaning as a preliminary issue, thought that it was trying to

E   reserve to the investor a part of his rights against the building society but that an assignment to I.C.S. of his remaining rights was legally impossible and invalid. An assignment of the investor's rights in respect of the same losses against the solicitors was also legally impossible and the whole assignment was therefore a failure. The Court of Appeal disagreed with the judge about the meaning of section 3(b). They thought it was intended to reserve to the investor the whole of his rights against the building

F   society. But they agreed that if it had been intended to assign part, it would have been ineffective. They also agreed that the assignment of rights against the solicitors was invalid. The unanimous view of the judge and the Court of Appeal was therefore that I.C.S. had no title to claim against either the building societies or the solicitors. Against this decision I.C.S. appeals to your Lordships' House.

G   My Lords, I must start by setting out the material provisions of section 54 of the Act of 1986, the Rules under which the Scheme is operated and the claim form which the investors signed. First, the Act:

"54(1) The Secretary of State may by rules establish a scheme for compensating investors in cases where persons who are or have been authorised persons are unable, or likely to be unable, to satisfy claims in respect of any description of civil liability incurred by them in

H   connection with their investment business. (2) Without prejudice to the generality of subsection (1) above, rules under this section may—(a) provide for the administration of the scheme and, subject to the Rules, the determination and regulation of any matter relating to its operation by a body appearing to the Secretary of State to be representative of, or of any class of, authorised persons; (b) establish a fund out of which compensation is to be paid; (c) provide for the

08-13555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Appendix to
Declaration of Lord Collins   Pg 218 of 428
908

**Lord Hoffmann**   I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))   **[1998]**

levying of contributions from, or from any class of, authorised persons   A
and otherwise for financing the scheme and for the payment of
contributions and other money into the fund; (*d*) specify the terms
and conditions on which, and to the extent to which, compensation is
to be payable and in any circumstances in which the right to
compensation is to be excluded or modified; (*e*) provide for treating
compensation payable under the scheme in respect of a claim against
any person as extinguishing or reducing the liability of that person in   B
respect of the claim and for conferring on the body administering the
scheme a right of recovery against that person, being, in the event of
his insolvency, a right not exceeding such right, if any, as the claimant
would have had in that event; and (*f*) contain incidental and
supplementary provisions."

Next, the rules. They are called the Financial Services (Compensation   C
of Investors) Rules 1990 and were made by the Securities and Investment
Board, exercising the powers under section 54 delegated by the Secretary
of State. In these Rules, I.C.S. is called "the management company" and
the financial advisers and other authorised persons are called "the
participant firms." For present purposes it is necessary to refer only to the
following rules:
                                                                          D
      "2.02 Payment of compensation
      "1. The management company is responsible for paying compensa-
tion to investors in accordance with these rules.
      "2. The management company may pay compensation where it is
satisfied, on the basis of evidence provided by an investor or which is
available to it from other sources, that: (a) an eligible investor has
duly applied for compensation; (b) the investor has a claim against a   E
participant firm in default ... (c) the participant firm is unable or
unlikely to be able to meet the claim within a reasonable period; and
(d) the investor has agreed, to the satisfaction of the management
company, that the whole or any part of his rights in the claim and, if
the management company so determines, any rights of his in a claim
against any other person which relate to the subject matter of the
claim, should pass to it."                                               F
      "2.10 Recoveries
      "1. Where, in connection with the payment of compensation, an
investor agrees that the whole or any part of his rights in a claim
against any person are to pass to the management company, the
payment of compensation extinguishes the liability of that person to
the investor in respect of that claim or part and confers on the
management company a right of recovery against that person which   G
is otherwise identical to the investor's former rights in the claim or
part thereof."

Finally we must look at the claim form. Various editions were produced
in 1992 but for present purposes nothing turns on the differences. This
case concerns a form used for claims in respect of a financial adviser called
Fisher Prew-Smith Financial Services Ltd. ("F.P.S.") which had marketed   H
its home income plan in conjunction with the West Bromwich Building
Society ("W.B.B.S."). I shall refer to the one which was in use in July 1993.
Sections 1 and 2 dealt with the personal details of the claimants and
the amount of compensation payable. Section 3(a) was called "claimant's
declaration" and contained the following statements:
      "I/we confirm that we have received no compensation of any kind in
respect of the amounts owed to us at the date of default by [F.P.S.] or

A   any other person. I/we also confirm that I/we do not expect to receive any such compensation in the future. Any such compensation received by me/us, I/we will pay to [I.C.S.] in accordance with section 4 attached hereto. I/we understand that, subject to section 3(b) below ... 2. [I.C.S.] in its capacity as administrator of the scheme will take over my rights and claims against [F.P.S.] and other third parties on
B   the payment of any compensation as described in the transfer of rights at section 4 of this form. Any amount received will be paid direct to [I.C.S.] and any amounts (less costs and interest) which exceed the compensation payment will be paid to me/us."

Section 3(b), which has given rise to all the difficulty, read, as follows:

"I.C.S. agrees that the following claims shall not be treated as a 'third
C   party claim' (as defined in section 4 of this form) for the purposes of this agreement and that the benefits of such claim shall enure to you absolutely: Any claim (whether sounding in rescission for undue influence or otherwise) that you have or may have against the [W.B.B.S.] in which you claim an abatement of sums which you would otherwise have to pay to that society in respect of sums borrowed by you from that society in connection with the transaction and dealings
D   giving rise to the claim (including interest on any such sums)."

Finally, section 4 contained a statement that:

"I/we, the claimant, agree and acknowledge as follows: 1. I/we agree that my/our rights against [F.P.S.] in respect of the claim shall pass to [I.C.S.] on payment of compensation ... 2. I/we agree that we will
E   accept the sum of ... from I.C.S. in satisfaction of my/our entitlement to compensation under the rules in respect of the claim. 3. I/we acknowledge that under the rules on payment of the amount of ... I/we will no longer have the right to make a claim against [F.P.S.] in respect of the claim and that any such right will be vested in I.C.S. pursuant to the rules, and I/we further acknowledge that any sums which would otherwise be payable to me/us in respect of the claim by
F   [F.P.S.] ... shall be paid instead to I.C.S. 4. So far as any rights in respect of the claim would otherwise remain vested in me/us, I/we agree that I/we assign those rights to I.C.S. to the extent of the amount of the said compensation and scheme interest paid. 5. I/we agree that in the event of my/our receiving any moneys or assets in respect of the claim from [F.P.S.] ... I/we will forthwith pay or transfer them to I.C.S. 6. I/we hereby assign absolutely to I.C.S. each and
G   every third party claim and the benefit thereof. 7. I.C.S. agrees and acknowledges that in the event that it recovers any moneys in respect of a third party claim, it will pay to you a sum equivalent to the aggregate of:—(a) the moneys which I.C.S. has recovered in respect of the third party claim; and (b) any moneys which I.C.S. has recovered in respect of the claim; and (c) any moneys which I.C.S. has recovered
H   pursuant to clause 5 or 6 above; *less* (i) the amount of compensation which I.C.S. had paid to you; (ii) such amount in respect of interest as I.C.S. considers just; and (iii) the costs which I.C.S. has incurred in effecting, or in attempting to effect, any such recovery. 8. I/we agree that I/we will provide all reasonable co-operation and assistance that I.C.S. asks me/us to give in connection with any pursuit by I.C.S. of claims corresponding to the claim and of any third party claim, including the provision of documents, the provision

of statements, the swearing of affidavits and the attendance at court
to give oral evidence. 9. I.C.S. may give a good receipt to any person
in respect of any third party claim the benefit of which is assigned by
this document. 10. I.C.S. will conduct all proceedings and settlement
negotiations regarding claims assigned by you reasonably and with
due regard to your interests as well as its own. 11. I.C.S. will reassign
to you at your request any claim which it and, if relevant its insurers
decide at any time not to pursue or to pursue further.
12. In this document, 'third party claim' means any right, claim or
cause of action which the claimant has or may have against any
person other than [F.P.S.] or against any fund or property in the
hands of any person other than [F.P.S.] and arising out of the
circumstances giving rise to the claim or otherwise relating to
the claim, whether such claims shall arise in debt, breach of contract,
tort, breach of trust or in any other manner whatsoever ..."

Although the form was obviously trying not to use too much legalese,
it could not have been easy for the ordinary retired home owner to
understand. It referred to technical concepts like "sounding in rescission"
and "in debt, breach of contract, tort, breach of trust or in any other
manner whatsoever." I.C.S. therefore also provided an explanatory note
which was a model of clarity:

"1. Under this document, once you have received your compensa-
tion from I.C.S., you will not be able to sue the 'participant firm'
mentioned above in relation to the claim which led to that
compensation. This is because your claim is being met by I.C.S.
instead (paragraphs 2 and 3). 2. But I.C.S. in turn may wish to
recover some or all of its outlay to you by suing the firm, and you
promise to help I.C.S. if I.C.S. decides to do so (paragraph 8).
3. Further, since you are being compensated in relation to this claim,
you should not expect any more money for it from the firm (or
liquidator) (second half of paragraph 3); and any money sent to you
because of it (e.g. by the liquidator) is really due to I.C.S. instead of
to you, so you must pay the money to I.C.S. (paragraph 5). 4. You
also agree that I.C.S. should be able to use any rights which you now
have against anyone else in relation to the claim. Examples might be
directors of the firm or other persons also responsible for causing the
loss for which you are being compensated. You give up all those rights
and transfer them to I.C.S. (paragraph 6)."

Before I turn to the question of construction, I must provide some of
the background to how this litigation has come about. A number of the
home owners instructed a firm of solicitors called Barnett Sampson to
negotiate their claims. The rules provided that claims were to be met "only
where the management company considers that it is essential in order to
provide fair compensation to the investor." I.C.S. decided that it would
not pay compensation in respect of various heads of claim: in particular,
that it would not reimburse money which the homeowners had given away
or spent on themselves, or fees paid to lawyers and other professionals, or
damages for illness, anxiety and stress. Barnett Sampson's clients challenged
this decision in proceedings for judicial review but this House decided in
*Reg. v. Investors Compensation Scheme Ltd., Ex parte Bowden* [1996] A.C.
261 that I.C.S. had acted within its powers.

I.C.S. then commenced proceedings against various building societies
for compensation for breach of statutory duty under the Act of 1986 and

A    damages for breach of duty at common law, claiming to sue as assignee of
the investors. In proceedings against Cheltenham and Gloucester Plc.
(previously the Cheltenham & Gloucester Building Society) the society
took the point that section 3(b) of the claim form reserved to the investor
all claims against the society and that I.C.S. therefore had no title to sue.
Evans-Lombe J. ordered this question to be tried as a preliminary issue
and on 1 November 1995 gave a judgment in which he held that the only
B    right reserved by section 3(b) was the right of the mortgagor, on rescission
of the mortgage, to an adjustment of the mortgage debt as part of the
mutual restoration of benefits consequent upon rescission. The assignment
of the investor's right to damages for misrepresentation or breach of duty
was unaffected. A year later the same point came before Evans-Lombe J.
in proceedings by I.C.S. against W.B.B.S. By this time, I.C.S. had also
C    commenced proceedings against a large number of firms of solicitors who
had acted for investors in connection with the home income plans.
A number of investors represented by Barnett Sampson ("the Alford
plaintiffs") and another firm of solicitors ("the Armitage plaintiffs") had
also commenced separate proceedings against W.B.B.S. for rescission of
their mortgages and damages. Evans-Lombe J. therefore directed
preliminary issues on the question of who, as between I.C.S. and the
D    investors, had the title to sue W.B.B.S. for damages. These are the
proceedings which are the subject of this appeal to your Lordships' House.

My Lords, I start with the construction of section 3(b). Evans-
Lombe J. followed his own decision in the earlier *Cheltenham and
Gloucester* case and I shall first summarise his reasoning and then that of
Leggatt L.J. in the Court of Appeal. Evans-Lombe J. focused on the words
E    "any claim (whether sounding in rescission for undue influence or
otherwise) that you have ... against the ... society in which you claim an
abatement of sums which you would otherwise have to repay to that
society ..." According to ordinary rules of syntax, "any claim" is the
antecedent of "that you have" and the words "or otherwise" in the
adjectival parenthesis mean that it does not limit the breadth of "any
claim." It follows that claims of any description are reserved as long as
F    they amount to claims for an "abatement" of what is owing to the Society.
There are various ways in which the amount owing might be abated but
one would be on account of a set-off against the society's liability for
damages. Thus the syntax of the words following "any claim" points to a
wide meaning of "abatement" which includes the effect of cross-claims.

Evans-Lombe J. then turned to the background against which the
G    language in the claim form had been used. Two features seemed to him
odd. First, the building society and the solicitors were the only solvent
parties against which the investors were likely to have any claim. As
between the building society and the solicitors, the former would certainly
be the prime target. It had profited from the home income plans by
lending money at enhanced rates of interest on safe security (maximum of
50 per cent. of value) at a time when lenders were falling over themselves
H    to lend as much money as possible. One might expect that I.C.S., having
paid compensation to the investor, would take over his claim against the
building society. If not, the investor might well be overcompensated. Other
provisions of the form, like clause 7, seemed to assume that I.C.S. would
do the suing and account to the investor for the net recovery in excess of
the compensation paid. But there was no provision for the investor having
to pay anything back to I.C.S. This pointed to I.C.S. being entitled to any
recoverable damages.

Lord Hoffmann        I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))        [1998]

Secondly, the parenthesis seemed very strange against the background    A
of the law. If it was exhaustive, why was "sounding in rescission for undue
influence" singled out? What about rescission on other grounds, or claims
for breach of statutory or common law duty? It was rather like providing
in a lease of a flat that the tenant should not keep "any pets (whether
neutered Persian cats or otherwise)." Something seemed to have gone
wrong.

Considerations of this kind led the judge to conclude in the *Cheltenham*    B
*and Gloucester* case that the wider construction of "any claim" and
"abatement" led to a "ridiculous commercial result which the parties to
the claim forms were quite unlikely to have intended" and that it was clear
that "the drafting of the second paragraph of section 3(b) was mistaken."
He therefore concluded that the meaning intended by the parties was that
the investor should retain any claim for an abatement of his debt which    C
arose out of a claim for rescission, whether for undue influence or
otherwise. This could be fitted easily into the scheme of the law because
the old equitable remedy of rescission included, as part of the restitutio in
integrum, an accounting for benefits and indemnity against liabilities which
could result in an abatement of the mortgage debt. Such a remedy was
quite separate from a common law action for misrepresentation or breach
of statutory duty. But the judge seems to have had some misgivings about    D
his interpretation: he said that was doing violence to the natural meaning
of the words and altering the drafting of the paragraph in a way "more
appropriate to rectification than the process of construction." In the
present case, however, the judge adhered to his construction and gave some
additional reasons.

In the Court of Appeal, Leggatt L.J. said, on the authority of *Through*    E
*the Looking-Glass,* that the judge's interpretation was "not an
available meaning of the words." "Any claim (whether sounding in
rescission for undue influence or otherwise)" could not mean "Any claim
sounding in rescission (whether for undue influence or otherwise)" and
that was that. He was unimpressed by the alleged commercial nonsense of
the alternative construction.

My Lords, I will say at once that I prefer the approach of the judge.    F
But I think I should preface my explanation of my reasons with some
general remarks about the principles by which contractual documents are
nowadays construed. I do not think that the fundamental change which
has overtaken this branch of the law, particularly as a result of the
speeches of Lord Wilberforce in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381,
1384–1386 and *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976]
1 W.L.R. 989, is always sufficiently appreciated. The result has been,    G
subject to one important exception, to assimilate the way in which such
documents are interpreted by judges to the common sense principles by
which any serious utterance would be interpreted in ordinary life. Almost
all the old intellectual baggage of "legal" interpretation has been discarded.
The principles may be summarised as follows.

(1) Interpretation is the ascertainment of the meaning which the    H
document would convey to a reasonable person having all the background
knowledge which would reasonably have been available to the parties in
the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as
the "matrix of fact," but this phrase is, if anything, an understated
description of what the background may include. Subject to the requirement
that it should have been reasonably available to the parties and to the

A    exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal

B    interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear. But this is not the occasion on which to explore them.

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars;

C    the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax: see *Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] A.C. 749.

D    (5) The "rule" that words should be given their "natural and ordinary meaning" reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention

E    which they plainly could not have had. Lord Diplock made this point more vigorously when he said in *Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191, 201:

"if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense."

F    If one applies these principles, it seems to me that the judge must be right and, as we are dealing with one badly drafted clause which is happily no longer in use, there is little advantage in my repeating his reasons at greater length. The only remark of his which I would respectfully question is when he said that he was "doing violence" to the natural meaning of the words. This is an over-energetic way to describe the process of interpretation. Many people, including politicians, celebrities and

G    Mrs. Malaprop, mangle meanings and syntax but nevertheless communicate tolerably clearly what they are using the words to mean. If anyone is doing violence to natural meanings, it is they rather than their listeners.

I shall, however, make four points supplemental to those of the judge. First, the claim form was obviously intended to be read by lawyers and the explanatory note by laymen. It is the terms of the claim form which govern the legal relationship between the parties. But in construing the

H    form, I think that one should start with the assumption that a layman who read the explanatory note and did not venture into the claim form itself was being given an accurate account of the effect of the transaction. It is therefore significant that paragraph 4 of the note says categorically and without qualification that the investor gives up all his rights against anyone else and transfers them to I.C.S. If the effect of the claim form was that the investor retained his claim against the building society,

paragraph 4 of the note was very misleading. Secondly, this leads to the    A
conclusion that section 3(b) was intended only to deal with the possibility
that a lawyer might argue that some right was a "claim" when it would
not be regarded as a claim by a layman. This is a fair description of the
possibility of a reduction of the mortgage debt as part of the equitable
taking of accounts upon rescission, which would not result in the investor
receiving any money but merely having to pay less to W.B.B.S. Thirdly, any    B
lawyer would think it extremely odd for I.C.S. to take an assignment of
the investor's claim for damages against the solicitors and leave the investor
with a claim for the same damages against W.B.B.S. He would be likely to
wonder whether this was conceptually possible and, as I shall explain,
I think that his doubts would be well founded. The investor and I.C.S.
could not between them recover more than the loss which the investor had
actually suffered. As a matter of common sense, one would therefore    C
expect that I.C.S. either had a right to the damages or it did not. It would
seem eccentric to leave this question to be decided (if such a thing were
possible) by a race to judgment. Fourthly, no lawyer in his right mind who
intended simply to say that all claims against the W.B.B.S. were reserved
to the investor would have used the parenthesis. Nor, unless he intended
to limit the reservation to the amount, if any, which happened to be    D
outstanding on the mortgage, would he have described them as claims "in
which you claim an abatement of the sums which you would otherwise
have to repay." And it is difficult to think of any reason for such an
arbitrary limitation.

Finally, on this part of the case, I must make some comments upon
the judgment of the Court of Appeal. Leggatt L.J. said that his
construction was "the natural and ordinary meaning of the words used."    E
I do not think that the concept of natural and ordinary meaning is very
helpful when, on any view, the words have not been used in a natural and
ordinary way. In a case like this, the court is inevitably engaged in chosing
between competing unnatural meanings. Secondly, Leggatt L.J. said that
the judge's construction was not an "available meaning" of the words. If
this means that judges cannot, short of rectification, decide that the parties
must have made mistakes of meaning or syntax, I respectfully think he    F
was wrong. The proposition is not, I would suggest, borne out by his
citation from *Through the Looking-Glass.* Alice and Humpty-Dumpty
were agreed that the word "glory" did not mean "a nice knock-down
argument." Anyone with a dictionary could see that. Humpty-Dumpty's
point was that "a nice knock-down argument" was what *he* meant by using
the word "glory." He very fairly acknowledged that Alice, as a reasonable    G
young woman, could not have realised this until he told her, but once he
had told her, or if, without being expressly told, she could have inferred it
from the background, she would have had no difficulty in understanding
what he meant.

The next question is whether, given the reservation of rights in
section 3(b), the assignment of claims to compensation and damages    H
against W.B.B.S. was valid. As we have seen, the judge and the Court of
Appeal thought that they were not. Evans-Lombe J. said that the
"fundamental problem" was that one could assign a chose in action but
not a particular remedy by which that chose in action was enforced. He
said:

> "However what was here sought to be assigned was not the chose in
> action but part of the remedies which the original holder of the chose

1 W.L.R.    I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))    Lord Hoffmann

A    in action, the investor, held prior to the purported assignment. It follows ... that what was purportedly assigned was not a chose in action and accordingly any attempted assignment is void."

In the Court of Appeal Leggatt L.J. accepted the submission of Mr. Oliver that:

B    "the assignment for which the I.C.S. contends attempts to divide the indivisible. Whatever else can be assigned, one remedy cannot be assigned whilst retaining a potentially alternative remedy. Since the purpose of section 3(b) is to procure a reduction in sums payable in respect of a mortgage, it is capable of constituting an alternative to rescission."

C    (I should say that, as a matter of construction of the judgment, I think that by using the word "rescission" Leggatt L.J. meant "damages.")

My Lords, I agree that a chose in action is property, something capable of being turned into money. Snell's Equity, 29th ed. (1990), p. 71 defines choses in action as "all personal rights of property which can only be claimed or enforced by action, and not by taking physical possession." At common law, for reasons into which it is unnecessary to discuss, choses in
D    action could not be assigned. In equity, they could. Assignment of a "debt or other legal thing in action" was made possible at law by section 136 of the Law of Property Act 1925. In each case, however, what is assignable is the debt or other personal right of property. It is recoverable by action, but what is assigned is the *chose*, the thing, the debt or damages to which the assignor is entitled. The existence of a remedy or remedies is an essential condition for the existence of the chose in action but that does
E    not mean that the remedies are property in themselves, capable of assignment separately from the *chose*. So, for example, there may be joint and several liability; a remedy for the recovery of a debt or damages may be available against more than one person. But this does not mean that there is more than one chose in action. The assignee either acquires the right to the money (or part of the money) or he does not. If he does, he
F    necessarily acquires whatever remedies are available to recover the money or the part which has been assigned to him. So far, therefore, I am in complete agreement with the judge and the Court of Appeal.

It is in applying these principles to the agreement constituted by the claim form that I respectfully differ. Let us consider what rights the investor might have had when he signed the form. He may have had a claim for damages in respect of the loss which he had suffered on account
G    of entering into the transaction. This may have included money which he had lost on the ill-advised investment in an equity-linked bond, fees which he paid to advisers to extricate himself from his predicament, high rates of interest paid to the building society, possibly even money spent under the impression that he could afford to do so. The persons liable for this loss might have been the financial adviser, the building society and his solicitor.
H    The building society, for example, might have been liable for participating in misrepresentations made by the financial adviser in the course of a joint scheme for marketing Home Improvement Plans, or in breach of its duties under the Act of 1986. I am not suggesting that any building society was actually liable on this basis, but only that the claim form contemplates this as a possibility. This right of damages would have been a chose in action, a right to recover money, which was capable of assignment in equity and under section 136 of the Law of Property Act 1925.

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
Declaration of Lord Collins    Pg 226 of 428
The Weekly Law Reports 29 May 1998
916

The investor might in addition have had a right against the building    A
society to rescission of his mortgage. Or he might have such a right
without having any claim for damages. For example, he might have been
able to show that the building society had actual or constructive knowledge
of undue influence exercised by the financial adviser: compare *Barclays
Bank Plc. v. O'Brien* [1994] 1 A.C. 180. This would entitle him to rescission
but not damages. By itself, the right to rescission would have done little to
solve the investor's problems because it would have been a condition of    B
rescission that the investor should restore the benefits which he had
received in return for the mortgage: the building society's advance and a
reasonable rate of interest for having the use of the money. His real
complaint was not merely that his house was mortgaged but that he no
longer had the money to pay back to the building society. Until he had
obtained compensation or damages, he would usually be unable to do so.    C
Nevertheless, one can imagine reasons why it would be more advantageous
to the investor, even after obtaining his compensation, to claim rescission
of the mortgage rather than simply paying it off. For example, the
reasonable rate of interest which a court might fix as a condition of
rescission might be less than the higher rate due under the contract (some
of which he had already paid) and so, on the taking of accounts for the
purposes of rescission, there might be an abatement of what he would    D
otherwise have to repay.

Now it is important to notice that a claim to rescission is a right of
action but can in no way be described as a chose in action or part of a
chose in action. It is a claim to be relieved of a mortgage, and such a
claim can be made only by the owner of the mortgaged property. The
owner cannot assign a right to rescission separately from his property    E
because it would make no sense to acquire a right to have someone else's
property relieved of a mortgage. Likewise, the possibility of an abatement
of the debt as part of the process of rescission is not a chose in action
which can be assigned. It is simply part of the process of rescission, which
is a right attached to the ownership of the house itself.

It can therefore be seen that in reserving to the investor any claim to
an abatement of the mortgage debt consequent upon rescission,    F
section 3(b) was not cutting down the scope of the chose in action which
was assigned to I.C.S. The possibility of an abatement could never have
formed part of that chose in action and could never have been assigned
separately from the house itself. One might therefore ask: what was the
point of section 3(b)? The answer, I would suggest, is lawyerly caution.
The draftsman wanted to make it clear that if, for example, the investor    G
brought an action for rescission, any abatement of the debt which he
secured was not something for which he would be accountable to the
I.C.S. In my view, it was a mistake. The draftsman muddled up two
separate questions. One is the extent of the assignment to I.C.S. and the
other is the extent to which the investor is accountable to I.C.S. for any
benefit he may receive. The two are not necessarily the same.

As this case shows, a right of action such as a claim for rescission of a    H
mortgage may be unassignable as a chose in action, but there is no reason
why the parties cannot agree that the investor is to be accountable to
I.C.S. for all or part of the improvement in his financial position as a
result of exercising his right to rescission. The words "the benefits of such
claim shall enure to you absolutely" in section 3(b) show that the
draftsman's concern was with accountability for benefits. He wanted to
make it clear that the investor would not be accountable for benefits

A   derived from a claim for rescission. But the language he used referred to the extent of the assignment, for which purpose the exception in section 3(b) was unnecessary. Hence all the litigation: if you say something which is unnecessary, people suspect that you must mean something else. However, there was one thing which section 3(b) was not and could not be, and that was a reservation of a remedy which would ordinarily form part of the chose in action assigned by I.C.S.

B   It is of course true that there are other links between the claim for damages and the claim for rescission. The facts giving rise to liability would have a great deal in common, so that if both claims were being made, by I.C.S. in the one case and the investor in the other, it would be sensible to try both cases together. But this can often happen when the same facts give rise to claims by different people and there are procedural means for dealing with the possibility of duplicated evidence and conflicting

C   decisions. For example, in *Wilson v. United Counties Bank Ltd.* [1920] A.C. 102 the breach by a bank of its contract to supervise Major Wilson's business while he was fighting in France gave rise to a claim for financial loss to the business and to general damages for injury to his credit and reputation. The House of Lords held that upon his bankruptcy the former claim was statutorily assigned to his trustee while the latter remained vested in him. He and the trustee joined as plaintiffs in the action and, if

D   they had not done so, the bank would have been entitled to have their actions consolidated.

In addition, the damages recoverable by I.C.S. as assignee may be affected by whether or not the mortgage has been rescinded. If there has been no rescission, the damages may be calculated on the basis that the transaction has involved the investor in liability to pay a high rate of

E   interest. If there has been rescission, the damages will be on the footing that the investor has only had to pay a reasonable rate. If the building society is to pay on the former basis, it is entitled to require that the investor affirm the mortgage and if I.C.S. cannot procure this, it may be necessary to assess damages on the footing that rescission will take place. If there is a dispute over the matter, the investor may have to be joined as a plaintiff, to avoid a situation in which the building society both resists a

F   claim to rescission and has damages assessed on the basis that rescission has taken place. But these again are problems capable of solution by procedural means.

The fact that the exercise by the investor of a right to rescission may affect the quantum of the damages recoverable by virtue of the assignment to I.C.S. does not, however, mean that the investor has attempted to assign different remedies in respect of the same chose in action. What was

G   assigned was the right to damages, whatever the quantum might be. It is not unusual for the quantum of damages to be affected by other proceedings which the person injured may bring, whether against a person liable for damages or someone else. For example, if one assumes that the financial adviser was solvent and that the investor had no cause of action whatever against the building society for damages but the possibility of rescission of the mortgage on the basis of constructive notice, the quantum

H   of damages recoverable from the financial adviser by the investor, or by I.C.S. as his assignee, would be affected by whether or not the investor took successful proceedings for rescission. No one would think this an odd state of affairs and in principle I do not see that it makes any difference that the claim for damages and the claim for rescission are both against the building society.

My Lords, I think that if the rights of the investor are properly analysed, it will become clear that clause 6 of section 4 of the claim form

Lord Hoffmann        I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))        [1998]

is a complete and effectual assignment of the whole of the investor's claim    A
to compensation and damages to I.C.S. Section 3(b) may well have been
unnecessary, but this conclusion seems to me preferable to attributing to
the parties an intention, as, in their different ways, the judge and the Court
of Appeal have done, to do six impossible things before breakfast and then
regretfully saying that they could not be done. I would therefore allow the
appeal. The first two questions which the judge directed to be tried as
preliminary issues and the answers I suggest your Lordships should give    B
are as follows.

*Question 1(a).* Whether, upon the true construction of the express and
(if any) implied terms of the I.C.S. claim form, any (and if so which and
to what extent) of the claims which the Alford and Armitage investors
advance in the actions numbered Ch. 1995 A. Nos. 2266 and 3129 have
been assigned to the I.C.S. and *(b)* if so, whether such assignment is valid    C
and effective and what consequences (if any) does it have as to the ability
of those investors to maintain the actions?

*Answer.* Upon the true construction of the I.C.S. claim form, all claims
for damages and compensation have been validly assigned to I.C.S. and
such claims cannot be maintained by the investors in their actions. The
investors retain the right to claim rescission of their mortgages upon such
terms as the court may consider just.    D

*Question 2(a).* Whether, upon the true construction of the express and
(if any) implied terms of the I.C.S. claim form and in the light of the
answer to issue 1, any (and if so which and which parts thereof) of the
claims which the I.C.S. advances in the actions numbered Ch. 1995 I.
Nos. 7087 and 8106 have been assigned to the I.C.S. and *(b)* if so, is such
assignment valid and effective and does it enable I.C.S. to maintain the
actions?    E

*Answer. (a)* All. *(b)* Yes.
The remaining questions do not arise.

LORD HOPE OF CRAIGHEAD.  My Lords, I have had the advantage of
reading in draft the speech prepared by my noble and learned friend, Lord
Hoffmann. For the reasons he gives I also would allow the appeal and
would answer the questions which the judge directed to be tried as    F
preliminary issues in the way he has suggested.

LORD CLYDE.  My Lords, I have had the advantage of reading a draft
of the speech of my noble and learned friend, Lord Hoffmann. For the
reasons he has given, I too would allow the appeal.

*Appeal allowed with costs.*    G
*Questions certified by Evans-Lombe J.
 answered as proposed by Lord
 Hoffmann.*
*I.C.S.'s costs in House of Lords arising
 from Mr. Haring's intervention to be
 paid out of legal aid fund under
 section 18 of Legal Aid Act 1988,    H
 such order suspended for four weeks
 to allow Legal Aid Board to object.*

*Solicitors: Clifford Chance; Eversheds, Birmingham; Reynolds Porter
Chamberlain; Barnett Sampson and J. Keith Park & Co., St. Helens.*

[Reported by JOHN SPENCER ESQ., Barrister]

LC/14

ch she *a*
of the
would

. claim
:ation.
.ld be *b*

.ave no
.urther
.urther
·prised
.e such *c*
:aring.
.ble to
: right

*d*


licitor.

# Re Sigma Finance Corp (in administrative receivership)

# Re the Insolvency Act 1986
## [2009] UKSC 2

SUPREME COURT

LORD HOPE DP, LORD SCOTT, LORD WALKER, LORD MANCE AND LORD COLLINS SCJJ

1, 2 JULY, 29 OCTOBER 2009

*Company – Receiver – Construction of security trust deed – Discharge of short term
liabilities during realisation period.*

S was a structured investment vehicle established to invest in certain types of
asset-backed securities and other financial instruments. S's assets were secured
in favour of its secured creditors upon the terms of a security trust deed made
between S as issuer and a security trustee. The scheme of the security trust
deed was that upon the occurrence of an enforcement event there would be a
realisation period of up to 60 days to enable the security trustee to establish
'Short Term and Long Term Pools' using S's assets. 'Assets' were defined in the
widest possible terms. The short and long term pools were to be structured
with a view to matching the principal amount of S's short and long term
liabilities with high quality rated assets in corresponding principal amounts and
with corresponding maturity and payment dates. If that was not possible
because the principal amount of S's assets was less than that of its total
indebtedness then the trustee was to calculate the proportionate deficit and
reduce the principal amount of assets allocable to each pool accordingly. Once
the pools were set up, each was to operate separately; within each pool, if it
later appeared that the assets allocated to that pool would be insufficient to
meet the pool's liabilities, the trustee was to calculate and pay to any creditor
only that proportion which could, in its reasonable opinion, be met. Clause 7.6
of the security trust deed provided, in its last sentence, that 'During the
Realisation Period the Security Trustee shall so far as possible discharge on the
due dates therefor any Short Term Liabilities falling due for payment during
such period, using cash or other realisable or maturing Assets of the Issuer'. In
September 2008 S received margin calls that it could not honour. Its board
resolved that it could no longer continue in business and it informed the
security trustee that it had resolved that there was no reasonable likelihood of
it avoiding insolvent liquidation. Receivers were appointed by the security
trustee in October 2008 under the security trust deed. The receivers applied to
the court for directions in relation the correct application of the security trust
deed. Four interested parties, representing different classes of creditors were
invited to appear. A and B submitted that the assets fell to be distributed
preferentially to the creditors in respect of certain unpaid secured liabilities,
with A contending that the assets were to be distributed according to the dates
when the relevant debts became due, while B argued that all debts falling due
in, or prior to, the realisation period were part of a single pool, within which
S's remaining assets fell to be distributed pari passu. C and D maintained that

08-13555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Appendix to
Declaration of Lord Collins   Pg 231 of 428
572                    All England Law Reports                    [2010] 1 All ER

S's remaining assets fell to be allocated equitably as between short and long *a* term liabilities and that, having been so allocated, its short term liabilities fell to be distributed pari passu in relation to each other, and that its long term liabilities fell to be treated likewise in relation to each other. The High Court and the Court of Appeal construed cl 7.6 of the security trust deed as meaning that the remaining assets fell to be distributed preferentially to the creditors whose debts fell due during the realisation period, with distribution to be made *b* according to the dates when payment became due. B, C and D appealed.

**Held** (Lord Walker dissenting) – On the true construction of cl 7.6 of the security trust deed and in the events that had happened the receivers had not been obliged to use cash or other realisable or maturing assets of S to pay short term liabilities falling due for payment during the realisation period either in *c* the order in which they fell due or pari passu with other short term liabilities due for payment during the realisation period. Such liabilities were to be treated along with all other short term liabilities in respect of which payments fell to be made out of the short term pool. The principles upon which a court should interpret a document such as that in the instant case were not in doubt; *d* the focus was on the general nature of the business involved, which was apparent from the document itself, and upon the scheme and wording of the security trust deed read as a whole. The resolution of an issue of interpretation in a case such as the instant case was an iterative process, involving checking each of the rival meanings against other provisions of the document and investigating its commercial consequences. In the ascertainment of the *e* meaning that the deed would convey to a reasonable person with the relevant background knowledge, an understanding of its overall scheme and a reading of individual sentences and phrases which placed them in the context of that overall scheme was of much greater importance than its infelicities. The conclusion of the Court of Appeal elevated a subsidiary provision for the interim discharge of debts 'so far as possible' to a level of predominance which *f* it had not been designed to have in a context where, if given that predominance, it conflicted with the basic scheme of the deed. The provision by cl 7.6 for discharge of short term liabilities as they fell due appeared in a context where the underlying assumption was that all secured liabilities could be covered and no issue of priority could arise. To treat it, in the different context of insolvency, as creating effective priority for such short term liabilities *g* as happened to fall due during the realisation period involved the risk of changing fundamentally the apparent financial structure of the relationship. The task of the reasonable person in understanding the meaning and application of the last sentence of cl 7.6 was greatly facilitated by the existence of a clear basic scheme from which it was improbable that the parties would *h* have wished to depart. That basic scheme involved the creation of short and long term pools, each with sufficient nominal assets of sufficient rating quality to meet, or meet pro rata, the pool's liabilities as and when they matured. The basic purpose of the realisation period was to give time for the creation of such pools. Realisation period debts were to be part of the short term pool. In the context of cl 7.6 the aim of the last sentence was to put realisation period debts *j* in the same position as other short term liabilities; they were to be paid so far as possible on their maturity and payment debts. Accordingly, the appeals of C and D would be allowed and the appeal of B dismissed (see [10], [12]–[17], [21]–[25], [31]–[35], [38], below).

08-13555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Appendix to
Declaration of Lord Collins   Pg 232 of 428
All ER                    SC                              Re Sigma (Lord Collins)                 589

CONCLUSION

[34] I would therefore allow the appeals of interested parties C and D and dismiss the appeal of interested party B, set aside the decisions of the courts below and declare that, on the true construction of cl 7.6 of the STD, and in the events that have happened, the receivers were not obliged to use cash or other realisable or maturing assets of Sigma to pay short-term liabilities falling due for payment during the realisation period after 6 October 2008 either in the order in which they fell due or pari passu with other short-term liabilities due for payment during the realisation period. I would further declare that such liabilities are to be treated along with all other short-term liabilities in respect of which payments fall to be made under cl 7.11 out of the short-term pool to be established under cll 7.6–7.10.

**LORD COLLINS SCJ** (with whom Lord Hope and Lord Mance SCJJ concur).

[35] I agree with Lord Mance that the appeals of interested parties C and D should be allowed for the reasons he gives, and I add only a few remarks of my own on the approach to interpretation. In complex documents of the kind in issue there are bound to be ambiguities, infelicities and inconsistencies. An over-literal interpretation of one provision without regard to the whole may distort or frustrate the commercial purpose. This is one of those too frequent cases where a document has been subjected to the type of textual analysis more appropriate to the interpretation of tax legislation which has been the subject of detailed scrutiny at all committee stages than to an instrument securing commercial obligations: cf *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487 at [2], [2008] 2 All ER (Comm) 465 at [2].

[36] Sigma Finance Corp financed its investments over a 13-year period by debt securities issued or guaranteed by it. It entered into liquidity facilities intended to hedge against market liquidity risks. It entered into financial instruments intended to hedge against currency and interest rate risk. Others provided liquidity facilities, or entered into financial hedging instruments. The security trust deed secures a variety of creditors, who hold different instruments, issued at different times, and in different circumstances.

[37] Consequently this is not the type of case where the background or matrix of fact is or ought to be relevant, except in the most generalised way. I do not consider, therefore, that there is much assistance to be derived from the principles of interpretation re-stated by Lord Hoffmann in the familiar passage in *Investors' Compensation Scheme Ltd v West Bromwich Building Society, Investors' Compensation Scheme Ltd v Hopkin & Sons (a firm), Alford v West Bromwich Building Society, Armitage v West Bromwich Building Society* [1998] 1 All ER 98 at 114–115, [1998] 1 WLR 896 at 912–913. Where a security document secures a number of creditors who have advanced funds over a long period it would be quite wrong to take account of circumstances which are not known to all of them. In this type of case it is the wording of the instrument which is paramount. The instrument must be interpreted as a whole in the light of the commercial intention which may be inferred from the face of the instrument and from the nature of the debtor's business. Detailed semantic analysis must give way to business common sense (see *Antaios Cia Naviera SA v Salen Rederierna AB, The Antaios* [1984] 3 All ER 229 at 233, [1985] AC 191 at 201).

[38] Once cl 7.6 of the security trust deed is seen in context, the conclusion that the receivers were not obliged to give priority to the first maturing

08-13555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Appendix to
590            Declaration of Lord Collins   Pg 233 of 428   [2010] 1 All ER
All England Law Reports

short-term liabilities is consistent with the wording of the clause in the context   a
of the trust deed as a whole and with the commercial purpose of the
instrument.

**LORD WALKER SCJ** (dissenting).
[**39**] These appeals will determine how the enormous loss incurred by Sigma
Finance Corp is to be borne as between the anonymous investment banks,   b
hedge funds and other entities which are its secured creditors. Lord Mance
refers to them as victims of the current financial crisis. An alternative view
would be that they are among the authors of the crisis. But that is not an issue
for the court.

[**40**] Although I was one of those who gave permission for a further appeal
(as it then was, to the Appellate Committee of the House of Lords) I find, on   c
closer consideration, that the case involves no issue of general public
importance. There is no doubt as to the principles of construction to be
applied. They are clearly summarised (under the heading 'the law') in
Lord Mance's judgment. The only issue is as to the interpretation of the
security trust deed in the light of those principles. Sales J (see [2008] EWHC   d
2997 (Ch), [2009] All ER (D) 204 (Apr)) and the majority of the Court of
Appeal (Lloyd and Rimer LJJ) took one view but Lord Neuberger of
Abbotsbury (sitting in the Court of Appeal) took a different view (see [2008]
EWCA Civ 1303).

[**41**] In respectful dissent from the majority of this court I prefer the view
taken by the judge and the majority of the Court of Appeal. Since no issue of   e
principle is involved it would be quite inappropriate to give any lengthy
explanation of my reasons. I will limit myself to three fairly general points.

[**42**] First, I completely agree that it is necessary to construe the language of
cl 7.6 of the deed 'in the landscape of the instrument as a whole' (in the words
of Lord Mustill in *Charter Reinsurance Co Ltd v Fagan* [1996] 3 All ER 46 at 51,
[1997] AC 313 at 384). One of the most striking features of the landscape of the   f
deed, to my mind, is that cl 7 does not provide for the immediate winding up of
Sigma on the occurrence of a default which amounts to an enforcement event.
On the contrary, secured creditors are prohibited from taking steps to wind up
the company. It is therefore necessary to repress any instinctive feeling (and it
is, I acknowledge, a strong instinctive feeling) that pari passu distribution at the
earliest practicable date is the most natural (one might almost say the only   g
rational) solution.

[**43**] Instead, the assets were to be retained and marshalled (in accordance
with the detailed provisions of cll 7.6–7.10) in order to match the company's
short-term and long-term liabilities, as defined, all of which were to be paid
(under cl 7.11 or 7.12) as they fell due. The procedure envisaged was   h
comparable to that of a funded occupational pension scheme which is closed
to new entrants but not wound up. In such a case the trustees would adjust the
way in which the fund was invested in order to match its predictable
short-term, medium-term and long-term liabilities. Scheme members would
still have to wait for the payment of their respective pensions to fall due, and as
each became entitled to a pension he or she would (in the typical case) then be   j
entitled to preference, as against those whose pensions had not fallen due, if
and when there was eventually a winding up.

[**44**] Second, the need to exclude any instinctive feeling about insolvent
winding up is reinforced by the fact, to which Lord Mance rightly attaches
importance, that the parties cannot have contemplated that Sigma would have

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
Declaration of Lord Collins    Pg 234 of 428
ll ER    SC    Re Sigma (Lord Walker)    591

insufficient assets to meet its liabilities even to secured creditors—especially not on the scale of the extraordinary loss that has actually occurred. These skilled and sophisticated investors expected to make money, not to lose it. The fact that the effect of the deed, in a situation which the parties never contemplated, may appear fortuitous or arbitrary does not therefore carry much weight. It is not for the court to make a new contract for experienced commercial operators advised by expert lawyers.

[45] Third, cl 7.6 (the crucial provision which has to be fitted into the landscape of the deed as a whole) is concerned with what is to happen during the 60-day realisation period. In setting up the pools the trustee was to perform what might well be a difficult exercise, but it was essentially an exercise of an administrative nature. The references to the trustee's 'absolute discretion' are to my mind explained by the trustee's wish to protect itself from possible criticism, rather than to any power for the trustee to prefer one secured creditor to another. The direction for payment of liabilities falling due for payment during the realisation period was no doubt expected to be more or less ancillary (as Lord Mance puts it) but it has, in the wholly unexpected events which have occurred, assumed unexpected importance. Reference was made to the direction applying 'so far as possible' (rather than 'if and so far as possible') and to the fact that those words are not immediately adjacent to the words 'on the due dates therefore'. I would not attach any importance to those details of language. The words are wide enough to cover both the possibility that a payment might for practical reasons have to be delayed by a few days, and the much more remote possibility (as it would have appeared to the parties at the time) that there would be a permanent deficiency of assets.

[46] I would therefore dismiss these appeals.

*C's and D's appeals allowed. B's appeal dismissed.*

Gareth Williams    Barrister.

LC/15



**Trinity Term**
**[2016] UKSC 29**
*On appeal from: [2015] EWCA Civ 1257*

# JUDGMENT

## BNY Mellon Corporate Trustee Services Limited (Appellant) *v* LBG Capital No 1 Plc and another (Respondents)

**before**

**Lord Neuberger, President**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Toulson**

## JUDGMENT GIVEN ON

### 16 June 2016

**Heard on 21 March 2016**

31.     In this connection, it is worth repeating the remarks of Lord Collins (with whom Lord Hope and Lord Mance agreed) in *In re Sigma Finance Corp (in administrative receivership)* [2010] 1 All ER 571, paras 36 and 37. Having pointed out that the trust deed in that case concerned "debt securities" issued to "a variety of creditors, who hold different instruments, issued at different times, and in different circumstances", Lord Collins, at para 37, said "[c]onsequently this is not the type of case where the background or matrix of fact is or ought to be relevant, except in the most generalised way." More generally, he said:

> "Where a security document secures a number of creditors who have advanced funds over a long period it would be quite wrong to take account of circumstances which are not known to all of them. In this type of case it is the wording of the instrument which is paramount. The instrument must be interpreted as a whole in the light of the commercial intention which may be inferred from the face of the instrument and from the nature of the debtor's business."

32.     As Mr Dicker QC points out on behalf of the Trustee, the same point was made by Lord Macmillan when giving the decision of the Privy Council in *Egyptian Salt and Soda Co Ltd v Port Said Salt Association Ltd* [1931] AC 677, 682. Disapproving the trial judge's reliance on "surrounding circumstances at the time when the memorandum was framed", Lord Macmillan said that "the purpose of the memorandum is to enable shareholders, creditors and those who deal with the company to know what is its permitted range of enterprise, and for this information they are entitled to rely on the constituent documents of the company" and that the "intention of the framers of the memorandum must be gathered from the language in which they have chosen to express it". (See also the observations of Lord Hoffmann to much the same effect in *Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988, para 36, *Homburg Houtimport BV v Agrosin Private Ltd* [2004] 1 AC 715, para 74, and *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101, para 40).

33.     In the present case, the Trust Deed, and in particular those parts of clauses 7, 8 and 19 of the T&Cs which fall to be construed, cannot be understood unless one has some appreciation of the regulatory policy of the FSA at and before the time that the ECNs were issued. That is self-evident from the provisions of clause 19 which are set out in paras 13 and 14 above. Accordingly, I consider that at least the general thrust and effect of the FSA regulatory material published in 2008 and 2009 can be taken into account when interpreting the T&Cs. That would also accord with good sense: while the individual purchasers of the ECNs may not by any means all have been sophisticated investors, it is appropriate to assume that most of them would have had advice from reasonably sophisticated and informed advisers before they purchased such moderately complex financial products. The Exchange    Offer

Memorandum and the letter from the LBG chairman present more difficulties, and the answer may depend on whether such documents would have been known about or in the minds of subsequent purchasers of the ECNs, a point on which there was no evidence, so far as I am aware.

34.    As it is, I do not consider that the terms of the Exchange Offer Memorandum or the letter from the LBG chairman take matters any further in this case. In my view, once one has in mind the general thrust and effect of the FSA regulatory approach in 2009, as summarised in paras 4 to 7 above, coupled with the commercial purpose of the ECNs as summarised in para 15 above, it is simply unhelpful on the facts of this case to cast one's eyes further than the T&Cs when resolving the issues on this appeal. I now turn to those two issues.

*The first issue: did the possibility of a CDE fall away following CRD IV?*

35.    I have no hesitation in agreeing with Sir Terence Etherton and the Court of Appeal in their conclusion that the reference to "the Consolidated Core Tier 1" in para (2) of the Definition should, in the events which have happened, be treated as a reference to "its then regulatory equivalent" - ie in the current context the Common Equity Tier 1 Capital. Etherton C and the Court of Appeal considered that this conclusion involves a departure from the strictly literal meaning of the definition of "Core Tier 1 Capital" in clause 19, but they concluded that such a departure was justified because it was "clear that something has gone wrong with the language and [it was] clear what a reasonable person would have understood the parties to have meant", applying the test laid down by Lord Hoffmann in *Chartbrook*, para 25.

36.    The reasons given by Gloster LJ in para 85 of her judgment for departing from what she considered was the literal meaning of the closing words of para (2) of the Definition were based on the arguments of Mr Miles QC. They were, in summary, that (i) it was notorious at the time of the issue of the ECNs that the regulatory requirements as to financial institutions' capital would be "strengthened and changed", (ii) it was envisaged in the T&Cs, in particular in clause 19, that expressions such as "Regulatory Capital Requirements" and "Core Tier 1 Capital" could change their meaning; (iii) indeed, it was inherent in the terms of the Definition that this was so; (iv) it was obvious that changes of substance might lead to changes of nomenclature; and (v) one of the essential features of the ECNs was that, if necessary, they could be converted into LBG core capital, whatever expression was used to define it.

37.    Gloster LJ concluded that, given these points, coupled with the existence of the ECN maturity dates, it made no commercial sense to limit the reference to "Core Tier 1 Capital" in para (2) of the Definition to CT1 Capital, as opposed to   holding

that it could, in the events which had happened (as summarised in paras 16 to 20 above), apply to CET1 Capital. She also considered that the error would "have been obvious to a reasonable addressee of the Exchange Offer Memorandum". She referred in this connection to another observation of Lord Collins in *Sigma*, where, in para 35, he said that in complex documents such as the Exchange Offer Memorandum, "there are bound to be ambiguities, infelicities and inconsistencies" and had gone on to warn against an "over-literal interpretation of one provision without regard to the whole", which may "distort or frustrate the commercial purpose".

38.    Subject to one point, I have no hesitation in agreeing with the analysis as summarised in paras 35 to 37 above. My only doubt is as to whether this conclusion really does involve a departure from the literal meaning of the closing words of para (2) of the Definition, not least in the light of the definitions of "Core Tier 1 Capital" and "Tier 1 Capital" in clause 19. It may involve a departure from the literal meaning, but, if it does, it is on the basis of a rather pedantic approach to interpretation. I do not, however, propose to discuss the point further: it is completely arid.

39.    I would add, however, that if the Trustee's argument was correct, it seems to me that LBG would have had a powerful basis for saying that this appeal should be dismissed rather than allowed. That is because, as a matter of language at least, LBG could say that para (2) of the Definition applied on the grounds that the ECNs had, on any view "cease[d] to be taken into account … for the purposes of any 'stress test' applied by the FSA in respect of the Consolidated Core Tier 1 Ratio", because that ratio was no longer being used by the FSA.

*The second issue: have the ECNs "ceased to be taken into account"?*

40.    The critical question raised by the second issue is whether, as LBG contends, in the light of the regulatory changes and events as described in paras 17-24 above, "the ECNs [have] cease[d] to be taken into account in whole or in part … for the purposes of any 'stress test' applied by the [PRA] in respect of [what I will call the Tier 1] ratio". To put the point slightly differently, the question is whether the implementation of CRD IV by the PRA through the new Capital Requirements summarised in paras 17 to 21 above, and applied as described in paras 23 and 24 above, entitle LBG to say that a CDE has occurred because para (2) of the Definition has been satisfied.

41.    The nature of the dispute on this second issue was very well expressed by Briggs LJ in para 114 in the Court of Appeal, in these terms:

LC/16

# SMITH v. CHADWICK.

[1876. S. 166.]

*Action for Deceit—Promoters of Company—Misrepresentation in Prospectus—Ambiguous Representations—Contemporaneous Documents.*

C. A.
1881
FRY, J.
Nov. 23, 24, 25, 26, 28, 29.

C. A.
1882
*March* 13, 14, 17.

In an action for deceit, if it is proved that the Plaintiff did not rely upon the false statement complained of, he cannot maintain the action.

If the name of a person is improperly placed on the list of directors in the prospectus of a company, it must depend upon the circumstances of the case whether it is a material misstatement.

If a statement, by which the plaintiff says he has been deceived, is ambiguous, the plaintiff is bound to state the meaning which he attached to it, and cannot leave the Court to put a meaning upon it.

The prospectus of a company stated that the present value of the turnover or output of the entire works was more than a million sterling per annum. The Plaintiff complained that that was untrue, but declined to state the meaning which he attached to the words "turnover or output," except that he understood them in their ordinary meaning:—

*Held*, that the expression was ambiguous, and that as the Plaintiff did not state in what sense he understood it, he could not rely upon the misstatement as a ground of action.

If a statement, although untrue to the knowledge of the Defendants, is so trivial that it could not in the opinion of the Court have influenced the conduct of the Plaintiff, it will not support an action for deceit.

A misstatement of the valuation of the property of a company to the amount of £3000 out of £301,000 *held* not to be a material misstatement.

The prospectus of an iron working company stated that the purchase-money for the works was to be paid by instalments, the amount of which was mentioned, but it did not state, according to the fact, that interest was to be paid on the instalments:—

*Held*, that the omission of mention of the interest was not a material misstatement.

The Defendants sent to the Plaintiff the prospectus of a company, for whom they acted as agents, on the faith of which the Plaintiff took shares in the company. A few days afterwards the Defendants sent the Plaintiff a circular containing other statements concerning the company, but the Plaintiff did not receive it till after he had taken the shares:—

*Held*, that the circular could not be taken as a contemporaneous document with the prospectus, and could not be read for the purpose of explaining it.

The judgment of *Fry*, J., reversed.

THIS was an action brought by *William Smith*, a steel manu-facturer at *Sheffield*, against Messrs. *Chadwick*, accountants, carrying on business in *London* and *Sheffield*, for damages alleged to

C. A.
1882
SMITH
v.
CHADWICK.

Jessel, M.R.

that it is perfectly plain what it means.  He says it is a simple question of the construction and meaning of the English language, and he says it is that you have the present value of the present output.  Those words are not there; he says, "I so understood the words when I first read the prospectus, I so understand the words after having heard the able argument of counsel for the Defendants."  Then he goes to another matter on which I have to comment; he says that he is confirmed by the circular.  Now, the circular of the 3rd of June did not reach the Plaintiff until after he had made his application for shares.  He does not suggest that he ever intended to withdraw, or that the circular induced him not to withdraw.  Indeed, that point was not taken before us.  But Mr. Justice *Fry* thinks he is entitled to look at that circular with a view to construe the contract, that is the prospectus.  I think he was not.  In the first place, the notion on which he proceeded, that of construing a contemporaneous document, has to my mind no application.  The document in question, the circular, was drawn up by Mr. *Adamson;* the original prospectus was drawn up by Mr. *Oldfield Chadwick,* but was certainly shewn to the other partners, they had some knowledge of it, although they were not the draughtsmen.  Again, as to the circular, it is not clear whether they all saw it; I suppose they did, but still there is this to be said, that it does not emanate from the same mind.  When the Plaintiff asked for the shares he knew nothing about the second document.  How could his mind have been influenced by an interpretation put upon it by the second document?  It cannot be said you must have meant this when you wrote the document, because you said so afterwards, or wrote so afterwards; that would be assuming that all the Defendants were parties to the second circular, but that is not allowed in the construction of written instruments.  You cannot affect the construction by what one party says is the construction.  That will not do.  The suggestion is, it is like contemporaneous documents between the same parties; but in the first place, these were not contemporaneous.  The interval between the 27th of May and the 3rd of June is important; and in the next place, the doctrine as to contemporaneous documents rests on this, that when documents are actually contemporaneous, that is, two deeds executed at the same

VOL. XX.]          CHANCERY DIVISION.                          63

moment, a very common case, or within so short an interval that
having regard to the nature of the transaction the Court comes to
the conclusion that the series of deeds represents a single trans-
action between the same parties, it is then that they are all treated
as one deed; and, of course, one deed between the same parties
may be read to shew the meaning of a sentence, and be equally
read, although not contained in one deed, but in several parch-
ments, if all the parchments together in the view of the Court
make up one document for this purpose. As I said before, the
doctrine has no application in my opinion to the case before us,
and the learned Judge was not justified in reading the circular as
explaining the meaning of the prospectus.

Beside this, if I were to be critical, I find that the words of the
circular are different from the words in the prospectus; and they
do not afford me, I must say, speaking for myself, that assistance
which they did afford to the learned Judge in the Court below as
to construing the prospectus, even if the circular had been ad-
missible for the purpose. It appears that this had some influence
with the learned Judge, but I cannot tell to what extent. He
says: "I am using the statement in the circular now, not by way
of any independent statement of the Defendants, but only as it
appears to me to be a contemporaneous exposition of the mean-
ing of the statement in the prospectus as used by the Defendants
themselves." I must, therefore, come to this conclusion, that if
he had not used the circular he would not have been quite so
clear about the meaning of this line, and therefore, in differing,
as I have differed to some extent only, from his conclusion, I am
not sure that I should differ from him if he had not had resort to
the circular.

Now, what does the line mean? It is a very difficult line, and
what is most singular is this, that Mr. Justice *Fry*, having with
some assistance come to the conclusion that it means one thing, I
have come to the conclusion that it has an ambiguous meaning,
that it may mean one of two things; one of the Lords Justices has
come to the conclusion that it means one of the two, and the other
Lord Justice has come to the conclusion that it means the other
of the two. You cannot have a better illustration of the difficulty
of knowing what it does mean. Assuming that it is capable of two

C. A.

1882

SMITH
*v.*
CHADWICK.

Jessel, M.R.

LC/17

**Satyam Computer Services Ltd v Upaid Systems Ltd.**
[2008] EWCA Civ 487

A

Court of Appeal (Civil Division).
Waller, Lawrence Collins and Rimer L JJ.
Judgment delivered 9 May 2008.

B

*Contract – Intellectual property rights – Assignment agreement – Services
agreement – Settlement agreement – Defendant contracted out development
of software for telecommunications invention it wished to patent – Assignment
agreement entered into relating to intellectual property rights – Services
agreement covering parties' commercial relationship did not supersede
assignment agreement – Disputes arose and led to settlement agreement – Claims
in US proceedings not precluded by settlement agreement – Release in settlement
agreement did not apply to claims that, unknown to defendant when settlement
agreement entered into, defendant had been supplied by claimant with forged
employee assignments – Claims did not arise out of or relate to settlement
agreement and not subject to English jurisdiction clause.*

C

D

**This was an appeal from a decision of Flaux J [2008] EWHC 31 (Comm) on
preliminary issues concerning the interpretation of three commercial agreements
between the parties.**

E

**The appellant was an Indian company, Satyam, whose business included
providing information technology services. The respondent, Upaid, was a BVI
company whose business included developing payment processing systems.
Upaid was developing the idea of converting any telephone into a de facto
pay-phone through the use of a pre-paid account associated with a caller
personal identification number. Upaid outsourced software development work
to Satyam.**

F

**After Satyam began work on the project Upaid decided to apply for a US
patent. Accordingly there were negotiations for the formal documentation of a
transfer to Upaid by Satyam of any intellectual property rights. An assignment
agreement was signed and Upaid filed a provisional patent application. The
assignment agreement was expressed to be governed by New York law and
contained (in para. 3) a covenant by Satyam that it would, on Upaid's request,
provide Upaid with all pertinent facts and documents relating to the patent
applications.**

G

H

**Upaid and Satyam also negotiated a services agreement covering their
commercial relationship. The services agreement contained an assignment of
intellectual property rights by Satyam to Upaid and was governed by Virginia
law. It also contained an 'entire agreement' clause. Upaid then filed a full**

A        **patent application accompanied by the assignment agreement and assignments executed by the relevant Satyam employees.**

B        **The relationship between the parties deteriorated and they entered into an agreement in order to settle their disputes and to terminate the relationship between them. The settlement agreement was expressed to be governed by English law, and provided for the exclusive jurisdiction of the English court for any and all disputes arising out of or relating to the agreement; the services agreement was terminated; Satyam confirmed all assignments of intellectual property rights to Upaid by it and those assignments executed by Satyam employees as co-inventors of Upaid intellectual property; the settlement**
C        **agreement also contained an entire agreement clause.**

D        **Upaid later filed patent infringement proceedings in Texas against two companies which had developed software platforms and were offering network services in a manner said to infringe Upaid's patent and subsequent patents. In their defence the two companies produced declarations from former Satyam employees that they had neither seen nor signed their respective employee assignments. There was evidence that the signatures on those documents were forged. Upaid settled the infringement proceedings and took proceedings against Satyam.**

E        **Satyam contended that the claims in Texas were brought in breach of the terms of the settlement agreement, which compromised all such claims, alternatively that by virtue of the exclusive jurisdiction clause in the settlement agreement, all such claims had to be brought before the English courts.**

F        **The judge held that the claims in Texas were not precluded by the settlement agreement and did not require to be litigated in England, and there was therefore no basis for any injunction restraining Upaid from continuing to pursue the proceedings in Texas. Satyam appealed.**

        *Held*, dismissing the appeal:

G

H        **1. In determining the relationship between the assignment agreement and the services agreement the entire agreement clause of the services agreement was not decisive. Satyam's reliance on the entire agreement clause was circular since the question still remained whether the subject matter of the assignment agreement was included within the services agreement or whether it was inconsistent with the services agreement in any material respect. The two agreements did not sit fully together, but if the matter was looked at both in broad commercial terms and by reference to the language of the two agreements, it was apparent that the subject matter was different. The key to the relative spheres of the two agreements was the date of the provisional patent application which was the effective date of the services agreement. By then the intellectual property in the**

A
**patent had been assigned by the assignment agreement. The services agreement was to establish a new way of working between the parties. It looked to the future. Despite some drafting infelicities in the services agreement, it did not supersede the assignment agreement.**

B
**2. The third sentence of cl 3.1(b) of the settlement agreement preserved Upaid's rights under para. 3 of the assignment agreement. The object of cl 3.1 was to ensure that Upaid retained all relevant intellectual property, and cl 3.1(b) was not limited to confirmation of past assignments in the sense of transfers of property. The relevant term was 'will survive and shall be governed' and that meant that the assignments would continue to apply in accordance with their terms.**

C

**3. The settlement agreement did not prevent Upaid from bringing damages claims for breach of para. 3 of the assignment agreement. In commercial terms intellectual property was very important to the parties and was treated separately in the settlement agreement. Since the assignment agreement was concerned exclusively with intellectual property it made commercial sense not to include it within the releases. Any claims based on the forged employee assignments were not covered by the release and covenant not to sue. They were provided pursuant to the assignment agreement.**

D

E
**4. On its proper construction the release/covenant not to sue in the settlement agreement did not apply to claims of the type made in the Texas proceedings, namely that, unknown to Upaid when the settlement agreement was entered into, Upaid was supplied by Satyam with forged assignments. Express words would be necessary for such a release.**

F
**5. Upaid's claims against Satyam were not within the scope of the English jurisdiction clause in the settlement agreement. The assignment agreement was governed by New York law and did not contain any jurisdiction clause. To import into it an English jurisdiction clause would be inconsistent with the terms of cl 3.1(b) of the settlement agreement which provided that the assignment should be governed by the assignment agreement. Whether a dispute under a different contract was within a jurisdiction agreement depended on the intention of the parties as revealed by the agreement. The effect of cl 3.1(b) was that any claims under the assignment agreement were governed by that agreement and not by the settlement agreement. Claims under an agreement preserved by the settlement agreement did not 'relate' to the settlement agreement.**

G

H

The following cases were referred to in the judgment of Lawrence Collins LJ:

*Arbuthnott v Fagan* [1995] CLC 1396.
*Bank of Credit and Commerce International (in liquidation) v Ali* [2001] UKHL 8; [2002] 1 AC 251.

A    *Chartbrook Ltd v Persimmon Homes Ltd* [2008] EWCA Civ 183.
*Fiona Trust & Holding Corp v Privalov* [2007] EWCA Civ 20; [2007] 1 CLC
144.
*HIH Casualty & General Insurance v Chase Manhattan Bank* [2001] EWCA Civ
1250; [2001] CLC 1853.

B    *MAN Nutzfahrzeuge AG v Ernst & Young* [2005] EWHC 2347 (Comm).
*MAN Nutzfahrzeuge AG v Freightliner Ltd* [2007] EWCA Civ 910; [2007] 2 CLC
455.
*Premium Nafta Products v Fili Shipping Co* [2007] UKHL 40; [2007] 2 CLC 553.

C    Geoffrey Vos QC and Anna Boase (instructed by Lawrence Graham) for the
appellant.

David Foxton QC and Emily Wood (instructed by Freshfields Bruckhaus Deringer)
for the respondent.

D                                      JUDGMENT

### Lawrence Collins LJ: I Background

E    1. This is an appeal from a decision of Flaux J dated 17 January 2008 on some
preliminary issues concerning the interpretation of three commercial agreements
between the parties. It is not a case (by contrast with e.g. *Chartbrook Ltd v Persimmon
Homes Ltd* [2008] EWCA Civ 183) in which either side suggests that there was such a
consensus on the points in issue as to justify any exceptional resort to pre-contractual
negotiations or as to justify a claim to rectification.

F    2. The case was most elaborately argued before the judge and before this court,
with an attention to the linguistic detail of the agreements more appropriate to the
interpretation of tax legislation which has received close scrutiny at all committee
stages than to the interpretation of commercial contracts. The main points of
interpretation on this appeal depend primarily on the ascertainment of the commercial
purpose of the agreements in the light of the commercial and factual background. The
G    main provisions involved are quoted below but all of the relevant provisions to which
detailed reference was made are reproduced in an appendix.

*The parties and the business*

H    3. Satyam Computer Services, Ltd ('Satyam'), the appellant, is an Indian
company. Satyam had a subsidiary called Satyam Enterprise Solutions Ltd ('Satyam
Enterprise'), which was a party to two of the three agreements in issue in these
proceedings. In 1999 Satyam Enterprise was merged with Satyam, which succeeded
to all its rights and liabilities. Upaid Systems, Ltd ('Upaid'), the respondent, is a BVI
company. It was formerly known as In Touch Technologies Holdings Ltd, and is the
successor through merger of In Touch Technologies Ltd (which is referred to in two

Entire Agreement clause

A

52. Fifth, the Entire Agreement clause (clause 14.16) of the Services Agreement had the effect of precluding reliance on the Assignment Agreement. The clause was a negotiated provision, and covered the subject matter of the Services Agreement, which included the obligations in the Assignment Agreement, and made it clear that the Assignment Agreement was superseded. The subject matter of the Services Agreement was the software (Call Manager and Net Manager) and that was the same as the subject matter of the Assignment Agreement. Clause 14.16 made it clear that it was the promises in the Assignment Agreement which were superseded, namely the supporting obligations in paragraph 3 (and not the actual assignment).

B

C

Commercial situation

53. Mr Vos QC accepted on the appeal that continuance in parallel of the two agreements would not have been a commercial absurdity, but it would be commercially difficult and commercially surprising to have two regimes supporting the assignments. That made it unlikely that the parties intended them both to apply.

D

C. *Conclusions*

54. The first question is whether there is any express provision which may have the effect of regulating the relationship between the Assignment Agreement and the Services Agreement. The only candidate is clause 14.16 of the Services Agreement:

E

'14.16 Entire Agreement

This Agreement together with its Annexures set forth and shall constitute the entire Agreement between [Upaid] and Satyam with respect to the subject hereof, and shall supersede any and all agreements, understandings, promises and representations made by one party to the other concerning this subject matter herein and the terms and conditions applicable hereto. Also, in case of any inconsistency between the documents constituting the Entire Agreement, this Agreement together with its Annexures would supersede all other documents.'

F

G

55. I accept Mr Vos QC's submission that the court should not approach this provision with the pre-conceived idea that its sole intention is to ensure that the parties cannot subsequently contradict the wording of the agreement by reference to agreements or understandings supposedly arrived at in the course of negotiations (which is undoubtedly normally the main object of such clauses).

H

56. But I agree with the judge that Satyam's reliance on the Entire Agreement clause is circular since it applies to supersede prior agreements 'concerning this subject matter herein and the terms and conditions applicable hereto,' and 'all other documents' inconsistent with 'the documents constituting the Entire Agreement'

A (namely the Services Agreement and its Annexures). The question still remains whether the subject matter of the Assignment Agreement is included within the Services Agreement or whether it is inconsistent with the Services Agreement in any material respect.

B
57. I can see no flaw in the judge's reasoning on this issue. I would accept that the two agreements do not sit fully together. There is no identifiable purpose in having the Assignment Agreement governed by New York law, and the Services Agreement governed by Virginia law, and there is undoubtedly some potential overlap between paragraph 3 of the Assignment Agreement and clause 11.1 of the Services Agreement.

C I also accept that the definition of Intellectual Property in clause 1.4 of the Services Agreement goes beyond the intellectual property comprised in the 'Software, Software projects, Software Products' (which are all defined by reference to the product of the Dedicated Team).

D
58. But if the matter is looked at both in broad commercial terms and by reference to the language of the two agreements, it is apparent that the subject matter is different. In particular I accept the argument for Upaid by Mr David Foxton QC that the key to the relative spheres of the two agreements is the divide at 15 September 1998, by which time the Provisional Patent Application provided a priority date. The intellectual property in the 947 patent was that assigned by the Assignment Agreement.

E
59. The choice of 15 September 1998 as the effective date for the Services Agreement was significant. The Services Agreement was to establish a new way of working with a Dedicated Team assembled in the Intouch Dedicated Center who would work solely on Upaid's account with a new regime covering remuneration and also addressing the Intellectual Property generated by the Dedicated Team. The

F InTouch Dedicated Center and the Dedicated Team operated only from 15 September 1998.

60. There are many provisions in the Services Agreement which indicate that it was forward looking from 15 September 1998, i.e. that it was intended to deal with

G the relationship of the parties as from that date. The recitals indicate that the object of the Services Agreement is to provide the terms and conditions upon which Upaid 'shall' engage Satyam (third recital). The definitions of Services, Software, Software Products and Software Projects in clauses 1.7, 1.8, 1.9 and 1.10 are directed to the work of the Dedicated Team. I do not consider that there is anything in Annexure 3 (which is essentially a blank form) which affects that conclusion. I accept Mr Foxton's

H submission that the form in the annexure is a proforma or template for the future.

61. The provisions in clause 2 as to the scope of the Agreement look to the future, namely to what Satyam 'shall provide' (clause 2.1), to how the InTouch Dedicated Center 'shall operate' (clause 2.2) what the size of the Dedicated Team 'shall be' (clause 2.3). The substantive obligations in clauses 3 to 8 also deal with the position

A
following the Effective Date. Clauses 3, 4, and 5 deal with the InTouch Dedicated Center planning, resource management, and infrastructure. Clauses 6 and 7 deal with project start-up and execution. Clause 8 deals with management review of the InTouch Dedicated Center.

B
62. Clause 10.3 provides that if Upaid fails to make payments, 'the rights set out in section 11.1 below shall revert to Satyam' until outstanding payments are received. In one sense it is logical for these rights to be limited to those acquired pursuant to the Services Agreement. The clause is intended to relate to payment for Services (as defined in clause 1.7), and it would make sense for there to be a reversion of rights deriving from the work of the Dedicated Team under the Services Agreement. But I would accept that here there is scope for some overlap because of the wide definition of Intellectual Property in clause 1.4 of the Services Agreement. But it does not follow from that one possibility that the two agreements have the same subject matter.

C

D
63. Clause 11.1 relates to Intellectual Property produced as a result of the work of the Dedicated Team ('relating to, arising in connection with or otherwise resulting from such work and services'). I accept Mr Foxton's submission that the inclusion of 'Satyam and Satyam's employees' in addition to 'the Dedicated Team' is minor surplusage of limited weight compared with the other strong pointers in the definitions, and that clause 11.1 is concerned only with the fruits of the work under the Services Agreement. The second sentence operates 'if any portion of the work or services to [be] performed by Satyam hereunder' does not fulfil the conditions stated there, and what follows is concerned with the fruits of work or services performed 'hereunder'. That is what was assigned, and the co-operation obligations relate to the Intellectual Property rights which are assigned pursuant to clause 11.1.

E

F
64. So also the warranties in clause 13.1 relate to services provided 'under this Agreement' and to the Software as defined, which is software resulting from the work of the Dedicated Team (clause 1.8).

65. Consequently in my judgment, despite some drafting infelicities in the Services Agreement, it does not supersede the Assignment Agreement.

G

**2. Whether the third sentence of clause 3.1(b) of the Settlement Agreement preserved Upaid's rights under paragraph 3 of the Assignment Agreement**

66. The third sentence of clause 3.1(b) of the Settlement Agreement is as follows:

H

'Further, Satyam confirms all assignments of intellectual property rights to Upaid by it and those assignments executed by Satyam employees as co-inventors of Upaid intellectual property and such assignments will survive and shall be governed by such Assignment agreements.'

A

B

C

67. Flaux J decided that the third sentence of clause 3.1(b) on its true construction made it clear that the Assignment Agreement continued in full force and effect after the Settlement Agreement. He rejected Satyam's argument that the third sentence of clause 3.1(b) was only designed to ensure that previous transfers of intellectual property rights remained valid and binding even after the termination of the relationship. That might be arguable if the words 'such assignments will survive' stood alone but they did not. The argument did not give any sensible meaning and effect to the words 'shall be governed by such Assignment agreements'. All the terms of the Assignment Agreement were covered by this phrase. That was the natural meaning of the words 'shall be governed by such Assignment agreements' and it made commercial sense. An important aspect of protection of any intellectual property rights was the obligation of co-operation imposed on Satyam by paragraph 3 of the Assignment Agreement. The third sentence was also dealing with the 'employee assignments', which also contained co-operation obligations.

D

E

68. The judge also rejected Satyam's argument that the Entire Agreement clause (clause 4(a)) in the Settlement Agreement supported its construction of clause 3.1(b) and demonstrated that paragraph 3 of the Assignment Agreement had been superseded by the Settlement Agreement. The judge found that the specific saving language of clause 3.1(b) clearly prevailed over the general words of clause 4(a). The effect of clause 4(a) was not to supersede the Assignment Agreement. The Assignment Agreement was not the 'subject matter' of the Settlement Agreement, but was expressly preserved in full by its terms.

F

G

69. On this appeal Satyam says that the purpose of clause 3.1(a) was to make it clear that Satyam agreed that all Intellectual Property as defined in the Services Agreement (i.e. all intellectual property relating to the project) belonged to Upaid. Because clause 3.1(a) was the governing provision in clause 3, it is clear that the third sentence of clause 3.1(b) was to support the once and for all assignment. Consequently it confirms the actual assignments of the intellectual property, but not the supporting obligations. That construction is supported by clause 3.1(b) (last sentence), which provides that costs if any arising from Satyam or its employees complying with the requests of Upaid under clause 3.1(b) shall be paid by Upaid. This is not in the same terms as the costs provision of the Assignment Agreement, and indicates that the Settlement Agreement was intended to be comprehensive. It would have been bizarre for the parties deliberately to sweep away the co-operation obligations under the Services Agreement, but expressly preserve those under the Assignment Agreement.

H

70. My conclusion on this short point is that the object of clause 3.1 was to ensure that Upaid retained all relevant intellectual property, and clause 3.1(b) is not limited to confirmation of past assignments in the sense of transfers of property. The relevant term is 'will survive and shall be governed' and I am satisfied that that means that the assignments will continue to apply in accordance with their terms.

LC/18

A

**UBS AG & Anor v HSH Nordbank AG.**
[2009] EWCA Civ 585

Court of Appeal (Civil Division).
Ward LJ, Lord Collins of Mapesbury and Toulson LJ.
Judgment delivered 18 June 2009.

B

*Jurisdiction clause – Conflict of laws – Banking – Negative declaration –
Collateralised debt obligations – Defendant sued claimant in New York alleging
misselling and mismanagement of securities – Parties had entered into different
agreements for different aspects of overall relationship with different terms as
to jurisdiction – Dealer's confirmation relating to notes used to pay for other
notes contained English jurisdiction clause – Parties did not intend jurisdiction
clause contained in dealer's confirmation would govern every dispute relating to
inducement of making such investment – Standard form bond issue jurisdiction
clause in dealer's confirmation did not apply to claims that transaction as a
whole induced by misrepresentation – Council Regulation 44/2001, art. 23.*

C

D

**This was an appeal by an investment bank, UBS, from a decision that the
English court did not have jurisdiction in respect of its claims for negative
declarations.**

E

**The respondent, HSH, was a commercial bank incorporated in Germany. HSH
had assumed the assets, rights and obligations of another German bank, LB Kiel.
The transactions in issue took place in 2002/2003 between UBS and LB Kiel.**

**HSH had brought proceedings against UBS in New York claiming that UBS
made fraudulent and negligent misrepresentations and non-disclosures thereby
inducing LB Kiel to invest in certain loan notes (the NS4 notes) in a transaction
governed by New York law.**

F

**UBS brought proceedings in England for declarations of non-liability relying
on an exclusive English jurisdiction clause in dealer's confirmation relating to
the notes (the Kiel MTN notes) which HSH had used to pay for the NS4 notes.**

G

**The judge held that that English jurisdiction clause was insufficiently wide to
cover the dispute set out in the New York complaint. All matters relating to the
NS4 notes were subject to the laws of New York and all the relevant agreements
contained submissions to the jurisdiction of the New York courts, except one
which was silent as to jurisdiction and hence effectively agreed that action could
be brought in any court of competent jurisdiction. That agreement would not
entitle UBS to sue HSH, a German domiciled company, in England. The result
was that the English court did not have jurisdiction under art. 23 of Regulation
44/2001.**

H

A

**UBS appealed arguing that the Kiel MTN notes were central to the transaction. The dealer's confirmation jurisdiction clause had been specially renegotiated to provide expressly for the exclusive jurisdiction of the English court. It should be given a generous interpretation. Also particular weight should be given to the fact that the dealer's confirmation jurisdiction clause, in favour of the English courts, was an exclusive jurisdiction clause. The other jurisdiction clauses in the other contracts comprising the transaction were each non-exclusive New York clauses. In so far as the parties were to be taken to have been addressing the question of how any overlap between different jurisdiction clauses was to be resolved, that was the clearest indication that they envisaged that if a matter fell within the wording they had agreed in the dealer's confirmation jurisdiction clause, then it would take precedence over any other clause which might also apply.**

B

C

*Held*, dismissing the appeal:

D

E

F

G

H

**Sensible business people would not have intended that a dispute of this kind would have been within the scope of two inconsistent jurisdiction agreements. The agreements were all connected and part of one package, and it seemed plain that the result for which UBS contended would be a wholly uncommercial result and one that sensible business people could not have intended. It was fanciful to suppose, as UBS contended, that the dealer's confirmation jurisdiction clause had been specially renegotiated to provide expressly for the exclusive jurisdiction of the English court to deal with disputes of this kind, or that the parties must have envisaged the risk of a clash. The dispute had nothing to do with the Kiel MTN notes, which were no more than the consideration for the NS4 notes. The parties could not be taken objectively to have intended that the jurisdiction clause contained in the dealer's confirmation, i.e. the method of payment for the investment, would govern every dispute relating to inducement of making such investment. The same allegations would be made if Kiel LB had paid for its investment in cash instead of notes. Whether a jurisdiction clause applied to a dispute was a question of construction. Where there were numerous jurisdiction agreements which might overlap, the parties must be presumed to be acting commercially, and not to intend that similar claims should be the subject of inconsistent jurisdiction clauses. The jurisdiction clause in the dealer's confirmation was a 'boiler plate' bond issue jurisdiction clause, and was primarily intended to deal with technical banking disputes. Where the parties had entered into a complex transaction it was the jurisdiction clauses in the agreements which were at the commercial centre of the transaction which the parties must have intended to apply to such claims as were made in the New York complaint and reflected in the draft particulars of claim in England. The standard form bond issue jurisdiction clause in the dealer's confirmation did not apply to claims that the transaction as a whole, and in particular the purchase of the NS4 notes, was induced by misrepresentation.**

A    'investment in a multiple tranche synthetic Collateralised Debt Obligation'. The
     declarations which were sought were:

     (i) that the Principal Agreements and the terms contained therein, as well as all other
     written agreements and/or written notifications and/or documents entered into and/or
     executed by the parties pursuant to or related to or in connection with the Transaction
B    (the 'Related Documents') were and had been at all material times valid, binding and
     enforceable;

     (ii) that HSH was not entitled to rescind any of the Principal Agreements or any of
     the Related Documents (which is no longer relevant since the claim for rescission has
C    been dropped);

     (iii) that HSH was not induced to enter into the Transaction by the alleged
     misrepresentations and/or non-disclosures;

D    (iv) that the obligations of the parties in relation to the Transaction were (and had at
     all material times been) governed by, and are limited to, the terms of the Principal
     Agreements and/or the Related Documents and, save as expressly set out in those
     Agreements and/or the Related Documents, UBS had assumed no obligation, duty or
     other responsibility, whether of a fiduciary or other nature, to HSH;

E    (v) alternatively, that any such duty, obligation or responsibility undertaken by UBS
     had been lawfully performed and discharged;

     (vi) that UBS had not been unjustly enriched as alleged and/or had not converted any
     of HSH's funds and/or HSH's investment as alleged;

F    (vii) that UBS had materially complied with and/or discharged each and all of its
     relevant obligations arising out of or in connection with the Principal Agreements
     and the Related Documents and accordingly UBS had not caused and/or was not
     liable to HSH in respect of any loss or damage arising out of or in connection with
     those Agreements and the Related Documents (whether in contract, tort, statute or
G    otherwise) which may have been suffered or incurred by HSH in connection with the
     Transaction.

     82. Are these claims within the Dealer's Confirmation jurisdiction clause? I accept
     UBS's submission that the proper approach to the construction of clauses agreeing
H    jurisdiction is to construe them widely and generously: *Donohue v Armco Inc* [2001]
     UKHL 64; [2002] CLC 440 at [14]. I also accept that in the usual case the words
     'arising out of' or 'in connection with' apply to claims arising from pre-inception
     matters such as misrepresentation: *Fiona Trust & Holding Corp v Privalov* [2007]
     EWCA Civ 20; [2007] 1 CLC 144 (affd sub nom *Premium Nafta Products Ltd v Fili
     Shipping Co Ltd* [2007] UKHL 40; [2007] 2 CLC 553, *Deutsche Bank AG v Asia*

A
*Pacific Broadband Wireless Communications Inc* [2008] EWCA Civ 1091; [2008] 2 CLC 520, *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488.

B
83. But the essential task is to construe the jurisdiction agreement in the light of the transaction as a whole. As I suggested in *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487; [2008] 2 CLC 864 at [93], whether a dispute falls within one or more related agreements depends on the intention of the parties as revealed by the agreements.

C
84. Plainly the parties did not actually contemplate at the time of the conclusion of the contracts that there would be litigation in two countries involving allegations of misrepresentation in the inception and performance of the agreements. But in my judgment sensible business people would not have intended that a dispute of this kind would have been within the scope of two inconsistent jurisdiction agreements. The agreements were all connected and part of one package, and it seems to me plain that the result for which UBS contends would be a wholly uncommercial result and one that sensible business people cannot have intended.

D

85. It is fanciful to suppose (as UBS contends) that the Dealer's Confirmation jurisdiction clause had been specially renegotiated to provide expressly for the exclusive jurisdiction of the English court to deal with disputes of this kind, or that the parties must have envisaged the risk of a clash.

E
86. The Dealer's Confirmation is expressed to be issued pursuant to LB Kiel's US$20 billion Global Medium Term Note Programme and simply confirms the issue of the US$500 Kiel MTN Notes to UBS as one of the dealers on HSH's bond programme. UBS immediately transferred them to NS4. NS4 kept the Kiel MTN Notes as an investment or 'collateral' to create income in order to fund payments under the NS4 Notes.

F

87. I accept HSH's argument that the Kiel MTN Notes are simple AAA-rated bonds that HSH issued pursuant to a pre-existing bond programme. HSH used these Notes (rather than cash) to pay for the NS4 Notes. This dispute has nothing to do with the Kiel MTN Notes, which were no more than the consideration for the NS4 Notes. The parties cannot be taken objectively to have intended that the jurisdiction clause contained in the Dealer's Confirmation (i.e. the method of payment for the investment) would govern every dispute relating to inducement of making such investment.

G

H
88. There is no dispute about the issue, sale or performance of the Kiel MTN Notes. Their holder, NS4, is not a party to any of the proceedings. None of the parties to the proceedings advances any claim under the Kiel MTN Notes against any other party. None of the parties suggests there has been any breach of the Kiel MTN Notes, or any misrepresentation in relation to them. The Kiel MTN Notes are supported by a German state guarantee and are virtually equivalent to cash. The misrepresentation

LC/19

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
Declaration of Lord Collins    Pg 259 of 428
106                    LLOYD'S LAW REPORTS                    [2011] Vol 1

## COURT OF APPEAL

28–29 April; 20 August 2010

———————

SEBASTIAN HOLDINGS INC

v

DEUTSCHE BANK AG

[2010] EWCA Civ 998

Before Lord Justice Mummery,
Lord Justice Thomas and
Lord Justice Pitchford

**Conflict of laws — Stay of proceedings — Actions between the parties in both New York and England — Whether English claims governed by exclusive jurisdiction clauses — Whether proceedings could be stayed on the basis of *forum non conveniens*.**

Between 2006 and 2008 the parties entered into a series of agreements under which the appellant, Sebastian, traded in the financial markets through the respondent bank.

The first agreement, in May 2006, was a Master Agreement on the 1992 International Swap Dealers Association standard form for trading in equities (the Equities ISDA Master Agreement) and provided a framework under which the parties could enter into over-the-counter derivative contracts. The agreement was subject to the exclusive jurisdiction of the English courts.

In November 2006 the parties entered into three further agreements: the FX Prime Brokerage Agreement setting out the framework for foreign exchange and related trading, which was subject to the exclusive jurisdiction of the New York courts; the FX Agent Master Agreement, to be used for offsetting transactions, which was subject to the non-exclusive jurisdiction of the English courts; and the Pledge and Pledgeholder Agreement, which was governed by Swiss law but the bank as pledgee was entitled to bring an action against Sebastian as pledgor before a competent court at its place of residence.

In January 2008 four further agreements were made: an Equities Prime Brokerage Agreement, for trading in equities, which was subject to the exclusive jurisdiction of the English courts; a Listed F&O Agreement under which the bank agreed to provide services for listed futures, options and other derivative transactions and which was subject to the exclusive jurisdiction of the English courts; an Overseas Securities Lender's Agreement between Sebastian and the bank for lending and borrowing securities, subject to London arbitration; and a Master Netting Agreement, which provided for the ability to terminate the Equities ISDA Master Agreement, the Equities Prime Brokerage Agreement and the Listed F&O Agreement, and which was subject to the exclusive jurisdiction of the English courts.

The trading ended in October 2008, when losses of US$750 million were made by Sebastian. In November 2008 Sebastian commenced proceedings in New York under the FX Prime Brokerage Agreement to recover its losses. In January 2009 the bank brought proceedings in England under the FX Agent Master Agreement and the Master Netting Agreement to recover US$250 million which it alleged Sebastian should have paid. Sebastian argued that the claims did not arise under those agreements so that the English jurisdiction clauses did not apply. Sebastian contended that the parties must have intended that claims would be brought in the forum from which the claim had its cause or origin, and in the present case the centre of gravity of the claim was under the FX Prime Brokerage Agreement. Sebastian argued in the alternative that, even if that was wrong, New York was the most convenient forum and that the English proceedings should be stayed. Walker J held on 14 August 2008 that the bank was entitled to bring its claim under the two agreements, and on 1 December 2009 Burton J refused to stay the proceedings.

Sebastian appealed against the decision of Walker J. Sebastian also sought permission to appeal against the judgment of Burton J.

————*Held*, by CA (Mummery, Thomas and Pitchford LJJ) that the appeal against the decision of Walker J would be dismissed, and that permission would be granted to appeal against the decision of Burton J but the appeal would be dismissed.

(1) The bank was entitled to bring its claims in the English courts (*see* para 55).

(a) In construing a jurisdiction clause, a broad and purposive construction was to be followed (*see* para 39);

————*Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425, *Fiona Trust & Holding Corporation v Privalov* [2007] 2 Lloyd's Rep 267 affirmed, *Premium Nafta Products v Fili Shipping* [2008] 1 Lloyd's Rep 254, applied.

(b) Where the parties had entered into a complex series of agreements, it was necessary to construe each one by taking account of the overall scheme and to read sentences and phrases in the context of that overall scheme (*see* para 40);

————*Re Sigma Finance Corporation* [2009] UKSC 2, applied.

(c) It was generally to be assumed that, just as parties to a single agreement did not intend as rational businessmen that disputes under the same agreement be determined by different tribunals, parties to an arrangement between them set out in multiple related agreements did not generally intend a dispute to be litigated in two different tribunals, although the task of the court in determining whether a dispute fell within the jurisdiction clauses of one or more related agreements depended upon the intention of the parties as revealed by the agreements (*see* paras 41 and 42);

————*Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487, applied; *Credit Suisse First Boston (Europe) Ltd v MLC Bermuda Ltd* [1999] 1 Lloyd's Rep 767, *UBS AG v HSH Nordbank AG* [2009] 2 Lloyd's Rep 272, considered.

CA]                **Sebastian Holdings v Deutsche Bank**                [THOMAS LJ

(d) The parties plainly intended the bank to be able to bring a claim under an agreement under which a debt was due in the jurisdiction provided for in that agreement. It was impossible to see how it could be said that the bank and Sebastian were to be taken to have agreed that the bank would analyse its claim and ascertain under which agreement the cause or origins of the debts arose before issuing its proceedings. Rational businessmen entering into agreements relating to different aspects of trading in the financial markets would understand that the bank would wish to be entitled to bring proceedings to enforce payment of debts under each agreement which gave rise to the specific debt. Businessmen agreeing to different jurisdiction clauses in a series of related contracts could not have been taken to have intended that the entitlement to bring that claim in the chosen forum in respect of one contract should depend on whether a defence had been raised prior to the bringing of the claim and that the defence to that claim might place the centre of gravity of the dispute as being related to a different jurisdiction clause. Not only would it give rise to a complete lack of certainty, but could seriously prejudice an institution such as a bank bringing a claim if there was a limitation period about to expire or there was otherwise a need to bring a claim urgently (*see* paras 58, 63 and 65);

————————*Royal Bank of Canada v Cooperatieve Centrale Raiffeisen-Boerenleenbank BA* [2004] 1 Lloyd's Rep 471, *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWHC 31 (Comm), applied.

(2) The English proceedings would not be stayed. The judge had applied the correct principles and the Court of Appeal would not interfere. Parties would be held to their contractual choice of English jurisdiction, unless there were overwhelming, or at least very strong, reasons for departing from the rule. The fact that the New York courts had jurisdiction did not take the matter any further (*see* paras 74, 78 and 80);

————————*Import Export Metro Ltd v Compania Sud Americana de Vapores SA* [2003] 1 Lloyd's Rep 405, *Antec International Ltd v Biosafety USA Inc* [2006] EWHC 47 (Comm), applied; *Spiliada Maritime Corporation v Cansulex Ltd (The Spiliada)* [1987] 1 Lloyd's Rep 1; [1987] AC 460, referred to.

————————

The following cases were referred to in the judgment:

*Ace Insurance SA NV v Zurich Insurance Co* (CA) [2001] EWCA Civ 173; [2001] 1 Lloyd's Rep 618;

*Antec International Ltd v Biosafety USA Inc* [2006] EWHC 47 (Comm);

*British Aerospace plc v Dee Howard Co* [1993] 1 Lloyd's Rep 368;

*Choudhary v Bhatter* (CA) [2009] EWCA Civ 1176;

*Credit Suisse First Boston (Europe) Ltd v MLC Bermuda Ltd* [1999] 1 Lloyd's Rep 767;

*Donohue v Armco Inc* (HL) [2001] UKHL 64; [2002] 1 Lloyd's Rep 425;

*Fiona Trust & Holding Corporation v Privalov* (CA) [2007] EWCA Civ 20; [2007] 2 Lloyd's Rep 267; (HL) [2007] UKHL 40; [2008] 1 Lloyd's Rep 254;

*Goshawk Dedicated Ltd v Life Receivables Ireland Ltd* [2009] IESC 7;

*Import Export Metro Ltd v Compania Sud Americana de Vapores SA* [2003] EWHC 11 (Comm); [2003] 1 Lloyd's Rep 405;

*Owusu v Jackson* (ECJ) [2005] 1 Lloyd's Rep 452; [2005] ECR I-1383;

*Royal Bank of Canada v Cooperatieve Centrale Raiffeisen-Boerenleenbank BA* (CA) [2004] EWCA Civ 7; [2004] 1 Lloyd's Rep 471;

*Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWHC 31 (Comm); (CA) [2008] EWCA Civ 487;

*Sigma Finance Corporation, Re* (SC) [2009] UKSC 2;

*Spiliada Maritime Corporation v Cansulex Ltd (The Spiliada)* (HL) [1987] 1 Lloyd's Rep 1; [1987] AC 460;

*UBS AG v HSH Nordbank AG* (CA) [2009] EWCA Civ 585; [2009] 2 Lloyd's Rep 272.

————————

This was an appeal by Sebastian Holdings Ltd against the ruling of Walker J, dated 14 August 2008, holding that England was the most appropriate forum for the hearing of the dispute between the parties, and an application for permission to appeal against the judgment of Burton J, dated 1 December 2009, refusing to stay the English proceedings.

Timothy Lord QC and Jasbir Dhillon, instructed by Travers Smith Solicitors LLP, for Sebastian Holdings Ltd; David Foxton QC and Sonia Tolaney, instructed by Freshfields Bruckhaus Deringer LLP, for Deutsche Bank AG.

The further facts are found in the judgment of Thomas LJ.

Friday, 20 August 2010

————————

### JUDGMENT

**Lord Justice THOMAS:**
*Introduction*

1. The principal issue in this appeal is the construction of jurisdiction clauses in a series of

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
Declaration of Lord Collins    Pg 261 of 428
[2011] Vol 1        LLOYD'S LAW REPORTS        113

(v) The agreements between the parties plainly contemplated that different jurisdiction clauses would apply to claims under the different agreements; in those circumstances multiplicity of proceedings was inevitable.

(vi) The court should not re-write the agreements by making one jurisdiction clause override the other with the effect of allocating all disputes to the court it considered best suited to deal with the dispute.

<u>(ii) The decision of Walker J</u>

37. Walker J rejected the argument put forward by Sebastian. A short summary cannot do justice to the careful and detailed analysis of the clauses and the decision in *UBS*, as set out at paras 45 to 48 and 63 to 80 of his judgment.

(i) The court had to begin by considering the development of the overall contractual relationship. In May 2006 the parties agreed by use of the ISDA clause as analysed in *Royal Bank of Canada v Cooperatieve Centrale Raiffeisen-Boerenleenbank BA* [2004] 1 Lloyd's Rep 471 that if one party brought proceedings in the English courts, then the other was obliged to submit, but either party could bring proceedings in other courts and the bringing of proceedings in one would not preclude the bringing of proceedings in another.

(ii) As regards the position at the end of November 2006, the use of the ISDA form and the specific choice of English jurisdiction in the FX Agent Master Agreement showed that the parties contemplated the same as regards that agreement; as to the FX Prime Brokerage Agreement, there was again consistency, as it contained a non-exclusive New York jurisdiction clause:

"70. . . . The general approach to a non-exclusive jurisdiction clause would be that in the ordinary course the parties cannot have contemplated that if proceedings were commenced in the forum each had agreed as convenient parallel proceedings would still take place in another forum. However it seems to me clear that the overall relationship between the parties departed from that course in May 2006, and in relation to [the FX Agent Master Agreement] continued to depart from that course in November 2006. It is in my view impossible to read into [the FX Prime Brokerage Agreement] a ban on proceedings elsewhere once a New York claim was under way. It follows that the jurisdiction clause in [the FX Prime Brokerage Agreement] was not inconsistent with those in [the Equities ISDA Master Agreement of May 2006] and [the FX Agent Master Agreement]."

(iii) After referring to the Swiss Pledge Agreement at paras 71 to 73 with its provision for Swiss jurisdiction, he concluded as regards the position in November 2006:

"74. Thus it seems to me as a matter of contractual entitlement to sue in a particular jurisdiction, the position in November 2006 was that any Proceedings could be begun in England if relating to [the FX Agent Master Agreement] or [the Equities ISDA Master Agreement], and it would not matter so far as contractual entitlement was concerned that the claim also fell within the [FX Prime Brokerage Agreement] jurisdiction clause . . . No contractual primacy was afforded to any one jurisdiction clause."

(iv) The position did not change as a result of the agreements in January 2008. The exclusive English jurisdiction clauses in the Master Netting Agreement and the Equities Prime Brokerage Agreement, although on the bank's standard form, could not be seen as being concerned with technical banking disputes, as they were at the heart of the agreements for the extension of trading in equities. It was impossible to contend that businessmen would have agreed that the obligation as to where to sue for debts arising under those agreements would give way to the jurisdiction clause in the earlier agreement.

(v) The bank was correct in accepting that, although it could not bring a claim in London in relation to the operation of the FX Prime Brokerage Agreement, issues arising under it might become part of the proceedings if Sebastian chose to raise such issues by way of defence.

(vi) The service of process provisions relied on by the bank could not provide a different result to that achieved by a construction of the jurisdiction clauses.

38. It was contended by Mr Tim Lord QC on the appeal that the judge had fallen into error by not applying the general principle set out by Lord Collins in *UBS*; he had failed to give effect to the fact that the centre of gravity of the claims and the dispute related to FX trading governed by the FX Prime Brokerage Agreement and thus subject to New York jurisdiction.

<u>(iii) The applicable principles</u>

39. It is clear that in construing a jurisdiction clause, a broad and purposive construction must be followed: *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425; *Fiona Trust & Holding Corporation v Privalov* [2007] 2 Lloyd's Rep 267 affirmed in *sub nom Premium Nafta Products v Fili Shipping* [2008] 1 Lloyd's Rep 254 where Lord Hoffmann observed at para 7:

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
Declaration of Lord Collins    Pg 262 of 428
114    LLOYD'S LAW REPORTS    [2011] Vol 1

"If, as appears to be generally accepted, there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention."

40. The Supreme Court emphasised in *Re Sigma Finance Corporation* [2009] UKSC 2 the need, when looking at a complex series of agreements, to construe an agreement which was part of a series of agreements by taking into account the overall scheme of the agreements and reading sentences and phrases in the context of that overall scheme.

41. It is generally to be assumed on these principles that just as parties to a single agreement do not intend as rational businessmen that disputes under the same agreement be determined by different tribunals, parties to an arrangement between them set out in multiple related agreements do not generally intend a dispute to be litigated in two different tribunals.

42. However, where there are multiple related agreements, the task of the court in determining whether a dispute falls within the jurisdiction clauses of one or more related agreements, depends upon the intention of the parties as revealed by the agreements against these general principles: see Collins LJ in *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487 at para 93 and *UBS* at para 83.

43. The considerations have been examined in particular by Rix J in *Credit Suisse v MLC* and by Lord Collins in *UBS*. It is necessary to refer to these in a little more detail. In the first of these cases, *Credit Suisse*, MLC, a hedge fund, had purchased bonds from Credit Suisse under two agreements made in March and May 1998 with exclusive English jurisdiction clauses. The parties had in April 1998 entered into a third agreement with the object of financing the purchase — the Global Master Repurchase Agreement (GMRA); this was governed by a non-exclusive English jurisdiction clause which expressly acknowledged the right of each party to bring proceedings in a court of competent jurisdiction. When the hedge fund defaulted under the GMRA, Credit Suisse sued in England under the GMRA; it sought an anti-suit injunction restraining the hedge fund from pursuing proceedings (including claims for violations of US securities laws) the hedge fund had brought against Credit Suisse and two of its associated companies in New York. Credit Suisse asserted that there was a breach of the exclusive jurisdiction clauses in the purchase agreements, as the whole of the hedge fund's claims fell within the English jurisdiction clauses in those agreements. The hedge fund contended that there were significant aspects of the New York proceedings that did not relate to the purchase agreements. Rix J referred to the dispute being, on the one hand, one single narrative arising out of the purchase, but on the other:

"where different agreements are entered into for different aspects of an overall relationship, and those different agreements contain different terms as to jurisdiction, it would seem to be applying too broad and indiscriminate a brush simply to ignore the parties' careful selection of palette" (page 777).

44. Although he considered that the centre of gravity of the hedge fund's complaints was focused on the purchases, he was reluctant to hold that the complaints in New York which related to the GMRA arose out of the purchase agreements. He continued:

"If they arise out of or in connection with both the Purchase Agreements and the GMRA, then, where the jurisdiction clauses are in conflict, I do not see why the GMRA clause should not prevail: either on the basis that, in a case of conflict on standard forms plainly drafted by [Credit Suisse], [the hedge fund] should be entitled to exercise the broader rights; or on the basis that the clause in the contract which is closer to the claim and which is more specifically invoked in the claim should prevail over the clause which is only more distantly or collaterally involved."

45. For those two reasons, he decided that the hedge fund's claims in New York were preferably to be viewed as claims under the GMRA rather than under the purchase agreement. If he was wrong about the claims being claims under the GMRA, then the New York court was better placed to analyse the complaint in the proceedings to decide whether claims in the complaint should be stayed in favour of English jurisdiction. He therefore refused to grant an injunction to Credit Suisse restraining the hedge fund continuing in New York with its claims under the GMRA, undesirable though it was in principle to have claims in two jurisdictions.

46. Before turning to *UBS*, it is convenient to note Lord Collins' comment at para 94 of his judgment in *UBS*:

"The essence of Rix J's first reason is that under the *contra proferentem* principle, the intention must be taken to have been that, where a dispute fell within the wording of both jurisdiction agreements, it was the GMRA which was to be taken as the agreed position. The second reason, which he must have meant as a matter of construction, was that the parties must be taken to have intended that, where a dispute fell within both sets of agreements, it should be governed by

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
Declaration of Lord Collins    Pg 263 of 428
[2011] Vol 1    LLOYD'S LAW REPORTS    115

CA]    **Sebastian Holdings v Deutsche Bank**    [Thomas LJ

the jurisdiction clause in the contract which was closer to the claim."

47. In *UBS*, UBS had entered into a complex set of agreements with HSH, a German bank, in connection with the issue of securities under a Collateralised Debt Obligation transaction. The overall structure of the transaction was set out in a letter agreement of 23 January 2002 governed by the law of New York. The transaction was then effected by a series of agreements dated 5 March 2002; two of the agreements (an Offering Circular embodied in the Indenture and the Reference Pool Side Agreement) were governed by New York law and had non-exclusive New York jurisdiction clauses; three (the Credit Swap, the Dealer's Confirmation and Pricing Supplement) were governed by English law with English jurisdiction clauses. When there were defaults in the underlying securities, the German bank brought proceedings in New York alleging mis-selling and mismanagement under the Reference Pool Side Agreement. UBS sought to bring an action in England for a declaration that it was not liable, relying upon the jurisdiction clause in the Dealers Confirmation; the sole point in invoking the jurisdiction of the English court was to pre-empt the proceedings in New York. The issue was whether the claims within the English action fell within the jurisdiction clause of the Dealer's Confirmation (see para 50). Walker J held that they did not and his decision was upheld on appeal. Lord Collins considered that the issue turned on whether, in the light of the complex documentation as a whole, the parties should have been taken objectively to have intended by the jurisdiction clause in the Dealer's Confirmation that claims in respect of misrepresentation in relation to the notes should be subject to the exclusive jurisdiction of the English court, whilst claims in respect of other agreements should be subject to the jurisdiction of the New York courts, observing at para 84:

"Plainly the parties did not actually contemplate at the time of the conclusion of the contracts that there would be litigation in two countries involving allegations of misrepresentation in the inception and performance of the agreements. But in my judgment sensible business people would not have intended that a dispute of this kind would have been within the scope of two inconsistent jurisdiction agreements. The agreements were all connected and part of one package, and it seems to me plain that the result for which UBS contends would be a wholly uncommercial result and one that sensible business people cannot have intended."

48. After examining the claims in the particulars of claim in the English proceedings and the role of the Dealer's Confirmation in the scheme of the transaction as a whole, he concluded that the parties

cannot have objectively been taken to have intended that the clause in that agreement would govern every claim for misrepresentation. After referring to the judgment of Rix J in *Credit Suisse* and to para 94 from which I quoted in para 46 above, he concluded:

"95. In this case it is not necessary to go so far. Whether a jurisdiction clause applies to a dispute is a question of construction. Where there are numerous jurisdiction agreements which may overlap, the parties must be presumed to be acting commercially, and not to intend that similar claims should be the subject of inconsistent jurisdiction clauses. The jurisdiction clause in the Dealer's Confirmation is a 'boiler plate' bond issue jurisdiction clause, and is primarily intended to deal with technical banking disputes. Where the parties have entered into a complex transaction it is the jurisdiction clauses in the agreements which are at the commercial centre of the transaction which the parties must have intended to apply to such claims as are made in the New York complaint and reflected in the draft particulars of claim in England."

49. The decisions in *Credit Suisse* and *UBS* are both examples of the process of construction that has to be undertaken, using the well-recognised general principles and tools of contractual construction in the context of the principles relating to different jurisdiction clauses in related agreements. The overall task of the court is summarised in the 2010 supplement to *Dicey, Morris and Collins* at para 12-094:

"But the decision in *Fiona Trust* has limited application to the questions which arise where parties are bound by several contracts which contain jurisdiction agreements for different countries. There is no presumption that a jurisdiction (or arbitration) agreement in contract A, even if expressed in wide language, was intended to capture disputes under contract B; the question is entirely one of construction ... The same approach to the construction of potentially-overlapping agreements on jurisdiction (but there will, in this respect, be no difference between the construction of agreements on jurisdiction, arbitration agreements and service of suit clauses) was taken in [*UBS*] ... In the final analysis, the question simply requires the careful and commercially-minded construction of the various agreements providing for the resolution of disputes, the point of departure being that agreements which appear to have been deliberately and professionally drafted are to be given effect so far as it is possible and commercially rational to do so, even where this may result in a degree of fragmentation in the resolution of disputes. It may be necessary to enquire under which of a

Thomas LJ]                **Sebastian Holdings v Deutsche Bank**                [CA

number of inter-related contractual agreements a dispute actually arises; this may be answered by seeking to locate its centre of gravity.

The same approach, namely to focus on the commercially-rational construction, governs the interpretation of agreements on jurisdiction as exclusive or non-exclusive, and of agreements which specifically provide that the parties will not take objection to the bringing of proceedings if proceedings are brought in more courts than one" (omitting the citation of the authorities).

(iv) The general approach in this case

50. I therefore turn to the construction of the agreements in issue focusing on finding the commercially-rational construction and giving effect to clear agreements, even if this may result in a degree of fragmentation in the resolution of disputes between parties to the series of agreements.

51. It is first important to begin by setting out what Sebastian accepted as a matter of construction of the agreements:

(i) The bank's claims could be brought in the English courts on the ordinary construction of each of the jurisdiction clauses in the Master Netting Agreement and the FX Agent Master Agreement, if they had stood alone without the FX Prime Brokerage Agreement. That was because the claims are claims brought for debts due under each of those agreements.

(ii) As was accepted in the course of argument, if, prior to the issue of proceedings by the bank, Sebastian had not said anything in relation to its denial of liability for the debts due under the FX Agent Master Agreement and the Master Netting Agreement being based in part on breaches of the FX Prime Brokerage Agreement, then the bank would have been entitled to bring its claim in England under each of those agreements, relying on the jurisdiction clauses in those agreements.

It follows from the above that it was not disputed that the clear language of the jurisdiction clauses in each of the two agreements permitted the bank ordinarily to bring its claims for debts due under the two agreements in the jurisdiction specified in the jurisdiction clauses.

52. Furthermore construing the agreements *contra proferentem* would not assist in arriving at their meaning or effect, as it may have done in *Credit Suisse*. The language of the agreements looked at as a whole is too clear. It must therefore follow, if the contention advanced by Sebastian is correct, that as a matter of construction, the language of the two agreements looked at as part of a series does not on its ordinary reading produce a commercially-rational result and therefore must be construed in a commercially-rational way to arrive at the meaning

put forward by Sebastian; that the parties, as rational businessmen, must have intended the agreements to be read as a whole in such a way as at least not to permit the claims for debts due under the FX Agent Master Agreement and the Master Netting Agreement being brought in London under the clauses in those agreements; that the agreements had also to be read so, whatever the nature of the claims, disputes in relation to the claims had to be heard in a single forum; that the probable effect was that, as a matter of construction, claims brought by the bank had also to be brought by the bank in a single forum.

53. The foundation of Sebastian's contention to that effect was that the parties must have intended claims to be brought in the forum specified in the agreement from which the claim had its cause or origin or the agreement which was at the commercial centre of the dispute. The contention can be formulated more fully as follows:

(i) As the bank had accepted in this case that, as matter of calculation, if there had been no losses on FX trading there would have been no loss on the equities account, the origin or cause of the claim was the FX trading which was regulated by the FX Prime Brokerage Agreement. As the bank knew this, their claim was not in fact a claim for debts under the agreements on which the bank was suing but was a claim which has its origin or cause in or arose out of the FX Prime Brokerage Agreement. The bank therefore had no claim under the agreements on which it had brought proceedings and therefore could not bring itself within the Judgments Regulation, as it had no claim under the two agreements; in other words, the centre of gravity of the claim was under the FX Prime Brokerage Agreement and not for debts due under the other two agreements. The claims could not therefore be brought in London and probably should be brought in New York.

(ii) Alternatively, Sebastian's defence to the claims under the two agreements was that the debts were the result of prior breaches of the FX Prime Brokerage Agreement. As the losses would not have occurred but for the FX trading, the dispute related to FX trading and it was that trading that was the centre of gravity of the dispute. As FX trading related primarily to the FX Prime Brokerage Agreement, the dispute was a dispute under that agreement and not under the other two agreements under which the debts in fact arose. The claim by Sebastian in respect of those breaches was therefore not only a defence to the obligations under the other agreements, but, as a matter of construction of the agreements as a whole, had the consequence that the bank no longer had any entitlement to bring its claims

LC/20

Neutral Citation Number: [2009] EWHC 339 (Ch)

Case No: 7MA91089

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**MANCHESTER DISTRICT REGISTRY**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 2 March 2009

Before:

**THE HONOURABLE MR. JUSTICE LEWISON**

- - - - - - - - - - - - - - - - - - - - -

**Between:**

| | |
|---|---|
| **EASYAIR LIMITED (Trading As OPENAIR)** | **Claimant** |
| - and - | |
| **OPAL TELECOM LIMITED** | **Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Miss Lesley Anderson QC** (instructed by **Cobbetts LLP**) for the **Claimant.**
**Mr. Michael J. Booth QC** (instructed by **Mason Hayes**) for the **Defendant.**

Hearing dates: 4, 5 February 2009

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HONOURABLE MR. JUSTICE LEWISON

**Mr Justice Lewison:**

1.  Until the end of April 2004 the Claimant, Easyair Ltd (which traded as "Openair"), operated a business providing SIMs to its business customers under a service provider agreement with O2, the mobile phone network. Openair's customers, in turn, used those SIMs to connect to the O2 network. However, they were not the end users of mobile phones. They connected to the O2 network as GSM gateways. GSM gateways allow a call made from a fixed line telephone to a mobile telephone to be recognized as a mobile to mobile call. The latter may be cheaper for the caller, particularly if he is recognised as being on the same mobile network as the recipient of the call. GSM gateways are often used in conjunction with software which determines whether a particular call will or will not be cheaper if treated as a mobile to mobile call and automatically selects the cheaper alternative.

2.  At that time a distinction was drawn by mobile network operators (MNOs) and the regulator (OFCOM) between "private" GSM gateways (used solely by a single end user for its own calls) and "public" GSM gateways (through which intermediaries enabled end users to make calls from fixed lines at potentially lower cost). Subsequently, a three-fold categorisation was adopted, distinguishing self-use gateways, commercial single-user gateways ("COSUGs") and commercial multi-user gateways ("COMUGs"). Openair's pleaded case asserts that its customers inserted the SIMs supplied by Openair into COMUG GSM gateways.

3.  At that time there was some doubt about whether an MNO could lawfully permit public gateways to connect to its network, without being in breach of its own licence conditions. O2 published its own policy about gateways. There were at least two versions of the policy. One version, issued in December 2003, stated:

    > "The term 'GSM Gateway' is used to describe equipment which enables the routing of voice calls from fixed line equipment to a mobile phone, yet it gives the impression it's a mobile to mobile call.

    > This type of equipment is being deployed widely across mobile networks without the prior consent of the network operators and is resulting in quality impairments, network congestion and safety/security concerns.

    > New legislation has been introduced which has allowed us to review our policy on the use of GSM Gateways.

    > Permitted use

    > The use of GSM Gateways by private users is permitted providing that the system is operated by or on behalf of the customer for the sole use of that customer

    > A private GSM Gateway registration process is being introduced in January 2004 which will allow us to strictly control the use of these devices on our network.

"If [Openair] disputes the amount of any payment (a "Disputed Payment") by OPAL under this Agreement, [Openair] shall as soon as reasonably practicable issue a notice in writing identifying the Disputed Payment and detailing the nature of and reason for the dispute, accompanied by supporting documentation. In the event that [Openair] fails to issue any such notice within 60 days of the receipt of the Disputed Payment, [Openair] agrees that the payment shall be deemed to have been agreed and that, notwithstanding the issue of any subsequent notice, it shall be deemed to have waived any right or remedy which it might otherwise have enjoyed in respect of any underpayment."

30.   Clause 10.3 provided that:

"Neither Party shall be liable to the other in contract, tort (including negligence and breach of statutory duty) or otherwise howsoever for:

(a) any loss of profit, business, goodwill, contract revenue, anticipated savings or business; or

(b) … or

(c) any special indirect consequential loss or damage of any nature whatsoever, whatever the cause thereof arising out of or in connection with this Agreement."

31.   It is this clause that explains why Openair brings its claim under the SPA rather than under the dealer agreement.  Clause 20.1 said that nothing in the agreement should be deemed to constitute a partnership between Openair and Opal. Clause 23 contained an entire agreement clause.

32.   Although each of the SPA and the dealer agreement contained an entire agreement clause, they were plainly part of one overall package. Indeed apart from the payment of £1, entry into the dealer agreement was the whole purchase price under the SPA. Moreover the entire agreement clause in the SPA said in terms that the entire agreement was contained not only in the SPA but also in the documents referred to in it, which included the dealer agreement. Clearly then, they must be construed together.

33.   The important features of the overall deal were in my judgment as follows:

i)   The SPA was just that. It was a sale and purchase. In other words the assets ceased to belong to Openair and became the property of Opal. Openair had no continuing proprietary interest in the sold assets.

ii)   Following the SPA, the only way in which Openair could make money from the assets it had sold was under the dealer agreement.

iii)   Commission was payable under the dealer agreement on two kinds of contract:

a)      Contracts which had been sold by Openair to Opal and which continued in force and

b)      Contracts between subscribers and Opal which Openair had procured.

iv)    Since commission was payable at the same rate for both kinds of contract it was a matter of financial indifference to Openair whether customers in its subscriber base signed up on new Opal terms or remained on Openair contracts;

v)     Indeed the dealer agreement positively required Openair to sign up "Customers" (a defined expression which includes Openair's subscribers) on Opal terms;

vi)    The parties expressly agreed that neither of them would be liable for loss of profit or revenue under the dealer agreement.

34.    It is against that background that clause 7.1 of the SPA must be construed. The essential question is: is it in substance no more than an indemnity; or does it impose a positive obligation on Opal breach of which sounds in substantial damages equivalent to the loss of profit that Openair would have made under the dealer agreement (but which it had agreed would not be recoverable under that agreement)?

35.    Valiantly though Ms Anderson argued the latter, I have no doubt that it was only an indemnity. She pointed, naturally enough, to parts of the SPA in which the parties had used the language of indemnity, and contrasted that with clause 7.1 which uses the language of positive obligation. Clause 7.1, she said, imposed a positive obligation on Opal to preserve the subscribers' connection to the O2 network, if necessary by taking proceedings against O2 in the event of disconnection. But that, to my mind, is a detailed linguistic and semantic analysis which makes no business sense.

36.    First, clause 7.1 applied only to "Subscriber Contracts" as defined. If a former customer of Openair signed up to a new contract on Opal Terms, its new contract would not qualify as a Subscriber Contract. Since Openair undertook an obligation to bring this about, it would be inconsistent to read clause 7.1 as obliging Opal to preserve Openair contracts. Second, it was common ground that the mechanism for inserting Opal into the shoes of Openair vis-à-vis subscribers was by way of novation, since that is the only way in which contractual burdens can be shifted from one person to another. It was also common ground that a novation took effect as a new contract. So a novated contract would not fall within clause 7.1 if construed as Openair wish to construe it. Third, since Openair was entitled to the same commission whether the subscriber was bound by Openair's terms or by Opal's there was no commercial reason for wishing to preserve the body of Subscriber Contracts, as defined. Fourth, it cannot be supposed that having agreed that neither party would be liable for damages for loss of profit under the dealer agreement, Opal would have undertaken an obligation under clause 7.1 of the SPA which led to the same result.

37.    Indemnity clauses cast in the language of positive obligation have a long history in sales and purchases. *In re Poole and Clarke's Contract* [1904] 2 Ch. 173, *Harris v. Boots Cash Chemists (Southern) Ltd* [1904] 2 Ch. 376 and *Reckitt v. Cody* [1920] 2 Ch. 452 are examples. The reason why the court construes such clauses as indemnities

LC/21

**[2005] 1 WLR**                    Dairy Containers Ltd v Tasman Orient CV (PC)

A                                    Privy Council

## *Dairy Containers Ltd *v* Tasman Orient Line CV*

### [2004] UKPC 22

2004  April 21;                    Lord Bingham of Cornhill, Lord Hoffmann,
B       May 20                    Lord Phillips of Worth Matravers, Lord Carswell,
                                        and Dame Sian Elias

*New Zealand — Shipping — Bill of lading — Cargo, damage to — Hague Rules
    contractually incorporated — Clause limiting liability to £100 sterling —
    Whether Hague Rules contractually amended by limitation clause — Hague
    Rules, art IV, r 5, art IX[1]*

C  *Ships' Names — Tasman Discoverer*

A cargo of 70 coils of electrolytic tin plate was shipped on board the *Tasman
Discoverer* from Busan, Korea to Tauranga, New Zealand. Clause 6(B)(b)(i) of the
bill of lading provided that "By the Hague Rules . . . if the loss or damage is proved to
have occurred at sea . . . for the purpose of this sub-paragraph the limitation of
liability under the Hague Rules shall be deemed to be £100 sterling, lawful money of
the United Kingdom per package or unit . . . and the Hague Rules shall be construed
D  accordingly . . ." Clause 7 provided that "In case of port to port shipment the
liability of the carrier in respect of loss or damage to the goods shall be
determined . . . by the Hague Rules as referred to in clause 6(B)(b)(i) . . ."
Clause 8(2) provided that "If any provision of this bill of lading is held to be
repugnant to any extent to any international convention or national law which is
applicable to this bill of lading by virtue of clauses 6 and 7 and subclause (1) above or
otherwise, such provision shall be null and void to that extent but no further." On
E  delivery, 55 of the coils were irreparably damaged by sea water and the respondent
carrier accepted liability. The parties could not agree on the construction of
clause 6(B)(b)(i) which the appellant claimed entitled it to damages of
NZ\$613,667·25 whereas the respondent claimed that damages were limited by the
clause to £100 sterling per damaged coil, making a total of £5,500 sterling. In
proceedings in the New Zealand High Court the judge, giving judgment for the
F  appellant, held that, since the Hague Rules were incorporated by clause 6(B)(b)(i),
the effect of clause 8(2) was to nullify the limitation in that clause to the extent that
it conflicted with the Hague Rules limitation provided by article IV, rule 5 and
article IX; that the Hague Rules were given contractual primacy, and that article III,
rule 8 invalidated the limitation. On the respondent's appeal, the New Zealand
Court of Appeal reversed the judge's decision.

On the appellant's appeal—

G  *Held*, dismissing the appeal, that clause 6(B)(b)(i) had to be construed in the
context of the contract as a whole; that the contract should be given the meaning it
would convey to a reasonable person having all the background knowledge which
was reasonable to the person or class of persons to whom the document was
addressed, including a holder of a bill of lading such as the appellant; that the Hague
Rules were to be construed in accordance with the deeming limitation provision in
clause 6(B)(b)(i), the purpose of which was to give the Hague Rules a different
meaning, namely to give effect to article IV, rule 5 as if it were unqualified by article
H  IX; that the express limitation stated by the parties in clause 6(B)(b)(i) altered the
limitation aspect of the Hague Rules and that effect had to be given to that

[1] Hague Rules, art IV, r 5: see post, para 10.
    art IX: see post, para 10.
    art III, r 8: see post, para 10.

216
**Dairy Containers Ltd v Tasman Orient CV (PC)**                    **[2005] 1 WLR**

A

contractual purpose; and that, accordingly, the respondent's liability was limited to
£5,500 sterling in paper currency and the appellant was entitled to the equivalent
amount in New Zealand currency at the date of payment ( post, paras 12–13, 18–19).

*The Rosa S* [1989] QB 419 and *Homburg Houtimport BV v Agrosin Private Ltd*
[2004] 1 AC 715, HL(E) considered.

Decision of the Court of Appeal of New Zealand [2002] 3 NZLR 353 affirmed.

B

The following cases are referred to in the judgment of their Lordships:

*Brown Boveri (Australia) Pty Ltd v Baltic Shipping Co* (unreported) 31 July 1986,
Yeldham J; (1989) 93 ALR 171
*Homburg Houtimport BV v Agrosin Private Ltd* [2003] UKHL 12; [2004] 1 AC 715;
[2003] 2 WLR 711; [2003] 2 All ER 785, HL(E)
*Rosa S, The* [1989] QB 419; [1989] 2 WLR 162; [1989] 1 All ER 489; [1988]
2 Lloyd's Rep 574

C

The following additional cases were cited in argument:

*Ansley v Prospectus Nominees Unlimited* (unreported) 3 March 2004, CA (NZ)
*Berry v British Transport Commission* [1962] 1 QB 306; [1961] 3 WLR 450; [1961]
3 All ER 65, CA
*DHL International (NZ) Ltd v Richmond Ltd* [1993] 3 NZLR 10
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998]
1 WLR 896; [1998] 1 All ER 98, HL(E)
*Yoshimoto v Canterbury Golf International Ltd* [2002] UKPC 40; [2004] 1 NZLR 1,
PC
*Yuen Kwok-Fung v Hong Kong Special Administrative Region of the People's
Republic of China* [2001] 3 NZLR 463

D

**APPEAL** from the Court of Appeal of New Zealand

The appellant, Dairy Containers Ltd, appealed from the decision of the
Court of Appeal of New Zealand (Keith, Blanchard and Anderson JJ) who
on 17 June 2002 reversed the decision of Williams J made on 27 June 2001
to the effect that judgment be entered for the appellant against the
respondent, Tasman Orient Line CV.

E

The facts are stated in the judgment of their Lordships.

*Philip Rzepecky* and *Matthew Flynn* (both of the New Zealand Bar) for
the appellant.

*C R Carruthers* QC and *T J Broadmore* (both of the New Zealand Bar)
for the respondent.

F

*Cur adv vult*

20 May. The judgment of their Lordships was delivered by **LORD
BINGHAM OF CORNHILL**

G

1  Dairy Containers Ltd appeals against a decision of the Court of
Appeal (Keith, Blanchard and Anderson JJ, 17 June 2002), reversing a
decision of Williams J made on 27 July 2001. The short, but financially
significant, issue in the appeal concerns the correct interpretation of a
damage limitation clause in a contract for the carriage of goods by sea. The
contract was contained in or evidenced by a bill of lading, issued on behalf of
Tasman Orient Line CV as carrier, of which Dairy Containers became the
holder.

H

2  The contract was for the carriage of 70 coils of electrolytic tin plate
from Busan in Korea to Tauranga in New Zealand aboard the carrier's vessel

A  *Tasman Discoverer*.  The bill of lading form used was apt for combined transport or port to port shipment, but the notation "tackle/wharf" and the identification of Tauranga as both the port of discharge and the place of delivery, on the face of the bill, made plain that this was intended to be (as in fact it was) port to port shipment.  On delivery, 55 of the coils were found to be irreparably damaged by sea water, and the carrier has accepted liability for that damage.  The loss suffered by Dairy Containers is agreed to be NZ\$613,667·25, a sum which would be recoverable on its construction of the damage limitation clause, and was awarded by the judge.  But the carrier contends (and the Court of Appeal held) that Dairy Containers' right of recovery is limited to £100 sterling, lawful money of the United Kingdom (or its equivalent in another currency), per damaged coil, a total of £5,500 sterling.

C    3   The cargo of 70 coils was recorded on the face of the bill as:

    "Accepted by the carrier from the shipper in apparent good order and condition (unless otherwise noted herein) the total number or quantity of containers or other packages or units indicated above (for purposes including limitation of carrier's liability) (*) stated by the shipper to comprise the goods specified below for transportation subject to all the terms hereof (including the terms on the reverse hereof and the terms of the carrier's applicable tariff) from the place of acceptance or the port of loading, whichever applicable, to the port of discharge or the place of delivery, which ever applicable.  On presentation of this document (duly endorsed) to the carrier, by or on behalf of the holder, the right and liabilities arising in accordance with the terms hereof shall(without prejudice to any rule of common law or statute rendering them binding on the shipper, holder and carrier)become binding in all respects between the carrier and holder as though the contract contained herein or evidenced hereby had been made between them."

The asterisk in brackets referred to the total number of packages, 70 coils, recorded in the box immediately above this clause.  No declaration of value was made.

    4   The terms on the reverse of the bill begin with a series of definitions. On a strict application of these, the present carriage would be "combined transport" and not "port to port shipment", but the parties are content to treat it as the latter and the distinction does not affect the outcome of the appeal but only the textual route by which the outcome is reached.

    5   Clause 5 of the printed terms is in these terms:

    "*Carrier's responsibility*
    "(1) The carrier shall be liable for loss of or damage to the goods occurring between the time when it accepts the goods for transport and the time of delivery, in accordance with the provisions of clauses 6(A), (B) and 7 of this bill of lading.

    "(2) Subject to any limitation of the carrier's liability which is applicable under clauses 6(A), (B) and 7, when the carrier is liable for compensation, in respect of loss of or damage to the goods, such compensation shall be calculated by reference to the invoice value of the goods plus freight and insurance if paid and the carrier shall not be responsible for any loss of profit or any consequential loss."

218
**Dairy Containers Ltd v Tasman Orient CV (PC)**                    **[2005] 1 WLR**

Clauses 6(A), (B) and 7, to which reference is there made, distinguish    *A*
between (a) combined transport when the stage of transport where the loss
or damage occurred is not known, (b) combined transport when the stage of
transport where the loss or damage occurred is known, and (c) port to port
shipment.

6   The rules governing the first of these categories (set out in
clause 6(A)(1)) are plainly inapplicable in the present case, since the stage of    *B*
transport where the loss or damage occurred is known.  When these rules
apply, the carrier is not to be liable for loss or damage caused by a series of
specified causes and is to be liable only for such loss or damage as is not
attributable to any of those causes, the burden of proving causation by one
of the excluded clauses being on the carrier.  Where, under this provision,
the carrier is liable for compensation for loss or damage to goods, "such
compensation shall not exceed US$2·50 per kilo of gross weight of the goods    *C*
lost or damaged".  Mr Rzepecky, in the course of his able and attractive
argument for Dairy Containers, relied on this limitation provision as being,
in any ordinary transaction, more generous and commercially realistic than
the limitation contended for by the carrier in the present case.

7   The second of these categories (combined transport when the stage of
transport where the loss or damage occurred is known) is subdivided.  The    *D*
carrier's liability may be governed (clause 6(B)(a))

"by the provisions contained in any international convention or
national law, which provisions: (i) cannot be departed from by private
contract to the detriment of the merchant [an expression defined to
include the holder of the bill of lading, consignee and receiver of the
goods], and (ii) would have applied if the merchant had made a separate
and direct contract with the carrier in respect of the particular stage of    *E*
transport where the loss or damage occurred and received as evidence
thereof any particular document which must be issued in order to make
such international convention or national law applicable."

This provision has no application in the present case, since it has been
common ground throughout that this carriage was not governed by any    *F*
international convention nor by the law of either Korea or New Zealand.
The carrier's liability was the subject of contract only, which is the subject of
clause 6(B)(b)(i):

"By the Hague Rules contained in the International Convention for the
Unification of Certain Rules relating to the bills of lading dated 25 August
1924 (hereinafter called the Hague Rules), if the loss or damage is proved    *G*
to have occurred at sea or on inland waterways; for the purpose of this
sub-paragraph the limitation of liability under the Hague Rules shall be
deemed to be £100 sterling, lawful money of the United Kingdom per
package or unit and references in the Hague Rules, to carriage by sea,
shall be deemed to include references to carriage by inland waterways and
the Hague Rules shall be construed accordingly . . ."

8   The third category of case (port to port shipment) is governed by    *H*
clause 7:

"In case of port to port shipment, the liability of the carrier in respect
of loss or damage to the goods shall be determined by the national law,

A   which would be applicable to the similar carriage by sea under
paragraph (B) of clause 6, or failing which, by the Hague Rules as referred
to in paragraph (B)(b)(i) of clause 6 irrespective of whether the loss or
damage is proved to have occurred while the goods are onboard a sea-
going vessel, or prior or subsequent thereto."

B   9   Reference should be made, lastly, to clause 8(2) of the terms, which
provides:

> "If any provision of this bill of lading is held to be repugnant to any
> extent to any international convention or national law which is
> applicable to this bill of lading by virtue of clauses 6 and 7 and subclause
> (1) above or otherwise, such provision shall be null and void to that
> extent but no further."

C   10   The parties are agreed, and the judge and the Court of Appeal rightly
accepted, that the carrier's liability is governed by clause 6(B)(b)(i), either as
applying directly or (preferably) as incorporated by clause 7. Thus the
Hague Rules, to which reference is made in both clauses, are of obvious
relevance. Three provisions have been referred to. Article IV, rule 5 (so far
as relevant) provides:

D   > "Neither the carrier nor the ship shall in any event be or become liable
> for any loss or damage to or in connection with goods in an amount
> exceeding £100"—100 *livres sterling* in the authentic French text—"per
> package or unit, or the equivalent of that sum in other currency unless the
> nature and value of such goods have been declared by the shipper before
> shipment and inserted in the bill of lading."

E   Article IX of the Rules provides:

> "The monetary units mentioned in this Convention are to be taken to
> be gold value. Those contracting states in which the pound sterling is not
> a monetary unit reserve to themselves the right of translating the sums
> indicated in this Convention in terms of pound sterling into terms of their
> own monetary system in round figures. The national laws may reserve to
F   > the debtor the right of discharging his debt in national currency according
> to the rate of exchange prevailing on the day of the arrival of the ship at
> the port of discharge of the goods concerned."

The third relevant provision is article III, rule 8, which is in these terms:

G   > "Any clause, covenant, or agreement in a contract of carriage relieving
> the carrier or the ship from liability for loss or damage to or in connection
> with, goods arising from negligence, fault, or failure in the duties and
> obligations provided in this article or lessening such liability otherwise
> than as provided in this Convention, shall be null and void and of no
> effect. A benefit of insurance in favour of the carrier or similar clause
> shall be deemed to be a clause relieving the carrier from liability."

H   11   Two observations may be made on these Rules. First, the effect of
article IX is to make plain that what article IV, rule 5 refers to is the gold
value of the pound sterling not its nominal or paper value: see *The Rosa S*
[1989] QB 419, 430, per Hobhouse J. In *Brown Boveri (Australia) Pty Ltd v
Baltic Shipping Co* (unreported) 31 July 1986, Yeldham J decided that the

limitation confining recovery to £100 per unit in article IV, rule 5 was, in the   *A*
light of article IX, to be calculated by reference to "the quantity of gold
which was the equivalent of £100 sterling in 1924", and his decision was
upheld by the Court of Appeal of New South Wales: (1989) 93 ALR 171,
172, 175, 188, 192.  This interpretation of these two provisions, read
together, has been accepted in this appeal.  With the passage of 80 years since
the Rules were adopted in 1924, and with the marked depreciation in the   *B*
value of the pound sterling over that period, the practical effect of article
IX has become increasingly great.  Secondly, where the Hague Rules
(including both article IV, rule 5 and article IX) have compulsory effect by
the operation of domestic law, any limitation of the carrier's liability to a
figure lower than that yielded on application of both those provisions will
fall foul of article III, rule 8 and will be null and void.  That result may, or
may not, follow where (as here) the application of the Rules is the result of   *C*
contractual incorporation and not compulsory application by operation of
law.

  12  In the present case, therefore, all turns on the correct interpretation
of clause 6(B)(b)(i).  This clause must be construed in the context of the
contract as a whole.  The general rule should be applied that if a party,
otherwise liable, is to exclude or limit his liability or to rely on an exemption,   *D*
he must do so in clear words; unclear words do not suffice; any ambiguity or
lack of clarity must be resolved against that party: *Homburg Houtimport
BV v Agrosin Private Ltd* [2004] 1 AC 715, 779, para 144, per Lord
Hobhouse of Woodborough.  There may reasonably be attributed to the
parties to a contract such as this such general commercial knowledge as a
party to such a transaction would ordinarily be expected to have, but with a
printed form of contract, negotiable by one holder to another, no inference   *E*
may be drawn as to the knowledge or intention of any particular party.  The
contract should be given the meaning it would convey to a reasonable person
having all the background knowledge which is reasonably available to the
person or class of persons to whom the document is addressed (the *Homburg*
case, at p 754, para 73, per Lord Hoffmann), which would certainly include
a holder such as Dairy Containers.

  13  The opening words of clause 6(B)(b)(i) serve to incorporate the   *F*
Hague Rules if no international convention or national law governs and the
loss or damage is proved to have occurred at sea or on inland waterways.
There then follow two deeming provisions expressed to take effect "for the
purposes of this sub-paragraph".  The limitation of liability under the Rules
is deemed to be "£100 sterling, lawful money of the United Kingdom per
package or unit".  References in the Rules to carriage by sea are deemed to   *G*
include references to carriage by inland waterways.  The Rules are to be
construed in accordance with these deemed meanings.  In each instance, the
need for the deeming provision arises because without it the term in question
does not have the meaning it is to be deemed to have.  The limitation of
liability under the Rules is not "£100 sterling, lawful money of the United
Kingdom per package or unit": it is the limitation provided by article IV,
rule 5 as qualified by article IX.  The references to carriage by sea in the   *H*
Rules do not include carriage by inland waterways.  Thus the purpose of the
deeming provision is to give the Rules a meaning different from that which
they would have in the absence of a deeming provision.  The deemed
extension of the Rules to include inland waterways is irrelevant to this case.

221

[2005] 1 WLR                          Dairy Containers Ltd v Tasman Orient CV (PC)

A   But the deemed limitation provision lies at the heart of it, because it
stipulates a limit of £100 sterling, lawful money of the UK, a nominal or
paper value (although article IV, rule 5 would permit payment of the
equivalent of that sum in another currency).   The deemed limitation
provision gives effect to article IV, rule 5 as if it were unqualified by
article IX.

B       14   In seeking to resist this conclusion, Mr Rzepecky for Dairy
Containers placed strong reliance on advice given by John Richardson
FCII in *The Hague and Hague-Visby Rules* 4th ed (1998), pp 43–44, when,
having referred to *The Rosa S* [1989] QB 419, he said:

    "Fortunately for carriers this result is not disastrous, as most nations
    where Hague Rules are still mandatorily applicable have converted the
    package limitation into local currency instead of using the gold
C   limitation.   However, great care is needed in drafting bill of lading
    contracts (which usually contractually apply Hague Rules to shipments
    from those nations that have no mandatorily applicable law) to write in
    only articles I to VIII of the Hague Rules and then provide separately for a
    package limitation of £100 (or whatever), thereby avoiding the 'gold
    clause' trap."

D   Thus Mr Rzepecky relied on the failure to exclude article IX when
incorporating the Hague Rules in this bill in support of the inference for
which he contended, that article IV, rule 5 was intended and should be
understood to be qualified by article IX.   It may be accepted that if the
draftsman of clause 6(B)(b)(i) had followed the course recommended by
Mr Richardson, the present argument would not in all probability have
E   arisen.   But this argument does not, in the Board's opinion, take
Mr Rzepecky far enough.   First, to accept that the carrier could have
achieved the limitation it seeks by using Mr Richardson's formula is not to
say that it is the only drafting formula capable of achieving that result: the
question is whether the language of clause 6(B)(b)(i) as it stands is also
effective to achieve it.   Secondly, as shown above, the language of the clause
F   has the purpose of altering the effect of the limitation provision in the Hague
Rules, and it is difficult to see what alteration could have been intended other
than to exclude the effect of article IX.   The object cannot have been to make
plain that it was British and not other pounds which were referred to, as is
evident from the reference in the authentic French text to "livres sterling".   It
cannot be supposed that commercial parties, in a form of contract intended
to be used all over the world, would have wished to stipulate for payment in
G   British currency.

        15   The language of clause 7, in the opinion of the Board, throws no
light on the problem.   If a claim is governed by a compulsorily applicable
national law, clause 6(B)(a) is applicable.   If not, the Hague Rules "as
referred to in paragraph (B)(b)(i) of clause 6" apply.   The words "as referred
to" can only mean, in effect, "as modified in" or "subject to".

        16   Clause 8(2) is equally unhelpful to Dairy Containers.   On a natural
H   reading, the reference here is to an international convention or national law
which is compulsorily applicable.   In any event, a term in the bill cannot be
repugnant to any provision of the Hague Rules if the term in question
represents a modification of the Hague Rules provision agreed by the parties
in exercise of their freedom to agree what they will.   It would similarly be

222
**Dairy Containers Ltd v Tasman Orient CV (PC)** [2005] 1 WLR

absurd to hold that a clear contractual limitation agreed by the parties is   *A*
invalidated by article III, rule 8 of the Hague Rules.

17   If it could be assumed that the terms of this bill had been drafted by a
single hand and that they expressed a single coherent intention, there would
be force in the point made by Mr Rzepecky, that the limitation of US$2·50
per kilo of gross weight in clause 6(A)(4) appears much more generous to the
cargo owner who has suffered damage than the limitation of £100 sterling in
clause 6(B)(b)(i). But these would be most unsafe assumptions to make   *B*
when construing a document such as this. It is notorious that clauses are
added and amended by different draftsmen at different times in response to
the exigencies of commercial life, when and as they arise. A single draftsman
expressing a single coherent intention would have been unlikely to provide
one limitation in US dollars per kilo and another in British pounds per
package or unit.   *C*

18   The judge held that, since the Hague Rules were incorporated by
clause 6(B)(b)(i), the effect of clause 8(2) was to nullify the limitation in that
clause to the extent that it conflicted with the Hague Rules limitation
provided by article IV, rule 5 and article IX; the Hague Rules were given
contractual primacy, and so article III, rule 8 invalidated the restriction. But
the Court of Appeal took a different view. In the unanimous judgment   *D*
delivered by Keith J it held, rightly in the opinion of the Board, that the
express limitation stated by the parties in clause 6(B)(b)(i) had the purpose of
altering the limitation aspect of the Hague Rules and that effect had to be
given to that contractual purpose.

19   Despite the arguments advanced for Dairy Containers the Board,
like the Court of Appeal and for essentially the same reasons, finds no lack of
clarity in clause 6(B)(b)(i). The carrier's liability is limited to £5,500 sterling   *E*
in ordinary or paper currency, and Dairy Containers is entitled to an amount
in New Zealand currency which it can exchange for that amount at the date
of payment. The Board will humbly advise Her Majesty that the appeal
should be dismissed, and that the unsuccessful appellant should pay the
respondent's costs of this appeal to the Board.

*Solicitors: Alan Taylor & Co; Moon Beever.*   *F*

M F

*G*

*H*

LC/22

## COURT OF APPEAL

2 March; 6 April 2006

————————

PEEKAY INTERMARK LTD AND ANOTHER

v

AUSTRALIA AND NEW ZEALAND
BANKING GROUP LTD

[2006] EWCA Civ 386

Before Lord Justice Chadwick,
Lord Justice Moore-Bick and
Mr Justice Lawrence Collins

**Misrepresentation — Bank making false statements to investor regarding nature of potential investment — Whether investor relied on statements — Whether statements corrected by the terms of the contract before investment made.**

The second claimant (Mr Pawani) had invested in emerging market instruments with the defendant bank (ANZ) since 1996. The first claimant (Peekay) was Mr Pawani's investment vehicle.

Throughout 1997 and the early part of 1998 the Russian government issued a series of bonds known as Gosudarstvenniye Kratkosrochniye Beskuponniye Obligatsio (GKO). ANZ developed an investment product, a GKO-linked deposit, based on the bonds. At the beginning of February 1998 Mrs Ranjita Balasubramaniam (Mrs B), a regional manager acting on behalf of ANZ in Dubai, telephoned Mr Pawani to see if he would be interested in investing in the proposed GKO-linked deposit. She sent him a copy of a document describing the product. However, she did not tell him that the product was a structured deposit linked to a GKO or that in the event of sovereign default investors would have no control over the manner in which the investment was liquidated.

As a result of their discussions Mr Pawani, acting on behalf of Peekay, told Mrs B that he wished to invest US$250,000 in the product she had described to him. However, no binding contract came into existence at that stage since Mr Pawani had not received any detailed terms of the proposed investment and did not have sufficient information to enable him to place an order.

A document containing what were described as final terms and conditions (FTCs) relating to a hedged Russian Treasury bill was sent to Mrs B from London on 2 February as an attachment to an e-mail. The FTCs described the investment as a deposit and set out various terms relating to it, including the maturity date and the projected rate of return. The FTCs were accompanied by a document described as an "Emerging Markets Risk Disclosure Statement" which was to be signed by the client and returned to ANZ together with the client's instructions to proceed with the investment.

On 4 February 1998 Mrs B sent copies of all the documents by fax to Mr Pawani for signature on behalf of Peekay together with a draft letter of instruction to the bank to transfer the funds needed to make the investment. Mr Pawani looked over the documents briefly but did not read them, assuming that they reflected what Mrs B had told him about the investment. He initialled each page of the documents and signed the Risk Disclosure Statement which he returned to ANZ under cover of a letter dated 7 February 1998 with instructions to debit Peekay's account in the sum of US$250,000 "to buy the Russian Hedged GKO Note as per the attached document". The reference to the attached document was a reference to the FTCs and Risk Disclosure Statement. In accordance with those instructions ANZ debited Peekay's account in order to fund a share in the GKO-linked deposit described in the FTCs.

In August 1998 the Russian government announced a moratorium on certain of its debt obligations, including those arising under GKOs, and as a result the GKO to which Peekay's deposit was linked was not paid on its maturity date. The amount recovered by Peekay on the maturity of its investment was only US$5,918.06.

The claimants claimed damages from ANZ under section 2(1) of the Misrepresentation Act 1967. They said that as a result of the telephone representations made to Mr Pawani by Mrs B in early February 1998 they had been led to expect that Peekay would obtain an interest in the GKO itself and that they would not have made the investment if they had realised that they would obtain no interest in the underlying GKO.

At first instance Richard Siberry QC, sitting as a deputy judge of the High Court, found that in the course of her conversations with Mr Pawani in early February 1998 Mrs B had misrepresented the nature of the investment that ANZ was offering its clients by giving him the impression that Peekay would obtain a proprietary interest of some kind in a GKO, and that Mr Pawani had been induced by that misrepresentation to make the investment on its behalf. He therefore gave judgment in favour of Peekay.

ANZ appealed.

————————*Held*, by CA (Chadwick and Moore-Bick LJJ and Lawrence Collins J) that the appeal would be allowed.

(1) Mrs B's description of the GKO-related investment developed by ANZ carried with it the implicit representation that the investment was one which was structured in a way that gave the investor a proprietary interest of some kind in the GKO. However, the terms of the FTCs were sufficient to make it clear to Mr Pawani, if he had read them, that the nature of the investment was fundamentally different from that which he had been given to understand (*see* paras 46 and 47).

(2) The judge's conclusion that Mr Pawani was induced to sign the documents by what Mrs B had previously told him could not be sustained. The only conclusion open to the judge was that Mr Pawani was induced to sign the documents and enter into the contract not by what Mrs B had told him, but by his own assumption that the investment product to which they related corresponded to the description he had previously been given (*see* paras 51 and 52).

LLOYD'S LAW REPORTS

MOORE-BICK LJ]    **Peekay v Australia and New Zealand Banking Group**    [CA

(3) By confirming that he had read and understood the Risk Disclosure Statement and returning it with his instructions to make the investment, Mr Pawani offered to enter into a contract with ANZ on behalf of Peekay on those terms and that offer was accepted by ANZ when it implemented his instructions. As a result it was part of the contract between them that Peekay was aware of the nature of the investment it was seeking to purchase and had satisfied itself that it was suitable for its needs. In those circumstances, since it had not been suggested that ANZ misrepresented to Mr Pawani the effect of the documents, it was not open to Peekay to say that it did not understand the nature of the transaction described in the FTCs. Accordingly, Peekay could not assert that it was induced to enter into the contract by a misunderstanding of the nature of the investment derived from what Mrs B had said about the product some days earlier (*see* para 60).

———————

The following cases were referred to in the judgment:

*Assicurazioni Generali SpA v Arab Insurance Group* (CA) [2003] Lloyd's Rep IR 131;

*Colchester Borough Council v Smith* (CA) [1992] Ch 421; [1991] Ch 448;

*Curtis v The Chemical Cleaning and Dyeing Co Ltd* (CA) [1951] 1 KB 805;

*Flack v Pattinson* (CA) [2002] EWCA Civ 1762;

*Grimstead (E A) & Son Ltd v McGarrigan* (CA), 27 October 1999, unreported;

*L'Estrange v Graucob* [1934] 2 KB 394;

*Lloyds Bank plc v Waterhouse* (CA) [1993] 2 FLR 97;

*Phelps v White* (1881) 7 LR Ir 160;

*Redgrave v Hurd* (CA) (1881) 20 Ch D 1.

———————

This was an appeal by the defendant bank, Australia and New Zealand Banking Group Ltd, from the decision of Richard Siberry QC, sitting as a deputy judge of the High Court, awarding the first claimant Peekay Intermark Ltd damages for misrepresentation relating to a potential investment.

Christopher Pymont QC and Jonathan Russen, instructed by Reed Smith Rambaud Charot LLP, for ANZ; David Railton QC and Shantanu Majumdar, instructed by Nelsons, Leicester, for the claimants.

The further facts are stated in the judgment of Moore-Bick LJ.

Judgment was reserved.

Thursday, 6 April 2006

———————

**JUDGMENT**

**Lord Justice MOORE-BICK:**

1. This is an appeal against the order of Mr Richard Siberry QC sitting as a deputy judge of the Commercial Court giving judgment for the first claimant, Peekay Intermark Ltd ("Peekay") against the defendant, Australia and New Zealand Banking Group Ltd ("ANZ" or "the bank"), on its claim for damages for misrepresentation under section 2(1) of the Misrepresentation Act 1967.

2. Peekay is a company incorporated in the Isle of Man which has a branch in Umm Al Qiwain in the United Arab Emirates and trades from an address in Dubai. It is used as an investment vehicle by its shareholders who include the second claimant, Mr Pawani. The company trades in a variety of investments including bonds, bills, emerging market instruments and derivatives, as well as bullion and currencies. Investment decisions are taken by Mr Pawani and his fellow directors. The judge found that Mr Pawani is a man of substantial means who has considerable investment experience. He began investing in emerging market instruments with ANZ in 1996.

3. ANZ is the ultimate parent of the various subsidiary companies which make up the group. At the time of the events with which this appeal is concerned it operated an investment banking division under the name "ANZ Investment Bank" from offices in the City of London. ANZ Investment Bank was itself made up of a number of separate departments, each of which was treated for administrative purposes as having a separate account within the bank.

4. ANZ itself and other companies within the group carried on a private banking business under the name "Grindlays Private Banking" ("GPB"). One of those companies, ANZ Grindlays Bank Ltd ("ANZ-GBL"), had a branch in Dubai. Mrs Ranjita Balasubramaniam was a regional manager of GPB employed by ANZ-GBL. She was based in Dubai but reported to GBP in London. Mr Pawani began making investments on behalf of Peekay through ANZ sometime in 1995. About a year later he met Mrs Balasubramaniam and thereafter regularly invested in emerging market instruments with ANZ through her, or occasionally through a Mr Wood who was employed in the general sales team of ANZ Investment Bank dealing with emerging markets. Russia was one of the emerging markets in which Mr Pawani invested during that period.

5. Throughout 1997 and the early part of 1998 the Russian government issued a series of bonds known as Gosudarstvenniye Kratkosrochniye Beskuponniye Obligatsio ("GKO"). These were short-term non-interest-bearing bonds denominated

# LLOYD'S LAW REPORTS

CA]    **Peekay v Australia and New Zealand Banking Group**    [MOORE-BICK LJ

in roubles which were quoted at a discount to face value. The right to hold GKOs was limited to 21 Russian banks and one western bank, Credit Suisse First Boston ("Credit Suisse"). During the latter part of 1997 and the early part of 1998 GKOs were traded at a substantial discount to their face value and therefore represented an interesting investment opportunity, albeit one which carried a substantial level of risk. In response to an initiative on the part of Credit Suisse in the latter part of 1997 the Structured Products Group within ANZ Investment Bank developed an investment product described as a "structured US Dollar hedged Russian Treasury bill deposit". The product was structured as a dollar deposit with ANZ with repayment linked to the performance of a reference obligation in the form of a GKO with a specified maturity date. The risk of depreciation of the rouble was to be hedged by ANZ by means of a forward contract with a major Russian bank for the purchase of US dollars. The rate of return to the investor would be represented by the discount to face value at which the GKO was traded at the time of the investment less the cost of the hedge. The main risks to which the investor would be exposed were a default on the part of the Russian Central Bank in making payment of the GKO at maturity and a default on the part of the bank with which the hedge contract had been placed. ANZ also produced a proposal for a similar tradable form of this investment structured as a note, the main details of which were set out in an Indicative Term Sheet produced by GPB for the purposes of generating interest among potential investors.

6. At some time in January 1998 Mr Aggarwal of GPB in London told Mrs Balasubramaniam that an opportunity had arisen for the bank's clients to invest in GKOs with a US dollar hedge. He sent her a copy of the Indicative Term Sheet which described the product as "a high yield note linked to Russian bonds hedged into US dollars offering a return equivalent to 16–17% per annum". The term sheet drew attention to the fact that the investor took various risks in relation to the GKO and the currency contract, including sovereign default by the Russian government, in which case the principal could be at risk. In the light of what she had been told by Mr Aggarwal, Mrs Balasubramaniam spoke by telephone to Mr Pawani on at least two occasions on 1 and 2 February 1998 to see if he would be interested in investing in the proposed GKO-linked deposit. At some point during their discussions she also sent him a copy of the Indicative Term Sheet describing the proposed GKO-linked note. However, the judge found that she did not tell him that the product he was being offered was a structured deposit linked to a GKO or that in the event of sovereign default investors would have

no control over the manner in which the investment was liquidated because that was not how she understood the position.

7. As a result of their discussions Mr Pawani acting on behalf of Peekay told Mrs Balasubramaniam that he wished to invest US$250,000 in the product she had described to him, that is, the GKO-linked deposit. However, no binding contract came into existence at that stage since Mr Pawani had not received any detailed terms of the proposed investment and did not therefore have sufficient information to enable him to place an order of any kind. A document containing what were described as final terms and conditions ("FTCs") relating to a hedged Russian Treasury Bill was sent to Mrs Balasubramaniam from London on 2 February as an attachment to an e-mail. They described the investment as a deposit and set out various terms relating to it, including the maturity date and the projected rate of return. In the ordinary way she would have opened the e-mail when she came into the office the next day, but because she was occupied with other matters she did not do so until 4 February. The judge found that, having opened the e-mail, Mrs Balasubramaniam printed off the documents attached to the e-mail but did not read them in any detail because she assumed that if there had been any significant difference between the investment to which they related and the product that had previously been described to her, that would have been drawn to her attention.

8. The FTCs themselves were accompanied by a document described as an "Emerging Markets Risk Disclosure Statement" which was to be signed by the client and returned to the bank together with its instructions to proceed with the investment. On 4 February Mrs Balasubramaniam sent copies of all the documents by fax to Mr Pawani for signature on behalf of Peekay and a draft letter of instruction to the bank to transfer the funds needed to make the investment. Mr Pawani knew from his previous dealings with ANZ that it would be necessary to sign a document of this kind, but apparently he regarded it as a mere formality. The judge found that he looked over the documents briefly but did not read them, assuming that they reflected what Mrs Balasubramaniam had told him about the investment. He did notice that the FTCs were headed "USD Hedged Russian Treasury Bill", but he regarded that as consistent with the description of the product that she had given him. Together with one of Peekay's employees he initialled each page of the documents and signed the Risk Disclosure Statement which he returned to the bank under cover of a letter dated 7 February 1998 to which I shall refer in a moment.

9. Although the FTCs were sent to Mr Pawani apparently to confirm the terms of the investment

that Peekay was being invited to make, they did not in fact set out the terms of a contract between the investor and the bank. Instead they described a deposit of US$2 million by "ANZ Private Bank" with "ANZ Bank" in relation to a structured US Dollar Hedged Russian Treasury Bill with a trade date of 2 February 1998, an effective date of 9 February 1998 and a maturity date of 16 October 1998. They also referred to a "Reference Obligation" which was identified as GKO No 21110 maturing on 14 October 1998, to International Moscow Bank as "Reference Forward Counterparty" and to a deposit rate of 21.50 per cent "subject to the provisions in Appendix 1".

10. Appendix 1 contained a number of provisions relating to Non-Payment Events. They included the following:

> ANZ makes the following disclosure to the Depositor. The payment of any amount by the Deposit Taker . . . is subject to the following Risks, in which event (an "Event") the Depositor may receive no income from the Deposit, and/or lose some or all of the initial Deposit Amount — See Settlement Procedures described in Appendix 2.

> **(1) Default Risk**

> Default including without limitation by the Central Bank of Russia . . . in making payments in respect of the underlying Reference Obligation . . . "

11. Appendix 2, which contained Settlement Procedures provided as follows:

> The occurrence of any Event shall be determined by the Calculation Agent [ANZ] in good faith and in its sole discretion, which determination shall be final and binding . . .

> **(1) Payments following Default by the Central Bank of Russia**

> In the event of Default, the Deposit Taker will pay an amount to the Depositor equal to the Market Value of the Reference Obligation and the Deposit Taker's obligations with respect to the Deposit will then irrevocably cease.

12. "Market Value" was explained in a footnote in the following terms:

> Market Value will be the bid value of the Reference Obligation inclusive of accrued interest on the day after the Default is deemed to have occurred, as determined by the Calculation Agent by reference to at least two dealers. The Market Value will then be converted into USD at an exchange rate determined by the Calculation Agent and paid to the Depositor, as soon as the Calculation Agent determines it is practicable to do so (after the deduction of any amounts determined to reflect the cost to the Deposit Taker).

13. The final page of the FTCs contained what was described in the heading as an 'Important Notice' in the following terms:

> The deposit transaction described in these Indicative Terms and Conditions involves a variety of significant risks including some risks not normally associated with investing in the developed capital markets in North America, Japan, and Western Europe. These risks include (but are not limited to) the risk of adverse or unanticipated market, financial or political developments in the Russian Federation . . . and the default by the issuer of the Reference obligation . . . In certain circumstances (more fully described above) ANZ Bank will be under no obligation to pay any amounts to you and you may lose all amounts you have paid under this transaction.

> Before considering entering into this transaction you must make your own independent assessment as to whether it is appropriate for you based upon your own judgment and upon advice from such advisors as you consider necessary. ANZ Bank is not acting as your financial advisor or in a fiduciary capacity in relation to this transaction. It is an express term that you may enter into with ANZ Bank that you are not relying on any communication (written or oral) made by ANZ Bank as constituting either investment advice or a recommendation to enter into this transaction.

> . . . Potential investors should refrain from entering into a transaction of the type described herein unless they fully understand their terms and risks, including the extent of their potential risk of loss and have independently determined that a transaction of this nature is appropriate for them.

14. The Risk Disclosure Statement ran to over five pages. It contained detailed warnings to investors of the risks associated with various kinds of investments in emerging markets including derivatives in the form of structured notes and other debt instruments. The penultimate page contained the following warning in capital letters:

> Before making any investment in an emerging markets instrument, you should independently satisfy yourself that you understand and appreciate the significance of the relevant risks, and that such an investment is appropriate and suitable for you or your managed accounts in light of your objectives, experience, financial and operational resources, and other relevant circumstances. You should also ensure that you fully understand the nature of the transaction and contractual relationship into which you are entering and the nature and extent of your exposure to risk of loss, which may significantly exceed the

amount of any initial payment by or to you. The issuer assumes that the customer is aware of the risks and practices described herein, and that prior to each transaction the customer has determined that such transaction is suitable for him.

15. Immediately above the space provided for the client's signature there appeared the following:

[Client] confirms it has read and understood the terms of the Emerging Markets Risk Disclosure Statement as set out above.

16. Mr Pawani returned the FTCs and the Risk Disclosure Statement signed on behalf of Peekay under cover of a letter dated 7 February 1998 which, apart from the instructions to transfer various amounts from other accounts to that of Peekay, followed quite closely the draft provided by Mrs Balasubramaniam, save that he added at the end of the last line the words "as per the attached document." As a result the letter read as follows:

You will receive US$245,250/- from ANZ Investment Bank, Minerva House for credit to our above mentioned account. Please add all amounts in the call accounts of Harish Pawani &/or Preeti Pawani viz US$12,735.26, US$1,250/- and US$275/- and transfer the same to the call account of Peekay Intermark Limited. A total of US$250,000/- should be utilised to buy the Russian Hedged GKO Note as per the attached document.

The reference to the attached document can only have been a reference to the FTCs and Risk Disclosure Statement. In accordance with those instructions ANZ debited Peekay's account in order to fund a share in the GKO-linked deposit described in the FTCs.

17. Meanwhile, ANZ had also sent Peekay an undated document described as a "Contract Note" purporting to advise it that it had purchased on Peekay's behalf 250,000 units of stock in a US dollar GKO maturing on 14 October 1998 at a price of US$1 in respect of which its account had been debited in the sum of US$250,000 with a bargain date of 3 February and a settlement date of 9 February. It also referred to an exchange rate between sterling and US dollars, although the investment was denominated in dollars and was to be made from a dollar account. As a record of the transaction which Mr Pawani had been discussing with Mrs Balasubramaniam this document was about as inaccurate as it was possible to be. Nonetheless, Mr Pawani said in evidence that he regarded it as "entirely consistent with a contract that had already been entered into for the purchase of a holding of GKOs". The judge held that that was a reasonable interpretation of the document, but that is not a view with which I find it easy to agree.

18. For reasons that are unclear and probably do not matter, Mr Pawani was sent a second set of documents in exactly the same terms which he and a different employee of the company signed on behalf of Peekay and returned to the bank. However, it is not suggested that they affected the position and it is therefore unnecessary to refer to them any further. Some months later Mr Pawani received a Safe Custody Statement which purported to confirm a holding of "250,000 Oct. USD GKO 03/02/98 Maturity 14.10.98", reflecting the terms of the erroneous contract note. The document does not form the basis of any claim by Peekay against ANZ, however, and can therefore also be disregarded.

19. In August 1998 the Russian government announced a moratorium on certain of its debt obligations, including those arising under GKOs, and as a result GKO No 21110 to which Peekay's deposit was linked was not paid on its maturity date. The obligation was virtually worthless. ANZ implemented the default procedure set out in appendix 2 of the FTCs and as a result the amount recovered by Peekay on the maturity of its investment was US$5,918.06. It is not suggested that the default procedure was operated in any way improperly. The loss in that way of substantially the whole of its investment gave rise to a dispute between Peekay and ANZ which culminated in these proceedings.

20. The essential grounds of Peekay's claim are to be found in paras 9, 17 and 18 of its amended particulars of claim which read as follows:

9. On 1 or 2 February 1998 Mr Pawani was telephoned by Mrs Balasubramaniam and she informed him . . . that:

(a) the Bank had a product which was being marketed, a US$2 million Russian "hedged treasury bill note" known as a "Hedged GKO" ("the Note");

(b) the Note comprised a deposit structured note by which Russian roubles were hedged by a strong bank, the International Moscow Bank;

(c) the Note was short term, yielding 21.5 per cent and maturing in October 1998;

. . .

Mrs Balasubramaniam gave to Mr Pawani on behalf of Peekay Intermark a document entitled "High Yield Note linked to Russian GKO Bonds hedged into USD" [the Indicative Term Sheet].

. . .

17. By reason of the statements referred to in para 9 hereof [Mrs Balasubramaniam] represented to Mr Pawani on behalf of Peekay Intermark that the instrument sold by the Bank to

Peekay Intermark was a GKO Note, the terms of which were represented as aforesaid.

18. Peekay Intermark relied as aforesaid on the said representations in entering into the Transaction.

21. This was intended to reflect Mr Pawani's case that he had been led to expect that Peekay would obtain an interest in the GKO itself and that he would not have made the investment on its behalf if he had realised that it would obtain no interest in the underlying GKO because that would give it no room for manoeuvre if there were a default by the Russian government. However, I find it difficult to see how Mr Pawani could reasonably have drawn the conclusion that Peekay would obtain an interest in the GKO itself from the representations pleaded in para 9 and the Indicative Term Sheet.

22. The judge found that in the course of her various conversations with Mr Pawani on 1 and 2 February Mrs Balasubramaniam had misrepresented the nature of the investment that ANZ was offering its clients by giving him the impression that Peekay would obtain a proprietary interest of some kind in a GKO and that he had been induced by that misrepresentation to make the investment on its behalf. He therefore awarded Peekay damages in the amount of its loss under section 2(1) of the Misrepresentation Act 1967. It is against that decision that ANZ now appeals.

23. The starting point when considering any claim for misrepresentation must be to determine whether the defendant did in fact make the statement on which the claimant relies. In the present case the judge summarised at some length the parties' submissions and referred extensively to the evidence given by the principal witnesses, but in the end his findings on this point were quite limited. In para 84 of his judgment he said this:

[Mrs Balasubramaniam] knew that individual clients could not hold GKOs, and that they would have to be held by an institution. I am entirely satisfied that, based on what she had been told about the products, she understood that ANZ would be buying and holding GKOs on behalf of her clients, who would have the beneficial interest in the GKOs (a beneficial interest which she expected to be documented), and that the GKOs would have the benefit of a USD hedge. I accept her evidence that *she told Mr Pawani that he would have a GKO with a USD hedge, and that in the event of a sovereign default, he would end up holding roubles* (as the GPB Indicative Term Sheet indicated). That may have been a rough and ready way to describe the situation as she understood it, but it was understandable short-hand for ANZ holding a GKO on behalf of

clients who would have a beneficial interest therein. Mr Pawani realised that he would have only a pro rata share in a GKO, but reasonably understood from this that ANZ would acquire and hold the GKO on his behalf and that of the other investors, and that he and the other investors would have the right to determine what was to be done with the GKO in the event, for example, of sovereign default . . . (emphasis added).

24. It is apparent from that paragraph, and from the fact that the relevant conversations between Mr Pawani and Mrs Balasubramaniam all took place before the FTCs were sent to Peekay on 4 February, that her statement that Peekay "would have a GKO with a USD hedge, and that in the event of a sovereign default, [it] would end up holding roubles" was more in the nature of a description of the investment than a representation of fact of the kind that one normally associates with a claim for damages for misrepresentation. In para 86 the judge went on to find that the product Mr Pawani was actually offered was very different from that which Mrs Balasubramaniam had described, being a financial derivative in the form of a structured deposit which gave the depositor no interest in the underlying GKO and no say in how the investment was to be liquidated in the event of a sovereign default.

25. Despite the rather rough and ready way in which Mrs Balasubramaniam had described the investment product, the judge found that Mr Pawani reasonably understood from what she had told him that Peekay would be acquiring an interest in a GKO. The judge's finding that Mr Pawani did in fact obtain that understanding in the light of his conversations with Mrs Balasubramaniam is one with which in my view this court should be very slow to interfere since it reflects the judge's conclusion after hearing his evidence on the point. I do not think, however, that we need feel quite so constrained when it comes to the finding that Mr Pawani's understanding was reasonable. I say that because he was acknowledged to be an experienced investor and had been sent a copy of the Indicative Term Sheet relating to the proposed GKO-linked note in order to give him some understanding of the nature of the product that ANZ was intending to offer. If he had read that document, he would have seen that the investment was described as a note linked to GKO bonds, rather than a share in the bonds themselves. That ought at least to have raised in the mind of an experienced investor the question whether the investment he was being offered was a derivative, and, if it was not, why ANZ had bothered to send him the document at all. Moreover, the terms in which Mrs Balasubramaniam had described the investment to him, as found by the

judge, were scarcely such as to enable him to obtain a very clear understanding of the precise nature of the investment.

26. Two days later, however, Mr Pawani received by e-mail from Mrs Balasubramaniam the FTCs and accompanying Risk Disclosure Statement. In para 88 the judge made the following findings about what he did next:

> I am satisfied that Mr Pawani did no more than glance through the FTCs and the Risk Disclosure Statement. Having seen and heard Mr Pawani give evidence, I do not find this at all incredible, as ANZ suggested it was. Mr Pawani clearly placed great confidence in GPB as his private bankers, and he evidently had no prior cause to think that the FTCs would contain any nasty surprises. He did notice the heading to the FTCs, "USD Hedged Russian Treasury Bill", which he reasonably regarded as consistent with what he had been told about the product by [Mrs Balasubramaniam]. He did not, however, take in either the fact that the FTCs described a structured deposit, which gave investors no interest, whether legal or equitable, in the GKO defined therein as the Reference Obligation, or the settlement procedures applicable in the event of default. Mr Shah, the countersignatory, did no more than exactly what he was told to do by Mr Pawani, ie to initial and countersign the documents.

27. The judge made no findings about what Mr Pawani would have learnt from the FTCs if he had taken the trouble to read them, even cursorily, but in my view it is possible to conclude simply from the form of the document that a number of things would have been obvious to him. First, he would have seen that the investment to which it related, and in which Peekay was being invited to participate, was a deposit of some kind and, moreover, one described as a "Structured USD Hedged Russian Treasury Bill" deposit. Next he would have seen the amount of the total deposit (US$2,000,000). He could hardly fail to notice the use of the expression "Reference Credit", if only because that is the one place where there is a direct reference to a specific GKO. In my view these features would have been enough to alert him as an experienced investor to the fact that the documents related to an investment in a derivative and therefore something that was in his mind fundamentally different from what he had been expecting. If he had read on as far as appendix 2 in order to see what would happen in the event of a default (a matter in which he had professed a particular interest), he would have seen that the investor would obtain only the market value of the Reference Obligation at the time of default.

28. By the end of the trial it was common ground that a contract between Peekay and ANZ did not come into existence until the documents had been returned to the bank at the earliest, and probably not until the bank acted on the instructions contained in Peekay's letter of 7 February. In those circumstances Mr Pymont QC for ANZ submitted that whatever Mrs Balasubramaniam had said about the investment in the course of her earlier conversations with Mr Pawani, any misrepresentation as to the nature of the investment product was dispelled by the terms of the FTCs of which Mr Pawani, having signed the disclosure statement, must be taken to have been aware, whether he had actually read them or not. Accordingly, Peekay could no longer say that it had been induced to enter into the contract by any representations made in the course of the earlier conversations.

29. Mr Railton QC accepted that the effect of a false statement can be nullified if a correction is effectively brought to the attention of the person to whom it was made before he enters into the contract, but he submitted that that is essentially a question of fact to be decided on the evidence in each case. Indeed, he went so far as to submit that for this purpose nothing short of actual knowledge will suffice and that even though Mr Pawani's ignorance of the true position resulted from his own failure to read the FTCs, he was still influenced by the original misrepresentation and was entitled to rely on it as having induced him to enter into the contract. In support of that submission he referred us to two decisions of this court, *Assicurazioni Generali SpA v Arab Insurance Group* [2003] Lloyd's Rep IR 131 and *Flack v Pattinson* [2002] EWCA Civ 1762. He submitted that in the present case ANZ could not surmount the obstacle posed by the judge's findings that Mr Pawani did not have actual knowledge that what Mrs Balasubramaniam had told him was wrong and that her misrepresentation had in fact induced him to enter into the contract on behalf of Peekay.

30. The starting point when considering this question is *Redgrave v Hurd* (1881) 20 Ch D 1. In that case the plaintiff, a solicitor who was on the verge of retirement, was looking for a partner to buy his house and eventually take over his practice. The defendant expressed interest and at a meeting with the plaintiff was told that the business brought in £300 a year. In response to a request from the defendant for some information about the amount of business done over the previous three years the plaintiff produced some summaries which indicated business of not quite £200 a year and showed the defendant some papers which he said related to other business not included in the summaries. The defendant did not examine the papers, which in fact showed only a small amount of additional business.

LLOYD'S LAW REPORTS

Moore-Bick LJ]    **Peekay v Australia and New Zealand Banking Group**    [CA

The defendant signed an agreement to purchase the plaintiff's house and paid a deposit, but on finding that the business was worth much less than he had been led to believe refused to complete and resisted a claim for specific performance on the grounds of misrepresentation. At first instance the plaintiff succeeded on the grounds that, since the defendant had had an opportunity of ascertaining the true position and had made a brief and careless examination of the papers, he must be taken not to have relied on the misrepresentation.

31. That decision was reversed on appeal, however, on the grounds that where a person induces another to enter into a contract by misrepresentation it is no answer to say that the person to whom it was made had the means of discovering the truth. Sir George Jessel MR said at page 13:

If a man is induced to enter into a contract by a false representation it is not a sufficient answer to him to say, "If you had used due diligence you would have found out that the statement was untrue. You had the means afforded you of discovering its falsity, and did not choose to avail yourself of them." I take it to be a settled doctrine of equity, not only as regards specific performance but also as regards rescission, that this is not an answer unless there is such delay as constitutes a defence under the Statute of Limitations.

32. Later at pages 21–22 he said:

. . . when a person makes a material representation to another to induce him to enter into a contract, and the other enters into that contract, it is not sufficient to say that the party to whom the representation is made does not prove that he entered into the contract, relying upon the representation. If it is a material representation calculated to induce him to enter into the contract, it is an inference of law that he was induced by the representation to enter into it, and in order to take away his title to be relieved from the contract on the ground that the representation was untrue, it must be shewn either that he had knowledge of the facts contrary to the representation, or that he stated in terms, or shewed clearly by his conduct, that he did not rely on the representation . . . Where you have neither evidence that he knew facts to shew that the statement was untrue, or that he said or did anything to shew that he did not actually rely upon the statement, the inference remains that he did so rely, and the statement being a material statement, its being untrue is a sufficient ground for rescinding the contract.

33. The explanation given by Baggallay LJ for the rule was that a person who makes a statement intending it to be relied on cannot complain if it is relied on. He said at page 23:

The person who has made the misrepresentation cannot be heard to say to the party to whom he has made that representation, "You chose to believe me when you might have doubted me, and gone further." The representation once made relieves the party from an investigation, even if the opportunity is afforded. I do not mean to say that there may not be certain circumstances of suspicion, which might put a person upon inquiry, and make it his duty to inquire, but under ordinary circumstances, the mere fact that he does not avail himself of the opportunity of testing the accuracy of the representation made to him will not enable the opposing party to succeed on that ground.

34. In *Assicurazioni Generali SpA v Arab Insurance Group* the defendant, ("ARIG"), sought to avoid a contract of reinsurance in the form of a retrocession on the grounds of misrepresentation as to the participation of a certain company, Munich Re, in the underlying reinsurance. The contract was part of a facility being arranged by the broker Alexander Howden which comprised an original insurance, reinsurance and retrocession. In the course of placing the retrocession the broker had sent a fax to ARIG inviting its participation attached to which was a series of documents including a draft slip setting out the terms of the original cover, section A of which related to property insurance and section B to liability insurance. ARIG's underwriter spoke to the broker by telephone about a fortnight later to discuss the proposal and in the course of that conversation gained the impression that Munich Re had a 35 per cent participation in both sections of the underlying reinsurance. On that basis he sent a fax a week later indicating ARIG's willingness to participate in a retrocession from Generali.

35. Ten days later the broker sent ARIG the retrocession slips for signature together with copies of both the underlying reinsurance and direct placing slips. A careful examination of those documents would have revealed that Munich Re did not participate in section B of the reinsurance at all. However, ARIG's underwriter did not notice that and in due course he signed the slips and copies of the reinsurance and direct placing slips all of which he returned by fax to the broker. ARIG subsequently sought to avoid the retrocession on the grounds that it had been induced to enter into the contract by the broker's misrepresentation that Munich Re participated in both sections of the reinsurance. Generali argued that the position had been made clear by the reinsurance slip that had been sent to ARIG when it was sent the retrocession slip for signature.

36. Clarke LJ summarised the law in relation to the correction of a misrepresentation in the following way:

> 63. Where the insured or reinsured corrects the misrepresentation or discloses the material fact before the insurer or reinsurer enters into the contract, the latter will not be entitled to avoid the contract for misrepresentation or non-disclosure. In such circumstances it may be said that there was no longer any or any material misrepresentation or non-disclosure or it may be said that there was no inducement. Perhaps it does not matter.

> 64. The correction must be fairly made to the insurer or reinsurer such that the corrected picture is fairly presented on behalf of the insured or reinsured and comes to the knowledge of the insurer or reinsurer. It is not sufficient to say that he would have discovered the true position if he had acted with all due care: see eg *Chitty on Contracts*, 28th edn, vol 1, para 6-036 and *Redgrave v Hurd* (1881) 20 Ch D 1. As I see it, it will in each case be a question of fact whether the misrepresentation was corrected so as to ensure that the corrected facts came to the knowledge of the insurer or reinsurer or whether, when the contract was made, the insurer or reinsurer was induced to make it by the original material misrepresentation or non-disclosure.

37. Having found that in the course of his telephone conversation with ARIG's underwriter the broker had misrepresented the participation of Munich Re in section B of the cover, Clarke LJ then considered whether that false information had been effectively corrected by the documents attached to the fax sent to ARIG covering the transmission of the retrocession slips. He held that, having once made a misrepresentation, it was incumbent on Generali or its broker expressly to bring the true position to the attention of ARIG and that the mere inclusion of the reinsurance slip was insufficient for that purpose. Accordingly, since ARIG was not in fact aware of the true position, it was induced to enter into the contract by the original misrepresentation.

38. *Flack v Pattinson* concerned the sale of an historic racing car. The claimant, Mr Flack, was a motor sport enthusiast who enjoyed competing in races for such cars. He became interested in buying a 2.5 litre Lotus 16 belonging to the defendant, Mr Pattinson, which he was given to understand had been driven in Formula 1 competitions in the late 1950s by a well-known racing driver of the time, Innes Ireland. Mr Flack had seen the car when it was in a workshop where his own car was undergoing repairs and when he learnt that it might be for sale he expressed interest in it. He was shown its authentication documents, one of which showed that the car had raced in Formula 2 events, but did not look at them closely. Sometime afterwards another dealer in historic cars, whom Mr Flack was visiting for the purposes of inspecting another car which he was interested in purchasing, warned him that the Lotus was well known to be a Formula 2 car.

39. Despite that warning, Mr Flack decided to pursue the Lotus and to judge the matter for himself. He eventually bought it. The judge found that during the negotiations leading to the sale Mr Pattinson had told him that the car was "Innes Ireland's 2.5 [litre] Grand Prix car". In fact the car had never been raced with a 2.5 litre engine; it was Innes Ireland's 1.5 litre Grand Prix car and would probably not have qualified for historic Grand Prix events while fitted with a 2.5 litre engine. One of the issues between the parties was whether Mr Pattinson had induced Mr Flack to enter into the contract by misrepresenting the true history and background of the vehicle. The judge found that Mr Flack did, as a matter of fact, rely on Mr Pattinson's statements, notwithstanding that he had been put on notice that they might not be correct, and his finding was upheld by this court.

40. It can certainly be said that these decisions support the conclusion that whether a person has been induced by misrepresentation to enter into a contract is a question of fact. As such is it always open to the defendant to show, if he can, that since the claimant was aware of the true facts, he was not induced by the misrepresentation to act as he did. For that purpose, however, it is not enough to show that the claimant *could have* discovered the truth, but that he *did* discover it. This seems to me to be the explanation of the decisions in all three of the cases to which I have referred. However, none of those cases concerned a misrepresentation which was "corrected" (if that is the right expression) by the express terms of the very contract to which the claimant put his signature. Mr Railton submitted that that was the case in *Assicurazioni Generali v Arab Insurance Group*, but it is not clear that the contract in that case incorporated the terms of the underlying slips and the court clearly approached the question simply on the basis that they contained the correct information.

41. In this context it is necessary to mention the Irish case of *Phelps v White* (1881) 7 LR Ir 160 on which Mr Railton placed some reliance. The plaintiff brought an action for damages arising out of the purchase of an estate. Prior to the purchase the vendor had provided him with a rental which showed that the timber on a part of the estate covered by a fee-farm grant in favour of a third party was reserved to the vendor. The contract provided that any material error in the rental given

MOORE-BICK LJ]        **Peekay v Australia and New Zealand Banking Group**        [CA

to the purchaser should not annul the sale but that compensation should be made in respect of it. In fact, although the timber had originally been reserved to the vendor in perpetuity, it had subsequently been granted to the lessee under the lease which had later been converted into the fee-farm grant. The vendor therefore had no title to it. The abstract of title and the copies of the deeds delivered with it disclosed the grant of the timber, but it was not noticed by the purchaser or his advisers and was discovered only after he had paid the purchase money and taken possession. In an action against the vendor the purchaser was held entitled to recover compensation for the value of the timber, both under the terms of the contract and as damages for misrepresentation.

42. The vendor appears to have argued that, since the mistake could have been discovered from the documents provided to the purchaser before completion, by executing the conveyance the purchaser confirmed the accuracy of the rental which had been provided to him and therefore could not recover damages for misrepresentation. The court was satisfied that the mistake had been committed through inadvertence and without any intention to deceive. Nonetheless, since the statement in the rental was known by the vendor and those advising him to be false, it was regarded as fraudulent and in those circumstances it is hardly surprising that a claim for damages should have succeeded. In my view this case does not provide any additional assistance.

43. One of the factors that distinguishes the present case from those to which I have referred so far is that the true position appeared clearly from the terms of the very contract which the claimant says it was induced to enter into by the misrepresentation. Moreover, it was not buried in a mass of small print but appeared on the face of the documents as part of the description of the investment product to which the contract related. It was accepted that a person who signs a document knowing that it is intended to have legal effect is generally bound by its terms, whether he has actually read them or not. The classic example of this is to be found in *L'Estrange v Graucob* [1934] 2 KB 394. It is an important principle of English law which underpins the whole of commercial life; any erosion of it would have serious repercussions far beyond the business community. Nonetheless, it is a rule which is concerned with the content of the agreement rather than its validity. Accordingly, as both Scrutton LJ and Maugham LJ recognised in that case, the contract may be rescinded if one party has been induced to enter into it by fraud or misrepresentation.

44. From time-to-time one party to a contract misrepresents to the other the content or effect of

the document which is intended to embody their agreement. In such cases it has been held that the party making the misrepresentation is prevented from enforcing the contract in accordance with its terms. An example is to be found in the well-known case of *Curtis v The Chemical Cleaning and Dyeing Co Ltd* [1951] 1 KB 805 in which the defendant was prevented from relying on a general exemption clause on the back of the cleaning ticket after its shop assistant had induced the customer to sign it by telling her that it excluded liability only for damage to beads or sequins. The principle was applied by Woolf LJ in *Lloyds Bank plc v Waterhouse* [1993] 2 FLR 97 in which the defendant was induced to sign a guarantee of a loan to his son by the bank's misrepresentation of its scope and content. He held that the bank was unable to enforce the guarantee in accordance with its terms.

45. In the course of her discussions with Mr Pawani, Mrs Balasubramaniam had innocently described the investment being offered by ANZ in a way that was inconsistent with its true nature, but she did not discuss the FTCs with him and said nothing to him about their meaning or effect or about the investment they actually described. In those circumstances it is necessary to consider whether what she said amounted to a misrepresentation of any kind; if it did, whether the FTCs described the investment in sufficiently clear terms to make Mr Pawani aware of the true nature of what Peekay was being offered, had he troubled to read them; and, if they did, whether he was induced to enter into the contract by what Mrs Balasubramaniam had previously said to him.

46. Peekay's pleaded case was that Mrs Balasubramaniam had told Mr Pawani that the instrument sold to Peekay was a note of the kind described in the Indicative Term Sheet: see para 17 of the amended particulars of claim quoted earlier. However, it is obvious that all she can have given him at the time was a description of the investment that the bank was proposing to offer him. The judge found that Mrs Balasubramaniam gave Mr Pawani to understand that if Peekay participated in the investment it would obtain an interest in a GKO. That is not the same thing by any means, but it is at least nearer the mark. An assurance of that kind about the consequences of a particular course of action might well give rise to a collateral contract, but it is not on the face of it a representation of the kind that will support a claim under section 2(1) of the Misrepresentation Act which must normally be a representation of fact: see *Chitty on Contracts*, 29th edn, para 6-004. Nonetheless, even if it was not said expressly, I would accept that Mrs Balasubramaniam's description carried with it the implicit representation that the GKO-related investment developed by ANZ was one which was structured

LLOYD'S LAW REPORTS

in a way that gave the investor a proprietary interest of some kind in the GKO, albeit an indirect one. So although the case was not pleaded in quite that way, I would accept that she did make a representation of a kind which was capable of supporting a claim under the Act.

47. In my view, however, the terms of the FTCs were sufficient to make it clear to Mr Pawani, if he had read them, that the nature of the investment was fundamentally different from that which he had been given to understand. It is almost as if Mrs Balasubramaniam had told him that ANZ was able to offer its customers apples but the offer document, when it later came, described the goods in a way that made it clear that it was really offering oranges. It is not said, however, that Mrs Balasubramaniam or anyone else on behalf of the bank told Mr Pawani that he need not bother to read the documents; nor did she or anyone else seek to explain their effect to him. For all he knew, the wrong documents had been sent to him by mistake. In these circumstances it is necessary to ask what really induced Mr Pawani to take up the investment they described.

48. The judge dealt with the issue of inducement in para 92 of his judgment where he said this:

I am satisfied that Mr Pawani was in fact induced to invest US$250,000 in the name of Peekay by Mrs B's misrepresentation as to the nature of the product. I accept his evidence that he would not have made the investment if he had known the true position, namely that Peekay would have no interest whatsoever in any GKO, which would merely be the Reference Obligation for the purpose of a derivative product, and no control over what was to happen in the event of a default in relation to that Reference Obligation. The element of control was important to Mr Pawani, and he would, for example, have wanted at least the opportunity to participate in any restructuring option in the event of sovereign default . . . Although he realised that he would be one of several investors with an interest (so he thought) in the GKO, and had given no thought to how, in the event of a default, the position would be resolved between the participating investors, he would at least have had some control: the liquidation of the investment would not have been entirely out of his hands, as was in fact the case.

49. Mr Railton submitted that the judge's finding that Mr Pawani was in fact induced to make the investment by Mrs Balasubramaniam's misrepresentation is one with which this court should be very slow to interfere, as with any finding of fact made by a trial judge on the basis of the witness evidence. In *Assicurazioni Generali v Arab Insur-*

*ance Group* this court considered, not for the first time, the approach which it ought to adopt to findings of fact made by the trial judge. As Clarke LJ pointed out, these may be based on evidence given by witnesses, whether orally or in documentary form, or on documents, or on a combination of the two. The weight to be given to any particular finding made by the judge will depend on the extent to which he had an advantage over the appellate court, which will itself depend to a considerable extent on the nature of the evidence on which that finding was based.

50. Before considering the basis of the judge's finding that Mr Pawani was induced to invest in the GKO-linked deposit on behalf of Peekay by a misrepresentation on the part of Mrs Balasubramaniam it is necessary to consider some of his other findings. These can be summarised as follows. Mr Pawani was told that Peekay would be offered the chance, if it so wished, to participate in an investment that would give it an interest in a GKO with the benefit of a currency hedge. He therefore expected to receive documents relating to an investment of that kind. What he was actually sent were documents inviting him to participate on behalf of Peekay in a fundamentally different kind of investment. He signed them without bothering to read them, not because he had received any assurance from Mrs Balasubramaniam or anyone else that they were the correct documents or that they described an investment of the kind he had been led to expect — that has never been part of Peekay's case — but simply because he assumed that to be the case. He then returned them to ANZ under cover of a letter which indicated that it was Peekay's wish to participate in the investment described in them.

51. In that context it can be seen that the judge's finding that Mr Pawani was induced to enter into the contract by the statements previously made by Mrs Balasubramaniam is in fact a conclusion based partly on his finding of what she had told him about the investment product and partly on his finding that Mr Pawani did not read the documents that were sent to him a few days later and so did not realise that the nature of the investment he was being offered was different from that which he expected. Those are all findings of primary fact based on the evidence of the witnesses and as such are findings with which this court should not in my view interfere, but the conclusion that Mr Pawani was induced to sign the documents by what Mrs Balasubramaniam had previously told him is a secondary finding reached by drawing an inference from the primary facts and as such I think we have greater freedom to review it.

52. In my view the judge's conclusion cannot be sustained. In para 89 of his judgment he recognised

MOORE-BICK LJ]          **Peekay v Australia and New Zealand Banking Group**          [CA

that Mr Pawani was taking the risk that the FTCs contained subsidiary or ancillary terms that were not to his liking, but he went on to hold in para 90 that his signature of the documents did not nullify Mrs Balasubramaniam's earlier misrepresentation because he had no reason to think that they would relate to a fundamentally different product. In my view that is where he went wrong. By finding that Mr Pawani had acted on the assumption that his attention would have been drawn to any material discrepancy between the FTCs and the investment previously described to him the judge put his finger on the real explanation for what occurred. Unfortunately, he did not follow the reasoning through to its logical conclusion. No doubt Mr Pawani had been led to expect documents relating to an investment of a certain kind, but he was aware that the FTCs contained the only formal description he would receive of the investment in which Peekay was being invited to participate. The description he had been given by Mrs Balasubramaniam was at best informal and, as the judge found, "rough and ready". The FTCs were the first and only opportunity he was given to satisfy himself that the nature of the investment and the terms relating to it were consistent with the broad description she had given him and that it was satisfactory to him in all other respects. He may not have been expecting the documents to contain any nasty surprises, but only by reading them could he satisfy himself that the product was what he had been led to expect. In those circumstances the only conclusion open to the judge in my view was that Mr Pawani was induced to sign the documents and enter into the contract not by what Mrs Balasubramaniam had told him, but by his own assumption that the investment product to which they related corresponded to the description he had previously been given.

53. For these reasons I have reached the conclusion that the appeal should be allowed.

54. In the course of the hearing of the appeal Mr Pymont applied for permission to amend ANZ's notice of appeal to raise an alternative argument to the effect that Peekay was estopped by its signature of the Risk Disclosure Statement from alleging that it had been induced to enter into the contract by misrepresentation on the part of Mrs Balasubramaniam. In view of the conclusion to which I have come on the primary ground of appeal it is unnecessary to decide this question, but since it was fully argued I propose to express my views on it as briefly as I can.

55. The argument was based on the following two passages in the Risk Disclosure Statement:

> You should also ensure that you fully understand the nature of the transaction and con-

tractual relationship into which you are entering.

and

> The issuer assumes that the customer is aware of the risks and practices described herein, and that prior to each transaction the customer has determined that such transaction is suitable for him.

which Mr Pawani on behalf of Peekay confirmed by his signature that he had read and understood. Mr Pymont submitted that as a result of having done so Mr Pawani and Peekay were estopped from asserting that they had not understood the nature and effect of the FTCs and so could not maintain that they had been induced by misrepresentation to enter into the contract.

56. There is no reason in principle why parties to a contract should not agree that a certain state of affairs should form the basis for the transaction, whether it be the case or not. For example, it may be desirable to settle a disagreement as to an existing state of affairs in order to establish a clear basis for the contract itself and its subsequent performance. Where parties express an agreement of that kind in a contractual document neither can subsequently deny the existence of the facts and matters upon which they have agreed, at least so far as concerns those aspects of their relationship to which the agreement was directed. The contract itself gives rise to an estoppel: see *Colchester Borough Council v Smith* [1991] Ch 448, affirmed on appeal [1992] Ch 421.

57. It is common to include in certain kinds of contracts an express acknowledgment by each of the parties that they have not been induced to enter the contract by any representations other than those contained in the contract itself. The effectiveness of a clause of that kind may be challenged on the grounds that the contract as a whole, including the clause in question, can be avoided if in fact one or other party was induced to enter into it by misrepresentation. However, I can see no reason in principle why it should not be possible for parties to an agreement to give up any right to assert that they were induced to enter into it by misrepresentation, provided that they make their intention clear, or why a clause of that kind, if properly drafted, should not give rise to a contractual estoppel of the kind recognised in *Colchester Borough Council v Smith*. However, that particular question does not arise in this case. A clause of that kind may (depending on its terms) also be capable of giving rise to an estoppel by representation if the necessary elements can be established: see *E A Grimstead & Son Ltd v McGarrigan* (CA) 27 October 1999, unreported.

58. Insofar as the argument in this case turns on the true construction and effect of the contractual documents (including the Risk Disclosure Statement) and is one to which no further findings of fact might have been relevant, ANZ should, in my view, be allowed to advance it. I would therefore grant the bank permission to amend its notice of appeal to raise the issue of contractual estoppel, but I would not allow it at this stage to contend that there was an estoppel by representation since the judge was not asked to consider that question and did not make findings in relation to it. The question then is whether, in the light of Mr Pawani's signature of the declaration at the foot of the Risk Disclosure Statement, Peekay is precluded as a matter of contract from contending that it did not understand the true nature of the investment.

59. The judge held in para 93 of his judgment that the advice to investors in the Risk Disclosure Statement provided no answer to the claim for misrepresentation. He did not explain in terms why he took that view, but I think he must have considered that because it was couched in general terms and did not provide any specific information about the investment being offered to Peekay, it could not dispel any misunderstanding Mr Pawani had obtained from his conversations with Mrs Balasubramaniam. However, it does not appear that he was asked to consider the contractual effect of the documents or the particular argument advanced before us. He also considered that Mr Pawani's letter giving instructions to the bank to make the investment on behalf of Peekay should have made it clear to the bank that he was still under a misapprehension as to its nature. That I find rather difficult to understand since, as far as I can see, there is nothing in that letter to indicate that Mr Pawani's understanding of the investment differed in any way from the description set out in the FTCs to which the letter itself referred.

60. The purpose of the Risk Disclosure Statement was both to draw to the attention of the investor the need for caution when investing in emerging markets and to make it clear that ANZ was only willing to enter into a contract with him on the assumption that he had satisfied himself that the transaction was suitable for him. By confirming that he had read and understood the statement and returning it with his instructions to make the investment Mr Pawani offered to enter into a contract with ANZ on behalf of Peekay on those terms and that offer was accepted by the bank when it implemented his instructions. As a result it was part of the contract between them that Peekay was aware of the nature of the investment it was seeking to purchase and had satisfied that it was suitable for its needs. In those circumstances, and since it is not suggested that the bank misrepresented to Mr

Pawani the effect of the documents, I do not think that it is open to Peekay to say that it did not understand the nature of the transaction described in the FTCs; and if that is so, it cannot assert that it was induced to enter into the contract by a misunderstanding of the nature of the investment derived from what Mrs Balasubramaniam had said about the product some days earlier.

61. For these reasons too I would allow the appeal.

**Mr Justice LAWRENCE COLLINS:**

62. I agree.

**Lord Justice CHADWICK:**

63. I agree that this appeal must be allowed for the reasons which Moore-Bick LJ has given. It is only because we have reached a conclusion which differs from that reached by the deputy judge that I add a short judgment of my own.

64. Moore-Bick LJ has set out the facts fully in his judgment. As he has pointed out (at para 16) the investment instructions given by Mr Pawani on behalf of Peekay Intermark Ltd are found in a letter dated 7 February 1998: "A total of US$250,000/- should be utilised to buy the Russian Hedged GKO Note *as per the attached document.*" The words which I have emphasised were added to the draft instruction letter prepared on behalf of ANZ by Mrs Balasubramaniam. The "attached document", in that context, was the "final terms and conditions" ("FTCs") and the "Emerging Markets Risk Disclosure Statement", copies of which (signed by Mr Pawani on behalf of Peekay) were returned to Mrs Balasubramaniam with the investment instructions. In those circumstances it is beyond argument that the terms upon which Peekay intended to invest incorporated the FTCs and the Risk Disclosure Statement.

65. The deputy judge held, at para 92 of his judgment, that Peekay was induced to invest "by Mrs B's misrepresentation as to the nature of the product". Although, at first sight, that might appear to be a finding of primary fact with which an appellate court should be reluctant to interfere, closer analysis shows that the finding turns upon an inference of secondary fact. This court can properly be invited to consider whether, in the absence of direct evidence, that was an inference which the judge was entitled to draw.

66. It is important to keep in mind that Mrs Balasubramaniam made no representation as to the actual contents of the FTCs. She had not seen those documents at the time of her telephone conversations with Mr Pawani on 1 and 2 February 1998. The effect of those conversations, as the judge found, was that Mr Pawani was given a "rough and ready" description of the product that he would be offered. But it could not be said that Mr Pawani —

an experienced investor in emerging markets — was under any misapprehension, following the telephone conversations, as to the need for a definitive and detailed description of the financial instrument to be employed (the "product"); nor that he would have made an investment decision on behalf of Peekay if he had not received documents which he understood to contain the definitive and detailed description which he needed. And the judge made no finding to the contrary.

67. The judge found that Mr Pawani did no more than glance at the FTCs and the Risk Disclosure Statement. On the basis of that finding, the judge must be taken to have accepted that Peekay entered into the investment contract in the knowledge that the terms of that contract were to be found in those documents, but without knowing what those terms were. In holding that Peekay was induced to invest by Mrs Balasubramaniam's misrepresentation as to the nature of the product the judge inferred that Mr Pawani was entitled to, and did, assume that the terms which (as Mr Pawani knew) were to be found in the documents would not differ materially from the "rough and ready" description which Mrs Balasubramaniam had given him a few days earlier. As he put it at para 88 of his judgment: "Mr Pawani . . . evidently had no prior cause to think that the FTCs would contain any nasty surprises."

68. I am satisfied that that inference was not open to the judge. There are three reasons which lead me to that conclusion. First, given the importance which Mr Pawani professed to place on the potential for exerting influence, as an investor, on the means by which the underlying investment was liquidated or realised in the event of sovereign default in payment of the Note or of default by the counter-party to the currency hedge, it was necessary for him to give careful consideration to the FTCs. It was in those documents — and not in the "rough and ready" description which he had been given by Mrs Balasubramaniam — that he would

find the provisions that would apply in the event of default. He could not say that he was entitled to or did assume that the documents were a formality.

69. Second, it is clear that Mr Pawani himself regarded the documents which he had signed and returned as important. It was he who had added the words "as per the attached document" to Mrs Balasubramaniam's draft letter of instructions. The judge made no finding as to why Mr Pawani thought it necessary to add those words if he attached no importance to the documents. But, as it seems to me, the reason is obvious. Mr Pawani was not content to rely upon Mrs Balasubramaniam's "rough and ready" description of the product. He was concerned to make it clear that Peekay was investing on the terms of the documents which he had signed.

70. Third, Peekay could not be heard to say (through Mr Pawani) that it had thought it unnecessary to read and understand the FTCs. The Risk Disclosure Statement was a contractual document — as Mr Pawani recognised when he returned it, signed, with the letter of 7 February 1998. ANZ accepted the investment instructions in that letter on the basis of the investor's confirmation that it had read and understood the terms of the statement. That confirmation, as it seems to me, operates as a contractual estoppel to prevent Peekay from asserting in litigation that it had not, in fact read and understood the Risk Disclosure Statement. And, if it had read and understood the Risk Disclosure Statement, it must be taken to have accepted that ANZ would assume that it fully understood the nature of the transaction into which it was entering, was aware of the risks, and had determined that the transaction was suitable for its purposes. Given that, Peekay could not be heard to say that Mr Pawani had assumed that the FTCs which he had signed on its behalf did not need to be read and understood.

LC/23

**701**

A    **Cassa di Risparmio della Repubblica di San Marino SpA v Barclays Bank Ltd.**
[2011] EWHC 484 (Comm)

Queen's Bench Division (Commercial Court).

B    Hamblen J.
Judgment delivered 9 March 2011.

C

D

*Banking – Derivatives – Misrepresentation – Deceit – Structured notes containing collateralised debt obligations (CDOs) referenced to pool or portfolio of credit default swaps – Notes described as CDO2s because CDO reference assets included further CDOs – Notes had AAA rating – Whether claimant San Marino bank induced by misrepresentation to buy and agree to subsequent restructuring – Alleged representations that CDO2s had very low risk of default not made – Restructuring representations not made – Defendant's employees had no intention to mislead – Claimant contractually estopped by defendant's terms from asserting that it was induced to enter into contract by misunderstanding of nature of risks of purchasing notes – Misrepresentation Act 1967, s. 2(1).*

E

**This was a claim by a San Marino bank (CRSM) that it was induced to buy four sets of structured notes from the defendant (Barclays), and to agree to the subsequent restructuring of the notes, by misrepresentations which in each case were fraudulent, or which in any event Barclays did not believe or have reasonable grounds to believe were true.**

F

**The notes constructed by Barclays and sold to CRSM had embedded within them credit derivatives known as collateralised debt obligations (CDOs) which gave exposure to the credit risk of a pool of 'reference assets' through a portfolio credit default swap. In this case the reference assets themselves included further CDOs, each of which was in turn referenced to another pool or portfolio of some 50 credit default swaps, hence the description 'CDO squared' or 'CDO$^2$'.**

G

H

**The CDO$^2$s had terms of five to seven and a half years. At the start of the period CRSM paid the principal amount of each note to Barclays, on which CRSM then received a coupon (generally Euribor + 0.95%). It was CRSM's intention to hold the notes until maturity. In the circumstances the key risk for CRSM was the 'credit risk' or risk of default of the CDO$^2$s, if a sufficient number and combination of 'credit events' (e.g. insolvency or default on a debt) occurred in relation to entities named in the portfolios underlying the CDO$^2$s.**

**In early 2005 CRSM started to become concerned that some of the companies whose names had been included in the portfolios underlying the CDO$^2$s were experiencing financial difficulties and that the credit risk of the instruments might therefore be higher than it had previously thought. Barclays responded**

to CRSM's concerns by recommending to CRSM a restructuring of the $CDO^2$s. That took the form of substitutions of some of the entities referenced in the portfolios and other structural changes to the $CDO^2$s, which Barclays allegedly represented would be beneficial to CRSM in risk terms.

CRSM's case was that in selling the $CDO^2$ notes to it Barclays impliedly represented that the notes had (and by implication that Barclays believed and expected them to have) a very low risk of default. That representation was made with the knowledge that it was likely to be relied on by CRSM, and CRSM did rely on it in agreeing to buy the notes. CRSM contended that those representations were made by describing the notes to CRSM as 'AAA' in fact sheets, which preceded the sales, and other communications, and by other statements made in the fact sheets.

CRSM contended that, whereas an AAA rating signified a default risk over a five year period which was close to zero, Barclays' own internal 'Expected Loss' (EL) financial modelling indicated that at their dates of issue the $CDO^2$s had a probability of default over their lives of around 30% (equivalent to single 'B' or 'junk'). The result was that the value of the investments at inception was allegedly some €50m less than CRSM paid for them. It was CSRM's case that the AAA ratings of the $CDO^2$s was misleading because it was based on the historical default rate of all assets within each relevant rating band, whereas Barclays had put into the CDO portfolios assets with probabilities of default significantly higher than the average for their ratings and the leveraged and tranched structure of the $CDO^2$s magnified the effect of that arbitrage strategy.

Barclays' case was that it was inherent in putting together a $CSO^2$ structure that the inner CSO portfolios would be populated by reference names with high credit spreads relative to the coupon being paid on any AAA-rated $CSO^2$ tranche. Repackaging portfolios of higher-yielding, lower-rated credits into a lower-yielding, higher-rated structure was the whole purpose of the exercise. Further, the practice of favouring higher-spread names in populating the inner CSO reference portfolios, so long as the $CSO^2$ tranche still attained any target rating(s), was practised not just by Barclays but by other structurers in the field. It was the basis of the CDO business.

CRSM's case in relation to the restructuring was that its the effect was, and was known and intended by Barclays at the time to be, the opposite of what was represented, and that it significantly increased the risk to which CRSM was exposed – thereby reducing the value of CRSM's investments – and enabling Barclays to extract further profits.

Barclays had subsequently agreed to repurchase from CRSM two of the three $CDO^2$s embedded in the notes. The third $CDO^2$ had lost its entire value. CRSM claimed damages of some €92 million for deceit, alternatively under s. 2(1) of

A    **the Misrepresentation Act 1967, alternatively for breach of an implied term of the contract.**

B    **Barclays denied liability on all of the claims and rejected any suggestion of fraud or dishonest dealing on its part. It contended that all the claims were unfounded on the facts, for multiple reasons. It further submitted that the claims (other than for fraud) were defeated, as a matter of contract, by the terms of the purchase and restructuring transactions agreed between the parties; that the claims were defeated because the extensive pre-contract disclaimers removed any factual foundation for the claims; and that there was no basis for the alleged implied term.**

C    *Held*, **dismissing CRSM's claims:**

D

E

F

G    **1. No representations were made by Barclays when the notes were purchased to the effect that they had a very low risk of default. It was inherently unlikely that a bank in the position of Barclays would make a generalised statement in relation to default risk, whether by way of opinion, estimation, expectation or belief. CRSM knew from its general experience, and its earlier trade with Barclays, that banks in Barclays' position presented information and transacted on the basis of wide ranging disclaimers, the general effect of which was that it was for the investor to make its own assessment of the risks involved. The reference to AAA in the fact sheets was as part of the description of the characteristics which the notes were expected and required to have. If there was any risk about which one would expect the investor to have to make up his own mind it was the default risk. The qualifications and disclaimers in the fact sheets made it plain that CRSM was to be responsible for its own independent appraisal of the risks in respect of the notes and could not rely on Barclays in connection with the matters referred to. On CRSM's own evidence, it relied upon the AAA rating, not what Barclays had said or was understood to have impliedly said. If any representations were made as alleged they involved no representation of fact. Default risk was not a matter of fact; it was a matter of estimation. If any representation was made it was one of opinion and/or expectation and/or belief. If it was a representation of opinion it was made on reasonable grounds. If any representation was made that the notes would have a very low risk of default, it was true.**

H    **2. No representation was made that Barclays would be no worse off or would not profit from the restructuring. Even if such a representation had been made it was not continuing and/or it would not have been reasonable to rely on it by the time the restructuring was concluded.**

**3. An implied probability of default derived from EL figures taken from the output of a pricing model such as that used by Barclays did not provide a reliable measure of the real world probability of default, and that was a reasonable view for banks such as Barclays to take at the time.**

**704**                    **Cassa di Risparmio v Barclays Bank**                    **[2011] 1 CLC**

A

**4. CRSM failed to make out its case of fraud against Barclays' employees in respect of the purchase representations. They did not understand that they or Barclays were representing that the notes had a very low risk of default, or that that was their or Barclays' belief or expectation. If such a representation had been made, and been understood to have been made, they would have considered it to be true. They had no intention to mislead CRSM. If the alleged representations were made they were made with reasonable grounds for belief in their truth.**

B

**5. CRSM failed to prove any fraudulent misrepresentation that Barclays would not make any profit from the restructuring, or any other misrepresentation in respect of the restructuring. There was no intention to mislead. CRSM's case rested on proof of deception. If negligence was in issue there were reasonable grounds to believe in the truth of any representation that could be understood actually to have been made.**

C

**6. CRSM had not shown that it relied on the purchase representations, if made, in any conclusion that the CSO$^2$ notes had a very low risk of default, or that the decision to invest in the notes was made upon the basis of any such conclusion. However, it had shown that it relied on one of the alleged restructuring representations.**

D

**7. Clause 5 of the purchase contracts sought to prevent reliance in the context of investment advice and recommendations. The purchase representation involved a statement relating to the risks of the investment. It did not purport to advise or recommend what CRSM should do in the light of that statement nor did CRSM seek to so rely upon it. The restructuring representations related to the criteria to be applied in carrying out the restructuring. Similarly they did not purport to advise or recommend what CRSM should do in the light thereof nor did CRSM seek to so rely upon them. Therefore the claim made did not involve reliance upon communications as advice or recommendations within clause 5.**

E

F

**8. Clause 6 of the contracts did give rise to a contractual estoppel in respect of the purchase representation claim since that involved a representation as to the risks of purchasing the notes and the effect of clause 6 was that it was the agreed basis of each purchase transaction that CRSM was capable of assessing the merits of and understanding the risks of concluding the contract, and purchasing the notes, in question, and in fact understood, accepted and assumed those risks. However, no contractual estoppel arose in respect of the restructuring representation claims under clause 6 (or its equivalent in the restructuring contract) because those representations did not relate to the risks of entering the restructuring transaction but to the criteria to be applied in carrying out the restructuring.**

G

H

A    **9. CRSM failed to show that a term was to be implied into the purchase contracts to the effect that, in structuring the CDO$^2$ incorporated in the relevant note, Barclays would not do so with the deliberate intention that its risk of default would be materially different from that indicated by its anticipated AAA rating.**

B    The following cases were referred to in the judgment:

*AIC Ltd v ITS Testing Services (UK) Ltd (The Kriti Palm)* [2007] 2 CLC 223.
*Armstrong v Strain* [1951] 1 TLR 856; [1952] 1 KB 232 (CA).
*Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988.

C    *Avon Insurance plc v Swire Fraser Ltd* [2000] CLC 665; [2000] 1 All ER (Comm) 573.
*Barton v Armstrong* [1976] AC 104.
*Barton v County NatWest Ltd* [1999] Ll Rep Bank 408.
*Board of Trade v Steel Bros & Co Ltd* [1952] 1 Ll Rep 87.

D    *BP Refinery (Westernport) Pty Ltd v Shire of Hastings* (1977) 180 CLR 266.
*Bradford Third Benefit Building Society v Borders* [1941] 2 All ER 205.
*Brown v Raphael* [1958] Ch 636.
*Cheltenham BC v Laird* [2009] IRLR 621.
*Clydesdale Bank Ltd v Paton* [1896] AC 381.
*Dadourian Group International Inc v Simms* [2009] 1 Ll Rep 601.

E    *Derry v Peek* (1889) 14 App Cas 337.
*Downs v Chappell* [1996] CLC 1492; [1997] 1 WLR 426.
*Equitable Life Assurance Society v Hyman* [2002] 1 AC 408.
*Golden Strait Corp v Nippon Yusen Kubishika Kaisha* [2007] 1 CLC 352; [2007] 2 AC 353.

F    *Goose v Wilson Sandford & Co* [2001] Ll Rep PN 189.
*Great Future International Ltd v Sealand Housing Corp* [2002] EWHC 2454 (Ch).
*H (Minors), Re* [1996] AC 563.
*IFE Fund SA v Goldman Sachs International* [2006] 2 CLC 1043.
*Kennedy v KB Van Emden & Co* (1997) 74 P&CR 19.

G    *Kyle Bay Ltd v Underwriters Subscribing under Policy No. 01957/08/01* [2007] 1 CLC 164.
*Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25.
*Lloyd v Grace, Smith & Co* [1912] AC 716.
*London County Properties v Berkeley Property Co* [1936] 2 All ER 1039 (CA).

H    *Mediterranean Salvage & Towage Ltd v Seamar Trading & Commerce Inc* [2009] 1 CLC 909.
*Miliangos v George Frank (Textiles) Ltd* [1976] AC 443.
*Naughton v O'Callaghan* [1990] 3 All ER 191.
*Oakes v Turquand* (1867) LR 2 HL 325.
*Peekay Intermark Ltd v Australia & New Zealand Banking Group Ltd* [2006] 1 CLC 582.

A
assessment of the risks and (b) an expectation that the purchaser is entitled to rely in making its assessment on information about the proposed transaction provided by the selling bank. The purchaser will naturally and rightly rely on such information unless the document in question makes clear that no reliance should be placed on it. CRSM submitted that none of the terms of the purchase letters have such an effect.

B
491. The terms relied on by Barclays were the 'Non-reliance', 'Assessment and Understanding' and 'Terms and Conditions' clauses which CRSM had agreed 'we hereby represent, warrant and covenant'.

C
*A. The Authorities*

492. Two principal authorities were relied on by Barclays in support of its arguments that the terms of the purchase contracts in this case had the effect of precluding CRSM's claim. These were *Peekay v Australia & New Zealand Banking Group* [2006] 1 CLC 582 and *Springwell Navigation v JP Morgan Chase Bank* [2008] EWHC 1186 (Comm) (Gloster J); [2010] EWCA Civ 1221; [2010] 2 CLC 705 (CA).

D

493. In *Peekay* the first claimant (Peekay), a company controlled by the second claimant (Mr Pawani), bought an investment product from the defendant (ANZ). The product was a note linked to Russian Government bonds known as GKOs. In a telephone conversation Mr Pawani was given (as the judge found) a 'rough and ready' description of the product by an employee of ANZ which led him to believe that, if it bought the product, Peekay would acquire an interest in a GKO. Subsequently, Mr Pawani was sent documentation consisting of final terms and conditions (FTCs) for the investment to which a Risk Disclosure Statement was attached which he was asked to sign. These documents made it clear that the investment being offered was a derivative, consisting of a deposit linked to GKO bonds, rather than a share in the bonds themselves.

E

F

494. The Risk Disclosure Statement included the following:

G
'You should also ensure that you fully understand the nature of the transaction and contractual relationship into which you are entering … The issuer assumes that the customer is aware of the risks and practices described herein, and that prior to each transaction the customer has determined that such transaction is suitable for him.'

H
Immediately above the space for signature there appeared:

'[Client] confirms it has read and understood the terms of the Emerging Markets Risk Disclosure Statement as set out above.'

A       495. Mr Pawani signed the documents and initialled every page of them but the
        trial judge found that he did no more than glance at their contents, with the result that
        he did not appreciate that he was buying a structured product. (He also did not read an
        Indicative Term Sheet previously sent to him which accurately described the nature of
        the investment.) On these facts the judge concluded that Peekay was induced to make
        the investment by the misrepresentation made in the initial telephone conversation
B       and was entitled to damages under s. 2(1) of the Act.

        496. The Court of Appeal allowed an appeal by ANZ on the issue of causation.
        Moore-Bick LJ (with whose judgment Lawrence Collins J and Chadwick LJ agreed)
        held, in effect, that the chain of causation was broken by Mr Pawani's signature
C       of the documents without reading them and that Peekay was induced to enter into
        the contract not by what had been said previously on the telephone, but by Mr
        Pawani's own assumption that the investment product to which the documents related
        corresponded to the description he had previously been given (see para. 52).

D       497. The Court of Appeal went on to hold that ANZ was also entitled to succeed
        on the alternative basis that the signature of the Risk Disclosure Statement gave rise
        to a contractual estoppel (see para. 54). Moore-Bick LJ said:

            'There is no reason in principle why parties to a contract should not agree that
            a certain state of affairs should form the basis for the transaction, whether it be
E           the case or not. For example, it may be desirable to settle a disagreement as to
            an existing state of affairs in order to establish a clear basis for the contract itself
            and its subsequent performance. Where parties express an agreement of that kind
            in a contractual document neither can subsequently deny the existence of the
            facts and matters upon which they have agreed, at least so far as concerns those
F           aspects of their relationship to which the agreement was directed. The contract
            itself gives rise to an estoppel' (para. 56)

            …

G           'I can see no reason in principle why it should not be possible for parties to an
            agreement to give up any right to assert that they were induced to enter into it by
            misrepresentation, provided that they make their intention clear, or why a clause
            of that kind, if properly drafted, should not give rise to a contractual estoppel …'
            (para. 57)

H       498. Moore-Bick LJ concluded (at para. 60) that, by signing the declaration
        that he had read and understood the Risk Disclosure Statement, Mr Pawani agreed
        contractually on behalf of Peekay that Peekay understood the nature of the transaction
        described in the FTCs, with the result that Peekay could not assert that it was induced
        to enter into the contract by a misunderstanding of the nature of the investment
        derived from what ANZ's employee had said about the product some days earlier.

A

499. Chadwick LJ in his concurring judgment characterised the estoppel (at para. 70) somewhat differently – as being that 'Peekay could not be heard to say that Mr Pawani had assumed that the FTCs which he had signed on its behalf did not need to be read and understood'.

B

500. In *Springwell* the principal claim advanced by the claimant was that Chase had been engaged to give general investment advice to it, and that this gave rise to duties of care in contract and tort together with fiduciary duties.

C

501. In addition, more specific allegations were made of negligent misrepresentation, under s. 2(1) of the Act and under the Hedley Byrne principle. The three broad categories of alleged misrepresentation (of which the first and second were pursued on appeal) were to the effect that (1) the GKO investments at issue were a 'conservative' investment, (2) they had a high degree of liquidity and (3) investment in them involved no currency risk.

D

502. The trial judge, Gloster J, held on the facts that the alleged misrepresentations had not been made, and in any event would not have been actionable (there being no basis, on the facts found, for concluding that Chase's salesman's expressions of opinion involved any implied representation about his having objectively reasonable grounds for his views); and these findings were upheld on appeal.

E

503. Since full argument had been heard and one point of general importance arose, the Court of Appeal went on to make findings about the effect on Springwell's misrepresentation claims of a number of provisions in the contractual documentation. These included the following:

F

(1) 'In addition, the Holder has not relied on, and acknowledges that neither CMSCI nor CMIL has made, any representation or warranty with respect to the advisability of purchasing this Note.' [Section 6(c) of the GKO Note]

(2) 'CMSCI has not made any representations and warranties whatsoever, either expressed or implied, including, without limitation, any representation or warranty as to (I) the due execution, legality, validity, adequacy or enforceability of the Designated GKO Assets or any other Transaction or any document relating thereto; (ii) the financial condition of any party to a Transaction or the performance of any party to a Transaction of any of their obligations related to any Transactions or that it has made, or will make, any inquiries concerning any such parties; and (iii) as to any tax matters related to the Transactions or investments in S Accounts; and (iv) as to the content of or the applicability of the S Account Rules.' [Section 5(e) of the GKO Note]

G

H

(3) 'Neither CMB nor CMIL nor CMp are required to give you investment advice generally or in relation to specific investments, make any enquiries about, or to

A consider, your particular financial circumstances or investment objectives. By placing an order with CMB or CMIL, or CMp, you represent that you are a sophisticated investor, are purchasing the instrument concerned for your own account for investment purposes and not with a view to any distribution thereof, and that you have independently, without reliance on CMB or CMIL or CMp, or any associated

B person, made a decision to acquire the instrument having examined such information relating to the instrument and the issuer thereof as you deem relevant and appropriate. You have represented to CMB and CMrt, and CMp, and therefore they have assumed that, you are fully familiar with and able to evaluate the merits and risks associated with such instruments and any consequence of these instruments forming part of a portfolio of investments and are able to assume the risk of loss associated with such

C instruments. You should therefore consider whether an instrument is appropriate in your particular financial circumstances or in the light of your investment objectives. Neither CMB nor CMIL nor CMp are liable for any loss which you may incur arising out of any investment decision made by you in consequence of any service contemplated in this letter unless such loss is caused by its gross negligence or wilful

D misconduct. Neither CMB nor CMIL nor CMp shall be obliged to provide any dealing services to you and may within its absolute discretion decline to do so at any time.' [Clause/Paragraph 4 of the DDCS Letters]

E (4) 'When providing you with any circular, information memorandum, investment advertisement, published recommendation or any other written or oral information regarding any instrument or investment opportunity neither CMB nor CMIL nor CMp, will have taken any independent steps to verify the document or information and no representation or warranty, express or implied, is or will be made by either CMB or CMIL or CMp, their representative officers, servants or agents or those of their associated companies in or in relation to such documents or information nor

F will CMB or CMIL or CMp or any of their associated companies be responsible or liable (save to the extent required under the applicable law, rules or regulations) for the fairness, accuracy or completeness of such documents or information.' [Clause/Paragraph 6 of the DDCS Letters]

G 504. The Court of Appeal, focussing initially on the first clause quoted above ('Section 6(c)'), held that:

(1) Section 6(c) applied to Springwell as holder of the notes (paras. 132–140).

(2) The statements of Moore-Bick LJ in *Peekay* about contractual estoppels were consistent with principle and authority, and represented the law (paras. 141–169).

H
(3) Applying *Peekay*, the effect of Section 6(c) was to bind Springwell to its statement or acknowledgment that Chase had not made 'any representation or warranty with respect to the advisability of purchasing this Note' (para. 170).

**820**           **Cassa di Risparmio v Barclays Bank**           **[2011] 1 CLC**
                              (*Hamblen* J)

A

(4) Similarly, Springwell must be bound by the terms of Section 5(e), 'which means that it accepts that CMSCI has not made any representations or warranties of the kind set out there' (para. 170).

B

(5) The effect of Sections 6(c) and 5(e) was, subject to any argument based on s. 3 of the *Misrepresentation Act* 1967 and the *Unfair Contract Terms Act* 1977, first, that Springwell was contractually estopped from contending that there were any actionable representations made by Chase on which Springwell could base its current claims. Secondly, those provisions pointed strongly against any statement by Chase's salesman being actionable (para. 171).

C

(6) Clause 4 of the DDCS letters meant that Springwell was contractually bound by the representations that it was a sophisticated investor, familiar with and able to evaluate the merits and risks associated with the instruments with which those letters were concerned and able to assume the risk of loss associated with such instruments (para. 172).

D

(7) Clause 6 of the DDCS letters meant Springwell accepted that no express or implied representations were made concerning any written or oral information regarding any instrument or investment opportunity offered by the terms of the letters (para. 172). Accordingly Springwell had agreed that statements by Chase's salesman in the numerous telephone calls which had taken place were to be treated as expressions of opinion, and not to be susceptible to scrutiny with a view to seeing if they constituted potential actionable misrepresentations (para. 173).

E

505. The authorities accordingly establish that:

F

(1) It is possible for parties to agree that one party has not made any pre-contract representations to the other about a particular matter, or that any such representations have not been relied on by the other party, even if they both know that such representations have in fact been made or relied on, and that such an agreement may give rise to a contractual estoppel.

G

(2) If a term is to be construed as having this effect (and thereby prevent from arising the ordinary consequences which would otherwise follow as a matter of law) clear words are necessary – see *Peekay* para. 57; *Board of Trade v Steel Bros & Co Ltd* [1952] 1 Ll Rep 87 at p. 95.

(3) Whether or not a clause or collection of clauses has this effect is a matter of construction of the contract.

H

(4) The principle may not apply where there has been a misrepresentation as to the effect of the contractual documents which give rise to the estoppel – see *Peekay* para. 60; *Springwell* para. 166.

A    506. The cases provide clear examples of clauses which will be construed as
having the effect of precluding claims for misrepresentation – see, for example, in the
banking context the provisions in the *Raiffeisen* case (para. 229):

B    'RZB acknowledges and agrees that … RBS and its Affiliates, officers,
employees, agents, and professional advisers do not make any representation or
warranty, express or implied as to, or assume any responsibility for, the accuracy,
adequacy, reliability or completeness of any of the Confidential Information.

C    The contents of this Memorandum have not been independently verified. No
representation, warranty or undertaking (express or implied) is made, and
no responsibility is accepted as to the adequacy, accuracy, completeness or
reasonableness of this Memorandum or any further information, notice or other
document at any time supplied in connection with the Facility.'

D    As Christopher Clarke J said in *Raiffeisen,* those provisions 'specify that no
representation is made or that RBS does not make any. These provisions are
unambiguous.'

507. The relevant clauses in *Springwell* also involved widely drafted provisions,
including clauses stating expressly that no representations had been made in relation
to the relevant matters, no representations had been relied on and no liability was

E    accepted for documents or information provided. I agree with CRSM that those
were the principal provisions which the Court of Appeal held would have defeated
Springwell's claims for misrepresentation, had those claims otherwise been good.

508. I also agree with CRSM that in so far as the Court of Appeal considered

F    that the provisions of the DDCS precluded Springwell from denying that it was
a sophisticated investor, familiar with and able to evaluate the merits and risks
associated with the relevant investment, there is no indication that the Court of Appeal
considered that that provision by itself would have defeated Springwell's claims.

509. Armed with the guidance provided by the authorities I turn to consider each

G    of the contractual provisions relied upon in this case.

*B. The contractual clauses*

Clause 5 ('Non-reliance')

H    510. This provided as follows:

'5. Non-reliance. We are acting for our own account and have made our own
independent decisions to enter into this letter and purchase the Notes and as to
whether the Note purchase is appropriate or proper for us based upon our own
judgment and upon advice from such advisors as we deem necessary. We are not

LC/24

A

[COURT OF APPEAL]

ARMITAGE v. NURSE AND OTHERS

1997   Feb. 18, 19, 20;                     Hirst, Millett and Hutchison L.JJ.
          March 19

B

*Trusts—Trustee—Breach of trust—Exclusion of liability—Clause
exempting trustee from liability for loss from any cause apart from
own actual fraud—Whether excluding liability in absence of
dishonesty—Whether repugnant to trust—Whether void on grounds
of public policy—Whether trustees entitled to costs in absence of
inquiry into their conduct*

C

   By a settlement made on 11 October 1984 the plaintiff, who
was then aged 17, became entitled in remainder to settled
agricultural land of which her mother was tenant for life. Her
portion was to be held on certain trusts until she reached the age
of 40. Clause 15 of the settlement provided that no trustee should
be liable for any loss or damage to the plaintiff's fund or the
income thereof at any time or from any cause unless it was caused
by his own actual fraud. On the trial of preliminary issues in an

D

action for breach of trust brought by the plaintiff against the
trustees, the judge held that clause 15 of the settlement could
operate to absolve the trustees from liability for breaches which
were not the result of dishonesty on their part and that the
plaintiff's claims in respect of breaches of trust allegedly
committed before 15 June 1987 were not barred by section 21 of
the Limitation Act 1980.[1] He awarded the trustees 80 per cent. of
their costs, but directed that, since the trustees were defending

E

themselves and had taken points which cost money and in respect
of which they were unsuccessful, they should not be at liberty to
reimburse themselves from the trust fund for the remaining
20 per cent.
   On appeal by the plaintiff from the judge's decision that the
trustees were absolved from liability by clause 15 and cross-appeal
by the trustees from his order for costs:—

F

   *Held,* dismissing the appeal, (1) that, since it was open to
contracting parties to exclude liability for ordinary or even gross
negligence, such an exclusion was also open to the parties to a
settlement; that, by referring to "actual" fraud, clause 15 of the
settlement excluded constructive fraud or equitable fraud and was
apt to exclude liability for breach of trust in the absence of a
dishonest intention; that, although trustees might deliberately
commit a breach of trust by consciously acting beyond their

G

powers, their conduct was not fraudulent if they did so in good
faith and in the honest belief that they were acting in the interest
of the beneficiaries; that a clause excluding the liability of a trustee
for equitable fraud or unconscionable behaviour was not so
repugnant to the trust or contrary to public policy as to be liable
to be set aside at the suit of a beneficiary; and that, accordingly,
since without amendment the pleadings could not support a plea

H

of fraud, clause 15 of the settlement operated to absolve the
trustees from liability for the alleged breaches so long as they had
not acted dishonestly; but that the plaintiff would be allowed to

[1] Limitation Act 1980, s. 21: see post, p. 260D–E.

examine the trust documents and investigate the trustees'   A
management in order to re-amend her statement of claim (see
post, pp. 250G, 251B–C, D–F, 253D–F, 254A–E, 259G, 263G–264B).

*Wilkins v. Hogg* (1861) 31 L.J.Ch. 41 applied.

(2) That section 21(1)(*a*) of the Limitation Act 1980 was
limited to cases of fraud or fraudulent breach of trust properly so
called and therefore to cases involving dishonesty; that liability for
a dishonest breach of trust endured without limitation of time,
but that in the absence of deliberate concealment liability for an   B
honest breach of trust was statute-barred after six years; that,
since the plaintiff had no present right to capital or income but
only the right to require the trustees to consider from time to
time whether to accumulate the income or to exercise their power
to pay or apply it for her benefit, she had merely a future interest
and not an interest in possession; and that, accordingly, her claim
was not barred by section 21(3) (post, pp. 260F–261A, H, 264A–B).

(3) Allowing the trustees' cross-appeal, that trustees were   C
entitled to a lien on the trust fund for the costs of successfully
defending themselves against an action for breach of trust, but
there was no such entitlement where their defence failed; that,
since the action against the trustees would be dismissed without
any inquiry into their conduct unless the pleadings were amended,
they were entitled to recoup themselves out of the trust fund if
and when the action against them was dismissed; and that,   D
accordingly, there had been no basis for the judge's order depriving
them of their right of recoupment (post, pp. 262D–E, 263A–C, F–G,
264A–B).

*In re Spurling's Will Trusts; Philpot v. Philpot* [1966] 1 W.L.R.
920 applied.

*Turner v. Hancock* (1882) 20 Ch.D. 303, C.A. distinguished.

*Per curiam.* The view is widely held that trustee exemption
clauses have gone too far, and that trustees who charge for their   E
services and who, as professional men, would not dream of
excluding liability for ordinary professional negligence should not
be able to rely on an exemption clause excluding liability for gross
negligence. If such clauses are to be denied effect, however, it
should be done by Parliament (post, pp. 256B–D, 264B).

Decision of Jacob J. affirmed.

The following cases are referred in the judgment of Millett L.J.:   F

*Attorney-General v. Heywood* (1887) 19 Q.B.D. 326, D.C.
*Aylesford (Earl of) v. Morris* (1873) L.R. 8 Ch.App. 484
*Beaman v. A.R.T.S. Ltd.* [1949] 1 K.B. 550; [1949] 1 All E.R. 465, C.A.
*Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250;
    [1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, C.A.
*Carruthers v. Carruthers* [1896] A.C. 659, H.L.(Sc.)
*Chapman, In re; Cocks v. Chapman* [1896] 2 Ch. 763, C.A.   G
*City Equitable Fire Insurance Co. Ltd., In re* [1925] Ch. 407, C.A.
*Clarke v. Clarke's Trustees*, 1925 S.C. 693
*Davy v. Garrett* (1878) 7 Ch.D. 473, C.A.
*Derry v. Peek* (1889) 14 App.Cas. 337, H.L.(E.)
*Gartside v. Inland Revenue Commissioners* [1968] A.C. 553; [1968] 2 W.L.R.
    277; [1968] 1 All E.R. 121, H.L.(E.)
*Goodman v. Harvey* (1836) 4 A. & E. 870   H
*Grill v. General Iron Screw Collier Co.* (1866) L.R. 1 C.P. 600
*Hinton v. Dibbin* (1842) 2 Q.B. 646
*Knox v. Mackinnon* (1888) 13 App.Cas. 753, H.L.(Sc.)
*Leedale v. Lewis* [1982] 1 W.L.R. 1319; [1982] 3 All E.R. 808, H.L.(E.)

showing that the false representation was made knowingly, that is to say, without an honest belief in its truth, or recklessly, that is to say, not caring whether it was true or false. Care needs to be taken when these concepts are applied not to a representation but to a breach of trust. Breaches of trust are of many different kinds. A breach of trust may be deliberate or inadvertent; it may consist of an actual misappropriation or misapplication of the trust property or merely of an investment or other dealing which is outside the trustees' powers; it may consist of a failure to carry out a positive obligation of the trustees or merely of a want of skill and care on their part in the management of the trust property; it may be injurious to the interests of the beneficiaries or be actually to their benefit. By consciously acting beyond their powers (as, for example, by making an investment which they know to be unauthorised) the trustees may deliberately commit a breach of trust; but if they do so in good faith and in the honest belief that they are acting in the interest of the beneficiaries their conduct is not fraudulent. So a deliberate breach of trust is not necessarily fraudulent. Hence the remark famously attributed to Selwyn L.J. by Sir Nathaniel Lindley M.R. in the course of argument in *Perrins v. Bellamy* [1899] 1 Ch. 797, 798: "My old master, the late Selwyn L.J., used to say, 'The main duty of a trustee is to commit *judicious* breaches of trust.'" The expression "actual fraud" in clause 15 is not used to describe the common law tort of deceit. As the judge appreciated it simply means dishonesty. I accept the formulation put forward by Mr. Hill on behalf of the respondents which (as I have slightly modified it) is that it

> "connotes at the minimum an intention on the part of the trustee to pursue a particular course of action, either knowing that it is contrary to the interests of the beneficiaries or being recklessly indifferent whether it is contrary to their interests or not."

It is the duty of a trustee to manage the trust property and deal with it in the interests of the beneficiaries. If he acts in a way which he does not honestly believe is in their interests then he is acting dishonestly. It does not matter whether he stands or thinks he stands to gain personally from his actions. A trustee who acts with the intention of benefiting persons who are not the objects of the trust is not the less dishonest because he does not intend to benefit himself.

In my judgment clause 15 exempts the trustee from liability for loss or damage to the trust property no matter how indolent, imprudent, lacking in diligence, negligent or wilful he may have been, so long as he has not acted dishonestly.

*The permitted scope of trustee exemption clauses*

It is submitted on behalf of Paula that a trustee exemption clause which purports to exclude all liability except for actual fraud is void, either for repugnancy or as contrary to public policy. There is some academic support for the submission (notably an article by Professor Matthews, "The Efficacy of Trustee Exemption Clauses in English Law" [1989] Conv. 42 and *Hanbury & Martin's Modern Equity*, 14th ed. (1993), pp. 473–474) that liability for gross negligence cannot be excluded, but this is not the view taken in *Underhill and Hayton's Law of Trusts and Trustees*, 15th ed.

(1995), pp. 560–561 (where it appears to be taken only because the editor confusingly uses the term "gross negligence" to mean reckless indifference to the interests of the beneficiaries). In its consultation paper Fiduciary Duties and Regulatory Rules, A Summary (1992) (Law Com. No. 124), para. 3.3.41 the Law Commission states:

> "Beyond this, trustees and fiduciaries cannot exempt themselves from liability for fraud, bad faith and wilful default. It is not, however, clear whether the prohibition on exclusion of liability for 'fraud' in this context only prohibits the exclusion of common law fraud or extends to the much broader doctrine of equitable fraud. It is also not altogether clear whether the prohibition on the exclusion of liability for 'wilful default' also prohibits exclusion of liability for gross negligence although we incline to the view that it does."

This passage calls for two comments. First, the expression "wilful default" is used in the cases in two senses. A trustee is said to be accountable on the footing of wilful default when he is accountable not only for money which he has in fact received but also for money which he could with reasonable diligence have received. It is sufficient that the trustee has been guilty of a want of ordinary prudence: see e.g. *In re Chapman; Cocks v. Chapman* [1896] 2 Ch. 763. In the context of a trustee exclusion clause, however, such as section 30 of the Trustee Act 1925, it means a deliberate breach of trust: *In re Vickery; Vickery v. Stephens* [1931] 1 Ch. 572. The decision has been criticised, but it is in line with earlier authority: see *Lewis v. Great Western Railway Co.* (1877) 3 Q.B.D. 195; *In re Trusts of Leeds City Brewery Ltd.'s Debenture Stock Trust Deed; Leeds City Brewery Ltd. v. Platts (Note)* [1925] Ch. 532 and *In re City Equitable Fire Insurance Co. Ltd.* [1925] Ch. 407. Nothing less than conscious and wilful misconduct is sufficient. The trustee must be

> "conscious that, in doing the act which is complained of or in omitting to do the act which it said he ought to have done, he is committing a breach of his duty, or is recklessly careless whether it is a breach of his duty or not:" see *In re Vickery* [1931] 1 Ch. 572, 583, *per* Maugham J.

A trustee who is guilty of such conduct either consciously takes a risk that loss will result, or is recklessly indifferent whether it will or not. If the risk eventuates he is personally liable. But if he consciously takes the risk in good faith and with the best intentions, honestly believing that the risk is one which ought to be taken in the interests of the beneficiaries, there is no reason why he should not be protected by an exemption clause which excludes liability for wilful default.

Secondly, the Law Commission was considering the position of fiduciaries as well as trustees, and in such a context it is sensible to consider the exclusion of liability for so-called equitable fraud. But it makes no sense in the present context. The nature of equitable fraud may be collected from the speech of Viscount Haldane L.C. in *Nocton v. Lord Ashburton* [1914] A.C. 932, 953 and *Snell's Equity*, 29th ed. (1990), pp. 550–551. It covers breach of fiduciary duty, undue influence, abuse of confidence, unconscionable bargains and frauds on powers. With the sole

A   exception of the last, which is a technical doctrine in which the word "fraud" merely connotes excess of vires, it involves some dealing by the fiduciary with his principal and the risk that the fiduciary may have exploited his position to his own advantage. In *Earl of Aylesford v. Morris* (1873) L.R. 8 Ch.App. 484, 490–491 Lord Selborne L.C. said: "Fraud does not here mean deceit or circumvention; it means an unconscientious use of the power arising out of these circumstances and conditions; ..." A

B   trustee exemption clause such as clause 15 of the settlement does not purport to exclude the liability of the fiduciary in such cases. Suppose, for example, that one of the respondents had purchased Paula's land at a proper price from his fellow trustees. The sale would be liable to be set aside. Clause 15 would not prevent this. This is not because the purchasing trustee would have been guilty of equitable fraud, but because by claiming

C   to recover the trust property (or even equitable compensation) Paula would not be suing in respect of any "loss or damage" to the trust. Her right to recover the land would not depend on proof of loss or damage. Her claim would succeed even if the sale was at an overvalue; the purchasing trustee could never obtain more than a defeasible title from such a transaction. But clause 15 would be effective to exempt his fellow trustees from liability for making good any loss which the sale had occasioned to the trust estate

D   so long as they had acted in good faith and in what they honestly believed was Paula's interests.

Accordingly, much of the argument before us which disputes the ability of a trustee exemption clause to exclude liability for equitable fraud or unconscionable behaviour is misplaced. But it is unnecessary to explore this further, for no such conduct is pleaded. What is pleaded is, at the very

E   lowest, culpable and probably gross negligence. So. the question reduces itself to this: can a trustee exemption clause validly exclude liability for gross negligence?

It is a bold submission that a clause taken from one standard precedent book and to the same effect as a clause found in another, included in a settlement drawn by Chancery counsel and approved by counsel acting for an infant settlor and by the court on her behalf, should be so repugnant

F   to the trusts or contrary to public policy that it is liable to be set aside at her suit. But the submission has been made and we must consider it. In my judgment it is without foundation.

There can be no question of the clause being repugnant to the trust. In *Wilkins v. Hogg* (1861) 31 L.J.Ch. 41, 42 Lord Westbury L.C. challenged counsel to cite a case where an indemnity clause protecting the trustee

G   from his ordinary duty had been held so repugnant as to be rejected. Counsel was unable to do so. No such case has occurred in England or Scotland since.

I accept the submission made on behalf of Paula that there is an irreducible core of obligations owed by the trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust. If the beneficiaries have no rights enforceable against the trustees there are no

H   trusts. But I do not accept the further submission that these core obligations include the duties of skill and care, prudence and diligence. The duty of the trustees to perform the trusts honestly and in good faith for the benefit of the beneficiaries is the minimum necessary to give

substance to the trusts, but in my opinion it is sufficient. As Mr. Hill    A
pertinently pointed out in his able argument, a trustee who relied on the
presence of a trustee exemption clause to justify what he proposed to do
would thereby lose its protection: he would be acting recklessly in the
proper sense of the term.

It is, of course, far too late to suggest that the exclusion in a contract
of liability for ordinary negligence or want of care is contrary to public
policy. What is true of a contract must be equally true of a settlement. It    B
would be very surprising if our law drew the line between liability for
ordinary negligence and liability for gross negligence. In this respect
English law differs from civil law systems, for it has always drawn a sharp
distinction between negligence, however gross, on the one hand and fraud,
bad faith and wilful misconduct on the other. The doctrine of the common
law is that: "Gross negligence may be evidence of mala fides, but is not    C
the same thing:" see *Goodman v. Harvey* (1836) 4 A. & E. 870, 876, *per*
Lord Denman C.J. But while we regard the difference between fraud on
the one hand and mere negligence, however gross, on the other as a
difference in kind, we regard the difference between negligence and gross
negligence as merely one of degree. English lawyers have always had a
healthy disrespect for the latter distinction. In *Hinton v. Dibbin* (1842)    D
2 Q.B. 646 Lord Denman C.J. doubted whether any intelligible distinction
exists; while in *Grill v. General Iron Screw Collier Co.* (1866) L.R. 1 C.P.
600, 612 Willes J. famously observed that gross negligence is ordinary
negligence with a vituperative epithet. But civilian systems draw the line in
a different place. The doctrine is culpa lata dolo aequiparatur; and
although the maxim itself is not Roman the principle is classical. There is    E
no room for the maxim in the common law; it is not mentioned in *Broom's
Legal Maxims*, 10th ed. (1939).

The submission that it is contrary to public policy to exclude the
liability of a trustee for gross negligence is not supported by any English
or Scottish authority. The cases relied on are the English cases of *Wilkins
v. Hogg*, 31 L.J.Ch. 41 and *Pass v. Dundas* (1880) 43 L.T. 665; and the
Scottish cases of *Knox v. Mackinnon* (1888) 13 App.Cas. 753, *Rae v. Meek*    F
(1889) 14 App.Cas. 558, *Wyman v. Paterson* [1900] A.C. 271 and *Clarke v.
Clarke's Trustees*, 1925 S.C. 693. These cases, together with two other
Scottish cases, *Seton v. Dawson* (1841) 4 D. 310 and *Carruthers v.
Carruthers* [1896] A.C. 659, and cases from the Commonwealth and
America, were reviewed by the Jersey Court of Appeal in *Midland Bank
Trustee (Jersey) Ltd. v. Federated Pension Services Ltd.* [1996] P.L.R. 179    G
in a masterly judgment delivered by Sir Godfray Le Quesne Q.C.

In *Wilkins v. Hogg*, 31 L.J.Ch. 41 Lord Westbury L.C. accepted that
no exemption clause could absolve a trustee from liability for knowingly
participating in a fraudulent breach of trust by his co-trustee. But, subject
thereto, he was clearly of opinion that a settlor could, by appropriate
words, limit the scope of the trustee's liability in any way he chose. The
decision was followed in *Pass v. Dundas*, 43 L.T. 665, where the relevant    H
clause was held to absolve the trustee from liability. In the course of his
judgment Sir James Bacon V.-C. stated the law in the terms in which
counsel for the unsuccessful beneficiaries had stated it, viz. that the clause

A    protected the trustee from liability unless gross negligence was established; but this was plainly obiter.

Each of the Scottish cases contains dicta, especially in the speeches of the Scottish members of the House of Lords, which have been taken by academic writers to indicate that no trustee exemption clause in a Scottish settlement could exonerate a trustee from his own culpa lata. But in fact all the cases were merely decisions on the true construction of the

B    particular clauses under consideration, which were in common form at the time. In *Knox v. Mackinnon*, 13 App.Cas. 753, for example, it was unnecessary to consider the exemption clause since the transaction in question was outside its scope. Lord Watson, nevertheless, speaking of "a clause conceived *in these or similar terms*," said, at pp. 765–766, that it was the settled law of Scotland that "such a clause is ineffectual to protect

C    a trustee against the consequences of culpa lata, or gross negligence on his part," and added, quoting Lords Ivory, Gillies and Murray in *Seton v. Dawson*, 4 D. 310, 318, that "*clauses of this kind* do not protect against positive breach of duty" (my emphasis). In *Seton v. Dawson* the judges who were in the majority spoke to the same effect both of "the protecting clause which occurs in this particular deed" and of "the usual clauses framed for the same object." In *Rae v. Meek*, 14 App.Cas. 558, 572–573

D    Lord Herschell pointed out that the clause in question was a common one found in many trust deeds and did not come before the court for construction for the first time. He said that its effect had been considered in *Seton v. Dawson* and adopted the passage in Lord Watson's speech in *Knox v. Mackinnon* to which I have already referred. In *Carruthers v. Carruthers* [1896] A.C. 659 the House was concerned with a standard

E    trustee exemption clause which was to be treated as inserted into the trust deed. Their Lordships held that the terms of such a clause would not exempt trustees from liability for culpa lata. *Wyman v. Paterson* [1900] A.C. 271 was not a case of negligence at all, but of a plain failure to perform a positive obligation. It turned on the true construction of the particular clause under consideration. In *Clarke v. Clarke's Trustees*, 1925 S.C. 693 the Lord President, Lord Clyde, held that the clause in question

F    did not protect the trustees from the consequence of their negligence. He added, at p. 707:

"It is difficult to imagine that any clause of indemnity in a trust settlement could be capable of being construed to mean that the trustees might with impunity neglect to execute their duty as trustees, in other words, that they were licensed to perform their duty carelessly.

G    There is at any rate no such clause in this settlement."

It is not easy to know what to make of this (save that it was obiter). In *Midland Bank Trustee (Jersey) Ltd. v. Federated Pension Services Ltd.* [1996] P.L.R. 179, Sir Godfray Le Quesne Q.C. read the passage as directed to the construction of the indemnity clauses common in Scottish settlements at the time. I do not so read it. I tend to think that the Lord

H    President was saying that it was difficult to conceive of a settlor permitting the inclusion of a clause which would have the effect stated. But I agree with Sir Godfray that the Lord President was emphasising the need to exclude liability for negligence by clear and unambiguous words, and was

not purporting to exclude the possibility of such a clause on the grounds   A
of public policy.

I agree with the conclusion of the Jersey Court of Appeal that all these cases are concerned with the true construction of the particular clauses under consideration or of similar clauses in standard form in the 19th century. None of them deal with the much wider form of clause which has become common in the present century, and none of them are authority for the proposition that it is contrary to public policy to exclude liability   B for gross negligence by an appropriate clause clearly worded to have that effect.

At the same time, it must be acknowledged that the view is widely held that these clauses have gone too far, and that trustees who charge for their services and who, as professional men, would not dream of excluding liability for ordinary professional negligence should not be able to rely on   C a trustee exemption clause excluding liability for gross negligence. Jersey introduced a law in 1989 which denies effect to a trustee exemption clause which purports to absolve a trustee from liability for his own "fraud, wilful misconduct or gross negligence." The subject is presently under consideration in this country by the Trust Law Committee under the chairmanship of Sir John Vinelott. If clauses such as clause 15 of the settlement are to be denied effect, then in my opinion this should be done   D by Parliament, which will have the advantage of wide consultation with interested bodies and the advice of the Trust Law Committee.

### Do the pleadings allege fraud?

The position which I have reached so far, therefore, is that the respondents are absolved by clause 15 of the settlement from liability for   E all loss or damage to the trust estate except loss or damage caused by their own dishonesty or the dishonesty of their deceased. The question which then arises is: does the amended statement of claim allege dishonesty?

In opening the appeal counsel for Paula expressly disclaimed any intention to allege dishonesty. He did the same before the judge. I would not, myself, hold him to this concession, from which he later resiled, because I think that he may have understood the word "dishonesty" more   F narrowly than is justified. I take his concession to mean only that it is not intended to allege that any of the trustees acted for their own personal benefit.

The general principle is well known. Fraud must be distinctly alleged and as distinctly proved: *Davy v. Garrett* (1878) 7 Ch.D. 473, 489, *per* Thesiger L.J. It is not necessary to use the word "fraud" or "dishonesty"   G if the facts which make the conduct complained of fraudulent are pleaded; but, if the facts pleaded are consistent with innocence, then it is not open to the court to find fraud. As Buckley L.J. said in *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250, 268:

"An allegation of dishonesty must be pleaded clearly and with particularity. That is laid down by the rules and it is a well-recognised rule of practice. This does not import that the word 'fraud' or the   H word 'dishonesty' must be necessarily used ... The facts alleged may sufficiently demonstrate that dishonesty is allegedly involved, but where the facts are complicated this may not be so clear, and in such

LC/25

## QUEEN'S BENCH DIVISION
## (COMMERCIAL COURT)

Apr. 17, 18, 22, 23, 24, 25, 29, 30,
May 1, 2, 7, 8, 9, 13,
14, 15, 16, 20, 21, 22, 23, June 4, 5,
6, 7, 10, 11, 12, 13,
Oct. 2, 3, 1996; Apr. 30, 1997

---

RED SEA TANKERS LTD. AND OTHERS
v.
PAPACHRISTIDIS AND OTHERS
HENDERSON, BAARMA AND BOUCKLEY
(THIRD PARTIES)

(THE "HELLESPONT ARDENT")

Before Mr. Justice MANCE

**Contract — Ship's purchase — Gross negligence — Contributory negligence — Plaintiffs entered into commercial and technical advisory agreements with defendants in relation to acquisition of oil tanker — Whether defendants owed duty of care to plaintiffs — Whether defendants grossly negligent and or guilty of wilful misconduct in recommending tanker for purchase — Whether officers of defendants owed duties personally to plaintiffs — Whether plaintiffs' directors and bankers contributorily negligent.**

The first plaintiff (Red Sea) was a fund incorporated in the Cayman Islands on Mar. 10, 1989 for the purpose of investment in oil tankers. The second to fifth plaintiffs were the first plaintiff's wholly owned subsidiaries incorporated to serve as one-ship companies owning the four tankers including *Hellespont Ardent* (*Ardent*) acquired in the summer of 1989.

The second (PL) and the third defendants (PSMSL) were English companies which offered service to persons engaged or interested in engaging in the shipping market. In June, 1989 PL entered a commercial advisory agreement (CAA) and PSMSL entered into a technical advisory agreement (TAA) with Red Sea subject to New York law. PSMSL was a wholly owned subsidiary of PL and PL's entire share capital was beneficially owned by the first defendant Mr. Papachristidis. The fourth defendant (Mr. Anderson) and the fifth defendant (Mr. Dunn) were managing directors and directors of PL and PSMSL respectively.

The fund originated in discussions between the National Commercial Bank of Saudi Arabia (NCB) and the Chase Manhattan Bank of New York (Chase) and the first and second third parties, Mr. Bouckley and Mr. Baarma were officers of NCB who became directors of Red Sea. The third party Mr. Henderson was an independent director of Red Sea.

Red Sea raised for the purchase of second-hand tankers some U.S.$71,588,000. These moneys appeared to have been wholly or largely spent and lost in the repair, upgrading and operation of the four vessels following their eventual sales at dates in the early 1990s

when the market stood much lower than in 1989. Red Sea sought to attribute responsibility for its losses to the five defendants.

Red Sea alleged that each of the five defendants were grossly negligent and/or guilty of wilful misconduct in failing to arrange for adequate inspection of *Ardent's* class records and/or adequate survey of her condition, in recommending her for purchase without adequate basis and/or misrepresenting her condition, in giving cost estimates and time scale projections without proper basis, in failing to warn of the risks of acquiring *Ardent* and in negotiating her purchase without any discount properly reflecting her condition.

Red Sea submitted that each of the defendants, Mr. Papachristidis, Mr. Dunn and Mr. Anderson owed a personal duty of care to the plaintiffs in respect of his acts or omissions and that Red Sea relied on the special expertise which they held themselves out as possessing. PL, PSMSL, Mr. Papachristidis, Mr. Dunn and Mr. Anderson denied liability and sought to rely on cll. 2 and 7.9 of the CAA and TAA to negative or exempt them from any tortious liability. Those clauses provided inter alia:

> 2. The Corporation will . . . indemnify and hold harmless the Commercial Advisor and its officers, directors . . . from any . . . claim . . . which . . . arise out of, relate to or are in connection with the performance of its duties . . . except for any Indemnified Damages that are found . . . to have resulted from the bad faith, gross negligence or wilful misconduct of . . . the person seeking indemnification.

> 7.9 Neither the Commercial Advisor nor its officers directors . . . shall be liable . . . to the Corporation for any losses, claims . . . suffered . . . by the Corporation . . . arising out of, relating to or in connection with any action taken within the scope of duties of the Commercial Advisor under this Agreement or omitted to be taken by the Commercial Advisor . . . except . . . Damages resulting from acts or omissions of the Commercial Advisor which (a) were the result of gross negligence, (b) constituted wilful misconduct . . .

The defendants alleged that the third parties were contributorily negligent.

The issues for decision were: (1) whether any of the first to fifth defendants owed a duty of care to the plaintiffs in contract, tort or otherwise in relation to the acquisition of *Ardent* and if so the nature and scope of such duty or duties; (2) whether the first to fifth defendants acted in breach of duty to the plaintiffs in relation to the acquisition of *Ardent*; (3) whether the first to third parties acted in breach of duty to the plaintiff in relation to the acquisition of *Ardent* and were liable to make contribution pursuant to the Civil Liability (Contribution) Act, 1978.

————*Held*, by Q.B. (Com. Ct.) (MANCE, J.), that (1) on the evidence it did not appear that the thoroughness of any pre-purchase investigation and inspection of vessels was in focus or discussed before the acquisition of *Ardent*; but general representations were made by Mr. Anderson and Mr. Papachristidis about PL's and PSMSL's capabilities as prospective advisers which would necessarily include their capability to identify and recommend the purchase of second-hand vessels;

LLOYD'S LAW REPORTS

but it was clear that they were at the relevant time in 1989 unaware of any significant risks that vessels would be acquired on a basis which might involve major uncertainty about their actual condition or might lead to the discovery after their acquisition of a need for major unbudgeted repairs (*see* p. 559, cols. 1 and 2; p. 560, col. 1);

(2) it was for the Papachristidis organization to identify any such risk within their knowledge if it was unavoidable or to avoid it if it was reasonably avoidable, whereas the bankers who dealt with the Papachristidis organization, some of whom became directors of Red Sea, were entitled to believe that there were no such significant risks or none that could not and would not be avoided by proper exercise of their functions by PL and PSMSL (*see* p. 560, col. 1);

(3) the figure of U.S.$2 m. given for repair costs was an overall assessment and was also intended to allow for general overhauling; it was not the result or object of any process of detailed calculation or breakdown (*see* p. 571, cols. 1 and 2);

(4) on the evidence, although the market was hot and still rising the price paid for *Ardent* was in excess of any market price which could be deduced from other sales or objective information, if it was assumed that the vessel would incur repair costs of anything like U.S. $2 m. on top of the price paid (*see* p. 578, col. 1);

(5) the concept of gross negligence appeared to embrace serious negligence amounting to reckless disregard without any necessary implication of consciousness of the high degree of risk or the likely consequences of the conduct on the part of the person acting or omitting to act; the conclusion applied under New York and English law (*see* p. 586, col. 2);

(6) "Gross" negligence was clearly intended to represent something more fundamental than failure to exercise proper skill and/or care constituting negligence; but as a matter of ordinary language and general impression the concept of gross negligence seemed to be capable of embracing not only conduct undertaken with actual appreciation of the risks involved but also serious disregard of or indifference to an obvious risk; the difference in the way in which the concepts in cll. 7.9 and 7.10 were expressed appeared entirely consistent with the phrase receiving its ordinary meaning and embracing acts or omissions resulting from gross negligence and acts or omissions constituting wilful misconduct (*see* p. 586, col. 2);

(7) in circumstances falling within the scope of cll. 7.9 and 7.10 respectively PL and PSMSL were under no contractual liability in the absence of wilful misconduct or gross negligence; and to the extent that they were under any parallel liability in tort in the same circumstances, it was subject to similar qualification (*see* p. 588, cols. 1 and 2);

(8) it was for PL and PSMSL to identify, investigate, evaluate and make appropriate recommendations to Red Sea in respect of vessels for acquisition by Red Sea; all the criticisms of PL and PSMSL related to the alleged acts or omissions within the scope of the duties with respect to the management or conduct of the affairs of Red Sea and of the business or affairs of PL or PSMSL relating to Red Sea; the last sentences of cll. 7.9 and 7.10 did not suggest any limitation on the scope of the earlier language of the clause; they simply introduced a limited immunity in cases where professional advice was followed, conditional on the exercise of "extreme care" in the choice of professional advisers (*see* p. 588, col. 2);

(9) under the CAA and TAA Red Sea obtained by contract undertakings of PL and PSMSL within their respective spheres; Red Sea never at any time sought express collateral undertakings from the personal defendants in the handling of the matters entrusted to PL and PSMSL; the personal liability sought to be imposed on the individual defendants as officers of PL and/or PSMSL was in respect of matters falling within PL's and PSMSL's responsibility under CAA and/or TAA; and although all three principal officers of PL and PSMSL were criticized as negligent the roles they played did not cover the whole field of PL's and PSMSL's activity; although they had overall responsibility for PL and PSMSL, the actual functions of Mr. Papachristidis, Mr. Anderson and Mr. Dunn could not be regarded together or a fortiori individually as co-terminous or co-extensive with those undertaken by PL and PSMSL (*see* p. 591, col. 2; p. 592, col. 1);

(10) each of cll. 7.9 and 7.10 started by identifying the beneficiaries of its protection; it then defined the scope of the losses in respect of which they were to be protected; the language of the clauses contemplated that "Damages" as defined might arise out of actions or omissions within the scope of the advisor's duties; in the exception the phrase "Damages resulting from acts or omissions of the . . . Advisor" simply repeated the same conception, with a slight degree of shorthand; it contained nothing to indicate that officers, and directors were not to be liable or responsible in case of gross negligence; on the contrary they could not claim the clauses' benefit if their gross negligence had led to acts or omissions of the advising company resulting in damages (*see* p. 592, col. 2);

(11) the fact that New York law would not recognize the validity of any · exclusion of gross negligence supported that conclusion; and whether or not the exceptions which the clauses contained precisely mirrored the restrictions on the ability to exclude liability under New York law it was improbable that the draftsman meant simply to disregard those restrictions in respect of officers, directors, employees and agents (*see* p. 592, col. 2; p. 593, col. 1);

(12) it would not be appropriate to treat the personal defendants as undertaking any duty of care, even a duty limited to responsibility for gross negligence, wilful misconduct, fraud or bad faith or carrying with it an exception from liability except in such circumstances; this was not an exceptional or special case and Red Sea and its subsidiaries should be held to the contractual framework which was deliberately negotiated; even if the personal defendants were grossly negligent there was no basis for treating them personally as having undertaken responsibility in respect of the substantial commercial risks of a financial nature in the success or failure of the relevant transactions (*see* p. 593, col. 2);

(13) it was no part of Mr. Anderson's role as chairman of Red Sea to undertake any of the functions entrusted to PL and PSMSL or to acquire or communicate knowledge of events leading up to a decision by

PL and/or PSMSL to make an unqualified recommendation to Red Sea; the evaluation of individual vessels was a matter for PL and/or PSMSL and Red Sea relied exclusively on PL and PSMSL for such matters (*see* p. 594, col. 2; p. 596, col. 1);

(14) any relevant knowledge acquired by Mr. Anderson was acquired by him while acting for PL and or PSMSL not for Red Sea or its subsidiary; even if Mr. Anderson was under a duty to communicate to Red Sea directors knowledge of factors relevant to PL's and/or PSMSL's recommendations for *Ardent*, such knowledge was not to be imputed to Red Sea since he did not communicate it and there was no suggestion that Mr. Anderson was the directing mind and will of Red Sea for the purpose of attributing his knowledge on that ground; the directing mind and will was the board as a whole which alone had the responsibility for approving or disproving any recommendation; and even if Mr. Anderson informed other directors of the recommendation, which was not shown in the case of *Ardent*, still his knowledge could be no substitute for communication to the whole board if he did not pass it on (*see* p. 596, col. 2; p. 597, col. 1; p. 98, col. 1);

————*El Ajou v. Dollar Land Holdings plc.*, [1994] 2 All E.R. 685 and *Meridian Global Funds Management Ltd. v. Securities Commission*, [1995] 2 A.C. 500, considered.

(15) Mr. Dunn neither undertook nor instructed any detailed analysis of the nature or cost of overhauls not specified by the surveyor or of steel work; he took U.S.$2 m. on a broad basis as sufficient for PSMSL's and PL's purposes; if he had focused on the likely cost of other overhauls he would have acknowledged that they required a substantial additional provision over and above the specific provisions allowed in the surveyor's report; Mr. Dunn with his experience ought to have recognized the need for an additional provision of this general order; the allowance made by Mr. Dunn did not cater for any uncertainty by taking a sufficiently large figure to cover all eventualities which it could then be expected might foreseeably materialize; and the excess over estimated repair costs could not be explained or excused on the basis that *Ardent* proved to be in a condition which could not reasonably be foreseen in relation to a vessel which had passed special survey some three years and remained in class (*see* p. 608, cols. 1 and 2);

(16) PSMSL and PL would not have pursued an interest in the vessel if they had conceived that so much steelwork would be required; if they had in such circumstances pursued any interest it would have been incumbent to warn the directors of the Red Sea fund expressly of the requirement to replace so much steel in a vessel, to which they were contemplating exposing the fund; they gave no such warning because, although they contemplated serious corrosion in the ballast tanks, they had in mind a lesser order of steel renewal and also allowed a total of U.S.$2 m. which Mr. Dunn thought was generous in relation to such an order of steel renewal; PSMSL's conduct through Mr. Dunn leading up to PL's decision to recommend the acquisition of *Ardent* was negligent (*see* p. 608, col. 2 p. 609, col. 1);

(17) in failing to inspect Lloyd's Register of Shipping class records, PSMSL through Mr. Dunn failed to exercise the care expected of a reasonable adviser in the position of PSMSL in relation to the Red Sea fund; the records could and should have been obtained and there was no reason why they should not have been obtained before the pre-purchase inspection in the case of *Ardent*; the complete omission to obtain them at any time was neither wilful nor in a subjective sense reckless; if Mr. Dunn had seen the full class records they should have demonstrated a need for caution about the vessel's maintenance and allowances for overhauling (*see* p. 609, col. 1; p. 611, cols. 1 and 2; p. 612, col. 2; p. 613, col. 1);

(18) Mr. Dunn failed sufficiently to address the particular problem of corrosion presented by *Ardent* in respect of which additional steps could and should have been taken before she was considered or assessed further as a candidate for the fund (*see* p. 614, col. 2);

(19) although Mr. Dunn believed that an assessment of U.S.$2 m. was sufficient and that he was being generous, there was no reliable basis for that belief; in respect of corrosion and steel renewals Mr. Dunn ought also to have realized that he had insufficient information to justify giving a U.S.$2 m. or indeed any, overall estimate to Mr. Anderson for him to use and rely on in assessing *Ardent* and in deciding whether to recommend her to the Red Sea fund without exposing the fund to inappropriate risk (*see* p. 614, col. 2; p. 615, col. 1);

(20) if fuller visual inspection of the permanent ballast tanks had been allowed, their actual condition would have been sufficiently apparent to make the vessel of no further interest; there was no sufficient reason for not requesting such inspection, and had the standard applicable been the familiar standard of reasonable skill, care and diligence PSMSL would have been held to be in breach, that breach would have led to the recommendation and purchase of *Ardent* and, apart from the breach, she would not have been recommended to or acquired by the Red Sea fund (*see* p. 615, cols. 1 and 2);

(21) the inspection of full class records was an elementary and simple step that any competent adviser fulfilling PSMSL's role ought to have undertaken and PSMSL's failure to inspect them must be regarded as gross negligence (*see* p. 615, col. 2; p. 616, col. 1);

(22) PSMSL's failure to insist on a proper inspection of any permanent ballast tanks in empty condition was a matter going to the core of their particular functions and this failure was underlined by PSMSL's gross negligence in failing to sight full class records; the contents of the full class record must be treated as known to PSMSL when considering whether it was grossly negligent of PSMSL to put forward the figure of U.S.$2 m. to Mr. Anderson; even so what occurred was no more than negligence by PSMSL in the course of inadequate attempts to fulfil its contractual role and the shortcoming in PSMSL's performance of its duties were not so serious that they should be categorized as gross negligence or should deprive PSMSL of the general contractual protection afforded by cl. 7.10; although the present case revealed significant misjudgments and shortcomings in approach and observance of proper standards in relation to *Ardent* it did not involve

**LLOYD'S LAW REPORTS**

**The "Ardent"**

negligence of so grave a nature as to fall outside the sphere of immunity (*see* p. 617, col. 2; p. 618, col. 1);

(23) it was Mr. Anderson's duty on behalf of PL to consider the situation and evaluate it in the interests of the fund; he had no sufficient assurance as to the significance which could properly be attached to Mr. Dunn's U.S.$2 m.; and he had reason to doubt whether that figure was reliable and to inquire into its basis; he was quite sufficiently familiar with usual ship purchase procedures and reports and sale contract negotiations for it to be incumbent on him to raise the possibility of insisting on further inspections; PL through Mr. Anderson failed to exercise proper skill and care in the steps which they took to consider and evaluate *Ardent* (*see* p. 621, col. 2; p. 622, col. 1);

(24) as to obtaining full class records this was a matter primarily for PSMSL; and Mr. Anderson or PL were not liable to criticism because full class records were not sighted (*see* p. 622, col. 1);

(25) Mr. Anderson allowed his perfectly proper desire to complete the acquisition of vessels for the fund to overcome normal or proper caution in respect of *Ardent*; and although the failure by Mr. Anderson to pursue with Mr. Dunn the significance of the U.S.$2 m. estimate and the possibility of inspecting at least some of *Ardent's* permanent ballast tanks constituted clear and serious aspects of negligence, it was not gross negligence to justify the conclusion that PL was deprived of its prima facie contractual immunity (*see* p. 622, cols. 1 and 2);

(26) on the assumption that Mr. Papachristidis had knowledge and was involved in the decision-making process his conduct was open to the criticism that he did not suggest or insist on any inspection of permanent ballast tanks in empty condition; but this did not amount to gross negligence; the most that could be said was that he failed to apply his mind sufficiently to this particular vessel and assumed that Mr. Anderson and Mr. Anderson and Mr. Dunn had between them done so; and failure to question the basis of Mr. Anderson's recommendation and Mr. Dunn's estimate did not amount to gross negligence depriving PL of contractual immunity (*see* p. 623, col. 2; p. 624, col. 1);

(27) although there was causatively relevant negligence on the part of PL and PSMSL, it did not amount to gross negligence or forfeit under cll. 7.9 and 7.10 the contractual immunity otherwise available to protect the defendants; and the action failed in relation to the acquisition of *Ardent*; the preliminary issues would be answered accordingly (*see* p. 624, col. 1);

(28) if the issue on contributory negligence had arisen none of the first third parties acted in breach of duty to the first or fifth plaintiff or was liable to make any contribution pursuant to the Civil Liability (Contribution) Act, 1978 (*see* p. 624, col. 2; p. 625, cols. 1 and 2).

———

The following cases were referred to in the judgment:

City Equitable Fire Insurance Co. Ltd., Re (C.A.) (1924) 19 Ll.L.Rep. 93; [1925] Ch. 407;

Colnaghi U.S.A. Ltd. v. Jewelers Protection Services, 79 N.Y. 2d 1027, 584 N.Y. S. 2d 430 (1992);

Davie v. *The City of Edinburgh*, 1953 S.C. 34;

Dorchester Finance Ltd. v. Stebbing, [1989] B.C.L.C. 498;

Edgworth Construction Ltd. v. N. D. Lea and Associates Ltd., [1993] 3 S.C.R. 206;

El Ajou v. Dollar Land Holdings plc., (C.A.) [1994] 2 All E.R. 685;

Fairline Shipping Corporation v. Adamson, [1975] Q.B. 180;

Federal Insurance Co. v. Honeywell Inc., 641 F. Supp. 1560 (S.D.N.Y. 1986);

Fireman's Fund Insurance Co. v. ADT Systems Inc., 847 F. Supp. 291 (E.D.N.Y. 1994);

Fraser v. Furmin, (C.A.) [1967] 2 Lloyd's Rep. 1;

Gardner v. Owasco River Railway, 142 A.D. 2d 61 534 N.Y.S. 2d 819 (3d Dep't. 1988);

Henderson v. Merrett Syndicates Ltd., (H.L.) [1994] 2 Lloyd's Rep. 468; [1995] 2 A.C. 145;

Henderson v. Merrett Syndicates Ltd., [1997] L.R.L.R. 265;

Hong Kong Export Credit Insurance Corporation v. Dun & Bradstreet, 414 F. Supp. 153 (S.D.N.Y. 1975);

Hooper Associates Ltd. v. AGS Computers Inc., 74 N.Y. 2d 487;

Ivory (Trevor) Ltd. v. Anderson, [1992] N.Z.L.R. 517;

Karp (Matter of) v. Hults, 12 A.D. 2d 718, 209 N.Y.S. 2d 128, affd. 9 N.Y. 2d 857, 316 N.Y.S. 2d 99, 175 N.E. 2d 465;

Kalisch-Jarcho Inc. v. City of New York, 58 N.Y. 2d 377 (1983);

London Drugs Ltd. v. Kuehne & Nagel International Ltd., [1992] 3 S.C.R. 299; 97 D.L.R. (4th) 261;

McCullogh v. Lane Fox & Partners, (C.A.) Dec. 19, 1995, unreported;

McDuffie v. Watkins Glen International Inc., 833 F. Supp. 197 (W.D.N.Y. 1993);

Meridian Global Funds Management Ltd. v. Securities Commission, (H.L.) [1995] 2 A.C. 500;

Metropolitan Life Insurance Co. v. Noble Lowndes International Inc., 84 N.Y. Rep. 2d 430; 643 N.E. 2d 504, 618 N.Y.S. 2d 882 (1994);

Midland Bank Ltd. v. Hett Stubbs and Kent, [1979] 1 Ch. 384;

Punjab National Bank Ltd. v. De Boinville, [1992] 1 Lloyd's Rep. 7;

R. v. Adamoko, (H.L.) [1995] 1 A.C. 171;

R. v. Bonython, [1984] S.A.S.R. 45;

think the parties intended to narrowly exclude from protection truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest. Under the interpretation tool of *ejus-dem generis* applicable to contracts as well as statutes, the phrase "willful acts" should be interpreted here as referring to conduct similar in nature to the "intentional misrepresentation" and "gross negligence" with which it was joined as exceptions.

Public policy was there referred to as a consideration arising after the Court had arrived at a proper definition of the limitation and its exception upon a true construction of the parties' agreement. However, the Court did point out that the construction at which it had arrived mirrored in effect that adopted in its earlier decisions on public policy.

In the light of this authority, the issue before me as to the scope of cll. 7.9 and 7.10 is essentially one of construction, and depends on the character and wording of the particular contract. Judge Frankel was in my judgment right to identify the purely commercial nature of a relationship as a material matter when considering both the operation of public policy and the construction of a particular exception. However, the authorities suggest to me that the New York Courts would not simply stop there. They would be likely to have regard to the precise nature of the commercial relationship. There is a distinction between the nature of the contract in the *Metropolitan Life* case and the nature of the contracts or relationship in issue in the authorities dealing with security. The former contract was a pure supply agreement, under which it could not be said that the provider of software and services undertook any duty to exercise reasonable skill and care to protect the plaintiffs' economic position or interests. The latter were decided in a context where the provider of services was expressly engaged with a view to the protection of the plaintiffs' proprietary and economic interests. In that context, as I have held, New York public policy is capable of invalidating attempts to contract out of liability on grounds of wilful misconduct or gross negligence, although the defendant's conduct was reckless in a sense not involving actual consciousness of risk on the part of the defendant. Here, the CAA and TAA were contracts under the advisers undertook duties which were essentially designed to promote and protect the plaintiffs' relevant commercial and technical interests. As a matter of construction, therefore, it would not be surprising if cll. 7.9 and 7.10 were, upon their true construction, to reflect a similar approach to that adopted by New York when identifying New York public policy. There is some attraction in treating the exceptions in cll. 7.9 and 7.10 as a simple reflection of the requirements

of New York public policy. Both parties emphasized this in their respective submissions, although taking different views of those requirements. This was not however the approach adopted in the *Metropolitan Life* case, and to apply it inflexibly would be contrary to the need to construe the particular contract according to its own terms. In the present case, so far as it has relevance, it reinforces the conclusion to which I would anyway come.

Viewing the particular words of the present contracts, four concepts are separately identified. They may overlap (e.g. in the case of wilful misconduct and fraud), but the draughtsman has recognized a distinction, to which I have already pointed, between acts or omissions *resulting from* gross negligence and acts or omissions *constituting* wilful misconduct, fraud or bad faith. Whether one looks to the authorities decided and the principles identified in the context of New York public policy or to the simple meaning of the words without attributing to them any special meaning under New York law at all, the concepts of "gross negligence" here appears to me to embrace serious negligence amounting to reckless disregard, without any necessary implication of consciousness of the high degree of risk or the likely consequences of the conduct on the part of the person acting or omitting to act.

If the matter is viewed according to purely English principles of construction, I would reach the same conclusion. "Gross" negligence is clearly intended to represent something more fundamental than failure to exercise proper skill and/or care constituting negligence. But, as a matter of ordinary language and general impression, the concept of gross negligence seems to me capable of embracing not only conduct undertaken with actual appreciation of the risks involved, but also serious disregard of or indifference to an obvious risk. The difference in the way in which the concepts in cll. 7.9 and 7.10 are expressed appears to me entirely consistent with the phrase receiving its ordinary meaning and embracing both situations.

As to authority, I was not referred to the criminal field, where "gross negligence" features in the law of manslaughter. In essence, the position there is that a breach of a duty of care will amount to manslaughter if its seriousness in all the circumstances is such that a jury considers that it should be characterized as a crime. See *R. v. Adamoko*, [1995] 1 A.C. 171. The analogy in the civil field would be to explain gross negligence as conduct so seriously negligent that the defendant should not be entitled to rely on the exemption clause. The test involves an element of circularity, but Lord Mackay in *Adamoko* said that it was "necessarily a question of degree, and an attempt to specify that degree more

closely is . . . extra likely to achieve only a spurious precision". Although, in the present context, the question cannot be left to a jury and it will be necessary to attempt to identify and evaluate various factors bearing on the decision, the question whether any negligence in the present case was "gross" appears to me ultimately still very much a matter of degree and judgment.

I was cited authorities from the civil field. The plaintiffs directed me to *Shawinigan Ltd. v. Vokins & Co. Ltd.*, [1961] 2 Lloyd's Rep. 153; [1961] 3 All E.R. 396 and the defendants to *Fraser v. Furman*, [1967] 2 Lloyd's Rep. 1. The latter case, decided in the context of construction of insurance policy cover against negligence and applied by later authority to property insurance, adopts a subjective approach to the mental element required before an insured may be said to have breached an express duty to take reasonable care or reasonable steps under the policy. Mr. Justice Megaw in *Shawinigan* on the other hand adopted an objective view of the mental element involved in recklessness in the context of a proviso in the London Lighterage Clause exempting from liability for unseaworthiness of the carrying barge, provided that the lighterman had not "knowingly or recklessly" supplied the unseaworthy barge. *Shawinigan* is clearly much closer in context to the present case, and I find assistance in the following passages from Mr. Justice Megaw's reasoning:

> . . . Mr. Justice Devlin had said this [in *Albert E. Reed & Co., Ltd. v. London & Rochester Co. Ltd.*, [1954] 2 Lloyd's Rep. 463, 475]:
>
> "The term 'recklessly', I think, does not really give rise to much difficulty. It means something more than mere negligence or inadvertence. I think it means running an unjustifiable risk. There is not anything necessarily criminal, or even morally culpable, about running an unjustifiable risk; it depends in relation to what risk is run; it may be a big matter or it may be a small matter."
>
> . . .
>
> The essence of the matter, therefore, as I see it, in the definition of Mr. Justice Devlin, must be in the word "unjustifiable" — "deliberately running an unjustifiable risk?" Counsel for the defendants says that it must be viewed subjectively. The test must be whether the doer of the act himself realized when he did the act, not only that he was taking a risk, but that the risk was unjustifiable. That would mean that if a man drove a car exceptionally fast along a private highway he could not properly be said to be driving recklessly if he himself was so confident of his own skill, or so obtuse or so selfish that he regarded the risk as justifiable. That is a proposi-

tion that I cannot accept. If, however, the question whether the risk is justifiable is to be viewed objectively by the standard of the reasonable man possessed of the knowledge and the circumstances which the doer of the act has or ought to have had, then I do not see that the deliberateness of the taking of the risk is an essential element. In my view, one who does something which he himself honestly, but foolishly, regards as involving no risk, may be reckless.

. . .

In my view "recklessly" means grossly careless. Recklessness is gross carelessness — the doing of something which in fact involves a risk, whether the doer realises it or not; and the risk being such having regard to all the circumstances, that the taking of that risk would be described as "reckless". The likelihood or otherwise that damage will follow is one element to be considered, not whether the doer of the act actually realised the likelihood. The extent of the damage which is likely to follow is another element, not the extent which the doer of the act, in his wisdom or folly, happens to foresee. If the risk is slight and the damage which will follow if things go wrong is small, it may not be reckless, however unjustified the doing of the act may be. If the risk is great, and the probable damage great, recklessness may readily be a fair description, however much the doer may regard the action is justified and reasonable. Each case has to be viewed on its own particular facts and not by reference to any formula. The only test, in my view, is an objective one. Would a reasonable man, knowing all the facts and circumstances which the doer of the act knew or ought to have known, describe the act as "reckless" in the ordinary meaning of that word in ordinary speech? As I have said, my understanding of the ordinary meaning of that word is a high degree of carelessness. I do not say "negligence", because "negligence" connotes a legal duty.

Whether cll. 7.9 and 7.10 are interpreted according to United States or English principles, the conclusion which I reach is that the concept of gross negligence in these clauses does not involve, necessarily, any subjective mental element of appreciation of risk. It may therefore include, taking the language of the American Restatement, conduct which a reasonable person would perceive to entail a high degree of risk of injury to others coupled with heedlessness or indifference to or disregard of the consequences. The heedlessness, indifference or disregard need not be conscious.

The formulation in the restatement emphasizes as the important factor the "high degree of risk" which ought reasonably to have foreseen. During

MANCE, J.]                          The "Ardent"                        [Q.B. (Com. Ct.)

oral evidence in response to questions in chief, Judge Frankel introduced a further theme, namely that the word "serious" should be placed before the word "risk" so that the concept should read "conduct which a reasonable person would perceive to entail a high degree of *serious* risk of injury . . . ". Further, the defendants submitted that the heedlessness, indifference or disregard should (a) relate to "*probable*" consequences "of serious injury"; and (b) consist in "a *complete absence* of any attempt to avoid or minimize the serious risk of injury". Neither Judge Frankel's evidence nor the defendants' submissions persuaded me that the concept of gross negligence was subject to rigid restrictions of this nature.

This is not to say that such factors, going as they do to the crassness or blatancy of a defendant's conduct, may not be important to a decision whether negligence was gross. I see no difficulty in accepting that (a) the seriousness or otherwise of any injury which might arise, (b) the degree of likelihood of its arising and (c) the extent to which someone takes any care at all are all potentially material when considering whether particular conduct should be regarded as so aberrant as to attract the epithet of "gross" negligence. In *Shawinigan* Mr. Justice Megaw was making just such a point in the last paragraph quoted above. The American Restatement appears, at least superficially, to be concentrating on (b), when using phrases such as "the high degree of risk involved", "the highly dangerous character of his conduct" and "a strong probability that harm may result". These phrases may be sufficiently flexible to embrace or allow consideration of other factors, such as (a) and (c). I would be surprised if they were not. In any event, as a matter of construction of the present contract, I consider that all such factors must be potentially relevant. This cuts both ways. For example, if *obvious* steps have been completely omitted to guard against or cater for a risk that could have *very serious* consequences, then the fact that in many or most cases the risk was *not* likely to materialize would not automatically defeat a charge of gross negligence. Ultimately, as it seems to me, no single factor can be determinative. All the circumstances must be weighed and balanced when considering whether acts or omissions causing damage resulted from negligence meriting the description "gross" and forfeiting the contractual immunity prima facie afforded by cll. 7.9/7.10.

### IV.4 *Scope of liability of PL and PSMSL*

It follows from the above analysis that, in circumstances falling within the scope of cll. 7.9 and 7.10 respectively, PL and PSMSL are under no contractual liability in the absence of (for present purposes) wilful misconduct or gross negligence. To the extent that they are under any parallel liability in tort in the same circumstances, it must be subject to similar qualification.

The plaintiffs suggest that their claims against PL and PSMSL fall outside the language of cll. 7.9 and 7.10. Their case is that PL and PSMSL recommended *Ardent* for purchase and/or gave repair estimates without any proper basis (in particular without having arranged any adequate records or physical inspection), misrepresented her condition, failed to warn (as to the risks of acquiring her and a whole number of other matters), negotiated an "as is" purchase and failed to negotiate any proper discount. The suggestion is that, in acting or failing to act in these respects, PL and in so far as they were involved PSMSL were not acting or omitting to act —

> . . . within the scope of duties of [PL or PSMSL, as the case is] with respect to (a) the management or conduct of the business and affairs of [Red Sea or Turnbridge] . . . [or] (c) the management and conduct of the business and affairs of [PL or PSMSL, as the case is] insofar as it relates to [Red Sea] . . . .

The phrase "with respect to" is said to be narrower in effect than the earlier phrase "arising out of, relating to or in connection with any action taken or omitted to be taken" within the scope of PL's or PSMSL's duties. There is in my view no substance in this suggestion. Between them it was for PL and PSMSL to identify, investigate, evaluate and make appropriate recommendations to Red Sea in respect of vessels for acquisition by Red Sea or Turnbridge. All the criticisms of PL and PSMSL relate to alleged acts or omissions within the scope of their duties with respect to the management or conduct of the affairs of Red Sea or Turnbridge, and of the business or affairs of PL or PSMSL (as the case is) relating to Red Sea. The last sentences of cll. 7.9 and 7.10 do not suggest any limitation on the scope of the earlier language of the clauses. They simply introduce a limited immunity in cases where professional advice is followed, conditional on the exercise of "extreme care" in the choice of professional advisers.

### IV.5 *The respective roles of PL and PSMSL*

As a matter of contract, the role of PL was to provide commercial advisory services relating to the tankers, while that of PSMSL was to provide technical advisory services. The CAA refers to PL performing and rendering "administrative, consulting and other services" including without limitation "providing general business advice, including

LC/26

**627**

A    **Camerata Property Inc v Credit Suisse Securities (Europe) Ltd.**
[2011] EWHC 479 (Comm)

Queen's Bench Division (Commercial Court).
Andrew Smith J.

B    Judgment delivered 9 March 2011.

C

D

*Banking – Investment advice – Negligence – Structured note – 5-year Autoredemption Note in USD Bearish on Eur/USD issued by Lehman Brothers entity – Claimant investment company entered into agreement to receive investment advisory service from defendant bank – Lehman Brothers became bankrupt – Loss of investment and complaint of negligent advice – Defendant's terms and conditions excluded liability except in case of gross negligence – Exclusion clause satisfied statutory test of reasonableness – No advice sought about risk of counterparty default – Negligent failure properly to consider account opening documents but that negligence not leading to breach of duty in relation to advice given – Advice given could properly have been given by relationship manager exercising reasonable skill and care – Claimant would not have sold note even if given different advice so any negligence or gross negligence if proved not causative – Unfair Contract Terms Act 1977, s. 2, 3, 11.*

E    **This was a claim by an investment company (Camerata) that the defendant bank (Credit Suisse) had given advice that was negligent and in breach of its contractual obligations in relation to a loan note issued by Lehman Brothers.**

F

G

**Camerata was an investment vehicle for a wealthy Greek businessman (V). Camerata entered into an agreement with Credit Suisse in June 2007 to receive an investment advisory service. V dealt with an advisor or relationship manager (S-K) who had a particular involvement with investments by way of structured notes. Credit Suisse structured the terms upon which a product should be offered to investors and, if it attracted interest, invited tenders from suitable institutions and arranged for it to be issued by one that offered competitive terms. As a result, it would sometimes not be known who would issue a product until after the client had agreed to invest.**

H

**Camerata bought the note in July 2007 for US$12 million. It was a '5-year Autoredemption Note in USD Bearish on Eur/USD'. It paid no regular coupon. It would automatically be redeemed if on six-monthly observation dates the exchange rate between the Euro and the US dollar was at the 'strike rate' or lower. If the note was so automatically redeemed, the investor received a premium upon his investment, the amount of the premium depending upon the period since the note was issued. If the exchange rate was not at the strike rate or lower upon any of the observation dates, then after five years the investor would recover all or some of his capital depending upon whether, during the**

A
**life of the note, the Euro appreciated against the US dollar so as to go above the 'knock-in rate'.**

B
**Lehman Brothers became insolvent in September 2008 and Camerata had lost all or a significant part of the investment. Camerata did not complain in its proceedings about the dealings with Credit Suisse whereby it came to buy the note. Nor did it allege that after it had bought the note Credit Suisse was under a continuing duty to volunteer advice about the note otherwise than by way of responding to inquiries or requests for advice. Camerata's complaint was that, after JP Morgan Chase and bought and rescued Bear Stearns & Co Inc in March 2008, V sought advice from S-K about Camerata's investments, including the note, and received from him advice that was negligent and in breach of the contractual obligations of Credit Suisse and but for which it would have sold the note before Lehman failed.**

C

*Held*, **dismissing Camerata's claim:**

D
**1. When V started to deal with S-K, he had no experience of risky investments, but, in the hope of higher returns, was willing to make investments which he knew might result in some limited loss to capital. To that extent he never limited himself to investments that were absolutely secure. In the course of his dealings with S-K increasingly he became interested in, and attracted and excited by, more adventurous investments. That understandably and reasonably led S-K to believe that he would contemplate running rather greater risks with his capital, and Camerata's funds, than the documentation completed by Camerata indicated. In fact, he never put any money into the most adventurous ideas that they discussed, and he would never seriously have contemplated any investment if he thought that there was any realistic chance that he would lose the whole or the greater part of his investment. He understood and accepted risks by way of market movements, but would not willingly have run the risk that any of the banks or institutions that he was dealing with might default if he had thought that seriously possible.**

E

F

G
**2. After the sale of Bear Stearns and throughout the summer of 2008, V frequently asked S-K about his views about the markets and about the prospects for his investments. V asked S-K whether he thought that another institution would face difficulties such as led to the sale of Bear Stearns and they discussed how the exchange rate between the Euro and the US dollar might move as a result of the market turbulence and so how it would affect the note. However, V did not ask specifically whether the note was safe from risk of counterparty default, nor whether the banks with which he had his investments were safe. In general terms S-K expressed optimistic views during the summer of 2008 that other banks would not fail as Bear Stearns had done and that V's investments remained sound. He gave his own view or impression that V's and Camerata's**

H

A    **investments would be safe, but did not give V any more specific or firmer advice or assurances.**

**3. As a matter of interpretation, the terms and conditions on which the investment was made excluded Credit Suisse's liability except in the case of gross negligence, fraud or wilful default. In context, gross negligence was clearly**
B    **intended to represent something more fundamental than failure to exercise proper skill and/or care constituting negligence. The concept of gross negligence was capable of embracing not only conduct undertaken with actual appreciation of the risks involved, but also serious disregard of or indifference to an obvious risk. (Red Sea Tankers Ltd v Papachristidis (The Ardent) [1997] 2 Ll Rep 547**
C    **applied.)**

**4. Those provisions of the terms and conditions satisfied the statutory requirement of reasonableness under the Unfair Contract Terms Act 1977. V was a wealthy businessman who approached S-K for Credit Suisse's advisory services. Camerata entered into the agreement with Credit Suisse through a**
D    **commercial lawyer who was aware of the sort of terms that might be included in a contract with a bank for advisory services. He also understood that, if Camerata did not wish to enter into a contract upon such onerous terms, it could use another bank. Those terms did not exclude all liability for fault falling short of dishonesty or wilful fault. Credit Suisse was providing services for clients to**
E    **invest in relatively adventurous investments, which inherently involved a risk that the clients might suffer loss and seek to blame Credit Suisse as their adviser whether or not it was at fault. It was reasonable that Credit Suisse should protect itself from such disputes by excluding liability for mere negligence when dealing with clients such as Camerata.**

F    **5. Credit Suisse relied on the warranties and representations made in part 8 of section B of the terms and conditions. However, para. 5.3 of part 6 of Section A stated the purpose for which the representations and warranties were made and given and for which it was contemplated that they might be used or relied upon by Credit Suisse: that was to enable Credit Suisse to make statements to such**
G    **effect when subscribing for investments on Camerata's behalf. That was the only role of the statements in section B part 8. Parties to a contract could agree upon an assumed basis for their contractual relationship even if it was known not to represent the true position. Equally, they could agree that one contracting party made representations and gave warranties which were to provide an assumed basis upon which the other could act for some specific purpose, but limit the**
H    **application of that assumption and stipulate that the representations should be relied upon only for the specified purpose. That was the effect of section A part 6 para. 5.3, and it prevented Credit Suisse from relying upon the statements in section B part 8 for other purposes and so from relying upon them to answer the complaints made by Camerata about S-K's advice. (Springwell Navigation Corp v JP Morgan Chase Bank [2010] EWCA Civ 1221; [2010] 2 CLC 705 applied.)**

A
**6. S-K was not negligent in not always having in mind which entity had issued the note when responding to V's questions, in view of their general nature and the context in which they were made. S-K was negligent, and grossly negligent, in failing to acquaint himself with the documentation completed by Camerata. However, that failure did not lead to any breach of duty on Credit Suisse's part in relation to advice that he gave to Camerata. Camerata had not shown that there were real grounds for doubting the creditworthiness of Lehman, still less that S-K should have appreciated that there were and advised V that there were. Camerata had not shown that Credit Suisse had stopped using Lehman as a counterparty because of real doubts about its creditworthiness, still less that S-K should have known that. Camerata had not established that there were grounds to think that it should liquidate its investment in the note. V had not asked specifically about counterparty risk in relation to the note. S-K was not negligent, still less grossly negligent, because he did not assess counterparty risk when responding to questions of the kind that V was asking, or because he did not pass on to V reports that he had read or other information or speculation about Lehman, or because those matters were not reflected in the views that he expressed. Therefore Credit Suisse was not in breach of duty.**

B

C

D

E
**7. If S-K had been asked about the risk of counterparty default he could not properly have said more than that the credit rating agencies had reduced Lehman's ratings, but that they still gave Lehman 'A' ratings and considered them to deserve Investment Grade ratings; that there had been some increase in the credit default swap spreads of Lehman following the collapse of Bear Stearns; and that there was some speculation in the financial press, and that some analysts thought, that Lehman might lose its independence as Bear Stearns had done. There is no credible evidence that, had he been given such advice, V would have arranged for the note to be sold. Therefore, even if Camerata had established that Credit Suisse had been guilty of negligence (or gross negligence), that fault would not have caused loss.**

F

The following cases were referred to in the judgment:

G
*Adams v Rhymney Valley DC* [2001] PNLR 4.
*Aneco Reinsurance Underwriting Ltd v Johnson & Higgins Ltd* [2001] UKHL 51; [2002] CLC 181.
*Armitage v Nurse* [1998] Ch 241.
*Bankers Trust International plc v PT Dharmala Sakti Sejahtera (No. 2)* [1996] CLC 518.
*Beary v Pall Mall Investments* [2005] EWCA Civ 415.

H
*Bolitho v City and Hackney Health Authority* [1998] AC 232.
*Caparo Industries Ltd v Dickman* [1990] 2 AC 605.
*Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2003] 1 CLC 921; [2004] 1 AC 715.
*Marex Financial Ltd v Fluxo-Cane Overseas Ltd* [2010] EWHC 2690 (Comm).

A    warnings, including those in the term sheet and the SCARP warning, when I consider
     whether CSSE were in breach of duty.)

**Gross negligence**

B    160. CSSE submit that the effect of section A part 5 paragraph 1.1 of the Terms
     and Conditions is that they are liable only if Mr Siakotos-Konstantinidis was guilty
     of gross negligence in the advice that he gave: no claim is advanced on the basis of
     fraud or wilful default, and, it is submitted, paragraph 1.1 excludes liability simply
     for what might be called 'mere' negligence in the sense of want of reasonable skill
C    and care. Camerata do not accept that the intention or effect of paragraphs 1.1 and
     1.2 is to exclude liability for mere negligence. They cite authorities in which the
     courts have commented upon the difficulty of distinguishing mere negligence and
     gross negligence, or, to put it another way, of identifying what, if any, meaning the
     adjective 'gross' should be given, and have concluded that there was no distinction
D    relevant to the cases before them: see, for example, *Sucden Financial v Fluxo-Cane
     Overseas Ltd* [2010] EWHC 2133 (Comm) ; [2010] 2 CLC 216 at paragraph 54; and
     *Marex Financial Ltd v Fluxo-Cane Overseas Ltd* [2010] EWHC 2690 (Comm) at
     paragraph 93. In *Tradigrain SA v Intertek Testing Services* [2007] EWCA Civ 154;
     [2007] 1 CLC 188 at paragraph 23, Moore-Bick LJ observed that 'The term "gross
     negligence", although often found in commercial documents, has never been accepted
E    by English civil law as a concept distinct from civil negligence …'.

     161. The relevant question, however, is not whether generally gross negligence
     is a familiar concept in English civil law, but the meaning of the expression in these
     paragraphs of the Terms and Conditions. I cannot accept that the parties intended
     it to connote mere negligence: in paragraph 1.2 and also in paragraph 1.3 both the
F    expression 'gross negligence' and the expression 'negligence' were used, and some
     distinction between them was clearly intended. Equally clearly, to my mind, the
     expression 'gross negligence' must be taken to have the same meaning in paragraphs
     1.1, 1.2 and 1.3: I cannot accept Camerata's suggestion that, because paragraph 1.1
     itself does not include any reference to mere 'negligence', no distinction between
G    'gross negligence' and 'negligence' is intended in the context of paragraph 1.1. I
     accept that the distinction between gross negligence and mere negligence is one of
     degree and not of kind: see *Armitage v Nurse* [1998] Ch 241 at p. 254C–D per Millett
     LJ. As such, it is not easy to define or even to describe with any precision. However,
     as Mance J recognised in *Red Sea Tankers Ltd v Papachristidis (The Ardent)* [1997]
     2 Ll Rep 547, 586, 'If the matter is viewed according to purely English principles of
H    construction … "Gross" negligence is clearly intended to represent something more
     fundamental than failure to exercise proper skill and/or care constituting negligence',
     and there is no reason to depart from conventional English law principles of
     construction when giving effect to paragraph 1.1. Mance J continued, '… as a matter
     of ordinary language and general impression, the concept of gross negligence seems
     to me capable of embracing not only conduct undertaken with actual appreciation of

A
the risks involved, but also serious disregard of or indifference to an obvious risk'.
That, as it seems to me, is what it connotes in the Terms and Conditions.

162. I therefore accept that, as a matter of interpretation, paragraphs 1.1 and 1.2
provide that, in order to establish liability, Camerata have to show more than mere
negligence on the part of CSSE. Camerata submit, however, that the paragraphs do
not have this effect because of the 1977 Act.

B

163. Section 2 of the 1977 Act provides:

'(1) …

C

(2) In the case of [loss other than death or personal injury], a person cannot [by
reference to any contract terms or to a notice given to persons generally or to a
particular person] exclude or restrict his liability for negligence except in so far
as the term or notice satisfies the requirement of reasonableness.

D

(3) Where a contract term or notice purports to exclude or restrict liability for
negligence a person's agreement to or awareness of it is not of itself to be taken
as indicating his voluntary acceptance of any risk.'

164. Section 3 of the 1977 provides:

E

'(1) This section applies as between contracting parties where one of them deals
as consumer or on the other's written standard terms of business.

(2) As against that party, the other cannot by reference to any contract term–

F
(a) when himself in breach of contract, exclude or restrict any liability of his in
respect of the breach; or

(b) claim to be entitled–

G
(i) to render a contractual performance substantially different from that which
was reasonably expected of him, or

(ii) in respect of the whole or any part of his contractual obligation, to render no
performance at all,

H
except in so far as (in any of the cases mentioned above in this subsection) the
contract term satisfies the requirement of reasonableness.'

(It was not disputed that Camerata were dealing as a consumer and on CSSE's
standard terms of business: the meaning of 'consumer' is defined in section 12 of the
1977 Act, which provides (so far as is material) that a party so deals if he does not

LC/27

*a*

# Winnetka Trading Corp v Julius Baer International Ltd and another

## [2011] EWHC 2030 (Ch)

*b*

CHANCERY DIVISION
ROTH J
24, 25, 28–31 MARCH,1, 4, 5, 11 APRIL, 29 JULY 2011

*c*

*Financial services – Banking – Duty of bank – Bank engaged by claimant under banking and investment advisory mandates – Claimant instructing bank to transfer funds to purchase shares in company – Funds transferred before transfer of securities – Not all shares purchased received – Whether bank failing to carry out claimant's instructions – Whether bank having duty to advise claimant of risks of transaction.*

*d*

The claimant was an investment company. The defendants were part of a Swiss banking group. The claimant entered into a banking mandate and an investment advisory and dealing services mandate (the investment mandate) with the second defendant. Under the banking mandate, the second defendant agreed to honour payment instructions and other orders duly authorised by the claimant. Under the investment mandate, the second defendant provided a service whereby an advisor would regularly contact the client with advice on investments and would effect transactions in investments when requested by the client. The second defendant delegated some of its functions to the first defendant and appointed it the manager of some of its discretionary portfolios and an investment advisor on its advisory portfolio. The claimant gave the defendants two sets of instructions to purchase shares in an American company listed on the NASDAQ exchange. The claimant had itself identified this investment opportunity. Pursuant to the first instruction $650,000 was paid out from the claimant's account. Pursuant to the second instruction $8.8 million was paid out on the claimant's account. However, instead of the anticipated shareholding of well over 4 million shares, only about 1 million shares were received. The claimant had planned to acquire this shareholding in anticipation of an imminent management buy-out of the company, whereupon it would have resold the shares at a substantial premium. That management buy-out never occurred, and the shares became worthless. The claimant brought proceedings against the defendants. The claimant submitted inter alia that it had instructed the defendants to make the payments under a secure settlement arrangement whereby the consideration from the purchaser and the shares from the seller were released only one as against the other, ie the transfer of securities and payment were simultaneous, and that the defendants had failed to carry out its instructions. Alternatively, even if the defendants were correct in their interpretation of the instructions, the claimant argued that they were in breach of their contractual and tortious obligations in failing to warn it of

*e*

*f*

*g*

*h*

*i*

*a*  the risk of carrying out the transaction in that manner, and that if it had
received such a warning it would not have proceeded with the transaction.
It submitted that such an obligation to warn arose from inter alia an
implied term in the mandates with the second defendant to provide proper
risk management systems; the implied duty of care in the mandates; and the
common law duty of care. The claimant also relied on the regulatory

*b*  framework established by the Financial Services Authority (FSA), which it
said informed the scope of the duty of care. The claimant argued that the
duty of care was to be determined by looking at the relations between the
parties as a whole.

*c*  **Held** – (1) On the evidence, the defendants had not misinterpreted the two
instructions and were not liable for paying out the money without a secure
method of ensuring that the shares would be delivered against payment. In
respect of the first instruction, the defendants should have clarified the
instruction with the client, and their failure to do so was a breach of
contract and also negligent. However, that breach was not causative of loss,

*d*  as even if the defendants had sought clarification, on the balance of
probabilities the basis of the deal between the claimant and K was that
payment would be sent first and that the release of shares would follow. In
respect of the second instruction, there was no breach of duty. There was no
possible ambiguity in the instruction (see [57]–[58], [61], [67], below).

(2) The defendants were under no obligation to warn the claimant of the
*e*  risks of the transaction. There was no such express duty in either the
banking or investment mandates. Moreover, there was no basis for the
implication of a term relating to the provision of proper risk management
systems insofar as it went beyond the ordinary skill, care and diligence
expected of a banker or investment advisor. The criterion for the
implication of a term into a contract remained that of necessity, not simply
*f*  reasonableness. In any event, proper risk management would apply to the
conduct of a transaction on behalf of a client when it was left to the
defendants to determine how the transaction should be handled; it would
not oblige them to tell a client that what he had asked them to do was
inadvisable or risky. Although it was true that the scope of the duty of care
was to be determined by looking at the relations between the parties as a
*g*  whole, and that its ambit could develop over time, the contacts between the
parties were not conducted on the basis that the claimant was dependent on
the defendants for advice. On the facts, the FSA regulatory framework did
not begin to create a duty to warn the claimant that its express instruction
involved an insecure or risky means of conducting a transaction in listed
*h*  securities. Accordingly, there was no breach of the duty to exercise due skill
and care on the defendants by the failure to give a warning, whether such
duty derived from an implied term in the contract, or as a matter of the
common law duty of care (see [92]–[97], below); *Seymour v Caroline
Ockwell* [2005] PNLR 758, [2005] All ER (D) 297 (Jun), *JP Morgan Chase
Bank v Springwell Navigation Corp* [2008] All ER (D) 167 (Jun),
*i*  *Mediterranean Salvage and Towage Ltd v Seamar Trading and
Commerce Inc, The Reborn* [2010] 1 All ER (Comm) 1, *Riley v Pickersgill*
[2004] 4 LRC 471 considered.

by Guernsey law but it was not suggested that for the purpose of *a* interpretation of these provisions there is any resulting difference from English law.

[12] In addition to these mandates, Winnetka signed a number of internet waiver agreements with JBG authorising the bank to accept instructions sent from a specified e-mail account. Although it was alleged in the re-amended particulars of claim that the defendants had wrongfully acted *b* upon instructions sent electronically that were not authorised, that allegation was not pursued. In the event, the terms of the internet waiver agreements do not have to be considered.

[13] JBI had no contract with Winnetka. Pursuant to an investment management agreement dated 23 May 2000, JBG delegated some of its functions to JBI and appointed JBI as manager of some of its discretionary *c* portfolios and an investment advisor on its advisory portfolio. There is no doubt that the primary contact of Winnetka, as a client of Julius Baer, was as between Mr Hazout and Mr Darren Porter, who was at the time head of portfolio management at JBI. Their communications were conducted by telephone, e-mail and at meetings. At no time did Mr Hazout, or either of *d* the other beneficial owners of Winnetka, go to Guernsey. Mr Porter clearly regarded Winnetka as one of his clients.

[14] Alongside the contractual obligations, it is accepted that JBG owed Winnetka a duty of care in tort, but that is a parallel duty which has no additional practical significance in the present case. As regards JBI, although denied in its pleaded defence, it was in the end sensibly accepted *e* that JBI owed Winnetka independently a duty of care. However, the defendants contend that this duty is defined and circumscribed by the contractual obligations and exclusions in the contracts with JBG to which I have referred.

[15] The defendants say that the payment provisions in both sets of instructions regarding Inyx were simple instructions to make payments and *f* receive shares and that, therefore, only the banking mandate was engaged. Winnetka says that the instructions were to execute the transactions (ie here to buy the shares) and thus the investment mandate was applicable and relevant.

[16] As set out above, both mandates contain limitation and exclusion provisions. Those include particular exclusions of liability for 'gross *g* negligence': banking mandate, cl 11; investment mandate, cl 10.5. The meaning of that expression is not entirely clear. However, since the investment mandate uses both the expressions 'negligence' and, separately, 'gross negligence', I consider that the two cannot be intended to have the same meaning; and I think the language in the banking mandate should be *h* construed consistently with the investment mandate. In that regard, I respectfully agree with the approach of Andrew Smith J in *Camerata Property Inc v Credit Suisse Securities (Europe) Ltd* [2011] EWHC 479 (Comm) at [161], [2011] 2 BCLC 54 at [161]. As he there observed, 'the distinction between gross negligence and mere negligence is one of degree and not of kind', and therefore not easy to describe with precision. Like the *i* judge in that case, I think it is appropriate to apply to the contractual provisions here the approach of Mance J in *Red Sea Tankers Ltd v Papachristidis, The Hellespont Ardent* [1997] 2 Lloyd's Rep 547 at 586:

*a*

> ' "Gross" negligence is clearly intended to represent something more fundamental than failure to exercise proper skill and/or care constituting negligence ... as a matter of ordinary language and general impression, the concept of gross negligence seems to me capable of embracing not only conduct undertaken with actual appreciation of the risks involved, but also serious disregard of or indifference to an
*b* obvious risk.'

However, it seems to me that 'gross negligence' is not the same as subjective recklessness, although it may come close to it: see *A v Bottrill* [2002] UKPC 44 at [76] and [79], [2003] 1 LRC 777 at [76] and [79], [2003] 1 AC 449 per Lord Nicholls of Birkenhead. I note also that 'gross negligence' is a term
*c* now used in the context of financial transactions in the Payment Services Regulations 2009, SI 2009/209, reg 62(2)(b), but without any statutory definition.

[17] In addition to the mandates, JBG agreed to provide Winnetka with a credit facility of €12.5m secured against the value of the portfolio. The facility was approved in January 2006 but only became operational on
*d* 21 April 2006 when the original signed documents were returned to JBG by Winnetka.

EVIDENCE

[18] Before addressing the factual events and communications on which
*e* this case, in my view, depends, it is appropriate to comment on the evidence as presented at trial.

[19] Winnetka called only one factual witness, Mr Hazout. He is a highly intelligent and confident young man with an energetic enthusiasm for the projects in which he is involved. His background is in electronic engineering
*f* and computer science, which he deployed when operating ESDS, and he apparently still does some consulting in that field. However, he is now primarily a full-time investor, an activity he pursues by a combination of himself following the markets and his personal contacts which have alerted him to particular investment opportunities. Those have included some investments outside the mainstream, where Mr Hazout perceived the
*g* potential for a good capital return.

[20] Mr Hazout clearly feels a strong sense of grievance over what happened regarding the Inyx shares. That is fully justified: Winnetka paid away over $9m as consideration for the purchase of over 4 million shares in Inyx but received only 1,008,000 shares. Although the primary blame for that clearly rests on the recipients of the money or on a Mr Jack Kachkar,
*h* the then chairman and chief executive officer of Inyx, a mysterious figure who played a prominent role in the factual background to this litigation, I accept that Mr Hazout came to be wholly convinced that Winnetka had been badly let down by Julius Baer in its handling of these two transactions. However, his resulting loss of confidence in Julius Baer has led him to believe that it could do virtually nothing right, and to make unwarranted
*i* assumptions or wide-ranging allegations against Julius Baer in ways that I consider wholly unjustified. Moreover, he was distinctly evasive in his evidence on a range of issues, particularly regarding some of his dealings with Mr Kachkar.

[21] Mr Hazout's complaints about Julius Baer, which I note did not start

LC/28

**705**

A    **Springwell Navigation Corp v JP Morgan Chase Bank & Ors.**
[2010] EWCA Civ 1221

Court of Appeal (Civil Division).
Rix, Rimer and Aikens L JJ.

B    Judgment delivered 1 November 2010.

C

D

*Contract – Tort – Misrepresentation – Misstatement – Exclusion clauses – Test
of reasonableness – Contractual estoppel – Investment company – Investment
advice – Investment in derivatives linked to Russian bonds – Forward currency
contracts – Moratorium on Russian debt led to default under linked notes
– Whether investments induced by misrepresentation – Bank employee did not
make representations alleged – Any representations statements of opinion – No
general duty to give advice – No actionable negligent misstatement – Investment
company contractually bound by statement or acknowledgment in terms of notes
that no representation or warranty made – Terms of dealing letters gave rise to
contractual estoppel – Contract terms excluding liability for misrepresentation
reasonable – No failure to extract value from outstanding forward contracts after
moratorium – Misrepresentation Act 1967, s. 2, 3.*

E    **This was an appeal by an investment company (Springwell) against two
decisions arising from the 1998 Russian moratorium on foreign debt repayments
and suspension of trading in Russian Federation issued bonds.**

F    **Springwell was owned and controlled by a Greek shipping family. It invested
in emerging market securities, including notes issued by the respondent bank
(Chase) linked to Russian bonds known as GKOs. The GKO linked notes were
traded in US dollars. Because the underlying GKOs were traded in roubles,
to avoid the possibility of a currency loss on the linked notes at redemption,
they contained, as part of their structure, a forward currency contract for the
conversion of the GKO rouble proceeds into US dollars at the redemption date
of the notes.**

G    **At the date of the Russian moratorium Springwell held GKO linked notes
bought from Chase at a cost of over \$87m. As a result of the moratorium the
underlying GKOs did not perform and Springwell's linked notes defaulted. They
were ultimately restructured. At the same time, the value of the rouble against
the US dollar fell substantially.**

H    **Springwell brought proceedings against Chase alleging that it had breached
various contractual, tortious and fiduciary duties in advising on the nature and
contents of Springwell's investment portfolio as a whole, which included not
only Russian securities but also those of other emerging market countries. Those
claims were collectively known as the 'pre-default claims'. Springwell also made**

A

**claims, known as the 'post-default claims', one of which was that Chase failed to take action after the Russian default to recover some of the value of the forward currency contracts which were part of the GKO linked notes.**

B

**Gloster J delivered two judgments ([2008] EWHC 1186 and 1793 (Comm)) dealing respectively with the pre and post default claims. She dismissed all but one of Springwell's claims, which was a minor custody fees claim.**

**Springwell appealed arguing that Chase, through its employee (JA), had made specific misstatements or misrepresentations which Springwell had relied on that the notes were 'conservative', liquid and without currency risk. It also appealed in respect of the claim that Chase had failed in its duty to Springwell to obtain some value from the forward currency contracts attached to the notes in the period after the Russian default.**

C

D

*Held*, dismissing the appeal:

**1. Springwell could not successfully impugn the judge's findings on the representations made. She was entitled to find that there was no statement in absolute terms that the notes were conservative and secure investments. Nor did JA represent that the notes were 'liquid' or 'liquid investments' in absolute terms. The statements of JA that were relied on had to be seen in their context, viz. that the notes were short-term and that the risks of sovereign default on the local currency underlying GKOs were seen as low. As for the alleged representation about 'currency risk', Springwell had no case on that at all. There was no actual currency risk unless a counterparty defaulted on the forward currency contracts. It was not asserted that JA made any representation that counterparties would never default. In any event the judge was correct to conclude that the 'representations' by JA would not amount to actionable representations in any event. They were properly characterised as nothing more than expressions of opinion, without any implied representation that JA had objectively reasonable grounds for his views. Similarly JA did not make any actionable misstatements, let alone negligent ones.**

E

F

G

**2. On the correct interpretation of the terms and conditions of the notes Springwell was bound by the terms of sections 5 and 6 of the terms and conditions as 'the Holder'.**

H

**3. Parties could agree that a state of affairs would be the basis of their contractual dealings with one another, even if they knew that it was not the case. There was a doctrine of contractual estoppel separate from estoppel by convention. (Lowe v Lombank [1960] 1 WLR 196, EA Grimstead & Son Ltd v McGarrigan (unreported, 27 October 1999), Burrough's Adding Machines Ltd v Aspinall (1925) 41 TLR 276 and Colchester Borough Council v Smith [1991] Ch**

**Section D: The Post-Default Appeal**

*Introduction*

191. It will be recalled that the overall question on the Post-Default appeal, which is against CMSCI alone, is whether, within the meaning of Section 3(c) of the terms of the GKO LNs, CMSCI was guilty of 'gross negligence' or 'wilful default' with respect to actions it took, or failed to take, in relation to nine of the eleven outstanding forward currency contracts (as at 17 August 1998) that had been concluded between CMIL and CMBI as part of each GKO LN purchase. Springwell's contention is that CMIL was at all times acting as the agent of CMSCI and that CMSCI is therefore responsible for the actions or failures of CMIL in relation to the currency forwards contracts. Springwell asserts that CMIL was 'grossly negligent' or guilty of 'wilful default' in failing to make efforts to procure performance of the nine currency forward contracts. Gloster J dismissed this claim. None of the disclaimers or exclusions relied on by Chase in relation to the Pre-Default claim are relevant to the Post-Default claim. There is no dispute that CMSCI was under the duty imposed by Section 3(c) of the terms of the GKO LNs.

192. I approach the issues on the Post-Default appeal on the basis, first, that Chase's obligation to Springwell under Section 3(c) of the GKO LN terms was to maximise recoveries under the relevant 'Transaction' (in this case the nine outstanding forward currency contracts) for the benefit of Springwell as the ultimate 'Holder'. Secondly, this means that Chase was not free, in the administration of these transactions, to disregard this primary function and to decide, for Chase's own separate economic benefit, not to attempt to do things which a reasonable person, acting on his own, would have done.209 Therefore, I agree with Gloster J's conclusion that '… CMSCI (acting by CMIL) would not be justified, by example, voluntarily to release CMBI from its obligations under a Designated Forward Transaction simply for the purpose of reducing CMSCI's payment obligations under the Notes or of reducing CMBI's financial obligations and in the "wider interests" of the Chase group'.210

193. Thirdly, if Chase was obliged, in relation to these 'Transactions' to use that degree of care that it would use if acting on its own account, then it has to be shown by Springwell that any actions or failures by CMIL, for which CMSCI is responsible as its principal were, at the least, negligent. Like Gloster J, in the context of the present case I regard the debate about what precisely is meant by 'gross negligence' as a 'somewhat sterile and semantic one'.211 Before the judge it was common ground that 'wilful misconduct' involved a knowingly wrongful action or failure to act or some act or failure to act that was done with 'reckless carelessness', that is not caring what the results of that carelessness might be.212 The parties adopted the same position on the appeal. Therefore, if 'gross negligence' is not established, there is no hope of proving 'wilful misconduct'.

LC/29

Neutral Citation Number: [2010] EWHC 1461 (Ch)

Case No: HC10C00062

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 17 June 2010

**Before** :

**THE CHANCELLOR OF THE HIGH COURT**

- - - - - - - - - - - - - - - - - - - -

**Between**

| | |
|---|---|
| **STATE STREET BANK AND TRUST COMPANY** | **Claimant** |
| **- and -** | |
| **(1)  SOMPO JAPAN INSURANCE INC** | **Defendants** |
| **(2)  CHEYNE CLO INVESTMENTS I LIMITED** | |
| **(3)  KBC INVESTMENTS LIMITED** | |

**AND BETWEEN**

| | |
|---|---|
| **SOMPO JAPAN INSURANCE INC** | **Part 20 Claimant** |
| **- and -** | |
| **(1) STATE STREET BANK AND TRUST COMPANY** | **Part 20** |
| **(2) CHEYNE CLO INVESTMENTS I LIMITED** | **Defendants** |
| **(3) KBC INVESTMENTS LIMITED** | |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**MR ANDREW AYRES** (instructed by Norton Rose LLP, London ) for the Claimant
**MR JEFFREY GRUDER QC & MR JAMES WILLAN** (instructed by Hogan Lovells International LLP) for the
Defendants

Hearing date: 25 May 2010

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

………………………………….

THE CHANCELLOR OF THE HIGH COURT

**The Chancellor:**

## Introduction

1.      On 4th April 2005 the second defendant Cheyne CLO Investments Ltd ("the
        Issuer") issued floating rate notes ("the Notes") to a face value of $140.5m in six
        tranches with varying priorities due in 2018.   The Notes were constituted by a
        Trust Deed dated 4th April 2005 and made between the claimant ("the Trustee"),
        the Issuer and the first defendant and the Conditions set out in the First Schedule
        thereto ("the Conditions").    The Notes were secured by, inter alia, total return
        swaps made between the Issuer and Credit Suisse First Boston International ("the
        Swap Counterparty") referencing collateralised loan obligations.    The obligations
        of the Issuer to the Swap Counterparty were guaranteed by the first defendant
        ("the Guarantor") on the terms of a Guarantee Agreement made between the
        Guarantor, the Trustee and the Swap Counterparty.   The obligations of the Issuer
        to the Guarantor were set out in a Reimbursement Agreement made between the
        Issuer and the Guarantor.

2.      On 31st March 2009 an event of default, as prescribed by paragraph 10(j) of the
        Conditions, occurred with the consequence that the swap agreements terminated.
        Accordingly, the Swap Counterparty claimed $160.2m from the Issuer and, after
        allowing sundry set-offs, $157.9m from the Guarantor.   The Guarantor paid the
        sum claimed and sought reimbursement of the like amount from the Issuer under
        the Reimbursement Agreement.   The issue which then arose and was set out in
        detail in a memorandum from the solicitors acting for the Guarantor was whether
        under the terms of the Reimbursement Agreement and the Conditions the
        Guarantor was entitled to the reimbursement it claimed.

3.      These Part 8 proceedings were instituted by the Trustee on 11th January 2010 for
        the purpose of resolving that doubt.  The nature of the doubt was crystallised by a
        Part 20 claim issued by the Guarantor on 12th March 2010.    The Guarantor
        contends that the doubt arises from an obvious error which the court can and
        should correct either (1) as part of the process of construction of the relevant
        documents or (2) by their rectification.    The third defendant KBC Investments
        Ltd ("the Noteholder") was joined as a representative noteholder but declined to
        take any part in the proceedings.    In those circumstances counsel for the Trustee,
        discharging his duty to the court, presented to me such arguments as he considered
        might reasonably be available to the noteholders in respect of the two issues I
        have identified. I will deal with them in due course but first it is necessary to
        describe the relevant documents in more detail and to identify the doubt.  This
        task is made more complicated by the use of over 500 defined terms.

## The Relevant Documents

4.      The starting point must be the Trust Deed made between the Issuer, the Trustee
        and the Guarantor.   The Issuer is a special purpose vehicle incorporated in the
        Republic of Ireland.   It has no assets other than such as are derived from the issue

of the Notes.  Its shares are held by a third party on charitable trusts.   By clause 3 the Issuer covenanted with the Trustee to pay to the Trustee all amounts payable to the noteholders in accordance with the Conditions and the Trustee undertook to hold the benefit of that covenant in trust for the noteholders and others.    The Trustee agreed by clause 7 to make payments of interest and principal in accordance with two orders of priority called respectively Pre-Enforcement and Post-Enforcement Priority of Payments.  Those priorities are set out at length in the Conditions.  Clause 23 of the Trust Deed makes it clear that the only assets of the Issuer available for payment of its obligations are the proceeds of the issue of the notes and other property representing them, called "Collateral".

5.    The Conditions are set out in Schedule 1 to the Trust Deed.    They refer throughout to the Guarantor as the Supersenior Guarantor but do not explain or justify the description 'supersenior'.  Clause 1 contains numerous definitions of which I should refer to the following:

> "**Financial Guarantee Floating Amount** means, upon the occurrence of an Event of Default with respect to the Notes, a Financial Guarantee Trigger Event or a Financial Guarantee Solvency Event, an amount equal to the sum of (a) the balance recorded on the Total Return Swap Interest Ledger, (b) the balance recorded on the Total Return Swap Principal Ledger, (c) any amounts due and payable under the Liquidity Swap;

> **Financial Guarantee Reimbursement Amount** means an amount payable by the Issuer to the Supersenior Guarantor to reimburse the Supersenior Guarantor for payments of Financial Guarantee Floating Amounts;

> **Total Return Swap Principal Ledger** means the ledger maintained by [the Trustee] to record amounts payable by the Issuer under the Ledger Swap of each of (a) the Accrued Total Return Swap Floating Amount, (b) the Total Return Swap Issuer Unwind Amount, (c) the Final Payment (as defined in the Total Return Swap Confirmation) and/or (d) any amount due on the redemption, in full or in part, of a Reference Obligation, as reduced from time to time;

> **Total Return Swap Termination Amount** means, with respect to the Total Return Swap Agreement, the net amount due from one party to the other under the Total Return Swap Agreement calculated pursuant to Section 6(e) of the ISDA Master Agreement as a result of a Total Return Swap Agreement Event of Default or a Total Return Swap Termination Event thereunder."

Those definitions are repeated exactly in the Master Definitions and Interpretation Schedule which governs all the documents relevant to these transactions.   As will

become apparent in due course the problem in this case arises from the limitation in the first definition to the sum of the three categories (a), (b) and (c).

6.      Paragraph 3.4 of the Conditions deals with Priority of Payments before enforcement of security over the Collateral in respect of interest and principal. Paragraph 11.2 deals with priority of payments post-enforcement of the security over the Collateral.  In each case, with only immaterial exceptions, the Financial Guarantee Reimbursement Amount is payable before payment to any class of noteholder.

7.      The Guarantee Agreement was made on 31st March 2005 between the Guarantor, the Trustee and the Swap Counterparty, therein called the Creditor.  Amongst the definitions is the following:

> "Guarantee Payment Amount means...the amount payable by the Guarantor to the Creditor pursuant to Clause 2."

By clause 2.1

> "...the Guarantor unconditionally and irrevocably guarantees the amount of (i) any and all sums due and payable by the Issuer to the Creditor under the Total Return Swap Agreement and (ii) any and all sums due and payable by the Issuer to the Creditor under the Liquidity Swap Agreement...".

The rights of the Guarantor against the Issuer are limited by clause 4 to those conferred by the Reimbursement Agreement.

8.      The Reimbursement Agreement was made between the Issuer and the Guarantor alone.  Clause 1.1 contains the following definition:

> "Financial Guarantee Reimbursement Amount means...the amount (if any) paid by the Issuer to the .. Guarantor pursuant to clause 3..."

It will be noted that this definition is different to the definition of the same term in the Conditions set out in paragraph 5 above.   By clause 2.2(k) the Issuer covenanted with the Guarantor that it would "on the terms and subject to the conditions of this Agreement, reimburse the ..Guarantor, subject to the Priorities of Payments..".  Clause 3 provides:

> "3. On each Payment Date on or following a date on which the ... Guarantor has paid a Guarantee Payment Amount (as defined in the .... Guarantee), the Issuer shall reimburse the .. Guarantor in an amount equal to the excess of (i) the aggregate of the Guarantee Payment Amounts paid by the ... Guarantor over (ii) the aggregate of all Financial

> Guarantee Reimbursement Amounts paid by the Issuer to
> the ... Guarantor prior to such Payment Date."

Clause 4 restricts the recourse the Guarantor may have to the Collateral applied in
accordance with the Post-Enforcement Priority of Payments.  It follows that if the
reimbursement of the Guarantor does not fall within that priority it cannot be
made.    The Financial Guarantee Reimbursement Amount does fall within that
priority but as defined in the Conditions not as defined in the Reimbursement
Agreement.

## The Problem

9.   The definition in the Conditions and the Master Definitions and Interpretation
Schedule of Financial Guarantee Reimbursement Amount brings in the definition
of Financial Guarantee Floating Amount, namely the sum of the balance of the
two specified ledgers and the equivalent under the Liquidity swap.  Nowhere is
any reference made to sums paid or payable by the Issuer to the Swap
Counterparty on the termination of the total return swap and guaranteed by the
Guarantor by clause 2.1 of the Guarantee Agreement.  In those circumstances
those seeking to find out the reason naturally turn to the Offering Circular
required by the relevant regulators ("the Circular").    This is a substantial
document extending to 208 pages including (pp.50-135) the Conditions.  There
are a number of relevant passages to which I should refer.

10.   On page 3 it is pointed out that with immaterial exceptions

> "..all...termination payments payable by the Issuer under
> the...Guarantee, the Total Return Swap Agreement and the
> Liquidity Swap Agreement shall rank in priority to the
> payments of interest and principal on the Notes in
> accordance with the Priority of Payments."

The summary of terms on pages 23 to 25 refer at some length to the Guarantee.
They point out that the Guarantee will cover all amounts payable to the swap
counterparty upon the occurrence of an event of default.  On such an event:

> "...the Trustee will direct the ...Guarantor to pay to the Total
> Return Swap Counterparty, … an amount equal to any
> unpaid portion of (a) the balance recorded on the Total
> Return Swap Interest Ledger; (b) the balance recorded on
> the Total Return Swap Principal Ledger; (c) any Total
> Return Swap Termination Amount owed by the Issuer to
> the Total Return Swap Counterparty and (d) any amounts
> due and payable under the Liquidity Swap (such sum, the
> "Financial Guarantee Floating Amount")."

It will be noted that that definition of Financial Guarantee Floating Amount includes in paragraph (c) "any Total Return Swap Termination Amount owed by the Issuer to the Total Return Swap Counterparty".   This amount is not to be found in the definition of the same term in the Conditions and the Master Definitions and Interpretation Schedule quoted in paragraph 5 above.   The summary continues:

> "... The Issuer will be required to reimburse the ... Guarantor, on any Payment Date thereafter, in accordance with the Priorities of Payment and to the extent funds are available, for the excess of (i) the aggregate of the Financial Guarantee Floating Amounts paid by the ... Guarantor over (ii) the aggregate of all Financial Guarantee Reimbursement Amounts (as defined below) paid by the Issuer to the ... Guarantor prior to such Payment Date..."

11.     In a section headed 'Subordination' it is stated on page 33:

> "Payments of principal and interest on each Class of Notes are subordinated to the payment of certain other amounts payable by the Issuer, as set out in the Priorities of Payments.   In particular, all payments under the Total Return Swap Agreements (except for Defaulted Total Return Swap Termination Payments), the Supersenior Financial Guarantee and the Liquidity Swap Agreement, shall rank in priority to the payments of interest and principal on all Notes except in certain circumstances, in respect of the Class A Notes, subject to the Priorities of Payments."

12.     After setting out the Conditions the Circular contains various sections giving details of the participants and other matters.   Pages 185 to 186 describe the Guarantee.   They contain passages corresponding to those on pages 23 to 25 quoted in paragraph 10 above but not in the same terms.   In a passage describing the credit protection provided it is stated that:

> "upon the occurrence of an Event of Default, the Trustee will direct the ... Guarantor to pay to the Total Return Swap Counterparty and/or the Liquidity Swap Counterparty, as applicable, an amount equal to any unpaid portion of the sum of (a) the balance recorded on the Total Return Swap Interest Ledger, (b) the balance recorded on the Total Return Swap Principal Ledger, (c) any amounts due and payable under the Liquidity Swap (such sum, the Financial Guarantee Floating Amount."

The definition in this passage is in the same terms as that contained in the Conditions and the Master Definitions and Interpretation Schedule but different

from that quoted on page 23 of the Circular in that it does not contain the reference to "any Total Return Swap Termination Amount owed by the Issuer to the Total Return Swap Counterparty".

13.    On page 186 of the circular the description of the position resulting from a payment of the Floating Amount by the Guarantor is, in substance, the same.  It reads:

> "In the event that the ... Guarantor pays the Financial Guarantee Floating Amount....The Issuer will be required to reimburse the ... Guarantor on each Payment Date thereafter and to the extent funds become available in accordance with the Priorities of Payment in an amount equal to the excess of (i) the Financial Guarantee Floating Amounts paid by the ... Guarantor over (ii) the aggregate of all amounts paid by the Issuer to the ... Guarantor with respect to the Financial Guarantee Reimbursement Amount prior to such payment."

The Circular records on page 188 that as at the Closing Date the Issuer had entered into Total Return Swaps with an aggregate notional value of $212m.

14.    In these circumstances counsel for the Guarantor submits that there is an obvious mistake in the definition of Financial Guarantee Floating Amount set out in the Conditions which can and should be cured by the established process of construction.  It is contended that the definition should be read as including paragraph (c) of the definition of that term to be found on page 23 of the Circular so as to include "any Total Return Swap Termination Amount owed by the Issuer to the Total Return Swap Counterparty".   That is the first issue referred in paragraph 3 above to which I now turn.

## Construction

15.    It is well established that in appropriate circumstances a clear mistake may be corrected as part of the process of construction.  I have been referred to a number of authorities.   They are, in chronological order **Schuler AG v Wickman Machine Tool Sales Ltd** [1974] 235; **East v Pantiles (Plant Hire)** (1981) 263 EG 61; **The Antaios** [1985] AC 191; **City Alliance Ltd v Oxford Forecasting Services Ltd** [2001] 1 AER (Comm) 233; **Holding & Barnes plc v Hill House Hammond Ltd** (No.2) [2001] EWCA  civ 1334; **Dalkia Utilities Services plc v Celtech International Ltd** [2006] 1 Ll.L.R. 599; **KPMG v Network Rail Infrastructure Ltd** [2007] EWCA Civ 363 and **Chartbrook Ltd v Persimmon Homes Ltd** [2009] 1 AC 1101.  It is only necessary for me to refer to two of them.

16.    In **East v Pantiles (Plant Hire)** (1981) 263 EG 61 the Court of Appeal was concerned with the date by which notice was required to be served so as to trigger

a rent review clause.  The principle to be applied was formulated by Brightman
LJ, with whom Lawton and Oliver LJJ agreed, in these terms:

> "It is clear on the authorities that a mistake in a written
> instrument can, in certain limited circumstances, be
> corrected as a matter of construction without obtaining a
> decree in an action for rectification. Two conditions must
> be satisfied: first, there must be a clear mistake on the face
> of the instrument; secondly, it must be clear what correction
> ought to be made in order to cure the mistake. If those
> conditions are satisfied, then the correction is made as a
> matter of construction. If they are not satisfied then either
> the claimant must pursue an action for rectification or he
> must leave it to a court of construction to reach what
> answer it can on the basis that the uncorrected wording
> represents the manner in which the parties decided to
> express their intention. In *Snell's Principles of Equity* 27th
> ed p 611 the principle of rectification by construction is said
> to apply only to obvious clerical blunders or grammatical
> mistakes. I agree with that approach. Perhaps it might be
> summarised by saying that the principle applies where a
> reader with sufficient experience of the sort of document in
> issue would inevitably say to himself, "Of course X is a
> mistake for Y"."

17.   Counsel for the Trustee suggested that a noteholder might rely on this proposition
to oppose the relief sought by the Guarantor on the ground that it is not clear from
the face of the Reimbursement Agreement that there has been any mistake.
Whilst accepting that the Circular was admissible on any issue of construction he
pointed out that it is not a contractual document.  Given that there are no fewer
than five definitions of the term Financial Guarantee Floating Amount and only
one of them is in the terms for which counsel for the Guarantor contends, he
submitted that it was not clear either what the mistake was or what correction
ought to be made.

18.   In response to this forceful submission counsel for the Guarantor relied on the
speech of Lord Hoffmann in **Chartbrook Ltd v Persimmon Homes Ltd** [2009] 1
AC 1101 which is the second case to which I need refer.  It concerned a mistake in
the formula to be used to calculate the price payable for some development land.
In paragraph 15 Lord Hoffmann noted that it required a strong case to persuade
the court that something had gone wrong with the language the parties had used in
their contract.   In paragraph 17 he noted the relevance of the label or defined term
used.   In paragraph 21 he reiterated that the process of interpretation did not
require any precise formulation of an alternative form of words to correct the clear
mistake.

19.   In paragraphs 22 to 24 Lord Hoffmann considered the judgment of Brightman LJ
in **East v Pantiles (Plant Hire) Ltd.**  He said:

22. In **East v Pantiles (Plant Hire) Ltd** (1981) 263 EG 61 Brightman LJ stated the conditions for what he called "correction of mistakes by construction":

"Two conditions must be satisfied: first, there must be a clear mistake on the face of the instrument; secondly, it must be clear what correction ought to be made in order to cure the mistake. If those conditions are satisfied, then the correction is made as a matter of construction."

23. Subject to two qualifications, both of which are explained by Carnwath LJ in his admirable judgment in **KPMG LLP v Network Rail Infrastructure Ltd** [2007] Bus LR 1336, I would accept this statement, which is in my opinion no more than an expression of the common sense view that we do not readily accept that people have made mistakes in formal documents. The first qualification is that "correction of mistakes by construction" is not a separate branch of the law, a summary version of an action for rectification. As Carnwath LJ said, at p 1351, para 50:

"Both in the judgment, and in the arguments before us, there was a tendency to deal separately with correction of mistakes and construing the paragraph 'as it stands', as though they were distinct exercises. In my view, they are simply aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended."

24. The second qualification concerns the words "on the face of the instrument". I agree with Carnwath LJ, paras 44-50, that in deciding whether there is a clear mistake, the court is not confined to reading the document without regard to its background or context. As the exercise is part of the single task of interpretation, the background and context must always be taken into consideration.

25. What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant. In my opinion, both of these requirements are satisfied."

20.    In my view Lord Hoffmann makes it clear in those passages that although the mistake must be clear it may emerge from a consideration of all the relevant documents, not only on the face of one of them; nor is there a limit to the correction which may be made provided that it is clear to the reasonable person

having regard to all the relevant documents what the parties meant. Accordingly, it appears to me that the argument assumed to have been put forward by a noteholder seeks to place limits on how the mistake may appear and how it may be corrected which the authorities do not warrant.

21.    It is true, as submitted by counsel for the Trustee, that the apparently unlimited obligation of the Issuer to reimburse the Guarantor contained in clause 3 of the Reimbursement Agreement is restricted by the provisions of clause 4 to recourse to the net proceeds of the Collateral applied in accordance with the Post-Enforcement Priority of Payments. But it is plainly envisaged that the obligation of the Issuer to reimburse the Guarantor for payments made on the termination of the swaps appears somewhere in that order of priority. Were it otherwise clause 4 would recognise that in the event of a shortfall the Guarantor would not be entitled to any reimbursement.

22.    That such reimbursement is contemplated is confirmed by the use of the term Financial Guarantee Reimbursement Amount in paragraph (i) of the Post-Enforcement Priority of Payments set out in Condition 11.2. Had the definition of that term been taken from the Reimbursement Agreement rather than the Conditions the present problem would not have arisen. As it is, the definition actually applied is limited to the sum of the three items set out in it. Sub-paragraph (b) refers to the balance recorded on the Total Return Swap Principal Ledger. The definition of that term in both the Conditions and the Master Definitions and Interpretation Schedule appears to exclude the Total Return Swap Termination Amount as defined. The contrary has not been asserted. The consequence is that such termination amounts are not included in the relevant ledger balance.

23.    But that makes no commercial sense. The ledger balances, be they for interest or principal, record, in the absence of an early termination, the gross amounts due but not paid by the Issuer to the Swap Counterparty during the currency of the swap agreement. The Total Return Swap Termination Amount is the net amount arrived at after netting off sums due by the Issuer against the sums due to the Issuer after termination. Thus the amounts appearing in the ledger accounts before termination include gross amounts which go to produce the net sum defined as the Total Return Termination Amount due after termination. But whereas the former is subject to reimbursement by the Issuer to the Swap Guarantor the latter is not. No reason has been suggested why the right of the Swap Guarantor to be reimbursed from the Collateral should depend on whether or not there has been an early termination.

24.    These conclusions appear from the convoluted definitions used in the Conditions. The Total Return Swap Principal Ledger referred to in paragraph (b) of the definition of Financial Guarantee Floating Amount is defined in the Conditions as the ledger recording amounts payable by the Issuer described as:

"(a) the Accrued Total Return Swap Floating Amount, (b) the Total Return Swap Issuer Unwind Amount, (c) the Final Payment (as defined in the Total Return Swap Confirmation and/or (d) any amount due on the redemption, in full or in part, of a Reference Obligation, as reduced from time to time;"

These terms are themselves defined, albeit not solely by reference to the Conditions. The Accrued Total Return Swap Floating Amount (a) is defined in the Conditions as all amounts accrued due by the Issuer but unpaid for the time being. The definition of the Total Return Swap Issuer Unwind Amount (b) in the Conditions incorporates the expression "Unwind Payment" in the Total Return Swap Confirmation. In the Total Return Swap Confirmation the expression "Unwind Payment" refers to an amount agreed by or determined as between the Issuer and the Total Return Swap Counterparty which is payable on or prior to the Scheduled Termination Date. A Reference Obligation (d) refers to an obligation under the Total Return Swaps. Thus it appears that, by one route or another, all sums due, but which remain unpaid by the Issuer to the Swap Counterparty prior to an early termination should be reflected in the Total Return Swap Principal Ledger.

25.    In addition no coherent explanation has been given why a Total Return Swap should, in this respect, be treated differently from a liquidity swap referred to in paragraph (c) of the definition of Financial Guarantee Floating Amount contained in the Conditions. Further the definition of Financial Guarantee Floating Amount set out on page 24 of the Circular is further confirmation of an intention that the Guarantor should be reimbursed with the like order of priority.

26.    I conclude that it is clear from a consideration of all the relevant documents that a mistake has been made in the definition of Financial Guarantee Reimbursement Amount as defined in the Conditions and applied in condition 11.2(i). The term ought to include the Total Return Swap Termination Amount. If the appropriate construction is to read the definition of Financial Guarantee Floating Amount where it appears in the Conditions as being in the form set out on page 24 of the Circular then the Total Return Swap Termination Amount owed by the Issuer to the Swap Counterparty will be included. Consequently the Issuer would be obliged to reimburse that amount to the Guarantor. As the obligation to reimburse only arises if the Guarantor has paid the amount due to the Total Return Swap Counterparty it matters not that the definition describes it as owed by the Issuer. Accordingly I conclude that it is clear from this consideration of the relevant documents what is the appropriate construction to adopt to correct the obvious mistake.

27.    For these reasons I accept the submissions made by Counsel for the Guarantor and will make the appropriate declaration as to the true construction of the relevant documents. In these circumstances the question of rectification does not arise. There would be no issues of fact to resolve if it did and it is not, therefore, necessary for me to deal with it.

### Postscript

28.    Not the least surprising feature of this case is the absence of any noteholder prepared to participate. As the Notes were issued in dematerialised form to Clearstream and Euroclear and are payable to bearer the Trustee is unable to ascertain the identity of all noteholders. Nevertheless the interlocutory processes, which included advertisement, revealed KBC Investments Ltd, BAWAG, Unicredit, Uniqa and Nataxis as noteholders. None of them was prepared to take

11

any part in the proceedings. In those circumstances I was grateful to counsel for the Trustee for his very helpful submissions but I think it is necessary to add a few words in relation to the position of a trustee in an application such as this.

29.     In view of the absence of any noteholder prepared to participate I indicated before the hearing that I expected the Trustee to advance any arguments reasonably available to the noteholders as a class. The response was a letter from the Trustee's solicitors stating

> "we are mindful of our duties to the Court, but we write on behalf of our client to request that the Chancellor does not require us or our client's counsel to address the court on any arguments available to any side in this litigation."

The reason for this request was stated to be the wish of the Trustee "to maintain complete neutrality". The letter indicated that if I was not minded to accept their request the Trustee should be formally ordered to make such arguments and an adjournment to enable such arguments to be advanced would be required. In the event I made no such order, granted no adjournment and received considerable assistance from counsel for the Trustee.

30.     Nevertheless I remain concerned that the duties of a trustee in seeking the assistance of the court should be properly understood. In the case of a private trust, including a pension scheme, the trustee has been likened to a watchdog for unrepresented interests, see **Re Druce** [1962] 1 AER 563, 568. The trustee is expected to assist the court in the varied circumstances indicated in paragraph 21.81 Lewin on Trusts 18th Edition and the cases there cited. Of course there are differences between those trustees and the Trustee in this case but those differences do not, in my view, lead to any difference in the duty of the Trustee to the Court. If a trustee, of any description, applies to the court he is expected to assist the court by bringing to the court's attention any relevant legal proposition or argument affecting the position of unrepresented beneficiaries or parties. This is, in my view, but a specific application of the general duty to which Lord Birkenhead LC referred in **Glebe Sugar Refining Company Ltd v Trustees of the Port and Harbours of Greenock** [1921] WN 85 to the case of particular fiduciaries. That said I am in no doubt that, in the event, the duty was amply observed and performed by Counsel for the Trustee.

12

LC/30

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
ER (Comm)    Declaration of Lord Collins    Pg 353 of 428
CA    Chartbrook v Persimmon    387

*[left margin fragments]*

them to the

so identifies

to treat the
on board the
place in the

possession,
nsfer of the
ntemplates,
mple is s 30,
ntity, which
:nt.
ined in the
l consider it
'actc...ses an
). This is so
'oth parties'
is engaging
alternative).
the place of
accordingly

opinion of
gives, with

rister (NZ).

# Chartbrook Ltd v Persimmon Homes Ltd (Chartbrook Ltd and another, Part 20 defendants)

## [2008] EWCA Civ 183

COURT OF APPEAL, CIVIL DIVISION

TUCKEY, LAWRENCE COLLINS AND RIMER LJJ

18, 19 DECEMBER 2007, 12 MARCH 2008

*Contract – Construction – Pre-contract negotiations – Evidence of surrounding circumstances – Private dictionary principle – Parties disputing amounts due under component of price of contract – Disputed component defined in contract – Whether evidence of parties' negotiations admissible as an aid to construction where disputed term defined in contract.*

The parties entered into a development agreement. A dispute arose and the claimant commenced proceedings alleging that it was owed money under the agreement. In particular the dispute concerned a term in the agreement which provided for an 'Additional Residential Payment' (ARP), a term defined in the contract, under which the claimant claimed to be entitled to a fixed percentage of the net proceeds of sale of each residential unit in excess of a minimum guaranteed amount. The defendant's case was that the claimant was entitled to receive either a fixed percentage of the sale revenue or the minimum guaranteed amount whichever was greater. In support of the construction for which it contended the defendant sought to rely on pre-contractual documents. Alternatively, the claimant sought rectification of the agreement to accord with what it claimed to be the parties' common agreement. The judge held: (i) that the claimant's construction was the correct one; (ii) that precontractual negotiations could not be relied on; and that in so far as there might be an exception to that principle in 'private dictionary' cases, that exception could not be used for a case such as the instant case where an express definition was contained within the agreement; and (iii) that the defendant had failed to prove the necessary common or unilateral mistake necessary to support a claim for rectification. The defendant appealed.

**Held** – The appeal would be dismissed for the following reasons:

(1) (Lawrence Collins LJ dissenting) The judge's construction of the wording of the agreement was correct (see [181]–[186], [192], [195], below).

(2) The court was bound by authority to accept as the starting point the rule that previous negotiations of the parties were excluded from the construction exercise. The private dictionary or agreed basis exceptions to that rule were open to the court; however, there was no scope for the application of those exceptions in the instant case (see [131], [132], [187], [191], below); *Investors Compensation Scheme Ltd v West Bromwich Building Society, Investors Compensation Scheme Ltd v Hopkin & Sons (a firm), Alford v West Bromwich Building Society, Armitage v West Bromwich Building Society* [1998] 1 All ER 98 applied; *Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd, The Karen Oltmann* [1976] 2 Lloyd's Rep 708 considered.

(3) There was no basis for interfering with the judge's findings on the defendant's claim to rectification (see [176]–[178], [189], [191], below).

Decision of Briggs J [2007] 1 All ER (Comm) 1083 affirmed.

## Notes

For the interpretation of express contractual terms, see 9(1) *Halsbury's Laws* (4th edn reissue) paras 772–777.

## Cases referred to in judgments

*Agip SpA v Navigazione Alta Italia SpA, The Nai Genova* [1984] 1 Lloyd's Rep 353, CA.

*Alexiou v Campbell* [2007] UKPC 11.

*Antaios Cia Naviera SA v Salen Rederierna AB, The Antaios* [1984] 3 All ER 229, [1985] AC 191, [1984] 3 WLR 592, HL.

*Assicurazioni Generali SpA v Arab Insurance Group (BSC)* [2002] EWCA Civ 1642, [2003] 1 All ER (Comm) 140, [2003] 1 WLR 577.

*Bank of Credit and Commerce International SA (in liq) v Ali* [2001] UKHL 8, [2001] 1 All ER 961, [2002] 1 AC 251, [2001] 2 WLR 735.

*Bates (Thomas) & Son Ltd v Wyndham's (Lingerie) Ltd* [1981] 1 All ER 1077, [1981] 1 WLR 505, CA.

*Britoil plc v Hunt Overseas Oil Inc* [1994] CLC 561, CA.

*Butlin's Settlement Trust, Re, Butlin v Butlin* [1976] 2 All ER 483, [1976] Ch 251, [1976] 2 WLR 425.

*Commission for the New Towns v Cooper (GB) Ltd* [1995] 2 All ER 929, [1995] Ch 259, [1995] 2 WLR 677, CA.

*Co-operative Wholesale Society Ltd v National Westminster Bank plc, Scottish Amicable Life Assurance Society v Middleton Potts & Co, Broadgate Square plc v Lehman Bros Ltd, Prudential Nominess Ltd v Greenham Trading Ltd* [1995] 1 EGLR 97, CA.

*Crane v Hegeman-Harris Co Inc* [1939] 1 All ER 662, [1971] 1 WLR 1390n; *affd* [1939] 4 All ER 68, CA.

*Datec Electronic Holdings Ltd v United Parcels Service Ltd* [2007] UKHL 23, [2007] 2 All ER (Comm) 1067, [2007] 1 WLR 1325.

*Ham v Somak Travel Ltd* (4 February 1998, unreported), CA.

*Investors Compensation Scheme Ltd v West Bromwich Building Society, Investors Compensation Scheme Ltd v Hopkin & Sons (a firm), Alford v West Bromwich Building Society, Armitage v West Bromwich Building Society* [1998] 1 All ER 98, [1998] 1 WLR 896, HL.

*IRC v Botnar* [1999] STC 711, CA.

*Jones v Bright Capital Ltd* [2006] EWHC 3151 (Ch).

*Joscelyne v Nissen* [1970] 1 All ER 1213, [1970] 2 QB 86, [1970] 2 WLR 509, CA.

*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] 3 All ER 352, [1997] AC 749, [1997] 2 WLR 945, HL.

*Moschi v Lep Air Services Ltd* [1972] 2 All ER 393, [1973] AC 331, [1972] 2 WLR 1175, HL

*Munt v Beasley* [2006] EWCA Civ 370, [2006] All ER (D) 29 (Apr).

*Pacific Gas and Electric Co v G W Thomas Drayage and Rigging Co* (1968) 442 P 2d 641 (Cal SC).

*Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd, The Karen Oltmann* [1976] 2 Lloyd's Rep 708.

08-13555-mg  Doc 53253-1  Filed 07/06/16  Entered 07/06/16 02:46:05  Appendix to
CA  Declaration of Lord Collins  Pg 355 of 428
(Comm)  Chartbrook v Persimmon (Lawrence Collins LJ)  409

in almost every case the full negotiating history would have to be traversed. The principle in *Prenn v Simmonds* [1971] 3 All ER 237, [1971] 1 WLR 1381 would therefore be swallowed by the exception.

[104] There was no suggestion in the February letters that they were an offer capable of acceptance. The February letters did not contain any of the words or phrases used in the price formula in the draft contract. Mr Pendlebury's letter of 24 May 2001 made some changes to the numbers, but was written on the footing that the terms of the agreement would be as set out in the draft contracts. The parties did not reach 'consensus' either in February or May 2001. They merely agreed that the solicitors should get on with the drafting so that the parties could then see whether a contract could be reached.

### Conclusions

[105] There is no doubt about the starting point, which is that 'for reasons of practical policy' the law excludes from the admissible background the previous negotiations of the parties: see the *Investors Compensation Scheme* case [1998] 1 All ER 98 at 114, [1998] 1 WLR 896 at 913. In *Alexiou v Campbell* [2007] UKPC 11 at [15], Lord Bingham of Cornhill referred to—

> 'the principle, vouched by such compelling authorities as *Prenn v Simmonds* ... and *Investors Compensation Scheme Ltd v West Bromwich Building Society* ... that evidence of prior negotiations not leading to any antecedent agreement is inadmissible to construe a contract.'

See also *Moschi v Lep Air Services Ltd* [1972] 2 All ER 393 at 406, [1973] AC 331 at 354 and *L Schuler AG v Wickman Machine Tool Sales Ltd* [1973] 2 All ER 39 at 53, [1974] AC 235 at 261.

[106] The policy reasons have not been fully articulated. In *Prenn v Simmonds* [1971] 3 All ER 237 at 240–241, [1971] 1 WLR 1381 at 1384–1385, Lord Wilberforce said:

> 'The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience (although the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, although converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does the construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back; indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to. It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense it is true; the commercial, or business object, of the transaction, objectively ascertained, may be a surrounding fact ... The words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get "agreement" and in the hope that disputes will not arise. The only course then can be to try to ascertain the "natural" meaning. Far more, and indeed totally, dangerous is it to admit evidence of one party's objective—even if this is known to the other party. However strongly pursued this may be, the other

08-13555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Appendix to
410        Declaration of Lord Collins   Pg 356 of 428
All England Law Reports   [2008] 2 All ER (Comm)

party may only be willing to give it partial recognition, and in a world of
give and take, men often have to be satisfied with less than they want. So,
again, it would be a matter of speculation how far the common intention
was that the particular objective should be realised ...

In my opinion, then, evidence of negotiations ... ought not to be
received, and evidence should be restricted to evidence of the factual
background known to the parties at or before the date of the contract,
including evidence of the "genesis" and objectively the "aim" of the
transaction.'

[107] In *Britoil plc v Hunt Overseas Oil Inc* [1994] CLC 561 at 573 Hobhouse LJ
said (in the context of a claim for rectification):

'The process of negotiation and progressing towards a complete and
formalised agreement is one which may contain many ambiguities. The
purpose of the final document is to remove those ambiguities and to
define authoritatively and clearly what the parties' respective rights and
obligations are to be.'

[108] The reasons for the exclusionary rule are by no means self-evident. The
American Law Institute *Restatement of the Law (Second) Contracts*, s 214, states
that 'negotiations prior to ... the adoption of a writing are admissible in
evidence to establish ... the meaning of the writing'. In the United States,
contract law is generally a matter of state law, and the courts of the majority of
states retain the 'plain meaning rule', namely that where the meaning of the
language taken in context is clear, evidence of prior negotiations cannot be
used in its interpretation. But there is a division of authority as to whether
evidence of prior negotiations can be used to show whether contract language
lacks the required degree of clarity: *Pacific Gas and Electric Co v G W Thomas
Drayage and Rigging Co* (1968) 442 P 2d 641. See Farnsworth *Contracts* (3rd edn,
2004) Vol 2 pp 306–319 (para 7.12). See also *Corbin On Contracts* (1998)
paras 24.7 et seq; *Williston on Contracts* (4th edn, 2007) vol 11, para 33.42.

[109] Nor is the exclusionary principle accepted in international instruments
dealing with private law contracts, such as the UNIDROIT Principles of
International Commercial Contracts (art 4.3) and the United Nations
Convention on Contracts for the International Sale of Goods (1980). That
material was referred to by Thomas J in the New Zealand Court of Appeal in
an important criticism of the exclusionary rule in a decision in which he
expressed the view that his construction was supported by provisions in earlier
drafts of the contract: see *Yoshimoto v Canterbury Golf International Ltd* [2001] 1
NZLR 523 at 538 (para 59ff). Thomas J's view was that the general exclusionary
rule should stand, but that there should be flexibility in its application where
cautious use of the pre-contract material would enable the court to arrive at a
meaning of the contract which accorded with the ascertainable intention of
the parties (at 541, 544 (paras 69, 76)). The point was not addressed on appeal
to the Privy Council: see [2002] UKPC 40, [2004] 1 NZLR 1.

[110] The UNIDROIT principles and the UN convention were also relied on
in a lecture by Lord Nicholls of Birkenhead arguing for a more flexible
approach, reprinted as 'My Kingdom for a horse: the meaning of words' (2005)
121 LQR 577. He said (p 583):

'there will be occasions where the pre-contract negotiations do shed light
on the meaning the parties intended to convey by the words they used.
There will be occasions, for instance, when the parties in their pre-contract

08-13555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Appendix to
CA   Declaration of Lord Collins   Pg 357 of 428

R (Comm)   *Chartbrook v Persimmon* (Lawrence Collins LJ)   411

exchanges made clear the meaning they intended by language they subsequently incorporated into their contract. When pre-contract negotiations assist in some such way, the notional reasonable person should be able to take that evidence into account in deciding how the contract is to be interpreted.

This would not be a departure from the objective approach. Rather, this would enable the notional reasonable person to be more fully informed of the background context. This would recognise that pre-contract negotiations are themselves part of the background of a contract and that, like other background material, they may be relevant when interpreting a contract. They differ from other background material in that, unlike other background material, they may afford direct evidence of the parties' actual intentions. That is not a reason for banning their use. That would be perverse. That would mean that in deciding the meaning intended to be conveyed by the language chosen by the parties the notional reasonable person would always be barred from having regard to what may be the best evidence of all. He must always conjecture, he must never know. The preferable approach is to recognise that pre-contract negotiations are relevant and admissible if they would have influenced the notional reasonable person in his understanding of the meaning the parties intended to convey by the words they used.'

[111] Lord Nicholls suggested (pp 587–588) that the policy reasons put forward for the proposition that pre-contract negotiations were inadmissible were as follows: (1) increased uncertainty and unpredictability in dispute resolution; (2) adverse effect on third party rights; (3) the use of the evidence would be unhelpful (Lord Wilberforce's reason); (4) subversion of the objective approach. Lord Nicholls accepted that these were important practical considerations, but that they were not conclusive. To that I would add a further one, which is that without such a rule sophisticated and knowledgeable negotiators would be tempted to lay a paper trail of self-serving documents.

[112] The judge in this case was particularly impressed by the second of Lord Nicholls' reasons, the effect on third parties. But, as Lord Nicholls recognised (p 588), the same objection would apply (although perhaps with less force) to the admissibility of other background material, which might be equally unavailable to third parties. The Law Commission (*Law of Contract: The Parol Evidence Rule* (Law Com no 154) (1986)), when concluding that the parol evidence rule did not have the effect of excluding evidence which ought to be admitted if justice was to be done between the parties, did not consider that assignees would be prejudiced: p 25 (para 2.43). It is also significant that the effect on assignees does not prevent (as I have indicated) the admissibility of pre-contract negotiations for the purposes of interpretation in the practice of the world's greatest capitalist nation, the United States.

[113] In the *Investors Compensation Scheme* case [1998] 1 All ER 98 at 114–115, [1998] 1 WLR 896 at 913, Lord Hoffmann accepted that the boundaries of the exception were not clear. In *Bank of Credit and Commerce International SA (in liq) v Ali* [2001] 1 All ER 961 at [31] Lord Nicholls added that whether the reasons of practical policy referred to by Lord Hoffmann still held good had been increasingly the subject of debate, and he said that he desired to keep the point open for consideration on a future occasion.

[114] A potentially relevant exception which is open to this court derives from *The Karen Oltmann* [1976] 2 Lloyd's Rep 708. In that case the owners let

the vessel 'for a period of 2 years 14 days more or less'. The charter provided *a*
that the charterers would have the option to redeliver the vessel 'after
12 months trading subject to giving 3 months' notice'. After trading for
19 months, the charterers gave three months' notice of their intention to
redeliver. The owners said that the redelivery provision meant that the
charterers had the option to redeliver on the expiry of 12 months from the
inception of the charter. The charterers said that it meant that they could *b*
terminate at any time after 12 months, and that their notice was therefore a
good one.

[115] The striking point about the case is that telexes between the parties
showed that when they used the word 'after' they meant 'on the expiry of' and
not 'at any time after the expiry of'.

[116] Kerr J accepted, first, that pre-contract telex exchanges were *c*
inadmissible to interpret the contract. Second, he accepted that the telex
exchanges could be looked at to determine whether there had been an estoppel
by representation, but held that they did not support the allegation of an
estoppel.

[117] His final conclusion (at 713) was that as a matter of impression the *d*
contract on its face meant 'on the expiry of', but said that if he should be
wrong about that the construction which he preferred, he found that it was
confirmed by the way in which the parties were themselves understanding and
using the word.

[118] His reasoning on the latter point has given rise to much discussion and
some misunderstanding. Having accepted the general exclusionary rule, he said *e*
(at 712):

> 'the principle can be stated as follows. If a contract contains words
> which, in their context, are fairly capable of bearing more than one
> meaning, and if it is alleged that the parties have in effect negotiated on an
> agreed basis that the words bore only one of the two possible meanings, *f*
> then it is permissible for the Court to examine the extrinsic evidence relied
> upon to see whether the parties have in fact used the words in question in
> one sense only, so that they have in effect given their own dictionary
> meaning to the words as the result of their common intention. Such cases
> would not support a claim for rectification of the contract, because the
> choice of words in the contract would not result from any mistake. The *g*
> words used in the contract would ex hypothesi reflect the meaning which
> both parties intended.'

[119] He went on (at 713):

> 'However, on the basis that the word "after" … is capable of bearing two
> meanings as a matter of construction, I do not think that there is any *h*
> authority precluding the Court from examining the pre-charter-party
> exchanges in order to see whether the owners can make good their
> contention that the parties were in agreement in using this word in only
> one of its two senses, and having in effect both given it the same dictionary
> meaning to the exclusion of the other meaning. Having then considered
> the pre-charter-party exchanges on this basis I find that this contention is *j*
> established. In these circumstances it seems to me that the charterers
> cannot now depart from this common meaning by asserting that this word
> has the opposite meaning in the charter-party.'

[120] Kerr J referred to the negotiation on 'an agreed basis that the words
bore only one of two possible meanings' and used the expression 'their own

08-13555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Appendix to
Declaration of Lord Collins   Pg 359 of 428
R (Comm)                        CA      Chartbrook v Persimmon (Lawrence Collins LJ)            413

dictionary meaning'. But it is plain from the facts that there had been no actual agreement on the meaning of the word 'after'. What happened was that the parties were negotiating on a common understanding of what the point in contention between them was, namely the period within which the notice had to be given so as to expire at the end of a period which the owners wanted to be of maximum duration and minimum flexibility where the charters wanted the precise opposite. There was no agreement on the word 'after' except in this sense: because they were negotiating on a common understanding of what each was endeavouring to achieve they were using the word in the same sense.

[121] On analysis, in my judgment, *The Karen Oltmann* does not lay down any special 'private dictionary' exception. All that Kerr J was saying was that the negotiations could be looked at to see whether the parties had negotiated on an agreed basis that the words bore only one of two possible meanings. I doubt whether this differs in any material respect from admitting evidence of prior negotiations in construing a contract.

[122] Kerr J suggested (at 712), obiter (because there was no claim for rectification) that private dictionary cases—

'would not support a claim for rectification of the contract, because the choice of words in the contract would not result from any mistake. The words used in the contract would ex hypothesi reflect the meaning which both parties intended.'

[123] Briggs J was right to point out that cases such as *Re Butlin's Settlement Trust, Butlin v Butlin* [1976] 2 All ER 483, [1976] Ch 251 show that rectification may be available even if words have been deliberately used, but where it was mistakenly considered that they bore a different meaning from their correct meaning as a matter of true construction. But I do not think he was right to suggest that *The Karen Oltmann* should have been decided on that basis. In my judgment, the problem in *The Karen Oltmann* was that the words in the contract were capable of bearing more than one possible meaning. There was no mistake either as to the words used or as to the consequence of the words used.

[124] The decision of Kerr J, a very experienced and eminent commercial judge, has been referred to with apparent approval by this court, although its reasoning does not appear to have been the ratio of any decision: see, e g *Ham v Somak Travel Ltd* (4 February 1998, unreported), *IRC v Botnar* [1999] STC 711 and *Proforce Recruit Ltd v Rugby Group Ltd* [2006] EWCA Civ 69, [2006] All ER (D) 247 (Feb).

[125] In the *Proforce Recruit* case the relevant phrase was 'preferred supplier status' in a service cleaning agreement. The question for the Court of Appeal was whether an otherwise unarguable case on construction could be saved (from being struck out or from summary judgment being granted) by reference to the meaning that it was alleged that the parties had in their negotiations placed on that phrase. In concluding that it might, and therefore in allowing the appeal against the striking out of the action, Mummery LJ, after quoting from *The Karen Oltmann*, said (at [31]):

'as stated in *Chitty on Contracts* para 12.119, evidence of facts about which the parties were negotiating is admissible to explain what meaning was intended and evidence of what the parties said in negotiations is admissible to show that the parties negotiated on an agreed basis that the words used bore a particular meaning.'

-13555-mg   Doc 53253-1   Filed 07/06/16   Entered 07/06/16 02:46:05   Appendix to
Declaration of Lord Collins   Pg 360 of 428
414                                              All England Law Reports   [2008] 2 All ER (Comm)

[126] Concurring in the result, Arden LJ said (at [55]):

> 'In this case, the parties have used a very unusual combination of words
> ("preferred supplier status"). These words are undefined and they are not
> introduced or accompanied by any words of explanation. In those
> circumstances it is in my judgment reasonably arguable that on their true
> interpretation those words bear the meaning that the parties in common
> gave them in their communications leading up to the signing of the
> agreement. In admitting evidence as to those communications, the court
> would be hearing that evidence not with a view to taking the parties'
> subjective intent into account for the purposes of interpretation (a purpose
> precluded by the principles laid down by Lord Hoffman in the *Investors
> Compensation Scheme* case [1998] 1 All ER 98, [1998] 1 WLR 896) but for the
> purpose of identifying the meaning that the parties in effect incorporated
> into their agreement in circumstances where the court was satisfied that
> on their true interpretation the terms of the agreement were to have this
> effect.'

[127] Richards LJ said that it was not appropriate at that stage to express any
concluded view on the extent to which pre-contract negotiations can be taken
properly into account in that case for the purpose of ascertaining the meaning
of the contract.

[128] At trial Cresswell J found that there had been no agreed meaning: see
*Proforce Recruit Ltd v Rugby Group Ltd* [2007] EWHC 1621 (QB), [2007] All ER
(D) 93 (Jul).

[129] The other most directly relevant decision at first instance is *Jones v
Bright Capital Ltd* [2006] EWHC 3151 (Ch). The issue was as to the meaning of
a paragraph in a defence in a claim about pension rights, which had been
incorporated as a term of the settlement of those proceedings. Sir Andrew
Morritt C referred to the argument for the claimant that correspondence was
admissible to show that the parties had used words in a special sense or to show
the commercial business genesis or object of the agreement. He cited *Prenn v
Simmonds*, the *Investors Compensation Scheme* case and *The Karen Oltmann*, and
went on (at [24]):

> 'In my view each of the letters in question is admissible on the issue of
> construction. They show the genesis and subject matter of para 38(3) of
> the defence which became a term of the compromise. They show the
> connection between the actuary's calculations and that paragraph and
> explain the figures and other terms which appear in it. None of them is
> relied on as indications of subjective intention and on the face of them
> they are not objectionable on that account. The mere fact that they were
> written in the course of inter-solicitor correspondence seeking to agree a
> redundancy package is not, in my judgment, a sufficient objection.'

[130] He then went on (at [25]) to say that none of the letters added a great
deal on the issue of construction, but (at [41]) used them to determine what he
described as 'the subject matter of discussion' to show that what the parties
were negotiating about was extra scheme pension (attracting pension
increases) rather than a flat rate annual payment. A literal reading of the
document would not have led to that result. This was not a 'private dictionary'
case. The use of the correspondence was justified on the basis that it showed
the genesis and object of the provision and provided a ground for treating the
parties as having negotiated on an agreed basis.

08-13555-mg    Doc 53253-1    Filed 07/06/16    Entered 07/06/16 02:46:05    Appendix to
CA    Declaration of Lord Collins    Pg 361 of 428

R (Comm)    Chartbrook v Persimmon (Lawrence Collins LJ)    415

[131] My conclusions on this aspect of the appeal are as follows. First, this court is bound to accept the exclusionary rule as the starting point. Second, the policy reasons for a strict application of the rule are not compelling, and I do not accept the judge's emphasis on the effect on third parties as a strong policy reason for the rule. Third, the 'private dictionary' and 'agreed basis' exceptions established in *The Karen Oltmann* are open to the court. Fourth, for the same reasons as I gave in the previous section of this judgment, I do not consider that the application of these exceptions is excluded simply because the words at issue are themselves contained in a definition section. Chartbrook makes the point that the judge has found in the rectification claim that there was no common intention, and that it would be wrong by introducing the documents (and only the documents) in the guise of interpretation, to find that there had been an agreement. That in itself would not be conclusive because subjective intention is not relevant under the head of construction, and in any event all that the judge did was to conclude, with evident hesitation, that Persimmon had not proved its rectification claim with sufficient clarity.

[132] The pre-contract material points very strongly in favour of Persimmon's construction, and if there were no limitations on its admissibility, it would not fall short of being determinative on the construction issue. But I do not consider that this is a case for the application of the 'private dictionary' or 'agreed basis' exceptions because the pre-contract negotiations do not establish a sufficiently clear evidential basis for them. There is no possible basis for a 'private dictionary' approach, and to look for 'an agreed basis' in the correspondence and the oral negotiations would be to eliminate any distinction between construction and rectification.

B RECTIFICATION

[133] There is no dispute on the applicable legal principles. The burden is on the party seeking rectification, and he must put forward convincing proof.

[134] The court will rectify a contract if the evidence is clear and unambiguous that a mistake has been made in the recording of the parties' intention, what that intention was, and that the alleged intention continued in both parties' minds down to the time of the execution of the agreement: see *Swainland Builders Ltd v Freehold Properties Ltd* [2002] EWCA Civ 560 at [33], [2002] 2 EGLR 71 at 74.

[135] The burden is particularly onerous where there have been prolonged negotiations between the parties eventually assuming the shape of a formal instrument on which they have been advised by skilled lawyers: see *Crane v Hegeman-Harris Co Inc* [1939] 1 All ER 662 at 664–665, [1971] 1 WLR 1390n; and also *Phillips Petroleum Co UK Ltd v Snamprogetti Ltd* [2001] EWCA Civ 889 at [36], (2001) 79 ConLR 80 at [36].

[136] In cases where common mistake is alleged, it is necessary to establish not merely a continuing common intention, but also some outward expression of that prior accord: *Joscelyne v Nissen* [1970] 1 All ER 1213 at 1222, [1970] 2 QB 86 at 97–98. The requirement of an outward manifestation of accord has been said to be an evidential factor rather than a strict legal requirement: *Munt v Beasley* [2006] EWCA Civ 370 at [36], [2006] All ER (D) 29 (Apr) at [36] per Mummery LJ. The claimant does not have to meet more than the civil standard of balance of probabilities, but convincing proof is required to counteract the cogent evidence of the parties' intention displayed by the instrument: *Thomas Bates & Son Ltd v Wyndham's (Lingerie) Ltd* [1981] 1 All ER 1077 at 1090, [1981] 1 WLR 505 at 521.

LC/31

Court of Appeal

# Aerospace Publishing Ltd and another *v* Thames Water Utilities Ltd

## [2007] EWCA Civ 3

2006 Oct 24, 25, 26, 27;                                Pill, Longmore and Wilson LJJ
2007 Jan 11

*Damages — Measure of damages — Picture archive, damage to — Claimants'
picture archive damaged by flood for which defendants liable — Archive used
extensively in claimants' publishing business — Whether damages to be assessed
by reference to cost of reinstating archive or diminution in value of archive —
Whether time spent by claimants' staff in salvaging and reorganising damaged
archive recoverable head of damages*

The claimant companies carried on business as publishers of specialist
publications relating to aviation and military history. In the premises which they
shared the claimants kept a large archive of photographs, transparencies, artwork
and other reference material which they used extensively in their publications. The
premises were flooded after a mains water pipe burst, causing considerable damage
to the archive. The defendants, who were the water undertakers responsible for the
pipe for the purposes of the Water Industry Act 1991, admitted liability. At the trial
on quantum, the judge accepted the claimants' contention that damages should be
measured by reference to the cost of reinstating the lost or damaged items rather than
by reference to the difference in the sale value of the archive before and after the loss,
and awarded damages accordingly. He also awarded damages for the cost of work
done by some of the claimants' staff in salvaging and reorganising the archive after
the flood.

On the defendants' appeal—

*Held*, (1) dismissing the appeal as to the correct measure of damages, that
although the archive had an economic value, in the sense of a commercial utility, its
value to the claimants was greater than such sum as could be obtained by selling it;
that, moreover, the fact that not every item in the archive could be precisely replaced
did not mean that the cost of reinstatement was not, in general, the measure of
damages to be preferred; and that, since there was a prospect of the claimants
publishing future publications for which the archive would have a use, and since they
would not have been able to continue to make the same sort of income without
reference to the archive, the appropriate measure of damages was the cost of
reinstatement ( post, paras 51–53, 69, 72, 105).

*Southampton Container Terminals Ltd v Schiffahrtsgesellschaft Hansa Australia
mbH & Co (The Maersk Colombo)* [2001] 2 Lloyd's Rep 275, CA applied.

(2) Substantially dismissing the appeal as to staff costs, that once a claimant had
established the fact and the extent of the diversion of staff time and that the diversion
had caused significant disruption to its business, it would be reasonable for the court
to infer from the disruption, unless the defendant could establish the contrary, that,
had their time not been thus diverted, staff would have applied it to activities which
would have generated revenue for the claimant in an amount at least equal to the
costs of employing them during that time; that since the diversion of the time of a
significant number of the claimants' employees had been adequately established, and
since there could be no sensible challenge to the conclusion that the claimants'
business was thereby disrupted, the judge had been entitled to draw the inference that
the employees had been diverted from revenue-generating activities; and that,
accordingly, there had been no error in his decision to award damages for the costs of
the employees referable to the diversion, although he had erred in awarding damages

A   for work done by two freelance workers which had in fact been referable to the
preparation of the claim against the defendants (post, paras 71, 75, 86–87, 106).
    *Standard Chartered Bank v Pakistan National Shipping Corpn* [2001] 1 All
ER (Comm) 822, CA considered.
    Decision of Holland J [2005] EWHC 2987 (QB) affirmed in part.

    The following cases are referred to in the judgments:

B   *Admiral Management Services Ltd v Para-Protect Europe Ltd* [2002] EWHC 233
(Ch); [2002] 1 WLR 2722; [2003] 2 All ER 1017; [2002] FSR 914
    *BP Exploration Co (Libya) Ltd v Hunt (No 2)* [1979] 1 WLR 783; [1982] 1 All
ER 925
    *Darbishire v Warran* [1963] 1 WLR 1067; [1963] 3 All ER 310; [1963] 2 Lloyd's Rep
187, CA
    *Horace Holman Group Ltd v Sherwood International Group Ltd* (unreported)
C   7 November 2001, Judge Peter Bowsher QC
    *Jaura v Ahmed* [2002] EWCA Civ 210; The Times, 18 March 2002, CA
    *Kaines (UK) Ltd v Osterreichische Warrenhandelsgesellschaft (formerly
CGL Handelsgesellschaft mbH)* [1993] 2 Lloyd's Rep 1, CA
    *R + V Versicherung AG v Risk Insurance and Reinsurance Solutions SA* [2006]
EWHC 42 (Comm)
    *Southampton Container Terminals Ltd v Schiffahrtsgesellschaft Hansa Australia
D   mbH & Co (The Maersk Colombo)* [2001] EWCA Civ 717; [2001] 2 Lloyd's Rep
275, CA
    *Standard Chartered Bank v Pakistan National Shipping Corpn (No 3)* [1999] 1 All
ER (Comm) 417; [1999] 1 Lloyd's Rep 747; [2001] EWCA Civ 55; [2001] 1 All
ER (Comm) 822, CA
    *Tate & Lyle Food and Distribution Ltd v Greater London Council* [1982] 1 WLR
149; [1981] 3 All ER 716

E   The following additional cases were cited in argument:
    *Allied Maples Group Ltd v Simmons & Simmons* [1995] 1 WLR 1602; [1995] 4 All
ER 907, CA
    *Asiansky Television plc v Bayer-Rosin* [2001] EWCA Civ 1792; [2002] 2 CPLR 111,
CA
    *Assicurazioni Generali SpA v Arab Insurance Group (Practice Note)* [2002]
F   EWCA Civ 1642; [2003] 1 WLR 577; [2003] 1 All ER (Comm) 140; [2003]
Lloyd's Rep IR 131, CA
    *Audergon v La Baguette Ltd* [2002] EWCA Civ 10; [2002] 2 CPLR 192, CA
    *Banco de Portugal v Waterlow & Sons Ltd* [1937] AC 452, HL(E)
    *Bryant v Macklin* [2005] EWCA Civ 762, CA
    *Cattle v Stockton Waterworks Co* (1875) LR 10 QB 453, DC
    *English v Emery Reimbold & Strick Ltd (Practice Note)* [2002] EWCA Civ 605;
G   [2002] 1 WLR 2409; [2002] 3 All ER 385, CA
    *Robinson v Bird* [2003] EWCA Civ 1820; [2004] WTLR 257, CA
    *Ruxley Electronics and Construction Ltd v Forsyth* [1996] AC 344; [1995] 3 WLR
118; [1995] 3 All ER 268, HL(E)
    *Scutt v Lomax* (2000) 79 P & CR D31, CA
    *Spartan Steel and Alloys Ltd v Martin & Co (Contractors) Ltd* [1973] QB 27; [1972]
3 WLR 502; [1972] 3 All ER 557, CA

H   **APPEAL** and **CROSS-APPEAL** from Holland J
    By a notice of appeal dated 23 January 2006 and pursuant to permission
granted by the Court of Appeal (Brooke and Rix LJJ) on 1 February 2006,
the defendants, Thames Water Utilities Ltd, appealed against the decision of
Holland J [2005] EWHC 2987 (QB) handed down on 13 January 2006 to

728
### Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)       [2007] Bus LR
### Longmore LJ

*A*

award the claimants, Aerospace Publishing Ltd and Midsummer Books Ltd, damages of £2,693,413 plus interest of £24,947 for loss and damage caused to the claimants' picture archive held at 3A Brackenbury Road, London W6 by a flood for which the defendants had admitted liability under section 209 of the Water Industry Act 1991. The grounds of appeal were, inter alia: (1) that the judge had erred in awarding damages by reference to the cost of reinstating the archive rather than by reference to the difference in the sale value of the archive before and after the loss; and (2) that the judge had erred in awarding damages of £31,250 in respect of costs occasioned by the need to divert employees from their normal duties to countering and mitigating the impact of the flood.

*B*

By a respondent's notice the claimants cross-appealed against the amount of interest awarded on the grounds: (1) that the judge erred in declining to award interest on the whole sum of £2,328,144 which was awarded for reinstatement of the archive, awarding interest only on £135,303 of that sum; (2) that the judge erred in calculating all interest from the mid-point between the date of the flood, 3 July 2001, and the date of the judgment, rather than from the precise dates when the respective losses were incurred; and (3) that the judge erred in calculating interest at 1% p a above base rate, rather than at 2·5% p a above base rate.

*C*

The facts are stated in the judgment of Longmore LJ.

*D*

*Simon Rainey QC* and *Peter McMaster* for the defendants.
*Timothy Young QC* and *Henry Byam-Cook* for the claimants.

*Cur adv vult*

11 January 2007. The following judgments were handed down.

*E*

### LONGMORE LJ

#### Introduction

1   This is an appeal on quantum. The question is how should one value a private archive which has been damaged or destroyed. The archive was partly lost and partly damaged. Although it is common ground that it is the diminution in value of the archive that constitutes the amount of the claimants' loss, should that diminution, on the facts of this case, be measured by reference to the difference in the sale value of the archive before and after the loss or by reference to the cost of reinstatement?

*F*

2   In the middle of the afternoon of Tuesday, 3 July 2001 a mains water pipe, situated at the junction of Goldhawk Road and Brackenbury Road in Hammersmith, London W6, burst. That caused a rapid and uncontrollable ingress of water into the lower floor of premises at 3A Brackenbury Road then occupied by Aerospace Publishing Ltd ("Aerospace") and Midsummer Books Ltd ("Midsummer") ("the companies" or sometimes "the claimants"). Aerospace published, at regular intervals, high quality, lavishly illustrated, formidably researched works on all aspects of aviation and its history. Midsummer brought similar qualities to publications relating to military history and a variety of other topics.

*G*

*H*

3   The lower floor of the premises contained the companies' library and archive; this archive consisting of photographs, transparencies, artwork and other reference material was largely contained in a number of four-drawer

A   filing cabinets and some chests. The flood water entered the lower three
drawers of each of the cabinets causing considerable loss of or damage to
the contents. It is not disputed that the Aerospace archive was a truly
comprehensive and historical collection, probably unique in the world in
private hands.

4   The defendants ("Thames Water") are and were the water undertakers
B   for the purposes of the Water Industry Act 1991 who owned and operated
the burst pipe. By virtue of section 209 of the 1991 Act, they were liable for
any loss and damage occasioned by the resultant escape of water, whether
they were at fault or not.

5   Accordingly there was no dispute about liability at trial. It was only
quantum which had to be resolved. The companies contended that they
should be entitled to recover the cost of replacing the archive in so far as it
C   could be reinstated (e g by searching out, identifying and paying for copies of
photographs and transparencies which had been lost or damaged). They
claimed about £3m on this basis. Thames Water contended that the
companies had no intention of replacing the archive and that it would
anyway be unreasonable to do so. It followed that the companies could only
recover the difference between the undamaged value of the archive and its
value in a damaged state in the sum of about £300,000. This issue was tried
D   by Holland J between 24 October and 3 November 2005. He determined in
a draft judgment made available on 11 November 2005 that the companies
did intend to reinstate if they had the money to do it and that it was
reasonable for them so to do. He was in principle, therefore, prepared to
award the cost of reinstatement.

6   Thames Water's reaction was to ask the judge to respond to a number
E   of specific points made in their closing submissions. The judge replied that
he was unwilling to add "paragraphs, each setting out a closing submission
and my comment" when the existing judgment had indicated his approach
with reasonable clarity.

7   Thames Water then sought permission to appeal on the basis that the
judge had given insufficient reasons for coming to his conclusions. In a
skeleton argument of 177 paragraphs and over 50 pages they instanced in
F   particular the following matters. (1) There was a considerable body of
evidence about the recent history of the claimants' business, in the light of
which the judge ought to have concluded that the aviation side of the
business was being run down so that it was clear that Aerospace would not
reinstate the aviation archive, and even if reinstatement did occur,
Aerospace would not themselves be able to use it. The judge scarcely
G   referred to this evidence and gave no or no adequate reason for refusing to
accept it. (2) There had also at trial been comprehensive expert evidence
about changes in the market for publications relating to aircraft which
should have led the judge to conclude that the claimants' plans for further
publications (especially a proposal called "WAIF 2") were so misguided that
reinstatement of the archive would be unreasonable. Again the judge had
given no or no adequate reason for rejecting this expert evidence; nor had the
H   judge critically evaluated the claimants' loss of profit claim. (3) The judge
had failed to address an argument that, since publication had been able to
continue after the flood, reinstatement of the archive was unnecessary.

8   In the light of these contentions, this court decided on 1 February
2006 that the judge's conclusions were "arguably inadequately supported by

730
**Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)**   **[2007] Bus LR**
**Longmore LJ**

*A*

his reasons so as to make it possible to say that Thames Water had a realistic prospect of success". In his short reasons in support of the grant of permission to appeal Rix LJ said [2006] EWCA Civ 717, paras 8–10:

"8. In essence, Thames Water had run a case that Mr Morse [Aerospace's managing director] had wanted to sell the Aerospace company and its archive because he was more interested in pressing ahead with other parts of his business and could not do both, that the market had changed and that there was not the room, at any rate in the business and in the profitable sense, for a further publication such as WAIF 2, and they also relied upon other changes in the market and, indeed, in Aerospace's own modus operandi: for instance, in planning to move the site of the archive from its then current position immediately under the hands of the publishers to a different site in Islington, where there was an aim to reposition it as a library, not so much for use by Aerospace as publishers themselves but for the use of third parties upon payment.

*B*

*C*

"9. I can, for instance, illustrate the judge's technique by reference to para 71 where he refers, as a point supporting Aerospace's case, to the efforts by Mr Morse in the months preceding the flood to sell the Aerospace business or its archive. The value put upon the archive was some US$3m or nearly £2m. The judge referred to this, at para 71, as a plus point and perhaps, on one view of the matter, it was. Thames Water's approach to that episode was, however, to point to the fact that Mr Morse was willing to sell his company and its archive and was yet unable to obtain any bids, for either the company or the archive, at all.

*D*

"10. There is no discussion of that counterpoint in that context . . ."

*E*

9   That then led to an application by the claimants (no doubt horrified by the expense of a full appeal and by the possible prospect of a retrial) to this court, accepting that the judge's reasons were not as fully expressed as they might have been and themselves asking that the judge be asked to give further reasons for his conclusions. This the court refused to do because, as Rix LJ put it, "the likely result is either a nil return or a danger of ex post facto rationalisation". He recorded that the claimants accepted that, in the light of their position about the judge's reasons, the appeal would have to be conducted on the basis that it was a full rehearing.

*F*

10   So it is that the appeal before us has been conducted on the basis of being a full rehearing on the papers and the transcripts of the evidence which was given to Holland J. Understandably, neither party has asked for a retrial and we have to do the best we can to assess the rival arguments on the material we have. In these circumstances it seems to us inevitable that we have to accept the judge's conclusions about the integrity and bona fides of the claimants' chief witness Mr Stanley Morse. Mr Rainey for Thames Water accepted that it would be virtually impossible for us to find that Mr Morse had been intentionally trying to deceive the court but he submitted that the extraneous circumstances set out in the evidence showed that it was wholly unreasonable to seek to reinstate the archive and, whatever Mr Morse's intention as to that was, damages should be assessed not on the basis of reinstatement but on the basis of diminution in the sale value of the archive.

*G*

*H*

731

A   11   I should now proceed to set out the facts of the matter in more detail. I can use the judge's narrative very largely but I shall supplement it by the further facts relied on by Thames Water.

### Facts in detail

12   Both the companies were incorporated in 1977, to further the
B   publishing ambitions of Mr Stanley Morse who has an 80% shareholding in each company, and they have traded pursuant to his control as managing director. Albeit closely associated, sharing the same premises and subject to the same overall control, these companies have maintained separate corporate identities, covering differing areas of commercial activity and accounting separately. Thus, at all material times up to the date of the flood Aerospace furthered Mr Morse's personal interest in, and enthusiasm for,
C   aeronautical matters. Midsummer brought similar qualities to publications relating to military history and to a variety of other topics. They were both profitable companies.

### Aerospace archive

13   From its incorporation Aerospace, under Mr Morse's direction, had
D   built up an archive. The material came from various sources. All the products of editorial research as demanded by a publishing venture went into the archive, which included material from military archives in this country, in France, in Germany and, more particularly, in the USA. Systematic attendance at major international air shows led to the acquisition of photographs and vital reference material. In 1986 a photograph library
E   was purchased for £25,000. In 1993 a large and exceptional photograph and artwork collection, the Pilot Press Collection (put together by a legendary figure in the compilation of aviation history, Mr William Green) was similarly purchased, this time for £105,000. At about the same time another collection, the John W R Taylor Collection, was purchased for £75,000. The accounts reveal that investment in this archive had been ongoing; financial statements identified continuing expenditure on this asset
F   in the sums of £24,970 in 1998, £17,396 in 1999 and £14,203 in 2000. Some of this ongoing expenditure is explained by the commissioning of artwork, that is, the commissioning from a few specialist artists of pictures of aircraft in flight in order to illustrate a given topic—pictures notable for their technical precision, essentially bringing the draughtsman's drawing to life. The judge recorded that the book value of the archive as at the end of
G   2000 was £562,298.

14   The overall expenditure on and for the archive was not limited to acquisitions. From 1995 a semi-retired aviation expert, Mr Douglas Stroud, was engaged on a freelance basis to "integrate" the archive by arranging and cataloguing it.   Confronted with the then newly acquired separate collections, his task was to fashion one "collection" out of the available material, that is, to form what then became the Aerospace archive. The task
H   was monumental given the amount of the material and the steady accretion of more material, but by May 2001 he had accomplished part of his task: the photographs were then integrated and indexed by subject on an A to Z basis. Other cataloguing work continued and in the event Mr Stroud was on the premises when the flood occurred.

15   While Mr Stroud's efforts were directed towards integration into one *A*
collection for the benefit of Aerospace, the provenance of the contributing
collections served to raise the external prestige of the whole. Thus, by way
of example, the fact that Mr Green's Pilot Press Collection accounted for a
significant part of the content of the archive undoubtedly contributed to the
reputation and thus the value of the whole.

16   The physical dimensions of the archive at 3 July 2001 can be *B*
described as follows. (a) The great bulk of the archive was stored in 57 filing
cabinets. Large sized artworks were predominately stored in four plan
chests. (b) Within the filing cabinets the bulk of the archive was distributed
amongst files. There were at least 3,220 such files: the files were in
alphabetical order with each file referable to a specific topic, typically an
aircraft type. The distribution of topics, on a broad-brush basis, could be *C*
apportioned as follows: (i) World War One and earlier, 4·5%; (ii) between
the wars, 20%; (iii) World War Two, 11%; (iv) post-World War Two, 60%;
(v) unclassifiable, 4·5%. (c) Within the files were 218,262 photographic
images, a figure which includes a number of transparencies. These covered
the full spectrum between the historically valuable rarity and the relatively
commonplace. There was also a spectrum as to quality. The judge found
that the scope for illustration of aviation and its history by way of *D*
photographs made the archive exceptional and arguably unique.   Yet
further, a significant number of the images were valuable in their own right,
either because of the historic value of their content or because they were the
work of photographers famed in the field. (d) Further, within the archive,
was a mass of reference material available for editorial research: press
cuttings; manufacturers' publicity material; letters; publications and plans. *E*
(e) An additional and important component was artwork. In the course of
its trading Aerospace commissioned or otherwise acquired artwork images,
viz, drawings and paintings of aircraft executed by specialists with an
exactitude in terms of detail to satisfy the purist. By July 2001 there were in
the archive over 5,000 items of such artwork, such covering a great range of
aviation subjects.

*F*
### Midsummer archive

17   This separate archive featured less in evidence: although substantial,
it was less in size than that of Aerospace: it could not aspire to the same
prestige and, significantly for present purposes, it suffered far less from the
flood. It too had been steadily built up, similarly inspired by Mr Morse's
overall direction, and its content was impressive: (a) car section: 60,000 *G*
images and 500 artwork items; (b) motor cycle section: 40,000 images and
250 artwork items; (c) military and naval section: 35,000 images and 3,500
artwork items. Additionally there was material relating to British and
European wildlife.

### Partworks and journals

18   A key component of the companies' respective trading activities was *H*
the creation of partworks, so called because an ultimate "work" can be
compiled by the consumer through the regular acquisition (whether by
subscription or purchase from the newsagent) of magazine style parts. Each
such publication can be dismantled into sections—the appropriate filing of

A  each section serves to add to the envisaged final reference work. To provide material to complete the partwork, publication would run for a predetermined prolonged period, typically for 200 or more issues. A claimant company engaged in this activity would formulate an idea for a new partwork and then cause it to be subjected to market research. Thus far the work would be "in house" and at the expense of the company.

B  Thereafter the enterprise would proceed in partnership with a publisher. The company would prepare the editorial and illustrative content of each issue (retaining copyright); the publisher would then publish and market it, typically setting the whole in motion with a television marketing campaign. The contractual agreement with the publisher would provide for payment by the publisher of a creation fee and a royalty (say, 4%) on cover price sales. This joint venture would be aimed at a worldwide market.

C  19  Aerospace produced partworks as follows: "Illustrated Encyclopaedia of Aircraft" (1980); "Warplane" (1984); "Take Off" (1987, relaunched in 1992); "Airplane" (1989); "World Aircraft Information Files" ("WAIF") (1997/98). Midsummer had produced similar partworks on military and other topics, such as wildlife and the Star Trek saga.

20  For the purposes of the trial much attention was focussed upon WAIF. Starting in 1997/8 this partwork issue was still in progress as at the

D  flood: Issue 180 had been published; Issue 181 was in the course of editorial preparation; and as at that time it was contemplated that the full work would be complete as at the publication of Issue 200 or some such number. As was normal, Aerospace employees, who for administrative convenience were on the Midsummer payroll, were preparing each issue for the printers, that is, they were compiling the editorial content and deciding upon the

E  numerous illustrations. Publishing had been contracted to Bright Star Publishing plc, a company then jointly owned by Mr Morse and a company independent of him, Eaglemoss Publications Ltd, in equal shares. The Aerospace editorial team then consisted of Paul Eden (Editor), John Heathcott (Deputy Editor) and two designers. The team brought to the enterprise a dedication to, and a real expertise in aviation matters—as perusal of the sample issues put before us graphically demonstrated. The

F  income to Aerospace pre-flood was substantial.

21  Additional to its output of partworks Aerospace had published two lavishly illustrated "glossy" journals on aviation topics: "World Air Power" and "Wings of Fame". These offered an in-depth approach to their respective topics, with content prepared by knowledgeable enthusiasts for other knowledgeable enthusiasts. "World Air Power" focused on current

G  military aircraft and was published quarterly. In the event there were 43 issues. "Wings of Fame" focused on historic aircraft and there were 20 issues. These journals were thus published less frequently than the partworks and were more detailed. Counsel drew a (no doubt very inexact) parallel with the distinction between Counsel magazine and the more scholarly Cambridge Law Journal or Law Quarterly Review.

H  *Use of the Aerospace archive*

22  It is beyond dispute that prior to the flood, use of the Aerospace archive had been crucial to the preparation of Aerospace publications. Perusal of the partwork issues and of the journals readily serves to highlight the imperative need for ready access during preparation to in-depth

734
**Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)**          [2007] Bus LR
**Longmore LJ**

*A*

reference material and to a wide-ranging sophisticated photographic library. It is not just the perusal of one issue or one journal—it is perusal in the context of ongoing commitments to repeat these publications at specified intervals, each covering different but (in the case of partworks) integrated topics, each demanding the same standards in editorial input. Absent a readily available comprehensive archive no such enterprise could have been contemplated, let alone achieved.

*B*

23 Despite several of the titles being highly detailed, in-depth publications for which no expense would be spared in presenting a comprehensive illustrative selection, on many occasions the Aerospace archive provided all the photographs necessary to complete the article. Where this was not the case, the photographs that were acquired to complete the article were often added to the collection. Archive material could, of course, be used without having to make any payment to outside bodies. If photographs or other material had to be outsourced, substantial payment would have to be made. In his written evidence Mr Morse put it this way:

*C*

"Because the Aerospace archive was beautifully organised, our editors were able to research and compile pictorial 'packages' for articles immediately and quickly. The richness, quality and comprehensiveness of each aircraft file provided nearly everything any article called for, whether it was about an individual aircraft, an airline, a war operation or a line of historic development. With the Aerospace archive, compiling an article was a single job conducted within a short while (from minutes to within an hour or two). By contrast, when photographs had to come from outside the Aerospace archive, there would be dozens of telephone calls to dozens of collectors spread over dozens of days. Many photographs were in overseas collections and owners would take days to research, package and despatch consignments to us. Many packages would come by Fed Ex with attendant costs. Others would come in by various postal systems, with consequent delays and losses. When asked for a shortlist of, say, ten aircraft photographs, a photographer or collection would often research and submit around 100. Because we had to take extreme care over submitted photographs and because there was usually a loss fee of up to £500 per photograph, each picture had to be individually and clerically logged in and out—a massive task that would inevitably become delayed and cause further problems and costs. There were also penalising insurance costs involved in having agency photographs in our offices. Without the Aerospace archive, the numbers of agency photographs required on site would have been a huge insurance liability. At least one full-time member of staff was deployed to 'traffic' these outside photographs, but it very often became the work of many. And this was when the Aerospace archive provided at least two thirds of the pictorial material we published. Had we relied on outside photographs and artworks, we would have needed several staff members permanently employed on administering and trafficking these items. Had Aerospace relied on outside sources for licensed photographs or artwork, it would also have had to pay reproduction fees for each use. For instance, all photo agencies (such as the Flight Collection, TRH Picture, Austin Brown etc) charge for each use of a photograph. The larger the picture used, the greater the fee. There would be further fees to pay if the

*D*

*E*

*F*

*G*

*H*

*A*  picture was used in later-derived books or new partwork. A single agency photograph used on a cover could end up costing thousands of pounds, whereas repeated uses of our archive material were at effectively zero cost. In addition licences from picture agencies were always for one-time use. Subsequent publications such as derived books could never have been published with these 'extra costs'. Finally only Aerospace archive

*B*  contained the high-quality technical artworks that were a hallmark of Aerospace's products and there are only an inadequate number of other sources of these illustrations in the world: no artwork agencies nor private collectors. This is because, although it is possible to commission artists to create such artworks from new, the costs are great and there is a need for considerable editorial research support and only restricted numbers due to the few artists available and the time it takes them to

*C*  create these artworks."

*The pre-flood history*

24  In the light of Thames Water's arguments it is necessary to trace Mr Morse's business activities over the years preceding the flood.

*D*  *Offer to sell Aerospace*

25  In his evidence Mr Morse explained in detail how he came to the decision that he would dispose of the Aerospace business, if a suitable buyer at the right price could be found. As he put it:

"Aerospace continued to be a profitable and vibrant business, as it had been since 1977 and as it would remain until the day of the flood. Looked

*E*  at in isolation as the Midsummer group's aviation publishing wing, Aerospace was a success. However, given the decision to cut back on growth and dispose of some of the group's assets, Aerospace was the obvious choice. Therefore, we considered selling Aerospace as a separate business, something that was always a built-in option since I started the business in 1977. We considered the sale of Aerospace precisely because

*F*  it had valuable assets that would be clearly attractive to the right buyer— the intellectual property asset of the Aerospace archive and the intellectual property asset of the journals, together with the promise of future growth."

26  Offers were then made first to Motorbooks, a US company, inviting purchase of the Aerospace archive and the journals, "World Air Power" and

*G*  "Wings of Fame" and then to a UK company, Chrysalis Books, offering "most of Aerospace and our archive including aviation, military, naval, motorcar and motorbike archive and resources" for £5m. Mr Morse said: "we have considerable presence in the partwork business and Aerospace no longer fits." Mr Soph Moeng, his senior editor and rights manager, put together a prospectus for Chrysalis which, inter alia, valued the Aerospace archive at £1,932,500. On 15 September 2000, on Mr Morse's behalf,

*H*  Mr Moeng quoted values to Motorbooks in dollars: $3m for the journals and $5m for the archive.

27  These proposals elicited no interest. A similar proposal was made in January 2001 to Marshall Cavendish, the well-known publishers, to sell the Aerospace archive for £1,932,500: again, nothing came of this. Finally in

early 2001 Mr Moeng again sought to solicit interest from Motorbooks for    *A*
the purchase of the archive but to no avail.

*Summertime*

28   On 5 October 2000 Summertime Publishing Ltd ("Summertime")
was incorporated. It had an authorised capital of £100 divided as to 1,000
shares at 10p each. In the event 501 shares were issued at par to    *B*
Midsummer, that is, in effect, to Mr Morse. On 8 December 2000 a number
of consequential agreements were made. By the principal agreement
International Masters Publishers Ltd ("IMP") acquired for £736,000 the
remaining 499 shares and consequential provisions were made to secure the
future conduct of Summertime as a joint venture of Midsummer and IMP.
By clause 15 Midsummer
                                                                           *C*
"covenants with IMP that Midsummer . . . shall not (and will procure
that none of the other members of its group shall) at any time . . . without
the prior written consent of IMP . . . carry on . . . any business which is
the same as or competitive . . ."

It is accepted that "its group" would include Aerospace.

29   Associated with the agreement of 8 December 2000 is a contract for    *D*
the provision by Midsummer and Mr Morse to Summertime of their
respective services as defined. Particular attention is drawn by Thames
Water to the following clauses:

"3.2 [Midsummer] shall provide its services in relation to the
origination of ideas for continuity series or projects exclusively to
[Summertime] and will convey to [Summertime] all ideas and concepts it    *E*
originates for continuity series during the term of this agreement and shall
not undertake any other business that competes with the business of
[Summertime] during the life of this agreement . . .
"4.1 [Midsummer] agrees not during the life of this agreement whether
by its officers, employees or agents or otherwise howsoever and whether
as a consultant, principal, partner, director, employee or otherwise
directly or indirectly . . . to provide or procure the provision of any    *F*
consultancy services or to carry out or procure the carrying out of any
other business activity work or services for a third party if the services
activity or work relate to or are concerned with the development . . . of
any product which is either the same as or substantially similar to and, in
any case, competitive with any of the products of [Summertime] which
are the subject of the service."
                                                                           *G*
30   Aerospace was not in terms party to any of the foregoing but on
8 January 2001 it was party to an agreement, the practical effect of which
was to assign to Summertime the rights hitherto assigned to Bright Star in the
copyright of WAIF and also to oblige Aerospace to use its best endeavours to
enable Summertime to be able to use the archive if, in the event, the archive
was sold. Since Thames Water attach considerable significance to that letter,    *H*
I set out its terms:

"In consideration of you today entering into the agreements listed in
the schedule hereto, we hereby jointly and severally undertake to you that
we will respectively use our best endeavours to procure that in [sic] any

737

A    sale of the rights to the Midsummer archive and/or the Aerospace archive
or any part thereof will exclude the right to exploit the material contained
in the Midsummer archive and the Aerospace archive as continuity series
in any format (including, without limitation, partworks). We further
jointly and severally undertake to you that in the event that either: (a) we
secure the exclusion of continuity series rights in any sale of the
B    Midsummer archive and/or the Aerospace archive or any part thereof or
(b) a sale of the Midsummer archive and/or the Aerospace archive or any
part thereof is not completed by us by 30 June 2001 we will negotiate
with you in good faith with you the grant of a licence to you to exploit
such rights in the Midsummer archive and/or the Aerospace archive."

*Art Tech*

C    31    In the autumn of 2000 Mr Stanislaw Gnych, a "book packager"
trading as Amber Books Ltd heard that Mr Morse was seeking a buyer for
the Aerospace archive. He had had earlier business dealings with the
companies in the course of which he had become knowledgeable about and
very impressed with the companies' archives. In his then opinion there was
hitherto unexploited commercial potential in using these archives as picture
D    libraries, with the result that the content would not just be exploited "in
house". Accordingly he conceived the idea of establishing a picture library
business based on these and other like archives and to that end he
approached Mr Morse. Discussions proved fruitful and by March 2001
there was an oral agreement to the effect that the archives would be moved
in stages from the Hammersmith premises to those that were to be leased by
E    Art Tech for this enterprise in Islington. Once in place in the autumn of
2001, Art Tech would conduct a picture library with the pictures coming
from these archives. The contracts, yet to be drafted, were to maintain
ownership of the material in the hands of the companies and their employees
were to have continuing free access to the material. A percentage of Art
Tech's fee income amounting to 50% would be the consideration.
32    This enterprise was getting underway as at the flood—as recently as
F    1 July Mr Gnych had personally conducted a final viewing and assessment at
the Hammersmith premises.
33    In evidence, Mr Morse explained his then attitude. He had neither
the skills nor the inclination to run a picture library ("a clerical business");
removal of the archives would serve to provide more space and the housing
in Islington would be rent-free to him; further, he could envisage future
G    editorial work utilising the archive being conducted in space available at
Islington without overmuch inconvenience.

*AIRtime*

34    By way of an agreement in writing of 24 April 2001 Aerospace sold
to AIRtime Publishing Inc, a US company, its journals, "World Air Power"
and "Wings of Fame", for $15,000. The agreement gave to AIRtime access
H    to the Aerospace archive to sustain continuing publication of AIRtime's own
publication, "International Air Power Review", subject to a royalty
agreement. In so far as archive material was published in this journal
Aerospace were to receive 4% of the net sale price on sales up to a total of
$85,000.

35  It is to be noted that this development led to AIRtime recruiting from
Aerospace two members of the expert editorial staff, David Donald and Dan
March.

*The flood and consequent damage*

*Aerospace archive*

36  Of the original 218,262 images, 65,174 (28·9%) were unaffected, in
the main because they had been in upper drawers. It is estimated that 32·1%
can be restored. The rest, effectively 50% of the archive, cannot be restored.
The reference material was wholly destroyed. In terms of files, the
schedule of 3,220 files identifies 867 that are undamaged, this time 26·9%.
Fundamental to the incidence of damage is the arbitrary nature inevitably
arising from the chance impact of the flood water.

37  The damage to artwork was higher in incidence. The state of the
flood-soaked material is such that some of the impact has to be estimated.
The claimants contend that there were originally 5,110 items and that only a
modest proportion have any residual value as being substantially intact or
susceptible to restoration.

*Midsummer archive*

38  In the event the damage was markedly less extensive—it was the
artwork that bore the brunt. The schedule put before the judge identified
341 items: 176 damaged beyond restoration; 92 susceptible to restoration;
and 73 largely intact.

*Post-flood*

*WAIF*

39  Aerospace—in effect Mr Eden and his team—maintained
production of this partwork initially up to Issue 200. The judge's finding
was that in the absence of the archive this was a difficult and expensive
exercise. The picture painted by Mr Eden is of time-consuming and costly
efforts to produce the required weekly issues utilising such material as was
still available and relying upon their extensive knowledge of aviation sources
to acquire sufficient additional images to allow publication. The judge
accepted that, despite all that was done, the post-flood issues were
sub-standard, judging them by the normal exacting requirements. Having
stopped at Issue 200, Aerospace received protests from readers who found
the resultant "work" was as to part incomplete and the team produced
another 18 issues so as to respond to these complaints. This activity apart,
Aerospace has since been in limbo save for activities directed at identifying
and quantifying loss.

*Art Tech*

40  By reason of the flood it was not until September 2002 that any effect
could be given to the oral agreement reached in March 2001. Thereafter
what remained of the Midsummer and Aerospace archives was moved in
stages to Art Tech's Islington premises there to be assessed "marketable or
no". In March 2003 Art Tech started active marketing of that which it now
has: the Midsummer archive less its artwork and the undamaged rump of the

739
[2007] Bus LR     Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)
Longmore LJ

A   Aerospace archive. Even on this limited basis the enterprise has proved worthwhile.

41   By way of a belated written agreement of 2 March 2004 the claimant companies agreed terms for the housing continuing cataloguing and insurance of the transferred archives. The continuing ownership remains vested in the companies and their employees retain full and unrestricted access during normal business hours. The agreement concludes with an intimation of an intention to make a further agreement, this time for the commercial exploitation of the archives.

B

42   The judge quoted from the oral evidence of Mr Gnych:

"*Holland J.* My impression, and it is no more than this, is that even with the much-reduced archive that you received, this whole enterprise has been, really, quite successful?

C   "*A.* It has been successful because it is a novel idea. There is not another archive of this sort anywhere in the world that I am aware of. My hopes, aspirations, were that it would be far more successful than it has been. I am not sure whether my Lord has seen the first year's figures; we had a profit, which is, for a start-up operation, pretty impressive. But I expected that profit to be much, much higher, frankly. I am reasonably

D   happy with where it is, but, I would have expected more than that. The idea of setting up an archive, photographs and artwork, which is so novel, which is so unusual, which is such high quality, was bound to be a success. I am just staggered that nobody had ever done it before, frankly.

"*Holland J.* I take it the lack of the Aerospace archive, or most of it, is deep frustration?

E   "*A.* Very frustrating, given that this has been dragging on for four years now."

*AIRtime*

43   As early as 10 July 2001 AIRtime put itself firmly behind Aerospace in the pursuit of compensation by means of an open letter:

F   "AIRtime Publishing Inc has an ongoing agreement with Aerospace Publishing Ltd, whereby AIRtime has access to the Aerospace photograph and artwork archive. Material from the archive is used in the recently launched 'International Air Power Review'. This archive is an invaluable and irreplaceable source of images for AIRtime, which draws a large proportion of the material for its publications from the picture/artwork library. By tying up the greater majority of the library

G   images for some considerable time during restoration, the flood damage to the archive has seriously affected our ability to produce the publications we are working on at present, and those in planning for the immediate future. This will result in our publications being delivered later than scheduled which, in turn, has serious ramifications for the financial side of our business. While the effect on our publishing

H   programme in the near term is disastrous, any delay in restoring the library will also have grave consequences on our programme in the longer term."

By way of a letter of 18 December 2001 AIRtime spelled out the serious impact upon the continuing production of "International Air Power Review"

of the damage to the Aerospace archive and confirmed that which had been   A
orally agreed, namely that there should be a revision of the royalty terms so
as to reduce payments to Aerospace. The ultimate financial significance of
that revision appeared from a subsequent letter of 22 July 2004.

*The parties' cases at trial and the judge's findings*

44   We have not been troubled by detailed figures and the parties' cases   B
can be summarised fairly briefly. The claim was for £3,265,127 on a
reinstatement basis, including £1,842,077 for replacement of 87,523
unrepairable photographic images, £135,303 for restoration of repairable
photographic images and £898,335 for replacement and some restoration of
artwork. Thames Water contend that, on a reinstatement basis, the claim
should be only £2,447,911. If the claim were properly to be assessed on the
basis of diminution of value, the claimants would then claim £1,058,513   C
while Thames Water put forward a figure of £274,460.

45   The judge held that while the first two figures claimed by way of
reinstatement were correct, the figure for replacement of artwork could not
be justified by reference to reinstatement because it was impossible for
artwork to be sensibly reinstated. He, therefore, reduced the third figure
claimed to £89,686. He reached a final figure of £2,564,378 on a   D
reinstatement basis and a final figure of £721,686 if the correct figure was
diminution in value. He then turned to consider consequential loss and held
that a claim could properly be made for loss of profit on future publications
which failed to be published of £1,612,134. This figure should, therefore, be
added to any loss calculated by reference to diminution in value. It could
not, however, be awarded in addition to the loss calculated by reference to
reinstatement because the only loss that would be suffered if reinstatement   E
were awarded would be the cost of delay in obtaining the profit which he
assessed at £129,035. The final figures were, therefore, £2,693,413 for
reinstatement loss and £2,574,504 for diminution in value.

46   It was no doubt because these figures were comparatively similar
that the judge thought it would not be particularly productive to lengthen
what was already a lengthy judgment in order to consider in detail the   F
evidence relating to the intention to reinstate and the reasonableness or
otherwise of reinstatement. What is now said, however, by Thames Water is
that, since no further partworks or journals were ever going to be produced
by Aerospace the whole claim for loss of profit must fall away. If, therefore,
the claim should be correctly assessed by reference to diminution in value it
would stand at maximum at £1,061,570 which is very different from the
sum finally awarded by the judge on the basis of reinstatement, viz the sum   G
of £2,693,413. Of course even the sum of £1,061,570 falls to be reduced yet
further according to Thames Water for reasons relating to further details of
the award on a diminution in value basis. Thus the stage is set for the
detailed arguments on the appeal.

*Thames Water's arguments in this court*   H

47   I have already observed that Thames Water found it necessary to file
a skeleton argument of 177 paragraphs; they then served a supplementary
skeleton argument of 149 paragraphs. Such lengthy documents invariably
make it difficult to distinguish the wood from the trees and we quite

A   understand why the judge did not feel it necessary or even sensible to do a
point by point rebuttal of all matters raised in Thames Water's concluding
written submissions which themselves constituted a lengthy document.
Fortunately Mr Rainey was able to distil four separate steps in the argument
in the course of his oral submissions. (a) Aerospace and its aviation
publishing business were, before the flood, shelved in favour of non-aviation

B   publishing and Aerospace was effectively in run-off. (b) Aerospace would
not have published a further partwork once the current WAIF publication
had come to its natural end, nor could they identify any other aviation
publication which would have been issued. The expert evidence was that the
market for WAIF-style publications had come to an end; the claimants had
produced no credible evidence to set against that and could say no more than
that they would research the market in some nebulous way and arrange fresh

C   publications in the light of that research; that was not sufficient to enable to
claimants to show that there was a viable future in aviation publishing, even
if step (a) above were rejected. (c) The evidence was that publication of
WAIF continued despite the flood; that showed that the archive was not
essential; with repair of such damaged photographs as could be repaired at a
cost of £135,000, the claimants would be fully compensated. (d) There was
no evidence to show that any future publication (especially if it was a WAIF-

D   style publication) would have generated any profit; moreover in the light of
(a) above any such loss of profit would have been suffered not by Aerospace
(or Midsummer) but by Summertime. Before dealing with those arguments,
I should say a little about the law and the correct approach to the distinction
between the cost of reinstatement on the one hand and diminution in sale
value on the other.

E
*The law*

48   The judge set out, at para 38 of his judgment, the principles as stated
in *Southampton Container Terminals Ltd v Schiffahrtsgesellschaft Hansa
Australia mbH & Co (The Maersk Colombo)* [2001] 2 Lloyd's Rep 275,
para 71:

F      "(1) On proof of the tortious destruction of a chattel, the owner is
prima facie entitled to damages reflecting the market value of the chattel
'as is'. (2) He is so entitled whether or not he intends to obtain a
replacement. (3) The market or resale value is to be assessed on the
evidence, there being no standard measure applicable to all
circumstances. (4) If the claimant intends to replace the chattel, and if the
market or resale value as assessed is inadequate for that purpose, then the

G      higher replacement value may, in the event, be the appropriate measure of
damages. (5) When and if replacement value is claimed, the claimant can
only succeed to the extent that the claim is reasonable; that is, that it
reflects reasonable mitigation of its loss. (6) The claim will ordinarily be
reasonable if it is reasonable to replace the chattel and the cost of
replacement is reasonable."

H   49   Although the parties agreed that these principles, coincidentally
formulated by Holland J himself in *The Maersk Colombo*, were indeed the
applicable principles, the facts of the present case require some elaboration
in two respects. First, there was some argument on the question whether, in
order to recover the cost of reinstatement, the claimant must intend actually

to reinstate. The principles espoused by counsel (Peter Gross QC) and   *A*
endorsed in *The Maersk Colombo*, paras 25–26, indicate that it may not
always be necessary. The Holland J principles, also espoused in that case,
suggest that it is. I would say only that it must be very rare when the cost of
reinstatement will be awarded to someone who does not intend to reinstate
in fact.

50  Secondly, the present case is not a case of a readily marketable asset,   *B*
nor yet of a unique chattel like a rare manuscript, a Picasso painting or a
Stradivarius violin. In the first sort of case little difficulty will arise;
reinstatement will not usually be appropriate as it would not be reasonable
to reinstate if an article can be bought in by the claimant at a lower cost. In
the case of a unique chattel it may be reasonable to reinstate but it will not be
too difficult, by reference to past auction prices, to assess realistically a
market value even though the chattel is itself unique. It will then be easy to   *C*
compare figures for reinstatement and market value.

51  Here, by contrast, while cost of reinstatement is calculable (and is in
the event largely agreed), market value is problematic to assess. Plutarch
regarded the human memory as an archive ("Essay on Curiosity" (2.520):
see Philemon Holland's 1603 translation as printed in *Plutarch's Moralia*
(Everyman ed, 1911), p 145 and that of Professor Donald Russell in   *D*
*Plutarch, Selected Essays and Dialogues* (Oxford World's Classics, 1993),
p 201). In a similar way the archive in the present case represents the
companies' memory and, as such, is an asset whose value could in
conventional parlance be described as "priceless" and whose actual value
can only be calculated with considerable difficulty. The relevant experts
agreed that it would be impossible to acquire a similar archive within a   *E*
reasonable time and that, even if one were to sell the archive, it would have
to be done through a number of auctions over a number of years in order to
achieve the best reasonable price. In these circumstances it was submitted
by Mr Young for the claimants that the court should lean towards
reinstatement unless the cost is prohibitive especially when, as in this case,
the only way in which a resale value (see (3) and (4) in para 48 above) could
be realised would be by destroying the very characteristic (namely its unity   *F*
and comprehensiveness) which gives the collection its true value in the first
place.

52  In general terms, I would be minded to accept this submission, on the
facts of this case, since it is difficult to regard what may be called the strictly
economic value of the archive (what the authorities call the resale value) as
being the sole value of the archive. It was a labour both of love and   *G*
dedication to build up and then catalogue the archive in the first place. The
fact that it has an economic value, in the sense of a commercial utility,
should not blind one to the further fact that its value to the owner may be
(and, in this case, is) greater than such sum as can be obtained by selling it at
spaced-out auctions. Moreover, the fact that not every item in the archive
can be precisely replaced does not mean that the cost of reinstatement is not,
in general, the measure of damages to be preferred. If the archive of a   *H*
famous and long-established art dealer such as the Fine Art Society Ltd or an
auctioneer such as Christie's or Sotheby's were destroyed, it would be
mealy-mouthed in the extreme to confine recovery to the resale value of
individual items.

A     53   This having been said, Thames Water's arguments still have to be confronted. If Aerospace were indeed about to go out of business or there was no prospect of future publications for which the archive would have a use or they would have been able to continue to make the same sort of income without reference to the archive, it would, no doubt, not be right to award the reinstatement cost.

B     *Run-down of Aerospace business*

    54   The salient facts relating to this argument are set out in paras 22–33 above and need not be repeated.

    55   Mr Rainey relied very heavily on the sale by Aerospace of the journals ("World Air Power" and "Wings of Fame") to AIRtime and the terms of the agreement with Summertime (as to any new publication) and

C the letter of 8 January 2001 as showing that Aerospace was, as he put it, effectively in run-off. It must, however, be remembered that: (1) the Aerospace business was not actually sold, despite overtures being made to Motorbooks and Chrysalis; (2) Aerospace was not actually a party to the Summertime arrangement, although it is fair to say that the restrictive covenant given by Midsummer covered any companies in its group, so that if

D Aerospace did compete with Summertime by causing a new magazine to be published, Midsummer would find itself in breach of that contract; (3) the archive was never sold to Art Tech, the arrangement being that, as from the time of its removal to Islington, it would be managed by Art Tech on a commercial basis; thus not only would free access continue to be offered to Aerospace as owners of the archive but other companies or individuals

E would be offered access for a fee.

    56   Mr Morse was, naturally enough, asked a number of questions about the attempted disposal of the Aerospace business and the actual disposal of that part of the business represented by the journals, as well as the arrangements with Summertime. Although it is not easy to see exactly where in a lengthy cross-examination of Mr Morse it was put to him fairly and squarely that the Aerospace business was effectively closing down as a

F whole, Mr Morse firmly rebutted suggestions relating to inferences to be drawn from particular transactions. On the face of it, the arrangements with Summertime did look as if it was to be Summertime who would be doing the business from January 2001, but since Mr Morse had a 50·1% shareholding as opposed to IMP's 49·9% in the company, Mr Morse was always in a position (if necessary) to reap a substantial part of any profit that might be

G made from Summertime ventures if Summertime were minded to use the archive. More importantly, perhaps, Mr Morse made the point that it was the entirety of the business which was to be handled by Summertime after IMP's injection of capital. The majority of the business was what had been the Midsummer enterprise and it was that which IMP had injected their capital to exploit. He said more than once that Summertime had no interest in aviation projects and the arrangement with IMP and Summertime was a

H friendly one by which he meant that, if future aviation projects were to be undertaken (as, without the flood, he had intended should occur) Summertime would never have raised any difficulty about Aerospace continuing to use their archive for projects in which they (Summertime) had no interest.

744
Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)      [2007] Bus LR
Longmore LJ

57   In relation to this part of the case Holland J made two important    *A*
findings: first (implicitly but throughout his judgment) that Mr Morse was
a credible and reliable witness and secondly (para 23) in relation to
Summertime, that there was no evidence of any impact upon the conduct of
Aerospace before the flood arising out of the two contractual arrangements
with Summertime. These were findings which were open to the judge and I,
for my part, have seen no evidence which could justifiably be said to        *B*
controvert them. Nor, looking at the evidence as a whole, could I conclude
that Aerospace's business or Mr Morse's participation in it had come to any
full stop. No buyer had been found either for the business as a whole nor for
the archive on its own. If there were to be any future aviation publications,
I have no doubt that they would have been arranged by Mr Morse as part of
Aerospace business rather than Summertime business or, if it had been
decided that Summertime should itself do the business, Aerospace (and        *C*
Mr Morse) would have been amply compensated for the use of the archive.

58   This is not an unimportant conclusion because the second step (see
para 47 above) in Mr Rainey's argument was, to a large extent, predicated
upon his success on step (a). If the Aerospace business had been truly in run-
off, it would no doubt be comparatively easy to decide that evidence for
further publications was lacking. Conversely once it is established that the
business is not in run-off it is comparatively easy to establish that decisions    *D*
would probably be made to issue future aircraft publications. Whether that
decision would be commercially sensible is a different (although allied)
question; but the two questions need to be kept distinct.

*Future publications*

59   Mr Rainey attempted, at trial, to tie Mr Morse down to a prediction    *E*
that Aerospace would publish a further partwork similar to WAIF 1 (to be
called WAIF 2 for the purposes of argument) and then to demonstrate that
there was no market for any such publication so that such publication (and
any decision to reinstate the archive for that purpose) was a commercially
unreasonable decision for which Thames Water could not be expected to
pay. This attempt failed at trial and its renewal must likewise fail before this
court. In the first place Mr Morse made it plain on several occasions in his    *F*
evidence that he did intend to reinstate the archive, that he did intend at the
date of the flood to continue with further publications once a decent interval
had elapsed from the natural end of WAIF 1 and that Aerospace could expect
to make a decent profit out of such further publications. On the basis (which
I have already said cannot be controverted) that Mr Morse was a credible
and reliable witness, it is very difficult for Mr Rainey to satisfy the court that    *G*
this evidence is not to be accepted. It is, moreover, wrong to categorise the
evidence as being confined to a "WAIF 2 publication". Mr Morse made clear
that, although he primarily had another partwork in mind, it would be
premature to come to any definite conclusion before doing some research at
the appropriate time. That then led Mr Rainey to submit that, since nothing
firm could be shown to be in Mr Morse's mind, he had failed to discharge the
burden of showing that on the balance of probabilities any future work    *H*
would be published at all. That is mere casuistry on Mr Rainey's part. Any
sensible businessman may intend to publish but be unsure what form the
publication will take until the market is tested. That does not make it in the
least improbable that future publication will occur.

745

A    60    The judge (with some justification) treated the arguments that the
Aerospace business was in run-off and that there was no intention to issue
further aviation publications as covering much the same ground. He said, at
para 71:

"Thus, I start by finding that as at say, 1 July 2001 WAIF was not the
last Aerospace publication of its time: as a matter of probability there
B    would in due course have been a successor. I so find notwithstanding the
point made as to the immediately preceding history because of an
overwhelming impression of Aerospace as an ongoing aviation-oriented
organisation with a reputation and a pride. Mr Morse was and is an
aviation enthusiast as is his effective number two, Mr Moeng. The
editorial staff then in place and working on WAIF were similarly skilled
C    and dedicated. There was intense and understandable pride in the
partworks and in the archive and it is not without significance that on the
very day of the flood Mr Stroud was working at cataloguing. Even
the efforts to sell the archive during the preceding months do not gainsay
this impression once one takes into account the asking price, £1,932,500.
This may have been of no assistance in establishing market value; it was
of great assistance in signalling the significance to Aerospace of the
D    archive and it served to counter the proposition that the only perceived
future role of the archive was a generator of picture library fees. The
notion that the flood was coincidental with a change of corporate heart so
that the damage to the archive was happily of less significance than
hitherto would have been the case, and so that WAIF was to be the last
Aerospace publication does not accord with my view of the reality of the
E    situation and I reject submissions that are to that effect."

It is true that these conclusions were made without detailed reference to the
evidence and, in particular, to the detail of Aerospace's recent history just
before the flood and that they could have engaged more closely with
Mr Rainey's arguments. But once those arguments have been tested against
the documentary and oral evidence, I can only say that not only were they
F    conclusions demonstrably open to the judge but that I would, so far, have
been minded to come to the same conclusions as the judge has done.

61    That, however, is to disregard the second aspect of step (b), namely
the alleged unwisdom of trying to issue aviation publications in the future
and the extent to which that might have affected both Mr Morse's own state
of mind and the reasonableness of reinstatement.

62    So I turn to the expert evidence which it is said that the judge
G    disregarded without giving reasons. Three preliminary observations are
relevant. First, the expert evidence was by no means all one way (see the
joint conclusions after the first exchange of reports). Secondly, the value of
expert evidence in a case such as the present is by no means obvious; it is all
too easy for an expert to be able to express an opinion at trial about market
movements and customer trends four years after the event which has given
rise to the liability in the first place. It was Mr Morse (himself having
H    considerable expertise in the publishing and marketing of aviation and other
publications) who had to make decisions affecting his business at the time.
In the absence of any attack on his bona fides his own views must be
accorded some weight, taking due account of his position as an interested
party in the proceedings. Thirdly, it is important to have in mind what is the

746
Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)        [2007] Bus LR
Longmore LJ

correct question which the expert should be addressing. I have already given
reasons for saying that a question which confined itself to the likely
marketability of a partwork almost identical to WAIF 1 was too narrow.
Since Mr Morse said that the likelihood was that a further partwork of some
kind would be published, a question about the viability of future partworks
was relevant but Mr Morse never confined himself to partworks. His
intention was to publish whatever seemed to him would be marketable at the
time, being confident that the market for aviation publications had not
exhausted itself. There is the further consideration that the time in relation
to which the relevant question had to be asked must (at any rate primarily)
be the date of the flood. Mr Rainey accepted that this would be so subject to
the obviously correct qualification that, since (a) it was never intended that
there be an immediate successor to WAIF 1 when that partwork series ended
but rather that a new publication would probably come out in 2003 and
(b) the trial did not take place until 2005, the relevant question would have
to relate to one or other or perhaps both of those dates. It is, in fact, the
latter date which is more relevant. The prospect in 2001 of commercial
viability of a 2003 publication (the judge, in para 72, preferred to find that
the more likely date for publication was 2005 in any event) would no doubt
be relevant to the question whether the Aerospace business was in existence
or in run-off as at 2001 but that question has already been answered. For the
present purpose of determining whether Mr Morse intended to reinstate,
once the flood had occurred, and whether it was reasonable for him so to
intend, the relevant question must be asked as at 2001 in relation to the time
when compensation would be likely to be received, viz at date of trial in
2005.

63    The question, therefore, which any expert (if he could be found)
would have to address would be whether a reasonable businessman would
have thought in 2001 that there was a reasonable prospect of profitably
issuing one or more aviation publications in about 2005. The question only
has to be stated for it to be seen how speculative it is; it is difficult to answer
without falling into the trap of relying on one's knowledge (acquired in
hindsight) of how business developed in 2002, 2003 and 2004. Not only did
the experts fall into the trap but it is far from clear that they were invited to
address the right question at all.

64    One might be forgiven for thinking that the most relevant pieces of
hard evidence which might help to answer this highly speculative question
were answers given to questionnaires circulated with one of the
WAIF 1 publications. These answers were analysed by a company called
Vivid Interface Ltd and, although the number of persons replying to a
questionnaire of this sort was inevitably limited (it was in fact 1,000 which is
a by no means negligible return) the replies received are not without interest.
More than 50% of responders expressed serious interest in world military
aircraft, aircraft weapons, air forces of the world, war in the air, aviation
technology, A to Z of aircraft and history of aviation. 91% and 93% thought
the text/picture balance and the technical content of WAIF 1 were about
right. Large numbers rated various formats as excellent. Much smaller
numbers read competing publications but 89% were sufficiently interested to
spend serious sums on aircraft books. These are not signs of a market in
serious decline.

747

[2007] Bus LR          Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)
Longmore LJ

A    65   We were not referred to any part of the evidence of the experts
retained by either side where this document was accorded any weight or
where any explanation was given as to why it should not be accorded
weight. Instead much was made of significantly later events. The thrust of
the evidence of Mr Byrne (the expert called by Thames Water) was that the
market for photo-intensive partworks in the style of WAIF 1 had declined in
favour of modern mixed medium partworks which rather than being photo-
B    intensive would have fewer photographs but be accompanied by a DVD or
other video representation. For this purpose he and Mr Rainey relied on
research done into something called a "Fighting Aircraft" project in 2003.
This research was commissioned by Summertime in collaboration with an
Italian company called De Agostini probably (according to Mr Morse) with
a view to distribution in Japan. This research did indeed show that DVDs
C    were a popular accompaniment for partworks but it did not exclude
marketability of more traditional partworks nor did it, in any way, go to
show that Aerospace and Mr Morse would decline to adapt to a changing
market if there was one. When one discovers further that this research was
based on a focus group discussion with only ten persons, one cannot help
feeling that it is a very slender foundation from which to address what I have
called the relevant question.
D    66   In the end Mr Rainey fell back on the onus of proof, saying that it was
for Aerospace to prove that they had it in mind to issue one or more
particular types of publication, and that they had alighted on a
WAIF 2 publication which would never have been feasible in the market
conditions as they had become. I have already said that that is too narrow
an approach and a wise businessman who intends to use his archive for
E    future publication will wait to see what sort of publication can best be made.
That state of mind should not (and, in my judgment, does not) preclude
recovery of the cost of reinstatement unless it is manifest that such a decision
would be commercially unwise. I have seen no persuasive evidence to
suggest that any publication which Mr Morse decided to publish would be
commercially disastrous.

F    *Continued publication of WAIF 1*

67   I can deal with this more briefly. The judge's finding was in para 72:

"Next I find that a condition precedent to the preparation of any such
successor partwork would have been ready access to an archive
substantially 'as was'. I so find because, as I see it, Aerospace could not
have lent itself to any work of less 'scholastic' depth compatible with
G    obtaining materials wholly or substantially from external sources and
because the extra costs involved would militate against the enterprise.
Yet further, I cannot regard an uncatalogued rump as any significant
substitute for the catalogued archive 'as was'."

There was ample evidence to justify this finding, since both Mr Morse and
Mr Eden had explained in evidence how difficult it was to continue WAIF 1,
H    how (against the odds) they had succeeded to the extent that few (if any)
customers complained about the fall in quality resulting from the flood and
how they had hoped to finish the run with Issue 200 in November 2001,
although they had not in fact been allowed by the public to do so. In the
light of this evidence the conclusions of the judge are eminently justifiable. It

is, indeed, inherently unattractive for Thames Water (who caused the flood    *A*
in the first place) to be arguing that the valiant continuation of WAIF 1
shows that in truth there was little need for the archive at all and that once
£135,000 had been spent in repairing damaged photographs, Aerospace
would be able to carry on just as before.

*Likelihood of profit*    *B*

68   The substance of this particular branch of the subject has already
been covered.   No doubt if subsequent publications were to be just like
WAIF 1 the likely profit would be small.   But once it is accepted (a) that
Mr Morse intends to reinstate and (b) that he is not intending to confine
himself to a WAIF 1 style publication and (c) that he is an honest and not an
unreasonable businessman, he is not bound to go further and show that his
business plans are bound to make a profit.   Debate about profitability does    *C*
not detract from his intention to reinstate, if it is found that his intention is
genuine.   Many reasonable businessmen make decisions which do not turn
out as well as they had hoped; he does not have to prove that his plans are
bound to be sound before he can recover the cost of reinstatement.   As far as
the question of the consequential loss claim is concerned, it is only the cost of
the delay in earning the anticipated profit which can form a proper head of    *D*
recovery if reinstatement is otherwise allowable.   The argument that it is
only a Summertime loss and not an Aerospace loss has been already dealt
with above.

*Conclusion on reinstatement as against a diminution in value*

69   I would, therefore, conclude that Aerospace are entitled to recover    *E*
damages on a reinstatement basis as the judge has found.   The fact that his
reasoning could have been fuller makes no difference to the ultimate
outcome.

*Reflection*

70   In a complex factual case such as the present it will often be    *F*
comparatively easy for an appellant to allege that a judgment is imperfectly
or inadequately reasoned on one aspect or another and even to persuade this
court, on an unopposed permission application, that that is arguably so.
Appellants must, however, be aware that there is no obligation on a judge to
give a particular response to every submission made ( judgments in this
country are quite long enough already) and that, unless it becomes apparent
in the course of the appeal that a serious injustice has been done, appeals on    *G*
the ground of inadequacy of reasons in complex factual disputes are likely to
fail.   One shudders to think what the costs of this appeal have been and it is
important to emphasise that the fact that one division of this court gave
permission to appeal is very far indeed from being any guarantee of success.

71   I have read and agree with Wilson LJ's analysis of staff costs and the
issues which arise on the cross-appeal.   The overall result is, therefore, that
the appeal of Thames Water is dismissed save in relation to the insignificant    *H*
sum of £6,047 allegedly incurred in respect of the two freelance
ex-employees.   The claimants' cross-appeal on interest is substantially
allowed, although it fails in relation to the lesser arguments set out in
paras 91(b) and (c) below.

749

*A*  **WILSON LJ**

72  I agree. Pill and Longmore LJJ have invited me to deliver the main judgment on two further, discrete areas of the case.

*Staff costs*

*B*
73  As part of their claim for special damage, the claimants included what initially was a very large sum allegedly referable to payments made to staff for work necessarily done by them in relation to, and consequent upon, the flood. In due course this head of claim was reduced to £31,520. In the event the judge upheld this part of the claim although in his judgment the digits are so transposed as to read £31,250. Recognising that, in the absence of their appeal on matters of far greater financial consequence, it would have been inappropriate for them to appeal against this small

*C*  proportion of the award, Thames Water nevertheless added objection to it to their other grounds of appeal.

74  The claim for £31,520 was broken down as to £25,473 in respect of the claimants' employees and as to £6,047 in respect of two ex-employees who had returned to work for them on a freelance basis. As figures, neither of them was challenged. But Thames Water articulated before the judge a

*D*  different type of objection to each of the two figures. Although it was almost de minimis, the fact is that the judge failed to address their objection referable to the freelancers. He did address their objection referable to the employees but, so Thames Water complain, fell into error in overruling it.

75  As summarised in Thames Water's grounds of appeal, "the judge should have held that the freelance costs were costs of the action to be assessed". What, then, was the evidence in relation to the work done by the

*E*  two freelancers? According to Mr Moeng, most of their work related to the inspection and assessment of damage in February and March 2003. In that the claim was issued on 27 May 2003, it seems to be a fair inference that the assessment done by the freelancers some three months earlier was referable to preparation of the claim. The balance of the claim referable to freelance work related to six small payments made to one freelancer between August

*F*  2003 and June 2005. The third of the six was described by the claimants as "Writing witness statement" and, before us, Mr Young was quick to concede that such, at least, was an item of costs rather than of damages. No doubt the dividing line between work referable to the claim and work referable to the attempted reconstitution of the claimants' business activity is narrow; but, in light of the fact that two of the areas of work done by the freelancers thus appear to relate to costs, the onus was in my view firmly on the

*G*  claimants to adduce clear evidence that the other items were not analogous. This they failed to do. So I consider that, had the judge descended to this minor issue, he should have upheld Thames Water's contention.

76  The claim referable to employees related to work done by seven of them in the weeks, months and years after the flood referable to the works of salvage, which were delicate and complex, and other works of reorganisation reactive to the flood. The contention of the claimants was,

*H*  of course, not that, in the absence of the flood, they would not have had to pay their employees but that in its absence their employees would have concentrated upon their conventional activities, out of which the claimants would have made money. One of their then senior editors, Mr Bishop, gave evidence that, had it not been for his work referable to the flood between

750
Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)  [2007] Bus LR
Wilson LJ

July and September 2001, he would have been working in his editorial-writing capacity in the creation of publications. The evidence of Mr Moeng was similar. That, however, was as far as the specific evidence went. Mr Young seems to have contended before the judge that he could confidently infer that, in the absence of the work done by them referable to the flood, the employees would, by their conventional activities, have contributed to increased revenue for the claimants. It was Mr Rainey's contention, by contrast, that any claim that the employees had been diverted from revenue-generating activities had not been spelt out, still less substantiated in evidence.

77  The judge explained his resolution of this issue in the following words:

"As to staff costs, this represents a calculation of the cost allegedly occasioned to Midsummer by the post-flood need to divert employees from their normal duties to countering and mitigating the impact of the flood. The defendants object to this head of claim: flood or no flood, the claimants would have expended the same sum, given that the individuals concerned were in their full-time employment. I reject this objection. Had the claimants engaged temporary workers, there could have been no objection to the cost. As I see it, there can be no objection in principle to essentially the same claim because they took the easier and possibly cheaper course of diverting their existing workforce from profit-earning activities to those arising from the flood."

78  It was the contention of Mr Rainey before us that any claim by a claimant that its employees have been diverted from revenue-generating activities in order to attend to the consequences of a tortious or otherwise wrongful act has to be strictly proved; that the claimants failed to prove such loss of revenue; and that it was not open to the judge in law simply to infer diversion from revenue-generating activities.

79  In this regard we were referred to five authorities.

80  First, *Tate & Lyle Food and Distribution Ltd v Greater London Council* [1982] 1 WLR 149. The defendants were liable to the claimants for having failed to dredge silt which they had caused to be accumulated when constructing new piers for the Woolwich ferry and which had obstructed the claimants' use of their barge moorings. The result had been that the claimants themselves had had to dredge the silt and, as part of their claim, they claimed managerial and supervisory expenses referable to that operation. In rejecting this part of the claim Forbes J said, at p 152:

"I have no doubt that the expenditure of managerial time in remedying an actionable wrong done to a trading concern can properly form the subject matter of a head of special damage. In a case such as this it would be wholly unrealistic to assume that no such additional managerial time was in fact expended. I would also accept that it must be extremely difficult to quantify. But modern office arrangements permit of the recording of the time spent by managerial staff on particular projects. I do not believe that it would have been impossible for the plaintiffs in this case to have kept some record to show the extent to which their trading routine was disturbed by the necessity for continual dredging sessions."

A  It is thus important to note that the claim was rejected not because of a failure specifically to establish that, had it not been diverted to the remedial measures, the managerial time would have been productive of revenue for the claimants but only because they had not properly demonstrated the amount of time thus diverted and, more generally, the extent to which their trading routine had been disturbed by it.

B  81  Second, *Standard Chartered Bank v Pakistan National Shipping Corpn (No 3)* [2001] 1 All ER (Comm) 822. As part of its attempt to mitigate its loss caused by deceit perpetrated in relation to it by the defendants, the claimant bank presided over the sale of a cargo of bitumen in Vietnam. In that regard it despatched Mr Griffiths, one of its officers, to Vietnam; and the report of the decision at first instance [1999] 1 All ER (Comm) 417 shows that he went to Vietnam on two occasions, each
C  for about two months. As part of its damages, the bank claimed an amount equal to his salary during those visits, namely US$30,000. On the defendants' appeal to this court, the trial judge's award to the bank of this sum was set aside. In giving the only substantive judgment, with which Henry LJ and Wall J agreed, Potter LJ cited the passage in the judgment of Forbes J set out above and continued [2001] 1 All ER (Comm) 822, para 49:

D      "It does not seem to me that either the passage quoted or the circumstances relating to the claim in the *Tate & Lyle* case justify the recovery of the proportion of Mr Griffiths's salary claimed in this case. No doubt it was true, as the judge stated, that, in visiting Vietnam, Mr Griffiths was engaged in an unusual task. However it is not suggested that his trip abroad, as an employee engaged in the business of [the bank]
E      and in respect of whose responsibilities his salary was in any event payable, led to any significant disruption in [the bank's] business or any loss of profit or increased expenditure on [the bank's] part . . . In certain situations, involving particular types of trading concern, such a claim may be appropriate. In particular, building contractors who, by reason of delay, suffer increased costs attributable to a particular job which costs are irrecoverable elsewhere, may claim for a proportion of their fixed
F      overheads (including head office salaries) as part of their claim for consequential loss. However, that is not this case. There is no suggestion that the business of [the bank], or the system of charging upon which its profits depend, were in any way adversely affected by the diversion of Mr Griffiths to Vietnam."

G  This, then, was a case of the diversion of one employee in a large organisation away from his normal duties; and it had not even been "suggested", let alone established, that his diversion had led to any significant disruption of, or indeed any adverse effect at all upon, the bank's business. Although this court was there identifying a low threshold, the bank had nevertheless failed to cross it.

82  Third, *Horace Holman Group Ltd v Sherwood International Group*
H  *Ltd* (unreported) 7 November 2001. The defendants were liable to the claimants for having failed to provide them with an adequate software package. As part of their damages, the claimants claimed time wasted by their directors and staff in struggling with the inadequacies of the software provided by the defendants. In allowing this claim Judge Bowsher QC, sitting in the Technology and Construction Court, noted what Forbes J had

752
Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)          [2007] Bus LR
Wilson LJ

said in the *Tate & Lyle* case [1982] 1 WLR 149 and observed that, by      A
contrast with that case, at least he had some evidence of the amount of time
spent by the directors and staff, albeit only in the form of a reconstruction
from memory. He continued, at para 73: "I cannot and do not say, in the
absence of records there is to be no recovery." Then, in paras 75–78, the
judge rejected the suggestion of the defendants that, in this regard, there
were relevant distinctions between an income-producing employee and what      B
was described as a "back office" employee or indeed between short periods
and long periods of diverted time. "In all cases", he said, at para 78, "the
claimants were paying for time which was to be a benefit to them and they
lost the benefit of that time". Earlier, at para 75, the judge had accepted the
observation of the claimants' forensic accountant that "every employer
values each employee at more than the employee is paid, otherwise there is
no point in employing him". Although it does not seem that the decision of      C
this court in the *Standard Chartered Bank* case, decided nine months earlier,
was cited to him, I do not consider that its citation would have led the judge
to a different conclusion. If the kernel of the decision in the *Standard
Chartered Bank* case was the requirement to demonstrate significant
disruption of business as well as the alleged diversion of time, both had been
well demonstrated before Judge Bowsher QC.

83    Fourth, *Admiral Management Services Ltd v Para-Protect Europe*      D
*Ltd* [2002] 1 WLR 2722. The claimants became suspicious that the
defendants were wrongfully using their confidential information. Their staff
made an initial investigation. They obtained a search and seizure order; and
the material thus seized was examined by the staff. In due course a Tomlin
order was made, under which an issue between the parties as to the
defendants' liability to the claimants for their staff costs referable to the      E
investigation and examination was referred to a judge. Stanley Burnton J
first held that, in so far as any member of the claimants' staff could be
classified as an expert and could be found in that regard to have performed
expert work, the costs referable to that member fell within the costs of and
incidental to the claim, which the defendants had agreed to pay. The judge
then proceeded to consider whether staff costs not thus recoverable as costs
of and incidental to the claim were recoverable by the claimants as damages.      F
Neither the decision of this court in the *Standard Chartered Bank* case nor,
for that matter, the then very recent decision of Judge Bowsher QC on the
*Horace Holman Group* case seems to have been cited to him. He
determined that, in that it was for payments to staff which would have been
made in any event, the claim had to be formulated, if at all, as a claim for lost
revenue as a result of the diversion of the time of the staff. The judge      G
continued, at para 87:

"Of course, it may be difficult to quantify any loss of revenue or
business consequential on the diversion of employee time to dealing with
a tort or breach of contract suffered by an employer. It may be that the
cost of employee time may be taken as an approximation for the loss of
revenue involved; but, if so, the claim remains a claim for loss of revenue      H
rather than a claim for expenditure occasioned by the tort or breach of
contract."

Then the judge concluded that, in so far as it existed at all, the necessary
evidence of loss of revenue was extremely vague and not confirmed by other

A   evidence which, had the loss existed, might have been expected to confirm it. He therefore concluded that, while in theory a claim for damages for loss of revenue might be available to the claimants in this regard, there was no evidence to justify it.

84   Fifth, *R + V Versicherung AG v Risk Insurance and Reinsurance Solutions SA* [2006] EWHC 42 (Comm). It had already been held that the defendants, insurance intermediaries, were liable to the claimants, a German reinsurance company, because of a conspiracy to defraud the claimants on the part of one of the defendants' employees. By this, second, judgment Gloster J had to decide issues of principle in relation to quantum of damage and in particular to the recoverability by the claimants of the costs of paying their staff during time devoted to investigation and/or mitigation of the tort.

C   The defendants conceded only that the claimants could recover for what they could establish as a loss of profit sustained by the diversion of staff time. In a careful judgment Gloster J sought to analyse the effect of the four decisions referred to above, as well as others. She observed, at para 76, that she had some difficulty with the reasoning of Stanley Burnton J in the *Admiral Management Services* case. Then she said, at para 77:

D        "In my judgment, as a matter of principle, such head of loss (i e the cost of wasted staff time spent on the investigation and/or mitigation of the tort) is recoverable, notwithstanding that no additional expenditure 'loss', or loss of revenue or profit can be shown. However, this is subject to the proviso that it has to be demonstrated with sufficient certainty that the wasted time was indeed spent on investigating and/or mitigating the relevant tort; i e that the expenditure was directly attributable to the tort . . . This is perhaps simply another way of putting what Potter LJ said in the *Standard Chartered Bank* case, namely that to be able to recover one has to show some significant disruption to the business; in other words that staff have been significantly diverted from their usual activities. Otherwise the alleged wasted expenditure on wages cannot be said to be 'directly attributable' to the tort."

F   85   In my view the divide between the decisions of Stanley Burnton J in the *Admiral Management Services* case [2002] 1 WLR 2722 and of Gloster J in the *R + V Versicherung AG* case [2006] EWHC 42 (Comm) is not as stark as may appear. But, to the extent that there is a difference, I consider that the approach of Gloster J is preferable as being, unsurprisingly, more consonant with the decision of this court in the *Standard Chartered Bank* case [2001]

G   1 All ER (Comm) 822, not cited to Stanley Burnton J.

86   I consider that the authorities establish the following propositions. (a) The fact and, if so, the extent of the diversion of staff time have to be properly established and, if in that regard evidence which it would have been reasonable for the claimant to adduce is not adduced, he is at risk of a finding that they have not been established. (b) The claimant also has to establish that the diversion caused significant disruption to its business.

H   (c) Even though it may well be that strictly the claim should be cast in terms of a loss of revenue attributable to the diversion of staff time, nevertheless in the ordinary case, and unless the defendant can establish the contrary, it is reasonable for the court to infer from the disruption that, had their time not been thus diverted, staff would have applied it to activities which would,

754
**Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)**    [2007] Bus LR
**Wilson LJ**

directly or indirectly, have generated revenue for the claimant in an amount    A
at least equal to the costs of employing them during that time.

87    In that in the present case the diversion of the time of a significant
number of the claimants' employees, particularly their senior employees,
was set out in detail and adequately established, and in that there could be
no sensible challenge to a conclusion that their business was thereby
disrupted, indeed substantially so, I consider that the judge was entitled to    B
draw the inference that the employees had been diverted from revenue-
generating activities; and accordingly I see no error in his allowance within
the damages for the costs of the employees referable to the diversion.

*The cross-appeal*

88    The subsidiary part of the claimants' cross-appeal was compromised    C
in the dying moments of the oral argument before us. It had related first to
two awards in relation to continuing losses calculated by the judge to the
date of his judgment, which the claimants contended should be so varied as
to include losses for the further year reflected by the pendency of this appeal.
But it had related in particular to the award of £129,035 reflective of loss of
profits consequent upon the delay in the publication of WAIF 2 from
September 2005 to January 2008 (rounded down by the judge to a period of    D
two years), which, again, the claimants contended should be so varied as to
include loss of profit for a further year of delay until January 2009
consequent upon the appeal. The compromise is that Thames Water
concede the validity of the latter contention and will submit to a 50%
increase in the award of £129,035, ie to £193,553, and that the claimants
will abandon the other contentions.                                                E

89    The main part of the cross-appeal relates to the judge's award of
interest to the effective date of judgment (agreed to be 21 December 2005
rather than 13 January 2006) pursuant to section 35A of the Supreme Court
Act 1981. The award was of £15,476. The claimants contend that it was
gravely deficient.

90    The reasoning behind the judge's award of interest proceeded in the    F
following way. (a) The judge correctly noted Mr Young's concession that no
interest should accrue on the award of £129,035 referable to the delay in the
receipt of profits from September 2005 to January 2008. Unfortunately,
however, the judge overlooked the concession when shortly thereafter he
turned to make his calculations. This error, which of course favoured the
claimants rather than vice versa, should be corrected by counsel when they
kindly make the fresh calculations consequent upon our judgments.    G
(b) The judge ruled that, with one exception set out at (c) below, no part of
the award of £2,328,144 referable to restoration of the archive and to the
diminution in value of the artwork should bear interest. In this regard he
purported to uphold the submissions of Mr Rainey. But such was not an
entirely accurate representation of Mr Rainey's submissions for he had
conceded that the award of £89,686 referable to the diminution in value of
the artwork should bear interest. (c) The judge's exception to the ruling set    H
out at (b) above related to the component of £135,303 within the figure of
£2,328,144. This component related to the cost of restoration of such of the
affected photographs as were susceptible of restoration. The judge ruled
that

A       "But for post-flood impecuniosity this sum should have been part of
the special damage and I agree with Mr Young that unless it is
supplemented with interest it is likely to prove to be an unrealistic
estimate given its age and provenance."

(d) Next, making a trivial arithmetical error, the judge calculated the total
part of the award which in his opinion should bear interest. (e) In light of the
B   fact that the losses within the interest-bearing part of the award had accrued
at different times between the dates of the flood and of the judgment, the
judge decided to calculate interest on all of them from a mid-point between
those two dates. (f) The judge also decided to award interest for that period
at a rate of 5% p a, being 1% above the base rate which, by averaging, the
parties had agreed at 4%. (g) Then, uncontroversially, the judge made
C   allowance for Thames Water's two interim payments to the claimants with
effect from their respective dates.

91   The claimants allege that the reasoning of the judge set out above
betrays appealable error in the following three areas: (a) in declining to
award interest on the whole sum of £2,328,144 referred to at para 90(b)
above; (b) in calculating all interest from the mid-point between the dates of
D   the flood and of the judgment, rather than from more precise dates when the
respective losses were incurred; and (c) in calculating interest at 1% p a above
base rate, rather than at 2·5% p a above base rate.

92   Upon what grounds did the judge decline to award interest on all
save £135,303 of the award of £2,328,144? Without having set out
Mr Rainey's argument, the judge said only that he was "correct in
principle".   Putting aside for this purpose Mr Rainey's overlooked
E   concession about the award referable to the artwork, one therefore has to
turn to see what Mr Rainey had argued. There is no transcript of the
proceedings before the judge conducted by video link on 20 December 2005,
at which issues relating to interest, costs and otherwise were canvassed. But,
in his skeleton argument dated 19 December 2005, Mr Rainey had
succinctly set out his case as follows:

F       "In the case of archival restoration no loss has been incurred: the
award gives to the claimants a fund which does not represent the chattel
(as diminution in value would) for a specific future exercise. No interest is
therefore recoverable."

93   In my view there is a fallacy at the heart of Mr Rainey's argument. It
G   jumps from the true proposition that no remedial costs have yet been
incurred to the false proposition that no loss has yet been incurred. The loss
was incurred on 3 July 2001 and the fact that in the end the judge—correctly
so we are holding—favoured a computation of most of the loss by reference
to the cost of a restoration not yet conducted does not alter the date of the
loss. Informing therefore the judge's exercise of discretion to award interest
under section 35A of the 1981 Act should have been "the basic principle . . .
H   that interest will be awarded from the date of loss". So said Robert Goff J in
a passage undisturbed on appeal in *BP Exploration Co (Libya) Ltd v Hunt
(No 2)* [1979] 1 WLR 783, 847C; and he proceeded to add: "the mere fact
that it is impossible for the defendant to quantify the sum due until judgment
has been given will not generally preclude such an award."

94 The basic principle is, of course, not immutable. Had the evidence *A* enabled him to do so, Mr Rainey might have argued that the costs of restoration included in the award were calculated by reference to figures which obtained in 2005 and thus that an award of interest would duplicate an allowance already built into it. But he never so argued. On the contrary it was Mr Young who, as part of his application for an award of interest, argued—apparently without challenge—that such costs were calculated by *B* reference to figures which obtained in 2001 and which had indeed been finally presented to Thames Water as early as 2003. In the minor area of photographic restoration Mr Young's argument found favour with the judge; but Mr Rainey has not sought to explain to us why the costs of such restoration should have fallen for treatment different from that of the costs of other aspects of the archival restoration.

95 Both before the judge and before us Mr Rainey relied primarily *C* on the decision of this court in *Kaines (UK) Ltd v Osterreichische Warrenhandelsgesellschaft (formerly CGL Handelsgesellschaft mbH)* [1993] 2 Lloyd's Rep 1. In June 1987 the defendants repudiated a contract to sell the claimants oil for lifting in September 1987 and for payment in October 1987. The claimants thereupon contracted to buy the oil at a higher price, again for lifting in September 1987 and for payment in October 1987; *D* and in August 1987 they issued their claim against the defendants. This court held that the trial judge had erred in awarding interest from as far back as the date of the issue of the claim in that it was only in October 1987, when they had paid the higher price, that the claimants had sustained the loss. In my view this decision is of no value whatever to Mr Rainey; indeed it reinforces the need to focus carefully on the date of loss. The fact is that, on analysis, Mr Rainey's successful submission to the judge was thoroughly *E* unprincipled: its effect was to reward Thames Water—and conversely to prejudice the claimants—for the delay of over four years which Thames Water had achieved by their resistance to a claim which had a far greater value than they had ever conceded.

96 For the above reasons I conclude that there was an appealable flaw in the judge's discretionary refusal to award interest on the entire figure of *F* £2,328,144; and I propose that the cross-appeal be allowed in that first regard.

97 Part of Mr Rainey's response to the second part of the cross-appeal as to interest is that, in the course of the hearing on 20 December 2005, Mr Young conceded that it would be permissible for the judge to calculate it in the manner to which he now objects, namely from the mid-point between the dates of the flood and of the judgment. In this regard the lack of a *G* transcript of the proceedings is unfortunate. Mr Young vehemently and in my view convincingly denies that he conceded—or at the very least intended to concede—that, in relation to his substantially unsuccessful application for interest on the figure of £2,328,144, the calculation should run only from that mid-point. For, as I have explained, that figure represented loss entirely incurred on the date of the flood. Even had he made such a concession, however, the circumstances are that the judge made no substantial award of *H* interest in that regard and so did not apply his mid-point to it, with the result that, if, as I propose, we substitute an award in that regard, we are in substance unconstrained from identifying the appropriate starting point, which is indubitably the date of the flood. In relation, however, to the

757

A   balance of the interest-bearing components of the total award, it is clear:
(a) that in his written submissions to the judge for the hearing on
20 December 2005 Mr Young conceded that different components of the
loss had been sustained over different periods and that, for all such
components, mid-points within those different periods should be taken as
the starting points of individual calculations of interest; (b) that in the course
B   of the hearing the judge invited counsel's submissions on a broader
approach, namely to effect one composite calculation in relation to all such
components from the mid-point between the dates of the flood and of the
judgment; and (c) that, like Mr Rainey, Mr Young did—as he accepted
before us—concede that the broader approach was permissible. In such
circumstances, as in effect Mr Young now recognises, the claimants can
scarcely press this area of their cross-appeal. Even absent his concession,
C   I would on balance have categorised the judge's approach as permissibly
simple rather than impermissibly crude.

98   I would also dismiss the third part of the cross-appeal as to interest.
The argument in this regard is founded upon evidence placed before the
judge as late as 20 December 2005 itself that between 2001 and 2005 the
claimants had had to borrow at a rate of 2·5% p a above base rate (and
D   indeed subject to payment of an additional risk fee upon which Mr Young
concedes that he cannot rely). Although in the light in particular of the
decision of this court in *Jaura v Ahmed*, The Times, 18 March 2002 the
judge might permissibly have departed from the conventional use of a rate
equal only to 1% above base rate in order to reflect the higher rate at which,
unsurprisingly in the light of the size of their operation, the claimants had
had to borrow, I do not consider that his refusal to depart from it exceeded
E   the bounds of his discretion.

### PILL LJ

99   I add a few words only on the issue of reinstatement versus market
value. Mr Morse underlined that he was a businessman and viewed the
Aerospace archive as a business asset for business use, and the issue should in
F   my view be approached on that basis. It was an unusual asset, assiduously
built up over many years by a man who combined a commercial motivation
with a deep and sustained enthusiasm for aviation literature.

100   The judge had, and was entitled to have, "an overwhelming
impression of Aerospace as an ongoing aviation oriented organisation with a
reputation and a pride" and Mr Morse, as an "aviation enthusiast", as was
G   his effective number two.

101   It is most unlikely that the archive could be reinstated exactly
because many of the archival items were probably very rare or even unique,
but sustained efforts would probably produce an aviation archive of equal
importance and interest. That is not in issue because the cost of
replacement, as distinct from whether damages should be calculated on a
reinstatement basis, has not been challenged.

H   102   The question is whether reinstatement would make sense
commercially. As Pearson LJ put it in *Darbishire v Warran* [1963] 1 WLR
1067, 1076, a case involving a damaged motor car:

"It is vital, for the purpose of assessing damages fairly between the
plaintiff and the defendant, to consider whether the plaintiff's course of

758
**Aerospace Publishing Ltd v Thames Water Utilities Ltd (CA)**       **[2007] Bus LR**
**Pill LJ**

A   action was economic or uneconomic, and if it was uneconomic it cannot (at any rate in the absence of special circumstances, of which there is no evidence in this case) form a proper basis for assessment of damages. The question has to be considered from the point of view of a businessman."

103   In this case, I would not be prepared, tempting though it would be, to hold that the rarity and interest of the collection in itself gave it a value in damages greater than its market value or in itself created a right to damages B   on a reinstatement basis. The measure of damage for a unique or "freak" article, considered in *Darbishire's* case, does not require consideration in this case.

104   However, in my judgment, the judge was entitled to conclude, at para 76:

C   "I find on balance of probability that Mr Morse does have a present intention to restore so much of the archive as is constituted by photographic images and reference material, funds permitting. I find that any award reflecting diminution in value would be inadequate for that purpose. I find that the cost of the restoration as intended by Mr Morse is reasonable in itself and that viewed objectively it is reasonable to expend such on that restoration."

D   105   Longmore LJ has analysed in detail the evidence about the commercial prospects for Aerospace. I agree with his analysis and with his conclusion that Aerospace is entitled to recover damages on a reinstatement basis, as the judge found. I also agree that the fact that the judge's reasoning could have been fuller does not affect the ultimate outcome.

106   I agree with Wilson LJ on the issue of staff costs and the issues E   which arise on the cross-appeal.

*Appeal allowed in part.*

*Solicitors: Lane & Partners LLP; Collyer Bristow.*

B P W

F

LC/32

# QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

19, 21–22, 26–29 April, 4–6, 10, 17–18 May;
9 November 2010

———

## BOREALIS AB
v
## GEOGAS TRADING SA

[2010] EWHC 2789 (Comm)

Before Lord Justice GROSS

**Sale of goods — Damages — Causation — Sale of butane to be used as feedstock in buyer's olefin plant — Butane contaminated with fluorides producing harmful acids — Acids causing physical damage to buyer's plant — Seller contending that loss and damage would have been avoided had buyer responded appropriately to acid alarm at plant — Whether chain of causation broken — Relevant principles.**

By a contract made on 22 August 2003 the defendant (Geogas) agreed to sell to the claimant (Borealis) 5,200 mt of butane to be used as a feedstock for Borealis's integrated olefin plant situated at Stenungsund, Sweden.

Borealis alleged that, in breach of contract, Geogas supplied butane heavily contaminated with fluorides that cracked under normal processing conditions to produce hydrofluoric acid which, in turn, caused serious and extensive physical damage to the plant, with consequential interruption to Borealis's business. Borealis claimed damages under various different heads, including loss of profits.

It was common ground that the butane was contaminated with fluorides, and Geogas admitted that it was in breach of an implied term of the contract that the butane would be of satisfactory quality. However, Geogas denied that it was liable for all the losses claimed by Borealis, raising arguments on causation, remoteness of damage, mitigation and quantum.

As to causation, Geogas contended that Borealis failed to react appropriately to a pH alarm. Had Borealis reacted appropriately, the physical damage to the plant would have been reduced by 22/58ths, and the claimed loss of production would have been avoided. Accordingly, Geogas should not be liable for more than 22/58ths of the physical damage, and should not be liable at all for the lost production.

———*Held* by QBD (Comm Ct) (GROSS LJ) that:

(1) The principles applicable to breaking the chain of causation were as follows (*see* paras 42 to 47).

(a) Although an evidential burden rested on the defendant insofar as it contended that there was a break in the chain of causation, the legal burden of proof rested throughout on the claimant to prove that the defendant's breach of contract caused its loss.

(b) In order to break the chain of causation, the conduct of the claimant had to constitute an event of such impact that it "obliterated" the wrongdoing of the defendant. The true cause of the loss had to be the conduct of the claimant rather than the breach of contract on the part of the defendant. If the breach of contract by the defendant and the claimant's subsequent conduct were concurrent causes, it was unlikely that the chain of causation would be broken. In circumstances where the defendant's breach of contract remained *an* effective cause of the loss, at least ordinarily, the chain of causation would not be broken.

(c) Anything less than unreasonable conduct on the part of the claimant was unlikely to be capable of breaking the chain of causation. However, mere unreasonable conduct on a claimant's part would not necessarily do so, eg where the defendant's breach remained an effective cause of the loss, albeit in combination with the claimant's failure to take reasonable precautions in its own interest. Reckless conduct by the claimant would ordinarily break the chain of causation.

(d) The claimant's state of knowledge at the time of and following the defendant's breach of contract was likely to be a factor of very great significance. For the claim of causation to be broken, the claimant need not have knowledge of the legal niceties of the breach of contract; nor would the chain of causation *only* be broken if the claimant had actual knowledge that a breach of contract had occurred — otherwise there would be a premium on ignorance. However, the more the claimant had actual knowledge of the breach, of the dangerousness of the situation which had thus arisen and of the need to take appropriate remedial measures, the greater the likelihood that the chain of causation would be broken. Conversely, the less the claimant knew the more likely it was that only recklessness would suffice to break the chain of causation.

(e) Ultimately, the question of whether there had been a break in the chain of causation was fact sensitive, involving a practical inquiry into the circumstances of the defendant's breach of contract and the claimant's subsequent conduct. It was always a question of degree at what point the damage claimed for ceased to flow naturally and directly from the breach:

———*County Ltd v Girozentrale Securities* [1996] 3 All ER 834, *Compania Naviera Maropan SA v Bowaters Lloyd Pulp and Paper Mills Ltd (The Stork)* [1955] 1 Lloyd's Rep 349; [1955] 2 QB 68, *Kristiandsands Tankrederei AS v Standard Tankers (Bahamas) Ltd (The Polyglory)* [1977] 2 Lloyd's Rep 353, *The Spontaneity* [1962] 1 Lloyd's Rep 460, *Lambert v Lewis* [1982] AC 225, *Schering Agro-chemicals Ltd v Resibel NV SA* 26 November 1992, unreported; CA Transcript No 1298 of 1992 and *Barings plc v Coopers & Lybrand* [2003] Lloyd's Rep IR 566 considered.

(2) Although Borealis's reaction left considerable room for improvement, and fell well short of best practice, it was not unreasonable. There was no break in the chain of causation. Even if Borealis's reaction

**LLOYD'S LAW REPORTS**

**Borealis v Geogas Trading**

*was* unreasonable, the chain of causation would not have been broken. There was no suggestion that Borealis's reaction was reckless, as distinct from unreasonable. Any failure on the part of Borealis did not "obliterate" or destroy the causative potency of the anterior Geogas breach of contract. Although Borealis knew or ought to have known of the presence of an acid in the system, it remained in the grip of an unknown breach giving rise to an unknown danger. In any event, the steps proposed by Geogas would not have successfully avoided the loss (*see* paras 93 to 119).

---

The following cases were referred to in the judgment:

*4 Eng Ltd v Harper* [2008] EWHC 915 (Ch); [2009] Ch 91;

*Aerospace Publishing Ltd v Thames Water Utilities Ltd* (CA) [2007] EWCA Civ 3; [2007] Bus LR 726;

*Al Rawas v Pegasus Energy Ltd* [2008] EWHC 617 (QB); [2009] 1 All ER 346;

*Banco de Portugal v Waterlow & Sons Ltd* (HL) [1932] AC 452;

*Barings plc v Coopers & Lybrand* [2003] EWHC 1319 (Ch); [2003] Lloyd's Rep IR 566;

*C Czarnikow Ltd v Koufos (The Heron II)* (HL) [1967] 2 Lloyd's Rep 457; [1969] 1 AC 350;

*Compania Naviera Maropan SA v Bowaters Lloyd Pulp and Paper Mills Ltd (The Stork)* (CA) [1955] 1 Lloyd's Rep 349; [1955] 2 QB 68;

*County Ltd v Girozentrale Securities* (CA) [1996] 3 All ER 834;

*Elpidoforos Shipping Corporation v Furness Withy (Australia) Pty Ltd (The Oinoussian Friendship)* [1987] 1 Lloyd's Rep 258;

*Hadley v Baxendale* (1854) 9 Exch 341;

*Hart v Lancashire and Yorkshire Railway Co* (1869) 21 LT 261;

*Islamic Republic of Iran Shipping Lines v Ierax Shipping Co of Panama (The Forum Craftsman)* [1991] 1 Lloyd's Rep 81;

*Kristiandsands Tankrederei AS v Standard Tankers (Bahamas) Ltd (The Polyglory)* [1977] 2 Lloyd's Rep 353;

*Lambert v Lewis* (HL) [1982] AC 225;

*Lodge Holes Colliery Co v Wednesbury Corporation* (HL) [1908] AC 323;

*Schering Agrochemicals Ltd v Resibel NV SA* (CA) 26 November 1992, unreported; CA Transcript No 1298 of 1992;

*Sotiros Shipping Inc v Sameiet Solholt (The Solholt)* (CA) [1983] 1 Lloyd's Rep 605;

*Spontaneity, The* [1962] 1 Lloyd's Rep 460;

*Sylvia Shipping Co Ltd v Progress Bulk Carriers Ltd (The Sylvia)* [2010] EWHC 542 (Comm); [2010] 2 Lloyd's Rep 81;

*Transfield Shipping Inc v Mercator Shipping Inc (The Achilleas)* (HL) [2008] UKHL 48; [2008] 2 Lloyd's Rep 275; [2009] 1 AC 61;

*West Wales, The* (1932) 43 Ll L Rep 504; [1932] P 165.

---

This was the trial of the action brought by the claimant buyers, Borealis AB, against the defendant sellers, Geogas Trading SA, for damages for breach of contract arising out of the sale of butane for use in the buyers' integrated olefin plant in Sweden.

Veronique Buehrlen QC and Henry King, instructed by Clyde & Co, for Borealis; Michael Ashcroft, instructed by Thomas Cooper, for Geogas.

The further facts are stated in the judgment of Gross LJ.

Judgment was reserved.

Tuesday, 9 November 2010

---

**JUDGMENT**

**Lord Justice GROSS:**
*Introduction*

1. The claimant ("Borealis") claims damages from the defendant ("Geogas"), arising out of the supply by Geogas to Borealis of some 5,200 mt of butane as feedstock for Borealis's integrated olefin plant situated at Stenungsund, Sweden, in September 2003 ("the plant"). It is Borealis's case that, in breach of contract, Geogas supplied butane ("the goods") heavily contaminated with fluorides that cracked under normal processing conditions to produce, amongst other substances, hydrofluoric acid ("HF") which, in turn, caused serious and extensive physical damage to the plant and equipment, together with consequential interruption to Borealis's business.

2. It is common ground that the goods were contaminated with fluorides. It is further admitted by Geogas that it was in breach of contract — in that the contamination of the goods (by 2 methyl 2 fluoropropane, "2M2F") placed Geogas in breach of an implied term of the contract to the effect that the goods must be of satisfactory quality. Geogas does not, however, concede that it was in breach of contract in other respects alleged by Borealis.

3. Against this background, the trial was essentially about causation, remoteness, mitigation and quantum.

143. I turn to the question of allocation. In general, I accept the accuracy of the Borealis accounting system, under which costs were allocated to particular work orders. To my mind, the detailed material contained in the Scott Schedule, in its final form and as attached to the Borealis closing submissions ("the Scott Schedule"), was of considerable assistance in this regard. Accordingly, I can see no basis for any significant discount. That said, I do have regard to the abandoned claim for November 2003 profits. I also have in mind that in the course of her closing submissions, Ms Buehrlen very properly conceded that she could not support some €55,000 of the claim. In works of this scale and nature it is very difficult to guard against any inaccuracies creeping in. I see no unfairness to Borealis if I make some limited allowance in this regard. Adopting Mr Ashcroft's rough and ready approach, I think that an award of €1,250,000 under this head of claim does justice to both parties.

## (2) Personnel costs

144. Borealis claims €135,748 under this head of claim. It relates essentially to amounts paid to its own employees and managers in respect of the inspection of and repairs to the heat exchangers. This claim includes an amount of basic rate time where wages would have had to be paid to employees in any event — but as they were diverted from their ordinary duties, additional costs were incurred by way of payments to sub-contractors who fulfilled their duties. The claim has been restricted to the employees' basic rate time given the difficulties of quantifying the increased costs relating to sub-contractors — and given that sub-contractors' time is more costly than the time of the employees in question. The sum claimed here also includes a round sum in respect of management time.

145. As appears from the Scott Schedule, Geogas disputes this amount on the following grounds:

(i) Salaries would have been incurred in any event.

(ii) There was no proven linkage to the heat exchanger damage.

(iii) There is no proof of increased sub-contractors' costs.

(iv) There is no proof that staff or management were diverted from revenue-generating activities.

146. Developing these grounds orally, Mr Ashcroft emphasised two matters in particular. First, he submitted that a significant part of the claim was for unproven sub-contractors' costs, "dressed up as a claim for personnel costs". Secondly, he contended that as the plant was focused on the planned October turnaround, no inference could be drawn that if management and staff had not had to spend more time dealing with the heat exchanger damage, they would have been engaged on revenue-earning activities.

147. It was common ground that the relevant principles appear from the following passage in *Aerospace Publishing Ltd v Thames Water Utilities Ltd* [2007] Bus LR 726, per Wilson LJ at para 86:

"I consider that the authorities establish the following propositions. (a) The fact and, if so, the extent of the diversion of staff time have to be properly established and, if in that regard evidence which it would have been reasonable for the claimant to adduce is not adduced, he is at risk of a finding that they have not been established. (b) The claimant also has to establish that the diversion caused significant disruption to its business. (c) Even though it may well be that strictly the claim should be cast in terms of a loss of revenue attributable to the diversion of staff time, nevertheless in the ordinary case, and unless the defendant can establish the contrary, it is reasonable for the court to infer from the disruption that, had their time not been thus diverted, staff would have applied to activities which would, directly or indirectly, have generated revenue for the claimant in an amount at least equal to the costs of employing them during that time."

See too, *Al Rawas v Pegasus Energy* [2009] 1 All ER 346, especially at paras 22 and 23; and *4 Eng Ltd v Harper* [2009] Ch 91, especially at para 40.

148. Insofar as Geogas denies this claim in its entirety, it seems to me that its approach is, with respect, unrealistic. I am satisfied on the totality of the evidence helpfully summarised in both the Borealis opening and closing written submissions (and which need not be set out here), that there was significant and major business disruption flowing from the Geogas breach of contract. Such disruption inescapably consumed staff and management time which was thus lost. I think that any Geogas insistence on further detail risks a disproportionate approach to proof of damage. As Jack J observed in *Al Rawas v Pegasus Energy Ltd* (*supra*), at para 23, in this area, "the application of common sense" may fill a gap in the evidence. I am also unable to accept Mr Ashcroft's submission that the inference, referred to by Wilson LJ under (c) in the passage of his judgment in *Aerospace* (*supra*) cited above, is negated because of the focus on the turnaround; that is to take altogether too narrow a view of revenue-generating activities.

149. However, it is also the case that there is a good deal of the broad brush in this Borealis claim — as Borealis in effect itself avers. There are difficulties of proof relating to the correlation of the

LLOYD'S LAW REPORTS [2011] Vol 1

Gross LJ]                    **Borealis v Geogas Trading**                    [QBD (Comm Ct)

expense on sub-contractors and the additional work done by staff. There must be recognition of the fact that wages would have been incurred in any event. As Borealis itself acknowledges, the figure for management time is a round figure. Doing the best I can on the evidence, I am satisfied that Borealis suffered a loss in this regard of at least €75,000 and it is that sum I propose to award under this head.

(3) Own equipment used to effect repairs

150. Here, Borealis claims €18,630. The basis of the claim lies in Borealis's use of its own equipment for 12 hours a day on 14 days to repair the heat exchangers. Borealis contends that this use gives rise to a recoverable loss, quantified as the same amount that an outside contractor would have charged by way of a daily rate for the equipment in question.

151. Geogas resists this claim, submitting that Borealis has not proved that costs were incurred or loss suffered. In any event — and though the amount of the claim is agreed as a reasonable figure for the hire of such equipment — the claim could only lie (if at all) for the cost of operating the equipment not the (notional) hire cost.

152. Both parties relied on the decision in The West Wales [1932] P 165. That case concerned the battleship HMS Nelson; she had been damaged in a collision and was put into a naval drydock for repairs. In assessing damages, the Registrar allowed nothing in respect of the use of the dock and cranes, on the ground that the Admiralty had suffered no pecuniary expenses or loss. Bateson J remitted the case to the Registrar for reassessment, holding that the ship had occupied the dock and used the cranes, to the exclusion of other vessels and some allowance was therefore to be made to the Admiralty in respect of these items. Bateson J said this, at page 168:

"The learned registrar has allowed nothing for either of these items. I think it is clear that something must be allowed. What the figure may be is a matter for him to decide, but I do not think it can be right to say that the Admiralty have suffered no loss by giving up their dry dock and by using their cranes in doing these repairs. The Nelson occupied the dock to the exclusion of other ships, and made use of the cranes and so on for the purpose of docking and cleaning and coating the bottom, which would be necessary in connection with these repairs. Docks and cranes cannot be used without expense, and there must be some damage to the Admiralty from these matters. The learned registrar says that in respect of these there was not a pecuniary expenditure or loss and, therefore, these items are not allowable. I think that is wrong. I think there was pecuniary

expenditure and loss. It may not be actual money paid out to any particular person, but these expensive appliances cannot be utilised without some loss."

153. Mr Ashcroft submitted that there was no evidential basis for a finding here that the use of the Borealis equipment could not take place without pecuniary expenditure and loss. I disagree. The logic of Bateson J's reasoning is, with respect, inherently attractive, practical and, to my mind, applicable here — at least in the absence of evidence or a compelling inference to the contrary. The use of the equipment carries a cost. However, Mr Ashcroft is plainly right in submitting that Borealis cannot recover for the daily rate it would have paid had it hired the equipment; that is simply not a loss it suffered. Borealis is accordingly restricted to the operating cost of the equipment in question; that cost cannot be equated with the cost of hiring the equipment — it must necessarily be significantly less. Doing the best I can, I assess the operating cost of the equipment as €6,000.

(4) Warehousing cost of corroded titanium tubes: €19,066

154. I confess to some regret that the parties did not find it possible to reach agreement on an item such as this. I take it summarily. Borealis was entitled to store these tubes while the litigation was pending; it is anything but fanciful to suppose that a point may have been taken by Geogas had Borealis not done so. I think this (external) cost is allowable. Geogas submitted that a deduction should be made for the scrap value of the tubes. There does come a time when common sense must prevail. I decline to investigate or to require the parties to investigate the scrap value of these tubes. I allow the claim in the full amount of €19,066 on terms that, on payment of that sum, Geogas shall be at liberty, if it so desires, to take delivery of the tubes and to dispose of them as it sees fit. In the order, a fallback provision should be made for Borealis to dispose of the tubes within a given period of time, should Geogas choose not to take delivery of the tubes.

(5) Spare parts: €19,420

155. This is a claim for consumables such as breathing masks, batteries, gloves, goggles, packing materials and so on. Geogas resists this claim on the basis that the cost of these items is not referable to its breach of contract. I adopt the same approach as I did in connection with the allocation question more generally. I think there is sufficient evidence of a linkage to justify the claim generally but that some allowance should be made for inevitable

LLOYD'S LAW REPORTS

**Borealis v Geogas Trading**

errors in allocation. I allow this claim but only in the amount of €15,000.

### (6) Loss of profit — September 2004

156. The hard-fought and already much discussed issue which arises under this heading concerns a relatively small sum of money, €72,202, agreed as a figure, concerning loss of profit incurred in September 2004 when reinstalling heat exchangers E and G. As will be recollected, these heat exchangers were disconnected in March 2004 as a result of the incident. The issue arises because, over the same period in September 2004, Borealis effected repairs to other equipment at the plant.

157. Geogas contends that no loss of profit is recoverable in respect of this period, as, given the other works done to the acetylene reactor (unconnected with Geogas's breach of contract), there would have been a similar loss of production — regardless of the reinstallation of the heat exchangers. Borealis contends that, as a matter of law, it is entitled to the entire period of lost production; that it did other works is neither here nor there. However, as a pragmatic matter, it is content to attribute the lost production over the three-day period in question equally between the heat exchangers and the acetylene reactor.

158. In cross-examination, Mr Eerola explained the position as to the various works as follows:

" . . . we had two parallel maintenance works going on at the site . . . both would have resulted . . . [in] . . . a production loss alone but since they were carried out in parallel the production loss that resulted was clearly less than in the case they would have been done at a different time individually."

As it seems to me, on such evidence as there was: (1) Borealis needed to reinstall the exchangers at some time — and whenever it did so, production was likely to be lost; (2) the other works undertaken in September 2004 were conveniently undertaken then — but it was not *necessary* for Borealis to

undertake those other works at that particular time.

159. These circumstances are such that guidance may usefully be obtained from a number of Admiralty (and commercial) cases, most simply summarised as follows. Let it be assumed that a ship is damaged in a collision. She is not immediately rendered unseaworthy but the repairs need to be undertaken at some convenient time. At the time when the collision repairs are undertaken, the owner takes the opportunity of undertaking other works, not immediately necessary. As I understand the authorities, the tortfeasor will be liable for the entire period of detention and the owner will not be obliged to give credit for the time required by the unrelated repairs. The position would be different if it was necessary to undertake the unrelated repairs at that time. See the very helpful summary in *McGregor on Damages*, 18th Edition, at para 32-037, together with the authorities there cited; see too, *Elpidoforos Shipping Corporation v Furness Withy (Australia) Pty Ltd (The Oinoussian Friendship)* [1987] 1 Lloyd's Rep 258, especially at pages 263 to 265.

160. In my judgment, the key to this issue is that whenever the heat exchangers were reinstalled there would, in all probability, be a loss of production. On the face of it, therefore, Borealis ought to be entitled to recover for the loss suffered when the reinstallation took place. No doubt if it had been *necessary* to do other works at the same time, then Geogas would have had a good answer to any such claim. But that was not this case; the evidence does not show that the other works Borealis undertook in September 2004 had to be done then. On that footing, Borealis is in principle entitled to recover for the lost production in September 2004. As, however, pragmatically (and attractively) Borealis has indicated that it is content to claim for only half the time in question, I shall allow the claim to such extent only, namely in the amount of €36,101.

161. I shall be grateful for the assistance of counsel in drawing up an appropriate order and as to all questions of costs.

LC/33

# DICEY, MORRIS AND COLLINS

## ON

# THE CONFLICT OF LAWS

### FIFTEENTH EDITION

UNDER THE GENERAL EDITORSHIP OF

## LORD COLLINS OF MAPESBURY

P.C., LL.D., LL.M., F.B.A.

WITH

SPECIALIST EDITORS

VOLUME 1

SWEET & MAXWELL           THOMSON REUTERS

# Chapter 7

# SUBSTANCE AND PROCEDURE

**RULE 19—All matters of procedure are governed by the domestic law of the country to which the court wherein any legal proceedings are taken belongs (*lex fori*).**    7R–001

## COMMENT

The principle that procedure is governed by the *lex fori* is of general application and universally admitted.[1] In a body of Rules such as those contained in this book, which state the principles enforced by an English court, the maxim that procedure is governed by the *lex fori* means in effect that it is governed by the ordinary law of England without any reference to any foreign law whatever. Thus the English court will always apply its own rules of procedure, and will, moreover, refuse to apply any foreign rule which in its view is procedural.[2] In deciding whether a foreign rule is procedural, the court refers to the foreign law in order to determine whether the rule is of such a nature as to be procedural in the English sense.[3]    7–002

While procedure is governed by the *lex fori*, matters of substance are governed by the law to which the court is directed by its choice of law rule (*lex causae*).[4] Dicey wrote that English lawyers gave "the widest possible extension to the meaning of the term 'procedure.' "[5] As a matter of history, this is true[6]; and a court may, even today, be tempted to extend the meaning of "procedure" in order to evade an unsatisfactory choice of law rule.[7] But in general the attitude expressed by Dicey has fallen into disfavour precisely because it tends to frustrate the purposes of choice of law rules. It has also been affected by the entry into force of harmonised European choice of law rules which require certain matters to be classified as substantive.[8] Thus some    7–003

---

[1] Ailes (1941) 39 Mich.L.Rev. 392.

[2] e.g. *Hansen v Dixon* (1906) 23 T.L.R. 56. Rule 19 was applied and the text was cited with approval in *De Gortari v Smithwick* [2000] 1 I.L.R.M. 463 (Sup Ct).

[3] *Huber v Steiner* (1835) 2 Bing. N.C. 202; *cf. Société Anonyme Metallurgique de Prayon v Koppel* (1933) 77 S.J. 800; Beckett (1934) 15 B.Y.I.L. 46, 75; Robertson, pp.248–253; Cook, p.224; above, Ch.2.

[4] *Huber v Steiner* (1835) 2 Bing.N.C. 202, 210; *Harding v Wealands* [2006] UKHL 32, [2007] 2 A.C. 1; *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7, [2011] 4 All E.R. 1027, at [105].

[5] 1st ed., p.712.

[6] *cf.* Lorenzen, pp.339–340.

[7] e.g. *Grant v McAuliffe*, 41 Cal. 2d 859, 246 P. 2d 944 (1953); *Kilberg v Northeast Airlines Inc*, 9 N.Y. 2d 34, 172 N.E. 2d 526 (1961); Currie, Ch.3.

[8] See below, paras 7–006 *et seq.*

Rule 25                              *Procedure*

where the evidence of expert witnesses as to the constitutionality or *vires* of
foreign legislation conflicts, it seems that the court can determine the ques-
tion,[92] provided at any rate that it is one which, according to the foreign law,
is determinable by ordinary judicial proceedings.[93] In addition the territory of
what was once a single country may be divided, for instance in times of
revolution or civil war, or as a result of enemy occupation; and the question
may then arise which of two legislatures or systems of courts has the right to
determine the law of any given part of that territory. In this situation, the
problem to be resolved is not one of proof of foreign law but rather that of
identifying the appropriate law-maker. The evidence of expert witnesses is
irrelevant on the latter issue which is discussed elsewhere in this work.[94]
Once, of course, the appropriate law-maker has been identified, the question
of proving what the content of the law handed down by that law-maker
actually is will have to be determined by reference to the evidence of an
appropriately qualified expert.

**9–018**     Since the effect of foreign sources is primarily a matter for the expert
witness, it is desirable, when proving a foreign statute, also to obtain evidence
as to its interpretation.[95] It may happen, however, that the text of a foreign
statute is admitted, or that it is proved without expert evidence under the
Evidence (Colonial Statutes) Act 1907,[96] or that the expert fails to give any
evidence as to its interpretation. In such cases, the court can put its own
construction on the foreign statute.[97] The court may also undertake this task
at the express request of the parties.[98] In all these cases the court acts on the
assumption that the foreign rules of construction are the same as those of
English law.[99]

**9–019**     The function of the expert witness in relation to the interpretation of foreign
statutes must be contrasted with his function in relation to the construction of
foreign documents. In the former case, the expert tells the court what the

---

[92] *King of the Hellenes v Brostrom* (1923) 16 Ll.L.R. 167, 190, 192; *Re Amand* [1941] 2 K.B.
239; *Re Amand (No.2)* [1942] 1 K.B. 445; *A/S Tallinna Laevauhisus v Estonian State Steamship
Line* (1947) 80 Ll.L.R. 99, 114 (CA); *Dubai Bank Ltd v Galadari (No.5)*, *The Times*, June 26,
1990; F.A. Mann, *Studies in International Law* (1973), pp.444–449.
[93] Lipstein (1967) 42 B.Y.I.L. 265. It has been said to be doubtful whether the court can
determine such a question if in the foreign country it cannot be decided by a court at all (as in
Switzerland) or only by a special constitutional court (as in Germany). See Kahn-Freund,
*Festschrift für FA Mann* (1977), pp.207–225.
[94] See below, para.25–004. For special provisions relating to corporations, see Foreign Cor-
porations Act 1991, discussed below, para.30–015.
[95] *Baron de Bode's Case* (1845) 8 Q.B. 208, 251, 265–266; *Castrique v Imrie* (1870) L.R. 4 HL
414, 430; *Higgins v Ewing's Trustees*, 1925 S.C. 440; *Allen v Standard Trusts Co* (1919) 49
D.L.R. 399 (Man).
[96] See below, para.9–022.
[97] e.g. *Prowse v European and American Steam Shipping Co* (1860) 13 Moo. P.C. 484;
*Papadopoulos v Papadopoulos* [1930] P. 55; *The Torni* [1932] P. 78 (CA); *Jasiewicz v Jasiewicz*
[1962] 1 W.L.R. 1426; *Mahadervan v Mahadervan* [1964] P. 233.
[98] See above, para.9–008, n.31.
[99] *F&K Jabbour v Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139, 147–148. This
approach was expressly adopted in *Neilson v Overseas Projects Corp of Victoria Ltd* [2005] HCA
54, (2005) 223 C.L.R. 331 by Callinan J., and expressly approved by Heydon J.; but it was
expressly rejected by McHugh and Kirby JJ. The majority (Gleeson C.J., Gummow and Hayne
JJ.) was able to reach its conclusion on the footing, denied by the other four judges, that the
evidence of foreign law before the court was sufficient to answer the question which arose for
decision without the need to rely on any such assumption as the basis for decision.

*Proof of Foreign Law*                    RULE 25

statute means, explaining his opinion, if necessary, by reference to foreign rules of construction. In the latter case, the expert merely proves the foreign rules of construction, and the court itself, in the light of these rules, determines the meaning of the documents.[100] Where a document which is to be construed by English law incorporates the words of a foreign statute as part of its terms, the court construes the document without reference to foreign rules of construction,[101] unless the parties to the document intend it to be construed in accordance with such foreign rules.[102]

Considerable weight is usually given to the decisions of foreign courts as evidence of foreign law,[103] though such decisions can only, it seems, be referred to if referred to in the evidence of an expert witness[104] and, further, must be interpreted in the light on the meaning attributed to the decisions by the expert rather than according to the court's independent research involving material not referred to by the expert.[105] But the court is not bound to apply a foreign decision if it is satisfied, as a result of all the evidence, that the decision does not accurately represent the foreign law.[106] Where foreign decisions conflict, the court may be asked to decide between them, even though in the foreign country the question still remains to be authoritatively settled.[107]     **9–020**

(iii) *Other modes of proof.* Under certain statutes, proof of foreign law may sometimes be dispensed with.     **9–021**

---

[100] *Trotter v Trotter* (1828) 4 Bli.(N.S.) 502; *King of Spain v Machado* (1827) 4 Russ. 225, 239–240; *Rouyer Guillet & Cie v Rouyer Guillet & Co Ltd* [1949] 1 All E.R. 244 (CA); *Mount Cook (Northland) Ltd v Swedish Motors Ltd* [1986] 1 N.Z.L.R. 720, 727. This sentence was approved in *Toomey (of Syndicate 2021) v Banco Vitalico de España SA de Seguros y Reaseguros* [2003] EWHC 1102 (Comm.) at [37] (affirmed without reference to this point: [2004] EWCA Civ 662); *Evialis SA v SIAT* [2003] EWHC 863 (Comm.), [2003] 2 Lloyd's Rep. 337 at [44]; *cf. Svenska Petroleum Exploration AB v Republic of Lithuania* [2005] EWHC 2437 (Comm.), [2006] 1 Lloyd's Rep. 181, [29] (affd. without reference to this point, [2006] EWCA Civ 1529, [2007] Q.B. 886). For further authority confirming that the proper role of the expert is to prove the rules of construction of foreign law but not to assume the court's function in applying those rules, see *King v Brandywine Reinsurance Co* [2005] EWCA Civ 235, [2005] 1 Lloyd's Rep. 655; *Rendell v Combined Insurance Co of America* [2005] EWHC 678 (Comm.).
[101] *Dobell v Steamship Rossmore Co* [1895] 2 Q.B. 408 (CA); *cf.*, paras 32–058 *et seq.*, below.
[102] See *Stafford Allen and Sons Ltd v Pacific Steam Navigation Co* [1956] 1 W.L.R. 629 (CA).
[103] *Beatty v Beatty* [1924] 1 K.B. 807 (CA); *Re Annesley* [1926] Ch. 692; *Bankers and Shippers Insurance Co of New York v Liverpool Marine and General Insurance Co Ltd* (1926) 24 Ll.L.R. 85 (HL); *In the Estate of Fuld (No.3)* [1968] P. 675, 701–702; *Law Debenture Trust Corp Plc v Elektrim SA* [2009] EWHC 1801 (Ch.), [100].
[104] *Bumper Development Corp v Commissioner of Police of the Metropolis* [1991] 1 W.L.R. 1362, 1370–1371 (CA).
[105] *ibid.*
[106] *Guaranty Trust Corp of New York v Hannay* [1918] 2 K.B. 623 (CA); *Callwood v Callwood* [1960] A.C. 659 (PC).
[107] *Re Duke of Wellington* [1947] Ch. 506; *Breen v Breen* [1964] P. 144. See also *JP Morgan Chase Bank v Lanner (The)* (2008) 305 D.L.R. (4th) 442 (difficulty presented by disagreement between US Circuit Courts of Appeal); *Blue Sky One Ltd v Mahan Air* [2010] EWHC 631 (Comm.), [88] (lack of decisive guidance from Supreme Court of Iran, requiring judge to "determine the trajectory" of Iranian law); *Abdel Hadi Abdullah Al Qahtani & Sons Beverage Industry Co v Antliff* [2010] EWHC 1735 (Comm.) (Saudi law).

LC/34

# RESTATEMENT OF THE LAW
## Second

# CONFLICT OF LAWS 2d

### Volume 1
§§ 1–221

*As Adopted and Promulgated*

BY

THE AMERICAN LAW INSTITUTE

AT WASHINGTON, D. C.

May 23, 1969

ST. PAUL, MINN.

AMERICAN LAW INSTITUTE PUBLISHERS

1971

§ **122**            CONFLICT OF LAWS            Ch. 6

may be the state of most significant relationship and hence the state of the applicable law.

Commonly, it is said that the forum will apply its own local law to matters of procedure and the otherwise applicable law to matters of substance. The Constitution of the United States imposes some limitations upon the power of a State to characterize an issue as procedural and then to determine the issue in accordance with its own local law. John Hancock Mut. Life Ins. Co. v. Yates, 299 U.S. 178 (1936); Home Insurance Co. v. Dick, 281 U.S. 397 (1930).

In the case of most of the issues discussed in this Chapter, it is possible to state categorically that the local law of the forum will be applied. In a few instances, no unqualified statement can be made.

This Chapter does not deal with the situations where federal courts apply State law and, conversely, where State courts apply federal law.

### TOPIC 1.  THE GENERAL PRINCIPLE

§ **122.**   **Issues Relating to Judicial Administration**

**A court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case.**

**Comment:**

    *a.  Rationale.* Each state has local law rules prescribing the procedure by which controversies are brought into its courts and by which the trial of these controversies is conducted. These rules for conducting lawsuits and administering the courts' processes vary from state to state. The forum has compelling reasons for applying its own rules to decide such issues even if the case has foreign contacts and even if many issues in the case will be decided by reference to the local law of another state. The forum is more concerned with how its judicial machinery functions and how its court processes are administered than is any other state. Also, in matters of judicial administration, it would often be disruptive or difficult for the forum to apply the local law rules of another state. The difficulties involved in doing so would not be repaid by a furtherance of the values that the application of another state's local law is designed to promote.

Parties do not usually give thought to matters of judicial administration before they enter into legal transactions. They do not usually place reliance on the applicability of the rules of a particular state to issues that would arise only if litigation should become necessary. Accordingly, the parties have no expectations as to such eventualities, and there is no danger of unfairly disappointing their hopes by applying the forum's rules in such matters.

Enormous burdens are avoided when a court applies its own rules, rather than the rules of another state, to issues relating to judicial administration, such as the proper form of action, service of process, pleading, rules of discovery, mode of trial and execution and costs. Furthermore, the burdens the court spares itself would have been wasted effort in most instances, because usually the decision in the case would not be altered by applying the other state's rules of judicial administration. Even if the outcome would be altered, however, the forum will usually apply its own rule if the issue primarily concerns judicial administration. The statute of limitations is a striking example of such an issue (see § 142).

The sections that follow deal separately with various issues relating to judicial administration that commonly arise in Conflict of Laws cases. As to many of them it is possible to state categorically that the local law of the forum will be applied. Other issues, as, for example, which side bears the burden of proof (see § 133) and which side bears the burden of going forward with the evidence (see § 134), fall into a gray area between issues relating primarily to judicial administration and those concerned primarily with the rights and liabilities of the parties. Such issues cannot be the subject of categorical rules, but the factors that may influence the court to apply forum local law rather than the local law of another state can usefully be stated.

One factor is whether the issue is one to which the parties are likely to have given thought in the course of entering into the transaction. If they probably shaped their actions with reference to the local law of a certain state, this is a weighty reason for applying that law rather than the local law of the forum the plaintiff has chanced to select. Another factor is whether the issue is one whose resolution would be likely to affect the ultimate result of the case. If so, the otherwise applicable law should be applied unless application of the local law of the forum is required by the dominant interest of the forum state in the decision of the particular issue. A third factor is whether the precedents have tended consistently to classify the issue as "procedural" or

§ **122**         CONFLICT OF LAWS         Ch. 6

"substantive" for choice-of-law purposes. If so, the settled classification should not be discarded without good reason. Lastly, there is the question whether an effort to apply the rules of the judicial administration of another state would impose an undue burden upon the forum. If so, this is a further reason why the local law of the forum should be applied.

   *b. Substance—procedure dichotomy.* The courts have traditionally approached issues falling within the scope of the rule of this Section by determining whether the particular issue was "procedural" and *therefore* to be decided in accordance with the forum's local law rule, or "substantive" and *therefore* to be decided by reference to the otherwise applicable law. These characterizations, while harmless in themselves, have led some courts into unthinking adherence to precedents that have classified a given issue as "procedural" or "substantive", regardless of what purposes were involved in the earlier classifications. Thus, for example, a decision classifying burden of proof as "procedural" for local law purposes, such as in determining the constitutionality of a statute that retroactively shifted the burden, might mistakenly be held controlling on the question whether burden of proof is "procedural" for choice-of-law purposes. To avoid encouraging errors of that sort, the rules stated in this Chapter do not attempt to classify issues as "procedural" or "substantive". Instead they face directly the question whether the forum's rule should be applied.

**Illustration:**

   1. A statute of state X provides that a person injured in an automobile in X may maintain an action against the motorist's insurer without first having obtained a judgment against the motorist himself. An X court has held that the statute may constitutionally be applied retroactively to accidents that pre-dated the statute on the ground that it deals only with "procedure" and not with "substantive rights." In determining whether or not to apply the statute in a conflicts case, the X court should not regard its earlier decision as a controlling precedent.

**Comment:**

   *c.* The Constitution of the United States places some limitations upon the power of a State which has no significant relationship to the transaction or the parties to characterize an issue as procedural in order to determine the issue in accordance with its

Ch. 6                     PROCEDURE                   § 123

own local law.   John Hancock Mutual Life Ins. Co. v. Yates, 299 U.S. 178 (1936);  Home Insurance Co. v. Dick, 281 U.S. 397 (1930).

### REPORTER'S NOTE

Levy v. Steiger, 233 Mass. 600, 124 N.E. 477 (1919) is a classic example of a case where a court mistakenly followed a local law precedent in determining whether an issue should be classified as "procedural" for choice-of-law purposes.

See Ailes, Substance and Procedure in the Conflict of Laws, 39 Mich.L.Rev. 392 (1941); 3 Beale, Conflict of Laws 1601 (1935); Cook, The Logical and Legal Bases of the Conflict of Laws 166 (1942); Stumberg, Conflict of Laws, 154–158 (3rd ed. 1963).

See also Collins v. American Automobile Ins. Co., 230 F.2d 416 (2nd Cir. 1956); Grant v. McAuliffe, 41 Cal.2d 859, 264 P.2d 944 (1953); Lauterbach v. Fleischer, 16 A.D.2d 701, 227 N.Y. 2d 726 (2d Dep't 1962); Murray v. New York, O. & W. R. Co., 242 App.Div. 374, 275 N.Y.S. 10 (1st Dep't 1935). But cf. Anderson v. State Farm Mutual Automobile Ins. Co., 222 Minn. 428, 24 N.W.2d 836 (1946); McArthur v. Maryland Casualty Co., 184 Miss. 663, 186 So. 305 (1939); Hopkins v. Kurn, 351 Mo. 41, 171 S.W.2d 625 (1943).

## TOPIC 2.  SPECIFIC APPLICATIONS OF GENERAL PRINCIPLE

### TITLE A.  RULES FOR MANAGEMENT OF LITIGATION

## § 123.  Proper Court

**The local law of the forum determines which of its courts, if any, may entertain an action on a claim involving foreign elements.**

**Comment:**

*a.*  Each state determines which of its courts or systems of courts, if any, are competent to hear a particular case over which the state has judicial jurisdiction.  So it is for each state to decide whether an action on a given claim shall be brought in a court of law, of equity, of probate or of admiralty.

*b.  When no court in which particular suit can be brought.* The state of the forum may fail to provide a court in which action on a particular claim can be brought.  If so, no action can be brought on such a claim even though suit would have been entertained in the state of the otherwise applicable law.  The Constitution of the United States may limit the operation of this rule.

Ch. 6                    **PROCEDURE**                    **§ 127**

forum determines the method of serving process and of giving notice to the defendant.

### REPORTER'S NOTE

See 3 Beale, Conflict of Laws 1604 (1935); Goodrich, Conflict of Laws 145 (Scoles, 4th ed. 1964); Stumberg, Conflict of Laws 134 (3rd ed. 1963).

## § 127.  Pleading and Conduct of Proceedings

**The local law of the forum governs rules of pleading and the conduct of proceedings in court.**

**Comment:**

*a.* The local law of the forum governs, among other things, the following matters:

    1.  what constitutes an appearance by the defendant

    2.  the form of the pleadings

    3.  the amendment of the pleadings

    4.  the joinder of causes of action

    5.  pre-trial practice, including the taking and use of depositions, discovery and penalties for refusal to comply with proper request for information

    6.  trial practice and motions, including (a) the examination of witnesses and (b) the power of the judge to grant a new trial on all or only part of the issues, or unless the affected party agrees to an increase or to a reduction in the amount of the verdict, to direct a verdict or to grant judgment notwithstanding the verdict or to refuse to dismiss a case without prejudice or to do so only upon conditions

    7.  the form of verdict and judgment

    8.  costs and security for costs

    9.  proceedings on appeal and other proceedings to review the judgment

### REPORTER'S NOTE

See Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954), cert. den. 348 U.S. 920 (1955); Noe v. Chicago Great Western Railway Co., 219 N.E.2d 111 (Ill.App.1966) (pleading of inconsistent defenses); Martin v. Talcott, 1 A.D.2d 679, 146 N.Y.S.2d 784 (2d Dep't 1955); Cook, The Logical and Legal Bases of the Conflict of Laws 169 (1942); Leflar, American Conflicts Law 292 (1968);

§ 127   CONFLICT OF LAWS   Ch. 6

Stumberg, Conflict of Laws 134
(3d ed. 1963). Federal law gov-
erns such questions in the federal
courts. Sedler, The Erie Outcome

Test as a Guide to Substance and
Procedure in the Conflict of Laws,
37 N.Y.U.L.Rev. 813, 834 (1962).

## § 128. Set-off, Counterclaim or Other Defense

**The forum will apply its own local law in determining
whether a claim may be pleaded by way of set-off, coun-
terclaim or other defense unless under the otherwise ap-
plicable law the defendant's claim, if allowed, would op-
erate to qualify the plaintiff's claim in whole or in part.
In the latter event, the defendant will be permitted to
plead his claim as a defense.**

**Comment:**

*a. Rationale.* Ordinarily, the question is simply whether
the parties' claims against each other can be disposed of in a
single action. In such a case, the local law of the forum gov-
erns and will be applied to determine whether the defendant may
plead his claim against the plaintiff by way of set-off, counter-
claim or other defense in the plaintiff's action. There are, how-
ever, the exceptional situations discussed in Comment *c.*

*b.* Whether the defendant may plead a claim by way of set-
off, counterclaim or other defense must be distinguished from
the question whether the defendant has a claim to assert. This
latter question is determined by the otherwise applicable law.
Suppose, for example, that an instrument in the form of a promis-
sory note, which was executed and made payable in state X, is de-
livered and endorsed to a holder in X, who under X local law
takes the instrument free from certain defenses that the maker
might have against the payee. In a suit by the holder against
the maker in state Y, the maker will not be permitted to assert
such defenses against the holder, even though he will have been
permitted to do so by the Y courts if his obligations under the
instrument had been governed by Y local law (compare § 214).
Conversely, the maker would be permitted by the Y courts to
raise such defenses against the holder as are accorded him by
X local law even though he would not have had such defenses
if his obligations under the instrument had been governed by Y
local law.

*c. When defendant's claim qualifies plaintiff's claim.* Situ-
ations will arise where under the otherwise applicable law the
defendant's claim, if allowed, would operate to qualify in whole
or in part the plaintiff's claim. In such situations, the question

§ 134          CONFLICT OF LAWS          Ch. 6

Ehrenzweig, Conflict of Laws 335 (1962); Sedler, The Erie Outcome Test as Guide to Substance and Procedure in the Conflict of Laws, 37 N.Y.U.L.Rev. 813, 865 (1962). See also, Cook, The Logical and Legal Bases of the Conflict of Laws 177–180 (1942).

Certain rules, although consistent with the balance of probability, may be primarily designed to favor one of the litigants. An example is the presumption against suicide in violent death cases. Cf. Sedler, supra.

In a case involving a purely local law situation, Justice Tray-

nor classified rebuttable presumptions as follows: (1) those requiring the litigant with greater access to the facts in dispute to make them known; (2) those employed to assist in solving a dilemma when there is little or no evidence to disprove a particular fact; (3) those employed to facilitate a finding in accord with the balance of probability; (4) those used to encourage a finding consonant with sound social policy. Speck v. Sarver, 20 Cal.2d 585, 590, 128 P.2d 16, 20 (1942) (dissenting opinion).

## § 135.   Sufficiency of Evidence

**The local law of the forum determines whether a party has introduced sufficient evidence to warrant a finding in his favor on an issue of fact, except as stated in §§ 133–134.**

**Comment:**

   *a. Rationale.* Considerations of efficiency and convenience require that the question whether a party has introduced sufficient evidence to warrant a finding in his favor should usually be governed by the local law of the forum. Determination of this question will frequently involve the respective functions of judge and jury (§ 129). Furthermore, this question must usually be decided by the trial judge with dispatch if the trial is to proceed with reasonable celerity. The exceptional situations where some other law is applied, either as a general rule or at least on occasion, involve integrated contracts (§ 140), the statute of frauds (§ 141), privileges against the disclosure of confidential information (§ 139), the burden of proof (§ 133) and the burden of going forward with the evidence (§ 134).

   *b. Res ipsa loquitur.* The doctrine of res ipsa loquitur comprises situations where the jury is permitted to infer negligence on the part of the defendant from the occurrence of the accident itself. Usually, the doctrine involves nothing more than an application of the rules of circumstantial evidence. The question in such cases is simply whether reasonable men could

infer from the fact of the accident itself that it was more probable than not that the accident was caused by the defendant's negligence. When this is the case, the local law of the forum will be applied to determine the circumstances under which the doctrine may be invoked, as, for example, the extent to which it is necessary that the instrumentality which did the harm should have been under the exclusive control of the defendant.

In some states, the doctrine has more far-reaching consequences in certain circumstances. So it may require the defendant to go forward with the evidence by introducing evidence of his own due care in order to escape a directed verdict against him, or it may actually impose upon the defendant the burden of proving himself free from negligence. Whether the defendant has the burden of going forward with the evidence will be determined by the law selected by application of the rule of § 134. Whether the defendant has the burden of proof will be determined by the law selected by application of the rule of § 133.

It is conceivable that on occasion the state of the otherwise applicable law might have a rule of res ipsa loquitur which, without imposing the burden of going forward with the evidence upon the defendant, permits the plaintiff to get to the jury on proof of the accident alone in situations where the occurrence of the accident does not of itself give rise to a legitimate inference that it was caused by the defendant's negligence. It may be that such a policy oriented rule would be applied by the forum.

**Illustration:**

1. In state X, while walking past a factory owned by the A corporation, B is struck by a chair that had been thrown from a window of the factory. B sues A in state Y. Whether, as a question of circumstantial evidence, the case will be permitted to go to the jury upon proof of the occurrence alone will be determined by Y local law.

### REPORTER'S NOTE

See the cases cited in the Reporter's Notes to §§ 133–134.

*Comment b.* As to the doctrine of res ipsa loquitur, see United Air Lines, Inc. v. Wiener, 335 F. 2d 379 (9th Cir. 1964); Dodson v. Maddox, 359 Mo. 742, 223 S.W. 2d 434 (1949); In re Kohn's Estate, 124 N.Y.S.2d 861 (Surr.Ct. 1953); Morgan, Choice of Law Governing Proof, 58 Harv.L.Rev. 153, 177–178 (1944). In the federal courts in diversity cases, the question is determined by State law. Some federal courts, without referring to the conflicts rule

§ **135**        CONFLICT OF LAWS        Ch. 6

of the State in which they sit, have applied the law that governed the tort. Matsumoto v. Chicago & N. W. Ry., 168 F.2d 496 (7th Cir. 1948), cert. den. 335 U.S. 826 (1948); Lachman v. Pennsylvania Greyhound Lines, 160 F.2d 496 (4th Cir. 1947). Other federal courts, again without referring to the conflicts rule of the State in which they sit, have applied that State's rule of res ipsa loquitur. Citrola v. Eastern Airlines, Inc., 264 F.2d 815 (2d Cir. 1959); Alexander v. Inland Steel Co., 263 F.2d 314 (8th Cir. 1958); International Derrick & Equipment Co. v. Buxbaum, 210 F.2d 384 (3d Cir. 1954); Lobell v. American Airlines, Inc., 192 F.2d 217 (2d Cir. 1951), cert. den. 342 U.S. 954 (1952).

See Sedler, The Erie Outcome Test as a Guide to Substance and Procedure in the Conflict of Laws, 37 N.Y.U.L.Rev. 813, 864 (1962).

## § **136.**   Notice and Proof of Foreign Law

**(1) The local law of the forum determines the need to give notice of reliance on foreign law, the form of notice and the effect of a failure to give such notice.**

**(2) The local law of the forum determines how the content of foreign law is to be shown and the effect of a failure to show such content.**

**Comment:**

*a. Scope of section.* The law selected by application of the rule of this Section determines whether a party must give notice of the fact that he relies on foreign law, the manner in which he must do so, and the effect of a failure on his part to give such notice. This law also determines the manner in which the content of foreign law shall be ascertained and the effect of a failure on the part of a party to show such content.

**Comment on Subsection (1):**

*b. Methods of giving notice.* The local law of the forum determines the method that a party must employ in giving notice of the fact that he relies on foreign law. This law determines whether the foreign law must be mentioned in the pleadings and, if so, the detail in which this must be done, as, for example, whether the relevant provisions of the foreign law must be pleaded *in haec verba* or whether it is enough that these provisions be summarized in the pleadings. The local law of the forum may give a party who intends to rely on foreign law the alternative of either pleading the foreign law or else of giving the opposing party some other form of notice.

LC/35

*TRUSTS, WILLS AND PROBATE LIBRARY*

# LEWIN ON TRUSTS

### NINETEENTH EDITION

*But they thinke it against al right and iustice, that men shuld be bound to those laws, which other be in numbre mo then be able to be readde, or els blinder and darker, then that any man can well understand them.*

Sir Thomas More
Bencher of Lincoln's Inn
*Utopia*, book II

BY

### LYNTON TUCKER, M.A., B.C.L.
*Barrister of Lincoln's Inn*

### NICHOLAS LE POIDEVIN, Q.C., M.A., LL.B.
*Bencher of Lincoln's Inn*

### JAMES BRIGHTWELL M.A., LL.M.
*Barrister of Lincoln's Inn*

ASSISTED BY

### THOMAS FLETCHER, M.A., LL.M.
*Barrister of The Inner Temple*

### CHRISTOPHER LLOYD, B.A.
*Barrister of Lincoln's Inn*

www.newsquarechambers.co.uk



SWEET & MAXWELL                    THOMSON REUTERS

solicitor who does this and becomes a trustee can rely on the clause, though it is otherwise if the solicitor inserted the clause into the will or settlement without calling the settlor's attention to it and knowing that the settlor did not realise its effect.[503]

### Interpretation of exemption clauses

**39–141**  An exemption clause is to be restrictively construed and anything that is not clearly written in should be treating as falling outside it.[504] Millett L.J. said of a trust instrument:[505]

> "The document is the unilateral work of the testator or settlor through whom the beneficiaries claim. There is no inherent improbability that he should intend to absolve his executors or trustees from liability for the consequences of their negligence. They accept office on the terms of a document for which they are not responsible,[506] and are entitled to have the document fairly construed according to the natural meaning of the words used."

In practice, professional trustees often insist on having wide exemption clauses, but where this happens it is a further reason for construing them restrictively.

*Unauthorised payments and acts wrongly done or omitted within scope of exercise of powers*

**39–142**  An exemption clause excusing a trustee from personal liability in respect of loss to the trust fund will cover a loss arising from an unauthorised payment or distribution made in excess of the trustee's authority as well as a loss arising from an improper investment or other acts wrongly done or omitted within the scope of the trustee's powers.[507]

*The construction of limiting words*

**39–143**  Two points commonly arise on the construction of such clauses. The first concerns the meaning of words which operate to limit the scope of the exemption from liability under the exemption clause. The most narrow limiting words permissible are "actual fraud", and these words should be construed in the way considered above[508] as to the permitted scope of exemption clauses. We doubt

---

[503]  *Bogg v Raper* (1998–99) 1 I.T.E.L.R. 267 at [41]–[53], CA. And see *Scott and Ascher on Trusts* (5th edn), Vol.4, § 24.27.4.

[504]  *Armitage v Nurse* [1998] 241 at 255G–256A, CA; *Bogg v Raper*, above; *Wight v Olswang* (1998–99) 1 I.T.E.L.R. 783, CA. See too the Scottish authorities cited in § 39–132; and *Midland Bank Trustees (Jersey) Ltd v Federated Pension Services Ltd* [1996] P.L.R. 179 at 192–193, Jers CA.

[505]  *Bogg v Raper*, above.

[506]  But see § 39–139.

[507]  *Bonham v Blake Lapthorn Linell* [2006] EWHC 2513 (Ch); [2007] W.T.L.R. 189 at [171]–[192].

[508]  See § 39–132.

DEFENCE UNDER EXCULPATORY PROVISIONS                    1919

whether the limiting word "fraud" without the adjective "actual" has a significantly different meaning.[509] The limiting words which cause the greatest difficulty are those which exclude "wilful default" from the scope of the exemption. That is because in the context of a trustee being made accountable on the footing of "wilful default", he is made liable to account for money which he could with reasonable diligence have received, and so "wilful default" includes ordinary negligence.[510] In the context of exemption clauses, however, "wilful default" is equated with consciousness that the act or omission complained of is a breach of duty, or recklessness as to whether the act or omission is a breach of duty.[511] Though the limiting words "wilful default" do not extend to negligence, they appear to be wider than the words "actual fraud" or "fraud" in that a trustee who deliberately does something which he knows to be a breach of trust is not protected, even if he honestly believes that the breach of trust is in the interests of the beneficiaries. It is thought that the limiting words "wilful misconduct" have a similar meaning to "wilful default" as construed in a exemption clause.[512] The limiting words "wilful breach of this trust" have been construed as meaning deliberately and purposely doing something which the trustee knows, when he does it, is a breach of trust, consisting in his failure to perform his duty as trustee,[513] and "wilful ... wrongdoing" has been construed as meaning a deliberate breach of trust.[514] Thus, where those words occur it is not clear whether (in contrast to "wilful default" and "wilful misconduct") recklessness would suffice to take the trustee outside the protection of the exemption clause. In the phrase "wilful default or wrongdoing" the adjective qualifies both nouns.[515] The meaning of the limiting words "gross negligence" in the context of an exemption clause is problematic, it having been said that English lawyers have a healthy disrespect for the distinction between negligence and gross negligence, and that it is merely one of degree.[516] The Jersey Court of Appeal has

---

509  It might be argued that the use of "fraud" alone allows the trustee to be made liable for "equitable fraud", though that is clearly not permissible where the limiting words are "actual fraud", see *Armitage v Nurse* [1998] Ch. 241 at 250C, CA. The problem with this argument is that "equitable fraud" generally covers matters which are outside the scope of exemption clauses anyway, see *Armitage v Nurse*, above, at 252H–253E.

510  See § 39–049 and *Re Chapman* [1896] Ch. 763.

511  *Re Trusts of Leeds City Brewery Ltd's Debenture Stock Trust Deed* (1921) [1925] Ch. 532n at 533, CA; *Re City Equitable Fire Insurance Co. Ltd* [1925] Ch. 407, Romer J. and CA; *Re Munton* [1927] 1 Ch. 262; *Re Vickery* [1931] 1 Ch. 572 at 583; *Armitage v Nurse*, above, at 252; and see § 39–094. See too *Woodland-Ferrari v UCL Group Retirement Benefits Scheme* [2002] EWHC 1354 (Ch); [2003] Ch. 115 at [68] (wilful default is not the same as fraudulent breach of trust).

512  *Lewis v Great Western Railway Company* (1877) 3 Q.B.D. 195, CA; *Forder v Great Western Railway Company* [1905] 2 K.B. 532, CA; contract cases both of which influenced the development of the law concerning "wilful default" in the cases cited in the previous paragraph. And see meaning of "wilful misconduct" in the context of personal injuries: *Horabin v British Overseas Airways Corporation* [1952] 2 All E.R. 1016; and in the context of local government: *Graham v Teesdale* (1983) 81 L.G.R. 117 at 123; *Lloyd v McMahon* [1987] 1 A.C. 625 at 647, 655–656, 674, CA (no appeal to the HL on the correctness of the definition); *Re Baird* [1989] N.I. 56 at 66–70; *Porter v Magill* [2001] UKHL 67; [2002] 2 A.C. 357.

513  *Re Trusts of Leeds City Brewery Ltd's Debenture Stock Trust Deed*, above, at 544, CA.

514  *Barnes v Tomlinson* [2006] EWHC 3115 (Ch); [2007] W.T.L.R. 377 at [77].

515  *Alexander Forbes Trustee Services Ltd v Halliwell* [2003] EWHC 1685 (Ch); [2003] P.L.R. 269 at [9]–[12]; *Barnsley v Noble* [2014] EWHC 2657 (Ch) at [290].

516  *Armitage v Nurse*, above, at 254, *per* Millett L.J.

said that gross negligence involves a serious or flagrant degree of negligence, which is a serious, unusual and marked departure from the normal standards of professional trustees.[517]

### *Do exemption clauses exclude the principle that ignorance of the law is no defence?*

**39–144**  The second point on the construction of exemption clauses which raises difficulty is whether they exclude liability in a case where a trustee intentionally does something which is a breach of trust, but through misconstruction or ignorance of the law, the trustee is unaware that his act is a breach of trust. In Jersey it has been held that a trustee whose exemption from liability does not extend to a "breach of trust knowingly and wilfully committed" is liable if he knowingly and wilfully (*i.e.* intentionally) does something which is a breach of trust, even though he does not know it to be a breach of trust.[518] The weight of English authority in relation to limiting words such as "wilful default", "wilful misconduct" and "wilful breach of trust" suggest, however, that it is not enough that the trustee intentionally does something which is a breach of trust, and that in addition there must be knowledge that his acts are unauthorised and so a breach of trust, or recklessness in that regard.[519] But if the trustee is aware that some course of action upon which he embarks is unauthorised, then, in the context of limiting words such as those mentioned above, it is no justification for him to say that he honestly thought that he was justified in doing so.[520] Trustees who knowingly set out to achieve a result (by way of an advancement held to have been a fraud on the power) which they knew they could not achieve directly, even though they thought themselves to be morally justified, have been held to be dishonest within the terms of an exemption clause and so not protected by it.[521] Nor will a trustee be protected, even if his liability is limited to actual fraud, if

---

[517]  *Midland Bank Trustees (Jersey) Ltd v Federated Pension Services Ltd* [1996] P.L.R. 179; *Freeman v Ansbacher Trustees (Jersey) Ltd* [2009] JRC 003; [2010] W.T.L.R. 569 at [63]. The phrase "gross negligence" is one with which the English courts have had difficulty, see *Doorman v Jenkins* (1834) 2 Ad. & El. 256 (gross negligence a jury question); *Hinton v Dibbin* (1842) 2 Q.B. 646; *Wilson v Brett* (1843) 11 M. & W. 113 at 115 (gross negligence is negligence with a vituperative epithet); *Grill v General Iron Screw Collier Co.* (1866) 35 L.J.(C.P.) 321 at 330; but to which they have given meaning in other contexts, see *Beal v The South Devon Railway Company* (1864) 3 H. & C. 337; *Giblin v McMullen* (1868) L.R. 2 P.C. 317 at 337; *Re City Equitable Fire Insurance Co. Ltd* [1925] Ch. 407 at 427–428, CA; *The Hellespont Argent* [1997] 2 Lloyd's Rep. 547 at 586–588, per Mance J. (gross negligence is serious negligence); *JP Morgan Chase Bank v Springwell Navigation Corp.* [2008] EWHC 1793 (Comm) at [204]–[205], per Gloster J. (a sterile and semantic debate), affd [2010] EWCA Civ 221; [2010] 2 C.L.C. 705 at [93]; *Sucden Financial Ltd v Fluxo-Cane Overseas Ltd* [2010] EWHC 2133; [2010] 2 C.L.C. 216 at [54] (not a term of art, may amount to little more than simple negligence). See too § 39–132.

[518]  *Midland Bank Trustees (Jersey) Ltd v Federated Pension Services Ltd*, above, at 196–201.

[519]  See the cases cited in the footnotes to § 39–143. For a case where the court struck out particulars of claim alleging breach of trust in trustees' grant of an option to purchase shares following counsel's advice, as disclosing no breach which would not fall within an exemption clause protecting against "wilful and individual fraud or wrongdoing", see *Bonham v Fishwick* [2007] EWHC 1859 (Ch); (2007–08) 10 I.T.E.L.R. 329; affd [2008] EWCA Civ 373; [2008] P.L.R. 289. Recklessness would seem to include wilful blindness: *Spencer v Spencer* [2013] NZCA 449; (2013–14) 16 I.T.E.L.R. 459 at [129]–[131].

[520]  *Re City Equitable Fire Insurance Co. Ltd*, above, CA, per Warrington L.J.

[521]  *Wong v Burt* [2004] NZCA 174; [2005] W.T.L.R. 291.

LC/36

THE COMMON LAW LIBRARY

# CHITTY
# ON
# CONTRACTS

## THIRTY-SECOND EDITION

VOLUME I

### GENERAL PRINCIPLES

26–173                    Chap. 26—Damages

**26–173**   **Management costs.** Where defective performance of a contract causes disruption to a business, for example because its staff have to spend time dealing with the ensuing problems, the reasonable costs can be recovered. In *Aerospace Publishing Ltd v Thames Water Utilities Ltd*[864] Wilson L.J. reviewed a number of authorities and said:

> "I consider that the authorities establish the following propositions. (a) The fact and, if so, the extent of the diversion of staff time have to be properly established and, if in that regard evidence which it would have been reasonable for the claimant to adduce is not adduced, he is at risk of a finding that they have not been established. (b) The claimant also has to establish that the diversion caused significant disruption to its business. (c) Even though it may well be that strictly the claim should be cast in terms of a loss of revenue attributable to the diversion of staff time, nevertheless in the ordinary case, and unless the defendant can establish the contrary, it is reasonable for the court to infer from the disruption that, had their time not been thus diverted, staff would have applied to activities which would, directly or indirectly, have generated revenue for the claimant in an amount at least equal to the costs of employing them during that time."[865]

**26–174**   **Loss of good will.** Where breach of a contract has caused the victim's business loss of good will, a Scottish court has measured the loss using a method of taking "portfolio" of customers and comparing the actual profits achieved from the those customers to those which were likely to have been achieved in the absence of a breach.[866]

*(f) Contracts to Pay or Lend Money*

**26–175**   **Contracts to pay money.** Most contracts contain a promise to pay money as part of the bargain between the parties. Although the agreed sum itself may be recoverable as a debt,[867] it was for many years uncertain whether at common law the creditor could claim for any other loss resulting from the debtor's failure to pay the agreed sum at the fixed time.[868] Except in the few cases where interest was recoverable at common law,[869] the rule was believed to be that only nominal

---

[864] [2007] EWCA Civ 3, [2007] Bus. L.R. 726 at [86]. See also *Al Rawas v Pegasus Energy Ltd* [2008] EWHC 617 (QB), [2009] 1 All E.R, 346, especially at [22]–[23]; *4Eng Ltd v Harper* [2008] EWHC 915 (Ch), [2009] Ch. 91 at [40]; and *Borealis AB v Geogas Trading SA* [2010] EWHC 2789 (Comm), [2011] 1 Lloyd's Rep. 482 at [147]; *Azzurri Communications Ltd v International Telecommunications Equipment Ltd* [2013] EWPCC 17 at [86]–[88].

[865] This is a further example of using a proxy measure when the actual loss is hard to determine: see above, para.26–015.

[866] *Tullis Russell Papermakers Ltd v Inveresk Ltd* [2010] CSOH 148, noted [2011] L.M.C.L.Q. 166.

[867] See above, para.26–008.

[868] *London, Chatham and Dover Ry Co v South Eastern Ry Co* [1893] A.C. 429 (a claim for interest at common law). cf. *Trans Trust SPRL v Danubian Trading Co Ltd* [1952] 2 Q.B. 297; and see the criticism of the rule by Jessel M.R. in *Wallis v Smith* (1882) 21 Ch. D. 243, 257. On a contract to pay interest, see Vol.II, paras 39–285 et seq.

[869] e.g. dishonour of bills of exchange and promissory notes. See below, Vol.II, para.34–117.

LC/37

THE COMMON LAW LIBRARY

# McGREGOR

## ON

# DAMAGES

BY

## HARVEY McGREGOR
C.B.E., Q.C., D.C.L., S.J.D.

CHAPTER ON THE HUMAN RIGHTS ACT CONTRIBUTED BY
MARTIN SPENCER Q.C.

CHAPTERS ON PROCEDURE REVISED BY
JULIAN PICTON Q.C.

*NINETEENTH EDITION*

SWEET & MAXWELL  THOMSON REUTERS

PARTICULARS OF CLAIM    **49–020**

anything I have said to indicate that there can be laxity in pleading special damage."[81]

The remedy available to a defendant presented with insufficient partic-    **49–019**
ularity in the claimant's statement of case is to raise requests for further information of the damage alleged pursuant to CPR Pt 18. Under the old procedural rules, it was well established that the defendant was entitled to demand such particulars of special damage,[82] although he could not get particulars of general damage.[83] If the claimant then supplied the particulars he would be bound by them; if he failed to deliver them the defendant might ask for the allegation of special damage to be struck out. In general the defendant was not entitled to the delivery of further and better particulars before he had filed his defence. Under CPR r.18.1(1), by contrast, the court may at any time order a party to clarify any matter which is in dispute or give additional information in relation to any such matter. Such an order could be made before defence if it was thought that the defendant needed the clarification or information at that stage.

Cases in which defendants have applied for and been granted particulars by    **49–020**
the court not only provide illustrations of this method of obtaining information about the special damage claimed but also indicate the particularity with which the special damage should have been pleaded in the first place. Two decisions are important in this connection. In *Monk v Redwing Aircraft Co*,[84] an action for wrongful dismissal where the contract of service did not state the length of notice required to terminate it, the defendants applied before defence for particulars of (1) the period claimed by the claimant to constitute reasonable notice, and (2) the special damage alleged, stating whether during the period alleged to be reasonable notice the claimant had obtained other employment and, if so, when, with whom, the date of commencement, the salary and payment terms, the nature of the employment, whether it was still continuing and, if not, the date of determination. It was held that the defendants were entitled to the particulars claimed except those as to the terms of payment and the nature of the employment. In *Phipps v Orthodox Unit Trusts*[85] the defendant successfully applied for particulars of the claimant's tax

---

[81] [1950] 2 All E.R. 662 at 677 to 678. This passage does not appear in the report at [1951] 2 K.B. 295. However, for claims in defamation there is the specific requirement, now appearing in para.2.10(1) of the Practice Direction supplementing CPR Pt 53 which deals with Defamation Claims, that "a claimant must give full details of the facts and matters on which he relies in support of his claim for damages".

[82] e.g. *Watson v North Metropolitan Tramways Co* (1887) 3 T.L.R. 273 (particulars ordered of "£4,000 loss of business" in a personal injury case); *Monk v Redwing Aircraft Co* [1942] 1 K.B. 182 CA (facts at para.49–020, below); *Phipps v Orthodox Unit Trusts* [1958] 1 Q.B. 314 CA (facts at para.49–020, below).

[83] See *London and North Western Bank v Newnes* (1900) 16 T.L.R. 433 CA, where the defendants were held "not entitled to particulars of the quantum of damages claimed": at 434. Cf. *Phipps v Orthodox Unit Trusts* [1958] 1 Q.B. 314 CA at 322, per Parker L.J.: "The particulars . . . are limited, as they must be, to special damage in cases of tort."

[84] [1942] 1 K.B. 182.

[85] [1958] 1 Q.B. 314 CA.