**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | No. 08-13555 (SCC) |
| | (Jointly Administered) |
| Debtors. | |

**RESPONSE TO THE PLAN ADMINISTRATOR'S REVISED OBJECTION TO DEMANDS
FOR POSTPETITION INTEREST RELATED TO CLAIM NO. 28308**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Centerbridge Special Credit Partners II, L.P. ("CSCP"), CCP Credit Acquisition

Holdings, L.L.C. ("CCP"), Recovery Partners Holdings I, LLC ("Recovery Partners")[1] and

Chase Lincoln First Commercial Corp. ("Chase Lincoln") (collectively, the "Holders")[2]

respectfully submit this Response to the Plan Administrator's Objection to Demands for

Postpetition Interest Related to Claim No. 28308 (the "Revised Objection") (ECF No. 52994).

## **INTRODUCTION**

1.      The Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") provides that holders of allowed claims

against Lehman Brothers Commercial Corporation ("LBCC") are entitled to postpetition interest

"at the rate applicable in the contract or contracts on which such Allowed Claim is based (or,

absent such contractual rate, at the statutory rate)." (Plan § 8.13(c).) Here, the Holders are

---

[1] Recovery Partners' Demand for postpetition interest was initially held by Lehman Re Ltd. ("Lehman Re"). On April 30, 2015, Lehman Re assigned its portion of Claim No. 28308, including its Demand for postpetition interest, to Recovery Partners.

[2] Each of the Holders files this Response (i) solely on its own behalf, and not representing or binding any of its affiliates or any other persons with respect hereto, and (ii) solely to address the issue of the postpetition interest payable by solvent debtor Lehman Brothers Commercial Corporation in respect of allowed claim number 28308, originally filed by Lehman Re, without prejudice to positions that each Holder or any other person may take in any other disputes in this bankruptcy case.

entitled to $23,872,769.75 in postpetition interest in respect of Claim No. 28308 (the "Allowed

Claim") for the following reasons:

2.      *First*, Lehman's Global Cash and Collateral Management ("GCCM") system

provides the contractual rate for determining postpetition interest on the Allowed Claim.  The

GCCM system was a "web deployed tool" that Lehman used to "centralize and internalize,

where possible, all of the Firm's cash flows."  (Manual §§ 2, 3.1.)  The GCCM system governs

the obligations of the Lehman affiliates as to funds – like the funds underlying the Allowed

Claim – owing by one Lehman affiliate to another, including a "process to calculate and post

intercompany interest" on such funds.  (Manual § 5.3.2.3.1.)  The GCCM system, and the rates at

which intercompany interest was calculated, is described in Lehman's Business Requirements

Document, Module One: Disbursements and Receipts (the "Manual").  The Manual states that

the interest rate under the GCCM system was "1 week LIBOR flat."  (Manual § 5.3.2.3.)  Given

that the GCCM system dictated the calculation of interest owing between Lehman affiliates, it

provides the contractual rate for determining the postpetition interest that the Plan requires

LBCC to pay in respect of Lehman Re's Allowed Claim.

3.      In the Plan Administrator's now-withdrawn Objection to Demands for

Postpetition Interest (ECF No. 52453) (the "Prior Objection"), the Plan Administrator *agreed*

with the Holders that Lehman's GCCM system provides the applicable contractual rate for

calculating postpetition interest on the Allowed Claim, at one week LIBOR flat.  In its Revised

Objection, however, the Plan Administrator now abandons that position, presumably out of

concern about *In re Dow Corning Corp.*, Case No. 2:01-cv-71843-DPH, ECF No. 36 (E.D.

Mich. May 18, 2004) (Ex. 1),[3] which directly controverts Lehman's position that the contractual

rate for postpetition interest is floating rather than fixed as of the petition date.

4.      If, as the Plan Administrator had previously argued, the contractual rate is

provided by the GCCM system but is *not* fixed as of the petition date, the postpetition interest

rate based on U.S. dollar ("USD") LIBOR (which the Plan Administrator contends would be the

applicable LIBOR rate) would be only 0.26%.  By contrast, if the contractual rate under the

GCCM system *is* fixed as of the petition date – as *Dow* correctly holds – the rate would be

greater: 5.37875% under Great British Pound ("GBP") LIBOR or 4.05% under USD LIBOR.  In

a transparent effort to avoid the higher rate that would apply if the rate under the GCCM system

is fixed, as it should be, the Plan Administrator has abandoned its previous position that the

GCCM system provides the applicable contractual rate and now contends that the federal

judgment rate of 1.59% applies.

5.      Although the Plan Administrator's Prior Objection accepted that the GCCM

system provides the applicable contractual rate, its Revised Objection argues that the Manual that

describes the GCCM system is merely a "draft."  However, the Plan Administrator does *not*

dispute that the GCCM system governs Lehman's intercompany obligations for calculating

interest.  Nor does the Plan Administrator dispute that the Manual accurately describes how the

GCCM system worked with respect to calculating interest.

6.      Accordingly, the Court should find that the GCCM system, as described by the

Manual, provides the contractual interest rate applicable to the Allowed Claim under the Plan.

Alternatively, if the Court finds that there is a factual dispute regarding the GCCM system, the

---

[3] Citations to "Ex." refer to the exhibits attached to the Declaration of Michael Kwon, dated July 15, 2016, submitted herewith.

