# Exhibit 3

Execution Version

# REINSURANCE AGREEMENT

Issued to
**Britannia Life Limited**
(hereinafter called the "Ceding Insurer")

By

**Lehman Re Ltd.**
(hereinafter called the "Reinsurer")

Execution Version

REINSURANCE AGREEMENT (the "Agreement") dated 22 March 1999

Between

(1)     Britannia Life Limited (the "Ceding Insurer") whose registered office is at
        Britannia Court
        50 Bothwell Street
        Glasgow
        G2 6HR

        and

(2)     Lehman Re Ltd. (the "Reinsurer") whose registered office is at
        HM 68
        Hamilton HM AX
        Bermuda

**WHEREAS:**

(i)     The Ceding Insurer is a life insurance company authorised to carry on life
        insurance business in the UK in accordance with the Insurance Companies Act
        1982;

(ii)    The Reinsurer is an insurance company authorised to carry on reinsurance
        business under the laws of Bermuda;

(iii)   The Ceding Insurer wishes to arrange for its payment obligations in relation to a
        pool of annuity contracts to be reinsured and it has been agreed between the
        Ceding Insurer and the Reinsurer that the Reinsurer will reinsure the Ceding
        Insurer's payment obligations under such annuity contracts on and subject to the
        terms and conditions of this Agreement.  **"Agreement"** means (a) this document,
        (b) Annex 1 (attached hereto) consisting of Annexes 1(A), 1(B) and 1(C)
        (Annexes 1A and 1B being separately bound and as described in Annex 1 and (c)
        Annexes, 2, 3 and 4 attached hereto.

## Article 1 – Business Reinsured

The Reinsurer agrees to reinsure with effect from 1 January 1998 (the **"Effective Date"**)
the Contractual Annuity Payments, as defined and set out in Annex 1, which the Ceding
Insurer is liable to make in respect of the Covered Policies, as defined and set out in
Annex 1, which Covered Policies were in force on 31 December 1997 (**"Business
Reinsured"**). This reinsurance shall be subject to the terms, conditions and limitations
hereinafter set forth and, subject thereto, shall continue until the Ceding Insurer is no

longer liable to make any payments in respect of any of the Covered Policies. The provisions of this Agreement shall not come into effect until the Commutation and Release Agreement between the Ceding Insurer and Nationale-Nederlanden Reinsurance Company N.V. has been signed by all the parties to the Commutation and Release Agreement.

## Article 2 – Contractual Annuity Payments

The Reinsurer's liability in respect of any Contractual Annuity Payment will be calculated in accordance with Article 3. The Reinsurer shall not be liable in respect of any non-Contractual Annuity Payments paid by the Ceding Insurer except as set out in this Article.

In the event of the death of an annuitant in respect of a Covered Policy (or at the end of the guaranteed period (if any) whichever is the later), the Ceding Insurer will reimburse the Reinsurer in respect of all sums paid by the Reinsurer in respect of the relevant Covered Policy, which were made in respect of the period following the date the payments were due to cease under the Covered Policy together with interest calculated at overnight LIBOR plus 1% per annum for the period from the Transfer Date (as defined in Article 9) following receipt of notification of the relevant annuitant's death by the Ceding Insurer to the date of reimbursement.

"LIBOR" means the overnight rate set forth for GBP (as defined below) as determined by the Valuation Agent by reference to Telerate page 3750 as of 11.a.m, London time.

## Article 3 – Reinsurer's Liability
The Reinsurer shall pay to the Ceding Insurer one hundred percent (100%) of the Ultimate Net Loss (as defined in Article 4) on the Business Reinsured.

## Article 4 – Ultimate Net Loss

"Ultimate Net Loss" is defined as the total sum actually paid by the Ceding Insurer, during each Quarterly Period in settlement of the Contractual Annuity Payments arising under the Covered Policies provided that the Ceding Insurer was legally liable to make such payment in respect of the Covered Policies.

"Quarterly Period" means each of the quarters 1 January to 31 March inclusive, 1 April to 30 June inclusive, 1 July to 30 September inclusive and 1 October to 31 December inclusive.

