# Exhibit 4

Execution Version

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT is made on    22 March 1999

BETWEEN

(1) Britannia Life Limited (the "Secured Party") of Britannia Court, 50 Bothwell Street, Glasgow, G2 6HR, (fax: 0141 223 6000); and

(2) Lehman Re Ltd. (the "Chargor") of HM 68, Hamilton HM AX, Bermuda (fax: 441-296-8452) with registered number EC24732.

IT IS AGREED as follows:

1. DEFINITIONS AND INTERPRETATION

1.1 In this Security Agreement:

"Accounts" means the accounts with the Custodian in which the Non-Cash Collateral and Cash Collateral subject to this Security Agreement are held.

"Banking Day" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in (i) London, Glasgow, Edinburgh and Bermuda and (ii) in the case of a delivery of Permitted Collateral (a) the location of the account into which such delivery is to be made, and (b) either, in the case of a delivery of Cash, the principal financial centre of the currency of such Cash or, in the case of a delivery of Non-Cash Assets, the location of the account out of which such delivery shall be made, and, if different, the place where the delivery will be registered (if applicable).

"Call Amount" means on any Valuation Date the GBP amount (rounded pursuant to Clause 5.1) by which the Required Amount exceeds the aggregate Value (calculated as at the close of business on the day immediately preceding the Valuation Date) of the Collateral held by the Custodian on behalf of the Secured Party on such date;

"Cash" means GBP and such other currency or currencies as may from time to time be agreed in writing between the parties.

"Cash Collateral" means Collateral comprising Cash.

"Collateral" means (except as referred to in Clause 6.3) all the Permitted Collateral delivered pursuant to this Security Agreement together with all Proceeds, interest earned on Cash Collateral, substitutions for and additions to the foregoing and which have not been redelivered to the Chargor.

"Collateral Rights" means all rights, powers and remedies of the Secured Party provided by this Security Agreement or by law.

"Custodian" means Lehman Brothers International (Europe) which will hold the Euroclear Collateral on behalf of the Secured Party.

"Custodian's Agreement" means the agreement between the Chargor and the Custodian substantially in the form of Annex 3.

"Deposit" means each credit balance from time to time on an Account and all rights, benefits and proceeds in respect thereof.

"Euroclear" means the securities custody and clearing system operated under that name by the Brussels branch of the Morgan Guaranty Trust Company of New York.

"Euroclear Collateral" means any Permitted Collateral comprising Non-Cash Collateral from time to time credited to the Euroclear Collateral Account.

"Euroclear Collateral Account" means the account number 97558 held in Euroclear in the name of the Custodian or such other account with Euroclear as the parties shall agree.

"Expected Annuity Cash Flows" means the then expected liability cash flows of the Covered Policies. The mortality assumption used to calculate these portfolios will be updated by agreement of the parties on each anniversary of the date of this Security Agreement, to account for changes in the expected future mortality in respect of the Covered Policies (as defined in the Reinsurance Agreement).

"GBP" means the lawful currency of the United Kingdom and, wherever mentioned in this Security Agreement, shall also include any successor currency thereto.

"Gilts" means the negotiable debt obligations of the United Kingdom, or negotiable debt obligations which are fully guaranteed or guaranteed as to principal and interest by the United Kingdom.

"Non-Cash Assets" means (a) Gilts and debt securities (including bank certificates of deposit) rated either AA by Standard & Poor's Ratings Group or Aa2 by Moody's Investor Services, Inc., or higher; (b) commercial paper rated A1 by Standard & Poor's Ratings Group or P1 by Moody's Investor Services, Inc., or higher and (c) such other assets (excluding Cash) as may be agreed by the parties in writing from time to time.

"Non-Cash Collateral" means Collateral comprising Non-Cash Assets.

"Obligations" means all obligations owing to the Secured Party by the Chargor under the Reinsurance Agreement, whether present or future, actual or contingent (and whether incurred by the Chargor alone or jointly, and whether as principal or surety or in some other capacity).

"Permitted Cash Collateral" means Cash Collateral not exceeding the amounts specified in Clause 6A.2.

"Permitted Collateral" means collectively Cash and Non-Cash Assets.

"Proceeds" means all principal, interest, dividends and other payments and distributions of cash or other property paid or distributed in connection with all Non-Cash Collateral and all rights privileges and other securities of every kind distributed with respect thereto or in exchange therefor. For the avoidance of doubt, Proceeds will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Collateral.

