# Exhibit 5

Execution Version

# CUSTODY AGREEMENT

## FOR LEHMAN BROTHERS INTERNATIONAL (EUROPE)

and

## LEHMAN RE LTD.

08-13555-mg Doc 53350-5 Filed 07/15/16 Entered 07/15/16 15:30:28 Exhibit 5
Pg 58 of 117

# TABLE OF CONTENTS

| SECTION | | PAGE |
|---|---|---|
| | PREAMBLE | 1 |
| 1. | DEFINITIONS | 1 |
| 2. | APPOINTMENT OF CUSTODIAN | 3 |
| 3. | PROPERTY ACCEPTED | 3 |
| 4. | REPRESENTATIONS AND WARRANTIES | 3 |
| 5. | IDENTIFICATION AND SEGREGATION OF ASSETS | 4 |
| 6. | PERFORMANCE BY THE CUSTODIAN | 4 |
| | (a) Transactions not requiring Instructions | 4 |
| | (b) Transactions requiring Instructions | 5 |
| 7. | REGISTRATION | 6 |
| 8. | CUSTODY ACCOUNT PROCEDURES | 6 |
| 9. | WITHDRAWAL AND DELIVERY | 6 |
| 10. | USE OF AGENTS, CLEARANCE SYSTEMS, AND DEPOSITORIES | 7 |
| 11. | SCOPE OF RESPONSIBILITY | 7 |
| 12. | INDEMNITY | 9 |
| 13. | FEES AND EXPENSES | 9 |
| 14. | TERMINATION | 9 |
| 15. | ASSIGNMENT | 10 |
| 16. | DISCLOSURE | 10 |
| 17. | NOTICES | 10 |
| 18. | GOVERNING LAW | 10 |
| | SIGNATURES | 10 |
| 19. | ANNEX 1 - Form of Notice to Custodian | 11 |
| 20. | ANNEX 2 - Form of Custodian's Acknowledgement | 12 |

## CUSTODY AGREEMENT

THIS CUSTODY AGREEMENT is made as of ⎵⎵19⎵⎵ March 1999 by and among Lehman Brothers International (Europe) ("**Lehman**") acting through its office at Genferstrasse 24, 8027 Zurich, Switzerland and Lehman Re Ltd. (the "**Client**") having its office or principal place of business at The Exchange Building, 2nd Floor, 46 Reid Street, Hamilton, HM DX, Bermuda.

WITNESSETH

THAT WHEREAS, the Client wishes to open and maintain a custody account or accounts with Lehman to hold certain assets in accordance with this Custody Agreement and on such other terms and conditions as may be referred to in the Schedules attached hereto (if any) or as otherwise may be incorporated herein and amended from time to time upon prior written notice to the Client. Lehman is hereafter referred to as, the "**Custodian**".

WHEREAS, the Client wishes to establish such custody account or accounts under the terms and conditions of this Custody Agreement and the Schedules attached hereto, if any (this Custody Agreement and such Schedules as both may be amended from time to time, collectively, the "**Agreement**" or "**Custody Agreement**");

NOW, THEREFORE, in consideration of the premises and of the agreements hereinafter set forth, the parties agree as follows:

1. **DEFINITIONS**

"**Authorised Person(s)**" means (i) any officers, employees or agents of the Client as have been authorised by notice in writing to the Custodian to act on its behalf in the performance of any acts or duties under this Agreement, or (ii) any other person, firm or company holding a duly executed Power-of-Attorney from the Client which is in a form acceptable to the Custodian or (iii) Britannia Life Limited in accordance with the provisions of a Security Agreement between Britannia Life Limited and the Client.

"**CGO**" means the Central Gilts Office; the computer based system managed by the Bank of England to facilitate the book-entry transfer of gilt-edged securities.

