WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Jacqueline Marcus
Denise Alvarez

Attorneys for Lehman Brothers Holdings
Inc. and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | **:** | **Chapter 11 Case No.** |
| | **:** | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | **:** | **08-13555 (SCC)** |
| | **:** | |
| **Debtors.** | **:** | **(Jointly Administered)** |

------------------------------------------------------------------x

# PRE-TRIAL MEMORANDUM OF LAW
## IN OPPOSITION TO DR. THOMAS MARSONER'S
## MOTION TO DEEM PROOFS OF CLAIM TIMELY FILED

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .........................................................................................1

BACKGROUND .........................................................................................................2

    Marsoner's Advisory Services for LBEL ..........................................................2

    LCPI's Stake in Formula One ...........................................................................3

    The Debtors' Bankruptcy Case .........................................................................4

    Marsoner's Claim in the U.K. Bankruptcy Case ..............................................6

    Marsoner's Claim in the U.S. Bankruptcy Case ...............................................6

ARGUMENT ...............................................................................................................8

    I.      MARSONER WAS NOT A KNOWN CREDITOR OF LCPI OR LBHI.............8

          A.      There Was No Evidence of the Claim in the Debtors' Books and Records. ................................................................................................9

          B.      Marsoner's Work with LBEL Does Not Render Him a Known Creditor of LCPI and LBHI. ...................................................11

          C.      The 2006 Agreement Confirms Marsoner Was Not a Known Creditor. .........................................................................................13

    II.    THERE IS NO RECORD THAT THE ANY LEHMAN ENTITY AGREED TO COMPENSATE MARSONER FOR FORMULA ONE...............13

          A.      Lehman Never Agreed to Compensate Marsoner for Formula One. ........14

          B.      Not Even Marsoner Believes that LCPI or LBHI Agreed to Compensate Him for Formula One. .......................................................15

          C.      Marsoner's Attempts To Navigate Around the Deficiencies in His Claim Fail. .........................................................................................16

               1.      There Was No Default Rule to Compensate Marsoner for Formula One. ..................................................................................16

               2.      BAWAG Does Not Support the Existence of a Default Rule. .........................................................................................18

    III.   THE DEBTORS PROVIDED MARSONER WITH NOTICE OF THE BAR DATE ...............................................................................................19

    CONCLUSION ........................................................................................20

WEIL:\95675861\18\58399.0011

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Best Prod. Co., Inc.*,
   140 B.R. 353 (Bankr. S.D.N.Y. 1992) ...................................................................9

*In re BGI, Inc.*,
   476 B.R. 812 (Bankr. S.D.N.Y. 2012) ...........................................................8, 10

*Chemetron Corp. v. Jones*,
   72 F.3d 341 (3d Cir. 1995) ...........................................................................8, 20

*In re Brooks Fashion Stores, Inc.*,
   124 B.R. 436 (Bankr. S.D.N.Y. 1991) ...............................................................8

*Krys v. Aaron (In re Refco Inc. Sec. Litig.)*,
   826 F. Supp. 2d 478 (S.D.N.Y. 2010) .............................................................12

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) .......................................................................................20

*In re Nortel Networks, Inc.*,
   531 B.R. 53 (Bankr. D. Del. 2015) .............................................................8, 12

*In re Thomson McKinnon Sec., Inc.*,
   130 B.R. 717 (Bankr. S.D.N.Y. 1991) ...............................................................9

*In re Waterman S.S. Corp.*,
   59 B.R. 724 (Bankr. S.D.N.Y. 1986) .................................................................9

*U.S.H. Corp. of N.Y.*,
   223 B.R. 654 (Bankr. S.D.N.Y. 1998) ...........................................................8,9

*In re XO Commc'n, Inc.*,
   301 B.R. 782 (Bankr. S.D.N.Y. 2003) .....................................................passim

WEIL:\95675861\18\58399.0011

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator (the "Plan Administrator") under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), for the entities in the above referenced chapter 11 cases (collectively, the "Debtors" and together with their non-Debtor affiliates, "Lehman"), including Lehman Commercial Paper Inc. ("LCPI"), files this memorandum of law in opposition to the motion (the "Motion"), of Dr. Thomas Marsoner ("Marsoner"), dated December 30, 2014, for an order permitting Marsoner to file late proofs of claim (the "Claim").

## PRELIMINARY STATEMENT

By his Motion, Marsoner seeks to file the Claim over five years after the Bar Date against LCPI and LBHI for advice he allegedly provided to certain European Lehman employees with respect to Lehman's interest in FIA Formula One World Championship ("Formula One").[1] The Motion should be denied because the evidence overwhelmingly shows that Marsoner was not a known creditor of LCPI or LBHI and therefore a Bar Date notice was not required. Among other things, the evidence shows that: (1) the Debtors conducted a more than reasonably diligent search to identify all creditors and cast a wide net to identify potential creditors; (2) there was no evidence of the Claim in the Debtors' books and records; (3) at best, Marsoner provided services solely to Lehman Brothers Europe Limited ("LBEL") pursuant to contracts with LBEL, not LCPI or LBHI, and even those contracts did not identify Formula One as a transaction covered by the agreements; and (4) no Lehman entity ever agreed to compensate Marsoner for Formula One. Indeed, there exists no writing, whether in contract form or otherwise, showing that LCPI or LBHI (or, LBEL) ever agreed to compensate Marsoner for Formula One.

Until he came up with his plan to extract money from LCPI and LBHI, even

---

[1] LCPI's interest in Formula One arises from shares held by LCPI in Delta Topco Limited and Delta Prefco Limited, private limited companies which had the rights to commercially exploit Formula One.

Marsoner did not believe he was one of their creditors. Rather, he believed he was a creditor of LBEL and filed a claim concerning Formula One in the LBEL bankruptcy. LBEL settled that claim with Marsoner for £2,500,000. Only then did Marsoner set his sights on LCPI and LBHI.

