# Exhibit F

IN THE UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -

IN THE MATTER OF

  IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL.,

Debtors.

- - - - - - - - - - - - - - - - - -

DEPOSITION OF VITTORIO PIGNATTI

VOLUME I

Monday, November 16th, 2015

AT:  3:30 p.m.

Taken at:

Hogan Lovells
50 Holborn Viaduct
London
EC1A 2FG
London
United Kingdom


CONFIDENTIAL

Court Reporter:

Chris Lang
Accredited Real-time Reporter

1       the witness and we can proceed.

2                       VITTORIO PIGNATTI

3   having been Sworn testified as follows:

4   BY MR JOHNSON:

5       Q.  And Mr. Pignatti, I wanted to start with your work

6       experience.  So when did you begin working at Lehman

7       Brothers?

8       A.  March 1989.

9       Q.  March 1989?

10      A.  1989 and I finished working for the liquidator of

11      Lehman Brothers in, I think it was April 2009.

12      Q.  And what jobs did you have whilst you were at

13      Lehman Brothers?

14      A.  I started as head of investment banking for Italy

15      then I was promoted in 1998, relocated to London and

16      became the head of mergers and acquisitions advisory for

17      Europe and then at the end of 2006, or some time in

18      2006, I became Vice Chairman, maybe the year before, but

19      I was assigned to be responsible for private equity for

20      non-US.

21      Q.  Okay.  And what were your responsibilities in those

22      positions?

23      A.  In the last position I was responsible for

24      non-listed balance sheet investments and Lehman Brothers

25      private equity funds, which included the buy out funds,

Page 8

1      A.  Between senior management and other officers, the

2      board members, I didn't have much relationship with

3      other than two.

4      Q.  Okay.  And to your understanding was it common for

5      members of Lehman Brothers' leadership to serve multiple

6      roles?

7      A.  Absolutely.

8      Q.  Now, how do you know Dr. Thomas Marsoner?

9      A.  I know him because when he joined Lehman Brothers

10     I was one of the managing directors of the firm, so

11     I participated in the hiring of that team, because he

12     didn't come on his own, he came with a group from

13     Soloman Brothers.

14     Q.  And did he work as an adviser to Lehman Brothers at

15     a certain point?

16     A.  Yes, after many years as an investment banker

17     within the ranks of the firm he sort of moved on to be

18     an adviser.

19     Q.  And are you aware of his advisory agreements?

20     A.  I am aware of his advisory agreements for as long

21     as I was the person responsible for any adviser to the

22     investment bank.

23     Q.  Okay.  And specifically were you involved in the

24     negotiation of Dr. Marsoner's 2002 agreement?

25     A.  Yes.  So I became, I was in charge of that division

1       from 1998 until 2006.

2        Q.  So that means you were involved in the 2004

3       agreement as well?

4        A.  Yes.

5        Q.  And did you sign both of these agreements?

6        A.  Yes, I think I did.

7        Q.  Did you sign both on behalf of Lehman Brothers

8       Europe Limited?

9    MS. ALVAREZ:  Objection to form.

10       Q.  You can still answer.

11       A.  Okay.

12       Q.  Do you want me to repeat the question?

13       A.  If I signed on behalf of Lehman Brothers?

14       Q.  Europe Limited?

15       A.  I think so, but it must say, I mean the contracts

16      are available, so if it says Lehman Brothers.  I would

17      be given, if it was companies on whose board I sat,

18      within Lehman I would sign because I had powers of

19      attorney, jointly with some other officers of the firm,

20      or individually for some contracts.  If it wasn't

21      I would be told, you know, this one had better go into

22      this company, this one had better go.  They would tell

23      me whether I had specific powers or I wouldn't sign it

24      at all, it would be someone else who was actually on the

25      board of that company.

1      Q.  Okay.  To your understanding why did Lehman

2      Brothers want to hire Dr. Marsoner as an adviser?

3   MS. ALVAREZ:  Objection to form.

4      A.  Mr. Marsoner continued his previous involvement, so

5      it was an evolution, it wasn't a hiring process, which

6      was quite normal with senior people who departed a full

7      time position at Lehman, they seldom -- unless they went

8      to work for a competitor, they were offered a choice to

9      stay on as an adviser, some with retainers, you know, we

10     had a lot of freedom on how to calibrate their

11     involvement.

