# Exhibit H

Dr. Thomas Marsoner - December 15, 2015

```
 1

 2                 UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF NEW YORK
 3       _____

 4       In re                        )

 5       LEHMAN BROTHERS HOLDING INC., )   Chapter 11

 6       et al.,                      )

 7                    Debtors.        )   Case No.

 8       _____)   08-13555 (SCC)

 9

10

11

12             VIDEOTAPED DEPOSITION OF DR. THOMAS

13               TUESDAY, DECEMBER 15, 2015

14                      9:45 a.m.

15

16

17

18

19            Video deposition of DR. THOMAS

20       MARSONER, taken by Lehman Brothers Holdings Inc.

21       and Lehman Brothers Commercial Paper Inc., at

22       the offices of Hogan Lovells, 875 Third Avenue,

23       New York, New York, before Brandon Rainoff, a

24       Federal Certified Realtime Reporter and Notary

25       Public of the State of New York.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                          MARSONER

2        institutions is my own specialty.  I used to run

3        the financial institutions group, but a whole

4        number of other groups like consumer retail,

5        energy, telecom also reported to me.

6                 And so I did have expertise in a whole

7        number of additional industries.

8        Q.    Who did you report to?

9        A.    Originally my contractual counter

10       party was Vittorio Pignatti through and

11       including the 2004 agreement, and that changed

12       when Pignatti changed jobs to Christian Meissner

13       from '06 to the end of Lehman.

14       Q.    Do you know what Christian Meissner's

15       position was at Lehman?

16       A.    At the time when he and I interacted

17       in that -- the contractual relationship, he was,

18       I think, co-head of European investment banking,

19       later became head.

20       Q.    Other than Mr. Pignatti and Mr.

21       Meissner, did you work primarily for any other

22       individuals at Lehman?

23       A.    If I may, I'd like to characterize

24       that I worked with other people.

25       Q.    Okay.
```

Dr. Thomas Marsoner - December 15, 2015

```
1                          MARSONER
2          A.     It was a very collegial place, and
3    when there was an opportunity that I had either
4    identified and thought useful to pursue, or
5    sometimes when Lehman had an opportunity where
6    Lehman thought that my expertise would be
7    useful, we would form teams ad hoc and would
8    work together on those.   There were a whole
9    number of generally senior Lehman investment
10   bankers that I worked with over the years.
11         Q.     Can you identify a couple of them?
12         A.     Well, certainly Vittorio Pignatti,
13   himself.   In the years when he was my
14   contractual counterpart, by definition I did
15   nothing that wasn't coordinated with him.   That
16   then later changed, and later that was Christian
17   Meissner.
18              But in the years we're talking about,
19   it was certainly Vittorio Pignatti who was my
20   direct interlocutor on essentially everything,
21   certainly worked closely with Ruggero Magnoni as
22   well.   Always had a very high regard for him.
23              There were other professionals like
24   Jonathan Rouner that in those years I worked
25   quite a bit with.   Certainly Michael Bonacker
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER
 2   and I went, at my suggestion, to the Monte Carlo
 3   Grand Prix in 1998.   I was still a full time
 4   employee of Lehman at the time.   This was the
 5   time when the various Bernie Ecclestone
 6   stratagems first became public.
 7             So I suggested to a number of the
 8   senior people at Lehman that this was likely
 9   going to grow into a business opportunity for
10   Lehman.   Ruggero is a close friend of Johann
11   Ruppert.   Johann Ruppert owned a company called
12   Rothman at the time.   Rothman sponsored the
13   Williams team, and Johann Ruppert and Ruggero
14   Magnoni had long planned to attend a Grand Prix
15   together, so we went there together which is
16   when Ruggero first met Bernie Ecclestone.   I had
17   met Bernie before.   And that is the moment when
18   it all started.
19        Q.    How did that moment lead to Lehman's
20   investment in Formula One?
21        A.    There were a whole number of different
22   transactions contemplated in various ways.
23   Ultimately Lehman financed Leo Kirch, the TV
24   rights entrepreneur and sports rights
25   entrepreneur, in his acquisition of 75 percent
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2    of the -- call it the Bernie Ecclestone company.

3            Lehman underwrote $300 million of the

4    $1.6 billion loan.  JPMorgan underwrote the

5    other 300, and Bayerische Landesbank, the house

6    bank of Mr. Kirch, underwrote a billion.

7            Relatively soon after that loan was

8    given, Mr. Kirch's business went bankrupt and

9    Lehman managed to enforce the collateral and

10   took delivery at the time of the 17 percent

11   stake in Formula One.  This is about 2002.

12       Q.    What was your role in that financing

13   to Kirch?

14       A.    Luckily for me, none, for the simple

15   reason that I had been asked what I thought of

16   Mr. Kirch and I truthfully responded that all my

17   German banking clients and friends had a very

18   low opinion of Mr. Kirch.

19            So I had no involvement whatsoever in

20   the loan itself, which is probably one of the

21   reasons why, when the loan had gone belly up, I

22   got the call, in that case it was Pignatti, who

23   used the words:  Thomas, we're thinking about

24   intensifying our relationship with you again.

25            I had done as an advisor already, I
```

