# Exhibit Q

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -
IN THE MATTER OF

    IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL.,

Debtors.

- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF RUGGERO MAGNONI

VOLUME I

Tuesday, November 17th, 2015

AT: 2:30 p.m.

Taken at:

Hogan Lovells
50 Holborn Viaduct
London
EC1A 2FG
London
United Kingdom

CONFIDENTIAL

Court Reporter:

Chris Lang
Accredited Real-time Reporter

Page 5

1                    RUGGERO MAGNONI

2      having been SWORN testified as follows:

3      BY MR. JOHNSON:

4         Q.  Mr. Magnoni, thank you for appearing here today.

5      I just wanted to give you a brief overview of what we

6      are going to be doing today.  I am going to be asking

7      you some questions and then the attorneys for Lehman

8      Brothers will have the opportunity to ask you some

9      questions.  If at some point you don't understand one of

10     the questions, please say so and we will repeat the

11     question, or possibly rephrase it.  If you hear either

12     side make an objection to form, you can still answer the

13     question that you have been asked.  Do you understand

14     these instructions?

15        A.  I do.

16        Q.  Okay, excellent.

17        A.  Let's see how it works.

18        Q.  So I wanted to start with your work history.  When

19     did you begin working at Lehman Brothers?

20        A.  February 1977 and I continued there until the last

21     day, which I think was September 15, 2008.  So 35 years.

22     My only job.  And then I continued with Nomura from 2008

23     to 2013, becoming senior adviser afterwards, but I was

24     chairman of investment banking division, EMEA, which is

25     European, Middle East and Africa, for Nomura during

Page 6

1    those years.  I started from the bottom as an associate
2    out of business school in Columbia in 1977, Columbia
3    Business School, and made, you know, up to managing
4    director about ten years later, and then I was appointed
5    as vice chairman of Inc. and vice chairman of
6    International Europe, which were our two operating
7    units, the broker dealers of the group, about around
8    2000 and where about, immediately after.  So it is my
9    pride to tell the truth about Lehman Brothers, which is
10   my passion in life, has been my career, my everything.
11       Q.  And you said you became vice chairman in 2000?
12       A.  I can't remember exactly.  I think it was the end
13   of, yes, I think it was around 2000.  1999/2000.
14       Q.  And you continued in that role until --
15       A.  To the last day.  I was vice chairman of both, of
16   Inc. and Europe.
17       Q.  Can are we please look at Exhibit 1, the Lehman
18   Brothers 2007 report.  Do you see in the bottom
19   right-hand corner it says Marsoner and then there is
20   a number?
21       A.  Yes.
22       Q.  Please turn to 606.
23       A.  606 is where, I am there, my picture and everything
24   is what you want?  Okay, what did you say, 6?
25       Q.  606.

Page 42

```
 1      Q.  Have you spoken --
 2      A.  When you say Formula 1, you are saying Formula 1
 3   events of those years?
 4      Q.  Yes.
 5      A.  I don't think I even spoke to him about the recent.
 6   Again, he doesn't care about Formula 1, for some reason.
 7   He is not a petrol head, as we are.
 8      Q.  Okay.
 9      A.  He doesn't really care.
10      Q.  Okay.  Have you discussed with Dr. Marsoner
11   anything about the negotiations of his advisory services
12   agreement?
13      A.  Never.
14      Q.  Have you discussed with Dr. Marsoner whether he
15   ever requested payment from Lehman for Formula 1?
16      A.  No.
17      Q.  Have you discussed with Dr. Marsoner whether Lehman
18   ever agreed to pay him for Formula 1?
19      A.  No.  Because I wouldn't know.  I was a bit out of
20   that loop.
21      Q.  Okay.
22      A.  I actually don't know if they agreed or didn't
23   agree.  It would be natural if they agreed to, because
24   that was the way we managed the relationship with our
25   advisers.  Everyone was on a small retainer and
```

Page 43

```
 1      a success fee.
 2         Q.   But at that point you were not in the, I think you
 3      called it the asset recovery group?
 4         A.   No I was not.
 5         Q.   So you didn't know?
 6         A.   No.
 7   MR. JOHNSON:  Objection.  Leading.  I am going to make the
 8      same objection you made to Mr. Pignatti's; you haven't
 9      provided a foundation that Mr. Magnoni is a hostile
10      witness, and earlier on he testified he was
11      disinterested and in fact loved Lehman Brothers --
12   MS. ALVAREZ:  That's right --
13   MR. JOHNSON:  -- I believe were his words.
14         A.   Sorry, can you say again, please Shane?
15   MS. ALVAREZ:  The court reporter can read it back, actually,
16      so he can read you exactly what Shane said.
17         A.   What is this, Shane, are you saying what Vittorio
18      said?
19   MR. JOHNSON:  He will read you back exactly what I said.
20         A.   Okay.
21   THE COURT REPORTER:  "Objection.  Leading.  I am going to
22      make the same objection you made to Mr. Pignatti's; you
23      haven't provided a foundation that Mr. Magnoni is a
24      hostile witness, and earlier on he testified he loved
25      Lehman Brothers."
```