Court should permit the Holders, which do not have access to Lehman's internal records, to take limited discovery on that issue.

7.    *Second*, as noted above and demonstrated in detail below, the applicable GCCM interest rate should be fixed as of the petition date – not floating, as the Plan Administrator incorrectly argues.  As *Dow* reflects, a claimant's entitlement to postpetition interest, even if based on a floating contractual or statutory rate, should be fixed at the specific rate in effect on the petition date.

8.    *Third*, the applicable GCCM interest rate is one week GBP LIBOR – not USD LIBOR, as the Plan Administrator incorrectly claims.  The Manual expressly provides that interest under the GCCM system is determined "by currency," and the Allowed Claim indisputably arose from Great British Pounds held by LBCC.

9.    Alternatively, if this Court were to find that neither the GCCM system nor any other contract provides the applicable interest rate, the applicable "statutory rate" under the Plan for determining postpetition interest should be the English statutory rate of 8%, because LBCC's intercompany obligations ran to British entities, over Great British Pounds, as a result of a breach of a contract that is governed by the laws of England.  Given the strong connection to Great Britain – and that LBCC, if sued by Lehman Re in a UK court, would have been liable for interest at the 8% statutory rate – the Court should find that the applicable statutory rate, if any, is the English statutory rate.

## BACKGROUND

### The Lehman Re Allowed Claim

10.    This postpetition interest dispute arises from a Proof of Claim filed by Lehman Re against LBCC because LBCC, as of its bankruptcy filing, was holding GBP 50,052,102.98 (the "Funds") belonging to Lehman Re.  (Ex. 2 ("Proof of Claim").)

11.    Lehman Re was a reinsurance company formed under the laws of Bermuda, a British Overseas Territory under the jurisdiction and sovereignty of the United Kingdom.[4] (Proof of Claim ¶ 4.)  Pursuant to a Reinsurance Agreement with Britannia Life Limited ("Britannia") (n/k/a Phoenix Life Limited ("PLL")), an insurance company registered in Great Britain, Lehman Re reinsured Britannia's payment obligations on certain annuity contracts.  (Ex. 3.)  The Reinsurance Agreement was supported by a Security Agreement between Lehman Re and Britannia pursuant to which Lehman Re granted security in favor of Britannia over certain collateral (the "Collateral") to secure its obligations under the Reinsurance Agreement.  (Ex. 4.)

12.    In connection with the Reinsurance Agreement and Security Agreement, Lehman Re entered into a Custody Agreement, dated March 19, 1999 (the "Custody Agreement") with Lehman Brothers International (Europe) ("LBIE"), another company registered in Great Britain, pursuant to which LBIE would hold the Collateral as custodian for Lehman Re.  (Ex. 5.)  The Custody Agreement provides that the Collateral could be in the form of securities and/or "Cash." (*Id.* § 3.)  It defines "Cash" as "Great British Pounds (or any successor currency) ('GBP') and such other currency or currencies acceptable to [LBIE] and capable of deposit under the terms of this Agreement."  (*Id.* § 3(b).)  The Custody Agreement further provides that it "shall be governed by and construed in accordance with the laws of the [*sic*] England."  (*Id.* § 18.)  Under

---

[4] *See* United Kingdom's Website, *UK Overseas Territories*, https://www.gov.uk/government/policies/uk-overseas-territories.

the Custody Agreement, LBIE could not dispose of, transfer or hypothecate the Collateral without prior authorization. (*Id.* § 6(b).)

13. Between July 1, 2007 and August 31, 2008, in breach of the Custody Agreement, LBIE redeemed 10 bonds that ought to have been held as Lehman Re's Collateral for PLL (f/k/a Britannia). (*See* Complaint, *Phoenix Life Ltd. v. Lehman Bros. Commercial Corp.*, Adv. Proc. No. 09-01484-JMP, ECF No. 1, ¶ 16 (Bankr. S.D.N.Y. Sept. 22, 2009) ("PLL Compl.").) LBIE then transferred the cash from those bonds – denominated in Great British Pounds – to LBCC. (*Id.*) LBCC held those Great British Pounds in account number 270-90007 in Lehman Re's name (the "LBCC Account"). (*Id.*) As of September 18, 2008, the LBCC Account had a balance of GBP 50,052,102.98, which are the Funds at issue in Lehman Re's Allowed Claim. (Proof of Claim Ex. B.)

14. On October 5, 2008 (the "Petition Date"), LBCC commenced a chapter 11 bankruptcy in this Court. In its Schedules, LBCC disclosed its liability for holding Lehman Re's Funds as an undisputed claim in the amount of $89,912,687.14 as of the Petition Date. (ECF No. 3938 (Schedule F at 2).) The claim was denominated in U.S. dollars rather than Great British Pounds solely because, pursuant to Section 502 of the Bankruptcy Code, claims must be determined "in lawful currency of the United States as of the date of the filing of the petition." 11 U.S.C. § 502(b).

15. On September 22, 2009, Lehman Re filed a Proof of Claim against LBCC to recover $89,912,687.14 – the same amount that LBCC had disclosed as an undisputed claim owed to Lehman Re. (Ex. 2.) In the Proof of Claim, Lehman Re attached two account statements from LBCC, which reflect that LBCC held the Funds in Great British Pounds totaling GBP 50,052,102.98 as of September 12, 2008. (Proof of Claim Ex. B.)