## Article 5 – Reinsurance Premiums, Commission and Taxes

The Ceding Insurer shall pay to the Reinsurer, or to such person as the Reinsurer shall direct on the date of this Agreement a **Reinsurance Premium** defined as a single lump sum payment in Great British Pounds (or any successor currency) (herein referred to as "**GBP**") of         (inclusive of adjustment in respect of (a) interest since the Effective Date

£ 11402 518

Execution Version

of this Agreement, (b) interest on claims paid by the Reinsurer to the Ceding Insurer in respect of the expected delay between the Ceding Insurer paying claims to its policyholders and receiving claims from the Reinsurer (c) the Interim Payment in accordance with Article 9 of this Agreement and (d) the Contribution to Survivorship Costs in accordance with Article 13 of this Agreement), together with the Asset Portfolio defined and set out in Annex 2 in respect of the Business Reinsured.

The Ceding Insurer will deliver to the Reinsurer duly executed transfers in favour of the Reinsurer in respect of the Asset Portfolio.

The Reinsurance Premium shall be paid to the Reinsurer gross of any commissions, taxes, stamp duties or proportion of any procuration or other expenses, all of which shall be paid by the Ceding Insurer. The Reinsurer shall not be liable for any such amounts.

## Article 6 - Events of Default

The occurrence at any time with respect to the specified party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party (the "Defaulting Party"):

**Failure to Pay:** Failure by either party to make, when due, any payment required to be made when due in accordance with Article 2, 3, 5 or 9 of this Agreement which failure has not been rectified on or before the fifth Banking Day after written notice is received from the other party of such failure.

**Breach of Agreement:** Failure by either party to comply with or perform any material obligation under this Agreement or the Security Agreement of even date herewith between the Ceding Insurer and the Reinsurer (the "Security Agreement") (other than an obligation to make any payment under this Agreement or any inadvertent delay, error or omission made in connection with this Agreement or the Security Agreement or any related transaction) which has not been rectified on or before the 30th day after notice is received from the other party of such failure.

**Bankruptcy:** The Reinsurer (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes, or has instituted against it, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official

Execution Version

management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

**Illegality:** Due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful for either party to perform any absolute or contingent obligation to make a payment or to receive a payment under this Agreement or to comply with any other material provision of this Agreement.

**Tax Event:** Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date of this Agreement (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a change in tax law, either party (the **"Burdened Party"**) will, or there is a substantial likelihood that it will, on the next date on which any payment is due (a) be required to pay to the other party an additional amount in respect of tax or (b) receive a payment from which an amount is required to be deducted or withheld for or on account of a tax.

**Regulatory Events:** (1) Failure by the Reinsurer to maintain the minimum margin of solvency required of it as an insurance company under the statutes or regulations of its domicile and such minimum margin solvency is not restored on or before fifteen days have elapsed since receipt of notice in accordance with Article 7 by the Ceding Insurer; (2) total or partial withdrawal or revocation of the Reinsurer's authorisation or licence to carry on insurance business in the jurisdiction of its domicile other than at the request of the Reinsurer; or (3) transfer at the instance of any competent governmental or regulatory authority of the Business Reinsured.

## Article 7 - Covenants

Each party hereby covenants to the other to notify such other party of any failure to maintain the minimum solvency margin required under the law of its domicile promptly upon becoming aware of such failure.

The Reinsurer hereby covenants to provide the Ceding Insurer with copies of the Reinsurer's annual financial statements and any relevant regulatory statements, within thirty days of the production of such statements.

## Article 8 - Termination

Immediately upon the occurrence of an Event of Default which is Bankruptcy this Agreement shall terminate. Such termination shall be without prejudice to any rights, remedies or obligations that arose before such termination. If an Event of Default occurs which is *not* Bankruptcy, the party which is the non-Defaulting party (or either party in the case of an Illegality or the Burdened Party in the case of a Tax Event) may by not more than 7 days notice to the defaulting party, specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as the termination date of this Agreement.

This Agreement may also be terminated upon the mutual written agreement of the parties.

On termination there will be payable to the Ceding Insurer the net present value of the then future expected annuity cash flows (**"Future Expected Annuity Cash Flows"**) in relation to the Covered Policies as calculated by the Valuation Agent as at the close of business on the termination date of this Agreement, such amount to be determined by reference to the Valuation Agent's proprietary models and such other commercial factors that the parties have agreed to in a letter dated of even date herewith, which may be amended by mutual agreement of the parties in writing from time to time (the "Models Letter") in the form set forth in Annex 4 attached hereto. The Valuation Agent is not a fiduciary and its conclusion will be binding, absent manifest error.