"Reinsurance Agreement" means the Reinsurance Agreement between the Secured Party and the Chargor dated the date hereof.

"Required Amount" means on any Valuation Date 98.5% of the net present value of the future Expected Annuity Cash Flows (after the payment in respect of the Expected Annuity Cash Flows to be made on that Valuation Date) (calculated as at the close of business on the day immediately preceding the Valuation Date) such amount to be determined by reference to the Valuation Agent's proprietary models and such other commercial factors as the parties have agreed to previously in accordance with Annex 4 (Models Letter) of the Reinsurance Agreement.

"Return Amount" means on any Valuation Date, the GBP amount (rounded pursuant to Clause 5.2) by which the aggregate Value (calculated as at the close of business on the day immediately preceding the Valuation Date) of the Collateral held by the Custodian on behalf of the Secured Party exceeds the then current Required Amount.

"Royal Decree No. 62" means the Belgian Royal Decree No. 62 of 10 November 1967 promoting the circulation of securities, as amended from time to time.

"Valuation Agent" means Lehman Brothers International (Europe).

"Valuation Date" means (i) the Transfer Date (as defined in the Reinsurance Agreement), (ii) the final Banking Day in each calendar month during the term of the Reinsurance Agreement and (iii) each Banking Day on which the Call Amount or the Return Amount exceeds GBP 1,000,000.

"Value" means on any date:

(i) with respect to GBP, the amount thereof and with respect to Cash comprising currencies other than GBP, the equivalent amount in GBP, determined by the Valuation Agent; Provided that Cash in excess of the Permitted Cash Collateral shall have a Value of zero;

(ii) with respect to any Gilts the bid price therefor obtained by the Valuation Agent; and

(iii) with respect to any other Permitted Collateral, the fair market value thereof (expressed in GBP) on such date as determined in any reasonable manner by the Valuation Agent having regard to standard market practice.

1.2 In this Security Agreement, any reference to (a) a "Clause" is, unless otherwise stated, a reference to a Clause hereof and (b) "this Security Agreement" is a reference to this

Security Agreement as amended, varied or supplemented from time to time. Clause headings are for ease of reference only. Terms used but not defined herein shall bear the respective meanings ascribed to them in the Reinsurance Agreement.

2. COVENANT AND CHARGE

2.1 The Chargor shall discharge each of the Obligations in the manner provided for in the Reinsurance Agreement and pay to the Secured Party when due and payable and in the manner provided for in the Reinsurance Agreement each sum owing by the Chargor to the Secured Party in respect of the Obligations.

2.2 On the date hereof, the Chargor shall transfer to the Accounts, Permitted Collateral, having an aggregate Value at least equal to the Required Amount.

2.3 The Chargor charges with full title guarantee and by way of first fixed charge all of the Collateral in the Accounts and all of its rights under the Custody Agreement (insofar as the same relate to the Collateral) in favour of the Secured Party as security for the payment and discharge of all of the Obligations.

2.4 The Chargor shall deliver a notice to the Custodian of the security interest over each of the Accounts, in the form set out in Annex 1.

2.5 The Chargor shall procure delivery of the Custodian's Agreement upon execution of this Security Agreement.

2.6 The Chargor hereby agrees that the security provided by the terms of the covenant and charge in this Security Agreement shall be a continuing security for each of its Obligations and shall not be satisfied by any intermediate payment or satisfaction of the whole or any part of the Obligations.

2.7 The Chargor hereby waives any right it may have of first requiring the Secured Party to proceed against or claim payment from any other person or enforce any guarantee or security before enforcing this Security Agreement.

2.8 Where any discharge (whether in respect of the security constituted by this Security Agreement, any other security or otherwise) is made on the faith of any payment, security or other disposition which is avoided or any amount paid pursuant to any such discharge or arrangement must be repaid on bankruptcy or liquidation (or otherwise) of the Chargor, the security constituted by this Security Agreement and the liability of the Chargor under this Security Agreement shall continue as if there had been no such discharge or arrangement.