"**Clearance System**" means Euroclear or the CGO;

"**Client Money Rules**" means the Financial Services (Client Money) Regulations 1991;

"**Instructions**" means instructions from any Authorised Person received by the Custodian, either orally or via telephone, telex (whether tested or untested), facsimile transmission, bank wire or other teleprocess or electronic instruction system acceptable to the Custodian which have been transmitted with proper testing or authentication on such terms and conditions as the Custodian may specify provided that:

(a) Instructions shall continue in full force and effect until cancelled or superseded;

(b) if any Instructions are unclear and/or ambiguous, the Custodian may without any liability on its part, act upon what it reasonably believes in good faith such Instructions to be or refuse to execute such Instructions until any ambiguity or conflict has been resolved to its satisfaction;

(c) Instructions shall be provided and carried out subject to the operating procedures, marketing practices, rules and regulations of any relevant stock exchange, Clearance System, depository or market where they are to be executed, and can be acted upon by the Custodian only during banking hours and on banking days when the applicable financial markets are open for business. All such Instructions shall be carried out subject to the local laws, regulations, customs, procedures and practices applicable at the place of performance of such Instructions or to which the Custodian is otherwise subject and shall be governed by and construed in accordance with the local law applicable at such place of performance; and

(d) Instructions are to be given in the English language and the Custodian shall be entitled to rely upon the continued authority of any Authorised Person to give the same until the Custodian receives notice from the Client to the contrary. The Custodian shall be entitled to rely upon any Instructions received in the manner prescribed it believes in good faith to have been given by any Authorised Person.

"**Lehman Organisation**" means, any entity controlled, directly or indirectly, by the Custodian, any entity that controls, directly or indirectly, the Custodian or any entity directly or indirectly under common control with the Custodian. For this purpose, "control" means ownership of a majority of the voting power of the Custodian.

"**Person**" means any person, firm, company, corporation, government, state or agency thereof or any association or partnership (whether or not having separate legal personality) or two or more of the foregoing;

"**Property**" means as the context requires, any Securities, Cash or any other property held by the Custodian under the terms of this Agreement.

"**Securities**" means bonds, debentures, notes, stocks, shares, units or other securities and all rights or property which may at any time accrue or be offered (whether by way of bonus, redemption, preference, option or otherwise) in respect of any of the foregoing or evidencing or representing any other rights or interests therein (including, without limitation, any of the foregoing not constituted, evidenced or represented by a certificate or other document but by an entry in the books or other permanent records of the issuer, a trustee or other fiduciary thereof or a Clearance System).

2. APPOINTMENT OF CUSTODIAN

The Client hereby authorises the Custodian to establish on the terms of this Agreement a custody account or accounts (the "**Custody Account**") in the name of the Client and in the capacity as Custodian, for the deposit of any Securities, and other Property (apart from Cash) from time to time received by the Custodian for the account of the Client, and a deposit account or accounts (the "**Client Deposit Account**") in the name of the Custodian which will be an account subject to the Client Money Rules and designated

as a client account, for the deposit of funds which are already from time to time received by the Custodian for the account of the Client, whether by way of deposit or arising out of or in connection with any Securities, or other property in the Custody Account.

3. PROPERTY ACCEPTED

(a) The Custodian agrees to accept for custody in the Custody Account at its discretion and subject to the conditions set forth herein:

  (i) Securities; and/or
  (ii) any other form of property (apart from Cash) acceptable to the Custodian and capable of deposit under the terms of this Agreement.

(b) The Custodian agrees to accept for custody in the Client Deposit Account at its discretion and subject to the conditions set forth herein Cash:

"Cash" means Great British Pounds (or any successor currency) ("GBP") and such other currency or currencies acceptable to the Custodian and capable of deposit under the terms of this Agreement.

4. REPRESENTATIONS AND WARRANTIES

The Client hereby represents and warrants to Custodian that:

(a) during the term of this Agreement it (and any Person on whose behalf it may act as agent or otherwise in a representative capacity) has and will continue to have full capacity and authority to enter into this Agreement and to carry out all the transactions contemplated herein, and has taken and will continue to take all action (including, without limitation, the obtaining of all necessary governmental consents in any applicable jurisdiction) and customer consents (where applicable) to authorise the execution, delivery and performance of this Agreement; and

(b) if a company or other corporate body, the resolutions of its Board of Directors or other managing body authorising the execution, delivery and performance of this Agreement have been obtained and that these remain and will continue to remain in full force and effect as of the date hereof and during the term of this Agreement without revocation or amendment.