Furthermore, although Marsoner was not a known creditor of LCPI or LBHI, the Debtors did, in fact, serve Marsoner with notice of the Bar Date at four separate addresses. Because LBHI acted as paying agent for LBEL, it had addresses in its system for Marsoner based on addresses he had provided on invoices he submitted to LBEL. As part of their reasonably diligent search, and out of an abundance of caution, the Debtors included these addresses on their mailing list for the Bar Date Notice. Marsoner argues that this should not count as service because the addresses he identified for receiving payments were sham addresses used solely to avoid paying taxes in the United Kingdom, and apparently LCPI and LBHI should have known that his real address was somewhere else. This dubious argument shows how far Marsoner will go to manufacture a claim where none exists. The Motion should be denied.

**BACKGROUND**

**Marsoner's Advisory Services for LBEL**

Marsoner was an advisor for Lehman's European investment banking business pursuant to a series of advisory agreements that he entered into with LBEL from 2001 through 2007.[2] LBEL is an English affiliate of the chapter 11 Debtors that, since September 15, 2008, has been in administration in the United Kingdom under the control of PricewaterhouseCoopers LLP ("PwC"), its court-appointed administrator. The Advisory Agreements LBEL executed with Marsoner between 2004 and 2007 each identify the transactions covered by each agreement and the compensation that LBEL agreed to pay Marsoner for his advice on each of the

---

[2] *See* Declaration of David J. Lender in Support of the Plan Administrator's Pre-Trial Memorandum in Opposition to the Motion, dated June 20, 2016 ("Lender Decl."), Exs. A-E. (collectively, the "Advisory Agreements").

WEIL:\95675861\18\58399.0011

transactions.  Lender Decl. Exs. C ("2004 Agreement") ¶ 3, D ("2006 Agreement") ¶ 3, E ("2007

Agreement") ¶ 3.  Formula One was never listed as a transaction for which Marsoner was to be

paid.  From 2001 to 2006, Marsoner worked under the supervision of Vittorio Pignatti

("Pignatti"), who at that time was the head of Lehman's Mergers and Acquisitions division in

Europe.  *See* Lender Decl. Ex. F, Dep. Tr. of Vittorio Pignatti, dated Nov. 16, 2015 ("Pignatti

Dep.") 5:12-20; Lender Decl. Ex. G.  During that time, Pignatti negotiated each of the Advisory

Agreements on LBEL's behalf and served as Marsoner's main contact on all of the advisory

work that he performed for LBEL.  Lender Decl. Ex. H, Dep. Tr. of Marsoner, dated Dec. 15,

2015 ("Marsoner Dep.") 53:11-12, 20:11-17; Pignatti Dep. 8:8-9:6, 10:25-11:13.

**LCPI's Stake in Formula One**

   In 2001, LCPI, JP Morgan ("JPM"), and Bayerische Landesbank ("BLB")

collectively loaned Kirch Group ("Kirch") $1.6 billion.  LCPI funded about $300 million of the

loan and Kirch pledged its interest in Formula One as collateral security.  Upon Kirch's default

in 2002, the lenders foreclosed on the loan, resulting in LCPI acquiring a 17% interest in

Formula One.  Lender Decl. Ex. I, Dep. Tr. of Peter Sherratt, dated Nov. 13, 2015 ("Sherratt

Dep.") 66:21-67:16, 67:25-68:12; Marsoner Dep. 31:19-32:11.  After LCPI acquired this interest,

a work-out team consisting of Peter Sherratt ("Sherratt"), Tom Bernard ("Bernard"), and Steve

Hannon was tasked with managing the Formula One investment to ensure that LCPI recouped its

investment.  Sherratt Dep. 70:25-71:23.  Around that time in 2002, JPM and Lehman considered

jointly retaining Marsoner to assist, but decided not to retain him.  Pignatti Dep. 56:22-57:5.

   In 2005, CVC Capital ("CVC"), a private equity firm, offered to purchase LCPI's

stake in Formula One.  After learning of the offer, in November 2005, Marsoner emailed Pignatti

and informed him that, in his opinion, Lehman should not sell its stake in Formula One to CVC.

Lender Decl. Ex. J at 215.  Marsoner did not claim that he had an agreement with LCPI or LBHI

(or any other Lehman entity) to be paid for this advice.[3]  Instead, Marsoner sought to get hired to

work on Formula One, stating:  "Needless to say, if a fresh face were helpful to facilitate things

here, mine continues to be available for a very modest percentage participation in LB's gain

upon eventual sale."  Lender Decl. Ex. J at 216; Marsoner Dep. 92:9-16.  Pignatti did not accept

Marsoner's "fresh face" offer.  Marsoner Dep. 93:14-25.  When no one responded, Marsoner re-

sent the email to Pignatti, adding Bernard and Sherratt to the email.  Again, looking to get

involved, he made a different offer, this time to buy Lehman out of the deal:

> If, conversely, you want to get LB out of the F1 headlines (or feel
> your relationship with Bernie has become too bad), a Marsoner
> family company previously involved in consumer products would
> happily consider taking it on . . . .

Lender Decl. Ex. J at 215.  Lehman also did not accept this offer.  Marsoner Dep. 94:14-96:10.

       The evidence developed in this matter makes clear that Lehman did not pay any

consultants without a written agreement, and since there was none here covering Formula One,

Marsoner was not a known creditor of LCPI or LBHI.  For example, Pignatti testified --

Q.     Was Mr. Sherratt aware that success fees were paid?

A.     Absolutely.

Q.     Even where there was no agreement covering the transaction?

A.     **No. I think I said earlier that no payment was ever done unless there was a
       documented agreement.**  Pignatti Dep. 128:19-129:8 (emphasis added).

## The Debtors' Bankruptcy Case

       On September 15, 2008 and periodically thereafter, the Debtors commenced

voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[3] At that point in time, Marsoner had no consulting agreement with LBEL because the 2004 Agreement with LBEL
had expired eleven months earlier at the end of 2004.  *See* 2004 Agreement ¶ 2.