12     Q.  Did Dr. Marsoner have certain expertise?

13  MS. ALVAREZ:  Objection to form.

14     A.  Yes he did.  By sector and by geography.  He had

15     spent almost his entire working career dealing with

16     Germany and Austria and financial institutions, which

17     gave him a, for a firm that was not particularly strong

18     in that part of the world, considerable senior hedge in

19     terms of relationships and understanding of situations

20     that were not obvious, especially in situations of work

21     outs or complicated deals.

22     Q.  And what about F1?

23     A.  F1 was a complicated deal.  So he met those

24     criterias and there were German banks involved.

25     Q.  And is it correct that you were a contact person

1      under the 2004 agreement?

2   MR. HORWITZ:  Objection to form.

3      A.  Absolutely.

4      Q.  And what did this entail?

5      A.  This entailed that any decision with -- these

6      contracts were rather general in terms of which

7      transactions would be covered and so on, and I was the

8      person on behalf of the firm where these decisions would

9      be centralized; what was in it, the exact terms, we used

10     to give a grade in terms of how much the person would be

11     entitled to be paid and then, you know, for the

12     avoidance of doubt and we would interpret on a case by

13     case basis.

14     Q.  Could you please look at Dr. Marsoner's motion.

15  MS. ALVAREZ:  Do you have extra copies?  We didn't bring

16     Sherratt's deposition exhibits with us -- we just

17     happened to have an extra copy of the 2007 annual

18     report -- since this is a separate deposition.  Thank

19     you so much.  And this is exhibit?

20  THE COURT REPORTER:  It should say on the front.  Exhibit --

21     A.  4.

22  BY MR JOHNSON:

23     Q.  Could you turn to exhibit C, please.

24     A.  Okay.

25     Q.  And then page 22, if you see at the top, page 22 of

1        Q.  Is that the section you referenced?  I believe you

2        referenced --

3    MS. ALVAREZ:  Objection to form.

4        Q.  -- that there were other transactions?

5        A.  Yes, absolutely.  He would attend.  I mean I was,

6        I had hundreds of people under me, so I was following,

7        as the person responsible of the advisory mergers and

8        acquisitions, I was following all of the transactions.

9        But if I can recall, Telekom Austria was under my direct

10       watch, the Republic of Austria, maybe, 50 percent, the

11       BAWAG, partially, zero personal involvement, but I would

12       monitor and ask the various teams whether he was doing

13       his job.

14       Q.  Mm-hm.

15       A.  You know, whether he was attending the meetings.

16       These meetings would probably be mostly in Austria,

17       Germany and so on so I wouldn't attend every single

18       meeting but I get through the Monday morning meeting

19       where each of the teams who kind of report back, find

20       out, and then I would speak with Thomas whenever needed.

21       I mean sometimes it would be three times a week,

22       sometimes it would be every two weeks.

23       Q.  And how is his pay determined?

24       A.  His pay was determined through negotiations with

25       him and then an approval by the committee of investment

Page 14

1     banking which was Skip McGee and another number of other

2     people.

3      Q.  And that included you?

4      A.  That included me, yes.  I was the proponent, so we

5     sat through and I had, you know, to approve any

6     expenditure, any commitment of the firm I would report

7     on and seek approval prior to signing.  But he was not

8     the only consultant to the group.

9      Q.  Okay, what would happen when one of the agreements

10     was no longer in effect?

11     A.  Normally, if it was no longer in effect we would

12     have a moment of truth as to whether the person was, and

13     I am talking in general not about Mr. Marsoner

14     specifically, I would establish whether the team felt,

15     or parts of the team that were interacting with the

16     senior adviser, would be interested in maintaining that

17     relationship and likewise I would check with the person

18     who was giving us the advice on whether they had

19     interest in providing the same level of commitment,

20     a higher level of commitment or a lower level of

21     commitment.  So we would start the new contract.  If

22     there was no change, we would roll it over.

23      Q.  Could you please hand Mr. Pignatti the October 13,

24     2015 email.