Dr. Thomas Marsoner - December 15, 2015

Page 53

| | |
|---|---|
| 1 | MARSONER |
| 2 | Q.    Did you know if there was anyone else |
| 3 | on that team? |
| 4 | A.    I have since, you know, I have since |
| 5 | heard, of course, of Steve Hannan who I did not |
| 6 | know at the time.  I certainly knew that Peter |
| 7 | Sherratt was involved as a lawyer.  And in my |
| 8 | perception, certainly through the end of my |
| 9 | discussions with Bernard in '05, Vittorio |
| 10 | Pignatti was also fully involved. |
| 11 | Q.    And Pignatti was your main contact? |
| 12 | A.    Pignatti was the main contact, yes. |
| 13 | Q.    Did you ever communicate with Tom |
| 14 | Bernard, other than the telephone calls we |
| 15 | talked about earlier, did you ever communicate |
| 16 | with Tom Bernard separately from Pignatti? |
| 17 | MR. VAN TOL:  Object to the form. |
| 18 | It's vague as to time. |
| 19 | Q.    I'm really talking about this 2005 |
| 20 | forward time period. |
| 21 | A.    We all have the salient e-mail |
| 22 | exchange which starts me briefing Pignatti, |
| 23 | copying Sherratt.  And when I then realized that |
| 24 | I really had critical, urgent, huge, as Bernard |
| 25 | calls it, information, I sent the e-mail |

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2    possibility of being compensated for it?

3         A.    I didn't have to.  I was a paid

4    advisor.  Terms were very clear.

5         Q.    Because of the advisory services

6    agreements?

7         A.    Yeah, absolutely, the 10 percent of

8    firm revenues had been set in stone from the

9    outset, and as the Cerberus BAWAG deal showed,

10   which was probably the second most important

11   thing I had done for Lehman, there was no

12   necessity to document that any further.

13        Q.    So Lehman had agreed to pay you ten

14   percent of firm revenues for your advice in

15   Formula One?

16        A.    Absolutely, for the simple reason that

17   those rules existed, were well understood by

18   everybody, and I was asked officially to help

19   out by one of the most senior people in Lehman

20   investment banking, Vittorio Pignatti.  There

21   was nothing further that I needed to do or would

22   have actually been inclined to do.

23              Might Pignatti, in the way he

24   described it, have used the high negotiating

25   power that Lehman had to negotiate me down at

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2     some point in the future, he might well have.

3     Christian Meissner did not do that in BAWAG

4     Cerberus, and I'd like to sort of make it very

5     clear that while I am trying always to be very

6     constructive, the negotiation that would have

7     negotiated me down from the well established

8     general rule never took place, and a bankrupt

9     Lehman does not have the negotiating power that

10    the living Lehman would have had.

11           So the rules were in place.  I was

12    officially asked to work on it.  That is all

13    that matters.

14    Q.    Where is this general rule that you

15    would be paid 10 percent documented?

16           MR. VAN TOL:  Objection, asked and

17    answered.  You can answer again.