Page 57

1    advisers and finders there was a standard agreement, to
2    tell you the truth, around investment banking in Wall
3    Street and the City.  Particularly at Lehman, we had
4    a 10 percent approach.  So it was well known by everyone
5    from Jeremy and Roger Nagioff and I am sure, I can say
6    myself, that that was the norm and therefore was pretty
7    well understood by everyone.
8        Q.  Did you negotiate any consultancy agreements for
9    any advisers?
10       A.  Including mine, yes.
11       Q.  Did you negotiate, were you involved in the
12   negotiations of Dr. Marsoner's?
13       A.  No.
14       Q.  So you don't know if he was ever retained for
15   Formula 1?
16       A.  I don't know.
17   MR. JOHNSON:  Objection.  Leading.
18       A.  I assumed, like everybody else, that if he was
19   working willingly with us, and Vittorio was the entry
20   point of that negotiation, that normally would have had
21   -- I didn't know.
22       Q.  Did you ask anyone whether Lehman would pay
23   Dr. Marsoner?
24       A.  Not at all.
25   MR. JOHNSON:  Objection.  Leading.

Page 58

```
 1         Q.  Do you know if anyone told Dr. Marsoner that he
 2      would be paid 10 percent?
 3         A.  No.
 4   MR. JOHNSON:  Objection.
 5         A.  I don't know of anyone.
 6         Q.  Okay.  I would like to mark the next exhibit,
 7      please.  Actually, it was marked at the last deposition.
 8      We can use the previous numbers, the Marsoner
 9      declaration.  It was previously marked as Pignatti 4.
10      You can look at it, I have a copy.  Thank you, this is
11      a declaration of Dr. Thomas Marsoner submitted in
12      support of his motion.  It was previously marked it
13      Mr. Pignatti's deposition as exhibit 4.  Have you seen
14      this document before?
15         A.  I am not sure.  I am not sure I have read this.
16         Q.  Okay.  I am going to point you to a particular
17      paragraph.  If you can look at paragraph 8 which is on
18      page 2.
19         A.  Yes.
20         Q.  I am just going to read it for the record.  It
21      states:
22         "In 2005, I advised Lehman in my role as Senior
23      Adviser both in emails and in telephone conversations to
24      continue Lehman's investment in F1, which service
25      I explicitly provided in exchange for 10 % of Lehman's
```

Page 65

1    Q.   Why did you send this to the administrators of
2    Lehman Brothers Europe?
3    A.   Because I was asked to do it.  I was sent this and
4    asked whether I agreed or not with it, which I did, and
5    I do, and I will continue doing it.
6    Q.   Who asked you to do it?
7    A.   I think Mr. Marsoner.
8    Q.   What is M&M Capital?
9    A.   It is a FCA registered advisory boutique founded by
10   Mr. Marsoner and participated by me as its chairman.
11   Q.   You say you are the chairman of M&M Capital?
12   A.   Correct.
13   Q.   And Dr. Marsoner is the founder of M&M Capital?
14   A.   He is the founder and managing director.
15   Q.   What does the M&M stand for?
16   A.   Well, the theory was Marsoner and Magnoni.
17   Q.   So you worked with Dr. Marsoner on a regular basis.
18   A.   No, not much, because it was really done to have
19   the basis for a potential future activity which we never
20   really acted upon.  Each of us does personal advice to
21   clients and then, you know, we book through M&M and it
22   keeps the books of the company.  So this really was, it
23   was really meant to be a center of potential growth to
24   attract other, which he haven't done yet.  But yes, we
25   worked together but the accounts are separate.

Page 66

1      Q.  Okay.  You have a joint interest in the success of
2      M&M Capital?
3      A.  To tell you the truth, it is not exactly that,
4      because we keep the accounts completely separate.  I am
5      glad if he is successful, but it doesn't affect me.
6      Because it is like having two companies with one same
7      name.  I don't think you can do that in the States, but
8      certainly you can do it in the UK, I was told, so my
9      clients pay M&M, but the they pay account B, which
10     declares a completely separate set of accounts to the
11     Inland Revenue, and to the FCA, so they are added
12     together but they are not one single entity from
13     an economic point of view.  In theory, one of the two
14     can do nothing and the other do very well and one is not
15     affecting the other.
16     Q.  When did you start M&M Capital?
17     A.  A couples of years ago.  Between -- two years ago.
18  MS. ALVAREZ:  Can we just go off the record for a moment?
19  MR. JOHNSON:  Are you almost done?
20  MS. ALVAREZ:  Yes.
21  MR. JOHNSON:  Okay.
22  THE VIDEOGRAPHER:  We are going off the record.  The time is
23     4:33 p.m.
24  (4:33 p.m.)
25                      (Break taken.)