16.    On February 16, 2012, Lehman Re, LBCC and various other parties entered into a Settlement Agreement providing that the Proof of Claim would be allowed in the amount of $87,621,000.00 (the "Settlement Agreement").  (ECF No. 25864.)  On March 22, 2012, the Bankruptcy Court entered an order approving the Settlement Agreement.  (ECF No. 27085.)

**The Holders' Demands for Postpetition Interest**

17.    On November 18, 2013, Lehman Re assigned 36.11% of the Allowed Claim to CCP and 19.51% of the Allowed Claim to CSCP.  (Demands ¶ 9.)  Chase Lincoln acquired portions of the CCP and CSCP holdings such that it now owns 10.05% of the Allowed Claim. Lehman Re retained the remaining 44.38% of the Allowed Claim, which it later assigned to Recovery Partners after the Demands for postpetition interest were filed.  (*Id.*)

18.    On March 24, 2014, this Court entered an Order Establishing Bar Date for Demands for Postpetition Interest Against Lehman Brothers OTC Derivatives Inc. and Lehman Brothers Commercial Corporation (the "PPI Bar Date Order"), which established the procedure for demanding postpetition interest in respect of allowed claims against LBCC.  (ECF No. 48966.)

19.    On April 24, 2015, in accordance with the PPI Bar Date Order, CCP, CSCP and Lehman Re submitted substantively identical Demands for postpetition interest on the Allowed Claim, and Chase Lincoln joined Lehman Re's Demand.  (ECF No. 52995, Exs. A-D (collectively, the "Demands").)

20.    In the Demands, the Holders pointed out that the applicable contractual rate for postpetition interest under the Plan is governed by the GCCM system, which "dictat[ed] the appropriate interest rate for intercompany claims" (Demands ¶ 11), such as Lehman Re's claim against LBCC for the Funds that it was holding, which belonged to Lehman Re.  The Holders

also noted that the interest rate under the GCCM system would be one week LIBOR flat (in this case GBP LIBOR), and that under well-established bankruptcy principles, the rate should be fixed as of the Petition Date.  (Demands ¶¶ 11-12.)

## The Plan Administrator's Changing Objections

21.     On April 7, 2016, the Plan Administrator filed its Prior Objection to the Demands (ECF No. 52453.)  The Plan Administrator did not dispute that the GCCM system "establishes a contractual rate."  (Prior Objection ¶¶ 13-14.)  The Plan Administrator also did not dispute that under the GCCM system, the interest rate should be one week LIBOR flat.  (*Id.* ¶¶ 11-12.)  The Plan Administrator took issue with the Demands on only two points, arguing that the interest rate should be USD (as opposed to GBP) LIBOR and should be a floating rate that continually changes after the Petition Date (as opposed to the rate in effect on the Petition Date).

22.     On May 12, 2016, the Plan Administrator withdrew its Prior Objection by filing a Notice of Withdrawal of the Plan Administrator's Objection to Demands for Postpetition Interest Related to Claim No. 28308.  (ECF No. 52757.)

23.     On June 9, 2016, the Plan Administrator filed its Revised Objection.  (ECF No. 52994.)  In the Revised Objection, the Plan Administrator does an about-face, contending that the Manual describing the GCCM system – which the Plan Administrator now refers to as the "Draft" – "appears to be an early-planning-stage manual relating to one of the several prepetition cash-management systems previously described to the Court as the 'GCCM.'"  (Revised Objection at 5 n.3.)  The Revised Objection further asserts that the Manual "plainly is not (and does not purport to be) the GCCM, nor does it describe the entirety of the GCCM or the complete prepetition cash-management systems."  (*Id.*)

24.     The Revised Objection, however, does not dispute that the GCCM system existed within Lehman, that it governs binding intercompany obligations, including with respect to the calculation of interest owing on funds held by Lehman affiliates, or that the Manual – draft or not – accurately describes how that interest obligation was calculated.  Instead, the Revised Objection argues that the GCCM system does not provide the applicable contractual rate for postpetition interest because the Allowed Claim is not "based on" the GCCM.  Rather, the Plan Administrator argues, the Allowed Claim should be deemed to be based on the Settlement Agreement (which does not, and would not, purport to provide a retroactive interest rate), ignoring the entire factual background that gave rise to the claim in the first place.  (Revised Objection ¶ 18.)  Thus, the Plan Administrator argues there is no contractual interest rate, and therefore under the Plan postpetition interest should be determined by the "statutory rate," which the Plan Administrator contends is the federal judgment rate.  (Revised Objection ¶¶ 20-21.)

25.     The Plan Administrator further argues that if the GCCM system does provide the applicable contractual rate, that rate should be a floating rate based on USD LIBOR.  (Revised Objection ¶¶ 30-34.)  However, the Revised Objection ignores *Dow*, which correctly held that for calculating postpetition interest, contractual interest rates are fixed as of the Petition Date regardless of whether the applicable contract provides for a floating rate during the life of the contract.  The Plan Administrator also ignores the fact that under the GCCM interest is determined "by currency" and the amounts at issue were in Great British Pounds.

## ARGUMENT

**I.    The GCCM System Provides the Contractual Rate for Postpetition Interest**

26.    Pursuant to Section 8.13(c) of the Plan, the Holders are entitled to postpetition interest on the Allowed Claim "at the rate applicable in the contract or contracts on which such Allowed Claim is based (or, absent such contractual rate, at the statutory rate)."