**"Valuation Agent"** means Lehman Brothers International (Europe) whose registered office is at
One Broadgate
London
EC2M 7HA

## Article 9 – Accounts

The Ceding Insurer shall prepare and provide the Reinsurer with a statement (the "Statement") containing the information set out in Annex 3 in respect of the Contractual Annuity Payments (as defined in Annex 1) in respect of each Quarterly Period after the calendar year 1998 within thirty days of the end of that Quarterly Period. Within 15 days of receipt by the Reinsurer of such statement the Reinsurer will calculate the payment, if any, to be made to the Ceding Insurer in respect of each Quarterly Period or the calendar year 1998, as the case may be. In respect of any payment due to be made on or after 28 February 1999, interest calculated at overnight LIBOR plus 1% per annum and accruing on a daily basis will be payable on the amount due in the event of the payment by the Reinsurer being made after the relevant Transfer Date (provided that the Reinsurer had

Execution Version

received the Statement within thirty days of the end of the relevant Quarterly Period) or, in the event that the Statement is delivered after the thirty day period for delivery, interest at overnight LIBOR plus 1% per annum shall accrue on a daily basis from the day which is thirty days after the day of receipt by the Reinsurer of the Statement. Such payment, if any, will be transferred by the Reinsurer on the relevant Transfer Date in respect of that Quarterly Period. If any of the Transfer Dates are not Business Days the first Business Day preceding that date shall be deemed to be the Transfer Date.

Notwithstanding the above, the Reinsurer will pay any interim amount to the Ceding Insurer in respect of Contractual Annuity Payments made by the Ceding Insurer during 1998 as shown in the Ceding Insurer's 1998 accounts (the "Interim Payment"). In relation to such Interim Payment, the Ceding Insurer will provide the information set out in Annex 3 to the Reinsurer by 30 April 1999.

"Business Day" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, Bermuda, Glasgow and Edinburgh.

"Transfer Date" means (i) 31 May in respect of each Quarterly Period ending 31 March, (ii) 31 August in respect of each Quarterly Period ending 30 June, (iii) 30 November in respect of each Quarterly Period ending 30 September and (iv) 28 February in respect of each Quarterly Period ending 31 December.

Notwithstanding the above, if in respect of each Quarterly Period any amounts are due to the Reinsurer under the provisions of Article 2 these amounts will be deducted from any amounts due to the Ceding Insurer and the balance will be paid by the Ceding Insurer to the Reinsurer if negative or the Reinsurer to the Ceding Insurer if positive and shall be the only amount payable in respect of that Quarterly Period.

## Article 10 – Currency

All payments under this Agreement will be effected in GBP, being in the same currency as the Covered Policies.

## Article 11 – Inspection of Books

For as long as either party remains under any liability hereunder during normal business hours, the Ceding Insurer shall, upon reasonable written notice by the Reinsurer, make available for inspection by such representatives as may be authorised by the Reinsurer for that purpose, all books, records and other information relating to the Covered Policies hereunder in the Ceding Insurer's possession or under its control and the said representatives may arrange at their own cost for copies to be made of any records containing such information as they may require. For the purposes of this Agreement, the Reinsurer's sole retrocessionaire shall act as a representative.

Execution Version

## Article 12 – Disclosure of Information

Neither party shall disclose any information relating to this Agreement or the Covered Policies to any person, except that such information may be disclosed (a) to any retrocessionaire which agrees to treat such information as confidential on terms substantially similar to those set forth herein, (b) to the employees, professional advisors or authorised representatives of each party, which agrees to treat such information as confidential on terms substantially similar to those set forth herein, or (c) to any third party if such information is already publicly known or if such disclosure is required by law, by any court of competent jurisdiction or any regulatory or taxation authority or upon obtaining the prior written consent of the other party.

## Article 13 – Expenses

All postal and other administrative expenses (apart from those relating to the Covered Policies), will be paid by the party incurring such expenses. Subject to the paragraph below, the Ceding Insurer shall be responsible for all claims and administration expenses related to the Covered Policies, excluding reasonable litigation expenses incurred with the prior written approval of the Reinsurer, whose consent shall not be unreasonably withheld. For the avoidance of doubt any expenses incurred as a result of arbitration under Article 15 shall be dealt with in accordance with Article 15.