3. DELIVERY OF ADDITIONAL COLLATERAL

3.1 If a Call Amount exists on a Valuation Date, the Secured Party may at any time, by giving written notice (a "Request for Collateral") to the Chargor and the Custodian, require the Chargor to comply with the provisions of Clause 3.2 or 3.3

3.2 If a Call Amount exists on a Valuation Date and the Chargor receives a Request for

London-2/203798/10  4

Collateral by 10am London time, the Chargor shall by 12pm London time on the Banking Day following the date of receipt of the Request for Collateral at the cost and expense of the Chargor, arrange for the delivery to the Accounts of further Permitted Collateral with a Value of not less than the Call Amount (and which, for the avoidance of doubt, will be subject to the charge in Clause 2 of this Agreement).

3.3 If a Call Amount exists on a Valuation Date and the Request for Collateral is received by the Chargor after 10am London time, the Chargor shall arrange for the delivery to the Accounts of further Permitted Collateral with a Value of not less than the Call Amount (and which, for the avoidance of doubt, will be subject to the charge in Clause 2 of this Agreement) by close of business on the second Banking Day following the date of the receipt of the Request for Collateral.

4. RETURN OF COLLATERAL

4.1 If a Return Amount exists on a Valuation Date, the Chargor may at any time, by giving written notice (a "**Request for Return**") to the Secured Party and the Custodian, require the Secured Party to comply with the provisions of Clause 4.2 or 4.3.

4.2 If a Return Amount exists on a Valuation Date, and the Secured Party receives a Request for Return, by 10 am London time, the Secured Party shall, by 12pm, London time, on the Banking Day following the date of receipt of the Request for Return, at the cost and expense of the Secured Party, arrange with the Custodian for the redelivery of a portion of the Collateral having a Value, as of the date of the redelivery, equal to the Return Amount to the Chargor, whereupon that portion of the Collateral shall be released from the security interest constituted by this Security Agreement.

4.3 If a Return Amount exists on a Valuation Date, and the Request for Return is received by the Secured Party after 10am, London time, the Secured Party shall arrange with the Custodian for the redelivery of the relevant portion of the Collateral equal to the Return Amount (rounded pursuant to Clause 5.2) by close of business on the second Banking Day following the date of receipt of the Request for Return.

4.4 When no more amounts are or may become payable by the Chargor with respect to the Obligations, the Secured Party will release the security interest under Clause 2 and procure that the Custodian shall redeliver all Collateral (together with any interest earned pursuant to Clause 8.1) to the Chargor.

4.5 Any notice given by the Chargor in accordance with Clause 4.1 shall specify:

(i) the Required Amount;

(ii) the Value of the Collateral in the Accounts as of the close of business on the day immediately preceding the relevant Valuation Date;

(iii) the Return Amount;

(iv) any other information necessary for the effective redelivery of Collateral in accordance with Clause 4.2 or 4.3; and

London-2/203798/10    5

(v)   the type of Collateral the Chargor wishes to have returned (where more than one type of Permitted Collateral has been delivered to the Accounts pursuant to this Security Agreement).

5.  ROUNDING AND MINIMUM TRANSFERS

5.1   All Call Amounts shall be rounded up to the nearest integral multiple of GBP100,000.

5.2   All Return Amounts shall be rounded down to the nearest integral multiple of GBP100,000.

5.3   The Chargor will procure that the Valuation Agent will notify each party by 9.a.m., London time on each Valuation Date of the existence of a Call Amount or a Return Amount as the case may be.

6.  EXCHANGE AND SUBSTITUTION OF COLLATERAL

6.1   The Chargor may replace all or any part of the Collateral with Permitted Collateral of equal Value provided that the Chargor shall have previously given not less than two (2) Banking Days notice to the Secured Party identifying such of the Collateral which the Chargor wishes to replace.

6.2   The Secured Party shall, at the cost and expense of the Chargor, arrange for the delivery to the Chargor of the Collateral which the Chargor wishes to replace pursuant to Clause 6.1, as soon as practicable after the Secured Party has received from the Chargor additional Permitted Collateral of at least equal Value, as of the date of delivery of such additional Permitted Collateral, as such Collateral being replaced.

6.3   (i)   In the event that any Non-Cash Assets which comprise Collateral does not have the minimum credit rating as stated in the definition of "Non-Cash Assets", the relevant Non-Cash Assets will be deemed Old Collateral and shall, subject to Clause 6.3(iv), cease to constitute or form part of the Permitted Collateral for the purposes of Clauses 2 and 3 and shall be deemed to have a Value of zero.