The Custodian hereby represents and warrants to the Client that it is duly authorised to act as Custodian and that it will comply with all applicable laws and regulations, including Swiss regulations.

5. IDENTIFICATION AND SEGREGATION OF ASSETS

(a) With respect to Property in the Custody Account except as otherwise provided in this Agreement, the Custodian will separately identify on its records all Property held on behalf of the Client by the Custodian.

(b) With respect to Property in the Custody Account or the Client Deposit Account, the Custodian will supply to the Client from time to time as mutually agreed upon, a statement with respect to all of the Property in the Custody Account

and the Client Deposit Account (such statement may be provided in the form of a printed statement or as electronically transmitted information). In the event that the Client does not inform the Custodian in writing of any exceptions or objections within 30 days after the date of such statement, the Client shall be deemed to have approved such statement.

(c) With respect to Cash in the Client Deposit Account, this shall be held by the Custodian in accordance with the Client Money Rules and will only be held in client bank accounts with banks from which the Custodian has previously received written acknowledgement:

(i) that all money standing to the credit of the account is held by the Custodian as trustee and that the bank is not entitled to combine the account with any other account or to exercise any right of set-off or counterclaim against money in that account in respect of any sum owed to it on any other account of the Custodian;

(ii) that interest earned on the account shall be credited to the account, or to an account of that type, and

(iii) that, in accordance with regulation 2.07.3 of the Client Money Rules; the title of the account sufficiently distinguishes the account from any account containing money that belongs to the Custodian, and is in the form requested by the Custodian.

6. PERFORMANCE BY THE CUSTODIAN

(a) Transactions not requiring Instructions

The Custodian is authorised by the Client to carry out the following transactions relating to the Property:

(i) to sign any affidavits, certificates of owner... or other certificates relating to the Property which may be ... regulations made by any tax authority c. authority in any relevant jurisdiction, whether ... otherwise, and whether relating to ownership, income tax or capital gains, or any other tax, duty or levy (and the Client further agrees to ratify and to confirm or to do such things as may be necessary to complete or evidence the Custodian's actions under this Section 6(a)(i) or otherwise under the terms of this Agreement);

(ii) (aa) to collect and receive, for the account of the Client, all income and other payments and distributions in respect of the Property, and (in the absence of contrary Instructions) credit the same to the Client Deposit Account;

(bb) to take any action necessary and proper in connection with the receipt of income and other payments and distributions as are referred to in Section 6(a)(ii)(aa) above, including (without limitation) the presentation of coupons and other interest items;

(iii) (aa) to receive and hold for the account of the Client any capital arising out of or in connection with the Property whether as a result of its being called or redeemed or otherwise becoming payable (other than at the option of the holder thereof) and (in the absence of contrary Instructions) credit the same to Client Deposit Account;

(bb) to take action necessary and proper in connection with the receipt of any capital as is referred to in Section 6(a)(iii)(aa) above, including (without limitation) the presentation for payment of any property which becomes payable as a result of its being called or redeemed or otherwise becoming payable (other than at the option of the holder thereof) and the endorsement for collection of cheques, drafts and other negotiable instruments;

(iv) to receive and hold for the account of the Client all Securities received by the Custodian as a result of a stock dividend, share subdivision or reorganisation, capitalisation of reserves or otherwise;

(v) to exchange interim or temporary receipts for definitive certificates, and old or overstamped certificates for new certificates;

(vi) to make cash disbursements for any expenses incurred in handling the Property and for similar items in connection with the Custodian's duties under this Agreement, and, (in the absence of contrary Instructions) debit the same to a designated fee account of the Client with the Custodian and;

(vii) to deliver to the Client transaction advices and/or regular statements of account (such statements may be provided in printed form or as an electronic transmission) showing the Property held at such intervals as may be agreed between the parties hereto and to notify the Client of all notices, reports and other financial information relating to the Property when received by the Custodian, and to seek Instructions as to any action to be taken in connection therewith.