On July 2, 2009 (the "Bar Date Order"), the Court established September 22, 2009 as the

deadline for filing proofs of claim (the "Bar Date") [ECF No. 4271].  The Bar Date Order stated

that service of notice of the Bar Date "shall be deemed good, adequate, and sufficient notice if it

is served by deposit in the United States mail, first class postage prepaid, on or before July 8,

2009 upon . . . all known holders of claims listed on the Schedules at the addresses stated

therein."  Bar Date Order at 10.  The Order further stated that any claimant who fails to file a

timely proof of claim would "forever be barred, estopped, and enjoined from asserting such

claim against the Debtors (or filing a Proof of Claim with respect thereto)."  *Id.* at 9-10.

        In addition to being published in various newspapers,[4] notice of the Bar Date was

mailed to all parties known to the Debtors as having claims or potential claims against the

Debtors' estates (the "Bar Date Notice").  Although not a known creditor of LCPI and LBHI, on

July 8, 2009, the Debtors served Marsoner with the Bar Date Notice at the following address set

forth on Schedule G of Debtors' Amended Schedules of Assets and Liabilities [ECF No. 3938]

("Schedule G"), which identified a derivatives contract between Marsoner and Lehman Brothers

Commercial Corporation, Inc. ("LBCC"):  "Marsoner, Thomas S, One Broadgate 5th Floor,

London, EC2M 7HA, United Kingdom."  Schedule G at LBCC Schedules 47.[5]  In addition, the

Debtors served the Bar Date Notice on Marsoner by first class mail to his attention at the

following three addresses:  (1) "Casa Andreas, 16 Trig Sant' Andrrija, Lija BLZ10, Malta"; (2)

"Casa Pelicanos, Costa Careyes, Mexico"; and (3) "Casa Carpione, Parco San Giacomo,

Gargano 25084, Italy."  *See* Corrected Aff. of Service of Herb Baer [ECF No. 9395].  Because

---

[4] The Bar Date was published in The New York Times (International Edition), The Wall Street Journal
(International Edition), and The Financial Times.

[5] The address on Schedule G matches the address on an electronic record indicating that LBCC was a party to a
derivatives contract with Marsoner.  *See* Decl. of Thomas Behnke in Supp. of the Obj. to the Mot., dated Feb. 12,
2015 [ECF No. 48198] ¶ 5.  Despite being identified on the Debtors' schedules, filed on June 15, 2009, as residing
at this address, Marsoner never directed that his mail be sent to another address as required by Rule 2002(g)(1) of
the Federal Rules of Bankruptcy Procedure.

LBHI served as paying agent for LBEL, the above addresses were in LBHI's accounts payable system as addresses for Marsoner and found on several invoices that Marsoner sent to LBEL. *See* Lender Decl. Exs. K, L; Marsoner Dep. 140:11-141:22. None of the Bar Date Notices that the Debtors mailed to Marsoner were returned as undeliverable. Baer Decl. ¶ 8.

**Marsoner's Claim in the U.K. Bankruptcy Case**

On September 15, 2008, LBEL filed for administration in the English courts. On November 12, 2013, Marsoner filed a proof of debt in LBEL's insolvency proceeding seeking compensation for his alleged services with respect to Formula One. Motion ¶ 25. Pignatti and Ruggero Magnoni ("Magnoni"), another European Lehman employee, both submitted letters to the English courts in support of Marsoner's claim for payment from LBEL for Formula One. *See* Lender Decl. Exs. M, N. On June 19, 2014, Marsoner and PwC, as administrator of LBEL's estate, settled the proof of debt for an allowed claim of £2,500,000. In exchange, Marsoner released "any and all Claims whatsoever" that he may have had against "the Parties," which was defined to include LBEL and PwC, not the chapter 11 Debtors. Lender Decl. Ex. O at 220-22.

**Marsoner's Claim in the U.S. Bankruptcy Case**

On December 30, 3014 – six months later and more than five years after the Bar Date – Marsoner filed the Motion seeking relief from the Bar Date Order so that he could assert claims with regard to Formula One, but this time against LCPI and LBHI. *See generally,* the Motion. Marsoner contends that he is entitled to this extraordinary relief on the grounds that he never received, and was entitled to, actual notice of the Bar Date. *Id.* On February 12, 2015, the Plan Administrator filed the Objection, arguing in part that Marsoner was not a "known creditor" of the chapter 11 Debtors. Objection ¶¶ 12-21. On February 17, 2015, Marsoner filed the Reply in Support of the Motion [ECF No. 48235] (the "Reply"), arguing in part that he was a known

6

creditor of LBHI and LCPI. Reply ¶¶ 8-13. On February 19, 2015, the Court held a hearing on the Objection. The Court stated: "I do not believe based on what [Marsoner has] put forth before me at this point that I can come to the conclusion that Marsoner was a known creditor." Feb. 19, 2015 Hr'g Tr. at 102:3-9 [ECF No. 48880]. Nevertheless, because the question of whether Marsoner was a known creditor was "sufficiently facty," *id.* at 102:6, the Court directed the parties to engage in limited discovery on the "threshold issue" of "whether or not [the Court] can deem this to be a timely filed proof of claim and that turns on . . . whether or not Marsoner was a known creditor" of the chapter 11 Debtors. *Id.* at 102:22-103:3.

Since that time, the parties have engaged in substantial discovery on the threshold issue. The parties exchanged several interrogatories and nearly two thousand pages of documents. In addition, the following witnesses were deposed: (1) Peter Sherratt, Lehman's former chief in-house counsel in Europe; (2) Vittorio Pignatti, former head of Lehman's mergers & acquisitions group in Europe; (3) Ruggero Magnoni, former senior investment banker and head of mergers & acquisitions of Lehman Brothers International (Europe) ("LBIE");[6] (4) Angharad Bowdler, senior case manager at EPIQ Bankruptcy Solutions; (5) Marsoner; (6) Steven Kotarba, Managing Director of the claims group at Alvarez & Marsal ("A&M"); and (7) Thomas Behnke, Managing Director at A&M. Discovery concluded on or about April 27, 2016.