25     THE COURT REPORTER:  That is exhibit 7.

Page 18

1       have enough traction from my teams to say yes, because

2       we had a budget we could spend so much on advisers.  So

3       if we took one, we wouldn't have another one to maybe

4       start the new vertical, maybe to cover another country.

5   THE COURT REPORTER:  Sorry, could you repeat the last bit?

6        A.  We would have to decide as a team, the advisory M&A

7       team, how to spend the budget, being the person in

8       charge, it was in the end my duty to present the annual

9       budget, but also to manage the budget.  So there were

10      times when the level of activity with one adviser did

11      not warrant a contract with a fixed amount, and so on.

12      So we would, say, use as a guideline the past but on

13      specific transactions you have to come to me and I will

14      sign off and sort of rejuvenate the old agreements with

15      the caveat that it may be without a fixed amount, with

16      a cap, you know, depending deal by deal.

17          I preferred, generally, to have contractors on,

18      because I had so many of them, just to remember what you

19      were doing with one or the other but it was, in the case

20      of Thomas and a few others, after a decade together we

21      could live with, sort of a play it by ear system.  But

22      I would always go back to the person within Lehman, sort

23      of full time Lehman MD, and check that the work was

24      being done, that it was a realistic request.

25       Q.  And so when his agreement expired how would his pay

Page 19

1     be determined?

2      A.  His pay would be determined the way that I do it

3     with this email, and I don't know if Jonathan responded

4     to me, but I would say these are the guidelines, this is

5     the deal, do you want me to confirm to the adviser that

6     he is on and, if so, within the usual sort of Lehman

7     scale, which I, for the avoidance of doubt repeat to

8     him; where would you place his services?  Because this

9     would come off the bonus pool.  So if we were introduced

10    to a deal by someone -- someone, by one of the senior

11    advisers -- we would use the net revenues for the team,

12    not the gross, so it was a team cost, it wasn't just

13    money that was flying around.  So I wanted the buy in

14    not to be told at the end of the year I made

15    USD 10 million.  Sorry, it is USD 8 million, because two

16    went to -- so they tended to forget on a personal basis

17    the expenses associated with the deals.

18     Q.  Do you know Peter Sherratt?

19     A.  Of course.

20     Q.  Was he involved in determining Dr. Marsoner's pay?

21     A.  No.

22     Q.  And changing topics, are you familiar with

23    Cerberus' acquisition of BAWAG?

24     A.  Yes.

25     Q.  Was Dr. Marsoner involved in that transaction?

Page 44

1       knew his part; a large organization, he knew the equity

2       investment, which was hundreds of millions of Euros, had

3       gone really badly and there was a positive recovery on

4       the loan.

5        Q.   Okay.  And when you were looking for documents to

6       prepare this deposition, did you look for any documents

7       showing that Lehman would pay Dr. Marsoner for

8       Formula 1?

9        A.   No.  I actually was looking at -- the documents

10      that I have were all of the ones under my watch.  So

11      I would have known what Lehman, I represented Lehman.

12       Q.   Mm-hm.

13       A.   To a large extent.  So I was looking to see what

14      exactly were -- sort of brushing up on the course of

15      events and in which years was I working on --

16       Q.   Okay.  Did you look for any agreements that covered

17      Formula 1 with Dr. Marsoner?

18       A.   Yes.

19       Q.   And did you find any?

20       A.   No, not under my watch.  It was not specifically

21      mentioned.  I found some emails on sort of advice

22      provided.  Prior to the sale to CVC there was the dates

23      confusion.

24       Q.   Okay.

25       A.   And the events with CVC was done in 2006.  That was

Page 56

1    MR. JOHNSON:  Objection.  Leading.

2        A.  My task was a different task.  Okay, at that time

3        the stake was unsaleable.

4        Q.  Okay.  Thank you.

5        A.  We owned 75 percent interest in a holding company

6        that an agreement with another holding company in

7        Guernsey and so on, and Peter Sherratt, give him credit,

8        and us, the banking team in three years would change

9        that situation.  Not smoothly, you know, through even

10       court cases and so on.  We at one point to eliminate the

11       BLB representative, who in theory was working on our

12       behalf, and finally some changes took place.

13       Q.  Okay.

14       A.  Which then led Bernie Ecclestone to become much

15       more amenable to a sale.  Rather than having three banks

16       being difficult and so on, they saw that we were quite

17       effective in making his life not so easy.