18    A.    Yeah.  In every one of the agreements,

19    the specific one that was in force, the specific

20    one whose rules were in force at the time is the

21    '04 agreement.  It says very clearly 20 percent

22    of the IBD fees, which in the case of M&A fees

23    means 20 percent of M&A fees, in the case of

24    financing fees it means 10 percent of firm

25    revenues, and in the case of holding gains, net

Dr. Thomas Marsoner — December 15, 2015

```
 1                    MARSONER

 2      of holding losses, it means 10 percent of those

 3      net gains.  The contract says that very, very

 4      clearly.

 5               MS. ALVAREZ:  Why don't we take a look

 6      at it?

 7               (Marsoner Exhibit 4, Multipage

 8      document bearing the heading Lehman Brothers,

 9      dated 13th February 2004, addressed to Thomas

10      Marsoner, and bearing no Bates stamps, marked

11      for identification)

12      BY MS. ALVAREZ:

13          Q.   So we have marked as Exhibit 4 the

14      letter agreement between Lehman Brothers Europe

15      Limited and Dr. Marsoner dated February 13,

16      2004.

17               This is the 2004 agreement that you

18      were just referring to?

19          A.   I'm just looking at it.

20               (Pause)

21          Q.   I'll represent this was attached as

22      Exhibit C to your motion as you can tell from

23      the header.

24          A.   Sorry --

25               MR. VAN TOL:  That was for us.  Don't
```

Dr. Thomas Marsoner — December 15, 2015

```
 1                      MARSONER
 2    worry.
 3              (Pause)
 4         Q.    I don't need you to look at the
 5    provision now, I just want to make sure this is
 6    the correct agreement.
 7         A.    Yes.
 8         Q.    And this agreement is dated February
 9    13, 2004?
10         A.    Correct.
11         Q.    Then under the date I see your name
12    and an address?
13         A.    Hm-hmm.
14         Q.    What address is this?
15         A.    This is the house of a friend of mine
16    in Malta where I stayed for a few days in that
17    time period, in the '04 time period.  I have not
18    stayed since.
19              If I may digress, I'll tell you why
20    the first agreement had the Austrian address and
21    the last two had the Austrian address, but the
22    middle two had different addresses.  It is
23    entirely UK tax driven.  In the UK, perfectly
24    legally, for non-UK citizens would distinguish
25    between onshore income and offshore income.
```

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2          Q.    Okay.

3          A.    And it -- particularly in this time

4    period I did not want to have a cosmetic piece

5    of paper out there that suggested that I was --

6    that this income, which was classic legal

7    offshore income for UK purposes, was either

8    Austrian taxable or UK taxable.  Has nothing to

9    do with the substance.  This was just cosmetic.

10              Everybody at Lehman knew where to find

11   me, everybody at Lehman knew both my Austrian

12   domiciliary address and my London residency

13   address, and everybody at Lehman also knew that

14   this was tax cosmetics.

15         Q.    When you say everybody at Lehman, you

16   are referring to your contacts on F1?

17         A.    My contacts there, yes.

18         Q.    So if you look at this agreement, it

19   is between Lehman Brothers Europe Limited and

20   you, correct?

21         A.    I believe the whole Lehman Group is

22   encompassed by it, represented by Lehman

23   Brothers Europe Limited.  You see in line 5 that

24   it says I will provide advice and assistance

25   also to other members of the Lehman Brothers

Dr. Thomas Marsoner - December 15, 2015

```
1                          MARSONER
2               I'll tell you that a few of these --
3     this is not the only one that's cut off, some of
4     the other -- the 2002, I think, and the 2006 are
5     cut off as well, so if you can look for the
6     full, complete copies.
7               MR. VAN TOL:  We'll make the same
8     request to you.
9               THE WITNESS:  Yeah.
10              MR. VAN TOL:  Not to you, we are
11    making the same request to Lehman for a copy of
12    its own agreement.
13    BY MS. ALVAREZ:
14       Q.   Right here -- so it says:  Lehman
15    Brothers shall pay the consultant a fee based on
16    a to be agreed upon percentage of the net
17    investment banking revenue.
18              Was a percentage agreed upon between
19    Lehman and you for F1?
20       A.   The percentage, 10 percent of firm
21    revenues is the default percentage that has been
22    in force at all times during the consultancy
23    period.  It didn't have to be specifically
24    agreed another time.  It was the well understood
25    fee for which I provided my services.
```

Dr. Thomas Marsoner - December 15, 2015

1                          MARSONER

2          Q.     Where does it state in this agreement

3     that 10 percent was the default fee that you

4     would be paid under the consultancy?

5          A.     If you look at all the agreements, you

6     will find 20 percent of IBD fees everywhere,

7     including in this one and the prior ones.