27.    The Allowed Claim was based on monies owed between Lehman affiliates – Lehman Re and LBCC.  At Lehman, intercompany obligations accrued interest pursuant to Lehman's GCCM system.  Lehman used the GCCM system to "centralize and internalize, where possible, all of the Firm's cash flows."  (Manual §§ 2, 3.1.)  The GCCM system included Lehman's rules governing the "process to calculate and post intercompany interest."  (Manual § 5.3.2.3.1.)  Because the GCCM system governed the calculation of interest that Lehman affiliates were obligated to pay each other, the Court should find that the GCCM system provides the applicable contractual rate for determining postpetition interest owed by LBCC to Lehman Re in respect of the Allowed Claim.

**A.    The Plan Administrator's Effort to Discredit the Manual Is of No Avail**

28.    As discussed above, in its Prior Objection, the Plan Administrator *agreed* with the Holders that the GCCM system provides the applicable contractual rate – albeit arguing that the rate should be floating rather than fixed as of the Petition Date.  However, evidently concerned about *Dow*, which directly controverts the Plan Administrator's position, the Plan Administrator withdrew its Prior Objection and now claims there is no contractual rate applicable to the Allowed Claim.[5]

---

[5] In its Prior Objection, the Plan Administrator indicated that it might want to change its position if doing so suited it, stating that it did not "presently" contest the applicability of the GCCM – despite submitting a proposed order providing for a 0.26% interest rate based on the GCCM.  (Prior Objection ¶ 14.)  The Plan Administrator could have made all the same arguments it is now making about the Manual and the GCCM's applicability in its Prior

29.     As noted above, in support of this new position the Plan Administrator asserts in a footnote that the Manual is merely a "draft," which "appears to be an early-planning-stage manual relating to one of the several prepetition cash-management-systems previously described to the Court as the 'GCCM,'" and that the Manual "plainly is not (and does not purport to be) the GCCM, nor does it describe the entirety of the GCCM or the complete prepetition cash-management systems."  (Revised Objection at 5 n.3.)

30.     However, the Plan Administrator's Revised Objection does not dispute that the GCCM system governed Lehman's intercompany obligations, including the calculation of interest accruing on funds held between Lehman affiliates.  To the contrary, by arguing that the Manual does not describe the entirety of the GCCM (which is irrelevant even if true), the Plan Administrator necessarily concedes the GCCM's existence.  Obviously the Manual, which is a document, is not the GCCM itself, which is a web-deployed system.  But the Plan Administrator does not deny that the Manual – which is labeled "GCCM" – describes the GCCM and, in particular, does not deny that the Manual accurately describes the part of the GCCM that governs how interest owing between Lehman affiliates was calculated.  The Plan Administrator also does not proffer a superseding "final" version of the Manual or assert that any such version differed from the so-called "draft" in terms of how intercompany interest was calculated.

31.     Given the Plan Administrator's failure to dispute the material facts, the Holders do not believe that the Plan Administrator's assertions about the Manual raise a genuine issue as to whether the GCCM system provides the applicable contractual rate.  However, if the Court finds that the Plan Administrator has raised a factual question in that regard, the Holders (which

---

Objection, making clear that the explanation for the Plan Administrator's changed position has nothing to do with anything learned about the GCCM or the Allowed Claim since its Prior Objection was submitted.

of course do not have access to Lehman's internal records) request the opportunity to take limited discovery on that narrow issue.[6]

### B.    There Is No Basis for the Plan Administrator's Argument That the Demands Are Not "Based on" the GCCM

32.    Rather than disputing that the GCCM system governed the calculation of Lehman's intercompany interest, the Plan Administrator relies on the language of the Plan providing for interest at "the rate applicable in the contract or contracts" on which an Allowed Claim "is based," by arguing that the Holders "fail[ed] to identify a contract . . . on which [Lehman Re's Allowed] Claim is based"; admit that they are not aware of "an express written agreement" governing the transfer and management of the Funds to LBCC; and "did not allege, as they must for the Holders to be entitled to PPI at an interest rate referred to in any such policy, that the Allowed Lehman Re Claim itself 'is based on'" the GCCM system.  (Revised Objection ¶ 13.)  However, the Plan Administrator's revisionist position distorts the facts and the Plan's language.

33.    The Holders' Demands clearly alleged that the GCCM dictated the appropriate interest rate for intercompany claims.  The Plan Administrator does not challenge that, but rather suggests that the GCCM – however binding it may have been on Lehman entities – is not a "contract" within the meaning of the Plan.  That is absurd.  By providing the agreed means by which Lehman affiliates determine their respective obligations, including interest, as to funds of one held by the other – which the Funds indisputably were – the GCCM is every bit as much a

---

[6] Counsel for the parties previously conferred on this point, and counsel for the Plan Administrator took the position that any question about whether discovery is required should be addressed at the upcoming hearing.  That is based on the fact that Lehman's Claims Hearing Procedures (ECF No. 8474), which are incorporated by reference in the PPI Bar Date Order, provides that discovery is enjoined unless the Court determines at a "Sufficiency Hearing" that the Holders' Demands are legally sufficient, in which case the Court would rule on the Demands at a "Merits Hearing" after discovery is taken.  Although the Plan Administrator's Notice of Hearing for its Revised Objection does not refer to the hearing as a "Sufficiency Hearing," the Holders have no objection to proceeding as the Plan Administrator has proposed, and accordingly did not serve discovery requests prior to the hearing.

contract as a piece of paper stamped "contract" on the top, which is apparently what the Plan

Administrator would require.