The Reinsurer shall be liable for GBP90,000 of those costs (**"Contribution to Survivorship Costs"**) relating to establishing evidence of survivorship as required in Annex 3. For the avoidance of doubt, the Contribution to Survivorship Costs have been deducted from the premium payable by the Ceding Insurer set forth in Article 5 above.

## Article 14 – Alterations to Agreement

Any alterations which may from time to time become necessary to this Agreement will be made by written agreement of both parties, or by means of correspondence to be attached to the Agreement, embodying such alterations as may be agreed upon and will be regarded as part of this Agreement and equally binding.

## Article 15 – Arbitration

Any dispute, controversy or claim arising out of or in connection with this Agreement or any retrocession agreement entered into by the Reinsurer in respect of the Covered Policies (the **"Reinsurance Agreements"**), including any question regarding their existence, validity, interpretation, breach or termination (a **"Dispute"**), shall be finally resolved by arbitration under the rules of the London Court of International Arbitration (the **"LCIA"**) (the **"Rules"**), which Rules are deemed to be incorporated by reference into this Article.

Execution Version

in relation to all Disputes other than a Dispute arising from an interpretation of the Models Letter (a "**Model Dispute**"), the Dispute shall be determined by one Arbitrator and such Arbitrator shall be appointed by the LCIA. In relation to a Model Dispute, the dispute shall be determined by one Arbitrator and such Arbitrator shall be appointed by the Chairman of the Life Board of the Institute of Actuaries and the Faculty of Actuaries or its successor professional body. In determining any Model Dispute such Arbitrator shall apply the methodology set forth in the Models Letter and such Arbitrator's decision shall be binding on the parties. The Arbitrator of a Model Dispute shall adopt such rules of evidence and procedure (including but not limited to all or part of the LCIA Rules) as he deems appropriate to effectuate the parties' intention to have an efficient and expeditious binding resolution to the dispute.

If any Dispute raises issues which are substantially the same as or connected with issues raised in a Dispute which has already been referred to arbitration (an "**Existing Dispute**"), or arises out of substantially the same facts as are the subject of an Existing Dispute (in either case, a "**Related Dispute**"), the Arbitrator appointed or to be appointed in respect of any such Existing Dispute shall also be appointed as the Arbitrator in respect of any Related Dispute.

The Arbitrator upon the request of one of the parties to a Dispute or a party to one of the Reinsurance Agreements which itself wishes to be joined in any reference to arbitration proceedings in relation to a Dispute, may join any party to one of the Reinsurance Agreements to any reference to arbitration proceedings in relation to that Dispute and may make a single, final award determining all Disputes between them. Each of the parties to this Agreement hereby consents to be joined to any reference to arbitration proceedings in relation to any Dispute at the request of a party to that Dispute.

Where, pursuant to the above provisions, the same Arbitrator has been appointed in relation to two or more Disputes, the Arbitrator may, with the agreement of all the parties concerned or upon the application of one of the parties, being a party to each of the Disputes, order that the whole or part of the matters at issue shall be heard together upon such terms or conditions as the Arbitrator thinks fit. The Arbitrator shall have power to make such directions and any provisional, interim or partial award as it considers just and desirable.

The seat of the arbitration shall be London and the language of the arbitration shall be English.

The parties hereby agree to waive any right of application to determine a point of law or appeal to any court of law or other judicial authority insofar as such waiver may be validly made.

## Article 16 – Governing Law

Execution Version

This Agreement shall be governed by and construed in accordance with the substantive law of England.

## Article 17 – Change in Law

In the event of any change in any relevant law as specified herein, whether arising from legislation, decisions or otherwise, at any time after the Reinsurer enters into this Agreement by which the Reinsurer's liability is increased or extended the parties hereto agree to take up for immediate discussion at the request of either party a suitable revision in the terms of the Agreement. Failing agreement on such revision within thirty days after such a request, it is agreed that the Reinsurer's liability hereunder whensoever arising shall be determined as if the said change in the governing law had not taken place.

## Article 18 - Third Party Rights

This Agreement is solely between the Ceding Insurer and the Reinsurer and in no circumstances shall any other party have any rights under this Agreement.

## Article 19 - Extra-contractual Obligations

This Agreement does not apply to and specifically excludes Extra-contractual Obligations. "**Extra-contractual Obligations**" means any claim or payment arising from any policy issued by the Ceding Insurer, other than the Contractual Annuity Payments.