   (ii)   The Secured Party may, within one (1) Banking Day of the first day on which it becomes aware that any Non-Cash Assets which comprise Collateral does not have the minimum credit rating as stated in the definition of "Non-Cash Assets" notify the Chargor accordingly. Within one (1) Banking Day of such notice being given the Chargor will deliver to the Accounts Permitted Collateral (the "Replacement Collateral") so that the Value of the Collateral in the Accounts has an aggregate Value at least equal to the Required Amount.

   (iii)  Within one (1) Banking Day of the due delivery by the Chargor to the Accounts of the Replacement Collateral, the Secured Party will arrange for the redelivery of the Old Collateral.

   (iv)  Until such time as the Old Collateral has been replaced to the satisfaction of the Secured Party, by Replacement Collateral, the Old Collateral shall continue to constitute Collateral for the purposes of this Security Agreement.

6.A SPECIAL PROVISIONS FOR CASH COLLATERAL

    6.A1 The Chargor shall ensure that any Collateral comprising Cash (whether as a result of the initial transfer on the date hereof, the receipt of Proceeds or otherwise howsoever) is reinvested in other Permitted Collateral (not being Cash) by no later than close of business on the 3rd Business Day on which that Cash first becomes Collateral.

    6.A2 The Chargor shall be permitted, during the period commencing three Business Days prior to each Transfer Date, to sell Non-Cash Collateral, the Value of which may not exceed the Ultimate Net Loss to be paid on that Transfer Date in respect of the previous Quarterly Period; Provided that any such Non-Cash Collateral and such proceeds shall at all times remain subject to this charge and comprise Non-Cash Collateral and Cash Collateral, as the case may be.

7. PROCEEDS OF NON-CASH COLLATERAL

7.1 The Secured Party shall arrange for the delivery to the Chargor of any Proceeds attributable to Non-Cash Collateral to the extent that the Value of such Proceeds when added to the Value of the other Collateral, as of the most recent Valuation Date, exceed the Required Amount on such date. All Proceeds not so delivered shall form part of the Collateral.

8. INTEREST ON CASH

8.1 Interest earned on the Cash Collateral shall accrue for the benefit of the Chargor and shall form part of the Cash Collateral. Interest shall be earned at such rate or rates as shall be agreed between the Chargor and the Custodian and in accordance with the Custodian's normal practice.

9. EUROCLEAR

In respect of any Collateral to be held in Euroclear, the parties agree as follows:

(i) The Custodian is a participant in Euroclear and Euroclear itself is an affiliate of the Caisse Interprofessionnelle de Dépôts et de Virements de Titres/Interprofessionele Effectendeposito-en Girokas, being the entity organised pursuant to article 1 of the Belgian Royal Decree No. 62.

(ii) The parties note that the English law security created by this Security Agreement is similar to a Belgian law pledge (*nantissement, gage* or *pand*), and wish to perfect it accordingly under the rules of Belgian law.

(iii) The Chargor shall deliver to the Secured Party all Permitted Collateral which is to be held in Euroclear and to be charged to the Secured Party under this Security Agreement, and for this purpose the Chargor shall arrange, and as the case may be, give the necessary transfer instructions for such Permitted Collateral to be credited to the Euroclear Collateral Account.

(iv) Each of the Chargor and the Secured Party shall, and shall procure that the Custodian shall, treat the Euroclear Collateral Account as a special account

specifically opened for the purpose of holding collateral, whether or not exclusively in the context of this Security Agreement, and each undertakes that it will not, and shall procure that the Custodian will not, use the Euroclear Collateral Account for any other purposes. The Chargor shall on the date of execution of this Security Agreement provide a letter of agreement from the Custodian to the Secured Party in the form set out in Annex 2 (Part A), (a) stating that the Euroclear Collateral Account will be treated as a special account specifically opened for the purpose of holding collateral and that it shall not use such account for any other purpose and (b) consenting to hold the Euroclear Collateral subject to the fixed charge in favour of the Secured Party constituted by this Security Agreement.

(v) The parties agree that the Euroclear Collateral shall be subject to the fungibility regime organised by Royal Decree No. 62.

(vi) The Chargor acknowledges that any monies standing from time to time to the credit of the Euroclear cash account associated with the Euroclear Collateral Account, whether such monies proceed from the sale or repayment of Collateral or otherwise, represent a claim against Euroclear which is exclusively owed to the Custodian and that the Chargor has no right whatsoever against Euroclear in respect of such monies or claim. Should, however, the Chargor have any such right pursuant to mandatory provisions of Belgian law or otherwise, then the parties hereby confirm for the avoidance of doubt that such right shall be part of the Collateral. For the avoidance of doubt, the parties confirm that the rights of the Chargor against the Custodian in connection with such monies are subjecet to the security created by this Security Agreement.