(b) <u>Transaction requiring Instructions</u>

The Custodian is authorised by the Client to carry out the following transactions relating to the Property upon receipt of specific Instructions:

(i) to deliver Property sold by the Client against payment or as may be specified by the Client in its Instructions;

(ii) to make payment for and to receive Property purchased by the Client, such payment to be made by the Custodian in accordance with the prevailing rules, operating procedures or market practice on any relevant stock exchange, Clearance System, depository or

market, where or through which such payment is to be made, or as may be specified by the Client in its Instructions;

(iii) to deal with bonus or script issues, warrants and other similar interest offered or received by the Custodian (or its nominee company or other agents) or to handle proxy forms, only as may be specified by the Client in its instructions;

(iv) to exercise any voting rights attached to Securities and to forward proxy forms signed in blank by the Custodian (or its nominee company or other agent) or to destroy proxy forms, only as may be specified by the Client in its Instructions; and

(v) excepts as otherwise provided herein, to deliver or dispose of the Property only as may be specified by the Client in its Instructions.

(c) the Custodian agrees that its obligations hereunder are subject to (i) the instruction given to it by the Client contained in Annex 1 of a Security Agreement between the Client and Britannia Life Limited and (ii) an acknowledgement it has given to Britannia Life Limited contained in Annex 2 of said Security Agreement, copies of which are attached.

## 7. REGISTRATION

The Client agrees and understands that except as may be specified by the Client in its Instructions, Property shall be registered as the Custodian may direct either in the name of the Custodian or its nominee company or its agent in the jurisdiction where the Property is required to be registered or otherwise held.

## 8. CUSTODY ACCOUNT PROCEDURES

Unless otherwise agreed to by the Custodian and the Client (and subject to Section 6(c) above), the Custodian shall, or shall instruct any other entity authorised to hold Property in accordance with Section 10 hereof, to receive or deliver Securities and credit or debit the Custody Account in accordance with proper Instructions. The proceeds from the sale or exchange of Property and Property purchased or acquired will be credited to the Custody Account on the date the proceeds of such Property are actually received by the Custodian.

## 9. WITHDRAWAL AND DELIVERY

The Client may at any time hereof subject to Clause 6(c) above, demand withdrawal of all or any part of the Property in the Custody Account and/or the Client Deposit Account. Payments of Cash shall be made at the expense of the Client by banker's draft, telegraphic transfer, cheque or otherwise as may be agreed by the Custodian. Delivery of any Property other than Cash will be made without undue delay at such locations as the parties hereto may agree at the expense of the Client. Where necessary, the Custodian will on withdrawal transfer any Property into the name of the Client or as it may direct at the expense of the Client. The Custodian shall have no obligation to deliver the Property of the Client where the Custodian believes that there may be insufficient Property in the Custody Account and the Client Deposit Account to cover any exposure that the Custodian has to the Client.

10  USE OF AGENTS, CLEARANCE SYSTEMS, AND DEPOSITORIES

The Client agrees and understand that:

(a) the Custodian is authorised, subject to applicable laws, rules and regulations, to appoint agents (including any member of the Lehman Organisation), whether in its own name or that of the Client, to perform any of the duties of the Custodian under this Agreement; provided that any agent so appointed other than Euroclear or the CGO shall only be appointed with the prior written consent of Britannia Life Limited (which is party to the Security Agreement of even date herewith between Britannia Life Limited and the Client). The Custodian may delegate to any agent so appointed any of its functions under this Agreement, including (without limitation) the collection of all payments due on the Property and whether of an income or a capital nature;

(b) if the Custodian appoints any agent pursuant to Section 10(a) above, it shall be entitled to pay all normal remuneration to such agent for the account of the Client;

(c) the Custodian is entitled to deposit any Property at its discretion in any Clearance System, or any other clearance system reasonably deemed appropriate by the Custodian on the condition that Britannia Life Limited's prior written consent has been obtained in accordance with Section 10(a) above, and any Property so held shall be subject to the rules and operating procedures of such Clearance System (or such other clearing system, as the case may be,) and any applicable laws and regulations whether of a governmental authority or otherwise.