On May 10, 2016, the Court entered the Stipulation and Order Establishing Pre-Trial Procedures in connection with the Motion [ECF No. 52740], establishing an evidentiary hearing date of July 25, 2016 (the "Evidentiary Hearing") on the threshold issue of whether Marsoner was a "known creditor" of the Debtors. As demonstrated below, despite all of the discovery, no one has identified a single record or document indicating that Marsoner had a

---

[6] The Plan Administrator is submitting deposition testimony from Sherratt, Pignatti, and Magnoni as part of its evidence opposing the Motion.

claim against LCPI or LBHI for his services with respect to Formula One.  As such, Marsoner's claim was not reasonably identifiable, rendering him an "unknown creditor" of LCPI and LBHI.

## ARGUMENT

### I.    MARSONER WAS NOT A KNOWN CREDITOR OF LCPI OR LBHI

A "known creditor" is a claimant whose identity is actually known to the debtor or . . . is "reasonably ascertainable by the debtor."  *In re BGI, Inc.,* 476 B.R. 812, 820 (Bankr. S.D.N.Y. 2012)) (internal citation omitted) (internal quotation marks omitted); *In re XO Commc'ns, Inc.,* 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003); *see also In re Nortel Networks, Inc.,* 531 B.R. 53, 63 (Bankr. D. Del. 2015).  A claimant's identity is "reasonably ascertainable" if his identity can be uncovered by the debtor through a "reasonably diligent" search of the debtor's books and records.  *XO Commc'ns,* 301 B.R. at 793; *see also U.S.H. Corp. of N.Y.,* 223 B.R. 654, 659 (Bankr. S.D.N.Y. 1998) ("[t]he requisite search instead focuses on the debtor's own books and records.  Efforts beyond a careful examination of these documents are generally not required.").  A "vast, open-ended investigation" to identify every "conceivable or possible creditor" is not required.  *See id.* (quoting *Chemetron Corp. v. Jones,* 72 F.3d 341, 347 (3d Cir. 1995) and *In re Brooks Fashion Stores, Inc.,* 124 B.R. 436, 445 (Bankr. S.D.N.Y. 1991)).

Here, Marsoner seeks to assert a quantum meruit claim for compensation against LCPI and LBHI for services he allegedly performed at the behest of LBEL, a non-debtor.  The evidence revealed in discovery, including Marsoner's own admissions, confirms that these alleged services were not even covered by any agreement between him and LBEL, much less with LCPI or LBHI.[7]  The Claim was not tracked on the Debtors' books and records and there was no writing indicating a right to payment from LCPI or LBHI.  Marsoner did not report to

---

[7] Although Marsoner asserts that he has "either contractual or quantum meruit claims," against LCPI and LBHI, he has not identified a single contract executed between him and LCPI or LBHI.  *See* Motion ¶ 8.

LCPI or LBHI.  Indeed, the very existence of the Claim was unknown to LCPI and LBHI and

entirely dependent on Marsoner's belated decision to seek compensation from LCPI and LBHI,

despite the facts that (1) his contracts were with LBEL, (2) he actually sought and received

compensation from LBEL, and (3) no contract covered Formula One.  Thus, the Claim was

"merely 'conceivable, conjectural or speculative" and not reasonably identifiable.  *See XO*

*Commc'ns,* 301 B.R. at 793 (quoting *In re Thomson McKinnon Sec., Inc.,* 130 B.R. 717, 720

(Bankr. S.D.N.Y. 1991)).  Accordingly, Marsoner was, at most, an "unknown creditor" of LCPI

and LBHI.  *See XO Commc'ns,* 301 B.R. at 794-795 (holding a claimant is an "unknown

creditor" where the claim is "not the type an entity generally tracks on its books and records" . . .

[and] is dependent on whether [the] claimant will opt to pursue the claim") (internal quotation

marks omitted); *In re Best Prods. Co.,* 140 B.R. 353, 358 (Bankr. S.D.N.Y. 1992) (a debtor must

"review its own books and records to ascertain the identity of the creditors, [but] a debtor is not

required to search elsewhere") (citing *In re Waterman S.S. Corp.,* 59 B.R. 724, 727 (Bankr.

S.D.N.Y. 1986); *U.S.H. Corp.*, 223 B.R. at 659 ("the requisite search instead focuses on the

debtor's own books and records . . . . Only those claimants who are identifiable through a

diligent search are 'reasonably ascertainable' and hence 'known' creditors").

> A.      **There Was No Evidence of the Claim in the Debtors' Books and Records.**

Because there was no record of the Claim, the Debtors did not identify Marsoner

as a potential creditor of LCPI or LBHI as they prepared the mailing list for the Bar Date Notice

(the "Creditor List").  Steven Kotarba ("Kotarba"), a Managing Director at A&M, oversaw the

preparation of the Creditor List, which he has done in multiple chapter 11 cases.  At the

Evidentiary Hearing, Kotarba will describe the process he undertook to identify the Debtors'

creditors.  He will explain that he followed the process generally used by A&M to identify

creditors in chapter 11 cases, the same process he has followed numerous times.  Kotarba

worked with multiple employees of the Debtors who served as subject matter experts for several

categories of claims, *e.g.*, vendor claims, contractual claims, etc.  Through these subject matter

experts, Kotarba identified the company systems that were likely to contain information

identifying creditors of the Debtors' estates.   Kotarba's team searched these systems for records

identifying creditors, including, but not limited to, any records of Debtors' contracts.

The evidence shows that the Debtors' review of their books and records was more

than reasonably diligent.  Kotarba will testify that he spent several months compiling the

Creditor List – a task that typically takes only thirty to forty five days in large chapter 11 cases –

and that the Debtors were over-inclusive in the scope of their search.  Kotarba will explain that

the Debtors did not distinguish between potential and actual creditors, but rather, cast a wide net

to ensure that all potential claimants – whether or not in fact creditors – were included on the

Creditor List.  For example, the Debtors added to the Creditor List, the names and addresses of

individuals and companies found in their accounts payable system just in case these records of

*past* payments included payees of the Debtors who might be entitled to additional payments in

the future.  Although such records are not indicative of actual outstanding debts, this search cast

a wide enough net to ensure that all actual creditors received a Bar Date Notice.  *See XO*

*Commc'ns,* 301 B.R. at 795 (finding claimant is an unknown creditor in part because "the record

does not show [] that there were any outstanding ordinary business debts due [claimant] on the

Debtor's books and records" despite the debtor's prior business relationship with claimant); *see*

*also In re BGI, Inc.,* 476 B.R. at 821 (holding Borders' gift card holders were unknown creditors

even though their contact information was in debtors' databases because there was no evidence

linking those addresses to the gift cards which serve as the basis for their claims).