18       Q.  Okay.

19       A.  Had it been only BLB, I think he would still now

20       age 84 control the company with 25 percent and make all

21       of the decisions single-handedly.

22       Q.  Okay.  So at this point you considered retaining

23       Dr. Marsoner.  The decision was made not to retain him

24       in 2002, correct?

25   MR. JOHNSON:  Objection.  Leading.

Page 57

```
 1        A.  That is correct.  I think JP came back saying,

 2      well, you know, for us, you know, JP, Lehman and we take

 3      a Lehman guy, you know, it sounds like we are giving you

 4      the keys and so on.  You know, if you want to, we would

 5      be delighted if you add him to the team at your expense.

 6        Q.  Okay.

 7   MR. JOHNSON:  Just to point out the objection to leading is

 8      based on the fact that he is not a hostile witness, he

 9      is an ex employee of Lehman Brothers.

10   MS. ALVAREZ:  You can take that position.  We are taking the

11      position that he is a friendly witness to Dr. Marsoner

12      so he would be a hostile witness to Lehman Brothers.  He

13      is no longer employed with Lehman Brothers.

14   MR. JOHNSON:  He is an ex employee, though.

15   MS. ALVAREZ:  That is fine.

16   MR. VAN TOL:  This is Pieter.  And unless you establish

17      a foundation, none of your questions are admissible.

18   MS. ALVAREZ:  Well, that is really for the court to decide.

19      So we will move on.

20   BY MS. ALVAREZ:

21        Q.  I want to jump head, that is 2002.  I want to jump

22      ahead three years, let us jump ahead to 2005.  In 2005

23      you learned that CVC Capital was considering making

24      an offer to Lehman to purchase the Formula 1 shares,

25      correct?
```

Page 62

1          Now, I want to look at what has been marked as

2     Pignatti exhibit 2, which is the letter you submitted to

3     the court, Mr. Pignatti, could we look at it again.  And

4     on the second page, the very last paragraph, you state:

5          "It was my understanding that Dr. Marsoner would

6     have been paid by Lehman Brothers for his services

7     concerning the F1 investment or I would not have asked

8     him to help."

9          What was the basis for your understanding?

10     A.  My understanding is that, as I think I mentioned

11     before, we had a long consolidated relationship with our

12     senior advisers which was regulated by contracts but

13     they were completely one sided.  You might have read

14     them.

15     Q.  Mm-hm.

16     A.  It says if the firm decides that you had a major

17     involvement in a transaction.  So completely left to our

18     discretion, the firm's discretion.  And therefore we

19     were instructed to use this power, not

20     opportunistically, but bearing in mind that we had

21     a name, a future and we had to keep our senior advisers,

22     you know, happy.

23     Q.  Mm-hm.

24     A.  But within, you know, the boundaries of the

25     economic interests of Lehman.  And therefore, as you can

Page 63

```
 1        see from previous emails and so on, any time we utilized

 2        the senior adviser, not just myself, but also other

 3        people on the team, and it was a large organization,

 4        I wanted it to be flagged, because if we agreed to use

 5        we would then remunerate.  I cannot tell you how much,

 6        it depended on our good will, on a discussion with

 7        a person and so on, but we wouldn't utilize someone

 8        outside of the contract to tell them thank you very

 9        much, it was free help, and so on.  Otherwise we would

10        not have been as successful as we were in retaining very

11        high caliber people for relatively low fixed amounts of

12        money.

13         Q.  Okay.  So when you got to that point, you realized

14        that someone needed to be remunerated, you would have

15        a conversation with that person about how much?

16    MR. JOHNSON:  Objection.  Leading.

17         A.  Absolutely.  I would have discussed the specifics

18        of something that was not in the contract and would have

19        had an internal discussion and then I would have gone

20        back with a response.  It was a negotiation to a certain

21        point.

22         Q.  Okay.  And then ultimately you would need to get

23        approval from someone more senior?

24    MR. JOHNSON:  Objection.  Leading.

25         A.  Depending on if it was the acquisition of a M&A
```

Page 64

1     advisory and so on.  I had my guidelines and I could

2     move on.  I would specify, because in an advisory

3     mandate you are getting a success fee and a retainer

4     fee.  So it is all, you are sharing profits with a third

5     party and I would have documented that and the contract

6     would have been seen and approved by Peter Sherratt and

7     others, and we actually had a person under Peter in our

8     division, in legal.  So everything would be documented.