8          Q.     Well, point it out to me.  Where does

9     it say that you would be paid 10 percent as the

10    default role?

11         A.     I'm trying to point out to you that it

12    was the agreed percentage, and the best place

13    for you to see that is probably the Graham

14    Wilson e-mail to me at the end of BAWAG Cerberus

15    which is appended as an exhibit to our motion

16    here.  That is also not specifically captioned

17    in any one paragraph here, but that reflects

18    exactly the rule I just told you:  20 percent of

19    M&A fees, 10 percent of financing fees, 10

20    percent of net holding gains.

21         Q.     So the Graham Wilson e-mail would be

22    the best place to look, not the actual

23    agreement?

24         A.     The Graham Wilson e-mail is the best

25    place to look how, even without a specific

Dr. Thomas Marsoner - December 15, 2015

```
1                    MARSONER
2    reference in any one of the five agreements,
3    Lehman Brothers very happily paid the
4    agreed-upon percentages in a relatively major
5    transaction when this was a hundred million fees
6    and -- to Lehman, and nearly ten to me, without
7    it having been captioned in any one of those
8    individual points in any one of the individual
9    agreements.
10        Q.    Other than BAWAG which we'll talk
11   about, what other transactions have you been
12   paid for that are not covered by your advisory
13   services agreements?
14        A.    That I do not currently know.  There I
15   would have to go back to my banking records.
16   Certainly BAWAG was the only major one.  There
17   may well have been smaller ones, but I do not
18   currently -- I do not currently know that
19   offhand.  I certainly know that the two biggest,
20   F1 and BAWAG Cerberus, were not in any paragraph
21   of any individual formal document.
22        Q.    Let's take a look at this paragraph 39
23   that we were just looking at, and it refers to
24   in relation to any other agreed transaction.
25             Do you see that?
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER
2          A.     Hm-hmm.
3          Q.     What would you consider -- well, let's
4    look at the definition of agreed transaction,
5    actually.
6                 On the very next page do you see it
7    says:  Agreed transaction means any transaction
8    which Lehman Brothers -- I assume that word is
9    "has" but correct me if I am wrong because it's
10   cut off -- has specifically designated in
11   writing to the consultant as falling within the
12   ambit of this agreement.
13                Do you see that?
14         A.     Hm-hmm.
15         Q.     And Formula One -- you have no
16   separate writing designating Formula One as an
17   agreed transaction, correct?
18         A.     I consider my e-mail exchange with Tom
19   Bernard, that designation in writing.  And I
20   certainly considered the formal oral request by
21   Pignatti to advise them on F1, mutually, in good
22   faith, as a very material matter, too.
23         Q.     Now, Pignatti never agreed in an
24   e-mail to pay you 10 percent for your work on
25   Formula One, correct?
```

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2          A.    Pignatti in a letter to the court

3    correctly compares it to my work for BAWAG

4    Cerberus which triggered the 10 percent.

5          Q.    You know, that was not my question.

6                My question was, Pignatti never agreed

7    to pay you 10 percent in an e-mail, correct?

8          A.    Pignatti never tried to negotiate the

9    usual 10 percent down.  He didn't have to write

10   me an e-mail reconfirming them.  They were

11   mutually usually agreed.

12         Q.    So, then, there was no e-mail?

13         A.    There was no e-mail by Pignatti trying

14   to negotiate me down, that is correct.

15         Q.    Was there an e-mail from anyone at

16   Lehman agreeing to pay you 10 percent for your

17   services on F1?

18         A.    There did not have to be an e-mail by

19   anybody.  This was the well-established course

20   of dealings between Lehman and me.

21         Q.    So no e-mail?

22         A.    There was no e-mail negotiating me

23   down, absolutely not.