34.    The Plan Administrator's further argument that, in any event, the Allowed Claim

is not "based on" the GCCM or any other contract makes no sense either.  The Allowed Claim is

based on the Funds, and the Funds were governed by the GCCM.  Most critically for present

purposes, the GCCM governed the rate of interest applicable to those Funds by providing the rate

for interest owing on intercompany claims.  As the Plan Administrator points out, the Holders

noted they are not aware of a written agreement governing the transfer of Lehman Re's Funds to

LBCC.  However, as reflected by the fact that the Funds were held by LBCC in Lehman Re's

name, obviously there was an understanding that LBCC was holding them on Lehman Re's

behalf.  That understanding was the basis of the Allowed Claim:  the Funds should be returned

because they belonged to Lehman Re.  (*See* Proof of Claim ¶ 6 ("Prior to the LBCC Petition

Date, Lehman Re and LBCC entered into one or more intercompany transactions or

arrangements, pursuant to which Lehman Re funds were deposited with LBCC. . . . These

intercompany transactions therefore give rise to an intercompany account receivable owed by

LBCC to Lehman Re . . . .").)  LBCC readily acknowledged that understanding by listing the

Funds as an undisputed claim of Lehman Re against LBCC.  (ECF No. 3938 (Schedule F at

2).)  The GCCM is an inextricable part of that – and any other – understanding with respect to

amounts owed between Lehman entities, because it governs the rate at which those obligations

accrue interest.

35.    Taken to its logical conclusion, the Plan Administrator's argument would require

that no entitlement to postpetition interest can be based on a prepetition contract providing for

interest, if the subject claim is also arguably based on other contracts or circumstances.  Section

13

8.13(c) of the Plan obviously cannot be read so narrowly.  The Plan itself is "is a contract to be interpreted by the court" and is "appropriate for consideration according to principles of contract law."  *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 89 (S.D.N.Y. 2008), *aff'd*, 379 F. App'x 10 (2d Cir. 2010).  As such, the Plan "should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties."  *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012).  The Plan clearly was intended to respect previously agreed-upon means of calculating interest, and the Plan Administrator's constricted reading would vitiate that obvious intent.

36.     The Plan Administrator also argues that the Settlement Agreement, which does not provide an interest rate, is the "sole basis" for the Allowed Claim.  And according to the Plan Administrator, the standard boilerplate language therein superseding prior contracts wipes away any prior understandings between the parties as to how interest should be calculated on amounts owed, including the entire GCCM system.  (Revised Objection ¶¶ 18-20.)  That argument, too, is groundless.

37.     The Settlement Agreement is not the *basis* for the Allowed Claim.  It *resolved* the Allowed Claim.  The Plan's reference to "the contract or contracts on which such Allowed Claim is based" plainly means contracts that governed the debtor's and the claimant's relationship prepetition, not standard form settlement agreements whereby a debtor in possession agrees to fix and allow a disputed prepetition claim.  The Settlement Agreement's language to the effect that prior agreements with respect to the amounts owed are superseded is a boilerplate integration clause, to avoid disputes as to what is the final agreement as to those amounts.  It does not retroactively nullify provisions in prepetition agreements concerning the accrual of interest.

38.     Moreover, the Plan specifically contemplates that Allowed Claims include "any Claim that is compromised, settled, or otherwise resolved" (Plan § 1.4) and provides that such settled Allowed Claims are entitled to postpetition interest (Plan § 8.13(c)).  By specifically providing that Allowed Claims – including those that are settled – are entitled to postpetition interest, the Plan's drafters could not have intended for boilerplate language in a settlement agreement to override the Plan's provision for postpetition interest.  Accordingly, there is no basis for the Plan Administrator's argument that the Settlement Agreement somehow undoes pre-existing rules for the calculation of interest.

## II.     The Interest Rate Provided by the GCCM Should Be Fixed as of the Petition Date

39.     The Plan Administrator also argues that, even if the GCCM system does provide the relevant interest rate, its floating rate of interest should not be fixed as of the Petition Date. That argument also fails.

40.     In support of its position, the Plan Administrator asserts that under the Manual, intercompany interest is calculated "on a daily basis," and cites to inapposite cases standing for the general proposition that a party to a contract may not "pick and choose" which provisions apply or do not apply.  (Revised Objection ¶¶ 30, 32.)[7]  But the Holders are not trying to "pick and choose" the applicable provisions of the GCCM system.  The GCCM rate for determining interest is simply fixed as of the Petition Date – at whatever the LIBOR rate prescribed by the GCCM was at that point – because under well-established bankruptcy principles "the rights of creditors are fixed . . . as of the filing of the petition in bankruptcy."  *United States v. Marxen*,

---

[7] The Plan Administrator cites *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 845 N.E.2d 1265, 1267 (N.Y. 2006); *Westinghouse Elec. Corp. v. N.Y.C. Transit Auth.*, 623 N.E.2d 531, 535 (N.Y. 1993); and *Seifert, Hirshorn & Packman, Inc. v. Ins. Co. of N. Am.*, 321 N.Y.S.2d 815, 817 (1st Dep't 1971).  Those are straightforward, state law breach of contract cases, and none involved the applicability of a contractual interest rate to the determination of postpetition interest in a bankruptcy.