## Article 20 - Counterparts

This Agreement may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

## Article 21 - Parties

This Agreement shall be deemed to have been drafted by both parties, and shall not be construed in favour of or against either party as a result of such party's role in drafting any relevant provision.

## Article 22 - Prior Communications

For the avoidance of doubt, all prior discussions and communications between the parties are superseded by the terms of this Agreement.

## Article 23 - Non-material changes to Data

In respect of the data set out in Annex 1 (the "**Data**"), the Reinsurer hereby agrees that the Ceding Insurer may make administrative changes to the Data from time to time which do not have an impact on the value of liabilities.

Execution Version

Executed in duplicate

For and on behalf of **Britannia Life Limited**

Date: 22nd March 99

Authorised signatory

For and on behalf of **Lehman Re Ltd.**

Date:

Authorised signatory

London-2/203867/12

11

Execution Version

## Annex 1

### Lehman Re Ltd. - Britannia Life Limited

### Reinsurance Agreement

This Annex is divided into three parts, Annex 1(A), Annex 1(B) and Annex 1(C) (Annexes 1(A) and 1(B) being separately bound but forming part of the Agreement).

*Annex 1(A)* is separately bound and is the list of Annuity Numbers corresponding to those policies covered by this Agreement ("**Covered Policies**").

*Annex 1(B)* is separately bound, consists of three parts: Part I (titled "D_OF_DTH.TXT"), Part II (titled "D1297ING.TXT") and Part III (titled "TSTOP.XLS") and consists of data provided by the Ceding Insurer regarding both Covered Policies and policies which are not covered by this Agreement. This is the form in which the data was received by the Reinsurer (and/or its advisors) from the Ceding Insurer.

Where an Annuity Number listed in Annex 1(A) appears twice in Annex 1(B) Part II (D1297ING.TXT), this Agreement covers the first life annuity and on the death of the first life annuitant the reversionary annuity.

The term "**Contractual Annuity Payments**" means, in respect of the Covered Policies, those payments which are itemised under the heading "GR-YR-AMT" in Annex 1(B) Part II (D1297ING.TXT).

*Annex 1(C):* The following are not liabilities under the policies listed in Annex 1(A) and should not be included in Annex 1(B):

1. The amount of annuity payable under "escalation only" policies where the annuity payable is equal to the increases each year on an increasing given amount.

2. The difference between the full amount of annuity payable under the policy and the amount actually paid (as set out in Annex 1(B)) in relation to policies with escalating annuities which have had the amount of in payment annuity limited by the UK Inland Revenue rules.

3. The amount of annuity payable under policies in respect of which payment is currently suspended (temporary stop) where the annuity becomes properly payable.

4. The amount of any spouse's pension which has not been identified in Annex 1(B).

Execution Version

*Annex 2*

### Lehman Re Ltd. - Britannia Life Limited

### Reinsurance Agreement

The Asset Portfolio means the portfolio of assets comprising:

| Nominal | Coupon | Description | Maturity |
|---|---|---|---|
| GBP 5,000,000 | 9.50% | British Conversion Stock | 18 April 2005 |
| GBP 25,000,000 | 9.00% | British Treasury | 6 August 2012 |
| GBP 7,000,000 | 10.00% | British Treasury | 8 September 2003 |
| GBP 11,000,000 | 9.00% | British Treasury | 13 October 2008 |
| GBP 6,000,000 | 13.00% | British Treasury | 14 July 2000 |
| GBP 17,000,000 | 8.75% | British Treasury | 25 August 2017 |

Execution Version

*Annex 3*

## Lehman Re Ltd. - Britannia Life Limited

### Reinsurance Agreement

At the close of each Quarterly Period hereunder:

> Details of all Contractual Annuity Payments made by the Ceding Insurer in respect of each Covered Policy at the end of the Quarterly Period and
>
> List of any annuitants in such Quarterly Period:
>
> (a) to whom payments have been suspended;
>
> (b) for whom a death certificate has been received by the Ceding Insurer; and
>
> (c) to whom payments have been suspended during the previous Quarterly Period under (a) above but in relation to which a death certificate has since been received by the Ceding Insurer.