(vii) The Chargor represents and warrants that the Euroclear Collateral will be comprised exclusively of securities which are admitted to listing on a stock exchange or are dealt in on another regulated market which operates regularly and is recognised and open to the public, and of debt instruments which are transferable, liquid and have a value which can be accurately determined at any time or at least twice a month, in Belgium or abroad. Without prejudice to any other rights of the Secured Party under English law or hereunder, the Chargor acknowledges the right of the Secured Party to enforce the security created by this Security Agreement over the Euroclear Collateral (in the form of securities) in accordance with the procedure set out in article 5, §2 of the Royal Decree No. 62, i.e. pursuant to the rules of Belgian law and without the need of a prior authorisation from the Belgian courts. The Chargor waives any right to object to, or claim damages by reason of, any enforcement made in accordance with such procedure on the grounds that all or part of the Collateral would not actually, or would no longer at the time of enforcement, meet the requirements described in the first sentence of this paragraph.

10. POWER OF SALE

10.1 If at any time an Event of Default has occurred under Article 6 of the Reinsurance Agreement and is continuing the Secured Party shall be entitled, without prior notice to the Chargor or prior authorisation from any court, to sell or otherwise dispose of in any manner permitted by law, all or any part of the Collateral. The Secured Party shall be entitled to apply the proceeds of that sale or other disposal in paying the costs of that sale or disposal and in or towards the discharge of the Obligations. The Secured Party shall be entitled to treat any Cash Collateral as if it were the proceeds of such sale or other disposal.

10.2 The power of sale or other disposal in Clause 10.1 shall operate as a variation and extension of the statutory power of sale under Section 101 of the Law of Property Act 1925 and the Secured Party may exercise any power available to it by virtue of this Security Agreement or available to a secured creditor. The restrictions contained in Sections 93 and 103 of the Law of Property Act 1925 shall not apply to this Security Agreement or to any exercise by the Secured Party of its right to consolidate mortgages or its power of sale.

10.3 In favour of a purchaser of all or any part of the Collateral, a certificate in writing by an officer, attorney or agent of the Secured Party that any power of sale or other disposal has arisen and is exercisable shall be conclusive evidence of that fact and no purchaser shall be concerned to enquire whether any power exercised or purported to be exercised by the Secured Party has become exercisable or whether any Obligation remains due.

11. APPLICATION OF CASH COLLATERAL

In respect of Collateral in the form of Cash, the Secured Party may at any time after an Event of Default with respect to the Chargor has occurred under Article 6 of the Reinsurance Agreement and is continuing, without prior notice to the Chargor, apply or appropriate the Collateral in or towards the payment or discharge of any amounts payable by the Chargor with respect to any Obligation in such order as the Secured Party sees fit; or set off all or any part of any amount payable by the Chargor with respect to any Obligation against any obligation of the Secured Party to repay any amount to the Chargor in respect of the Permitted Collateral; and for these purposes the Secured Party shall be entitled to make any currency conversions or effect any transaction in currencies which it thinks fit and to do so at such times and rates as it thinks proper.

12. FURTHER ASSURANCE

On demand by the Secured Party, the Chargor shall promptly upon notice from the Secured Party execute all documents and do all things (including the delivery, transfer, assignment or payment of all or part of the Collateral to the Custodian on behalf of the Secured Party) that the Secured Party may reasonably specify for the purpose of (a) exercising the Collateral Rights when the relevant Collateral Rights become exercisable or (b) securing and perfecting its security over or title to all or any part of the Collateral or (c) enabling the Secured Party to vest all or part of the Collateral in its name or in the name(s) of its nominee(s), agent or any purchaser when the Collateral Rights become exercisable.

13. POWER OF ATTORNEY

The Chargor, by way of security, irrevocably appoints the Secured Party as its attorney and in its name, on its behalf and as its act and deed to execute, deliver and perfect all documents and do all things in the name of the Chargor or the Secured Party (as the attorney may decide) that the Secured Party may consider to be requisite for (a) carrying out any obligation imposed on the Chargor under this Security Agreement or (b) exercising any of the Collateral Rights. The Chargor shall ratify and confirm all things done and all documents executed by the Secured Party in the exercise of that power of attorney.