11. SCOPE OF RESPONSIBILITY

The Client agrees and understands that:

(a) subject to the terms hereof, the Custodian shall use all reasonable care in the performance of its duties under this Agreement but shall not be responsible for any loss or damages suffered by the Client as a result of the Custodian performing such duties unless the same results from acts of negligence, fraud or wilful default on the part of the Custodian or its employees in which event the liability of the Custodian in connection with any Property shall not exceed the market value of such Property at the time of such negligence, fraud or wilful default as aforesaid together with reasonable legal costs incurred in such a recovery;

(b) unless otherwise expressly agreed, the Custodian need not maintain any insurance on Property held under the terms of this Agreement;

(c) upon receipt of each and every transaction advice and/or statement of account supplied to it by the Custodian pursuant to Section 6(a)(vii) hereof, the Client shall examine the same and notify the Custodian within thirty (30) days of the date of any such advice or statement of any discrepancy between Instructions given and the situation shown therein and/or of any other errors therein. In the absence of any notification by the Client, the Custodian shall not (in the absence of negligence or wilful default on its own part) be liable for the consequences of any discrepancy or error which was made or existed during the period covered by the

statement or the transaction indicated by the advice <u>provided however</u> that the Custodian shall not be liable for any such consequences during the period prior to the receipt of any such notification;

(d) the Custodian or its nominee company or agents, as the case may be, after notification to the Client and receipt from the Client of its consent, may (but without being under any duty or obligation) institute or defend legal proceedings, or take or defend any other action arising out of or in connection with the Property provided that the Client indemnifies the Custodian against any reasonable costs, charges and expenses arising from such proceedings or other action and makes available to the Custodian such security in respect of such reasonable costs, charges and expenses as the Custodian in its absolute discretion deems necessary. The Custodian shall not be entitled to the indemnification above if such legal proceeding or action is the result of its negligence or wilful default.

(e) (i) the Custodian does not have any responsibility if for any reason or cause beyond its control, including (without limitation) nationalisation, expropriation, currency restrictions, acts of war, terrorism, insurrection, revolution, nuclear fusion, fission or acts of God, the operation of the Custody Account and/or Client Deposit Account and/or the Custodian's ability to carry out Instructions or account to the Client is restricted removed or subject to delay in any way;

(ii) all collections of the Property and or any funds or other property paid or distributed in respect of the Property are made at the risk of the Client, provided that the Custodian has not acted in a negligent manner or in bad faith;

(iii) the Custodian shall not be liable for any loss resulting from or caused by, the carrying out of any Instructions of the Client;

(f) the Client shall be responsible for all filings, tax returns and reports on any transactions undertaken pursuant to this Agreement which must be made to any relevant authority whether governmental or otherwise and for the payment of all unpaid calls, taxes (including without limitation any value added tax), imports, levies or duties due on any principal or interest, or any other liability or payment arising out of or in connection with the Property, and in so far as the Custodian is under any obligation (whether of a governmental nature or otherwise) to pay the same on behalf of the Client it may do so out of any monies or assets held by the Custodian pursuant to the terms of this Agreement;

(g) the Custodian is not acting under this Agreement as investment manager or investment adviser to the Client and the Custodian's duty is solely to keep safe custody of the Property (with responsibility for the selection, acquisition and disposal of the Property remaining with the Client at all times) and;

(h) the Custodian may rely in the performance of its duties under this Agreement and without liability on its part, upon any Instructions believed by it in good faith to be genuine and given by an Authorised Person.

12. INDEMNITY

The Client agrees to indemnify the Custodian and each of the Custodian's nominees or other agents and to hold the Custodian and such nominees or agents harmless, against all reasonable costs, liabilities and expenses including (without limitation) any reasonable legal fees and disbursements, arising directly or indirectly:

(a) from the fact that the Property is registered in the name of or held by the Custodian or any such nominees or agents;

(b) without limiting the generality of Section 12(a) above, from any act or thing including without limitation any overdraft or other financial accommodation which arises on the records of the Custodian (whether on an advised or unadvised basis), which the Custodian or such nominee or agent allows, takes or does or omits to allow, take or do in relation to the Property under or pursuant to the terms of this Agreement or as a consequence of the carrying out of any Instructions; or

(c) from the Custodian or any such nominee or agent carrying out any Instructions believed by it in good faith to have been given by an Authorised Person.