Despite the breadth of the search, the Debtors found no records identifying

Marsoner as a creditor of LCPI or LBHI. Marsoner has repeatedly argued that the Debtors should have known that he was a creditor because LBHI paid Marsoner on numerous occasions. *See, e.g.,* Reply ¶ 11. But the fact that LBHI paid Marsoner in the past does not mean that LBHI owed any payments to Marsoner at the time that it commenced its chapter 11 case. *See XO Commc'ns,* 301 B.R. at 795 (finding no evidence of "any outstanding, ordinary business debts" on the debtor's books and records despite the prior business relationship). In fact, the evidence shows that LBHI's branch in the United Kingdom only paid Marsoner because it functioned as a paymaster for many of LBHI's European affiliates, including LBEL. In this role, LBHI sent payments to Marsoner on behalf of LBEL, meaning that LBHI paid off LBEL's – not LBHI's – debts. *See* Decl. of Raymond O'Grady, dated Feb. 12, 2015 [ECF No. 48199] ¶ 7.

### B. Marsoner's Work with LBEL Does Not Render Him a Known Creditor of LCPI and LBHI.

No amount of diligence into the Debtors' books and records would have revealed that Marsoner was owed any compensation by LCPI or LBHI, as (1) no Lehman entity agreed to pay him any amount with respect to Formula One, and (2) if he was owed any amounts, such amounts would have been owed by LBEL, not LCPI or LBHI. Nevertheless, Marsoner argues that he was a "known creditor" of the Debtors because of his "[consulting] agreements with [LBEL] and the advice he provided that led to the FI Reinvestment." Reply ¶ 2. As discovery confirmed, however, the Advisory Agreements were not with LCPI or LBHI, but with LBEL. Moreover, each of the Advisory Agreements since 2004 specifically identifies the transactions or subjects covered by the agreements and ***none identifies Formula One.*** *See* 2004-2007 Agreements ¶ 3; *see also* Pignatti Dep. 44:16-23; Marsoner Dep. 71:24-72:2, 72:9-23.[8]

---

[8] Moreover, each of these agreements specifically states that it sets forth all of the mandates for which Marsoner was eligible for compensation, superseding any prior agreements. *See* 2004-2007 Agreements at 1 and ¶ 3. Marsoner argued that LBHI should have known of the Advisory Agreements because the Advisory Agreements, with varying

11

Furthermore, in preparing a list of creditors, a debtor is not required to consider the creditors of non-debtor entities, including any foreign entities subject to separate insolvency proceedings. It is axiomatic that "affiliated corporations are, as a rule, treated separately and independently so that one will not be held liable for the contractual obligations of [an] other." *Krys v. Aaron (In re Refco Inc. Sec. Litig.),* 826 F.Supp. 2d 478, 495 (S.D.N.Y. 2010). Indeed, in *In re Nortel Networks, Inc.,* 531 B.R. 53 (Bankr. D. Del. 2015), the court held that the employees of Canadian affiliates of U.S. debtors were "unknown creditors" of the U.S. debtors despite having received termination letters from the company's Human Resources office in the United States stating that the Canadian employees would receive severance pay from the Canadian entities *and* their "subsidiaries and affiliates," which included the U.S. debtors. *Id.* at 63. Although the termination letters were sent from the United States and signed by some of the claimants' U.S.-based supervisors, the court concluded that it was "not convinced that [the Canadian employees] were creditors whose identities were reasonably ascertainable by the U.S. Debtors at the time the Court entered the Bar Date Order" because those employees performed services for the Canadian, not the U.S. entities, and the U.S. entities were not signatories to the termination letters. *Id.* The court stated, "[i]dentifying a tiny subset of former employees of a foreign, non-debtor affiliate who received a certain form termination letter to which the U.S. Debtors were not a signatory goes well beyond the purview of a reasonably diligent search." *Id.*

Similarly, the Debtors were not required to review the books and records of non-debtor entities while preparing the Creditor List, or any contracts of those non-debtor entities.

---

language, state that Marsoner would provide assistance to "[LBEL] and *other members of the Lehman Brothers' group*." *See* Reply ¶ 10 (emphasis in original). But, the agreements do not identify what entities are in the "Lehman Brothers' group" other than to define that term in relation to LBEL. Moreover, the agreements make clear that, other than the listed transactions (which do not list Formula One), only Agreed Transactions are covered, which are transactions that LBEL has "specifically designated in writing to the Consultant as falling within the ambit of this Agreement." *See, e.g.,* 2004 Agreement ¶ 3. No such writing exists with respect to Formula One.

12

The Debtors did not have open access to LBEL's books and records.  But even if they had such

access and were required to look, LBEL's records would not have put LCPI and LBHI on notice

of the Claim since neither LCPI nor LBHI were signatories to Marsoner's Advisory Agreements

with LBEL and there was never an agreement to compensate Marsoner in connection with

Formula One.  Because a reasonably diligent search did not reveal that Marsoner was a "known

creditor" of the Debtors, he is an "unknown creditor" under the Bankruptcy Code.

### C.        The 2006 Agreement Confirms Marsoner Was Not a Known Creditor.

Marsoner claims to rely on the 2004 Agreement as the basis for his Claim against

LBHI and LCPI, despite the fact that the 2004 Agreement was solely with LBEL, never

identified Formula One, and expired nearly one year before he suggested to Lehman that it retain

its stake in Formula One.  *See* Marsoner Dep. 80:17-81:8; 2004 Agreement ¶ 2; Lender Decl. Ex.