9     But it wasn't a payment that came from the balance sheet

10    of the firm, it was a forgone revenue, because they were

11    all success based.  And the fixed amount would be

12    budgeted in my division, so at the beginning of the year

13    I get so many millions in external expenditures; so much

14    for travel, so much for advisers and so on.  The

15    variable part would be a deduction of revenues, so quote

16    unquote, since my guys were all on a percentage bonus

17    pool calculated, so obviously it was an investment made

18    by my division and I had the authority within those

19    boundaries to use my best judgment.

20       Q.  Okay.

21       A.  Okay.  If, on the other hand, it was the sale of

22    an asset owned by the firm -- there weren't that many --

23    and that would have been always remunerated but dealt

24    with in a different conceal.

25       Q.  Okay.

Page 67

1    at the investment bank they would have to pay.  I would

2    participate in the negotiation but I couldn't force them

3    to pay out of their budget more or less.

4       Q.  Okay.  So when the BAWAG transaction was completed,

5    Lehman and Dr. Marsoner came to an agreement regarding

6    how much he would be paid for his help?

7  MR. JOHNSON:  Objection.  Leading.

8       A.  Yes.

9       Q.  Now, you mentioned when you were explaining the

10    differences to me --

11       A.  Mm-hm.

12       Q.  -- that the sale of an asset situation is

13    different?

14       A.  Yes.

15       Q.  Formula 1, would that fall into that category of

16    transaction, sale of an asset?

17  MR. JOHNSON:  Objection.  Leading.

18       A.  It was the sale of an asset and therefore there

19    wasn't a mandate originating fees for -- you know, we

20    were not getting paid, you know, inside of the

21    investment banking division there wasn't an advisory fee

22    of 3 million that Formula 1 was paying to Lehman.

23    Because we owned the company, or co-owned, we couldn't

24    charge any fees, so it would have come out of pocket

25    from the firm.  Therefore it happened, you know, several

1       conference.  He is going to be dialing in soon.

2  MS. ALVAREZ:  Okay.

3  BY MS. ALVAREZ:

4       Q.  So Dr. Marsoner was offering to coordinate

5       a response to CVC?

6  MR. JOHNSON:  Objection.  Leading.

7       A.  I think it was more offered internally to see

8       whether the deal could be, you know, improved, limiting

9       the size of the stake that was being sold.

10      Q.  Okay.  And he was suggesting that he would do this

11      for what he called a modest fee?

12  MR. JOHNSON:  Objection.  Leading.

13      A.  Yes.

14      Q.  So he is offering to facilitate things in exchange

15      for a percentage upon LB's eventual sale?

16  MR. JOHNSON:  Objection.  Form.

17      Q.  You never took him up on this offer, correct?

18  MR. JOHNSON:  Objection.  Leading.

19      A.  I never took him up.  I think I passed on the

20      information to the people --

21      Q.  To whom?

22      A.  To Bernard, and, you know, and the others.  Maybe

23      verbally on a call, and I said guys, this is a view.

24      And that was a time when this was, you know, a debated

25      issue at Lehman as to what to do.

Page 73

1      Q.  And to your knowledge, Tom Bernard never took him

2      up on the offer, correct?

3  MR. JOHNSON:  Objection.  Leading.

4      A.  I don't know.  There certainly was an exchange of

5      emails with Tom Bernard.

6      Q.  Do you know if Tom Bernard retained Dr. Marsoner to

7      coordinate a response to CVC?

8      A.  I don't know.

9  MR. JOHNSON:  Objection.  Form.

10     Q.  Peter Sherratt didn't take him up on the offer,

11     correct?

12 MR. JOHNSON:  Objection.  Leading.

13     A.  I don't think it would have been Peter Sherratt's

14     task to sign up a non-legal adviser.