24         Q.    And no advisory services agreement

25   identifying Formula One as a transaction for

Dr. Thomas Marsoner - December 15, 2015

Page 72

```
 1                        MARSONER

 2    which you would be paid?

 3              MR. VAN TOL:  Object to the form.

 4              You may answer.

 5        A.    Could you just rephrase that, please?

 6        Q.    Sure.  Could you just repeat the

 7    question so I can hear it?

 8              (Question read)

 9        A.    There was, of course -- we all have

10    the documents -- no reference to Formula One

11    specifically in any one of these five.  That

12    does not mean that Lehman did not ask me to

13    provide services at the usual generally agreed

14    terms.

15        Q.    Okay.  I understand that.

16              I just want to make sure -- are there

17    any other consultancy agreements that we don't

18    have?

19        A.    There were these five.

20        Q.    Were there any amendments or addendums

21    to any of these consultancy agreements?

22        A.    I do not recall any amendments or

23    addendums, no.

24        Q.    Did you ever ask that Formula One be

25    added to any one of these agreements?
```

Dr. Thomas Marsoner — December 15, 2015

Page 80

```
1                      MARSONER
2              And if I may add, Mr. Mackenzie, the
3       senior CVC partner, in about 2012 in one of the
4       Bernie Ecclestone legal proceedings, stated
5       under oath that as late as 2011 he, Mackenzie of
6       CVC, still thought that his stake may be worth
7       zero.
8              MS. ALVAREZ:  Why don't we take
9       another break.
10             THE VIDEOGRAPHER:  The time is 11:44
11      a.m.  We are going off the record.
12             (Recess)
13             THE VIDEOGRAPHER:  This begins media
14      number three.  The time is 12:09 p.m.  We are
15      back on the record.
16      BY MS. ALVAREZ:
17         Q.   Dr. Marsoner, I would like to go back
18      and take a look at Exhibit 4 which was your 2004
19      consultancy agreement with Lehman.
20             Is this the agreement you rely -- is
21      this the agreement you rely on as the basis for
22      your claim?
23         A.   It's the contents of the agreement
24      that I rely upon.  Technically it had, of
25      course, expired, and technically it was
```

Dr. Thomas Marsoner – December 15, 2015

Page 81

1                          MARSONER

2      abrogated by the next one, but in the

3      interregnum period, during which I worked with

4      Lehman seamlessly, there had to have been rules

5      that governed the mutual behavior.  And I

6      contend that the rules were exactly those that

7      were in here because this is the way it had also

8      happened when agreements before had expired.

9          Q.    Do you rely on the contents of the

10     2006 agreement for your claim?

11         A.    No, I couldn't, because the salient

12     aspect of F1 was my exchange with Tom Bernard,

13     and that predates the '06 agreement materially.

14         Q.    So, then, you don't rely on the

15     contents of the 2007 agreement either?

16         A.    I do not rely on the contents of the

17     2007 agreement either, no.  It is the contents

18     of the 2004 agreement that I rely on for the --

19     for the formal -- the contract part of my claim.

20              Additional and separate to that is, of

21     course, the quantum meruit part of my claim.

22         Q.    If you can turn to Section 3 again of

23     Exhibit 4 which is the compensation provision or

24     the compensation section.  As you see, it states

25     that you would be paid a retainer and a

Dr. Thomas Marsoner - December 15, 2015

Page 92

```
1                    MARSONER
2    knew it all anyway.
3         Q.    And that conversation occurred prior
4    to November 25?
5         A.    Oh, yeah, that occurred three years
6    prior to November 25th of '02 -- of '05.  It
7    occurred in '02 at the end of the JPMorgan
8    discussion.
9         Q.    So, then, if you look -- if you can
10   look at Lehman 216 which is the bottom of the
11   November 25th e-mail, the second to last
12   paragraph states:  Needless to say, if a fresh
13   face were helpful to facilitate things here,
14   mine continues to be available for a very modest
15   percentage participation in LB's gain upon
16   eventual sale.
17             Do you see that?
18        A.    Yes, I see that.
19        Q.    What did you mean by the statement?
20        A.    It is a factual statement just
21   reconfirming that I was working here for my
22   usual modest percentage, ten to be precise.
23        Q.    Did Pignatti respond to this e-mail?
24        A.    There was one response by him
25   somewhere in this chain which was a two-word
```

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER
2    response with the words "the devil."
3            And what that was was Pignatti making
4    fun of a young colleague of ours called Makram
5    Azar, who sort of two days after we had
6    essentially done all the material stuff that
7    needed to be done and needed to be discussed,
8    offered to start working on it.
9            So there is a -- it's somewhere in the
10   disclosure, there is a written acknowledgment by
11   Pignatti to very much have received and read
12   these e-mails by making fun of somebody that
13   offered his services way after the fact.
14       Q.    Is there written acknowledgment from
15   Pignatti agreeing to pay you a very modest
16   percentage participation in LB's gain upon
17   eventual sale?
18       A.    There didn't have to be.  The terms
19   were clear from the outset.
20       Q.    So nothing in writing?
21           MR. VAN TOL:  Object to the form.
22       A.    The course of dealings between
23   Pignatti and me, between Lehman and me was very
24   clearly established.  It did not require any
25   further repetition.
```

Dr. Thomas Marsoner – December 15, 2015

Page 94