307 U.S. 200, 207 (1939); *see also In re Saint Vincent's Catholic Med. Centers of New York*, 440 B.R. 587, 597 (Bankr. S.D.N.Y. 2010) ("A claim is measured as of the petition date.").

41.      The decision in *In re Dow Corning Corporation*, Case No. 2:01-cv-71843-DPH, ECF No. 36 (E.D. Mich. May 18, 2004) is squarely on point.  In *Dow*, the court held that where a plan of reorganization provides for postpetition interest at a contractual rate, even if the contract provides for a floating rate, the postpetition interest rate is fixed as of the petition date.  The debtor in *Dow*, like the Plan Administrator here, argued that "the contract rate where the interest is variable or floating is a formula based on the application of the relevant benchmark LIBOR rate" and should apply "over the pendency of the bankruptcy."  *Id.* at 2.  The court explicitly rejected that argument, holding that "the contract rate of a contract with floating or variable rates was *'fixed' or set* at the specific rate in effect on the date of the filing of the petition for the purposes of determining the pendency interest rate" because "[t]he case law supports the application of a *set* rate, more often than not, an interest rate set by statute, such as the federal judgment rate."  *Id.* at 3.[8]  Under that principle, regardless of whether the GCCM system provided for a floating or fixed rate for intercompany interest, the rate for determining postpetition interest is fixed as of the Petition Date.

42.      Although the federal judgment rate does not apply in this case and did not apply in *Dow*, it provides a useful analogy, as the *Dow* court observed.  The federal judgment rate statute specifies a floating interest rate based on "the weekly average 1-year constant maturity Treasury yield."  *See* 28 U.S.C. § 1961(a).  Yet courts applying the federal judgment rate consistently fix the rate as of the petition date.  *See, e.g.*, *Savage & Assocs., P.C. v. Mandl (In re*

---

[8] In the appeal of this decision and others, the Sixth Circuit declined to reach the issue of whether the district court correctly held that the contractual interest rate is fixed as of the petition date, instead dismissing that portion of the appeal as moot because it remanded the action on other grounds.  *See Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 680 (6th Cir. 2006).

*Teligent, Inc.)*, 380 B.R. 324, 328 (Bankr. S.D.N.Y. 2008); *In re Melenyzer*, 143 B.R. 829, 834-

35 (W.D. Tex. 1992).  Indeed, the Plan Administrator concedes that if the federal judgment rate

applies, postpetition interest would be fixed at the rate "that was in effect on LBCC's

Commencement Date."  (Revised Objection ¶ 21.)

43.    That is particularly significant given the structure of the Plan's provision for

postpetition interest.  In support of its claim for the federal judgment rate, the Plan Administrator

points to the "statutory rate" default language contained in precisely the same sentence that

provides for use of the contract rate if there is one.  (*See* Plan § 8.13(c).)  If the statutory rate is

fixed as of the Petition Date, so too must be any applicable contract rate.  There is no express

language in either case with respect to fixing the rate as of the Petition Date, but – as the Plan

Administrator's construction of the statutory rate language reflects – it is understood that this is

the appropriate way to proceed with respect to postpetition interest.

44.    Similarly, even though foreign exchange rates constantly fluctuate, when a claim

is in a foreign currency, courts use the "exchange rate in effect on the Petition Date to convert

the claim to U.S. dollars," rather than having the amount of the claim fluctuate with the exchange

rate over the course of the bankruptcy.  *USGen New England, Inc. v. TransCanada Pipelines,*

*Ltd. (In re USGen New England, Inc.)*, 429 B.R. 437, 492 (Bankr. D. Md. 2010); *In re Global*

*Power Equipment Group, Inc.*, Nos. 06-11045 (BLS), 2008 WL 435197, at *5 (Bankr. D. Del.

Feb. 14, 2008).

45.    For the same reasons, as the *Dow* court correctly concluded, a floating contractual

interest rate applicable to a claim should be fixed where it stood on the Petition Date.

### III.     Under the GCCM System, the Applicable Interest Rate Is GBP LIBOR

46.     Under the GCCM, the intercompany interest rate was "1 week LIBOR flat." (Manual § 5.3.2.3.).)  As noted, the Plan Administrator does not dispute that the GCCM so provided, but incorrectly asserts that "the applicable LIBOR index currency is U.S. dollars, not pounds sterling."  (Revised Objection ¶¶ 33-34.)

47.     In fact, the applicable LIBOR rate under the GCCM would be GBP LIBOR, not USD LIBOR.  The Funds owned by Lehman Re and held by LBCC that gave rise to the Allowed Claim were Great British Pounds, not U.S. dollars.  (*See* Proof of Claim Ex. B.)  Contrary to the Plan Administrator's argument that "nothing in the text of the [Manual] requires the expression of LIBOR in pounds sterling" (Revised Objection ¶ 34), the Manual provides that under the GCCM system the "basic interest calculation for intercompany interest recovery is *by currency*." (Manual § 5.3.2.3.1 (emphasis added).)  Thus, under the GCCM system, the applicable contractual rate should be GBP LIBOR, not USD LIBOR.