At the close of each Quarterly Period ending 31 December details of all Covered Policies in force:

> Annuity Number
> Sex
> Date of birth
> Date of birth of spouse (if applicable)
> Current annuity
> Reversionary annuity (if applicable)
> Escalation rate (if applicable)
> Date of last evidence of survivorship
> Names of beneficiaries and spouses.

Every year commencing on the Quarterly Period ending on 31 December 1999:

> Proof/certification of evidence of survivorship for the current calendar year for each policy.
>
> In the event of any dispute arising between the parties relating to evidence of survivorship the provisions of Article 15 will apply.

Execution Version

*Annex 4*

[on the letterhead of Lehman Re Ltd.]

Models Letter

[Date]

Britannia Life Limited
Britannia Court
5 Bothwell Street
Glasgow
G2 6HR

**Dear Sirs,**

Calculation of Discount Factors and Mortality Basis

We refer to the Reinsurance Agreement and Security Agreement to be entered into
between ourselves and yourselves. Terms defined in the Reinsurance Agreement and the
Security Agreement shall have the same meaning in this letter.

Pursuant to Article 8 of the Reinsurance Agreement and the definition of Required
Amount in the Security Agreement, the calculation by the Valuation Agent of the
discount factors and mortality basis used to determine the net present value of the Future
Expected Annuity Cash Flows is based on the following methodology.

**Discount Factors**

The discount factors are calculated from the swap curve. The swap curve comprises the
par yields for each maturity at which banks lend to each other. GBP long term swap rates
are currently published on Reuters' pages ICAQ and BIRV01.
*Example*

Assume the swap rate in year $i$ is $S_i$, and the discount factor in year $i$ is $D_i$.

**Year 1**

The 1 year swap rate is $S_1$, and the discount factor, $D_1$, is $\dfrac{1}{(1+S_1)}$.

Execution Version

**Year 2**

We know that the value of a two year bond with an interest rate $S_2$ will have a price of par.

$$S_2 * (D_1 + D_2) + 100\% * D_2 = 100\%$$

$$100\% - S_2 * D_1 = S_2 * D_2 + 100\% * D_2$$

$$D_2 = \frac{100\% - S_2 * D_1}{100\% + S_2}$$

**Year n**

We know that the value of an $n$ year bond with an interest rate $S_n$ will have a price of par.

$$S_n * (D_1 + D_2 + \ldots + D_n) + 100\% * D_n = 100\%$$

$$100\% - S_n * (D_1 + D_2 + \ldots + D_{n-1}) = S_n * D_n + 100\% * D_n$$

$$D_n = \frac{100\% - S_n * (D_1 + D_2 + \ldots + D_{n-1})}{100\% + S_n}$$

In the event that the Reinsurance Agreement is terminated pursuant to the terms of Article 8 thereof, the Valuation Agent shall calculate the discount factors by obtaining bid quotations from three leading dealers in the GBP swaps market. The highest and the lowest quotations will be discarded and the remaining quotation will be used.

**Mortality Basis**

The mutually agreed mortality basis used in the calculation of the net present value of the then Future Expected Annuity Cash Flows in Article 8 of the Reinsurance Agreement, will be determined by reference to the mortality tables published from time to time by the Continuous Mortality Investigations Bureau and the mortality experience of the Covered Policies.

If the parties fail to agree on a mortality basis then such Dispute shall be a "**Model Dispute**" and shall be finally resolved by arbitration in accordance with the terms of Article 15 of the Reinsurance Agreement.

This letter will be governed by and construed in accordance with English law.

Yours faithfully,

**Lehman Re Ltd.**

Accepted and agreed

.......................................
**Britannia Life Limited**

Date:

**C L I F F O R D**
**C H A N C E**

LIMITED LIABILITY PARTNERSHIP

EXECUTION VERSION

> **Comment:** NB At first opportunity
> include provision to rectify incorrect
> cross reference to the Custodian
> Agreement in clause 2.3 of the Security
> Agreement.

DATED February 24     2006

ALBA LIFE LIMITED

AND

LEHMAN RE LTD.