14. RECEIVER

14.1 If at any time, an Event of Default has occurred under Article 6 of the Reinsurance Agreement and is continuing, the Secured Party may by writing (acting through an authorised officer of the Secured Party) without notice to the Chargor appoint one or more persons to be receiver of the whole or any part of the Collateral (each such person being (a) entitled to act individually as well as jointly and (b) for all purposes deemed to be the agent of the Chargor).

14.2 In addition to the powers of the Secured Party conferred by Clause 13, each person appointed pursuant to Clause 14.1 shall have, in relation to the part of the Collateral in respect of which he was appointed, all the powers (as varied and extended by the provisions hereof) conferred by the Insolvency Act 1986 and the Law of Property Act 1925 on mortgagors and mortgagees in possession, administrators, receivers and administrative receivers appointed under those Acts (whether or not such person is such).

15. EFFECTIVENESS OF COLLATERAL

15.1 The collateral constituted by this Security Agreement and the Collateral Rights shall be cumulative, in addition to and independent of every other security which the Secured Party may at any time hold for the Obligations or any rights, powers and remedies provided by law. No prior security held by the Secured Party over the whole or any part of the Collateral shall merge into the collateral hereby constituted.

15.2 This Security Agreement shall remain in full force and effect as a continuing arrangement unless and until the Secured Party discharges it.

15.3 No failure on the part of the Secured Party to exercise, or delay on its part in exercising, any Collateral Right shall operate as a waiver thereof, nor shall any single or partial exercise of a Collateral Right preclude any further or other exercise of that or any other Collateral Right. The obligations of the Chargor under this Security Agreement shall not be affected by any act, omission or circumstance which, but for this provision, might operate to release or otherwise exonerate the Chargor from its obligations hereunder.

15.4 If, at any time, any provision of this Security Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Security Agreement nor of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

15.5 In relation to any share in a company which is for the time being part of the Collateral, the rights attached to such share shall be exercisable by the Secured Party only for the purpose of preserving the value of such share or of realising it, and unless there is an Event of Default with respect to the Chargor, shall be exercisable only in accordance with the Chargor's instructions or otherwise in its interests.

15.6 The Chargor acknowledges that any securities held through, by or in Euroclear or any successor or any other clearance system are held on a fungible basis.

16. SUBSEQUENT INTERESTS AND ACCOUNTS

16.1 If the Secured Party at any time receives notice of any subsequent mortgage, assignment, charge or other interest affecting all or any part of the Collateral, all payments which would otherwise have been made by the Chargor to an Account shall thereafter be treated as having been credited to a new account of the Chargor and not as having been applied in reduction of the Obligations as at the time when the Secured Party received notice.

16.2 All monies received, recovered or realised by the Secured Party under this Security Agreement (including the proceeds of any conversion of currency) may in its discretion be credited to and held in any suspense or impersonal account pending their application from time to time in or towards the discharge of any of the Obligations.

17 REPRESENTATIONS AND WARRANTIES RELATING TO THE CHARGOR

The Chargor represents and warrants to the Secured Party that:

17.1 the Collateral is beneficially owned by the Chargor free from any mortgage, charge, pledge, lien, option, restriction, right of first refusal, right of pre-emption, third-party right or interest, other encumbrance or security interest of any kind, or another type of preferential arrangement having similar effect ("Encumbrance") other than the security interest granted under Clause 2;

17.2 it has the power to grant a security interest in any Collateral it transfers to the Secured Party under this Security Agreement and all the necessary corporate authority has been obtained and action taken for the Chargor to grant a security interest in any Collateral it transfers to the Secured Party under this Security Agreement and execute and deliver and perform the covenants and obligations contained in this Security Agreement;

17.3 upon the transfer of any Collateral by the Chargor to the Secured Party, the Secured Party shall have a valid security interest in such Collateral; and

London-2/203798/10       11

17.4  the performance by the Chargor of any of its obligations contained in this Security Agreement will not result in the creation of any Encumbrance on any Collateral transferred to the Secured Party other than the security interest created under this Security Agreement.