PROVIDED THAT neither the Custodian, its nominees nor agent shall be indemnified against any liability arising out of the Custodian's or such nominee's or agent's own wilful misfeasance, bad faith, negligence or reckless disregard of its duties under this Agreement.

13. FEES AND EXPENSES

Without prejudice to any of its liabilities and obligations under this Agreement, the Client agrees to pay to the Custodian from time to time such fees/commissions for its services pursuant to this Agreement as may be notified by the Custodian to the Client from time to time and the Custodian's out-of-pocket or incidental expenses including (but without limitation) all those items referred to in Section 12 hereof, and to hold the Custodian harmless from any liability, loss or withholding, resulting from any taxes or other governmental charges, and any expenses related thereto, which may be imposed, or assessed in connection with or arising out of the Custody Account and/or the Client Deposit Account. Subject to specific Instructions from the Client to the contrary, the Custodian is further authorised to debit (as well after as before the date of any termination pursuant to Section 14 hereof) any designated fee account of the Client with the Custodian any amount owing to the Custodian from time to time under this Agreement.

14. TERMINATION

Either of the parties hereto may terminate this Agreement on giving not less than 30 days written notice to the other party. Upon the expiration of such notice the Custodian shall account to the Client in accordance with the terms of Section 9 hereof provided however that if the Custodian has effected any transaction on behalf of the Client the contractual settlement date of which is or is likely to extend beyond the expiration of such notice, then the Custodian and the Client shall mutually agree whether to close out or complete such transaction and the Custodian shall be entitled in its absolute discretion to retain sufficient funds from the Property for that purposes.

15. ASSIGNMENT

This Agreement shall bind and enure for the benefit of the parties hereto and their respective successors, and neither party may assign, transfer or charge all or any of its rights and benefits hereunder without the written consent of the other.

16. DISCLOSURE

The Client agrees and understands that the Custodian or its agent may disclose information regarding the Custody Account and/or the Client Deposit Account if required to do so by any court order or similar process in any relevant jurisdiction or by order of an authority having power to do so over the Custodian or its agents within the jurisdiction of such court or authority, provided that prior to making any such disclosure the Custodian advises the Client so that if the Client objects to such disclosure the Client may take appropriate action in the applicable court or with the appropriate authority.

17. NOTICES

Except as otherwise provided herein all notices and other communications to be given under this Agreement shall be in writing in the English language and shall be made either by telex or facsimile, or by letter addressed to the party concerned at the addresses set out above (or at such other addresses as may be notified in writing by one party to any other party from time to time).

18. GOVERNING LAW AND JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the England. Both Parties irrevocably submit to the jurisdiction of England.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement, and the Schedules hereto (if any), to be executed by their respective officers thereunto duly authorised.

| LEHMAN BROTHERS INTERNATIONAL (EUROPE) | LEHMAN RE LTD. |
|---|---|
| | as Client |
| By: _____ | By: _____ |
| Title: _____ | Title: S.V.P. |
| Attest: _____ | Attest: _____ |

London-2228471.06       10

## ANNEX 1

## FORM OF NOTICE TO CUSTODIAN

To: Lehman Brothers International (Europe)

Copy to: Britannia Life Limited

We refer to the Security Agreement (the "Security Agreement") dated [         ] entered into by us in favour of Britannia Life Limited of Britannia Court, 50 Bothwell Street, Glasgow G2 6HR, a copy of which is annexed to this notice. Terms defined in the Security Agreement shall have the same meanings in this notice.

Notice is hereby given by us to you that, by and pursuant to the Security Agreement, we have charged in favour of the Secured Party all of the Collateral.

We hereby instruct that you shall accept instructions from Britannia Life Limited in relation to the Collateral to Britannia Life in accordance with the provisions of the Security Agreement.

Yours faithfully

..............................