J (advising Lehman in November 2005).  But even if a contract with one party that does not

cover a transaction could somehow put a different party on notice of a claim for that transaction,

the 2006 Agreement, executed by Marsoner only six months after he suggested that Lehman

retain its stake in Formula One, expressly bars any claims based on the 2004 Agreement.

- "By executing this Agreement the Consultant acknowledges that he will not be entitled to any payments or other rights under the Executive Advisory Services Agreement between the Consultant and Lehman Brothers dated 13 February 2004 (the 'Prior Agreement')." (2006 Agreement at 1).

- "For the avoidance of doubt, the foregoing [which did not identify Formula One] sets forth the total fees that may be payable to the Consultant in relation to the transactions referred to above.  The Consultant shall not be entitled to any other fees or payments pursuant to the Executive Advisory Services Agreement between the Consultant and Lehman Brothers dated 13 February 2004 or otherwise." (*Id.* ¶ 3).

Thus, the 2006 Agreement confirms that Marsoner was not a known creditor of LCPI or LBHI.

## II.    THERE IS NO RECORD THAT THE ANY LEHMAN ENTITY AGREED TO COMPENSATE MARSONER FOR FORMULA ONE

In support of the Motion, Marsoner swore that "Lehman agreed both orally and by

e-mail" to pay him "10% of Lehman's revenues" on Formula One "in exchange for [his] F1 advice." Motion, Ex. B ¶ 8. Marsoner, however, never produced this purported email and the Plan Administrator did not find such an email in the Debtors' files. Instead, discovery confirmed that (1) LCPI and LBHI *never agreed* to compensate Marsoner for Formula One; and (2) *no Lehman entity, not even non-debtor LBEL, agreed to compensate Marsoner for Formula One.*

A.    **Lehman Never Agreed to Compensate Marsoner for Formula One.**

To support the Motion, Marsoner sought letters from three former European Lehman employees – Sherratt, Pignatti and Magnoni. Sherratt declined Marsoner's request. Pignatti and Magnoni submitted letters in support of the Claim, as they did in support of Marsoner's claim in LBEL's bankruptcy case.[9] *See* Lender Decl. Exs. M, N. When testifying under oath at their depositions, each of these witnesses, including Pignatti and Magnoni, demolished Marsoner's newly-minted claim that he was a known creditor of LCPI and LBHI.

Pignatti: From 2001 through 2006, Marsoner reported to Vittorio Pignatti regarding his services for the firm and never did any work that "was wasn't coordinated with [Pignatti]." Marsoner Dep. 53:11-12, 19:8-13, 20:11-17. From 2002 through 2004, Pignatti negotiated each of the Advisory Agreements on behalf of LBEL, including which the transactions covered by each agreement and the compensation to be paid to Marsoner. Pignatti Dep. 8:23-9:6, 10:25-11:13; *see* 2004 Agreement ¶ 3. Pignatti explained that Marsoner's compensation was determined through negotiations with Marsoner and approval by an investment committee. Pignatti Dep. 13:23-14:22. Pignatti made clear that Marsoner would not be paid unless there was an express written agreement to do so. *Id.* at 128:19-129:8. He also

---

[9] Marsoner prepared the first drafts of the letters signed by Pignatti and Magnoni in the U.S. Pignatti refused to sign the letter as drafted by Marsoner because of his concerns that doing so would risk him committing perjury. *See* Lender Decl. Ex. P at 19. The letters are attached to Marsoner's Supplemental Declaration in Support of the Motion, dated February 10, 2015 [ECF No. 48171].

testified that he is not aware of any agreement to pay Marsoner for Formula One, and that such

compensation was not approved by Lehman. *Id.* at 44:5-23, 72:4-73:25, 75:6-24, 104:23-105:1.

Magnoni:  Ruggero Magnoni was a senior investment banker and LBIE's head of

mergers & acquisitions in Milan at the time Marsoner allegedly advised Lehman on Formula

One.  Sherratt Dep. 84:24-85:1; Lender Decl. Ex. G.[10]  Magnoni and Marsoner are partners in a

joint venture called M&M Capital founded by Marsoner approximately two and a half years ago.

Lender Decl. Ex. Q, Dep. Tr. of Ruggero Magnoni, dated Nov. 17, 2015 ("Magnoni Dep.") 65:8-

66:17.  Magnoni admitted that he does not know whether Lehman "agreed or didn't agree" to

compensate Marsoner for Formula One because he was "a bit out of that loop." *Id.* at 42:14-

43:6, 57:22-24.[11]  Although Magnoni "assumed" that Marsoner would be paid for Formula One,

he simply does not know whether Lehman agreed to do so. *Id.* at 42:17-20, 57:8-58:3.

Sherratt:  Peter Sherratt, former chief in-house counsel in Europe, declined

Marsoner's request for a letter in support, stating "[w]e both know that there was no agreement

to pay you relating to F1."  Lender Decl. Ex. R  at 198.  Like Pignatti, Sherratt too had concerns

that Marsoner was trying to get him to say something unlawful:

> I do feel a lot of loyalty to old colleagues, especially those I've
> known for a very long time like you.  But helping on the claim
> would not only be wrong but involve giving false evidence, which
> is of course a criminal offence [sic] in England.  Just fyi, Linklaters
> have spoken to Tom and Christian, who share the view the claim is
> unjustified. *Id.*; *see also* Sherratt Dep. 110:13-112:2.

### B.    Not Even Marsoner Believes that LCPI or LBHI Agreed to Compensate Him for Formula One.

The evidence shows that, despite what he is claiming now, Marsoner knows that

---

[10] Magnoni testified that he was also the Vice Chairman of Lehman Brothers Inc. and LBIE at various points in time.  Magnoni Dep. 5:18-6:16; *see also* Lender Decl. Ex. G at 7.