15     Q.  Well Jeremy Isaacs didn't take him up on the offer?

16 MR. JOHNSON:  Objection.  Leading.

17     A.  Okay, that would have been the sort of person.

18     I don't see Christian Meissner.  Maybe it was before he

19     stepped in.

20     Q.  Did Jeremy Isaacs take him up on the offer?

21     A.  Not that I know.

22 MR. JOHNSON:  Objection.

23     A.  He is the only one who could have retained

24     an adviser for corporate Europe, for example.  That

25     would be him.

Page 75

1       were people from finance, legal, so on and not the line

2       managers.

3        Q.  Okay, that's fair.  So regardless of Lehman

4       entity --

5        A.  Mm-hm.

6        Q.  -- you have no writings indicating that Lehman

7       agreed to pay Dr. Marsoner for Formula 1, correct?

8    MR. JOHNSON:  Objection.  Leading.

9        A.  That is correct.  I used in this sentence my

10      experience and the fact that I received information from

11      Mr. Marsoner.  I distributed it and it created

12      a dialogue with a follow up.  So he didn't get an email

13      saying thank you very much, as I would have done in the

14      same situations in my division.  If there was an adviser

15      that I thought was no longer going to be utilized

16      I would not have exploited that person, I would have cut

17      the mail flow by saying thank you very much,

18      I appreciate it.  It sounds like a great idea.  Feel

19      free to take it where ever.  In this case, obviously,

20      that didn't apply because who could this idea -- it

21      could only be sold to Lehman or JP Morgan.

22       Q.  And normally you would have eventually documented

23      an agreement to pay?

24       A.  Yes, absolutely.

25       Q.  In writing?

Page 76

1     MR. JOHNSON:  Objection.  Leading.

2         A.  Even post facto in the sense, as I told you,

3     because we operated with a completely one sided

4     methodology, and therefore I didn't need to document

5     things immediately.  I did because it is my practice to

6     do these things, but it was not necessary because if we

7     wanted we would do it.  But the policy of the firm was

8     if we used someone considerably, we would then price the

9     services.  If it was someone that was a trusted adviser

10    with other contracts and so on, we would not have them

11    work unless we intended to remunerate them.  That

12    doesn't define the amount.

13        Q.  And then eventually you would negotiate a price

14    with the adviser?

15    MR. JOHNSON:  Objection.  Leading.

16        A.  Basically we would tell the adviser what the price

17    was going to be.

18        Q.  And document it in writing?

19        A.  Yes.

20    MR. JOHNSON:  Objection.  Leading.

21        A.  We would not pay not inconsiderable amounts without

22    a valid reason and all documentation.

23        Q.  And getting approval from the senior people at

24    Lehman?

25    MR. JOHNSON:  Objection.  Leading.

Page 77

```
 1        A.  In this particular case it was only the senior

 2        people in Lehman dealing with the person, so it was

 3        a matter of putting it down on paper and we would be

 4        told which company it would be and then, you know, we

 5        could make the payment.  We could not make a payment

 6        without any form of contract or anything, but in many

 7        cases it would just be if there was an existing contract

 8        pertaining to a general adviser and so on, then we would

 9        write an addendum to that contract, dating it and so on,

10        and saying as per point six we consider the BAWAG

11        transaction a success and therefore associated with this

12        the fee of 1 percent in the scale provided in, you know,

13        and then we would pay.

14        Q.  Okay.  I want to make the declaration of

15        Dr. Marsoner as the next exhibit.  We are getting close

16        to a break.  What number is this?

17            (Exhibit Pignatti 4 marked for identification)

18   THE COURT REPORTER:  4.

19        Q.  Okay.  That is the document exhibited by

20        Dr. Marsoner, it is actually exhibited to his motion.

21        Have you seen this before, Mr. Pignatti?

22        A.  No.

23        Q.  No.  I want to focus on a particular paragraph.  If

24        you go to paragraph E on the bottom of page 2.

25            "In 2005 I advised Lehman in my role as senior
```

Page 104

1     an investment, it wasn't even clear.  It didn't turn out

2     to be a good investment, either, no.  But it was common

3     not to utilize, because Marsoner couldn't say "you know

4     what, there are many funds around the world.  I am

5     interested in keeping the relationship with Cerberus,

6     frankly, why should I bother alerting the Lehman funds

7     of the opportunity, inviting them to Austria, doing the

8     management presentation and so on", which he did.