```
1                        MARSONER

2        Q.    So let's look -- let's look at the

3    November 26 e-mail which is on Lehman 215.  This

4    is the e-mail we were discussing a few minutes

5    ago where you sent it to Pignatti, Peter

6    Sherratt and Tom Bernard, and again you provide

7    some more information regarding F1.

8              And then in the second paragraph you

9    state:  Hence, don't also panic, keep your stake

10   and don't be spooked if JPM does a BayLaBa.  As

11   a matter of fact, JPM selling out would make it

12   easier to admit LP to the top (Alpha Prema)

13   table.

14             Then you state in the third paragraph:

15   If conversely you want to get LB out of the F1

16   headlines (or feel your relationship with Bernie

17   has become too bad), a Marsoner family company

18   previously involved in consumer products would

19   happily consider taking it on if it comes with a

20   to-be-agreed financing package fairly sharing

21   risks and rewards.

22             Do you see that?

23       A.    I see that, yes.

24       Q.    What did you mean by that?

25       A.    That was an offer that turned out to
```

Dr. Thomas Marsoner - December 15, 2015

1                    MARSONER

2     be completely unnecessary because Lehman was

3     very happy to stay invested and have its name as

4     a shareholder.

5            So that was just an alternative offer

6     that it turns out was not necessary and -- and

7     therefore it was neither taken up nor discussed.

8     Has nothing to do with my advisory relationship.

9     This was a principal offer.

10         Q.     An offer by whom?

11         A.     Well, the company's name would have

12    been Getranke Management, a -- that was a client

13    of Lehman's publicly known to have been involved

14    in the great Austrian beer wars where Pignatti

15    actually advised us, the Marsoner family, who

16    were the principals at the time, in a whole

17    series of difficult discussions that have no

18    bearing on this topic, but it's a -- it was so

19    well known and it was the largest shareholder of

20    the largest brewer in the country which had 56

21    percent market share, so it's a substantial

22    company that would have been credible as an

23    investor if they had needed it.  But nothing to

24    do with my advisory relationship.

25         Q.     Now, you call it a Marsoner family

Dr. Thomas Marsoner - December 15, 2015

```
1                        MARSONER

2    company?

3        A.    Yeah.

4        Q.    What interest do you have in this

5    company or did you have at the time?

6        A.    This was primarily my dad's company.

7    I -- my interest in it sort of evolved over

8    time.  What it was at that point in time I don't

9    remember, but it's best described as a Marsoner

10   family company.

11       Q.    Now, had Lehman taken you up on the

12   offer and this Marsoner family company purchased

13   Lehman's stake, how would you, as Lehman's

14   advisor, have been compensated?

15             MR. VAN TOL:  Objection, calls for

16   speculation.

17       A.    That would have required a complete

18   new set of negotiations.  It never came to it.

19       Q.    So you would have had to have

20   negotiated your fee at that point?

21       A.    If this had come to pass, obviously a

22   potential conflict of interest would have

23   arisen.  That potential conflict of interest,

24   which never did arise because it never came to

25   pass, would have had to be managed in some way,
```

Dr. Thomas Marsoner - December 15, 2015

```
 1                    MARSONER

 2   to get my LBCC margin balance back.

 3        Q.    I want to ask you about a couple of

 4   addresses.

 5             Do you recognize the address -- and I

 6   may not pronounce these right, I probably

 7   won't -- Casa Andreas 16 Trig Sant Adrija Lija

 8   BLZ10 Morocco.

 9             Do you recognize that address?

10        A.    Well, absolutely not.   That is

11   definitely a nonexisting address because it has

12   elements of the Maltese address that is on my

13   '04 agreement, but it obviously also has the

14   country Morocco that is relatively far away from

15   Malta.

16        Q.    So let's focus on the Maltese address.

17             What is that an address to?

18             MR. VAN TOL:  Objection, asked and

19   answered.   You may answer again.