48.     The Plan Administrator also argues that the applicable LIBOR index currency under the GCCM system is USD LIBOR because Section 502(b) of the Bankruptcy Code requires claims to be expressed in U.S. dollars.  (Revised Objection ¶ 34.)  But Section 502(b) does not speak to what postpetition interest rate applies.  And Section 8.13(c) of the Plan, which does, clearly refers to a contractual rate in effect prepetition.  Here, that rate is governed by the GCCM, and under the GCCM the interest rate is driven by the currency in which the amounts owing were held.  The purpose of awarding postpetition interest at the parties' agreed-upon rate is to give creditors what they would have expected to recover based on their understanding as to interest.  *See, e.g.*, *In re Dvorkin Holdings, LLC*, 547 B.R. 880, 897-98 (N.D. Ill. 2016) (because "bankruptcy is a procedure for enforcing pre-bankruptcy entitlements," "it seems fundamentally

unfair to require a creditor to accept a lower interest rate than he bargained for when the

bankruptcy estate has enough money to pay all unsecured creditors' claims, including interest, in

full") (citation omitted); *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) ("[I]n

solvent debtor cases, . . . courts have generally confined themselves to determining and enforcing

whatever pre-petition rights a given creditor has against the debtor."). The Bankruptcy Code's

requirement that filed claims be expressed in U.S. dollars is simply irrelevant.

49.    The Plan Administrator also argues that "[i]t makes no sense to apply LIBOR

expressed in pounds sterling to a claim stated in U.S. dollars because it would yield an actual rate

other than LIBOR." (Revised Objection ¶ 34.) That is demonstrably false. GBP LIBOR as of

the Petition date was 5.3785%. That rate can be applied to any amount, whether expressed in

pounds or dollars. The Plan Administrator's argument that doing so for a dollar amount would

somehow yield a rate other than LIBOR is based on the erroneous, unsupported assertion that

"LIBOR is generally expressed in relation to different index currencies" and that "each LIBOR

rate is designed to compensate for the differences in index currency exchange rates." (Revised

Objection ¶ 34.) In fact, the Intercontinental Exchange (ICE), the entity that sets the various

LIBOR benchmarks, makes clear that the various international LIBOR rates are determined

independently of each other, by a "reference panel of between 11 and 18 contributor banks *for

each currency calculated*." ICE LIBOR, *available at* https://www.theice.com/iba/libor

(emphasis added). Contrary to the Plan Administrator's assertion, LIBOR rates are not set based

on currency exchange rates.[9]

---

[9] Applying the GBP LIBOR rate to an amount expressed in U.S. dollars is mathematically the same as applying the rate to the amount in pounds before converting it to dollars, then converting both the amount owed and interest thereon to dollars.

50.      Accordingly, the Court should find that the applicable LIBOR rate under the

GCCM system is GBP LIBOR, not USD LIBOR.  Alternatively, if the Court finds that there is

any question as to whether GBP LIBOR or USD LIBOR applies to the Funds held by LBCC

under the GCCM system, the Holders respectfully request permission to take narrowly-tailored

discovery on that issue.

## IV.    If the GCCM Does Not Apply, the Applicable Statutory Rate Is the English Statutory Rate

51.      If there is no contractual rate, the Plan provides that postpetition interest on an

allowed claim is awarded "at the statutory rate" – leaving open the question of *which* statutory

rate.  (Plan § 8.13(c).)  Here, if the Court were to conclude that the GCCM system does not

provide a contractual rate under the Plan, it should find that the statutory rate applicable to the

Allowed Claim is 8% pursuant to the Judgments Act 1838 under English law (the "English

Statutory Rate").

52.      The English Statutory Rate should apply because the Funds (i) were denominated

in Great British Pounds, (ii) belonged to Lehman Re, an entity formed under the laws of

Bermuda, which is a British territory, (iii) and were transferred to LBCC by LBIE, an English

entity, (iv) in breach of the Custody Agreement, which is "governed by and construed in

accordance with the laws of . . . England"[10] (Ex. 5 § 18).  Given this strong nexus to British law,

the applicable "statutory rate" here should be the English Statutory Rate.  *See, e.g.*, *In re Azabu*

*Buildings Co.*, 383 B.R. 738, 744 (D. Haw. 2008) (awarding post-judgment interest at the

Japanese judgment rate because "Japan has the most significant relationship to the parties, the

---

[10] The Plan Administrator's attempts to argue away the significance of the Custody Agreement are of no avail. (Revised Objection ¶¶ 13, 24 & n.4.)  But for the Custody Agreement and its breach, LBCC would not have held the Funds that belonged to Lehman Re.  Thus, the Custody Agreement is at the heart of the factual matrix here for choice of law purposes, regardless of the fact that the Allowed Claim is not based on it and LBCC is not a party to it. Nor is it of any moment that the Custody Agreement was not submitted with the Demands, inasmuch as it has been on the record in this case since 2009 (*see* PLL Compl. Ex. C).

transaction, and the judgment"); *Faggionato v. Lerner*, 500 F. Supp. 2d 237, 243 (S.D.N.Y. 2007) (applying French law because New York federal courts "apply the law of the jurisdiction [there, France] with the most significant relationship with the occurrence and with the parties").

53.     The Plan Administrator argues that the "statutory rate" under the Plan must be the federal judgment rate.  The Plan *could have* provided for the federal statutory rate; but as negotiated and confirmed, it does not do so.  *See In re Wash. Mut., Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. Feb. 8, 2011), *Confirmed Plan § 1.151*, ECF No. 6696 (providing for postpetition interest "at the contract rate set forth in any agreement related to such Allowed Claim or, if no such rate or contract exists, *at the federal judgment rate*") (emphasis added).  The Plan Administrator supports its position with citations only to decisions interpreting the term "legal rate" under Section 726(a)(5) of the Bankruptcy Code, which is not at issue here, including Chapter 11 cases in which the plan was *silent* as to how postpetition interest is determined.  (*See* Revised Objection ¶¶ 25, 28.)  But in this case, the Plan indisputably authorizes varying postpetition interest where different contracts apply, and is naturally read also to authorize varying postpetition interest where different statutes apply.

54.     In fact, the language of the Plan is strikingly similar to that used by courts applying the "state law approach" to the interpretation of the phrase "legal rate" in Section 726(a)(5), construing it to mean "at the contract rate, or, if a contract rate does not exist, at the otherwise applicable state statutory rate."  *See, e.g., In re Dow Corning Corp.*, 237 B.R. 380, 394 (E.D. Mich. 1999).  The state law approach provides greater flexibility than the "federal judgment rate approach," by allowing the postpetition interest rate to vary based on whether there is a contract or on the law of the most relevant state.  The primary justification for the inflexible application of the federal judgment rate – that it is unfair if "different creditors will

have different rates of interest, depending upon their contracts or the applicable statutory rate,"
*see, e.g., In re Melenyzer*, 143 B.R. 829, 832 (Bankr. W.D. Tex. 1992) – has no force in this case
because the confirmed Plan expressly contemplates different creditors having different rates of
interest, where a contract applies.[11]  Indeed, the Plan provides even more flexibility than the state
law approach because it does not qualify the phrase "statutory rate" with the term "state,"
thereby not limiting the candidate jurisdictions to this country.

55.    The Plan Administrator also cites a number of cases, having nothing to do with
postpetition interest, for the general proposition that a class of creditors cannot receive more than
full consideration for its claims, and from that argues that "[u]nsecured creditors without contract
rates of interest, therefore, cannot obtain Distributions in excess of their Allowed Claims plus
interest at 'the statutory rate,' i.e., the federal judgment rate."  (Revised Objection ¶ 27.)  But this
argument simply *assumes* that the "statutory rate" is the federal judgment rate, a proposition for
which – as described above – there is no basis.

56.    Lastly, presumably referring to the fact that LBCC is solvent, but its parent
company, LBHI, is not, the Plan Administrator argues that "it would be inequitable to require
payment of PPI at greater than the federal judgment rate."  (Revised Objection ¶ 29.)[12]
However, the Plan indisputably allows for postpetition interest at contractual rates, which may

---

[11] The Plan Administrator's additional argument that the federal judgment rate should apply because an allowed claim in bankruptcy is a "federal" judgment (Revised Objection ¶ 26) also fails.  The bankruptcy court authorities it cites are Chapter 7 cases interpreting the term "legal rate" under Section 726(a)(5) and applying the federal judgment rate approach, which is inapplicable here for the reasons noted above.  As for the two Second Circuit Court of Appeals authorities the Plan Administrator invokes, one had nothing to do with bankruptcy law, much less a plan that provides interest terms as this Plan does, while the other is over 100 years old and applied a predecessor to the federal judgment rate statute that called for the application of *state law* rates to allowed claims.  (*See id.*)

[12] The Plan Administrator cites *In re Energy Futures Holdings Corp.*, 540, B.R. 109, 117-18 (Bankr. D. Del. 2015), which suggests, in *dicta*, that a court may limit postpetition interest to creditors of one debtor where creditors of a parent debtor are not paid in full.  (*See id.*)

well be above the federal judgment rate.  Thus, the Court already has determined that it would

not be "inequitable" if postpetition interest is greater than the federal judgment rate.

57.    In sum, if this Court were to find that the GCCM system does not provide the

applicable contractual rate, the English Statutory Rate rather than the federal judgment rate

should apply.

## CONCLUSION

For the foregoing reasons, the Holders respectfully request that the Court award

postpetition interest in respect of the Allowed Claim at the rate of 5.3785% (1 week GBP LIBOR

fixed as of the Petition Date) for a total of $23,872,769.75, or, alternatively, if the GCCM does

not provide the applicable rate, at the rate of 8% (the English Statutory Rate) for a total of

$37,297,224.96.

Dated:  New York, New York
        July 15, 2016

**SCHULTE ROTH & ZABEL LLP**

By:  /s/ Alan R. Glickman
_____
     Alan R. Glickman
     Brian D. Pfeiffer
     Michael Kwon
     Neil S. Begley
919 Third Avenue
New York, New York  10022
(212) 756-2000

*Attorneys for Centerbridge Special
Credit Partners II, L.P., CCP Credit
Acquisition Holdings, L.L.C., and
Recovery Partners Holdings I, LLC*

**MORGAN, LEWIS & BOCKIUS LLP**


By:  /s/ Joshua Dorchak
_____
      Joshua Dorchak
101 Park Avenue
New York, New York  10178
(212) 309-6700

*Attorneys for Chase Lincoln First Commercial Corp.*