---

DEED OF AMENDMENT RELATING TO A SECURITY
AGREEMENT AND REINSURANCE AGREEMENT BOTH
DATED 22 MARCH 1999

---

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Amendment Of Security Agreement | 1 |
| 2. | Amendment Of Reinsurance Agreement | 2 |
| 3. | Duty Of Disclosure | 2 |
| 4. | Law And Jurisdiction | 2 |
| 5. | Counterparts | 2 |
| 6. | Third Party Rights | 2 |
| 7. | Delivery | 2 |

THIS DEED is made on  ~~Fel~~ y 28                2006

BETWEEN

(1)   **ALBA LIFE LIMITED (FORMERLY KNOWN AS BRITANNIA LIFE LIMITED)**, a company incorporated in Scotland and whose registered address is at Britannic Court, 50 Bothwell Street, Glasgow G2 6HR (the "**Secured Party**"); and

(2)   **LEHMAN RE LTD.**, a company incorporated under the laws of Bermuda with registered number EC24732 whose registered address is at 3 Queen Street, Hamilton, HM 11 Bermuda (the "**Chargor**").

**INTRODUCTION:**

(A)   The Secured Party and the Chargor entered into both a security agreement ("**Security Agreement**") and a reinsurance agreement ("**Reinsurance Agreement**") on 22 March 1999, whereby the Chargor granted the Secured Party a first fixed charge as security for the payment and discharge of all the Obligations (as such term is defined in the Security Agreement).

(B)   The parties wish to amend the Security Agreement and the Reinsurance Agreement.

**THIS DEED WITNESSES:**

1.    **AMENDMENT OF SECURITY AGREEMENT**

      The Security Agreement is with effect from 22 March 1999 amended as follows:

1.1   by the insertion between Clause 1.2 and Clause 2 of a new Clause 1.3 in the following terms:

      "In this Security Agreement, a reference to a document is a reference to that document as modified from time to time."

1.2   by the deletion of Clause 17.A and replacing it by:

      "17.A     **NEGATIVE PLEDGE AND UNDERTAKING**

      17.A1     The Chargor covenants that it will not during the subsistence of this Security Agreement, except with the prior written consent of the Secured Party:

                (i)    create, grant or permit to exist any Encumbrance, as defined in Clause 17.1, other than the charge hereby created, on or over all or any part of the Collateral or any interest therein; or

                (ii)   except to the extent permitted by Clauses 6, and 6A, sell, transfer, lend, assign or otherwise deal with all or any part of the Collateral or any interest therein; or

                (iii)  terminate or rescind the Custodian's Agreement.

17.A2    The Chargor undertakes that it will during the subsistence of this Security Agreement procure that the Custodian will not terminate or rescind the Custodian's Agreement, except with the prior written consent of the Secured Party and pursuant to the Chargor's right under the Custodian's Agreement or as otherwise permitted by law."

2.    **AMENDMENT OF REINSURANCE AGREEMENT**

The Reinsurance Agreement is with effect from 22 March 1999 amended by the deletion of the third paragraph of Article 6 (*Breach of Agreement*) and replacing it by:

"**Breach of Agreement:** Failure by either party to comply with or perform any material obligation under this Agreement or the Security Agreement of even date herewith between the Ceding Insurer and the Reinsurer as modified from time to time (the **"Security Agreement"**) (other than an obligation to make any payment under this Agreement or any inadvertent delay, error or omission made in connection with this Agreement or the Security Agreement or any related transaction) which has not been rectified on or before the 30[th] day after notice is received from the other party of such failure."

3.    **DUTY OF DISCLOSURE**

Neither the Secured Party, nor any agent of the Secured Party, shall, in anticipation or as a result of entering into this Deed, have a duty or obligation to make any representation, warranty or disclosure of any nature, express or implied, and the Chargor hereby waives any remedy or right it might have in relation to any failure to perform any such duty or obligation.

4.    **LAW AND JURISDICTION**

This Deed shall be governed by English Law and, for the Secured Party's benefit, the English Courts shall have exclusive jurisdiction to settle any dispute which my arise from or in connection with it.

5.    **COUNTERPARTS**

This Deed may be executed and delivered in counterparts (including by facsimile transmission) each of which will be deemed an original.

6.    **THIRD PARTY RIGHTS**

The parties to this Deed agree to exclude the provisions of the Contracts (Rights of Third Parties) Act 1999.

7.    **DELIVERY**

This Deed is delivered on the date written at the start of this Deed.

EXECUTED as a DEED by:

**ALBA LIFE LIMITED**

_____ Director

_____ Director/Secretary


**LEHMAN RE LTD.**

_____ Director

_____ Director/~~Secretary~~