17.5  it is not unable to pay its debts within the meaning of section 123 of the Insolvency Act 1986 or otherwise, and that it has not and will not become unable to pay its debts within the meaning of that section in consequence of its entering into, or doing any act or thing contemplated or permitted or required to be done by it under this Security Agreement and the assets of the Chargor are now and will remain immediately after the date hereof greater than its liabilities (taking into account the actuarial value of its contingent and prospective liabilities) for the purposes of Section 123(2) and 241 of the Insolvency Act 1986.

17.A  NEGATIVE PLEDGE

The Chargor covenants that it will not during the subsistence of this Security Agreement, except with the prior written consent of the Secured Party:

(i) create, grant or permit to exist any Encumbrance, as defined in Clause 17.1, other than the charge hereby created, on or over all or any part of the Collateral or any interest therein; or

(ii) except to the extent permitted by Clauses 6, and 6A, sell, transfer, lend, assign or otherwise deal with all or any part of the Collateral or any interest therein.

18.  COSTS AND EXPENSES

All the Secured Party's costs and expenses (including legal fees and any value added tax) incurred in connection with (a) the perfection or enforcement of the collateral hereby constituted or (b) the exercise of any Collateral Right, shall be reimbursed to the Secured Party by the Chargor on demand on a full indemnity basis together with interest from the date the same were incurred to the date of payment at overnight LIBOR plus 1% per annum.

19.  THE TRANSFERRED COLLATERAL

19.1  All calls or other payments which may become due in respect of the Collateral transferred to the Secured Party shall be paid by the Chargor, and any failure on the part of the Chargor to make such payment will result in the Secured Party having the right to elect to make such payment on behalf of the Chargor and demand immediate repayment by the Chargor of such payment to itself (and such payment shall be so repayable by the Chargor).

19.2  At any time after the occurrence of an Event of Default and without any further consent or authority on the part of the Chargor, the Secured Party may exercise, at its discretion (in the name of the Chargor or otherwise) in respect of any of the Collateral transferred to it, any voting rights and any powers or rights which may be exercised by the person or persons in whose name or names such Collateral is registered or who is the bearer or holder of them.

19.3 The Secured Party shall have no liability to perform or fulfil any obligation of the Chargor in respect of the Collateral transferred to the Secured Party.

20. CURRENCY CONVERSION

For the purpose of or pending the discharge of any of the Obligations the Secured Party may convert any money received, recovered or realised or subject to application by it under this Security Agreement from one currency to another, as the Secured Party may think fit: and any such conversion shall be effected at the Valuation Agent's spot rate of exchange for the time being for obtaining such other currency with the first currency.

21. NOTICES

Any notice or demand to be served by one person on another pursuant to this Security Agreement may be served by leaving it at the address specified above (or such other address as such person may previously have specified in writing) or by letter posted by prepaid first-class post to such address (which shall be deemed to have been served on the [tenth] day following the date of posting), or by fax to the fax number specified above (or such other number as such person may previously have specified) (which shall be deemed to have been received when transmission has been completed).

22. SUCCESSORS

This Security Agreement shall remain in effect despite any amalgamation or merger (however effected) relating to the Secured Party; and references to the Secured Party shall be deemed to include any assignee or successor in title of the Secured Party and any person who, under the laws of its jurisdiction of incorporation or domicile, has assumed the rights and obligations of the Secured Party hereunder or to which under such laws the same have been transferred.

23. CLIENT MONEY RULES

Each party agrees as follows:

23.1 that the Secured Party is not treating the Chargor as a client as defined in the Financial Services (Client Money) Regulations 1991 (the "**Rules**");

23.2 that money transferred to the Secured Party pursuant to this Security Agreement will not be subject to the protections conferred by the Rules to which the Secured Party is subject.

24. VALUATION AGENT

24.1 The Chargor shall procure that all calculations carried out by the Valuation Agent shall be determined in a commercially reasonable manner.

25. LAW AND JURISDICTION

This Security Agreement shall be governed by English law and, for the Secured Party's

benefit, the English courts shall have exclusive jurisdiction to settle any dispute which may arise from or in connection with it.

26. AMENDMENTS

No amendment, modification or waiver in respect of this Security Agreement will be effective unless in writing (including writing evidenced by facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

27. COUNTERPARTS

This Agreement may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

IN WITNESS WHEREOF this Security Agreement has been signed on behalf of the Secured Party and executed as a deed by the Chargor and is intended to be and is hereby delivered by it as a deed on the date specified above.

The Secured Party
BRITANNIA LIFE LIMITED

By: _____

Name: WG Henderson

Title: Finance Director

Department/officer for receipt of Notices:


EXECUTED as a DEED
by LEHMAN RE LTD.

_____ Director

_____ Director

## ANNEX 1
## NOTICE TO CUSTODIAN

To:   Lehman Brothers International (Europe)

Copy to: Britannia Life Limited

We refer to the Security Agreement (the "Security Agreement") dated [          ] entered into by us in favour of Britannia Life Limited of Britannia Court, 50 Bothwell Street, Glasgow G2 6HR, a copy of which is annexed to this notice. Terms defined in the Security Agreement shall have the same meanings in this notice.

Notice is hereby given by us to you that, by and pursuant to the Security Agreement, we have charged in favour of the Secured Party all of the Collateral.

We hereby instruct that you shall accept instructions from Britannia Life Limited in relation to the Collateral to Britannia Life in accordance with the provisions of the Security Agreement.

Yours faithfully

..................................

For and on behalf of
Lehman Re Ltd.
Date ..........................

Acknowledged by Lehman Brothers International (Europe)

..................................
Date ..........................

ANNEX 2
FORM OF CUSTODIAN'S ACKNOWLEDGEMENT

[on the letterhead of Lehman Brothers International (Europe)]

BRITANNIA LIFE LIMITED  [date]
Britannia Court
50 Bothwell Street
Glasgow G2 6HR


Gentlemen,

**Euroclear account No. 97558**

We acknowledge receipt of a security agreement dated _____ 1999 between Lehman Re Ltd. as Chargor and yourselves as Secured Party (the "Security Agreement"). Terms defined in the Security Agreement shall have the same meaning in this letter.

We hereby confirm that the above mentioned account is opened in our name in Euroclear. We agree to treat such account as a special account specifically opened for the purpose of holding collateral, whether or not exclusively for your account and/or in the context of the transactions on the occasion of which this letter is issued, and we undertake that we will not knowingly use such account for any other purposes.

We confirm that all Permitted Collateral delivered to us and which is to be held in Euroclear shall be transferred to and held in the Euroclear Collateral Account.

We agree that the Euroclear Collateral is and shall be subject to the fungibility regime organised by the Royal Decree No. 62. We acknowledge that the Euroclear Collateral is to be held in the Euroclear Collateral Account subject to the fixed charge in your favour constituted by the Security Agreement, and agree to hold the Euroclear Collateral in charge for your benefit.

We agree that we shall accept instructions from Britannia Life Limited in relation to the Euroclear Collateral to Britannia Life in accordance with the provisions of the Security Agreement.

Yours faithfully,

*[signature]*

Lehman Re Ltd.

Accepted and agreed

*[signature]*

**Britannia Life Limited**

Date: 22-d March 99.

Year 2

We know that the value of a two year bond with an interest rate $S_2$ will have a price of par.

$$S_2 * (D_1 + D_2) + 100\% * D_2 = 100\%$$

$$100\% - S_2 * D_1 = S_2 * D_2 + 100\% * D_2$$

$$D_2 = \frac{100\% - S_2 * D_1}{100\% + S_2}$$

Year n

We know that the value of an $n$ year bond with an interest rate $S_n$ will have a price of par.

$$S_n * (D_1 + D_2 + .... + D_n) + 100\% * D_n = 100\%$$

$$100\% - S_n * (D_1 + D_2 + .... + D_{n-1}) = S_n * D_n + 100\% * D_n$$

$$D_n = \frac{100\% - S_n * (D_1 + D_2 + .... + D_{n-1})}{100\% + S_n}$$

In the event that the Reinsurance Agreement is terminated pursuant to the terms of Article 8 thereof, the Valuation Agent shall calculate the discount factors by obtaining bid quotations from three leading dealers in the GBP swaps market. The highest and the lowest quotations will be discarded and the remaining quotation will be used.

**Mortality Basis**

The mutually agreed mortality basis used in the calculation of the net present value of the then future expected annuity cash flows in Article 8 of the Reinsurance Agreement, will be determined by reference to the mortality tables published from time to time by the Continuous Mortality Investigations Bureau and the mortality experience of the Covered Policies.

If the parties fail to agree a mortality basis then such Dispute shall be a "Model Dispute" and shall be finally resolved by arbitration in accordance with the terms of Article 15 of the Reinsurance Agreement.

This letter will be governed by and construed in accordance with English law.

Yours faithfully,