For and on behalf of
Lehman Re Ltd.
Date March 19/99

Acknowledged by Lehman Brothers International (Europe)

..............................
Date March 19, 1999

## FORM OF CUSTODIAN'S ACKNOWLEDGEMENT

[on the letterhead of Lehman Brothers International (Europe)]

BRITANNIA LIFE LIMITED        [date]
Britannia Court
50 Bothwell Street
Glasgow G2 6HR

Gentlemen,

**Euroclear account No. 97558**

We acknowledge receipt of a security agreement dated _____ 1999 between Lehman Re Ltd. as Chargor and yourselves as Secured Party (the "Security Agreement"). Terms defined in the Security Agreement shall have the same meaning in this letter.

We hereby confirm that the above mentioned account is opened in our name in Euroclear. We agree to treat such account as a special account specifically opened for the purpose of holding collateral, whether or not exclusively for your account and/or in the context of the transactions on the occasion of which this letter is issued, and we undertake that we will not knowingly use such account for any other purposes.

We confirm that all Permitted Collateral delivered to us and which is to be held in Euroclear shall be transferred to and held in the Euroclear Collateral Account.

We agree that the Euroclear Collateral is and shall be subject to the fungibility regime organised by the Royal Decree No. 62. We acknowledge that the Euroclear Collateral is to be held in the Euroclear Collateral Account subject to the fixed charge in your favour constituted by the Security Agreement, and agree to hold the Euroclear Collateral in charge for your benefit.

We agree that we shall accept instructions from Britannia Life Limited in relation to the Euroclear Collateral to Britannia Life in accordance with the provisions of the Security Agreement.

Yours faithfully,

London-2 228471 06        12

**Britannia Life Limited**
Britannia Court
50 Bothwell Street
Glasgow G2 6HR

Tel (0141) 248 2000
Fax (0141) 223 6000
DX GLASGOW 6 950501

Our Reference  WGH/EG/SOLREV
Please ask for  Ext 6175
Your Reference

Lehman Re Ltd.
HM 68
Hamilton
HM AX
BERMUDA

Dear Sirs,

## LETTER OF INTENT

We refer to the Reinsurance Agreement between Britannia Life Limited and Lehman Re Ltd. to be dated 22nd March 1999 (the "**Reinsurance Agreement**"). Terms defined in the Reinsurance Agreement shall have the same meaning in this letter.

By your signature below, please acknowledge the agreement in principle of Britannia Life Limited and Lehman Re Ltd. to conclude the following transaction on or before 30 June 1999 with an effective date of 1 January 1998:

1. Nationale-Nederlanden Reinsurance Company NV ("NN Re") and Britannia Life Limited intend to enter into a commutation and release agreement in respect of the remaining liabilities of the Life Association of Scotland Limited ("L.A.S.") annuity portfolio which was ceded by L.A.S. and reinsured with NN Re on 31st December 1992 and which have not been reinsured with Lehman Re Ltd., pursuant to the Reinsurance Agreement (the "**Remaining Liabilities**"); and

2. Simultaneously therewith, Lehman Re Ltd. will enter into a reinsurance agreement with Britannia Life Limited, in respect of the Remaining Liabilities. Any Remaining Liabilities so ceded shall form part of the Covered Policies under the Reinsurance Agreement.

The consideration payable by Britannia Life Limited to Lehman Re Ltd. for the reinsurance of the Remaining Liabilities shall be determined in accordance with the following methodology:

### Mortality Basis

The mortality basis, which will be determined in a manner consistent with Annex 4 of the Reinsurance Agreement, will be used to determine the expected liability cash flows under the Covered Policies. The reinsurance premiums will be these cash flows divided by 96%.

### Discount Factors

The consideration will be calculated from the swap curve. The swap curve comprises the par yields for each maturity at which banks lend to each other. GBP long term swap rates are currently published on Reuters' pages ICAQ and BIRV01. Below are examples of how the discount factors are calculated for various maturities using annual swap rates.

*Example*

Assume the swap rate in year $i$ is $S_i$, and the discount factor for the end of year $i$ is $D_i$

Year 1

The 1 year swap rate is $S_1$, and the discount factor, $D_1$, is $\frac{1}{(1 + S_1)}$

Year 2

We know that the value of a two year bond with an interest rate $S_2$ will have a price of par.

$S_2 * (D_1 + D_2) + 100\% * D_2 = 100\%$

$100\% - S_2 * D_1 = S_2 * D_2 + 100\% * D_2$

$D_2 = \frac{100\% - S_2 * D_1}{100\% + S_2}$

Year $n$

We know that the value of an $n$ year bond with an interest rate $S_n$ will have a price of par.

$S_n * (D_1 + D_2 + \ldots + D_n) + 100\% * D_n = 100\%$

$100\% - S_n * (D_1 + D_2 + \ldots + D_{n-1}) = S_n * D_n + 100\% * D_n$

$D_n = \frac{100\% - S_n * (D_1 + D_2 + \ldots + D_{n-1})}{100\% + S_n}$

The actual consideration shall be determined on the trade date of the transactions and will be subject to, amongst other factors, approval by all parties, the then current interest rates, the assets to be transferred and the underlying insurance portfolio.

The conclusion of the transaction is conditional upon all of the following being satisfied:

(a) the conclusion of documentation in form and substance satisfactory to all parties;

(b) approval being given by the Board of Directors of each party;

(c)   appropriate regulatory approval being given;

(d)   the continuance of the arrangements set out in the Reinsurance Agreement; and

(e)   simultaneously, NN Re and Britannia Life Limited enter into the commutation and release agreement referred to in paragraph 1. above in respect of the Remaining Liabilities.

**Refund of Premiums**

In the event that on or prior to 30th June 1999, it is determined that an annuitant had died and the guaranteed period (if any) had ended in respect of a Covered Policy prior to 1st January 1998, Britannia Life Limited and Lehman Re Ltd. agree that the effect thereof shall be reflected in the calculation of the consideration for the reinsurance of the Remaining Liabilities as referred to above. The net payment ("Payment") shall equal the net present value of the reinsurance premiums (after adjustment for claims paid) adjusted for interest at overnight Libor – 1% per annum due pursuant to the Reinsurance Agreement and attributable to such annuitants less the net present value of the quotient of (i) the Remaining Liabilities and (ii) 96 percent. If the Payment is positive, Lehman Re Ltd. shall remit to Britannia Life Limited an amount equal to the Payment, and if that amount is a negative amount, the absolute value thereof shall be payable by Britannia Life Limited to Lehman Re Ltd..

This letter will be governed by and construed in accordance with English Law.

We look forward to working with you to conclude this transaction.

Yours faithfully,

*[signature]*

**Britannia Life Limited**


Agreed and accepted

*[signature]*

**Lehman Re Ltd.**

Date: March 22 1999

EXECUTION VERSION

# LEHMAN RE

## Models Letter

22 March 1999

Britannia Life Limited
Britannia Court
5 Bothwell Street
Glasgow G2 6HR

Dear Sirs,

### Calculation of Discount Factors and Mortality Basis

We refer to the Reinsurance Agreement and Security Agreement to be entered into between ourselves and yourselves. Terms defined in the Reinsurance Agreement and the Security Agreement shall have the same meaning in this letter.

Pursuant to Article 8 of the Reinsurance Agreement and the definition of Required Amount in the Security Agreement, the calculation by the Valuation Agent of the discount factors and mortality basis used to determine the net present value of the Expected Annuity Cash Flows is based on the following methodology.

### Discount Factors

The discount factors are calculated from the swap curve. The swap curve comprises the par yields for each maturity at which banks lend to each other. GBP long term swap rates are currently published on Reuters' pages ICAQ and BIRV01.

*Example*

Assume the swap rate in year $i$ is $S_i$, and the discount factor in year $i$ is $D_i$.

**Year 1**

The 1 year swap rate is $S_1$, and the discount factor, $D_1$, is $\frac{1}{(1+S_1)}$

LEHMAN RE LTD.
HM 68
HAMILTON HMAX BERMUDA
(441) 296-8451
FAX: (441) 296-8452

LONDON-2\263770 v2