[11] As Magnoni testified, he was not in the asset recovery group responsible for managing LCPI's investment in Formula One.  Magnoni Dep. 43:2-4; Sherratt Dep. 21:9-18.  Rather, he had been involved in arranging LCPI's loan to Kirch, the default of which resulted in LCPI acquiring its stake in Formula One.  Sherratt Dep. 66:21-67:17.

he is not a known creditor of LCPI or LBHI.  In 2002, after LCPI and the other banks acquired

interests in Formula One, Lehman and JPM considered jointly retaining Marsoner, but decided

not to retain him.  Pignatti Dep. 56:22-57:5.  Thereafter, in November 2005, Marsoner suggested

to Lehman that it not sell its interest in Formula One to CVC.  After relaying his opinion,

Marsoner did not say that he had an agreement with LCPI or LBHI (or anyone else) to be paid on

Formula One.  Instead, he offered to be "a fresh face" in exchange "for a very modest

percentage."  Marsoner Dep. 92:9-16.  At the same time, Marsoner offered to have a "Marsoner

family company" purchase Lehman's stake in Formula One.  Lehman did not accept either offer.

*Id.* at. 94:14-96:10.  Marsoner's offers are entirely inconsistent with the position he is taking here

that LCPI and LBHI had agreed to pay him for Formula One.  Further, when Marsoner decided

to seek payment for his services in connection with Formula One, he did not seek such payment

from LCPI or LBHI.  Rather, he filed a proof of debt in LBEL's bankruptcy case.[12]

**C.      Marsoner's Attempts To Navigate Around the Deficiencies in His Claim Fail.**

Marsoner admits that there is no written record that any Lehman entity agreed to

compensate him for work relating to Formula One, and that he never discussed the terms of this

alleged compensation with anyone at Lehman. *See, e.g.,* Marsoner Dep. 71:15-72:23, 93:14-25.

1.      <u>There Was No Default Rule to Compensate Marsoner for Formula One</u>.

Marsoner attempts to justify the lack of a written record by claiming that there

was a "default percentage" that would be paid to him absent an express agreement. *Id.* at 67:18-

25, 58:13-60:4.  According to Marsoner, written agreements were necessary *only* when Lehman

was looking to "negotiate [him] down" from the understood 10% of firm revenues rate that

always applied. *Id.* at 58:13-59:13.  But the testimony from his own witness, Pignatti, directly

---

[12] Marsoner also filed a timely claim against Lehman Brothers Inc. ("<u>LBI</u>") in the SIPA liquidation (*Securities Investor Protection Corporation v. LBI,* No. 08-01420 (SCC)) four months prior to LBHI's Bar Date (and it has been expunged).  Marsoner's claim against LBI was unrelated to Formula One.

16

contradicts him.  Pignatti explained that Marsoner's compensation was determined through

negotiations, subject to a rigorous internal approval process, and completely subject to Lehman's

discretion.  Pignatti Dep. 13:23-14:8, 62:1-64:19, 129:9-25.  And, Pignatti repeatedly testified

that any compensation paid to Marsoner would have been internally confirmed and approved in

writing, and an agreement would always be documented, even if after the fact.[13]  Sherratt's

testimony further confirmed that all agreements to compensate were documented in writing.  He

testified that it was customary – and necessary – to have a written agreement identifying the

relevant subject matter prior to compensating a consultant for his services.[14]

Pignatti's and Sherratt's understanding is consistent with the terms of Marsoner's

Advisory Agreements.  The 2004 Agreement with LBEL, which Marsoner relies upon, Marsoner

Dep. 80:17-81:8, provides that, in addition to the specific transactions listed in the agreement,

Marsoner may only be paid on an "Agreed Transaction" and only for fees that are agreed upon.

> In relation to any other Agreed Transaction … Lehman Brothers
> shall pay [Marsoner] a fee based on a ***to be agreed upon
> percentage*** of the Net Investment Banking Revenues which are
> both earned and received by Lehman Brothers' Investment
> Banking Division after the date of this Agreement in connection
> with such Agreed Transaction.  2004 Agreement ¶ 3(ix) (emphasis
> added).

The 2004 Agreement defines "Agreed Transaction" as "any transaction which Lehman Brothers

---

[13] *Id.* at 18:25-19:17 (when agreement expired, pay was determined by seeking approval via email); 63:13-64:19 (payment terms for something that was not in the contract would be discussed with the adviser, then internally discussed and approved at Lehman, and documented ); 75:22-76:22 (Pignatti would have documented an agreement to pay in writing and Lehman would not have paid "without a valid reason and all documentation"); 76:23-77:13 (Lehman "could not make a payment without any form of contract or anything, but in many cases it would just be if there was an existing contract pertaining to a general adviser and so on, then we would write an addendum to that contract . . ."); 128:19-129:8 ("I think I said earlier that no payment was ever done unless there was a documented agreement.").

[14] Sherratt Dep. 35:19-36:13 ("I was just used to having agreements and I was used to situations where people were paid for things that they had been, it was agreed that they would be paid in respect of"); 38:6-21 ("you would normally expect a consultant to have a list of clients and that would be the basis upon which people would normally be paid, so that was my understanding" and "normally in a consulting arrangement you normally list the clients that the consultant is going to be paid in respect of, otherwise you have uncertainty and it makes it very difficult to keep proper accounting records"); 95:9-16 (agreements are important because "you don't want people thinking that they should be paid when they, when it has not been agreed").

17

has *specifically designated in writing* to [Marsoner] as falling within the ambit of this

Agreement." *Id.* (emphasis added).  Thus, even the agreement upon which Marsoner relies

provides that all covered transactions must be "specifically designated in writing" and the

percentage to be paid "agreed upon" by Lehman.[15]

Other than Marsoner's self-serving testimony, none of the evidence supports the

existence of a so-called "default percentage."  Rather, the evidence confirms that an agreement to

compensate Marsoner for Formula One would have been documented in writing and no such

writing exists.

2.    BAWAG Does Not Support the Existence of a Default Rule.

Marsoner argues that BAWAG is an example where he was paid without an

agreement due to the "default" rule.  Pignatti, however, testified that Lehman and Marsoner

came to an agreement on how much Lehman would pay him for BAWAG after the transaction

was completed.  Pignatti Dep. 67:4-8.  The email from Graham Wilson, upon which Marsoner

relies, supports Pignatti's testimony.  Mr. Wilson informed Marsoner that he would be paid for

his services in connection with BAWAG, stating, "Apologies for the delay *am now authorized*

*to agree this with you* and move forward with processing the payment."   Motion, Ex. F

(emphasis added).  Thus, Lehman's payment to Marsoner for BAWAG was not automatic, but

had to be approved by Lehman.  No similar email exists with regard to Formula One.  Marsoner

Dep. 203:7-204:15.  In any case, whether or not Marsoner was once paid for one transaction

absent an agreement is irrelevant to whether Marsoner was a "known creditor."  With respect to

---

[15] Grasping for straws, Marsoner argued that he considered the "fresh face" email the "designation in writing"
required by the 2004 Agreement.  Marsoner Dep. 70:15-22.  A unilateral proposal that no one at Lehman accepted
cannot be the specific designation in writing contemplated by the 2004 Agreement.  Moreover, although Marsoner
relies on the 2004 Agreement, he has no basis for doing so given that he provided his alleged "advice" in November
2005, *see* Lender Decl. Ex. J, and the 2004 agreement expired on December 2, 2004.  The subsequent agreement
executed by LBEL and Marsoner – the 2006 Agreement – further provides that Marsoner's fees for any transactions
not covered by the 2006 Agreement but later designated in writing, shall not exceed $2,500,000, significantly less
than the $147 million Claim asserted against LCPI and LBHI.  *See* 2006 Agreement ¶ 3(vii); Motion n.5.

WEIL:\95675861\18\58399.0011

Formula One, Marsoner has failed to show any evidence – documentary or otherwise – that LCPI
or LBHI, or for that matter, LBEL, agreed to compensate him.

## III.    THE DEBTORS PROVIDED MARSONER WITH NOTICE OF THE BAR DATE

Even if Marsoner were entitled to actual notice of the Bar Date (which he was

not), the Debtors acted reasonably and satisfied due process by serving the Bar Date Notice on

the addresses identified in their records.  The addresses for Marsoner in LBHI's accounts

payable system are the same addresses on invoices that Marsoner sent to LBEL.  Lender Decl.

Exs. K, L; Marsoner Dep. 140:11-141:22.  In other words, these were addresses that Marsoner

himself had provided to Lehman in connection with requesting payment for services rendered to

LBEL, and thus, were the addresses reasonably ascertainable in the Debtor's books and records.

Marsoner argues that he should not have been served at these addresses because

he did not reside there.  Reply ¶ 18.  He admitted to using the addresses of vacation homes and

friends' homes on invoices and agreements to avoid paying taxes in the U.K and Austria.

Marsoner Dep. 61:8-62:14, 139:5-141:22.  Whether or not the use of sham addresses to avoid

paying taxes is legal, the Debtors should not be penalized if they, too, were deceived by

Marsoner's shell game.  Marsoner also testified that his "contacts" on Formula One knew this

was nothing but "tax cosmetics."  Marsoner Dep. 62:3-17.  But even if true, there is no evidence

that Marsoner's actual address was reasonably ascertainable from Debtors' books and records.[16]

Marsoner also suggested that Debtors were in possession of his true address

because his 2007 Agreement with LBEL, which identifies his actual address in Austria, was

attached to an email the Debtors produced in discovery.  *See* Lender Decl. Ex. S (the "Johari

Email").  This argument is unpersuasive.  First, Marsoner assumes that the Debtors were

---

[16] It is unknown whether Marsoner's "contacts" actually knew of his home address because counsel never asked
Pignatti, Magnoni, or Sherratt during their depositions.

obligated to search every single email of tens of thousands of employees in identifying creditors. Not only would this have been impossible, this is not what the law requires. Reasonable diligence does not require an exhaustive search of all emails ever sent or received by every individual ever employed by the debtor. *See XO Commc'ns,* 301 B.R. at 793 ("Reasonable diligence does not require impracticable and extended searches . . . in the name of due process") (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950)); *Chemetron,* 72 F.3d at 347 (same). Second, even if the 2007 Agreement with LBEL had been located, the Debtors likely would have disregarded it as immaterial because it did not concern any of the chapter 11 Debtors, but rather, Lehman's U.K. affiliates.[17] Thus, the agreement would not have been reviewed to identify creditors of LCPI and LBHI or their addresses.

## CONCLUSION

For the foregoing reasons, the Motion should be denied. Even though Marsoner's relationships were with LBEL in Europe pursuant to agreements signed solely with LBEL that never identified Formula One, Marsoner claims that LCPI and LBHI should have known that he actually was a creditor of theirs regarding that transaction. Marsoner argues this without a single document showing that LCPI or LBHI ever agreed to pay him for Formula One, and in the face of testimony that the Debtors reasonably searched their records and found nothing indicating that he was a creditor. And when it came to filing a claim, even Marsoner did not think he was a creditor of LCPI or LBHI, filing his claim in the U.K. instead. The Motion is nothing more than a baseless attempt to extract additional funds from Lehman and should be denied.

---

[17] For the same reason, the Debtors would not have searched Aaron Johari's email account because Johari was not an employee of any of the Debtors. Rather, he was a member of LBEL's in-house legal department located in London, *see* Lender Decl. Ex. G, and the email was sent from Mr. Johari to certain attorneys at Linklaters – the firm that represented the LBEL administrators post-petition – and copying other employees of Lehman's U.K. affiliates. *See* Johari Email. In other words, this was likely intended to be a privileged email from LBEL's in-house lawyer to LBEL's external counsel – the Debtors were not the intended recipients, and would never have uncovered this email but for the searches that they conducted in connection with discovery in this contested matter.

WEIL:\95675861\18\58399.0011

Dated:  June 20, 2016
        New York, New York

/s/ David J. Lender

David J.  Lender
Jacqueline Marcus
Denise Alvarez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings
Inc. and Certain of Its Affiliates*

21