9      Q.  Mm-hm.

10     A.  And they, I think, decided to pay something less

11    than this, but they did pay him something.  That is what

12    I was referring to before.  So I would do this before

13    the transaction closed to make sure that I wasn't

14    misrepresenting and the adviser felt cheated because he

15    had done extra work and so on.  This I did with every

16    other division, including head office upstairs, you

17    know.  So if there was something and I was using

18    an adviser who was paid by investment banking, I would

19    make sure that they wanted to chip in or I would say

20    candidly to the adviser, you know what, they don't

21    really think you are adding value so you won't get paid.

22    Do what you want but don't come back to me.

23     Q.  Okay.  You didn't send a similar email seeking

24    approval of Dr. Marsoner's payment for Formula 1?

25  MR. JOHNSON:  Objection.  Leading.

Page 105

1      A.  No I did not.  Although I did convey the

2      information and things, but then it was no longer my

3      responsibility to even sign these agreements with him.

4      I was no longer the nominated person with whom he had to

5      get everything approved.  So apart from the fact that we

6      had known each other for a long time and so on, I wasn't

7      going to step in and create a mess by having someone who

8      was running another division, who was making agreements

9      on services, it was too big an organization for that.

10     Q.  Okay, so you weren't the guy who could approve

11     payment to Marsoner on Formula 1?

12 MR. JOHNSON:  Objection.  Leading.

13     A.  Not after, you know, the advisory services were

14     rendered, but for advice on whether to sell a principal

15     position on inherited from a bad loan.  In selling it

16     who was in investment banking or the funds not exposed

17     to the asset, say here is a million.  What I would have

18     done is I would have conveyed the information to Tom

19     Bernard, you know, and the people who had to make

20     a decision, and to the best of my knowledge, they did

21     take up --

22     Q.  Okay.

23     A.  -- the information.  They didn't say sorry, we

24     don't know who this guy is, we don't care what he says

25     and so on.  I kind of left it to them and said this is

Page 128

1      questions.

2    BY MR. JOHNSON:

3      Q.  I have a couple of additional questions for you,

4      Mr. Pignatti.

5          Would it be normal to agree on a consultant's

6      success fee before any profits were realized?

7    MS. ALVAREZ:  Objection to form.

8      A.  If the advice was accepted by the firm, or

9      stipulated, yes.  Or, rephrasing the question, did

10     Lehman pay advisers on a percentage of profits in my

11     20 years at Lehman Brothers?  The answer is yes, many

12     times.

13     Q.  But would they pay before they had received any

14     profits?

15     A.  Would they be paid?  No.

16     Q.  I believe you testified earlier that you know

17     Peter Sherratt?

18     A.  Yes.

19     Q.  Was Mr. Sherratt aware that success fees were paid?

20   MS. ALVAREZ:  Objection to form.

21     A.  Absolutely.

22     Q.  Even where there was no agreement covering the

23     transaction?

24   MS. ALVAREZ:  Objection to form.

25     A.  No.  I think I said earlier that no payment was

Page 129

1    ever done unless there was a documented agreement.  So

2    especially substantial amounts, which were not just

3    reimbursements of expenses or reimbursements of expenses

4    but anything formulaic, based on a success would be

5    either regulated by a framework agreement to which

6    an addendum would be done, specifying and for this

7    transaction we have decided to pay the following amount,

8    but it would be a documented amount.

9      Q.  And on Dr. Marsoner's F1 advice, isn't it true that

10    such an addendum wouldn't have been made until profits

11    were realized?

12  MS. ALVAREZ:  Objection to form.

13      A.  It could have been done before or after.  As you

14    see, an email that was previously shown from me to our

15    colleagues on the fund side, you know, the transaction

16    had already been done.  Which is subsequent to the BAWAG

17    advisory.  A transaction was also originated for another

18    department in the absence of any sort of documentation

19    and so on, because the marginal cost to the adviser who

20    was working on a bigger transaction to channel a piece

21    of business to our funds would not have probably merited

22    a pre-approval by that division.  So the adviser took

23    the risk of sort of notifying his will or his request at

24    a later stage and it was approved.  So you have

25    an example of that.