20        A.    That's the address of the house of a

21   friend of mine in Malta.

22        Q.    Okay.

23        A.    Where I happened to be once in the '04

24   time period.

25        Q.    Do you know if a bar date notice
```

Dr. Thomas Marsoner - December 15, 2015

```
1                          MARSONER
2     arrived at that house?
3          A.    I never got anything from that house.
4     I used, as I described to you, as a non-UK,
5     non-Austrian address for pure tax cosmetics
6     purposes.
7          Q.    Does your friend still live in that
8     house?
9          A.    I do not know.  I do not know if he
10    still owns it.
11         Q.    Do you recognize the address Casa
12    Peliganos, Costa Keretas?  Do you recognize that
13    as an address?
14         A.    That I recognize.  That is a house
15    that at one point I had rented in Mexico for a
16    three-week family holiday.
17         Q.    Did you use that address on any
18    contracts with Lehman Brothers?
19         A.    I'm not sure that I used it on any
20    contract, but I would assume that I or rather my
21    secretary must have put it on an invoice or two
22    that I probably sent -- sent to Lehman, where,
23    again, for tax cosmetic purposes I preferred a
24    non-UK, non-Austrian address.
25         Q.    Okay.  What about the address Casa
```

Dr. Thomas Marsoner - December 15, 2015

Page 141

```
1                        MARSONER
2    Carrion Parco, San Giacomo?
3            Do you recognize that?
4        A.    That's the address of a holiday flat
5    of my -- then of my father's, only Garda in
6    northern Italy.
7        Q.    Did you ever stay there?
8        A.    I occasionally stayed there for
9    periods never exceeding a few days and only
10   during the summer.  No mail is received there.
11   There is not even a mailbox or a -- there is not
12   even a sort of a slit in the door where one
13   could put mail in because it would be pointless.
14       Q.    Did you ever include that address on
15   any contracts with Lehman Brothers?
16       A.    I do not believe I put that on a
17   contract but, again, I may well have put it on
18   an invoice.
19            If I was in the general area at the
20   time, I might well have told my assistant for
21   the often enough discussed tax cosmetic purposes
22   to put that address on the invoice.
23       Q.    Does your father still own that flat?
24       A.    My father had two flats in that house
25   which a year ago he gave to his two sons.
```

Dr. Thomas Marsoner - December 15, 2015

Page 203

```
1                          MARSONER

2       e-mail:  Thomas, apologies for the delay, am now

3       authorized to agree with you and move forward

4       with processing the payment.

5               Do you see that?

6       A.    Yes, I see that.

7       Q.    Now, you testified that this e-mail

8       concerned your compensation for your work on

9       BAWAG, is that right?

10      A.    Most of it, yes.

11      Q.    Graham Wilson here states that he is

12      now authorized to agree this with you.

13              Do you know who authorized this?

14      A.    No, I do not.

15      Q.    Does a similar e-mail exist with

16      regard to your work on F1?

17      A.    Does --

18              MR. VAN TOL:  If it does, please

19      produce it.

20              I'm sorry, you may answer.

21      A.    This -- sorry, your question is does

22      the equivalent of this e-mail exist relating to

23      my work on F1?

24      Q.    That's right.

25      A.    That, with respect, is an
```

Dr. Thomas Marsoner - December 15, 2015

| | |
|---|---|
| 1 | MARSONER |
| 2 | impossibility.  The fees, the gross revenues |
| 3 | that are shown here for BAWAG Cerberus in the F1 |
| 4 | case only materialized in May or June of 2012 at |
| 5 | which point Lehman had been bankrupt for more |
| 6 | than four years. |
| 7 |    Q.   Does there exist an e-mail indicating |
| 8 | payment had been authorized by Lehman to you for |
| 9 | F1? |
| 10 |    A.   It's the same answer.  Revenues had to |
| 11 | crystalize first, only then could such an |
| 12 | attachment or such a cover e-mail be produced. |
| 13 |      The earliest date it could have been |
| 14 | produced would have been May or June of 2012. |
| 15 | At that point Lehman wasn't around any more. |
| 16 |      MS. ALVAREZ:  That's all we have. |
| 17 |      (Pause) |
| 18 |      MR. VAN TOL:  We have no further |
| 19 | questions either, thank you. |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |